UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


         Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        June 26, 2013

        10:08 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2   (Doc# 4002) Debtors' Motion for an Order Authorizing the

3   Debtors to Advance the NJ Carpenters Notice Costs and Transfer

4   Those Funds into Escrow Filed by Gary S. Lee on Behalf of

5   Residential Capital, LLC

6

7   (CC: Doc# 3814) Debtors' Motion for an Order Under Bankruptcy

8   Code Sections 105(a) and 363(b) Authorizing the Debtors to

9   Enter Into and Perform Under a Plan Support Agreement with Ally

10  Financial Inc., the Creditors' Committee, and Certain

11  Consenting Claimants.

12

13  (Doc# 3812, 3813) Motion of Berkshire Hathaway Inc. to Unseal

14  the Examiner's Report Pursuant to 11 U.S.C. Section 107(a)

15  Filed by Seth Goldman on Behalf of Berkshire Hathaway Inc.

16

17  (CC: Doc# 3374, 3375) Status Conference RE: Debtors' Motion for

18  Entry of an Order to Permit the Debtors to Continue Using Cash

19  Collateral.

20

21  Transcribed by:  Sara Davis

22  eScribers, LLC

23  700 West 192nd Street, Suite #607

24  New York, NY 10040

25  (973)406-2250; operations@escribers.net

3

1

2 A P P E A R A N C E S :

3 MORRISON & FOERSTER LLP

4         Attorneys for Debtors

5         1290 Avenue of the Americas

6         New York, NY 10104

7

8 BY:   GARY S. LEE, ESQ.

9         TODD M. GOREN, ESQ.

10         CHARLES L. KERR, ESQ.

11         LORENZO MARINUZZI, ESQ. (TELEPHONICALLY)

12

13

14 CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

15         Conflicts Counsel to Debtors

16         101 Park Avenue

17         New York, NY 10178

18

19 BY:   MARYANN GALLAGHER, ESQ.

20         THERESA FOUDY, ESQ.

21         MICHAEL MOSCATO, ESQ.

22

23

24

25

**4**

1

2  SEWARD & KISSEL LLP

3        Attorneys for U.S. Bank, N.A. as RMBS Trustee

4        One Battery Park Plaza

5        New York, NY 10004

6

7  BY:   DALE C. CHRISTENSEN, JR., ESQ.

8        ARLENE R. ALVES, ESQ.

9        MARK D. KOTWICK, ESQ.

10       THOMAS R. HOOPER, ESQ.

11

12

13  ZUCKERMAN SPAEDER LLP

14        Attorneys for National Credit Union Administration Board

15        1800 M Street, NW

16        Suite 1000

17        Washington, DC   20036

18

19  BY:   GRAEME W. BUSH, ESQ.

20        NELSON C. COHEN, ESQ.

21

22

23

24

25

1

2  GIBSON DUNN & CRUTCHER LLP

3        Attorneys for Amherst Advisory & Management, LLC

4        200 Park Avenue

5        New York, NY 10166

6

7  BY:   JOSHUA WEISSER, ESQ.

8        DAVID M. FELDMAN, ESQ.

9

10

11  ALSTON & BIRD LLP

12        Attorneys for Wells Fargo Bank N.A., as Trustee

13        1201 West Peachtree Street

14        Suite 4200

15        Atlanta, GA 30309

16

17  BY:   JOHN C. WEITNAUER, ESQ.

18

19

20  ALSTON & BIRD LLP

21        Attorneys for Wells Fargo Bank N.A.

22        90 Park Avenue

23        New York, NY 10016

24

25  BY:   MICHAEL E. JOHNSON, ESQ.

6

1

2   WOLLMUTH MAHER & DEUTSCH LLP

3          Attorneys for Syncora

4          500 Fifth Avenue

5          New York, NY 10110

6

7   BY:   PAUL R. DEFILIPPO, ESQ.

8

9

10   AKIN GUMP STRAUSS HAUER & FELD LLP

11          Attorneys for UMB Bank, N.A.

12          One Bryant Park

13          New York, NY 10036

14

15   BY:   DANIEL H. GOLDEN, ESQ.

16          RACHEL E. ALBANESE, ESQ.

17

18

19   CHADBOURNE & PARKE LLP

20          Attorneys for the Examiner

21          30 Rockerfeller Plaza

22          New York, NY 10112

23

24   BY:   DAVID M. LEMAY, ESQ.

25          HOWARD SEIFE, ESQ.

1

2   MUNGER TOLLES & OLSON LLP

3          Attorneys for Berkshire Hathaway, Inc.

4          355 South Grand Avenue

5          35th Floor

6          Los Angeles, CA 90071

7

8   BY:   THOMAS B. WALPER, ESQ.

9

10

11   DECHERT LLP

12          Attorneys for Bank of New York Mellon;

13          Bank of New York Mellon Trust Co., N.A.

14          1095 Avenue of the Americas

15          New York, NY 10036

16

17   BY:   REBECCA S. KAHAN, ESQ.

18          GLENN E. SIEGEL, ESQ.

19

20   WHITE & CASE LLP

21          Attorneys for Ad Hoc Group of Junior Secured Noteholders

22          1155 Avenue of the Americas

23          New York, NY 10036

24

25   BY:   HARRISON DENMAN, ESQ.

1

2  KIRKLAND & ELLIS LLP

3         Attorneys for Ally Financial, Inc. and Ally Bank

4         601 Lexington Avenue

5         New York, NY 10022

6

7  BY:   RAY C. SCHROCK, ESQ.

8         JUDSON D. BROWN, ESQ.

9         DANIEL T. DONNOVAN, ESQ.

10

11

12  ALLEN & OVERY LLP

13         Attorneys for HSBC Bank USA, N.A.

14         1221 Avenue of the Americas

15         New York, NY 10020

16

17  BY:   DANIEL GUYDER, ESQ.

18

19

20  CRAVATH SWAINE & MOORE LLP

21         Attorneys for Credit Suisse Securities (USA) LLC

22         825 Eighth Avenue

23         New York, NY 10019

24

25  BY:   RICHARD LEVIN, ESQ.

1

2   MORRISON COHEN LLP

3         Attorneys for ResCap Independent Directors

4         909 Third Avenue

5         New York, NY 10022

6

7   BY:   JOSEPH T. MOLDOVAN, ESQ.

8         MICHAEL CONNOLLY, ESQ.

9

10

11  WILLKIE FARR & GALLAGHER LLP

12        Attorneys for Stonehill Capital Management LLC; Monarch

13        Alternative Capital LP; Bayview Fund Management

14        787 Seventh Avenue

15        New York, NY 10019

16

17  BY:   PAUL V. SHALHOUB, ESQ.

18

19

20  PROSKAUER ROSE LLP

21        Attorneys for Assured Guaranty

22        Eleven Times Square

23        New York, NY 10036

24

25  BY:   IRENA M. GOLDSTEIN, ESQ.

1

2      MCKOOL SMITH PC

3             Attorneys for Freddie Mac

4             One Bryant Park

5             47th Floor

6             New York, NY 10036

7

8      BY: MICHAEL R. CARNEY, ESQ.

9

10

11     QUINN EMANUEL URQUHART & SULLIVAN LLP

12            Attorneys for AIG, Allstate, Prudential, Mass Mutual

13            865 South Figueroa Street

14            10th Floor

15            Los Angeles, CA 90017

16

17     BY:   ERIC D. WINSTON, ESQ.

18

19

20     PATTERSON BELKNAP WEBB & TYLER LLP

21            Attorneys for Ambac Assurance Corporation

22            1133 Avenue of the Americas

23            New York, NY 10036

24

25     BY:   BRIAN P. GUINEY, ESQ.

1

2   GIBBS & BRUNS LLP

3         Attorneys for Steering Committee, RMBS Investors

4         1100 Louisiana

5         Suite 5300

6         Houston, TX 77002

7

8   BY:   KATHY D. PATRICK, ESQ.

9

10

11   CADWALADER, WICKERSHAM & TAFT LLP

12         Attorneys for MBIA Insurance Co.

13         700 Sixth Street, N.W.

14         Washington, DC 20001

15

16   BY:   MARK C. ELLENBERG, ESQ.

17

18

19   SIMPSON THACHER & BARTLETT LLP

20         Attorneys for Deutsche Bank Defendants

21         425 Lexington Avenue

22         New York, NY 10017

23

24   BY:   SANDEEP QUSBA, ESQ.

25

1

2   JONES DAY

3        Attorneys for FGIC

4        222 East 41st Street

5        New York, NY 10017

6

7   BY:   RICHARD L. WYNNE, ESQ.

8

9

10  CARTER LEDYARD & MILBURN LLP

11       Attorneys for Talcott Franklin Group Investors

12       2 Wall Street

13       New York, NY 10005

14

15  BY:   AARON R. CAHN, ESQ.

16

17

18  FORAN GLENNON PALANDECH PONZI & RUDLOFF PC

19       Attorneys for Certain Insurers under GM Combined

20       Specialty Insurance Program

21       222 North LaSalle Street

22       Suite 1400

23       Chicago, IL 60601

24

25  BY:   SUSAN N. K. GUMMOW, ESQ.

1

2   KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP

3          Attorneys for Official Creditors' Committee

4          1177 Avenue of the Americas

5          New York, NY 10036

6

7   BY:   KENNETH H. ECKSTEIN, ESQ.

8

9

10  MILBANK TWEED HADLEY & MCCLOY LLP

11         Attorneys for Ad Hoc Group of Junior Secured Noteholders

12         One Chase Manhattan Plaza

13         New York, NY 10005

14

15  BY:   GERARD UZZI, ESQ.

16         DENNIS C. O'DONNELL, ESQ.

17

18

19  WILMER CUTLER PICKERING HALE & DORR LLP

20         Attorneys for Creditors' Committee

21         7 World Trade Center

22         250 Greenwich Street

23         New York, NY 10007

24

25  BY:   WILLIAM J. PERLSTEIN, ESQ.

1

2    MORGAN LEWIS & BOCKIUS LLP

3           Attorneys for Deutsche Bank Trust Company Americas

4           101 Park Avenue

5           New York, NY 10178

6

7    BY:   JAMES L. GARRITY, JR., ESQ.

8           JULIA A. ENGEL, ESQ.

9           JOHN M. ROSENTHAL, ESQ.

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12          Attorneys for Wilmington Trust, N.A.

13          One Liberty Plaza

14          New York, NY 10006

15

16   BY:   MARK A. LIGHTNER, ESQ.

17          THOMAS J. MOLONEY, ESQ.

18

19   KELLER ROHRBACK PLC

20          Attorneys for Federal Home Loan Banks

21          3101 North Central Avenue

22          Suite 1400

23          Phoenix, AZ 85012

24

25   BY:   GARY A. GOTTO, ESQ.

1

2  KIRBY MCINERNEY LLP

3       Attorneys for Landon Rothstein, Jennifer Davidson,

4       Robert Davidson, and Ihor Kobryn, individually

5       and on behalf of all others similarly situated

6       825 Third Avenue

7       New York, NY 10022

8

9  BY:   MARK A. STRAUSS, ESQ.

10

11

12  U.S. DEPARTMENT OF JUSTICE

13       U.S. Attorney's Office

14       86 Chambers Street

15       3rd Floor

16       New York, NY 10007

17  BY:   JOSEPH CORDARO, ESQ.

18

19  POLSINELLI PC

20       Attorneys for Rowena Drennan

21       900 Third Avenue

22       Suite 2100

23       New York, NY 10022

24

25  BY:   DAN FLANIGAN, ESQ.

1

2   PENSION BENEFIT GUARANTY CORPORATION

3        Office of the Chief Counsel

4        1200 K Street, N.W.

5        Washington, DC 20005

6

7   BY:  VICENTE MATIAS MURRELL, ESQ.

8

9

10  ALSO PRESENT:

11  FRED REED, CREDITOR PRO SE

12  WENDY ALISON NORA, Access Legal Services (TELEPHONICALLY)

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.                    17

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  We're here in

3    Residential Capital, number 12-12020.

4            Mr. Lee?

5            MR. LEE:  Good morning, Your Honor; Gary Lee from

6    Morrison & Foerster for the debtors.

7            Your Honor, if we may, we'd just like to go out of

8    order slightly on the agenda with the uncontested matter which

9    is on page 9 of the proposed agenda which is the debtors'

10   motion for an order authorizing the debtors to advance the New

11   Jersey Carpenters notice costs and transfer those funds into

12   escrow.

13           Your Honor, the debtors have received no objections

14   with respect to that matter and I believe we provided a copy of

15   the order to Your Honor's chambers.

16           THE COURT:  All right.  Does anybody wish to be heard

17   with respect to the debtors' motion to advance costs of notice

18   in the New Jersey Carpenters class action?

19           All right.  Hearing none, the Court has reviewed the

20   papers and the motion is approved.

21           MR. LEE:  Your Honor, the second matter which is not

22   on the agenda, more in the way of an announcement -- which

23   apparently the press managed to get out ahead of our reaching

24   an agreement -- the debtors have reached an agreement with the

25   Federal Reserve Board in connection with the foreclosure review

1   obligations.  Essentially, the agreement requires that GMAC

2   Mortgage establish an escrow in an amount slightly less than

3   230 million dollars which funds will be used to fund a

4   qualified settlement fund, in effect the fund that then gets

5   distributed to the borrowers.

6          Your Honor, there'll be a two-step procedure.  The

7   first is an order from this Court authorizing the debtors to

8   execute the term sheet which is substantially identical to the

9   term sheet that was entered into with the other participants in

10  the foreclosure review process, the other banks.  And then once

11  that term sheet has been signed, we'll fund the escrow.  The

12  foreclosure review process will then stop for a period of

13  thirty days during which time there will be a form of amended

14  consent order which we will then bring to Your Honor's

15  attention by which of motion on notice to all parties.

16         THE COURT:  And as you know, Mr. Lee, the order

17  approving the establishment of the escrow that I signed that

18  order a little while ago, what it does, of course, is authorize

19  the escrowing of the funds but the debtor, within the next

20  thirty days, needs to go forward and make a motion to have this

21  Court approve the amended agreement with the FRB.

22         MR. LEE:  Yeah, that's correct, Your Honor.

23         THE COURT:  All right.

24         MR. LEE:  Thank you.

25         Your Honor, will you just excuse me for one second?

1              THE COURT:  Sure.

2              MR. LEE:  Because someone's handed me an order with

3    respect to something else.

4              THE COURT:  Go ahead, Mr. Lee.

5              MR. LEE:  I just want to check what that is.

6              Your Honor, the next item on the agenda, which is a

7    contested matter which is docket number 3814, is the debtors'

8    motion for an order under Bankruptcy Code Sections 105(a) and

9    363(b) authorizing the debtors to enter into and perform under

10   a plan support agreement with the creditors' committee, Ally

11   Financial, Inc., and a number of creditors who we refer to as

12   the consenting creditors.

13             As Your Honor is aware, the plan support agreement

14   represents a very significant milestone in these cases.  What

15   makes it particularly significant is the sheer breadth of

16   consensus that it reflects.  It's been signed by twenty-one

17   different parties who've been at war with the debtors, with

18   Ally, and with each other, in some cases for seven or eight

19   years.  And that consensus was driven by an extraordinary

20   mediation process that was put in place by Your Honor and

21   driven by Judge Peck.

22             If Your Honor approves the plan support agreement, the

23   debtors and the committee as plan -- sorry, co-plan proponents

24   intend to file the plan contemplated by the plan support

25   agreement and the disclosure statement on July the 3rd, in time

1    for the July 4th holidays, so that everybody can read it at

2    their leisure.

3           To be clear to everybody in this courtroom, Your

4    Honor, we're not asking this Court to approve the plan just

5    yet.  It would be nice.  We are instead seeking just two

6    relatively limited things; first, authority to enter into the

7    plan support agreement which will actually allow us to commence

8    the comprehensive plan process that will then follow; and

9    second, to ask Your Honor to enter certain good-faith findings

10   necessary to facilitate the RMBS trustees' entry into the plan

11   support agreement.

12          What we are not seeking, and I will go through the

13   revised form of order at the appropriate time, are any findings

14   in connection with the underlying transactions that are

15   contemplated by the plan support agreement.  Those findings are

16   reserved for confirmation or any other hearing that Your Honor

17   sets for consideration of the merits of the transactions.

18          Your Honor, if it's okay with you, what I'd like to do

19   is just set what I think is the road map for today's hearing

20   and see if that's in line with what the Court would like us to

21   do.

22          THE COURT:  That's fine, Mr. Lee.  Go ahead.

23          MR. LEE:  So first, Your Honor, what I'd like to do is

24   provide the Court and everybody who's listening with an

25   overview of the plan support agreement and the benefits that it

1  provides to the estates and to everybody.  Next, I'd like to

2  talk briefly about the debtors' business judgment and the

3  evidence that we will introduce in support of that judgment.

4  Then I would like to just very briefly propose to address the

5  objections we received and how we have tried to resolve them.

6  And there have been some resolutions.

7       After that, I would propose to have my partner, Mr.

8  Kerr, introduce the debtors' evidence that we submitted in

9  support of the motion.  Mr. Kruger is obviously here in court

10 if people wish to cross-examine him.  I know that the trustees

11 are also going to want to introduce their evidence after that,

12 and I believe that all but one of their declarants is in court

13 and available for cross-examination.

14      THE COURT:  Before you go ahead, and what I'll have

15 you do is go ahead with the overview.  I've just been handed a

16 note that there is a long line of people trying to get into the

17 building for the ResCap hearing, so they're not here or the

18 overflow room yet.  But what I'll let you do is proceed with

19 the overview.  When we're ready for introduction of evidence, I

20 want to be -- you're leaning against the switches against the

21 door, okay -- I want to be sure that those who wish to attend

22 are able to hear the evidence that comes in.

23      But, go ahead, Mr. Lee.

24      MR. LEE:  Okay.  So Your Honor, if I may, I just will

25 describe the plan support agreement and the really quite

1  extraordinary process that led to its creation.  And as the

2  docket will reflect in these cases, and as I'm sure that Judge

3  Peck will attest to after months and months and months of

4  hearing everybody's arguments and litigation positions, if we

5  don't have a plan support entered in this case, the

6  intercreditor and interdebtor disputes, as well as those

7  relating to Ally, when taken together, we think create an

8  insurmountable hurdle to the successful resolution of these

9  cases.

10        Your Honor, we described the gating issues over the

11  course of these cases.  And those gating issues alone would

12  have taken months and probably years of litigation to resolve

13  before we even knew what a confirmable plan would look like.

14  Fortunately, Your Honor, enough of the key parties in these

15  cases have recognized that burning finite estate resources over

16  the course of years and taking difficult litigation positions

17  is not really the ideal outcome.

18        As Your Honor will recall, towards the end of last

19  year when it became, I think, clear to us and to the committee,

20  the parties were quite entrenched in their respective

21  litigation positions, reluctant to make compromises and

22  reluctant to go first, Your Honor, the debtors asked that this

23  Court appoint a mediator.  And we believe that that request is

24  what really has paid off here.  Once appointed, Judge Peck

25  brought the parties to the negotiating table and managed to

RESIDENTIAL CAPITAL, LLC, et al.                    23

1   keep them at the table over the course of several months.  And
2   I think that that resolution and Judge Peck's efforts are what
3   have led to the PSA.  And to give the judge credit as he
4   himself said in the Lehman case, "Plan support agreements,
5   whether or not court-approved, achieve the highly desirable
6   purpose of orderliness in lieu of unnecessary litigation."  And
7   we believe that the plan support agreement does just that.
8           Your Honor, if you will indulge me, I'm happy to
9   review the compromises that are reflected in the plan support
10  agreement that will be embodied in the form of the plan, if
11  that would be helpful.
12          THE COURT:  Go ahead.
13          MR. LEE:  Okay.  I think first and importantly, the
14  RMBS trust claims.  What the plan comtemplates or will
15  contemplate is the settlement of the claims asserted by the
16  RMBS trustees arising from -- it's now over 1,000 RMBS trusts.
17  I think Your Honor asked what that number was precisely.  It's
18  moving, but it's over 1,000 now.  That also doesn't just
19  include the arguments relating to rep and warranty claims, but
20  it also addresses the administrative cure claims and it also
21  addresses the servicing cure claims, each of which could
22  potentially run into billions of dollars.
23          Trial on the merits of each or any one of these trusts
24  is the product of years.  As I think Your Honor will recall, we
25  were involved in litigation with MBIA with respect to a handful

1    of securitization trusts that spanned six years and eighty-nine

2    depositions.  We simply cannot have that replicated over the

3    course of 1,000 separate trusts.  We'd have no money left when

4    we were done.  And then once we'd actually figured out what the

5    number was, we'd then have another piece of litigation over

6    subordination.  And I don't know how long that would take, Your

7    Honor, but again, I think that what ultimately this does is it

8    resolves all of those things.

9         The plan support agreement also resolved the claims

10   brought by FGIC and MBIA for a fraction of the billions of

11   dollars asserted in the aggregate by those parties.  And I just

12   wanted to make it clear if it wasn't already, but he plan also

13   contemplates that the other monoline claims are treated in a

14   similar fashion as well so that the monoline claims will be

15   treated equally in the plan that we will file next week.

16        It also eliminates, Your Honor, billions of dollars of

17   potential collateral-loss claims that the RMBS trustees can

18   bring related to the securities insured by MBIA and FGIC as

19   well.  And Your Honor has pending in front of you a motion with

20   respect to FGIC which I believe was now set for trial in

21   August.

22        The plan support agreement also addresses tens of

23   billions of dollars of claims against the debtors and non-

24   debtor affiliates arising from their residential mortgage-

25   backed security issuances.  First, the plan support agreement

RESIDENTIAL CAPITAL, LLC, et al.                    25

1  resolved litigation with AIG, MassMutual and Prudential and
2  Allstate over the subordination and classification of their
3  claims.  The plan support agreement contemplates that those
4  claimants as well as those that are similarly situated -- and
5  by "similarly situation" I mean those that brought claims
6  against the debtors and also filed suit against or were subject
7  to a tolling agreement with AFI -- all received the same
8  treatment.  And they will receive their recoveries through the
9  private securities claims trust.  One of the advantages of that
10 trust, Your Honor, is obviously, once it's set, it will prevent
11 dilution of unsecured creditor claims.
12        Second, with respect to securities claims, the plan
13 support agreement also settles the New Jersey Carpenters class
14 action.  In that class action, claimants have asserted claims
15 for securities laws relating to the RMBS certificates with
16 twenty-seven billion dollars in face value.  Class has already
17 been certified in the district court in connection with that
18 case, and the case has survived a motion to dismiss.
19        So, Your Honor, that case represents one of the
20 biggest claims in the debtors' case, and the settlement
21 embodied in the plan support agreement resolves those claims on
22 terms that we believe are fair and beneficial to the debtors,
23 their estates, and creditors, and obviously avoids very costly
24 litigation.
25        With respect to borrower claims, and I think this is

1   important, what the plan will reflect is a floor on borrower

2   claim recoveries.  In other words, the floor has been set.

3   There will be a true-up, Your Honor, and that's reflected in

4   the form of the revised order and I'll explain that when we get

5   to it.  It establishes a borrowers' claims trust that's going

6   to streamline the procedures for borrowers to receive

7   distributions.  Your Honor, we've been working very hard to

8   reconcile the borrower claims.  I thought it would be worth

9   mentioning, we are in settlement discussions with every single

10  one of the class actions that have been brought against ResCap

11  and Ally by borrower representatives.  And we're hopeful that

12  we will be able to either reach resolution or appropriately

13  estimate those claims if we can't.

14       With respect to individual borrower claims, I think

15  either through objection or resolution, we've gone through

16  about 1,000 of the 3,000 claims, and again, we're hopeful by

17  the time we get to confirmation that we will have completed

18  that exercise as well.

19       I think very importantly for the borrowers and I think

20  at least one or two of the objectors who had some concern about

21  the obligations under the Federal Reserve Board's review

22  process, obviously we've announced today a settlement with the

23  Fed which will have ResCap paying 230 million dollars.  That

24  money will go directly to borrowers.  So this plan and this

25  case will have made very, very significant contributions in

1    terms of dollars to borrowers.

2            With respect to the junior secured noteholders, the

3    plan support agreement reflects the compromise that would allow

4    the holders of the junior secured notes to be paid in full on

5    the effective date.  Your Honor's heard arguments ad nauseam as

6    to whether the junior secured noteholders are undersecured,

7    fully secured, and the junior secured noteholders will have

8    their day in court the beginning of October to determine

9    whether or not they are undersecured.  But we believe that the

10   plan support agreement actually is generous in the sense that

11   the collateral that secures the junior secured notes will

12   effectively be collected over time, and the plan provides that

13   they will get paid on the effective date.

14           The plan support agreement also resolves questions

15   concerning the substantive consolidation of the debtors'

16   estates.  I think Your Honor's heard me say this before, but

17   given the debtors' capital structure, it has been clear that

18   certain parties were incentivized to seek substantive

19   consolidation.  And the plan support agreement avoids that

20   result and an Adelphia-like litigation that would span several

21   years.

22           The plan support agreement also contemplates a

23   settlement of intercompany claims between the debtors' estates.

24   The disclosure statement that we will file on July the 3rd will

25   shed more light on the creation and composition of the

1  intercompany balances reflected on the debtors' schedules.
2  We've carefully examined the facts and records behind the
3  balances, and it becomes apparent that there are several
4  factors that support the conclusion that the intercompany
5  balances are really equity contributions and not bona fide
6  debt.   In the interest of avoiding years of very complex and
7  expensive litigation, the proposed plan will resolve those
8  intercompany balances.

9          Obviously, Your Honor, the highlight in addition to
10 resolving all of the complex intercreditor-interdebtor disputes
11 is a truly historic settlement with AFI.  It resolves both
12 estate and third-party claims against Ally; claims that the
13 creditors' committee spent thousands of hours investigating
14 since its formation.  Obviously, the committee had access to
15 the documents that were produced to the examiner.  And after
16 months of hard-fought negotiations under the direction of Judge
17 Peck, Ally agreed to contribute 2.1 billion dollars to the
18 debtors' estate.  That's an incremental value of 1.35 billion
19 dollars in cash from where we were in May of last year.

20         Obviously, Your Honor, the Ally contribution will
21 materially enhance by several multiples the recoveries to the
22 debtors' creditors.  And in the absence of an Ally settlement,
23 what we'd have would be litigation with Ally and then,
24 obviously, Ally looking to seek indemnification from ResCap,
25 issues that will take years to resolve and will hold up

RESIDENTIAL CAPITAL, LLC, et al.                    29

1  distributions to creditors.

2          So in sum, Your Honor, we think that, based on that

3  overview, the plan support agreement represents an incredible

4  step forward in resolving the disputes that have bedeviled this

5  case.  The agreement was reached as a result of a great deal of

6  hard work by parties with very different interests, and we

7  would like to thank, once again, Judge Peck for getting us

8  there.

9          The notion that anybody would accuse the debtors, the

10  committee and the consenting creditors of cutting some sort of

11  backroom deal in Judge Peck's mediation, or as one counsel so

12  eloquently put it, "intentionally buried their heads in the

13  sand", is a little insulting to the process.  It's insulting to

14  the efforts that have been made by everybody and I don't wish

15  to undermine the efforts of Judge Peck or the mediation that

16  led to this resolution.

17          Your Honor, I'm not sure if people have managed to get

18  there -- they're in; I just wanted to start now with a brief

19  summary of the standard that we think should apply in the

20  evidence.

21          THE COURT:  That's fine, go ahead.  We've given ample

22  time for people to get in.

23          MR. LEE:  Your Honor, in our papers, we've urged this

24  Court to apply the business judgment standards to this motion.

25  In support of the process by which we arrived at the plan

1    support agreement, as well as in support of the substantial

2    value that the plan support agreement provides the estates, we

3    submitted the declaration of Mr. Kruger.  And in addition, the

4    RMBS trustees submitted declarations reflecting their roles in

5    the process.

6         Your Honor, we believe that all of the evidence that's

7    been submitted supports a finding that the debtors acted in

8    good faith in accordance with their reasonable business

9    judgment and in the best interest of creditors.  There has been

10   no discovery, there has been no evidence submitted to the

11   contrary and, Your Honor, we believe in light of the process

12   that was run, there really can be none.

13        THE COURT:  What we'll do is, after you finish your

14   remarks, you should offer declarations and the RMBS trustees

15   should likewise offer the declarations.  We'll see whether

16   anybody wishes to cross-examine any of the declarants.  But, so

17   go ahead with your discussion of the standards and what you

18   believe the evidence will show.

19        MR. LEE:  Thank you, Your Honor.

20        First, Your Honor, the deal was premised on over half-

21   a-year of intensive negotiations led by a sitting federal court

22   bankruptcy judge.  I'm pleased that Judge Peck doesn't keep

23   time records because that would have been a very expensive

24   mediation, but he spent hours focused on the mediation.  He

25   attended all of the in-person meetings; he participated in and

1    held bilateral meetings with parties; and he did so all in an
2    effort to drive the process to a settlement.  We believe that
3    the plan support agreement and the evidence demonstrates that
4    really represents hard-fought resolution.
5              Second, the evidence shows that the deal
6    comprehensively resolves massive litigation that would
7    otherwise have taken years to finalize.  I think I've already
8    walked the Court through those.  And it's clear from the number
9    of signatures to the plan support agreement and the relatively
10   few objections that we received, that there is a broad and
11   expansive support for the terms of the plan support agreement.
12             I think finally what the evidence shows is it's
13   genuinely inconceivable that we would be able to come up with a
14   deal better than the one that's embodied in the plan support
15   agreement if we were just simply to proceed along the path of
16   litigation.
17             THE COURT:  Let me ask you now to address -- because
18   many of the objections or some of the objections argued that
19   the entire fairness doctrine is the applicable standard in the
20   circumstances.  The debtors, the committee, the RMBS trustees,
21   and I think other supporters of the PSA argue that in the
22   circumstances here, the business judgment standard applies.  If
23   you could address why you believe it's the business judgment
24   standard rather than the entire fairness standard?  I know you
25   argued in the alternative that even if the entire fairness

RESIDENTIAL CAPITAL, LLC, et al.                    32

1    standard applied, you believe you satisfied it, but just

2    address that issue specifically.

3            MR. LEE:  So, Your Honor, as Your Honor is aware,

4    bankruptcy courts in the Southern District of New York

5    routinely apply the business judgment rule when considering the

6    debtors' entry into a plan support agreement.  Your Honor

7    approved the debtors' entry into a plan support agreement as an

8    exercise of sound business judgment in General Maritime.  And

9    the plan support agreements have been approved by bankruptcy

10   courts under the business judgment rule in a very, very long

11   list of cases.

12           THE COURT:  So here you have a very substantial

13   agreement with the debtors' nondebtor parent which may arguably

14   distinguish it from other matters.  So why, in light of the

15   settlement with AFI, do you believe that the Court should

16   evaluate the PSA using the business judgment rule?

17           MR. LEE:  Your Honor, I think all of the evidence will

18   show that, in fact, Ally wasn't on both sides of the

19   transaction.  First and foremost, and this comes through from

20   the committee's papers but also the papers that we filed and

21   Mr. Kruger's affidavit, the committee led the negotiations with

22   AFI.  The committee expended -- I'm not going to say how long

23   it expended, but the time records will reflect it -- a

24   considerable amount of time investigating the claims against

25   AFI.  They did so with the support of the debtors.  We turned

1    over all the materials to the committee relating to the pre-

2    petition investigation that we had done.  They then conducted a

3    very vigorous investigation by themselves.  They were aided by

4    the materials provided to the examiner in terms of all of the

5    documents that were produced.  And equally important, there

6    were several rounds of submissions by different claimants to

7    the examiner -- I think somewhere over twenty or so -- relating

8    to the claims they had, third-party claims, how those claims

9    should be quantified, questions of releases.  So the --

10           THE COURT:  Were those submissions shared with the

11   committee?

12           MR. LEE:  Yes, Your Honor.

13           So armed, I think, with all of that, several

14   presentations to Judge Peck by all of the parties to the

15   mediation including the debtor, I think that the reality is

16   that the negotiation was very much driven by the creditors'

17   committee and by the consenting claimants.  And the consenting

18   claimants have been, effectively, the ones that have been at

19   war with AFI for six, seven, eight years.

20           I think that the mere fact that this was overseen -- a

21   process that was overseen by Judge Peck should give everybody

22   comfort that there were not the same parties on both sides of

23   this --

24           THE COURT:  Several of the objections, as you know,

25   raise the issue -- this is not the exact terms that they've

 1   applied -- that unless and until the examiner report becomes

 2   public, it's really premature to determine whether the PSA

 3   should be approved.  You referred to the committee's

 4   investigation, and I certainly note the committee conducted

 5   quite an extensive investigation beside what the examiner did,

 6   but could you address that for me?

 7           MR. LEE:  Yes, Your Honor.  So certainly we had the

 8   benefit of not just our own internal investigation pre-

 9   petition; we had the benefit of all the materials that were

10   submitted to the examiner by way of discovery.  We had,

11   ourselves, all of the disclosures and the statements that were

12   submitted with respect to the third parties, each of which we

13   addressed.  We had the benefit of, I believe, two separate

14   presentations by the creditors' committee of the precise case

15   that they would bring.  We had a presentation from AFI.  And

16   then within the mediation itself, there were several

17   presentations as well, lasting over several days.

18           THE COURT:  Yeah, when the PSA was reached, I had

19   before me two pending STN motions; one by the committee and one

20   by Wilmington Trust.  Those hearings were adjourned in light of

21   the PSA, but -- and Wilmington Trust had certainly drafted a

22   proposed complaint.  I think the committee fairly well

23   indicated what claims they would be asserting although they

24   didn't provide a complaint.

25           MR. LEE:  Your Honor, we certainly recognize -- and I

RESIDENTIAL CAPITAL, LLC, et al.                    35

1   think I said this in connection with the STN motion -- that

2   there was a perception that the committee would be a better

3   party to pursue that litigation given concerns.  So I think at

4   the end of the day, Your Honor, I think we were incredibly well

5   informed as we were heading into those negotiations.

6           THE COURT:  All right.  Go ahead.

7           MR. LEE:  If you would just bear with me for a second,

8   Your Honor?

9           Your Honor, we also believe that the evidence supports

10  the good faith findings contained in the proposed order that

11  are necessary to facilitate the RMBS trustees' entry into the

12  PSA.  As I'm sure Mr. Siegel will describe in more detail in

13  his presentation, the record including the very extensive

14  declarations of the trustees in support of the plan support

15  motion make it clear that the trustees, with advice from

16  counsel as well as a close to year-long analysis done by Duff &

17  Phelps -- navigated the negotiations with diligence and care

18  and acted appropriately and in accordance with their duties.

19          So, Your Honor, if I could just briefly turn to the

20  objections and what we've tried to do to resolve them.  I

21  think, Your Honor, the objections fall roughly into three

22  different categories.  First, the group of parties simply

23  reserving their rights, although I shouldn't say simply

24  reserving their rights because some of the submissions were

25  very extensive.

RESIDENTIAL CAPITAL, LLC, et al.                    36

1         Second, the group of objections that are not

2  objections to the entry into the plan support agreement but

3  instead preview plan confirmation objections.

4         And then the third, which I think we just addressed,

5  Your Honor, which are the objections that challenge our ability

6  to enter into the plan support agreement and findings that are

7  being sought.

8         Your Honor, with respect to the reservation of rights,

9  I don't know if it would be helpful just to give Your Honor the

10  docket numbers for those.

11         THE COURT:  You know, Mr. Lee, I've spent days reading

12  every objection and every reply.

13         MR. LEE:  All right.  Your Honor, I just wanted to

14  make one point clear which is that the approval of the plan

15  support agreement isn't intended to prejudice anybody's rights

16  with respect to the contemplated plan and disclosure statement.

17  We took direction from Your Honor and filed a revised proposed

18  order which was docket 4006 on June 19th to make it clear that

19  nobody was waiving any rights including with respect to the

20  FGIC settlement.

21         And then, in an effort to provide objecting parties

22  further comfort after they'd filed objections and reservation

23  of rights, we modified the proposed order a second time.  We

24  then sent the second amended order out to everybody and asked

25  for further comments and what you have -- what was filed this

1    morning, Your Honor, is the third amended order which

2    incorporates those comments that we thought we were able to

3    take.

4              And I don't know if Your Honor has a redline --

5              THE COURT:  I do.

6              MR. LEE:  -- and if it would be just helpful.

7              THE COURT:  I have it.

8              MR. LEE:  All right.

9              Your Honor, what the revised order reflects is that

10   we've made changes to three ordered paragraphs.

11             First, we removed language from paragraph 3 that would

12   have asked this Court to find that the transactions

13   contemplated by the PSA in the best interest of the debtors and

14   its creditors.  It now states that "The performance of the RMBS

15   trustees contemplated by the PSA is in the best interest of the

16   RMBS investors."  We wanted to make it clear that nothing in

17   the order was intended to constitute a finding by the Court as

18   to the underlying transactions.

19             Second, Your Honor, we revised paragraph 5 to make it

20   clear that notwithstanding the finding the debtors seek that

21   the PSA is in the best interest of creditors and that the RMBS

22   trustees acted in good faith in the best interests of investors

23   in entering into the PSA.  Nothing will prejudice or waive any

24   party's rights to object to any proposed disclosure statement,

25   any proposed plan or any other motion that seeks to effectuate

1     the terms of the PSA and the transactions contemplated therein.

2               In addition, at UMB Bank request, we made it clear

3     that the reservation extends to the junior secured note

4     adversary proceedings to be heard in October.

5               I think, Your Honor, just pausing briefly, with

6     respect to the changes that we did in paragraph 5, I believe

7     that that resolves the limited objection filed by Assured

8     Guaranty.  I actually want to thank Ms. Goldstein for making

9     some suggestions that found their way into paragraph 5.  So I

10    think that's at least one that was resolved as a result of

11    this.

12              Your Honor, paragraphs 9 and 10 were -- I'm sorry;

13    paragraph 10 was resolved to clarify the findings with respect

14    to what the order refers to as discretionary rights.

15              THE COURT:  Say that again.

16              MR. LEE:  Sorry.  Yes, Your Honor.

17              So I'm looking at paragraph 10.  Paragraph 10 refers

18    to the discretionary rights of the private securities

19    claimants, and what the change is meant to clarify is that that

20    finding is merely intended to provide the private securities

21    claimants that they could terminate the plan support agreement

22    if the private securities trust agreement is not satisfactory

23    to them.

24              All the parties to the plan support agreement have

25    similar termination rights if the supplemental documents are

1  not in form and substance satisfactory to them.

2         The last change, Your Honor, is one that came in last

3  night which relates to paragraph 11.  And what this is intended

4  to do is to extend the date by which the debtors have to

5  provide a true-up on borrower claims and it extends it to the

6  date on which we file -- sorry, extended until we file the plan

7  supplement.  And what that basically was intended to do, Your

8  Honor, was to give the parties more time to continue to work

9  with the borrowers to try to avoid estimation proceedings and

10  try and reach as many resolutions as we can, and under the

11  original schedule we just simply haven't given ourselves enough

12  time.  So I want to thank the Kessler plaintiffs for suggesting

13  that and agreeing to it as well.

14         So we think, Your Honor, or at least we hope, Your

15  Honor, this resolves a number of the objections.  One -- the

16  next bucket are what I think are confirmation objections; I'm

17  not planning on addressing those.  They relate to third-party

18  releases and expected distributions under the plan.  I think

19  our view is that those objections are largely -- well, they're

20  entirely misplaced because the findings that we're seeking

21  today are specific to the plan support agreement.

22         What's helpful about those objections, Your Honor, is

23  they give us some guidance as to the kind of work that we're

24  going to need to do between now and confirmation, and more

25  importantly, perhaps between now and the disclosure statement

1  hearing.  What we will do, Your Honor, is make sure that we

2  take the guidance that those objections provide us and make

3  sure that we work with all of the parties that have filed

4  objections.  And our hope, Your Honor, is similar to what

5  happened in -- with respect to the sale hearing.  We end up

6  with what turned out to be a largely uncontested sale hearing.

7  Whether we can end up with a largely uncontested confirmation

8  hearing remains to be seen.

9          The last bucket, Your Honor, I think is the challenges

10 to the actual plan support agreement and I've addressed the

11 standard that I think applies.

12         With respect to Credit Suisse's objection, which I

13 believe is docket number 4019, we've discussed that objection

14 with counsel to Credit Suisse.  We think we have a resolution,

15 and what we are going to do, along with the creditors'

16 committee is work with Credit Suisse and other parties to build

17 an appropriate judgment reduction provision into the plan.

18         So with that, Your Honor, I'll turn the podium over to

19 my partner, Mr. Kerr, who will introduce Mr. Kruger's

20 declaration into the record.

21         THE COURT:  Thank you very much.

22         MR. LEE:  Thank you, Your Honor.

23         THE COURT:  Mr. Kerr?

24         MR. KERR:  Good morning, Your Honor.  Charles Kerr,

25 Morrison & Foerster on behalf of the debtors.

1          Your Honor, in support of the debtors' motion for an

2     order authorizing the debtors to enter into a plan support

3     agreement, the debtors offer as defendant -- excuse me -- as

4     Debtor's Exhibit 1, the declaration of Lewis Kruger dated May

5     23rd, 2013 which was filed as part of docket entry 3814.

6          If Mr. Kruger was called to testify, he would testify

7     to what is in his declaration.  We, therefore, offer his

8     declaration in factual support of this motion.

9          Your Honor, I believe --

10          THE COURT:  Let me see, are there any objections to

11     the Kruger declaration?

12          All right.  It's admitted in evidence.

13       (Declaration of Lewis Kruger was hereby received into

14     evidence as Debtor's Exhibit 1, as of this date.)

15          MR. KERR:  Your Honor, I have an extra copy.  I think

16     you have a copy.

17          THE COURT:  I do, but I got so much paper up here, Mr.

18     Kerr, it would be helpful if you handed it up to me.

19          MR. KERR:  Can I hand it up to Your Honor right now?

20          THE COURT:  Yes.  You absolutely can.  Thank you very

21     much.

22          All right.  So Exhibit 1 is in evidence.

23          MR. KERR:  Your Honor, we also offer as supporting

24     exhibits to this motion the following.

25          We offer as Debtor's Exhibit 2, the plan support

1   agreement, dated as of May 13th, 2013 which was filed as part

2   of docket entry number 3814.

3             THE COURT:  Any objections to the PSA?

4             All right.  It's admitted in evidence.

5        (Plan support agreement dated 5/13/2013 was hereby

6   received into evidence as Debtor's Exhibit 2, as of this date.)

7             MR. KERR:  Your Honor, may I bring up a copy for you?

8             THE COURT:  You have a lot of exhibits you're going to

9   introduce?

10            MR. KERR:  No, I just have four.  That's it.

11            THE COURT:  Well, why don't you do the others then --

12            MR. KERR:  Okay.

13            THE COURT:  -- you'll hand them up to me at one time.

14            MR. KERR:  Excuse me.

15            We also offer as Debtor's Exhibit 3 the term sheet for

16  proposed joint Chapter 11 plan which is Exhibit A to the plan

17  support agreement and which was filed as part of docket entry

18  number 3814.

19            THE COURT:  Any objections?

20            All right.  The term sheet is admitted in evidence as

21  Exhibit 3.

22        (Term sheet for proposed joint Chapter 11 plan was hereby

23  received into evidence as Debtor's Exhibit 3, as of this date.)

24            MR. KERR:  And, Your Honor, we also offer as Debtor's

25  Exhibit 4, the supplemental term sheet for proposed joint

RESIDENTIAL CAPITAL, LLC, et al.                    43

1  Chapter 11 plan which is Exhibit B to the plan support

2  agreement and which was filed as part of docket entry number

3  3814.

4           THE COURT:  Any objections to Exhibit 4?

5           All right.  It's admitted in evidence, as well.

6      (Supplemental term sheet for proposed joint Chapter 11

7  plan was hereby received into evidence as Debtor's Exhibit 4,

8  as of this date.)

9           MR. KERR:  Your Honor, why don't I bring these up to

10 you, if I may?

11          THE COURT:  Thank you very much.  Yeah, please.

12          Thank you.

13          MR. KERR:  Your Honor, two other things I'd like to

14 note.  As the Court aware, this plan of support agreement Mr.

15 Lee described was a result of a lengthy mediation process by --

16 thank you -- Judge Peck.  It involved extensive discussions

17 among the parties and their counsel.

18          In offering Mr. Kruger's testimony in support of the

19 plan support agreement, we do not intend to waive any

20 privileges that apply to Mr. Kruger's discussion with his own

21 counsel in connection with the mediation or the plan support

22 agreement.

23          In addition, Your Honor, under the order appointing

24 the mediator, which is dated December 26, 2012, which is docket

25 number 2519 by which Your Honor appointed Judge Peck as the

RESIDENTIAL CAPITAL, LLC, et al.                    44

1   mediator in this case, there are strict and broad

2   confidentiality requirements with respect to the mediation.

3           In offering Mr. Kruger's testimony in support of the

4   plan support agreement, Mr. Kruger is and remains bound by

5   those confidentiality provisions.

6           With that, Your Honor, Mr. Kruger is available to be

7   cross-examined.

8           THE COURT:  Does anybody wish to cross-examine Mr.

9   Kruger?

10          Seeing no one, we have Mr. Kruger's testimony and no

11  cross-examination.

12          MR. KERR:  Thank you, Your Honor.

13          THE COURT:  Thank you very much, Mr. Kerr.

14          Mr. Lee?

15          MR. LEE:  Your Honor, if I may, can I turn the podium

16  over to Mr. Siegel --

17          THE COURT:  Yes, you can.

18          MR. LEE:  -- to introduce the trustee's evidence?

19  Thank you.

20          THE COURT:  Absolutely.

21          MR. SIEGEL:  Good morning, Your Honor.  I'm Glenn

22  Siegel from Dechert and I'm here on behalf of Bank of New York

23  Mellon.  As has been our practice in this case, I am also

24  speaking on behalf of the other trustees, namely, Deutsche

25  Bank, HSBC, Law Debenture, US Bank and Wells Fargo.  Unless I

RESIDENTIAL CAPITAL, LLC, et al.                    45

1   am contradicted by one of my colleagues, you should assume that

2   what I say is on behalf of all of the various RMBS trustees.

3           As Your Honor knows, this agreement and the RMBS

4   settlement contemplated therein are the result of hard fought

5   arms'-length negotiations ably facilitated by the mediator.

6   This is a global deal.  It does not just simply resolve the

7   claims of the RMBS trusts, but it does so in the context of an

8   overall case where there are many issues and many compromises

9   that were required to be made.  It was not sufficient for the

10  trustees to subjectively determine what was going to happen

11  without also considering how that affected all the other moving

12  parts.

13          We had a -- we had to negotiate and participate in

14  negotiation that also dealt with the size of the Ally

15  contribution and how the other constituencies were, in fact,

16  going to share in that contribution.  And then, further, we had

17  to determine as between 1,000 trusts what would be a fair

18  allocation between those trusts.  And picking out one discrete

19  issue does not do justice to what the trustees had to decide at

20  any particular point in time.

21          The -- as --

22          THE COURT:  Whether you do it right now or before you

23  sit down, a number of the objections focused on the methodology

24  used for allocating money among the trusts and I do want you to

25  talk about that.

1          MR. SIEGEL:  That is part of my presentation, Your

2     Honor.

3          THE COURT:  Okay.  Go ahead.

4          MR. SIEGEL:  Your Honor, as was observed by Mr. Lee,

5     there were over 1,000 RMBS trusts involved here.  As a point of

6     information, Your Honor should know that HSBC received five

7     trust directions to opt out of the settlement.  It is our

8     understanding that these are not significant amounts and, in

9     fact, as I'm advised by the debtor, we don't even know if those

10    trusts have rep and warranty claims at all.  They may have some

11    servicing claims, but that should have no impact on the overall

12    settlement.

13          Again, what is significant here is that by approving

14    this settlement, it will enable the trustees to vote in favor

15    of the plan and, therefore, facilitate confirmation of the

16    plan.  And in the absence of that, the trustees will not have

17    the comfort moving forward given the diversity of the opinion

18    of the various certificate holders that they can proceed to go

19    forward without subjecting themselves to liability for what we

20    believe is doing our job and doing it well.

21          Again, Your Honor, as I said a moment ago, this is not

22    a scientific process.  We are not asking this Court to rule nor

23    could this Court rule nor could we have concluded that the

24    decisions we made are empirically correct.  What we're asking

25    the Court to find is that what we did under the circumstances

RESIDENTIAL CAPITAL, LLC, et al.                    47

1  discharged our duty as reflected in the order to our various

2  certificate holders.  And as Your Honor observed, that really

3  comes down to two things; whether or not the gross amount that

4  we agreed to was reasonable under the circumstances and whether

5  the methodology we used to distribute that gross amount to the

6  trust is appropriate, as well.

7           Again, we believe that we insured a fair process.  I

8  would observe, for example, that when this proposal was first

9  made to us by the institutional investors it only included a

10 subset of the trusts which I think were approximately thirty-

11 eight percent of the overall trusts.  The trustees assured that

12 all trusts would be put to the process and all be treated in

13 the exact same fashion.

14          And, Your Honor, we also observed, even to the extent

15 that there are individual objections, we think those individual

16 objections quite rightfully reflect the individual interests of

17 any particular certificate holder trying to get a bigger piece

18 of the pie than other certificate holders which is what we

19 would expect advocates would do under the circumstances.

20 However, the trustees, because of their unique position,

21 because we are trustees for all of these trusts, we simply have

22 no axe to grind.  The only thing that we're trying to do is

23 fairly allocate, and we think that we've come up with a process

24 that succeeds in doing that.  And while it is possible that an

25 individual objecting party might have a methodology that could

RESIDENTIAL CAPITAL, LLC, et al.                    48

1  be justified under the circumstances, the question is not that;

2  the question is whether or not our methodology is a fair and

3  reasonable process that is designed to make sure that the

4  allocation between the various trusts is, in fact, there.

5          THE COURT:  So what I read in the objections is what I

6  gleaned from them is there's a concern about the transparency

7  of the process by which allocation is being made.

8          What, Duff & Phelps is going to do the allocation?

9          MR. SIEGEL:  Yes.  And Duff & Phelps is fairly

10 advanced into the allocation.

11         As Your Honor can appreciate, this was done through

12 substantial sampling; thousands and thousands of loans were

13 looked at.

14         THE COURT:  Well, as I understand it, it's over 6,500

15 loans were sampled by Duff & Phelps.

16         MR. SIEGEL:  That's correct.  And this goes back to

17 what I said a moment ago which is we can't come up with this as

18 a matter of scientific certainty because it's not cost-

19 effective and not practical to review every single loan.  So we

20 engaged a firm that is very conversant in this space, that they

21 have gone out and they've used a scientific method of sampling

22 where they have determined how it is based upon sampling of the

23 loans they can allocate losses determining which trust suffered

24 more losses, relatively speaking to the other trusts.  And that

25 they've gone through a process, by the way, from which they

RESIDENTIAL CAPITAL, LLC, et al.                    49

1    took input.  We have had input from the institutional investors

2    that did, in fact, sign confidentiality agreements and did

3    support this settlement, as well as, by the way, when the

4    initial 9019 process went on, we had various objecting parties.

5    Duff & Phelps met with those parties and, in fact, altered the

6    methodology to reflect some of the comments that were made

7    because they thought they were well taken.

8            THE COURT:  So how far advanced is Duff & Phelps

9    process at this point?

10           MR. SIEGEL:  I am advised that they should shortly be

11   able to come out with the actual numbers, that they have

12   something like -- I don't know, was it thirty, about thirty --

13   about thirty more files to go through and then they'll be

14   complete and then they'll be able to come up with a number.

15           THE COURT:  And when they come up with the numbers,

16   what's going to be done with them?  I mean is -- I mean some of

17   the objections which I really took to be disclo -- most of the

18   objections that were asserted which I really take to be

19   disclosure statement or confirmation objections, with respect

20   to disclosure statement objections, adequate information being

21   the essential test, do you contemplate that the disclosure

22   statement will include more details regarding the allocation of

23   distributions trusts?

24           MR. SIEGEL:  We do contemplate that, Your Honor.

25   However, just to be clear about this process because I don't

1   want to create a misimpression, the fact is that the individual

2   certificate holders, as is currently contemplated, will not

3   have an ability to object to confirmation of the plan because

4   they are not creditors of this estate.  So that while that will

5   be disclosed, they will not have an ability other than to come

6   to the trustees and explain to the trustees why they think

7   those numbers are incorrect --

8           THE COURT:  Should we take any bets about how many

9   objections get filed on the docket?

10          MR. SIEGEL:  But -- if they're filed, they're filed.

11  But the fact is that --

12          THE COURT:  My only question now, Mr. Siegel, is do

13  you expect -- and I guess this is really a question for the

14  debtors and the committee as co-proponents -- whether you

15  anticipate that the disclosure statement will include -- the

16  test is going to be adequate information, and we may have a

17  dispute about what's adequate, but -- information about the

18  allocation of distributions among the trusts?

19          MR. SIEGEL:  We do.

20          THE COURT:  Okay.

21          MR. SIEGEL:  Your Honor, just to follow the structure

22  that was used by Mr. Lee, I will introduce the declarations at

23  the conclusion --

24          THE COURT:  Okay.

25          MR. SIEGEL:  -- of my discussion --

RESIDENTIAL CAPITAL, LLC, et al.                    51

1          THE COURT:  Fine.

2          MR. SIEGEL:  -- as opposed to at this point.

3          But what we do want to talk about is the governing

4    agreements for the RMBS trusts and what rights they give the

5    investors.  And we should start with this:  These RMBS trusts

6    were offered into the marketplace, with prospectuses, with the

7    underlying documents there, and that people who bought these

8    instruments knew what rights they had vis-a-vis their

9    securities.  And the rights they have vis-a-vis their

10   securities are two:  One is that the RMBS trustees have an

11   obligation to them, written to the documents, about how they're

12   supposed to perform under the agreements.  If in fact the

13   investors in an individual trust did not want to leave that

14   decision-making to the trustees in the individuals trusts,

15   their recourse would be to direct the trustee, in accordance

16   with those individual documents, to follow their specific

17   instructions.  Those are really the only rights certificate

18   holders have under the documents.

19         Now, absent -- excluding those five trusts we've

20   described to you, with the remainder of the trusts the only

21   question is whether or not we've fulfilled our duties.  We are

22   not acting pursuant to a direction of any holder, and no holder

23   has the right to direct us with respect to this.  Therefore,

24   the standard here is not whether or not a holder disagrees with

25   us or whether or not a critical mass of holders in any

1   individual trust disagree with us.  The question is simply

2   whether or not we have fulfilled our duties.

3           Now, the order, which essentially in our view tracks

4   what our obligations are under the documents, asks this Court

5   to find that the agreement and the RMBS trustees' performance

6   under the agreement are in the best interests of the trusts and

7   the investors, that the trustees acted reasonably, in good

8   faith and the best interest of the investors in the RMBS

9   trust -- and the RMBS trusts, in entering into the agreements,

10  and that the notice that was provided and the due process that

11  was provided to all those parties was sufficient under the

12  circumstances.

13          THE COURT:  So my major question, Mr. Siegel, is the

14  preclusive effect, if any, of the findings I make in connection

15  with the trustees' decision to sign and support the PSA and

16  what happens at the time of plan confirmation.

17          MR. SIEGEL:  Okay, this is my view of what your order

18  means and how it affects confirmation:  that what your order

19  means is, once you sign this order, the trustees have the

20  comfort that in the event that an individual certificate holder

21  is unhappy with the result in this case and brings and action

22  against the trustees, the trustees will have your order to

23  offer as a defense to such action, that they will be bound not

24  within the bankruptcy case but in a third-party proceeding

25  where they sue the trustees for having violated their duty.

1          THE COURT:  You think that that's true even if the

2    plan that embodies the terms of the PSA is not confirmed?

3          MR. SIEGEL:  I do, because to the extent to which the

4    plan is not confirmed and someone wants to suggest that we did

5    something that caused them damages, we would still assert in

6    the same way what happened.  This is not about the ultimate

7    confirmation of the plan; this is about the decision that we've

8    entered into to support this plan.

9          THE COURT:  Well, I view this as an interlocutory

10   order.  Absent a plan that's confirmed that embodies the terms,

11   I'm not sure what the meaning of the PSA is; it disappears.

12         MR. SIEGEL:  Your Honor, I --

13         THE COURT:  You agree --

14         MR. SIEGEL:  -- appreciate that.

15         THE COURT:  -- it disappears?

16         MR. SIEGEL:  I agree that the plan support agreement

17   is simply an agreement to support this plan under these

18   circumstances.  And if the plan is not confirmed --

19         THE COURT:  The consequences of me confirming a plan

20   may be different, because at the time of confirmation they'll

21   probably be maybe similar, but also some additional findings of

22   fact that I would have to make to support plan confirmation.

23   But why doesn't the PSA -- it may not even get to plan

24   confirmation.  I mean, various parties have rights to terminate

25   the agreement on specified conditions.

1          MR. SIEGEL:  Your Honor, if the plan support agreement

2    is terminated and someone were to sue the trustees,

3    notwithstanding the fact it was terminated, I have a difficult

4    time understanding how they would explain the damages they

5    suffered.

6          THE COURT:  Well, that may be true, but I'm not sure

7    that's my problem --

8          MR. SIEGEL:  No, no --

9          THE COURT:  -- okay --

10          MR. SIEGEL:  -- I understand.

11          THE COURT:  -- because that lawsuit won't be before

12    me.

13          MR. SIEGEL:  But what -- but I also think, Your Honor,

14    that in that instance, Your Honor would not be interpreting the

15    scope of your order at that point.  I mean, maybe we would come

16    back to you, and you would tell us at that point in time what

17    you --

18          THE COURT:  But I need some clarity about what it is

19    I'm going to order.

20          MR. SIEGEL:  Your Honor --

21          THE COURT:  And here's where I see --

22          MR. SIEGEL:  Okay.

23          THE COURT:  -- what you're telling me is inconsistent

24    with what the debtor has told me.  And when I focus on -- and I

25    think, in the debtors' reply, for example, they tried to

1   make -- I thought that they made clear that the findings that

2   I'm making relate to the adoption of the PSA; they don't bind

3   me and they don't bind objectors in a disclosure statement

4   hearing or a plan confirmation hearing or a FGIC 9019

5   settlement, which for a variety of circumstances occurs outside

6   of the confirmation hearing.

7         MR. SIEGEL:  But, Your Honor, I agree with all of

8   those things.  I don't think any party who has standing to

9   object will be precluded from objecting on any grounds with

10  respect to the plan support agreement.  However, what I do

11  think this does is this binds the trusts to the plan support

12  agreement so that --

13        THE COURT:  It does, but so long as the plan support

14  agreement remains effective.  But if the --

15        MR. SIEGEL:  Of course.

16        THE COURT:  -- if the plan support agreement

17  terminates -- look, I -- you'll have to introduce your

18  evidence; I'll have to see whether anybody wants to cross-

19  examine.  I read all the declarations.

20        So let's assume that I, based on the declarations --

21  and we'll see whether there's any cross-examination -- I were

22  to conclude that the trustees engaged in an appropriate

23  process.  Duff & Phelps' experts evaluated the strength and

24  weaknesses of claims and possible outcomes in litigation and in

25  good faith decided to enter into the settlement, the settlement

RESIDENTIAL CAPITAL, LLC, et al.                    56

1  embodied in the term sheets, and did so in good faith and

2  believed that it was in the best interests of investors.  Okay.

3  That seems to me -- but because this is interlocutory --

4  because if the term sheet -- if the PSA terminates, I think

5  people are back to square one, frankly --

6           MR. SIEGEL:  Well --

7           THE COURT:  -- at that point.

8           MR. SIEGEL:  -- Your Honor, maybe this is the simplest

9  way to --

10          THE COURT:  We may have a disagreement here,

11 Mr. Siegel --

12          MR. SIEGEL:  Well, I --

13          THE COURT:  -- about what the --

14          MR. SIEGEL:  -- I don't know that we --

15          THE COURT:  -- import of what I'm being asked to do

16 is.

17          MR. SIEGEL:  Well, I don't know.  And I think I could

18 resolve the extent to which we might have a disagreement.  The

19 plan support agreement is the plan support agreement.  If in

20 fact the plan contemplated by the plan support agreement is not

21 confirmed, the findings are simply not relevant to any sort of

22 litigation that would be commenced against the trustees in the

23 future, because it never happened.  So as a consequence, it

24 would seem to me that if something were to happen in the future

25 and the trustee were to take some future action outside of the

1    plan support agreement, we could not rely on these findings as

2    protection for that, because they were not contemplated by your

3    order, because your order only contemplates our entry into, and

4    performance under, the plan support agreement.  I don't think

5    that's inconsistent with any of these reservations of rights.

6           If Your Honor is asking us what we expect the value of

7    the plan support agreement -- these findings to be -- excuse

8    me -- in the event the plan is not confirmed, I would expect

9    that -- because I'm an advocate for my client, I don't want to

10   rule out some hypothetical circumstance where this might have

11   value.  But I would expect ordinarily it would have no value,

12   because we didn't do anything, because the plan contemplated

13   under the plan support agreement never happened.

14          THE COURT:  Well, I think what you will have done, and

15   so will the creditors' committee and the debtors and the other

16   supporting parties, is try and, if the Court approves it, carry

17   forward with a structure for a proposed plan, with lots of

18   issues that people who aren't signatories, didn't participate

19   in the mediation, may well have objections but will need to get

20   sorted out either consensually or otherwise.  That's a major

21   accomplishment in itself.

22          So -- but let me see what the evidence -- and I've

23   read the declarations; let me see whether there's cross-

24   examination.

25          MR. SIEGEL:  I understand, Your Honor.

1        I'm just skipping down here because our colloquy

2    included many of the things that are in my notes.

3        Just to talk about the objections first broadly and

4    then I'll talk about them more narrowly, the objections

5    generally, that we see, go beyond the agreement and our

6    confirmation arguments, in many instances.  Also, we don't

7    think there are arguments that -- none of these objections are

8    significant enough to overcome the findings that we've asked

9    this Court to enter into and to our declarations, that we don't

10   think any of the objections credibly describe a different

11   process we should have gone through or a process that is so

12   manifestly different than the one we went into, that it should

13   call our judgment into question.  I mean, we were parties in an

14   overall bankruptcy case; we participated on the creditors'

15   committee quite extensively; we were actively involved in the

16   proposed 9019 -- the original 9019; we participated heavily in

17   the mediation --

18           THE COURT:  Actively involved but never took a

19   position, really, at the end of the day, in the RMBS trial.

20           MR. SIEGEL:  We're taking it now --

21           THE COURT:  I know.

22           MR. SIEGEL:  -- because --

23           THE COURT:  I know that.  I'm just tweaking you on

24   this point, okay?

25           MR. SIEGEL:  Your Honor, I promise you, had the day

RESIDENTIAL CAPITAL, LLC, et al.                    59

1    come that we were --

2              THE COURT:  It's about time.  But go ahead.

3              MR. SIEGEL:  Had the day come that we were required to

4    make a decision, we were prepared to make that decision.

5              THE COURT:  You were prepared to make a decision, I

6    know; I'm sure.

7              MR. SIEGEL:  I think we actually filed a pleading that

8    said what decision we were going to make.

9              THE COURT:  All right.  In the mountains of paper I

10   have, I must have missed that sentence.  But --

11             MR. SIEGEL:  I am reminded --

12             THE COURT:  -- go ahead.  I'm --

13             MR. SIEGEL:  -- by one of my colleagues that also in

14   the absence of this order being entered, we are not certain

15   that we would be prepared to proceed at all.

16             THE COURT:  Look, the order -- the PSA and the term

17   sheets provide what they provide.  An order has been submitted,

18   modified, consistent with the PSA; I'll decide it based on what

19   I have before me.  So whether you would have signed onto

20   something different is really -- is not before me.

21             MR. SIEGEL:  No, I understand.  But what I do want to

22   point out is that if these findings are not made, this leaves

23   the trustees with only two possible alternatives:  One

24   alternative is we simply do nothing, which we think would

25   create chaos within the case; the other alternative is we

1  petition the state court under Article 77, and that would --

2          THE COURT:  Tune in in a couple years again.

3          MR. SIEGEL:  Exactly.

4          THE COURT:  Okay.

5          MR. SIEGEL:  So I just wanted to point out --

6          THE COURT:  No, I --

7          MR. SIEGEL:  -- those alternatives.

8          THE COURT:  -- I'm very mindful of that.  I think the

9  only place where we've engaged in this colloquy about it is

10  what's the preclusive effect of findings I make in connection

11  with the trustees' decision to sign and support the PSA.

12          MR. SIEGEL:  Well, I think we agree that if this

13  contemplated plan is confirmed, these findings are meaningful.

14          THE COURT:  Yeah --

15          MR. SIEGEL:   The question --

16          THE COURT:  -- they are --

17          MR. SIEGEL:  -- you asked --

18          THE COURT:  -- clearly.

19          MR. SIEGEL:  -- is, if the plan is not confirmed, what

20  do these findings mean.  And I think we're speaking different

21  words, but I think --

22          THE COURT:  Okay.

23          MR. SIEGEL:  -- we're pretty much --

24          THE COURT:  All right.

25          MR. SIEGEL:  -- in the same place.

RESIDENTIAL CAPITAL, LLC, et al.                    61

1          THE COURT:  Why don't you go on with your argument.

2          MR. SIEGEL:  Your Honor, I'd just briefly talk about

3   the jurisdiction -- the jurisdictional issues here.  We simply

4   think you have jurisdiction to enter this order, that this is a

5   related-to matter, that this goes right to the core of the

6   bankruptcy case, this plan support agreement is absolutely

7   essential to the progress of the case, and that the resolution

8   of this issue greatly facilitates getting there.

9          THE COURT:  The only way I would disagree with you is

10  I think approval of a settlement is a core matter and not a

11  related-to matter.  But --

12         MR. SIEGEL:  Oh, no, I was about to get to that.

13         THE COURT:  Okay.

14         MR. SIEGEL:  Your Honor, when I used "related-to", I

15  was using it in 1330(b) -- 34(b) terms.

16         THE COURT:  And I'm using it in those terms too.  I

17  mean, I consider approval of a 9019 settlement -- and the case

18  law that's developed post-Stern v. Marshall supports the view

19  that approval of a 9019 settlement arises under or arises in a

20  bankruptcy case and it's a core matter.  And the cases that

21  have been decided so far find that the bankruptcy court has the

22  authority to enter the order.

23         Go ahead.

24         MR. SIEGEL:  And I would never disagree with you on

25  that --

1          THE COURT:  Okay.

2          MR. SIEGEL:  -- point.

3          Also, just to be clear, that we believe the governing

4    agreements give us authority to enter into this agreement, that

5    under these governing agreements, we have the right to litigate

6    these claims.  If we have the right to litigate them, the law,

7    we think, establishes pretty clearly we have the right to

8    settle them as well.  We think that under the applicable law,

9    which is New York law, that we have acted in good faith and

10   reasonably.  We cite in our papers what those cases are and

11   what the standards are there.

12         And as Your Honor knows from the declarations, we

13   were -- and actually from our appearance in this court, that we

14   have been intimately involved in the case throughout.  And we

15   think, at least, we have been acting in the best interests of

16   all of our certificate holders, in trying to deal with the

17   sheer magnitude of the amount of trusts and the amount of

18   certificate holders there are, and dealing with the fact that

19   while individual holders may have different points of view,

20   that our obligation is collectively to each trust individually

21   and as trustee to all of the trusts.  And we think we've met

22   our obligation to be fair, in that respect.

23         Okay, we think that the actual agreement is in the

24   best interests of the holders, that -- and by the way, while I

25   will mention the FGIC piece of this, I recognize all the

1  reservations of rights, that we resolved all the issues not

2  only with respect to the trusts but with respect to the

3  monolines that insured certain of the trusts.  We think that

4  the solution we came up with respect to the monolines, in each

5  instance, was reasonable under the circumstances and created

6  the best possible outcome for the trusts collectively and for

7  the wrapped trusts in particular.

8           Now -- and, Your Honor, we also believe -- and we

9  think this Court has approved the notice that we gave to people

10  in advance of this hearing.

11          Just to briefly talk about the individual objections,

12  we have the AAM objection, which is the individual certificate

13  holder objection that was out there, about our allocation.

14  And, Your Honor, I very much appreciate the issue that there is

15  no actual number out there that people can look at so that they

16  can see, relatively speaking, how they do vis-a-vis the other

17  trusts; that, as I indicated earlier, the methodology that has

18  been used is designed to create fairness with respect to all of

19  the trusts; and that we -- not only did Duff & Phelps come up

20  with an analysis, and not only did we meet extensively to

21  discuss that analysis with Duff & Phelps -- and when I say

22  "we", I mean each individual trustee did so, as well as all of

23  the professionals -- they also took input from the organized

24  institutional investors.  And to the extent that parties were

25  interested in providing data to Duff & Phelps about the

RESIDENTIAL CAPITAL, LLC, et al.                    64

1    process, they also took that.  As I said, in the case of AAM,

2    it's my understanding they objected to the original 9019

3    statement, that they in fact met with Duff & Phelps.  And part

4    of their concerns, or about all of their concerns -- we

5    believe, all of their concerns -- were met by adjustments to

6    the methodology to reflect what we thought were the valid

7    points they made.  They refer --

8            THE COURT:  Let me ask you -- I think the Amherst

9    Advisory --

10           MR. SIEGEL:  Yeah.

11           THE COURT:  -- limited objection is one of those that

12   focuses -- raises the issue about sufficient information about

13   allocation.

14           MR. SIEGEL:  Um-hum.

15           THE COURT:  Now, are you saying that Amherst Advisory

16   doesn't have standing to --

17           MR. SIEGEL:  No, I am not saying --

18           THE COURT:  Okay.

19           MR. SIEGEL:  -- that.  They absolutely have standing

20   to make this argument today, because this is an action we are

21   seeking to take --

22           THE COURT:  Okay.

23           MR. SIEGEL:  -- with respect to their trust.  And we

24   think this is a completely -- we think they have the standing

25   to make the argument; we just think the argument's not well-

RESIDENTIAL CAPITAL, LLC, et al.                    65

1   founded.

2         THE COURT:  Let me ask you -- even outside of the

3   disclosure statement process, I know earlier in the case, when

4   we were headed toward the RMBS trial, I think you had told me

5   that the trustees had set up meetings with the institutional

6   investors and others.  Is there a process underway, Mr. Siegel,

7   to try and better communicate or communicate more information,

8   if not better --

9         MR. SIEGEL:  Your Honor, there's two different things

10  going on here; one is, to the extent that holders want to talk

11  to us and want to talk to Duff & Phelps, we have been very open

12  to that.  And we take the information and we understand it.  We

13  do have an obligation, though, to all of the certificate

14  holders, and we have concerns about confidentiality.  And if we

15  tell one holder how they're going to do, without telling the

16  others, we have a lot of discomfort about that.

17        THE COURT:  Well, I'm focused as much on methodology

18  as the bottom-line numbers.  Whether you have confiden -- I'm

19  not trying to stick my nose in a tent it doesn't belong in, but

20  I think what -- assume -- let's see if we get to the approval

21  today; but if that happens, there are lots of issues that need

22  to try and be resolved consensually.  And consensual resolution

23  requires discussion.  Judge Peck remains available as a

24  mediator, but in a lot of these things the mediator isn't

25  required.  Where I read these objections, and they say they

1    don't understand the PSA --

2              MR. SIEGEL:  We are --

3              THE COURT:  -- they don't think there's enough

4    information -- allocation was one of the issues that was

5    raised.

6              MR. SIEGEL:  We are absolutely prepared, and have in

7    every instance when been asked, met with individual holders to

8    explain what we're doing to them.

9              THE COURT:  Okay.  All right.  Go ahead, Mr. Siegel.

10             MR. SIEGEL:  Okay, now I'm just going to turn to what

11   I think is the one remaining monoline objection, which is the

12   objection of Syncora.  Your Honor, I want to start with this

13   premise:  the major issue that was troubling the trustees

14   throughout the case was how to deal with the competing claims

15   between the monolines and the trusts that they wrapped.  The

16   monolines took the position that since they could assert those

17   claims individually against Ally and ResCap, that they could

18   essentially -- using our words and our legal position --

19   circumvent the waterfall within the document that provided a

20   reimbursement mechanism for the monolines that would have an

21   order of priority of recovery.  Ultimately the way we resolved

22   that -- and we also thought we had arguments under the

23   Bankruptcy Code, which I will not trouble you with right now.

24             In order to resolve this, with respect to those

25   monolines that were performing -- and Syncora is one of the

1   performing monolines -- we simply said that we will not assert

2   the trust claims with respect to the wrapped trusts so long as

3   the monoline is performing, because if the monoline is

4   performing, it means the certificate holders are getting paid.

5   And we thought that --

6        THE COURT:  They're subordinated to the rights of the

7   holders.

8        MR. SIEGEL:  Your Honor, they are subordinated, but

9   they're subordinated subject to the documents that were signed

10   and subject to some bankruptcy law.  But it doesn't matter.

11        THE COURT:  Okay.

12        MR. SIEGEL:  As an economic matter, we determined they

13   were not harmed and, therefore, we can defer those issues to

14   another day.

15        I would suggest to you, Your Honor, that the objection

16   raised by Syncora makes no sense in the context of that,

17   because Syncora's only issue -- to the extent we owe any

18   obligation to the insurer under the circumstances, we met that

19   obligation by agreeing that so long as they were not in default

20   of the agreement, that we would not file a claim that

21   duplicated their claim.  That's what this is about.

22        They spend a lot of time talking about how we're

23   dealing with the unwrapped tranches of the wrapped trusts.  I

24   think the answer to that is that will figure in the calculation

25   overall.  We think it unlikely, because of the size of the rep

1   and warranty claims relative to the size of the trusts and

2   that, generally speaking, the more senior tranches are the

3   wrapped tranches, that there is any way that you could

4   attribute to a junior tranche a recovery on a rep and warranty

5   claim that would be going to a monoline.  But in any event,

6   that will not affect the recovery that Syncora would receive,

7   because we are not competing with Syncora's direct claim.

8           THE COURT:  Syncora -- I mean, part of their objection

9   is that they have servicing claims against GMACM, separate and

10  apart from whatever claims they have regarding the trusts

11  themselves.

12          MR. SIEGEL:  And if they have direct servicing claims,

13  they can assert them; this doesn't prohibit them from doing it.

14  If they think they're entitled to recovery through the trusts

15  on that, they will be treated the way every other trust is.

16          THE COURT:  Before you go any further -- I mean, when

17  I read the Syncora objection, and I read it several times

18  because I wasn't sure on some of the things in it, again, it

19  didn't seem to me -- and I'll hear from Syncora's counsel, I'm

20  sure -- but it didn't seem to me to be an issue for approval of

21  the PSA.  It's one of those areas that I think is going to

22  require further discussion -- I'll leave the word "negotiation"

23  out for now -- it's going to require further discussion and

24  clarification, if the PSA is approved, before we get to a

25  disclosure statement and confirmation hearing, so there's

1   clarity.

2        MR. SIEGEL:  I do think that Syncora has to better

3   understand how they would be treated under the proposed plan.

4        THE COURT:  Okay.

5        MR. SIEGEL:  I also think that in the event they are

6   dissatisfied with their treatment under the proposed plan, they

7   will have standing to argue about their direct claims and that

8   the plan support agreement, and in particular the RMBS

9   trustees' participation in the plan support agreement, has no

10   effect on their ability to make those arguments.

11        THE COURT:  Okay.  Go ahead, Mr. Siegel.  Let's get on

12   and get your evidence in too.  Let's --

13        MR. SIEGEL:  Okay.  Just --

14        THE COURT:  -- try and keep this moving along.

15        MR. SIEGEL:  -- briefly, there are three other

16   objections.  The National Credit Union has made an objection

17   about the proposed findings; we simply believe that our

18   declarations support them.  The U.S. Trustee objected to the

19   fees and expenses of the trustees; I think they didn't --

20        THE COURT:  It's going to be a confirmation issue.

21        MR. SIEGEL:  That's fine.  And --

22        THE COURT:  I think, Mr. Masumoto, you agree with

23   that?  That was your position; it's a confirmation issue?

24        MR. MASUMOTO:  That's right, Your Honor.

25        MR. SIEGEL:  And --

RESIDENTIAL CAPITAL, LLC, et al.                    70

1          THE COURT:  It's a confirmation issue.

2          MR. SIEGEL:  And, Your Honor, with respect to the

3    Monarch-Stonehill reservation of rights, we think that that's

4    simply resolved by the revisions to the order and, as a

5    consequence, we don't need to talk about it.

6          THE COURT:  Okay.

7          MR. SIEGEL:  Finally, Your Honor, I'd like to move the

8    various declarations --

9          THE COURT:  Okay.

10         MR. SIEGEL:  -- into evidence.

11         THE COURT:  Identify them specifically and move them

12   into evidence; we'll see whether --

13         MR. SIEGEL:  Okay.

14         THE COURT:  -- there's anybody cross-examining.

15         MR. SIEGEL:  Your Honor, I will start -- and I am

16   authorized by the other counsel to introduce for each of the

17   trustees their various exhibits; first, the declaration of

18   Robert J. (sic) Major of the Bank of New York.  If Mr. Major

19   was called to testify, he would testify in accordance with the

20   testimony contained in the declaration, and we move for the

21   admission of his declaration as Exhibit A.

22         THE COURT:  I need ECF docket numbers.

23         MR. SIEGEL:  Let me see if it's on here.  These are

24   all attached to the joinder, so I will get the DCF (sic) docket

25   number for the joinder.  Excuse me.

RESIDENTIAL CAPITAL, LLC, et al.                    71

1              It's 3940?

2              Okay, it's docket -- Your Honor, these are all

3     attached --

4              THE COURT:  All as part of 3940?

5              MR. SIEGEL:  -- to 3940, yes.

6              THE COURT:  Okay.

7              MR. SIEGEL:  Thank you, Your Honor.

8              THE COURT:  The Major declaration -- any objections to

9     the Major declaration being admitted into evidence?

10             Hearing none, the Major declaration, Exhibit A, is

11    admitted into evidence.

12         (Declaration of Robert H. Major was hereby received into

13    evidence as RMBS Trustees' Exhibit A, as of this date.)

14             MR. SIEGEL:  Your Honor, I next move for the admission

15    of the Declaration of Brendan Meyer of Deutsche Bank, which

16    is --

17             THE COURT:  Is this B -- Exhibit B?

18             MR. SIEGEL:  This is Exhibit B, yes, Your Honor.

19    Again, if Mr. Meyer were called to testify, he would testify in

20    accordance with the testimony contained in the declaration.

21    And the RMBS trustees move for the admission of his

22    declaration.

23             THE COURT:  Any objection to Exhibit B, the Meyer

24    declaration?

25             All right, it's admitted into evidence.

RESIDENTIAL CAPITAL, LLC, et al.                    72

1        (Declaration of Brendan Meyer was hereby received into

2    evidence as RMBS Trustees' Exhibit B, as of this date.)

3            MR. SIEGEL:  Your Honor, I now move for the admission

4    of the declaration of Fernando Asabedo (ph.) of HSBC, which is

5    attached to 3940 as Exhibit C.  Again, if Mr. Asabedo were

6    called to testify, he would testify in accordance with the

7    testimony contained in the declaration.  And accordingly, the

8    RMBS trustees move for the admission of his declaration.

9            THE COURT:  Any objections to the Asabedo declaration?

10           All right, it's admitted into evidence.

11       (Declaration of Fernando Asabedo (ph.) was hereby received

12   into evidence as RMBS Trustees' Exhibit C, as of this date.)

13           MR. SIEGEL:  Your Honor, I now move for the admission

14   of the declaration of Thomas Musarra of Law Debentures, which

15   is attached as Exhibit D to docket entry 3940.  If Mr. Mussara

16   were called to testify, he would testify in accordance with the

17   testimony contained in the declaration.  And accordingly, the

18   RMBS trustees move for the admission of Mr. Mussara's

19   declaration

20           THE COURT:  Any objections to the Musarra declaration?

21           All right, it's admitted into evidence.

22       (Declaration of Thomas Musarra was hereby received into

23   evidence as RMBS Trustees' Exhibit D, as of this date.)

24           MR. SIEGEL:  Your Honor, I also move for the admission

25   of the declaration of Mamta Scott of U.S. Bank, which is

1   attached to 3940 as Exhibit E.  And if Ms. Scott were called to

2   testify, she would testify in accordance with the testimony

3   contained in the declaration.  And accordingly, the RMBS

4   trustees move for the admission of the declaration of Mamta

5   Scott.

6           THE COURT:  Any objections to the Scott declaration?

7           All right, it's admitted into evidence as well.

8       (Declaration of Mamta Scott was hereby received into

9   evidence as RMBS Trustees' Exhibit E, as of this date.)

10          MR. SIEGEL:  And, Your Honor, I also move for the

11  admission of the declaration of Mary Sohlberg of Wells Fargo,

12  which is attached to 3940 as Exhibit F.  And if Ms. Sohlberg

13  were called to testify, she would testify in accordance with

14  the testimony contained in the declaration.  And accordingly,

15  the RMBS trustees move for the admission of Ms. Sohlberg's

16  declaration

17          THE COURT:  Any objections to the admission of the

18  Sohlberg declaration?

19          MR. SIEGEL:  And, Your Honor, finally, I move for

20  the --

21          THE COURT:  That's admitted into evidence.  Wait for

22  my ruling.

23      (Declaration of Mary Sohlberg was hereby received into

24  evidence as RMBS Trustees' Exhibit F, as of this date.)

25          MR. SIEGEL:  I apologize.

1          THE COURT:  Go ahead.

2          MR. SIEGEL:  It's a long list.

3          Your Honor, I also move for the admission of the

4    affidavit regarding dissemination of notices and information to

5    RMBS trust certificate holders, made by Jose Fraga of The

6    Garden City Group, which is attached as Exhibit G to

7    declarat -- I'm sorry -- to the joinder, docket entry 3940.  If

8    Mr. Fraga were called to testify, he would testify in

9    accordance with the testimony contained in the declaration.

10   And accordingly, the RMBS trustees move for the admission of

11   the affidavit of Mr. Fraga.

12         THE COURT:  Any objections to the Fraga declaration?

13         All right, it's admitted into evidence --

14         MR. SIEGEL:  And --

15         THE COURT:  -- as well.

16      (Affidavit of Jose Fraga was hereby received into evidence

17   as RMBS Trustees' Exhibit G, as of this date.)

18         MR. SIEGEL:  -- Your Honor, I would also state that

19   all of the declarants and the affiant are in the court and

20   available for cross-examination.

21         THE COURT:  I thought we had one on the phone; no?

22         MR. SIEGEL:  If that's true, I --

23         THE COURT:  Mr. Johnson?

24         MR. JOHNSON:  Your Honor, Mike Johnson for Wells

25   Fargo.  Our declarant, I think, just arrived; she may be in the

RESIDENTIAL CAPITAL, LLC, et al.                    75

1    overflow room.

2              THE COURT:  Okay.

3              MR. JOHNSON:  She's a client --

4              THE COURT:  All right.

5              MR. JOHNSON:  -- in today's hearing.

6              THE COURT:  Thank you.

7          (Pause)

8              THE COURT:  Mr. Garrity's going to give you a lesson

9    in evidence, so --

10             MR. SIEGEL:  No -- while he certainly could, that was

11   not the substance of our conversation.

12             Your Honor, actually I'm advised that there has been a

13   recent amendment to the declaration of Brendan Meyer and that,

14   rather than the original declaration, I should be moving to

15   admit the amended declaration of Brendan Meyer.

16             THE COURT:  And do we have an ECF docket number for

17   that?

18             MR. SIEGEL:  Let's see.  Yes.  Well, it's -- no --

19   yes, it is; it's document 3980.

20             THE COURT:  3980.  Okay.

21             MR. GARRITY:  Your Honor, excuse me.

22             THE COURT:  Go ahead.

23             MR. GARRITY:  Jim Garrity from Morgan Lewis.  Just to

24   put a finer point on it, it is -- just what we did was we

25   amended the schedule that was attached to Mr. Meyer's

RESIDENTIAL CAPITAL, LLC, et al.                    76

1  declaration.  So we'd ask Your Honor to consider both the

2  declaration and the amendment as his testimony.

3          THE COURT:  All right.

4          MR. GARRITY:  Thank you very much, Mr. Garrity.

5          MR. SIEGEL:  And, Your Honor, what I would like to do

6  is to --

7          THE COURT:  Any objections to the amended declar -- as

8  the amended -- as the schedule?

9          All right, it's in evidence.

10      (Amended schedule attached to declaration of Brendan Meyer

11  was hereby received into evidence as an RMBS Trustees' exhibit,

12  as of this date.)

13          MR. SIEGEL:  Your Honor, what I'd like to do is hand

14  up the various declarations --

15          THE COURT:  Please.

16          MR. SIEGEL:  -- to you.

17          THE COURT:  Thank you.  Thank you.

18          All right, does anybody wish to cross-examine any of

19  the declarants' Exhibits A through G?  Please --

20          MR. FELDMAN:  Thank you.

21          THE COURT:  -- come on up.  Tell me who you are and

22  who you want to cross-examine.

23          MR. FELDMAN:  I want to make a brief -- very brief

24  clarification which I think is important even though it's

25  not --

RESIDENTIAL CAPITAL, LLC, et al.                    77

1            THE COURT:  Tell me who you are, first.

2            MR. FELDMAN:  David Feldman, Gibson Dunn, on behalf of

3    Amherst Advisory.

4            THE COURT:  Sure.  Go ahead, Mr. Feldman.

5            MR. FELDMAN:  And I think one major point and that

6    perhaps I assume Mr. Siegel's unaware of -- although pretty

7    much every other counsel, I think, up at the two front tables

8    were aware and didn't correct the record -- is that Amherst

9    Advisory, on behalf of the RALI Series 2006, '07 trust did in

10   fact deliver direction to Deutsche Bank, our trustee,

11   yesterday, to opt out of the plan support agreement.

12   Mr. Siegel made reference to five HSBC trusts that they

13   didn't -- they weren't sure there were rep and warranty claims.

14   Our trust has a 1.5 billion dollar original face amount, which

15   clearly has rep and warranty issues, and our client is probably

16   the most significant holder of that trust.  And we, in fact,

17   delivered a direction to Deutsche Bank, which they've

18   acknowledged is valid.

19            You asked a question specifically about my client,

20   which is, do they have standing to object.  Mr. Siegel, who's a

21   very talented and clever lawyer, said, 'Yes, they object' --

22   'they have standing to object today,' but what he also said

23   earlier in his statements was that, once the PSA is approved,

24   the trustees' position is that all the certificate holders will

25   not having standing to object to confirmation.

1          THE COURT:  That's what --

2          MR. FELDMAN:  And --

3          THE COURT:  -- prompted me to ask the question,

4    because he -- his statement earlier about --

5          MR. FELDMAN:  And so --

6          THE COURT:  -- lack of standing --

7          MR. FELDMAN:  -- so I'm not here on --

8          THE COURT:  Why don't I only deal with the issues I

9    have today --

10         MR. FELDMAN:  No --

11         THE COURT:  -- and --

12         MR. FELDMAN:  So I'm not here on behalf of any other

13   certificate holder other than Amherst.  But given that we have

14   in fact satisfied the requirement of 5.2(c) of the plan support

15   agreement, I wanted to make that clear for the record, because

16   I think you'll hear from us again later in the hearing, in that

17   regard, that we believe, given that we have satisfied that

18   condition and our trustee believes, given we have -- that we

19   have satisfied that condition, that we will have standing and

20   do intend to object to confirmation --

21         THE COURT:  Okay.

22         MR. FELDMAN:  -- on the substantive issues.

23         THE COURT:  I'm dealing with the issues I have today.

24   Thank you, Mr. Feldman.

25         MR. FELDMAN:  Thank you.

1         THE COURT:  All right, does anybody wish to cross-

2    examine any of the declarants?  Somebody's coming up.  So we're

3    talking about Major, Meyer, Asabedo, Musarra, Scott, Sohlberg

4    and Fraga.

5         MR. DEFILIPPO:  Good morning, Your Honor.  Paul

6    DeFilippo, for Syncora.  I really have a procedural question,

7    and that is, if we forego cross-examination --

8         THE COURT:  Sure.

9         MR. DEFILIPPO:  -- today, would we be permitted to

10   cross-examine these witnesses at a later date?

11        THE COURT:  I don't know what you mean by "a later

12   date", but what I'm doing today isn't binding anybody with

13   respect to confirmation.  So -- or disclosure statement

14   hearing.  So you're not waiving any rights you have at a

15   subsequent hearing.  Does that answer your question?

16        MR. DEFILIPPO:  Yes, it does, Your Honor.  And we see

17   no need to cross-examine today.

18        THE COURT:  Okay.  Thank you.

19        Mr. Sie --

20        MR. SIEGEL:  Your Honor, I appreciate that we're kind

21   of going a little out of order here but, given the state --

22        THE COURT:  Could I just find out whether anybody

23   wants to cross-examine any of these declarants?

24        MR. SIEGEL:  Oh, I thought that was --

25        THE COURT:  That was my question.

1          MR. SIEGEL:  I'm sorry.

2          THE COURT:  I still -- okay.  No one has expressed a

3    desire to cross-examine, so those witnesses' testimony is

4    closed.

5          Go ahead, Mr. Siegel.

6          MR. SIEGEL:  While I would defer to Mr. Garrity in

7    detail with respect to Amherst, since it's a Deutsche Bank

8    trust, I just want to clarify at least what our view is

9    generally.  If in fact Amherst provided a direction to Deutsche

10   Bank that is determined to be valid, that means that the trust

11   itself is no longer controlled by the trustee but is rather

12   controlled by the directing holder.  Under the terms of the

13   plan support agreement, that would entitle the trustee to

14   withdraw that trust from the PSA, which would mean Amherst,

15   acting through that trust, would have all rights to object to

16   confirmation, to object to the disclosure statement, and so

17   forth.  That may be the perceived inconsistency between what I

18   said earlier in the argument and what I said later in the

19   argument.  But that's all I wanted to clarify.

20         THE COURT:  Thank you, Mr. Siegel.

21         All right, are there any other proponent of the PSA

22   who desires to offer any evidence in support of it?

23         All right.  Does anybody else wish to speak in support

24   of the PSA?

25         MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

1    Eckstein of Kramer Levin, on behalf of the official creditors'
2    committee.  I couldn't resist at least getting up and
3    introducing myself at the podium today.  But I honestly --
4         THE COURT:  As if anybody in this courtroom doesn't
5    know who you are, but, you know.
6         MR. ECKSTEIN:  But I honestly don't have that much
7    more to add at this point in time.  I think Mr. Lee covered
8    quite comprehensively the presentation.  Given the fact that
9    there is no cross-examination of the evidence, I might suggest
10   that it'd be most efficient, if people want to raise
11   specific --
12        THE COURT:  Well, here's --
13        MR. ECKSTEIN:  -- issues or objections --
14        THE COURT:  -- what I'm going to do, Mr. Eckstein:
15   After those speaking in support have had their chance, I'm
16   going to ask whether the proponents rest.  Then I'm going to
17   ask the objectors whether they wish to offer any evidence in
18   opposition; and if not, they will rest, at which point I will
19   hear any arguments.  But I want to get the evidence in and
20   closed.  Okay?
21        MR. ECKSTEIN:  That would be fine, Your Honor.
22        THE COURT:  Okay.
23        MR. ECKSTEIN:  Thank you.
24        THE COURT:  All right.  I didn't mean to cut you off.
25   Is there anything else you want to say, Mr. Eckstein?  You're

1    welcome.

2             MR. ECKSTEIN:  I will wait until --

3             THE COURT:  Okay.

4             MR. ECKSTEIN:  -- there's a next round.

5             THE COURT:  Okay.  All right.

6             MS. PATRICK:  May it please the Court.  Kathy Patrick

7    for the steering committee of RMBS holders.  As the Court

8    knows, our clients are the largest group of RMBS holders.  We

9    have filed a pleading in support of the plan support agreement.

10   Collectively, our clients hold twelve billion dollars of these

11   trusts.  And as stated in our pleadings, we support the

12   findings requested by the trustees; they are abundantly

13   supported in the evidence, not just by the record of the

14   mediation but by the terms of the underlying contracts that are

15   at issue.  And that's a point I think that should not be lost

16   here.

17             It is clearly true that the trustees own the claims

18   that are at issue in the RMBS trusts' cases.  It is equally

19   true, though sometimes lost in the shuffle of certificate

20   holder agitation, that the trustees are not required to assume

21   financial risk or liability to discharge their obligations in

22   connection with those pooling and servicing agreements.

23             Therefore, the findings are supported not just by the

24   trustees' actions here and by the abundant reasonableness of

25   the settlement; they are supported by the very contracts in

RESIDENTIAL CAPITAL, LLC, et al.                    83

 1   question, because the trustees are not required to proceed with

 2   this plan support agreement if they, in doing so, are exposing

 3   themselves to any claim of liability.  And I rise to make that

 4   point because it is a point of deep importance to our client,

 5   who have tried very hard over the last several years to work

 6   cooperatively with trustees not just in this case but in

 7   others, as the Court knows.  And the confusion around what the

 8   trustees are and are not required to do is important here.

 9   This is, in other words, not an extraordinary request by the

10   trustees; it is a request and an entitlement that every

11   certificate holder agreed to when they purchased these

12   securities.

13           Separately, I want the Court to know that this has

14   been the process -- this has been carefully evaluated.  You've

15   got the evidence in the 9019 record, but there are some things

16   that should not be lost there, as well.

17           THE COURT:  You say "in the 9019 record".  What I have

18   today is the PSA hearing; I've got evidence on that.  I don't

19   have the 9 -- this is not a 9019 --

20           MS. PATRICK:  Correct, Your Honor, but the statistical

21   evidence that has been submitted by the trustees in their

22   declaration is the evidence that was put together in the 9019

23   record.  So --

24           THE COURT:  Yes.

25           MS. PATRICK:  -- that was --

1          THE COURT:  You're referring to the -- what the --

2          MS. PATRICK:  -- was short-handing --

3          THE COURT:  -- the first go-round and --

4          MS. PATRICK:  The first go-round --

5          THE COURT:  Yes.

6          MS. PATRICK:  -- that got picked up and affirmed in

7    the declarations --

8          THE COURT:  All right.  Okay.

9          MS. PATRICK:  -- the Court has just --

10         THE COURT:  Yes.

11         MS. PATRICK:  -- received in evidence.  The --

12         THE COURT:  This is the Duff & Phelps --

13         MS. PATRICK:  Correct.

14         THE COURT:  -- valuation; they sampled something over

15   6,500 loans, they estimated future losses, is what they did.

16         MS. PATRICK:  Correct.  And according to those -- to

17   that record that is before the Court, the RMBS trusts' claims

18   are between -- are north of seven billion dollars; could be

19   even higher.  And it is unquestionably true that in the absence

20   of an RMBS trust settlement, the Ally contribution is a

21   nonevent; it will not happen.  And in that event, the debtors

22   plainly lack the resources to respond, and that affects not

23   just the certificate holders whose best interest is at stake in

24   this finding that the trustees have requested; it also affects

25   every unsecured creditor, and protects potentially every

1  secured creditor because the trusts have cure claims.

2          And so this is a circumstance in which we would

3  suggest that the perfect not be permitted to become the enemy

4  of the merely good.  And what I would say is the merely

5  outstanding result here from the work of the creditors'

6  committee, which led those negotiations with Ally, the

7  trustees, everybody worked very hard, and it is quite an

8  achievement --

9          THE COURT:  I've always believed that the best

10 settlements are the ones when no one is particularly happy.

11         MS. PATRICK:  Yes.

12         THE COURT:  It's --

13         MS. PATRICK:  Well, we're not -- yeah, let's just

14 leave it there.

15         THE COURT:  You're not unhappy, I know that,

16 Ms. Patrick.  But --

17         MS. PATRICK:  We'd be -- I'm here to say that we

18 support --

19         THE COURT:  Yes, I understand.

20         MS. PATRICK:  -- the settlement.

21         The other thing I will address, Your Honor, is the

22 allocation formula.  The allocation formula originally was the

23 allocation formula that was used in the Bank of America

24 settlement.  Based on the objection of Amherst, it was revised

25 based on a sampling that was done by Duff & Phelps.  That

RESIDENTIAL CAPITAL, LLC, et al.                    86

1   revised allocation formula was disclosed in an amendment to the

2   9019 motion; it is not unknown to the certificate holders; it

3   has been out there for, I believe, several months at this

4   point.

5           But more important, the trustees have been clear that

6   the disclosure statement will include not just the allocation

7   formula but also a pro forma allocation.  Obviously, a lot is

8   contingent on the liquidation of assets, but it's not the case

9   the certificate holders will not know.

10          And with that, Your Honor, I'll conclude --

11          THE COURT:  Thank you very much --

12          MS. PATRICK:  -- my remarks.

13          THE COURT:  -- Ms. Patrick.

14          Others speaking in support of the PSA?

15          MR. CAHN:  Good morning, Your Honor.  Aaron Cahn,

16  Carter Ledyard & Milburn, for the Talcott Franklin group of

17  RMBS investors.  We are the other significant investor group.

18  We have not filed a pleading in support of the -- of this

19  motion, because, among other things, as Your Honor indicated,

20  you've got enough paper already.

21          We represent fifty-five individual institutional

22  clients, for the most part, that have controlling interest as

23  to, say, twenty-five percent interest in 189 out of the

24  original 392 trusts that were the subject of the RMBS 9019

25  settlement.  With the exception of one client who has filed a

RESIDENTIAL CAPITAL, LLC, et al.                    87

1   limited objection with respect to the FGIC issue, all of our

2   clients have either indicated positively their support for the

3   settlement or have not raised any objection, not told us not to

4   go forward and make this statement this morning.

5           So that's all I wanted to say.  I wanted to let you

6   know that, between the two groups of organized investors in

7   this case, we both support the settlement and urge Your Honor's

8   approval.

9           THE COURT:  Thank you, Mr. Cahn.

10          Anyone else wish to speak in support of the PSA?

11          MR. FLANIGAN:  Good morning -- pardon me.  Good

12  morning, Your Honor.  Dan Flanigan representing Rowena Drennan.

13  Ms. Drennan is the only borrower represented on the creditors'

14  committee and is one of the named plaintiffs in one of the --

15  in a putative class action in the Western District of

16  Pennsylvania, involving 45,000 borrowers.

17          The case has been going on for thirteen years.  You've

18  heard of the hundred-years war and the seven-years war, and we

19  have the thirteen-years war.  And we hope it will soon be

20  resolved by a settlement agreement.  The allegations there

21  involve an alleged scheme to violate, and did violate RESPA,

22  TILA, HOEPA, and RICO.

23          We've had a pending 7023 motion on for a while, filed

24  a class proof of claim in the amount of two billion dollars,

25  and by mutual agreement with the debtor and the committee have

1   adjourned the hearing on our 7023 motion in order to engage in

2   settlement negotiations over the course of several months.  We

3   participated in the mediation but ended up being the only one

4   of the consenting claimants -- and we are a consenting

5   claimant, at least at the moment -- whose claim was not dealt

6   with, treated, established at that time.

7           So there are some conditions to our continuing

8   support.  Those conditions are on page 10 of the supplemental

9   term sheet, number 8.  One of those conditions is that a

10  written settlement agreement have been entered into by June 24,

11  2013.  We haven't made that.  Everybody's been working very

12  hard on it, but we're not there.  We have continued

13  that -- or extended that condition day by day.  We hope to

14  achieve final settlement tonight, but if it doesn't happen,

15  unfortunately, we may be in an objecting position but very

16  optimistic that it will be dealt with.  And on that basis, we

17  support the agreement.

18          THE COURT:  Thank you, Mr. Flanigan.

19          MR. FLANIGAN:  Thank you.

20          THE COURT:  Anyone else wish to speak in support?

21          All right.  Let me hear from objectors.  First let me

22  find out, are any of the objectors -- do they intend to offer

23  any evidence in opposition?

24          MR. BUSH:  Yes, Your Honor.  Graeme Bush.

25          THE COURT:  Come up -- come on up.  Let's go.  If

1   you're going to offer evidence, let's get it in, okay?

2          MR. BUSH:  Sure.

3          THE COURT:  Tell me your name again.  I'm sorry.  I

4   couldn't hear you in the back.

5          MR. BUSH:  Yeah.  My name is Graeme Bush.  I'm from

6   Zuckerman Spaeder, and I represent the National Credit Union

7   Administration Board which is the liquidating agent for two

8   national credit unions that failed primarily as a result of

9   their investments in --

10          THE COURT:  Sure.

11          MR. BUSH:  -- RMBS.  And we have filed an objection to

12   the plan support agreement.  We've raised essentially two

13   issues.  One is with respect to the findings that the Court is

14   being asked to make, and some of these have been resolved.  One

15   in particular in paragraph 10, we reached an agreement with the

16   consenting claimants on the amendment to that particular

17   provision, but there remains in the prefatory language to the

18   order some findings that we do not believe they are supported

19   in the record, and that is on the first page of -- these remain

20   on the first page of the proposed order.

21          THE COURT:  The first page is not findings.

22          MR. BUSH:  It's not, but it says, "the Court having

23   found that the relief requested in the motion is in the best

24   interest of the debtors' estates, their creditors, the

25   institutional investors, the investors in each RMBS trust, et

RESIDENTIAL CAPITAL, LLC, et al.                    90

1    cetera" --

2              THE COURT:  Okay.  Let me ask this question.  Are you

3    offering any evidence?

4              MR. BUSH:  Yes, I am.

5              THE COURT:  Could you do that?

6              MR. BUSH:  I'd be happy to.  In response to -- or as

7    a -- in support of our objection, there is a declaration from

8    Mr. Nelson Cohen, and this is document 4020-1, and I would

9    offer that into evidence.

10             THE COURT:  All right.  Any objections to the

11   declaration of Nelson Cohen?

12             Yes.

13             Do you have an additional copy, by any chance?  And

14   I've read it.  I --

15             MR. BUSH:  I can give you my copy.  I --

16             THE COURT:  I don't -- finding it is --

17             MR. BUSH:  Yes, I understand that.

18             THE COURT:  -- a little more challenging.

19             MR. BUSH:  I'd be happy to give you my copy, Your

20   Honor.

21             THE COURT:  I'll give it back to you.  Just let me

22   look at it.  Come on up.

23             Thank you very much.  I'll give it back to you.

24             Okay.  I can give it back.  I read it, and I'm

25   familiar with the contents of it.  Thank you very much.

RESIDENTIAL CAPITAL, LLC, et al.                    91

1          MR. BUSH:  You're welcome, Your Honor.

2          THE COURT:  Mr. Eckstein or -- do you have any

3    objections to the declaration?

4          MR. ECKSTEIN:  Your Honor, one moment.

5          THE COURT:  All right.  I hear no objection.  It's in

6    evidence.

7        (Cohen declaration was hereby received in evidence as

8    Creditor's Exhibit 4020-1, as of this date.)

9          THE COURT:  Go ahead, Mr. Bush.

10         MR. BUSH:  Would you like me to continue?

11         THE COURT:  Yes.  Go ahead.

12         MR. BUSH:  Okay.  So as I was saying, we have the

13   objections to the proposed form of order and in particular

14   on the first page at the bottom, I already read the first part

15   of it, but the second part says, the Court having found that

16   each of the parties -- and going on to the next

17   page -- to the agreement, including the RMBS trustees have

18   acted reasonably in good faith and in the best interests of

19   their respective constituencies in entering into the agreement.

20   And I recognize that there isn't a specific numbered finding

21   after that, but that language suggests that it is a finding,

22   and we do not believe that's supported in the record.

23         THE COURT:  Well, okay.

24         MR. BUSH:  It's particularly not supported with

25   respect to the NCUA.

1      THE COURT:  The Cohen declaration, the gist of it is

2  that Mr. Cohen asserts that he tried to get some clarity from

3  Mr. Kruger and the debtors and the committee with respect to

4  the treatment of your client's claim and why it's being treated

5  as it is.  There's going -- there clearly -- what I read your

6  objection doing is raising a confirmation plan classification

7  issue.  You say that you filed, I don't know, what, ten proofs

8  of claim against the debtor, whether that -- I don't

9  remember --

10      MR. BUSH:  I think it's eleven.

11      THE COURT:  Okay, eleven proofs of claim against the

12  debtor.

13      MR. BUSH:  I won't quibble with you.

14      THE COURT:  You have a draft of a complaint against

15  AFI but have not filed it, and you don't know why your client

16  is being treated differently.  It doesn't -- at least, as the

17  PSA would provide, it wouldn't be treated as part of the

18  private securities litigation trust.

19      MR. BUSH:  That's right.

20      THE COURT:  Do I have that right?

21      MR. BUSH:  That's right, but that trust has 200 and --

22      THE COURT:  220-some-odd million dollars --

23      MR. BUSH:  -- some-odd million dollars.

24      THE COURT:  -- a lot of money.

25      MR. BUSH:  And the general unsecured --

RESIDENTIAL CAPITAL, LLC, et al.                    93

1              THE COURT:  I know.

2              MR. BUSH:  -- pot is about nineteen million --

3              THE COURT:  Okay.

4              MR. BUSH:  -- which is where we'd be relegated.

5              THE COURT:  And you will, no doubt -- unless the

6    issues resolve, you're going to have a confirmation issue.

7    Okay.  I note, and it's not reflected in the -- I don't think

8    this was reflected in the reply that the debtors filed, but I

9    saw a couple of days ago that the debtors filed an objection to

10   your client's claims in the Chapter 11 case arguing they're all

11   time barred.

12             MR. BUSH:  That's correct, but --

13             THE COURT:  And that's on for a hearing later in July.

14             MR. BUSH:  I understand.

15             THE COURT:  So I don't know -- look, by the time we

16   get the confirmation, you may not have any claims at all.

17             MR. BUSH:  But the point is, Your Honor, that our

18   claims are being treated differently and discriminated against

19   compared to --

20             THE COURT:  No, they're being treated differently.

21   Whether they're being discriminated against, we'll find out at

22   the time of confirmation.

23             MR. BUSH:  We will find out, but the other claims in

24   the private securities litigation trust, those claimants have a

25   private settlement in which their claimants are allowed.

1    Nobody is challenging or objecting to the claims.  And the

2    arguments against those claims are exactly the same.

3              THE COURT:  You have the right to deal with your

4    clients' claims and argue that it's not a proper classification

5    for them to be excluded from the private securities litigation

6    trust.  And in due course, at the time of confirmation, if

7    that's objection is still extant, the Court will resolve it.

8    What I know is that on July 24th or something about then, on

9    the calendar is the debtors' objection to your eleven proofs of

10   claim in this case, arguing they're all time barred.  I don't

11   know whether they are or not.  So -- but that's what -- you

12   know, I read your objection carefully.

13             I focused on it as clearly raises classification

14   issue.  Okay.  I don't see how that goes to a finding of good

15   faith on the part of the supporting parties -- the debtor and

16   the supporting parties to the PSA.  That doesn't mean, to be

17   clear, that a plan on those terms will be confirmed, and if you

18   have a valid classification issue and they can't justify why

19   you were not included within the classification, the Court will

20   rule accordingly.  But I'm going to take it one step at a time.

21   The step today -- I don't see how the fact that you don't like

22   the classification because your client doesn't get to

23   participate in the 220 million dollar securities litigation

24   trust.  There are lots of creditors what aren't going to be

25   happy here, but that doesn't make what the supporting parties

1   have done improper.

2           MR. BUSH:  Right.

3           THE COURT:  It may make it unconfirmable, but I don't

4   know that.

5           MR. BUSH:  But the finding is that the constituents

6   have been fairly represented by whoever was representing them

7   in the negotiations, and what I'm saying is that as a

8   securities claimant with nontime-barred claims against the

9   debtor and nontime-barred --

10          THE COURT:  Whose constituency does your client fall

11  in?

12          MR. BUSH:  Apparently none.  Apparently --

13          THE COURT:  Well --

14          MR. BUSH:  -- nobody was representing us, but

15  somebody --

16          THE COURT:  Then I guess you don't have to worry about

17  it because what --

18          MR. BUSH:  But somebody --

19          THE COURT:  -- what this says -- stop.  What this says

20  is that each of the parties to the agreement -- I'm leaving

21  some words out -- in the best interests of their respective

22  constituencies.  I guess they don't consider you part of their

23  constituency, so we'll take it at the time -- I mean, your

24  issue is -- and I did -- I made a list of what I thought were

25  confirmation issues.  Yours was right on there, okay?

1        MR. BUSH:  Sure.

2        THE COURT:  And I did read the Cohen declaration, and

3   I asked myself why were you treated differently.  Then I read

4   the objection to the eleven proofs of claim that were filed in

5   this case arguing that they're time barred.  I don't know

6   whether they are time barred or not.  In an appropriate time,

7   the Court will deal with that.  So I have your point.

8        Any other evidence you wish to offer?

9        MR. BUSH:  No, Your Honor.  Thank you.

10       THE COURT:  All right.  Are there any other objectors

11  who wish offer any evidence in opposition to the PSA?

12       Hearing no one, the objectors have rested.

13       Is there any additional evidence that the proponents

14  wish to offer?

15       MR. KERR:  Charles Kerr on behalf of debtors.  We have

16  no further evidence, Your Honor.

17       THE COURT:  All right.  Evidence is closed.

18       All right.  What I'd like to do now is hear from the

19  objector's counsel for argument, and then I'll give the

20  proponents an opportunity to respond.

21       Let's take a short recess.  We're not going to take a

22  lunch recess at this point.  We're going to take a fifteen-

23  minute recess and resume.  Okay.

24     (Recess from 11:55 a.m. until 12:18 p.m.)

25       THE COURT:  Please be seated.

1          All right.  Any other objectors wish to be heard?

2          Come on up.  Mr. Reed, do I have that right?

3          MR. REED:  Your Honor, you remember well.  Frank Reed,

4    creditor pro se.  I --

5          THE COURT:  So you ought to be happy, Mr. Reed, that

6    the debtor announced at the start of the hearing today that

7    they've reached an agreement with the FRB.  That was part of

8    your objection.

9          MR. REED:  Oh, I'm thrilled to death, Your Honor.

10   Actually, I'll be reserving my objection to that confirmation

11   of that modified consent decree for that up-and-coming hearing

12   that was mentioned earlier.  And I'd like to just make clear

13   for the record that my objections that will be heard at that

14   time are not to the Federal Reserve's authority to regulate the

15   debtor, but the debtors' ability to voluntarily submit to or

16   agree to the regulating authority of the Federal Reserve.

17         THE COURT:  You think it was voluntary?

18         MR. REED:  Well, that's what a consent decree is, Your

19   Honor, and a modification of a consent decree.  A consent

20   decree is a multilateral or bilateral agreement.  There's arm-

21   twisting.

22         THE COURT:  Do you know that the FRB was one of AFI's

23   principal regulators, and it gave them jurisdiction not only

24   over Ally Bank but over the entire corporate family?

25         MR. REED:  Yeah, yes, Your Honor.  And -- and I'm

RESIDENTIAL CAPITAL, LLC, et al.                    98

1    not -- I'm not and will not oppose that regulating authority or

2    their authority to unilaterally enforce that authority, but --

3    well, I guess I'll be supplying further documents --

4              THE COURT:  Let me put it this way, Mr. Reed.  Let's

5    take it up when I have the proposal to approve an amended

6    agreement with the FRB.

7              MR. REED:  That sounds great.

8              THE COURT:  Okay.  Thank you very much.

9              MR. REED:  All right.

10             THE COURT:  All right.  Who else wants to be heard?

11             MR. GOTTO:  Good afternoon, Your Honor.  Gary Gotto,

12   Keller Rohrback, for the Federal Home Loan Banks.

13             THE COURT:  Just tell me your last name again.

14             MR. GOTTO:  Gotto, G-O-T-T-O.

15             THE COURT:  Thank you.

16             MR. GOTTO:  Represent the Federal Home Loan Banks of

17   Chicago, Indianapolis, and Boston.  And Your Honor, very

18   briefly, I -- frankly, with the revisions to the form of order

19   and Your Honor's comments this morning, as I understand the

20   procedural posture at this point, the approval, the order

21   that's being sought would not have any preclusive effect on my

22   clients' abilities to assert their objections to disclosure

23   statement or plan confirmation.  And I raise -- really, my only

24   cause for some hesitance was commentary made by Mr. Siegel

25   regarding the rights of investors at RMBS trusts since my

RESIDENTIAL CAPITAL, LLC, et al.                    99

1  clients are, of course, investors in RMBS trusts, but they are

2  also independent securities claimants against Ally and various

3  residential funding entities.

4          So Your Honor, as long as there's no suggestion that

5  my clients' rights to assert those objections in the disclosure

6  statement and plan confirmation process would be compromised,

7  we have no problem reserving our objections for those

8  proceedings.

9          THE COURT:  Okay.  I mean, your primary objection, you

10 argued that the heightened scrutiny at Innkeepers applied to

11 the standards that the Court has to consider that was --

12         MR. GOTTO:  And Your Honor, we're objecting to the --

13 ultimately to the third-party release that's contemplated by

14 the plan but --

15         THE COURT:  Yeah.  And that's clearly going to be a

16 plan confirmation hearing, unquestionably.

17         MR. GOTTO:  And as long as we can assert that at that

18 time, Your Honor --

19         THE COURT:  You can.

20         MR. GOTTO:  -- we're fine.

21         THE COURT:  Thank you, Mr. Gotto.

22         MR. GOTTO:  Thank you, Your Honor.

23         THE COURT:  All right.  Other objectors' counsel wish

24 to be heard?

25         Mr. Golden.

RESIDENTIAL CAPITAL, LLC, et al.                    100

1           MR. GOLDEN:  Morning, Your Honor.  Daniel Golden, Akin
2   Gump Strauss Hauer & Feld, counsel for UMB Bank.  Your Honor,
3   in the joinder to the statement and reservation of rights filed
4   by the ad hoc junior secured noteholders group, UMB Bank, as
5   the successor indenture trustee made two things perfectly
6   clear.  Number one, UMB had no objection to the entry of an
7   order authorizing the debtors to enter into and perform under
8   the plan support agreement; and number two, UMB had no
9   objection to such approval order determining that neither the
10  debtors' entry into or the performance under the PSA would
11  constitute a violation of Section 1125(b) of the Bankruptcy
12  Code.
13          Frankly, Your Honor, from our --
14          THE COURT:  This is not a disclosure statement; this
15  is a PSA and --
16          MR. GOLDEN:  Right, but they did want a finding, and I
17  understand it.  We've drafted our other PSAs and presented to
18  the Court that there was no improper solicitation --
19          THE COURT:  Right.
20          MR. GOLDEN:  -- in connection with the negotiations
21  surrounding it and leading up to the PSA.
22          Frankly, Your Honor, from our perspective, that should
23  have been the end of the dispute concerning the form of the
24  proposed order, but it's not.  The PSA motion also seeks
25  certain affirmative findings in connection with the RMBS

RESIDENTIAL CAPITAL, LLC, et al.                    101

1    trustees' entry into the plan support agreement, citing Section
2    5.2(d) of the plan support agreement.  And you've heard this
3    morning from Mr. Lee who indicated very early in his
4    presentation that these limited good-faith findings were
5    necessary to facilitate the RMBS trustees entering into the
6    plan support agreement.  And in the words of the official
7    creditors committee at page 3 of their reply, they say,
8    "certain limited good-faith findings necessary to facilitate
9    the RMBS trustees entering into the plan support agreement."
10          So, Your Honor, let's turn to Section 5.2(d) of the
11   plan support agreement.  It's at page 14, I think you've been
12   handed up a copy --
13          THE COURT:  All right.
14          MR. GOLDEN:  -- I think it's Debtors' Exhibit 2, and
15   see what that section really requires.  And I'm going to try --
16          THE COURT:  Let me turn there, okay?
17          MR. GOLDEN:  -- and quote it leaving out the parts
18   that aren't relevant for today's dispute where it provides,
19   "The PSA order shall include affirmative findings reasonably
20   acceptable to the RMBS trustees that this agreement" --
21   referring to the PSA agreement -- "is in the best interests of
22   investors, that the RMBS trustees acted in good faith and the
23   best interests of the investors in agreeing to this agreement,"
24   and it goes on towards the end, "provided, however, that the
25   findings in such orders shall be binding solely in connection

RESIDENTIAL CAPITAL, LLC, et al.                    102

1    with the RMBS trustees and the RMBS trusts and the actions of

2    the RMBS trusts and the RMBS trustees with respect to this

3    agreement."

4           Now, leaving aside the question of whether this court

5    has the power, and indeed if it determines it has the power,

6    whether it's appropriate to make the findings as it relates to

7    the RMBS trustees and the trusts, and there was quite a bit of

8    colloquy about that with Mr. Siegel, that's not UMB's fight.

9    We don't raise that.  It doesn't concern us.  We never raised

10   an objection to those findings.  But what is absolutely clear,

11   that there is nothing about Section 5.2(d) that requires a

12   finding that the plan support agreement -- and there they're

13   defining plan support agreement is not only the plan support

14   agreement itself but the two related plan term sheets -- are in

15   the "best interests of the debtors' estates and their

16   creditors", and yet that is exactly what the debtors are asking

17   this Court to find in their final form of proposed order, and

18   not only in their final form of proposed order, in every form

19   of proposed order, the initial one attached to their motion,

20   the two subsequent ones that were filed, and the one that was

21   filed earlier this morning.

22          It is this inconsistency and whenever intended or

23   unintended consequences that may flow from this -- I'll call it

24   overly ambitious drafting by the debtors, is what led UMB to

25   attach its own form of proposed order approving the PSA, and we

1     attached a copy of that former proposed order to our joinder.

2             And Your Honor, if you don't have a copy of it, I'm

3     happy to provide one to --

4             THE COURT:  I have a copy --

5             MR. GOLDEN:  Okay.

6             THE COURT:  -- but I'm finding it would be a different

7     story.

8             MR. GOLDEN:  May I approach?

9             THE COURT:  Please.  Thank you.

10            MR. GOLDEN:  The UMB proposed form of order does two

11    things.  It limits the "best interest finding" relating to the

12    plan support agreement to what is actually required by Section

13    5.2(d).  It relates only to the RMBS trustees, the RMBS trusts,

14    and their respective investors.  It also includes a broad

15    reservation of rights with respect to the upcoming disclosure

16    statement, plan, any proceeding that seeks to approve or

17    implement the terms of the plan support agreement, and the two

18    adversary proceedings commenced against the JSNs, one by the

19    committee, one by the debtor.

20            While the debtors' final form of proposed order has

21    now -- has gone through several variations.  It now adoptS --

22    and I appreciate the adoption -- of the UMB broad form of

23    reservation of rights.  But that final form of proposed order

24    by the debtors are still insisting on a findings from this

25    Court that the plan support agreement and the two related term

1   sheets are in the best interests of the debtors' estates and

2   their creditors.  There is no reason at this stage that they

3   need such a finding.

4           THE COURT:  Look, they spent seven months in mediation

5   with Judge Peck.  They came to a very large number of

6   compromises and settlements to try and resolve the myriad of

7   issues that the parties in this case have faced.  When, in the

8   Kruger declaration and the other evidence that I have before

9   me, I don't see what is at all questionable about their view

10  that they believe that the settlements and agreements

11  contemplated in the PSA and the two term sheets are in the best

12  interests of the debtor and the estates.  I mean, I'm missing,

13  something, Mr. Golden.

14          MR. GOLDEN:  Okay.  Well --

15          THE COURT:  It seems very fundamental that that's a

16  conclusion that they've reached and the evidence before me

17  supports, doesn't preclude anybody from challenging whether

18  everything that's in these term sheets can be confirmed or not,

19  that's a different issue.

20          MR. GOLDEN:  Okay.  I understand that, Your Honor, and

21  I recognize that to some extent we are all dancing on the head

22  of a pin here.  But it's not just the UMB saying --

23          THE COURT:  Don't dance on the head of a pin.

24          MR. GOLDEN:  But it's the --

25          THE COURT:  I'll deal with it when we get to the

RESIDENTIAL CAPITAL, LLC, et al.                    105

1    confirmation hearing.

2          MR. GOLDEN:  But, Your Honor, there -- there --

3          THE COURT:  I don't understand your point.

4          MR. GOLDEN:  I'm -- I'll try to explain it better

5    then, Your Honor.  These plan support agreements, they're not

6    just an ordinary garden-variety settlement agreement where the

7    debtor wants a finding for best interests of the estates.

8    These go to the very heart of the plan of reorganization that's

9    going to be filed.  They don't need this finding of best

10   interests at this point.  They will need --

11         THE COURT:  Tell me why the evidence doesn't support

12   the finding, whether you personally think they don't need it,

13   okay.  I have evidence before me, I think they've put in -- the

14   evidence is now closed.  My take-away -- I have read all the

15   declarations before coming to court -- to the hearing, and my

16   take-away from the evidence is that they have supported the

17   debtors' good faith in entering into the PSA and the belief

18   that -- the debtors' belief that it is in the best interests of

19   the estate.  The fact that you don't like it or don't want it

20   is of little moment to me, Mr. Golden.

21         MR. GOLDEN:  I appreciate that, Your Honor, and I'm

22   not disputing a finding of good faith.  That's not the finding

23   they're asking for.  They're asking for a finding that the plan

24   support agreement, which is the underbelly of the plan, is in

25   the best interests of the estates.

1         THE COURT:  Okay.  I have your point.  What's your

2    next point?

3         MR. GOLDEN:  Your Honor, we think it would be

4    premature to give them that finding at this point.  It's --

5         THE COURT:  What's your next point?

6         MR. BUSH:  Your Honor, I have no further points on

7    that.

8         THE COURT:  Okay.  Thank you very much, Mr. Golden.

9         Who else wants to be heard?

10        MR. DEFILIPPO:  Your Honor, Paul DeFilippo for

11   Syncora.  I'm going to limit my comments to the disputed

12   findings.  Your Honor, your statements that if you enter an

13   order approving the plan support agreement, it is interlocutory

14   is important because it underscores why the disputed findings

15   that relate to the trustees' behavior are premature and not

16   preclusive.  There hasn't been a full and fair opportunity to

17   litigate --

18        THE COURT:  Premature and not preclusive are two

19   different issues, okay?

20        MR. DEFILIPPO:  I'm --

21        THE COURT:  I don't see why they're premature.  I've

22   already -- I've spoken to the issue of preclusive effect.

23        MR. DEFILIPPO:  Yes, Your Honor.  Thank you.  As long

24   as all parties are clear then, as it sounds like Your Honor is,

25   that these findings do not have preclusive effect --

1          THE COURT:  What is it that you disagree about the

2     finding?

3          MR. DEFILIPPO:  That the trustees have acted in the

4     best interests of the trusts and the investors.

5          THE COURT:  Well, they put in evidence and you didn't.

6     What is the evidence that's before me that would support --

7     thaw you say -- what's the -- I mean, you say the evidence

8     doesn't support a finding of good faith on their part and best

9     interests?

10          MR. DEFILIPPO:  I'm speaking about the trustees'

11     proposed findings that the transactions contemplated by this

12     agreement --

13          THE COURT:  The term "transactions" was taken out of

14     the order.  That was one of the express changes that Mr. Lee

15     talked about at the start of the hearing to make it clear that

16     the only thing covered by the PSA order is the PSA.

17          MR. DEFILIPPO:  That -- the language now states the

18     agreement, including the RMBS trustees' performance

19     contemplated thereunder.  So, Your Honor, to us, that has the

20     same effect as the transactions.

21          THE COURT:  Where -- let's talk about the evidence.

22     Why is it that you don't believe the evidence before me

23     supports a findings of good faith and best interests by the

24     RMBS trustees?

25          MR. DEFILIPPO:  We haven't had a full and fair

RESIDENTIAL CAPITAL, LLC, et al.                    108

1  opportunity to litigate that issue, Your Honor.

2          THE COURT:  Well, the full --

3          MR. DEFILIPPO:  They -- they did not --

4          THE COURT:  -- and fair opportunity --

5          MR. DEFILIPPO:  Well --

6          THE COURT:  This hearing was set.  I permitted some

7  discovery; there were no depositions taken.  I asked the

8  proponents to put in their evidence; they did.  I offered the

9  opportunity to cross-examine; no one took it.  I asked the

10 objectors whether they were offering any evidence; they didn't.

11 So in my view, you had a full and fair opportunity to present

12 for purposes of the PSA -- we're not talking about what's going

13 to happen at confirmation.

14         MR. DEFILIPPO:  Then the point is, Your Honor, there

15 is a lack of clarity with respect to several features of the

16 plan that is yet to be filed.

17         THE COURT:  There is no plan.  It hasn't been filed

18 yet.

19         MR. DEFILIPPO:  Exactly.

20         THE COURT:  And I think I addressed that in some of my

21 comments.  Some of the objections really dealt to the issues

22 of -- we'll call it lack of clarity or greater specificity in

23 the term sheet, and you know, the standards for a disclosure

24 statement and a plan are different than the standards for this

25 PSA.  And hopefully, they'll be able to flesh out -- hopefully,

RESIDENTIAL CAPITAL, LLC, et al.                    109

1   they'll be able consensually to resolve many of these open

2   issues.  And what they don't, if I get plan confirmations, I'll

3   deal with them accordingly.

4           MR. DEFILIPPO:  Your Honor, Your Honor has stated and

5   all of the proponents of this agreement have stated that the

6   PSA does not determine any substantive rights of nonparties to

7   that agreement.  We submit that the order approving the PSA

8   should likewise not determine any substantive rights of

9   nonparties to that agreement.

10          THE COURT:  Okay.

11          MR. DEFILIPPO:  Thank you.

12          THE COURT:  Thank you, Mr. DeFilippo.

13          Anybody else?  Mr. Uzzi, you're coming up?

14          MR. UZZI:  Yes.

15          MR. UZZI:  Your Honor, good afternoon.  Gerard Uzzi of

16  Milbank Tweed Hadley & McCloy on behalf of the ad hoc group of

17  junior secured noteholders.  Your Honor, just a process and

18  administrative update first, we reached an agreement with the

19  creditors committee and the debtors on a proposed order in aid

20  of mediation, the so-called Vitro order.  I think we intend to

21  deal with that at the end of the calendar today and --

22          THE COURT:  Maybe.

23          MR. UZZI:  Understood, Your Honor.  But if acceptable

24  to Your Honor, we have a mediation scheduled with Judge Peck

25  for next Monday starting at 2 p.m. in the afternoon.

RESIDENTIAL CAPITAL, LLC, et al.                    110

1              Your Honor --

2              THE COURT:  May I ask you this?

3              MR. UZZI:  Yes.

4              THE COURT:  Did -- have you -- has Judge Peck had an

5      opportunity to review the confidentiality order?

6              MR. UZZI:  He -- I need to defer to the debtors.

7              THE COURT:  Okay.

8              MR. UZZI:  I know there's been conversations with

9      them, but I don't know if he's seen the order itself.

10             THE COURT:  Because, I mean, in the -- going back to

11     the original mediation order, I left those issues to Judge

12     Peck.  I understand why you're asking me to do something, but I

13     want to know in the first instance whether Judge Peck has had

14     an opportunity to receive, review it, et cetera.

15             MR. UZZI:  Well, we will make sure that --

16             THE COURT:  Okay.  All right.

17             MR. UZZI:  -- that he has, Your Honor.

18             THE COURT:  Okay.  Thanks, Mr. Uzzi.

19             MR. UZZI:  We filed a statement of reservation of

20     rights, Your Honor, in response to this motion now raising

21     some --

22             THE COURT:  And then you filed something else.  I

23     mean --

24             MR. UZZI:  And we followed the supplement, Your Honor.

25             I won't rehash what's in our papers.  I trust that you

1   have read them, but there just are a few comments, and I'll be

2   very brief, that I think are important to make for the record.

3            One of the issues we had was some -- we felt lack of

4   clarity on whether there is a traditional fiduciary out in

5   these PSAs.  There is something that's a little bit

6   untraditional relating to the Ally settlement portion of it.

7            THE COURT:  And they've come back and said the only

8   thing that they don't have the out on is the Ally settlement

9   portion, and everything else they do.

10            MR. UZZI:  And they've made that clarification, Your

11   Honor, and we appreciate it.

12            With respect to our supplemental statement, Your

13   Honor, in their amended dec action, they made some statements

14   regarding the intercompany claims.  We were confused by it.  We

15   were concerned by it.  We had some --

16            THE COURT:  Nobody would be more surprised to me --

17   than me to find out that they had released intercompany claims

18   during the course of the case, okay?

19            MR. UZZI:  Well, and Your Honor, for that reason,

20   we -- and we did reach out to them.  They did clarify.  We

21   thought it was important to file the supplement just for the

22   record, and we did for that reason.  Your Honor, but since

23   then, they filed some more statements with respect to the enter

24   company claims and made some statements today that go even

25   further than what's there.  We're comfortable with our

RESIDENTIAL CAPITAL, LLC, et al.                    112

1    reservation of rights, Your Honor.  We will though talk to them

2    about those and may be back for your court with -- the court

3    with respect to some issues we need to discuss further.

4           THE COURT:  Mr. Uzzi, I hold out hope that before we

5    get to the confirmation hearing your clients will be on board

6    supporting a plan.

7           MR. UZZI:  And I hold out that hope probably just a --

8    almost as much as you, Your Honor, maybe more.

9           The -- so that's that issue, Your Honor, for the

10   record.

11          The other issue we raised, of course -- and I know we

12   addressed this a little bit in the off-the-record status

13   conference we had with Your Honor, but it really hasn't been

14   addressed in the record.  It's the whole issue of our

15   entitlements to post-petition interest and plan confirmation.

16   And Your Honor had asked the question at the on-the-record

17   status conference with respect to this motion --

18          THE COURT:  So just for those who aren't aware, the

19   off-the-record conferences that I think Mr. Uzzi refers to, in

20   scheduling conversations --

21          MR. UZZI:  Yes.

22          THE COURT:  -- I typically do those without being

23   recorded, reported.  They've typically happened at 5 o'clock in

24   the afternoon or after when sequester doesn't allow us to have

25   recordings made of our hearings, and they've dealt with

1    scheduling matters.  So those -- I assume those are the

2    conferences you're referring to.

3            MR. UZZI:  Yeah, that is the conference that I am

4    referring to, Your Honor, that we did participate in.

5            THE COURT:  Okay.

6            MR. UZZI:  And Your Honor, you asked at the original

7    status conference the question whether you can still confirm

8    the plan if you find that we're oversecured because I think we

9    were all in agreement that it was a little bit ambiguous, and

10   that you were expecting the answer to the question with respect

11   to this motion.  I think the answer, for the record, is

12   important, Your Honor.  We've had conversations with them, and

13   based upon those conversations, I think I understand their

14   position, but I still think the record is not clear.

15           What I understand their position to be, Your Honor, is

16   that the Court can find that we are entitled to post-petition

17   interest and still confirm the plan if and only if our

18   entitlement is based upon certain limited issues that they seek

19   to resolve in the adversary proceeding.  The debtors in --

20           THE COURT:  I don't understand what you're saying.

21   What I understood them to say is that -- because there was a

22   big important -- in coming into this PSA hearing, if it gets

23   contested and I conclude that the junior secured noteholders

24   are entitled to post-petition interest, could the plan be

25   confirmed.  I was given a clear answer "yes," and they made

RESIDENTIAL CAPITAL, LLC, et al.                    114

1  clear that the one thing that they don't believe can be altered

2  is the waiver of intercompany claims.  What I took it to mean,

3  and maybe I'm reading too much into it, is if there's a court

4  determination that you're entitled to post-petition interest,

5  they'll find the money consistent with the still waiving

6  intercompany claims.  I mean, that may be a shorthand, but

7  that's the way I understood it.  Do you understand it

8  differently?

9          MR. UZZI:  That is not what I understand, Your Honor.

10  If the reason why you find that we are entitled to post-

11  petition interest is because you find that there is actually

12  value in the intercompany claims that we have a lien on,

13  because those claims would then not be waived at least to the

14  extent of your lien, the plan fails.  That's not -- I mean,

15  that's our understanding.  That's not the only issue.  I focus

16  on the intercompany claims, Your Honor, because it's the

17  easiest one to illustrate.  The plan requires to the

18  intercompany claims --

19          THE COURT:  There's no plan yet but the term sheets,

20  yes.

21          MR. UZZI:  Understood, Your Honor.  The plan -- well,

22  the plan term sheet provides that the intercompany claims need

23  to be recognized at zero value and that, in our view, Your

24  Honor, is an extraordinary determination.  I'm not going to say

25  today what they should be recognized at, but just from a

1  possibility standpoint --

2         THE COURT:  Do you care anything other than whether,

3  if the Court ultimately determines you're entitled to post-

4  petition interest, that you get it?

5         MR. UZZI:  We offered that to the debtors, Your Honor,

6  and that was the point of your papers.  We think this is a

7  risky process.  They are forcing us into a position in order to

8  actually protect our entitlements to post-position interests to

9  otherwise attack the global settlement.

10         THE COURT:  Well, look, you're -- according to the

11  current schedule, the trial of the issues of your entitlement

12  to post-petition interest is going to happen before a

13  confirmation hearing.

14         MR. UZZI:  Well, only with respect to limited issues,

15  Your Honor, because there are issues that are in the global

16  settlement that go to the very heart of whether or not we're

17  entitled to post-petition interest.

18         Now, to be clear, Your Honor, there are determinations

19  that you can make with respect to the adversary proceeding

20  that, without looking to intercompany claims, get us fully and

21  by a wide margin over secured, and of course, Your Honor, we're

22  hoping that you make those determinations, and if you do, that

23  renders this issue moot.  But we're walking down a path of -- I

24  just -- I think we're walking down a very risky path, Your

25  Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    116

1          THE COURT:  Okay.  But it's fair to say that what you

2   have filed is a reservation of rights with respect to this PSA;

3   is that right?

4          MR. UZZI:  That is what we filed, Your Honor.  We're

5   prepared to do it.  And Your Honor, I will defer to Your Honor

6   as to whether the debtors have satisfied you with respect to

7   your own question.

8          THE COURT:  Okay.  Thank you, Mr. Uzzi.

9          MR. UZZI:  But one -- just one last point very

10  briefly, Your Honor, and I wish I didn't need to address this

11  point.  I thought I dispensed with it at the last status

12  conference, but in its reply brief, the committee has continued

13  in its refrain that the JSNs refuse to participate in the

14  mediation.

15         THE COURT:  Look, I'm going to see this Vitro order

16  that you've drafted.  Look, that -- we are where we are today.

17  The issue is are you going to be in the mediation on Monday and

18  on what terms.  So there's no --

19         MR. UZZI:  I would --

20         THE COURT:  Don't revisit the past, okay?

21         MR. UZZI:  I would like to put it behind me, Your

22  Honor.

23         THE COURT:  Put it behind you.

24         MR. UZZI:  Okay.  I would ask that the committee puts

25  it behind them as well.

RESIDENTIAL CAPITAL, LLC, et al.                    117

1            THE COURT:  Put it -- everybody put it behind you.

2    The issue is are you going to have a good-faith mediation with

3    principals and try and resolve these issues.

4            MR. UZZI:  I won't raise it again, Your Honor --

5            THE COURT:  Okay.

6            MR. UZZI:  -- if it's not raised by anybody else.

7            THE COURT:  Thank you.

8            MR. UZZI:  Your Honor --

9            THE COURT:  Why do I think I will hear it again?

10           MR. UZZI:  I appreciate your time, Your Honor.  Unless

11   you have any other questions.

12           THE COURT:  I don't.

13           MR. UZZI:  Thank you.

14           THE COURT:  Thank you very much.

15           Who else wants to be heard?  Others who want to be

16   heard ought to line up so we can get everybody up here.

17           Come on up.

18           MR. MURRELL:  Good afternoon, Your Honor.  Vicente

19   Matias Murrell on behalf of the Pension Benefit Guaranty

20   Corporation.  Your Honor, I just want to make clear that PBGC

21   is not objecting to the plan support agreement.  It's not

22   taking a position one way or the other.

23           THE COURT:  You're saving your objection for

24   confirmation if they haven't resolved the issue?

25           MR. MURRELL:  Well, we filed a limited objection, Your

1    Honor, simply because there's a third-party release of Ally and

2    its affiliated entities.

3         THE COURT:  You and everybody else is raising a

4    confirmation issue about the third-party release so --

5         MR. MURRELL:  Well, the only thing, Your Honor, I just

6    want to make clear that, you know, we know the debtors and --

7    we know the debtor is considered to be a confirmation issue,

8    and I've heard Your Honor's comments of earlier today as well.

9    I just want to point out, Your Honor, that we stand in a sort

10   of similar situation to the FDIC in that we have the other

11   legal obligations that Ally has that --

12        THE COURT:  See, the FDIC and the FHFA have a

13   different statutory provision, which it was those agencies'

14   view, stripped any court of the power to interfere with their

15   ability to collect.  It resulted in the withdrawal of the

16   reference in an adversary proceeding against FHFA and the FDIC.

17   You don't have a similar statute.  So don't compare yourself --

18   I mean, the status in this case of FHFA and FDIC, I think, is

19   different.

20        MR. MURRELL:  Yeah.  And Your Honor, I won't go into

21   the nuances of ERISA.  I know that's a whole nother -- that's a

22   whole 'nother ball game and that's not what's here.

23        THE COURT:  Okay.  I think I understand your point.  I

24   read the limited objection you filed.  We'll see whether you

25   can get your issues worked out with them before confirmation,

RESIDENTIAL CAPITAL, LLC, et al.                    119

1    okay?

2          MR. MURRELL:  Yeah, it's -- the concern is just, Your

3    Honor, that with the plan support agreement being -- you know,

4    being approved by the Court, that we're --

5          THE COURT:  It's not releasing Ally from anything,

6    okay?  AFI is not released by virtue of the plan support

7    agreement.  Your concern was that somehow, even though it

8    didn't say it, that AFI was getting a release, and they're not.

9          MR. MURRELL:  No, that might possibly be prejudiced --

10         THE COURT:  And they're not.

11         MR. MURRELL:  -- regarding that and the pension plan.

12         THE COURT:  You can come back if you can't resolve

13   your issues.  Every other case I've had with PBGC, your

14   agency's issues, you've been very good at getting the issues

15   worked out.  So I hope that'll happen again here.

16         MR. MURRELL:  Thank you.  We expect that to happen

17   here as well, Your Honor.

18         THE COURT:  All right.  Thank you very much.

19         MR. MURRELL:  Thank you, Your Honor.

20         THE COURT:  Mr. Levin.

21         MR. LEVIN:  Good afternoon, Your Honor.  Richard

22   Levin, Cravath, Swaine & Moore, on behalf of Credit Suisse

23   Securities USA, LLC.

24         Your Honor, based on the representation Mr. Lee made

25   in the opening -- his opening remarks that there would be, his

RESIDENTIAL CAPITAL, LLC, et al.                    120

1    words, "appropriate judgment reduction provision" --

2           THE COURT:  Well, you're going to try and negotiate a

3    judgment -- reduction provision, right?  And if not, you can

4    object to confirmation.

5           MR. LEVIN:  Exactly.  We're not pursuing our -- I just

6    wanted to make the record clear.  I also want to note that Mr.

7    Eckstein has given me similar assurances on behalf of the

8    committee and wanted that to be on the record.

9           THE COURT:  Thank you.

10          MR. LEVIN:  And we're not pursuing the objection to

11   the PSA, reserving all other rights.

12          THE COURT:  Thank you very much.

13          MR. LEVIN:  Thank you.

14          THE COURT:  Anybody else?

15          MR. FELDMAN:  Your Honor, David Feldman again from

16   Gibson Dunn on behalf of Amherst Advisory.  Based on the

17   statements made in the debtors' and the committee's reply that

18   the issues we've raised in our pleading are reserved for

19   confirmation, we don't need to -- I guess some of them are

20   confirmation, as you noted, Your Honor.  One of our objections

21   may be to disclosure statement depending on the disclosure

22   related to our distribution or our allocation.  We have nothing

23   further to add.  I'd also note that at some point at the end of

24   the objections, I understand that Mr. Garrity on behalf of

25   Deutsch Bank, our trustee, will stand up and make a statement

RESIDENTIAL CAPITAL, LLC, et al.                    121

1   regarding our rights under our trust agreement.

2            THE COURT:  Okay.  Thank you very much.

3            Anybody else wish to be heard?  Any reply?

4            MS. NORA:  Your Honor, Wendy Alison Nora, just -- I

5   didn't know who else was appearing personally.

6            THE COURT:  Go ahead.

7            MS. NORA:  I just wanted to clarify that the new

8   proposed order at paragraph 9 where it says that all

9   reservations of rights are overruled on the merits.  The Court

10  does not mean what it -- if it signs this order that the

11  reservations of rights to argue against the confirmation of the

12  plan or object to the disclosure statement are overruled at

13  this time?

14           THE COURT:  It's only as to this PSA hearing, not as

15  to confirmation or disclosure statement, Ms. Nora.

16           MS. NORA:  Thank you, Your Honor.

17           THE COURT:  Thank you, Ms. Nora.

18           MS. NORA:  Also, with respect to the new settlement

19  that was just disclosed, I wonder if that changes the footnote

20  in the term sheet with respect to the estimated availability of

21  what would be, by my calculations, 357.6 million dollars for

22  the borrower.

23           THE COURT:  I don't know --

24           MS. NORA:  Is this not the right time to raise that?

25           THE COURT:  I don't know the answer to that.

1    They'll -- you know, the term sheet for the revised settlement

2    with the FRB should be on line and available now.  The term

3    sheet's about six pages single-spaced, I think.

4            MS. NORA:  Yes, I have a printout of that, Your Honor,

5    but it was just indicated on the record this morning that 230

6    million was going to be distributed under the consent order.

7    This footnote that I'm referring to, which is on page, I

8    believe -- well, it's the first page of annex 1, indicates that

9    the borrowers' claims trust recovery have been set to be 57.6

10   million, and I realize that may be increased by a true-up, but

11   there's a footnote, number 2, and it said that the borrowers'

12   claim trust recovery does not reflect approximately 300 million

13   in additional payments to be made by the debtors in respect of

14   borrower obligations under the consent order and DOJ/AG

15   settlement.  The consent order is not the same as the DOJ/AG

16   settlement.  So if there's 230 million going to the borrowers

17   under the settlement that was just reached, that leaves 70

18   million for the DOJ/AG settlements which have been consistently

19   referred to in these proceedings as preserved and reserved, and

20   I haven't been able to do the math, but I believe that the

21   obligation of the debtors and their parents are in excess of 70

22   million under the DOJ/AG settlement.  I just want to note my

23   reservation of that issue for the record.

24           THE COURT:  That's fine, Ms. Nora.  We'll get some

25   clarity going forward, okay?

RESIDENTIAL CAPITAL, LLC, et al.                    123

1          MS. NORA:  Thank you.

2          THE COURT:  Thank you, Ms. Nora.

3          Anybody else in the courtroom wish to be heard?

4          Anybody on the phone wish to be heard?

5          All right.  Mr. Eckstein -- wait, hold on.

6          MR. CORDARO:  Good afternoon, Your Honor.  Joseph

7    Cordaro with the United States Attorney on behalf of the United

8    States.  It wasn't actually my intent to address the Court at

9    this hearing this morning, but there was a reference to the

10   DOJ/AG settlement in Ms. Nora's last remarks, and I'm not sure

11   what she was saying or what she was representing.

12         THE COURT:  Nothing's been altered with respect to the

13   DOJ settlement, Mr. Cordaro.

14         MR. CORDARO:  Thank you, Your Honor.

15         THE COURT:  That's a fair statement, Mr. Lee?

16         MR. LEE:  One hundred percent accurate, if there's any

17   doubt ever.

18         THE COURT:  Okay.

19         MR. LEE:  It's in every order, Your Honor.

20         MR. CORDARO:  And I didn't doubt it either, Your

21   Honor.  I just wanted to be clear because we didn't want any

22   confusion in the record.  Thank you, sir.

23         THE COURT:  Okay.  Mr. Eckstein, do you want to be

24   heard?

25         MR. ECKSTEIN:  Your Honor, thank you very much.

1    Kenneth Eckstein of Kramer Levin on behalf of the official

2    creditors committee.

3           Your Honor, we're pleased to be able to represent at

4    this point that we believe we have a record before Your Honor

5    that supports the representations that have been made that the

6    plan support agreement does, in fact, represent an important

7    and valuable milestone in these cases, laying the foundation

8    for the proposal, what we hope will be a largely, I don't want

9    to say entirely consensual, Chapter 11 plan.

10          THE COURT:  From your lips.

11          MR. ECKSTEIN:  We recognize, Your Honor, that we still

12   have work to do, and I don't say it lightly when we represent

13   that the positions that each of the parties who have filed

14   objections to the plan support agreement, and we believe have

15   dealt constructively with difficult issues are going to be

16   accounted for both in the plan and I can represent firsthand,

17   Your Honor, that the debtor and the committee are in dialogue

18   with, I believe, virtually every party that has objected with a

19   view toward trying to resolve their issues consensually in this

20   case.  We may not achieve that, but I think it's important for

21   everybody in the courtroom to know that that is the goal and

22   that the phone lines are open, the e-mail lines are open, and

23   we're prepared to do what we can to resolve the issues that

24   need to be dealt with in order to get through a disclosure

25   statement and confirmation.

1      That said, we strongly endorse the approval of the

2  plan support agreement, and we believe that with the

3  modifications that have been made to the proposed order,

4  including what we think is a very clear reservation of rights

5  by all parties as to objections that they might raise to the

6  disclosure statement to confirmation or to any substantive

7  motions, whether it be the FGIC 9019 motion or to other motions

8  affecting the JSNs or other parties.  With those reservations

9  of rights, we believe that the findings and the order

10  provisions that are now included in the revised order are fully

11  appropriate and are entirely supported by the record.

12      A couple of observations about certain of the

13  objections that have been raised.  I don't think that there's

14  been a lot of energy beyond the pleadings as to the Court's

15  authority to enter an order approving a plan support agreement,

16  but I believe that there is ample authority in this district

17  that I know Your Honor is familiar with firsthand that would

18  allow the Court to approve a plan support agreement

19  particularly one that involves so many parties as they do in

20  this case.  There is note a plan support agreement that had

21  been entered into pre-petition.  This has been entered into

22  twelve months into this bankruptcy case with extensive

23  mediation with the involvement of a debtor that has a chief

24  restructuring officer that has played an active hand-on role

25  with the creditors committee and obviously with the active

RESIDENTIAL CAPITAL, LLC, et al.                    126

1  guidance of the mediator in Judge Peck.

2         So we think that the Court clearly has the authority

3  to enter the order approving the plan support agreement and I

4  believe that the memoranda of law submitted by the debtor and

5  the committee support that.

6         Second, Your Honor, issues were raised, although again

7  I don't think that parties have invested a lot of energy in the

8  standard, but given the fact that various parties did raise the

9  issue, I think it's worth addressing briefly again.  This case

10  is a case with a business judgment we believe appropriately

11  applies.  Some parties had cited Your Honor to the Innkeepers

12  case, and we believe that the distinctions between Innkeepers

13  and this case are stark.  In Innkeepers, we had a PSA that was

14  negotiated pre-petition.  The creditors, almost across the

15  board in Innkeepers, opposed, and the broad participation that

16  is important and fundamental is absent there.  In this case, I

17  think Your Honor knows the record, and I think Mr. Kruger's

18  declaration strongly supports the Court's ability to determine

19  that the business judgment standard is the appropriate standard

20  in this case.

21         As Your Honor as heard, the committee took the lead in

22  negotiating the Ally settlement.  This was not negotiated by

23  the debtor with its parent; this was negotiated by a creditor's

24  committee that includes representatives of virtually all of the

25  key creditor constituencies in this case.  In addition, we had

1   other parties that participated beyond the creditor's committee

2   including the institutional investors, holders of the HoldCo

3   bonds and other parties who participated actively in the

4   negotiation.  This is, in fact, I think, a model for the way in

5   which a plan support agreement should get negotiated in a

6   bankruptcy case, and we think that the with the involvement of

7   the debtors' chief restructuring officer and the involvement of

8   the parties, we think this is certainly a case where the Court

9   can issue or determine that the business judgment that's being

10  applied is the appropriate standard.

11          And so we would respectfully ask Your Honor, in

12  entering the order, to apply that standard to the approval of

13  the PSA.

14          In terms of the other objections, Your Honor, I think

15  that most of the parties have ultimately, in their closing

16  remarks, essentially have, I think, conceded that they're

17  satisfied with the order being entered with the appropriate

18  reservation of rights.  Mr. Golden, I know, made an argument to

19  try to limit the order, and I believe Your Honor's remarks are

20  consistent with the view that we believe is appropriate, which

21  is that the record does support the findings that are being

22  proposed in the order, that this PSA, in fact, is in the best

23  interests of the estate and it's various creditors.

24          I think, as Your Honor notes, the transaction that is

25  the essential basis for this PSA was a negotiated agreement

1   with Ally where Ally has now agreed to contribute 2.1 billion

2   dollars to contribute to funding of a plan.  And while we

3   recognize that this case has not yet satisfied the confirmation

4   standards or the disclosure standards, we think that the fact

5   that we been able to put in place an agreement where all

6   parties are committed to seeking to propose and confirm a plan

7   in accordance with the time line, that is valuable.

8          And that is what is being accomplished by the PSA, is

9   that disparate parties are all committed to an agreement that

10  includes Ally, that includes trustees, that includes the -- all

11  the consenting claimants and the debtor are all working

12  together with a defined framework that is designed to move this

13  case to confirmation while giving all parties an interest in

14  this case complete and full opportunities to preserve all of

15  their legal rights to raise issues and if not resolve issues,

16  litigate objections.  And we think that is exactly the right

17  way in which a PSA should be presented, and we believe that

18  that strongly supports the finding that this agreement, the

19  PSA, is in the best interests of the estate and creditors with

20  the reservation of rights that have been reflected.

21         I would concur with the comments made by Mr. Levin on

22  behalf of Credit Suisse that we'll attempt to work with Mr.

23  Levin and his clients to see if we can arrive at an appropriate

24  judgment reduction.  We are working with the JSNs to see if we

25  can resolve their issues, and if we can't resolve their issues,

1    we will deal with the post-petition interest issue through a

2    litigation.  The plan will provide that in the event the Court

3    determines that the JSNs are, in fact, oversecured and entitled

4    to post-petition interest, that that will be provided for in

5    the plan.  It is correct, I think as it was articulated,

6    that -- and by the way, the number of issues they want to

7    litigate are not limited.  They have a wide range of issues,

8    and all of those issues will be litigated in connection with

9    the trial scheduled right now for October.

10            The one issue that will be dealt with separately, and

11   that will be in connection with confirmation, will be the

12   global settlement that included an agreement to compromise and

13   waive the enter company claims as part of a global settlement

14   that affects not only the JSNs but affects a wide array of

15   parties in this case and ultimately was a determination that

16   was reached with the debtor with all of the consenting

17   claimants and the parties in order to arrive at a global

18   settlement.  We would hope that that does not necessitate the

19   JSNs feeling that they have to object to every aspect of

20   confirmation, but we'll have to deal with that as it proceeds,

21   but I think that there is clarity as to how the JSN issues are

22   being dealt with, and we'll attempt, if we can, to resolve

23   them.

24            I will also confirm that there is no limitation on the

25   ability of the creditors committee or the debtor to agree to

1    resolve the post-petition interest issue.  It doesn't

2    necessarily mean that all the consenting claimants will be in

3    agreement, and if we have a problem, we may have a termination

4    event under the PSA, and for that reason, the discussions that

5    are going to take place with the JSNs are being done with the

6    involvement of all of the consenting claimants so that if we

7    can reach some kind of a resolution, it will be a resolution

8    that hopefully has the support of the consenting claimants,

9    that whatever agreement the plan proponents agree to will be

10   one that will not trigger any termination event under the plan

11   support agreement.  But I think in terms of fiduciary

12   flexibility I believe that that is both appropriate and

13   consistent with what I think Mr. Uzzi's understanding was on

14   the record.

15          In terms of Amherst and its reservation of rights, we

16   think that their rights are appropriately reserved.  I would

17   note we have not seen the direction letter that was provided,

18   and we haven't had an opportunity to look specifically at

19   exactly what rights they have under the pooling and servicing

20   agreements, but whatever rights they have to advocate on their

21   behalf or on behalf of their trust are preserved, and they're

22   not being impaired by this agreement, and I assume that those

23   rights will be expressed in connection with disclosure and

24   confirmation.

25          I think, Your Honor, that this covered the objections

1  that have been raised.  We believe that this record amply and

2  strongly supports the entry of the order to approve the PSA.  I

3  will note that this, in fact, is a remarkable step in this

4  case, and we would hope that the Court will feel comfortable

5  and positive about entering the order and allowing this case to

6  move to the important next step which is the proposal of the

7  plan.  Thank you very much.

8        THE COURT:  Thank you, Mr. Eckstein.

9        Mr. Lee, do you have anything you want to add?

10        MR. LEE:  You were right, I think I spoke for an

11  inordinately long time at the beginning of the hearing, and it

12  was only fair to have Mr. Eckstein conclude, and I will say was

13  a collective effort that led to this resolution.  And again, I

14  want to thank Your Honor for appointing Judge Peck and Judge

15  Peck for his efforts which appear to be --

16        THE COURT:  Are not over.

17        MR. LEE:  -- not over, and I -- rarely a week goes by

18  when somebody says, well, perhaps we can have a mediation with

19  Judge Peck.

20        THE COURT:  Thank you, Mr. Lee.

21        Anybody else wish to be heard?

22        Mr. Siegel, briefly.

23        MR. SIEGEL:  Your Honor, I echo the comments by Mr.

24  Eckstein and Mr. Lee.  Obviously, the trustees have worked very

25  hard to get to this point.  We very much believe this to be in

1  the best interest of our holders and urge this Court to enter

2  the order.

3          THE COURT:  Thank you.

4          Anybody else wish to be heard?

5          All right.  I am going to grant the motion approving

6  the PSA.  It's my intention, I assume later today -- and I also

7  intend to enter the order as revised and proposed by the

8  debtor.  That'll happen promptly after the conclusion of the

9  hearing.  I also anticipate issuing an opinion that addresses

10 more fully the issues raised by objections.  I don't want to

11 spend a lot of time now, but let me just address a few

12 comments.

13         I think the PSA is a single accomplishment in this

14 case.  There have been numerous objections, limited objections,

15 and reservations of rights which were filed in response to the

16 motion.  And in considering the motion and the objections, it's

17 important to keep in mind the limited issues that the Court

18 must decide now and the context in which the issues arise.  The

19 Court is asked to enter an interlocutory order approving an

20 agreement between the debtor and many of -- debtors and many of

21 their key creditor constituencies that, after more than a year

22 of contentious proceedings in the bankruptcy court and many

23 months of mediation overseen by my colleague Judge Peck, have

24 reached an agreement to support a reorganization plan

25 consistent with the terms of the PSA and its two attached term

1  sheets.

         The PSA is not a disclosure statement and it is not a

2  reorganization plan.

3          Those are important, indeed critical steps yet to come

4  to move this case forward, hopefully to a successful

5  conclusion.  Without the PSA, however, this case would return

6  to square one.  The PSA and the attached term sheets, if they

7  ultimately result in a confirmed plan, embody numerous

8  settlements and resolutions of extremely complicated legal and

9  factual issues that must be resolved to achieve a confirmable

10 plan in the case.  But to be clear, the approval of the PSA

11 does not assure that a plan embodying its terms will be

12 confirmed.  Approval of the PSA does not bind the objecting

13 parties or the Court from challenging in the case of the

14 objectors or rejecting in the case of the Court a plan

15 substantially on the terms set forth in the PSA.

16         Some of the objections, unless consensually resolved,

17 raise difficult issues, but those are issues for another day.

18 The standards for -- the standards applicable to approval of a

19 PSA are not the standards applicable to approval of a

20 disclosure statement or confirmation plan.

21         Most of the objections that have been made are

22 confirmation objections not properly raised or considered at

23 this time.  I also agree that the applicable standard for

24 determining whether to approve the PSA is the business judgment

25 standard rather than the entire fairness doctrine, and I'll

1   address that more fully in the written opinion, but I'm
2   satisfied this is a very different case than Innkeepers, the
3   circumstances under which this PSA was negotiated, the debtors
4   having a CRO who was an independent fiduciary.  This is not a
5   related-party transaction in that sense.  And so I'm satisfied
6   that the business judgment standard is the applicable standard.
7           So I intend to, as I said, enter the written order as
8   revised.  I intend, probably later today, to issue a written
9   opinion that will elaborate on my evaluation.
10          Separately, it's my intention to enter today a very
11  short order unsealing the examiner's report.  I've said, since
12  the PSA was first presented and it included as a term that the
13  examiner's report then not yet filed, I believe May 13th was
14  the date that it was filed, Mr. Seife?
15          MR. SEIFE:  Yes, that's correct.
16          THE COURT:  -- that it would -- it was filed under
17  seal.  I hope you all enjoy reading the 2,235 pages.  It is a
18  masterful job, and we'll see what impact it has on the case as
19  a whole.  So I plan to enter an order today that unseals the
20  examiner's report.
21          Mr. Lee, what else do we have to deal with?
22          MR. LEE:  And for those who are going to need July 4th
23  hearing will have a reading -- we'll have a plan and disclosure
24  statement so you can finish on the Wednesday and then pick that
25  up on Thursday and Friday.

1          THE COURT:  Maybe you'll be finished reading the

2     examiner's report by then.

3          MR. LEE:  I think this could be a Cliff Notes version.

4          THE COURT:  Actually, there is.  It's the first forty-

5     six pages or so or an excellent Cliff Notes version.

6          MR. LEE:  That's what I will read.

7          Sorry, Your Honor.

8          THE COURT:  I'm glad you have a sense of humor.

9          MR. LEE:  Even after a year-and-a-half, yes, Your

10    Honor.

11         Your Honor, I think that the next item on the agenda

12    was a status conference on the debtors' continuing use of cash

13    collateral.  And I think at the same time, perhaps we can also

14    address the order that we're going to be asking Your Honor to

15    enter in connection with the mediation with the junior secured

16    noteholders.  But I don't know --

17         THE COURT:  Okay.  Well, let me just say.  Anybody who

18    wishes to be excused, feel free to leave.  Okay, let's just --

19    we'll give it two minutes before we resume.  I'm not going to

20    leave the bench but anybody wants to shut the meter off, go

21    ahead.

22         Oh, wait, wait, wait.  Stop.  Stop, stop, stop.  I

23    almost forgot.  This is really important.

24         I was handed a note.  Someone dropped a large sum in

25    cash, in twenty-dollar bills, in the area where the interns are

1 | sitting.  They want to announce this.  That was me; I'm
2 | announcing it.
3 |         MR. LEE:  That's the stampede, Your Honor.
4 |         THE COURT:  Sorry about that.  Did somebody lose a
5 | large amount of cash in twenty-dollar bills?
6 |         I do not accept bribes, I want to make it clear.  I'm
7 | not going to touch this money.
8 |     (Pause)
9 |         THE COURT:  While the courtroom is clearing, just let
10 | me say that the entry of the order unsealing the examiner's
11 | report moots the motions to unseal the examiner's report.
12 |         MR. LEE:  Thank you, Your Honor.  That was going to be
13 | my question.
14 |         MR. WALPER:  Oh, Your Honor.
15 |         THE COURT:  If you'd like to argue it, Mr. Walper --
16 |         MR. LEE:  Your Honor, he wants to cross Mr. Puntus yet
17 | again.
18 |         MR. WALPER:  Thank you, Your Honor.
19 |         MR. LEE:  Your Honor, if I could turn the podium over
20 | to my colleague, Mr. Goren, to address the cash collateral --
21 |         THE COURT:  You can.
22 |         MR. LEE:  -- and the -- what we're I think now loosely
23 | calling a Vitro order, but hopefully it'll soon be called
24 | something else.
25 |         MR. GOREN:  Thank you, Your Honor; Todd Goren,

1    Morrison & Foerster on behalf of the debtors.

2            I had really hoped we'd be done with cash collateral

3    by the time we got here today.  Unfortunately, an unexpec --

4            THE COURT:  Do you want to call your first witness or

5    what?

6            MR. GOREN:  I've had enough with that for now.

7            An issue came up in the last couple days that was sort

8    of unexpected in negotiating it.  We're going to try our best

9    to work through it over the next several days.  Hopefully,

10   we'll be able to get there.  In the meantime, I think we'd like

11   to adjourn cash collateral to the 10th.  I really believe this

12   time this will be the last adjournment.  We're going to go

13   forward on the 10th, or we're going to resolve it before then

14   or we're going to go forward on the 10th because I think we're

15   at a binary point as to whether we can get past this issue.

16   And if we can, I think we'll be done with our stipulation.  If

17   we can't, we'll need the hearing.

18           THE COURT:  Okay.  Thank you.

19           MR. GOREN:  So I don't know if --

20           THE COURT:  July 10th?

21           MR. GOREN:  I think that's the next hearing we have,

22   so I think that's acceptable to us.

23           THE COURT:  Anybody else wish to be heard on the cash

24   collateral order?

25           July 10th it is.

RESIDENTIAL CAPITAL, LLC, et al.                    138

1          MR. GOREN:  And then the last point, Your Honor, was

2     the Vitro order or the order in need of mediation.  We do have

3     several copies of it here and a disk if you'd like us to hand

4     it up to you.

5          THE COURT:  I would.  I do want Judge Peck to see it.

6          Judge Peck and I have not discussed what has

7     transpired at the mediation.  He has told me from time to time

8     when he has meeting schedules, generally -- that's almost every

9     day.  But even as to who he's meeting with.

10          I, with the consent of those who are here, I would

11     like to talk to him about the Vitro -- this form of

12     confidentiality order.  This is the one issue I had made clear

13     at the start of the case I wanted to leave to Judge Peck to

14     decide what was the appropriate confidentially.  So I don't

15     want to talk to him about the substance of anything that goes

16     on in mediation, but I do wasn't to talk to him about the

17     confidentially order that was entered.

18          MR. GOREN:  That's certainly acceptable to the debtors

19     and we have discussed the concept of the Vitro order.  We did

20     send him the original order from Vitro.  He seemed -- I mean,

21     he obviously --

22          THE COURT:  He'll speak for himself.

23          MR. GOREN:  Okay.

24          THE COURT:  Mr. Uzzi, do you have any problem about me

25     talking to him about it?

RESIDENTIAL CAPITAL, LLC, et al.                    139

1          MR. UZZI:  No, Your Honor.

2          THE COURT:  Okay.  Anybody else have anything they

3    want to say?

4          Again, he and I have not spoken about the substance of

5    anything that's gone on in the mediation and I don't plan to do

6    that.

7          MR. GOREN:  And we will, immediately after the phone

8    hearing, we will send him the proposed form that we're handing

9    up to you now.  And I'll hand it up.

10         THE COURT:  Okay, thanks, Mr. Goren.

11         Thank you.

12         MR. UZZI:  Your Honor, obviously, we're also all

13   available after you review it if you have questions --

14         THE COURT:  Okay.

15         MR. UZZI:  -- to answer those.

16         THE COURT:  All right.  Thank you.

17         All right, anything else today, Mr. Lee?  Mr. Goren?

18         MR. GOREN:  I believe that is it, Your Honor.  Thank

19   you very much.

20         THE COURT:  Thank you very much.

21         All right, we're adjourned.

22         IN UNISON:  Thank you, Your Honor.

23      (Whereupon these proceedings were concluded at 1:16 PM)

24

25

```
 1
 2                            I N D E X
 3
 4                          E X H I B I T S
 5   DEBTORS              DESCRIPTION                PAGE
 6   1                    Declaration of Lewis Kruger    40
 7   2                    PSA dated 5/13/2013            41
 8   3                    Term Sheet for proposed        41
 9                          joint Chapter 11 plan
10   4                    Supplemental term sheet for    42
11                          proposed joint Chapter 11
12                          plan
13
14   RMBS TRUSTEES        DESCRIPTION                PAGE
15   A                    Declaration of Robert H.       71
16                          Major
17   B                    Declaration of Brendan Meyer   72
18   C                    Declaration of Fernando        72
19                          Asabedo
20   D                    Declaration of Thomas Musarra  72
21   E                    Declaration of Mamta Scott
                                                        73
22   F                    Declaration of Mary Sohlberg   73
23   G                    Affidavit of Jose Fraga        74
24   --                   Amended schedule attached to   79
25                          declaration of Brendan Meyer
```

1

2                              I N D E X (cont'd)

3

4                          E X H I B I T S

5    CREDITORS              DESCRIPTION                    PAGE

6    4020-1                 Declaration of Nelson Cohen      91

7

8

9                              RULINGS

10                                            Page     Line

11   Motion to authorize debtors to advance      16       21

12    notice costs for New Jersey Carpenters

13    class action is approved

14   PSA approved by the Court                   132        5

15   Motion to unseal examiner's report granted  134       10

16

17

18

19

20

21

22

23

24

25

1

2                  C E R T I F I C A T I O N

3

4   I, Sara Davis, certify that the foregoing transcript is a true

5   and accurate record of the proceedings.

6

7

8

9

10   _____

11   SARA DAVIS

12   AAERT Certified Electronic Transcriber CET**D 567

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  June 27, 2013

19

20

21

22

23

24

25

**#**

**#607 (1)**
2:23

**A**

**AAM (2)**
63:12;64:1
**AARON (2)**
12:15;86:15
**abilities (1)**
98:22
**ability (8)**
36:5;50:3,5;69:10;
97:15;118:15;
126:18;129:25
**able (12)**
21:22;26:12;
31:13;37:2;49:11,
14;108:25;109:1;
122:20;124:3;128:5;
137:10
**ably (1)**
45:5
**absence (4)**
28:22;46:16;
59:14;84:19
**absent (3)**
51:19;53:10;
126:16
**absolutely (6)**
41:20;44:20;61:6;
64:19;66:6;102:10
**abundant (1)**
82:24
**abundantly (1)**
82:12
**accept (1)**
136:6
**acceptable (4)**
101:20;109:23;
137:22;138:18
**Access (2)**
16:12;28:14
**accomplished (1)**
128:8
**accomplishment (2)**
57:21;132:13
**accordance (11)**
30:8;35:18;51:15;
70:19;71:20;72:6,
16;73:2,13;74:9;
128:7
**according (2)**
84:16;115:10
**accordingly (7)**
72:7,17;73:3,14;
74:10;94:20;109:3
**accounted (1)**
124:16
**accurate (1)**

**123:16**
**accuse (1)**
29:9
**achieve (4)**
23:5;88:14;
124:20;133:9
**achievement (1)**
85:8
**acknowledged (1)**
77:18
**across (1)**
126:14
**acted (8)**
30:7;35:18;37:22;
52:7;62:9;91:18;
101:22;107:3
**acting (3)**
51:22;62:15;80:15
**action (9)**
17:18;25:14,14;
52:21,23;56:25;
64:20;87:15;111:13
**actions (3)**
26:10;82:24;102:1
**active (2)**
125:24,25
**actively (3)**
58:15,18;127:3
**actual (4)**
40:10;49:11;
62:23;63:15
**actually (13)**
20:7;24:4;27:10;
38:8;59:7;62:13;
75:12;97:10;103:12;
114:11;115:8;123:8;
135:4
**Ad (5)**
7:21;13:11;27:5;
100:4;109:16
**add (3)**
81:7;120:23;131:9
**addition (5)**
28:9;30:3;38:2;
43:23;126:25
**additional (4)**
53:21;90:13;
96:13;122:13
**address (12)**
21:4;31:17,23;
32:2;34:6;85:21;
116:10;123:8;
132:11;134:1;
135:14;136:20
**addressed (6)**
34:13;36:4;40:10;
108:20;112:12,14
**addresses (4)**
23:20,21;24:22;
132:9
**addressing (2)**
39:17;126:9
**Adelphia-like (1)**

**27:20**
**adequate (3)**
49:20;50:16,17
**adjourn (1)**
137:11
**adjourned (3)**
34:20;88:1;139:21
**adjournment (1)**
137:12
**adjustments (1)**
64:5
**Administration (2)**
4:14;89:7
**administrative (2)**
23:20;109:18
**admission (14)**
70:21;71:14,21;
72:3,8,13,18,24;
73:4,11,15,17;74:3,
10
**admit (1)**
75:15
**admitted (12)**
41:12;42:4,20;
43:5;71:9,11,25;
72:10,21;73:7,21;
74:13
**adoption (2)**
55:2;103:22
**adoptS (1)**
103:21
**Advance (4)**
2:3;17:10,17;
63:10
**advanced (2)**
48:10;49:8
**advantages (1)**
25:9
**adversary (5)**
38:4;103:18;
113:19;115:19;
118:16
**advice (1)**
35:15
**advised (3)**
46:9;49:10;75:12
**Advisory (6)**
5:3;64:9,15;77:3,
9;120:16
**advocate (2)**
57:9;130:20
**advocates (1)**
47:19
**affect (1)**
68:6
**affected (1)**
45:11
**affecting (1)**
125:8
**affects (5)**
52:18;84:22,24;
129:14,14
**affiant (1)**

**74:19**
**affidavit (4)**
32:21;74:4,11,16
**affiliated (1)**
118:2
**affiliates (1)**
24:24
**affirmative (1)**
100:25;101:19
**affirmed (1)**
84:6
**AFI (10)**
25:7;28:11;32:15,
22,25;33:19;34:15;
92:15;119:6,8
**AFI's (1)**
97:22
**afternoon (7)**
98:11;109:15,25;
112:24;117:18;
119:21;123:6
**again (23)**
24:7;26:16;29:7;
38:15;46:13,21;
47:7;60:2;68:18;
71:19;72:5;78:16;
89:3;98:13;117:4,9;
119:15;120:15;
126:6,9;131:13;
136:17;139:4
**against (23)**
21:20,20;24:23;
25:6,6,26:10;28:12;
32:24;52:22;56:22;
66:17;68:9;92:8,11,
14;93:18,21;94:2;
95:8;99:2;103:18;
118:16;121:11
**agencies' (1)**
118:13
**agency's (1)**
119:14
**agenda (5)**
17:8,9,22;19:6;
135:11
**agent (1)**
89:7
**aggregate (1)**
24:11
**agitation (1)**
82:20
**ago (4)**
18:18;46:21;
48:17;93:9
**agree (9)**
53:13,16;55:7;
60:12;69:22;97:16;
129:25;130:9;
133:23
**agreed (4)**
28:17;47:4;83:11;
128:1
**agreeing (3)**

**39:13;67:19;**
**101:23**
**Agreement (147)**
2:9;17:24,24;18:1,
21;19:10,13,22,25;
20:7,11,15,25;21:25;
23:7,10;24:9,22,25;
25:3,7,13,21;27:3,
10,14,19,22;29:3,5;
30:1,2;31:3,9,11,15;
32:6,7,13;36:2,6,15;
38:21,22,24;39:21;
40:10;41:3;42:1,5,
17;43:2,14,19,22;
44:4;45:3;52:5,6;
53:16,17,25;54:1;
55:10,12,14,16;
56:19,19,20;57:1,4,
7,13;58:5;61:6;62:4,
23;67:20;69:8,9;
77:11;78:15;80:13;
82:9;83:2;87:20,25;
88:10,17;89:12,15;
91:17,19;95:20;97:7,
20;98:6;100:8;
101:1,2,6,9,11,20,21,
23;102:3,12,13,14;
103:12,17,25;105:6,
24;106:13;107:12,
18;109:5,7,9,18;
113:9;117:21;119:3,
7;121:1;124:6,14;
125:2,15,18,20;
126:3;127:5,25;
128:5,9,18;129:12;
130:3,9,11,22;
132:20,24
**agreements (12)**
23:4;32:9;49:2;
51:4,12;52:9;62:4,5;
82:22;104:10;105:5;
130:20
**ahead (24)**
17:23;19:4;20:22;
21:14,15,23;23:12;
29:21;30:17;35:6;
46:3;59:2,12;61:23;
66:9;69:11;74:1;
75:22;77:4;80:5;
91:9,11;121:6;
135:21
**aid (1)**
109:19
**aided (1)**
33:3
**AIG (2)**
10:12;25:1
**AKIN (2)**
6:10;100:1
**ALBANESE (1)**
6:16
**ALISON (2)**
16:12;121:4

**allegations (1)**
87:20
**alleged (1)**
87:21
**ALLEN (1)**
8:12
**allocate (2)**
47:23;48:23
**allocating (1)**
45:24
**allocation (17)**
45:18;48:4,7,8,10;
49:22;50:18;63:13;
64:13;66:4;85:22,22,
23;86:1,6,7;120:22
**allow (4)**
20:7;27:3;112:24;
125:18
**allowed (1)**
93:25
**allowing (1)**
131:5
**Allstate (2)**
10:12;25:2
**Ally (29)**
2:9;8:3,3;19:10,
18;22:7;26:11;
28:12,17,20,22,23,
24;32:18;45:14;
66:17;84:20;85:6;
97:24;99:2;111:6,8;
118:1,11;119:5;
126:22;128:1,1,10
**almost (4)**
112:8;126:14;
135:23;138:8
**alone (1)**
22:11
**along (3)**
31:15;40:15;69:14
**ALSTON (2)**
5:11,20
**altered (3)**
49:5;114:1;123:12
**Alternative (4)**
9:13;31:25;59:24,
25
**alternatives (2)**
59:23;60:7
**although (4)**
34:23;35:23;77:6;
126:6
**ALVES (1)**
4:8
**always (1)**
85:9
**Ambac (1)**
10:21
**ambiguous (1)**
113:9
**ambitious (1)**
102:24
**amended (11)**

18:13,21;36:24;
37:1;75:15,25;76:7,
8,10;98:5;111:13
**amendment (4)**
75:13;76:2;86:1;
89:16
**America (1)**
85:23
**Americas (6)**
7:14,22;8:14;
10:22;13:4;14:3
**Amherst (12)**
5:3;64:8,15;77:3,
8;78:13;80:7,9,14;
85:24;120:16;
130:15
**among (4)**
43:17;45:24;
50:18;86:19
**amount (9)**
18:2;32:24;47:3,5;
62:17,17;77:14;
87:24;136:5
**amounts (1)**
46:8
**ample (2)**
29:21;125:16
**amply (1)**
131:1
**analysis (3)**
35:16;63:20,21
**Angeles (2)**
7:6;10:15
**annex (1)**
122:8
**announce (1)**
136:1
**announced (2)**
26:22;97:6
**announcement (1)**
17:22
**announcing (1)**
136:2
**anticipate (2)**
50:15;132:9
**apart (1)**
68:10
**apologize (1)**
73:25
**apparent (1)**
28:3
**apparently (3)**
17:23;95:12,12
**appear (1)**
131:15
**appearance (1)**
62:13
**appearing (1)**
121:5
**applicable (6)**
31:19;62:8;
133:18,19,23;134:6
**applied (4)**

32:1;34:1;99:10;
127:10
**applies (3)**
31:22;40:11;
126:11
**apply (5)**
29:19,24;32:5;
43:20;127:12
**appoint (1)**
22:23
**appointed (2)**
22:24;43:25
**appointing (2)**
43:23;131:14
**appreciate (8)**
48:11;53:14;
63:14;79:20;103:22;
105:21;111:11;
117:10
**approach (1)**
103:8
**appropriate (15)**
20:13;40:17;47:6;
55:22;96:6;102:6;
120:1;125:11;
126:19;127:10,17,
20;128:23;130:12;
138:14
**appropriately (4)**
26:12;35:18;
126:10;130:16
**approval (15)**
36:14;61:10,17,
19;65:20;68:20;
87:8;98:20;100:9;
125:1;127:12;
133:10,12,18,19
**approve (7)**
18:21;20:4;98:5;
103:16;125:18;
131:2;133:24
**approved (8)**
17:20;32:7,9;34:3;
63:9;68:24;77:23;
119:4
**approves (2)**
19:22;57:16
**approving (9)**
18:17;46:13;
102:25;106:13;
109:7;125:15;126:3;
132:5,19
**approximately (2)**
47:10;122:12
**area (1)**
135:25
**areas (1)**
68:21
**arguably (1)**
32:13
**argue (5)**
31:21;69:7;94:4;
121:11;136:15

**argued (3)**
31:18,25;99:10
**arguing (3)**
93:10;94:10;96:5
**argument (7)**
61:1;64:20,25;
80:18,19;96:19;
127:18
**arguments (9)**
22:4;23:19;27:5;
58:6,7;66:22;69:10;
81:19;94:2
**argument's (1)**
64:25
**arise (1)**
132:18
**arises (2)**
61:19,19
**arising (2)**
23:16;24:24
**ARLENE (1)**
4:8
**arm- (1)**
97:20
**armed (1)**
33:13
**arms'-length (1)**
45:5
**around (1)**
83:7
**array (1)**
129:14
**arrive (2)**
128:23;129:17
**arrived (2)**
29:25;74:25
**Article (1)**
60:1
**articulated (1)**
129:5
**Asabedo (5)**
72:4,5,9,11;79:3
**aside (1)**
102:4
**aspect (1)**
129:19
**assert (7)**
53:5;66:16;67:1;
68:13;98:22;99:5,17
**asserted (4)**
23:15;24:11;
25:14;49:18
**asserting (1)**
34:23
**asserts (1)**
92:2
**assets (1)**
86:8
**assume (8)**
45:1;55:20;65:20;
77:6;82:20;113:1;
130:22;132:6
**Assurance (1)**

10:21
**assurances (1)**
120:7
**assure (1)**
133:11
**Assured (3)**
9:21;38:7;47:11
**Atlanta (1)**
5:15
**attach (1)**
102:25
**attached (13)**
70:24;71:3;72:5,
15;73:1,12;74:6;
75:25;76:10;102:19;
103:1;132:25;133:6
**attack (1)**
115:9
**attempt (2)**
128:22;129:22
**attend (1)**
21:21
**attended (1)**
30:25
**attention (1)**
18:15
**attest (1)**
22:3
**Attorney (1)**
123:7
**Attorneys (34)**
4:3,14;5:3,12,21;
6:3,11,20;7:3,12,21;
8:3,13,21;9:3,12,21;
10:3,12,21;11:3,12,
20;12:3,11,19;13:3,
11,20;14:3,12,20;
15:3,20
**Attorney's (1)**
15:13
**attribute (1)**
68:4
**August (1)**
24:21
**authority (11)**
20:6;61:22;62:4;
97:14,16;98:1,2,2;
125:15,16;126:2
**authorize (1)**
18:18
**authorized (1)**
70:16
**Authorizing (7)**
2:2,8;17:10;18:7;
19:9;41:2;100:7
**availability (1)**
121:20
**available (6)**
21:13;44:6;65:23;
74:20;122:2;139:13
**Avenue (18)**
5:4,22;6:4;7:4,14,
22;8:4,14,22;9:4,14;

10:22;11:21;13:4;
14:4,21;15:6,21
**avoid (1)**
39:9
**avoiding (1)**
28:6
**avoids (2)**
25:23;27:19
**aware (5)**
19:13;32:3;43:14;
77:8;112:18
**axe (1)**
47:22
**a-year (1)**
30:21
**AZ (1)**
14:23

**B**

**back (11)**
48:16;54:16;56:5;
89:4;90:21,23,24;
110:10;111:7;112:2;
119:12
**backed (1)**
24:25
**backroom (1)**
29:11
**balances (4)**
28:1,3,5,8
**ball (1)**
118:22
**Bank (26)**
4:3;5:12,21;6:11;
7:12,13;8:3,13;
11:20;14:3;38:2;
44:22,25,25;70:18;
71:15;72:25;77:10,
17;80:7,10;85:23;
97:24;100:2,4;
120:25
**Bankruptcy (16)**
2:7;19:8;30:22;
32:4;9;52:24;58:14;
61:6,20,21;66:23;
67:10;100:11;
125:22;127:6;
132:22
**Banks (4)**
14:20;18:10;
98:12,16
**barred (4)**
93:11;94:10;96:5,
6
**BARTLETT (1)**
11:19
**based (10)**
29:2;48:22;55:20;
59:18;85:24,25;
113:13,18;119:24;
120:16
**basically (1)**

39:7
**basis (2)**
88:16;127:25
**Battery (1)**
4:4
**Bayview (1)**
9:13
**bear (1)**
35:7
**became (1)**
22:19
**become (1)**
85:3
**becomes (2)**
28:3;34:1
**bedeviled (1)**
29:4
**beginning (2)**
27:8;131:11
**Behalf (24)**
2:4,15;15:5;40:25;
44:22,24;45:2;77:2,
9;78:12;81:1;96:15;
109:16;117:19;
119:22;120:7,16,24;
123:7;124:1;128:22;
130:21,21;137:1
**behavior (1)**
106:15
**behind (5)**
28:2;116:21,23,
25;117:1
**belief (2)**
105:17,18
**believes (1)**
78:18
**BELKNAP (1)**
10:20
**belong (1)**
65:19
**bench (1)**
135:20
**beneficial (1)**
25:22
**BENEFIT (5)**
16:2;34:8,9,13;
117:19
**benefits (1)**
20:25
**Berkshire (3)**
2:13,15;7:3
**beside (1)**
34:5
**best (33)**
30:9;37:13,15,21,
22;52:6,8;56:2;
62:15,24;63:6;
84:23;85:9;89:23;
91:18;95:21;101:21,
23;102:15;103:11;
104:1,11;105:7,9,18,
25;107:4,8,23;
127:22;128:19;

132:1;137:8
**bets (1)**
50:8
**better (6)**
31:14;35:2;65:7,8;
69:2;105:4
**beyond (3)**
58:5;125:14;127:1
**big (1)**
113:22
**bigger (1)**
47:17
**biggest (1)**
25:20
**bilateral (2)**
31:1;97:20
**billion (8)**
25:16;28:17,18;
77:14;82:10;84:18;
87:24;128:1
**billions (4)**
23:22;24:10,16,23
**bills (2)**
135:25;136:5
**binary (1)**
137:15
**bind (3)**
55:2,3;133:12
**binding (2)**
79:12;101:25
**binds (1)**
55:11
**BIRD (2)**
5:11,20
**bit (4)**
102:7;111:5;
112:12;113:9
**Board (5)**
4:14;17:25;89:7;
112:5;126:15
**Board's (1)**
26:21
**BOCKIUS (1)**
14:2
**bona (1)**
28:5
**bonds (1)**
127:3
**borrower (9)**
25:25;26:1,8,11,
14;39:5;87:13;
121:22;122:14
**borrowers (8)**
18:5;26:6,19,24;
27:1;39:9;87:16;
122:16
**borrowers' (3)**
26:5;122:9,11
**Boston (1)**
98:17
**both (7)**
28:11;32:18;
33:22;76:1;87:7;

124:16;130:12
**bottom (1)**
91:14
**bottom-line (1)**
65:18
**bought (1)**
51:7
**bound (2)**
44:4;52:23
**breadth (1)**
19:15
**Brendan (5)**
71:15;72:1;75:13,
15;76:10
**BRIAN (1)**
10:25
**bribes (1)**
136:6
**brief (5)**
29:18;76:23,23;
111:2;116:12
**briefly (11)**
21:2,4;35:19;38:5;
61:2;63:11;69:15;
98:18;116:10;126:9;
131:22
**bring (5)**
18:14;24:18;
34:15;42:7;43:9
**brings (1)**
52:21
**broad (5)**
31:10;44:1;
103:14,22;126:15
**broadly (1)**
58:3
**brought (4)**
22:25;24:10;25:5;
26:10
**BROWN (1)**
8:8
**BRUNS (1)**
11:2
**Bryant (2)**
6:12;10:4
**bucket (2)**
39:16;40:9
**build (1)**
40:16
**building (1)**
21:17
**buried (1)**
29:12
**burning (1)**
22:15
**BUSH (38)**
4:19;88:24,24;
89:2,5,5,11,22;90:4,
6,15,17,19;91:1,9,10,
12,24;92:10,13,19,
21,23,25;93:2,4,12,
14,17,23;95:2,5,12,
14,18;96:1,9;106:6

**business (14)**
21:2;29:24;30:8;
31:22,23;32:5,8,10,
16;126:10,19;127:9;
133:24;134:6

**C**

**CA (2)**
7:6;10:15
**CADWALADER (1)**
11:11
**CAHN (4)**
12:15;86:15,15;
87:9
**calculation (1)**
67:24
**calculations (1)**
121:21
**calendar (2)**
94:9;109:21
**call (4)**
58:13;102:23;
108:22;137:4
**called (9)**
41:6;70:19;71:19;
72:6,16;73:1,13;
74:8;136:23
**calling (1)**
136:23
**came (4)**
39:2;63:4;104:5;
137:7
**can (42)**
20:1;24:17;30:12;
39:10;40:7;41:19,
20;44:15,17;46:18;
48:11,23;63:15,16;
67:13;68:13;90:15,
24;99:17,19;104:18;
113:7,16;114:1;
115:19;117:16;
118:25;119:12;
120:3;124:16,23;
127:9;128:23,25;
129:22;130:7;
131:18;134:24;
135:13;136:21;
137:15,16
**Capital (5)**
2:5;9:12,13;17:3;
27:17
**care (2)**
35:17;115:2
**carefully (3)**
28:2;83:14;94:12
**CARNEY (1)**
10:8
**Carpenters (4)**
2:3;17:11,18;
25:13
**carry (1)**
57:16

**CARTER (2)**
12:10;86:16
**CASE (63)**
7:20;22:5;23:4;
25:18,18,19,20;
26:25;29:5;34:14;
44:1,23;45:8;52:21,
24;58:14;59:25;
61:6,7,17,20;62:14;
64:1;65:3;66:14;
83:6;86:8;87:7,17;
93:10;94:10;96:5;
104:7;111:18;
118:18;119:13;
124:20;125:20,22;
126:9,10,12,13,16,
20,25;127:6,8;128:3,
13,14;129:15;131:4,
5;132:14;133:4,5,10,
13,14;134:2,18;
138:13
**cases (11)**
19:14,18;22:2,9,
11,15;32:11;61:20;
62:10;82:18;124:7
**Cash (9)**
2:18;28:19;
135:12,25;136:5,20;
137:2,11,23
**categories (1)**
35:22
**cause (1)**
98:24
**caused (1)**
53:5
**CC (2)**
2:7,17
**Center (1)**
13:21
**Central (1)**
14:21
**Certain (10)**
2:10;12:19;20:9;
27:18;59:14;63:3;
100:25;101:8;
113:18;125:12
**certainly (7)**
34:4,7,21,25;
75:10;127:8;138:18
**certainty (1)**
48:18
**certificate (20)**
46:18;47:2,17,18;
50:2;51:17;52:20;
62:16,18;63:12;
65:13;67:4;74:5;
77:24;78:13;82:19;
83:11;84:23;86:2,9
**certificates (1)**
25:15
**certified (1)**
25:17
**cetera (2)**

**CHADBOURNE (1)**
6:19
**challenge (1)**
36:5
**challenges (1)**
40:9
**challenging (4)**
90:18;94:1;
104:17;133:13
**Chambers (2)**
15:14;17:15
**chance (2)**
81:15;90:13
**change (2)**
38:19;39:2
**changes (4)**
37:10;38:6;
107:14;121:19
**chaos (1)**
59:25
**Chapter (6)**
42:16,22;43:1,6;
93:10;124:9
**Charles (2)**
40:24;96:15
**Chase (1)**
13:12
**check (1)**
19:5
**Chicago (2)**
12:23;98:17
**Chief (3)**
16:3;125:23;127:7
**CHRISTENSEN (1)**
4:7
**circumstance (2)**
57:10;85:2
**circumstances (12)**
31:20,22;46:25;
47:4,19;48:1;52:12;
53:18;55:5;63:5;
67:18;134:3
**circumvent (1)**
66:19
**cite (1)**
62:10
**cited (1)**
126:11
**citing (1)**
101:1
**City (1)**
74:6
**claim (14)**
26:2;67:20,21;
68:5,7;83:3;87:24;
88:5;92:4,8,11;
94:10;96:4;122:12
**claimant (2)**
88:5;95:8
**Claimants (18)**
2:11;25:4,14;33:6,
17,18;38:19,21;88:4;

89:16;93:24,25;
99:2;128:11;129:17;
130:2,6,8
**claims (71)**
23:14,15,19,20,21;
24:9,13,14,17,23;
25:3,5,9,11,12,14,20,
21,25;26:5,8,13,14,
16;27:23;28:12,12;
32:24;33:8,8,8;
34:23;39:5;45:7;
46:10,11;55:24;
62:6;66:14,17;67:2;
68:1,9,10,12;69:7;
77:13;82:17;84:17;
85:1;93:10,16,18,23;
94:1,2,4;95:8;
111:14,17,24;114:2,
6,12,13,16,18,22;
115:20;122:9;
129:13
**clarification (3)**
68:24;76:24;
111:10
**clarify (6)**
38:13,19;80:8,19;
111:20;121:7
**clarity (8)**
54:18;69:1;92:2;
108:15,22;111:4;
122:25;129:21
**class (7)**
17:18;25:13,14,
16;26:10;87:15,24
**classification (7)**
25:2;92:6;94:4,13,
18,19,22
**clear (34)**
20:3;22:19;24:12;
27:17;31:8;35:15;
36:14,18;37:16,20;
38:2;49:25;55:1;
62:3;78:15;86:5;
94:17;97:12;100:6;
102:10;106:24;
107:15;113:14,25;
114:1;115:18;
117:20;118:6;120:6;
123:21;125:4;
133:10;136:6;
138:12
**clearing (1)**
136:9
**clearly (8)**
60:18;62:7;77:15;
82:17;92:5;94:13;
99:15;126:2
**CLEARY (1)**
14:11
**clever (1)**
77:21
**client (9)**
57:9;75:3;77:15,

19;83:4;86:25;
92:15;94:22;95:10
**clients (7)**
82:8,10;86:22;
87:2;99:1;112:5;
128:23
**clients' (3)**
94:4;98:22;99:5
**client's (2)**
92:4;93:10
**Cliff (2)**
135:3,5
**close (1)**
35:16
**closed (4)**
80:4;81:20;96:17;
105:14
**closing (1)**
127:15
**Co (2)**
7:13;11:12
**Code (4)**
2:8;19:8;66:23;
100:12
**COHEN (8)**
4:20;9:2;90:8,11;
91:7;92:1,2;96:2
**Collateral (7)**
2:19;27:11;
135:13;136:20;
137:2,11,24
**collateral-loss (1)**
24:17
**colleague (2)**
132:23;136:20
**colleagues (2)**
45:1;59:13
**collect (1)**
118:15
**collected (1)**
27:12
**collective (1)**
131:13
**collectively (3)**
62:20;63:6;82:10
**colloquy (3)**
58:1;60:9;102:8
**Combined (1)**
12:19
**comfort (4)**
33:22;36:22;
46:17;52:20
**comfortable (2)**
111:25;131:4
**coming (4)**
79:2;105:15;
109:13;113:22
**commence (1)**
20:7
**commenced (2)**
56:22;103:18
**commentary (1)**
98:24

19;83:4;86:25;
92:15;94:22;95:10
**comments (11)**
36:25;37:2;49:6;
98:19;106:11;
108:21;111:1;118:8;
128:21;131:23;
132:12
**committed (2)**
128:6,9
**Committee (45)**
2:10;11:3;13:3,20;
19:10,23;22:19;
28:13,14;29:10;
31:20;32:21,22;33:1,
11,17;34:4,14,19,22;
35:2;40:16;50:14;
57:15;58:15;81:2;
82:7;85:6;87:14,25;
92:3;101:7;103:19;
109:19;116:12,24;
120:8;124:2,17;
125:25;126:5,21,24;
127:1;129:25
**committee's (3)**
32:20;34:3;120:17
**communicate (2)**
65:7,7
**Company (3)**
14:3;111:24;
129:13
**compare (1)**
118:17
**compared (1)**
93:19
**competing (2)**
66:14;68:7
**complaint (3)**
34:22,24;92:14
**complete (2)**
49:14;128:14
**completed (1)**
26:17
**completely (1)**
64:24
**complex (2)**
28:6,10
**complicated (1)**
133:8
**composition (1)**
27:25
**comprehensive (1)**
20:8
**comprehensively (2)**
31:6;81:8
**compromise (2)**
27:3;129:12
**compromised (1)**
99:6
**compromises (4)**
22:21;23:9;45:8;
104:6
**comtemplates (1)**
23:14
**conceded (1)**

RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020-mg

June 26, 2013

127:16

**concept (1)**
138:19

**concern (5)**
26:20;48:6;102:9;
119:2,7

**concerned (1)**
111:15

**concerning (2)**
27:15;100:23

**concerns (5)**
35:3;64:4,4,5;
65:14

**conclude (4)**
55:22;86:10;
113:23;131:12

**concluded (2)**
46:23;139:23

**conclusion (5)**
28:4;50:23;
104:16;132:8;133:5

**concur (1)**
128:21

**condition (3)**
78:18,19;88:13

**conditions (4)**
53:25;88:7,8,9

**conducted (2)**
33:2;34:4

**Conference (7)**
2:17;112:13,17;
113:3,7;116:12;
135:12

**conferences (2)**
112:19;113:2

**confiden (1)**
65:18

**confidentiality (6)**
44:2,5;49:2;65:14;
110:5;138:12

**confidentially (2)**
138:14,17

**confirm (4)**
113:7,17;128:6;
129:24

**confirmable (2)**
22:13;133:9

**confirmation (59)**
20:16;26:17;36:3;
39:16,24;40:7;
46:15;49:19;50:3;
52:16,18;53:7,20,22,
24;55:4,6;58:6;
68:25;69:20,23;
70:1;77:25;78:20;
79:13;80:16;92:6;
93:6,16,22;94:6;
95:25;97:10;98:23;
99:6,16;105:1;
108:13;112:5,15;
115:13;117:24;
118:4,7,25;120:4,19,
20;121:11,15;

124:25;125:6;128:3,
13;129:11,20;
130:24;133:20,22

**confirmations (1)**
109:2

**confirmed (13)**
53:2,4,10,18;
56:21;57:8;60:13,
19;94:17;104:18;
113:25;133:7,12

**confirming (1)**
53:19

**confused (1)**
111:14

**confusion (2)**
83:7;123:22

**connection (15)**
17:25;20:14;
25:17;35:1;43:21;
52:14;60:10;82:22;
100:20,25;101:25;
129:8,11;130:23;
135:15

**CONNOLLY (1)**
9:8

**consensual (2)**
65:22;124:9

**consensually (5)**
57:20;65:22;
109:1;124:19;
133:16

**consensus (2)**
19:16,19

**consent (9)**
18:14;97:11,18,19,
19;122:6,14,15;
138:10

**Consenting (13)**
2:11;19:12;29:10;
33:17,17;88:4,4;
89:16;128:11;
129:16;130:2,6,8

**consequence (2)**
56:23;70:5

**consequences (2)**
53:19;102:23

**consider (4)**
61:17;76:1;95:22;
99:11

**considerable (1)**
32:24

**consideration (1)**
20:17

**considered (2)**
118:7;133:22

**considering (3)**
32:5;45:11;132:16

**consistent (5)**
59:18;114:5;
127:20;130:13;
132:25

**consistently (1)**
122:18

**consolidation (2)**
27:15,19

**constituencies (5)**
45:15;91:19;
95:22;126:25;
132:21

**constituency (2)**
95:10,23

**constituents (1)**
95:5

**constitute (2)**
37:17;100:11

**constructively (1)**
124:15

**contained (8)**
35:10;70:20;
71:20;72:7,17;73:3,
14;74:9

**contemplate (3)**
23:15;49:21,24

**contemplated (16)**
19:24;20:15;
36:16;37:13,15;
38:1;45:4;50:2;
56:20;57:2,12;
60:13;99:13;104:11;
107:11,19

**contemplates (4)**
24:13;25:3;27:22;
57:3

**contentious (1)**
132:22

**contents (1)**
90:25

**contested (2)**
19:7;113:23

**context (3)**
45:7;67:16;132:18

**contingent (1)**
86:8

**Continue (3)**
2:18;39:8;91:10

**continued (2)**
88:12;116:12

**continuing (2)**
88:7;135:12

**contracts (2)**
82:14,25

**contradicted (1)**
45:1

**contrary (1)**
30:11

**contribute (3)**
28:17;128:1,2

**contribution (4)**
28:20;45:15,16;
84:20

**contributions (2)**
26:25;28:5

**controlled (2)**
80:11,12

**controlling (1)**
86:22

**conversant (1)**
48:20

**conversation (1)**
75:11

**conversations (4)**
110:8;112:20;
113:12,13

**cooperatively (1)**
83:6

**copies (1)**
138:3

**co-plan (1)**
19:23

**co-proponents (1)**
50:14

**copy (11)**
17:14;41:15,16;
42:7;90:13,15,19;
101:12;103:1,2,4

**CORDARO (6)**
15:17;123:6,7,13,
14,20

**core (3)**
61:5,10,20

**corporate (1)**
97:24

**Corporation (3)**
10:21;16:2;117:20

**cost- (1)**
48:18

**costly (1)**
25:23

**Costs (3)**
2:3;17:11,17

**Counsel (12)**
16:3;29:11;35:16;
40:14;43:17,21;
68:19;70:16;77:7;
96:19;99:23;100:2

**couple (4)**
60:2;93:9;125:12;
137:7

**course (12)**
18:18;22:11,16;
23:1;24:3;55:15;
88:2;94:6;99:1;
111:18;112:11;
115:21

**COURT (408)**
17:2,16,19;18:7,
16,21,23;19:1,4;
20:4,20,22,24;21:9,
12,14;22:23;23:12;
25:17;27:8;29:21,
24;30:13,21;31:8,17;
32:12,15;33:10,24;
34:18;35:6;36:11;
37:5,7,12,17;38:15;
40:21,23;41:10,17,
20;42:3,8,11,13,19;
43:4,11,14;44:8,13,
17,20;45:22;46:3,22,
23,25;48:5,14;49:8,

15;50:8,12,20,24;
51:1;52:4,13;53:1,9,
13,15,19;54:6,9,11,
18,21,23;55:13,16;
56:7,10,13,15;57:14,
16;58:9,18,21,23;
59:2,5,9,12,16;60:1,
2,4,6,8,14,16,18,22,
24;61:1,9,13,16,21;
62:1,13;63:9;64:8,
11,15,18,22;65:2,17;
66:3,9;67:6,11;68:8,
16;69:4,11,14,20,22;
70:1,6,9,11,14,22;
71:4,6,8,17,23;72:9,
20;73:6,17,21;74:1,
12,15,19,21,23;75:2,
4,6,8,16,20,22;76:3,
7,15,17,21;77:1,4;
78:1,3,6,8,11,21,23;
79:1,8,11,18,22,25;
80:2,20;81:4,12,14,
22,24;82:3,5,6,7;
83:7,13,17,24;84:1,
3,5,8,9,10,12,14,17;
85:9,12,15,19;86:11,
13;87:9;88:18,20,25;
89:3,10,13,21,22;
90:2,5,10,16,18,21;
91:2,5,9,11,15,23;
92:1,11,14,20,22,24;
93:1,3,5,13,15,20;
94:3,7,19;95:3,10,
13,16,19;96:2,7,10,
17,25;97:5,17,22;
98:4,8,10,13,15;
99:9,11,15,19,21,23;
100:14,18,19;
101:13,16;102:4,17;
103:4,6,9,25;104:4,
15,23,25;105:3,11,
15;106:1,5,8,18,21;
107:1,5,13,21;108:2,
4,6,17,20;109:10,12,
22;110:2,4,7,10,16,
18,22;111:7,16;
112:2,2,4,18,22;
113:5,16,20;114:3,
19;115:2,3,10;116:1,
8,15,20,23;117:1,5,7,
9,12,14,23;118:3,12,
14,23;119:4,5,10,12,
18,20;120:2,9,12,14;
121:2,6,9,14,17,23,
25;122:24;123:2,8,
12,15,18,23;124:10;
125:18;126:2;127:8;
129:2;131:4,8,16,20;
132:1,3,17,19,22;
133:13,14;134:16;
135:1,4,8,17;136:4,
9,15,21;137:4,18,20,
23;138:5,22,24;

139:2,10,14,16,20
court-approved (1)
  23:5
courtroom (5)
  20:3;81:4;123:3;
  124:21;136:9
courts (2)
  32:4,10
Court's (2)
  125:14;126:18
covered (3)
  81:7;107:16;
  130:25
CRAVATH (2)
  8:20;119:22
create (4)
  22:7;50:1;59:25;
  63:18
created (1)
  63:5
creation (2)
  22:1;27:25
credibly (1)
  58:10
Credit (11)
  4:14;8:21;23:3;
  40:12,14,16;69:16;
  89:6,8;119:22;
  128:22
CREDITOR (7)
  16:11;25:11;
  84:25;85:1;97:4;
  126:25;132:21
creditors (22)
  19:11,12;25:23;
  28:22;29:1,10;30:9;
  37:14,21;50:4;
  89:24;94:24;101:7;
  102:16;104:2;
  109:19;124:2;
  125:25;126:14;
  127:23;128:19;
  129:25
Creditors' (13)
  2:10;13:3,20;
  19:10;28:13;33:16;
  34:14;40:15;57:15;
  58:14;81:1;85:5;
  87:13
Creditor's (3)
  91:8;126:23;127:1
critical (2)
  51:25;133:3
CRO (1)
  134:4
cross (1)
  136:16
cross- (3)
  55:18;57:23;79:1
cross-examination (6)
  21:13;44:11;
  55:21;74:20;79:7;
  81:9

cross-examine (10)
  21:10;30:16;44:8;
  76:18,22;79:10,17,
  23;80:3;108:9
cross-examined (1)
  44:7
cross-examining (1)
  70:14
CRUTCHER (1)
  5:2
cure (3)
  23:20,21;85:1
current (1)
  115:11
currently (1)
  50:2
cut (1)
  81:24
CUTLER (1)
  13:19
cutting (1)
  29:10

D

DALE (1)
  4:7
damages (2)
  53:5;54:4
DAN (2)
  15:25;87:12
dance (1)
  104:23
dancing (1)
  104:21
DANIEL (4)
  6:15;8:9,17;100:1
data (1)
  63:25
date (20)
  27:5,13;39:4,6;
  41:14;42:6,23;43:8;
  71:13;72:2,12,23;
  73:9,24;74:17;
  76:12;79:10,12;
  91:8;134:14
dated (4)
  41:4;42:1,5;43:24
DAVID (2)
  5:8;6:24;77:2;
  120:15
Davidson (2)
  15:3,4
Davis (1)
  2:21
DAY (11)
  12:2;27:8;35:4;
  58:19,25;59:3;
  67:14;88:13,13;
  133:17;138:9
days (7)
  18:13,20;34:17;
  36:11;93:9;137:7,9

DC (3)
  4:17;11:14;16:5
DCF (1)
  70:24
deal (17)
  29:5,11;30:20;
  31:5,14;45:6;62:16;
  66:14;78:8;94:3;
  96:7;104:25;109:3,
  21;129:1,20;134:21
dealing (3)
  62:18;67:23;78:23
dealt (9)
  45:14;88:5,16;
  108:21;112:25;
  124:15,24;129:10,22
death (1)
  97:9
Debenture (1)
  44:25
Debentures (1)
  72:14
debt (1)
  28:6
debtor (25)
  18:19;24:24;
  33:15;46:9;54:24;
  87:25;92:8,12;
  94:15;95:9;97:6,15;
  103:19;104:12;
  105:7;118:7;124:17;
  125:23;126:4,23;
  128:11;129:16,25;
  132:8,20
Debtors (48)
  2:3,8,18;17:6,10,
  13,24;18:7;19:9,17,
  23;22:22;24:23;
  25:6,22;29:9;30:7;
  31:20;32:25;37:13,
  20;39:4;40:25;41:2,
  3;50:14;57:15;
  84:21;92:3;93:8,9;
  96:15;100:7;102:16,
  24;103:24;109:19;
  110:6;113:19;115:5;
  116:6;118:6;122:13,
  21;132:20;134:3;
  137:1;138:18
Debtors' (33)
  2:2,7,17;17:9,17;
  19:7;21:2,8;25:20;
  27:15,17,23;28:1,18,
  22;32:6,7,13;41:1;
  54:25;89:24;94:9;
  97:15;100:10;
  101:14;102:15;
  103:20;104:1;
  105:17,18;120:17;
  127:7;135:12
Debtor's (8)
  41:4,14,25;42:6,
  15,23,24;43:7

dec (1)
  111:13
December (1)
  43:24
DECHERT (2)
  7:11;44:22
decide (4)
  45:19;59:18;
  132:18;138:14
decided (2)
  55:25;61:21
decision (7)
  52:15;53:7;59:4,4,
  5,8;60:11
decision-making (1)
  51:14
decisions (1)
  46:24
declr (1)
  76:7
declarant (1)
  74:25
declarants (5)
  21:12;30:16;
  74:19;79:2,23
declarants' (1)
  76:19
declarat (1)
  74:7
declaration (56)
  30:3;40:20;41:4,7,
  8,11,13;70:17,20,21;
  71:8,9,10,12,15,20,
  22,24;72:1,4,7,8,9,
  11,14,17,19,20,22,
  25;73:3,4,6,8,11,14,
  16,18,23;74:9,12;
  75:13,14,15;76:1,2,
  10;83:22;90:7,11;
  91:3,7;92:1;96:2;
  104:8;126:18
declarations (15)
  30:4,14,15;35:14;
  50:22;55:19,20;
  57:23;58:9;62:12;
  69:18;70:8;76:14;
  84:7;105:15
decree (4)
  97:11,18,19,20
deep (1)
  83:4
default (1)
  67:19
defendant (1)
  41:3
Defendants (1)
  11:20
defense (1)
  52:23
defer (4)
  67:13;80:6;110:6;
  116:5
DEFILIPPO (20)

defined (1)
  128:12
defining (1)
  102:13
deliver (1)
  77:10
delivered (1)
  77:17
demonstrates (1)
  31:3
DENMAN (1)
  7:25
DENNIS (1)
  13:16
DEPARTMENT (1)
  15:12
depending (1)
  120:21
depositions (2)
  24:2;108:7
describe (3)
  21:25;35:12;58:10
described (3)
  22:10;43:15;51:20
designed (3)
  48:3;63:18;128:12
desirable (1)
  23:5
desire (1)
  80:3
desires (1)
  80:22
detail (2)
  35:12;80:7
details (1)
  49:22
determination (3)
  114:4,24;129:15
determinations (2)
  115:18,22
determine (8)
  27:8;34:2;45:10,
  17;109:6,8;126:18;
  127:9
determined (3)
  48:22;67:12;80:10
determines (3)
  102:5;115:3;129:3
determining (3)
  48:23;100:9;
  133:24
DEUTSCH (2)
  6:2;120:25
Deutsche (8)
  11:20;14:3;44:24;
  71:15;77:10,17;80:7,
  9
developed (1)

6:7;79:5,6,9,16;
  106:10,10,20,23;
  107:3,10,17,25;
  108:3,5,14,19;109:4,
  11,12

61:18

**dialogue (1)**
124:17

**different (18)**
19:17;29:6;33:6;
35:22;53:20;58:10,
12;59:20;60:20;
62:19;65:9;103:6;
104:19;106:19;
108:24;118:13,19;
134:2

**differently (5)**
92:16;93:18,20;
96:3;114:8

**difficult (4)**
22:16;54:3;
124:15;133:17

**diligence (1)**
35:17

**dilution (1)**
25:11

**direct (5)**
51:15,23;68:7,12;
69:7

**directing (1)**
80:12

**direction (7)**
28:16;36:17;
51:22;77:10,17;
80:9;130:17

**directions (1)**
46:7

**directly (1)**
26:24

**Directors (1)**
9:3

**disagree (4)**
52:1;61:9,24;
107:1

**disagreement (2)**
56:10,18

**disagrees (1)**
51:24

**disappears (2)**
53:11,15

**discharge (1)**
82:21

**discharged (1)**
47:1

**disclo (1)**
49:17

**disclosed (3)**
50:5;86:1;121:19

**disclosure (30)**
19:25;27:24;
36:16;37:24;39:25;
49:19,20,21;50:15;
55:3;65:3;68:25;
79:13;80:16;86:6;
98:22;99:5;100:14;
103:15;108:23;
120:21,21;121:12,
15;124:24;125:6;

128:4;130:23;
133:20;134:23

**disclosures (1)**
34:11

**discomfort (1)**
65:16

**discovery (3)**
30:10;34:10;108:7

**discrete (1)**
45:18

**discretionary (2)**
38:14,18

**discriminated (2)**
93:18,21

**discuss (2)**
63:21;112:3

**discussed (3)**
40:13;138:6,19

**discussion (6)**
30:17;43:20;
50:25;65:23;68:22,
23

**discussions (3)**
26:9;43:16;130:4

**disk (1)**
138:3

**dismiss (1)**
25:18

**disparate (1)**
128:9

**dispensed (1)**
116:11

**dispute (3)**
50:17;100:23;
101:18

**disputed (2)**
106:11,14

**disputes (3)**
22:6;28:10;29:4

**disputing (1)**
105:22

**dissatisfied (1)**
69:6

**dissemination (1)**
74:4

**distinctions (1)**
126:12

**distinguish (1)**
32:14

**distribute (1)**
47:5

**distributed (2)**
18:5;122:6

**distribution (1)**
120:22

**distributions (5)**
26:7;29:1;39:18;
49:23;50:18

**district (4)**
25:17;32:4;87:15;
125:16

**diversity (1)**
46:17

**Doc# (4)**
2:2,7,13,17

**docket (17)**
19:7;22:2;36:10,
18;40:13;41:5;42:2,
17;43:2,24;50:9;
70:22,24;71:2;
72:15;74:7;75:16

**doctrine (2)**
31:19;133:25

**document (3)**
66:19;75:19;90:8

**documents (10)**
28:15;33:5;38:25;
51:7,11,16,18;52:4;
67:9;98:3

**DOJ (1)**
123:13

**DOJ/AG (5)**
122:14,15,18,22;
123:10

**dollar (2)**
77:14;94:23

**dollars (17)**
18:3;23:22;24:11,
16,23;25:16;26:23;
27:1;28:17,19;
82:10;84:18;87:24;
92:22,23;121:21;
128:2

**done (1)**
24:4;33:2;35:16;
48:11;49:16;57:14;
85:25;95:1;130:5;
137:2,16

**DONNOVAN (1)**
8:9

**door (1)**
21:21

**DORR (1)**
13:19

**doubt (3)**
93:5;123:17,20

**down (5)**
45:23;47:3;58:1;
115:23,24

**draft (1)**
92:14

**drafted (3)**
34:21;100:17;
116:16

**drafting (1)**
102:24

**Drennan (3)**
15:20;87:12,13

**drive (1)**
31:2

**driven (3)**
19:19,21;33:16

**dropped (1)**
135:24

**due (2)**
52:10;94:6

**Duff (14)**
35:16;48:8,9,15;
49:5,8;55:23;63:19,
21,25;64:3;65:11;
84:12;85:25

**DUNN (3)**
5:2;77:2;120:16

**duplicated (1)**
67:21

**during (2)**
18:13;111:18

**duties (3)**
35:18;51:21;52:2

**duty (2)**
47:1;52:25

---

# E

**earlier (8)**
63:17;65:3;77:23;
78:4;80:18;97:12;
102:21;118:8

**early (1)**
101:3

**easiest (1)**
114:17

**East (1)**
12:4

**ECF (2)**
70:22;75:16

**echo (1)**
131:23

**ECKSTEIN (22)**
13:7;80:25;81:1,6,
13,14,21,23,25;82:2,
4;91:2,4;120:7;
123:5,23,25;124:1,
11;131:8,12,24

**economic (1)**
67:12

**effect (8)**
18:4;52:14;60:10;
69:10;98:21;106:22,
25;107:20

**effective (4)**
27:5,13;48:19;
55:14

**effectively (2)**
27:12;33:18

**effectuate (1)**
37:25

**efficient (1)**
81:10

**effort (3)**
31:2;36:21;131:13

**efforts (4)**
23:2;29:14,15;
131:15

**eight (3)**
19:18;33:19;47:11

**Eighth (1)**
8:22

**eighty-nine (1)**

**Duff (14)** — column 4

24:1

**either (5)**
26:12,15;57:20;
87:2;123:20

**elaborate (1)**
134:9

**Eleven (5)**
9:22;92:10,11;
94:9;96:4

**eliminates (1)**
24:16

**ELLENBERG (1)**
11:16

**ELLIS (1)**
8:2

**eloquently (1)**
29:12

**else (24)**
19:3;80:23;81:25;
87:10;88:20;98:10;
106:9;109:13;
110:22;111:9;117:6,
15;118:3;120:14;
121:3,5;123:3;
131:21;132:4;
134:21;136:24;
137:23;139:2,17

**e-mail (1)**
124:22

**EMANUEL (1)**
10:11

**embodied (4)**
23:10;25:21;
31:14;56:1

**embodies (2)**
53:2,10

**embody (1)**
133:7

**embodying (1)**
133:11

**empirically (1)**
46:24

**enable (1)**
46:14

**end (9)**
22:18;35:4;40:5,7;
58:19;100:23;
101:24;109:21;
120:23

**ended (1)**
88:3

**endorse (1)**
125:1

**enemy (1)**
85:3

**energy (2)**
125:14;126:7

**enforce (1)**
98:2

**engage (1)**
88:1

**engaged (3)**
48:20;55:22;60:9

**ENGEL (1)**
14:8
**enhance (1)**
28:21
**enjoy (1)**
134:17
**enough (6)**
22:14;39:11;58:8;
66:3;86:20;137:6
**Enter (24)**
2:9;19:9;20:6,9;
36:6;41:2;55:25;
58:9;61:4,22;62:4;
100:7;106:12;
111:23;125:15;
126:3;129:13;132:1,
7,19;134:7,10,19;
135:15
**entered (9)**
18:9;22:5;53:8;
59:14;88:10;125:21,
21;127:17;138:17
**entering (8)**
37:23;52:9;91:19;
101:5,9;105:17;
127:12;131:5
**entire (5)**
31:19,24,25;
97:24;133:25
**entirely (3)**
39:20;124:9;
125:11
**entities (2)**
99:3;118:2
**entitle (1)**
80:13
**entitled (8)**
68:14;113:16,24;
114:4,10;115:3,17;
129:3
**entitlement (3)**
83:10;113:18;
115:11
**entitlements (2)**
112:15;115:8
**entrenched (1)**
22:20
**Entry (18)**
2:18;20:10;32:6,7;
35:11;36:2;41:5;
42:2,17;43:2;57:3;
72:15;74:7;100:6,
10;101:1;131:2;
136:10
**equally (3)**
24:15;33:5;82:18
**equity (1)**
28:5
**ERIC (1)**
10:17
**ERISA (1)**
118:21
**eScribers (1)**

2:22
**Escrow (5)**
2:4;17:12;18:2,11,
17
**escrowing (1)**
18:19
**ESQ (51)**
4:7,8,9,10,19,20;
5:7,8,17,25;6:7,15,
16,24,25;7:8,17,18,
25;8:7,8,9,17,25;9:7,
8,17,25;10:8,17,25;
11:8,16,24;12:7,15,
25;13:7,15,16,25;
14:7,8,9,16,17,25;
15:9,17,25;16:7
**essential (3)**
49:21;61:7;127:25
**Essentially (5)**
18:1;52:3;66:18;
89:12;127:16
**establish (1)**
18:2
**established (1)**
88:6
**establishes (2)**
26:5;62:7
**establishment (1)**
18:17
**estate (7)**
22:15;28:12,18;
50:4;105:19;127:23;
128:19
**estates (11)**
21:1;25:23;27:16,
23;30:2;89:24;
102:15;104:1,12;
105:7,25
**estimate (1)**
26:13
**estimated (2)**
84:15;121:20
**estimation (1)**
39:9
**et (2)**
89:25;110:14
**evaluate (1)**
32:16
**evaluated (2)**
55:23;83:14
**evaluation (1)**
134:9
**even (13)**
22:13;31:25;46:9;
47:14;53:1,23;65:2;
76:24;84:19;111:24;
119:7;135:9;138:9
**event (8)**
52:20;57:8;68:5;
69:5;84:21;129:2;
130:4,10
**everybody (12)**
20:1,3,24;21:1;

29:14;33:21;36:24;
85:7;117:1,16;
118:3;124:21
**everybody's (2)**
22:4;88:11
**evidence (81)**
21:3,8,11,19,22;
29:20;30:6,10,18;
31:3,5,12;32:17;
35:9;41:12,14,22;
42:4,6,20,23;43:5,7;
44:18;55:18;57:22;
69:12;70:10,12;71:9,
11,13,25;72:2,10,12,
21,23;73:7,9,21,24;
74:13,16;75:9;76:9,
11;80:22;81:9,17,19;
82:13;83:15,18,21,
22;84:11;88:23;
89:1;90:3,9;91:6,7;
96:8,11,13,16,17;
104:8,16;105:11,13,
14,16;107:5,6,7,21,
22;108:8,10
**exact (2)**
33:25;47:13
**Exactly (7)**
60:3;94:2;102:16;
108:19;120:5;
128:16;130:19
**examination (1)**
57:24
**examine (2)**
55:19;79:2
**examined (1)**
28:2
**Examiner (7)**
6:20;28:15;33:4,7;
34:1,5,10
**Examiner's (7)**
2:14;134:11,13,
20;135:2;136:10,11
**example (2)**
47:8;54:25
**excellent (1)**
135:5
**exception (1)**
86:25
**excess (1)**
122:21
**excluded (1)**
94:5
**excluding (1)**
51:19
**excuse (6)**
18:25;41:3;42:14;
57:7;70:25;75:21
**excused (1)**
135:18
**execute (1)**
18:8
**exercise (2)**
26:18;32:8

**Exhibit (33)**
41:4,14,22,25;
42:6,15,16,21,23,25;
43:1,4,7;70:21;
71:10,13,17,18,23;
72:2,5,12,15,23;
73:1,9,12,24;74:6,
17;76:11;91:8;
101:14
**exhibits (4)**
41:24;42:8;70:17;
76:19
**expansive (1)**
31:11
**expect (5)**
47:19;50:13;57:6,
8,11;119:16
**expected (1)**
39:18
**expecting (1)**
113:10
**expended (2)**
32:22,23
**expenses (1)**
69:19
**expensive (1)**
28:7;30:23
**experts (1)**
55:23
**explain (5)**
26:4;50:6;54:4;
66:8;105:4
**exposing (1)**
83:2
**express (1)**
107:14
**expressed (2)**
80:2;130:23
**extant (1)**
94:7
**extend (1)**
39:4
**extended (2)**
39:6;88:13
**extends (2)**
38:3;39:5
**extensive (5)**
34:5;35:13,25;
43:16;125:22
**extensively (2)**
58:15;63:20
**extent (8)**
47:14;53:3;56:18;
63:24;65:10;67:17;
104:21;114:14
**extra (1)**
41:15
**extraordinary (4)**
19:19;22:1;83:9;
114:24
**extremely (1)**
133:8

**F**

**face (2)**
25:16;77:14
**faced (1)**
104:7
**facilitate (5)**
20:10;35:11;
46:15;101:5,8
**facilitated (1)**
45:5
**facilitates (1)**
61:8
**fact (29)**
32:18;33:20;
45:15;46:9;48:4;
49:2,5;50:1,11;
51:12;53:22;54:3;
56:20;62:18;64:3;
77:10,16;78:14;
80:9;81:8;94:21;
105:19;124:6;126:8;
127:4,22;128:4;
129:3;131:3
**factors (1)**
28:4
**facts (1)**
28:2
**factual (2)**
41:8;133:9
**failed (1)**
89:8
**fails (1)**
114:14
**fair (12)**
25:22;45:17;47:7;
48:2;62:22;106:16;
107:25;108:4,11;
116:1;123:15;
131:12
**fairly (4)**
34:22;47:23;48:9;
95:6
**fairness (5)**
31:19,24,25;
63:18;133:25
**faith (14)**
30:8;35:10;37:22;
52:8;55:25;56:1;
62:9;91:18;94:15;
101:22;105:17,22;
107:8,23
**fall (2)**
35:21;95:10
**familiar (2)**
90:25;125:17
**family (1)**
97:24
**far (2)**
49:8;61:21
**Fargo (5)**
5:12,21;44:25;

12-12020-mg    Doc 4121    Filed 06/27/13    Entered 07/01/13 14:43:16    Main Document
Pg 151 of 166

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

June 26, 2013

73:11;74:25

**FARR (1)**
9:11

**fashion (2)**
24:14;47:13

**favor (1)**
46:14

**FDIC (4)**
118:10,12,16,18

**features (1)**
108:15

**Fed (1)**
26:23

**Federal (8)**
14:20;17:25;
26:21;30:21;97:14,
16;98:12,16

**feel (2)**
131:4;135:18

**feeling (1)**
129:19

**fees (1)**
69:19

**FELD (2)**
6:10;100:2

**FELDMAN (17)**
5:8;76:20,23;77:2,
2,4,5;78:2,5,7,10,12,
22,24,25;120:15,15

**felt (1)**
111:3

**Fernando (2)**
72:4,11

**few (3)**
31:10;111:1;
132:11

**FGIC (9)**
12:3;24:10,18,20;
36:20;55:4;62:25;
87:1;125:7

**FHFA (3)**
118:12,16,18

**fide (1)**
28:5

**fiduciary (3)**
111:4;130:11;
134:4

**fifteen- (1)**
96:22

**Fifth (1)**
6:4

**fifty-five (1)**
86:21

**fight (1)**
102:8

**Figueroa (1)**
10:13

**figure (1)**
67:24

**figured (1)**
24:4

**file (7)**
19:24;24:15;

27:24;39:6,6;67:20;
111:21

**Filed (45)**
2:4,15;25:6;32:20;
36:17,22,25;38:7;
40:3;41:5;42:1,17;
43:2;50:9,10,10;
59:7;82:9;86:18,25;
87:23;89:11;92:7,
15;93:8,9;96:4;
100:3;102:20,21;
105:9;108:16,17;
110:19,22;111:23;
116:2,4;117:25;
118:24;124:13;
132:15;134:13,14,16

**files (1)**
49:13

**final (5)**
88:14;102:17,18;
103:20,23

**finalize (1)**
31:7

**finally (3)**
31:12;70:7;73:19

**Financial (4)**
2:10;8:3;19:11;
82:21

**find (15)**
37:12;46:25;52:5;
61:21;79:22;88:22;
93:21,23;102:17;
111:17;113:8,16;
114:5,10,11

**finding (25)**
30:7;37:17,20;
38:20;84:24;90:16;
91:20,21;94:14;
95:5;100:16;102:12;
103:6,11;104:3;
105:7,9,12,22,22,23;
106:4;107:2,8;
128:18

**findings (39)**
20:9,13,15;35:10;
36:6;38:13;39:20;
52:14;53:21;55:1;
56:21;57:1,7;58:8;
59:22;60:10,13,20;
69:17;82:12,23;
89:13,18,21;100:25;
101:4,8,19,25;102:6,
10;103:24;106:12,
14,25;107:11,23;
125:9;127:21

**fine (7)**
20:22;29:21;51:1;
69:21;81:21;99:20;
122:24

**finer (1)**
75:24

**finish (2)**
30:13;134:24

**finished (1)**
135:1

**finite (1)**
22:15

**firm (1)**
48:20

**first (28)**
18:7;20:6,23;
22:22;23:13;24:25;
30:20;32:19;35:22;
37:11;47:8;58:3;
70:17;77:1;84:3,4;
88:21;89:19,20,21;
91:14,14;109:18;
110:13;122:8;
134:12;135:4;137:4

**firsthand (2)**
124:16;125:17

**five (3)**
46:6;51:19;77:12

**FLANIGAN (5)**
15:25;87:11,12;
88:18,19

**flesh (1)**
108:25

**flexibility (1)**
130:12

**Floor (6)**
7:5;10:5,14;15:15;
26:1,2

**flow (1)**
102:23

**focus (2)**
54:24;114:15

**focused (4)**
30:24;45:23;
65:17;94:13

**focuses (1)**
64:12

**Foerster (3)**
17:6;40:25;137:1

**follow (3)**
20:8;50:21;51:16

**followed (1)**
110:24

**following (1)**
41:24

**footnote (3)**
121:19;122:7,11

**FORAN (1)**
12:18

**forcing (1)**
115:7

**foreclosure (3)**
17:25;18:10,12

**forego (1)**
79:7

**foremost (1)**
32:19

**forgot (1)**
135:23

**form (18)**
18:13;20:13;

23:10;26:4;39:1;
91:13;98:18;100:23;
102:17,18,18,25;
103:10,20,22,23;
138:11;139:8

**forma (1)**
86:7

**formation (1)**
28:14

**former (1)**
103:1

**formula (5)**
85:22,22,23;86:1,7

**forth (2)**
80:17;133:15

**Fortunately (1)**
22:14

**forty- (1)**
135:4

**forward (10)**
18:20;29:4;46:17,
19;57:17;87:4;
122:25;133:4;
137:13,14

**fought (1)**
45:4

**found (3)**
38:9;89:23;91:15

**foundation (1)**
124:7

**founded (1)**
65:1

**four (1)**
42:10

**fraction (1)**
24:10

**Fraga (6)**
74:5,8,11,12,16;
79:4

**framework (1)**
128:12

**Frank (1)**
97:3

**FRANKEL (1)**
13:2

**Franklin (2)**
12:11;86:16

**frankly (4)**
56:5;98:18;
100:13,22

**FRB (5)**
18:21;97:7,22;
98:6;122:2

**FRED (1)**
16:11

**Freddie (1)**
10:3

**free (1)**
135:18

**Friday (1)**
134:25

**front (2)**
24:19;77:7

**fulfilled (1)**
51:21;52:2

**full (6)**
27:4;106:16;
107:25;108:2,11;
128:14

**fully (5)**
27:7;115:20;
125:10;132:10;
134:1

**Fund (5)**
9:13;18:3,4,4,11

**fundamental (2)**
104:15;126:16

**funding (2)**
99:3;128:2

**Funds (4)**
2:4;17:11;18:3,19

**further (12)**
36:22,25;45:16;
68:16,22,23;96:16;
98:3;106:6;111:25;
112:3;120:23

**future (4)**
56:23,24,25;84:15

**G**

**GA (1)**
5:15

**GALLAGHER (1)**
9:11

**game (1)**
118:22

**Garden (1)**
74:6

**garden-variety (1)**
105:6

**GARRITY (8)**
14:7;75:21,23,23;
76:4,4;80:6;120:24

**Garrity's (1)**
75:8

**Gary (4)**
2:4;14:25;17:5;
98:11

**gating (2)**
22:10,11

**gave (2)**
63:9;97:23

**General (2)**
32:8;92:25

**generally (4)**
58:5;68:2;80:9;
138:8

**generous (1)**
27:10

**genuinely (1)**
31:13

**GERARD (2)**
13:15;109:15

**gets (2)**
18:4;113:22

**GIBBS (1)**
11:2
**GIBSON (3)**
5:2;77:2;120:16
**gist (1)**
92:1
**given (13)**
27:17;29:21;35:3;
39:11;46:17;78:13,
17,18;79:21;81:8;
113:25;120:7;126:8
**giving (1)**
128:13
**glad (1)**
135:8
**gleaned (1)**
48:6
**GLENN (2)**
7:18;44:21
**GLENNON (1)**
12:18
**global (6)**
45:6;115:9,15;
129:12,13,17
**GM (1)**
12:19
**GMAC (1)**
18:1
**GMACM (1)**
68:9
**goal (1)**
124:21
**goes (6)**
48:16;61:5;94:14;
101:24;131:17;
138:15
**GOLDEN (22)**
6:15;99:25;100:1,
1,16,20;101:14,17;
103:5,8,10;104:13,
14,20,24;105:2,4,20,
21;106:3,8;127:18
**Goldman (1)**
2:15
**GOLDSTEIN (2)**
9:25;38:8
**Good (29)**
17:5;30:8;35:10;
37:22;40:24;44:21;
52:7;55:25;56:1;
62:9;79:5;80:25;
85:4;86:15;87:11,
11;91:18;94:14;
98:11;101:22;
105:17,22;107:8,23;
109:15;117:18;
119:14,21;123:6
**good-faith (4)**
20:9;101:4,8;
117:2
**Goren (13)**
136:20,25,25;
137:6,19,21;138:1,

18,23;139:7,10,17,
18
**go-round (2)**
84:3,4
**GOTTLIEB (1)**
14:11
**GOTTO (11)**
14:25;98:11,11,14,
14,16;99:12,17,20,
21,22
**G-O-T-T-O (1)**
98:14
**governing (3)**
51:3;62:3,5
**GRAEME (3)**
4:19;88:24;89:5
**Grand (1)**
7:4
**grant (1)**
132:5
**great (2)**
29:5;98:7
**greater (1)**
108:22
**greatly (1)**
61:8
**Greenwich (1)**
13:22
**grind (1)**
47:22
**gross (2)**
47:3,5
**grounds (1)**
55:9
**Group (11)**
7:21;12:11;13:11;
35:22;36:1;74:6;
82:8;86:16,17;
100:4;109:16
**groups (1)**
87:6
**Guaranty (4)**
9:21;16:2;38:8;
117:19
**guess (5)**
50:13;95:16,22;
98:3;120:19
**guidance (3)**
39:23;40:2;126:1
**GUINEY (1)**
10:25
**GUMMOW (1)**
12:25
**GUMP (2)**
6:10;100:2
**GUYDER (1)**
8:17

## H

**HADLEY (2)**
13:10;109:16
**HALE (1)**

13:19
**half- (1)**
30:20
**HAMILTON (1)**
14:11
**hand (5)**
41:19;42:13;
76:13;138:3;139:9
**handed (5)**
19:2;21:15;41:18;
101:12;135:24
**handful (1)**
23:25
**handing (1)**
139:8
**hand-on (1)**
125:24
**happen (9)**
45:10;56:24;
84:21;88:14;108:13;
115:12;119:15,16;
132:8
**happened (5)**
40:5;53:6;56:23;
57:13;112:23
**happens (2)**
52:16;65:21
**happy (7)**
23:8;85:10;90:6,
19;94:25;97:5;103:3
**hard (7)**
26:7;29:6;45:4;
83:5;85:7;88:12;
131:25
**hard-fought (2)**
28:16;31:4
**harmed (1)**
67:13
**HARRISON (1)**
7:25
**Hathaway (3)**
2:13,15;7:3
**HAUER (2)**
6:10;100:2
**head (2)**
104:21,23
**headed (1)**
65:4
**heading (1)**
35:5
**heads (1)**
29:12
**hear (9)**
21:22;68:19;
78:16;81:19;88:21;
89:4;91:5;96:18;
117:9
**heard (22)**
17:16;27:5,16;
38:4;87:18;97:1,13;
98:10;99:24;101:2;
106:9;117:15,16;
118:8;121:3;123:3,4,

24;126:21;131:21;
132:4;137:23
**Hearing (41)**
17:19;20:16,19;
21:17;22:4;40:1,5,6,
8;55:4,4,6;63:10;
68:25;71:10;75:5;
78:16;79:14,15;
83:18;88:1;93:13;
96:12;97:6,11;
99:16;105:1,15;
107:15;108:6;112:5;
113:22;115:13;
121:14;123:9;
131:11;132:9;
134:23;137:17,21;
139:8
**hearings (2)**
34:20;112:25
**heart (2)**
105:8;115:16
**heavily (1)**
58:16
**heightened (1)**
99:10
**held (5)**
31:1
**helpful (5)**
23:11;36:9;37:6;
39:22;41:18
**hereby (13)**
41:13;42:5,22;
43:7;71:12;72:1,11,
22;73:8,23;74:16;
76:11;91:7
**here's (2)**
54:21;81:12
**hesitance (1)**
98:24
**higher (1)**
84:19
**highlight (1)**
28:9
**highly (1)**
23:5
**himself (2)**
23:4;138:22
**historic (1)**
28:11
**Hoc (4)**
7:21;13:11;100:4;
109:16
**HOEPA (1)**
87:22
**hold (5)**
28:25;82:10;
112:4;7;123:5
**HoldCo (1)**
127:2
**holder (12)**
47:17;51:22,22,
24;52:20;63:13;
65:15;77:16;78:13;

80:12;82:20;83:11
**holders (25)**
27:4;46:18;47:2,
18;50:2;51:18,25;
62:16,18,19,24;
65:10,14;66:7;67:4,
7;74:5;77:24;82:7,8;
84:23;86:2,9;127:2;
132:1
**holidays (1)**
20:1
**Home (3)**
14:20;98:12,16
**honestly (2)**
81:3,6
**Honor (279)**
17:5,7,13,21;18:6,
22,25;19:6,13,20,22;
20:4,9,16,18,23;
21:24;22:10,14,18,
22;23:8,17,24,24:7,
16,19;25:10,19;26:3,
7;28:9,20;29:2,17,
23;30:6,11,19,20;
32:3,3,6,17;33:12;
34:7,25;35:4,8,9,19,
21;36:5,8,9,13,17;
37:1,4,9,19;38:5,12,
16;39:2,8,14,15,22;
40:1,4,9,18,22,24;
41:1,9,15,19,23;
42:7,24;43:9,13,23,
25;44:6,12,15,21;
45:3;46:2,4,6,21;
47:2,14;48:11;
49:24;50:21;53:12;
54:1,13,14,20;55:7;
56:8;57:6,25;58:25;
61:2,14;62:12;63:8,
14;65:9;66:12;67:8,
15;69:24;70:2,7,15;
71:2,7,14,18;72:3,
13,24;73:10,19;74:3,
18,24;75:12,21;76:1,
5,13;79:5,16,20;
80:25;81:21;83:20;
85:21;86:10,15,19;
87:12;88:24;90:20;
91:1,4;93:17;96:9,
16;97:3,9,19,25;
98:11,17;99:4,12,18,
22;100:1,2,13,22;
101:10;103:2;
104:20;105:2,5,21;
106:3,6,10,12,23,24;
107:19;108:1,14;
109:4,4,15,17,23,24;
110:1,17,20,24;
111:11,13,19,22;
112:1,8,9,13,16;
113:4,6,12,15;114:9,
16,21,24;115:5,15,
18,21,25;116:4,5,5,

10,22;117:4,8,10,18,
20;118:1,5,9,20;
119:3,17,19,21,24;
120:15,20;121:4,16;
122:4;123:6,14,19,
21,25;124:3,4,11,17;
125:17;126:6,11,17,
21;127:11,14,24;
130:25;131:14,23;
135:7,10,11,14;
136:3,12,14,16,18,
19,25;138:1;139:1,
12,18,22

**Honor's (8)**
17:15;18:14;27:5,
16;87:7;98:19;
118:8;127:19

**HOOPER (1)**
4:10

**hope (11)**
39:14;40:4;87:19;
88:13;112:4,7;
119:15;124:8;
129:18;131:4;
134:17

**hoped (1)**
137:2

**hopeful (1)**
26:11,16

**hopefully (6)**
108:25,25;130:8;
133:4;136:23;137:9

**hoping (1)**
115:22

**hours (2)**
28:13;30:24

**Houston (1)**
11:6

**HOWARD (1)**
6:25

**HSBC (5)**
8:13;44:25;46:6;
72:4;77:12

**humor (1)**
135:8

**hundred (1)**
123:16

**hundred-years (1)**
87:18

**hurdle (1)**
22:8

**hypothetical (1)**
57:10

# I

**ideal (1)**
22:17

**identical (1)**
18:8

**Identify (1)**
70:11

**Ihor (1)**

15:4

**IL (1)**
12:23

**illustrate (1)**
114:17

**immediately (1)**
139:7

**impact (2)**
46:11;134:18

**impaired (1)**
130:22

**implement (1)**
103:17

**import (1)**
56:15

**importance (1)**
83:4

**important (17)**
26:1;33:5;76:24;
83:8;86:5;106:14;
111:2,21;113:12,22;
124:6,20;126:16;
131:6;132:17;133:3;
135:23

**importantly (3)**
23:13;26:19;39:25

**improper (2)**
95:1;100:18

**Inc (6)**
2:10,13,15;7:3;
8:3;19:11

**incentivized (1)**
27:18

**include (5)**
23:19;49:22;
50:15;86:6;101:19

**included (6)**
47:9;58:2;94:19;
125:10;129:12;
134:12

**includes (5)**
103:14;126:24;
128:10,10,10

**including (7)**
33:15;35:13;
36:19;91:17;107:18;
125:4;127:2

**inconceivable (1)**
31:13

**inconsistency (2)**
80:17;102:22

**inconsistent (2)**
54:23;57:5

**incorporates (1)**
37:2

**incorrect (1)**
50:7

**increased (1)**
122:10

**incredible (1)**
29:3

**incredibly (1)**
35:4

**incremental (1)**
28:18

**indeed (2)**
102:5;133:3

**indemnification (1)**
28:24

**indenture (1)**
100:5

**Independent (3)**
9:3;99:2;134:4

**Indianapolis (1)**
98:17

**indicated (6)**
34:23;63:17;
86:19;87:2;101:3;
122:5

**indicates (1)**
122:8

**individual (16)**
26:14;47:15,15,16,
25;50:1;51:13,16;
52:1,20;62:19;63:11,
12,22;66:7;86:21

**individually (3)**
15:4;62:20;66:17

**individuals (1)**
51:14

**indulge (1)**
23:8

**information (9)**
46:6;49:20;50:16,
17;64:12;65:7,12;
66:4;74:4

**informed (1)**
35:5

**initial (2)**
49:4;102:19

**Innkeepers (6)**
99:10;126:11,12,
13,15;134:2

**inordinately (1)**
131:11

**in-person (1)**
30:25

**input (3)**
49:1,1;63:23

**insisting (1)**
103:24

**instance (4)**
54:14;63:5;66:7;
110:13

**instances (1)**
58:6

**instead (2)**
20:5;36:3

**institutional (7)**
47:9;49:1;63:24;
65:5;86:21;89:25;
127:2

**instructions (1)**
51:17

**instruments (1)**
51:8

**insulting (2)**
29:13,13

**Insurance (2)**
11:12;12:20

**insured (3)**
24:18;47:7;63:3

**insurer (1)**
67:18

**Insurers (1)**
12:19

**insurmountable (1)**
22:8

**intend (8)**
19:24;43:19;
78:20;88:22;109:20;
132:7;134:7,8

**intended (6)**
36:15;37:17;
38:20;39:3,7;102:22

**intensive (1)**
30:21

**intent (1)**
123:8

**intention (2)**
132:6;134:10

**intentionally (1)**
29:12

**intercompany (13)**
27:23;28:1,4,8;
111:14,17;114:2,6,
12,16,18,22;115:20

**intercreditor (1)**
22:6

**intercreditor-interdebtor (1)**
28:10

**interdebtor (1)**
22:6

**interest (24)**
28:6;30:9;37:13,
15,21;52:8;84:23;
86:22,23;89:24;
103:11;112:15;
113:17,24;114:4,11;
115:4,12,17;128:13;
129:1,4;130:1;132:1

**interested (1)**
63:25

**interests (24)**
29:6;37:22;47:16;
52:6;56:2;62:15,24;
91:18;95:21;101:21,
23;102:15;104:1,12;
105:7,10,18,25;
107:4,9,23;115:8;
127:23;128:19

**interfere (1)**
118:14

**interlocutory (4)**
53:9;56:3;106:13;
132:19

**internal (1)**
34:8

**interns (1)**

135:25

**interpreting (1)**
54:14

**intimately (1)**
62:14

**into (69)**
2:4,9;17:11;18:9;
19:9;20:6,10;21:16;
23:22;32:6,7;35:5,
11,21;36:2,6;37:23;
38:9;40:17,20;41:2,
13;42:6,23;43:7;
48:10;51:6;52:9;
53:8;55:25;57:3;
58:9,12,13;62:4;
70:10,12;71:9,11,12,
25;72:1,10,12,21,22;
73:7,8,21,23;74:13,
16;76:11;88:10;
90:9;91:19;100:7,
10;101:1,5,9;105:17;
113:22;114:3;115:7;
118:20;125:21,21,22

**introduce (9)**
21:3,8,11;40:19;
42:9;44:18;50:22;
55:17;70:16

**introducing (1)**
81:3

**introduction (1)**
21:19

**invested (1)**
126:7

**investigating (2)**
28:13;32:24

**investigation (5)**
33:2,3;34:4,5,8

**investments (1)**
89:9

**investor (1)**
86:17

**Investors (24)**
11:3;12:11;37:16,
22;47:9;49:1;51:5,
13;52:7,8;56:2;
63:24;65:6;86:17;
87:6;89:25,25;
98:25;99:1;101:22,
23;103:14;107:4;
127:2

**involve (1)**
87:21

**involved (6)**
23:25;43:16;46:5;
58:15,18;62:14

**involvement (4)**
125:23;127:6,7;
130:6

**involves (1)**
125:19

**involving (1)**
87:16

**IRENA (1)**

9:25

**issuances (1)**
24:25

**issue (43)**
32:2;33:25;45:19;
61:8;63:14;64:12;
66:13;67:17;68:20;
69:20,23;70:1;82:15,
18;87:1;92:7;93:6;
94:14,18;95:24;
104:19;106:22;
108:1;112:9,11,14;
114:15;115:23;
116:17;117:2,24;
118:4,7;122:23;
126:9;127:9;129:1,
10;130:1;134:8;
137:7,15;138:12

**issues (53)**
22:10,11;28:25;
45:8;57:18;61:3;
63:1;65:21;66:4;
67:13;77:15;78:8,22,
23;81:13;89:13;
93:6;95:25;104:7;
106:19;108:21;
109:2;110:11;111:3;
112:3;113:18;
115:11,14,15;117:3;
118:25;119:13,14,
14;120:18;124:15,
19,23;126:6;128:15,
15,25,25;129:6,7,8,
21;132:10,17,18;
133:9,17,17

**issuing (1)**
132:9

**item (2)**
19:6;135:11

## J

**JAMES (1)**
14:7

**Jennifer (1)**
15:3

**Jersey (3)**
17:11,18;25:13

**Jim (1)**
75:23

**job (2)**
46:20;134:18

**JOHN (2)**
5:17;14:9

**JOHNSON (6)**
5:25;74:23,24,24;
75:3,5

**joinder (5)**
70:24,25;74:7;
100:3;103:1

**joint (4)**
42:16,22,25;43:6

**JONES (1)**

12:2

**Jose (2)**
74:5,16

**JOSEPH (3)**
9:7;15:17;123:6

**JOSHUA (1)**
5:7

**JR (2)**
4:7;14:7

**JSN (1)**
129:21

**JSNs (8)**
103:18;116:13;
125:8;128:24;129:3,
14,19;130:5

**Judge (29)**
19:21;22:2,24;
23:2,3;28:16;29:7,
11,15;30:22,22;
33:14,21;43:16,25;
65:23;104:5;109:24;
110:4,11,13;126:1;
131:14,14,19;
132:23;138:5,6,13

**judgment (20)**
21:2,3;29:24;30:9;
31:22,23;32:5,8,10,
16;40:17;58:13;
120:1,3;126:10,19;
127:9;128:24;
133:24;134:6

**JUDSON (1)**
8:8

**JULIA (1)**
14:8

**July (8)**
19:25;20:1;27:24;
93:13;94:8;134:22;
137:20,25

**June (2)**
36:18;88:10

**Junior (13)**
7:21;13:11;27:2,4,
6,7,11;38:3;68:4;
100:4;109:17;
113:23;135:15

**jurisdiction (3)**
61:3,4;97:23

**jurisdictional (1)**
61:3

**JUSTICE (2)**
15:12;45:19

**justified (1)**
48:1

**justify (1)**
94:18

## K

**KAHAN (1)**
7:17

**KATHY (2)**
11:8;82:6

**keep (4)**
23:1;30:22;69:14;
132:17

**KELLER (2)**
14:19;98:12

**KENNETH (3)**
13:7;80:25;124:1

**Kerr (20)**
21:8;40:19,23,24,
24,41:15,18,19,23;
42:7,10,12,14,24;
43:9,13;44:12,13;
96:15,15

**Kessler (1)**
39:12

**key (3)**
22:14;126:25;
132:21

**kind (3)**
39:23;79:20;130:7

**KIRBY (1)**
15:2

**KIRKLAND (1)**
8:2

**KISSEL (1)**
4:2

**knew (2)**
22:13;51:8

**knows (5)**
45:3;62:12;82:8;
83:7;126:17

**Kobryn (1)**
15:4

**KOTWICK (1)**
4:9

**KRAMER (3)**
13:2;81:1;124:1

**Kruger (11)**
21:9;30:3;41:4,6,
11,13;44:4,6,9;92:3;
104:8

**Kruger's (7)**
32:21;40:19;
43:18,20;44:3,10;
126:17

## L

**lack (5)**
78:6;84:22;
108:15,22;111:3

**Landon (1)**
15:3

**language (4)**
37:11;89:17;
91:21;107:17

**large (3)**
104:5;135:24;
136:5

**largely (4)**
39:19;40:6,7;
124:8

**largest (1)**

82:8

**LaSalle (1)**
12:21

**last (13)**
22:18;28:19;39:2,
2;40:9;83:5;98:13;
116:9,11;123:10;
137:7,12;138:1

**lasting (1)**
34:17

**later (7)**
78:16;79:10,11;
80:18;93:13;132:6;
134:8

**Law (8)**
44:25;61:18;62:6,
8,9;67:10;72:14;
126:4

**laws (1)**
25:15

**lawsuit (1)**
54:11

**lawyer (1)**
77:21

**laying (1)**
124:7

**lead (1)**
126:21

**leading (1)**
100:21

**leaning (1)**
21:20

**least (9)**
26:20;38:10;
39:14;62:15;80:8;
81:2;88:5;92:16;
114:13

**leave (6)**
51:13;68:22;
85:14;135:18,20;
138:13

**leaves (2)**
59:22;122:17

**leaving (3)**
95:20;101:17;
102:4

**led (8)**
22:1;23:3;29:16;
30:21;32:21;85:6;
102:24;131:13

**LEDYARD (2)**
12:10;86:16

**Lee (59)**
2:4;17:4,5,5,21;
18:16,22,24;19:2,4,
5;20:22,23;21:23,24;
23:13;29:23;30:19;
32:3,17;33:12;34:7,
25;35:7;36:11,13;
37:6,8;38:16;40:22;
43:15;44:14,15,18;
46:4;50:22;81:7;
101:3;107:14;

119:24;123:15,16,
19;131:9,10,17,20,
24;134:21,22;135:3,
6,9;136:3,12,16,19,
22;139:17

**left (2)**
24:3;110:11

**Legal (5)**
16:12;66:18;
118:11;128:15;
133:8

**Lehman (1)**
23:4

**leisure (1)**
20:2

**LEMAY (1)**
6:24

**lengthy (1)**
43:15

**less (1)**
18:2

**lesson (1)**
75:8

**letter (1)**
130:17

**LEVIN (12)**
8:25;13:2;81:1;
119:20,21,22;120:5,
10,13;124:1;128:21,
23

**LEWIS (3)**
14:2;41:4,13;
75:23

**Lexington (2)**
8:4;11:21

**liability (3)**
46:19;82:21;83:3

**Liberty (1)**
14:13

**lien (2)**
114:12,14

**lieu (1)**
23:6

**light (4)**
27:25;30:11;
32:14;34:20

**lightly (1)**
124:12

**LIGHTNER (1)**
14:16

**likewise (2)**
30:15;109:8

**limit (2)**
106:11;127:19

**limitation (1)**
129:24

**limited (13)**
20:6;38:7;64:11;
87:1;101:4,8;
113:18;115:14;
117:25;118:24;
129:7;132:14,17

**limits (1)**

103:11
line (5)
  20:20;21:16;
  117:16;122:2;128:7
lines (2)
  124:22,22
lips (1)
  124:10
liquidating (1)
  89:7
liquidation (1)
  86:8
list (3)
  32:11;74:2;95:24
listening (1)
  20:24
litigate (6)
  62:5,6;106:17;
  108:1;128:16;129:7
litigated (1)
  129:8
litigation (22)
  22:4,12,16,21;
  23:6,25;24:5;25:1,
  24;27:20;28:7,23;
  31:6,16;35:3;55:24;
  56:22;92:18;93:24;
  94:5,23;129:2
little (8)
  18:18;29:13;
  79:21;90:18;105:20;
  111:5;112:12;113:9
LLC (6)
  2:5,22;5:3;8:21;
  9:12;119:23
LLP (29)
  4:2,13;5:2,11,20;
  6:2,10,19;7:2,11,20;
  8:2,12,20;9:2,11,20;
  10:11,20;11:2,11,19;
  12:10;13:2,10,19;
  14:2,11;15:2
Loan (4)
  14:20;48:19;
  98:12,16
loans (4)
  48:12,15,23;84:15
long (12)
  21:16;24:6;32:10,
  22;55:13;67:2,19;
  74:2;99:4,17;
  106:23;131:11
longer (1)
  80:11
look (11)
  22:13;55:17;
  59:16;63:15;90:22;
  93:15;104:4;115:10;
  116:15,16;130:18
looked (1)
  48:13
looking (3)
  28:24;38:17;

115:20
loosely (1)
  136:22
Los (2)
  7:6;10:15
lose (1)
  136:4
losses (3)
  48:23,24;84:15
lost (3)
  82:15,19;83:16
lot (9)
  42:8;65:16,24;
  67:22;86:7;92:24;
  125:14;126:7;
  132:11
lots (3)
  57:17;65:21;94:24
Louisiana (1)
  11:4
LP (1)
  9:13
lunch (1)
  96:22

**M**

Mac (1)
  10:3
magnitude (1)
  62:17
MAHER (1)
  6:2
major (11)
  52:13;57:20;
  66:13;70:18;71:8,
  9,10,12;77:5;79:3
makes (2)
  19:15;67:16
making (2)
  38:8;55:2
Mamta (3)
  72:25;73:4,8
managed (3)
  17:23;22:25;29:17
Management (3)
  5:3;9:12,13
Manhattan (1)
  13:12
manifestly (1)
  58:12
many (12)
  31:18;39:10;45:8,
  8;50:8;58:2,6;109:1;
  125:19;132:20,20,22
map (1)
  20:19
margin (1)
  115:21
Maritime (1)
  32:8
MARK (4)
  4:9;11:16;14:16;

15:9
marketplace (1)
  51:6
Marshall (1)
  61:18
Mary (2)
  73:11,23
Mass (2)
  10:12;51:25
massive (1)
  31:6
MassMutual (1)
  25:1
masterful (1)
  134:18
Masumoto (2)
  69:22,24
materially (1)
  28:21
materials (3)
  33:1,4;34:9
math (1)
  122:20
MATIAS (2)
  16:7;117:19
matter (11)
  17:8,14,21;19:7;
  48:18;61:5,10,11,20;
  67:10,12
matters (2)
  32:14;113:1
may (33)
  17:7;21:24;28:19;
  32:13;41:4;42:1,7;
  43:10;44:15;46:10;
  50:16;53:20,23;
  54:6;56:10;57:19;
  62:19;74:25;80:17;
  82:6;88:15;93:16;
  95:3;102:23;103:8;
  110:2;112:2;114:6;
  120:21;122:10;
  124:23;130:3;
  134:13
maybe (7)
  53:21;54:15;56:8;
  109:22;112:8;114:3;
  135:1
MBIA (4)
  11:12;23:25;
  24:10,18
MCCLOY (2)
  13:10;109:16
MCINERNEY (1)
  15:2
MCKOOL (1)
  10:2
mean (28)
  25:5;49:16,16;
  53:24;54:15;58:13;
  60:20;61:17;63:22;
  68:8,16;79:11;
  80:14;81:24;94:16;

95:23;99:9;104:12;
  107:7;110:10,23;
  114:2,6,14;118:18;
  121:10;130:2;
  138:20
meaning (1)
  53:11
meaningful (1)
  60:13
means (4)
  52:18,19;67:4;
  80:10
meant (1)
  38:19
meantime (1)
  137:10
mechanism (1)
  66:20
mediation (29)
  19:20;29:11,15;
  30:24,24;33:15;
  34:16;43:15,21;
  44:2;57:19;58:17;
  82:14;88:3;104:4;
  109:20,24;110:11;
  116:14,17;117:2;
  125:23;131:18;
  132:23;135:15;
  138:2,7,16;139:5
mediator (7)
  22:23;43:24;44:1;
  45:5;65:24,24;126:1
meet (1)
  63:20
meeting (2)
  138:8,9
meetings (3)
  30:25;31:1;65:5
Mellon (3)
  7:12,13;44:23
memoranda (1)
  126:4
mention (1)
  62:25
mentioned (1)
  97:12
mentioning (1)
  26:9
mere (1)
  33:20
merely (3)
  38:20;85:4,4
merits (3)
  20:17;23:23;121:9
met (6)
  49:5;62:21;64:3,5;
  66:7;67:18
meter (1)
  135:20
method (1)
  48:21
methodology (8)
  45:23;47:5,25;

48:2;49:6;63:17;
  64:6;65:17
Meyer (8)
  71:15,19,23;72:1;
  75:13,15;76:10;79:3
Meyer's (1)
  75:25
MICHAEL (3)
  5:25;9:8;10:8
might (6)
  47:25;56:18;
  57:10;81:9;119:9;
  125:5
Mike (1)
  74:24
MILBANK (2)
  13:10;109:16
MILBURN (2)
  12:10;86:16
milestone (2)
  19:14;124:7
million (13)
  18:3;26:23;92:22,
  23;93:2;94:23;
  121:21;122:6,10,12,
  16,18,22
mind (1)
  132:17
mindful (1)
  60:8
minute (1)
  96:23
minutes (1)
  135:19
misimpression (1)
  50:1
misplaced (1)
  39:20
missed (1)
  59:10
missing (1)
  104:12
model (1)
  127:4
modification (1)
  97:19
modifications (1)
  125:3
modified (3)
  36:23;59:18;97:11
MOLDOVAN (1)
  9:7
MOLONEY (1)
  14:17
moment (5)
  46:21;48:17;88:5;
  91:4;105:20
Monarch (1)
  9:12
Monarch-Stonehill (1)
  70:3
Monday (2)
  109:25;116:17

**money (6)**
24:3;26:24;45:24;
92:24;114:5;136:7
**monoline (6)**
24:13,14;66:11;
67:3,3;68:5
**monolines (7)**
63:3,4;66:15,16,
20,25;67:1
**months (11)**
22:3,3,3,12;23:1;
28:16;86:3;88:2;
104:4;125:22;
132:23
**MOORE (2)**
8:20;119:22
**moot (1)**
115:23
**moots (1)**
136:11
**more (20)**
17:22;27:25;
35:12;39:8,24;
48:24;49:13,22;
58:4;65:7;68:2;81:7;
86:5;90:18;111:16,
23;112:8;132:10,21;
134:1
**MORGAN (2)**
14:2;75:23
**morning (16)**
17:5;37:1;40:24;
44:21;79:5;80:25;
86:15;87:4,11,12;
98:19;100:1;101:3;
102:21;122:5;123:9
**MORRISON (4)**
9:2;17:6;40:25;
137:1
**Mortgage (1)**
18:2
**mortgage- (1)**
24:24
**most (6)**
49:17;77:16;
81:10;86:22;127:15;
133:21
**Motion (34)**
2:2,7,13,17;17:10,
17,20;18:15,20;19:8;
21:9;24:19;25:18;
29:24;35:1,15;
37:25;41:1,8,24;
86:2,19;87:23;88:1;
89:23;100:24;
102:19;110:20;
112:17;113:11;
125:7;132:5,16,16
**motions (4)**
34:19;125:7,7;
136:11
**mountains (1)**
59:9

**move (19)**
70:7,11,20;71:14,
21;72:3,8,13,18,24;
73:4,10,15,19;74:3,
10;128:12;131:6;
133:4
**moving (5)**
23:18;45:11;
46:17;69:14;75:14
**much (28)**
33:16;40:21;
41:17,21;43:11;
44:13;60:23;63:14;
65:17;76:4;77:7;
81:6;86:11;90:23,
25;98:8;106:8;
112:8;114:3;117:14;
119:18;120:12;
121:2;123:25;131:7,
25;139:19,20
**multilateral (1)**
97:20
**multiples (1)**
28:21
**MUNGER (1)**
7:2
**MURRELL (11)**
16:7;117:18,19,
25;118:5,20;119:2,9,
11,16,19
**Musarra (4)**
72:14,20,22;79:3
**Mussara (1)**
72:15
**Mussara's (1)**
72:18
**must (3)**
59:10;132:18;
133:9
**Mutual (2)**
10:12;87:25
**myriad (1)**
104:6
**myself (2)**
81:3;96:3

## N

**NA (7)**
4:3;5:12,21;6:11;
7:13;8:13;14:12
**NAFTALIS (1)**
13:2
**name (3)**
89:3,5;98:13
**named (1)**
87:14
**namely (1)**
44:24
**narrowly (1)**
58:4
**National (4)**
4:14;69:16;89:6,8

**nauseam (1)**
27:5
**navigated (1)**
35:17
**NCUA (1)**
91:25
**necessarily (1)**
130:2
**necessary (4)**
20:10;35:11;
101:5,8
**necessitate (1)**
129:18
**need (20)**
39:24;54:18;
57:19;65:21;70:5,
22;79:17;104:3;
105:9,10,12;110:6;
112:3;114:22;
116:10;120:19;
124:24;134:22;
137:17;138:2
**needs (1)**
18:20
**negotiate (2)**
45:13;120:2
**negotiated (6)**
126:14,22,23;
127:5,25;134:3
**negotiating (3)**
22:25;126:22;
137:8
**negotiation (4)**
33:16;45:14;
68:22;127:4
**negotiations (10)**
28:16;30:21;
32:21;35:5,17;45:5;
85:6;88:2;95:7;
100:20
**neither (1)**
100:9
**NELSON (3)**
4:20;90:8,11
**New (39)**
2:24;4:5;5:5,23;
6:5,13,22;7:12,13,
15,23;8:5,15,23;9:5,
15,23;10:6,23;11:22;
12:5,13;13:5,13,23;
14:5,14;15:7,16,23;
17:10,18;25:13;
32:4;44:22;62:9;
70:18;121:7,18
**next (15)**
18:19;19:6;21:1;
24:15;39:16;71:14;
82:4;91:16;106:2,5;
109:25;131:6;
135:11;137:9,21
**nice (1)**
20:5
**night (1)**

39:3
**nineteen (1)**
93:2
**NJ (1)**
2:3
**nobody (4)**
36:19;94:1;95:14;
111:16
**non- (1)**
24:23
**nondebtor (1)**
32:13
**none (5)**
17:19;30:12;58:7;
71:10;95:12
**nonevent (1)**
84:21
**nonparties (2)**
109:6,9
**nontime-barred (2)**
95:8,9
**nor (2)**
46:22,23
**NORA (13)**
16:12;121:4,4,7,
15,16,17,18,24;
122:4,24;123:1,2
**Nora's (1)**
123:10
**North (3)**
12:21;14:21;84:18
**nose (1)**
65:19
**note (12)**
21:16;34:4;38:3;
43:14;93:7;120:6,
23;122:22;125:20;
130:17;131:3;
135:24
**noted (1)**
120:20
**Noteholders (9)**
7:21;13:11;27:2,6,
7;100:4;109:17;
113:23;135:16
**notes (6)**
27:4,11;58:2;
127:24;135:3,5
**nother (2)**
118:21,22
**Nothing's (1)**
123:12
**Notice (6)**
2:3;17:11,17;
18:15;52:10;63:9
**notices (1)**
74:4
**notion (1)**
29:9
**notwithstanding (2)**
37:20;54:3
**nuances (1)**
118:21

**number (23)**
17:3;19:7,11;
23:17;24:5;31:8;
39:15;40:13;42:2,
18;43:2,25;45:23;
49:14;63:15;70:25;
75:16;88:9;100:6,8;
104:5;122:11;129:6
**numbered (1)**
91:20
**numbers (6)**
36:10;49:11,15;
50:7;65:18;70:22
**numerous (2)**
132:14;133:7
**NW (3)**
4:15;11:13;16:4
**NY (28)**
2:24;4:5;5:5,23;
6:5,13,22;7:15,23;
8:5,15,23;9:5,15,23;
10:6,23;11:22;12:5,
13;13:5,13,23;14:5,
14;15:7,16,23

## O

**object (9)**
37:24;50:3;55:9;
77:20,22,25;78:20;
80:15,16;120:4;
121:12;129:19
**object' (1)**
77:21
**objected (3)**
64:2;69:18;124:18
**objecting (9)**
36:21;47:25;49:4;
55:9;88:15;94:1;
99:12;117:21;
133:12
**objection (37)**
26:15;36:12;38:7;
40:12,13;63:12,13;
64:11;66:11,12;
67:15;68:8,17;
69:16;71:23;85:24;
87:1,3;89:11;90:7;
91:5;92:6;93:9;94:7,
9,12;96:4;97:8,10;
99:9;100:6,9;
102:10;117:23,25;
118:24;120:10
**objections (71)**
17:13;21:5;31:10,
18,18;33:24;35:20,
21;36:1,2,3,5,22;
39:15,16,19,22;40:2,
4;41:10;42:3,19;
43:4;45:23;47:15,
16;48:5;49:17,18,19,
20;50:9;57:19;58:3,
4,7,10;63:11;65:25;

69:16;71:8;72:9,20;
73:6,17;74:12;76:7;
81:13;90:10;91:3,
13;97:13;98:22;
99:5,7;108:21;
120:20,24;124:14;
125:5,13;127:14;
128:16;130:25;
132:10,14,14,16;
133:16,21,22
**objectors (10)**
26:20;55:3;81:17;
88:21,22;96:10,12;
97:1;108:10;133:14
**objectors' (1)**
99:23
**objector's (1)**
96:19
**obligation (7)**
51:11;62:20,22;
65:13;67:18,19;
122:21
**obligations (6)**
18:1;26:21;52:4;
82:21;118:11;
122:14
**observations (1)**
125:12
**observe (1)**
47:8
**observed (3)**
46:4;47:2,14
**obviously (13)**
21:9;25:10,23;
26:22;28:9,14,20,24;
86:7;125:25;131:24;
138:21;139:12
**occurs (1)**
55:5
**o'clock (1)**
112:23
**October (3)**
27:8;38:4;129:9
**O'DONNELL (1)**
13:16
**off (3)**
22:24;81:24;
135:20
**offer (17)**
30:14,15;41:3,7,
23,25;42:15,24;
52:23;80:22;81:17;
88:22;89:1;90:9;
96:8,11,14
**offered (3)**
51:6;108:8;115:5
**offering (4)**
43:18;44:3;90:3;
108:10
**Office (2)**
15:13;16:3
**officer (2)**
125:24;127:7

**Official (4)**
13:3;81:1;101:6;
124:1
**off-the-record (2)**
112:12,19
**OLSON (1)**
7:2
**once (7)**
18:10;22:24;24:4;
25:10;29:7;52:19;
77:23
**One (72)**
4:4;6:12;10:4;
13:12;14:13;18:25;
21:12;23:23;25:9,
19;26:10,20;29:11;
31:14;34:19,19;
36:14;38:10;39:2,
15;42:13;44:10;
45:1,18;51:10;56:5;
58:12;59:13,23;
64:11;65:10,15;66:4,
11,25;68:21;74:21;
77:5;80:2;85:10;
86:25;87:14,14;88:3,
9;89:13,14;91:4;
94:20;96:12;97:22;
100:6;102:19,20;
103:3,18,19;107:14;
108:9;111:3;114:1,
17;116:9,9;117:22;
120:20;123:16;
125:19;129:10;
130:10;133:6;
138:12
**ones (3)**
33:18;85:10;
102:20
**only (30)**
47:9,22;50:12;
51:17,20;57:3;
59:23;60:9;61:9;
63:2,19,20;67:17;
78:8;87:13;88:3;
97:23;98:23;102:13,
18;103:13;107:16;
111:7;113:17;
114:15;115:14;
118:5;121:14;
129:14;131:12
**on-the-record (1)**
112:16
**onto (1)**
59:19
**open (4)**
65:11;109:1;
124:22,22
**opening (2)**
119:25,25
operations@escribersnet (1)
2:25
**opinion (4)**
46:17;132:9;

134:1,9
**opportunities (1)**
128:14
**opportunity (9)**
96:20;106:16;
108:1,4,9,11;110:5,
14;130:18
**oppose (1)**
98:1
**opposed (2)**
51:2;126:15
**opposition (3)**
81:18;88:23;96:11
**opt (2)**
46:7;77:11
**optimistic (1)**
88:16
**Order (108)**
2:2,7,18;17:8,10,
15;18:7,14,16,18;
19:2,8;20:13;26:4;
35:10;36:18,23,24;
37:1,9,17;38:14;
41:2;43:23;47:1;
52:3,17,18,19,22;
53:10;54:15,19;57:3,
3;59:14,16,17;61:4,
22;66:21,24;70:4;
79:21;88:1;89:18,
20;91:13;98:18,20;
100:7,9,24;101:19;
102:17,18,19,25;
103:1,10,20,23;
106:13;107:14,16;
109:7,19,20;110:5,9,
11;115:7;116:15;
121:8,10;122:6,14,
15;123:19;124:24;
125:3,9,10,15;126:3;
127:12,17,19,22;
129:17;131:2,5;
132:2,7,19;134:7,11,
19;135:14;136:10,
23;137:24;138:2,2,
12,17,19,20
**ordered (1)**
37:10
**orderliness (1)**
23:6
**orders (1)**
101:25
**ordinarily (1)**
57:11
**ordinary (1)**
105:6
**organized (2)**
63:23;87:6
**original (9)**
39:11;58:16;64:2;
75:14;77:14;86:24;
110:11;113:6;
138:20
**originally (1)**

85:22
**others (7)**
15:5;42:11;65:6,
16;83:7;86:14;
117:15
**otherwise (3)**
31:7;57:20;115:9
**ought (2)**
97:5;117:16
**ourselves (2)**
34:11;39:11
**out (37)**
17:7,23;24:4;
36:24;40:6;45:18;
46:7;48:21;49:11;
57:10,20;59:22;
60:5;63:13,15;
68:23;77:11;79:21,
22;86:3,23;88:22;
93:21,23;95:21;
101:17;107:13;
108:25;111:4,8,17,
20;112:4,7;118:9,25;
119:15
**outcome (2)**
22:17;63:6
**outcomes (1)**
55:24
**outside (3)**
55:5;56:25;65:2
**outstanding (1)**
85:5
**over (27)**
22:10,15;23:1,16,
18;24:2,5;25:2;
27:12;30:20;33:1,7;
34:17;40:18;44:16;
46:5;48:14;83:5;
84:14;88:2;97:24,
24;115:21;131:16,
17;136:19;137:9
**overall (5)**
45:8;46:11;47:11;
58:14;67:25
**overcome (1)**
58:8
**overflow (2)**
21:18;75:1
**overly (1)**
102:24
**overruled (2)**
121:9,12
**oversecured (2)**
113:8;129:3
**overseen (3)**
33:20,21;132:23
**overview (4)**
20:25;21:15,19;
29:3
**OVERY (1)**
8:12
**owe (1)**
67:17

**own (5)**
34:8;43:20;82:17;
102:25;116:7

---

**P**

**page (11)**
17:9;88:8;89:19,
20,21;91:14,17;
101:7,11;122:7,8
**pages (3)**
122:3;134:17;
135:5
**paid (4)**
22:24;27:4,13;
67:4
**PALANDECH (1)**
12:18
**paper (3)**
41:17;59:9;86:20
**papers (7)**
17:20;29:23;
32:20,20;62:10;
110:25;115:6
**paragraph (10)**
37:11,19;38:6,9,
13,17,17;39:3;89:15;
121:8
**paragraphs (2)**
37:10;38:12
**pardon (1)**
87:11
**parent (2)**
32:13;126:23
**parents (1)**
122:21
**Park (6)**
4:4;5:4,22;6:12;
10:4;14:4
**PARKE (1)**
6:19
**part (17)**
41:5;42:1,17;43:2;
46:1;64:3;68:8;71:4;
86:22;91:14,15;
92:17;94:15;95:22;
97:7;107:8;129:13
**participants (1)**
18:9
**participate (5)**
45:13;57:18;
94:23;113:4;116:13
**participated (6)**
30:25;58:14,16;
88:3;127:1,3
**participation (2)**
69:9;126:15
**particular (7)**
45:20;47:17;63:7;
69:8;89:15,16;91:13
**particularly (4)**
19:15;85:10;
91:24;125:19

**parties (50)**
18:15;19:17;
22:14,20,25;24:11;
27:18;29:6;31:1;
33:14,22;34:12;
35:22;36:21;38:24;
39:8;40:3,16;43:17;
49:4,5;52:11;53:24;
57:16;58:13;63:24;
91:16;94:15,16,25;
95:20;104:7;106:24;
124:13;125:5,8,19;
126:7,8,11;127:1,3,
8,15;128:6,9,13;
129:15,17;133:13

**partner (2)**
21:7;40:19

**parts (2)**
45:12;101:17

**party (4)**
35:3;47:25;55:8;
124:18

**party's (1)**
37:24

**past (2)**
116:20;137:15

**path (3)**
31:15;115:23,24

**PATRICK (19)**
11:8;82:6,6;83:20,
25;84:2,4,6,9,11,13,
16;85:11,13,16,17,
20;86:12,13

**PATTERSON (1)**
10:20

**PAUL (4)**
6:7;9:17;79:5;
106:10

**Pause (2)**
75:7;136:8

**pausing (1)**
38:5

**paying (1)**
26:23

**payments (1)**
122:13

**PBGC (2)**
117:20;119:13

**PC (3)**
10:2;12:18;15:19

**Peachtree (1)**
5:13

**Peck (25)**
19:21;22:3,24;
28:17;29:7,15;
30:22;33:14,21;
43:16,25;65:23;
104:5;109:24;110:4,
12,13;126:1;131:14,
15,19;132:23;138:5,
6,13

**Peck's (2)**
23:2;29:11

**pending (3)**
24:19;34:19;87:23

**Pennsylvania (1)**
87:16

**PENSION (3)**
16:2;117:19;
119:11

**people (10)**
21:10,16;29:17,
22;51:7;56:5;57:18;
63:9,15;81:10

**perceived (1)**
80:17

**percent (3)**
47:11;86:23;
123:16

**perception (1)**
35:2

**perfect (1)**
85:3

**perfectly (1)**
100:5

**Perform (4)**
2:9;19:9;51:12;
100:7

**performance (5)**
37:14;52:5;57:4;
100:10;107:18

**performing (4)**
66:25;67:1,3,4

**perhaps (4)**
39:25;77:6;
131:18;135:13

**period (1)**
18:12

**PERLSTEIN (1)**
13:25

**Permit (1)**
2:18

**permitted (3)**
79:9;85:3;108:6

**personally (2)**
105:12;121:5

**perspective (1)**
100:22

**petition (5)**
33:2;34:9;60:1;
114:11;115:4

**ph (2)**
72:4,11

**Phelps (13)**
35:17;48:8,9,15;
49:5,8;63:19,21,25;
64:3;65:11;84:12;
85:25

**Phelps' (1)**
55:23

**Phoenix (1)**
14:23

**phone (4)**
74:21;123:4;
124:22;139:7

**pick (1)**
134:24

**picked (1)**
84:6

**PICKERING (1)**
13:19

**picking (1)**
45:18

**pie (1)**
47:18

**piece (3)**
24:5;47:17;62:25

**pin (2)**
104:22,23

**place (5)**
19:20;60:9,25;
128:5;130:5

**plainly (1)**
84:22

**plaintiffs (2)**
39:12;87:14

**Plan (191)**
2:9;19:10,13,22,
23,24,24;20:4,7,8,10,
15,25;21:25;22:5,13;
23:4,7,9,10,14;24:9,
12,15,22,25;25:3,12,
21;26:1,24;27:3,10,
12,14,19,22;28:7;
29:3,25;30:2;31:3,9,
11,14;32:6,7,9;
35:14;36:2,3,6,14,
16;37:25;38:21,24;
39:6,18,21;40:10,17;
41:2,25;42:5,16,16,
22;43:1,1,7,14,19,
21;44:4;46:15,16;
50:3;52:16;53:2,4,7,
8,10,16,17,18,19,22,
23;54:1;55:4,10,11,
13,16;56:19,19,20,
20;57:1,4,7,8,12,13,
17;60:13,19;61:6;
69:3,6,8,9;77:11;
78:14;80:13;82:9;
83:2;89:12;92:6;
94:17;98:23;99:6,14,
16;100:8;101:1,2,6,
9,11;102:12,13,13,
14;103:12,16,17,25;
105:5,8,23,24;
106:13;108:16,17,
24;109:2;112:6,15;
113:8,17,24;114:14,
17,19,21,22;117:21;
119:3,6,11;121:12;
124:6,9,14,16;125:2,
15,18,20;126:3;
127:5;128:2,6;129:2,
5;130:9,10;131:7;
132:24;133:2,7,10,
11,14,20;134:19,23;
139:5

**planning (1)**

**39:17**

**played (1)**
125:24

**Plaza (4)**
4:4;6:21;13:12;
14:13

**PLC (1)**
14:19

**pleading (4)**
59:7;82:9;86:18;
120:18

**pleadings (2)**
82:11;125:14

**Please (7)**
17:2;43:11;76:15,
19;82:6;96:25;103:9

**pleased (2)**
30:22;124:3

**pm (3)**
96:24;109:25;
139:23

**podium (4)**
40:18;44:15;81:3;
136:19

**point (41)**
36:14;45:20;46:5;
49:9;51:2;54:15,16;
56:7;58:24;59:22;
60:5;62:2;75:24;
77:5;81:7,18;82:15;
83:4,4;86:4;93:17;
96:7,22;98:20;105:3,
10;106:1,2,4,5;
108:14;115:6;116:9,
11;118:9,23;120:23;
124:4;131:25;
137:15;138:1

**points (3)**
62:19;64:7;106:6

**POLSINELLI (1)**
15:19

**PONZI (1)**
12:18

**pooling (2)**
82:22;130:19

**portion (2)**
111:6,9

**position (11)**
47:20;58:19;
66:16,18;69:23;
77:24;88:15;113:14,
15;115:7;117:22

**positions (4)**
22:4,16,21;124:13

**positive (1)**
131:5

**positively (1)**
87:2

**possibility (1)**
115:1

**possible (4)**
47:24;55:24;
59:23;63:6

**possibly (1)**
119:9

**post- (2)**
114:10;115:3

**post-petition (9)**
112:15;113:16,24;
114:4;115:12,17;
129:1,4;130:1

**post-position (1)**
115:8

**post-Stern (1)**
61:18

**posture (1)**
98:20

**pot (1)**
93:2

**potential (1)**
24:17

**potentially (2)**
23:22;84:25

**power (3)**
102:5,5;118:14

**practical (1)**
48:19

**practice (1)**
44:23

**pre- (2)**
33:1;34:8

**precise (1)**
34:14

**precisely (1)**
23:17

**preclude (1)**
104:17

**precluded (1)**
55:9

**preclusive (7)**
52:14;60:10;
98:21;106:16,18,22,
25

**prefatory (1)**
89:17

**prejudice (2)**
36:15;37:23

**prejudiced (1)**
119:9

**premature (5)**
34:2;106:4,15,18,
21

**premise (1)**
66:13

**premised (1)**
30:20

**prepared (6)**
59:4,5,15;66:6;
116:5;124:23

**pre-petition (2)**
125:21;126:14

**PRESENT (2)**
16:10;108:11

**presentation (5)**
34:15;35:13;46:1;
81:8;101:4

**presentations (3)**
33:14;34:14,17
**presented (3)**
100:17;128:17;
134:12
**preserve (1)**
128:14
**preserved (2)**
122:19;130:21
**press (1)**
17:23
**pretty (3)**
60:23;62:7;77:6
**prevent (1)**
25:10
**preview (1)**
36:3
**primarily (1)**
89:8
**primary (1)**
99:9
**principal (1)**
97:23
**principals (1)**
117:3
**printout (1)**
122:4
**priority (1)**
66:21
**private (8)**
25:9;38:18,20,22;
92:18;93:24,25;94:5
**privileges (1)**
43:20
**PRO (3)**
16:11;86:7;97:4
**probably (5)**
22:12;53:21;
77:15;112:7;134:8
**problem (4)**
54:7;99:7;130:3;
138:24
**procedural (2)**
79:6;98:20
**procedure (1)**
18:6
**procedures (1)**
26:6
**proceed (5)**
21:18;31:15;
46:18;59:15;83:1
**proceeding (5)**
52:24;103:16;
113:19;115:19;
118:16
**proceedings (7)**
38:4;39:9;99:8;
103:18;122:19;
132:22;139:23
**proceeds (1)**
129:20
**process (34)**
18:10,12;19:20;

20:8;22:1;26:22;
29:13,25;30:5,11;
31:2;33:21;43:15;
46:22;47:7,12,23;
48:3,7,25;49:4,9,25;
52:10;55:23;58:11,
11;64:1;65:3,6;
83:14;99:6;109:17;
115:7
**produced (2)**
28:15;33:5
**product (1)**
23:24
**professionals (1)**
63:23
**Program (1)**
12:20
**progress (1)**
61:7
**prohibit (1)**
68:13
**promise (1)**
58:25
**prompted (1)**
78:3
**promptly (1)**
132:8
**proof (1)**
87:24
**proofs (4)**
92:7,11;94:9;96:4
**proper (1)**
94:4
**properly (1)**
133:22
**proponent (1)**
80:21
**proponents (7)**
19:23;81:16;
96:13,20;108:8;
109:5;130:9
**proposal (4)**
47:8;98:5;124:8;
131:6
**propose (3)**
21:4,7;128:6
**proposed (35)**
17:9;28:7;34:22;
35:10;36:17,23;
37:24,25;42:16,22,
25;43:6;57:17;
58:16;69:3,6,17;
89:20;91:13;100:24;
102:17,18,19,25;
103:1,10,20,23;
107:11;109:19;
121:8;125:3;127:22;
132:7;139:8
**PROSKAUER (1)**
9:20
**prospectuses (1)**
51:6
**protect (1)**

115:8
**protection (1)**
57:2
**protects (1)**
84:25
**provide (11)**
20:24;34:24;
36:21;38:20;39:5;
40:2;59:17,17;
92:17;103:3;129:2
**provided (9)**
17:14;33:4;52:10,
11;66:19;80:9;
101:24;129:4;
130:17
**provides (5)**
21:1;27:12;30:2;
101:18;114:22
**providing (1)**
63:25
**provision (5)**
40:17;89:17;
118:13;120:1,3
**provisions (2)**
44:5;125:10
**Prudential (2)**
10:12;25:1
**PSA (75)**
23:3;31:21;32:16;
34:2,18,21;35:12;
37:13,15,21,23;38:1;
42:3;52:15;53:2,11,
23;55:2;56:4;59:16,
18;60:11;66:1;
68:21,24;77:23;
80:14,21,24;83:18;
86:14;87:10;92:17;
94:16;96:11;100:10,
15,21,24;101:19,21;
102:25;104:11;
105:17;107:16,16;
108:12,25;109:6,7;
113:22;116:2;
120:11;121:14;
126:13;127:13,22,
25;128:8,17,19;
130:4;131:2;132:6,
13,25;133:5,6,10,12,
15,19,24;134:3,12
**PSAs (2)**
100:17;111:5
**public (1)**
34:2
**Puntus (1)**
136:16
**purchased (1)**
83:11
**purpose (1)**
23:6
**purposes (1)**
108:12
**Pursuant (2)**
2:14;51:22

**pursue (1)**
35:3
**pursuing (2)**
120:5,10
**put (14)**
19:20;29:12;
47:12;75:24;83:22;
98:4;105:13;107:5;
108:8;116:21,23;
117:1,1;128:5
**putative (1)**
87:15
**puts (1)**
116:24

**Q**

**qualified (1)**
18:4
**quantified (1)**
33:9
**questionable (1)**
104:9
**quibble (1)**
92:13
**QUINN (1)**
10:11
**quite (8)**
21:25;22:20;34:5;
47:16;58:15;81:8;
85:7;102:7
**quote (1)**
101:17
**QUSBA (1)**
11:24

**R**

**RACHEL (1)**
6:16
**raise (10)**
33:25;81:10;
98:23;102:9;117:4;
121:24;125:5;126:8;
128:15;133:17
**raised (13)**
66:5;67:16;87:3;
89:12;102:9;112:11;
117:6;120:18;
125:13;126:6;131:1;
132:10;133:22
**raises (2)**
64:12;94:13
**raising (3)**
92:6;110:20;118:3
**RALI (1)**
77:9
**range (1)**
129:7
**rarely (1)**
131:17
**rather (4)**
31:24;75:14;

80:11;133:25
**RAY (1)**
8:7
**RE (1)**
2:17
**reach (4)**
26:12;39:10;
111:20;130:7
**reached (10)**
17:24;29:5;34:18;
89:15;97:7;104:16;
109:18;122:17;
129:16;132:24
**reaching (1)**
17:23
**read (18)**
20:1;48:5;55:19;
57:23;65:25;68:17,
17;90:14,24;91:14;
92:5;94:12;96:2,3;
105:14;111:1;
118:24;135:6
**reading (5)**
36:11;114:3;
134:17,23;135:1
**ready (1)**
21:19
**reality (1)**
33:15
**realize (1)**
122:10
**really (22)**
21:25;22:17,24;
28:5;30:12;31:4;
34:2;47:2;49:17,18;
50:13;51:17;58:19;
59:20;79:6;98:23;
101:15;108:21;
112:13;135:23;
137:2,11
**reason (5)**
104:2;111:19,22;
114:10;130:4
**reasonable (4)**
30:8;47:4;48:3;
63:5
**reasonableness (1)**
82:24
**reasonably (4)**
52:7;62:10;91:18;
101:19
**REBECCA (1)**
7:17
**recall (2)**
22:18;23:24
**receive (4)**
25:8;26:6;68:6;
110:14
**received (19)**
17:13;21:5;25:7;
31:10;41:13;42:6,
23;43:7;46:6;71:12;
72:1,11,22;73:8,23;

74:16;76:11;84:11;
91:7
**recent (1)**
75:13
**recess (4)**
96:21,22,23,24
**recognize (6)**
34:25;62:25;
91:20;104:21;
124:11;128:3
**recognized (3)**
22:15;114:23,25
**reconcile (1)**
26:8
**record (29)**
35:13;40:20;77:8;
78:15;82:13;83:15,
17,23;84:17;89:19;
91:22;97:13;111:2,
22;112:10,14;
113:11,14;120:6,8;
122:5,23;123:22;
124:4;125:11;
126:17;127:21;
130:14;131:1
**recorded (1)**
112:23
**recordings (1)**
112:25
**records (3)**
28:2;30:23;32:23
**recourse (1)**
51:15
**recoveries (3)**
25:8;26:2;28:21
**recovery (6)**
66:21;68:4,6,14;
122:9,12
**redline (1)**
37:4
**reduction (4)**
40:17;120:1,3;
128:24
**REED (11)**
16:11;97:2,3,3,5,9,
18,25;98:4,7,9
**refer (2)**
19:11;64:7
**reference (3)**
77:12;118:16;
123:9
**referred (2)**
34:3;122:19
**referring (5)**
84:1;101:21;
113:2,4;122:7
**refers (3)**
38:14,17;112:19
**reflect (7)**
22:2;26:1;32:23;
47:16;49:6;64:6;
122:12
**reflected (7)**

23:9;26:3;28:1;
47:1;93:7,8;128:20
**reflecting (1)**
30:4
**reflects (3)**
19:16;27:3;37:9
**refrain (1)**
116:13
**refuse (1)**
116:13
**regard (1)**
78:17
**regarding (7)**
49:22;68:10;74:4;
98:25;111:14;
119:11;121:1
**regulate (1)**
97:14
**regulating (2)**
97:16;98:1
**regulators (1)**
97:23
**rehash (1)**
110:25
**reimbursement (1)**
66:20
**rejecting (1)**
133:14
**relate (3)**
39:17;55:2;106:15
**related (4)**
24:18;102:14;
103:25;120:22
**related-party (1)**
134:5
**related-to (3)**
61:5,11,14
**relates (3)**
39:3;102:6;103:13
**relating (7)**
22:7;23:19;25:15;
33:1,7;103:11;111:6
**relative (1)**
68:1
**relatively (4)**
20:6;31:9;48:24;
63:16
**release (4)**
99:13;118:1,4;
119:8
**released (2)**
111:17;119:6
**releases (2)**
33:9;39:18
**releasing (1)**
119:5
**relegated (1)**
93:4
**relevant (2)**
56:21;101:18
**relief (1)**
89:23
**reluctant (2)**

22:21,22
**rely (1)**
57:1
**remain (1)**
89:19
**remainder (1)**
51:20
**remaining (1)**
66:11
**remains (5)**
40:8;44:4;55:14;
65:23;89:17
**remarkable (1)**
131:3
**remarks (6)**
30:14;86:12;
119:25;123:10;
127:16,19
**remember (2)**
92:9;97:3
**reminded (1)**
59:11
**removed (1)**
37:11
**renders (1)**
115:23
**reorganization (3)**
105:8;132:24;
133:2
**rep (6)**
23:19;46:10;
67:25;68:4;77:13,15
**replicated (1)**
24:2
**reply (7)**
36:12;54:25;93:8;
101:7;116:12;
120:17;121:3
**Report (8)**
2:14;34:1;134:11,
13,20;135:2;136:11,
11
**reported (1)**
112:23
**represent (7)**
86:21;89:6;98:16;
124:3,6,12,16
**representation (1)**
119:24
**representations (1)**
124:5
**representatives (2)**
26:11;126:24
**represented (2)**
87:13;95:6
**representing (4)**
87:12;95:6,14;
123:11
**represents (4)**
19:14;25:19;29:3;
31:4
**request (4)**
22:23;38:2;83:9,

10
**requested (3)**
82:12;84:24;89:23
**require (2)**
68:22,23
**required (7)**
45:9;59:9;3;65:25;
82:20;83:1,8;103:12
**requirement (1)**
78:14
**requirements (1)**
44:2
**requires (5)**
18:1;65:23;
101:15;102:11;
134:17
**ResCap (6)**
9:3;21:17;26:10,
23;28:24;66:17
**reservation (15)**
36:8,22;38:3;70:3;
100:3;103:15,23;
110:19;112:1;116:2;
122:23;125:4;
127:18;128:20;
130:15
**reservations (6)**
57:5;63:1;121:9,
11;125:8;132:15
**Reserve (3)**
17:25;26:21;97:16
**reserved (4)**
20:16;120:18;
122:19;130:16
**Reserve's (1)**
97:14
**reserving (5)**
35:23,24;97:10;
99:7;120:11
**Residential (4)**
2:5;17:3;24:24;
99:3
**resist (1)**
81:2
**resolution (12)**
22:8;23:2;26:12,
15;29:16;31:4;
40:14;61:7;65:22;
130:7,7;131:13
**resolutions (3)**
21:6;39:10;133:8
**resolve (23)**
21:5;22:12;28:7,
25;35:20;45:6;
56:18;66:24;93:6;
94:7;104:6;109:1;
113:19;117:3;
119:12;124:19,23;
128:15,25,25;
129:22;130:1;
137:13
**resolved (13)**
24:9;25:1;38:10,

13;63:1;65:22;
66:21;70:4;87:20;
89:14;117:24;133:9,
16
**resolves (7)**
24:8;25:21;27:14;
28:11;31:6;38:7;
39:15
**resolving (2)**
28:10;29:4
**resources (2)**
22:15;84:22
**RESPA (1)**
87:21
**respect (52)**
17:14,17;19:3;
23:25;24:20;25:12,
25;26:14;27:2;
34:12;36:8,16,19;
38:6,13;40:5,12;
44:2;49:19;51:23;
55:10;62:22;63:2,2,
4,18;64:23;66:24;
67:2;70:2;79:13;
80:7;87:1;89:13;
91:25;92:3;102:2;
103:15;108:15;
111:12,23;112:3,17;
113:10;115:14,19;
116:2,6;121:18,20;
122:13;123:12
**respectfully (1)**
127:11
**respective (4)**
22:20;91:19;
95:21;103:14
**respond (2)**
84:22;96:20
**response (5)**
90:6;110:20;
132:15
**rest (2)**
81:16,18
**rested (1)**
96:12
**restructuring (2)**
125:24;127:7
**result (9)**
27:20;29:5;38:10;
43:15;45:4;52:21;
85:5;89:8;133:7
**resulted (1)**
118:15
**resume (2)**
96:23;135:19
**return (1)**
133:5
**review (9)**
17:25;18:10,12;
23:9;26:21;48:19;
110:5,14;139:13
**reviewed (1)**
17:19

**revised (11)**
20:13;26:4;36:17;
37:9,19;85:24;86:1;
122:1;125:10;132:7;
134:8
**revisions (2)**
70:4;98:18
**revisit (1)**
116:20
**RICHARD (3)**
8:25;12:7;119:21
**RICO (1)**
87:22
**right (71)**
17:16,19;18:23;
35:6;36:13;37:8;
41:12,19,22;42:4,20;
43:5;45:22;51:23;
59:9;60:24;61:5;
62:5,6,7;66:9,23;
69:24;71:25;72:10,
21;73:7;74:13;75:4;
76:3,9,18;79:1;
80:21,23;81:24;
82:5;84:8;88:21;
90:10;91:5;92:19,20,
21;94:3;95:2,25;
96:10,17,18;97:1,2;
98:9,10;99:23;
100:16,19;101:13;
110:16;116:3;
119:18;120:3;
121:24;123:5;
128:16;129:9;
131:10;132:5;
139:16,17,21
**rightfully (1)**
47:16
**rights (46)**
35:23,24;36:8,15,
19,23;37:24;38:14,
18,25;51:4,8,9,17;
53:24;57:5;63:1;
67:6;70:3;79:14;
80:15;98:25;99:5;
100:3;103:15,23;
109:6,8;110:20;
112:1;116:2;120:11;
121:1,9,11;125:4,9;
127:18;128:15,20;
130:15,16,19,20,23;
132:15
**rise (1)**
83:3
**risk (1)**
82:21
**risky (2)**
115:7,24
**RMBS (69)**
4:3;11:3;20:10;
23:14,16,16;24:17;
25:15;30:4,14;
31:20;35:11;37:14,

16,21;45:2,3,7;46:5;
51:4,5,10;52:5,8,9;
58:19;65:4;69:8;
71:13,21;72:2,8,12,
18,23;73:3,9,15,24;
74:5,10,17;76:11;
82:7,8,18;84:17,20;
86:17,24;89:11,25;
91:17;98:25;99:1;
100:25;101:5,9,20,
22;102:1,1,2,2,7;
103:13,13;107:18,24
**road (1)**
20:19
**Robert (3)**
15:4;70:18;71:12
**Rockerfeller (1)**
6:21
**ROHRBACK (2)**
14:19;98:12
**role (1)**
125:24
**roles (1)**
30:4
**room (2)**
21:18;75:1
**ROSE (1)**
9:20
**ROSENTHAL (1)**
14:9
**Rothstein (1)**
15:3
**roughly (1)**
35:21
**round (1)**
82:4
**rounds (1)**
33:6
**routinely (1)**
32:5
**Rowena (2)**
15:20;87:12
**RUDLOFF (1)**
12:18
**rule (7)**
32:5,10,16;46:22,
23;57:10;94:20
**ruling (1)**
73:22
**run (2)**
23:22;30:12

### S

**sale (2)**
40:5,6
**same (9)**
25:7;33:22;47:13;
53:6;60:25;94:2;
107:20;122:15;
135:13
**sampled (2)**
48:15;84:14

**sampling (4)**
48:12,21,22;85:25
**sand (1)**
29:13
**SANDEEP (1)**
11:24
**Sara (1)**
2:21
**satisfactory (2)**
38:22;39:1
**satisfied (9)**
32:1;78:14,17,19;
116:6;127:17;128:3;
134:2,5
**saving (1)**
117:23
**saw (1)**
93:9
**saying (7)**
64:15,17;91:12;
95:7;104:22;113:20;
123:11
**schedule (5)**
39:11;75:25;76:8,
10;115:11
**scheduled (2)**
109:24;129:9
**schedules (1)**
28:1;138:8
**scheduling (2)**
112:20;113:1
**scheme (1)**
87:21
**SCHROCK (1)**
8:7
**scientific (3)**
46:22;48:18,21
**scope (1)**
54:15
**Scott (6)**
72:25;73:1,5,6,8;
79:3
**scrutiny (1)**
99:10
**SE (2)**
16:11;97:4
**seal (1)**
134:17
**seated (2)**
17:2;96:25
**second (12)**
17:21;18:25;20:9;
25:12;31:5;35:7;
36:1,23,24;37:19;
91:15;126:6
**Section (7)**
2:14;100:11;
101:1,10,15;102:11;
103:12
**Sections (2)**
2:8;19:8
**Secured (15)**
7:21;13:11;27:2,4,

6,7,7,11;38:3;85:1;
100:4;109:17;
113:23;115:21;
135:15
**secures (1)**
27:11
**Securities (18)**
8:21;24:18;25:9,
12,15;38:18,20,22;
51:9,10;83:12;
92:18;93:24;94:5,
23;95:8;99:2;119:23
**securitization (1)**
24:1
**security (1)**
24:25
**Seeing (1)**
44:10
**seek (4)**
27:18;28:24;
37:20;113:18
**seeking (5)**
20:5,12;39:20;
64:21;128:6
**seeks (3)**
37:25;100:24;
103:16
**seem (3)**
56:24;68:19,20
**seemed (1)**
138:20
**seems (2)**
56:3;104:15
**SEIFE (3)**
6:25;134:14,15
**send (2)**
138:20;139:8
**senior (1)**
68:2
**sense (4)**
27:10;67:16;
134:5;135:8
**sent (1)**
36:24
**sentence (1)**
59:10
**separate (3)**
24:3;34:13;68:9
**Separately (3)**
83:13;129:10;
134:10
**sequester (1)**
112:24
**Series (1)**
77:9
**Services (1)**
16:12
**servicing (6)**
23:21;46:11;68:9,
12;82:22;130:19
**set (8)**
20:19;24:20;
25:10;26:2;65:5;

108:6;122:9;133:15
**Seth (1)**
2:15
**sets (1)**
20:17
**settle (1)**
62:8
**settlement (51)**
18:4;23:15;25:20;
26:9,22;27:23;28:11,
22;31:2;32:15;
36:20;45:4;46:7,12,
14;49:3;55:5,25,25;
61:10,17,19;82:25;
84:20;85:20,24;
86:25;87:3,7,20;
88:2,10,14;93:25;
105:6;111:6,8;115:9,
16;121:18;122:1,15,
16,17,22;123:10,13;
126:22;129:12,13,18
**settlements (5)**
85:10;104:6,10;
122:18;133:8
**settles (1)**
25:13
**seven (4)**
19:18;33:19;
84:18;104:4
**Seventh (1)**
9:14
**seven-years (1)**
87:18
**several (17)**
23:1;27:20;28:3,
21;33:6,13,24;34:16,
17;68:17;83:5;86:3;
88:2;103:21;108:15;
137:9;138:3
**SEWARD (1)**
4:2
**SHALHOUB (1)**
9:17
**shall (2)**
101:19,25
**share (1)**
45:16
**shared (1)**
33:10
**shed (1)**
27:25
**sheer (2)**
19:15;62:17
**sheet (14)**
18:8,9,11;42:15,
20,22,25;43:6;56:4;
88:9;108:23;114:22;
121:20;122:1
**sheets (9)**
56:1;59:17;
102:14;104:1,11,18;
114:19;133:1,6
**sheet's (1)**

122:3

**short (2)**
96:21;134:11
**shorthand (1)**
114:6
**short-handing (1)**
84:2
**shortly (1)**
49:10
**show (2)**
30:18;32:18
**shows (2)**
31:5,12
**shuffle (1)**
82:19
**shut (1)**
135:20
**sic (2)**
70:18,24
**sides (2)**
32:18;33:22
**Sie (1)**
79:19
**SIEGEL (118)**
7:18;35:12;44:16,
21,22;46:1,4;48:9,
16;49:10,24;50:10,
12,19,21,25;51:2;
52:13,17;53:3,12,14,
16;54:1,8,10,13,20,
22;55:7,15;56:6,8,
11,12,14,17;57:25;
58:20,22,25;59:3,7,
11,13,21;60:3,5,7,12,
15,17,19,23,25;61:2,
12,14,24;62:2;64:10,
14,17,19,23;65:6,9;
66:2,6,9,10;67:8,12;
68:12;69:2,5,11,13,
15,21,25;70:2,7,10,
13,15,23;71:5,7,14,
18;72:3,13,24;73:10,
19,25;74:2,14,18,22;
75:10,18;76:5,13,16;
77:12,20;79:20,24;
80:1,5,6,20;98:24;
102:8;131:22,23
**Siegel's (1)**
77:6
**sign (4)**
49:2;52:15,19;
60:11
**signatories (1)**
57:18
**signatures (1)**
31:9
**signed (5)**
18:11,17;19:16;
59:19;67:9
**significant (8)**
19:14,15;26:25;
46:8,13;58:8;77:16;
86:17

**signs (1)**
121:10
**similar (7)**
24:14;38:25;40:4;
53:21;118:10,17;
120:7
**similarly (3)**
15:5;25:4,5
**simplest (1)**
56:8
**simply (16)**
24:2;31:15;35:22,
23;39:11;45:6;
47:21;52:1;53:17;
56:21;59:24;61:3;
67:1;69:17;70:4;
118:1
**SIMPSON (1)**
11:19
**single (3)**
26:9;48:19;132:13
**single-spaced (1)**
122:3
**sit (1)**
45:23
**sitting (2)**
30:21;136:1
**situated (2)**
15:5;25:4
**situation (2)**
25:5;118:10
**six (4)**
24:1;33:19;122:3;
135:5
**Sixth (1)**
11:13
**size (3)**
45:14;67:25;68:1
**skipping (1)**
58:1
**slightly (2)**
17:8;18:2
**SMITH (1)**
10:2
**so-called (1)**
109:20
**Sohlberg (5)**
73:11,12,18,23;
79:3
**Sohlberg's (1)**
73:15
**solely (1)**
101:25
**solicitation (1)**
100:18
**solution (1)**
63:4
**somebody (4)**
95:15,18;131:18;
136:4
**Somebody's (1)**
79:2
**somehow (1)**

119:7
**some-odd (1)**
92:23
**someone (3)**
53:4;54:2;135:24
**someone's (1)**
19:2
**sometimes (1)**
82:19
**somewhere (1)**
33:7
**soon (2)**
87:19;136:23
**sorry (9)**
19:23;38:12,16;
39:6;74:7;80:1;89:3;
135:7;136:4
**sort (4)**
29:10;56:21;
118:9;137:7
**sorted (1)**
57:20
**sought (2)**
36:7;98:21
**sound (1)**
32:8
**sounds (2)**
98:7;106:24
**South (2)**
7:4;10:13
**Southern (1)**
32:4
**space (1)**
48:20
**SPAEDER (2)**
4:13;89:6
**span (1)**
27:20
**spanned (1)**
24:1
**speak (4)**
80:23;87:10;
88:20;138:22
**speaking (8)**
44:24;48:24;
60:20;63:16;68:2;
81:15;86:14;107:10
**Specialty (1)**
12:20
**specific (4)**
39:21;51:16;
81:11;91:20
**specifically (4)**
32:2;70:11;77:19;
130:18
**specificity (1)**
108:22
**specified (1)**
53:25
**spend (2)**
67:22;132:11
**spent (4)**
28:13;30:24;

36:11;104:4
**spoke (1)**
131:10
**spoken (2)**
106:22;139:4
**Square (3)**
9:22;56:5;133:6
**stage (1)**
104:2
**stake (1)**
84:23
**stampede (1)**
136:3
**stand (2)**
118:9;120:25
**standard (17)**
29:19;31:19,22,24,
24;32:1;40:11;
51:24;126:8,19,19;
127:10,12;133:23,
25;134:6,6
**standards (11)**
29:24;30:17;
62:11;99:11;108:23,
24;128:4,4;133:18,
18,19
**standing (10)**
55:8;64:16,19,24;
69:7;77:20,22,25;
78:6,19
**standpoint (1)**
115:1
**stark (1)**
126:13
**start (7)**
29:18;51:5;66:12;
70:15;97:6;107:15;
138:13
**starting (1)**
109:25
**state (3)**
60:1;74:18;79:21
**stated (3)**
82:11;109:4,5
**statement (35)**
19:25;27:24;
36:16;37:24;39:25;
49:19,20,22;50:15;
55:3;64:3;65:3;
68:25;78:4;79:13;
80:16;86:6;87:4;
98:23;99:6;100:3,
14;103:16;108:24;
110:19;111:12;
120:21,25;121:12,
15;123:15;124:25;
125:6;133:20;
134:24
**statements (7)**
34:11;77:23;
106:12;111:13,23,
24;120:17
**states (4)**

37:14;107:17;
123:7,8
**statistical (1)**
83:20
**Status (7)**
2:17;112:12,17;
113:7;116:11;
118:18;135:12
**statute (1)**
118:17
**statutory (1)**
118:13
**STEEN (1)**
14:11
**Steering (2)**
11:3;82:7
**step (5)**
29:4;94:20,21;
131:3,6
**steps (1)**
133:3
**stick (1)**
65:19
**still (9)**
53:5;80:2;94:7;
103:24;113:7,14,17;
114:5;124:11
**stipulation (1)**
137:16
**STN (2)**
34:19;35:1
**Stonehill (1)**
9:12
**stop (6)**
18:12;95:19;
135:22,22,22,22
**story (1)**
103:7
**STRAUSS (3)**
6:10;15:9;100:2
**streamline (1)**
26:6
**Street (11)**
2:23;4:15;5:13;
10:13;11:13;12:4,12,
21;13:22;15:14;16:4
**strength (1)**
55:23
**strict (1)**
44:1
**stripped (1)**
118:14
**strongly (4)**
125:1;126:18;
128:18;131:2
**structure (3)**
27:17;50:21;57:17
**subject (4)**
25:6;67:9,10;
86:24
**subjecting (1)**
46:19
**subjectively (1)**

45:10

**submissions (3)**
33:6,10;35:24

**submit (2)**
97:15;109:7

**submitted (10)**
21:8;30:3,4,7,10;
34:10,12;59:17;
83:21;126:4

**subordinated (3)**
67:6,8,9

**subordination (2)**
24:6;25:2

**subsequent (2)**
79:15;102:20

**subset (1)**
47:10

**substance (4)**
39:1;75:11;
138:15;139:4

**substantial (3)**
30:1;32:12;48:12

**substantially (2)**
18:8;133:15

**substantive (6)**
27:15,18;78:22;
109:6,8;125:6

**succeeds (1)**
47:24

**successful (2)**
22:8;133:4

**successor (1)**
100:5

**sue (2)**
52:25;54:2

**suffered (2)**
48:23;54:5

**sufficient (2)**
45:9;52:11;64:12

**suggest (4)**
53:4;67:15;81:9;
85:3

**suggesting (1)**
39:12

**suggestion (1)**
99:4

**suggestions (1)**
38:9

**suggests (1)**
91:21

**Suisse (5)**
8:21;40:14,16;
119:22;128:22

**Suisse's (1)**
40:12

**suit (1)**
25:6

**Suite (7)**
2:23;4:16;5:14;
11:5;12:22;14:22;
15:22

**SULLIVAN (1)**
10:11

**sum (2)**
29:2;135:24

**summary (1)**
29:19

**supplement (3)**
39:7;110:24;
111:21

**supplemental (5)**
38:25;42:25;43:6;
88:8;111:12

**supplying (1)**
98:3

**Support (142)**
2:9;19:10,13,22,
24;20:7,11,15,25;
21:3,9,25;22:5;23:4,
7,9;24:9,22,25;25:3,
13,21;27:3,10,14,19,
22;28:4;29:3,25;
30:1,1,2;31:3,9,11,
11,14;32:6,7,9,25;
35:14,14;36:2,6,15;
38:21,24;39:21;
40:10;41:1,2,8,25;
42:5,17;43:1,14,18,
19,21;44:3,4;49:3;
52:15;53:8,16,17,22;
54:1;55:10,11,13,16;
56:19,19,20;57:1,4,
7,13;60:11;61:6;
69:8,9,18;77:11;
78:14;80:13,22,23;
81:15;82:9,9,11;
83:2;85:18;86:14,
18;87:2,7,10;88:8,
17,20;89:12;90:7;
100:8;101:1,2,6,9,
11;102:12,13,13;
103:12,17,25;105:5,
11,24;106:13;107:6,
8;117:21;119:3,6;
124:6,14;125:2,15,
18,20;126:3,5;127:5,
21;130:8,11;132:24

**supported (8)**
82:13,23,25;
89:18;91:22,24;
105:16;125:11

**supporters (1)**
31:21

**supporting (6)**
41:23;57:16;
94:15,16,25;112:6

**supports (9)**
30:7;35:9;61:18;
104:17;107:23;
124:5;126:18;
128:18;131:2

**supposed (1)**
51:12

**Sure (21)**
19:1;21:21;22:2;
29:17;35:12;40:1,3;

48:3;53:11;54:6;
59:6;68:18,20;77:4,
13;79:8;89:2,10;
96:1;110:15;123:10

**surprised (1)**
111:16

**surrounding (1)**
100:21

**survived (1)**
25:18

**SUSAN (1)**
12:25

**SWAINE (2)**
8:20;119:22

**switches (1)**
21:20

**Syncora (10)**
6:3;66:12,25;
67:16;68:6,8,17;
69:2;79:6;106:11

**Syncora's (3)**
67:17;68:7,19

---

## T

**table (2)**
22:25;23:1

**tables (1)**
77:7

**TAFT (1)**
11:11

**take-away (2)**
105:14,16

**Talcott (2)**
12:11;86:16

**talented (1)**
77:21

**talk (15)**
21:2;45:25;51:3;
58:3,4;61:2;63:11;
65:10,11;70:5;
107:21;112:1;
138:11,15,16

**talked (1)**
107:15

**talking (4)**
67:22;79:3;
108:12;138:25

**TELEPHONICALLY (1)**
16:12

**telling (2)**
54:23;65:15

**ten (1)**
92:7

**tens (2)**
24:22

**tent (1)**
65:19

**term (26)**
18:8,9,11;42:15,
20,22,25;43:6;56:1,
4;59:16;88:9;
102:14;103:25;

104:11,18;107:13;
108:23;114:19,22;
121:20;122:1,2;
132:25;133:6;
134:12

**terminate (2)**
38:21;53:24

**terminated (2)**
54:2,3

**terminates (2)**
55:17;56:4

**termination (3)**
38:25;130:3,10

**terms (21)**
25:22;27:1;31:11;
33:4,25;38:1;53:2,
10;61:15,16;80:12;
82:14;94:17;103:17;
116:18;127:14;
130:11,15;132:25;
133:11,15

**test (2)**
49:21;50:16

**testify (16)**
41:6,6;70:19,19;
71:19,19;72:6,6,16,
16;73:2,2,13,13;
74:8,8

**testimony (12)**
43:18;44:3,10;
70:20;71:20;72:7,
17;73:2,14;74:9;
76:2;80:3

**THACHER (1)**
11:19

**Thanks (2)**
110:18;139:10

**that'll (2)**
119:15;132:8

**thaw (1)**
107:7

**therefore (5)**
41:7;46:15;51:23;
67:13;82:23

**therein (2)**
38:1;45:4

**there'll (1)**
18:6

**thereunder (1)**
107:19

**Third (6)**
9:4;15:6,21;34:12;
36:4;37:1

**third-party (7)**
28:12;33:8;39:17;
52:24;99:13;118:1,4

**thirteen (1)**
87:17

**thirteen-years (1)**
87:19

**thirty (5)**
18:13,20;49:12,12,
13

**thirty- (1)**
47:10

**THOMAS (5)**
4:10;7:8;14:17;
72:14,22

**though (5)**
65:13;76:24;
82:19;112:1;119:7

**thought (12)**
26:8;37:2;49:7;
55:1;64:6;66:22;
67:5;74:21;79:24;
95:24;111:21;
116:11

**thousands (3)**
28:13;48:12,12

**three (3)**
35:21;37:10;69:15

**thrilled (1)**
97:9

**throughout (2)**
62:14;66:14

**Thursday (1)**
134:25

**TILA (1)**
87:22

**Times (2)**
9:22;68:17

**today (24)**
26:22;39:21;
64:20;65:21;78:9,
23;79:9,12,17;81:3;
83:18;94:21;97:6;
109:21;111:24;
114:25;116:16;
118:8;132:6;134:8,
10,19;137:3;139:17

**today' (1)**
77:22

**today's (3)**
20:19;75:5;101:18

**Todd (1)**
136:25

**together (3)**
22:7;83:22;128:12

**told (3)**
54:24;65:4;87:3;
138:7

**TOLLES (1)**
7:2

**tolling (1)**
25:7

**tonight (1)**
88:14

**took (10)**
36:17;49:1,17;
58:18;63:23;64:1;
66:16;108:9;114:2;
126:21

**touch (1)**
136:7

**toward (2)**
65:4;124:19

**towards (2)**
22:18;101:24
**tracks (1)**
52:3
**Trade (1)**
13:21
**traditional (1)**
111:4
**tranche (1)**
68:4
**tranches (3)**
67:23;68:2,3
**transaction (3)**
32:19;127:24;
134:5
**transactions (8)**
20:14,17;37:12,
18;38:1;107:11,13,
20
**Transcribed (1)**
2:21
**Transfer (2)**
2:3;17:11
**transparency (1)**
48:6
**transpired (1)**
138:7
**treated (12)**
24:13,15;47:12;
68:15;69:3;88:6;
92:4,16,17;93:18,20;
96:3
**treatment (3)**
25:8;69:6;92:4
**Trial (6)**
23:23;24:20;
58:19;65:4;115:11;
129:9
**tried (5)**
21:5;35:20;54:25;
83:5;92:2
**trigger (1)**
130:10
**trouble (1)**
66:23
**troubling (1)**
66:13
**true (6)**
53:1;54:6;74:22;
82:17,19;84:19
**true-up (3)**
26:3;39:5;122:10
**truly (1)**
28:11
**Trust (40)**
7:13;14:3,12;
23:14;25:9,10;26:5;
34:20,21;38:22;
46:7;47:6;48:23;
51:13;52:1,9;62:20;
64:23;67:2;68:15;
74:5;77:9,14,16;
80:8,10,14,15;84:20;

89:25;92:18,21;
93:24;94:6,24;
110:25;121:1;122:9,
12;130:21
**Trustee (13)**
4:3;5:12;51:15;
56:25;62:21;63:22;
69:18;77:10;78:18;
80:11,13;100:5;
120:25
**trustees (66)**
21:10;23:16;
24:17;30:4,14;
31:20;35:14,15;
37:15,22;44:24;45:2,
10,19;46:14,16;
47:11,20,21;50:6,6;
51:10,14;52:7,19,22,
22,25;54:2;55:22;
56:22;59:23;65:5;
66:13;69:19;70:17;
71:21;72:8,18;73:4,
15;74:10;82:12,17,
20;83:1,6,8,10,21;
84:24;85:7;86:5;
91:17;101:5,9,20,22;
102:1,2,7;103:13;
107:3,24;128:10;
131:24
**trustees' (20)**
20:10;35:11;52:5,
15;60:11;69:9;
71:13;72:2,12,23;
73:9,24;74:17;
76:11;77:24;82:24;
101:1;106:15;
107:10,18
**trustee's (1)**
44:18
**trusts (51)**
23:16,23;24:1,3;
45:7,17,18,24;46:5,
10;47:10,11,12,21;
48:4,24;49:23;
50:18;51:4,5,14,19,
20;52:6,9;55:11;
62:17,21;63:2,3,6,7,
17,19;66:15;67:2,23;
68:1,10,14;77:12;
82:11;85:1;86:24;
98:25;99:1;102:1,2,
7;103:13;107:4
**trusts' (2)**
82:18;84:17
**try (13)**
39:9,10;57:16;
65:7,22;69:14;
101:15;104:6;105:4;
117:3;120:2;127:19;
137:8
**trying (6)**
21:16;47:17,22;
62:16;65:19;124:19

**Tune (1)**
60:2
**turn (7)**
35:19;40:18;
44:15;66:10;101:10,
16;136:19
**turned (2)**
32:25;40:6
**tweaking (1)**
58:23
**TWEED (2)**
13:10;109:16
**twelve (2)**
82:10;125:22
**twenty (1)**
33:7
**twenty-dollar (2)**
135:25;136:5
**twenty-five (1)**
86:23
**twenty-one (1)**
19:16
**twenty-seven (1)**
25:16
**twisting (1)**
97:21
**two (25)**
20:5;26:20;34:13,
19;43:13;47:3;
51:10;59:23;65:9;
77:7;87:6,24;89:7,
12;100:5,8;102:14,
20;103:10,17,25;
104:11;106:18;
132:25;135:19
**two-step (1)**
18:6
**TX (1)**
11:6
**TYLER (1)**
10:20
**typically (2)**
112:22,23

**U**

**ultimate (1)**
53:6
**ultimately (7)**
24:7;66:21;99:13;
115:3;127:15;
129:15;133:7
**UMB (10)**
6:11;38:2;100:2,4,
6,8;102:24;103:10,
22;104:22
**UMB's (1)**
102:8
**Um-hum (1)**
64:14
**unaware (1)**
77:6
**unconfirmable (1)**

95:3
**uncontested (3)**
17:8;40:6,7
**Under (45)**
2:7,9;12:19;19:8,
9;26:21;28:16;
32:10;39:10,18;
43:23;46:25;47:4,
19;48:1;51:12,18;
52:4,6,11;53:17;
57:4,13;60:1;61:19;
62:5,8;63:5;66:22;
67:18;69:3,6;80:12;
100:7,10;121:1;
122:6,14,17,22;
130:4,10,19;134:3,
16
**underbelly (1)**
105:24
**underlying (4)**
20:14;37:18;51:7;
82:14
**undermine (1)**
29:15
**underscores (1)**
106:14
**undersecured (2)**
27:6,9
**Understood (4)**
109:23;113:21;
114:7,21
**underway (1)**
65:6
**unexpec (1)**
137:3
**unexpected (1)**
137:8
**unfortunately (2)**
88:15;137:3
**unhappy (2)**
52:21;85:15
**unilaterally (1)**
98:2
**unintended (1)**
102:23
**Union (3)**
4:14;69:16;89:6
**unions (1)**
89:8
**unique (1)**
47:20
**UNISON (1)**
139:22
**United (2)**
123:7,7
**unknown (1)**
86:2
**unless (5)**
34:1;44:25;93:5;
117:10;133:16
**unlikely (1)**
67:25
**unnecessary (1)**

23:6
**unquestionably (2)**
84:19;99:16
**Unseal (2)**
2:13;136:11
**unsealing (2)**
134:11;136:10
**unseals (1)**
134:19
**unsecured (3)**
25:11;84:25;92:25
**untraditional (1)**
111:6
**unwrapped (1)**
67:23
**up (41)**
28:25;31:13;40:5,
7;41:17,18,19;42:7,
13;43:9;47:23;
48:17;49:14,15;63:4,
19;65:5;76:14,21;
77:7;79:2;81:2;84:6;
88:3,25,25;90:22;
97:2;98:5;100:21;
101:12;109:13;
117:16,16,17;
120:25;134:25;
137:7;138:4;139:9,9
**up-and-coming (1)**
97:11
**upcoming (1)**
103:15
**update (1)**
109:18
**upon (3)**
48:22;113:13,18
**urge (2)**
87:7;132:1
**urged (1)**
29:23
**URQUHART (1)**
10:11
**USA (3)**
8:13,21;119:23
**USC (1)**
2:14
**use (1)**
135:12
**used (8)**
18:3;45:24;47:5;
48:21;50:22;61:14;
63:18;85:23
**Using (5)**
2:18;32:16;61:15,
16;66:18
**UZZI (41)**
13:15;109:13,14,
15,15,23;110:3,6,8,
15,17,18,19,24;
111:10,19;112:4,7,
19,21;113:3,6;114:9,
21;115:5,14;116:4,8,
9,19,21,24;117:4,6,8,

10,13;138:24;139:1,
12,15
**Uzzi's (1)**
130:13

## V

**valid (4)**
64:6;77:18;80:10;
94:18
**valuable (2)**
124:7;128:7
**valuation (1)**
84:14
**value (8)**
25:16;28:18;30:2;
57:6,11,11;114:12,
23
**variations (1)**
103:21
**variety (1)**
55:5
**various (12)**
45:2;46:18;47:1;
48:4;49:4;53:24;
70:8,17;76:14;99:2;
126:8;127:23
**version (2)**
135:3,5
**VICENTE (2)**
16:7;117:18
**view (13)**
39:19;52:3,17;
53:9;61:18;62:19;
80:8;104:9;108:11;
114:23;118:14;
124:19;127:20
**vigorous (1)**
33:3
**violate (2)**
87:21,21
**violated (1)**
52:25
**violation (1)**
100:11
**virtually (2)**
124:18;126:24
**virtue (1)**
119:6
**vis-a-vis (3)**
51:8,9;63:16
**Vitro (7)**
109:20;116:15;
136:23;138:2,11,19,
20
**voluntarily (1)**
97:15
**voluntary (1)**
97:17
**vote (1)**
46:14

## W

**Wait (6)**
73:21;82:2;123:5;
135:22,22,22
**waive (3)**
37:23;43:19;
129:13
**waived (1)**
114:13
**waiver (1)**
114:2
**waiving (3)**
36:19;79:14;114:5
**walked (1)**
31:8
**walking (2)**
115:23,24
**Wall (1)**
12:12
**WALPER (4)**
7:8;136:14,15,18
**wants (9)**
53:4;55:18;79:23;
98:10;105:7;106:9;
117:15;135:20;
136:16
**war (5)**
19:17;33:19;
87:18,18,19
**warranty (6)**
23:19;46:10;68:1,
4;77:13,15
**Washington (3)**
4:17;11:14;16:5
**waterfall (1)**
66:19
**way (18)**
17:22;34:10;38:9;
48:25;49:3;53:6;
56:9;61:9;62:24;
66:21;68:3,15;98:4;
114:7;117:22;127:4;
128:17;129:6
**weaknesses (1)**
55:24
**WEBB (1)**
10:20
**Wednesday (1)**
134:24
**week (2)**
24:15;131:17
**WEISSER (1)**
5:7
**WEITNAUER (1)**
5:17
**welcome (2)**
82:1;91:1
**well- (1)**
64:25
**Wells (5)**
5:12,21;44:25;

73:11;74:24
**WENDY (2)**
16:12;121:4
**weren't (1)**
77:13
**West (2)**
2:23;5:13
**Western (1)**
87:15
**What's (11)**
39:22;49:16;
50:17;60:10;106:1,
5;107:7;108:12;
110:25;111:25;
118:22
**whenever (1)**
102:22
**Whereupon (1)**
139:23
**WHITE (1)**
7:20
**whole (4)**
112:14;118:21,22;
134:19
**who's (2)**
20:24;77:20
**whose (3)**
84:23;88:5;95:10
**who've (1)**
19:17
**WICKERSHAM (1)**
11:11
**wide (3)**
115:21;129:7,14
**WILLIAM (1)**
13:25
**WILLKIE (1)**
9:11
**WILMER (1)**
13:19
**Wilmington (3)**
14:12;34:20,21
**WINSTON (1)**
10:17
**wish (23)**
17:16;21:10,21;
29:14;44:8;76:18;
79:1;80:23;81:17;
87:10;88:20;96:8,11,
14;97:1;99:23;
116:10;121:3;123:3,
4;131:21;132:4;
137:23
**wishes (2)**
30:16;135:18
**withdraw (1)**
80:14
**withdrawal (1)**
118:15
**within (6)**
18:19;34:16;
52:24;59:25;66:19;
94:19

**without (6)**
45:11;46:19;
65:15;112:22;
115:20;133:5
**witness (1)**
137:4
**witnesses (1)**
79:10
**witnesses' (1)**
80:3
**WOLLMUTH (1)**
6:2
**wonder (1)**
121:19
**word (1)**
68:22
**words (7)**
26:2;60:21;66:18;
83:9;95:21;101:6;
120:1
**work (10)**
29:6;39:8,23;40:3,
16;83:5;85:5;
124:12;128:22;
137:9
**worked (4)**
85:7;118:25;
119:15;131:24
**working (4)**
26:7;88:11;
128:11,24
**World (1)**
13:21
**worry (1)**
95:16
**worth (2)**
26:8;126:9
**wrapped (5)**
63:7;66:15;67:2,
23;68:3
**written (5)**
51:11;88:10;
134:1,7,8
**WYNNE (1)**
12:7

## Y

**year (3)**
22:19;28:19;
132:21
**year-and-a-half (1)**
135:9
**year-long (1)**
35:16
**years (13)**
19:19;22:12,16;
23:24;24:1;27:21;
28:6,25;31:7;33:19;
60:2;83:5;87:17
**yesterday (1)**
77:11
**York (34)**

2:24;4:5;5:5,23;
6:5,13,22;7:12,13,
15,23;8:5,15,23;9:5,
15,23;10:6,23;11:22;
12:5,13;13:5,13,23;
14:5,14;15:7,16,23;
32:4;44:22;62:9;
70:18

## Z

**zero (1)**
114:23
**ZUCKERMAN (2)**
4:13;89:6

## 0

**07 (1)**
77:9

## 1

**1 (4)**
41:4,14,22;122:8
**1,000 (6)**
23:16,18;24:3;
26:16;45:17;46:5
**1.35 (1)**
28:18
**1.5 (1)**
77:14
**1:16 (1)**
139:23
**10 (6)**
38:12,13,17,17;
88:8;89:15
**1000 (1)**
4:16
**10004 (1)**
4:5
**10005 (2)**
12:13;13:13
**10006 (1)**
14:14
**10007 (2)**
13:23;15:16
**10016 (1)**
5:23
**10017 (2)**
11:22;12:5
**10019 (2)**
8:23;9:15
**10020 (1)**
8:15
**10022 (4)**
8:5;9:5;15:7,23
**10036 (7)**
6:13;7:15,23;9:23;
10:6,23;13:5
**10040 (1)**
2:24
**101 (1)**

12-12020-mg    Doc 4121    Filed 06/27/13    Entered 07/01/13 14:43:16    Main Document

RESIDENTIAL CAPITAL, LLC, et al.    Pg 166 of 166

Case No. 12-12020-mg    June 26, 2013

14:4
**10110 (1)**
6:5
**10112 (1)**
6:22
**10166 (1)**
5:5
**10178 (1)**
14:5
**105a (2)**
2:8;19:8
**107a (1)**
2:14
**1095 (1)**
7:14
**10th (6)**
10:14;137:11,13,
14,20,25
**11 (8)**
2:14;39:3;42:16,
22;43:1,6;93:10;
124:9
**11:55 (1)**
96:24
**1100 (1)**
11:4
**1125b (1)**
100:11
**1133 (1)**
10:22
**1155 (1)**
7:22
**1177 (1)**
13:4
**12:18 (1)**
96:24
**1200 (1)**
16:4
**1201 (1)**
5:13
**12-12020 (1)**
17:3
**1221 (1)**
8:14
**1330b (1)**
61:15
**13th (2)**
42:1;134:13
**14 (1)**
101:11
**1400 (2)**
12:22;14:22
**1800 (1)**
4:15
**189 (1)**
86:23
**192nd (1)**
2:23
**19th (1)**
36:18

**2**

**2 (6)**
12:12;41:25;42:6;
101:14;109:25;
122:11
**2,235 (1)**
134:17
**2.1 (2)**
28:17;128:1
**200 (2)**
5:4;92:21
**20001 (1)**
11:14
**20005 (1)**
16:5
**20036 (1)**
4:17
**2006 (1)**
77:9
**2012 (1)**
43:24
**2013 (3)**
41:5;42:1;88:11
**2100 (1)**
15:22
**220 (1)**
94:23
**220-some-odd (1)**
92:22
**222 (2)**
12:4,21
**230 (4)**
18:3;26:23;122:5,
16
**23rd (1)**
41:5
**24 (1)**
88:10
**24th (1)**
94:8
**250 (1)**
13:22
**2519 (1)**
43:25
**26 (1)**
43:24

**3**

**3 (5)**
37:11;42:15,21,
23;101:7
**3,000 (1)**
26:16
**30 (1)**
6:21
**300 (1)**
122:12
**30309 (1)**
5:15
**3101 (1)**
14:21
**3374 (1)**
2:17

**3375 (1)**
2:17
**34b (1)**
61:15
**355 (1)**
7:4
**357.6 (1)**
121:21
**35th (1)**
7:5
**363b (2)**
2:8;19:9
**3812 (1)**
2:13
**3813 (1)**
2:13
**3814 (6)**
2:7;19:7;41:5;
42:2,18;43:3
**392 (1)**
86:24
**3940 (8)**
71:1,4,5;72:5,15;
73:1,12;74:7
**3980 (2)**
75:19,20
**3rd (3)**
15:15;19:25;27:24

**4**

**4 (3)**
42:25;43:4,7
**4002 (1)**
2:2
**4006 (1)**
36:18
**4019 (1)**
40:13
**4020-1 (2)**
90:8;91:8
**41st (1)**
12:4
**4200 (1)**
5:14
**425 (1)**
11:21
**45,000 (1)**
87:16
**47th (1)**
10:5
**4th (2)**
20:1;134:22

**5**

**5 (4)**
37:19;38:6,9;
112:23
**5.2c (1)**
78:14
**5.2d (4)**
101:2,10;102:11;

103:13
**5/13/2013 (1)**
42:5
**500 (1)**
6:4
**5300 (1)**
11:5
**57.6 (1)**
122:9

**6**

**6,500 (2)**
48:14;84:15
**601 (1)**
8:4
**60601 (1)**
12:23

**7**

**7 (1)**
13:21
**70 (2)**
122:17,21
**700 (2)**
2:23;11:13
**7023 (2)**
87:23;88:1
**77 (1)**
60:1
**77002 (1)**
11:6
**787 (1)**
9:14

**8**

**8 (1)**
88:9
**825 (2)**
8:22;15:6
**85012 (1)**
14:23
**86 (1)**
15:14
**865 (1)**
10:13

**9**

**9 (4)**
17:9;38:12;83:19;
121:8
**90 (1)**
5:22
**900 (1)**
15:21
**90017 (1)**
10:15
**90071 (1)**
7:6
**9019 (14)**

49:4;55:4;58:16,
16;61:17,19;64:2;
83:15,17,19,22;86:2,
24;125:7
**909 (1)**
9:4
**973406-2250 (1)**
2:25