***THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION. THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS DISCLOSURE STATEMENT.***

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
Samantha Martin
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000

Alexandra Steinberg Barrage
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
Telephone: (202) 887-1500

*Counsel to the Debtors and Debtors in Possession*
Dated:   July [**3**], 2013
          New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for the Official Committee of Unsecured Creditors*

| IMPORTANT INFORMATION FOR YOU TO READ |
|---|

**THE DEADLINE TO VOTE ON THE PLAN IS   [                    ], 2013, AT 5:00 P.M.
EASTERN TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY
RECEIVED BY THE NOTICE AND CLAIMS AGENT BEFORE THE VOTING
DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT ARTICLE V OF THE PLAN CONTAINS
RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS.  YOU SHOULD
REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR
RIGHTS MAY BE AFFECTED THEREUNDER.**

**The Plan Proponents (defined herein) are providing the information in this
Disclosure Statement (defined herein) to holders of Claims and Equity Interests entitled to
vote on the Plan for the purpose of soliciting votes to accept the Plan.  Nothing in this
Disclosure Statement may be relied upon or used by any entity for any other purpose.**

**This Disclosure Statement may not be deemed as providing any legal, financial,
securities, tax, or business advice.  The Plan Proponents urge any holder of a Claim or
Equity Interest to consult with its own advisors with respect to any such legal, financial,
securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each
of the proposed transactions contemplated thereby.  The Bankruptcy Court's approval of
the adequacy of disclosures contained in this Disclosure Statement does not constitute the
Bankruptcy Court's approval of the merits of the Plan or a guarantee of the accuracy or
completeness of the information contained herein.   The Plan Proponents have not
authorized any entity to give any information about or concerning the Plan other than that
which is contained in this Disclosure Statement.  The Debtors have not authorized any
representations concerning the value of their property other than as set forth in this
Disclosure Statement.  Any information, representations, or inducements made to obtain
acceptance of the Plan, which are other than or inconsistent with the information contained
in this Disclosure Statement, in the Plan, or in the Plan Supplement should not be relied
upon by any holder of a Claim or Equity Interest entitled to vote to accept or reject the
Plan.**

**The Plan Proponents urge every holder of a Claim or Equity Interest entitled to vote
on the Plan to (1) read the entire Disclosure Statement and the Plan carefully, (2) consider
all of the information in this Disclosure Statement, including, importantly, the risk factors
described in Article [●] of this Disclosure Statement, and (3) consult with its own advisors
with respect to reviewing this Disclosure Statement, the Plan, all documents annexed hereto
or filed in connection herewith, and the proposed transactions contemplated under the
Plan before deciding whether to vote to accept or reject the Plan.**

**This Disclosure Statement contains summaries of the Plan, certain statutory
provisions, events in the Debtors' Chapter 11 Cases, and certain documents related to the
Plan.   In the event of any inconsistency or discrepancy between a description in this**

Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Plan Proponents do not represent or warrant that the information contained herein or annexed hereto is without any material inaccuracy or omission.

Although the Plan Proponents have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise. The Plan Proponents are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Plan Proponents may subsequently update the information in this Disclosure Statement, the Plan Proponents have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation, or waiver. No reliance should be placed on the fact that a particular Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Plan Proponents may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents annexed hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' notice and claims agent by: (i) visiting http://www.KCCllc.net/rescap; (ii) writing to Residential Capital, LLC c/o Kurtzman Carson Consultants LLC, 2335 Alaska Ave, El Segundo, CA, 90245; or (iii) calling (888) 251-2914.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION AND PLAN SUMMARY ......................................................... 1

    A.    Introduction and Overview ......................................................................... 1

    B.    General Information ..................................................................................... 4

    C.    Overview of Chapter 11 .............................................................................. 5

    D.    Summary of Classification and Voting Rights of Allowed Claims and Equity Interests ......................................................................................... 6

    E.    Summary of Solicitation Package and Voting Instructions ...................... 13

    F.    Summary of Treatment of Allowed Claims and Equity Interests .............. 14

    G.    Implementation of the Plan ....................................................................... 17

    H.    Confirming and Consummating the Plan .................................................. 20

ARTICLE II. THE GLOBAL SETTLEMENT ................................................................... 21

    B.    The Plan Includes a Settlement of RMBS Trust Claims .......................... 27

    C.    The Plan Settles the Claims of FGIC and MBIA ..................................... 28

    D.    The Plan Resolves Certain Securities Claims Against the Debtors and Ally ...... 31

    E.    The Plan Resolves the Claims of NJ Carpenters ...................................... 31

    F.    The Plan Resolves the Claims in the Kessler Class Action ........................... 32

    G.    The Plan Provides a Trust to Allow for Payment in Cash to Holders of Borrower Claims ..................................................................................... 32

    H.    The Plan Provides Junior Secured Noteholders with Payment in Full ................ 33

    I.    The Plan Resolves Claims of the Senior Unsecured Noteholders and the Senior Unsecured Noteholder Trustee .................................................. 33

    J.    The Plan Resolves Issues Relating to Substantive Consolidation of the Debtors' Estates ....................................................................................... 33

    K.    The Plan Contains a Compromise of Intercompany Balances and Resolves Subrogation and Other Disputed Intercompany Issues ...................... 34

    L.    The Plan Allocates the Estate Assets and Administrative Expenses among Debtor Groups and Creditor Constituencies ........................................ 36

ARTICLE III. BACKGROUND ................................................................................... 38

    A.    The Debtors' Businesses and Operations ................................................. 38

    B.    The Debtors' Organizational Structure ..................................................... 41

-i-

# TABLE OF CONTENTS
(continued)

**Page**

C.    The Debtors' Assets and Capital Structure ........................................... 41

D.    Events Leading to the Filing of the Chapter 11 Cases ........................... 46

ARTICLE IV. THE CHAPTER 11 CASES ...................................................... 56

A.    Commencement of the Chapter 11 Cases ............................................. 56

ARTICLE V. OTHER PLAN PROVISIONS ..................................................... 96

A.    Unclassified Claims ............................................................................ 96

B.    Classification, Treatment, and Voting of Claims and Equity Interests ............... 99

C.    Establishment of Trusts and Provisions Governing Issuance of Units and
      Distributions ...................................................................................... 99

D.    Cancellation of Securities, Indentures, and Other Documents
      Evidencing Claims and Equity Interests ............................................. 107

E.    Senior Unsecured Notes; Fees and Expenses .................................... 108

F.    Corporate Action ............................................................................. 109

G.    Dissolution of the Debtors ................................................................ 110

H.    Exemption from Certain Taxes and Fees ........................................... 110

I.    Preservation of Causes of Action ..................................................... 111

J.    Nonconsensual Confirmation ........................................................... 112

K.    Treatment of Executory Contracts and Unexpired Leases ................. 112

L.    Surrender of Existing Publicly Traded Securities .............................. 115

M.    Minimum Distributions; Foreign Exchange Rate; and Other Distribution
      Limitations ...................................................................................... 116

N.    Undeliverable Distributions and Unclaimed Property ........................ 117

O.    Compliance with Tax Requirements .................................................. 117

P.    Setoffs and Recoupment .................................................................. 118

Q.    Interest on Claims ........................................................................... 118

R.    Claims Paid or Payable by Third Parties ........................................... 118

S.    Allowed Unsecured Claims for Which More than One Debtor in a Debtor
      Group Is Jointly and/or Severally Liable ........................................... 119

T.    Distributions Free and Clear ............................................................ 119

U.    Procedures for Resolving Disputed Claims ........................................ 120

# TABLE OF CONTENTS
(continued)

**Page**

V.      Claims Estimation; Allowance ............................................................. 120

W.      Settlement, Release, Injunction, and Related Provisions..................... 122

X.      Conditions Precedent to Confirmation and Consummation of the Plan ........... 126

Y.      Modification, Revocation, or Withdrawal of the Plan ........................ 129

Z.      Retention of Jurisdiction ..................................................................... 130

AA.     Miscellaneous Plan Provisions ........................................................... 130

BB.     Plan Supplement ................................................................................. 133

ARTICLE VI. VOTING PROCEDURES ............................................................. 134

A.      Voting Deadline .................................................................................. 134

B.      Holders of Claims or Interests Entitled to Vote................................. 135

D.      Vote Required for Acceptance by a Class .......................................... 136

E.      Returning Your Ballot........................................................................ 137

ARTICLE VII. RECOVERY ANALYSIS............................................................ 138

ARTICLE VIII. CONFIRMATION OF THE PLAN ............................................. 139

A.      Confirmation Hearing ......................................................................... 139

B.      Deadline to Object to Confirmation................................................... 139

C.      Confirmation Standards ...................................................................... 140

D.      Persons to Contact for More Information ........................................... 145

E.      Disclaimer .......................................................................................... 145

ARTICLE IX. PLAN-RELATED RISK FACTORS AND  ALTERNATIVES TO
            CONFIRMING THE PLAN ...................................................... 146

A.      General ................................................................................................ 146

B.      Certain Bankruptcy Law Considerations ........................................... 146

C.      Disclosure Statement Disclaimer ....................................................... 149

D.      Additional Factors to Be Considered ................................................. 150

ARTICLE X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
            PLAN ........................................................................................ 152

A.      Certain U.S. Federal Income Tax Consequences to the Debtors....................... 153

-iii-

# TABLE OF CONTENTS
### (continued)

**Page**

B.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims ........................................................................................................... 154

C.    Tax Treatment of the Liquidating and Holders of Beneficial Interests ............ 158

D.    Treatment of the Disputed Claims Reserve ...................................................... 160

E.    Tax Treatment of the Private Securities Claims Trust and the Borrowers Claims Trust....................................................................................................... 160

ARTICLE XI. SECURITIES LAW MATTERS ....................................................................... 161

ARTICLE XII. RULES OF INTERPRETATION ...................................................................... 163

A.    Rules of Construction ....................................................................................... 163

B.    Computation of Time ........................................................................................ 164

C.    Governing Law ................................................................................................. 164

ARTICLE XIII. CONCLUSION AND RECOMMENDATION ............................................... 164

ny-1097924

### **EXHIBITS**

1. Joint Chapter 11 Plan
2. List of Debtors
3. Organizational Chart
4. Illustrative Unit Issuance Structure
5. List of Seven Largest Intercompany Balances
6. Recovery Analysis
7. Liquidation Analysis
8. RMBS Trust Allocation Protocol Methodology

# ARTICLE I.
## INTRODUCTION AND PLAN SUMMARY[1]

### A.    Introduction and Overview

The Debtors and the Creditors' Committee[2] (together, the "Plan Proponents") submit this disclosure statement (the "Disclosure Statement") pursuant to Section 1125 of the Bankruptcy Code to holders of Claims against and Equity Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Chapter 11 Plan of Residential Capital, LLC, et al.*, dated July 3, 2013.  A copy of the Plan is annexed hereto as Exhibit 1 and incorporated herein by reference.

The purpose of this Disclosure Statement, including the Exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Chapter 11 Cases and certain documents related to the Plan.[3]

Prior to the Petition Date, the Debtors were a leading originator of residential mortgage loans and, together with their non-Debtor affiliates, the fifth largest servicer of residential mortgage loans in the United States, servicing approximately $374 billion of domestic[4] residential mortgage loans and working with more than 2.4 million mortgage loans across the United States.  On May 14, 2012, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York.  **Neither Ally Financial Inc. (f/k/a GMAC Inc.) ("AFI", and together with its direct**

---

[1]    This introduction is qualified in its entirety by the more detailed information contained in the plan and elsewhere in this Disclosure Statement.  Capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2]    On May 16, 2012, the U.S. Trustee for the Southern District of New York appointed nine (9) creditors to represent all unsecured creditors in these Chapter 11 Cases on the Creditors' Committee [Docket No. 102].  The Creditors' Committee is comprised of the following creditors:  (1) Wilmington Trust , N.A.; (2) Deutsche Bank Trust Company Americas; (3) The Bank of New York Mellon Trust Company, N.A.; (4) MBIA Insurance Corporation; (5) Rowena L. Drennen; (6) AIG Asset Management (U.S.), LLC (along with its affiliates ""); (7) U.S. Bank National Association; (8) Allstate Life Insurance Company; and (9) Financial Guaranty Insurance Company.

[3]    Reference is made to the actual documents for the complete terms of the Plan.

[4]    Unless otherwise specified, all information regarding the Debtors' mortgage loan operations refers only to domestic operations.

ny-1097924

**and indirect subsidiaries excluding the Debtors, "Ally"),[5] ResCap's indirect parent, nor Ally Bank (f/k/a GMAC Bank),[6] ResCap's affiliate, are Debtors in the Chapter 11 Cases.**

The Debtors and the Creditors' Committee, which represents the interests of all unsecured creditors, are co-proponents of the Plan and believe that the Plan is the best means to fairly and efficiently resolve the Debtors' Chapter 11 Cases. Additional parties who support the Plan include the signatories (in addition to the Plan Proponents) to that certain Plan Support Agreement dated May 13, 2013 (the "Plan Support Agreement"), including, in addition to Ally, parties who hold a variety of claims against the Debtors (the "Consenting Claimants").[7] The Consenting Claimants and Ally represent the majority of the Debtors' largest creditor constituencies. The Debtors' entry into the Plan Support Agreement was approved by the Bankruptcy Court on June 26, 2013. [Docket No. 4098].

The Plan is the culmination of extensive, good faith negotiations guided by the Honorable James M. Peck, as mediator (the "Mediator"), among the Debtors, the Creditors' Committee, Ally, and the Consenting Claimants. The terms of the Plan are premised upon Ally's agreement to provide, in addition to the substantial financial and operational support already provided to the Estates throughout the Chapter 11 Cases, an additional contribution of $2.1 billion in plan funding, comprised of (1) $1.95 billion in Cash to be paid on the Effective Date of the Plan and (2) the first $150 million received by Ally for any Directors and Officers or Errors and Omissions claims it pursues against its insurance carriers related to the claims released in connection with the Plan; provided, that Ally guarantees that the Debtors (or the Liquidating Trust) will receive $150 million on account of such insurance claims, which guarantee shall be payable without defense, objection, or setoff on September 30, 2014 (collectively (1) and (2), (the "Ally Contribution"), in exchange for the Debtor Release and the Third Party Releases. The Ally Contribution represents a near three-fold increase in Plan funding from the prior agreement among the Debtors, Ally, and certain other constituencies that was presented on the Petition Date. In addition, the Plan settles a variety of highly complex disputes that have been a source of contention throughout the Chapter 11 Cases and which, if left unresolved, would have led to years of costly litigation and resulted in significant uncertainty and delays in distributions to creditors. Each of the settlements embodied in the Plan are dependent upon all others and, thus, constitute a Global Settlement (the "Global Settlement") of the numerous issues resolved under the Plan. Absent the Ally Contribution, the Global Settlement would not be possible. As set forth in further detail in Article [●], the Global Settlement embodied in the Plan provides for, among other things:

---

[5]    AFI, a bank-holding company regulated by the Board of Governors of the Federal Reserve System, is the parent company of GMAC Mortgage Group, LLC, the intermediate non-Debtor company that owns 100% of ResCap's equity.

[6]    Ally Bank is a commercial state chartered bank regulated by the Federal Deposit Insurance Corporation.

[7]    The Consenting Claimants do not waive any argument, claim or defense or make any admission with respect to anything contained herein. In addition, the Consenting Claimants do not make any representations or warranties as to the accuracy of any of the information contained herein. The Consenting Claimants have not adopted, and may not agree with, the contents of this Disclosure Statement.

-2-

- A settlement of the size, allocation, and priority of all of the claims asserted by the RMBS Trustees arising from over 1,000 RMBS Trusts, including mortgage loan repurchase claims relating to breach of origination or sale representations and warranties (often referred to as "put-back claims"), cure claims, and servicing-related claims, which comprise the largest disputed claims against the Debtors' Estates, as well as approval of the RMBS Settlement, which was the subject of substantial litigation in the Chapter 11 Cases.

- A settlement of the allowance, allocation, and priority of the claims of certain monoline insurers, including MBIA (defined below) and FGIC (defined below), eliminating the need for complex and uncertain litigation concerning the scope and nature of the claims held by these entities and the potential subordination of such claims, separate and apart from the litigation concerning the claims of the RMBS Trusts.

- A settlement of tens of billions of dollars of Private Securities Claims against the Debtors, including claims involving Ally, arising from their structuring, sponsoring, underwriting, and sale of RMBS, eliminating litigation concerning such issues as the validity and value of these claims and their potential subordination pursuant to Section 510 of the Bankruptcy Code. The settlement of the Private Securities Claims is implemented through the establishment of a Private Securities Claims Trust, which will settle and administer distributions to holders of Allowed Private Securities Claims in accordance with the procedures and methodology set forth in the Private Securities Claims Trust Agreement.

- The establishment of a Borrower Claims Trust, which sets a floor of available assets for distributions to Borrowers and provides streamlined procedures for holders of Allowed Borrower Claims to receive distributions in accordance with the procedures and methodology set forth in the Borrower Claims Trust Agreement. The amounts distributed to the holders of Borrower Claims through the Borrower Claims Trust are in addition to approximately $230 million to be paid by the Debtors for the benefit of Borrowers through a settlement of the Debtors' foreclosure file review obligations under the Consent Order.

- A resolution of approximately $1.003 billion in claims held by Wilmington Trust, National Association, in its capacity as Senior Unsecured Notes Indenture Trustee.

- An agreed-upon allocation of Estate assets, including the Ally Contribution, to be distributed via three groups of Debtors (the ResCap Debtors, the GMACM Debtors and the RFC Debtors), the Borrower Claims Trust, the Private Securities Claims Trust, and the NJ Carpenters Claims Distribution.

- An agreed-upon allocation of projected Administrative Claims pursuant to which Administrative Claims will be allocated among the GMACM Debtors and RFC Debtors, but not to the ResCap Debtors.

- Payment in full of all administrative, secured, and priority claims, including the Junior Secured Notes Claim (as determined either by agreement or pursuant to the JSN Adversary Proceeding, discussed in further detail in section [●] below). The payment in full of the Allowed Junior Secured Notes Claims represents an improvement upon the treatment proposed in their pre-petition agreement between the holders of the Junior Secured Notes Claims and the Debtors.

- Subject to the approval of the Bankruptcy Court and United States District Court for the Southern District of New York (the "District Court"), a settlement of the Allowed Claim amount and distribution to the NJ Carpenters Class Members, whose class was certified for settlement purposes in the NJ Carpenters Class Action.

- A waiver of any Subrogation Claims held by the GMACM Debtors and the RFC Debtors against the ResCap Debtors.

- A compromise of all Intercompany Balances, potential subrogation claims, potential avoidance of historical debt forgiveness, claims relating to failure to charge Debtor entities with allocable expenses, and substantive consolidation.

Notably, as explained in more detail in Article III.A.5 herein, the Report of the Examiner (as each defined below) supports the terms of the Global Settlement.

**THE DEBTORS, THE CREDITORS' COMMITTEE, ALLY, AND THE CONSENTING CLAIMANTS BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. FOR ALL OF THESE REASONS AND THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, (THE DATE BY WHICH YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u>), WHICH IS [OCTOBER 10], 2013 AT [●] P.M. (PREVAILING EASTERN TIME) (the "<u>Voting Deadline</u>").**

<div style="border:1px solid">

**ARTICLE [●] OF THE DISCLOSURE STATEMENT AND ARTICLE[S] [IV] [AND IX] OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

</div>

## B.     General Information

### 1.     Important Information About this Disclosure Statement

On [●], 2013, the Bankruptcy Court entered an order (the "<u>Disclosure Statement Approval Order</u>") approving this Disclosure Statement as containing "adequate information," *i.e.*, information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of Claims or Equity Interests to make an informed judgment about the Plan [Docket No. [●]]. This Disclosure Statement is submitted pursuant to Section 1125 of the

<div align="center">-4-</div>

Bankruptcy Code to holders of Claims against the Debtors in connection with (i) the solicitation of votes on the Plan, and (ii) the hearing scheduled for [●], 2013, at [●] a.m. (prevailing Eastern Time) (the "Confirmation Hearing") to consider an order confirming the Plan (the "Confirmation Order").

The Disclosure Statement Approval Order sets forth, among other things, (i) the deadlines, procedures, and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, (ii) the record date for voting purposes, and (iii) the applicable standards for tabulating Ballots. A Ballot for acceptance or rejection of the Plan is enclosed with the copies of this Disclosure Statement submitted to the holders of Claims that are entitled to vote on the Plan. Detailed voting instructions accompany each Ballot. **The last day for a Ballot to be actually received with respect to voting to accept or reject the Plan is the Voting Deadline, [October 10] at [5:00] p.m. (Prevailing Eastern Time).**

THE DEBTORS, THE CREDITORS' COMMITTEE, ALLY, AND THE CONSENTING CLAIMANTS BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. FOR ALL OF THESE REASONS AND THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE.

## C.    Overview of Chapter 11

Under Chapter 11 of the Bankruptcy Code, a debtor may propose to reorganize or liquidate its business and assets subject to the provisions of the Bankruptcy Code. In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan. The Bankruptcy Code defines "claims" and "equity security holders" rather than "creditors" and "shareholders;" as a result, this Disclosure Statement speaks in terms of "claims" and "equity interests." Under Section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in that class, or (ii) to the extent defaults exist, provides for the cure of existing defaults, reinstatement of the maturity of claims in that class, compensates each holder of a claim for any pecuniary damages incurred as a result of reasonable reliance upon the default, and does not otherwise alter the legal, equitable or contractual rights of each holder of a claim in that class.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal, contractual, and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that a debtor may continue to manage and operate its business and remain in possession of its property as a "debtor-in-possession." The consummation of a plan is a principal objective of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor and, if appropriate, the future conduct of the debtor's business or the liquidation of the debtor's remaining assets. Confirmation of a plan by the bankruptcy court binds the debtor, any person acquiring property under the plan, and any creditor or equity security holder of a debtor to the terms and provisions of the plan as of the effective

date of the plan.  Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment to accept or reject the plan.  The Plan Proponents are distributing this Disclosure Statement to holders of Claims against and Equity Interests in the Debtors that are expected to receive a distribution under the Plan in satisfaction of the requirements of Section 1125 of the Bankruptcy Code.

## D.    Summary of Classification and Voting Rights of Allowed Claims and Equity Interests

The primary purpose of the Plan is to set forth the manner in which the Debtors' assets will be liquidated and allocated and describe how Claims against and Equity Interests in the Debtors will be treated if the Plan is confirmed by the Bankruptcy Court and thereafter consummated on the Effective Date.  The Plan proposes partial consolidation of the Debtors' bankruptcy Estates solely for the purpose of describing distributions to the holders of Allowed Claims under the Plan.  The Plan creates the following three Debtor Groups (each, a "<u>Debtor Group</u>" and collectively, the "<u>Debtor Groups</u>") for ease of describing distributions:[8]

(i)    The "**<u>ResCap Debtors</u>,**" comprised of three (3) sub-Classes, including ResCap, GMAC Residential Holding Company, LLC, and GMAC-RFC Holding Company, LLC;

(ii)    The "**<u>GMACM Debtors</u>**," comprised of twenty-one (21) sub-Classes, including each of the direct and indirect Debtor subsidiaries of GMAC Residential Holding Company, LLC;[9] and

(iii)    The "**<u>RFC Debtors</u>**," comprised of twenty-seven (27) sub-Classes, including each of the direct and indirect Debtor subsidiaries of GMAC-RFC Holding Company, LLC.[10]

Only claims (including claims for administrative expenses) and equity interests that are "allowed" may receive distributions under a Chapter 11 plan.  An "allowed" claim or equity interest means that the debtors agree, or, in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, including the amount thereof, is in fact a valid obligation of or equity interest in, the debtors.  Section 502(a) of the Bankruptcy Code provides that a timely filed, claim or equity interest is "allowed" unless the debtor or another party in interest objects.  However, Section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed.  These include

---

[8]    <u>Exhibit 2</u> annexed hereto contains organizational charts detailing the Debtor entities.

[9]    Prior to the Asset Sales (defined herein), the GMACM Debtors were primarily responsible for conducting the Debtors' business operations, including originating, brokering, and servicing loans.

[10]    Prior to the Asset Sales, the RFC Debtors were primarily the private issuers of mortgage-backed and home equity loan asset-backed securities and master servicer for many of the securitizations.

claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest in unsecured and/or undersecured obligations, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Rule 3003(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") prohibits the allowance of any claim or equity interest that either is not listed on the debtor's Schedules (as defined below) or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a Chapter 11 plan categorize the different claims against, and equity interests in, the Debtors into separate classes based upon their legal nature. Claims of a substantially similar legal nature are typically classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests that give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a Chapter 11 plan. For example, pursuant to Section 1126(f) of the Bankruptcy Code, holders of claims and interests that are unimpaired by a plan are presumed to accept such plan and, therefore, are not entitled to vote. Additionally, pursuant to Bankruptcy Code Section 1126(g), holders of claims or interests receiving no distributions under a plan are presumed to have rejected such plan and are not entitled to vote.

As set forth in Article [●] of the Plan and in accordance with Sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Equity Interests, other than Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth in Article [●] of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in connection with Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot indicating acceptance or rejection of the Plan, such Class will be presumed to have accepted the Plan.[11] Within each

---

[11]    The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Section 510(b) of the Bankruptcy Code, or otherwise. The Plan Proponents or the Liquidating Trust, as applicable, reserve the right to

-7-

Debtor Group, holders of Allowed Claims entitled to vote on the Plan will vote within the applicable Debtor sub-Class.[12]

Your ability to vote and your distribution under the Plan, if any, depends on the type of Claim or Interest you hold.  As set forth in Article [●] of the Plan, Claims in Classes R-3, R-4, R-5, R-6, R-7, R-8, GS-3, GS-4, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, RS-7, and RS-8 are impaired and entitled to vote on the Plan.  All other Classes of Claims (Classes R-1, R-2, R-9, R-10, R-11, R-12, GS-1, GS-2, GS-8, GS-9, GS-10, RS-1, RS-2, RS-9, RS-10, and RS-11), are not entitled to vote on the Plan because the Claims or Equity Interests in those classes are either unimpaired and presumed to accept the Plan, or impaired and presumed to reject the plan.

The following charts summarize the classification, treatment, and voting rights of Claims against and Equity Interests in the Debtors and the potential distributions to holders of Allowed Claims and Equity Interests under the Plan, in accordance with the three partial entity consolidations discussed above:[13]

---

re-classify any Allowed Claim or Equity Interest other than the Consenting Claimants' Allowed Claims, the NJ Carpenters Claims (assuming the NJ Carpenters Approval), and the Ally Contract Claims, in accordance with any contractual, legal, or equitable subordination relating thereto under the Bankruptcy Code, subject to further order of the Bankruptcy Court.  An initial list of Claims proposed to be subordinated under the Plan shall be set forth in the Plan Supplement, without prejudice to the right of the Plan Proponents or Liquidating Trust, as the case may be, to seek to subordinate additional Claims. Subordinated Claims shall not receive a distribution under the Plan until all senior Allowed Claims are paid in full.

[12]   Any Class of Claims or Equity Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies Section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

[13]   These charts are only a summary of the classification and treatment of Allowed Claims and Equity Interests. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Equity Interests.  All Estimated Aggregate Allowed Claim Amounts are reflected

-8-

**ALL DEBTORS**
**($ in Millions)**

| CLASS | TYPE OF CLAIM OR EQUITY INTEREST | TREATMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT | ESTIMATED PERCENTAGE RECOVERY UNDER CH. 7 LIQUIDATION | ESTIMATED RECOVERY UNDER PLAN |
|---|---|---|---|---|---|---|
| | Administrative Expense Claims | Unclassified | Presumed to Accept | 300.00 – 400.00 | 100.0% | 100.0% |
| | Priority Tax Claims | Unclassified | Presumed to Accept | 5.31 | 100.0% | 100.0% |

**RESCAP DEBTORS**
**($ in Millions)**

| CLASS | TYPE OF CLAIM OR EQUITY INTEREST | TREATMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT | ESTIMATED PERCENTAGE RECOVERY UNDER CH. 7 LIQUIDATION | ESTIMATED RECOVERY UNDER PLAN |
|---|---|---|---|---|---|---|
| R-1 | Other Priority Claims | Unimpaired | Presumed to Accept | N/A | N/A | N/A |
| R-2 | Other Secured Claims | Unimpaired | Presumed to Accept | 0.01 | 100.0% | 100.0% |
| R-3[14] | Junior Secured Notes Claims | Impaired/ Unimpaired | Presumed to Accept/ Entitled to Vote | 2,223.00 | 71.4% - 77.1% | 100.0% |
| R-4 | ResCap Unsecured Claims | Impaired | Entitled to Vote | 2,146.94 | 0.1% - 0.1% | 36.3% |
| R-5 | Borrower Claims | Impaired | Entitled to Vote | N/A | N/A | N/A |
| R-6 | Private Securities Claims | Impaired | Entitled to Vote | N/A | N/A | N/A |

---

[14] Recovery rates for the Junior Secured Notes are shown on a consolidated basis for both the Chapter 7 Liquidation and the Recovery Scenario.

-9-

| | | | | | | |
|---|---|---|---|---|---|---|
| R-7 | NJ Carpenters Claims | Impaired | Entitled to Vote | N/A | N/A | N/A |
| R-8 | General Unsecured Convenience Claims | Impaired | Entitled to Vote | 0.30 | 0.1% - 0.1% | 36.3% |
| R-9 | Intercompany Balances | Impaired | Presumed to Reject | N/A | N/A | N/A |
| R-10 | Equity Interests | Impaired | Presumed to Reject | N/A | N/A | N/A |
| R-11 | FHFA Claims | Impaired | Presumed to Reject | N/A | N/A | N/A |
| R-12 | Revolving Credit Facility Claims | Impaired | Entitled to Vote | N/A | N/A | N/A |

## GMACM DEBTORS
### ($ in Millions)

| CLASS | TYPE OF CLAIM OR EQUITY INTEREST | TREATMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT | ESTIMATED PERCENTAGE RECOVERY UNDER CH. 7 LIQUIDATION | ESTIMATED RECOVERY UNDER PLAN |
|---|---|---|---|---|---|---|
| GS-1 | Other Priority Claims | Unimpaired | Presumed to Accept | 0.13 | 100.0% | 100.0% |
| GS-2 | Other Secured Claims | Unimpaired | Presumed to Accept | 0.04 | 100.0% | 100.0% |
| GS-3[15],[16] | Junior Secured Notes Claims | Impaired/ Unimpaired | Presumed to Accept/ Entitled to Vote | 2,223.00 | 71.4% - 77.1% | 100.0% |

---

[15]    The holders of Junior Secured Notes Claims are impaired and entitled to vote on the Plan at the following GMACM Debtors: GMACM; they are unimpaired and presumed to accept the Plan at the following GMACM Debtors: Passive Asset Transactions, LLC; Residential Mortgage Real Estate Holdings, LLC; Home Connects Lending Services, LLC; GMACR Mortgage Products, LLC; ditech, LLC; Residential Consumer Services, LLC; and GMAC Mortgage USA Corporation.

[16]    Recovery rates for the Junior Secured Notes are shown on a consolidated basis for both the Chapter 7 Liquidation and the Recovery Scenario.

-10-

| GS-4 | GMACM Unsecured Claims | Impaired | Entitled to Vote | 2,077.47 | 6.7% - 8.6% | 30.1% |
| GS-5[17] | Borrower Claims | Impaired | Entitled to Vote | 88.57 | 6.7% - 8.6% | 30.1% |
| GS -6[18] | Private Securities Claims | Impaired | Entitled to Vote | N/A | 0.0% - 6.7% | N/A |
| GS -7 | General Unsecured Convenience Claims | Impaired | Entitled to Vote | 2.50 | 6.7% - 8.6% | 30.1% |
| GS -8 | Intercompany Balances | Impaired | Presumed to Reject | N/A | N/A | N/A |
| GS -9 | Equity Interests | Impaired | Presumed to Reject | N/A | N/A | N/A |
| GS-10 | Revolving Credit Facility Claims | Impaired | Entitled to Vote | N/A | N/A | N/A |

## RFC DEBTORS
### ($ in Millions)

| CLASS | TYPE OF CLAIM OR EQUITY INTEREST | TREATMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT | ESTIMATED PERCENTAGE RECOVERY UNDER CH. 7 LIQUIDATION | ESTIMATED RECOVERY |
|---|---|---|---|---|---|---|
| RS-1 | Other Priority Claims | Unimpaired | Presumed to Accept | 0.01 | 100.0% | 100.0% |
| RS-2 | Other Secured Claims | Unimpaired | Presumed to Accept | 0.01 | 100.0% | 100.0% |

---

[17]    Allocation of recovery amounts for Allowed Borrower Claims, in the Plan, is subject to determination by the Borrower Trust; however, the recovery rate will be comparable, subject to the Borrower Claims Trust True-Up, to that of GMACM Unsecured Claims.

[18]    No estimate was made for Private Securities Claims under the Recovery Scenario. Under the higher case of the Chapter 7 Liquidation Scenario, it is assumed that the Private Securities Claims are subordinated resulting in no recovery for these claims.

-11-

| RS-3[19] | Junior Secured Notes Claims | Impaired/ Unimpaired | Presumed to Accept/ Entitled to Vote | 2,223.00 | 71.4% - 77.1% | 100.0% |
| RS-4 | RFC Unsecured Claims | Impaired | Entitled to Vote | 9,158.03 | 2.9% - 3.6% | 9.0% |
| RS-5[20] | Borrower Claims | Impaired | Entitled to Vote | 333.09 | 2.9% - 3.6% | 9.0% |
| RS-6[21] | Private Securities Claims | Impaired | Entitled to Vote | N/A | 0.0% - 2.9% | N/A |
| RS -7[22] | NJ Carpenters Claims | Impaired | Entitled to Vote | N/A | 0.0% - 2.9% | N/A |
| RS -8 | General Unsecured Convenience Claims | Impaired | Entitled to Vote | 0.70 | 2.9% - 3.6% | 9.0% |
| RS -9 | Intercompany Balances | Impaired | Presumed to Reject | N/A | N/A | N/A |
| RS -10 | Equity Interests | Impaired | Presumed to Reject | N/A | N/A | N/A |
| RS -11 | FHFA Claims | Impaired | Presumed to Reject | N/A | N/A | N/A |

---

[19]  The holders of Junior Secured Notes Claims are impaired and entitled to vote on the Plan at the following RFC Debtors: RFC and Homecomings Financial, LLC; they are unimpaired and presumed to accept the Plan at the following RFC Debtors:  GMAC Model Home Finance I, LLC; DOA Holding Properties, LLC; RFC Asset Holdings II, LLC; RFC Construction Funding, LLC; Residential Funding Real Estate Holdings, LLC; Homecomings Financial Real Estate Holdings, LLC; Residential Funding Mortgage Securities I, Inc.; RFC Asset Management, LLC; RFC SFJV-2002, LLC; and RCSFJV2004, LLC.

[20]  Allocation of recovery amounts for Allowed Borrower Claims is subject to determination by the Borrower Trust; however, the recovery rate will be comparable, subject to the Borrower Claims Trust True-Up, to that of RFC Unsecured Claims.

[21]  No estimate was made for Private Securities Claims under the Recovery Scenario.  Under the higher case of the Chapter 7 Liquidation Scenario, it is assumed that the Private Securities Claims are subordinated resulting in no recover for these claims.

[22]  No estimate was made for NJ Carpenters Claims under the Recovery Scenario.  Under the higher case of the Chapter 7 Liquidation Scenario, it is assumed that the NJ Carpenters Claims are subordinated resulting in no recovery for these claims.

-12-

| RS-12 | Revolving Credit Facility Claims | Impaired | Entitled to Vote | N/A | N/A | N/A |

### E.    Summary of Solicitation Package and Voting Instructions

Together with this Disclosure Statement, the Plan Proponents are distributing or causing to be distributed Solicitation Packages (the "Solicitation Packages") containing the documents described below to all parties entitled to receive notice of the hearing before the Bankruptcy Court pursuant to Bankruptcy Code Section 1128 to consider confirmation of the Plan.

### 1.    Solicitation Packages

The Solicitation Packages for holders of Claims in Classes R-3, R-4, R-5, R-6, R-7, R-8, GS-3, GS-4, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, RS-7, and RS-8 (collectively, the "Voting Classes") will contain:

1.   A copy of the Disclosure Statement Approval Order (without exhibits);

2.   A paper copy of the notice of the Confirmation Hearing (the "Confirmation Hearing Notice")

3.   The Disclosure statement, which shall include the Plan as an exhibit thereto and the proposed order to approve the Disclosure Statement (without exhibits);

4.   An appropriate form of Ballot in paper form, instructions on how to complete the Ballot, and a Ballot return envelope;

5.   A paper copy of a letter from the Plan Proponents recommending acceptance of the Plan;

6.   As appropriate, a postage pre-paid envelope;

7.   Such other materials as the Bankruptcy Court may direct.

The holders of Claims or Interests in Classes R-1, R-2, R-9, R-10, R-11, GS-1, GS-2, GS-8, GS-9, GS-10, RS-1, RS-2, RS-9, RS-10, and RS-11 will receive a Confirmation Hearing Notice and a notice of non-voting status.

To reduce the administrative costs associated with printing and mailing such a voluminous document, the Plan Proponents may, but are not required to, elect to serve the Disclosure Statement and the Plan (including exhibits) via CD-ROM instead of in printed format. In addition to the service procedures outlined above: (a) the Plan, the Disclosure Statement and, once they are filed, all exhibits to both documents will be made available at no charge via the internet at http://www.KCCllc.net/rescap; and (b) the Plan Proponents will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement upon (i) written

-13-

request to Kurtzman Carson Consultants LLC ("KCC"), at ResCap Balloting Center, c/o KCC, 2335 Alaska Avenue, El Segundo, CA 90245, or (ii) calling (888) 251-2914.

**2.      Voting Procedures, Ballots and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.

Please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan after carefully reviewing (1) the Plan, (2) the Disclosure Statement, (3) the Disclosure Statement Approval Order, and (4) the detailed instructions accompanying the Ballot.

**In order for your vote to be counted, you must complete and sign your original Ballot (copies will not be accepted) and return it so that it is actually received by KCC prior to the Voting Deadline of 5:00 p.m. (Prevailing Eastern Time) on [●], 2013.**

For further information, refer to Article [●] below, entitled "Solicitation and Voting Procedures". For answers to any questions regarding solicitation procedures, parties may contact KCC directly, by (i) writing to Kurtzman Carson Consultants LLC, at ResCap Balloting Center, c/o KCC, 2335 Alaska Avenue, El Segundo, CA 90245, or (ii) calling (888) 251-2914.

<div style="border:1px solid black">

**THE PLAN PROPONENTS RECOMMEND THAT ALL HOLDERS OF CLAIMS, IN CLASSES ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN.**

</div>

**F.      Summary of Treatment of Allowed Claims and Equity Interests**

The Plan provides for payment in full of Allowed Administrative Expense Claims and Allowed Priority Tax Claims. Holders of Equity Interests in, and Intercompany Balances against, the ResCap Debtors, the GMACM Debtors, and the RFC Debtors will receive no distributions under the Plan and, therefore, are presumed to reject the Plan. All other classes in each Debtor Group either are (i) unimpaired, and therefore presumed to accept the Plan, or (ii) impaired and expected to receive a distribution, and therefore permitted to vote on the Plan. The Plan is presented as a joint plan for administrative convenience, but applies to each Debtor individually.

The following table summarizes the treatment of Claims and Equity Interests under the Plan:

| CLASS OF CLAIMS | APPLICABLE DEBTORS | TREATMENT OF CLAIM |
| --- | --- | --- |

-14-

| CLASS OF CLAIMS | APPLICABLE DEBTORS | TREATMENT OF CLAIM |
|---|---|---|
| Other Priority Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Other Priority Claims in the Debtor Groups, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim shall receive one of the following treatments on account of such Claim, as determined by the Plan Proponents or the Liquidating Trust, as applicable: (i) payment in full in Cash, or (ii) treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code; provided, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof. |
| Other Secured Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Allowed Other Secured Claims against the Debtor Groups, on or as soon as practicable after the Effective Date, each holder of such a Claim shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents or the Liquidating Trust, as applicable: (i) payment in full in Cash, including any interest, at the non-default rate, required to be paid pursuant to Section 506(b) of the Bankruptcy Code, or (ii) the collateral securing its Allowed Other Secured Claim. |
| Junior Secured Notes Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Junior Secured Notes Claims, on or as soon as practicable after the Effective Date, each holder of an Allowed Junior Secured Notes Claim shall receive payment in full forth the Allowed amount of such Junior Secured Notes Claim as determined by the Bankruptcy Court in the JSN Adversary Proceeding; provided, however, if the Bankruptcy Court determines that the Junior Secured Noteholders are entitled to post-petition interest, the Allowed amount of such post-petition interest shall be paid in accordance with the requirements under the Bankruptcy Code, which may include at the Plan Proponents' election the payment of post-petition interest over time at the appropriate market rate. |
| General Unsecured Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Unsecured Claims against the Debtor Groups, as soon as practicable after the Effective Date, each holder of an allowed General Unsecured Claim will receive its Pro Rata Unit Share of the Unit Distribution of the applicable Debtor Group. |

-15-

| CLASS OF CLAIMS | APPLICABLE DEBTORS | TREATMENT OF CLAIM |
|---|---|---|
| Borrower Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Borrower Claims, as soon as practicable after the Effective Date, holders of Allowed Borrower Claims shall receive their allocated share of Cash available for distribution from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement. |
| Private Securities Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Private Securities Claims against the Debtor Groups, as soon as practicable after the Effective Date, holders of Allowed Private Securities Claims shall receive their allocated share of Cash distributions from the Private Securities Claims Trust, in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement. |
| NJ Carpenters Claims | ResCap Debtors RFC Debtors | Subject to the approvals of the NJ Carpenters Settlement by the Bankruptcy Court (through confirmation or otherwise) and the District Court in full and final satisfaction of the NJ Carpenters Claims, within ten (10) business days of the Effective Date, the lead plaintiffs, on behalf of holders of Allowed NJ Carpenters Claims, shall receive the NJ Carpenters Claims Distribution, which will thereafter be distributed pursuant to the NJ Carpenters Plan of Allocation. Absent the NJ Carpenters Approval, Claims held by NJ Carpenters Class Members, to the extent Allowed, shall be classified as General Unsecured Claims, which claims may be subject to subordination. |
| General Unsecured Convenience Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the General Unsecured Convenience Claim against the Debtor Groups, as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Convenience Claims shall receive a distribution in Cash equal to 36.3% at the ResCap Debtors, 30.1% at the GMACM Debtors, and 9.0% at the RFC Debtors of such holder's Allowed General Unsecured Convenience Claim against each applicable Debtor Group. |
| Intercompany Balances | ResCap Debtors GMACM Debtors RFC Debtors | On the Effective Date, as part of the overall compromise embodied in the Plan, Intercompany Balances shall be waived, cancelled, and discharged. Holders of Intercompany Balances shall receive no recovery on account of their Claims. |
| Equity Interests | ResCap Debtors GMACM Debtors RFC Debtors | Holders of Equity Interests in the Debtor Groups shall receive no recovery on account of such Equity Interests and such Equity Interests shall be canceled on the Effective Date. |

-16-

| CLASS OF CLAIMS | APPLICABLE DEBTORS | TREATMENT OF CLAIM |
|---|---|---|
| FHFA Claims | ResCap Debtors RFC Debtors | Holders of FHFA Claims shall receive no recovery on account of such Claims; provided, that if the Bankruptcy Court determines that the FHFA Claims are not subject to subordination under section 510(b) of the Bankruptcy Code, each holder of an Allowed ResCap FHFA Claim shall receive a distribution in Cash equal to 3% of such holder's Allowed RFC FHFA Claim, which accounts for the fact that no holder of an FHFA Claim is subject to the Third Party Releases, as soon as practicable after the later of the Effective Date or the allowance of such Claim. |
| Revolving Credit Facility Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Revolving Credit Facility Claims, on or as soon as practicable after the Effective Date, any payment under the Paydown Order with respect to an Allowed Ally Secured Claim shall be indefeasibly and finally approved and allowed; provided, that holders of Allowed Revolving Credit Facility Claims shall waive any right to receive additional interest or fees on account of such Claims. |

### G.   Implementation of the Plan

#### 1.   Plan Funding

Funding for the Plan is derived from two primary sources, (1) proceeds from the Asset Sales (defined herein) and the liquidation of the remaining assets of the Estates, and (2) the Ally Contribution. The creation and implementation of the Liquidating Trust, the Borrower Claims Trust and the Private Securities Claims Trust, each as described below will facilitate the making of distributions to holders of Allowed Claims.

#### 2.   Establishment of the Liquidating Trust

The Plan establishes a Liquidating Trust and vests substantially all of the Debtors' assets, including the Ally Contribution and all causes of action not waived, released or compromised in the Plan (with the exception of certain assets designated to remain with the Debtors) in the Liquidating Trust. From and after the Effective Date, the Liquidating Trust will (i) make cash distributions to holders of certain Claims, as described below; (ii) issue Units (defined below) to holders of Allowed Unsecured Claims and to a Disputed Claims Reserve (defined below); (iii) monetize the non-Cash assets; (iv) make Cash distributions to holders of Units; (v) administer and make distributions from the Disputed Claims Reserve; (iv) effect the general wind-down of the Debtors' Estates following the Effective Date; (v) facilitate and complete the potential resolution of any remaining regulatory obligations owed by the Debtors under the DOJ/AG Settlement; and (vi) engage in general administrative functions in connection with the foregoing.

-17-

### 3.    Distributions of Cash by the Liquidating Trust

On or as soon as practicable after the Effective Date, the Liquidating Trust will: (i) fund the Borrower Claims Trust with Cash in the amount of $57.6 million ; (ii) if the related settlement is approved, pay the NJ Carpenters Claim Distribution in Cash in the amount of $100 million, less any funds previously expended by the Estates to administer the NJ Carpenters Settlement; (iii) make Cash distributions to the holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Other Secured Claims; (iv) pay the Allowed Junior Secured Notes Claim in full in Cash; (v) establish Cash reserves for administrative costs, professional fees, and contingent, disputed, or unliquidated administrative, priority, or convenience claims that may be resolved and/or paid after the Effective Date; and (vi) make Cash distributions on account of Units, as set forth below.

### 4.    Issuance of Units by the Liquidating Trust

As soon as practicable after the Effective Date, beneficial interests in the liquidating trust, in the form of liquidating trust units (the "Units") will be issued by the Liquidating Trust to holders of Unsecured Claims (other than Borrower Claims and the NJ Carpenters Claims) against the ResCap Debtors, the GMACM Debtors, and the RFC Debtors that are Allowed as of [_____ 2013] the ("Initial Unit Distribution Record Date"), and to the Private Securities Claims Trust.

The total number of Units to be initially issued and outstanding, including the Units to be held in the Disputed Claims Reserve as set forth below, will be $100 million. The Units issuable pursuant to the Plan will be allocated among the Private Securities Claims Trust and the holders of Claims against the respective Debtor Groups by adjusting the starting issuance percentages (the "Unit Issuance Percentages") in the table below by the procedure described in the following paragraph.

| | | |
|---|---|---|
| ResCap Debtors | $780.2 million | 31.7% |
| GMACM Debtors | $626.0 million | 25.4% |
| RFC Debtors | $820.8 million | 33.3% |
| Private Securities Claims Trust | $235.0 million | 9.5% |
| Total | $2.462 billion | 100.00% |

The Plan Proponents will file an estimation motion prior to the Effective Date to estimate, as of the Initial Unit Issuance Record Date, the estimated amount of the Disputed Unsecured Claims against each of the Debtor Groups. Following this estimation, the starting Unit Issuance Percentages will be adjusted such that all holders of Allowed Unsecured Claims and the Private Securities Claims Trust shall share proportionately in the accretion or dilution of recoveries as a result of variances in the Allowed amounts of Unsecured Claims from the amounts set forth in the Disclosure Statement; and will be further adjusted through an iterative mathematical process such that all holders of Allowed Unsecured Claims against a Debtor Group receive Units in the same ratio of number of Units to Allowed amount of Claim. For the

-18-

purposes of this paragraph, proportionately means in proportion to the recovery of the holders of Unsecured Claims in the amounts set forth in the Disclosure Statement.

The Private Securities Claims Trust will receive a number of Units equal to the total Units initially issued and outstanding multiplied by its Unit Issuance Percentage, as adjusted. The holders of Allowed Unsecured Claims against a Debtor Group will receive their proportionate share of the total Units initially issued and outstanding multiplied by the Unit Issuance Percentage, as adjusted, of that Debtor Group (each a "Debtor Group Unit Distribution"). The Illustrative Unit Issuance Structure, which explains how the Units will be distributed in accordance with the Plan, is annexed hereto as Exhibit 4.

Each Unit will entitle its holder to the pro rata share of the Cash of the Liquidating Trust available for distribution following the funding of the Borrower Claims Trust, the making of payments to or reserving for Allowed Administrative Claims, Allowed Priority Claims, and Allowed Other Secured Claims the distribution on account of NJ Carpenters Claims, and payment of the Junior Secured Notes Claims, and the funding of reserves to pay the administrative expenses of the Liquidating Trust. The Cash of the Liquidating Trust will include Cash transferred to the Liquidating Trust as of the Effective Date, including the Ally Contribution, and Cash that subsequently becomes available to the Liquidating Trust as a result of the sale or other monetization of the non-Cash assets of the Liquidating Trust.

The Liquidating Trust will make an initial distribution of Cash to the holders of Units as soon as practicable after the Effective Date. The Liquidating Trust will make subsequent, additional distributions of Cash to holders of Units as its non-Cash assets are monetized.

## 5.    Establishment of the Disputed Claims Reserve

On the Effective Date, the Liquidating Trust will also issue Units to a reserve for those Disputed Claims that remain disputed but may become Allowed through the claims resolution process after the Effective Date (the "Disputed Claims Reserve"). The number of Units issued to the Disputed Claims Reserve in respect of each Debtor Group will equal the Debtor Group Unit Distribution of that Debtor Group, less the Units issuable to holders of Allowed Unsecured Claims against that Debtor Group as of the Initial Unit Distribution Record Date, which will be in an amount sufficient to satisfy all Disputed Claims against the particular Debtor Group as if they were Allowed in their estimated amounts as of the Initial Unit Distribution Record Date.

Upon each Cash distribution to holders of Units, Cash distributed in respect of the Units in the Disputed Claims Reserve will remain in the Disputed Claims Reserve. As Disputed Claims become Allowed, Units and Cash will be distributed from the Disputed Claims Reserve in an amount equal to what the holders of the Claims would have received had they been Allowed as of the Initial Unit Distribution Record Date. To the extent Disputed Claims are disallowed, the Units reserved on account of those claims will be cancelled, and the Cash on reserve for such Units will be available for distribution to holders of Units or to pay expenses of the Liquidating Trust. After all Units, and the Cash distributed with respect thereto, have been distributed from the Disputed Claims Reserve, no further distributions will be made in respect of Disputed Claims.

-19-

6.      **Establishment of the Private Securities Claims Trust**

As described in greater detail in Article **[●],** the Plan contemplates establishing a Private Securities Claims Trust which shall administer and distribute the Private Securities Claims Trust assets to holders of Private Securities Claims in accordance with the Private Securities Claims Trust Agreement. The Private Securities Claims Trust shall, among other things, (i) direct the processing, liquidation and payment of the Allowed Private Securities Claims in accordance with the Plan, and (ii) preserve, hold, and manage the assets of the Private Securities Claims Trust for use in making distributions to holders of Allowed Private Securities Claims.

7.      **Establishment of the Borrower Claims Trust**

As described in greater detail in Article **[●],** the Plan contemplates establishing a Borrower Claims Trust that will, among other things, (i) direct the processing, liquidation and payment of Allowed Borrower Claims, (ii) provide for the treatment of insurance, if any, that may be available for the satisfaction of Borrower Claims, (iii) provide for the prosecution and settlement of objections to Borrower Claims including those that may have been filed previously by the Debtors or any other party (iv) establish affirmative claims reserved for disputed Borrower Claims, and (v) establish streamlined procedures for the resolution of objections to any disputed Borrower Claims, inclusive of any counterclaims or offsets in favor of the Debtors.

**H.      Confirming and Consummating the Plan**

Bankruptcy Code Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  Bankruptcy Code Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has fixed **[[●], 2013]**, or as soon as practicable thereafter, as the date and time of the Confirmation Hearing, and the Debtors will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned from time to time by filing a notice or without further notice except for an announcement of the adjourned date made at the Confirmation Hearing, whether or not such hearing has already been adjourned.

It is a condition to confirmation of the Plan that the Bankruptcy Court shall have approved this Disclosure Statement as containing "adequate information" and entered the Confirmation Order in form and substance acceptable to the Plan Proponents and the Consenting Claimants.  Additionally, pursuant to the provisions of Article [●] of the Plan, certain other conditions contained in the Plan must be satisfied or waived.  There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived.

Following Confirmation, the Plan will be consummated and the Effective Date will occur on the date that is the first Business Day following the Confirmation Date on which the Confirmation Order is a Final Order and all conditions specified in Article [●] of the Plan have been satisfied or waived pursuant to Article [●] of the Plan.  If the Plan is confirmed by the Bankruptcy Court and consummation occurs, all holders of Claims and Equity Interests

-20-

(including those holders of Claims or Equity Interests that do not submit ballots to accept or reject the Plan, or that are not entitled to vote on the Plan) will be bound by the terms of the Plan and the proposed transactions contemplated thereby.

## ARTICLE II.
## THE GLOBAL SETTLEMENT

The Plan reflects a global compromise among the Debtors, the Creditors' Committee, Ally, and the Debtors' major creditor constituencies, pursuant to which, among other things, Ally has agreed to contribute $2.1 billion to the Estates, pursuant to the terms and conditions of the Plan Support Agreement, an increase of $1.35 billion over the amount Ally had agreed to contribute in its pre-petition Plan Support Agreement with the Debtors.

The settlement is the product of a year of intense, arm's length negotiations among the Debtors, the Creditors' Committee, Ally, and each of the major creditor constituencies in these Chapter 11 Cases. As discussed in Article [●] herein, prior to the Petition Date, the Debtors entered into Plan Support Agreements with Ally and certain other parties in interest whereby Ally agreed to contribute $750 million to the Debtors' Estates, and these Chapter 11 Cases were filed contemplating a pre-packaged plan process and swift emergence from bankruptcy. Following the Petition Date, the Debtors and Ally allowed the prepetition Plan Support Agreements to expire and continued to negotiate the terms of a potential settlement that would appeal to a larger group of creditor constituents. The Debtors have engaged in numerous discussions and meetings with the Creditors' Committee, Ally, and various interested parties. The process culminated in the appointment of the Mediator in late 2012. Generally, the Mediator's role was to facilitate a global resolution of pivotal issues and the treatment of certain Claims and Classes of Claims. Following his appointment, the Mediator, the Debtors, the Creditors' Committee, Ally, and numerous other parties in interest convened several all-day meetings and participated in intensive negotiation sessions in order to pursue a Global Settlement of the existing issues. With the assistance of the Mediator, on May 13, 2013, the Debtors and the substantial majority of parties in interest entered into a comprehensive settlement, which is embodied in the Plan. The Plan Proponents now hope to achieve confirmation of the Plan on a consensual basis as efficiently as possible.

1.    **The Global Settlement**

As detailed below, the Plan includes a proposed settlement of numerous inter-Debtor, Debtor-Creditor and inter-Creditor disputes designed to provide the maximum recovery to all Creditors of the Debtors' Estates. Among other things, the Plan includes: (i) the RMBS Settlement and the resolution of the amount and allocation of the RMBS Trust Claims, (ii) a settlement of the amount, allocation, and priority of the Unsecured Claims held by the Monoline insurers, including MBIA and FGIC, (iii) the settlement of the Private Securities Claims, the RMBS subordination litigation, and the establishment of the Private Securities Claims Trust, (iv) subject to Bankruptcy Court and District Court approval, the settlement of the NJ Carpenters Class Action, (v) the settlement with the Senior Unsecured Notes and the Senior Unsecured Notes Trustee, (vi) treatment of the Claims of the Junior Secured Noteholders, and an allocation of the Junior Secured Notes Deficiency Claim, if any, or post-petition interest, if any, (vii) the

-21-

establishment of the Borrower Claims Trust and procedures for resolving Disputed Borrower Claims, (viii) the settlement of Estate and third party claims against Ally embodied in the Debtor Release and the Third Party Releases, and (ix) the compromise of all Intercompany Balances and subrogation claims.

## 2.    Settlement of Claims Against Ally and Plan Releases

The Plan provides for the Releases of claims that the Debtors and third parties have brought or may bring against Ally in connection with the Debtors' businesses.  In exchange for those Releases, Ally has agreed to fund $2.1 billion to the Estates for distribution to Creditors, comprised of (1) $1.95 billion in Cash to be paid on the Effective Date of the Plan and (2) the first $150 million received by Ally for any Directors and Officers or Errors and Omissions claims it pursues against its insurance carriers related to the claims released in connection with the Plan: provided that Ally guarantees that the Debtors will receive $150 million on account of such insurance claims, which guarantee shall be payable without defense, objection, or setoff on September 30, 2014 (collectively (1) and (2), (the "Ally Contribution"), in exchange for Estate and Third Party Releases. In addition, the Debtors assert that Ally has provided substantial financial and operational support to the Estates during the Chapter 11 Cases, including, among other things: (i) providing up to $220 million in debtor in possession financing; (ii) enabling the Debtors to continue originating mortgages during the restructuring by entering into a broker agreement with the Debtors that calls for Ally to fund the mortgages on market terms and face the market on account of certain mortgage loan sales pools; (iii) permitting the Debtors to continue subservicing Ally Bank's MSRs, which assisted the Debtors in the successful completion of the sale of their Platform Sale (defined below); (iv) continuing to provide the Debtors with use of Ally's back-office shared services, such as centralized payroll and risk management services, among others; (v) cooperating with the Debtors to separate the shared services resources and permit the smooth transition of the Debtors' businesses to the purchasers; and (vi) agreeing to serve as a stalking horse bidder for the Debtors' Whole Loan Sale (defined below).  Absent Ally's contributions to these Chapter 11 Cases, the Debtors may have been unable to continue their operations and conduct going concern Asset Sales and it is possible that the Debtors would have shared the fate of every other mortgage servicer that has filed for bankruptcy in recent years—a "firesale" liquidation

YOUR RIGHTS MAY BE IMPACTED BY THE DEBTORS' RELEASE AND THE THIRD PARTY RELEASES IN FAVOR OF THE ALLY RELEASED PARTIES CONTAINED IN THE PLAN.  YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND THE RELEASES CONTAINED THEREIN.

If the Plan is confirmed, Ally, the Debtors, and each of Ally's and the Debtors' respective successors and assigns, members, shareholders, partners, non-Debtor affiliates, and Representatives— including Ally's and the Debtors' Current and Former Officers and Directors, as discussed in greater detail below— each in its capacity as such (collectively, the "Ally Released Parties") will be fully released and discharged from claims that either have been asserted or could be asserted against the Ally Released Parties by (i) the Debtors, the Estates, and the Liquidating Trust (the "Debtor Release") and (ii) third parties whose claims relate to the Debtors' businesses, e.g., claims arising from or related in any way to the Debtors, including

-22-

claims related to (x) RMBS issued and/or sold by the Debtors or their affiliates and (y) the Debtors' mortgage origination, servicing and securitization activities, and other business activities (the "Third Party Releases" and together with the Debtor Release, the "Releases"). The Releases include any and all Causes of Action, including tort, fraud, contract, violations of federal or state securities laws, and veil piercing or alter-ego theories of liability, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise. The Releases will apply to all holders of claims (as such terms are defined in Section 101(5) of the Bankruptcy Code) and Equity Interests (as defined in the Plan), whether or not such entities have filed Proofs of Claim as noted above in these Chapter 11 Cases.

The Releases in favor of the Ally Released Parties—made in exchange for the $2.1 billion Ally Contribution as well as other monetary and non-monetary contributions made by Ally throughout these Cases, and other settlements embodied in the Plan Support Agreement— were an essential component of the Global Settlement and the Consenting Claimants' execution and approval of the Plan Support Agreement. Indeed, Ally has insisted that the Releases are a condition to its agreement to make the Ally Contribution. The Releases are the product of extensive arms'-length negotiations between the Debtors, the Creditors' Committee, Ally, and the Consenting Claimants, with the guidance of the Mediator, in connection with the Plan Support Agreement. The Debtors, the Creditors' Committee, and the Consenting Claimants have agreed to support the Releases. The Debtors, the Creditors' Committee, and the Consenting Claimants determined that the exchange of the Releases for all of Ally's substantial contributions throughout the Chapter 11 Cases is fair, and based on a well-reasoned, and calculated assessment of their respective claims against Ally and the attendant litigation risks related thereto.

Generally speaking, the Plan resolves any and all claims against the Ally Released Parties as specified above and spares all parties, including the Debtors, costly and uncertain litigation that would inevitably delay consummation of a plan and recoveries to holders of Claims and Equity Interests, and would result in the substantial reduction of such recoveries. Accordingly, the Plan Proponents believe that the Releases are an essential component and critical to the success of the Plan, in addition to being in the best interests of all creditors. Importantly, of the total estimated cash projected to be distributed on account of unsecured claims, approximately 80% will be funded with Estate assets available because of the Ally Contribution. Thus, without the Releases embodied in the Plan, creditors would receive only a small fraction of the anticipated distributions described herein.

### (b)    The Plan Resolves Estate Claims Against the Ally-Released Parties

The Plan includes the Debtor Release, pursuant to which all Estate claims against the Ally Released Parties are released. The Plan Proponents believe that the Debtor Release is fair, equitable and in the best interests of the Estates, as required by applicable law.

First, the settlement of the Estate claims against the Ally Released Parties is the product of extensive arms' length bargaining among the Creditors' Committee, the Consenting Claimants, the Debtors and Ally, overseen by the Mediator. As discussed in more detail in Article [●], below, following the Petition Date, each of the Examiner and the Creditors'

-23-

Committee investigated the Potential Claims against Ally arising out of pre-petition transactions among the Debtors and Ally.   During the course of these Chapter 11 Cases, the Creditors' Committee and the Examiner considered the merits and defenses to Potential Claims and causes of action against Ally.    As a result of these thorough investigations of the claims and the vigorous and arms' length negotiations overseen by the Mediator, the Plan Proponents, along with the support of the Consenting Claimants, reasonably, in good faith, and in the best interests of their respective constituencies, concluded that the Ally Contribution of $2.1 billion, in addition to Ally's contributions to the Estates throughout these Chapter 11 Cases, represents a substantial contribution without which these Chapter 11 Cases likely would not come to a successful conclusion.

Second, the Debtor Release is broadly supported by nearly all of the Debtors' key constituencies, including, in addition to the Committee: all six RMBS Trustees; the Institutional Investors; the largest securities fraud claimants; MBIA and FGIC, as the two largest monoline claimants; Wilmington Trust; the Supporting Senior Unsecured Noteholders (as defined in the Plan Support Agreement), including Paulson & Co., Inc.; and the representatives of the Borrowers on the Committee.    Each of these parties was represented by competent and experienced counsel in the negotiations leading to agreement on the terms of the Debtor Release.

Third, the settlement reflects a reasonable balance between the litigation's possibility of success and the settlement's future benefits.   Each party to the negotiations that led to the settlement was armed with a wealth of information, gleaned from the months' long investigations conducted by the Committee and Examiner.   To facilitate settlement negotiations, the parties reviewed extensive document discovery, briefed the merits of the claims, and exchanged written and oral presentations regarding their legal positions.   With the knowledge accumulated in this process, each party independently determined that the settlement of the Estate claims against the Ally Released Parties reflected a reasonable resolution of the claims.

Fourth, the Debtor Release resolves myriad complex disputes among the parties regarding the nature, scope and validity of the Estate claims against Ally, obviating the need for protracted litigation with its attendant expense, inconvenience and delay.   The settlement spares all parties, including the Debtors, costly and uncertain litigation that would inevitably delay consummation of a plan and recoveries to holders of Claims.[23]

For the foregoing reasons, the settlement of the Estate claims against the Ally Released Parties falls well within the range of reasonableness and satisfies the applicable standards for approval of settlements in bankruptcy cases.

(c)    **The Plan Resolves Third Party Claims Against the Ally Released Parties**

The Plan includes the Third-Party Releases, pursuant to which claims relating to the Debtors' business that claimants have asserted or could assert against the Ally Released Parties are released.   The Plan Proponents believe that the Third-Party Releases are within the Court's

---

[23] The Plan Proponents believe that the Examiner's Report supports the Global Settlement.

-24-

subject matter jurisdiction, and that the unique circumstances of these Chapter 11 Cases render the Third-Party Releases crucial to the success of the Plan. Indeed, without the Third-Party Releases, the Ally Contribution could not have been obtained and no Global Settlement achieved.

The Court has subject matter jurisdiction over the released claims because the claims, if not released, would have a direct impact on the Estates. Absent the Third-Party Release, claims against the Ally Released Parties would indirectly be asserted against the Estates due to various alleged indemnification and contribution obligations between the Debtors and the Ally Released Parties. First, ResCap's operating agreement sets out certain indemnification obligations owed to Ally. Second, the Debtors' current and former directors and officers are entitled to indemnification for a broad variety of claims pursuant to ResCap's limited liability company agreement. Third, the Debtors owe indemnification obligations to Ally Securities pursuant to various underwriting agreements. Fourth, Ally Bank has indemnity rights against GMAC Mortgage, LLC under certain custodial agreements entered into between, among others, Ally Bank and GMACM in connection with a series of home equity loan transactions. Therefore, to the extent that Ally would incur defense costs and losses in connection with claims that would otherwise be released under the Plan, Ally could have direct claims against the Debtors' Estates.

In addition, certain claims covered by the Third-Party Release could otherwise have an impact on the Debtors' Estates as a result of Errors & Omissions insurance policies that provide shared coverage to the Debtors and Ally Bank. The proceeds of those policies are an asset of the Estates. Because they are "wasting" policies, the provision of policy benefits to the non-debtor insureds would deplete an estate asset—most likely irreversibly. The Bankruptcy Court has clear subject matter jurisdiction to prevent that outcome, including through approval of the Third-Party Release.

The Third-Party Releases are justified by the truly unusual circumstances of this case where the success of the Plan, and indeed the prospects for any meaningful distribution to many of the Debtors' creditors, hinges on the very substantial financial contribution provided by Ally, and where the settlement was negotiated by and is supported by representatives of every creditor constituency that is receiving less than a full recovery under the Plan. The execution and approval by the Consenting Claimants of the Plan Support Agreement would not have been possible without the Ally Contribution. Ally's substantial contributions have enabled and will continue to allow the Debtors to maximize stakeholder recovery. For these reasons the Third-Party Releases meet the requisite standard adopted by the United States Court of Appeals for the Second Circuit (the "Second Circuit"). A more detailed discussion of the pre- and post-petition negotiations between Ally, the Creditors' Committee, the Consenting Claimants and the Debtors, and the substantial consideration provided by Ally during these Chapter 11 Cases, is contained below in Article [●].

**3.      The Plan Releases Claims Against the Debtors' Current and Former Officers and Directors**

Certain parties have alleged that claims may lie against the Debtors' current and former officers and directors regarding their pre- and post-petition actions. While the Debtors and their

officers and directors vigorously dispute the validity of any such claims, the Plan provides that, in exchange for valuable consideration in the form of the forbearances described below, the Debtor Release and Third Party Releases shall release all Claims that have been or could have been brought against the Representatives of the Debtors, as that term is defined in the Plan. Representatives of the Debtors include, but are not limited to, the Debtors' former and current officers and directors, including the Debtors' Chief Restructuring Officer, Lewis Kruger. The Claims to be released under the Plan against such individuals include, but are not limited to, claims relating to the Pre-petition AFI-ResCap Settlement Agreement (as defined below), RMBS Settlement, DOJ/AG Settlement, Consent Order, and the pre-petition sales of certain of the Debtors' assets to Ally and affiliates of Cerberus Capital Management. In exchange for these Releases, the Representatives of the Debtors have agreed to forego any claims for coverage they may have under any directors & officers or errors & omissions insurance policies covering the Debtors or their Representatives for the period between November 2006 and the Effective Date, with respect to those Claims that are released under the Plan. This forbearance by the Debtors' Representatives enabled Ally to reach settlement with certain of Ally's insurers, which in turn increased the amount that Ally was willing to contribute to the Plan through the Ally Contribution. Additionally, the Representatives of the Debtors have agreed to a forbearance of contractual claims for indemnification that the representatives of the Debtors many have against the Debtors and Ally with respect to those Claims released under the Plan. As a result, Ally was willing to make a greater contribution to the Plan and the Debtors and Ally were relieved of these contractual indemnification claims. The full scope of the release provisions in favor of the Representatives of the Debtors is described in further detail in Article [V].

> **(d)    The Plan Releases Ally and the Debtors' Current and Former Officers and Directors from Continuing Obligations, Including Under the DOJ/AG Settlement**

Under the Plan, through the Effective Date, the Debtors shall perform any of their remaining obligations under (i) the DOJ/AG Settlement (other than those obligations under the DOJ/AG Settlement that were assumed by Ocwen Loan Servicing, LLC ("Ocwen") and Walter Investment Management Corporation ("Walter") under the Ocwen APA (as defined below) and related Walter Assignment (as defined below)), (ii) the Consent Order, and (iii) the Order of Assessment, including, for the avoidance of doubt, satisfying the settlement of the foreclosure file review obligations under the Consent Order in full in Cash. Ally shall not be responsible to perform any of the Debtors' Continuing Obligations (as defined below) under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment. On or after the Effective Date, the Liquidating Trust shall assume any and all rights and remaining obligations of only the Debtors under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment (collectively, the "Continuing Obligations").

On the Effective Date, upon the appointment of the Liquidating Trust Board, the persons acting as directors and officers of the Debtors prior to the Effective Date will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases—including, for the avoidance of doubt, the Continuing Obligations—and, upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations

-26-

of the Debtors and these Chapter 11 Cases. Upon the Effective Date, Ally shall be fully released from the Continuing Obligations and shall have no monetary obligations in respect of the Continuing Obligations under the Consent Order, DOJ/AG Settlement, and the Order of Assessment.

As described above, the consideration provided by the Debtors' current and former officers and directors in exchange for the release discussed in this section includes their forbearance regarding any claims for coverage they may have under any directors & officers or errors & omissions insurance policies covering the Debtors or their Representatives between November 2006 and the Effective Date, and their forbearance regarding any contractual claims for indemnification that they may have against Ally or the Debtors. In addition, the Plan's release provisions seek to release the Debtors' current and former officers and directors from any post-Effective Date liability, thereby preventing certain of these individuals, as a practical matter, from performing the Continuing Obligations described in this section post-Effective Date.

Notwithstanding anything to the contrary herein, nothing in the Plan shall release, enjoin, or preclude any Representative of the Debtors from pursuing any rights a Representative of the Debtors may have (i) to indemnification or advancement from Ally solely for any claims that are not released by the Plan and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased by Ally or covering Representatives of the Debtors, or against any party (other than the Debtors) arising out of such policies of insurance, solely for any claims that are not released by the Plan and the Confirmation Order. For the avoidance of doubt, nothing in the Plan expands or reduces any existing indemnification rights or rights as an "insured" for any Representative of the Debtors for claims that are not released by the Plan. No rights of the Consenting Claimants are released under the Plan in their capacity as liability insurance or reinsurance carriers for Ally or the Debtors.

## B.    The Plan Includes a Settlement of RMBS Trust Claims

One element of the overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code, the Plan contemplates approval of a settlement that provides for the allowance, priority, and allocation of claims of residential mortgage backed securities Trusts (the "RMBS Settlement"). The Plan's treatment of those claims is a modification of the Debtors' prior settlement agreement with certain Investors in certain RMBS Trusts (the "Original RMBS Settlement Agreement"), expanded to include the Additional Settling Trusts and modified in a number of additional respects. The RMBS Settlement embodied in the Plan resolves: (i) alleged and Potential Claims for breaches of representations and warranties held by all RMBS Trusts and (ii) all alleged and Potential Claims for damages arising from servicing, in exchange for Allowed Claims in the aggregate amount of $7.301 billion for the RMBS Trusts, to be allocated as between the GMACM Debtors and the RFC Debtors. The allocation of distributions received on account of the RMBS Trust Claims is subject to the RMBS Trust Allocation Protocol, as set forth in more detail in Article [●] of the Plan. A copy of the RMBS Trust Allocation Protocol is attached as Exhibit 8 hereto.

-27-

Upon confirmation of the Plan, no RMBS Trust can opt out of the RMBS Settlement embodied in the Plan. Consistent with the order approving the Plan Support Agreement, any RMBS Trust that has withdrawn from the Plan Support Agreement preserves its right to object to the Disclosure Statement and Plan. Upon confirmation of the Plan, distributions to the RMBS Trusts on account of the RMBS Trust Claims will be in accordance with the RMBS Trust Allocation Protocol.

Importantly, the Plan resolves outstanding disputes regarding the claims of the RMBS Trusts that are insured by monoline insurers (the "Insured RMBS Trusts"). The Plan provides that certain monoline insurers will have allowed claims against the Debtors' Estates independent of the claims of the RMBS Trusts, and the Insured RMBS Trusts will have no allowed RMBS Trust Claims but will reserve the ability to enforce their rights against any monoline insurer (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of the applicable RMBS Trust. In addition, those Insured RMBS Trusts that have made policy claims against an applicable monoline insurer but have not received full payment on account of such claims as of the Effective Date shall receive an allocated distribution that takes into account such partial payment on account of the RMBS Trust Claims, reduced by any partial payments from such monolines, in accordance with the RMBS Trust Allocation Protocol.

The Plan treatment covers all of the RMBS Trusts that have Claims against the Debtors, whether the RMBS Trust was sponsored by the Debtors and their affiliates or was sponsored by a third party. These claims comprise the single largest set of disputed claims against the Debtors' Estates. The Plan resolves such claims without the need for protracted and costly litigation that would otherwise result. By way of example, litigation over the claims asserted by the RMBS Trustees could require a Trust-by-Trust analysis of the claims and could last several years, presenting a significant burden on the Debtors' Estates. As discussed below, the Plan also avoids the cost of going forward with the trial on the Debtors' motion seeking approval of the Original RMBS Settlement Agreement pursuant to Bankruptcy Rule 9019, as well as likely follow-up litigation regarding the subordination of the RMBS Trust Claims pursuant to Section 510 of the Bankruptcy Code, each of which would have posed a significant burden on the Estates and required a massive amount of time, effort, and expense.

## C.    The Plan Settles the Claims of FGIC and MBIA

The Plan also resolves the allowance, priority and allocation of the Claims of Monoline insurers, arising generally from alleged breaches by the Debtors and their affiliates of representations, warranties, and/or covenants in various governing documents and offering documents related to RMBS and insurance agreements associated with the relevant RMBS transactions. Specifically, certain monoline insurers, including MBIA Insurance Corporation ("MBIA") and Financial Guaranty Insurance Company ("FGIC"), filed lawsuits against the Debtors and Ally asserting billions of dollars of Claims, and the continued litigation of such Claims would have been costly and could have taken years to resolve.

***MBIA.***    The Plan resolves the allowed amount and allocation of MBIA's claims and avoids the need for further litigation between the Debtors and MBIA. MBIA has asserted claims against the Debtors for alleged breaches of representations and warranties and fraud in

-28-

connection with RMBS Trusts associated with securities insured by MBIA (the "MBIA Insured Trusts").[24]    The RMBS Trustees for the MBIA Insured Trusts have asserted that the MBIA Insured Trusts hold claims that could be equal to the lifetime reduction in the value of the collateral pools underlying such RMBS Trusts—*i.e.*, the estimated lifetime collateral losses of the MBIA Insured Trusts—and MBIA has asserted that its claims could be equal to the amount of claims it must pay under its relevant financial guaranty insurance policies in connection with such future collateral losses.    The Debtors performed an analysis with respect to the MBIA claims regarding estimated lifetime losses and determined, in an exercise of their business judgment, that a settlement of the MBIA claims, as outlined in the Plan, represents a reasonable resolution of the novel and fact-intensive issues that have already been the subject of several years of litigation, and is in the best interest of the Estates.

As one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code, the Plan approves the settled Allowed amount of General Unsecured Claims held by MBIA in the amount of $719 million against the ResCap Debtors, $1.45 billion against the GMACM Debtors, and $1.45 billion against the RFC Debtors.[25]    The RMBS Trustees have agreed to waive any claims held by the MBIA Insured Trust, subject to the Monoline Reserve.  On account of such Allowed General Unsecured Claims, MBIA shall receive its Pro Rata Share of the GMACM Debtors Unit Distribution, RFC Debtors Unit Distribution, and ResCap Debtors Unit Distribution, as applicable.

***FGIC.***    The Plan contemplates a resolution of FGIC's Claims through a separate FGIC settlement agreement entered into as of May 23, 2013, among the Debtors, The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association, and Wells Fargo Bank, N.A. (the RMBS Trustees for the Debtor-sponsored RMBS Trusts with one or more class of securities insured by FGIC, the "FGIC Insured Trusts"), each in their respective capacities as Trustees, indenture trustees, or separate trustees, FGIC and certain Institutional Investors, holders of securities issued by the FGIC Insured Trusts (the "FGIC Settlement Agreement").  Subject to approval by the Bankruptcy Court and the New York State Supreme Court with jurisdiction over FGI's rehabilitation proceeding (the "FGIC Rehabilitation Court"), the FGIC Settlement Agreement resolves FGIC's claims against the Debtors, as well as the Claims asserted against the Debtors by the RMBS Trustees on behalf of the FGIC Insured Trusts.  In addition, the FGIC Settlement Agreement settles, releases, and discharges FGIC's obligation under the policies it issued in connection with the FGIC Insured Trusts, in exchange for a $253.3 million cash

---

[24]    The MBIA Insured Trusts include both Debtor-sponsored RMBS Trusts and one third-party securitization that included RFC loans for which RFC had provided representations as to which MBIA had not sued the Debtors on prepetition.

[25]    The Plan calls for MBIA and FGIC to receive recoveries against ResCap in recognition of MBIA and FGIC's alter ego and aiding and abetting theories of liability alleged against ResCap based on alleged fraud by RFC and GMACM and alleged breaches of contract by RFC and GMACM.  Although the Debtors dispute such allegations, the provisions in the Plan relating to the ResCap Debtors' allocation of distributions to FGIC and MBIA are part of a larger settlement designed to resolve potentially burdensome and costly litigation in connection with the largest Claims filed in these Chapter 11 Cases.

-29-

payment from FGIC to the applicable RMBS Trustees. Absent agreement on these issues, the parties would be faced with significant and uncertain litigation regarding the validity, amount and priority of the claims of FGIC and the RMBS Trustees in connection with the FGIC Insured Trusts, particularly in light of the novel and fact-intensive issues raised in connection with the pre-petition FGIC litigation, described in further detail below. The parties would also face difficult and novel issues regarding the effect of the proceedings in the FGIC Rehabilitation Court on the treatment of FGIC's Claims in the Chapter 11 Cases.

On June 7, 2013, the Debtors filed a motion pursuant to Bankruptcy Rule 9019 seeking the Bankruptcy Court's approval of the FGIC Settlement Agreement [Docket No. 3929], and the Bankruptcy Court will hold a hearing to consider the motion on August 16 and 19, 2013. In addition, the FGIC Rehabilitation Court scheduled a hearing on August 6, 2013 to consider approval of the FGIC Settlement Agreement. It is a condition precedent to Plan consummation that the Bankruptcy Court and the FGIC Rehabilitation Court shall have approved the FGIC Settlement Agreement, in each case by August 19, 2013.

Pursuant to the FGIC Settlement Agreement, if approved, the FGIC Claims shall be deemed allowed as general unsecured claims against each of the ResCap Debtors, the GMACM Debtors, and the RFC Debtors in the aggregate amount of $596.5 million and will be allocated among each of those Debtors pro rata based on which of the Debtors would be obligated to reimburse FGIC for such payments under certain agreements governing the Trusts. If the Plan does not become effective, FGIC will also be allowed to assert general unsecured claims against each of the ResCap Debtors, the GMACM Debtors, and the RFC Debtors as reflected in the proofs of claim filed by FGIC in the Chapter 11 Cases, with all claims by FGIC (including the deemed allowed portion referenced above or otherwise) against each such entity capped in each case at the amount of $596.5 million, and the Debtors reserve all rights to object to such claims, including any objection to the amount or priority of such claims above the deemed allowed portion.

If the Plan becomes effective, the Allowed amounts of the General Unsecured Claims held by FGIC shall be; $337.5 million against the ResCap Debtors, $181.5 million against the GMACM Debtors, and $415.0 million against the RFC Debtors. On account of such Allowed General Unsecured Claims, FGIC shall receive its Pro Rata Share of the GMACM Debtors Unit Distribution, RFC Debtors Unit Distribution and ResCap Debtors Unit Distribution, as applicable.

In addition, pursuant to the FGIC Settlement Agreement, the RMBS Trustees have agreed to release all Claims asserted by the RMBS Trustees on behalf of the FGIC Insured Trusts, except claims for past or future losses to holders of securities related to such RMBS Trusts not insured by FGIC. The RMBS Trustees have asserted throughout the Chapter 11 Cases that, in the absence of a settlement, their asserted Claims could be equal to the estimated lifetime reduction in the value of the collateral pools underlying such RMBS Trusts. Accordingly, the Debtors performed an analysis of the estimated lifetime collateral losses of the FGIC Insured Trusts and determined, in an exercise of their business judgment, that settlement of FGIC's Claims and the Claims asserted by the RMBS Trustees on behalf of the FGIC Insured Trusts, pursuant to the terms of the FGIC Settlement Agreement, is in the best interests of the Estates.

-30-

**D.    The Plan Resolves Certain Securities Claims Against the Debtors and Ally**

Private Securities Claims comprise securities litigation claims against the Debtors and Ally, arising from the purchase or sale of RMBS, asserted by parties who have filed a lawsuit against the Debtors and Ally (including Ally Securities, LLC) within the relevant limitations period or who are Tolled Claimants (defined below).  No Private Securities Claims rely on statutory or equitable tolling.  The Plan Proponents have established that Private Securities Claimants include only 21 entities, or groups of affiliated entities[26].

The creation of the Private Securities Claims Trust resolves tens of billions of dollars in securities law claims against the Debtors and non-Debtor affiliates arising from the Debtors' loan origination activities and the structuring, sponsoring, underwriting, and sale of RMBS.  The Private Securities Claims Trust creates a streamlined process for the distribution recoveries to the Private Securities Claimants with alleged Claims against the Debtors and avoids significant litigation regarding some of the largest claims asserted against the Debtors, including litigation over the validity and value of the Private Securities Claims and whether such claims should be subordinated pursuant to Section 510 of the Bankruptcy Code.  The Private Securities Claims will be settled and resolved through the Private Securities Claims Trust.  On the Effective Date, the Private Securities Claims Trust will receive Units constituting the Private Securities Claims Trust Unit Distribution and, subsequently on a periodic basis, will receive distributions equal to $235.0 million in aggregate, subject to the Adjustments (collectively, the "Private Securities Trust Assets").  As more fully described in Article [●] below, the Private Securities Trust Assets will be held in the Private Securities Claims Trust for the benefit of the Holders of Allowed Private Securities Claims (the "Private Securities Claims Trust Beneficiaries"), and the Private Securities Claimants shall forego any other recovery from the Debtors or the Liquidating Trust in respect of their Private Securities Claims.

**E.    The Plan Resolves the Claims of NJ Carpenters**

Subject to District Court approval, the Plan resolves an ongoing securities class action filed against certain Debtors' and their former officers and directors, *N.J. Carpenters Health Fund v. Residential Capital LLC*, No. 08 Civ. 8781 (HB) (S.D.N.Y.) (the "NJ Carpenters Securities Class Action").  The proposed settlement would resolve federal securities law claims based on alleged misstatements and omissions in the offering materials for 59 different RMBS

---

[26]    The Private Securities Claimants are (i) AIG, (ii) Allstate, (iii) Asset Management Funds d/b/a AMF Funds, AMF Intermediate Mortgage Fund, AMF Ultra Short Mortgage Fund, (iv) Bank Hapoalim B.M., (v) Cambridge I, (vi) Cambridge II, (vii) Deutsche Zentra-Genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York, DH Holding Trust, (viii) Federal Home Loan Bank of Boston, (ix) Federal Home Loan Bank of Chicago, (x) Federal Home Loan Bank of Indianapolis, (xi) HSH Nordbank AG, HSH Nordbank AG Luxembourg Branch, HSH Nordbank AG New York Branch, HSH Nordbank Securities S.A., (xii) Huntington Bancshares Inc., (xiii) IKB Deutsche Industriebank AG, IKB International S.A. in liquidation, (xiv) John Hancock Life Insurance Company (U.S.A.), (xv) MassMutual, (xvi) Principal Life Insurance Company, Principal Funds, Inc., Principal Variable Contracts Funds, Inc., (xvii) Prudential, (xviii) Sealink Funding Limited, (xix) Stiching Pensioenfonds ABP, (xx) The Union Central Life Insurance Company/Ameritas Life Insurance Corp./Acacia Life Insurance Company, and (xxi) the Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc.

offerings with original face amount of approximately $38 billion.  Although the Debtors dispute these claims, they are a source of significant potential liability.  Subject to District Court approval, the Plan resolves these claims for a distribution of $100 million.  On June 28, 2013, the District Court preliminarily approved the proposed settlement.  Reasonable costs of class notice and administration (estimated to be $450,000) will be advanced by the Debtors pursuant to authorization by the Bankruptcy Court, which amounts will be deducted from the NJ Carpenters Claims distribution.  If members of the class opt out of the settlement class, they will be ineligible to share in the settlement distribution.  To the extent such opt-outs have Allowed Claims against the Estates, or if the settlement is not approved and any class members have Allowed Claims against the Estates, such claims will be treated as General Unsecured Claims, provided that they may be subject to contractual, legal, or equitable subordination.[27]

F.    **The Plan Resolves the Claims in the Kessler Class Action**

The Plan contemplates a resolution of claims asserted against the Debtors in *In re: Community Bank of Northern Virginia Second Mortgage Lending Practice Litigation*, filed in the United States District Court for the Western District of Pennsylvania, MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 051386 (the "Kessler Class Action"), alleging violations of various consumer protection statutes as discussed in detail in Article **[●].** The Kessler Class Action has been pending against the Debtors for over 10 years, and is one of the largest putative Borrower class actions pending against the Debtors.

G.    **The Plan Provides a Trust to Allow for Payment in Cash to Holders of Borrower Claims**

The Plan provides for the treatment of claims asserted by Borrowers through the establishment of the Borrower Claims Trust.  As more fully described in Article **[●]** below, on the Effective Date, the Borrower Claims Trust will be funded in cash with $57.6 million plus the Borrower Trust True-Up, if any.  The Borrower Claims Trust will be sufficiently funded such that the estimated Allowed Borrower Claims will receive a recovery from the Borrower Claims Trust comparable to recoveries of unsecured Creditors against the applicable Debtor Group against which the Borrower Claims would otherwise have been asserted.  The Borrower Claims Trust Agreement will establish streamlined procedures for the resolution of objections to disputed Borrower claims, whether pending at the time of confirmation and thereafter.  Further, pursuant to a separate proposed settlement agreement reached with the Board of Governors of the Federal Reserve System (the "FRB"), the Debtors have agreed, subject to Bankruptcy Court approval, to fund an additional amount of $230 million in cash, for the benefit of Borrowers subject to foreclosure.[28]  To the extent a holder of a Borrower Claim receives payment pursuant

---

[27] The Plan Proponents acknowledge that, in the event the NJ Carpenters Settlement has been terminated or the District Court declines to approve the NJ Carpenters Settlement, the rights of the NJ Carpenters Class Members to object to their proposed treatment are reserved.

[28] The Borrowers who will be entitled to some payment under the FRB settlement include any Borrower who was in some stage of active foreclosure proceedings during 2009 and 2010.  In addition, certain Borrowers will receive remediation payments as a consequence of a separate review related to Borrowers who were eligible to receive benefits under the Service Members' Civil Relief Act from January 1, 2006 – March 12, 2012 undertaken as part of the DOJ/AG Settlement.

-32-

to the settlement of the Debtors' obligations under the Consent Order, the amount of such Borrower Claim shall be reduced in an amount equal to the amount received.

Certain Borrower Claims may also be covered by insurance policies. The Plan provides that, except as set forth in the Kessler Settlement Agreement, to the extent a Borrower recovers insurance proceeds on account of all or some of a Borrower Claim, (i) if distributions on account of such Allowed Borrower Claim have not been made, the Allowed Borrower Claim amount shall be reduced to the extent paid by insurance proceeds, or (ii) if distributions on account of such Allowed Borrower Claim have been made, the direct recipient of such proceeds will be required to return a proportionate amount (such proportionate amount determined by dividing the recovered insurance proceeds by the Allowed amount of the Borrower Claim) of any prior distributions from the Borrower Claims Trust Assets made on account of such Borrower Claim to the Borrower Claims Trust. Such Borrower shall hereafter be entitled to its proportionate share of any distribution from the Borrower Claims Trust.

## H.    The Plan Provides Junior Secured Noteholders with Payment in Full

While the Junior Secured Noteholders (as defined herein) are not a party to the Plan Support Agreement and have not consented thereto, the Plan provides that the Junior Secured Noteholders will receive payment in full on account of their Allowed Claims (*e.g.*, the secured claims for outstanding principal and accrued pre-petition interest), with such amount to be determined pursuant to pending adversary proceedings challenging the extent and validity of the Junior Secured Noteholders' claims and security interests. Specifically, the Debtors and the Creditors' Committee believe that the Junior Secured Noteholders are significantly undersecured and therefore not entitled to post-petition interest. Accordingly, as described in greater detail below, the Debtors and the Creditors' Committee each filed a complaint seeking to determine the extent and validity of the liens and claims of the Junior Secured Noteholders. Such litigation has been consolidated and is going forward. If the Court ultimately determines in the adversary proceeding that the Junior Secured Noteholders are oversecured, the Junior Secured Noteholders will receive payment by the Liquidating Trust of post-petition interest under the Plan on account of their secured claims, which will reduce the value of Units distributable under the Plan.

## I.    The Plan Resolves Claims of the Senior Unsecured Noteholders and the Senior Unsecured Noteholder Trustee

The Plan provides for a good faith compromise and settlement of claims that the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, has against the Ally Released Parties and certain other Debtors. The claims related to, among other things, a breach of the Senior Unsecured Notes Indenture as well as claims held by the ResCap Estate against Ally relating to, among other things, the transfer of Ally Bank from ResCap to or for the benefit of Ally.

## J.    The Plan Resolves Issues Relating to Substantive Consolidation of the Debtors' Estates

The Plan provides for a settlement and compromise of the issues relating to whether the liabilities and the assets of the Debtors should be substantively consolidated for purposes of

-33-

distributions under the Plan.  After considering the various factors weighing both in favor of and against substantive consolidation, the Debtors concluded that complex, time-consuming, and uncertain substantive consolidation litigation was likely if the issue was not earlier resolved, and that the cost of such litigation could pose material risk to the Debtors' reorganization efforts and all Creditor recoveries.

Although the Plan does not substantively consolidate any of the Debtors, the Plan provides for partial consolidation of the Debtors into three (3) Debtor Groups, as described above, solely for purposes of describing their treatment under the Plan, confirmation of the Plan, and making distributions under the Plan.[29]

The majority of the assets of the Debtors' Estates reside at ResCap, GMACM, and RFC, with the Debtor subsidiaries within each Debtor Group having little to no assets available for distribution to Creditors.  In addition, the majority of Claims asserted against the Debtors are asserted against ResCap, GMACM, and RFC, with, in limited circumstances, de minimis Claims asserted against the other Debtor subsidiaries within a Debtor Group.  Accordingly, based upon the Plan Proponents' analysis, no creditors are harmed by the proposed limited consolidation of the Debtors in to the Debtor Groups for distribution purposes under the Plan.[30]

## K.    The Plan Contains a Compromise of Intercompany Balances and Resolves Subrogation and Other Disputed Intercompany Issues

The Debtors' books and records reflect various intercompany payables and receivables among various Debtor entities as of the Petition Date.  These balances were accumulated through tens of thousands of separate transactions over a period of years from a course of dealing whereby certain Debtors made payments under pre-petition loan agreements for the benefit of other Debtors, or by operation of the Debtors' centralized cash management system.  The seven largest Intercompany Balances, which comprise approximately 96% of all Intercompany Balances, are described on Exhibit 5 annexed hereto.

The Debtors filed their Schedules of assets and liabilities on June 30, 2012 [Docket Nos. 548 - 649], as amended, which reflected the Intercompany Balances that existed on the Debtors' books and records as of the Petition Date.  Since the filing of these Schedules, the Debtors conducted an extensive analysis of the Intercompany Balances to determine whether they should be treated as Allowed Claims, subordinated to other Claims, subject to set-off, or recharacterized as equity contributions or dividends.  The analyses focused on the intent associated with each balance, including but not limited to consideration of the following factors:  (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a rate of interest and interest payments; (iv) the source of repayments of the purported indebtedness; (v) the adequacy or inadequacy of the capitalization of the net receiver; (vi) the identity of interest between net receiver and the "lender"; (vii) the security, if any, for the putative debt; (viii) the ability of the

---

[29]    Exhibit 3 annexed hereto contains organizational charts detailing the Debtor entities.

[30]    As set forth in the Plan Support Agreement, the grouping of Debtors set forth in the Plan remains subject to change with the reasonable consent of the Plan Proponents, Ally, and the Consenting Claimants.

-34-

net receiver to obtain financing from outside lenders; (ix) the extent to which the payments were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments. The Debtors also reviewed historical practices and other evidence as to whether there was any intent that Intercompany Balances would be enforced or repaid.

The Debtors shared their analyses and supporting materials with advisors for the Creditors' Committee. The Creditors' Committee's advisors independently reviewed the supporting materials and analyses and performed follow-up due diligence on the Intercompany Balances. The Creditors' Committee's advisors provided reports to the full Creditors' Committee on the Intercompany Balances.

After conducting this analysis, the Debtors and the Creditors' Committee, based upon their independent review and analysis, believe that the Intercompany Balances reflected in the Schedules lack many of the indicia of true debt and likely would not be enforceable Intercompany Balances. While the Intercompany Balances generally were a result of the Debtors' shared cash management system, evidence reflects no consistent practice of repayment or other formal settlement of such balances. Most Intercompany Balances are not supported by documents other than entries in the accounting records. For the few instances in which agreements exist, the documents often contemplated a "lending" relationship (A owes B) that is the reverse of the existing balance (B owes A). In nearly all instances, interest on Intercompany Balances did not accrue, accrued but was not paid, or, in one instance, was paid even though the agreement did not provide an interest rate. Further, in each instance, the same individuals, entities, or affiliates controlled both the "lender" and the net receiver upon the commencement of the "lending" relationship.

On numerous occasions, where the existence of an intercompany payable on a Debtor's balance sheet threatened the solvency and net worth thresholds required under external funding agreements, or by federal and state regulators, the putative debt obligations were forgiven. Additionally, putative debt obligations were forgiven among the Debtors and certain non-Debtor subsidiaries in connection with the Debtors' international transactions and the dissolution of entities. Approximately $16.6 billion of debt was forgiven without consideration from 2007 through the Petition Date.

As a result of these facts, even if the Intercompany Balances reflected on the Debtors' books and records were accurate and enforceable debts, any attempt to enforce such claims would inevitably result in litigation relating to, among other things, (i) potential avoidance of historical debt forgiveness; (ii) failure to charge Debtor entities with allocable expenses; and (iii) substantive consolidation. Indeed, as discussed herein, Wilmington Trust, on behalf of the Senior Unsecured Noteholders, has already requested in the Wilmington Trust Standing Motion standing to pursue certain Estate Causes of Action that forgiveness of intercompany debt constituted constructive and actual fraudulent transfers. Pursuant to the Global Settlement, all Intercompany Balances will be compromised under the Plan. In light of the analysis of the Intercompany Balances, in addition to the cost and delay that could result from litigating these issues, the Plan Proponents believe that the compromise of Intercompany Balances embodied in the Plan is in the best interest of the Estates and creditors.

-35-

Setting aside the cost of reviewing, analyzing, and taking discovery with respect to tens of thousands of transactions, litigation of these and similar claims would be extremely time-consuming and expensive. Fraudulent conveyance, substantive consolidation, recharacterization, and similar issues are highly complex and factually intensive, requiring extensive discovery and expert testimony addressing solvency, valuation, contemporaneous exchange of value, arms'-length terms, accounting practices, allocation issues, and so forth. Experience in similar cases demonstrates that, absent consensual resolution, fully litigating these issues would cost the Estates tens of millions of dollars, and substantially delay the ability to confirm any Chapter 11 plan.

Given the numerous inter-related litigations that would arise from any attempt to enforce the Intercompany Balances and any objections thereto, it was clear that the uncertainty and costs associated with litigating the intercompany issues would impact all creditor recoveries. As part of the Global Settlement, each Debtor, with the support of the Creditors' Committee and the Consenting Claimants, has agreed to compromise the Intercompany Balances. For purposes of the Plan, Intercompany Balances, as well as any subrogation claims and fraudulent conveyance claims related to the forgiveness of intercompany debt, will be compromised as part of the Global Settlement, and waived, cancelled, and discharged on the Effective Date, and holders of Intercompany Balances will receive no recovery on account of such claims.

The Debtors and the Creditors' Committee have concluded that the compromise of Intercompany Balances is reasonable in consideration of all of the factors discussed above, including (i) the Debtors' and Creditors' Committee's analysis and conclusion that the Intercompany Balances reflected on the Schedules lack indicia of true debt and are not enforceable claims; (ii) the costly and time-consuming litigation that would result from any effort to enforce the putative Intercompany Balances; (iii) the inability to reach consensual agreement with numerous creditor constituencies absent consensual resolution of the Intercompany Balances and inextricably related issues; and (iv) the substantial benefits to all creditor constituencies from the Global Settlement. For these reasons, the Plan Proponents and the Consenting Claimants agree that it is in the best interest of the Debtors' Estates and their creditors to compromise the Intercompany Balances.

## L.    The Plan Allocates the Estate Assets and Administrative Expenses among Debtor Groups and Creditor Constituencies

The cornerstone of the Global Settlement is the $2.1 billion contribution by Ally to the Estate assets in exchange for the Debtor Release and Third Party Releases. Through the negotiation process, the parties determined to allocate the Ally Contribution as follows (which remains subject to adjustment based on amounts reserved for Disputed Claims):

-36-

| Entity | Allocation |
|---|---|
| ResCap Debtors | $782.7 million |
| GMACM Debtors | $462.3 million |
| RFC Debtors | $462.3 million |
| Private Securities Claims Trust | $235.0 million |
| Borrower Claims Trust | $57.6 million |
| NJ Carpenters Claims Distribution | $100.0 million |

The agreed upon allocation of the Ally Contribution was a central focus of the mediation sessions, and reflects a thorough analysis of a number of variables.[31]  First, the parties analyzed the assets available for unsecured Creditors at each of the Debtor Groups, and determined that the GMACM and RFC Debtors held significant unencumbered assets, whereas the ResCap Debtors had little to no unencumbered assets available for distribution to unsecured Creditors at those entities.  Second, the parties then analyzed the secured and unsecured Claims asserted against each of the Debtors, the allocation of Allowed Claims against each Debtor Group, as well as the potential post-petition intercompany claims held by each of the Debtor Groups.  Third, the parties considered the rights and Causes of Action that each of the Debtor Groups could pursue against Ally, as identified by the Debtors and the Committee through their investigations.  After conducting each of these analyses, the parties determined that the proposed allocation of the Estate assets is reasonable and appropriate, and is in the best interest of the Estates and the creditors of each of the Debtor Groups.

The Global Settlement also embodies an allocation of accrued and projected administrative expenses among the Debtor Groups.  The Debtors project that, after April 30, 2013, there will be approximately $1.086 billion in administrative costs.  In light of the fact that the GMACM Debtors and the RFC Debtors were the operating companies and have the greatest amount of unencumbered assets available for unsecured Creditors, in contrast to the ResCap Debtors with limited operations and assets, and as part of the global compromise and settlement, the settling parties agreed to allocate the accrued and projected administrative costs to the GMACM Debtors and the RFC Debtors, with no administrative expenses allocated to the ResCap Debtors, as appropriate under the circumstances.  Specifically, the parties determined that of the projected $1.086 billion in administrative costs, $836.3 million shall be allocated to the GMACM Debtors, and $249.8 million shall be allocated to the RFC Debtors.

After payment of all Allowed secured claims and projected Allowed administrative and priority Claims, the Debtors project that, based upon the allocation of the Ally Contribution and projected Estate assets (including Cash and non-Cash assets) available for distribution to unsecured creditors at each of the Debtors' Estates, the following amounts will be available for distribution to unsecured creditors (subject to adjustment based on amounts reserved for Disputed Claims):

---

[31]    Thus, the Global Settlement does not include an allocation of any portion of the Ally Contribution on account of specific claims or causes of action that could be pursued by the Debtors or third parties.

-37-

| Entity | Allocation |
|--------|-----------|
| ResCap Debtors | $780.2 million |
| GMACM Debtors | $626.0 million |
| RFC Debtors | $820.8 million |
| Private Securities Claims Trust | $235.0 million |
| Borrower Claims Trust | $57.6 million |
| NJ Carpenters Claims Distribution | $100.0 million |

In light of the fact that the amount of Allowed Administrative Expense Claims remains uncertain and the value of certain non-Cash assets held by the Estates will vary as they are liquidated over time, the parties to the Plan Support Agreement determined that any increase or decrease in administrative expenses and/or the value of all of the Debtor Estates from current projections, would be shared among the GMACM Debtors, the RFC Debtors, and the Private Securities Claims Trust, pro rata, regardless of the Debtor Group against which their claims are asserted.

## ARTICLE III.
## BACKGROUND

**A.    The Debtors' Businesses and Operations**

**1.    Overview**

As a result of the commencement of the Chapter 11 Cases and the sale of the Debtors' mortgage loan servicing and origination platform (the "Origination and Servicing Business") to Ocwen and Walter and the Debtors' "whole loan" portfolio (the "Whole Loan Portfolio") to Berkshire Hathaway, Inc. ("Berkshire") for a combined total of approximately $4.1 billion in gross sale proceeds (prior to reduction for payment of assumed liabilities, core costs, and other associated liabilities) (together, the "Asset Sales"). Following the transfer of the majority of the Debtors' business pursuant to the Asset Sales, the Debtors' operations have significantly changed. A general description of the Debtors' organization and business prior to the Petition Date is set forth below.

Prior to the Petition Date, the Debtors were a leading residential real estate finance company indirectly owned by non-Debtor AFI. The Debtors, together with their non-debtor subsidiaries, managed their mortgage-related businesses in two business lines:    (i) the Origination and Servicing Business, and (ii) the Whole Loan Portfolio and other business, which the Debtors started to wind down prior to the Petition Date. As discussed herein, following the Petition Date, the Debtors sold substantially all of the assets associated with the Origination and Servicing Business to Ocwen and Walter and sold the Whole Loan Portfolio to Berkshire.

-38-

## 2.    Origination and Servicing

Prior to the closing of the Asset Sales, the principal activities of the Debtors' Origination and Servicing Business included: (a) brokering, originating, purchasing, selling and securitizing residential mortgage loans throughout the United States for the Debtors and their non-Debtor affiliate, Ally Bank; and (b) servicing residential mortgage loans throughout the United States for the Debtors, Ally Bank, and other investors in residential mortgage loans and in RMBS.  The Debtors obtained Bankruptcy Court approval to continue these operations in the ordinary course during the pendency of these Chapter 11 Cases.

GMACM, under the GMAC Mortgage brand, brokered and originated mortgage loans through a consumer lending business that consisted of internet and telephone-based call center operations and, to a lesser extent, a retail network of loan officers who had direct contact with consumers.  GMACM brokered its loan production in 47 states to Ally Bank.  Ally Bank underwrote and originated loans based on loan application packages submitted by GMACM in accordance with applicable regulatory and industry standards.  In recent years, substantially all of the Debtors' loan production consisted of conforming loans (that is, loans that met the required guidelines of Fannie Mae,[32] Freddie Mac,[33] or Ginnie Mae,[34] as applicable) and a limited number of prime nonconforming jumbo mortgage loans.

A fundamental part of the Debtors' business strategy consisted of securitizing or selling substantially all of the mortgage loans they purchased or originated.  The Debtors participated in the securitization programs of Fannie Mae, Freddie Mac, and Ginnie Mae.  Securitization Trusts are the issuing entities associated with the RMBS held by a broad range of investors, including pension funds, money market funds, mutual funds, banks, insurance companies, governmental bodies, and other public and private entities.[35]

Since 2008, mortgage loan servicing had been the Debtors' primary source of ongoing revenue.  The Debtors held "mortgage servicing rights" (referred to as "MSRs") that consisted of primary or master servicing rights.  In addition, the Debtors sub-serviced loans for a fee.  As a primary servicer, the Debtors, among other things, collected and remitted mortgage loan payments, responded to Borrower inquiries, accounted for and applied principal and interest, held custodial and escrow funds for payment of property taxes and insurance premiums, provided ancillary products, counseled or otherwise worked with delinquent Borrowers, supervised foreclosures and property dispositions, made Advances of required principal, interest,

---

[32]    Fannie Mae was formerly known as the Federal National Mortgage Association.

[33]    Freddie Mac was formerly known as the Federal Home Loan Mortgage Company.

[34]    Ginnie Mae is the Government National Mortgage Association.

[35]    Since the collapse of the mortgage loan industry in 2007, the Debtors have not been active sponsors of private label securitizations ("PLS").  In a PLS, the Debtors pooled together nonconforming mortgage loans in their own names ("private label") and conveyed the pool of loans to a newly formed securitization Trust (a "PLS Trust").  The PLS Trust raised cash to purchase the mortgage loans from the Debtors by issuing RMBS to investors. The RMBS entitle their holders to receive the principal (including prepayments) and interest collected on the mortgage loans in the PLS Trust.

and certain "property protection" costs with respect to delinquent and defaulted mortgage loans and the real estate that the Trust or owner acquired as the result of a foreclosure of the loan (the "Advances"), and generally administered the loans consistent with their contractual undertakings and business practices. When the Debtors acted as master servicer, they collected mortgage loan payments from primary servicers or sub-servicers and distributed those funds to investors and to other transaction parties in RMBS and whole-loan packages. Finally, as a sub-servicer (where another party owns the MSR), the Debtors performed functions similar to the primary servicing functions described above pursuant to contractual arrangements, and the Debtors received a fee based on the unpaid principal balance ("UPB") of the mortgage pool, or in some cases, for each loan serviced. In addition, the Debtors received other remuneration for loan servicing, including interest earned on custodial accounts where mortgage payments are held pending remittance to investors, as well as Borrower-contracted fees, such as late charge fees, assignment transfer fees, and other incidental fees and charges. On January 31, 2013 and February 15, 2013, respectively, the Debtors sold their servicing and origination platforms to Walter and Ocwen.

During the course of these Chapter 11 Cases, the Debtors, with Ally's operational and financial support, have been able to achieve what no other mortgage originator and servicer had ever been able to achieve: the Debtors remained a going concern after filing their Chapter 11 petitions and operated their mortgage servicing and origination businesses in bankruptcy. The Debtors have maintained their qualified servicer status, which enabled them to continue to issue loans and offer loan modifications to thousands of Borrowers, originate new mortgage loans to allow individuals to purchase homes or refinance their existing mortgage loans, and service millions of mortgage loans during the pendency of the Chapter 11 Cases. In addition, the Debtors were able to continue employing thousands of employees, most of whom were transferred to Ocwen and Walter following the Asset Sales. Since the Petition Date, the Debtors originated or brokered billions of dollars in UPB of mortgage loans and continued certain Borrower programs. Because the Debtors (together with their non-Debtor affiliates) were a significant originator and servicer of residential mortgage loans nationally, their continued operation of mortgage servicing activities during the Chapter 11 Cases has minimized any adverse effects on homeowners, the housing market, and existing securitizations for which the Debtors function as servicers.

### 3.    Whole Loan Portfolio and Other Operations

The Debtors' Whole Loan Portfolio principally consisted of the mortgage loan assets from their historical nonconforming domestic residential mortgage loan origination and securitization activities, and its other operations principally consisting of the Debtors' remaining international operations and the Debtors' captive mortgage reinsurance operation. Following the Petition Date, the Debtors sold a significant portion of their Whole Loan Portfolio to Berkshire. The remaining assets in the Whole Loan Portfolio and the Debtors' other operations will be wound down by the Liquidating Trust through opportunistic asset sales, workouts, or other strategic disposition transactions.

-40-

**B.      The Debtors' Organizational Structure**

The Debtors are wholly owned, indirect domestic subsidiaries of AFI.  As of the Petition Date, the Debtors consist of 51 separate entities organized and located in the United States. ResCap also has 13 wholly owned indirect subsidiaries organized under the laws of various international jurisdictions.  All of the direct and indirect domestic subsidiaries of ResCap except for Cap Re of Vermont LLC ("Cap Re")[36] and Phoenix Residential Securities, LLC ("Phoenix RS") are Debtors in this case.  Exhibit 2 annexed hereto is a list of the Debtors that filed for Chapter 11 relief on the Petition Date, and Exhibit 3 annexed hereto is a summary organizational chart.  In all cases, this information excludes the securitization trusts, which are not Debtors.

**C.      The Debtors' Assets and Capital Structure**

**1.       The Debtors' Assets**

Prior to the Asset Sales, the principal property owned by the Debtors were its Servicing Advance Receivables, held-for-sale ("HFS") mortgage loans, held-for-investment ("HFI") mortgage loans, MSRs, claims with respect to government-insured loans (included within Debtors' accounts receivable), and derivative assets.

As of April 30, 2013, the Debtors continue to hold approximately $1.4 billion of non-cash assets, after certain proforma adjustments.  At that time, the Debtors retained 257 employees to assist in both their short-term and long-term management and wind down activities.  With respect to certain of these assets (for example, FHA/VA Loans), the Debtors have entered into servicing agreements with Ocwen, pursuant to which Ocwen subservices the assets for a fee pending liquidation or other disposition.  The Debtors' remaining employees also manage and conduct activities related to the monetization of the remaining assets, the claims reconciliation and distribution process, resolution of outstanding cure objections, the pursuit of recoveries on the Debtors' claims against correspondent lenders, the effective communication and reporting to constituents, and the administration of the Estates in a cost-effective manner, among other wind down activities, in some cases with support from the Debtors' professionals.

**(a)      Platforms**

Prior to the Petition Date, the Debtors maintained the following business platforms:

- Origination Platform: consisted of a direct call center, a retail network, and an operations fulfillment center.

- Capital Markets Platform: used to price, hedge, and distribute mortgage loans as well as to transact interest rate and foreign currency swaps, futures, forwards, options, swaptions, and agency to-be-announced securities in connection with the Debtors' risk management activities.

---

[36]    While not a debtor in the Chapter 11 Cases, each of Cap Re and Phoenix RS are an "Ally Released Party" under the Plan.

- <u>Servicing Platform</u>: addressed the servicing, foreclosure trustee, recovery, and special servicing needs of the Debtors' customers.

- <u>Master Servicing Operations</u>: included oversight of approximately 38 servicers and the provision of bond administration services.

- <u>Special Servicing Operations</u>: addressed those loans that required additional "high touch" capability for managing loss mitigation, collections, and real estate owned ("<u>REO</u>") liquidation.

- <u>Recovery Operations</u>: certain of the Debtors served as foreclosure trustees in five states and managed recoveries on charged-off assets.

### (b)    Servicing Advance Receivables

The Debtors, much like other mortgage loan servicers, were required to make Advances on behalf of Borrowers that were delinquent or in default on their loan obligations. The Debtors made the Advances monthly, and such Advances constituted the single largest use of the Debtors' Cash. These Advances were repaid from the Debtors' collections on principal, interest, tax, and insurance payments made by the mortgage Borrowers (assuming the Borrowers cured their defaults). Alternatively, the Debtors recovered such Advances following the foreclosure sales of the properties securing the defaulted mortgage loans. The right to collect repayment of Advances (the "<u>Servicing Advance Receivables</u>") was a significant asset of the Debtors.

### (c)    Mortgage Loans

The Debtors held domestic HFS mortgage loans (i.e. those not sold or securitized), consisting of first and second lien mortgage loans (including mortgage loans that were subject to the Debtors' conditional repurchase options).

The Debtors also held the held for investment consumer finance receivables and loan portfolio (the "<u>HFI Portfolio</u>"), which primarily consisted of non-economic PLS assets required to be recognized by the Debtors under generally accepted accounting principles in the United States of America ("<u>GAAP</u>"). The corresponding liabilities were recognized on the Debtors' financial statements as collateralized borrowings in securitization Trusts as a component of total borrowings. The Debtors' economic exposure to the net assets of these PLS Trusts was limited to their retained interests in such PLS Trusts and the related MSRs. The balance of the Debtors' HFI Portfolio represented home equity mortgage loans financed through the use of a special purpose entity. These PLS assets were transferred to special purpose entities as part of the Debtors' Whole Loan Portfolio's nonconforming securitization activities.

### (d)    Mortgage Servicing Rights

The Debtors' MSRs are rights the Debtors either retained upon a sale of loans or purchased from other industry participants.

### (e)    Other Assets

-42-

As of the Petition Date, the Debtors held $475.5 million of unrestricted Cash and $136.0 million of restricted Cash. The Debtors also owned other assets, consisting of: (i) accounts receivable, including a net loan insurance guarantee receivable that represented mortgage loans in foreclosure, which loans were guaranteed by the Federal Housing Administration or the U.S. Department of Veterans Affairs, and other various accounts receivable; (ii) net property and equipment and foreclosed assets, including REO assets; (iii) trading securities, consisting of RMBS or mortgage-related asset-backed securities (including senior and subordinated interests), and interest-only, principal-only or residual interests, which may be investment grade, non-investment grade, or unrated securities.

### 2.    The Debtors' Liabilities

Prior to the Petition Date, certain of the Debtors were borrowers, guarantors, and/or obligors under credit facilities and also maintained collateralized nonrecourse borrowing facilities for securitization Trusts. ResCap also issued $2.1 billion of secured and $972.2 million of unsecured publicly traded U.S. dollar, Euro and U.K. Sterling-denominated notes.

### (f)    AFI Senior Secured Credit Facility

On December 30, 2009, Debtors Residential Funding Company, LLC and GMACM, as borrowers, and Debtors ResCap, Passive Asset Transactions, LLC ("PATI"), and RFC Asset Holdings II, LLC ("RAHI"), as guarantors, entered into a loan agreement with AFI, as agent and lender (as amended from time to time, the "AFI Senior Secured Credit Facility"), which amended and restated the original loan agreement entered into on June 4, 2008. While no longer a revolving facility as of the Petition Date, the borrowers were permitted to use certain accounts as revolving accounts to make Advances under certain securitizations that were not funded under the GSAP Facility (described below). The outstanding principal amount under the AFI Senior Secured Credit Facility as of the Petition Date was approximately $747 million. The AFI Senior Secured Credit Facility is secured by a first priority lien for the benefit of AFI on certain assets of the Debtors with certain exclusions, such as the Ginnie Mae MSRs and related assets, as well as certain of the assets that secure the other secured debt facilities. The assets that secure the AFI Senior Secured Credit Facility also secure the Junior Secured Notes (as discussed below).

On June 13, 2013, the Debtors repaid the AFI Senior Secured Credit Facility in full, plus all accrued and unpaid interest, pursuant to the Paydown Order. [Docket No. 3967] (the "Paydown Order"). As a result, subject to the conditions of the Paydown Order, the AFI Senior Secured Credit Facility is no longer outstanding.

### (g)    AFI LOC

On December 30, 2009, Debtors RFC and GMACM, as borrowers, Debtors ResCap, PATI and RAHI, and certain other Debtors, as guarantors, and AFI, as agent and lender, entered into a $1.1 billion amended and restated secured loan agreement (as amended from time to time, the "AFI LOC"). The outstanding principal amount under the AFI LOC as of Petition Date was

-43-

approximately $380 million.[37]  The AFI LOC provided funds to the Debtors, generally limited to unused capacity, when the Debtors' unrestricted liquidity was less than $300 million.  The AFI LOC is secured by assets of the Debtors, including, without limitation: certain mortgage loans secured by properties located in the United States; certain notes and related agreements issued by third parties that are held by PATI and RFC; certain equity interests of special purpose vehicles (including a pledge by RFC of 100% of the equity of Equity Investment I, LLC, a pledge by PATI of 100% of the equity of PATI Real Estate Holdings, LLC, and a pledge by RAHI of 100% of the equity of RAHI Real Estate Holdings, LLC); certain MSRs; certain Freddie Mac servicing Advances; and, from time to time, certain domestic loans and Advances.  The obligations under the AFI LOC and certain derivative agreements with AFI (or its subsidiaries) are cross-collateralized for the benefit of AFI.

On June 13, 2013, the Debtors repaid the AFI LOC in full, plus all accrued and unpaid interest, pursuant to the Paydown Order [Docket No. 3967].  As a result, subject to the conditions of the Paydown Order, the AFI LOC is no longer outstanding.

### (h)    Secured Notes

In June 2008, ResCap issued approximately $5.7 billion of new senior and Junior Secured Notes consisting of 8.5% Senior Secured Notes due 2010 (the "Senior Secured Notes") and 9.625% Junior Secured Notes due 2015 (the "Junior Secured Notes," and together with the Senior Secured Notes, the "Secured Notes"), in exchange for approximately $8.6 billion of its then outstanding unsecured notes.  The Senior Secured Notes and the Junior Secured Notes held second and third priority liens, respectively, on the same assets that secure the AFI Senior Secured Credit Facility (the first lienholder).  On May 15, 2010, the then outstanding Senior Secured Notes were repaid at maturity, and the Junior Secured Notes effectively stepped into the second lien position.

As of the Petition Date, the outstanding principal amount of Junior Secured Notes was approximately $2.1 billion.  The Junior Secured Notes are guaranteed by GMACM, RFC, Homecomings, GMAC-RFC Holding Company, LLC, and GMAC Residential Holding Company, LLC.  The Junior Secured Notes accrued interest at a non-default rate of 9.625% per annum, payable semi-annually in arrears and were repayable in three equal tranches of $707 million in May of 2013, 2014 and 2015.

On June 13, 2013, the Bankruptcy Court entered an order authorizing the Debtors to partially satisfy the principal balance of the Junior Secured Notes in the amount of $800 million. [Docket No. 3967].

### (i)    Loans Against Mortgage Servicing Rights

GMACM was a borrower, and ResCap was a guarantor, under a revolving facility with Citibank N.A. ("Citibank," and such facility, the "Citibank MSR Facility") consisting, until

---

[37]    Following the Petition Date, the Debtors were granted authority to make post-petition draws under the AFI LOC in an amount not to exceed $220 million.

-44-

March 30, 2012, of a $300 million committed line of credit with an additional $250 million of uncommitted capacity, secured by MSRs for mortgage loans in Freddie Mac and Fannie Mae securitization pools.   Prior to the Petition Date, the Debtors repaid $124 million of the outstanding principal in connection with an extension of the termination date.  The outstanding amount under the Citibank MSR Facility as of the Petition Date was approximately $152 million.

Pursuant to the Sale Orders entered on November 21, 2012, the Bankruptcy Court allowed the Debtors to use the proceeds of the Asset Sales to pay off the Citibank MSR Facility, and as a result, such facility is no longer outstanding.

### (j)    Funding of Non-Agency Servicing Advances

As noted above, Advances constituted the single largest use of the Debtors' cash.   In order to meet their liquidity needs to fund Advances, in addition to the Debtors' credit facilities, the Debtors maintained a nonrecourse servicing advance facility to fund Advances for specified PLS Trusts secured by the receivables relating to those Advances.  Under the servicing advance facility (the "GSAP Facility"), the Debtors sold the Servicing Advance Receivables through a two-step transaction to a Cayman Islands special purpose entity, GMAC Mortgage Servicer Advance Funding Company Ltd. (the "GSAP Issuer"), which is not a Debtor in these Chapter 11 Cases.  The GSAP Issuer, in turn, issued to investors term notes and/or variable funding notes secured by the Servicing Advance Receivables.  The amount of Servicing Advance Receivables that Secured Notes issued under the GSAP Facility fluctuated depending on the volume of Advances required to be made by the Debtors under the servicing agreements and the sale of the related Servicing Advance Receivables to the GSAP Issuer.

Pursuant to an order entered on May 15, 2012, the Bankruptcy Court allowed the Debtors to use the proceeds of the Barclays DIP Facility (as defined below) to refinance the GSAP Facility.  As a result, the GSAP Facility is no longer outstanding.

### (k)    BMMZ Repurchase Facility

From time to time, the Debtors have entered into secured financing facilities pursuant to which they sell assets under repurchase agreements and agree to repurchase the assets at a later date.  The Debtors entered into a repurchase agreement, dated December 21, 2011, with BMMZ Holdings LLC, an indirect, wholly owned subsidiary of AFI ("BMMZ"), with a facility amount of $250 million (the "BMMZ Repo Facility").  The BMMZ Repo Facility was secured by the assets being sold pursuant to the repurchase agreements.  The total amount outstanding under the BMMZ Repo Facility as of the Petition Date was approximately $250 million.

Pursuant to an order entered on May 15, 2012, the Bankruptcy Court also allowed the Debtors to use the proceeds of the Barclays DIP Facility to refinance the BMMZ Repo Facility.  As a result, such facility is no longer outstanding.

### (l)    Funding of Certain Fannie Mae Servicing Advances

Pursuant to a Term Sheet, dated August 1, 2010, as amended and restated, Fannie Mae provided GMACM with early partial reimbursement of certain required Fannie Mae servicing

Advances (the "FNMA EAF Facility"), which amounts were secured by certain collection accounts. In turn, Fannie Mae recouped such early reimbursement amounts from future final servicing advance reimbursements to, and other recoveries by, GMACM. The total commitment under this facility was $125 million, of which $40.3 million was outstanding as of the Petition Date.

Pursuant to the Sale Orders entered on November 21, 2012, the Bankruptcy Court allowed the Debtors to use the proceeds of the Asset Sales to pay off the FNMA EAF Facility, and as a result, such facility is no longer outstanding.

### (m)    HELOC Facility

The Debtors established a nonrecourse funding facility to assist in the financing of certain home equity mortgage loans. The Debtors formed a special purpose entity, GMACM Home Equity Notes 2004 Variable Funding Trust (the "GMEN Issuer"), which is not a Debtor in these Chapter 11 Cases. The GMEN Issuer issued variable funding notes (the "GMEN Notes") collateralized by home equity loans and revolving lines of credit. Under this facility, the Debtors sold certain home equity mortgage loans in a two-step transaction to the GMEN Issuer, which, in turn, issued the GMEN Notes. Under the mortgage sale agreement, the GMEN Issuer purchased the initial loan balances on the home equity mortgage loans and any additional balances up to the commencement of the amortization period for such loans. The maturity date of the GMEN Notes is February 25, 2031. As of March 31, 2012, the principal amount due to holders of the GMEN Notes was $127.3 million. No further draws on this facility are permitted.

### (n)    Unsecured Notes

As of May 14, 2012, ResCap had outstanding Senior Unsecured Notes consisting of $665.5 million of U.S. dollar denominated notes maturing between June 2012 and June 2015, $127.4 million in euro denominated notes maturing in May 2012 and $162.4 million in U.K. sterling denominated notes maturing between May 2013 and July 2014, based on exchange rates as of May 11, 2012. The figures do not account for accrued interest.

## D.    Events Leading to the Filing of the Chapter 11 Cases

### 1.    Restructuring Initiatives

Starting in 2007, the mortgage and capital markets experienced severe stress due to credit concerns and housing market contractions, which led to record declines in home values and continuing gluts of homes available for sale and in foreclosure. Homeowners have had difficulty paying their mortgages, refinancing their mortgages (despite record low interest rates), selling their homes or buying new homes. As both loan delinquencies and regulation increased, the costs of servicing mortgage loans also increased. Since 2007, the Debtors' management explored various strategic alternatives and took aggressive actions in an attempt to reduce risk, reduce leverage, streamline the Debtors' cost structure and maximize the value of the Debtors' assets.

-46-

As part of a global out-of-court restructuring effort, a series of inter-related transactions were consummated by the Debtors in June 2008, including, among other things: (i) exchange offers for the Debtors' publicly traded unsecured notes; (ii) modifications of certain debt facilities, including modified consolidated tangible net worth covenants; and (iii) sales of certain non-core assets to AFI and affiliates of Cerberus Capital Management (the largest equity owner of Ally at that time) on terms favorable to the Debtors to increase the Debtors' liquidity position. Notwithstanding these efforts, the Debtors continued to struggle through the economic downturn.

In total, from January 1, 2008 through March 31, 2012, the Debtors sold approximately $790.5 million of domestic non-core mortgage loan assets to affiliates and third parties, including $3.9 billion of UPB of mortgage loans, and substantially eliminated their international operations. Over the same period, the Debtors' workforce decreased by 63% from approximately 10,900 to 4,031 employees, and the use of independent contractors substantially declined. In addition, since January 1, 2007, Ally has made capital contributions of over $8 billion to ResCap in the form of debt forgiveness and infusions of cash and securities.

## 2. Representation and Warranty Claims

Since 2007, the Debtors have faced substantial and continuing increases in repurchase requests due to their alleged breaches of representations and warranties as to loans sold into securitization or whole loan pools or early payment defaults of such loans. From January 1, 2008 through March 31, 2012, the Debtors repurchased mortgage loans or otherwise made payments with respect to representation and warranty claims of approximately $2.8 billion. On March 31, 2012, the Debtors' aggregate reserve in respect of representation and warranty liabilities was $810.8 million.[38]

Certain Debtors are (or were) party to a number of lawsuits commenced prior to the Petition Date. These lawsuits are summarized in Article [●] and are stayed against the Debtors as a result of the Chapter 11 Cases.[39]

## 3. Consent Order and DOJ/AG Settlement

Commencing in the third quarter of 2010, various federal and state governmental entities and regulatory authorities began investigations into the Debtors' mortgage loan servicing and origination operations, including the Debtors' servicing practices for mortgage loans of Borrowers in foreclosure and bankruptcy. Throughout the third and fourth quarters of 2010 and into 2011, the Debtors were served with many formal document requests and subpoenas in connection with these investigations. The Debtors promptly cooperated with the investigating authorities and commenced discussions with them about their concerns.

---

[38]  This estimated loss reserve is primarily based on an internal model that considers current and historic repurchase request volume, rescission rates on claims and severity of loss on repurchase or indemnification, among other factors. Adjustments to the reserve were also made based on consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

[39]  Other pre-petition lawsuits not discussed herein have been withdrawn.

(a)    **The Federal Reserve Board Consent Order**

As a result of an examination conducted by the FRB and the FDIC, on April 13, 2011, Debtors ResCap and GMACM, and non-debtor affiliates AFI and Ally Bank, entered into a Consent Order with the FRB and the FDIC (the "Consent Order"). Pursuant to the Consent Order, certain of the Debtors were responsible for making improvements to various aspects of their Origination and Servicing Business, including, among other things, compliance programs, internal audit, communications with Borrowers, vendor management, employee training, and oversight by the board of directors of ResCap. Additionally, the Consent Order required GMACM to retain and compensate an independent consultant to conduct an extensive review of past foreclosure proceedings and sales pending or completed during 2009 and 2010 with respect to loans serviced by GMACM and its subsidiaries, and to prepare and submit a report regarding the results of that review. As of the Petition Date, the Debtors estimated that the performance of this review could cost as much as $180 million. By September 2012, the estimated cost of the foreclosure review had increased to approximately $250 million and by February of 2013, the estimated cost had skyrocketed to approximately $450 million—in large part due to changing regulatory guidance from the FRB.

As described further in Section [●], *infra*, the Debtors continued to comply with the requirements of the Consent Order through the closing of the Platform Sale. On February 27, 2013, the Debtors filed a motion seeking a determination that GMACM's obligation to conduct the foreclosure review required by the Consent Order is a general unsecured claim, and that the automatic stay prevents enforcement of the foreclosure review obligation. [Docket No. 3055]. The Debtors have continued to comply with their foreclosure review obligations pending resolution of this motion. To date, the Bankruptcy Court has not ruled on the Debtors' motion. As a result of the Plan Support Agreement, however, pleadings seeking to classify the claims arising from the foreclosure review obligations under the Consent Order as unsecured claims, in addition to objections to the compensation of PricewaterhouseCoopers LLP, or other professionals, for services performed in connection with the foreclosure review under the Consent Order, are stayed during the term of the Plan Support Agreement. The Debtors expect to consensually resolve their foreclosure review obligations with the FRB, as described below. In addition, the Plan contemplates that any continuing regulatory obligations will be transferred to the Liquidating Trust on the Effective Date.

ResCap, GMAC Mortgage and the Fed have agreed in principle to the terms of an amendment to the Consent Order (the "FRB Amendment"). Under the FRB Amendment, GMAC Mortgage will pay approximately $230 million (the "FRB Settlement Amount") in satisfaction of certain obligations contained in the Consent Order, including the foreclosure review obligations set forth in paragraphs 3 and 4 of the Consent Order. In order to suspend payments to consultants in connection with the Foreclosure Review while seeking Court approval of the FRB Amendment, ResCap, GMAC Mortgage, and the FRB negotiated a Term Sheet related to the FRB Amendment, which provided for a suspension of the foreclosure review once GMAC Mortgage transferred the Settlement Amount into an escrow account. On June 26, 2013, the Court entered an order authorizing the ResCap and GMAC Mortgage to enter into the Term Sheet and authorizing GMAC Mortgage to transfer the Settlement Amount into an escrow account. As of June 28, 2013, the Foreclosure Review was suspended. The Debtors and the FRB

-48-

are currently preparing the FRB Amendment. The Debtors intend to seek approval from the Court to enter into and perform under the FRB Amendment.

### (b)    The DOJ/AG Settlement

In addition, in March 2011, representatives of the Debtors met in Washington, D.C. with various members of the Department of Treasury, the Department of Housing and Urban Development ("HUD"), the Department of Justice ("DOJ") and the offices of numerous State attorneys general to discuss the investigations and the potential resolution of various claims being made against the Debtors by such entities.  Extensive arms' length negotiations among the parties—including four other large servicers—continued throughout 2011 and into 2012.

On February 9, 2012, the DOJ, HUD, and several State attorneys' general announced that the federal government, 49 State attorneys' general, and 48 state banking departments had successfully negotiated a settlement with the five largest servicers, including ResCap and GMACM, and other parties, including Ally, regarding their mortgage loan servicing and origination operations (the "DOJ/AG Settlement").  On March 12, 2012, definitive DOJ/AG Settlement documents were filed by the parties with the United States District Court for the District of Columbia in the case styled *U.S., et al., v. Bank of America Corp., et al.,* Case No. 1:12-cv-00361-RMC.  On April 4, 2012, after a duly noticed hearing, the District Court for the District of Columbia approved the settlement and signed the Consent Judgment negotiated among the parties approving the DOJ/AG Settlement.

The material terms of the DOJ/AG Settlement included the following:

- The implementation of comprehensive new standards regarding the servicing of residential mortgage loans, the handling of foreclosures and the verification of information provided about mortgage loans in federal bankruptcy court proceedings.

- The payment by the Debtors of $109,628,425 into escrow in settlement of civil claims of various federal and state governmental entities against the Debtors with respect to their mortgage origination and servicing operations, the proceeds of which were to be used, in part, for disbursement to eligible Borrowers who allege harm from the Debtors' alleged deficiencies in its mortgage servicing operations. The funds required by this portion of the settlement were deposited into an escrow account prior to the Petition Date.

- The commitment by the Debtors to provide a minimum of $185 million of financial relief within three years—including, among other things, loan modifications, such as principal reductions, rate modifications and refinancing for Borrowers that meet certain requirements—to eligible Borrowers who were either delinquent or at imminent risk of default and owed more on their mortgages than their homes were worth, or were otherwise qualified to obtain relief under the terms of the DOJ/AG Settlement.

-49-

- The Debtors' commitment to provide an additional minimum of $15 million of additional refinancing relief within three years to eligible Borrowers who were current on their mortgages but who owed more on their mortgage than their homes were worth. Once the Debtors' reach the floor threshold of their $200 million contribution—comprised of the minimum of $185 million of financial relief stated above and the minimum of $15 million of additional relief stated herein—the Debtors were required to fulfill their continued solicitation obligation to consumers and give any responsive, eligible Borrower a loan or rate modification, which may include a principal reduction or other refinancing obligation.

- The commitment by the Debtors to undertake a review of their compliance with the Servicemembers Civil Relief Act ("SCRA"), which provides certain protections for active duty service members with respect to foreclosure actions and modifications to mortgage loan interest rates. This review is currently ongoing and, to the extent it is not completed by the Effective Date, the Liquidating Trust shall be responsible for assuring compliance with any then-existing obligations arising from that review.

- Joseph A. Smith Jr. (the "Monitor"), was designated to oversee compliance with the DOJ/AG Settlement as an independent Monitor, including: (i) the implementation of the servicing standards required by the agreement; (ii) the imposition of penalties of up to $1 million per violation (or up to $5 million for certain repeat violations); (iii) the imposition of penalties of $15 million, and possibly up to $25 million in certain instances, in the event the Debtors do not substantially comply with their Consumer Relief solicitation obligations and fail to cure any failure to comply; and (iv) publication of regular public reports that identify any quarter in which a servicer fell short of the standards imposed in the DOJ/AG Settlement.

- The release of certain Claims against the Debtors held by the settling governmental authorities and regulatory agencies, which released Claims do not include, inter alia, securities claims, certain claims raised in specifically referenced lawsuits, criminal enforcements, and claims by county recorders.

Under the DOJ/AG Settlement, all consumer relief obligations must be met by October 4, 2015 and are enforceable through April 4, 2016. The Monitor will review any required final reports by April 4, 2016, the date on which the Debtors are officially released from their obligations under the Consent Judgment; to the extent there remain outstanding violations of the Consent Judgment on this date (or any such violations are discovered during the Monitor's review of the final reports), the District Court for the District of Columbia retains jurisdiction to remedy those outstanding violations.

On February 14, 2013, the Monitor filed an Interim Consumer Relief Report and Certification with the U.S. District Court for the District of Columbia in respect of the DOJ/AG Settlement, certifying that ResCap has provided more than $350 million in consumer relief.

-50-

Based on that certification, the Debtors have exceeded the minimum amount of consumer relief required by the DOJ/AG Settlement and are not required to provide more consumer relief except in respect of any relief that may be provided in any remaining outstanding Borrower solicitations. ResCap believes it has completed the solicitation process during the second quarter of 2013, and expects that the Monitor will be in position to certify that compliance on or around October 31, 2013.

Ocwen and Walter agreed to comply with the DOJ/AG Settlement with respect to the purchased assets and to cooperate with and assist the Debtors with respect to these matters. The Plan contemplates that any continuing regulatory obligations of the Debtors under the DOJ/AG Settlement will be transferred to the Liquidating Trust after confirmation of the Plan. The Liquidating Trust will facilitate the potential resolution of any remaining regulatory obligations owed by the Debtors under the DOJ/AG Settlement—namely, the payment of Monitor-related expenses (estimated by the Debtors at approximately $30 million) and any then-existing SCRA file review and remediation costs (which the Debtors believe will already be satisfied by October 2013).

### (c)    Order of Assessment of Civil Money Penalty

On February 9, 2012, AFI, ResCap, and GMACM also agreed with the FRB to pay a civil money penalty of $207 million related to the same activities that were the subject of the DOJ/AG Settlement, which amount will be reduced dollar-for-dollar in connection with satisfaction of the required monetary payment and Borrower relief obligations included within the DOJ/AG Settlement, as well as through participation in other similar programs approved by the FRB. To date, the Debtors believe there have been sufficient payments made and Borrower relief requirements completed to satisfy the civil money penalty, but a final determination must be made by the Monitor that ResCap has fully complied with its consumer solicitation obligations, as referenced above. The Debtors expect to be in position to complete solicitation compliance testing and receive the Monitor's certification on or around October 31, 2013.

### 4.    Pre-petition Negotiations with Ally

Prior to the Petition Date, on or about September 2011, the Debtors and their advisors began a comprehensive review of the Potential Claims that could be made by the Debtors against Ally in the context of a bankruptcy proceeding, as well as the potential third party claims that could be brought against Ally, including claims that are derivative of the Debtors' conduct (collectively, the "Potential Claims"). As part of this review, the Debtors' legal counsel, Morrison & Foerster LLP ("Morrison & Foerster"), conducted an in-depth review of every material related-party transaction between any of the Debtors on one hand and Ally on the other, as well as an investigation of the financial and operational course of dealing between the Debtors and Ally dating back to 2005. The Morrison & Foerster investigation focused on evaluating the nature of the relationship between ResCap and Ally and any and all claims that could be raised against Ally by ResCap and its creditors/third parties. Morrison & Foerster also retained FTI to conduct an evaluation of the Debtors' capitalization, solvency, enterprise value, and damages scenarios. As part of this process, the Independent Directors directed their counsel, Morrison Cohen LLP ("Morrison Cohen"), to interface on a regular basis with Morrison & Foerster and FTI in order to be in a position to report to the Independent Directors on the progress of the

investigation and to independently review both the process and the results of the investigation. Morrison Cohen was provided with investigatory material and research by both Morrison & Foerster and FTI and actively participated in the analytical process including conducting its own research and analysis. Morrison Cohen provided frequent updates to the Independent Directors. The investigation was not conducted as part of a formal legal process, and as a result, the Debtors did not obtain discovery from Ally.

During this process, Morrison & Foerster focused on issues relating to the following groups of claims, as outlined below:

- Single entity claims, including claims related to whether the Debtors and Ally functioned (or were perceived to function) as a single entity, either through a substantive consolidation analysis or veil-piercing/alter-ego theory;

- Bankruptcy claims, including Potential Claims related to equitable subordination, recharacterization of debt as equity, and actual or constructive fraudulent conveyance; and

- Contribution/indemnity/subrogation claims, including claims arising as a result of the Debtors' alleged liability to third parties.

The Debtors expended significant resources in connection with analyzing the Potential Claims. The Debtors and the Independent Directors retained competent and experienced outside counsel and outside consultants to conduct a thorough examination of the legal and factual bases for these claims. Notwithstanding, the investigation was not conducted as part of a formal legal process, and as a result, the Debtors did not obtain discovery from Ally.[40] The investigation of Potential Claims formed the basis of the Pre-Petition AFI-ResCap Settlement Agreement between the Debtors and Ally (the "Pre-Petition AFI-ResCap Settlement Agreement"), which enabled the successful Asset Sales and the Debtors' soft landing in Chapter 11.

### 5.    Entry into the Original RMBS Settlement Agreements

After engaging in extensive pre-petition negotiations with two sets of Consenting Institutional Investors (as defined below)—one led by Kathy Patrick of Gibbs & Bruns LLP and the other led by Talcott Franklin of Talcott Franklin, P.C. (collectively, the "Institutional Investors")—on May 13, 2012, the Debtors entered into two substantially similar settlement agreements with the Institutional Investors (the terms of which, as amended, collectively comprise the "Original RMBS Settlement Agreements").[41] Generally, the Original RMBS Settlement Agreements sought to resolve potential liability arising from contractual claims relating to 392 Trusts (each a "Trust" and collectively the "Trusts") associated with Debtor-

---

[40]    Ally asserted, and continues to assert, that the Potential Claims are meritless, but Ally sought an expedited resolution of such claims to support Ally refocusing on non-Debtor related businesses.

[41]    Copies of the Original RMBS Settlement Agreements are annexed as Exhibits A and B to *Declaration of LaShann M. DeArcy in Further Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements* (Docket No. 3222).

sponsored mortgage-backed securitization transactions occurring from 2004 to 2007.  Mortgage-backed securities with a total original issue balance ("OIB") of approximately $221 billion were issued in connection with these transactions.

### (a)    The Reasons for the Original RMBS Settlement Agreements

Prior to the Petition Date, amidst significant regulatory and financial pressures, the Debtors were faced with possible liquidation due to, among other things, uncertainty regarding their ability to assume and assign the valuable portions of numerous pooling and servicing agreements, mortgage loan purchase agreements, indentures, servicing agreements and/or Trust agreements (collectively, the "PSAs") governing the securitizations at issue, while rejecting other provisions in their PSAs related to origination and sale of the mortgage loans into the Trusts—*e.g.*, provisions associated with the bulk of the Debtors' legacy liability regarding representations and warranties made in connection with such sales.

In the absence of this bifurcation, it was conceivable that the Debtors would have been required to pay billions of dollars of additional defaults under origination-related provisions in the PSAs prior to assuming and assigning these agreements to a purchaser.  Accordingly, the Debtors intended that the Original RMBS Settlement would facilitate the continued operation of their businesses during the Chapter 11 Cases.

In addition to deferring the issue of the permissibility of bifurcating the PSAs, the Original RMBS Settlement Agreements facilitated the Debtors' ability to limit the amount of cure claims that could be asserted by the RMBS Trustees on behalf of the Trusts.  This limitation included a cap on (i) cure claims on a Trust-by-Trust basis, and (ii) the overall cure claims that could be asserted in connection with the origination-related provisions in the PSAs. Accordingly, the Debtors entered into the Original RMBS Settlement Agreements to avoid potential long-term litigation, which could have resulted in massive expense to the Estates and delay in the filing and confirmation of a Chapter 11 plan.  The Original RMBS Settlement Agreements endeavored to resolve claims and benefit creditors by allowing an ailing enterprise to seamlessly continue operating its massive Origination and Servicing Business in Chapter 11, thus permitting the sale of a going concern not encumbered by billions of dollars of claims.  Moreover, these agreements indirectly helped save approximately 3,000 jobs by avoiding a sale of financial assets alone — the fate suffered by virtually every prior mortgage servicer debtor in the U.S.

### (b)    The Terms of the Original RMBS Settlement Agreements

In exchange for an allowed general unsecured claim, as described below, the Original RMBS Settlement Agreements were intended to resolve Potential Claims against RFC and GMACM for breaches of representations and warranties (the "R&W Claims").  The Original RMBS Settlement Agreements included a release by the Trusts, the Institutional Investors, and persons claiming derivatively through the Trusts of all other non-securities claims, including claims arising under the PSAs, as described therein, in exchange for an allowed general unsecured claim.

As proposed, the RMBS Trustees, on behalf of the respective Trusts would have had 30 days after entry of an order approving the Original RMBS Settlement Agreements by the

-53-

Bankruptcy Court in which to elect to participate in the settlement. Those Trusts that opted into the settlement would have received an allocable share of an allowed general unsecured claim in the maximum amount of $8.7 billion against debtors RFC and GMACM (the "Original RMBS Allowed Claim"), subject to adjustment based on the number of Trusts that opted in to the Original RMBS Settlement Agreements. In exchange for their allocable portion of the Original RMBS Allowed Claim, the participating Trusts would have released all R&W Claims against RFC and GMACM. The Institutional Investors also agreed to direct the respective RMBS Trustees for the Trusts in which they hold sufficient securities to accept the terms set forth in the Original RMBS Settlement Agreements. The final amount of the Original RMBS Allowed Claim as against the Debtors (excluding ResCap) was to be reduced from $8.7 billion proportionally by the percentage, based on OIB, of the non-accepting Trusts.

Under the Original RMBS Settlement Agreements, the Institutional Investors also agreed to provide various types of support to the Debtors. In particular, the Institutional Investors agreed to support the Debtors' first and second day relief, use commercially reasonable efforts to persuade other investors to join in the Original RMBS Settlement Agreements, and support the Debtors' efforts to propose and confirm a Chapter 11 plan consistent with a pre-petition plan term sheet and the terms of the Pre-Petition AFI-ResCap Settlement Agreement. Moreover, each group of Institutional Investors agreed to maintain their 25% holdings in at least one class of securities related to approximately 80% of the Trusts in which the respective group originally held at least 25% of the securities in a class, subject to minor exceptions. This provided assurance that the Institutional Investors would continue to have the authority to influence a large portion of the Trustees and comply with their other support obligations under the Original RMBS Settlement Agreements. Finally, Ally agreed, under the terms of the Original RMBS Settlement Agreements, not to object to Original RMBS Allowed Claim or to the allocation of such proceeds among the Trusts.

The motion to approve the Original RMBS Settlement Agreements was originally scheduled for hearing in November 2012, but was delayed on several occasions, and was most recently scheduled to begin on May 28, 2013. As described in further detail in Article [●], the parties determined that it was in their collective best interests to avoid protracted and costly litigation with respect to the Original RMBS Settlement Agreements, and instead to resolve the RMBS Trusts' claims in the context of the Plan Support Agreement. Following extensive discussion in connection with the overall Global Settlement, the parties determined that the Plan would incorporate a modification of the Original RMBS Settlement Agreements with, among other things, certain important modifications to cover all RMBS Trusts holding RMBS Trust Claims, including the Original Settling RMBS Trusts and any Additional Settling RMBS Trusts.

6.    **Formation of Ad Hoc Group of Junior Secured Noteholders and the Pre-Petition JSN Plan Support Agreement**

In November 2011, approximately 37% of the Junior Secured Noteholders formed a group (the "Ad Hoc Group")[42] and acted collectively by and through their representatives, White

---

[42]    Based on the Ad Hoc Group's recent Rule 2019 Statement, the Ad Hoc Group currently holds approximately 50% of the Junior Secured Notes. *See Supplement to Amended Verified Statement of White & Case LLP and*

-54-

& Case LLP and Milbank, Tweed, Hadley & McCloy LLP as co-counsel and Houlihan Lokey Capital Inc. as financial advisors.  In April 2012, the Debtors and their advisors entered into extensive discussions with the Ad Hoc Group and its advisors regarding the potential Chapter 11 filing, the potential debtor-in-possession financing facilities, and the potential Asset Sales.  The Ad Hoc Group participated in each of these processes, as well as in the negotiations leading up to the development of the Pre-Petition AFI-ResCap Settlement Agreement.  Ultimately, the Debtors obtained the Ad Hoc Group's support pre-petition for a restructuring plan premised upon the Asset Sales, which was reflected in a separate Plan Support Agreement (the "<u>JSN Plan Support Agreement</u>").

Pursuant to the plan contemplated by the JSN Plan Support Agreement, the Junior Secured Noteholders and AFI would share in the proceeds of the collateral securing the AFI Revolver and the Junior Secured Notes as follows:   <u>First</u>, AFI would receive the first $400 million of collateral proceeds, plus any accrued postpetition interest on the $400 million. <u>Second</u>, the Junior Secured Noteholders would receive the next $1 billion of collateral proceeds. <u>Third</u>, with respect to the remaining collateral proceeds, AFI would receive 19% of such proceeds and the Junior Secured Noteholders would receive 81% of such proceeds until the Junior Secured Notes were paid in full.  AFI would receive any excess proceeds in satisfaction of any remaining postpetition interest under the AFI Revolver.  In the event the collateral proceeds were insufficient to repay the AFI Revolver and the Junior Secured Notes in full, until the Junior Secured Notes were paid in full AFI would receive 19% of any distributions on account of the deficiency claims under the AFI Revolver and the Junior Secured Notes, and the Junior Secured Noteholders would receive 81% of such distributions.   Any remaining distributions would go to AFI in satisfaction of any remaining postpetition interest under the AFI Revolver.

Significantly, the Ad Hoc Group agreed to waive any and all rights to any postpetition interest under the Junior Secured Noteholders through December 31, 2012, so long as (i) no unsecured creditor received postpetition interest, (ii) the JSN Plan Support Agreement did not terminate, and (iii) (x) the effective date of the contemplated by the JSN Plan Support Agreement occurred by December 31, 2012 or (y) the closing of the Asset Sales occurred by December 31, 2013 <u>and</u> the effective date of the contemplated plan occurred by March 31, 2013.

Following the Petition Date, the JSN Plan Support Agreement was terminated on September 26, 2012.

## 7.    Other Factors

Other factors leading up to the filing of these Chapter 11 Cases include the magnitude of the Debtors' potential liability for representation and warranty claims in connection with mortgage loans sold by the Debtors (as detailed in Article [●]), and the significant time and defense costs in respect of defending such claims; the Debtors' overwhelming debt burden, including the principal and final maturity payments on the Junior Secured Notes, the near-term principal payments on the Senior Unsecured Notes, and the near-term maturities of the Debtors'

---

*Milbank, Tweed, Hadley & McCloy LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 3770].

credit facilities; and the continuing volatility in the interest rate markets, which affected the Debtors' ability to hedge the value of their MSRs and to comply with financial covenants imposed in their credit facilities and other agreements.

In addition, while the Debtors were heavily dependent on AFI for funding and capital support, AFI indicated that there could be no assurance that AFI or its affiliates would continue any such support or that AFI would choose to execute any further strategic transactions with respect to the Debtors or that any transactions undertaken would be successful. In particular, AFI was not willing to extend the termination dates for the various credit facilities with the Debtors beyond May 14, 2012. For all of the foregoing reasons, the Debtors did not expect to be able to satisfy their obligations as they became due.

## ARTICLE IV.
## THE CHAPTER 11 CASES

On May 14, 2012, the Debtors commenced their Chapter 11 Cases to preserve their assets and maximize value for the benefit of all of their economic stakeholders. Exhibit 2 annexed hereto contains a list of the Debtor entities. The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

### A.    Commencement of the Chapter 11 Cases

### 1.    First and Second Day Motions

On or shortly after the Petition Date, the Debtors filed certain "first day" and "second day" pleadings with the Bankruptcy Court to facilitate the Debtors' seamless transition into Chapter 11, minimize disruption to the Debtors' operations, and aid in the preservation of the Debtors' going-concern value. On the Petition Date, the Bankruptcy Court considered and approved the Debtors' motions to: (i) continue using their cash management system; (ii) gain interim access to senior secured superpriority debtor-in-possession financing (discussed below); and (iii) use certain of their pre-petition lenders' cash collateral (discussed below).

The remaining first day "operational" motions were heard shortly after the Petition Date, and the Bankruptcy Court entered orders that, collectively, authorized the Debtors to: (i)(a) continue their operations with respect to the servicing and origination business in the ordinary course; (b) pay pre-petition amounts due to third party vendors and foreclosure professionals, and (c) grant limited stay relief to enable Borrowers to assert related counterclaims in foreclosure proceedings (discussed in greater detail below, the "Servicing Relief"); (ii) notify Borrowers that the Debtors would no longer fund draws under home equity lines of credit; (iii) honor pre-petition obligations to customers; (iv) continue the Debtors' shared services arrangements with non-debtor affiliates, including AFI and Ally Bank; (v) maintain their cash management practices and use pre-petition bank accounts, checks, and other business forms; (vi) make tax payments to federal, local and state taxing authorities; (vii) prohibit utility companies

-56-

from discontinuing services; and (viii) pay certain pre-petition employee wages and benefits and continue related programs.

In addition to these "operational" orders, the Bankruptcy Court entered several procedural and administrative orders to facilitate the efficient administration of these Chapter 11 Cases. These orders: (i) authorized the joint administration of the Chapter 11 Cases; (ii) extended the time during which the Debtors could file certain Schedules of assets and liabilities and statements of financial affairs; (iii) authorized the Debtors to file a consolidated list of the Debtors' 50 largest creditors; and (iv) established certain notice, case management, and administrative procedures that govern the Chapter 11 Cases.

### 2.    Servicing Relief

The orders granting Servicing Relief enabled the Debtors to continue operating their mortgage loan servicing and origination business in the ordinary course, which was essential to the Debtors' efforts to consummate the Asset Sales and necessary for the Debtors to continue their pre-petition operations unabated.

Ordinary Course Servicing Activities. On June 15, 2012, the Bankruptcy Court entered orders authorizing the Debtors to continue in the ordinary course of business (i) servicing Governmental Association loans (the "GA Loans"), (ii) participating in foreclosure activities involving GA Loans and maintaining property that is "real estate owned" by Fannie Mae, Freddie Mac, and Ginnie Mae (together, the "Governmental Associations"), (iii) servicing non-Governmental Association loans (the "Non-GA Loans"), (iv) participating in foreclosure activities involving Non-GA Loans and maintaining property that is "real estate owned" by the Debtors, and (v) with respect to each of these activities, making certain payments related to pre-petition obligations [Docket Nos. 401, 402]. The GA Loans consist of domestic mortgage loans that are pooled together into securitization Trusts guaranteed or insured by the Governmental Associations. The Non-GA Loans are comprised of domestic mortgage loans originated or acquired by the Debtors and sold to private investors and securitization Trusts for so-called "private label" securitization pools.

Ordinary Course Origination Activities. On July 25, 2012, the Bankruptcy Court entered a final order authorizing the Debtors to continue their mortgage loan retail, brokerage and origination activities, and their purchase and resale of Ginnie Mae loans pursuant to various agreements [Docket No. 898]. Pursuant to this order, the Debtors were authorized to (i) process and where applicable fund pre-petition mortgage loan commitments; (ii) continue origination activities (including direct origination and brokering of completed loan applications) and sale activities related to the ultimate securitization of mortgage loans; (iii) continue to (a) perform under the Purchase and Sale Agreement with Ally Bank and the related Master Forward Agreement with Ally Investment Management LLC ("AIM"), and incur secured indebtedness under those agreements, and (b) perform under the Pledge and Security Agreement with Ally Bank, AFI, GMAC Mortgage Group, LLC and AIM, and grant such parties superpriority administrative claims in relation to the foregoing; (iv) pay certain amounts due to critical vendors providing origination services that accrued prior to the Petition Date; and (v) continue honoring

-57-

certain mortgage loan repurchase and other related obligations arising in connection with the sale and servicing of loans, each in the ordinary course of business.

Supplemental Servicing Relief.    On July 13, 2013 the Bankruptcy Court entered a supplemental order (i) authorizing the Debtors to continue implementing loss mitigation programs, (ii) approving procedures for the compromise and settlement of certain claims, litigations and causes of action in the ordinary course of the Debtors' business, (iii) granting limited stay relief to permit (a) Borrowers or their tenants, as applicable, to prosecute direct claims and counter-claims in foreclosure and eviction proceedings (including in states in which non-judicial foreclosure is followed), (b) Borrowers to prosecute certain actions in Borrower bankruptcy cases, and (c) the Debtors to prosecute foreclosure actions in those circumstances where they service senior mortgage loans and own the junior loans on the underlying property, and (iv) authorizing the Debtors to pay certain securitization Trustee fees and expenses.  [Docket No. 774] (the "Supplemental Servicing Order").

Shared Services.    In light of the integrated nature of the Debtors' and AFI's businesses, on May 15, 2012, the Bankruptcy Court entered a final order authorizing the Debtors to enter into a shared services agreement with AFI to prevent any disruption in the Debtors' day-to-day operations [Docket No. 387].  The agreement permitted the Debtors and AFI to provide and receive from one another during the Debtors' Chapter 11 Cases certain services including, among other things: (i) information technology services; (ii) employee benefits administration and other human resources functions; (iii) accounting, tax and internal audit services; (iv) treasury and collateral management; (v) risk management functions; (vi) supply chain management, including procurement of goods and services from third parties; (vii) government and regulatory relations and compliance services; (viii) facilities management services; (ix) marketing services; and (x) capital markets services relating to managing the value of certain of the Debtors' loan servicing rights.

3.    **Retention of Restructuring and Other Professionals**

(a)    **The Debtors' Professionals**

To assist the Debtors in carrying out their duties as debtors-in-possession and to represent their interests in the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to retain (i) Morrison & Foerster as their lead restructuring attorneys, (ii) FTI, as financial advisors, (iii) Centerview Partners LLC ("Centerview") as investment bankers, (iv) Bradley Arant Boult Cummings LLP as special litigation and compliance counsel, and (v) Kurtzman Carson Consultants, LLC as the Debtors' claims and noticing agent and the Debtors' balloting and solicitation agent.  In addition to these key professionals, the Debtors have retained Curtis, Mallet-Prevost, Colt & Mosle LLP as conflicts counsel, as well as special counsel, communication consultants, auditors, tax service providers, compensation consultants, and other professionals to assist them in managing the Chapter 11 Cases.  The Debtors are required to pay the fees of their own advisors, as well as fees incurred by the respective advisors for certain of the Debtors' other constituencies related to the Chapter 11 Cases.  In addition, the Bankruptcy Court granted the Debtors the authority to utilize the services of various additional attorneys as

-58-

"ordinary course professionals" to assist the Debtors in managing the Debtors' pre-existing litigation filed nation-wide (as described herein at [●]).

### (b)    The Creditors' Committee's Professionals

To assist the Creditors' Committee in carrying out its duties and to represent the interests of unsecured creditors in the Chapter 11 Cases, the Creditors' Committee obtained Bankruptcy Court approval to retain Kramer Levin Naftalis & Frankel LLP as counsel ("Committee Counsel"), Pachulski Stang Ziehl & Jones LLP as conflicts and co-counsel ("Committee Co-Counsel"), SilvermanAcampora LLP as special counsel for Borrower-related matters ("Committee Borrower Counsel"), and Wilmer Cutler Pickering Hale and Dorr LLP as special counsel for regulatory matters ("Committee Regulatory Counsel").  In addition, the Creditors' Committee received Bankruptcy Court approval to retain AlixPartners, LLP as financial advisor and Moelis & Company LLC as investment banker.

### 4.    Post-petition Financing and Use of Cash Collateral

In January 2012, the Debtors, with the assistance of Centerview and FTI Consulting, Inc. ("FTI"), their financial advisors, commenced a marketing process to obtain debtor-in-possession financing for these Chapter 11 Cases.  As part of that process, the Debtors approached several potential lenders, including AFI, Barclays Bank PLC ("Barclays"), other pre-petition providers of debt capital to the Debtors and certain third party lenders with experience in financing mortgage loan servicing and origination businesses and providing debtor-in-possession financings of the magnitude required in these Chapter 11 Cases.

After engaging in extensive discussions and negotiations with the potential lenders, the Debtors ultimately determined to enter into a post-petition debtor-in-possession financing arrangement (the "Barclays DIP Facility") with Barclays, as administrative agent for a syndicate of financial institutions (together with Barclays, the "DIP Lenders").  As the Petition Date approached, the Debtors determined that the Barclays DIP Facility would be insufficient to cover the Debtors' second largest expense—repurchases (the "Ginnie Buybacks") of certain whole loans that were sold into securitization Trusts guaranteed by Ginnie Mae (the "Ginnie Mae Trusts").  These repurchases were funded prior to the Petition Date by draws under the AFI LOC.  Beginning in April 2012, the Debtors engaged in discussions with AFI regarding funding the Ginnie Buybacks prior to and during these Chapter 11 Cases.  Such discussions eventually morphed into negotiations regarding the terms and structure of an additional post-petition financing facility from AFI in the form of post-petition draws under the AFI LOC (the "AFI DIP Facility").  Ultimately, AFI agreed to allow the Debtors to draw on the AFI LOC post-petition in an amount up to $220 million to fund the Ginnie Buybacks.

Accordingly, on the Petition Date, the Debtors filed three motions (the "DIP and Cash Collateral Motions") seeking authority to (i) enter into the Barclays DIP Facility with Barclays as administrative agent for the DIP Lenders, (ii) use the cash collateral of Citibank under the Citibank MSR Facility, and (iii) continue making post-petition draws under the AFI LOC in an amount up to $220 million (the "AFI DIP Loans") and to use the cash collateral under the AFI LOC, the AFI Revolver, and the Junior Secured Notes (the "AFI DIP and Cash Collateral Motion").  The relief sought in the DIP and Cash Collateral Motions advanced the Debtors'

-59-

efforts in obtaining post-petition liquidity, which was essential for the Debtors in order for them to continue operating their business in the ordinary course during the Chapter 11 Cases. The Bankruptcy Court approved the DIP and Cash Collateral Motions on an interim basis on May 15, 2012, and on a final basis on June 25, 2012.

Barclays DIP Facility. The Barclays DIP Facility, approved by the Bankruptcy Court on June 25, 2012 [Docket No. 491], consisted of revolving and term loans with a total commitment of $1.45 billion. Of this amount, the DIP Lenders provided (i) revolving loans in an aggregate principal amount up to $190 million, and (ii) two term loans in (a) an aggregate principal amount up to $1.06 billion, and (b) an aggregate principal amount up to $200 million (collectively, the "Barclays Loans"). The Debtors used the proceeds of the Barclays Loans to (i) refinance the GSAP Facility and the BMMZ Repo Facility through the purchase of certain mortgage loans and Servicing Advance Receivables, which brought substantial assets into the Debtors' Estates that otherwise may not have been available to the Debtors, (ii) fund general corporate and working capital requirements, including the acquisition of additional Servicing Advance Receivables, (iii) pay interest, fees and expenses payable under the Barclays DIP Facility, and (iv) pay certain costs of administration of the Chapter 11 Cases in accordance with the DIP budget. The Debtors granted the DIP Lenders senior security interests on the collateral that previously secured the GSAP Facility and the BMMZ Repo Facility, and junior security interests on the collateral that secured the AFI LOC and the Citibank MSR Facility. The Debtors also granted the DIP Lenders superpriority administrative expense claims, subject to a carveout. The DIP Lenders did not take any liens on the primary unencumbered assets of the Debtors or liens on causes of action under Chapter 5 of the Bankruptcy Code (or the proceeds of such causes of action). The Barclays DIP Facility was paid off in full upon the closing of the Asset Sales.

AFI DIP Facility. Pursuant to the order granting the AFI DIP and Cash Collateral Motion [Docket No. 491] (the "AFI/JSN Cash Collateral Order"), the Debtors were authorized to enter into a post-petition financing facility pursuant to which the Debtors were permitted to make post-petition draws under the AFI LOC in an amount up to $220 million, provided that the aggregate amount of AFI LOC pre-petition and post-petition draws (plus any unpaid interest, expenses, or other costs thereunder) did not exceed $600 million. The post-petition extensions of credit under the AFI LOC were to be used solely to fund repurchases of Ginnie Buybacks to the extent necessary to (i) continue making repurchases of whole loans from Ginnie Mae Trusts in order to prevent the Debtors from being in violation of delinquency triggers applicable under the Ginnie Mae Guide, (ii) effect foreclosures, conveyances, or other normal course loss mitigation activities of the related properties in connection with the submission of HUD claims, and (iii) allow for trial modifications under programs implemented by the Debtors for which the related loans and Borrowers were qualified. In exchange for the post-petition draws under the AFI LOC, the Debtors granted AFI, in its capacity as lender under the AFI DIP Facility, (i) a senior security interest on the repurchased whole loans and HUD claims funded with the AFI DIP Loans, (ii) a priming lien on all other assets securing the AFI LOC, and (iii) superpriority administrative expense claims in an amount equal to the principal and interest on the post-petition draws. The AFI DIP Facility was paid off in full upon the closing of the Asset Sales.

Use of Cash Collateral. Pursuant to orders entered by the Bankruptcy Court [Docket Nos. 471, 491] (as it relates to Citibank, the "Citibank Cash Collateral Order"), the Debtors used

-60-

the cash collateral under the Citibank MSR Facility, the AFI LOC, the AFI Revolver, and the Junior Secured Notes to fund only the cash needs related to the operations (including an allocated portion of the costs to administer the Chapter 11 Cases based on the asset values within each collateral pool) and assets of each of the respective collateral pools based on an agreed-upon budget. Each of AFI, the Junior Secured Noteholders, and Citibank consented to the Debtors' use of Cash Collateral and were provided with adequate protection for the use thereof.

Following the closing of the Asset Sales, the Citibank MSR Facility was paid off in full. However, Citibank contends that the interest rate used by the Debtors to calculate the payoff amount was insufficient because it did not include the default interest rate under the Citibank MSR Facility. The Debtors and Citibank remain in the process of negotiating a resolution of this issue. In the event Citibank is entitled to receive interest under the default rate, it would be entitled to approximately $5 million in addition to the amounts already paid.

Each of the AFI/JSN Cash Collateral Order and the Citibank Cash Collateral Order authorized the Debtors to use Cash Collateral through the effective date of a Chapter 11 plan for any Debtor.[43] Pursuant to the AFI/JSN Cash Collateral Order, the Debtors' ability to use Cash Collateral was limited to the terms of a 20-week forecast for anticipated cash receipts and disbursements that was to be updated on a monthly basis (collectively, the "Forecasts"). The Forecasts also provided for the pro rata allocation of the cash disbursements during the relevant period to the assets securing the Debtors' various secured credit facilities as well as unencumbered assets. Pursuant to the AFI/JSN Cash Collateral Order, the Debtors, AFI, and the Ad Hoc Group agreed that the Forecasts would be approved by AFI.

The Debtors subsequently negotiated several extensions regarding the use of the Cash Collateral of AFI and the Junior Secured Noteholders, including most recently the *Eighth Stipulation and Order Amending the AFI DIP and Cash Collateral Order* [Docket No. 4115]. On April 8, 2013, the Debtors filed a motion to continue using the Cash Collateral of AFI and the Junior Secured Noteholders on a non-consensual basis (the "Cash Collateral Motion"). AFI, the Ad Hoc Group of Junior Secured Noteholders, and UMB Bank filed objections to the Cash Collateral Motion. In addition, the Creditors' Committee filed a limited objection to the Cash Collateral Motion. The parties have engaged in discovery, and subsequently agreed to continue the use of Cash Collateral on a limited, consensual basis until the Cash Collateral Motion is heard by the Bankruptcy Court on July 10, 2013. AFI and the Junior Secured Noteholders consent to the Debtors' use of cash collateral until the expiration on July 11, 2013.

### 5. Sale Process

On the Petition Date, the Debtors filed a motion with the Bankruptcy Court seeking: (i) approval of Nationstar Mortgage LLC ("Nationstar") and Ally as proposed stalking horse purchasers, including related bid protections for Nationstar; (ii) approval of sale procedures; (iii)

---

[43]   The AFI/JSN Cash Collateral Order contained a covenant requiring that the effective date of the Debtors' Chapter 11 plan occur by December 15, 2012. Accordingly, on December 20, 2012, the Bankruptcy Court entered the Stipulation and Order Amending the AFI DIP and Cash Collateral Order [Docket No. 2495] (the "First AFI/JSB Cash Collateral Stipulation"), which removed the covenant and also revised the termination date to be the earlier of, among other things, the effective date of the closing of the Platform Sale or March 31, 2013.

to schedule a bid deadline and Sale Hearing; and (iv) approval of and authorization to enter into the respective Nationstar and AFI asset purchase agreements (the "Sale Motion").

The Debtors' dual sale structure allowed for certain combinations of sale transactions, ensuring that the Debtors received the highest or best value for the assets. The robust marketing process for the Debtors' servicing and mortgage loan origination platforms (effectively comprising the entirety of the Debtors' Origination and Servicing Business) (the "Servicing Platform") and a significant portion of the Debtors' and Whole Loan Portfolio, which began pre-petition and extended post-petition, was designed to maximize the value of these assets for the benefit of the Debtors' Estates and their creditors.

Prior to the Petition Date, the Debtors commenced and pursued a targeted marketing process, launched and managed by Centerview, their investment banker, for their most valuable assets. On May 13, 2012, after several months of extensive negotiations, the Debtors executed two separate stalking-horse asset purchase agreements to effectuate the sales of the Debtors' Servicing Platform and Whole Loan Portfolio, respectively: one with Nationstar, for the Debtors' Servicing Platform; the second with AFI and BMMZ Holdings LLC, for the Debtors' Whole Loan Portfolio. The original Nationstar stalking horse bid was approximately $2.3 billion for the purchase of the Debtors' Servicing Platform. The original AFI stalking horse bid for the Whole Loan Portfolio, contained a "toggle" whereby Ally would agree to purchase the Whole Loan Assets at a higher purchase price of $1.6 billion provided that the chapter 11 plan provide for the Releases contained in the Pre-Petition AFI-ResCap Settlement Agreement, and, if the sale was not consummated through the chapter 11 plan, would pay a lower purchase price of $1.4 billion.

Prior to the June 18, 2012 hearing date on the Sale Motion, the Creditors' Committee filed an objection to the Sale Motion, raising a number of issues with the proposed stalking horse bids, the sale procedures, and the timeline. The Creditors' Committee also objected to the "toggle" feature in the AFI stalking horse agreement. Berkshire also filed a timely objection to the Sale Motion, seeking to replace the stalking-horse offers of Nationstar and AFI, respectively. In connection with its objection, Berkshire submitted two separate executed asset purchase agreements to purchase the Servicing Platform and the Whole Loan Portfolio.

In response to the objections to the Sale Motion, Nationstar agreed to reduce its proposed break-up fee, expense, reimbursement, and initial bid increment, and AFI agreed to remove the "toggle" in its stalking horse price for the Whole Loan Assets. Following a mini-auction to serve as stalking horse bidder among Nationstar and Berkshire for the Servicing Platform, and AFI, Berkshire and Lone Star U.S. Acquisitions, LLC for the Whole Loan Portfolio, the Court approved Nationstar as the stalking-horse bidder for the Servicing Platform with a stalking horse bid of an increase of $125 million over the original stalking horse bid, and Berkshire as the stalking-horse bidder for the Whole Loan Portfolio with a stalking horse bid of an increase of $42 million over the original stalking horse bid (each calculated using of February 29, 2012 asset balances). On June 28, 2012, the Bankruptcy Court entered the Sales Procedures Order approving, among other things, the asset purchase agreement by and among the Debtors and Nationstar for the Platform Sale and the asset purchase agreement by and among the Debtors and Berkshire for the Whole Loan Portfolio.

-62-

Following the entry of the Sales Procedures Order, the Debtors provided notice of the bid procedures and auction details.  The Debtors conducted the Auctions from October 23, 2012 through October 25, 2012.  The auction for the Servicing Platform was held from October 23 through October 24, 2012.  Nationstar and Ocwen were the two bidders that presented offers for the Servicing Platform assets.  Although Ocwen was the bidder of record, the Ocwen APA provided for the assignment of the Debtors' Fannie Mae servicing assets to Walter or one of its affiliates as part of the transaction.

After 28 rounds of bidding, however, Ocwen made the highest and best offer to purchase the Servicing Platform, which included the Debtors' mortgage loan servicing, origination, and capital markets platforms, as well as mortgage loan servicing rights and servicer Advances belonging to Ginnie Mae (the "Ginnie Mae MSRs").  The purchase price for these assets was comprised of a joint bid by Ocwen and Walter for approximately $3 billion, subject to adjustment, of which approximately $160 million related to the Ginnie Mae MSRs.  Walter coordinated with the Debtors and Ocwen to enter into an ancillary agreement whereby Ocwen assigned to Walter the Debtors' origination and capital markets platforms, as well as the Fannie Mae mortgage servicing rights (the "Fannie Mae MSRs") contained in the Debtors' servicing portfolio.  Ocwen's winning bid included approximately $782.4 million of incremental value over Nationstar's stalking horse bid, for the benefit of the Debtors' Estates and stakeholders.

On October 25, 2012, ResCap held an auction for its Whole Loan Portfolio, which consisted of loans with an aggregate unpaid principal balance as of August 31, 2012 of $3.05 billion and book value of $1.37 billion. The two bidders who participated in the Auction were Berkshire and a consortium of bidders referred to as the DLJ Consortium.

The Whole Loan Auction commenced with Berkshire's stalking horse bid of $1.32 billion for the Whole Loan Portfolio, which was comprised of approximately 28,000 whole loans.  After 11 rounds of bidding, Berkshire won the auction with the highest and best offer of $1.5 billion, subject to adjustment.  As compared to Berkshire's stalking horse bid of $1.32 billion, Berkshire's winning bid included approximately $176 million of incremental value over the stalking horse bid for the benefit of the Debtors' Estates and stakeholders, and removed certain meaningful conditions previously in the agreement.

Subsequent to the Auctions but prior to the Sale Hearing (defined below), the Debtors received approximately 60 objections to the Platform Sale; however, not one of them took issue with the sale process, the conduct at the Auctions, the purchase price for the respective assets, and/or whether the sales remained in the best interest of the Debtors and their creditors.  Rather, the objections to the Platform Sale were, for the most part, limited to the assumption by the Debtors and assignment to Ocwen of various agreements, Ocwen's ability to perform under those agreements, and other sale objections, e.g., requests for clarification language in the Sale Motion (collectively, the "Cure/Sale Objections").  There were no objections to the Whole Loan Sale.

The terms of the Asset Sales were reflected in two separate asset purchase agreements, which were the product of significant governmental cooperation and extensive negotiations among the Debtors, AFI, Ocwen, Walter, Berkshire, and numerous stakeholders, including the

-63-

Creditors' Committee: (i) the asset purchase agreement with Ocwen, dated as of November 2, 2012 as amended from time to time (the "Ocwen APA"); and (ii) the asset purchase agreement with Berkshire, dated November 2, 2012 as amended from time to time (the "Berkshire APA"). In connection with these transactions, Ocwen assigned certain of the purchased assets to Walter for approximately $509 million under the "Walter Assignment."[44]   At a hearing held on November 19, 2012, the Bankruptcy Court approved the Debtors' Asset Sales (the "Sale Hearing"), and on November 21, 2012, the Bankruptcy Court entered the Sale Orders approving the Asset Sales (the "Sale Orders"). Following the Sale Hearing and prior to the closings of the Asset Sales, the Debtors resolved a majority of the Cure/Sale Objections. For the remainder of the Cure/Sale Objections and other objections, the Debtors agreed with each of the remaining objectors on a process and schedule by which any alleged cure claims would be resolved post-closing.

The transactions comprising the Debtors' Platform Sale closed in two parts: the sale to Walter closed on January 31, 2013, and the sale to Ocwen closed on February 15, 2013. The Debtors' Whole Loan Sale to Berkshire closed on February 5, 2013. In the aggregate, the Asset Sales yielded approximately $4.1 billion in gross sale proceeds (prior to reduction for payment of assumed liabilities, cure costs and other associated liabilities) to the Debtors' Estates, providing over $1 billion of incremental value for the Debtors' Estates over what the Debtors' Estates would have received through the original stalking horse bids.

The Plan sets forth the mechanism by which the Debtors will distribute the remaining proceeds of the Asset Sales, the Ally Contribution, and any other Estate assets so as to achieve their goals of maximizing value to their various creditor constituencies and bringing a successful conclusion to these Chapter 11 Cases.

### 6.    Key Employee Retention Plan (KERP) and Key Employee Incentive Plan (KEIP)

On July 17, 2012, the Debtors filed a motion seeking entry of an order approving a key employee incentive plan ("Sale KEIP") and a key employee retention plan ("Sale KERP") in connection with the Debtors' efforts to effectuate an unprecedented going-concern sale of substantially all of their assets to the third party providing the highest and best offer. [Docket No. 812]. The Sale KERP was intended to retain certain key personnel, who were identified by the Debtors' senior management as necessary to execute the Debtors' business plan, maintain operational stability throughout the sale processes and transition the Debtors' businesses as a going concern, with a financial incentive to remain with the Debtors during the sale process. The Bankruptcy Court entered an order approving the Sale KERP on August 15, 2012 [Docket No. 1169].   The Sale KEIP was intended to provide certain senior executives with financial incentives to maximize value for the Debtors' creditors through the Asset Sales while also achieving certain financial and operational goals. On October 18, 2012, following the revision of the initial proposal and with the consent of both the U.S. Trustee and the Creditors'

---

[44]    As of the date hereof, this figure is still the subject of a "true-up" accounting of amounts paid for assets transferred to Walter.

Committee, the Debtors obtained the Bankruptcy Court's approval of the Sale KEIP [Docket No. 1854].

Upon the conclusion of the Asset Sales, the Chapter 11 Cases focused on managing the Estates' remaining assets and maximizing value for the creditors. Accordingly, on March 20, 2013, the Debtors filed a motion seeking entry of an order approving both a short-term ("Executive Estate KEIP") and long-term key employee incentive program ("Estate KEIP") as well as a key employee retention program ("Estate KERP," together with the Executive Estate KEIP and the Estate KEIP, the "Estate Plans") [Docket No. 3280]. The Estate Plans were intended to both incentivize the senior executives that remained with the Estate to preserve and maximize the Estate's value in order to enhance the return for creditors, as well as provide non-insider employees with a fixed award to ensure that they work with the Estate through the end of their retention period. The Bankruptcy Court entered an order approving the Estate Plans on April 16, 2013 [Docket No. 3443].

### 7.    Plan Exclusivity

Upon commencement of these Chapter 11 Cases, Section 1121(d) of the Bankruptcy Code provided the Debtors with the exclusive right to file and solicit a Chapter 11 plan through and including September 11, 2012 and November 10, 2012, respectively. The Bankruptcy Court granted several extensions of the Debtors' exclusive periods, and most recently, the Debtors were granted the exclusive right (i) to file a plan through and including August 21, 2013, and (ii) solicit votes through and including October 21, 2013 [Docket No. 3919]. The Debtors requested each of these extensions to give them sufficient time to, among other things, reach accord with AFI and other major parties in interest on a consensual plan.

### 8.    Committee Investigation of Claims against AFI

Prior to the appointment of the Examiner, the Creditors' Committee sought authority under Bankruptcy Rule 2004 to subpoena information from the Debtors, AFI, and AFI's parent Cerberus Capital Management L.P. On June [●], 2012, the Bankruptcy Court granted the Creditors' Committee's request and authorized the issuance of subpoenas [Docket No. 217]. After the Examiner's appointment, the Bankruptcy Court entered an order providing that the scope of the Examiner's investigation would be co-extensive with the scope of the Creditors' Committee investigation. [Docket No. 925].

Over the course of several months, the Creditors' Committee conducted an extensive investigation, beginning with the time period associated with ResCap's formation in 2004, of the pre-petition and post-petition transactions and agreements between the Debtors, AFI, and non-Debtor AFI affiliates. During the course of its investigation, the Creditors' Committee reviewed and analyzed millions of pages of documents from a shared document depository made available by the Examiner. For purposes of furthering its understanding of the Debtors' historical solvency and capitalization, together with the complex historical, business, and legal relationships among the Debtors, AFI, and AFI's affiliates, the Creditors' Committee retained specialists from AlixPartners and Moelis & Company to assist its counsel.

The primary focus of the Creditors' Committee investigation was on the following:

ny-1097924

- Whether the transfer to AFI over several years of one of the Debtors' assets, Ally Bank, was for adequate consideration; and whether the promise at the inception of the transfer that AFI would pursue an industrial bank charter for ResCap and return its assets thereto was false.

- Whether a Master Mortgage Loan Purchase and Sale Agreement and several swap agreements relating to mortgage servicing rights ("MSRs") between GMAC Mortgage Inc. ("GMACM") and Ally Bank contained non-market terms; whether these agreements were intended to insulate Ally Bank from representation and warranty related risk and liability in connection with loans it had originated or acquired, as well as the volatility risks relating to the ownership of MSRs, and shift all of that risk and liability onto GMACM; and whether the Debtors' boards of directors adequately vetted these transactions at the time they were executed.

- Whether profitable and valuable businesses were transferred away from the Debtors at less than fair market value over the course of several years; and whether these transfers occurred in compressed timeframes, without adequate valuations or fairness opinions, without comprehensive (or any) third-party marketing.

- Whether the Debtors assumed AFI's financial liabilities and obligations in connection with the April 13, 2011 Consent Order with the Federal Reserve Board, and the February 9, 2012 settlement agreement with the U.S. Department of Justice and the Attorneys General of several states; and whether the Debtors made fraudulent and preferential transfers to or for the benefit of AFI in the days leading up to the Petition Date.

Based on the foregoing, the Creditors' Committee determined that the Debtors could pursue claims against AFI and its directors sounding in alter ego/veil piercing, substantive consolidation, fraudulent conveyance, preferential transfer, recharacterization, equitable subordination, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.]

On January 9, 2013 and January 17, 2013, respectively, the Creditors' Committee presented its perspective on the evidence and Potential Claims to AFI and the Debtors. The Creditors' Committee also presented its perspective on the evidence and Potential Claims to the Examiner and Ally on January 23, 2013, and in written submissions dated March 7, 2013, May 2, 2013 and May 6, 2013.

Ally has denied and continues to deny any breach, fault, liability, or wrongdoing regarding claims alleged against Ally.

## 9.    Appointment of an Examiner

On June 28, 2012, the Bankruptcy Court entered an order granting Berkshire's motion to appoint an examiner in the Chapter 11 Cases to investigate the pre-petition activities of the parties and the Pre-Petition AFI-ResCap Settlement Agreement. [Docket No. 454]. The scope, timing, and budget for this investigation was set by the Bankruptcy Court after the U.S. Trustee's

appointment of former Judge Arthur J. Gonzalez[45] (the "Examiner"), which the Bankruptcy Court approved on July 3, 2012 [Docket No. 674].

On August 6, 2012, the Examiner filed a Work Plan with the Bankruptcy Court. The Work Plan detailed the scope of the Examiner's investigation, specifically identifying the following areas of investigation: (i) pre-petition transactions between Debtors and one or more of AFI, Cerberus Capital Partners, LLC, and/or Ally Bank; (ii) negotiations and approval of the AFI-ResCap Settlement Agreement or any other pre-petition settlement agreements entered by the Debtors; (iii) activities of Debtors' officers and directors concerning (a) the pre-petition transactions, (b) post-petition transactions, and (c) the investigation of claims against AFI; (iv) the Debtors' corporate relationship with AFI, Cerberus, and Ally Bank; and (v) the nature and value of all third party claims against Ally the Debtors then proposed to release under the Pre-Petition AFI-ResCap Settlement Agreement against AFI. On August 20, 2012, the Bankruptcy Court issued an order granting the Examiner broad powers to subpoena witnesses and documents, and to investigate each item set out above. [Docket No. 1223].

The Examiner and his financial and legal advisors conducted 42 interviews of the Debtors' current and former employees and directors, and more than 55 interviews of non-Debtor witnesses. Additionally, the Debtors produced over six million pages of material in response to the Examiner's requests for information, and the Examiner's advisors collected more than 3 million pages of documents from over 20 other parties. The Examiner also received multiple written submissions from the Debtors, AFI, the Creditors' Committee, and other major creditors regarding each subject of the Examiner's inquiry. Additionally, the Examiner met with interested parties on more than sixty occasions. The Examiner projected that preparation of the Examiner's report (the "Report") would cost the Debtors' Estates more than $80 million.

Upon agreeing to the terms of the Plan Support Agreement, the Debtors applied for an order temporarily sealing the Report. The Bankruptcy Court entered a supplemental sealing order [Docket No. 3739] further sealing the Report through and including the earlier of (x) July 3, 2013 or (y) the date that the Bankruptcy Court determined the Debtors' motion seeking authorization to enter into and perform under the Plan Support Agreement.

On June 26, 2013, the Bankruptcy Court approved the Plan Support Agreement and unsealed the Report [Docket No. 3698], which spans nine volumes and over 2,200 pages.[46] The Report's scope is exceptionally broad and contains a number or findings and conclusions covering the course of conduct and material intercompany dealings involving ResCap, AFI, Ally Bank, and Cerberus within an approximate ten year period. As a general matter, the factual findings in the Report are inadmissible into evidence as unsubstantiated hearsay—but the Examiner's findings and conclusions in the Report support the Plan.

---

[45]    Judge Gonzalez retired as Chief Judge of the Bankruptcy Court for the Southern District of New York in March 2012 and currently is a professor of bankruptcy law at the New York University School of Law.

[46]    The Report is publicly available and can be accessed at:
http://www.KCCllc.net/rescap/document/1212020130513000000000009

The majority of the Examiner's findings and conclusions cover: (i) potential Causes of Action of the Estates; (ii) the negotiation and entry into the now-terminated Pre-Petition AFI-ResCap Settlement Agreement and Original RMBS Settlement Agreements, including the role of the ResCap Board in such negotiations; (iii) the proposed third-party release of AFI and its affiliates from all Causes of Action arising from or related in any way to the Debtors (as articulated in the Pre-Petition AFI-ResCap Settlement Agreement), including asserted (or assertable) third-party claims against AFI, Ally Securities, and Ally Bank; (iv) whether the proposed debtor release and third-party release contemplated by the Pre-Petition AFI-ResCap Settlement Agreement were warranted; and (v) the financial condition of ResCap, RFC, and GMACM at various points in time. The following provides a very high level synopsis of some of these findings and conclusions; the summary below is in no respect intended to supplant or conflict with any portions of the Report.

### (a)    Potential Causes of Action of the Estates

After analyzing in great detail a host of potential claims for alter ego, veil piercing, fraudulent conveyance, preference, fraud, breach of contract, contribution, constructive trust, breach of fiduciary duty, substantive consolidation, equitable subordination, and debt recharacterization, the Report concludes that the Debtors' Estates could assert claims with varying likelihoods of success.

In particular, the Estates could assert claims seeking:

- Up to approximately $1.31 billion in damages with respect to claims the Examiner believes are likely to prevail;

- Up to approximately $1.78 billion in damages with respect to claims the Examiner believes, while a close question, are more likely than not to prevail;

- Up to approximately $2.36 billion in damages with respect to claims the Examiner believes, while a close question, are more likely than not to fail; and

- Equitable subordination of AFI's claims (totaling approximately $1.13 billion), with respect to which the Examiner concludes, while a close question, is more likely than not to fail. (I-29)

The Examiner found that the Debtors' Estates were unlikely to prevail on:

> Claims against AFI or its subsidiaries for veil piercing, alter ego, substantive consolidation, aiding and abetting breaches of fiduciary duty, fraudulent transfer in connection with Ally Bank transactions; fraudulent transfer regarding asset sales between the Debtors and AFI or its subsidiaries, and various other claims. (I-33).

    **(b)**    **Negotiation and Entry into Pre-Petition AFI-ResCap Settlement Agreement and Original RMBS Settlement Agreements**

Regarding the processes leading to the Original RMBS Trust Settlement Agreements and related Plan Support Agreements, the Examiner concluded that, while a "close question," (i) the process underlying negotiation of the settlements was conducted at arm's length and (ii) that the ResCap Board voted on an informed basis when approving the agreements.[47]  The Examiner concluded that the "ResCap Board acted on a sufficiently informed basis, in good faith, and with an honest and reasonable belief that the settlement of major claims -- perceived by the Board as facilitating the efficacy of ResCap's imminent bankruptcy filing through eliminating an obstacle to sale of ResCap's assets -- was in the best interests of ResCap and its creditors." (VII.E-43). The Report also concludes that no viable claims for breach of fiduciary duty exist in connection with the ResCap Board's approval of the Pre-Petition AFI-ResCap Settlement Agreement and Original RMBS Trust Settlement Agreements.  (VII.E-42).[48]

    **(c)**    **Third-Party Claims against AFI Defendants**

Section VIII of the Report (i) summarizes the Debtors' mortgage securitization business; (ii) analyzes the merits of identified Debtor-related third-party claims against AFI, Ally Bank, Ally Securities, and their respective directors and officers (the "AFI Defendants"); and (iii) analyzes the potential damages arising from those claims.

While most of the claims discussed in Section VIII depend on a threshold finding of primary liability against the Debtors, the Report does not analyze the merits of any underlying claims against the Debtors.  Moreover, the Report does not, for the most part, describe or summarize the purported basis for relevant underlying claims against the Debtors.  The Examiner did not present any findings regarding the anticipated range of actual damages of the Third-Party claimants.  Rather, the Examiner accepted at face-value the damages numbers asserted by the Third-Party claimants (which the Debtors have consistently challenged).

The Report identifies and analyzes four categories of Potential Claims against the AFI Defendants: (i) RMBS-related claims against Debtors, AFI, Ally Bank, and Ally Securities; (ii) RMBS-related claims against Debtor, AFI, Ally Bank, and Ally Securities' directors and officers; (iii) claims against the Debtors and the AFI Defendants that are not RMBS-related; and (iv) potential causes of action belonging to unsecured noteholders.  Given the exhaustive analysis included in the Report on these potential claims, parties should refer directly to the Report for additional information on the Examiner's findings.

---

[47]    The Examiner explicitly did *not* opine on whether the $8.7 billion unsecured claim proposed in the Original RMBS Trust Settlement Agreements was within the range of reasonableness.

[48]  VII.E-43

        **(d)**        **Propriety of the Consideration for Releases Contained in Pre-Petition AFI-ResCap Settlement Agreement**

The Pre-Petition AFI-ResCap Settlement Agreement proposed to settle all of the Estate's causes of action against and third-party claims against certain AFI released parties. AFI proposed a cash contribution of $750 million (in addition to other non-cash contributions including the ability to continue to originate in bankruptcy and sell a going concern) in exchange for these releases. The Examiner concluded that in the context of the Pre-Petition AFI-ResCap Settlement Agreement, it is unlikely a court would have approved such a settlement.

Nevertheless, the Examiner urged: "the best course for AFI to seek to achieve a Third-Party Release is to negotiate a Plan that enjoys very broad creditor support," (Report at I-44), which the Consenting Claimants have done through the Global Settlement

        **(e)**        **Conclusions Regarding the Debtors' Financial Condition**

Using the balance sheet test for solvency, the Examiner concluded that ResCap was balance sheet solvent on May 4, 2005, the date that AFI announced the capitalization of ResCap, and was balance sheet insolvent from December 31, 2007 through the Petition Date. (I-45). Using the "inadequate capital" test, the Examiner concluded that ResCap was adequately capitalized on May 4, 2005, and was left with unreasonably small capital from August 15, 2007 through the Petition Date.

<div align="center">*    *    *</div>

The Debtors, Ally, and the Creditors' Committee dispute a number of the findings and conclusions contained in the Report. Nevertheless, the Plan Proponents, Ally, and all Consenting Claimants believe the Report, as a whole, supports the Plan Support Agreement and confirmation of the Plan.

**10.**        **Appointment of a Chief Restructuring Officer**

Following the Asset Sales, in addition to administering and monetizing the remaining assets and winding down the Estates, the Debtors' primary focus shifted to reaching and obtaining confirmation of a consensual plan. In furtherance of this goal, on February 11, 2013, the Debtors sought the appointment of Lewis Kruger to act as the Debtors' chief restructuring officer ("CRO"). After consultation with the Creditors' Committee regarding the appropriate scope of the CRO's appointment, on March 5, 2013, the Bankruptcy Court appointed Mr. Kruger as CRO [Docket No. 3103].

Mr. Kruger, an independent business leader with significant restructuring experience, has been integral in addressing and seeking resolution of key disputes among the Debtors' major stakeholders, in brokering a consensual settlement of the Estates' and others' claims against Ally, and in determining the appropriate allocation of assets of the Estates among the Debtors' creditors throughout the negotiation and mediation process.

<div align="center">-70-</div>

### 11.    Motions Seeking Standing to Pursue Claims Against Ally

*Committee Standing Motion*. Following its investigation (as described above), the Creditors' Committee believed it identified viable and valuable Claims and Causes of Action against Ally, and that it was best suited to prosecute and settle claims against AFI and certain of AFI's non-debtor affiliates (the "AFI Defendants") arising from those transactions.  On April 11, 2013, the Creditors' Committee filed a motion seeking entry of an order authorizing it to prosecute and settle veil-piercing, fraudulent transfer, indemnification, pre-petition preference, and equitable subordination claims on behalf of the Debtors' Estates against the AFI Defendants [Docket No. 3412].  Prior to the filing of this motion, the Debtors consented to the Creditors' Committee's standing to investigate these claims after determining that the Creditors' Committee was best positioned to pursue the claims and causes of action against the AFI Defendants in light of the Pre-Petition AFI-ResCap Settlement Agreement.   The motion was heard by the Bankruptcy Court on May 7, 2013, but the Bankruptcy Court reserved decision.  The Creditors' Committee's motion is stayed during the term of the Plan Support Agreement.

*Wilmington Trust Standing Motion*. On April 19, 2013, Wilmington Trust, National Association, solely in its capacity as Indenture Trustee for the Senior Unsecured Notes ("Wilmington Trust") filed a motion (the "Wilmington Trust Standing Motion") seeking authority to prosecute claims and other causes of action on behalf of the ResCap Estate [Docket No. 3475].  In particular, Wilmington Trust sought permission to file a complaint to pursue certain Estate claims and claims that Wilmington Trust alleged were third party claims, including constructive and actual fraudulent transfers, in coordination with the Creditors' Committee's efforts to prosecute Estate claims.  On May 6, 2013, the Debtors filed a limited objection to the Wilmington Trust Standing Motion [Docket No. 3598].  The Wilmington Trust Standing Motion has not yet been heard by the Bankruptcy Court.

As a result of the Plan Support Agreement, the Wilmington Trust Standing Motion and other motions seeking standing to pursue claims or Causes of Action against AFI or its affiliates on behalf of the Debtors' Estates are stayed during the term of the Plan Support Agreement, and will be rendered moot once the Plan is confirmed.

### 12.    Appointment of a Mediator

Recognizing the numerous, divergent interests held by the Debtors' key stakeholders, on December 6, 2012, the Debtors requested the appointment of a Mediator to assist with the plan negotiations process [Docket No. 2357].   Such request was supported by the Creditors' Committee.  On December 26, 2012, the Bankruptcy Court entered an order appointing the Honorable James M. Peck as Mediator in these Chapter 11 Cases to assist in plan negotiations, foster a dialogue with key stakeholders, and reach resolution on significant plan issues [Docket No. 2519].  Initially, the Mediator was appointed for a limited period ending February 28, 2013, but as a result of subsequent negotiations amongst parties involved in the mediation, the Court further extended the term of the Mediator's appointment through October 31, 2013, or such earlier date as the Mediator declares that the mediation is at an impasse and should be terminated [Docket Nos. 2519, 3101, 3877] (collectively, the "Mediation Order").

-71-

The Mediator has offered constructive and independent guidance to the Mediation parties (as defined below) on the complex interdebtor and intercreditor issues that necessarily impact plan distributions. In particular, the focus of the mediation to date has been twofold: (1) to settle certain potential Estate and third party claims and causes of action identified against Ally in exchange for a contribution from Ally to the Debtors' Estates, in the form of the Debtor Release and the Third Party Releases, and (2) to address intercreditor issues related to the allocation of the Debtors' assets. Tremendous progress was made under the Mediator's guidance, ultimately culminating in the Plan Support Agreement.

### 13.    Mediation Process

As discussed above, commencing shortly after the Mediator's appointment through the date of the filing of this Disclosure Statement, the Mediator attended numerous mediation sessions with the following parties, both on an individual basis and jointly with different combinations of representative parties: the Debtors, the Creditors' Committee (as well as its individual members), the Ad Hoc Group, Ally, FHFA, the Institutional Investors, Paulson, and certain of the Debtors' other key constituencies (collectively, the "Mediation parties"). In an effort to facilitate these discussions and to guide the Mediation parties in their negotiations, the Debtors and their advisors prepared and provided the Mediator and the Mediation parties with comprehensive business and financial information, including multiple "waterfall" analyses that helped set forth hypothetical returns to creditors based on shifting recovery scenarios. In addition, certain parties provided to each other, as well as to the Mediator, presentations and draft pleadings outlining the strengths and weaknesses of their own, and other parties' claims. Subject to the Mediation Order, materials provided by any party as part of the mediation remain confidential in order to promote progress and protect commercially sensitive information. Ultimately, a global resolution was reached on a consensual plan and embodied in the Plan Support Agreement.

### 14.    The Termination of the Pre-Petition AFI-ResCap Settlement Agreement

Following the Asset Sales, the Debtors engaged in numerous discussions with various parties in interest, including Lewis Kruger, the Debtors' CRO, the Mediator, and the Creditors' Committee, regarding the framework of the Plan and the Potential Claims. Because the Asset Sales successfully closed thus accomplishing the primary objective of the Pre-Petition AFI-ResCap Settlement Agreement, the Debtors, with the support of the Creditors' Committee, allowed the AFI-ResCap Settlement Agreement to expire by its terms. However, the Creditors' Committee determined that negotiations with Ally regarding the resolution of the Potential Claims should continue. As discussed below, after substantial investigation and examination of claims and causes of action against Ally by the Creditors' Committee and the Examiner, the negotiations among the Debtors, Ally, the Creditors' Committee and the Consenting Claimants culminated in the Ally Contribution and the Global Settlement embodied in the Plan.

### 15.    Adjournment of the RMBS Trial

On June 11, 2012, the Debtors filed a motion pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "9019 Motion") for approval of the Original RMBS Settlement Agreements, [see Docket Nos. 320, 1176 and 1887]. When it became clear that the sale of the Debtors'

servicing assets would occur before the 9019 Motion would be heard by the Bankruptcy Court, the RMBS Trustees agreed in July 2012 (i) not to object to the assignment of PSAs free and clear of R&W Claims and (ii) to defer and cap the amount of their cure claims.

A hearing on the 9019 Motion was originally scheduled for November 2012, but was adjourned on several occasions and was most recently scheduled to begin on May 28, 2013. A number of parties, including the Creditors' Committee, Wilmington Trust, FGIC and MBIA, among others, filed objections to the 9019 Motion.

### 16.    The RMBS Settlement Embodied in the Plan

The parties ultimately determined that it was in their collective best interests to avoid protracted and costly litigation with respect to the Original RMBS Settlement Agreements, and instead to resolve the RMBS Trusts' claims in the context of, and as provided by, the Plan Support Agreement. Following extensive discussions in connection with the overall Global Settlement, the parties agreed that the Plan should expand the scope of the Original RMBS Settlement Agreements to cover all RMBS Trusts holdings RMBS Trust Claims, including the Original Settling RMBS Trusts and any Additional Settling RMBS Trusts.

Pursuant to the Plan, the RMBS Trust Claims shall be Allowed as non-subordinated unsecured claims in the amount of $209.8 million against the GMACM Debtors and $7,091.2 million against the RFC Debtors. In exchange for these Allowed Claims, the RMBS Trust Claims shall be deemed to provide a full and complete discharge of the ResCap Debtors from any and all RMBS Trust Claims. The allocation among the RMBS Trusts of the RMBS Trust Claims against the GMACM Debtors and the RFC Debtors is set forth on Exhibit 8 annexed hereto. Notwithstanding the Allowance of the RMBS Trust Claims as noted, distributions under the Plan on account of such Allowed Claims will be further subject to the RMBS Trust Allocation Protocol. Among other things, the RMBS Trust Allocation Protocol provides for a different split of recoveries as between (i) RFC-sponsored RMBS Trusts and GMACM-sponsored Trusts with respect to the RMBS Trust Claims on the one hand, and (ii) the holders of GMACM Unsecured Claims and RFC Unsecured Claims, on the other hand. This allocation settles (i) any disputed claims that RFC-sponsored RMBS Trusts have asserted or could assert against GMACM, (ii) disputes as to the proper allocation of Estate assets as between the GMACM Debtors and the RFC Debtors, and (iii) other potential disputes that the RMBS Trusts could have with respect to the terms of this Plan.

In addition, the RMBS Trust Allocation Protocol provides for distributions based on the determinations of the RMBS Trustees' expert, Duff & Phelps ("Duff"), of "Recognized" claims by RMBS Trusts that have timely filed Proofs of Claim, taking into account the impact of payments by monoline insurers. Duff's methodology for determining the Recognized Claims is annexed hereto as [●]. Duff's determination of each RMBS Trust's Recognized Claims is annexed to the Plan as the RMBS Trust Claims Schedules. The RMBS Trust Claims Schedules annexed to the Plan as originally filed are subject to correction and modification based on further due diligence and in accordance with the provisions of the Plan Support Agreement. A final version of the RMBS Trust Claims Schedules will be filed with the Plan Supplement. The RMBS Trust Allocation Protocol accounts for the fact that some of the PSAs were assumed by

-73-

the Debtors, giving rise to administrative priority status, and distributions to RMBS Trusts having such claims are weighted accordingly for purposes of distribution to each RMBS Trust.

While the RMBS Trustees were willing to accept the foregoing Allowed Claims for the purposes of determining the Units to be distributed to the RMBS Trusts on a collective basis, they required the ability to reallocate those Units to account for differences between those Allowed Claims (as so allocated), and their expert's determinations regarding the amount and allocation of the claims of the RMBS Trusts (the "RMBS Trust Allocation Protocol"). Thus, under the RMBS Trust Allocation Protocol, certain Units to be distributed on the RMBS Trust Claims from the RFC Debtors (the "RFC Pool") are added to the Units to be distributed on the RMBS Trust Claims from the GMACM Debtors. From those two adjusted pools of Units, distributions will be made, first, to provide for a priority distribution on account of RMBS Cure Claims, and second, to make pro rata distribution of RMBS Trust Claims that are Unsecured, all in settlement of (i) disputed claims that RFC - sponsored RMBS Trusts asserted against GMACM, (ii) disputes as to the proper allocation of Estate assets among the GMACM Debtors and RFC Debtors, and (iii) other potential disputes that the RMBS Trusts could have with respect to the terms of this Plan. Schedules attached to the Plan detail the amount of each type of Claim held by each RMBS Trust. These schedules were calculated by Duff, in accordance with the methodology set forth in Exhibit 8**.**

In addition, each Insured RMBS Trust shall retain the ability to enforce its rights, in the Bankruptcy Court or otherwise, against any Monoline (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of that RMBS Trust. The Debtors also agreed to pay the RMBS Trustees in full on the Effective Date for their reasonable pre- and post-petition fees and expenses, subject to the procedures set forth in the *Supplemental Order Under Bankruptcy Code Section 105(a), 362, 502, 1107 (a), and 1108 and Bankruptcy Rules 9019 (I) Authorizing the Debtors to Continue Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* [Docket No. 774].

### 17.    Plan Support Agreement

After months of intensive negotiations and a series of all-day mediation sessions led by the Mediator, on May 13, 2013, the Debtors, the Creditors' Committee, certain of the Debtors' creditors[49] and Ally entered into the Plan Support Agreement and plan term sheet (the "Original Plan Term Sheet"). The Plan Support Agreement and Original Plan Term Sheet outlined the main terms of the Plan and the resolution of many complex legal issues involving the Debtors' largest claimant constituencies. These documents were endorsed by a large number of the Debtors' largest claimant constituencies, outlining the main terms of the Plan and resolving many complex legal issues involving these parties signatory thereto. Following entry into an announcement of the Plan Support Agreement on May 13, 2013, the parties to the Plan Support Agreement engaged in further negotiations over the terms of a Supplemental Plan Term Sheet

---

[49]    As noted above, the Junior Secured Noteholders are not a party to the Plan Support Agreement.

(the "Supplemental Plan Term Sheet" and together with the Original Plan Term Sheet, the "Term Sheets"), which addressed the Plan Compromises in substantial detail. As discussed above, the Term Sheets address, among other things: (1) Ally's contributions to the Estates, including the Ally Contribution, in exchange for, among other things, the Debtor Release and the Third Party Releases (each as defined in the Plan Support Agreement) in favor of Ally, (2) the allocation of proceeds available for distribution to Creditors based on a mediated compromise and settlement of disputed inter-creditor and intra-Debtor issues, and (3) the creation of various Trusts designed to provide distributions to creditors and to administer the Estates following confirmation of the Plan. Absent agreement on these issues, the parties would be faced with significant and uncertain litigation prospects, particularly in light of the novel and fact-intensive issues at play. On June 26, 2013, the Court entered an order authorizing the Debtors to enter into the Plan Support Agreement [Docket No. 4098].

The Plan Support Agreement also provides a number of relevant Milestones (collectively, the "Milestones") that must be satisfied, including:

(a) Not later than August 19, 2013, the "FGIC Rehabilitation Court" will have approved the Plan Support Agreement (as it relates to FGIC) and the FGIC Settlement Agreement;

(b) Not later than August 30, 2013, the Bankruptcy Court will have approved the Disclosure Statement; and

(c) Not later than 30 days following entry of the Confirmation Order, but in no event later than December 15, 2013, the Plan will be effective.

Ally and the Creditors' Committee may terminate their support of the Plan and the Plan Term Sheet if any Milestone is not satisfied. A Consenting Claimant may terminate its support of the Plan Support Agreement if certain Milestones are not satisfied. FGIC may terminate its support of the Plan and the Term Sheets if Milestone (a) is not satisfied. The Plan Support Agreement and the Term Sheets are discussed in further detail in Article [●].

### 18. Claims Process and Bar Date

#### (a) Schedules and Statements of Financial Affairs

On June 30, 2012, the Debtors filed their Schedules of assets and liabilities, statements of financial affairs, and Schedules of executory contracts and unexpired leases (the "Schedules"). On July 3, 2012, the Debtors filed amendments to their Schedules. On July 19, 2012, the Debtors filed the Statement of Financial Affairs 3A and 3B ("SOFA 3A and 3B"). On December 11, 2012, the Debtors filed amendments to SOFA 3A and 3B.

#### (b) Bar Date and Claims Reconciliation Process

On August 29, 2012, the Bankruptcy Court entered an order establishing: (i) November 9, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for creditors to file Proofs of Claim against the Debtors and prescribing the form and manner thereof; and (ii) November 30, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for governmental units to file Proofs of

Claim [Docket No. 1309] (the "Bar Date").  Due to events precipitated by Hurricane Sandy, the Bankruptcy Court approved an extension of the Bar Date to November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time) [Docket No. 2093].

As of June 2013, approximately 6,850 Proofs of Claim in the aggregate amount of approximately $99.7 billion had been filed against the Debtors in these Chapter 11 Cases. The Debtors and their advisors have been engaged in a diligent and comprehensive review and reconciliation of all claims.  On March 21, 2013, the Bankruptcy Court entered an order approving certain omnibus claim objection procedures [Docket No. 3294] (the "Claims Procedures Order").  The Claims Procedures Order permits the Debtors, in consultation with the Creditors' Committee through Committee Borrower Counsel, to: (i) object to filed claims on a collective basis on additional grounds not set forth in Bankruptcy Rule 3007(d); (ii) object to Borrower Claims subject to certain specified procedures; (iii) settle certain claims without further Bankruptcy Court approval; and (iv) amend the Debtors' Schedules to resolve any discrepancies that may be discovered as part of the claims reconciliation process.  Based on a thorough and ongoing examination of the Proofs of Claim and in accordance with the Claims Procedures Order, the Debtors and their advisors are in the process of determining which filed claims should be allowed, and which should be disallowed and expunged, reduced in amount, reclassified, or subordinated so as to avoid providing certain creditors with improper recoveries to the detriment of other creditors.

Since the entry of the Claims Procedures Order, the Debtors have filed twenty-one (21) omnibus claims objections, including eleven (11) omnibus objections addressing certain non-Borrower claims, asserting that such claims should be disallowed and expunged from the claims register on the basis that they were: (i) filed after the Bar Date and thus not timely filed; (ii) duplicates of other claims; (iii) amended and superseded by a claim subsequently filed by the same claimant on the same basis, or (iv) duplicative of bondholder Trustee claims.  On June 6, 2013, the Bankruptcy Court entered orders approving the relief requested in each of the omnibus claims objections identified in (i), (ii) and (iii) above, thereby expunging claims in the approximate aggregate amount of $225.1 million.  The Debtors intend to continue filing omnibus claims objections, as well as objections to specific disputed claims, to create an identifiable claims pool with a more definite size limitation, which will assist them in ensuring that each Class of creditors receives its appropriate distribution from the Debtors' Estates.

### (c)    Composition of Filed Claims

As part of their claims reconciliation process, the Debtors have determined that claims filed in these Chapter 11 Cases primarily fall into the following subject matter categories: (i) PLS Claims; (ii) breach of representation and warranty whole loan claims (excluding RMBS Trustees); (iii) monoline insurance claims; (iv) master servicer claims; (v) governmental agency claims; (vi) servicing claims; (vii) claims filed by current or former individual Borrowers; (viii) putative class action litigation claims; (ix) bondholder claims; (x) tax claims; (xi) trade claims; and (xii) employee benefit and indemnification claims.

Many claims filed against the Debtors are based on litigations related to the Debtors' businesses, and many of those parties bring claims against Ally or other non-Debtor affiliates

based on veil piercing and aiding and abetting theories of liability.    After conducting an exhaustive and expensive investigation, the Examiner concluded that such claims against Ally are unlikely to prevail.

The claims comprising the General Unsecured Claims primarily relate to Borrower claims, claims related to pending putative class actions commenced on behalf of current or former Borrowers, trade claims, employment-related claims, contract based claims related to mortgage loan servicing, and claims alleging of breach of contract arising from the Debtors' mortgage business operations.

To date, approximately 3,000 Proofs of Claim totaling approximately $14.2 billion in asserted aggregate liquidated amount have been filed against the Debtors by or on behalf of Borrowers or former Borrowers allegedly in connection with mortgage loans originated, acquired, securitized, or serviced by the Debtors.    In general, the Borrower Claims consist of claims arising out of the Debtors' mortgage loan servicing activities and assert damages for alleged wrongful foreclosures, failure to approve or comply with loan modification obligations, improper assignment of deeds of Trust, lender-placed insurance policies, violations of RESPA (defined below) and/or the Truth In Lending Act, and fraud.    The Debtors currently are reviewing and analyzing the Borrower Proofs of Claim in consultation with the Committee Borrower Counsel, and believe that a substantial number of the Borrower Proofs of Claim are subject to reduction or disallowance on, among others, the basis that they are overstated, invalid, or duplicative.    The Debtors, the Creditors' Committee and Committee Borrower Counsel also analyzed all the Borrower class action claims, some of which are discussed in greater detail in [sub-Section (h)] contained herein.    Based on that analysis, it is believed that a substantial portion of those claims will be significantly reduced.

Pursuant to the Claims Procedures Order, the Debtors are required to consult with Committee Borrower Counsel prior to filing an objection to a Borrower claim on designated grounds, which grounds and Borrower claims procedures were mutually agreed upon by the Debtors, the Creditors' Committee, and the Committee Borrower Counsel.    The Debtors also are required, under the terms of the Claims Procedures Order, to contact Borrowers that filed a Proof of Claim with insufficient or no supporting documentation to request additional information prior to objecting to such claims.    To determine which Borrowers were required to be contacted, the Debtors and Committee Borrower Counsel expended a substantial amount of time reviewing all the Proofs of Claim filed by Borrowers and through this process were able to develop a subset of the Borrower Claims where additional information was needed to assess the claim.    To date, the Debtors have mailed approximately 1,800 letters to Borrowers requesting additional information with respect to their Proofs of Claim.    The Debtors and Committee Borrower Counsel have reviewed and continue to review the Borrower responses to those letters in an effort to evaluate and reconcile all Borrower Claims.

In addition, to date the Debtors have filed ten (10) omnibus claim objections to Borrower claims.    The basis for these ten (10) omnibus Borrower Claims objections included, among others: (i) claims filed after the Bar Date and thus not timely filed; (ii) duplicate claims filed by the same Borrower; (iii) amended and superseded claims filed by the same Borrower on the same basis; or (iv) redundant and substantially identical claims to a previously filed Borrower Claim

-77-

filed by the same Borrower. Under the Claims Procedures Order, the Debtors were not required to consult with the Creditors' Committee or Committee Borrower Counsel prior to filing these omnibus claims objections. These omnibus claims objections are scheduled for a hearing before the Bankruptcy Court on July 15, 2013. In connection with the claims reconciliation effort, the Debtors, in consultation with Committee Borrower Counsel when appropriate, will be filing additional omnibus objections to Borrower Claims, as well as individual objections to Borrower claims.

### (d)   Creditor/Borrower Hotline

In an effort to assist Borrowers and other creditors through the bankruptcy process, Committee Borrower Counsel has operated a dedicated, toll-free hotline for Borrower inquiries (the "Borrower Hotline"). Inquiries to the Borrower Hotline have primarily focused on questions regarding procedures for filing proofs of claim, information regarding the sale of the Debtors' loan portfolios, the claims reconciliation process, omnibus objections to claims, Borrower-specific requirements of the Omnibus Claims Procedures, and the overall status of the Chapter 11 Cases. In addition, Committee Borrower Counsel assisted Borrowers in connection with specific loan inquiries by facilitating communication between the Borrower and the Debtors regarding specific loans. To date, Committee Borrower Counsel has responded to more than 400 phone inquiries from Borrowers.

### (e)   Borrower Adversary Proceedings

The Debtors, the Creditors' Committee, and Committee Borrower Counsel, have reviewed all pleadings filed by Borrowers against the Debtors. At the direction of the Court, the Debtors, Committee Counsel, and/or Committee Borrower Counsel have attempted to contact those Borrowers via telephone and/or written correspondence to, among other things, reach a resolution of the claims being asserted against the Debtors. Additionally, in order to establish mechanisms for the efficient intake and review of the adversary proceedings commenced by current or former Borrowers under the Bankruptcy Rules (the "Borrower Adversary Proceedings"), on March 21, 2013, the Court entered an order approving and implementing a supplement to the Case Management Order[50] establishing notice, case management, and administrative procedures to assist the Debtors in the management and administration of the Borrower Adversary Proceedings (the "Supplemental Procedures Order"). The terms of the Supplemental Procedures Order were the product of several discussions by and among the Debtors and the Creditors' Committee. Since the entry of the Supplemental Procedures Order, the Debtors and Committee Borrower Counsel have conducted several initial case conferences with Borrowers, and continue to conduct case conferences in an effort to resolve the Borrower Adversary Proceedings. These communications have resulted in the successful resolution, without the need for judicial intervention, of several Borrower Adversary Proceedings.

---

[50]   On May 23, 2012, the Court entered an order establishing certain notice, case management, and administrative procedures applicable to these Chapter 11 Cases [Docket No. 141] (the "Case Management Order").

ny-1097924

### (f)    Mortgage-backed Securities Litigation

The Debtors currently are defendants in numerous securities litigation cases relating to various PLS Trusts containing mortgage loans with an aggregate UPB of $9.3 billion.  The plaintiffs in all cases have alleged that the various defendant Debtors made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and/or other documents related to RMBS offerings in connection with the mortgages held by the PSA Trusts.  The alleged misstatements and omissions typically concern representations regarding the underwriting standards employed in the origination of the mortgage loans held by the PLS Trusts.  The plaintiffs claim that such misstatements and omissions constitute violations of state and/or federal securities law and common law including negligent misrepresentation and fraud.  The plaintiffs seek monetary damages and rescission.  Set forth below are summaries of certain notable pending mortgage-backed securities litigations, which are for illustrative purposes only and are not intended to be inclusive of all litigation pending against the Debtors.

### (i)    Tolled Claimants

Certain Debtors and non-Debtor Affiliates, including AFI and Ally Securities have at various times entered into tolling agreements with parties who claim to have causes of action against the Debtors or non-Debtor Affiliates related to RMBS (the "Tolled Claimants").  Many of the Tolled Claimants filed proofs of claim in these Chapter 11 Cases.  To the extent the statute of limitations had not run prior to the execution of any particular tolling agreement, the applicable Tolled Claimants would not be time-barred from commencing litigation against those Debtor and non-Debtor Affiliates with whom they have tolling agreements.  The Ally Contribution is conditioned upon the receipt of Releases from the Tolled Claimants for claims against any non-Debtor Affiliate subject to the tolling agreements.  The Plan provides that any claims filed by the Tolled Claimants will be administered in the Private Securities Claims Trust.

### (ii)    Notable Private-label Securities Litigation

The Debtors are currently defendants in at least 14 private-label securities litigation cases relating to the packaging, marketing, offering, and sale of private label securities.  The plaintiffs in these cases have alleged that the various defendant Debtors made misrepresentations in the offering materials, that the Debtors' public filings and offering documents associated contained false statements and omissions of material facts, and that the Debtors' alleged actions constitute violations of state and/or federal securities law.  The plaintiffs assert claims for fraud, negligent misrepresentation, fraudulent inducement, aiding and abetting, and unjust enrichment and seek rescission, monetary damages, and costs.

Allstate Ins. Co., et al. v. GMACM, et al.  On February 18, 2011, the Allstate Insurance Company and various of its subsidiaries and affiliates (collectively, "Allstate") filed a complaint in Hennepin County District Court, Minnesota, against numerous defendants, including Residential Funding Securities LLC n/k/a Ally Securities LLC ("Ally Securities")[51] and Debtors

---

[51]    Underwriter Ally Securities was formerly owned by the Debtors.  In 2009, the Debtors sold Ally Securities to AFI.

GMACM, RFC, Residential Accredit Loans, Inc. ("RALI"), Residential Asset Mortgage Products, Inc. ("RAMP"), Residential Funding Mortgage Securities I, Inc. ("RFMSI"), Residential Funding Mortgage Securities II, Inc. ("RFMSII"), and Residential Asset Securities Corp. ("RASC"). GMACM and RFC are named as seller, sponsor and servicer defendants. Ally Securities is named as an affiliated underwriter defendant, with responsibility for underwriting and managing the securitizations' sale, including screening mortgage loans for compliance with underwriting guidelines. RALI, RAMP, RASC, RFMSI, and RFMSII are named as depositor defendants. The complaint alleges that the defendants misrepresented in the offering materials the riskiness and credit quality of, and omitted material information related to, RMBS purchased by Allstate. The complaint asserts claims for fraud and negligent misrepresentation, fraudulent inducement and violations of the Minnesota Consumer Fraud Act against all defendants and seeks money damages and costs, including attorneys' fees. Discovery is proceeding against the non-Debtor defendants in this action.

Federal Home Loan Bank of Boston. On April 20, 2011, the Federal Home Loan Bank of Boston ("FHLB of Boston") filed a complaint in Superior Court of the Commonwealth of Massachusetts, Suffolk County, naming numerous defendants including non-Debtors AFI and GMAC Mortgage Group LLC and Debtors RFC and RALI. The complaint alleges that the defendants collectively packaged, marketed, offered, and sold private label MBS, and FHLB of Boston purchased such securities in reliance upon misstatements and omissions of material facts in the offering documents. The complaint seeks rescission and damages for negligent misrepresentation and violations of the Massachusetts Uniform Securities Act, among other claims. On May 23, 2011, the case was removed to federal court in the United States District Court for the District of Massachusetts. Plaintiff's motion to remand was denied on March 9, 2012. On June 29, 2012, the FHLB of Boston filed an amended complaint, which expressly acknowledged the automatic stay in the Debtors' Chapter 11 Cases. On October 11, 2012, all defendants except the Debtors moved to dismiss the Amended Complaint and those motions are pending.

Federal Home Loan Bank of Chicago. On October 15, 2010, the Federal Home Loan Bank of Chicago filed a Complaint for Rescission and Damages in the Circuit Court for Cook County, Illinois, naming as defendants, among others, Debtors RFC, RAMP, RASC, and RFMSI, as well as non-Debtor affiliates Ally Securities, GMAC Mortgage Group LLC, and AFI, and asserting claims under the Illinois Securities Law and for common law negligence (the complaint was subsequently amended to add claims against certain defendants under the North Carolina and New Jersey securities statutes). This action was removed to federal court on November 23, 2010 and, on January 18, 2011, the action was remanded to the Circuit Court for Cook County. The Debtors, their affiliates, and others moved to dismiss the Amended Complaint on May 27, 2011. On September 19, 2012, the court denied defendants' motions to dismiss in their entirety. Written discovery as to all parties except Debtors RFC, RAMP, RASC, and RFMSI is currently in its early stages and is ongoing.

Federal Home Loan Bank of Indianapolis. On October 15, 2010, the Federal Home Loan Bank of Indianapolis ("FHLB of Indianapolis") filed a complaint in Indiana in the Marion County Superior Court naming as defendants, among others, Debtor RMFSI and non-debtor affiliates Ally Securities and GMAC Mortgage Group LLC, and asserting claims under the

Indiana Uniform Securities Act, Sections 11, 12 and 15 of the Securities Act of 1933, and for common law negligence (only the negligence claim was asserted against Debtor RFMSI). On November 24, 2010, the FHLB of Indianapolis action was removed to federal court and, on May 25, 2011, the action was remanded to the Marion County Superior Court. On July 14, 2011, FHLB of Indianapolis filed an amended complaint. Debtor RFMSI, its affiliates, and others moved to dismiss the amended complaint on September 14, 2011. On May 24, 2012, while motions to dismiss were pending, the state court entered an order staying the entire proceeding due to RFMSI's bankruptcy filing. On July 3, 2012, the state court granted FHLB of Indianapolis' motion to dismiss the claims against RFMSI without prejudice. On the same date, the court issued a memorandum opinion and order denying defendants' motions to dismiss as to all but FHLB of Indianapolis' federal securities claims, which the court concluded were time-barred. Written discovery is currently underway against the non-Debtor defendants.

Massachusetts Mutual Life Ins. Co. v. Residential Funding Co., LLC, et al. On February 9, 2011, the Massachusetts Mutual Life Insurance Company ("MassMutual") filed a complaint in the United States District Court for the District of Massachusetts against Ally Securities and Debtors RFC, RALI, RAMP and RASC, and seven former directors and officers of Debtor entities. The complaint alleges that the defendants' public filings and offering documents associated with RMBS MassMutual purchased contained false statements and omissions of material facts and that the directors and officers were involved in the day-to-day affairs of the primary violators and had control over the securitizations at issue, as evidenced by their signatures on the registration statements. MassMutual asserts claims for violations of the Massachusetts Uniform Securities Act and seeks unspecified compensatory and statutory damages. On February 14, 2012, all Debtor entities were dismissed from this action, but Ally Securities remains in the action as a defendant. Discovery is proceeding against the non-Debtor defendants in this action.

National Credit Union Administration Board (the "NCUAB") Litigation. On August 9, 2011, the NCUAB filed a complaint as liquidating agent of U.S. Central Federal Credit Union ("U.S. Central") and Western Corporate Federal Credit Union ("WesCorp"), in the United States District Court for the Central District of California, against Goldman, Sachs & Co. as underwriter and seller, and Fremont Mortgage Securities Corp., GS Mortgage Securities Corp., Long Beach Securities Corp., and RALI, as issuers, with respect to certain RMBS purchased by U.S. Central and WesCorp. Previously, on June 20, 2011, the NCUAB filed a complaint as liquidating agent of U.S. Central against numerous defendants, including RFMSII, in the United States District Court for the District of Kansas. The complaints assert claims under Sections 11 and 12 of the Securities Act of 1933 and state securities laws and allege that the offering documents associated with the underlying transactions contained untrue statements and omissions of material facts. These complaints seek costs and rescission, rescissory damages, or money damages. The defendants moved to dismiss both complaints. In the Kansas action, motions to dismiss were, in general, denied. The case is being coordinated with five other NCUAB actions and discovery will likely commence soon, although the action is stayed as to the Debtors. A petition seeking leave to appeal with regard to certain issues involving the statute of limitations applicable to NCUAB's federal Securities Act claims is also pending in the United States Court of Appeals for the Tenth Circuit. In the California action, motions to dismiss were granted in part and denied in part. NCUAB filed a first amended complaint on October 29, 2012

and defendants (excluding RALI) moved to dismiss on December 13, 2012. The district court entered a preliminary order denying the motions to dismiss on March 14, 2013 and a final order on June 17, 2013.  On May, 8, 2013, the defendants filed a motion to reconsider or, in the alternative, for leave to take an interlocutory appeal of the denial of their motions to dismiss. That motion is fully briefed.

New Jersey Carpenters Health Fund v. Residential Capital, LLC.  On September 22, 2008, New Jersey Carpenters Health Fund, New Jersey Carpenters Vacation Fund, and Boilermaker Blacksmith National Pension Trust, on behalf of themselves and a putative class (collectively, "NJ Carpenters Class Members") filed a complaint in New York Supreme Court, New York County.  On October 14, 2008, the case was removed to the District Court.  On May 18, 2009, NJ Carpenters Class Members filed a Consolidated First Amended Securities Class Action Complaint against Ally Securities and numerous Debtor defendants including ResCap, RFC and RALI, and eight directors and officers of Debtor entities.  The First Amended Complaint alleges that the plaintiffs and the class purchased RMBS issued between March 28, 2006, and October 9, 2007, and asserts that the offering documents associated with these transactions contained misrepresentations and omitted material information in violation of Sections 11, 12, and 15 of the Securities Act of 1933.  The complaint seeks unspecified compensatory damages, rescission or a rescissory measure of damages, and attorneys' fees and costs, among other relief.  On July 30, 2010, several additional pension funds moved to intervene.  On August 16, 2010, NJ Carpenters Class Members moved for class certification and to be named class representative.  On December 22, 2010, the District Court granted the motion to intervene, and NJ Carpenters Class Members then filed a second amended complaint adding in the intervenor claims.  On January 18, 2011, the Court denied NJ Carpenters Class Members' motion for class certification.  The Second Circuit granted leave to appeal, but ultimately affirmed the District Court's denial of class certification on April 30, 2012.  On remand, NJ Carpenters Class Members renewed their motion for class certification, which was granted on October 15, 2012.  The non-Debtor defendants' petition for leave to appeal this ruling was denied by the Second Circuit and factual discovery has commenced.  On April 30, 2013, the District Court issued an opinion reinstating previously dismissed claims as to an additional 37 offerings.  The NJ Carpenters Class Members have sought class certification with respect to 19 of these additional offerings.  Discovery has been proceeding as to the non-debtor defendants and the Court has entered a scheduling order placing this matter on the District Court's January 2015 trial calendar.

Subject to approval of the Bankruptcy Court and the District Court, the Plan contemplates resolution of the NJ Carpenters Class Action and related proofs of claim filed by the named plaintiffs in the Chapter 11 Cases.  This NJ Carpenters Settlement, which is subject to Bankruptcy Court and District Court approval, reduces burdensome and costly discovery, including detailed loan-level discovery of up to 59 separate securitizations.  In addition, the settlement avoids continued litigation and motion practice regarding class certification and the adequacy of class representation in mortgaged backed securities litigation.  Based on the few publicly-available comparable settlements, the Debtors believe that the terms of the proposed settlement are reasonable and beneficial to the Debtors' Estates.  On June 28, 2013, the District Court preliminarily approved the proposed settlement.

### (iii)    Notable Securities Litigations Against Non-Debtor Affiliates

Federal Housing Finance Agency Litigation.    On September 2, 2011, the FHFA, as conservator for Freddie Mac, filed a complaint naming numerous defendants, including AFI, Ally Securities, GMAC Mortgage Group, LLC and against Debtors ResCap, GMAC-RFC, RFC, RAMP, RASC, and RALI, in New York County Supreme Court.    The complaint alleges that Freddie Mac purchased over $6.0 billion of RMBS issued in connection with twenty-one securitizations sponsored and/or underwritten by the defendants.    It further alleges that the registration statements, prospectuses, and other offering materials associated with these transactions contained false and misleading statements and omissions of material facts.    Based on these allegations, the complaint brings claims for violation of the Securities Act of 1933, the Virginia Securities Act, and control-person claims.    The complaint also asserts claims for fraud and aiding and abetting fraud, and seeks rescission and recovery of the consideration Freddie Mac paid for the securities, as well as other compensatory and punitive damages.    AFI and ResCap removed this case to the United States District Court for the Southern District of New York.    The case was coordinated with 15 other cases brought by FHFA against other issuers, underwriters, and affiliated parties.    The first of the 15 cases to proceed is the one filed by FHFA against UBS.    On May 4, 2012 the District Court denied in large part the UBS defendants' motion to dismiss.    On June 13, 2012 FHFA filed an amended complaint withdrawing the claims against the Debtors.    All of the cases have survived motions to dismiss in large part, and on April 5, 2013, the Second Circuit considered an interlocutory appeal of the District Court's order on the UBS motion to dismiss and affirmed the District Court's denial thereof.    Following this decision, AFI, Ally Securities, GMAC Mortgage Group, LLC and certain third parties remain pending with factual discovery in progress.    The trial in the first of the coordinated cases is scheduled for early 2014, but the trial in the case proceeding against AFI and its affiliates is not scheduled until early 2015.

The Plan provides that the Third Party Releases will not apply to any claims held by the FHFA against Ally Bank.    The Plan further provides that the FHFA will not receive any recovery from the Private Securities Claims Trust established under the Plan, and the FHFA will retain all securities claims against AFI and its affiliates.

NCUAB Litigation.    On March 20, 2009, the NCUAB was appointed receiver for US Central Federal Credit Union and Western Corporate Federal Credit Union, and on October 1, 2010, it was appointed liquidator for the same two credit unions.    In addition to the actions filed against the Debtors identified in [Section [●] above], NCUAB also informed the Debtors, on [●], that it believes it has claims against AFI and Ally Securities that are not time barred based on equitable tolling and constructive notice arguments.    The claims that NCUAB purports to have against AFI and Ally Securities include, among others, the same claims that are the subject of its proofs of claim.    On June 6, 2013, the Debtors filed an objection seeking to disallow and expunge NCUAB's proofs of claim on the following grounds:    (i) the NCUAB claims are untimely;  (ii) the NCUAB cannot allege, let alone prove, any material misstatement in the offering materials; and (iii) the underlying losses were caused by a market-wide collapse, not by any misstatement by the Debtors.    To the extent the NCUAB's Claims are Allowed, such Claims will be General Unsecured Claims

-83-

### (iv)    Resolution of Private Securities Claims in Plan Support Agreement

As discussed further in Article [●], the Debtors and the holders of Private Securities Claims agreed to resolve tens of billions of dollars in claims against the Debtors and non-Debtor affiliates arising from their structuring, sponsoring, underwriting, and sale of RMBS in the Plan Support Agreement. Pursuant to the Plan Support Agreement, the Private Securities Claims will be transferred into the Private Securities Claims Trust and will recover, in the aggregate, $235.0 million, subject to the adjustments, in full and complete satisfaction of their claims against the Debtors, and in full resolution of the Debtors' claims that the Private Securities Claims should be subordinated to the Debtors' general unsecured creditors' claims pursuant to Section 510 of the Bankruptcy Code.

### (g)    Private-label Monoline Bond Insurer Litigation

The Debtors are currently defendants in 14 cases in which monoline insurance companies, which provided financial guaranty insurance for certain tranches of the RMBS issued by the Debtors' PLS Trusts, have alleged that certain of the Debtors breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain RMBS offerings insured by the applicable insurer. The Monoline insurers further allege that the defendant Debtors failed to follow certain remedy procedures set forth in the contracts and improperly serviced the mortgage loans. The Monoline insurers allege both breach of contract and fraud. Set forth below are summaries of certain notable pending private-label monoline bond insurer litigations, which are included for illustrative purposes only and are not intended to be inclusive of all litigation pending against the Debtors.

### (i)    MBIA Litigations

MBIA brought two cases against Debtors RFC and GMACM in New York State Supreme Court for New York County: <u>MBIA Insurance Corporation v. RFC</u>, filed December 4, 2008,[52] and <u>MBIA Insurance Corporation v. GMACM</u>, filed April 1, 2010. The complaints allege that the defendants: (i) breached their contractual representations and warranties relating to the characteristics of mortgage loans contained in certain insured RMBS offerings; (ii) failed to follow the repurchase specific remedy procedures set forth in the contracts; (iii) improperly serviced the mortgage loans; and (iv) committed fraud. The RFC complaint also included negligent misrepresentation, breach of the duty of good faith and fair dealing, equitable and implied indemnification and unjust enrichment counts which have been dismissed. The GMACM complaint also included negligent misrepresentation and breach of the duty of good faith and fair dealing counts which have been dismissed. The RFC case involves five securitizations MBIA insured in 2006 and 2007. The GMACM case involves three securitizations MBIA insured between 2004 and 2007. MBIA seeks, among other remedies, repurchase of certain loans, monetary damages for past and future payments MBIA has made payments on current and future claims under the relevant insurance policies, indemnification for

---

[52]    MBIA first filed a complaint against RFC in the District Court on October 15, 2008. On December 4, 2008, MBIA voluntarily dismissed that case and filed the state court complaint against RFC.

attorneys' fees and costs, and punitive damages. Fact discovery was substantially complete in the RFC case on the Petition Date and expert discovery was underway. The GMACM case was in the middle of fact discovery on the Petition Date. Both cases were stayed by the filing of the Debtors' Chapter 11 Cases. MBIA also filed a complaint on September 17, 2012 in the Fourth Judicial District Court for the State of Minnesota naming as defendants AFI, IB Finance, Ally Bank, Ally Securities, and GMAC Mortgage Group. The complaint asserts claims for aiding and abetting fraud (and breach of contract as to Ally Bank) relating to seven of the eight securitizations at issue in the previously filed lawsuits against debtors RFC and GMACM. MBIA did not include in this complaint claims with respect to a 2004 securitization sponsored by GMACM at issue included in the GMACM suit. The case was removed to the United States District Court for the District of Minnesota. Briefing on the defendants' motion to dismiss has not yet been completed, but oral argument has not yet been held on this motion. The scheduled oral argument on the motion to dismiss has been cancelled based on the entry into the PSA.

MBIA is a Consenting Claimant and the Plan seeks to resolve the MBIA litigation through the allowance, priority, and allocation of the Allowed Claims held by MBIA. (See, *supra* Article [●]).

### (ii)    FGIC Litigations

Beginning on November 29, 2011, and prior to the Petition Date, FGIC initiated a total of twelve (12) civil suits asserting a variety of claims against ResCap, GMACM, and/or RFC in connection with twenty (20) of the FGIC Insured Trusts. Summaries of these lawsuits are below. The FGIC Settlement Agreement, if approved by the Bankruptcy Court and the FGIC Rehabilitation Court, will resolve all of the claims asserted in these lawsuits in exchange for FGIC receiving allowed claims in the Debtors' Chapter 11 Cases, as explained in greater detail above.

Financial Guaranty Insurance Company v. Ally Financial, Inc., Residential Capital, LLC, and Residential Funding Co., LLC ("FGIC v. AFI"). On December 12, 2011, FGIC filed a complaint against AFI and Debtors ResCap and RFC in the New York County Supreme Court for New York County. The complaint alleges that: (i) the defendants breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured RMBS offerings and fraudulently induced FGIC to enter into these contracts; (ii) the defendants breached their contractual obligations to permit access to loan files and certain books and records; (iii) ResCap and RFC are alter egos of AFI, and that AFI is therefore liable for the actions of its subsidiaries; and (iv) AFI aided and abetted ResCap and RFC's fraudulent inducement of the insurance contracts. FGIC filed three additional complaints with substantially similar allegations in New York County Supreme Court on December 27, 2011 with respect to different securitizations, and each of these four complaints was removed to federal court on January 13, 2012. FGIC filed two substantially similar complaints in the Southern District of New York on March 5 and 13, 2012 regarding additional securitizations. In each of the six FGIC v. AFI actions, FGIC seeks, among other relief, reimbursement of all sums it paid under the various policies and an award of legal, rescissory, equitable, and punitive damages. No answers or dispositive motions have been filed in these cases, and they were stayed as to the non-Debtor defendants through April 30, 2013.

-85-

Financial Guaranty Insurance Company v. Ally Financial, Inc., Residential Capital, LLC, Ally Bank, and GMACM. On January 31, 2012, FGIC filed a complaint against AFI, Ally Bank, and Debtors ResCap and GMACM in the District Court. The complaint alleges that the defendants improperly transferred a large volume of mortgage loans after the closing of the relevant transaction in violation of the contractual provisions which permitted the addition of loans in these securitizations after the closing. FGIC further alleges that the defendants breached their contractual obligations to permit access to loan files and certain books and records. With regard to AFI, FGIC alleges that ResCap and GMACM are alter egos of AFI, and that AFI is therefore liable for the actions of its subsidiaries. FGIC also alleges that Ally Bank breached its obligations as custodian of the underlying mortgage notes. FGIC filed two additional lawsuits against AFI, ResCap, GMACM, and Ally Bank on March 6 and 12, 2012 regarding additional securitizations, which tracked the allegations brought on January 31, 2012, with regards to AFI's alter ego liability and Ally Bank's custodial breach, but did not include allegations of improper transfer, and also alleged that defendants (i) breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured RMBS offerings, (ii) fraudulently induced FGIC to enter into these contracts and (iii) that AFI and Ally Bank aided and abetted ResCap and GMACM's fraudulent inducement. On March 30, 2012, FGIC amended a complaint—originally brought in the New York Supreme Court on November 29, 2011, and subsequently removed to the Southern District of New York— in a fourth action against ResCap, GMACM and Ally Bank to add AFI and to include improper subsequent transfer and alter ego allegations substantially similar to those alleged in the January 31, 2012 action, as well as allegations of breach of representations and warranties, fraudulent inducement, and aiding and abetting fraud substantially similar to those alleged in the March 6 and 12 actions. In each of these four actions, FGIC seeks, among other relief, reimbursement of all sums it paid under the various policies and an award of legal, rescissory, equitable, and punitive damages. No answers or dispositive motions have been made in these cases, and they were stayed as to the non-Debtor defendants through April 30, 2013.

Financial Guaranty Insurance Company v. Residential Funding Co., LLC, and Residential Capital, LLC. On November 29, 2011, FGIC filed two complaints against Debtors ResCap and RFC in New York County Supreme Court for New York County. These complaints allege that RFC breached its contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured RMBS offerings. FGIC further alleges that RFC breached its contractual obligations to permit access to loan files and certain books and records. FGIC alleges that ResCap tortiously interfered with FGIC's contract with RFC. Both actions against RFC were removed to the District Court on December 30, 2011. FGIC voluntarily dismissed the claims against ResCap in both actions against RFC on March 27, 2012, and no answers or dispositive motions have been filed by RFC prior to the Petition Date.

### (iii)    Assured Guaranty Municipal Corp. Litigations

Assured Guaranty Municipal Corp., f/k/a Financial Security Assurance Inc., v. GMACM, et. al. On May 11, 2012, Assured Guaranty Municipal Corp. filed a complaint against Ally Bank, AFI, GMACM, RAMP, RFC, ResCap, and RFMSII in the Southern District of New York. The complaint alleges that GMACM, RAMP, RFC, ResCap, and RFMSII breached their contractual representations and warranties relating to the characteristics of the mortgage loans

-86-

contained in certain insured RMBS offerings. The complaint also alleges that GMACM, RFC, and ResCap breached their contractual obligations as servicers. The complaint also alleges that Ally Bank and ResCap breached their obligations as document custodians. Finally, the complaint alleges that AFI shares all liability alleged because of its alleged direction and control of the other parties' actions. The complaint seeks compensatory, consequential, and rescissory damages, reimbursement, and indemnification. In light of the bankruptcy proceedings, the case was stayed as to all parties through April 30, 2013. Currently, no answer or dispositive motions have been filed in this matter.

### (h)    Borrower Class Actions and Other Loan Servicing Related Litigations

The Debtors are currently defendants in [●] cases in which Borrower Claimants or classes of Borrower Claimants, allege violations of, among other things, the Real Estate Settlement Procedures Act ("RESPA"), the Truth in Lending Act ("TILA"), as amended by the Home Ownership and Equity Protection Act ("HOEPA"); and/or the Racketeer Influenced and Corrupt Organizations Act ("RICO") by the Debtors. Set forth below are summaries of certain pending Borrower and other class action litigations, which are included for illustrative purposes only and are not intended to be inclusive of all mortgage loan-related litigation pending against the Debtors.

### (i)    Notable Borrower and Other Class Actions

Kessler Litigation. Several putative class actions filed between 2001-2003, all alleging that originators Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee charged certain interest rates and fees in violation of the applicable Secondary Mortgage Loan Act, were consolidated for settlement purposes in the U.S. District Court for the Western District of Pennsylvania. On September 22, 2010, the Third Circuit Court of Appeals vacated an order approving the settlement and remanded the case to the trial court for further proceedings. On October 10, 2011, plaintiffs filed a joint consolidated amended class action complaint against, among others, RFC alleging violations of RESPA; TILA, HOEPA, and RICO. Prior to the Petition Date, RFC filed a motion to dismiss the complaint. The action as against RFC was stayed upon the filing of the Petition. On June 27, 2013, the district court granted in part and denied in part the motions to dismiss of certain of the non-debtor defendants in the consolidated action.

Representatives of the putative class filed proofs of claim in the Chapter 11 Cases purportedly on behalf of the class, and on November 2, 2012, filed a motion with the Bankruptcy Court for authority to certify the class pursuant to Bankruptcy Rule 7023. In connection with the mediation and as provided for in the Plan Support Agreement, the Plan Proponents, over a period of several weeks, participated in extensive, good faith and arm's length negotiations with representative of the Kessler Class Action plaintiffs in an effort to resolve the class Proofs of Claim and the underlying litigation against RFC. Those efforts proved to be successful and the Debtors and representatives entered into a settlement agreement providing for, among other things, the treatment of the Kessler class' Proofs of Claim as Borrower Claims, and the certification of the putative class for settlement purposes.

-87-

The parties will be filing a joint motion to approve the settlement and for related relief. The settlement will be conditioned upon Plan effectiveness.

Moore v. GMACM, *et al.*    On December 20, 2006, a putative class action complaint was filed in United States District Court for the Northern District of California against defendants GMAC LLC (now AFI) and Cap Re.    After several named plaintiffs were dismissed from the action, the parties stipulated that the case would be transferred to the United States District Court for the Eastern District of Pennsylvania, where it is currently pending.    The plaintiffs have amended their claims several times, most recently in the third amended complaint, filed November 26, 2010.    That complaint, filed on behalf of plaintiffs Donna Moore, Frenchola Holden, and Keith McMillon, alleges that defendants GMACM, GMAC Bank (now known as Ally Bank) and Cap Re engaged in captive reinsurance arrangements that violated RESPA, 12 U.S.C. § 2607.    The third amended complaint seeks certification of a nationwide class, declaratory relief, statutory damages, and attorneys' fees and costs.

On July 10, 2012, GMACM filed a notice of bankruptcy, informing the court that GMACM and certain of its affiliates had filed petitions for relief under Chapter 11 of the Bankruptcy Code and the resulting imposition of the automatic stay under Section 362 of the Bankruptcy Code, enjoining the continued prosecution of the action against it.    Currently, the litigation remains stayed in its entirety, including plaintiffs' motion for class certification, although it could resume against defendants Cap Re and Ally Bank at any time.    Cap Re, Ally and the plaintiffs have, during the course of the litigation, engaged in formal mediation.    To date, the parties have not reached a resolution of the matter.    The class plaintiffs in the Moore litigation have filed Proofs Claim in the Chapter 11 Cases purportedly on behalf of the putative class.

#### (ii)    Other Borrower Class Actions

In addition to the *Moore* and *Kessler* putative class actions, the Debtors are also named defendants in approximately twelve (12) other putative actions commenced prior to the Petition Date, which were filed on behalf of current or former Borrowers in state and federal courts throughout the country (all of which have been stayed as a result of the filing of these Chapter 11 Cases).    The Borrower-plaintiffs seek monetary damages from the Debtors, which are premised on broad-based allegations that pertain generally to: (i) improper lending and disclosure practices; (ii) force-placing of hazard or flood insurance on individual Borrowers; (iii) improperly charging closing or refinancing fees to Borrowers; and (iv) wrongfully foreclosing on Borrowers' homes and subsequently disposing of the Borrowers' real property.    With the exception of two related cases in which a class was certified for settlement purposes before the Petition Date, none of these putative classes were certified as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure before the Petition Date or have been certified by this Court subsequent to the Petition Date.    Notwithstanding, certain of the named plaintiffs in these actions have filed proofs of claims against the Debtors purporting to represent and speak for the putative class without previously obtaining authority from any court of competent jurisdiction to do so.

The Debtors contend that they have meritorious defenses on both procedural and substantive grounds to each of these putative class actions and, prior to the Petition Date, the

Debtors were vigorously defending each such action other than those literally filed on the eve of the Petition Date. Nonetheless, based on: (i) the volume of the class actions; (ii) the damages asserted therein which exceed several billions of dollars in the aggregate; (iii) the anticipated costs of litigating these matters in connection with the claims resolution process; (iv) the uncertainty inherent in any litigation; and (v) the Debtors' objective of providing fair treatment to Borrowers under the Plan, the Debtors have or anticipate engaging in settlement discussions with lead counsel for each of these class actions in an effort to reach a consensual resolution of the underlying claims. To the extent the Debtors are unable to settle any putative class action on acceptable terms for which a proof of claim has been asserted, the Debtors expect they will promptly file claim objections with the Bankruptcy Court and pursue all appropriate procedural and substantive objections to these claims. To the extent the Debtors pursue such objections, the class action plaintiffs will have "Disputed" Claims and will not be entitled to receive any distributions from the Borrower Claims Trust until such time that the Claim are deemed "Allowed."

### (iii)    Notable Borrower Litigations Against Non-Debtor Affiliates

Included among the litigation commenced by the Debtors' current and former Borrowers against the Debtors are actions naming non-Debtor affiliates AFI, Ally Bank, and GMAC Mortgage Group as co-defendants. Among other bases, these actions assert claims against AFI, Ally Bank, and GMAC Mortgage Group under theories of alter ego, veil-piercing, dominion and control, and agency. As of the Petition Date, AFI and Ally Bank collectively were named as co-defendants in approximately 45 pending actions—including several putative class actions—commenced by current and former Borrowers. In addition, AFI is named as a co-defendant in an adversary proceeding commenced by American Residential Equities, LLC against GMACM and third party Balboa Insurance Company (Adv. Pro. No. 12-01934 (MG)), which is currently pending before the Bankruptcy Court. Several of the class actions have either been stayed as against all of the named defendants by the presiding courts pending the disposition of the Chapter 11 Cases, or are otherwise being held in abeyance. Ally has denied and continues to deny any breach, fault, liability or wrongdoing regarding claims alleged against Ally.

AFI and/or Ally Bank are named as co-defendants with a particular Debtor entity in five additional putative Borrower class actions pending in Ohio, Georgia, Alabama and South Carolina; however, the named plaintiffs in these actions have not filed proofs of claim in the Chapter 11 Cases on behalf of the punitive class.

Also included among the putative Borrower class actions naming AFI and/or Ally Bank are Moore *et al.* v. GMAC, LLC, Cap Re of Vermont, Inc., Case No. 06-cv-07817 (JCS) (N.D. Cal. Dec. 20, 2006); Rothstein v. Ally Financial, Inc. *et al.*, Case No. 12-cv3412 (AJN) (S.D.N.Y.) (the "Rothstein Action"). None of these class actions have been certified. The named plaintiffs in each of these class actions have filed proofs of claim on behalf of the putative class; however, none of these parties have obtained authority to do so from any court of competent jurisdiction.

The Rothstein Action was commenced by the filing of a complaint on April 30, 2012, naming only GMACM, Balboa Insurance Company ("Balboa"), a Balboa affiliate, and several

-89-

unnamed "John Does" as defendants. The original complaint was amended twice; by the first amended class action complaint filed in the Rothstein Action, the plaintiffs dropped GMACM as a defendant and named Ally Bank and AFI as co-defendants, along with additional Balboa entities. A second amended class action complaint was filed in the Rothstein Action on January 22, 2013.

In the Rothstein Action, the plaintiffs assert causes of action against AFI and Ally Bank under, among other bases, alter ego and dominion and control theories. The Rothstein Action is a nationwide class action arising out of allegations concerning hazard insurance allegedly placed by GMACM in its capacity as a servicer after March 6, 2003. Among other things, the plaintiffs allege that the mortgagors were overcharged for such services as a consequence of an undisclosed "kick- back scheme" between GMACM and Balboa. The amended complaint alleges violations of both RICO and RESPA, among other counts. As framed by the complaint filed in the Rothstein Action, the Debtors' preliminary estimates suggest that if ultimately certified, the certified class would be extremely large. Although, GMACM was dropped from the amended complaint filed in the Rothstein Action, the plaintiffs in the Rothstein Action have filed proofs of claim on behalf of the putative class in the Chapter 11 Cases.

AFI and Ally Bank have filed a motion in the Bankruptcy Court to enjoin the prosecution of the Rothstein Action on the basis that the alter ego and related claims alleged against AFI and Ally Bank constitute the property of the Debtors' Estates, and as such, only the Debtors are authorized to bring such claims. [Docket Nos. 2511]. The Debtors have joined in this motion and the Rothstein plaintiffs are opposing the motion. As of the date hereof, this motion has not been heard by the Bankruptcy Court. The Rothstein plaintiffs and AFI have agreed to stay further litigation against AFI and Ally Bank in the action pending the disposition of this motion. The Balboa defendants have moved in the District Court to dismiss the action as against Balboa. Balboa's motion to dismiss has been fully briefed before the District Court and remains pending as of the date hereof.

The Debtors have meritorious defenses on both standing and substantive grounds to each of the class actions and other Borrower related litigation to which their non-Debtor affiliates are named as parties. The Debtors understand that AFI, Ally Bank, and GMAC Mortgage Group likewise have meritorious defenses to these actions. Nonetheless, in combination, the class actions and other Borrower-related litigation allege damages in excess of several hundred million dollars. If any non-Debtor affiliate of AFI were to be found liable in any of these actions, such liability would give rise to claims for contribution and indemnity against the Debtors both on legal and contractual bases. Similarly, the AFI non-debtor affiliates have incurred and should these actions continue against such parties, will continue to incur professional fees and expenses associated with their defense of such actions for which they could seek indemnification from the Debtors. These expenses could easily exceed several millions of dollars, particularly in the event one or more of such actions survive motions to dismiss and then proceed with the class certification phases.

To properly defend each of the actions, AFI, Ally Bank, and GMAC Mortgage Group will require extensive access to the Debtors' books and records, current and former personnel, and the Debtors' external counsel. Moreover, many of those records now reside with Ocwen.

-90-

Supporting AFI and Ally Bank in these efforts would require considerable expense and effort on the part of the Debtors' Estates.

### 19.    Litigation against the Junior Secured Noteholders

The Junior Secured Noteholders collectively assert secured Claims in the amount of $2.223 billion, including principal and accrued pre-petition interest.  The Debtors and the Creditors' Committee believe that the Junior Secured Noteholders are significantly undersecured because the value of the collateral securing the Junior Secured Notes is approximately $1.69 billion (subject to adjustment based on expense allocation).  The Ad Hoc Group has publicly contended that the Junior Secured Noteholders are oversecured and thus entitled to principal and pre-petition interest, as well as accrued post-petition interest at the default contractual rate of 10.625%.  In response, the Debtors and the Creditors' Committee have separately commenced adversary proceedings seeking judicial determinations as to a number of issues bearing on the size of the Junior Secured Noteholders' Claims and the extent and validity of the liens securing the Junior Secured Notes.  On June 21, 2013, the Court entered an order consolidating the adversary proceedings (the "Consolidated Proceedings"), which are expected to go to trial on or about the week of October 7.  The Junior Secured Noteholders are not a party to the Plan Support Agreement and, as a result, the Consolidated Proceedings are not stayed.

The Plan currently provides that the Junior Secured Noteholders will receive payment for the full amount of their pre-petition claims, including both principal and pre-petition accrued interest.  However, the Plan (i) does not resolve the issue of whether the Junior Secured Noteholders' pre-petition claim for the principal balance includes approximately $377 million in original issue discount that had not been amortized as of the Petition Date, and (ii) reserves on the issue of whether the Junior Secured Noteholders are entitled to post-petition interest and other charges.   As noted above, it is anticipated that these issues will be litigated prior to the Confirmation Hearing.  If the Court determines the Junior Secured Noteholders are oversecured creditors, the Junior Secured Noteholders could be entitled to up to approximately $330 million in post-petition interest (calculated as of October 2013).  The Plan contains a mechanism to allow for such payments, by adjusting certain other Creditor recoveries accordingly.

On June 13, 2013, the Bankruptcy Court approved the Debtors' amended motion requesting authorization to (i) fully satisfy the outstanding secured claims of AFI under the AFI LOC in the amount of $380 million, plus accrued and unpaid interest; (ii) fully satisfy the outstanding secured claims of AFI under the AFI Senior Secured Credit Facility in the amount of $747 million, plus accrued and unpaid interest; and (iii) partially satisfy the outstanding secured claims of the Junior Secured Noteholders in the amount of $800 million [Docket No. 3967].  The Debtors decided to fully pay down AFI, and partially pay down the Junior Secured Noteholders, in accordance with the Plan Support Agreement.  The Plan Support Agreement provides that the Creditors' Committee and the Consenting Claimants will support a partial paydown of the Junior Secured Notes as long as the Debtors first repay the AFI Senior Secured Credit Facility, subject to a reservation of rights to permit the Debtors to seek to recharacterize or subordinate the AFI Claims relating to the AFI LOC or the AFI Senior Secured Credit Facility in the event that the Plan Support Agreement is terminated or the Plan is not approved.  The parties believe that the repayment of each of the AFI LOC, the AFI Senior Secured Credit Facility, and the Junior

Secured Notes will benefit the Debtors' Estates by eliminating the interest expense associated with the AFI LOC and the AFI Senior Secured Credit Facility, which the Debtor had been paying on a current basis, thereby enhancing distributions to unsecured creditors, as well as reducing the potential interest expenses for the Junior Secured Notes. In the event that the Court determines the Junior Secured Noteholders are oversecured creditors, the partial repayment of the Junior Secured Noteholders alleviates the accrual of post-petition interest on such claims. Accordingly, the Debtors do not believe that the proposed payments will in any way prejudice unsecured Creditor recoveries.

### (a)   Creditors' Committee's Motion for Standing to Prosecute Claims Against the Junior Secured Noteholders

Pursuant to the AFI/JSN Cash Collateral Order, shortly after its appointment, the Creditors' Committee undertook an investigation of the validity and enforceability of the claims and liens of the Junior Secured Noteholders. On September 24, 2012, after identifying potential challenges to the claims and liens of the Junior Secured Noteholders, on September 24, 2012, the Creditors' Committee filed a motion seeking authorization to prosecute and settle certain claims on behalf of the Debtors' Estates against U.S. Bank, as indenture trustee for the Junior Secured Notes (as succeeded by UMB Bank, N.A., the "Junior Secured Notes Indenture Trustee"), and Wells Fargo Bank, N.A., as collateral agent for the Junior Secured Notes (the "JSN Collateral Agent"). [Docket No. 1546].

The Creditors' Committee believed it was best positioned to prosecute and settle the claims because the Debtors had (i) entered into numerous stipulations in the AFI/JSN Cash Collateral Order regarding the validity, enforceability, and perfection of the Claims and Liens of the Junior Secured Notes Indenture Trustee, the JSN Collateral Agent, and the Junior Secured Noteholders (collectively, the "Junior Secured Parties"), and (ii) agreed to waive all such claims against the Junior Secured Parties. These stipulations and waivers would have become binding on all parties in interest unless objected to by the Creditors' Committee by September 24, 2012. Prior to that deadline, the Creditors' Committee conducted an extensive investigation into the Claims and Liens of the Junior Secured Parties, and the Debtors consented to the Creditors' Committee's derivative standing to investigate the Claims and initiate an adversary proceeding against the Junior Secured Parties. The Creditors' Committee preserved its objection rights by filing a motion for standing to prosecute and settle the Claims before the deadline.

On December 26, 2012, the Bankruptcy Court entered an order granting the Creditors' Committee's motion for standing to prosecute and settle certain claims on behalf of the Debtors' Estates against the Junior Secured Parties (the "Committee JSN Standing Order"). The Committee JSN Standing Order required that the Creditors' Committee to file an adversary complaint by February 28, 2013, and authorized the Creditors' Committee to enter into any settlements with the Junior Secured Parties in consultation with the Debtors. [Docket No. 2518].

### (b)   Adversary Proceeding:
### *Official Committee of Unsecured Creditors v. UMB Bank, N.A., et al.*

Pursuant to the Committee JSN Standing Order, on February 28, 2013, the Creditors' Committee filed a complaint commencing an adversary proceeding against the Junior Secured

-92-

Notes Indenture Trustee and the JSN Collateral Agent for declaratory judgment, avoidance of Liens, and disallowance of Claims. [Docket No. 3069]. The complaint seeks: (i) a declaratory judgment that certain property of the Debtors is not subject to Liens or security interests asserted by the JSN Collateral Agent for the benefit of the Junior Secured Notes Indenture Trustee and the Junior Secured Noteholders; (ii) a declaratory judgment that certain Liens or security interests asserted by the Junior Secured Parties on property of the Debtors are unperfected; (iii) an order avoiding the Junior Secured Parties' unperfected Liens on or security interests in certain property under Sections 544, 550, and 551 of the Bankruptcy Code; (iv) an order avoiding certain Liens or security interests asserted by the Junior Secured Parties on at least $350 million of assets as preferential transfers under Sections 547, 550, and 551 of the Bankruptcy Code; (v) an order recharacterizing postpetition payments to the Junior Secured Parties' professionals as payments of principal; (vi) an order clarifying the priority of the Junior Secured Parties' Liens; (vii) an order disallowing the Junior Secured Parties' Claims pending final resolution of the Claims in the complaint; and (viii) an order disallowing the Junior Secured Parties' Claims to the extent such Claims include unmatured interest arising as a result of an original issue discount at the time the Junior Secured Notes were issued.

(c)    **Adversary Proceeding:**
*Residential Capital, et al. v. UMB Bank, N.A., et al.*

On May 3, 2013, the Debtors filed a complaint against the Junior Secured Parties to determine the extent of certain liens securing the Junior Secured Notes [Docket No. 3592]. On June 19, 2013, the Debtors amended their complaint [Adv. Pro. Docket No. 8]. The Debtors' amended complaint seeks declaratory judgments that: (i) the Junior Secured Noteholders' Lien on general intangibles does not extend to any portion of the proceeds of, or value attributed to, the Debtors' sale of assets to Ocwen or Walter; (ii) the Junior Secured Noteholders are not entitled to an adequate protection replacement Lien in an amount equal to all or any portion of the Junior Secured Noteholders' cash collateral that the Debtors have used during the Chapter 11 Cases because there has been no diminution in the value of the Junior Secured Noteholders' collateral during the pendency of the Chapter 11 Cases; (iii) the Junior Secured Noteholders are not entitled to a Lien on the assets that secure the AFI LOC or any other assets that have been released from the Junior Secured Noteholders' collateral; (iv) the Junior Secured Noteholders are not entitled to a Lien on any proceeds from avoidance actions prosecuted on behalf of the Debtors' Estates; and (v) the Junior Secured Noteholders are not oversecured at any individual Debtor entity, and as a result are not entitled to post-petition interest either at the contractual rate or the contractual default rate.

On June 28, 2013, the Junior Secured Parties filed the *Answer, Affirmative Defenses and Counterclaims of Defendants UMB Bank, N.A. and the Ad Hoc Group of Junior Secured Noteholders to Debtors' First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment* [Adv. Pro. Docket No. 14], which, in addition to answering the complaint and raising certain affirmative defenses, sets forth thirty-four (34) counterclaims relating to all aspects of these Chapter 11 Cases. In particular the Junior Secured Noteholders seek declarations concerning: (i) the ownership and value of collateral, (ii) the Intercompany Balances and the value of those claims, (iii) the allocation of the Ally Contribution among the Debtors' Estates and among each potential Cause of Action underlying the Debtor Release and

-93-

the Third Party Releases, (iv) the allocation of the purchase prices of the Asset Sales, (v) the collateral released prepetition in connection with one of the Debtors' secured financings, (vi) the Junior Secured Noteholders' alleged entitlement to adequate protection Liens, (vii) the Junior Secured Noteholders' alleged entitlement to postpetition interest, fees, and expenses, including accrual of interest at the contractual default rate pursuant to the Junior Secured Notes Indenture, and (viii) the treatment of certain General Unsecured Claims resolved by the Global Settlement that the Junior Secured Noteholders' allege should be subordinated to other Creditors under Section 510 of the Bankruptcy Code, each of which the Junior Secured Noteholders' allege impacts their entitlement to post-petition interest, fees, and expenses.

### (d)      Treatment of Junior Secured Noteholders' Claims under Plan

No principals for the Junior Secured Noteholders participated in Mediation or in any Plan negotiation sessions, and ultimately did not enter into the Plan Support Agreement. Notwithstanding the Plan provides that the Junior Secured Noteholders will receive payment in full on account of their Allowed Claims, with such amount to be determined pursuant to pending adversary proceedings challenging the extent and validity of the Junior Secured Noteholders' claims and security interests. To the extent the Bankruptcy Court ultimately determines that the Junior Secured Noteholders are oversecured and entitled to post-petition interest, the Plan contains a mechanism to allow for such payments.

### 20.      Other Pending Adversary Proceedings

### (a)      *Residential Capital, LLC et al. v. Allstate Ins. Co. et al.*

On November 27, 2012, Allstate Insurance Company (and affiliated entities), AIG Asset Management (U.S.), LLC (and affiliated entities), Massachusetts Mutual Life Insurance Company, Prudential Insurance Company of America (and affiliated entities) (collectively with the NCUAB, the "Securities Investors") filed a motion seeking a declaration that their claims arising from the purchase of the Debtors' RMBS were not subordinated under Section 510 of the Bankruptcy Code. [Docket No. 2284] (the "Rule 3013 Motion"). On January 4, 2013, the NCUAB filed a joinder to the Rule 3013 Motion. [Docket No. 2555]. On February 19, 2013, the Debtors filed an opposition to the Rule 3013 Motion [Docket No. 3953] and commenced an adversary proceeding against the Securities Investors seeking a declaration from the Bankruptcy Court that the Securities Investors' claims should be subordinated to the Debtors' general unsecured claims pursuant to section 510 of the Bankruptcy Code. [Docket No. 2970]. The Securities Investors had brought securities fraud claims (including federal claims, blue-sky law claims, and common law claims) against the Debtors arising out of their investments in the Debtors' RMBS. Those claims had been asserted in pre-petition litigation and/or in proofs of claim filed in the Chapter 11 Cases. The Rule 3013 Motion and the adversary proceeding were subsequently consolidated. After the Bankruptcy Court directed the parties to meet and confer to determine whether the disputed issues could be resolved by summary judgment, all of the parties moved for summary judgment with the Bankruptcy Court's permission. As a result of the Plan Support Agreement, this litigation and all other pleadings seeking to subordinate the claims of the Securities Investors pursuant to Section 510 of the Bankruptcy Code are stayed during the term of the Plan Support Agreement.

-94-

### (b)    *American Residential Equities, LLC v. GMACM*

American Residential Equities, LLC ("ARE") commenced an adversary proceeding against GMACM, Balboa Insurance Company, and AFI on November 9, 2012 [Docket No. 2118].  On March 22, 2013, ARE filed a first amended complaint in the adversary proceeding. The first amended complaint contains various counts against GMACM, including alleged breaches of a loan servicing agreement between ARE and GMACM, a declaratory judgment that certain alleged assets are not property of the Debtors' Estates, conversion, breach of fiduciary duty, turnover, a request for an accounting, and fraud and fraudulent inducement.  Among other things, the first amended complaint requests damages in an amount to be determined at final judgment.  GMACM, Balboa and AFI have filed motions to dismiss the first amended complaint. To date, the Bankruptcy Court has not ruled on any of these motions.

### 21.    FIRREA Investigation

On March 18, 2013, the US Attorney's Office for the Central District of California served an investigative subpoena on counsel for ResCap, and related entities, under 12 U.S.C. 1833a (Financial Institutions Reform, Recovery, and Enforcement Act of 1989, or FIRREA).  The subpoena seeks documents relating to ResCap's (and related entities') RMBS, as well as information relating to loans underlying the RMBS and general information about ResCap's business.  The requests seek information for the time period of 2005 to the present.  ResCap has produced documents and otherwise has cooperated in the investigation.  This fact-finding investigation is ongoing.  No claims have been asserted against ResCap or any of its current or former personnel.

### 22.    SEC Investigation

On February 23, 2012, the staff of the Los Angeles Regional Office of the US Securities and Exchange Commission served an investigative subpoena on counsel for ResCap, and related entities.  The staff issued the subpoena pursuant to the Commission's Formal Order of Investigation issued under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.  The subpoena sought documents relating to ResCap's (and related entities') RMBS, as well as general information about ResCap's business.  The subpoena sought information from the time period of 2006 to the present.  ResCap produced documents responsive to the subpoena and otherwise cooperated with the staff.  On June 13, 2012, the staff served a second subpoena on counsel for ResCap seeking additional information about the RMBS and investors in the RMBS, again for the time period of 2006 to the present.  ResCap produced documents responsive to the subpoena and otherwise cooperated with the staff.  No claims have been asserted against ResCap or any of its current or former personnel.

### 23.    Intercompany Balances

For a complete description of the Intercompany Balances and a discussion of the compromise thereof, see Article [**III**] and Exhibit 5**.**

24.     **Wind Down of Daily Operations**

Following the close of the Asset Sales, the Debtors still hold significant and material assets, including approximately $1.4 billion[53] of non-cash assets to be monetized, as discussed in detail in Article VI—"Recovery Analysis."  Accordingly, the Estates will continue to administer and manage these assets as part of their wind down process by monetizing and maximizing the assets' value.

<div align="center">

**ARTICLE V.**
**OTHER PLAN PROVISIONS**

</div>

**IN ADDITION TO THE DISCUSSION OF THE PLAN IN ARTICLE [●], THE FOLLOWING IS A SUMMARY OF SIGNIFICANT ELEMENTS OF THE PLAN.  THE SUMMARIES OF THE PLAN PROVISIONS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE DESCRIPTIONS OF ALL OF THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.   IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**PLEASE   BE   ADVISED   THAT   THE   PLAN   CONTAINS   RELEASE, EXCULPATION AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER  THE  PLAN  CAREFULLY  BECAUSE  YOUR  RIGHTS  MAY  BE AFFECTED THEREUNDER.**

A.     **Unclassified Claims**

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, certain types of claims— including Administrative Claims, Professional Claims, Priority Tax Claims and U.S. Trustee Fees (collectively, the "Unclassified Claims")—are not included in the classification of Claims and Equity Interests under the Plan.  Accordingly, the Unclassified Claims have not been classified and, therefore, are excluded from the Classes of Claims and Equity Interests set forth in Article III of the Plan.   The Unclassified Claims shall have the following treatment:

---

[53] The asset balances are $1.4 billion after certain proforma adjustments, as of April 30, 2013.

<div align="center">

-96-

</div>

1.      **Administrative Claims**

(a)      **Treatment of Administrative Claims Other than Professional Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim, or set forth in an order of the Bankruptcy Court, the Liquidating Trust will pay each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to Section 1930 of Chapter 123 of title 28 of the United States Code) the full unpaid amount of such Claim in Cash: (1) if the Administrative Claim is Allowed before the Effective Date, on the Effective Date, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); or (2) if the Administrative Claim is Allowed on or after the Effective Date, on the date such Administrative Claim is Allowed, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); provided, however, that Allowed Administrative Claims other than Professional Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, that accrued and unpaid Postpetition Intercompany Balances shall be satisfied pursuant to the Cash Management Order without further application or order of the Bankruptcy Court.  On or after the Effective Date, the Liquidating Trust may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(b)      **Administrative Claims Bar Date**

Except as provided for in the Plan or in any order of the Bankruptcy Court, holders of Administrative Claims (other than holders of Administrative Claims paid in the ordinary course of business, holders of Professional Claims, holders of Claims for fees and expenses pursuant to Section 1930 of Chapter 123 of title 28 of the United States Code, and holders of Postpetition Intercompany Balances) must File and serve on the Plan Proponents or the Liquidating Trust, as applicable, requests for the payment of such Administrative Claims not already Allowed by Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claims Bar Date or be forever barred, estopped, and enjoined from asserting such Claims against the Debtors, the Liquidating Trust, or their assets or properties, and such Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the Plan Proponents or the Liquidating Trust, as applicable, and the requesting party no later than ___.

2.      **Professional Claims**

(a)      **Final Fee Applications**

All final requests for Professional Claims must be Filed no later than seventy-five (75) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims will be determined by the Bankruptcy Court.

(b)    **Professional Fee Escrow Account**

On the Effective Date, the Debtors will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account will be maintained in Trust for the Professionals. The funds in such account will not be property of the Liquidating Trust.  The amount of Professional Claims owing to the Professionals will be paid in Cash to such Professionals by the Liquidating Trust, or at the Liquidating Trust's direction, from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by Final Order; provided, that the Liquidating Trust's liability for Professional Claims shall not be limited nor be deemed to be limited to the funds available from the Professional Fee Escrow Account. After all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, will be transferred to the Liquidating Trust. Specific treatment for certain amounts payable to Centerview Partners LLC and Moelis & Company LLC is set forth in the Plan.

(c)    **Professional Fee Reserve Amount**

To receive payment for Accrued Professional Compensation incurred through the Effective Date, Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and deliver such estimate to the Plan Proponents at least five (5) Business Days prior to the anticipated Effective Date. If a Professional does not provide such estimate, the Plan Proponents may estimate the unbilled fees and expenses of such Professional. The total amount so estimated will constitute the Professional Fee Reserve Amount; provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional. The Professional Fee Reserve Amount and the estimated Accrued Professional Compensation amounts submitted by the Professionals will be subject to review by the Debtors, the Consenting Claimants, and the Creditors' Committee, and any objections to the Professional Fee Reserve Amount must be served on the Plan Proponents prior to the Effective Date.

(d)    **Post-Effective Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, the Liquidating Trust shall pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals from and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date,

-98-

the Liquidating Trust will pay such holder of an Allowed Priority Tax Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash on, or as soon as practicable after, the latest of: (1) the Effective Date; (2) the date such Allowed Priority Tax Claim becomes Allowed; or (3) in quarterly payments over a period of time not to exceed five (5) years after the Petition Date, in accordance with Bankruptcy Code section 1129(a)(9)(C); provided that such election will be without prejudice to the Liquidating Trust's right to prepay such Allowed Priority Tax Claim in full or in part without penalty.

### 4.    U.S. Trustee Fees

On the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  For the avoidance of doubt, nothing in the Plan shall release the Liquidating Trust from its obligation to pay all U.S. Trustee Fees due and owing after the Effective Date before a Final Order is entered by the Bankruptcy Court concluding or closing the Chapter 11 Cases.

### B.    Classification, Treatment, and Voting of Claims and Equity Interests

All Claims and Equity Interests, except Administrative Expense Claims, Professional Claims, Priority Tax Claims, U.S. Trustee Fees, and Postpetition Intercompany Balances, are classified in the Classes set forth in Article III of the Plan.  The classification, voting rights and treatment of Allowed Claims and Equity Interests are summarized in Article I above.

### C.    Establishment of Trusts and Provisions Governing Issuance of Units and Distributions

As discussed above in Article I, the Plan establishes three separate Trusts for administering distributions to creditors: (i) the Liquidating Trust, (ii) the Private Securities Claims Trust, and (iii) the Borrower Claims Trust.  All Available Assets will be transferred to the Liquidating Trust on the Effective Date, and the Liquidating Trust will fund the Borrower Claims Trust in Cash, and the Private Securities Claims Trust with Units.  Except as provided below, the Liquidating Trust will administer all other distributions under the Plan.

### 1.    Liquidating Trust

The Liquidating Trust shall be established for the purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose described in this Plan and set forth in the Liquidating Trust Agreement. The Liquidating Trust, acting through the Liquidating Trust Board, Liquidating Trust Management, and their agents, shall wind down the affairs of the Debtors and perform the assumed obligations under the DOJ/AG Settlement, Consent Order, and Order of Assessment in accordance with the terms of the Plan.

a)    *Transfer of Assets to the Liquidating Trust*. On the Effective Date, the Debtors are authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating

-99-

Trustee, for the benefit of the Liquidating Trust, in the form thereof existing on such date, all of the Debtors' and Estates' right, title and interest in and to the Available Assets free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons and Entities to the maximum extent contemplated by and permissible under section 1141 of the Bankruptcy Code.

Notwithstanding the foregoing, (i) if on the Effective Date, any of the Available Assets cannot be transferred to the Liquidating Trust for any reason, the Debtors shall continue to hold such Available Assets, as bailee for the account of the Liquidating Trust, until such time as the Liquidating Trust may receive such Available Assets (and any proceeds of such assets retained by the Debtors shall constitute Available Assets) and (ii) subject to the entry of the Kessler Settlement Approval Order, the GM Insurance Rights to be assigned to the Kessler Settlement Class or any other GM Insurance Rights that are assigned to any other Creditor pursuant to order of the Bankruptcy Court prior to or at Confirmation, shall be excluded from the Available Assets assigned to the Liquidating Trust.

The Debtors and the Liquidating Trust, as successor in interest to the Estates, may (i) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (ii) take, or cause to be taken, all such further action in order to evidence, vest, perfect or effectuate the transfer of the Available Assets to the Liquidating Trust and consummate transactions contemplated by and to otherwise carry out the intent of the Plan.   Upon the transfer of the Available Assets, the Liquidating Trust shall succeed to all of the Debtors' right, title and interest in the Available Assets, and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

b) *Liquidating Trust Administrative Reserve*. The Liquidating Trust Administrative Reserve shall be established on the Effective Date for the purpose of maintaining Cash from time to time necessary, subject to the Liquidating Trust Budget, to satisfy reasonable costs and expenses of the Liquidating Trust and other obligations incurred or reasonably anticipated by the Liquidating Trust in accordance with the Plan Documents, including without limitation, fees and costs incurred in connection with (i) the implementation of the Plan, including to the extent not paid on the Effective Date, funds for making the payments provided in Article VII.B.2 (ii) the liquidation of the Liquidating Trust Assets, (iii) the resolution of Disputed Claims, and other Causes of Action, (iv) the winding down of the Estate and affairs of the Debtors, (v) the costs of performing under the DOJ/AG Settlement, (vi) the reserves for potential liabilities and (vii) compensation for the Liquidating Trust Board, Liquidating Trust Management, and the employees, professionals, advisors and other agents of the Liquidating Trust.  Any Cash released from the Liquidating Trust Administrative Reserve shall be available for distribution to the Unitholders.

c) *Liquidating Trust Governance*. The affairs of the Liquidating Trust shall be managed by, or under the direction of, the Liquidating Trust Board, which shall consist of five (5) Liquidating Trustees, one of whom shall be selected by each of (i) MBIA, (ii) FGIC, (iii) the RMBS Trustees that are members of the Creditors' Committee, the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants, jointly, (iv) Paulson, and

-100-

(v) the holders of Private Securities Claims, and such other Liquidating Trustees as agreed to by the Plan Proponents and the Consenting Claimants. The Liquidating Trust Board shall be authorized and empowered to undertake, acting through the management and agents of the Liquidating Trust, actions on behalf of the Liquidating Trust, including without limitation (i) to hold, manage, dispose and convert to Cash, the Liquidating Trust Assets, (ii) to maintain the Liquidating Trust Administrative Reserve and the Disputed Claims Reserve, (iii) to appoint and supervise management and agents of the Trust and (iv) to prepare and review periodic financial reports of the Liquidating Trust.

The Liquidating Trust Board shall elect a Liquidating Trustee to act as the Chairman of the Liquidating Trust Board and may designate one or more committees of the Liquidating Trust Board. The Liquidating Trust Board shall appoint officers or other representative agents of the Liquidating Trust, including a Liquidating Trust manager and a secretary to serve as the Liquidating Trust Management and carry out the purpose of the Liquidating Trust. The Liquidating Trust Management shall be authorized to hire employees and engage advisors and other professionals, subject to any limitations imposed by the Liquidating Trust Board.

   d)   *Tax Treatment*

      a. *In General*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trust Board and the Unitholders) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as:

   (i)   a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Unitholders, other than Liquidating Trust Assets that will be distributed pursuant to Article VII.B of the Plan or that are allocable to Disputed Claims (based on such Claims' Pro Rata Share of such Liquidating Trust Assets), followed by

   (ii)   the transfer by such Unitholders to the Liquidating Trust of such Liquidating Trust Assets in exchange for the Units.

Accordingly, those holders of Allowed Unsecured Claims receiving Units shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets that will be distributed pursuant to Article VII.B of the Plan or that are allocable to the Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

      b. *Tax Reporting*

   (i)   The Liquidating Trust shall file returns treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Article VI.F. The Liquidating Trust also shall annually send or otherwise make available to each holder of Units a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their U.S. federal

income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income tax returns. The Liquidating Trust Board also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit.

(ii)    As soon as possible after the Effective Date, the Liquidating Trust shall make a good-faith valuation of the Liquidating Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the holders of Allowed Unsecured Claims, and the Unitholders) for all U.S. federal income tax purposes.

(iii)    Allocation of Liquidating Trust taxable income and loss among the beneficiaries of the Liquidating Trust (other than taxable income and loss allocable to the Disputed Claims Reserve) shall be made Pro Rata to the holders of beneficial interests in the Liquidating Trust.

(iv)    The Liquidating Trust shall (A) treat the Disputed Claims Reserve and Liquidating Trust Assets allocable thereto as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 by timely making an election and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

(v)    The Liquidating Trust shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including the Disputed Claims Reserve. In the event, and to the extent, that any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts otherwise distributable as a result of the resolution of such Disputed Claims.

(vi)    The Liquidating Trust may request an expedited determination of taxes of the Liquidating Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

e)    *Duration.* The Liquidating Trust shall be dissolved as soon as practicable after the date that is the earliest to occur of: (i) the distribution of all Liquidating Trust Assets available for distribution pursuant to the Plan, (ii) the determination of the Liquidating Trust Board that the administration of the Liquidating Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all the distributions required to be made by the Liquidating Trust have been completed; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date, unless the Bankruptcy Court, upon motion within the six (6) months prior to the third (3rd) anniversary of the Effective Date, determines that a fixed-period extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets (without the need for a favorable private letter ruling from the Internal Revenue Service that any further extension

-102-

would not adversely affect the status of the trust as a Liquidating Trust for United States federal income tax purposes).

f) *Exculpation; Indemnification; Insurance*. The Liquidating Trust Board, the Delaware Trustee, the Liquidating Trust Management and their respective affiliates, and their respective officers, directors, partners, members, managers and employees shall be indemnified to the fullest extent permitted by law by the Liquidating Trust against all liabilities arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of their duties with respect to the Liquidating Trust, except for those acts that are determined by Final Order to have arisen out of their own willful misconduct, gross negligence, or bad faith.

The Liquidating Trust will maintain customary insurance coverage for the protection of the Liquidating Trustees, the Delaware Trustee and the Liquidating Trust Management from and after the Effective Date.

## 2.    Private Securities Claims Trust

The Private Securities Claims Trust will assume all liability for the Private Securities Claims. Distributions from the Private Securities Claims Trust to Private Securities Claims Trust Beneficiaries will occur in accordance with the Private Securities Claims Trust Agreement, which will be executed in a form reasonably acceptable to the Plan Proponents, Ally, and the Settling Private Securities Claimants on or before the Effective Date. The Private Securities Claims Trust Agreement, or a substantially complete version thereof, will be filed no later than ten (10) days prior to the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, as part of the Plan Supplement. The Settling Private Securities Claimants are conferring with the other Holders of Private Securities Claims on the terms of the Private Securities Claims Trust, and will continue to do so, with involvement from the Plan Proponents, in order to facilitate the understanding and agreement of all Private Securities Claimants.

The Private Securities Claims Trustee will be appointed in the Confirmation Order, following the recommendation of one or more candidates by the Settling Private Securities Claimants and the designation of the final choice with the reasonable consent of the Plan Proponents. The Private Securities Claims Trustee's authority will be effective as of the Effective Date, provided that the Private Securities Claims Trustee will be permitted to act in accordance with the Private Securities Claims Trust Agreement following the Confirmation Date.

Each Private Securities Trust Assets, each Private Securities Claim will be classified, strictly for purposes of the Private Securities Claims Trust, based on objective characteristics that establish its strength, viability, and litigation status (a "Tier"). The Settling Private Securities Claimants are currently engaged in discussions concerning the specifics of the Tiers and anticipate providing additional information concerning the Tiers in the Plan Supplement. The Settling Private Securities Claimants are also engaged in discussions with other Private Securities Claimants regarding the possibility of establishing additional Tiers for allocating distributions on account of other categories of claims. These additional Tiers, if any, will be set forth in the Private Securities Claims Trust Agreement.

-103-

Further to the goal of an objective and impartial allocation of the Private Securities Trust Assets, each Private Securities Claim has been or will be valued based on the losses/damages incurred by each Private Securities Claimant, as determined in accordance with the procedures set forth in the Private Securities Claims Trust Agreement.   For purposes of the Private Securities Claims Trust, the Allowed Private Securities Claims held by AIG, Allstate, MassMutual, and Prudential are set forth in the Supplemental Term Sheet.[54]   All other Private Securities Claims will be determined in a consistent manner.

The Private Securities Claims Trustee will distribute income received by the Private Securities Claims Trust promptly upon receipt, after paying unpaid expenses of the Private Securities Claims Trustee and reserving (x) for future reasonable expenses, (y) for Private Securities Claims that are disputed or not yet Allowed, and (z) as needed to ensure that sufficient assets will be available for each Private Securities Claims Trust Beneficiary to receive its share of Private Securities Trust Assets following any dilution of recoveries caused by the Adjustments.

### 3.    Borrower Claims Trust

The Borrower Claims Trust shall be established for the sole benefit of the holders of Allowed Borrower Claims, and shall consist of the Borrower Claims Trust Assets. The Borrower Claims Trust shall be administered by the Borrower Claims Trustee, subject to oversight and supervision by the Borrower Claims Trust Committee, who shall administer and distribute the Borrower Claims Trust Assets to holders of Allowed Borrower Claims in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.  The Borrower Claims Trust shall be completely independent of the Liquidating Trust and the Liquidating Trustee shall have no authority over the Borrower Claim Trust or the Borrower Claims Trustee.

a)    *Borrower Claims Trust Agreement.* On or before the Effective Date, the Borrower Claims Trust Agreement, in a form reasonably acceptable to the Plan Proponents, Ally and the Kessler Class Claimants, shall be executed, and all other necessary steps shall be taken to establish the Borrower Claims Trust and the interests therein, which shall be for the benefit of the holders of Allowed Borrower Claims.  In the event of any conflict between the terms of the Plan with respect to the Borrower Claims Trust and the terms of the Borrower Claims Trust Agreement, the Borrower Claims Trust Agreement shall govern.   The Borrower Claims Trust Agreement includes: (i) participation and qualification criteria for holders of Borrower Claims to receive a distribution from the Borrower Claims Trust Assets, (ii) procedures for the prosecution and settlement of objections to Borrower Claims, including those previously filed by the Debtors or any other party, (iii) the establishment of reserves for Disputed Borrower Claims; and (iv) the establishment of procedures to resolve Disputed Borrower Claims, inclusive of any counterclaims or offsets in favor of the Debtors.

b)    *Purpose of the Borrower Claims Trust.* The Borrower Claims Trust shall be established to, among other things, (i) direct the processing, liquidation and payment of the

---

[54] For voting purposes only, AIG's Claim will be valued at $1.168 billion; Allstate's Claim will be valued at $140 million; MassMutual's Claim will be valued at $218 million; and Prudential's Claim will be valued at $227 million.

-104-

ny-1097924

Allowed Borrower Claims in accordance with the Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserve, hold, and manage the assets of the Borrower Claims Trust for use in satisfying Allowed Borrower Claims.

c)    *Assumption of Certain Liabilities by the Borrower Claims Trust*.  In consideration of the Borrower Claims Trust Assets transferred to the Borrower Claims Trust and in furtherance of the purposes of the Borrower Claims Trust and the Plan, the Borrower Claims Trust shall assume all liability for all Borrower Claims, and neither the Debtors, the Released Parties, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor.

d)    *Borrower Claims Trust Assets*.  The Borrower Claims Trust shall consist of the Borrower Claims Trust Assets and any other assets held from time to time incidental to the administration of the Borrower Claims Trust.  On the Effective Date, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the Borrower Claims Trust with the Cash portion of the Borrower Claims Trust Assets free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein.

e)    *Governance of the Borrower Claims Trust*.  The Borrower Claims Trust shall be administered by the Borrower Claims Trustee subject to the supervision and oversight of the Borrower Claims Trust Committee.  The Borrower Claims Trustee will be designated by counsel for the Kessler Class Claimants with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.  The Borrower Claims Trust Committee will comprise Borrowers or representatives of Borrowers appointed to oversee the administration of the Borrower Claims Trust and the disposition of the Borrower Claims Trust Assets.  The identities of the initial Persons to serve on the Borrower Claims Trust Committee as of the Effective Date will be set forth in the Plan Supplement, and will include (i) counsel for the Kessler Settlement Class and (ii) those Borrowers or representatives of Borrowers appointed by the Kessler Settlement Class, with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.  The Borrower Claims Trustee will be designated by counsel for the Kessler Settlement Class with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.

f)    *Distribution of the Borrower Claims Trust Assets*.  It is the intention that distributions made from the Borrower Claims Trust on account of an Allowed Borrower Claim will be comparable to the recovery that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim, based on the value of the assets in the Liquidating Trust available for distribution to holders of Units as of the Effective Date (without in each case giving effect to any insurance proceeds, including proceeds from the GM Policies, that may be received in respect of certain of the Allowed Borrower Claims or to the time delay in receipt of distributions in respect of the Units issued by the Liquidating Trust).  For the avoidance of doubt, the comparable recovery percentages that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim shall be established once and finally and for all  purposes, including for all future distributions by the Borrower Claims Trust, at the time of and in connection with the Borrower Trust True-Up and confirmation of the Plan, and neither the amount to be transferred to the Borrower Claims Trust nor the percentage

-105-

distributions from the Borrower Claims Trust shall be adjusted following the Effective Date based on actual experience with respect to recoveries from the Liquidating Trust following the Effective Date of the Plan.

Except as otherwise provided herein or in the Kessler Settlement Agreement, to the extent a Borrower recovers insurance proceeds on account of all or some of an Allowed Borrower Claim, (i) if distributions on account of such Allowed Borrower Claim have not been made, the amount of such Allowed Borrower Claim shall be reduced to the extent paid by insurance proceeds, or (ii) if distributions on account of such Allowed Borrower Claim have been made, the Borrower shall be required to return an amount equal to all distributions received by the Borrower from the Borrower Claims Trust on account of such Allowed Borrower Claim multiplied by a fraction, the numerator of which is the amount of the insurance proceeds received and the denominator of which is the amount of its Allowed Borrower Claim.  Such Borrower shall thereafter continue to be entitled to its proportionate share of any future distribution from the Borrower Claims Trust.  For the avoidance of doubt, the Kessler Settlement Class shall continue to be entitled to its proportionate share of any such future distribution.  Any Borrower who recovers insurance proceeds on account of all or some of an Allowed Borrower Claim shall be required to notify the Borrower Claims Trustee of such recovery within ten (10) Business Days of receipt.

If any Borrower Claim constitutes, in whole or in part, a Consent Order Borrower Claim, the Allowed amount of such Borrower Claim shall be reduced to the extent paid pursuant to the Consent Order or any settlement of the Debtors' obligations thereunder, without further order of the Bankruptcy Court.

g)    *U.S. Federal Income Tax Treatment of Borrower Claims Trust*. All parties (including, without limitation, the Debtors, the Borrower Claims Trustee, and the holders of Borrower Claims) shall treat the Borrower Claims Trust as a "qualified settlement fund" within the meaning of Section 468B of the Tax Code and the Treasury Regulations thereunder.

h)    *Dissolution of the Borrower Claims Trust*.  The Borrower Claims Trustee and the Borrower Claims Trust shall be discharged or dissolved, as applicable, at such time as (i) all Borrower Claims have been resolved by Final Order, written agreement, or pursuant to the Plan, and (ii) all distributions to be made by the Borrower Claims Trustee under the Plan and the Borrower Claims Trust Agreement have been made.  Any Cash or other remaining assets in the Borrower Claims Trust shall be transferred to the Liquidating Trust upon dissolution of the Borrower Claims Trust.

i)    *Costs and Expenses of Borrower Claims Trust*.   The reasonable costs and expenses of administering the Borrower Claims Trust, including the reasonable fees and expenses of the Borrower Claims Trustee and its retained professionals, shall be funded on the Effective Date as agreed to by the Plan Proponents and Consenting Claimants. Such costs shall not include fees and expenses incurred by the Kessler Class Claimants pursuit of GM Insurance Rights.

j)    *Retention of Professionals by Borrower Claims Trustee*. The Borrower Claims Trustee may retain and reasonably compensate counsel and other professionals to assist in its

-106-

duties as Borrower Claims Trustee on such terms as the Borrower Claims Trustee deem appropriate without Bankruptcy Court approval, but subject to the terms and conditions provided for in the Borrower Claims Trust Agreement. The Borrower Claims Trustee may retain professionals who represented parties in the Chapter 11 Cases, provided such retention is otherwise permissible under applicable law.

k)    *Indemnification of the Borrower Claims Trustee and Borrower Claims Trust Committee*. The Borrower Claims Trustee and members of the Borrower Claims Trust Committee and their agents or professionals shall not be liable for any actions taken or omitted in its capacity as, or on behalf of, the Borrower Claims Trustee or the Borrower Claims Trust, except those acts arising out of its or their own willful misconduct, gross negligence, or bad faith, and each shall be entitled to indemnification or reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Borrower Claims Trust except for an action or inactions involving willful misconduct, gross negligence, or bad faith. Any indemnification claim of the Borrower Claims Trustee and the Borrower Claims Trust Committee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Borrower Claims Trust Assets and no recourse may be had to the Liquidating Trust, the Released Parties or any creditor in these Chapter 11 Cases. The Borrower Claims Trustee and the members of the Borrower Claims Trust Committee shall be entitled to rely, in good faith, on the advice of its retained professionals.

l)    *Borrower Claims Trustee as Estate Representative under 1123(b)(3)(B)*. The Borrower Claims Trustee is hereby appointed as the representative of the estate with respect to Borrower-Related Causes of Action pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

4.    **Provisions Governing Issuance of Units and Distributions**

The provisions governing the issuance of Units and distributions are summarized in Article I of this Disclosure Statement and set forth in Article IV of the Plan.

D.    **Cancellation of Securities, Indentures, and Other Documents Evidencing Claims and Equity Interests**

Subject to the assumption of Executory Contracts and Unexpired Leases as set forth in the Plan, and except for purposes of evidencing a right to distributions under the Plan, on the Effective Date, all notes, stock, instruments, certificates, indentures, guarantees, and other documents or agreements evidencing a Claim against or Equity Interest in the Debtors will be deemed automatically cancelled with respect to the Debtors and shall be of no further force or effect as against the Debtors, whether such document is surrendered for cancellation or not, and the obligations of Ally, the Debtors, or the Liquidating Trust, thereunder or in any way related thereto will be discharged

Notwithstanding anything to the contrary herein, the Senior Unsecured Notes Indenture will continue in effect for the limited purposes set forth in the Senior Unsecured Notes Indenture including (i) allowing the Senior Unsecured Noteholders to receive distributions on account of their Senior Unsecured Notes Claims, and (ii) allowing the Senior Unsecured Notes Indenture Trustee to make distributions in accordance with the

-107-

terms of the Plan, to fund the Senior Unsecured Notes Indenture Trustee Reserve, and to exercise its Senior Unsecured Notes Indenture Trustee Charging Lien against distributions under the Plan and against the Senior Unsecured Notes Indenture Trustee Reserve for payment of Senior Unsecured Notes Indenture Trustee Fees and Expenses.

## E.    Senior Unsecured Notes; Fees and Expenses

Wilmington Trust succeeded DB as the Senior Unsecured Notes Indenture Trustee shortly after the Petition Date and has continued in that capacity during the pendency of the Chapter 11 Cases. Wilmington Trust was appointed by the U.S. Trustee to be a member of the Creditors' Committee and was subsequently elected co-chair. Wilmington Trust was initially represented by Seward & Kissel LLP ("SK"), but shortly after the Petition Date, Loeb & Loeb LLP ("Loeb") replaced SK as general bankruptcy counsel.

Certain beneficial holders of the Senior Unsecured Notes, or the nominees of such beneficial holders with full power to act on behalf of and bind such beneficial holders, representing in the aggregate over 50% of principal of the outstanding Senior Unsecured Notes, delivered a letter of direction pursuant to section 6.06 of the Senior Unsecured Notes Indenture (the "Direction") to Wilmington Trust instructing and directing it, among other things, (a) to retain Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") as special restructuring counsel in the bankruptcy cases and (b) to authorize and instruct Cleary Gottlieb to engage Alvarez and Marsal North America, LLC ("A&M," and together with SK, Loeb and Cleary Gottlieb, the "SUN Professionals") as financial advisors in connection with restructuring issues in the Chapter 11 Cases concerning the Senior Unsecured Notes Indenture and the Senior Unsecured Notes. Accordingly, Wilmington Trust retained Cleary Gottlieb pursuant to the Direction, and Cleary Gottlieb retained A&M.

Wilmington Trust and the SUN Professionals have taken an active role in the Chapter 11 Cases. In addition to serving as co-chair of the Creditors' Committee, preparing and filing the proof of claim on behalf of the Senior Unsecured Notes and providing various notices to the Senior Unsecured Noteholders, Wilmington Trust, through the SUN Professionals, often took a lead role in, various contested matters on issues of importance to the Senior Unsecured Noteholders. For instance, after the Original RMBS Settlement Agreement was amended to allow a claim of up to $1.74 billion against ResCap (the sole obligor on the Senior Unsecured Notes), the SUN Professionals actively opposed that amendment by objecting to the proposed settlement and participating in discovery. Additionally, at the invitation of the Examiner, the SUN Professionals made multiple submissions with respect to third-party claims that Wilmington Trust and the Senior Unsecured Noteholders might assert against Ally related to, among other things, a breach of the Senior Unsecured Notes Indenture as well as claims held by the ResCap estate against Ally relating to, among other things, the transfer of Ally Bank from ResCap to or for the benefit of AFI. The SUN Professionals performed substantial due diligence and analysis concerning such claims. The SUN Professionals also prepared the Wilmington Trust Standing Motion, which seeks authority and standing to prosecute certain alleged ResCap Estate Causes of Action against Ally and its officers and directors and the officers and directors of ResCap as well as against other Debtors for constructive fraudulent transfers related to, among other things, the forgive of intercompany debt. Furthermore, Wilmington Trust and the SUN

-108-

Professionals actively participated in the motion to appoint Judge Peck as the Mediator, mediation sessions and negotiations that led to the Global Settlement embodied in the Plan Support Agreement, numerous meetings and drafting sessions with the Mediator, the Plan Proponents, and the other Consenting Claimants.

Wilmington Trust has incurred, and estimates that it will incur through the Effective Date, Indenture Trustee Fees and Expenses on account of its own fees and those of all the SUN Professionals in the amount of approximately $\_\_ (the "Senior Notes Indenture Trustee Fee Claim"). In accordance with the Senior Unsecured Notes Indenture, including Section 6.03 and 7.06 thereof, all monies collected by Wilmington Trust on account of the Senior Unsecured Notes Claims for distribution must first be applied to the payment of the Senior Unsecured Notes Indenture Trustee Fee Claim and remain subject to the Senior Notes Indenture Trustee Charging Lien before such funds may be distributed to the Senior Unsecured Noteholders. In accordance with Section VII.G of the Plan, Wilmington Trust may withhold distributions until such time as the Liquidating Trust makes a Cash distribution sufficient to pay in full the Senior Unsecured Notes Indenture Trustee Fee Claim and the Senior Unsecured Notes Indenture Trustee Reserve (as defined below). Wilmington Trust may also establish a reserve in the amount of $\_\_ ("Senior Unsecured Notes Indenture Trustee Reserve") for any liability and for any future costs and expenses that may be incurred by Wilmington Trust and the SUN Professionals which exceed the Senior Notes Indenture Trustee Fee Claim. The initial distribution of Cash to the Senior Unsecured Noteholders on account of their distributed Units shall be reduced by the Senior Unsecured Notes Indenture Trustee Fee Claim and the Senior Unsecured Notes Indenture Trustee Reserve. To effectuate the distribution of any Cash remaining in the Senior Unsecured Notes Indenture Trustee Reserve that Wilmington Trust determines is no longer required to be reserved, Wilmington Trust anticipates that the appropriate securities depository will maintain the register of the Senior Unsecured Notes (or maintain such a register in a similar form).

## F.    Corporate Action

Except as otherwise provided in the Plan, the corporate or related actions to be taken by or required of the Debtors in connection with each matter provided for by the Plan shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by holders of Claims or Equity Interests, directors of the Debtors, or any other Entity. On or prior to the Effective Date, the appropriate officers of the Debtors shall be authorized and directed to issue, execute, and deliver the agreements, securities, instruments, or other documents contemplated by the Plan, or necessary or desirable to effect the transactions contemplated by the Plan, in the name of and on behalf of the Debtors, prior to the Effective Date, or the Liquidating Trust, following the Effective Date. Notwithstanding any requirements under nonbankruptcy law, the authorizations and approvals contemplated by this provision shall be effective.

On the Effective Date, upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date as the case may be, will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases. Upon such

-109-

release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases, except to the extent such authority, duties, responsibilities, and obligations are to be undertaken by the Private Securities Claims Trustee, the RMBS Claims Trust Trustees, the Borrower Claims Trustee, or, with respect to the NJ Carpenters Claims Distribution, in each case as provided in the Plan.

## G.    Dissolution of the Debtors

On and after the Effective Date, the Liquidating Trust Board shall be authorized, in its sole and absolute discretion, to take all actions reasonably necessary to manage or dissolve the Debtors and their subsidiaries, including the Non-Debtor Subsidiaries, under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, notwithstanding any applicable consent requirements or other restrictions contained in any financing agreements or other debt documents to which any Debtor is a party, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation.  The Liquidating Trust Board shall have no liability for using its discretion to dissolve or not dissolve any of the Debtors or their subsidiaries.   Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of this Plan from and after the Effective Date except as specifically provided otherwise in the Plan.   Notwithstanding the foregoing, the Liquidating Trust Board shall not dissolve any Debtor to the extent such Debtor is required to hold Available Assets after the Effective Date pursuant to Article VI of the Plan, and any such Debtors shall be authorized to take such actions at the direction of the Liquidating Trust Board as may be necessary to implement the provisions of the Plan with respect to such Available Assets.

Upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases—including, for the avoidance of doubt, the Continuing Obligations—and, upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases.

## H.    Exemption from Certain Taxes and Fees

Pursuant to Bankruptcy Code aection 1146(a), any transfers of property pursuant to the Plan shall not be subject to any stamp, real estate transfer, mortgage reporting, sales, use tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

-110-

**I.      Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including pursuant to the Plan Support Agreement), or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Borrower Claims Trust with respect to Borrower-Related Causes of Action, and the Liquidating Trust with respect to all other Causes of Action, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Debtors' Estates, whether arising before or after the Petition Date, including any Causes of Action specifically enumerated in the Plan Supplement, and the Liquidating Trust's and Borrower Claims Trust's respective rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.   The Liquidating Trust and Borrower Claims Trust may pursue their respective Causes of Action, as appropriate, in accordance with the best interests of the respective Trust.  **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Liquidating Trust or Borrower Claims Trust, as the case may be, will not pursue any and all available Causes of Action against such Entity. The Liquidating Trust and Borrower Claims Trust expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Liquidating Trust expressly reserves all Causes of Action other than Borrower-Related Causes of Action, and the Borrower Claims Trust expressly reserves all Borrower-Related Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, the Plan does not release any Causes of Action that the Plan Proponents or the Liquidating Trust or Borrower Claims Trust have or may have now or in the future against any Entity other than the Released Parties.

Except as otherwise provided in the Plan or in a Final Order, the Liquidating Trust reserves and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity that is not released under the Plan or a separate settlement approved by Final Order shall vest in the Borrower Claims Trust with respect to Borrower-Related Causes of Action and in the Liquidating Trust with respect to all other Causes of Action. The Liquidating Trust and Borrower Claims Trust, as the case may be, through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action other than Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or

-111-

action, order, or approval of the Bankruptcy Court. The Borrower Claims Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## J.    Nonconsensual Confirmation

If fewer than all Impaired Classes accept the Plan, but at least one Class of Claims that is Impaired under the Plan has accepted the Plan (and which Class' acceptance is determined without inclusion of any vote submitted by the holder of a Claim that is an "insider," as such term is defined in Section 101(31) of the Bankruptcy Code), the Plan Proponents may seek to have the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code. The Plan Proponents request confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to Section 1126 of the Bankruptcy Code.

## K.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms herein. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, including any Executory Contracts or Unexpired Leases rejected or deemed rejected under the Plan, must be Filed in accordance with the procedures set forth in the Bar Date Order by the Rejection Damages Claim Bar Date or such Claims will be automatically disallowed, forever barred from assertion, and shall be unenforceable against the Debtors, the Liquidating Trust, or their assets or properties without the need for any objection by the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims against the applicable Debtor Groups and treated in accordance with the terms of Article III. The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the Claims Objection Deadline.

-112-

### 2.        Assumption of Executory Contracts and Unexpired Leases

The Debtors will file the Assumption Schedule with the Bankruptcy Court at least twenty-one (21) days before the commencement of the Confirmation Hearing.  The Assumption Schedule will include (a) the name of the non-Debtor counterparty, (b) the legal description of the Executory Contract or Unexpired Lease to be assumed, and (c) the proposed amount to be paid on account of an associated Cure Claim, if any.  On or as soon as practicable thereafter, the Debtors will serve a notice of filing of the Assumption Schedule upon each non-Debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption of their respective Executory Contract or Unexpired Lease or the proposed Cure Claim amount, and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.  Objections, if any, to the proposed assumption and/or Cure Claim must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors no later than __.  Any non-Debtor counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or Cure Claim amount.

If an objection to the proposed Cure Claim is sustained by the Bankruptcy Court, the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it on proper notice to the non-Debtor counterparty thereto, which non-Debtor counterparties shall then be entitled to file Proofs of Claim asserting Claims arising from the rejection thereof, if applicable, in accordance with the terms of the Plan and the Bar Date Order.

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, may settle any dispute on the amount of a Cure Claim without further notice to any party or action, approval, or order of the Bankruptcy Court.  If the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, object to any request for payment of a Cure Claim, the Bankruptcy Court shall determine the Allowed amount of such Cure Claim and any related issues.  Unless the parties to the Executory Contract or Unexpired Lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later of (i) ten days after entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto and (ii) the Effective Date.  The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty days after a Final Order determining a Cure Claim greater than that proposed by the Debtors.

**Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date of the Debtors or the Liquidating Trust assume such executory contract or unexpired lease.  Any proofs of claim filed with respect to an executory contract or unexpired lease that has been**

-113-

**assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's Schedules, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease capable of assumption, that any Debtor has any liability thereunder or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Plan Proponents expressly may (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject an Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

The assumption of Executory Contracts and Unexpired Leases under the Plan shall include the vesting of such contracts in the Liquidating Trust. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and vesting.

In the event a written objection is filed with the Bankruptcy Court as to whether a contract or lease is executory or unexpired, the right of the Plan Proponents to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired, in which case the deemed assumptions and rejections provided for in the Plan shall not apply to such contract or lease.

### 3.   Contracts and Leases Entered Into After the Applicable Petition Date

Counterparties to contracts and leases entered into after the Petition Date by a Debtor, including any Executory Contract or Unexpired Lease assumed by a Debtor, must File a proof of claim for an Administrative Claim against the appropriate Debtor by the Administrative Claims Bar Date or have their rights with respect to such Administrative Claims forever waived and released; provided that this provision shall not apply to any Ally Contract Claims.

### 4.   Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms herein. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

-114-

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, including any Executory Contracts or Unexpired Leases rejected or deemed rejected under the Plan, must be Filed in accordance with the procedures set forth in the Bar Date Order by the Rejection Damages Claim Bar Date or such Claims will be automatically disallowed, forever barred from assertion, and shall be unenforceable against the Debtors, the Liquidating Trust, or their assets or properties without the need for any objection by the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims against the applicable Debtor Groups and treated in accordance with the terms of Article III. The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the Claims Objection Deadline.

### 5. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request, pursuant to Bankruptcy Code Section 365(d)(4), to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases.

### 6. No Change in Control

The consummation of the Plan or the assumption of any Executory Contract or unexpired lease is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

### L. Surrender of Existing Publicly Traded Securities

On the Effective Date, or as soon as reasonably practicable thereafter, the Junior Secured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall direct DTC and any other applicable securities depository to surrender the Junior Secured Notes to the Junior Secured Notes Indenture Trustee. No distributions under the Plan shall be made for or on behalf of a Registered Holder of the Junior Secured Notes unless and until (i) such debt securities have been received by the Junior Secured Notes Indenture Trustee or appropriate instructions from the applicable securities depository have been received by the Junior Secured Notes Indenture Trustee; or (ii) the loss, theft, or destruction of such debt securities has been established to the reasonable satisfaction of such Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the applicable Indenture Trustee harmless in respect of such debt securities and distributions made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. On the surrender date, holders of Allowed Junior Secured Notes Claims shall be entitled to receive distributions pursuant to the Plan. Any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss,

theft, or destruction of such debt securities to the Junior Secured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Junior Secured Notes Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Liquidating Trust by such Indenture Trustee and any such debt securities shall be cancelled.

On the Effective Date, or as soon as reasonably practicable thereafter, the Senior Unsecured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall advise DTC and any other applicable securities depository of the occurrence of such Effective Date and the cancellation of the Debtors obligations with respect to the Senior Unsecured Notes, but not to terminate the CUSIP or ISIN numbers of the Senior Unsecured Notes.  At such time as the Senior Unsecured Notes Indenture Trustee is prepared to release the Units it received on account of the Senior Unsecured Notes Claims, it may request that such depositories surrender the Senior Unsecured Notes, if deemed appropriate, or with the cooperation of the Debtors or the Liquidating Trust, issue such other instructions to DTC and any other securities depository, as appropriate to effectuate the distributions contemplated under the Plan; provided, however, that nothing herein shall contravene the effectiveness of the Senior Unsecured Notes as set out in Article IV.J.  No distributions under the Plan shall be made for or on behalf of a Registered Holder unless and until (i) such debt securities have been received by the applicable Indenture Trustee or other appropriate instructions have been issued or received by the applicable Indenture Trustee; or (ii) the loss, theft, or destruction of such debt securities has been established to the reasonable satisfaction of the Senior Unsecured Notes Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the Senior Unsecured Notes Indenture Trustee harmless in respect of such debt securities and any distributions to be made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. On such surrender or deemed surrender date, the Senior Unsecured Noteholders shall be entitled to receive distributions pursuant to the Plan. If required by the Senior Unsecured Notes Indenture Trustee, any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss, theft, or destruction of such debt securities to the Senior Unsecured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Senior Unsecured Notes Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Liquidating Trust by the respective Indenture Trustee and any such debt securities shall be cancelled.

## M.   Minimum Distributions; Foreign Exchange Rate; and Other Distribution Limitations

Other than with respect to General Unsecured Convenience Claims, no Cash payment of less than $50 shall be made to a holder of an Allowed Claim on account of such Allowed Claim.

-116-

If a holder of an Allowed Claim would be entitled to receive less than $50 as of the time of a particular distribution, but would be entitled to receive more than $50 in combination with later distributions, the Disbursing Agent will combine such distributions with later distributions to such holder of an Allowed Claim so that such holder may eventually be entitled to a distribution of at least $50 in value.

Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate as of the Petition Date as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

## N.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to a holder of an Allowed Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of six (6) months from the applicable date of distribution. After such date, all unclaimed property or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

## O.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed upon it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such withholding tax obligations and, if the Disbursing Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Disbursing Agent. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding

-117-

distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within six months, such distribution shall be deemed an unclaimed distribution. Finally, the Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

## P.    Setoffs and Recoupment

The Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that it may have against the claimant, including any Causes of Action transferred to the Liquidating Trust by the Debtors, but neither the failure to do so nor the Allowance of any Claim shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

Before the Liquidating Trust can set-off or recoup against the distribution to be made on account of an Allowed Claim, the holder of the Claim shall be served with written notice of the proposed setoff or recoupment at least thirty (30) days prior to the Liquidating Trust exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before thirty (30) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, inter alia, Bankruptcy Rule 9014 and Local Bankruptcy Rules 9014-1 and 9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with such contested matter, and (iii) the Liquidating Trust shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection.

## Q.    Interest on Claims

Except as specifically provided for in the Plan, no Claims, Allowed or otherwise (including Administrative Claims), shall be entitled, under any circumstances, to receive any interest on a Claim.

## R.    Claims Paid or Payable by Third Parties

### 1.    Claims Paid by Third Parties

Except as otherwise provided herein, including with respect to the Ally Contract Claims, the Debtors, on or prior to the Effective Date, or the Liquidating Trust, after the Effective Date, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice, action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, the Liquidating Trust, or other party making distributions on account of the Claim pursuant to the Plan.

-118-

2.      **Claims Payable by Insurers**

Except as otherwise provided herein, including with respect to the rights of (i) the Kessler Settlement Class and (ii) other creditors who have entered into a settlement agreement with the Debtors prior to the Effective Date, in and to the GM Insurance Rights as provided herein and in the Kessler Settlement Agreement, and the Ally Contract Claims (a) no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, excluding the GM Policies, until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy and (b) to the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' payment, such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, provided, that if a Debtor or the Liquidating Trust believes a holder of an Allowed Claim has recourse to an insurance policy and intends to withhold a distribution pursuant to this Article VII.K, the Debtor, prior to the Effective Date, or Liquidating Trust, following the Effective Date, shall provide written notice to such holder as to what the Debtor or Liquidating Trust believes to be the nature and scope of applicable insurance coverage. Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Liquidating Trust or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any Insurance Defenses.

S.      **Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable**

Where a Creditor holds Allowed Unsecured Claims for which more than one Debtor in a Debtor Group is jointly and/or severally liable, such creditor shall only receive one recovery from the Debtor Group on account of such Claim.  This provision shall not affect distributions on account of such Creditor's Allowed Claims, if any, against the Debtors in another Debtor Group.

T.      **Distributions Free and Clear**

Except as otherwise provided herein, any distributions under this Plan shall be free and clear of any Liens, Claims, and encumbrances, and no other Entity, including the Debtors, the Liquidating Trust, or the Disbursing Agent shall have any interest (legal, beneficial or otherwise) in property of the Estate distributed pursuant to this Plan, except that distributions on account of Senior Unsecured Note Claims shall remain subject to the Senior Unsecured Notes Indenture Trustee Charging Lien.

-119-

**U.    Procedures for Resolving Disputed Claims**

**1.    Resolution of Disputed Claims**

The provisions of this Article VIII of the Plan shall govern the resolution of Disputed Claims to the extent not otherwise provided for in this Plan or in any other trust agreement (such as the RMBS Trust Agreement, the Private Securities Claims Trust Agreement or the Borrower Claims Trust Agreement) or plan of allocation (such as the RMBS Trust Allocation Protocol) approved under this Plan.  To the extent the provisions of any such trust agreement or plan of allocation address specifically matters set forth in Article VIII of the Plan, the provision of such trust agreement or plan of allocation shall govern.

**V.    Claims Estimation; Allowance**

**1.    Allowance of Claims**

On or after the Effective Date, the Liquidating Trust shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim (i) deemed Allowed as of the Effective Date or (ii) waived, relinquished, exculpated, released, compromised, settled, or Allowed in the Plan or in a Final Order. Except as otherwise provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed (a) under the Plan or the Bankruptcy Code or (b) by Final Order of the Bankruptcy Court, including the Confirmation Order.

**2.    Prosecution of Objections to Claims**

On the Effective Date, the Liquidating Trust will have the exclusive authority to: (a) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests (other than Borrower Claims, Private Securities Claims, and the NJ Carpenters Claims); (b) settle or compromise (or decline to do any of the foregoing) any Disputed Claim (other than Borrower Claims, Private Securities Claims, and NJ Carpenters Claims) or Cause of Action without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**3.    Claims Estimation**

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement), as applicable, following the Effective Date, may request that the Bankruptcy Court estimate any disputed, contingent, or unliquidated Claim to the extent permitted by Bankruptcy Code section 502(c) regardless of whether the Plan Proponents (prior to the Effective Date) or the Liquidating Trust or Borrower Claims Trust (following the Effective Date) has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.   Among other things, the Plan Proponents may request that the

ny-1097924

Bankruptcy Court estimate the Recognized RMBS Claims in the amounts set out in the RMBS Trust Claims Schedules for the purpose of implementing the RMBS Trust Allocation Protocol. The Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. Except as set forth below with respect to reconsideration under section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under this Plan, including for purposes of distributions. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement) may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before twenty one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**4.      Expungement or Adjustment of Claims Without Objection**

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Debtors' notice and claims agent, and any Claim that has been amended may be adjusted thereon by the Debtors' notice and claims agent, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

**5.      Deadline to File Claims Objections**

Any objections to Claims shall be Filed by no later than the applicable Claims Objection Deadline.

**6.      Disallowance of Claims**

Any Claims held by an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, or 550, or that is a transferee of a transfer avoidable under Bankruptcy Code section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), shall be deemed disallowed pursuant to Bankruptcy Code section 502(d), and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, by that Entity have been turned over or paid by such Entity to the Debtors or the Liquidating Trust.

-121-

**Except as otherwise agreed by the Liquidating Trust, any and all proofs of claim filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late proof of claim is deemed timely filed by a Final Order of the Bankruptcy Court.**

7.    **Amendments to Claims**

On or after the Effective Date, a Claim may not be Filed or amended without prior authorization of the Bankruptcy Court or the Liquidating Trust, and any such new or amended Claim Filed without such prior authorization shall be deemed disallowed in full and expunged without any further action.

W.    **Settlement, Release, Injunction, and Related Provisions**

As discussed in detail in Article II above, the Plan contains the following settlements, Releases, exculpations, and injunctions:

1.    **Compromise and Settlement of Claims, Equity Interests, and Controversies**

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest.    The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against the Debtors and Causes of Action against other Entities.

2.    **Release of Liens**

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of any Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged,**

-122-

and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest in the Liquidating Trust.

3.    **Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including with respect to the Ally Released Parties, the Ally Contribution provided to the Estates under the Plan and otherwise, on and as of the Effective Date of the Plan, the Debtor Released Parties are deemed released and discharged by the Debtors, the Estates and the Liquidating Trust from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Debtor Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other Entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Debtor Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtors' release; (3) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to the Debtors, the Liquidating Trust and any holder of a Claim or Equity Interest or other Entity who would have been legally entitled to assert such Claim or Equity Interest on behalf of any of the Debtors or any of their Estates from asserting any Claim or Cause of Action released pursuant to the Debtors' release.

4.    **Third Party Releases by Holders of Claims and Equity Interests**

On and as of the Effective Date of the Plan, the holders of Claims and Equity Interests, shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS

-123-

issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, and any obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute the Bankruptcy Court's finding that this Third Party Release is:  (1) in exchange for the good, valuable and substantial consideration provided by the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for a hearing; (5) justified by truly unusual circumstances; (6) an essential component and critical to the success of the Plan; (7) resulted in distributions to the Creditors that would otherwise have been unavailable; (8) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (9) a bar to any party asserting a claim or cause of action released pursuant to this Third Party Release against any of the Ally Released Parties.

Notwithstanding anything to the contrary herein, the Third Party Release shall not apply to any claims held by (i) the FDIC, in its capacity as a receiver, against Ally and (ii) the FHFA against Ally.

5.    Ally Releases

Except with respect to the Ally Contract Claims, on and as of the Effective Date of the Plan, the Ally Released Parties shall release the Creditors' Committee, the Debtors, and the Consenting Claimants and their respective successors and assigns, members, partners, advisors, and Representatives, in their capacities as such, from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors' liquidation, including the negotiation, formulation, or preparation of the Plan Support Agreement, the Plan, the Disclosure Statement, and any other Plan Documents and related disclosures, as well as any counterclaims in commenced or tolled litigation with the Debtors or the Consenting Claimants.

6.    Exculpation

The Exculpated Parties shall neither have, nor incur, any liability to any entity for any pre-petition or post-petition act or omission taken in connection with, or related to, formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of any prepetition plan support agreements, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS Settlement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any entity that results from any such act that is determined in a final,

-124-

non-appealable order to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, and the RMBS Settlement.

7.    **Injunction**

Except as otherwise provided in the Confirmation Order, all Entities, including Investors, who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that constitute Released Claims, are permanently enjoined and precluded, from and after the effective date of the Plan, from: (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Released Party on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting or enforcing any lien (other than any charging lien of a trustee under its respective indenture), claim or encumbrance of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; (d) asserting any right to setoff, subrogation or recoupment of any kind against any obligation due from any Released Party on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in a Proof of Claim or Equity Interest or otherwise that such holder asserts, has or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; and (f) seeking relief or collecting judgments on a securities-related claim in a manner that fails to conform with the terms of the proportionate judgment reduction provision set forth in the Plan and the Confirmation Order; provided, that nothing contained herein shall be construed to prevent any entity from objecting to claims or defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law. Such injunction shall extend to the successors of the Liquidating Trust, if any, and to their respective properties and interests in property. Any person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.

8.    **Waiver of Subrogation**

The GMACM Debtors and the RFC Debtors hereby release the ResCap Debtors from any and all liability or responsibility to the GMACM Debtors and the RFC Debtors or any entity claiming through or under the GMACM Debtors and the RFC Debtors by way of subrogation or otherwise, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud,

-125-

contract, violations of federal or state securities laws, or otherwise, including those subrogated Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.

### 9.    Judgment Reduction

A defendant against which a judgment is obtained on a securities-related claim that is subject to the Third Party Releases shall be entitled to a judgment credit, for each such claim, state or federal, for which contribution or indemnity from an Ally Released Party would be available if not for the Third Party Releases, in an amount that is the greater of (a) the amount of the applicable Ally Released Party's indemnification or contribution obligations under the relevant contract(s) as determined by a court of competent jurisdiction or (b) the proportionate share of the applicable Ally Released Party's fault as to such claim; provided that (i) no Ally Released Party shall be deemed to have admitted to such fault by virtue of this provision; (ii) nothing herein shall create a right for a defendant to obtain discovery from any Ally Released Party, or an obligation for any Ally Released Party to participate in any proceeding to determine fault, in connection with such claim; and (iii) no finding in any proceeding to determine fault shall create any claim against any Ally Released Party or obligation of any Ally Released Party to satisfy any claim.

### X.    Conditions Precedent to Confirmation and Consummation of the Plan

### 1.    Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived in accordance with the terms of the Plan:

(a)    Court approval of the Disclosure Statement in a form and substance reasonably acceptable to the Plan Proponents, Ally, and the Consenting Claimants, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

(b)    The Plan shall be reasonably acceptable to the Plan Proponents, Ally and each of the Consenting Claimants, in accordance with the terms of the Plan Support Agreement;

(c)    The Confirmation Order shall be reasonably acceptable to the Plan Proponents, Ally, and each of the Consenting Claimants;

(d)    The Plan Supplement and any related documentation shall be reasonably satisfactory to the Plan Proponents, Ally, and each of the Consenting Claimants;

(e)    Court approval of the RMBS Settlement pursuant to Bankruptcy Rule 9019; and

(f)      No Plan modifications that have altered distributions to be made under the Plan shall have occurred without the consent of the Plan Proponents, Ally, and each of the Consenting Claimants;

(g)      Court approval of the Third Party Releases, Debtor Releases and Exculpation provisions in the Plan, without any modification thereto.

## 2.      Conditions Precedent to Consummation

It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.C of the Plan:

(a)      the Bankruptcy Court shall have entered the Confirmation Order, which shall grant final approval of the Plan, including all settlements therein, the Debtor Releases, the Third Party Releases, the injunctions, and exculpation of the Exculpated Parties;

(b)      the Confirmation Order shall not have been stayed, modified, or vacated on appeal, and the time to appeal shall have passed;

(c)      on or before August 19, 2013, the FGIC Rehabilitation Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit E (or such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees) approving the Plan Support Agreement (as it relates to FGIC) and the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies;

(d)      the Bankruptcy Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit D (or such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees and counsel for the Institutional Investors) approving the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies and the allowance of FGIC's General Unsecured Claims against the Debtors, pursuant to a Bankruptcy Rule 9019 motion, which order shall include a finding that the transactions contemplated by the FGIC Settlement Agreement are in the best interests of the RMBS Trusts;

(e)      Ally will have funded at least $1,950,000,000 of the Ally Contribution;

(f)      the Liquidating Trust Agreement, the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement and the Borrower Claims Trust Agreement shall have been executed;

(g)      any and all Ally Contract Claims will have been Allowed indefeasibly and approved by the Bankruptcy Court without subordination of any kind, and satisfied as set forth herein;

ny-1097924

(h)    the Available Assets shall have been transferred to the Liquidating Trust;

(i)    the Professional Fee Escrow Account shall have been funded;

(j)    all material governmental and third party approvals and consents, including Bankruptcy Court approval, and approvals Ally may be required to obtain, necessary in connection with the transactions contemplated by this Plan, shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and

(k)    all other actions, documents, and agreements necessary to implement the Plan as of the Effective Date will have been delivered and all conditions precedent thereto will have been satisfied or waived.

### 3.    Waiver of Conditions

The Plan Proponents shall have the right to waive one or more of the conditions to Confirmation and Consummation of the Plan set forth in Articles X.A and X.B(b), and (e) through (k), with the Consent of Ally and the Consenting Claimants, and, solely with respect to such waivers of the conditions set forth in Article X.B(c) and (d) of the Plan with the consent of FGIC and the RMBS Trustees, at any time without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### 4.    Effect of Nonoccurrence of Conditions to Consummation

Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur on or before the earlier of thirty (30) days after the Confirmation Date or December 15, 2013.  If the Effective Date has not occurred on or before the earlier of thirty (30) days after the Confirmation Date or December 15, 2013, then upon motion by the Plan Proponents or Ally made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

ny-1097924

**Y.      Modification, Revocation, or Withdrawal of the Plan**

**1.      Modification and Amendments**

Subject to the terms of the Plan Support Agreement, the Plan Proponents may amend, modify, or supplement the Plan pursuant to Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date; provided, that the Plan Proponents obtain the consent, which shall not be unreasonably withheld, of the Settling Parties in accordance with the terms of the Plan Support Agreement. After the Confirmation Date, but prior to Consummation of the Plan, the Plan Proponents may with the consent of the other Settling Parties, which shall not be unreasonably withheld, in accordance with the terms of the Plan Support Agreement, amend, modify, or supplement the Plan without further order of the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order.  At all times, the Plan Proponents may amend, modify, or supplement the Plan without the consent of any other Entity to the extent that such amendments, modifications, or supplements are non-material.  At any time, at the request of the RMBS Trustees, Art. IV.C.3 of the Plan may be amended as will be required to preserve the REMIC tax status of the RMBS Trusts notwithstanding the distribution of Units to the RMBS Claims Trust under the Plan to the RMBS Claims Trust on behalf of the RMBS Trusts, and such amendment will be deemed non-material.

**2.      Effect of Confirmation on Modifications**

Pursuant to Bankruptcy Code Section 1127(a), entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**3.      Revocation or Withdrawal of the Plan**

Subject to the terms of the Plan Support Agreement and conditions to the Effective Date, the Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in the Plan shall constitute a waiver or release of any Claims or Equity Interests prejudice in any manner the rights of the Plan Proponents, the Settling Parties, or any other Entity, or constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponents or any other Entity.

### Z.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction, as set forth in further detail in Article XII of the Plan.

### AA.    Miscellaneous Plan Provisions

#### 1.    Immediate Binding Effect

Subject to Article X.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trust, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are presumed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

Notwithstanding anything in Bankruptcy Rule 3020(e) to the contrary, (i) the entry of the Confirmation Order shall constitute a Final Order and the period in which an appeal must be filed shall commence upon the entry thereof, and (ii) the Confirmation Order shall take effect immediately upon its entry and the Plan Proponents are authorized to consummate the Plan immediately after entry of the Confirmation Order and the satisfaction or waiver of all other conditions to the Effective Date of the Plan, in accordance with the terms of the Plan.

#### 2.    Additional Documents

On or before the Effective Date, the Plan Proponents may File with the Bankruptcy Court any and all agreements and other documents that may be necessary or appropriate in order to effectuate and further evidence the terms and conditions of the Plan.

#### 3.    Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 and, if applicable, 28 U.S.C. § 3717, as determined by the Bankruptcy Court at a hearing pursuant to Bankruptcy Code section 1128, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

#### 4.    Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve; provided, however, that, following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or

-130-

applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors' Committee is a party, (iii) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a party, and (iv) responding to creditor inquiries for one-hundred twenty (120) days following the Effective Date.  Upon the dissolution of the Creditors' Committee, the current and former members of the Creditors' Committee and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibility and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate, except that the Creditors' Committee and their respective Professionals shall have the right to pursue, review and object to any applications for compensation or reimbursement of expenses filed in accordance with Article II hereof.

### 5.    Access to Debtors' Records After Effective Date

On the Effective Date, Debtors shall be deemed to have transferred, assigned and conveyed to the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and the Private Securities Claims Trust, as their interests may appear with respect to the Claims of their respective beneficiaries, and the Liquidating Trust shall be authorized to take possession of, all of the books and records of the Debtors,  including, except as set forth in any Ally Contract, all information and data on computers owned or leased by the Debtors or otherwise on premises occupied by the Debtors, and all rights of access to data of the Debtors and their affiliates, that were not otherwise transferred to a third party on or prior to the Effective Date.  The Liquidating Trust shall have the responsibility of storing and maintaining such books and records to and for the benefit of each of the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and Private Securities Claims Trust as their interests may appear, and the respective Plan Trusts shall enter into an agreement or protocol with respect to access to such books and records.  The Debtors shall cooperate with the Plan Trustees of the Plan Trusts to facilitate the delivery and storage of such books and records in accordance herewith.  For the purpose of this Section, books and records include computer generated or computer maintained books and records and computerized data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties, except as set forth in any Ally Contract, and all of the claims and rights of the Debtors in and to books and records, wherever located.  The Debtors or the Liquidating Trust, as applicable, shall make available current and historic tax returns with supporting files to Ally as necessary for Ally to address Ally's audit requirements and to facilitate Ally filing 2013 tax returns.

### 6.    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.

7.      **Reservation of Rights**

Except as otherwise provided in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Plan Proponents or Ally with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Plan Proponents or Ally with respect to the holders of Claims or Equity Interests prior to the Effective Date.

8.      **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

9.      **Further Assurances**

The Debtors or the Liquidating Trust, all holders of Claims receiving distributions pursuant to the Plan, and all other Entities, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

10.     **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to Bankruptcy Code Sections 105 or 362 or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan and the Confirmation Order shall remain in full force and effect in accordance with their terms.

11.     **Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.     **Exhibits and Related Documents**

All exhibits and documents Filed in relation to the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Liquidating Trust's counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website, http://www.KCCllc.net/rescap, or the

-132-

Bankruptcy Court's website, http://www.nys.uscourts.gov (a PACER login and password are required to access documents on the Bankruptcy Court's website).

### 13.    Severability of Plan Provisions

Except as otherwise provided herein including Article X.A, B and C, if, before Confirmation of the Plan, subject to the terms of the Plan Support Agreement, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan, including the Third Party Releases, Debtor Releases, and Exculpation, shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Plan Proponents' consent; and (c) nonseverable and mutually dependent.

### 14.    Waiver or Estoppel Conflicts

Each holder of a Claim or Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated, by virtue of an agreement made with the Plan Proponents, or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

### 15.    Conflicts

Except as set forth in the Plan or unless otherwise ordered by the Bankruptcy Court, to the extent that the Disclosure Statement, any order of the Bankruptcy Court (other than the Confirmation Order), or any exhibit to the Plan or document executed or delivered in connection with the Plan is inconsistent with the terms of the Plan, the terms of the Plan shall control.

### BB.    Plan Supplement

The Plan Proponents will file a Plan Supplement with the Bankruptcy Court no later than ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, except as otherwise provided under the Plan with the exception of the Assumption Schedule which shall be filed no later than ___ days before the commencement

-133-

of the Confirmation Hearing.  The Plan Supplement will include documents and forms of documents, Schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules), including the Liquidation Trust Agreement, the Borrower Claims Trust Agreement and the Private Securities Claims Trust Agreement.

The Plan and all documents to be executed and/or delivered in connection with the consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

## ARTICLE VI.
## VOTING PROCEDURES

The Disclosure Statement Approval Order entered by the Bankruptcy Court approved certain procedures for the Plan Proponents' solicitation of votes to approve the Plan, including setting the deadline for voting, which holders of Claims or Equity Interests are eligible to receive Ballots to vote on the Plan, and certain other voting procedures.

THE DISCLOSURE STATEMENT APPROVAL ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.  YOU SHOULD READ THE DISCLOSURE STATEMENT APPROVAL ORDER, THE CONFIRMATION HEARING NOTICE (AS DEFINED IN THE DISCLOSURE STATEMENT APPROVAL ORDER), AND THE INSTRUCTIONS ANNEXED TO YOUR BALLOT AS THEY SET FORTH IN DETAIL, AMONG OTHER THINGS, PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

If you have any questions about the procedures for voting your Claim or the Solicitation Package you received, or if you wish to obtain a paper copy of the Plan, the Disclosure Statement, or any exhibits to such documents, please contact KCC by telephone at (888) 251 2914 or in writing at Kurtzman Carson Consultants LLC, at ResCap Balloting Center, c/o KCC, 2335 Alaska Avenue, El Segundo, CA 90245.

## A.    Voting Deadline

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all holders of Claims that are entitled to vote on the Plan.  In order to facilitate vote tabulation, there is a separate Ballot designated for each impaired Voting Class; however, all Ballots are substantially similar in form and substance, and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT APPROVAL ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE SOLICITATION AND TABULATION AGENT NO LATER THAN 5:00 P.M. (PREVAILING PACIFIC TIME) ON THE VOTING DEADLINE OF [**October 10**], 2013.  ONLY THOSE BALLOTS ACTUALLY RECEIVED BY KCC BEFORE THE VOTING DEADLINE WILL BE COUNTED AS

-134-

EITHER ACCEPTING OR REJECTING THE PLAN.  NO BALLOTS MAY BE SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL, AND ANY BALLOTS SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NEITHER BE ACCEPTED NOR COUNTED BY KCC. BALLOTS SHOULD NOT BE SENT TO THE DEBTORS OR ANY OF THEIR ADVISORS.

## B.    Holders of Claims or Interests Entitled to Vote

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a Chapter 11 plan unless: (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under Section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a Chapter 11 plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan. Under Section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a Chapter 11 plan is deemed to have accepted the plan, and the Plan Proponent need not solicit such holder's vote.  Under Section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to Article [II.D], entitled "Summary of Treatment of Allowed Claims and Equity Interests," and Article [●] of the Plan.

PURSUANT TO THE PLAN, ONLY THE HOLDERS OF CLAIMS IN CLASSES [R-3, R-4, R-5, R-6, R-7, R-8, GS-3, GS-4, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, RS-7, AND RS-8] ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN,

The Voting Record Date is [**August 16, 2013**], 2013.  The Voting Record Date is the date for determining (1) which holders of Claims or Equity Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Disclosure Statement Approval Order and (2) whether Claims or Equity Interests have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of the Claim.  The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

As more fully set forth in the Disclosure Statement Approval Order, claimants who have timely filed proofs of claim or have been scheduled by the Debtors and are classified in the Plan in one of the Voting Classes may vote on the plan unless: (a) as of the Voting Record Date, the outstanding amount of such holder's claim is not greater than zero ($0.00); (b) as of the Voting Record Date, such claim has been disallowed or expunged; (c) the Debtors scheduled such claim as contingent, unliquidated, or disputed and a proof of claim was not filed by the General Bar Date or deemed timely filed by order of the Court at least five (5) business day prior to the Voting Deadline; (d) such Claim is subject to an objection by [September 10], 2013; and (e) the holder of a Claim has timely filed a motion pursuant to Bankruptcy Rule 3018(a) seeking

-135-

temporary allowance of such Claim for voting purposes only and the Debtor has not opposed such motion or objected to the Claim, in which case the holder's vote will be counted only upon order of the Bankruptcy Court; or (f) by other order of the Bankruptcy Court.

AS SET FORTH IN THE CONFIRMATION HEARING NOTICE AND IN THE DISCLOSURE STATEMENT APPROVAL ORDER, OTHER HOLDERS OF CLAIMS MUST FILE MOTIONS TO HAVE THEIR CLAIMS TEMPORARILY ALLOWED FOR VOTING PURPOSES ON OR BEFORE [**September 20**], 2013.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Approval Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

**C.**    Beneficial Owners of the Junior Secured Notes and Senior Unsecured Notes**.**

If you are the beneficial owner of the Junior Secured Notes or the Senior Unsecured Notes and you received a Ballot for beneficial owners of a security (a "Beneficial Owner Ballot") from a brokerage firm, commercial bank, Trust company or other nominee (each a "Master Ballot Agent") with a return envelope addressed to the Master Ballot Agent, return the completed Ballot to the appropriate Master Ballot Agent so that the Master Ballot Agent will have sufficient time to complete a Ballot summarizing votes cast by beneficial owners holding securities (each a "Master Ballot") so that it can be forwarded to KCC by the Voting Deadline. If your Beneficial Owner Ballot is not received by your Master Ballot Agent with sufficient time for the Master Ballot Agent to submit its Master Ballot by the Voting Deadline, your vote will not count.

If you received a return envelope addressed to KCC, your Master Ballot Agent has pre-validated your Beneficial Owner Ballot. Therefore, you must return your pre-validated Beneficial Owner Ballot directly to KCC so it is actually received by KCC on or before the Voting Deadline.

If you are the Beneficial Owner of the Junior Secured Notes or the Senior Unsecured Notes and hold them in your own name, you can vote by completing either a Beneficial Owner Ballot or by completing and signing the enclosed Ballot and returning it directly to KCC using the enclosed pre-addressed, postage prepaid envelope.

Do not return your Junior Secured Notes or the Senior Unsecured Notes or any other instruments or agreements that you may have with your Ballot(s).

**D.    Vote Required for Acceptance by a Class**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Approval Order.

-136-

**E.     Returning Your Ballot**

HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN MAY DO SO BY COMPLETING THE APPROPRIATE BALLOTS AND RETURNING THEM IN THE ENVELOPE PROVIDED.  VOTING INSTRUCTIONS ARE ANNEXED TO EACH BALLOT.  BALLOTS CAST BY HOLDERS AND MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDERS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE NOTICE AND CLAIMS AGENT BY THE VOTING DEADLINE AT THE FOLLOWING ADDRESS

| **BALLOTS AND MASTER BALLOTS** |
|---|

1. Ballots and Master Ballots must be actually received by KCC by the Voting Deadline.

2. Please send your completed Ballot in the envelope provided.  If you have received a return envelope addressed to your Nominee, please allow additional time for your vote to be included on a Master Ballot and sent to KCC by the Voting Deadline.

3. All Ballots must be returned directly to KCC and may be sent by First Class Mail, Overnight Courier, or Personal Delivery to:

**ResCap Balloting Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES.   IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT AND MASTER BALLOT.   IF YOU ARE RETURNING YOUR BALLOT TO YOUR NOMINEE, YOU MUST RETURN YOUR BALLOT WITH SUFFICIENT TIME FOR YOUR VOTE TO BE INCLUDED BY YOUR NOMINEE ON A MASTER BALLOT AND SENT TO KCC BY THE VOTING DEADLINE.   PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE PLAN PROPONENTS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF

-137-

A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

THE FOLLOWING BALLOTS WILL <u>NOT</u> BE COUNTED: (I) ANY BALLOT THAT IS COMPLETED, EXECUTED, AND TIMELY RETURNED TO KCC, BUT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN; (II) ANY BALLOT SUBMITTED FOR WHICH THE HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN VOTES TO BOTH ACCEPT AND REJECT THE PLAN; (III) IN THE ABSENCE OF ANY EXTENSION OF THE VOTING DEADLINE GRANTED BY THE PLAN PROPONENTS, ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE; (IV) ANY BALLOT THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT; (V) ANY BALLOT CAST BY A PERSON OR ENTITY THAT DOES NOT HOLD A CLAIM THAT IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN; (VI) ANY UNSIGNED BALLOT; OR (VII) ANY BALLOT TRANSMITTED TO KCC BY FAX, E-MAIL, OTHER ELECTRONIC MEANS OF TRANSMISSION, UNLESS OTHERWISE AGREED TO BY THE PLAN PROPONENTS.

**If you have any questions on the procedures for voting on the Plan, please call KCC at the following telephone number:**

**(888) 251-2914**

## ARTICLE VII.
## <u>RECOVERY ANALYSIS</u>

On January 31, 2013, the Debtors closed the sale of their originations and capital markets platform to Walter. This sale also included the Fannie Mae MSR portion of the Debtors' servicing portfolio, representing approximately $43.8 billion in UPB at December 31, 2012. On February 5, 2013, the Debtors then sold a Whole Loan Portfolio, made up of over 49,000 whole loans with $2.9 billion in UPB at December 31, 2012, to Berkshire. FinAlly, on February 15, 2013, the Debtors closed the sale of their servicing platform assets, representing approximately $175.4 billion of UPB (inclusive of master serviced loans) at December 31, 2012, to Ocwen.

Notwithstanding the significant transfer of assets included in the Platform and Legacy Sales, as of April 30, 2013, approximately $1.4 billion of non-cash assets as of April 30, 2013, after certain pro forma adjustments, remain in the Debtors' Estates to be monetized. Most significantly, there are approximately $945 million of loans and Advances insured by the FHA or the VA that the Debtors intend to monetize for the Estate's benefit. In addition, there are other residual financial assets to be monetized including, but not limited to, servicer Advances, non-FHA/VA Loans, trading securities, restricted cash balances, non-debtor equity interests, accounts receivable and other illiquid assets that will take some time to liquidate and ultimately yield value for the Debtors and the Estates. The Estates will also include those residual servicing

-138-

rights and servicing Advances that were not assigned to Ocwen as part of the assets sale transactions closed in the first quarter of 2013.

As described in more detail in the recovery analysis annexed hereto as <u>Exhibit 6</u> (the "<u>Recovery Analysis</u>"), the Debtors have provided an analysis of the recovery from these assets, along with cash on hand as of April 30, 2013 and the proceeds from the settlement with Ally Financial, Inc., which are then distributed to: (i) holders of secured claims, (ii) administrative and priority expenses, and (iii) general unsecured claims. THE DEBTORS' RECOVERY ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF THE ORDERLY LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the Recovery Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the Debtors. In addition, various decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the values of the assets will result in an accurate estimate of the proceeds that will be realized. In addition, amounts of Claims against the Estate could vary significantly from the estimate set forth herein. Therefore, the actual recovery received by creditors of the Debtors could vary materially from the estimates provided herein.

<div align="center">

**ARTICLE VIII.**
**CONFIRMATION OF THE PLAN**

</div>

**A.    Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a Confirmation Hearing at which it will hear objections (if any) and consider evidence with respect to whether the Plan should be confirmed. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all the requirements of Section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing has been scheduled to begin on [●]. Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Bankruptcy Code Section 1128(b) provides that any party in interest may object to confirmation of the Plan. The Court has fixed [●], 2013, at [●] [a.m.][p.m.] (Prevailing Eastern Time) before the Honorable Martin Glenn, United States Bankruptcy Judge for the Southern District of New York, Room 500, New York, New York 10004, or as soon as practicable thereafter, as the date of the Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court, without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court, and will also be available at the Debtors' restructuring website, www.KCCllc.net/rescap.

**B.    Deadline to Object to Confirmation**

Objections, if any, to the Confirmation of the Plan must: (1) be in writing; (2) state the name and address of the objecting party and the nature of the Claim, Equity Interest or other

<div align="center">-139-</div>

interest of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Bankruptcy Court, and served on the following parties so that they are received no later than [12]:00 [p].m., Prevailing Eastern Time, on [●], 2013:

    (a) the Debtors, (i) if by mail or courier to: Residential Capital LLC, Lewis Kruger, CRO, c/o Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104; with copies to: Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104, Attn: Gary Lee, Lorenzo Marinuzzi, and Todd Goren; (ii) if by e-mail, to: Lewis.Kruger@gmacrescap.com, glee@mofo.com, lmarinuzzi@mofo.com and tgoren@mofo.com;

    (b) the Creditors' Committee, (i) if by mail or courier to: Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036; Attn: Kenneth H. Eckstein, Douglas H. Mannal and Stephen D. Zide, (ii) if by email to keckstein@kramerlevin.com, dmannal@kramerlevin.com and szide@kramerlevin.com;

    (c) Ally Financial, Inc., 1177 Avenue of the Americas, New York, New York 10036; Attn: William B. Solomon and Timothy Devine; with copies to: Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Richard M. Cieri and Ray C. Schrock; and

    (d) the Office of the United States Trustee, Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004; Attn: Brian Masumoto and Michael Driscoll.

## C.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of Section 1129 of the Bankruptcy Code have been satisfied. The Plan Proponents believe that they will satisfy Section 1129 because, among other things:

    (i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

    (ii)    the Debtors and the Creditors' Committee, have complied with the applicable provisions of the Bankruptcy Code;

    (iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

    (iv)    any payment made or promised under the Plan for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

    (v)    the Plan Proponents will disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer or voting

Trustee of the Debtors or Liquidating Trust, an affiliate of the Debtors participating in the Plan with the Debtor or a successor to the Debtors under the Plan. The appointment to, or continuance in, such office of such individuals, will be consistent with the interests of holders of Claims and Equity Interests and with public policy, and the Debtors will have disclosed the identity of any insider that the Liquidating Trust will employ or retain and the nature of any compensation for such insider;

(vi)     with respect to each Class of Impaired Claims or Equity Interests, each holder of a Claim or Equity Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code (see Section [●] below);

(vii)    each class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to Section 1129(b) of the Bankruptcy Code;

(viii)   except to the extent that the holder of a particular Administrative Claim has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims will be paid in full in Cash on the Effective Date;

(ix)     except to the extent that a holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such holder shall receive cash in an amount equal to the Allowed amount of such Claim, or treatment in a manner so that such Claim shall otherwise be rendered Unimpaired, (i) on the Effective Date or as soon as reasonably practicable thereafter; (ii) if an Other Priority Claim is Allowed after the Effective Date, on the date such Other Priority Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Liquidating Trust, as the case may be; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court;

(x)      except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (ii) Cash in an amount agreed to by the Debtors or the Liquidating Trust, as applicable, and such holder; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (iii) at the option of the Debtors or the Liquidating Trust, as applicable, and in lieu of payment in full in Cash of an Allowed Priority Tax Claim, deferred Cash payments on account thereof in the manner and to the extent

-141-

permitted under Section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors or the Liquidating Trust, as applicable, and such holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business;

(xi)     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan (see Section [●] below, "Financial Feasibility"); and

(xii)    all fees payable under Section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

The Plan Proponents believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (ii) they have complied, or will have complied, with all of the requirements of Chapter 11; and (iii) they have proposed the Plan in good faith.

## 1.      Best Interests of Creditors Test/Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that any holder of an impaired claim or interest voting against a proposed Chapter 11 plan must be provided in the plan with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's operations were terminated and its assets liquidated under Chapter 7 of the Bankruptcy Code.  To determine what the holders of Claims and Equity Interests in each impaired Class would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from a liquidation of each Debtor's assets in the context of a hypothetical liquidation.  Such a determination must take into account the fact that Secured Claims, and any Administrative Claims resulting from the original Chapter 11 Cases and from the hypothetical Chapter 7 cases, would have to be paid in full from the liquidation proceeds before the balance of those proceeds were made available to pay unsecured Creditors and make distributions to holders of Equity interests.

As described in more detail in the hypothetical liquidation analysis annexed hereto as Exhibit 7 (the "Liquidation Analysis"), the Plan Proponents believe that the value of the Estate under Chapter 7 would be less than the value of the Estate under the Plan.  In particular, proceeds received in a Chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a Chapter 7 Trustee would likely further reduce Cash available for distribution.  THESE LIQUIDATION VALUATIONS HAVE BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DO NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF THE PLAN PROPONENTS FOR ANY PURPOSE. The assumptions used in developing the Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which would be beyond the

-142-

control of the Debtors or a Chapter 7 trustee.  Accordingly, there can be no assurances that the values assumed in the Liquidation Analysis would be realized if the Debtors were actually liquidated. In addition, any liquidation would take place in the future at which time circumstances may exist that cannot presently be predicted.  A description of the procedures followed and the assumptions and qualifications made by the Debtors in connection with the Liquidation Analysis are set forth in the notes thereto.

### 2.    Financial Feasibility

In connection with Confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible in accordance with Section 1129(a)(11) of the Bankruptcy Code (which Section requires that the Confirmation of the Plan is not likely to be followed by the further liquidation of the Debtors, other than a liquidation contemplated by the Plan).  The Plan contemplates liquidation of the Debtors' assets, which process will be funded by the proceeds received through the Asset Sales, the Ally Contribution, and activities of the Liquidation Trust.  The Debtors are expected to be dissolved promptly after Consummation of the Plan.  Thus, the Plan Proponents believe that the Plan can be consummated without a risk of an additional liquidation or conversion, and therefore that the Plan meets the financial feasibility requirement.

### 3.    Acceptance by Impaired Classes

As a condition to confirmation, the Bankruptcy Code requires that, except as described in the following Section, each class of claims and interests that is impaired under a plan accepts the plan.  A class of claims or equity interests that is unimpaired under the plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Under Section 1124 of the Bankruptcy Code, a class is impaired under a Chapter 11 plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a Chapter 11 plan by an impaired class as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Under Section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted a Chapter 11 plan if holders of such equity interests holding at least two-thirds in amount have actually voted to accept the plan.  Holders of Claims who fail to vote are deemed neither to accept nor to reject the Plan.

-143-

4.        **Confirmation Without Acceptance by All Impaired Classes**

Bankruptcy Code Section 1129(b) allows a Bankruptcy Court to confirm a plan, even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Bankruptcy Code Section 1129(b) states that, notwithstanding an Impaired class's failure to accept a plan, the plan shall be confirmed, at the Plan Proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims and interests that is Impaired under, and has not accepted, the plan.

(a)        **Unfair Discrimination**

A Chapter 11 plan does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated. The Plan Proponents do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests.

(b)        **Fair and Equitable**

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

(a)        Secured Creditors. A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (i) that each holder of a secured claim included in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the Estate's interest in such property; (ii) that each holder of a secured claim included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (iii) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

(b)        Unsecured Creditors. A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (i) each holder of a claim included in the rejecting class under the plan receives or retains property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

(c)        Holders of Equity Interests. A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides that: (i) each holder of an equity interest

-144-

included in the rejecting class under the plan receives or retains property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) any fixed redemption price to which such holder is entitled or (C) the value of the interest; or (ii) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Plan Proponents submit that, pursuant to Bankruptcy Code Section 1129(b), the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

## D.    Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact: Counsel for the Debtors:  Gary S. Lee, Esq., Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, via e-mail at glee@mofo.com, or by telephone at (212) 468-7900; Counsel for the Committee: Kenneth H. Eckstein, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036, via e-mail at keckstein@kramerlevin.com, or by telephone at (212) 715-9100.

## E.    Disclaimer

In formulating the Plan, the Plan Proponents have relied upon financial data derived from the Debtors' books and records.  The Plan Proponents, therefore, represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Plan Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Plan.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology.   The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement or the Plan is, or shall be deemed to be, an admission or statement against interest by the Plan Proponents for purposes of any pending or future litigation matter or proceeding.**

Although the attorneys, accountants, advisors, and other Professionals employed by the Plan Proponents have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of the Debtors, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys, accountants, advisors, and other Professionals employed by the Plan Proponents shall have no liability for the information in this Disclosure Statement.

The Plan Proponents and their Professionals also have made a diligent effort to identify in this Disclosure Statement pending litigation claims and projected objections to claims.  However, no reliance should be placed upon the fact that a particular litigation claim or projected objection to claim is, or is not, identified in this Disclosure Statement.

## ARTICLE IX.
## PLAN-RELATED RISK FACTORS AND
## ALTERNATIVES TO CONFIRMING THE PLAN

Prior to voting to accept or reject the Plan, all holders of Claims in Classes R-3, R-4, R-5, R-6, R-7, R-8, GS-3, GS-4, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, RS-7, and RS-8 should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.

A.    General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims in Classes R-3, R-4, R-5, R-6, R-7, R-8, GS-3, GS-4, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, and RS-8 are entitled to vote and should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

B.    Certain Bankruptcy Law Considerations

1.    Parties in Interest May Object to the Plan Proponents' Classification of Claims and Equity Interests

Bankruptcy Code Section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Plan Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponents created [●] Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

-146-

**2.      The Plan Proponents May Fail to Satisfy the Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, as promptly as practicable thereafter, the Plan Proponents intend to seek Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative Chapter 11 plan.  There can be no assurance that the terms of any such alternative Chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Equity Interests as those proposed in the Plan.

**3.      The Plan Proponents May Not Be Able to Secure Confirmation of the Plan**

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and the voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirements that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, confirmation is not likely to be followed by a liquidation or a need for further financial reorganization, and the value of distributions to non-accepting holders of Claims and Equity Interests within a particular Class under the Plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  While the Plan Proponents believe that the Plan complies with Bankruptcy Code Section 1129, there can be no assurance that the Bankruptcy Court will find that these requirements are met.

Confirmation of the Plan is also subject to certain conditions as described in Article [●] of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims or Equity Interests would receive with respect to their Allowed Claims and Equity Interests.

Subject to the terms and conditions of the Plan and the Bankruptcy Code, the Plan Proponents reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior thereto, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

**4.      The Plan Proponents May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, the Plan Proponents and the Liquidating Trust reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan.  Any holder of a Claim or Equity Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**5.        Risk of Non-Occurrence or Delayed Occurrence of the Effective Date**

Although the Plan Proponents believe that the Effective Date will occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

Consummation of the Plan is also subject to certain conditions as described in Article [●] of the Plan, which are not certain.  For example, the determination of appropriate distribution reserves and the resolution of the dispute regarding the validity of certain disputed liens may not be resolved for a significant period of time, thereby potentially delaying consummation.

**6.        Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

**7.        Liquidation under Chapter 7**

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a Trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code.  Even if a plan is confirmed, under certain specified scenarios, the Debtors may seek to convert the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have upon the recoveries of holders of Claims and Equity Interests is set forth in the Debtors' Liquidation Analysis (a copy of which is annexed hereto as Exhibit **7).**

**8.        Estimation for Allowed Claims**

There can be no assurance that the estimated amounts of Claims set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from the Plan Proponents' estimates.  Because the estimated amounts are based solely upon (i) a review of the Debtors' books and records, (ii) a review of the Claims, (iii) the Plan Proponents' estimates as to additional Claims that may be filed in the Chapter 11 Cases or that would arise in the event of a conversion of the cases from Chapter 11 to Chapter 7; and (iv) the Plan Proponents' estimates of Claims that will be Allowed following the objections to Claims by the Plan Proponents, such estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein.

-148-

**C.      Disclosure Statement Disclaimer**

**1.      The Information Contained Herein Is for Soliciting Votes Only**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

**2.      The Information in this Disclosure Statement May Be Inaccurate**

Unless otherwise specified herein, the statements contained in this Disclosure Statement are made by the Plan Proponents as of the date hereof, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein.  The Plan Proponents may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.  Further, the performance and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited.

Although the Plan Proponents used their reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement.  While the Plan Proponents believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and annexed hereto is without inaccuracies.

**3.      This Disclosure Statement Was Not Approved by the Securities and Exchange Commission**

This Disclosure Statement has not been filed with the Securities and Exchange Commission or any state regulatory authority.  Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

**4.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

**The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.**  Each holder of a Claim or Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**5.      No Reliance Should be Placed upon any Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed upon the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure

-149-

Statement. The Plan Proponents or the Liquidating Trust may seek to investigate, file and prosecute Claims and Equity Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

**6.      Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets**

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims of the Debtors or the Liquidating Trust or rights of the Plan Proponents or the Liquidating Trust (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their Estates is specifically or generally identified herein.

**7.      No Representations Made Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Plan Proponents and the U.S. Trustee.

**D.      Additional Factors to Be Considered**

**1.      The Plan Support Agreement May Terminate**

Pursuant to the Plan Support Agreement, the Debtors, the Creditors' Committee, and Consenting Claimants have agreed to support the Plan; subject, however, to certain termination events not having occurred, including, without limitation, if:

(a)    the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing a Trustee under Chapter 11 of the Bankruptcy Code;

(b)    any of the Chapter 11 Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(c)    any court has entered a final, non-appealable judgment or order declaring the Plan Support Agreement or any material portion thereof to be unenforceable;

(d)    the Releases set forth in the Plan Term Sheet are modified, amended, changed, severed or otherwise altered in the Plan or any other definitive document in any manner;

-150-

(e) the Plan Support Agreement ceases to be binding on Ally or the Creditors' Committee;

(f) the Plan Support Agreement ceases to be binding on any Consenting Claimant;

(g) the Debtors file with the Bankruptcy Court a proposed disclosure statement, Chapter 11 plan, confirmation order or other related document that is not an Approved Plan Document (as such term is defined in the Plan Term Sheet); or

(h) the Milestones provided in the Plan Support Agreement are not satisfied.

To the extent the terms or conditions of the Plan Support Agreement are not satisfied, or to the extent events of termination arise under the Plan Support Agreement, the Plan Support Agreement may terminate prior to the confirmation or consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents. Any such loss of support could have an adverse effect on the Debtors' ability to confirm and consummate the Plan or any alternative plan.

## 2.    Plan Releases May Not Be Approved

There can be no assurance that the Plan Releases will be approved by the Bankruptcy Court. If the Plan Releases are not approved, there will be no Ally Contribution, and it would be highly unlikely that the Plan would be consummated. In the absence of any Ally Contribution, the proposed Distributions in the Plan could not be effectuated, and holders of Claims and Equity Interests would receive significantly reduced recoveries in any alternative plan scenario.

## 3.    Potential Creditor Actions

Certain holders of Claims against the Debtors may express dissatisfaction with the proposed Plan. As of the date hereof, the Plan Proponents do not express any views with respect to the outcome of potential actions of such holders. It is possible that such actions could lead to modifications to the Plan. It is also possible that such actions could impact the Debtors' existing business operations.

## 4.    The Junior Secured Noteholders May Be Entitled to Post-Petition Interest, Which Would Decrease Recoveries

The Debtors and Creditors' Committee currently are involved in litigation with the Junior Secured Noteholders before the Bankruptcy Court regarding the extent and validity of the Junior Secured Noteholders' security interests. The Debtors and Creditors' Committee believe that the Junior Secured Noteholders are undersecured and not entitled to post-petition interest under the Bankruptcy Code; however, the Junior Secured Noteholders believe that they are oversecured and entitled to post-petition interest. The litigation involves, among other things, determinations regarding the existence and perfection of Liens on certain of the Debtors' assets, determinations regarding the Junior Secured Noteholders' entitlement to adequate protection claims resulting

-151-

from the Debtors' use of Cash Collateral, and the validity of Intercompany Balances. This litigation is not stayed, and the majority of this litigation will proceed following the Voting Deadline. To the extent the Bankruptcy Court determines that the Junior Secured Noteholders are entitled to post-petition interest, the recoveries for holders of Claims will be lower than the amounts provided for in the Plan.

### 5.    Certain Tax Implications

Certain consequences of the Plan regarding U.S. federal income taxes are summarized under "Certain U.S. Federal Income Tax Consequences of the Plan." Many of these tax issues raise unsettled and complex legal issues, and are subject to substantial uncertainties. No ruling from the U.S. Internal Revenue Service ("IRS") has been sought by the Debtors regarding the tax consequences described in this Disclosure Statement. Nevertheless, the IRS may challenge the various positions the Debtors have taken, or intend to take, with respect to their tax treatment, and a court may sustain such a challenge or objection by the IRS. For a more detailed discussion of risks relating to the specific positions the Debtors intend to take with respect to various tax issues, please review Article [●].

### ARTICLE X.
### CERTAIN U.S. FEDERAL INCOME
### TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of implementation of the Plan to the Debtors and certain holders of Claims.

This discussion is based on the Internal Revenue Code of 1986, as amended, (the "IRC") and the Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings, and pronouncements of the IRS, each as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the discussion set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences described herein.

Except as otherwise set forth herein, this discussion does not address the U.S. federal income tax consequences to holders of Claims who (a) are unimpaired or otherwise entitled to payment in full in Cash on the Effective Date under the Plan, or (b) are otherwise not entitled to vote under the Plan. The discussion assumes that each holder of a Claim holds only Claims in a single class, each holder of a Claim holds such Claims only as "capital assets" within the meaning of the IRC, none of the Claims have "original issue discount" ("OID") within the meaning of the IRC, and the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

The U.S. federal income tax consequences of the Plan are complex and are subject to substantial uncertainties. Except as described below, the Debtors have not requested a ruling from the IRS, and the discussion set forth below of certain U.S. federal income tax consequences of the Plan is not binding upon the IRS. Thus, no assurance can be given that the IRS would not

-152-

assert, or that a court would not sustain, a position different from any discussed herein, resulting in U.S. federal income tax consequences to the Debtors and/or holders of Claims that are substantially different from those discussed herein.  The Debtors have not requested an opinion of counsel with respect to any of the tax aspects of the Plan, and no opinion is given by this Disclosure Statement.

This discussion does not apply to a holder of a Claim that is not a "United States person," as such term is defined in the IRC.  Moreover, this discussion does not address U.S. federal taxes other than income taxes nor any state, local or non-U.S. tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to United States persons in light of their individual circumstances or to United States persons that may be subject to special tax rules, such as persons who are related to the Debtors within the meaning of the IRC, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate mortgage investment conduits, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, Subchapter S corporations, employees of the Debtors, persons who received their Claims as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark to market method of accounting, and holders of Claims who are themselves in bankruptcy.  If a partnership or entity treated as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner generally will depend on the status of the partner and the activities of the partnership.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S. INCOME, ESTATE, GIFT, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**:  ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **Certain U.S. Federal Income Tax Consequences to the Debtors**

1.    **Tax Filing Status**

For U.S. federal income tax purposes, the Debtors, excluding Debtors organized as corporations, are classified as disregarded entities (the "<u>Disregarded Debtors</u>").  Accordingly, all assets and liabilities of the Disregarded Debtors are treated as assets and liabilities of AFI for

-153-

U.S. federal income tax purposes.  As such, the Disregarded Debtors are not taxpaying entities, but rather operate as unincorporated divisions of AFI with their taxable income (or loss) accounted for in the consolidated federal U.S. Corporation Income Tax Return filed by AFI.

### 2.    Tax Impact of the Plan on the Debtors

Since the Disregarded Debtors are not taxpaying entities, but rather operate as unincorporated divisions of AFI for U.S. federal income tax purposes, the U.S. federal income tax impact of the Plan to such entities will be reported and accounted for by AFI.  Consequently, the transactions contemplated by the Plan, including the transfer of assets to the Liquidating Trust should be treated as though AFI entered into them directly and should not have any U.S. federal income tax consequences to the Disregarded Debtors.

### 3.    Tax Sharing Agreements

ResCap, and certain ResCap Debtors, are party to certain tax sharing agreements (each, a "TSA"), which govern the allocation and payment of certain U.S. federal income tax liabilities of such Debtors.  Such tax sharing agreements generally allocate the amount of U.S. federal income tax liability computed as if such Debtor were a corporation for U.S. federal income tax purposes and filed a separate consolidated U.S. federal income tax return including all of such Debtor's eligible subsidiaries.  Specifically, ResCap is a party to a TSA with GMAC Mortgage Group LLC, its immediate parent (the "ResCap TSA").  A separate TSA between GMAC Mortgage Group LLC and AFI provides for similar obligations with respect to the payment of taxes by GMAC Mortgage Group LLC (the "GMAC MG TSA," and together with the ResCap TSA, the "TSAs").[55]  The Debtors have not assumed the TSAs.  To the extent the Debtors are obligated to perform under the TSAs, the Debtors may be exposed to substantial liability.

## B.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims

### 1.    General

The U.S. federal income tax consequences to a holder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim will depend on a number of factors, including the nature of the Claim, the holder's method of tax accounting, and its own particular tax situation.

Because the holders' Claims and tax situations differ, holders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.  Among other things, the U.S. federal income tax

---

[55]    The ResCap TSA provides that ResCap must make quarterly estimated tax payments based on the estimated separate tax liability of the hypothetical ResCap tax group.  After the filing of the AFI consolidated U.S. federal income tax return, the difference between the estimated tax payments made by ResCap and the separate tax liability of ResCap will be either paid by ResCap or by AFI depending on whether ResCap underpaid or overpaid its estimated tax liability.  Additionally, a similar method to that provided for in the tax sharing agreement for allocating U.S. federal income taxes to the hypothetical ResCap tax group will be used to allocate any state, local, or foreign tax liability in which there is a combined tax liability between ResCap and GMAC Mortgage Group LLC.

consequences of a payment to a holder may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a payment in repayment of the principal amount of a loan is generally not included in the gross income of an original lender.

The U.S. federal income tax consequences of a transfer to a holder may also depend on whether the item to which the payment relates has previously been included in the holder's gross income or has previously been subject to a loss or a worthless security or bad debt deduction. For example, if a payment is made in satisfaction of a receivable acquired in the ordinary course of a holder's trade or business, the holder had previously included the amount of such receivable payment in its gross income under its method of tax accounting, and had not previously claimed a loss or a worthless security or bad debt deduction for that amount, the receipt of the payment should not result in additional income to the holder but may result in a loss. Conversely, if the holder had previously claimed a loss or worthless security or bad debt deduction with respect to the item previously included in income, the holder generally would be required to include the amount of the payment in income.

A holder receiving a payment pursuant to the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (i) the amount of cash and the fair market value (if any) of any property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest), including, as discussed below, any beneficial interests in the Liquidating Trust, and (ii) its adjusted tax basis in the Claim (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. The character of any income or loss that is recognized will depend upon a number of factors, including the status of the creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the holder's hands.

When gain or loss is recognized, as discussed below (see Section B.2 – "Consequences to Holders of Junior Secured Notes Claims, Senior Unsecured Notes Claims, Junior Secured Notes Deficiency Claims, and General Unsecured Claims"), such gain or loss may be long-term capital gain or loss if the Claim has been held for more than one year. Each holder of the Claim should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

As discussed below (see Section C —"Tax Treatment of the Liquidating Trust and holders of Beneficial Interests"), each holder of a Claim that receives a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets, consistent with its economic rights in the Trust. Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including holders of Claims receiving Liquidating Trust Units) must consistently use such valuation for all U.S. federal income tax purposes.

-155-

A holder's share of any proceeds received by the Liquidating Trust upon the sale or other disposition of the assets of the Liquidating Trust (other than any such amounts received as a result of the subsequent disallowance of Disputed Claims or the reallocation among holders of the Claims of undeliverable Plan distributions) should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Liquidating Trust. See Section C —"Tax Treatment of the Liquidating Trust and holders of Beneficial Interests," below.

A holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of each such interest on the date the Liquidating Trust is created, and the holder's holding period generally will begin the day following the establishment of the Liquidating Trust.

## 2.    Consequences to Holders of Junior Secured Notes Claims, Senior Unsecured Notes Claims, Junior Secured Notes Deficiency Claims, and General Unsecured Claims.

Pursuant to the Plan, a holder of Junior Secured Notes Claims, Senior Unsecured Notes Claims, Junior Secured Notes Deficiency Claims, and General Unsecured Claims will receive their pro rata share of distributions of deferred cash payments from time to time and their pro rata share of the beneficial interests in the Liquidating Trust, respectively (not to exceed the amount of its Allowed Claim). The holder of any such Allowed Claim generally will realize gain or loss in an amount equal to the difference, if any, between (a) the amount of Cash and the fair market value (if any) of any property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) including the fair market value of beneficial interests in the Liquidating Trust received in exchange for such Claims, and (b) the holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). It is possible that any loss, or a portion of any gain, realized by a holder of a Claim may have to be deferred until all of the distributions to such holder are received.

As discussed in the next Section, the amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under his method of accounting.

## 3.    Allocation of Consideration to Interest

Pursuant to Section [VII.H] of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest.

However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether Cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each

-156-

holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### 4.    Market Discount

Market discount is the amount by which a holder's tax basis in a debt obligation immediately after its acquisition is exceeded by the adjusted issue price of the debt obligation at such time, subject to a *de minimis* exception. A holder generally is required to include gain on the disposition of a market discount debt instrument as ordinary income to the extent of the accrued market discount on the debt instrument.

### 5.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Furthermore, all distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the applicable withholding rate.

Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

***HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, INCLUDING POTENTIAL WITHHOLDING ON DISTRIBUTIONS BY THE DEBTORS OR PAYMENTS FROM THE LIQUIDATING TRUST, PRIVATE SECURITIES CLAIMS TRUST, AND THE BORROWERS CLAIM TRUST, RESPECTIVELY.***

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

-157-

C.    **Tax Treatment of the Liquidating and Holders of Beneficial Interests**

1.    **Classification of the Liquidating Trust**

The Liquidating Trust, created pursuant to the Plan, is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, all income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustees, and holders) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust. The holders of beneficial interests in the Liquidating Trust are the owners and grantors of the Liquidating Trust. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. The Liquidating Trust intends to request a ruling from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. However, prior to obtaining a favorable ruling by the IRS, there can be no assurance that the IRS would not take a contrary position. If the IRS were to successfully challenge the classification of the Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust and the holders of beneficial interests in the Liquidating Trust, respectively, and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidating Trust). Moreover, if the Liquidating Trust were found to be carrying on a profit-making business, the Trust would be treated as a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes. As a result, the U.S. federal income tax consequences to the Liquidating Trust, the holders of beneficial interests in the Liquidating Trust, and the Debtors could vary from those discussed herein.

2.    **General Tax Reporting by the Liquidating Trust and Holders of Beneficial Interests**

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and holders) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust Assets (other than assets allocable to Disputed Claims) are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims receiving beneficial interests in the Liquidating Trust (with each holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the holders of such assets to the Liquidating Trust in exchange for a beneficial interest in the Liquidating Trust. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the holders of beneficial interests in the Liquidating Trust are the owners and grantors, and treat the holders of beneficial interests in the Liquidating Trust as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein, for all U.S. federal income tax purposes.

-158-

Each holder of a beneficial interest in the Liquidating Trust must report on its U.S. federal income tax return its pro rata allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust. Moreover, upon the sale or other disposition (or deemed disposition) of any Liquidating Trust asset, each holder of a beneficial interest in the Liquidating Trust must report on its U.S. federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of Cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating Trust asset so sold or otherwise disposed of and (2) such holder's adjusted tax basis in its pro rata share of such Liquidating Trust asset. The character of any such gain or loss to the holder will be determined as if such holder itself had directly sold or otherwise disposed of the Liquidating Trust asset. The character of items of income, gain, loss, deduction and credit to any holder of a beneficial interest in the Liquidating Trust, and the ability of the holder to benefit from any deductions or losses, depends on the particular circumstances or status of the holder.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors and holders of beneficial interests) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a holder of a beneficial interest in the Liquidating Trust will be treated as income or loss with respect to holder's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the holder of a beneficial interest in the Liquidating Trust.

The U.S. federal income tax obligations of a holder with respect to its beneficial interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent distribution to the holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash by the Liquidating Trust will not be separately taxable to a holder of a beneficial interest in the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustees will comply with all applicable governmental withholding requirements (see Section [**VII.H**] of the Plan). Thus, in the case of any holders of beneficial interests in the Liquidating Trust that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

-159-

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust consistent with its classification as a grantor Trust pursuant to Treasury Regulation Section 1.671-4(a). Except as discussed below with respect to any reserve for Disputed Claims, the Liquidating Trustee also will send annually to each holder of a beneficial interest in the Liquidating Trust a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

**D.    Treatment of the Disputed Claims Reserve**

The Disputed Claims Reserve is intended to be treated, for U.S. federal income tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations Section 1.468B-9(b)(1). If so treated, any payment of Cash or distribution of Liquidating Trust Units made out of the Disputed Claims Reserve should not be deemed to have been made to any recipient until, and to the extent that, the amount to which the recipient is entitled has been determined and distributed. At such time, the recipient (including the holders of Liquidating Trust Units upon the disallowance of a Disputed Claim) will take such amount into account for U.S. federal income tax purposes as an amount received in respect of its Claim. Upon the disallowance of a Disputed Claim, the Disputed Claims Reserve will be treated as having distributed to holders of Liquidating Trust Units the portion of the Liquidating Trust Assets allocable to such Disputed Claim. Recipients of amounts from the Disputed Claims Reserve should report these amounts consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of amounts from the Disputed Claims Reserve.

Upon the allowance or disallowance of a Disputed Claim, the Disputed Claims Reserve generally will be treated as having sold or exchanged the portion of the Liquidating Trust Assets allocable to such Claim for purposes of IRC Section 1001(a). Any income realized by the Disputed Claims Reserve will be reported as income of and taxable to the Disputed Claims Reserve.

**E.    Tax Treatment of the Private Securities Claims Trust and the Borrowers Claims Trust**

All parties including, without limitation, the Debtors, the Private Securities Claims Trustee and the holders of Private Securities Claims (with respect to the Private Securities Claims Trust), and the Borrowers Claims Trustee and the holders of Borrowers Claims (with respect to the Borrowers Claims Trust) shall treat each of the Private Securities Claims Trust and the Borrowers Claims Trust, respectively, as a qualified settlement fund within the meaning of IRC Section 468B and the Treasury Regulations thereunder. Pursuant to such treatment, any payment made out of the Private Securities Claims Trust or the Borrowers Claims Trust to a holder of a Private Securities Claim or a Borrowers Claim, respectively, should not be deemed to have been made to any recipient until, and to the extent that, the amount to which the recipient is entitled has been determined and distributed. At such time, the recipient will take such amount

-160-

into account for U.S. federal income tax purposes as an amount received in respect of its Claim. Recipients of amounts from the Private Securities Claims Trust or the Borrowers Claims Trust, respectively, should report these amounts consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of amounts from the Private Securities Claims Trust or the Borrowers Claims Trust, respectively.

As qualified settlement funds, amounts earned by the Private Securities Claims Trust and the Borrowers Claims Trust, respectively, will generally be subject to an entity level tax on amounts earned on a current basis.  In general, in determining the Private Securities Claims Trust's and the Borrowers Claims Trust's taxable income, (1) any amounts transferred to the Trust would be excluded from its income, (2) any sale or exchange of property  by the Private Securities Claims Trust and the Borrowers Claims Trust, respectively, would result in the recognition of gain or loss equal to the difference between the amount received on such disposition and the respective Trust's adjusted basis in such property, and (3) any interest income or other earnings with respect to the Private Securities Claims Trust (through its interests in the Liquidating Trust) and the Borrowers Claims Trust's assets, respectively, would be included in income.  Additionally, the Private Securities Claims Trust generally will treat a distribution of Liquidating Trust Units in respect of Private Securities Claims, as a sale or exchange of such Units for purposes of IRC Section 1001(a).  Any income realized by the Private Securities Claims Trust and the Borrowers Claims Trust will be reported as income of and taxable to the Private Securities Claims Trust and the Borrowers Claims Trust.  The Private Securities Claims Trustee and the Borrowers Claims Trustee will file with the IRS tax returns for the Privates Securities Claims Trust and the Borrowers Claims Trust, respectively, consistent with its classification as a qualified settlement fund pursuant to Treasury Regulation Section 1.468B-2(k)(1).

***THE FOREGOING SUMMARY IS PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY.  HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN TO THEM.***

### ARTICLE XI.
### SECURITIES LAW MATTERS

In connection with the Plan, pursuant to Section 1145 of the Bankruptcy Code, and except as provided in sub-Section (b) thereof, the issuance of the Units will be exempt from registration pursuant to Section 4 of the Securities Act and all other applicable non-bankruptcy laws or regulations.

The issuance of the Units pursuant to the Plan is being made pursuant to the exemption available under Section 1145 of the Bankruptcy Code. Subsequent transfers of the Units by holders that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

Section 1145(a) of the Bankruptcy Code generally exempts from such registration requirements the issuance of securities if the following conditions are satisfied:

-161-

(a) the securities are issued or sold under a Chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor, or (c) a successor to a debtor under the plan and

(b) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate, or are issued principally in such exchange and partly for cash or property.

The Plan Proponents believe that the exchange of Units for Claims against the Debtors under the circumstances provided in the Plan will satisfy the requirements of Section 1145(a) of the Bankruptcy Code. In reliance upon these exemptions, the offer and sale of the Units would not require registration under the Securities Act and should not be so registered.

The Units will be deemed to have been issued in a public offering under the Securities Act and, therefore, may be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by Section 4(a)(1) thereof, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b)(1) of the Bankruptcy Code, or a statutory underwriter, as described below. In addition, such securities generally may be resold by the holders thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, holders of Units are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

If the Units are not covered by Section 1145 of the Bankruptcy Code, the Units will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act, and may not be resold under the Securities Act and applicable state securities laws, absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act. Recipients of the Units are advised to consult with their own legal advisors as to the applicability of Section 1145 to the Units and the availability of any exemption from registration under federal and state law in the event that Section 1145 is not applicable to the Units.

Section 1145(b)(1) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (iv) is an issuer of the securities within the meaning of Section 2(a)(4) of the Securities Act.

The reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the

-162-

Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, a member of the Liquidating Trust Board or Liquidating Trust Management may be deemed to be a "control person" for these purposes.

Resales of the Units by persons deemed to be statutory underwriters would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Units who may potentially be deemed to be "underwriters" may  be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule  144 of the Securities Act and in compliance with applicable state and foreign securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three month period, the requirement that the securities be sold in a "brokers' transaction" or in a transaction directly with a "market maker" and that, under certain circumstances, notice of the resale be filed with the SEC. The Plan Proponents Debtors cannot assure, however, that adequate current public information will exist with respect to the Units and therefore, that the safe harbor provisions of Rule 144 of the Securities Act will be available.  To the extent that the interests in the Private Securities Claims Trust may be deemed to be securities, the Plan Proponents believe that the issuance of these interests to holders of Private Securities Claims under the terms of the Plan satisfies the requirements of Section 1145(a) of the Bankruptcy Code.  The treatment of these interests for securities law purposes would therefore be the same as the treatment of the Units, as described above and subject to the caveat below, mutatis mutandis.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE PLAN PROPONENT MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE UNITS. ACCORDINGLY, THE PLAN PROPONENTS ADVISE THAT POTENTIAL RECIPIENTS OF THE UNITS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE THE UNITS.

<div align="center">

**ARTICLE XII.**
**RULES OF INTERPRETATION**

</div>

**A.      Rules of Construction**

The following rules for interpretation and construction shall apply to this Disclosure Statement: (i) capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed to them in the Plan; (ii) terms and phrases, whether capitalized or not, that are used but not defined herein or in the Plan, but that are defined in the Bankruptcy Code, shall have the meanings ascribed to them in the Bankruptcy Code; (iii) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall

<div align="center">-163-</div>

include the masculine, feminine, and the neuter gender; (iv) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (v) unless otherwise specified, all references herein to "Parts" are references to Articles hereof; (vi) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (vii) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (viii) the rules of construction set forth in Bankruptcy Code Section 102 shall apply; and (ix) any immaterial effectuating provisions may be interpreted by the Plan Proponents in a manner that is consistent with the overall purpose and intent of the Plan and Disclosure Statement, all without further order of the Bankruptcy Court.

**B.** **Computation of Time**

Unless otherwise specified herein, Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**C.** **Governing Law**

Unless a rule of law or procedure is supplied by federal law or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, securities, instruments, or other documents executed or delivered in connection with the Plan (except as otherwise set forth in those documents, in which case the governing law of such documents shall control); *provided, however,* that corporate governance matters relating to the Debtors shall be governed by the laws of the State of Delaware

## ARTICLE XIII.
## CONCLUSION AND RECOMMENDATION

In the opinion of the Plan Proponents, because the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code, the Plan is preferable to the alternatives described in this Disclosure Statement.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions than those which are proposed under the Plan.  Accordingly, the Plan Proponents recommend that parties entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s/ Lewis Kruger
Residential Capital, LLC
By: Lewis Kruger
Title: Chief Restructuring Officer
Dated: July 3, 2013

Prepared by:

Gary S. Lee                                           Kenneth H. Eckstein
Lorenzo Marinuzzi                                     Doughlas H. Mannal
Todd M. Goren                                         Stephen D. Zide
Jennifer L. Marines                                   Rachael L. Ringer
Samantha Martin                                       KRAMER LEVIN NAFTALIS &
MORRISON & FOERSTER LLP                               FRANKEL LLP
1290 Avenue of the Americas                           1177 Avenue of the Americas
New York, New York 10104                              New York, New York 10036
Telephone: (212) 468-8000                             Telephone: (212) 715-9100
Facsimile: (212) 468-7900                             Facsimile: (212) 715-8000

- and -                                               *Counsel for the Official Committee of
                                                      Unsecured Creditors*

Alexandra Steinberg Barrage
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
Telephone:  (202) 887-1500
Facsimile:  (202) 887-0763

*Counsel for Debtors and
Debtors in Possession*

-165-

## Exhibit 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | |
| ) | Case No. 12-12010 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., ) | |
| ) | Chapter 11 |
| Debtors. ) | |
| ) | Jointly Administered |
| ) | |

---

**JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al.
AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

---

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:    (212) 468-7900

*Counsel for Debtors and Debtors-in
Possession*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Unsecured
Creditors*

Dated:  July 3, 2013
        New York, New York

THIS PLAN IS BEING SUBMITTED FOR APPROVAL BY THE
BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF AN
ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE
MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE, 11 U.S.C.
§ 1125. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED
UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE
STATEMENT. NOTHING CONTAINED HEREIN SHALL CONSTITUTE
AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION
OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST.

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS, RULES OF CONSTRUCTION, COMPUTATION OF
TIME, AND GOVERNING LAW ........................................................................ 5

    A.    Defined Terms ........................................................................................... 5

    B.    Rules of Construction............................................................................... 33

    C.    Computation of Time ................................................................................ 34

    D.    Governing Law ......................................................................................... 34

ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, PRIORITY
TAX CLAIMS, AND U.S. TRUSTEE FEES ...................................................... 34

    A.    Administrative Claims .............................................................................. 34

    B.    Professional Claims.................................................................................. 35

    C.    Priority Tax Claims .................................................................................. 36

    D.    U.S. Trustee Fees ..................................................................................... 37

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
EQUITY INTERESTS........................................................................................ 37

    A.    Classification of Claims and Equity Interests ......................................... 37

    B.    Record Date for Claims............................................................................ 37

    C.    Summary of Classification and Class Identification................................ 37

    D.    Treatment of Claims and Equity Interests ............................................... 40

    E.    Subordinated Claims ................................................................................ 53

    F.    Distributions on Account of Allowed Claims and Interests..................... 54

    G.    Elimination of Vacant Classes................................................................. 54

    H.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
Code......................................................................................................... 54

ARTICLE IV. IMPLEMENTATION OF THE PLAN .............................................. 54

    A.    Global Settlement ..................................................................................... 54

    B.    Ally Settlement ......................................................................................... 56

    C.    RMBS Settlement ..................................................................................... 59

    D.    Settlement of Monoline Claims................................................................ 64

    E.    Private Securities Claims Trust ................................................................ 64

    F.    Borrower Claims Trust............................................................................. 66

    G.    Settlement of Claims of Kessler Class Claimants.................................... 69

H.    NJ Carpenters Claims Settlement .................................................................. 70

I.    Senior Unsecured Notes Settlement ............................................................... 70

K.    Cancellation of Securities, Indentures, and Other Documents Evidencing
Claims and Equity Interests ......................................................................... 71

L.    Treatment of Intercreditor Agreement .......................................................... 71

M.    Compensation Order .................................................................................... 71

N.    Corporate Action ......................................................................................... 71

O.    Dissolution of the Debtors ........................................................................... 72

P.    Effectuating Documents; Further Transactions ............................................. 73

Q.    Exemption from Certain Taxes and Fees ....................................................... 73

R.    Preservation of Causes of Action ................................................................. 73

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ....................................................................................................... 74

A.    Rejection of Executory Contracts and Unexpired Leases ............................... 74

B.    Assumption of Executory Contracts and Unexpired Leases ........................... 75

C.    Contracts and Leases Entered Into After the Petition Date ............................ 77

D.    Pre-existing Obligations to the Debtors Under Executory Contracts and
Unexpired Leases ......................................................................................... 77

E.    Nonoccurrence of Effective Date ................................................................. 77

F.    No Change in Control ................................................................................... 77

ARTICLE VI. THE LIQUIDATING TRUST ............................................................. 77

A.    Generally ..................................................................................................... 77

B.    Purpose of the Liquidating Trust .................................................................. 78

C.    Transfer of Assets to the Liquidating Trust ................................................... 78

D.    Liquidating Trust Administrative Reserve ..................................................... 78

E.    Liquidating Trust Governance ...................................................................... 79

F.    Financial Statements/Reporting .................................................................... 79

G.    Tax Treatment .............................................................................................. 79

H.    Duration ....................................................................................................... 81

J.    Exculpation; Indemnification; Insurance ...................................................... 81

ARTICLE VII. PROVISIONS GOVERNING ISSUANCE OF UNITS AND OTHER
DISTRIBUTIONS ........................................................................................ 82

A.    Applicability ................................................................................................ 82

B.    Cash Distributions ........................................................................................ 82

2

C.    Initial Issuance of Units and Distributions in Respect of Units by the Liquidating Trust .......................................................................................... 82

D.    Fractional Units ................................................................................. 83

E.    Timing and Calculation of Amounts to be Distributed ................... 83

F.    Disbursing Agent .............................................................................. 84

G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ..... 85

H.    Compliance with Tax Requirements ................................................. 88

I.    Allocations ........................................................................................ 89

J.    Setoffs and Recoupment ................................................................... 89

K.    Claims Paid or Payable by Third Parties .......................................... 89

L.    Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable .......................................... 90

M.    Distributions Free and Clear ............................................................. 90

ARTICLE VIII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ............................ 91

A.    Resolution of Disputed Claims.......................................................... 91

B.    Disallowance of Claims ..................................................................... 92

C.    Amendments to Claims ...................................................................... 93

D.    Disputed Claims Reserve .................................................................. 93

ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ................................................................................... 94

A.    Compromise and Settlement of Claims, Equity Interests, and Controversies 94

B.    Release of Liens................................................................................. 94

C.    Releases by the Debtors .................................................................... 95

D.    Third Party Release ........................................................................... 95

E.    Ally Release ...................................................................................... 96

F.    Exculpation ....................................................................................... 96

G.    Injunction .......................................................................................... 97

H.    Waiver of Subrogation ...................................................................... 97

I.    Satisfaction and Release of Claims and Equity Interests ................. 98

J.    Judgment Reduction for Co-Defendants in Securities Litigation .................. 98

K.    Limitations ........................................................................................ 98

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................... 99

A.    Conditions Precedent to Confirmation............................................... 99

3

B.     Conditions Precedent to the Effective Date .................................................... 99

C.     Waiver of Conditions ...................................................................................... 100

D.     Effect of Nonoccurrence of Conditions ......................................................... 101

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..... 101

A.     Modification and Amendments ....................................................................... 101

B.     Effect of Confirmation on Modifications ....................................................... 102

C.     Revocation or Withdrawal of the Plan ........................................................... 102

ARTICLE XII. RETENTION OF JURISDICTION ............................................................... 102

ARTICLE XIII. MISCELLANEOUS PROVISIONS .............................................................. 104

A.     Immediate Binding Effect .............................................................................. 104

B.     Additional Documents .................................................................................... 105

C.     Payment of Statutory Fees ............................................................................. 105

D.     Dissolution of the Creditors' Committee ........................................................ 105

E.     Access to Debtors' Records after Effective Date. ......................................... 105

F.     Substantial Consummation ............................................................................. 106

G.     Reservation of Rights ..................................................................................... 106

H.     Successors and Assigns ................................................................................... 106

I.     Service of Documents ..................................................................................... 106

J.     Further Assurances .......................................................................................... 109

K.     Term of Injunctions or Stays ......................................................................... 109

L.     Entire Agreement ............................................................................................ 109

M.     Exhibits and Related Documents .................................................................... 109

N.     Severability of Plan Provisions ...................................................................... 109

O.     Waiver or Estoppel Conflicts ......................................................................... 110

P.     Conflicts .......................................................................................................... 110

## INTRODUCTION

The Debtors and the Creditors' Committee together propose this Joint Chapter 11 Plan[1] for resolution and satisfaction of all Claims against and Equity Interests in the Debtors. Each Debtor and the Creditors' Committee is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

---

[1] All capitalized terms not defined in this introduction have the meanings ascribed to them in Article I of this Plan.

Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, and operations and risk factors, together with a summary and analysis of the Plan and a description of the settlements agreed to by the Debtors, the Creditors' Committee and certain other parties pursuant to the Global Settlement. All holders of Claims entitled to vote on the Plan are encouraged to consult the Disclosure Statement and to read the Plan carefully before voting to accept or reject the Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AS APPROVED BY THE BANKRUPTCY COURT HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    **Defined Terms**

1.    "Accrued Professional Compensation" means, at any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's accrued and unpaid fees (including success fees) and reimbursable expenses for services rendered in the Chapter 11 Cases through and including such date, whether or not such Professional has filed a fee application for payment of such fees and expenses, (i) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying any retainer that has been provided by the Debtors to such Professional and not previously applied. No amount of a Professional's fees and expenses denied under a Final Order shall constitute Accrued Professional Compensation.

2.    "Additional Settling RMBS Trusts" means all RMBS Trusts other than the Original RMBS Settling Trusts.

3.    "Administrative Claim" means any Claim for costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code, (d) any indebtedness or obligations assumed by the Debtors in connection with the conduct of their businesses; and (e) any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

4.     "<u>Administrative Claim Bar Date</u>" means the deadline for filing requests for payment of Administrative Claims, which shall be the first Business Day that is [●] days following the Effective Date, unless otherwise ordered by the Bankruptcy Court, except with respect to Professional Claims which shall be subject to the provisions of Article II.

5.     "<u>Affiliate</u>" means an "affiliate" as such term is defined in section 101(2) of the Bankruptcy Code.

6.     "<u>AFI</u>" means Ally Financial Inc.

7.     "<u>AIG</u>" means AIG Asset Management (U.S.), LLC, on behalf of itself and its affiliates, as investment advisor for certain affiliated entities that have filed proofs of claim in the Chapter 11 Cases.

8.     "<u>Allowed</u>" means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is (i) listed in the Schedules as of the Effective Date as neither disputed, contingent nor unliquidated, and for which no Proof of Claim has been timely filed, or (ii) evidenced by a valid Proof of Claim or request for payment of Administrative Claim, as applicable, Filed by the applicable Bar Date, and as to which the Debtors or other parties in interest have not Filed an objection to the allowance thereof by the Claims Objection Deadline, or (b) a Claim that is Allowed under the Plan or any stipulation or settlement approved by, or Final Order of, the Bankruptcy Court; <u>provided, however</u>, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims" under the Plan, <u>provided further, however,</u> any Claims expunged or disallowed under the Plan or otherwise shall not be Allowed Claims. If a Claim is Allowed only in part, references to Allowed Claims include and are limited to the Allowed portion of such Claim. Notwithstanding anything to the contrary herein, no Claim that is disallowed in accordance with Bankruptcy Rule 3003 or section 502(d) of the Bankruptcy Code is Allowed and each such Claim shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

9.     "<u>Allowed Fee Claim</u>" means 5.7% of the Allowed RMBS Trust Claims, which shall be distributed to counsel to the Institutional Investors as fees via direct allocation to counsel for the Institutional Investors and without conveyance to the RMBS Claims Trust, the RMBS Trustees, or the RMBS Trusts.

10.     "<u>Allowed Kessler Claim</u>" means a non-subordinated Allowed Borrower Claim for voting and distribution purposes in an amount to be determined under the Kessler Settlement Agreement.

11.     "<u>Allstate</u>" means Allstate Insurance Company and its subsidiaries and affiliates.

12.     "<u>Ally</u>" means, collectively, AFI and its direct and indirect subsidiaries and affiliates, excluding the Debtors and their direct and indirect subsidiaries.

13.    "<u>Ally Contract Claim</u>" means any and all amounts owed to Ally as of the Effective Date by any of the Debtors pursuant to (i) orders of the Bankruptcy Court and (ii) the Debtors performance of the Ally Contracts following the Petition Date, provided, no Revolving Credit Facility Claim is an Ally Contract Claim.

14.    "<u>Ally Contracts</u>" means the contracts listed in Annex IV to Exhibit B of the Plan Support Agreement.

15.    "<u>Ally Contribution</u>" means Ally's contribution to the Estates of (a) $1,950,000,000 in Cash on the Effective Date,  and (b) promptly after receipt on or after the Effective Date, the first $150,000,000 received by Ally for any directors and officers or errors and omissions insurance policy claims it pursues against its insurance carriers related to the Claims released in connection with this Plan, provided that Ally guarantees that the Liquidating Trust will receive such $150,000,000 on account of such insurance, which guarantee shall be payable without defense, setoff or objection on September 30, 2014.

16.    "<u>Ally Indemnity Escrow Account</u>" means the escrow account created pursuant to the *Stipulation and Order Reserving Rights with Respect to Debtors' Motion for Interim and Final Orders under Bankruptcy Code Section 105(a) and 363 Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business* [Docket No. 1420].

17.    "<u>Ally Released Parties</u>" means (a) Ally, and each of Ally's and the Debtors' respective members, shareholders, partners, non-Debtor affiliates, and Representatives, including Cap Re of Vermont, LLC and its current and former members, officers, and directors and (b) each of Ally's successors and assigns, each Entity in clause (a) and (b) solely in its capacity as such. For the avoidance of doubt, and without limiting the foregoing, the Ally Released Parties shall not include (i) any purchaser of any assets relating to the Debtors' servicing business that is not Ally or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally or a Debtor, (iii) notwithstanding any status as a shareholder of any Ally Released Party, and solely in their capacity as such, any underwriter of RMBS that is unaffiliated with Ally, and the Representatives of such underwriter, against which an Investor has a pending or tolled Cause of Action, (iv) the FHFA, (v) the FDIC, (vi) any assignee of executory contracts that were assumed by the Debtors that is not Ally, (vii) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover Debtors, (viii) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT, and (ix) the Plan Trustees.

18.    "<u>Ally Securities</u>" means Ally Securities, LLC.

19.    "<u>Assumption Schedule</u>" means the schedule in the Plan Supplement setting forth certain Executory Contracts and Unexpired Leases for assumption under section 365 of the Bankruptcy Code.

20.    "<u>Available Assets</u>" means all the assets of the Estates, including all Equity Interests in the Non-Debtor Subsidiaries and the Ally Contribution, excluding, however, (i)

any "residual" interest in any REMIC held by a Debtor and (ii) any equity interest in any PFIC held by a Debtor.

21.     "Ballot" means each of the ballot forms distributed to each holder of a Claim that is entitled to vote to accept or reject this Plan and on which the holder is to indicate, among other things, acceptance or rejection of this Plan.

22.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*, as in effect as of the date hereof.

23.     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases.

24.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as the context may require.

25.     "Bar Date" means, collectively, the Administrative Claim Bar Date, the Rejection Damages Claim Bar Date, and any deadline by which a Proof of Claim must be filed under the Bar Date Order, as applicable.

26.     "Bar Date Order" means the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on August 29, 2012 [Docket No. 1309], as amended, supplemented, or modified.

27.     "BNY Mellon" means The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts.

28.     "Borrower" means an individual whose current or former mortgage loan was originated, serviced, sold, consolidated, or owned by any of the Debtors.

29.     "Borrower-Related Cause of Action" means a Cause of Action of any of the Debtors that has been or could be asserted, including by way of setoff, recoupment, defense, or counterclaim, by any of the Debtors against a Borrower or a Borrower Claim as of the Effective Date.

30.     "Borrower Claims" means (i) Claims of a Borrower arising from or relating to any alleged act or omission or any other basis of liability of any Debtor (or any predecessor) in connection with the origination, sale, and/or servicing of a mortgage loan originated, sold, consolidated, purchased, and/or serviced by any Debtor, (ii) Claims filed for or on behalf of a Borrower by such Person's attorney or agent, including as part of a proof of claim filed on behalf of a putative class of Borrowers, and (iii) claims that have become Allowed as a result of settlement of Borrower litigation commenced against Ally and the Debtors.  For the avoidance of doubt, Borrower Claims shall include Allowed Claims held by the Kessler Class Claimants (to the extent that the Kessler Class Claimants are certified as a class action

8

for settlement or allowance purposes), and shall not include the: (a) Senior Unsecured Notes Claims; (b) Junior Secured Notes Claims; (c) RMBS Trust Claims; (d) Private Securities Claims; (e) General Unsecured Claims; (f) General Unsecured Convenience Claims; or (g) Intercompany Balances.   For the further avoidance of doubt, no Claim described in subsection (ii) hereof shall be considered an Allowed Borrower Claim unless such Claim is either certified under Bankruptcy Rule 7023 or by Final Order for purposes of settlement or allowance.

31.    "<u>Borrower Claims Trust</u>" means the trust established for the benefit of the holders of Allowed Borrower Claims.

32.    "<u>Borrower Claims Trust Agreement</u>" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things, sets forth the methodology and procedures for resolving Disputed Borrower Claims and making distributions to holders of Allowed Borrower Claims.

33.    "<u>Borrower Claims Trust Assets</u>" means (i) Cash transferred to the Borrower Claims Trust by the Liquidating Trust as of the Effective Date in the amount of $57,600,000 plus the amount of the Borrower Trust True-Up; and (ii) all Borrower-Related Causes of Action.

34.    "<u>Borrower Claims Trust Committee</u>" means (i) counsel for the Kessler Settlement Class, and (ii) those Borrowers or the representatives of Borrowers appointed by the Kessler Settlement Class, with the consent of the Plan Proponents, which consent shall not be unreasonably withheld, to oversee the administration of the Borrower Claims Trust and the disposition of the Borrower Claims Trust Assets.   The identities of the initial Persons to serve on the Borrower Claims Trust Committee as of the Effective Date will be set forth in the Plan Supplement.

35.    "<u>Borrower Claims Trustee</u>" means the Person selected to serve as the trustee of the Borrower Claims Trust.   The identity of the Person to serve as the Borrower Claims Trustee as of the Effective Date will be set forth in the Plan Supplement.

36.    "<u>Borrower Trust True-Up</u>" means the additional Cash, if any, required to be added to the Borrower Claims Trust Assets such that distributions, estimated as of the Confirmation Date, made from the Borrower Claims Trust on account of an Allowed Borrower Claim will be comparable to the recovery that a holder of an Allowed Claim of the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim, based on the value of the assets in the Liquidating Trust available for distribution to holders of Units as of the Effective Date (without in each case giving effect to any insurance proceeds, including proceeds from the GM Policies, that may be received in respect of the Allowed Borrower Claims in accordance with the Plan or to the time delay in receipt of distributions in respect of the Units from the Liquidating Trust).   For the avoidance of doubt, to the extent necessary, there shall only be a single Borrower Trust True-Up.

37.    "Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are required or authorized by law or governmental action to close.

38.    "Cash" means legal tender of the United States of America or the equivalent thereof.

39.    "Cash Management Order" means the *Final Order Under Bankruptcy Code Sections 105(a), 345, 363, 364, and 503(b)(1) and Bankruptcy Rules 6003 and 6004 Authorizing (I) Continued Use of Cash Management Services and Practices, (II) Continued Use of Existing Bank Accounts, Checks, and Business Forms, (III) Implementation of Modified Cash Management Procedures and Use of Certain Bank Accounts Established in Connection with Use of Pre-And Post-Petition Lenders Financing Facilities and Cash Collateral, (IV) Waiver of the Investment and Deposit Requirements of Bankruptcy Code Section 345, (V) Debtors to Honor Specified Outstanding Prepetition Payment Obligations, and (VI) Continuation of Intercompany Transactions and Granting Administrative Expense Status to Intercompany Balances*, entered by the Bankruptcy Court on June 11, 2012 [Docket No. 309], as amended, supplemented, or modified.

40.    "Cause of Action" means any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including those of the Debtors, and/or the bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending as of the date hereof or instituted hereafter against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date hereof.

41.    "Centerview" means Centerview Partners LLC.

42.    "Chapter 11 Cases" means the chapter 11 cases commenced by the Debtors, which are jointly administered, styled *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG), and currently pending before the Bankruptcy Court, or any of such cases as applicable.

43.    "Claim" means a "claim" as such term is defined in section 101(5) of the Bankruptcy Code.

44.    "Claims Objection Deadline" means (i) two hundred seventy (270) days following the Effective Date or (ii) such other later date the Bankruptcy Court may establish

10

upon a motion by the Liquidating Trust, which motion may be approved without a hearing and without notice to any party.

45.     "Claims Record Date" means the Voting Deadline, which is the date for determining which holders of Allowed Claims are entitled to receive distributions under the Plan, and on which the transfer register for each Class of Claims or Equity Interests, as maintained by the Debtors or their agents, shall be deemed closed.

46.     "Claims Register" means the official register of Claims in these Chapter 11 Cases maintained by Kurtzman Carson Consultants LLC, in its capacity as the Debtors' notice and claims agent.

47.     "Class" means a group of holders of Claims or Equity Interests classified together under this Plan.

48.     "CBNV" means Community Bank of Northern Virginia.

49.     "Compensation Order" means the *Amended Order Under Bankruptcy Code Sections 105(a), 363, 503(b)(1), 507(a)(2), 1107(a) and 1108 and Bankruptcy Rule 9019 to the Final Wages Order (I) Authorizing and Directing the Debtors to Reimburse Ally Financial Inc. for Payments Made to the Debtors Employees on Account of Compensation Issued on or After the Petition Date; (II) Granting Ally Financial Inc. an Administrative Expense Claim on Account of Such Payments; (III) Granting Ally Financial Inc. a Limited Release; and (IV) Authorizing the Debtors to Establish and Fund an Escrow Account for the Benefit of Ally Financial Inc. on Account of Such Administrative Expense Claims, including Additional Amounts to the Escrow Account as Necessary* [Docket No. 2548].

50.     "Confirmation" means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

51.     "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

52.     "Confirmation Hearing" means the hearing before the Bankruptcy Court under section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as the same may be continued from time to time.

53.     "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan, as amended, supplemented, or modified, under, among others, section 1129 of the Bankruptcy Code.

54.     "Consent Order" means the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMACM, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, as amended.

55.     "Consent Order Borrower Claims" means claims held by Borrowers arising from residential mortgage foreclosure actions (including judicial and non-judicial

11

foreclosures and related bankruptcy proceedings, and other related litigation) or proceedings (including foreclosures that were in process or completed) for loans serviced by the Mortgage Servicing Companies (as defined in the Consent Order), whether brought in the name of Ally Bank, the Mortgage Servicing Companies, the investor, or any agent for the mortgage note holder (including Mortgage Electronic Registration Systems, Inc.), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as claims arising from residential foreclosure sales that occurred during this time period.

56.    "Consenting Claimants" means, collectively, AIG, Allstate, FGIC, the Kessler Class Claimants, MassMutual, MBIA, Prudential, the RMBS Trustees, the Steering Committee Consenting Claimants, the Talcott Franklin Consenting Claimants, the Supporting Senior Unsecured Noteholders, Wilmington Trust, Paulson, and any other parties (other than Ally) that agree to be bound by the terms of the Plan Support Agreement. Each of the foregoing parties is a Consenting Claimant.

57.    "Consummation" means the occurrence of the Effective Date.

58.    "Creditor" means a "creditor" as defined in section 101(10) of the Bankruptcy Code.

59.    "Creditors' Committee" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases.

60.    "Cure Claim" means a Claim based upon a monetary default, if any, by a Debtor under an Executory Contract or Unexpired Lease as of the time such contract or lease is assumed by such Debtor under sections 365 or 1123 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

61.    "DB" means Deutsche Bank Trust Company Americas and Deutsche Bank National Trust Company each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian, and/or similar agency capacities in respect of certain of the RMBS Trusts.

62.    "Debtor Group" means, individually or collectively, the ResCap Debtors, the GMACM Debtors or the RFC Debtors.

63.    "Debtor Group Unit Distribution" means each of the GMACM Debtors Unit Distribution, the ResCap Debtors Unit Distribution and the RFC Debtors Unit Distribution.

64.    "Debtor Released Parties" means the Ally Released Parties, the Creditors' Committee, the Consenting Claimants, and their respective successors and assigns, members, partners, non-Debtor affiliates, and Representatives, each in its capacity as such. For the avoidance of doubt, and without limiting the foregoing, the Debtor Released Parties shall not include (i) any purchaser of any assets relating to the Debtors' servicing business that is not Ally or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally or a Debtor (iii) any underwriter of RMBS that is unaffiliated with the Debtors or Ally, and the Representatives of such underwriter, against which an Investor has a pending or tolled

12

Cause of Action, (iv) any assignee of executory contracts that were assumed by the Debtors that is not Ally, (v) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover the Debtors in their capacity as insurers, or (vi) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT.

65.    "Debtors" means ditech, LLC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC RH Settlement Services, LLC; GMACM; GMACM Borrower LLC; GMACM Holding; GMACM REO LLC; GMACR Mortgage Products, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial Real Estate Holdings, LLC; Homecomings Financial, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; ResCap; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC Holding; RFC REO LLC; RFC SFJV-2002, LLC; and RFC–GSAP Servicer Advance, LLC.

66.    "Debtor Release" means the release set forth in Article IX.C.

67.    "Delaware Trustee" means the trustee, or its successor, appointed in accordance with the Liquidating Trust Agreement to comply with the requirement of Section 3807 of the Delaware Statutory Trust Act.

68.    "Disbursing Agent" means the Liquidating Trust, or any Person engaged by the Liquidating Trust, to perform the function of a disbursing agent.

69.    "Disclosure Statement" means the disclosure statement for this Plan, as amended, supplemented, or modified in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

70.    "Disputed Borrower Claim" means any Borrower Claim that is not Allowed, until it is disallowed or expunged by Final Order, written agreement, or under the Plan.

71.    "Disputed Claim" means any Claim that is not Allowed until it is disallowed or expunged by Final Order, written agreement, or under the Plan, other than Disputed Borrower Claims and Disputed Private Securities Claims.

72.    "Disputed Claims Reserve" means the reserve of Units maintained by the Liquidating Trust for distribution to the Liquidating Trust Unit Beneficiaries that are holders of Disputed Claims, if and when such Disputed Claims become Allowed.

13

73. "<u>Disputed Private Securities Claims</u>" means any Private Securities Claim that is not Allowed until it is disallowed or expunged by Final Order or under the Plan.

74. "<u>Distributable Cash</u>" means the Cash to be distributed to holders of Units, including the Disputed Claims Reserve, on any Distribution Date.

75. "<u>Distribution Date</u>" means, a date or dates, as determined by the Liquidating Trust Board in accordance with the Liquidating Trust Agreement, on which the Liquidating Trust makes a distribution, or causes a distribution to be made, of Distributable Cash to the Unitholders.

76. "<u>District Court</u>" means the United States District Court for the Southern District of New York.

77. "<u>DOJ/AG Settlement</u>" means the Consent Judgment entered by the United States District Court for the District of Columbia, dated February 9, 2012.

78. "<u>DTC</u>" means the Depository Trust Company.

79. "<u>Duff</u>" means Duff & Phelps, LLC, financial advisor to certain of the RMBS Trustees.

80. "<u>Effective Date</u>" means the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all of the conditions precedent to the Effective Date specified in Article X.B have been satisfied or waived pursuant to Article X.C.

81. "<u>Entity</u>" means an "entity" as such term is defined in section 101(15) of the Bankruptcy Code.

82. "<u>Equity Interest</u>" means any "equity security" as defined in section 101(16) of the Bankruptcy Code, of a Debtor existing immediately prior to the Effective Date, or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell, or subscribe for any such interest.

83. "<u>Estates</u>" means the estates of the Debtors created under section 541 of the Bankruptcy Code.

84. "<u>Exculpated Party</u>" means each of the following in its capacity as such: (a) the Debtors; (b) the Consenting Claimants; (c) Ally, (d) the Creditors' Committee and the members thereof; and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entity's successors and assigns, members, affiliates, subsidiaries, officers, directors, partners, principals, employees, and Representatives; <u>provided, however</u>, without limiting the foregoing, the following shall not be an Exculpated Party: (i) any purchaser of any assets relating to the Debtors' servicing business that is not Ally or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally or a Debtor (iii) any underwriter of RMBS that is unaffiliated with the Debtors or Ally, and the Representatives of such

14

underwriter, against which an Investor has a pending or tolled Cause of Action, (iv) any assignee of executory contracts that were assumed by the Debtors that is not Ally, (v) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover the Debtors, in their capacity as insurers, or (vi) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT.

85.    "<u>Executory Contract</u>" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

86.    "<u>FDIC</u>" means the Federal Deposit Insurance Corporation.

87.    "<u>FGIC</u>" means Financial Guaranty Insurance Company and its subsidiaries and affiliates.

88.    "<u>FGIC Policies</u>" means insurance policies issued by FGIC in connection with the RMBS Trusts insured by FGIC.

89.    "<u>FGIC Rehabilitation Court</u>" means the New York State Supreme Court with jurisdiction over FGIC's rehabilitation proceeding.

90.    "<u>FGIC Settlement Agreement</u>" means that certain settlement agreement dated, as of May 23, 2013, among the Debtors, FGIC, BNY Mellon, U.S. Bank and WFB, each in its capacity as RMBS Trustee, and the Institutional Investors.

91.    "<u>FHFA</u>" means Federal Housing Finance Agency.

92.    "<u>FHFA Claims</u>" means Claims held by FHFA in its capacity as Conservator for the Federal Home Loan Mortgage Corporation.

93.    "<u>File</u>" or "<u>Filed</u>" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, in the case of a Proof of Claim, with the Debtors' notice and claims agent.

94.    "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, which has not been modified, amended, reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under

15

the Bankruptcy Rules, may be Filed relating to such order, shall not cause an order not to be a Final Order.

95.    "General Unsecured Claim" means any Claim against a Debtor that is not a/an: (a) Administrative Claim; (b) Priority Tax Claim; (c) Other Priority Claim; (d) Borrower Claim; (e) Revolving Credit Facility Claims, (f) Junior Secured Notes Claim; (g) Other Secured Claim; (h) Senior Unsecured Notes Claim; (i) RMBS Trust Claim; (j) Intercompany Balance; (k) Professional Claim; (l) General Unsecured Convenience Claim; (m) Private Securities Claim, (n) Postpetition Intercompany Balance, or (o) FHFA Claim.

96.    "General Unsecured Convenience Claim" means Claims that would otherwise be classified as General Unsecured Claims but, with respect to each Claim either (i) the aggregate amount of such Claim is less than $30,000, or (ii) the aggregate amount of such Claim is reduced to $30,000 by agreement of the holder of such Claim.  For the avoidance of doubt, General Unsecured Convenience Claims do not include Borrower Claims.

97.    "Global Settlement" means the settlement among the Debtors, the Creditors' Committee, Ally and the Consenting Claimants set forth in Article IV of the Plan.

98.    "GM Insurance Rights" means any and all of the Debtors' rights, titles, privileges, interests, claims, demands, or entitlements to any proceeds, payments, causes of action, and choses in action under, for, or related to the GM Policies with respect to a particular item of loss under the GM Policies, including the rights (1) to recover insurance proceeds for an item of loss covered under the GM Policies and (2) to recover from the insurers that issued the GM Policies for breach of contract or breach of other duty or obligation owed by such insurer under the GM Policies, as applicable, including the duty to settle, together with any extra contractual or tort claim arising therefrom, including bad faith, breach of implied covenant of good faith and fair dealing, fraud, or violation of any statutory or common law duty owed by the insurer under the GM Policies, as applicable, and all with respect to a particular item of loss under the GM Policies.

99.    "GM Policies" means the General Motors Combined Specialty Insurance Program 12/15/00 – 12/15/03, with the policy numbers as set forth in the Plan Supplement.

100.    "GMACM" means GMAC Mortgage, LLC.

101.    "GMACM Debtors" means each of following Debtor subsidiaries of GMACM Holding:  GMACM, ditech, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Mortgage USA Corporation; GMAC RH Settlement Services, LLC; GMACM Borrower LLC; GMACM REO LLC; GMACR Mortgage Products, LLC; Home Connects Lending Services, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; and Residential Mortgage Real Estate Holdings, LLC.

102.    "GMACM Debtors Unit Distribution" means 25,425,656 Units, representing 25.43% of the Total Initial Units Outstanding, subject to the adjustment as provided in Article IV.J.

103.    "GMACM Holding" means GMAC Residential Holding Company, LLC.

104.    "GMACM Plan Allowed Unsecured Claims" means the following GMACM Unsecured Claims Allowed under the Plan: (i) the RMBS Trusts' Allowed Claim in the amount of $209.8 million, (ii) MBIA's Allowed Claim in the amount of $1,450 million, and (iii) FGIC's Allowed Claim in the amount of $181.5 million.

105.    "GMACM Unsecured Claims" means the RMBS Trust Claims and General Unsecured Claims, in each case, against the GMACM Debtors.

106.    "GNBT" means Guaranty National Bank of Tallahassee.

107.    "Governmental Unit" means "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code.

108.    "HSBC" means HSBC Bank USA, N.A. solely in its capacity as trustee in respect of certain of the RMBS Trusts.

109.    "Impaired" means, with respect to any Class, a Class that is impaired as set forth in section 1124 of the Bankruptcy Code.

110.    "Indenture Trustees" means the Junior Secured Notes Indenture Trustee and the Senior Unsecured Notes Indenture Trustee.

111.    "Indentures" means the Junior Secured Notes Indenture and the Senior Unsecured Notes Indenture.

112.    "Initial Unit Distribution Date" means the date on which the Liquidating Trust makes, or causes to be made, the initial distribution of Distributable Units and Distributable Cash.

113.    "Initial Unit Distribution Record Date" means [●], which is the record date for determining the Liquidating Trust Unit Beneficiaries holding Allowed Claims that are entitled to receive a distribution of Units on the Initial Unit Distribution Date.

114.    "Institutional Investors" means the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants.

115.    "Insurance Defenses" means any legal, equitable or contractual defense that any insurer may have under applicable non-bankruptcy law to an assertion that such insurer is obligated to defend, pay, indemnify or reimburse, or provide insurance coverage for, any item of loss or liability under any insurance policy, except for any defense (a) that is based on the assertion that the transfer of the insurance rights is invalid, unenforceable or otherwise breaches the terms of any applicable policy or any other agreement with that

17

insurer, (b) that has been released, waived, altered or otherwise resolved, in full or in part, in any other agreement with that insurer, (c) to the extent affected by applications of principles of res judicata, collateral estopped, claim preclusion or issue preclusion, (d) adjudicated by the Bankruptcy Court, (e) premised upon the commencement of the Chapter 11 Cases under section 301 of the Bankruptcy Code, or (f) that is based on reasonableness

116. "Insured RMBS Trust" means any RMBS Trust that has an insurance policy with a Monoline.

117. "Intercompany Balance" means any prepetition Claim of a Debtor against another Debtor, or any prepetition Claim held by a Non-Debtor Subsidiary against a Debtor, including any subrogation claims and fraudulent conveyance claims related to the forgiveness of intercompany debt, and any other subrogation claims owed by any Debtor to any other Debtor. For the avoidance of doubt, Intercompany Balances do not include any Claim that Ally may assert against a Debtor.

118. "Intercreditor Agreement" means the intercreditor agreement, dated as of June 6, 2008, by and among WFB, GMAC LLC, USB, RFC, GMACM, ResCap, Homecomings Financial, LLC, GMAC-RFC Holding Company, LLC, GMAC Residential Holding Company, LLC, GMAC Model Home Finance, LLC, Developers of Hidden Springs, LLC, DOA Holding Properties, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, Residential Mortgage Real Estate Holdings, LLC, Residential Funding, Real Estate Holdings, LLC, Homecomings Financial Real Estate Holdings, LLC and Equity Investment I, LLC [Docket No. 1866, Ex. A].

119. "Investor" means a current or former holder of RMBS, in such capacity.

120. "JSN Adversary Proceeding" means the adversary proceeding which consolidates the adversary proceeding commenced against the Junior Secured Noteholders by the Creditors' Committee in the proceeding *Official Committee of Unsecured Creditors v. UMB Bank, N.A. et al.* Case No. 13-01277(MG) and the adversary proceeding commenced by the Debtors in the proceeding *Residential Capital, et al. v. UMB Bank, N.A.*, Case No. 13-01343(MG) seeking a determination of the Allowed amount and collateral of the Junior Secured Notes Claims.

121. "Junior Secured Noteholders" means the holders of Junior Secured Notes.

122. "Junior Secured Notes" means the 9.625% junior secured notes due 2015 issued by ResCap pursuant to the Junior Secured Notes Indenture.

123. "Junior Secured Notes Claim" means the Junior Secured Notes Secured Claim and the Junior Secured Notes Deficiency Claim, if any.

124. "Junior Secured Notes Deficiency Claim" means the unsecured portion of the Junior Secured Notes Claims as determined by the JSN Adversary Proceeding.

125. "Junior Secured Notes Indenture" means that certain Indenture, dated as of June 6, 2008, among ResCap, as issuer, GMAC Holding, GMAC-RFC Holding Company,

LLC, GMACM, RFC, and Homecoming Financial, LLC as guarantors, and the Junior Secured Notes Indenture Trustee.

126.    "Junior Secured Notes Indenture Trustee" means UMB Bank, N.A., as indenture trustee or successor indenture trustee under the Junior Secured Notes Indenture, together with its respective successors and assigns in such capacity.

127.    "Junior Secured Notes Secured Claim" means the portion of the Junior Secured Notes Claim that is a Secured Claim as determined by the JSN Adversary Proceeding.

128.    "Kessler Class Action" means the consolidated class action entitled *In re Community Bank of Northern Virginia Second Mortgage Lending Practice Litigation*, consolidated in the United States District Court for the Western District of Pennsylvania, MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 05-1386.

129.    "Kessler Class Claimants" means the putative class of Persons represented in the Kessler Class Action, asserting claims against the Debtors.

130.    "Kessler Settlement Agreement" means that certain Settlement Agreement between the Debtors and the representatives of the Kessler Class Claimants a copy of which will be filed with the Bankruptcy Court in connection with a motion seeking approval of the Kessler Settlement Agreement.

131.    "Kessler Settlement Approval Orders" means the preliminary and final orders approving the certification of the Kessler Class Claimants as a settlement class under Bankruptcy Rule 7023 and approving the Kessler Settlement Agreement under section 105(a) of the Bankruptcy Code and Bankruptcy Rules 9019 and 7023.

132.    "Kessler Settlement Class" means the settlement class comprised of the Kessler Class Claimants certified pursuant to the Kessler Settlement Approval Orders.

133.    "LDTC" means Law Debenture Trust Company of New York solely in its capacity as separate trustee in respect of certain of the RMBS Trusts.

134.    "Lien" means a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

135.    "Liquidating Trust" means that certain trust to be created on the Effective Date in accordance with the provisions of Article VI and the Liquidating Trust Agreement.

136.    "Liquidating Trust Administrative Reserve" means the reserve established for paying costs, fees, and expenses, and reserving for liabilities, of the Liquidating Trust, including costs, fees, and expenses of the Estates payable after the Effective Date.

137.    "Liquidating Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things: (a) establishes and governs the Liquidating Trust; (b) describes the powers, duties and responsibilities of

the Liquidating Trustees, and (c) provides for the liquidation and distribution of proceeds of the Liquidating Trust Assets.

138.    "Liquidating Trust Assets" means all property held from time to time by the Liquidating Trust, including the Available Assets transferred to the Liquidating Trust on the Effective Date.

139.    "Liquidating Trust Board" means the board of trustees appointed to oversee the administration of the Liquidating Trust and the disposition of the Liquidating Trust Assets.  The identities of the Persons to serve on the Liquidating Trust Board as of the Effective Date will be set forth in the Plan Supplement.

140.    "Liquidating Trust Budget" means the annual budget of expenses for administering the Liquidating Trust.

141.    "Liquidating Trust Management" means those Persons designated by the Liquidating Trust Board to manage the Liquidating Trust.  The identities of the Persons to serve as Liquidating Trust Management as of the Effective Date will be set forth in the Plan Supplement.

142.    "Liquidating Trust Unit Beneficiaries" means (i) other than holders of RMBS Trust Claims, the holders of ResCap Unsecured Claims, GMACM Unsecured Claims, and RFC Unsecured Claims (in each case, whether Allowed or Disputed), (ii) the RMBS Claims Trust and (iii) the Private Securities Claims Trust.  For the avoidance of doubt, Liquidating Trust Unit Beneficiaries includes Wilmington Trust, on behalf of the Senior Unsecured Noteholders, until such time as Wilmington Trust causes the distribution of Units received by it to the Senior Unsecured Noteholders.

143.    "Liquidating Trustee" means a member of the Liquidating Trust Board.

144.    "MassMutual" means Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates.

145.    "MBIA" means MBIA Insurance Corporation and its subsidiaries and affiliates but excluding Cutwater Holdings, LLC and its subsidiaries Cutwater Investor Services Corp., Cutwater Asset Management Corp. and Trifinium Advisors (UK) Limited.

146.    "Misdirected Funds" means the approximately $2.6 million of funds that were misdirected to the Debtors' tri-party account with Bank of New York Mellon prior to the Petition Date.

147.    "Moelis" means Moelis & Company LLC.

148.    "Monolines" means FGIC, MBIA, and the other insurers who provided financial guaranty insurance policies insuring amounts payable to RMBS in connection with certain of the RMBS Trusts, but does not include insurers of particular mortgage loans or groups of mortgage loans held by an RMBS Trust, for the purposes of the RMBS Trust Allocation Protocol.

20

149.    "<u>Monoline Claims Settlement</u>" means the settlement of the Allowed amount and allocation among Debtor Groups of the Claims held by MBIA, and FGIC.

150.    "<u>Monoline Reservation</u>" means the reservation of rights of each Insured RMBS Trustee (excluding the RMBS Trusts insured by FGIC) as set forth in Article IV herein.

151.    "<u>NJ Carpenters Approval</u>" means the approvals of the NJ Carpenters Settlement from the Bankruptcy Court (which may be the Confirmation Order or a separate order of the Bankruptcy Court), and the District Court.

152.    "<u>NJ Carpenters Claims</u>" means any and all claims, demands, rights, liabilities, and causes of action of every nature and description, known or Unknown, suspected or unsuspected, contingent or non-contingent, matured or unmatured, whether or not concealed or hidden, which now exist, or heretofore have existed, whether arising under federal, state, common, or foreign law, that any NJ Carpenters Class Member (a) asserted in the NJ Carpenters Class Action, or (b) could have asserted in any forum arising from or related in any way to the acts, failures to act, transactions, facts, events, matters, disclosures, statements, occurrences, representations, or omissions asserted or that could have been asserted in the NJ Carpenters Class Action against the NJ Carpenters Released Parties. Notwithstanding the foregoing, "NJ Carpenters Claims" shall not include (a) any rights or claims against the Debtors that any NJ Carpenters Class Member may possess or be entitled to as a holder of RMBS pursuant to the RMBS Trust Settlement or any other distribution in the Plan in connection with the claims asserted in connection with the RMBS Trust Settlement, or (b) claims against any NJ Carpenters Non-Settling Defendant.

153.    "<u>NJ Carpenters Claims Distribution</u>" means a distribution in the amount of $100 million in Cash in full and final satisfaction of the NJ Carpenters Claims, on terms as set forth in the NJ Carpenters Settlement.

154.    "<u>NJ Carpenters Class Action</u>" means the class action entitled *New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC, et al.,* Civ. No. 08-8781(HB) pending in the District Court.

155.    "<u>NJ Carpenters Class Members</u>" means the named plaintiffs in the NJ Carpenters Class Action and all other persons or entities who purchased or otherwise acquired beneficial interests in any of the following pass-through certificates and who were allegedly damaged thereby: RALI Series 2007-QS1, RALI Series 2007-QO4, RALI Series 2007-QH4, RALI Series 2006-QO7, RALI Series 2007-QS5, RALI Series 2006-QS7, RALI Series 2007-QO2, RALI Series 2006-QS11, RALI Series 2007-QS4, RALI Series 2006-QA4, RALI Series 2006-QA6, RALI Series 2006-QA7, RALI Series 2006-QA8, RALI Series 2006-QA10, RALI Series 2006-QA11, RALI Series 2007-QA1, RALI Series 2007-QA2, RALI Series 2007-QO3, RALI Series 2007-QA3, RALI Series 2007-QA5, RALI Series 2007-QH8, RALI Series 2007-QH9, RALI Series 2007-QO5, RALI Series 2007-QS11, RALI Series 2007-QS6, RALI Series 2006-QS8, RALI Series 2006-QS9, RALI Series 2007-QS7, RALI Series 2007-QH2, RALI Series 2007-QH5, RALI Series 2007-QH6, RALI Series 2006-QS18, RALI Series 2006-QO10, RALI Series 2006-QO3, RALI Series 2006-QO6, RALI Series 2007-QH3, RALI Series 2007-QS2, RALI Series 2006-

QO9, RALI Series 2006-QO8, RALI Series 2006-QO5, RALI Series 2006-QA5, RALI Series 2006-QA9, RALI Series 2006-QH1, RALI Series 2006-QO4, RALI Series 2006-QS5, RALI Series 2006-QS16, RALI Series 2006-QS17, RALI Series 2007-QH1, RALI Series 2007-QO1, RALI Series 2007-QS3, RALI Series 2007-QA4, RALI Series 2007-QH7, RALI Series 2007-QS8, RALI Series 2007-QS10, RALI Series 2006-QS12, RALI Series 2006-QS13, RALI Series 2006-QS6, RALI Series 2007-QS9 and RALI Series 2006-QS15. Notwithstanding the foregoing, "NJ Carpenters Class Members" shall not include (a) the NJ Carpenters Class Opt-Outs, (b) the Private Securities Claimants, or (c) the NJ Carpenters Defendants, and their respective officers, affiliates and directors at all relevant times, members of their immediate families and their legal representatives, executors, estates, administrators, successors and assigns, insurers, or any entity in which any defendants have or had a controlling interest, provided that any investment company or pooled investment fund (including, but not limited to, mutual fund families, exchange-traded funds, fund of funds, and hedge funds) in which any of the NJ Carpenters Defendants have or may have a direct or indirect interest, or as to which its affiliates may act as investment advisors, but in which any of the NJ Carpenters Defendants or any of their respective affiliates is not a majority owner or does not hold a majority beneficial interest, shall not be deemed an excluded person or entity by definition.

156.    "NJ Carpenters Class Opt-Outs" means any persons or entities who exclude themselves from the NJ Carpenters Class Action and the NJ Carpenters Settlement in the manner contemplated by the NJ Carpenters Notice.

157.    "NJ Carpenters Defendants" means the NJ Carpenters Non-Settling Defendants and the NJ Carpenters Settling Defendants.

158.    "NJ Carpenters Non-Settling Defendants" means Goldman, Sachs & Co., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., and UBS Securities LLC, as well as any other defendant(s) later brought into the NJ Carpenters Class Action (not including the NJ Carpenters Released Parties).

159.    "NJ Carpenters Notice" means the Notice of Pendency of Class Action and Proposed Settlement, Settlement Fairness Hearing and Motion for Reimbursement of Litigation Expenses, attached as Exhibit A-1 to the NJ Carpenters Settlement.

160.    "NJ Carpenters Plan of Allocation" means the plan of allocation for the NJ Carpenters Claims Distribution to be approved by and under the jurisdiction of the District Court.

161.    "NJ Carpenters Released Parties" means (a) the NJ Carpenters Settling Defendants, and (b) with respect to each of the foregoing, as applicable, their parents, subsidiaries, and affiliates and all of their respective past, current, and future respective directors, officers, employees, partners, insurers, co-insurers, reinsurers, agents, controlling shareholders, shareholders, attorneys, accountants, auditors, advisors, investment advisors, personal or legal representatives, predecessors, successors, divisions, joint ventures, assigns, spouses, heirs, related or affiliated entities, and any entity in which any NJ Carpenters Released Party has a controlling interest, and all of their respective property. For the

22

avoidance of doubt, the insurers, co-insuerers, and reinsurers listed above do not include the insurers that issued the GM Policies in their capacity as insurers under the GM Policies.

162. "NJ Carpenters Settlement" means the Stipulation and Agreement of Settlement with Certain Defendants, dated as of June 14, 2013, by and among the lead plaintiffs in the NJ Carpenters Class Action and the NJ Carpenters Released Parties, which is subject to the NJ Carpenters Approval.

163. "NJ Carpenters Settling Defendants" means Residential Capital, LLC, Residential Funding Company, LLC, Residential Accredit Loans, Inc., Bruce J. Paradis, Kenneth M. Duncan, Davee L. Olson, Ralph T. Flees, Lisa R. Lundsten, James G. Jones, David M. Bricker, James N. Young and Ally Securities.

164. "Non-Debtor Subsidiaries" means Canada Mortgage Acceptance Corporation; Cap Re of Vermont, LLC; Foreign Obligation Exchange, Inc. 2003-H11; Foreign Obligation Exchange, Inc. 2003-H12; Foreign Obligation Exchange, Inc. 2003-H14; Foreign Obligation Exchange, Inc. 2004-H11; Foreign Obligation Export, Inc.; Flume (No. 8) Limited; GMAC Residential Funding of Canada Limited; GMAC-RFC Auritec, S.A.; GMAC-RFC Espana Hipoteacas SL; GMAC-RFC Europe Limited; GMAC-RFC Holdings Limited; GMAC-RFC Property Finance Limited; Investments B.V. GXI; Investments B.V. GXII; Phoenix Residential Securities, LLC; PreEmac 2 NL B.V.; and Viaduct (No. 7) Limited.

165. "Ocwen" means Ocwen Loan Servicing, LLC.

166. "Ocwen APA" means that certain Asset Purchase Agreement, dated as of November 2, 2012, as amended and supplemented, entered into by and among Ocwen, ResCap, RFC, GMACM, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC, GMACM Borrower LLC and RFC Borrower LLC [Docket No. 2246, Ex. 1].

167. "Order of Assessment" means the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012.

168. "Original RMBS Settlement Agreements" means, collectively, the Third Amended and Restated RMBS Trust Settlement Agreement between the Debtors and the Steering Committee Consenting Claimants, and the Third Amended and Restated RMBS Trust Settlement Agreement between the Debtors and the Talcott Franklin Consenting Claimants, filed with the Bankruptcy Court on March 15, 2013, as Exhibits 1 and 2, respectively to the *Declaration of LaShann M. DeArcy in further support of Debtors Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements* [Docket No. 3220].

169. "Original Settling RMBS Trusts" means those 392 RMBS Trusts covered in the Original RMBS Settlement Agreements.

170. "Other Priority Claim" means any Claim other than an Administrative Claim or Priority Tax Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

171.    "Other Secured Claim" means any Secured Claim other than a Junior Secured Notes Secured Claim.

172.    "Paulson" means funds and accounts managed by Paulson & Co. Inc.

173.    "Paydown Order" means the *Order Granting Debtors' Amended Motion for Entry Under 11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Satisfy Certain Secured Claims* [Docket No. 3967].

174.    "Person" means a "person" as such term is defined in section 101(41) of the Bankruptcy Code.

175.    "Petition Date" means May 14, 2012.

176.    "PFIC" means a passive foreign investment company as defined in section 1297(a) of the Tax Code or "grantor trust" under section 671-679 of the Tax Code.

177.    "Plan" means this Joint Chapter 11 Plan proposed by Residential Capital, LLC, *et al.* and the Official Committee of Unsecured Creditors, including all exhibits, addenda, schedules or other attachments hereto, and the Plan Supplement, each of which is incorporated herein by reference, as may be amended, modified, or supplemented from time to time in accordance with the Plan Support Agreement.

178.    "Plan Allowed Claims" means, collectively, the ResCap Plan Allowed Unsecured Claims, GMACM Plan Allowed Unsecured Claims, and the RFC Plan Allowed Unsecured Claims.

179.    "Plan Documents" means, collectively, the Plan, including all exhibits thereto and the Plan Supplement, the Disclosure Statement and the Confirmation Order.

180.    "Plan Proponents" means the Debtors and the Creditors' Committee.

181.    "Plan Supplement" means a compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed on notice to parties-in-interest, and additional documents filed as supplements or amendments to the Plan Supplement including the following: (i) the Assumption Schedule, (ii) the Liquidating Trust Agreement, (iii) the RMBS Claims Trust Agreement, (iv) the Borrower Claims Trust Agreement, (v) the Private Securities Claims Trust Agreement, (vi) the identities of the initial Liquidating Trust Board, (vii) the identities of the initial Liquidating Trust Management, (viii) the identity of the Borrower Claims Trustee and the initial members of the Borrower Claims Trust Committee, (ix) the identity of the Private Securities Claims Trustee, (x) the amount of the Borrower Trust True-Up, (xi) a cooperation agreement by and between the Liquidating Trustee and the Kessler Settlement Class (xii) the policy numbers for the GM Policies, (xiii) the Liquidating Trust Causes of Action, (xiv) the stipulated amounts of the Allowed Fee Claim, (xv) the Borrower Trust Causes of Action, (xvi) updated RMBS Trust Claims Schedules, (xvii) estimated Ally Contract Claims, and (xviii) the identity of the RMBS Claims Trust Trustees.  The Plan Proponents shall File the Assumption Schedule no later than [●] days before the commencement of the Confirmation Hearing, and the remainder of

24

the substantially complete versions of the materials comprising the Plan Supplement no later than ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, except as otherwise provided under the Plan.

182.    "Plan Support Agreement" means the agreement to support the Plan together with all exhibits attached thereto, including the term sheets, dated as of May 13, 2013, by and among the Debtors, Ally, the Creditors' Committee, and the Consenting Claimants, as the same may be amended or modified in accordance with its terms. [Docket No. 3814, Ex. 3].

183.    "Plan Trustees" means, collectively, the Liquidating Trustees, the RMBS Claims Trust Trustees, the Borrower Claims Trustee, and the Private Securities Claims Trustee.

184.    "Plan Trusts" means, collectively, the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and the Private Securities Claims Trust.

185.    "Postpetition Intercompany Balances" means any Claim against a Debtor held by another Debtor based on "Intercompany Transactions" arising pursuant to the Cash Management Order, which Claim is, pursuant to the Cash Management Order, accorded administrative expense status and priority of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

186.    "Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

187.    "Private Securities Claimants" means (i) AIG, (ii) Allstate, (iii) Asset Management Funds d/b/a AMF Funds, AMF Intermediate Mortgage Fund, AMF Ultra Short Mortgage Fund, (iv) Bank Hapoalim B.M., (v) Cambridge I, (vi) Cambridge II, (vii) Deutsche Zentra-Genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York, DH Holding Trust, (viii) Federal Home Loan Bank of Boston, (ix) Federal Home Loan Bank of Chicago, (x) Federal Home Loan Bank of Indianapolis, (xi) HSH Nordbank AG, HSH Nordbank AG Luxembourg Branch, HSH Nordbank AG New York Branch, HSH Nordbank Securities S.A., (xii) Huntington Bancshares Inc., (xiii) IKB Deutsche Industriebank AG, IKB International S.A. in liquidation, (xiv) John Hancock Life Insurance Company (U.S.A.), (xv) MassMutual, (xvi) Principal Life Insurance Company, Principal Funds, Inc., Principal Variable Contracts Funds, Inc., (xvii) Prudential, (xviii) Sealink Funding Limited, (xix) Stiching Pensioenfonds ABP, (xx) The Union Central Life Insurance Company/Ameritas Life Insurance Corp./Acacia Life Insurance Company, and (xxi) the Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc., all in their capacity as holders of Private Securities Claims.

188.    "Private Securities Claims" means those securities litigation claims against the Debtors, including claims against the Debtors and Ally, arising from the purchase or sale of RMBS, held by the Private Securities Claimants.

189.    "Private Securities Claims Trust" means the trust established for the benefit of the holders of the Private Securities Claims.

190.    "Private Securities Claims Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things, sets forth the criteria, methodology and procedures for making distributions to holders of Private Securities Claims.

191.    "Private Securities Claims Trust Unit Distribution" means the number of Units to be issued by the Liquidating Trust to the Private Securities Claims Trust on the Initial Unit Distribution Date, which shall equal 9,545,578 Units, representing 9.55% of the Total Initial Units Outstanding, subject to the adjustment as provided in Article IV.J..

192.    "Private Securities Claims Trustee" means the Person selected to serve as trustee of the Private Securities Claims Trust. The identity of the Person to serve as the Private Securities Claims Trustee as of the Effective Date will be set forth in the Plan Supplement.

193.    "Pro Rata Share" means, with respect to any Claim, at any time, the proportion that the amount of such Claim in a particular Class or group of Classes bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or group of Classes, unless in each case the Plan provides otherwise. The amount of a Disputed Claim shall be the amount of such Claim as estimated in accordance with the provisions of Article VIII.D, and as such definition is used in Article III.D.1(d), Article III.D.2(d) and Article III.D.3(d), the Claim amounts shall be determined as of the Initial Unit Distribution Record Date.

194.    "Pro Rata Unit Share" means, with respect to a Unitholder at any time, the fraction (which may be expressed as a percentage) equal to the number of Units held by such Unitholder divided by the Total Units Outstanding at that time.

195.    "Professional" means any Person or Entity: (a) employed in the Chapter 11 Cases under a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code and compensated for services rendered prior to or on the Effective Date under sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (b) for which the Bankruptcy Court has allowed compensation and reimbursement under section 503(b)(4) of the Bankruptcy Code.

196.    "Professional Claim" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred from and after the Petition Date through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

197.    "Professional Fee Escrow Account" means an interest-bearing escrow account to be funded with the Professional Fee Reserve Amount by the Liquidating Trust on the Effective Date solely for the purpose of paying all Allowed Professional Claims.

198.    "Professional Fee Reserve Amount" means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Professionals in accordance with Article II.B.3.

199.    "Proof of Claim" means a written proof of Claim Filed against any Debtor in the Chapter 11 Cases.

200.    "Prudential" means Prudential Insurance Company of America and its subsidiaries and affiliates.

201.    "Recognized Additional R+W Claims" has the meaning set forth in Article IV.C.3.a.ii.2.

202.    "Recognized Cure Claims" has the meaning set forth in Article IV.C.3.a.i.

203.    "Recognized Original R+W Claims" has the meaning set forth in Article IV.C.3.a.ii.1.

204.    "Recognized RMBS Claims" means (i) Recognized Cure Claims, (ii) Recognized Original R+W Claims, (iii) Recognized Additional R+W Claims, and (iv) Recognized Unsecured Servicing Claims.

205.    "Recognized Unsecured Servicing Claims" has the meaning set forth in Article IV.C.3.a.iii.

206.    "Registered Holder" means the registered holders of the Junior Secured Notes and the Senior Unsecured Notes issued pursuant to the Indentures.

207.    "Rejection Damages Claim Bar Date" means the date that is (a) with respect to an Executory Contract or Unexpired Lease that is rejected pursuant to the Plan, forty-five (45) days after the Effective Date, or (b) with respect to an Executory Contract or Unexpired Lease that is otherwise rejected, the applicable bar date established by the Bar Date Order or other order of the Bankruptcy Court.

208.    "Released Claims" means Claims, Equity Interests, Causes of Action or liabilities that: (i) have been discharged or terminated pursuant to the terms of the Plan; (ii) have been released pursuant to the Plan; or (iii) are subject to exculpation pursuant to the Plan.

209.    "Released Party" means the Liquidating Trust, and each Ally Released Party, Debtor Released Party, and Exculpated Party, or the property or Estate of any Entity so released, discharged or exculpated.

210.    "REMIC" means a real estate mortgage investment conduit as defined in section 860D(a) of the Tax Code.

211.    "Representatives" means a person's or entity's former and current officers, former and current directors, former and current principals, employees, agents, financial

27

advisors, attorneys, accountants, investment bankers, consultants, and other professionals, each solely in its capacity as such; provided, that in the case of Ally and the Debtors, "Representatives" shall not include an underwriter that is unaffiliated with Ally or the Debtors against which an Investor has a pending or tolled Cause of Action.  For the avoidance of doubt, Lewis Kruger shall be deemed to be a Representative of the Debtors.

212.    "ResCap" means Residential Capital LLC.

213.    "ResCap Debtors" means ResCap, GMACM Holding, and RFC Holding.

214.    "ResCap Debtors Unit Distribution" means 31,689,942 Units, representing 31.69% of the Total Initial Units Outstanding, subject to the adjustment as provided in Article IV.J.

215.    "ResCap Plan Allowed Unsecured Claims" means the following ResCap Unsecured Claims Allowed under the Plan (i) MBIA's Allowed Claim in the amount of $719.0 million, (ii) FGIC's Allowed Claim in the amount of $337.5 million, and (iii) the Senior Unsecured Notes Claim in the amount of $1,003,327,213.90.

216.    "ResCap Unsecured Claims" means the Senior Unsecured Notes Claims and General Unsecured Claims, in each case against the ResCap Debtors.

217.    "Revolving Credit Facility" means that certain Amended and Restated Credit Agreement, dated as of December 30, 2009 (as amended, supplemented or otherwise modified), by and among AFI as initial lender and agent, Wells Fargo, N.A. as first priority collateral agent, RFC and GMACM as borrowers, and ResCap and certain other affiliates of the borrowers as guarantors.

218.    "Revolving Credit Facility Claims" means any Claim held by Ally for default interest or fees under the Revolving Credit Facility.

219.    "RFC" means Residential Funding Company, LLC.

220.    "RFC Debtors" means each of the following Debtor subsidiaries of RFC Holding:  RFC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; GMAC Model Home Finance I, LLC; HFN REO SUB II, LLC; Homecomings Financial Real Estate Holdings, LLC; Homecomings Financial, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; RFC–GSAP Servicer Advance, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO LLC; and RFC SFJV-2002, LLC.

221.    "RFC Debtors Unit Distribution" means 33,338,825 Units, representing 33.34% of the Total Initial Units Outstanding, subject to the adjustment as provided in Article IV.J.

222.    "RFC Holding" means GMAC-RFC Holding Company, LLC.

223.    "RFC Plan Allowed Unsecured Claims" means the following RFC Unsecured Claims Allowed under the Plan (i) the RMBS Trusts' Allowed Claim in the amount of $7,091.2 million, (ii) MBIA's Allowed Claim in the amount of $1,450.0 million, and (iii) FGIC's Allowed Claim in the amount of $415 million.

224.    "RFC Unsecured Claims" means the RMBS Trust Claims and General Unsecured Claims, in each case against the RFC Debtors.

225.    "RMBS" means residential mortgage-backed securities, notes and certificates issued by the RMBS Trusts.

226.    "RMBS Claims Trust" means the trust established for the benefit of the RMBS Trusts that have Recognized RMBS Claims, which shall be treated by all parties, including, without limitation, the Debtors, the RMBS Claims Trust Trustees, and the RMBS Trustees as a "qualified settlement fund" within the meaning of 468B of the Tax Code and the Treasury Regulations thereunder.

227.    "RMBS Claims Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things, sets forth the criteria, methodology and procedures for making distributions to RMBS Trusts having Recognized RMBS Claims.

228.    "RMBS Claims Trust Trustees" means the Persons selected to serve as trustees of the RMBS Claims Trust, which may be one or more of the RMBS Trustees. The identity of the Persons to serve as the RMBS Claims Trustees as of the Effective Date will be set forth in the Plan Supplement.

229.    "RMBS Cure Claims" means all claims of RMBS Trusts against the Debtors other than RMBS R+W Claims, including, without limitation, all claims of RMBS Trusts against the Debtors based on servicing obligations and other obligations of the Debtors as servicers and otherwise that were outstanding as of the date of the closing of the sale of the Debtors' servicing platform to Ocwen, that became due and owing after such closing date, or that become due and owning, as a result of pre-closing actions of the Debtors as servicers and were required to be cured prior to the assumption and assignment to Ocwen pursuant to section 365(b)(1)(A) of the Bankruptcy Code.

230.    "RMBS R+W Claims" means claims of the RMBS Trusts against the Debtors arising from any obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts.

231.    "RMBS Settlement" means, as part of the Global Settlement, the settlement that provides for the allowance, priority, and allocation of the RMBS Trust Claims, through approval of the Original RMBS Settlement Agreements as expanded, modified and superseded as set forth in Article IV.C of the Plan.

232.    "<u>RMBS Trust Claims Schedules</u>" means Schedules 1-G, 1-R, 2-G, 2-R, 3-G, 3-R, 4-G and 4-R attached to the Plan, as amended and restated when filed as part of the Plan Supplement.

233.    "<u>RMBS Trusts</u>" means all residential mortgage backed securitization trusts, net interest margin trusts and similar residential mortgage backed trusts for which the Debtors act as sponsor, depositor, servicer, master servicer or in similar capacities.

234.    "<u>RMBS Trustees</u>" means BNY Mellon, DB, USB, HSBC, LDTC, and WFB.

235.    "<u>RMBS Trust Allocation Protocol</u>" means the provisions set forth in Article IV.C.3 of the Plan.

236.    "<u>RMBS Trust Claims</u>" means all the claims, including RMBS Cure Claims and RMBS R+W Claims, of the RMBS Trusts against the Debtors which shall be Allowed under Article VI.C.2(a) of the Plan as non-subordinated unsecured Claims.

237.    "<u>Schedules</u>" means the Debtors' schedules of assets and liabilities and statements of financial affairs, Filed under section 521 of the Bankruptcy Code and the Bankruptcy Rules, as amended, supplemented, or modified.

238.    "<u>Secured Claim</u>" means any Claim that is (a) secured by a Lien on collateral, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or (b) subject to a valid right of setoff under section 553 of the Bankruptcy Code.

239.    "<u>Senior Unsecured Noteholders</u>" means the beneficial holders of Senior Unsecured Notes.

240.    "<u>Senior Unsecured Notes</u>" means the United States dollar denominated notes maturing between June 2012 and June 2015, euro denominated notes matured in May 2012, and U.K. sterling denominated notes maturing between May 2013 and July 2014, each issued by ResCap pursuant to the Senior Unsecured Notes Indenture.

241.    "<u>Senior Unsecured Notes Claim</u>" means any Claim under or evidenced by the Senior Unsecured Notes, which shall be deemed Allowed against the ResCap Debtors in an amount of $1,003,327,213.90.

242.    "<u>Senior Unsecured Notes Indenture</u>" means that certain Indenture, dated as of June 24, 2005, between ResCap, any guarantors party thereto, and the Senior Unsecured Notes Indenture Trustee, as supplemented from time to time.

243.    "<u>Senior Unsecured Notes Indenture Trustee</u>" means Wilmington Trust, as successor indenture trustee with respect to the Senior Unsecured Notes, and as paying agent, calculation agent and registrar with respect to the United States Dollar Senior Unsecured Notes, under the Senior Unsecured Notes Indenture, together with its respective successors and assigns in such capacity.

244.    "Senior Unsecured Notes Indenture Trustee Charging Lien" means the Liens and other priority in payment and rights available to the Senior Unsecured Notes Indenture Trustee under the Senior Unsecured Notes Indenture or otherwise available to the Senior Unsecured Notes Indenture Trustee under applicable law, for the payment of Senior Unsecured Notes Indenture Trustee Fees and Expenses.

245.    "Senior Unsecured Notes Indenture Trustee Fees and Expenses" means the reasonable fees, costs, expenses and indemnity claims of the Senior Unsecured Notes Indenture Trustee, including, but not limited to, the fees, costs and expenses of the Senior Unsecured Notes Indenture Trustees' counsel and financial advisors.

246.    "Senior Unsecured Notes Indenture Trustee Reserve" means the reserve of Cash to be funded from the Initial Cash Distribution issued on account of the Senior Unsecured Notes Claims, and held by the Senior Unsecured Notes Indenture Trustee for the payment of future projected accrued and unpaid, Senior Unsecured Notes Indenture Trustee Fees and Expenses.

247.    "Servicing Agreement" means either a "Pooling and Servicing Agreement" or an integrated set of "Servicing Agreements," "Mortgage Loan Purchase Agreements," "Indentures," and/or "Trust Agreements," which, when combined, provide for, among other things, the servicing of the mortgage loans held by an RMBS Trust.

248.    "Settlement Insurance Policies" means all directors & officers and errors & omissions insurance policies with policy periods between November 2006 and the Effective Date which provide coverage to Ally or its Representatives as well as to the Debtors and/or their Representatives.

249.    "Settling Parties" means each of the following in its capacity as such: the Debtors, the Creditors' Committee, Ally, and the Consenting Claimants.

250.    "Settling Private Securities Claimants" means each of AIG, Allstate, MassMutual and Prudential.

251.    "Steering Committee Consenting Claimants" means certain Investors in RMBS backed by mortgage loans held by RMBS Trusts associated with securitizations sponsored by the Debtors between 2004 and 2007 and represented by Kathy D. Patrick of Gibbs & Bruns LLP and Keith H. Wofford of Ropes & Gray LLP.

252.    "Supporting Senior Unsecured Noteholders" means the holders of the Senior Unsecured Notes that have executed or joined the Plan Support Agreement.

253.    "Talcott Franklin Consenting Claimants" means certain Investors in RMBS backed by mortgage loans held by RMBS Trusts associated with securitizations sponsored by the Debtors between 2004 and 2007 represented by Talcott Franklin of Talcott Franklin, P.C., Carter Ledyard & Milburn LLP and Miller Johnson.

254.    "Tax Code" means the Internal Revenue Code of 1986, as amended.

255.    "Third Party Release" means the release set forth in Article IX.D.

256.    "Total Units Outstanding" means 100 million Units, which is the total number of Units to be issued by the Liquidating Trust pursuant to the Plan.

257.    "Treasury Regulations" means the Treasury regulations promulgated under the Tax Code.

258.    "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

259.    "Unimpaired" means, with respect to any Class, a Class that is not Impaired.

260.    "Unit Distribution Date" means a date established pursuant to the Liquidating Trust Agreement or otherwise determined by the Liquidating Trust Board, as of which a distribution of Units shall be made to Liquidating Trust Unit Beneficiaries that are holders of Disputed Claims that became Allowed, in whole or in part.

261.    "Unit Issuance Percentage" means, in the case of the GMACM  Debtors, 25.43%; in the case of the ResCap Debtors, 31.69%;in the case of the RFC Debtors, 33.34%; and in the case of the Private Securities Claims Trust, 9.55%.

262.    "United States" means the United States of America, its agencies, departments, and agents.

263.    "Unitholders" means holders of Units.

264.    "Units" means units of beneficial interest issued by the Liquidating Trust, which entitle the holders thereof to receive from the Liquidating Trust a Pro Rata Unit Share of Distributable Cash.

265.    "Unknown" as used in the definition of NJ Carpenters Claims, means any and all NJ Carpenter Claims that any NJ Carpenters Class Member does not know or suspect to exist in his, her or its favor at the time of the release, which if known by him, her or it might have affected his, her or its settlement with and release of the NJ Carpenters Released Parties, or might have affected his, her or its decision not to object to the NJ Carpenters Settlement or not exclude himself, herself or itself from the settlement class.   With respect to any and all NJ Carpenters Claims, the parties stipulated and agreed under the NJ Carpenters Settlement that, upon the Effective Date, the NJ Carpenters Class Members shall expressly waive, and shall be deemed to have waived, and by operation of the order approving the NJ Carpenters Settlement, shall have expressly waived, to the fullest extent permitted by law, any and all provisions, rights and benefits conferred by Cal. Civ. Code § 1542 (to the extent it applies to the Action), and any law of any state or territory of the United States, or principle of common law, or the law of any foreign jurisdiction, that is similar, comparable or equivalent to Cal. Civ. Code § 1542, which provides:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if**

**known by him or her must have materially affected his or her settlement with the debtor.**

266. "<u>Unsecured Claims</u>" which will mean collectively, the GMACM Unsecured Claims, the ResCap Unsecured Claims and the RFC Unsecured Claims.

267. "<u>USB</u>" means U.S. Bank National Association solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts.

268. "<u>U.S. Trustee</u>" means the United States Trustee for the Southern District of New York.

269. "<u>U.S. Trustee Fees</u>" means fees arising under 28 U.S.C. § 1930, and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

270. "<u>Voting Deadline</u>" means the date set forth in the order of the Bankruptcy Court approving the Disclosure Statement as the deadline for, among other things, voting to accept or reject the Plan.

271. "<u>WFB</u>" means Wells Fargo Bank, N.A. solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian, and/or similar agency capacities in respect of certain of the RMBS Trusts.

272. "<u>Wilmington Trust</u>" means Wilmington Trust, National Association, not individually, but solely in its capacity as Senior Unsecured Notes Indenture Trustee.

## B.     Rules of Construction

For the purposes of the Plan: (1) any term used in capitalized form that is not defined in the Plan, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, has the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (2) in the appropriate context, each term, whether stated in the singular or the plural, includes both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender include the masculine, feminine, and the neutral gender; (3) unless otherwise stated herein, any reference in the Plan to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (4) except as otherwise provided in the Plan, all references in the Plan to "Articles" are references to Articles of the Plan; (5) except as otherwise provided in the Plan, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) the words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity, or specificity and do not in any respect qualify, characterize, or limit the generality of the class within which such things are included; (7) any reference to an Entity or a Person as a holder of a Claim or Equity Interest includes that Entity's or Person's successors, assigns, and affiliates; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) the rules of construction set forth in section 102 of the

Bankruptcy Code shall apply; and (10) any immaterial effectuating provisions may be interpreted by the Plan Proponents or the Liquidating Trust, as applicable, in a manner that is consistent with the overall purpose and intent of the Plan, all without further order of the Bankruptcy Court.

## C.    Computation of Time

Except as otherwise provided in the Plan, Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require application of the law of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, securities, instruments, or other documents executed or delivered in connection with the Plan (except as otherwise set forth in those documents, in which case the governing law of such documents shall control); provided, however, that governance matters relating to the Debtors, the Liquidating Trust, the Borrower Claims Trust, the RMBS Claims Trust, or the Private Securities Claims Trust, as applicable, shall be governed by the laws of the State of incorporation or formation thereof.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, Priority Tax Claims and U.S. Trustee Fees have not been classified and, therefore, are excluded from the Classes of Claims and Equity Interests set forth in Article III and shall have the following treatment:

## A.    Administrative Claims

### 1.    **Treatment of Administrative Claims Other than Professional Claims**.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim, or set forth in an order of the Bankruptcy Court, the Liquidating Trust will pay each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) the full unpaid amount of such Claim in Cash: (1) if the Administrative Claim is Allowed before the Effective Date, on the Effective Date, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); or (2) if the Administrative Claim is Allowed on or after the Effective Date, on the date such Administrative Claim is Allowed, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon

as practicable thereafter); provided, however, that Allowed Administrative Claims other than Professional Fee Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, however, that accrued and unpaid Postpetition Intercompany Balances shall be satisfied pursuant to the Cash Management Order without further application or order of the Bankruptcy Court.  On or after the Effective Date, the Liquidating Trust may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.    **Administrative Claims Bar Date**.

Except as provided for herein or in any order of the Bankruptcy Court, holders of Administrative Claims (other than holders of Administrative Claims paid in the ordinary course of business, holders of Professional Claims, holders of Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and holders of Postpetition Intercompany Balances) must File and serve on the Plan Proponents or the Liquidating Trust, as applicable, requests for the payment of such Administrative Claims not already Allowed by Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claim Bar Date or be forever barred, estopped, and enjoined from asserting such Claims against the Debtors, the Liquidating Trust, or their assets or properties, and such Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the Plan Proponents or the Liquidating Trust, as applicable, and the requesting party no later than [●].

B.    **Professional Claims**

1.    **Final Fee Applications**

All final requests for Professional Claims must be Filed no later than seventy-five (75) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims will be determined by the Bankruptcy Court.

2.    **Professional Fee Escrow Account**

On the Effective Date, the Liquidating Trust will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account will be maintained in trust for the Professionals.  The funds in such account will not be property of the Liquidating Trust.  The amount of Professional Claims owing to the Professionals will be paid in Cash to such Professionals by the Liquidating Trust, or at the Liquidating Trust's direction, from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by Final Order; provided, that notwithstanding the foregoing, on the Effective Date, the Debtors shall pay (1) Centerview's full In-Court Transaction Fee (as defined in

paragraph 3(b) of the engagement letter by and between Centerview and the Debtors) and (2) Moelis full Restructuring Fee (as defined in paragraph 2 of the engagement letter between Moelis & Company LLC and the Committee); provided, further, that Centerview and Moelis shall File final requests for Professional Claims in accordance with Section II.B.1 above; and provided, further, that the Liquidating Trust's liability for Professional Claims shall not be limited nor be deemed to be limited to the funds available from the Professional Fee Escrow Account. After all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, will be transferred to the Liquidating Trust.

3.    **Professional Fee Reserve Amount**

To receive payment for Accrued Professional Compensation incurred through the Effective Date, Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and deliver such estimate to the Plan Proponents at least five (5) Business Days prior to the anticipated Effective Date. If a Professional does not provide such estimate, the Plan Proponents may estimate the unbilled fees and expenses of such Professional. The total amount so estimated will constitute the Professional Fee Reserve Amount; provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional. The Professional Fee Reserve Amount and the estimated Accrued Professional Compensation amounts submitted by the Professionals will be subject to review by the Debtors, the Consenting Claimants, and the Creditors' Committee, and any objections to the Professional Fee Reserve Amount must be served on the Plan Proponents prior to the Effective Date.

4.    **Post-Effective Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, the Liquidating Trust shall pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals from and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Liquidating Trust will pay such holder of an Allowed Priority Tax Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash on, or as soon as practicable after, the latest of: (1) the Effective Date; (2) the date such Allowed Priority Tax Claim becomes Allowed; or (3) in quarterly payments over a period of time not to exceed five (5) years after the Petition Date, in accordance with Bankruptcy Code section 1129(a)(9)(C);

36

provided that such election will be without prejudice to the Liquidating Trust's right to prepay such Allowed Priority Tax Claim in full or in part without penalty.

**D.    U.S. Trustee Fees**

On the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. For the avoidance of doubt, nothing in the Plan shall release the Liquidating Trust from its obligation to pay all U.S. Trustee Fees due and owing after the Effective Date before a Final Order is entered by the Bankruptcy Court concluding or closing the Chapter 11 Cases.

## ARTICLE III.

### CLASSIFICATION, TREATMENT, AND VOTING
### OF CLAIMS AND EQUITY INTERESTS

**A.    Classification of Claims and Equity Interests**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests. A Claim or Equity Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest has not been paid, withdrawn or otherwise settled before (i) the Claims Record Date for voting purposes, or (ii) the time at which distributions are made with respect to such Claims or Equity Interests pursuant to the Plan for distribution purposes.

**B.    Record Date for Claims**

As of the Claims Record Date, the transfer registers for each Class of Claims or Equity Interests (other than for publicly traded securities), as maintained by the Debtors or their agents, shall be deemed closed and there shall be no further changes made to reflect any new record holders of any Claims or Equity Interests. The Debtors and the Liquidating Trust shall have no obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Claims Record Date.

**C.    Summary of Classification and Class Identification**

i.        Except for Claims addressed in Article II, all Claims and Equity Interests are classified in the Classes set forth in this Article III in accordance with section 1122 of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. In no event shall any holder of an Allowed Claim be entitled to receive

payments under this Plan that, in the aggregate, exceed the Allowed amount of such holder's Claim.

ii.        Although the Plan applies to all of the Debtors, (a) the Plan constitutes fifty-one (51) distinct chapter 11 plans, one for each Debtor; and (b) for voting purposes, each class of the Debtor Groups will contain sub-classes for each of the Debtors within a particular Debtor Group.  The Plan groups the Debtors into three Debtor Groups (the ResCap Debtors, the GMACM Debtors and the RFC Debtors) solely for purposes of describing treatment under the Plan and making distributions under the Plan.  Such grouping shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities. For voting purposes, each Class of the Debtor Groups will contain sub-classes for each of the Debtors within a particular Debtor Group (*e.g.,* there will be three (3) sub-Classes for each Class of the ResCap Debtors, twenty-one (21) sub-classes for each Class of the GMACM Debtors, and twenty-seven (27) sub-Classes for each Class of the RFC Debtors, and many of the sub-Classes may be vacant).  Notwithstanding the foregoing, the Plan Proponents reserve the right to seek approval of the Bankruptcy Court to consolidate any two or more Debtors for purposes of administrative convenience, provided that such consolidation does not materially and adversely impact the amount of distributions to any Person under the Plan and is in accordance with the terms of the Plan Support Agreement.

iii.        Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan.  The Plan Proponents shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.  The Plan Proponents reserve the right to modify the Plan in accordance with Article XI.A hereof, including the right to withdraw the Plan as to an individual Debtor at any time before the Effective Date.

iv.        The following are tables assigning each Class a letter and number designation for purposes of identifying each separate Class, a description of whether that Class is Impaired, and the Class' voting rights:

1.        **ResCap Debtors**

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| R-1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| R-2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| R-3 | Junior Secured Notes Claims | Impaired/ Unimpaired | Yes/No (presumed to accept) |
| R-4 | ResCap Unsecured Claims | Impaired | Yes |

| R-5 | Borrower Claims | Impaired | Yes |
| R-6 | Private Securities Claims | Impaired | Yes |
| R-7 | NJ Carpenters Claims | Impaired | Yes |
| R-8 | General Unsecured Convenience Claims | Impaired | Yes |
| R-9 | Intercompany Balances | Impaired | No (deemed to reject) |
| R-10 | Equity Interests | Impaired | No (deemed to reject) |
| R-11 | FHFA Claims | Impaired | No (deemed to reject) |
| R-12 | Revolving Credit Facility Claims | Impaired | Yes |

2.    **GMACM Debtors**

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| GS-1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| GS-2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| GS-3 | Junior Secured Notes Claims | Impaired/ Unimpaired | Yes/No (presumed to accept) |
| GS-4 | GMACM Unsecured Claims | Impaired | Yes |
| GS-5 | Borrower Claims | Impaired | Yes |
| GS-6 | Private Securities Claims | Impaired | Yes |
| GS-7 | General Unsecured Convenience Claims | Impaired | Yes |
| GS-8 | Intercompany Balances | Impaired | No (deemed to reject) |
| GS-9 | Equity Interests | Impaired | No (deemed to reject) |
| GS-10 | Revolving Credit Facility Claims | Impaired | Yes |

3.    **RFC Debtors**

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| RS-1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| RS-2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| RS-3 | Junior Secured Notes Claims | Impaired/ Unimpaired | Yes/No (presumed to accept) |
| RS-4 | RFC Unsecured Claims | Impaired | Yes |
| RS-5 | Borrower Claims | Impaired | Yes |
| RS-6 | Private Securities Claims | Impaired | Yes |
| RS-7 | NJ Carpenters Claims | Impaired | Yes |
| RS-8 | General Unsecured Convenience Claims | Impaired | Yes |
| RS-9 | Intercompany Balances | Impaired | No (deemed to reject) |
| RS-10 | Equity Interests | Impaired | No (deemed to reject) |
| RS-11 | FHFA Claims | Impaired | No (deemed to reject) |
| RS-12 | Revolving Credit Facility Claims | Impaired | Yes |

**D.    Treatment of Claims and Equity Interests**

Except to the extent that a holder of an Allowed Claim or Equity Interest, as applicable, agrees to a less favorable treatment, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Equity Interest, receive the treatment described below under the Plan.

1.    **Claims Against and Equity Interests in the ResCap Debtors**

(a)    Class R-1 – Other Priority Claims

(i)    <u>Classification:</u> Class R-1 consists of all Allowed Other Priority Claims against the ResCap Debtors.

(ii)    <u>Treatment:</u> In full and final satisfaction of the Other Priority Claims in Class R-1, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim in Class R-1 shall receive one of the following treatments on account of such Claim, as determined by the Plan Proponents prior to the Effective Date or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, or (b) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; <u>provided</u>, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

(iii)    <u>Voting:</u> Class R-1 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class R-1 Claims are conclusively presumed to accept the Plan.

(b)    Class R-2 – Other Secured Claims

(i)    <u>Classification:</u> Class R-2 consists of all Allowed Other Secured Claims against the ResCap Debtors.

(ii)    <u>Treatment:</u> In full and final satisfaction of the Other Secured Claims in Class R-2, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim in Class R-2 shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, including any interest, at the non-default rate, required to be paid pursuant to section 506(b) of the Bankruptcy Code,

40

or (b) the collateral securing its Allowed Other Secured Claim.

(iii)  <u>Voting:</u> Class R-2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class R-2 Claims are conclusively presumed to accept the Plan.

(c)  Class R-3 – Junior Secured Notes Claims

(i)  <u>Classification:</u> Class R-3 consists of all Allowed Junior Secured Notes Claims against the ResCap Debtors.

(ii)  <u>Treatment:</u> In full and final satisfaction of the Junior Secured Notes Claims in Class R-3, on or as soon as practicable after the Effective Date, each holder of an Allowed Junior Secured Notes Claim in Class R-3 shall receive payment in full for the Allowed amount of such Junior Secured Notes Claim as determined by the Bankruptcy Court in the JSN Adversary Proceeding; <u>provided, however,</u> if the Bankruptcy Court determines that the Junior Secured Noteholders are entitled to post-petition interest, the Allowed amount of such post-petition interest shall be paid in accordance with the requirements under the Bankruptcy Code, which may include at the Plan Proponents' election the payment of post-petition interest over time at the appropriate market rate.

(iii)  <u>Voting:</u> Class R-3 is Impaired. Holders of Allowed Class R-3 Claims are entitled to vote to accept or reject the Plan; provided that if the Bankruptcy Court makes a finding in the JSN Adversary Proceeding that the Junior Secured Notes Claims are oversecured such that they are entitled to payment in full in an amount that will render them unimpaired, and the Plan Proponents pay them in full in Cash on or as soon as practicable after the Effective Date, then holders of Allowed Class R-3 Claims will be conclusively presumed to accept the Plan and such votes will not be counted.

(d)  Class R-4 – ResCap Unsecured Claims

(i)  <u>Classification:</u> Class R-4 consists of all Allowed ResCap Unsecured Claims.

(ii)  <u>Treatment:</u> In full and final satisfaction of the ResCap Unsecured Claims in Class R-4, as soon as practicable after the Effective Date, each holder of an Allowed ResCap Unsecured Claim in Class R-4 shall receive its Pro Rata Share of the ResCap Debtors Unit Distribution.

41

     (iii)    <u>Voting:</u> Class R-4 is Impaired. Holders of Allowed Class R-4 Claims are entitled to vote to accept or reject the Plan.

(e)    Class R-5 – Borrower Claims

     (i)    <u>Classification:</u> Class R-5 consists of all Allowed Borrower Claims against the ResCap Debtors.

     (ii)    <u>Treatment:</u> In full and final satisfaction of the Borrower Claims in Class R-5, as soon as practicable after the Effective Date, holders of Allowed Borrower Claims in Class R-5 shall receive their allocated share of Cash available for distribution from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

     (iii)    <u>Voting:</u> Class R-5 is Impaired.  Holders of Allowed Class R-5 Claims are entitled to vote to accept or reject the Plan.

(f)    Class R-6 – Private Securities Claims

     (i)    <u>Classification:</u> Class R-6 consists of all Allowed Private Securities Claims against the ResCap Debtors.

     (ii)    <u>Treatment:</u> In full and final satisfaction of the Private Securities Claims in Class R-6, as soon as practicable after the Effective Date, holders of Allowed Private Securities Claims in Class R-6 shall receive their allocated share of Cash distributions from the Private Securities Claims Trust, in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

     (iii)    <u>Voting:</u> Class R-6 is Impaired.  Holders of Allowed Class R-6 Claims are entitled to vote to accept or reject the Plan.

(g)    Class R-7 – NJ Carpenters Claims

     (i)    <u>Classification:</u> Class R-7 consists of all Allowed NJ Carpenters Claims against the ResCap Debtors.

     (ii)    <u>Treatment:</u> Subject to the NJ Carpenters Approval, in full and final satisfaction of the NJ Carpenters Claims in Class R-7, within ten (10) business days of the Effective Date, the lead plaintiff, on behalf of holders of Allowed NJ Carpenters Claims in Class R-7 shall receive the NJ Carpenters Claims Distribution which will thereafter be distributed pursuant to the NJ Carpenters Plan of Allocation.  Absent the NJ Carpenters Approval, Claims held by NJ Carpenters Class

42

Members, to the extent Allowed, shall be classified as General Unsecured Claims, which claims may be subject to subordination.

 (iii) Voting: Class R-7 is Impaired. Holders of Allowed Class R-7 Claims are entitled to vote to accept or reject the Plan.

(h) Class R-8 – General Unsecured Convenience Claims

 (i) Classification: Class R-8 consists of all Allowed ResCap General Unsecured Convenience Claims against the ResCap Debtors.

 (ii) Treatment: In full and final satisfaction of the General Unsecured Convenience Claims in Class R-8, as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Convenience Claim in Class R-8 shall receive a distribution in Cash equal to 36.3% of such holder's Allowed Class R-8 Claim.

 (iii) Voting: Class R-8 is Impaired. Holders of Allowed Class R-8 Claims are entitled to vote to accept or reject the Plan.

(i) Class R-9 – Intercompany Balances

 (i) Classification: Class R-9 consists of all Intercompany Balances against the ResCap Debtors.

 (ii) Treatment: On the Effective Date, Intercompany Balances against the ResCap Debtors in Class R-9 shall be waived, cancelled, and discharged. Holders of Intercompany Balances in Class R-9 shall receive no recovery on account of their Claims.

 (iii) Voting: Class R-9 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class R-9 Claims are deemed to reject the Plan.

(j) Class R-10 – Equity Interests

 (i) Classification: Class R-10 consists of all Equity Interests in the ResCap Debtors.

 (ii) Treatment: Holders of Equity Interests in Class R-10 shall receive no recovery on account of such Equity Interests and such Equity Interests shall be canceled on the Effective Date.

43

          (iii)    <u>Voting:</u> Class R-10 is Impaired.  Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class R-10 Equity Interests are deemed to reject the Plan.

(k)    Class R-11 – FHFA Claims

          (i)    <u>Classification:</u> Class R-11 Consists of all FHFA Claims against the ResCap Debtors.

          (ii)    <u>Treatment:</u>  Holders of FHFA Claims in Class R-11 shall receive no recovery on account of such Claims; <u>provided</u>, that if the Bankruptcy Court determines that the FHFA Claims are not subject to subordination under section 510(b) of the Bankruptcy Code, each holder of an Allowed ResCap FHFA Claim shall receive a distribution in Cash equal to 0.001% of such holder's Allowed ResCap FHFA Claim, which accounts for the fact that no holder of an FHFA Claim is subject to the Third Party Releases, as soon as practicable after the later of the Effective Date or the allowance of such Claim.

          (iii)    <u>Voting:</u> Class R-11 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class R-11 Claims are deemed to reject the Plan.

(l)    Class R-12 – Revolving Credit Facility Claims

          (i)    <u>Classification:</u> Class R-12 consists of all Allowed Revolving Credit Facility Claims against the ResCap Debtors.

          (ii)    <u>Treatment:</u> In full and final satisfaction of the Revolving Credit Facility Claims in Class R-12, any amounts paid under the Paydown Order shall be indefeasibly and finally approved and allowed; <u>provided</u>, that on the Effective Date holders of Allowed Revolving Credit Facility Claims in Class R-12 shall waive any right to payment on account of the Revolving Credit Facility Claims.

          (iii)    <u>Voting:</u> Class R-12 is Impaired.  Holders of Allowed Class R-12 Claims are entitled to vote to accept or reject the Plan.

2.    **Claims Against and Equity Interests in the GMACM Debtors**

(a)    Class GS-1 – Other Priority Claims

          (i)    <u>Classification:</u> Class GS-1 consists of all Allowed Other Priority Claims against the GMACM Debtors.

(ii)    <u>Treatment:</u> In full and final satisfaction of the Other Priority Claims in Class GS-1, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim in Class GS-1 shall receive one of the following treatments on account of such Claim, as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, or (b) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; <u>provided</u>, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

(iii)    <u>Voting:</u> Class GS-1 is Unimpaired.  Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class GS-1 Claims are conclusively presumed to accept the Plan.

(b)    Class GS-2 – Other Secured Claims

(i)    <u>Classification:</u> Class GS-2 consists of all Allowed Other Secured Claims against the GMACM Debtors.

(ii)    <u>Treatment:</u> In full and final satisfaction of the Other Secured Claims in Class GS-2, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim in Class GS-2 shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, including any interest, at the non-default rate, required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim.

(iii)    <u>Voting:</u> Class GS-2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class GS-2 Claims are conclusively presumed to accept the Plan.

(c)    Class GS-3 – Junior Secured Notes Claims

(i)    <u>Classification:</u> Class GS-3 consists of all Allowed Junior Secured Notes Claims against the GMACM Debtors.

(ii)    <u>Treatment:</u> In full and final satisfaction of the Junior Secured Notes Claims in Class GS-3, on or as soon as practicable after the Effective Date, each holder of an Allowed Junior Secured Notes Claim in Class GS-3 shall receive payment in full for

45

the Allowed amount of such Junior Secured Notes Claim as determined by the Bankruptcy Court in the JSN Adversary Proceeding; provided, however, if the Bankruptcy Court determines that the Junior Secured Noteholders are entitled to post-petition interest, the Allowed amount of such post-petition interest shall be paid in accordance with the requirements under the Bankruptcy Code, which may include at the Plan Proponents' election the payment of post-petition interest over time at the appropriate market rate.

(iii)    Voting: Holders of Allowed Class GS-3 Claims are unimpaired and deemed to accept the Plan at the following GMACM Debtors: Passive Asset Transactions, LLC; Residential Mortgage Real Estate Holdings, LLC; Home Connects Lending Services, LLC; GMACR Mortgage Products, LLC; ditech, LLC; Residential Consumer Services, LLC; and GMAC Mortgage USA Corporation. Holders of Allowed Class GS-3 Claims are impaired and entitled to vote on the Plan at GMACM; provided that if the Bankruptcy Court makes a finding in the JSN Adversary Proceeding that the Junior Secured Notes Claims are oversecured such that they are entitled to payment in full in Cash in an amount that will render them unimpaired pursuant to the treatment provided under this Plan, then holders of Allowed Class GS-3 Claims will be conclusively presumed to accept the Plan and such votes will not be counted.

(d)    Class GS-4 – GMACM Unsecured Claims

(i)    Classification: Class GS-4 consists of all Allowed GMACM Unsecured Claims.

(ii)    Treatment: In full and final satisfaction of the GMACM Unsecured Claims in Class GS-4, as soon as practicable after the Effective Date, each holder of an Allowed GMACM Unsecured Claim in Class GS-4 shall receive its Pro Rata Share of the GMACM Debtors Unsecured Unit Distribution, provided, however, that, with respect to the distributions on account of the Allowed Claims of the RMBS Trusts, the holder shall be the RMBS Claims Trust, and subsequent distributions of, or on account of, such Units, shall be governed by Article IV.C of the Plan.

(iii)    Voting: Class GS-4 is Impaired. Holders of Allowed Class GS-4 Claims are entitled to vote to accept or reject the Plan.

(e)    Class GS-5 – Borrower Claims

46

    (i)    <u>Classification:</u> Class GS-5 consists of all Allowed Borrower Claims against the GMACM Debtors.

    (ii)    <u>Treatment:</u> In full and final satisfaction of the Borrower Claims in Class GS-5, as soon as practicable after the Effective Date, holders of Allowed Borrower Claims in Class GS-5 shall receive their allocated share of Cash available for distributions from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

    (iii)    <u>Voting:</u> Class GS-5 is Impaired. Holders of Allowed Class GS-5 Claims are entitled to vote to accept or reject the Plan.

(f)    Class GS-6 – Private Securities Claims

    (i)    <u>Classification:</u> Class GS-6 consists of all Allowed Private Securities Claims against the GMACM Debtors.

    (ii)    <u>Treatment:</u> In full and final satisfaction of the Private Securities Claims in Class GS-6, as soon as practicable after the Effective Date, holders of Allowed Private Securities Claims in Class GS-6 shall receive their allocated share of Cash distributions from the Private Securities Claims Trust, in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

    (iii)    <u>Voting:</u> Class GS-6 is Impaired. Holders of Allowed Class GS-6 Claims are entitled to vote to accept or reject the Plan.

(g)    Class GS-7 – General Unsecured Convenience Claims

    (i)    <u>Classification:</u> Class GS-7 consists of all Allowed General Unsecured Convenience Claims against the GMACM Debtors.

    (ii)    <u>Treatment:</u> In full and final satisfaction of the General Unsecured Convenience Claims in Class GS-7, as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Convenience Claim in Class GS-7 shall receive a distribution in Cash equal to 30.1% of such holder's Allowed Class GS-7 Claim.

    (iii)    <u>Voting:</u> Class GS-7 is Impaired. Holders of Allowed Class GS-7 Claims are entitled to vote to accept or reject the Plan.

(h)    Class GS-8 – Intercompany Balances

47

(i)      <u>Classification:</u> Class GS-8 consists of all Intercompany Balances against the GMACM Debtors.

(ii)     <u>Treatment:</u> On the Effective Date, Intercompany Balances against the GMACM Debtors in Class GS -8 shall be waived, cancelled, and discharged.  Holders of Intercompany Balances in Class GS -8 shall receive no recovery on account of their Claims.

(iii)    <u>Voting:</u> Class GS-8 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class GS-8 Claims are deemed to reject the Plan.

(i)    Class GS-9 – Equity Interests

    (i)      <u>Classification:</u> Class GS-9 consists of all Equity Interests in the GMACM Debtors.

    (ii)     <u>Treatment:</u> Holders of Equity Interests in Class GS-9 shall receive no recovery on account of such Equity Interests and such Equity Interests shall be canceled on the Effective Date.

    (iii)    <u>Voting:</u> Class GS-9 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class GS-9 Equity Interests are deemed to reject the Plan.

(j)    Class GS-10 – Revolving Credit Facility Claims

    (i)      <u>Classification:</u> Class GS-10 consists of all Allowed Revolving Credit Facility Claims against the GMACM Debtors.

    (ii)     <u>Treatment:</u> In full and final satisfaction of the Revolving Credit Facility Claims in Class GS-10, any amounts paid under the Paydown Order shall be indefeasibly and finally approved and allowed; <u>provided</u>, that on the Effective Date holders of Allowed Revolving Credit Facility Claims in Class GS-10 shall waive any right to payment on account of the Revolving Credit Facility Claims

    (iii)    <u>Voting:</u> Class GS-10 is Impaired.  Holders of Allowed Class GS-10 Claims are entitled to vote to accept or reject the Plan.

3.    **Claims Against and Equity Interests in the RFC Debtors**

(a)    Class RS-1 – Other Priority Claims

    (i)      <u>Classification:</u> Class RS-1 consists of all Allowed Other Priority Claims against the RFC Debtors.

48

(ii)    <u>Treatment:</u> In full and final satisfaction of the Other Priority Claims in Class RS-1, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim in Class RS-1 shall receive one of the following treatments on account of such Claim, as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, or (b) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; <u>provided</u>, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

(iii)    <u>Voting:</u> Class RS-1 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class RS-1 Claims are conclusively presumed to accept the Plan.

(b)    Class RS-2 – Other Secured Claims

    (i)    <u>Classification:</u> Class RS-2 consists of all Allowed Other Secured Claims against the RFC Debtors.

    (ii)    <u>Treatment:</u> In full and final satisfaction of the Other Secured Claims in Class RS-2, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim in Class RS-2 shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, including any interest, at the non-default rate, required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim.

    (iii)    <u>Voting:</u> Class RS-2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class RS-2 Claims are conclusively presumed to accept the Plan.

(c)    Class RS-3 – Junior Secured Notes Claims

    (i)    <u>Classification:</u> Class RS-3 consists of all Allowed Junior Secured Notes Claims against the RFC Debtors.

    (ii)    <u>Treatment:</u> In full and final satisfaction of the Junior Secured Notes Claims in Class RS-3, on or as soon as practicable after the Effective Date, each holder of an Allowed Junior Secured Notes Claim in Class RS-3 shall receive payment in full for

the Allowed amount of such Junior Secured Notes Claim as determined by the Bankruptcy Court in the JSN Adversary Proceeding; provided, however, if the Bankruptcy Court determines that the Junior Secured Noteholders are entitled to post-petition interest, the Allowed amount of such post-petition interest shall be paid in accordance with the requirements under the Bankruptcy Code, which may include the payment of post-petition interest over time at the appropriate market rate.

    (iii)    Voting: Holders of Allowed RS-3 Claims are unimpaired and deemed to accept the Plan at the following RFC Debtors: GMAC Model Home Finance I, LLC; DOA Holding Properties, LLC; RFC Asset Holdings II, LLC; RFC Construction Funding, LLC; Residential Funding Real Estate Holdings, LLC; Homecomings Financial Real Estate Holdings, LLC; Residential Funding Mortgage Securities I, Inc.; RFC Asset Management, LLC; RFC SFJV-2002, LLC; and RCSFJV2004, LLC. Holders of Allowed RS-3 Claims are impaired and entitled to vote on the Plan at RFC and Homecomings Financial, LLC; provided that if the Bankruptcy Court makes a finding in the JSN Adversary Proceeding that the Junior Secured Notes Claims are oversecured such that they are entitled to payment in full in Cash in an amount that will render them unimpaired pursuant to the treatment provided under this Plan, then holders of Allowed Class RS-3 Claims will be conclusively presumed to accept the Plan and such votes will not be counted.

(d)    Class RS-4 – RFC Unsecured Claims

    (i)    Classification: Class RS-4 consists of all Allowed RFC Unsecured Claims.

    (ii)    Treatment: In full and final satisfaction of the RFC Unsecured Claims in Class RS-4, as soon as practicable after the Effective Date, each holder of an Allowed RFC Unsecured Claim in Class RS-4 shall receive its Pro Rata Share of the RFC Debtors Unit Distribution; provided, however, that, with respect to the distributions on account of the Allowed Claims of the RMBS Trusts, the holder shall be the RMBS Claims Trust, and subsequent distributions of, or on account of, such Units, shall be governed by Article IV.C of the Plan.

    (iii)    Voting: Class RS-4 is Impaired. Holders of Allowed Class RS-4 Claims are entitled to vote to accept or reject the Plan.

(e)    Class RS-5 – Borrower Claims

50

(i)　　Classification: Class RS-5 consists of all Allowed Borrower Claims against the RFC Debtors.

(ii)　　Treatment: In full and final satisfaction of the Borrower Claims in Class RS-5, as soon as reasonably practicable after the Effective Date, holders of Allowed Borrower Claims in Class RS-5 shall receive their allocated share of Cash available for distributions from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

(iii)　　Voting: Class RS-5 is Impaired. Holders of Allowed Class RS-5 Claims are entitled to vote to accept or reject the Plan.

(f)　　Class RS-6 – Private Securities Claims

(i)　　Classification: Class RS-6 consists of all Allowed Private Securities Claims against the RFC Debtors

(ii)　　Treatment: In full and final satisfaction of the Private Securities Claims in Class RS-6, as soon as practicable after the Effective Date, holders of Allowed Private Securities Claims in Class RS-6 shall receive their allocated share of Cash distributions from the Private Securities Claims Trust, in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

(iii)　　Voting: Class RS-6 is Impaired. Holders of Allowed Class RS-6 Claims are entitled to vote to accept or reject the Plan.

(g)　　Class RS-7 – NJ Carpenters Claims

(i)　　Classification: Class RS-7 consists of all Allowed NJ Carpenters Claims against the RFC Debtors.

(ii)　　Treatment: Subject to the NJ Carpenters Approval, in full and final satisfaction of the NJ Carpenters Claims in Class RS-7, within ten (10) business days of the Effective Date, the lead plaintiff, on behalf of holders of Allowed NJ Carpenters Claims in Class RS-7 shall receive the NJ Carpenters Claims Distribution which will thereafter be distributed pursuant to the NJ Carpenters Plan of Allocation.  Absent the NJ Carpenters Approval, Claims held by NJ Carpenters Class Members, to the extent Allowed, shall be classified as General Unsecured Claims, which claims may be subject to subordination.

51

        (iii)    <u>Voting:</u> Class RS-7 is Impaired. Holders of Allowed Class RS-7 Claims are entitled to vote to accept or reject the Plan.

(h)    Class RS-8 – General Unsecured Convenience Claims

        (i)    <u>Classification:</u> Class RS-8 consists of all Allowed General Unsecured Convenience Claims against the RFC Debtors.

        (ii)    <u>Treatment:</u> In full and final satisfaction of the General Unsecured Convenience Claims in Class RS-8, as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Convenience Claim in Class RS-8 shall receive a distribution in Cash equal to 9.0% of such holder's Allowed Class RS-8 Claim.

        (iii)    <u>Voting:</u> Class RS-8 is Impaired. Holders of Allowed Class RS-8 Claims are entitled to vote to accept or reject the Plan.

(i)    Class RS-9 – Intercompany Balances

        (i)    <u>Classification:</u> Class RS-9 consists of all Intercompany Balances against the RFC Debtors.

        (ii)    <u>Treatment:</u> On the Effective Date, Intercompany Balances against the RFC  Debtors in Class RS -9 shall be waived, cancelled, and discharged.  Holders of Intercompany Balances against the RFC  Debtors in Class RS -9 shall receive no recovery on account of their Claims.

        (iii)    <u>Voting:</u> Class RS-9 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class RS-9 Claims are conclusively deemed to reject the Plan.

(j)    Class RS-10 – Equity Interests

        (i)    <u>Classification:</u> Class RS-10 consists of all Equity Interests in the RFC Debtors.

        (ii)    <u>Treatment:</u> Holders of Equity Interests in Class RS-10 shall receive no recovery on account of such Equity Interests and such Equity Interests shall be canceled on the Effective Date.

        (iii)    <u>Voting:</u> Class RS-10 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class RS-10 Equity Interests are conclusively deemed to reject the Plan.

(k)    Class RS-11 – FHFA Claims

     (i)       <u>Classification:</u> Class RS-11 consists of all FHFA Claims against the RFC Debtors.

     (ii)     <u>Treatment:</u> Holders of FHFA Claims in Class RS-11 shall receive no recovery on account of such Claims; <u>provided</u>, that if the Bankruptcy Court determines that the FHFA Claims are not subject to subordination under section 510(b) of the Bankruptcy Code, each holder of an Allowed FHFA Claim in Class RS-11 shall receive a distribution in Cash equal to 3% of such holder's Allowed FHFA Claim, which accounts for the fact that no holder of an FHFA Claim is subject to the Third Party Releases, in Class RS-11 as soon as practicable after the later of the Effective Date or the allowance of such Claim.

     (iii)    <u>Voting:</u> Class RS-11 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class RS-11 Claims are deemed to reject Plan.

  (l)    Class RS-12 – Revolving Credit Facility Claims

     (i)       <u>Classification:</u> Class RS-12 consists of all Allowed Revolving Credit Facility Claims against the RFC Debtors.

     (ii)     <u>Treatment:</u> In full and final satisfaction of the Revolving Credit Facility Claims in Class RS-12, any amounts paid under the Paydown Order shall be indefeasibly and finally approved and allowed; <u>provided</u>, that on the Effective Date holders of Allowed Revolving Credit Facility Claims in Class RS-12 shall waive any right to payment on account of the Revolving Credit Facility Claims

     (iii)    <u>Voting:</u> Class RS-12 is Impaired. Holders of Allowed Class RS-12 Claims are entitled to vote to accept or reject the Plan.

## E.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. For purposes of Bankruptcy Rule 7001(8), the Plan provides for subordination. The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, reserve the right to subordinate any Claim or Equity Interest, other than the Consenting Claimants' Allowed Claims, the NJ Carpenters Claims (assuming the NJ Carpenters Approval) and the Ally Contract Claims, in accordance with any contractual, legal, or equitable subordination relating thereto under the Bankruptcy Code as long as such treatment is consistent with the Plan Support Agreement. An initial list of

Claims proposed to be subordinated under the Plan shall be set forth in the Plan Supplement, without prejudice to the right of the Plan Proponents or Liquidating Trust, as the case may be, to seek to subordinate additional Claims. Subordinated Claims shall not receive a distribution under the Plan until all senior Allowed Claims are paid in full.

**F.      Distributions on Account of Allowed Claims and Interests**

Except as otherwise provided in this Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the distributions that this Plan provides for Allowed Claims in the applicable Class from either the Liquidating Trust, RMBS Claims Trust, Borrower Claims Trust, or Private Securities Claims Trust, as applicable and as set forth below. Distributions on account of Disputed Claims shall be made from the Disputed Claims Reserve pursuant to the Plan. Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions regardless of whether such distributions are delivered on or at any time after the Effective Date.

**G.      Elimination of Vacant Classes**

Any Class of Claims or Equity Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

**H.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

`      Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Plan Proponents shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.

## ARTICLE IV.

## IMPLEMENTATION OF THE PLAN

**A.      Global Settlement**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a compromise and settlement of numerous inter-Debtor, Debtor-Creditor and inter-Creditor issues designed to achieve an economic settlement of Claims against the Debtors and Ally and an efficient resolution of these Chapter 11 Cases. This Global Settlement constitutes a settlement of the potential litigation of issues including substantive consolidation, the validity and enforceability of Intercompany Balances, the allocation of the

Available Assets, the amount and allocation of certain disputed Unsecured Claims, in addition to the resolution of extensive litigation, Claims, and potential Claims against Ally. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements and all other compromises and settlements provided for herein, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Creditors, the RMBS Trusts, Investors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. Each provision of the Global Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.  As set forth in detail herein, the Global Settlement will be implemented as follows:

a)      The Ally Contribution will be paid to the Estates in accordance with the Plan and will be allocated by the Plan Proponents, consistent with the terms of Articles II and III herein, as follows:

| Entity | Allocation |
|---|---|
| ResCap Debtors | $782.7 million |
| GMACM Debtors | $462.3 million |
| RFC Debtors | $462.3 million |
| Private Securities Claims Trust | $235.0 million |
| Borrower Claims Trust | $57.6 million |
| NJ Carpenters Claims Distribution | $100.0 million |

b)      Administrative Claims shall be allocated among the ResCap Debtors, the GMACM Debtors and the RFC Debtors in accordance with the Plan Support Agreement. Of the projected Administrative Claims of $1,086.2 million, $836.3 million shall be allocated to the GMACM Debtors, and $249.8 million shall be allocated to the RFC Debtors.  Any variation in the amount of the Administrative Claims above or below $1,086.2 million shall be borne or realized by the Liquidating Trust.

c)      On the Effective Date, the Borrower Claims Trust will be funded with the Borrower Claims Trust Assets for the benefit of holders of Borrower Claims.  Holders of Borrower Claims shall receive their allocated share of the Borrower Claims Trust Assets in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

d)      On or as soon as practicable after the Effective Date, the Private Securities Claims Trust shall be funded with the Private Securities Claims Trust Unit Distribution, for the benefit of Private Securities Claimants.  Private Securities Claimants shall receive their allocable share of Cash distributions received by the Private Securities Claims Trust from the Liquidating Trust in respect of the Private Securities Claims Trust Unit Distribution, and shall not be required to tender or surrender the RMBS underlying their Private Securities Claims.

e)    The RMBS Settlement is incorporated in the Plan and shall become effective on the Effective Date.

f)    The Monoline Claims Settlement is incorporated in the Plan and shall become effective on the Effective Date.

g)    A settlement of the Allowed amounts and treatment of the Claims held by the Settling Private Securities Claimants for voting purposes is incorporated in the Plan and shall become effective on the Effective Date.

h)    Subject to the NJ Carpenters Approval, the amount of the NJ Carpenters Claims Distribution is incorporated in the Plan and shall become effective on the Effective Date.

i)    Subject to approval of the Kessler Settlement Agreement by the Bankruptcy Court, a settlement of the Allowed amount and treatment of the Claims of the Kessler Class Claimants pursuant to the Kessler Settlement Agreement is incorporated in the Plan and shall become effective on the Effective Date.

j)    A settlement of potential Claims, whether liquidated or unliquidated, of the Senior Unsecured Noteholders and of the Senior Unsecured Notes Indenture Trustee shall become effective on the Effective Date.

k)    As agreed upon among the Consenting Claimants, the Junior Secured Notes Claims shall be allocated among the Debtors and holders of Allowed Junior Secured Notes Claims shall receive payment in full on the Effective Date on account of such Allowed Claims, as determined by the JSN Adversary Proceeding.

l)    The GMACM Debtors and the RFC Debtors shall waive and release all subrogation claims against the ResCap Debtors.

m)    Each Debtor agrees to compromise Intercompany Balances and such Claims shall not be entitled to receive any recovery under the Plan.

## B.    Ally Settlement

Ally shall pay the Estates the Ally Contribution in accordance with the Plan. In exchange for Ally's contributions to the Chapter 11 Cases, including the Ally Contribution, Ally shall be entitled to the following consideration:

a)    Debtor Releases;

b)    Third Party Releases;

c)    *Settlement of Debtors' Rights to and Under Settlement Insurance Policies*:   The Debtors (i) agree to permit Ally exclusively to recover under the Settlement Insurance Policies, (ii) relinquish in favor of Ally and its Representatives all coverage that might otherwise belong to, or inure to the benefit of, the Debtors under such Settlement Insurance Policies, (iii) shall, at

Ally's discretion, assign, and seek an Order of the Bankruptcy Court permitting the assignment, to Ally of any and all of the Debtors' rights under the Settlement Insurance Policies with respect to any claims made against the Debtors or their Representatives prior to or during the bankruptcy, including each of the claims set forth on a schedule to Exhibit B to the Plan Support Agreement, and (iv) shall cooperate fully with Ally, in order to help maximize Ally's recovery under the Settlement Insurance Policies with respect to claims against the Debtors or their Representatives.

The Debtors shall retain their rights as insureds under the existing Ally general liability and workers' compensation insurance policies for bodily injury and property damage claims to the extent covered by those insurance policies. By the Effective Date, the Debtors shall be required to have purchased their own insurance policies (including general liability and workers' compensation insurance) to cover all risks of loss, damage or injury (including bodily injury and property damage) occurring on or after the Effective Date.  For the avoidance of doubt, there is no obligation for Ally to provide insurance under the Plan, or otherwise.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall release, enjoin, or preclude any Representative of the Debtors from pursuing any rights a Representative of the Debtors may have (i) to indemnification or advancement from Ally solely for any claims that are not released by the Plan and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased by Ally or covering Representatives of the Debtors, or against any party (other than the Debtors) arising out of such policies of insurance, solely for any claims that are not released herein and in the Confirmation Order.  For the avoidance of doubt, nothing in this Plan expands or reduces any existing indemnification rights or rights as an "insured" for any Representative of the Debtors for claims that are not released by the Plan.

For the avoidance of doubt, the releases in the Plan shall not extend to any rights, defenses, or counterclaims, under any directors & officers or errors & omissions insurance policies sold by any of the Consenting Claimants or their affiliates and covering either Debtors or any of the Ally Released Parties. Nor do the releases herein extend to any indemnity rights against non-Ally Released Parties arising out of the Kessler Class Action or to any other indemnity right against non-Ally Released Parties arising out of any other claims of Borrowers; specifically, the releases do not extend to any indemnity rights RFC may have against any non-Ally Released Party that is a successor in interest to CBNV and GNBT, including, but not limited to, those indemnity rights extending out of the Client Contracts between RFC, on the one hand, and either CBNV or GNBT, on the other hand, which incorporate by reference the indemnity provisions of RFC's AlterNet Seller Guide.

No rights of the Consenting Claimants are released under the Plan in their capacity as liability insurance or reinsurance carriers for Ally or the Debtors, to the extent applicable.  In addition, nothing herein or in the Confirmation Order shall impair any of the Debtors' or any Borrower or former Borrower's rights or remedies (including the GM Insurance Rights) under or with respect to insurance policies other than the Settlement Insurance Policies (as assigned in the Plan), including but not limited to the GM Policies.

With respect to the Settlement Insurance Policies, the Confirmation Order shall contain language regarding the settlement of insurance that is reasonably acceptable to Ally, the Plan Proponents, and the Consenting Claimants.

d)  *Release of Funds*:  On the Effective Date, the Debtors will (i) transfer the funds held in the Ally Indemnity Escrow Account to Ally, and (ii) remit the Misdirected Funds to Ally, and Ally shall release the approximately $1.787 million in Cash that was overfunded by the Debtors prior to the petition Date and which is currently held by Ally.

e)  *Regulatory Obligations*: Through the Effective Date, the Debtors shall perform all respective obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment, including, for the avoidance of doubt, satisfying the settlement of the foreclosure review obligations under the Consent Order, fulfilling all specific performance obligations, and satisfying all monetary obligations in full in Cash; provided, however, that the Debtors shall not be obligated to perform those obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment that Ocwen performs under the Ocwen APA.  On or after the Effective Date, the Liquidating Trust shall assume all rights and obligations of the Debtors under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment other than Ocwen's rights and obligations under the Ocwen APA.  For the avoidance of doubt, as of the Effective Date, Ally shall have no monetary obligations under the Consent Order, DOJ/AG Settlement and the Order of Assessment.

f)  *Treatment of Ally Contract Claims*.  On the Effective Date, the Ally Contract Claims shall be presumptively Allowed in full and the Debtors shall pay such Claims in full in Cash.  The parties to the Ally Contracts shall perform under such contracts in accordance with the terms of such contracts and orders of the Bankruptcy Court.  For the avoidance of doubt, the parties performance under each Ally Contract shall terminate in accordance with the terms of such contract and orders of the Bankruptcy Court, subject to an agreement among the Debtors, the Creditors' Committee, and Ally to otherwise terminate such contract. Ally shall provide to the Plan Proponents a good-faith estimate of the Ally Contract Claims on or about August 15, 2013; and every month thereafter until the Effective Date, provided, for the avoidance of doubt, such estimate shall be non-binding on Ally and subject to change.  Except with respect to the Debtors' obligations in this Article IV.B, on and after the Effective Date the Debtors shall have no other obligations to the Ally Released Parties.  Nothing herein will be deemed an assumption of the Ally Contracts.

The consideration set forth above and the rights and obligations accorded elsewhere in this Plan to Ally shall constitute the compromise and settlement under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code in exchange for the consideration provided by Ally, and shall further constitute the Bankruptcy Court's finding that such consideration to Ally is: (1) in exchange for the good, valuable and substantial consideration from the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (3) a good faith settlement and compromise of the claims released under the Plan; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a hearing; (6) justified by truly unusual circumstances; (7) an essential component and critical to the success of the Plan; (8) resulting in distributions to the creditors that would otherwise have been unavailable; (9) the result of an identity of interest between the

Debtors and the Ally Released Parties regarding the Plan; and (10) a bar to the Debtors, the Liquidating Trust, in the case of the Debtor Releases, and any party asserting a claim or cause of action released against any of the Ally Released Parties in connection with the Third Party Release.

## C.   RMBS Settlement

Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the RMBS Settlement, on terms set forth herein. The Global Settlement constitutes a good faith compromise and settlement of all objections to the Original RMBS Settlement Agreements by the Creditors' Committee and Consenting Claimants, as applicable, and all such objections shall be deemed withdrawn with prejudice upon entry of the Confirmation Order.

1.   *Modification of Original RMBS Settlement Agreements*.   The Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein.

2.   *Allowance of RMBS Trust Claims and Distribution of Units to the RMBS Claims Trust for the benefit of the RMBS Trusts*.

(a)   Entry of the Confirmation Order shall constitute approval of the Allowed amount of the RMBS Trust Claims as non-subordinated Unsecured Claims, subject only to the Allowed Fee Claim, in the aggregate amounts of (i) $209.8 million against the GMACM Debtors; (ii) $7,091.2 million against the RFC Debtors; and (iii) $0 against the ResCap Debtors. On account of the Allowed RMBS Trust Claims, the RMBS Claims Trust shall receive (i) its Pro Rata Share of the GMACM Debtors Unit Distribution (the "GMACM Pool") and (ii) its Pro Rata Share of the RFC Debtors Unit Distribution (the "RFC Pool"), provided, however, 5.7% of the Allowed RMBS Trust Claims, including the Units to be distributed on account thereof (and any Distributable Cash thereon), shall be directly allocated to counsel for the Institutional Investors, without conveyance to the RMBS Claims Trust, the RMBS Trustees, or the RMBS Trusts, as the Allowed Fee Claim, in accordance with Article IV.C.6 of this Plan.

(b)   Notwithstanding anything to the contrary contained in the Plan, including but not limited to the approval of the Allowed amounts of the Claims held by RMBS Trust against the GMACM Debtors, the RFC Debtors and the ResCap Debtors described in the preceding paragraph,  the Units distributed to the RMBS Claims Trust shall be reallocated in accordance with Section 3 below.

3.   *RMBS Trust Allocation Protocol.* The Units distributed to the RMBS Claims Trust, pursuant to Article IV.C.2(a) shall be re-allocated between the GMACM Pool and the RFC Pool as provided in subparagraph (b) below, and subsequent distributions from the RMBS Claims Trust of such Units or Distributable Cash received from the Liquidating Trust as distributions on such Units, as so reallocated, shall be made to the RMBS Trusts pursuant to subparagraphs (c) and (d) below. In no event shall the provisions of this paragraph 3 entitle the RMBS Claims Trust to a distribution any more or any less than the Units described in Article IV.C.2(a), Article III or other applicable provisions of the Plan.

(a)     *Recognized RMBS Trust Claims.*

(i)     **Recognized Cure Claims**. For each RMBS Trust whose Servicing Agreement was assumed by the applicable Debtor, the Recognized cure claims for servicing damages against any of the GMACM Debtors are listed on Schedule 1-G (the "GMACM Recognized Cure Claims") and the Recognized Cure Claims for Servicing Damages against any of the RFC Debtors are listed on Schedule 1-R (the "RFC Recognized Cure Claims", together with the GMACM Recognized Cure Claims, the "Recognized Cure Claims").  The Recognized Cure Claims do not include servicing damage claims arising under any Servicing Agreement that was not assumed by the applicable Debtor, for any reason, including the following: (a) prior to the Petition Date, the applicable Debtors transferred all of  its servicing obligations for the RMBS Trust to a non-Debtor servicer; (b) prior to the Petition Date, the applicable Debtor ceased servicing all mortgage loans in the RMBS Trust, either because the RMBS Trust was wound up or otherwise; or (c) after the Petition Date, the applicable Debtor chose not to assume the Servicing Agreement.

(ii)     **Recognized R+W Claims**

(1)     *Recognized Original R+W Claims.*  For each of the Original Settling RMBS Trusts, the Recognized R+W Claims against GMACM are listed on Schedule 2-G (the "GMACM Recognized Original R+W Claims") and the Recognized R+W claims against RFC are listed on Schedule 2-R (the "RFC Recognized Original R+W Claims," together with the GMACM Recognized Original R+W Claims, the "Recognized Original R+W Claims").

(2)     *Recognized Additional R+W Claims.*  For each of the Additional Settling Trusts, the Recognized R+W Claims against GMACM are listed on Schedule 3-G (the "GMACM Recognized Additional R+W Claims") and the Recognized R+W Claims against RFC are listed on Schedule 3-R (the "RFC Recognized Additional R+W Claims," together with the GMACM Recognized Additional R+W Claims, the "Recognized Additional R+W Claims").

(iii)     **Recognized Unsecured Servicing Claims**. For each RMBS Trust whose Servicing Agreement was not assumed by the applicable Debtor, the Recognized Unsecured Claims for servicing damages against GMACM are listed on Schedule 4-G (the "GMACM Recognized Unsecured Servicing Claims"), and the Recognized Unsecured Claims for servicing damages against RFC are listed on Schedule 4-R (the "RFC Recognized Unsecured Servicing Claim,"

together with the GMACM Recognized Unsecured Servicing Claim, the "Recognized Unsecured Servicing Claims"). RMBS Trusts that are Insured RMBS Trusts do not have any Recognized Unsecured Servicing Claims.

(iv)    **Effect of Monoline Insurance on Recognized Claims.** If an RMBS Trust (i) is an Insured RMBS Trust and (ii) has made policy claims against its Monoline and, as of the Effective Date has received full payment of such claims, such RMBS Trust will not have any Recognized Claim, unless the Insured Exception applies. The Insured Exception is defined as an Insured RMBS Trust for which the sum of the net unreimbursed insurance payments, the accrued and unpaid losses, and projected future policy payments is zero or close to zero, as determined by Duff. If an RMBS Trust (i) is an Insured RMBS Trust and (ii) has made policy claims against its Monoline and, as of the Effective Date has not received full payment of such claims, the Recognized Claims of such RMBS Trusts are reduced to take into account the partial payments made by such Monoline, if any, on such claims, as determined by Duff.

(v)    **Necessity of a Timely Filed Proof of Claim**. An RMBS Trust will not have any Recognized Claim unless a Proof of Claims asserting an RMBS R+W Claim or an RMBS Cure Claim, as applicable, was timely filed for that RMBS Trust.

(b)    _Reallocation of Units from the RFC Pool to the GMACM Pool_. The number of Units distributed to the GMACM Pool and the RFC Pool is a function of the approval of the Allowed Amounts of the Unsecured Claims held by the RMBS Trusts against the Debtor Groups as provided in Article IV.C.3(a), but, as an integral part of the RMBS Settlement, the Units to be held in the GMACM Pool and the RFC Pool shall be determined on the amount of the GMACM Recognized Cure Claims, the RFC Recognized Cure Claims, the GMACM Recognized Original R+W Claims, the RFC Recognized Original R+W Claims, the GMACM Recognized Additional R+W Claims, the RFC Recognized Additional R+W Claims, the GMACM Recognized Servicing Claims and the RFC Recognized Servicing Claims. Based on calculations prepared by Duff (taking into account the allocation of the Allowed Fee Claim), 2,940,581 Units[2] (together with any cash distributions, if any, on such Units made prior to the reallocation of Units contemplated by this paragraph) shall be moved from the RFC Pool to the GMACM Pool.

(c)    _Allocations of Units in the GMACM Pool to RMBS Trusts with Recognized Claims against GMACM_. For purposes of allocations of Units held in the GMACM Pool to RMBS Trusts having Recognized Claims against GMACM, Duff shall calculate the aggregate value of each such RMBS Trust's Recognized Claims as of the Effective Date as follows: (i) GMACM Recognized Cure Claims shall be valued at 100% of the GMACM Recognized Cure Claims, if any, for such RMBS Trust shown on the applicable RMBS Trust Claims Schedules,

---

[2] Subject to adjustment based on further due diligence; any changes will be included in the Plan Supplement.

(ii) GMACM Recognized Original R+W Claims, GMACM Recognized Additional R+W Claims and GMACM Recognized Unsecured Servicing Claims of such RMBS Trust, if any, will be valued at 18.2%[3] of the GMACM Recognized Original R+W Claims, GMACM Recognized Additional R+W Claims, and GMACM Recognized Unsecured Servicing Claims shown on the applicable RMBS Trust Claims Schedules, and (iii) the values so calculated will be summed for each such RMBS Trust (the "GMACM Weighted Claim").  All distributions from the RMBS Claims Trust from the GMACM Pool to RMBS Trusts with Recognized Claims against GMACM will be based on the percentage that such RMBS Trust's GMACM Weighted Claim has to the total of all of the GMACM Weighted Claims.

(d)    *Allocations of Units in the RFC Pool to RMBS Trusts with Recognized Claims against RFC.*  For purposes of allocations of Units held in the RFC Pool to RMBS Trusts having Recognized Claims against RFC, Duff shall calculate the aggregate value of each such RMBS Trust's Recognized Claims as of the Effective Date as follows:  (i) RFC Recognized Cure Claims shall be valued at 100% of the RFC Recognized Cure Claims, if any, for such RMBS Trust shown on the applicable RMBS Trust Claims Schedules, (ii) RFC Recognized Original R+W Claims, RFC Recognized Additional R+W Claims and RFC Recognized Unsecured Servicing Claims of such RMBS Trust, if any, will be valued at 6.1%[4] of the RFC Recognized Original R+W Claims, RFC Recognized Additional R+W Claims, and RFC Recognized Unsecured Servicing Claims shown on the applicable RMBS Trust Claims Schedules, and (iii) the values so calculated will be summed for each such RMBS Trust (the "RFC Weighted Claim").  All distributions from the RMBS Claims Trust from the RFC Pool to RMBS Trusts with Recognized Claims against RFC will be based on the percentage that such RMBS Trust's RFC Weighted Claim has to the total of all of the RFC Weighted Claims.

(e)    *Distributions as Subsequent Recoveries.*  All distributions from the GMACM Pool or the RFC Pool on account of any Recognized RMBS Claim shall be treated as "Subsequent Recoveries," as that term is defined in the applicable governing agreement for that RMBS Trust; *provided that* if the governing agreement for a particular RMBS Trust does not include the term "Subsequent Recovery," the distribution resulting from any Recognized Claim shall be distributed as though it was unscheduled principal available for distribution on that distribution date; *provided, however*, that should the Bankruptcy Court determine that a different treatment is required to conform the distributions to the requirements of the governing agreements, that determination shall govern and shall not constitute a material change to this Plan.  Notwithstanding the forgoing or anything to the contrary in any governing agreement, no distributions from the GMACM Pool or the RFC Pool will be paid over to any Monoline.

4.    *Monoline Reservation.*  Each Insured RMBS Trust shall retain the ability to enforce its rights, in the Bankruptcy Court or otherwise, against any Monoline (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of that RMBS Trust.

---

[3] Subject to adjustment based on further due diligence; any changes will be included in the Plan Supplement.

[4] Subject to adjustment based on further due diligence; any changes will be included in the Plan Supplement.

5.      *RMBS Trustee Fees and Expenses*. In addition to distributions made on account of RMBS Trust Claims, the RMBS Trustees will be paid in full in Cash on the Effective Date for their reasonable pre- and post-petition fees and expenses, pursuant to the provisions of and subject to the procedures set forth in the *Final Supplemental Order (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* [Docket No. 774], and the *Order under 11 U.S.C. §§ 105, 363, and 365, and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* [Docket No. 2246], which provisions and procedures will also apply to HSBC.  The RMBS Trustees may be reimbursed for their reasonable fees and expenses associated with making distributions and taking other actions required under the Plan following the Effective Date in accordance with the provisions of the applicable pooling and servicing agreements, including but not limited to pooling and servicing agreements assumed by the Debtors and assigned to the purchaser/assignee of same.

6.      *Allowed Fee Claim*. The Plan Supplement sets forth the stipulated amounts of the Allowed Fee Claim. On the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall distribute Units on account of the Allowed Fee Claim to counsel for the Institutional Investors.  For the avoidance of doubt, the amount of the Allowed Fee Claim shall reduce the total Units (and Cash distributed thereon) by the Liquidating Trust on account of RMBS Trust Claims to the RMBS Claims Trust, and shall have no impact on any other party entitled to a distribution under this Plan. The Allowed Fee Claim payable to counsel for the Institutional Investors may be reduced to separate claim stipulations for the convenience of the parties subject to the terms of the Plan.

7.      *Affirmative Findings*. The Confirmation Order shall include affirmative findings that the Plan, including the RMBS Settlement and the FGIC Settlement Agreement, is in the best interests of Investors, that the RMBS Trustees acted in good faith and in the best interests of the Investors in entering into the Plan Support Agreement and performing their obligations thereunder, including voting for the Plan, *provided, however*, the Confirmation Order shall provide that such findings shall be binding solely in connection with the RMBS Trustees, the RMBS Trusts and the Investors in the RMBS of such RMBS Trusts and the actions of the RMBS Trusts and the RMBS Trustees with respect to the Plan Support Agreement and the Plan, including the RMBS Settlement, and the FGIC Settlement Agreement.

8.      *Continuation of Governing Agreements*.  Except with respect to the Debtors and the Liquidating Trust, all agreements, indentures, pooling and servicing agreements and other documents governing the RMBS Trusts shall remain in full force and effect in accordance with their terms and conditions, except (i) to the extent modified by consent in connection with any assumption and assignment thereof or (ii) as specifically provided in Article IV.C.3.e above.

**D.      Settlement of Monoline Claims.**

1.      *MBIA Settlement.* Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the Allowed non-subordinated General Unsecured Claims held by MBIA in the amount of $719 million against the ResCap Debtors, $1,450 million against the GMACM Debtors, and $1,450 million against the RFC Debtors.  On account of such Allowed General Unsecured Claims, MBIA shall receive (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, and (iii) its Pro Rata Share of the ResCap Debtors Unit Distribution, as applicable.

2.      *FGIC Settlement.* As a condition precedent to Plan Consummation, the Bankruptcy Court and the FGIC Rehabilitation Court each shall have approved, by no later than August 19, 2013, the FGIC Settlement Agreement, which governs the amount and priority of the General Unsecured Claims held by FGIC.  Entry of an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit D (or such other form as agreed to by FGIC, the Debtors, the RMBS Trustees, and counsel for the Institutional Investors), pursuant to Bankruptcy Rule 9019, shall constitute approval, among other things, of the minimum Allowed non-subordinated General Unsecured  Claim amounts as set forth therein.   Entry of the Confirmation Order pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of  Allowed non-subordinated General Unsecured Claims held by FGIC in the amount of $337.5 million against the ResCap Debtors, $181.5 million against the GMACM Debtors, and $415.0 million against the RFC Debtors, as implemented by the Plan.  On account of such Allowed General Unsecured Claims, FGIC shall receive (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, and (iii) its Pro Rata Share of the ResCap Debtors Unit Distribution, as applicable.

**E.      Private Securities Claims Trust**

The Private Securities Claims Trust shall be established for the sole benefit of the holders of Allowed Private Securities Claims, and shall be funded on the Effective Date with the Private Securities Claims Trust Unit Distribution. The Private Securities Claims Trust shall be administered by the Private Securities Claims Trustee, who shall distribute the Allowed Private Securities Claims Trust Unit Distribution to holders of Allowed Private Securities Claims in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

1.      *Private Securities Claims Trust Agreement.* On or before the Effective Date, the Private Securities Claims Trust Agreement, in a form reasonably acceptable to the Plan Proponents, Ally and the Settling Private Securities Claimants, each in their individual capacity, shall be executed, and all other necessary steps shall be taken to establish the Private Securities Claims Trust and the interests therein, which shall be for the benefit of the holders of Allowed Private Securities Claims.

2.      *Purpose of the Private Securities Claims Trust.* The Private Securities Claims Trust shall be established to, among other things, (i) direct the processing, liquidation and

payment of the Allowed Private Securities Claims in accordance with the Plan, and (ii) preserve, hold, and manage the assets of the Private Securities Claims Trust for use in paying and satisfying Allowed Private Securities Claims. The Private Securities Claims Trust Agreement shall include, among other things: (i) the terms, methodology, criteria, and procedures for distributing the Cash distributed by the Liquidating Trust in respect of the Units held by the Private Securities Claims Trust to holders of Allowed Private Securities Claims, and (ii) the establishment of appropriate disputed claims reserves.

3.     _Private Securities Claimants to Receive Distributions from Private Securities Claims Trust_.   In consideration of the Private Securities Claims Trust Unit Distribution transferred to the Private Securities Claims Trust and in furtherance of the purposes of the Private Securities Claims Trust and the Plan, the Private Securities Claimants shall agree to forego any other recovery from the Debtors or the Liquidating Trust in respect of the Private Securities Claims, and neither the Debtors, Ally, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor.  Private Securities Claimants instead shall be entitled to receive their allocated share of the Cash available for distribution from the Private Securities Claims Trust in respect of the Private Securities Claims Trust Assets as their sole source of recovery in respect of the Private Securities Claims.

4.     _Administration of the Private Securities Claims Trust_.   The Private Securities Claims Trust shall be administered by the Private Securities Claims Trustee.  For the avoidance of doubt, upon the Effective Date, the Private Securities Claims Trust shall be completely independent of the Liquidating Trust and the Liquidating Trust shall have no authority over the Private Securities Claims Trust.   One or more candidates for the Private Securities Claims Trustee shall be recommended on or before the Effective Date by the Settling Private Securities Claimants, in each of their individual capacities, and the Private Securities Claims Trustee will be designated with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.

5.     _Distributions from the Private Securities Claims Trust_.   The Cash distributions received by the Private Securities Claims Trust in respect of the Units that it holds shall be distributed to holders of Allowed Private Securities Claims in accordance with the methodology, criteria and procedures established in the Private Securities Claims Trust Agreement.

6.     _Settlement of Allowed Claims of Settling Private Securities Claimants_. Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the settlement of the Allowed Claim amounts for voting purposes of each of the Settling Private Securities Claimants as follows: AIG shall have an allowed claim of $1.168 billion for voting purposes, Allstate shall have an allowed claim of $140 million for voting purposes, MassMutual shall have an allowed claim of $218 million for voting purposes, and Prudential shall have an allowed claim of $227 million for voting purposes.  The Settling Private Securities Claimants shall also have settled claim amounts against the Private Securities Claims Trust for distribution purposes, which amounts shall be set forth in the Private Securities Claims Trust Agreement.

7.     _Costs and Expenses of Private Securities Claims Trust_.   The reasonable costs and expenses of administering the Private Securities Claims Trust, including the reasonable fees and

expenses of the Private Securities Claims Trustee and its retained professionals, shall be funded on the Effective Date as agreed to by the Plan Proponents and Consenting Claimants.

8.       *Retention of Professionals by Private Securities Claims Trustee*. The Private Securities Claims Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Private Securities Claims Trustee on such terms as the Private Securities Claims Trustee deems appropriate without Bankruptcy Court approval, but subject to the terms and conditions provided for in the Private Securities Claims Trust Agreement.  The Private Securities Claims Trustee may retain professionals who represented parties in the Chapter 11 Cases, provided such retention is otherwise permissible under applicable law.

9.       *Indemnification of the Private Securities Claims Trustee*.  The Private Securities Claims Trustee and its agents or professionals shall not be liable for any actions taken or omitted in its capacity as, or on behalf of, the Private Securities Claims Trustee or the Private Securities Claims Trust, except those acts arising out of its own willful misconduct, gross negligence, or bad faith, and each shall be entitled to indemnification or reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Private Securities Claims Trustee except for any and all actions or inactions involving willful misconduct, gross negligence, or bad faith.  Any indemnification claim of the Private Securities Claims Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the assets of the Private Securities Claims Trust and no recourse may be had to the Liquidating Trust, Ally, or the Debtors' Estates.  The Private Securities Claims Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

## F.    Borrower Claims Trust

The Borrower Claims Trust shall be established for the sole benefit of the holders of Allowed Borrower Claims, and shall consist of the Borrower Claims Trust Assets. The Borrower Claims Trust shall be administered by the Borrower Claims Trustee, subject to oversight and supervision by the Borrower Claims Trust Committee, who shall administer and distribute the Borrower Claims Trust Assets to holders of Allowed Borrower Claims in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.  The Borrower Claims Trust shall be completely independent of the Liquidating Trust and the Liquidating Trustee shall have no authority over the Borrower Claim Trust or the Borrower Claims Trustee.

1.       *Borrower Claims Trust Agreement*. On or before the Effective Date, the Borrower Claims Trust Agreement, in a form reasonably acceptable to the Plan Proponents, Ally and the Kessler Class Claimants, shall be executed, and all other necessary steps shall be taken to establish the Borrower Claims Trust and the interests therein, which shall be for the benefit of the holders of Allowed Borrower Claims.  In the event of any conflict between the terms of the Plan with respect to the Borrower Claims Trust and the terms of the Borrower Claims Trust Agreement, the Borrower Claims Trust Agreement shall govern.  The Borrower Claims Trust Agreement includes: (i) participation and qualification criteria for holders of Borrower Claims to receive a distribution from the Borrower Claims Trust Assets, (ii) procedures for the prosecution and settlement of objections to Borrower Claims, including those previously filed by the Debtors or any other party, (iii) the establishment of reserves for Disputed Borrower Claims; and (iv) the

establishment of procedures to resolve Disputed Borrower Claims, inclusive of any counterclaims or offsets in favor of the Debtors.

2.      *Purpose of the Borrower Claims Trust.*  The Borrower Claims Trust shall be established to, among other things, (i) direct the processing, liquidation and payment of the Allowed Borrower Claims in accordance with the Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserve, hold, and manage the assets of the Borrower Claims Trust for use in satisfying Allowed Borrower Claims.

3.      *Assumption of Certain Liabilities by the Borrower Claims Trust*.  In consideration of the Borrower Claims Trust Assets transferred to the Borrower Claims Trust and in furtherance of the purposes of the Borrower Claims Trust and the Plan, the Borrower Claims Trust shall assume all liability for all Borrower Claims, and neither the Debtors, the Released Parties, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor.

4.      *Borrower Claims Trust Assets*.  The Borrower Claims Trust shall consist of the Borrower Claims Trust Assets and any other assets held from time to time incidental to the administration of the Borrower Claims Trust.  On the Effective Date, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the Borrower Claims Trust with the Cash portion of the Borrower Claims Trust Assets free and clear of all Liens, Claims, and encumbrances, except to the extent otherwise provided herein.

5.      *Administration of the Borrower Claims Trust*.  The Borrower Claims Trust shall be administered by the Borrower Claims Trustee subject to the supervision and oversight of the Borrower Claims Trust Committee.  The Borrower Claims Trustee will be designated by counsel for the Kessler Class Claimants with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.

6.      *Distributions from the Borrower Claims Trust*.  It is the intention that distributions made from the Borrower Claims Trust on account of an Allowed Borrower Claim will be comparable to the recovery that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim, based on the value of the assets in the Liquidating Trust available for distribution to holders of Units as of the Effective Date (without in each case giving effect to any insurance proceeds, including proceeds from the GM Policies, that may be received in respect of certain of the Allowed Borrower Claims or to the time delay in receipt of distributions in respect of the Units issued by the Liquidating Trust).  For the avoidance of doubt, the comparable recovery percentages that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim shall be established once and finally and for all  purposes, including for all future distributions by the Borrower Claims Trust, at the time of and in connection with the Borrower Trust True-Up and confirmation of the Plan, and neither the amount to be transferred to the Borrower Claims Trust nor the percentage distributions from the Borrower Claims Trust shall be adjusted following the Effective Date based on actual experience with respect to recoveries from the Liquidating Trust following the Effective Date of the Plan.

Except as otherwise provided herein or in the Kessler Settlement Agreement, to the extent a Borrower recovers insurance proceeds on account of all or some of an Allowed Borrower Claim, (i) if distributions on account of such Allowed Borrower Claim have not been made, the amount of such Allowed Borrower Claim shall be reduced to the extent paid by insurance proceeds, or (ii) if distributions on account of such Allowed Borrower Claim have been made, the Borrower shall be required to return an amount equal to all distributions received by the Borrower from the Borrower Claims Trust on account of such Allowed Borrower Claim multiplied by a fraction, the numerator of which is the amount of the insurance proceeds received and the denominator of which is the amount of its Allowed Borrower Claim. Such Borrower shall thereafter continue to be entitled to its proportionate share of any future distribution from the Borrower Claims Trust. For the avoidance of doubt, the Kessler Settlement Class shall continue to be entitled to its proportionate share of any such future distribution. Any Borrower who recovers insurance proceeds on account of all or some of an Allowed Borrower Claim shall be required to notify the Borrower Claims Trustee of such recovery within ten (10) Business Days of receipt.

If any Borrower Claim constitutes, in whole or in part, a Consent Order Borrower Claim, the Allowed amount of such Borrower Claim shall be reduced to the extent paid pursuant to the Consent Order or any settlement of the Debtors' obligations thereunder, without further order of the Bankruptcy Court.

7. _U.S. Federal Income Tax Treatment of Borrower Claims Trust_. All parties (including, without limitation, the Debtors, the Borrower Claims Trustee, and the holders of Borrower Claims) shall treat the Borrower Claims Trust as a "qualified settlement fund" within the meaning of 468B of the Tax Code and the Treasury Regulations thereunder.

8. _Dissolution of the Borrower Claims Trust_. The Borrower Claims Trustee and the Borrower Claims Trust shall be discharged or dissolved, as applicable, at such time as (i) all Borrower Claims have been resolved by Final Order, written agreement, or pursuant to the Plan, and (ii) all distributions to be made by the Borrower Claims Trustee under the Plan and the Borrower Claims Trust Agreement have been made. Any Cash or other remaining assets in the Borrower Claims Trust shall be transferred to the Liquidating Trust upon dissolution of the Borrower Claims Trust.

9. _Costs and Expenses of Borrower Claims Trust_. The reasonable costs and expenses of administering the Borrower Claims Trust, including the reasonable fees and expenses of the Borrower Claims Trustee and its retained professionals, shall be funded on the Effective Date as agreed to by the Plan Proponents and Consenting Claimants. Such costs shall not include fees and expenses incurred by the Kessler Class Claimants pursuit of GM Insurance Rights.

10. _Retention of Professionals by Borrower Claims Trustee_. The Borrower Claims Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Borrower Claims Trustee on such terms as the Borrower Claims Trustee deem appropriate without Bankruptcy Court approval, but subject to the terms and conditions provided for in the Borrower Claims Trust Agreement. The Borrower Claims Trustee may retain

professionals who represented parties in the Chapter 11 Cases, provided such retention is otherwise permissible under applicable law.

11.    *Indemnification of the Borrower Claims Trustee and the Borrower Claims Trust Committee*.    The Borrower Claims Trustee and members of the Borrower Claims Trust Committee and their agents or professionals shall not be liable for any actions taken or omitted in its capacity as, or on behalf of, the Borrower Claims Trustee or the Borrower Claims Trust, except those acts arising out of its or their own willful misconduct, gross negligence, or bad faith, and each shall be entitled to indemnification or reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Borrower Claims Trust except for an action or inactions involving willful misconduct, gross negligence, or bad faith.    Any indemnification claim of the Borrower Claims Trustee and the Borrower Claims Trust Committee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Borrower Claims Trust Assets and no recourse may be had to the Liquidating Trust, the Released Parties or any creditor in these Chapter 11 Cases. The Borrower Claims Trustee and the members of the Borrower Claims Trust Committee shall be entitled to rely, in good faith, on the advice of its retained professionals.

12.    *Borrower Claims Trustee as Estate Representative under 1123(b)(3)(B)*.    The Borrower Claims Trustee is hereby appointed as the representative of the estate with respect to Borrower-Related Causes of Action pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

## G.    Settlement of Claims of Kessler Class Claimants

1.    *Settlement of Allowed Amount of Kessler Class Claims*.    As provided in the Kessler Settlement Agreement**,** as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan and subject to the entry of the Kessler Settlement Approval Orders, the Kessler Settlement Class shall receive the Allowed Kessler Claim against the RFC Debtors.    The sole source of recovery of the Allowed Kessler Claim shall be distributions from the Borrower Claims Trust and the GM Insurance Rights, and not from any other assets or property of the Released Parties, the Liquidating Trust, or the Private Securities Claims Trust.

2.    *Transfer of GM Insurance Rights*. Subject to entry of the Kessler Settlement Approval Orders, on the Effective Date, the Debtors shall convey, transfer, and assign the GM Insurance Rights under the GM Policies in accordance with the Kessler Settlement Agreement and the Kessler Settlement Approval Orders, to (i) the Kessler Settlement Class with respect to indemnity for the Allowed Kessler Claim, and (ii) except to the extent that any such GM Insurance Rights have been transferred by the Debtors to other creditors on or before the Effective Date, the Liquidating Trust with respect to any other GM Insurance Rights.    For the avoidance of doubt, the (i) rights of the Kessler Settlement Class in and to the GM Insurance Rights and proceeds thereof, and (ii) the rights of any other creditor who has received from the Debtors an assignment of GM Insurance Rights prior to the Effective Date, shall not be transferred to the Liquidating Trust and shall not constitute Available Assets.

3.    *Discovery of Additional Insurance Policies*. Subject to the entry of the Kessler Settlement Approval Orders, if, after the Effective Date, the Liquidating Trust discovers any

additional insurance policies under which any of the Debtors are an insured and that provide coverage for the Debtors' liability to the Kessler Settlement Class, then the Liquidating Trust will assign to the Kessler Settlement Class the insurance rights under such policies with respect to the liability of the Debtors to the Kessler Settlement Class.

## H.    NJ Carpenters Claims Settlement

The NJ Carpenters Settlement, which is subject to the NJ Carpenters Approval, contemplates the payment of the NJ Carpenters Claims Distribution in settlement of the NJ Carpenters Claims, which amount shall be the sole source of recovery available in respect of the NJ Carpenters Claims. If the NJ Carpenters Approval occurs, the NJ Carpenters Class Members shall be entitled to the NJ Carpenters Claims Distribution. The NJ Carpenters Class Opt-Outs shall not receive any portion of the NJ Carpenters Claims Distributions and shall receive no consideration under the Plan other than in respect of their Allowed Claims against the Estates, which Claims shall be classified as General Unsecured Claims and may be subject to subordination. The reasonable costs of class notice and administration shall be advanced by the Debtors prior to the Effective Date in accordance with applicable orders of the Bankruptcy Court and District Court, which costs will be deducted from the NJ Carpenters Claims Distribution. Absent the NJ Carpenters Approval, the NJ Carpenters Class Members will not receive any portion of the NJ Carpenters Claims Distribution, and, to the extent any NJ Carpenters Class Members hold Allowed Claims, such Claims shall be classified as General Unsecured Claims, which claims may be subject to subordination.

## I.    Senior Unsecured Notes Settlement

The Plan shall constitute a good faith compromise and settlement of claims that the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, has against the Ally Released Parties and any Debtor, both as described in the Disclosure Statement. Distributions to the Senior Unsecured Noteholders shall be carried out consistent with Article VIII.F.1 of the Plan.

## J.    Adjustment Mechanism

The allocation of Units issuable pursuant to the Plan shall be determined in accordance with the following adjustment mechanism. A determination shall be made as of the Initial Unit Issuance Record Date of the estimated amount of the Disputed Unsecured Claims against each of the Debtor Groups, in accordance with the provisions of Article VIII.D. Thereupon, the Unit Issuance Percentages shall be adjusted such that all holders of Allowed Unsecured Claims and the Private Securities Claims Trust shall share proportionately in the accretion or dilution of recoveries as a result of variances in the Allowed amounts of Unsecured Claims from the amounts set forth in the Disclosure Statement; and shall be further adjusted through an iterative mathematical process such that all holders of Allowed Unsecured Claims against a Debtor Group receive Units in the same ratio of number of Units to Allowed amount of Claim. For the purposes of this paragraph, "proportionately" means in proportion to the recovery of the holders of Unsecured Claims in the amounts set forth in the Disclosure Statement.

70

The Debtor Group Unit Distributions shall be determined based on the respective Unit Issuance Percentages, after adjustment, and shall include, with respect to each Debtor Group, the Units to be issued to holders of Allowed Unsecured Claims against that Debtor Group as of the Initial Unit Distribution Record Date and the Units to be issued to the Disputed Claims Reserve with respect to that Debtor Group.

**K.      Cancellation of Securities, Indentures, and Other Documents Evidencing Claims and Equity Interests**

Subject to the assumption of Executory Contracts and Unexpired Leases as set forth in the Plan, and except for purposes of evidencing a right to distributions under the Plan, on the Effective Date, all notes, stock, instruments, certificates, indentures, guarantees, and other documents or agreements evidencing a Claim against or Equity Interest in the Debtors will be deemed automatically cancelled with respect to the Debtors and shall be of no further force or effect as against the Debtors, whether such document is surrendered for cancellation or not, and the obligations of Ally, the Debtors, or the Liquidating Trust, thereunder or in any way related thereto will be discharged.

Notwithstanding anything to the contrary herein, the Senior Unsecured Notes Indenture will continue in effect for the limited purposes set forth in the Senior Unsecured Notes Indenture including (i) allowing the Senior Unsecured Noteholders to receive distributions on account of their Senior Unsecured Notes Claims, and (ii) allowing the Senior Unsecured Notes Indenture Trustee to make distributions in accordance with the terms of the Plan, to fund the Senior Unsecured Notes Indenture Trustee Reserve, and to exercise its Senior Unsecured Notes Indenture Trustee Charging Lien against distributions under the Plan and against the Senior Unsecured Notes Indenture Trustee Reserve for payment of Senior Unsecured Notes Indenture Trustee Fees and Expenses.

**L.      Treatment of Intercreditor Agreement**

Nothing contained herein shall affect the enforceability of the Intercreditor Agreement in accordance with, and subject to, the terms thereof and any applicable law, and all rights and obligations, if any, of the parties to the Intercreditor Agreement thereunder, or in connection therewith, are preserved until such time that the Confirmation Order becomes a Final Order.

**M.      Compensation Order**

Notwithstanding anything herein to the contrary, following the Effective Date, Ally and the Liquidating Trust shall continue to comply with their respective obligations under the Compensation Order.

**N.      Corporate Action**

Except as otherwise provided in the Plan, the corporate or related actions to be taken by or required of the Debtors in connection with each matter provided for by the Plan shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date,

ratified in all respects without any requirement of further action by holders of Claims or Equity Interests, directors of the Debtors, or any other Entity. On or prior to the Effective Date, the appropriate officers of the Debtors shall be authorized and directed to issue, execute, and deliver the agreements, securities, instruments, or other documents contemplated by the Plan, or necessary or desirable to effect the transactions contemplated by the Plan, in the name of and on behalf of the Debtors, prior to the Effective Date, or the Liquidating Trust, following the Effective Date. Notwithstanding any requirements under nonbankruptcy law, the authorizations and approvals contemplated by this provision shall be effective.

On the Effective Date, upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date as the case may be, will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases. Upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases, except to the extent such authority, duties, responsibilities, and obligations are to be undertaken by the Private Securities Claims Trustee, the RMBS Claims Trust Trustees, the Borrower Claims Trustee, or, with respect to the NJ Carpenters Claims Distribution, in each case as provided in the Plan.

**O.    Dissolution of the Debtors**

On and after the Effective Date, the Liquidating Trust Board shall be authorized, in its sole and absolute discretion, to take all actions reasonably necessary to manage or dissolve the Debtors and their subsidiaries, including the Non-Debtor Subsidiaries, under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, notwithstanding any applicable consent requirements or other restrictions contained in any financing agreements or other debt documents to which any Debtor is a party, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation. The Liquidating Trust Board shall have no liability for using its discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of this Plan from and after the Effective Date except as specifically provided otherwise in the Plan. Notwithstanding the foregoing, the Liquidating Trust Board shall not dissolve any Debtor to the extent such Debtor is required to hold Available Assets after the Effective Date pursuant to Article VI.C of the Plan, and any such Debtors shall be authorized to take such actions at the direction of the Liquidating Trust Board as may be necessary to implement the provisions of the Plan with respect to such Available Assets.

Upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases and, upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases.

**P.      Effectuating Documents; Further Transactions**

On the Effective Date, the Liquidating Trust Board will be authorized to take any actions or effect transactions, including conversions, dissolutions, transfers, liquidations, or other corporate transactions, as may be determined by the Liquidating Trust Board to be necessary or appropriate to implement to terms of the Plan. After the Effective Date, the Liquidating Trust Board may utilize the aforementioned authority without any further notice to or action, order or approval of the Bankruptcy Court.

On and after the Effective Date, the Liquidating Trust Board, directly or acting through the Liquidating Trust Management, is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Plan Proponents, without the need for any approvals, authorization, or consents, except for those expressly required by the Plan.

**Q.      Exemption from Certain Taxes and Fees**

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant to the Plan shall not be subject to any stamp, real estate transfer, mortgage reporting, sales, use tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

**R.      Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including pursuant to the Plan Support Agreement), or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Borrower Claims Trust with respect to Borrower-Related Causes of Action, and the Liquidating Trust with respect to all other Causes of Action, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Debtors' Estates, whether arising before or after the Petition Date, including any Causes of Action specifically enumerated in the Plan Supplement, and the Liquidating Trust's and Borrower Claims Trust's respective rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Liquidating Trust and the Borrower Claims Trust may pursue their respective Causes of Action, as appropriate, in accordance with the best interests of the respective Trust. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Liquidating Trust or Borrower Claims Trust, as the case may be, will not pursue any and all available Causes of Action against such Entity. The Liquidating Trust and the Borrower Claims Trust expressly reserve all rights to**

**prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Liquidating Trust expressly reserves all Causes of Action other than Borrower-Related Causes of Action, and the Borrower Claims Trust expressly reserves all Borrower-Related Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, the Plan does not release any Causes of Action that the Plan Proponents or the Liquidating Trust or Borrower Claims Trust have or may have now or in the future against any Entity other than the Released Parties.

Except as otherwise provided in the Plan or in a Final Order, the Liquidating Trust reserves and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity that is not released under the Plan or a separate settlement approved by Final Order shall vest in the Borrower Claims Trust with respect to Borrower-Related Causes of Action and in the Liquidating Trust with respect to all other Causes of Action. The Liquidating Trust and Borrower Claims Trust, as the case may be, through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action other than Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.  The Borrower Claims Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

<div align="center">

**ARTICLE V.**

**TREATMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES**

</div>

**A.    Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date;

(iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms herein.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, including any Executory Contracts or Unexpired Leases rejected or deemed rejected under the Plan, must be Filed in accordance with the procedures set forth in the Bar Date Order by the Rejection Damages Claim Bar Date or such Claims will be automatically disallowed, forever barred from assertion, and shall be unenforceable against the Debtors, the Liquidating Trust, or their assets or properties without the need for any objection by the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims against the applicable Debtor Groups and treated in accordance with the terms of Article III. The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the Claims Objection Deadline.

## B.    Assumption of Executory Contracts and Unexpired Leases

The Debtors will file the Assumption Schedule with the Bankruptcy Court at least twenty-one (21) days before the commencement of the Confirmation Hearing.  The Assumption Schedule will include (a) the name of the non-Debtor counterparty, (b) the legal description of the Executory Contract or Unexpired Lease to be assumed, and (c) the proposed amount to be paid on account of an associated Cure Claim, if any.  On or as soon as practicable thereafter, the Debtors will serve a notice of filing of the Assumption Schedule upon each non-Debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption of their respective Executory Contract or Unexpired Lease or the proposed Cure Claim amount, and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.  Objections, if any, to the proposed assumption and/or Cure Claim must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors no later than [●].  Any non-Debtor counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or Cure Claim amount.

If an objection to the proposed Cure Claim is sustained by the Bankruptcy Court, the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it on proper notice to the non-Debtor counterparty thereto, which non-Debtor counterparties shall then be entitled to file Proofs of Claim asserting Claims arising from the rejection thereof, if applicable, in accordance with the terms of the Plan and the Bar Date Order.

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, may settle any dispute on the amount of a Cure Claim without further notice to any party or action, approval, or order of the Bankruptcy Court.  If the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective

Date, object to any request for payment of a Cure Claim, the Bankruptcy Court shall determine the Allowed amount of such Cure Claim and any related issues. Unless the parties to the Executory Contract or Unexpired Lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later of (i) ten days after entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto and (ii) the Effective Date. The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty days after a Final Order determining a Cure Claim greater than that proposed by the Debtors.

**ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTORS OR THE LIQUIDATING TRUST ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's Schedules, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease capable of assumption, that any Debtor has any liability thereunder or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Plan Proponents expressly may (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject an Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

The assumption of Executory Contracts and Unexpired Leases under the Plan shall include the vesting of such contracts in the Liquidating Trust. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and vesting.

In the event a written objection is filed with the Bankruptcy Court as to whether a contract or lease is executory or unexpired, the right of the Plan Proponents to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired, in which case the deemed assumptions and rejections provided for in the Plan shall not apply to such contract or lease.

**C.      Contracts and Leases Entered Into After the Petition Date**

Counterparties to contracts and leases entered into after the Petition Date by a Debtor, including any Executory Contract or Unexpired Lease assumed by a Debtor, must File a proof of claim for an Administrative Claim against the appropriate Debtor by the Administrative Claims Bar Date or have their rights with respect to such Administrative Claims forever waived and released; provided that this provision shall not apply to any Ally Contract Claims.

**D.      Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contract or Unexpired Lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a non-Debtor party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from non-Debtor parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall vest in the Liquidating Trust as of the Effective Date.

**E.      Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request, pursuant to Bankruptcy Code section 365(d)(4), to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases.

**F.      No Change in Control**

The consummation of the Plan or the assumption of any Executory Contract or Unexpired Lease is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

<div align="center">

**ARTICLE VI.**

**THE LIQUIDATING TRUST**

</div>

**A.      Generally**

The powers, authority, responsibilities, and duties of the Liquidating Trust, are set forth in and will be governed by the Liquidating Trust Agreement, the form of which shall be included in the Plan Supplement.  The Liquidating Trust shall be a representative of the Estates pursuant to section 1123(b)(3)(B).

**B.        Purpose of the Liquidating Trust**

The Liquidating Trust shall be established for the purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose described in this Plan and set forth in the Liquidating Trust Agreement. The Liquidating Trust, acting through the Liquidating Trust Board, Liquidating Trust Management, and their agents, shall wind down the affairs of the Debtors and perform the assumed obligations under the DOJ/AG Settlement, Consent Order, and Order of Assessment in accordance with the terms of the Plan.

**C.        Transfer of Assets to the Liquidating Trust**

On the Effective Date, the Debtors are authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating Trustee, for the benefit of the Liquidating Trust, in the form thereof existing on such date, all of the Debtors' and Estates' right, title and interest in and to the Available Assets free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons and Entities to the maximum extent contemplated by and permissible under section 1141 of the Bankruptcy Code.

Notwithstanding the foregoing, (i) if on the Effective Date, any of the Available Assets cannot be transferred to the Liquidating Trust for any reason, the Debtors shall continue to hold such Available Assets, as bailee for the account of the Liquidating Trust, until such time as the Liquidating Trust may receive such Available Assets (and any proceeds of such assets retained by the Debtors shall constitute Available Assets) and (ii) subject to the entry of the Kessler Settlement Approval Order, the GM Insurance Rights to be assigned to the Kessler Settlement Class or any other GM Insurance Rights that are assigned to any other Creditor pursuant to order of the Bankruptcy Court prior to or at Confirmation, shall be excluded from the Available Assets assigned to the Liquidating Trust.

The Debtors and the Liquidating Trust, as successor in interest to the Estates, may (i) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (ii) take, or cause to be taken, all such further action in order to evidence, vest, perfect or effectuate the transfer of the Available Assets to the Liquidating Trust and consummate transactions contemplated by and to otherwise carry out the intent of the Plan.  Upon the transfer of the Available Assets, the Liquidating Trust shall succeed to all of the Debtors' right, title and interest in the Available Assets, and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

**D.        Liquidating Trust Administrative Reserve**

The Liquidating Trust Administrative Reserve shall be established on the Effective Date for the purpose of maintaining Cash from time to time necessary, subject to the Liquidating Trust Budget, to satisfy reasonable costs and expenses of the Liquidating Trust and other obligations incurred or reasonably anticipated by the Liquidating Trust in accordance with the Plan Documents, including without limitation, fees and costs incurred in connection with (i)

the implementation of the Plan, including to the extent not paid on the Effective Date, funds for making the payments provided in Article VII.B.2 (ii) the liquidation of the Liquidating Trust Assets, (iii) the resolution of Disputed Claims, and other Causes of Action, (iv) the winding down of the Estate and affairs of the Debtors, (v) the costs of performing under the DOJ/AG Settlement, (vi) the reserves for potential liabilities and (vii) compensation for the Liquidating Trust Board, Liquidating Trust Management, and the employees, professionals, advisors and other agents of the Liquidating Trust.   Any Cash released from the Liquidating Trust Administrative Reserve shall be available for distribution to the Unitholders.

## E.    Liquidating Trust Governance

The affairs of the Liquidating Trust shall be managed by, or under the direction of, the Liquidating Trust Board, which shall consist of five (5) Liquidating Trustees, one of whom shall be selected by each of (i) MBIA, (ii) FGIC, (iii) the RMBS Trustees that are members of the Creditors' Committee, the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants, jointly, (iv) Paulson, and (v) the holders of Private Securities Claims, and such other Liquidating Trustees as agreed to by the Plan Proponents and the Consenting Claimants.  The Liquidating Trust Board shall be authorized and empowered to undertake, acting through the management and agents of the Liquidating Trust, actions on behalf of the Liquidating Trust, including without limitation (i) to hold, manage, dispose and convert to Cash, the Liquidating Trust Assets, (ii) to maintain the Liquidating Trust Administrative Reserve and the Disputed Claims Reserve, (iii) to appoint and supervise management and agents of the Trust and (iv) to prepare and review periodic financial reports of the Liquidating Trust.

The Liquidating Trust Board shall elect a Liquidating Trustee to act as the Chairman of the Liquidating Trust Board and may designate one or more committees of the Liquidating Trust Board.   The Liquidating Trust Board shall appoint officers or other representative agents of the Liquidating Trust, including a Liquidating Trust manager and a secretary to serve as the Liquidating Trust Management and carry out the purpose of the Liquidating Trust.  The Liquidating Trust Management shall be authorized to hire employees and engage advisors and other professionals, subject to any limitations imposed by the Liquidating Trust Board.

## F.    Financial Statements/Reporting

The Liquidating Trust will provide sufficient reporting and financial statements to the extent required to make Units freely tradable.

## G.    Tax Treatment

1.    *In General*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trust Board and the Unitholders) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as:

a) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Unitholders, other than Liquidating Trust Assets that will be distributed

79

pursuant to Article VII.B of the Plan or that are allocable to Disputed Claims (based on such Claims' Pro Rata Share of such Liquidating Trust Assets), followed by

b) the transfer by such Unitholders to the Liquidating Trust of such Liquidating Trust Assets in exchange for the Units.

Accordingly, those holders of Allowed Unsecured Claims receiving Units shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets that will be distributed pursuant to Article VII.B of the Plan or that are allocable to the Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

2.    *Tax Reporting.*

(a)    The Liquidating Trust shall file returns treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article VI.F.  The Liquidating Trust also shall annually send or otherwise make available to each holder of Units a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their U.S. federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income tax returns.  The Liquidating Trust Board also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit.

(b)    As soon as possible after the Effective Date, the Liquidating Trust shall make a good-faith valuation of the Liquidating Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the holders of Allowed Unsecured Claims, and the Unitholders) for all U.S. federal income tax purposes.

(c)    Allocation of Liquidating Trust taxable income and loss among the beneficiaries of the Liquidating Trust (other than taxable income and loss allocable to the Disputed Claims Reserve) shall be made Pro Rata to the holders of beneficial interests in the Liquidating Trust.

(d)    The Liquidating Trust shall (A) treat the Disputed Claims Reserve and Liquidating Trust Assets allocable thereto as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 by timely making an election and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

(e)    The Liquidating Trust shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including the Disputed Claims Reserve.  In the event, and to the extent, that any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any

subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts otherwise distributable as a result of the resolution of such Disputed Claims.

(f)    The Liquidating Trust may request an expedited determination of taxes of the Liquidating Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

**H.    Duration** The Liquidating Trust shall be dissolved as soon as practicable after the date that is the earliest to occur of: (i) the distribution of all Liquidating Trust Assets available for distribution pursuant to the Plan, (ii) the determination of the Liquidating Trust Board that the administration of the Liquidating Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all the distributions required to be made by the Liquidating Trust have been completed; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date, unless the Bankruptcy Court, upon motion within the six (6) months prior to the third (3rd) anniversary of the Effective Date, determines that a fixed-period extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets (without the need for a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the trust as a Liquidating Trust for United States federal income tax purposes).

**I.    Conflicting Terms** To the extent that the terms of the Plan with respect to the Liquidating Trust are inconsistent with the terms set forth in the Liquidating Trust Agreement, then the terms of the Liquidating Trust Agreement shall govern.

**J.    Exculpation; Indemnification; Insurance**

The Liquidating Trust Board, the Delaware Trustee, the Liquidating Trust Management and their respective affiliates, and their respective officers, directors, partners, members, managers and employees shall be indemnified to the fullest extent permitted by law by the Liquidating Trust against all liabilities arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of their duties with respect to the Liquidating Trust, except for those acts that are determined by Final Order to have arisen out of their own willful misconduct, gross negligence, or bad faith.

The Liquidating Trust will maintain customary insurance coverage for the protection of the Liquidating Trustees, the Delaware Trustee and the Liquidating Trust Management from and after the Effective Date.

## ARTICLE VII.

## PROVISIONS GOVERNING ISSUANCE OF UNITS AND OTHER DISTRIBUTIONS

### A.    Applicability

The provisions of this Article VII shall govern distributions to the extent not otherwise provided for in the Plan or in any indenture, trust agreement or plan of allocation recognized under the Plan.  To the extent the provisions of any such indenture, trust agreement or plan of allocation address specifically matters set forth in this Article VII, the provision of such indenture, trust agreement or plan of allocation shall govern.

### B.    Cash Distributions

1.    *Administrative, Priority, Secured and General Unsecured Convenience Claims*. On the Effective Date, the Liquidating Trust shall fund the Professional Fee Escrow Account. On or as soon as practicable after the Effective Date, the Liquidating Trust, in its capacity as Disbursing Agent, shall make Cash distributions to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Junior Secured Notes Claims, and General Unsecured Convenience Claims.

2.    *Borrower Claims Trust*.   On the Effective Date, the Debtors shall transfer the Borrower-Related Causes of Action to the Borrower Claims Trust. On or as soon as practicable after the Effective Date, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the Borrower Claims Trust with $57.6 million in Cash.  Distributions to holders of Borrower Claims will be made in accordance with methodology, criteria and procedures established in the Borrower Claims Trust Agreement.

3.    *NJ Carpenters Claims Settlement*. Assuming the NJ Carpenters Approval, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the NJ Carpenters Claims Distribution with Cash within ten (10) business days of the Effective Date. Distributions to holders of NJ Carpenters Claims will be made in accordance with the methodology, criteria and procedures established in the NJ Carpenters Plan of Allocation.

### C.    Initial Issuance of Units and Distributions in Respect of Units by the Liquidating Trust

On the Initial Unit Distribution Date, the Liquidating Trust shall issue Units to the RMBS Claims Trust, the Private Securities Claims Trust, the Disputed Claims Reserve, and the holders of GMACM Unsecured Claims, ResCap Unsecured Claims, and RFC Unsecured Claims, in each case, that are Allowed (except for the Disputed Claims Reserve) as of the Initial Unit Distribution Record Date, in accordance with the terms of the Plan, including the RMBS Trust Allocation Protocol.

Units shall entitle the holder thereof to receive a Pro Rata Unit Share of the distributions of Distributable Cash paid by the Liquidating Trust, when and as such distributions are made. Prior to making any distributions on the Units, the Liquidating Trust will (i) fund the

82

Professional Fee Escrow Account with the Professional Fee Reserve Amount, the Borrower Claims Trust with the Borrower Claims Trust Assets, and the NJ Carpenters Claims Distribution, and (ii) pay, or adequately reserve for the payment in full of, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Junior Secured Notes Claims, and General Unsecured Convenience Claims. Distributions on account of Disputed Claims shall be made in accordance with Article VIII.D. of the Plan.

Units will be issued in global certificate form only and registered to DTC, with interests in the certificate being held through DTC participants, for so long as the Units are eligible to be held through DTC. Holders of Allowed Claims must follow specified procedures to designate a direct or indirect DTC participant to receive its Units. The Units shall be freely negotiable and transferrable, subject to restrictions under applicable securities laws. The Units shall not be listed on any national security exchange or interdealer quotation system, and the Liquidating Trust shall not take any action to promote or facilitate a trading market in the Units.

On each Distribution Date, pursuant to the Liquidating Trust Agreement, the Liquidating Trust (i) shall distribute to each Unitholder, on account of its Units, an amount equal to its respective Pro Rata Unit Share of the Distributable Cash, and (ii) shall deposit into the Disputed Claims Reserve the Pro Rata Unit Share of the Distributable Cash allocable to the Units held in the Disputed Claims Reserve. The initial distribution of Distributable Cash to the Unitholders shall be made by the Liquidating Trust on an initial Distribution Date as soon as practicable after the Effective Date. Subsequent Distribution Dates shall be determined by the Liquidating Trust Board from time to time, but shall occur no less frequently than at intervals provided in the Liquidating Trust Agreement, provided that the Liquidating Trust shall not be required to make a distribution if the aggregate Distributable Cash at the time would make the distribution impracticable, as determined by the Liquidating Trust Board.

Holders of Units shall not be entitled to interest on Cash distributions made in respect of such Units, regardless of when such distributions are made.

### D.    Fractional Units

No fractional Units shall be issued or distributed under the Plan. The actual distribution of Units shall be rounded to the next higher or lower whole number as follows: (i) fractions less than one-half (½) shall be rounded to the next lower whole number and (ii) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number. The total amount of Units to be distributed hereunder shall be adjusted as necessary to account for such rounding. No consideration shall be provided in lieu of fractional Units that are rounded down.

### E.    Timing and Calculation of Amounts to be Distributed

### 1.    Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter, each holder of an Allowed Claim against the Debtors as of the Effective Date shall receive the full amount of the distributions that the Plan provides for

Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 2.    Distributions on Account of Claims Allowed After the Effective Date

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be resolved in accordance with the provisions set forth in Article VIII. Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### F.    Disbursing Agent

### 1.    Generally

All distributions under the Plan shall be made by the Liquidating Trust, as Disbursing Agent, or by such other Person designated by the Liquidating Trust to act as a Disbursing Agent.  Except as otherwise ordered by the Bankruptcy Court, a Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### 2.    Rights and Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, securities, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated by the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 3.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by a Person designated by the Liquidating Trust as Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Liquidating Trust from the Liquidating Trust Administrative Reserve.

**G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.    **Delivery of Distributions**

If a Creditor holds more than one Allowed Claim in any one Class, all Allowed Claims of the Creditor in a single Class will be aggregated into one Allowed Claim and one distribution will be made with respect to the aggregated Allowed Claim.

Distributions under the Plan to holders of Allowed Junior Secured Notes Claims shall be made to the Junior Secured Notes Indenture Trustee, in accordance with the practice and procedures of DTC to the extent applicable, for the benefit of the holders of Allowed Junior Secured Notes Claims, and shall be deemed completed when made to the Junior Secured Notes Indenture Trustee in accordance with such practice and procedures, as applicable.

Distributions under the Plan to Senior Unsecured Noteholders shall be made to the Senior Unsecured Notes Indenture Trustee for the benefit of the Senior Unsecured Noteholders and shall be deemed completed when made to the Senior Unsecured Notes Indenture Trustee.  On the Effective Date, and subject to the provisions in paragraph IV.J, the Senior Unsecured Notes, the Senior Unsecured Notes Indenture and all other related documents will be deemed cancelled except as set forth herein.  Notwithstanding the foregoing, the Senior Unsecured Notes may continue to trade until the Senior Unsecured Notes Indenture Trustee makes distributions of Units it has received to the Senior Unsecured Noteholders.  The Senior Unsecured Notes Indenture Trustee may (a) assert its rights under the Senior Unsecured Notes Indenture Trustee Charging Lien, including for the payment of any and all accrued Senior Unsecured Note Indenture Trustee Fees and Expenses and (b) establish the Senior Unsecured Notes Indenture Trustee Reserve on any distribution of Units or Cash.  The Senior Unsecured Notes Indenture Trustee may withhold distribution of the Units and any Cash it receives on account of such Units, until such time as it determines that it has received sufficient payment to satisfy the accrued Senior Unsecured Note Indenture Trustee Fees and Expenses and to fund the Senior Unsecured Notes Indenture Trustee Reserve.  At such time, the Senior Unsecured Notes Indenture Trustee shall distribute such Units and any remaining Cash it has received on account of such Units to the Registered Holders of the Senior Unsecured Notes, which distributions shall satisfy the Senior Unsecured Notes Indenture Trustee's obligations hereunder.  The Senior Notes Indenture Trustee shall be reimbursed by the Liquidating Trustee as a Disbursing Agent in accordance with this Plan.  Notwithstanding the foregoing, in the event that the Units are not registered with DTC, the Senior Unsecured Notes Indenture Trustee shall not bear any responsibility for the distribution of the Units to the  Senior Unsecured Noteholders and such distributions will be effected by the Disbursing Agent. Upon release by the Senior Unsecured Notes Indenture Trustee of any funds remaining in the Senior Unsecured Notes Indenture Trustee Reserve, such funds shall be delivered to the Senior Unsecured Noteholders.

Subject to the NJ Carpenters Approval, the distributions under the Plan to holders of NJ Carpenters Claims shall be made and deemed completed when made to the lead plaintiff in the NJ Carpenters Class Action or as the District Court may otherwise order.  The RMBS Claims Trust Trustee shall be empowered to make distributions to holders of Recognized RMBS Claims, and any distributions to holders of Recognized RMBS Claims, and any

distributions to the RMBS Claims Trust for the benefit of holders of Recognized RMBS Claims by the Liquidating Trust shall be deemed completed upon the funding of the RMBS Claims Trust. The Borrower Claims Trustee shall be empowered to make distributions to holders of Allowed Borrower Claims, and any distributions to or for the benefit of holders of Allowed Borrower Claims by the Debtors or Liquidating Trust shall be deemed completed upon the funding of the Borrower Claims Trust. The Private Securities Claims Trustee shall be empowered to make distributions to holders of Allowed Private Securities Claims, and distributions to holders of Allowed Private Securities Claims shall be deemed completed upon the issuance of the Private Securities Claims Trust Distribution to the Private Securities Claims Trust.

2.      **Distributions to Holders of Disputed Claims**

Except as otherwise provided in the Plan or agreed to by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged. Any distributions arising from property distributed to holders of Allowed Claims in a Class and made to such holders under the Plan shall be made also, in the applicable amounts, to any holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such distributions were earlier made to holders of Allowed Claims in such Class.

3.      **Surrender of Junior Secured Notes and Senior Unsecured Notes**

a. Junior Secured Notes. On the Effective Date, or as soon as reasonably practicable thereafter, the Junior Secured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall direct DTC and any other applicable securities depository to surrender the Junior Secured Notes to the Junior Secured Notes Indenture Trustee. No distributions under the Plan shall be made for or on behalf of a Registered Holder of the Junior Secured Notes unless and until (i) such debt securities have been received by the Junior Secured Notes Indenture Trustee or appropriate instructions from the applicable securities depository have been received by the Junior Secured Notes Indenture Trustee; or (ii) the loss, theft, or destruction of such debt securities has been established to the reasonable satisfaction of such Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the applicable Indenture Trustee harmless in respect of such debt securities and distributions made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. On the surrender date, holders of Allowed Junior Secured Notes Claims shall be entitled to receive distributions pursuant to the Plan. Any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss, theft, or destruction of such debt securities to the Junior Secured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Junior Secured Notes Indenture Trustee in respect

of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Liquidating Trust by such Indenture Trustee and any such debt securities shall be cancelled.

b. <u>Senior Unsecured Notes</u>. On the Effective Date, or as soon as reasonably practicable thereafter, the Senior Unsecured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall advise DTC and any other applicable securities depository of the occurrence of such Effective Date and the cancellation of the Debtors obligations with respect to the Senior Unsecured Notes, but not to terminate the CUSIP or ISIN numbers of the Senior Unsecured Notes.  At such time as the Senior Unsecured Notes Indenture Trustee is prepared to release the Units it received on account of the Senior Unsecured Notes Claims, it may request that such depositories surrender the Senior Unsecured Notes, if deemed appropriate, or with the cooperation of the Debtors or the Liquidating Trust, issue such other instructions to DTC and any other securities depository, as appropriate to effectuate the distributions contemplated under the Plan; provided, however, that nothing herein shall contravene the effectiveness of the Senior Unsecured Notes as set out in Article IV.J.  No distributions under the Plan shall be made for or on behalf of a Registered Holder unless and until (i) such debt securities have been received by the applicable Indenture Trustee or other appropriate instructions have been issued or received by the applicable Indenture Trustee; or (ii) the loss, theft, or destruction of such debt securities has been established to the reasonable satisfaction of the Senior Unsecured Notes Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the Senior Unsecured Notes Indenture Trustee harmless in respect of such debt securities and any distributions to be made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. On such surrender or deemed surrender date, the Senior Unsecured Noteholders shall be entitled to receive distributions pursuant to the Plan. If required by the Senior Unsecured Notes Indenture Trustee, any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss, theft, or destruction of such debt securities to the Senior Unsecured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Senior Unsecured Notes Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Liquidating Trust by the respective Indenture Trustee and any such debt securities shall be cancelled.

4.    **Minimum Distributions; Foreign Exchange Rate; and Other Distribution Limitations**

Other than with respect to General Unsecured Convenience Claims, no Cash payment of less than $50 shall be made to a holder of an Allowed Claim on account of such Allowed Claim. If a holder of an Allowed Claim would be entitled to receive less than $50 as of the time of a particular distribution, but would be entitled to receive more than $50 in combination with later distributions, the Disbursing Agent will combine such distributions

with later distributions to such holder of an Allowed Claim so that such holder may eventually be entitled to a distribution of at least $50 in value.

Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate as of the Petition Date as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

5.      **Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to a holder of an Allowed Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of six (6) months from the applicable date of distribution. After such date, all unclaimed property or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

**H.      Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed upon it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such withholding tax obligations and, if the Disbursing Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Disbursing Agent. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The

Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within six months, such distribution shall be deemed an unclaimed distribution. Finally, the Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

## I.    Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for federal income tax purposes) of such Claims, and then, to the extent the consideration exceeds the principal amount of such Claims, to any portion of such Claims for accrued but unpaid interest, <u>provided, however</u>, that distributions on the RMBS Trust Claims shall be allocated pursuant to the RMBS Trust Allocation Protocol described in Article IV herein.

## J.    Setoffs and Recoupment

The Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that it may have against the claimant, including any Causes of Action transferred to the Liquidating Trust by the Debtors, but neither the failure to do so nor the Allowance of any Claim shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

Before the Liquidating Trust can set-off or recoup against the distribution to be made on account of an Allowed Claim, the holder of the Claim shall be served with written notice of the proposed setoff or recoupment at least thirty (30) days prior to the Liquidating Trust exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before thirty (30) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, inter alia, Bankruptcy Rule 9014 and Local Bankruptcy Rules 9014-1 and 9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with such contested matter, and (iii) the Liquidating Trust shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection.

## K.    Claims Paid or Payable by Third Parties

### 1.    Claims Paid by Third Parties

Except as otherwise provided herein, including with respect to the Ally Contract Claims, the Debtors, on or prior to the Effective Date, or the Liquidating Trust, after the Effective Date, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice, action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, the Liquidating Trust, or other party making distributions on account of the Claim pursuant to the Plan.

### 2.    Claims Payable by Insurers

Except as otherwise provided herein, including with respect to the rights of (i) the Kessler Settlement Class and (ii) other creditors who have entered into a settlement agreement with the Debtors prior to the Effective Date, in and to the GM Insurance Rights as provided herein and in the Kessler Settlement Agreement, and the Ally Contract Claims (a) no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, excluding the GM Policies, until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy and (b) to the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' payment, such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, provided, that if a Debtor or the Liquidating Trust believes a holder of an Allowed Claim has recourse to an insurance policy and intends to withhold a distribution pursuant to this Article VII.K, the Debtor, prior to the Effective Date, or Liquidating Trust, following the Effective Date, shall provide written notice to such holder as to what the Debtor or Liquidating Trust believes to be the nature and scope of applicable insurance coverage. Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Liquidating Trust or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any Insurance Defenses.

**L.      Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable**

Where a Creditor holds Allowed Unsecured Claims for which more than one Debtor in a Debtor Group is jointly and/or severally liable, such creditor shall only receive one recovery from the Debtor Group on account of such Claim.  This provision shall not affect distributions on account of such Creditor's Allowed Claims, if any, against the Debtors in another Debtor Group.

**M.      Distributions Free and Clear**

Except as otherwise provided herein, any distributions under this Plan shall be free and clear of any Liens, Claims, and encumbrances, and no other Entity, including the Debtors, the Liquidating Trust, or the Disbursing Agent shall have any interest (legal, beneficial or otherwise) in property of the Estate distributed pursuant to this Plan, except that distributions on account of Senior Unsecured Note Claims shall remain subject to the Senior Unsecured Notes Indenture Trustee Charging Lien.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A.     **Resolution of Disputed Claims**

1.     **Applicability**

The provisions of this Article VIII shall govern the resolution of Disputed Claims to the extent not otherwise provided for in this Plan or in any other trust agreement (such as the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement or the Borrower Claims Trust Agreement) or plan of allocation (such as the RMBS Trust Allocation Protocol) approved under this Plan.  To the extent the provisions of any such trust agreement or plan of allocation address specifically matters set forth in this Article VIII, the provision of such trust agreement or plan of allocation shall govern.

2.     **Allowance of Claims**

On or after the Effective Date, the Liquidating Trust shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim (i) deemed Allowed as of the Effective Date or (ii) waived, relinquished, exculpated, released, compromised, settled, or Allowed in the Plan or in a Final Order. Except as otherwise provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed (a) under the Plan or the Bankruptcy Code or (b) by Final Order of the Bankruptcy Court, including the Confirmation Order.

3.     **Prosecution of Objections to Claims**

On the Effective Date, the Liquidating Trust will have the exclusive authority to: (a) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests (other than Borrower Claims, Private Securities Claims, and the NJ Carpenters Claims); (b) settle or compromise (or decline to do any of the foregoing) any Disputed Claim (other than Borrower Claims, Private Securities Claims, and NJ Carpenters Claims) or Cause of Action without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

4.     **Claims Estimation**

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement), as applicable, following the Effective Date, may request that the Bankruptcy Court estimate any disputed, contingent, or unliquidated Claim to the extent permitted by Bankruptcy Code section 502(c) regardless of whether the Plan Proponents (prior to the Effective Date) or the Liquidating Trust or Borrower Claims Trust (following the Effective Date) has previously objected to such Claim or whether the Bankruptcy Court has ruled on

any such objection. Among other things, the Plan Proponents may request that the Bankruptcy Court estimate the Recognized RMBS Claims in the amounts set out in the RMBS Trust Claims Schedules for the purpose of implementing the RMBS Trust Allocation Protocol. The Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. Except as set forth below with respect to reconsideration under section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under this Plan, including for purposes of distributions. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement) may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before twenty one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 5. Expungement or Adjustment of Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Debtors' notice and claims agent, and any Claim that has been amended may be adjusted thereon by the Debtors' notice and claims agent, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 6. Deadline to File Claims Objections

Any objections to Claims shall be Filed by no later than the applicable Claims Objection Deadline.

### B. Disallowance of Claims

Any Claims held by an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, or 550, or that is a transferee of a transfer avoidable under Bankruptcy Code section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), shall be deemed disallowed pursuant to Bankruptcy Code section 502(d), and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, by that Entity have been turned over or paid by such Entity to the Debtors or the Liquidating Trust.

EXCEPT AS OTHERWISE AGREED BY THE DEBTORS, THE LIQUIDATING TRUST, OR THE BORROWER CLAIMS TRUST, AS APPLICABLE, OR ORDERED BY THE BANKRUPTCY COURT, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

**C.    Amendments to Claims**

On or after the Effective Date, a Claim may not be Filed or amended without prior authorization of the Bankruptcy Court, the Liquidating Trustee, or the Borrower Claims Trustee, as applicable, and any such new or amended Claim Filed without such prior authorization shall be deemed disallowed in full and expunged without any further action.

**D.    Disputed Claims Reserve**

The provisions of this Article VIII.D shall apply to Disputed Claims held by Liquidating Trust Unit Beneficiaries.

To effect distributions to holders of Allowed Claims in a timely manner, prior to the Effective Date, the Plan Proponents shall file a motion for an order establishing the Disputed Claims Reserve with respect to unliquidated and/or Disputed Claims.  The Disputed Claims Reserve shall be issued a number of Units equal to the amount sufficient to provide the distributions to which holders of Disputed Claims would be entitled under the Plan as of such date as if the Disputed Claims were Allowed Claims either in the amounts of the Claims as filed or in such amounts as estimated by the Bankruptcy Court. The Disputed Claims Reserve shall also hold the Cash distributed with respect to such Units.

Disputed Claims that become Allowed, in whole or in part, shall be satisfied exclusively out of the Disputed Claims Reserve.  The holder of a Disputed Claim that becomes Allowed, in whole or in part, shall receive a number of Units and amount of Cash equal to the number of Units and amount of Cash such holder would have received in accordance with the provisions of the Plan had such Claim been Allowed as of the Initial Unit Distribution Record Date.  In the event the Units, and the Cash distributed with respect thereto, remaining in the Disputed Claims Reserve shall be insufficient to satisfy all the Disputed Claims that have become Allowed and are due to be satisfied with distributions from the Disputed Claims Reserve on any Unit Distribution Date, such Disputed Claims shall be satisfied Pro Rata from the Disputed Claims Reserve.  After all Units, and the Cash distributed with respect thereto, have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed Claims.

If a Disputed Claim is disallowed, in whole or in part, then on the Unit Distribution Date next following the date of determination of such disallowance, unless the Liquidating Trust Board determines otherwise, there shall be released from the Disputed Claims Reserve, (i) a

number of Units equal to the Units that would have been released from the Disputed Claims Reserve to the holder thereof had such Claim been Allowed in the estimated amount of such Claim, or disallowed portion thereof if such Claim is disallowed in part, which Units shall be cancelled and retired and (ii) Cash, in the amount of such distribution made to the Disputed Claims Reserve in respect of such Units since the Effective Date, which shall then be unreserved and unrestricted, and which shall be added to the Liquidating Trust Administrative Reserve or available for distribution to the Unitholders, as determined by the Liquidating Trust Board.

If the Liquidating Trust Board at any time determines that it is not necessary to hold in the Disputed Claims Reserve all of the Units and Cash contained therein in order to satisfy all Disputed Claims of Liquidating Trust Unit Beneficiaries, the Liquidating Trust Board may, but shall not be required to, cancel such number of Units in the Disputed Claims Reserve as it determines is not required for the satisfaction of Disputed Claims and release from the Disputed Claims Reserve for distribution to Unitholders, or for deposit to the Liquidating Trust's Administrative Reserve, some or all of the Cash previously deposited to the Disputed Claims Reserve in respect of such Units. At such time as all Disputed Claims of the Liquidating Trust Unit Beneficiaries have been resolved, any remaining Units in the Disputed Claims Reserve shall be cancelled and any remaining Cash in the Disputed Claims Reserve shall be released from the Disputed Claims Reserve for application as aforesaid.

## ARTICLE IX.

## SETTLEMENT, RELEASE, INJUNCTION,
## AND RELATED PROVISIONS

### A.    Compromise and Settlement of Claims, Equity Interests, and Controversies

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against the Debtors and Causes of Action against other Entities.

### B.    Release of Liens

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date**

and concurrently with the applicable distributions made pursuant to the Plan and, in the case of any Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest in the Liquidating Trust.

C.    **Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including with respect to the Ally Released Parties, the Ally Contribution provided to the Estates under the Plan and otherwise, on and as of the Effective Date of the Plan, the Debtor Released Parties are deemed released and discharged by the Debtors, the Estates and the Liquidating Trust from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Debtor Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other Entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Debtor Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtors' release; (3) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to the Debtors, the Liquidating Trust and any holder of a Claim or Equity Interest or other Entity who would have been legally entitled to assert such Claim or Equity Interest on behalf of any of the Debtors or any of their Estates from asserting any Claim or Cause of Action released pursuant to the Debtors' release.

D.    **Third Party Release**

On and as of the Effective Date of the Plan, the holders of Claims and Equity Interests, shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise,

whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, and any obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute the Bankruptcy Court's finding that this Third Party Release is: (1) in exchange for the good, valuable and substantial consideration provided by the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for a hearing; (5) justified by truly unusual circumstances; (6) an essential component and critical to the success of the Plan; (7) resulted in distributions to the Creditors that would otherwise have been unavailable; (8) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (9) a bar to any party asserting a claim or cause of action released pursuant to this Third Party Release against any of the Ally Released Parties.

Notwithstanding anything to the contrary herein, the Third Party Release shall not apply to any claims held by (i) the FDIC, in its capacity as a receiver, against Ally and (ii) the FHFA against Ally.

E.    **Ally Release**

Except with respect to the Ally Contract Claims, on and as of the Effective Date of the Plan, the Ally Released Parties shall release the Creditors' Committee, the Debtors, and the Consenting Claimants and their respective successors and assigns, members, partners, advisors, and Representatives, in their capacities as such, from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors' liquidation, including the negotiation, formulation, or preparation of the Plan Support Agreement, the Plan, the Disclosure Statement, and any other Plan Documents and related disclosures, as well as any counterclaims in commenced or tolled litigation with the Debtors or the Consenting Claimants.

F.    **Exculpation**

The Exculpated Parties shall neither have, nor incur, any liability to any entity for any pre-petition or post-petition act or omission taken in connection with, or related to, formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of any prepetition plan support agreements, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS Settlement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan provided, that the foregoing provisions of this exculpation shall have no effect

on the liability of any entity that results from any such act that is determined in a final, non-appealable order to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, and the RMBS Settlement.

## G.    Injunction

Except as otherwise provided in the Confirmation Order, all Entities, including Investors, who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that constitute Released Claims, are permanently enjoined and precluded, from and after the effective date of the Plan, from: (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Released Party on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting or enforcing any lien (other than any charging lien of a trustee under its respective indenture), claim or encumbrance of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; (d) asserting any right to setoff, subrogation or recoupment of any kind against any obligation due from any Released Party on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in a Proof of Claim or Equity Interest or otherwise that such holder asserts, has or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; and (f) seeking relief or collecting judgments on a securities-related claim in a manner that fails to conform with the terms of the proportionate judgment reduction provision set forth in the Plan and the Confirmation Order; provided, that nothing contained herein shall be construed to prevent any entity from objecting to claims or defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.  Such injunction shall extend to the successors of the Liquidating Trust, if any, and to their respective properties and interests in property.  Any person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.

## H.    Waiver of Subrogation

The GMACM Debtors and the RFC Debtors hereby release the ResCap Debtors from any and all liability or responsibility to the GMACM Debtors and the RFC Debtors or any entity claiming through or under the GMACM Debtors and the RFC Debtors by way of subrogation or otherwise, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud,

contract, violations of federal or state securities laws, or otherwise, including those subrogated Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.

## I.      Satisfaction and Release of Claims and Equity Interests

The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Liquidating Trust, or any of their respective assets or properties arising prior to the Effective Date.   Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such Claim or Equity Interest shall be precluded from asserting against the Debtors, the Liquidating Trust, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order.

## J.      Judgment Reduction for Co-Defendants in Securities Litigation

A defendant against which a judgment is obtained on a securities-related claim that is subject to the Third Party Releases shall be entitled to a judgment credit, for each such claim, state or federal, for which contribution or indemnity from an Ally Released Party would be available if not for the Third Party Releases, in an amount that is the greater of (a) the amount of the applicable Ally Released Party's indemnification or contribution obligations under the relevant contract(s) as determined by a court of competent jurisdiction or (b) the proportionate share of the applicable Ally Released Party's fault as to such claim; provided that (i) no Ally Released Party shall be deemed to have admitted to such fault by virtue of this provision; (ii) nothing herein shall create a right for a defendant to obtain discovery from any Ally Released Party, or an obligation for any Ally Released Party to participate in any proceeding to determine fault, in connection with such claim; and (iii) no finding in any proceeding to determine fault shall create any claim against any Ally Released Party or obligation of any Ally Released Party to satisfy any claim.

## K.      Limitations

For the avoidance of doubt, the releases set forth in this Article IX shall not extend to: (i) any rights, defenses, or counterclaims under any directors & officers or errors & omissions insurance policies sold by any of the Consenting Claimants or their affiliates and covering either the Debtors or any of the Ally Released Parties; (ii) any indemnity rights against non-Ally Released Parties arising out of the Kessler Class Action or to any other indemnity right against non-Ally Released Parties arising out of any other claims of Borrowers; specifically, these releases do not extend to any indemnity rights RFC may have against any non-Ally Released

Party that is a successor in interest to CBNV and GNBT, including, but not limited to, those indemnity rights extending out of the client contracts between RFC, on the one hand, and either CBNV or GNBT, on the other hand, which incorporate by reference the indemnity provisions of RFC's AlterNet Seller Guide, and (iii) any indemnity rights held by the Debtors' Representatives against Ally and arising from Claims not released by this Article IX.

<div align="center">

**ARTICLE X.**

**CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

</div>

**A.      Conditions Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived in accordance with the terms of the Plan:

(a)      Court approval of the Disclosure Statement in a form and substance reasonably acceptable to the Plan Proponents, Ally, and each of the Consenting Claimants, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

(b)      The Plan shall be reasonably acceptable to the Plan Proponents, Ally and each of the Consenting Claimants, in accordance with the terms of the Plan Support Agreement;

(c)      The Confirmation Order shall be reasonably acceptable to the Plan Proponents, Ally, and each of the Consenting Claimants;

(d)      The Plan Supplement and any related documentation shall be reasonably satisfactory to the Plan Proponents, Ally, and each of the Consenting Claimants;

(e)      Court approval of the RMBS Settlement as part of the Plan pursuant to Bankruptcy Rule 9019;

(f)      No Plan modifications that have altered distributions to be made under the Plan shall have occurred without the consent of the Plan Proponents, Ally, and each of the Consenting Claimants; and

(g)      Court approval of the Third Party Releases, Debtor Releases and Exculpation provisions in the Plan, without any modification thereto.

**B.      Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.C:

(a)      the Bankruptcy Court shall have entered the Confirmation Order, which shall grant final approval of the Plan, including all settlements therein, the Debtor Releases, the Third Party Releases, the injunctions, and exculpation of the Exculpated Parties;

(b)      the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

(c)      on or before August 19, 2013, the FGIC Rehabilitation Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit E (or such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees) approving the Plan Support Agreement (as it related to FGIC) and the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies;

(d)      the Bankruptcy Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit D (or such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees and counsel for the Institutional Investors) approving the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies and the allowance of FGIC's General Unsecured Claims against the Debtors, pursuant to a Bankruptcy Rule 9019 motion, which order shall include a finding that the transactions contemplated by the FGIC Settlement Agreement are in the best interests of the RMBS Trusts;

(e)      Ally will have funded at least $1,950,000,000 of the Ally Contribution;

(f)      the Liquidating Trust Agreement, the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement and the Borrower Claims Trust Agreement shall have been executed;

(g)      any and all Ally Contract Claims will have been Allowed indefeasibly and approved by the Bankruptcy Court without subordination of any kind, and satisfied as set forth herein;

(h)      the Available Assets shall have been transferred to the Liquidating Trust;

(i)      the Professional Fee Escrow Account shall have been funded;

(j)      all material governmental and third party approvals and consents, including Bankruptcy Court approval, and approvals Ally may be required to obtain, necessary in connection with the transactions contemplated by this Plan, shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and

(k)      all other actions, documents, and agreements necessary to implement the Plan as of the Effective Date will have been delivered and all conditions precedent thereto will have been satisfied or waived.

## C.    Waiver of Conditions

The Plan Proponents shall have the right to waive one or more of the conditions to Confirmation and Consummation of the Plan set forth in Articles X.A and X.B(b), and (e)

through (k), with the consent of Ally and the Consenting Claimants, and, solely with respect to such waivers of the conditions set forth in Article X.B(c) and (d) with the consent of FGIC and the RMBS Trustees, at any time without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## D.    Effect of Nonoccurrence of Conditions

Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur on or before the earlier of thirty (30) days after the Confirmation Date or December 15, 2013.  If the Effective Date has not occurred on or before the earlier of thirty (30) days after the Confirmation Date or December 15, 2013, then upon motion by the Plan Proponents or Ally made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A.    Modification and Amendments

Subject to the terms of the Plan Support Agreement, the Plan Proponents may amend, modify, or supplement the Plan pursuant to Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date; provided, that the Plan Proponents obtain the consent, which shall not be unreasonably withheld, of the Settling Parties in accordance with the terms of the Plan Support Agreement. After the Confirmation Date, but prior to Consummation of the Plan, the Plan Proponents may with the consent of the other Settling Parties, which shall not be unreasonably withheld, in accordance with the terms of the Plan Support Agreement, amend, modify, or supplement the Plan without further order of the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order.  At all times, the Plan Proponents may amend, modify, or supplement the Plan without the consent of any other Entity to the extent that such amendments, modifications, or supplements are non-material.  At any time, at the request of the RMBS Trustees, Art. IV.C.3 of the Plan may be amended as will be required to preserve the REMIC tax status of the RMBS Trusts notwithstanding the distribution of Units to the RMBS Claims Trust under the Plan to the RMBS Claims Trust on behalf of the RMBS Trusts, and such amendment will be deemed non-material.

B.    **Effect of Confirmation on Modifications**

Pursuant to Bankruptcy Code section 1127(a), entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    **Revocation or Withdrawal of the Plan**

Subject to the terms of the Plan Support Agreement and conditions to the Effective Date, the Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in the Plan shall constitute a waiver or release of any Claims or Equity Interests prejudice in any manner the rights of the Plan Proponents, the Settling Parties, or any other Entity, or constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponents or any other Entity.

<div align="center">

**ARTICLE XII.**

**RETENTION OF JURISDICTION**

</div>

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction:[5]

(a)    to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(b)    to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date;

(c)    to hear and determine any matter, case, controversy, suit, dispute, or Causes of Action: (i) regarding the existence, nature, and scope of the releases, injunctions, and

---

[5] For the avoidance of doubt, the effectiveness of the NJ Carpenters Settlement and the related NJ Carpenters Class Distribution is subject to District Court approval.

exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(d)     to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)     to hear and determine rights to proceeds under the GM Policies, including consideration of any Insurance Defenses;

(f)     to hear and determine the rights and obligations relating to insurance claims against the Debtors, including coverage disputes;

(g)     to resolve disputes as to the ownership of any Claim or Equity Interest;

(h)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified, or vacated;

(i)     to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(j)     to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan including, without limitation, the allocation of RMBS Trust Claims, the RMBS Trust Allocation Protocol, the Monoline Reservation, and the Kessler Settlement Agreement;

(l)     to hear and determine any matters relating to the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and/or the Private Securities Claims Trust, including to hear and determine any actions brought against the Liquidating Trust Board, Borrower Claims Trustee and/or the Private Securities Claims Trustee, as applicable, in connection with the Plan, including any action or other dispute relating to distributions under the Plan, provided, that if the Plan does not become effective, nothing herein shall be deemed to transfer the venue or jurisdiction over any underlying litigation against Ally to the Bankruptcy Court;

(m)     to hear and determine any issue for which the Plan requires a Final Order of the Bankruptcy Court;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     hear and determine all matters related to: (i) applications for allowance of compensation or  reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan or (ii) the reasonableness of the fees of the Junior Secured Notes Indenture Trustee and the fees of the ad hoc group of Junior Secured Noteholders that

are referred to in the Junior Secured Noteholders Plan Support Agreement as the "Ad Hoc Group."

(p)    to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) potential contractual obligation under any executory contract or unexpired lease that is assumed  the Debtors or the Liquidating Trust amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases to the Assumption Schedule or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(q)    to hear and determine any Causes of Action preserved under the Plan;

(r)    to enter a final decree closing any of the Chapter 11 Cases;

(s)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(t)    to enforce the affirmative findings governing the RMBS Trustees that are contemplated in Article IV herein;

(u)    to enforce all orders previously entered by the Bankruptcy Court; and

(v)    to hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Subject to Article X.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trust, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

Notwithstanding anything in Bankruptcy Rule 3020(e) to the contrary, (i) the entry of the Confirmation Order shall constitute a Final Order and the period in which an appeal must be filed shall commence upon the entry thereof, and (ii) the Confirmation Order shall take effect immediately upon its entry and the Plan Proponents are authorized to consummate the Plan

104

immediately after entry of the Confirmation Order and the satisfaction or waiver of all other conditions to the Effective Date of the Plan, in accordance with the terms of the Plan.

**B.    Additional Documents**

On or before the Effective Date, the Plan Proponents may File with the Bankruptcy Court any and all agreements and other documents that may be necessary or appropriate in order to effectuate and further evidence the terms and conditions of the Plan.

**C.    Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930 and, if applicable, 28 U.S.C. § 3717, as determined by the Bankruptcy Court at a hearing pursuant to Bankruptcy Code section 1128, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**D.    Dissolution of the Creditors' Committee**

On the Effective Date, the Creditors' Committee shall dissolve; <u>provided, however</u>, that, following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors' Committee is a party, (iii) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a party, and (iv) responding to creditor inquiries for one-hundred twenty (120) days following the Effective Date.  Upon the dissolution of the Creditors' Committee, the current and former members of the Creditors' Committee and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibility and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate, except that the Creditors' Committee and their respective Professionals shall have the right to pursue, review and object to any applications for compensation or reimbursement of expenses filed in accordance with Article II hereof.

**E.    Access to Debtors' Records after Effective Date.**

On the Effective Date, Debtors shall be deemed to have transferred, assigned and conveyed to the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and the Private Securities Claims Trust, as their interests may appear with respect to the Claims of their respective beneficiaries, and the Liquidating Trust shall be authorized to take possession of, all of the books and records of the Debtors,  including, except as set forth in any Ally Contract, all information and data on computers owned or leased by the Debtors or otherwise on premises occupied by the Debtors, and all rights of access to data of the Debtors and their affiliates, that were not otherwise transferred to a third party on or prior to the Effective Date.  The Liquidating Trust shall have the responsibility of storing and maintaining such books and records to and for

the benefit of each of the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and Private Securities Claims Trust as their interests may appear, and the respective Plan Trusts shall enter into an agreement or protocol with respect to access to such books and records. The Debtors shall cooperate with the Plan Trustees of the Plan Trusts to facilitate the delivery and storage of such books and records in accordance herewith. For the purpose of this Section, books and records include computer generated or computer maintained books and records and computerized data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties, except as set forth in any Ally Contract, and all of the claims and rights of the Debtors in and to books and records, wherever located. The Debtors or the Liquidating Trust, as applicable, shall make available current and historic tax returns with supporting files to Ally as necessary for Ally to address Ally's audit requirements and to facilitate Ally filing 2013 tax returns.

## F.    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## G.    Reservation of Rights

Except as otherwise provided in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Plan Proponents or Ally with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Plan Proponents or Ally with respect to the holders of Claims or Equity Interests prior to the Effective Date.

## H.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## I.    Service of Documents

All notices, requests and demands hereunder to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    if to the Debtors, (i) if by mail or courier to: Residential Capital LLC, Lewis Kruger, CRO, c/o Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104; with copies to: (a) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104, Attn: Gary Lee, Lorenzo Marinuzzi, and Todd Goren; and (b) Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178, Attn: Steven J. Reisman, Theresa

A. Foudy, and Maryann Gallagher (ii) if by e-mail, to: Lewis.Kruger@gmacrescap.com, glee@mofo.com, lmarinuzzi@mofo.com, tgoren@mofo.com, sresiman@curtis.com, tfoudy@curtis.com, and mgallagher@curtis.com.

(b)     if to the Liquidating Trust to: [ ].

(c)     if to the Borrower Claims Trust to: [ ].

(d)     if to the Private Securities Claims Trust to: [ ].

(e)     if to the RMBS Claims Trust to: [ ].

(f)     if to Ally to: Ally Financial, Inc., 1177 Avenue of the Americas, New York, NY 10036; Attn:  William B. Solomon and Timothy Devine; with copies to: Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Richard M. Cieri, and Ray C. Schrock.

(g)     if to the Creditors' Committee, (i) if by mail or courier to: Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036; Attn: Kenneth H. Eckstein, Douglas H. Mannal and Stephen D. Zide, (ii) if by email to keckstein@kramerlevin.com, dmannal@kramerlevin.com and szide@kramerlevin.com.

(h)     if to AIG, Allstate, MassMutual and/or Prudential, (i) if by mail or courier to: Quinn Emanuel Urquhart & Sullivan LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010; Attn: Susheel Kirpalani and Scott Shelley; (ii) if by email to susheelkirpalani@quinnemanuel.com and scottshelley@quinnemanuel.com.

(i)     if to FGIC, (i) if by mail or courier to: Jones Day, 222 East 41st Street, New York, New York 10017; Attn: Richard L. Wynne and Howard F. Sidman; and the Superintendent of Financial Services of the State of New York, as Rehabilitator of FGIC, c/o Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153; Attn: Gary T. Holtzer (ii) if by e-mail to: rlwynne@jonesday.com, hfsidman@jonesday.com, and gary.holtzer@weil.com.

(j)     if to the Steering Committee Consenting Claimants, (i) if by mail or courier to: Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002; Attn: Kathy D. Patrick and Robert J. Madden; and Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036; Attn: Keith H. Wofford and Ross Martin, (ii) if by e-mail to: kpatrick@gibbsbruns.com, rmadden@gibbsbruns.com, keith.wofford@ropesgray.com, and ross.martin@ropesgray.com.

(k)     if to the Talcott Franklin Consenting Claimants, (i) if by mail or courier to: (a) Talcott Franklin, P.C., 208 N. Market Street, Suite 200, Dallas, Texas 75202; Attn: Talcott J. Franklin, (b) Carter Ledyard & Milburn LLP, 2 Wall Street, New

107

York 10005, Attn: James Gadsden, and (c) Miller Johnson, 250 Monroe Avenue, NW, Suite 800, P.O. Box 306, Grand Rapids, Michigan; Attn: Thomas Sarb; (ii) if by e-mail to: tal@talcottfranklin.com, gadsden@clm.com and sarbt@millerjohnson.com.

(l)     if to Wilmington Trust, (i) if by mail or courier to: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Attn: Thomas J. Moloney and Sean A. O'Neal and Loeb & Loeb, 345 Park Avenue, New York, New York 10154, Attn: Walter H. Curchack; (ii) if by e-mail to: tmoloney@cgsh.com, soneal@cgsh.com, and wcurchack@loeb.com.

(m)    if to MBIA, (i) if by mail or courier to: Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281; Attn: Gregory M. Petrick and Mark Ellenberg; (ii) if by e-mail to: Gregory.Petrick@cwt.com and Mark.Ellenberg@cwt.com.

(n)     if to the Kessler Class Claimants, (i) if by mail or courier to: Polsinelli, 900 Third Avenue, 21st Floor, New York, New York 10022; Attn: Daniel J. Flanigan; Carlson Lynch, Ltd., PNC Park, 115 Federal Street Suite 210, Pittsburgh, PA 15212, Attn: R. Bruce Carlson, Walters Bender Strohbehn & Vaughan, P.C., 2500 City Center Square, 12th & Baltimore, P.O. Box 26188, Kansas City, MO 64196, Attn: R. Frederick Walters (ii) if by e-mail to: dflanigan@polsinelli.com, bcarlson@carlsonlynch.com, and fwalters@wbsvlaw.com.

(o)     if to the RMBS Trustees (i) if by mail or courier to: BNY Mellon, c/o Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attn: Glenn E. Siegel; DB, c/o Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178, Attn: James L. Garrity, Jr.; USB, c/o Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn: Arlene R. Alves; WFB, c/o Alston & Bird LLP, 1 Atlantic Center, 1201 W. Peachtree Street, NW, Atlanta, Georgia 30309-3424, Attn: John C. Weitnauer; LDTC, Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn: Dale C. Christensen, Jr., HSBC, c/o John Kibler, Allen & Overy, 1221 Avenue of the Americas, New York, NY 10020, (ii) if by e-mail to: glenn.siegel@dechert.com, jgarrity@morganlewis.com, alves@sewkis.com, kit.weitnauer@alston.com, christensen@sewkis.com, and John.Kibler@AllenOvery.com.

(p)     if to Paulson, (i) if by mail or courier to: Paulson & Co., Inc., 1251 Avenue of the Americas, New York, New York 10020, Attn: Daniel J. Kamensky, (ii) if by e-mail to: Daniel.Kamensky@paulsonco.com.

After the Effective Date, the Liquidating Trust has authority to send a notice to any Entity that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, it must File a renewed request to receive documents with the Bankruptcy Court. After the Effective Date, the Liquidating Trust is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**J.      Further Assurances**

The Debtors or the Liquidating Trust, all holders of Claims receiving distributions pursuant to the Plan, and all other Entities, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

**K.      Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan and the Confirmation Order shall remain in full force and effect in accordance with their terms.

**L.      Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**M.      Exhibits and Related Documents**

All exhibits and documents Filed in relation to the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Liquidating Trust's counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website, http://www.kccllc.net/rescap, or the Bankruptcy Court's website, http://www.nys.uscourts.gov (a PACER login and password are required to access documents on the Bankruptcy Court's website).

**N.      Severability of Plan Provisions**

Except as otherwise provided herein, if, before Confirmation of the Plan, subject to the terms of the Plan Support Agreement, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan, including the Third Party Releases, Debtor Releases, Exculpation, including Article X.A, B and C, shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable. The

Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Plan Proponents' consent; and (c) nonseverable and mutually dependent.

## O.    Waiver or Estoppel Conflicts

Each holder of a Claim or Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated, by virtue of an agreement made with the Plan Proponents, or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

## P.    Conflicts

Except as set forth in the Plan or unless otherwise ordered by the Bankruptcy Court, to the extent that the Disclosure Statement, any order of the Bankruptcy Court (other than the Confirmation Order), or any exhibit to the Plan or document executed or delivered in connection with the Plan is inconsistent with the terms of the Plan, the terms of the Plan shall control.

Dated: July 3, 2013                                 Respectfully Submitted,
       New York, New York


                                                    RESIDENTIAL CAPITAL, LLC for itself
                                                    and its Debtor subsidiaries


                                                    By: Lewis Kruger
                                                    Name: Lewis Kruger
                                                    Title: Chief Restructuring Officer


                                                    THE OFFICIAL COMMITTEE OF
                                                    UNSECURED CREDITORS

                                                    By: /s/ John S. Dubel
                                                    Name: John S. Dubel
                                                    Title: Co-Chair

                                                    By: /s/ Peter F. Finkel
                                                    Name: Peter F. Finkel
                                                    Title: Co-Chair

**SCHEDULE 1-G**

**GMACM Recognized Cure Claims**

**Schedule 1-G - GMACM Recognized Cure Claims**
**Subject to Further Review and Due Diligence**

| | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 2 | ACE 1999-A | Subprime 1999 | 9.00% | $ 8 | MBIA | $ - |
| 3 | ACE 2005-SL1 | CES 2005 | 53.10% | $ 5,706 | | $ 5,706 |
| 4 | ACE 2006-SL1 | CES 2006 | 29.54% | $ 4,693 | | $ 4,693 |
| 5 | ACE 2006-SL4 | CES 2006 | 100.00% | $ 5,096 | | $ 5,096 |
| 6 | ACE 2007-HE4 | Subprime 2007 | 11.23% | $ 94,944 | | $ 94,944 |
| 7 | ACE 2007-SL1 | CES 2007 | 76.47% | $ 1,334 | | $ 1,334 |
| 8 | AHM 2004-4 | ALT-A 2004 | 14.48% | $ 70,691 | MBIA | $ - |
| 9 | AHM 2006-2 | CES 2006 | 3.64% | $ 14,252 | CIFG | $ - |
| 10 | AHM 2007-A | CES 2007 | 8.24% | $ 22,977 | Assured Guaranty | $ - |
| 11 | AHM 2007-SD2 | Subprime 2007 | 5.00% | $ 17,434 | | $ 17,434 |
| 12 | ALBT 2007-S1 | CES 2007 | 5.00% | $ 17 | | $ 17 |
| 13 | ARMT 2004-5 | ALT-A 2004 | 13.09% | $ 13,686 | | $ 13,686 |
| 14 | ARMT 2005-1 | ALT-A 2005 | 2.92% | $ 4,519 | | $ 4,519 |
| 15 | ARMT 2005-10 | ALT-A 2005 | 13.49% | $ 35,168 | | $ 35,168 |
| 16 | ARMT 2005-11 | ALT-A 2005 | 13.80% | $ 55,844 | | $ 55,844 |
| 17 | ARMT 2005-9 | ALT-A 2005 | 22.06% | $ 53,026 | | $ 53,026 |
| 18 | BAFC 2005-6 | Prime 2005 | 8.27% | $ 2,584 | | $ 2,584 |
| 19 | BAFC 2005-8 | Prime 2005 | 9.08% | $ 2,959 | | $ 2,959 |
| 20 | BAFC 2006-1 | ALT-A 2006 | 3.11% | $ 806 | | $ 806 |
| 21 | BAFC 2006-2 | ALT-A 2006 | 0.99% | $ 495 | | $ 495 |
| 22 | BAFC 2006-4 | ALT-A 2006 | 17.43% | $ 11,144 | | $ 11,144 |
| 23 | BAFC 2006-5 | Prime 2006 | 5.76% | $ 2,141 | | $ 2,141 |
| 24 | BAFC 2007-3 | Prime 2007 | 1.84% | $ 7,005 | | $ 7,005 |
| 25 | BAFC 2007-4 | Prime 2007 | 12.13% | $ 32,852 | | $ 32,852 |
| 26 | BAFC 2007-7 | ALT-A 2007 | 0.71% | $ 1,802 | | $ 1,802 |
| 27 | BALTA 2003-1 | ALT-A 2003 | 4.50% | $ 106 | | $ 106 |
| 28 | BALTA 2004-12 | ALT-A 2004 | 0.92% | $ 1,859 | | $ 1,859 |
| 29 | BALTA 2004-4 | ALT-A 2004 | 9.05% | $ 3,741 | | $ 3,741 |
| 30 | BALTA 2004-6 | ALT-A 2004 | 0.69% | $ 521 | | $ 521 |
| 31 | BALTA 2005-10 | ALT-A 2005 | 0.06% | $ 619 | | $ 619 |
| 32 | BALTA 2005-3 | ALT-A 2005 | 16.03% | $ 33,961 | | $ 33,961 |
| 33 | BALTA 2005-4 | ALT-A 2005 | 0.61% | $ 2,276 | | $ 2,276 |
| 34 | BALTA 2005-5 | ALT-A 2005 | 0.31% | $ 1,204 | | $ 1,204 |
| 35 | BALTA 2006-1 | ALT-A 2006 | 7.43% | $ 47,274 | | $ 47,274 |
| 36 | BALTA 2006-3 | ALT-A 2006 | 4.09% | $ 53,735 | | $ 53,735 |
| 37 | BALTA 2006-4 | ALT-A 2006 | 0.19% | $ 4,864 | | $ 4,864 |
| 38 | BALTA 2006-5 | ALT-A 2006 | 0.20% | $ 1,535 | | $ 1,535 |
| 39 | BALTA 2006-8 | ALT-A 2006 | 0.52% | $ 3,630 | | $ 3,630 |
| 40 | BAYV 2003-AA | Subprime 2003 | 2.77% | $ 811 | | $ 811 |
| 41 | BAYV 2004-A | Subprime 2004 | 4.00% | $ 2,394 | | $ 2,394 |
| 42 | BAYV 2006-B | Subprime 2006 | 4.63% | $ 5,888 | | $ 5,888 |
| 43 | BAYV 2006-D | Subprime 2006 | 1.33% | $ 2,095 | | $ 2,095 |
| 44 | BAYV 2007-A | Subprime 2007 | 5.00% | $ 9,273 | | $ 9,273 |
| 45 | BAYV 2007-B | Subprime 2007 | 14.45% | $ 23,939 | | $ 23,939 |
| 46 | BSABS 2003-AC3 | ALT-A 2003 | 1.02% | $ 179 | | $ 179 |
| 47 | BSABS 2003-AC4 | ALT-A 2003 | 0.14% | $ 62 | | $ 62 |
| 48 | BSABS 2004-AC1 | ALT-A 2004 | 1.36% | $ 231 | | $ 231 |
| 49 | BSABS 2004-AC2 | ALT-A 2004 | 0.24% | $ 59 | | $ 59 |

Schedule 1-G - GMACM Recognized Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 50 | BSABS 2004-AC7 | ALT-A 2004 | 2.40% | $ 1,121 | | $ 1,121 |
| 51 | BSABS 2004-BO1 | Subprime 2004 | 100.00% | $ 449,967 | | $ 449,967 |
| 52 | BSABS 2005-AC3 | ALT-A 2005 | 0.03% | $ 24 | | $ 24 |
| 53 | BSABS 2005-AC7 | ALT-A 2005 | 0.27% | $ 224 | | $ 224 |
| 54 | BSABS 2006-SD2 | Subprime 2006 | 0.08% | $ 99 | | $ 99 |
| 55 | BSABS 2007-SD2 | Subprime 2007 | 0.01% | $ 22 | | $ 22 |
| 56 | BSABS 2007-SD3 | Subprime 2007 | 0.71% | $ 1,964 | FGIC | $ 1,964 |
| 57 | BSARM 2001-4 | Prime 2001 | 51.63% | $ 1,489 | | $ 1,489 |
| 58 | BSARM 2002-11 | Prime 2002 | 18.40% | $ 794 | | $ 794 |
| 59 | BSARM 2003-1 | Prime 2003 | 5.04% | $ 462 | | $ 462 |
| 60 | BSARM 2003-3 | Prime 2003 | 26.07% | $ 1,212 | | $ 1,212 |
| 61 | BSARM 2003-4 | Prime 2003 | 5.43% | $ 270 | | $ 270 |
| 62 | BSARM 2003-5 | Prime 2003 | 4.00% | $ 468 | | $ 468 |
| 63 | BSARM 2003-6 | Prime 2003 | 2.88% | $ 293 | | $ 293 |
| 64 | BSARM 2003-7 | Prime 2003 | 1.94% | $ 634 | | $ 634 |
| 65 | BSARM 2004-1 | Prime 2004 | 0.32% | $ 160 | | $ 160 |
| 66 | BSARM 2004-10 | Prime 2004 | 19.58% | $ 20,239 | | $ 20,239 |
| 67 | BSARM 2004-12 | Prime 2004 | 38.54% | $ 40,797 | | $ 40,797 |
| 68 | BSARM 2004-5 | Prime 2004 | 100.00% | $ 20,160 | | $ 20,160 |
| 69 | BSARM 2004-9 | Prime 2004 | 72.17% | $ 21,305 | | $ 21,305 |
| 70 | BSARM 2005-11 | Prime 2005 | 70.51% | $ 18,749 | | $ 18,749 |
| 71 | BSARM 2005-12 | Prime 2005 | 8.76% | $ 17,049 | | $ 17,049 |
| 72 | BSARM 2006-2 | Prime 2006 | 0.36% | $ 805 | | $ 805 |
| 73 | CMLTI 2004-2 | Prime 2004 | 1.72% | $ 51 | | $ 51 |
| 74 | CMLTI 2004-HYB4 | ALT-A 2004 | 21.30% | $ 6,499 | | $ 6,499 |
| 75 | CMLTI 2005-1 | ALT-A 2005 | 24.89% | $ 10,892 | | $ 10,892 |
| 76 | CMLTI 2005-2 | ALT-A 2005 | 0.01% | $ 7 | | $ 7 |
| 77 | CMLTI 2005-3 | ALT-A 2005 | 6.02% | $ 14,346 | | $ 14,346 |
| 78 | CMLTI 2005-5 | ALT-A 2005 | 58.96% | $ 103,155 | | $ 103,155 |
| 79 | CMLTI 2005-8 | Prime 2005 | 3.33% | $ 3,966 | | $ 3,966 |
| 80 | CMLTI 2005-SHL1 | Subprime 2005 | 9.00% | $ 7,449 | | $ 7,449 |
| 81 | CMLTI 2006-4 | ALT-A 2006 | 0.07% | $ 41 | | $ 41 |
| 82 | CMLTI 2006-AR3 | Prime 2006 | 0.22% | $ 874 | | $ 874 |
| 83 | CMLTI 2007-AMC2 | Subprime 2007 | 25.68% | $ 410,995 | | $ 410,995 |
| 84 | CMLTI 2007-AR1 | ALT-A 2007 | 0.02% | $ 72 | | $ 72 |
| 85 | CMLTI 2007-SHL1 | Subprime 2007 | 5.00% | $ 21,793 | | $ 21,793 |
| 86 | CSFB 2002-34 | Prime 2002 | 5.31% | $ 2,732 | | $ 2,732 |
| 87 | CSFB 2002-AR33 | ALT-A 2002 | 3.62% | $ 263 | | $ 263 |
| 88 | CSFB 2003-23 | Prime 2003 | 9.70% | $ 6,012 | | $ 6,012 |
| 89 | CSFB 2005-10 | Prime 2005 | 3.03% | $ 6,983 | | $ 6,983 |
| 90 | CSFB 2005-11 | Prime 2005 | 3.02% | $ 3,603 | | $ 3,603 |
| 91 | CSFB 2005-12 | ALT-A 2005 | 2.16% | $ 6,823 | | $ 6,823 |
| 92 | CSFB 2005-3 | Prime 2005 | 27.68% | $ 18,115 | | $ 18,115 |
| 93 | CSFB 2005-4 | Prime 2005 | 15.77% | $ 6,741 | | $ 6,741 |
| 94 | CSFB 2005-5 | Prime 2005 | 2.54% | $ 910 | | $ 910 |
| 95 | CSFB 2005-6 | Prime 2005 | 5.02% | $ 5,320 | | $ 5,320 |
| 96 | CSFB 2005-8 | ALT-A 2005 | 3.33% | $ 7,176 | | $ 7,176 |
| 97 | CSFB 2005-9 | ALT-A 2005 | 2.60% | $ 3,661 | | $ 3,661 |

Schedule 1-G - GMACM Recognized Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 98 | CSMC 2006-1 | Prime 2006 | 0.19% | $ 320 | | $ 320 |
| 99 | CSMC 2006-8 | Prime 2006 | 2.50% | $ 2,209 | | $ 2,209 |
| 100 | CSMC 2006-9 | ALT-A 2006 | 0.09% | $ 162 | | $ 162 |
| 101 | CSMC 2007-6 | ALT-A 2007 | 0.49% | $ 807 | | $ 807 |
| 102 | CSMC 2007-7 | Prime 2007 | 0.21% | $ 174 | | $ 174 |
| 103 | DBALT 2003-2XS | ALT-A 2003 | 95.38% | $ 29,732 | | $ 29,732 |
| 104 | DBALT 2003-4XS | ALT-A 2003 | 84.05% | $ 20,321 | MBIA | $ - |
| 105 | DBALT 2005-3 | ALT-A 2005 | 2.59% | $ 1,361 | | $ 1,361 |
| 106 | DBALT 2005-4 | ALT-A 2005 | 48.82% | $ 30,502 | | $ 30,502 |
| 107 | DBALT 2005-5 | ALT-A 2005 | 52.13% | $ 71,284 | | $ 71,284 |
| 108 | DBALT 2005-6 | ALT-A 2005 | 61.14% | $ 92,999 | | $ 92,999 |
| 109 | DBALT 2005-AR1 | ALT-A 2005 | 50.36% | $ 37,832 | | $ 37,832 |
| 110 | DBALT 2005-AR2 | ALT-A 2005 | 28.39% | $ 32,672 | | $ 32,672 |
| 111 | DBALT 2006-AB1 | ALT-A 2006 | 14.64% | $ 39,007 | FSA | $ - |
| 112 | DBALT 2006-AB3 | ALT-A 2006 | 1.45% | $ 4,020 | FSA | $ - |
| 113 | DBALT 2006-AF1 | ALT-A 2006 | 41.00% | $ 161,441 | | $ 161,441 |
| 114 | DBALT 2006-AR1 | ALT-A 2006 | 33.11% | $ 100,943 | | $ 100,943 |
| 115 | DBALT 2006-AR2 | ALT-A 2006 | 46.14% | $ 106,036 | | $ 106,036 |
| 116 | DBALT 2006-AR3 | ALT-A 2006 | 79.69% | $ 493,096 | | $ 493,096 |
| 117 | DBALT 2006-AR5 | ALT-A 2006 | 57.98% | $ 455,211 | | $ 455,211 |
| 118 | DBALT 2006-AR6 | ALT-A 2006 | 65.68% | $ 593,173 | | $ 593,173 |
| 119 | DBALT 2006-OA1 | Pay Option ARM 2006 | 6.11% | $ 25,345 | | $ 25,345 |
| 120 | DBALT 2007-1 | ALT-A 2007 | 38.32% | $ 447,823 | MBIA | $ - |
| 121 | DBALT 2007-3 | Pay Option ARM 2007 | 94.63% | $ 396,145 | | $ 396,145 |
| 122 | DBALT 2007-AR3 | ALT-A 2007 | 25.88% | $ 362,386 | MBIA | $ - |
| 123 | DBALT 2007-OA2 | Pay Option ARM 2007 | 11.92% | $ 28,618 | | $ 28,618 |
| 124 | DBALT 2007-OA3 | Pay Option ARM 2007 | 32.60% | $ 184,977 | | $ 184,977 |
| 125 | DBALT 2007-OA4 | Pay Option ARM 2007 | 13.87% | $ 146,976 | | $ 146,976 |
| 126 | DBALT 2007-OA5 | Pay Option ARM 2007 | 97.59% | $ 144,129 | | $ 144,129 |
| 127 | DMSI 2004-1 | ALT-A 2004 | 55.58% | $ 20,619 | | $ 20,619 |
| 128 | DMSI 2004-2 | ALT-A 2004 | 30.30% | $ 7,149 | | $ 7,149 |
| 129 | DMSI 2004-4 | ALT-A 2004 | 6.46% | $ 5,357 | | $ 5,357 |
| 130 | DMSI 2004-5 | ALT-A 2004 | 38.89% | $ 33,457 | FGIC | $ 33,457 |
| 131 | FMRMT 2003-A | 2003 | 50.00% | $ 938 | | $ 938 |
| 132 | FNBA 2004-AR1 | ALT-A 2004 | 100.00% | $ 32,118 | | $ 32,118 |
| 133 | FNR 2002-66 | Subprime 2002 | 4.50% | $ 10,631 | FNMA/FNMA (Agency Wrap) | $ 10,631 |
| 134 | GMACM 2000-HE2 | Second Lien 2000 | 100.00% | $ 31,280 | MBIA | $ - |
| 135 | GMACM 2000-HE4 | Second Lien 2000 | 100.00% | $ 16,360 | MBIA | $ - |
| 136 | GMACM 2002-HE3 | Second Lien 2002 | 100.00% | $ 19,387 | MBIA | $ - |
| 137 | GMACM 2003-AR1 | Prime 2003 | 100.00% | $ 9,113 | | $ 9,113 |
| 138 | GMACM 2003-AR2 | Prime 2003 | 100.00% | $ 9,355 | | $ 9,355 |
| 139 | GMACM 2003-GH1 | Subprime 2003 | 100.00% | $ 31,247 | MBIA - Insurer Exception | $ 31,247 |
| 140 | GMACM 2003-GH2 | Subprime 2003 | 100.00% | $ 37,419 | | $ 37,419 |
| 141 | GMACM 2003-J10 | Prime 2003 | 100.00% | $ 2,764 | | $ 2,764 |
| 142 | GMACM 2003-J5 | Prime 2003 | 100.00% | $ 1,950 | | $ 1,950 |
| 143 | GMACM 2003-J6 | Prime 2003 | 100.00% | $ 5,723 | | $ 5,723 |
| 144 | GMACM 2003-J7 | Prime 2003 | 100.00% | $ 6,487 | | $ 6,487 |
| 145 | GMACM 2003-J8 | Prime 2003 | 100.00% | $ 8,405 | | $ 8,405 |

Schedule 1-G - PMACM Recognized Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 146 | GMACM 2003-J9 | Prime 2003 | 100.00% | $ 11,071 | | $ 11,071 |
| 147 | GMACM 2004-AR1 | Prime 2004 | 100.00% | $ 23,171 | | $ 23,171 |
| 148 | GMACM 2004-AR2 | Prime 2004 | 100.00% | $ 21,975 | | $ 21,975 |
| 149 | GMACM 2004-GH1 | Subprime 2004 | 100.00% | $ 44,808 | | $ 44,808 |
| 150 | GMACM 2004-HE2 | CES 2004 | 100.00% | $ 4,122 | OLD REPUBLIC INSURANCE COMPANY (Pool Policy) | $ 4,122 |
| 151 | GMACM 2004-J1 | Prime 2004 | 100.00% | $ 11,670 | MBIA - Insurer Exception | $ 11,670 |
| 152 | GMACM 2004-J2 | Prime 2004 | 100.00% | $ 15,299 | MBIA - Insurer Exception | $ 15,299 |
| 153 | GMACM 2004-J3 | Prime 2004 | 100.00% | $ 6,589 | | $ 6,589 |
| 154 | GMACM 2004-J4 | Prime 2004 | 100.00% | $ 17,087 | | $ 17,087 |
| 155 | GMACM 2004-J5 | Prime 2004 | 100.00% | $ 12,725 | | $ 12,725 |
| 156 | GMACM 2004-J6 | Prime 2004 | 100.00% | $ 4,035 | | $ 4,035 |
| 157 | GMACM 2005-AA1 | ALT-A 2005 | 100.00% | $ 39,599 | | $ 39,599 |
| 158 | GMACM 2005-AF1 | ALT-A 2005 | 100.00% | $ 31,093 | | $ 31,093 |
| 159 | GMACM 2005-AF2 | ALT-A 2005 | 100.00% | $ 100,758 | | $ 100,758 |
| 160 | GMACM 2005-AR1 | Prime 2005 | 100.00% | $ 24,530 | | $ 24,530 |
| 161 | GMACM 2005-AR2 | Prime 2005 | 100.00% | $ 36,946 | | $ 36,946 |
| 162 | GMACM 2005-AR3 | Prime 2005 | 100.00% | $ 43,794 | | $ 43,794 |
| 163 | GMACM 2005-AR4 | Prime 2005 | 100.00% | $ 25,035 | | $ 25,035 |
| 164 | GMACM 2005-AR5 | Prime 2005 | 100.00% | $ 46,907 | | $ 46,907 |
| 165 | GMACM 2005-AR6 | Prime 2005 | 100.00% | $ 57,746 | | $ 57,746 |
| 166 | GMACM 2005-J1 | Prime 2005 | 100.00% | $ 28,472 | | $ 28,472 |
| 167 | GMACM 2006-AR1 | Prime 2006 | 100.00% | $ 58,868 | | $ 58,868 |
| 168 | GMACM 2006-AR2 | Prime 2006 | 100.00% | $ 48,637 | | $ 48,637 |
| 169 | GMACM 2006-HE3 | CES 2006 | 100.00% | $ 18,792 | FGIC | $ 18,792 |
| 170 | GMACM 2006-HE5 | CES 2006 | 100.00% | $ 16,026 | FGIC | $ 16,026 |
| 171 | GMACM 2006-HLTV1 | Second Lien 2006 | 100.00% | $ 4,205 | FGIC | $ 4,205 |
| 172 | GMACM 2006-J1 | Prime 2006 | 100.00% | $ 38,673 | | $ 38,673 |
| 173 | GMACM 2007-HE2 | CES 2007 | 100.00% | $ 12,792 | FGIC | $ 12,792 |
| 174 | GMACM 2007-HE3 | CES 2007 | 100.00% | $ 2,732 | | $ 2,732 |
| 175 | GPMF 2005-HE4 | Second Lien 2005 | 100.00% | $ 19,037 | | $ 19,037 |
| 176 | GPMF 2006-AR4 | ALT-A 2006 | 1.23% | $ 5,664 | | $ 5,664 |
| 177 | GPMF 2006-AR5 | ALT-A 2006 | 0.13% | $ 740 | | $ 740 |
| 178 | GPMF 2006-AR6 | ALT-A 2006 | 0.02% | $ 96 | | $ 96 |
| 179 | GPMF 2006-AR7 | ALT-A 2006 | 1.49% | $ 6,305 | FSA | $ - |
| 180 | GPMF 2006-AR8 | ALT-A 2006 | 0.79% | $ 2,672 | | $ 2,672 |
| 181 | GPMF 2007-AR2 | Pay Option ARM 2007 | 27.58% | $ 153,831 | | $ 153,831 |
| 182 | GRCAP 1991-4 | Prime 1999 | 4.50% | $ 12 | | $ 12 |
| 183 | GSAA 2005-9 | ALT-A 2005 | 19.48% | $ 31,023 | | $ 31,023 |
| 184 | GSAMP 2004-SD1 | Subprime 2004 | 0.75% | $ 486 | | $ 486 |
| 185 | GSAMP 2004-SEA1 | Subprime 2004 | 49.85% | $ 18,718 | | $ 18,718 |
| 186 | GSMPS 2003-2 | Subprime 2003 | 2.87% | $ 3,409 | FHLMC (Agency Wrap) | $ - |
| 187 | GSMPS 2003-3 | Subprime 2003 | 16.16% | $ 8,672 | | $ 8,672 |
| 188 | GSMPS 2004-1 | Subprime 2004 | 0.75% | $ 989 | CHASE (Financial Guaranty)/FHLMC | $ - |
| 189 | GSMPS 2004-3 | Subprime 2004 | 4.54% | $ 9,207 | CHASE (Financial Guaranty)/FHLMC | $ - |
| 190 | GSMPS 2004-4 | Subprime 2004 | 11.21% | $ 36,436 | | $ 36,436 |

**Schedule 1-G - GMACM Recognized Cure Claims**
**Subject to Further Review and Due Diligence**

| | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 191 | GSMPS 2005-LT1 | Subprime 2005 | 3.44% | $ 11,426 | | $ 11,426 |
| 192 | GSMPS 2005-RP1 | Subprime 2005 | 1.35% | $ 3,451 | | $ 3,451 |
| 193 | GSMPS 2005-RP2 | Subprime 2005 | 2.36% | $ 6,909 | | $ 6,909 |
| 194 | GSMPS 2005-RP3 | Subprime 2005 | 2.23% | $ 7,437 | | $ 7,437 |
| 195 | GSMPS 2006-RP1 | Subprime 2006 | 5.92% | $ 21,589 | | $ 21,589 |
| 196 | GSMPS 2006-RP2 | Subprime 2006 | 3.55% | $ 5,120 | | $ 5,120 |
| 197 | GSR 2003-2F | Prime 2003 | 32.89% | $ 549 | | $ 549 |
| 198 | GSR 2004-10F | Prime 2004 | 17.47% | $ 2,319 | | $ 2,319 |
| 199 | GSR 2005-5F | Prime 2005 | 4.61% | $ 1,693 | | $ 1,693 |
| 200 | GSR 2005-6F | Prime 2005 | 2.68% | $ 956 | | $ 956 |
| 201 | GSR 2005-7F | Prime 2005 | 5.84% | $ 649 | | $ 649 |
| 202 | GSR 2005-8F | Prime 2005 | 11.75% | $ 8,295 | | $ 8,295 |
| 203 | GSR 2005-9F | Prime 2005 | 0.29% | $ 197 | | $ 197 |
| 204 | GSR 2005-AR3 | Prime 2005 | 7.89% | $ 9,758 | | $ 9,758 |
| 205 | GSR 2006-2F | Prime 2006 | 1.20% | $ 1,065 | | $ 1,065 |
| 206 | GSR 2006-3F | Prime 2006 | 1.45% | $ 843 | | $ 843 |
| 207 | GSR 2006-4F | Prime 2006 | 18.88% | $ 16,061 | | $ 16,061 |
| 208 | GSR 2006-AR1 | Prime 2006 | 15.22% | $ 27,083 | | $ 27,083 |
| 209 | GSR 2006-AR2 | Prime 2006 | 15.01% | $ 18,926 | | $ 18,926 |
| 210 | GSR 2007-4F | Prime 2007 | 2.73% | $ 2,156 | | $ 2,156 |
| 211 | GSRPM 2002-1A | Subprime 2002 | 4.50% | $ 4,458 | | $ 4,458 |
| 212 | GSRPM 2003-2 | Subprime 2003 | 77.00% | $ 28,514 | | $ 28,514 |
| 213 | GSRPM 2004-1 | Subprime 2004 | 4.50% | $ 2,448 | | $ 2,448 |
| 214 | HVMLT 2003-1 | ALT-A 2003 | 95.95% | $ 4,363 | | $ 4,363 |
| 215 | HVMLT 2004-10 | ALT-A 2004 | 22.07% | $ 11,797 | | $ 11,797 |
| 216 | HVMLT 2004-4 | ALT-A 2004 | 51.59% | $ 9,106 | | $ 9,106 |
| 217 | HVMLT 2004-5 | ALT-A 2004 | 40.64% | $ 13,917 | | $ 13,917 |
| 218 | HVMLT 2004-6 | ALT-A 2004 | 50.68% | $ 16,724 | | $ 16,724 |
| 219 | HVMLT 2004-7 | ALT-A 2004 | 22.34% | $ 11,102 | | $ 11,102 |
| 220 | HVMLT 2004-8 | Pay Option ARM 2004 | 10.69% | $ 12,266 | | $ 12,266 |
| 221 | HVMLT 2005-11 | Pay Option ARM 2005 | 100.00% | $ 120,995 | XL | $ - |
| 222 | HVMLT 2005-15 | Pay Option ARM 2005 | 90.86% | $ 216,821 | XL | $ - |
| 223 | HVMLT 2005-4 | ALT-A 2005 | 0.43% | $ 279 | | $ 279 |
| 224 | HVMLT 2005-6 | ALT-A 2005 | 19.08% | $ 4,131 | | $ 4,131 |
| 225 | HVMLT 2005-7 | Pay Option ARM 2005 | 5.87% | $ 11,384 | | $ 11,384 |
| 226 | HVMLT 2006-10 | Pay Option ARM 2006 | 100.00% | $ 786,290 | FSA | $ - |
| 227 | HVMLT 2006-13 | ALT-A 2006 | 2.18% | $ 1,012 | | $ 1,012 |
| 228 | HVMLT 2006-14 | Pay Option ARM 2006 | 23.22% | $ 294,005 | Ambac | $ 294,005 |
| 229 | HVMLT 2006-8 | Pay Option ARM 2006 | 2.10% | $ 11,630 | | $ 11,630 |
| 230 | HVMLT 2006-SB1 | Pay Option ARM 2006 | 100.00% | $ 117,564 | | $ 117,564 |
| 231 | HVMLT 2007-3 | Pay Option ARM 2007 | 100.00% | $ 473,256 | | $ 473,256 |
| 232 | HVMLT 2007-4 | Pay Option ARM 2007 | 89.07% | $ 354,168 | | $ 354,168 |
| 233 | HVMLT 2007-6 | Pay Option ARM 2007 | 85.17% | $ 268,682 | | $ 268,682 |
| 234 | HVMLT 2007-7 | Pay Option ARM 2007 | 25.54% | $ 157,435 | | $ 157,435 |
| 235 | HVMLT 2007-A | CES 2007 | 5.00% | $ 809 | | $ 809 |
| 236 | IMM 2002-9F | ALT-A 2002 | 50.00% | $ 3,099 | | $ 3,099 |
| 237 | IMM 2003-2F | ALT-A 2003 | 50.00% | $ 3,061 | | $ 3,061 |
| 238 | IMM 2004-10 | ALT-A 2004 | 46.05% | $ 132,141 | FGIC | $ 132,141 |

Schedule 1-G - PMA/GMACM Recognized Cure Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 239 | IMM 2004-11 | ALT-A 2004 | 19.04% | $ 47,074 | FGIC | $ 47,074 |
| 240 | IMM 2004-4 | ALT-A 2004 | 8.04% | $ 6,012 | | $ 6,012 |
| 241 | IMM 2004-5 | ALT-A 2004 | 2.63% | $ 1,902 | | $ 1,902 |
| 242 | IMM 2004-7 | ALT-A 2004 | 50.00% | $ 93,569 | AMBAC | $ 93,569 |
| 243 | IMM 2004-8 | ALT-A 2004 | 46.81% | $ 64,042 | FGIC | $ 64,042 |
| 244 | IMM 2004-9 | ALT-A 2004 | 9.00% | $ 1,777 | AMBAC | $ 1,777 |
| 245 | IMM 2005-1 | ALT-A 2005 | 48.73% | $ 82,877 | | $ 82,877 |
| 246 | IMM 2005-2 | ALT-A 2005 | 90.84% | $ 182,127 | | $ 182,127 |
| 247 | IMM 2005-4 | ALT-A 2005 | 46.24% | $ 139,445 | | $ 139,445 |
| 248 | IMM 2005-8 | ALT-A 2005 | 36.07% | $ 72,794 | | $ 72,794 |
| 249 | IMM 2007-A | ALT-A 2007 | 33.77% | $ 43,290 | Assured Guaranty | $ - |
| 250 | IMSA 2002-2 | ALT-A 2002 | 50.00% | $ 4,637 | | $ 4,637 |
| 251 | IMSA 2002-3 | ALT-A 2002 | 100.00% | $ 3,469 | | $ 3,469 |
| 252 | IMSA 2003-1 | ALT-A 2003 | 50.00% | $ 3,911 | | $ 3,911 |
| 253 | IMSA 2003-3 | ALT-A 2003 | 50.00% | $ 8,720 | | $ 8,720 |
| 254 | IMSA 2004-1 | ALT-A 2004 | 50.00% | $ 8,899 | | $ 8,899 |
| 255 | IMSA 2004-2 | ALT-A 2004 | 50.00% | $ 13,883 | | $ 13,883 |
| 256 | IMSA 2004-4 | ALT-A 2004 | 100.00% | $ 148,535 | | $ 148,535 |
| 257 | IMSA 2006-1 | ALT-A 2006 | 32.62% | $ 116,127 | | $ 116,127 |
| 258 | IMSA 2006-2 | ALT-A 2006 | 34.93% | $ 114,327 | | $ 114,327 |
| 259 | IMSA 2006-4 | ALT-A 2006 | 5.00% | $ 32,809 | | $ 32,809 |
| 260 | IMSA 2006-5 | ALT-A 2006 | 7.44% | $ 40,967 | Ambac | $ 40,967 |
| 261 | LMT 2006-7 | ALT-A 2006 | 0.43% | $ 1,134 | | $ 1,134 |
| 262 | LUM 2006-4 | Pay Option ARM 2006 | 81.76% | $ 131,834 | | $ 131,834 |
| 263 | LUM 2006-5 | Pay Option ARM 2006 | 4.38% | $ 10,020 | | $ 10,020 |
| 264 | LXS 2006-10N | ALT-A 2006 | 0.46% | $ 2,790 | | $ 2,790 |
| 265 | LXS 2006-12N | ALT-A 2006 | 0.03% | $ 263 | | $ 263 |
| 266 | LXS 2006-GP1 | ALT-A 2006 | 50.00% | $ 163,604 | | $ 163,604 |
| 267 | LXS 2006-GP2 | ALT-A 2006 | 50.00% | $ 223,251 | | $ 223,251 |
| 268 | LXS 2006-GP3 | ALT-A 2006 | 50.00% | $ 195,606 | | $ 195,606 |
| 269 | LXS 2006-GP4 | ALT-A 2006 | 0.16% | $ 826 | | $ 826 |
| 270 | MABS 2005-AB1 | Subprime 2005 | 0.48% | $ 1,288 | FGIC | $ 1,288 |
| 271 | MALT 2002-1 | ALT-A 2002 | 60.97% | $ 3,333 | | $ 3,333 |
| 272 | MALT 2002-2 | ALT-A 2002 | 66.86% | $ 9,865 | | $ 9,865 |
| 273 | MALT 2002-3 | ALT-A 2002 | 55.67% | $ 17,592 | MBIA | $ - |
| 274 | MALT 2003-2 | ALT-A 2003 | 6.05% | $ 785 | | $ 785 |
| 275 | MALT 2003-3 | ALT-A 2003 | 35.32% | $ 6,342 | | $ 6,342 |
| 276 | MALT 2003-4 | ALT-A 2003 | 10.89% | $ 1,384 | | $ 1,384 |
| 277 | MALT 2003-5 | ALT-A 2003 | 4.50% | $ 1,447 | | $ 1,447 |
| 278 | MALT 2003-6 | ALT-A 2003 | 22.25% | $ 2,845 | | $ 2,845 |
| 279 | MALT 2003-7 | ALT-A 2003 | 6.43% | $ 3,235 | | $ 3,235 |
| 280 | MALT 2003-8 | ALT-A 2003 | 3.16% | $ 426 | | $ 426 |
| 281 | MALT 2003-9 | ALT-A 2003 | 7.80% | $ 655 | | $ 655 |
| 282 | MALT 2004-1 | ALT-A 2004 | 8.15% | $ 1,077 | | $ 1,077 |
| 283 | MALT 2004-10 | ALT-A 2004 | 11.02% | $ 2,762 | | $ 2,762 |
| 284 | MALT 2004-11 | ALT-A 2004 | 18.18% | $ 8,580 | | $ 8,580 |
| 285 | MALT 2004-12 | ALT-A 2004 | 28.11% | $ 9,955 | | $ 9,955 |
| 286 | MALT 2004-13 | ALT-A 2004 | 20.39% | $ 5,827 | | $ 5,827 |

Schedule 1-G - GMACM Recognized Cure Claims
Pg 293 of 399
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 287 | MALT 2004-2 | ALT-A 2004 | 5.11% | $ 1,132 | | $ 1,132 |
| 288 | MALT 2004-3 | ALT-A 2004 | 6.41% | $ 1,351 | | $ 1,351 |
| 289 | MALT 2004-4 | ALT-A 2004 | 5.55% | $ 1,447 | | $ 1,447 |
| 290 | MALT 2004-5 | ALT-A 2004 | 11.45% | $ 1,171 | | $ 1,171 |
| 291 | MALT 2004-6 | ALT-A 2004 | 14.82% | $ 7,553 | | $ 7,553 |
| 292 | MALT 2004-7 | ALT-A 2004 | 8.78% | $ 1,670 | | $ 1,670 |
| 293 | MALT 2004-8 | ALT-A 2004 | 19.48% | $ 5,239 | | $ 5,239 |
| 294 | MALT 2004-9 | ALT-A 2004 | 8.33% | $ 3,321 | | $ 3,321 |
| 295 | MALT 2005-1 | ALT-A 2005 | 35.28% | $ 13,479 | | $ 13,479 |
| 296 | MALT 2005-2 | ALT-A 2005 | 28.87% | $ 15,102 | | $ 15,102 |
| 297 | MALT 2005-3 | ALT-A 2005 | 24.62% | $ 10,570 | | $ 10,570 |
| 298 | MALT 2005-4 | ALT-A 2005 | 20.48% | $ 11,762 | | $ 11,762 |
| 299 | MALT 2005-5 | ALT-A 2005 | 13.07% | $ 6,610 | | $ 6,610 |
| 300 | MALT 2005-6 | ALT-A 2005 | 2.51% | $ 2,691 | | $ 2,691 |
| 301 | MALT 2006-1 | ALT-A 2006 | 0.72% | $ 463 | | $ 463 |
| 302 | MALT 2006-3 | ALT-A 2006 | 0.12% | $ 114 | | $ 114 |
| 303 | MALT 2007-1 | ALT-A 2007 | 0.62% | $ 262 | | $ 262 |
| 304 | MALT 2007-HF1 | ALT-A 2007 | 4.80% | $ 6,094 | | $ 6,094 |
| 305 | MARM 2003-2 | Prime 2003 | 6.62% | $ 399 | | $ 399 |
| 306 | MARM 2003-7 | ALT-A 2003 | 2.44% | $ 50 | | $ 50 |
| 307 | MARM 2004-1 | Prime 2004 | 2.64% | $ 512 | | $ 512 |
| 308 | MARM 2004-10 | Prime 2004 | 31.23% | $ 6,062 | | $ 6,062 |
| 309 | MARM 2004-11 | ALT-A 2004 | 34.51% | $ 24,116 | | $ 24,116 |
| 310 | MARM 2004-12 | Prime 2004 | 7.61% | $ 2,022 | | $ 2,022 |
| 311 | MARM 2004-14 | ALT-A 2004 | 36.97% | $ 19,885 | | $ 19,885 |
| 312 | MARM 2004-15 | ALT-A 2004 | 37.61% | $ 17,720 | | $ 17,720 |
| 313 | MARM 2004-2 | ALT-A 2004 | 36.99% | $ 5,791 | | $ 5,791 |
| 314 | MARM 2004-3 | Prime 2004 | 48.47% | $ 9,491 | | $ 9,491 |
| 315 | MARM 2004-4 | ALT-A 2004 | 58.20% | $ 10,233 | | $ 10,233 |
| 316 | MARM 2004-5 | Prime 2004 | 11.45% | $ 4,128 | | $ 4,128 |
| 317 | MARM 2004-6 | Prime 2004 | 34.37% | $ 9,721 | | $ 9,721 |
| 318 | MARM 2004-7 | Prime 2004 | 36.03% | $ 22,606 | | $ 22,606 |
| 319 | MARM 2004-8 | ALT-A 2004 | 44.06% | $ 17,536 | | $ 17,536 |
| 320 | MARM 2004-9 | Prime 2004 | 33.16% | $ 28,471 | | $ 28,471 |
| 321 | MARM 2005-1 | ALT-A 2005 | 48.18% | $ 88,172 | | $ 88,172 |
| 322 | MARM 2005-2 | ALT-A 2005 | 30.04% | $ 31,893 | | $ 31,893 |
| 323 | MARM 2005-3 | ALT-A 2005 | 50.36% | $ 28,347 | | $ 28,347 |
| 324 | MARM 2005-6 | Prime 2005 | 38.40% | $ 32,561 | | $ 32,561 |
| 325 | MARM 2005-7 | Prime 2005 | 48.64% | $ 47,445 | | $ 47,445 |
| 326 | MARM 2005-8 | ALT-A 2005 | 0.65% | $ 1,539 | | $ 1,539 |
| 327 | MARM 2006-OA2 | Pay Option ARM 2006 | 4.19% | $ 49,473 | FSA | $ - |
| 328 | MARM 2007-2 | ALT-A 2007 | 0.03% | $ 126 | | $ 126 |
| 329 | MARP 2005-1 | Subprime 2005 | 9.26% | $ 8,375 | | $ 8,375 |
| 330 | MARP 2005-2 | Subprime 2005 | 0.89% | $ 1,577 | | $ 1,577 |
| 331 | MARP 2006-1 | Subprime 2006 | 0.12% | $ 106 | | $ 106 |
| 332 | MARP 2006-2 | Subprime 2006 | 4.42% | $ 2,882 | | $ 2,882 |
| 333 | MASD 2004-1 | Subprime 2004 | 100.00% | $ 35,081 | | $ 35,081 |
| 334 | MASD 2004-2 | Subprime 2004 | 90.46% | $ 24,887 | | $ 24,887 |

Schedule 1-G - GMACM Recognized Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 335 | MASD 2005-1 | Subprime 2005 | 9.00% | $ 4,173 | | $ 4,173 |
| 336 | MASD 2005-2 | Subprime 2005 | 90.38% | $ 35,849 | | $ 35,849 |
| 337 | MASD 2005-3 | Subprime 2005 | 92.42% | $ 59,666 | | $ 59,666 |
| 338 | MASD 2006-1 | Subprime 2006 | 94.56% | $ 109,250 | | $ 109,250 |
| 339 | MASD 2006-2 | Subprime 2006 | 5.00% | $ 10,517 | | $ 10,517 |
| 340 | MASD 2006-3 | Subprime 2006 | 5.00% | $ 8,907 | | $ 8,907 |
| 341 | MASTR 2002-7 | Prime 2002 | 5.81% | $ 249 | | $ 249 |
| 342 | MASTR 2002-8 | Prime 2002 | 2.20% | $ 76 | | $ 76 |
| 343 | MASTR 2003-10 | Prime 2003 | 18.15% | $ 1,577 | | $ 1,577 |
| 344 | MASTR 2003-11 | Prime 2003 | 2.27% | $ 256 | | $ 256 |
| 345 | MASTR 2003-12 | Prime 2003 | 7.76% | $ 514 | | $ 514 |
| 346 | MASTR 2003-2 | Prime 2003 | 14.62% | $ 530 | | $ 530 |
| 347 | MASTR 2003-3 | Prime 2003 | 14.24% | $ 785 | | $ 785 |
| 348 | MASTR 2003-4 | Prime 2003 | 0.38% | $ 22 | | $ 22 |
| 349 | MASTR 2003-5 | Prime 2003 | 1.07% | $ 102 | | $ 102 |
| 350 | MASTR 2003-6 | Prime 2003 | 7.84% | $ 1,688 | | $ 1,688 |
| 351 | MASTR 2003-7 | Prime 2003 | 2.84% | $ 309 | | $ 309 |
| 352 | MASTR 2003-8 | Prime 2003 | 3.16% | $ 461 | MBIA | $ - |
| 353 | MASTR 2003-9 | Prime 2003 | 26.56% | $ 1,246 | | $ 1,246 |
| 354 | MASTR 2004-1 | Prime 2004 | 12.12% | $ 306 | | $ 306 |
| 355 | MASTR 2004-10 | Prime 2004 | 12.11% | $ 980 | | $ 980 |
| 356 | MASTR 2004-11 | Prime 2004 | 6.07% | $ 584 | | $ 584 |
| 357 | MASTR 2004-3 | Prime 2004 | 10.46% | $ 528 | | $ 528 |
| 358 | MASTR 2004-4 | Prime 2004 | 2.65% | $ 200 | | $ 200 |
| 359 | MASTR 2004-5 | Prime 2004 | 2.56% | $ 107 | | $ 107 |
| 360 | MASTR 2004-6 | Prime 2004 | 2.80% | $ 290 | | $ 290 |
| 361 | MASTR 2004-8 | Prime 2004 | 0.98% | $ 34 | | $ 34 |
| 362 | MASTR 2004-9 | Prime 2004 | 5.95% | $ 914 | | $ 914 |
| 363 | MHL 2007-1 | ALT-A 2007 | 100.00% | $ 782,704 | | $ 782,704 |
| 364 | MLMI 2003-A2 | Prime 2003 | 1.79% | $ 61 | | $ 61 |
| 365 | MLMI 2003-A4 | Prime 2003 | 17.23% | $ 1,871 | | $ 1,871 |
| 366 | MLMI 2005-A6 | ALT-A 2005 | 16.10% | $ 36,547 | | $ 36,547 |
| 367 | MMFT 2007-1A | Second Lien 2007 | 100.00% | $ 44,014 | FSA | $ - |
| 368 | MSSTR 2004-1 | Prime 2004 | 3.36% | $ 792 | | $ 792 |
| 369 | MSSTR 2005-1 | Prime 2005 | 3.91% | $ 1,085 | | $ 1,085 |
| 370 | MSSTR 2005-2 | Prime 2005 | 1.37% | $ 164 | | $ 164 |
| 371 | NAA 2004-AP1 | ALT-A 2004 | 21.49% | $ 7,424 | | $ 7,424 |
| 372 | NAA 2004-AP2 | ALT-A 2004 | 100.00% | $ 42,442 | | $ 42,442 |
| 373 | NAA 2004-AR1 | ALT-A 2004 | 100.00% | $ 40,006 | | $ 40,006 |
| 374 | NAA 2005-AP1 | ALT-A 2005 | 96.07% | $ 70,706 | | $ 70,706 |
| 375 | NAA 2005-AP2 | ALT-A 2005 | 100.00% | $ 107,909 | | $ 107,909 |
| 376 | NAA 2005-AP3 | ALT-A 2005 | 99.55% | $ 128,158 | | $ 128,158 |
| 377 | NAA 2005-S1 | ALT-A 2005 | 9.00% | $ 347 | | $ 347 |
| 378 | NAA 2005-S2 | CES 2005 | 100.00% | $ 7,671 | | $ 7,671 |
| 379 | NAA 2005-S3 | CES 2005 | 100.00% | $ 4,215 | | $ 4,215 |
| 380 | NAA 2005-S4 | CES 2005 | 0.06% | $ 7 | | $ 7 |
| 381 | NAA 2006-AR3 | ALT-A 2006 | 86.48% | $ 220,972 | | $ 220,972 |
| 382 | NAA 2006-AR4 | ALT-A 2006 | 99.94% | $ 410,444 | | $ 410,444 |

Schedule 1-G - PMA/CS Recognized Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 383 | NAA 2006-S1 | CES 2006 | 0.30% | $ 28 | | $ 28 |
| 384 | NAA 2006-S2 | CES 2006 | 5.00% | $ 540 | | $ 540 |
| 385 | NAA 2007-1 | ALT-A 2007 | 61.99% | $ 746,060 | FSA/Ambac | $ 746,060 |
| 386 | NAA 2007-2 | ALT-A 2007 | 99.85% | $ 355,337 | | $ 355,337 |
| 387 | NAA 2007-S2 | CES 2007 | 33.17% | $ 416 | Assured Guaranty | $ - |
| 388 | NCHET 2004-A | Subprime 2004 | 71.68% | $ 204,677 | FNMA/FGIC | $ 204,677 |
| 389 | NHELI 2007-1 | ALT-A 2007 | 99.92% | $ 809,373 | | $ 809,373 |
| 390 | PRIME 2003-3 | Prime 2003 | 3.16% | $ 186 | MBIA | $ - |
| 391 | PRIME 2004-1 | Prime 2004 | 1.72% | $ 89 | Radian | $ - |
| 392 | PRIME 2004-CL1 | Prime 2004 | 0.14% | $ 69 | | $ 69 |
| 393 | PRIME 2004-CL2 | Prime 2004 | 12.24% | $ 1,033 | | $ 1,033 |
| 394 | PRIME 2005-2 | Subprime 2005 | 10.66% | $ 1,969 | | $ 1,969 |
| 395 | PRIME 2005-4 | Prime 2005 | 0.75% | $ 194 | | $ 194 |
| 396 | PRIME 2005-5 | Subprime 2005 | 4.94% | $ 1,204 | | $ 1,204 |
| 397 | PRIME 2006-1 | ALT-A 2006 | 10.93% | $ 6,777 | | $ 6,777 |
| 398 | PRIME 2006-CL1 | ALT-A 2006 | 12.79% | $ 3,822 | | $ 3,822 |
| 399 | RBSGC 2005-A | ALT-A 2005 | 11.01% | $ 7,266 | | $ 7,266 |
| 400 | RBSGC 2007-B | ALT-A 2007 | 0.11% | $ 152 | | $ 152 |
| 401 | RYMS 1991-15 | Prime 1999 | 10.70% | $ 46 | GEMICO (Pool Policy) | $ 46 |
| 402 | RYMS 1991-16 | Prime 1999 | 24.48% | $ 61 | GEMICO (Pool Policy) | $ 61 |
| 403 | SACO 2005-GP1 | Second Lien 2005 | 100.00% | $ 4,504 | Assured Guaranty | $ - |
| 404 | SACO 2005-WM1 | CES 2005 | 20.77% | $ 3,787 | | $ 3,787 |
| 405 | SACO 2005-WM3 | CES 2005 | 20.77% | $ 4,999 | | $ 4,999 |
| 406 | SACO 2006-1 | Second Lien 2006 | 16.36% | $ 496 | XL | $ - |
| 407 | SACO 2006-10 | CES 2006 | 47.57% | $ 1,987 | | $ 1,987 |
| 408 | SACO 2006-12 | Second Lien 2006 | 23.99% | $ 631 | CIFG | $ - |
| 409 | SACO 2006-5 | CES 2006 | 41.41% | $ 3,437 | | $ 3,437 |
| 410 | SACO 2006-6 | CES 2006 | 26.65% | $ 2,133 | | $ 2,133 |
| 411 | SACO 2006-7 | CES 2006 | 17.72% | $ 469 | | $ 469 |
| 412 | SACO 2006-9 | CES 2006 | 73.38% | $ 3,370 | | $ 3,370 |
| 413 | SACO 2007-1 | CES 2007 | 73.83% | $ 1,683 | | $ 1,683 |
| 414 | SACO 2007-2 | CES 2007 | 62.19% | $ 1,473 | | $ 1,473 |
| 415 | SAIL 2005-5 | Subprime 2005 | 10.93% | $ 78,484 | CIFG | $ - |
| 416 | SAIL 2005-9 | Subprime 2005 | 0.66% | $ 7,306 | | $ 7,306 |
| 417 | SAIL 2006-2 | Subprime 2006 | 0.78% | $ 6,121 | | $ 6,121 |
| 418 | SAIL 2006-3 | Subprime 2006 | 2.30% | $ 34,947 | | $ 34,947 |
| 419 | SAMI 2003-AR1 | Prime 2003 | 4.06% | $ 686 | | $ 686 |
| 420 | SAMI 2004-AR6 | ALT-A 2004 | 4.25% | $ 1,158 | | $ 1,158 |
| 421 | SAMI 2005-AR1 | ALT-A 2005 | 8.56% | $ 4,619 | | $ 4,619 |
| 422 | SASC 1995-2A | Prime 1999 | 27.89% | $ 951 | FGIC | $ 951 |
| 423 | SASC 2001-8A | Prime 2001 | 9.00% | $ 175 | | $ 175 |
| 424 | SASC 2001-9 | Prime 2001 | 4.50% | $ 218 | MBIA | $ - |
| 425 | SASC 2002-12 | Prime 2002 | 9.00% | $ 11,196 | LEHMAN (Financial Guaranty )/FHLMC (Pool Policy) - Insurer Exception | $ 11,196 |
| 426 | SASC 2002-4H | Subprime 2002 | 20.87% | $ 1,044 | | $ 1,044 |
| 427 | SASC 2002-9 | Prime 2002 | 16.74% | $ 2,459 | | $ 2,459 |
| 428 | SASC 2005-RF1 | Subprime 2005 | 2.90% | $ 830 | | $ 830 |

Schedule 1-G - GMACM Recognized Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 429 | SASC 2005-RF2 | Subprime 2005 | 9.50% | $ 6,885 | | $ 6,885 |
| 430 | SASC 2005-RF4 | Subprime 2005 | 7.49% | $ 7,256 | | $ 7,256 |
| 431 | SASC 2005-RF6 | Subprime 2005 | 6.70% | $ 3,146 | | $ 3,146 |
| 432 | SASC 2005-S1 | CES 2005 | 7.22% | $ 1,133 | United Guaranty (Pool Policy) | $ 1,133 |
| 433 | SASC 2005-S2 | CES 2005 | 22.81% | $ 2,519 | | $ 2,519 |
| 434 | SASC 2005-S3 | CES 2005 | 39.01% | $ 7,490 | | $ 7,490 |
| 435 | SASC 2005-S4 | CES 2005 | 0.03% | $ 3 | | $ 3 |
| 436 | SASC 2005-S5 | CES 2005 | 14.25% | $ 1,372 | | $ 1,372 |
| 437 | SASC 2005-S6 | CES 2005 | 44.48% | $ 7,012 | | $ 7,012 |
| 438 | SASC 2005-S7 | CES 2005 | 1.29% | $ 33 | United Guaranty (Pool Policy) | $ 33 |
| 439 | SASC 2006-BC2 | Subprime 2006 | 0.90% | $ 6,942 | | $ 6,942 |
| 440 | SASC 2006-S1 | CES 2006 | 4.40% | $ 220 | | $ 220 |
| 441 | SASC 2007-TC1 | Subprime 2007 | 7.75% | $ 4,622 | | $ 4,622 |
| 442 | SASC 2008-RF1 | Subprime 2008 | 5.00% | $ 1,316 | | $ 1,316 |
| 443 | SASI 1993-6 | Prime 1999 | 4.50% | $ 63 | GEMICO (Pool Policy)/FSA - Insurer Exception | $ 63 |
| 444 | SEMT 2004-10 | Prime 2004 | 7.22% | $ 1,486 | | $ 1,486 |
| 445 | SEMT 2004-11 | Prime 2004 | 13.06% | $ 1,666 | | $ 1,666 |
| 446 | SEMT 2004-12 | Prime 2004 | 14.63% | $ 3,905 | | $ 3,905 |
| 447 | SEMT 2004-3 | Prime 2004 | 51.23% | $ 8,984 | | $ 8,984 |
| 448 | SEMT 2004-4 | Prime 2004 | 2.82% | $ 515 | | $ 515 |
| 449 | SEMT 2004-5 | Prime 2004 | 3.64% | $ 504 | | $ 504 |
| 450 | SEMT 2004-6 | Prime 2004 | 0.11% | $ 24 | | $ 24 |
| 451 | SEMT 2004-7 | Prime 2004 | 0.79% | $ 148 | | $ 148 |
| 452 | SEMT 2004-8 | Prime 2004 | 5.38% | $ 1,319 | | $ 1,319 |
| 453 | SEMT 2004-9 | Prime 2004 | 7.42% | $ 1,725 | | $ 1,725 |
| 454 | SEMT 2005-1 | Prime 2005 | 23.83% | $ 2,381 | | $ 2,381 |
| 455 | SEMT 2005-2 | Prime 2005 | 13.15% | $ 1,345 | | $ 1,345 |
| 456 | SEMT 2005-3 | ALT-A 2005 | 23.86% | $ 2,960 | | $ 2,960 |
| 457 | SEMT 2005-4 | Prime 2005 | 2.35% | $ 202 | | $ 202 |
| 458 | SEMT 2007-1 | Prime 2007 | 25.14% | $ 28,751 | | $ 28,751 |
| 459 | SEMT 2007-2 | Prime 2007 | 8.47% | $ 7,985 | | $ 7,985 |
| 460 | SEMT 2007-3 | Prime 2007 | 27.27% | $ 19,372 | | $ 19,372 |
| 461 | SEMT 2007-4 | Prime 2007 | 59.37% | $ 19,559 | | $ 19,559 |
| 462 | SMART 1993-3A | Prime 1999 | 4.50% | $ 4 | GEMICO (Pool Policy)/FGIC | $ 4 |
| 463 | SMART 1993-6A | Prime 1999 | 4.50% | $ 6 | FGIC/GEMICO (Pool Policy) | $ 6 |
| 464 | SMSC 1992-2 | Prime 1999 | 8.99% | $ 34 | GEMICO (Pool Policy)/PMI (Pool Policy) | $ 34 |
| 465 | SMSC 1992-3 | Prime 1999 | 43.13% | $ 192 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $ 192 |
| 466 | SMSC 1992-4 | Prime 1999 | 44.51% | $ 527 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $ 527 |
| 467 | SMSC 1992-6 | Prime 1999 | 47.68% | $ 159 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSA (Pool Policy) | $ 159 |
| 468 | SMSC 1994-2 | Prime 1999 | 26.35% | $ 90 | | $ 90 |
| 469 | Southwest Savings 1988-1 | 1999 | 4.50% | $ 1 | | $ 1 |
| 470 | SVHE 2003-2 | Subprime 2003 | 53.42% | $ 8,154 | | $ 8,154 |
| 471 | SVHE 2005-A | Subprime 2005 | 45.96% | $ 7,347 | | $ 7,347 |

**Schedule 1-G - GMACM Recognized Cure Claims**
**Subject to Further Review and Due Diligence**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 472 | SVHE 2005-B | Subprime 2005 | 65.47% | $ 11,673 | | $ 11,673 |
| 473 | TMTS 2005-13SL | Second Lien 2005 | 100.00% | $ 2,041 | FGIC | $ 2,041 |
| 474 | TMTS 2005-9HGS | Second Lien 2005 | 100.00% | $ 1,105 | | $ 1,105 |
| 475 | TMTS 2006-2HGS | Second Lien 2006 | 100.00% | $ 6,294 | FGIC | $ 6,294 |
| 476 | TMTS 2006-HF1 | Second Lien 2006 | 100.00% | $ 2,645 | | $ 2,645 |
| 477 | TRUMN 2004-1 | Subprime 2004 | 9.00% | $ 6,351 | | $ 6,351 |
| 478 | TRUMN 2005-1 | Subprime 2005 | 9.00% | $ 5,377 | | $ 5,377 |
| 479 | TRUMN 2006-1 | Subprime 2006 | 5.00% | $ 4,954 | | $ 4,954 |

**SCHEDULE 1-R**

**RFC Recognized Cure Claims**

Schedule 1-R RFC Recognized Cure Claims
Pg 299 of 399
Subject to Further Review and Due Diligence

| | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | AHM 2004-4 | ALT-A 2004 | 14.48% | $ 70,691 | MBIA | $ - |
| 3 | BAFC 2005-3 | Prime 2005 | 16.89% | $ 4,454 | | $ 4,454 |
| 4 | BAFC 2005-4 | Prime 2005 | 6.30% | $ 755 | Assured Guaranty - Insurer Exception | $ 755 |
| 5 | BAFC 2005-5 | Prime 2005 | 16.22% | $ 3,036 | | $ 3,036 |
| 6 | BAFC 2005-6 | Prime 2005 | 6.36% | $ 1,988 | | $ 1,988 |
| 7 | BAFC 2005-7 | Prime 2005 | 2.11% | $ 721 | | $ 721 |
| 8 | BAFC 2005-8 | Prime 2005 | 9.20% | $ 2,998 | | $ 2,998 |
| 9 | BAFC 2006-1 | ALT-A 2006 | 13.02% | $ 3,374 | | $ 3,374 |
| 10 | BAFC 2006-5 | Prime 2006 | 5.76% | $ 2,141 | | $ 2,141 |
| 11 | BALTA 2003-1 | ALT-A 2003 | 4.50% | $ 106 | | $ 106 |
| 12 | BALTA 2005-4 | ALT-A 2005 | 0.03% | $ 109 | | $ 109 |
| 13 | BAYV 2004-C | Subprime 2004 | 4.00% | $ 2,215 | | $ 2,215 |
| 14 | BAYV 2004-D | Subprime 2004 | 5.00% | $ 3,415 | | $ 3,415 |
| 15 | BAYV 2005-B | Subprime 2005 | 3.97% | $ 2,136 | FGIC | $ 2,136 |
| 16 | BSARM 2005-12 | Prime 2005 | 8.76% | $ 17,049 | | $ 17,049 |
| 17 | CARR 2006-RFC1 | Subprime 2006 | 100.00% | $ 372,883 | | $ 372,883 |
| 18 | CARR 2007-RFC1 | Subprime 2007 | 100.00% | $ 475,313 | | $ 475,313 |
| 19 | CMLTI 2007-AMC2 | Subprime 2007 | 25.68% | $ 410,995 | | $ 410,995 |
| 20 | CSFB 2002-34 | Prime 2002 | 5.31% | $ 2,732 | | $ 2,732 |
| 21 | CSFB 2002-AR33 | ALT-A 2002 | 3.62% | $ 263 | | $ 263 |
| 22 | CSFB 2003-23 | Prime 2003 | 9.70% | $ 6,012 | | $ 6,012 |
| 23 | DBALT 2005-AR2 | ALT-A 2005 | 17.87% | $ 20,565 | | $ 20,565 |
| 24 | DBALT 2007-RMP1 | ALT-A 2007 | 100.00% | $ 105,984 | | $ 105,984 |
| 25 | DMSI 2004-5 | ALT-A 2004 | 38.89% | $ 33,457 | FGIC | $ 33,457 |
| 26 | FMRMT 2003-A | 2003 | 50.00% | $ 938 | | $ 938 |
| 27 | FNR 2002-66 | Subprime 2002 | 4.50% | $ 10,631 | FNMA/FNMA (Agency Wrap) | $ 10,631 |
| 28 | GRCAP 1991-4 | Prime 1999 | 4.50% | $ 12 | | $ 12 |
| 29 | GSAMP 2004-SD1 | Subprime 2004 | 0.75% | $ 486 | | $ 486 |
| 30 | GSR 2005-AR7 | Prime 2005 | 9.00% | $ 11,022 | | $ 11,022 |
| 31 | GSR 2006-AR2 | Prime 2006 | 15.60% | $ 19,677 | | $ 19,677 |
| 32 | GSR 2007-AR1 | Prime 2007 | 15.91% | $ 42,067 | | $ 42,067 |
| 33 | GSR 2007-HEL1 | Second Lien 2007 | 100.00% | $ 189 | MBIA | $ - |
| 34 | GSRPM 2002-1A | Subprime 2002 | 4.50% | $ 4,458 | | $ 4,458 |
| 35 | GSRPM 2004-1 | Subprime 2004 | 4.50% | $ 2,448 | | $ 2,448 |
| 36 | HALO 2007-AR2 | ALT-A 2007 | 0.33% | $ 369 | | $ 369 |
| 37 | IMM 2002-9F | ALT-A 2002 | 50.00% | $ 3,099 | | $ 3,099 |
| 38 | IMM 2003-2F | ALT-A 2003 | 50.00% | $ 3,061 | | $ 3,061 |
| 39 | IMM 2003-9F | ALT-A 2003 | 56.09% | $ 3,913 | | $ 3,913 |
| 40 | IMM 2004-10 | ALT-A 2004 | 46.05% | $ 132,141 | FGIC | $ 132,141 |
| 41 | IMM 2004-4 | ALT-A 2004 | 8.04% | $ 6,012 | | $ 6,012 |
| 42 | IMM 2004-5 | ALT-A 2004 | 2.63% | $ 1,902 | | $ 1,902 |
| 43 | IMM 2004-7 | ALT-A 2004 | 50.00% | $ 93,569 | AMBAC | $ 93,569 |
| 44 | IMM 2004-8 | ALT-A 2004 | 46.81% | $ 64,042 | FGIC | $ 64,042 |
| 45 | IMM 2005-1 | ALT-A 2005 | 48.73% | $ 82,877 | | $ 82,877 |

## Schedule 1-RFC Recognized Cure Claims
### Pg 300 of 399
### Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 46 | IMM 2005-4 | ALT-A 2005 | 46.24% | $ 139,445 | | $ 139,445 |
| 47 | IMM 2005-8 | ALT-A 2005 | 36.07% | $ 72,794 | | $ 72,794 |
| 48 | IMSA 2002-2 | ALT-A 2002 | 50.00% | $ 4,637 | | $ 4,637 |
| 49 | IMSA 2003-1 | ALT-A 2003 | 50.00% | $ 3,911 | | $ 3,911 |
| 50 | IMSA 2003-3 | ALT-A 2003 | 50.00% | $ 8,720 | | $ 8,720 |
| 51 | IMSA 2004-1 | ALT-A 2004 | 50.00% | $ 8,899 | | $ 8,899 |
| 52 | IMSA 2004-2 | ALT-A 2004 | 50.00% | $ 13,883 | | $ 13,883 |
| 53 | IMSA 2006-1 | ALT-A 2006 | 32.62% | $ 116,127 | | $ 116,127 |
| 54 | IMSA 2006-2 | ALT-A 2006 | 34.93% | $ 114,327 | | $ 114,327 |
| 55 | LMT 2006-7 | ALT-A 2006 | 0.43% | $ 1,134 | | $ 1,134 |
| 56 | LUM 2006-3 | ALT-A 2006 | 28.35% | $ 75,730 | | $ 75,730 |
| 57 | LUM 2006-5 | Pay Option ARM 2006 | 51.86% | $ 118,640 | | $ 118,640 |
| 58 | LXS 2006-12N | ALT-A 2006 | 16.77% | $ 146,831 | | $ 146,831 |
| 59 | LXS 2006-GP1 | ALT-A 2006 | 50.00% | $ 163,604 | | $ 163,604 |
| 60 | LXS 2006-GP2 | ALT-A 2006 | 50.00% | $ 223,251 | | $ 223,251 |
| 61 | LXS 2006-GP3 | ALT-A 2006 | 50.00% | $ 195,606 | | $ 195,606 |
| 62 | MANA 2007-A2 | ALT-A 2007 | 3.30% | $ 19,800 | | $ 19,800 |
| 63 | MANA 2007-OAR3 | Pay Option ARM 2007 | 46.88% | $ 97,131 | | $ 97,131 |
| 64 | MARM 2006-OA2 | Pay Option ARM 2006 | 4.19% | $ 49,473 | FSA | $ - |
| 65 | MARM 2007-1 | ALT-A 2007 | 3.27% | $ 30,644 | FSA | $ - |
| 66 | MASD 2007-1 | Subprime 2007 | 100.00% | $ 307,003 | | $ 307,003 |
| 67 | MASD 2007-2 | Subprime 2007 | 100.00% | $ 255,864 | | $ 255,864 |
| 68 | PRIME 2006-1 | ALT-A 2006 | 10.93% | $ 6,777 | | $ 6,777 |
| 69 | RAAC 2004-RP1 | Subprime 2004 | 100.00% | $ 120,806 | | $ 120,806 |
| 70 | RAAC 2004-SP1 | ALT-A 2004 | 100.00% | $ 23,457 | | $ 23,457 |
| 71 | RAAC 2004-SP2 | Prime 2004 | 100.00% | $ 7,224 | | $ 7,224 |
| 72 | RAAC 2004-SP3 | ALT-A 2004 | 100.00% | $ 24,788 | | $ 24,788 |
| 73 | RAAC 2005-RP1 | Subprime 2005 | 100.00% | $ 187,170 | | $ 187,170 |
| 74 | RAAC 2005-RP2 | Subprime 2005 | 100.00% | $ 205,427 | | $ 205,427 |
| 75 | RAAC 2005-RP3 | Subprime 2005 | 100.00% | $ 264,006 | | $ 264,006 |
| 76 | RAAC 2005-SP1 | Prime 2005 | 100.00% | $ 18,114 | | $ 18,114 |
| 77 | RAAC 2005-SP2 | ALT-A 2005 | 100.00% | $ 116,281 | | $ 116,281 |
| 78 | RAAC 2005-SP3 | Subprime 2005 | 100.00% | $ 91,823 | | $ 91,823 |
| 79 | RAAC 2006-RP1 | Subprime 2006 | 100.00% | $ 236,050 | | $ 236,050 |
| 80 | RAAC 2006-RP2 | Subprime 2006 | 100.00% | $ 391,355 | | $ 391,355 |
| 81 | RAAC 2006-RP3 | Subprime 2006 | 100.00% | $ 358,733 | | $ 358,733 |
| 82 | RAAC 2006-RP4 | Subprime 2006 | 100.00% | $ 322,478 | | $ 322,478 |
| 83 | RAAC 2006-SP1 | Subprime 2006 | 100.00% | $ 160,346 | | $ 160,346 |
| 84 | RAAC 2006-SP2 | Subprime 2006 | 100.00% | $ 155,653 | | $ 155,653 |
| 85 | RAAC 2006-SP3 | Subprime 2006 | 100.00% | $ 111,429 | | $ 111,429 |
| 86 | RAAC 2006-SP4 | Subprime 2006 | 100.00% | $ 99,983 | | $ 99,983 |
| 87 | RAAC 2007-RP1 | Subprime 2007 | 100.00% | $ 256,307 | | $ 256,307 |
| 88 | RAAC 2007-RP2 | Subprime 2007 | 100.00% | $ 228,117 | | $ 228,117 |
| 89 | RAAC 2007-RP3 | Subprime 2007 | 100.00% | $ 263,262 | | $ 263,262 |

**Schedule 1-RFC Recognized Cure Claims**
**Subject to Further Review and Due Diligence**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 90 | RAAC 2007-RP4 | Subprime 2007 | 100.00% | $ 197,644 | | $ 197,644 |
| 91 | RAAC 2007-SP1 | Subprime 2007 | 100.00% | $ 114,137 | | $ 114,137 |
| 92 | RAAC 2007-SP2 | Subprime 2007 | 100.00% | $ 176,662 | | $ 176,662 |
| 93 | RAAC 2007-SP3 | Subprime 2007 | 100.00% | $ 173,563 | | $ 173,563 |
| 94 | RALI 1999-QS4 | ALT-A 1999 | 100.00% | $ 1,723 | | $ 1,723 |
| 95 | RALI 2001-QS13 | ALT-A 2001 | 100.00% | $ 2,061 | | $ 2,061 |
| 96 | RALI 2001-QS16 | ALT-A 2001 | 100.00% | $ 5,548 | | $ 5,548 |
| 97 | RALI 2001-QS17 | ALT-A 2001 | 100.00% | $ 7,231 | MBIA - Insurer Exception | $ 7,231 |
| 98 | RALI 2001-QS18 | ALT-A 2001 | 100.00% | $ 9,779 | | $ 9,779 |
| 99 | RALI 2001-QS19 | ALT-A 2001 | 100.00% | $ 2,870 | | $ 2,870 |
| 100 | RALI 2002-QS1 | ALT-A 2002 | 100.00% | $ 7,376 | | $ 7,376 |
| 101 | RALI 2002-QS10 | ALT-A 2002 | 100.00% | $ 5,017 | | $ 5,017 |
| 102 | RALI 2002-QS11 | ALT-A 2002 | 100.00% | $ 9,253 | | $ 9,253 |
| 103 | RALI 2002-QS12 | ALT-A 2002 | 100.00% | $ 14,861 | | $ 14,861 |
| 104 | RALI 2002-QS13 | ALT-A 2002 | 100.00% | $ 2,711 | | $ 2,711 |
| 105 | RALI 2002-QS14 | ALT-A 2002 | 100.00% | $ 6,651 | | $ 6,651 |
| 106 | RALI 2002-QS15 | ALT-A 2002 | 100.00% | $ 13,495 | MBIA - Insurer Exception | $ 13,495 |
| 107 | RALI 2002-QS16 | ALT-A 2002 | 100.00% | $ 2,483 | | $ 2,483 |
| 108 | RALI 2002-QS17 | ALT-A 2002 | 100.00% | $ 18,874 | | $ 18,874 |
| 109 | RALI 2002-QS18 | ALT-A 2002 | 100.00% | $ 3,171 | | $ 3,171 |
| 110 | RALI 2002-QS19 | ALT-A 2002 | 100.00% | $ 30,021 | | $ 30,021 |
| 111 | RALI 2002-QS2 | ALT-A 2002 | 100.00% | $ 6,218 | | $ 6,218 |
| 112 | RALI 2002-QS3 | ALT-A 2002 | 100.00% | $ 15,216 | | $ 15,216 |
| 113 | RALI 2002-QS4 | ALT-A 2002 | 100.00% | $ 1,617 | | $ 1,617 |
| 114 | RALI 2002-QS5 | ALT-A 2002 | 100.00% | $ 15,568 | | $ 15,568 |
| 115 | RALI 2002-QS6 | ALT-A 2002 | 100.00% | $ 15,921 | | $ 15,921 |
| 116 | RALI 2002-QS7 | ALT-A 2002 | 100.00% | $ 7,193 | | $ 7,193 |
| 117 | RALI 2002-QS8 | ALT-A 2002 | 100.00% | $ 1,410 | | $ 1,410 |
| 118 | RALI 2002-QS9 | ALT-A 2002 | 100.00% | $ 8,680 | | $ 8,680 |
| 119 | RALI 2003-QA1 | ALT-A 2003 | 100.00% | $ 9,522 | | $ 9,522 |
| 120 | RALI 2003-QS1 | ALT-A 2003 | 100.00% | $ 26,282 | MBIA - Insurer Exception | $ 26,282 |
| 121 | RALI 2003-QS10 | ALT-A 2003 | 100.00% | $ 24,717 | | $ 24,717 |
| 122 | RALI 2003-QS11 | ALT-A 2003 | 100.00% | $ 36,713 | | $ 36,713 |
| 123 | RALI 2003-QS12 | ALT-A 2003 | 100.00% | $ 4,052 | | $ 4,052 |
| 124 | RALI 2003-QS13 | ALT-A 2003 | 100.00% | $ 32,032 | | $ 32,032 |
| 125 | RALI 2003-QS14 | ALT-A 2003 | 100.00% | $ 3,319 | | $ 3,319 |
| 126 | RALI 2003-QS15 | ALT-A 2003 | 100.00% | $ 30,323 | | $ 30,323 |
| 127 | RALI 2003-QS16 | ALT-A 2003 | 100.00% | $ 5,072 | | $ 5,072 |
| 128 | RALI 2003-QS17 | ALT-A 2003 | 100.00% | $ 36,119 | | $ 36,119 |
| 129 | RALI 2003-QS18 | ALT-A 2003 | 100.00% | $ 2,656 | | $ 2,656 |
| 130 | RALI 2003-QS19 | ALT-A 2003 | 100.00% | $ 26,356 | | $ 26,356 |
| 131 | RALI 2003-QS2 | ALT-A 2003 | 100.00% | $ 17,115 | | $ 17,115 |
| 132 | RALI 2003-QS20 | ALT-A 2003 | 100.00% | $ 4,612 | | $ 4,612 |
| 133 | RALI 2003-QS21 | ALT-A 2003 | 100.00% | $ 22,628 | | $ 22,628 |

Schedule 1-R RFC Recognized Cure Claims
Pg 302 of 399
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 134 | RALI 2003-QS22 | ALT-A 2003 | 100.00% | $ 13,411 | | $ 13,411 |
| 135 | RALI 2003-QS23 | ALT-A 2003 | 100.00% | $ 2,930 | | $ 2,930 |
| 136 | RALI 2003-QS3 | ALT-A 2003 | 100.00% | $ 2,477 | | $ 2,477 |
| 137 | RALI 2003-QS4 | ALT-A 2003 | 100.00% | $ 17,033 | | $ 17,033 |
| 138 | RALI 2003-QS5 | ALT-A 2003 | 100.00% | $ 7,036 | | $ 7,036 |
| 139 | RALI 2003-QS6 | ALT-A 2003 | 100.00% | $ 13,937 | | $ 13,937 |
| 140 | RALI 2003-QS7 | ALT-A 2003 | 100.00% | $ 12,890 | | $ 12,890 |
| 141 | RALI 2003-QS8 | ALT-A 2003 | 100.00% | $ 15,741 | MBIA - Insurer Exception | $ 15,741 |
| 142 | RALI 2003-QS9 | ALT-A 2003 | 100.00% | $ 2,904 | | $ 2,904 |
| 143 | RALI 2004-QA1 | ALT-A 2004 | 100.00% | $ 14,098 | | $ 14,098 |
| 144 | RALI 2004-QA2 | ALT-A 2004 | 100.00% | $ 38,534 | | $ 38,534 |
| 145 | RALI 2004-QA3 | ALT-A 2004 | 100.00% | $ 21,229 | | $ 21,229 |
| 146 | RALI 2004-QA4 | ALT-A 2004 | 100.00% | $ 22,973 | | $ 22,973 |
| 147 | RALI 2004-QA5 | ALT-A 2004 | 100.00% | $ 28,550 | | $ 28,550 |
| 148 | RALI 2004-QA6 | ALT-A 2004 | 100.00% | $ 101,487 | | $ 101,487 |
| 149 | RALI 2004-QS1 | ALT-A 2004 | 100.00% | $ 22,175 | | $ 22,175 |
| 150 | RALI 2004-QS10 | ALT-A 2004 | 100.00% | $ 16,158 | | $ 16,158 |
| 151 | RALI 2004-QS11 | ALT-A 2004 | 100.00% | $ 11,891 | | $ 11,891 |
| 152 | RALI 2004-QS12 | ALT-A 2004 | 100.00% | $ 28,579 | | $ 28,579 |
| 153 | RALI 2004-QS13 | ALT-A 2004 | 100.00% | $ 2,929 | | $ 2,929 |
| 154 | RALI 2004-QS14 | ALT-A 2004 | 100.00% | $ 16,313 | | $ 16,313 |
| 155 | RALI 2004-QS15 | ALT-A 2004 | 100.00% | $ 16,650 | | $ 16,650 |
| 156 | RALI 2004-QS16 | ALT-A 2004 | 100.00% | $ 42,306 | | $ 42,306 |
| 157 | RALI 2004-QS2 | ALT-A 2004 | 100.00% | $ 23,186 | | $ 23,186 |
| 158 | RALI 2004-QS3 | ALT-A 2004 | 100.00% | $ 4,513 | | $ 4,513 |
| 159 | RALI 2004-QS4 | ALT-A 2004 | 100.00% | $ 18,897 | | $ 18,897 |
| 160 | RALI 2004-QS5 | ALT-A 2004 | 100.00% | $ 20,306 | | $ 20,306 |
| 161 | RALI 2004-QS6 | ALT-A 2004 | 100.00% | $ 4,000 | | $ 4,000 |
| 162 | RALI 2004-QS7 | ALT-A 2004 | 100.00% | $ 38,124 | | $ 38,124 |
| 163 | RALI 2004-QS8 | ALT-A 2004 | 100.00% | $ 18,479 | | $ 18,479 |
| 164 | RALI 2004-QS9 | ALT-A 2004 | 100.00% | $ 4,100 | | $ 4,100 |
| 165 | RALI 2005-QA1 | ALT-A 2005 | 100.00% | $ 41,831 | | $ 41,831 |
| 166 | RALI 2005-QA10 | ALT-A 2005 | 100.00% | $ 172,009 | | $ 172,009 |
| 167 | RALI 2005-QA11 | ALT-A 2005 | 100.00% | $ 125,708 | | $ 125,708 |
| 168 | RALI 2005-QA12 | ALT-A 2005 | 100.00% | $ 74,222 | | $ 74,222 |
| 169 | RALI 2005-QA13 | ALT-A 2005 | 100.00% | $ 172,624 | | $ 172,624 |
| 170 | RALI 2005-QA2 | ALT-A 2005 | 100.00% | $ 76,624 | | $ 76,624 |
| 171 | RALI 2005-QA3 | ALT-A 2005 | 100.00% | $ 87,111 | | $ 87,111 |
| 172 | RALI 2005-QA4 | ALT-A 2005 | 100.00% | $ 83,517 | | $ 83,517 |
| 173 | RALI 2005-QA5 | ALT-A 2005 | 100.00% | $ 17,946 | | $ 17,946 |
| 174 | RALI 2005-QA6 | ALT-A 2005 | 100.00% | $ 105,403 | | $ 105,403 |
| 175 | RALI 2005-QA7 | ALT-A 2005 | 100.00% | $ 96,292 | | $ 96,292 |
| 176 | RALI 2005-QA8 | ALT-A 2005 | 100.00% | $ 98,941 | | $ 98,941 |
| 177 | RALI 2005-QA9 | ALT-A 2005 | 100.00% | $ 161,047 | | $ 161,047 |

Schedule 1-R RFC Recognized Cure Claims
Pg 303 of 399
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 178 | RALI 2005-QO1 | Pay Option Arm 2005 | 100.00% | $ 191,101 | | $ 191,101 |
| 179 | RALI 2005-QO2 | Pay Option Arm 2005 | 100.00% | $ 118,198 | | $ 118,198 |
| 180 | RALI 2005-QO3 | Pay Option Arm 2005 | 100.00% | $ 153,192 | | $ 153,192 |
| 181 | RALI 2005-QO4 | Pay Option Arm 2005 | 100.00% | $ 248,439 | | $ 248,439 |
| 182 | RALI 2005-QO5 | Pay Option Arm 2005 | 100.00% | $ 464,571 | | $ 464,571 |
| 183 | RALI 2005-QS1 | ALT-A 2005 | 100.00% | $ 21,649 | | $ 21,649 |
| 184 | RALI 2005-QS10 | ALT-A 2005 | 100.00% | $ 38,468 | | $ 38,468 |
| 185 | RALI 2005-QS11 | ALT-A 2005 | 100.00% | $ 33,389 | | $ 33,389 |
| 186 | RALI 2005-QS12 | ALT-A 2005 | 100.00% | $ 79,859 | | $ 79,859 |
| 187 | RALI 2005-QS13 | ALT-A 2005 | 100.00% | $ 109,496 | | $ 109,496 |
| 188 | RALI 2005-QS14 | ALT-A 2005 | 100.00% | $ 102,051 | | $ 102,051 |
| 189 | RALI 2005-QS15 | ALT-A 2005 | 100.00% | $ 90,358 | | $ 90,358 |
| 190 | RALI 2005-QS16 | ALT-A 2005 | 100.00% | $ 90,338 | | $ 90,338 |
| 191 | RALI 2005-QS17 | ALT-A 2005 | 100.00% | $ 133,246 | | $ 133,246 |
| 192 | RALI 2005-QS2 | ALT-A 2005 | 100.00% | $ 24,721 | | $ 24,721 |
| 193 | RALI 2005-QS3 | ALT-A 2005 | 100.00% | $ 54,833 | | $ 54,833 |
| 194 | RALI 2005-QS4 | ALT-A 2005 | 100.00% | $ 24,756 | | $ 24,756 |
| 195 | RALI 2005-QS5 | ALT-A 2005 | 100.00% | $ 31,742 | Radian | $ - |
| 196 | RALI 2005-QS6 | ALT-A 2005 | 100.00% | $ 39,341 | | $ 39,341 |
| 197 | RALI 2005-QS7 | ALT-A 2005 | 100.00% | $ 50,073 | | $ 50,073 |
| 198 | RALI 2005-QS8 | ALT-A 2005 | 100.00% | $ 5,967 | | $ 5,967 |
| 199 | RALI 2005-QS9 | ALT-A 2005 | 100.00% | $ 67,135 | | $ 67,135 |
| 200 | RALI 2006-QA1 | ALT-A 2006 | 100.00% | $ 199,055 | | $ 199,055 |
| 201 | RALI 2006-QA10 | ALT-A 2006 | 100.00% | $ 208,660 | | $ 208,660 |
| 202 | RALI 2006-QA11 | ALT-A 2006 | 100.00% | $ 214,469 | | $ 214,469 |
| 203 | RALI 2006-QA2 | ALT-A 2006 | 100.00% | $ 149,158 | | $ 149,158 |
| 204 | RALI 2006-QA3 | ALT-A 2006 | 100.00% | $ 148,057 | | $ 148,057 |
| 205 | RALI 2006-QA4 | ALT-A 2006 | 100.00% | $ 125,709 | | $ 125,709 |
| 206 | RALI 2006-QA5 | ALT-A 2006 | 100.00% | $ 304,411 | | $ 304,411 |
| 207 | RALI 2006-QA6 | ALT-A 2006 | 100.00% | $ 278,463 | | $ 278,463 |
| 208 | RALI 2006-QA7 | ALT-A 2006 | 100.00% | $ 278,231 | | $ 278,231 |
| 209 | RALI 2006-QA8 | ALT-A 2006 | 100.00% | $ 395,530 | | $ 395,530 |
| 210 | RALI 2006-QA9 | ALT-A 2006 | 100.00% | $ 147,667 | | $ 147,667 |
| 211 | RALI 2006-QS1 | ALT-A 2006 | 100.00% | $ 74,809 | | $ 74,809 |
| 212 | RALI 2006-QS10 | ALT-A 2006 | 100.00% | $ 165,057 | | $ 165,057 |
| 213 | RALI 2006-QS11 | ALT-A 2006 | 100.00% | $ 244,250 | | $ 244,250 |
| 214 | RALI 2006-QS12 | ALT-A 2006 | 100.00% | $ 195,371 | | $ 195,371 |
| 215 | RALI 2006-QS13 | ALT-A 2006 | 100.00% | $ 180,358 | | $ 180,358 |
| 216 | RALI 2006-QS14 | ALT-A 2006 | 100.00% | $ 260,980 | | $ 260,980 |
| 217 | RALI 2006-QS15 | ALT-A 2006 | 100.00% | $ 185,866 | | $ 185,866 |
| 218 | RALI 2006-QS16 | ALT-A 2006 | 100.00% | $ 275,253 | | $ 275,253 |
| 219 | RALI 2006-QS17 | ALT-A 2006 | 100.00% | $ 204,761 | | $ 204,761 |
| 220 | RALI 2006-QS18 | ALT-A 2006 | 100.00% | $ 483,952 | | $ 483,952 |
| 221 | RALI 2006-QS2 | ALT-A 2006 | 100.00% | $ 202,901 | | $ 202,901 |

**Schedule 1-R - RFC Recognized Cure Claims**
**Subject to Further Review and Due Diligence**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 222 | RALI 2006-QS3 | ALT-A 2006 | 100.00% | $ 304,105 | | $ 304,105 |
| 223 | RALI 2006-QS4 | ALT-A 2006 | 100.00% | $ 217,114 | | $ 217,114 |
| 224 | RALI 2006-QS5 | ALT-A 2006 | 100.00% | $ 212,130 | | $ 212,130 |
| 225 | RALI 2006-QS6 | ALT-A 2006 | 100.00% | $ 262,416 | | $ 262,416 |
| 226 | RALI 2006-QS7 | ALT-A 2006 | 100.00% | $ 191,876 | | $ 191,876 |
| 227 | RALI 2006-QS8 | ALT-A 2006 | 100.00% | $ 364,498 | | $ 364,498 |
| 228 | RALI 2006-QS9 | ALT-A 2006 | 100.00% | $ 185,444 | | $ 185,444 |
| 229 | RALI 2007-QA1 | ALT-A 2007 | 100.00% | $ 202,556 | | $ 202,556 |
| 230 | RALI 2007-QA2 | ALT-A 2007 | 100.00% | $ 188,348 | | $ 188,348 |
| 231 | RALI 2007-QA3 | ALT-A 2007 | 100.00% | $ 502,986 | | $ 502,986 |
| 232 | RALI 2007-QA4 | ALT-A 2007 | 100.00% | $ 154,103 | | $ 154,103 |
| 233 | RALI 2007-QA5 | ALT-A 2007 | 100.00% | $ 252,777 | | $ 252,777 |
| 234 | RALI 2007-QS1 | ALT-A 2007 | 100.00% | $ 449,295 | | $ 449,295 |
| 235 | RALI 2007-QS10 | ALT-A 2007 | 100.00% | $ 174,883 | | $ 174,883 |
| 236 | RALI 2007-QS11 | ALT-A 2007 | 100.00% | $ 115,373 | | $ 115,373 |
| 237 | RALI 2007-QS2 | ALT-A 2007 | 100.00% | $ 216,978 | | $ 216,978 |
| 238 | RALI 2007-QS3 | ALT-A 2007 | 100.00% | $ 432,816 | | $ 432,816 |
| 239 | RALI 2007-QS4 | ALT-A 2007 | 100.00% | $ 282,123 | | $ 282,123 |
| 240 | RALI 2007-QS5 | ALT-A 2007 | 100.00% | $ 160,045 | | $ 160,045 |
| 241 | RALI 2007-QS6 | ALT-A 2007 | 100.00% | $ 297,646 | | $ 297,646 |
| 242 | RALI 2007-QS7 | ALT-A 2007 | 100.00% | $ 285,371 | | $ 285,371 |
| 243 | RALI 2007-QS8 | ALT-A 2007 | 100.00% | $ 236,896 | | $ 236,896 |
| 244 | RALI 2007-QS9 | ALT-A 2007 | 100.00% | $ 270,392 | | $ 270,392 |
| 245 | RAMP 2001-RS2 | Subprime 2001 | 100.00% | $ 35,268 | | $ 35,268 |
| 246 | RAMP 2002-RS2 | Subprime 2002 | 100.00% | $ 65,774 | AMBAC - Insurer Exception | $ 65,774 |
| 247 | RAMP 2002-RS3 | Subprime 2002 | 100.00% | $ 84,691 | | $ 84,691 |
| 248 | RAMP 2002-RZ2 | Subprime 2002 | 100.00% | $ 35,595 | | $ 35,595 |
| 249 | RAMP 2002-RZ3 | Subprime 2002 | 100.00% | $ 59,495 | | $ 59,495 |
| 250 | RAMP 2002-SL1 | Subprime 2002 | 100.00% | $ 3,601 | | $ 3,601 |
| 251 | RAMP 2003-RS10 | Subprime 2003 | 100.00% | $ 310,393 | | $ 310,393 |
| 252 | RAMP 2003-RS7 | Subprime 2003 | 100.00% | $ 253,574 | AMBAC - Insurer Exception | $ 253,574 |
| 253 | RAMP 2003-SL1 | Subprime 2003 | 100.00% | $ 23,057 | | $ 23,057 |
| 254 | RAMP 2004-KR1 | Subprime 2004 | 100.00% | $ 142,211 | | $ 142,211 |
| 255 | RAMP 2004-KR2 | Subprime 2004 | 100.00% | $ 63,182 | | $ 63,182 |
| 256 | RAMP 2004-RS10 | Subprime 2004 | 100.00% | $ 392,647 | | $ 392,647 |
| 257 | RAMP 2004-RS11 | Subprime 2004 | 100.00% | $ 298,504 | | $ 298,504 |
| 258 | RAMP 2004-RS12 | Subprime 2004 | 100.00% | $ 306,168 | | $ 306,168 |
| 259 | RAMP 2004-RS2 | Subprime 2004 | 100.00% | $ 246,496 | | $ 246,496 |
| 260 | RAMP 2004-RS3 | Subprime 2004 | 100.00% | $ 134,805 | | $ 134,805 |
| 261 | RAMP 2004-RS4 | Subprime 2004 | 100.00% | $ 302,245 | | $ 302,245 |
| 262 | RAMP 2004-RS6 | Subprime 2004 | 100.00% | $ 261,804 | | $ 261,804 |
| 263 | RAMP 2004-RS8 | Subprime 2004 | 100.00% | $ 253,864 | | $ 253,864 |
| 264 | RAMP 2004-RZ1 | Subprime 2004 | 100.00% | $ 74,222 | | $ 74,222 |
| 265 | RAMP 2004-RZ3 | Subprime 2004 | 100.00% | $ 54,129 | | $ 54,129 |

Schedule 1-R — RFC Recognized Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 266 | RAMP 2004-RZ4 | Subprime 2004 | 100.00% | $ 41,187 | | $ 41,187 |
| 267 | RAMP 2004-SL1 | Subprime 2004 | 100.00% | $ 54,372 | | $ 54,372 |
| 268 | RAMP 2004-SL2 | Subprime 2004 | 100.00% | $ 41,942 | | $ 41,942 |
| 269 | RAMP 2004-SL3 | Subprime 2004 | 100.00% | $ 16,502 | | $ 16,502 |
| 270 | RAMP 2004-SL4 | Subprime 2004 | 100.00% | $ 12,364 | | $ 12,364 |
| 271 | RAMP 2005-EFC1 | Subprime 2005 | 100.00% | $ 338,614 | | $ 338,614 |
| 272 | RAMP 2005-EFC2 | Subprime 2005 | 100.00% | $ 261,001 | | $ 261,001 |
| 273 | RAMP 2005-EFC3 | Subprime 2005 | 100.00% | $ 287,435 | | $ 287,435 |
| 274 | RAMP 2005-EFC4 | Subprime 2005 | 100.00% | $ 294,083 | | $ 294,083 |
| 275 | RAMP 2005-EFC5 | Subprime 2005 | 100.00% | $ 273,477 | | $ 273,477 |
| 276 | RAMP 2005-EFC6 | Subprime 2005 | 100.00% | $ 287,657 | | $ 287,657 |
| 277 | RAMP 2005-RS1 | Subprime 2005 | 100.00% | $ 305,624 | | $ 305,624 |
| 278 | RAMP 2005-RS2 | Subprime 2005 | 100.00% | $ 241,548 | | $ 241,548 |
| 279 | RAMP 2005-RS3 | Subprime 2005 | 100.00% | $ 225,797 | | $ 225,797 |
| 280 | RAMP 2005-RS4 | Subprime 2005 | 100.00% | $ 175,079 | | $ 175,079 |
| 281 | RAMP 2005-RS5 | Subprime 2005 | 100.00% | $ 137,737 | | $ 137,737 |
| 282 | RAMP 2005-RS6 | Subprime 2005 | 100.00% | $ 386,206 | | $ 386,206 |
| 283 | RAMP 2005-RS7 | Subprime 2005 | 100.00% | $ 183,560 | | $ 183,560 |
| 284 | RAMP 2005-RS8 | Subprime 2005 | 100.00% | $ 272,425 | | $ 272,425 |
| 285 | RAMP 2005-RZ1 | Subprime 2005 | 100.00% | $ 31,660 | | $ 31,660 |
| 286 | RAMP 2005-RZ2 | Subprime 2005 | 100.00% | $ 94,444 | | $ 94,444 |
| 287 | RAMP 2005-RZ3 | Subprime 2005 | 100.00% | $ 138,182 | | $ 138,182 |
| 288 | RAMP 2005-RZ4 | Subprime 2005 | 100.00% | $ 125,353 | | $ 125,353 |
| 289 | RAMP 2005-SL1 | ALT-A 2005 | 100.00% | $ 31,355 | | $ 31,355 |
| 290 | RAMP 2005-SL2 | ALT-A 2005 | 100.00% | $ 27,635 | | $ 27,635 |
| 291 | RAMP 2006-EFC1 | Subprime 2006 | 100.00% | $ 267,832 | | $ 267,832 |
| 292 | RAMP 2006-EFC2 | Subprime 2006 | 100.00% | $ 188,094 | | $ 188,094 |
| 293 | RAMP 2006-NC1 | Subprime 2006 | 100.00% | $ 333,254 | | $ 333,254 |
| 294 | RAMP 2006-NC2 | Subprime 2006 | 100.00% | $ 538,972 | | $ 538,972 |
| 295 | RAMP 2006-NC3 | Subprime 2006 | 100.00% | $ 399,661 | | $ 399,661 |
| 296 | RAMP 2006-RS1 | Subprime 2006 | 100.00% | $ 632,682 | | $ 632,682 |
| 297 | RAMP 2006-RS2 | Subprime 2006 | 100.00% | $ 436,129 | | $ 436,129 |
| 298 | RAMP 2006-RS3 | Subprime 2006 | 100.00% | $ 469,928 | MGIC | $ 469,928 |
| 299 | RAMP 2006-RS4 | Subprime 2006 | 100.00% | $ 579,879 | | $ 579,879 |
| 300 | RAMP 2006-RS5 | Subprime 2006 | 100.00% | $ 232,874 | | $ 232,874 |
| 301 | RAMP 2006-RS6 | Subprime 2006 | 100.00% | $ 246,878 | | $ 246,878 |
| 302 | RAMP 2006-RZ1 | Subprime 2006 | 100.00% | $ 167,595 | | $ 167,595 |
| 303 | RAMP 2006-RZ2 | Subprime 2006 | 100.00% | $ 167,112 | | $ 167,112 |
| 304 | RAMP 2006-RZ3 | Subprime 2006 | 100.00% | $ 395,529 | | $ 395,529 |
| 305 | RAMP 2006-RZ4 | Subprime 2006 | 100.00% | $ 470,079 | | $ 470,079 |
| 306 | RAMP 2006-RZ5 | Subprime 2006 | 100.00% | $ 218,864 | | $ 218,864 |
| 307 | RAMP 2007-RS1 | Subprime 2007 | 100.00% | $ 328,954 | | $ 328,954 |
| 308 | RAMP 2007-RS2 | Subprime 2007 | 100.00% | $ 233,445 | | $ 233,445 |
| 309 | RAMP 2007-RZ1 | Subprime 2007 | 100.00% | $ 151,997 | | $ 151,997 |

Schedule 1-R - RFC Recognized Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 310 | RASC 2001-KS2 | Subprime 2001 | 100.00% | $ 316,792 | | $ 316,792 |
| 311 | RASC 2001-KS3 | Subprime 2001 | 100.00% | $ 408,359 | | $ 408,359 |
| 312 | RASC 2002-KS2 | Subprime 2002 | 100.00% | $ 234,076 | | $ 234,076 |
| 313 | RASC 2003-KS10 | Subprime 2003 | 100.00% | $ 195,261 | | $ 195,261 |
| 314 | RASC 2003-KS11 | Subprime 2003 | 100.00% | $ 286,454 | | $ 286,454 |
| 315 | RASC 2003-KS2 | Subprime 2003 | 100.00% | $ 321,485 | | $ 321,485 |
| 316 | RASC 2003-KS3 | Subprime 2003 | 100.00% | $ 102,467 | | $ 102,467 |
| 317 | RASC 2003-KS6 | Subprime 2003 | 100.00% | $ 118,514 | | $ 118,514 |
| 318 | RASC 2003-KS7 | Subprime 2003 | 100.00% | $ 217,245 | | $ 217,245 |
| 319 | RASC 2003-KS8 | Subprime 2003 | 100.00% | $ 153,783 | | $ 153,783 |
| 320 | RASC 2004-KS1 | Subprime 2004 | 100.00% | $ 178,677 | | $ 178,677 |
| 321 | RASC 2004-KS10 | Subprime 2004 | 100.00% | $ 262,005 | | $ 262,005 |
| 322 | RASC 2004-KS11 | Subprime 2004 | 100.00% | $ 179,872 | | $ 179,872 |
| 323 | RASC 2004-KS12 | Subprime 2004 | 100.00% | $ 134,518 | | $ 134,518 |
| 324 | RASC 2004-KS2 | Subprime 2004 | 100.00% | $ 208,832 | | $ 208,832 |
| 325 | RASC 2004-KS3 | Subprime 2004 | 100.00% | $ 149,922 | | $ 149,922 |
| 326 | RASC 2004-KS5 | Subprime 2004 | 100.00% | $ 247,535 | | $ 247,535 |
| 327 | RASC 2004-KS6 | Subprime 2004 | 100.00% | $ 223,504 | | $ 223,504 |
| 328 | RASC 2004-KS8 | Subprime 2004 | 100.00% | $ 128,491 | | $ 128,491 |
| 329 | RASC 2005-AHL1 | Subprime 2005 | 100.00% | $ 278,227 | | $ 278,227 |
| 330 | RASC 2005-AHL2 | Subprime 2005 | 100.00% | $ 283,024 | | $ 283,024 |
| 331 | RASC 2005-AHL3 | Subprime 2005 | 100.00% | $ 348,842 | | $ 348,842 |
| 332 | RASC 2005-EMX1 | Subprime 2005 | 100.00% | $ 165,424 | | $ 165,424 |
| 333 | RASC 2005-EMX2 | Subprime 2005 | 100.00% | $ 195,550 | | $ 195,550 |
| 334 | RASC 2005-EMX3 | Subprime 2005 | 100.00% | $ 283,113 | | $ 283,113 |
| 335 | RASC 2005-EMX4 | Subprime 2005 | 100.00% | $ 244,083 | | $ 244,083 |
| 336 | RASC 2005-KS1 | Subprime 2005 | 100.00% | $ 193,815 | | $ 193,815 |
| 337 | RASC 2005-KS10 | Subprime 2005 | 100.00% | $ 619,415 | | $ 619,415 |
| 338 | RASC 2005-KS11 | Subprime 2005 | 100.00% | $ 647,594 | | $ 647,594 |
| 339 | RASC 2005-KS12 | Subprime 2005 | 100.00% | $ 500,547 | | $ 500,547 |
| 340 | RASC 2005-KS2 | Subprime 2005 | 100.00% | $ 161,695 | | $ 161,695 |
| 341 | RASC 2005-KS3 | Subprime 2005 | 100.00% | $ 122,454 | | $ 122,454 |
| 342 | RASC 2005-KS4 | Subprime 2005 | 100.00% | $ 118,474 | | $ 118,474 |
| 343 | RASC 2005-KS5 | Subprime 2005 | 100.00% | $ 134,156 | | $ 134,156 |
| 344 | RASC 2005-KS6 | Subprime 2005 | 100.00% | $ 220,979 | | $ 220,979 |
| 345 | RASC 2005-KS7 | Subprime 2005 | 100.00% | $ 155,954 | | $ 155,954 |
| 346 | RASC 2005-KS8 | Subprime 2005 | 100.00% | $ 532,192 | | $ 532,192 |
| 347 | RASC 2005-KS9 | Subprime 2005 | 100.00% | $ 184,585 | | $ 184,585 |
| 348 | RASC 2006-EMX1 | Subprime 2006 | 100.00% | $ 231,476 | | $ 231,476 |
| 349 | RASC 2006-EMX2 | Subprime 2006 | 100.00% | $ 355,696 | | $ 355,696 |
| 350 | RASC 2006-EMX3 | Subprime 2006 | 100.00% | $ 541,669 | | $ 541,669 |
| 351 | RASC 2006-EMX4 | Subprime 2006 | 100.00% | $ 505,700 | | $ 505,700 |
| 352 | RASC 2006-EMX5 | Subprime 2006 | 100.00% | $ 456,770 | | $ 456,770 |
| 353 | RASC 2006-EMX6 | Subprime 2006 | 100.00% | $ 565,013 | | $ 565,013 |

**Schedule 1-R RFG Recognized Cure Claims**
**Subject to Further Review and Due Diligence**

| | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
|---|---|---|---|---|---|---|
| 354 | RASC 2006-EMX7 | Subprime 2006 | 100.00% | $ 444,893 | | $ 444,893 |
| 355 | RASC 2006-EMX8 | Subprime 2006 | 100.00% | $ 704,611 | | $ 704,611 |
| 356 | RASC 2006-EMX9 | Subprime 2006 | 100.00% | $ 804,091 | | $ 804,091 |
| 357 | RASC 2006-KS1 | Subprime 2006 | 100.00% | $ 400,498 | | $ 400,498 |
| 358 | RASC 2006-KS2 | Subprime 2006 | 100.00% | $ 459,951 | | $ 459,951 |
| 359 | RASC 2006-KS3 | Subprime 2006 | 100.00% | $ 633,463 | | $ 633,463 |
| 360 | RASC 2006-KS4 | Subprime 2006 | 100.00% | $ 365,068 | | $ 365,068 |
| 361 | RASC 2006-KS5 | Subprime 2006 | 100.00% | $ 338,557 | | $ 338,557 |
| 362 | RASC 2006-KS6 | Subprime 2006 | 100.00% | $ 285,028 | | $ 285,028 |
| 363 | RASC 2006-KS7 | Subprime 2006 | 100.00% | $ 290,560 | | $ 290,560 |
| 364 | RASC 2006-KS8 | Subprime 2006 | 100.00% | $ 345,505 | | $ 345,505 |
| 365 | RASC 2006-KS9 | Subprime 2006 | 100.00% | $ 909,121 | | $ 909,121 |
| 366 | RASC 2007-KS1 | Subprime 2007 | 100.00% | $ 225,025 | | $ 225,025 |
| 367 | RASC 2007-KS2 | Subprime 2007 | 100.00% | $ 631,326 | | $ 631,326 |
| 368 | RASC 2007-KS3 | Subprime 2007 | 100.00% | $ 876,330 | | $ 876,330 |
| 369 | RASC 2007-KS4 | Subprime 2007 | 100.00% | $ 148,837 | | $ 148,837 |
| 370 | RFMS2 1998-HI2 | CES 1999 | 100.00% | $ 17,885 | | $ 17,885 |
| 371 | RFMS2 2002-HI4 | Second Lien 2002 | 100.00% | $ 26,786 | | $ 26,786 |
| 372 | RFMS2 2002-HI5 | Second Lien 2003 | 100.00% | $ 29,362 | | $ 29,362 |
| 373 | RFMS2 2002-HS1 | CES 2002 | 100.00% | $ 2,615 | | $ 2,615 |
| 374 | RFMS2 2002-HS2 | CES 2002 | 100.00% | $ 2,419 | | $ 2,419 |
| 375 | RFMS2 2003-HI1 | Second Lien 2003 | 100.00% | $ 24,640 | | $ 24,640 |
| 376 | RFMS2 2003-HI2 | Second Lien 2003 | 100.00% | $ 25,999 | | $ 25,999 |
| 377 | RFMS2 2003-HI4 | Second Lien 2003 | 100.00% | $ 23,702 | | $ 23,702 |
| 378 | RFMS2 2003-HS3 | CES 2003 | 100.00% | $ 9,903 | MBIA | $ - |
| 379 | RFMS2 2004-HI1 | Second Lien 2004 | 100.00% | $ 23,240 | | $ 23,240 |
| 380 | RFMS2 2004-HS2 | CES 2004 | 100.00% | $ 9,685 | MBIA | $ - |
| 381 | RFMS2 2005-HI2 | Second Lien 2005 | 100.00% | $ 7,294 | | $ 7,294 |
| 382 | RFMS2 2005-HI3 | Second Lien 2005 | 100.00% | $ 3,665 | | $ 3,665 |
| 383 | RFMS2 2006-HI1 | Second Lien 2006 | 100.00% | $ 3,311 | | $ 3,311 |
| 384 | RFMS2 2006-HI3 | Second Lien 2006 | 100.00% | $ 3,183 | FGIC | $ 3,183 |
| 385 | RFMS2 2006-HI4 | Second Lien 2006 | 100.00% | $ 3,951 | FGIC | $ 3,951 |
| 386 | RFMS2 2006-HSA1 | CES 2006 | 100.00% | $ 7,494 | FGIC | $ 7,494 |
| 387 | RFMS2 2006-HSA3 | Second Lien 2006 | 100.00% | $ 3,104 | FSA | $ - |
| 388 | RFMS2 2006-HSA4 | Second Lien 2006 | 100.00% | $ 5,847 | MBIA | $ - |
| 389 | RFMS2 2006-HSA5 | Second Lien 2006 | 100.00% | $ 4,690 | MBIA | $ - |
| 390 | RFMSI 2003-S10 | Prime 2003 | 100.00% | $ 2,432 | | $ 2,432 |
| 391 | RFMSI 2003-S11 | Prime 2003 | 100.00% | $ 1,661 | | $ 1,661 |
| 392 | RFMSI 2003-S12 | Prime 2003 | 100.00% | $ 8,813 | | $ 8,813 |
| 393 | RFMSI 2003-S13 | Prime 2003 | 100.00% | $ 4,924 | MBIA - Insurer Exception | $ 4,924 |
| 394 | RFMSI 2003-S14 | Prime 2003 | 100.00% | $ 787 | | $ 787 |
| 395 | RFMSI 2003-S15 | Prime 2003 | 100.00% | $ 270 | | $ 270 |
| 396 | RFMSI 2003-S16 | Prime 2003 | 100.00% | $ 867 | | $ 867 |
| 397 | RFMSI 2003-S17 | Prime 2003 | 100.00% | $ 6,716 | | $ 6,716 |

Schedule 1-R – RFC Recognized Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 398 | RFMSI 2003-S18 | Prime 2003 | 100.00% | $ 1,070 | | $ 1,070 |
| 399 | RFMSI 2003-S19 | Prime 2003 | 100.00% | $ 2,540 | | $ 2,540 |
| 400 | RFMSI 2003-S20 | Prime 2003 | 100.00% | $ 3,056 | Radian - Insurer Exception | $ 3,056 |
| 401 | RFMSI 2003-S4 | Prime 2003 | 100.00% | $ 3,500 | MBIA - Insurer Exception | $ 3,500 |
| 402 | RFMSI 2003-S6 | Prime 2003 | 100.00% | $ 841 | | $ 841 |
| 403 | RFMSI 2003-S7 | Prime 2003 | 100.00% | $ 4,876 | | $ 4,876 |
| 404 | RFMSI 2003-S9 | Prime 2003 | 100.00% | $ 2,960 | | $ 2,960 |
| 405 | RFMSI 2004-PS1 | Prime 2004 | 100.00% | $ 387 | | $ 387 |
| 406 | RFMSI 2004-S1 | Prime 2004 | 100.00% | $ 3,710 | | $ 3,710 |
| 407 | RFMSI 2004-S2 | Prime 2004 | 100.00% | $ 4,456 | Radian - Insurer Exception | $ 4,456 |
| 408 | RFMSI 2004-S3 | Prime 2004 | 100.00% | $ 1,387 | | $ 1,387 |
| 409 | RFMSI 2004-S4 | Prime 2004 | 100.00% | $ 4,444 | MBIA - Insurer Exception | $ 4,444 |
| 410 | RFMSI 2004-S5 | Prime 2004 | 100.00% | $ 3,715 | | $ 3,715 |
| 411 | RFMSI 2004-S6 | Prime 2004 | 100.00% | $ 10,027 | | $ 10,027 |
| 412 | RFMSI 2004-S7 | Prime 2004 | 100.00% | $ 1,462 | | $ 1,462 |
| 413 | RFMSI 2004-S8 | Prime 2004 | 100.00% | $ 5,829 | | $ 5,829 |
| 414 | RFMSI 2004-S9 | Prime 2004 | 100.00% | $ 18,777 | | $ 18,777 |
| 415 | RFMSI 2004-SA1 | Prime 2004 | 100.00% | $ 9,892 | | $ 9,892 |
| 416 | RFMSI 2005-S1 | Prime 2005 | 100.00% | $ 12,896 | | $ 12,896 |
| 417 | RFMSI 2005-S3 | Prime 2005 | 100.00% | $ 2,942 | | $ 2,942 |
| 418 | RFMSI 2005-S4 | Prime 2005 | 100.00% | $ 13,574 | | $ 13,574 |
| 419 | RFMSI 2005-S5 | Prime 2005 | 100.00% | $ 7,282 | Assured Guaranty - Insurer Exception | $ 7,282 |
| 420 | RFMSI 2005-S6 | Prime 2005 | 100.00% | $ 10,559 | | $ 10,559 |
| 421 | RFMSI 2005-S8 | Prime 2005 | 100.00% | $ 22,255 | | $ 22,255 |
| 422 | RFMSI 2005-S9 | Prime 2005 | 100.00% | $ 26,641 | | $ 26,641 |
| 423 | RFMSI 2005-SA1 | Prime 2005 | 100.00% | $ 16,165 | | $ 16,165 |
| 424 | RFMSI 2005-SA2 | Prime 2005 | 100.00% | $ 38,296 | | $ 38,296 |
| 425 | RFMSI 2005-SA3 | Prime 2005 | 100.00% | $ 64,145 | | $ 64,145 |
| 426 | RFMSI 2005-SA4 | Prime 2005 | 100.00% | $ 98,467 | | $ 98,467 |
| 427 | RFMSI 2005-SA5 | Prime 2005 | 100.00% | $ 48,433 | | $ 48,433 |
| 428 | RFMSI 2006-S1 | Prime 2006 | 100.00% | $ 29,790 | | $ 29,790 |
| 429 | RFMSI 2006-S10 | Prime 2006 | 100.00% | $ 85,004 | | $ 85,004 |
| 430 | RFMSI 2006-S11 | Prime 2006 | 100.00% | $ 56,174 | | $ 56,174 |
| 431 | RFMSI 2006-S12 | Prime 2006 | 100.00% | $ 88,657 | | $ 88,657 |
| 432 | RFMSI 2006-S2 | Prime 2006 | 100.00% | $ 25,440 | | $ 25,440 |
| 433 | RFMSI 2006-S3 | Prime 2006 | 100.00% | $ 46,206 | | $ 46,206 |
| 434 | RFMSI 2006-S4 | Prime 2006 | 100.00% | $ 25,030 | | $ 25,030 |
| 435 | RFMSI 2006-S5 | Prime 2006 | 100.00% | $ 72,443 | | $ 72,443 |
| 436 | RFMSI 2006-S6 | Prime 2006 | 100.00% | $ 64,802 | | $ 64,802 |
| 437 | RFMSI 2006-S7 | Prime 2006 | 100.00% | $ 51,321 | | $ 51,321 |
| 438 | RFMSI 2006-S8 | Prime 2006 | 100.00% | $ 42,720 | | $ 42,720 |
| 439 | RFMSI 2006-S9 | Prime 2006 | 100.00% | $ 45,588 | | $ 45,588 |
| 440 | RFMSI 2006-SA1 | Prime 2006 | 100.00% | $ 39,704 | | $ 39,704 |
| 441 | RFMSI 2006-SA2 | Prime 2006 | 100.00% | $ 122,779 | | $ 122,779 |

**Schedule 1-R RFC Recognized Cure Claims**
**Subject to Further Review and Due Diligence**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 442 | RFMSI 2006-SA3 | Prime 2006 | 100.00% | $ 51,953 | | $ 51,953 |
| 443 | RFMSI 2006-SA4 | Prime 2006 | 100.00% | $ 42,269 | | $ 42,269 |
| 444 | RFMSI 2007-S1 | Prime 2007 | 100.00% | $ 53,441 | | $ 53,441 |
| 445 | RFMSI 2007-S2 | Prime 2007 | 100.00% | $ 46,307 | | $ 46,307 |
| 446 | RFMSI 2007-S3 | Prime 2007 | 100.00% | $ 64,827 | | $ 64,827 |
| 447 | RFMSI 2007-S4 | Prime 2007 | 100.00% | $ 49,682 | | $ 49,682 |
| 448 | RFMSI 2007-S5 | Prime 2007 | 100.00% | $ 62,374 | | $ 62,374 |
| 449 | RFMSI 2007-S6 | Prime 2007 | 100.00% | $ 94,150 | | $ 94,150 |
| 450 | RFMSI 2007-S7 | Prime 2007 | 100.00% | $ 44,028 | | $ 44,028 |
| 451 | RFMSI 2007-S8 | Prime 2007 | 100.00% | $ 58,826 | | $ 58,826 |
| 452 | RFMSI 2007-S9 | Prime 2007 | 100.00% | $ 23,063 | | $ 23,063 |
| 453 | RFMSI 2007-SA1 | Prime 2007 | 100.00% | $ 49,702 | | $ 49,702 |
| 454 | RFMSI 2007-SA2 | Prime 2007 | 100.00% | $ 68,328 | | $ 68,328 |
| 455 | RFMSI 2007-SA3 | Prime 2007 | 100.00% | $ 63,614 | | $ 63,614 |
| 456 | RFMSI 2007-SA4 | Prime 2007 | 100.00% | $ 75,708 | | $ 75,708 |
| 457 | RFSC 2001-RM2 | ALT-A 2001 | 100.00% | $ 6,381 | | $ 6,381 |
| 458 | RFSC 2002-RM1 | ALT-A 2002 | 100.00% | $ 3,901 | | $ 3,901 |
| 459 | RFSC 2003-RM1 | Prime 2003 | 100.00% | $ 2,448 | | $ 2,448 |
| 460 | RFSC 2003-RM2 | Prime 2003 | 100.00% | $ 4,875 | | $ 4,875 |
| 461 | SACO 2005-WM1 | CES 2005 | 20.77% | $ 3,787 | | $ 3,787 |
| 462 | SACO 2005-WM3 | CES 2005 | 20.77% | $ 4,999 | | $ 4,999 |
| 463 | SACO 2006-10 | CES 2006 | 47.57% | $ 1,987 | | $ 1,987 |
| 464 | SAIL 2005-5 | Subprime 2005 | 10.93% | $ 78,484 | CIFG | $ - |
| 465 | SAIL 2005-9 | Subprime 2005 | 0.66% | $ 7,306 | | $ 7,306 |
| 466 | SARM 2007-3 | Prime 2007 | 2.95% | $ 10,724 | | $ 10,724 |
| 467 | SARM 2007-6 | ALT-A 2007 | 0.75% | $ 2,429 | | $ 2,429 |
| 468 | SASC 2001-9 | Prime 2001 | 4.50% | $ 218 | MBIA | $ - |
| 469 | SASC 2002-9 | Prime 2002 | 0.90% | $ 132 | | $ 132 |
| 470 | SASC 2005-RF1 | Subprime 2005 | 2.90% | $ 830 | | $ 830 |
| 471 | SASC 2005-RF2 | Subprime 2005 | 9.50% | $ 6,885 | | $ 6,885 |
| 472 | SASC 2005-RF4 | Subprime 2005 | 7.49% | $ 7,256 | | $ 7,256 |
| 473 | SASC 2005-RF6 | Subprime 2005 | 6.70% | $ 3,146 | | $ 3,146 |
| 474 | SASC 2005-S1 | CES 2005 | 7.22% | $ 1,133 | United Guaranty (Pool Policy) | $ 1,133 |
| 475 | SASC 2007-TC1 | Subprime 2007 | 7.75% | $ 4,622 | | $ 4,622 |
| 476 | SASI 1993-6 | Prime 1999 | 4.50% | $ 63 | GEMICO (Pool Policy)/FSA - Insurer Exception | $ 63 |
| 477 | SEMT 2004-10 | Prime 2004 | 1.87% | $ 385 | | $ 385 |
| 478 | SEMT 2004-11 | Prime 2004 | 0.15% | $ 19 | | $ 19 |
| 479 | SEMT 2005-2 | Prime 2005 | 14.64% | $ 1,498 | | $ 1,498 |
| 480 | SEMT 2005-3 | ALT-A 2005 | 23.86% | $ 2,960 | | $ 2,960 |
| 481 | SMART 1993-3A | Prime 1999 | 4.50% | $ 4 | GEMICO (Pool Policy)/FGIC | $ 4 |
| 482 | SMART 1993-6A | Prime 1999 | 4.50% | $ 6 | FGIC/GEMICO (Pool Policy) | $ 6 |
| 483 | SMSC 1992-3 | Prime 1999 | 43.13% | $ 192 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $ 192 |

**Schedule 1-R – RFC Recognized Cure Claims**
Pg 310 of 399
**Subject to Further Review and Due Diligence**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 484 | SMSC 1992-4 | Prime 1999 | 44.51% | $ 527 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $ 527 |
| 485 | SMSC 1992-6 | Prime 1999 | 47.68% | $ 159 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSA (Pool Policy) | $ 159 |
| 486 | SMSC 1994-2 | Prime 1999 | 26.35% | $ 90 | | $ 90 |
| 487 | Southwest Savings 1988-1 | 1999 | 4.50% | $ 1 | | $ 1 |
| 488 | TMTS 2005-11 | Second Lien 2005 | 9.00% | $ 2,667 | | $ 2,667 |

**SCHEDULE 2-G**

**GMACM Recognized Original R+W Claims**

**Schedule 2-C: GMACM Capital P&W Claims**
**Subject to Further Review and Due Diligence**

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 2 | GMACM 2004-AR1 | Prime 2004 | $ 8,436,910 | $ 8,436,910 | $ 4,332,603 | $ 1,804,362 | | $ 1,804,362 | 100.00% |
| 3 | GMACM 2004-AR2 | Prime 2004 | $ 8,682,592 | $ 8,682,592 | $ 4,402,386 | $ 1,833,424 | | $ 1,833,424 | 100.00% |
| 4 | GMACM 2004-GH1 | Subprime 2004 | $ 10,167,719 | $ 10,167,719 | $ 5,700,828 | $ 2,374,175 | | $ 2,374,175 | 100.00% |
| 5 | GMACM 2004-HE1 | Second Lien 2004 | $ 94,042,576 | $ 94,042,576 | $ 52,660,113 | $ 21,930,906 | FGIC | $ 21,930,906 | 100.00% |
| 6 | GMACM 2004-HE2 | CES 2004 | $ 1,760,345 | $ 1,760,345 | $ 694,873 | $ 289,388 | OLD REPUBLIC INSURANCE COMPANY (Pool Policy) | $ 289,388 | 100.00% |
| 7 | GMACM 2004-HE3 | Second Lien 2004 | $ 99,943,218 | $ 99,943,218 | $ 55,836,734 | $ 23,253,845 | FSA | $ - | 100.00% |
| 8 | GMACM 2004-HE4 | Second Lien 2004 | $ 123,542,921 | $ 123,542,921 | $ 68,822,043 | $ 28,661,726 | MBIA | $ - | 100.00% |
| 9 | GMACM 2004-HE5 | CES 2004 | $ 22,329,699 | $ 22,329,699 | $ 8,555,177 | $ 3,562,901 | FGIC | $ 3,562,901 | 100.00% |
| 10 | GMACM 2004-HLTV1 | Second Lien 2004 | $ 22,575,910 | $ 22,575,910 | $ 12,392,387 | $ 5,160,951 | FGIC | $ 5,160,951 | 100.00% |
| 11 | GMACM 2004-J1 | Prime 2004 | $ 2,087,993 | $ 2,087,993 | $ 1,118,351 | $ 465,750 | MBIA - Insurer Exception | $ 465,750 | 100.00% |
| 12 | GMACM 2004-J2 | Prime 2004 | $ 3,228,005 | $ 3,228,005 | $ 1,669,643 | $ 695,342 | MBIA - Insurer Exception | $ 695,342 | 100.00% |
| 13 | GMACM 2004-J3 | Prime 2004 | $ 2,371,419 | $ 2,371,419 | $ 1,378,753 | $ 574,197 | | $ 574,197 | 100.00% |
| 14 | GMACM 2004-J4 | Prime 2004 | $ 4,546,196 | $ 4,546,196 | $ 2,417,852 | $ 1,006,942 | | $ 1,006,942 | 100.00% |
| 15 | GMACM 2004-J5 | Prime 2004 | $ 3,825,887 | $ 3,825,887 | $ 2,009,520 | $ 836,888 | | $ 836,888 | 100.00% |
| 16 | GMACM 2004-J6 | Prime 2004 | $ 2,323,661 | $ 2,323,661 | $ 1,259,304 | $ 524,451 | | $ 524,451 | 100.00% |
| 17 | GMACM 2004-VF1 | Second Lien 2004 | $ 45,464,909 | $ 45,464,909 | $ 26,109,245 | $ 10,873,493 | MBIA | $ - | 100.00% |
| 18 | GMACM 2005-AA1 | ALT-A 2005 | $ 25,413,853 | $ 25,413,853 | $ 10,814,503 | $ 4,503,823 | | $ 4,503,823 | 100.00% |
| 19 | GMACM 2005-AF1 | ALT-A 2005 | $ 20,245,375 | $ 20,245,375 | $ 8,435,517 | $ 3,513,067 | | $ 3,513,067 | 100.00% |
| 20 | GMACM 2005-AF2 | ALT-A 2005 | $ 48,473,380 | $ 48,473,380 | $ 21,027,865 | $ 8,757,295 | | $ 8,757,295 | 100.00% |
| 21 | GMACM 2005-AR1 | Prime 2005 | $ 14,932,794 | $ 14,932,794 | $ 7,541,437 | $ 3,140,718 | | $ 3,140,718 | 100.00% |
| 22 | GMACM 2005-AR2 | Prime 2005 | $ 24,056,306 | $ 24,056,306 | $ 12,015,342 | $ 5,003,927 | | $ 5,003,927 | 100.00% |
| 23 | GMACM 2005-AR3 | Prime 2005 | $ 25,896,285 | $ 25,896,285 | $ 13,087,384 | $ 5,450,391 | | $ 5,450,391 | 100.00% |
| 24 | GMACM 2005-AR4 | Prime 2005 | $ 22,267,542 | $ 22,267,542 | $ 10,988,637 | $ 4,576,344 | | $ 4,576,344 | 100.00% |
| 25 | GMACM 2005-AR5 | Prime 2005 | $ 36,479,091 | $ 36,479,091 | $ 18,380,676 | $ 7,654,843 | | $ 7,654,843 | 100.00% |
| 26 | GMACM 2005-AR6 | Prime 2005 | $ 44,597,347 | $ 44,597,347 | $ 22,210,041 | $ 9,249,625 | | $ 9,249,625 | 100.00% |
| 27 | GMACM 2005-HE1 | Second Lien 2005 | $ 165,480,838 | $ 165,480,838 | $ 92,575,594 | $ 38,554,164 | FGIC | $ 38,554,164 | 100.00% |
| 28 | GMACM 2005-HE2 | CES 2005 | $ 56,932,966 | $ 56,932,966 | $ 21,801,141 | $ 9,083,499 | FGIC | $ 9,083,499 | 100.00% |
| 29 | GMACM 2005-HE3 | Second Lien 2005 | $ 234,275,325 | $ 234,275,325 | $ 130,986,693 | $ 54,550,904 | AMBAC | $ 54,550,904 | 100.00% |
| 30 | GMACM 2005-J1 | Prime 2005 | $ 15,446,805 | $ 15,446,805 | $ 7,838,299 | $ 3,264,349 | | $ 3,264,349 | 100.00% |
| 31 | GMACM 2006-AR1 | Prime 2006 | $ 50,527,836 | $ 50,527,836 | $ 18,272,130 | $ 7,609,637 | | $ 7,609,637 | 100.00% |
| 32 | GMACM 2006-AR2 | Prime 2006 | $ 39,573,740 | $ 39,573,740 | $ 14,320,331 | $ 5,963,865 | | $ 5,963,865 | 100.00% |
| 33 | GMACM 2006-HE1 | Second Lien 2006 | $ 428,677,180 | $ 428,677,180 | $ 211,635,077 | $ 88,137,845 | FGIC | $ 88,137,845 | 100.00% |
| 34 | GMACM 2006-HE2 | CES 2006 | $ 121,708,276 | $ 121,708,276 | $ 64,445,158 | $ 26,838,922 | FGIC | $ 26,838,922 | 100.00% |
| 35 | GMACM 2006-HE3 | Second Lien 2006 | $ 212,878,457 | $ 212,878,457 | $ 112,756,584 | $ 46,958,767 | FGIC | $ 46,958,767 | 100.00% |
| 36 | GMACM 2006-HE4 | Second Lien 2006 | $ 418,375,565 | $ 418,375,565 | $ 206,432,205 | $ 85,971,049 | MBIA | $ - | 100.00% |
| 37 | GMACM 2006-HE5 | CES 2006 | $ 269,693,714 | $ 269,693,714 | $ 142,806,181 | $ 59,473,265 | FGIC | $ 59,473,265 | 100.00% |
| 38 | GMACM 2006-HLTV1 | Second Lien 2006 | $ 65,032,767 | $ 65,032,767 | $ 32,085,924 | $ 13,362,549 | FGIC | $ 13,362,549 | 100.00% |
| 39 | GMACM 2006-J1 | Prime 2006 | $ 32,980,554 | $ 32,980,554 | $ 11,816,068 | $ 4,920,936 | | $ 4,920,936 | 100.00% |
| 40 | GMACM 2007-HE1 | CES 2007 | $ 298,576,293 | $ 298,576,293 | $ 158,554,763 | $ 66,031,942 | MBIA | $ - | 100.00% |
| 41 | GMACM 2007-HE2 | CES 2007 | $ 372,412,307 | $ 372,412,307 | $ 197,927,529 | $ 82,429,180 | FGIC | $ 82,429,180 | 100.00% |
| 42 | GMACM 2007-HE3 | CES 2007 | $ 142,133,973 | $ 142,133,973 | $ 75,274,321 | $ 31,348,851 | | $ 31,348,851 | 100.00% |

**SCHEDULE 2-R**


**RFC Recognized Original R+W Claims**

Schedule 2.5 - RFC Original R&W Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 2 | RAAC 2004-RP1 | Subprime 2004 | $ 25,488,465 | $ 25,488,465 | $ 14,540,161 | $ 6,055,416 | | $ 6,055,416 | 100.00% |
| 3 | RAAC 2004-SP1 | ALT-A 2004 | $ 5,829,643 | $ 5,829,643 | $ 2,597,674 | $ 1,081,831 | | $ 1,081,831 | 100.00% |
| 4 | RAAC 2004-SP2 | Prime 2004 | $ 840,170 | $ 840,170 | $ 452,601 | $ 188,491 | | $ 188,491 | 100.00% |
| 5 | RAAC 2004-SP3 | ALT-A 2004 | $ 9,110,069 | $ 9,110,069 | $ 3,674,706 | $ 1,530,373 | | $ 1,530,373 | 100.00% |
| 6 | RAAC 2005-RP1 | Subprime 2005 | $ 44,858,529 | $ 44,858,529 | $ 25,602,709 | $ 10,662,540 | | $ 10,662,540 | 100.00% |
| 7 | RAAC 2005-RP2 | Subprime 2005 | $ 42,970,959 | $ 42,970,959 | $ 24,458,673 | $ 10,186,094 | | $ 10,186,094 | 100.00% |
| 8 | RAAC 2005-RP3 | Subprime 2005 | $ 57,677,643 | $ 57,677,643 | $ 32,885,588 | $ 13,695,579 | | $ 13,695,579 | 100.00% |
| 9 | RAAC 2005-SP1 | Prime 2005 | $ 7,290,030 | $ 7,290,030 | $ 4,112,765 | $ 1,712,808 | | $ 1,712,808 | 100.00% |
| 10 | RAAC 2005-SP2 | ALT-A 2005 | $ 43,367,419 | $ 43,367,419 | $ 18,560,284 | $ 7,729,642 | | $ 7,729,642 | 100.00% |
| 11 | RAAC 2005-SP3 | Subprime 2005 | $ 40,439,330 | $ 40,439,330 | $ 22,986,205 | $ 9,572,868 | | $ 9,572,868 | 100.00% |
| 12 | RAAC 2006-RP1 | Subprime 2006 | $ 69,775,076 | $ 69,775,076 | $ 38,788,671 | $ 16,153,985 | | $ 16,153,985 | 100.00% |
| 13 | RAAC 2006-RP2 | Subprime 2006 | $ 112,519,282 | $ 112,519,282 | $ 62,535,640 | $ 26,043,681 | | $ 26,043,681 | 100.00% |
| 14 | RAAC 2006-RP3 | Subprime 2006 | $ 118,193,050 | $ 118,193,050 | $ 65,685,631 | $ 27,355,531 | | $ 27,355,531 | 100.00% |
| 15 | RAAC 2006-RP4 | Subprime 2006 | $ 123,912,917 | $ 123,912,917 | $ 68,878,756 | $ 28,685,345 | | $ 28,685,345 | 100.00% |
| 16 | RAAC 2006-SP1 | Subprime 2006 | $ 79,151,196 | $ 79,151,196 | $ 43,987,684 | $ 18,319,173 | | $ 18,319,173 | 100.00% |
| 17 | RAAC 2006-SP2 | Subprime 2006 | $ 90,252,984 | $ 90,252,984 | $ 50,165,955 | $ 20,892,185 | | $ 20,892,185 | 100.00% |
| 18 | RAAC 2006-SP3 | Subprime 2006 | $ 77,562,062 | $ 77,562,062 | $ 43,117,082 | $ 17,956,601 | | $ 17,956,601 | 100.00% |
| 19 | RAAC 2006-SP4 | Subprime 2006 | $ 68,197,668 | $ 68,197,668 | $ 37,915,529 | $ 15,790,355 | | $ 15,790,355 | 100.00% |
| 20 | RAAC 2007-RP1 | Subprime 2007 | $ 125,983,175 | $ 125,983,175 | $ 70,039,947 | $ 29,168,936 | | $ 29,168,936 | 100.00% |
| 21 | RAAC 2007-RP2 | Subprime 2007 | $ 99,312,044 | $ 99,312,044 | $ 55,211,008 | $ 22,993,255 | | $ 22,993,255 | 100.00% |
| 22 | RAAC 2007-RP3 | Subprime 2007 | $ 169,917,951 | $ 169,917,951 | $ 94,454,420 | $ 39,336,622 | | $ 39,336,622 | 100.00% |
| 23 | RAAC 2007-RP4 | Subprime 2007 | $ 130,100,639 | $ 130,100,639 | $ 72,326,162 | $ 30,121,056 | | $ 30,121,056 | 100.00% |
| 24 | RAAC 2007-SP1 | Subprime 2007 | $ 80,842,372 | $ 80,842,372 | $ 44,966,473 | $ 18,726,801 | | $ 18,726,801 | 100.00% |
| 25 | RAAC 2007-SP2 | Subprime 2007 | $ 112,917,165 | $ 112,917,165 | $ 62,784,686 | $ 26,147,400 | | $ 26,147,400 | 100.00% |
| 26 | RAAC 2007-SP3 | Subprime 2007 | $ 125,157,905 | $ 125,157,905 | $ 69,596,339 | $ 28,984,190 | | $ 28,984,190 | 100.00% |
| 27 | RALI 2004-QA1 | ALT-A 2004 | $ 5,028,313 | $ 5,028,313 | $ 2,169,714 | $ 903,602 | | $ 903,602 | 100.00% |
| 28 | RALI 2004-QA2 | ALT-A 2004 | $ 13,644,863 | $ 13,644,863 | $ 5,814,267 | $ 2,421,418 | | $ 2,421,418 | 100.00% |
| 29 | RALI 2004-QA3 | ALT-A 2004 | $ 9,118,939 | $ 9,118,939 | $ 3,865,262 | $ 1,609,733 | | $ 1,609,733 | 100.00% |
| 30 | RALI 2004-QA4 | ALT-A 2004 | $ 10,115,612 | $ 10,115,612 | $ 4,356,600 | $ 1,814,356 | | $ 1,814,356 | 100.00% |
| 31 | RALI 2004-QA5 | ALT-A 2004 | $ 14,539,303 | $ 14,539,303 | $ 6,208,247 | $ 2,585,495 | | $ 2,585,495 | 100.00% |
| 32 | RALI 2004-QA6 | ALT-A 2004 | $ 43,885,906 | $ 43,885,906 | $ 19,034,737 | $ 7,927,234 | | $ 7,927,234 | 100.00% |
| 33 | RALI 2004-QS1 | ALT-A 2004 | $ 7,116,080 | $ 7,116,080 | $ 2,999,267 | $ 1,249,079 | | $ 1,249,079 | 100.00% |
| 34 | RALI 2004-QS10 | ALT-A 2004 | $ 6,805,929 | $ 6,805,929 | $ 2,947,235 | $ 1,227,410 | | $ 1,227,410 | 100.00% |
| 35 | RALI 2004-QS11 | ALT-A 2004 | $ 6,117,274 | $ 6,117,274 | $ 2,597,569 | $ 1,081,787 | | $ 1,081,787 | 100.00% |
| 36 | RALI 2004-QS12 | ALT-A 2004 | $ 11,958,833 | $ 11,958,833 | $ 5,061,895 | $ 2,108,084 | | $ 2,108,084 | 100.00% |
| 37 | RALI 2004-QS13 | ALT-A 2004 | $ 1,296,699 | $ 1,296,699 | $ 559,309 | $ 232,931 | | $ 232,931 | 100.00% |
| 38 | RALI 2004-QS14 | ALT-A 2004 | $ 7,191,774 | $ 7,191,774 | $ 3,089,872 | $ 1,286,812 | | $ 1,286,812 | 100.00% |
| 39 | RALI 2004-QS15 | ALT-A 2004 | $ 9,037,632 | $ 9,037,632 | $ 3,947,324 | $ 1,644,075 | | $ 1,644,075 | 100.00% |
| 40 | RALI 2004-QS16 | ALT-A 2004 | $ 17,997,855 | $ 17,997,855 | $ 7,719,780 | $ 3,214,990 | | $ 3,214,990 | 100.00% |
| 41 | RALI 2004-QS2 | ALT-A 2004 | $ 7,920,781 | $ 7,920,781 | $ 3,418,624 | $ 1,423,725 | | $ 1,423,725 | 100.00% |
| 42 | RALI 2004-QS3 | ALT-A 2004 | $ 1,556,543 | $ 1,556,543 | $ 666,648 | $ 277,633 | | $ 277,633 | 100.00% |
| 43 | RALI 2004-QS4 | ALT-A 2004 | $ 7,559,444 | $ 7,559,444 | $ 3,214,118 | $ 1,338,556 | | $ 1,338,556 | 100.00% |
| 44 | RALI 2004-QS6 | ALT-A 2004 | $ 8,197,861 | $ 8,197,861 | $ 3,502,121 | $ 1,458,498 | | $ 1,458,498 | 100.00% |
| 45 | RALI 2004-QS6 | ALT-A 2004 | $ 1,342,050 | $ 1,342,050 | $ 574,277 | $ 239,164 | | $ 239,164 | 100.00% |
| 46 | RALI 2004-QS7 | ALT-A 2004 | $ 12,123,587 | $ 12,123,587 | $ 5,090,930 | $ 2,120,176 | | $ 2,120,176 | 100.00% |
| 47 | RALI 2004-QS8 | ALT-A 2004 | $ 7,532,047 | $ 7,532,047 | $ 3,196,591 | $ 1,331,257 | | $ 1,331,257 | 100.00% |
| 48 | RALI 2004-QS9 | ALT-A 2004 | $ 1,299,101 | $ 1,299,101 | $ 565,749 | $ 235,613 | | $ 235,613 | 100.00% |
| 49 | RALI 2005-QA1 | ALT-A 2005 | $ 26,941,306 | $ 26,941,306 | $ 11,653,331 | $ 4,853,163 | | $ 4,853,163 | 100.00% |
| 50 | RALI 2005-QA10 | ALT-A 2005 | $ 105,311,972 | $ 105,311,972 | $ 45,478,554 | $ 18,940,063 | | $ 18,940,063 | 100.00% |
| 51 | RALI 2005-QA11 | ALT-A 2005 | $ 90,295,594 | $ 90,295,594 | $ 39,108,273 | $ 16,287,087 | | $ 16,287,087 | 100.00% |
| 52 | RALI 2005-QA12 | ALT-A 2005 | $ 50,221,201 | $ 50,221,201 | $ 21,779,888 | $ 9,070,483 | | $ 9,070,483 | 100.00% |
| 53 | RALI 2005-QA13 | ALT-A 2005 | $ 117,130,395 | $ 117,130,395 | $ 50,990,383 | $ 21,235,527 | | $ 21,235,527 | 100.00% |
| 54 | RALI 2005-QA2 | ALT-A 2005 | $ 45,465,536 | $ 45,465,536 | $ 19,344,626 | $ 8,056,290 | | $ 8,056,290 | 100.00% |
| 55 | RALI 2005-QA3 | ALT-A 2005 | $ 49,178,768 | $ 49,178,768 | $ 21,025,437 | $ 8,756,284 | | $ 8,756,284 | 100.00% |
| 56 | RALI 2005-QA4 | ALT-A 2005 | $ 59,640,460 | $ 59,640,460 | $ 25,450,417 | $ 10,599,117 | | $ 10,599,117 | 100.00% |
| 57 | RALI 2005-QA5 | ALT-A 2005 | $ 10,110,760 | $ 10,110,760 | $ 4,475,540 | $ 1,863,890 | | $ 1,863,890 | 100.00% |
| 58 | RALI 2005-QA6 | ALT-A 2005 | $ 64,578,681 | $ 64,578,681 | $ 27,764,532 | $ 11,562,856 | | $ 11,562,856 | 100.00% |
| 59 | RALI 2005-QA7 | ALT-A 2005 | $ 70,450,769 | $ 70,450,769 | $ 29,969,557 | $ 12,481,164 | | $ 12,481,164 | 100.00% |
| 60 | RALI 2005-QA8 | ALT-A 2005 | $ 70,082,400 | $ 70,082,400 | $ 30,143,320 | $ 12,553,530 | | $ 12,553,530 | 100.00% |

**Schedule 2.5 - RFC Original RMW Claims**
**Subject to Further Review and Due Diligence**

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 61 | RALI 2005-QA9 | ALT-A 2005 | $ 110,903,775 | $ 110,903,775 | $ 48,032,944 | $ 20,003,868 | | $ 20,003,868 | 100.00% |
| 62 | RALI 2005-QO1 | Pay Option Arm 2005 | $ 121,308,683 | $ 121,308,683 | $ 33,635,129 | $ 14,007,734 | | $ 14,007,734 | 100.00% |
| 63 | RALI 2005-QO2 | Pay Option Arm 2005 | $ 82,682,064 | $ 82,682,064 | $ 23,234,995 | $ 9,676,479 | | $ 9,676,479 | 100.00% |
| 64 | RALI 2005-QO3 | Pay Option Arm 2005 | $ 109,314,347 | $ 109,314,347 | $ 31,027,729 | $ 12,921,852 | | $ 12,921,852 | 100.00% |
| 65 | RALI 2005-QO4 | Pay Option Arm 2005 | $ 183,454,329 | $ 183,454,329 | $ 52,146,933 | $ 21,717,186 | | $ 21,717,186 | 100.00% |
| 66 | RALI 2005-QO5 | Pay Option Arm 2005 | $ 316,028,961 | $ 316,028,961 | $ 90,530,833 | $ 37,702,599 | | $ 37,702,599 | 100.00% |
| 67 | RALI 2005-QS1 | ALT-A 2005 | $ 14,250,968 | $ 14,250,968 | $ 5,880,447 | $ 2,448,979 | | $ 2,448,979 | 100.00% |
| 68 | RALI 2005-QS10 | ALT-A 2005 | $ 26,870,836 | $ 26,870,836 | $ 11,343,246 | $ 4,724,024 | | $ 4,724,024 | 100.00% |
| 69 | RALI 2005-QS11 | ALT-A 2005 | $ 22,481,714 | $ 22,481,714 | $ 9,492,304 | $ 3,953,179 | | $ 3,953,179 | 100.00% |
| 70 | RALI 2005-QS12 | ALT-A 2005 | $ 55,651,247 | $ 55,651,247 | $ 23,510,977 | $ 9,791,415 | | $ 9,791,415 | 100.00% |
| 71 | RALI 2005-QS13 | ALT-A 2005 | $ 74,970,968 | $ 74,970,968 | $ 31,725,335 | $ 13,212,378 | | $ 13,212,378 | 100.00% |
| 72 | RALI 2005-QS14 | ALT-A 2005 | $ 55,553,504 | $ 55,553,504 | $ 23,492,736 | $ 9,783,818 | | $ 9,783,818 | 100.00% |
| 73 | RALI 2005-QS15 | ALT-A 2005 | $ 55,021,759 | $ 55,021,759 | $ 23,491,408 | $ 9,783,265 | | $ 9,783,265 | 100.00% |
| 74 | RALI 2005-QS16 | ALT-A 2005 | $ 54,522,209 | $ 54,522,209 | $ 23,264,325 | $ 9,688,694 | | $ 9,688,694 | 100.00% |
| 75 | RALI 2005-QS17 | ALT-A 2005 | $ 76,335,380 | $ 76,335,380 | $ 32,761,396 | $ 13,643,857 | | $ 13,643,857 | 100.00% |
| 76 | RALI 2005-QS2 | ALT-A 2005 | $ 14,575,418 | $ 14,575,418 | $ 5,969,690 | $ 2,486,145 | | $ 2,486,145 | 100.00% |
| 77 | RALI 2005-QS3 | ALT-A 2005 | $ 31,012,081 | $ 31,012,081 | $ 12,928,771 | $ 5,384,335 | | $ 5,384,335 | 100.00% |
| 78 | RALI 2005-QS4 | ALT-A 2005 | $ 16,353,729 | $ 16,353,729 | $ 6,803,076 | $ 2,833,219 | | $ 2,833,219 | 100.00% |
| 79 | RALI 2005-QS5 | ALT-A 2005 | $ 17,083,942 | $ 17,083,942 | $ 7,135,443 | $ 2,971,637 | Radian | $ | 100.00% |
| 80 | RALI 2005-QS6 | ALT-A 2005 | $ 23,875,505 | $ 23,875,505 | $ 10,023,050 | $ 4,174,214 | | $ 4,174,214 | 100.00% |
| 81 | RALI 2005-QS7 | ALT-A 2005 | $ 33,424,474 | $ 33,424,474 | $ 14,017,531 | $ 5,837,761 | | $ 5,837,761 | 100.00% |
| 82 | RALI 2005-QS8 | ALT-A 2005 | $ 2,539,785 | $ 2,539,785 | $ 1,045,359 | $ 435,352 | | $ 435,352 | 100.00% |
| 83 | RALI 2005-QS9 | ALT-A 2005 | $ 34,132,932 | $ 34,132,932 | $ 14,243,899 | $ 5,932,034 | | $ 5,932,034 | 100.00% |
| 84 | RALI 2006-QA1 | ALT-A 2006 | $ 143,143,534 | $ 143,143,534 | $ 49,442,759 | $ 20,591,002 | | $ 20,591,002 | 100.00% |
| 85 | RALI 2006-QA10 | ALT-A 2006 | $ 118,689,793 | $ 118,689,793 | $ 41,080,594 | $ 17,108,483 | | $ 17,108,483 | 100.00% |
| 86 | RALI 2006-QA11 | ALT-A 2006 | $ 126,081,604 | $ 126,081,604 | $ 43,673,618 | $ 18,188,377 | | $ 18,188,377 | 100.00% |
| 87 | RALI 2006-QA2 | ALT-A 2006 | $ 100,201,818 | $ 100,201,818 | $ 34,610,103 | $ 14,413,773 | | $ 14,413,773 | 100.00% |
| 88 | RALI 2006-QA3 | ALT-A 2006 | $ 102,957,233 | $ 102,957,233 | $ 35,632,752 | $ 14,839,667 | | $ 14,839,667 | 100.00% |
| 89 | RALI 2006-QA4 | ALT-A 2006 | $ 81,080,562 | $ 81,080,562 | $ 28,046,484 | $ 11,680,279 | | $ 11,680,279 | 100.00% |
| 90 | RALI 2006-QA5 | ALT-A 2006 | $ 173,465,680 | $ 173,465,680 | $ 59,944,580 | $ 24,964,605 | | $ 24,964,605 | 100.00% |
| 91 | RALI 2006-QA6 | ALT-A 2006 | $ 184,902,914 | $ 184,902,914 | $ 64,155,515 | $ 26,718,297 | | $ 26,718,297 | 100.00% |
| 92 | RALI 2006-QA7 | ALT-A 2006 | $ 190,695,376 | $ 190,695,376 | $ 66,172,290 | $ 27,558,206 | | $ 27,558,206 | 100.00% |
| 93 | RALI 2006-QA8 | ALT-A 2006 | $ 261,080,121 | $ 261,080,121 | $ 90,598,338 | $ 37,730,713 | | $ 37,730,713 | 100.00% |
| 94 | RALI 2006-QA9 | ALT-A 2006 | $ 91,185,526 | $ 91,185,526 | $ 31,531,071 | $ 13,131,475 | | $ 13,131,475 | 100.00% |
| 95 | RALI 2006-QH1 | Pay Option Arm 2006 | $ 137,316,708 | $ 137,316,708 | $ 50,153,444 | $ 20,886,975 | Ambac | $ 20,886,975 | 100.00% |
| 96 | RALI 2006-QO1 | Pay Option Arm 2006 | $ 249,254,578 | $ 249,254,578 | $ 89,526,973 | $ 37,284,530 | | $ 37,284,530 | 100.00% |
| 97 | RALI 2006-QO10 | Pay Option Arm 2006 | $ 359,931,316 | $ 359,931,316 | $ 129,861,905 | $ 54,082,474 | | $ 54,082,474 | 100.00% |
| 98 | RALI 2006-QO2 | Pay Option Arm 2006 | $ 187,034,845 | $ 187,034,845 | $ 66,952,310 | $ 27,883,054 | | $ 27,883,054 | 100.00% |
| 99 | RALI 2006-QO3 | Pay Option Arm 2006 | $ 202,660,477 | $ 202,660,477 | $ 73,189,418 | $ 30,480,569 | | $ 30,480,569 | 100.00% |
| 100 | RALI 2006-QO4 | Pay Option Arm 2006 | $ 286,648,834 | $ 286,648,834 | $ 103,157,096 | $ 42,960,951 | XL | $ - | 100.00% |
| 101 | RALI 2006-QO5 | Pay Option Arm 2006 | $ 368,247,434 | $ 368,247,434 | $ 132,962,766 | $ 55,373,862 | | $ 55,373,862 | 100.00% |
| 102 | RALI 2006-QO6 | Pay Option Arm 2006 | $ 449,322,172 | $ 449,322,172 | $ 162,375,739 | $ 67,623,231 | | $ 67,623,231 | 100.00% |
| 103 | RALI 2006-QO7 | Pay Option Arm 2006 | $ 561,840,228 | $ 561,840,228 | $ 203,780,662 | $ 84,866,784 | | $ 84,866,784 | 100.00% |
| 104 | RALI 2006-QO8 | Pay Option Arm 2006 | $ 496,397,971 | $ 496,397,971 | $ 179,185,447 | $ 74,623,826 | | $ 74,623,826 | 100.00% |
| 105 | RALI 2006-QO9 | Pay Option Arm 2006 | $ 346,346,750 | $ 346,346,750 | $ 125,271,925 | $ 52,170,924 | | $ 52,170,924 | 100.00% |
| 106 | RALI 2006-QS1 | ALT-A 2006 | $ 52,154,309 | $ 52,154,309 | $ 17,857,760 | $ 7,437,068 | | $ 7,437,068 | 100.00% |
| 107 | RALI 2006-QS10 | ALT-A 2006 | $ 100,557,075 | $ 100,557,075 | $ 34,479,649 | $ 14,359,444 | | $ 14,359,444 | 100.00% |
| 108 | RALI 2006-QS11 | ALT-A 2006 | $ 153,640,103 | $ 153,640,103 | $ 52,778,607 | $ 21,980,254 | | $ 21,980,254 | 100.00% |
| 109 | RALI 2006-QS12 | ALT-A 2006 | $ 124,652,535 | $ 124,652,535 | $ 43,020,221 | $ 17,916,263 | | $ 17,916,263 | 100.00% |
| 110 | RALI 2006-QS13 | ALT-A 2006 | $ 118,153,596 | $ 118,153,596 | $ 40,588,991 | $ 16,903,749 | | $ 16,903,749 | 100.00% |
| 111 | RALI 2006-QS14 | ALT-A 2006 | $ 163,538,308 | $ 163,538,308 | $ 56,348,772 | $ 23,467,090 | | $ 23,467,090 | 100.00% |
| 112 | RALI 2006-QS15 | ALT-A 2006 | $ 121,625,404 | $ 121,625,404 | $ 41,928,540 | $ 17,461,619 | | $ 17,461,619 | 100.00% |
| 113 | RALI 2006-QS16 | ALT-A 2006 | $ 167,277,151 | $ 167,277,151 | $ 57,498,540 | $ 23,945,924 | | $ 23,945,924 | 100.00% |
| 114 | RALI 2006-QS17 | ALT-A 2006 | $ 126,729,837 | $ 126,729,837 | $ 43,573,311 | $ 18,146,603 | | $ 18,146,603 | 100.00% |
| 115 | RALI 2006-QS18 | ALT-A 2006 | $ 285,759,094 | $ 285,759,094 | $ 98,518,965 | $ 41,029,348 | | $ 41,029,348 | 100.00% |
| 116 | RALI 2006-QS2 | ALT-A 2006 | $ 137,150,883 | $ 137,150,883 | $ 46,992,151 | $ 19,570,418 | | $ 19,570,418 | 100.00% |
| 117 | RALI 2006-QS3 | ALT-A 2006 | $ 184,888,187 | $ 184,888,187 | $ 63,650,649 | $ 26,508,040 | | $ 26,508,040 | 100.00% |
| 118 | RALI 2006-QS4 | ALT-A 2006 | $ 143,712,269 | $ 143,712,269 | $ 49,376,733 | $ 20,563,504 | | $ 20,563,504 | 100.00% |
| 119 | RALI 2006-QS5 | ALT-A 2006 | $ 139,833,975 | $ 139,833,975 | $ 48,072,553 | $ 20,020,364 | | $ 20,020,364 | 100.00% |

Schedule 2.5 - RFC Original R&W Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 120 | RALI 2006-QS6 | ALT-A 2006 | $ 170,394,717 | $ 170,394,717 | $ 58,701,890 | $ 24,447,073 | | $ 24,447,073 | 100.00% |
| 121 | RALI 2006-QS7 | ALT-A 2006 | $ 113,855,935 | $ 113,855,935 | $ 39,215,364 | $ 16,331,686 | | $ 16,331,686 | 100.00% |
| 122 | RALI 2006-QS8 | ALT-A 2006 | $ 204,742,078 | $ 204,742,078 | $ 70,445,452 | $ 29,337,813 | | $ 29,337,813 | 100.00% |
| 123 | RALI 2006-QS9 | ALT-A 2006 | $ 114,720,418 | $ 114,720,418 | $ 39,534,943 | $ 16,464,778 | | $ 16,464,778 | 100.00% |
| 124 | RALI 2007-QA1 | ALT-A 2007 | $ 135,783,325 | $ 135,783,325 | $ 46,948,050 | $ 19,552,052 | | $ 19,552,052 | 100.00% |
| 125 | RALI 2007-QA2 | ALT-A 2007 | $ 122,561,937 | $ 122,561,937 | $ 42,455,608 | $ 17,681,123 | | $ 17,681,123 | 100.00% |
| 126 | RALI 2007-QA3 | ALT-A 2007 | $ 331,625,616 | $ 331,625,616 | $ 114,864,146 | $ 47,836,486 | | $ 47,836,486 | 100.00% |
| 127 | RALI 2007-QA4 | ALT-A 2007 | $ 87,240,592 | $ 87,240,592 | $ 30,295,539 | $ 12,616,923 | | $ 12,616,923 | 100.00% |
| 128 | RALI 2007-QA5 | ALT-A 2007 | $ 168,998,365 | $ 168,998,365 | $ 58,365,751 | $ 24,307,084 | | $ 24,307,084 | 100.00% |
| 129 | RALI 2007-QH1 | ALT-A 2007 | $ 202,655,058 | $ 202,655,058 | $ 69,834,430 | $ 29,083,346 | | $ 29,083,346 | 100.00% |
| 130 | RALI 2007-QH2 | ALT-A 2007 | $ 134,525,243 | $ 134,525,243 | $ 46,343,223 | $ 19,300,164 | | $ 19,300,164 | 100.00% |
| 131 | RALI 2007-QH3 | ALT-A 2007 | $ 139,167,011 | $ 139,167,011 | $ 47,962,922 | $ 19,974,707 | | $ 19,974,707 | 100.00% |
| 132 | RALI 2007-QH4 | ALT-A 2007 | $ 154,380,286 | $ 154,380,286 | $ 53,069,172 | $ 22,101,263 | | $ 22,101,263 | 100.00% |
| 133 | RALI 2007-QH5 | ALT-A 2007 | $ 196,626,279 | $ 196,626,279 | $ 67,651,062 | $ 28,174,058 | | $ 28,174,058 | 100.00% |
| 134 | RALI 2007-QH6 | ALT-A 2007 | $ 234,932,685 | $ 234,932,685 | $ 80,805,321 | $ 33,652,299 | | $ 33,652,299 | 100.00% |
| 135 | RALI 2007-QH7 | ALT-A 2007 | $ 131,566,911 | $ 131,566,911 | $ 45,158,352 | $ 18,806,712 | | $ 18,806,712 | 100.00% |
| 136 | RALI 2007-QH8 | ALT-A 2007 | $ 220,474,243 | $ 220,474,243 | $ 75,804,176 | $ 31,569,515 | | $ 31,569,515 | 100.00% |
| 137 | RALI 2007-QH9 | ALT-A 2007 | $ 228,871,769 | $ 228,871,769 | $ 78,626,391 | $ 32,744,859 | | $ 32,744,859 | 100.00% |
| 138 | RALI 2007-QO1 | Pay Option Arm 2007 | $ 248,001,070 | $ 248,001,070 | $ 90,084,572 | $ 37,516,749 | | $ 37,516,749 | 100.00% |
| 139 | RALI 2007-QO2 | Pay Option Arm 2007 | $ 213,492,089 | $ 213,492,089 | $ 77,160,670 | $ 32,134,442 | | $ 32,134,442 | 100.00% |
| 140 | RALI 2007-QO3 | Pay Option Arm 2007 | $ 119,591,896 | $ 119,591,896 | $ 43,464,620 | $ 18,101,337 | | $ 18,101,337 | 100.00% |
| 141 | RALI 2007-QO4 | Pay Option Arm 2007 | $ 201,474,477 | $ 201,474,477 | $ 73,446,510 | $ 30,587,638 | | $ 30,587,638 | 100.00% |
| 142 | RALI 2007-QO5 | Pay Option Arm 2007 | $ 95,228,288 | $ 95,228,288 | $ 34,885,606 | $ 14,528,509 | | $ 14,528,509 | 100.00% |
| 143 | RALI 2007-QS1 | ALT-A 2007 | $ 299,795,012 | $ 299,795,012 | $ 102,785,334 | $ 42,806,126 | | $ 42,806,126 | 100.00% |
| 144 | RALI 2007-QS10 | ALT-A 2007 | $ 127,891,133 | $ 127,891,133 | $ 44,021,301 | $ 18,333,174 | | $ 18,333,174 | 100.00% |
| 145 | RALI 2007-QS11 | ALT-A 2007 | $ 90,763,338 | $ 90,763,338 | $ 31,312,099 | $ 13,040,281 | | $ 13,040,281 | 100.00% |
| 146 | RALI 2007-QS2 | ALT-A 2007 | $ 126,979,943 | $ 126,979,943 | $ 43,545,056 | $ 18,134,836 | | $ 18,134,836 | 100.00% |
| 147 | RALI 2007-QS3 | ALT-A 2007 | $ 253,087,310 | $ 253,087,310 | $ 86,963,337 | $ 36,216,875 | | $ 36,216,875 | 100.00% |
| 148 | RALI 2007-QS4 | ALT-A 2007 | $ 180,670,983 | $ 180,670,983 | $ 62,110,660 | $ 25,866,694 | | $ 25,866,694 | 100.00% |
| 149 | RALI 2007-QS5 | ALT-A 2007 | $ 115,597,289 | $ 115,597,289 | $ 39,663,031 | $ 16,518,122 | | $ 16,518,122 | 100.00% |
| 150 | RALI 2007-QS6 | ALT-A 2007 | $ 217,738,744 | $ 217,738,744 | $ 74,873,512 | $ 31,181,929 | | $ 31,181,929 | 100.00% |
| 151 | RALI 2007-QS7 | ALT-A 2007 | $ 201,065,807 | $ 201,065,807 | $ 68,917,044 | $ 28,701,290 | | $ 28,701,290 | 100.00% |
| 152 | RALI 2007-QS8 | ALT-A 2007 | $ 165,411,041 | $ 165,411,041 | $ 56,624,303 | $ 23,581,838 | | $ 23,581,838 | 100.00% |
| 153 | RALI 2007-QS9 | ALT-A 2007 | $ 192,460,010 | $ 192,460,010 | $ 66,118,025 | $ 27,535,607 | | $ 27,535,607 | 100.00% |
| 154 | RAMP 2004-KR1 | Subprime 2004 | $ 144,538,814 | $ 144,538,814 | $ 82,718,529 | $ 34,449,076 | | $ 34,449,076 | 100.00% |
| 155 | RAMP 2004-KR2 | Subprime 2004 | $ 108,308,750 | $ 108,308,750 | $ 61,960,330 | $ 25,804,087 | | $ 25,804,087 | 100.00% |
| 156 | RAMP 2004-RS1 | Subprime 2004 | $ 96,090,202 | $ 96,090,202 | $ 54,772,896 | $ 22,810,798 | AMBAC - Insurer Exception | $ 22,810,798 | 100.00% |
| 157 | RAMP 2004-RS10 | Subprime 2004 | $ 150,264,174 | $ 150,264,174 | $ 85,761,303 | $ 35,716,274 | | $ 35,716,274 | 100.00% |
| 158 | RAMP 2004-RS11 | Subprime 2004 | $ 107,613,913 | $ 107,613,913 | $ 61,371,174 | $ 25,558,726 | | $ 25,558,726 | 100.00% |
| 159 | RAMP 2004-RS12 | Subprime 2004 | $ 120,763,421 | $ 120,763,421 | $ 68,856,856 | $ 28,676,224 | | $ 28,676,224 | 100.00% |
| 160 | RAMP 2004-RS2 | Subprime 2004 | $ 73,698,308 | $ 73,698,308 | $ 42,077,597 | $ 17,523,696 | | $ 17,523,696 | 100.00% |
| 161 | RAMP 2004-RS3 | Subprime 2004 | $ 43,546,254 | $ 43,546,254 | $ 24,660,092 | $ 10,269,977 | | $ 10,269,977 | 100.00% |
| 162 | RAMP 2004-RS4 | Subprime 2004 | $ 95,821,753 | $ 95,821,753 | $ 54,632,342 | $ 22,752,263 | | $ 22,752,263 | 100.00% |
| 163 | RAMP 2004-RS5 | Subprime 2004 | $ 90,129,395 | $ 90,129,395 | $ 51,300,556 | $ 21,364,703 | AMBAC | $ 21,364,703 | 100.00% |
| 164 | RAMP 2004-RS6 | Subprime 2004 | $ 88,188,163 | $ 88,188,163 | $ 50,247,267 | $ 20,926,048 | | $ 20,926,048 | 100.00% |
| 165 | RAMP 2004-RS7 | Subprime 2004 | $ 104,499,590 | $ 104,499,590 | $ 59,400,890 | $ 24,738,179 | FGIC | $ 24,738,179 | 100.00% |
| 166 | RAMP 2004-RS8 | Subprime 2004 | $ 95,835,922 | $ 95,835,922 | $ 54,545,844 | $ 22,716,240 | | $ 22,716,240 | 100.00% |
| 167 | RAMP 2004-RS9 | Subprime 2004 | $ 104,819,428 | $ 104,819,428 | $ 59,754,453 | $ 24,885,425 | AMBAC | $ 24,885,425 | 100.00% |
| 168 | RAMP 2004-RZ1 | Subprime 2004 | $ 31,288,911 | $ 31,288,911 | $ 17,788,402 | $ 7,408,183 | | $ 7,408,183 | 100.00% |
| 169 | RAMP 2004-RZ2 | Subprime 2004 | $ 37,810,685 | $ 37,810,685 | $ 21,465,153 | $ 8,939,408 | FGIC | $ 8,939,408 | 100.00% |
| 170 | RAMP 2004-RZ3 | Subprime 2004 | $ 27,415,401 | $ 27,415,401 | $ 15,572,553 | $ 6,485,368 | | $ 6,485,368 | 100.00% |
| 171 | RAMP 2004-RZ4 | Subprime 2004 | $ 26,113,146 | $ 26,113,146 | $ 14,841,277 | $ 6,180,819 | | $ 6,180,819 | 100.00% |
| 172 | RAMP 2004-SL1 | Subprime 2004 | $ 6,909,905 | $ 6,909,905 | $ 3,914,434 | $ 1,630,211 | | $ 1,630,211 | 100.00% |
| 173 | RAMP 2004-SL2 | Subprime 2004 | $ 7,592,754 | $ 7,592,754 | $ 4,321,426 | $ 1,799,707 | | $ 1,799,707 | 100.00% |
| 174 | RAMP 2004-SL3 | Subprime 2004 | $ 3,129,096 | $ 3,129,096 | $ 1,775,634 | $ 739,483 | | $ 739,483 | 100.00% |
| 175 | RAMP 2004-SL4 | Subprime 2004 | $ 2,441,144 | $ 2,441,144 | $ 1,382,772 | $ 575,871 | | $ 575,871 | 100.00% |
| 176 | RAMP 2005-EFC1 | Subprime 2005 | $ 159,413,295 | $ 159,413,295 | $ 90,742,068 | $ 37,790,571 | | $ 37,790,571 | 100.00% |
| 177 | RAMP 2005-EFC2 | Subprime 2005 | $ 119,418,493 | $ 119,418,493 | $ 68,027,619 | $ 28,330,879 | | $ 28,330,879 | 100.00% |

Schedule 2-5 - RFC Original RMBS Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 178 | RAMP 2005-EFC3 | Subprime 2005 | $ 135,780,883 | $ 135,780,883 | $ 77,283,087 | $ 32,185,424 | | $ 32,185,424 | 100.00% |
| 179 | RAMP 2005-EFC4 | Subprime 2005 | $ 152,941,006 | $ 152,941,006 | $ 87,063,947 | $ 36,258,775 | | $ 36,258,775 | 100.00% |
| 180 | RAMP 2005-EFC5 | Subprime 2005 | $ 150,993,027 | $ 150,993,027 | $ 85,885,725 | $ 35,768,091 | | $ 35,768,091 | 100.00% |
| 181 | RAMP 2005-EFC6 | Subprime 2005 | $ 152,667,513 | $ 152,667,513 | $ 86,910,766 | $ 36,194,981 | | $ 36,194,981 | 100.00% |
| 182 | RAMP 2005-EFC7 | Subprime 2005 | $ 172,534,942 | $ 172,534,942 | $ 98,182,813 | $ 40,889,354 | FGIC | $ 40,889,354 | 100.00% |
| 183 | RAMP 2005-NC1 | Subprime 2005 | $ 237,019,561 | $ 237,019,561 | $ 134,904,651 | $ 56,182,583 | FGIC | $ 56,182,583 | 100.00% |
| 184 | RAMP 2005-RS1 | Subprime 2005 | $ 139,257,948 | $ 139,257,948 | $ 79,183,898 | $ 32,977,039 | | $ 32,977,039 | 100.00% |
| 185 | RAMP 2005-RS2 | Subprime 2005 | $ 105,681,985 | $ 105,681,985 | $ 60,188,767 | $ 25,066,299 | | $ 25,066,299 | 100.00% |
| 186 | RAMP 2005-RS3 | Subprime 2005 | $ 111,977,827 | $ 111,977,827 | $ 63,506,513 | $ 26,448,013 | | $ 26,448,013 | 100.00% |
| 187 | RAMP 2005-RS4 | Subprime 2005 | $ 87,844,838 | $ 87,844,838 | $ 49,928,653 | $ 20,793,358 | | $ 20,793,358 | 100.00% |
| 188 | RAMP 2005-RS5 | Subprime 2005 | $ 78,918,244 | $ 78,918,244 | $ 44,845,646 | $ 18,676,481 | | $ 18,676,481 | 100.00% |
| 189 | RAMP 2005-RS6 | Subprime 2005 | $ 196,285,050 | $ 196,285,050 | $ 111,639,543 | $ 46,493,563 | | $ 46,493,563 | 100.00% |
| 190 | RAMP 2005-RS7 | Subprime 2005 | $ 90,102,688 | $ 90,102,688 | $ 51,047,643 | $ 21,259,374 | | $ 21,259,374 | 100.00% |
| 191 | RAMP 2005-RS8 | Subprime 2005 | $ 145,694,510 | $ 145,694,510 | $ 82,745,251 | $ 34,460,205 | | $ 34,460,205 | 100.00% |
| 192 | RAMP 2005-RS9 | Subprime 2005 | $ 305,677,566 | $ 305,677,566 | $ 173,914,733 | $ 72,428,777 | FGIC | $ 72,428,777 | 100.00% |
| 193 | RAMP 2005-RZ1 | Subprime 2005 | $ 26,165,060 | $ 26,165,060 | $ 14,828,611 | $ 6,175,545 | | $ 6,175,545 | 100.00% |
| 194 | RAMP 2005-RZ2 | Subprime 2005 | $ 62,150,926 | $ 62,150,926 | $ 35,335,342 | $ 14,715,807 | | $ 14,715,807 | 100.00% |
| 195 | RAMP 2005-RZ3 | Subprime 2005 | $ 83,350,730 | $ 83,350,730 | $ 47,418,698 | $ 19,748,058 | | $ 19,748,058 | 100.00% |
| 196 | RAMP 2005-RZ4 | Subprime 2005 | $ 109,352,684 | $ 109,352,684 | $ 62,236,860 | $ 25,919,251 | | $ 25,919,251 | 100.00% |
| 197 | RAMP 2005-SL1 | ALT-A 2005 | $ 14,325,821 | $ 14,325,821 | $ 6,136,903 | $ 2,555,783 | | $ 2,555,783 | 100.00% |
| 198 | RAMP 2005-SL2 | ALT-A 2005 | $ 9,217,411 | $ 9,217,411 | $ 3,974,880 | $ 1,655,384 | | $ 1,655,384 | 100.00% |
| 199 | RAMP 2006-EFC1 | Subprime 2006 | $ 159,020,291 | $ 159,020,291 | $ 88,392,775 | $ 36,812,181 | | $ 36,812,181 | 100.00% |
| 200 | RAMP 2006-EFC2 | Subprime 2006 | $ 145,961,973 | $ 145,961,973 | $ 81,157,809 | $ 33,799,096 | | $ 33,799,096 | 100.00% |
| 201 | RAMP 2006-NC1 | Subprime 2006 | $ 159,183,181 | $ 159,183,181 | $ 88,472,180 | $ 36,845,250 | | $ 36,845,250 | 100.00% |
| 202 | RAMP 2006-NC2 | Subprime 2006 | $ 240,397,472 | $ 240,397,472 | $ 133,627,425 | $ 55,650,668 | | $ 55,650,668 | 100.00% |
| 203 | RAMP 2006-NC3 | Subprime 2006 | $ 172,536,205 | $ 172,536,205 | $ 95,907,796 | $ 39,941,897 | | $ 39,941,897 | 100.00% |
| 204 | RAMP 2006-RS1 | Subprime 2006 | $ 339,133,433 | $ 339,133,433 | $ 188,526,741 | $ 78,514,115 | | $ 78,514,115 | 100.00% |
| 205 | RAMP 2006-RS2 | Subprime 2006 | $ 238,815,251 | $ 238,815,251 | $ 132,767,183 | $ 55,292,410 | | $ 55,292,410 | 100.00% |
| 206 | RAMP 2006-RS3 | Subprime 2006 | $ 212,508,763 | $ 212,508,763 | $ 118,158,671 | $ 49,208,528 | MGIC | $ 49,208,528 | 100.00% |
| 207 | RAMP 2006-RS4 | Subprime 2006 | $ 339,775,547 | $ 339,775,547 | $ 188,863,061 | $ 78,654,179 | | $ 78,654,179 | 100.00% |
| 208 | RAMP 2006-RS5 | Subprime 2006 | $ 134,828,562 | $ 134,828,562 | $ 74,965,711 | $ 31,220,327 | | $ 31,220,327 | 100.00% |
| 209 | RAMP 2006-RS6 | Subprime 2006 | $ 145,250,766 | $ 145,250,766 | $ 80,739,215 | $ 33,624,768 | | $ 33,624,768 | 100.00% |
| 210 | RAMP 2006-RZ1 | Subprime 2006 | $ 143,042,887 | $ 143,042,887 | $ 79,521,655 | $ 33,117,702 | | $ 33,117,702 | 100.00% |
| 211 | RAMP 2006-RZ2 | Subprime 2006 | $ 131,396,228 | $ 131,396,228 | $ 73,032,056 | $ 30,415,034 | | $ 30,415,034 | 100.00% |
| 212 | RAMP 2006-RZ3 | Subprime 2006 | $ 287,504,926 | $ 287,504,926 | $ 159,812,698 | $ 66,555,824 | | $ 66,555,824 | 100.00% |
| 213 | RAMP 2006-RZ4 | Subprime 2006 | $ 361,348,145 | $ 361,348,145 | $ 200,871,269 | $ 83,655,134 | | $ 83,655,134 | 100.00% |
| 214 | RAMP 2006-RZ5 | Subprime 2006 | $ 206,734,353 | $ 206,734,353 | $ 114,923,950 | $ 47,861,392 | | $ 47,861,392 | 100.00% |
| 215 | RAMP 2007-RS1 | Subprime 2007 | $ 180,650,270 | $ 180,650,270 | $ 100,451,811 | $ 41,834,304 | | $ 41,834,304 | 100.00% |
| 216 | RAMP 2007-RS2 | Subprime 2007 | $ 179,097,122 | $ 179,097,122 | $ 99,573,802 | $ 41,468,647 | | $ 41,468,647 | 100.00% |
| 217 | RAMP 2007-RZ1 | Subprime 2007 | $ 144,954,039 | $ 144,954,039 | $ 80,584,269 | $ 33,560,239 | | $ 33,560,239 | 100.00% |
| 218 | RASC 2004-KS1 | Subprime 2004 | $ 51,578,237 | $ 51,578,237 | $ 29,338,146 | $ 12,218,206 | | $ 12,218,206 | 100.00% |
| 219 | RASC 2004-KS10 | Subprime 2004 | $ 84,771,633 | $ 84,771,633 | $ 48,359,086 | $ 20,139,694 | | $ 20,139,694 | 100.00% |
| 220 | RASC 2004-KS11 | Subprime 2004 | $ 61,870,579 | $ 61,870,579 | $ 35,320,299 | $ 14,709,542 | | $ 14,709,542 | 100.00% |
| 221 | RASC 2004-KS12 | Subprime 2004 | $ 51,380,544 | $ 51,380,544 | $ 29,340,390 | $ 12,219,140 | | $ 12,219,140 | 100.00% |
| 222 | RASC 2004-KS2 | Subprime 2004 | $ 59,103,860 | $ 59,103,860 | $ 33,626,824 | $ 14,004,275 | | $ 14,004,275 | 100.00% |
| 223 | RASC 2004-KS3 | Subprime 2004 | $ 43,796,821 | $ 43,796,821 | $ 24,901,619 | $ 10,370,564 | | $ 10,370,564 | 100.00% |
| 224 | RASC 2004-KS4 | Subprime 2004 | $ 65,524,480 | $ 65,524,480 | $ 37,282,763 | $ 15,526,832 | AMBAC | $ 15,526,832 | 100.00% |
| 225 | RASC 2004-KS5 | Subprime 2004 | $ 73,784,997 | $ 73,784,997 | $ 41,946,706 | $ 17,469,185 | | $ 17,469,185 | 100.00% |
| 226 | RASC 2004-KS6 | Subprime 2004 | $ 72,787,877 | $ 72,787,877 | $ 41,479,227 | $ 17,274,498 | | $ 17,274,498 | 100.00% |
| 227 | RASC 2004-KS7 | Subprime 2004 | $ 57,406,452 | $ 57,406,452 | $ 32,622,252 | $ 13,585,909 | FGIC | $ 13,585,909 | 100.00% |
| 228 | RASC 2004-KS8 | Subprime 2004 | $ 48,940,622 | $ 48,940,622 | $ 27,853,060 | $ 11,599,725 | | $ 11,599,725 | 100.00% |
| 229 | RASC 2004-KS9 | Subprime 2004 | $ 42,011,977 | $ 42,011,977 | $ 23,866,963 | $ 9,939,669 | FGIC | $ 9,939,669 | 100.00% |
| 230 | RASC 2005-AHL1 | Subprime 2005 | $ 103,874,351 | $ 103,874,351 | $ 59,207,687 | $ 24,657,717 | | $ 24,657,717 | 100.00% |
| 231 | RASC 2005-AHL2 | Subprime 2005 | $ 107,034,163 | $ 107,034,163 | $ 60,940,420 | $ 25,379,334 | | $ 25,379,334 | 100.00% |
| 232 | RASC 2005-AHL3 | Subprime 2005 | $ 130,010,244 | $ 130,010,244 | $ 74,034,571 | $ 30,832,543 | | $ 30,832,543 | 100.00% |
| 233 | RASC 2005-EMX1 | Subprime 2005 | $ 70,450,976 | $ 70,450,976 | $ 39,920,295 | $ 16,625,263 | | $ 16,625,263 | 100.00% |
| 234 | RASC 2005-EMX2 | Subprime 2005 | $ 84,960,449 | $ 84,960,449 | $ 48,198,745 | $ 20,072,918 | | $ 20,072,918 | 100.00% |
| 235 | RASC 2005-EMX3 | Subprime 2005 | $ 136,158,468 | $ 136,158,468 | $ 77,493,718 | $ 32,273,144 | | $ 32,273,144 | 100.00% |
| 236 | RASC 2005-EMX4 | Subprime 2005 | $ 122,681,529 | $ 122,681,529 | $ 69,852,374 | $ 29,090,819 | | $ 29,090,819 | 100.00% |

Schedule 2.5 – RFC Original R+W Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 237 | RASC 2005-EMX5 | Subprime 2005 | $ 118,345,620 | $ 118,345,620 | $ 67,514,399 | 28,117,143 | FGIC | $ 28,117,143 | 100.00% |
| 238 | RASC 2005-KS1 | Subprime 2005 | $ 73,646,522 | $ 73,646,522 | $ 41,915,256 | 17,456,087 | | $ 17,456,087 | 100.00% |
| 239 | RASC 2005-KS10 | Subprime 2005 | $ 312,202,223 | $ 312,202,223 | $ 177,813,547 | 74,052,482 | | $ 74,052,482 | 100.00% |
| 240 | RASC 2005-KS11 | Subprime 2005 | $ 339,883,340 | $ 339,883,340 | $ 193,478,701 | 80,576,415 | | $ 80,576,415 | 100.00% |
| 241 | RASC 2005-KS12 | Subprime 2005 | $ 296,784,489 | $ 296,784,489 | $ 169,069,831 | 70,411,062 | | $ 70,411,062 | 100.00% |
| 242 | RASC 2005-KS2 | Subprime 2005 | $ 60,824,018 | $ 60,824,018 | $ 34,625,904 | 14,420,353 | | $ 14,420,353 | 100.00% |
| 243 | RASC 2005-KS3 | Subprime 2005 | $ 53,245,885 | $ 53,245,885 | $ 30,324,510 | 12,620,659 | | $ 12,620,659 | 100.00% |
| 244 | RASC 2005-KS4 | Subprime 2005 | $ 56,221,454 | $ 56,221,454 | $ 31,990,699 | 13,322,892 | | $ 13,322,892 | 100.00% |
| 245 | RASC 2005-KS5 | Subprime 2005 | $ 59,799,933 | $ 59,799,933 | $ 34,049,613 | 14,180,350 | | $ 14,180,350 | 100.00% |
| 246 | RASC 2005-KS6 | Subprime 2005 | $ 99,775,494 | $ 99,775,494 | $ 56,769,116 | 23,642,147 | | $ 23,642,147 | 100.00% |
| 247 | RASC 2005-KS7 | Subprime 2005 | $ 72,001,341 | $ 72,001,341 | $ 40,954,590 | 17,056,007 | | $ 17,056,007 | 100.00% |
| 248 | RASC 2005-KS8 | Subprime 2005 | $ 232,230,541 | $ 232,230,541 | $ 132,119,180 | 55,022,542 | | $ 55,022,542 | 100.00% |
| 249 | RASC 2005-KS9 | Subprime 2005 | $ 98,652,592 | $ 98,652,592 | $ 56,075,559 | 23,353,307 | | $ 23,353,307 | 100.00% |
| 250 | RASC 2006-EMX1 | Subprime 2006 | $ 124,261,748 | $ 124,261,748 | $ 69,068,194 | 28,764,238 | | $ 28,764,238 | 100.00% |
| 251 | RASC 2006-EMX2 | Subprime 2006 | $ 180,566,630 | $ 180,566,630 | $ 100,359,091 | 41,795,690 | | $ 41,795,690 | 100.00% |
| 252 | RASC 2006-EMX3 | Subprime 2006 | $ 286,788,012 | $ 286,788,012 | $ 159,392,682 | 66,380,903 | | $ 66,380,903 | 100.00% |
| 253 | RASC 2006-EMX4 | Subprime 2006 | $ 268,490,087 | $ 268,490,087 | $ 149,222,797 | 62,145,538 | | $ 62,145,538 | 100.00% |
| 254 | RASC 2006-EMX5 | Subprime 2006 | $ 248,959,683 | $ 248,959,683 | $ 138,368,530 | 57,625,155 | | $ 57,625,155 | 100.00% |
| 255 | RASC 2006-EMX6 | Subprime 2006 | $ 276,425,960 | $ 276,425,960 | $ 153,642,481 | 63,986,166 | | $ 63,986,166 | 100.00% |
| 256 | RASC 2006-EMX7 | Subprime 2006 | $ 228,850,653 | $ 228,850,653 | $ 127,197,596 | 52,972,892 | | $ 52,972,892 | 100.00% |
| 257 | RASC 2006-EMX8 | Subprime 2006 | $ 345,029,067 | $ 345,029,067 | $ 191,775,218 | 79,866,980 | | $ 79,866,980 | 100.00% |
| 258 | RASC 2006-EMX9 | Subprime 2006 | $ 369,490,396 | $ 369,490,396 | $ 205,384,534 | 85,534,735 | | $ 85,534,735 | 100.00% |
| 259 | RASC 2006-KS1 | Subprime 2006 | $ 225,981,412 | $ 225,981,412 | $ 125,616,553 | 52,314,448 | | $ 52,314,448 | 100.00% |
| 260 | RASC 2006-KS2 | Subprime 2006 | $ 275,779,387 | $ 275,779,387 | $ 153,291,894 | 63,840,160 | | $ 63,840,160 | 100.00% |
| 261 | RASC 2006-KS3 | Subprime 2006 | $ 350,767,904 | $ 350,767,904 | $ 194,960,938 | 81,193,709 | | $ 81,193,709 | 100.00% |
| 262 | RASC 2006-KS4 | Subprime 2006 | $ 221,554,442 | $ 221,554,442 | $ 123,159,629 | 51,291,234 | | $ 51,291,234 | 100.00% |
| 263 | RASC 2006-KS5 | Subprime 2006 | $ 245,259,431 | $ 245,259,431 | $ 136,339,723 | 56,780,235 | | $ 56,780,235 | 100.00% |
| 264 | RASC 2006-KS6 | Subprime 2006 | $ 196,773,592 | $ 196,773,592 | $ 109,388,963 | 45,556,283 | | $ 45,556,283 | 100.00% |
| 265 | RASC 2006-KS7 | Subprime 2006 | $ 198,312,428 | $ 198,312,428 | $ 110,252,728 | 45,916,008 | | $ 45,916,008 | 100.00% |
| 266 | RASC 2006-KS8 | Subprime 2006 | $ 213,273,867 | $ 213,273,867 | $ 118,570,585 | 49,380,075 | | $ 49,380,075 | 100.00% |
| 267 | RASC 2006-KS9 | Subprime 2006 | $ 535,118,326 | $ 535,118,326 | $ 297,467,147 | 123,883,591 | | $ 123,883,591 | 100.00% |
| 268 | RASC 2007-EMX1 | Subprime 2007 | $ 307,211,736 | $ 307,211,736 | $ 170,822,289 | 71,140,893 | FGIC | $ 71,140,893 | 100.00% |
| 269 | RASC 2007-KS1 | Subprime 2007 | $ 177,948,543 | $ 177,948,543 | $ 98,934,561 | 41,202,428 | | $ 41,202,428 | 100.00% |
| 270 | RASC 2007-KS2 | Subprime 2007 | $ 465,615,242 | $ 465,615,242 | $ 258,855,738 | 107,803,429 | | $ 107,803,429 | 100.00% |
| 271 | RASC 2007-KS3 | Subprime 2007 | $ 607,964,402 | $ 607,964,402 | $ 338,031,313 | 140,777,001 | | $ 140,777,001 | 100.00% |
| 272 | RASC 2007-KS4 | Subprime 2007 | $ 121,561,440 | $ 121,561,440 | $ 67,577,877 | 28,143,579 | | $ 28,143,579 | 100.00% |
| 273 | RFMS2 2004-HI1 | Second Lien 2004 | $ 29,067,274 | $ 29,067,274 | $ 15,797,164 | 6,578,909 | | $ 6,578,909 | 100.00% |
| 274 | RFMS2 2004-HI2 | Second Lien 2004 | $ 40,589,877 | $ 40,589,877 | $ 22,057,372 | 9,186,045 | FGIC | $ 9,186,045 | 100.00% |
| 275 | RFMS2 2004-HI3 | Second Lien 2004 | $ 34,882,879 | $ 34,882,879 | $ 19,008,197 | 7,916,181 | FGIC | $ 7,916,181 | 100.00% |
| 276 | RFMS2 2004-HS1 | CES 2004 | $ 14,666,812 | $ 14,666,812 | $ 5,706,947 | 2,376,723 | FGIC | $ 2,376,723 | 100.00% |
| 277 | RFMS2 2004-HS2 | CES 2004 | $ 22,088,851 | $ 22,088,851 | $ 8,537,180 | 3,555,406 | MBIA | $ - | 100.00% |
| 278 | RFMS2 2004-HS3 | CES 2004 | $ 11,688,112 | $ 11,688,112 | $ 4,539,215 | 1,890,408 | FGIC | $ 1,890,408 | 100.00% |
| 279 | RFMS2 2005-HI1 | Second Lien 2005 | $ 42,101,490 | $ 42,101,490 | $ 23,090,697 | 9,616,384 | FGIC | $ 9,616,384 | 100.00% |
| 280 | RFMS2 2005-HI2 | Second Lien 2005 | $ 47,190,282 | $ 47,190,282 | $ 26,028,238 | 10,839,757 | | $ 10,839,757 | 100.00% |
| 281 | RFMS2 2005-HI3 | Second Lien 2005 | $ 51,159,961 | $ 51,159,961 | $ 28,347,534 | 11,805,654 | | $ 11,805,654 | 100.00% |
| 282 | RFMS2 2005-HS1 | CES 2005 | $ 128,240,880 | $ 128,240,880 | $ 49,301,040 | 20,531,981 | FGIC | $ 20,531,981 | 100.00% |
| 283 | RFMS2 2005-HS2 | CES 2005 | $ 116,787,734 | $ 116,787,734 | $ 45,161,217 | 18,807,905 | FGIC | $ 18,807,905 | 100.00% |
| 284 | RFMS2 2005-HSA1 | CES 2005 | $ 78,983,870 | $ 78,983,870 | $ 30,809,959 | 12,831,159 | FGIC | $ 12,831,159 | 100.00% |
| 285 | RFMS2 2006-HI1 | Second Lien 2006 | $ 63,288,600 | $ 63,288,600 | $ 31,213,000 | 12,999,010 | | $ 12,999,010 | 100.00% |
| 286 | RFMS2 2006-HI2 | Second Lien 2006 | $ 75,614,844 | $ 75,614,844 | $ 37,293,378 | 15,531,253 | FGIC | $ 15,531,253 | 100.00% |
| 287 | RFMS2 2006-HI3 | Second Lien 2006 | $ 74,611,370 | $ 74,611,370 | $ 36,807,035 | 15,328,710 | FGIC | $ 15,328,710 | 100.00% |
| 288 | RFMS2 2006-HI4 | Second Lien 2006 | $ 103,313,860 | $ 103,313,860 | $ 50,933,437 | 21,211,812 | FGIC | $ 21,211,812 | 100.00% |
| 289 | RFMS2 2006-HI5 | Second Lien 2006 | $ 93,051,612 | $ 93,051,612 | $ 45,892,914 | 19,112,628 | FGIC | $ 19,112,628 | 100.00% |
| 290 | RFMS2 2006-HSA1 | CES 2006 | $ 114,950,092 | $ 114,950,092 | $ 60,462,898 | 25,180,464 | FGIC | $ 25,180,464 | 100.00% |
| 291 | RFMS2 2006-HSA2 | CES 2006 | $ 136,700,838 | $ 136,700,838 | $ 71,762,124 | 29,886,156 | FGIC | $ 29,886,156 | 100.00% |
| 292 | RFMS2 2006-HSA3 | Second Lien 2006 | $ 63,770,684 | $ 63,770,684 | $ 31,391,808 | 13,073,477 | FSA | $ - | 100.00% |
| 293 | RFMS2 2006-HSA4 | Second Lien 2006 | $ 140,473,560 | $ 140,473,560 | $ 69,159,497 | 28,802,263 | MBIA | $ - | 100.00% |
| 294 | RFMS2 2006-HSA5 | Second Lien 2006 | $ 125,451,151 | $ 125,451,151 | $ 61,752,175 | 25,717,399 | MBIA | $ - | 100.00% |
| 295 | RFMS2 2007-HI1 | Second Lien 2007 | $ 101,097,525 | $ 101,097,525 | $ 49,866,470 | 20,767,461 | FGIC | $ 20,767,461 | 100.00% |

Schedule 2.5 - RFC Original RMBS Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 296 | RFMS2 2007-HSA1 | Second Lien 2007 | $ 288,158,516 | $ 288,158,516 | $ 141,974,643 | $ 59,126,962 | MBIA | $ - | 100.00% |
| 297 | RFMS2 2007-HSA2 | CES 2007 | $ 764,932,605 | $ 764,932,605 | $ 400,718,052 | $ 166,883,610 | MBIA | $ - | 100.00% |
| 298 | RFMS2 2007-HSA3 | Second Lien 2007 | $ 486,738,648 | $ 486,738,648 | $ 239,780,944 | $ 99,859,513 | MBIA | $ - | 100.00% |
| 299 | RFMSI 2004-PS1 | Prime 2004 | $ 146,369 | $ 146,369 | $ 87,498 | $ 36,439 | | $ 36,439 | 100.00% |
| 300 | RFMSI 2004-S1 | Prime 2004 | $ 1,124,681 | $ 1,124,681 | $ 623,808 | $ 259,792 | | $ 259,792 | 100.00% |
| 301 | RFMSI 2004-S2 | Prime 2004 | $ 1,679,195 | $ 1,679,195 | $ 919,118 | $ 382,777 | Radian - Insurer Exception | $ 382,777 | 100.00% |
| 302 | RFMSI 2004-S3 | Prime 2004 | $ 265,438 | $ 265,438 | $ 154,960 | $ 64,535 | | $ 64,535 | 100.00% |
| 303 | RFMSI 2004-S4 | Prime 2004 | $ 1,949,608 | $ 1,949,608 | $ 1,100,418 | $ 458,282 | MBIA - Insurer Exception | $ 458,282 | 100.00% |
| 304 | RFMSI 2004-S5 | Prime 2004 | $ 1,829,386 | $ 1,829,386 | $ 1,016,310 | $ 423,254 | | $ 423,254 | 100.00% |
| 305 | RFMSI 2004-S6 | Prime 2004 | $ 3,048,831 | $ 3,048,831 | $ 1,654,473 | $ 689,024 | | $ 689,024 | 100.00% |
| 306 | RFMSI 2004-S7 | Prime 2004 | $ 218,428 | $ 218,428 | $ 130,546 | $ 54,368 | | $ 54,368 | 100.00% |
| 307 | RFMSI 2004-S8 | Prime 2004 | $ 2,014,217 | $ 2,014,217 | $ 1,043,772 | $ 434,691 | | $ 434,691 | 100.00% |
| 308 | RFMSI 2004-S9 | Prime 2004 | $ 6,164,094 | $ 6,164,094 | $ 3,157,892 | $ 1,315,140 | | $ 1,315,140 | 100.00% |
| 309 | RFMSI 2004-SA1 | Prime 2004 | $ 3,091,361 | $ 3,091,361 | $ 1,620,051 | $ 674,689 | | $ 674,689 | 100.00% |
| 310 | RFMSI 2005-S1 | Prime 2005 | $ 6,345,542 | $ 6,345,542 | $ 3,285,043 | $ 1,368,094 | | $ 1,368,094 | 100.00% |
| 311 | RFMSI 2005-S2 | Prime 2005 | $ 5,312,528 | $ 5,312,528 | $ 2,672,784 | $ 1,113,112 | FGIC - Insurer Exception | $ 1,113,112 | 100.00% |
| 312 | RFMSI 2005-S3 | Prime 2005 | $ 499,929 | $ 499,929 | $ 282,445 | $ 117,627 | | $ 117,627 | 100.00% |
| 313 | RFMSI 2005-S4 | Prime 2005 | $ 6,672,692 | $ 6,672,692 | $ 3,417,486 | $ 1,423,251 | | $ 1,423,251 | 100.00% |
| 314 | RFMSI 2005-S5 | Prime 2005 | $ 5,474,075 | $ 5,474,075 | $ 2,772,392 | $ 1,154,594 | Assured Guaranty - Insurer Exception | $ 1,154,594 | 100.00% |
| 315 | RFMSI 2005-S6 | Prime 2005 | $ 7,627,544 | $ 7,627,544 | $ 4,014,295 | $ 1,671,799 | | $ 1,671,799 | 100.00% |
| 316 | RFMSI 2005-S7 | Prime 2005 | $ 14,869,326 | $ 14,869,326 | $ 7,058,645 | $ 2,939,653 | FGIC | $ 2,939,653 | 100.00% |
| 317 | RFMSI 2005-S8 | Prime 2005 | $ 12,223,392 | $ 12,223,392 | $ 6,021,888 | $ 2,507,884 | | $ 2,507,884 | 100.00% |
| 318 | RFMSI 2005-S9 | Prime 2005 | $ 17,604,957 | $ 17,604,957 | $ 8,233,430 | $ 3,428,906 | | $ 3,428,906 | 100.00% |
| 319 | RFMSI 2005-SA1 | Prime 2005 | $ 8,756,852 | $ 8,756,852 | $ 4,413,047 | $ 1,837,864 | | $ 1,837,864 | 100.00% |
| 320 | RFMSI 2005-SA2 | Prime 2005 | $ 26,078,868 | $ 26,078,868 | $ 13,141,301 | $ 5,472,845 | | $ 5,472,845 | 100.00% |
| 321 | RFMSI 2005-SA3 | Prime 2005 | $ 39,427,480 | $ 39,427,480 | $ 19,652,304 | $ 8,184,426 | | $ 8,184,426 | 100.00% |
| 322 | RFMSI 2005-SA4 | Prime 2005 | $ 60,271,981 | $ 60,271,981 | $ 29,765,623 | $ 12,396,234 | | $ 12,396,234 | 100.00% |
| 323 | RFMSI 2005-SA5 | Prime 2005 | $ 33,394,115 | $ 33,394,115 | $ 15,940,758 | $ 6,638,711 | | $ 6,638,711 | 100.00% |
| 324 | RFMSI 2006-S1 | Prime 2006 | $ 25,559,947 | $ 25,559,947 | $ 9,171,219 | $ 3,819,459 | | $ 3,819,459 | 100.00% |
| 325 | RFMSI 2006-S10 | Prime 2006 | $ 63,707,058 | $ 63,707,058 | $ 22,923,508 | $ 9,546,757 | | $ 9,546,757 | 100.00% |
| 326 | RFMSI 2006-S11 | Prime 2006 | $ 44,443,729 | $ 44,443,729 | $ 15,997,010 | $ 6,662,137 | | $ 6,662,137 | 100.00% |
| 327 | RFMSI 2006-S12 | Prime 2006 | $ 81,399,421 | $ 81,399,421 | $ 29,228,284 | $ 12,172,453 | | $ 12,172,453 | 100.00% |
| 328 | RFMSI 2006-S2 | Prime 2006 | $ 19,792,392 | $ 19,792,392 | $ 7,116,729 | $ 2,963,843 | | $ 2,963,843 | 100.00% |
| 329 | RFMSI 2006-S3 | Prime 2006 | $ 29,079,076 | $ 29,079,076 | $ 10,476,944 | $ 4,363,243 | | $ 4,363,243 | 100.00% |
| 330 | RFMSI 2006-S4 | Prime 2006 | $ 22,071,738 | $ 22,071,738 | $ 7,923,935 | $ 3,300,013 | | $ 3,300,013 | 100.00% |
| 331 | RFMSI 2006-S5 | Prime 2006 | $ 54,693,301 | $ 54,693,301 | $ 19,696,279 | $ 8,202,740 | | $ 8,202,740 | 100.00% |
| 332 | RFMSI 2006-S6 | Prime 2006 | $ 49,382,385 | $ 49,382,385 | $ 17,815,384 | $ 7,419,420 | | $ 7,419,420 | 100.00% |
| 333 | RFMSI 2006-S7 | Prime 2006 | $ 37,706,573 | $ 37,706,573 | $ 13,588,282 | $ 5,658,995 | | $ 5,658,995 | 100.00% |
| 334 | RFMSI 2006-S8 | Prime 2006 | $ 32,108,589 | $ 32,108,589 | $ 11,549,042 | $ 4,809,730 | | $ 4,809,730 | 100.00% |
| 335 | RFMSI 2006-S9 | Prime 2006 | $ 30,560,226 | $ 30,560,226 | $ 11,013,905 | $ 4,586,866 | | $ 4,586,866 | 100.00% |
| 336 | RFMSI 2006-SA1 | Prime 2006 | $ 35,073,859 | $ 35,073,859 | $ 12,662,191 | $ 5,273,314 | | $ 5,273,314 | 100.00% |
| 337 | RFMSI 2006-SA2 | Prime 2006 | $ 108,839,368 | $ 108,839,368 | $ 39,308,526 | $ 16,370,485 | | $ 16,370,485 | 100.00% |
| 338 | RFMSI 2006-SA3 | Prime 2006 | $ 39,569,806 | $ 39,569,806 | $ 14,268,775 | $ 5,942,394 | | $ 5,942,394 | 100.00% |
| 339 | RFMSI 2006-SA4 | Prime 2006 | $ 39,731,186 | $ 39,731,186 | $ 14,381,060 | $ 5,989,157 | | $ 5,989,157 | 100.00% |
| 340 | RFMSI 2007-S1 | Prime 2007 | $ 43,925,697 | $ 43,925,697 | $ 15,789,882 | $ 6,575,877 | | $ 6,575,877 | 100.00% |
| 341 | RFMSI 2007-S2 | Prime 2007 | $ 40,886,238 | $ 40,886,238 | $ 14,682,107 | $ 6,114,531 | | $ 6,114,531 | 100.00% |
| 342 | RFMSI 2007-S3 | Prime 2007 | $ 53,410,266 | $ 53,410,266 | $ 19,231,697 | $ 8,009,260 | | $ 8,009,260 | 100.00% |
| 343 | RFMSI 2007-S4 | Prime 2007 | $ 31,192,233 | $ 31,192,233 | $ 11,221,345 | $ 4,673,257 | | $ 4,673,257 | 100.00% |
| 344 | RFMSI 2007-S5 | Prime 2007 | $ 47,491,017 | $ 47,491,017 | $ 17,031,643 | $ 7,093,022 | | $ 7,093,022 | 100.00% |
| 345 | RFMSI 2007-S6 | Prime 2007 | $ 76,697,013 | $ 76,697,013 | $ 27,625,655 | $ 11,505,019 | | $ 11,505,019 | 100.00% |
| 346 | RFMSI 2007-S7 | Prime 2007 | $ 41,373,718 | $ 41,373,718 | $ 14,874,313 | $ 6,194,577 | | $ 6,194,577 | 100.00% |
| 347 | RFMSI 2007-S8 | Prime 2007 | $ 48,402,576 | $ 48,402,576 | $ 17,437,026 | $ 7,261,849 | | $ 7,261,849 | 100.00% |
| 348 | RFMSI 2007-S9 | Prime 2007 | $ 16,135,353 | $ 16,135,353 | $ 5,811,768 | $ 2,420,377 | | $ 2,420,377 | 100.00% |
| 349 | RFMSI 2007-SA1 | Prime 2007 | $ 46,302,169 | $ 46,302,169 | $ 16,729,983 | $ 6,967,392 | | $ 6,967,392 | 100.00% |
| 350 | RFMSI 2007-SA2 | Prime 2007 | $ 61,617,542 | $ 61,617,542 | $ 22,275,167 | $ 9,276,748 | | $ 9,276,748 | 100.00% |

Schedule 2-B - RFC Original R&W Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 351 | RFMSI 2007-SA3 | Prime 2007 | $ 61,970,258 | $ 61,970,258 | $ 22,395,020 | $ 9,326,662 | | $ 9,326,662 | 100.00% |
| 352 | RFMSI 2007-SA4 | Prime 2007 | $ 66,075,305 | $ 66,075,305 | $ 23,843,398 | $ 9,929,855 | | $ 9,929,855 | 100.00% |

**SCHEDULE 3-G**

**GMACM Recognized Additional R+W Claims**

**Schedule 3-G: GMACM Additional R+W Claims**
**Subject to Further Review and Due Diligence**

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|
| ARMT 2005-10 | ALT-A 2005 | $ 162,594,558 | $ 14,633,510 | $ 6,274,806 | $ 1,323,126 | | $ 1,323,126 | 4.50% |
| ARMT 2005-11 | ALT-A 2005 | $ 210,858,080 | $ 18,977,227 | $ 8,221,754 | $ 1,733,665 | | $ 1,733,665 | 4.50% |
| ARMT 2005-9 | ALT-A 2005 | $ 134,439,993 | $ 12,099,599 | $ 5,213,778 | $ 2,198,788 | | $ 2,198,788 | 9.00% |
| BAFC 2005-6 | Prime 2005 | $ 14,000,958 | $ 2,048,340 | $ 1,032,787 | $ 246,208 | | $ 246,208 | 8.27% |
| BAFC 2005-8 | Prime 2005 | $ 18,127,512 | $ 3,313,709 | $ 1,689,572 | $ 353,930 | | $ 353,930 | 9.08% |
| BAFC 2006-1 | ALT-A 2006 | $ 42,810,591 | $ 3,390,599 | $ 1,138,636 | $ 247,372 | | $ 247,372 | 4.08% |
| BAFC 2006-2 | ALT-A 2006 | $ 73,869,467 | $ 729,929 | $ 246,237 | $ 103,845 | | $ 103,845 | 0.99% |
| BAFC 2006-4 | ALT-A 2006 | $ 38,933,269 | $ 6,190,390 | $ 2,098,458 | $ 884,975 | | $ 884,975 | 15.90% |
| BAFC 2006-5 | Prime 2006 | $ 34,040,250 | $ 1,702,013 | $ 612,134 | $ 129,076 | | $ 129,076 | 2.50% |
| BAFC 2007-3 | Prime 2007 | $ 162,538,459 | $ 2,990,708 | $ 1,082,135 | $ 456,365 | | $ 456,365 | 1.84% |
| BAFC 2007-4 | Prime 2007 | $ 136,688,162 | $ 3,304,047 | $ 1,190,995 | $ 502,274 | | $ 502,274 | 2.42% |
| BAFC 2007-7 | ALT-A 2007 | $ 142,137,602 | $ 1,009,177 | $ 343,909 | $ 145,036 | | $ 145,036 | 0.71% |
| BALTA 2004-4 | ALT-A 2004 | $ 15,686,663 | $ 1,419,643 | $ 593,354 | $ 250,233 | | $ 250,233 | 9.05% |
| BALTA 2005-3 | ALT-A 2005 | $ 114,711,210 | $ 18,388,207 | $ 7,771,306 | $ 3,277,365 | | $ 3,277,365 | 16.03% |
| BALTA 2005-4 | ALT-A 2005 | $ 218,755,055 | $ 1,394,667 | $ 591,987 | $ 238,231 | | $ 238,231 | 0.61% |
| BALTA 2006-4 | ALT-A 2006 | $ 1,465,348,322 | $ 2,732,422 | $ 947,141 | $ 399,434 | | $ 399,434 | 0.19% |
| BALTA 2006-5 | ALT-A 2006 | $ 388,828,637 | $ 774,915 | $ 268,826 | $ 113,371 | | $ 113,371 | 0.20% |
| BALTA 2006-8 | ALT-A 2006 | $ 396,815,761 | $ 2,058,383 | $ 711,979 | $ 300,260 | | $ 300,260 | 0.52% |
| BSABS 2004-AC1 | ALT-A 2004 | $ 6,317,402 | $ 85,917 | $ 37,276 | $ 15,720 | | $ 15,720 | 1.36% |
| BSABS 2004-AC7 | ALT-A 2004 | $ 14,497,964 | $ 347,951 | $ 149,512 | $ 63,053 | | $ 63,053 | 2.40% |
| BSABS 2007-SD2 | Subprime 2007 | $ 102,282,816 | $ 10,277 | $ 5,717 | $ 2,411 | | $ 2,411 | 0.01% |
| BSABS 2007-SD3 | Subprime 2007 | $ 149,122,838 | $ 1,053,972 | $ 586,272 | $ 247,246 | FGIC | $ 247,246 | 0.71% |
| BSARM 2001-4 | Prime 2001 | $ 734,869 | $ 409,910 | $ 64,893 | $ 27,367 | | $ 27,367 | 55.78% |
| BSARM 2002-11 | Prime 2002 | $ 806,503 | $ 148,397 | $ 40,067 | $ 16,897 | | $ 16,897 | 18.40% |
| BSSLT 2007-SV1A | CES 2007 | $ 525,306,659 | $ 26,265,333 | $ 13,848,235 | $ 2,920,083 | XL - Insurer Exception | $ 2,920,083 | 2.50% |
| CSFB 2002-34 | Prime 2002 | $ 6,006,255 | $ 540,563 | $ 88,083 | $ 37,147 | | $ 37,147 | 9.00% |
| CSFB 2002-AR33 | Prime 2002 | $ 2,224,976 | $ 200,248 | $ 51,667 | $ 21,789 | | $ 21,789 | 9.00% |
| CSFB 2005-10 | Prime 2005 | $ 86,970,264 | $ 3,984,364 | $ 1,866,154 | $ 787,006 | | $ 787,006 | 4.58% |
| CSFB 2005-11 | Prime 2005 | $ 47,691,840 | $ 1,440,250 | $ 654,508 | $ 276,023 | | $ 276,023 | 3.02% |
| CSFB 2005-12 | ALT-A 2005 | $ 163,083,499 | $ 5,469,599 | $ 2,373,356 | $ 1,000,907 | | $ 1,000,907 | 3.35% |
| CSFB 2005-3 | Prime 2005 | $ 24,246,768 | $ 2,182,209 | $ 1,081,578 | $ 456,130 | | $ 456,130 | 9.00% |
| CSFB 2005-4 | Prime 2005 | $ 17,646,201 | $ 1,588,158 | $ 815,454 | $ 343,898 | | $ 343,898 | 9.00% |
| CSFB 2005-5 | Prime 2005 | $ 14,926,132 | $ 379,124 | $ 201,551 | $ 84,999 | | $ 84,999 | 2.54% |
| CSFB 2005-6 | Prime 2005 | $ 36,695,597 | $ 2,798,611 | $ 1,321,788 | $ 557,433 | | $ 557,433 | 7.63% |
| CSFB 2005-8 | ALT-A 2005 | $ 125,669,453 | $ 4,254,181 | $ 1,802,763 | $ 760,273 | | $ 760,273 | 3.39% |
| CSFB 2005-9 | Prime 2005 | $ 90,228,643 | $ 2,502,843 | $ 1,052,317 | $ 443,790 | | $ 443,790 | 2.77% |
| CSMC 2006-1 | Prime 2006 | $ 74,526,618 | $ 145,049 | $ 52,244 | $ 22,033 | | $ 22,033 | 0.19% |
| CSMC 2006-8 | Prime 2006 | $ 51,370,731 | $ 1,285,412 | $ 467,097 | $ 196,987 | | $ 196,987 | 2.50% |
| CSMC 2006-9 | ALT-A 2006 | $ 121,312,907 | $ 105,489 | $ 35,623 | $ 15,023 | | $ 15,023 | 0.09% |
| CSMC 2007-6 | ALT-A 2007 | $ 125,841,476 | $ 616,515 | $ 211,192 | $ 89,065 | | $ 89,065 | 0.49% |
| CSMC 2007-7 | Prime 2007 | $ 47,431,829 | $ 101,356 | $ 36,669 | $ 15,464 | | $ 15,464 | 0.21% |
| FMRMT 2003-A | 2003 | $ 4,886,622 | $ 4,886,622 | $ 2,118,735 | $ 893,526 | | $ 893,526 | 100.00% |
| FNR 2002-66 | Subprime 2002 | $ 60,569,102 | $ 5,530,484 | $ 1,543,658 | $ 325,501 | FNMA/FNMA (Agency Wrap) | $ - | 4.50% |
| GMACM 2000-HE2 | Second Lien 2000 | $ 19,906,549 | $ 19,906,549 | $ 5,251,401 | $ 2,214,654 | MBIA | $ - | 100.00% |
| GMACM 2000-HE4 | Second Lien 2000 | $ 11,277,479 | $ 11,277,479 | $ 3,003,327 | $ 1,266,582 | MBIA | $ - | 100.00% |
| GMACM 2001-HE2 | CES 2001 | $ 15,255,603 | $ 15,255,603 | $ 2,469,868 | $ 1,041,609 | FGIC | $ 1,041,609 | 100.00% |
| GMACM 2001-HE3 | Second Lien 2001 | $ 5,751,684 | $ 5,751,684 | $ 1,581,937 | $ 667,144 | FGIC | $ 667,144 | 100.00% |
| GMACM 2001-HLT1 | Second Lien 2001 | $ 29,894,097 | $ 29,894,097 | $ 7,888,749 | $ 3,326,894 | AMBAC | $ 3,326,894 | 100.00% |
| GMACM 2001-HLT2 | Second Lien 2001 | $ 17,442,275 | $ 17,442,275 | $ 4,628,691 | $ 1,952,041 | Ambac | $ 1,952,041 | 100.00% |
| GMACM 2002-HE1 | Second Lien 2002 | $ 11,592,473 | $ 11,592,473 | $ 3,257,729 | $ 1,373,870 | FGIC | $ 1,373,870 | 100.00% |
| GMACM 2002-HE3 | Second Lien 2002 | $ 18,212,606 | $ 18,212,606 | $ 5,191,004 | $ 2,189,183 | MBIA | $ - | 100.00% |
| GMACM 2002-HE4 | Second Lien 2002 | $ 8,301,994 | $ 8,301,994 | $ 2,336,034 | $ 985,167 | FGIC | $ 985,167 | 100.00% |
| GMACM 2002-HLT1 | Second Lien 2002 | $ 20,411,373 | $ 20,411,373 | $ 5,442,575 | $ 2,295,277 | AMBAC | $ 2,295,277 | 100.00% |
| GMACM 2003-AR1 | Prime 2003 | $ 2,908,751 | $ 2,908,751 | $ 913,751 | $ 385,353 | | $ 385,353 | 100.00% |
| GMACM 2003-AR2 | Prime 2003 | $ 2,470,931 | $ 2,470,931 | $ 899,780 | $ 379,461 | | $ 379,461 | 100.00% |
| GMACM 2003-GH1 | Subprime 2003 | $ 7,058,451 | $ 7,058,451 | $ 3,025,834 | $ 1,276,074 | MBIA - Insurer Exception | $ 1,276,074 | 100.00% |
| GMACM 2003-GH2 | Subprime 2003 | $ 10,627,139 | $ 10,627,139 | $ 4,600,070 | $ 1,939,971 | | $ 1,939,971 | 100.00% |
| GMACM 2003-HE1 | Second Lien 2003 | $ 22,095,452 | $ 22,095,452 | $ 9,416,824 | $ 3,971,323 | FGIC | $ 3,971,323 | 100.00% |
| GMACM 2003-HE2 | CES 2003 | $ 8,395,094 | $ 8,395,094 | $ 1,931,450 | $ 814,544 | FGIC | $ 814,544 | 100.00% |

**Schedule 3-C: GMACM Additional R+W Claims**
**Subject to Further Review and Due Diligence**

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 61 | GMACM 2003-J10 | Prime 2003 | $ 96,499 | $ 96,499 | $ 44,083 | $ 18,591 | | $ 18,591 | 100.00% |
| 62 | GMACM 2003-J5 | Prime 2003 | $ 208,554 | $ 208,554 | $ 55,391 | $ 23,360 | | $ 23,360 | 100.00% |
| 63 | GMACM 2003-J6 | Prime 2003 | $ 823,235 | $ 823,235 | $ 312,716 | $ 131,881 | | $ 131,881 | 100.00% |
| 64 | GMACM 2003-J7 | Prime 2003 | $ 1,036,293 | $ 1,036,293 | $ 383,469 | $ 161,719 | | $ 161,719 | 100.00% |
| 65 | GMACM 2003-J8 | Prime 2003 | $ 1,599,442 | $ 1,599,442 | $ 548,267 | $ 231,219 | | $ 231,219 | 100.00% |
| 66 | GMACM 2003-J9 | Prime 2003 | $ 1,477,100 | $ 1,477,100 | $ 508,427 | $ 214,417 | | $ 214,417 | 100.00% |
| 67 | GMACM 2010-1 | Subprime 2008 | $ 21,539,078 | $ 21,539,078 | $ 11,050,362 | $ 4,660,225 | | $ 4,660,225 | 100.00% |
| 68 | GMACM 2010-2 | Subprime 2008 | $ 82,325,375 | $ 82,325,375 | $ 42,943,715 | $ 18,110,498 | | $ 18,110,498 | 100.00% |
| 69 | GPMF 2006-HE1 | Second Lien 2006 | $ 978,035,296 | $ 4,303,355 | $ 2,117,757 | $ 893,114 | XL/CIFG | | 0.44% |
| 70 | GSAA 2005-9 | ALT-A 2005 | $ 98,622,215 | $ 19,208,605 | $ 8,208,885 | $ 3,461,903 | | $ 3,461,903 | 19.48% |
| 71 | GSAMP 2004-SEA1 | Subprime 2004 | $ 9,788,104 | $ 880,929 | $ 500,269 | $ 210,977 | | $ 210,977 | 9.00% |
| 72 | GSMPS 2004-3 | Subprime 2004 | $ 35,147,950 | $ 1,597,417 | $ 888,439 | $ 374,678 | CHASE (Financial Guaranty)/FHLMC | $ - | 4.54% |
| 73 | GSMPS 2004-4 | Subprime 2004 | $ 52,933,731 | $ 4,764,036 | $ 2,648,375 | $ 1,116,890 | | $ 1,116,890 | 9.00% |
| 74 | GSMPS 2005-LT1 | Subprime 2005 | $ 19,467,663 | $ 669,688 | $ 380,700 | $ 160,551 | | $ 160,551 | 3.44% |
| 75 | GSMPS 2005-RP1 | Subprime 2005 | $ 79,308,886 | $ 1,070,670 | $ 593,721 | $ 250,388 | | $ 250,388 | 1.35% |
| 76 | GSMPS 2005-RP2 | Subprime 2005 | $ 78,246,279 | $ 1,846,612 | $ 1,024,319 | $ 431,983 | | $ 431,983 | 2.36% |
| 77 | GSMPS 2005-RP3 | Subprime 2005 | $ 82,503,729 | $ 1,839,833 | $ 1,020,478 | $ 430,362 | | $ 430,362 | 2.23% |
| 78 | GSMPS 2006-RP1 | Subprime 2006 | $ 87,582,659 | $ 4,379,133 | $ 2,440,065 | $ 1,029,040 | | $ 1,029,040 | 5.00% |
| 79 | GSMPS 2006-RP2 | Subprime 2006 | $ 60,213,087 | $ 2,137,565 | $ 1,191,023 | $ 502,286 | | $ 502,286 | 3.55% |
| 80 | GSR 2003-2F | Prime 2003 | $ 671,271 | $ 220,781 | $ 69,076 | $ 29,131 | | $ 29,131 | 32.89% |
| 81 | GSR 2004-10F | Prime 2004 | $ 2,717,936 | $ 474,907 | $ 258,405 | $ 108,976 | | $ 108,976 | 17.47% |
| 82 | GSR 2005-5F | Prime 2005 | $ 17,918,492 | $ 826,042 | $ 456,113 | $ 192,355 | | $ 192,355 | 4.61% |
| 83 | GSR 2005-6F | Prime 2005 | $ 22,175,060 | $ 594,292 | $ 306,471 | $ 129,247 | | $ 129,247 | 2.68% |
| 84 | GSR 2005-7F | Prime 2005 | $ 7,298,135 | $ 656,832 | $ 342,133 | $ 144,236 | | $ 144,236 | 9.00% |
| 85 | GSR 2005-8F | Prime 2005 | $ 33,807,499 | $ 3,042,675 | $ 1,508,160 | $ 636,031 | | $ 636,031 | 9.00% |
| 86 | GSR 2005-9F | Prime 2005 | $ 40,537,200 | $ 168,463 | $ 80,262 | $ 33,849 | | $ 33,849 | 0.42% |
| 87 | GSR 2005-AR3 | Prime 2005 | $ 64,624,698 | $ 5,096,950 | $ 2,467,639 | $ 1,040,669 | | $ 1,040,669 | 7.89% |
| 88 | GSR 2005-AR7 | Prime 2005 | $ 85,788,530 | $ 2,420,021 | $ 1,250,651 | $ 527,432 | | $ 527,432 | 2.82% |
| 89 | GSR 2006-2F | Prime 2006 | $ 39,008,172 | $ 468,098 | $ 167,604 | $ 70,683 | | $ 70,683 | 1.20% |
| 90 | GSR 2006-3F | Prime 2006 | $ 39,173,373 | $ 566,359 | $ 203,264 | $ 85,722 | | $ 85,722 | 1.45% |
| 91 | GSR 2006-4F | Prime 2006 | $ 44,120,814 | $ 8,330,010 | $ 2,999,375 | $ 1,264,915 | | $ 1,264,915 | 18.88% |
| 92 | GSR 2006-AR1 | Prime 2006 | $ 129,484,284 | $ 6,474,214 | $ 2,326,746 | $ 981,250 | | $ 981,250 | 5.00% |
| 93 | GSR 2006-AR2 | Prime 2006 | $ 93,791,475 | $ 4,689,574 | $ 1,685,410 | $ 710,782 | | $ 710,782 | 5.00% |
| 94 | GSR 2007-4F | Prime 2007 | $ 58,018,802 | $ 1,583,913 | $ 568,011 | $ 239,545 | | $ 239,545 | 2.73% |
| 95 | GSR 2007-AR1 | Prime 2007 | $ 194,227,685 | $ 9,711,384 | $ 3,500,758 | $ 1,476,362 | | $ 1,476,362 | 5.00% |
| 96 | GSR 2007-HEL1 | Second Lien 2007 | $ 70,670,360 | $ 3,533,518 | $ 1,742,067 | $ 367,338 | MBIA | $ - | 2.50% |
| 97 | GSR 2007-OA2 | PAY OPTION ARM 2007 | $ 182,931,273 | $ 9,146,564 | $ 3,375,095 | $ 1,423,366 | | $ 1,423,366 | 5.00% |
| 98 | HVMLT 2003-1 | ALT-A 2003 | $ 880,638 | $ 468,235 | $ 164,308 | $ 69,293 | | $ 69,293 | 53.17% |
| 99 | HVMLT 2003-2 | ALT-A 2003 | $ 3,717,868 | $ 5,949 | $ 2,175 | $ 917 | | $ 917 | 0.16% |
| 100 | HVMLT 2004-4 | ALT-A 2004 | $ 6,367,437 | $ 338,748 | $ 143,075 | $ 60,338 | | $ 60,338 | 5.32% |
| 101 | HVMLT 2006-13 | ALT-A 2006 | $ 39,021,465 | $ 849,176 | $ 291,405 | $ 122,893 | | $ 122,893 | 2.18% |
| 102 | HVMLT 2007-7 | PAY OPTION ARM 2007 | $ 587,770,870 | $ 70,885,167 | $ 26,376,112 | $ 11,123,502 | | $ 11,123,502 | 12.06% |
| 103 | LMT 2005-1 | Prime 2005 | $ 44,627,191 | $ 1,218,322 | $ 579,002 | $ 122,090 | | $ 122,090 | 1.37% |
| 104 | LMT 2006-7 | ALT-A 2006 | $ 174,865,117 | $ 8,568,391 | $ 2,943,480 | $ 620,672 | | $ 620,672 | 2.45% |
| 105 | LUM 2006-4 | PAY OPTION ARM 2006 | $ 134,926,422 | $ 16,015,766 | $ 5,706,799 | $ 2,406,708 | | $ 2,406,708 | 11.87% |
| 106 | LUM 2006-6 | PAY OPTION ARM 2006 | $ 204,139,613 | $ 158,534,823 | $ 57,935,169 | $ 12,697,751 | | $ 12,697,751 | 40.36% |
| 107 | LUM 2007-2 | ALT-A 2007 | $ 186,502,776 | $ 3,702,401 | $ 1,272,324 | $ 268,286 | | $ 268,286 | 0.99% |
| 108 | LXS 2006-10N | ALT-A 2006 | $ 346,799,572 | $ 1,595,278 | $ 552,005 | $ 232,795 | | $ 232,795 | 0.46% |
| 109 | Magnetar 2008-R1 | Subprime 2008 | $ 95,989,813 | $ 4,799,491 | $ 2,426,273 | $ 511,612 | | $ 511,612 | 2.50% |
| 110 | MALT 2004-12 | ALT-A 2004 | $ 14,632,081 | $ 731,604 | $ 303,375 | $ 63,971 | | $ 63,971 | 2.50% |
| 111 | MALT 2004-4 | ALT-A 2004 | $ 9,689,085 | $ 484,454 | $ 200,117 | $ 42,197 | | $ 42,197 | 2.50% |
| 112 | MALT 2004-6 | ALT-A 2004 | $ 16,129,592 | $ 1,451,663 | $ 596,545 | $ 125,789 | | $ 125,789 | 4.50% |
| 113 | MALT 2004-7 | ALT-A 2004 | $ 13,609,728 | $ 1,224,875 | $ 504,936 | $ 106,472 | | $ 106,472 | 4.50% |
| 114 | MALT 2004-8 | ALT-A 2004 | $ 12,227,406 | $ 1,100,467 | $ 461,335 | $ 97,279 | | $ 97,279 | 4.50% |
| 115 | MALT 2005-3 | ALT-A 2005 | $ 25,844,174 | $ 1,292,209 | $ 526,255 | $ 110,968 | | $ 110,968 | 2.50% |
| 116 | MALT 2005-4 | ALT-A 2005 | $ 20,736,975 | $ 1,866,328 | $ 789,403 | $ 166,456 | | $ 166,456 | 4.50% |
| 117 | MALT 2005-5 | ALT-A 2005 | $ 31,783,831 | $ 1,589,192 | $ 660,864 | $ 139,352 | | $ 139,352 | 2.50% |
| 118 | MALT 2006-1 | ALT-A 2006 | $ 39,940,754 | $ 289,161 | $ 98,398 | $ 41,497 | | $ 41,497 | 0.72% |
| 119 | MALT 2007-HF1 | ALT-A 2007 | $ 63,704,536 | $ 3,059,368 | $ 1,051,590 | $ 443,483 | | $ 443,483 | 4.80% |
| 120 | MARP 2005-1 | Subprime 2005 | $ 30,690,433 | $ 2,762,139 | $ 1,531,512 | $ 645,879 | | $ 645,879 | 9.00% |

Schedule 3-5 - GMACM Additional R+W Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 121 | MARP 2005-2 | Subprime 2005 | $ 46,471,574 | $ 414,561 | $ 229,801 | $ 96,913 | | $ 96,913 | 0.89% |
| 122 | MARP 2006-1 | Subprime 2006 | $ 39,839,074 | $ 69,065 | $ 38,484 | $ 16,230 | | $ 16,230 | 0.17% |
| 123 | MARP 2006-2 | Subprime 2006 | $ 34,065,976 | $ 1,506,702 | $ 839,531 | $ 354,052 | | $ 354,052 | 4.42% |
| 124 | MASTR 2002-7 | Prime 2002 | $ 701,346 | $ 40,748 | $ 9,652 | $ 4,070 | | $ 4,070 | 5.81% |
| 125 | MASTR 2003-2 | Prime 2003 | $ 426,841 | $ 38,416 | $ 13,645 | $ 5,754 | | $ 5,754 | 9.00% |
| 126 | MASTR 2003-3 | Prime 2003 | $ 1,055,883 | $ 95,029 | $ 27,362 | $ 11,539 | | $ 11,539 | 9.00% |
| 127 | MASTR 2003-4 | Prime 2003 | $ 798,818 | $ 3,036 | $ 1,344 | $ 567 | | $ 567 | 0.38% |
| 128 | MASTR 2004-1 | Prime 2004 | $ 1,300,893 | $ 117,080 | $ 65,380 | $ 27,572 | | $ 27,572 | 9.00% |
| 129 | MASTR 2004-10 | Prime 2004 | $ 1,314,601 | $ 118,314 | $ 63,210 | $ 26,657 | | $ 26,657 | 9.00% |
| 130 | MASTR 2004-11 | Prime 2004 | $ 2,451,222 | $ 197,002 | $ 100,029 | $ 42,185 | | $ 42,185 | 8.04% |
| 131 | MASTR 2004-3 | Prime 2004 | $ 726,522 | $ 65,387 | $ 37,035 | $ 15,619 | | $ 15,619 | 9.00% |
| 132 | MASTR 2004-4 | Prime 2004 | $ 873,307 | $ 23,143 | $ 12,009 | $ 5,065 | | $ 5,065 | 2.65% |
| 133 | MASTR 2004-5 | Prime 2004 | $ 966,113 | $ 31,809 | $ 16,896 | $ 7,125 | | $ 7,125 | 3.29% |
| 134 | MASTR 2004-6 | Prime 2004 | $ 1,997,124 | $ 55,919 | $ 31,781 | $ 13,403 | | $ 13,403 | 2.80% |
| 135 | MASTR 2004-9 | Prime 2004 | $ 2,475,702 | $ 147,304 | $ 76,346 | $ 32,197 | | $ 32,197 | 5.95% |
| 136 | Mganetar 2008-R2 | Subprime 2008 | $ 19,437,444 | $ 971,872 | $ 488,468 | $ 103,000 | | $ 103,000 | 2.50% |
| 137 | MLMI 2003-A2 | Prime 2003 | $ 1,238,419 | $ 63,264 | $ 23,109 | $ 9,746 | | $ 9,746 | 5.11% |
| 138 | MLMI 2003-A4 | Prime 2003 | $ 2,262,586 | $ 270,695 | $ 79,375 | $ 33,474 | | $ 33,474 | 11.96% |
| 139 | MLMI 2005-A6 | ALT-A 2005 | $ 140,749,118 | $ 7,037,456 | $ 3,022,113 | $ 1,274,505 | | $ 1,274,505 | 5.00% |
| 140 | MSSTR 2005-2 | Prime 2005 | $ 1,866,373 | $ 25,569 | $ 13,620 | $ 5,744 | | $ 5,744 | 1.37% |
| 141 | RBSGC 2005-A | ALT-A 2005 | $ 33,667,293 | $ 3,030,056 | $ 1,258,800 | $ 265,435 | | $ 265,435 | 4.50% |
| 142 | RBSGC 2007-B | ALT-A 2007 | $ 102,658,554 | $ 116,238 | $ 39,601 | $ 16,701 | | $ 16,701 | 0.11% |
| 143 | RYMS 1991-15 | Prime 1999 | $ 1,511,848 | $ 136,066 | $ 10,205 | $ 2,152 | GEMICO (Pool Policy) | $ 2,152 | 4.50% |
| 144 | RYMS 1991-16 | Prime 1999 | $ 2,147,994 | $ 193,319 | $ 14,499 | $ 3,057 | GEMICO (Pool Policy) | $ 3,057 | 4.50% |
| 145 | SACO 2007-1 | CES 2007 | $ 181,113,882 | $ 9,055,694 | $ 4,738,844 | $ 1,998,496 | | $ 1,998,496 | 5.00% |
| 146 | SAIL 2006-2 | Subprime 2006 | $ 414,289,936 | $ 3,231,461 | $ 1,795,938 | $ 757,394 | | $ 757,394 | 0.78% |
| 147 | SARM 2004-4 | ALT-A 2004 | $ 38,060,492 | $ 21,184 | $ 8,619 | $ 3,635 | | $ 3,635 | 0.06% |
| 148 | SASC 2001-8A | Prime 2001 | $ 498,511 | $ 44,866 | $ 8,381 | $ 3,535 | | $ 3,535 | 9.00% |
| 149 | SASC 2002-12 | Prime 2002 | $ 953,594 | $ 85,823 | $ 12,874 | $ 5,429 | LEHMAN (Financial Guaranty )/FHLMC (Pool Policy) - Insurer Exception | $ 5,429 | 9.00% |
| 150 | SASC 2002-4H | Subprime 2002 | $ 3,129,880 | $ 621,594 | $ 179,289 | $ 75,611 | | $ 75,611 | 19.86% |
| 151 | SASC 2005-RF1 | Subprime 2005 | $ 18,396,671 | $ 1,655,700 | $ 918,144 | $ 387,206 | | $ 387,206 | 9.00% |
| 152 | SASC 2005-RF2 | Subprime 2005 | $ 15,456,095 | $ 1,391,049 | $ 770,853 | $ 325,089 | | $ 325,089 | 9.00% |
| 153 | SASC 2005-RF4 | Subprime 2005 | $ 24,615,331 | $ 2,215,380 | $ 1,229,652 | $ 518,577 | | $ 518,577 | 9.00% |
| 154 | SASC 2005-RF6 | Subprime 2005 | $ 12,269,204 | $ 1,104,228 | $ 612,965 | $ 258,503 | | $ 258,503 | 9.00% |
| 155 | SASC 2005-S7 | CES 2005 | $ 177,035,883 | $ 15,933,229 | $ 6,182,751 | $ 2,607,429 | United Guaranty (Pool Policy) | $ 2,607,429 | 9.00% |
| 156 | SASC 2006-BC2 | Subprime 2006 | $ 455,373,244 | $ 4,099,674 | $ 2,279,014 | $ 961,120 | | $ 961,120 | 0.90% |
| 157 | SASC 2008-RF1 | Subprime 2008 | $ 22,474,726 | $ 1,123,736 | $ 585,612 | $ 246,968 | | $ 246,968 | 5.00% |
| 158 | SASI 1993-6 | Prime 1999 | $ 4,108,918 | $ 369,803 | $ 27,819 | $ 5,866 | GEMICO (Pool Policy)/FSA - Insurer Exception | $ 5,866 | 4.50% |
| 159 | SEMT 2004-10 | Prime 2004 | $ 8,385,316 | $ 754,678 | $ 377,184 | $ 79,534 | | $ 79,534 | 4.50% |
| 160 | SEMT 2004-11 | Prime 2004 | $ 6,920,307 | $ 401,378 | $ 206,498 | $ 43,543 | | $ 43,543 | 2.90% |
| 161 | SEMT 2004-12 | Prime 2004 | $ 7,461,459 | $ 462,610 | $ 236,976 | $ 49,969 | | $ 49,969 | 3.10% |
| 162 | SEMT 2004-4 | Prime 2004 | $ 6,293,710 | $ 249,860 | $ 127,733 | $ 26,934 | | $ 26,934 | 1.99% |
| 163 | SEMT 2004-5 | Prime 2004 | $ 5,037,454 | $ 453,371 | $ 236,707 | $ 49,913 | | $ 49,913 | 4.50% |
| 164 | SEMT 2004-6 | Prime 2004 | $ 6,617,789 | $ 553,909 | $ 280,264 | $ 59,097 | | $ 59,097 | 4.19% |
| 165 | SEMT 2004-7 | Prime 2004 | $ 7,207,407 | $ 634,973 | $ 337,761 | $ 71,221 | | $ 71,221 | 4.41% |
| 166 | SEMT 2004-8 | Prime 2004 | $ 7,663,305 | $ 595,400 | $ 305,877 | $ 64,498 | | $ 64,498 | 3.88% |
| 167 | SEMT 2004-9 | Prime 2004 | $ 8,662,083 | $ 779,588 | $ 405,500 | $ 85,505 | | $ 85,505 | 4.50% |
| 168 | SEMT 2005-1 | Prime 2005 | $ 5,864,463 | $ 527,802 | $ 276,490 | $ 58,302 | | $ 58,302 | 4.50% |
| 169 | SEMT 2005-3 | ALT-A 2005 | $ 11,878,947 | $ 1,069,105 | $ 429,311 | $ 90,526 | | $ 90,526 | 4.50% |
| 170 | SEMT 2005-4 | Prime 2005 | $ 5,423,971 | $ 127,473 | $ 74,213 | $ 31,298 | | $ 31,298 | 2.35% |
| 171 | SEMT 2007-1 | Prime 2007 | $ 76,684,957 | $ 2,538,272 | $ 911,786 | $ 192,262 | | $ 192,262 | 1.66% |
| 172 | SEMT 2007-2 | Prime 2007 | $ 77,271,708 | $ 3,859,761 | $ 1,377,070 | $ 290,373 | | $ 290,373 | 2.50% |
| 173 | SEMT 2007-3 | Prime 2007 | $ 61,547,995 | $ 3,077,400 | $ 1,102,774 | $ 232,535 | | $ 232,535 | 2.50% |
| 174 | SEMT 2007-4 | Prime 2007 | $ 18,337,016 | $ 916,851 | $ 328,595 | $ 69,289 | | $ 69,289 | 2.50% |

Schedule 3-E, GMACM Additional R+W Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | E | F | G | H | I |
| 175 | SMSC 1992-2 | Prime 1999 | $ 2,290,659 | $ 206,012 | $ 15,451 | $ 6,516 | GEMICO (Pool Policy)/PMI (Pool Policy) | $ 6,516 | 8.99% |
| 176 | SMSC 1992-3 | Prime 1999 | $ 1,720,281 | $ 154,825 | $ 11,612 | $ 2,449 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $ 2,449 | 4.50% |
| 177 | SMSC 1992-4 | Prime 1999 | $ 2,099,770 | $ 188,979 | $ 14,173 | $ 2,989 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $ 2,989 | 4.50% |
| 178 | SMSC 1992-6 | Prime 1999 | $ 2,267,979 | $ 204,118 | $ 15,309 | $ 3,228 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSA (Pool Policy) | $ 3,228 | 4.50% |
| 179 | SMSC 1994-2 | Prime 1999 | $ 2,770,473 | $ 249,343 | $ 18,945 | $ 3,995 | | $ 3,995 | 4.50% |
| 180 | STAC 2007-1 | 2007 | $ 59,599,534 | $ 2,979,977 | $ 11,949,115 | $ 2,519,628 | XL Capital | $ - | 2.50% |
| 181 | STWH 2009-2 | Subprime 2008 | $ 28,390,872 | $ 1,419,544 | $ 704,315 | $ 148,514 | | $ 148,514 | 2.50% |
| 182 | STWH 2010-2 | Subprime 2008 | $ 61,286,113 | $ 3,064,306 | $ 1,530,916 | $ 322,814 | | $ 322,814 | 2.50% |
| 183 | TMTS 2005-11 | Second Lien 2005 | $ 249,419,608 | $ 22,447,765 | $ 12,231,135 | $ 2,579,096 | | $ 2,579,096 | 4.50% |
| 184 | TMTS 2005-13SL | Second Lien 2005 | $ 218,436,644 | $ 19,659,298 | $ 10,636,235 | $ 2,242,790 | FGIC | $ 2,242,790 | 4.50% |
| 185 | TMTS 2005-9HGS | Second Lien 2005 | $ 76,790,255 | $ 6,911,123 | $ 3,770,216 | $ 795,000 | | $ 795,000 | 4.50% |
| 186 | TMTS 2006-2HGS | Second Lien 2006 | $ 248,705,850 | $ 12,435,292 | $ 6,120,955 | $ 1,290,684 | FGIC | $ 1,290,684 | 2.50% |
| 187 | TMTS 2006-4SL | Second Lien 2006 | $ 292,966,388 | $ 14,648,319 | $ 7,209,906 | $ 1,520,304 | AMBAC | $ 1,520,304 | 2.50% |
| 188 | TMTS 2006-6 | Second Lien 2006 | $ 541,683,535 | $ 27,084,177 | $ 13,330,460 | $ 2,810,903 | | $ 2,810,903 | 2.50% |
| 189 | TMTS 2006-HF1 | Second Lien 2006 | $ 43,658,354 | $ 2,182,918 | $ 1,074,507 | $ 226,574 | | $ 226,574 | 2.50% |

**SCHEDULE 3-R**

**RFC Recognized Additional R+W Claims**

Schedule 8 - RFC Additional RMBW Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 2 | ARMT 2005-10 | ALT-A 2005 | $ 162,594,558 | $ 14,633,510 | $ 6,274,806 | $ 1,323,126 | | $ 1,323,126 | 4.50% |
| 3 | ARMT 2005-11 | ALT-A 2005 | $ 210,858,080 | $ 18,977,227 | $ 8,221,754 | $ 1,733,665 | | $ 1,733,665 | 4.50% |
| 4 | BAFC 2005-3 | Prime 2005 | $ 3,658,263 | $ 157,357 | $ 87,724 | $ 36,996 | | $ 36,996 | 4.30% |
| 5 | BAFC 2005-4 | Prime 2005 | $ 4,231,206 | $ 266,566 | $ 148,070 | $ 62,445 | Assured Guaranty - Insurer Exception | $ 62,445 | 6.30% |
| 6 | BAFC 2005-5 | Prime 2005 | $ 9,968,625 | $ 1,616,911 | $ 845,778 | $ 356,687 | | $ 356,687 | 16.22% |
| 7 | BAFC 2005-6 | Prime 2005 | $ 14,000,958 | $ 2,048,340 | $ 1,032,787 | $ 189,345 | | $ 189,345 | 6.36% |
| 8 | BAFC 2005-7 | Prime 2005 | $ 20,813,853 | $ 541,160 | $ 277,832 | $ 117,169 | | $ 117,169 | 2.60% |
| 9 | BAFC 2005-8 | Prime 2005 | $ 18,127,512 | $ 3,313,709 | $ 1,689,572 | $ 358,607 | | $ 358,607 | 9.20% |
| 10 | BAFC 2006-1 | ALT-A 2006 | $ 42,810,591 | $ 3,390,599 | $ 1,138,636 | $ 232,821 | | $ 232,821 | 3.84% |
| 11 | BAFC 2006-5 | Prime 2006 | $ 34,040,250 | $ 1,702,013 | $ 612,134 | $ 129,076 | | $ 129,076 | 2.50% |
| 12 | BALTA 2005-4 | ALT-A 2005 | $ 218,755,055 | $ 1,394,667 | $ 591,987 | $ 11,425 | | $ 11,425 | 0.03% |
| 13 | BSSLT 2007-SV1A | CES 2007 | $ 525,306,659 | $ 26,265,333 | $ 13,848,235 | $ 2,920,083 | XL - Insurer Exception | $ 2,920,083 | 2.50% |
| 14 | CARR 2006-RFC1 | Subprime 2006 | $ 236,844,665 | $ 236,844,665 | $ 131,688,808 | $ 55,536,645 | | $ 55,536,645 | 100.00% |
| 15 | CARR 2007-RFC1 | Subprime 2007 | $ 341,374,765 | $ 341,374,765 | $ 189,871,385 | $ 80,073,773 | | $ 80,073,773 | 100.00% |
| 16 | FNR 2002-66 | Subprime 2002 | $ 60,569,102 | $ 5,530,484 | $ 1,543,658 | $ 325,501 | FNMA/FNMA (Agency Wrap) | $ - | 4.50% |
| 17 | GSR 2007-HEL1 | Second Lien 2007 | $ 70,670,360 | $ 3,533,518 | $ 1,742,067 | $ 367,338 | MBIA | $ - | 2.50% |
| 18 | HALO 2007-AR2 | ALT-A 2007 | $ 91,075,316 | $ 302,911 | $ 103,523 | $ 43,658 | | $ 43,658 | 0.33% |
| 19 | HVMLT 2007-2 | PAY OPTION ARM 2007 | $ 575,480,501 | $ 59,159,395 | $ 21,371,485 | $ 9,012,919 | AMBAC | $ 9,012,919 | 10.28% |
| 20 | LMT 2005-1 | Prime 2005 | $ 44,627,191 | $ 1,218,322 | $ 579,002 | $ 122,090 | | $ 122,090 | 1.37% |
| 21 | LMT 2006-7 | ALT-A 2006 | $ 174,865,117 | $ 8,568,391 | $ 2,943,480 | $ 620,672 | | $ 620,672 | 2.45% |
| 22 | LUM 2006-3 | ALT-A 2006 | $ 185,107,723 | $ 52,486,568 | $ 18,186,864 | $ 7,669,881 | | $ 7,669,881 | 28.35% |
| 23 | LUM 2006-5 | PAY OPTION ARM 2006 | $ 151,787,226 | $ 78,716,856 | $ 28,697,131 | $ 12,102,337 | | $ 12,102,337 | 51.86% |
| 24 | LUM 2006-6 | PAY OPTION ARM 2006 | $ 204,139,613 | $ 158,534,823 | $ 57,935,169 | $ 11,735,038 | | $ 11,735,038 | 37.30% |
| 25 | LUM 2007-2 | ALT-A 2007 | $ 186,502,776 | $ 3,702,401 | $ 1,272,324 | $ 268,286 | | $ 268,286 | 0.99% |
| 26 | LXS 2006-12N | ALT-A 2006 | $ 532,162,165 | $ 89,243,595 | $ 30,903,297 | $ 13,032,736 | | $ 13,032,736 | 16.77% |
| 27 | LXS 2007-3 | PAY OPTION ARM 2007 | $ 360,858,904 | $ 9,856,036 | $ 3,710,665 | $ 1,564,885 | | $ 1,564,885 | 2.73% |
| 28 | LXS 2007-15N | PAY OPTION ARM 2007 | $ 1,121,516,742 | $ 173,796,025 | $ 64,416,111 | $ 27,165,974 | Ambac | $ 27,165,974 | 15.50% |
| 29 | LXS 2007-2N | PAY OPTION ARM 2007 | $ 510,481,150 | $ 181,067,664 | $ 64,989,154 | $ 27,407,641 | | $ 27,407,641 | 35.47% |
| 30 | LXS 2007-4N | PAY OPTION ARM 2007 | $ 805,885,723 | $ 117,901,081 | $ 42,464,158 | $ 17,908,256 | | $ 17,908,256 | 14.63% |
| 31 | Magnetar 2008-R1 | Subprime 2008 | $ 95,989,813 | $ 4,799,491 | $ 2,426,273 | $ 511,612 | | $ 511,612 | 2.50% |
| 32 | MALT 2004-12 | ALT-A 2004 | $ 14,632,081 | $ 731,604 | $ 303,375 | $ 63,971 | | $ 63,971 | 2.50% |
| 33 | MALT 2004-4 | ALT-A 2004 | $ 9,689,085 | $ 484,454 | $ 200,117 | $ 42,197 | | $ 42,197 | 2.50% |
| 34 | MALT 2004-6 | ALT-A 2004 | $ 16,129,592 | $ 1,451,663 | $ 596,545 | $ 125,789 | | $ 125,789 | 4.50% |
| 35 | MALT 2004-7 | ALT-A 2004 | $ 13,609,728 | $ 1,224,875 | $ 504,936 | $ 106,472 | | $ 106,472 | 4.50% |
| 36 | MALT 2004-8 | ALT-A 2004 | $ 12,227,406 | $ 1,100,467 | $ 461,335 | $ 97,279 | | $ 97,279 | 4.50% |
| 37 | MALT 2005-3 | ALT-A 2005 | $ 25,844,174 | $ 1,292,209 | $ 526,255 | $ 110,968 | | $ 110,968 | 2.50% |
| 38 | MALT 2005-4 | ALT-A 2005 | $ 20,736,975 | $ 1,866,328 | $ 789,403 | $ 166,456 | | $ 166,456 | 4.50% |
| 39 | MALT 2005-5 | ALT-A 2005 | $ 31,783,831 | $ 1,589,192 | $ 660,864 | $ 139,352 | | $ 139,352 | 2.50% |
| 40 | Mganetar 2008-R2 | Subprime 2008 | $ 19,437,444 | $ 971,872 | $ 488,468 | $ 103,000 | | $ 103,000 | 2.50% |
| 41 | RALI 1999-QS4 | ALT-A 1999 | $ 230,773 | $ 230,773 | $ 30,724 | $ 12,957 | | $ 12,957 | 100.00% |
| 42 | RALI 2001-QS13 | ALT-A 2001 | $ 346,324 | $ 346,324 | $ 91,112 | $ 38,424 | | $ 38,424 | 100.00% |
| 43 | RALI 2001-QS16 | ALT-A 2001 | $ 2,113,267 | $ 2,113,267 | $ 548,624 | $ 231,369 | | $ 231,369 | 100.00% |
| 44 | RALI 2001-QS17 | ALT-A 2001 | $ 2,187,528 | $ 2,187,528 | $ 561,927 | $ 236,979 | MBIA - Insurer Exception | $ 236,979 | 100.00% |
| 45 | RALI 2001-QS18 | ALT-A 2001 | $ 2,995,344 | $ 2,995,344 | $ 774,161 | $ 326,484 | | $ 326,484 | 100.00% |
| 46 | RALI 2001-QS19 | ALT-A 2001 | $ 350,949 | $ 350,949 | $ 91,637 | $ 38,646 | | $ 38,646 | 100.00% |
| 47 | RALI 2002-QS1 | ALT-A 2002 | $ 2,212,425 | $ 2,212,425 | $ 557,330 | $ 235,041 | | $ 235,041 | 100.00% |
| 48 | RALI 2002-QS10 | ALT-A 2002 | $ 638,581 | $ 638,581 | $ 159,531 | $ 67,278 | | $ 67,278 | 100.00% |
| 49 | RALI 2002-QS11 | ALT-A 2002 | $ 3,238,550 | $ 3,238,550 | $ 826,328 | $ 348,484 | | $ 348,484 | 100.00% |
| 50 | RALI 2002-QS12 | ALT-A 2002 | $ 3,791,820 | $ 3,791,820 | $ 954,960 | $ 402,732 | | $ 402,732 | 100.00% |
| 51 | RALI 2002-QS13 | ALT-A 2002 | $ 671,875 | $ 671,875 | $ 173,560 | $ 73,195 | | $ 73,195 | 100.00% |
| 52 | RALI 2002-QS14 | ALT-A 2002 | $ 2,318,529 | $ 2,318,529 | $ 575,862 | $ 242,856 | | $ 242,856 | 100.00% |
| 53 | RALI 2002-QS15 | ALT-A 2002 | $ 3,759,239 | $ 3,759,239 | $ 933,776 | $ 393,798 | MBIA - Insurer Exception | $ 393,798 | 100.00% |
| 54 | RALI 2002-QS16 | ALT-A 2002 | $ 368,653 | $ 368,653 | $ 92,674 | $ 39,083 | | $ 39,083 | 100.00% |
| 55 | RALI 2002-QS17 | ALT-A 2002 | $ 5,525,124 | $ 5,525,124 | $ 1,390,448 | $ 586,389 | | $ 586,389 | 100.00% |
| 56 | RALI 2002-QS18 | ALT-A 2002 | $ 793,671 | $ 793,671 | $ 200,279 | $ 84,463 | | $ 84,463 | 100.00% |
| 57 | RALI 2002-QS19 | ALT-A 2002 | $ 6,987,448 | $ 6,987,448 | $ 1,724,906 | $ 727,438 | | $ 727,438 | 100.00% |
| 58 | RALI 2002-QS2 | ALT-A 2002 | $ 1,929,280 | $ 1,929,280 | $ 491,863 | $ 207,432 | | $ 207,432 | 100.00% |
| 59 | RALI 2002-QS3 | ALT-A 2002 | $ 4,018,979 | $ 4,018,979 | $ 1,015,285 | $ 428,172 | | $ 428,172 | 100.00% |

Schedule 8 - RFC Additional RMBW Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 60 | RALI 2002-QS4 | ALT-A 2002 | $ 489,411 | $ 489,411 | $ 127,502 | $ 53,771 | | $ 53,771 | 100.00% |
| 61 | RALI 2002-QS5 | ALT-A 2002 | $ 4,104,647 | $ 4,104,647 | $ 1,053,114 | $ 444,126 | | $ 444,126 | 100.00% |
| 62 | RALI 2002-QS6 | ALT-A 2002 | $ 4,672,740 | $ 4,672,740 | $ 1,189,908 | $ 501,816 | | $ 501,816 | 100.00% |
| 63 | RALI 2002-QS7 | ALT-A 2002 | $ 3,061,206 | $ 3,061,206 | $ 770,981 | $ 325,143 | | $ 325,143 | 100.00% |
| 64 | RALI 2002-QS8 | ALT-A 2002 | $ 401,401 | $ 401,401 | $ 104,368 | $ 44,015 | | $ 44,015 | 100.00% |
| 65 | RALI 2002-QS9 | ALT-A 2002 | $ 3,469,375 | $ 3,469,375 | $ 890,621 | $ 375,598 | | $ 375,598 | 100.00% |
| 66 | RALI 2003-QA1 | ALT-A 2003 | $ 2,828,241 | $ 2,828,241 | $ 1,091,093 | $ 460,143 | | $ 460,143 | 100.00% |
| 67 | RALI 2003-QS1 | ALT-A 2003 | $ 4,991,061 | $ 4,991,061 | $ 1,901,733 | $ 802,011 | MBIA - Insurer Exception | $ 802,011 | 100.00% |
| 68 | RALI 2003-QS10 | ALT-A 2003 | $ 7,555,943 | $ 7,555,943 | $ 2,808,136 | $ 1,184,265 | | $ 1,184,265 | 100.00% |
| 69 | RALI 2003-QS11 | ALT-A 2003 | $ 9,179,197 | $ 9,179,197 | $ 3,440,321 | $ 1,450,874 | | $ 1,450,874 | 100.00% |
| 70 | RALI 2003-QS12 | ALT-A 2003 | $ 819,357 | $ 819,357 | $ 308,398 | $ 130,059 | | $ 130,059 | 100.00% |
| 71 | RALI 2003-QS13 | ALT-A 2003 | $ 8,449,079 | $ 8,449,079 | $ 3,088,336 | $ 1,302,433 | | $ 1,302,433 | 100.00% |
| 72 | RALI 2003-QS14 | ALT-A 2003 | $ 778,491 | $ 778,491 | $ 293,881 | $ 123,937 | | $ 123,937 | 100.00% |
| 73 | RALI 2003-QS15 | ALT-A 2003 | $ 8,645,770 | $ 8,645,770 | $ 3,218,095 | $ 1,357,156 | | $ 1,357,156 | 100.00% |
| 74 | RALI 2003-QS16 | ALT-A 2003 | $ 1,004,680 | $ 1,004,680 | $ 376,335 | $ 158,711 | | $ 158,711 | 100.00% |
| 75 | RALI 2003-QS17 | ALT-A 2003 | $ 9,565,223 | $ 9,565,223 | $ 3,535,683 | $ 1,491,091 | | $ 1,491,091 | 100.00% |
| 76 | RALI 2003-QS18 | ALT-A 2003 | $ 457,048 | $ 457,048 | $ 168,075 | $ 70,882 | | $ 70,882 | 100.00% |
| 77 | RALI 2003-QS19 | ALT-A 2003 | $ 7,651,174 | $ 7,651,174 | $ 2,846,765 | $ 1,200,556 | | $ 1,200,556 | 100.00% |
| 78 | RALI 2003-QS2 | ALT-A 2003 | $ 4,246,654 | $ 4,246,654 | $ 1,586,257 | $ 668,966 | | $ 668,966 | 100.00% |
| 79 | RALI 2003-QS20 | ALT-A 2003 | $ 900,274 | $ 900,274 | $ 329,125 | $ 138,801 | | $ 138,801 | 100.00% |
| 80 | RALI 2003-QS21 | ALT-A 2003 | $ 6,586,508 | $ 6,586,508 | $ 2,493,625 | $ 1,051,627 | | $ 1,051,627 | 100.00% |
| 81 | RALI 2003-QS22 | ALT-A 2003 | $ 5,473,878 | $ 5,473,878 | $ 2,054,235 | $ 866,325 | | $ 866,325 | 100.00% |
| 82 | RALI 2003-QS23 | ALT-A 2003 | $ 740,798 | $ 740,798 | $ 280,771 | $ 118,409 | | $ 118,409 | 100.00% |
| 83 | RALI 2003-QS3 | ALT-A 2003 | $ 712,343 | $ 712,343 | $ 272,950 | $ 115,110 | | $ 115,110 | 100.00% |
| 84 | RALI 2003-QS4 | ALT-A 2003 | $ 5,001,964 | $ 5,001,964 | $ 1,869,223 | $ 788,301 | | $ 788,301 | 100.00% |
| 85 | RALI 2003-QS5 | ALT-A 2003 | $ 911,196 | $ 911,196 | $ 348,817 | $ 147,105 | | $ 147,105 | 100.00% |
| 86 | RALI 2003-QS6 | ALT-A 2003 | $ 4,005,808 | $ 4,005,808 | $ 1,493,456 | $ 629,830 | | $ 629,830 | 100.00% |
| 87 | RALI 2003-QS7 | ALT-A 2003 | $ 3,777,491 | $ 3,777,491 | $ 1,419,217 | $ 598,521 | | $ 598,521 | 100.00% |
| 88 | RALI 2003-QS8 | ALT-A 2003 | $ 4,468,434 | $ 4,468,434 | $ 1,686,423 | $ 711,209 | MBIA - Insurer Exception | $ 711,209 | 100.00% |
| 89 | RALI 2003-QS9 | ALT-A 2003 | $ 602,679 | $ 602,679 | $ 221,661 | $ 93,480 | | $ 93,480 | 100.00% |
| 90 | RAMP 2001-RS1 | Subprime 2001 | $ 25,474,564 | $ 25,474,564 | $ 7,115,414 | $ 3,000,758 | AMBAC | $ 3,000,758 | 100.00% |
| 91 | RAMP 2001-RS2 | Subprime 2001 | $ 11,907,960 | $ 11,907,960 | $ 3,327,456 | $ 1,403,276 | | $ 1,403,276 | 100.00% |
| 92 | RAMP 2001-RS3 | Subprime 2001 | $ 32,167,458 | $ 32,167,458 | $ 9,002,261 | $ 3,796,491 | AMBAC | $ 3,796,491 | 100.00% |
| 93 | RAMP 2002-RS1 | Subprime 2002 | $ 23,660,945 | $ 23,660,945 | $ 6,616,081 | $ 2,790,176 | AMBAC - Insurer Exception | $ 2,790,176 | 100.00% |
| 94 | RAMP 2002-RS2 | Subprime 2002 | $ 21,033,604 | $ 21,033,604 | $ 5,892,947 | $ 2,485,211 | AMBAC - Insurer Exception | $ 2,485,211 | 100.00% |
| 95 | RAMP 2002-RS3 | Subprime 2002 | $ 24,569,669 | $ 24,569,669 | $ 6,894,542 | $ 2,907,610 | | $ 2,907,610 | 100.00% |
| 96 | RAMP 2002-RS4 | Subprime 2002 | $ 25,271,329 | $ 25,271,329 | $ 7,080,926 | $ 2,986,213 | AMBAC | $ 2,986,213 | 100.00% |
| 97 | RAMP 2002-RS5 | Subprime 2002 | $ 19,853,890 | $ 19,853,890 | $ 5,588,038 | $ 2,356,623 | Ambac | $ 2,356,623 | 100.00% |
| 98 | RAMP 2002-RS6 | Subprime 2002 | $ 31,106,549 | $ 31,106,549 | $ 8,756,217 | $ 3,692,728 | Ambac | $ 3,692,728 | 100.00% |
| 99 | RAMP 2002-RS7 | Subprime 2003 | $ 9,367,589 | $ 9,367,589 | $ 3,998,868 | $ 1,686,428 | Ambac | $ 1,686,428 | 100.00% |
| 100 | RAMP 2002-RZ2 | Subprime 2002 | $ 13,272,629 | $ 13,272,629 | $ 3,732,358 | $ 1,574,034 | | $ 1,574,034 | 100.00% |
| 101 | RAMP 2002-RZ3 | Subprime 2002 | $ 24,688,747 | $ 24,688,747 | $ 6,961,306 | $ 2,935,766 | | $ 2,935,766 | 100.00% |
| 102 | RAMP 2002-RZ4 | Subprime 2002 | $ 21,679,381 | $ 21,679,381 | $ 6,121,335 | $ 2,581,529 | Ambac | $ 2,581,529 | 100.00% |
| 103 | RAMP 2002-SL1 | Subprime 2002 | $ 681,335 | $ 681,335 | $ 196,907 | $ 83,041 | | $ 83,041 | 100.00% |
| 104 | RAMP 2003-RS1 | Subprime 2003 | $ 35,209,076 | $ 35,209,076 | $ 14,819,102 | $ 6,249,606 | Ambac | $ 6,249,606 | 100.00% |
| 105 | RAMP 2003-RS10 | Subprime 2003 | $ 93,313,248 | $ 93,313,248 | $ 39,307,071 | $ 16,576,829 | | $ 16,576,829 | 100.00% |
| 106 | RAMP 2003-RS11 | Subprime 2003 | $ 107,964,118 | $ 107,964,118 | $ 45,739,701 | $ 19,289,639 | AMBAC - Insurer Exception | $ 19,289,639 | 100.00% |
| 107 | RAMP 2003-RS2 | Subprime 2003 | $ 65,300,558 | $ 65,300,558 | $ 27,482,686 | $ 11,590,174 | AMBAC | $ 11,590,174 | 100.00% |
| 108 | RAMP 2003-RS3 | Subprime 2003 | $ 53,678,766 | $ 53,678,766 | $ 22,553,949 | $ 9,511,595 | AMBAC | $ 9,511,595 | 100.00% |
| 109 | RAMP 2003-RS4 | Subprime 2003 | $ 64,265,290 | $ 64,265,290 | $ 27,075,254 | $ 11,418,349 | Ambac | $ 11,418,349 | 100.00% |
| 110 | RAMP 2003-RS5 | Subprime 2003 | $ 65,297,436 | $ 65,297,436 | $ 27,583,679 | $ 11,632,765 | Ambac | $ 11,632,765 | 100.00% |
| 111 | RAMP 2003-RS6 | Subprime 2003 | $ 60,781,307 | $ 60,781,307 | $ 25,690,150 | $ 10,834,214 | Ambac | $ 10,834,214 | 100.00% |
| 112 | RAMP 2003-RS7 | Subprime 2003 | $ 73,604,308 | $ 73,604,308 | $ 31,181,326 | $ 13,149,988 | AMBAC - Insurer Exception | $ 13,149,988 | 100.00% |
| 113 | RAMP 2003-RS8 | Subprime 2003 | $ 84,907,564 | $ 84,907,564 | $ 35,970,868 | $ 15,169,864 | Ambac - Insurer Exception | $ 15,169,864 | 100.00% |
| 114 | RAMP 2003-RS9 | Subprime 2003 | $ 80,997,455 | $ 80,997,455 | $ 34,228,877 | $ 14,435,221 | AMBAC - Insurer Exception | $ 14,435,221 | 100.00% |

**Schedule 8 - RFC Additional RMW Claims**
**Subject to Further Review and Due Diligence**

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RAMP 2003-RZ1 | Subprime 2003 | $ 34,853,569 | $ 34,853,569 | $ 14,796,672 | $ 6,240,147 | AMBAC | $ 6,240,147 | 100.00% |
| RAMP 2003-RZ2 | Subprime 2003 | $ 13,651,172 | $ 13,651,172 | $ 5,810,718 | $ 2,450,533 | AMBAC | $ 2,450,533 | 100.00% |
| RAMP 2003-RZ3 | Subprime 2003 | $ 27,865,310 | $ 27,865,310 | $ 11,886,240 | $ 5,012,741 | Ambac - Insurer Exception | $ 5,012,741 | 100.00% |
| RAMP 2003-RZ4 | Subprime 2003 | $ 54,461,943 | $ 54,461,943 | $ 23,363,557 | $ 9,853,028 | AMBAC - Insurer Exception | $ 9,853,028 | 100.00% |
| RAMP 2003-RZ5 | Subprime 2003 | $ 50,707,820 | $ 50,707,820 | $ 21,696,313 | $ 9,149,908 | AMBAC - Insurer Exception | $ 9,149,908 | 100.00% |
| RAMP 2003-SL1 | Subprime 2003 | $ 3,037,943 | $ 3,037,943 | $ 1,320,013 | $ 556,684 | | $ 556,684 | 100.00% |
| RASC 1999-RS1 | Subprime 1999 | $ 4,443,608 | $ 4,443,608 | $ 623,489 | $ 262,942 | AMBAC | $ 262,942 | 100.00% |
| RASC 2001-KS1 | Subprime 2001 | $ 132,250,578 | $ 132,250,578 | $ 36,904,991 | $ 15,563,808 | FGIC | $ 15,563,808 | 100.00% |
| RASC 2001-KS2 | Subprime 2001 | $ 104,872,465 | $ 104,872,465 | $ 29,308,347 | $ 12,360,103 | | $ 12,360,103 | 100.00% |
| RASC 2001-KS3 | Subprime 2001 | $ 126,456,882 | $ 126,456,882 | $ 35,351,506 | $ 14,908,663 | | $ 14,908,663 | 100.00% |
| RASC 2002-KS1 | Subprime 2002 | $ 157,493,626 | $ 157,493,626 | $ 44,055,639 | $ 18,579,426 | Ambac | $ 18,579,426 | 100.00% |
| RASC 2002-KS2 | Subprime 2002 | $ 44,357,508 | $ 44,357,508 | $ 12,442,338 | $ 5,247,262 | | $ 5,247,262 | 100.00% |
| RASC 2002-KS4 | Subprime 2002 | $ 123,192,882 | $ 123,192,882 | $ 34,486,625 | $ 14,543,920 | AMBAC | $ 14,543,920 | 100.00% |
| RASC 2002-KS6 | Subprime 2002 | $ 80,118,655 | $ 80,118,655 | $ 22,462,333 | $ 9,472,958 | AMBAC | $ 9,472,958 | 100.00% |
| RASC 2002-KS8 | Subprime 2002 | $ 55,880,155 | $ 55,880,155 | $ 15,773,406 | $ 6,652,061 | Ambac | $ 6,652,061 | 100.00% |
| RASC 2003-KS10 | Subprime 2003 | $ 36,062,998 | $ 36,062,998 | $ 15,417,182 | $ 6,501,832 | | $ 6,501,832 | 100.00% |
| RASC 2003-KS11 | Subprime 2003 | $ 80,709,303 | $ 80,709,303 | $ 34,009,150 | $ 14,342,556 | | $ 14,342,556 | 100.00% |
| RASC 2003-KS2 | Subprime 2003 | $ 46,647,710 | $ 46,647,710 | $ 19,757,492 | $ 8,332,256 | | $ 8,332,256 | 100.00% |
| RASC 2003-KS3 | Subprime 2003 | $ 19,943,321 | $ 19,943,321 | $ 8,371,881 | $ 3,530,643 | | $ 3,530,643 | 100.00% |
| RASC 2003-KS4 | Subprime 2003 | $ 60,434,411 | $ 60,434,411 | $ 25,527,203 | $ 10,765,495 | Ambac | $ 10,765,495 | 100.00% |
| RASC 2003-KS5 | Subprime 2003 | $ 34,794,667 | $ 34,794,667 | $ 14,697,443 | $ 6,198,299 | Ambac | $ 6,198,299 | 100.00% |
| RASC 2003-KS6 | Subprime 2003 | $ 21,116,797 | $ 21,116,797 | $ 8,867,053 | $ 3,739,470 | | $ 3,739,470 | 100.00% |
| RASC 2003-KS7 | Subprime 2003 | $ 39,857,359 | $ 39,857,359 | $ 16,990,338 | $ 7,165,274 | | $ 7,165,274 | 100.00% |
| RASC 2003-KS8 | Subprime 2003 | $ 24,992,452 | $ 24,992,452 | $ 10,654,547 | $ 4,493,304 | | $ 4,493,304 | 100.00% |
| RASC 2003-KS9 | Subprime 2003 | $ 57,430,846 | $ 57,430,846 | $ 24,322,775 | $ 10,257,556 | AMBAC | $ 10,257,556 | 100.00% |
| RBSGC 2005-A | ALT-A 2005 | $ 33,667,293 | $ 3,030,056 | $ 1,258,800 | $ 265,435 | | $ 265,435 | 4.50% |
| RFMS2 1998-HI2 | CES 1999 | $ 36,874,298 | $ 36,874,298 | $ 3,072,858 | $ 1,295,905 | | $ 1,295,905 | 100.00% |
| RFMS2 1999-HI1 | Second Lien 1999 | $ 42,090,362 | $ 42,090,362 | $ 5,532,636 | $ 2,333,259 | AMBAC | $ 2,333,259 | 100.00% |
| RFMS2 1999-HI4 | Second Lien 1999 | $ 38,836,252 | $ 38,836,252 | $ 5,101,035 | $ 2,151,241 | AMBAC | $ 2,151,241 | 100.00% |
| RFMS2 1999-HI6 | Second Lien 1999 | $ 53,810,517 | $ 53,810,517 | $ 7,080,076 | $ 2,985,855 | AMBAC | $ 2,985,855 | 100.00% |
| RFMS2 1999-HI8 | Second Lien 1999 | $ 36,830,215 | $ 36,830,215 | $ 4,844,699 | $ 2,043,138 | AMBAC | $ 2,043,138 | 100.00% |
| RFMS2 2000-HI1 | Second Lien 2000 | $ 78,255,907 | $ 78,255,907 | $ 20,541,307 | $ 8,662,811 | AMBAC | $ 8,662,811 | 100.00% |
| RFMS2 2000-HI2 | Second Lien 2000 | $ 43,320,956 | $ 43,320,956 | $ 11,399,065 | $ 4,807,286 | AMBAC | $ 4,807,286 | 100.00% |
| RFMS2 2000-HI3 | Second Lien 2000 | $ 55,718,850 | $ 55,718,850 | $ 14,668,589 | $ 6,186,131 | AMBAC | $ 6,186,131 | 100.00% |
| RFMS2 2000-HI4 | Second Lien 2000 | $ 56,742,397 | $ 56,742,397 | $ 14,951,653 | $ 6,305,507 | AMBAC | $ 6,305,507 | 100.00% |
| RFMS2 2000-HI5 | Second Lien 2000 | $ 116,322,256 | $ 116,322,256 | $ 30,572,651 | $ 12,893,293 | AMBAC | $ 12,893,293 | 100.00% |
| RFMS2 2000-HL1 | Second Lien 2000 | $ 8,217,325 | $ 8,217,325 | $ 2,162,815 | $ 912,116 | AMBAC | $ 912,116 | 100.00% |
| RFMS2 2001-HI1 | Second Lien 2001 | $ 26,300,354 | $ 26,300,354 | $ 6,942,348 | $ 2,927,771 | AMBAC | $ 2,927,771 | 100.00% |
| RFMS2 2001-HI2 | Second Lien 2001 | $ 20,412,783 | $ 20,412,783 | $ 5,382,763 | $ 2,270,053 | AMBAC | $ 2,270,053 | 100.00% |
| RFMS2 2001-HI3 | Second Lien 2001 | $ 43,565,258 | $ 43,565,258 | $ 11,515,249 | $ 4,856,284 | AMBAC | $ 4,856,284 | 100.00% |
| RFMS2 2001-HI4 | Second Lien 2001 | $ 43,248,845 | $ 43,248,845 | $ 11,434,080 | $ 4,822,053 | AMBAC | $ 4,822,053 | 100.00% |
| RFMS2 2001-HS2 | Second Lien 2001 | $ 4,334,878 | $ 4,334,878 | $ 1,146,006 | $ 483,301 | AMBAC | $ 483,301 | 100.00% |
| RFMS2 2001-HS3 | CES 2001 | $ 1,046,707 | $ 1,046,707 | $ 169,114 | $ 71,320 | Radian /Pool Policy/AMBAC | $ 71,320 | 100.00% |
| RFMS2 2002-HI1 | Second Lien 2002 | $ 38,611,429 | $ 38,611,429 | $ 10,211,802 | $ 4,306,586 | AMBAC | $ 4,306,586 | 100.00% |
| RFMS2 2002-HI2 | Second Lien 2002 | $ 28,158,829 | $ 28,158,829 | $ 7,452,318 | $ 3,142,839 | AMBAC | $ 3,142,839 | 100.00% |
| RFMS2 2002-HI3 | Second Lien 2002 | $ 33,128,765 | $ 33,128,765 | $ 8,773,820 | $ 3,700,151 | AMBAC | $ 3,700,151 | 100.00% |
| RFMS2 2002-HI4 | Second Lien 2002 | $ 30,137,013 | $ 30,137,013 | $ 7,985,092 | $ 3,367,524 | | $ 3,367,524 | 100.00% |
| RFMS2 2002-HI5 | Second Lien 2003 | $ 24,109,874 | $ 24,109,874 | $ 9,612,201 | $ 4,053,719 | | $ 4,053,719 | 100.00% |
| RFMS2 2002-HS1 | CES 2002 | $ 3,966,719 | $ 3,966,719 | $ 652,114 | $ 275,014 | | $ 275,014 | 100.00% |
| RFMS2 2002-HS2 | CES 2002 | $ 4,008,989 | $ 4,008,989 | $ 656,166 | $ 276,722 | | $ 276,722 | 100.00% |
| RFMS2 2002-HS3 | CES 2002 | $ 4,374,814 | $ 4,374,814 | $ 703,592 | $ 296,723 | FGIC | $ 296,723 | 100.00% |
| RFMS2 2003-HI1 | Second Lien 2003 | $ 22,605,058 | $ 22,605,058 | $ 9,045,679 | $ 3,814,801 | | $ 3,814,801 | 100.00% |
| RFMS2 2003-HI2 | Second Lien 2003 | $ 27,190,194 | $ 27,190,194 | $ 10,908,801 | $ 4,600,529 | | $ 4,600,529 | 100.00% |
| RFMS2 2003-HI3 | Second Lien 2003 | $ 27,373,314 | $ 27,373,314 | $ 11,018,044 | $ 4,646,600 | AMBAC | $ 4,646,600 | 100.00% |
| RFMS2 2003-HI4 | Second Lien 2003 | $ 34,926,719 | $ 34,926,719 | $ 14,097,862 | $ 5,945,440 | | $ 5,945,440 | 100.00% |
| RFMS2 2003-HS1 | CES 2003 | $ 8,600,754 | $ 8,600,754 | $ 2,021,639 | $ 852,579 | FGIC | $ 852,579 | 100.00% |
| RFMS2 2003-HS2 | CES 2003 | $ 12,444,637 | $ 12,444,637 | $ 2,891,426 | $ 1,219,390 | FGIC | $ 1,219,390 | 100.00% |
| RFMS2 2003-HS3 | CES 2003 | $ 13,212,124 | $ 13,212,124 | $ 3,004,266 | $ 1,266,978 | MBIA | $ - | 100.00% |
| RFMS2 2003-HS4 | Second Lien 2003 | $ 6,691,471 | $ 6,691,471 | $ 2,800,608 | $ 1,181,090 | AMBAC | $ 1,181,090 | 100.00% |

Schedule 3 - RFC Additional RMBW Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 174 | RFMSI 2003-S10 | Prime 2003 | $ 742,602 | $ 742,602 | $ 237,774 | $ 100,275 | | $ 100,275 | 100.00% |
| 175 | RFMSI 2003-S11 | Prime 2003 | $ 400,858 | $ 400,858 | $ 122,690 | $ 51,741 | | $ 51,741 | 100.00% |
| 176 | RFMSI 2003-S12 | Prime 2003 | $ 1,729,948 | $ 1,729,948 | $ 515,771 | $ 217,514 | | $ 217,514 | 100.00% |
| 177 | RFMSI 2003-S13 | Prime 2003 | $ 1,196,219 | $ 1,196,219 | $ 367,697 | $ 155,068 | MBIA - Insurer Exception | $ 155,068 | 100.00% |
| 178 | RFMSI 2003-S14 | Prime 2003 | $ 51,038 | $ 51,038 | $ 23,302 | $ 9,827 | | $ 9,827 | 100.00% |
| 179 | RFMSI 2003-S15 | Prime 2003 | $ 68,054 | $ 68,054 | $ 25,107 | $ 10,588 | | $ 10,588 | 100.00% |
| 180 | RFMSI 2003-S16 | Prime 2003 | $ 164,724 | $ 164,724 | $ 57,709 | $ 24,338 | | $ 24,338 | 100.00% |
| 181 | RFMSI 2003-S17 | Prime 2003 | $ 1,063,034 | $ 1,063,034 | $ 421,652 | $ 177,822 | | $ 177,822 | 100.00% |
| 182 | RFMSI 2003-S18 | Prime 2003 | $ 108,089 | $ 108,089 | $ 49,473 | $ 20,864 | | $ 20,864 | 100.00% |
| 183 | RFMSI 2003-S19 | Prime 2003 | $ 713,351 | $ 713,351 | $ 290,683 | $ 122,589 | | $ 122,589 | 100.00% |
| 184 | RFMSI 2003-S20 | Prime 2003 | $ 835,548 | $ 835,548 | $ 276,867 | $ 116,762 | Radian - Insurer Exception | $ 116,762 | 100.00% |
| 185 | RFMSI 2003-S4 | Prime 2003 | $ 632,532 | $ 632,532 | $ 229,566 | $ 96,814 | MBIA - Insurer Exception | $ 96,814 | 100.00% |
| 186 | RFMSI 2003-S6 | Prime 2003 | $ 84,101 | $ 84,101 | $ 35,666 | $ 15,041 | | $ 15,041 | 100.00% |
| 187 | RFMSI 2003-S7 | Prime 2003 | $ 977,344 | $ 977,344 | $ 387,129 | $ 163,263 | | $ 163,263 | 100.00% |
| 188 | RFMSI 2003-S9 | Prime 2003 | $ 157,566 | $ 157,566 | $ 57,650 | $ 24,313 | | $ 24,313 | 100.00% |
| 189 | RFSC 2001-RM2 | ALT-A 2001 | $ 1,976,457 | $ 1,976,457 | $ 511,031 | $ 215,515 | | $ 215,515 | 100.00% |
| 190 | RFSC 2002-RM1 | ALT-A 2002 | $ 571,069 | $ 571,069 | $ 138,145 | $ 58,259 | | $ 58,259 | 100.00% |
| 191 | RFSC 2002-RP1 | Subprime 2002 | $ 17,643,793 | $ 17,643,793 | $ 4,924,097 | $ 2,076,621 | AMBAC | $ 2,076,621 | 100.00% |
| 192 | RFSC 2002-RP2 | Subprime 2002 | $ 18,486,483 | $ 18,486,483 | $ 5,162,881 | $ 2,177,323 | AMBAC | $ 2,177,323 | 100.00% |
| 193 | RFSC 2003-RM1 | Prime 2003 | $ 570,953 | $ 570,953 | $ 214,879 | $ 90,620 | | $ 90,620 | 100.00% |
| 194 | RFSC 2003-RM2 | Prime 2003 | $ 746,964 | $ 746,964 | $ 267,731 | $ 112,909 | | $ 112,909 | 100.00% |
| 195 | RFSC 2003-RP1 | Subprime 2003 | $ 27,374,370 | $ 27,374,370 | $ 11,474,965 | $ 4,839,295 | AMBAC - Insurer Exception | $ 4,839,295 | 100.00% |
| 196 | RFSC 2003-RP2 | Subprime 2003 | $ 18,592,004 | $ 18,592,004 | $ 7,847,907 | $ 3,309,670 | AMBAC | $ 3,309,670 | 100.00% |
| 197 | RYMS 1991-15 | Prime 1999 | $ 1,511,848 | $ 136,066 | $ 10,205 | $ 2,152 | GEMICO (Pool Policy) | $ 2,152 | 4.50% |
| 198 | RYMS 1991-16 | Prime 1999 | $ 2,147,994 | $ 193,319 | $ 14,499 | $ 3,057 | GEMICO (Pool Policy) | $ 3,057 | 4.50% |
| 199 | SARM 2007-3 | Prime 2007 | $ 210,704,597 | $ 6,215,786 | $ 2,245,083 | $ 946,811 | | $ 946,811 | 2.95% |
| 200 | SARM 2007-6 | ALT-A 2007 | $ 226,910,370 | $ 1,701,828 | $ 587,661 | $ 247,832 | | $ 247,832 | 0.75% |
| 201 | SASI 1993-6 | Prime 1999 | $ 4,108,918 | $ 369,803 | $ 27,819 | $ 5,866 | GEMICO (Pool Policy)/FSA - Insurer Exception | $ 5,866 | 4.50% |
| 202 | SEMT 2004-10 | Prime 2004 | $ 8,385,316 | $ 754,678 | $ 377,184 | $ 79,534 | | $ 79,534 | 4.50% |
| 203 | SEMT 2004-11 | Prime 2004 | $ 6,920,307 | $ 401,378 | $ 206,498 | $ 43,543 | | $ 43,543 | 2.90% |
| 204 | SEMT 2004-12 | Prime 2004 | $ 7,461,459 | $ 462,610 | $ 236,976 | $ 49,969 | | $ 49,969 | 3.10% |
| 205 | SEMT 2004-4 | Prime 2004 | $ 6,293,703 | $ 249,860 | $ 127,733 | $ 26,934 | | $ 26,934 | 1.99% |
| 206 | SEMT 2004-5 | Prime 2004 | $ 5,037,454 | $ 453,371 | $ 236,707 | $ 49,913 | | $ 49,913 | 4.50% |
| 207 | SEMT 2004-6 | Prime 2004 | $ 6,617,789 | $ 553,909 | $ 280,264 | $ 59,097 | | $ 59,097 | 4.19% |
| 208 | SEMT 2004-7 | Prime 2004 | $ 7,207,407 | $ 634,973 | $ 337,761 | $ 71,221 | | $ 71,221 | 4.41% |
| 209 | SEMT 2004-8 | Prime 2004 | $ 7,663,305 | $ 595,400 | $ 305,877 | $ 64,498 | | $ 64,498 | 3.88% |
| 210 | SEMT 2004-9 | Prime 2004 | $ 8,662,083 | $ 779,588 | $ 405,500 | $ 85,505 | | $ 85,505 | 4.50% |
| 211 | SEMT 2005-1 | Prime 2005 | $ 5,864,463 | $ 527,802 | $ 276,490 | $ 58,302 | | $ 58,302 | 4.50% |
| 212 | SEMT 2005-2 | Prime 2005 | $ 3,891,724 | $ 570,044 | $ 303,933 | $ 128,177 | | $ 128,177 | 14.65% |
| 213 | SEMT 2005-3 | ALT-A 2005 | $ 11,878,947 | $ 1,069,105 | $ 429,311 | $ 90,526 | | $ 90,526 | 4.50% |
| 214 | SEMT 2007-1 | Prime 2007 | $ 76,684,957 | $ 2,538,272 | $ 911,786 | $ 192,262 | | $ 192,262 | 1.66% |
| 215 | SEMT 2007-2 | Prime 2007 | $ 77,271,708 | $ 3,859,761 | $ 1,377,070 | $ 290,373 | | $ 290,373 | 2.50% |
| 216 | SEMT 2007-3 | Prime 2007 | $ 61,547,995 | $ 3,077,400 | $ 1,102,774 | $ 232,535 | | $ 232,535 | 2.50% |
| 217 | SEMT 2007-4 | Prime 2007 | $ 18,337,016 | $ 916,851 | $ 328,595 | $ 69,289 | | $ 69,289 | 2.50% |
| 218 | SMSC 1992-3 | Prime 1999 | $ 1,720,281 | $ 154,825 | $ 11,612 | $ 2,449 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $ 2,449 | 4.50% |
| 219 | SMSC 1992-4 | Prime 1999 | $ 2,099,770 | $ 188,979 | $ 14,173 | $ 2,989 | GEMICO (Pool Policy)/FSI (Pool Policy) | $ 2,989 | 4.50% |
| 220 | SMSC 1992-6 | Prime 1999 | $ 2,267,979 | $ 204,118 | $ 15,309 | $ 3,228 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSA (Pool Policy) | $ 3,228 | 4.50% |
| 221 | SMSC 1994-2 | Prime 1999 | $ 2,770,473 | $ 249,343 | $ 18,945 | $ 3,995 | | $ 3,995 | 4.50% |

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 222 | STAC 2007-1 | 2007 | $ 59,599,534 | $ 2,979,977 | $ 11,949,115 | $ 2,519,628 | XL Capital | $ - | 2.50% |
| 223 | STWH 2009-2 | Subprime 2008 | $ 28,390,872 | $ 1,419,544 | $ 704,315 | $ 148,514 | | $ 148,514 | 2.50% |
| 224 | STWH 2010-2 | Subprime 2008 | $ 61,286,113 | $ 3,064,306 | $ 1,530,916 | $ 322,814 | | $ 322,814 | 2.50% |
| 225 | TMTS 2005-11 | Second Lien 2005 | $ 249,419,608 | $ 22,447,765 | $ 12,231,135 | $ 2,579,096 | | $ 2,579,096 | 4.50% |
| 226 | TMTS 2005-13SL | Second Lien 2005 | $ 218,436,644 | $ 19,659,298 | $ 10,636,235 | $ 2,242,790 | FGIC | $ 2,242,790 | 4.50% |
| 227 | TMTS 2005-9HGS | Second Lien 2005 | $ 76,790,255 | $ 6,911,123 | $ 3,770,216 | $ 795,000 | | $ 795,000 | 4.50% |
| 228 | TMTS 2006-2HGS | Second Lien 2006 | $ 248,705,850 | $ 12,435,292 | $ 6,120,955 | $ 1,290,684 | FGIC | $ 1,290,684 | 2.50% |
| 229 | TMTS 2006-4SL | Second Lien 2006 | $ 292,966,388 | $ 14,648,319 | $ 7,209,906 | $ 1,520,304 | AMBAC | $ 1,520,304 | 2.50% |
| 230 | TMTS 2006-6 | Second Lien 2006 | $ 541,683,535 | $ 27,084,177 | $ 13,330,460 | $ 2,810,903 | | $ 2,810,903 | 2.50% |
| 231 | TMTS 2006-HF1 | Second Lien 2006 | $ 43,658,354 | $ 2,182,918 | $ 1,074,507 | $ 226,574 | | $ 226,574 | 2.50% |

**SCHEDULE 4-G**

**GMACM Recognized Unsecured Servicing Claims**

**Schedule 4-G – GMACM Recognized Unsecured Servicing Claims**
**Subject to Further Review and Due Diligence**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 2 | ACE 2007-SL2 | CES 2007 | 65.80% | $ 1,369 | Assured Guaranty | $ - |
| 3 | ACE 2007-SL3 | Second Lien 2007 | 5.00% | $ 30 | Assured Guaranty | $ - |
| 4 | AHM 2005-1 | ALT-A 2005 | 1.72% | $ 9,540 | FGIC | $ 9,540 |
| 5 | AHM 2005-2 | ALT-A 2005 | 1.84% | $ 19,777 | Ambac/FGIC | $ 19,777 |
| 6 | ALBT 2007-OA1 | Pay Option ARM 2007 | 100.00% | $ 5,725 | | $ 5,725 |
| 7 | BSABS 2001-2 | CES 2001 | 9.00% | $ 1,177 | | $ 1,177 |
| 8 | BSABS 2005-AC5 | ALT-A 2005 | 0.09% | $ 11 | FGIC/Assured Guaranty | $ 11 |
| 9 | BSSLT 2007-1 | Second Lien 2007 | 33.79% | $ 1,101 | Ambac | $ 1,101 |
| 10 | BSSLT 2007-SV1A | CES 2007 | 36.90% | $ 7,685 | XL - Insurer Exception | $ 7,685 |
| 11 | DBALT 2006-AB2 | ALT-A 2006 | 31.18% | $ 87,305 | Ambac | $ 87,305 |
| 12 | DBALT 2006-AB4 | ALT-A 2006 | 48.17% | $ 312,520 | FSA | $ - |
| 13 | DBALT 2006-AR4 | ALT-A 2006 | 20.26% | $ 678 | | $ 678 |
| 14 | DBALT 2007-2 | ALT-A 2007 | 34.32% | $ 197,842 | | $ 197,842 |
| 15 | DBALT 2007-4 | Pay Option ARM 2007 | 100.00% | $ 79,969 | FHLMC (Agency Wrap) | $ 79,969 |
| 16 | DBALT 2007-AB1 | ALT-A 2007 | 22.99% | $ 77,432 | | $ 77,432 |
| 17 | DBALT 2007-AR1 | ALT-A 2007 | 73.73% | $ 16,794 | | $ 16,794 |
| 18 | DBALT 2007-AR2 | ALT-A 2007 | 91.06% | $ 527,760 | | $ 527,760 |
| 19 | DBALT 2007-BAR1 | ALT-A 2007 | 83.88% | $ 42,028 | | $ 42,028 |
| 20 | GMACM 2001-HE2 | CES 2001 | 100.00% | $ 16,806 | FGIC | $ 16,806 |
| 21 | GMACM 2001-HE3 | Second Lien 2001 | 100.00% | $ 7,391 | FGIC | $ 7,391 |
| 22 | GMACM 2001-HLT1 | Second Lien 2001 | 100.00% | $ 34,554 | AMBAC | $ 34,554 |
| 23 | GMACM 2001-HLT2 | Second Lien 2001 | 100.00% | $ 18,758 | Ambac | $ 18,758 |
| 24 | GMACM 2002-HE1 | Second Lien 2002 | 100.00% | $ 15,246 | FGIC | $ 15,246 |
| 25 | GMACM 2002-HE4 | Second Lien 2002 | 100.00% | $ 9,847 | FGIC | $ 9,847 |
| 26 | GMACM 2002-HLT1 | Second Lien 2002 | 100.00% | $ 24,192 | AMBAC | $ 24,192 |
| 27 | GMACM 2003-HE1 | Second Lien 2003 | 100.00% | $ 25,350 | FGIC | $ 25,350 |
| 28 | GMACM 2003-HE2 | CES 2003 | 100.00% | $ 8,831 | FGIC | $ 8,831 |
| 29 | GMACM 2004-HE1 | Second Lien 2004 | 100.00% | $ 113,300 | FGIC | $ 113,300 |
| 30 | GMACM 2004-HE3 | Second Lien 2004 | 100.00% | $ 71,190 | FSA | $ - |
| 31 | GMACM 2004-HE4 | Second Lien 2004 | 100.00% | $ 64,461 | MBIA | $ - |
| 32 | GMACM 2004-HE5 | CES 2004 | 100.00% | $ 9,985 | FGIC | $ 9,985 |
| 33 | GMACM 2004-HLTV1 | Second Lien 2004 | 100.00% | $ 16,763 | FGIC | $ 16,763 |
| 34 | GMACM 2004-VF1 | Second Lien 2004 | 100.00% | $ 45,133 | MBIA | $ - |
| 35 | GMACM 2005-HE1 | Second Lien 2005 | 100.00% | $ 50,859 | FGIC | $ 50,859 |
| 36 | GMACM 2005-HE2 | CES 2005 | 100.00% | $ 18,688 | FGIC | $ 18,688 |
| 37 | GMACM 2005-HE3 | Second Lien 2005 | 100.00% | $ 32,374 | AMBAC | $ 32,374 |
| 38 | GMACM 2006-HE1 | Second Lien 2006 | 100.00% | $ 45,216 | FGIC | $ 45,216 |
| 39 | GMACM 2006-HE2 | CES 2006 | 100.00% | $ 10,732 | FGIC | $ 10,732 |
| 40 | GMACM 2006-HE4 | Second Lien 2006 | 100.00% | $ 25,374 | MBIA | $ - |
| 41 | GMACM 2007-HE1 | CES 2007 | 100.00% | $ 12,540 | MBIA | $ - |
| 42 | GMACM 2010-1 | Subprime 2008 | 100.00% | $ 106,688 | | $ 106,688 |
| 43 | GMACM 2010-2 | Subprime 2008 | 100.00% | $ 1,123 | | $ 1,123 |
| 44 | GPMF 2006-HE1 | Second Lien 2006 | 100.00% | $ 1,350 | XL/CIFG | $ - |
| 45 | GSR 2007-OA2 | Pay Option ARM 2007 | 5.00% | $ 427 | | $ 427 |

Schedule 4-G – GMACM Recognized Unsecured Servicing Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 46 | GSRPM 2003-1 | Subprime 2003 | 2.50% | $ 1,132 | Ambac | $ 1,132 |
| 47 | HVMLT 2003-2 | ALT-A 2003 | 59.98% | $ 3,778 | | $ 3,778 |
| 48 | HVMLT 2004-1 | Prime 2004 | 67.73% | $ 2,273 | | $ 2,273 |
| 49 | HVMLT 2007-2 | Pay Option ARM 2007 | 67.20% | $ 89,845 | AMBAC | $ 89,845 |
| 50 | IMM 2003-4 | ALT-A 2003 | 28.57% | $ 6,313 | AMBAC | $ 6,313 |
| 51 | IMM 2004-6 | ALT-A 2004 | 8.26% | $ 12,124 | AMBAC | $ 12,124 |
| 52 | IMM 2005-5 | ALT-A 2005 | 32.57% | $ 106,685 | AMBAC | $ 106,685 |
| 53 | IMM 2005-6 | ALT-A 2005 | 87.26% | $ 432,991 | AMBAC | $ 432,991 |
| 54 | IMM 2005-7 | ALT-A 2005 | 4.50% | $ 29,673 | Ambac | $ 29,673 |
| 55 | IMSA 2005-2 | ALT-A 2005 | 9.00% | $ 5,792 | Ambac | $ 5,792 |
| 56 | IMSA 2006-3 | ALT-A 2006 | 9.44% | $ 95,837 | Ambac | $ 95,837 |
| 57 | LMT 2005-1 | Prime 2005 | 0.53% | $ 45 | | $ 45 |
| 58 | LUM 2007-2 | ALT-A 2007 | 18.14% | $ 5,750 | | $ 5,750 |
| 59 | LXS 2007-15N | Pay Option ARM 2007 | 6.24% | $ 92,308 | Ambac | $ 92,308 |
| 60 | Magnetar 2008-R1 | Subprime 2008 | 2.50% | $ 322 | | $ 322 |
| 61 | MANA 2007-AF1 | ALT-A 2007 | 0.03% | $ 92 | | $ 92 |
| 62 | Mganetar 2008-R2 | Subprime 2008 | 2.50% | $ 3 | | $ 3 |
| 63 | MHL 2004-1 | ALT-A 2004 | 100.00% | $ 62,012 | | $ 62,012 |
| 64 | MHL 2004-2 | ALT-A 2004 | 100.00% | $ 50,294 | | $ 50,294 |
| 65 | MHL 2005-1 | ALT-A 2005 | 100.00% | $ 86,416 | | $ 86,416 |
| 66 | MHL 2005-2 | ALT-A 2005 | 100.00% | $ 73,434 | | $ 73,434 |
| 67 | MHL 2005-3 | ALT-A 2005 | 100.00% | $ 124,318 | | $ 124,318 |
| 68 | MHL 2005-4 | ALT-A 2005 | 100.00% | $ 165,991 | | $ 165,991 |
| 69 | MHL 2005-5 | ALT-A 2005 | 100.00% | $ 234,225 | | $ 234,225 |
| 70 | MHL 2005-AR1 | Pay Option ARM 2005 | 100.00% | $ 113,682 | | $ 113,682 |
| 71 | MHL 2006-1 | ALT-A 2006 | 100.00% | $ 251,265 | | $ 251,265 |
| 72 | MHL 2007-2 | Prime 2007 | 23.04% | $ 821 | | $ 821 |
| 73 | MSM 2005-10 | Prime 2005 | 100.00% | $ 302 | | $ 302 |
| 74 | MSM 2005-11AR | ALT-A 2005 | 15.31% | $ 1,770 | | $ 1,770 |
| 75 | MSM 2005-3AR | ALT-A 2005 | 15.31% | $ 600 | | $ 600 |
| 76 | MSM 2005-5AR | ALT-A 2005 | 15.31% | $ 3,086 | | $ 3,086 |
| 77 | MSM 2005-6AR | ALT-A 2005 | 15.31% | $ 1,329 | | $ 1,329 |
| 78 | MSM 2005-7 | Prime 2005 | 6.25% | $ 69 | | $ 69 |
| 79 | MSM 2005-9AR | ALT-A 2005 | 15.31% | $ 414 | | $ 414 |
| 80 | MSM 2006-11 | ALT-A 2006 | 10.93% | $ 63 | | $ 63 |
| 81 | MSM 2006-12XS | ALT-A 2006 | 10.93% | $ 310 | | $ 310 |
| 82 | MSM 2006-15XS | ALT-A 2006 | 10.93% | $ 5,149 | MBIA | $ - |
| 83 | MSM 2006-17XS | ALT-A 2006 | 10.93% | $ 3,954 | MBIA | $ - |
| 84 | MSM 2006-1AR | ALT-A 2006 | 10.93% | $ 6,015 | | $ 6,015 |
| 85 | MSM 2006-7 | ALT-A 2006 | 10.93% | $ 266 | | $ 266 |
| 86 | MSM 2007-1XS | ALT-A 2007 | 18.19% | $ 1,651 | | $ 1,651 |
| 87 | MSM 2007-2AX | ALT-A 2007 | 18.19% | $ 10,558 | | $ 10,558 |
| 88 | MSM 2007-3XS | ALT-A 2007 | 18.19% | $ 4,113 | | $ 4,113 |
| 89 | MSM 2007-6XS | ALT-A 2007 | 18.19% | $ 1,994 | | $ 1,994 |

**Schedule 4-G – GMACM Recognized Unsecured Servicing Claims**
**Subject to Further Review and Due Diligence**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 90 | MSM 2007-7AX | ALT-A 2007 | 18.19% | $ 25,879 | | $ 25,879 |
| 91 | MSM 2007-8XS | ALT-A 2007 | 18.19% | $ 6,375 | MBIA | $ - |
| 92 | NAA 2004-AP3 | ALT-A 2004 | 40.74% | $ 21,361 | Ambac | $ 21,361 |
| 93 | NAA 2005-AR3 | ALT-A 2005 | 100.00% | $ 37,470 | | $ 37,470 |
| 94 | NAA 2005-AR4 | ALT-A 2005 | 100.00% | $ 27,670 | | $ 27,670 |
| 95 | NAA 2005-AR5 | ALT-A 2005 | 100.00% | $ 76,629 | | $ 76,629 |
| 96 | NAA 2005-AR6 | ALT-A 2005 | 100.00% | $ 8,042 | | $ 8,042 |
| 97 | NAA 2006-AF1 | ALT-A 2006 | 100.00% | $ 9,352 | | $ 9,352 |
| 98 | NAA 2006-AF2 | ALT-A 2006 | 98.04% | $ 4,761 | | $ 4,761 |
| 99 | NAA 2006-AP1 | ALT-A 2006 | 100.00% | $ 3,317 | | $ 3,317 |
| 100 | NAA 2006-AR1 | ALT-A 2006 | 100.00% | $ 4,520 | | $ 4,520 |
| 101 | NAA 2006-AR2 | ALT-A 2006 | 100.00% | $ 4,539 | | $ 4,539 |
| 102 | NAA 2006-S3 | CES 2006 | 5.00% | $ 2 | | $ 2 |
| 103 | NAA 2006-S4 | CES 2006 | 78.04% | $ 209 | | $ 209 |
| 104 | NAA 2006-S5 | CES 2006 | 5.00% | $ 58 | | $ 58 |
| 105 | NAA 2007-3 | ALT-A 2007 | 100.00% | $ 356,613 | Ambac | $ 356,613 |
| 106 | NAA 2007-S1 | CES 2007 | 5.00% | $ 71 | | $ 71 |
| 107 | NHELI 2006-AF1 | Subprime 2006 | 99.56% | $ 5,944 | | $ 5,944 |
| 108 | PFCA 2002-IFC1 | Subprime 2002 | 4.50% | $ 134 | Ambac | $ 134 |
| 109 | PFCA 2002-IFC2 | Subprime 2002 | 4.50% | $ 96 | Ambac | $ 96 |
| 110 | PFCA 2003-IFC4 | Subprime 2003 | 4.50% | $ 111 | Ambac | $ 111 |
| 111 | PFCA 2003-IFC5 | Subprime 2003 | 4.50% | $ 148 | Ambac | $ 148 |
| 112 | PFCA 2003-IFC6 | Subprime 2003 | 4.50% | $ 271 | Ambac | $ 271 |
| 113 | SACO 2006-8 | Second Lien 2006 | 72.68% | $ 4,901 | Ambac | $ 4,901 |
| 114 | SARM 2004-4 | ALT-A 2004 | 0.06% | $ 35 | | $ 35 |
| 115 | STAC 2007-1 | 2007 | 2.50% | $ 3,018 | XL Capital | $ - |
| 116 | SVHE 2007-1 | Subprime 2007 | 7.61% | $ 1,198 | | $ 1,198 |
| 117 | TMTS 2006-4SL | Second Lien 2006 | 100.00% | $ 13,906 | AMBAC | $ 13,906 |
| 118 | TMTS 2006-6 | Second Lien 2006 | 100.00% | $ 12,516 | | $ 12,516 |

## SCHEDULE 4-R

**RFC Recognized Unsecured Servicing Claims**

**Schedule 4-R – RFC Recognized Uninsured Servicing Claims
Subject to Further Review and Due Diligence**

| | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
|---|---|---|---|---|---|---|
| 2 | BSSLT 2007-SV1A | CES 2007 | 36.90% | $ 7,685 | XL - Insurer Exception | $ 7,685 |
| 3 | DBALT 2006-AR4 | ALT-A 2006 | 20.26% | $ 678 | | $ 678 |
| 4 | DBALT 2007-OA1 | Pay Option ARM 2007 | 60.86% | $ 21,432 | | $ 21,432 |
| 5 | GSRPM 2003-1 | Subprime 2003 | 2.50% | $ 1,132 | Ambac | $ 1,132 |
| 6 | HVMLT 2007-2 | Pay Option ARM 2007 | 10.28% | $ 13,744 | AMBAC | $ 13,744 |
| 7 | IMM 2003-4 | ALT-A 2003 | 28.57% | $ 6,313 | AMBAC | $ 6,313 |
| 8 | IMM 2005-5 | ALT-A 2005 | 32.57% | $ 106,685 | AMBAC | $ 106,685 |
| 9 | IMM 2005-7 | ALT-A 2005 | 4.50% | $ 29,673 | Ambac | $ 29,673 |
| 10 | IMSA 2006-3 | ALT-A 2006 | 9.44% | $ 95,837 | Ambac | $ 95,837 |
| 11 | LMT 2005-1 | Prime 2005 | 0.53% | $ 45 | | $ 45 |
| 12 | LUM 2006-6 | Pay Option ARM 2006 | 77.66% | $ 31,926 | | $ 31,926 |
| 13 | LUM 2007-2 | ALT-A 2007 | 18.14% | $ 5,750 | | $ 5,750 |
| 14 | LXS 2007-12N | Pay Option ARM 2007 | 2.73% | $ 475 | | $ 475 |
| 15 | LXS 2007-15N | Pay Option ARM 2007 | 15.50% | $ 229,344 | Ambac | $ 229,344 |
| 16 | LXS 2007-2N | Pay Option ARM 2007 | 35.47% | $ 6,074 | | $ 6,074 |
| 17 | LXS 2007-4N | Pay Option ARM 2007 | 14.62% | $ 4,058 | | $ 4,058 |
| 18 | Magnetar 2008-R1 | Subprime 2008 | 2.50% | $ 322 | | $ 322 |
| 19 | MANA 2007-OAR4 | Pay Option ARM 2007 | 63.96% | $ 14,514 | | $ 14,514 |
| 20 | Mganetar 2008-R2 | Subprime 2008 | 2.50% | $ 3 | | $ 3 |
| 21 | MHL 2007-2 | Prime 2007 | 23.04% | $ 821 | | $ 821 |
| 22 | MSM 2005-11AR | ALT-A 2005 | 15.31% | $ 1,770 | | $ 1,770 |
| 23 | MSM 2005-3AR | ALT-A 2005 | 15.31% | $ 600 | | $ 600 |
| 24 | MSM 2005-5AR | ALT-A 2005 | 15.31% | $ 3,086 | | $ 3,086 |
| 25 | MSM 2005-6AR | ALT-A 2005 | 15.31% | $ 1,329 | | $ 1,329 |
| 26 | MSM 2005-7 | Prime 2005 | 6.25% | $ 69 | | $ 69 |
| 27 | MSM 2005-9AR | ALT-A 2005 | 15.31% | $ 414 | | $ 414 |
| 28 | MSM 2006-11 | ALT-A 2006 | 10.93% | $ 63 | | $ 63 |
| 29 | MSM 2006-12XS | ALT-A 2006 | 10.93% | $ 310 | | $ 310 |
| 30 | MSM 2006-15XS | ALT-A 2006 | 10.93% | $ 5,149 | MBIA | $ - |
| 31 | MSM 2006-17XS | ALT-A 2006 | 10.93% | $ 3,954 | MBIA | $ - |
| 32 | MSM 2006-1AR | ALT-A 2006 | 10.93% | $ 6,015 | | $ 6,015 |
| 33 | MSM 2006-7 | ALT-A 2006 | 10.93% | $ 266 | | $ 266 |
| 34 | MSM 2007-1XS | ALT-A 2007 | 18.19% | $ 1,651 | | $ 1,651 |
| 35 | MSM 2007-2AX | ALT-A 2007 | 18.19% | $ 10,558 | | $ 10,558 |
| 36 | MSM 2007-3XS | ALT-A 2007 | 18.19% | $ 4,113 | | $ 4,113 |
| 37 | MSM 2007-6XS | ALT-A 2007 | 18.19% | $ 1,994 | | $ 1,994 |
| 38 | MSM 2007-7AX | ALT-A 2007 | 18.19% | $ 25,879 | | $ 25,879 |
| 39 | MSM 2007-8XS | ALT-A 2007 | 18.19% | $ 6,375 | MBIA | $ - |
| 40 | PFCA 2002-IFC1 | Subprime 2002 | 4.50% | $ 134 | Ambac | $ 134 |
| 41 | PFCA 2002-IFC2 | Subprime 2002 | 4.50% | $ 96 | Ambac | $ 96 |
| 42 | PFCA 2003-IFC4 | Subprime 2003 | 4.50% | $ 111 | Ambac | $ 111 |
| 43 | PFCA 2003-IFC5 | Subprime 2003 | 4.50% | $ 148 | Ambac | $ 148 |
| 44 | PFCA 2003-IFC6 | Subprime 2003 | 4.50% | $ 271 | Ambac | $ 271 |

**Schedule 4-R – RFC Recognized Uninsured Servicing Claims**
**Subject to Further Review and Due Diligence**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 45 | RALI 2006-QH1 | Pay Option Arm 2006 | 100.00% | $ 15,752 | Ambac | $ 15,752 |
| 46 | RALI 2006-QO1 | Pay Option Arm 2006 | 100.00% | $ 64,824 | | $ 64,824 |
| 47 | RALI 2006-QO10 | Pay Option Arm 2006 | 100.00% | $ 57,393 | | $ 57,393 |
| 48 | RALI 2006-QO2 | Pay Option Arm 2006 | 100.00% | $ 46,114 | | $ 46,114 |
| 49 | RALI 2006-QO3 | Pay Option Arm 2006 | 100.00% | $ 45,849 | | $ 45,849 |
| 50 | RALI 2006-QO4 | Pay Option Arm 2006 | 100.00% | $ 67,607 | XL | $ - |
| 51 | RALI 2006-QO5 | Pay Option Arm 2006 | 100.00% | $ 83,782 | | $ 83,782 |
| 52 | RALI 2006-QO6 | Pay Option Arm 2006 | 100.00% | $ 98,142 | | $ 98,142 |
| 53 | RALI 2006-QO7 | Pay Option Arm 2006 | 100.00% | $ 109,814 | | $ 109,814 |
| 54 | RALI 2006-QO8 | Pay Option Arm 2006 | 100.00% | $ 87,895 | | $ 87,895 |
| 55 | RALI 2006-QO9 | Pay Option Arm 2006 | 100.00% | $ 51,659 | | $ 51,659 |
| 56 | RALI 2007-QH1 | ALT-A 2007 | 100.00% | $ 20,491 | | $ 20,491 |
| 57 | RALI 2007-QH2 | ALT-A 2007 | 100.00% | $ 13,878 | | $ 13,878 |
| 58 | RALI 2007-QH3 | ALT-A 2007 | 100.00% | $ 12,992 | | $ 12,992 |
| 59 | RALI 2007-QH4 | ALT-A 2007 | 100.00% | $ 10,254 | | $ 10,254 |
| 60 | RALI 2007-QH5 | ALT-A 2007 | 100.00% | $ 16,249 | | $ 16,249 |
| 61 | RALI 2007-QH6 | ALT-A 2007 | 100.00% | $ 15,567 | | $ 15,567 |
| 62 | RALI 2007-QH7 | ALT-A 2007 | 100.00% | $ 7,191 | | $ 7,191 |
| 63 | RALI 2007-QH8 | ALT-A 2007 | 100.00% | $ 14,544 | | $ 14,544 |
| 64 | RALI 2007-QH9 | ALT-A 2007 | 100.00% | $ 12,735 | | $ 12,735 |
| 65 | RALI 2007-QO1 | Pay Option Arm 2007 | 100.00% | $ 35,371 | | $ 35,371 |
| 66 | RALI 2007-QO2 | Pay Option Arm 2007 | 100.00% | $ 28,643 | | $ 28,643 |
| 67 | RALI 2007-QO3 | Pay Option Arm 2007 | 100.00% | $ 10,270 | | $ 10,270 |
| 68 | RALI 2007-QO4 | Pay Option Arm 2007 | 100.00% | $ 21,184 | | $ 21,184 |
| 69 | RALI 2007-QO5 | Pay Option Arm 2007 | 100.00% | $ 8,125 | | $ 8,125 |
| 70 | RAMP 2001-RS1 | Subprime 2001 | 100.00% | $ 71,364 | AMBAC | $ 71,364 |
| 71 | RAMP 2001-RS3 | Subprime 2001 | 100.00% | $ 92,850 | AMBAC | $ 92,850 |
| 72 | RAMP 2002-RS1 | Subprime 2002 | 100.00% | $ 77,510 | AMBAC - Insurer Exception | $ 77,510 |
| 73 | RAMP 2002-RS4 | Subprime 2002 | 100.00% | $ 81,090 | AMBAC | $ 81,090 |
| 74 | RAMP 2002-RS5 | Subprime 2002 | 100.00% | $ 78,878 | Ambac | $ 78,878 |
| 75 | RAMP 2002-RS6 | Subprime 2002 | 100.00% | $ 117,114 | Ambac | $ 117,114 |
| 76 | RAMP 2002-RS7 | Subprime 2003 | 100.00% | $ 41,458 | Ambac | $ 41,458 |
| 77 | RAMP 2002-RZ4 | Subprime 2002 | 100.00% | $ 62,404 | Ambac | $ 62,404 |
| 78 | RAMP 2003-RS1 | Subprime 2003 | 100.00% | $ 137,791 | Ambac | $ 137,791 |
| 79 | RAMP 2003-RS11 | Subprime 2003 | 100.00% | $ 366,620 | AMBAC - Insurer Exception | $ 366,620 |
| 80 | RAMP 2003-RS2 | Subprime 2003 | 100.00% | $ 264,644 | AMBAC | $ 264,644 |
| 81 | RAMP 2003-RS3 | Subprime 2003 | 100.00% | $ 217,986 | AMBAC | $ 217,986 |
| 82 | RAMP 2003-RS4 | Subprime 2003 | 100.00% | $ 250,872 | AMBAC | $ 250,872 |
| 83 | RAMP 2003-RS5 | Subprime 2003 | 100.00% | $ 239,482 | Ambac | $ 239,482 |
| 84 | RAMP 2003-RS6 | Subprime 2003 | 100.00% | $ 217,162 | Ambac | $ 217,162 |

**Schedule 4-R – RFC Recognized Insured Servicing Claims**
**Subject to Further Review and Due Diligence**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 85 | RAMP 2003-RS8 | Subprime 2003 | 100.00% | $ 270,256 | Ambac - Insurer Exception | $ 270,256 |
| 86 | RAMP 2003-RS9 | Subprime 2003 | 100.00% | $ 274,573 | AMBAC - Insurer Exception | $ 274,573 |
| 87 | RAMP 2003-RZ1 | Subprime 2003 | 100.00% | $ 87,802 | AMBAC | $ 87,802 |
| 88 | RAMP 2003-RZ2 | Subprime 2003 | 100.00% | $ 38,832 | AMBAC | $ 38,832 |
| 89 | RAMP 2003-RZ3 | Subprime 2003 | 100.00% | $ 62,971 | Ambac - Insurer Exception | $ 62,971 |
| 90 | RAMP 2003-RZ4 | Subprime 2003 | 100.00% | $ 115,737 | AMBAC - Insurer Exception | $ 115,737 |
| 91 | RAMP 2003-RZ5 | Subprime 2003 | 100.00% | $ 104,926 | AMBAC - Insurer Exception | $ 104,926 |
| 92 | RAMP 2004-RS1 | Subprime 2004 | 100.00% | $ 367,277 | AMBAC - Insurer Exception | $ 367,277 |
| 93 | RAMP 2004-RS5 | Subprime 2004 | 100.00% | $ 282,090 | AMBAC | $ 282,090 |
| 94 | RAMP 2004-RS7 | Subprime 2004 | 100.00% | $ 292,007 | FGIC | $ 292,007 |
| 95 | RAMP 2004-RS9 | Subprime 2004 | 100.00% | $ 269,310 | AMBAC | $ 269,310 |
| 96 | RAMP 2004-RZ2 | Subprime 2004 | 100.00% | $ 77,656 | FGIC | $ 77,656 |
| 97 | RAMP 2005-EFC7 | Subprime 2005 | 100.00% | $ 300,108 | AMBAC | $ 300,108 |
| 98 | RAMP 2005-NC1 | Subprime 2005 | 100.00% | $ 507,981 | FGIC | $ 507,981 |
| 99 | RAMP 2005-RS9 | Subprime 2005 | 100.00% | $ 591,701 | FGIC | $ 591,701 |
| 100 | RASC 1999-RS1 | Subprime 1999 | 100.00% | $ 10,560 | AMBAC | $ 10,560 |
| 101 | RASC 2001-KS1 | Subprime 2001 | 100.00% | $ 354,691 | FGIC | $ 354,691 |
| 102 | RASC 2002-KS1 | Subprime 2002 | 100.00% | $ 453,041 | Ambac | $ 453,041 |
| 103 | RASC 2002-KS4 | Subprime 2002 | 100.00% | $ 420,840 | AMBAC | $ 420,840 |
| 104 | RASC 2002-KS6 | Subprime 2002 | 100.00% | $ 264,417 | AMBAC | $ 264,417 |
| 105 | RASC 2002-KS8 | Subprime 2002 | 100.00% | $ 175,259 | Ambac | $ 175,259 |
| 106 | RASC 2003-KS4 | Subprime 2003 | 100.00% | $ 252,750 | Ambac | $ 252,750 |
| 107 | RASC 2003-KS5 | Subprime 2003 | 100.00% | $ 150,901 | Ambac | $ 150,901 |
| 108 | RASC 2003-KS9 | Subprime 2003 | 100.00% | $ 234,389 | AMBAC | $ 234,389 |
| 109 | RASC 2004-KS4 | Subprime 2004 | 100.00% | $ 215,271 | AMBAC | $ 215,271 |
| 110 | RASC 2004-KS7 | Subprime 2004 | 100.00% | $ 205,778 | FGIC | $ 205,778 |
| 111 | RASC 2004-KS9 | Subprime 2004 | 100.00% | $ 152,696 | FGIC | $ 152,696 |
| 112 | RASC 2005-EMX5 | Subprime 2005 | 100.00% | $ 226,696 | FGIC | $ 226,696 |
| 113 | RASC 2007-EMX1 | Subprime 2007 | 100.00% | $ 552,472 | FGIC | $ 552,472 |
| 114 | RFMS2 1999-HI1 | Second Lien 1999 | 100.00% | $ 28,606 | AMBAC | $ 28,606 |
| 115 | RFMS2 1999-HI4 | Second Lien 1999 | 100.00% | $ 25,673 | AMBAC | $ 25,673 |
| 116 | RFMS2 1999-HI6 | Second Lien 1999 | 100.00% | $ 34,539 | AMBAC | $ 34,539 |
| 117 | RFMS2 1999-HI8 | Second Lien 1999 | 100.00% | $ 23,392 | AMBAC | $ 23,392 |
| 118 | RFMS2 2000-HI1 | Second Lien 2000 | 100.00% | $ 97,083 | AMBAC | $ 97,083 |
| 119 | RFMS2 2000-HI2 | Second Lien 2000 | 100.00% | $ 53,177 | AMBAC | $ 53,177 |
| 120 | RFMS2 2000-HI3 | Second Lien 2000 | 100.00% | $ 67,074 | AMBAC | $ 67,074 |
| 121 | RFMS2 2000-HI4 | Second Lien 2000 | 100.00% | $ 67,115 | AMBAC | $ 67,115 |

**Schedule 4-R – RFC Recognized Uninsured Servicing Claims**
**Subject to Further Review and Due Diligence**

| | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
|---|---|---|---|---|---|---|
| 122 | RFMS2 2000-HI5 | Second Lien 2000 | 100.00% | $ 136,057 | AMBAC | $ 136,057 |
| 123 | RFMS2 2000-HL1 | Second Lien 2000 | 100.00% | $ 9,979 | AMBAC | $ 9,979 |
| 124 | RFMS2 2001-HI1 | Second Lien 2001 | 100.00% | $ 30,220 | AMBAC | $ 30,220 |
| 125 | RFMS2 2001-HI2 | Second Lien 2001 | 100.00% | $ 23,448 | AMBAC | $ 23,448 |
| 126 | RFMS2 2001-HI3 | Second Lien 2001 | 100.00% | $ 48,787 | AMBAC | $ 48,787 |
| 127 | RFMS2 2001-HI4 | Second Lien 2001 | 100.00% | $ 47,370 | AMBAC | $ 47,370 |
| 128 | RFMS2 2001-HS2 | Second Lien 2001 | 100.00% | $ 4,878 | AMBAC | $ 4,878 |
| 129 | RFMS2 2001-HS3 | CES 2001 | 100.00% | $ 2,980 | Radian (Pool Policy)/AMBAC | $ 2,980 |
| 130 | RFMS2 2002-HI1 | Second Lien 2002 | 100.00% | $ 40,339 | AMBAC | $ 40,339 |
| 131 | RFMS2 2002-HI2 | Second Lien 2002 | 100.00% | $ 28,503 | AMBAC | $ 28,503 |
| 132 | RFMS2 2002-HI3 | Second Lien 2002 | 100.00% | $ 31,652 | AMBAC | $ 31,652 |
| 133 | RFMS2 2002-HS3 | CES 2002 | 100.00% | $ 3,088 | FGIC | $ 3,088 |
| 134 | RFMS2 2003-HI3 | Second Lien 2003 | 100.00% | $ 22,312 | AMBAC | $ 22,312 |
| 135 | RFMS2 2003-HS1 | CES 2003 | 100.00% | $ 7,540 | FGIC | $ 7,540 |
| 136 | RFMS2 2003-HS2 | CES 2003 | 100.00% | $ 9,853 | FGIC | $ 9,853 |
| 137 | RFMS2 2003-HS4 | Second Lien 2003 | 100.00% | $ 5,480 | AMBAC | $ 5,480 |
| 138 | RFMS2 2004-HI2 | Second Lien 2004 | 100.00% | $ 24,931 | FGIC | $ 24,931 |
| 139 | RFMS2 2004-HI3 | Second Lien 2004 | 100.00% | $ 15,321 | FGIC | $ 15,321 |
| 140 | RFMS2 2004-HS1 | CES 2004 | 100.00% | $ 7,386 | FGIC | $ 7,386 |
| 141 | RFMS2 2004-HS3 | CES 2004 | 100.00% | $ 3,602 | FGIC | $ 3,602 |
| 142 | RFMS2 2005-HI1 | Second Lien 2005 | 100.00% | $ 11,562 | FGIC | $ 11,562 |
| 143 | RFMS2 2005-HS1 | CES 2005 | 100.00% | $ 20,193 | FGIC | $ 20,193 |
| 144 | RFMS2 2005-HS2 | CES 2005 | 100.00% | $ 13,637 | FGIC | $ 13,637 |
| 145 | RFMS2 2005-HSA1 | CES 2005 | 100.00% | $ 7,413 | FGIC | $ 7,413 |
| 146 | RFMS2 2006-HI2 | Second Lien 2006 | 100.00% | $ 3,573 | FGIC | $ 3,573 |
| 147 | RFMS2 2006-HI5 | Second Lien 2006 | 100.00% | $ 3,217 | FGIC | $ 3,217 |
| 148 | RFMS2 2006-HSA2 | CES 2006 | 100.00% | $ 7,710 | FGIC | $ 7,710 |
| 149 | RFMS2 2007-HI1 | Second Lien 2007 | 100.00% | $ 2,559 | FGIC | $ 2,559 |
| 150 | RFMS2 2007-HSA1 | Second Lien 2007 | 100.00% | $ 7,668 | MBIA | $ - |
| 151 | RFMS2 2007-HSA2 | CES 2007 | 100.00% | $ 21,037 | MBIA | $ - |
| 152 | RFMS2 2007-HSA3 | Second Lien 2007 | 100.00% | $ 10,288 | MBIA | $ - |
| 153 | RFMSI 2005-S2 | Prime 2005 | 100.00% | $ 8,832 | FGIC - Insurer | $ 8,832 |
| 154 | RFMSI 2005-S7 | Prime 2005 | 100.00% | $ 26,635 | FGIC | $ 26,635 |
| 155 | RFSC 2002-RP1 | Subprime 2002 | 100.00% | $ 20,304 | AMBAC | $ 20,304 |
| 156 | RFSC 2002-RP2 | Subprime 2002 | 100.00% | $ 80,700 | AMBAC | $ 80,700 |
| 157 | RFSC 2003-RP1 | Subprime 2003 | 100.00% | $ 140,554 | AMBAC - Insurer Exception | $ 140,554 |
| 158 | RFSC 2003-RP2 | Subprime 2003 | 100.00% | $ 99,146 | AMBAC | $ 99,146 |
| 159 | STAC 2007-1 | 2007 | 2.50% | $ 3,018 | XL Capital | $ - |
| 160 | SVHE 2007-1 | Subprime 2007 | 7.61% | $ 1,198 | | $ 1,198 |

## Exhibit 2

| Name of Filing Entity | State of Incorporation | Tax Identification Number |
|---|---|---|
| | | |
| ditech, LLC | Delaware | 23-2887228 |
| DOA Holding Properties, LLC | Delaware | 26-1424257 |
| DOA Properties IX (Lots-Other), LLC | Delaware | 26-2783274 |
| EPRE LLC | Delaware | 26-2747974 |
| Equity Investment I, LLC | Delaware | 02-0632797 |
| ETS of Virginia, Inc. | Virginia | 26-4051445 |
| ETS of Washington, Inc. | Washington | 45-2910665 |
| Executive Trustee Services, LLC | Delaware | 23-2778943 |
| GMAC-RFC Holding Company, LLC | Delaware | 23-2593763 |
| GMAC Model Home Finance I, LLC | Delaware | 26-2748469 |
| GMAC Mortgage USA Corporation | Delaware | 20-4796930 |
| GMAC Mortgage, LLC | Delaware | 23-1694840 |
| GMAC Residential Holding Company, LLC | Delaware | 91-1902190 |
| GMACRH Settlement Services, LLC | Delaware | 23-3036156 |
| GMACM Borrower LLC | Delaware | 45-5064887 |
| GMACM REO LLC | Delaware | 45-5222043 |
| GMACR Mortgage Products, LLC | Delaware | 03-0536369 |
| HFN REO SUB II, LLC | Delaware | None |
| Home Connects Lending Services, LLC | Pennsylvania | 25-1849412 |
| Homecomings Financial Real Estate Holdings, LLC | Delaware | 26-2736869 |
| Homecomings Financial, LLC | Delaware | 51-0369458 |
| Ladue Associates, Inc. | Pennsylvania | 23-1893048 |
| Passive Asset Transactions, LLC | Delaware | 51-0404130 |
| PATI A, LLC | Delaware | 26-3722729 |
| PATI B, LLC | Delaware | 26-3722937 |
| PATI Real Estate Holdings, LLC | Delaware | 27-0515201 |
| RAHI A, LLC | Delaware | 26-3723321 |
| RAHI B, LLC | Delaware | 26-3723553 |
| RAHI Real Estate Holdings, LLC | Delaware | 27-0515287 |
| RCSFJV2004, LLC | Nevada | 20-3802772 |
| Residential Accredit Loans, Inc. | Delaware | 51-0368240 |
| Residential Asset Mortgage Products, Inc. | Delaware | 41-1955181 |
| Residential Asset Securities Corporation | Delaware | 51-0362653 |
| Residential Capital, LLC | Delaware | 20-1770738 |
| Residential Consumer Services of Alabama, LLC | Alabama | 63-1105449 |
| Residential Consumer Services of Ohio, LLC | Ohio | 34-1754796 |
| Residential Consumer Services of Texas, LLC | Texas | 75-2510515 |
| Residential Consumer Services, LLC | Delaware | 20-4812167 |
| Residential Funding Company, LLC | Delaware | 93-0891336 |
| Residential Funding Mortgage Exchange, LLC | Delaware | 41-1674247 |
| Residential Funding Mortgage Securities I, Inc. | Delaware | 75-2006294 |
| Residential Funding Mortgage Securities II, Inc. | Delaware | 41-1808858 |
| Residential Funding Real Estate Holdings, LLC | Delaware | 26-2736505 |
| Residential Mortgage Real Estate Holdings, LLC | Delaware | 26-2737180 |
| RFC – GSAP Servicer Advance, LLC | Delaware | 26-1960289 |

| Name of Filing Entity | State of Incorporation | Tax Identification Number |
|---|---|---|
|  |  |  |
| RFC Asset Holdings II, LLC | Delaware | 41-1984034 |
| RFC Asset Management, LLC | Delaware | 06-1664678 |
| RFC Borrower LLC | Delaware | 45-5065558 |
| RFC Construction Funding, LLC | Delaware | 41-1925730 |
| RFC REO LLC | Delaware | 45-5222407 |
| RFC SFJV-2002, LLC | Nevada | 06-1664670 |

## Exhibit 3





ResCap Organizational Structure

ResCap Organizational Structure







ResCap Organizational Structure



ResCap Organizational Structure





ResCap Organizational Structure



## Exhibit 4

*FOR ILLUSTRATIVE PURPOSES ONLY*

| ($ in millions) | Debtor Group | | | Private Securities Claims Trust | Total |
|---|---|---|---|---|---|
| | ResCap | GMACM | RFC | | |

**STEP 1 – UNIT DISTRIBUTION (PRE-ADJUSTMENT)**

| | | | | | |
|---|---|---|---|---|---|
| **Initial Unit Allocation** | **31,689,942** | **25,425,656** | **33,338,825** | **9,545,578** | **100,000,000** |
| **Percentage** | **31.69%** | **25.43%** | **33.34%** | **9.55%** | **100.00%** |

**STEP 2 – TOTAL ALLOCATED UNITS (PRE-ADJUSTMENT)**

**Estimated / Allowed Unsecured Claims**

| | | | | | |
|---|---|---|---|---|---|
| MBIA | $719.0 | $1,450.0 | $1,450.0 | | |
| FGIC | 337.5 | 181.5 | 415.0 | | |
| Estimated Other Monolines | 86.5 | 175.0 | 175.0 | | |
| Senior Unsecured Notes Claims | 1,003.3 | - | - | | |
| RMBS Trust Claims | - | 209.8 | 7,091.2 | | |
| Estimated General Unsecured Claim | 0.9 | 63.7 | 27.5 | | |
| Private Securities Claims | - | - | - | | |
| **Estimated / Allowed Unsecured Claims** | **$2,147.2** | **$2,080.0** | **$9,158.7** | | |

**Initial Unit Allocation (Pre-Adjustment)**

| | | | | | |
|---|---|---|---|---|---|
| MBIA | 10,611,312 | 17,724,831 | 5,278,164 | - | 33,614,307 |
| FGIC | 4,980,970 | 2,218,660 | 1,510,647 | - | 8,710,277 |
| Estimated Other Monolines | 1,276,604 | 2,139,204 | 637,020 | - | 4,052,828 |
| Senior Unsecured Notes Claims | 14,807,535 | - | - | - | 14,807,535 |
| RMBS Trust Claims | - | 2,564,600 | 25,812,769 | - | 28,377,369 |
| Estimated General Unsecured Claim | 13,520 | 778,361 | 100,225 | - | 892,106 |
| Private Securities Claims | - | - | - | 9,545,578 | 9,545,578 |
| **Initial Unit Allocation** | **31,689,942** | **25,425,656** | **33,338,825** | **9,545,578** | **100,000,000** |

**STEP 3 – CALCULATION OF ESTIMATED RECOVERY FROM CLAIM VARIANCE**

■ The below example assumes $60.0 million of incremental claims, with $20.0 million at each Debtor Group

| | | | | | |
|---|---|---|---|---|---|
| **Incremental Claim** | **$20.0** | **$20.0** | **$20.0** | | **$60.0** |

| | | | | | |
|---|---|---|---|---|---|
| Estimated / Allowed Unsecured Claims | $2,147.2 | $2,080.0 | $9,158.7 | | $13,386.0 |
| + Incremental Claim | 20.0 | 20.0 | 20.0 | | 60.0 |
| **= Adjusted Unsecured Claims** | **$2,167.2** | **$2,100.0** | **$9,178.7** | | **$13,446.0** |

| | | | | | |
|---|---|---|---|---|---|
| Assets - $ | $780.2 | $626.0 | $820.8 | | $2,227.0 |
| / Adjusted Unsecured Claims | 2,167.2 | 2,100.0 | 9,178.7 | | 13,446.0 |
| **= Incremental Claims Recovery %** | **36.00%** | **29.81%** | **8.94%** | | **16.56%** |

| | | | | | |
|---|---|---|---|---|---|
| Incremental Claim | $20.0 | $20.0 | $20.0 | | $60.0 |
| x Incremental Claim Recovery % (Pre- Iteration) | 36.00% | 29.81% | 8.94% | | 24.92% |
| **= Incremental Claim Recovery $** | **$7.2** | **$6.0** | **$1.8** | | **$15.0** |

| | | | | | |
|---|---|---|---|---|---|
| **Incremental Claim Units** | **292,445** | **242,152** | **72,644** | | **607,240** |
| **Incremental Claim %** | **0.29%** | **0.24%** | **0.07%** | | **0.61%** |
| **Incremental Claim Adjustment Factor** | | | | | **99.39%** |

1

*FOR ILLUSTRATIVE PURPOSES ONLY*

| ($ in millions) | Debtor Group | | | Private Securities Claims Trust | Total |
|---|---|---|---|---|---|
| | ResCap | GMACM | RFC | | |

### STEP 4 - ADJUSTED UNIT ALLOCATION

■ Estimated / Allowed Unsecured Creditors will receive Units equal to Initial Unit Allocation multiplied by the Incremental Claims Adjustment Factor in Step 3 (99.39% in this example)

| | ResCap | GMACM | RFC | Private Securities Claims Trust | Total |
|---|---|---|---|---|---|
| MBIA | 10,546,876 | 17,617,199 | 5,246,113 | - | 33,410,187 |
| FGIC | 4,950,724 | 2,205,187 | 1,501,474 | - | 8,657,385 |
| Estimated Other Monolines | 1,268,852 | 2,126,214 | 633,152 | - | 4,028,217 |
| Senior Unsecured Notes Claims | 14,717,618 | - | - | - | 14,717,618 |
| RMBS Trust Claims | - | 2,549,026 | 25,656,024 | - | 28,205,050 |
| Estimated General Unsecured Claim | 13,438 | 773,634 | 99,616 | - | 886,689 |
| Private Securities Claims | - | - | - | 9,487,613 | 9,487,613 |
| Incremental Claim Units | 292,445 | 242,152 | 72,644 | - | 607,240 |
| **Total Adjusted Unit Allocation** | **31,789,953** | **25,513,413** | **33,209,022** | **9,487,613** | **100,000,000** |

### STEP 5 – ADDITIONAL ALLOCATION OF UNITS FOR CLAIMS RESERVE

■ Units shall be further adjusted through an iterative mathematical process such that all holders of Estimated / Allowed Unsecured Claims against a Debtor Group receive Units in the same ratio of number of Units to Allowed amount of Claim

### STEP 6 – FINAL UNIT ALLOCATION

**Final Unit Allocation**

| | ResCap | GMACM | RFC | Private Securities Claims Trust | Total |
|---|---|---|---|---|---|
| MBIA | 10,546,174 | 17,616,939 | 5,246,035 | - | 33,409,148 |
| FGIC | 4,950,395 | 2,205,155 | 1,501,451 | - | 8,657,001 |
| Estimated Other Monolines | 1,268,768 | 2,126,182 | 633,142 | - | 4,028,092 |
| Senior Unsecured Notes Claims | 14,718,269 | - | - | - | 14,718,269 |
| RMBS Trust Claims | - | 2,548,989 | 25,655,645 | - | 28,204,634 |
| Estimated General Unsecured Claim | 13,437 | 773,623 | 99,615 | - | 886,675 |
| Private Securities Claims | - | - | - | 9,487,473 | 9,487,473 |
| Incremental Claim Units | 293,357 | 242,992 | 72,359 | - | 608,708 |
| **Final Unit Allocation** | **31,790,399** | **25,513,880** | **33,208,248** | **9,487,473** | **100,000,000** |

**Recovery %**

| | ResCap | GMACM | RFC | | |
|---|---|---|---|---|---|
| MBIA | 36.11293% | 29.91294% | 8.90758% | | |
| FGIC | 36.11293% | 29.91294% | 8.90758% | | |
| Estimated Other Monolines | 36.11293% | 29.91294% | 8.90758% | | |
| Senior Unsecured Notes Claims | 36.11293% | - | - | | |
| RMBS Trust Claims | - | 29.91294% | 8.90758% | | |
| Estimated General Unsecured Claim | 36.11293% | 29.91294% | 8.90758% | | |
| Private Securities Claims | - | - | - | | |
| Incremental Claim Units | 36.11293% | 29.91294% | 8.90758% | | |
| **Recovery %** | **36.11293%** | **29.91294%** | **8.90758%** | | |

2

## Exhibit 5

**Top Seven Intercompany Net Balances**[1]
($ in millions)

| | "Accounts Receivable" Entity | "Accounts Payable" Entity | Net Balance | Comments |
|---|---|---|---|---|
| 1 | Residential Capital, LLC ("ResCap") | GMAC Residential Holding Company, LLC ("ResHolding") | $3,334 | Balance generally arose from transactions under an agreement between ResCap and ResHolding. ResHolding borrowed funds from ResCap and then distributed funds to GMACM for general operating purposes.<br><br>Documentation exists reflecting the lending relationship between ResCap and ResHoldings. *ResCap Restated Loan Agreement*, dated January 1, 2006, among ResCap, as lender, and ResHolding, GMACM, and RFC, as borrowers. This agreement is characterized by the following:<br>• upon termination, borrower's obligation to repay continues<br>• no fixed maturity date, interest rate, or repayment terms<br>• unsecured debt<br><br>While there was no fixed interest rate in the loan agreement, interest was paid regularly until the petition date at an average rate of 9.6% (multi-tiered interest rate based on intercompany balances).<br><br>In 2009, $2.52 billion of debt owed by GMACM to ResHolding was forgiven so that GMACM could meet certain tangible net worth debt covenants. ResCap did not forgive any of ResHolding's debt at that time because ResHolding was not at risk of defaulting on its net worth requirements.<br><br>Before accounting for any administrative expenses, ResHolding has assets consisting of an approximate $50 million intercompany claim against GMACM. |

---

[1]    The top seven intercompany net balances represent 96% of the total intercompany net balances.

| | "Accounts Receivable" Entity | "Accounts Payable" Entity | Net Balance | Comments |
|---|---|---|---|---|
| 2 | Residential Funding Company ("<u>RFC</u>") | ResCap | $1,955 | Balance generally arose out of operation of the company's centralized cash management system. As RFC generated cash, that cash would be swept to ResCap.  Balance changed frequently.<br><br>Interest was not accrued or paid.<br><br>There is no documentation reflecting this intercompany relationship.<br><br>In 2008, $2 billion of debt owed by RFC to ResCap was forgiven so that RFC could meet certain tangible net worth debt covenants.  In 2009, an additional $151 million of debt owed by RFC to ResCap was forgiven.<br><br>ResCap has no unencumbered assets. |
| 3 | Homecomings Financial, LLC ("<u>Homecomings</u>") | RFC | $1,252 | Balance generally arose out of operation of the company's centralized cash management system. Homecomings sold loans to RFC for securitization as part of normal business operations, subserviced loans, and generated other cash through operations that was swept up to RFC.  Receivable balance consists largely of this, less payables to RFC for general overhead expenses.  Balance changed frequently until 2008.<br><br>Homecomings became largely dormant in 2008, but continued to have wind down activity that created cash that has been swept to RFC.<br><br>Interest was accrued but not paid on the intercompany balance (this amount has been included in the intercompany balance).<br><br>There is no documentation reflecting this intercompany relationship. |

| | "Accounts Receivable" Entity | "Accounts Payable" Entity | Net Balance | Comments |
|---|---|---|---|---|
| 4 | Passive Asset Transactions, LLC ("PATI") | GMAC Mortgage, LLC ("GMACM") | $697 | Balance generally arose out of operation of the company's centralized cash management system. Majority of balance reflects cash collected by PATI from non-Debtor entities (Flume and GX II) that were swept to GMACM and then to ResCap.

Interest was not accrued or paid.

Documentation exists reflecting a lending relationship from PATI to ResCap (not GMACM). *Intercompany Advance Agreement*, dated June 9, 2009, between ResCap, as borrower, and PATI, as lender. This agreement is characterized by the following:
  • contains bankruptcy standstill provision indicating claims on account of obligations are not enforceable in bankruptcy
  • no fixed maturity date, interest rate, or repayment terms
  • unsecured debt

In 2008, $44 million of debt owed by PATI to GMACM was forgiven so that PATI could meet certain tangible net worth debt covenants. |
| 5 | Executive Trustee Services, LLC ("ETS") | GMACM | $265 | Balance generally arose out of operation of the company's centralized cash management system. Revenue received by ETS (as foreclosure trustee) was swept to GMACM. GMACM, in turn, satisfied ETS's cash needs. Intercompany balances were created to record impact to ETS, but no cash settlements occurred.

Interest was accrued but not paid on the intercompany balance (this amount has been included in the intercompany balance).

There is no documentation reflecting this intercompany relationship. |

| | "Accounts Receivable" Entity | "Accounts Payable" Entity | Net Balance | Comments |
|---|---|---|---|---|
| 6 | RFC | RFC Asset Holdings II, LLC ("RAHI") | $232 | Balance generally arose out of operation of the company's centralized cash management system. RAHI owned a portfolio of non-economic residuals that generated excess inclusion income that resulted in current taxes payable.  Balance primarily attributable to settlement of taxes under the tax sharing agreement.<br><br>Interest was accrued but not paid on the intercompany balance (this amount has been included in the intercompany balance).<br><br>There is no documentation reflecting this intercompany relationship.<br><br>In 2008, $1.2 billion of debt owed by RAHI to RFC was forgiven so that RAHI could meet certain tangible net worth debt covenants.<br><br>RAHI has no unencumbered assets. |
| 7 | RFC | GMACM | $140 | Majority of balance consists of (i) amounts recorded in connection with AFI billings for shared services (e.g. payroll, outside counsel) – RFC routinely remitted payment to AFI for services and RFC then charged GMACM for its portion; and (ii) service fee income received by GMACM as subservicer relating to RFC MSR.<br><br>Prior to the petition date, cash settlements occurred.<br><br>Interest was not accrued or paid.<br><br>There is no documentation reflecting this intercompany relationship. |

**Exhibit 6**

# RECOVERY ANALYSIS

## RESIDENTIAL CAPITAL, LLC

1.      The Recovery Analysis[1] is based on the planned orderly wind-down of the assets remaining in the Estates as of April 30, 2013.  The recovery from these assets, along with cash on hand as of April 30, 2013 and the proceeds from the settlement with Ally Financial, Inc. (the "Ally Contribution"), are then distributed to; i) holders of secured claims, ii) administrative and priority expenses, and iii) general unsecured claims.

2.      Estimates were made of the cash proceeds which might be realized from the orderly liquidation of the Debtors' assets.  The liquidation is based on asset balances as of April 30, 2013 with certain proforma adjustments[2] used to estimate recoveries. Recoveries to creditors are presented on an undiscounted basis and are assumed to occur over the course of 7 years with over 85% of recoveries occurring over the first 3 years.  There can be no assurance that the recoveries assigned to the assets will in fact be realized.

### *Estimate of Costs*

3.      The Recovery Analysis assumes the wind-down of the Estates lasts for a period of approximately 3 years for the settlement of claims, although certain asset realization costs will continue through 7 years. During this time the Debtors will incur administrative expenses for operating expenses, restructuring professional fees, foreclosure file review costs, and other items. There can be no assurance that the administrative expenses will not exceed the estimates included in this analysis.

4.      THE DEBTORS' RECOVERY ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF THE ORDERLY LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the Recovery Analysis are a number of estimates and material assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the Debtors.  In addition, various decisions upon which certain assumptions are based are subject to change.  Therefore, there can be no assurance that the assumptions and estimates employed in determining the

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

[2] The pro-forma adjustments were made to exclude certain assets that are either non-economic or securitized (i.e. assets with offsetting liabilities recorded on the balance sheet).  The asset balances also exclude certain accounting adjustments related to pre-paid expenses and accounts receivable, as well as entries recorded to estimate true-up payments for the asset sale transactions with Ocwen and Walter.

recovery values of the assets will result in an accurate estimate of the proceeds that will be realized.  In addition, amounts of Claims against the Estates could vary significantly from the estimate set forth herein. Therefore, the actual recovery received by creditors of the Debtors could vary materially from the estimates provided herein.

5.      THE RECOVERY ANALYSIS SET FORTH HEREIN WAS BASED ON THE VALUES OF THE DEBTORS' ASSETS AS OF APRIL 30, 2013 WITH CERTAIN PROFORMA ADJUSTMENTS.  TO THE EXTENT THAT OPERATIONS THROUGH SUCH DATE WERE DIFFERENT THAN ESTIMATED, THE ASSET VALUES MAY CHANGE. DELOITTE TOUCHE TOHMATSU LLP, THE INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR RESCAP, HAS NOT EXAMINED, COMPILED OR OTHERWISE APPLIED PROCEDURES TO THESE VALUES AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE VALUES IN THE RECOVERY ANALYSIS.

## ASSET RECOVERY ASSUMPTIONS

### *Cash and Cash Equivalents*

6.      Cash and cash equivalents include cash in the Debtors' domestic bank accounts and other cash equivalents.  The estimated recovery for this category of assets is 100%.

### *Restricted Cash*

7.      Restricted cash primarily consists of cash held at Ally Bank, escrow funds for GNMA pooling agreements and other amounts held in escrow related to the Ocwen APA and Walter Assignment, and other parties.  Outstanding amounts are estimated to be fully recovered in the Recovery Analysis scenarios.

### *FHA/VA Mortgage Assets*

8.      Federal Housing Administration and Department of Veterans Affairs ("FHA/VA") mortgage assets consist of mortgage loans, servicer advances, and accrued interest.  These assets constitute the bulk of the Estates' remaining assets. The FHA/VA recovery calculation assumes two primary resolution strategies, including: 1) recoveries through delivery of modified loans into GNMA securitizations, and 2) recovery of loan principal, interest and advances through FHA/VA insurance claims. The timing of claim recoveries is driven by the individual loan status and is dependent on foreclosure status, presence of documentation deficiencies and geography. Geography has become particularly important, as some judicial foreclosure states have an average foreclosure timeline of 4 years.

9.      FHA/VA loans are assumed to have a blended net recovery rate of approximately 93% of book value in the Recovery Analysis.

### *Non FHA/VA Mortgage Assets*

10.      The Estates' Non FHA/VA mortgage assets consist primarily of mortgage loans, servicer advances and accrued interest on loans removed from Fannie Mae ("FNMA") and Freddie Mac ("FHLMC") securitizations, loans rejected from the Berkshire Hathaway asset purchase

agreement and other loans deemed to be non-marketable. These assets are not guaranteed by any government agency.

11.    The Recovery Analysis assumes approximately 15% of the loan portfolio will be resolved through foreclosure or real estate owned ("REO") sales. The analysis further assumes a bulk sale of the remaining portfolio by the end of 2013. The Estates are currently preparing to market this portfolio. The blended recovery rate is assumed to be approximately 73% in the Recovery Analysis.

### MSRs and Associated Servicer Advances

12.    Mortgage servicing rights ("MSRs") and the associated servicer advances consist of assets excluded from the asset purchase agreements with Ocwen and Walter, due to various counterparty objections. The Estates are currently negotiating with the counterparties to resolve the objections and intends to sell these MSRs and servicer advances once settlements have been achieved. The blended recovery rate is assumed to be 103% of book value in the Recovery Analysis.

### Other Debtors' Assets

13.    Other Debtors' Assets consist primarily of securitized Home Equity Lines of Credit ("HELOCs"), REO properties, trading securities and derivative assets.

14.    The securitized HELOCs are comprised of current paying home equity lines which are projected to run off over the next 15 months.

15.    REO properties are assumed to be sold in the ordinary course.

16.    The GMAC 2010-01 securitization asset is assumed to continue paying off at historical rates over the first 2 years of the Estates. After the first 2 years, the securitization will be unwound through a cleanup call and the resulting whole loans will be sold at prices consistent with on-balance sheet FHA/VA loans.

17.    Derivative collateral is expected to be collected upon the completion of the delivery of modified loans into GNMA securitizations.

18.    The Other Debtors' Assets are expected to recover at a blended average rate of approximately 61% of book value in the Recovery Analysis.

### Non-Debtors' Assets

19.    Non-Debtors' Assets are comprised primarily of equity interests in the Debtors' foreign affiliates. These affiliates are working to liquidate assets and to resolve claims and litigation. The Debtors assume in the Recovery Analysis that they will be able to recover $24 million from non-Debtor affiliates.

*Other Recoveries*

20.    Additional incremental recoveries are expected to materialize from client recoveries and broker fees from the wind-down of the originations pipeline, however, these fees are expected to be offset by incremental costs for the Berkshire loan repurchase true-up[3]. In total, incremental recoveries are estimated to generate approximately $0 net recovery.

*Ally Contribution*

21.    The Ally Contribution is assumed to result in an additional contribution to the Estates of $2.1 billion in the Recovery Analysis. The Ally Contribution is comprised of $1.95 billion in cash to be paid on the Effective Date and $150 million on account of certain insurance claims. The Recovery Analysis assumes that $783 million of the AFI Contribution will be allocated to ResCap Debtors, $462 million will be allocated to GMACM Debtors, $462 million will be allocated to RFC Debtors and $393 million will be allocated to the Private Securities Claims Trust, Borrowers Claims Trust, and NJ Carpenters Claims Trust based on the plan term sheet.

## ADMINISTRATIVE EXPENSES

22.    Administrative expenses include payments for operating expenses, asset management costs, interest expense, professional fees, foreclosure file review related expenses, and post-petition accounts payable and accrued expenses.  Post-petition intercompany claims, which are subject to administrative priority status, are reflected in the April 30, 2013 cash balances by legal entity. The assumed total administrative expenses in the Recovery Analysis are $1.086 billion.

*Operating Expenses and Compensation and Benefits*

23.    Operating expenses consist of a number of costs necessary to administer the Estates after April 30, 13. These costs are primarily related to compensation and benefits, document storage and destruction costs, transition service agreement expenses, ordinary course professional fees and other operating expenses and are assumed to be $379 million in the Recovery Analysis.

24.    The estimation for compensation and benefits assumes an initial headcount of 257 as of April 30, 2013 which winds down over the forecast period. By the expected Confirmation Date of October 31, 2013, headcount is anticipated to decline to approximately 135.  Compensation and benefits includes severance, retention, and incentive payments.

25.    Document storage and destruction costs include expenses relating to the physical retention and destruction of documents. The Recovery Analysis assumes that all document destruction occurs at the end of the three years.

26.    Transition service agreement ("TSA") costs reflect the current TSA agreements between the Estates and Ocwen, AFI, and Walter. The Recovery Analysis reflects all extensions, modifications, and terminations as currently known and the most recent pricing available.

---

[3] Excludes any adjustments related to Walter and Ocwen sale true-ups.

27.    Ordinary course (non-reorganization) professional fees are projected based on the analysis of historical costs of closed cases, discounted for a reduction in litigation costs due to the AFI Contribution.

28.    Other operating expenses consist primarily of overhead costs necessary to run the Estates. This category includes costs related to facilities, insurance, information technology, and taxes[4], as well as other miscellaneous expenses.

### Direct Asset Management Costs

29.    Direct asset management costs primarily consist of servicing and subservicing fees to Ocwen and custodial fees.

30.    Servicing and subservicing costs are a function of the delinquency status of the individual loans being serviced. Servicing and subservicing costs reflect fees for the full asset disposition period (i.e. 7 years). The Recovery Analysis includes $47 million of direct asset management costs.

### Interest Expense

31.    Interest expense consists of post-petition interest payments made on the senior secured AFI Revolver and AFI LOC facilities. As of the date of the Disclosure Statement, both the AFI Revolver and the AFI LOC have been paid in full and no additional interest expense is assumed in the forecast. Total interest included in the Recovery Analysis is $8 million.

### Foreclosure File Review and Remediation Expenses

32.    Foreclosure file review and remediation costs consist of (i) expenses related to the Debtors' pending final settlement with the Board of Governors of the Federal Reserve of the independent foreclosure review ("IFR") under the Consent Order, as well as (ii) expenses related to ongoing compliance with the DOJ/AG Settlement entered into by the Debtors with the Department of Justice and 49 state attorneys general. These include costs related to the pending IFR settlement, third party professional fee expenses, costs and related to the SCRA file review component of the DOJ/AG Settlement, and a pro-rata share of the ongoing fees and expenses of the Office of Mortgage Settlement Oversight during the DOJ/AG Settlement enforcement period. The $230 million IFR settlement was agreed in June 2013 and bankruptcy court approval will be sought during July 2013. Total foreclosure review and remediation costs are assumed to be $328 million in the Recovery Analysis.

### Restructuring Professional Fee Expenses

33.    Restructuring Professional Fee Expenses include those fees paid to professionals engaged by the Debtors, the Unsecured Creditors Committee ("UCC"), the Junior Secured Noteholders, the Residential Mortgage Backed Securities ("RMBS") trustees, the Examiner, the US Trustee,

---

[4] The Estates have retained advisors for tax matters. The tax estimate is presented based upon preliminary guidance the Estates have received from their tax advisors.  It should be noted that the tax analysis has not been completed, and accordingly the guidance may change and those changes may be material.

and the Chief Restructuring Office ("CRO"). Where applicable, forecasted fees are based on third party vendor forecast submissions. Restructuring professional expenses are assumed to be approximately $310 million in the Recovery Analysis.

## Claims

### Ally Secured Claims

34.    Secured claims are given priority under the Bankruptcy Code and are entitled to payment prior to any payment on unsecured claims.  Secured claims from secured facilities include the claims related to the Ally Revolver and the Ally LOC facilities.

### Junior Secured Notes

35.    The JSNs' claim of $2.223 billion ($2.121 billion of principal plus $102 million of pre-petition interest) is assumed to be satisfied in full in the Recovery Analysis by the residual value of AFI Revolver collateral and pledged equity after the satisfaction of the AFI Revolver.

36.    The allocation of the JSN recoveries among the Debtors is listed below.  The Plan also contemplates that the JSN claims will be paid in full on the Effective Date.

| | |
|---|---|
| ResCap Debtors | 8% |
| GMACM Debtors | 62% |
| RFC Debtors | 30% |

### General Unsecured Claims

37.    General Unsecured Claims include:

(1)    RMBS Trust Claims;

(2)    Monoline Claims;

(3)    Other General Unsecured Claims;

(4)    Borrower Claims; and

(5)    Senior Unsecured Notes

38.    The treatment of many of these claims in the Recovery Analysis is assumed to be subject to the settlement terms agreed upon by the Consenting Claimants.

39.    Per the terms of the settlement, the Monoline Claims held by MBIA Inc. ("MBIA") are assumed to be fully and finally allowed as non-subordinated unsecured claims of $719 million against the ResCap Debtors, $1.450 billion against the GMACM Debtors, and $1.450 billion against the RFC Debtors.  Pursuant to the FGIC Settlement Agreement, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Plan, as of the Effective Date, the Allowed amounts of the General Unsecured

Claims held by FGIC shall be; $337.5 million against the ResCap Debtors, $181.5 million against the GMACM Debtors, and $415.0 million against the RFC Debtors. On account of such Allowed General Unsecured Claims, FGIC shall receive its Pro Rata Share of the GMACM Debtors Unit Distribution, RFC Debtors Unit Distribution and ResCap Debtors Unit Distribution, as applicable. The Monoline Claims held by all other Monolines are assumed to be treated under the Plan as unsecured claims of the ResCap Debtors, the RFC Debtors or the GMACM Debtors, as applicable, or as otherwise approved by the Plan Proponents and the Consenting Claimants.

40.    Per the terms of the settlement, the plan incorporates a settlement that provides for the allowance, priority, and allocation of the RMBS Trust Claims through approval of the Debtors' prior agreement with the Institutional Investors, which covered 392 RMBS Trusts. The RMBS Settlement shall provide that all RMBS Trust Claims of the Original Settling Trusts and the Additional Settling Trusts shall be fully and finally allowed as non-subordinated unsecured claims in the aggregate amount of $7.051 billion for the Original Settling Trusts and in the aggregate amount of $250 million for the Additional Settling Trusts. The $7.301 billion of claims is allocated $210 million to the GMACM Debtors and $7.091 billion to the RFC Debtors; provided, however, the allowance and allocation of such claims shall not affect the distributions to be made in accordance with the RMBS Trust Allocation Protocol.

41.    Senior Unsecured Claims of $1.003 billion is assumed to be asserted against Residential Capital LLC and is assumed to recover pari passu with the general unsecured creditors at Residential Capital LLC.

42.    Other General Unsecured Claims are comprised of trade claims, lease rejections, and other unsecured claims and are assumed to be $92 million.

43.    Borrower Claims will be addressed through the establishment of a Borrower Claims Trust for the benefit of the holders of Borrower Claims at each of the Debtors and shall be funded in an amount of $57.6 million, subject to the Adjustments as defined in the Supplemental Term Sheet.

### *Additional Securities Claims*

44.    Per the terms of the settlement, the recoveries for Securities Claims have been fixed. These include the NJ Carpenters Claims totaling $100 million and Private Securities Claims totaling $226 million, plus a pro-rata share of incremental recoveries beyond amounts contemplated in the Term Sheet.

**Residential Capital, LLC and Subsidiaries**
**Recovery Analysis**
**($ Millions)**

| | | Book Value | | | |
|---|---|---|---|---|---|
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 1 | Restricted Cash | $ 27.9 | $ 39.2 | $ - | $ 67.1 |
| 2 | FHA/VA Mortgage Assets | - | 945.3 | - | 945.3 |
| 3 | Non FHA/VA Mortgage Assets | - | 39.4 | 7.3 | 46.7 |
| 4 | MSRs and Associated Servicer Advances | - | 189.2 | 21.8 | 211.0 |
| 5 | Other Debtors' Assets | 0.1 | 85.3 | 9.7 | 95.1 |
| 6 | Non-Debtor Assets (5) | - | - | - | - |
| 7 | Other Recoveries | - | - | - | - |
| 8 | **Total** | **$ 28.0** | **$ 1,298.3** | **$ 38.9** | **$ 1,365.2** |

| | | Recoveries ($) | | | |
|---|---|---|---|---|---|
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 9 | Restricted Cash | $ 27.9 | $ 39.2 | $ - | $ 67.1 |
| 10 | FHA/VA Mortgage Assets | - | 878.3 | - | 878.3 |
| 11 | Non FHA/VA Mortgage Assets | - | 27.6 | 6.4 | 34.0 |
| 12 | MSRs and Associated Servicer Advances | - | 189.5 | 28.4 | 217.9 |
| 13 | Other Debtors' Assets | - | 50.9 | 6.6 | 57.5 |
| 14 | Non-Debtor Assets | - | - | 24.2 | 24.2 |
| 15 | Other Recoveries | - | 5.5 | (6.8) | (1.3) |
| 16 | **Total** | **$ 27.9** | **$ 1,191.0** | **$ 58.8** | **$ 1,277.6** |

| | | Recoveries (%) | | | |
|---|---|---|---|---|---|
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 17 | Restricted Cash | 100.0% | 100.0% | n/a | 100.0% |
| 18 | FHA/VA Mortgage Assets | n/a | 92.9% | n/a | 92.9% |
| 19 | Non FHA/VA Mortgage Assets | n/a | 70.1% | 87.1% | 72.8% |
| 20 | MSRs and Associated Servicer Advances | n/a | 100.2% | 130.3% | 103.3% |
| 21 | Other Debtors' Assets | 0.0% | 59.7% | 67.9% | 60.4% |
| 22 | Non-Debtor Assets | n/a | n/a | n/a | n/a |
| 23 | Other Recoveries | n/a | n/a | n/a | n/a |

---

[5] Book values for the recoveries of the non-debtor assets are not shown as these assets for Debtors' represent equity claims.

**Residential Capital, GMACM and RFC**
**Recovery Analysis**
**($ Millions)**

|   |   | ResCap Debtors | GMACM Debtors | RFC Debtors | Settlement Payment | Total |
|---|---|---|---|---|---|---|
| | **Distributable Value** | | | | | |
| 1 | Cash | $ 143.5 | $ 2,037.8 | $ 1,496.9 | $ - | $ 3,678.3 |
| 2 | Remaining Assets | 27.9 | 1,191.0 | 58.8 | - | 1,277.6 |
| 3 | AFI Contribution | 782.7 | 462.3 | 462.3 | - | 1,707.4 |
| 4 | Trust Contribution | - | - | - | 392.6 | 392.6 |
| 5 | **Total Distributable Value** | **$ 954.1** | **$ 3,691.1** | **$ 2,018.0** | **$ 392.6** | **$ 7,055.9** |
| | | | | | | |
| | **Paydown of Sec. Debt and JSN** | | | | | |
| 6 | Ally Revolver and Ally Line of Credit | $ - | $ (854.4) | $ (272.7) | $ - | $ (1,127.1) |
| 7 | Total JSN Paydown | (173.9) | (1,374.4) | (674.7) | - | (2,223.0) |
| 8 | **Total Paydown** | **$ (173.9)** | **$ (2,228.8)** | **$ (947.4)** | **$ -** | **$ (3,350.1)** |
| | | | | | | |
| | **Priority/Wind-Down** | | | | | |
| 9 | Priority/Wind-Down | $ - | $ (836.3) | $ (249.8) | $ - | $ (1,086.2) |
| | | | | | | |
| | **Value Available to GUC** | | | | | |
| 10 | Total Value Available to GUC | $ 780.2 | $ 626.0 | $ 820.8 | $ 392.6 | $ 2,619.6 |
| | | | | | | |
| | **GUC Claims** | | | | | |
| 11 | Monolines | $ 1,143.0 | $ 1,806.5 | $ 2,040.0 | $ - | $ 4,989.5 |
| 12 | RMBS Trusts | - | 209.8 | 7,091.2 | - | 7,301.0 |
| 13 | Senior Unsecured Notes | 1,003.3 | - | - | - | 1,003.3 |
| 14 | Other GUCs | 0.9 | 63.7 | 27.5 | - | 92.1 |
| 15 | Securities Claimants | - | - | - | - | - |
| 16 | Borrower Claimants | - | - | - | - | - |
| 17 | **Total GUC Claims** | **$ 2,147.2** | **$ 2,080.0** | **$ 9,158.7** | **$ -** | **$ 13,386.0** |
| | | | | | | |
| | **GUC Recoveries ($)** | | | | | |
| 18 | Monolines | $ 415.3 | $ 543.7 | $ 182.8 | $ - | $ 1,141.8 |
| 19 | RMBS Trusts | - | 63.1 | 635.5 | - | 698.7 |
| 20 | Senior Unsecured Notes | 364.6 | - | - | - | 364.6 |
| 21 | Other GUCs | 0.3 | 19.2 | 2.5 | - | 22.0 |
| 22 | Securities Claimants | - | - | - | 335.0 | 335.0 |
| 23 | Borrower Claimants | - | - | - | 57.6 | 57.6 |
| 24 | **Total GUC Recoveries ($)** | **$ 780.2** | **$ 626.0** | **$ 820.8** | **$ 392.6** | **$ 2,619.6** |
| | | | | | | |
| | **GUC Recoveries (%)** | | | | | |
| 25 | Monolines | 36.3% | 30.1% | 9.0% | n/a | 22.9% |
| 26 | RMBS Trusts | n/a | 30.1% | 9.0% | n/a | 9.6% |
| 27 | Senior Unsecured Notes | 36.3% | n/a | n/a | n/a | 36.3% |
| 28 | Other GUCs | 36.3% | 30.1% | 9.0% | n/a | 23.8% |
| 29 | Securities Claimants | n/a | n/a | n/a | n/a | n/a |
| 30 | Borrower Claimants | n/a | n/a | n/a | n/a | n/a |
| 31 | **Total GUC Recoveries (%)** | **36.3%** | **30.1%** | **9.0%** | **n/a** | **19.6%** |

## Exhibit 7

# HYPOTHETICAL LIQUIDATION ANALYSIS

# RESIDENTIAL CAPITAL, LLC

1.      The Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Plan of Reorganization or (b) receive or retain property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if Residential Capital, LLC and its debtor subsidiaries/affiliates (collectively "ResCap", the "Debtors", or the "Estates") were liquidated under Chapter 7 of the Bankruptcy Code.  The first step in determining whether this test has been met is to determine the estimated amount that would be generated from the liquidation of the Debtors' assets and properties in the context of the Chapter 7 liquidation case.  The gross amount of cash available to the holders of Impaired Claims or Interests would be the sum of the proceeds from the disposition of the Debtors' assets through the liquidation proceedings and the cash held by the Debtors at the time of the commencement of the Chapter 7 case.  This gross amount of cash available is reduced by the amount of any claims secured by the Estates' assets, the costs and expenses of the liquidation, and additional administrative expenses that may result from the termination of the Debtors' businesses and the use of Chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code.  For purposes of this liquidation analysis[1], which was prepared by Management with the assistance of the Debtors' advisors (Morrison & Foerster and FTI), it is assumed that the assets of Residential Capital, LLC and its' Debtor subsidiaries are liquidated for the benefit of ResCap's creditors.  Additionally, only entities with assets that will generate recoveries for their creditors are considered relevant for this analysis (see "Summary of Unscheduled Entities" on page 24).  A general summary of the assumptions used by ResCap's Management in preparing this liquidation analysis follows.

### *Estimate of Net Proceeds*

2.      Estimates were made of the cash proceeds which might be realized from the liquidation of the Debtors' assets.  The Chapter 7 liquidation period is assumed to commence on April 30, 2013, and the monetization of assets is assumed to last 12 months following the appointment of a Chapter 7 trustee.  Recoveries to creditors are presented on an undiscounted basis.  For purposes of this analysis, recoveries were estimated based on estimated book asset balances as of April 30, 2013 with certain proforma adjustments[2].  There can be no assurance that the liquidation would

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

[2] The pro-forma adjustments were made to exclude certain assets that are either non-economic or securitized (i.e. assets with offsetting liabilities recorded on the balance sheet).  The asset balances also exclude certain accounting adjustments related to pre-paid expenses and accounts receivable, as well as entries recorded to estimate true-up payments for the asset sale transactions with Ocwen and Walter.

be completed within this limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under Section 704 of the Bankruptcy Code, an appointed trustee must, among other duties, collect and convert the property of the Estates as expeditiously (generally at distressed prices) as is compatible with the best interests of the parties-in-interest.

### Estimate of Costs

3.      The Liquidation Analysis assumes the wind-down of the Estates lasts for a period of approximately 3 years for pending litigation and the settlement of claims. The Debtors' cost of liquidation under Chapter 7 would include fees payable to a Chapter 7 trustee, as well as those which might be payable to attorneys and other professionals that a trustee may engage, as well as other internal and overhead costs. Further, costs of liquidation would include any obligations and unpaid expenses incurred by the Debtors until conclusion of the Chapter 7 case.

4.      Additional Claims would arise by reason of the breach or rejection of obligations incurred under executory contracts, or leases entered into by the Debtors. It is possible that in a Chapter 7 case, the wind-down expenses may be materially different than the estimated amount. Such expenses are in part dependent on the duration of the liquidation.

### Distribution of Net Proceeds under Absolute Priority

5.      The costs, expenses, fees and such other Claims that may arise and constitute necessary costs and expenses in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to General Unsecured Creditors. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors were paid in full.

6.      This analysis considers the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee and professional advisors to such trustee and (ii) an erosion in the value of assets in the Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the forced sales atmosphere that would likely prevail. THE DEBTORS HAVE DETERMINED, AS SUMMARIZED ON THE FOLLOWING PAGES, THAT CONFIRMATION OF THE PLAN OF REORGANIZATION WILL PROVIDE SUBSTANTIALLY MORE VALUE TO THE DEBTORS' ESTATES THAN WOULD BE RECEIVED PURSUANT TO A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

7.      THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the liquidation analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties, and contingencies beyond the control of the Debtors or a Chapter 7 trustee. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the assets will result in an accurate estimate of the proceeds that would be realized were the Debtors to

undergo an actual liquidation.  The actual amounts of Claims against the Estates could vary significantly from the estimate set forth herein, depending on the Claims asserted during the pendency of the Chapter 7 case.  Moreover, this liquidation analysis may not include all liabilities that may arise as a result of additional litigation, potential tax assessments, or other potential Claims.  Neither this analysis, nor the Recovery Analysis, include potential recoveries from avoidance actions or intangible assets, and includes no incremental costs for the pursuit of such recoveries.  No value was assigned to additional proceeds that might result from the sale of certain items with intangible value.  Therefore, the actual liquidation value of the Debtors' assets could vary materially from the estimates provided herein.

8.        THE LIQUIDATION ANALYSIS SET FORTH HEREIN WAS BASED ON THE ESTIMATED BOOK VALUES OF THE DEBTORS' ASSETS ON APRIL 30, 2013 WITH CERTAIN PROFORMA ADJUSTMENTS.  TO THE EXTENT THAT OPERATIONS THROUGH SUCH DATE WERE DIFFERENT THAN ESTIMATED, THE ASSET VALUES MAY CHANGE.  DELOITTE TOUCHE TOHMATSU LLP, THE INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR RESCAP, HAS NOT EXAMINED, COMPILED OR OTHERWISE APPLIED PROCEDURES TO THESE VALUES AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE VALUES IN THE LIQUIDATION ANALYSIS.

9.        Estimated net proceeds may be realized from the liquidation of ResCap's subsidiaries.  The method of liquidation may vary greatly from subsidiary to subsidiary depending on the jurisdiction or country in which it resides or was formed.  The obligations are assumed to be satisfied at the individual entity level, with excess proceeds flowing upward to the next ownership level and ultimately to Residential Capital, LLC, to the extent available.

**ASSET RECOVERY ASSUMPTIONS**

10.        All recoveries cited in the asset recovery assumptions below are presented on a consolidated basis and are presented as a blended average percentage of book value.  The mix of assets may vary between Debtors, and as such, recovery percentages may vary on an unconsolidated basis.

***Cash and Cash Equivalents***

11.        Cash and cash equivalents include cash in the Debtors' domestic bank accounts and other cash equivalents.  The estimated recovery for this category of assets is 100%.

***Restricted Cash***

12.        Restricted cash primarily consists of cash held at Ally Bank, escrow funds for GNMA pooling agreements and other amounts held in escrow related to the Ocwen APA and Walter Assignment, and other parties.  Outstanding amounts are estimated to be fully recovered in the Chapter 7 liquidation scenarios.

***FHA/VA Mortgage Assets***

13.        FHA/VA mortgage assets consist of mortgage loans, servicer advances, and accrued interest, which are guaranteed by the Federal Housing Administration's ("FHA") mortgage

insurance program or the US Department of Veterans' Affairs ("VA"), and constitute the bulk of the Estates' remaining assets. The total blended recovery for FHA/VA mortgage assets is 57% - 71% in the lower and higher Chapter 7 scenarios, respectively.

14.    The Chapter 7 liquidation scenarios assume that the Debtors will continue to liquidate mortgage loans through the ongoing retail liquidation process for the nine months immediately following April 30, 2013, immediately followed by a bulk sale of all remaining mortgage loans. Loans are assumed to be sold on an "as is, where is" basis, without representations and warranties from the Estates and without kickout provisions, resulting in steep discounts to pricing. The blended average recovery under these assumptions is estimated to be between 61% - 74% in the lower and higher Chapter 7 liquidation scenarios, respectively.

15.    The servicing advances are comprised of advances on Estates' FHA/VA loan portfolio and aged expense claims. As such, it is assumed likely that existing loan advances would likely trade at prices similar to the underlying loan, while there would be minimal to no value on the aged advances. FHA/VA servicer advances are estimated to recover between 30% - 50% in the lower and higher Chapter 7 scenarios, respectively.

### Non FHA/VA Mortgage Assets

16.    The Estates' Non FHA/VA mortgage assets consist primarily of mortgage loans, servicer advances and accrued interest on loans removed from government insured deals, loans rejected from the Berkshire APA and other loans deemed to be non-marketable. They are assumed to be sold in a bulk sale during the 1-year asset disposition period.

17.    Non FHA/VA mortgage assets are assumed to generate between 28% - 54% in the lower and higher Chapter 7 scenarios, due to the assumed quick liquidation, certain documentation deficiencies, the absence of representations and warranties from the Estates, and other material risks.

### MSRs and Associated Servicer Advances

18.    MSRs and associated servicer advances consist of assets excluded from the asset purchase agreements with Ocwen and Walter, due to various counterparty objections. The Estates are currently negotiating with the counterparties to resolve the objections and intend to sell these MSRs and servicer advances once settlements have been achieved, however, the Liquidation Analysis assumes that negotiations will not be successful after the conversion to a Chapter 7 liquidation. The blended average recovery rate is assumed to be 65% and 75% in the lower and higher liquidation scenarios, respectively.

19.    MSRs are assumed to recover a de minimis amount due to the termination of counterparty settlement negotiations under the Chapter 7 liquidation scenarios.

20.    Based on a scenario assuming bulk asset sales without resolution of pending cures, excluded servicer advances are assumed to generate between 72% – 83% recoveries in the lower and higher Chapter 7 liquidation scenarios, respectively.

*Other Debtors' Assets*

21.    Other Debtors' Assets consist primarily of securitized HELOCs, REO properties, trading securities and derivative assets, which are expected to recover at a blended average rate ranging from 30% - 39% in the lower and higher Chapter 7 liquidation scenarios, respectively.  Non-economic assets are assumed to generate zero recovery value.

22.    Securitized HELOCs are assumed to recover between 40% - 60% in the lower and higher Chapter 7 liquidation scenarios, as these assets are expected to sell at a significant discount in an accelerated bulk sale scenario.

23.    REO properties are assumed to recover between 40% - 60% in the lower and higher Chapter 7 liquidation scenarios, as REO assets are expected to sell at a significant discount in an accelerated bulk sale scenario.

24.    Under the Chapter 7 liquidation scenarios, the GMAC 2010-01 securitization asset is assumed to be liquidated as a single asset (rather than as whole loans), and to sell at a significant discount from the Recovery Analysis.  Recoveries on this asset are estimated to be between 35% - 50% in the lower and higher Chapter 7 liquidation scenarios, respectively.

25.    Chapter 7 liquidation scenarios assume 100% recovery on derivative assets and associated collateral, the majority of which has already been collected as of the date of this Disclosure Statement.

26.    There are a number of other Debtor-owned assets including accounts receivable and other assets, which are assumed to provide zero recovery to the Estates.

*Non-Debtors' Assets*

27.    Non-Debtors' Assets are comprised primarily of equity interests in the Debtors' foreign affiliates. These affiliates are working to liquidate assets and to resolve claims and litigation. The Debtors assume in the Recovery Analysis that they will be able to recover $24 million from non-Debtor affiliates.

*Other Recoveries*

28.    Additional incremental recoveries are expected to materialize from client recoveries and broker fees from the wind-down of the originations pipeline, however, these fees are expected to be offset by incremental costs for the Berkshire loan repurchase true-up[3]. In total, incremental recoveries are estimated to generate approximately $0 net recovery.

*Affirmative Claims Against Ally*

29.    No estimate is included in the Liquidation Analysis for recoveries relating to potential affirmative damage claims against Ally. The Debtors believe that an estimate of the ultimate recoveries from such claims is highly subjective and dependent on numerous variables, including

---

[3] Excludes any adjustments related to Walter and Ocwen sale true-ups.

(i) the probabilities of successful judgments; (ii) the cost and time required to litigate the affirmative claims; (iii) any offsetting claims Ally may have against the Debtors; and (iv) the collectability of amounts significant enough to alter the outcome of the Liquidation Analysis.  The Examiner's Report [Docket No. 3698] includes an assessment of potential claims against Ally.

## Chapter 7 Wind-Down Costs and Administrative Claims

30.    For the purposes of the Chapter 7 liquidation scenarios, Chapter 11 administrative claims and Chapter 7 wind-down costs are shown as combined for administrative ease.  The Liquidation Analysis assumes wind-down expenses of $180 million are allocated to the JSN collateral for the period after April 30, 2013, and as such those costs have been removed from JSN secured recoveries.  All other wind-down and administrative costs are shown in the wind-down and administrative cost line of the Liquidation Analysis.

31.    Chapter 7 wind-down costs are allocated to legal entities based on total value available after repayment of the AFI LOC, the AFI Revolver, and the secured portion of the JSNs.

32.    Post-petition intercompany claims, which are subject to administrative priority status, are reflected in the April 30, 2013 cash balances by legal entity and, as such, are not shown in the Liquidation Analysis.

### Trustee Fees

33.    Trustee fees include all fees that would be paid to the Chapter 7 trustee by each Debtor, consistent with Bankruptcy Code requirements.  Chapter 7 trustee fees are estimated to be 3% of gross distributions in both the higher and lower Chapter 7 liquidation scenarios, which are included in wind-down administrative costs.

### Professional Fees

34.    Restructuring professional fees and ordinary course professional fees are estimated to be higher under the Chapter 7 liquidation scenarios than in the Recovery Analysis.  This is due primarily to potentially extensive third party litigation that the Estates will most likely need to defend and pursue for purposes of settling claim amounts and monetizing assets.

35.    Because the Chapter 7 Trustee and, to the extent applicable, the Chapter 7 Trustee's professionals must familiarize themselves with the Estates, including their assets and liabilities, it is anticipated that additional professional fees will be incurred in a Chapter 7 liquidation. Restructuring professional and ordinary course professional fees are expected to be approximately $175 million higher in the Chapter 7 liquidation scenarios than in the Recovery Analysis (exclusive of Chapter 7 trustee fees).  No professional fees are assumed for pursuing litigation against Ally, as no amounts received from litigation pursued against Ally are contemplated in the Liquidation Analysis (see paragraph 29.)

### Chapter 7 Wind-Down Costs

36.    Estimated costs under the Chapter 7 liquidation scenarios are consistent with total estimated costs under the Recovery Analysis.  Any savings achieved in the accelerated wind-

down of the asset portfolio would be insignificant for the purposes of this analysis, and would likely be offset by higher internal costs required to pursue and defend litigation. As such, these costs are assumed to be the same under both the Recovery Analysis and the Liquidation Analysis scenarios.

37.      The remaining costs are assumed to be unaffected by the hypothetical Chapter 7 filing. Costs related to facilities, insurance, IT, accounts payable, document storage and destruction, tax[4], post-petition representation and warranty liabilities, and the various TSAs are assumed to remain constant, as the Estates will need to maintain certain personnel, documentation and other overhead capabilities in order to pursue or fight litigation and to maintain legal documents and systems until all legal proceedings are resolved.

**Claims**

***AFI Secured Claims***

38.      As of April 30, 2013, the Estates had pre-petition debt and accrued interest obligations under both the AFI Revolver and the AFI LOC. The estimated recovery for AFI Secured Claims is 100%.

***Junior Secured Notes***

39.      The JSNs' claim of $2.223 billion ($2.121 billion of principal plus $102 million of interest) of principal and prepetition accrued interest is satisfied by the AFI Revolver collateral, on which the JSNs hold a second lien. To the extent the JSN claim is not satisfied by AFI Revolver collateral, a deficiency claim is asserted against the borrower and the guarantor entities. These deficiency claims recover pari passu with the General Unsecured Creditors ("GUC") at each entity. Under the Chapter 7 liquidation scenarios, the recovery of the JSNs reflects the remaining JSN collateral. Secured recoveries are limited by the remaining value of the JSN collateral package and pledged equity at each Debtor entity after payment of the Revolver. The estimated recovery for the JSNs, including recoveries from deficiency claims, is estimated between 71% and 77% under the Chapter 7 liquidation scenarios.

***General Unsecured Claims***

40.      General Unsecured Claims is by far the largest claims category under the Chapter 7 liquidation scenarios, and includes:

> (1) RMBS Trust Claims;

> (2) Monoline Claims;

> (3) Borrower Claims;

---

[4] The Estates have retained advisors for tax matters. The tax estimate is presented based upon preliminary guidance the Estates have received from their tax advisors. It should be noted that the tax analysis has not been completed, and accordingly the guidance may change and those changes may be material.

(4) Senior Unsecured Notes Claims; and

(5) Other General Unsecured Claims

41.    The Liquidation Analysis assumes that the Debtors litigate all Claims asserted against the Debtors, significantly increasing the assumed cost of litigation in the Liquidation Analysis.  As a result of the additional litigation and incremental expenditures, it is assumed that, with the exception of Borrower Claims and Private Securities Claims, allowed Claims in the Liquidation Analysis are consistent with claims estimates in the Recovery Analysis.

42.    In the Chapter 7 liquidation scenarios, Borrower Claims are assumed to recover pari passu with other General Unsecured Claims.  In the Recovery Analysis, Borrower Claims are subject to settlement, and as such, no Borrower Claim amount is estimated for the Recovery Analysis.  However, for purposes of the Liquidation Analysis in the higher Chapter 7 scenario, Borrower Claims are estimated to be approximately $422 million and $557 million in the higher and lower Chapter 7 scenarios, respectively.

### *Private Securities Claims*

43.    Private Securities Claims, including the NJ Carpenters' Trust Claims, are assumed to be $2 billion for the purposes of the Liquidation Analysis.  These claims are assumed to be pari passu with GUC in the lower scenario, and are assumed to be subordinated in the higher scenario.  Although these claims are estimated to be approximately $2 billion, there is no assurance that the allowed claim amount will not be materially different from this estimate.

**Residential Capital, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ 27.9 | $ 27.9 | 100.0% | $ 27.9 | 100.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | 0.1 | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | **$ 28.0** | **$ 27.9** | | **$ 27.9** | |

| | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| **Distribution of Values** | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 143.5 | | $ 143.5 | |
| 10  Remaining Assets | | | 27.9 | | 27.9 | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 171.4** | | **$ 171.4** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (157.0) | | (157.0) | |
| 15  **Total Paydown** | | | **$ (157.0)** | | **$ (157.0)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (8.9) | | $ (8.6) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ 2,066.0 | $ 2,066.0 | $ 2.7 | 0.1% | $ 2.9 | 0.1% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ 2,147.2 | $ 2,147.2 | $ 2.8 | 0.1% | $ 3.0 | 0.1% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | 0.1% | 0.1% | 36.3% |

**GMAC Mortgage, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1 Restricted Cash | $ 39.2 | $ 39.2 | 100.0% | $ 39.2 | 100.0% |
| 2 FHA/VA Mortgage Assets | 945.3 | 542.5 | 57.4% | 673.5 | 71.2% |
| 3 Non FHA/VA Mortgage Assets | 39.4 | 10.4 | 26.4% | 20.3 | 51.6% |
| 4 MSRs and Associated Servicer Advances (1) | 189.2 | 125.1 | 66.1% | 144.5 | 76.4% |
| 5 Other Debtors' Assets | 56.4 | 16.3 | 28.8% | 19.2 | 34.0% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries (1) | - | 5.3 | 0.0% | 5.3 | 0.0% |
| 8 **Total Remaining Assets** | **$ 1,269.4** | **$ 738.8** | | **$ 902.0** | |

| | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| **Distribution of Values** | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 1,977.7 | | $ 1,977.7 | |
| 10 Remaining Assets | | | 738.8 | | 902.0 | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | **$ 2,716.5** | | **$ 2,879.7** | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ (854.4) | | $ (854.4) | |
| 14 JSN Secured Claims | | | (1,177.8) | | (1,267.6) | |
| 15 **Total Paydown** | | | **$ (2,032.2)** | | **$ (2,122.0)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ (466.0) | | $ (495.8) | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ 1,045.2 | $ 955.4 | $ 67.6 | 6.5% | $ 80.2 | 8.4% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ 2,332.0 | $ 2,163.7 | $ 150.8 | 6.5% | $ 181.7 | 8.4% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ 57.5 | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | 6.5% | 8.4% | 30.1% |

(1) Includes assets of GMACM Borrower.

(2) Book values for the recoveries of the non-debtor assets are not shown as these assets represent the Debtors' equity claims.

**Passive Asset Transactions, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | 28.7 | 9.2 | 32.2% | 13.2 | 46.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | **$ 28.7** | **$ 9.2** | | **$ 13.2** | |

| | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 27.8 | | $ 27.8 | |
| 10  Remaining Assets | | | 9.2 | | 13.2 | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 37.0** | | **$ 40.9** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims (1) | | | (37.0) | | (40.9) | |
| 15  **Total Paydown** | | | **$ (37.0)** | | **$ (40.9)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ - | | $ - | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 30.1% |

(1)  JSN secured claim amount represents distribution of equity from Passive Asset Transactions, LLC which is pledged to the JSNs.

**Executive Trustee Services, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | 0.2 | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | 0.3 | 0.0% | 0.3 | 0.0% |
| 8      **Total Remaining Assets** | **$ 0.2** | **$ 0.3** | | **$ 0.3** | |

| | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| **Distribution of Values** | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 30.8 | | $ 30.8 | |
| 10  Remaining Assets | | | 0.3 | | 0.3 | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12      **Total Distributable Value** | | | **$ 31.1** | | **$ 31.1** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims (1) | | | (6.9) | | (7.7) | |
| 15      **Total Paydown** | | | **$ (6.9)** | | **$ (7.7)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (19.2) | | $ (18.5) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ 5.0 | $ 4.8 | $ 5.0 | 100.0% | $ 4.8 | 100.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | 100.0% | 100.0% | 30.1% |

(1)  JSN secured claim amount represents distribution of equity from Executive Trustee Services, LLC which is pledged to the JSNs.

**Ditech, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | **$ -** | **$ -** | | **$ -** | |

| | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 0.9 | | $ 0.9 | |
| 10  Remaining Assets | | | - | | - | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 0.9** | | **$ 0.9** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (0.7) | | (0.7) | |
| 15  **Total Paydown** | | | **$ (0.7)** | | **$ (0.7)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (0.2) | | $ (0.2) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ 0.0 | $ 0.0 | $ 0.0 | 100.0% | $ 0.0 | 100.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | 100.0% | 100.0% | 30.1% |

**Residential Consumer Services, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | 0.0 | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | **$ 0.0** | **$ -** | | **$ -** | |

| Distribution of Values | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 0.2 | | $ 0.2 | |
| 10  Remaining Assets | | | - | | - | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 0.2** | | **$ 0.2** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (0.1) | | (0.1) | |
| 15  **Total Paydown** | | | **$ (0.1)** | | **$ (0.1)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (0.1) | | $ (0.1) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 30.1% |

**GMAC Mortgage USA Corporation**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 **Total Remaining Assets** | **$ -** | **$ -** | | **$ -** | |

| | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 0.5 | | $ 0.5 | |
| 10 Remaining Assets | | | - | | - | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | **$ 0.5** | | **$ 0.5** | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 JSN Secured Claims | | | (0.2) | | (0.2) | |
| 15 **Total Paydown** | | | **$ (0.2)** | | **$ (0.2)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ (0.3) | | $ (0.3) | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 30.1% |

**Residential Funding Company, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets (1) | 7.3 | 2.6 | 35.0% | 4.8 | 65.0% |
| 4 MSRs and Associated Servicer Advances (1) | 21.8 | 12.2 | 56.0% | 14.1 | 64.6% |
| 5 Other Debtors' Assets (1) | 9.1 | 3.0 | 32.6% | 4.5 | 49.0% |
| 6 Non-Debtors' Assets | - | 24.2 | 0.0% | 24.2 | 0.0% |
| 7 Other Recoveries (1) | - | (6.8) | 0.0% | (6.8) | 0.0% |
| 8 **Total Remaining Assets** | $ 38.3 | $ 35.1 | | $ 40.7 | |

| | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| **Distribution of Values** | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 1,469.0 | | $ 1,469.0 | |
| 10 Remaining Assets | | | 35.1 | | 40.7 | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | $ 1,504.1 | | $ 1,509.7 | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ (272.7) | | $ (272.7) | |
| 14 JSN Secured Claims | | | (46.9) | | (50.6) | |
| 15 **Total Paydown** | | | $ (319.6) | | $ (323.3) | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ (791.3) | | $ (768.1) | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ 2,176.1 | $ 2,172.4 | $ 62.9 | 2.9% | $ 78.0 | 3.6% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ 11,424.7 | $ 9,473.7 | $ 330.2 | 2.9% | $ 340.2 | 3.6% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ 1,942.5 | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | 2.9% | 3.6% | 9.0% |

(1) Includes assets of RFC Borrower.
(2) Book values for the recoveries of the non-debtor assets are not shown as these assets represent the Debtors' equity claims.

**RFC Asset Holdings II, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | 0.6 | 0.0 | 1.6% | 0.0 | 2.4% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 **Total Remaining Assets** | **$ 0.6** | **$ 0.0** | | **$ 0.0** | |

| | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| **Distribution of Values** | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 27.6 | | $ 27.6 | |
| 10 Remaining Assets | | | 0.0 | | 0.0 | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | **$ 27.6** | | **$ 27.6** | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 JSN Secured Claims (1) | | | (27.6) | | (27.6) | |
| 15 **Total Paydown** | | | **$ (27.6)** | | **$ (27.6)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ - | | $ - | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

(1) JSN secured claim amount represents distribution of equity from RFC Asset Holdings II, LLC which is pledged to the JSNs.

**Homecomings Financial, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 **Total Remaining Assets** | **$ -** | **$ -** | | **$ -** | |

| | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 0.3 | | $ 0.3 | |
| 10 Remaining Assets | | | - | | - | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | **$ 0.3** | | **$ 0.3** | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 JSN Secured Claims | | | - | | - | |
| 15 **Total Paydown** | | | **$ -** | | **$ -** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ (0.2) | | $ (0.2) | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ 2,223.0 | $ 2,223.0 | $ 0.1 | 0.0% | $ 0.1 | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ 33.9 | $ 17.8 | $ 0.0 | 0.0% | $ 0.0 | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | 0.0% | 0.0% | 9.0% |

**Residential Funding Mortgage Exchange, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 **Total Remaining Assets** | **$ -** | **$ -** | | **$ -** | |

| | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distribution of Values** | | | | | | |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 0.0 | | $ 0.0 | |
| 10 Remaining Assets | | | - | | - | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | **$ 0.0** | | **$ 0.0** | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 JSN Secured Claims | | | (0.0) | | (0.0) | |
| 15 **Total Paydown** | | | **$ (0.0)** | | **$ (0.0)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ (0.0) | | $ (0.0) | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

**DOA Holding Properties, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

|  | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
|  |  | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** |  |  |  |  |  |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 **Total Remaining Assets** | **$ -** | **$ -** |  | **$ -** |  |

|  | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
|  |  |  | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** |  |  |  |  |  |  |
| 9 Cash |  |  | $ 0.0 |  | $ 0.0 |  |
| 10 Remaining Assets |  |  | - |  | - |  |
| 11 AFI Claims Recovery |  |  | - |  | - |  |
| 12 **Total Distributable Value** |  |  | **$ 0.0** |  | **$ 0.0** |  |
| **Paydown of Secured Debt** |  |  |  |  |  |  |
| 13 Ally Revolver and Ally Line of Credit |  |  | $ - |  | $ - |  |
| 14 JSN Secured Claims |  |  | (0.0) |  | (0.0) |  |
| 15 **Total Paydown** |  |  | **$ (0.0)** |  | **$ (0.0)** |  |
| **Admin/Wind-Down Costs** |  |  |  |  |  |  |
| 16 Admin/Wind-Down Costs |  |  | $ (0.0) |  | $ (0.0) |  |
| **JSN Deficiency Claim** |  |  |  |  |  |  |
| 17 JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** |  |  |  |  |  |  |
| 18 General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** |  |  |  |  |  |  |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

|  | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
|  | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

**RFC Asset Management, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | **$ -** | **$ -** | | **$ -** | |

| | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distribution of Values** | | | | | | |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 0.0 | | $ 0.0 | |
| 10  Remaining Assets | | | - | | - | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 0.0** | | **$ 0.0** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (0.0) | | (0.0) | |
| 15  **Total Paydown** | | | **$ (0.0)** | | **$ (0.0)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (0.0) | | $ (0.0) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

**RFC SFJV-2002, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 **Total Remaining Assets** | **$ -** | **$ -** | | **$ -** | |

| | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| **Distribution of Values** | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 0.0 | | $ 0.0 | |
| 10 Remaining Assets | | | - | | - | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | **$ 0.0** | | **$ 0.0** | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 JSN Secured Claims | | | (0.0) | | (0.0) | |
| 15 **Total Paydown** | | | **$ (0.0)** | | **$ (0.0)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ (0.0) | | $ (0.0) | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

**RCSFJV2004, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| Liquidation of Remaining Assets | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | **$ -** | **$ -** | | **$ -** | |

| Distribution of Values | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 0.0 | | $ 0.0 | |
| 10  Remaining Assets | | | - | | - | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 0.0** | | **$ 0.0** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (0.0) | | (0.0) | |
| 15  **Total Paydown** | | | **$ (0.0)** | | **$ (0.0)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (0.0) | | $ (0.0) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

**Residential Capital, LLC**
**Summary of Unscheduled Entities**

| | Entity Name | Total Assets (1) |
|---|---|---|
| 1 | DOA Properties IX (Lots-Other), LLC | $ - |
| 2 | EPRE LLC | - |
| 3 | Equity Investments I, LLC | - |
| 4 | ETS of Virginia, Inc. | - |
| 5 | ETS of Washington, Inc | - |
| 6 | GMAC Model Home Finance I, LLC | - |
| 7 | GMAC Residential Holding Company, LLC | - |
| 8 | GMAC RH Settlement Service, LLC | - |
| 9 | GMACM REO LLC | - |
| 10 | GMACR Mortgage Products, LLC | - |
| 11 | GMAC-RFC Holding Company, LLC | - |
| 12 | HFN REO Sub II, LLC | - |
| 13 | Home Connects Lending Services, LLC | - |
| 14 | Homecomings Financial Real Estate Holdings, LLC | - |
| 15 | Ladue Associates, Inc. | - |
| 16 | PATI A, LLC | - |
| 17 | PATI B, LLC | - |
| 18 | PATI Real Estate Holdings, LLC | - |
| 19 | RAHI A, LLC | - |
| 20 | RAHI B, LLC | - |
| 21 | RAHI Real Estate Holdings, LLC | - |
| 22 | Residential Accredit Loans, Inc. | - |
| 23 | Residential Asset Mortgage Products, Inc. | - |
| 24 | Residential Asset Securities Corporation | - |
| 25 | Residential Consumer Services of Alabama, LLC | - |
| 26 | Residential Consumer Services of Ohio, LLC | - |
| 27 | Residential Consumer Services of Texas, LLC | - |
| 28 | Residential Funding Mortgage Securities I, Inc. | - |
| 29 | Residential Funding Mortgage Securities II, Inc. | - |
| 30 | Residential Funding Real Estate Holdings, LLC | - |
| 31 | Residential Mortgage Real Estate Holdings, LLC | - |
| 32 | RFC – GSAP Servicer Advance, LLC | - |
| 33 | RFC Construction Funding, LLC | - |
| 34 | RFC REO LLC | - |
| | **Total Assets** | **$ -** |

(1) Total assets exclude certain non-economic assets recognized by the Company in
    accordance with generally accepted accounting principles, investment in subsidiaries
    and intercompany balances.

## Exhibit 8

## <u>RMBS Trust Allocation Protocol Methodology</u>

### 1.    CALCULATION OF RECOGNIZED RMBS R+W CLAIMS

<u>Step 1</u>: Calculate Net Total Collateral Losses

The calculation of each RMBS Trust's Recognized R+W Claim begins with estimating each trust's Net Total Collateral Losses, which is the sum of the trust's (i) Realized Collateral Losses and (ii) Projected Collateral Losses.  Realized Collateral Losses were obtained from the Debtors' VISION platform for Debtor-sponsored RMBS Trusts, and through databases from Intex and Bloomberg for non-Debtor-sponsored RMBS Trusts. Projected Collateral Losses were estimated by Duff & Phelps ("<u>Duff</u>")—the RMBS Trustees' expert—using a proprietary loss model.

<u>Step 2</u>: Calculate Debtor's Attributable Portion of Net Collateral Losses

The Net Total Collateral Loss for each RMBS Trust is then multiplied by the percentage of an RMBS Trust's loans sold into that trust by a Debtor (the "<u>Seller Percentage</u>").  This result is the Debtor's Attributable Portion of Net Collateral Losses.

For (i) Original Settling RMBS Trusts and (ii) Debtor sponsored Additional Settling RMBS Trusts, the Debtor's Seller Percentage is assumed to be 100%.

For third party sponsored Additional Settling RMBS Trusts, the Seller Percentage is obtained, in the first instance, from the RMBS Trust's Prospectus.  Where the Seller Percentage is not available from a trust's prospectus, the Seller Percentage is obtained from a third-party data source (*e.g.*, Intex).  If the Seller Percentage is neither available from the trust's prospectus, nor from a third party data source, the percentage of loans serviced by a Debtor entity (the "<u>Servicer Percentage</u>") is employed as a proxy for the Seller Percentage.  The Servicer Percentage is capped at 100% less the sum of the non-Debtor entity Seller Percentage(s) listed in the RMBS Trust's prospectus, provided, however, that if neither the Seller Percentage nor Servicer Percentage is available, then the Seller Percentage is set at 5% for vintages 2006 and later, and at 9% for vintages prior to 2006.  Further, if the Debtor entity associated with the assumed Seller Percentage cannot be identified, the assumed Seller Percentage is divided evenly between RFC and GMACM.

1

**Step 3: Calculate Losses Due to Breach**

For each RMBS Trust, the Debtor's Attributable Portion of Net Collateral Losses is multiplied by the applicable Exception Rates for the particular RMBS Trust in order to arrive at that trust's Losses Due to Breach.

*Exception Rates for Original Settling Trusts*

For each Original Settling Trust Stratum (as defined below), the applicable Exception Rates means the fractions—observed in liquidated loans for Realized Collateral Losses and in active loans for Projected Collateral Losses— (i) the denominator of which is the number of loans in the Original Settling RMBS Trust and (ii) the numerator of which was determined by Duff in the following manner:

*first*, all the loans in the Original Settling RMBS Trusts were stratified by vintage (*e.g.*, 2006) and product type (*e.g.*, Alt A) into cohorts or strata (each, a "Stratum");

*second*, Duff reviewed (i) a sufficiently large sample of loans drawn from the Original Settling RMBS Trusts, (ii) each Original Settling RMBS Trust's Governing Agreements, and (iii) third-party, loan-level data sources (*e.g.*, CoreLogic data), to determine a statistically significant estimate, within each Stratum, of the ratio ("Stratum Ratio") of (1) the number of loans in that Stratum for which there was a deviation from the applicable guidelines and other requirements in the representations and warranties contained in the Governing Agreements to (2) the total number of loans in that Stratum; and

*third*, upon doing so, determining the numerator by making the following calculations: (I) for each Stratum in an Original Settling RMBSTrust, calculating the product of (x) the number of loans in such trust in such Stratum and (y) such Stratum's Ratio, and (II) adding the products for each Stratum calculated in clause (I).

*Exception Rates for Additional Settling Trusts*

For an Additional Settling Trust, the applicable Exception Rates are equal to the Original Settling RMBS Trust's Exception Rates (for liquidated and active loans) for that Stratum that corresponds to such Additional Settling Trust's product type, adjusted as follows based on that trust's vintage:

Pre-2000: 25% of 2004 Original Settling RMBS Trust Exception Rate

2000–2002: 50% of 2004 Original Settling RMBS Trust Exception Rate

2003: 75% of 2004 Original Settling RMBS Trust Exception Rate

2004: 100% of 2004 Original Settling RMBS Trust Exception Rate

2005: 100% of 2005 Original Settling RMBS Trust Exception Rate

2006: 100% of 2006 Original Settling RMBS Trust Exception Rate

2007: 100% of 2007 Original Settling RMBS Trust Exception Rate

Post-2007: 100% of 2007 Original Settling RMBS Trust Exception Rate

**Step 4: Calculate Claim Scaling Factor**

The Losses Due to Breach are multiplied by the Claim Scaling Factor to calculate the Claim.

The Claim Scaling Factor is a fraction, the (i) numerator of which is the $8.7 billion aggregate Allowed Claim contained in the Original RMBS Settlement for the Original Settling RMBS Trusts, and (ii) the denominator of which is the sum of each and every Original Settling RMBS Trust's Losses Due to Breach.

**Step 5: Calculate Recognized RMBS R&W Claim**

Each RMBS Trust's Recognized RMBS R&W Claim is equal to the Claim, unless the RMBS Trust is an Insured RMBS Trust, in which case, the Recognized RMBS R&W Claim is zero, except where the Insured Exception applies, in which case the Recognized RMBS R&W Claim is equal to the Claim.  The Insured Exception is defined as an Insured Trust for which the sum of the net unreimbursed insurance payment, the accrued and unpaid losses, and projected future policy payments is zero or close to zero.

2.     **CALCULATION OF SERVICING CURE CLAIM AND SERVICING DAMAGE CLAIM**

Each RMBS Trust's Servicing Damage Claim is equal to the total servicing claim amount (*i.e.*, $96 million) multiplied by that RMBS Trust's Servicing Claim Share.

Each RMBS Trust's Servicing Claim Share is equal to: the product of that RMBS Trust's Estimated Servicing Losses divided by the sum of each and every RMBS Trust's Estimated Servicing Losses, as determined by Duff.

Estimated Servicing Losses are related to 1) misapplied and miscalculated payments, 2) wrongful foreclosure and improper loss mitigation practices, and 3) extended foreclosure timing issues caused by improper affidavits, documentation and collection practices. Information employed to calculate Estimated Servicing Losses was obtained from a review of 146 non-Debtor servicing related litigations and approximately 1,500 Debtor servicing litigations, a review of complaints filed with the Debtor on Debtor-serviced loans, and a review of a sample of Debtor-serviced loans.

Each RMBS Trust's Estimated Servicing Losses is adjusted to reflect liability only for those loans serviced by Debtor entities.  Servicer Percentage is obtained from the applicable governing documents, the RMBS Trusts' prospectus where such information in the prospectus, and, if not available, from third-party sources (*e.g.*, Intex).  In those cases where the Servicer Percentage was unavailable from the governing documents,  the prospectus or other third-party sources, the Servicer Percentage was assumed to be the RMBS Trust shelf's average Servicer Percentage.  If it is not possible to calculate a shelf average, the Servicer Percentage is assumed to be the Stratum average.  For some RMBS Trusts, Duff determined that GMACM serviced 100% of the loans; for others, Duff determined that RFC serviced 100% of the loans; and for the rest, Duff determined that both GMACM and RFC serviced a portion of the loans, and the claims are listed against GMACM or RFC or both in accordance with those determinations.

The Servicing Damages Claims of the RMBS Trusts are divided into two groups:  If the Servicing Agreement of a trust was assumed by the applicable Debtor by July 1, 2013, the Servicing Damage Claim is a cure claim; if it was not assumed by that date, the Servicing Damage Claim is an unsecured claim.  Since a Servicing Agreement that had not been assumed by July 1, 2013 may be assumed as late as the Effective Date, the two groups may have to be updated after the filing of the Plan, which will impact many of the calculations contained in the RMBS Trust Claim Schedules.

Each RMBS Trust's Recognized Cure Claim is equal to the Servicing Damage Claim, unless the RMBS Trust is an Insured RMBS Trust, in which case, the Recognized Cure

Claim is zero, except where the Insured Exception applies, in which case the Recognized Cure Claim is equal to the Claim.  The Insured Exception is defined as an Insured Trust for which the sum of the net unreimbursed insurance payment, the accrued and unpaid losses, and projected future policy payments is zero or close to zero or for which there exist uninsured tranches senior or pari passu in priority to the reimbursement rights of any Monoline Insurer (in which case the Claim shall be adjusted to equal the pro-rated portion of the Claim allocable to such uninsured tranches).