**Hearing Date: August 28, 2013 at 10:00 a.m. (ET)**
**Objection Deadline: August 9, 2013 at 4:00 p.m. (ET)**

| | |
|---|---|
| MORRISON & FOERSTER LLP | LOCKE LORD LLP |
| 1290 Avenue of the Americas | 44 Montgomery Street, Suite 2400 |
| New York, New York 10104 | San Francisco, California 94104 |
| Telephone:    (212) 468-8000 | Telephone:    (415) 318-8810 |
| Facsimile:    (212) 468-7900 | Facsimile:    (415) 676-5816 |
| Gary S. Lee | Regina J. McClendon |
| Norman S. Rosenbaum | |
| Jordan A. Wishnew | *Special Litigation Counsel to the Debtors and Debtors in Possession* |
| *Counsel for the Debtors and Debtors in Possession* | |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------------

## NOTICE OF DEBTORS' OBJECTION TO PROOFS OF CLAIM
## FILED BY CERTAIN PLAINTIFFS IN CALIFORNIA LITIGATION

**PLEASE TAKE NOTICE** that the undersigned have filed the attached *Objection to Proofs of Claim Filed by Certain Plaintiffs in California Litigation* (the "Objection").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will take place on **August 28, 2013 at 10:00 a.m. (prevailing Eastern Time)** before the Honorable Martin Glenn, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Room 501.

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the

Local Bankruptcy Rules for the Southern District of New York, and the Notice, Case

Management, and Administrative Procedures approved by the Bankruptcy Court [Docket

No. 141], be filed electronically by registered users of the Bankruptcy Court's electronic

case filing system, and be served, so as to be received no later than **August 9, 2013 at**

**4:00 p.m. (Prevailing Eastern Time)**, upon (a) counsel to the Debtors, Morrison &

Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S.

Lee, Norman S. Rosenbaum and Jordan A. Wishnew); (b) litigation counsel to the

Debtors, Locke Lord LLP, 44 Montgomery Street, Suite 2400, San Francisco, CA 94104

(Attention:  Regina J. McClendon); (c) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004

(Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (d) the Office

of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania

Avenue NW, Washington, DC 20530-0001 (Attention: US Attorney General, Eric H.

Holder, Jr.); (e)  Office of the New York State Attorney General, The Capitol, Albany,

NY 12224-0341 (Attention: Nancy Lord, Esq. and Enid N. Stuart, Esq.); (f) Office of the

U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York,

NY 10007 (Attention: Joseph N. Cordaro, Esq.); (g) counsel for Ally Financial Inc.,

Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attention: Richard M.

Cieri and Ray Schrock); (h) counsel for the committee of unsecured creditors, Kramer

Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036

(Attention: Kenneth Eckstein and Douglas Mannal); (i) counsel for Ocwen Loan

Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019

(Attention: Jennifer C. DeMarco and Adam Lesman); (j) counsel for Berkshire Hathaway

Inc., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071

(Attention:  Thomas Walper and Seth Goldman); (k) Internal Revenue Service, P.O. Box

7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail

Stop 5-Q30.133, Philadelphia, PA 19104-5016); and (l) Securities and Exchange

Commission, New York Regional Office, 3 World Financial Center, Suite 400, New

York, NY 10281-1022 (Attention: George S. Canellos, Regional Director).

     **PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a

written response to the relief requested in the Objection, the Bankruptcy Court may deem

any opposition waived, treat the Objection as conceded, and enter an order granting the

relief requested in the Objection without further notice or hearing.

Dated: July 10, 2013

       _/s/ Norman S. Rosenbaum_____

Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the Debtors and
Debtors in Possession*

-and-

LOCKE LORD LLP
44 Montgomery Street, Suite 2400
San Francisco, California 94104
Telephone:    (415) 318-8810
Facsimile:    (415) 676-5816
Regina J. McClendon

*Special Litigation Counsel for the Debtors and
Debtors in Possession*

ny-1097292

**Hearing Date: August 28, 2013 at 10:00 a.m. (ET)**
**Objection Deadline: August 9, 2013 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew

*Counsel for the Debtors and*
*Debtors in Possession*

LOCKE LORD LLP
44 Montgomery Street, Suite 2400
San Francisco, California 94104
Telephone:    (415) 318-8810
Facsimile:    (415) 676-5816
Regina J. McClendon

*Special Litigation Counsel to the*
*Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------------------

**DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED**
**BY CERTAIN PLAINTIFFS IN CALIFORNIA LITIGATION**

## TABLE OF CONTENTS

JURISDICTION, VENUE AND STATUTORY PREDICATE ................................................... 2

PRELIMINARY STATEMENT ................................................................................... 2

BACKGROUND ........................................................................................................ 3

    A.    The California Litigation .............................................................. 4

    B.    The California Litigation Claims ................................................ 7

RELIEF REQUESTED ............................................................................................... 9

OBJECTION ............................................................................................................. 9

I.     THE AMENDED COMPLAINT FAILS TO SATISFY BASIC PLEADING STANDARDS ................................................................................................. 10

    A.    The Amended Complaint Fails to Satisfy Rule 8(a) ........................... 11

    B.    The Amended Complaint's Fraud-Based Claims Fail to Satisfy Rule 9(b) ......... 13

II.    THE AMENDED COMPLAINT FAILS TO PLEAD A BASIS FOR DERIVATIVE LIABILITY ......................................................................... 15

    A.    The Amended Complaint Alleges No Basis for Agency or Conspiracy Liability ................................................................................ 15

    B.    The Intracorporate Immunity Doctrine Bars the California Litigation Claimants' "Conspiracy"-Based Claims ................................... 16

III.   THE PLAINTIFFS FAIL TO STATE ANY FRAUD-BASED CLAIM ...................... 17

    A.    California Litigation Claimants Fail to Allege Facts Giving Rise to a Duty to Disclose ............................................................................ 17

    B.    California Litigation Claimants Fail to Allege Scienter or Intent to Defraud ............................................................................. 19

    C.    California Litigation Claimants Fail to Allege Reliance or Damages ................. 20

    D.    California Litigation Claimants' Origination-Based Claims are Time-Barred ............................................................................... 21

    E.    California Litigation Claimants' Fraud Claims are Preempted by the Truth in Lending Act and the Fair Credit Reporting Act ........................ 22

IV.   THE AMENDED COMPLAINT'S ALLEGATIONS OF WRONGFUL FORECLOSURE ARE INSUFFICIENT TO STATE A CLAIM ............................. 23

    A.    California Litigation Claimants Fail to State a Claim For Violation of Civil Code § 2924 et seq ....................................................... 25

V.    THE AMENDED COMPLAINT'S ALLEGATION OF IMPROPER INFLUENCE OVER AN APPRAISER IS INSUFFICIENT TO ESTABLISH A CLAIM .................................................................................................... 26

VI.   RESERVATION OF RIGHTS .......................................................................... 27

NOTICE ............................................................................................................................ 27

CONCLUSION ................................................................................................................. 28

ny-1092850

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Abdallah v. United Savs. Bank,
    43 Cal. App. 4th 1101 (1996) ........................................................................26

Agosta v. Astor,
    120 Cal. App. 4th 596 (2004) .......................................................................20

Ascroft v. Iqbal,
    556 U.S. 662 (2009).......................................................................................11

Bank of Am. Corp. v. Superior Court of Los Angeles Cnty.,
    198 Cal. App. 4th 862 (2011) .......................................................................20

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)................................................................................20, 16

Bonyadi v. CitiMortgage Bank,
    Case No. 12-5239-CAS FFMX, 2013 WL 877603 (C.D. Cal. Mar. 8, 2013)........................18

Calvo v. HSBC Bank USA, N.A.,
    199 Cal. App. 4th 118 (2011) .......................................................................24

Cameron v. Church,
    253 F. Supp. 2d 611 (S.D.N.Y. 2003)..........................................................16

Cockerell v. Title Ins. Co.,
    42 Cal.2d 284 (1954) ....................................................................................24

Debrunner v. Deutsche Bank Nat'l. Trust Co.,
    204 Cal. App. 4th 433 (2012) ..................................................................24, 25

Decker v. GlenFed, Inc. (In re GlenFed, Inc. Secs. Lit.),
    42 F.3d 1541 (9th Cir. 1994) ........................................................................14

Elliott v. Mortg. Elec. Registration Sys. Inc.,
    2013 WL 1820904 (N.D. Cal. Apr. 30, 2013) .............................................25

Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.),
    398 B.R. 736 (Bankr. S.D.N.Y. 2008)..........................................................10

Foreman v. Salazano (In re Norvergence, Inc.),
    405 B.R. 709 (Bankr. D.N.J. 2009) .........................................................11, 14

Gomes v. Countrywide Home Loans, Inc.,
    192 Cal. App. 4th 1149 (2011), cert. denied, 132 S. Ct. 419 (2011) ......................................23

Gowan v. Amaranth (In re Dreier LLP),
    452 B.R. 451 (Bankr. S.D.N.Y. 2011) ......................................................................14

Gowan v. Patriot Group, LLC (In re Dreier LLP),
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ......................................................................14

Hensley v. Bank of New York Mellon,
    2011 WL 2118810 (E.D. Cal. May 27, 2011) ..........................................................25

Herrera v. Fed. Nat'l Mortg. Ass'n,
    141 Cal. Rptr. 3d 326 (2012) ............................................................................24, 25

In re DJK Residential LLC,
    416 B.R. 100 (Bankr. S.D.N.Y. 2009) ......................................................................10

In re Hess,
    404 B.R. 747 (Bankr. S.D.N.Y. 2009) ........................................................................9

In re Jensen,
    Case No. 09-14830 (MG), 2010 WL 424690 (Bankr. S.D.N.Y. Feb. 3, 2010) ......................27

In re Lois/USA, Inc.,
    264 B.R. 69 (Bankr. S.D.N.Y. 2001) ........................................................................14

In re Nortel Networks, Inc.,
    469 B.R. 478 (Bankr. D. Del. 2012) ....................................................................10, 15

In re North Bay Gen. Hosp., Inc.,
    404 B.R. 443 (Bankr. S.D. Tex. 2009) ......................................................................27

In re Rockefeller Ctr. Props.,
    272 B.R. 529 (Bankr. S.D.N.Y. 2000), aff'd sub nom., NBC v. Rockefeller Ctr.
    Props. (In re Rockefeller Ctr. Props.), 226 B.R. 52 (S.D.N.Y. 2001), aff'd, 46 Fed.
    App'x 40 (2d Cir. 2002) ............................................................................................10

In re W.R. Grace & Co.,
    346 B.R. 672 (Bankr. D. Del. 2006) ..........................................................................9

In re W.R. Grace & Co.,
    366 B.R. 302 (Bankr. D. Del. 2007) ........................................................................27

Jenkins v. JPMorgan Chase Bank, N.A.,
    216 Cal. App. 4th 497 (2013) ..................................................................................24

iv

Jones v. Pollard-Buckinham,
　　348 F.3d 1072 (8th Cir. 2003) ...................................................................11

Kajitani v. Downey Savs. & Loan Ass'n, F.A.,
　　647 F. Supp. 2d 1208 (D. Haw. 2008) .....................................................22

Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.,
　　285 F.3d 848 (9th Cir. 2002) ...................................................................21

Karlsen v. Am. Savs. & Loan Ass'n,
　　15 Cal. App. 3d 112 (1971) .....................................................................25

Kearns v. Ford Motor Co.,
　　567 F.3d 1120 (9th Cir. 2009) .................................................................14

Kimball v. Flagstar Bank F.S.B.,
　　881 F. Supp. 2d 1209 (S.D. Cal. 2012).....................................................17

Knapp v. Doherty,
　　123 Cal. App. 4th 76 (2004) ....................................................................25

Kovich v. Paseo Del Mar Homeowners' Ass'n,
　　41 Cal. App. 4th 863 (1996) ....................................................................17

Levine v. Blue Shield of Cal.,
　　189 Cal. App. 4th 1117 (2010) ................................................................17

Linear Tech. Corp. v. Applied Materials, Inc.,
　　152 Cal. App. 4th 115 (2007) ..................................................................19

Mirkin v. Wasserman,
　　5 Cal. 4th 1082 (1993) ............................................................................20

Montgomery v. PNC Bank, N.A.,
　　No. 12-2453, 2012 WL 3670650 (N.D. Cal. Aug. 24, 2012) .................23

N.L.R.B. v. Semco Printing Ctr., Inc.,
　　721 F.2d 886 (2d Cir. 1983)....................................................................16

Nymark v. Heart Fed. Savs. & Loan Ass'n.,
　　231 Cal. App. 3d 1089 (1991) .................................................................19

Oaks Mgmt. Corp. v. Super. Ct.,
　　145 Cal. App. 4th 453 (2006) ..................................................................17

Parsons v. Tickner,
　　31 Cal. App. 4th 1513 (1995) ..................................................................22

v

Perlas v. GMAC Mortg., LLC,
    187 Cal. App. 4th 429 (2010) ............................................................18

Peterson v. Cellco P'ship,
    164 Cal. App. 4th 1583 (2008) ..........................................................26

Poulsen v. Sterling Savs. Bank,
    Case No. 12-02306 (EDL), 2012 WL 3638605 (N.D. Cal. Aug. 22, 2012) ..........................17

Regis Techs., Inc. v. Oien (In re Oien),
    404 B.R. 311 (Bankr. N.D. Ill. 2009) ....................................................11

Riggins v. Bank of America, N.A.,
    Case No. 12-0033 (DOC), 2013 WL 319285 (C.D. Cal. Jan. 24, 2013) ..............................18

Sack v. V.T. Low,
    478 F.2d 360 (2d Cir.1973)...............................................................14

Settle v. World Savs. Bank, F.S.B.,
    No. 11-00800-MMM, 2012 WL 1026103 (C.D. Cal. Jan. 11, 2012) ......................................18

Shroyer v. New Cingular Wireless Servs., Inc.,
    622 F.3d 1035 (9th Cir. 2010) ..........................................................19

Shuster v. BAC Home Loans Servicing, LP,
    211 Cal. App. 4th 505 (2012) ..........................................................24

Sun'N Sand, Inc. v. United Cal. Bank,
    21 Cal. 3d 671 (1978) ..................................................................22

Swartz v. KPMG, LLP,
    476 F.3d 756 (9th Cir. 2007) ..........................................................14

Vanston Bondholders Protective Comm. v. Green,
    329 U.S. 156 (1946).....................................................................9

Vess v. Ciba-Geigy Corp. USA,
    317 F.3d 1097 (9th Cir. 2003) ..........................................................16

**STATUTES**

11 U.S.C.
    § 502(a) ...............................................................................9
    § 502(b)(1) ...........................................................................9

15 U.S.C.
    § 1610..................................................................................22

Cal. Civ. Code
   § 2924(a)(1) ...................................................................................................................25
   § 2936............................................................................................................................24

Cal. Code Civ. Proc.
   § 338(d)...........................................................................................................................21

**OTHER AUTHORITIES**

4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. rev. 2012) ......................................9

9 COLLIER ON BANKRUPTCY ¶ 3001.06 (16th ed. Rev. 2012).......................................27

FED. R. BANKR. PROC. 3001(f).........................................................................................9

FED. R. CIV. PROC. 8(a)(2) .............................................................................................11

FED. R. CIV. PROC. 9(b)...................................................................................................13

ny-1092850

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

Residential Capital, LLC and its affiliated debtors in the above-captioned chapter 11

cases (the "Chapter 11 Cases"),[1] as debtors and debtors in possession (collectively, the

"Debtors")[2] hereby file this objection (the "Objection"), seeking to disallow and expunge certain

proofs of claim listed on Schedule A hereto (individually, a "California Litigation Claim" and

collectively, the "California Litigation Claims") filed by sixty-one individuals (each a

"California Litigation Claimant," and collectively the "California Litigation Claimants")[3]

pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and

Rule 3007(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") on the

grounds that they fail to state a claim against the Debtors.[4]   The Debtors seek entry of an order,

substantially in the form attached hereto as Exhibit 1 (the "Proposed Order"), granting the

requested relief.[5]   In support of the Objection, the Debtors respectfully represent as follows:

---

[1]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 Cases or the relief requested in this Objection may refer to http://www.kccllc.net/rescap for additional information.

[2]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6].

[3]    The California Litigation Claimants include: Carolyn Hairston, Christine Petersen, William Mimiaga, Robin Gaston, Patrick Gaston, Mary Serrano, Sarah Sebagh, Rick Albritton, Veronica Grey, Brenda Mella, Joselito Mella, Michael Man, Judy Lim, David Cruz, Yesenia Cruz, Gregory Buck, Christina Palbicke, Khalil Subat, Manija Subat, Genevie Cabang, Julio Gonzalez, Lisa Simonyi, Rick Ewald, Regina Faison, Alex Ibarra, Maria Elena Del Cid, Julo Del Cid, Mesbel Mohamoud, Michael Moultrie, Willie Gilmore, Phyllis McCrea, Cecilia Chaube, Magdalena Avila, Gricelda Ruano, Lois Elisa Jordan, Terrell Sullivan, Gloria Portillo, Florastene Holden, Marco Badilla, Manuela Badilla, Ignacio Rodriguez, Rosa Rodriguez, Salvador Barajas, Maria Barajas, Brian Foote, Olan Ross, Evelyn Ross, Gary Johnson, Joellyn Johnson, Rodelina Santos, Jun O. Santos, Michael Brown, Claudinette Brown, Martin Kassowitz, Shirley Kaplan, Henry Completo, Irma Laredo, Marcia Willoughby and Victor Pazos.

[4]    The Debtors reserve all of their rights to object on any other basis to any California Litigation Claim not set forth in this Objection, and the Debtors reserve all of their rights to amend this Objection should any further bases come to light.

[5]    A combined motion addressing all of the California Litigation Claims is appropriate since they all say exactly the same thing and suffer from the same failings.

1

## JURISDICTION, VENUE AND STATUTORY PREDICATE

1.       This Court has jurisdiction over this Objection under 28 U.S.C. § 1334.

This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court

under 28 U.S.C. §§ 1408 and 1409.

2.       The statutory predicate for the relief requested herein is Bankruptcy Code

section 502(b) and Bankruptcy Rule 3007(a).

## PRELIMINARY STATEMENT[6]

3.       Each of sixty-one individual California Litigation Claimants, through

purported counsel Brookstone Law, P.C. ("Purported Counsel"), filed against the Debtors'

estates a California Litigation Claim asserting nine identical claims, each in the amount of $1.3

million.  Together, they total $713.7 million.  Each of these claims should be disallowed and

expunged pursuant to Bankruptcy Code section 502(b) on, among others, the ground that they

fail to state a single, colorable claim against any of the Debtors under applicable law.

4.       In the weeks before the Petition Date, the California Litigation Claimants

filed a rambling and incoherent initial complaint (the "Initial Complaint") against a multitude of

Debtor and non-debtor defendants, which sought monetary damages because a group of

California homeowners believe they were allegedly harmed by the defendants' home lending

practices in California between 2003 and 2008 when the individuals obtained loans from one or

more of the named defendants.  Certain non-debtor defendants sought, and were granted,

dismissal of the Initial Complaint in its entirety because the Initial Complaint lacked the

specificity necessary to satisfy basic pleading standards.

---

[6]     Capitalized terms used in this Preliminary Statement shall have the meanings ascribed to such terms below.

5.      After the Petition Date, the California Litigation Claimants filed an

Amended Complaint against the same defendants (including Debtor entities), which largely

repeated the same allegations made in the Initial Complaint.  The Amended Complaint serves as

the basis for the California Litigation Claims.

6.      Now, after two complaints, two motions to dismiss, and entry of an order

dismissing the Initial Complaint, the California Litigation Claimants seek to assert the California

Litigation Claims in these Chapter 11 Cases.  Notwithstanding their voluntary dismissal of the

Amended Complaint earlier this year, the California Litigation Claimants continue to prosecute

the California Litigation Claims against the Debtors, apparently hoping that they will achieve a

better outcome in this Court.  However, as discussed herein, the California Litigation Claims are

no different from the previously dismissed claims alleged against the non-debtor defendants, and

therefore, should be summarily disposed of in a similar manner.  Simply because the California

Litigation Claimants seek to litigate their claims in the Bankruptcy Court does not ease their

evidentiary and pleading burdens.  For a proof of claim to be allowed, the allegations in such

claim must meet the pleadings requirements of the Federal Rules of Civil Procedure (the

"Rules").  Therefore, each of the California Litigation Claims should be disallowed and

expunged from the Debtors' claims register in their entirety because the California Litigation

Claims are predicated on a factually deficient complaint in which the allegations are devoid of

specificity and fail to state a single valid colorable claim against any of the Debtors.

## BACKGROUND

7.      On May 14, 2012, each of the Debtors filed a voluntary petition in this

Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors are managing and

operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a)

and 1108.  These Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

8.      On May 16, 2012, the United States Trustee for the Southern District of New York appointed a nine member official committee of unsecured creditors [Docket No. 102].

9.      On June 20, 2012, the Court directed that an examiner be appointed, and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner (the "Examiner") [Docket Nos. 454, 674].  On May 13, 2013, the Examiner filed his report under seal and, on June 26, 2013, the Court entered an order unsealing the report [Docket Nos. 3698, 4099].

10.      On July 17, 2012, the Court entered an order [Docket No. 798] appointing Kurtzman Carson Consultants LLC ("KCC") as the notice and claims agent in these Chapter 11 Cases.  Among other things, KCC is authorized to (a) receive, maintain, and record and otherwise administer the proofs of claim filed in these Chapter 11 cases and (b) maintain official claims registers for each of the Debtors.

11.      On August 29, 2012, this Court entered an order approving the Debtors' motion to establish procedures for filing proofs of claim in the Chapter 11 Cases [Docket No. 1309] (the "Bar Date Order").[7]

A.      **The California Litigation**

12.      The sixty-one California Litigation Claimants filed the Initial Complaint and the Amended Complaint (as defined below) against multiple defendants, including various

---

[7]      The Bar Date Order established, among other things, (i) November 9, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline to file proofs of claim by virtually all creditors against the Debtors (the "General Bar Date") and prescribing the form and manner for filing proofs of claim; and (ii) November 30, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for governmental units to file proofs of claim (the "Governmental Bar Date").  (Bar Date Order ¶¶ 2, 3).  On November 7, 2012, the Court entered an order extending the General Bar Date to November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time) [Docket No. 2093].  The Governmental Bar Date was **not** extended.  To date, approximately 6,860 proofs of claim have been filed in these Chapter 11 Cases as reflected on the Debtors' claims registers.

4

non-debtor and Debtor-entities, in the United States District Court, Central District of California – Western Division (the "District Court"), Case No.: 12-5016-JAK (AGRx) (the "California Litigation").

13.     On May 9, 2012, the California Litigation Claimants filed the Initial Complaint asserting a number of causes of action against numerous defendants, including the "ResCap defendants": (1) Residential Capital, LLC, (2) GMAC-RFC Holding Company, LLC, (3) Residential Funding Corporation, (4) Homecomings Financial, LLC, (5) Executive Trustee Services, LLC, and (6) Home Connects Lending Services, LLC (collectively, the "ResCap Defendants"), arising from loans alleged to have been obtained by each Plaintiff during the years 2003-2008.  The Initial Complaint was also filed against GMAC Mortgage Group, Inc. n/k/a GMAC Mortgage Group LLC, a non-debtor entity.

14.     The Initial Complaint asserted eight causes of action against the defendants, including (i) Fraudulent Concealment (First); (ii) Intentional Misrepresentation (Second); (iii) Negligent Misrepresentation (Third); (iv) Cal. Bus. & Prof. Code § 17200 (Fourth); (v) Wrongful Foreclosure (Fifth); (vi) Truth in Lending Act, 15 U.S.C. § 1601 et seq. (Sixth); (vii) Violation of Appraisal Independence in violation of Dodd-Frank, 12 U.S.C. § 1640 et seq. (Seventh); and (viii) Violation of Appraiser Independence in violation of 12 C.F.R. § 225.65 and 12 C.F.R. § 323.5 (Eighth).

15.     On June 12, 2012, the ResCap Defendants, through their counsel, filed the "Notice of Bankruptcy and Effect of Automatic Stay" (the "Notice of Stay").  The Notice of Stay provides that "[a]ny action taken by the [California Litigation Claimants] against the Debtors without obtaining relief from the automatic stay from the Bankruptcy Court may be void *ab*

5

*initio* and may result in finding of contempt against [California Litigation Claimants] by the

Bankruptcy Court."

16.     On June 28, 2012, Ally Bank (on its own behalf and on behalf of the entity

incorrectly named as "GMAC, A National Banking Association"), Ally Financial Inc., and

GMAC Mortgage Group LLC (the "Non-Debtor Defendants") filed a Motion to Dismiss (the

"Motion to Dismiss"), which sought dismissal of the Initial Complaint on the grounds that,

among other things, it failed to satisfy elementary federal pleading standards and did not present

concrete facts that entitled the California Litigation Claimants to relief.  The Motion to Dismiss

also asserted that the Initial Complaint's fraud-based allegations failed to satisfy Rule 9(b) 's

heightened standard of particularity and, alternatively, failed to state a claim for any of the

causes of action contained in the Initial Complaint.

17.     On September 24, 2012, the Honorable John A. Kronstadt, United States

District Judge, issued an order granting the Motion to Dismiss (the "Order"), without prejudice

as to the following causes of action: (i) Fraudulent Concealment (First); (ii) Intentional

Misrepresentation (Second); (iii) Negligent Misrepresentation (Third); (iv) Unfair Competition

pursuant to Cal. Bus. & Prof. Code § 17200 (Fourth); (v) Wrongful Foreclosure (Fifth); and

(vi) Truth in Lending Act, 15 U.S.C. § 1601 et seq. (Sixth).  The District Court also granted the

Motion to Dismiss, with prejudice, as to claims arising from Violation of Appraisal

Independence in violation of Dodd-Frank, 12 U.S.C. § 1640 et seq. and Violation of Appraiser

Independence in violation of 12 C.F.R. § 225.65 and 12 C.F.R. § 323.5.  A copy of the Order is

attached hereto as Exhibit 2.

18.     On October 31, 2012, the California Litigation Claimants filed the "First

Amended Complaint" asserting six causes of action: (i) Fraudulent Concealment [Violation of

6

ny-1092850

Civ. Code §§ 1572, 1709 and 1710]; (ii) Intentional Misrepresentation [Violation of Civ. Code §§ 1572, 1709 and 1710]; (iii) Negligent Misrepresentation [Violation of Civ. Code §§ 1572, 1709 and 1710]; (iv) Unfair Competition [Violation of Bus. & Prof. Code § 17200 et seq.]; (v) Wrongful Foreclosure [Violation of Civ. Code § 2924]; and (vi) Improper Influence Over Appraiser [Violation of Cal. Civ. Code § 1090.5] (the "Amended Complaint").[8]  The Amended Complaint attaches a voluminous "Appendix A" that purportedly attempts to cure the deficiencies in the Initial Complaint, which were noted in the Order.  The Amended Complaint also names the ResCap Defendants as among the defendants.[9]

19.    On November 19, 2012, the Non-Debtor Defendants filed a "Notice of Motion and Motion to Dismiss First Amended Complaint" seeking dismissal of the Amended Complaint in its entirety, largely on the grounds they had employed in their successful motion to dismiss the Complaint.

20.    On January 31, 2013, the California Litigation Claimants filed the "Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c)" (the "Notice of Dismissal") dismissing the Amended Complaint in its entirety as against both the Debtor Defendants and the Non-Debtor Defendants.  The Notice of Dismissal is attached hereto as Exhibit 3.

---

[8]    A copy of the Amended Complaint is attached hereto as Exhibit 4.  Due to the voluminous nature of the appendix to the Amended Complaint, it has not been included in Exhibit 4.  The Debtors have provided the Court with a copy of the Amended Complaint (including the Appendix A), and will provide to parties-in-interest electronic or hard copies of the complete Amended Complaint upon request.  The factual allegations made by the California Litigation Claimants set forth therein are fully incorporated herein by reference.  To avoid duplication, a complete recitation of purported facts contained in the Amended Complaint will not be provided in this Objection.

[9]    The filing of the Amended Complaint clearly was a violation of the automatic stay in these Chapter 11 Cases.  However, as noted below, having suffered reverses, the California Litigation Claimants subsequently dismissed the Amended Complaint without prejudice.

ny-1092850

B.    **The California Litigation Claims**

21.    On November 9, 2012, the California Litigation Claimants filed nearly

identical proofs of claims against certain Debtor entities, including, (1) GMAC Mortgage, LLC,

(2) GMAC-RFC Holding Residential Funding Company, LLC, (3) Home Connects Lending

Services, LLC, (4) Homecomings Financial, LLC, (5) Executive Trustee Services, LLC,

(6) Residential Funding Company, LLC, (7) Residential Capital, LLC, (8) Residential Funding

Real Estate Holdings, LLC, and (9) Residential Mortgage Real Estate Holdings, LLC.[10]  Each

California Litigation Claimant asserted an unsecured claim in the amount of $1,300,000 for

"Contingent Fraud Claim in litigation."  An example of one of the California Litigation Claims is

attached hereto as Exhibit 5.  At the time the California Litigation Claims were filed, the ResCap

Defendants had not responded to the Amended Complaint.   The California Litigation Claims

both refer to the Amended Complaint and identify the same six causes of action asserted therein.

22.    As justification for the California Litigation Claims, the California

Litigation Claimants generally assert that the ResCap Defendants "set out upon a massive and

centrally-directed fraud by which Defendants purportedly (1) placed [the applicable California

Litigation Claimant] into loans which Defendants *knew* [the California Litigation Claimant]

could not afford and would default upon to a mathematical certainty, (2) abandoned industry-

standard underwriting guidelines, (3) concealed/mispresented the terms of their loans to

[California Litigation Claimants] to induce unwitting consent, and (4) intentionally inflated the

appraisal values of homes throughout California in a market-fixing scheme –*knowing that their

scheme would cause the precipitous decline in values of all homes throughout California*,

---

[10]    The California Litigation Claimants filed claims against two Debtor-entities not listed in the caption to the
Amended Complaint, Residential Funding Real Estate Holdings, LLC and Residential Mortgage Real Estate
Holdings, LLC.

including those of [the California Litigation Claimants]." (Ex. 4, at 2). On these grounds, each

of the California Litigation Claimants seeks monetary damages of approximately $1.3 million

against each of the Debtor-entities, but fail to: (1) adequately allege any wrongdoing by a

specific Debtor entity; and (2) provide any objective basis to substantiate such purported

damages.

## RELIEF REQUESTED

23.    The Debtors file this Objection pursuant to Bankruptcy Code section

502(b), seeking to disallow and expunge the California Litigation Claims from the Debtors'

claims register in their entirety.

## OBJECTION

24.    A filed proof of claim is "deemed allowed, unless a party in interest . . .

objects." 11 U.S.C. § 502(a). A properly completed proof of claim is *prima facie* evidence of

validity and amount of a claim. See FED. R. BANKR. P. 3001(f). A party in interest may object to

a proof of claim, and once an objection is made, the court must determine whether the objection

is well founded. See 4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. rev. 2012).

25.    Bankruptcy Code section 502(b)(1) provides, in relevant part, that a claim

may not be allowed to the extent that "such claim is unenforceable against the debtor and

property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). Whether

a claim is allowable "generally is determined by applicable nonbankruptcy law. . . ." In re W.R.

Grace & Co., 346 B.R. 672, 673 (Bankr. D. Del. 2006). "What claims of creditors are valid and

subsisting obligations against the bankrupt at the time a petition is filed, is a question which, in

the absence of overruling federal law, is to be determined by reference to state law." In re Hess,

404 B.R. 747, 749 (Bankr. S.D.N.Y. 2009) (quoting Vanston Bondholders Protective Comm. v.

Green, 329 U.S. 156, 161 (1946)).  For the reasons set forth below, the California Litigation

Claims fail to state a claim against any of the Debtors under the applicable law and should be

disallowed and expunged in their entirety.

## I.    THE AMENDED COMPLAINT FAILS TO SATISFY BASIC PLEADING STANDARDS

26.    Several courts, including those in this district, have applied the federal

pleadings standards when assessing the validity of a proof of claim.  See In re DJK Residential

LLC, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their

burden in connection with a proof of claim, bankruptcy courts have looked to the pleading

requirements set forth in the Federal Rules of Civil Procedure.") (citing In re Rockefeller Ctr.

Props., 272 B.R. 529, 542, n.17 (Bankr. S.D.N.Y. 2000), aff'd sub nom., NBC v. Rockefeller

Ctr. Props. (In re Rockefeller Ctr. Props.), 226 B.R. 52 (S.D.N.Y. 2001), aff'd, 46 Fed. App'x 40

(2d Cir. 2002); Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.), 398 B.R.

736, 748 (Bankr. S.D.N.Y. 2008) ("The documents attached to the proofs of claim should be

treated, for purposes of a motion to disallow claims, like documents that are attached to or relied

upon in a complaint are treated on a Rule 12(b)(6) motion to dismiss. . . ") (citation omitted); In

re Nortel Networks, Inc., 469 B.R. 478, 479 (Bankr. D. Del. 2012) (applying the standards of

Rule 9(b) to a review of amended claims that asserted claims for, *inter alia*, breach of fiduciary

duty, aiding and abetting breach of fiduciary duty, civil conspiracy, unjust enrichment, and

subrogation).  Indeed, since a claim objection is a contested matter under Fed. R. Bankr. P.

9014(a), Rule 9(b) applies per Fed. R. Bankr. P. 9014(c).

27.    The Debtors seek to expunge in their entirety the California Litigation

Claims.  However, because the California Litigation Claims incorporate by reference the

Amended Complaint and do not add any additional substantive bases in support of the Claims,

this Objection addresses the merits of each count of the Amended Complaint in detail below.

Accordingly, the validity of the California Litigation Claims, which are based wholly on the

assertions made in the Amended Complaint, should be adjudged under the pleading standards

applicable to the Amended Complaint.

### A.     The Amended Complaint Fails to Satisfy Rule 8(a)

28.     Pursuant to Federal Rule of Civil Procedure 8(a)(2), a "pleading that states

a claim for relief must contain . . . a short and plain statement of the claim showing that the

pleader is entitled to relief."). Fed. R. Civ. P. 8(a)(2). Rule 8(a) "demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation." Ascroft v. Iqbal, 556 U.S. 662,

678 (2009) (citation omitted). It is insufficient for a complaint to simply "le[ave] open the

possibility that a plaintiff might later establish some 'set of undisclosed facts' to support

recovery." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561 (2007). Rather, it must plead

sufficient facts "to provide the 'grounds' of his 'entitle[ment] to relief,' [which] requires more

than labels and conclusions, and [for which] a formulaic recitation of the elements of a cause of

action will not do." Id. at 555 (citation omitted). The purpose of Rule 8(a)(2) is to ensure that

the complaint "give[s] enough detail to illuminate the nature of the claims *and allow defendants

to respond.*" Regis Techs., Inc. v. Oien (In re Oien), 404 B.R. 311, 317 (Bankr. N.D. Ill. 2009

(emphasis added) (citations and internal quotation marks omitted). In other words each

defendant must know what he is charged with. See, e.g., Jones v. Pollard-Buckinham, 348 F.3d

1072, 1073 (8th Cir. 2003) (though inartful, *pro se* complaint satisfied Rule 8(a)(2) because "it

clearly identified how each defendant was involved in the conduct of which . . . [the plaintiff]

complains."); Forman v. Salazano (In re Norvergence, Inc.), 405 B.R. 709, 736-37 (Bankr.

D.N.J. 2009) (complaint's setoff allegations inadequate because, among other things, it did not

identify specific defendants with specific transactions).  The Amended Complaint fails to meet

this standard in a variety of ways.

29.     As an initial matter, the Amended Complaint fails to specify what actions

each individual defendant took or details of the omissions and/or misrepresentations each

individual defendant made that would give rise to the claims asserted in the Amended Complaint

(and, by reference to the Amended Complaint in the proofs of claim, the California Litigation

Claims).

30.     In addition, the Amended Complaint fails to allege the specific corporate

entity that originated many of the California Litigation Claimants' loans (collectively, the

"Loans" and each a "Loan").  Instead, the Amended Complaint only asserts that either "GMAC"

(an undefined entity) or "GMAC and Defendants" originated each Loan.  (See Amended

Complaint, Appendix A at "Table 1").  Moreover, the Amended Complaint inconsistently

identifies several other parties—including Paul Financial, LLC, Nationwide Lending Corp.,

Green Point Mortg. Fund, Inc., and SCME—as "Loan Originators."  (See Appendix A ¶¶ 1-2).

As a result, the Amended Complaint fails to put the defendants on notice of any specific claim

against them.  In that regard, the Amended Complaint violates the basic principle of Rule 8(a)(2),

inasmuch as the Amended Complaint does not set forth "a *short and plain* statement of the

claim[s] . . . ," (emphasis added).  In fact, the Amended Complaint requires that the ResCap

Defendants piece together information about each of them by oscillating back and forth between

its 111 pages and 349 paragraphs, and the Appendix A.

31.     The Amended Complaint also fails to indicate with whom each California

Litigation Claimant communicated when the Loans were originated.  Specially, the Amended

Complaint does not reference what the California Litigation Claimants were told about their

respective Loan or what information pertaining to the terms and conditions of the Loan the California Litigation Claimants relied upon for their respective Loan.  Though the Appendix A attached to the Amended Complaint purports to provide "Individualized Plaintiff Allegations," it merely provides vague allegations that each California Litigation Claimant spoke with a "Loan Consultant" and that various "Defendants and Loan Consultants" committed certain acts and omissions that caused the California Litigation Claimants harm.  (See Appendix A ¶¶ 1-42).

32.    Moreover, the Amended Complaint fails to allege the corporate entity that serviced the Loans beyond referencing "GMAC"—a fact that should clearly be within the knowledge of each California Litigation Claimant.  (See, e.g., Amended Complaint, ¶¶ 11-22 (defining various defendants but not identifying any as "GMAC"); id. ¶ 48 (using undefined term "GMAC" for first time, in allegations relating to "GMAC and its co-conspirators . . . Defendants herein"); Amended Complaint, Appendix A at 1 (using term "GMAC" and stating "the loan was originated by "GMAC and defendants" and "GMAC is currently servicing the loan").)

33.    In sum, the Amended Complaint is a long-winded recitation of purported "facts" that are devoid of any factual allegations against any specific defendant.   Despite being given an opportunity to remedy earlier deficiencies, there remains a fatal absence of specific facts about any of the defendants, and the California Litigation Claimants fail to substantiate the broad allegations made in the Amended Complaint or any claims against the ResCap Defendants through the California Litigation Claims.  In short, the Amended Complaint fails to provide the ResCap Defendants with adequate notice about the alleged claims being asserted against them.

34.    Based upon the fact that the California Litigation Claims are predicated on allegations that fail to comply with Rule 8(a)(2)'s basic pleading standards, the California Litigation Claims should be disallowed and expunged in their entirety for that reason alone.

B.    **The Amended Complaint's Fraud-Based Claims Fail to Satisfy Rule 9(b)**

35.    The Amended Complaint similarly fails to meet the heightened standard of particularity that Rule 9(b) imposes on fraud-based claims.  Pursuant to Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake" if making allegations of fraud.  Fed. R. Civ. P. 9(b).

36.    "Rule 9(b) demands that, [when averments of fraud are made,] the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (citations and quotations and citation omitted).[11]  Further, Rule 9(b) "does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." Swartz v. KPMG, LLP, 476 F.3d 756, 764-65 (9th Cir. 2007) (quotations omitted); see also Gowan v. Patriot Group, LLC (In re Dreier LLP), 452 B.R. 391, 408 (Bankr. S.D.N.Y. 2011); In re Norvergence, 405 B.R. at 726-27. If the claim "sounds in fraud," plaintiffs must plead the whole claim with particularity against each defendant. Kearns, 567 F.3d at 1125-28; Gowan v. Amaranth (In re Dreier LLP), 452 B.R. 451, 462 (Bankr. S.D.N.Y. 2011).

---

[11]    With respect to the choice-of-law rules applicable to the determination of "conduct-relating" rules of law, courts look to the place of the tort.  See In re Lois/USA, Inc., 264 B.R. 69, 108 (Bankr. S.D.N.Y. 2001).  "For actions sounding in fraud, the substantive law of the state in which the injury was suffered—rather that the state where the fraudulent conduct was initiated—usually governs." Id. (quoting Sack v. V.T. Low, 478 F.2d 360, 365 (2d Cir.1973) ("[W]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made.")).  Based on these "choice of law" principles, the appropriate law to apply to assess the validity of the California Litigation Claims is California law.

37.     Each of the first four claims in the Amended Complaint, and the first four claims listed on the "Summary of Basis for Creditor's Claim" attached to each of the California Litigation Claims, are asserted fraud claims and are, therefore, subject to Rule 9(b).  (See Amended Complaint ¶¶ 186-219 (Fraudulent Concealment); ¶¶ 221-271 (Intentional Misrepresentation); ¶¶ 272-282 (Negligent Misrepresentation)[12], ¶¶ 283-325 (Unfair Competition); see also "Summary of Basis For Creditor's Claim" attached to California Litigation Claims at ¶ 2).

38.     The allegations in the Amended Complaint fail to meet Rule 9(b)'s heightened pleading standard with respect to the first four causes of action.  The Amended Complaint fails to allege any specific misrepresentation, nondisclosure, or concealment by any specific defendant, let alone the ResCap Defendants.  Further, the California Litigation Claimants have not identified the particular facts specific to each defendant (including the ResCap Defendants) and how that defendant's acts harmed each plaintiff.  The general allegations made by the California Litigation Claimants, without distinguishing one defendant from another or alleging specific facts about each defendant's involvement in the loan process or the alleged fraud, are insufficient to sustain the causes of action—and the claims asserted by the California Litigation Claimants against the Debtors—under Rule 9(b).

39.     Accordingly, the first through fourth counts in the Amended Complaint should be disallowed because they do not state a claim in accordance with Rule 9(b).  Fed. R. Bankr. P. 9014(c) (rendering Rule 9(b) applicable in contested matters); see also In re Nortel Networks, Inc., 469 B.R. at 479 (applying the standards of Rule 9(b) to a review of claims).

---

[12]   Claims for negligent misrepresentation must meet Rule 9(b)'s particularity requirements.  See Decker v. GlenFed, Inc. (In re GlenFed, Inc. Secs. Lit.), 42 F.3d 1541, 1547-48 (9th Cir. 1994).

## II.    THE AMENDED COMPLAINT FAILS TO PLEAD A BASIS FOR DERIVATIVE LIABILITY

### A.    The Amended Complaint Alleges No Basis for Agency or Conspiracy Liability

40.    The California Litigation Claimants' unsubstantiated attempt to paint the defendants (including the ResCap Defendants) as "co-conspirators" who, "through a common plan and scheme," "ratified" one another's conduct, or "collaborated" to entice plaintiffs into "dangerous loans," fails to plead a basis for derivative liability.  (See, e.g., Amended Complaint ¶¶ 23-25, 32-33).

41.    The bare allegations of conspiracy in the Amended Complaint and allegations that lenders were "correspondents" who were "authorized" to lend on behalf of "Defendants," are insufficient to satisfy either Rule 8(a)'s pleading standards or the more stringent requirements of Rule 9(b).  See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (dismissing claims where plaintiff failed to "provide the particulars of when, where, or how the alleged conspiracy occurred."); Twombly, 550 U.S. at 556-57 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); see, e.g., N.L.R.B. v. Semco Printing Ctr., Inc., 721 F.2d 886, 891 (2d Cir. 1983) (A "bare assertion" of authorization "hardly makes out a prima facie case of agency. . . .").

### B.    The Intracorporate Immunity Doctrine Bars the California Litigation Claimants' "Conspiracy"-Based Claims

42.    California Litigation Claimants' "conspiracy"-based claims are also barred by application of the "intracorporate immunity doctrine."  This doctrine provides "that the officers, agents and employees of a single corporate or municipal entity, each acting within the

16

scope of his or her employment, legally are incapable of conspiring together."  See Cameron v.

Church, 253 F. Supp. 2d 611, 623 (S.D.N.Y. 2003).  Because the defendants were sued as

affiliated parent/subsidiary entities and alleged "agents" of one another, see Amended Complaint

¶¶ 21, 25, the intracorporate immunity doctrine applies to plaintiffs' conspiracy-based claims.

## III.    THE PLAINTIFFS FAIL TO STATE ANY FRAUD-BASED CLAIM

### A.    California Litigation Claimants Fail to Allege Facts Giving Rise to a Duty to Disclose

43.    The first four of the California Litigation Claimants' causes of action

(fraudulent concealment, intentional misrepresentation, negligent misrepresentation, and unfair

competition) appear to be based upon the allegation that the defendants failed to disclose *to the*

*California Litigation Claimants* the facts about *the California Litigation Claimants' own* credit

worthiness and ability to repay the Loans, and about the value of their homes.  (See Amended

Complaint ¶¶ 179-185, 186-325).[13]

44.    Contrary to the California Litigation Claimants' unfounded assertions, in

California, "[t]he general rule for liability for nondisclosure is that even if material facts are

known to one party and not the other, failure to disclose those facts is not actionable fraud unless

there is some fiduciary or confidential relationship giving rise to a duty to disclose." Kovich v.

Paseo Del Mar Homeowners' Ass'n, 41 Cal. App. 4th 863, 866 (1996) (citation omitted).[14]  This

rule also applies to the lender/borrower relationship.  "Absent special circumstances a loan

---

[13]    For example, under applicable California law, a claim for fraudulent concealment must allege that:
(1) defendant concealed a material fact, (2) defendant had a duty to disclose the fact to plaintiff, (3) defendant
intentionally concealed the fact with intent to defraud plaintiff, (4) plaintiff was unaware of the fact and would
not have acted as he did if he had known the concealed fact, and (5) as a result plaintiff sustained damage.  See
Levine v. Blue Shield of Cal., 189 Cal. App. 4th 1117, 1126-27 (2010).

[14]    See also, e.g., Kimball v. Flagstar Bank F.S.B., 881 F. Supp. 2d 1209, 1217 (S.D. Cal. 2012) (mortgage lender's
failure to disclose material facts known only to defendant and not to plaintiffs during mortgage refinancing
transaction, including material disclosure notices, not actionable fraud); Poulsen v. Sterling Savs. Bank, Case
No. 12-02306 (EDL), 2012 WL 3638605, at *6 (N.D. Cal. Aug. 22, 2012);

transaction is at arm's length and there is no fiduciary relationship between the borrower and lender." Oaks Mgmt. Corp. v. Super. Ct., 145 Cal. App. 4th 453, 455 (2006) (citing numerous California cases). In this instance, the California Litigation Claims have alleged no special circumstances. Indeed, the California Litigation Claims do not contain a single factual assertion regarding the relationship between any California Litigation Claimant and any defendant. The Amended Complaint contains overly broad and general allegations of the ResCap Defendants lending money, administering loans, selling loans and raising capital, all of which are common services provided by other banks and lenders in the Defendants' industry. The assertion by the California Litigation Claimants that the ResCap Defendants *allegedly* preformed such services in a predatory manner does not create a fiduciary duty running to the California Litigation Claimants. Rather, a fiduciary duty must be established prior to such alleged conduct.

45.    Moreover, "[a] lender is under no duty 'to determine the borrower's ability to repay the loan. . . . The lender's efforts to determine the creditworthiness and ability to repay by a borrower are for the lender's protection, not the borrower's.'" Perlas v. GMAC Mortg., LLC, 187 Cal. App. 4th 429, 436 (2010) (citations omitted); see also Bonyadi v. CitiMortgage Bank, Case No. 12-5239-CAS FFMX, 2013 WL 877603, at *5 (C.D. Cal. Mar. 8, 2013) ("plaintiff cannot state a claim for fraud based upon on any failure on the part of Citi to disclose to her whether or not her loan was affordable for her. Borrowers must rely on their own judgment and risk assessment in deciding whether to accept a loan, and a lender cannot be liable in tort for failing to advise a borrower about a loan's affordability, as plaintiff contends."). Accordingly, borrowers cannot "rely upon a [lender's] knowingly [and allegedly] false determination that they *qualified* for the loans as a determination by [lender] that they could *afford* the loans." Id. at 431 (emphasis in original); see also Bonyadi, 2013 WL 877603, at *5;

Riggins v. Bank of America, N.A., Case No. 12-0033 (DOC), 2013 WL 319285, at *5 (C.D. Cal.

Jan. 24, 2013).[15]

46.    Here, the California Litigation Claimants can not seek to assert claims

against the ResCap Defendants for the California Litigation Claimants' own failure to properly

assess their financial condition and whether or not they could afford to make the payments due

under the Loans.

### B.    California Litigation Claimants Fail to Allege Scienter or Intent to Defraud

47.    The Amended Complaint also fails to allege facts indicating that the

ResCap Defendants' alleged omissions or misrepresentations were made with the intent to

defraud.  The conclusory allegations in the Amended Complaint, including the assertion that the

"[d]efendants intended to deceive [California Litigation Claimants] and induce their reliance, by

intentionally failing to disclose the above concealments," and "the misrepresentations were made

with the intention that [California Litigation Claimants] rely thereon," see Amended Complaint

¶¶ 201, 251, 271, are insufficient to state a claim and are mere conclusory statements.  See

Linear Tech. Corp. v. Applied Materials, Inc., 152 Cal. App. 4th 115, 132 (2007) ("[M]ere

conclus[ory] allegations that the omissions were intentional and for the purpose of defrauding

and deceiving plaintiffs . . . are insufficient to show fraud by concealment.") (citation omitted).[16]

---

[15]    California Litigation Claimants' claims that the banks assumed a duty by "offer[ing] an opportunity to plaintiffs
for a loan modification," (Amended Complaint ¶ 184(i)), are also misplaced.  See Settle v. World Savs. Bank,
F.S.B., Case No. 11-00800-MMM, 2012 WL 1026103, at *8 (C.D. Cal. Jan. 11, 2012) ("[n]umerous cases have
characterized a loan modification as a traditional money lending activity, warranting application of the rule
articulated in Nymark v. Heart Fed. Savs. & Loan Ass'n., 231 Cal. App. 3d 1089, 1093, n.1 (1991), that a
financial institution in general owes no duty of care to a borrower."  The argument that defendants misled
California Litigation Claimants through inflated appraisals similarly fails under its own weight.  See Nymark,
231 Cal. App. 3d at 1097 ("in preparing the appraisal, defendant was acting in its conventional role as a lender
of money to ascertain the sufficiency of the collateral as security for the loan. . . .  Thus, we must conclude that
defendant owed no duty of care to plaintiff in the preparation of the property appraisal.").

[16]    There is also no basis for the California Litigation Claimants to assert fraud based on supposed
misrepresentations to investors or the public about the quality of the loans sold to investors.  (See Amended
(Cont.'d)

C.    **California Litigation Claimants Fail to Allege Reliance or Damages**

48.    The California Litigation Claimants' allegations of reliance on the

Debtors' conduct or damages relating thereto are also insufficient as a matter of law.  Though the

California Litigation Claimants allege "harm" through a decline in property values, damage to

the California Litigation Claimants' credit reports, and reduced access to other financing options,

see Amended Complaint ¶¶ 197(d), 197(aa), 211, 264, 319, such bald statements, without

support, is insufficient to plead reliance.  See Bank of Am. Corp. v. Superior Court of Los

Angeles Cnty., 198 Cal. App. 4th 862, 872-73 (2011).  Indeed, those allegations would only be

relevant to damages.  Moreover, it is difficult to see how any reliance, even if alleged, could be

justifiable.  Agosta v. Astor, 120 Cal. App. 4th 596, 603 (2004), rehearing denied, review denied

(justifiable reliance is element of all misrepresentation claims).

49.    The main argument alleged in the California Litigation Claims alleges is

that the California Litigation Claimants were brought into the ResCap Defendants' alleged

scheme in the first instance through misrepresentations that the California Litigation Claimants

could afford to make the payments due in connection with the Loans.  However, the California

Litigation Claimants are the parties with the most intimate knowledge of their financial ability to

meet their obligations under the Loans.  Therefore, the Amended Complaint's fraud and

misrepresentation claims fail as a matter of law because there could not have been any justifiable

reliance.

50.    The California Litigation Claimants also fail to specifically plead any

damages to their financial condition on account of any actions taken by the defendants.  See

---

Complaint ¶ 177).  See, e.g., Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1043 (9th Cir.
2010) (dismissal appropriate where claimants "could not allege that they actually read or heard the alleged
misrepresentations. . . .") (citation and quotations omitted).

<u>Mirkin v. Wasserman</u>, 5 Cal. 4th 1082, 1092 (1993) ("[S]pecific pleading is necessary to 'establish a completed causal relationship' between the alleged misrepresentations and the harm claimed to have resulted therefrom.").  The California Litigation Claimants have failed to adequately allege reliance or damages.

### D.    <u>California Litigation Claimants' Origination-Based Claims are Time-Barred</u>

51.     In addition to the pleading deficiencies noted above, nearly all of the "origination-based" claims brought by the California Litigation Claimants for fraud, misrepresentation, and alleged unfair competition violations, are barred by the statute of limitations.  Moreover, the California Litigation Claimants' attempt to resuscitate their claims by invocation of the discovery rule is unavailing.  (<u>See</u> Amended Complaint ¶¶ 188, 219, 270).

52.     First, the California Litigation Claimants' claim for unfair competition is subject to a four-year statute of limitations.  Cal. Bus & Prof. Code § 17208.  The discovery rule does not apply to unfair competition actions.  <u>Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.</u>, 285 F.3d 848, 857 (9th Cir. 2002).  All but two[17] of the California Litigation Claimants obtained their loans prior to May 9, 2008, the date that is four years prior to the filing of the Initial Complaint, rendering substantially all of the unfair competition claims time-barred.

53.     Second, the California Litigation Claimants' fraud-based claims are similarly barred by the applicable three-year statute of limitations.  Cal. Code Civ. Proc. § 338(d).  Although the discovery rule applies to the three-year statute of limitations in this regard, "the plaintiff 'must affirmatively excuse his failure to discover the fraud within three years after it took place, by establishing facts showing that he was not negligent in failing to make the

---

[17]    Only Alex (Alejandra) Ibarra and Irma Laredo allegedly received loans after May 9, 2008.  They allegedly obtained loans on May 13, 2008 and July 15, 2008, respectively.  (<u>See</u> Amended Complaint, Appendix A ¶¶ 20, 40).

21

discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put

him on inquiry.'" Sun'N Sand, Inc. v. United Cal. Bank, 21 Cal. 3d 671, 701-02 (1978) (citation

omitted).[18]

54.    The California Litigation Claimants have not alleged any such facts that

would demonstrate that they were not negligent in failing to make the discovery of any such

alleged fraud.  In fact, as reflected in Appendix A attached to the Amended Complaint, the

California Litigation Claimants obtained their loans between 2003 and 2008.  (See Amended

Complaint, Appendix A ¶¶ 1-42).  Accordingly, even accepting their allegations as true, the

California Litigation Claimants would have been on notice that misrepresentations were made

soon after origination, or, at the very latest, in 2008.  Therefore, given that the Initial Complaint

was filed on May 9, 2012, the California Litigation Claimants' origination-based fraud

allegations are time-barred.

## E.    California Litigation Claimants' Fraud Claims are Preempted by the Truth in Lending Act and the Fair Credit Reporting Act

55.    The California Litigation Claimants' fraud-based claims should also be

dismissed because they are preempted by the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*

("TILA"), and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

56.    TILA preempts inconsistent state laws.  See 15 U.S.C. § 1610; Kajitani v.

Downey Savs. & Loan Ass'n, F.A., 647 F. Supp. 2d 1208, 1220 (D. Haw. 2008) ("[T]o the

extent [plaintiffs'] state law claims rest on TILA violations or concern subject matters explicitly

preempted in 12 C.F.R. § 560.2(b), those claims are clearly preempted.").

---

[18]    "The rule is that the plaintiff *must plead and prove the facts* showing: (a) Lack of knowledge.  (b) Lack of means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date).  (c) How and when [h]e did actually discover the fraud or mistake."  Parsons v. Tickner, 31 Cal. App. 4th 1513, 1525 (1995) (emphasis in original).

57.    Similarly, the FCRA "preempts all state law requirements relating to the furnishing of accurate information to credit reporting agencies."  See, e.g., Montgomery v. PNC Bank, N.A., Case No. 12-2453, 2012 WL 3670650, at *5 (N.D. Cal. Aug. 24, 2012).  Thus, the FCRA preempts the California Litigation Claims based on allegedly inaccurate information furnished to credit reporting agencies, to the extent that such claims are based on allegations of (i) reduced credit scores; (ii) unavailability of credit; (iii) increased cost of credit; (iv) reduced availability of goods and services tied to credit ratings; and (v) increased costs of those services." See id.

58.    Thus, the California Litigation Claimants' first through fourth claims fail to state a claim against the Debtors and should be dismissed.

## IV.    THE AMENDED COMPLAINT'S ALLEGATIONS OF WRONGFUL FORECLOSURE ARE INSUFFICIENT TO STATE A CLAIM

59.    The California Litigation Claimants make several factual allegations regarding the foreclosure on certain of the California Litigation Claimants' properties that fail to establish any liability for wrongful foreclosure.  (See, e.g., Amended Complaint ¶ 336).  The allegations that the defendants "acted outrageously" and "persistently with actual malice" in conducting foreclosures are irrelevant and conclusory, devoid of any underlying facts that would support those conclusions.

60.    The California Litigation Claimants argue that the defendants had no power to foreclose on the Loans because the defendants were not the holders of the notes.  (See Amended Complaint ¶ 329).  This allegation is incorrect as a matter of law and should be rejected.  See Gomes v. Countrywide Home Loans, Inc., 192 Cal. App. 4th 1149, 1156 (2011), cert. denied, 132 S. Ct. 419 (2011) ("nowhere does the [nonjudicial foreclosure] statute provide for a judicial action to determine whether the person initiating the foreclosure process is indeed

23

authorized, and we see no ground for implying such an action.").[19]  Further, "California's

statutory nonjudicial foreclosure scheme (§§ 2924–2924k) does not require that the foreclosing

party have a beneficial interest in or physical possession of the note."  Shuster v. BAC Home

Loans Servicing, LP, 211 Cal. App. 4th 505, 511 (2012); accord Jenkins v. JPMorgan Chase

Bank, N.A., 216 Cal. App. 4th 497 (2013); Debrunner, 204 Cal. App. 4th at 440 (2012) ("We . . .

see nothing in the applicable statutes that precludes foreclosure when the foreclosing party does

not possess the original promissory note.").

       61.    Further, the California Litigation Claimants also based their arguments

relating to improper foreclosure on the unsupported factual allegations that the notes were

improperly assigned.  "The assignment of the debt (the promissory note), as opposed to the

security (the [deed of trust]), commonly is not recorded, [so] the lender could have assigned the

note to the beneficiary in an unrecorded document not disclosed to plaintiffs."  Herrera v. Fed.

Nat'l Mortg. Ass'n, 141 Cal. Rptr. 3d 326, 334 (2012); accord Calvo v. HSBC Bank USA, N.A.,

199 Cal. App. 4th 118 (2011) (assignment of deed of trust need not be recorded in order to

foreclose); see also Cal. Civ. Code § 2936 ("The assignment of a debt secured by mortgage

carries with it the security."); see, e.g., Cockerell v. Title Ins. Co., 42 Cal. 2d 284, 289 (1954).

Applying the foregoing legal standard here, the defendants therefore need not record an

assignment of any such deed of trust or related document.  Moreover, the Amended Complaint is

devoid of any factual allegations suggesting that the note was not properly assigned.[20]

---

[19]    The California Litigation Claimants' references to Article 3 of the Uniform Commercial Code, see Amended
Complaint ¶¶ 331-32, 334, is likewise unavailing and has been rejected by courts.  See Debrunner v. Deutsche
Bank Nat'l. Trust Co., 204 Cal. App. 4th 433, 440-41 (2012) ("Plaintiff's reliance on the Commercial Code
provisions pertaining to negotiable instruments is misplaced.  'The comprehensive statutory framework
established [in sections 2924 to 2924k] to govern nonjudicial foreclosure sales is intended to be exhaustive.'")
(citation omitted).

[20]    The California Litigation Claimants' allegations that MERS's status as beneficiary somehow taints the process
is unfounded.  (See Amended Complaint ¶¶ 129, 152, 303).  Civil Code section 2924(a)(1) provides that "[t]he
(Cont.'d)

### A.    California Litigation Claimants Fail to State a Claim For Violation of Civil Code § 2924 *et seq.*

62.     The California Litigation Claimants' wrongful foreclosure claims fail to allege (i) prejudice and (ii) tender.  With respect to prejudice, "[a] nonjudicial foreclosure sale is presumed to have been conducted regularly and fairly; one attacking the sale must overcome this common law presumption 'by pleading and proving an improper procedure and the resulting prejudice.'"  Knapp v. Doherty, 123 Cal. App. 4th 76, 86, n4 (2004) (citation omitted).  Accordingly, a borrower cannot set aside a foreclosure sale unless the defect was prejudicial.  See, e.g., Herrera, 205 Cal. App. 4th at 335-36; Debrunner, 204 Cal. App. 4th at 443.

63.     The Amended Complaint fails to include any statements that the California Litigation Claimants did not default on their loans.  Therefore, the California Litigation Claimants have not been and cannot point to any prejudice.  Moreover, as the California Litigation Claimants assert in the Amended Complaint, the Loans were undersecured at the time of the foreclosures and, therefore, the California Litigation Claimants could not have been prejudiced by losing their respective property because such properties did not have any equity that would have otherwise been available to the California Litigation Claimants.

64.     Second, "[a] valid and viable tender of payment of the indebtedness owing is essential to an action to cancel a voidable sale under a deed of trust."  Karlsen v. Am. Savs. &

---

trustee, mortgagee, or beneficiary, or any of their authorized agents" may commence nonjudicial foreclosure. Cal. Civ. Code § 2924(a)(1).  Under this grant of authority, MERS is authorized to commence foreclosure proceedings on behalf of the lender, as held by numerous courts.  Elliott v. Mortg. Elec. Registration Sys. Inc., 2013 WL 1820904, at *3 (N.D. Cal. Apr. 30, 2013) ("MERS, as the nominee of the beneficiary, has the authority to foreclose and the authority to assign its beneficial interest to a third party."); Hensley v. Bank of New York Mellon, Case No. 1:10-CV-1316 AWI SMS, 2011 WL 2118810, at *3 (E.D. Cal. May 27, 2011) ("This contractual language [naming MERS the beneficiary in the deed of trust] is consistent with numerous cases in which courts have held that where MERS acts as a beneficiary under a deed of trust, it has the right to assign its interest."); Herrera, 205 Cal. App. 4th at 1498 ("The courts in California have universally held that MERS, as nominee beneficiary, has the power to assign its interest under a deed of trust.  California Litigation Claimants granted MERS such authority by signing the deed of trust.").

ny-1092850

Loan Ass'n, 15 Cal. App. 3d 112, 117 (1971).  A party is "required to allege tender of the

amount of [the] secured indebtedness in order to maintain any cause of action for irregularity in

the sale procedure."  Abdallah v. United Savs. Bank, 43 Cal. App. 4th 1101, 1109 (1996).

California Litigation Claimants provide no facts indicating that any single individual tendered

the amounts of their defaults.  Therefore, the California Litigation Claimants fail to establish any

basis for a claim against the ResCap Defendants on account of any actions or inactions taken by

the Debtors in connection with the loans at issue.

## V.    THE AMENDED COMPLAINT'S ALLEGATION OF IMPROPER INFLUENCE OVER AN APPRAISER IS INSUFFICIENT TO ESTABLISH A CLAIM

65.    The California Litigation Claimants' claims for alleged "improper

influence over appraisal [violation of Cal. Civ Code § 1090.5] likewise falls flat.  (See Amended

Complaint ¶¶ 339-48).  First, there is no private right of action to enforce Cal. Civ. Code §

1090.5.  "[W]hen regulatory statutes provide a comprehensive scheme for enforcement by an

administrative agency, the courts ordinarily conclude that the Legislature intended the

administrative remedy to be exclusive unless the statutory language or legislative history clearly

indicates an intent to create a private right of action.  Peterson v. Cellco P'ship, 164 Cal. App.

4th 1583, 1295 (2008) (citation and quotation omitted).  Nothing in Cal. Civ Code § 1090.5

indicates an intent to create a private right and the statutory scheme focuses on the individuals it

regulates, real estate appraisers, and not on borrowers impacted by appraisals.

66.    Moreover, the California Litigation Claimants' claims for "wrongful

appraisal", which arose between 2003 and 2008, are also barred by the four-year statute of

limitations set forth in Cal. Code Civ. Proc. § 343.

67.     The claims for "wrongful appraisal" do not give rise to any liability on the part of the ResCap Defendants and the portion of the California Litigation Claims relating thereto should be disallowed in their entirety.

## VI.     RESERVATION OF RIGHTS

68.     The Debtors further reserve all rights to object to one or more of the California Litigation Claims on the ground that Purported Counsel lacked standing and/or authority to assert such claims on behalf of the California Litigation Claimants.  An agent filing a proof of claim on behalf of a creditor must "have express-and not merely implied-authority to do so."  In re North Bay Gen. Hosp., Inc., 404 B.R. 443, 459 (Bankr. S.D. Tex. 2009).  Indeed, "[t]he proof of claim form itself requires evidence of authority."  9 COLLIER ON BANKRUPTCY ¶ 3001.06 (16th ed. Rev. 2012); but see In re Jensen, Case No. 09-14830 (MG), 2010 WL 424690 (Bankr. S.D.N.Y. Feb. 3, 2010).  Accordingly, in at least one case involving facts similar to those present here–where one law firm asserted identical or nearly identical claims on behalf of seventy-one claimants without evidence of the law firm's authority to do so, the court authorized discovery regarding the law firm's authority to execute the proofs of claim.  See Order Granting Relief and Directing Certain Discovery with Respect to Speights & Runyan, In re W.R. Grace & Co., Case No. 01-01139 (JFK) (Bankr. D. Del. Sept. 23, 2005) [Docket No. 9501]; see also In re W.R. Grace & Co., 366 B.R. 302, 304 (Bankr. D. Del. 2007).  In addition to reserving their rights to object generally on all other grounds, the Debtors reserve their right to seek discovery regarding the basis of Purported Counsel's authority to file claims on behalf of the California Litigation Claimants and, if warranted, object based on the law firm's lack of appropriate authority.

ny-1092850

**NOTICE**

69.     The Debtors have provided notice of this Motion in accordance with the

Case Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141].

**CONCLUSION**

WHEREFORE, the Debtors respectfully request entry of the Proposed Order

granting the relief requested herein and such other and further relief as the Court may deem

proper.

Dated: July 10, 2013

_/s/ Norman S. Rosenbaum_____

Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the Debtors and
Debtors in Possession*

-and-

Regina J. McClendon
LOCKE LORD LLP
44 Montgomery Street, Suite 2400
San Francisco, California 94104
Telephone:    (415) 318-8810
Facsimile:    (415) 676-5816

*Special Litigation Counsel for the Debtors and
Debtors in Possession*

28

## Schedule A

## Schedule A-1

### Claims Asserted Against Executive Trustee Services, LLC

| Claim No. | Claimant Name | Claim No. | Claimant Name |
|---|---|---|---|
| 3432 | Alex Ibarra | 3188 | Martin Kassowitz |
| 3473 | Brenda Mella | 3179 | Mary Serrano |
| 3422 | Brian Foote | 3167 | Mesbel Mohamoud |
| 3524 | Carolyn Hairston | 3153 | Michael Brown |
| 3122 | Cecilia Chaube | 3143 | Michael Man |
| 2982 | Christina Palbicke | 3125 | Michael Moultrie |
| 3416 | Christine Petersen | 3113 | Olan Ross |
| 3402 | Claudinette Brown | 3100 | Patrick Gaston |
| 3255 | David Cruz | 3092 | Phyllis McCrea |
| 3062 | Deborah Albritton | 3081 | Regina Faison |
| 3002 | Evelyn Ross | 3075 | Rick Albritton |
| 3015 | Florastene Holden | 3061 | Rick Ewald |
| 2911 | Franco Soro | 3046 | Robin Gaston |
| 3395 | Gary Johnson | 3039 | Rodelina Santos |
| 3201 | Genevie Cabang | 3028 | Rosa Rodriguez |
| 3386 | Gloria Portillo | 3007 | Salvador Barajas |
| 3378 | Gregory Buck | 2981 | Sarah Sebagh |
| 3369 | Gricelda Ruano | 2994 | Shirley Kaplan |
| 3360 | Henry Completo | 2969 | Terrell Sullivan |
| 3353 | Ignacio Rodriguez | 2955 | Veronica Grey |
| 3343 | Irma Laredo | 2946 | Victor Pazos |
| 3159 | Joellyn Johnson | 2939 | William Mimiaga |
| 3330 | Joselito Mella | 2930 | Willie Gilmore |
| 3321 | Judy Lim | 2922 | Yesenia Cruz |
| 3315 | Julio Del Cid | | |
| 2899 | Julio Gonzalez | | |
| 3304 | Jun O. Santos | | |
| 3294 | Khalil Subat | | |
| 3247 | Lisa Simonyi | | |
| 3286 | Lois Elisa Jordan | | |
| 3276 | Magdalena Avila | | |
| 3269 | Manija Subat | | |
| 3241 | Manuela Badilla | | |
| 3223 | Marcia Willoughby | | |
| 3216 | Marco Badilla | | |
| 3206 | Maria Barajas | | |
| 3194 | Maria Elena Del Cid | | |

**Schedule A-2**

**Claims Asserted Against GMAC Mortgage, LLC**

| Claim No. | Claimant Name | Claim No. | Claimant Name |
|---|---|---|---|
| 3435 | Alex Ibarra | 3185 | Martin Kassowitz |
| 3470 | Brenda Mella | 3174 | Mary Serrano |
| 3425 | Brian Foote | 3163 | Mesbel Mohamoud |
| 3118 | Cecilia Chaube | 3157 | Michael Brown |
| 2991 | Christina Palbicke | 3141 | Michael Man |
| 3413 | Christine Petersen | 3130 | Michael Moultrie |
| 3403 | Claudinette Brown | 3116 | Olan Ross |
| 3257 | David Cruz | 3107 | Patrick Gaston |
| 3078 | Deborah Albritton | 3090 | Phyllis McCrea |
| 3006 | Evelyn Ross | 3080 | Regina Faison |
| 3020 | Florastene Holden | 3069 | Rick Albritton |
| 2907 | Franco Soro | 3058 | Rick Ewald |
| 3397 | Gary Johnson | 3048 | Robin Gaston |
| 3230 | Genevie Cabang | 3037 | Rodelina Santos |
| 3388 | Gloria Portillo | 3030 | Rosa Rodriguez |
| 3376 | Gregory Buck | 3010 | Salvador Barajas |
| 3371 | Gricelda Ruano | 2979 | Sarah Sebagh |
| 3362 | Henry Completo | 3000 | Shirley Kaplan |
| 3351 | Ignacio Rodriguez | 2968 | Terrell Sullivan |
| 3341 | Irma Laredo | 2957 | Veronica Grey |
| 3169 | Joellyn Johnson | 2948 | Victor Pazos |
| 3327 | Joselito Mella | 2941 | William Mimiaga |
| 3325 | Judy Lim | 2932 | Willie Gilmore |
| 3313 | Julio Del Cid | 2921 | Yesenia Cruz |
| 2901 | Julio Gonzalez | | |
| 2902 | Julio Gonzalez | | |
| 3302 | Jun O. Santos | | |
| 3296 | Khalil Subat | | |
| 3245 | Lisa Simonyi | | |
| 3284 | Lois Elisa Jordan | | |
| 3274 | Magdalena Avila | | |
| 3267 | Manija Subat | | |
| 3252 | Manuela Badilla | | |
| 3225 | Marcia Willoughby | | |
| 3214 | Marco Badilla | | |
| 3205 | Maria Barajas | | |
| 3196 | Maria Elena Del Cid | | |

**Schedule A-3**

**Claims Asserted Against GMAC-RFC Holding Company, LLC**

| Claim No. | Claimant Name | Claim No. | Claimant Name |
|---|---|---|---|
| 3430 | Alex Ibarra | 3190 | Martin Kassowitz |
| 3476 | Brenda Mella | 3181 | Mary Serrano |
| 3420 | Brian Foote | 3170 | Mesbel Mohamoud |
| 3533 | Carolyn Hairston | 3154 | Michael Brown |
| 3108 | Cecilia Chaube | 3147 | Michael Man |
| 2989 | Christina Palbicke | 3123 | Michael Moultrie |
| 3418 | Christine Petersen | 3110 | Olan Ross |
| 3409 | Claudinette Brown | 3097 | Patrick Gaston |
| 3262 | David Cruz | 3094 | Phyllis McCrea |
| 3053 | Deborah Albritton | 3085 | Regina Faison |
| 2997 | Evelyn Ross | 3066 | Rick Albritton |
| 3011 | Florastene Holden | 3064 | Rick Ewald |
| 2908 | Franco Soro | 3044 | Robin Gaston |
| 3393 | Gary Johnson | 3042 | Rodelina Santos |
| 3234 | Genevie Cabang | 3022 | Rosa Rodriguez |
| 3383 | Gloria Portillo | 3003 | Salvador Barajas |
| 3381 | Gregory Buck | 2980 | Sarah Sebagh |
| 3366 | Gricelda Ruano | 2986 | Shirley Kaplan |
| 3357 | Henry Completo | 2965 | Terrell Sullivan |
| 3347 | Ignacio Rodriguez | 2953 | Veronica Grey |
| 3345 | Irma Laredo | 2952 | Victor Pazos |
| 3135 | Joellyn Johnson | 2936 | William Mimiaga |
| 3335 | Joselito Mella | 2928 | Willie Gilmore |
| 3319 | Judy Lim | 2919 | Yesenia Cruz |
| 3317 | Julio Del Cid | | |
| 2897 | Julio Gonzalez | | |
| 3307 | Jun O. Santos | | |
| 3291 | Khalil Subat | | |
| 3249 | Lisa Simonyi | | |
| 3289 | Lois Elisa Jordan | | |
| 3278 | Magdalena Avila | | |
| 3272 | Manija Subat | | |
| 3238 | Manuela Badilla | | |
| 3229 | Marcia Willoughby | | |
| 3219 | Marco Badilla | | |
| 3204 | Maria Barajas | | |
| 3198 | Maria Elena Del Cid | | |

## Schedule A-4

**Claims Asserted Against Home Connects Lending Services, LLC**

| Claim No. | Claimant Name | Claim No. | Claimant Name |
|-----------|---------------|-----------|---------------|
| 3437 | Alex Ibarra | 3184 | Martin Kassowitz |
| 3467 | Brenda Mella | 3177 | Mary Serrano |
| 3427 | Brian Foote | 3160 | Mesbel Mohamoud |
| 3521 | Carolyn Hairston | 3150 | Michael Brown |
| 3112 | Cecilia Chaube | 3139 | Michael Man |
| 2987 | Christina Palbicke | 3131 | Michael Moultrie |
| 3411 | Christine Petersen | 3119 | Olan Ross |
| 3406 | Claudinette Brown | 3105 | Patrick Gaston |
| 3263 | David Cruz | 3088 | Phyllis McCrea |
| 3086 | Deborah Albritton | 3079 | Regina Faison |
| 3009 | Evelyn Ross | 3071 | Rick Albritton |
| 3023 | Florastene Holden | 3055 | Rick Ewald |
| 2913 | Franco Soro | 3051 | Robin Gaston |
| 3399 | Gary Johnson | 3035 | Rodelina Santos |
| 3231 | Genevie Cabang | 3032 | Rosa Rodriguez |
| 3390 | Gloria Portillo | 3016 | Salvador Barajas |
| 3374 | Gregory Buck | 2977 | Sarah Sebagh |
| 3373 | Gricelda Ruano | 2993 | Shirley Kaplan |
| 3364 | Henry Completo | 2963 | Terrell Sullivan |
| 3349 | Ignacio Rodriguez | 2959 | Veronica Grey |
| 3338 | Irma Laredo | 2950 | Victor Pazos |
| 3172 | Joellyn Johnson | 2943 | William Mimiaga |
| 3333 | Joselito Mella | 2934 | Willie Gilmore |
| 3324 | Judy Lim | 2915 | Yesenia Cruz |
| 3312 | Julio Del Cid | | |
| 2904 | Julio Gonzalez | | |
| 3300 | Jun O. Santos | | |
| 3298 | Khalil Subat | | |
| 3243 | Lisa Simonyi | | |
| 3282 | Lois Elisa Jordan | | |
| 3280 | Magdalena Avila | | |
| 3266 | Manija Subat | | |
| 3261 | Manuela Badilla | | |
| 3228 | Marcia Willoughby | | |
| 3212 | Marco Badilla | | |
| 3209 | Maria Barajas | | |
| 3199 | Maria Elena Del Cid | | |

## Schedule A-5

**Claims Asserted Against Homecomings Financial, LLC**

| Claim No. | Claimant Name | Claim No. | Claimant Name |
|-----------|---------------|-----------|---------------|
| 3431 | Alex Ibarra | 3187 | Martin Kassowitz |
| 4159 | Brenda Mella | 3180 | Mary Serrano |
| 3421 | Brian Foote | 3168 | Mesbel Mohamoud |
| 3517 | Carolyn Hairston | 3151 | Michael Brown |
| 3124 | Cecilia Chaube | 3145 | Michael Man |
| 2978 | Christina Palbicke | 3126 | Michael Moultrie |
| 3417 | Christine Petersen | 3111 | Olan Ross |
| 3404 | Claudinette Brown | 3098 | Patrick Gaston |
| 3254 | David Cruz | 3093 | Phyllis McCrea |
| 3059 | Deborah Albritton | 3083 | Regina Faison |
| 3001 | Evelyn Ross | 3067 | Rick Albritton |
| 3013 | Florastene Holden | 3063 | Rick Ewald |
| 2906 | Franco Soro | 3045 | Robin Gaston |
| 3394 | Gary Johnson | 3040 | Rodelina Santos |
| 3236 | Genevie Cabang | 3026 | Rosa Rodriguez |
| 3385 | Gloria Portillo | 3005 | Salvador Barajas |
| 3379 | Gregory Buck | 2973 | Sarah Sebagh |
| 3368 | Gricelda Ruano | 2992 | Shirley Kaplan |
| 3359 | Henry Completo | 2967 | Terrell Sullivan |
| 3354 | Ignacio Rodriguez | 2954 | Veronica Grey |
| 3344 | Irma Laredo | 2945 | Victor Pazos |
| 3161 | Joellyn Johnson | 2938 | William Mimiaga |
| 3336 | Joselito Mella | 2929 | Willie Gilmore |
| 3320 | Judy Lim | 2923 | Yesenia Cruz |
| 3316 | Julio Del Cid | | |
| 2898 | Julio Gonzalez | | |
| 3305 | Jun O. Santos | | |
| 3293 | Khalil Subat | | |
| 3248 | Lisa Simonyi | | |
| 3287 | Lois Elisa Jordan | | |
| 3277 | Magdalena Avila | | |
| 3270 | Manija Subat | | |
| 3240 | Manuela Badilla | | |
| 3222 | Marcia Willoughby | | |
| 3217 | Marco Badilla | | |
| 3207 | Maria Barajas | | |
| 3193 | Maria Elena Del Cid | | |

## Schedule A-6

**Claims Asserted Against Residential Capital, LLC**

| Claim No. | Claimant Name | Claim No. | Claimant Name |
|-----------|---------------|-----------|---------------|
| 3434 | Alex Ibarra | 3186 | Martin Kassowitz |
| 3472 | Brenda Mella | 3176 | Mary Serrano |
| 3423 | Brian Foote | 3164 | Mesbel Mohamoud |
| 3525 | Carolyn Hairston | 3152 | Michael Brown |
| 3120 | Cecilia Chaube | 3142 | Michael Man |
| 2984 | Christina Palbicke | 3129 | Michael Moultrie |
| 3414 | Christine Petersen | 3115 | Olan Ross |
| 3405 | Claudinette Brown | 3101 | Patrick Gaston |
| 3256 | David Cruz | 3091 | Phyllis McCrea |
| 3073 | Deborah Albritton | 3076 | Regina Faison |
| 3004 | Evelyn Ross | 3068 | Rick Albritton |
| 3018 | Florastene Holden | 3060 | Rick Ewald |
| 2910 | Franco Soro | 3047 | Robin Gaston |
| 3396 | Gary Johnson | 3038 | Rodelina Santos |
| 3202 | Genevie Cabang | 3029 | Rosa Rodriguez |
| 3387 | Gloria Portillo | 3019 | Salvador Barajas |
| 3377 | Gregory Buck | 2975 | Sarah Sebagh |
| 3370 | Gricelda Ruano | 2996 | Shirley Kaplan |
| 3361 | Henry Completo | 2970 | Terrell Sullivan |
| 3352 | Ignacio Rodriguez | 2956 | Veronica Grey |
| 3342 | Irma Laredo | 2947 | Victor Pazos |
| 3166 | Joellyn Johnson | 2940 | William Mimiaga |
| 3328 | Joselito Mella | 2931 | Willie Gilmore |
| 3326 | Judy Lim | 2924 | Yesenia Cruz |
| 3314 | Julio Del Cid | | |
| 2900 | Julio Gonzalez | | |
| 3303 | Jun O. Santos | | |
| 3295 | Khalil Subat | | |
| 3246 | Lisa Simonyi | | |
| 3285 | Lois Elisa Jordan | | |
| 3275 | Magdalena Avila | | |
| 3268 | Manija Subat | | |
| 3251 | Manuela Badilla | | |
| 3224 | Marcia Willoughby | | |
| 3215 | Marco Badilla | | |
| 3208 | Maria Barajas | | |
| 3195 | Maria Elena Del Cid | | |

## Schedule A-7

### Claims Asserted Against Residential Funding Company, LLC

| Claim No. | Claimant Name | Claim No. | Claimant Name |
|---|---|---|---|
| 3429 | Alex Ibarra | 3189 | Martin Kassowitz |
| 3478 | Brenda Mella | 3182 | Mary Serrano |
| 3424 | Brian Foote | 3171 | Mesbel Mohamoud |
| 3523 | Carolyn Hairston | 3155 | Michael Brown |
| 3128 | Cecilia Chaube | 3146 | Michael Man |
| 2976 | Christina Palbicke | 3136 | Michael Moultrie |
| 3419 | Christine Petersen | 3109 | Olan Ross |
| 3401 | Claudinette Brown | 3102 | Patrick Gaston |
| 3260 | David Cruz | 3096 | Phyllis McCrea |
| 3056 | Deborah Albritton | 3084 | Regina Faison |
| 2999 | Evelyn Ross | 3074 | Rick Albritton |
| 3027 | Florastene Holden | 3065 | Rick Ewald |
| 2909 | Franco Soro | 3043 | Robin Gaston |
| 3392 | Gary Johnson | 3041 | Rodelina Santos |
| 3233 | Genevie Cabang | 3024 | Rosa Rodriguez |
| 3384 | Gloria Portillo | 3012 | Salvador Barajas |
| 3380 | Gregory Buck | 2972 | Sarah Sebagh |
| 3367 | Gricelda Ruano | 2990 | Shirley Kaplan |
| 3358 | Henry Completo | 2966 | Terrell Sullivan |
| 3355 | Ignacio Rodriguez | 2961 | Veronica Grey |
| 3346 | Irma Laredo | 2944 | Victor Pazos |
| 3137 | Joellyn Johnson | 2937 | William Mimiaga |
| 3332 | Joselito Mella | 2925 | Willie Gilmore |
| 3318 | Judy Lim | 2918 | Yesenia Cruz |
| 3309 | Julio Del Cid | | |
| 2896 | Julio Gonzalez | | |
| 3306 | Jun O. Santos | | |
| 3292 | Khalil Subat | | |
| 3250 | Lisa Simonyi | | |
| 3288 | Lois Elisa Jordan | | |
| 3273 | Magdalena Avila | | |
| 3271 | Manija Subat | | |
| 3239 | Manuela Badilla | | |
| 3221 | Marcia Willoughby | | |
| 3218 | Marco Badilla | | |
| 3203 | Maria Barajas | | |
| 3192 | Maria Elena Del Cid | | |

## Schedule A-8

**Claims Asserted Against Residential Funding Real Estate Holdings, LLC**

| Claim No. | Claimant Name | Claim No. | Claimant Name |
|-----------|---------------|-----------|---------------|
| 3438 | Alex Ibarra | 3191 | Martin Kassowitz |
| 3477 | Brenda Mella | 3173 | Mary Serrano |
| 3428 | Brian Foote | 3158 | Mesbel Mohamoud |
| 3520 | Carolyn Hairston | 3148 | Michael Brown |
| 3104 | Cecilia Chaube | 3138 | Michael Man |
| 2974 | Christina Palbicke | 3134 | Michael Moultrie |
| 3410 | Christine Petersen | 3121 | Olan Ross |
| 3408 | Claudinette Brown | 3103 | Patrick Gaston |
| 3253 | David Cruz | 3095 | Phyllis McCrea |
| 3050 | Deborah Albritton | 3087 | Regina Faison |
| 2995 | Evelyn Ross | 3072 | Rick Albritton |
| 3025 | Florastene Holden | 3054 | Rick Ewald |
| 2905 | Franco Soro | 3052 | Robin Gaston |
| 3400 | Gary Johnson | 3034 | Rodelina Santos |
| 3235 | Genevie Cabang | 3033 | Rosa Rodriguez |
| 3391 | Gloria Portillo | 3014 | Salvador Barajas |
| 3382 | Gregory Buck | 2971 | Sarah Sebagh |
| 3365 | Gricelda Ruano | 2988 | Shirley Kaplan |
| 3356 | Henry Completo | 2962 | Terrell Sullivan |
| 3348 | Ignacio Rodriguez | 2960 | Veronica Grey |
| 3337 | Irma Laredo | 2951 | Victor Pazos |
| 3132 | Joellyn Johnson | 2935 | William Mimiaga |
| 3331 | Joselito Mella | 2926 | Willie Gilmore |
| 3322 | Judy Lim | 2916 | Yesenia Cruz |
| 3311 | Julio Del Cid | | |
| 2895 | Julio Gonzalez | | |
| 3308 | Jun O. Santos | | |
| 3299 | Khalil Subat | | |
| 3242 | Lisa Simonyi | | |
| 3290 | Lois Elisa Jordan | | |
| 3279 | Magdalena Avila | | |
| 3264 | Manija Subat | | |
| 3237 | Manuela Badilla | | |
| 3226 | Marcia Willoughby | | |
| 3220 | Marco Badilla | | |
| 3211 | Maria Barajas | | |
| 3200 | Maria Elena Del Cid | | |

## **Schedule A-9**

### **Claims Asserted Against Residential Mortgage Real Estate Holdings, LLC**

| Claim No. | Claimant Name | Claim No. | Claimant Name |
|---|---|---|---|
| 3436 | Alex Ibarra | 3183 | Martin Kassowitz |
| 3469 | Brenda Mella | 3178 | Mary Serrano |
| 3426 | Brian Foote | 3162 | Mesbel Mohamoud |
| 3529 | Carolyn Hairston | 3149 | Michael Brown |
| 3114 | Cecilia Chaube | 3140 | Michael Man |
| 2985 | Christina Palbicke | 3133 | Michael Moultrie |
| 3412 | Christine Petersen | 3117 | Olan Ross |
| 3407 | Claudinette Brown | 3106 | Patrick Gaston |
| 3258 | David Cruz | 3089 | Phyllis McCrea |
| 3082 | Deborah Albritton | 3077 | Regina Faison |
| 3008 | Evelyn Ross | 3070 | Rick Albritton |
| 3021 | Florastene Holden | 3057 | Rick Ewald |
| 2912 | Franco Soro | 3049 | Robin Gaston |
| 3398 | Gary Johnson | 3036 | Rodelina Santos |
| 3232 | Genevie Cabang | 3031 | Rosa Rodriguez |
| 3389 | Gloria Portillo | 3017 | Salvador Barajas |
| 3375 | Gregory Buck | 2983 | Sarah Sebagh |
| 3372 | Gricelda Ruano | 2998 | Shirley Kaplan |
| 3363 | Henry Completo | 2964 | Terrell Sullivan |
| 3350 | Ignacio Rodriguez | 2958 | Veronica Grey |
| 3339 | Irma Laredo | 2949 | Victor Pazos |
| 3175 | Joellyn Johnson | 2942 | William Mimiaga |
| 3334 | Joselito Mella | 2933 | Willie Gilmore |
| 3323 | Judy Lim | 2920 | Yesenia Cruz |
| 3310 | Julio Del Cid | | |
| 2903 | Julio Gonzalez | | |
| 3301 | Jun O. Santos | | |
| 3297 | Khalil Subat | | |
| 3244 | Lisa Simonyi | | |
| 3283 | Lois Elisa Jordan | | |
| 3281 | Magdalena Avila | | |
| 3265 | Manija Subat | | |
| 3259 | Manuela Badilla | | |
| 3227 | Marcia Willoughby | | |
| 3213 | Marco Badilla | | |
| 3210 | Maria Barajas | | |
| 3197 | Maria Elena Del Cid | | |

**EXHIBIT 1**

ny-1092850

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---------------------------------------------------------------

**ORDER GRANTING THE DEBTORS' OBJECTION TO PROOFS OF**
**CLAIM FILED BY CERTAIN PLAINTIFFS IN CALIFORNIA LITIGATION**

Upon the objection to the claims of the California Litigation Claimants (the

"Objection")[1] filed by Residential Capital, LLC and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtor-in-possession, seeking entry of an order, pursuant to

section 502(b) of the Bankruptcy Code and Rule 3007(d) of the Bankruptcy Rules, disallowing

and expunging the California Litigation Claims on the grounds that they fail to state a claim

against the Debtors, all as more fully described in the Objection; and due and proper notice of the

Objection having been provided; and it appearing that no other or further notice need be

provided; and the Court having reviewed the Objection, and having found and determined that

the relief sought in the Objection is in the best interests of the Debtors, their estates, creditors,

and all parties in interest and that the legal and factual bases set forth in the Objection establish

just cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefore,

**IT IS HEREBY ORDERED THAT**:

1. The Objection is **SUSTAINED** and the relief requested in the Objection is

granted to the extent provided therein.

---

[1]  Capitalized terms not otherwise defined herein have the meanings given to them in the Objection.

2.      Pursuant to section 502(b) of the Bankruptcy Code, the California Litigation Claims are hereby disallowed with prejudice and expunged in their entirety with prejudice from the Debtors' Claims Register.

3.      If the relief requested in the Objection is not granted herein as to any particular claim included in the California Litigation Claims, the Debtors may object to such claim in the future on any basis other than the bases set forth in the Objection.

4.      The disallowance and expungement of the California Litigation Claims does not constitute any admission or finding with respect to any other claims, and the Debtors' right to object to any other claims on any basis is hereby preserved.

5.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Objection.

6.      The terms and conditions of this Order shall be immediately effective and enforceable upon entry of the Order.

7.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: August __, 2013
         New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 2**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV12-5016 JAK (AGRx) | Date | September 24, 2012 |
|---|---|---|---|
| Title | Carolyn Hairston, et al. v. Ally Bank, N.A., et al. | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Alex Joko |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Sasan Behnood | Rebecca Saelao |

**Proceedings:** **MOTION TO DISMISS FILED BY ALLY BANK, ALLY FINANCIAL INC., AND GMAC MORTGAGE GROUP LLC (Dkt. 9)**

The motion hearing is held with respect to Defendants' Motion to Dismiss each of the eight causes of action set forth in the Complaint. The Court states its detailed, tentative views on the record. The Court is inclined to grant the motion to dismiss, without prejudice, as to each of the following causes of action: (i) Fraudulent Concealment (First); (ii) Intentional Misrepresentation (Second); (iii) Negligent Misrepresentation (Third); (iv) Cal. Bus. & Prof. Code § 17200 (Fourth); (v) Wrongful Foreclosure (Fifth); and (vi) Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA") (Sixth). The Court is inclined to grant the motion to dismiss, with prejudice, as to the following claims: (i) Violation of Appraisal Independence in violation of Dodd-Frank, 12 U.S.C. § 1640 et seq. (Seventh); and (ii) Violation of Appraiser Independence in violation of 12 C.F.R. § 225.65 and 12 C.F.R. § 323.5 (Eighth).

The Court's general view is that the complaint suffers from an overall lack of clarity and specificity. Thus, despite its great length, it fails to present a clear and meaningful statement of each claim by each Plaintiff against each Defendant. It, therefore, fails to meet the standards of Rule 8. In any amended complaint, Plaintiffs must correct this overarching problem by properly addressing, with sufficient particularity and clarity, the claims that each individual Plaintiff is advancing against each individual Defendant.

Turning to the challenge to each of the eight causes of action, the first cause of action should be dismissed with leave to amend. A cause of action for fraudulent concealment must contain five elements: "(1) the defendant must have concealed or suppressed a material fact, (2) *the defendant must have been under a duty to disclose the fact to the plaintiff,* (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Levine v. Blue Shield of California*, 189 Cal. App. 4th 1117, 1126-27 (2010) (internal quotations omitted, italics in original).

"[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV12-5016 JAK (AGRx) | Date | September 24, 2012 |
|---|---|---|---|
| Title | Carolyn Hairston, et al. v. Ally Bank, N.A., et al. | | |

of money." *Nymark v. Heart Fed. Savings & Loan Ass'n*, 231 Cal. App. 3d 1089, 1096 (1991); s*ee also Resolution Trust Corp. v. BVS Dev, Inc.*, 42 F.3d 1206, 1214 (9th Clr.1994) ("Under California law, a lender does not owe a borrower or third party any duties beyond those expressed in the loan agreement, excepting those imposed due to special circumstance or a finding that a joint venture exists.")

A fraudulent concealment claim is subject to Fed. R. Civ. P. 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9(b) has three goals: "(1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints 'as a pretext for the discovery of unknown wrongs'; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to 'prohibit [ ] plaintiffs[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (brackets in original). Claims based on fraud must include "the who, what, when, where, and how" of the alleged misconduct, and the claims must "be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* at 1124 (internal quotations omitted). Rule 9(b) "does not allow a complaint to merely lump defendants together"; the plaintiff must "inform each defendant separately of the allegations surrounding his alleged participating in the fraud," identifying the role of each defendant in the scheme. *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007).

The first cause of action contains only very general allegations about Defendants, *i.e.,*that all Defendants concealed material facts about their business practices in an attempt to defraud all Plaintiffs, to damage the housing market, and to make profits. As pleaded, the cause of action suffers from two major deficiencies.

First, the complaint fails to allege the nature or basis for any duty each Defendant had to each Plaintiff from which a disclosure obligation would arise. A claim for fraudulent concealment requires that "the defendant must have been under a duty to disclose the fact to the plaintiff," *Levine*, 189 Cal. App. 4th at 1126. But under *Nyman*, a financial institution owes no duty of care to a borrower when it is acting in its traditional role. Here, it is unclear from the allegations in the complaint how Defendants exceeded the scope of their traditional roles as money lenders in their relationships with Plaintiffs.

Second, the complaint fails to meet the requirements of Rule 9(b). Plaintiffs lump defendants together and fail to describe their individual roles in the alleged fraudulent scheme. The "who, what, when, where, why, and how" of the allegedly fraudulent conduct are vague at best; there are no specifics about which Defendants allegedly took actions that may have affected which Plaintiffs. And, although most of the allegations refer to events that took place between 2003 and 2008, there is no specificity as to when during that five-year period any specific conduct occurred or where it allegedly occurred. The allegations are, in short, vague and general rather than particular, as required by Rule 9.

The second cause of action for intentional misrepresentation, should be dismissed with leave to amend for similar reasons. Intentional misrepresentation has five elements: "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." *Anderson v. Deloitte &*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV12-5016 JAK (AGRx) | Date | September 24, 2012 |
|---|---|---|---|
| Title | Carolyn Hairston, et al. v. Ally Bank, N.A., et al. | | |

*Touche LLP*, 56 Cal. App. 4th 1468, 1474 (1997). Intentional misrepresentation is a claim for fraud; it is, therefore, subject to aforementioned heightened pleading requirements set forth in Fed. R. Civ. P. 9(b). *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) (a claim "'grounded in fraud' . . . must satisfy the particularity requirement of Rule 9(b).").

The second cause of action suffers from the same particularity defects described above with respect to the first cause of action. Thus, once again, the allegations of the complaint lump Defendants together, and fail to specify the relationships between any individual Defendants and each of the Plaintiffs or the dates and places where the alleged events took place. Again, as pleaded, this claim is presented as a long, generalized theory, rather than a specific statement of alleged wrongdoing that provides to each Defendant notice of its particular, alleged misconduct.

The third cause of action, for negligent misrepresentation, should be dismissed with leave to amend for the same reasons. Negligent misrepresentation has five elements: "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Cambridge Integrated Servs. Group, Inc.*, 171 Cal. App. 4th 35, 50 (2009) (internal quotations omitted). A negligent misrepresentation claim must meet the requirements of Rule 9(b). *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003); *see also Errico v. Pac. Capital Bank, N.A.*, 753 F. Supp. 2d 1034, 1149 (N.D. Cal. 2010).

The fourth cause of action, for unfair competition under Cal. Bus. & Prof. Code § 17200, should be dismissed without prejudice. To state a claim for unfair competition, a plaintiff must allege that a defendant engaged in an "unlawful, unfair or fraudulent business act or practice" or in "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Fraud is not a necessary element of an unfair competition claim, but a "plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of that claim." *Kearns*, 567 F.3d at 1125. In such a case, "the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading . . . as a whole must satisfy the particularity requirement of Rule 9(b)." *Id.* As a claim dependent on the conduct described in the first three causes of action, the fourth cause of action suffers from the same particularity defects.

The fifth cause of action, for wrongful foreclosure under Cal. Civ. Code § 2924, should be dismissed without prejudice. In *Gomes v. Countrywide Home Loans, Inc.*, 192 Cal. App. 4th 1149, 1155 (2011), a California Court of Appeal rejected a plaintiff's contention that § 2924 "allows for an action to test whether the person initiating the foreclosure has the authority to do so," after the plaintiff challenged the authority of MERS to initiate a foreclosure. The court stated that the "recognition of the right to bring a lawsuit to determine a nominee's authorization to proceed with foreclosure on behalf of the noteholder would fundamentally undermine the nonjudicial nature of the process" under § 2924. *Id.* However, the court differentiated *Gomes* from other cases where "the plaintiff's complaint identified a *specific factual basis* for alleging that the foreclosure was not initiated by the correct party." *Id.* at 1156 (noting that "Gomes has not asserted *any* factual basis to suspect that MERS lacks authority" and that he "simply seeks the right to bring a lawsuit to find out *whether* MERS has such authority"). Similarly, other courts have found that *Gomes* allows for some judicial challenges to foreclosure under § 2924. *See, e.g.,*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV12-5016 JAK (AGRx) | Date | September 24, 2012 |
|---|---|---|---|
| Title | Carolyn Hairston, et al. v. Ally Bank, N.A., et al. | | |

*Wise v. Wells Fargo Bank, N.A.*, 850 F. Supp. 2d 1047, 1051 (C.D. Cal. 2012) ("This case is a challenge to the principal's authority to foreclose rather than to whether an agent had the authorization of its principal to initiate foreclosure."); *Sacchi v. Mortg. Elec. Registration Sys., Inc.*, No. CV 11-1658 AHM (CWx), 2011 WL 2533029, *8 (C.D. Cal. 2011) (noting that *Gomes* "suggested that a cause of action for wrongful foreclosure might survive if 'the plaintiff's complaint identified a *specific factual basis*'" and that "[h]ere, Plaintiffs have alleged just such a specific factual basis"). Plaintiffs' assertions under the fifth cause of action fall far short of a "specific factual basis." The allegation in the complaint that "Defendants are not the holders of the notes and deeds of trust and are not operating under a valid power" is not sufficient, under *Gomes*, to state a claim pursuant to § 2924. Furthermore, to the extent that Plaintiffs seek to rely simply on the theory that MERS was not properly authorized to proceed with foreclosures, Plaintiffs' cause of action fails under *Gomes*.

The sixth cause of action, for violations of the TILA, 15 U.S.C. § 1601 et seq., should be dismissed without prejudice. Fed. R. Civ. P. 8(a)(2), requires that, to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Detailed factual allegations are not required, but Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation. . . . A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The pleading is required to have "enough facts to state a claim to relief that is plausible on its face," and it is not enough to just leave "open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561, 570 (2007) (brackets in original). The sixth claim fails to meet these requirements. Plaintiffs' assertions are no more than a laundry list of supposed violations, rather than a statement of facts that supports a plausible basis to assert a claim for the violation of the TILA. Plaintiffs must provide more specific facts that state a claim for relief that is plausible on its face.

The seventh cause of action, for violations of appraisal independence under 15 U.S.C. § 1639e, should be dismissed with prejudice. Under 15 U.S.C. § 1639e, it is "unlawful, in extending credit or in providing any services for a consumer credit transaction secured by the principal dwelling of the consumer, to engage in any act or practice that violates appraisal independence." The statute was passed in July 2010, as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act. But, the wrongdoing that is alleged in the complaint occurred prior to the enactment of this legislation. Plaintiffs' argument that this provision in the statute has a retroactive effect is unpersuasive. There is no statement to that effect in the statute itself. And, there is a "traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 278 (1994). When Congress has not expressly called for the retroactive application of a statute, "the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.* at 280. Plaintiffs point to a recent district court decision that found that a whistleblower provision of Dodd-Frank was to have retroactive effect. But, the provision had nothing to do with 15 U.S.C. § 1639e and involved "an amendment under Dodd-Frank operat[ing] retroactively because it is a clarification of the original statute." *Leshinsky v. Telvent GIT, S.A.*, No. 10 Civ. 4511(JPO), 2012 WL 2686111, *18 (S.D.N.Y. July 9, 2012). There is no similar

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV12-5016 JAK (AGRx) | Date | September 24, 2012 |
| Title | Carolyn Hairston, et al. v. Ally Bank, N.A., et al. | | |

reason to find that Congress intended to have 15 U.S.C. § 1639e apply retroactively.

The eighth cause of action, for violations of appraiser independence under 12 C.F.R. § 225.65 and 12 C.F.R. § 323.5, should be dismissed with prejudice. The regulations, 12 C.F.R. § 225.65 and 12 C.F.R. § 323.5, were adopted by the Federal Reserve System and the Federal Deposit Insurance Corporation, respectively. Each provides that "[i]f an appraisal is prepared by a staff appraiser, that appraiser must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." In determining whether a private right of action arises from either of these regulations, the statute that gave rise to the regulation must be examined. Thus, the "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001); *see also N. Cnty. Commc'ns Corp. v. California Catalog & Tech.*, 594 F.3d 1149, 1155 (9th Cir. 2010) (explaining that "it is not enough for North County to broadly proclaim that it is entitled to a compensation under the Federal Communications Act. Instead, North County 'must demonstrate that a federal statute vests [North County] with such a right'" (brackets in original)). There is nothing presented here that shows any Congressional intent through 12 U.S.C. § 1818 or 12 U.S.C. § 1819 -- which are the basis for the regulations on which Plaintiffs rely -- to create such a private right of action. Standing alone, the regulations cannot do so.

The Court adheres to its tentative views. The Court GRANTS the motion to dismiss with regard to the first, second, third, fourth, fifth, and sixth causes of action, without prejudice, *i.e.,* with leave to amend. The Court GRANTS the motion to dismiss with regard to the seventh and eighth causes of action, with prejudice.

The Court confers with counsel regarding the parties' September 19, 2012 Joint Report and sets the following deadlines:

| | |
|---|---|
| October 31, 2012: | Last day to amend or add parties |
| December 14, 2013: | Joint Report re Settlement Procedure |
| January 7, 2013 at 1:30 p.m.: | Status Conference re Settlement |
| July 2, 2013: | Non-Expert Discovery Cut-Off |
| July 9, 2013: | Initial Expert Disclosures |
| July 23, 2013: | Rebuttal Expert Disclosures |
| August 6, 2013: | Expert Discovery Cut-Off |
| August 6, 2013: | Last day to hear motions |
| September 23, 2013 at 3:00 p.m.: | Final Pretrial Conference / Motions in Limine |

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV12-5016 JAK (AGRx) | Date | September 24, 2012 |
| Title | Carolyn Hairston, et al. v. Ally Bank, N.A., et al. | | |


October 4, 2013 at 3:00 p.m.:          Status Conference re Exhibits

October 8, 2013 at 9:00 a.m.:          Jury Trial (est. 18 days)

Counsel shall meet and confer regarding a possible settlement method and include in the December 14, 2012 Joint Report a description of their respective views as to the type of alternative dispute resolution that may be effective in this matter, the name of any neutral agreed upon by the parties and the proposed date by which the process can be completed.

Counsel for all parties are reminded of their respective obligations to comply with this Court's standing orders with respect to documents to be prepared for, and filed in connection with, the Final Pretrial Conference.


**IT IS SO ORDERED.**


_____ :   32

Initials of Preparer    ak   _____

# **EXHIBIT 3**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | CASE NUMBER |
|---|---|---|
| | Plaintiff(s), | |
| v. | | |
| | | **NOTICE OF DISMISSAL PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 41(a) or (c)** |
| | Defendant(s). | |

PLEASE TAKE NOTICE: (*Check one*)

☐  This action is dismissed by the Plaintiff(s) in its entirety.

☐  The Counterclaim brought by Claimant(s) _____ is dismissed by Claimant(s) in its entirety.

☐  The Cross-Claim brought by Claimants(s) _____ is dismissed by the Claimant(s) in its entirety.

☐  The Third-party Claim brought by Claimant(s) _____ is dismissed by the Claimant(s) in its entirety.

☐  **ONLY** Defendant(s) _____

_____ is/are dismissed from (*check one*) ☐ Complaint, ☐ Counterclaim, ☐ Cross-claim, ☐ Third-Party Claim brought by _____.

The dismissal is made pursuant to F.R.Civ.P. 41(a) or (c).

_____          _____
*Date*                                              *Signature of Attorney/Party*

**NOTE:** **F.R.Civ.P. 41(a): This notice may be filed at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs.**

**F.R.Civ.P. 41(c): Counterclaims, cross-claims & third-party claims may be dismissed before service of a responsive pleading or prior to the beginning of trial.**

**<u>EXHIBIT 4</u>**

1  Vito Torchia, Jr. (SBN244687)
   vjt@brookstonelaw.com
2  Sasan Behnood (SBN 250626)
   sbehnood@brookstonelaw.com
3  **BROOKSTONE LAW, PC**
   4000 MacArthur Blvd., Suite 1110
4  Newport Beach, California 92660
   Telephone: (800) 946-8655
5  Facsimile: (866) 257-6172
   E-mail: HairstonvAlly@BrookstoneLaw.com
6
7  Attorneys for Plaintiffs

8                **UNITED STATES DISTRICT COURT**

9       **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

10

11  CAROLYN HAIRSTON, an individual;
12  CHRISTINE PETERSEN, an individual;
    WILLIAM MIMIAGA, an individual;
13  ROBIN  GASTON, an individual;
14  PATRICK GASTON, an individual;
    MARY SERRANO, an individual;
15  SARAH SEBAGH, an individual;
16  RICK ALBRITTON, an individual;
17  DEBORAH ALBRITTON, an individual;
    VERONICA GREY, an individual;
18  BRENDA MELLA, an individual;
19  JOSELITO MELLA, an individual;
20  MICHAEL MAN, an individual; JUDY
    LIM, , an individual;  DAVID CRUZ, an
21  individual; YESENIA CRUZ, an
22  individual; GREGORY  BUCK, an
    individual;
23  CRISTINA PALBICKE, an individual;
24  KHALIL SUBAT , an individual;
    MANIJA SUBAT, an individual;
25  GENEVIE  CABANG, an individual;
26  JULIO  GONZALEZ, an individual; LISA
    SIMONYI , an individual;
27  RICK EWALD, an individual;
28  REGINA  FAISON, an individual; ALEX

Case No.: 12-5016-JAK (AGRx)
Honorable Judge John A. Kronstadt
Courtroom 750

**FIRST AMENDED COMPLAINT FOR:**

1.  **FRAUDULENT CONCEALMENT
    [VIOLATION OF CIV. CODE §§
    1572,
    1709 AND 1710];**

2.  **INTENTIONAL
    MISREPRESENTATION
    [VIOLATION OF CIV. CODE §§
    1572, 1709 AND 1710];**

3.  **NEGLIGENT
    MISREPRESENTATION
    [VIOLATION OF CIV. CODE §§
    1572, 1709 AND 1710];**

4.  **UNFAIR COMPETITION
    [VIOLATION OF BUS. & PROF.
    CODE §17200 ET SEQ.];**

5.  **WRONGFUL FORECLOSURE
    [VIOLATION OF CIV CODE   §
    2924];**

6.  **IMPROPER INFLUENCE OVER
    APPRAISER [VIOLATION OF
    CAL. CIV. CODE §1090.5]**


**[JURY TRIAL DEMANDED]**

- 1 -

**FIRST AMENDED COMPLAINT**

IBARRA, an individual; MARIA ELENA
DEL CID, an individual; JULIO DEL
CID, an individual; MESBEL
MOHAMOUD, an individual;
MICHAEL  MOULTRIE, an individual;
WILLIE  GILMORE, an individual;
PHYLLIS MCCREA, an individual;
CECILIA  CHAUBE, an individual;
MAGDALENA  AVILA, an individual;
GRICELDA  RUANO, an individual;
ELISA JORDAN, an individual; LOIS
TERRELL SULLIVAN, an individual;
GLORIA PORTILLO, an individual;
FLORASTENE  HOLDEN, an individual;
MARCO  BADILLA, an individual;
MANUELA BADILLA, an individual;
IGNACIO RODRIGUEZ, an individual;
ROSA RODRIGUEZ, an individual;
SALVADOR BARAJAS, an individual;
MARIA BARAJAS, an individual;
BRIAN FOOTE, an individual; OLAN
ROSS, an individual; EVELYN ROSS, an
individual; GARY JOHNSON, an
individual; JOELLYN JOHNSON, an
individual; RODELINA SANTOS, an
individual; JUN O. SANTOS, an
individual; MICHAEL BROWN, an
individual; CLAUDINETTE BROWN, an
individual; MARTIN KASSOWITZ, an
individual; SHIRLEY KAPLAN, an
individual;
HENRY COMPLETO, an individual;
IRMA LAREDO, an individual; MARCIA
WILLOUGHBY, an individual; VICTOR
PAZOS, an individual.

        Plaintiffs,

    vs.

-2-

**FIRST AMENDED COMPLAINT**

1  ALLY BANK, N.A., f/k/a GMAC BANK,
   a Utah Corporation, in its own capacity
2  and as an acquirer of certain assets and
3  liabilities of GMAC; GMAC, a National
   Banking Association; ALLY
4  FINANCIAL, INC. f/k/a/ GMAC, LLC, a
5  Delaware Corporation; GMAC
6  MORTGAGE GROUP, INC., A Delaware
   Corporation; RESIDENTITAL CAPITAL,
7  LLC f/k/a RESIDENTIAL CAPITAL
8  CORPORATION, a Delaware
   Corporation; GMAC-RFC HOLDING
9  COMPANY, LLC d/b/a/ GMAC
10 RESIDENTIAL FUNDING
   CORPORATION, a Delaware
11 Corporation; RESIDENTIAL FUNDING
12 COMPANY, LLC f/k/a RESIDENTIAL
13 FUNDING CORPORATION, a Delaware
   Corporation; HOMECOMINGS
14 FINANCIAL, LLC, a Delaware
15 Corporation; EXECUTIVE TRUSTEE
   SERVICES DBA ETS SERVICES ,LLC,
16 a Delaware limited liability company;
17 HOME CONNECTS LENDING
18 SERVICES, LLC, a Pennsylvania limited
   liability company; MTC FINANCIAL
19 INC. d/b/a TRUSTEE CORPS, a
20 California Corporation; and Does 1
   through 1000 , inclusive.
21

22
          Defendants.
23

24

25

26

27

28

- 3 -

**FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**NATURE OF ACTION** .................................................................................. - 7 -

**PARTIES** ....................................................................................................... - 9 -

    *Plaintiffs* ....................................................................................................... - 9 -

    *Defendants* ................................................................................................. - 10 -

    *Relationship of Defendants* ...................................................................... - 13 -

**ALLY CEASED ACTING AS A CONVENTIONAL MONEY LENDER AND
INSTEAD MORPHED INTO AN ENTERPRISE ENGAGED IN
SYSTEMATIC FRAUD** ................................................................................ - 18 -

    *The Fraudulent Appraisal Process* ........................................................... - 23 -

    *Defendants' Scheme to Fix the Market Through Their Wholly-Owned Appraisal
Subsidiary: HCLS* ...................................................................................... - 32 -

    *Defendants Systematically Abused and Abandoned Their Underwriting Guidelines
to Place Unqualified Borrowers into Loans They Could Never Afford* .............. - 34 -

    *Defendants Turned Substantial Profits Through Their Borrowers' Default
Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible and
Unaffordable Loans* ...................................................................................... - 38 -

    *Defendants Misled the Public – Including Plaintiffs* ............................................ - 41 -

**DEFENDANTS' DECEPTION CONTINUED WITH LOAN
MODIFICATIONS** ........................................................................................ - 45 -

    *Defendants Deceived Borrowers Into Entering Loan Modifications In An Outright
Cash Grab With No Intent Of Ever Modifying, For Fear Of Having Their Own
Fraud Discovered By Their Investors* ................................................................ - 45 -

- 4 -

**FIRST AMENDED COMPLAINT**

*Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else* - 47 -

*Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs* ........................................ - 47 -

**DEFENDANTS THEN INTENTIONALLY STEAMROLLED WRONGFUL FORECLOSURE AFTER WRONGFUL FORECLOSURE WITHOUT ANY OWNERSHIP INTEREST IN THE NOTES OR DEEDS OF TRUST TO COLLECT WILDLY INFLATED FEES AND TURN UNIMAGINABLE PROFIT** ............................................................................................................. - 49 -

*Defendants Seek to Enforce Notes & Deeds of Trust Without Evidencing Their Ownership Interest* ............................................................................ - 50 -

*Defendants' Improper Securitization: Foreclosing Trusts Had No Ownership Interest In Plaintiffs' Notes Or Deeds Of Trust Under The Explicit Terms Of Their Own Pooling & Service Agreements* .................................................. - 51 -

*The Aftermath of Defendants' Wrongful Foreclosures* ...................................... - 57 -

**BANK DEFENDANTS OWED PLAINTIFFS A DUTY** ......................................... - 59 -

**FIRST CAUSE OF ACTION (*By All Plaintiffs – Fraudulent Concealment – Against All Defendants*)** ............................................................................. - 64 -

**SECOND CAUSE OF ACTION (*By All Plaintiffs – Intentional Misrepresentation – Against All Defendants*)** ............................................. - 76 -

*Authority to Bind* ................................................................................. - 80 -

*The Difference Between Being "Qualified" for a Loan and Being able to "Afford" a Loan* ................................................................................................ - 82 -

**FIRST AMENDED COMPLAINT**

*Plaintiffs' Reasonable Reliance*............................................................................ - 87 -

**THIRD CAUSE OF ACTION (*By All Plaintiffs – Negligent Misrepresentation –
Against All Defendants*)**............................................................................ - 91 -

**FOURTH CAUSE OF ACTION (*By All Plaintiffs – Unfair Competition –
Against All Defendants*)**............................................................................ - 93 -

**FIFTH CAUSE OF ACTION (*By Plaintiffs Rick Albritton, Deborah Albritton, David
Cruz, Yesenia Cruz, Cristina Palbicke, Magdalena Avila, Cecilia Chaube, Florastene
Holden, Ignacio Rodriguez, Rosa Rodriguez, Sarah Sebagh, Gricelda Ruano, Elisa
Jordan– Wrongful Foreclosure, Violation of Cal. Civil Code § 2924 –Against All
Defendants*) **............................................................................ - 103 -

**SIXTH CAUSE OF ACTION (*By All Plaintiffs – Improper Influence Over Appraisers
– Cal. Civ. Code §1090.5 –Against Bank Defendants and HCLS*)** ............................. - 107 -

**PRAYER FOR RELIEF**............................................................................ - 111 -

**FIRST AMENDED COMPLAINT**

Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

## NATURE OF ACTION

1.    Defendant Banks have for the last decade taken the losses of others and used them for their own private gain. That Defendants are in the business of making profit, and are entitled to do so is not at issue. Nor is at issue that Defendants engage in an inherently lucrative business. But it is the lengths to which Defendants have gone, to attain that profit, which is. It is where corporate lust for profit leads corporations and banks to abandon common principles of fair business dealing so well-entrenched in the human consciousness, that they need not even be announced by law, but are inherently apparent to all of us, that the courts *must* intervene – that an example *must* be set. A line must be drawn putting Corporations, Banks, and Defendants herein on notice that where their greed exceeds the extant public need for informed disclosure in business dealings, the law will not sanction.

2.    With greed as their motive, Defendants set out upon a massive and centrally directed fraud by which Defendants placed homeowners into loans which Defendants *knew* Plaintiffs could not afford, abandoned industry standard underwriting guidelines, and intentionally inflated the appraisal values of homes throughout California for the sole purpose of herding as many borrowers as they could into the largest loans possible which Defendants would then sell on the secondary market at inflated values for unimaginable, ill-gotten profit (wildly surpassing the profit they would make by holding the loans), *knowing that their scheme would cause the precipitous decline in values of all homes throughout California*, including those of Plaintiffs herein.

3.    Like cattle, Plaintiff-borrowers were led to slaughter by Defendants and their greed. Borrowers were intentionally placed in loans which Defendants knew Plaintiffs could not afford, and whose default they knew was a mathematical certainty. Their fraudulent inflation of real estate values throughout the State of California, the demise of which sent real estate values spiraling downwards, caused Plaintiffs to be placed in

**FIRST AMENDED COMPLAINT**

homes that were immediately upside-down, and to instantly lose their equity – if not their homes altogether. And as a result of these two schemes coupled together, Borrowers were placed into loans far larger than would be supported by the true value of their property or their income. Then, based on these fraudulently inflated loan amounts, Defendants deceptively extracted excessive and unearned payments, points, fees, and interest from Plaintiffs. And as the final coup-de-grace, Defendants then intentionally steamrolled foreclosures upon those borrowers whose very peril was caused by Defendants' fraud in the first place, by charging grossly excessive "foreclosure fees' to line their pockets with ill-gotten profit.

4.     Simply put, Defendants let their greed get in the way of fair business. Where, as here, corporate greed exceeds the extant and imperative public need for informed disclosure, the law must not sanction. This Court must recognize Defendants' duty to disclose.  Without such duties, Banks are effectively granted immunity for their continued future wrongs against the borrowing public who have a right to depend on the fundamental notion of good faith and fair dealing in contractual relationships. No business, particularly one as centrally-important to the American economy as banking, should be allowed to so egregiously deceive its consumers.  If Banks are to conduct business, their business *must not be* that of fraud and deception.

5.     It is admitted that this Complaint alleges great harm. But Defendants should not be granted immunity on the grounds that their fraudulent scheme, which envisioned far-reaching, sweeping and inarticulable harms, succeeded in achieving just that.

6.     It bears emphasizing – that the gravamen of the Complaint is not about the harm and frauds that Defendants have perpetrated on 3rd party investors, but rather the harms and frauds perpetrated upon Plaintiffs herein. The fraud described in the Complaint upon the investor, were merely the *incentive* for Defendants' fraud on Plaintiffs, and only one prong, in Defendants' brazen, intertwined and multi-pronged fraudulent scheme.

- 8 -
**FIRST AMENDED COMPLAINT**

7.    A fair reading of the Complaint, including reasonable inferences from the facts alleged therein, is that the concealment pertained *not only* to the commission of torts and crimes involving third parties, but also to, among other things: (1) the possession of internal reports concluding that if a Plaintiff took a loan from Defendants that Plaintiff would suffer material losses; (2) contrary to its advertising and other broadly disseminated public statements, (i) Defendants had abandoned their conventional lending business, appraisal, underwriting and lending standards and was now granting credit as part of an overall unlawful scheme based on insider trading and other frauds that Defendants knew and expected would gravely damage Defendants, the mortgage market and home values, and (ii) Defendants now provided mortgages only for the purpose of immediately reselling the mortgage at an inflated value and without regard to laws intended to protect consumers, such as the Truth in Lending Act and Patriot Act; (3) Defendants' systematic and intentional inflation of Plaintiffs' property values in order to approve them for loans which Defendants knew Plaintiffs were not qualified for and would to a certainty default;  (4) undocumented domestic and foreign transfers of multiple interests in the loans and sourcing of money for the loans, without complying with laws intended to protect consumers, including the Patriot Act and Truth in Lending Act; and (5) the fact that Defendant had ceased acting as a conventional money lender and had instead morphed into a fraudulent enterprise. Such information would be highly material to a borrower's decision to enter into a contract with lenders/Defendants.

## PARTIES

### *Plaintiffs*

8.    All Plaintiffs listed in the above caption are competent adults and individuals residing in the State of California, who borrowed money from one or more of the Defendants or its subsidiaries or affiliates or successors and assigns between January 1, 2003, and December 31, 2008, secured by a deed of trust on his or her California real

**FIRST AMENDED COMPLAINT**

1    estate(s).  At all material times hereto, one or more of the Defendants have acted as

2    Servicer or some other control or capacity over processing the loan.

3        9.    Based on information now available to them, fewer than 100 plaintiffs are

4    ~~alleging claims in amounts that would, as to them, equal or exceed the jurisdictional~~

5    amount for federal jurisdiction under 28 U.S.C. § 1332(a).

6        ~~10.    **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT**~~

7    **THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE**

8    **OTHERWISE NOTED), <u>APPENDIX "A"</u> ("INDIVIDUALIZED PLAINTIFF**

9    **ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO**

10   **EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC**

11   **WRONGS DONE BY EACH DEFENDANT.**  By this reference, Plaintiffs hereby

12   incorporate Appendix "A" to this Complaint.

13

14                 ***Defendants***

15       11.    Defendant Ally Bank, Inc. ("Ally Bank") is a multi-national bank that

16   became a bank holding company in December 2008. The bank is headquartered in

17   Detroit, Michigan and incorporated in the State of Utah. The bank is based at 6895 Union

18   Park Center, Midvale, Utah, and is FDIC insured. Since August 2, 2004 it operated two

19   main offices in the United States, one in Utah and one in Pennsylvania, and has 616

20   employees as of June 2009. It also has a Canadian operation, simply called Ally which

21   operates under Resmor Trust Company, and which is Canadian Deposit Insurance

22   Corporation insured. Ally Bank is a direct bank that markets to customers offering

23   mortgages, savings products, certificates of deposit, online savings accounts, money

24   market accounts and interest checking accounts. Back office operations for Ally Bank

25   and Ally Financial are located in Charlotte, North Carolina. Ally Bank does business in

26   the State of California.

27       12.    Defendant Ally Financial, Inc. ("Ally"), a leading, multi-national financial

28   services firm with a corporate office center in New York, has approximately $179 billion

- 10 -

**FIRST AMENDED COMPLAINT**

1    of assets and operations in approximately 25 countries. Ally is the parent and sole owner

2    of Defendants GMAC Mortgage Group, Inc. and Residential Funding Services, LLC.

3    Prior to 2010, Ally was known as GMAC, LLC. Ally does business in the State of

4    California.

5        13.    Defendant GMAC Mortgage Group, Inc. ("GMACM") is a wholly- owned

6    subsidiary and the mortgage arm of Ally. GMACM is a Delaware corporation with its

7    principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania

8    19034. GMACM transacted and is continuing to do business in the State of California.

9        14.    Defendant Residential Capital, LLC ("ResCap") is a wholly-owned

10   subsidiary of GMACM and originates, services, and securitizes mortgage loan in the

11   United States, including California. ResCap was incorporated in the State of Delaware

12   and its principal office is located at One Meridian Crossings, Minneapolis, Minnesota

13   55423. Prior to 2007, ResCap was known as Residential Capital Corporation. ResCap

14   does business in the State of California.

15       15.    Defendant GMAC-RFC Holding Company, LLC, doing business as GMAC

16   Residential Funding Corporation ("GMAC-RFC"), is a wholly-owned subsidiary of

17   ResCap and acquires residential mortgages and loans, which it then packages as

18   mortgage –backed securities and sells to institutional investors. GMAC-RFC was

19   incorporated in the State of Delaware and its principal office is located at 8400

20   Normandale Lake Boulevard, Minneapolis, Minnesota 55437. GMAC-RFC transacted

21   business in California.

22       16.    Defendant Residential Funding Company, LLC ("RFC") is a wholly-owned

23   subsidiary of GMAC-RFC. RFC is a Delaware corporation. Prior to October 2006, RFC

24   was known as Residential Funding Corporation. RFC was known as Sponsor of

25   Securitization transactions which involve some of the Plaintiffs in this complaint.

26   Defendant RFC is the parent and sole owner of Homecomings Financial, LLC ("HFN"),

27   the originator of loans underlying some of the Plaintiffs in this complaint. Prior to 2006,

28

- 11 -

**FIRST AMENDED COMPLAINT**

1    HFN was known as Homecomings Financial Network, Inc. RFC does business in the

2    State of California.

3         17.    Defendant Homecomings Financial, LLC ("HFN") is a wholly-owned

4    subsidiary of RFC. HFN is a Delaware corporation and its principal office is located at

5    8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437. Prior to October

6    2006, HFN was known as Homecomings Financial Network, Inc. HFN is the originator

7    of some of the Plaintiffs loans included in this complaint. HFN continues to do business

8    in the State of California.

9         18.    Defendant Executive Trustee Services, LLC ("ETS") is a wholly-owned

10   subsidiary of ALLY. ETS was and is a limited liability company organized and existing

11   under the laws of the State of Delaware, with its principal place of business in Fort

12   Washington, Pennsylvania, and doing business in the State of California and the County

13   of Los Angeles, and has intentionally and maliciously concealed the true names of

14   entities to which Plaintiffs' home loans were transferred by other Defendants. ETS is one

15   of the Defendants' agents which acts as trustee under the deeds of trust securing real

16   estate loans so as to foreclose on property securing the real estate loans held or serviced

17   by the Defendants.  The foregoing is part of a scheme by which the Defendants concealed

18   the transferees of loans and deeds of trust, inter alia in violation of California Civil Code

19   § 2923.5, §2934(a) and 15 U.S.C. § 1641, as more fully described herein.

20        19.    Defendant Home Connects Lending Services, LLC ("HCLS") is a wholly –

21   owned subsidiary of Ally. Home Connects Lending Services is a limited liability

22   company organized and existing under the laws of the state of Pennsylvania, with its

23   principal place of business in Fort Washington, Pennsylvania, and doing business in the

24   State of California and the County of Los Angeles. Home Connects Lending Services,

25   LLC is a settlement service provider for Ally and assigns and reviews all of Ally's

26   appraisals.

27        20.    Defendant MTC Financial Inc., doing business as Trustee Corps ("Trustee

28   Corps"), is a California Corporation with its principal place of business in Irvine,

**FIRST AMENDED COMPLAINT**

1  California, and doing business in the State of California. Plaintiff herein can allege with

2  detailed factual specificity Trustee Corps's involvement as an essential element of

3  Defendants' fraud in executing foreclosures which Defendants knew were wrongful and

4  without right and intended would be unavoidable, and whose sales resulted in additional

5  profit to Defendants, in furtherance of the Defendants' conspiracy described herein.

6          21.    As used herein the term "ALLY DEFENDANTS" shall refer to all entities

7  owned by Ally Financial.  In other words the term "ALLY DEFENDANTS" shall refer to

8  all Defendants in this action with the exception of MERS and MTC Financial Inc., d/b/a

9  Trustee Corps.

10         22.    As used herein the term "BANK DEFENDANTS" shall refer to all

11  Defendants in this action which are all Defendants that have originated loans, namely,

12  GMAC Bank aka Ally Bank, GMAC Mortgage, GMAC Residential Funding

13  Corporation, Residential Funding Corporation, Homecomings Financial, LLC.

14

15              *__Relationship of Defendants__*

16         23.    At all times material hereto, the business of Defendants was operated

17  through a common plan and scheme designed to conceal the material facts set forth

18  herein from Plaintiffs, from the California public, and from regulators, either directly or

19  as successors-in-interest to other Defendants.

20         24.    The concealment was completed, ratified and/or confirmed by each

21  Defendant herein directly or as a successor-in-interest for another Defendant, and each

22  Defendant performed the tortious acts set forth herein for its own monetary gain and as a

23  part of a common plan developed and carried out with the other Defendants, or as a

24  successor-in-interest to a Defendant that did the foregoing.

25         25.    Plaintiffs believe and thereon allege that the agents and co-conspirators

26  through which the named Defendants operated included, without limitation, financial

27  institutions and other firms that originated loans on behalf of the Defendants.  These

28

- 13 -

**FIRST AMENDED COMPLAINT**

1    institutions acted at the behest and direction of the Defendants, or agreed to participate –

2    knowingly or unknowingly - in the fraudulent scheme described herein.

3        26.    Those firms originating loans that knowingly participated in the scheme are

4    jointly and severally liable with the Defendants for their acts in devising, directing,

5    knowingly benefitting from and ratifying the wrongful acts of the knowing participants.

6    Upon learning the true name of such knowing participants, Plaintiffs may seek leave to

7    amend this Complaint to identify such knowing participants as Doe Defendants.

8        27.    For avoidance of doubt, such knowing participants include, without

9    limitation, legal and natural persons owned in whole or in part by the Defendants or

10   affiliates thereof; legal and natural persons owning directly or through affiliates financial

11   interests in Defendants; legal and natural persons directly or through affiliates acting

12   pursuant to agreements, understandings and arrangements to share in the benefits of the

13   wrongdoing alleged in this Complaint and knowingly, to at least some degree,

14   committing acts and omissions in support thereof; and legal and natural persons

15   knowingly, to at least some degree, acting in concert with the Defendants.

16       28.    As to those legal and natural persons acting in concert without an express

17   legal relationship with Defendants or their affiliates, on information and belief,

18   Defendants knowingly induced and encouraged the parallel acts and omissions, created

19   circumstances permitting and authorizing the parallel acts and omissions, benefited

20   therefrom and ratified the improper behavior, becoming jointly and severally liable

21   therefore.

22       29.    As to those legal and natural persons whose acts and omissions in support of

23   the Defendants scheme were unwitting, on information and belief, Defendants knowingly

24   induced and encouraged the acts and omissions, created circumstances permitting and

25   authorizing the parallel acts and omissions, benefited therefrom and ratified the improper

26   behavior, becoming liable therefore.

27       30.    To the extent that certain Plaintiffs herein become aware of information that

28   provides a basis for asserting the Defendants herein are liable for the origination of their

- 14 -

**FIRST AMENDED COMPLAINT**

1    loans, those Plaintiffs reserve the right to seek leave of this Court to re-assert the
2    appropriate claims herein.

3       31.     The true names and capacities of the Defendants listed herein as DOES 1
4    ~~through 1,000 are unknown to Plaintiffs who therefore sue these Defendants by such~~
5    fictitious names. Each of the DOE Defendants was the agent of each of the other
6    ~~Defendants herein, named or unnamed, and thereby participated in all of the wrongdoing~~
7    set forth herein. On information and belief, each such Defendant is responsible for the
8    acts, events and concealment set forth herein and is sued for that reason. Upon learning
9    the true names and capacities of the DOE Defendants, Plaintiffs may amend this
10   Complaint accordingly.

11      32.     Plaintiffs are informed and believe, and thereon allege, that: (1) the
12   Defendants are liable for all wrongful acts of the companies which Ally acquired prior to
13   the date thereof as the successor-in-interest to those companies; (2) Ally directly and
14   through its subsidiaries and other agents sued herein as Does have continued the unlawful
15   practices of the acquired companies since the dates of their acquisition, including,
16   without limitation thereof, writing fraudulent mortgages as set forth above and concealing
17   wrongful acts that occurred in whole or in part prior thereto, and (3) Ally and its
18   subsidiaries are jointly and severally liable as alter egos and as a single, greater unified
19   whole.

20      33.     Ally's public disclosures, as reflected in its filings with the SEC, make clear
21   that Ally considers itself both a common enterprise operating as a greater whole and
22   without meaningful distinctions as to its operating units, and the successor to GMAC
23   Mortgage, Homecomings, RFC and its subsidiaries.

24      34.     More than 36 months before the filing of this Complaint, Ally completed the
25   purchase of the assets and operations and succeeded to the businesses of various
26   mortgage lenders. The assets of these predecessor businesses purportedly included the
27   loans made to Plaintiffs secured by their real estate that are the subject of this action.
28   Ally can have no greater rights in the assets of these prior businesses than their original

**FIRST AMENDED COMPLAINT**

1  owners had.  No transfer by any predecessor, on the one hand, to Ally, on the other hand,

2  actually or in fact involved any rights in or to mortgages against any of the properties of

3  Plaintiffs, for the reasons previously alleged.

4        35.    The other Defendants followed Ally's directions because they are or were

5  either subsidiaries of Ally, directly or indirectly owned, controlled and dominated by

6  Ally, or because they are in an unequal economic and/or legal relationship with Ally by

7  which they are beholden to Ally and are thereby controlled and dominated by Ally.

8        36.    Executive Trustee Services ("ETS") involvement was an essential ingredient

9  in Defendants' conspiracy to defraud (and to commit the other acts alleged herein) in that

10  it was through ETS, the foreclosing trustee,  that Defendants were able to force wrongful

11  foreclosures which Defendants knew and intended would be unavoidable, and whose

12  sales resulted in substantial additional profit to Defendants resulting from their

13  assessment of numerous fees associated with initiating or conducting foreclosures

14  including inspection fees, default fees, late fees, advance fees, attorney's fees, and trustee

15  fees. In short Defendants had a motive to wrongfully initiate foreclosures because they

16  made money by doing so through the assessment of excessive, disproportionate and

17  unearned fees, and because Defendants were insured against the losses arising from

18  defaults. ETS was a necessary instrument to make sure that the conspiracy of Defendants

19  got to reap that profit.   In furtherance of these acts ETS wrongfully initiated foreclosures

20  forged recorded documents, executed assignments of deeds of trust without the authority

21  of the previous beneficiary, and effectuated numerous other violations of California's

22  non-judicial foreclosure laws, in order to steamroll foreclosures at the direction of Ally

23  Defendants, and for the benefit of the conspiracy. ETS also violated numerous other laws

24  and statutes in furtherance of this conspiracy. ETS acted intentionally, and with malice in

25  doing these acts, for which ETS was paid by handsomely by Defendants.

26        37.    Defendant Home Connects Lending Services, LLC ("HCLS"), Ally's

27  Appraisal Management Company (AMC) was also a necessary and integral element of

28  Defendants' conspiracy to carry out their fraud. As the owner, Ally exercised its vast

**FIRST AMENDED COMPLAINT**

1  influence over HCLS to artificially inflate and manipulate the values of these properties,

2  including the properties of Plaintiffs, to further its fraud and increase their profits, in

3  furtherance of their overall conspiracy to defraud. Their purpose was twofold:

4            a.  First, by falsely inflating said property values, investors were defrauded

5                into believing their investments in these loans were less risky than they

6                actually were. This in turn led to more sales and even more profits on the

7                secondary market.

8            b.  Second, Defendants would then turn around and use these false property

9                valuations to induce Plaintiffs and other borrowers into entering ever-

10               larger loans on increasingly risky terms. The result was, again, more

11               profits

12     38.    Hand-in-hand, and at the direction of the other Defendants, HCLS could

13 carry out the fraud without anyone ever finding out. If the appraisals were done by

14 independent appraisers the homeowners would have found out that the homes they were

15 purchasing or refinancing were being over valued and that the loans they were obtaining

16 was taking every last bit of equity out of their homes. The customer never had a choice as

17 to the settlement providers.  Ally Defendants controlled and took the choice out of the

18 customer's hands and directed and collaborated with all their partners to systematically

19 inflate and disgorge the homeowners of their freedom to choose and suck every last bit of

20 equity out of their homes. In furtherance of this act they used the manipulated property

21 valuations to seek premiums on their loans to Plaintiffs, and Secondary Market

22 transactions. Ally Defendants not only defrauded the Plaintiffs, but the rating agencies

23 that graded the paper being sold, the insurance companies who assessed the risk of the

24 loans being insured through loan to valuation risk models and their investors.

25     39.    Upon information and belief, though ETS's powers are limited to

26 performing as a trust company, the Defendants, have regularly used ETS to foreclose, as

27 trustee with power of sale, trust deeds on California realty and realty in other states.  Such

28 foreclosures are commonly conducted non-judicially.  Such foreclosures result in the

- 17 -

**FIRST AMENDED COMPLAINT**

1  dispossession of debtors, including certain Plaintiffs herein, and also entail the assertion
2  in certain instances of claims for the deficiency between amounts assertedly owed and the
3  actual sale prices.  Such foreclosures are without authority.

4       40.    Upon information and belief, ETS is acting under the direct control of Ally
5  Defendants and is an alter ego of Ally. ETS is personally responsible for robo-signing
6  affidavits, executing assignments, and recording of Notice of Defaults and Trustee Sale
7  Notices which are defective and not in accordance to California Law.

8       41.    This Complaint seeks significant relief from ETS since its conduct under the
9  direction of Ally Defendant's and the key role that they played caused some Plaintiffs to
10 lose their homes. Through a number of wrongful foreclosure actions they conspired with
11 the other defendants to commit assorted violations of California's Unfair Competition
12 Law. All of the violations done by this specific defendant were made in the State of
13 California against California citizens.

14

15       **ALLY CEASED ACTING AS A CONVENTIONAL MONEY LENDER**
16       **AND INSTEAD MORPHED INTO AN ENTERPRISE**
17       **ENGAGED IN SYSTEMATIC FRAUD**

18       42.    During the 1980s and 1990s, the mortgage securitization business grew
19 rapidly, making it possible for mortgage originators to make more loans than would have
20 been possible using only the traditional primary source of funds from deposits. During
21 that period, Ally made loans in accordance with its stated underwriting and appraisal
22 standards.

23       43.    Under the traditional mortgage model, which Ally and Defendants originally
24 subscribed to, a mortgage originator originated loans to borrowers, *held* the loans to
25 maturity, and therefore retained the credit default risk. As such, under the traditional
26 model, the mortgage originator had a financial incentive to ensure that (i) the borrowers
27 had the financial ability to repay the loans, and (ii) the underlying properties had

28

**FIRST AMENDED COMPLAINT**

1    sufficient value to enable the mortgage originator to recover its principal and interest if

2    the borrowers defaulted on the loans.

3        44.    Traditionally, mortgage lenders financed their mortgage business primarily

4    using funds from depositors, retained ownership of the mortgage loans they originated,

5    and received a direct benefit from the income flowing from the mortgages. When a lender

6    held a mortgage through the term of the loan, it received revenue from the borrower's

7    payments of interest and fees, and also bore the risk of loss if the borrower defaulted and

8    the value of collateral was not sufficient to repay the loan. As a result of this "**originate**

9    **to hold**" model, the lender had an economic incentive to verify the borrower's

10   creditworthiness through prudent underwriting and to obtain an accurate appraisal of the

11   value of the underlying property before issuing the mortgage loan.

12       45.    With the advent of securitization, the traditional "originate to hold" model

13   gave way to the "originate to sell" model, in which mortgage originators sold the

14   mortgages and transferred credit risk to their investors through the issuance and sale of

15   Mortgage Backed Securities. Securitization concurrently provided lenders like Ally with

16   an incentive to increase the number of mortgages they issued and reduced their incentive

17   to ensure the mortgages' credit quality.

18       46.    With the aforementioned mandate for growth as the backdrop and incentive

19   for their fraud, Defendants abandoned the traditional model of "**originate to hold**" and

20   instead adopted the much more lucrative "**originate to sell**" model, and in the early

21   2000's Ally began to systematically disregard its stated underwriting guidelines in an

22   effort to originate an unprecedented number of loans for securitization.

23       47.    But to feed its investors and continue to make such never-before-seen

24   profits, Defendants needed more borrowers. In turn, Bank Defendants began disregarding

25   their own underwriting standards, and approving borrowers who were grossly under-

26   qualified, in the name of getting as many loans out the door, and sold to investors for a

27   profit, as possible.

28

- 19 -

**FIRST AMENDED COMPLAINT**

48.    In fact they *preferred* under qualified borrowers.  Because Defendants had taken out insurance policies against the possibility of default, GMAC and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default.  In fact, in many cases, Defendants had taken out numerous redundant policies on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit* when borrowers defaulted.  In other words, Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they made a lot of money.

49.    Rapidly, these two intertwined schemes grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage-providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an unprecedented scale.

50.    It is now all too clear that this was the ultimate high-stakes fraudulent investment scheme of the last decade.  Couched in banking and securities jargon, the deceptive gamble with consumers' primary assets – their homes – was nothing more than a financial fraud perpetrated by Defendants and others on a scale never before seen.

51.    To further this scheme, Ally, using its size and prominent market share, began systematically creating false and inflated property appraisals throughout California, hand-in-hand with the other Defendants herein, namely HCLS. The purpose was twofold:

      a. First, by falsely inflating said property values, investors were defrauded into believing their investments in these loans were less risky than they actually were. This in turn led to more sales and even more profits on the secondary market.

      b. Second, Defendants would then turn around and use these false property valuations to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms.

- 20 -

**FIRST AMENDED COMPLAINT**

52.    In a scathing complaint filed by the Federal Housing Finance Agency on September 2, 2011 they outlined how this brazen planned worked. Ally would use their in-house or contract appraisers at Home Connects Lending Services to artificially inflate Plaintiff's home values in order for their loans to be used in Securitization transactions. According to that complaint, "an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan", mainly our Plaintiffs' homes.

53.    These inaccuracies with respect to their Loan-to-Values ratios also indicate that the representations that were made to them were false and that at Ally's direction appraisal practices were unsound. Ally and their affiliates furnished appraisals to the Plaintiff's that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.

54.    According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated appraisals" as a pervasive problem at Ally during the period of the Securitizations in the time span mentioned in this complaint, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to "produce inflated results".

55.    From as early as 2005, Ally's senior management *knew* the scheme would cause a liquidity crisis that would devastate Plaintiffs' home values and net worths. But, they didn't care, because their plan was based on insider trading – pumping for as long as they could and then dumping before the truth came out and Plaintiffs' losses were locked in.

56.    Defendants, and each of them, wrongfully acted and continue to act as if they are either the owner, beneficiary, successor, assignee or servicer, or have some other right, title, or interest in Plaintiffs' notes and deeds of trust, when, in reality, they have no basis to assert any such right, title or interest.

57.    This action seeks remedies for the foregoing improper activities, including a massive fraud perpetrated upon Plaintiffs and other borrowers by the Defendants'

- 21 -

**FIRST AMENDED COMPLAINT**

business that devastated the values of their residences, in most cases resulting in Plaintiffs' loss of all or substantially all of their net worth.

58.    The Defendants' business premise (although concealed from the Plaintiffs) was to leave the borrowers, including Plaintiffs, holding the bag as the Defendants used the Plaintiffs and other borrowers as pawns in massive securities games and fodder to feed its fraud on investors perpetrated on a global scale. This massive fraudulent scheme was a disaster both foreseen by the Defendants and waiting to happen. Defendants knew it, and yet Defendants still induced the Plaintiffs into their scheme without telling them. In fact, had the Plaintiffs been aware of the true facts which the Defendants concealed and failed to disclose, they would not have entered into these transactions.

59.    At the very least, at the time of entering into the notes and deeds of trust referenced herein with respect to each Plaintiff, the Defendants were bound and obligated to fully and accurately disclose to each borrower, including each Plaintiff herein, that the loan and mortgage being offered to the Plaintiff was, in fact, part of a massive fraud that the Defendants knew would result in the loss of the equity invested by each Plaintiff in his or her home, the severe impairment of each Plaintiff's credit rating, and the other damages described in this Complaint

60.    Since the homes of Plaintiffs herein were Ally's main target, this scheme led directly to a mortgage meltdown for Plaintiffs in this complaint that was substantially worse than any economic problems facing Defendants' borrowers in the rest of the United States.

61.    As a result of Defendants' improper scheme, Plaintiffs lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in illegal and fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for fraudulent swaps.

- 22 -

**FIRST AMENDED COMPLAINT**

62.    Further as a result of Defendant's (1) artificial and fraudulent inflation of Plaintiffs' property values, and property values throughout the State of California, as well as (2) Defendants' abandonment of their own as well as industry standard underwriting guidelines, coupled with (3) Defendants incentive to package and sell as many dollars' worth of loans as they could to the secondary market, Defendants placed Plaintiff-borrowers into loans which were considerably larger than were justified by (a) the *true* uninflated valued  of their properties, (b) Plaintiffs true uninflated incomes and (c)by Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

63.    Further, Defendants either directly or through their subsidiaries, including ETS, often charged fees associated with initiating or conducting the foreclosures resulting from their fraudulent lending including inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees. In short, Defendants made money by wrongfully initiating foreclosures against Plaintiffs herein.   The award of damages or restitution for these unmerited fees obtained through deceit is proper.

### *The Fraudulent Appraisal Process*

64.    An accurate appraisal performed pursuant to a legitimate appraisal process is critical to calculating the loan-to-value ("LTV") ratio, a financial metric commonly used to evaluate the risk associated with a mortgage, and which would also be used as part of the valuation of a Mortgage Backed Security (which were sold on the secondary market for profit). The LTV ratio expresses the amount of the mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home appraised for $100,000, the LTV ratio would be $90,000 divided by $100,000, or 90% - which was viewed in the industry as a risky loan. Typically any loan over 80% LTV was considered risky, and would require the purchase

- 23 -

**FIRST AMENDED COMPLAINT**

1   of "Mortgage Insurance" to insure against the additional risk associated with such high

2   LTV loans. The idea being that a high LTV means that a borrower has invested little of

3   his own money in the property, and is thus more likely to walk away from the property

4   when things get tough. Now imagine the above scenario with a slight modification –

5   instead of the above property being appraised at $100,000 dollars, the appraisal was

6   manipulated to reflect that the home was instead $112,500, now the Loan-to-Value ratio

7   would appear as a much safer, and less risky 80% LTV ($90,000 Loan divided by

8   $112,500 property value = 80%).

9       65.    From an **investor's perspective**, a high LTV ratio represents a greater risk

10  of default on the loan, which means they are unwilling to pay as much for that loan as

11  they would one which was less risky. This is true for a number of reasons. First

12  borrowers with a small equity position in the underlying property have "less to lose" in

13  the event of default. Second, even a slight drop in housing prices might cause a loan with

14  a high LTV ratio to exceed the value of the underlying collateral, which might cause the

15  borrower to default and would prevent the issuing trust recouping its expected return in

16  the case of foreclosure and subsequent sale of the property.

17      66.    From the **Defendant bank's perspective**, because of their shift from the

18  "originate to hold" model to the "originate to sell" model, Defendant was incentivized to

19  enter into as many loans as possible to sell on to the secondary market for profit. Because

20  they weren't holding these loans anymore, Defendants held no risk – they had no reason

21  to ensure that the borrower was adequately qualified, or more importantly, in the context

22  of *this* discussion, that the property had sufficient value, because Defendants immediately

23  turned around and sold that loan. Here's where things take a turn for the worst – because

24  investors were willing to pay more for less risky loans (lower LTV loans), Defendants

25  were given an incentive to fraudulently inflate the appraisal values of their property, thus

26  making the collateral (the subject property) of the loan seem safer to the investor, and

27  thus more valuable to them. More value to the investors means more money in

28  Defendants pockets. And so it began, Defendants quickly embarked on a scheme to

- 24 -

**FIRST AMENDED COMPLAINT**

1  inflate their appraisals, and more broadly, property values throughout the State of

2  California, because, in short, they made a *lot more money by doing so.*

3      67.    At Ally Defendants' behest, and at their direction, Home Connects Lending

4  Services began systematically inflating the valuations they rendered upon the subject

5  properties of each loan, including the loans of Plaintiffs herein. As is common knowledge

6  in the real estate industry, appraisers take the value of other nearby homes (called

7  comparables aka "comps") into account in determining the value of the homes they

8  appraise. **These inflated appraisals and home valuation conducted by Ally and**

9  **HCLS *then* acted as comps upon which numerous *other* appraisers based their**

10 **valuations of *other* homes.   The results were a vicious self-feeding exponential cycle,**

11 **both expected and intended by Defendants.  Ally's inflated appraisals caused other**

12 **homes to be valued for more than they were worth, which in turn acted as the**

13 **predicate for even higher appraisals and which caused even more homes to be**

14 **valued for more than they were worth.** The inevitable and intended result of

15 Defendants' conspiracy was the creation of a super-heated pricing bubble in the real

16 estate economy, created by and at the direction of Defendants, designed to manipulate

17 and inflate property values, and effectuated for the sole purpose of lining Ally's (and

18 other Defendants') pockets with money. The harm it inflicted to Plaintiffs herein,

19 California's real estate economy, and more broadly, the American economy mattered

20 little. Defendants were making money and plenty of it.

21 Defendants had another reason for driving the prices of real estate up – by doing so

22 Defendants created the illusion of a naturally appreciating real economy, which resulted

23 in a purchase *and* refinance boom – which meant more loans for Defendants, and thus

24 more money.

25      68.    From the **Borrower's perspective** (Plaintiffs herein), the harm was five-

26 fold:

27          a. The hyper-inflated property values intended and caused Plaintiffs to pay

28             more for their homes (or to refinance their homes for more) than they

- 25 -
**FIRST AMENDED COMPLAINT**

were truly worth. When the market corrected itself, Plaintiffs
immediately suffered a substantial loss of equity.

b. The hyper-inflated property values also caused Plaintiffs to pay
substantially higher property taxes.

c. Defendants also used these inflated values, to induce Plaintiffs and other
borrowers into entering ever-larger loans on increasingly risky terms. The
result was more money for Defendants.

d. With the inflated property values as their predicate, Defendants placed
Plaintiffs into inflated loan amounts, unjustified by the true *uninflated*
value of Plaintiffs' property. Defendants used these intentionally inflated
loan amounts to charge Plaintiffs even more interest, points and fees,
than would have been proper under the terms of a non-inflated loan
value. The result was, shockingly, even more money for Defendants.

e. The resultant higher payments coupled with the housing crash (both
known if not intended by Defendants) resulted in Plaintiffs' inevitable
default, wreaking havoc with their credit, and upon which Defendants
charged a host of excessive fees (trustee fees, default fees, cleanup fees,
inspection fees, late fees, advance fees, and attorney fees) all of which
were marked up dramatically. In short, Defendants couldn't lose; they
were making money no matter what, and were benefitting from
Plaintiffs' default. By tossing on so many fees Defendants made it
impossible for Plaintiffs to be able to ever pay off their "default"
amounts. Why? Because Defendants made money by doing so. By
making it impossible for Plaintiffs to pay off their unilaterally imposed
default amounts, Defendants could come in and scoop up whatever
equity Plaintiffs had left in the property. It was a win win win scenario.

69.    Many mortgage loan originators, including Ally and Defendants herein,
allowed the sales personnel or account executives to order and control the appraisal

- 26 -

**FIRST AMENDED COMPLAINT**

process. These personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible. These sales personnel and account executives would pressure appraisers to appraise properties at artificially high levels or they would not be hired again, and were afforded the ability to do so by the very policies and procedures explicitly set forth by Ally and Defendants. According to the April 7, 2010 FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers to increase the value." He continued:

> To put things in perspective, during my company's history, half of all the loans we underwrote were overvalued by as much as 10%. This means one out of two appraisals were still within an acceptable tolerance for our end investors. Our experiences showed that 10% was the most an appraisal could be overvalued and still be purchased by investors. Another quarter that we reviewed were overvalued by 11-20%. These loans were either declined or we reduced the property to an acceptable tolerance level. The remaining 25% of appraisals that we initially underwrote were so overvalued they defied all logic. *Throwing a dart at a board while blindfolded would've produced more accurate results*

70. Mr. Bitner testified about the implications of inflated appraisals:

> **If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals. The process then repeats itself.** We saw it on several occasions. We'd close a loan in January, and see the subject property show up as a comparable sale in the same neighborhood six months later. Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant.

**FIRST AMENDED COMPLAINT**

71.    Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street Banks: "[T]he demand from Wall Street investment banks to feed the securitization machines coupled with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

72.    Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraiser "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals being doing on a "drive-by" basis which appraisers issued their appraisal without reasonable bases for doing so.

73.    A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review* , found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."

74.    Because HCLS was owned by Ally, Ally and Defendants herein directed HCLS as their alter ego to provide the results requested, or engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that met Ally and Defendants' business objectives even if the use of such appraisal technique was improper and in violation of industry standards. Ally black-listed appraisers who did not provide appraisal reports with Ally's expectations.

75.    This coercion to fraudulently inflate appraisal values was particularly rampant in the context of refinance transactions. When a property didn't appraise for a high enough value, a deal wouldn't "go through." This meant that (1) the loan consultant on the transaction wouldn't get a commission, (2) the Area Divisions (sometimes referred

- 28 -

**FIRST AMENDED COMPLAINT**

1  to as "Home Loan Centers" – often comprised of hundreds of loan consultants over
2  several cities, and managed by a single manager) which were paid handsomely for each
3  funded loan wouldn't get paid, and (3) Defendants wouldn't be able to sell the loan on
4  the secondary market for profit. Nobody made money. However, the system was set up
5  to allow coercion, bribery, and undue influence over the appraisers. Loan consultants
6  would contact appraiser and direct them specifically as to what value was "needed" to
7  make the deal go through, some even going so far as to give gifts to the appraisers, and
8  many were given outright bribes. Area Division managers who also had a financial
9  incentive as mentioned earlier, would exercise undue influence and contact appraisers
10  and demand certain values from them, abolishing the exercise of independent thought
11  necessary to render an accurate/good faith appraisals. The same Area Division Managers,
12  because of their power and influence within the company, would even go so far as to call
13  the appraisal group's *managers* and request (read "demand") an appraisal to come in at a
14  certain value, or if that appraisal had already been rendered and it was too low, would
15  request the appraisal value to be "bumped" or increased. The Area Division Managers
16  who often had personal or friendly relationships with the Appraisal *managers* would
17  coerce, bribe or influence, give gifts to or "call in favors" from the Appraisal managers to
18  ensure that the appraised value of the subject property was high enough to make the deal
19  "go through," so that all parties could make their money. The Appraisal managers
20  obliged.

21      76.      On other occasions appraisers and/or their managers would be instructed to
22  use overvalued, inflated or out-of-area comps from non-comparable *superior* properties
23  in valuating the subject property for the purpose of arriving at a higher value than would
24  be supported by nearby or appropriate comps. Defendants intended this to artificially
25  inflate the appraised value of the subject property.

26      77.      On the rare occasion when a loan consultant's or Area Division Manager's
27  influence didn't get the appraiser to inflate the value of the appraisal by a sufficient
28  amount, Defendants' policies gave them another, more effective way to fraudulently

**FIRST AMENDED COMPLAINT**

1  inflate the amount – they were allowed to hire an *outside appraiser*. It was well known in
2  the industry that outside appraisers would deliver an appraisal in the amount they were
3  told to deliver. Why? Because they were being paid directly by the loan consultant, or the
4  Area Division Manager. In other words, loan consultants and Area Division Manager's
5  had outside appraisers "in their pockets." Outside appraisers would deliver the results
6  (meaning inflated values) they were expected to deliver for two reasons: (1) In the
7  interest of keeping the client happy and hopefully earning future business and (2) for fear
8  of not getting paid on their individual deal if they didn't deliver the results they were
9  expected to deliver. This procedure (allowing the hiring of easily-influenced outside
10 appraises) was explicitly made part of Defendants' own policies, and its use was
11 encouraged by Defendants, as well as their mid-level and upper management.

12      78.     This coercion and influence even existed from the top down – Regional
13 Managers (in charge of entire portions of the country, several states large) would also call
14 in favors and demand appraised values to be inflated or changed to make deals happen in
15 the interest of making money. This pattern was not only tolerated by Defendants, but
16 ratified and encouraged by them, because more funded loans meant more money for
17 Defendants (who as described above, held none of the risk). In fact, Defendants had
18 intentionally set up the appraisal system in such a way as to allow for the exercise of
19 influence over appraisals and the appraisal departments. This influence was intended and
20 foreseen.

21      79.     In short, Defendants intentionally designed an appraisal system which they
22 could manipulate through influence and coercion to further their own ends – namely,
23 profit. By its very design, the independence of thought necessary for a professional
24 appraiser to render a good faith opinion was decimated. (1) Defendants *owned* the very
25 appraisal company which was supposed to render independent appraisals. Then, (2)
26 Defendants through its explicit (as well as unwritten) policies and procedures,
27 intentionally allowed  their own employees who made commission/money as a function
28 of every funded loan (managers, loan consultants, etc.), to contact individual appraisers

- 30 -

**FIRST AMENDED COMPLAINT**

1    and bribe, exercise influence, call in favors, harass, and coerce appraisers into rendering

2    the exact value they needed. And finally, when all else failed (3) Defendants set up a

3    fail-safe; they created an internal policy which allowed for the hiring of "outside"

4    appraisers who were particularly well known within the industry for being willing to

5    "fudge" the numbers.

6        80.    Moreover, as HCLS was Ally's wholly owned subsidiary, HCLS was

7    specifically directed by Defendants to systematically "bump" or inflate appraisal values

8    of homes throughout California, with the intent of creating housing appreciation, leading

9    to a real estate boom, which Defendants could then capitalize on by selling not only more

10   loans, but more loans at even higher loan amounts. From the very top to the very bottom,

11   Defendants created a system intended to render consistently inflated appraisals. But they

12   knew the 'boom' they were creating, was one stilted up and fueled by their fraud – and

13   that when the music stopped playing the house of cards they'd built would come

14   crumbling down destroying any and all equity Plaintiff borrowers had in their home.

15       81.    These artificially inflated appraisal reports and values were then used by

16   homeowners and real estate agents alike in setting sales prices for their homes, resulting

17   in artificially inflated sales, both known and intended by Defendants. Defendants told

18   their borrowers that the value their property appraised for was the true value of their

19   property. Furthermore, Defendants went so far as to furnish the appraisal reports to many

20   of their borrowers, including Plaintiffs herein. **The result was a vicious exponential**

21   **cycle. The artificially inflated sales would act as comps, inflating the sales prices of**

22   **other homes. The cycle would repeat.** And Defendants intended it to repeat because it

23   perpetuated an inflationary real estate economy in California, which resulted in massive

24   profit to the Defendant Banks.

25       82.    Ally and Defendant conspirators perpetrated this systematic appraisal fraud

26   at the direction of the conspiracy, and with the knowledge and acquiescence of their

27   executives and board members.

28

- 31 -

**FIRST AMENDED COMPLAINT**

1    83.    .To carry out this fraud, GMAC, hand-in-hand with the other Defendants

2  herein, used its size and market share as one of the largest lenders in California to

3  systematically create false and inflated property appraisals throughout California, through

4  its wholly-owned subsidiary HOME CONNECTS LENDING SERVICES, LLC. (HOME

5  CONNECTS LENDING SERVICES, LLC is a division of Defendant Ally Bank –

6  hereinafter "HCLS")

7

8    ### *Defendants' Scheme to Fix the Market*

9    ### *Through Their Wholly-Owned Appraisal Subsidiary: HCLS*

10    84.    HCLS was created in 1999 as a GMAC brainchild. GMAC figured that if

11  they could control all of the settlement service providers, including appraisers, it would

12  make it easier for Ally Defendants to carry out this fraud. Any borrower, broker or lender

13  that chose to conduct business with GMAC was forced to use their settlement service

14  providers as a standard course of business. If a broker submitted a loan, the appraisal was

15  to be done by someone on the HCLS approved appraiser list. The homeowners were also

16  required to pay for a secondary appraisal review through HCLS. Since there were two

17  appraisals that were done on each property the aggregator being ResCap was now able to

18  choose which appraisal would suit them best for their multiple transactions. The

19  homeowners would be disclosed one value and the secondary appraisal done by HCLS

20  could be used for Secondary Market purposes.

21    85.    As the owner, GMAC exercised its vast influence over HCLS to artificially

22  inflate and manipulate the values of these properties, including the properties of

23  Plaintiffs, to further its fraud and increase their profits. Their purpose was two-fold:

24    a.  First, by falsely inflating said property values, investors were defrauded

25        into believing their investments in these loans were less risky than they

26        actually were. This in turn led to more sales and even more profits on the

27        secondary market.

28    b.  Second, Defendants would then turn around and use these false property

- 32 -

**FIRST AMENDED COMPLAINT**

1
2
3

        valuations to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms. The result was, again, more profits.

4   86.   Furthering this scheme, GMAC & Homecomings Financial then struck
5   sweetheart deals with some of the Nation's largest homebuilders in which they
6   collaborated to artificially inflate the values of the properties being built and through a
7   joint venture. Some of the largest homebuilders such as Lennar Homes. The
8   unsuspecting homeowners would be forced to pre-qualify through the builders so called
9   "In-House Lender" and they would be incentivized with offers of free upgrades or credits
10  towards their closing costs only to be overcharged for these loans and artificially inflated
11  purchase price that would cover the incentives. Since GMAC was the in house lender
12  they could easily manipulate the value of the homes since their own appraisers would be
13  appraising the properties, and in fact, they did just that.

14  87.   Hand-in-hand with their builders and HCLS companies, Defendants could
15  carry out the fraud without anyone ever finding out. If the appraisals were done by
16  independent appraisers the homeowners would have found out that the homes they were
17  purchasing or refinancing were being over valued and that the loans they were obtaining
18  was taking every last bit of equity out of their homes. The customer never had a choice as
19  to the settlement providers. Ally Defendants controlled and took the choice out of the
20  customer's hands and directed and collaborated with all their partners to systematically
21  inflate and disgorge the homeowners of their freedom to choose and suck every last bit of
22  equity out of their homes. In furtherance of this act they used the manipulated property
23  valuations to seek premiums on Secondary Market transactions. Ally Defendants not only
24  defrauded the Plaintiffs, but the rating agencies that graded the paper being sold, the
25  insurance companies who assessed the risk of the loans being insured through loan to
26  valuation risk models and their investors.

27  88.   From as early as 2004, GMAC's senior management, and Ally Defendants
28  *knew* the scheme would cause a liquidity crisis that would devastate Plaintiffs' home

- 33 -

**FIRST AMENDED COMPLAINT**

1   values and net worths. But, they did not care, because their plan was based on insider

2   trading – pumping for as long as they could and then dumping before the truth came out

3   and Plaintiffs' losses were locked in.

4       89.    These acts are now subject of numerous complaints and very large scale

5   litigations and settlements. The largest recently announced lawsuit was filed by the

6   Federal Housing Finance Agency as Conservator for Freddie Mac. The complaint alleges

7   that Ally Defendants furnished appraisals that they understood were inaccurate and that

8   they knew bore no reasonable relationship to the actual value of the underlying

9   properties. Some of Plaintiffs loans seeking relief in this complaint are part of these

10   REMIC's as mentioned in the FHFA complaint.

11

12   ### *Defendants Systematically Abused and Abandoned*

13   ### *Their Underwriting Guidelines to Place Unqualified*

14   ### *Borrowers into Loans They Could Never Afford*

15

16       90.    As mentioned above, however, Defendants' fraud was multipronged. To

17   feed its investors and continue to make such never-before-seen profits, Defendants

18   needed more borrowers. In turn, Defendants Banks systematically and intentionally

19   began disregarding their own underwriting standards, and approving borrowers who were

20   grossly under-qualified, in the name of getting as many loans out the door, and sold to

21   investors for a profit, as possible.

22       91.    In other words, not only did Defendants inflate appraisal values in the name

23   of making the loans appear safer to investors, and thus more profitable to the banks, but

24   Defendants also abandoned their own underwriting guidelines to approve more and more

25   borrowers for loans. In doing so, Defendants intentionally placed borrowers into loans

26   which would imperil their entire livelihoods, and often cases into loans whose default

27   was an absolute mathematical certainty. The result was, once again, more profit obtained

28   through deception.

- 34 -

**FIRST AMENDED COMPLAINT**

92.    To achieve their fraud, Defendant Banks intentionally and grossly falsified Plaintiffs' salary, income, bank accounts, liquid assets, non-liquid assets, employment, real estate owned values, rental income ad infinitum, and by doing so simultaneously achieved two goals. First, they were able to approve borrowers who could never have been approved under their own published conventional underwriting guidelines (as well as industry standard underwriting guidelines used throughout the United States.) Second, they were able to conceal from the investor the highly risk nature of the loan, which resulted in more profit to the Bank. Investors were willing to pay more money for less risky loans. The translation is that Defendants had every incentive to deceive borrowers into entering loans which they realistically could never afford. The result was that Defendants turned unimaginable ill-gotten profit, *at the sole expense of their borrowers*. When the music stopped, only the borrowers were left without a chair.

93.    In fact, Defendants intentionally put mechanisms and programs in place to allow their own employee's/Loan Consultants/Loan Representatives to **falsify** the income, asset and other material information of their borrowers, without a borrower ever knowing that their income or assets had been inflated. One such program was called the **"Stated Income"** program. Under this program, Defendant Banks would take as true any income stated on the application, without requesting any documentation in support. Seizing this unbridled free-for-all, Defendants' own employees who were paid commission based on the number and size of loans they got approved, rampantly falsified material income and asset information of their borrowers. By doing so they were paid more commission. But more importantly, Defendant Banks themselves created more products to be sold on the secondary market for even more profit. In other words, Defendants intentionally put policies and programs into motion which would allow it to place unqualified borrowers into loans – all while maintaining the semblance of propriety, and all without ever having to disclose to their investors that the incomes listed on their loan applications were false.

- 35 -

**FIRST AMENDED COMPLAINT**

94.    Numerous others similar programs were also adopted such as **"stated assets"**, and **"low documentation loans"**.  Both of which allowed Defendants to falsify information, and get loans approved which would  never been approved under traditional documentation

95.    Even in the absence of these programs Defendants and their employees nevertheless had the ability to and did, falsify their borrower's income and assets through numerous other means. For example, Defendants would inflate a borrower's income by making it appear as though the borrower was earning rental income on of their other properties when in fact they were earning none.  To legitimatize this false income, Defendants would add insult to injury by manufacturing an entirely false rental agreement, showing the false monthly rental income, complete with the forged signature of a non-existent renter.

96.    Defendants *regularly* inflated borrowers' incomes by over 50% and on many occasions by as much as a mind-numbing 300%. An egregious number by any measure.

97.    Defendants were intentionally turning a blind-eye to the rampant and egregious manipulations of incomes by their own employees, through policies and programs intentionally set forth by Defendants' very own top executives to achieve *just such a result*. The result was that Defendant were able to originate loans which they knew were false, and they intended to be false, but without ever having to *admit* to their secondary market investors that the loans were, in fact, false.

98.    Defendant banks knew and intended that their employees would falsify this information, for the very reasons set forth above, and in fact incentivized them through their commission and reward structure to do so.  In other words Defendants intended that this program would be abused. And by doing so, Defendants allowed and intended for their borrowers to be placed into loans which the  borrowers had no chance of being able to afford had their true income/asset information been used. .

**FIRST AMENDED COMPLAINT**

99.    Defendants then told their borrowers, and Plaintiffs herein, that a determination by the Bank that they were "*qualified*" for a loan meant that the borrowers would be able to "*afford*" their loan

100.    Because Defendants held themselves out as (1) experienced professionals (2) with superior knowledge, education, and expertise, (3) a bank their customers and borrowers could trust and rely on Borrower plaintiffs believed them, and justifiably so. (See Ally's ads - "We make money with you, not off you": http://www.businessinsider.com/ally-bank-print-ad). Borrower Plaintiffs were deceived into reposing trust into the very company who would defraud them.

101.    For the purposes of the following paragraphs it is important to define two key terms: **"front-end"** debt to income ratio, and **"back end"** debt to income ratio.

102.    A **"front end"** debt to income ratio compares ONLY the loan payment (as well as taxes and insurance) to a person's income, and does not take into account any other debt whatsoever. For example a person who makes $10,000 per month, and whose mortgage costs $3,000 per month (including tax and interest), has a "front end" debt to income ratio of 30%.

103.    A **"back end"** debt to income ratio, by contrast, takes into account not only a person's loan payment (as well as taxes and insurance) but also *all other* debt reflected on their credit report. If that same person used in the example above, also had an additional $4,000 in monthly expenses such as credit card debt, car loans/payments, other mortgages, student debt, etc. etc., then that person's "back end" ratio would be 70%. ($3,000 per month for her loan, taxes & insurance plus, $4,000 per month for other debts = $7,000 per month in debt. $7,000 of debt divided by $10,000 in monthly income equals, 70% "back end" debt to income ratio).

104.    Industry Standard and Conventional Underwriting guidelines, including those used by Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be rejected – and that 45% figure was on the on the

- 37 -

**FIRST AMENDED COMPLAINT**

1  *very* high end. For a loan with a 45% "back end" debt to income ratio to be approved, a

2  borrower had to have excellent credentials in all other areas such as 720+ median credit

3  score and high liquid asset reserves totaling more than 12 months of their ).

4      105.   However, Defendants in this action regularly approved loans with front end

5  ratios wildly exceeding 35% (and back end ratios wildly exceeding 45%) on a regular

6  basis, and as a matter of course, in violation of their own published underwriting

7  guidelines as well industry standard underwriting guidelines used throughout the banking

8  industry.

9      106.   In many cases, borrowers were approved with front-end debt to income

10  ratios at almost 100%. In other words, borrowers were being approved for mortgages,

11  where after spending almost every penny of their monthly income, they would have

12  almost nothing left over to pay for the myriad other life expenses such as electricity, gas,

13  car payments, telephone, insurance, medicine, or even food.

14

15  ### *Defendants Turned Substantial Profits Through*

16  ### *Their Borrowers' Default Furthering Their Incentive to*

17  ### *Intentionally Place Plaintiffs Into Impossible and Unaffordable Loans*

18
19      107.   Not only did Defendants approve under qualified borrowers – they preferred

20  them. That's because a defaulting borrower meant profit for Defendants.

21      108.   All of the Defendants managed risk through leverage and derivatives

22  trading. With the advent of "Credit Default Swaps" ("CDS"), they had the protection they

23  needed to push these loans out the door to grossly under qualified borrowers, without any

24  fear of loss whatsoever. The CDS gave defendants *another* incentive to give grossly

25  under qualified borrowers – whose default was virtually certain. Not only (1) were

26  Defendants incentivized to give loans to unqualified borrowers because they were turning

27  other-worldly profit by selling as many loans on the secondary market as possible, *but*

28  *also* ... (see next paragraph).

- 38 -

**FIRST AMENDED COMPLAINT**

109.  (2) Because Defendants had taken out these insurance policies – aka Credit Default Swaps - against the possibility of default, GMAC and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous redundant Credit Default Swaps and insurance policies out on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit* when borrowers defaulted.  In other words, Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they made a lot of money.

110.  This technique gave these Defendants the insurance they needed to pass the risk along to third party without taking the risk themselves.  Since they planned on securitizing all of their loans and not keeping any of them, the Defendants could not care less about quality or who they hurt.  They would push insurance on the investors and actually over insure the loan pools, at times betting that the Plaintiffs and other borrowers would default.

111.  Since the Defendants created these pools to begin with, they were fully aware of the lack of quality and lack of due diligence that went into setting up these pools.  These "swaps" are life insurance policies that are placed on Plaintiffs' loans.  If the loan dies, the Defendants get paid.

112.  These swaps have been considered to be so dangerous that the majority of the financial world has simply stayed away.  They are best described by the following prominent experts:

       a.  Nobel prize-winning economist George Akerlof predicted that CDS would cause the next meltdown;

       b.  Warren Buffett called them "weapons of mass destruction";

       c.  Warren Buffett's colleague, Charles T. Munger, has called the CDS prohibition the best solution, and said "it isn't as though the economic world didn't function quite well without it, and it isn't as though what has

- 39 -

**FIRST AMENDED COMPLAINT**

happened has been so wonderfully desirable that we should logically want more of it;"

   d. Former Federal Reserve Chairman Alan Greenspan says CDS are dangerous;

   e. Newsweek called CDS "The Monster that Ate Wall Street"

   f. President Obama said in a June 17 speech on his plans for finance industry regulatory reform that credit swaps and other derivatives **"have threatened the entire financial system;"**

   g. In a February 9th, 2012 speech, President Obama scolded "irresponsible" and "reckless" lenders, who "sold homes to people who couldn't afford them". He continued:

> It's well known that millions of Americans who did the right thing and the responsible thing -- shopped for a house, secured a mortgage that they could afford, made their payments on time -- were, nevertheless, hurt badly by the irresponsible actions of others: by lenders who sold loans to people who couldn't afford them; … by banks that took risky mortgages, packaged them up, and traded them for large profits.
>
> …
>
> It was wrong and it cost more than 4 million families their homes to foreclosure"
>
> …
>
> Even worse, many companies that handled these foreclosures didn't give people a fighting chance to hold onto their homes. In many cases, they didn't even verify that these foreclosures were actually legitimate. Some of the people they hired to process foreclosures used fake signatures to -- on fake documents to speed up the foreclosure process. Some of them didn't read what they were signing at all.
>
> …
>
> The mortgage fraud task force I announced in my State of the Union address retains its full authority to aggressively investigate the packaging and selling of risky mortgages **that led to this crisis**

   h. George Soros says the market is still unsafe, and that credit- default swaps are "toxic" and "a very dangerous derivative" because it's easier and

- 40 -

**FIRST AMENDED COMPLAINT**

1
2

potentially more profitable for investors to bet against companies by

purchasing swaps rather than shorting their publicly traded stocks.

3    113.    But insurance against default wasn't the only way Defendants made money

4  from the losses of their imperiled borrowers. Defendant banks also made money by

5  charging a litany of unearned and egregiously marked up fees associated with the

6  initiation of and conducting (their own wrongful) foreclosures including:  inspection fees,

7  default fees, late fees, advance fees, attorney's fees, and trustee fees. In short Defendants

8  had an incentive *to place Plaintiff borrowers into loans they knew their borrowers could*

9  *not afford* because by doing so, the bank would turn a profit. Not only that, but

10  Defendants had an incentive *to wrongfully initiate foreclosures* because they made

11  money by doing so through the assessment of excessive, disproportionate and unearned

12  fees.

13

14              ### *Defendants Misled the Public – Including Plaintiffs*

15    114.    The Defendants concealed and did not accurately or fully disclose to any

16  Plaintiff herein any of the foregoing facts.  Further, Defendants did not disclose or

17  explain their scheme to Plaintiffs at any time.   They did the foregoing with the intent to

18  deceive Plaintiffs and the investing public.  Plaintiffs did not know the massive scheme

19  Defendants had devised.

20    115.    To the contrary, Defendants affirmatively misrepresented its underwriting

21  processes, the value of its mortgages and the fundamental nature of its business model in

22  its press releases, annual report and securities filings, all of which were widely distributed

23  to the public, including Plaintiffs.  Defendants intended the public, including Plaintiffs, to

24  rely upon its misrepresentations and made those misrepresentations to create false

25  confidence in Defendants and to further its fraud on borrowers and investors.

26    116.    Plaintiffs would never have done business with the Defendants if Defendants

27  had disclosed their scheme.  Had the Plaintiffs known the facts concealed from them by

28  Defendants, Plaintiffs would have never entered into bogus and predatory transactions

- 41 -

**FIRST AMENDED COMPLAINT**

with the Defendants designed only to line the pockets of Defendants and their executives and not to actually and justifiably create value and generate capital from the Plaintiffs' equity investments in their primary residences.

117.  If the Plaintiffs had later learned the truth, each Plaintiff would have either (1) rescinded the loan transaction under applicable law and/or (2) refinanced the loan transaction with a reputable institution prior to the decline in mortgage values in late 2008.  Instead, each Plaintiff reasonably relied on the deceptions of the Defendants in originating their loans and forbearing from exercising their rights to rescind or refinance their loans.

118.  After entering into the transactions with each Plaintiff herein as alleged herein, the Defendants sold in securities transactions the notes and deeds of trust pertaining to Plaintiffs' properties.  The sales:

    a. Involved misrepresentations by Defendants to investors and concealment from investors of Plaintiff's true financial condition and the true value of Plaintiff's home and mortgage;

    b. Involved misrepresentations by Defendants to investors and concealment from investors of the true financial condition of other borrowers and the true value of their homes and mortgages also included in the pools;

    c. Were for consideration greater than the actual value of the said notes and deeds of trust;

    d. Were for consideration greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon; and

    e. Were part of schemes by which the Defendants bilked investors by selling collateralized mortgage pools at an inflated value and used the notes and mortgages as collateral for fraudulent swaps, all the while using Plaintiffs as the fodder for Defendants' fraudulent schemes.

- 42 -

**FIRST AMENDED COMPLAINT**

119.   Defendants hid from Plaintiffs that Defendants were engaged in an effort to increase market share and sustain revenue generation through unprecedented expansions of its underwriting guidelines, taking on ever-increasing credit risk.

120.   At the time the Defendants induced Plaintiffs to enter into mortgages, they knew their scheme would lead to a liquidity crisis and grave damage to each Plaintiff's property value and thereby result in each Plaintiff's loss of the equity such Plaintiff invested in his or her house, as well as damaging that Plaintiff's credit rating, thereby causing the Plaintiff additional severe financial damage consisting of the foregoing damages and damages described elsewhere in this Complaint. The Defendants concealed the foregoing from Plaintiffs, and California consumers and regulators.

121.   Based upon the Defendants' (1)long term media campaign holding themselves out as a trustworthy and reputable lending institution, (2) position as leading financial institutions,(3)Defendants' expertise, highly specialized training, unique understanding of the highly complicated terms and mathematics of financing  as well as Defendant Banks' capacity as an advisor, in addition to their (4) intentionally misleading and/or partially true statements found in omissions, including in their securities filings, numerous documents, advertisements and other media, statements made by their employees and agents with apparent and/or actual authority and their publicly available underwriting guidelines the Plaintiffs reasonably relied upon the statements and omissions made by Defendants and reasonably relied that no material information necessary to their decisions would be withheld or incompletely, inaccurately or otherwise improperly disclosed. In so relying, the Plaintiffs were gravely damaged as described herein. The Defendants acted willfully with the intention to conceal and deceive in order to benefit therefrom at the expense of the Plaintiffs.

122.   The other Defendants followed Ally's directions because they are or were either subsidiaries of Ally, directly or indirectly owned, controlled and dominated by Ally, or because they are in an unequal economic and/or legal relationship with Ally by which they are beholden to Ally and are thereby controlled and dominated by Ally.

- 43 -

**FIRST AMENDED COMPLAINT**

1    123.  At all relevant times, Defendants falsely assured the public, including

2    Plaintiffs, that they were primarily prime quality mortgage lenders who had avoided the

3    excesses of their competitors.  To the contrary, affirmative misrepresentations and

4    material omissions permeated the Defendants' websites, customer and investor materials,

5    and required securities filings and presentations.

6    124.  Defendants concealed and did not accurately or fully disclose to any Plaintiff

7    herein any of the foregoing facts.  Defendants neither disclosed nor explained their

8    schemes to Plaintiffs at any time.  They did the foregoing with the intent to deceive

9    Plaintiffs, the investing public, the U.S. taxpayer, and California and other regulatory

10    agencies.

11    125.  Defendants affirmatively misrepresented their underwriting processes, the

12    value of its mortgages and the fundamental nature of its business model to their investors

13    and to Plaintiffs in their press releases, annual reports and securities filings, all of which

14    were widely distributed to the public, including Plaintiffs.

15    126.  Defendants fraudulently classified their liar loans as "prime" loans.

16    Defendants' personnel who objected to the liar loans were reprimanded or fired.

17    127.  It is precisely the previously alleged loss of value on which the Defendants

18    now seek to capitalize.  They would transfer a material portion of that wealth to

19    themselves or those in collusion with them.  This scheme includes acquiring the real

20    property at reduced values, collecting U.S. Government money for paper losses, and

21    harvesting the future increase on the value of these artificially depressed homes. Since its

22    government guarantee to purchase troubled assets Ally has been aggressively foreclosing

23    on Plaintiffs homes.  With Government protection in its hip pocket, any losses incurred

24    will be covered through loss provisions afforded by the tax payer.

25    //

26    //

27    //

28    //

- 44 -

**FIRST AMENDED COMPLAINT**

1

## DEFENDANTS' DECEPTION CONTINUED WITH LOAN MODIFICATIONS

2

### *Defendants Deceived Borrowers Into Entering Loan Modifications*

3

### *In An Outright Cash Grab With No Intent Of Ever Modifying,*

4

### *For Fear Of Having Their Own Fraud Discovered By Their Investors*

5      128.    After inducing Plaintiff Borrowers into entering dangerous loans through

6    outright deception and in the name of greed - loans which would threaten their

7    livelihoods - Defendants refused to modify Plaintiff Borrowers' loans despite laws and

8    court orders which required them to make good faith efforts to do. Why? To protect

9    themselves. Not the borrowers, but themselves. Because Defendants were required to buy

10   back loans from their investors if a material misrepresentation was discovered,

11   Defendants refused to modify loans which qualified in every regard for one, for fear of

12   having their own fraud and falsified information discovered by the investor, and having

13   to buy back their fraudulent loans, and incurring massive loss.  In other words,

14   Defendants placed their fiscal interests ahead of borrowers who desperately needed and

15   *qualified* for the modifications, and who would face financial ruin or homelessness

16   without one.  Instead, Defendants chose to line their coffers, rather than offer assistance

17   to the very people they imperiled through their greed – assistance they were under a good

18   faith obligation to provide. Simply put, Defendants were looking out for themselves.

19      129.    Plaintiffs believe and hereby allege that the servicers would want to use

20   MERS to keep the investor information private is to obscure truth from the Plaintiffs and

21   the Certificate Holders of the Trust.

22      130.    Every Pooling and Servicing Agreement has strict Warranties and Material

23   Misrepresentation Provisions that must be honored by the Depositors. In the event that a

24   loan has a material misrepresentation or violates the warranties given to certificate

25   holders and the Trustee of the REMIC, the loan must be purchased from the Certificate

26   Holders and whatever insurance was in place is now void due to fraud being detected on

27   the loan.

28

- 45 -

### FIRST AMENDED COMPLAINT

131.    In the case of loan modifications it benefits the servicer to keep vital information away from the Certificate Holders and the Trustee that oversees the Trust. In the event that fraud is detected on a mortgage loan the "**buy back**" provisions kick in and the servicer or originator, which is sometimes the same company, would be forced to take back the loan. In this case Ally would be forced to put a dead loan on their balance sheet with no hopes of being able to collect on the insurance policy that is in place due to fraud.

132.    When Plaintiffs are desperate for help, Ally refuses to assist them. In the event that Ally forwards the true and accurate financial information to the Trustee overseeing the REMIC or to a third party chosen by the Trustee, they can and sometimes do find material misrepresentations that took place at origination. A Plaintiff supplies current financial information up to and including a signed 4506-T and the investor or Ally through their processing centers find out that the income listed on the initial loan application was not correct.

133.    This leads to a chain of events that Plaintiffs and the Courts are unaware of. Based on evidence Plaintiffs will introduce at trial Ally instructs their employees to decline any application that contains a material misrepresentation for *fear of having to buy back the loan.*

134.    This practice has led to numerous lawsuits including Government lawsuits in which Government Sponsored Enterprises have independently sent out modification requests and have verified fraudulent information was used at the origination of the Plaintiffs loans.

135.    This practice alone has led to millions of American's losing their homes for fear of reprisal from investors that were lied to, when they purchased these *Toxic* loans. Defendants' wrongful acts continue to this day with hardball tactics and deception that continue to threaten Plaintiffs' rights and financial security, as well as the economic future of the State of California.  Since 2010, these tactics and Defendants' other wrongful acts have finally been revealed as a result of extensive litigation and Government investigations.

- 46 -

**FIRST AMENDED COMPLAINT**

### *Defendants Used The Promise Of Loan Modifications*
### *As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs*
### *From Obtaining Financing Anywhere Else*

136. Defendants had an unfair and fraudulent pattern on inducing and directing borrowers to fall behind on their payments with the promise that by doing so, they would become eligible for a loan modification. Relying on these representations, Plaintiffs fell behind on their loan payments, but were never offered a loan modification.

137. In doing so, Plaintiffs' credit was substantially damaged, they suffered greatly diminished access to credit and financing, and were penalized with fees, penalties and charges in addition to becoming delinquent on their loan as recommended by the Bank.

138. By recommending that Plaintiffs fall behind, Defendants effectively trapped Plaintiffs into keeping their loan with Defendants, because no other institution would help Plaintiffs after they became delinquent on their mortgage, or after their credit was destroyed.

139. At its most fundamental level, these sorts of unscrupulous business tactics, undermine notions of fair play and good faith in business dealings, and jeopardize the consuming public.

### *Defendants Used The Promise Of Loan Modifications As Bait*
### *For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs*

140. Defendants also had an unfair and fraudulent pattern of offering borrowers what appeared to be Loan modification offers (called "Trial Payment Plans"), but in reality these offers were nothing more than "cash grabs." Defendants never intended to permanently modify Plaintiffs' loans. Specifically, Defendants would offer Plaintiffs and homeowners who were already on the brink of default/foreclosure a lower payment called a "trial payment." Defendants promised that if Plaintiffs were able to make the trial payment for 3 (or more) months, Defendants would permanently modify Plaintiffs'

**FIRST AMENDED COMPLAINT**

1   payment to be the same amount under the trial payments. But Defendants had a pattern of

2   rejecting these loan modifications despite Plaintiffs' compliance with every term of the

3   loan modification offer. Instead Defendants would use the offer as bait to induce

4   Plaintiffs to make payments which would never be applied to the principal and interest of

5   their loan, but instead would be applied to the mountain of unmerited late charges, and

6   fees, taking what little money the financially imperiled plaintiffs had left, and duping

7   them into spending it on unfairly placed fees and late charges. Defendants never had any

8   intent of modifying their loans, despite Plaintiffs' full compliance with the terms of the

9   offer. Such acts are patently unfair and fraudulent, and Plaintiffs are entitled to

10  remuneration of all payments made under such trial payment plans, as well as an

11  injunction prohibiting Defendants from this deceptive business practice. More

12  specifically, Defendants' unlawful and unfair practices in this regard include, but are not

13  limited to, the following:

14          a.  failing to make good faith efforts to provide them with a loan

15              modification and breaching their contractual obligations, written and

16              implied promises, loan servicing functions owed to Plaintiffs, who

17              fulfilled their obligations by making timely modified payments;

18          b.  making false and/or misleading representations that Plaintiffs were

19              eligible and entered into the trial modification period, which would lead

20              to a permanent modification of their mortgage payment;

21          c.  failing to disclose to Plaintiffs that their modified payments may be

22              reported to credit bureaus as default or late payments that would destroy

23              their credit scores;

24          d.  delaying processing, demanding duplicate documentation, and failing to

25              provide adequate information or communication regarding the loan

26              modification programs to Plaintiffs;

27          e.  engaging in conduct that undermines or violates the spirit or intent of the

28              consumer protection laws alleged in this Complaint; and

- 48 -

**FIRST AMENDED COMPLAINT**

f. omitting to inform Plaintiffs that they could be rejected from the trial modification period at any point, and that this would result in the immediate demand for a balloon payment consisting of purported delinquency payments and substantial late fees, default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees, trustee sale guarantee fees, mail fees, recording fees, and default servicing fees.

## **DEFENDANTS THEN INTENTIONALLY STEAMROLLED WRONGFUL FORECLOSURE AFTER WRONGFUL FORECLOSURE WITHOUT ANY OWNERSHIP INTEREST IN THE NOTES OR DEEDS OF TRUST TO COLLECT WILDLY INFLATED FEES AND TURN UNIMAGINABLE PROFIT**

141. Continuing their chronology of greed-driven deception and intentional wrongdoing, Defendants not only (1) intentionally placed Plaintiffs into egregiously dangerous, unaffordable and impossible loans in the name of profit on the secondary market, and, (2) offered Plaintiffs trial loan modifications in an attempt to grab as much cash as they could before foreclosing – none of which would be applied to the principal or interest of Plaintiff's loans - with no intent of ever actually modifying Plaintiffs' loans for fear of having their own (Defendants') fraud discovered by their investors and being forced to buy back the loan at a massive loss, but in a final coup-de-grace (3) intentionally foreclosed on plaintiffs despite having no ownership interest in the notes or deeds of trust, in the name of collecting preposterous and unmerited "foreclosure fees" including: inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees.

142. Defendants charged these ill-defined and ambiguous fees whose amounts were *never* disclosed to Plaintiffs in any writing or contract whatsoever, unilaterally. They decided how much they wanted to charge for whatever reason they wanted to charge it. And the amounts they charged were tantamount to price gauging, often charging double, triple or even quadruple the fair market value for these "services."

- 49 -

**FIRST AMENDED COMPLAINT**

1   Needless to say, the outrageous price markups all inured to the benefit of the conspiracy

2   of Defendants. Especially in light of the fact that Defendants did not have an ownership

3   interest in the property upon which to foreclose, these charges and fees were entirely

4   unjustified, and constitute numerous cognizable sources of restitution.

5        143.   In short, Defendants made money by initiating foreclosures, and for this very

6   reason intentionally steamrolled wrongful foreclosures over plaintiffs without having any

7   true possessory or ownership interest in the deed of trust, threatening to wrongfully

8   dispossess Plaintiffs of their homes and placing them on the streets.

9        144.   In the greed-driven world of Defendants, neither law nor ethics would be

10  allowed to stand as an obstacle in their insatiable hunt for profit.

11

12                    ***Defendants Seek to Enforce Notes & Deeds of Trust***

13                    ***Without Evidencing Their Ownership Interest***

14       145.   Securitizing a loan generally entails the sale of a loan to private investors,

15  together with other loans, in a "pool" of loans.  Indeed, as typically executed, a

16  securitization process may result in up to three successive sales of the loan or in interests

17  in the loan.  These interests in the same loan are sold in tranches that can be found in

18  many collateralized debt obligation securities.  As a result, the ultimate note holders are

19  many, disparate and unrelated entities, no one of which can lawfully enforce the note

20  without the participation of all the other anonymous note holders to partial interests in a

21  single home loan.

22       146.   Defendants' continue to demand payment and to foreclose and threaten to

23  foreclose on Plaintiffs, despite the facts that:

24            a.  Defendants have no proof that they own the notes and deeds of trust they

25                seek to enforce;

26            b.  There is considerable evidence that Defendants do not own the notes and

27                deeds of trust they enforce and seek to enforce and based thereon,

28                Plaintiffs allege that they do not; and

- 50 -
**FIRST AMENDED COMPLAINT**

c. Whether or not they can demonstrate ownership of the requisite notes and deeds of trust, Defendants lack the legal right to enforce the foregoing because they have not complied with disclosure requirements intended to assure mortgages are funded with monies obtained lawfully.

Plaintiffs believe and thereon allege that Defendants have made demand for payment on the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants are incapable of establishing (and do not have any credible knowledge regarding) who owns the promissory notes Defendants are purportedly servicing.   Plaintiffs believe and thereon allege that because Defendants are not the holders of Plaintiffs' notes and deeds of trust and are not operating under a valid power from the various current holders of the notes and deeds of trust, Defendants may not enforce the notes or deeds of trust.

### *Defendants' Improper Securitization: Foreclosing Trusts Had No Ownership Interest In Plaintiffs' Notes Or Deeds Of Trust Under The Explicit Terms of Their Own Pooling & Service Agreements*

147.   Almost every Mortgage loan investigated which was produced by a major Banking Institution between the years 2000 - 2008 was securitized. Securitization is the act of producing an investment vehicle of Mortgage-Backed Securities ("MBS") using the Borrower's Mortgage NOTE as the under-lying corpus, as collateral.

148.   In a typical Securitization Transaction, mortgage loans are transferred by loan "Originators" to a "Sponsor." The "Sponsor", in turn, sells the mortgage loans to a "Depositor," a single –purpose entity.  When the Sponsor acts in selling capacity, it is often referred to as a "Seller," as well as a Sponsor.  The Depositor, in turn, deposits the loans into the securitization trust also known as a "REMIC", pursuant to a Pooling and Servicing Agreement ("PSA") or similarly-named agreement.

149.   The parties to the Pooling and Servicing Agreement (PSA) generally are the Seller, the Depositor, the "Master Servicer," which services the mortgage loans and/or

- 51 -
**FIRST AMENDED COMPLAINT**

monitors the servicing of the mortgage loans by sub-servicers, and the "Trustee" who administers the trust that is established pursuant to the PSA.

150. The reason loans are pooled and placed into these loan trusts named REMIC's is due to income tax purposes. A REMIC is an "SPV" or Special Purpose Vehicle that is treated by the IRS as a "QSPE" or Qualifying Special Purpose Entity. It specifically was designed by Congress to allow the vehicle to not be taxed as the cash flows through the vehicle and distributed to the investor and certificate holders. It is like an S Corp where there is no double taxation.

151. Pooling and Servicing Agreements only allow loans to be placed into a REMIC for **two years** after the set-up of the Trust due to tax implications. You can only substitute in loans for two years thereafter, if there is non-compliance with the aforementioned PSA the penalty is 100% of the face value of the asset in tax penalties.

152. Plaintiffs believe that their loans are illegally being substituted in and out of these loan Trusts in direct violation of the PSA's in order to cure deficiencies with the Chain of Title that never should have occurred to begin with. Defendants are attempting to cure these defects with the use of (MERS) Mortgage Electronic Registration System.

153. Moreover, Plaintiffs allege that in numerous instances, Defendants foreclosed on behalf of trusts which had no ownership interest whatsoever in the DOT, **because the trusts had been-long closed under the terms of their very own PSA.** In other words, it was impossible for the subject loan to be placed into the trust such that the trust would have any ownership interest in the loan upon which to foreclose.

154. Defendants are defrauding Plaintiff's by transferring or purporting to transfer ownership of these loans to entities that **can no longer accept these assigned loans**, and thus have no ownership interest in the loans upon which they could foreclose. Under strict REMIC rules a loan must follow a specific protocol in order to become property of the Trust.

a. Originator/ Lender must endorse the Note in Blank to the Sponsor/Seller

**FIRST AMENDED COMPLAINT**

      b. The Seller assigns the Note to the Depositor/Purchaser who is to insure that all of the trust assets are actually deposited into the REMIC.

      c. The Depositor assigns all of the Notes and Deeds of Trust/Mortgages into the name of the Issuing Entity.

      d. The Issuing Entity is the newly formed REMIC that obtains an issuer number from the Securities and Exchange Commission to issue Certificates to Investors.

      e. The Issuing Entity hires an independent Trustee to become the Custodian of the Trust.  Trustee's job is to supervise the activities of the Trust and to insure that the Certificate Holders/Investors **"True Owner's"** of the loans are paid based on the Certificate grades they purchased.

      f. The Trustee hires a Master Servicer and Sub-Servicers to collect mortgage payments and service the loans on behalf of the Trust.

      g. In the event of a foreclosure action the REMIC Trustee must follow proper foreclosure procedures as laid out in the Pooling and Servicing Agreement.

155.    It is standard in the securitization industry and the secondary markets to endorse a note to blank. Most often times the pool servicing agreement requires the Depositor to endorse the Note to Blank, in other words it is not endorsed to a person or entity, it's endorsed in blank making the Note a bear or bear instrument making it possible for the holder of that instrument to Deposit it into the Trust as required by the pool agreement. However, with this endorsement the pooling and servicing agreement requires that the Depositor transfer the Note to the Trustee for the benefit of the certificate holders.

156.    A "Custodian" is sometimes a party to the PSA and sometimes enters into a separate Custodial Agreement with the Trustee or the Trustee can act as both if so designated in the PSA.

**FIRST AMENDED COMPLAINT**

1    157.    Pursuant to the Custodial agreement, the Custodian maintains possession of

2    the loan files on behalf of the Trustee.

3    158.    An "Underwriter" typically enters into an Underwriting Agreement with the

4    Depositor pursuant to which the Underwriter commits to purchase certain of the trust

5    certificates and/or notes issued by the trust. In turn, the trust certificates and/or notes are

6    sold to investors by the Underwriter (or Underwriters) pursuant to a Registration

7    Statement or Prospectus filed with the Securities and Exchange Commission ("SEC").

8    159.    When the transaction is complete, the Trust files a Form 8-K with the SEC.

9    The form is accompanied by the documents involved in the securitization transaction.

10    160.    Trust certificates are frequently issued in different classes. The different

11    classes are associated with different payment terms, and different levels of risk. One loan

12    can be placed in multiple classes of securities; these different classes of trust certificates

13    are called "Tranches". The terms, including payment schedule, distribution priority, and

14    allocation of losses, and the level of risk attributable to each class of certificates, or

15    tranche, are defined in the PSA and related exhibits, and in the Prospectus and Prospectus

16    Supplements.

17    161.    When a loan is placed into a Tranche there can be more than one owner of

18    the security since the loan has been chopped up into smaller pieces and listed as security

19    in different classes of certificates based on risk.

20    162.    The relative risk associated with any class, or tranche, of the trust certificates

21    may be set by various devices, including credit enhancements, the subordination of lower

22    level tranches through an agreement to absorb losses first, the over-collateralization of

23    loan pools in excess of the aggregate amount of the trust certificates, or the creation of an

24    excess spread fund to cover the difference between the interest collected from the pooled

25    mortgage notes and the amounts owed to investors who purchase the trust certificates.

26    163.    Subordinating the right of certain of the trust certificates to receive cash flow

27    from the pooled mortgage until senior trust certificates have been paid, or allocating the

28    cash flow from the pooled mortgages until senior certificates have been paid, or

- 54 -

**FIRST AMENDED COMPLAINT**

allocating the cash flow from the pooled mortgages to different levels of trust certificates may be employed to create a tiered structure known as a **"Waterfall."**

164.    Losses from mortgage defaults, delinquencies, or other factors may be allocated in reverse seniority, with the junior tranches incurring losses first until their interests are reduced to zero. Each class of trust certificates or tranche may have a credit rating issued by one or more nationally recognized statistical rating organizations who rate the likelihood of payment of interest and principal owed to the tranche, based on their internal projections of expected losses from the loan pool.

165.    Securitization transactions involving government sponsored entities such as Fannie Mae and Freddie Mac follow the same general pattern involving the pooling of loans and sale of securities to investors, although the terminology and intermediate entities may be different.

166.    In simple terms, in a securitization transaction, the loan is made by the "originator," and then sold into the market. Ownership of the loan is transferred to a trust. Certain files, including the original note and original deed of trust are maintained by a custodian or the trustee. The loan is serviced by the servicer, who collects the payments, keeps the payment history, and initiates (but typically does not conduct) foreclosure sales. Participants in the trust earn income, and absorb losses, according to the terms of the trust and associated contracts.

167.    Other mortgage notes are owned by the issuing banks and are held in inventory for their own investment purposes.

168.    The following diagram illustrates the various parties involved in the typical securitization transaction, and also evidences custody and ownership of the underlying mortgage note.

//

//

//

//

- 55 -

**FIRST AMENDED COMPLAINT**

It is important to have a general familiarity with mortgage securitization in order to understand the foreclosure process.  Securitization involves a series of conveyances of the note evidencing the residential loan and assignment of the mortgage or trust deed securing it. Therefore, chain of title and beneficial interest issues frequently turn on the securitization trajectories.

*Securitization* is the process pooling loans into "mortgage-backed securities" or "MBS" for sale to investors.  MBS is an investment instrument backed by an undivided interest in a pool of mortgages or trust deeds.  Income from the underlying mortgages is used to pay interest and principal on the securities.    Figure A below is a simplified schematic depicting the general securitization process and some of the parties involved.



**Figure A - Securitization Schematic**

The process begins with O*riginators,* which are the lenders (such as banks or finance companies) that initially make the loans to homeowners. *Sponsor/Sellers* (or "sponsors") purchase these loans from one or more Originators to form the pool of assets to be securitized. (Most large financial institutions are both Originators and Sponsor/Sellers.)    A *Depositor* creates a *Securitization Trust,* a special-purpose entity, for the securitized transaction. The depositor acquires the pooled assets from the Sponsor/Seller and in turn deposits them into the Securitization Trust.  An I*ssuer* acquires the Securitization Trust and issues certificates to eventually be sold to investors.

- 56 -

**FIRST AMENDED COMPLAINT**

169.    Defendants, and each of them, wrongfully acted and continue to act as if they are either the owner, beneficiary, successor, assignee or servicer, or have some other right, title, or interest in Plaintiffs' notes and deeds of trust, when, in reality, they have no basis to assert any such right, title or interest.

170.    As a result of Defendants' improper scheme, Plaintiffs lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein.  At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in illegal and fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for fraudulent swaps.

### *The Aftermath of Defendants' Wrongful Foreclosures*

171.    To add further insult to injury, Defendants, knowing of this massive fraud, and sought to swoop in like the Civil War carpetbaggers and profiteer from the carnage that they had wreaked on Plaintiffs.

172.    With the proceeds of TARP funds and a voraciousness that has already been chastised by numerous courts, Defendants then sought to obliterate the last vestiges of value held by Plaintiffs, and proceeded to flip distressed assets for a profit.

173.    Defendants' other improper acts since 2008 are numerous, including but not limited to: (1) issuing Notices of Default to some Plaintiffs in violation of Cal. Civil Code §2923.5; (2) issuing Notices of Defaults, and initiating foreclosure on behalf of those with no beneficial interest in the note or deed of trust , (3) conducting the unauthorized sale of Plaintiff's property by a trustee who was never properly appointed or substituted as trustee (4) misrepresenting their intention to arrange loan modifications for many Plaintiffs, while in fact creating abusive roadblocks to deprive Plaintiffs of their rights; and (5) failing to respond to most Plaintiffs' communications while often erecting barriers to make it difficult for the Plaintiffs to communicate with them.

- 57 -

**FIRST AMENDED COMPLAINT**

174.    Defendants continue to demand payment and to threaten to foreclose on Plaintiffs, despite the facts that: (1) Defendants have no proof that they own the notes and deeds of trust they seek to enforce; (2) there is considerable evidence that Defendants *do not* own the notes and deeds of trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do not; and (3) whether or not they can demonstrate ownership of the requisite notes and deeds of trust, Defendants lack the legal right to enforce the foregoing because they have not complied with required disclosure requirements intended to assure that mortgages are funded with monies obtained lawfully in addition to California's non-judicial foreclosure statutes codified at Cal. Civ. Code 2924 et seq., with which, it has been repeatedly affirmed by California courts, "*strict compliance*" is required.

175.    As a proximate and foreseeable result of the Defendants' sale of the notes and deeds of trust regarding Plaintiffs' properties and others similarly situated for more than the actual value of such instruments, securitization pools lacked the cash flow necessary to maintain the securitization pools in accordance with their indentures. Further, it was only a matter of time before Defendants' fraudulent offshore swaps were uncovered. The unraveling of the Defendants' fraudulent scheme has materially depressed the price of real estate in many parts of California, particularly including the real estate owned by Plaintiffs.

176.    Defendants have admitted in their various securities filings that they sold Plaintiffs' notes and mortgages. There is no evidence that Defendants have re-acquired Plaintiffs' notes or deeds of trust. Accordingly, their claims of subsequent ownership appear to be specious.

177.    Plaintiffs believe and thereon allege that Defendants have made demand for payment on the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants were incapable of establishing (and did not have any credible knowledge regarding) who owns the promissory notes Defendants were purportedly servicing, and that these acts are continuing. Because Defendants are not, and were not at the relevant times, the holders

- 58 -

of Plaintiffs' notes and deeds of trust and are not, and were not at the relevant times, operating under a valid power from the current holders of the notes and deeds of trust, ~~Defendants are not and were not at the relevant times allowed legally to enforce the notes or deeds of trust. Defendants' attempts to enforce these notes were nothing but a sham~~ and a fraud upon the Plaintiffs, the public, and the courts.

## BANK DEFENDANTS OWED PLAINTIFFS A DUTY

178.   For seven separate and independent reasons, Bank Defendants owed Plaintiffs a duty.

179.   **First** under California Civil Code §1572, parties to a contract have an unequivocal duty to disclose material facts to one another. (*Walker v. KFC Corp.* (S.D.Cal. 1981) 515 F.Supp. 612, 622 ["[section] 1572 affirmatively imposes the duty not to suppress facts on persons who are parties to a contract or who are inducing others to enter into a contract."]) Here Plaintiffs are engaged in contracts with respective loan contracts with each of the Bank Defendants, and plaintiffs have alleged numerous failure to disclose such material facts. (See paragraph 197, and Appendix A).

180.   **Second,** California Civil Code §§1709 and 1710 establish a separate independent duty of disclosure, even in the absence of a contractual relationship, where, as here, Bank Defendants and HCLS have made partial inaccurate disclosures which are likely to mislead for want of the missing fact, codifying the long-standing rule that the "telling of a half-truth calculated to deceive, is fraud." Plaintiffs have alleged numerous such partially misleading disclosures at paragraph 200, of this Complaint, and in Appendix A. The Supreme Court of California has held the same. (*Warner Constr. Corp., supra,* 2 Cal.3d at 294 [A defendant has a duty of disclosure "when the defendant makes partial representations but also suppresses some material facts."]).

181.   **Third,** Bank Defendants and HCLS had exclusive knowledge of numerous items of highly material information which they did not disclose. Numerous cases including those from the Supreme Court of California hold that a defendant has a duty of

- 59 -

**FIRST AMENDED COMPLAINT**

1  disclosure "when the defendant had exclusive knowledge of material facts not known to
2  plaintiff." *Warner Constr. Corp., supra,* 2 Cal.3d at 294

3  ~~182. **Fourth,** a Defendant has a duty to disclose "when it actively conceals a~~
4  ~~material fact from the plaintiff." *Warner Constr. Corp., supra,* 2 Cal.3d at 294. This~~
5  Complaint alleges throughout that Bank Defendants and HCLS embarked on a campaign
6  of active suppression and concealment of numerous material facts.

7      183.  **Fifth,** Numerous court, including the California Court of Appeal have held
8  that where, as here, the disclosures in Plaintiffs' Option ARM loans discussing negative
9  amortization, only frame negative amortization as a mere *possibility*, rather than the
10 reality which is that when making a minimum payment negative amortization is a
11 *certainty*, the disclosure is insufficient under law, giving rise to a valid cause of action
12 not only for UCL but also for fraud/misrepresentation. (*Boschma v. Home Loan Center,*
13 *Inc.* (2011) 198 Cal.App.4[th] 230.)  The court in *Boshcma* explicitly held that Banks have
14 a duty to disclose such material information. Plaintiffs allege that Bank Defendants,
15 identically, failed to disclose the certainty of negative amortization in the Option ARM
16 loans. Plaintiffs have attached supporting documentation. (See Appendix A).

17     184.  **Sixth,** Defendants have **ceased acting as conventional money lenders**. In
18 conducting the wrongs described above and throughout this Complaint, the Bank
19 Defendants stepped vastly outside of their role as conventional money lenders, and
20 instead morphed into an enterprise engaged in intentional fraud upon their borrowers.
21 Among their numerous departures from the actions of a conventional money lender,
22 Defendants:

23           a.  **Intentionally falsified the values and appraisals of each of the**
24               **Plaintiffs' subject properties** – numerous courts have held that such
25               falsification of appraisals "do not fall within a bank's role as a traditional
26               money lender." *Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010)
27               725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL
28               2196083 at *9

- 60 -

**FIRST AMENDED COMPLAINT**

b. Artificially and fraudulently inflated the value of all of the California real estate market, (as opposed to just those of Plaintiffs herein) in **a Price Fixing scheme achieved through pervasive and coordinated falsification of appraisals** conducted hand-in-hand with their wholly-owned-appraisal subsidiary and alter-ego HCLS, knowing that by doing so their fraudulent appraisals would act as comparables which would artificially inflate the rest of the market (as detailed in paragraphs 64-89, above)

c. **Coerced their appraisers to falsify their appraisals through bribery, undue influence, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit** – that if their appraisals didn't return a valuation above that demanded by Bank Defendants (1) future business with the appraiser would either diminish or discontinue altogether or (2) that the individual appraiser would be fired/blacklisted. Specifically, these allegations are found above at paragraphs 67-89,

d. Intentionally and knowingly subjected their appraisers to known conflicts of interest

e. **Intentionally falsifying the income and asset documentation** of their borrowers to place them into loans which Defendants knew Plaintiffs could not afford, and would default upon to a mathematical certainty. Numerous courts have held banks liable for fraud for such identical acts because such acts "do not fall within a bank's traditional role as money lender." (*Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL 2196083 at *9.)

f. Abandoned the "originate to hold" business model of conventional money lenders, and instead became a **loan packaging and re-selling facility** in

- 61 -

**FIRST AMENDED COMPLAINT**

which bank defendants **originated loans for the sole purpose of reselling them on the secondary market for vast profit** –creating an incentive to place borrowers into loans which bank defendants knew they could not afford and simultaneously passing along all risk of default to the purchasers of the loan. (See Paragraphs 45-49).

g. Intentionally abandoned *industry-standard* underwriting guidelines – the hallmark of conventional money lending - in order to place borrowers into loans they *knew* they could not afford solely in the name of profit;

h. **Originated loans with an eye towards immediately securitizing and re-selling them on the secondary market and becoming the <u>servicer</u> on the loan**, thus creating an incentive to place borrowers into loans they knew their borrowers could not afford because by doing so Defendants-now-turned-servicers would be in a position to collect highly-lucrative fees from their imperiled borrowers, such as late fees, default fees, and indeed foreclosure fees. In doing so, Defendants became anything but conventional money lenders – **their interests were directly aligned with those of a servicer.** Numerous courts have held that where, as here, a bank acts as servicer they have exceed their role as a conventional money lender. (*Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D.Cal. 2012) 2012 WL 928433 *4.)

i. **Entered into loan modifications with Plaintiffs**. A lender goes beyond its "role as a silent lender and loan servicer [when it] offer[s] an opportunity to plaintiffs for loan modification and to engage with them concerning the trial period plan. ... [T]his is precisely beyond the domain of a usual money lender ... [and] constitutes sufficient active participation to create a duty of care", as held by numerous courts. (*Garcia v. Ocwen Loan Serv., LLC* (N.D. Cal.) 2010 WL 1881098 at *3; *Ansanelli v. JPMorgan Chase Bank, N.A.,* No. C 10-03892 WHA, 2011 U.S. Dist.

- 62 -

**FIRST AMENDED COMPLAINT**

LEXIS 32350, at *21-22 (N.D.Cal. Mar. 28, 2011; *Johnson v. HSBC Bank USA,* (S.D. Cal. 2012) 2012 WL 928433 at *3.)

     j.  **Engaged in massive intentional fraud upon its borrowers.** ~~While a bank may in the course of conventional lending act negligently from time~~ to time, intentional committed torts cannot be said to be conventional practice for lenders. If Bank Defendants wish to assert that massive intentional fraud on their borrowers is conventional practice for lenders, they should do so at trial. Numerous courts, including the Supreme Court of the United States have recognized that a duty properly attaches to a bank when it acts intentionally, rather than negligently. (*Connor v. Great Western Sav. & Loan Ass'n* (1968) 69 Cal.2d 850, 865; *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089; *Becker v. Wells Fargo Bank, N.A.* (E.D.Cal. 2011) 2011 WL 3319577; *Dumas, supra,* 2011 WL 4906412; *Champlaie, supra,* 706 F.Supp.2d at 1060; *Watkinson v. MortgageIT, Inc.* (S.D. Cal. 2010) 2010 WL 2196083.)

    185.  **Seventh**, and finally, even when acting as a conventional money lender, Banks nevertheless owe a duty to their borrowers, when they meet the following test:

> In California, the test for determining whether a financial institution owes a duty of care to a borrower-client " 'involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

(*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1098). Each of the 6 elements are amply alleged throughout this Complaint.

//

//

//

- 63 -

**FIRST AMENDED COMPLAINT**

## FIRST CAUSE OF ACTION

### (*By All Plaintiffs – Fraudulent Concealment – Against All Defendants*)

186.    The preceding paragraphs and subsequent causes of action are hereby incorporated by reference as though fully set forth herein.

187.    **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), <u>APPENDIX "A"</u> ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

188.    In connection with entering into mortgage contracts with Plaintiffs, from 2003 through 2008, Defendants:

  a.  engaged in a centrally-directed fraud by which they concealed numerous material facts, including that Ally, then one of the nation's largest mortgage lenders, and other Defendants herein, had ceased acting as a conventional money lender and had, instead, morphed into an enterprise engaged in systematic fraud on all of its material constituencies, including Plaintiffs – a fraud their *own internal reports* concluded would cause a liquidity crisis and thereby destroy the equity value of each borrower's home; and

  b.  engaged in widespread disclosure of information that was broadly disseminated to the public, including Plaintiffs, but suppressed contrary material facts relevant to Plaintiffs' decisions regarding whether they should enter into mortgage contracts with the Defendants.

189.    On or about January 2003, Ally Defendants determined that they could not sustain their businesses. So Ally Defendants hatched a simple plan – they would pool

- 64 -

**FIRST AMENDED COMPLAINT**

their loans, fraudulently inflate the value of these pooled loans and then sell the pools to unsuspecting investors for grossly unmerited profit.

190.   But to feed its investors and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn, Ally Defendants began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible. As part of this scheme, Defendants fraudulently inflated the appraisal values of Plaintiffs' properties, as well as the real estate values throughout California, knowing that their scheme would cause the market to crash, and the precipitous decline of real estate values throughout the State.

191.   Rapidly, these two intertwined schemes grew into a brazen plot to disregard underwriting standards and fraudulently inflate property values . . . in order to take business from legitimate mortgage providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgag[ors] on an unprecedented scale.

192.   To further this scheme, Ally, using its size and influence in California, began systematically creating false and inflated property appraisals throughout California, through its wholly-owned subsidiary HLCS Appraisals, hand-in-hand with the other Defendants herein. The purpose was two-fold:

     a.  First, by falsely inflating said property values, investors were defrauded into believing their investments in these loans were less risky than they actually were. This in turn led to more sales and even more profits on the secondary market.

     b.  Second, Defendants would then turn around and use these false property valuations to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms. The result was, again, more profits.

- 65 -

**FIRST AMENDED COMPLAINT**

193.  However, Defendants knew these loans were unsustainable for the borrowers and, to a certainty, would result in a crash that would destroy the equity invested by Plaintiffs and other of Defendants' borrowers.

194.  Defendants expected that the deteriorating quality of the loans that Defendants were writing, and the poor performance over time of those loans, would ultimately curtail Defendants ability to sell those loans in the secondary mortgage market and/or to purchase credit default swaps as hedges.

195.  Despite their awareness of and concerns about the increasing risk the Defendants were undertaking, they hid these risks from the Plaintiffs, borrowers, potential borrowers, and investors.

196.  Defendants had exclusive knowledge, not available to Plaintiffs, of material facts pertaining to their mortgage lending activities that it did not disclose to Plaintiffs at the time they were entering into contracts with Plaintiffs.

197.  The Defendants misled the Plaintiffs, borrowers, potential borrowers and investors by failing to disclose substantial negative information regarding Defendants' loan products, namely that:

   a.  The fact that Defendants had intentionally abandoned their own as well as industry standard underwriting guidelines;

   b.  The fact that Defendants had intentionally abandoned their own as well as industry standard underwriting guidelines *for the purpose of* placing borrowers into loans which they knew borrowers could not afford and upon which they knew borrowers would default to a mathematical certainty;

   c.  The fact that Defendants had intentionally and falsely inflated the appraisals on Plaintiffs properties, hand in hand with Defendant HCLS.

   d.  The fact that Defendants had systematically, intentionally, and artificially inflated the prices of real estate throughout California (otherwise known as "market fixing") through HCLS, over whom Defendants exercised

- 66 -
**FIRST AMENDED COMPLAINT**

dominion, resulting in:

    i.  Plaintiffs being forced to pay much more for their properties than they were truly worth;

    ii.  Plaintiffs being forced to take out larger loans to afford the same property, resulting in more profit to Defendant Banks by virtue of additional interest Plaintiffs would have to pay;

e.  That Defendants had fixed the real-estate market and systematically driven the prices of property well above what they were worth, with the intent of creating the illusion of a naturally-appreciating real estate economy to spur a purchase and refinance boom resulting in more business and thus more profits for the bank;

f.  That Defendants knew that the true uninflated value of Plaintiffs' homes were insufficient to justify the size of the loans Plaintiffs were being given;

g.  That Defendants falsely inflated the appraisals of Plaintiffs' properties in order to place Plaintiffs into loans that they would not otherwise be able to obtain or afford, all so Defendants and their employee-Loan Consultants could turn profit;

h.  That Defendants falsely inflated the appraisals of Plaintiffs' properties in order to assure them that the property was indeed worth what they were paying for it, such that Plaintiff would move forward with the purchase;

i.  That Defendants falsely inflated the appraisals of Plaintiffs' properties to induce plaintiffs to enter into loan and assure them that their collateral was sound;

j.  That Defendants had falsified Plaintiffs' income and asset documentation to intentionally place them into loans they could not otherwise afford;

k.  That Defendants and co-conspirator HCLS, the appraisal arm of Ally Defendants' fraud, was subject to a massive conflict of interest precluding

**FIRST AMENDED COMPLAINT**

1        it from being able to render good-faith, accurate, technically proper

2        appraisals in conformity with the standards required in the profession;

3    l.  That Defendants possessed internal reports concluding that if a Plaintiff

4        took a loan from Defendants, that Plaintiff would suffer material losses,

5        including but not limited to the loss of substantial equity;

6    m.  That Defendants knew their scheme would cause a liquidity crisis that

7        would devastate home prices;

8    n.  That Defendants were no longer making loans based on a borrower's

9        qualifications or their ability to afford such a loan and that those ideas

10       were now unimportant to them, but were instead making loans without

11       regard for a borrowers qualifications or ability to afford simply to create

12       sufficient product to sell to investors on the secondary market for profit;

13    o.  That Defendants *knew* Plaintiff-borrowers could not afford the loans they

14       were being placed into and which they knew Plaintiffs would default

15       upon to a mathematical *certainty*, but intentionally placed them into these

16       impossible loans nonetheless in the name of making profit;

17    p.  That Defendants actively concealed the material terms of their loans from

18       their borrowers, including but not limited to the fact a borrower was

19       *certain* to defer interest under an Option ARM loan by making the

20       minimum payment in aims of inducing borrowers to sign a loan they

21       would not have otherwise accepted, so once again Defendants could make

22       a profit by selling such loans;

23    q.  That Defendants were no longer making loans based upon the

24       profitability of their mortgage lending business (but rather instead upon

25       the profitability of sales of these loans to investors and secondary

26       markets);

27    r.  That because of this profitable scheme and because their loans were

28       insured, Defendants stood to profit regardless of whether their loans

- 68 -

**FIRST AMENDED COMPLAINT**

performed and as such had no incentive to insure that borrowers were actually qualified for (or could make payments on) the loans into which they were being placed – in fact they had a disincentive to do so;

s.  That because Defendants were selling their loans to investors rather than holding their loans, Defendants had no incentive to insure that the borrowers were actually qualified for (or could make payments on) the loans into which they were being placed – in fact they had a disincentive to do so;

t.  That Defendants were in fact dependent on selling loans it originated into the secondary mortgage market, to sustain its business;

u.  That Defendants were making loans simply to create sufficient product to sell to investors for profit;

v.  That Defendants had ceased acting as conventional money lenders and had, instead, morphed into an enterprise engaged in systematic fraud on all of its material constituencies, including Plaintiffs;

w.  That Defendants had ceased acting as conventional money lenders who carried their own risk and turned profit through the production of low-risk loans, and instead morphed into a loan conveyor belt, packaging loans with little if any regard for their underwriting standards, and selling those loans at extravagant profit to investors on the secondary market to whom the risk would be passed on, through fraud and misrepresentation – a business enterprise vastly more profitable than the business model of being a conventional money lender;

x.  That in furtherance of this scheme, Defendants had in fact abandoned their conventional lending business and prudent lending standards, consistently lending to those who were grossly under-qualified;

y.  Defendants knew these loans were unsustainable for themselves and the borrowers and to a certainty would result in a crash that would destroy the

- 69 -

**FIRST AMENDED COMPLAINT**

equity invested by Plaintiffs and other of Defendants' borrowers;

z. Defendants, their officers and employees internally referred to these loans as "Sacks of Shit";

aa. Defendants knew the sheer scope of their loan portfolio and fraudulent packaging of the portfolio would cause a liquidity crisis that would devastate home prices and gravely damage Plaintiffs;

bb. Defendants knew Plaintiffs would be materially and substantially harmed by contracting with Defendants;

cc. Defendants knew their business model was simply unsustainable;

dd. Defendants' pursuit of a matching strategy in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators dangerously placed borrowers into loans regardless of whether or not they were actually qualified for the loan or could actually afford the loan, instead ceding their underwriting guidelines to whoever was the most lax lender at the time, regardless of whether or not *that* lenders guidelines were proper, safe, negligent or even dangerous or guided by reason;

ee. The high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;

ff. Defendants' definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

gg. The high percentage of Defendants' subprime originations that had a loan to value ratio of 100%; and

hh. Defendants' subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income,

- 70 -

**FIRST AMENDED COMPLAINT**

1    piggyback second liens, and LTVs in excess of 95%.

2    198.    Defendants knew this negative information from numerous reports they

3  regularly received and from regulators and presentations prepared by Defendants' risk

4  assessment officers.  Defendants nevertheless concealed this negative information from

5  the public, including Plaintiffs.

6    199.    The Plaintiffs did not know the concealed facts.

7    200.    In addition to said concealments, Defendants, hand-in-hand with one

8  another, further stated numerous half-truths and made partial representations (through

9  Defendants' securities filings, speeches, advertisements, public utterances, websites,

10 brokers, loan consultants, branches, communications with clients, and other media)

11 calculated to deceive Plaintiffs and to create a substantially false impression. By making

12 such partial misrepresentations, Defendants incurred a duty to speak the whole truth such

13 that Defendants did not conceal any facts which would materially qualify those stated.

14 Such **partial misrepresentations** include:

15    a.    Representations calculated to make a borrower believe that his or her

16         payment would only be X dollars, when in reality such payment was only

17         available for a limited undisclosed period of time and would then

18         drastically increase;

19    b.    Representations that a borrower could afford payments under their loan,

20         calculated to make a borrower believe that the loan payment would

21         always be constant, but made knowing that the such payments would later

22         drastically increase and knowing that the borrower would be *unable* to

23         afford such increased payments;

24    c.    Representations that a borrower qualified for a loan, when in reality the

25         borrower's qualification was only obtained through Bank Defendants'

26         falsification of the borrower's income, asset and other documentation,

27         done without the borrower's knowledge;

28

- 71 -

**FIRST AMENDED COMPLAINT**

d. Bank Defendants' intentional publication and dissemination of their underwriting guidelines intended to create the perception that Defendants lent in conformity with those guidelines and that their lending standards were safe, when in reality Defendants had abandoned their underwriting guidelines and were issuing loans which they knew were in unsafe;

e. Representations made by Bank Defendants that a borrower *qualified* for a loan (oftentimes based on documents falsified by Defendants) calculated to induce the borrower's belief they could *afford* their loan, when in reality Defendants knew borrowers would be unable to afford their loan as a matter of fact (oftentimes because Defendants had falsified their income and asset documentation as well as abandoned their own underwriting guidelines);

f. Representations by Bank Defendants to a borrower that his payment would cover both principal and interest, and calculated to induce the borrower to believe that his or her payment would always cover principal and interest, when in reality that same payment would no longer cover any principal after a very short period of time, and indeed would not even cover the minimum interest on the loan resulting in deferred interest;

g. Representations that by making the minimum payment of an Option ARM loan, a party *may* defer interest (aka "negatively amortize"), when in *reality* by making the minimum payment a party was *certain* to defer interest. As the California Court of Appeals in *Boschma* put it, a disclosure of what may happen, is not a sufficient disclosure of what will happen;

h. The provision of an intentionally ambiguous Truth in Lending Disclosure ("TILDS") Payment Schedule which did not make it clear that borrowers could have avoided negative amortization (under an Option ARM loan) by making payments larger than those that were mandated by the payment

- 72 -

**FIRST AMENDED COMPLAINT**

schedule, in fact the payment schedule created the materially false
impression that by following the recommended payment schedule,
Plaintiff borrowers would not negatively amortize their loan;

i.  Other partial misrepresentations and half-truths calculated to induce the
borrower to fundamentally misunderstand the nature of their loan, such
that Plaintiff-borrowers would agree to a loan they would not have
otherwise agreed to, such as the meaning of a pre-payment penalty, or
whether they had a pre-payment penalty.

201.  Defendants intended to deceive Plaintiffs and induce their reliance, by
intentionally failing to disclose the above concealments. This deception was essential to
their scheme to make extravagant profit by packaging and reselling these loans on the
secondary market.

202.  Plaintiffs did in fact rely on each of the aforementioned concealments in
deciding to contract with Defendants

203.  Plaintiffs reasonably and foreseeably relied upon the deception of
Defendants in deciding to enter into a mortgage contract with Ally Defendants -
Defendants were among the nation's leading providers of mortgages. It was highly
regarded and by dint of its long-term campaign of deception through securities filings,
press releases, public utterances, web sites, advertisements, brokers, loan consultants and
branch offices, Bank Defendants had acquired a reputation for performance and quality
underwriting.

204.  Moreover, as consumers unfamiliar with the myriad intricacies, terms and
mathematics of mortgages (such as amortization calculations, negative amortization, loan
recasting, front and back end debt to income ratios, indices, margins, ad nauseum), it was
both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the
advice of loan professionals and bank representatives (many of whom held the title "Loan
CONSULTANT") trained to understand the highly-complicated terms and mathematics
of the mortgage world, in deciding to contract with Defendants. The same is true of

**FIRST AMENDED COMPLAINT**

1  appraisals. It is reasonable and foreseeable that a consumer would rely upon an appraisal

2  arrived at by a professional appraiser – particularly in light of their complicated nature.

3  Plaintiffs did in fact rely on the representations and concealments of these parties.

4      205.   In reliance on the above concealments and/or material misrepresentations,

5  Plaintiffs entered into mortgage contracts with Defendants they otherwise would not have

6  entered into and as a result thereof were damaged. This damage was not only foreseeable

7  by Defendants, but actually foreseen (and then concealed) by them.

8      206.   The unraveling of Defendants' scheme has caused the material depression of

9  real estate values throughout California, including the real estate of Plaintiffs herein.

10     207.   Defendants expected that the deteriorating quality of the loans that Bank

11 Defendants were writing, and the poor performance over time of those loans, would

12 ultimately curtail Bank Defendants ability to sell those loans in the secondary mortgage

13 market and/or to purchase credit default swaps as hedges.

14     208.   Defendants knew that within a foreseeable period, its investors would

15 discover that Defendants' borrowers could not afford their loans and the result would be

16 foreclosures and economic devastation.

17     209.   Despite their awareness of and concerns about the increasing risk the

18 Defendants were undertaking, they hid these risks from the Plaintiffs, borrowers,

19 potential borrowers, and investors.

20     210.   The unraveling of the Defendants' scheme has materially depressed the price

21 of real estate throughout California, including the real estate owned by the Plaintiffs,

22 resulting in losses to the Plaintiffs.

23     211.   As a proximate result of the foregoing concealments and/or

24 misrepresentations made by Defendants, California property values have precipitously

25 declined and continue to decline, gravely damaging Plaintiffs by materially reducing the

26 value of their primary residences, depriving them of access to equity lines, second

27 mortgages and other financings previously  available based upon ownership of a primary

28 residence in California, in numerous instances leading to payments in excess of the value

**FIRST AMENDED COMPLAINT**

of their properties, thereby resulting in payments with no consideration and often subjecting them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability.

212.    Furthermore Plaintiffs were damaged in having their home values artificially inflated by Defendants.

213.    The hyper-inflated property values resulting from Defendants' inflated appraisals and market-fixing scheme directly caused Plaintiffs to pay a substantially higher price for their home than they would have otherwise, and then their home was truly worth at the time. The additional amounts Plaintiffs were forced to pay above and beyond the true uninflated value of their property at the time of purchase, constitutes damage to Plaintiffs directly caused by Defendant's scheme. The damage didn't end there however - the unraveling of Defendants' scheme sent the market into a downward spiral, causing Plaintiffs' home value to plummet *much below the true value* of the property at the time of purchase. These two losses in sum constitute Plaintiffs' loss of equity, and can be determined by subtracting the current depressed value of Plaintiffs' property from the artificially inflated price they were forced to purchase it for. Even for those Plaintiffs who did not purchase their property, but rather refinanced it, the demise of Defendants' scheme drove the value of their property far below its original purchase price, once again resulting in the loss of substantial equity;

214.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

215.    To this day, the Defendants profess willingness to modify Plaintiffs' loans in accordance with law, but nonetheless they persist to this day in their secret plan to deprive Plaintiffs of their rights.

- 75 -

**FIRST AMENDED COMPLAINT**

216.   As a result of the foregoing, Plaintiffs' damages herein are exacerbated by a continuing decline in residential property values and further erosion of their credit records.

217.   Defendants' concealments and misrepresentations, both as to the their scheme to profiteer from the mortgage melt-down and as to their purported efforts to resolve loan modifications with Plaintiffs, are substantial factors in causing the harm to Plaintiffs described in this Complaint.

218.   Defendants acted outrageously and persistently with actual malice in performing the acts alleged herein and continue to do so.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein

219.   These frauds and concealments were unknown to all Plaintiffs referenced herein at the time of loan origination.  All Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years prior to the date of filing this action.  A reasonable person would have been unable to reasonably discover said frauds any earlier.

## SECOND CAUSE OF ACTION

*(By All Plaintiffs – Intentional Misrepresentation – Against All Defendants)*

220.   The preceding paragraphs and subsequent causes of action are hereby incorporated by reference as though fully set forth herein.

221.   **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), APPENDIX "A" ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

**FIRST AMENDED COMPLAINT**

222.  In addition to the aforementioned partial misrepresentations and half-truths, Defendants, hand in hand with one another, **intentionally and affirmatively misrepresented** the following through Defendants' securities filings, speeches, advertisements, public utterances, websites, brokers, loan consultants, branches, and communications with clients and other media:

    a.  That Plaintiffs would be able to *afford* the loans they were being given;

    b.  That Defendants' calculations confirmed that Plaintiffs will be able to afford the loans they were being given;

    c.  That Defendants calculations confirmed that Plaintiffs would be able to shoulder the additional debt resulting from Defendant's loans, in light of Plaintiffs' other debts and expenses;

    d.  That the term "qualify" was synonymous with being able to "afford" a loan.

    e.  That by paying the minimum payment on the Option ARM loan they would not be deferring interest (aka "negatively amortizing"), when in reality, they would be deferring interest;

    f.  That by paying the minimum payment on the Option ARM loan, Plaintiffs would be paying principal and interest, when in reality the minimum payment did not pay down any principal, and actually resulted in deferred interest (aka negative amortization);

    g.  That the value arrived at by Defendants' appraisals of Plaintiffs' property was indeed the true value of Plaintiffs' property (when in reality Defendants appraisals' were intentionally and artificially inflated, and moreover when Defendants had engaged in a systematic price fixing scheme which had already falsely inflated the value of Plaintiffs' property);

    h.  That the value arrived at by Defendants' appraisals of Plaintiffs' property was sufficient to justify the size of the loan they were being given (when

- 77 -

**FIRST AMENDED COMPLAINT**

internally Defendants were inflating appraisal values and knew that the values being used did not justify the size of the loans being placed on the property, and moreover that Defendants knew such valuations would inevitably result in the home going "upside" down followed by inevitable default);

i.   The true terms of the their loans, including their interest rate, the terms of their loans, whether the loan was variable or fixed, the duration of any fixed period,  and the inclusion of a prepayment penalty;

j.   That Defendants only entered into mortgages with qualified borrowers (when in reality Defendants were recklessly and intentionally ignoring their own underwriting standards, and offering mortgages to substantially under-qualified borrowers, including Plaintiffs herein who they knew could not afford their loans);

k.   That Defendants were financially sound (when in reality Defendants were dependent on selling their fraudulently-pooled loans to investors and the secondary market to sustain their business);

l.   That Defendants held their loans in their own portfolio and did not sell them on the secondary market (when in reality Defendants sold the overwhelming majority of their loans on the secondary market);

m.  That Defendants were engaged in lending of the highest caliber. (when in reality Defendants  (1)were disregarding industry standard quality assurance and underwriting guidelines as well as their own underwriting guidelines, (2)had ceded their underwriting guidelines to the bottom of the market by virtue policy to match loans of any other lender no matter how unsafe,  and (3) were lending to under qualified borrowers upon properties which were intentionally overvalued – all in the name of making as much money on the secondary/investor market as quickly as possible);

- 78 -

**FIRST AMENDED COMPLAINT**

n. That the loans they offered were safe and secure (when internally Defendants and their officers were referring to their loans as "SACKS OF SHIT");

o. That Plaintiffs and other borrowers were qualified for the loans Defendants were placing them into and that Plaintiffs were capable of affording the fully amortized payments on those loans (when internally Defendants knew that Plaintiffs were not qualified, that Plaintiffs could not afford the loan, and that, in many instances, it was a mathematical inevitability that the Plaintiffs would default);

p. That Plaintiffs would be able to refinance their loans at a later date (when internally Defendants knew that Plaintiffs would not be able to refinance Plaintiffs as a result of the depressed real estate market created by Defendants, the overvaluation of Plaintiffs' property, the damage to Plaintiffs' credit score which defendants knew would ensue, and for the many reasons already set forth above);

q. Defendants would modify Plaintiffs' loans (when in fact Defendants did not modify Plaintiffs' loans, had no intentions to do so, and it was more profitable for Defendants to leave the loans unmodified).

r. Finally, HLCS, as the wholly-owned subsidiary of Ally, intentionally misrepresented the appraised values of Plaintiffs' subject properties, at the direction and behest of the conspiracy of Defendants, in order to (1) manipulate and fix real estate values throughout California (as described in Paragraph 64-83 of this Complaint, entitled "The Fraudulent Appraisal Process") and (2) falsely assure Plaintiff's that the properties they were purchasing were indeed worth what they were paying for it, thereby inducing Plaintiffs' reliance to enter into a loan contract with Bank Defendants

- 79 -

**FIRST AMENDED COMPLAINT**

### ***Authority to Bind***

223.    These representations were not made as statements of opinion, but as statements of fact, made by the employees and agents of Defendants charged with the duty of originating loans ("**Loan Representatives**") and who were specifically employed by Defendants to walk Plaintiff borrowers through the loan process, and vested with the authority, both apparent and actual, to bind Defendants.

224.    These Loan Representatives were charged with the duties of educating borrowers about the loan process, the various type of loans from which they could choose, the payments that would result for each given type of loan, the pros and cons of each loan, how each loan would amortize, providing truth in lending disclosures, offering interest rate quotes, cost quotes, point quote, and APR quotes, and running all the various payment calculations and debt to income calculations.  These Loan Representatives were also charged with properly taking each borrower's loan application, as well as the loan application fee and/or ensuring the accuracy of each loan application filled out, and collecting and analyzing documentation relating to each borrower's income, job stability, assets, creditworthiness, outgoing debt, as well as collateral as well as giving the necessary Truth in Lending disclosures required under law.

225.    These Loan Representatives were charged with the duty of quarterbacking the entire loan process from start to finish, including initiating escrow, acquiring title reports and initiating title insurance,  obtaining the loan application from the borrower (or in Defendants' case falsifying the loan application on behalf of the borrower),  collecting any and all fees due (such as appraisal fees and application fees) collecting necessary documents (such as paystubs, tax statements, w2's, schedules of real estate owned, etc etc), regularly interfacing between Defendants' underwriting department and each borrower to make sure the loan gets approved, coordinating the appraisal and appraisal dates,  rendering estimated HUD or HUD-1 disclosures, through loan document printing, loan signing side by side with a notary, to loan funding, and post-funding issues.

**FIRST AMENDED COMPLAINT**

226.  It was through these Loan Representatives, *and only through these Loan Representatives*, that borrowers (Plaintiffs herein) came to understand exactly what the bank wanted from them, and whether the bank was going to give them a loan, and on what grounds the loan was going to be granted. Each and every one of these Loan Representatives was vested by the respective bank they work for – the bank/lending institution from which a Plaintiff got his/her loan – with both actual and apparent authority to bind that bank/lending institution.  These Loan Representatives were the *sole* interface between the bank/lending institution and the customer/borrower/plaintiff. Defendant banks very much intended to create the distinct perception that the representations made by these Loan Representatives, were factual representations coming directly from the  bank, and representations upon which the borrower Plaintiffs could reasonably rely, well above-and-beyond that of mere opinion.

227.  Specifically, with regard to subparagraph "(f)", above, the representation made by Defendants to Plaintiff borrowers, that they could "afford" the loans they were being given were statements delivered as statements of fact upon which Plaintiffs could reasonably rely, particularly in light of the specialized expertise of the Defendant employees who made the statements.  These employees spend months and years, undergoing specialized education, to learn the highly complicated mathematics of lending such as loan amortization, loan re-casting, front end debt to income ratios, back end debt to income ratios, and  loan to value ratios – mathematics which borrowers simply don't understand, nor could they be expected to. Because of their vastly superior knowledge, and because of the actual and apparent authority vested in these employees by the Defendant Banks, as described above, Plaintiffs herein reasonably relied on these statements. By making these false and misleading statements, they incurred a duty to be truthful.

//

//

//

- 81 -

**FIRST AMENDED COMPLAINT**

### *The Difference Between Being "Qualified" for a*
### *Loan and Being able to "Afford" a Loan*

228.   The difference between the term "qualified" and "afford" is a palpable one in this case.

229.   Even despite this difference, it is important to understand that a bank's qualification process is by its very nature designed to measure a borrower's ability to *afford* a loan.

230.   In determining whether a borrower is "qualified" for a loan, banks, including Defendant Banks, use two principal metrics known as **"front-end"** debt to income ratio, and **"back end"** debt to income ratio – both of which are intended to measure a borrower's ability to afford their loan.

231.   A **"front end"** debt to income ratio compares ONLY the loan payment (as well as taxes and insurance) to a person's income, and does not take into account any other debt whatsoever. For example a person who makes $10,000 per month, and whose mortgage costs $3,000 per month (including tax and interest), has a "front end" debt to income ratio of 30%.

232.   A **"back end"** debt to income ratio, by contrast, takes into account not only a person's loan payment (as well as taxes and insurance) but also *all other* debt reflected on their credit report. If that same person used in the example above, also had an additional $4,000 in monthly expenses such as credit card debt, car loans/payments, other mortgages, student debt, etc. etc., then that person's "back end" ratio would be 70%. ($3,000 per month for her loan, taxes & insurance plus, $4,000 per month for other debts = $7,000 per month in debt. $7,000 of debt divided by $10,000 in monthly income equals, 70% "back end" debt to income ratio).

233.   Industry Standard and Conventional Underwriting guidelines, including those used by Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be rejected – and that 45% figure was on the on the

- 82 -

**FIRST AMENDED COMPLAINT**

*very* high end. For a loan with a 45% "back end" debt to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as 720+ median credit score and high liquid asset reserves totaling more than 12 months of their ). In other words, Defendant Banks would not approve borrowers whose loan payment was more than 35% of their total monthly income, or whose total outgoing monthly debt as reflected on their credit report (including the loan payments) was more than 45% of their total monthly income.

234.    Intuitively, these two figures seem low. The typical lay borrowers ask "why are these figures so low? Clearly, I'm able to afford a larger loan if I still have **55%** (100% - 45% back end ratio) of my income available to me, after I've paid all my other debts, to pay for that larger loan.**" And therein lies the fundamental problem.** Borrowers, because of their lack of knowledge, simply don't understand that, in fact, they **cannot** afford more. They often overestimate themselves. By contrast, Banks have made a science of understanding exactly how much a borrower can afford, dedicating millions of dollars, hiring teams of expert statisticians, and spending years formulating underwriting guidelines, predicated on 100's of years of prior underwriting acumen, all to craft underwriting guidelines which reflect what appears to be a deceptively simple question – how much debt can a borrower realistically shoulder without imperiling themselves or their ability to pay back their loan? It is through their detailed efforts that Banks have settled upon the 35% front-end and 45% back-end debt-to-income ratios as a realistic measure of what borrowers can afford.

235.    The answer to the above question ("why are these figures so low?") is that banks, unlike borrowers, have recognized through their detailed research, that borrowers simply cannot *afford* a loan unless they are left with at least 55% of their income (after having paid their mortgage payment as well as all the other debt reflected on their credit report) to account for life's myriad non-credit reported expenditures such as emergency expenditures, unexpected events, non-credit reported debts, as well as one-time (non-recurring) expenses, including: **health care, medical emergencies, educational**

- 83 -

**FIRST AMENDED COMPLAINT**

**expenses/tuition, food, water, electricity, catastrophic & natural disasters,
emergency home repairs, medication, doctor's bills, medical insurance, car
payments, fuel, auto insurance, phone bills, internet, medication– these items are
even more expensive if a borrower has children**. And this is before even turning to the
discussion of a borrower's need set money aside for their savings and/or retirement.

236.    In other words the term *afford* as used herein describes a borrower's ability
to shoulder the additional debt burden resulting from the subject loan, in light of the
**numerous** other real-life demands placed on that borrower's income such as their…

237.    **Credit-reported debts** (i.e. credit card debt, car loans/payments, other
mortgages or financing, installment debt student debt, etc. etc);

238.    **Non-Credit Reported Expenses/Debt** (i.e. health care, medical
emergencies, educational expenses/tuition, food, water, electricity, catastrophic & natural
disasters, emergency home repairs, medication, doctor's bills, medical insurance, car
payments, fuel, auto insurance, phone bills, internet, medication)

239.    Real world need to set aside some of their income into a savings account,
such that they are not living month to month.

240.    Thus, the back-end debt to income ratio is a measure of a borrower's ability
to afford their loan which takes into account that borrowers have great demands placed
on their money outside of their credit reported debts – demands which borrowers
typically fail to account for or demands which, because of their lack of expertise,
borrowers are not as cognizant of, as banks are.

241.    Moreover, a Bank's qualification/underwriting process is also meant to
temper borrowers who overestimate themselves or their ability to pay back/afford their
loan.

242.    Because Defendant Banks have seen the pitfalls associated with the loans of
*hundreds of thousands* of borrowers, unlike borrowers who only know the pitfalls of their
own solitary loan,  and because banks enjoy the benefit of 100's of years of underwriting
acumen, unlike borrowers who enjoy no such benefit,  banks are substantially better

**FIRST AMENDED COMPLAINT**

1    positioned to understand the myriad expected and unexpected demands placed on a

2    borrower's income which would jeopardize a borrower's ability to afford the additional

3    debt burden resulting from a loan. Thus, banks, unlike borrowers, are intimately familiar

4    with how much a borrower is truly capable of affording. The sum result of their detailed

5    studies, established underwriting principles, and statistical analysis is that a borrower

6    would be imperiled and likely to default on his loan if their loan payment exceeds more

7    than 35% of their total income (front end), and that a borrower's loan payments in

8    combination with their credit-reported debts cannot exceed more than 45% of their

9    income (back end). And for that reason, they have made back end and front end debt to

10    income ratios - which are intended to measure a borrower's ability to *afford* a loan - a

11    cornerstone element of their qualification process.

12        243.    In sum, then, by its own nature Defendants' qualification process is intended

13    to measure whether a borrower can truly *afford* the loan they're being given.

14        244.    Yet even despite the fact that the qualification process is implicitly

15    predicated on the notion that a borrower can afford the loan, Defendants went one step

16    further, and **affirmatively and explicitly** (mis)represented to Plaintiffs that they would

17    be able to *afford* the loans that they were being given. In part, if not in whole, Defendants

18    did this in order to assuage Plaintiffs of rightful concerns regarding their ability to

19    shoulder the additional debt burden caused by taking on the loan – and Defendants did so

20    in an attempt to induce Plaintiffs into accepting financing so that the Loan

21    Representatives could make their commission, and so that Defendant Banks could make

22    their money by selling the loan on the secondary market for profit.

23        245.    Specifically, Plaintiff Borrowers in this action were explicitly told by

24    Defendants and their employee Loan Representatives that they could *afford* the loans

25    they were being given, and that they need not worry about whether they would be able to

26    shoulder the additional debt burden. Defendants told Plaintiffs that their calculations

27    show that the Plaintiffs will be able to afford their loans and comfortably shoulder the

28    additional debt from the loan, when taking into account all of Plaintiffs' other monthly

**FIRST AMENDED COMPLAINT**

1  debt. These statements were not offered as statements of opinion, but rather as outright

2  statements of fact.

3      246.   More specifically, the Plaintiff-borrowers in this action were told by

4  Defendants and their employee Loan Representatives that they would be able to

5  comfortably afford the fully amortized payments under the loan, or in some instances

6  they were told that they would be able to comfortably afford the payments on the loan,

7  but Defendants failed to additionally disclose that the initial payments were not the

8  permanent payments on the loan, or that those payments would drastically increase in the

9  future, and that the Plaintiffs would not be able to afford such drastically increased

10  payments.

11      247.   In fact in many instances, Plaintiffs were additionally told by Defendants

12  that a determination that they were qualified indeed meant, and was synonymous with,

13  that Plaintiffs could in fact *afford* their loans.

14      248.   As Plaintiffs' counsel continues to survey Plaintiffs and collect information

15  regarding their reliance upon Defendants' misrepresentations, Plaintiffs will seek leave to

16  amend to allege such supplemental allegations.

17      249.   For all of the reasons already listed, all of the above-listed material

18  misrepresentations were, in fact, false.  Defendants were not financially sound;

19  Defendants did not hold their loans in their own portfolio but rather sold them on the

20  secondary market; Defendants were not engaged in lending of the highest caliber, but

21  quite the contrary;  the loans offered by Defendants were anything but safe and secure;

22  Defendants did not refinance Plaintiffs loans  at a later date ; Defendants did not modify

23  Plaintiffs' loans; Plaintiffs and other borrowers were not qualified for the loans

24  Defendants were placing them into;  Plaintiffs were not capable of affording the fully

25  amortized payments on those loans as represented by Defendants;  Plaintiffs and other

26  borrowers' homes were falsely valued at inflated sums in order to place Plaintiffs into

27  larger loans; Defendants did not utilize a quality underwriting process; and Defendants

28  regularly entered into mortgages with grossly under-qualified borrowers.

- 86 -

**FIRST AMENDED COMPLAINT**

250.   The campaign of misinformation described throughout this complaint and in the First Cause of Action was intended to be repeated and broadly disseminated through the media, analyst reports and individual communications, and it was.  It was intended to become part of the well-understood "givens" among homeowners and prospective homeowners seeking mortgages, and it was.  The campaign of disinformation and the manifestation of that campaign described in the preceding paragraphs of this Second Cause of Action succeeded.  Plaintiffs relied upon the misrepresentations and entered into mortgages with Defendants.

251.   The misrepresentations were made with the intention that Plaintiffs rely thereon.  It was important to Defendants that Plaintiffs rely on its misrepresentations so that Plaintiffs would come to a false understanding as to the nature of their business.  The foregoing misrepresentations were specifically intended to convince Plaintiffs to enter into mortgages with Bank Defendants.

252.   In reliance on the above concealments and/or material misrepresentations, Plaintiffs entered into loan contracts with Defendants they otherwise would not have entered into and as a result thereof were damaged. This damage was not only foreseeable by Defendants, but actually foreseen (and then concealed) by them.

### *Plaintiffs' Reasonable Reliance*

253.   Plaintiffs reasonably and foreseeably relied upon the deception of Defendants in deciding to enter into a mortgage contract with Ally and Bank Defendants – Ally and Bank Defendants were among the nation's leading providers of mortgages.  It was highly regarded and by dint of its campaign of deception through securities filings, press releases, public utterances, web sites, advertisements, brokers, loan consultants and branch offices, Bank Defendants had acquired a reputation for performance and quality underwriting.  Furthermore, Ally, through its advertisements had cultivated a reputation of trustworthiness and that Ally worked in the interests of their client borrowers, and not just in its own interests. (See Ally's ads - "We make money with you, not off you" -

- 87 -

**FIRST AMENDED COMPLAINT**

http://www.businessinsider.com/ally-bank-print-ad). Again for these reasons, Plaintiff-borrowers' reliance was reasonable.

254.    By reason of Ally's prominence and long term campaign of deception as to its business plans and the relationship of trust developed between each of the Defendants and Plaintiffs, Plaintiffs were justified in relying upon Defendants' representations.

255.    Moreover, as consumers unfamiliar with the myriad intricacies, terms and mathematics of mortgages, it was both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the advice of loan professionals and bank representatives (many of whom held the title "Loan CONSULTANT") trained to understand the highly-complicated terms and mathematics of financing, amortization, indices, margins, and collateralization in the mortgage world, in deciding to contract with Defendants.

256.    Further, the fundamental advisory role that a lender takes in a lender-borrower relationship is also grounds for a borrower's reasonable reliance on their statements and advice. The reality is that borrowers simply don't understand the highly complicated mathematics of lending such as amortization, loan re-casting, loan to value ratios, or debt to income ratios, etc. Nor could they be expected to – those mathematics require specialized training and education. The borrower's knowledge is inferior. Teams of highly trained underwriters spend weeks determining whether a borrower can handle their loan. How can it be expected that a single lay-borrower can do the same? It is *frequently* the case that a borrower walks into a lender's office and asks the loan consultant "how much can I afford?"   Because of the vast imbalance of knowledge, when a loan consultant tells a borrower that they can afford their loan, borrowers *believe* that – they rely on their lender's knowledge. Though banks might not like to acknowledge it, that *is* the reality – and facts establishing this reality can be readily established at trial through testimony and otherwise. For these very same reasons, a lenders duty to be truthful is implicated as well.

- 88 -

**FIRST AMENDED COMPLAINT**

257.   The same is true of appraisals. It is reasonable and foreseeable that a consumer would rely upon an appraisal arrived at by a professional licensed appraiser – particularly in light of their *complicated* and highly fact sensitive & contextual nature - particularly where, as here, the appraisers were held out as being employed and/or contracted by Ally and Bank Defendants; Borrowers believed that Bank Defendants, by virtue of its reputation would only work with scrupulous, professional, and ethical appraisers. Additionally, the appraisers delivered their valuations and appraisals as statements of fact, not as statements of opinion. Moreover Bank Defendants ratified the statements and values offered by their appraisers by communicating to Plaintiffs that the values arrived at by their appraisers were in fact the true values of their properties/homes. Plaintiffs did in fact rely on the representations and concealments of these parties.

258.   Plaintiffs did in fact rely on the representations and concealments of these parties.

259.   As a result of Defendants' scheme described herein, Plaintiffs could not afford their mortgage when its variable rate features and/or balloon payments kicked in or its introductory rate expired. In fact, because of Defendants' deception, many Plaintiffs were placed into loans they could not even afford from outset of the loan.   Further, as a result of the Defendants' scheme, Plaintiffs could not refinance or sell their residence without suffering a massive loss of their equity investments.

260.   As a result of the foregoing, Plaintiffs have lost all or a substantial portion of the equity invested in their houses and suffered reduced credit ratings and increased borrowing costs, among other damages described herein.

261.   Bank Defendants represented to multiple Plaintiffs that they would be assisted by Defendants in a loan modification. As described herein, that representation was false. Defendants knew that representation was false when they made it.

262.   Because of new laws pertaining to loan modifications and Defendants' insistence that they had a genuine interest in complying therewith and in keeping borrowers in their homes, Plaintiffs reasonably relied on the representations.

- 89 -

**FIRST AMENDED COMPLAINT**

263.  By delaying Plaintiffs from pursuing their rights and by increasing Plaintiffs' costs and the continuing erosion of each Plaintiff's credit rating, each Plaintiff's reliance harmed that Plaintiff. .

264.  As a proximate result of the foregoing concealments and/or misrepresentations made by Defendants, California property values have precipitously declined and continue to decline, gravely damaging Plaintiffs by materially reducing the value of their primary residences, depriving them of access to equity lines, second mortgages and other financings previously available based upon ownership of a primary residence in California, in numerous instances leading to payments in excess of the value of their properties, thereby resulting in payments with no consideration and often subjecting them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability.

265.  Furthermore Plaintiffs were damaged in having their homes values artificially inflated by Defendants. Specifically, since down payments are calculated as a percentage of the home value, by over valuating the loans, Defendants were also required to place larger down payments. Defendants knew Plaintiffs would lose their down payments as a result of the fact that Defendants were intentionally placing borrowers into loans for which they were unqualified, (2) the loan products they were being placed into were unsustainable (3) the financial meltdown Defendants knew their actions would cause, (4) for the sake of brevity, for all reasons already mentioned herein.

266.  Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from the matters complained of in this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

267.  Plaintiffs' reliance on the representations made by Defendants was a substantial factor in causing Plaintiffs' harm.

**FIRST AMENDED COMPLAINT**

268.    Furthermore, Plaintiffs' reliance on the misrepresentations of the HCLS all directed and ratified by the Ally and Bank Defendants, was a substantial factor in causing Plaintiffs' harm.

269.    Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

270.    These frauds and concealments were unknown to all Plaintiffs referenced herein at the time of loan origination. All Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years prior to the date of filing this action. A reasonable would have been unable to reasonably discover said frauds any earlier.

271.    Specifically, Defendants repeatedly emphasized Defendants' underwriting quality in public statements from 2003 through 2008. With an incentive to bundle and sell large quantities of loans as quickly as possible, banks all over the country, including Defendants, became conduits for the securitization and sale of loans to Wall Street. The banking industry began to move away from the traditional model of "originate to hold" towards a new system of banks as loan-conveyor belts under the "originate to sell" model which eviscerated the incentives of a traditional lender to ensure quality loan production, instead replacing those incentives with an incentive to churn out as many loans as possible regardless of loan quality. Notably, the ease with which securitized mortgage products could be sold encouraged poor underwriting and guidelines which had been established to mitigate and control risk were often ignored.

### THIRD CAUSE OF ACTION

*(By All Plaintiffs – Negligent Misrepresentation – Against All Defendants)*

272.    All preceding and subsequent paragraphs are hereby incorporated by reference as though fully set forth herein.

273.    **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE**

- 91 -

**FIRST AMENDED COMPLAINT**

1  **OTHERWISE NOTED), <u>APPENDIX "A"</u> ("INDIVIDUALIZED PLAINTIFF**
2  **ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO**
3  **EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC**
4  **WRONGS DONE BY EACH DEFENDANT.**  By this reference, Plaintiffs hereby
5  incorporate Appendix "A" to this Complaint.

6      274.   Although Defendants may have reasonably believed that some or all of the
7  representations they made, as described in this Complaint, were true, none of them had
8  reasonable grounds for believing such representations to be true at the time: (1) the
9  representations were instructed to be made, as to those Defendants instructing others to
10  make representations, or (2) at the time the representations were made, as to those
11  Defendants making representations and those Defendants instructing others to make the
12  representations, or (3) at the time the representations were otherwise ratified by the
13  Defendants.

14      275.   Such representations, fully set forth in the Second Causes of Action and
15  previous sections of this Complaint, were not true.

16      276.   Defendants intended that Plaintiffs rely upon those misrepresentations.

17      277.   As described herein, Plaintiffs reasonably relied on those representations.

18      278.   By reason of the prominence of Defendants and the campaign of deception
19  as to its business plans and the relationship of trust developed between Defendants and
20  Plaintiffs, Plaintiffs were justified in relying upon Defendants' representations.

21      279.   As a result of relying upon the foregoing misrepresentations, each Plaintiff
22  entered into a mortgage contract with Defendants.

23      280.   As a result of scheme described herein, Plaintiffs could not afford his or her
24  mortgage when its variable rate features and/or balloon payments kicked in.  Further, as a
25  result of the Defendants' continuing scheme, Plaintiffs could not refinance or sell his or
26  her residence without suffering a loss of Plaintiff's equity.

27      281.   Without limiting the damages as described elsewhere in this Complaint,
28  Plaintiffs damages as a result of the foregoing also include loss of equity in their houses,

- 92 -

**FIRST AMENDED COMPLAINT**

costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

282.   Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## FOURTH CAUSE OF ACTION

### *(By All Plaintiffs – Unfair Competition – Against All Defendants)*

283.   The preceding paragraphs and subsequent causes of action are incorporated by reference as though fully set forth herein.

284.   **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), APPENDIX "A" ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

285.   As it pertains to Unfair Competition Law "the universal test is whether the public is likely to be deceived." (Grant v. California Bench Co. (1946) 76 Cal.App.2d 706, 707-708.)

286.   As described in this Complaint, and here in this Cause of Action, Defendants have acted unlawfully, unfairly, and fraudulently. To say the least, their actions were likely to deceive the public.

287.   As detailed in the First and Second Causes of Action above (and hereby incorporated by reference), Defendants' fraud upon Plaintiffs was pervasive and multi-

- 93 -

**FIRST AMENDED COMPLAINT**

1    pronged. Defendants' material misrepresentations and affirmative concealments, if left
2    unchecked, are highly likely to deceive the public.

3        288.    Defendants' actions in implementing and perpetrating their fraudulent
4    scheme of inducing Plaintiffs to accept mortgages for which they were not qualified
5    based on inflated property valuations and undisclosed disregard of their own
6    underwriting standards and the sale of overpriced collateralized mortgage pools, all the
7    while knowing that the plan would crash and burn, taking the Plaintiffs down and costing
8    them the equity in their homes and other damages, violates numerous federal and state
9    statutes and common law protections enacted for consumer protection, privacy, trade
10   disclosure, and fair trade and commerce. In addition to being fraudulent and violates
11   numerous federal and state statutes and common law protections enacted for consumer
12   protection, privacy, trade disclosure, and fair trade and commerce.

13       289.    These actions were immoral, unethical, oppressive, unscrupulous and
14   substantially injurious to similarly situated borrowers, and Plaintiffs herein. Defendants'
15   conduct had no utility other than for their own ill-gotten gain, and the harm was great not
16   only to Plaintiffs herein, but also to residents of California, broadly, who have seen a
17   decrease in their home and property values as a result of the bursting of the super-heated
18   pricing bubble created by Defendants' fraudulently inflated appraisal; at the time of their
19   fraud, Defendants *knew* that their conduct would cause the precipitous decline in property
20   values throughout the State of California. Defendant's acts caused substantial consumer
21   injury with no benefits to consumer competition. Plaintiffs could not have reasonably
22   avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation,
23   and omission. Further, Defendants acts significantly threatened harm to competition.

24       290.    The Defendants perpetrated their fraudulent scheme of selling off overpriced
25   loans by making willful and inaccurate credit disclosures regarding Defendants'
26   borrowers, including Plaintiffs, to third parties. This false credit disclosure was critical to
27   the success of Defendants' continued sales of the massive pools of mortgage loans
28   necessary to perpetuate the scheme. The Defendants were aware that if the true credit

**FIRST AMENDED COMPLAINT**

1   profiles of the borrowers and the values of their real estate were accurately disclosed, the

2   massive fraudulent scheme would end.  As a result, the Defendants repeated, reinforced

3   and embellished their false disclosures.

4       291.  Defendants had an unfair and fraudulent pattern on inducing and directing

5   borrowers to fall behind on their payments with the promise that by doing so, they would

6   become eligible for a loan modification. Relying on these representations, Plaintiffs fell

7   behind on their loan payments, but were never offered a loan modification. In doing so,

8   Plaintiffs' credit was substantially damaged, they suffered greatly diminished access to

9   credit and financing, and were penalized with fees, penalties and charges in addition to

10  becoming delinquent on their loan as recommended by the Bank. By recommending that

11  Plaintiffs fall behind, Defendants effectively trapped Plaintiffs into keeping their loan

12  with Defendants, because no other institution would help Plaintiffs after they became

13  delinquent on their mortgage, or after their credit was destroyed.

14      292.  Defendants also had an unfair and fraudulent pattern of offering borrowers

15  what appeared to be Loan modification offers (called "Trial Payment Plans"), but in

16  reality these offers were nothing more than "cash grabs." Defendants never intended to

17  permanently modify Plaintiffs' loans. Specifically, Defendants would offer Plaintiffs and

18  homeowners who were already on the brink of default/foreclosure a lower payment called

19  a "trial payment." Defendants promised that if Plaintiffs were able to make the trial

20  payment for 3 (or more) months, Defendants would permanently modify Plaintiffs'

21  payment to be the same amount under the trial payments. But Defendants had a pattern of

22  rejecting these loan modifications despite Plaintiffs' compliance with every term of the

23  loan modification offer. Instead Defendants would use the offer as bait to induce

24  Plaintiffs to make payments which would never be applied to the principal and interest of

25  their loan, but instead would be applied to the mountain of unmerited late charges, and

26  fees, taking what little money the financially imperiled plaintiffs had left, and duping

27  them into spending it on unfairly placed fees and late charges. Defendants never had any

28  intent of modifying their loans, despite Plaintiffs' full compliance with the terms of the

- 95 -

**FIRST AMENDED COMPLAINT**

offer. Such acts are patently unfair and fraudulent, and Plaintiffs are entitled to remuneration of all payments made under such trial payment plans, as well as an injunction prohibiting Defendants from this deceptive business practice. More specifically, Defendants' unlawful and unfair practices in this regard include, but are not limited to, the following:

      a.  failing to make good faith efforts to provide them with a loan modification and breaching their contractual obligations, written and implied promises, loan servicing functions owed to Plaintiffs, who fulfilled their obligations by making timely modified payments;

      b.  making false and/or misleading representations that Plaintiffs were eligible and entered into the trial modification period, which would lead to a permanent modification of their mortgage payment;

      c.  failing to disclose to Plaintiffs that their modified payments may be reported to credit bureaus as default or late payments that would destroy their credit scores;

      d.  delaying processing, demanding duplicate documentation, and failing to provide adequate information or communication regarding the loan modification programs to Plaintiffs; and

      e.  engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint

      f.  omitting to inform Plaintiffs that they could be rejected from the trial modification period at any point, and that this would result in the immediate demand for a balloon payment consisting of purported delinquency payments and substantial late fees, default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees, trustee sale guarantee fees, mail fees, recording fees, and default servicing fees.

293.   Regulation Z obligates creditors providing "closed-end credit" (such as a mortgage) to "make the disclosures required by this subpart clearly and conspicuously in

**FIRST AMENDED COMPLAINT**

1   writing, in a form that the consumer may keep." (12 C.F.R. § 226.17(a)(1) (2010).) "This

2   standard requires that disclosures be in a reasonably understandable form. For example,

3   while the regulation requires no mathematical progression or format, the disclosures must

4   be presented in a way that does not obscure the relationship of the terms to each other."

5   (12 C.F.R. § 226, Supp. 1, par. 17(a)(1).)

6       294.    Variable rate mortgage borrowers must be provided with "[a] loan program

7   disclosure" that includes "[a]ny rules relating to changes in the index, interest rate,

8   payment amount, and outstanding loan balance including, for example, an explanation of

9   interest rate or payment limitations, negative amortization, and interest rate carryover."

10  (12 C.F.R. § 226.19(b)(2)(vii) (2010).) "If the initial interest rate will be a discount or a

11  premium rate, creditors must alert the consumer to this fact." (12 C.F.R. § 226, Supp. 1

12  par. 19(b)(2)(v)(1).) "A creditor must disclose, where applicable, the possibility of

13  negative amortization. For example, the disclosure might state, 'If any of your payments

14  is not sufficient to cover the interest due, the difference will be added to your loan

15  amount.' . . . If a consumer is given the option to cap monthly payments that may result

16  in negative amortization, the creditor must fully disclose the rules relating to the option,

17  including the effects of exercising the option (such as negative amortization will occur

18  and the principal loan balance will increase). . . ." (12 C.F.R. § 226, Supp. 1 par.

19  19(b)(2)(vii)(2).)

20      295.    The Defendants knew the borrowers' credit was inadequate to support

21  continued loan payments, absent unsustainable inflation of property values. These

22  pervasive false credit disclosures to third parties (including purchasers of bundled

23  mortgage pool created by the Defendants) constituted false credit reports in violation of

24  the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.,* and these pervasive false

25  disclosures permitted the Defendants to continue their scheme and victimize the

26  Plaintiffs.

27      296.    These pervasive false disclosures also caused the bubble to burst. Once it

28  became known that some of the information provided by Defendants was false, the

- 97 -

**FIRST AMENDED COMPLAINT**

1    market for the sale of bundled loans dried up.  The Defendants began to issue foreclosure

2    notices, property values began dropping, and then, under the weight of *deflation* in a

3    market that requires *inflation*, the equity investments made by Plaintiffs and others in

4    their homes was lost . . . and then Plaintiffs were lost in the greatest economic recession

5    since the 1930s.

6    297.  As alleged by the SEC, this fraud also violated Federal law, including,

7    without limitation,  the antifraud provisions and insider provisions of the Securities Act

8    of 1933 ("*Securities Act*") and the Securities Exchange Act of 1935 ("*Exchange Act*")

9    including, without limitation:

10         a.  Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), by engaging

11              conduct which acted as a fraud on the purchaser of securities based on

12              collateralized mortgage pools;

13         b.  Section 10(b) of the Securities Act and Rule 10b-5 thereunder, 15 U.S.C.

14              § 78j(b) and 17 C.F.R. 240.10b-5, by making untrue statements of

15              material fact and omitting to state material facts necessary in order to

16              make the statements made, in the light of the circumstances under which

17              they were made, not misleading and/or otherwise engaging in acts,

18              practices, or courses of business which operated as a fraud or deceit upon

19              purchasers of securities based on collateralized mortgage pools; and

20         c.  Section 13(a) of the Securities Exchange Act and Rules 12b-20, 13a-1

21              and 13a-3 thereunder, 15 U.S.C. § 78t (e), by filing with the SEC false

22              information for the fiscal years 2005 through 2007.

23    298.  The foregoing violations were in furtherance of the fraud perpetrated on

24    Plaintiffs.  In fact, Defendants could not have told the truth in their public filings without

25    that truth becoming known to Plaintiffs.  Conversely, the false filings gave additional

26    credence and support to omissions, concealment, promises and inducements.

27

28

- 98 -

**FIRST AMENDED COMPLAINT**

299.   Defendants violated the Patriot Act as described above by failing to adequately identify the source of funds used to fund mortgages and fund the securitization pools that purchased mortgages.

300.   Defendants further violated by Patriot Act by failing to adopt procedures required thereunder as to the sources of funds and record-keeping pertaining thereto.

301.   Defendants further violated the Patriot Act by failing to timely and accurately provide the disclosures required under the Patriot Act pertaining to its sources of funds, thereby depriving Plaintiffs and others of information pertaining possibly money laundering.

302.   Defendants herein both in their individual capacity, and in their capacity as co-conspirators with one another and with HLCS (Ally's wholly-owned appraisal management company) have violated Cal. Civ. Code §1090.5 by improperly influencing appraisers through, among other things, compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal management company itself, and its management and executives, as described at length in the sixth cause of action below.

303.   Defendants violated California common law by pursuing foreclosures through mere nominees, such as MERS, and without proof they owned the notes and deeds of trust underlying their foreclosure actions.

304.   While processing the home loans of each Plaintiff herein, the Ally Defendants and other Defendants herein came into possession, custody and control of their Private Information.

305.   The guarantee of privacy granted to each Californian is a special personal and property right.  Other states may accord privacy rights by way of statute, or otherwise, but the privacy right in California is a unique, fundamental, Constitutional, and *inalienable* right that is also a protectable property interest.  The privacy right granted by the California Constitution necessarily includes protection from the release of the Private Information.

- 99 -

**FIRST AMENDED COMPLAINT**

306. By foreclosing on Plaintiffs without being "holders" or in possession of their respective Notes, Defendants unlawfully foreclosed on Plaintiffs without having the authority to enforce the debt in violation of UCC 3-301.

307. The Ally Defendants acknowledge and admit that their agents and/or employees disclosed the Private Information of Plaintiffs to outside persons.

308. This Private Information of Plaintiffs was sold or otherwise disclosed to third parties without Plaintiffs' consent, further violating Article I, § 1 of the California Constitution and the California Financial Information Privacy Act.

309. The Private Information was disclosed and then used unlawfully and fraudulently to apply for and receive multiple credit cards, charge accounts, and other credit from businesses in the mistaken belief that they were dealing with a Plaintiff, and not with an identity thief.

310. These undeniable disclosures by the Defendants of nonpublic personal information of the Plaintiffs and others also violated the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.*

311. By violating Plaintiffs' right to privacy and by misappropriating nonpublic personal information for their own use, the Defendants thus wrongfully took each Plaintiff's property interest in his or her Private Information and privacy, injuring each Plaintiff, and, as a result, Plaintiffs are eligible for restitution because the Defendants wrongfully acquired the property in which Plaintiffs had an ownership or vested interest.

312. The forgoing fraudulent concealment, material misstatements, and the intentional violations of state and federal statutes cited herein constitute unlawful, unfair and fraudulent business acts or practices and so constitute unfair business practices within the meaning of the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17200, 17500. Sections 17200 *et seq.* of the California Business & Professions Code provides, in the disjunctive, for liability in the event of any such "unlawful, unfair or fraudulent business act or practice."

**FIRST AMENDED COMPLAINT**

1    313.   The violations described herein are unlawful, in that they violate *inter alia*
2  Article I, § 1 of the California Constitution, the California Financial Information Privacy
3  Act, Cal. Civil Code §§ 1798.80-84, the Fair Credit Reporting Act, the Gramm-Leach-
4  Bliley Act and the Federal laws described herein. These violations are the basis for
5  liability under § 17200 of the Business and Professions Code, as is the unlawful and
6  fraudulent activity described herein.

7    314.   The unfair, unlawful and fraudulent acts and practices of Defendants named
8  herein present a continuing threat to Plaintiff and to members of the public in that these
9  acts and practices are ongoing and are harmful and disruptive to business and financial
10  markets.

11    315.   The actions described herein are unfair and patently fraudulent in that they
12  were conducted for the sole purpose of perpetuating an unlawful and unsustainable
13  investment scheme.

14    316.   As a result of the actions, concealment and deceit described herein, each of
15  the Plaintiffs has suffered material financial injury in fact, including as described
16  elsewhere in this Complaint, loss of equity in their houses, costs and expenses related to
17  protecting themselves, reduced credit scores, unavailability of credit, increased costs of
18  credit, reduced availability of goods and services tied to credit ratings, increased costs of
19  those services, as well as fees and costs, including, without limitation, attorneys' fees and
20  costs.

21    317.   As a further result of the actions, concealment and deceit described herein,
22  each of the Plaintiffs has lost money or property as a result of such unfair competition,
23  including the loss of Plaintiffs' property interest in their Private Information as a result of
24  the unconscionable invasion of privacy and misappropriation of nonpublic personal
25  information.

26    318.   California Civil Code § 2923.5 requires that each mortgagee, trustee,
27  beneficiary, or authorized agent may not file a notice of default pursuant to California
28  Civil Code § 2924 until 30 days after initial contact is made as required therein, or 30

**FIRST AMENDED COMPLAINT**

1    days after satisfying the due diligence requirements to contact the mortgage described

2    therein.  Defendants violated the foregoing law by causing a notice of default to be filed

3    against Plaintiffs without the mandatory notice.  Defendants did not diligently endeavor

4    to contact the Plaintiffs as required by § 2923.5(g) and Defendants thereby also violated

5    California Civil Code §§ 2923.5 and 2924.

6        319.   As a result of the foregoing unlawful conduct, Plaintiffs suffered further

7    injury in fact by the filing of notices of default and as such the Plaintiffs suffered

8    monetary and property loss.  Such injuries and loss included diminished credit scores

9    with a concomitant increase in borrowing costs and diminished access to credit, fees and

10   costs, including, without limitation, attorneys' fees and costs with respect to wrongful

11   notices of default and loss of some or all of the benefits appurtenant to the ownership and

12   possession of real property.

13       320.   The foregoing unlawful activities were pervasive and violate Business and

14   Professions Code § 17200 *et seq.*

15       321.   As a result of Defendants' unfair competition, Plaintiffs are entitled to

16   restitution for all sums received by Defendants with respect to Defendants' unlawful

17   and/or unfair and/or fraudulent conduct, including, without limitation, interest payments

18   made by Plaintiffs, fees paid to Defendants, including, without limitation, the excessive

19   fees paid at Defendants' direction as alleged by the FTC, and premiums received upon

20   selling the mortgages at an inflated value.

21       322.   Further as a result of Defendant's (1) artificial and fraudulent inflation of

22   Plaintiffs' property values, and property values throughout the State of California, as well

23   as (2) Defendants' abandonment of their own as well as industry standard underwriting

24   guidelines, coupled with (3) Defendants incentive to package and sell as many dollars'

25   worth of loans as they could to the secondary market, Defendants placed Plaintiff-

26   borrowers into loans which were considerably larger than were justified by (a) the *true*

27   uninflated valued  of their properties, (b) Plaintiffs true uninflated incomes and (c)by

28   Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger

**FIRST AMENDED COMPLAINT**

1  loans than they could afford or should have been placed into. The additional fees, points

2  and interests paid as a result of the higher/inflated loan amounts constitute damages, and

3  legally cognizable sources of restitution.

4       323.    Further, Defendants either directly or through their subsidiaries, including

5  ETS (and any other such companies), often charged fees associated with initiating or

6  conducting the foreclosures resulting from their fraudulent lending including inspection

7  fees, default fees, late fees, advance fees, attorney fees, and trustee fees. In short,

8  Defendants made money by wrongfully initiating foreclosures against Plaintiffs herein.

9  The award of damages or restitution for these unmerited fees obtained through deceit is

10 proper.

11      324.    Plaintiffs are also entitled to the issuance of a temporary restraining order, a

12 preliminary injunction, and a permanent injunction restraining and enjoining Defendants

13 from any further concealment with respect to the sale of notes and mortgages, any further

14 violation of § 2923.5, any further violation of Article I, § 1 of the California Constitution,

15 the California Financial Information Privacy Act, Cal. Civil Code § 1798.82, the Fair

16 Credit Reporting Act, and the Gramm-Leach-Bliley Act, and any further disclosure or use

17 of the Private Information, other than as intended by the Plaintiffs.

18      325.    Plaintiffs are entitled to such relief as is set forth in this Cause of Action and

19 such further relief as is set forth below in the section captioned Prayer for Relief which is

20 by this reference incorporated herein.

21

22                              **FIFTH CAUSE OF ACTION**

23                   ***(By Plaintiffs listed Below– Wrongful Foreclosure,***

24                ***Violation of Cal. Civil Code § 2924 –Against All Defendants)***

25      326.    The preceding paragraphs and the paragraphs following this cause of action

26 are incorporated by reference as though fully set forth herein.

27      327.    **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT**

28 **THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE**

**FIRST AMENDED COMPLAINT**

OTHERWISE NOTED), **APPENDIX "A"** ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

328.   Defendants have already foreclosed upon the following property owned by the following Plaintiffs – allegations establishing the specific factual basis of the wrongful nature of the foreclosure as against each of the Plaintiffs below are set forth in **APPENDIX A.**

      a) Rick Albritton  (Appendix A, ¶7)
          2030 W Windhaven Dr,
          Rialto CA 92377

      b) Deborah Albritton (Appendix A, ¶7)
          2030 W Windhaven Dr,
          Rialto CA 92377

      c) David Cruz (Appendix A, ¶11)
          48159 Sol De Linda,
          Coachella, CA 92236

      d) Yesenia Cruz (Appendix A, ¶11)
          48159 Sol De Linda,
          Coachella, CA 92236

      e) Cristina Palbicke (Appendix A, ¶13)
          27949 Harwood Dr,
          Santa Clarita, CA 91350

      f)  Magdalena Avila (Appendix A, ¶25)
          1015 Via Carmelita
          Burbank, CA 91501

      g) Cecilia Chaube (Appendix A, ¶24)
          2617 Ranchwood Dr.

**FIRST AMENDED COMPLAINT**

Brentwood, CA 94513

h) Florastene Holden (Appendix A, ¶29)
   2114 Oak Crest Dr.
   Riverside, CA 92506

i) Ignacio Rodriguez (Appendix A, ¶31)
   2714 Norton Ave.
   Lynwood, CA 90262

j) Rosa Rodriguez (Appendix A, ¶31)
   2714 Norton Ave.
   Lynwood, CA 90262

k) Sarah Sebagh (Appendix A, ¶6)
   1233 N. Flores St., Apt. 302
   West Hollywood, CA 90069

l) Gricelda Ruano (Appendix A, ¶26)
   170 East Street, Unit D9
   Chula Vista, CA 91910

m) Elisa Jordan
   170 East Street, Unit D9 (Appendix A, ¶26)
   Chula Vista, CA 91910

329.    Because Defendants are not the holders of the notes and deeds of trust and are not operating under a valid power from the current holders of the notes and deeds of trust, Defendants did not have the right to proceed with the foregoing foreclosures.

330.    The burden of proving an assignment falls upon the party asserting rights thereunder.  In an action by an assignee to enforce an assigned right the evidence must not only be sufficient to establish the fact of assignment when that fact is in issue, but the measure of sufficiency requires that the evidence of assignment be clear and positive to protect an obligor from any further claim by the primary obligee.  Defendants, they failed

**FIRST AMENDED COMPLAINT**

1    to do so and improperly foreclosed by reason of lack of proof that they had the right to
2    proceed.

3        331.    Under the California Uniform Commercial Code, a negotiable instrument,
4    such as a promissory note secured by a mortgage, may only be enforced by the holder or
5    a person with the rights of a holder. Com. Code § 3-301. For instruments payable to an
6    identified person, such as a lender, a holder is generally recognized as the payee or one to
7    whom the negotiable instrument has been negotiated. This requires transfer of possession
8    and endorsement by the prior holder. Com. Code § 3-201. Unless the parties otherwise
9    provide, the mortgage follows the note. Civ. Code § 2936.

10       332.    Though in California, the assignment of a note generally carries with it an
11   assignment of the mortgage (Civ. Code § 2936), it is still required in California that the
12   holder of the note or a person operating with authority from that holder be the foreclosing
13   party and that the mortgage not have been assigned away from that note.

14       333.    Defendants no longer own the notes it originated and there is just no way of
15   knowing who now owns the Plaintiffs' mortgages because the Defendants do not know
16   who owns these mortgages. Indeed, the Defendants do not know where it is that they
17   obtained their alleged rights to collect money from Plaintiffs thereunder.

18       334.    Once separated from the note, the trust deed is unenforceable and of no legal
19   value. For negotiable instruments payable to an identified person, such as a lender, a
20   holder is generally recognized as the payee or one to whom the negotiable instrument has
21   been negotiated. This requires transfer of possession and endorsement by the prior
22   holder. (Com. Code § 3-201). Unless the parties otherwise provide, the mortgage
23   follows the note. (Civ. Code § 2936; see also *Carpenter v. Longan* (1872) 83 U.S. 271,
24   275).

25       335.    Civil Code § 2936 provides: "the assignment of a debt secured by mortgage
26   carries with it the security." Defendants have no evidence that they own the notes or
27   have any power to enforce them from the rightful owners.

28

- 106 -

**FIRST AMENDED COMPLAINT**

336.    Foreclosure was wrongful for each of the following reasons, independent of any of the other following reasons: (1) because Plaintiff's mortgage was obtained through concealment and/or misrepresentation; (2) because Defendants do not own the note and do not have a power of attorney with respect to the note; (3) because the note and deed of trust have become separated; (4) because Defendants do not own the deed of trust and do not have a power of attorney with respect to the deed of trust; (5) because Defendants cannot surmount their burden of demonstrating they own the note or have a power of attorney with respect thereto; and (6) because Defendants cannot surmount their burden of demonstrating they own the deed of trust or have a power of attorney with respect thereto.

337.    As a result of the foreclosures, Plaintiff was dispossessed of Plaintiff's property and put to the expense of relocating and securing alternative properties.  Plaintiff was further dispossessed of the value of Plaintiff's home and the potential appreciation thereof.

338.    Defendants, including Trustee, acted outrageously and persistently with actual malice in performing the acts alleged in this cause of action.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## SIXTH CAUSE OF ACTION

*(By All Plaintiffs – Improper Influence Over Appraisers – Cal. Civ. Code §1090.5 – Against Bank Defendants and HCLS)*

339.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

340.    **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), APPENDIX "A" ("INDIVIDUALIZED PLAINTIFF**

- 107 -

**ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

341.    California Civil Code §1090.5 "Valuation of real estate; improper influence; violation" forbids the exercise of influence over the valuation of property by any person with an interest in that real estate transaction. Specifically California Civil Code §1090.5 states:

(a) No person with an interest in a real estate transaction involving a valuation shall improperly influence or attempt to improperly influence the *development*, *reporting*, result, or review of that valuation, through coercion, extortion, bribery, intimidation, compensation, or instruction. For purposes of this section, a valuation is defined as an estimate of the value of real property in written or electronic form, other than one produced solely by an automated valuation model or system. Prohibited acts include, but are not limited to, the following:

(1) Seeking to influence a person who prepares a valuation to report a minimum or maximum value for the property being valued. Such influence may include, but is not limited to:

(A) Requesting that a person provide a preliminary estimate or opinion of value prior to entering into a contract with that person for valuation services.

(B) Conditioning whether to hire a person based on an expectation of the value conclusion likely to be returned by that person.

(C) Conditioning the amount of a person's compensation on the value conclusion returned by that person.

(D) Providing to a person an anticipated, estimated, encouraged, or desired valuation prior to their completion of a valuation.

(2) Withholding or threatening to withhold timely payment to a person or entity that prepares a valuation, or provides valuation management

- 108 -

**FIRST AMENDED COMPLAINT**

functions, because that person or entity does not return a value at or above a certain amount.

(3) Implying to a person who prepares a valuation that current or future retention of that person depends on the amount at which the person estimates the value of real property.

(4) Excluding a person who prepares a valuation from consideration for future engagement because the person reports a value that does not meet or exceed a predetermined threshold.

(5) Conditioning the compensation paid to a person who prepares a valuation on consummation of the real estate transaction for which the valuation is prepared.

(6) Requesting the payment of compensation to achieve higher priority in the assignment of valuation business.

342. Bank Defendants and their Co-conspirators herein had a direct interest in the valuation of real estate transactions at issue, as they were the institution that was lending on the property, and moreover because they stood to profit from the consummation of the real estate transaction – which depended in large part on a sufficient valuation being returned by the appraiser. Their wrongful influence occurred in connection with the "development, reporting, result, or review of that valuation" in accord with the language of the statute.

343. Defendants herein both in their individual capacity, and in their capacity as co-conspirators with one another and with HCLS (Ally's wholly-owned appraisal management company) have violated California Civil Code §1090.5 by violating appraiser independence through, among other things, compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal management company itself, and its management and executives, as well as other independent, outside, or "fee appraisers" not employed by HCLS Appraisals.

344. As described throughout this Complaint at length, but particularly at paragraphs 64-89, Ally and Defendants herein as well as their employees, officers, and agents intentionally:

- 109 -

**FIRST AMENDED COMPLAINT**

a. Caused the appraisers to base the value of their appraisals on a factor other than the independent judgment of the appraiser;

b. Mischaracterized and/or suborned the mischaracterization of the appraised value of the property securing the extension of credit;

c. Sought to influence the appraiser to facilitating the making of and pricing of their transactions;

d. Sought to influence the appraiser to achieve a targeted value;

e. Withheld or threatened to withhold payment for the appraisal services rendered in conformity with the contract between the parties;

f. Implied, directly or indirectly or threatened that the future retention of the appraiser was contingent upon their return of a satisfactory valuation;

g. Excluded other appraisers from rendering future valuations based on the return of valuations which did not meet a certain target in the past.

345. Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

346. As alleged at length above, Bank Defendants violated California Civil Code §1090.4 by subjecting, both, their appraisers as well as their appraisal management company, HCLS to coercion, undue influence, bribery, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit – that if their appraisals didn't come back in at value (1) future business with HCLS would either diminish or discontinue altogether or (2) that the individual appraiser would be blacklisted. Specifically, these allegations are found above at paragraphs 64-89, and are hereby incorporated into this cause of action by reference.

347. Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

- 110 -

**FIRST AMENDED COMPLAINT**

348.   As a result of Defendants' acts, California's real estate economy, and the individual values of Plaintiffs' properties were artificially inflated, resulting in and causing the substantial loss of Plaintiffs' net equity upon the unraveling of their fraudulent scheme.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

1.    General, Actual, Compensatory, Special and Exemplary damages according to proof under the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action, and any other causes of action for which such relief may be available;

2.    Twice the amount of finance charges under the Second Cause of action;

3.    Statutory relief according to proof under the Fourth and Fifth Causes of Action and any other causes of action for which such relief may be available;

4.    Restitution under the Fourth Cause of Action and any other causes of action for which such relief may be available;

5.    Temporary, preliminary, and permanent injunctive relief under the Fourth and Fifth Causes of Action and any other causes of action for which such relief may be available;

6.    On all causes of action, for costs of suit herein;

7.    On all causes of action, for pre- and post-judgment interest;

8.    On all causes of action for which attorney's fees may be awarded pursuant to the governing contract, by statute or otherwise, reasonable attorneys' fees; and

9.    On all causes of action, for such other and further relied as this Court may deem just and proper.

Dated:  October 31, 2012

Respectfully submitted,
**BROOKSTONE LAW, PC**

By: _____
Vito Torchia, Jr.
Attorneys for Plaintiffs

- 111 -

**FIRST AMENDED COMPLAINT**

**EXHIBIT 5**

Claim #3517  Date Filed: 11/9/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number:

**Homecomings Financial, LLC, Case No. 12-12042**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**Carolyn Hairston**

Name and address where notices should be sent:

Vito Torchia, Jr.
Brookstone Law, P.C.
4000 MacArthur Blvd. Suite 1110
Newport Beach, CA 92660

Telephone number: 800-946-8655   email: bankruptcy@brookstonelaw.com

Name and address where payment should be sent (if different from above):

Telephone number:   email:

☐ Check box if this claim amends a previously filed claim.

**Court Claim Number:** _____
*(If known)*

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed: $ 1,300,000**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Contingent Fraud Claim in litigation
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** ___ ___ ___ ___

**3a. Debtor may have scheduled account as:**
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:**

**Value of Property: $** _____ **Annual Interest Rate** _____ % ☐ Fixed ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,

if any: $ _____           **Basis for perfection:** _____

**Amount of Secured Claim: $** _____    **Amount Unsecured: $** _____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ _____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.   ☑ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)   ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Richard Sturdevant
Title: Attorney
Company: Brookstone Law, P.C.
Address and telephone number (if different from notice address above):

_(Signature)_  11-8-12  _(Date)_

Telephone number:   Email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**

$ _____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**RECEIVED**
NOV 09 2012
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18*

1212042121109000000000063

## SUMMARY OF BASIS FOR CREDITOR'S CLAIM

Creditor is a Plaintiff in active litigation against Debtors. Because the complaint is voluminous at 111 pages long, Creditor is submitting this summary of the basis for the Creditor's claim per the instructions of the Notice of Deadlines for Filing Proofs of Claim. Plaintiff filed the initial complaint on May 9, 2012, in United States District Court, Central district of California—Western Division, Case No.: 12-5016-JAK (AGRx). The First Amended Complaint ("FAC") was filed on October 31, 2012. As of the date of this proof of claim, Defendants/Debtors GMAC Mortgage, LLC, GMAC-RFC Holding Residential Funding Company, LLC, Home Connects Lending Services, LLC, Homecomings Financial, LLC, Executive Trustee Services, LLC, Residential Funding Company, LLC, Residential Capital, LLC, Residential Funding Real Estate Holdings, LLC, and Residential Mortgage Real Estate Holdings, LLC (collectively referred to as "Defendants") have not responded to Plaintiff's FAC.

Plaintiff alleges the following causes of actions: (1) fraudulent concealment pursuant to California Civil Code (Civil Code) sections 1572, 1709 and 1710; (2) intentional misrepresentations pursuant to Civil Code sections 1572, 1709, and 1710; (3) negligent misrepresentations pursuant to Civil Code sections 1572, 1709, and 1710; (4) unfair competition pursuant to California Business and Professions Code section 17200; (5) wrongful foreclosure pursuant to Civil Code section 2924; and (6) improper influence over appraiser pursuant to Civil Code section 1090.5.

Plaintiff claims the Defendants set out upon a massive and centrally-directed fraud by which Defendants (1) placed Plaintiff into loans which Defendants *knew* Plaintiff could not afford and would default upon to a mathematical certainty, (2) abandoned industry-standard underwriting guidelines, (3) concealed/ misrepresented the terms of their loans to Plaintiff to induce unwitting consent, and (4) intentionally inflated the appraisal values of homes throughout California in a market-fixing scheme *—knowing that their scheme would cause the precipitous decline in values of all homes throughout California*, including those of Plaintiff's. Plaintiff seeks monetary damages of approximately $1.3 million dollars.