## __Exhibit 3__

**Series 2005 A Bond Offering Circular**

NEW ISSUE — BOOK-ENTRY ONLY
LIMITED OFFERING

NOT RATED

*In the opinion of Bond Counsel, under existing statutes, regulations, rulings and court decisions, assuming continuing compliance with certain tax covenants and the accuracy of certain representations of the District, interest on the Series 2005 Bonds (as defined below) will be excludable from gross income for federal income tax purposes. Interest on the Series 2005 Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. See "TAX MATTERS" herein for a description of certain other federal tax consequences of ownership of the Series 2005 Bonds. Bond Counsel is further of the opinion that the Series 2005 Bonds will be exempt from taxation under the laws of the State of Florida except as to estate taxes and taxes imposed by Chapter 220, Florida Statutes, on interest, income or profits on debt obligations owned by corporations as defined in Chapter 220. For a more complete discussion of certain tax aspects relating to the Series 2005 Bonds, see "TAX MATTERS" herein.*

# DURBIN CROSSING COMMUNITY DEVELOPMENT DISTRICT
## (ST. JOHNS COUNTY, FLORIDA)
### $54,995,000 Special Assessment Bonds, Series 2005A
### $8,735,000 Special Assessment Bonds, Series 2005B-1
### $14,590,000 Special Assessment Bonds, Series 2005B-2

Dated: October 1, 2005

Due: As shown below

Durbin Crossing Community Development District (St. Johns County, Florida) Special Assessment Bonds, Series 2005A (the "Series 2005A Bonds"), Series 2005B-1 (the "Series 2005B-1 Bonds") and Series 2005B-2 (the "Series 2005B-2 Bonds"; collectively, with the Series 2005A Bonds and the Series 2005B-1 Bonds, the "Series 2005 Bonds") are being issued by the Durbin Crossing Community Development District (the "District") only in fully registered form, without coupons, in denominations of $5,000 and integral multiples thereof; provided, however, that the Series 2005 Bonds will be deliverable to the initial purchasers only in denominations of $100,000 or integral multiples of $5,000 in excess of $100,000.

The District is a local unit of special purpose government of the State of Florida, created under and pursuant to the Uniform Community Development District Act of 1980, Chapter 190, Florida Statutes, as amended (the "Act") and established by Rule 42MM-1, Florida Administrative Code (the "Rule") adopted by the Florida Land and Water Adjudicatory Commission (the "Commission"), located within unincorporated St. Johns County, Florida (the "County"). The Series 2005 Bonds are being issued pursuant to the Act, resolutions adopted by the Board of Supervisors of the District (the "Board") and a Master Trust Indenture, dated as of October 1, 2005 (the "Master Indenture"), as supplemented by a First Supplemental Trust Indenture, dated as of October 1, 2005, with respect to the Series 2005A Bonds (the "Series 2005A Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2005A Indenture"), as supplemented by a Second Supplemental Trust Indenture, dated as of October 1, 2005, with respect to the Series 2005B-1 Bonds (the "Series 2005B-1 Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2005B-1 Indenture"), and as supplemented by a Third Supplemental Trust Indenture, dated as of October 1, 2005, with respect to the Series 2005B-2 Bonds (the "Series 2005B-2 Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2005B-2 Indenture"), between the District and Wachovia Bank, National Association, as trustee (the "Trustee"). The Series 2005A Indenture, the Series 2005B-1 Indenture and the Series 2005B-2 Indenture are sometimes individually referred to as one of the "Series 2005 Indentures" and collectively referred to as the "Indenture".

The Series 2005 Bonds will bear interest at the fixed rates set forth below, calculated on the basis of a 360-day year comprised of twelve 30-day months, payable semi-annually on each May 1 and November 1, commencing May 1, 2006. The Series 2005 Bonds, when issued, will be registered in the name of Cede & Co., as the registered owner and nominee for The Depository Trust Company ("DTC"), New York, New York. Purchases of beneficial interests in the Series 2005 Bonds will be made in book-entry only form. Accordingly, principal of and interest on the Series 2005 Bonds will be paid by the Trustee directly to Cede & Co. as the nominee of DTC and the registered owner thereof. Disbursements of such payments to the Direct Participants is the responsibility of DTC and disbursements of such payments to the beneficial owners is the responsibility of Direct Participants and the Indirect Participants, as more fully described herein. Any purchaser as a beneficial owner of a Bond must maintain an account with a broker or dealer who is, or acts through, a Direct Participant to receive payment of the principal of and interest on such Bond. See "DESCRIPTION OF THE SERIES 2005 BONDS - Book-Entry Only System" herein.

Each series of the Series 2005 Bonds (each, a "Series") will be equally and ratably secured under the respective Series 2005 Indenture by a separate lien upon and pledge of the revenues derived from the non-ad valorem special assessments (respectively, the "Series 2005A Special Assessments", the "Series 2005B-1 Special Assessments" and the "Series 2005B-2 Special Assessments; and collectively, the "Series 2005 Special Assessments") levied upon the respective lands within the District specially benefited by the infrastructure improvements to be acquired, constructed and equipped by the District in part from the proceeds of such Series of Series 2005 Bonds (as more particularly described under "THE SERIES 2005 PROJECT" herein and "APPENDIX C — DISTRICT ENGINEER'S REPORTS" hereto). The Series 2005A Bonds are secured by the Series 2005A Special Assessments and by moneys on deposit in the Funds and Accounts under the Series 2005A Indenture (the "Series 2005A Pledged Revenues"). The Series 2005B-1 Bonds are secured by the Series 2005B-1 Special Assessments and by moneys on deposit in the Funds and Accounts under the Series 2005B-1 Indenture (the "Series 2005B-1 Pledged Revenues"). The Series 2005B-2 Bonds are secured by the Series 2005B-2 Special Assessments and by moneys on deposit in the Funds and Accounts under the Series 2005B-2 Indenture (the "Series 2005B-2 Pledged Revenues"; collectively, with the Series 2005A Pledged Revenues and the Series 2005B-1 Pledged Revenues, the "Pledged Revenues"). No Series of the Series 2005 Bonds is secured by the Pledged Revenues securing another Series. The Pledged Revenues exclude in each instance moneys transferred to the respective Series 2005 Rebate Fund and investment earnings thereon and special assessments levied and collected for maintenance purposes or maintenance special assessments as provided in the Act.

Each Series of the Series 2005 Bonds is subject to optional, mandatory and extraordinary mandatory redemption at the times, in the amounts and at the redemption prices as more fully described under the caption "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions" herein.

Each Series of the Series 2005 Bonds is being issued to provide funds for (i) the payment of a portion of the cost of acquisition, construction, installation and equipping the respective Series 2005 Project, (ii) the payment of a portion of the interest to come due on such Series of Series 2005 Bonds, (iii) the funding of the respective Debt Service Reserve Account for such Series of Series 2005 Bonds and (iv) the payment of the costs of issuance of the respective Series of Series 2005 Bonds.

THE SERIES 2005 BONDS ARE LIMITED OBLIGATIONS OF THE DISTRICT PAYABLE SOLELY OUT OF THE RESPECTIVE PLEDGED REVENUES PLEDGED THEREFOR UNDER THE MASTER INDENTURE AND IN THE RESPECTIVE SUPPLEMENTAL INDENTURE AUTHORIZING SUCH SERIES OF SERIES 2005 BONDS, AND NEITHER THE PROPERTY, THE FULL FAITH AND CREDIT, NOR THE TAXING POWER OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED AS SECURITY FOR THE PAYMENT OF THE SERIES 2005 BONDS, EXCEPT THAT THE DISTRICT IS OBLIGATED UNDER EACH SERIES 2005 INDENTURE TO LEVY, AND TO EVIDENCE AND CERTIFY, OR CAUSE TO BE CERTIFIED, FOR COLLECTION, THE CORRESPONDING SERIES 2005 SPECIAL ASSESSMENTS (AS DEFINED IN SUCH SERIES 2005 INDENTURE) TO SECURE AND PAY THE RESPECTIVE SERIES OF SERIES 2005 BONDS. THE SERIES 2005 BONDS DO NOT CONSTITUTE AN INDEBTEDNESS OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISION OR LIMITATION.

NO APPLICATION HAS BEEN MADE FOR A RATING WITH RESPECT TO THE SERIES 2005 BONDS. PURSUANT TO APPLICABLE FLORIDA LAW, THE UNDERWRITER IS LIMITING THIS INITIAL OFFERING OF THE SERIES 2005 BONDS TO ONLY ACCREDITED INVESTORS WITHIN THE MEANING OF THE RULES OF THE FLORIDA DEPARTMENT OF FINANCIAL SERVICES. THE LIMITATION ON THE INITIAL OFFERING TO ACCREDITED INVESTORS DOES NOT DENOTE RESTRICTIONS ON TRANSFER IN ANY SECONDARY MARKET FOR THE SERIES 2005 BONDS.

This cover page contains information for quick reference only. It is not a summary of the Series 2005 Bonds. Investors must read the entire Limited Offering Memorandum to obtain information essential to the making of an informed investment decision.

---

### MATURITY SCHEDULE

$54,995,000  5.500%  Series 2005A Term Bond due May 1, 2037  (Price: 100%)  CUSIP No. 266601 AA 1*
$8,735,000  4.875%  Series 2005B-1 Term Bond due November 1, 2010  (Price: 99.875%)  CUSIP No. 266601 AB 9*
$14,590,000  4.875%  Series 2005B-2 Term Bond due November 1, 2010  (Price: 99.875%)  CUSIP No. 266601 AC 7*

(Plus accrued interest from October 1, 2005)

*The Series 2005 Bonds are offered for delivery when, as and if issued by the District and accepted by the Underwriter, subject to the receipt of the opinion of legality by Greenberg Traurig, P.A., Miami, Florida, Bond Counsel, as to the validity of the Series 2005 Bonds and the excludability of interest thereon from gross income for federal income tax purposes. Certain legal matters will be passed upon for the Underwriter by its counsel, Squire, Sanders & Dempsey L.L.P., Miami and Tampa, Florida; for the District by its counsel, Hopping Green & Sams, P.A., Tallahassee, Florida; for the Master Developer (as defined herein) by its counsel, Jeri Poller, P.A., Boca Raton, Florida, and Pappas, Metcalf, Jenks & Miller, P.A., Jacksonville, Florida, and for the Durbin North Developer (as defined herein) by its counsel, Pappas, Metcalf, Jenks & Miller, P.A., Jacksonville, Florida. It is expected that the Series 2005 Bonds will be delivered in book-entry form through the facilities of The Depository Trust Company, New York, New York on or about October 28, 2005.*

## PRAGER, SEALY & CO., LLC

Dated: October 21, 2005
* The District shall not be responsible for the use of CUSIP numbers, nor is any representation made as to their correctness. They are included solely for the convenience of the readers of this Limited Offering Memorandum.

## DURBIN CROSSING COMMUNITY DEVELOPMENT DISTRICT

### BOARD OF SUPERVISORS

Patrick E. Sessions, Chairman
Jason R. Sessions, Vice Chairman
Christian Blonshine, Supervisor and Assistant Secretary
Kenneth Strauss, Supervisor and Assistant Secretary
Susan Wood, Supervisor and Assistant Secretary

### DISTRICT MANAGER

Governmental Management Services, LLC
Jacksonville, Florida

### DISTRICT COUNSEL

Hopping Green & Sams, P.A.
Tallahassee, Florida

### BOND COUNSEL

Greenberg Traurig, P.A.
Miami, Florida

### FINANCIAL CONSULTANT TO THE DISTRICT

Fishkind and Associates, Inc.
Orlando, Florida

### DISTRICT ENGINEER

England, Thims & Miller, Inc.
Jacksonville, Florida

## REGARDING USE OF THIS LIMITED OFFERING MEMORANDUM

No broker, dealer, salesperson, or other person has been authorized by the District or the Underwriter (as defined herein) to give any information or to make any representations, other than those contained in this Limited Offering Memorandum, and if given or made, such other information or representations must not be relied upon as having been authorized by either of the foregoing. This Limited Offering Memorandum does not constitute an offer to sell or the solicitation of an offer to buy any of the Series 2005 Bonds and there shall be no offer, solicitation, or sale of the Series 2005 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

The Underwriter has provided the following sentence for inclusion in this Limited Offering Memorandum. The Underwriter has reviewed the information in this Limited Offering Memorandum in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy or completeness of such information.

CERTAIN STATEMENTS INCLUDED OR INCORPORATED BY REFERENCE IN THIS LIMITED OFFERING MEMORANDUM CONSTITUTE "FORWARD LOOKING STATEMENTS." SUCH STATEMENTS GENERALLY ARE IDENTIFIABLE BY THE TERMINOLOGY USED, SUCH AS "PLAN," "EXPECT," "ESTIMATE," "BUDGET" OR OTHER SIMILAR WORDS. SUCH FORWARD LOOKING STATEMENTS INCLUDE BUT ARE NOT LIMITED TO CERTAIN STATEMENTS CONTAINED IN THE INFORMATION UNDER THE CAPTIONS "ESTIMATED SOURCES AND USES OF BOND PROCEEDS," "THE SERIES 2005 PROJECT," "THE MASTER DEVELOPER," "THE DURBIN NORTH DEVELOPER" AND "THE DEVELOPMENT" IN THIS LIMITED OFFERING MEMORANDUM. THE ACHIEVEMENT OF CERTAIN RESULTS OR OTHER EXPECTATIONS CONTAINED IN SUCH FORWARD LOOKING STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS THAT MAY CAUSE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS DESCRIBED TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD LOOKING STATEMENTS. NEITHER THE MASTER DEVELOPER (as defined herein) OR THE DURBIN NORTH DEVELOPER (as defined herein) OR THE DISTRICT PLAN TO ISSUE ANY UPDATES OR REVISIONS TO THOSE FORWARD LOOKING STATEMENTS IF OR WHEN ITS EXPECTATIONS OR EVENTS, CONDITIONS OR CIRCUMSTANCES ON WHICH SUCH STATEMENTS ARE BASED OCCUR, SUBJECT TO ANY CONTRACTUAL OR LEGAL RESPONSIBILITIES TO THE CONTRARY.

The information and expressions of opinion herein contained are subject to change without notice and neither the delivery of this Limited Offering Memorandum, nor any sale made hereunder, shall, under any circumstances, create any implication that there has been no change in the affairs of the District, the Master Developer or the Durbin North Developer since the date hereof.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITER MAY OVERALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE SERIES 2005 BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

THE SERIES 2005 BONDS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, NOR HAS THE INDENTURE BEEN QUALIFIED UNDER THE TRUST INDENTURE ACT OF 1939. THE REGISTRATION OR QUALIFICATION OF THE SERIES 2005 BONDS UNDER

THE SECURITIES LAWS OF ANY JURISDICTIONS IN WHICH THEY MAY HAVE BEEN REGISTERED OR QUALIFIED, IF ANY, SHALL NOT BE REGARDED AS A RECOMMENDATION THEREOF.  NEITHER THE STATE OF FLORIDA (THE "STATE"), ST. JOHNS COUNTY (THE "COUNTY"), THE DISTRICT, NOR ANY OF THEIR AGENCIES HAVE PASSED UPON THE MERITS OF THE SERIES 2005 BONDS.  THE DISTRICT HAS PASSED UPON THE ACCURACY AND FACTUAL COMPLETENESS OF THIS LIMITED OFFERING MEMORANDUM, OTHER THAN THOSE SECTIONS CAPTIONED "INTRODUCTION" (in so far as such description relates to the Master Developer or the Durbin North Developer), "DESCRIPTION OF THE SERIES 2005 BONDS — Book-Entry Only System," "THE DISTRICT — The District Manager," "THE MASTER DEVELOPER," "THE DURBIN NORTH DEVELOPER," "THE DEVELOPMENT," "TAX MATTERS;" AND "LITIGATION" (in so far as such description relates to the Master Developer or the Durbin North Developer); HOWEVER, NEITHER THE STATE, THE COUNTY, NOR ANY OF THEIR AGENCIES HAVE PASSED UPON THE ACCURACY OR COMPLETENESS OF THIS LIMITED OFFERING MEMORANDUM.

THIS LIMITED OFFERING MEMORANDUM SHALL NOT CONSTITUTE A CONTRACT BETWEEN THE DISTRICT OR THE UNDERWRITER AND ONE OR MORE OWNERS OF THE SERIES 2005 BONDS DESCRIBED HEREIN.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................1

DESCRIPTION OF THE SERIES 2005 BONDS .....................................................................4

    General Description .............................................................................................4
    Redemption Provisions ........................................................................................5
    Notice of Redemption .........................................................................................9
    Purchase of Series 2005A Bonds ......................................................................10
    Book-Entry Only System ...................................................................................10

ESTIMATED SOURCES AND USES OF BOND PROCEEDS ...............................................14

SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2005 BONDS ..............15

    General ...............................................................................................................15
    Parity Bonds .......................................................................................................16
    Enforcement of Payment of Series 2005 Special Assessments .........................17
    Prepayment of Series 2005 Special Assessments ..............................................17
    Adjustments to Series 2005 Special Assessments .............................................18
    Re-Assessments ..................................................................................................18

ENFORCEMENT OF ASSESSMENT COLLECTIONS ........................................................18

    Collection Procedures ........................................................................................18
    Collection through Uniform Method ..................................................................19
    Sale of Tax Certificates .....................................................................................20
    Judicial Proceedings ..........................................................................................21
    Method of Collection by District for Series 2005 Special Assessments ............22

FUNDS AND ACCOUNTS .....................................................................................................22

    Acquisition and Construction Fund ...................................................................22
    Debt Service Fund .............................................................................................24
    Reserve Fund .....................................................................................................24
    Rebate Fund .......................................................................................................27

FLOW OF FUNDS ..................................................................................................................27

    Revenue Fund ....................................................................................................27

INVESTMENTS .......................................................................................................................30

BOND OWNERS' RISKS ........................................................................................................35

SERIES 2005A BONDS DEBT SERVICE REQUIREMENT ................................................40

THE DISTRICT ........................................................................................................................42

    General ...............................................................................................................42
    Powers ...............................................................................................................42
    Board of Supervisors .........................................................................................42
    The District Manager .........................................................................................43

THE SERIES 2005 PROJECT .................................................................................................44

THE MASTER DEVELOPER ..................................................................................................45

**Page**

P. E. Sessions & Associates, Inc .......................................................................................46
Resumes ............................................................................................................................47

THE DURBIN NORTH DEVELOPER ...................................................................................50

THE DEVELOPMENT ..........................................................................................................51

General .............................................................................................................................51
Jacksonville and St. Johns County Statistics ..................................................................52
Land Acquisition ..............................................................................................................53
Development Entitlements ................................................................................................54
Land Use/Development Plan ............................................................................................56
District Infrastructure and Finance Plan .........................................................................58
Assessment Area ..............................................................................................................59
Residential Product Offerings .........................................................................................60
Recreational and Lifestyle Amenities .............................................................................60
Education .........................................................................................................................60
Land Sales and Builder Contracts ...................................................................................61
Projected Absorption .......................................................................................................62
Marketing .........................................................................................................................63
Fees and Assessments ......................................................................................................63
Competition .....................................................................................................................64

ASSESSMENT METHODOLOGY .......................................................................................65

TAX MATTERS ....................................................................................................................65

General .............................................................................................................................65
Original Issue Discount ...................................................................................................66
Original Issue Premium ...................................................................................................67

AGREEMENT BY THE STATE ............................................................................................67

LEGALITY FOR INVESTMENT ..........................................................................................67

SUITABILITY FOR INVESTMENT .....................................................................................67

DISCLOSURE REQUIRED BY FLORIDA BLUE SKY REGULATIONS ............................68

CONTINUING DISCLOSURE .............................................................................................68

ENFORCEABILITY OF REMEDIES ....................................................................................69

LITIGATION ........................................................................................................................69

NO RATINGS OR CREDIT ENHANCEMENT ....................................................................69

NO FINANCIAL STATEMENTS ..........................................................................................69

UNDERWRITING ................................................................................................................69

VALIDATION .......................................................................................................................70

EXPERTS .............................................................................................................................70

LEGAL MATTERS ...............................................................................................................70

CONTINGENT AND OTHER FEES .....................................................................................70

MISCELLANEOUS ..............................................................................................................70

APPENDIX A:        FORMS OF MASTER INDENTURE AND SUPPLEMENTAL TRUST
                   INDENTURES
APPENDIX B:        FORM OF OPINIONS OF BOND COUNSEL
APPENDIX C:        DISTRICT ENGINEER'S REPORTS
APPENDIX D:        ASSESSMENT REPORT
APPENDIX E:        FORM OF CONTINUING DISCLOSURE AGREEMENTS

[THIS PAGE INTENTIONALLY LEFT BLANK]

**Durbin Crossing Community Development District**
**(St. Johns County, Florida)**
**$54,995,000 Special Assessment Bonds, Series 2005A**
**$8,735,000 Special Assessment Bonds, Series 2005B-1**
**$14,590,000 Special Assessment Bonds, Series 2005B-2**

## INTRODUCTION

The purpose of this Limited Offering Memorandum, including the cover page and appendices hereto, is to set forth certain information in connection with the offering and issuing by the Durbin Crossing Community Development District (the "District") of its $54,995,000 Special Assessment Bonds, Series 2005A (the "Series 2005A Bonds"), $8,735,000 Special Assessment Bonds, Series 2005B-1 (the "Series 2005B-1 Bonds") and $14,590,000 Special Assessment Bonds, Series 2005B-2 (the "Series 2005B-2 Bonds"; collectively, with the Series 2005A Bonds and the Series 2005B-1 Bonds, the "Series 2005 Bonds"). The District was created under and pursuant to the Uniform Community Development District Act of 1980, Chapter 190, Florida Statutes, as amended (the "Act") and established pursuant to Rule 42MM-1, Florida Administrative Code (the "Rule"), adopted by the Florida Land and Water Adjudicatory Commission (the "Commission"), effective November 5, 2003.

The Series 2005 Bonds are being issued pursuant to the Act, Resolution No. 2004-20, adopted by the Board of Supervisors (the "Board") of the District on February 24, 2004, and Resolution No. 2005-05, adopted on May 24, 2005, as amended by Resolution No. 2006-01 adopted by the District on October 20, 2005 (collectively, the "Bond Resolution"), a Master Trust Indenture, dated as of October 1, 2005 (the "Master Indenture"), between the District and Wachovia Bank, National Association, as trustee (the "Trustee"), as supplemented by a First Supplemental Trust Indenture, dated as of October 1, 2005, with respect to the Series 2005A Bonds (the "Series 2005A Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2005A Indenture"), as supplemented by a Second Supplemental Trust Indenture, dated as of October 1, 2005, with respect to the Series 2005B-1 Bonds (the "Series 2005B-1 Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2005B-1 Indenture"), and as supplemented by a Third Supplemental Trust Indenture, dated as of October 1, 2005, with respect to the Series 2005B-2 Bonds (the "Series 2005B-2 Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2005B-2 Indenture"), between the District and the Trustee. The Series 2005A Indenture, the Series 2005B-1 Indenture and the Series 2005B-2 Indenture are sometimes individually referred to as one of the "Series 2005 Indentures" and collectively referred to as the "Indenture". All capitalized terms used in this Limited Offering Memorandum that are defined in a Series 2005 Indenture and not defined herein shall have the respective meanings set forth in such Series 2005 Indenture. See "APPENDIX A — FORMS OF MASTER INDENTURE AND SUPPLEMENTAL TRUST INDENTURES" attached hereto.

The Series 2005A Bonds will be equally and ratably secured under the Series 2005A Indenture by a lien upon and pledge of the revenues derived from the non-ad valorem special assessments (the "Series 2005A Special Assessments") levied upon the lands within the District specially benefited by the master infrastructure improvements to be acquired, constructed and equipped by the District in part from the proceeds of the Series 2005A Bonds (the "Series 2005A Project," as more particularly described under the caption "THE SERIES 2005 PROJECT" herein and "APPENDIX C — DISTRICT ENGINEER'S REPORTS" hereto). The Series 2005A Bonds are secured by the Series 2005A Special Assessments and by moneys on deposit in the Funds and Accounts (excluding the Series 2005A Rebate Fund) under the Series 2005A Indenture (the "Pledged Revenues" therein, but for ease of reference herein, the "Series 2005A Pledged Revenues"). THE SERIES 2005A BONDS ARE NOT SECURED BY THE PLEDGED

REVENUES SECURING THE SERIES 2005B-1 BONDS OR THE SERIES 2005B-2 BONDS, AND A DEFAULT UNDER THOSE SERIES IS NOT A DEFAULT UNDER THE SERIES 2005A BONDS.

The Series 2005B-1 Bonds will be equally and ratably secured under the Series 2005B-1 Indenture by a lien upon and pledge of the revenues derived from the non-ad valorem special assessments (the "Series 2005B-1 Special Assessments") levied upon the lands within the District specially benefited by the infrastructure improvements to be acquired, constructed and equipped by the District in part from the proceeds of the Series 2005B-1 Bonds (the "Series 2005B-1 Project," as more particularly described under the caption "THE SERIES 2005 PROJECT" herein and "APPENDIX C — DISTRICT ENGINEER'S REPORTS" hereto). The Series 2005B-1 Bonds are secured by the Series 2005B-1 Special Assessments and by moneys on deposit in the Funds and Accounts (excluding the Series 2005B-1 Rebate Fund) under the Series 2005B-1 Indenture (the "Pledged Revenues" therein, but for ease of reference herein, the "Series 2005B-1 Pledged Revenues"). THE SERIES 2005 B-1 BONDS ARE NOT SECURED BY THE PLEDGED REVENUES SECURING THE SERIES 2005A BONDS OR THE SERIES 2005B-2 BONDS, AND A DEFAULT UNDER THOSE SERIES IS NOT A DEFAULT UNDER THE SERIES 2005 B-1 BONDS.

The Series 2005B-2 Bonds will be equally and ratably secured under the Series 2005B-2 Indenture by a lien upon and pledge of the revenues derived from the non-ad valorem special assessments (the "Series 2005B-2 Special Assessments") levied upon the lands within the District specially benefited by the infrastructure improvements to be acquired, constructed and equipped by the District in part from the proceeds of the Series 2005B-2 Bonds (the "Series 2005B-2 Project," as more particularly described under the caption "THE SERIES 2005 PROJECT" herein and "APPENDIX C — DISTRICT ENGINEER'S REPORTS" hereto). The Series 2005B-2 Bonds are secured by the Series 2005B-2 Special Assessments and by moneys on deposit in the Funds and Accounts (excluding the Series 2005B-2 Rebate Fund) under the Series 2005B-2 Indenture (the "Pledged Revenues" therein, but for ease of reference herein, the "Series 2005B-2 Pledged Revenues"). THE SERIES 2005 B-2 BONDS ARE NOT SECURED BY THE PLEDGED REVENUES SECURING THE SERIES 2005A BONDS OR THE SERIES 2005B-1 BONDS, AND A DEFAULT UNDER THOSE SERIES IS NOT A DEFAULT UNDER THE SERIES 2005 B-2 BONDS.

The Series 2005A Pledged Revenues, the Series 2005B-1 Pledged Revenues and the Series 2005B-2 Pledged Revenues are sometimes collectively referred to as the "Pledged Revenues". The Pledged Revenues exclude in each instance moneys transferred to the respective Series 2005 Rebate Fund and investment earnings thereon and special assessments levied and collected for maintenance purposes or maintenance special assessments as provided in the Act.

THE SERIES 2005 BONDS ARE NOT RATED OR CREDIT ENHANCED, AND ARE NOT A SUITABLE INVESTMENT FOR ALL INVESTORS. See "BOND OWNERS' RISKS" and "SUITABILITY FOR INVESTMENT" herein. Prospective investors in the Series 2005 Bonds are invited to visit the District, ask questions of representatives of the Master Developer and the Durbin North Developer (as hereinafter defined) and to request documents, instruments and information which may not necessarily be referred to, summarized or described herein. Therefore, prospective investors should rely on the information appearing in this Limited Offering Memorandum within the context of the availability of such additional information and the sources thereof. Prospective investors may request such additional information and arrange to visit the District as described herein under the caption "SUITABILITY FOR INVESTMENT" herein.

The District was established on November 5, 2003, under the provisions of the Act for the purposes of financing and managing the acquisition, construction, maintenance and operation of a portion of the

infrastructure necessary for community development. The Act authorizes the District to issue bonds for the purpose of, among others, financing, funding, planning, establishing, acquiring, constructing or reconstructing, enlarging or extending, equipping, operating and maintaining water management, water supply, sewer and wastewater management, bridges or culverts, district roads, street lights and other basic infrastructure projects within or without the boundaries of the District as provided in the Act. The Act, in particular Section 190.012(2)(a) thereof, also authorizes the District to acquire and construct recreational facilities with the consent of the St. Johns County Board of County Commissioners. The Series 2005 Bonds described herein are the first Series of Bonds to be issued by the District.

Lands within the District are situated within the 2,047 acre Durbin Crossing Development of Regional Impact (the "Durbin Crossing DRI") located in northwest unincorporated St. Johns County, Florida (the "County"), approximately twenty miles south of downtown Jacksonville and fifteen miles northwest of historic St. Augustine. The boundaries of Durbin Crossing (the "Development") are coterminus with the boundaries of the Durbin Crossing DRI. The Development is a master-planned residential community currently planned for 1,518 single-family units, 947 multi-family units, 170,000 square feet of commercial/office, recreational facilities and a future elementary school. See "THE DEVELOPMENT" herein.

Each respective Series of the Series 2005 Bonds is being issued to provide funds for: (i) the payment of a portion of the cost of acquisition, construction, installation and equipping the respective Series 2005 Project (as defined herein), (ii) the payment of a portion of the interest to come due on such Series of the Series 2005 Bonds, (iii) the funding of the respective Series 2005 Debt Service Reserve Account for such Series of Series 2005 Bonds, and (iv) the payment of the costs of issuance of the respective Series of Series 2005 Bonds. See "THE SERIES 2005 PROJECT" and "ESTIMATED SOURCES AND USES OF BOND PROCEEDS" herein and "APPENDIX C — DISTRICT ENGINEER'S REPORTS" attached hereto.

In the Series 2005 Indentures, the District covenants and agrees that, so long as there are any Outstanding Series 2005 Bonds of a Series, the respective Pledged Revenues for such Series will not be subject to any other lien senior to or on a parity with the lien created in favor of the respective Series 2005 Bonds of such Series except for bonds issued to refund a portion of such Series of Series 2005 Bonds (in the case of the Series 2005A Bonds) or bonds issued to provide funds for the completion of the corresponding Series 2005 Project. The District intends to issue a future series of bonds which will be secured by special assessments that encumber some of the properties encumbered by the Series 2005 Special Assessments. Any such future bonds will not be on a parity with the Series 2005 Bonds within the meaning of the Indenture.] See "SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2005 BONDS" and "BOND OWNERS' RISKS" herein and the forms of the Supplemental Indenture set out in Appendix A hereto.

In addition, the District and/or other public entities may impose taxes or other assessments on the same properties encumbered by the Series 2005 Special Assessments without the consent of the Owners of the Series 2005 Bonds. The District anticipates levying maintenance assessments, which are non-ad valorem special assessments that will encumber the same lands encumbered by the Series 2005 Special Assessments to fund the maintenance and operation of the District. See "BOND OWNERS' RISKS" herein.

The District has covenanted in the Indenture to comply with the continuing disclosure requirements contained in Securities and Exchange Commission Rule 15c2-12. See "CONTINUING DISCLOSURE" herein and "APPENDIX E — FORM OF CONTINUING DISCLOSURE AGREEMENTS" hereto.

There follows in this Limited Offering Memorandum a brief description of the District, the Series 2005 Project, the Development, the Master Developer and the Durbin North Developer, together with summaries of the terms of the Series 2005 Bonds, the Indenture and certain provisions of the Act. All references herein to the Indenture and the Act are qualified in their entirety by reference to such documents and all references to the Series 2005 Bonds are qualified by reference to the definitive forms thereof and the information with respect thereto contained in the Indenture. The forms of the Master Indenture and the Supplemental Indentures are set forth in Appendix A hereto. The information herein under the captions "THE MASTER DEVELOPER," "THE DURBIN NORTH DEVELOPER" and "THE DEVELOPMENT" has been furnished by the Master Developer and the Durbin North Developer and has been included herein without independent investigation by the District, and neither the District nor the Underwriter makes any representation or warranty concerning the accuracy or completeness of such information. The Master Developer and the Durbin North Developer make no representation or warranty as to the accuracy or completeness of information contained herein which has been furnished by any other party to the transactions contemplated hereby.

This Limited Offering Memorandum speaks only as of its date and the information contained herein is subject to change.

## DESCRIPTION OF THE SERIES 2005 BONDS

### General Description

The Series 2005 Bonds of each Series are issuable as fully registered bonds, without coupons, in the denomination of $5,000 or any integral multiple thereof; provided, however, that the Series 2005 Bonds will be deliverable to the initial purchasers only in aggregate principal amounts of $100,000 or integral multiples of $5,000 in excess of $100,000. The Series 2005 Bonds will be sold only to Accredited Investors, as such term is defined in the Rules of the Florida Department of Financial Services; however, the limitation of the initial offering to Accredited Investors does not denote restrictions on transfer in any secondary market for the Series 2005 Bonds.

The Series 2005 Bonds will be dated October 1, 2005. Interest on the Series 2005 Bonds is due and payable on each May 1 and November 1, commencing May 1, 2006, at the applicable rate or rates set forth on the cover page hereof on the basis of a 360-day year of twelve 30-day months.

The Series 2005 Bonds will mature, subject to the redemption provisions set forth below, on the applicable date or dates and in the applicable amount or amounts set forth on the cover page hereof.

The Series 2005 Bonds will be and have all the qualities and incidents of investment securities under the laws of the State of Florida.

The Series 2005 Bonds of each Series will be initially issued in the form of a single fully registered certificate for each maturity thereof. Upon initial issuance, the ownership of the Series 2005 Bonds will be registered in the registration books kept by the Trustee in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), the initial bond depository. All of the Outstanding Series 2005 Bonds will be registered in the registration books kept by the Trustee in the name of Cede & Co., as nominee of DTC (see "DESCRIPTION OF THE SERIES 2005 BONDS — Book-Entry Only System" herein).

The Indenture provides that with respect to Series 2005 Bonds registered in the registration books kept by the Registrar in the name of Cede & Co., as nominee of DTC, the District, the Trustee, the Registrar

4

and the Paying Agent will have no responsibility or obligation to any DTC Participant (as defined in the Indenture) or to any Indirect Participant (as defined in the Indenture). The District, the Trustee, the Registrar and the Paying Agent will treat and consider the person in whose name each Series 2005 Bond is registered in the registration books kept by the Registrar as the absolute owner of such Series 2005 Bond for the purpose of receiving payment of or on account of the principal of and interest on such Series 2005 Bond, and for all other purposes, including for the purpose of giving notices of redemption and other matters with respect to such Series 2005 Bond and for the purpose of registering transfers with respect to such Series 2005 Bond.

The Paying Agent will pay all principal of and premium, if any, and interest on the Series 2005 Bonds only to or upon the order of the respective Owners, as shown in the registration books kept by the Registrar, or their respective attorneys duly authorized in writing, as provided in the Indenture, and all such payments will be valid and effective to fully satisfy and discharge the District's obligations with respect to payment of principal of, premium, if any, and interest on the Series 2005 Bonds of such Series to the extent of the sum or sums so paid. No person other than an Owner, as shown in the registration books kept by the Registrar, will receive a certificated Series 2005 Bond evidencing the obligation of the District to make payments of principal, premium, if any, and interest pursuant to the provisions of the Indenture.

Wachovia Bank, National Association, is the Trustee, Registrar and Paying Agent for the Series 2005 Bonds.

THE SERIES 2005 BONDS ARE LIMITED OBLIGATIONS OF THE DISTRICT PAYABLE SOLELY OUT OF THE RESPECTIVE PLEDGED REVENUES PLEDGED THEREFOR UNDER THE MASTER INDENTURE AND IN THE RESPECTIVE SUPPLEMENTAL INDENTURE AUTHORIZING SUCH SERIES OF SERIES 2005 BONDS, AND NEITHER THE PROPERTY, THE FULL FAITH AND CREDIT, NOR THE TAXING POWER OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED AS SECURITY FOR THE PAYMENT OF THE SERIES 2005 BONDS, EXCEPT THAT THE DISTRICT IS OBLIGATED UNDER EACH SERIES 2005 INDENTURE TO LEVY, AND TO EVIDENCE AND CERTIFY, OR CAUSE TO BE CERTIFIED, FOR COLLECTION, THE CORRESPONDING SERIES 2005 SPECIAL ASSESSMENTS (AS DEFINED IN SUCH SERIES 2005 INDENTURE) TO SECURE AND PAY THE RESPECTIVE SERIES OF SERIES 2005 BONDS. THE SERIES 2005 BONDS DO NOT CONSTITUTE AN INDEBTEDNESS OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISION OR LIMITATION.

**Redemption Provisions**

*Optional Redemption*. The Series 2005A Bonds are subject to redemption at the option of the District as a whole or in part, at any time, on or after May 1, 2014 (less than all Series 2005A Bonds to be selected by lot), at par plus accrued interest from the most recent Interest Payment Date to the redemption date.

The Series 2005B-1 Bonds and the Series 2005 B-2 Bonds are not subject to redemption prior to maturity at the option of the District.

*Mandatory Sinking Fund Redemption*. The Series 2005A Bonds are subject to mandatory redemption in part by the District by lot prior to their scheduled maturity from moneys on deposit in the Series 2005A Sinking Fund Account established under the Series 2005A Supplemental Indenture, on

May 1 of the respective years and in the amounts set forth in the following table, at a Redemption Price of
100% of the principal amount thereof plus accrued interest to the redemption date:

<u>Series 2005A Bonds Maturing May 1, 2037</u>

| Year (May 1) | Principal Amount | Year (May 1) | Principal Amount |
|---|---|---|---|
| 2008 | $740,000 | 2023 | $1,685,000 |
| 2009 | 780,000 | 2024 | 1,780,000 |
| 2010 | 825,000 | 2025 | 1,880,000 |
| 2011 | 870,000 | 2026 | 1,990,000 |
| 2012 | 920,000 | 2027 | 2,100,000 |
| 2013 | 975,000 | 2028 | 2,220,000 |
| 2014 | 1,030,000 | 2029 | 2,345,000 |
| 2015 | 1,085,000 | 2030 | 2,480,000 |
| 2016 | 1,150,000 | 2031 | 2,620,000 |
| 2017 | 1,210,000 | 2032 | 2,765,000 |
| 2018 | 1,280,000 | 2033 | 2,925,000 |
| 2019 | 1,355,000 | 2034 | 3,090,000 |
| 2020 | 1,430,000 | 2035 | 3,265,000 |
| 2021 | 1,510,000 | 2036 | 3,450,000 |
| 2022 | 1,595,000 | 2037 * | 3,645,000 |

\*     Final Maturity

As more particularly set forth in the Series 2005A Indenture, any Series 2005A Bonds that are
purchased by the District with amounts held to pay an Amortization Installment will be cancelled and the
principal amount so purchased will be applied as a credit against the applicable Amortization Installment of
Series 2005A Bonds. The above Amortization Installments are subject to recalculation, as provided in the
Master Indenture, as the result of certain purchases or the redemption of Series 2005A Bonds other than in
accordance with scheduled Amortization Installments so as to re-amortize the remaining Outstanding
Principal of Series 2005A Bonds in substantially equal installments of principal and interest (subject to
rounding to Authorized Denomination of principal) over the remaining term thereof.

The Series 2005B-1 Bonds and the Series 2005 B-2 Bonds are not subject to redemption prior to
maturity from sinking fund redemptions to pay Amortization Installments.

*Extraordinary Mandatory Redemption of Series 2005A Bonds in Whole or in Part*. The Series
2005A Bonds are subject to extraordinary mandatory redemption prior to maturity by the District in whole,
on any date, or in part, on any Interest Payment Date, at an extraordinary mandatory redemption price equal
to 100% of the principal amount of the Series 2005A Bonds to be redeemed, plus interest accrued to the
redemption date, as follows:

(i)     from Series 2005A Prepayment Principal deposited into the Prepayment
Account of the Series 2005A Bond Redemption Fund established under the Series 2005A
Supplemental Indenture following the payment in whole or in part of Series 2005A Special
Assessments on any portion of the District Lands specially benefited by the Series 2005A
Project in accordance with the provisions of the Series 2005A Supplemental Indenture,
including excess moneys in the Series 2005A Debt Service Reserve Account resulting

6

from Series 2005A Special Assessment Prepayments and transferred from the Series 2005A Debt Service Reserve Account to the Prepayment Account of the Series 2005A Bond Redemption Fund pursuant to the Series 2005A Supplemental Indenture;

(ii)    from moneys on deposit in the Series 2005A Funds and Accounts and subaccounts (other than the Series 2005A Rebate Fund) when such moneys are sufficient to pay and redeem all Outstanding Series 2005A Bonds and accrued interest thereon to the redemption date in addition to any amounts owed under the Master Indenture which moneys shall be transferred to the General Account of the Series 2005A Bond Redemption Fund, credited toward extinguishment of the Series 2005A Special Assessments and applied toward the redemption of the Series 2005A Bonds;

(iii)    on or after the Completion Date of the Series 2005A Project, (A) by application of moneys remaining in the Series 2005A Acquisition and Construction Account of the Acquisition and Construction Fund not reserved by the District for the payment of any remaining part of the Cost of the Series 2005A Project and/or Deferred Costs (see "FUNDS AND ACCOUNTS — Acquisition and Construction Fund — Series 2005 Acquisition and Construction Accounts" herein), shall be transferred to the General Account of the Series 2005A Bond Redemption Fund pursuant to the Series 2005A Supplemental Indenture, and applied by the District toward the redemption of the Series 2005A Bonds in accordance with the manner it has credited such excess moneys toward extinguishment of Series 2005A Special Assessments which the District shall describe to the Trustee in writing; (B) after November 1, 2007, by application of any moneys transferred from the Capitalized Interest Subaccount pursuant to the Series 2005A Indenture (see "FLOW OF FUNDS –– Revenue Fund — Capitalized Interest Subaccounts" herein), applied by the District toward the redemption of the Series 2005A Bonds and (C) after closure of the Deferred Costs Subaccount, from amounts remaining in the Deferred Costs Subaccount, if any, at the time such Subaccount is closed (see "FUNDS AND ACCOUNTS — Acquisition and Construction Fund — Series 2005 Acquisition and Construction Accounts" herein);

(iv)    from excess moneys transferred from the Series 2005A Revenue Account of the Revenue Fund to the General Account of the Series 2005A Bond Redemption Fund in accordance with the Series 2005A Supplemental Indenture; and

(v)    from amounts on deposit in the Series 2005A Debt Service Reserve Account in excess of the Debt Service Reserve Requirement for the Series 2005A Bonds (as defined in the Series 2005A Indenture) and transferred to the General Account of the Series 2005A Bond Redemption Fund in accordance with the Series 2005A Indenture. See "FUNDS AND ACCOUNTS — Reserve Fund — Series 2005A Debt Service Reserve Account" herein.

If less than all of the Series 2005A Bonds are called for redemption, the particular Series 2005A Bonds or portions of Series 2005A Bonds to be redeemed are selected by lot by the Registrar as provided in the Indenture.

As provided in the Master Indenture, the term "Completion Date" will be the date of completion of the Series 2005A Project, as evidenced by the delivery of a Certificate of the Consulting Engineer and adoption of a resolution by the Board of Supervisors of the District accepting the Series 2005A Project as provided by Florida law.

7

*Extraordinary Mandatory Redemption of Series 2005B-1 and 2005B-2 Bonds in Whole or in Part.*
The Series 2005B-1 and 2005B-2 Bonds are subject to extraordinary mandatory redemption prior to maturity by the District in whole, on any date, or in part, on any February 1, May 1, August 1 and November 1 (each, a "Quarterly Redemption Date") and except as otherwise provided in clause (vi) below with respect to the Series 2005B-2 Bonds, at an extraordinary mandatory redemption price equal to 100% of the principal amount of the Series 2005B-1 or 2005B-2 Bonds as the case may be to be redeemed, plus interest accrued to the redemption date, as follows:

(i)    from moneys deposited into the respective Prepayment Account of the Series 2005B-1 or 2005B-2 Bond Redemption Fund following the payment in full of Series 2005B-1 or 2005B-2 Special Assessments on any portion of the South Phase I Subdivision Parcels or the North Phase I Subdivision Parcels (as respectively defined in the Series 2005B-1 and 2005B-2 Indentures) in accordance with the provisions of the Series 2005B-1 and 2005B-2 Indentures, including excess moneys transferred from the Series 2005B-1 or 2005B-2 Debt Service Reserve Account to the respective Prepayment Account of the Series 2005B-1 or 2005B-2 Bond Redemption Fund resulting from such Series 2005B-1 or 2005B-2 Special Assessment prepayments, as the case may be, pursuant to the Master Indenture;

(ii)    from moneys, if any, on deposit in the Series 2005B-1 or 2005B-2 Funds and Accounts (other than the Series 2005B-1 or 2005B-2 Rebate Fund) sufficient to pay and redeem all Series 2005B-1 or 2005B-2 Outstanding Bonds, as the case may be, and accrued interest thereon to the redemption date plus certain amounts owed under the Master Indenture;

(iii)    on or after the date of completion of the Series 2005B-1 or 2005B-2 Project, by application of moneys remaining in the respective Series 2005B-1 or 2005B-2 Acquisition and Construction Account of the Acquisition and Construction Fund not reserved by the District for the payment of any remaining part of the Cost of the Series 2005B-1 or 2005B-2 Project, as applicable;

(iv)    from excess moneys transferred from the Series 2005B-1 or 2005B-2 Revenue Account of the Revenue Fund to the respective General Account of the Series 2005B-1 or 2005B-2 Bond Redemption Fund in accordance with the Master Indenture;

(v)    from amounts on deposit in the respective Series 2005B-1 or 2005B-2 Debt Service Reserve Account in excess of the respective Debt Service Reserve Requirement for the Series 2005B-1 or 2005B-2 Bonds, as applicable (other than an excess resulting from a prepayment of corresponding Series 2005B-1 or 2005B-2 Special Assessments described under the caption "SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2005 BONDS — Prepayment of Series 2005 Special Assessments" herein), and transferred to the respective General Account of the Series 2005B-1 or 2005B-2 Bond Redemption Fund in accordance with the Series 2005B-1 and 2005B-2 Supplemental Indentures, as applicable; and

(vi)    with respect to the Series 2005B-2 Bonds only, on the earliest date for which notice can be given in accordance with the Series 2005B-2 Indenture, from amounts transferred to the General Account of the Series 2005B-2 Bond Redemption Fund as provided in the Series 2005B-2 Indenture in the event of an Escrow Termination. See "FUNDS AND ACCOUNTS — Acquisition and Construction Fund — Escrow

8

Subaccount of the Series 2005B-2 Acquisition and Construction Account" and "—
Reserve Fund — Series 2005B-1 and 2005B-2 Debt Service Reserve Accounts" herein.

If less than all of the Series 2005B-1 or 2005B-2 Bonds are called for redemption, the particular
Series 2005B-1 or 2005B-2 Bonds or portions of Series 2005B-1 or 2005B-2 Bonds to be redeemed are
selected by lot by the Registrar as provided in the Indenture.

**Notice of Redemption**

The Trustee shall cause notice of the redemption, either in whole or in part, to be mailed at least
thirty (30) but not more than sixty (60) days prior to the redemption or purchase date to all registered
Owners of Series 2005 Bonds to be redeemed (as such Owners appear on the Bond Register on the fifth (5th)
day prior to such mailing), at their registered addresses, but failure to mail any such notice or defect in the
notice or in the mailing thereof shall not affect the validity of the redemption or purchase of the Series 2005
Bonds of such Series for which notice was duly mailed in accordance with the Indenture. Such notice is
given in the name of the District, shall be dated, shall set forth the Series 2005 Bonds of such Series
Outstanding which are called for redemption and shall include, without limitation, the following additional
information: the redemption date, the redemption price, CUSIP numbers, to the extent applicable, and any
other distinctive numbers and letters, if less than all Outstanding Series 2005 Bonds of a Series to be
redeemed, the identification (and, in the case of partial redemption, the respective principal amounts) of the
Series 2005 Bonds of such Series to be redeemed, that on the redemption date the redemption price will
become due and payable upon surrender of each such Series 2005 Bond or portion thereof called for
redemption, and that interest thereon shall cease to accrue from and after said date, and the place where such
Series 2005 Bonds are to be surrendered for payment of the redemption price, which place of payment is a
corporate trust office of the Trustee.

If at the time of mailing of notice of an optional redemption, the District shall not have deposited
with the Trustee or Paying Agent moneys sufficient to redeem or purchase all the Series 2005 Bonds called
for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the
Trustee or Paying Agent, as the case may be, not later than the opening of business on the redemption date,
and such notice is of no effect unless such moneys are so deposited.

If the amount of funds deposited with the Trustee for such redemption, or otherwise available, is
insufficient to pay the redemption price and accrued interest on the Series 2005 Bonds of such Series so
called for redemption on the redemption date, the Trustee shall redeem and pay on such date an amount of
such Series 2005 Bonds for which such funds are sufficient, selecting the Series 2005 Bonds to be redeemed
by lot from among all such Series 2005 Bonds of the Series called for redemption on such date, and among
different maturities of Series 2005 Bonds of such Series in the same manner as the initial selection of Series
2005 Bonds of such Series to be redeemed, and from and after such redemption date, interest on the Series
2005 Bonds of such Series or portions thereof so paid shall cease to accrue and become payable; but interest
on any Series 2005 Bonds or portions thereof not so paid shall continue to accrue until paid at the same rate
as it would have had such Series 2005 Bonds not been called for redemption.

Reference is hereby specifically made to "APPENDIX A — FORMS OF MASTER INDENTURE
AND SUPPLEMENTAL TRUST INDENTURES" attached hereto for additional details concerning the
redemption of the Series 2005 Bonds.

**Purchase of Series 2005A Bonds**

The District reserves the option to purchase, at any time, whether or not the Series 2005A Bonds are then subject to redemption, at the most advantageous price obtainable with reasonable diligence as provided in the Series 2005A Indenture, such price not to exceed the principal of such Series 2005A Bonds plus accrued interest, provided that firm purchase commitments can be made before the notice of redemption or purchase would otherwise be required to be given. Before making each such purchase, the District shall file with the Trustee a statement in writing directing the Trustee to pay the purchase price of the Series 2005A Bonds so purchased upon their delivery and cancellation, which statement shall set forth a description of such Series 2005A Bonds, the purchase price to be paid therefor, the name of the seller and the place of delivery of the Series 2005A Bonds. The Trustee shall pay the interest accrued on such Series 2005A Bonds to the date of delivery thereof from the Series 2005A Interest Account and the principal portion of the purchase price of Series 2005A Bonds from the Series 2005A Sinking Fund Account, or from such other Accounts as provided in the Series 2005A Indenture.

In lieu of paying the Debt Service Requirements necessary to allow any mandatory redemption of Series 2005A Bonds from the Series 2005A Sinking Fund Account, the District may present to the Trustee Series 2005A Bonds purchased by the District pursuant to the Series 2005A Indenture and furnished for such purposes; provided, however, that no Series 2005A Bonds so purchased shall be credited towards the Debt Service Requirements of the Series 2005A Bonds in respect of the mandatory redemption of Series 2005A Bonds for which notice of redemption has been given pursuant to the Master Indenture. Any Series 2005A Bond so purchased shall be presented to the Trustee for cancellation. In such event, the Debt Service Requirements with respect to the Series 2005A Bonds for the period in which the purchased Series 2005A Bonds are presented to the Trustee shall, for all purposes under the Series 2005A Indenture, be reduced by an amount equal to the aggregate principal amount of any such Series 2005A Bonds so presented.

**Book-Entry Only System**

The information set forth under this caption concerning the Depository Trust Company ("DTC"), New York, New York, and DTC's book-entry system has been obtained from sources the District believes to be reliable, but the District takes no responsibility for the accuracy thereof.

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Series 2005 Bonds. The Series 2005 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered certificate will be issued for maturity of each Series of the Series 2005 Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. If, however, the aggregate principal amount of any maturity of a Series of Series 2005 Bonds exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount and an additional certificate will be issued with respect to any remaining principal amount of such maturity.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for securities that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities

certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of Series 2005 Bonds of a Series under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2005 Bonds on DTC's records. The ownership interest of each actual purchaser of each Security ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2005 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Series 2005 Bonds, except in the event that use of the book-entry system for the Series 2005 Bonds is discontinued.

To facilitate subsequent transfers, all Series 2005 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other name as may be requested by an authorized representative of DTC. The deposit of Series 2005 Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2005 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2005 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2005 Bonds may wish to take certain steps to augment transmission to them of notices of significant events with respect to the Series 2005 Bonds, such as redemptions, tenders, defaults, and proposed amendments to the security documents. For example, Beneficial Owners of Series 2005 Bonds may wish to ascertain that the nominee holding the Series 2005 Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners, or in the alternative, Beneficial Owners may wish to provide their names and addresses to the Registrar and request that copies of the notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Series 2005 Bonds within a Series or maturity of a Series of Series 2005 Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to any Series of the Series 2005 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the District as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts such Series of the Series 2005 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, premium, if any and interest payments on the Series 2005 Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from the District or Paying Agent on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC nor its nominee, Paying Agent, or the District, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, premiums, if any, and interest on the Series 2005 Bonds to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the District or Paying Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

THE DISTRICT, THE TRUSTEE, THE REGISTRAR AND THE PAYING AGENT DO NOT HAVE ANY RESPONSIBILITY OR OBLIGATIONS TO THE DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR THE BENEFICIAL OWNERS WITH RESPECT TO THE SERIES 2005 BONDS IN RESPECT OF: (A) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT; (B) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT DUE TO ANY BENEFICIAL OWNER IN RESPECT OF THE PRINCIPAL OF, REDEMPTION PRICE OR INTEREST ON THE SERIES 2005 BONDS; (C) THE DELIVERY OR TIMELINESS OF DELIVERY BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY NOTICE TO ANY BENEFICIAL OWNER WHICH IS REQUIRED OR PERMITTED UNDER THE TERMS OF THE INDENTURE TO BE GIVEN TO OWNERS; (D) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF PARTIAL REDEMPTION OF THE SERIES 2005 BONDS; OR (E) ANY CONSENT GIVEN OR OTHER ACTION TAKEN BY DTC, OR ITS NOMINEE, CEDE & CO., AS OWNERS.

DTC may discontinue providing its services as securities depository with respect to any Series of the Series 2005 Bonds at any time by giving reasonable notice to the District or Paying Agent. Under such circumstances, in the event that a successor securities depository is not obtained, certificates for such Series of Series 2005 Bonds are required to be printed and delivered.

The District may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, certificates for such Series 2005 Bonds will be printed and delivered to DTC.

SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES 2005 BONDS, AS NOMINEE OF DTC, REFERENCES HEREIN TO THE HOLDER OF THE SERIES 2005 BONDS OR REGISTERED OWNERS OF THE SERIES 2005 BONDS SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES 2005 BONDS.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

## ESTIMATED SOURCES AND USES OF BOND PROCEEDS

Proceeds of the Series 2005 Bonds are expected to be applied as follows:

|  | Series 2005A Bonds | Series 2005B-1 Bonds | Series 2005B-2 Bonds |
|---|---|---|---|
| **Sources of Funds** | | | |
| Principal Amount of Series 2005 Bonds | $54,995,000.00 | $8,735,000.00 | $14,590,000.00 |
| Original Issue Premium/(Discount) | | (10,918.75) | (18,237.50) |
| Plus Accrued Interest | 226,854.38 | 31,937.34 | 53,344.69 |
| Total Sources | $55,221,854.38 | $8,756,018.59 | $14,625,107.19 |
| **Uses of Funds** | | | |
| Deposit to Series 2005 Acquisition and Construction Accounts | $44,110,751.35 | $7,862,475.41 | $10,703,761.70 |
| Deposit to Series 2005B-2 Escrow Subaccount | XXXXXX | XXXXXX | 2,429,306.00 |
| Cost of Issuance (including Underwriter's discount) | 1,279,900.00 | 203,700.00 | 339,800.00 |
| Deposit to Series 2005 Reserve Accounts | 3,745,725.00 | 212,915.63 | 355,631.25 |
| Deposit to Series 2005 Capitalized Interest Accounts [*] | 5,858,623.65 | 444,990.21 | 743,263.55 |
| Deposit of Accrued Interest to Series 2005 Interest Accounts | 226,854.38 | 31,937.34 | 53,344.69 |
| Total Uses | $55,221,854.38 | $8,756,018.59 | $14,625,107.19 |

---

[*]    Includes interest, which along with investment earnings, shall pay interest through November 1, 2007 for the Series 2005A Bonds; interest through November 1, 2006 for the Series 2005B-1 Bonds, and interest through November 1, 2006 for the Series 2005B-2 Bonds.

**[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]**

## SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2005 BONDS

**General**

  The principal of and interest on the Series 2005A Bonds issued under the Series 2005A Indenture will be secured by a lien upon the amounts collected by or on behalf of the District from landowners or otherwise collected as a result of the Series 2005A Special Assessments (as defined in the Series 2005A Indenture), including any amount received from any foreclosure proceeding for the enforcement of collection of such Special Assessments or from the issuance and sale of tax certificates with respect to such Special Assessments, and by amounts on deposit in the Funds and Accounts (except for the Series 2005A Rebate Fund) established pursuant to the Series 2005A Supplemental Indenture (collectively, the "Series 2005A Pledged Revenues"). The Series 2005A Special Assessments will be levied upon land within the District specially benefited by certain Master Infrastructure improvements (sometimes referred to as the "Series 2005A Project") to be acquired, constructed and equipped by the District in part from the proceeds of the Series 2005A Bonds (as more particularly described under "THE SERIES 2005 PROJECT" herein).

  The principal of and interest on the Series 2005B-1 Bonds issued under the Series 2005B-1 Indenture will be secured by a lien upon the amounts collected by or on behalf of the District from landowners or otherwise collected as a result of the Series 2005B-1 Special Assessments (as defined in the Series 2005B-1 Indenture), including any amount received from any foreclosure proceeding for the enforcement of collection of such Special Assessments or from the issuance and sale of tax certificates with respect to such Special Assessments, and by amounts on deposit in the Funds and Accounts (except for the Series 2005B-1 Rebate Fund) established pursuant to the Series 2005B-1 Supplemental Indenture (collectively, the "Series 2005B-1 Pledged Revenues"). The Series 2005B-1 Special Assessments will be levied upon Durbin Crossing South lands within the District specially benefited by certain Neighborhood Infrastructure improvements (sometimes referred to as the "Series 2005B-1 Project") to be acquired, constructed and equipped by the District in part from the proceeds of the Series 2005B-1 Bonds (as more particularly described under "THE SERIES 2005 PROJECT" herein).

  The principal of and interest on the Series 2005B-2 Bonds issued under the Series 2005B-2 Indenture will be secured by a lien upon the amounts collected by or on behalf of the District from landowners or otherwise collected as a result of the Series 2005B-2 Special Assessments (as defined in the Series 2005B-2 Indenture), including any amount received from any foreclosure proceeding for the enforcement of collection of such Special Assessments or from the issuance and sale of tax certificates with respect to such Special Assessments, and by amounts on deposit in the Funds and Accounts (except for the Series 2005B-2 Rebate Fund) established pursuant to the Series 2005B-2 Supplemental Indenture (collectively, the "Series 2005B-2 Pledged Revenues"). The Series 2005B-2 Special Assessments will be levied upon Durbin Crossing North lands within the District specially benefited by certain Neighborhood Infrastructure improvements (sometimes referred to as the "Series 2005B-2 Project") to be acquired, constructed and equipped in part by the District from the proceeds of the Series 2005B-2 Bonds (as more particularly described under "THE SERIES 2005 PROJECT" herein).

  THE PLEDGED REVENUES WITH RESPECT TO ONE SERIES OF THE SERIES 2005 BONDS DO NOT SECURE THE OTHER SERIES OF SERIES 2005 BONDS. The Pledged Revenues exclude in each instance moneys transferred to the Series 2005 Rebate Funds and investment earnings thereon and special assessments levied and collected for maintenance purposes or maintenance special assessments as provided in the Act.

  The Indenture provides that the pledge will be valid and binding from and after the date of delivery of each Series of the Series 2005 Bonds, and the proceeds of the Series 2005 Bonds and the Pledged

Revenues will immediately be subject to the lien of the pledge without any physical delivery thereof or further act.

The Series 2005 Special Assessments consist of all non-ad valorem special assessments levied and collected by or on behalf of the District pursuant to Section 190.022 of the Act (exclusive of "special assessments" levied and collected by the District under Section 190.022 of the Act for maintenance purposes or "maintenance special assessments" levied and collected by the District under Section 190.021(3) of the Act), together with the interest specified by a resolution adopted by the Board, the interest specified in Chapter 170, Florida Statutes, as amended from time to time, if any such interest is collected by or on behalf of the District, and any applicable penalties collected by or on behalf of the District, together with any and all amounts received by the District from the sale of tax certificates or otherwise from the collection of delinquent Special Assessments, which are imposed, levied and collected by the District with respect to property specially benefited by the respective Series 2005 Project. The Act authorizes the District to finance the construction of each Series 2005 Project by levying Series 2005 Special Assessments upon the respective lands benefited thereby. Non-ad valorem assessments are not based on millage and can become a lien against the homestead as permitted in Section 4, Article X of the Florida State Constitution.

See "APPENDIX D — ASSESSMENT REPORT" attached hereto, which is part of the Assessment Proceedings.[*]

THE SERIES 2005 BONDS ARE LIMITED OBLIGATIONS OF THE DISTRICT PAYABLE SOLELY OUT OF THE RESPECTIVE PLEDGED REVENUES PLEDGED THEREFOR UNDER THE MASTER INDENTURE AND IN THE RESPECTIVE SUPPLEMENTAL INDENTURE AUTHORIZING SUCH SERIES OF SERIES 2005 BONDS, AND NEITHER THE PROPERTY, THE FULL FAITH AND CREDIT, NOR THE TAXING POWER OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED AS SECURITY FOR THE PAYMENT OF THE SERIES 2005 BONDS, EXCEPT THAT THE DISTRICT IS OBLIGATED UNDER EACH SERIES 2005 INDENTURE TO LEVY, AND TO EVIDENCE AND CERTIFY, OR CAUSE TO BE CERTIFIED, FOR COLLECTION, THE CORRESPONDING SERIES 2005 SPECIAL ASSESSMENTS (AS DEFINED IN SUCH SERIES 2005 INDENTURE) TO SECURE AND PAY THE RESPECTIVE SERIES OF SERIES 2005 BONDS. THE SERIES 2005 BONDS DO NOT CONSTITUTE AN INDEBTEDNESS OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISION OR LIMITATION.

**Parity Bonds**

In the Indenture, the District covenants and agrees that, so long as there are any Series 2005A Bonds Outstanding, the Series 2005A Pledged Revenues will not be subject to any other lien senior to or on a parity with the lien created in favor of the Series 2005A Bonds; provided, however, that the District may issue additional bonds (the "Additional Bonds") under the Series 2005A Indenture to complete the Series 2005A Project, to refund a portion of the Series 2005A Bonds, to provide for necessary reserves and to pay

---

[*]    The Supplemental Assessment Report for the Series 2005 Bonds, attached hereto within APPENDIX D — ASSESSMENT REPORT, allocates the anticipated Series 2005 Special Assessments upon the respective lands benefited by each Series 2005 Project. However, that portion of the Series 2005B-2 Special Assessments securing the Escrow Amount as defined in the Series 2005B-2 Indenture (See "FUNDS AND ACCOUNTS — Acquisition and Construction Fund — Escrow Subaccount of the Series 2005B-2 Acquisition and Construction Account" herein) has not been levied as of the date of this Limited Offering Memorandum.

the costs of issuance of such Additional Bonds, if the Series 2005A Pledged Revenues will be sufficient to pay the principal and interest on such Additional Bonds and/or other obligations without the levy of additional Special Assessments.

In the Indenture, the District also covenants and agrees that, so long as there are any Series 2005B-1 or 2005B-2 Bonds Outstanding, the respective Series 2005B-1 and 2005B-2 Pledged Revenues will not be subject to any other lien senior to or on a parity with the lien created in favor of such Series of Series 2005 Bonds.

WHILE NO FUTURE BONDS WILL BE PAYABLE FROM OR SECURED BY THE SERIES 2005 PLEDGED REVENUES, EXCEPT AS STATED ABOVE, THE DISTRICT, ST. JOHNS COUNTY, THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA OR ANY POLITICAL SUBDIVISION THEREOF MAY IN THE FUTURE IMPOSE, LEVY AND COLLECT TAXES AND ASSESSMENTS, THE LIENS OF WHICH WILL BE CO-EQUAL WITH THE LIEN OF THE SERIES 2005 SPECIAL ASSESSMENTS. See "ENFORCEMENT OF ASSESSMENT COLLECTIONS" herein. The Indenture permits the District to issue Bonds to finance District projects payable from assessments on the same properties subject to the Series 2005 Special Assessments securing the respective Series of Series 2005 Bonds. See also paragraph 5 under "BOND OWNERS' RISKS" herein regarding taxes and other obligations payable on a parity with the Series 2005 Special Assessments.

### Enforcement of Payment of Series 2005 Special Assessments

The District has covenanted in the Indenture to assess, levy, collect or cause to be collected and enforced the payment of Series 2005 Special Assessments in the manner prescribed by the Indenture and all resolutions, ordinances or laws thereunto appertaining at the times and in the amounts as shall be necessary to pay, when due, the principal of and interest on the respective Series of Series 2005 Bonds and to make all other payments required by the Indenture. See "ENFORCEMENT OF ASSESSMENTS COLLECTIONS" herein.

### Prepayment of Series 2005 Special Assessments

Pursuant to the terms of the Act, the owner of property subject to assessments may pay the entire balance of the corresponding Series 2005 Special Assessments remaining due, without interest, within thirty (30) days after a Series 2005 Project has been completed and the Board of Supervisors of the District has adopted a resolution accepting such Series 2005 Project as provided by Section 170.09, Florida Statutes. At the time of issuance of the Series 2005 Bonds, the Master Developer and the Durbin North Developer will each waive this right to prepay the Special Assessments on behalf of itself and future landowners in the District.

Pursuant to the Assessment Methodology (see "APPENDIX D — ASSESSMENT REPORT," herein), subsequent to thirty (30) days after completion and acceptance of a Series 2005 Project, the owner of property subject to assessments may prepay the entire remaining balance of the applicable Series 2005 Special Assessment at any time, or, with respect to the Series 2005A Project only, a portion of the remaining balance of the Series 2005A Special Assessment one time if there is also paid, in addition to the prepaid principal balance of the applicable Series 2005 Special Assessment, an amount equal to (A), in the case of the Series 2005A Bonds, the interest that would otherwise be due on such prepaid amount on the next succeeding Interest Payment Date or, if prepaid during the forty-five (45) day period preceding such Interest Payment Date, to the Interest Payment Date following such next succeeding Interest Payment Date for the Series 2005A Bonds, or (B) in the case of the Series 2005B-1 or 2005B-2 Bonds, the interest that would otherwise be due on such prepaid amount on the next succeeding Quarterly Redemption Date or, if

17

prepaid during the forty-five (45) day period preceding such Quarterly Redemption Date, to the Quarterly Redemption Date following such next succeeding Quarterly Redemption Date for the applicable Series of Series 2005B-1 or 2005B-2 Bonds.

The Series 2005 Bonds are subject to extraordinary mandatory redemption from Prepayments as indicated under the captions "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005A Bonds in Whole or in Part" and "— Extraordinary Mandatory Redemption of Series 2005B-1 and 2005B-2 Bonds in Whole or in Part" herein. The prepayment of Series 2005 Special Assessments does not entitle the owner of the property to a discount for early payment.

### Adjustments to Series 2005 Special Assessments

Upon completion of the each of the Series 2005 Projects, the corresponding Series 2005 Special Assessments will be credited, pro rata, with any excess of the original Series 2005 Special Assessments over the actual cost of such Series 2005 Project funded from proceeds of the respective Series of Series 2005 Bonds. In making such credit, no credit will be given for Series 2005 Bonds financing costs, capitalized interest, funded reserves or Series 2005 Bonds discount.

### Re-Assessments

Pursuant to the Indenture, if the Series 2005 Special Assessment with respect to a Series 2005 Project is in whole or in part annulled, vacated or set aside by the judgment of any court, or if the District is satisfied that any such Series 2005 Special Assessment is so irregular or defective that it cannot be enforced or collected, or if the District omitted to make such Series 2005 Special Assessment when it might have done so, the District will, with respect to such Series 2005 Project, either (i) take all necessary steps to cause a new Series 2005 Special Assessment to be made for the whole or any part of such improvement or against any property benefited by said improvement, or (ii) in its sole discretion, make up the amount of such Series 2005 Special Assessment from legally available moneys, which moneys shall be deposited into the applicable Series 2005 Revenue Account. In case any such second Series 2005 Special Assessment shall be annulled, the District will obtain and make other Series 2005 Special Assessments until a valid Series 2005 Special Assessment is made.

## ENFORCEMENT OF ASSESSMENT COLLECTIONS

### Collection Procedures

The respective Series 2005 Special Assessments imposed on the corresponding parcels of benefited land within the District pursuant to the resolutions adopting the Assessment Methodology are the primary source of payment for each Series of the Series 2005 Bonds. The Series 2005 Special Assessments are non-ad valorem special assessments which are imposed and levied against the land subject thereto upon the basis of a special benefit to such land determined to result from the implementation of the corresponding Series 2005 Projects. To the extent that landowners fail to pay such Series 2005 Special Assessments, delay payments, or are unable to pay the same, the successful pursuit of collection procedures available to the District is essential to continued payment of principal of and interest on the Series 2005 Bonds. The Act provides for various methods of collection of delinquent Series 2005 Special Assessments by reference to other provisions of the Florida Statutes. **The following is a description of certain statutory provisions of assessment, payment, collection and enforcement procedures appearing in the Florida Statutes, but is qualified in its entirety by reference to such statutes and applicable rules.**

The Series 2005A Special Assessments will be payable in annual installments and will be levied by the District each year. The determination, order, levy and collection of Series 2005A Special Assessments must be done in compliance with procedural requirements and guidelines provided by State law. Failure by the District or the St. Johns County Tax Collector (the "Tax Collector") or the St. Johns County Property Appraiser (the "Property Appraiser") to comply with such requirements could result in delays in the collection of, or the complete inability to collect, Series 2005A Special Assessments during any year. Such delays in the collection of, or complete inability to collect, Series 2005A Special Assessments could have a material adverse effect on the ability of the District to make full or punctual payment of debt service on the Series 2005A Bonds.

The District may arrange for the Series 2005A Special Assessments to be collected by the Tax Collector on the annual Tax Notice pursuant to the uniform method for the levy, collection and enforcement of assessments afforded by Sections 197.3631, 197.3632 and 197.3635, Florida Statutes (the "Uniform Method"). Additionally, the District may bill and collect the Series 2005A Special Assessments directly or the Series 2005A Special Assessments may be collected by the Tax Collector on a tax bill that is not the official Tax Notice or by the Clerk on a separate mailing. The Series 2005A Indenture provides that the Series 2005A Special Assessments will be collected using the Uniform Method following platting of the burdened land. Prior to platting, the Series 2005A Indenture provides that the Series 2005A Special Assessments will be collected by the District unless the District determines that collection pursuant to the Uniform Method is in the best interests of the District. The Series 2005B-1 and 2005B-2 Indentures provide that the Series 2005B-1 and 2005B-2 Special Assessments will be collected by the District. The election to collect and enforce Series 2005 Special Assessments against the unplatted land in any year pursuant to any one method shall not, to the extent permitted by law, preclude the District from electing to collect and enforce the Series 2005 Special Assessments pursuant to any other method permitted by law in any subsequent year, or require the District to utilize the same method of collection for the Series 2005 Special Assessments.

**Collection through Uniform Method**

As referenced in "SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2005 BONDS," the Florida Statutes provide that, subject to certain conditions, special assessments such as the Series 2005A Special Assessments may be collected in the same manner as county and municipal ad valorem taxes (this is the method to be employed for the Series 2005A Special Assessments securing the Series 2005A Bonds following platting of the burdened land). The statutes relating to enforcement of county taxes (and thus the Series 2005A Special Assessments) provide that county taxes become due and payable on November 1 of the year when assessed and constitute a lien upon the land from January 1 of such year. The lien of the Series 2005 Special Assessments with respect to the corresponding Series of Series 2005 Bonds is of equal dignity with the liens for state, county, district and municipal taxes upon land, and thus is a first lien, superior to all other liens, including mortgages (except for state, county, district and municipal taxes which are of equal dignity). The Tax Collector is to bill such taxes together with all other county, district and municipal taxes, and landowners in the District are required to pay all such taxes without preference in payment of any particular increment of the tax bill, such as the increment owing for the Series 2005A Special Assessments. Upon receipt by the Tax Collector of the Series 2005A Special Assessments and payment to the District, moneys therefrom will be deposited as provided in the Indenture.

All county, municipal, school and special district taxes, special assessments (if the Uniform Method of collection is utilized), including the Series 2005A Special Assessments levied by the District, and voter approved ad valorem taxes levied to pay principal of and interest on bonds are payable at one time. If a taxpayer does not make complete payment, he or she cannot designate specific line items on his or her tax bill as deemed paid in full. In such cases, the Tax Collector does not accept such partial payment and the

partial payment is returned to the taxpayer. Therefore, any failure to pay any one line item, whether it be the Series 2005A Special Assessments or not, would cause the Series 2005A Special Assessments collected by this method to not be collected to that extent, which would have a significant adverse effect on the ability of the District to make full or punctual payment of debt service on the Series 2005A Bonds.

If Series 2005A Special Assessments collected by the Uniform Method are paid during November when due or during the following three months, the taxpayer is granted a variable discount equal to 4% in November and decreasing one percentage point per month to 1% in February. All unpaid taxes become delinquent on April 1 of the year following assessment, and the Tax Collector is required to collect taxes prior to April 1 and after that date to institute statutory procedures upon delinquency to collect assessed taxes. Delay in the mailing of tax notices to taxpayers may result in a delay throughout this process.

**Sale of Tax Certificates**

The collection of delinquent assessments collected by the Uniform Method is, in essence, based upon the sale by the Tax Collector of "tax certificates" and remittance of the proceeds of such sale to the District for the payment of the Series 2005A Special Assessment due. The demand for such certificates is in turn dependent upon various factors, which include the interest that can be earned by ownership of such certificates and the value of the land that is the subject of such certificates and which may be subject to sale at the demand of the certificate holder. Therefore, the underlying value of the land within the District may affect the demand for such certificates and the successful collection of the Series 2005A Special Assessments. See "BOND OWNERS' RISKS" herein.

In the event of a delinquency in the payment of taxes on real property, the Tax Collector is required to attempt to sell tax certificates on such property to the person who pays the delinquent taxes and interest and certain costs and charges relating thereto, and who accepts the lowest interest rate per annum to be borne by the certificates (not to exceed eighteen percent (18%)). Delinquent taxes may be paid by a taxpayer prior to the date of sale of a tax certificate by the payment of such taxes, together with interest and all costs and charges relating thereto. Generally, tax certificates are sold by public bid. If there are no bidders at the public sale of tax certificates, the certificate is issued to the County in which the assessed lands are located, at the maximum rate of interest allowed (currently, eighteen percent (18%)). The Tax Collector does not collect any money if tax certificates are issued to the county. Proceeds from the sale of tax certificates are required to be used to pay taxes (including Series 2005A Special Assessments), interest, costs and charges on the real property described in the certificate.

County-held certificates may be purchased and any tax certificate may be redeemed, in whole, by any person at any time before a tax deed is issued or the property is placed on the list of lands available for sale, at a price equal to the face amount of the certificate or portion thereof together with all interest (but not less than five percent (5%) of the face amount of the certificate), costs, charges and omitted taxes due. The proceeds of such a redemption are paid to the Tax Collector who transmits to the holder of the certificate such proceeds less service charges, and the certificate is canceled. Any holder, other than the county, of a tax certificate that has not been redeemed has seven (7) years from the date of issuance of the tax certificate during which to act against the land that is the subject of the tax certificate.

After an initial period ending at least two (2) years from April 1 of the year of issuance of a certificate, during which period actions against the land are held in abeyance to allow for sales and redemptions of tax certificates and before the expiration of seven (7) years from the date of issuance, the holder of a certificate may apply for a tax deed to the subject land. The applicant is required to pay to the Tax Collector at the time of application all amounts required to redeem or purchase all other outstanding tax certificates covering the land, plus interest, any omitted taxes or delinquent taxes and interest, and current

taxes, if due. If the County holds a tax certificate on property valued at $5,000 or more and has not succeeded in selling it, the County must apply for a tax deed two (2) years after April 1 of the year of issuance. The County pays costs and fees to the Tax Collector but not any amount to redeem any other outstanding certificates covering the land. Thereafter, the property is advertised for public sale.

In any such public sale, the private holder of the tax certificate who is seeking a tax deed for non-homestead property is deemed to submit a minimum bid equal to the amount required to redeem the tax certificate, charges for the cost of sale, redemption of other tax certificates on the land, and the amount paid by such holder in applying for the tax deed, plus interest thereon. In the case of homestead property, the bid is also deemed to include an amount equal to one-half of the latest assessed value of the homestead. If there are no higher bids, the holder receives title to the land and the amounts paid for the certificate and in applying for a tax deed are credited towards the purchase price. If there are other bids, the holder may enter the bidding. The highest bidder is awarded title to the land. The portion of proceeds of such sale needed to redeem the tax certificate, and all other amounts paid by such person in applying for a tax deed, are forwarded to the holder thereof or credited to such holder if such holder is the successful bidder. Excess proceeds are distributed first to satisfy governmental liens against the land and then to the former title holder of the property (less service charges), lienholders of record, mortgagees of record, vendees of recorded contracts for deeds, and other lienholders and any other person to whom the land was last assessed on the tax roll for the year in which the land was assessed, all as their interests may appear.

Except for certain governmental liens and certain restrictive covenants and restrictions, no right, interest, restriction or other covenant survives the issuance of a tax deed. Thus, for example, outstanding mortgages on property subject to a tax deed would be extinguished.

If there are no bidders at the public sale, the County may at any time within ninety (90) days from the date of offering for public sale purchase the land without further notice or advertising for a statutorily prescribed opening bid. After ninety (90) days have passed, any person or governmental unit may purchase the land by paying the amount of the opening bid. Three (3) years from the date of offering for public sale, unsold lands escheat to the County in which they are located and all tax certificates and liens against the property are canceled and a deed is executed vesting title in the County Commission.

**Judicial Proceedings**

If the Uniform Method of collection is not utilized for any reason (such as the case of the Series 2005A Special Assessments securing the Series 2005A Bonds on unplatted lots and the Series 2005B-1 and 2005B-2 Special Assessments securing, respectively, the Series 2005B-1 and 2005B-2 Bonds), the foreclosure of the lien of delinquent assessments may be accomplished by a judicial proceeding pursuant to Chapter 173, Florida Statutes. Pursuant to this procedure, the District would bring suit to foreclose the lien of any delinquent assessments in the Circuit Court. A proceeding under Chapter 173, Florida Statutes, may not be commenced until one (1) year from the date the Series 2005 Special Assessments become due and payable. The District may also foreclose on the lien of delinquent assessments pursuant to Section 170.10, Florida Statutes, which provides that upon the failure of any property owner to pay the principal of the Series 2005 Special Assessments or the interest thereon, when due, the governing body of the District is authorized to commence legal proceedings for the enforcement of the payment thereof, including commencement of an action in chancery, commencement of a foreclosure proceeding in the same manner as the foreclosure of a real estate mortgage.

In general, after the District commences the suit, there is a period of notice to, and an opportunity for response by, affected persons. Ultimately a hearing will be held and, if the court decides in favor of the District, a judgment will be rendered in the amount of the delinquent assessments and costs of the

21

proceeding. The judgment would also direct sale of the land subject to the delinquent assessments by public bid to the highest bidder, with proceeds of the sale being applied to payment of the delinquent assessments. If no bidder bids at least the amount of the delinquent assessments and applicable costs, the District may obtain title to the land.

Enforcement of the obligation to pay Series 2005 Special Assessments and the ability of the Tax Collector to sell tax certificates and ultimately tax deeds, or the ability to foreclose the lien created by the failure to pay Series 2005 Special Assessments, may not be readily available or may be limited as such enforcement is dependent upon judicial actions that are often subject to discretion and delay.

**Method of Collection by District for Series 2005 Special Assessments**

The District plans to collect Series 2005 Special Assessments directly until such time as lots subject to the Series 2005A Special Assessments are platted, at which time the District shall, as soon as possible, begin to collect the Series 2005A Special Assessments through the Uniform Method.

### FUNDS AND ACCOUNTS

The following Funds and Accounts are held by the Trustee pursuant to the Indenture:

**Acquisition and Construction Fund**

The Indenture establishes within the Acquisition and Construction Fund held by the Trustee separate Series 2005A, 2005B-1 and 2005B-2 Acquisition and Construction Accounts, and within the Series 2005A Acquisition and Construction Account, a Deferred Costs Subaccount.

*Series 2005 Acquisition and Construction Accounts.* Amounts on deposit in each of the Series 2005 Acquisition and Construction Accounts are applied to pay the Costs of the corresponding Series 2005 Project, upon compliance with the requirements of the requisition provisions set forth in the Master Indenture.

Series 2005A Acquisition and Construction Account; Deferred Costs. The Series 2005A Indenture provides that, until the Deferred Costs are paid in full as evidenced by a certificate of the Trustee to such effect delivered to the Trustee, but in any case, no earlier than the later to occur of the Completion Date of the Master Infrastructure or November 1, 2008: (A) the Trustee shall not close the Deferred Costs Subaccount in the Series 2005A Acquisition and Construction Account; and (B) the Trustee shall deposit into the Deferred Costs Subaccount the amounts required to be so transferred pursuant to the provisions of the Series 2005A Indenture which amounts are held separate and apart from other amounts on deposit in the Series 2005A Acquisition and Construction Account, and shall, subject to the pledge of the Series 2005A Pledged Revenues, including the amounts on deposit in such Subaccount to the payment of the Series 2005A Bonds, be used to pay Deferred Costs. Deferred Costs are paid pursuant to a written contract or agreement pursuant to which the District may become obligated to pay for Costs of the Series 2005A Project. Amounts remaining in the Deferred Costs Subaccount, if any, at the time such Subaccount is closed, shall be transferred into the General Account of the Series 2005A Redemption Fund and applied to the extraordinary mandatory redemption of the Series 2005A Bonds.

The Series 2005A Indenture defines the term "Deferred Costs" as meaning Costs incurred by the Developers for Master Infrastructure which have not been paid by or on behalf of the District from the proceeds of the Bonds or which have not been reimbursed to the District, and which are identified by the District to the Trustee in writing as having been advanced under any contract or agreement pursuant to

which the District may become obligated to pay for such Costs of the Master Infrastructure. Notwithstanding the foregoing, Deferred Costs shall not be due and payable to a Developer that is in default under its respective Completion Agreement.

After the Completion Date of the Series 2005A Project, moneys remaining in the Series 2005A Acquisition and Construction Account of the Acquisition and Construction Fund not reserved by the District for the payment of any remaining part of the Cost of the Series 2005A Project, after payment of any accrued but unpaid Deferred Costs, are transferred to the General Account of the Series 2005A Bond Redemption Fund pursuant to the Series 2005A Indenture, and applied by the District toward the extraordinary mandatory redemption of the Series 2005A Bonds in accordance with the Series 2005A Indenture. See "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005A Bonds in Whole or in Part" herein.

Series 2005B-1 and 2005B-2 A Acquisition and Construction Accounts. After the respective Completion Dates of the Series 2005B-1 and 2005B-2 Projects, moneys remaining in the applicable Series 2005B-1 or 2005B-2 Acquisition and Construction Account of the Acquisition and Construction Fund not reserved by the District for the payment of any remaining part of the Costs of the Series 2005B-1 or 2005B-2 Project, as the case may be, are transferred to the respective General Account of the Series 2005B-1 or 2005B-2 Bond Redemption Fund pursuant to the Series 2005B-1 and 2005B-2 Indentures, and applied by the District toward the extraordinary mandatory redemption of the Series 2005B-1 or 2005B-2 Bonds in accordance with the Series 2005B-1 or 2005B-2 Indenture, as the case may be. See "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005B-1 and 2005B-2 Bonds in Whole or in Part" herein.

Escrow Subaccount of the Series 2005B-2 Acquisition and Construction Account. Moneys in the Escrow Subaccount under the Series 2005B-2 Indenture shall remain therein until the earlier to occur of (i) the date on which the District adopts a final assessment resolution levying the Series 2005B-2 Special Assessments in an amount equal to the principal amount of the Series 2005B-2 Bonds, or (ii) the Escrow Termination Date. If the event described in clause (i) occurs prior to the Escrow Termination Date, as evidenced by a certificate of the District delivered to the Trustee, the Trustee shall transfer the amounts on deposit in the Escrow Subaccount to the Series 2005B-2 Acquisition and Construction Account. If the Escrow Termination Date occurs prior to the event described in clause (i), the Trustee shall transfer the Escrow Amount to the General Account of the Series 2005B-2 Redemption Fund, which together with moneys transferred from the Series 2005B-2 Debt Service Reserve Account to the General Account of the Series 2005B-2 Bond Redemption Fund in accordance with the Series 2005B-2 Indenture (see "— Reserve Fund — Series 2005B 1 and 2005B 2 Debt Service Reserve Accounts" below), shall be applied to the redemption of Series 2005B-2 Bonds in accordance with the Series 2005B-2 Indenture. See "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005B-1 and 2005B-2 Bonds in Whole or in Part" herein. Interest earnings on amounts in the Escrow Subaccount shall be transferred to the Series 2005B-2 Acquisition and Construction Account.

The Series 2005B-2 Indenture defines the term "Escrow Termination Date" as meaning one year from the date of initial delivery of the Series 2005-2 Bonds, unless such date is extended at the request of the District, and the term "Escrow Termination" as meaning the failure by the District's Board of Supervisors prior to the Escrow Termination Date to approve a final assessment resolution levying the Series 2005B-2 Special Assessments in an amount equal to the principal amount of the Series 2005B-2 Bonds.

The amounts deposited in the Series 2005 Acquisition and Construction Accounts may be used to pay costs of issuance of the corresponding Series of Series 2005 Bonds as provided in the Indenture.

**Debt Service Fund**

Each Series 2005 Indenture establishes within the Debt Service Fund held by the Trustee a separate Series 2005 Principal Account, and Series 2005 Interest Account and, and within each of the Series 2005 Interest Accounts, an Interest Subaccount and a Capitalized Interest Subaccount. Additionally, the Series 2005A Indenture establishes a Series 2005A Sinking Fund Account within the Debt Service Fund.

**Reserve Fund**

Each Series 2005 Indenture establishes within the Reserve Fund held by the Trustee a separate Series 2005 Debt Service Reserve Account, which is held for the benefit of the Series of Series 2005 Bonds for which it is established.

Amounts on deposit in the Series 2005A Debt Service Reserve Account are used only for the purpose of making payments into the Series 2005A Interest Account, the Series 2005A Principal Account and the Series 2005A Sinking Fund Account to pay debt service on the Series 2005A Bonds, when due, to the extent the moneys on deposit in such Accounts therein and available therefor are insufficient and for no other purpose. Amounts on deposit in the Series 2005B-1 Debt Service Reserve Account are used only for the purpose of making payments into the Series 2005B-1 Interest Account and the Series 2005B-1 Principal Account to pay debt service on the Series 2005B-1 Bonds, when due, to the extent the moneys on deposit in such Accounts therein and available therefor are insufficient and for no other purpose. Amounts on deposit in the Series 2005B-2 Debt Service Reserve Account are used only for the purpose of making payments into the Series 2005B-2 Interest Account and the Series 2005B-2 Principal Account to pay debt service on the Series 2005B-2 Bonds, when due, to the extent the moneys on deposit in such Accounts therein and available therefor are insufficient and for no other purpose. THE SERIES 2005 DEBT SERVICE RESERVE ACCOUNT WITH RESPECT TO ONE SERIES OF THE SERIES 2005 BONDS DOES NOT SECURE THE OTHER SERIES OF SERIES 2005 BONDS. The respective Series 2005 Debt Service Reserve Accounts shall consist only of cash and Investment Securities.

The respective Series 2005 Debt Service Reserve Requirements may be satisfied by the deposit in the corresponding Series 2005 Debt Service Reserve Account of cash, Investment Securities, a Debt Service Reserve Insurance Policy or a Debt Service Reserve Letter of Credit (as such terms are defined in and subject to the Master Indenture), or any combination of the foregoing. The District may at anytime and from time to time substitute cash, Investment Securities, a Debt Service Reserve Insurance Policy or a Debt Service Reserve Letter of Credit for any of the foregoing then on deposit in any Series 2005 Debt Service Reserve Account. If any such Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit is substituted for moneys on deposit in a Series 2005 Debt Service Reserve Account, the Indenture requires that the excess moneys in such Series 2005 Debt Service Reserve Account be transferred to and deposited in the corresponding Series 2005 Revenue Account. If a disbursement is made from a Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit, the District is obligated to either reinstate the maximum limits of such Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit immediately following such disbursement or to deposit into the corresponding Series 2005 Debt Service Reserve Account, as provided in the Indenture, funds in the amount of the disbursement made under such Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit.

*Series 2005A Debt Service Reserve Account.* On each March 15 and September 15 (or, if such date is not a Business Day, on the Business Day next preceding such day), the Series 2005A Indenture requires

the Trustee to determine the amount on deposit in the Series 2005A Debt Service Reserve Account and transfer any excess therein (other than as a result of earnings on investments therein) above the Debt Service Reserve Requirement for the Series 2005A Bonds first, prior to the closure of the Deferred Costs Subaccount in the Series 2005A Acquisition and Construction Account, to the Deferred Costs Subaccount, and thereafter to the General Account of the Series 2005A Bond Redemption Fund to be used for the extraordinary mandatory redemption of Series 2005A Bonds as described herein under the caption "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005A Bonds in Whole or in Part" herein.

Notwithstanding the transfers described immediately above, in the event that the amount of proceeds of the Series 2005A Bonds on deposit in the Series 2005A Debt Service Reserve Account exceeds the Series 2005A Debt Service Reserve Requirement due to a decrease in the amount of Series 2005A Bonds that will be outstanding as a result of an optional prepayment (or true-up payment) by the owner of a lot or parcel of land of a Series 2005A Special Assessment against such lot or parcel, the Series 2005A Indenture requires that the excess amount to be released be transferred from the Series 2005A Debt Service Reserve Account to the Prepayment Account of the Series 2005A Bond Redemption Fund as a credit against the Series 2005A Prepayment Principal otherwise required to be made by the owner of such lot or parcel.  See the captions "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005A Bonds in Whole or in Part" herein.

The Series 2005A Indenture defines the "Debt Service Reserve Requirement" with respect to the Series 2005A Bonds (for ease of reference, the "Series 2005A Debt Service Reserve Requirement") (A) at the time of issuance, an amount equal to the lesser of (i) the maximum annual debt service for the Outstanding Series 2005A Bonds, (ii) 125% of the average annual debt service for all Outstanding Series 2005A Bonds, and (iii) 10% of the original stated principal amount of the Series 2005A Bonds, which upon calculation is the maximum annual debt service for the Outstanding Series 2005A Bonds, and (B) at anytime after the date of initial issuance, the Series 2005A Bonds, the Series 2005A Reserve Account Percentage times the Deemed Outstanding Series 2005A Bonds.  On the date of initial issuance of the Series 2005A Bonds, the "Series 2005A Debt Service Reserve Requirement" is $3,745,725.00, or 6.8110282% of the initial principal amount of the Series 2005A Bonds.

The Series 2005A Indenture defines "Series 2005A Reserve Account Percentage" as meaning the result of dividing (i) the Series 2005A Debt Service Reserve Requirement on the date of initial issuance and delivery of the Series 2005A Bonds ($3,745,725.00) by (ii) the initial Outstanding aggregate principal amount of the Series 2005A Bonds, which equals (6.8110282 %); provided, however, that subsequent to the date on which the Series 2005 Bonds have received (i) an Investment Grade Rating (defined as a rating on the Series 2005A Bonds of at least "BBB-," "Baa3," or "BBB-," by S&P, Moody's, or Fitch, respectively) or (ii) the date on which the Series 2005A Special Assessments have been Substantially Absorbed (defined as the date on which a principal amount of the Series 2005A Special Assessments equaling at least 75% of the then Outstanding principal amount of the Series 2005A Bonds is levied on the District Lands as evidenced by a certificate of occupancy for a structure thereon), in each case as evidenced by a certificate to such effect delivered to the Trustee from a Responsible Officer of the District on which the Trustee may conclusively rely, the Series 2005A Reserve Account Percentage shall mean the result of dividing 50% of the then maximum Debt Service Requirement by the then-Deemed Outstanding principal amount of the Series 2005A Bonds, but only if the amount so determined is less than the amount determined in the preceding clause.

"Deemed Outstanding" means with respect to the Series 2005A Bonds the Outstanding principal amount of Series 2005A Bonds reduced by the result of dividing the amount on deposit in the Prepayment

Account of the Series 2005A Bond Redemption Fund by 1 minus the Series 2005A Reserve Account Percentage.

*Series 2005B-1 and 2005B-2 Debt Service Reserve Accounts.*   On each March 15, June 15, September 15 and December 15 (or, if such date is not a Business Day, on the Business Day next preceding such day), the Series 2005B-1 and 2005B-2 Indentures require the Trustee to determine the respective amounts on deposit in the Series 2005B-1 and the 2005B-2 Debt Service Reserve Accounts and transfer any excess therein (other than as a result of a Prepayment described immediately below or earnings on investments therein or, in the case of the Series 2005B-2 Debt Service Reserve Account, a redemption from amounts on deposit in the Escrow Subaccount of the Series 2005B-2 Acquisition and Construction Account as described below) above the respective Series 2005B-1 and 2005B-2 Debt Service Reserve Requirements to the corresponding General Account of the Series 2005B-1 or 2005B-2 Bond Redemption Fund to be used for the extraordinary mandatory redemption of Series 2005B-1 Bonds or Series 2005B-2 Bonds, as the case may be, as described herein under the caption "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005B-1 and 2005B-2 Bonds in Whole or in Part" herein.

In the event that the amount of proceeds of Series 2005B-1 or B-2 Bonds on deposit in the corresponding Series 2005B-1 or 2005B-2 Debt Service Reserve Account exceeds the respective Series 2005B-1 or 2005B-2 Debt Service Reserve Requirement due to a decrease in the amount of such Series of Series 2005B-1 or 2005B-2 Bonds that will be outstanding as a result of an optional prepayment (or true-up payment) by the owner of a lot or parcel of land of a Series 2005B-1 or 2005B-2 Special Assessment against such lot or parcel, the Indenture requires that the excess amount to be released be transferred from the applicable Series 2005B-1 or 2005B-2 Debt Service Reserve Account to the corresponding Prepayment Account of the applicable Series 2005B-1 or 2005B-2 Bond Redemption Fund as a credit against the respective Series 2005B-1 or 2005B-2 Prepayment Principal otherwise required to be made by the owner of such lot or parcel.  See the captions "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005B-1 and 2005B-2 Bonds in Whole or in Part" herein.

In connection with a redemption of Series 2005B-2 Bonds as described in clause (vi) under the caption "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005B 1 and 2005B 2 Bonds in Whole or in Part" herein, an amount on deposit in the Series 2005B-2 Debt Service Reserve Account allocable to the Escrow Amount shall be transferred to the General Account of the Series 2005B-2 Bond Redemption Fund and applied, together with amounts transferred thereto from the Escrow Subaccount, to the redemption of Series 2005B-2 Bonds.

The Series 2005B-1 and 2005B-2 Indentures define the "Debt Service Reserve Requirement" with respect to the Series 2005B-1 Bonds and the Series 2005B-2 Bonds (for ease of reference, the "Series 2005B-1 Debt Service Reserve Requirement" and "Series 2005B-2 Debt Service Reserve Requirement") as meaning (A) on the date of initial issuance of the Series 2005B-1 and Series 2005B-2 Bonds, the respective amounts equal 50% of the maximum annual interest on the Series 2005B-1 Bonds and on the Series 2005B-2 Bonds, and (B) at anytime after the date of initial issuance, 2.4375% of the Deemed Outstanding Series 2005B-1 Bonds or 2.4375% of the aggregate principal amount of the Deemed Outstanding 2005B-2 Bonds as of any time of calculation.  On the date of initial issuance, the "Series 2005B-1 Debt Service Reserve Requirement" is $212,915.63, or 2.4375% of the initial principal amount of the Series 2005B-1 Bonds, and the "Series 2005B-2 Debt Service Reserve Requirement" is $355,631.25, or 2.4375% of the initial principal amount of the Series 2005B-2 Bonds.

The Series 2005B-1 and 2005B-2 Indentures define "Series 2005B-1 Reserve Account Percentage" and "Series 2005B-2 Reserve Account Percentage" as meaning the result of dividing (i) the applicable Series 2005B-1 or 2005B-2 Debt Service Reserve Requirement on the date of initial issuance and delivery of the corresponding Series 2005B-1 and 2005B-2 Bonds by (ii) the corresponding initial Outstanding aggregate principal amount of the Series 2005B-1 and 2005B-2 Bonds, which equals 2.4375% in the case of the Series 2005B-1 Reserve Account Percentage, and 2.4375% in the case of the Series 2005B-2 Reserve Account Percentage.

"Deemed Outstanding" means with respect to the Series 2005B-1 and 2005B-2 Bonds the aggregate Outstanding principal amount of such Series of Series 2005 Bonds, reduced by the result of dividing (x) the amount on deposit in the corresponding Series 2005 Prepayment Account by (y) 1 minus the corresponding Series 2005 Reserve Account Percentage.

**Rebate Fund**

The Indenture establishes a Series 2005A Rebate Fund, a Series 2005B-1 Rebate Fund and a Series 2005B-2 Rebate Fund (collectively, the "Series 2005 Rebate Funds") each held by the Trustee. The Trustee shall deposit moneys in the Series 2005 Rebate Funds as required to be deposited therein pursuant to the Arbitrage Certificate. The District shall comply with the Tax Regulatory Covenants included as part of the Supplemental Indenture.

## FLOW OF FUNDS

**Revenue Fund**

The Indenture establishes within the Revenue Fund held by the Trustee a separate Series 2005A Revenue Account, a separate Series 2005B-1 Revenue Account and a separate Series 2005B-2 Revenue Account (collectively, the "Series 2005 Revenue Accounts") to be held by the Trustee separate and apart from all other Funds and Accounts held under the Indenture and from all other moneys of the Trustee. Series 2005 Special Assessments (except for Prepayments (as defined in the Indenture)) are deposited by the Trustee in the corresponding Series 2005 Revenue Account. Prepayments are deposited in the Prepayment Account of the corresponding Series 2005 Bond Redemption Funds (see the captions "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005A Bonds in Whole or in Part" and "— Extraordinary Mandatory Redemption of Series 2005B-1 and 2005B-2 Bonds in Whole or in Part" herein).

*Capitalized Interest Subaccounts.* Prior to November 1, 2007, amounts on deposit in the Capitalized Interest Subaccount of the Series 2005A Interest Account shall be used to pay on each Interest Payment Date an amount equal to the lesser of (x) the amount of interest on the Series 2005A Bonds coming due on such Interest Payment Date, or (y) the balance on deposit in such Capitalized Interest Subaccount. In the event that on November 1, 2007, any moneys representing Capitalized Interest on deposit in the Capitalized Interest Subaccount in excess of the amount required to pay interest on the Series 2005A Bonds shall be transferred from the Capitalized Interest Subaccount prior to the Completion Date of the Series 2005A Project to the Series 2005A Acquisition and Construction Account and thereafter to the General Account of the Series 2005A Bond Redemption Fund as described under the caption "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005A Bonds in Whole or in Part" herein, and applied toward the redemption of the Series 2005A Bonds.

Amounts on deposit in the respective Capitalized Interest Subaccounts of the Series 2005B-1 and 2005B-2 Interest Account shall be used to pay (x) on each Interest Payment Date an amount equal to the

amount of interest on the applicable Series 2005B-1 and 2005B-2 Bonds coming due on such Interest Payment Date, and (y) on each February 1 and August 1 an amount equal to the amount of interest on the applicable Series 2005B-1 and 2005B-2 Bonds equal to the accrued interest on the Series 2005B-1 or 2005B-2 Bonds, if any, to be redeemed on such February 1 or August 1 until the amounts in the respective Capitalized Interest Accounts are exhausted.

*Series 2005A Revenue Account.* The Trustee shall transfer from amounts on deposit in the Series 2005A Revenue Account to the Funds and Accounts described below, the following amounts, at the following times and in the following order of priority:

FIRST, upon receipt but no later than the Business Day preceding the first May 1 for which there remains an insufficient amount on deposit in the Capitalized Interest Subaccount of the Series 2005A Interest Account of the Debt Service Fund to be applied to the payment of interest on the Series 2005A Bonds due on the next succeeding May 1, and no later than the Business Day next preceding each May 1 thereafter to the Interest Subaccount of the Series 2005A Interest Account of the Debt Service Fund, an amount from the Series 2005A Revenue Account equal to the interest on the Series 2005A Bonds becoming due on the next succeeding May 1, less any amounts on deposit in the Interest Subaccount of the Series 2005A Interest Account not previously credited;

SECOND, no later than the Business Day next preceding May 1, 2037, to the Series 2005A Principal Account of the Debt Service Fund, an amount from the Series 2005A Revenue Account equal to the principal amount of Outstanding Series 2005A Bonds maturing on such May 1, if any, less any amounts on deposit in the Series 2005A Principal Account not previously credited;

THIRD, no later than the Business Day next preceding each May 1, commencing May 1, 2008, to the Series 2005A Sinking Fund Account of the Debt Service Fund, an amount from the Series 2005A Revenue Account equal to the principal amount of Series 2005A Bonds subject to sinking fund redemption on such May 1, less any amount on deposit in the Series 2005A Sinking Fund Account not previously credited;

FOURTH, upon receipt but no later than the Business Day preceding the first November 1 for which there remains an insufficient amount from Series 2005A Bond proceeds (or investment earnings thereon) on deposit in the Capitalized Interest Subaccount of the Series 2005A Interest Account to be applied to the payment of interest on the Series 2005A Bonds due on the next succeeding November 1, and upon receipt but no later than the Business Day next preceding each November 1 thereafter to the Interest Subaccount of the Series 2005A Interest Account of the Debt Service Fund, an amount from the Series 2005A Revenue Account equal to the interest on the Series 2005A Bonds becoming due on the next succeeding November 1, less any amount on deposit in the Interest Subaccount of Series 2005A Interest Account not previously credited; and

FIFTH, upon receipt but no later than the Business Day next preceding each Interest Payment Date while Series 2005A Bonds remain Outstanding, to the Series 2005A Debt Service Reserve Account, an amount from the Series 2005A Revenue Account equal to the amount, if any, which is necessary to make the amount on deposit therein equal to the Debt Service Reserve Requirement for the Series 2005A Bonds.

The Trustee shall within ten (10) Business Days after the last Interest Payment Date in any calendar year, at the written direction of the Issuer, withdraw any moneys held for the credit of the Series 2005A Revenue Account which are not otherwise required to be deposited as described under this caption or required to satisfy a deficit in the Series 2005A Debt Service Reserve Account and deposit such moneys first to the Deferred Costs Subaccount of the Series 2005A Acquisition and Construction Account to the extent that there remain any outstanding and unpaid Deferred Costs, then, provided no event of default has occurred and is continuing, for any purpose determined by the District in accordance with the provisions of the Series 2005A Supplemental Indenture, and thereafter, to the credit of the General Account of the Series 2005A Bond Redemption Fund as described under the caption "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005A Bonds in Whole or in Part" herein. Prepayments of Series 2005A Special Assessment shall be deposited directly into the Prepayment Account of the Series 2005A Bond Redemption Fund as provided in the Series 2005A Indenture.

*Series 2005B-1 and 2005B-2 Revenue Accounts*. The Trustee shall transfer from amounts on deposit in the Series 2005B-1 Revenue Account to the Funds and Accounts in the Series 2005B-1 Indenture described below and from amounts on deposit in the Series 2005B-2 Revenue Account to the Funds and Accounts in the Series 2005B-2 Indenture described below, the following amounts, at the following times and in the following order of priority:

FIRST, upon receipt but no later than the Business Day (1) preceding May 1, 2006, and no later than the Business Day next preceding each May 1 and November 1 thereafter while Series 2005B-1 or 2005B-2 Bonds issued under the Indenture remain Outstanding for which there remains an insufficient amount from Series 2005B-1 or 2005B-2 Bond proceeds (or investment earnings thereon), as the case may be, on deposit in the applicable Capitalized Interest Subaccount of the Series 2005B-1 or 2005B-2 Interest Account of the Debt Service Fund to be applied to the payment of interest on the Series 2005B-1 or 2005B-2 Bonds, as applicable, to the Series 2005B-1 or 2005B-2 Interest Account of the Debt Service Fund, an amount equal to the interest on the Series 2005B-1 or 2005B-2 Bonds becoming due on the next succeeding May 1 or November 1, less any amount on deposit in the Series 2005B-1 or 2005B-2 Interest Account, as applicable, not previously credited; (2) preceding each February 1 and August 1, an amount from the Series 2005B-1 or 2005B-2 Revenue Subaccount equal to the accrued interest on the Series 2005B-1 or 2005 B-2 Bonds, if any, as the case may be, to be redeemed on such February 1 or August 1, and (3) in the case of the Series 2005B-2 Bonds only, preceding a redemption as described in clause (vi) under the caption "DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2005B-1 and 2005B-2 Bonds in Whole or in Part" herein.

SECOND, no later than the Business Day next preceding November 1, 2010, if any Series 2005B-1 or 2005B-2 Bonds issued under the Indenture remain Outstanding, to the Series 2005B-1 Principal Account of the Debt Service Fund, an amount equal to the principal amount of Series 2005B-1 Bonds Outstanding maturing on November 1, 2010, and to the Series 2005B-2 Principal Account of the Debt Service Fund, an amount equal to the principal amount of Series 2005B-2 Bonds Outstanding maturing on November 1, 2010, less any amount on deposit in the Series 2005B-1 or 2005B-2 Principal Account not previously credited;

THIRD, upon receipt but no later than the Business Day next preceding each Interest Payment Date while Series 2005B-1 or 2005B-2 Bonds issued under the Indenture

remain Outstanding, to the Series 2005B-1 Debt Service Reserve Account, an amount
equal to the amount, if any, which is necessary to make the amount on deposit therein equal
to the Series 2005B-1 Debt Service Reserve Requirement, and to the Series 2005B-2 Debt
Service Reserve Account, an amount equal to the amount, if any, which is necessary to
make the amount on deposit therein equal to the Series 2005B-2 Debt Service Reserve
Requirement; and

        FOURTH, subject to the following paragraph, the balance of any moneys
remaining in the Series 2005B-1 or 2005B-2 Revenue Account after making the foregoing
deposits shall remain therein.

The Trustee shall within ten (10) Business Days after the last Interest Payment Date in any calendar
year, at the direction of the District, withdraw any moneys held for the credit of the Series 2005B-1 or
2005B-2 Revenue Account as the case may be which are not otherwise required to be deposited as
described under this caption or required to satisfy a deficit in the respective Series 2005B-1 or 2005B-2
Debt Service Reserve Account and deposit such moneys as directed to the credit of the respective General
Account of the Series 2005B-1 or 2005B-2 Bond Redemption Fund as described under the caption
"DESCRIPTION OF THE SERIES 2005 BONDS — Redemption Provisions — Extraordinary Mandatory
Redemption of Series 2005B-1 and 2005B-2 Bonds in Whole or in Part" herein.

## INVESTMENTS

Earnings on investments in all of the Funds and Accounts held as security for the Series 2005
Bonds shall be invested only in Investment Securities except that moneys held in the Series 2005 Principal
Accounts, the Series 2005 Interest Accounts (and subaccounts, if any, therein) and the Series 2005A
Sinking Fund Account in the Debt Service Fund and in any Series 2005 Bond Redemption Fund (and
subaccounts therein) created under the respective Series 2005 Indentures only in Government Obligations
and securities described in subparagraphs (b), (c), (f), and (j) of the definition of Investment Securities set
out below. Except as described under this caption, earnings on the Funds and Accounts established under
the Series 2005 Indentures and the subaccounts therein shall be retained, as realized, in such Accounts or
subaccounts and used for the purpose of such Account or subaccount.

*Series 2005A Debt Service Reserve Account*. Earnings on investments in the Series 2005A Debt
Service Reserve Account shall be disposed of as follows:

    (i)    As long as there exists no default under the Series 2005A Indenture and the
amount in the Series 2005A Debt Service Reserve Account is not reduced below
the then Series 2005A Debt Service Reserve Requirement, earnings on
investments in the Series 2005A Debt Service Reserve Account shall, through
November 1, 2007, be transferred to the Capitalized Interest Subaccount of the
Series 2005A Interest Account, and after November 1, 2007, be transferred to and
deposited first, prior to the Completion Date of the Series 2005A Project, to the
Series 2005A Acquisition and Construction Account, then, prior to the closure of
the Deferred Costs Subaccount, into the Deferred Costs Subaccount to the extent
of any accrued but unpaid Deferred Costs, and thereafter, into the Series 2005A
Revenue Account; and

    (ii)    If as of the last date, prior to the closure of the Deferred Costs Subaccount, on
which amounts on deposit in the Series 2005A Debt Service Reserve Account
were valued by the Trustee there was a deficiency in the Series 2005A Debt

Service Reserve Account, or if after such date withdrawals have been made from the Series 2005A Debt Service Reserve Account and have created such a deficiency, then earnings on investments in the Series 2005A Debt Service Reserve Account shall be deposited to the credit of the Series 2005A Debt Service Reserve Account until the amount on deposit therein equals the Series 2005A Debt Service Reserve Requirement and thereafter through November 1, 2007, shall be transferred to the Capitalized Interest Subaccount of the Series 2005A Interest Account, and after November 1, 2007, shall be transferred to and deposited first, prior to the Completion Date of the Series 2005A Project, to the Series 2005A Acquisition and Construction Account, then, prior to the closure of the Deferred Costs Subaccount, into the Deferred Costs Subaccount to the extent of any accrued but unpaid Deferred Costs, and thereafter into the Series 2005A Revenue Account.

*Series 2005B-1 and 2005B-2 Debt Service Reserve Accounts.* As long as there exists no default under the Series 2005B-1 or 2005B-2 Indenture and the respective amounts in the Series 2005B-1 and 2005B-2 Debt Service Reserve Accounts are not reduced below the then applicable Series 2005B-1 and 2005B-2 Debt Service Reserve Requirements, earnings on investments in the Series 2005B-1 and 2005B-2 Debt Service Reserve Accounts shall, through November 1, 2006, be transferred to the respective Capitalized Interest Subaccount of the Series 2005B-1 or Series 2005B-2 Interest Account, as the case may be, and after November 1, 2006, first, prior to the Completion Date of the respective Series 2005B-1 or 2005B-2 Project, to the respective Series 2005B-1 or 2005B-2 Acquisition and Construction Account and then for deposit to the respective Series 2005B-1 or 2005B-2 Revenue Account, as the case may be.

*Investment Securities.* The Indenture defines "Investment Securities" as meaning and including any of the following securities, if and to the extent that such securities are legal investments for funds of the District:

(a)    Government Obligations (defined as meaning direct obligations of, or obligations the timely payment of principal of and interest on which are unconditionally guaranteed by, the United States of America);

(b)    obligations of any of the following agencies: Government National Mortgage Association (including participation certificates issued by such Association); Fannie Mae (including participation certificates issued by Fannie Mae); Federal Home Loan Banks; Federal Farm Credit Banks; Tennessee Valley Authority; Rural Economic Community Development Administration (formerly the Farmers Home Administration); Student Loan Marketing Association; or Federal Home Loan Mortgage Corporation;

(c)    deposits, Federal funds or bankers' acceptances (with term to maturity of 270 days or less) of any bank which has an unsecured, uninsured and unguaranteed obligation rated in one of the top two rating categories by both Moody's and S&P;

(d)    commercial paper rated in the top two rating categories by both Moody's and S&P;

(e)    obligations of any state of the United States or political subdivision thereof or constituted authority thereof the interest on which is exempt from federal income taxation under Section 103 of the Code and rated in one of the top two rating categories by both Moody's and S&P;

(f)     both (A) shares of a diversified open-end management investment company (as defined in the Investment Company Act of 1940) or a regulated investment company (as defined in Section 851(a) of the Code) that is a money market fund that is rated in the highest rating category by both Moody's and S&P, and (B) shares of money market mutual funds that invest only in Government Obligations and repurchase agreements secured by such obligations, which funds are rated in the highest categories for such funds by both Moody's and S&P;

(g)     repurchase agreements, which will be collateralized at the onset of the repurchase agreement of at least 103% marked to market weekly with Collateral with a domestic or foreign bank or corporation (other than life or property casualty insurance company) the long-term debt of which, or, in the case of a financial guaranty insurance company, claims paying ability, of the guarantor is rated at least "AA" by S&P and "Aa" by Moody's provided that the repurchase agreement shall provide that if during its term the provider's rating by either S&P or Moody's falls below "AA-" or "Aa3," respectively, the provider shall immediately notify the Trustee and the provider shall at its option, within ten days of receipt of publication of such downgrade, either (A) maintain Collateral at levels, sufficient to maintain an "AA" rated investment from S&P and an "Aa" rated investment from Moody's, or (B) repurchase all Collateral and terminate the repurchase agreement. Further, if the provider's rating by either S&P or Moody's falls below "A-" or "A3," respectively, the provider must at the direction of the Issuer to the Trustee, within ten (10) calendar days, either (1) maintain Collateral at levels sufficient to maintain an "AA" rated investment from S&P and an "Aa" rated investment from Moody's, or (2) repurchase all Collateral and terminate the repurchase agreement without penalty. In the event the repurchase agreement provider has not satisfied the above conditions within ten (10) days of the date such conditions apply, then the repurchase agreement shall provide that the Trustee shall be entitled to, and in such event, the Trustee shall withdraw the entire amount invested plus accrued interest within two (2) Business Days. Any repurchase agreement entered into pursuant to this Indenture shall contain the following additional provisions:

       (1)     Failure to maintain the requisite Collateral percentage will require the District or the Trustee to liquidate the Collateral as provided above;

       (2)     The Holder of the Collateral, as hereinafter defined, shall have possession of the Collateral or the Collateral shall have been transferred to the Holder of the Collateral, in accordance with applicable state and federal laws (other than by means of entries on the transferor's books);

       (3)     The repurchase agreement shall state and an opinion of Counsel in form and in substance satisfactory to the Trustee shall be rendered that the Holder of the Collateral has a perfected first priority security interest in the collateral, any substituted Collateral and all proceeds thereof (in the case of bearer securities, this means the Holder of the Collateral is in possession);

(4)     The repurchase agreement shall be a "repurchase agreement" as
defined in the United States Bankruptcy Code and, if the provider
is a domestic bank, a "qualified financial contract" as defined in
the Financial Institutions Reform, Recovery and Enforcement Act
of 1989 ("FIRREA") and such bank is subject to FIRREA;

(5)     The repurchase transaction shall be in the form of a written
agreement, and such agreement shall require the provider to give
written notice to the Trustee of any change in its long-term debt
rating;

(6)     The Issuer or its designee shall represent that it has no knowledge
of any fraud involved in the repurchase transaction;

(7)     The Issuer and the Trustee shall receive the opinion of Counsel
(which opinion shall be addressed to the Issuer and the Trustee
and shall be in form and substance satisfactory to the Trustee) that
such repurchase agreement complies with the terms of this section
and is legal, valid, binding and enforceable upon the provider in
accordance with its terms;

(8)     The term of the repurchase agreement shall be no longer than ten
years;

(9)     The interest with respect to the repurchase transaction shall be
payable no less frequently than quarterly;

(10)    The repurchase agreement shall provide that the Trustee may
withdraw funds without penalty at any time, or from time to time,
for any purpose permitted or required under this Indenture;

(11)    Any repurchase agreement shall provide that a perfected security
interest in such investments is created for the benefit of the
Beneficial Owners under the Uniform Commercial Code of
Florida, or book-entry procedures prescribed at 31 C.F.R. 306.1 et
seq. or 31 C.F.R. 350.0 et seq. are created for the benefit of the
Beneficial Owners; and

(12)    The Collateral delivered or transferred to the Issuer, the Trustee,
or a third-party acceptable to, and acting solely as agent for, the
Trustee (the "Holder of the Collateral") shall be delivered and
transferred in compliance with applicable state and federal laws
(other than by means of entries on provider's books) free and clear
of any third-party liens or claims pursuant to a custodial
agreement subject to the prior written approval of the majority of
the Holders and the Trustee.  The custodial agreement shall
provide that the Trustee must have disposition or control over the
Collateral of the repurchase agreement, irrespective of an event of
default by the provider of such repurchase agreement.

If such investments are held by a third-party, they shall be held as agent for the benefit of the Trustee as fiduciary for the Beneficial Owners and not as agent for the bank serving as Trustee in its commercial capacity or any other party and shall be segregated from securities owned generally by such third party or bank;

(h)    any other investment with respect to a Series of Series 2005 Bonds approved in writing by the Owners of a majority in aggregate principal amount of the corresponding Series of Series 2005 Bonds secured thereby;

(i)    bonds, notes and other debt obligations of any corporation organized under the laws of the United States, any state or organized territory of the United States or the District of Columbia, if such obligations are rated in one of the three highest ratings by both Moody's and S&P or in one of the two highest categories by either S&P or Moody's; and

(j)    investment agreements with a bank, insurance company or other financial institution, or the subsidiary of a bank, insurance company or other financial institution if the parent guarantees the investment agreement, which bank, insurance company, financial institution or parent has an unsecured, uninsured and unguaranteed obligation (or claims-paying ability) rated in the highest short-term rating category by Moody's or S&P (if the term of such agreement does not exceed 365 days), or has an unsecured, uninsured and unguaranteed obligation (or claims paying ability) rated by Aa2 or better by Moody's and AA or better by S&P or Fitch, respectively (if the term of such agreement is more than 365 days) or is the lead bank of a parent bank holding company with an uninsured, unsecured and unguaranteed obligation of the aforesaid ratings, provided:

(A)    interest is paid on any date interest is due on the Bonds (not more frequently than quarterly) at a fixed rate (subject to adjustments for yield restrictions required by the Code) during the entire term of the agreement;

(B)    moneys invested thereunder may be withdrawn without penalty, premium, or charge upon not more than two days' notice unless otherwise specified in a Supplemental Indenture;

(C)    the same guaranteed interest rate will be paid on any future deposits made to restore the account to its required amount;

(D)    the Trustee receives an opinion of counsel that such agreement is an enforceable obligation of such insurance company, bank, financial institution or parent;

(E)    in the event of a suspension, withdrawal, or downgrade below Aa3, AA- or AA- by Moody's, S&P or Fitch, respectively, the provider shall notify the Trustee within five (5) days of such downgrade event and the provider shall at its option, within ten (10) business days after notice is given to the Trustee take any one of the following actions:

(1)      collateralize the agreement at levels, sufficient to maintain an "AA" rated investment from S&P or Fitch and an "Aa2" from Moody's with a market to market approach, or

(2)      assign the agreement to another provider, as long as the minimum rating criteria of "AA" rated investment from S&P or Fitch and an "Aa2" from Moody's with a market to market approach; or

(3)      have the agreement guaranteed by a provider which results in a minimum rating criteria of an "AA" rated investment from S&P or Fitch and an "Aa2" from Moody's with a market to market approach; or

(4)      repay all amounts due and owing under the agreement; and

(F)      In the event the provider has not satisfied any one of the above condition within three (3) days of the date such conditions apply, then the agreement shall provide that the Trustee shall be entitled to withdraw the entire amount invested plus accrued interest without penalty or premium.

(k)      the Local Government Surplus Funds Trust Fund as described in Florida Statutes, Section 218.405 or the corresponding provisions of subsequent laws provided that such fund is rated at least "AA" by S&P (without regard to gradation) or at least "Aa" by Moody's (without regard to gradation); and

(l)      other investments permitted by Florida law.

Under all circumstances, the Trustee shall be entitled to request and to receive from the Issuer a certificate of a Responsible Officer setting forth that any investment directed by the Issuer is permitted under the Indenture.

## BOND OWNERS' RISKS

Certain risks are inherent in an investment in obligations secured by assessments issued by a public authority or governmental body in the State. Certain of these risks are described in the preceding section entitled "ENFORCEMENT OF ASSESSMENT COLLECTIONS"; however, certain additional risks are associated with the Series 2005 Bonds offered hereby. This section does not purport to summarize all risks that may be associated with purchasing or owning the Series 2005 Bonds and prospective purchasers are advised to read this Limited Offering Memorandum (including all of the Appendices) in its entirety for a more complete description of investment considerations relating to the Series 2005 Bonds.

(1)      Until further development takes place on the benefited land within the District, payment of a significant portion of the Series 2005 Special Assessments is dependent upon their timely payment by the Master Developer (as defined herein) with respect to the Series 2005A and 2005B-1 Special Assessments and by the Durbin North Developer (as defined herein) with respect to the Series 2005A and 2005B-2 Special Assessments. See "THE MASTER DEVELOPER", "THE DURBIN NORTH DEVELOPER" and "THE DEVELOPMENT" herein. At closing of the sale of the Series 2005 Bonds, it is expected that a majority of the land within the District burdened by the corresponding Series 2005 Special Assessments will continue to be owned either directly or indirectly by the Master Developer and the Durbin North Developer (collectively, the "Developers"). In the event of the institution of bankruptcy or similar

proceedings with respect to the Master Developer, the Durbin North Developer or any other subsequent owner of significant property within the District, delays could occur in the payment of debt service on the Series 2005A or 2005B-1 Bonds (in the case of bankruptcy of the Master Developer) or the Series 2005A or 2005B-2 Bonds (in the case of the bankruptcy of the Durbin North Developer) as such bankruptcy could negatively impact the ability of: (i) the Developers and any other land owner being able to pay the respective Series 2005 Special Assessments; (ii) the District to foreclose the lien on the respective Series 2005 Special Assessments if tax certificates are not sold, and (iii) the County to sell tax certificates in relation to such property. In addition, the remedies available to the Beneficial Owners of the Series 2005 Bonds upon an Event of Default under the corresponding Series 2005 Indentures are in many respects dependent upon judicial actions which are often subject to discretion and delay. Under existing constitutional and statutory law and judicial decisions, during a bankruptcy of the Master Developer or the Durbin North Developer, the remedies specified by federal, state and local law and in the Indenture and the Series 2005 Bonds, including, without limitation, enforcement of the obligation to pay the applicable Series 2005 Special Assessments may not be readily available or may be limited. The various legal opinions to be delivered concurrently with the delivery of the Series 2005 Bonds (including Bond Counsel's approving opinions) will be qualified as to the enforceability of the various legal instruments by limitations imposed by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors enacted before or after such delivery. The inability, either partially or fully, to enforce remedies available respecting the Series 2005 Bonds could have a material adverse impact on the interest of the Beneficial Owners thereof.

(2)    The principal security for the payment of the principal of and interest on the Series 2005 Bonds is the timely collection of the corresponding Series 2005 Special Assessments. The Series 2005 Special Assessments do not constitute a personal indebtedness of the owners of the land subject thereto, but are secured only by a lien on such land. The Master Developer and the Durbin North Developer expect to proceed in the normal course of business to develop and sell lots to individual builders to be served by the Series 2005 Projects. There is no assurance that the subsequent owners of this land will be able to pay the Series 2005 Special Assessments or that they will pay such Series 2005 Special Assessments even though financially able to do so. Beyond legal delays that could result from bankruptcy, the ability of the County to sell tax certificates, if the uniform method is selected, will be dependent upon various factors, including the interest rate which can be earned by ownership of such certificates and the value of the land which is the subject of such certificates and which may be subject to sale at the demand of the certificate holder after two years. The determination of the benefits to be received by the land within the District as a result of implementation and development of the Series 2005 Projects is not indicative of the realizable or market value of the land, which value may actually be higher or lower than the assessment of benefits. To the extent that the realizable or market value of the land is lower than the assessment of benefits, the ability of the County to sell tax certificates relating to such land may be adversely affected. Such adverse effect could render the District unable to collect delinquent assessments, if any, and could negatively impact the ability of the District to make the full or punctual payment of Debt Service on the corresponding Series of Series 2005 Bonds.

(3)    The proposed Development may be affected by changes in general economic conditions, fluctuations in the real estate market and other factors beyond the control of the Master Developer and the Durbin North Developer. In addition, the proposed Development is subject to comprehensive federal, state, and local regulations and future changes to such regulations. Approval is required from various public agencies in connection with, among other things, the design, nature and extent of required public improvements, both public and private, and construction of the Series 2005 Projects in accordance with applicable zoning, land use and environmental regulations for the Development. Although no delays are anticipated, failure to obtain any such approvals in a timely manner could delay or adversely affect the Development, which may negatively impact the Master Developer's or the Durbin North

Developer's desire or ability to develop the Development as contemplated. See "APPENDIX C —
DISTRICT ENGINEER'S REPORTS" attached hereto for a discussion of permits and approvals.

(4)    The District has not granted and, under Florida law, may not grant a mortgage or
security interest in the Series 2005 Projects. Furthermore, the District has not pledged any revenues from
the operation of the Series 2005 Projects as security for, or a source of payment of, the corresponding Series
2005 Bonds. Neither has the District covenanted to establish rates, fees and charges for the Series 2005
Projects at any specified levels. Each Series of the Series 2005 Bonds is payable solely from, and secured
solely by, the corresponding Series 2005 Pledged Revenues. The Master Developer's and the Durbin North
Developer's respective obligation to pay the applicable Series 2005 Special Assessments is limited solely to
the obligation of any landowner to pay its assessment. The Developers are not guarantors of payment on
any Series 2005 Special Assessment or of any other Series 2005 Pledged Revenues and the recourse for a
Developer's failure to pay the applicable Series 2005 Special Assessments is limited to its ownership
interest in the assessed land.

(5)    The willingness and/or ability of an owner of land within the District to pay the
Series 2005A Special Assessments could be affected by the existence of other taxes and assessments
imposed upon the land by the District or by the County. Under the Uniform Method, county, municipal,
school, special district taxes and assessments, including the Series 2005A Special Assessments and
maintenance assessments if the District chooses the Uniform Method, and voter-approved ad valorem taxes
levied to pay principal of and interest on bonds are payable at one time. As referenced above, if a taxpayer
does not make complete payment, he or she cannot designate specific line items on the tax bill as deemed
paid in full. In such case, the Tax Collector does not accept such partial payment. Therefore, any failure to
pay any one line item, whether or not it be the Series 2005A Special Assessments, would cause the Series
2005A Special Assessments not to be collected to that extent, which could have a significant adverse
impact on the District's ability to make full or punctual payment of Debt Service on the Series 2005A
Bonds. Public entities whose boundaries overlap those of the District, such as the County and the County
school district, could, without the consent of the owners of the land within the District, impose additional
taxes or assessments on the property within the District. As referenced herein, the District may also impose
additional assessments, inclusive of maintenance assessments, which could encumber the property
burdened by the Series 2005 Special Assessments.

(6)    There is no assurance that a liquid secondary market will exist for the Series 2005
Bonds in the event a Beneficial Owner thereof determines to solicit purchasers of the Series 2005 Bonds.
Even if a liquid secondary market exists, there can be no assurance as to the price for which the Series 2005
Bonds may be sold. Such price may be lower than that paid by the current Beneficial Owner of the Series
2005 Bonds, depending on the progress of the Development, existing market conditions and other factors.

(7)    England Thims & Miller Inc. (the "Engineer") has estimated the total cost of the
Master Infrastructure, including the Series 2005A Project, described in "APPENDIX C — DISTRICT
ENGINEER'S REPORTS" attached hereto to be $58,266,000 and that the total cost of the Durbin South
Neighborhood Infrastructure, including the Series 2005B-1 Project, and Durbin South Neighborhood
Infrastructure, including the Series 2005B-2 is estimated to be $66,300,000. The proceeds of the Series
2005 Bonds are anticipated to fund only a portion of such costs. The District intends to issue future bonds
to fund another portion of the costs of the Master Infrastructure. If, however, the proceeds of the Series
2005A Bonds or such future bonds were not sufficient, it is unlikely that the District would have other funds
to complete the Master Infrastructure. To the extent that the Master Infrastructure is not funded by the
Series 2005A Bonds or such future bonds, the remainder of the Master Infrastructure has been and is
expected to continually be funded by the Developers. The Master Developer has agreed to fund any cost
overruns with respect to the Master Infrastructure (except for that portion the Durbin North Developer has

37

agreed to fund) and the Durbin South Neighborhood Infrastructure pursuant to the Completion Agreements, and the Durbin North Developer has agreed to fund any cost overruns with respect to that portion of the Master Infrastructure which it has agreed to develop and the Durbin North Neighborhood Infrastructure pursuant to a Completion Agreement; however, these obligations are unsecured.

(8)    In addition to legal delays that could result from bankruptcy, the ability of the District to enforce collection of delinquent assessments will be dependent upon various factors, including the delay inherent in any judicial proceeding to enforce the lien of the Series 2005 Special Assessments and the value of the land which is the subject of such proceedings and which may be subject to sale. See "ENFORCEMENT OF ASSESSMENT COLLECTION" herein. If the District has difficulty in collecting the Series 2005 Special Assessments with respect to any Series, the corresponding Series 2005 Debt Service Reserve Account could be rapidly depleted and the ability of the District to pay debt service on such Series of the Series 2005 Bonds could be materially adversely affected.

(9)    The District is only undertaking the improvements included in the Series 2005 Projects with proceeds of the Series 2005 Bonds. The cost of certain improvements within the District that are not included in the Series 2005 Projects will be paid for by Master Developer or the Durbin North Developer, as applicable, or other landowner funds and/or a future bond issue to be secured by special assessments imposed, levied and collected by the District with respect to property specially benefited by projects financed with proceeds of such bonds. There can be no assurance that the Developers or other landowners or the District will be able to pay, or arrange to pay, for the costs or construction of these other improvements.

(10)    No application for credit enhancement or a rating on the Series 2005 Bonds has been made.

(11)    Undeveloped or partially developed land is inherently less valuable than developed land and provides less security to the Bond Owners should it be necessary to institute proceedings due to the nonpayment of the Series 2005 Special Assessments. Failure to complete development or substantial delays in the completion of the development of the Development due to litigation or other causes may reduce the value of the Development and increase the length of time during which Series 2005 Special Assessments will be payable from undeveloped property and may affect the willingness and ability of the owners of such property to pay the Series 2005 Special Assessments when due.

(12)    Owners should note that several mortgage lenders have, in the past, raised legal challenges to the primacy of the liens similar to those of the Series 2005 Special Assessments in relation to the liens of mortgages burdening the same real property; to the best knowledge of the District (without investigation), in all such cases to date, the applicable courts have held that the assessment liens (like those of the Series 2005 Special Assessments) are superior to those of the commercial mortgage lenders. The mortgagees of the existing mortgage loans encumbering the land within the District secured by the Series 2005 Special Assessments will expressly subordinate their respective liens to the applicable Series 2005 Special Assessments.

(13)    Various proposals are mentioned from time to time by members of the Congress of the United States of America and others concerning reform of the internal revenue (tax) laws of the United States. Certain of these proposals, if implemented, could have the effect of diminishing the value of obligations of states and their political subdivisions, such as the Series 2005 Bonds, by eliminating or changing the tax-exempt status of interest on certain of such bonds. Whether any of such proposals will ultimately become law, and if so, what effect such proposals could have upon the value of bonds such as the

Series 2005 Bonds, cannot be predicted. The Indenture does not provide for any adjustment to the interest rates borne by the Series 2005 Bonds in the event of a change in the tax-exempt status of the Series 2005 Bonds.

(14)    Each Series of the Series 2005 Bonds is separately secured notwithstanding the collective descriptions used herein. The Series 2005A Special Assessments and the Funds and Accounts under the Series 2005A Indenture do not secure either the Series 2005B-1 Bonds or the Series 2005B-2 Bonds. Likewise, the Series 2005B-1 Special Assessments and the Funds and Accounts under the Series 2005B-1 Indenture do not secure either the Series 2005A Bonds or the Series 2005B-2 Bonds. And, the Series 2005B-2 Special Assessments and the Funds and Accounts under the Series 2005B-2 Indenture do not secure either the Series 2005A Bonds or the Series 2005B-1 Bonds.

(15)    Certain lands outside of the Development and outside of the Aberdeen development are required in order to construct the transportation improvements required by the Durbin Crossing DRI and the Aberdeen DRI (as hereinafter described). Substantially all of those lands for the "Durbin Roads" as defined in the Durbin Crossing DRI are under contract with Durbin Crossing, LLC. Some or all of the lands for the "Aberdeen Roads" as defined in the Aberdeen DRI are under contract with the developer of Aberdeen or the Aberdeen Community Development District. Until acquisition and closing on all of the lands required by the Durbin Roads and the Aberdeen Roads, there is no assurance that all such lands will be acquired.

(16)    The 2005B-2 Special Assessments described under the heading "SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2005 BONDS" herein and in "APPENDIX D — ASSESSMENT REPORT" attached hereto exceed the special assessments levied pursuant to the assessment resolution adopted by the District's Board of Supervisors on March 30, 2004 on the Durbin Crossing North lands within the District due to construction cost increases. Accordingly, the Series 2005B-2 Indenture provides that a portion of the proceeds of the Series 2005B-2 Bonds (in the amount of $2,429,306 will be escrowed with the Trustee until such time as the District's Board of Supervisors approves a final assessment resolution levying the Series 2005B-2 Special Assessments in an amount equal to the principal amount of the Series 2005B-2 Bonds. If the District shall fail to approve such final assessment resolution prior to the first anniversary of the date of initial delivery of the Series 2005B-2 Bonds (as such date may be extended, the "Escrow Termination Date"), such funds are required to be used to extraordinarily redeem a portion of the Outstanding Series 2005B-2 Bonds. See "FUNDS AND ACCOUNTS — Acquisition and Construction Fund — Escrow Subaccount of the Series 2005B-2 Acquisition and Construction Account" herein.

This section does not purport to summarize all risks that may be associated with purchasing or owning the Series 2005 Bonds and prospective purchasers are advised to read this Limited Offering Memorandum in its entirety (inclusive of Appendices) for a more complete description of investment considerations relating to the Series 2005 Bonds.

**[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]**

### SERIES 2005A BONDS DEBT SERVICE REQUIREMENT

The following table sets forth the scheduled debt service on the Series 2005A Bonds.

| Date | Amortization Installments | Coupon | Interest* | Total Debt Service |
|---|---|---|---|---|
| May 1, 2006 | | | $1,764,422.92 | $1,764,422.92 |
| November 1, 2006 | | | $1,512,362.50 | $1,512,362.50 |
| May 1, 2007 | | | $1,512,362.50 | $1,512,362.50 |
| November 1, 2007 | | | $1,512,362.50 | $1,512,362.50 |
| May 1, 2008 | $740,000 | 5.5000% | $1,512,362.50 | $2,252,362.50 |
| November 1, 2008 | | | $1,492,012.50 | $1,492,012.50 |
| May 1, 2009 | $780,000 | 5.5000% | $1,492,012.50 | $2,272,012.50 |
| November 1, 2009 | | | $1,470,562.50 | $1,470,562.50 |
| May 1, 2010 | $825,000 | 5.5000% | $1,470,562.50 | $2,295,562.50 |
| November 1, 2009 | | | $1,447,875.00 | $1,447,875.00 |
| May 1, 2011 | $870,000 | 5.5000% | $1,447,875.00 | $2,317,875.00 |
| November 1, 2011 | | | $1,423,950.00 | $1,423,950.00 |
| May 1, 2012 | $920,000 | 5.5000% | $1,423,950.00 | $2,343,950.00 |
| November 1, 2012 | | | $1,398,650.00 | $1,398,650.00 |
| May 1, 2013 | $975,000 | 5.5000% | $1,398,650.00 | $2,373,650.00 |
| November 1, 2013 | | | $1,371,837.50 | $1,371,837.50 |
| May 1, 2014 | $1,030,000 | 5.5000% | $1,371,837.50 | $2,401,837.50 |
| November 1, 2014 | | | $1,343,512.50 | $1,343,512.50 |
| May 1, 2015 | $1,085,000 | 5.5000% | $1,343,512.50 | $2,428,512.50 |
| November 1, 2015 | | | $1,313,675.00 | $1,313,675.00 |
| May 1, 2016 | $1,150,000 | 5.5000% | $1,313,675.00 | $2,463,675.00 |
| November 1, 2016 | | | $1,282,050.00 | $1,282,050.00 |
| May 1, 2017 | $1,210,000 | 5.5000% | $1,282,050.00 | $2,492,050.00 |
| November 1, 2017 | | | $1,248,775.00 | $1,248,775.00 |
| May 1, 2018 | $1,280,000 | 5.5000% | $1,248,775.00 | $2,528,775.00 |
| November 1, 2018 | | | $1,213,575.00 | $1,213,575.00 |
| May 1, 2019 | $1,355,000 | 5.5000% | $1,213,575.00 | $2,568,575.00 |
| November 1, 2019 | | | $1,176,312.50 | $1,176,312.50 |
| May 1, 2020 | $1,430,000 | 5.5000% | $1,176,312.50 | $2,606,312.50 |
| November 1, 2020 | | | $1,136,987.50 | $1,136,987.50 |
| May 1, 2021 | $1,510,000 | 5.5000% | $1,136,987.50 | $2,646,987.50 |
| November 1, 2021 | | | $1,095,462.50 | $1,095,462.50 |
| May 1, 2022 | $1,595,000 | 5.5000% | $1,095,462.50 | $2,690,462.50 |
| November 1, 2022 | | | $1,051,600.00 | $1,051,600.00 |
| May 1, 2023 | $1,685,000 | 5.5000% | $1,051,600.00 | $2,736,600.00 |
| November 1, 2023 | | | $1,005,262.50 | $1,005,262.50 |
| May 1, 2024 | $1,780,000 | 5.5000% | $1,005,262.50 | $2,785,262.50 |
| November 1, 2024 | | | $956,312.50 | $956,312.50 |
| May 1, 2025 | $1,880,000 | 5.5000% | $956,312.50 | $2,836,312.50 |
| November 1, 2025 | | | $904,612.50 | $904,612.50 |
| May 1, 2026 | $1,990,000 | 5.5000% | $904,612.50 | $2,894,612.50 |
| November 1, 2026 | | | $849,887.50 | $849,887.50 |
| May 1, 2027 | $2,100,000 | 5.5000% | $849,887.50 | $2,949,887.50 |
| November 1, 2027 | | | $792,137.50 | $792,137.50 |
| May 1, 2028 | $2,220,000 | 5.5000% | $792,137.50 | $3,012,137.50 |
| November 1, 2028 | | | $731,087.50 | $731,087.50 |
| May 1, 2029 | $2,345,000 | 5.5000% | $731,087.50 | $3,076,087.50 |

| Date | Amortization Installments | Coupon | Interest* | Total Debt Service |
|---|---|---|---|---|
| November 1, 2029 | | | $666,600.00 | $666,600.00 |
| May 1, 2030 | $2,480,000 | 5.5000% | $666,600.00 | $3,146,600.00 |
| November 1, 2030 | | | $598,400.00 | $598,400.00 |
| May 1, 2031 | $2,620,000 | 5.5000% | $598,400.00 | $3,218,400.00 |
| November 1, 2031 | | | $526,350.00 | $526,350.00 |
| May 1, 2032 | $2,765,000 | 5.5000% | $526,350.00 | $3,291,350.00 |
| November 1, 2032 | | | $450,312.50 | $450,312.50 |
| May 1, 2033 | $2,925,000 | 5.5000% | $450,312.50 | $3,375,312.50 |
| November 1, 2033 | | | $369,875.00 | $369,875.00 |
| May 1, 2034 | $3,090,000 | 5.5000% | $369,875.00 | $3,459,875.00 |
| November 1, 2034 | | | $284,900.00 | $284,900.00 |
| May 1, 2035 | $3,265,000 | 5.5000% | $284,900.00 | $3,549,900.00 |
| November 1, 2035 | | | $195,112.50 | $195,112.50 |
| May 1, 2036 | $3,450,000 | 5.5000% | $195,112.50 | $3,645,112.50 |
| November 1, 2036 | | | $100,237.50 | $100,237.50 |
| May 1, 2037 | $3,645,000 | 5.5000% | $100,237.50 | $3,745,237.50 |
| | | | | |
| Total | $54,995,000 | | $63,609,722.92 | $118,604,722.92 |

\*    Includes interest accrued and capitalized from Bond proceeds and estimated earnings thereon. Interest on Series 2005A Bonds is capitalized through November 1, 2007.

**[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]**

# THE DISTRICT

## General

The District is a local unit of special purpose government which was established pursuant to Rule 42MM-1, Florida Administrative Code, adopted by the Florida Land and Water Adjudicatory Commission effective November 5, 2003. The District encompasses approximately 2,047 acres of land located in northwest unincorporated St. Johns County, Florida, approximately twenty miles south of downtown Jacksonville and fifteen miles northwest of historic St. Augustine.

Lands within the District are situated within the 2,047 acre Durbin Crossing Development of Regional Impact (previously described as the "Durbin Crossing DRI") which are subject to the St. Johns County Development Order for the Durbin Crossing DRI (the "Development Order"). As part of the Development Order, land uses established for the District include residential (single family and multifamily), commercial, office, recreational and ancillary uses. See "THE DEVELOPMENT" herein.

## Powers

Among other provisions, the Act gives the District's Board of Supervisors the authority to (a) plan, establish, acquire, construct or reconstruct, enlarge or extend, equip, operate and maintain: (i) water management and control of lands within the District and to connect any of such facilities with roads and bridges, (ii) water supply, sewer and waste water management systems or any combination thereof and to construct and operate connecting intercept or outlet sewers and sewer mains and pipes and water mains, conduits, or pipelines in, along, and under any street, alley, highway, or other public places or ways, and to dispose of any effluent, residue, or other byproducts of such system or sewer system; (iii) district roads equal to or exceeding county specifications, and street lights, (iv) bridges and culverts, and (v) conservation and mitigation areas, (b) borrow money and issue notes and bonds of the District; (c) impose and foreclose special assessment liens as provided in the Act, and (d) exercise all other powers, necessary, convenient, incidental or proper in connection with any of the powers or duties of the District stated in the Act.

The Act provides, that with the consent of the local general-purpose government within the jurisdiction of which such facilities will be operated (in the case of the District, St. Johns County), the District may also acquire, equip, operate, and maintain additional systems and facilities for, among other purposes, parks and facilities for indoor and outdoor recreational, cultural, and educational uses.

The Act does not empower the District to adopt and enforce land use plans or zoning ordinances and the Act does not empower the District to grant building permits; these functions are performed by the County acting through its County Commission and its departments of government.

## Board of Supervisors

The Act provides for a five member Board of Supervisors (the "Board") to serve as the governing body of the District. Members of the Board ("Supervisors") must be residents of the State and citizens of the United States. The initial Supervisors are identified in Rule 42MM-1 establishing the District pursuant to Chapter 190, Florida Statutes, until an election is advertised. Following advertisement, the Supervisors are elected on an at-large basis by the owners of the property within the District. Ownership of land within the District initially entitles the owner to one vote per acre (with fractions thereof rounded upward to the nearest whole number). Each Supervisor serves until expiration of his or her term and until his or her successor is chosen and qualified. If, during a term of office, a vacancy occurs, a majority of the remaining

42

Supervisors may fill the vacancy by an appointment of an interim Supervisor for the remainder of the unexpired term.

The landowners in the District elect two Supervisors to four-year terms and three Supervisors to two-year terms at the first landowner election. After the first election of the Board, the next election by landowners will be the first Tuesday in the applicable November. Thereafter, the elections will take place every two years on a date in November established by the Board. Until the later of six years after the initial appointment of Supervisors or the year when the District attains at least 250 qualified electors, Supervisors whose terms are expiring will begin to be elected (as their terms expire) by qualified electors of the District. A qualified elector is a registered voter who is a resident of the District and the State and a citizen of the United States. At the election where Supervisors are first elected by qualified electors, two Supervisors must be qualified electors and be elected by qualified electors, both to four-year terms. The other Supervisor will be elected by landowners to a four-year term and is not required to be a qualified elector. Thereafter, as terms expire, all Supervisors must be qualified electors and be elected by qualified electors to serve staggered terms for terms of four years.

Notwithstanding the foregoing, if at any time the Board proposes to exercise its ad valorem taxing power, prior to the exercise of such power it shall call an election at which all Supervisors shall be elected by qualified electors of the District. Elections subsequent to such decision shall be held in a manner such that the Supervisors will serve four-year terms with staggered expiration dates in the manner set forth in the Act.

The Act provides that it shall not be an impermissible conflict of interest under State law governing public officials for a Supervisor to be a stockholder, officer or employee of a landowner.

The current members of the Board and their terms of office are set forth below:

| Name | Title | Term Expires |
|------|-------|--------------|
| Patrick E. Sessions * | Chairman | 2008 |
| Jason R. Sessions * | Vice Chairman | 2008 |
| Christian Blonshine * | Supervisor and Assistant Secretary | 2006 |
| Kenneth Strauss * | Supervisor and Assistant Secretary | 2006 |
| Susan Wood ** | Supervisor and Assistant Secretary | 2008 |

\*     Principals or employees of the Master Developer or its affiliates.
\*\*    Principal or employee of the Durbin North Developer or its affiliates.

The Act authorizes the Board to hire such employees and agents as it may determine necessary. Hopping Green & Sams, P.A., Tallahassee, Florida, serves as counsel to the District. The District has retained Greenberg Traurig, P.A., Miami, Florida, as Bond Counsel. The District has retained Governmental Management Services, LLC, Jacksonville, Florida, as district manager (the "District Manager") and Fishkind and Associates, Inc., as its financial consultant ("Fishkind"). Fishkind will prepare the assessment roll for the Series 2005 Assessments. The District has retained England, Thims & Miller, Inc., Jacksonville, Florida, as the District's engineer.

**The District Manager**

The Act authorizes the Board to hire a district manager as the chief administrative official of the District. The Act provides that such district manager shall have charge and supervision of the works of the District and shall be responsible for (i) preserving and maintaining any improvement or facility constructed

or erected pursuant to the provisions of the Act, (ii) maintaining and operating the equipment owned by the District, and (iii) performing such other duties as may be prescribed by the Board.

Governmental Management Services, LLC ("GMS") has been retained as the firm to provide district management services for the District (in that capacity, the "District Manager"). GMS is part of a newly-organized family of companies established for the purpose of providing special district management services to community development districts (CDD). GMS and its affiliates currently have offices in Jacksonville and Ft. Lauderdale, Florida and Knoxville, Tennessee. The current staff of GMS has been providing management, financial and administrative reporting services to over 100 special taxing districts and homeowners associations during their careers at prior organizations. The District Manager's office is currently located 14785-4 St. Augustine Road, Jacksonville, Florida 32258, and its telephone number is (904) 288-9130.

### THE SERIES 2005 PROJECT

In order to serve the residents of the District, the District has developed an Improvement Plan to allow it to finance, acquire and construct certain infrastructure that will specifically benefit the District. The Improvement Plan includes both master infrastructure improvements (the "Master Infrastructure") and neighborhood infrastructure improvements (the "Neighborhood Infrastructure"). The Master Infrastructure includes onsite and offsite roadways, water and sewer improvements, stormwater management, recreation facilities, right-of-way acquisition, entry features, and associated professional fees for permitting, engineering and design. The District Engineer has estimated the total cost of the Master Infrastructure at $58,266,000. The Master Infrastructure cost estimates include the cost of Jacksonville Electric Authority ("JEA") transmission components of the water, sewer and reuse facilities within the District roadways estimated at $3,511,200. The cost of the JEA components will be reimbursed to the District by JEA on a monthly basis. The Neighborhood Infrastructure includes clearing and grubbing, earthwork, water and sewer improvements, re-use underground utility construction, paving and drainage, grassing, sodding, underground electrical conduit, neighborhood street lighting and the neighborhood parks system. The District Engineer has estimated the total cost of the Neighborhood Infrastructure at $66,300,000. See "APPENDIX C — DISTRICT ENGINEER'S REPORTS" for a more detailed description of these improvements.

The Master Developer, as defined below, is developing all of the Master Infrastructure for the Development except for certain items that the Durbin North Developer (as described immediately below) has agreed to develop. Proceeds of the Series 2005A Bonds (including investment earnings thereon) will be used to fund approximately $44,800,000 of the Master Infrastructure (as previously described, the "Series 2005A Project"). The District anticipates issuing a future series of bonds in 2006 to fund the remainder of the Master Infrastructure, consisting of transportation and park improvements, not funded by the Series 2005A Bonds. See paragraph 7 under "BOND OWNERS' RISKS" herein. The Master Developer will also be developing the Neighborhood Infrastructure for the single-family units planned within the southern portion of the Development ("Durbin Crossing South"). Proceeds of the Series 2005B-1 Bonds will be used to fund the Phase 1 Neighborhood Infrastructure in Durbin Crossing South estimated to cost $7,963,000 (as previously described, the "Series 2005B-1 Project").

The Master Developer has sold the residential land in the northern portion of the Development ("Durbin Crossing North") to another developer (see "DURBIN NORTH DEVELOPER" herein) who will be developing the Neighborhood Infrastructure for the single-family units planned within Durbin Crossing North. Proceeds of the Series 2005B-2 Bonds will be used to fund the Phase 1 Neighborhood Infrastructure in Durbin Crossing North estimated to cost $13,303,000 (as previously described, the "Series 2005B-2 Project").

The Series 2005A Project, Series 2005B-1 Project and Series 2005B-2 Project are collectively referred to as the "Series 2005 Project".

*The information appearing below under the captions "THE MASTER DEVELOPER, "THE DURBIN NORTH DEVELOPER" and "THE DEVELOPMENT" has been furnished by the Master Developer and the Durbin North Developer. This information has not been independently verified by the District or the Underwriter and neither the District nor the Underwriter makes any representation or warranty as to the accuracy or completeness of the information.*

## THE MASTER DEVELOPER

PJK Development Corp., a Florida corporation, and Durbin Crossing, LLC, Brickell Manor, LLC, Orchard Park Jax, LLC and Silvertree Estates, LLC, each a Florida limited liability company (each, a "Related Company" and collectively, with PJK Development Corp., the "Master Developer"), are developing all of the Master Infrastructure for the Development (except for certain items the Durbin North Developer has agreed to develop) and the Neighborhood Infrastructure for 705 single-family units planned within Durbin Crossing South.

Each Related Company is responsible for the costs of development of its respective lands and for its proportionate share of the Wachovia Loan. See "THE DEVELOPMENT — Land Acquisition" herein. PJK Development Corp., on behalf of Durbin Crossing, LLC, is responsible for developing 19.20% of the Development. Brickell Manor, LLC was responsible for 64.80% of the Development but has sold substantially all of its lands within the Development to Durbin Crossing North, LLC (which entity is the Durbin North Developer described herein), which is now responsible for developing that portion of the Development. Orchard Park Jax, LLC is responsible for developing 11.20% of the Development and Silvertree Estates, LLC is responsible for developing 4.80% of the Development. Silvertree Estates, LLC anticipates that it will be selling its lands to multifamily builders as undeveloped land sales and thus will not incur development costs.

The shareholders (and their percentage interests) of PJK Development Corp. are Vegso Holdings, LLC (45% interest), Patrick E. Sessions (25% interest), Jason R. Sessions (5% interest), Melinda and Christian Blonshine (20% interest) and Kenneth J. Strauss (5% interest). Peter Vegso is the sole member of Vegso Holdings, LLC. The shareholders of PJK Development Corp. have contributed a total of $3,500,000 to PJK Development Corp. PJK Development Corp. is the sole member of Durbin Crossing, LLC.

The ownership structures of Brickell Manor, LLC, Orchard Park Jax, LLC and Silvertree Estates, LLC, are the same and each has two classes of members: (i) a capital member, and (ii) the profit members. The sole capital member of these three Related Companies is Vegso Holdings, LLC, a Florida limited liability company which holds a 65% interest in these three Related Companies. Peter Vegso has contributed a total of $5,000,000 as the capital member of Brickell Manor, LLC, Orchard Park Jax, LLC and Silvertree Estates, LLC. The profit members of each remaining Related Company are Patrick E. Sessions (25% interest), BDPB Durbin Crossing, LLC, a Florida limited liability company (5% interest), and Jason R. Sessions (5% interest). Durbin Crossing Development Corp. is the Manager of each Related Company. Patrick E. Sessions is the sole shareholder and president of Durbin Crossing Development Corp. Kenneth J. Strauss is the sole shareholder, sole director and president of Kenneth J. Strauss, CPA, CFP, P.A., which (i) is a partner in Berkowitz Dick Pollack and Brant LLP, (ii) is the Manager of BDPB Durbin Crossing, LLC, a 5% profit member of each remaining Related Company, (iii) as trustee for the partners of Berkowitz Dick Pollack and Brant LLP, is the sole member of BDPB Durbin Crossing, LLC, and (iv) is the financial manager of each remaining Related Company.

Pursuant to an agreement among the Related Companies, the Related Companies have given PJK Development Corp. (in such capacity, the "Development Agent") the authority to manage their respective lands and act as their agent for the development of the Development.  PJK Development Corp., Brickell Manor, LLC, Silvertree Estates, LLC and Orchard Park Jax, LLC. retained Durbin Crossing Development Corp. (in such capacity, the "Development Manager") to perform, or cause to be performed, the (i) day-to-day management of the operations of each Related Company in accordance with the terms of each operating agreement, and (ii) all functions in connection with the ownership of the land, the development, management, sales, marketing, and leasing efforts in connection with developing the Development.  PJK Development Corp., Brickell Manor, LLC, Silvertree Estates, LLC and Orchard Park Jax, LLC. retained Southeastern Development Group, Inc as project manager (the "Project Manager") for the Development to work at its direction.  Jason Sessions is the sole shareholder and president of Southeastern Development Group, Inc.

**P. E. Sessions & Associates, Inc.**

The President of the Development Manager, Patrick E. Sessions, is also President and Chief Executive Officer of P .E. Sessions & Associates, Inc. ("S&A"), multi-faceted development company which offers management and consulting for all types of real estate projects.  Various disciplines such as economic feasibility, financial modeling, sales management, marketing and construction management are provided both through in-house staff and the use of outside consultants where appropriate.  S&A also specializes in workout situations for both developers and lending institutions.  Their clients have included some of the largest and most prestigious firms in both these fields.

From 1992 through 1999, S&A was retained by Atlantic Gulf Communities ("AGC") as a consultant on all aspects of AGC's business.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

The following table summarizes S&A's and S&A's affiliates' current and completed projects.

| Year | Project | Location | Description | Status | S&A's Role |
|------|---------|----------|-------------|--------|-----------|
| 1996 | Regency at Island Dunes | Hutchison Island, FL | 144 luxury condos | Sold out | Partner and Project Manager |
| 1997 | River Walk Towers | Ft. Lauderdale, FL | 375 luxury condos; 300 room hotel; 300,000 sq. ft. office space | Sold out | Acquired and permitted |
| 1998 | Spring Valley Ranch (Chenoa) | Outside Aspen, CO | 500 single-family units; 75 quarter share cabins; 2 golf courses; clubhouse; equestrian center, 25,000 sq. ft. commercial space | Under Development | Managed the acquisition, financing, land and product planning, permitting and marketing |
| 2000 | High Aspen Ranch | Outside Aspen, CO | 29 thirty-five acre ranch sites, clubhouse, equestrian center, pool, tennis, trail system | 11 lots sold | Partner and Development Manager |
| 2000 | Ocean Links of Ponte Vedra | Ponte Vedra Beach, FL | 192 condo conversion | Sold Out | Partner and Project Manager |
| 2000 | Lakeside Village | Orlando, FL | 800 single-family units | Sold out | Partner and Project Manager |
| 2002 | Bartram Springs | Jacksonville, FL | 1,400 single-family units | Under Development | Management and Development Consultant |
| 2004 | Indigo Bay Yacht | Marathon, FL | 92 single-family; 115 slip marina; clubhouse | Under Development | Development and Marketing Consultant |

**Resumes**

*Patrick E. Sessions*

Prior to forming S&A, Mr. Sessions was a member of the Board of Directors for Atlantic Gulf Communities Corporation in Miami, Florida from 1992 to 1993. Prior to that, Mr. Sessions was Vice President of Real Estate for Huizenga Holdings, Inc. in Fort Lauderdale, Florida from 1990 to 1992. At Huizenga Holdings, Mr. Sessions was responsible for acquisitions, development, management, and sales of real estate holdings personally held by H. Wayne Huizenga, former Chairman of Blockbuster Entertainment and Chairman of Republic Industries and AutoNation. These assets included a 300-acre waterfront single-family community with an 18-hole championship golf course and 88-slip marina in Stuart and the Dolphin Center Project, which includes the Pro Player Stadium (formerly Joe Robbie Stadium), 800,000 square feet of office space and 465,000 square feet of retail space in Dade County, Florida. Responsibilities also included feasibility analysis for potential acquisitions of residential and commercial properties.

From 1981 to 1990, Mr. Sessions was President of both the Weston Division and the Special Projects Division of the Arvida Company in Boca Raton, Florida. As President of these two divisions from 1986 through 1990, Mr. Sessions was responsible for all aspects of these projects with approximately 25 senior employees reporting directly to him and approximately 400 employees in the divisions.

Weston, a wholly owned project of the Arvida Company, is a 10,000 acre Planned Unit Development in Broward County, Florida, ten miles west of the City of Fort Lauderdale, Florida. As President of this division, Mr. Sessions was responsible for all activities at Weston, which included land planning, product development, sales, public relations and marketing activities. Responsibilities also

47

included development and operation of Weston Hills Country Club, with a 50,000 square foot clubhouse, an 18-hole championship golf course, an athletic club, a cable television franchise, equestrian center and a 150,000 square foot shopping center. Weston also has its own special taxing district, which is responsible for all water management systems, roads, sewer and water. The special taxing district issued in excess of $170,000,000 to fund infrastructure for the Weston project.

Sales at Weston averaged $125,000,000 per year. There were an average of fifteen product lines, which ranged in price from $125,000 to custom homes in excess of $5,000,000. The sales operation employed eighteen salespeople and the entire project employed approximately 350. Weston's construction division was responsible for construction of 600 units per year with the remainder being constructed by outside builders. Weston's development district annually expended an additional $30,000,000.

Specialized activities included extensive interface with the Environmental Protection Agency and other Federal and State agencies regarding environmental issues, as well as master planning issues with the County and State. Also, included are schools, churches, police stations and other public facilities. In 1997 Weston was incorporated as the City of Weston. Build out was substantially completed in 2003.

The Special Projects Division was made up of joint ventures with VMS Realty, City Federal Savings & Loan and the Miami Savings Group. As President of the division, it was also Mr. Sessions' responsibility to negotiate these joint ventures as well as to negotiate land sales to various builders. As President of the Special Project Division, Mr. Sessions was directly involved with the following projects:

**THE ADDISON** – The Addison is a 180-unit luxury condominium on the Atlantic Ocean in Boca Raton with an average initial sales price of $600,000 per unit. Resales at the Addison now average in excess of $1,000,000 per unit.

**MIZNER VILLAGE** – Mizner Village consists of Mizner Court, a 200-unit five-story garden style condominium project with initial prices averaging $350,000, and Mizner Tower, a 134-unit high-rise condominium project with initial prices averaging $650,000. These projects are on the grounds of the Boca Raton Hotel and Club on Lake Boca Raton.

**COCOPLUM** – Cocoplum is a high-end waterfront single-family community in Coral Gables, Florida. It has 320 lots, which average $350,000 each, and a 175-slip full service marina and yacht club.

**BOCA WEST** – Boca West is a 1,400-acre luxury resort development in Boca Raton, Florida. As Director of Development, Mr. Sessions' responsibilities included product conception, land planning, product design, overview of bidding and construction, as well as coordination of sales efforts on all residential and commercial projects in Boca West. Sales averaged 350 units annually, with an average price of $350,000. Responsibilities also included the completion of a 100,000 square foot country club center with four championship golf courses and 36 tennis courts as well as negotiations of joint ventures with outside builders and development of the commercial core of Boca West.

From 1977 to 1981 Mr. Sessions was a Vice President for Housing Investment Corporation of Florida, a subsidiary of the Chase Manhattan Bank, in Miami, Florida. Mr. Sessions was initially employed as Manager of Construction Operations, with the responsibility of completion, rehabilitation or tenant improvements for over thirty projects valued in excess of $350,000,000 foreclosed by HIC as lender. These projects included PUDs, single-family homes, town houses, condominiums, office buildings, warehouses and rental apartments throughout the southeast United States. In 1978 Mr. Sessions was appointed Vice President with total responsibility for completion, management and sale of projects valued at approximately $150,000,000. This included negotiations of all phases of disposition, including sales price, mortgages,

release provisions and project viability in cases of purchase money mortgages. The corporation liquidated the projects and has now been dissolved.

*Jason Sessions*

Jason Sessions is a vice president of S&A and is the sole shareholder and president of Southeastern Development Group, Inc. From 2000 to 2002, Southeastern Development Group, Inc. was Project Manager for Ocean Links of Ponte Vedra, in Ponte Vedra, Florida. As Project Manager, Mr. Session directed the conversion of 192 luxury apartments homes to condominium ownership. His responsibilities included completing project due diligence to facilitate acquisition funding with GE Capital; preparing budgets and reporting to the equity partner on a quarterly basis; all sales, marketing (leasing and sales), rehab and accounting operations. Mr. Sessions also supervised the design and construction of the second phase. Sales totaled $28 million in two years and the project was completed eight months ahead of projections.

From 1995 to 2000, Mr. Sessions worked for Atlantic Gulf Communities in Miami Florida as Project Manager for several developments including:

**JUPITER OCEAN GRANDE,** Jupiter, Florida (1999 - 2000) – Mr. Sessions directed the design, construction, and sales for the development of 148 luxury condominiums totaling $60 million in sales. His responsibilities included implementing a new marketing plan with a million dollar per year budget; supervising the sales manager and two sales associates; selecting the general contractor and negotiating a $30 million dollar contract.

**SUNSET LAKES,** Miramar, Florida (1998 - 1999) – Mr. Sessions directed the design and construction of the $4 million amenity center; assisted in the land planning and the earthwork necessary to market the lots to individual homebuilders; monitored the progress of the general contractor, overseeing the quality of the job and approving draw requests exceeding $1 million; worked with project director designing and building sales office.

**REGENCY ISLAND DUNES,** Stuart, Florida (1995 – 1998) – Mr. Sessions assisted the Project Managing Director in the design, construction, marketing and management for the development of 144 individually designed luxury condominiums valued at $47 million. His responsibilities included working directly with the sales staff to guide homeowners throughout the planning of their plans for owner changes and implemented a computer system streamlining the custom planning of units to the general contractor; executing change orders for owner changes that exceeded $30,000/unit; monitoring the progress of the general contractor, overseeing the quality of the job and approving draw requests averaging $1 million; serving as a liaison between the owner and the general contractor, interior designer, architect, and engineer. Mr. Sessions was also involved in the negotiation and the selection process of sub-contractors and suppliers. In 1997, he was promoted from Assistant Project Manager to Project Manager and also assumed responsibility for all marketing and sales operations.

Prior to joining Atlantic Gulf Communities, Mr. Sessions was a Director of Marketing for Marbledge, Inc., in Lake Worth, Florida. His responsibilities included controlling the marketing and the production of marble, granite and stone products; supervising sales and distribution of $10.5 million in inventory per year working with major retailers such as Home Depot; developing the process for receiving and distributing of orders; supervising sales representatives throughout the United States.

Jason Sessions received a Bachelor of Science in Marketing from Florida State University, Tallahassee, Florida.

### THE DURBIN NORTH DEVELOPER

Durbin Crossing North, LLC, a Florida limited liability company (the "Durbin North Developer"), is developing the Neighborhood Infrastructure for Durbin Crossing North, which is planned for 813 single-family units and certain items of the Master Infrastructure. The Wood Development Company of Jacksonville ("WDC"), a Florida corporation, and W.R. Howell Company ("WRH"), a Florida corporation, each have a 50% membership interest in Durbin Crossing North, LLC and WDC is the managing member. As of September 30, 2005, the members had made a total capital contribution of $1,000 in the form of equity, and $2,036,526 in the form of loans (the "Priority Loans").

Since 1986, Rick Wood has been the President/Founder of WDC, a real estate development company developing projects in the Northeast Florida area. In 1987, Mr. Wood founded, and has since served as President, of Rick Wood and Associates, Inc, a real estate sales company specializing in commercial brokerage, leasing and consulting.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

The following table summarizes the current and completed projects of WDC:

| Year | Project | Location | Description | Status |
|---|---|---|---|---|
| 2005 | Aberdeen | St. Johns County, FL | 563 single family lots | Under Development |
| 2005 | Bartram Springs | St. Johns County, FL | 278 multi-family units | Under Development |
| 2005 | Murabella | St. Johns County, FL | 740 single-family lots | Under Development |
| 2005 | Liberty Park | St. Johns County, FL | 408 single-family lots | Permitting |
| 2004-Present | Worthington Park | St. Johns County, FL | 149 single-family lots | Under Development |
| 2004-Present | Kernan Forest West | Duval County, FL | 235 single-family lots | Permitting |
| 2004-Present | Sevilla | St. Johns County, FL | 405 single-family lots | Under Development |
| 2004-Present | Whisper Ridge | St. Johns County, FL | 405 single-family lots | Under Development |
| 2003-2004 | Waterleaf | Duval County, FL | 337 single-family lots | Sold Out |
| 2003-2004 | Espanita | St. Johns County, FL | 24 single-family lots | Sold Out |
| 2003-2004 | Kernan Forest | Duval County, FL | 154 single-family lots, 316 multi-family units | Sold Out |
| 2001-2004 | Stonehurst Plantation | St. Johns County, FL | 518 single-family lots | Sold Out |
| 2001-2003 | Whisper Creek | Clay County, FL | 230 single-family lots | Sold Out |
| 2000-2002 | Canterwood | Duval County, FL | 35 single-family lots | Sold Out |
| 2000-2002 | Coachman Meadows | Duval County, FL | 106 single-family lots | Sold Out |
| 2000-Present | WaterMill | Duval County, FL | 1,100 single-family lots | Under Development |
| 2000-2003 | Brannan Mill Plantation | Clay County, FL | 269 single-family lots | Sold Out |
| 2000-2002 | Watermill of Orange Park | Clay County, FL | 47 single-family lots | Sold Out |
| 2000-2002 | Cutters Point | Clay County, FL | 108 single-family lots | Sold Out |
| 1999-2001 | Hammock Grove | Clay County, FL | 59 single-family lots | Sold Out |
| 1999-2001 | Cranes Landing | Clay County, FL | 71 single-family lots | Sold Out |
| 1999-2001 | Coachman Lakes | Duval County, FL | 172 single-family lots | Sold Out |
| 1998-2000 | Olde Sutton Oaks | Clay County, FL | 109 single-family lots | Sold Out |
| 1998-2000 | Savannah Glen | Clay County, FL | 252 single-family lots | Sold Out |
| 1998-2000 | Glen Laurel | Clay County, FL | 198 single-family lots | Sold Out |
| 1996-2002 | Christopher Cove, Unit 2 | Clay County, FL | 24 single-family lots | Sold Out |
| 1995-2000 | Sweetbriar | Clay County, FL | 306 single-family lots | Sold Out |
| 1994-1995 | Christopher Cove Unit 1 | Clay County, FL | 14 single-family lots | Sold Out |
| 1994-1966 | Hidden Village, Unit VIII | Duval County, FL | 62 single-family lots | Sold Out |
| 1993-1996 | Crystal Springs, Unit V | Duval County, FL | 40 single-family lots | Sold Out |
| 1993-1996 | Spencers Crossing | Duval County, FL | 316 single-family lots | Sold Out |
| 1992-1997 | Ashford | Duval County, FL | 64 single-family lots | Sold Out |
| 1992-1993 | Egret's Glade | Clay County, FL | 69 single-family lots | Sold Out |
| 1991-1993 | Hibernia Oaks, Unit II | Clay County, FL | 33 single-family lots | Sold Out |
| 1991-1993 | Crystal Springs, Unit IV | Duval County, FL | 51 single-family lots | Sold Out |
| 1989-1991 | Crystal Springs, Unit I-III | Duval County, FL | 166 single-family lots | Sold Out |
| 1989-1991 | Hibernia Oaks, Unit I | Clay County, FL | 33 single-family lots | Sold Out |
| 1988-1991 | Blanding Boulevard | Orange Park, FL | Commercial Property | Sold Out |
| 1987-1988 | Indian Pines | Clay County, FL | 34 single-family lots | Sold Out |

## THE DEVELOPMENT

### General

Durbin Crossing (the "Development") is a 2,047 acre master-planned residential community located in northwest unincorporated St. Johns County, Florida south of Racetrack Road, approximately twenty miles south of downtown Jacksonville and fifteen miles northwest of historic St. Augustine. The Development is currently planned for 1,518 single-family units, 947 multi-family units, 170,000 square feet of commercial/office space, recreational facilities and a future elementary school.

51

The Development is situated east of the Aberdeen Development of Regional Impact (the "Aberdeen DRI"), which is planned for an approximately 1,950 unit residential community and will be developed concurrently with the Development.  Direct access to the Development will be via planned County Road 244 that is to extend west from Russell Sampson Road on the east, through the Development to its western border and continue west through the Aberdeen DRI, or planned County Road 223, which will connect Race Track Road to the north with planned County Road 244 while passing through a portion of the Development.  The Development is highly accessible via a number of roadways and thoroughfares. Race Track Road provides access to US Highway 1 to the east and State Road 13 to the west.  State Road 13 provides access to Interstate 295, approximately seven miles north of the Development.  County Road 210, just south of the Development, provides direct access to Interstate 95 and US Highway 1 to the east (approximately two and four miles, respectively), and State Road 13 to the west.  Interstate 95 is the major north-south corridor along the eastern seaboard, from Canada to Miami and runs north-south through the heart of the County.  U.S. Highway 1 served as the major north-south route prior to the construction of Interstate 95 and also runs through the County.  Interstate 295 and Interstate 4 are approximately six miles north and sixty miles south, respectively, via Interstate 95.

The Jacksonville International Airport is approximately thirty miles north of the Development via Interstate 95 and the St. Augustine and St. Johns County Airport, a general aviation airport, is approximately fifteen miles southeast of the Development.  The Orlando International Airport can be reached in less than two hours.

The Development is situated approximately five miles east of the St. Johns River, approximately twelve miles west of the Intracoastal Waterway, approximately fifteen miles west of the Atlantic Ocean and is centrally located to recreational opportunities, shopping and restaurants.  Located approximately eighteen miles southeast of the Development at the interchange of Interstate 95 and State Road 16 are two outlet malls in excess of 300,000 square feet, Belz Factory Outlet World and the St. Augustine Premium Outlets.  The nearest regional shopping mall is The Avenues Mall, which is located at the merger of U.S. Highway 1 and Southside Boulevard in south Jacksonville approximately eleven miles from the Development.  The Avenues Mall opened in September 1990 and contains approximately 1.3 million square feet of enclosed retail shopping area, making it the second largest mall in Jacksonville and northeast Florida.

**Jacksonville and St. Johns County Statistics**

The statistical information appearing below has been obtained from County publications and the County's website.  Neither the Master Developer, the Durbin North Developer nor the District make any representation regarding its accuracy.

The Jacksonville area is the home office for ten life insurance companies and regional offices for eight others.  Other industries include manufacturing, ship dry dock and repair, agriculture, personal services and government.  In addition, there are two naval bases in the Jacksonville area including Jacksonville Naval Air Station (one of the largest overhaul and repair facilities in the United States) and the Mayport Naval Air Station.  The Jacksonville area has attracted such nationally known institutions as the Mayo Clinic and the PGA Tour.  Other national companies which have either expanded or relocated to the Jacksonville area during the past decade include Citicorp Credit Services, AT&T, Merrill Lynch, Coach Leatherwear, Prudential, American Tourister, Vistakon (Johnson & Johnson), Modis, Humana and Fidelity National - Financial Services.  Other recent additions in the area include a new Baptist Medical Center. Major employers within a fifteen mile radius of the Development include the following:

| Establishment * | Business or Service | # of Employees |
|---|---|---|
| Citicorp Credit Services | Financial Services | 5,000 |
| St. Johns County School District | Education | 2,771 |
| Flagler Hospital | Healthcare | 1,400 |
| Northrop-Grumman | Aircraft Manufacturing | 1,200 |
| St. Johns County | County Government | 1,157 |
| Florida East Coast Industries | Trans./Real Estate | 873 |
| Florida School of the Deaf and Blind | Education for Handicapped | 728 |
| Ponte Vedra Inn and Club | Hotel/Resort | 700 |
| PGA Tour | Golf Tournament | 650 |
| Community Hospice of Northeast Florida | Care for Terminal Illnesses | 625 |
| Hydro Aluminum | Aluminum Extrusion | 565 |

---
\*      As of September 30, 2004.

The County realized an annual population growth rate of approximately three and nine-tenths percent from 1990 – 2000 representing an approximately forty-seven percent increase during that period. Based upon 2004 estimates, the population in the County increased by more then twenty percent from 2000 – 2004 (77.75% increase from 1990 – 2004). As evidenced in the table below both St. Johns County and the Jacksonville MSA consisting of St. Johns, Duval, Nassau and Clay Counties have achieved strong residential growth as evidenced by the increase in the number of building permits issued over the last five years.

**Building Permits**

| Year | St. Johns County | Jacksonville MSA |
|---|---|---|
| 2005 (to August) | 3,254 | 12,289 |
| 2004 | 3,610 | 13,636 |
| 2003 | 3,002 | 11,976 |
| 2002 | 2,401 | 10,473 |
| 2001 | 1,945 | 9,600 |

Based on the Florida Comprehensive Assessment Test (FCAT) scores and teacher tenure, the County offers one of the best school systems throughout the State. During the past several years, the school district has consistently ranked among the top ten percent of school districts in the State with regard to test scores and in 2004 ranked fourth out of the sixty-seven of the Florida counties on the FCAT. As part of the Florida School Recognition Award Program, nineteen St. Johns County schools received special recognition and were awarded more than $1.5 million through the 2004 program. The St. Johns County School District currently has sixteen A-rated schools, four B-rated schools, three C-rated schools, two D-rated schools and one F-rated school.

**Land Acquisition**

Durbin Crossing, LLC, Orchard Park Jax, LLC, Silvertree Estates, LLC and Brickell Manor, LLC, each a Florida limited liability company (each previously described as a "Related Company," and collectively, with PJK Development Corp, as the "Master Developer") acquired the lands comprising the Development from Rayland, LLC and Rayonier Timberlands Operating Company, L.P., under an assignment from P.E. Sessions & Associates, Inc. (previously described as "S&A"), an affiliate of the Related Companies. See caption "THE MASTER DEVELOPER" herein and the subheading "— P.E.

Sessions & Associates, Inc." thereunder.  S&A had acquired the right to acquire the lands from E&W Investment, LLC pursuant to an Amended and Restated Purchase and Sale Agreement (the "Acquisition Contract") dated as of August 27, 2003.  E&W Investment, LLC had, in turn, acquired the right to acquire such lands as assignee and successor to Tallwood Associates, Inc. and Hunter Tract, LLC under a 1999 Purchase Agreement, as amended, between Hunter Tract, LLC and Rayland, LLC and Rayonier Timberlands Operating Company, L.P. to purchase the land comprising the Development for $25,000,000.

For purposes of acquiring the property, the Master Developer entered into a loan agreement with Wachovia Bank, N.A. for $25,000,000 (the "Wachovia Loan") which is secured by a mortgage against the property.  Pursuant to the Wachovia Loan, letters of credit have been issued in the aggregate amount of $8,399,185 which are also secured by the mortgage.  The Wachovia Loan requires monthly interest only payments, which commenced September 2003, based on a variable rate per annum equal to LIBOR plus 2.75%.  The entire principal balance, along with all accrued interest is due and payable on August 31, 2006.  The loan is secured by a mortgage on the property, and repayment is unconditionally guaranteed by Patrick E. Sessions and Peter Vegso, jointly and severally.  As of October 6, 2005 the outstanding balance of the Wachovia Loan was $1,100,723.  The Related Companies are currently in the process of amending the Wachovia Loan to a revolving loan.  The Master Developer plans to pay down the Wachovia Loan with proceeds from the sale of land planned for 300 multi-family units expected to close shortly after the District issues its Series 2005 Bonds.

Simultaneously with and in conjunction with the closing of the Land Contract and the Wachovia Loan, Vegso Holdings, LLC, as capital member of each Related Company, contributed a total of $5,000,000.

**Development Entitlements**

Lands within the District are situated within the 2,047 acre Durbin Crossing Development of Regional Impact (previously described as the "Durbin Crossing DRI").  The development order governing the Durbin Crossing DRI (previously described as the "Development Order") was approved on April 1, 2003 by the St. Johns Board of County Commissioners.  The Development Order authorizes the following land uses and densities (but not all such uses are necessarily planned):  1,551 single-family homes; 947 multi-family units; 70,000 square feet of office/civic uses; 100,000 square feet of retail/commercial/service uses; an elementary school; and 30,000 square feet of community center uses.  The Developers may increase certain land uses and simultaneously decrease other land uses without filing a Notice of Proposed Change or other modification of the Development Order, provided that such changes are consistent with a conversion table included in the Development Order.

The Development is zoned under the Durbin Crossing Planned Unit Development (PUD), which became effective January 20, 2004, and covers the same land area as the Durbin Crossing DRI.  The PUD is consistent with the land use designation and the requirements in the Development Order.  The table below illustrates the development program and entitlements as stipulated in the Development Order.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

| Land Use | Phase 1: 2003-2007 | | Phase 2: 2008-2010 | | Total | | |
|---|---|---|---|---|---|---|---|
| | DU | Sq. Feet | DU | Sq. Feet | Acres | DU | Sq. Feet |
| Residential | 1,337 | | 1,161 | | 697 | 2,498 | |
| Single-Family | 1,167 | | 384 | | 601 | 1,551 | |
| Multi-Family (1) | 170 | | 777 | | 96 | 947 | |
| Commercial (2) | | 26,800 | | 73,200 | 21 | | 100,000 |
| Office (2) | | 12,000 | | 58,000 | 11 | | 70,000 |
| Elementary School | | | | | 20 | | |
| Recreation/Open Space | | | | | 291 | | |
| Community Center | | 10,000 | | 20,000 | 10 | | 30,000 |
| Neighborhood Parks | | | | | 21 | | |
| Community Park | | | | | 35 | | |
| Roadway Buffer | | | | | 26 | | |
| Wetland Buffer | | | | | 109 | | |
| Undeveloped Upland | | | | | 90 | | |
| Wetlands | | | | | 892 | | |
| Right-of-way Reservation | | | | | 115 | | |
| Total | 1,337 | 48,800 | 2,322 | 151,200 | 2,047 | 2,498 | 200,000 |

| | |
|---|---|
| (1) | Multi-family uses are located in the Village Center and multi-family pods |
| (2) | Commercial, Office and Civic uses are located in the Village Center and mixed use pods |

The entitlements depicted in the table above currently exceed the density in the existing development plans for the property within the District. The Master Developer has satisfied the conditions for the Phase 2 development. Accordingly, the phasing referenced above does not necessarily correspond to the planned or actual phasing or timing of the Development.

The Development Order sets forth certain conditions relative to vegetation and wildlife, wetland impacts, water supply, water quality, wastewater and stormwater management and transportation impacts all of which are very typical in nature for Florida DRIs. The Development Order requires a contribution in funded transportation improvements to offset the transportation impacts of the Development. Specifically, these transportation obligations are the construction of the North/South Arterial, the North/South Connector, Russell Sampson Road (the three foregoing segments now collectively known as CR 2209), and construction of the East/West Connector from the intersection with CR 223 to the intersection with Russell Sampson Road (now known as CR 244 (East Section)). The District will be funding the entire amount of its proportionate cost share of transportation obligations with a portion of the proceeds from the Series 2005A Bonds and an anticipated future series of bonds in 2006. Pursuant to the Development Order, the District is entitled to transportation impact fee credits in an amount equal to its proportionate cost share which may only be applied to the Development.

The Development Order is interdependent upon certain obligations of the Aberdeen DRI Development Order. Specifically, these transportation obligations are the construction of Aberdeen Boulevard from Greenbriar Road to the east boundary of Aberdeen, the construction of the County Road 244 from the east boundary of Aberdeen up to and including the intersection with County Road 223, and County Road 223 from its intersection with County Road 244 to Race Track Road. The Development Orders governing both DRIs stipulate that the commencement and guaranteed completion (through performance bond or community development district financing) of the construction of the transportation improvements must occur within two years in order for either project to obtain building permits for vertical improvements. The Aberdeen Community Development District is expected to issue bonds sometime in October 2005. In order to construct the roads, lands must be acquired from third parties from properties

lying outside of the Aberdeen and Durbin Crossing DRIs. Substantially all required lands are under contract with the respective owners. It is anticipated that all such lands will be acquired by the District or the Aberdeen Community Development District, as appropriate, after the issuance of the Series 2005 Bonds by the District and the issuance of such Aberdeen bonds.

The Master Developer is currently in compliance with all aspects of the DO and PUD. Failure to comply in the future could result in the cessation of development activities or the inability to obtain building permits.

**Land Use/Development Plan**

The table below illustrates the current residential land use plan for the District identified by neighborhood, parcel and development phase. Such land use plan is subject to change.

*Durbin Crossing North*

| Parcel | Phase | Lot Size | Units |
|--------|-------|----------|-------|
| A1 | 2 | 63' | 36 |
| A2 | 2 | 53' | 37 |
| A3 | 2 | 63' | 100 |
| B1 | 2 | 53' | 47 |
| C | 2 | 73' | 86 |
| D1 | 2 | 80' | 82 |
| | 2 | 83' | 25 |
| D2 | 1 | 80' | 14 |
| | 1 | 83' | 33 |
| E1 | 1 | 80' | 8 |
| | 1 | 83' | 62 |
| E2 | 1 | 73' | 64 |
| E3 | 1 | 83' | 24 |
| F | 1 | 73' | 71 |
| G1 | 1 | 63' | 44 |
| G2 | 1 | 63' | 12 |
| H1 | 1 | 53' | 25 |
| H2 | 1 | 53' | 43 |
| Sub-Total | | | 813 |

| Phase 1 | | Phase 2 | |
|---------|-----------------|---------|-----------------|
| Product | Number of Units | Product | Number of Units |
| 80'/83' | 141 | 80'/83' | 107 |
| 70'/73' | 135 | 70'/73' | 86 |
| 63' | 56 | 63' | 136 |
| 53' | 68 | 53' | 84 |
| MF | 0 | MF | 0 |
| Sub-Total | 400 | Sub-Total | 413 |

56

### *Durbin Crossing South*

| Parcel | Phase | Lot Size | Units |
|---|---|---|---|
| B | 1 | 53' | 76 |
| B | 2 | 53' | 64 |
| I1 | 1 | 80' | 25 |
| I2 | 2 | 80' | 48 |
| J1 | 1 | 70' | 86 |
| J2 | 2 | 70' | 97 |
| K | 1 | 80' | 48 |
| M1 | 1 | 63' | 63 |
| M2 | 2 | 63' | 122 |
| O | 1 | 53' | 67 |
| P | 1 | 80' | 9 |
| Q | 1 | MF | 300 |
| R | | TBD | |
| S | | Mixed Use | |
| T | | Village Center | |
| V1 | | Mixed Use | |
| V2 | | Mixed Use | |
| Y | 2 | MF | 647 |
| Sub-Total | | | 1,652 |

| **Phase 1** | | **Phase 2** | |
|---|---|---|---|
| Product | Number of Units | Product | Number of Units |
| 80' | 82 | 80' | 48 |
| 70'/73' | 86 | 70'/73' | 97 |
| 63' | 63 | 63' | 122 |
| 53' | 143 | 53' | 64 |
| MF | 300 | MF | 647 |
| Sub-Total | 674 | Sub-Total | 978 |

### *Total Units*
### *(Durbin Crossing North and South)*

| Product | Phase 1 | Phase 2 | Total Units |
|---|---|---|---|
| 80'/83' | 223 | 155 | 378 |
| 70'/73' | 221 | 183 | 404 |
| 63' | 119 | 258 | 377 |
| 53' | 211 | 148 | 359 |
| MF | 300 | 647 | 947 |
| | 1,074 | 1,391 | 2,465 |

In addition to the residential units identified in the table above, the District is planned to include approximately 70,000 square feet of office space and 100,000 square feet of commercial/retail space.

**District Infrastructure and Finance Plan**

In order to serve the residents of the District, the District has developed an Improvement Plan to allow it to finance, acquire and construct certain infrastructure that will specifically benefit the District. The Improvement Plan includes both master infrastructure improvements (the "Master Infrastructure") and neighborhood infrastructure improvements (the "Neighborhood Infrastructure"). The Master Infrastructure includes onsite and offsite roadways, water and sewer improvements, stormwater management, recreation facilities, right-of-way acquisition, entry features, and associated professional fees for permitting, engineering and design. The District Engineer has estimated the total cost of the Master Infrastructure at $58,266,000. The Master Infrastructure cost estimates include the cost of Jacksonville Electric Authority (as previously described, "JEA") transmission components of the water, sewer and reuse facilities within the District roadways estimated at $3,511,200. The cost of the JEA components will be reimbursed to the District by JEA on a monthly basis. The Neighborhood Infrastructure includes clearing and grubbing, earthwork, water and sewer improvements, re-use underground utility construction, paving and drainage, grassing, sodding, underground electrical conduit, neighborhood street lighting and the neighborhood parks system. The District Engineer has estimated the total cost of the Neighborhood Infrastructure at $66,300,000. See "APPENDIX C — DISTRICT ENGINEER'S REPORTS" for a more detailed description of these improvements.

The Master Developer is developing all of the Master Infrastructure for the Development (except for certain items the Durbin North Developer has agreed to develop). Proceeds of the Series 2005A Bonds (including investment earnings thereon) will be used to fund approximately $44,800,000 of the Master Infrastructure (the "Series 2005A Project"). The District anticipates issuing a future series of bonds in 2006 to fund the remainder of the Master Infrastructure, consisting of transportation and park improvements, not funded by the Series 2005A Bonds. See paragraph 7 under "BOND OWNERS' RISKS" herein. The Master Developer will also be developing the Neighborhood Infrastructure for the single-family units planned within the southern portion of the Development ("Durbin Crossing South"). Proceeds of the Series 2005B-1 Bonds will be used to fund the Phase 1 Neighborhood Infrastructure in Durbin Crossing South estimated to cost $7,963,000 (the "Series 2005B-1 Project").

The Master Developer has sold the residential land in the northern portion of the Development ("Durbin Crossing North") to another developer (see the "Durbin North Developer" herein) who will be developing the Neighborhood Infrastructure for the single-family units planned within Durbin Crossing North. Proceeds of the Series 2005B-2 Bonds will be used to fund the Phase 1 Neighborhood Infrastructure in Durbin Crossing North estimated to cost $13,303,000 (the "Series 2005B-2 Project").

The Development is expected to be constructed in two phases. The first phase of the Development (Phase 1) consists of 774 single-family residential units and 300 multi-family units. The second construction phase of the Development (Phase 2) consists of 744 single-family residential units and 647 multi-family units. Phase 1 construction is expected to commence immediately following the issuance of the Series 2005 Bonds. Timing of construction as to Phase 1 and Phase 2 may be slower or faster than stated herein.

A Utility Service Agreement (the "JEA Agreement") was made and entered into on March 31, 2003 between JEA and SouthStar Development Partners, Inc. This agreement was subsequently assigned to the Master Developer. In accordance with the JEA Agreement, JEA will be responsible for the cost of construction of the JEA transmission components of the water, sewer and reuse facilities located within the master transportation roadway improvements. The costs of these JEA transmission components are included in the costs of the appropriate master transportation roadway improvements identified in

"APPENDIX C — DISTRICT ENGINEER'S REPORTS" attached hereto, and will be reimbursed to the District by JEA on a monthly basis.

Jurisdictional wetland delineation for the entire property within the District has been completed and accepted by the St. Johns River Water Management (SJRWMD) and U.S. Army Corps of Engineers (USACOE). A USACOE permit has been obtained for Durbin Crossing North, and a separate USACOE permit has been obtained for a combination of Durbin Crossing South and District roadways. Two separate SJRWMD permits have been obtained for the single-family development portions of the project. A separate SJRWMD permit has been obtained for the East/West Connector, North/South Connector, North South Arterial, and Russell Sampson Road. Construction plans have been approved by St. Johns County for the single-family development portions of the property, which will total 1,518 single family lots. Construction of these improvements is anticipated to begin shortly after issuance of the Series 2005 Bonds. Separate construction plans for the East/West Connector, North/South Connector, North South Arterial, and Russell Sampson Road have also been approved by St. Johns County.

**Assessment Area**

The Assessments levied in connection with the Series 2005A Bonds have been levied over the 2,465 residential units and the 170,000 square feet of office and commercial space planned within Phase 1 and Phase 2 of the Development. (See subheading "— Land Use/Development Plan" hereinabove.) The Assessments levied in connection with the Series 2005B-1 Bonds have been levied over the 374 units planned within Phase 1 of Durbin Crossing South. The Assessments levied in connection with the Series 2005B-2 Bonds have been levied over the 400 single family units planned within Phase 1 of Durbin Crossing North. See "APPENDIX D — ASSESSMENT REPORT" attached hereto for a detailed description of the parcels on which the Assessments securing the Series 2005A, 2005B-1 and 2005B-2 Bonds are levied.

The 2005B-2 Special Assessments described under the heading "SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2005 BONDS" herein and in "APPENDIX D — ASSESSMENT REPORT" attached hereto exceed the special assessments levied pursuant to the assessment resolution adopted by the District's Board of Supervisors on March 30, 2004 on the Durbin Crossing North lands within the District due to construction cost increases. Accordingly, the Series 2005B-2 Indenture provides that a portion of the proceeds of the Series 2005B-2 Bonds (in the amount of $2,429,306) will be escrowed with the Trustee until such time as the District's Board of Supervisors approves a final assessment resolution levying the Series 2005B-2 Special Assessments in an amount equal to the principal amount of the Series 2005B-2 Bonds. See "FUNDS AND ACCOUNTS — Acquisition and Construction Fund — Escrow Subaccount of the Series 2005B-2 Acquisition and Construction Account" herein.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

**Residential Product Offerings**

The following table reflects the Master Developer's current expectations of the mix of unit types to be constructed in the Development and their respective approximate base prices and square footages, all of which are subject to change.

| Product Type | Lot Width | Number of Units | Approximate Square Footages | Approximate Range of Home Prices |
|---|---|---|---|---|
| Multi-Family | N/A | 947 | 800-2,500 | $150,000-$400,000 |
| 53' Single-Family | 53'x110' | 359 | 1,400-2,500 | $200,000-$400,000 |
| 63' Single-Family | 63'x110' | 377 | 1,600-3,000 | $250,000-$450,000 |
| 70'/73' Single-Family | 70'/73'x110' | 404 | 1,800-3,500 | $300,000-$500,000 |
| 80'/83' Single-Family | 80'/83'x110' | 378 | 2,200-4,000 | $350,000-$700,000 |
| | | 2,465 | | |

**Recreational and Lifestyle Amenities**

The District intends to finance, design and construct recreational facilities within the Development. These improvements include two community centers on ten acres, approved (but not necessarily planned) for up to 30,000 square feet, and three community parks consisting of thirty-five acres total. One community center will be located north of the East/West Connector (County Road 244), east of the main subdivision road. The second community center will be located south of the East/West Connector (County Road 244), west of the main subdivision road. The basic components of these facilities are planned to include a clubhouse, fitness equipment, bathrooms, family pool and/or competition pool, playground equipment, barbeque grills and picnic tables, and tennis courts. The community park sites are consolidated south of the East/West Connector (County Road 244). The community park improvements are planned to include, at a minimum, four lighted baseball fields, two lighted soccer/football fields and parking for the fields. The cost to construct the community centers and community parks is estimated at $7.75 million.

**Education**

School age children residing in the Development are expected to attend Durbin Creek Elementary School, Fruit Cove Middle School and Alan D. Nease High School, all of which are located within two miles from the Development. Florida's A+ Plan School Grades Program's ratings for the elementary and middle school are in the "A" category and the rating for the high school is in the "B" category. Although the foregoing information is current as of the date hereof, the St. Johns County School District may change school boundaries from time to time and there is no requirement that students residing in the Development be permitted to attend the schools which are closest to the Development.

Pursuant to the terms of a Memorandum of Understanding between the Master Developer and the St. Johns County School Board, the Master Developer has agreed to convey a twenty acre future elementary school site to the St. Johns County School Board prior to issuance of building permits for vertical construction within the Development. The Master Developer has agreed to use all reasonable efforts to cause a school to be constructed on the school site by the District for the Development so that the school can be opened when the population in the Aberdeen DRI and Durbin Crossing DRI will generate 450 students for such school.

The Development is also close to several undergraduate and post graduate institutions including Flagler College in St. Augustine, the University of North Florida, Florida Community College at

Jacksonville and Jacksonville University. In addition, the Development is located approximately one hour from the University of Florida, located in Gainesville, Florida.

**Land Sales and Builder Contracts**

On March 29, 2005 the Master Developer completed the sale of the land comprising Durbin Crossing North, planned for 813 single-family lots, to the Durbin North Developer at a purchase price of $19,222,055. The Durbin North Developer subsequently entered into contracts with four homebuilders for the sale of 369 single-family lots planned within Phase 1 of Durbin Crossing North. The remaining 31 lots planned within Phase 1 have been deliberately held off the market. The table below illustrates the number of lots to be purchased by product type and purchase price.

| Purchaser | Product | Phase 1 Lots[1] | Phase 1 Price Per Lot | Total Purchase Price |
|---|---|---|---|---|
| Panitz Signature Homes, LLC | 53' | 43 | $67,500 | $2,902,500 |
| Panitz Signature Homes, LLC | 80' | 42 | $106,500 | $4,473,000 |
| Subtotal | | 85 | | $7,375,500 |
| | | | | |
| Archstone Homes Corp | 63' | 56 | $80,500 | $4,508,000 |
| Archstone Homes Corp | 73' | 39 | $93,500 | $3,646,500 |
| Archstone Homes Corp | 80' | 12 | $106,500 | $1,278,000 |
| Subtotal | | 107 | | $9,432,500 |
| | | | | |
| Providence Construction Company | 73' | 29 | $93,500 | $2,711,500 |
| Providence Construction Company | 80' | 54 | $106,500 | $5,751,000 |
| Subtotal | | 83 | | $8,462,500 |
| | | | | |
| Toll Jacksonville Limited Partnership | 73' | 61 | $93,500 | $5,703,500 |
| Toll Jacksonville Limited Partnership | 80' | 33 | $106,500 | $3,514,500 |
| Subtotal | | 94 | | $9,218,000 |
| | | | | |
| Total | | 369 | | $34,488,500 |

[1]    The closing shall occur after the Durbin North Developer has recorded the plat and no later than ten days from the date Builder receives notice that the subdivision improvements have been substantially completed and there is no impediment to the issuance of a building permit as a result of any performance obligation of Durbin North Developer.

The Durbin North Developer acquired the land comprising Durbin Crossing North with a $26,923,000 revolving acquisition and development loan from Wachovia Bank (the "North A&D Loan"). The North A&D Loan requires monthly interest only payments, which commenced on May 10, 2005, based on a variable rate per annum equal to LIBOR plus two percent. The entire principal balance, along with all accrued interest is due and payable on April 1, 2007. A principal payment of $20,000,000 is due and payable on or before September 30, 2006; however, the Durbin North Developer anticipates a modification of these payment terms. The North A&D Loan is secured by a mortgage on the Phase 1 and Phase 2 property of Durbin Crossing North. As of September 30, 2005, the balance of the North A&D Loan was $17,056,867.

Durbin Crossing, LLC has entered into contracts with three homebuilders for the sale of all of the 705 single-family units planned within Durbin Crossing South. Each builder is expected to close on their respective single-family lots in two phases, approximately twelve months apart. Phase 1 closings are expected to occur by January 2007. The Master Developer has also entered into contract with one of the single-family builders for the sale of land designated for 300 multi-family units, and anticipates closing on this sale shortly after the closing of the Series 2005 Bonds. The table below illustrates the number of single-family lots to be purchased by product type, purchase price and development phase (as described under the subheading "— Land Use/Development Plan" hereinabove).

| Purchaser | Product | Phase 1 Lots[1] | Phase 1 Price Per Lot | Phase 2 Lots[2] | Phase 2 Price Per Lot | Total Purchase Price |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| Admiral Homes, LLC | 70' | 37 | $91,000 | 42 | $96,460 | $7,418,320 |
| Admiral Homes, LLC | 80' | 39 | $104,000 | 24 | $110,240 | $6,701,760 |
| Subtotal | | 76 | | 66 | | $14,120,080 |
| | | | | | | |
| KB Home Jacksonville, LLC | 53' | 72 | $68,900 | 32 | $73,034 | $7,297,888 |
| KB Home Jacksonville, LLC | 63' | 31 | $81,900 | 61 | $86,814 | $7,834,554 |
| KB Home Jacksonville, LLC | 70' | 6 | $91,000 | 6 | $96,460 | $1,124,760 |
| KB Home Jacksonville, LLC | 80' | 2 | $104,000 | 0 | $110,240 | $208,000 |
| Subtotal | | 111 | | 99 | | $16,465,202 |
| | | | | | | |
| Ryland Homes | 53' | 71 | $68,900 | 32 | $73,034 | $7,228,988 |
| Ryland Homes | 63' | 32 | $81,900 | 61 | $86,814 | $7,916,454 |
| Ryland Homes | 70' | 43 | $91,000 | 49 | $96,460 | $8,639,540 |
| Ryland Homes | 80' | 41 | $104,000 | 24 | $110,240 | $6,909,760 |
| Subtotal | | 187 | | 166 | | $30,694,742 |
| | | | | | | |
| Total (Single Family) | | 374 | | 331 | | $61,280,024 |
| | | | | | | |
| | | | | | | |

[1]    Phase 1 closing shall occur after Seller has recorded the plat and no later than ten days from the date Builder receives notice that permanent water, sewer and electric are available to the lots, and there is no impediment to the issuance of a building permit or certificate of occupancy as a result of any performance obligation of the Seller.

[2]    Phase 2 closing shall take place on or before twelve months after the Phase 1 closing so long as permanent water, sewer and electric are available to the Phase 2 lots and there is no impediment to the issuance of a building permit or certificate of occupancy as a result of any performance obligation of the Seller.

**Projected Absorption**

It is projected that all of the 2,465 single-family and multi-family units planned within the Development will be sold to residents within an eight year period. Retail sales are expected to commence in the second quarter of 2006. Durbin Crossing, LLC projects that it will close on all of the Durbin South Phase 1 single-family lots to homebuilders (see subheading "— Land Sales" immediately above) by January 31, 2007, and all of the Durbin South Phase 2 single-family lots to homebuilders approximately 12 months thereafter.

The Durbin North Developer projects that it will close on all of the Durbin North Phase 1 single-family lots to homebuilders (see subheading "— Land Sales" immediately above) by January, 2007, and all of the Durbin North Phase 2 single-family lots to homebuilders approximately 12 months thereafter.

The anticipated absorption rates are based upon estimates and assumptions made by the respective entities that are inherently uncertain, though considered reasonable by the respective entities, and are subject to significant business, economic and competitive uncertainties and contingencies, all of which are difficult to predict and many of which are beyond the control of the respective entities. As a result, there can be no assurance such absorption rates will occur or be realized in the time frames anticipated.

## Marketing

Each builder will be responsible for constructing, furnishing and staffing model homes from a centrally located model center that will accommodate all of the builder models. Marketing efforts conducted by the builders are expected to highlight the family oriented nature of the community and its amenities.

## Fees and Assessments

All landowners within the District are subject to annual ad-valorem property taxes, non ad-valorem special assessments and homeowner's association fees as described in more detail below.

The current approximate millage rate for the area of the County in which the District is located is 16.28 mills. Assuming an average home cost of $350,000 with a $25,000 homestead exemption ($325,000 taxable value), with the millage rate applicable for the fiscal year ended September 30, 2005, the annual ad-valorem property tax would be approximately $5,921.

The Master Developer will establish the Durbin Crossing Master Association ("HOA") for architectural review, maintenance and deed restriction enforcement. The annual HOA fee is anticipated to commence the month following the issuance of the first certificate of occupancy within the Development, but no later than January 1, 2008.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

All landowners within the District are subject to annual debt service assessments levied over a thirty (30) year period in connection with the issuance by the District of its 2005A Bonds to finance certain master infrastructure improvements.  In addition, all landowners are subject to annual operation and maintenance assessments, which are based upon the District's annual budget.  The table below illustrates the projected annual debt service and operation and maintenance assessments by product type.

| Product Type | Estimated Debt Service Assessments [*] |
|---|---|
| Apartments | $539 |
| Condos | $816 |
| 53' Single-Family | $1,633 |
| 63' Single-Family | $1,941 |
| 70' Single-Family | $2,207 |
| 80' Single-Family | $2,503 |
| Commercial | $0.82/square foot |
| Office | $0.82/square foot |

[*] Includes allowance for collection costs and discount for early payment.

The 374 single-family units planned within Phase 1 (development phase) of Durbin Crossing South are subject to assessments levied in connection with the issuance by the District of its Series 2005B-1 Bonds.  The 400 single-family units planned within Phase 1 (development phase) of Durbin Crossing North are subject to assessments levied in connection with the issuance by the District of its Series 2005B-2 Bonds.  Both the Series 2005B-1 Special Assessments and the Series 2005B-2 Special Assessments are expected to be prepaid no later than at the time of closing between a builder and retail buyer.

| Product Type | Series 2005B-1 Special Assessments * | Series 2005B-2 Special Assessments * |
|---|---|---|
| 53' Single-Family | $18,997 | $27,366 |
| 63' Single-Family | $22,581 | $32,529 |
| 70' Single-Family | $25,675 | $36,985 |
| 80' Single-Family | $29,119 | $41,947 |

[*] Includes debt service reserve fund allocations.

In addition, the District anticipates issuing a future series of bonds in 2006 to fund the remainder of the Master Infrastructure, consisting of transportation and park improvements, not funded by the Series 2005A Bonds.  The assessments levied in connection with this future series of bonds will be levied over the same land as the Series 2005A Special Assessments and will be prepaid no later than at the time a building permit is applied for.

**Competition**

Competition for the Development will primarily come from the following large scale master planned communities located in the surrounding area.  Below is a description of those communities.

*Aberdeen* is a 1,313-acre master planned residential community being developed by Aberdeen Development, LLC, an affiliate of SouthStar Development Partners. Aberdeen is located south of Race Track Road, approximately three miles west of Interstate 95 and is planned to include 1,553 single-family units, 394 multi-family units and 100,000 square feet of commercial and office space. Planned recreational amenities include a five acre community center with 4,000 square feet of building, twenty acres of onsite community parks and a fifty acre offsite community park. The community center is planned to include a clubhouse, pool and playground. The community parks are planned to include at least four lighted baseball fields and two lighted soccer/football fields. A portion of the land is being sold to D.R. Horton, Inc. — Jacksonville and a portion is being sold to an affiliate of WDC as undeveloped pods with master infrastructure servicing the site. Development activities are expected to start concurrently with Durbin Crossing.

*Bartram Springs* is located 5 miles east of Aberdeen in Duval County and is being developed by Sandler @ Bartram Lakes, LLC, an affiliate of Southstar Development Partners. The project is planned for 1,400 single family lots, 300 multi-family units and 25 acres of commercial property. Since sales began in mid 2003, absorption has equaled approximately one sale per day. Currently almost one half of the single family homes have been sold with prices ranging the upper $100,000's to over $400,000.

*Nocatee* is an approximately 15,000-acre parcel of land straddling both St. Johns and Duval County with the majority of the land in St. Johns County. Approximately 8,000 acres are planned to be developed with the remainder designated as conservation land and passive greenways. Nocatee is approved for 14,000 residential units, 4.2 million square feet of office space, 1 million square feet of retail space, 250,000 square feet of industrial space, 710 hotel rooms and 710 assisted living units. Development activities for the major transportation requirements for the project are expected to commence in the first quarter of 2006.

The information appearing above does not purport to list all of the communities in the County that may pose competition to the Development. There can be no assurance that the Master Developer, the Durbin North Developer or other developers may not develop future projects which may pose competition to the Development.

## ASSESSMENT METHODOLOGY

The allocation of benefits and costs to benefited parcels within the District, along with a narrative overview of the same, are presented in "APPENDIX D — ASSESSMENT REPORT" attached hereto.

## TAX MATTERS

### General

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the District must continue to meet after the issuance of the Series 2005 Bonds in order for interest on the Series 2005 Bonds to be and remain excludable from gross income for federal income tax purposes. The District's failure to meet these requirements may cause interest on the Series 2005 Bonds to be included in gross income for federal income tax purposes retroactively to the date of issuance of the Series 2005 Bonds. The District has covenanted to take the actions required by the Code in order to maintain the excludability from federal gross income of interest on the Series 2005 Bonds.

In the opinion of Bond Counsel with respect to each Series of the Series 2005 Bonds, to be rendered on the date of issuance of the Series 2005 Bonds, under existing statutes, regulations, rulings and court decisions, assuming continuing compliance by the District with the tax covenants referred to above and the

accuracy of the certifications and representations of the District, interest on the Series 2005 Bonds will be excludable from gross income for federal income tax purposes and will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. However, interest on the Series 2005 Bonds will be taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on corporations. Bond Counsel is further of the opinion that the Series 2005 Bonds will be exempt from taxation under the laws of the State of Florida, except as to estate taxes and taxes imposed by Chapter 220, Florida Statutes, on interest, income or profits on debt obligations owned by corporations as defined in Chapter 220.

Except as described above, Bond Counsel will express no opinion regarding the federal income tax consequences resulting from the ownership of, receipt of interest on, or disposition of the Series 2005 Bonds. Prospective purchasers of the Series 2005 Bonds should be aware that the ownership of Series 2005 Bonds may result in other collateral federal tax consequences, including, without limitation, (i) the denial of a deduction for interest on indebtedness incurred or continued to purchase or carry Series 2005 Bonds or, in the case of a financial institution, that portion of an owner's interest expense allocable to interest on the Series 2005 Bonds; (ii) the reduction of the loss reserve deduction for property and casualty insurance companies by fifteen percent (15%) of certain items, including interest on the Series 2005 Bonds; (iii) the inclusion of interest on the Series 2005 Bonds in the earnings of certain foreign corporations doing business in the United States for purposes of the branch profits tax; (iv) the inclusion of interest on the Series 2005 Bonds in passive investment income subject to federal income taxation of certain Subchapter S corporations with Subchapter C earnings and profits at the close of the taxable year; and (v) the inclusion of interest on the Series 2005 Bonds in the determination of the taxability of certain Social Security and Railroad Retirement benefits to certain recipients of such benefits.

Bond Counsel will express no opinion regarding federal tax consequences arising with respect to the Series 2005 Bonds other than the excludability from gross income of the interest thereon. The nature and extent of the other tax consequences described above and below will depend on the particular tax status and situation of each owner of the Series 2005 Bonds. Prospective purchasers of the Series 2005 Bonds should consult their own tax advisors as to the impact of these other tax consequences.

From time to time, there are legislative proposals pending in Congress that, if enacted into law, could alter or amend one or more of the federal tax matters described above including, without limitation, the excludability from gross income of interest on the Series 2005 Bonds, adversely affect the market price or marketability of the Series 2005 Bonds, or otherwise prevent the holders from realizing the full current benefit of the status of the interest thereon. It cannot be predicted whether or in what form any such proposal may be enacted, or whether, if enacted, any such proposal would apply to the Series 2005 Bonds.

**Original Issue Discount**

Certain of the Series 2005 Bonds ("Discount Bonds") as indicated on the cover of this Limited Offering Memorandum were offered and sold to the public at an original issue discount ("OID"). OID is the excess of the stated redemption price at maturity (the principal amount) over the "issue price" of a Discount Bond. The issue price of a Discount Bond is the initial offering price to the public (other than to bond houses, brokers or similar persons acting in the capacity of underwriters or wholesalers) at which a substantial amount of the Discount Bonds of the same maturity is sold pursuant to that offering. For federal income tax purposes, OID accrues to the owner of a Discount Bond over the period to maturity based on the constant yield method, compounded semiannually (or over a shorter permitted compounding interval selected by the owner). The portion of OID that accrues during the period of ownership of a Discount Bond (i) is interest excludable from the owner's gross income for federal income tax purposes to the same extent, and subject to the same considerations discussed above, as other interest on the Series 2005 Bonds, and (ii)

is added to the owner's tax basis for purposes of determining gain or loss on the maturity, redemption, prior sale or other disposition of that Discount Bond. A purchaser of a Discount Bond in the initial public offering at the price for that Discount Bond stated on the cover of this Limited Offering Memorandum who holds that Discount Bond to maturity will realize no gain or loss upon the retirement of that Discount Bond.

Owners of Discount Bonds should consult their own tax advisers as to the determination for federal income tax purposes of the amount of OID properly accruable in any period with respect to the Discount Bonds and as to other federal tax consequences and the treatment of OID for purposes of state and local taxes on, or based on, income.

**Original Issue Premium**

The difference between the principal amount of certain of the Series 2005 as indicated on the cover of this Limited Offering Memorandum (the "Premium Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Premium Bonds of the same maturity was sold constitutes to an initial purchaser amortizable bond premium which is not deductible from gross income for Federal income tax purposes. The amount of amortizable bond premium for a taxable year is determined actuarially on a constant interest rate basis over the term of each Premium Bond (or, in the case of a Premium Bond callable prior to maturity, the amortization period and yield must be determined on the basis of the earliest call date that results in the lowest yield on the Premium Bonds). For purposes of determining gain or loss on the sale or other disposition of a Premium Bond, an initial offering price is required to decrease such purchaser's adjusted basis in such Premium Bond annually by the amount of amortizable bond premium for the taxable year. The amortization of bond premium may be taken into account as a reduction in the amount of tax-exempt income for purposes of determining various other tax consequences of owning such Premium Bonds. Owners of the Premium Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Premium Bonds.

## AGREEMENT BY THE STATE

Under the Act, the State pledges to the holders of any bonds issued thereunder, including the Series 2005 Bonds, that it will not limit or alter the rights of the District of such bonds to own, acquire, construct, reconstruct, improve, maintain, operate or furnish the projects subject to the Act or to levy and collect taxes, assessments, rentals, rates, fees, and other charges provided for in the Act and to fulfill the terms of any agreement made with the holders of such bonds and that it will not in any way impair the rights or remedies of such holders.

## LEGALITY FOR INVESTMENT

The Act provides that the Series 2005 Bonds are legal investments for savings banks, banks, trust companies, insurance companies, executors, administrators, trustees, guardians, and other fiduciaries, and for any board, body, agency, instrumentality, county, municipality or other political subdivision of the State, and constitute securities which may be deposited by banks or trust companies as security for deposits of state, county, municipal or other public funds, or by insurance companies as required for voluntary statutory deposits.

## SUITABILITY FOR INVESTMENT

In accordance with applicable provisions of the Uniform Special District Accountability Act of 1989, as amended, Chapter 189, Florida Statutes, the Series 2005 Bonds may be sold by the District only to

"accredited investors" within the meaning of Florida Securities and Investor Protection Act, as amended, Chapter 517, Florida Statutes, and the rules promulgated thereunder. Investment in the Series 2005 Bonds poses certain economic risks. See "BOND OWNER'S RISKS" herein. No dealer, broker, salesman or other person has been authorized by the District or the Underwriter to give any information or make any representations, other than those contained in this Limited Offering Memorandum. Additional information will be made available to each prospective investor, including the benefit of a site visit to the District, and the opportunity to ask questions of the Developers, as such prospective investor deems necessary in order to make an informed decision with respect to the purchase of the Series 2005 Bonds. Prospective investors are encouraged to request such additional information, visit the District and ask such questions. Such requests should be directed to the Underwriter at: 200 South Orange Avenue, Suite 1900, Orlando, Florida 32801, Telephone: 407/481-9182, Attention: Brett A. Sealy, Managing Director.

## DISCLOSURE REQUIRED BY FLORIDA BLUE SKY REGULATIONS

Section 517.051, Florida Statutes, and the regulations promulgated thereunder, requires that the District make a full and fair disclosure of any bonds or other debt obligations that it has issued or guaranteed and that are or have been in default as to principal or interest at any time after December 31, 1975 (including bonds or other debt obligations for which it has served only as a conduit issuer such as industrial development or private activity bonds issued on behalf of private businesses). The Series 2005 Bonds will be the first debt issued or guaranteed by the District. The District is not and has never been in default as to principal and interest on its bonds or other debt obligations.

## CONTINUING DISCLOSURE

The Act will require that financial statements of the District be audited by an independent certified public accountant at least once a year. The current fiscal year of the District commences October 1 and the audited financial statements are generally available within one hundred eighty (180) days after the end of each fiscal year. See "NO FINANCIAL STATEMENTS" herein. The Act further provides that the District's budget for the following fiscal year be adopted prior to October 1 of each year. Meetings of the Board are open to the public, and a proposed schedule of meetings for the year is published at the beginning of each calendar year. Notice of meetings and the agenda for meetings are published prior to each meeting.

The District covenants and agrees that it will comply with and carry out all of the provisions of the Continuing Disclosure Agreements, the form of which is attached hereto as Appendix E. Notwithstanding any other provisions of the Indenture, failure of the District to comply with a Continuing Disclosure Agreement shall not be considered an Event of Default; however, the Trustee may and, at the request of any Participating Underwriter (as defined in Rule 15c2-12 of the Securities and Exchange Commission) or the Beneficial Owners of at least 25% aggregate principal amount of the applicable Series of Outstanding Series 2005 Bonds, and receipt of indemnity satisfactory to the Trustee or any such Bond Owner may take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the District to comply with its obligations. The covenants contained in the Indenture and the Continuing Disclosure Agreements have been made in order to assist the Underwriter in complying with Securities Exchange Commission Rule 15c2-12(b)(5) (the "Rule"). The District has not failed, in any material respect, to comply with any continuing disclosure undertakings entered into pursuant to the Rule.

It is the current policy of the District to make the information referred to above available to requesting Owners or potential investors in the Series 2005 Bonds of the District. The District reserves the right to change this policy to comply with law, the requirements of the Securities and Exchange Commission or for any other reason in its sole discretion. Owners or potential investors requesting

information should contact the District office c/o Governmental Management Services, LLC, 14785-4 St. Augustine Road, Jacksonville, Florida 32258, and its telephone number is (904) 288-9130.

## ENFORCEABILITY OF REMEDIES

The remedies available to the Beneficial Owners of the Series 2005 Bonds upon an event of default under the Indenture are in many respects dependent upon judicial actions which are often subject to discretion and delay. Under existing constitutional and statutory law and judicial decisions, including the federal bankruptcy code, the remedies specified by the Indenture and the Series 2005 Bonds may not be readily available or may be limited. The various legal opinions to be delivered concurrently with the delivery of the Series 2005 Bonds will be qualified, as to the enforceability of the remedies provided in the various legal instruments, by limitations imposed by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors enacted before or after such delivery.

## LITIGATION

There is no litigation of any nature now pending or threatened restraining or enjoining the issuance, sale, execution or delivery of the Series 2005 Bonds, or in any way contesting or affecting the validity of the Series 2005 Bonds or any proceedings of the District taken with respect to the issuance or sale thereof, or the pledge or application of any moneys or security provided for the payment of the Series 2005 Bonds, or the existence or powers of the District.

There is no litigation pending, or to the knowledge of the Master Developer or the Durbin North Developer, threatened against the respective Developers that could in any way affect the issuance, sale or performance of the Development.

## NO RATINGS OR CREDIT ENHANCEMENT

No application for a rating on the Series 2005 Bonds has been made to any rating agency. The Series 2005 Bonds are not credit enhanced.

## NO FINANCIAL STATEMENTS

The District was established pursuant to Rule 42MM-1 and became effective November 5, 2003. The District is not required to prepare financial statements until such fiscal year as its revenues or the total of its expenditures and expenses exceed $100,000 or, if the District has revenues or the total of expenditures and expenses between $50,000 and $100,000 that has not been subject to a financial audit for the 2 preceding fiscal years. Therefore no financial statements for the District are available at this time.

## UNDERWRITING

Prager, Sealy & Co., LLC (the "Underwriter") has agreed pursuant to a contract with the District, subject to certain conditions, to purchase the Series 2005 Bonds from the District at a purchase price of $77,036,580.16, consisting of $78,320,000.00 par amount, less original issue discount (Series 2005B-1 and 2005B-2 Bonds, only) in the amount of $29,156.25, plus accrued interest from October 1, 2005 to the date of delivery of and payment therefor in the amount of $312,136.41, less the Underwriter's discount in the amount of $1,566,400.00. The Underwriter's obligations are subject to certain conditions precedent and the Underwriter will be obligated to purchase all of the Series 2005 Bonds if they are purchased. The Series 2005 Bonds may be offered and sold to certain dealers, banks and others at prices lower than the initial offering prices, and such initial offering prices may be changed from time to time by the Underwriter.

## VALIDATION

On April 27, 2004, the Circuit Court for St. Johns County, Florida validated the issuance by the District of not exceeding $120,000,000 in principal amount of its Special Assessment Bonds, the existence and legal authority of the District. The Series 2005 Bonds are included within the validated amount. The appeal period for this judgment has expired.

## EXPERTS

The references herein to England, Thims & Miller, Inc., as the District Engineer and the inclusion of the District Improvement Plan relating to the Series 2005 Project as "APPENDIX C — DISTRICT ENGINEER'S REPORTS" attached hereto has been approved by said firm. The District Engineer's Report should be read in its entirety for complete information with respect to the subjects discussed therein. The District Engineer also serves as the Master Developer's engineer and as the Durbin North Developer's engineer.

Fishkind & Associates, Inc., has served as Financial Consultant to the District with respect to the issuance and delivery of the Series 2005 Bonds. The Financial Consultant has also prepared "APPENDIX D — ASSESSMENT REPORT" attached hereto and its inclusion in this Limited Offering Memorandum is used with the permission of Fishkind.

## LEGAL MATTERS

Certain legal matters related to the authorization, sale and delivery of the Series 2005 Bonds are subject to the approval of Greenberg Traurig, P.A., Miami, Florida, Bond Counsel. Certain legal matters will be passed upon for the District by its counsel, Hopping Green & Sams, P.A., Tallahassee, Florida; for the Related LLCs who collectively constitute the Master Developer, by their counsel, Jeri Poller, P.A., Boca Raton, Florida, and Pappas, Metcalf, Jenks & Miller, P.A., Jacksonville, Florida, and for the Durbin North Developer, by its counsel, Pappas, Metcalf, Jenks & Miller, P.A., Jacksonville, Florida. Certain legal matters will be passed upon for the Trustee by its counsel, Holland & Knight, LLP, Miami, Florida. Certain legal matters will be passed upon for the Underwriter by its counsel, Squire, Sanders & Dempsey L.L.P., Miami and Tampa, Florida.

## CONTINGENT AND OTHER FEES

The District has retained Bond Counsel, District Counsel, the Financial Consultant, the Underwriter (who has retained Underwriter's Counsel) and the Trustee (who has retained Trustee's Counsel), with respect to the authorization, sale, execution and delivery of the Series 2005 Bonds. Payment of the fees of such professionals, except for the payment of fees to District Counsel and the Financial Consultant, are each contingent upon the issuance of the Series 2005 Bonds.

## MISCELLANEOUS

Any statements made in this Limited Offering Memorandum involving matters of opinion or of estimates, whether or not so expressly stated, are set forth as such and not as representations of fact, and no representation is made that any of the estimates will be realized. Neither this Limited Offering Memorandum nor any statement that may have been made verbally or in writing is to be construed as a contract with the holders of the Series 2005 Bonds.

The information and expression of opinion herein are subject to change without notice and neither the delivery of this Limited Offering Memorandum nor any sale made hereunder is to create, under any circumstances, any implication that there has been no change in the affairs of the District, the Developers or the Development from the date hereof.  However, certain parties to the transaction will, on the closing date of the Series 2005 Bonds, deliver certificates to the effect that nothing has come to their attention that would lead them to believe that applicable portions of the Limited Offering Memorandum contains an untrue statement of a material fact or omits to state a material fact that should be included herein for the purpose for which the Limited Offering Memorandum is intended to be used, or that is necessary to make the statements contained herein, in light of the circumstances under which they were made, not misleading and to the effect that from the date of the Limited Offering Memorandum to the date of closing of the Series 2005 Bonds that there has been no material adverse change in the information provided.

This Limited Offering Memorandum is submitted in connection with the sale of the securities referred to herein and may not be reproduced or used, as a whole or in part, for any other purpose.

The appendices hereof are integral parts of this Limited Offering Memorandum and must be read in their entirety together with all foregoing statements.

DURBIN CROSSING COMMUNITY
DEVELOPMENT DISTRICT


By:      /s/Patrick E. Sessions
         Patrick E. Sessions
         Chairman, Board of Supervisors

71