## Exhibit 4

**Series 2006-1 Bond Offering Circular**

NEW ISSUE — BOOK-ENTRY ONLY
LIMITED OFFERING

NOT RATED

*In the opinion of Bond Counsel, under existing statutes, regulations, rulings and court decisions, assuming continuing compliance with certain tax covenants and the accuracy of certain representations of the District, interest on the Series 2006 Bonds (as defined below) will be excludable from gross income for federal income tax purposes. Interest on the Series 2006 Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. See "TAX MATTERS" herein for a description of certain other federal tax consequences of ownership of the Series 2006 Bonds. Bond Counsel is further of the opinion that the Series 2006 Bonds will not be subject to taxation under the laws of the State of Florida except as to estate taxes and taxes imposed by Chapter 220, Florida Statutes, on interest, income or profits on debt obligations owned by corporations as defined in Chapter 220. For a more complete discussion of certain tax aspects relating to the Series 2006 Bonds, see "TAX MATTERS" herein.*

# DURBIN CROSSING COMMUNITY DEVELOPMENT DISTRICT
## (St. Johns County, Florida)

| $11,365,000 | $635,000 |
|---|---|
| **Special Assessment Bonds,** | **Impact Fee Bonds,** |
| **Series 2006-1** | **Series 2006-2** |

Dated: November 1, 2006

Due: As shown below

The $11,365,000 Durbin Crossing Community Development District (St. Johns County, Florida) Special Assessment Bonds, Series 2006-1 (the "Series 2006-1 Bonds") and $635,000 Durbin Crossing Community Development District (St. Johns County, Florida) Impact Fee Bonds, Series 2006-2 (the "Series 2006-2 Bonds"; collectively, with the Series 2006-1 Bonds, the "Series 2006 Bonds") are being issued by the Durbin Crossing Community Development District (the "District") only in fully registered form, without coupons, in denominations of $5,000 and integral multiples thereof; provided, however, that the Series 2006 Bonds will be deliverable to the initial purchasers only in denominations of $100,000 or integral multiple of $5,000 in excess of $100,000.

The District is a local unit of special purpose government of the State of Florida, created under and pursuant to the Uniform Community Development District Act of 1980, Chapter 190, Florida Statutes, as amended (the "Act") and established by Rule 42MM-1, Florida Administrative Code (the "Rule") adopted by the Florida Land and Water Adjudicatory Commission (the "Commission"), located within unincorporated St. Johns County, Florida (the "County"). The Series 2006 Bonds are being issued pursuant to the Act, resolutions adopted by the Board of Supervisors of the District (the "Board") and a Master Trust Indenture, dated as of October 1, 2005 (the "Master Indenture"), between the District and Wachovia Bank, National Association, as trustee, as supplemented by a Fourth Supplemental Trust Indenture, dated as of November 1, 2006, between the District and U.S. Bank National Association, as successor trustee under the Master Indenture (the "Trustee") with respect to the Series 2006-1 Bonds (the "Series 2006-1 Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2006-1 Indenture"), and as supplemented by a Fifth Supplemental Trust Indenture, dated as of November 1, 2006, between the District and the Trustee with respect to the Series 2006-2 Bonds (the "Series 2006-2 Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2006-2 Indenture"). The Series 2006-1 Indenture and the Series 2006-2 Indenture are sometimes individually referred to as one of the "Series 2006 Indentures" and collectively referred to as the "Indenture".

The Series 2006 Bonds will bear interest at the fixed rates set forth below, calculated on the basis of a 360-day year comprised of twelve 30-day months. Interest on the Series 2006-1 Bonds is payable semi-annually on each May 1 and November 1, commencing May 1, 2007, and interest on the Series 2006-2 Bonds is payable quarterly on each February 1, May 1, August 1 and November 1, commencing February 1, 2007. The Series 2006 Bonds, when issued, will be registered in the name of Cede & Co., as the registered owner and nominee for The Depository Trust Company ("DTC"), New York, New York. Purchases of beneficial interests in the Series 2006 Bonds will be made in book-entry only form. Accordingly, principal of and interest on the Series 2006 Bonds will be paid by the Trustee directly to Cede & Co. as the nominee of DTC and the registered owner thereof. Disbursements of such payments to the Direct Participants is the responsibility of DTC and disbursements of such payments to the beneficial owners is the responsibility of Direct Participants and the Indirect Participants, as more fully described herein. Any purchaser as a beneficial owner of a Bond must maintain an account with a broker or dealer who is, or acts through, a Direct Participant to receive payment of the principal of and interest on such Bond. See "DESCRIPTION OF THE SERIES 2006 BONDS — Book-Entry Only System" herein.

The Series 2006-1 Bonds will be equally and ratably secured under the Series 2006-1 Indenture by a lien upon and pledge of the revenues derived from the non-ad valorem special assessments (the "Series 2006-1 Special Assessments") levied upon the respective lands within the District specially benefited by the infrastructure improvements to be acquired, constructed and equipped by the District in part from the proceeds of the Series 2006 Bonds (as more particularly described under "THE SERIES 2006 PROJECT" herein and "APPENDIX A — DISTRICT ENGINEER'S REPORTS" hereto), and certain impact fee revenues as more particularly described under "IMPACT FEES" herein. The Series 2006-1 Bonds are secured by the Series 2006-1 Special Assessments, by a pledge of a portion of such impact fees and by moneys on deposit in the Funds and Accounts under the Series 2006-1 Indenture (the "Series 2006-1 Pledged Revenues").

The Series 2006-2 Bonds will be equally and ratably secured under the Series 2006-2 Indenture by a lien upon and pledge of certain impact fee revenues as more particularly described under "SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2006 BONDS — Series 2006-2 Bonds" and "IMPACT FEES" herein. The Series 2006-2 Bonds are secured by such impact fee revenues and by moneys on deposit in the Funds and Accounts under the Series 2006-2 Indenture (the "Series 2006-2 Pledged Revenues"; collectively, with the Series 2006-1 Pledged Revenues, the "Pledged Revenues"). No Series of the Series 2006 Bonds is secured by the Pledged Revenues securing the other Series. The Pledged Revenues exclude in each instance moneys transferred to the respective Series 2006 Rebate Fund and investment earnings thereon and special assessments levied and collected for maintenance purposes or maintenance special assessments as provided in the Act.

The Series 2006 Bonds are not subject to optional redemption or mandatory sinking fund redemption prior to maturity, but are subject to extraordinary mandatory redemption at the times, in the amounts and at the redemption prices as more fully described herein under the caption "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions" herein.

Each Series of the Series 2006 Bonds is being issued to provide funds for (i) the payment of a portion of the cost of acquisition, construction, installation and equipping the Series 2006 Project, (ii) the payment of a portion of the interest to come due on such Series of Series 2006 Bonds, (iii) the funding of the respective Series 2006-1 or Series 2006-2 Debt Service Reserve Accounts, and (iv) the payment of the costs of issuance of the Series 2006 Bonds.

THE SERIES 2006 BONDS ARE LIMITED OBLIGATIONS OF THE DISTRICT PAYABLE SOLELY OUT OF THE RESPECTIVE PLEDGED REVENUES PLEDGED THEREFOR UNDER THE MASTER INDENTURE AND IN THE RESPECTIVE SUPPLEMENTAL INDENTURE AUTHORIZING SUCH SERIES OF SERIES 2006 BONDS, AND NEITHER THE PROPERTY, THE FULL FAITH AND CREDIT, NOR THE TAXING POWER OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED AS SECURITY FOR THE PAYMENT OF THE SERIES 2006 BONDS, EXCEPT THAT THE DISTRICT IS OBLIGATED UNDER THE SERIES 2006-1 INDENTURE TO LEVY, AND TO EVIDENCE AND CERTIFY, OR CAUSE TO BE CERTIFIED, FOR COLLECTION, THE SERIES 2006-1 SPECIAL ASSESSMENTS (AS DEFINED IN THE SERIES 2006-1 INDENTURE) TO SECURE AND PAY THE SERIES 2006-1 BONDS. THE SERIES 2006 BONDS DO NOT CONSTITUTE AN INDEBTEDNESS OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISION OR LIMITATION.

NO APPLICATION HAS BEEN MADE FOR A RATING WITH RESPECT TO THE SERIES 2006 BONDS. PURSUANT TO APPLICABLE FLORIDA LAW, THE UNDERWRITER IS LIMITING THIS INITIAL OFFERING OF THE SERIES 2006 BONDS TO ONLY ACCREDITED INVESTORS WITHIN THE MEANING OF THE RULES OF THE FLORIDA DEPARTMENT OF FINANCIAL SERVICES. THE LIMITATION ON THE INITIAL OFFERING TO ACCREDITED INVESTORS DOES NOT DENOTE RESTRICTIONS ON TRANSFER IN ANY SECONDARY MARKET FOR THE SERIES 2006 BONDS.

This cover page contains information for quick reference only. It is not a summary of the Series 2006 Bonds. Investors must read the entire Limited Offering Memorandum to obtain information essential to the making of an informed investment decision.

## MATURITY SCHEDULE

$11,365,000  5.250%  Series 2006-1 Term Bond due November 1, 2015  (Price: 100%)  CUSIP No. 266601 AD 5*
$635,000  5.500%  Series 2006-2 Term Bond due November 1, 2011  (Price: 100%)  CUSIP No. 266600 AA 3*
(Plus accrued interest from November 1, 2006)

*The Series 2006 Bonds are offered for delivery when, as and if issued by the District and accepted by the Underwriter, subject to the receipt of the opinion of legality by Greenberg Traurig, P.A., Miami, Florida, Bond Counsel, as to the validity of the Series 2006 Bonds and the excludability of interest thereon from gross income for federal income tax purposes. Certain legal matters will be passed upon for the Underwriter by its counsel, Squire, Sanders & Dempsey L.L.P., Miami and Tampa, Florida; for the District by its counsel, Hopping Green & Sams, P.A., Tallahassee, Florida; for the Master Developer (as defined herein) by its counsel, Jeri Poller, P.A., Boca Raton, Florida, and Pappas, Metcalf, Jenks & Miller, P.A., Jacksonville, Florida, and for the Durbin North Developer (as defined herein) by its counsel, Pappas, Metcalf, Jenks & Miller, P.A., Jacksonville, Florida, and for the Trustee by its counsel, Holland & Knight, LLP, Miami, Florida. It is expected that the Series 2006 Bonds will be delivered in book-entry form through the facilities of The Depository Trust Company, New York, New York on or about November 29, 2006.*

## PRAGER, SEALY & CO., LLC

Dated: November 16, 2006

---

\* The District shall not be responsible for the use of CUSIP numbers, nor is any representation made as to their correctness. They are included solely for the convenience of the readers of this Limited Offering Memorandum.

**DURBIN CROSSING COMMUNITY DEVELOPMENT DISTRICT**

### BOARD OF SUPERVISORS

Patrick E. Sessions, Chairman
Jason R. Sessions, Vice Chairman
Scott Henley, Supervisor and Assistant Secretary
Kenneth Strauss, Supervisor and Assistant Secretary
Susan Wood, Supervisor and Assistant Secretary

### DISTRICT MANAGER

Governmental Management Services, LLC
St. Augustine, Florida

### DISTRICT COUNSEL

Hopping Green & Sams, P.A.
Tallahassee, Florida

### BOND COUNSEL

Greenberg Traurig, P.A.
Miami, Florida

### FINANCIAL CONSULTANT TO THE DISTRICT

Fishkind and Associates, Inc.
Orlando, Florida

### DISTRICT ENGINEER

England, Thims & Miller, Inc.
Jacksonville, Florida

## REGARDING USE OF THIS LIMITED OFFERING MEMORANDUM

No broker, dealer, salesperson, or other person has been authorized by the District or the Underwriter (as defined herein) to give any information or to make any representations, other than those contained in this Limited Offering Memorandum, and if given or made, such other information or representations must not be relied upon as having been authorized by either of the foregoing. This Limited Offering Memorandum does not constitute an offer to sell or the solicitation of an offer to buy any of the Series 2006 Bonds and there shall be no offer, solicitation, or sale of the Series 2006 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

The Underwriter has provided the following sentence for inclusion in this Limited Offering Memorandum. The Underwriter has reviewed the information in this Limited Offering Memorandum in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy or completeness of such information.

CERTAIN STATEMENTS INCLUDED OR INCORPORATED BY REFERENCE IN THIS LIMITED OFFERING MEMORANDUM CONSTITUTE "FORWARD LOOKING STATEMENTS". SUCH STATEMENTS GENERALLY ARE IDENTIFIABLE BY THE TERMINOLOGY USED, SUCH AS "PLAN", "EXPECT", "ESTIMATE", "BUDGET" OR OTHER SIMILAR WORDS. SUCH FORWARD LOOKING STATEMENTS INCLUDE BUT ARE NOT LIMITED TO CERTAIN STATEMENTS CONTAINED IN THE INFORMATION UNDER THE CAPTIONS "ESTIMATED SOURCES AND USES OF BOND PROCEEDS", "THE SERIES 2006 PROJECT", "THE MASTER DEVELOPER", "THE DURBIN NORTH DEVELOPER" AND "THE DEVELOPMENT" IN THIS LIMITED OFFERING MEMORANDUM. THE ACHIEVEMENT OF CERTAIN RESULTS OR OTHER EXPECTATIONS CONTAINED IN SUCH FORWARD LOOKING STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS THAT MAY CAUSE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS DESCRIBED TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD LOOKING STATEMENTS. NEITHER THE MASTER DEVELOPER (as defined herein) OR THE DURBIN NORTH DEVELOPER (as defined herein) OR THE DISTRICT PLAN TO ISSUE ANY UPDATES OR REVISIONS TO THOSE FORWARD LOOKING STATEMENTS IF OR WHEN ITS EXPECTATIONS OR EVENTS, CONDITIONS OR CIRCUMSTANCES ON WHICH SUCH STATEMENTS ARE BASED OCCUR, SUBJECT TO ANY CONTRACTUAL OR LEGAL RESPONSIBILITIES TO THE CONTRARY.

The information and expressions of opinion herein contained are subject to change without notice and neither the delivery of this Limited Offering Memorandum, nor any sale made hereunder, shall, under any circumstances, create any implication that there has been no change in the affairs of the District, the Master Developer or the Durbin North Developer since the date hereof.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITER MAY OVERALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE SERIES 2006 BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

THE SERIES 2006 BONDS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, NOR HAS THE INDENTURE BEEN QUALIFIED UNDER THE TRUST INDENTURE ACT OF 1939. THE REGISTRATION OR QUALIFICATION OF THE SERIES 2006 BONDS UNDER

THE SECURITIES LAWS OF ANY JURISDICTIONS IN WHICH THEY MAY HAVE BEEN REGISTERED OR QUALIFIED, IF ANY, SHALL NOT BE REGARDED AS A RECOMMENDATION THEREOF.  NEITHER THE STATE OF FLORIDA (THE "STATE"), ST. JOHNS COUNTY (THE "COUNTY"), THE DISTRICT, NOR ANY OF THEIR AGENCIES HAVE PASSED UPON THE MERITS OF THE SERIES 2006 BONDS.  THE DISTRICT HAS PASSED UPON THE ACCURACY AND FACTUAL COMPLETENESS OF THIS LIMITED OFFERING MEMORANDUM, OTHER THAN THOSE SECTIONS CAPTIONED "INTRODUCTION" (IN SO FAR AS SUCH DESCRIPTION RELATES TO THE MASTER DEVELOPER OR THE DURBIN NORTH DEVELOPER), "DESCRIPTION OF THE SERIES 2006 BONDS — BOOK-ENTRY ONLY SYSTEM", "THE DISTRICT — THE DISTRICT MANAGER", "THE MASTER DEVELOPER", "THE DURBIN NORTH DEVELOPER", "THE DEVELOPMENT", "TAX MATTERS;" AND "LITIGATION" (IN SO FAR AS SUCH DESCRIPTION RELATES TO THE MASTER DEVELOPER OR THE DURBIN NORTH DEVELOPER); HOWEVER, NEITHER THE STATE, THE COUNTY, NOR ANY OF THEIR AGENCIES HAVE PASSED UPON THE ACCURACY OR COMPLETENESS OF THIS LIMITED OFFERING MEMORANDUM.

THIS LIMITED OFFERING MEMORANDUM SHALL NOT CONSTITUTE A CONTRACT BETWEEN THE DISTRICT OR THE UNDERWRITER AND ONE OR MORE OWNERS OF THE SERIES 2006 BONDS DESCRIBED HEREIN.

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................................1

DESCRIPTION OF THE SERIES 2006 BONDS ........................................................................4

    General Description ...............................................................................................4
    Redemption Provisions ..........................................................................................5
    Notice of Redemption ............................................................................................7
    Partial Redemption of Series 2006 Bonds .............................................................8
    Purchase of Series 2006 Bonds .............................................................................8
    Book-Entry Only System .......................................................................................8

ESTIMATED SOURCES AND USES OF BOND PROCEEDS .................................................11

DEBT SERVICE REQUIREMENTS FOR SERIES 2006-1 BONDS .....................................12

DEBT SERVICE REQUIREMENTS FOR SERIES 2006-2 BONDS .....................................12

SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2006 BONDS ...........13

    Series 2006-1 Bonds ...........................................................................................13
    Series 2006-2 Bonds ...........................................................................................14
    No Parity Bonds ..................................................................................................15
    Enforcement of Payment of Series 2006-1 Special Assessments ..........................16
    Prepayment of Series 2006-1 Special Assessments ..............................................16
    Adjustments to Series 2006-1 Special Assessments .............................................16
    Re-Assessments ...................................................................................................17

ENFORCEMENT OF SERIES 2006-1 SPECIAL ASSESSMENT COLLECTIONS ............17

    Collection Procedures .........................................................................................17
    Judicial Proceedings............................................................................................18
    Method of Collection by District for Series 2006-1 Special Assessments .............18

IMPACT FEES .............................................................................................................................18

    General ...............................................................................................................18
    Impact Fee Agreements .......................................................................................19
    Impact Fee Schedule ...........................................................................................20

SERIES 2006-1 FUNDS AND ACCOUNTS .............................................................................21

    Acquisition and Construction Fund .....................................................................21
    Debt Service Fund ..............................................................................................22
    Debt Service Reserve Fund..................................................................................23
    Bond Redemption Fund.......................................................................................25
    Revenue Fund .....................................................................................................26
    Renewal and Replacement Fund..........................................................................27
    Rebate Fund ........................................................................................................28
    Disposition of Remaining Moneys .......................................................................28

SERIES 2006-2 FUNDS AND ACCOUNTS .............................................................................28

    Acquisition and Construction Fund .....................................................................28
    Debt Service Fund ..............................................................................................29

**Page**

    Debt Service Reserve Fund................................................................30
    Bond Redemption Fund....................................................................32
    Revenue Fund................................................................................32
    Rebate Fund..................................................................................33
    Disposition of Remaining Moneys .....................................................34

INVESTMENTS.....................................................................................34

BONDHOLDERS' RISKS ........................................................................38

THE DISTRICT .....................................................................................43
    General ........................................................................................43
    Powers .........................................................................................43
    Board of Supervisors......................................................................44
    The District Manager ......................................................................45

THE SERIES 2006 PROJECT ...................................................................45

THE MASTER DEVELOPER ....................................................................46
    P. E. Sessions & Associates, Inc.......................................................47
    Resumes .......................................................................................48

THE DURBIN NORTH DEVELOPER .........................................................50

THE DEVELOPMENT .............................................................................52
    General ........................................................................................52
    Land Acquisition............................................................................53
    Development Entitlements.................................................................53
    Land Use/Development Plan .............................................................55
    District Infrastructure and Finance Plan ..............................................57
    Road and Park Impact Fee Credit Agreement .......................................58
    Impact Fees and Impact Fee Credits ...................................................58
    Assessment Area............................................................................59
    Residential Product Offerings............................................................59
    Recreational and Lifestyle Amenities ..................................................60
    Education .....................................................................................60
    Land Sale to Durbin North Developer .................................................61
    Builder Contracts ...........................................................................62
    Projected Absorption ......................................................................64
    Marketing.....................................................................................64
    Fees and Assessments .....................................................................65
    Competition ..................................................................................67

ASSESSMENT METHODOLOGY ..............................................................70

TAX MATTERS .....................................................................................70
    General .........................................................................................70

AGREEMENT BY THE STATE .................................................................71

LEGALITY FOR INVESTMENT................................................................71

SUITABILITY FOR INVESTMENT ............................................................71

**Page**

DISCLOSURE REQUIRED BY FLORIDA BLUE SKY REGULATIONS .......................................... 72

CONTINUING DISCLOSURE ........................................................................................................ 72

ENFORCEABILITY OF REMEDIES .............................................................................................. 72

LITIGATION ................................................................................................................................... 73

NO RATINGS OR CREDIT ENHANCEMENT ............................................................................. 73

FINANCIAL STATEMENTS .......................................................................................................... 73

UNDERWRITING ........................................................................................................................... 73

VALIDATION .................................................................................................................................. 73

EXPERTS ........................................................................................................................................ 74

LEGAL MATTERS .......................................................................................................................... 74

CONTINGENT AND OTHER FEES ............................................................................................... 74

MISCELLANEOUS ......................................................................................................................... 74

APPENDIX A:      DISTRICT ENGINEER'S REPORTS
APPENDIX B:      SPECIAL ASSESSMENT REPORTS
APPENDIX C:      COMPOSITE OF MASTER TRUST INDENTURE AND FORMS OF FOURTH
                          SUPPLEMENTAL TRUST INDENTURE AND FIFTH SUPPLEMENTAL
                          TRUST INDENTURE
APPENDIX D:      FORM OF OPINIONS OF BOND COUNSEL
APPENDIX E:      FORM OF CONTINUING DISCLOSURE AGREEMENT
APPENDIX F:      FORM OF PREPAID IMPACT FEE CREDIT AGREEMENT
APPENDIX G:      AUDITED FINANCIAL STATEMENTS OF THE DISTRICT FOR FISCAL
                          YEAR ENDED SEPTEMBER 30, 2005

[THIS PAGE INTENTIONALLY LEFT BLANK]

## DURBIN CROSSING COMMUNITY DEVELOPMENT DISTRICT
### (St. Johns County, Florida)

<table>
<tr><td align="center">$11,365,000<br>**Special Assessment Bonds,**<br>**Series 2006-1**</td><td align="center">$635,000<br>**Impact Fee Bonds,**<br>**Series 2006-2**</td></tr>
</table>

## INTRODUCTION

The purpose of this Limited Offering Memorandum, including the cover page and appendices hereto, is to set forth certain information in connection with the offering and issuing by the Durbin Crossing Community Development District (the "District") of its $11,365,000 Durbin Crossing Community Development District Special Assessment Bonds, Series 2006-1 (the "Series 2006-1 Bonds") and $635,000 Durbin Crossing Community Development District Impact Fee Bonds, Series 2006-2 (the "Series 2006-2 Bonds"; collectively, with the Series 2006-1 Bonds, the "Series 2006 Bonds"). The District was created under and pursuant to the Uniform Community Development District Act of 1980, Chapter 190, Florida Statutes, as amended (the "Act") and established pursuant to Rule 42MM-1, Florida Administrative Code (the "Rule"), adopted by the Florida Land and Water Adjudicatory Commission (the "Commission"), effective November 5, 2003.

The Series 2006 Bonds are being issued pursuant to the Act, Resolution No. 2004-20, adopted by the Board of Supervisors (the "Board") of the District on February 24, 2004, and Resolution No. 2007-01, adopted on October 24, 2006 (collectively, the "Bond Resolution"), a Master Trust Indenture, dated as of October 1, 2005 (the "Master Indenture"), between the District and Wachovia Bank, National Association, as trustee, as supplemented by a Fourth Supplemental Trust Indenture, dated as of November 1, 2006, between the District and U.S. Bank National Association, as successor trustee under the Master Indenture (the "Trustee") with respect to the Series 2006-1 Bonds (the "Series 2006-1 Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2006-1 Indenture"), and as supplemented by a Fifth Supplemental Trust Indenture, dated as of November 1, 2006, between the District and the Trustee with respect to the Series 2006-2 Bonds (the "Series 2006-2 Supplemental Indenture"; collectively, with the Master Indenture, the "Series 2006-2 Indenture"). The Series 2006-1 Indenture and the Series 2006-2 Indenture are sometimes individually referred to as one of the "Series 2006 Indentures" and collectively referred to as the "Indenture". All capitalized terms used in this Limited Offering Memorandum that are defined in a Series 2006 Indenture and not defined herein shall have the respective meanings set forth in such Series 2006 Indenture. See "APPENDIX C — COMPOSITE OF MASTER TRUST INDENTURE AND FORMS OF FOURTH SUPPLEMENTAL TRUST INDENTURE AND FIFTH SUPPLEMENTAL TRUST INDENTURE" attached hereto.

THE SERIES 2006 BONDS ARE NOT RATED OR CREDIT ENHANCED, AND ARE NOT A SUITABLE INVESTMENT FOR ALL INVESTORS. See "SUITABILITY FOR INVESTMENT" and "BONDHOLDERS' RISKS" herein. The Underwriter is limiting the offering of the Series 2006 Bonds to Accredited Investors within the meaning of the rules of the Florida Department of Financial Services. Such limitation regarding the initial offering does not denote restrictions on transfer in any secondary market for the Series 2006 Bonds. Other than as referenced in the section captioned "SUITABILITY FOR INVESTMENT" herein, no person has been authorized by the District or the Underwriter to give any information or to make any representations, other than those contained in this Limited Offering Memorandum, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing.

The District was established on November 5, 2003, under the provisions of the Act for the purpose of, among other things, financing and managing the acquisition, construction, maintenance and operation of the major infrastructure within and outside the boundaries of the District for community development. The Act authorizes the District to issue special assessment bonds and revenue bonds for the purpose of financing the cost of acquiring and constructing assessable improvements (as defined in the Act), to levy and collect special assessments therefor as provided by Chapter 170, Florida Statutes, as amended and to levy and collect user charges and fees therefor as provided in Section 190.011, Florida Statutes, as amended. Section 190.012(2)(a) of the Act also authorizes the District to acquire and construct recreational facilities with the consent of the St. Johns County Board of County Commissioners. The District has the power and authority under the Act to issue revenue bonds and to use the proceeds thereof to finance the cost of acquiring and constructing water management and control facilities (as defined in the Act) and, by virtue of Section 190.021 of the Act, to levy and collect Special Assessments and Maintenance Special Assessments therefor.

The District is located in northwest unincorporated St. Johns County, Florida (the "County"), approximately twenty miles south of downtown Jacksonville and fifteen miles northwest of historic St. Augustine and incorporates the 2,047-acre Durbin Crossing Development of Regional Impact (the "Durbin Crossing DRI"). The boundaries of Durbin Crossing (the "Development") are coterminus with the boundaries of the Durbin Crossing DRI. The Development is a master-planned residential community currently planned for 1,518 single-family units, 997 multi-family units, 170,000 square feet of commercial/office, recreational facilities and a future elementary school. See "THE DEVELOPMENT" herein.

The Series 2006 Bonds are collectively, the fourth and fifth series of securities issued by the District. The Series 2006 Bonds are being issued to: (i) pay a portion of the costs of the Series 2006 Project (as defined herein), (ii) pay interest on the Series 2006 Bonds through May 1, 2008, (iii) fund the Series 2006 Debt Service Reserve Accounts, and (iv) pay the costs of issuance of the Series 2006 Bonds. See "THE SERIES 2006 PROJECT", "ESTIMATED SOURCES AND USES OF BOND PROCEEDS" herein and "APPENDIX A — DISTRICT ENGINEER'S REPORTS" attached hereto.

The Series 2006-1 Bonds will be equally and ratably secured under the Series 2006-1 Indenture by a lien upon and pledge of (i) the revenues derived from the non-ad valorem special assessments (the "Series 2006-1 Special Assessments") levied upon the lands within the District specially benefited by the master infrastructure improvements to be acquired, constructed and equipped by the District in part from the proceeds of the Series 2006-1 Bonds (the "Series 2006 Project"), (ii) a portion of the impact fees (the "Impact Fee Revenues") collected by the District, (iii) after the Series 2006-2 Bonds have been paid in full and all amounts owing under the Series 2006-2 Indenture have been paid, all Impact Fee Revenues that had been pledged to the Series 2006-2 Bonds, and (iv) all moneys on deposit in the Funds and Accounts established under the Series 2006-1 Indenture (except for moneys deposited in the Series 2006-1 Rebate Account and the Renewal and Replacement Fund and assessments levied and collected for maintenance purposes and maintenance special assessments under the Act as provided in the Series 2006-1 Indenture) (collectively, the "Series 2006-1 Pledged Revenues"). THE SERIES 2006-1 BONDS ARE NOT SECURED BY THE SERIES 2006-2 PLEDGED REVENUES SECURING THE SERIES 2006-2 BONDS, AND A DEFAULT UNDER THE SERIES 2006-2 BONDS IS NOT A DEFAULT UNDER THE SERIES 2006-1 BONDS.

The Series 2006-2 Bonds will be equally and ratably secured under the Series 2006-2 Indenture by a lien upon and pledge of the Impact Fee Revenues exclusive of that portion which the District has directed to be applied to extinguishment of the Series 2006-1 Special Assessments and all moneys on deposit in the Funds and Accounts established under the Series 2006-2 Indenture (except for moneys deposited in the Series 2006-2 Rebate Account and assessments levied and collected for maintenance purposes and

2

maintenance special assessments under the Act as provided in the Series 2006-2 Indenture) (collectively, the "Series 2006-2 Pledged Revenues"). THE SERIES 2006-2 BONDS ARE NOT SECURED BY THE SERIES 2006-1 PLEDGED REVENUES SECURING THE SERIES 2006-1 BONDS, AND A DEFAULT UNDER THE SERIES 2006-1 BONDS IS NOT A DEFAULT UNDER THE SERIES 2006-2 BONDS.

The District has covenanted not to issue or incur any obligations payable on a parity from the proceeds of Series 2006-1 Special Assessments levied in connection with the Series 2006-1 Bonds or the Impact Fee Revenues securing a portion of the Series 2006-1 Bonds and the Series 2006-2 Bonds nor to voluntarily create or cause to be created any debt, lien, pledge, assignment, encumbrance or other charge upon the Series 2006-1 Special Assessments or the Impact Fee Revenues except for fees, commissions, costs, and other charges payable to the Property Appraiser or to the Tax Collector pursuant to State law. The District may however levy assessments on the same real property which is encumbered by the Series 2006-1 Special Assessments. See "SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2006 BONDS", "ENFORCEMENT OF SERIES 2006-1 SPECIAL ASSESSMENT COLLECTIONS" and "ASSESSMENT METHODOLOGY FOR THE SERIES 2006 PROJECT" herein.

In addition, the District and/or other public entities may impose taxes or other assessments on the same properties encumbered by the Series 2006-1 Special Assessments without the consent of the Owners of the Series 2006 Bonds. The District anticipates levying maintenance assessments, which are non-ad valorem special assessments that will encumber the same lands encumbered by the Series 2006-1 Special Assessments to fund the maintenance and operation of the District. See "BONDHOLDERS' RISKS" herein.

The District has covenanted in the Indenture to comply with the continuing disclosure requirements contained in Securities and Exchange Commission Rule 15c2-12. See "CONTINUING DISCLOSURE" herein and "APPENDIX E — FORM OF CONTINUING DISCLOSURE AGREEMENT" hereto.

There follows in this Limited Offering Memorandum a brief description of the District, the Series 2006 Project, the Development, the Master Developer and the Durbin North Developer, together with summaries of the terms of the Series 2006 Bonds, the Indenture and certain provisions of the Act. All references herein to the Indenture and the Act are qualified in their entirety by reference to such documents and all references to the Series 2006 Bonds are qualified by reference to the definitive forms thereof and the information with respect thereto contained in the Indenture. The Master Indenture and the forms of Supplemental Indentures are set forth in Appendix C hereto. The information herein under the captions "THE MASTER DEVELOPER", "THE DURBIN NORTH DEVELOPER" and "THE DEVELOPMENT" has been furnished by the Master Developer and the Durbin North Developer and has been included herein without independent investigation by the District, and neither the District nor the Underwriter makes any representation or warranty concerning the accuracy or completeness of such information. The Master Developer and the Durbin North Developer make no representation or warranty as to the accuracy or completeness of information contained herein which has been furnished by any other party to the transactions contemplated hereby.

This Limited Offering Memorandum speaks only as of its date and the information contained herein is subject to change.

## DESCRIPTION OF THE SERIES 2006 BONDS

**General Description**

The Series 2006 Bonds are issuable as fully registered bonds, without coupons, in the denomination of $5,000 or any integral multiple thereof; provided, however, that the Series 2006 Bonds will be deliverable to the initial purchasers only in aggregate principal amounts of $100,000 or integral multiples of $5,000 in excess of $100,000. The Series 2006 Bonds will be sold only to Accredited Investors, as such term is defined in the Rules of the Florida Department of Financial Services; however, the limitation of the initial offering to Accredited Investors does not denote restrictions on transfer in any secondary market for the Series 2006 Bonds.

The Series 2006 Bonds will be dated November 1, 2006. Interest on the Series 2006-1 Bonds is due and payable on each May 1 and November 1 (each, with respect to the Series 2006-1 Bonds, an "Interest Payment Date"), commencing May 1, 2007, to maturity or prior redemption, and interest on the Series 2006-2 Bonds is due and payable on each February 1, May 1, August 1 and November 1 (each, with respect to the Series 2006-2 Bonds, an "Interest Payment Date"), commencing February 1, 2007, to maturity or prior redemption. Interest on the Series 2006 Bonds shall be payable from the most recent Interest Payment Date next preceding the date of authentication thereof to which interest has been paid, unless the date of authentication thereof is an Interest Payment Date to which interest has been paid, in which case from such date of authentication, or unless the date of authentication thereof is prior to the first Interest Payment Date, in which case from November 1, 2006, or unless the date of authentication thereof is between a Record Date and the next succeeding Interest Payment Date, in which case from such Interest Payment Date. Interest on the Series 2006 Bonds will be computed in all cases at the applicable rate or rates set forth on the cover page hereof on the basis of a 360-day year of twelve 30-day months.

The Series 2006 Bonds will be and have all the qualities and incidents of investment securities under the laws of the State of Florida.

The Series 2006 Bonds will be initially issued in the form of a single fully registered certificate for each Series and maturity thereof. Upon initial issuance, the ownership of the Series 2006 Bonds will be registered in the registration books kept by the Trustee in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), the initial bond depository, who is responsible for establishing and maintaining records of ownership for its participants. See "DESCRIPTION OF THE SERIES 2006 BONDS — Book-Entry Only System" herein. Except as provided under the Indenture, all of the Outstanding Series 2006 Bonds shall be registered in the registration books kept by the Registrar in the name of Cede & Co., as nominee of DTC

The Indenture provides that with respect to Series 2006 Bonds registered in the registration books kept by the Registrar in the name of Cede & Co., as nominee of DTC, the District, the Trustee, the Registrar and the Paying Agent will have no responsibility or obligation to any DTC Participant (as defined in the Indenture) or to any Indirect Participant (as defined in the Indenture). The District, the Trustee, the Registrar and the Paying Agent will treat and consider the person in whose name each Series 2006 Bond is registered in the registration books kept by the Registrar as the absolute owner of such Series 2006 Bond for the purpose of receiving payment of or on account of the principal of and interest on such Series 2006 Bond, and for all other purposes, including for the purpose of giving notices of redemption and other matters with respect to such Series 2006 Bond and for the purpose of registering transfers with respect to such Series 2006 Bond.

4

The Paying Agent will pay all principal of and premium, if any, and interest on the Series 2006 Bonds only to or upon the order of the respective Owners, as shown in the registration books kept by the Registrar, or their respective attorneys duly authorized in writing, as provided in the Indenture, and all such payments will be valid and effective to fully satisfy and discharge the District's obligations with respect to payment of principal of, premium, if any, and interest on the Series 2006 Bonds of such Series to the extent of the sum or sums so paid. No person other than an Owner, as shown in the registration books kept by the Registrar, will receive a certificated Series 2006 Bond evidencing the obligation of the District to make payments of principal, premium, if any, and interest pursuant to the provisions of the Indenture.

U.S. Bank National Association is the initial Trustee, Registrar and Paying Agent for the Series 2006 Bonds.

THE SERIES 2006 BONDS ARE LIMITED OBLIGATIONS OF THE DISTRICT PAYABLE SOLELY OUT OF THE RESPECTIVE PLEDGED REVENUES PLEDGED THEREFOR UNDER THE MASTER INDENTURE AND IN THE RESPECTIVE SUPPLEMENTAL INDENTURE AUTHORIZING SUCH SERIES OF SERIES 2006 BONDS, AND NEITHER THE PROPERTY, THE FULL FAITH AND CREDIT, NOR THE TAXING POWER OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED AS SECURITY FOR THE PAYMENT OF THE SERIES 2006 BONDS, EXCEPT THAT THE DISTRICT IS OBLIGATED UNDER THE SERIES 2006-1 INDENTURE TO LEVY, AND TO EVIDENCE AND CERTIFY, OR CAUSE TO BE CERTIFIED, FOR COLLECTION, THE SERIES 2006-1 SPECIAL ASSESSMENTS (AS DEFINED IN THE SERIES 2006-1 INDENTURE) TO SECURE AND PAY THE SERIES 2006-1 BONDS. THE SERIES 2006 BONDS DO NOT CONSTITUTE AN INDEBTEDNESS OF THE DISTRICT, ST. JOHNS COUNTY, FLORIDA, THE STATE OF FLORIDA, OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISION OR LIMITATION.

**Redemption Provisions**

*Optional Redemption*. The Series 2006-1 Bonds and the Series 2006-2 Bonds are not subject to redemption prior to maturity at the option of the District.

*Mandatory Sinking Fund Redemption*. The Series 2006-1 Bonds and the Series 2006-2 Bonds are not subject to redemption from sinking fund redemptions prior to maturity.

*Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part*. The Series 2006-1 Bonds are subject to extraordinary mandatory redemption prior to maturity by the District in whole, on any date, or in part, on any Quarterly Redemption Date commencing February 1, 2007, at a redemption price equal to 100% of the principal amount of the Series 2006-1 Bonds to be redeemed, plus interest accrued to the redemption date, as follows:

(i)     on or after the Completion Date of the Series 2006 Project, after payment of Deferred Costs, if any, by application of moneys transferred from the Series 2006-1 Acquisition and Construction Account of the Acquisition and Construction Fund not reserved by the District for the payment of any remaining part of the Cost of the Series 2006 Project and/or Deferred Costs (see "SERIES 2006-1 FUNDS AND ACCOUNTS — Acquisition and Construction Fund" herein), to the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account in accordance with the Series 2006-1 Indenture,

(ii)     on or after May 1, 2008, if such date is after the Completion Date of the Series 2006
        Project, after payment of Deferred Costs, if any, by application of any moneys transferred
        from the Series 2006-1 Capitalized Interest Subaccount established under the Series
        2006-1 Indenture (see "SERIES 2006-1 FUNDS AND ACCOUNTS — Revenue Fund —
        Series 2006-1 Capitalized Interest Subaccount" herein), to the Series 2006-1 General
        Redemption Subaccount of the Series 2006-1 Bond Redemption Account in accordance
        with the Series 2006-1 Indenture,

(iii)    from Prepayment Principal deposited into the Series 2006-1 Prepayment Subaccount under
        the Series 2006-1 Bond Redemption Account following the Prepayment in whole or in part
        of Series 2006-1 Special Assessments on any portion of the District Lands, including
        receipt of amounts paid under the True-Up Agreement and from Impact Fee Revenues (see
        "SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2006 BONDS —
        Prepayment of Series 2006-1 Special Assessments" herein),

(iv)     from excess amounts on deposit in the Series 2006-1 Revenue Account transferred on
        November 2 of each year on or after the Deferred Costs Completion Date into the Series
        2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account
        from the Series 2006-1 Revenue Account (see clause FIFTH under "SERIES 2006-1
        FUNDS AND ACCOUNTS — Revenue Fund — Series 2006-1 Revenue Account"
        herein), or

(v)      from moneys on deposit in the Funds and Accounts and subaccounts (other than the Series
        2006-1 Rebate Fund or the Renewal and Replacement Fund) established under the Series
        2006-1 Indenture when such moneys are sufficient to pay and redeem all Outstanding
        Series 2006-1 Bonds and accrued interest thereon to the redemption date and to pay all
        amounts owed to persons under the Master Indenture. See "SERIES 2006-1 FUNDS AND
        ACCOUNTS — Debt Service Reserve Fund" herein.

    If less than all of the Series 2006-1 Bonds are called for redemption, the particular Series 2006-1
Bonds or portions of Series 2006-1 Bonds to be redeemed are selected by lot by the Registrar as provided in
the Series 2006-1 Indenture.

    _Extraordinary Mandatory Redemption of Series 2006-2 Bonds in Whole or in Part_.  The Series
2006-2 Bonds are subject to extraordinary mandatory redemption prior to maturity by the District in whole,
on any date, or in part, on any Quarterly Redemption Date commencing February 1, 2007, at a redemption
price equal to 100% of the principal amount of the Series 2006-2 Bonds to be redeemed, plus interest
accrued to the redemption date, as follows:

(i)      on or after the Completion Date of the Series 2006 Project, after payment of Deferred
        Costs, if any, by application of moneys transferred from the Series 2006-2 Acquisition and
        Construction Account of the Acquisition and Construction Fund not reserved by the
        District for the payment of any remaining part of the Cost of the Series 2006 Project and/or
        Deferred Costs (see "SERIES 2006-2 FUNDS AND ACCOUNTS — Acquisition and
        Construction Fund" herein), to the Series 2006-2 Bond Redemption Account in accordance
        with the Series 2006-2 Indenture,

(ii)     on or after May 1, 2008, if such date is after the Completion Date of the Series 2006
        Project, after payment of Deferred Costs, if any, by application of any moneys transferred
        from the Series 2006-2 Capitalized Interest Subaccount established under the Series

2006-2 Indenture (see "SERIES 2006-2 FUNDS AND ACCOUNTS — Revenue Fund — Series 2006-2 Capitalized Interest Subaccount" herein), to the Series 2006-2 Bond Redemption Account in accordance with the Series 2006-2 Indenture,

(iii)   from Impact Fee Revenues deposited into the Series 2006-2 Bond Redemption Account from the Series 2006-2 Revenue Account in accordance with the Series 2006-2 Indenture "IMPACT FEES — Impact Fee Agreements" herein),

(iv)   from amounts deposited into the Series 2006-2 Bond Redemption Account from the Series 2006-2 Debt Service Reserve Account resulting from a reduction in the Series 2006-2 Reserve Account Requirement in accordance with the Series 2006-2 Indenture (see "SERIES 2006-2 FUNDS AND ACCOUNTS — Debt Service Reserve Fund" herein), or

(v)   from moneys on deposit in the Funds and Accounts and subaccounts (other that the Series 2006-2 Rebate Fund) established under the Series 2006-2 Indenture when such moneys are sufficient to pay and redeem all Outstanding Series 2006-2 Bonds and accrued interest thereon to the redemption date and to pay all amounts owed to persons under the Master Indenture. See "SERIES 2006-2 FUNDS AND ACCOUNTS — Debt Service Reserve Fund" herein.

If less than all of the Series 2006-2 Bonds are called for redemption, the particular Series 2006-2 Bonds or portions of Series 2006-2 Bonds to be redeemed are selected by lot by the Registrar as provided in the Series 2006-2 Indenture.

As provided in the Master Indenture, the term "Completion Date" will be the date of completion of the Series 2006 Project, as evidenced by the delivery of a Certificate of the Consulting Engineer and adoption of a resolution by the Board of Supervisors of the District accepting the Series 2006 Project as provided by Florida law.

**Notice of Redemption**

The Trustee shall cause notice of the redemption, either in whole or in part, to be mailed at least thirty (30) but not more than sixty (60) days prior to the redemption or purchase date to all registered Owners of Series 2006 Bonds to be redeemed (as such Owners appear on the Bond Register on the fifth (5th) day prior to such mailing), at their registered addresses, but failure to mail any such notice or defect in the notice or in the mailing thereof shall not affect the validity of the redemption or purchase of the Series 2006 Bonds of such Series for which notice was duly mailed in accordance with the Indenture. Such notice is given in the name of the District, shall be dated, shall set forth the Series 2006 Bonds of such Series Outstanding which are called for redemption and shall include, without limitation, the following additional information: the redemption date, the redemption price, CUSIP numbers, to the extent applicable, and any other distinctive numbers and letters, if less than all Outstanding Series 2006 Bonds of a Series to be redeemed, the identification (and, in the case of partial redemption, the respective principal amounts) of the Series 2006 Bonds of such Series to be redeemed, that on the redemption date the redemption price will become due and payable upon surrender of each such Series 2006 Bond or portion thereof called for redemption, and that interest thereon shall cease to accrue from and after said date, and the place where such Series 2006 Bonds are to be surrendered for payment of the redemption price, which place of payment is a corporate trust office of the Paying Agent.

If at the time of mailing of notice of an optional redemption, the District shall not have deposited with the Trustee or Paying Agent moneys sufficient to redeem or purchase all the Series 2006 Bonds called

for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Trustee or Paying Agent, as the case may be, not later than the opening of business on the redemption date, and such notice is of no effect unless such moneys are so deposited.

If the amount of funds deposited with the Trustee for such redemption, or otherwise available, is insufficient to pay the redemption price and accrued interest on the Series 2006 Bonds of such Series so called for redemption on the redemption date, the Trustee shall redeem and pay on such date an amount of such Series 2006 Bonds for which such funds are sufficient, and, subject to the procedures of DTC while the Series 2006 Bonds are in a book-entry-only system, selecting the Series 2006 Bonds to be redeemed by lot from among all such Series 2006 Bonds of the Series called for redemption on such date, and among different maturities of Series 2006 Bonds of such Series in the same manner as the initial selection of Series 2006 Bonds of such Series to be redeemed, and from and after such redemption date, interest on the Series 2006 Bonds of such Series or portions thereof so paid shall cease to accrue and become payable; but interest on any Series 2006 Bonds or portions thereof not so paid shall continue to accrue until paid at the same rate as it would have had such Series 2006 Bonds not been called for redemption.

Reference is hereby specifically made to "APPENDIX C — COMPOSITE OF MASTER TRUST INDENTURE AND FORMS OF FOURTH SUPPLEMENTAL TRUST INDENTURE AND FIFTH SUPPLEMENTAL TRUST INDENTURE" attached hereto for additional details concerning the redemption of the Series 2006 Bonds.

**Partial Redemption of Series 2006 Bonds**

If less than all of the Series 2006 Bonds of a Series are to be redeemed, the District shall select the particular Series 2006 Bonds or portions of such Series 2006 Bonds to be called for redemption in writing to the Trustee pro rata.

**Purchase of Series 2006 Bonds**

The District reserves the option to direct the Trustee to purchase the Series 2006 Bonds on the date which would be the redemption date if such Series 2006 Bonds were redeemed rather than purchased in lieu thereof at a purchase price equal to the redemption price which would have been applicable to such Series 2006 Bonds on the redemption date. In the event the Trustee is so directed to purchase Series 2006 Bonds in lieu of redemption, no notice to the Bondholders of Series 2006 Bonds to be so purchased (other than the notice of redemption otherwise required hereunder) shall be required. The Master Indenture provides that the Trustee is authorized to apply to such purchase the funds which would have been used to pay the redemption price for such Series 2006 Bonds if such Series 2006 Bonds had been redeemed rather than purchased.

**Book-Entry Only System**

The information set forth under this caption concerning the Depository Trust Company ("DTC"), New York, New York, and DTC's book-entry system has been obtained from sources the District believes to be reliable, but the District takes no responsibility for the accuracy thereof.

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Series 2006 Bonds. The Series 2006 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered certificate will be issued for maturity of each Series of the Series 2006 Bonds, each in the aggregate principal amount of such maturity, and will be deposited

with DTC. If, however, the aggregate principal amount of any maturity of a Series of Series 2006 Bonds exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount and an additional certificate will be issued with respect to any remaining principal amount of such maturity.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for securities that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of Series 2006 Bonds of a Series under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2006 Bonds on DTC's records. The ownership interest of each actual purchaser of each Security ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2006 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Series 2006 Bonds, except in the event that use of the book-entry system for the Series 2006 Bonds is discontinued.

To facilitate subsequent transfers, all Series 2006 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other name as may be requested by an authorized representative of DTC. The deposit of Series 2006 Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2006 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2006 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2006 Bonds may wish to take certain

steps to augment transmission to them of notices of significant events with respect to the Series 2006 Bonds, such as redemptions, tenders, defaults, and proposed amendments to the security documents. For example, Beneficial Owners of Series 2006 Bonds may wish to ascertain that the nominee holding the Series 2006 Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners, or in the alternative, Beneficial Owners may wish to provide their names and addresses to the Registrar and request that copies of the notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Series 2006 Bonds within a Series or maturity of a Series of Series 2006 Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to any Series of the Series 2006 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the District as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts such Series of the Series 2006 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, premium, if any and interest payments on the Series 2006 Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from the District or Paying Agent on a payment date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such Participant and not of DTC nor its nominee, Paying Agent, or the District, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, premium, if any, and interest on the Series 2006 Bonds to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the District or Paying Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

THE DISTRICT, THE TRUSTEE, THE REGISTRAR AND THE PAYING AGENT DO NOT HAVE ANY RESPONSIBILITY OR OBLIGATIONS TO THE DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR THE BENEFICIAL OWNERS WITH RESPECT TO THE SERIES 2006 BONDS IN RESPECT OF: (A) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT; (B) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT DUE TO ANY BENEFICIAL OWNER IN RESPECT OF THE PRINCIPAL OF, REDEMPTION PRICE OR INTEREST ON THE SERIES 2006 BONDS; (C) THE DELIVERY OR TIMELINESS OF DELIVERY BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY NOTICE TO ANY BENEFICIAL OWNER WHICH IS REQUIRED OR PERMITTED UNDER THE TERMS OF THE INDENTURE TO BE GIVEN TO OWNERS; (D) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF PARTIAL REDEMPTION OF THE SERIES 2006 BONDS; OR (E) ANY CONSENT GIVEN OR OTHER ACTION TAKEN BY DTC, OR ITS NOMINEE, CEDE & CO., AS OWNERS.

DTC may discontinue providing its services as securities depository with respect to any Series of the Series 2006 Bonds at any time by giving reasonable notice to the District or Paying Agent. Under such

circumstances, in the event that a successor securities depository is not obtained, certificates for such Series of Series 2006 Bonds are required to be printed and delivered.

The District may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, certificates for such Series 2006 Bonds will be printed and delivered to DTC.

SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES 2006 BONDS, AS NOMINEE OF DTC, REFERENCES HEREIN TO THE HOLDER OF THE SERIES 2006 BONDS OR REGISTERED OWNERS OF THE SERIES 2006 BONDS SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES 2006 BONDS.

## ESTIMATED SOURCES AND USES OF BOND PROCEEDS

Proceeds of the Series 2006 Bonds are expected to be applied as follows:

|  | Series 2006-1 Bonds | Series 2006-2 Bonds | Total |
|---|---|---|---|
| **Sources of Funds [**] |  |  |  |
| Principal Amount of Series 2006 Bonds | $11,365,000.00 | $635,000.00 | $12,000,000.00 |
| Original Issue Premium/(Discount) Plus Accrued Interest | 46,407.08 | 2,716.39 | 49,123.47 |
| Total Sources | $11,411,407.08 | $637,716.39 | $12,049,123.47 |
| **Uses of Funds [**] |  |  |  |
| Deposit of Accrued Interest to Series 2006 Interest Accounts | $46,407.08 | $2,716.39 | $49,123.47 |
| Deposit to Series 2006 Capitalized Interest Accounts [*] | 801,021.93 | 46,886.96 | 847,908.89 |
| Cost of Issuance (including Underwriter's discount) | 377,300.00 | 22,700.00 | 400,000.00 |
| Deposit to Series 2006 Debt Service Reserve Accounts | 298,331.25 | 17,462.50 | 315,793.75 |
| Deposit to Series 2006 Acquisition and Construction Accounts | 9,888,346.82 | 547,950.54 | 10,436,297.36 |
| Total Uses | $11,411,407.08 | $637,716.39 | $12,049,123.47 |

---

[*]    Includes interest, which along with investment earnings, shall pay interest through May 1, 2008 for the Series 2006-1 Bonds and through May 1, 2008 for the Series 2006-2 Bonds.

[**]    Excludes approximately $500,000 of prepaid transportation and park impact fees collected by the Durbin North Developer on closings from the sale of 132 lots to homebuilders and paid to the District. See "THE DEVELOPMENT — Assessment Area" herein. Such prepaid impact fees will be deposited in the Series 2006-1 Prepayment Subaccount within the Series 2006-1 Bond Redemption Account and will be used to redeem Series 2006-1 Bonds on February 1, 2007. See item (iii) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein.

## DEBT SERVICE REQUIREMENTS FOR SERIES 2006-1 BONDS

| Date | Principal | Coupon | Interest [*] | Total |
|------|-----------|--------|----------|-------|
| May 1, 2007 | | 5.250% | $298,331.25 | $298,331.25 |
| November 1, 2007 | | 5.250% | 298,331.25 | 298,331.25 |
| May 1, 2008 | | 5.250% | 298,331.25 | 298,331.25 |
| November 1, 2008 | | 5.250% | 298,331.25 | 298,331.25 |
| May 1, 2009 | | 5.250% | 298,331.25 | 298,331.25 |
| November 1, 2009 | | 5.250% | 298,331.25 | 298,331.25 |
| May 1, 2010 | | 5.250% | 298,331.25 | 298,331.25 |
| November 1, 2010 | | 5.250% | 298,331.25 | 298,331.25 |
| May 1, 2011 | | 5.250% | 298,331.25 | 298,331.25 |
| November 1, 2011 | | 5.250% | 298,331.25 | 298,331.25 |
| May 1, 2012 | | 5.250% | 298,331.25 | 298,331.25 |
| November 1, 2012 | | 5.250% | 298,331.25 | 298,331.25 |
| May 1, 2013 | | 5.250% | 298,331.25 | 298,331.25 |
| November 1, 2013 | | 5.250% | 298,331.25 | 298,331.25 |
| May 1, 2014 | | 5.250% | 298,331.25 | 298,331.25 |
| November 1, 2014 | | 5.250% | 298,331.25 | 298,331.25 |
| May 1, 2015 | | 5.250% | 298,331.25 | 298,331.25 |
| November 1, 2015 [**] | $11,365,000.00 | 5.250% | 298,331.25 | 11,663,331.25 |
| **Totals** | $11,365,000.00 | | $5,369,962.50 | $16,734,962.50 |

[*]    Includes interest accrued and capitalized from Series 2006-1 Bond proceeds and estimated earnings thereon. Interest on Series 2006-1 Bonds is capitalized through May 1, 2008.

[**]    Final Maturity.

## DEBT SERVICE REQUIREMENTS FOR SERIES 2006-2 BONDS

| Date | Principal | Coupon | Interest [*] | Total |
|------|-----------|--------|----------|-------|
| February 1, 2007 | | 5.500% | $8,731.25 | $8,731.25 |
| May 1, 2007 | | 5.500% | 8,731.25 | 8,731.25 |
| August 1, 2007 | | 5.500% | 8,731.25 | 8,731.25 |
| November 1, 2007 | | 5.500% | 8,731.25 | 8,731.25 |
| February 1, 2008 | | 5.500% | 8,731.25 | 8,731.25 |
| May 1, 2008 | | 5.500% | 8,731.25 | 8,731.25 |
| August 1, 2008 | | 5.500% | 8,731.25 | 8,731.25 |
| November 1, 2008 | | 5.500% | 8,731.25 | 8,731.25 |
| February 1, 2009 | | 5.500% | 8,731.25 | 8,731.25 |
| May 1, 2009 | | 5.500% | 8,731.25 | 8,731.25 |
| August 1, 2009 | | 5.500% | 8,731.25 | 8,731.25 |
| November 1, 2009 | | 5.500% | 8,731.25 | 8,731.25 |
| February 1, 2010 | | 5.500% | 8,731.25 | 8,731.25 |
| May 1, 2010 | | 5.500% | 8,731.25 | 8,731.25 |
| August 1, 2010 | | 5.500% | 8,731.25 | 8,731.25 |
| November 1, 2010 | | 5.500% | 8,731.25 | 8,731.25 |
| February 1, 2011 | | 5.500% | 8,731.25 | 8,731.25 |
| May 1, 2011 | | 5.500% | 8,731.25 | 8,731.25 |
| August 1, 2011 | | 5.500% | 8,731.25 | 8,731.25 |
| November 1, 2011 [**] | $635,000.00 | 5.500% | 8,731.25 | 643,731.25 |
| **Totals** | $635,000.00 | | $174,625.00 | $809,625.00 |

[*]    Includes interest accrued and capitalized from Series 2006-2 Bond proceeds and estimated earnings thereon. Interest on Series 2006-2 Bonds is capitalized through May 1, 2008.

[**]    Final Maturity.

## SECURITY FOR AND SOURCE OF PAYMENT OF THE SERIES 2006 BONDS

*THE SERIES 2006-1 BONDS ARE NOT SECURED BY THE SERIES 2006-2 PLEDGED REVENUES SECURING THE SERIES 2006-2 BONDS, AND THE SERIES 2006-2 BONDS ARE NOT SECURED BY THE SERIES 2006-1 PLEDGED REVENUES SECURING THE SERIES 2006-1 BONDS. A DEFAULT UNDER EITHER SERIES OF SERIES 2006 BONDS IS NOT A DEFAULT UNDER THE OTHER SERIES OF SERIES 2006 BONDS.*

**Series 2006-1 Bonds**

The principal of and interest on the Series 2006-1 Bonds issued under the Series 2006-1 Indenture will be secured by a lien upon (i) the amounts collected by or on behalf of the District from landowners or otherwise collected as a result of the Series 2006-1 Special Assessments (as defined in the Series 2006-1 Indenture), including any amount received from any foreclosure proceeding for the enforcement of collection of such Special Assessments, (ii) that portion of the Impact Fee Revenues set out in the Impact Fee Schedule (see "IMPACT FEES — Impact Fee Schedule" herein) that the District has directed in the Impact Fee Agreement to be applied to extinguishment of the Series 2006-1 Special Assessments, (iii) after the Series 2006-2 Bonds have been paid in full and all amounts owing under the Series 2006-2 Indenture have been paid, all Impact Fee Revenues that had been pledged to the Series 2006-2 Bonds, and (iv) by amounts on deposit in the Funds and Accounts (except for the Series 2006-1 Rebate Fund) established pursuant to the Series 2006-1 Indenture (collectively, the "Series 2006-1 Pledged Revenues"). The Series 2006-1 Special Assessments will be levied upon land within the District specially benefited by certain Master Infrastructure improvements (sometimes referred to as the "Series 2006 Project") to be acquired, constructed and equipped by the District in part from the proceeds of the Series 2006-1 Bonds (as more particularly described under "THE SERIES 2006 PROJECT" and "THE DEVELOPMENT — Impact Fees and Impact Fee Credits" herein).

The Series 2006-1 Indenture provides that the pledge will be valid and binding from and after the date of delivery of the Series 2006-1 Bonds, and the proceeds of the Series 2006-1 Bonds and the Series 2006-1 Pledged Revenues will immediately be subject to the lien of the pledge without any physical delivery thereof or further act, and the lien of the pledge shall be valid and binding as against all parties having claims of any kind or tort, contract or otherwise against the District or the Trustee, irrespective of whether such parties have notice thereof. Such lien shall be prior and superior to all other liens now existing or hereafter created.

The Series 2006-1 Special Assessments consist of all non-ad valorem special assessments levied and collected by or on behalf of the District pursuant to Section 190.022 of the Act (exclusive of "special assessments" levied and collected by the District under Section 190.022 of the Act for maintenance purposes or "maintenance special assessments" levied and collected by the District under Section 190.021(3) of the Act), together with the interest specified by a resolution adopted by the Board, the interest specified in Chapter 170, Florida Statutes, as amended from time to time, if any such interest is collected by or on behalf of the District, and any applicable penalties collected by or on behalf of the District, or otherwise received from the collection of delinquent Series 2006-1 Special Assessments and which are referred to as such and pledged to the Series 2006-1 Bonds pursuant to the Series 2006-1 Indenture.

For purposes hereof, delinquent Series 2006-1 Special Assessment means any installment of any Series 2006-1 Special Assessment which is not paid within thirty (30) days of the date on which such installments are due and payable.

The Act authorizes the District to finance the construction of the Series 2006 Project by levying Series 2006-1 Special Assessments upon the lands benefited thereby. Non-ad valorem assessments are not based on millage and can become a lien against the homestead as permitted in Section 4, Article X of the Florida State Constitution.

It is currently contemplated that the Series 2006-1 Special Assessments will be collected by the District pursuant to Chapter 170, Florida Statutes. Please refer to "ENFORCEMENT OF SERIES 2006-1 SPECIAL ASSESSMENT COLLECTIONS" herein.

The Series 2006-1 Indenture provides that, if the owner of any lot or parcel of land assessed for the Series 2006 Project shall be delinquent in the payment of the Series 2006-1 Special Assessment, then the District shall, to the extent permitted by law, utilize any method of enforcement as provided by law, including, without limitation, declaring the entire unpaid balance of such Series 2006-1 Special Assessment to be in default and, at its own expense, cause such delinquent property to be foreclosed as provided by law. If any property shall be offered for sale for the nonpayment of any Series 2006-1 Special Assessment which is pledged to the Series 2006-1 Bonds and no person shall purchase such property for an amount equal to the full amount due on the Series 2006-1 Special Assessment (principal, interest, penalties and costs, plus attorneys' fees, if any), plus other taxes and assessments then due and payable, the property shall then be purchased by the District for an amount equal to the balance due on the Series 2006-1 Special Assessment (principal, interest, penalties and costs, plus attorneys' fees, if any), plus other taxes and assessments then due and payable, and the District shall receive in its corporate name title to the property for the benefit of the Owners of the Series 2006-1 Bonds to which such Series 2006-1 Special Assessments were pledged. It should be noted that the District may not have sufficient funds to complete such a purchase.

If any Series 2006-1 Special Assessment shall be either in whole or in part annulled, vacated or set aside by the judgment of any court, or the District shall be satisfied that any such Series 2006-1 Special Assessment is so irregular or defective that it cannot be enforced or collected, or if the District shall have omitted to make such Series 2006-1 Special Assessment when it might have done so, the District has covenanted to either: (i) take all necessary steps to cause a new Special Assessment to be made for the whole or any part of such improvement or against any property benefited by such improvement; or (ii) in its sole discretion, make up the amount of such Special Assessment from legally available moneys, which moneys shall be deposited into the Series 2006-1 Revenue Account. In case any such subsequent Special Assessment shall also be annulled, the District shall obtain and make other Special Assessments until a valid Special Assessment shall be made.

**The Series 2006-1 Bonds are limited obligations of the District issued under the provisions of the Act and the Series 2006-1 Indenture and do not constitute an indebtedness of the State or the County, but are payable solely from the proceeds of the funds so pledged under the Series 2006-1 Indenture and the Series 2006-1 Pledged Revenues, and the District is not obligated to pay the Series 2006-1 Bonds except from such funds. The issuance of the Series 2006-1 Bonds shall not directly, indirectly or contingently obligate the District to levy or pledge any other funds whatever therefor or to make any appropriation for its payment except from such funds. The Series 2006-1 Bonds are not obligations or indebtedness of the State or any agency, authority, district or political subdivision of the State, including the County, other than the District.**

### Series 2006-2 Bonds

The principal of and interest on the Series 2006-2 Bonds issued under the Series 2006-2 Indenture will be secured by a lien upon all Impact Fee Revenues collected at the time of electrical energizing of a residence or business under St. Johns County's road and park impact fee ordinances, or payments made by

14

the Master Developer pursuant to the Prepaid Impact Fee Credit Agreement (see "IMPACT FEES — Impact Fee Agreements" herein and "APPENDIX F — FORM OF PREPAID IMPACT FEE CREDIT AGREEMENT" attached hereto), exclusive of that portion set out in the Impact Fee Schedule (see "IMPACT FEES — Impact Fee Schedule" herein) that the District has directed in the Impact Fee Agreement to be applied to extinguishment of the Series 2006-1 Special Assessments, and (b) all moneys on deposit in the Funds and Accounts established with respect to the Series 2006-2 Bonds under the Series 2006-2 Indenture (the "Series 2006-2 Pledged Revenues"). The portion of the Impact Fee Revenues pledged to the Series 2006-1 Bonds will be utilized to prepay the Series 2006-1 Special Assessments, which are the security for the Series 2006-1 Bonds. The balance of the Impact Fee Revenues are pledged to the Series 2006-2 Bonds and will be utilized to pay interest on and prepay the principal of the Series 2006-2 Bonds. The Series 2006-2 Bonds are secured by a portion of the Impact Fee Revenues and a prepaid impact fee credit agreement with the Master Developer to insure timely payment of both principal and interest on the Series 2006-2 Bonds. See "IMPACT FEES" herein.

**The Series 2006-2 Bonds are limited obligations of the District issued under the provisions of the Act and the Series 2006-2 Indenture and do not constitute an indebtedness of the State or the County, but are payable solely from the proceeds of the funds so pledged under the Series 2006-2 Indenture and the Series 2006-2 Pledged Revenues, and the District is not obligated to pay the Series 2006-2 Bonds except from such funds. The issuance of the Series 2006-2 Bonds shall not directly, indirectly or contingently obligate the District to levy or pledge any other funds whatsoever therefor or to make any appropriation for its payment except from such funds. The Series 2006-2 Bonds are not obligations or indebtedness of the State or any agency, authority, district or political subdivision of the State, including the County, other than the District.**

**No Parity Bonds**

In the Indenture, the District covenants and agrees that that so long as there are any Series 2006 Bonds Outstanding, it shall not cause or permit to be caused any lien, charge or claim against the Series 2006-1 or 2006-2 Pledged Revenues; provided, however, that the District reserves the right to issue bonds, notes or other obligations payable from or secured by the respective Series 2006-1 or 2006-2 Pledged Revenues pledged to the corresponding Series 2006 Bonds, but only so long as such bonds, notes or other obligations are not entitled to a lien upon or charge against the Series 2006-1 or 2006-2 Pledged Revenues equal or prior to the liens of the Series 2006-1 and Series 2006-2 Indentures securing the corresponding Series 2006 Bonds. Each bond, note or other obligation issued pursuant to the authority of the preceding sentence shall conspicuously state on the face thereof that such obligation is, and such obligation shall be, subordinate and inferior in right of lien and payment to the lien of the corresponding Series 2006-1 and Series 2006-2 Indentures on such Series 2006-1 and 2006-2 Pledged Revenues and the rights and remedies of the holders of such subordinate debt to payment and upon default thereon and under any instrument securing such subordinate debt shall not be subject to action for collection or acceleration thereof except upon the exercise of and subject to the first and prior rights of the Trustee and Owners of the Series 2006 Bonds to payment and the control of remedies and acceleration granted under the Indenture.

WHILE NO FUTURE BONDS WILL BE PAYABLE FROM OR SECURED BY THE SERIES 2006-1 OR SERIES 2006-2 PLEDGED REVENUES, EXCEPT AS STATED ABOVE, THE DISTRICT, ST. JOHNS COUNTY, THE SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA OR ANY POLITICAL SUBDIVISION THEREOF MAY IN THE FUTURE IMPOSE, LEVY AND COLLECT TAXES AND ASSESSMENTS, THE LIENS OF WHICH WILL BE CO-EQUAL WITH THE LIEN OF THE SERIES 2006-1 SPECIAL ASSESSMENTS. See "ENFORCEMENT OF ASSESSMENT COLLECTIONS" herein. The Indenture permits the District to issue Bonds to finance District projects payable from assessments on the same properties subject to the Series 2006-1 Special Assessments securing

the Series 2006-1 Bonds. See also Item 4 under "BONDHOLDERS' RISKS" herein regarding taxes and other obligations payable on a parity with the Series 2006-1 Special Assessments. The District has previously issued its Series 2005A, Series 2005B-1 and Series 2005B-2 Special Assessment Bonds and levied Series 2005A, Series 2005B-1 and Series 2005B-2 Special Assessments on properties within the District subject to the Series 2006-1 Special Assessments.

**Enforcement of Payment of Series 2006-1 Special Assessments**

The District has covenanted in the Indenture to assess, levy, collect or cause to be collected and enforced the payment of Series 2006-1 Special Assessments in the manner prescribed by the Indenture and all resolutions, ordinances or laws thereunto appertaining at the times and in the amounts as shall be necessary to pay, when due, the principal of and interest on the Series 2006-1 Bonds and to make all other payments required by the Indenture. See "ENFORCEMENT OF ASSESSMENTS COLLECTIONS" herein.

**Prepayment of Series 2006-1 Special Assessments**

At any time any owner of property subject to the Series 2006-1 Special Assessments may, at its option, or under certain circumstances described in the Assessment Resolutions or in the assessment methodology in connection with prepayments derived from application of the True-Up Agreement, or by application of Impact Fee Revenues in accordance with the Impact Fee Schedule, shall, require the District to reduce or release and extinguish the lien upon its property by virtue of the levy of the Series 2006-1 Special Assessments by paying to the District all or a portion of the Series 2006-1 Special Assessment, which shall constitute Prepayment Principal, plus accrued interest to the next succeeding Quarterly Redemption Date (or the second succeeding Quarterly Redemption Date if such prepayment is made within thirty-five (35) calendar days before an Quarterly Redemption Date), attributable to the property subject to Series 2006-1 Special Assessment owned by such owner.

Upon receipt of Prepayment Principal as described in above, subject to satisfaction of the conditions set forth in the Series 2006-1 Supplemental Indenture, the District shall immediately pay the amount so received to the Trustee, and the District shall take such action as is necessary to record in the official records of St. Johns County an affidavit or affidavits, as the case may be, executed by the District Manager, to the effect that the Series 2006-1 Special Assessment has been paid in whole or in part and that such Series 2006-1 Special Assessment lien is thereby reduced, or released and extinguished, as the case may be. Upon receipt of any such Prepayment Principal, plus accrued interest to the applicable Quarterly Redemption Date, from the District, the Trustee shall immediately deposit the Prepayment Principal into the Series 2006-1 Prepayment Subaccount of the Series 2006-1 Bond Redemption Account to be applied to the redemption of Series 2006-1 Bonds in accordance with the Series 2006-1 Supplemental Indenture. See item (iii) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein, and the accrued interest into the Series 2006-1 Revenue Account.

**Adjustments to Series 2006-1 Special Assessments**

Upon completion of the Series 2006 Project, the Series 2006-1 Special Assessments will be credited, pro rata, with any excess of the original Series 2006-1 Special Assessments over the actual cost of the Series 2006 Project funded from proceeds of the Series 2006 Bonds. In making such credit, no credit will be given for Series 2006 Bonds financing costs, capitalized interest, funded reserves or Series 2006 Bonds discount.

16

**Re-Assessments**

      Pursuant to the Indenture, if the Series 2006-1 Special Assessment with respect to the Series 2006 Project is in whole or in part annulled, vacated or set aside by the judgment of any court, or if the District is satisfied that any Series 2006-1 Special Assessment is so irregular or defective that it cannot be enforced or collected, or if the District omitted to make Series 2006-1 Special Assessments when it might have done so, the District will, with respect to the Series 2006 Project, either (i) take all necessary steps to cause a new Series 2006-1 Special Assessment to be made for the whole or any part of such improvement or against any property benefited by said improvement, or (ii) in its sole discretion, make up the amount of such Series 2006-1 Special Assessment from legally available moneys, which moneys shall be deposited into the Series 2006-1 Revenue Account. In case any such second Series 2006-1 Special Assessment shall be annulled, the District will obtain and make other Series 2006-1 Special Assessments until a valid Series 2006-1 Special Assessment is made.

## ENFORCEMENT OF SERIES 2006-1 SPECIAL ASSESSMENT COLLECTIONS

**Collection Procedures**

      The Series 2006-1 Special Assessments imposed on the parcels of benefited land within the District pursuant to the resolutions adopting the Assessment Methodology are the primary source of payment for the Series 2006-1 Bonds. The Series 2006-1 Special Assessments are non-ad valorem special assessments which are imposed and levied against the land subject thereto upon the basis of a special benefit to such land determined to result from the implementation of the Series 2006 Project. To the extent that landowners fail to pay the Series 200A-1 Special Assessments, delay payments, or are unable to pay the same, the successful pursuit of collection procedures available to the District is essential to continued payment of principal of and interest on the Series 2006-1 Bonds. The Act provides for various methods of collection of delinquent Series 2006-1 Special Assessments by reference to other provisions of the Florida Statutes. **The following is a description of certain statutory provisions of assessment, payment, collection and enforcement procedures appearing in the Florida Statutes, but is qualified in its entirety by reference to such statutes and applicable rules.**

      The Series 2006-1 Special Assessments will be payable in semiannual installments and will be levied and billed by the District. The determination, order, levy and collection of Series 2006-1 Special Assessments must be done in compliance with procedural requirements and guidelines provided by State law. Failure by the District to comply with such requirements could result in delays in the collection of, or the complete inability to collect, Series 2006-1 Special Assessments during any year. Such delays in the collection of, or complete inability to collect, Series 2006-1 Special Assessments could have a material adverse effect on the ability of the District to make full or punctual payment of debt service on the Series 2006-1 Bonds.

      The Series 2006-1 Indenture provides that the Series 2006-1 Special Assessments will be collected by the District unless and until the District determines that collection pursuant to the Uniform Method is in the best interests of the District. The election to collect and enforce Series 2006-1 Special Assessments against the unplatted land in any year pursuant to any one method shall not, to the extent permitted by law, preclude the District from electing to collect and enforce the Series 2006-1 Special Assessments pursuant to any other method permitted by law in any subsequent year, or require the District to utilize the same method of collection for the Series 2006-1 Special Assessments.

**Judicial Proceedings**

The foreclosure of the lien of delinquent assessments may be accomplished by a judicial proceeding pursuant to Chapter 173, Florida Statutes. Pursuant to this procedure, the District would bring suit to foreclose the lien of any delinquent assessments in the Circuit Court. A proceeding under Chapter 173, Florida Statutes, may not be commenced until one (1) year from the date the Series 2006-1 Special Assessments become due and payable. The District may also foreclose on the lien of delinquent assessments pursuant to Section 170.10, Florida Statutes, which provides that upon the failure of any property owner to pay the principal of the Series 2006-1 Special Assessments or the interest thereon, when due, the governing body of the District is authorized to commence legal proceedings for the enforcement of the payment thereof, including commencement of an action in chancery, commencement of a foreclosure proceeding in the same manner as the foreclosure of a real estate mortgage.

In general, after the District commences the suit, there is a period of notice to, and an opportunity for response by, affected persons. Ultimately a hearing will be held and, if the court decides in favor of the District, a judgment will be rendered in the amount of the delinquent assessments and costs of the proceeding. The judgment would also direct sale of the land subject to the delinquent assessments by public bid to the highest bidder, with proceeds of the sale being applied to payment of the delinquent assessments. If no bidder bids at least the amount of the delinquent assessments and applicable costs, the District may obtain title to the land.

Enforcement of the obligation to pay Series 2006-1 Special Assessments or the ability to foreclose the lien created by the failure to pay Series 2006-1 Special Assessments, may not be readily available or may be limited as such enforcement is dependent upon judicial actions that are often subject to discretion and delay.

**Method of Collection by District for Series 2006-1 Special Assessments**

The District plans to collect Series 2006-1 Special Assessments directly.

## IMPACT FEES

**General**

Impact fees are essentially a fee charged by a governmental entity to a builder of residential or commercial property, usually at the time the builder applies for permitting. The fees are meant to cover the impact made by the property and its occupants upon local infrastructure. Impact fees were originally created as a way to (i) slow growth before appropriate infrastructure was in place, or (ii) finance the provision of necessary infrastructure concurrently with development. Today, impact fees most commonly are used to fund transportation, roads, schools, parks, sewer systems, police and fire protection, and other public facilities.

*Legal Status of Impact Fees.* Florida courts have upheld impact fees when they satisfied a 2-part test: First, the local government must demonstrate a reasonable connection between the need for additional capital facilities and the growth in population generated by the new development, and second, the government must show a reasonable connection between the expenditures of the funds collected and the benefits accruing to the new development. In order to satisfy this latter requirement, the Florida courts require that the impact fee ordinance must specifically earmark the funds collected for use in acquiring capital facilities to benefit the new residents. Impact fees that fail this test could be considered an unauthorized tax and thus invalid. Any such impact fee would presumably not have been levied as a tax and

18

thus a tax lien cannot not be levied against the applicable developers or individual parcels in the case of non-payment.

Impact fees are usually considered a land use regulation, but unlike other regulations, they support an interest that can be credited or prepaid, and those subsequent credits are transferable, as in the present structure. St. Johns County and the District have entered into a Road and Park Impact Fee Credit Agreement pursuant to which any property owner seeking electrical energizing of construction within the District will pay the County's otherwise applicable road and park impact fees directly to the District until the District has been paid $18,578,703 in road impact fees and $2,249,894 in park impact fees.

*Risks Related to Impact Fee-backed Bond Indebtedness.* Impact fees are essentially unsecured payment obligations and not a direct, and foreclosable interest in land. Accordingly, even if an obligated developer (or the District in this case) builds impact fee producing infrastructure, there is no guarantee that impact fees will be paid. In other words, if builders do not apply for permits, no impact fees will be paid, and there will be no revenue stream with which to repay indebtedness backed by impact fees. This risk of non-development is, however, shared with Special Assessment-backed securities, but without the ultimate lien on the land in question.

Another risk related to impact fee backed Bonds is that the developer's expenditures for the impact fees for capital improvements will not be fully compensated with the impact fee credits. That is, if the local government issuing the impact fee credits thinks that the costs of the subject capital improvements are inflated or unjustified, it may not issue impact fee credits for that portion of the expense it believes to be excessive. The problem then is that the developer (or in this case the District) will not be fully repaid for its improvements, and instead will only be repaid to the amount of impact fee credits issued to it. There is also the risk that the local government issuing the impact fee credits will not fulfill its end of the bargain and will refuse to allow permit applicants to pay impact fees to the developer (District in this case) in exchange for credit, this risk is however mitigated by the Impact Fee Agreement and the Prepaid Impact Fee Credit Agreement described below.

Given the foregoing, Bonds backed solely by impact fee credits share the same risks associated with slow, or no, development that Special Assessment backed Bonds have, along with contractual risk on the part of the impact fee credit issuing governmental entity and without the additional security of a lien on real property.

## Impact Fee Agreements

St. Johns County imposes impact fees on new development for road construction and parks pursuant to St. Johns County Ordinance Nos. 87-57 and 87-58, both as reaffirmed, readopted, consolidated and incorporated within the St. Johns County Land Development Code by St. Johns County Ordinance No. 2005-27 (collectively, the "Impact Fee Ordinances"). The Impact Fee Ordinances provide for certain credits to "fee payers" who provide eligible roadways and park facilities.

The District and St. Johns County have entered into a Road and Park Impact Fee Credit Agreement (sometimes referred to as the "Impact Fee Agreement") pursuant to which the County has agreed to provide credits in the amount of $18,578,703 for eligible roadway improvements and $2,2249,894 for eligible park improvements described in the Impact Fee Agreement. A copy of the Impact Fee Agreement is included as an exhibit within "APPENDIX F — FORM OF PREPAID IMPACT FEE CREDIT AGREEMENT" attached hereto.

Prior to the issuance of the Series 2006 Bonds, the Durbin Crossing, LLC (one of the entities included in the "Master Developer" as described herein) and the District will enter into an Agreement Regarding a Guarantee of Impact Fee Revenue (sometimes referred to as the "Prepaid Impact Fee Credit Agreement", a copy of which is attached hereto as Appendix F) which sets forth a minimum quarterly schedule for the purchase of impact fee credits in such amounts so as to retire the Series 2006-2 Bonds by extraordinary mandatory calls for redemption prior to or on their maturity date. See item (iii) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-2 Bonds in Whole or in Part" herein. In the event that revenue provided from the sale of impact fee credits to the Developers or builders within the District are less than the amount necessary to meet the requirements under the minimum quarterly schedule, the Master Developer agrees to make available to the District monies equivalent to the difference between the actual revenues generated from the sale of impact fee credits and such minimum quarterly requirement. The Master Developer's obligation under the Prepaid Impact Fee Credit Agreement is unsecured.

**Impact Fee Schedule**

All builders applying for electrical energizing in connection with any construction within the Development shall pay the amount due under the then current Impact Fee Ordinances for transportation and park impact fees directly to the District. As transportation and park impact fees are collected by the District, the portion of the impact fee revenues pledged to the Series 2006-1 Bonds will be utilized to prepay the assessment lien levied in connection with the Series 2006-1 Bonds. See "APPENDIX B — SPECIAL ASSESSMENT REPORTS" attached hereto for a detailed description of the parcels on which the Series 2006-1 Special Assessments securing the Series 2006-1 Bonds are levied. Each landowner will be responsible for the semi-annual interest associated with the Series 2006-1 principal assessment until such time as the lien on that lot is extinguished.

As illustrated in the table below, the Series 2006-1 Special Assessment may be less than the actual impact fee paid on behalf of a specific land use. The reason for this is because the assessment per unit cannot exceed the benefit received by that unit from the Master Infrastructure pursuant to the Assessment Report. The full impact fee payments for each unit will still be collected by the District, and the excess impact fee revenue not pledged to the Series 2006-1 Bonds will be utilized to pay interest and the principal of the Series 2006-2 Bonds. The Master Developer has, or will, prior to the issuance of the Series 2006 Bonds, enter into a Prepaid Impact Fee Credit Agreement discussed above to insure timely payment of both principal and interest on the Series 2006-2 Bonds.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

**Impact Fee Schedule**

| Product Type | Current County Transportation & Park Impact Fee [1] | Impact Fees Pledged to Extinguish Series 2006-1 Special Assessments | Transportation & Park Impact Fee Revenue Pledged to Series 2006-2 Bonds [2] |
|---|---|---|---|
| SF - 80'/83' > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| SF - 70'/73' > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| SF - 63' > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| SF - 53' > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| SF - 53' < or = 1,800 sq. ft | $3,725 | $3,725 | $0 |
| Townhomes > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| Condos < or = 1,800 sq. ft | $3,725 | $3,725 | $0 |
| Apartments < or = 1,800 sq. ft | $3,725 | $2,492 | $1,233 |
| Commercial (per 1,000 sq feet) | $5,420 | $3,776 | $1,644 |
| Office (per 1,000 sq feet) | $6,274 | $3,776 | $2,498 |

---

[1]   Subject to increase based on increases in St. Johns County's transportation and park impact fee schedules.

[2]   As St. Johns County's transportation and park impact fees increase, the excess impact fee revenue not pledged to the Series 2006-1 Bonds will be utilized to pay interest and the principal of the Series 2006-2 Bonds.

## SERIES 2006-1 FUNDS AND ACCOUNTS

The following Funds and Accounts are held by the Trustee pursuant to the Series 2006-1 Indenture:

### Acquisition and Construction Fund

The Series 2006-1 Indenture establishes within the Acquisition and Construction Fund held by the Trustee a separate Series 2006-1 Acquisition and Construction Account, and within such Series 2006-1 Acquisition and Construction Account, (i) a Series 2006-1 General Construction Subaccount, and (ii) a Series 2006-1 Deferred Costs Subaccount.

The Series 2006-1 Indenture provides that proceeds of the Series 2006-1 Bonds in the amount set forth in the Series 2006-1 Supplemental Indenture, and any moneys deposited by or on behalf of the District which the District directs to be deposited in the Series 2006-1 Acquisition and Construction Account, are to be deposited into the Series 2006-1 General Construction Subaccount under the Series 2006-1 Acquisition and Construction Account. Any such moneys in the Series 2006-1 Acquisition and Construction Account, together with any excess moneys that may be transferred to the Series 2006-1 Acquisition and Construction Account, shall be applied to pay Costs of the Series 2006 Project. The requisition for disbursements from the Acquisition and Construction Fund shall specify the amounts to be paid from the Series 2006-1 General Construction Subaccount (or from the similar Series 2006-2 General Construction Subaccount described under "SERIES 2006-2 FUNDS AND ACCOUNTS — Acquisition and Construction Fund" herein).

Any balance remaining in a Series 2006-1 General Construction Subaccount of the Series 2006-1 Acquisition and Construction Account after the Completion Date of the Series 2006 Project, and after retaining the amount, if any, of all remaining unpaid Costs of the Series 2006 Project set forth in the Consulting Engineer's certificate establishing such Completion Date, shall be transferred to and deposited in the Series 2006-1 Deferred Costs Subaccount of the Series 2006-1 Acquisition and Construction Account until the Deferred Costs Completion Date, and any remaining balance, if any, after taking into account all

remaining unpaid Deferred Costs, shall be transferred to and deposited in the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account and applied in to the extraordinary mandatory redemption of the Series 2006-1 Bonds as described in item (i) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein.

The Series 2006-1 Indenture provides that, until the Deferred Costs Completion Date: (i) the Trustee shall not close the Series 2006-1 Deferred Costs Subaccount in the Series 2006-1 Acquisition and Construction Account, and (ii) the Trustee shall deposit into the Series 2006-1 Deferred Costs Subaccount the amounts transferred pursuant to the Series 2006-1 Indenture, which amounts shall be held separate and apart from other amounts on deposit in the Series 2006-1 Acquisition and Construction Account, including amounts on deposit in the Series 2006-1 General Construction Subaccount and shall be used solely to pay Deferred Costs. Deferred Costs shall be paid from amounts held in the Series 2006-1 Deferred Costs Subaccount (or from the similar Series 2006-2 Deferred Costs Subaccount described under "SERIES 2006-2 FUNDS AND ACCOUNTS — Acquisition and Construction Fund" herein) upon compliance with the requisition provisions set forth in the Master Indenture and any contract or agreement pursuant to which the District is obligated to pay such Deferred Costs. The District will provide the Trustee on each May 1 and November 1 in writing with the amount of all accrued and unpaid Deferred Costs.

After the Deferred Costs Completion Date, any balance remaining in the Series 2006-1 Deferred Costs Subaccount, after retaining the amount, if any, of all remaining unpaid Costs of the Capital Improvement Plan set forth in the Consulting Engineer's certificate establishing such Deferred Costs Completion Date, shall be transferred to and deposited in the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account and applied to the extraordinary mandatory redemption of the Series 2006-1 Bonds as described in item (i) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein.

The Series 2006-1 Supplemental Indenture and the Series 2006-2 Supplemental Indenture define the term "Deferred Costs" as the Costs of the Capital Improvement Plan which have not been paid by or on behalf of the District from the proceeds of the Series 2006-1 Bonds or the Series 2006-2 Bonds (or any Additional Bonds of the District issued under the Master Indenture), or which have not been reimbursed to the District, and which are identified by the District to the Trustee in writing as having been advanced under any contract or agreement pursuant to which the District may become obligated to pay for such Costs of the Capital Improvement Plan. Notwithstanding the foregoing, Deferred Costs shall not be due and payable to a Developer that is in default under its respective Completion Agreement (the "Completion Agreement").

Notwithstanding the foregoing, amounts on deposit in the Series 2006-1 Deferred Costs Subaccount are subject to the lien on the Series 2006-1 Pledged Revenues for the payment of the Series 2006-1 Bonds.

The amounts deposited in the Series 2006-1 Acquisition and Construction Account may be used to pay costs of issuance of the Series 2006-1 Bonds as provided in the Series 2006-1 Indenture.

**Debt Service Fund**

The Series 2006-1 Indenture establishes within the Debt Service Fund held by the Trustee a Series 2006-1 Principal Account and a Series 2006-1 Interest Account, and within such Series 2006-1 Interest Account, a Series 2006-1 Interest Subaccount and a Series 2006-1 Capitalized Interest Subaccount.

In the event that on May 1, 2008, the amount of proceeds (and any investment earnings thereon) of the Series 2006-1 Bonds representing Capitalized Interest on deposit in the Series 2006-1 Capitalized Interest Subaccount exceeds the amount needed for Capitalized Interest with respect to the Series 2006-1 Bonds on May 1, 2008, such excess shall be transferred from the Series 2006-1 Capitalized Interest Subaccount, prior to the Completion Date of the Series 2006 Project, to the Series 2006-1 General Construction Subaccount of the Series 2006-1 Acquisition and Construction Account, and after the Completion Date, first to the Series 2006-1 Deferred Costs Subaccount of the Series 2006-1 Acquisition and Construction Account to pay Deferred Costs and after the Deferred Costs Completion Date, the balance, if any, to the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account and applied to the extraordinary mandatory redemption of the Series 2006-1 Bonds as described in item (ii) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein.

**Debt Service Reserve Fund**

The Series 2006-1 Indenture establishes within the Reserve Fund held by the Trustee a Series 2006-1 Debt Service Reserve Account which is held for the benefit of the Series 2006-1 Bonds. THE SERIES 2006-2 DEBT SERVICE RESERVE ACCOUNT (described under "SERIES 2006-2 FUNDS AND ACCOUNTS — Debt Service Reserve Fund" herein) DOES NOT SECURE THE SERIES 2006-1 BONDS.

Proceeds of the Series 2006-1 Bonds shall be deposited in the Series 2006-1 Debt Service Reserve Account in the amount set forth in the Series 2006-1 Supplemental Indenture, and such moneys, together with any other moneys deposited in the Series 2006-1 Debt Service Reserve Account pursuant to the Series 2006-1 Indenture, shall be used only for the purpose of making payments into the Series 2006-1 Interest Account and the Series 2006-1 Principal Account to pay debt service on the Series 2006-1 Bonds, when due, to the extent the moneys on deposit in such Accounts therein and available therefor are insufficient and for no other purpose. The Series 2006-1 Debt Service Reserve Account shall consist only of cash and Investment Securities.

The Series 2006-1 Reserve Account Requirement may be satisfied by the deposit in the Series 2006-1 Debt Service Reserve Account of cash, Investment Securities, a Debt Service Reserve Insurance Policy or a Debt Service Reserve Letter of Credit (as such terms are defined in and subject to the Master Indenture), or any combination of the foregoing. The District may at anytime and from time to time substitute cash, Investment Securities, a Debt Service Reserve Insurance Policy or a Debt Service Reserve Letter of Credit for any of the foregoing then on deposit in the Series 2006-1 Debt Service Reserve Account. If any such Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit is substituted for moneys on deposit in the Series 2006-1 Debt Service Reserve Account, the Series 2006-1 Indenture requires that the excess moneys in the Series 2006-1 Debt Service Reserve Account be transferred to and deposited in the Series 2006-1 Revenue Account. If a disbursement is made from a Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit, the District is obligated to either reinstate the maximum limits of such Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit immediately following such disbursement or to deposit into the Series 2006-1 Debt Service Reserve Account, as provided in the Master Indenture, funds in the amount of the disbursement made under such Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit.

On each March 25, June 25, September 25 and December 25 (or, if such date is not a Business Day, on the Business Day next preceding such date), the Trustee shall determine the amount on deposit in the Series 2006-1 Debt Service Reserve Account and transfer any excess therein (other than as a result of earnings on investments therein) above the Series 2006-1 Reserve Account Requirement from the Series

2006-1 Debt Service Reserve Account, prior to the Completion Date of the Series 2006 Project, to the Series 2006-1 General Construction Subaccount of the Series 2006-1 Acquisition and Construction Account and, after the Completion Date, first to the Series 2006-1 Deferred Costs Subaccount of the Series 2006-1 Acquisition and Construction Account to pay Deferred Costs and, after the Deferred Costs Completion Date, the balance, if any, to the Renewal and Replacement Fund pursuant to the Series 2006-1 Supplemental Indenture.

Earnings on investments in the Series 2006-1 Debt Service Reserve Account shall be disposed of as follows:

(i)    As long as there exists no default under the Series 2006-1 Indenture and the amount on deposit in the Series 2006-1 Debt Service Reserve Account as of the most recent date on which such amounts deposited therein were valued by the Trustee is not reduced below the then Series 2006-1 Reserve Account Requirement (and if no withdrawals have been made from the Series 2006-1 Debt Service Reserve Account which would create such a deficiency), earnings on investments in the Series 2006-1 Debt Service Reserve Account shall, through May 1, 2008, be transferred to the Series 2006-1 Capitalized Interest Subaccount of the Series 2006-1 Interest Account and, after May 1, 2008, be transferred to and deposited into the Series 2006-1 Revenue Account, or

(ii)    If, as of the last date on which amounts on deposit in the Series 2006-1 Debt Service Reserve Account were valued by the Trustee, there was a deficiency in the Series 2006-1 Debt Service Reserve Account, or if after such date withdrawals have been made from the Series 2006-1 Debt Service Reserve Account and have created such a deficiency, then earnings on investments in the Series 2006-1 Debt Service Reserve Account shall be deposited to the credit of the Series 2006-1 Debt Service Reserve Account until the amount on deposit therein equals the Series 2006-1 Reserve Account Requirement and thereafter shall be allocated to and deposited, until May 1, 2008, into the Series 2006-1 Capitalized Interest Subaccount of the Series 2006-1 Interest Account and, after May 1, 2008, be transferred to and deposited into the Series 2006-1 Revenue Account.

For purposes of the foregoing discussion, the Series 2006-1 Supplemental Indenture defines the following terms:

"Deemed Outstanding" shall mean with respect to the Series 2006-1 Bonds the Outstanding principal amount of the Series 2006-1 Bonds reduced by the result of dividing (i) the amount on deposit in the Series 2006-1 Bond Redemption Account by (ii) 1 minus the Series 2006-1 Reserve Account Percentage.

"Series 2006-1 Reserve Account Percentage" shall mean the result of dividing (i) the Series 2006-1 Reserve Account Requirement on the date of initial issuance and delivery of the Series 2006-1 Bonds ($298,331.25), by (ii) the initial Outstanding aggregate principal amount of the Series 2006-1 Bonds, which percentage equals 2.625%.

"Series 2006-1 Reserve Account Requirement" shall mean (A) as of the date of issuance and delivery of the Series 2006-1 Bonds, an amount (which upon calculation is $298,331.25) equal to 50% of the maximum annual interest on the Series 2006-1 Bonds, and (B) at any time subsequent to the date of issuance and delivery of the Series 2006-1 Bonds, the Series 2006-1 Reserve Account Percentage times the Deemed Outstanding Series 2006-1 Bonds as of the time of any such calculation.

**Bond Redemption Fund**

The Series 2006-1 Indenture establishes a Series 2006-1 Bond Redemption Account held by the Trustee, and within such Series 2006-1 Bond Redemption Account, two separate subaccounts designated as the "Series 2006-1 General Redemption Subaccount" and the "Series 2006-1 Prepayment Subaccount". Except as otherwise provided therein, the Series 2006-1 Supplemental Indenture directs the Trustee to deposit any moneys to be deposited into the Series 2006-1 Bond Redemption Account as provided in the Master Indenture to the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account.

*Series 2006-1 General Redemption Subaccount.* Moneys in the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account (including all earnings on investments held therein) shall be accumulated therein to be used in the following order of priority, to the extent that the need therefor arises:

FIRST, to make such deposits into the Series 2006-1 Rebate Fund, if any, as the District may direct in accordance with the provisions of the Master Indenture and the Arbitrage Rebate Covenants, such moneys thereupon to be used solely for the purposes specified in the Arbitrage Rebate Covenants. Any moneys so transferred from the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account to the Series 2006-1 Rebate Fund shall thereupon be free from the lien and pledge of the Indenture;

SECOND, to be used to call for redemption pursuant to the Series 2006-1 Supplemental Indenture (as described in items (i), (ii), (iv) and (v) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein) an amount of Series 2006-1 Bonds equal to the amount of money transferred to the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account pursuant to the Series 2006-1 Indenture for the purpose of such extraordinary mandatory redemption on the dates and at the prices provided in the Series 2006-1 Supplemental Indenture, as appropriate.

*Series 2006-1 Prepayment Subaccount.* Moneys in the Series 2006-1 Prepayment Subaccount of the Series 2006-1 Bond Redemption Account (including all earnings on investments held in such Series 2006-1 Prepayment Subaccount of the Series 2006-1 Bond Redemption Account) shall be used to call for redemption pursuant to the Series 2006-1 Supplemental Indenture an amount of Series 2006-1 Bonds equal to the amount of money transferred to the Series 2006-1 Prepayment Subaccount of the Series 2006-1 Bond Redemption Account pursuant to the aforesaid provisions. See item (iii) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein.

On each March 25 and September 25 (or if such March 25 or September 25 is not a Business Day, on the Business Day next preceding such day), the Trustee shall determine the amount on deposit in the Series 2006-1 Prepayment Subaccount and the Series 2006-1 General Redemption Subaccount as described under the subheadings "— Series 2006-1 Prepayment Subaccount" and "— Series 2006-1 General Redemption Subaccount" above and, if the balance in either or both such accounts is greater than zero dollars ($-0-), and if such transfer will not result in insufficient money being on deposit in the Series 2006-1 Revenue Account to make the transfers required pursuant to the Series 2006-1 Supplemental Indenture, shall transfer from the Series 2006-1 Revenue Account for deposit into the Series 2006-1 Prepayment

Subaccount and/or the Series 2006-1 General Redemption Subaccount, as applicable, an amount sufficient to increase the amount(s) on deposit therein to the next integral multiple of $5,000, and shall thereupon give notice and cause the extraordinary mandatory redemption of the Series 2006-1 Bonds on the next succeeding applicable redemption date in the maximum aggregate principal amount for which moneys are then on deposit in such Series 2006-1 Prepayment Subaccount and/or Series 2006-1 General Redemption Subaccount, as applicable, in accordance with the provisions for extraordinary redemption of Series 2006-1 Bonds as described under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein.

**Revenue Fund**

The Series 2006-1 Indenture establishes within the Revenue Fund held by the Trustee a separate Series 2006-1 Revenue Account to be held by the Trustee separate and apart from all other Funds and Accounts held under the Series 2006-1 Indenture and from all other moneys of the Trustee. Series 2006-1 Special Assessments (except for Prepayments (as defined in the Series 2006-1 Indenture)) are deposited by the Trustee in the Series 2006-1 Revenue Account. The Trustee is directed to deposit Prepayments of Series 2006-1 Special Assessments that the District identifies as such in the Series 2006-1 Prepayment Subaccount of the Series 2006-1 Bond Redemption Account (as described in "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" and "SERIES 2006-1 FUNDS AND ACCOUNTS — Bond Redemption Fund — Series 2006-1 Prepayment Subaccount" herein).

*Series 2006-1 Capitalized Interest Subaccount*. Prior to May 1, 2008, amounts on deposit in the Series 2006-1 Capitalized Interest Subaccount of the Series 2006-1 Interest Account shall be used to pay on each Interest Payment Date and February 1 or August 1 Quarterly Redemption Date an amount equal to the lesser of (x) the amount of interest on the Series 2006-1 Bonds coming due on such Interest Payment Date, or the amount of interest on the Series 2006-1 Bonds called for redemption on such Quarterly Redemption Date, or (y) the balance on deposit in such Capitalized Interest Subaccount. In the event that on May 1, 2008, moneys representing Capitalized Interest on deposit in the Series 2006-1 Capitalized Interest Subaccount exceeds the amount needed for Capitalized Interest with respect to the Series 2006-1 Bonds on May 1, 2008, the Series 2006-1 Supplemental Indenture directs the Trustee to transfer such excess from the Series 2006-1 Capitalized Interest Subaccount prior to the Completion Date of the Series 2006 Project, to the Series 2006-1 General Construction Subaccount of the Series 2006-1 Acquisition and Construction Account and, after the Completion Date, first to the Series 2006-1 Deferred Costs Subaccount of the Series 2006-1 Acquisition and Construction Account to pay Deferred Costs and, after the Deferred Costs Completion Date, the balance, if any, to the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account and applied toward the extraordinary mandatory redemption of the Series 2006-1 Bonds. See item (ii) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein.

*Series 2006-1 Revenue Account*. The Series 2006-1 Supplemental Indenture directs the Trustee to transfer from amounts on deposit in the Series 2006-1 Revenue Account to the Funds and Accounts described below, the following amounts, at the following times and in the following order of priority:

FIRST, upon receipt but no later than the fifth (5th) Business Day preceding the first Interest Payment Date for which there remains an insufficient amount from Series 2006-1 Bond proceeds (or investment earnings thereon) on deposit in the Series 2006-1 Capitalized Interest Subaccount to be applied to the payment of interest on the Series 2006-1 Bonds due on the next succeeding Interest Payment Date, and no later than the fifth

(5th) Business Day next preceding each Interest Payment Date thereafter to the Series 2006-1 Interest Subaccount in the Series 2006-1 Interest Account of the Debt Service Fund, an amount equal to the interest on the Series 2006-1 Bonds becoming due on such next succeeding Interest Payment Date, less any amounts on deposit in the Series 2006-1 Interest Subaccount not previously credited;

SECOND, upon receipt but no later than the fifth (5th) Business Day preceding the first February 1 or August 1 Quarterly Redemption Date for which there remains an insufficient amount from Series 2006-1 Bond proceeds (or investment earnings thereon) on deposit in the Series 2006-1 Capitalized Interest Subaccount to be applied to the payment of interest on the Series 2006-1 Bonds called for redemption on the next succeeding February 1 or August 1 Quarterly Redemption Date, and no later than the fifth (5th) Business Day next preceding each February 1 or August 1 Quarterly Redemption Date thereafter to the Series 2006-1 Interest Subaccount in the Series 2006-1 Interest Account of the Debt Service Fund, an amount equal to the interest on the Series 2006-1 Bonds called for redemption on such next succeeding February 1 or August 1 Quarterly Redemption Date, less any amounts on deposit in the Series 2006-1 Interest Subaccount not previously credited;

THIRD, no later than the fifth (5th) Business Day next preceding November 1, 2015, if any Series 2006-1 Bonds issued under the Series 2006-1 Indenture remain Outstanding, to the Series 2006-1 Principal Account of the Debt Service Fund, an amount equal to the principal amount of Series 2006-1 Bonds Outstanding maturing on May 1, 2015, less any amount on deposit in the Series 2006-1 Principal Account not previously credited;

FOURTH, upon receipt but no later than the fifth (5th) Business Day next preceding each Interest Payment Date while Series 2006-1 Bonds issued under the Indenture remain Outstanding, to the Series 2006-1 Debt Service Reserve Account, an amount equal to the amount, if any, which is necessary to make the amount on deposit in the Series 2006-1 Debt Service Reserve Account equal to the Series 2006-1 Reserve Account Requirement; and

FIFTH, the balance of any moneys remaining on November 2 of each year after making the foregoing deposits shall be applied, first, to the Series 2006-1 Deferred Costs Subaccount of the Series 2006-1 Acquisition and Construction Account to pay Deferred Costs, if any, and, after the Deferred Costs Completion Date, the balance, if any, to the Series 2006-1 General Redemption Subaccount of the Series 2006-1 Bond Redemption Account until such moneys are sufficient to pay and redeem all Outstanding Series 2006-1 Bonds and accrued interest thereon to the redemption date (see item (iv) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein) and thence to the Renewal and Replacement Fund as described under "SERIES 2006-1 FUNDS AND ACCOUNTS — Renewal and Replacement Fund" herein.

## Renewal and Replacement Fund

Amounts on deposit in the Renewal and Replacement Fund shall be used solely to pay costs of Eligible Roadway Improvements and/or Eligible Park Improvements as such terms are defined in the Impact Fee Agreement. See "IMPACT FEES — Impact Fee Agreements" herein. Such costs shall be paid

in compliance with the requisition provisions set forth in the Master Indenture and with the Impact Fee Agreement. The Series 2006-1 Supplemental Indenture provides that the Trustee may conclusively rely on any requisition for disbursement of amounts from the Renewal and Replacement Fund approved by the Consulting Engineer as proof that such requisition and disbursement comply with the Impact Fee Agreement. At such time as the Series 2006-1 Bonds have been paid in full and are no longer Outstanding, the Trustee shall release the Renewal and Replacement Fund from the lien of the Series 2006-1 Indenture and distribute any amounts remaining therein to the District to finance, construct, acquire, install or make capital improvements to "Eligible Roadway Improvements" and/or "Eligible Park Improvements" as such terms are defined in the Impact Fee Agreement.

**Rebate Fund**

The Series 2006-1 Indenture establishes a Series 2006-1 Rebate Fund held by the Trustee. The Series 2006-1 Indenture directs the Trustee to deposit moneys in the Series 2006-1 Rebate Funds as required to be deposited therein pursuant to the Arbitrage Certificate and to comply with the Tax Regulatory Covenants included as part of the Series 2006-1 Supplemental Indenture.

**Disposition of Remaining Moneys**

The Series 2006-1 Indenture provides that so long as any rebate requirements are first satisfied, any amounts remaining in the Funds and Accounts (and subaccounts) under the Series 2006-1 Indenture after payment in full of the principal of and interest and any premium on the Series 2006-1 Bonds and all other amounts due thereunder have been paid in full, shall be transferred to the Renewal and Replacement Fund described above.

### SERIES 2006-2 FUNDS AND ACCOUNTS

The following Funds and Accounts are held by the Trustee pursuant to the Series 2006-2 Indenture:

**Acquisition and Construction Fund**

The Series 2006-2 Indenture establishes within the Acquisition and Construction Fund held by the Trustee a separate Series 2006-2 Acquisition and Construction Account, and within such Series 2006-2 Acquisition and Construction Account, (i) a Series 2006-2 General Construction Subaccount, and (ii) a Series 2006-2 Deferred Costs Subaccount.

The Series 2006-2 Indenture provides that proceeds of the Series 2006-2 Bonds in the amount set forth in the Series 2006-2 Supplemental Indenture, and any moneys deposited by or on behalf of the District which the District directs to be deposited in the Series 2006-2 Acquisition and Construction Account, are to be deposited into the Series 2006-2 General Construction Subaccount under the Series 2006-2 Acquisition and Construction Account. Any such moneys in the Series 2006-2 Acquisition and Construction Account, together with any excess moneys that may be transferred to the Series 2006-2 Acquisition and Construction Account, shall be applied to pay Costs of the Series 2006 Project. The requisition for disbursements from the Acquisition and Construction Fund shall specify the amounts to be paid from the Series 2006-2 General Construction Subaccount (or from the similar Series 2006-1 General Construction Subaccount described under "SERIES 2006-1 FUNDS AND ACCOUNTS — Acquisition and Construction Fund" herein).

Any balance remaining in a Series 2006-2 General Construction Subaccount of the Series 2006-2 Acquisition and Construction Account after the Completion Date of the Series 2006 Project, and after retaining the amount, if any, of all remaining unpaid Costs of the Series 2006 Project set forth in the

Consulting Engineer's certificate establishing such Completion Date, shall be transferred to and deposited in the Series 2006-2 Deferred Costs Subaccount of the Series 2006-2 Acquisition and Construction Account until the Deferred Costs Completion Date, and any remaining balance, if any, after taking into account all remaining unpaid Deferred Costs, shall be transferred to and deposited in the Series 2006-2 Bond Redemption Account and applied in to the extraordinary mandatory redemption of the Series 2006-2 Bonds as described in item (i) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-2 Bonds in Whole or in Part" herein.

The Series 2006-2 Indenture provides that, until the Deferred Costs Completion Date: (i) the Trustee shall not close the Series 2006-2 Deferred Costs Subaccount in the Series 2006-2 Acquisition and Construction Account, and (ii) the Trustee shall deposit into the Series 2006-2 Deferred Costs Subaccount the amounts transferred pursuant to the Series 2006-2 Indenture, which amounts shall be held separate and apart from other amounts on deposit in the Series 2006-2 Acquisition and Construction Account, including amounts on deposit in the Series 2006-2 General Construction Subaccount and shall be used solely to pay Deferred Costs . Deferred Costs shall be paid from amounts held in the Series 2006-2 Deferred Costs Subaccount (or from the similar Series 2006-1 Deferred Costs Subaccount described under "SERIES 2006-1 FUNDS AND ACCOUNTS — Acquisition and Construction Fund" herein) upon compliance with the requisition provisions set forth in the Master Indenture and any contract or agreement pursuant to which the District is obligated to pay such Deferred Costs. The District will provide the Trustee on each May 1 and November 1 in writing with the amount of all accrued and unpaid Deferred Costs.

After the Deferred Costs Completion Date, any balance remaining in a Series 2006-2 Deferred Costs Subaccount, after retaining the amount, if any, of all remaining unpaid Costs of the Capital Improvement Plan set forth in the Consulting Engineer's certificate establishing such Deferred Costs Completion Date, shall be transferred to and deposited in the Series 2006-2 Bond Redemption Account and applied to the extraordinary mandatory redemption of the Series 2006-2 Bonds as described in item (i) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-2 Bonds in Whole or in Part" herein.

The Series 2006-2 Supplemental Indenture and the Series 2006-1 Supplemental Indenture define the term "Deferred Costs" as the Costs of the Capital Improvement Plan which have not been paid by or on behalf of the District from the proceeds of the Series 2006-1 Bonds or the Series 2006-2 Bonds (or any Additional Bonds of the District issued under the Master Indenture), or which have not been reimbursed to the District, and which are identified by the District to the Trustee in writing as having been advanced under any contract or agreement pursuant to which the District may become obligated to pay for such Costs of the Capital Improvement Plan. Notwithstanding the foregoing, Deferred Costs shall not be due and payable to a Developer that is in default under its respective Completion Agreement (the "Completion Agreement").

Notwithstanding the foregoing, amounts on deposit in the Series 2006-2 Deferred Costs Subaccount are subject to the lien on the Series 2006-2 Pledged Revenues for the payment of the Series 2006-2 Bonds.

The amounts deposited in the Series 2006-2 Acquisition and Construction Account may be used to pay costs of issuance of the Series 2006-2 Bonds as provided in the Series 2006-2 Indenture.

**Debt Service Fund**

The Series 2006-2 Indenture establishes within the Debt Service Fund held by the Trustee a Series 2006-2 Principal Account and a Series 2006-2 Interest Account, and within such Series 2006-2 Interest Account, a Series 2006-2 Interest Subaccount and a Series 2006-2 Capitalized Interest Subaccount.

In the event that on May 1, 2008, the amount of proceeds (and any investment earnings thereon) of the Series 2006-2 Bonds representing Capitalized Interest on deposit in the Series 2006-2 Capitalized Interest Subaccount exceeds the amount needed for Capitalized Interest with respect to the Series 2006-2 Bonds on May 1, 2008, such excess shall be transferred from the Series 2006-2 Capitalized Interest Subaccount, prior to the Completion Date of the Series 2006 Project, to the Series 2006-2 General Construction Subaccount of the Series 2006-2 Acquisition and Construction Account, and after the Completion Date, first to the Series 2006-2 Deferred Costs Subaccount of the Series 2006-2 Acquisition and Construction Account to pay Deferred Costs and after the Deferred Costs Completion Date, the balance, if any, to the Series 2006-2 Bond Redemption Account and applied to the extraordinary mandatory redemption of the Series 2006-2 Bonds as described in item (ii) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-2 Bonds in Whole or in Part" herein.

**Debt Service Reserve Fund**

The Series 2006-2 Indenture establishes within the Reserve Fund held by the Trustee a Series 2006-2 Debt Service Reserve Account which is held for the benefit of the Series 2006-2 Bonds. THE SERIES 2006-1 DEBT SERVICE RESERVE ACCOUNT (described under "SERIES 2006-1 FUNDS AND ACCOUNTS — Debt Service Reserve Fund" herein) DOES NOT SECURE THE SERIES 2006-2 BONDS.

Proceeds of the Series 2006-2 Bonds shall be deposited in the Series 2006-2 Debt Service Reserve Account in the amount set forth in the Series 2006-2 Supplemental Indenture, and such moneys, together with any other moneys deposited in the Series 2006-2 Debt Service Reserve Account pursuant to the Series 2006-2 Indenture, shall be used only for the purpose of making payments into the Series 2006-2 Interest Account and the Series 2006-2 Principal Account to pay debt service on the Series 2006-2 Bonds, when due, to the extent the moneys on deposit in such Accounts therein and available therefor are insufficient and for no other purpose. The Series 2006-2 Debt Service Reserve Account shall consist only of cash and Investment Securities.

The Series 2006-2 Reserve Account Requirement may be satisfied by the deposit in the Series 2006-2 Debt Service Reserve Account of cash, Investment Securities, a Debt Service Reserve Insurance Policy or a Debt Service Reserve Letter of Credit (as such terms are defined in and subject to the Master Indenture), or any combination of the foregoing. The District may at anytime and from time to time substitute cash, Investment Securities, a Debt Service Reserve Insurance Policy or a Debt Service Reserve Letter of Credit for any of the foregoing then on deposit in the Series 2006-2 Debt Service Reserve Account. If any such Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit is substituted for moneys on deposit in the Series 2006-2 Debt Service Reserve Account, the Series 2006-2 Indenture requires that the excess moneys in the Series 2006-2 Debt Service Reserve Account be transferred to and deposited in the Series 2006-2 Revenue Account. If a disbursement is made from a Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit, the District is obligated to either reinstate the maximum limits of such Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit immediately following such disbursement or to deposit into the Series 2006-2 Debt Service Reserve Account, as provided in the Master Indenture, funds in the amount of the disbursement made under such Debt Service Reserve Insurance Policy or Debt Service Reserve Letter of Credit.

On each March 25, June 25, September 25 and December 25 (or, if such date is not a Business Day, on the Business Day next preceding such date), simultaneously with the transfer of moneys deposited in the Series 2006-2 Revenue Account to the Series 2006-2 Bond Redemption Account, the Series 2006-2 Supplemental Indenture provides that the Trustee is directed to recalculate the Series 2006-2 Reserve

Account Requirement and to transfer any resulting excess in the Series 2006-2 Debt Service Reserve Account (other than as a result of earnings on investments therein) to the Series 2006-2A Bond Redemption Account and apply such excess to the extraordinary mandatory redemption of Series 2006-2 Bonds as described herein in item (iv) under the caption "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-2 Bonds in Whole or in Part" herein.

Earnings on investments in the Series 2006-2 Debt Service Reserve Account shall be disposed of as follows:

(i)     As long as there exists no default under the Series 2006-2 Indenture and the amount on deposit in the Series 2006-2 Debt Service Reserve Account as of the most recent date on which such amounts deposited therein were valued by the Trustee is not reduced below the then Series 2006-2 Reserve Account Requirement (and if no withdrawals have been made from the Series 2006-2 Debt Service Reserve Account which would create such a deficiency), earnings on investments in the Series 2006-2 Debt Service Reserve Account shall, through May 1, 2008, be transferred to the Series 2006-2 Capitalized Interest Subaccount of the Series 2006-2 Interest Account and, after May 1, 2008, be transferred to and deposited into the Series 2006-2 Revenue Account, or

(ii)    If, as of the last date on which amounts on deposit in the Series 2006-2 Debt Service Reserve Account were valued by the Trustee, there was a deficiency in the Series 2006-2 Debt Service Reserve Account, or if after such date withdrawals have been made from the Series 2006-2 Debt Service Reserve Account and have created such a deficiency, then earnings on investments in the Series 2006-2 Debt Service Reserve Account shall be deposited to the credit of the Series 2006-2 Debt Service Reserve Account until the amount on deposit therein equals the Series 2006-2 Reserve Account Requirement and thereafter shall be allocated to and deposited, until May 1, 2008, into the Series 2006-2 Capitalized Interest Subaccount of the Series 2006-2 Interest Account and, after May 1, 2008, be transferred to and deposited into the Series 2006-2 Revenue Account.

For purposes of the foregoing discussion, the Series 2006-2 Supplemental Indenture defines the following terms:

"Deemed Outstanding" shall mean with respect to the Series 2006-2 Bonds the Outstanding principal amount of the Series 2006-2 Bonds reduced by the result of dividing (i) the amount on deposit in the Series 2006-2 Bond Redemption Account by (ii) 1 minus the Series 2006-2 Reserve Account Percentage.

"Series 2006-2 Reserve Account Percentage" shall mean the result of dividing (i) the Series 2006-2 Reserve Account Requirement on the date of initial issuance and delivery of the Series 2006-2 Bonds ($17,462.50), by (ii) the initial Outstanding aggregate principal amount of the Series 2006-2 Bonds, which percentage equals 2.750%.

"Series 2006-2 Reserve Account Requirement" shall mean (A) as of the date of issuance and delivery of the Series 2006-2 Bonds, an amount (which upon calculation is $17,462.50) equal to 50% of the maximum annual interest on the Series 2006-2 Bonds, and (B) at any time subsequent to the date of issuance and delivery of the Series 2006-2 Bonds, the Series 2006-2 Reserve Account Percentage times the Deemed Outstanding Series 2006-2 Bonds as of the time of any such calculation.

**Bond Redemption Fund**

      The Series 2006-2 Indenture establishes a Series 2006-2 Bond Redemption Account held by the Trustee. Moneys in the Series 2006-2 Bond Redemption Account (including all earnings on investments held therein) shall be accumulated therein to be used in the following order of priority, to the extent that the need therefor arises:

                FIRST, to make such deposits into the Series 2006-2 Rebate Fund, if any, as the District may direct in accordance with the provisions of the Master Indenture and the Arbitrage Rebate Covenants, such moneys thereupon to be used solely for the purposes specified in the Arbitrage Rebate Covenants. Any moneys so transferred from the Series 2006-2 Bond Redemption Account to the Series 2006-2 Rebate Fund shall thereupon be free from the lien and pledge of the Indenture;

                SECOND, to be used to call for redemption pursuant to the Series 2006-2 Supplemental Indenture (as described under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-2 Bonds in Whole or in Part" herein) an amount of Series 2006-2 Bonds equal to the amount of money transferred to the Series 2006-2 Bond Redemption Account pursuant to the Series 2006-2 Indenture for the purpose of such extraordinary mandatory redemption on the dates and at the prices provided in the Series 2006-2 Supplemental Indenture, as appropriate.

      On each March 25, June 25, September 25 and December 25 (or if such date is not a Business Day, on the Business Day next preceding such day), the Trustee shall determine the amount on deposit in the Series 2006-2 Bond Redemption Account as described above and, if the balance in such account is greater than zero dollars ($-0-), and if such transfer will not result in insufficient money being on deposit in the Series 2006-2 Revenue Account to make the transfers required pursuant to the Series 2006-2 Supplemental Indenture, shall transfer from the Series 2006-2 Revenue Account for deposit into the Series 2006-2 Bond Redemption Account an amount sufficient to increase the amount on deposit therein to the next integral multiple of $5,000, and shall thereupon give notice and cause the extraordinary mandatory redemption of the Series 2006-2 Bonds on the next succeeding applicable redemption date in the maximum aggregate principal amount for which moneys are then on deposit in such Series 2006-2 Bond Redemption Account in accordance with the provisions for extraordinary redemption of Series 2006-2 Bonds as described under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-2 Bonds in Whole or in Part" herein.

**Revenue Fund**

      The Series 2006-2 Indenture establishes within the Revenue Fund held by the Trustee a separate Series 2006-2 Revenue Account to be held by the Trustee separate and apart from all other Funds and Accounts held under the Series 2006-2 Indenture and from all other moneys of the Trustee. The Trustee is directed to deposit the Impact Fee Revenues (exclusive of that portion set out in the Impact Fee Schedule that the District has directed to be applied to the extinguishment of Series 2006-1 Special Assessments) are deposited by the Trustee in the Series 2006-2 Revenue Account. See "IMPACT FEES" herein.

      *Series 2006-2 Capitalized Interest Subaccount*. Prior to May 1, 2008, amounts on deposit in the Series 2006-2 Capitalized Interest Subaccount of the Series 2006-2 Interest Account shall be used to pay on each Interest Payment Date an amount equal to the lesser of (x) the amount of interest on the Series 2006-2 Bonds coming due on such Interest Payment Date, or (y) the balance on deposit in such Capitalized Interest

Subaccount. In the event that on May 1, 2008, moneys representing Capitalized Interest on deposit in the Series 2006-2 Capitalized Interest Subaccount exceeds the amount needed for Capitalized Interest with respect to the Series 2006-2 Bonds on May 1, 2008, the Series 2006-2 Supplemental Indenture directs the Trustee to transfer such excess from the Series 2006-2 Capitalized Interest Subaccount prior to the Completion Date of the Series 2006 Project, to the Series 2006-2 General Construction Subaccount of the Series 2006-2 Acquisition and Construction Account and, after the Completion Date, first to the Series 2006-2 Deferred Costs Subaccount of the Series 2006-2 Acquisition and Construction Account to pay Deferred Costs and, after the Deferred Costs Completion Date, the balance, if any, to the Series 2006-2 General Redemption Subaccount of the Series 2006-2 Bond Redemption Account, and applied toward the extraordinary mandatory redemption of the Series 2006-2 Bonds. See item (ii) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-2 Bonds in Whole or in Part" herein.

*Series 2006-2 Revenue Account.* The Series 2006-2 Supplemental Indenture directs the Trustee to transfer from amounts on deposit in the Series 2006-2 Revenue Account to the Funds and Accounts described below, the following amounts, at the following times and in the following order of priority:

FIRST, upon receipt but no later than the March 25, June 25, September 25 or December 25 (or, if such date is not a Business Day, on the Business Day next preceding such date) preceding the first Interest Payment Date for which there remains an insufficient amount from Series 2006-2 Bond proceeds (or investment earnings thereon) on deposit in the Series 2006-2 Capitalized Interest Subaccount to be applied to the payment of interest on the Series 2006-2 Bonds due on the next succeeding Interest Payment Date, and no later than each March 25, June 25, September 25 or December 25 (or, if such date is not a Business Day, on the Business Day next preceding such date) next preceding each Interest Payment Date thereafter to the Series 2006-2 Interest Subaccount in the Series 2006-2 Interest Account of the Debt Service Fund, an amount equal to the interest on the Series 2006-2 Bonds becoming due on such next succeeding Interest Payment Date, less any amounts on deposit in the Series 2006-2 Interest Subaccount not previously credited;

SECOND, no later than the fifth (5th) Business Day next preceding November 1, 2011, if any Series 2006-2 Bonds issued under the Series 2006-2 Indenture remain Outstanding, to the Series 2006-2 Principal Account of the Debt Service Fund, an amount equal to the principal amount of Series 2006-2 Bonds Outstanding maturing on November 1, 2011, less any amount on deposit in the Series 2006-2 Principal Account not previously credited; and

THIRD, upon receipt but no later than each March 25, June 25, September 25 and December 25 preceding each Quarterly Redemption Date commencing February 1, 2007, the balance, if any, remaining in the Series 2006-2 Revenue Fund shall be transferred to and deposited in the Series 2006-2 Bond Redemption Account.

## Rebate Fund

The Series 2006-2 Indenture establishes a Series 2006-2 Rebate Fund held by the Trustee. The Series 2006-2 Indenture directs the Trustee to deposit moneys in the Series 2006-2 Rebate Funds as required to be deposited therein pursuant to the Arbitrage Certificate and to comply with the Tax Regulatory Covenants included as part of the Series 2006-2 Supplemental Indenture.

**Disposition of Remaining Moneys**

The Series 2006-2 Indenture provides that so long as any rebate requirements are first satisfied, any amounts remaining in the Funds and Accounts (and subaccounts) under the Series 2006-2 Indenture after payment in full of the principal of and interest and any premium on the Series 2006-2 Bonds and all other amounts due thereunder have been paid in full, shall be transferred to the Renewal and Replacement Fund as described under "SERIES 2006-1 FUNDS AND ACCOUNTS — Renewal and Replacement Fund" hereinabove.

## INVESTMENTS

Earnings on investments in all of the Funds and Accounts held as security for the Series 2006 Bonds shall be invested only in Investment Securities except that moneys held in the Series 2006-1 and Series 2006-2 Principal Accounts and the Series 2006-1 and Series 2006-2 Interest Accounts (and subaccounts, if any, therein) in the Debt Service Fund and in the Series 2006-1 and Series A-2 Bond Redemption Accounts (and subaccounts, if any, therein) in the Bond Redemption Fund under the respective Series 2006-1 and Series 2006-2 Indentures only in Government Obligations and securities described in subparagraphs (b), (c), (f), and (j) of the definition of Investment Securities set out below. Except as described under this caption, earnings on the Funds and Accounts established under the Series 2006-1 and Series 2006-2 Indentures and the subaccounts therein shall be retained, as realized, in such Accounts or subaccounts and used for the purpose of such Account or subaccount.

The Master Indenture defines "Investment Securities" as meaning and including any of the following securities, if and to the extent that such securities are legal investments for funds of the District:

(a)     Government Obligations (defined as meaning direct obligations of, or obligations the timely payment of principal of and interest on which are unconditionally guaranteed by, the United States of America);

(b)     obligations of any of the following agencies:  Government National Mortgage Association (including participation certificates issued by such Association); Fannie Mae (including participation certificates issued by Fannie Mae); Federal Home Loan Banks; Federal Farm Credit Banks; Tennessee Valley Authority; Rural Economic Community Development Administration (formerly the Farmers Home Administration); Student Loan Marketing Association; or Federal Home Loan Mortgage Corporation;

(c)     deposits, Federal funds or bankers' acceptances (with term to maturity of 270 days or less) of any bank which has an unsecured, uninsured and unguaranteed obligation rated in one of the top two rating categories by both Moody's and S&P;

(d)     commercial paper rated in the top two rating categories by both Moody's and S&P;

(e)     obligations of any state of the United States or political subdivision thereof or constituted authority thereof the interest on which is exempt from federal income taxation under Section 103 of the Code and rated in one of the top two rating categories by both Moody's and S&P;

(f)     both (A) shares of a diversified open-end management investment company (as defined in the Investment Company Act of 1940) or a regulated investment

34

company (as defined in Section 851(a) of the Code) that is a money market fund
that is rated in the highest rating category by both Moody's and S&P, and (B)
shares of money market mutual funds that invest only in Government Obligations
and repurchase agreements secured by such obligations, which funds are rated in
the highest categories for such funds by both Moody's and S&P;

(g)    repurchase agreements, which will be collateralized at the onset of the repurchase
agreement of at least 103% marked to market weekly with Collateral with a
domestic or foreign bank or corporation (other than life or property casualty
insurance company) the long-term debt of which, or, in the case of a financial
guaranty insurance company, claims paying ability, of the guarantor is rated at
least "AA" by S&P and "Aa" by Moody's provided that the repurchase agreement
shall provide that if during its term the provider's rating by either S&P or Moody's
falls below "AA-" or "Aa3", respectively, the provider shall immediately notify
the Trustee and the provider shall at its option, within ten days of receipt of
publication of such downgrade, either (A) maintain Collateral at levels, sufficient
to maintain an "AA" rated investment from S&P and an "Aa" rated investment
from Moody's, or (B) repurchase all Collateral and terminate the repurchase
agreement. Further, if the provider's rating by either S&P or Moody's falls below
"A-" or "A3", respectively, the provider must at the direction of the Issuer to the
Trustee, within ten (10) calendar days, either (1) maintain Collateral at levels
sufficient to maintain an "AA" rated investment from S&P and an "Aa" rated
investment from Moody's, or (2) repurchase all Collateral and terminate the
repurchase agreement without penalty. In the event the repurchase agreement
provider has not satisfied the above conditions within ten (10) days of the date
such conditions apply, then the repurchase agreement shall provide that the
Trustee shall be entitled to, and in such event, the Trustee shall withdraw the entire
amount invested plus accrued interest within two (2) Business Days. Any
repurchase agreement entered into pursuant to this Indenture shall contain the
following additional provisions:

(1)    Failure to maintain the requisite Collateral percentage will require
the District or the Trustee to liquidate the Collateral as provided
above;

(2)    The Holder of the Collateral, as hereinafter defined, shall have
possession of the Collateral or the Collateral shall have been
transferred to the Holder of the Collateral, in accordance with
applicable state and federal laws (other than by means of entries
on the transferor's books);

(3)    The repurchase agreement shall state and an opinion of Counsel in
form and in substance satisfactory to the Trustee shall be rendered
that the Holder of the Collateral has a perfected first priority
security interest in the collateral, any substituted Collateral and all
proceeds thereof (in the case of bearer securities, this means the
Holder of the Collateral is in possession);

(4)    The repurchase agreement shall be a "repurchase agreement" as
defined in the United States Bankruptcy Code and, if the provider

35

is a domestic bank, a "qualified financial contract" as defined in
the Financial Institutions Reform, Recovery and Enforcement Act
of 1989 ("FIRREA") and such bank is subject to FIRREA;

(5)    The repurchase transaction shall be in the form of a written
agreement, and such agreement shall require the provider to give
written notice to the Trustee of any change in its long-term debt
rating;

(6)    The Issuer or its designee shall represent that it has no knowledge
of any fraud involved in the repurchase transaction;

(7)    The Issuer and the Trustee shall receive the opinion of Counsel
(which opinion shall be addressed to the Issuer and the Trustee
and shall be in form and substance satisfactory to the Trustee) that
such repurchase agreement complies with the terms of this section
and is legal, valid, binding and enforceable upon the provider in
accordance with its terms;

(8)    The term of the repurchase agreement shall be no longer than ten
years;

(9)    The interest with respect to the repurchase transaction shall be
payable no less frequently than quarterly;

(10)    The repurchase agreement shall provide that the Trustee may
withdraw funds without penalty at any time, or from time to time,
for any purpose permitted or required under this Indenture;

(11)    Any repurchase agreement shall provide that a perfected security
interest in such investments is created for the benefit of the
Beneficial Owners under the Uniform Commercial Code of
Florida, or book-entry procedures prescribed at 31 C.F.R. 306.1 et
seq. or 31 C.F.R. 350.0 et seq. are created for the benefit of the
Beneficial Owners; and

(12)    The Collateral delivered or transferred to the Issuer, the Trustee,
or a third-party acceptable to, and acting solely as agent for, the
Trustee (the "Holder of the Collateral") shall be delivered and
transferred in compliance with applicable state and federal laws
(other than by means of entries on provider's books) free and clear
of any third-party liens or claims pursuant to a custodial
agreement subject to the prior written approval of the majority of
the Holders and the Trustee.  The custodial agreement shall
provide that the Trustee must have disposition or control over the
Collateral of the repurchase agreement, irrespective of an event of
default by the provider of such repurchase agreement.

If such investments are held by a third-party, they shall be held as agent for the
benefit of the Trustee as fiduciary for the Beneficial Owners and not as agent for

the bank serving as Trustee in its commercial capacity or any other party and shall be segregated from securities owned generally by such third party or bank;

(h)    any other investment with respect to a Series of Series 2006 Bonds approved in writing by the Owners of a majority in aggregate principal amount of the corresponding Series of Series 2006 Bonds secured thereby;

(i)    bonds, notes and other debt obligations of any corporation organized under the laws of the United States, any state or organized territory of the United States or the District of Columbia, if such obligations are rated in one of the three highest ratings by both Moody's and S&P or in one of the two highest categories by either S&P or Moody's; and

(j)    investment agreements with a bank, insurance company or other financial institution, or the subsidiary of a bank, insurance company or other financial institution if the parent guarantees the investment agreement, which bank, insurance company, financial institution or parent has an unsecured, uninsured and unguaranteed obligation (or claims-paying ability) rated in the highest short-term rating category by Moody's or S&P (if the term of such agreement does not exceed 365 days), or has an unsecured, uninsured and unguaranteed obligation (or claims paying ability) rated by Aa2 or better by Moody's and AA or better by S&P or Fitch, respectively (if the term of such agreement is more than 365 days) or is the lead bank of a parent bank holding company with an uninsured, unsecured and unguaranteed obligation of the aforesaid ratings, provided:

    (A)    interest is paid on any date interest is due on the Bonds (not more frequently than quarterly) at a fixed rate (subject to adjustments for yield restrictions required by the Code) during the entire term of the agreement;

    (B)    moneys invested thereunder may be withdrawn without penalty, premium, or charge upon not more than two days' notice unless otherwise specified in a Supplemental Indenture;

    (C)    the same guaranteed interest rate will be paid on any future deposits made to restore the account to its required amount;

    (D)    the Trustee receives an opinion of counsel that such agreement is an enforceable obligation of such insurance company, bank, financial institution or parent;

    (E)    in the event of a suspension, withdrawal, or downgrade below Aa3, AA- or AA- by Moody's, S&P or Fitch, respectively, the provider shall notify the Trustee within five (5) days of such downgrade event and the provider shall at its option, within ten (10) business days after notice is given to the Trustee take any one of the following actions:

        (1)    collateralize the agreement at levels, sufficient to maintain an "AA" rated investment from S&P or Fitch and an "Aa2" from Moody's with a market to market approach, or

(2)    assign the agreement to another provider, as long as the minimum rating criteria of "AA" rated investment from S&P or Fitch and an "Aa2" from Moody's with a market to market approach; or

(3)    have the agreement guaranteed by a provider which results in a minimum rating criteria of an "AA" rated investment from S&P or Fitch and an "Aa2" from Moody's with a market to market approach; or

(4)    repay all amounts due and owing under the agreement; and

(F)    In the event the provider has not satisfied any one of the above condition within three (3) days of the date such conditions apply, then the agreement shall provide that the Trustee shall be entitled to withdraw the entire amount invested plus accrued interest without penalty or premium.

(k)    the Local Government Surplus Funds Trust Fund as described in Florida Statutes, Section 218.405 or the corresponding provisions of subsequent laws provided that such fund is rated at least "AA" by S&P (without regard to gradation) or at least "Aa" by Moody's (without regard to gradation); and

(l)    other investments permitted by Florida law.

Under all circumstances, the Trustee shall be entitled to request and to receive from the Issuer a certificate of a Responsible Officer setting forth that any investment directed by the Issuer is permitted under the Indenture.

## BONDHOLDERS' RISKS

Certain risks are inherent in an investment in obligations secured by assessments issued by a public authority or governmental body in the State. Certain of these risks are described in the sections entitled "ENFORCEMENT OF SERIES 2006-1 SPECIAL ASSESSMENT COLLECTIONS" and "IMPACT FEES"; however, certain additional risks are associated with the Series 2006 Bonds offered hereby. This section does not purport to summarize all risks that may be associated with purchasing or owning the Series 2006 Bonds and prospective purchasers are advised to read this Limited Offering Memorandum (including all of the Appendices) in its entirety for a more complete description of investment considerations relating to the Series 2006 Bonds.

(1)    Until further development takes place on the benefited land within the District, payment of a significant portion of the Series 2006-1 Special Assessments is dependent upon their timely payment by the Master Developer and the Durbin North Developer (each, as defined herein). See "THE MASTER DEVELOPER", "THE DURBIN NORTH DEVELOPER" and "THE DEVELOPMENT" herein. For purposes of this "BONDHOLDERS' RISKS" section, the Master Developer and the Durbin North Developer will be collectively referred to as the "Developers". At closing of the sale of the Series 2006 Bonds, it is expected that a majority of the land within the District burdened by the Series 2006-1 Special Assessments will continue to be owned either directly or indirectly by the Developers. In the event of the institution of bankruptcy or similar proceedings with respect to a Developer or any other subsequent owner of significant property within the District, delays could occur in the payment of debt service on the Series 2006-1 Bonds as such bankruptcy could negatively impact the ability of: (i) such Developer or such subsequent land owner being able to pay the Series 2006-1 Special Assessments, and (ii) the District to

38

foreclose the lien on the Series 2006-1 Special Assessments.  In addition, the remedies available to the
Beneficial Owners of the Series 2006 Bonds upon an Event of Default under the corresponding Series
2006-1 or Series 2006-2 Indenture are in many respects dependent upon judicial actions which are often
subject to discretion and delay.  Under existing constitutional and statutory law and judicial decisions,
during a bankruptcy of a Developer, the remedies specified by federal, state and local law and in the
Indenture and the Series 2006 Bonds, including, without limitation, enforcement of the obligation to pay the
applicable Series 2006-1 Special Assessments may not be readily available or may be limited.  The various
legal opinions to be delivered concurrently with the delivery of the Series 2006 Bonds (including Bond
Counsel's approving opinions) will be qualified as to the enforceability of the various legal instruments by
limitations imposed by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of
creditors enacted before or after such delivery.  The inability, either partially or fully, to enforce remedies
available respecting the Series 2006 Bonds could have a material adverse impact on the interest of the
Beneficial Owners thereof.

(2)     The principal security for the payment of the principal of and interest on the Series
2006-1 Bonds is the timely collection of the corresponding Series 2006-1 Special Assessments.  The Series
2006-1 Special Assessments do not constitute a personal indebtedness of the owners of the land subject
thereto, but are secured only by a lien on such land.  The Developers expect to proceed in the normal course
of business to develop and sell lots to individual builders to be served by the Series 2006 Project.  There is
no assurance that the subsequent owners of this land will be able to pay the Series 2006-1 Special
Assessments or that they will pay such Series 2006-1 Special Assessments even though financially able to
do so.  The determination of the benefits to be received by the land within the District as a result of
implementation and development of the Series 2006 Project is not indicative of the realizable or market
value of the land, which value may actually be higher or lower than the assessment of benefits.  Such
adverse effect could render the District unable to collect delinquent assessments, if any, and could
negatively impact the ability of the District to make the full or punctual payment of Debt Service on the
Series 2006-1 Bonds.  The payment of the annual Series 2006-1 Special Assessments and the ability of the
District to foreclose the lien of the unpaid taxes, including the Series 2006-1 Special Assessments, may be
limited by bankruptcy, insolvency, or other laws generally affecting creditors' rights or by the laws of the
State relating to court foreclosure.  Bankruptcy of a property owner will most likely also result in a delay by
the Tax Collector or the District in prosecuting court foreclosure proceedings.  Such delay would increase
the likelihood of a delay or default in payment of and interest on the Series 2006-1 Bonds.

(3)     The proposed Development may be affected by changes in general economic
conditions, fluctuations in the real estate market and other factors beyond the control of the Developers.  In
addition, the proposed Development is subject to comprehensive federal, state, and local regulations and
future changes to such regulations.  Approval is required from various public agencies in connection with,
among other things, the design, nature and extent of required public improvements, both public and private,
and construction of the Series 2006 Project in accordance with applicable zoning, land use and
environmental regulations for the Development.  Although no delays are anticipated, failure to obtain any
such approvals in a timely manner could delay or adversely affect the Development, which may negatively
impact the Developers' desire or ability to develop the Development as contemplated.  See "APPENDIX A
— DISTRICT ENGINEER'S REPORTS" attached hereto for a discussion of permits and approvals.

(4)     The willingness and/or ability of an owner of land within the District to pay the
Series 2006-1 Special Assessments could be affected by the existence of other taxes and assessments
imposed upon the land by the District (including the Special Assessments securing the District's
outstanding Series 2005A, 2005B-1 and 2005B-2 Special Assessment Bonds) or by the County, or by other
public entities, which may be affected by the value of the land subjected to such taxation and assessment.
Under the Uniform Method, county, municipal, school, special district taxes and assessments, including the

Series 2006-1 Special Assessments and maintenance assessments if the District were to choose the Uniform Method, and voter-approved ad valorem taxes levied to pay principal of and interest on bonds are payable at one time. Public entities whose boundaries overlap those of the District, such as the County and the County school district, could, without the consent of the owners of the land within the District, impose additional taxes or assessments on the property within the District. The District has no control over the amount of taxes or assessments levied by governmental entities other than the District. The lien of the Series 2006-1 Special Assessments is, however, of equal dignity with the liens for State and County and certain taxes upon land. As referenced herein, the District has imposed the Special Assessments securing the District's outstanding Series 2005A, 2005B-1 and 2005B-2 Special Assessment Bonds and may also impose additional assessments which could encumber the property burdened by the Series 2006-1 Special Assessments.

(5)    There is no assurance that a liquid secondary market will exist for the Series 2006 Bonds in the event a Beneficial Owner thereof determines to solicit purchasers of the Series 2006 Bonds. Even if a liquid secondary market exists, there can be no assurance as to the price for which the Series 2006 Bonds may be sold. Such price may be lower than that paid by the current Beneficial Owner of the Series 2006 Bonds, depending on the progress of the Development, existing market conditions and other factors.

(6)    England Thims & Miller Inc. (the "Engineer") has estimated the total cost of the Master Infrastructure, including the Series 2006 Project, described in "APPENDIX A — DISTRICT ENGINEER'S REPORTS" attached hereto to be $59,266,000. The proceeds of the Series 2006 Bonds are anticipated to fund only a portion of such costs of the Master Infrastructure. If, however, the proceeds of the Series 2006 Bonds were not sufficient, it is unlikely that the District would have other funds to complete the Master Infrastructure. The Developers have agreed to fund any cost overruns pursuant to the Completion Agreements; however, these obligations are unsecured.

(7)    Owners should note that several mortgage lenders have, in the past, raised legal challenges to the primacy of the liens similar to those of the Series 2006-1 Special Assessments in relation to the liens of mortgages burdening the same real property; to the best knowledge of the District (without investigation), in all such cases to date, the applicable courts have held that the assessment liens (like those of the Series 2006-1 Special Assessments) are superior to those of the commercial mortgage lenders. The mortgagees of the existing mortgage loans encumbering the land within the District secured by the Series 2006-1 Special Assessments will expressly subordinate their respective liens to the applicable Series 2006-1 Special Assessments.

(8)    The interest rate borne by the Series 2006 Bonds is, in general, higher than interest rates borne by other bonds of political subdivisions that do not involve the same degree of risk as investment in the Series 2006 Bonds. These higher interest rates are intended to compensate investors in the Series 2006 Bonds for the risk inherent in a purchase of the Series 2006 Bonds. However, such higher interest rates, in and of themselves, increase the amount of Series 2006-1 Special Assessments that the District must levy in order to provide for payments of debt service on the Series 2006-1 Bonds, and, in turn, may increase the burden upon owners of lands within the District.

(9)    Various proposals are mentioned from time to time by members of the Congress of the United States of America and others concerning reform of the internal revenue (tax) laws of the United States. Certain of these proposals, if implemented, could have the effect of diminishing the value of obligations of states and their political subdivisions, such as the Series 2006 Bonds, by eliminating or changing the tax-exempt status of interest on certain of such bonds. Whether any of such proposals will ultimately become law, and if so, what effect such proposals could have upon the value of bonds such as the Series 2006 Bonds, cannot be predicted. The Indenture does not provide for any adjustment to the interest

40

rates borne by the Series 2006 Bonds in the event of a change in the tax-exempt status of the Series 2006 Bonds.

(10)    The District is required to comply with statutory procedures in levying the Series 2006-1 Special Assessments. Failure of the District to follow these procedures could result in the Series 2006-1 Special Assessments not being levied or potential future challenges to such levy. See "SECURITY FOR AND SOURCE OF PAYMENT FOR THE SERIES 2006 BONDS" herein

(10)    Undeveloped or partially developed land is inherently less valuable than developed land and provides less security to the Bondholders should it be necessary to institute proceedings due to the nonpayment of the Series 2006-1 Special Assessments. Failure to complete development or substantial delays in the completion of the development of the Development due to litigation or other causes may reduce the value of the Development and increase the length of time during which Series 2006-1 Special Assessments will be payable from undeveloped property and may affect the willingness and ability of the owners of such property to pay the Series 2006-1 Special Assessments when due.

(11)    While the District has represented to the Underwriter that it has selected its manager, financial advisor, counsel, engineer, corporate trustee and other professionals with the appropriate due diligence and care, and while the foregoing professionals have each represented in their respective areas as having the requisite expertise to accurately and timely perform the duties assigned to them in such roles, the Underwriter does not guaranty any portion of the performance of these professionals. Failure on the part of any one of these professionals to perform their obligations could result in a delay in payment on the 2006 Bonds, and in the worst possible situation, the non-payment of the 2006 Bonds.

(12)    Portions of the Series 2006-1 Bonds and the entirety of the Series 2006-2 Bonds are to be prepaid from Impact Fee Revenues as paid to the District by builders pursuant to the Impact Fee Agreement. While any risk in the payment of Special Assessments is also mitigated by build-out and diversity in payors, bonds secured solely by Impact Fee Revenues are dependent exclusively upon the timely development and construction of end product units on the subject property. Bonds supported by Special Assessments enjoy a priority lien on the subject property co-equal with other governmental units, while bonds supported by Impact Fee Revenues do not enjoy a lien on real property but only an obligation on the part of the District to use the impact fees to pay the Series 2006-2 Bonds as funds come in.

As referenced above, impact fees are essentially unsecured payment obligations and not a direct, and foreclosable interest in land. Accordingly, even if an obligated developer (or the District in this case) builds impact fee producing infrastructure, there is no guarantee that impact fees will be paid. In other words, if builders do not apply for electrical energizing, no impact fees will be paid, and there will be no revenue stream with which to repay indebtedness backed by impact fees. This risk of non-development is, however, shared with special assessment-backed securities, but without the ultimate lien on the land in question.

Another risk related to impact fee-backed bonds, such as the Series 2006-2 Bonds, is that the developer's expenditures for the impact fees for capital improvements will not be fully compensated with the impact fee credits. That is, if the local government issuing the impact fee credits believes that the costs of the subject capital improvements are inflated or unjustified, it may not issue impact fee credits for that portion of the expense it believes to be excessive. The problem then is that the developer (or in this case the District) would not be fully repaid for its improvements, and instead would only be repaid to the amount of impact fee credits issued to it. There is also the risk that the local government issuing the impact fee credits will not fulfill its end of the bargain and will refuse to allow electrical energizing applicants to

pay impact fees to the developer (District in this case) in exchange for credit, this risk is however mitigated by the Impact Fee Agreement as described under "IMPACT FEES — Impact Fee Agreements" herein.

Additionally, the obligation of Durbin Crossing, LLC to make minimum quarterly payments in the event of a shortfall in collection of impact fee credits is an unsecured obligation of Durbin Crossing, LLC.

Given the foregoing, bonds backed solely by impact fee credits, such as the Series 2006-2 Bonds, share the same risks associated with slow, or no, development that special assessment-backed bonds have, along with contractual risk on the part of the impact fee credit issuing governmental entity and without the additional security of a lien on real property. See also "THE DEVELOPMENT — Road and Park Impact Fee Agreement" and "— Impact Fees and Impact Fee Credits" herein.

(13)    No application for credit enhancement or a rating on the Series 2006 Bonds has been made.

(14)    Each Series of the Series 2006 Bonds is separately secured notwithstanding the collective descriptions used herein. The Series 2006-1 Special Assessments and the Funds and Accounts under the Series 2006-1 Indenture do not secure the Series 2006-2 Bonds. Likewise, the Impact Fee Revenues exclusive of that portion set out in the Impact Fee Schedule which the District has directed to be applied to extinguishment of the Series 2006-1 Special Assessments, and the Funds and Accounts under the Series 2006-2 Indenture do not secure the Series 2006-1 Bonds.

(15)    Certain lands outside of the Development and outside of the Aberdeen development are required in order to construct the transportation improvements required by the Durbin Crossing DRI and the Aberdeen DRI (as hereinafter described). Substantially all of those lands for the "Durbin Roads" as defined in the Durbin Crossing DRI are under contract with Durbin Crossing, LLC.

(16)    The homebuilding industry in Florida is currently undergoing significant slowing of new home sales and new home closings, as well as an increased rate of cancellation of new home purchase contracts, as compared to recent years. Although the projected absorption rate illustrated under the heading "THE DEVELOPMENT — Projected Absorption" is based upon estimates and assumptions made by the Developers, and although considered reasonable by the Developers utilizing historical data, and taking into account current market conditions, it is inherently uncertain and subject to significant business, economic and competitive uncertainties and contingencies, all of which are difficult to predict and many of which are beyond the control of the Developers. In particular, historical data will likely not be indicative of future market conditions. The Developers can not predict with certainty the duration of the slowing of new home sales and deliveries, whether significant additional slowing of new home sales and deliveries will occur, and the extent to which the slowdown will impact the Development. As a result, there can be no assurance that the absorption rate will occur or be realized in the manner set forth under "THE DEVELOPMENT — Projected Absorption".

(17)    The Durbin DO (see "THE DEVELOPMENT — Development Entitlements" herein) is interdependent upon certain obligations required by the Aberdeen Development of Regional Impact development order (the "Aberdeen DO"). Specifically, these transportation obligations are the construction of Aberdeen Boulevard from Greenbriar Road to the east boundary of Aberdeen, the construction of County Road 244 from the east boundary of Aberdeen up to and including the intersection with County Road 223, and County Road 223 from its intersection with County Road 244 to Race Track Road. Both the Durbin DO and the Aberdeen DO stipulate that the commencement and guaranteed completion (through performance bond or community development district financing) of the construction

of the transportation improvements must occur within two years in order for either project to obtain building permits for vertical improvements. The Aberdeen Community Development District issued its Special Assessment Bonds, Series 2005 in October 2005 and anticipates issuing a future series of bonds in December 2006 to fund its transportation obligations required by the Aberdeen DO.

This section does not purport to summarize all risks that may be associated with purchasing or owning the Series 2006 Bonds and prospective purchasers are advised to read this Limited Offering Memorandum in its entirety (inclusive of Appendices) for a more complete description of investment considerations relating to the Series 2006 Bonds.

## THE DISTRICT

**General**

The District is a local unit of special purpose government which was established pursuant to Rule 42MM-1, Florida Administrative Code, adopted by the Florida Land and Water Adjudicatory Commission effective November 5, 2003. The District encompasses approximately 2,047 acres of land located in northwest unincorporated St. Johns County, Florida, approximately twenty miles south of downtown Jacksonville and fifteen miles northwest of historic St. Augustine.

Lands within the District are situated within the 2,047 acre Durbin Crossing Development of Regional Impact (previously described as the "Durbin Crossing DRI") which are subject to the St. Johns County Development Order for the Durbin Crossing DRI (the "Development Order" or the "Durbin DO"). As part of the Development Order, land uses established for the District include residential (single family and multifamily), commercial, office, recreational and ancillary uses. See "THE DEVELOPMENT" herein.

**Powers**

Among other provisions, the Act gives the District's Board of Supervisors the authority to (a) plan, establish, acquire, construct or reconstruct, enlarge or extend, equip, operate and maintain: (i) water management and control of lands within the District and to connect any of such facilities with roads and bridges, (ii) water supply, sewer and waste water management systems or any combination thereof and to construct and operate connecting intercept or outlet sewers and sewer mains and pipes and water mains, conduits, or pipelines in, along, and under any street, alley, highway, or other public places or ways, and to dispose of any effluent, residue, or other byproducts of such system or sewer system; (iii) district roads equal to or exceeding county specifications, and street lights, (iv) bridges and culverts, and (v) conservation and mitigation areas, (b) borrow money and issue notes and bonds of the District; (c) impose and foreclose special assessment liens as provided in the Act, and (d) exercise all other powers, necessary, convenient, incidental or proper in connection with any of the powers or duties of the District stated in the Act.

The Act provides, that with the consent of the local general-purpose government within the jurisdiction of which such facilities will be operated (in the case of the District, St. Johns County), the District may also acquire, equip, operate, and maintain additional systems and facilities for, among other purposes, parks and facilities for indoor and outdoor recreational, cultural, and educational uses.

The Act does not empower the District to adopt and enforce land use plans or zoning ordinances and the Act does not empower the District to grant building permits; these functions are performed by the County acting through its County Commission and its departments of government.

**Board of Supervisors**

The Act provides for a five member Board of Supervisors (the "Board") to serve as the governing body of the District. Members of the Board ("Supervisors") must be residents of the State and citizens of the United States. The initial Supervisors are identified in Rule 42MM-1 establishing the District pursuant to Chapter 190, Florida Statutes, until an election is advertised. Following advertisement, the Supervisors are elected on an at-large basis by the owners of the property within the District. Ownership of land within the District initially entitles the owner to one vote per acre (with fractions thereof rounded upward to the nearest whole number). Each Supervisor serves until expiration of his or her term and until his or her successor is chosen and qualified. If, during a term of office, a vacancy occurs, a majority of the remaining Supervisors may fill the vacancy by an appointment of an interim Supervisor for the remainder of the unexpired term.

The landowners in the District elect two Supervisors to four-year terms and three Supervisors to two-year terms at the first landowner election. After the first election of the Board, the next election by landowners will be the first Tuesday in the applicable November. Thereafter, the elections will take place every two years on a date in November established by the Board. Until the later of six years after the initial appointment of Supervisors or the year when the District attains at least 250 qualified electors, Supervisors whose terms are expiring will begin to be elected (as their terms expire) by qualified electors of the District. A qualified elector is a registered voter who is a resident of the District and the State and a citizen of the United States. At the election where Supervisors are first elected by qualified electors, two Supervisors must be qualified electors and be elected by qualified electors, both to four-year terms. The other Supervisor will be elected by landowners to a four-year term and is not required to be a qualified elector. Thereafter, as terms expire, all Supervisors must be qualified electors and be elected by qualified electors to serve staggered terms for terms of four years.

Notwithstanding the foregoing, if at any time the Board proposes to exercise its ad valorem taxing power, prior to the exercise of such power it shall call an election at which all Supervisors shall be elected by qualified electors of the District. Elections subsequent to such decision shall be held in a manner such that the Supervisors will serve four-year terms with staggered expiration dates in the manner set forth in the Act.

The Act provides that it shall not be an impermissible conflict of interest under State law governing public officials for a Supervisor to be a stockholder, officer or employee of a landowner.

The current members of the Board and their terms of office are set forth below:

| Name | Title | Term Expires |
|------|-------|--------------|
| Patrick E. Sessions * | Chairman | 2008 |
| Jason R. Sessions * | Vice Chairman | 2008 |
| Scott Henley | Supervisor and Assistant Secretary | 2008 |
| Kenneth Strauss * | Supervisor and Assistant Secretary | 2010 |
| Susan Wood ** | Supervisor and Assistant Secretary | 2010 |

\*     Principals or employees of the Master Developer or its affiliates.
\*\*    Principal or employee of the Durbin North Developer or its affiliates.

The Act authorizes the Board to hire such employees and agents as it may determine necessary. Hopping Green & Sams, P.A., Tallahassee, Florida, serves as counsel to the District. The District has retained Greenberg Traurig, P.A., Miami, Florida, as Bond Counsel. The District has retained

Governmental Management Services, LLC, St. Augustine, Florida, as district manager (the "District Manager") and Fishkind and Associates, Inc., as its financial consultant ("Fishkind"). Fishkind will prepare the assessment roll for the Series 2006-1 Special Assessments. The District has retained England, Thims & Miller, Inc., Jacksonville, Florida, as the District's engineer.

**The District Manager**

The Act authorizes the Board to hire a district manager as the chief administrative official of the District. The Act provides that such district manager shall have charge and supervision of the works of the District and shall be responsible for (i) preserving and maintaining any improvement or facility constructed or erected pursuant to the provisions of the Act, (ii) maintaining and operating the equipment owned by the District, and (iii) performing such other duties as may be prescribed by the Board.

Governmental Management Services, LLC ("GMS") has been retained as the firm to provide district management services for the District (in that capacity, the "District Manager"). GMS is part of a newly-organized family of companies established for the purpose of providing special district management services to community development districts (CDD). GMS and its affiliates currently have offices in Jacksonville and Ft. Lauderdale, Florida and Knoxville, Tennessee. The current staff of GMS has been providing management, financial and administrative reporting services to over 100 special taxing districts and homeowners associations during their careers at prior organizations. The District Manager's office is currently located at World Golf Village, 475 West Town Place, Suite 111, St. Augustine, Florida 32092, and its telephone number is (904) 940-5850.

### THE SERIES 2006 PROJECT

In order to serve the landowners of the District, the District developed an improvement plan to allow it to finance, acquire, construct and maintain certain infrastructure that will specifically benefit the District (the "Improvement Plan"). The Improvement Plan includes both master infrastructure improvements (the "Master Infrastructure") and neighborhood infrastructure improvements (the "Neighborhood Infrastructure"). The Master Infrastructure includes onsite and offsite roadways, water and sewer improvements, stormwater management, recreation facilities, right-of-way acquisition, entry features, and associated professional fees for permitting, engineering and design. The District Engineer has estimated the total cost of the Master Infrastructure at $59,266,000. The Master Infrastructure cost estimates include the cost of JEA transmission components of the water, sewer and reuse facilities within the District roadways estimated at $3,511,200. The cost of the JEA transmission components will be reimbursed to the District by JEA on a monthly basis. The Neighborhood Infrastructure includes clearing and grubbing, earthwork, water and sewer improvements, re-use underground utility construction, paving and drainage, grassing, sodding, underground electrical conduit, neighborhood street lighting and the neighborhood parks system. The District Engineer has estimated the total cost of the Neighborhood Infrastructure at $66,300,000. See "APPENDIX A — DISTRICT ENGINEER'S REPORTS" for a more detailed description of these improvements.

The Master Developer, as defined below, is developing all of the Master Infrastructure for the Development except for certain items that the Durbin North Developer (as described immediately below) has agreed to develop. The District issued its Series 2005A Bonds to fund approximately $44,762,915 of the Master Infrastructure (the "Series 2005A Project"). The District is issuing its Series 2006 Bonds to fund approximately $10,436,297 of Master Infrastructure consisting of transportation and park improvements (the "Series 2006 Project"). Any portion of the Master Infrastructure not funded by either the Series 2005A Bonds or the Series 2006 Bonds will be funded by the Master Developer. See "THE DEVELOPMENT – District Infrastructure and Finance Plan" for additional information regarding the Improvement Plan.

*The information appearing below under the captions "THE MASTER DEVELOPER", "THE DURBIN NORTH DEVELOPER" and "THE DEVELOPMENT" has been furnished by the Master Developer and the Durbin North Developer. This information has not been independently verified by the District or the Underwriter and neither the District nor the Underwriter makes any representation or warranty as to the accuracy or completeness of the information.*

## THE MASTER DEVELOPER

PJK Development Corp., a Florida corporation, and Durbin Crossing, LLC, Brickell Manor, LLC, Orchard Park Jax, LLC and Silvertree Estates, LLC, each a Florida limited liability company (each, a "Related Company" and collectively, with PJK Development Corp., the "Master Developer"), are developing all of the Master Infrastructure for the Development (except for certain items the Durbin North Developer has agreed to develop) and the Neighborhood Infrastructure for 705 single-family units planned within Durbin Crossing South.

Each Related Company is responsible for the costs of development of its respective lands and for its proportionate share of the Wachovia Loan. See "THE DEVELOPMENT — Land Acquisition" herein. PJK Development Corp., on behalf of Durbin Crossing, LLC, is responsible for developing 19.20% of the Development. Brickell Manor, LLC was responsible for 64.80% of the Development but has sold substantially all of its lands within the Development to Durbin Crossing North, LLC (which entity is the Durbin North Developer described herein), which is now responsible for developing the Neighborhood Infrastructure for that portion of the Development. Orchard Park Jax, LLC is responsible for developing 11.20% of the Development and Silvertree Estates, LLC is responsible for developing 4.80% of the Development. Silvertree Estates, LLC has sold a portion of its land holdings to a multifamily builder and intends to sell its remaining lands as undeveloped land and thus will not incur development costs.

The shareholders (and their percentage interests) of PJK Development Corp. are Vegso Holdings, LLC (45% interest), Patrick E. Sessions (25% interest), Jason R. Sessions (5% interest), Melinda and Christian Blonshine (20% interest) and Kenneth J. Strauss (5% interest). Peter Vegso is the sole member of Vegso Holdings, LLC. The shareholders of PJK Development Corp. have contributed a total of $3,500,000 to PJK Development Corp. PJK Development Corp. is the sole member of Durbin Crossing, LLC.

The ownership structures of Brickell Manor, LLC, Orchard Park Jax, LLC and Silvertree Estates, LLC, are the same and each has two classes of members: (i) a capital member, and (ii) the profit members. The sole capital member of these three Related Companies is Vegso Holdings, LLC, a Florida limited liability company which holds a 65% interest in these three Related Companies. The profit members of each remaining Related Company are Patrick E. Sessions (25% interest), BDPB Durbin Crossing, LLC, a Florida limited liability company (5% interest), and Jason R. Sessions (5% interest). Durbin Crossing Development Corp. is the Manager of each Related Company. Patrick E. Sessions is the sole shareholder and president of Durbin Crossing Development Corp. Kenneth J. Strauss is the sole shareholder, sole director and president of Kenneth J. Strauss, CPA, CFP, P.A., which (i) is a partner in Berkowitz Dick Pollack and Brant LLP, (ii) is the Manager of BDPB Durbin Crossing, LLC, a 5% profit member of each remaining Related Company, (iii) as trustee for the partners of Berkowitz Dick Pollack and Brant LLP, is the sole member of BDPB Durbin Crossing, LLC, and (iv) is the financial manager of each remaining Related Company.

Pursuant to an agreement among the Related Companies, the Related Companies have given PJK Development Corp. (in such capacity, the "Development Agent") the authority to manage their respective lands and act as their agent for the development of the Development. PJK Development Corp., Brickell Manor, LLC, Silvertree Estates, LLC and Orchard Park Jax, LLC retained Durbin Crossing Development

Corp. (in such capacity, the "Development Manager") to perform, or cause to be performed, the (i) day-to-day management of the operations of each Related Company in accordance with the terms of each operating agreement, and (ii) all functions in connection with the ownership of the land, the development, management, sales, marketing, and leasing efforts in connection with developing the Development. PJK Development Corp., Brickell Manor, LLC, Silvertree Estates, LLC and Orchard Park Jax, LLC retained Southeastern Development Group, Inc as project manager (the "Project Manager") for the Development to work at its direction. Jason Sessions is the sole shareholder and president of Southeastern Development Group, Inc.

**P. E. Sessions & Associates, Inc.**

The President of the Development Manager, Patrick E. Sessions, is also President and Chief Executive Officer of P .E. Sessions & Associates, Inc. ("S&A"), multi-faceted development company which offers management and consulting for all types of real estate projects. Various disciplines such as economic feasibility, financial modeling, sales management, marketing and construction management are provided both through in-house staff and the use of outside consultants where appropriate. S&A also specializes in workout situations for both developers and lending institutions. Their clients have included some of the largest and most prestigious firms in both these fields.

From 1992 through 1999, S&A was retained by Atlantic Gulf Communities ("AGC") as a consultant on all aspects of AGC's business.

The following table summarizes S&A's and S&A's affiliates' current and completed projects.

| Year | Project | Location | Description | Status | S&A's Role |
|------|---------|----------|-------------|--------|------------|
| 1996 | Regency at Island Dunes | Hutchison Island, FL | 144 luxury condos | Sold out | Partner and Project Manager |
| 1997 | River Walk Towers | Ft. Lauderdale, FL | 375 luxury condos; 300 room hotel; 300,000 sq. ft. office space | Sold out | Acquired and permitted |
| 1998 | Spring Valley Ranch (Chenoa) | Outside Aspen, CO | 500 single-family units, 75 quarter share cabins; 2 golf courses; clubhouse; equestrian center, 25,000 sq. ft. commercial space | Under Development | Managed the acquisition, financing, land and product planning, permitting and marketing |
| 2000 | High Aspen Ranch | Outside Aspen, CO | 29 thirty-five acre ranch sites, clubhouse, equestrian center, pool, tennis, trail system | 11 lots sold | Partner and Development Manager |
| 2000 | Ocean Links of Ponte Vedra | Ponte Vedra Beach, FL | 192 condo conversion | Sold out | Partner and Project Manager |
| 2000 | Lakeside Village | Orlando, FL | 800 single-family units | Sold out | Partner and Project Manager |
| 2002 | Bartram Springs | Jacksonville, FL | 1,400 single-family units | Under Development | Management and Development Consultant |
| 2004 | Marlin Bay | Marathon, FL | 92 single-family; 115 slip marina; clubhouse | Under Development | Development and Marketing Consultant |
| 2005 | Sail Cove | Jacksonville, FL | 280 unit condominium conversion | Sold out | Partner and Project Manager |

**Resumes**

*Patrick E. Sessions*

Prior to forming S&A, Mr. Sessions was a member of the Board of Directors for Atlantic Gulf Communities Corporation in Miami, Florida from 1992 to 1993. Prior to that, Mr. Sessions was Vice President of Real Estate for Huizenga Holdings, Inc. in Fort Lauderdale, Florida from 1990 to 1992. At Huizenga Holdings, Mr. Sessions was responsible for acquisitions, development, management, and sales of real estate holdings personally held by H. Wayne Huizenga, former Chairman of Blockbuster Entertainment and Chairman of Republic Industries and AutoNation. These assets included a 300-acre waterfront single-family community with an 18-hole championship golf course and 88-slip marina in Stuart and the Dolphin Center Project, which includes the Pro Player Stadium (formerly Joe Robbie Stadium), 800,000 square feet of office space and 465,000 square feet of retail space in Dade County, Florida. Responsibilities also included feasibility analysis for potential acquisitions of residential and commercial properties.

From 1981 to 1990, Mr. Sessions was President of both the Weston Division and the Special Projects Division of the Arvida Company in Boca Raton, Florida. As President of these two divisions from 1986 through 1990, Mr. Sessions was responsible for all aspects of these projects with approximately 25 senior employees reporting directly to him and approximately 400 employees in the divisions.

Weston, a wholly owned project of the Arvida Company, is a 10,000 acre Planned Unit Development in Broward County, Florida, ten miles west of the City of Fort Lauderdale, Florida. As President of this division, Mr. Sessions was responsible for all activities at Weston, which included land planning, product development, sales, public relations and marketing activities. Responsibilities also included development and operation of Weston Hills Country Club, with a 50,000 square foot clubhouse, an 18-hole championship golf course, an athletic club, a cable television franchise, equestrian center and a 150,000 square foot shopping center. Weston also has its own special taxing district, which is responsible for all water management systems, roads, sewer and water. The special taxing district issued in excess of $170,000,000 to fund infrastructure for the Weston project.

Sales at Weston averaged $125,000,000 per year. There was an average of fifteen product lines, which ranged in price from $125,000 to custom homes in excess of $5,000,000. The sales operation employed eighteen salespeople and the entire project employed approximately 350. Weston's construction division was responsible for construction of 600 units per year with the remainder being constructed by outside builders. Weston's development district annually expended an additional $30,000,000.

Specialized activities included extensive interface with the Environmental Protection Agency and other Federal and State agencies regarding environmental issues, as well as master planning issues with the County and State. Also, included are schools, churches, police stations and other public facilities. In 1997 Weston was incorporated as the City of Weston. Build out was substantially completed in 2003.

The Special Projects Division was made up of joint ventures with VMS Realty, City Federal Savings & Loan and the Miami Savings Group. As President of the division, it was also Mr. Sessions' responsibility to negotiate these joint ventures as well as to negotiate land sales to various builders. As President of the Special Project Division, Mr. Sessions was directly involved with the following projects:

**THE ADDISON** – The Addison is a 180-unit luxury condominium on the Atlantic Ocean in Boca Raton with an average initial sales price of $600,000 per unit. Resales at the Addison now average in excess of $1,000,000 per unit.

**MIZNER VILLAGE** – Mizner Village consists of Mizner Court, a 200-unit five-story garden style condominium project with initial prices averaging $350,000, and Mizner Tower, a 134-unit high-rise condominium project with initial prices averaging $650,000. These projects are on the grounds of the Boca Raton Hotel and Club on Lake Boca Raton.

**COCOPLUM** – Cocoplum is a high-end waterfront single-family community in Coral Gables, Florida. It has 320 lots, which average $350,000 each, and a 175-s1ip full service marina and yacht club.

**BOCA WEST** – Boca West is a 1,400-acre luxury resort development in Boca Raton, Florida. As Director of Development, Mr. Sessions' responsibilities included product conception, land planning, product design, overview of bidding and construction, as well as coordination of sales efforts on all residential and commercial projects in Boca West. Sales averaged 350 units annually, with an average price of $350,000. Responsibilities also included the completion of a 100,000 square foot country club center with four championship golf courses and 36 tennis courts as well as negotiations of joint ventures with outside builders and development of the commercial core of Boca West.

From 1977 to 1981 Mr. Sessions was a Vice President for Housing Investment Corporation of Florida, a subsidiary of the Chase Manhattan Bank, in Miami, Florida. Mr. Sessions was initially employed as Manager of Construction Operations, with the responsibility of completion, rehabilitation or tenant improvements for over thirty projects valued in excess of $350,000,000 foreclosed by HIC as lender. These projects included PUDs, single-family homes, town houses, condominiums, office buildings, warehouses and rental apartments throughout the southeast United States. In 1978 Mr. Sessions was appointed Vice President with total responsibility for completion, management and sale of projects valued at approximately $150,000,000. This included negotiations of all phases of disposition, including sales price, mortgages, release provisions and project viability in cases of purchase money mortgages. The corporation liquidated the projects and has now been dissolved.

*Jason Sessions*

Jason Sessions is a vice president of S&A and is the sole shareholder and president of Southeastern Development Group, Inc. From 2005 to September 2006, Southeastern Development Group, Inc. was Project Manager for Sail Cove, a 280 unit condominium conversion in Jacksonville, Florida. Sales at Sail Cove totaled approximately $47 million over the course of approximately eighteen months. From 2000 to 2002, Southeastern Development Group, Inc. was Project Manager for Ocean Links of Ponte Vedra, in Ponte Vedra, Florida. As Project Manager, Mr. Session directed the conversion of 192 luxury apartments homes to condominium ownership. His responsibilities in both the Ocean Links and Sail Cove developments included completing project due diligence to facilitate acquisition funding with GE Capital; preparing budgets and reporting to the equity partner on a quarterly basis; all sales, marketing (leasing and sales), rehab and accounting operations. Mr. Sessions also supervised the design and construction of the second phase. Sales totaled $28 million in two years and the project was completed eight months ahead of projections.

From 1995 to 2000, Mr. Sessions worked for Atlantic Gulf Communities in Miami Florida as Project Manager for several developments including:

**JUPITER OCEAN GRANDE**, Jupiter, Florida (1999 - 2000) – Mr. Sessions directed the design, construction, and sales for the development of 148 luxury condominiums totaling $60 million in sales. His responsibilities included implementing a new marketing plan with a million dollar per year budget; supervising the sales manager and two sales associates; selecting the general contractor and negotiating a $30 million dollar contract.

**SUNSET LAKES**, Miramar, Florida (1998 - 1999) – Mr. Sessions directed the design and construction of the $4 million amenity center; assisted in the land planning and the earthwork necessary to market the lots to individual homebuilders; monitored the progress of the general contractor, overseeing the quality of the job and approving draw requests exceeding $1 million; worked with project director designing and building sales office.

**REGENCY ISLAND DUNES**, Stuart, Florida (1995 – 1998) – Mr. Sessions assisted the Project Managing Director in the design, construction, marketing and management for the development of 144 individually designed luxury condominiums valued at $47 million. His responsibilities included working directly with the sales staff to guide homeowners throughout the planning of their plans for owner changes and implemented a computer system streamlining the custom planning of units to the general contractor; executing change orders for owner changes that exceeded $30,000/unit; monitoring the progress of the general contractor, overseeing the quality of the job and approving draw requests averaging $1 million; serving as a liaison between the owner and the general contractor, interior designer, architect, and engineer. Mr. Sessions was also involved in the negotiation and the selection process of sub-contractors and suppliers. In 1997, he was promoted from Assistant Project Manager to Project Manager and also assumed responsibility for all marketing and sales operations.

Prior to joining Atlantic Gulf Communities, Mr. Sessions was a Director of Marketing for Marbledge, Inc., in Lake Worth, Florida. His responsibilities included controlling the marketing and the production of marble, granite and stone products; supervising sales and distribution of $10.5 million in inventory per year working with major retailers such as Home Depot; developing the process for receiving and distributing of orders; supervising sales representatives throughout the United States.

Jason Sessions received a Bachelor of Science in Marketing from Florida State University, Tallahassee, Florida.

### THE DURBIN NORTH DEVELOPER

Durbin Crossing North, LLC, a Florida limited liability company (the "Durbin North Developer"), is developing the Neighborhood Infrastructure and certain items of the Master Infrastructure for the northern portion of the Development ("Durbin Crossing North"), which is planned for 813 single-family units. The members of Durbin Crossing North, LLC include The Wood Development Company of Jacksonville ("WDC"), a Florida corporation (45% interest), Mandarin Christian Church, Inc., a Florida not-for-profit corporation known as Christ Church of Mandarin (5% interest), and W.R. Howell Company ("WRH"), a Florida corporation (50% interest). WDC is the managing member. As of September 30, 2006, the members had made a total capital contribution of $1,000 in the form of equity, and $2,005,854 in the form of loans.

Since 1986, Rick Wood has been the President/Founder of WDC, a real estate development company developing projects in the Northeast Florida area. In 1987, Mr. Wood founded, and has since served as President, of Rick Wood and Associates, Inc, a real estate sales company specializing in commercial brokerage, leasing and consulting.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

The following table summarizes the current and completed projects of WDC:

| Year | Project | Location | Description | Status |
|------|---------|----------|-------------|--------|
| 2006 | Kernan West Addition | Duval County, FL | 36 single-family lots | Permitting |
| 2006 | Orangedale | St. Johns County, FL | 29 single-family lots | Permitting |
| 2006 | Blackcreek | Clay County, FL | commercial and multi-family | Permitting |
| 2005 | Aberdeen | St. Johns County, FL | 563 single-family units | Under Development |
| 2005 | Durbin Crossing | St. Johns County, FL | 813 single-family units | Under Development |
| 2005 | Bartram Springs | St. Johns County, FL | 278 multi-family units | Under Development |
| 2005 | Murabella | St. Johns County, FL | 959 single-family lots | Under Development |
| 2005 | Liberty Park | St. Johns County, FL | 408 single-family lots | Permitting |
| 2004-2006 | Worthington Park | St. Johns County, FL | 149 single-family lots | Sold Out |
| 2004-2006 | Kernan Forest West | Duval County, FL | 235 single-family lots | Sold Out |
| 2004-Present | Sevilla | St. Johns County, FL | 405 single-family lots | Under Development |
| 2004-2005 | Whisper Ridge | St. Johns County, FL | 405 single-family lots | Sold Out |
| 2003-2004 | Waterleaf | Duval County, FL | 337 single-family lots | Sold Out |
| 2003-2004 | Espanita | St. Johns County, FL | 24 single-family lots | Sold Out |
| 2003-2004 | Kernan Forest | Duval County, FL | 154 single-family lots, 316 multi-family units | Sold Out |
| 2001-2004 | Stonehurst Plantation | St. Johns County, FL | 518 single-family lots | Sold Out |
| 2001-2003 | Whisper Creek | Clay County, FL | 230 single-family lots | Sold Out |
| 2000-2002 | Canterwood | Duval County, FL | 35 single-family lots | Sold Out |
| 2000-2002 | Coachman Meadows | Duval County, FL | 106 single-family lots | Sold Out |
| 2004-2006 | WaterMill | Duval County, FL | 1,100 single-family lots | Sold Out |
| 2000-2003 | Brannan Mill Plantation | Clay County, FL | 269 single-family lots | Sold Out |
| 2000-2002 | Watermill of Orange Park | Clay County, FL | 47 single-family lots | Sold Out |
| 2000-2002 | Cutters Point | Clay County, FL | 108 single-family lots | Sold Out |
| 1999-2001 | Hammock Grove | Clay County, FL | 59 single-family lots | Sold Out |
| 1999-2001 | Cranes Landing | Clay County, FL | 71 single-family lots | Sold Out |
| 1999-2001 | Coachman Lakes | Duval County, FL | 172 single-family lots | Sold Out |
| 1998-2000 | Olde Sutton Oaks | Clay County, FL | 109 single-family lots | Sold Out |
| 1998-2000 | Savannah Glen | Clay County, FL | 252 single-family lots | Sold Out |
| 1998-2000 | Glen Laurel | Clay County, FL | 198 single-family lots | Sold Out |
| 1996-2002 | Christopher Cove, Unit 2 | Clay County, FL | 24 single-family lots | Sold Out |
| 1995-2000 | Sweetbriar | Clay County, FL | 306 single-family lots | Sold Out |
| 1994-1995 | Christopher Cove Unit 1 | Clay County, FL | 14 single-family lots | Sold Out |
| 1994-1966 | Hidden Village, Unit VIII | Duval County, FL | 62 single-family lots | Sold Out |
| 1993-1996 | Crystal Springs, Unit V | Duval County, FL | 40 single-family lots | Sold Out |
| 1993-1996 | Spencers Crossing | Duval County, FL | 316 single-family lots | Sold Out |
| 1992-1997 | Ashford | Duval County, FL | 64 single-family lots | Sold Out |
| 1992-1993 | Egret's Glade | Clay County, FL | 69 single-family lots | Sold Out |
| 1991-1993 | Hibernia Oaks, Unit II | Clay County, FL | 33 single-family lots | Sold Out |
| 1991-1993 | Crystal Springs, Unit IV | Duval County, FL | 51 single-family lots | Sold Out |
| 1989-1991 | Crystal Springs, Unit I-III | Duval County, FL | 166 single-family lots | Sold Out |
| 1989-1991 | Hibernia Oaks, Unit I | Clay County, FL | 33 single-family lots | Sold Out |
| 1988-1991 | Blanding Boulevard | Orange Park, FL | Commercial Property | Sold Out |
| 1987-1988 | Indian Pines | Clay County, FL | 34 single-family lots | Sold Out |

## THE DEVELOPMENT

**General**

Durbin Crossing (the "Development") is a 2,047 acre master-planned residential community located in northwest unincorporated St. Johns County, Florida south of Racetrack Road, approximately twenty miles south of downtown Jacksonville and fifteen miles northwest of historic St. Augustine. The Development is currently planned for 1,518 single-family units, 997 multi-family units, 170,000 square feet of commercial/office space, recreational facilities and a future elementary school.

The Development is situated east of the Aberdeen Development of Regional Impact (the "Aberdeen DRI"), which is planned for a 1,947 unit residential community and is being developed concurrently with the Development. Direct access to the Development will be via planned County Road 244 which will extend west from Russell Sampson Road on the east, through the Development to its western border and continue west through the Aberdeen DRI, or planned County Road 223, which will connect Race Track Road to the north with planned County Road 244 while passing through a portion of the Development. The Development is highly accessible via a number of roadways and thoroughfares. Race Track Road provides access to US Highway 1 to the east and State Road 13 to the west. State Road 13 provides access to Interstate 295, approximately seven miles north of the Development. County Road 210, just south of the Development, provides direct access to Interstate 95 and US Highway 1 to the east (approximately two and four miles, respectively), and State Road 13 to the west. Interstate 95 is the major north-south corridor along the eastern seaboard, from Canada to Miami and runs north-south through the heart of the County. U.S. Highway 1 served as the major north-south route prior to the construction of Interstate 95 and also runs through the County. Interstate 295 and Interstate 4 are approximately six miles north and sixty miles south, respectively, via Interstate 95.

The Jacksonville International Airport is approximately thirty miles north of the Development via Interstate 95 and the St. Augustine and St. Johns County Airport, a general aviation airport, is approximately fifteen miles southeast of the Development. The Orlando International Airport can be reached in less than two hours.

The Development is situated approximately five miles east of the St. Johns River, approximately twelve miles west of the Intracoastal Waterway, approximately fifteen miles west of the Atlantic Ocean and is centrally located to recreational opportunities, shopping and restaurants. Located approximately eighteen miles southeast of the Development at the interchange of Interstate 95 and State Road 16 are two outlet malls in excess of 300,000 square feet, Belz Factory Outlet World and the St. Augustine Premium Outlets. The nearest regional shopping mall is The Avenues Mall, which is located at the merger of U.S. Highway 1 and Southside Boulevard in south Jacksonville approximately eleven miles from the Development. The Avenues Mall opened in September 1990 and contains approximately 1.3 million square feet of enclosed retail shopping area, making it the second largest mall in Jacksonville and northeast Florida.

Based on the Florida Comprehensive Assessment Test (FCAT) scores and teacher tenure, the County offers one of the best school systems throughout the State. During the past several years, the St. Johns County School District has consistently ranked among the top ten percent of school districts in the State and is one of only ten school districts in the State to receive an overall grade of "A" four years in a row. In 2005, it ranked fifth among the sixty-seven Florida counties on the FCAT. As part of the Florida School Recognition Award Program, sixteen St. Johns County schools received special recognition and were awarded more than $1.6 million through the 2005 program.

52

**Land Acquisition**

Durbin Crossing, LLC, Orchard Park Jax, LLC, Silvertree Estates, LLC and Brickell Manor, LLC, each a Florida limited liability company (each previously described as a "Related Company"), acquired the lands comprising the Development from Rayland, LLC and Rayonier Timberlands Operating Company, L.P., under an assignment from P.E. Sessions & Associates, Inc. (previously described as "S&A"), an affiliate of the Related Companies. PJK Development Corp. (as previously described, collectively with the Related Companies, the "Master Developer") subsequently acquired the member interests in Durbin Crossing, LLC. See caption "THE MASTER DEVELOPER" herein and the subheading "— P.E. Sessions & Associates, Inc" thereunder. S&A had acquired the right to acquire the lands from E&W Investment, LLC pursuant to an Amended and Restated Purchase and Sale Agreement (the "Acquisition Contract") dated as of August 27, 2003. E&W Investment, LLC had, in turn, acquired the right to acquire such lands as assignee and successor to Tallwood Associates, Inc. and Hunter Tract, LLC under a 1999 Purchase Agreement, as amended, between Hunter Tract, LLC and Rayland, LLC and Rayonier Timberlands Operating Company, L.P. to purchase the land comprising the Development for $25,000,000.

To finance the acquisition of the property, the Related Companies entered into a loan agreement with Wachovia Bank, N.A. for $25,000,000, subsequently amended to increase the loan to a total of $27,230,000. The loan has been further amended and converted to a revolving credit facility. The current revolving credit facility is limited to $5,228,160 (the "Wachovia Loan"). The Wachovia Loan requires monthly interest only payments, based on a variable rate per annum equal to LIBOR plus 2.75%. The entire principal balance, along with all accrued interest is due and payable, in full, on the earlier of: (i) written demand by Wachovia Bank, N.A. for payment, or (ii) the date of the release of all remaining residential lots in the final phase of the development of a portion of the property owned by Durbin Crossing, LLC. The Wachovia Loan is secured by a mortgage on the properties owned by the Related Companies, and repayment is unconditionally guaranteed by Patrick E. Sessions and Peter Vegso, jointly and severally. As of October 16, 2006, the outstanding balance of the Wachovia Loan was $2,012,586.

**Development Entitlements**

Lands within the District are situated within the 2,047 acre Durbin Crossing Development of Regional Impact (previously described as the "Durbin Crossing DRI"). The development order governing the Durbin Crossing DRI (the "Durbin DO") was approved on April 1, 2003 by the St. Johns Board of County Commissioners. The Durbin DO authorizes the following land uses and densities (but not all such uses are necessarily planned): 1,551 single-family homes; 997 multi-family units; 70,000 square feet of office/civic uses; 100,000 square feet of retail/commercial/service uses; an elementary school; and 30,000 square feet of community center uses. The Developers may increase certain land uses and simultaneously decrease other land uses without filing a Notice of Proposed Change or other modification of the Durbin DO, provided that such changes are consistent with a conversion table included in the Durbin DO.

The Development is zoned under the Durbin Crossing Planned Unit Development (the "Durbin PUD"), which became effective January 20, 2004, and covers the same land area as the Durbin Crossing DRI. The Durbin PUD is consistent with the land use designation and the requirements in the Durbin DO. The table below illustrates the development program and entitlements as stipulated in the Durbin DO.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

|  | Phase 1: 2003-2007 | | Phase 2: 2008-2010 | | Total | | |
| Land Use | DU | Sq. Feet | DU | Sq. Feet | Acres | DU | Sq. Feet |
|---|---|---|---|---|---|---|---|
| Residential | 1,337 | | 1,161 | | 697 | 2,498 | |
|   Single-Family | 1,167 | | 384 | | 601 | 1,551 | |
|   Multi-Family [1] | 170 | | 777 | | 96 | 947 | |
| Commercial [2] | | 26,800 | | 73,200 | 21 | | 100,000 |
| Office [2] | | 12,000 | | 58,000 | 11 | | 70,000 |
| Elementary School | | | | | 20 | | |
| Recreation/Open Space | | | | | 291 | | |
|   Community Center | | 10,000 | | 20,000 | 10 | | 30,000 |
|   Neighborhood Parks | | | | | 21 | | |
|   Community Park | | | | | 35 | | |
|   Roadway Buffer | | | | | 26 | | |
|   Wetland Buffer | | | | | 109 | | |
|   Undeveloped Upland | | | | | 90 | | |
| Wetlands | | | | | 892 | | |
| Right-of-way Reservation | | | | | 115 | | |
| | | | | | | | |
| Total | 1,337 | 48,800 | 2,322 | 151,200 | 2,047 | 2,498 | 200,000 |

[1]    Multi-family uses are located in the Village Center and multi-family pods
[2]    Commercial, Office and Civic uses are located in the Village Center and mixed use pods

The multi-family density planned in the Development currently exceeds the entitlements depicted in the table above by fifty units. The Master Developer intends to convert unused single-family entitlements to approximately fifty multi-family units pursuant to the conversion table in the Durbin DO. In addition, the Master Developer has satisfied the conditions for Phase 2 development. Accordingly, the phasing referenced above does not necessarily correspond to the planned or actual phasing or timing of the Development.

The Durbin DO sets forth certain conditions relative to vegetation and wildlife, wetland impacts, water supply, water quality, wastewater and stormwater management and transportation impacts all of which are very typical in nature for Florida Developments of Regional Impact. The Durbin DO requires a contribution in funded transportation improvements to offset the transportation impacts of the Development. Specifically, these transportation obligations are the construction of the North/South Arterial and the North/South Connector from County Road 210 to Russell Sampson Road, improvement of Russell Sampson Road (the three foregoing segments now collectively known as County Road 2209), and construction of County Road 244 from the intersection with County Road 223 to its intersection with Russell Sampson Road. The District intends to fund the entire amount of its proportionate cost share of transportation obligations with a portion of the proceeds from the Series 2005A Bonds and the Series 2006 Bonds. Pursuant to the Durbin DO, the District is entitled to transportation impact fee credits in an amount equal to its proportionate cost share which may only be applied to the Development.

The Durbin DO is interdependent upon certain obligations required by the Aberdeen Development of Regional Impact development order (the "Aberdeen DO"). Specifically, these transportation obligations are the construction of Aberdeen Boulevard from Greenbriar Road to the east boundary of Aberdeen, the construction of County Road 244 from the east boundary of Aberdeen up to and including the intersection with County Road 223, and County Road 223 from its intersection with County Road 244 to Race Track Road. Both the Durbin DO and the Aberdeen DO stipulate that the commencement and guaranteed completion (through performance bond or community development district financing) of the construction of the transportation improvements must occur within two years in order for either project to obtain building permits for vertical improvements. The Aberdeen Community Development District issued its

54

Special Assessment Bonds, Series 2005 in October 2005 and anticipates issuing a future series of bonds in December 2006, to fund its transportation obligations required by the Aberdeen DO.

The Master Developer is currently in compliance with all aspects of the Durbin DO and Durbin PUD. Failure to comply in the future could result in the cessation of development activities or the inability to obtain building permits.

**Land Use/Development Plan**

The table below illustrates the current residential land use plan for the District identified by neighborhood, parcel and development phase. Such land use plan is subject to change.

### *Durbin Crossing North*

| Parcel | Phase | Lot Size | Units |
|--------|-------|----------|-------|
| A1 | 2 | 63' | 36 |
| A2 | 2 | 53' | 37 |
| A3 | 2 | 63' | 100 |
| B1 | 2 | 53' | 47 |
| C | 2 | 73' | 86 |
| D1 | 2 | 80' | 82 |
| | 2 | 83' | 25 |
| D2 | 1 | 80' | 14 |
| | 1 | 83' | 33 |
| E1 | 1 | 80' | 8 |
| | 1 | 83' | 62 |
| E2 | 1 | 73' | 64 |
| E3 | 1 | 83' | 24 |
| F | 1 | 73' | 71 |
| G1 | 1 | 63' | 44 |
| G2 | 1 | 63' | 12 |
| H1 | 1 | 53' | 25 |
| H2 | 1 | 53' | 43 |
| Sub-Total | | | 813 |

| Phase 1 | | Phase 2 | |
|---------|---------------|---------|---------------|
| Product | Number of Units | Product | Number of Units |
| 80'/83' | 141 | 80'/83' | 107 |
| 70'/73' | 135 | 70'/73' | 86 |
| 63' | 56 | 63' | 136 |
| 53' | 68 | 53' | 84 |
| MF | 0 | MF | 0 |
| Sub-Total | 400 | Sub-Total | 413 |

*Durbin Crossing South*

| Parcel | Phase | Lot Size | Units |
|--------|-------|----------|-------|
| B | 1 | 53' | 76 |
| B | 2 | 53' | 64 |
| I1 | 1 | 80' | 25 |
| I2 | 2 | 80' | 48 |
| J1 | 1 | 70' | 86 |
| J2 | 2 | 70' | 97 |
| K | 1 | 80' | 48 |
| M1 | 1 | 63' | 63 |
| M2 | 2 | 63' | 122 |
| O | 1 | 53' | 67 |
| P | 1 | 80' | 9 |
| Q | 1 | MF | 300 |
| R | | TBD | |
| S | | Mixed Use | |
| T | | Village Center | |
| V1 | | Mixed Use | |
| V2 | | Mixed Use | |
| Y | 2 | MF | 697 |
| Sub-Total | | | 1,702 |

| Phase 1 | | Phase 2 | |
|---------|------------------|---------|------------------|
| Product | Number of Units | Product | Number of Units |
| 80' | 82 | 80' | 48 |
| 70'/73' | 86 | 70'/73' | 97 |
| 63' | 63 | 63' | 122 |
| 53' | 143 | 53' | 64 |
| MF | 300 | MF | 697 |
| Sub-Total | 674 | Sub-Total | 1,028 |

*Total Units*
*(Durbin Crossing North and South)*

| Product | Phase 1 | Phase 2 | Total Units |
|---------|---------|---------|-------------|
| 80'/83' | 223 | 155 | 378 |
| 70'/73' | 221 | 183 | 404 |
| 63' | 119 | 258 | 377 |
| 53' | 211 | 148 | 359 |
| MF | 300 | 697 | 997 |
| | 1,074 | 1,441 | 2,515 |

In addition to the residential units identified in the table above, the District is planned to include approximately 70,000 square feet of office space and 100,000 square feet of commercial/retail space.

**District Infrastructure and Finance Plan**

In order to serve the landowners of the District, the District developed an Improvement Plan to allow it to finance, acquire, construct and maintain certain infrastructure that will specifically benefit the District. The Improvement Plan includes both Master Infrastructure and Neighborhood Infrastructure. The Master Infrastructure includes onsite and offsite roadways, water and sewer improvements, stormwater management, recreation facilities, right-of-way acquisition, entry features, and associated professional fees for permitting, engineering and design. The District Engineer has estimated the total cost of the Master Infrastructure at $59,266,000. The Neighborhood Infrastructure includes clearing and grubbing, earthwork, water and sewer improvements, re-use underground utility construction, paving and drainage, grassing, sodding, underground electrical conduit, neighborhood street lighting and the neighborhood parks system. The District Engineer has estimated the total cost of the Neighborhood Infrastructure at $66,300,000. See "APPENDIX A — DISTRICT ENGINEER'S REPORTS" for a more detailed description of these improvements.

The Master Developer is developing all of the Master Infrastructure for the Development except for certain items that the Durbin North Developer has agreed to develop. The District issued its Series 2005A Bonds to fund approximately $44,762,915 of the Master Infrastructure (the "Series 2005A Project"). The District is issuing its Series 2006 Bonds to fund approximately $10,436,297 of Master Infrastructure consisting of transportation and park improvements (the "Series 2006 Project"). Any portion of the Master Infrastructure not funded by either the Series 2005A Bonds or the Series 2006 Bonds will be funded by the Master Developer.

A Utility Service Agreement (the "JEA Agreement") was made and entered into on March 31, 2003 between JEA and SouthStar Development Partners, Inc. This agreement was subsequently assigned to the Master Developer. In accordance with the JEA Agreement, JEA will be responsible for the cost of construction of the JEA transmission components of the water, sewer and reuse facilities located within the master transportation roadway improvements. The costs of the JEA transmission components, estimated at $3,511,200, are included in the costs of the appropriate Master Infrastructure transportation improvements identified in "APPENDIX A — DISTRICT ENGINEER'S REPORTS" attached hereto, and will continue to be reimbursed to the District by JEA on a monthly basis.

All development permits necessary to complete the Master Infrastructure transportation improvements have been issued by the regulatory agencies having jurisdiction and all permits are active. Construction of the Master Infrastructure transportation improvements commenced in October 2005 and is expected to be completed by August, 2007. Construction of all other Master Infrastructure, which includes an amenity center, community parks and entry features, is expected to commence in December 2006 and is expected to be completed by December, 2007. Additional detail on the status of Master Infrastructure construction is included within the Supplemental Engineer's Report dated October 24, 2006. See "APPENDIX A — DISTRICT ENGINEER'S REPORTS."

The Development has been designed and planned in two phases. The first phase of Development (Phase 1) consists of 774 single-family residential units and 300 multi-family units. The second phase of Development (Phase 2) consists of 744 single-family residential units and 697 multi-family units. See "THE DEVELOPMENT — Land Use/Development Plan" for the District's current residential land use plan illustrated by neighborhood, phase, parcel, and product type.

The Master Developer is also developing the Neighborhood Infrastructure for the 705 single-family units planned within the southern portion of the Development ("Durbin Crossing South"). The Durbin North Developer is developing the Neighborhood Infrastructure for the 813 single-family units

planned within Durbin Crossing North. The District issued its Series 2005B-1 Bonds and Series 2005B-2 Bonds to fund Phase 1 Neighborhood Infrastructure in Durbin Crossing South and Durbin Crossing North, respectively. The Master Developer and the Durbin North Developer expect to complete Phase 1 Neighborhood Infrastructure by November 2006 and December 2006, respectively.

**Road and Park Impact Fee Credit Agreement**

As referenced herein, the District and the County have entered into a Road and Park Impact Fee Credit Agreement (the "Impact Fee Agreement"), dated October 20, 2005, whereby in exchange for the District's agreement to fund and provide certain non-site related roadway improvements and park impact fees the District is to receive certain Impact Fee Credits (described below). In connection with such Impact Fee Agreement, the District has been required to provide the County with financial assurances that will complete the applicable improvements. The Series 2006 Bond proceeds held by the Trustee are intended to provide the financial assurances required by the County under this Impact Fee Agreement.

The subject improvements to be funded or completed by the District shall give rise to Road Impact Fee Credits in the amount of $18,578,703 and Park Impact Fee Credits in the amount of $2,249,894 (collectively, the "Impact Fee Credits"). In accordance with the Impact Fee Agreement, payment of Impact Fees by builders seeking permits shall be made directly to the District in exchange for vouchers that will be used by the applicable builders to obtain electrical energizing for construction from the County. Copies of the Impact Fee Agreement are available from the District upon request.

**Impact Fees and Impact Fee Credits**

As previously discussed, the District is issuing its Series 2006 Bonds to fund a portion of the transportation and park improvements composing a portion of the Master Infrastructure. These transportation and park improvements are required by the Durbin Crossing DO, and pursuant to Section 13 of St. Johns County Ordinance No. 87-57 and Section 13 of St. Johns County Ordinance No. 87-58, both as reaffirmed, readopted, consolidated and incorporated within the St. Johns County Land Development Code by St. Johns County Ordinance No. 2005-27 (collectively, the "Impact Fee Ordinances"), Impact Fee Credits will be granted for the constructing, acquisition, dedication and/or installation of these improvements. Ordinance No. 2005-27 made changes to all of the County's impact fees and provided for the automatic updating of such impact fees based upon indexing.

Pursuant to the Impact Fee Credit Agreement, so long as the District has a balance of transportation and park impact fee credits, all builders applying for electrical energizing in connection with any construction within the Development shall pay the amount due under the then current Impact Fee Ordinances directly to the District. Then, for so long as the Impact Fee Credits for which the District has issued vouchers under the Impact Fee Credit Agreement is less than the impact fees authorized by the Impact Fee Credit Agreement, the District shall issue to builders a voucher evidencing full payment of road and park impact fees. Upon presentation of such voucher to the County by the builder, the County shall issue a receipt to the builder and shall deduct the amount of such voucher from the District's balance of road and impact fee credits.

The District has pledged a portion of its Impact Fee Revenues to the Series 2006 Bonds. The portion of the Impact Fee Revenues pledged to the Series 2006-1 Bonds will be utilized to prepay the Series 2006-1 Special Assessments, which are the security for the Series 2006-1 Bonds. The balance of the Impact Fee Revenues are pledged to the Series 2006-2 Bonds and will be utilized to pay interest on and prepay the principal of the Series 2006-2 Bonds. The Series 2006-2 Bonds are secured by a portion of the Impact Fee

58

Revenues and a Prepaid Impact Fee Credit Agreement with the Master Developer to insure timely payment of both principal and interest on the Series 2006-2 Bonds.

The Series 2006-1 Special Assessments levied in connection with the Series 2006-1 Bonds have been levied over all of the lands within the District, which are planned to include a total of 2,515 residential units and up to 170,000 square feet of office/commercial space. See "APPENDIX B — SPECIAL ASSESSMENT REPORTS" attached hereto for a detailed description of the parcels on which the Series 2006-1 Special Assessments securing the Series 2006-1 Bonds are levied.

It is important to note that while the Series 2006-1 and Series 2006-2 Supplemental Indentures differentiate the security and pledged revenues for the Series 2006-1 Bonds and Series 2006-2 Bonds, respectively, the impact fees are pledged without priority of lien over one Series of Series 2006 Bonds. Rather, there is a specific amount of impact fees pledged to each Series of Series 2006 Bonds from specific product types which is illustrated in both the Series 2006-1 and Series 2006-2 Supplemental Indentures. See table referenced in the section "Fees and Assessments —Series 2006-1 Special Assessment and Series 2006-2 Pledged Revenues" below.

### Assessment Area

The Assessments levied in connection with the Series 2006-1 Bonds have been levied over 813 residential units planned for Durbin Crossing North, 1,702 residential units planned for Durbin Crossing South and the 170,000 square feet of office and commercial space planned within the Development. See "APPENDIX B — SPECIAL ASSESSMENT REPORTS" attached hereto for a detailed description of the parcels on which the Assessments securing the Series 2006-1 Bonds are levied.

The Durbin North Developer has closed on 132 lots with homebuilders and required these homebuilders to prepay transportation and park impact fees to the District at their lot closings. On the issuance of the Series 2006 Bonds, the District will deposit such prepaid impact fees in the Series 2006-1 Prepayment Subaccount and will thereafter use the collected prepaid impact fee revenue to prepay the Series 2006-1 Special Assessments levied on these 132 lots and redeem Series 2006-1 Bonds on the first Quarterly Redemption Date, February 1, 2007. See item (iii) under "DESCRIPTION OF THE SERIES 2006 BONDS — Redemption Provisions — Extraordinary Mandatory Redemption of Series 2006-1 Bonds in Whole or in Part" herein.

### Residential Product Offerings

The Master Developer expects the Development will be marketed as a family-oriented, amenity-rich community offering a diverse selection of single-family homes, and will attract first-time and move-up homebuyers. The area of the County in which the Development is located continues to attract homebuyers as a result of its highly-rated schools, convenient access to Interstate 95 and the business/cultural centers of downtown Jacksonville, and close proximity to numerous recreational opportunities.

### *[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

The following table reflects the Master Developer's current expectations of the mix of unit types to be constructed in the Development and their respective approximate base prices and square footages, all of which are subject to change.

| Product Type | Lot Width | Number of Units | Approximate Square Footages | Approximate Range of Home Prices |
|---|---|---|---|---|
| Multi-Family | N/A | 997 | 800-2,500 | $150,000-$400,000 |
| 53' Single-Family | 53'x110' | 359 | 1,400-2,500 | $200,000-$400,000 |
| 63' Single-Family | 63'x110' | 377 | 1,600-3,000 | $250,000-$450,000 |
| 70'/73' Single-Family | 70'/73'x110' | 404 | 1,800-3,500 | $300,000-$500,000 |
| 80'/83' Single-Family | 80'/83'x110' | 378 | 2,200-4,000 | $350,000-$700,000 |
| | | 2,515 | | |

**Recreational and Lifestyle Amenities**

The District intends to finance, design and construct recreational facilities within the Development. These improvements include two community centers on ten acres, approved (but not necessarily planned) for up to 30,000 square feet, and three community parks consisting of thirty-five acres total. One community center will be located north of the East/West Connector (County Road 244), east of the main subdivision road. The second community center will be located south of the East/West Connector (County Road 244), west of the main subdivision road. The basic components of these facilities are planned to include a clubhouse, fitness equipment, bathrooms, family pool and/or competition pool, playground equipment, barbeque grills and picnic tables, and tennis courts. The community park sites are consolidated south of the East/West Connector (County Road 244). The community park improvements are planned to include, at a minimum, four lighted baseball fields, two lighted soccer/football fields and parking for the fields. The cost to construct the community centers and community parks is estimated at $8.75 million. Construction is expected to commence in December 2006 and is expected to be completed by August 2007.

**Education**

School age children residing in the Development are expected to attend Durbin Creek Elementary School, Fruit Cove Middle School and Alan D. Nease High School, all of which are located within two miles from the Development. Florida's A+ Plan School Grades Program's ratings for the elementary and middle school are in the "A" category and the rating for the high school is in the "B" category. Although the foregoing information is current as of the date hereof, the St. Johns County School District may change school boundaries from time to time and there is no requirement that students residing in the Development be permitted to attend the schools which are closest to the Development.

Pursuant to the terms of a Memorandum of Understanding between the Master Developer and the St. Johns County School Board, the Master Developer agreed to convey a twenty acre future elementary school site to the St. Johns County School Board prior to issuance of building permits for vertical construction within the Development. The Master Developer anticipates that the property will be conveyed before year-end 2006. In addition, the Master Developer has agreed to use all reasonable efforts to cause a school to be constructed on the school site by the District for the Development so that the school can be opened when the population in the Aberdeen DRI and Durbin Crossing DRI will generate 450 students for such school.

The Development is also close to several undergraduate and post graduate institutions including Flagler College in St. Augustine, the University of North Florida, Florida Community College at

Jacksonville and Jacksonville University. In addition, the Development is located approximately one hour from the University of Florida, located in Gainesville, Florida.

**Land Sale to Durbin North Developer**

On March 29, 2005 the Master Developer completed the sale of the land comprising Durbin Crossing North to the Durbin North Developer at a purchase price of $19,222,055.

The Durbin North Developer acquired the land comprising Durbin Crossing North with a $26,923,000 revolving acquisition and development loan from Wachovia Bank (the "North A&D Loan"). The North A&D Loan requires monthly interest only payments, which commenced on May 10, 2005, based on a variable rate per annum equal to LIBOR plus two percent (2%). The entire principal balance, along with all accrued interest is due and payable on April 1, 2007. Pursuant to a note modification agreement executed in July 2006, a principal payment of $20,000,000 is due and payable on or before January 15, 2007 (extended from September 30, 2006). The North A&D Loan is secured by a mortgage on the Phase 1 and Phase 2 property of Durbin Crossing North. As of October 31, 2006, the balance of the North A&D Loan was $13,859,613.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

**Builder Contracts**

*Durbin Crossing North*

The Durbin North Developer has entered into contracts with five homebuilders for the sale of 368 of the 400 single-family lots planned within Phase 1 of Durbin Crossing North.  As of November 16, 2006, homebuilders had closed on 132 single-family lots and prepaid transportation and park impact fees to the District (see "— Assessment Area" hereinabove) and the Durbin North Developer anticipates that builders will close on the remaining 236 lots under contract before December 31, 2006.  The table below summarizes the builder contracts for the 368 single-family lots within Phase 1 of Durbin Crossing North.

### Durbin Crossing North — Builder Contracts

| Purchaser | Product | Phase 1 Lots[1] | Phase 1 Price Per Lot | Total Purchase Price | Deposit |
|---|---|---|---|---|---|
| Panitz Signature Homes, LLC | 53' | 43 | $67,500 | $2,902,500 | $322,500 |
| Panitz Signature Homes, LLC | 80'/83' | 42 | $106,500 | $4,473,000 | $315,000 |
| Subtotal[3,4] | | 85 | | $7,375,500 | $637,500 |
| | | | | | |
| Beazer Homes Corp.[2] | 63' | 56 | $80,500 | $4,508,000 | $420,000 |
| Beazer Homes Corp.[2] | 73' | 20 | $93,500 | $1,870,000 | $150,000 |
| Beazer Homes Corp. | 80'/83' | 0 | $106,500 | $0 | $0 |
| Subtotal[3,4] | | 76 | | $9,432,500 | $570,000 |
| | | | | | |
| Providence Construction Company | 73' | 29 | $93,500 | $2,711,500 | $217,500 |
| Providence Construction Company | 80'/83' | 54 | $106,500 | $5,751,000 | $405,000 |
| Subtotal[3,4] | | 83 | | $8,462,500 | $622,500 |
| | | | | | |
| Toll Jacksonville Limited Partnership | 73' | 67 | $93,500 | $6,264,500 | $502,500 |
| Toll Jacksonville Limited Partnership | 80' | 33 | $106,500 | $3,514,500 | $247,500 |
| Subtotal[3,4] | | 100 | | $9,779,000 | $750,000 |
| | | | | | |
| Watson Custom Home Builders, Inc[3] | 53' | 24 | $74,500 | $1,788,000 | $240,000 |
| | | | | | |
| Total | | 368 | | $33,783,300 | $2,820,000 |

[1]  The closing shall occur after the Durbin North Developer has recorded the plat and no later than ten days from the date a builder receives notice that the subdivision improvements have been substantially completed and there is no impediment to the issuance of a building permit as a result of any performance obligation of the Durbin North Developer.  Delivery of the lots to the builder will occur on or before December 31, 2006.  Builders will close at one time on all lots within a pod to which the notice of substantial completion relates to.

[2]  Pursuant to the Assignment of and First Amendment to Durbin Crossing Builder Purchase and Sale Agreement dated October 4, 2006 (the "Archstone Assignment"), Archstone Homes Corp. assigned its purchasing rights for 76 homes to Beazer Homes Corp. Pursuant to the Archstone Assignment, the Durbin North Developer kept $232,500 of Archstone Homes Corp's original $802,500 deposit and the remaining $570,000 will be applied as a credit to Beazer's purchase price.

[3]  Fill Reimbursements: Each builder, at its cost, shall perform the final grade of each lot, including the building pad, to assure proper drainage consistent with all governmental approvals and regulations and engineering plans.  Each builder, at its cost, shall also compact the building pad of each lot, if required.

[4]  Each builder shall reimburse the Durbin North Developer at the closing of the lots the following costs for each lot that has been cleared and filled by the Durbin North Developer: 53' Lots: $7,000; 63' Lots: $8,000; 73' Lots: $9,000; 80'/83' Lots: $10,000.

*Durbin Crossing South*

Durbin Crossing, LLC has entered into contracts with three homebuilders for the sale of all of the 705 single-family lots planned within Durbin Crossing South. In addition, Silvertree Estates, LLC has closed on land designated for 300 multi-family units to GMAC Model Home Finance, LLC. The table below summarizes the builder contracts for the single-family and multi-family lots/units in Durbin Crossing South.

### Durbin Crossing South — Builder Contracts

| Purchaser | Product | Phase 1 Lots[1] | Phase 1 Price Per Lot | Phase 2 Lots[2] | Phase 2 Price Per Lot | Total Purchase Price | Deposit |
|---|---|---|---|---|---|---|---|
| Lennar Homes, Inc.[3] | 70' | 37 | $91,000 | 42 | $96,460 | $7,418,320 | |
| Lennar Homes, Inc.[3] | 80' | 39 | $104,000 | 24 | $110,240 | $6,701,760 | |
| Subtotal | | 76 | | 66 | | $14,120,080 | $2,188,012 |
| | | | | | | | |
| KB Home Jacksonville, LLC | 53' | 72 | $68,900 | 32 | $73,034 | $7,297,888 | |
| KB Home Jacksonville, LLC | 63' | 31 | $81,900 | 61 | $86,814 | $7,834,554 | |
| KB Home Jacksonville, LLC | 70' | 6 | $91,000 | 6 | $96,460 | $1,124,760 | |
| KB Home Jacksonville, LLC | 80' | 2 | $104,000 | 0 | $110,240 | $208,000 | |
| Subtotal | | 111 | | 99 | | $16,465,202 | $2,382,966 |
| | | | | | | | |
| Ryland Homes | 53' | 71 | $60,900 | 32 | $73,034 | $6,660,988 | |
| Ryland Homes | 63' | 33 | $72,450 | 61 | $86,814 | $7,686,504 | |
| Ryland Homes | 70' | 44 | $80,500 | 49 | $96,460 | $8,268,540 | |
| Ryland Homes | 80' | 39 | $92,000 | 24 | $110,240 | $6,233,760 | |
| Subtotal | | 187 | | 166 | | $28,849,792 | $4,604,211 |
| | | | | | | | |
| **Total (Single Family)** | | **374** | | **331** | | **$59,435,074** | **$9,175,189** |
| | | | | | | | |
| GMAC Model Home Finance, LLC.[4] | | 300 | | | | $8,100,000 | |
| **Total (Multifamily)** | | **300** | | | | **$8,100,000** | |

[1] Phase 1 closing shall occur after the Master Developer has recorded the plat and no later than ten days from the date builder receives notice that permanent water, sewer and electric are available to the lots, and there is no impediment to the issuance of a building permit or certificate of occupancy as a result of any performance obligation of Durbin Crossing, LLC.

[2] Phase 2 closing shall take place on or before twelve months after the Phase 1 closing so long as permanent water, sewer and electric are available to the Phase 2 lots and there is no impediment to the issuance of a building permit or certificate of occupancy as a result of any performance obligation of the Durbin Crossing, LLC.

[3] Admiral Homes, LLC was acquired by Lennar Homes, Inc.

[4] Pursuant to a Consent to Transfer Agreement dated November 15, 2005, Admiral Homes, LLC assigned its purchasing rights for land designated for 300 multi-family units to GMAC Model Home Finance, Inc. (now known as GMAC Model Home Finance, LLC.) GMAC Model Homes Finance has closed on this property.

The existing single-family builder contracts require each homebuilder to close at one time on all the lots within a phase upon the Master Developer's satisfaction of its closing conditions. Based upon the anticipated completion date for the Phase 1 Neighborhood Infrastructure in Durbin Crossing South, the Master Developer expects to satisfy its closing conditions for Phase 1 by December 2006. All three

homebuilders identified in the table above have requested Durbin Crossing, LLC to amend their existing contracts to accommodate quarterly takedowns or lot price reductions. If Durbin Crossing, LLC elects to grant such request, it projects that the 705 single-family lots planned within Durbin Crossing South would be closed to homebuilders in multiple takedowns by 2009. If no mutually acceptable modifications can be made to a homebuilder's contract, then Durbin Crossing, LLC intends to replace such homebuilder with another homebuilder who will integrate well into the community.

**Projected Absorption**

The Master Developer projects that all of the 2,515 residential units and commercial/office space planned within the Development will be sold to residents/end users within a seven year period as depicted in the table below.

| Product | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|---|---|---|---|
| 80'/83' Single-Family | 45 | 77 | 73 | 63 | 56 | 56 | 8 | 378 |
| 70'/73' Single-Family | 52 | 80 | 72 | 58 | 65 | 62 | 15 | 404 |
| 63' Single-Family | 41 | 55 | 54 | 73 | 72 | 70 | 12 | 377 |
| 53' Single-Family | 48 | 62 | 65 | 70 | 56 | 55 | 3 | 359 |
| Townhome | 80 | 80 | 80 | 80 | 80 | 50 | 0 | 450 |
| Condos | 35 | 70 | 70 | 70 | 5 | 0 | 0 | 250 |
| Apartments | 0 | 50 | 100 | 100 | 47 | 0 | 0 | 297 |
| | 301 | 474 | 514 | 514 | 381 | 293 | 38 | 2,515 |
| Commercial | 0 | 0 | 40,000 | 40,000 | 20,000 | 0 | 0 | 100,000 |
| Office | 0 | 20,000 | 0 | 20,000 | 30,000 | 0 | 0 | 70,000 |

The homebuilding industry in Florida is currently undergoing significant slowing of new home sales and new home closings, as well as an increased rate of cancellation of new home purchase contracts, as compared to recent years. Although the projected absorption rate shown above is based upon estimates and assumptions made by the Developers, and although considered reasonable by the Developers utilizing historical data, and taking into account current market conditions, it is inherently uncertain and subject to significant business, economic and competitive uncertainties and contingencies, all of which are difficult to predict and many of which are beyond the control of the Developers. In particular, historical data will likely not be indicative of future market conditions. The Developers can not predict with certainty the duration of the slowing of new home sales and deliveries, whether significant additional slowing of new home sales and deliveries will occur, and the extent to which the slowdown will impact the Development. As a result, there can be no assurance that the absorption rate will occur or be realized in the manner set forth in the preceding table. See also "BONDHOLDER'S RISKS" herein, in particular Item Nos. 3 and 16 thereunder.

**Marketing**

Builders are expected to market the Development through their national, regional and local marketing campaigns. Locally, this includes the utilization of newspaper, magazine, billboard, radio and television advertisements. Marketing efforts conducted by the builders are expected to highlight the family oriented nature of the community and its amenities.

In addition, each builder will be responsible for constructing, furnishing and staffing model homes from a centrally located model center that will accommodate all of the builder models. The first model homes are expected to be complete by mid-year 2007.

The Durbin North Developer will implement an overall marketing campaign which will include billboards, brochures, promotions, newspaper articles (public relations), newspaper advertisements and marketing meetings with builders' sales personnel. Upon the sale of each lot in Durbin Crossing North, each builder is required to pay the Durbin North Developer a marketing fee equal to one percent (1%) of the gross sales price of the lot.

**Fees and Assessments**

All landowners within the District are subject to annual ad-valorem property taxes, non ad-valorem special assessments and homeowners' association fees as described in more detail below.

The current approximate millage rate for the area of the County in which the District is located is 15.7525 mills. Assuming an average home cost of $300,000 with a $25,000 homestead exemption ($275,000 taxable value), with the millage rate applicable during the fiscal year ended September 30, 2006, the annual ad-valorem property tax would be approximately $4,332.

The Master Developer has established the Durbin Crossing Master Association ("HOA") for architectural review, maintenance and deed restriction enforcement. The annual HOA fee is anticipated to commence the month following the issuance of the first certificate of occupancy within the Development, but no later than January 1, 2008.

All landowners within the District are subject to annual debt service assessments levied over a thirty (30) year period in connection with the issuance by the District in October 2005 of its Special Assessment Bonds, Series 2005A (the "Series 2005A Bonds") in the original principal amount of $54,995,000 to finance certain master infrastructure improvements. In addition, all landowners are subject to annual operation and maintenance assessments, which are based upon the District's annual budget. The table below illustrates the projected annual debt service and operation and maintenance assessments by product type.

| Product Type | Series 2005A Debt Service Assessments * |
|---|---|
| Apartments | $539 |
| Condos | $816 |
| 53' Single-Family | $1,633 |
| 63' Single-Family | $1,941 |
| 70' Single-Family | $2,207 |
| 80' Single-Family | $2,503 |
| Commercial | $0.82/square foot |
| Office | $0.82/square foot |

\*    Includes allowance for collection costs and discount for early payment.

The Series 2005A Bonds are outstanding in their original principal amount.

The 374 single-family units planned within Phase 1 (development phase) of Durbin Crossing South are subject to assessments levied in connection with the issuance by the District in October 2005 of its Special Assessment Bonds, Series 2005B-1 (the "Series 2005B-1 Bonds") in the original principal amount of $8,735,000 to finance neighborhood improvements in Durbin Crossing South. The 400 single-family units planned within Phase 1 (development phase) of Durbin Crossing North are subject to separates assessments levied in connection with the issuance by the District in October 2005 of its Special Assessment Bonds, Series 2005B-2 (the "Series 2005B-2 Bonds") in the original principal amount of $14,590,000 to finance neighborhood improvements in Durbin Crossing North. The Series 2005B-1 Bonds and the Series 2005B-2 Bonds are outstanding in their respective original principal amounts. Both the Series 2005B-1 Special Assessments and the Series 2005B-2 Special Assessments which secure the corresponding Series 2005B-1 Bonds and Series 2005B-2 Bonds are expected to be prepaid no later than at the time of closing between a builder and retail buyer.

| Product Type | Series 2005B-1 Special Assessments * | Series 2005B-2 Special Assessments * |
|---|---|---|
| 53' Single-Family | $18,997 | $27,366 |
| 63' Single-Family | $22,581 | $32,529 |
| 70'/73' Single-Family | $25,675 | $36,985 |
| 80'/83' Single-Family | $29,119 | $41,947 |

\*    Includes debt service reserve fund allocations.

*Series 2006-1 Special Assessments and Series 2006-2 Pledged Revenues*

All builders applying for electrical energizing in connection with any construction within the Development shall pay the amount due under the then current Impact Fee Ordinances for transportation and park impact fees directly to the District. As transportation and park impact fees are collected by the District, the portion of the impact fee revenues pledged to the Series 2006-1 Bonds will be utilized to prepay the assessment lien levied in connection with the Series 2006-1 Bonds. See "APPENDIX B — SPECIAL ASSESSMENT REPORTS" attached hereto for a detailed description of the parcels on which the Series 2006-1 Special Assessments securing the Series 2006-1 Bonds are levied. Each landowner will be responsible for the semi-annual interest associated with the Series 2006-1 principal assessment until such time as the lien on that lot is extinguished.

As illustrated in the table below, the Series 2006-1 Special Assessment may be less than the actual impact fee paid on behalf of a specific land use. The reason for this is because the assessment per unit cannot exceed the benefit received by that unit from the Master Infrastructure. The full impact fee payments for each unit will still be collected by the District, and the excess impact fee revenue not pledged to the Series 2006-1 Bonds will be utilized to pay interest and the principal of the Series 2006-2 Bonds. The Master Developer has, or will, prior to the issuance of the Series 2006 Bonds, enter into a prepaid impact fee credit agreement to insure timely payment of both principal and interest on the Series 2006-2 Bonds.

**[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]**

| Product Type | Current County Transportation & Park Impact Fee [1] | Impact Fees Pledged to Extinguish Series 2006-1 Special Assessments | Transportation & Park Impact Fee Revenue Pledged to Series 2006-2 Bonds [2] |
|---|---|---|---|
| SF - 80'/83' > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| SF - 70'/73' > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| SF - 63' > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| SF - 53' > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| SF - 53' < or = 1,800 sq. ft | $3,725 | $3,725 | $0 |
| Townhomes > 1,800 sq. ft | $4,608 | $4,608 | $0 |
| Condos < or = 1,800 sq. ft | $3,725 | $3,725 | $0 |
| Apartments < or = 1,800 sq. ft | $3,725 | $2,492 | $1,233 |
| Commercial (per 1,000 sq feet) | $5,420 | $3,776 | $1,644 |
| Office (per 1,000 sq feet) | $6,274 | $3,776 | $2,498 |

[1]    Subject to increase based on increases in St. Johns County's transportation and park impact fee schedules.

[2]    As St. Johns County's transportation and park impact fees increase, the excess impact fee revenue not pledged to the Series 2006-1 Bonds will be utilized to pay interest and the principal of the Series 2006-2 Bonds.

**Competition**

There are a number of active and proposed large scale master planned communities located in the St. Johns County housing market. A summary of each of these communities is provided below to illustrate the extensive entitlement and development activities ongoing in St. Johns County.

*Aberdeen* is a 1,313-acre development of regional impact being developed by Aberdeen Development, LLC, an affiliate of SouthStar Development Partners. Aberdeen is located south of Race Track Road, approximately three miles west of Interstate 95 and is planned to include 1,553 single-family units, 394 multi-family units and 100,000 square feet of commercial and office space. Planned recreational amenities include a five acre community center with 4,000 square feet of building, twenty acres of onsite community parks and a fifty acre offsite community parks. The community center is planned to include a clubhouse, pool and playground. The community parks are planned to include at least four lighted baseball fields and two lighted soccer/football fields. A portion of the land is being sold as undeveloped pods with master infrastructure servicing the site to D.R. Horton, Inc. – Jacksonville and Aberdeen of St. Johns, LLC, an affiliate of Wood Development Company of Jacksonville. Development activities commenced in November 2005. As of September 30, 2006, Aberdeen of St. Johns, LLC had 297 single-family lots under contract to builders. D.R. Horton, Inc. – Jacksonville will construct homes on 990 single-family lots and 394 multi-family lots.

*Nocatee* is an approximately 15,000-acre parcel of land straddling both St. Johns and Duval County with the majority of the land in St. Johns County. Approximately 8,000 acres are planned to be developed with the remainder designated as conservation land and passive greenways. Nocatee is approved for 14,000 residential units, 4.2 million square feet of office space, 1 million square feet of retail space, 250,000 square feet of industrial space, 710 hotel rooms and 710 assisted living units. SONOC Company, LLC is the master developer of the Nocatee and the landowner of substantially all of the lands in Nocatee. Tolomato CDD and Split Pine CDD, together, encompass the lands within Nocatee. Development activities for the major transportation requirements for the project commenced in the third quarter of 2005. Pulte Homes and Toll Brothers purchased certain lands within Tolomato CDD and began selling homes in July 2006. In

addition, a joint venture between Centex Homes and Lennar Homes recently closed on a tract of land in Nocatee.

*Rivertown*, located on County Road 244 and on the St. Johns River, is being developed by The St. Joe Company. Rivertown received development order approval in 2004 for the development of 4,500 residential units and 700,000 square feet of commercial and industrial space. The St. Joe Company recently received rezoning approvals and is expected to commence development of the initial phase of Rivertown, planned for 1,800 residential units and 100,000 square feet of commercial space, in the fourth quarter of 2006.

*Bartram Springs* is located on the east side of Interstate 95, south of St. Augustine Road, and is being developed by Sandler at Bartram Lakes, L.L.C., an affiliate of Southstar Development Partners. Bartram Springs is planned for 1,400 single family lots, 300 multi-family units and twenty-five acres of commercial property. Since sales began in Bartram Springs in mid 2003, absorption has equaled approximately one sale per day. Currently almost two-thirds of the single family homes have been sold at prices ranging from the upper $100,000's to over $400,000.

*Bartram Park* is situated on the west side of Interstate 95, south of St. Augustine Road, and is being developed by Eastland Company, LLC. Bartram Park is planned for approximately 5,167 multifamily residential units and 126,540 square feet of office space. Bartram Park is intended to be developed in two phases with the initial phase is planned to include approximately 2,980 multi-family units of which approximately 323 are expected to be rental units. Substantially all of the units in the initial phase have been contracted or sold with the vast majority of those having been contracted or sold to Pulte Homes and Beazer Homes. Both builders commenced retail sales late in the second quarter of 2005. Construction of the second phase of the development began in the third quarter of 2006.

*St Johns Forest* is a 435-acre gated community located at the intersection of County Road 210 and Leo Maguire Parkway. Taylor Woodrow is the developer of this community, which is planned to include 532 single-family homes. The current home builders in St Johns Forest include Morrison Homes, David Weekley Homes, Richard R. Dostie and ICI Homes. Home and lot packages are priced from the mid-$200,000's to over $900,000. Amenities within this community include a clubhouse with fitness center, resort style pool with beach entry, lighted tennis courts, a multi-purpose playfield, full and half-court basketball, a roller hockey court, and a tot lot. As of September 30, 2006, Taylor Woodrow had closed on 268 lots with builders, and builders had closed on 153 homes with residents.

While not in the same submarket of the St. Johns County housing market as the Development, the following active and proposed large scale master planned communities may pose competition to the Development.

*World Golf Village* is a large mixed-use development located at International Golf Parkway and Interstate 95 which has as its centerpiece the World Golf Hall of Fame, serving the entire international golf community and industry. World Golf Village is approved for fifty-four holes of golf with 7,200 residential units, 1,200 hotel rooms, and over five million square feet of office and commercial development. The World Golf Village complex attracts nearly 850,000 visitors each year to its Hall of Fame Golf Museum, 300-seat IMAX Theater and year-round resort activities including two championship golf courses. World Golf Village is also home to the 300-room Renaissance Resort Hotel, 80,000 square foot St. Johns County Convention Center and 400 time-share units at Sheraton Vistana Resort as well as numerous residential neighborhoods. In addition, an affiliated entity of LandMar Group recently purchased the last large residential tract within World Golf Village for the development of an approximately 2,000 unit upscale neighborhood. Construction is scheduled to commence in the second quarter of 2007.

*Heritage Landing* is an approximately 600-acre master planned residential community situated within World Golf Village, being developed by D.R. Horton. Heritage Landing is currently planned to include 1,154 single-family units and a recreation complex reminiscent of a traditional, summer camp known as Camp Heritage. D.R. Horton is marketing Heritage Landing as a family-oriented, amenity rich community, offering a diverse selection of affordable single-family homes within a lush natural Florida habitat. Homes within Heritage Landing are planned to range in size from 1,364 to 3,589 square feet, and in price from $165,000 to $380,000. Homebuilding began in November, 2003, sales activity commenced in January, 2004 and the closings commenced in May, 2004. As of September 30, 2006, D.R. Horton has closed 306 lots with third-party builders and 547 homes with retail buyers.

*Sevilla at World Commerce* (or "*Sevilla*") is a 137-acre residential community within World Commerce Center, being developed by World Commerce Residential, LLC, an affiliated entity of The Wood Development Company of Jacksonville, Inc. World Commerce Center is located directly south of and across International Golf Parkway from World Golf Village, and is planned to include 405 single-family residential units, 595 multi-family residential units, 1,415,200 square feet of office uses, 709,000 square feet of retail/commercial uses, 388,000 square feet of light industrial uses and 500 hotel units. Sevilla is planned to include all of the planned 405 single-family residential units consisting of 136 sixty-three foot wide lots and 269 fifty-three foot wide lots. Homes within Sevilla are planned to range from 1,487 to 2,940 square feet, and in price from $180,000 to $325,000. The neighborhood's amenity center includes a clubhouse, family pool, interactive water feature, playground, activity court, and play field, all overlooking one of the neighborhoods two lakes. Development activities commenced in the third quarter of 2004. As of September 30, 2006, 276 lots had been closed to builders, and 62 of homes had been closed to residents.

*MuraBella* is a 498-acre residential community, being developed by Turnbull Creek Development Company, Inc and MuraBella, LLC, both affiliated entities of The Wood Development Company of Jacksonville, Inc. MuraBella is located in the southwest quadrant of State Road 16 and County Road 13A and is planned to include 959 single-family residential units and homes planned to range from 1,500 to 3,000 square feet, and in price from $300,000 to $550,000. The neighborhood's amenity center includes a clubhouse, super pool, and waterslide tower. The park recreational area includes volleyball and tennis courts, multi-purpose court, soccer field, softball diamond and playground. Development activities commenced in the first quarter of 2004. As of September 30, 2006, all of the lots had been contracted to builders, 502 lots had been closed to builders, and 131 homes had been closed to residents.

*Palencia* is a 1,358-acre development of regional impact being developed by an affiliated entity of the Hines Group which is located at the intersection of U.S. 1 and International Golf Parkway. Palencia is planned to include 1,127 residential units including both single-family attached and detached units, 550 attached multi-family residential units, and 400,000 square feet of commercial in the vicinity of U.S. 1, 60,000 square feet of commercial space situated within a village center. Planned recreational amenities include an 18-hole championship golf course with a 30,000 square foot clubhouse, putting green and practice facility, a tennis center, a swim and fitness facility, a series of neighborhood parks, two community boardwalks, a multi purpose athletic complex, lakes and preservation areas. Homes within Palencia have been sold at prices ranging from $200,000 to $1,500,000+. There are currently more than ten home builders building homes in Palencia. Residential sales began in September 2001 and as of September 30, 2006, 300 multi-family units and 889 single-family lots had been closed to builders and 146 homes had been closed to residents.

*Silverleaf* and *Ashford Mills* are two separate large tracts of land that recently received DRI approval. The commencement of developmental activities at Silverleaf is expected to occur in the fourth

quarter of 2007. The timing for the approval of permits and commencement of construction for Ashford Mills is unknown at this time.

*Twin Creeks*, located on the west side of U.S. 1 straddling both side of County Road 210 recently received development order approval for approximately 5,000 residential units and three million square feet of commercial, office and industrial space. The commencement of developmental activities at Twin Creeks is unknown at this time.

The information appearing above does not purport to list all of the active or future communities in St. Johns County that may pose competition to the Development.

## ASSESSMENT METHODOLOGY

The allocation of benefits and costs to benefited parcels within the District, along with a narrative overview of the same, are presented in "APPENDIX B — SPECIAL ASSESSMENT REPORTS" attached hereto.

## TAX MATTERS

### General

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the District must continue to meet after the issuance of the Series 2006 Bonds in order for interest on the Series 2006 Bonds to be and remain excludable from gross income for federal income tax purposes. The District's failure to meet these requirements with respect to the Series 2006-1 Bonds or Series 2006-2 Bonds may cause interest on the Series 2006 Bonds to be included in gross income for federal income tax purposes retroactively to the date of issuance of the Series 2006 Bonds. The District has covenanted to take the actions required by the Code in order to maintain the excludability from federal gross income of interest on the Series 2006 Bonds.

In the opinions of Bond Counsel, to be rendered on the date of issuance of the Series 2006 Bonds, under existing statutes, regulations, rulings and court decisions, assuming continuing compliance by the District with the tax covenants referred to above and the accuracy of the certifications and representations of the District, interest on the Series 2006 Bonds will be excludable from gross income for federal income tax purposes and will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. However, interest on the Series 2006 Bonds will be taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on corporations. Bond Counsel is further of the opinion that the Series 2006 Bonds will be not be subject to taxation under the laws of the State of Florida, except as to estate taxes and taxes imposed by Chapter 220, Florida Statutes, on interest, income or profits on debt obligations owned by corporations as defined in Chapter 220.

Except as described above, Bond Counsel will express no opinion regarding the federal income tax consequences resulting from the ownership of, receipt of interest on, or disposition of the Series 2006 Bonds. Prospective purchasers of the Series 2006 Bonds should be aware that the ownership of Series 2006 Bonds may result in other collateral federal tax consequences, including, without limitation, (i) the denial of a deduction for interest on indebtedness incurred or continued to purchase or carry Series 2006 Bonds or, in the case of a financial institution, that portion of an owner's interest expense allocable to interest on the Series 2006 Bonds; (ii) the reduction of the loss reserve deduction for property and casualty insurance companies by fifteen percent (15%) of certain items, including interest on the Series 2006 Bonds; (iii) the

70

inclusion of interest on the Series 2006 Bonds in the earnings of certain foreign corporations doing business in the United States for purposes of the branch profits tax; (iv) the inclusion of interest on the Series 2006 Bonds in passive investment income subject to federal income taxation of certain Subchapter S corporations with Subchapter C earnings and profits at the close of the taxable year; and (v) the inclusion of interest on the Series 2006 Bonds in the determination of the taxability of certain Social Security and Railroad Retirement benefits to certain recipients of such benefits.

Bond Counsel will express no opinion regarding federal tax consequences arising with respect to the Series 2006 Bonds other than the excludability from gross income of the interest thereon. The nature and extent of the other tax consequences described above and below will depend on the particular tax status and situation of each owner of the Series 2006 Bonds. Prospective purchasers of the Series 2006 Bonds should consult their own tax advisors as to the impact of these other tax consequences.

From time to time, there are legislative proposals pending in Congress that, if enacted into law, could alter or amend one or more of the federal tax matters described above including, without limitation, the excludability from gross income of interest on the Series 2006 Bonds, adversely affect the market price or marketability of the Series 2006 Bonds, or otherwise prevent the holders from realizing the full current benefit of the status of the interest thereon. It cannot be predicted whether or in what form any such proposal may be enacted, or whether, if enacted, any such proposal would apply to the Series 2006 Bonds.

## AGREEMENT BY THE STATE

Under the Act, the State pledges to the holders of any bonds issued thereunder, including the Series 2006 Bonds, that it will not limit or alter the rights of the issuer of such bonds to own, acquire, construct, reconstruct, improve, maintain, operate or furnish the projects subject to the Act or to levy and collect taxes, assessments, rentals, rates, fees, and other charges provided for in the Act and to fulfill the terms of any agreement made with the holders of such bonds and that it will not in any way impair the rights or remedies of such holders.

## LEGALITY FOR INVESTMENT

The Act provides that the Series 2006 Bonds are legal investments for savings banks, banks, trust companies, insurance companies, executors, administrators, trustees, guardians, and other fiduciaries, and for any board, body, agency, instrumentality, county, municipality or other political subdivision of the State, and constitute securities which may be deposited by banks or trust companies as security for deposits of state, county, municipal or other public funds, or by insurance companies as required for voluntary statutory deposits.

## SUITABILITY FOR INVESTMENT

In accordance with applicable provisions of the Uniform Special District Accountability Act of 1989, as amended, Chapter 189, Florida Statutes, the Series 2006 Bonds may be sold by the District only to "accredited investors" within the meaning of Florida Securities and Investor Protection Act, as amended, Chapter 517, Florida Statutes, and the rules promulgated thereunder. Investment in the Series 2006 Bonds poses certain economic risks. See "BONDHOLDER'S RISKS" herein. No dealer, broker, salesman or other person has been authorized by the District or the Underwriter to give any information or make any representations, other than those contained in this Limited Offering Memorandum. Additional information will be made available to each prospective investor, including the benefit of a site visit to the District, and the opportunity to ask questions of the Developers, as such prospective investor deems necessary in order to make an informed decision with respect to the purchase of the Series 2006 Bonds. Prospective investors are

encouraged to request such additional information, visit the District and ask such questions. Such requests should be directed to the Underwriter at: 200 South Orange Avenue, Suite 1900, Orlando, Florida 32801, Telephone: 407/481-9182, Attention: Brett A. Sealy, Managing Director.

## DISCLOSURE REQUIRED BY FLORIDA BLUE SKY REGULATIONS

Section 517.051, Florida Statutes, and the regulations promulgated thereunder, requires that the District make a full and fair disclosure of any bonds or other debt obligations that it has issued or guaranteed and that are or have been in default as to principal or interest at any time after December 31, 1975 (including bonds or other debt obligations for which it has served only as a conduit issuer such as industrial development or private activity bonds issued on behalf of private businesses). The Series 2006 Bonds will be the first debt issued or guaranteed by the District. The District is not and has never been in default as to principal and interest on its bonds or other debt obligations.

## CONTINUING DISCLOSURE

The Act will require that financial statements of the District be audited by an independent certified public accountant at least once a year. The current fiscal year of the District commences October 1 and the audited financial statements are generally available within one hundred eighty (180) days after the end of each fiscal year. See "FINANCIAL STATEMENTS" herein. The Act further provides that the District's budget for the following fiscal year be adopted prior to October 1 of each year. Meetings of the Board are open to the public, and a proposed schedule of meetings for the year is published at the beginning of each calendar year. Notice of meetings and the agenda for meetings are published prior to each meeting.

The District covenants and agrees that it will comply with and carry out all of the provisions of the Continuing Disclosure Agreements, the form of which is attached hereto as Appendix E. Notwithstanding any other provisions of the Indenture, failure of the District to comply with a Continuing Disclosure Agreement shall not be considered an Event of Default; however, the Trustee may and, at the request of any Participating Underwriter (as defined in Rule 15c2-12 of the Securities and Exchange Commission) or the Beneficial Owners of at least 25% aggregate principal amount of the applicable Series of Outstanding Series 2006 Bonds, and receipt of indemnity satisfactory to the Trustee or any such Bondholder may take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the District to comply with its obligations. The covenants contained in the Indenture and the Continuing Disclosure Agreements have been made in order to assist the Underwriter in complying with Securities Exchange Commission Rule 15c2-12(b)(5) (the "Rule"). The District has not failed, in any material respect, to comply with any continuing disclosure undertakings entered into pursuant to the Rule.

It is the current policy of the District to make the information referred to above available to requesting Owners or potential investors in the Series 2006 Bonds of the District. The District reserves the right to change this policy to comply with law, the requirements of the Securities and Exchange Commission or for any other reason in its sole discretion. Owners or potential investors requesting information should contact the District office c/o Governmental Management Services, LLC, World Golf Village, 475 West Town Place, Suite 111, St. Augustine, Florida 32092, and its telephone number is (904) 940-5850.

## ENFORCEABILITY OF REMEDIES

The remedies available to the Beneficial Owners of the Series 2006 Bonds upon an event of default under the Indenture are in many respects dependent upon judicial actions which are often subject to discretion and delay. Under existing constitutional and statutory law and judicial decisions, including the

federal bankruptcy code, the remedies specified by the Indenture and the Series 2006 Bonds may not be readily available or may be limited. The various legal opinions to be delivered concurrently with the delivery of the Series 2006 Bonds will be qualified, as to the enforceability of the remedies provided in the various legal instruments, by limitations imposed by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors enacted before or after such delivery.

## LITIGATION

There is no litigation of any nature now pending or threatened restraining or enjoining the issuance, sale, execution or delivery of the Series 2006 Bonds, or in any way contesting or affecting the validity of the Series 2006 Bonds or any proceedings of the District taken with respect to the issuance or sale thereof, or the pledge or application of any moneys or security provided for the payment of the Series 2006 Bonds, or the existence or powers of the District.

There is no litigation pending, or to the knowledge of the Master Developer or the Durbin North Developer, threatened against the respective Developers that could in any way affect the issuance, sale or performance of the Development.

## NO RATINGS OR CREDIT ENHANCEMENT

No application for a rating on the Series 2006 Bonds has been made to any rating agency. The Series 2006 Bonds are not credit enhanced.

## FINANCIAL STATEMENTS

The annual audited financial statements for the District for fiscal year ended September 30, 2005 are attached hereto as Appendix G.

## UNDERWRITING

Prager, Sealy & Co., LLC (the "Underwriter") has agreed pursuant to a contract with the District, subject to certain conditions, to purchase the Series 2006 Bonds from the District at a purchase price of $11,809,123.47, consisting of $12,000,000 par amount, plus accrued interest from November 1, 2006 to the date of delivery of and payment therefor in the amount of $49,123.47, less the Underwriter's discount in the amount of $240,000.00. The Underwriter's obligations are subject to certain conditions precedent and the Underwriter will be obligated to purchase all of the Series 2006 Bonds if they are purchased. The Series 2006 Bonds may be offered and sold to certain dealers, banks and others at prices lower than the initial offering prices, and such initial offering prices may be changed from time to time by the Underwriter.

## VALIDATION

On April 27, 2004, the Circuit Court for St. Johns County, Florida validated the issuance by the District of not exceeding $120,000,000 in principal amount of its Special Assessment Bonds, the existence and legal authority of the District. The Series 2006-1 Bonds are included within the validated amount. The appeal period for this judgment has expired. The Series 2006-2 Bonds have a final maturity of not in excess of five years following their dated date, and accordingly are not required to be validated.

## EXPERTS

The references herein to England, Thims & Miller, Inc., as the District Engineer and the inclusion of the District Improvement Plan relating to the Series 2006 Project as "APPENDIX A — DISTRICT ENGINEER'S REPORTS" attached hereto has been approved by said firm. The District Engineer's Report should be read in its entirety for complete information with respect to the subjects discussed therein. The District Engineer also serves as the Master Developer's engineer and as the Durbin North Developer's engineer.

Fishkind & Associates, Inc., has served as Financial Consultant to the District with respect to the issuance and delivery of the Series 2006 Bonds. The Financial Consultant has also prepared "APPENDIX B — SPECIAL ASSESSMENT REPORTS" attached hereto and its inclusion in this Limited Offering Memorandum is used with the permission of Fishkind.

## LEGAL MATTERS

Certain legal matters related to the authorization, sale and delivery of the Series 2006 Bonds are subject to the approval of Greenberg Traurig, P.A., Miami, Florida, Bond Counsel. Certain legal matters will be passed upon for the District by its counsel, Hopping Green & Sams, P.A., Tallahassee, Florida; for the Related LLCs who collectively constitute the Master Developer, by their counsel, Jeri Poller, P.A., Boca Raton, Florida, and Pappas, Metcalf, Jenks & Miller, P.A., Jacksonville, Florida, and for the Durbin North Developer, by its counsel, Pappas, Metcalf, Jenks & Miller, P.A., Jacksonville, Florida. Certain legal matters will be passed upon for the Trustee by its counsel, Holland & Knight, LLP, Miami, Florida. Certain legal matters will be passed upon for the Underwriter by its counsel, Squire, Sanders & Dempsey L.L.P., Miami and Tampa, Florida.

## CONTINGENT AND OTHER FEES

The District has retained Bond Counsel, District Counsel, the Financial Consultant, the Underwriter (who has retained Underwriter's Counsel) and the Trustee (who has retained Trustee's Counsel), with respect to the authorization, sale, execution and delivery of the Series 2006 Bonds. Payment of the fees of such professionals, except for the payment of fees to District Counsel and the Financial Consultant, are each contingent upon the issuance of the Series 2006 Bonds.

## MISCELLANEOUS

Any statements made in this Limited Offering Memorandum involving matters of opinion or of estimates, whether or not so expressly stated, are set forth as such and not as representations of fact, and no representation is made that any of the estimates will be realized. Neither this Limited Offering Memorandum nor any statement that may have been made verbally or in writing is to be construed as a contract with the holders of the Series 2006 Bonds.

The information and expression of opinion herein are subject to change without notice and neither the delivery of this Limited Offering Memorandum nor any sale made hereunder is to create, under any circumstances, any implication that there has been no change in the affairs of the District, the Developers or the Development from the date hereof. However, certain parties to the transaction will, on the closing date of the Series 2006 Bonds, deliver certificates to the effect that nothing has come to their attention that would lead them to believe that applicable portions of the Limited Offering Memorandum contains an untrue statement of a material fact or omits to state a material fact that should be included herein for the purpose for which the Limited Offering Memorandum is intended to be used, or that is necessary to make the

74

statements contained herein, in light of the circumstances under which they were made, not misleading and to the effect that from the date of the Limited Offering Memorandum to the date of closing of the Series 2006 Bonds that there has been no material adverse change in the information provided.

This Limited Offering Memorandum is submitted in connection with the sale of the securities referred to herein and may not be reproduced or used, as a whole or in part, for any other purpose.

The appendices hereof are integral parts of this Limited Offering Memorandum and must be read in their entirety together with all foregoing statements.

DURBIN CROSSING COMMUNITY
DEVELOPMENT DISTRICT

By:    /s/  Jason Sessions
       Jason Sessions
       Vice Chairman, Board of Supervisors