1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Lead Case No. 12-12020-mg   Adv. Proc. No. 12-02065-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matters of:

7   RESIDENTIAL CAPITAL, LLC, et al.,

8               Debtors.

9   - - - - - - - - - - - - - - - - - - - -x

10  DEMUSTCHINE,

11                  Plaintiff,

12              - against -

13  RAHI REAL ESTATE HOLDINGS, LLC,

14                  Defendant.

15  - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              July 10, 2013

21              10:04 AM

22

23  B E F O R E:

24  HON. MARTIN GLENN

25  U.S. BANKRUPTCY JUDGE

1

2   Status Conference RE: Dispute in Reference to Confirmation

3   Order of FGIC Settlement.

4

5   Doc# 2511, (CC: Doc no. 3343) Status Conference Re: Motion to

6   Approve Motion By Ally Financial Inc. and Ally Bank for an

7   Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. 362

8   (a)(3) By (1) Enjoining Prosecution of Alter Ego and Veil

9   Piercing Claims in the Class Action Entitled Landon Rothstein,

10  Et Al. v GMAC Mortgage, LLC Et Al., and (2) Declaring Such

11  Claims Void Ab Initio

12

13  (CC: Doc# 3374, 3375) Evidentiary Hearing RE: Debtors Motion

14  for Entry of an Order to Permit the Debtors to Continue Using

15  Cash Collateral

16

17  (CC: Doc# 3848) Motion for Relief from Stay as to the property

18  located at 11941 Delvin, Sterling Heights, MI 48313.

19

20

21

22

23

24

25

1

2   Adversary proceeding: 12-02065-mg DeMustchine v. RAHI Real

3   Estate Holdings, LLC

4   Doc# 13 Case Management Conference

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER, LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:   TODD M. GOREN, ESQ.

9        STEFAN W. ENGELHARDT, ESQ.

10        JAMES A. NEWTON, ESQ.

11        CHARLES L. KERR, ESQ.

12        NORMAN S. ROSENBAUM, ESQ.

13        PAUL A. GALANTE, ESQ.

14

15

16  KRAMER LEVIN NAFTALIS & FRANKEL LLP

17        Attorneys for Official Creditors' Committee

18        1177 Avenue of the Americas

19        New York, NY 10036

20

21  BY:   STEPHEN D. ZIDE, ESQ.

22        DOUGLAS MANNAL, ESQ.

23        ANDREW M. DOVE, ESQ.

24        ELISE S. FREJKA, ESQ.

25        GREGORY A. HOROWITZ, ESQ.

1

2  KIRKLAND & ELLIS LLP

3         Attorneys for Ally Financial Inc. & Ally Bank

4         601 Lexington Avenue

5         New York, NY 10022

6

7  BY:   RAY C. SCHROCK, ESQ.

8

9

10  MCKOOL SMITH, P.C.

11         Attorneys for Freddie Mac

12         One Bryant Park

13         47th Floor

14         New York, NY 10036

15

16  BY:   MICHAEL R. CARNEY, ESQ.

17

18

19  DECHERT LLP

20         Attorneys for Bank of New York Mellon, et al.

21         1095 Avenue of the Americas

22         New York, NY 10036

23

24  BY:   REBECCA S. KAHAN, ESQ.

25

1

2  AKIN GUMP STRAUSS HAUER & FELD LLP

3          Attorneys for UMB

4          One Bryant Park

5          New York, NY 10036

6

7  BY:   PHILIP C. DUBLIN, ESQ.

8

9

10  ALSTON & BIRD LLP

11          Attorneys for Wells Fargo Bank

12          90 Park Avenue

13          New York, NY 10016

14

15  BY:   MICHAEL E. JOHNSON, ESQ.

16

17

18  WEIL, GOTSHAL & MANGES LLP

19          Attorneys for Rehabilitator of FGIC

20          767 Fifth Avenue

21          New York, NY 10153

22

23  BY:   RICHARD W. STACK, ESQ.

24

25

1

2   WILLKIE FARR & GALLAGHER LLP

3          Attorneys for Monarch Alternative Capital, et al.

4          787 Seventh Avenue

5          New York, NY 10019

6

7   BY:   MARY EATON, ESQ.

8          EMMA J. JAMES, ESQ.

9

10

11   SEWARD & KISSEL LLP

12          Attorneys for US Bank as RMBS Trustee

13          One Battery Park Plaza

14          New York, NY 10004

15

16   BY:   MARK D. KOTWICK, ESQ.

17

18

19   CLEARY GOTTLIEB STEEN & HAMILTON LLP

20          Attorneys for Wilmington Trust, NA

21          One Liberty Plaza

22          New York, NY 10006

23

24   BY:   MARK A. LIGHTNER, ESQ.

25

```
 1   JONES DAY

 2        Attorneys for FGIC

 3        222 East 41st Street

 4        New York, NY 10017

 5

 6   BY:   HOWARD F. SIDMAN, ESQ.

 7

 8

 9   JONES DAY

10        Attorneys for FGIC

11        555 South Flower Street

12        Fiftieth Floor

13        Los Angeles, CA 90071

14

15   BY:   RICHARD L. WYNNE, ESQ.

16

17

18   WHITE & CASE LLP

19        Attorneys for Ad Hoc Group of Junior Secured Noteholders

20        1155 Avenue of the Americas

21        New York, NY 10036

22

23   BY:   J. CHRISTOPHER SHORE, ESQ.

24        HARRISON DENMAN, ESQ.

25
```

```
 1
 2   SHAPIRO, DICARO & BARAK, LLC
 3         Attorneys for RBS
 4         195 Maxess Road
 5         Suite N109
 6         Melville, NY 11747
 7
 8   BY:   ELOY A. PERAL, ESQ.
 9
10
11   KIRBY MCINERNEY, LLP
12         Attorneys for Landon Rothstein Plaintiff
13         825 Third Avenue
14         New York, NY 10022
15
16   BY:   MARK A. STRAUSS, ESQ.
17
18
19   MILBANK, TWEED, HADLEY & MCCLOY, LLP
20         Attorneys for Ad Hoc Group of Junior Secured Noteholders
21         One Chase Manhattan Plaza
22         New York, NY 10005
23
24   BY:   GERARD UZZI, ESQ.
25
```

```
 1
 2   MUNGER, TOLLES & OLSON, LLP
 3          Attorneys for Berkshire Hathaway, Inc.
 4          355 South Grand Ave.
 5          35th Floor
 6          Los Angeles, CA 90071
 7
 8   BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)
 9
10
11   LAW OFFICES OF THOMAS MASON
12          Attorney for Bruce DeMustchine
13          15 New England Executive Park
14          Burlington, MA 01803
15
16   BY:   THOMAS MASON, ESQ. (TELEPHONICALLY)
17
18
19   ALSO PRESENT: (TELEPHONICALLY)
20          ALFREDIA PRUITT, Pro Se
21
22
23
24
25
```

RESIDENTIAL CAPITAL, LLC, ET AL.                    11

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  We're here in

3    Residential Capital, number 12-12020.  Mr. Goren?

4            MR. GOREN:  Thank you, Your Honor.  Todd Goren,

5    Morrison & Foerster, on behalf of the debtors.  If you don't

6    mind, we'd like to go slightly out of order.  We actually are

7    pleased to report that we do have a resolution on cash

8    collateral --

9            THE COURT:  Okay.

10           MR. GOREN:   -- after carrying it for months and

11   months.  Since I know there are a few people waiting around to

12   deal with that and get out of here, we thought we'd take that

13   first.

14           THE COURT:  That's fine.

15           MR. GOREN:  If you'd like, I can bring up a copy of

16   the stipulation and we can e-mail it to chambers later.

17           THE COURT:  Please.  Thank you.

18           MR. GOREN:  Effectively, Your Honor, what this

19   stipulation provides is we are terminating the use of cash

20   collateral except for the limited purpose of continuing to make

21   advances on mortgage servicing rights that remain in the

22   estates.  These are deals that were excluded from the Ocwen

23   sale, and we're sort of slowly disposing of.  The advances were

24   previously funded out of the revolver and junior secured bonds

25   collateral.  So we're continuing the ability to fund those

1   subject to limits set forth in the stipulation.

2          And then really -- and in exchange, we're ceasing any

3   adequate protection payments to the junior secured bonds.  And

4   the other key for the debtors and the committee was that

5   there's a full reservation of rights to seek to retroactively

6   go back and apply those expenses as part of the broader dispute

7   we're going to be dealing with in October.

8          THE COURT:  Okay.

9          MR. GOREN:  But given that, it didn't make sense for

10  anybody to stand up and have the fight now, we realize.  So

11  that is, in effect, the resolution.  I don't know if anyone

12  else would like to be heard on it.

13         THE COURT:  Well, that's what I'm seeing.  Anybody

14  else want to be heard?

15         MR. HOROWITZ:  Good morning, Your Honor.  Gregory

16  Horowitz on behalf of the creditors' committee.  I just wanted

17  to take a minute to explain the significance of the reservation

18  of rights and maybe why it was so difficult and took so long to

19  get to an agreement.

20         As far as the committee is concerned, the most

21  important issue here is the issue relating to the junior

22  secured noteholders' claim for post-petition interest, of

23  whether the use of cash collateral, both in the past and going

24  forward would give rise to a diminution in value claim, as to

25  which they'd be entitled to adequate protection.  That dispute,

1  which will be heard in connection with both the motion to

2  dismiss under our scheduling order and the phase 1 trial, is

3  one of the two or three most significant drivers of this post-

4  petition interest issue.

5       The JSNs are contending that because of the 506(c)

6  surcharge waiver, every dollar that has been spent on their --

7  from their cash collateral, whether it was related to the

8  preservation and maintenance and maximization of the value of

9  their collateral or not, should give rise to diminution in

10  value.  And the committee and the debtors say no, to the

11  contrary, they're only entitled to adequate protection to the

12  extent that the use of their cash collateral has resulted in an

13  aggregate diminution in the value of their collateral.  We'll

14  show during the phase 1 trial that in fact, the use of the cash

15  collateral has resulted in an increase in the value of their

16  collateral.

17       So as I said, the issue's going to be teed up, both

18  the legal standard issue in the motion to dismiss and factual

19  issues in the phase 1 trial.  And I think the parties agreed it

20  didn't make sense to prematurely tee that up in connection with

21  a cash collateral fight, particularly given that the debtors

22  have advised the committee there's sufficient unencumbered cash

23  to fund operations at least through the anticipated

24  confirmation hearing and hoped-for effective date.

25       With that in mind, we wanted to negotiate an agreement

1  that allowed us to fund from -- operations from the

2  unencumbered cash while still fully preserving both sides'

3  ability to argue that -- as to what the situation should be.

4        There's a sentence in paragraph 5 of the stipulation

5  that I just want to specifically highlight.  It's the second

6  sentence.  It says, "The debtors expressly reserve the right to

7  seek on appropriate notice authorization to replenish from cash

8  collateral any unencumbered funds,"  basically the next

9  language is used for the purposes that were originally

10 contemplated in the cash collateral order, "as those such

11 expenses have been paid in the first instance from cash

12 collateral."

13        So I just wanted to highlight for Your Honor, we think

14 that's the most important reservation of rights here,

15 notwithstanding that the ongoing operations including expenses

16 related to the JSN's collateral are going to be funded now in

17 largest part from unencumbered cash.  We're reserving our right

18 to argue the diminution in value of adequate protection issue,

19 as though those amounts had been spent from cash collateral.

20        THE COURT:  Thank you, Mr. Horowitz.

21        Mr. Uzzi, did you want to be heard?

22        MR. UZZI:  Good morning, Your Honor.  For the record,

23 Gerard Uzzi of Milbank, Tweed, Hadley & McCloy, on behalf of

24 the ad hoc group of junior secured noteholders.

25        Your Honor, the issue of adequate protection and what

1  will constitute adequate protection has been teed up for the

2  adversary proceeding.  So notwithstanding the statements on the

3  record here, I'm not going to address that issue.  It's for the

4  adversary proceeding.  I just want to say, the reservation of

5  rights in here speaks for itself.  We negotiated it.  It means

6  what it means.

7          There's reciprocal reservation of rights too.  So I

8  don't want the record to be expanding what we've spent a long

9  time negotiating, Your Honor.  Other than that, we consent to

10  the entry of this order, unless you have questions for me, Your

11  Honor.  I don't have anything else to say.

12          THE COURT:  I don't.  Anybody else want to be heard?

13  Mr. Goren?

14          MR. GOREN:  Thank you, Your Honor.

15          THE COURT:  Well --

16          MR. GOREN:  We'll e-mail it over to chambers, and I'll

17  just turn it over to my partner, Charles Kerr for the FGIC

18  status.

19          THE COURT:  All right.  Just give me a chance to look

20  at it, see whether I have any questions before.

21      (Pause)

22          THE COURT:  Without me searching back, could you tell

23  me what the significance of the May 14th, 2013 date in

24  paragraph 5 is?

25          MR. GOREN:  That was the date that it was -- I think

RESIDENTIAL CAPITAL, LLC, ET AL.                          16

1   the motion was origin -- we had use of cash collateral to fund

2   all the expenses up to that date.  That was the date where it

3   ceased, and we agreed to a more limited use of cash collateral.

4   So and that was then built into the preceding extension

5   stipulation.  So we just wanted to make it clear that it

6   reverted back to that date.

7           THE COURT:  Okay.  All right.  I'll -- I've read it

8   over quickly.  I didn't see any problem.  But I'll look at it

9   more --

10          MR. GOREN:  Okay.

11          THE COURT:  -- carefully.

12          MR. GOREN:  We'll have it e-mailed to chambers.

13          THE COURT:  Thank you.

14          MR. GOREN:  And I will turn the podium over to my

15  partner, Charles Kerr, for the FGIC status conference.

16          THE COURT:  Thank you.

17          MR. HOROWITZ:  Your Honor, may I be excused?

18          THE COURT:  Certainly, Mr. Horowitz, Mr. Uzzi.

19          MR. UZZI:  Thank you, Your Honor.

20          THE COURT:  Nice to see you again, Mr. Uzzi.

21          Go ahead, Mr. Kerr.

22          MR. KERR:  Good morning, Your Honor.  Charles Kerr of

23  Morrison & Foerster on behalf of the debtors.  I'm here on the

24  status conference on the debtors' motion pursuant to 9019 for

25  approval of the settlement agreement involving the FGIC.  That

1  was docket number 3929.

2          Your Honor, I can give any information Your Honor

3  wants about the update of the status of the proceeding.  But I

4  know Your Honor was specifically interested to speak about the

5  confidentiality agreement the parties --

6          THE COURT:  Well --

7          MR. KERR:  -- had been --

8          THE COURT:  -- I want to put that to rest.

9          MR. KERR:  And that's fine, Your Honor.  So if you --

10  may I turn to that for a second?

11          THE COURT:  Yes, you can.

12          MR. KERR:  Okay.  We had been working with all parties

13  to try and reach resolution of a confidentiality agreement.

14  And we had actually sent out a draft originally on June 14th.

15  I think my letter incorrectly said it was June 23rd.  It was

16  even earlier than that.

17          We've exchanged a variety of drafts, had meet-and-

18  confers, and we unfortunately were not able to reach a

19  consensus.  And so we told the parties before the holiday that

20  because depositions were beginning, we needed to get it

21  resolved, and we submitted to Your Honor what we thought was

22  appropriate.

23          There's been various correspondence both from Willkie

24  Farr, from Freddie Mac's counsel, whatever.  And I think

25  there's a couple of discrete issues that have been presented.

1   And let me just highlight those issues for Your Honor, because

2   I think they're --

3           THE COURT:  And I -- let me just -- I've read all the

4   correspondence.

5           MR. KERR:  Okay.  And those -- so let me just --

6           THE COURT:  And the competing versions of the proposed

7   confidentiality order.

8           MR. KERR:  So let me just deal with those four issues.

9   And one of them I'm actually going to refer to FGIC's counsel

10  to deal with.  But the first one has to do with language that

11  the objectors wanted to include in the confidentiality

12  stipulation essentially providing them a screen order, allowing

13  them to continue to trade --

14          THE COURT:  Yes, the two -- let me make clear.  The

15  two issues that -- I'm not precluding you from talking about

16  others, but the two issues I definitely want to hear about is

17  the ethical screen and the use of discovery in the state court.

18          MR. KERR:  Well, let me focus on those two issues,

19  Your Honor.

20          THE COURT:  All right.

21          MR. KERR:  In terms of the ethical screen, when we

22  were negotiating this, this was a stipulation.  And they had

23  included that proposed language.  We said to them we, as the

24  debtors, didn't feel that was something we should be

25  stipulating to in that form.  We said, instead, we thought that

1    if you wanted a screen order, and that's fine, you should make

2    a motion as other parties have done.  And we -- like Allstate

3    had made a motion, I believe, earlier on.  And that put us on

4    notice, allows anybody else to come in and comment on it and

5    whatever.

6         We proposed that to them a couple weeks ago.  They

7    have not done that.  And that language has now been added back

8    into the draft they sent to Your Honor on Monday.  I think it's

9    paragraph 3(h).  So Your Honor, on that issue, what we -- we

10   just don't believe that's appropriate for this confidentiality

11   stipulation; it should be done by separate motion that way.

12        With respect to the interplay with discovery in this

13   proceeding and the rehabilitation hearing before Justice Ling-

14   Cohan, on that, Your Honor, I actually would like to turn that

15   issue over to FGIC's counsel.  We're not a party to the

16   rehabilitation court.  I think that's an issue that is of

17   concern to parties who are in that proceeding.  So if I may,

18   could I ask --

19        THE COURT:  In a moment, you can.

20        MR. KERR:  Okay.

21        THE COURT:  Okay?  Let me ask you, with respect to the

22   screen, does the debtor object to a separate order approving

23   the screen?  I mean, I think the reason that -- why it would

24   arguably seem appropriate to include it in the confidentiality

25   order, it's who can get the stuff -- who can get to see the

1   stuff.  All right?  And what they're saying is if we establish

2   an appropriate ethical screen, that the people who are not on

3   the trading side can have access to the information.

4          MR. KERR:  Our position is, Your Honor, we don't

5   object to a screen order in the appropriate place and

6   appropriate time.  What led to this was the fact that this

7   was -- although we sent to Your Honor a form of an order

8   because the parties couldn't agree, this was going to be part

9   of a stipulation.

10          THE COURT:  Okay.

11          MR. KERR:  And we were uncomfortable -- and I

12   frankly -- I think --

13          THE COURT:  Well, put it this way.  It's now going to

14   be in the form of an order.

15          MR. KERR:  Okay.  And Your Honor, again, from the

16   debtors' point of view, what we thought was the better

17   procedure --

18          THE COURT:  Okay, but let's -- I want to put that

19   aside, okay?

20          MR. KERR:  Okay.

21          THE COURT:  I'm entering an order.

22          MR. KERR:  Okay.  Your Honor, we --

23          THE COURT:  Stop -- stop.  I'm entering an order,

24   okay?  Do you object to the language that they've proposed for

25   the ethical screen?

1          MR. KERR:  As they propose in 3(h), we do not, Your

2     Honor.

3          THE COURT:  Okay, all right.

4          MR. KERR:  So if I -- turning then to the issue about

5     the interrelationship with the FGIC --

6          THE COURT:  Right.

7          MR. KERR:  -- rehabilitation proceeding, if I can turn

8     it over to maybe Mr. Sidman, who I think is really -- has the

9     issue.

10         THE COURT:  That's fine, Mr. Kerr.

11         MR. SIDMAN:  Good morning, Your Honor.  Howard Sidman,

12    Jones Day for FGIC.  The issue is sort of, I think, fairly laid

13    out in the letters to Your Honor.  It is whether the parties

14    who are disputing the 9019 motion can use the discovery that

15    they've received in connection with the 9019 motion in

16    connection with the ongoing rehabilitation proceeding.

17         As the letters also indicate, there is a pending

18    dispute.  In fact, counsel for Freddie Mac has requested that

19    the -- sent a letter to Justice Ling-Cohan of the -- who is

20    supervising the rehabilitation action, requesting that Her

21    Honor allow this discovery in connection with the 9019 motion

22    to be used in connection with the rehabilitation proceedings.

23         THE COURT:  Let me -- one thing I want to be clear

24    about.

25         MR. SIDMAN:  Yeah.

1          THE COURT:  Not all documents or depositions in
2    connection with the contested matter before me involves
3    confidential information.  Do you agree with that?

4          MR. SIDMAN:  Yes, Your Honor.

5          THE COURT:  Okay.  So the -- anything that's not
6    subject to confidentiality, I'm not imposing any -- there's
7    nothing that I know of that would impose limits on the use of
8    nonconfidential information in this or other proceedings.  Do
9    you agree with that?

10          MR. SIDMAN:  I would agree with that -- I would agree
11   with that --

12          THE COURT:  All right.

13          MR. SIDMAN:  -- Your Honor.

14          THE COURT:  So the issue is with respect to things
15   that are designated as confidential --

16          MR. SIDMAN:  Right.

17          THE COURT:  -- whether they get to get used just here
18   or there as well.  Fair statement?

19          MR. SIDMAN:  Yes, Your Honor.  With one caveat, that
20   to the extent that there's any -- that Justice Ling-Cohan
21   permits us to use -- the parties, in connection with their
22   rehabilitation proceeding to use any discovery, that's for her
23   to -- that's for her to decide.

24          THE COURT:  Absolutely.

25          MR. SIDMAN:  So that's the only caveat.  But I agree

RESIDENTIAL CAPITAL, LLC, ET AL.                    23

1   with what you're saying generally, Your Honor.

2            THE COURT:  Okay.  All right.  So what's your position

3   in this issue?

4            MR. SIDMAN:  My position is we should not have -- this

5   issue is premature.  This issue is squarely in front of Justice

6   Ling-Cohan.  If she decides that the parties can use this

7   discovery in connection with the rehabilitation proceeding, we

8   will be happy to work with counsel for Freddie Mac to make sure

9   there is no duplicative discovery and make sure that the

10  provisions of the confidentiality agreement extend to the

11  rehabilitation proceeding.  But right now, this issue is

12  squarely in front of --

13           THE COURT:  Okay.

14           MR. SIDMAN:  -- the court --

15           THE COURT:  Let me just say, in terms of the effect, I

16  don't disagree with you.

17           MR. SIDMAN:  Okay.

18           THE COURT:  But in terms of an order, I do disagree.

19  If I enter -- I mean, it's very common, most common, for

20  documents that are marked as confidential in discovery in my

21  case, are limited to use in my case.  Let me say right now, I

22  don't abide overdesignation of confidential material.  And so

23  if people have a gripe about whether something has been labeled

24  confidential or not, there's a mechanism to raise that issue.

25           MR. SIDMAN:  Yes, Your Honor.

1        THE COURT:  Okay.  With that said, if an order I enter

2   says that confidential material may only be used in connection

3   with this case, that doesn't prevent Justice Ling-Cohan from

4   entering an order saying I permit discovery from the same

5   parties for the same information, and it doesn't relieve them

6   of the obligation of producing the materials in connection with

7   the state court proceeding.

8        But with all due respect for her, or the same would

9   apply to me if she entered it, I can't order that things that

10  were marked as confidential in a proceeding before her can be

11  used before me.

12       MR. SIDMAN:  Agreed, Your Honor.

13       THE COURT:  Because the effect may be the same thing,

14  right, because just ask the same -- ask the same question, get

15  the same material from the same party, subject to whatever

16  restrictions Justice Ling-Cohan imposes on it.  But I don't

17  think I've ever entered an order specifically authorizing the

18  use of confidential information in a proceeding other than the

19  one before me.  Okay?  So you're -- anything else you want to

20  add at this point?

21       MR. SIDMAN:  No, Your Honor.

22       THE COURT:  Okay.

23       MR. SIDMAN:  Thank you.  I've said enough.

24       THE COURT:  Let me hear first from anybody who wants

25  to speak as to the ethical screen issue, and then we'll get to

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1    the --

2              MR. KERR:  Your Honor, just if I may with --

3              THE COURT:  Go ahead, Mr. Kerr.

4              MR. KERR:  -- one of the points.  I just went back and

5    read the language.  And in their 3(h) --

6              THE COURT:  Yes.

7              MR. KERR:  -- they've done it's fine.  But in

8    incorporating 3(h) they took out some language in 3(b) in our

9    draft which allowed any receiving party to see it if they

10   signed the appropriate stipulation at the end of the --

11             THE COURT:  Yeah, you had that language in yours that

12   said if anybody signed Exhibit A, they could see it.

13             MR. KERR:  Correct.  So at least with the debtor and

14   any other party that aren't faced with those screen issues, we

15   just want to make sure that they can do that as well --

16             THE COURT:  Yes.

17             MR. KERR:  -- and we'd like to have that in the order.

18             THE COURT:  Okay.

19             MR. KERR:  Thank you.

20             THE COURT:  All right.

21             MS. EATON:  Good morning, Your Honor.  Mary Eaton from

22   Willkie Farr --

23             THE COURT:  Good morning.

24             MS. EATON:  -- on behalf of the investors.  Just

25   briefly with respect to the screening order.  I don't think

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1  that there's much of an issue except with respect to the impact

2  of 3(b).  In deleting that provision it was not our intent to

3  preclude the debtors or anyone else from getting access to

4  information that was marked confidential, but rather to prevent

5  access to information that was marked as attorneys'-eyes-only.

6  Our thought was, there are other provisions in the order that

7  the debtors submitted to Your Honor that covered that

8  adequately but --

9          THE COURT:  I'll tell you.  I said I don't have a lot

10  of tolerance for overdesignation of confidential information.

11  I have even less tolerance about attorneys'-eyes-only.  So --

12          MS. EATON:  Indeed, Your Honor.  And that's why we

13  ourselves proposed a provision that the attorneys'-eyes-only

14  category should be used sparingly and reasonably.  We have no

15  intention of designating a whole swath of materials as

16  attorneys'-eyes-only.  But there is a core set of materials

17  that go to the heart of my client's business that frankly we

18  don't think should be let out into the universe even --

19          THE COURT:  Well, it's not let out into the universe.

20  I mean, if it's designated as confidential, and anybody who

21  gets to see it has got to sign that Exhibit A confidentiality

22  agreement, what's wrong with that?

23          MS. EATON:  Well, there's nothing per se wrong with

24  it, Your Honor.  We don't see the need and -- that those

25  documents should be going to businesspeople at a variety of

1   institutions that is highly proprietary and confidential.

2   Indeed, I don't understand the need for the information they're

3   requesting in the first place, which relates to specific

4   decisions --

5           THE COURT:  Give me an example of what you think is

6   appropriately designated attorneys'-eyes-only.

7           MS. EATON:  The only category that we have in mind,

8   Your Honor, is the category of information that -- documents

9   and testimony, I assume as well -- that relates to specific

10  decisions to buy or sell ResCap-related securities.  We don't

11  even think that information is relevant to the issue at hand,

12  which of course, is whether the trustees --

13          THE COURT:  Why is information -- historical

14  information about decisions to buy or sell ResCap securities

15  appropriately designated attorneys'-eyes-only?  It's not future

16  plans.  It's -- you've filed a proof of claim?

17          MS. EATON:  We did not, Your Honor.

18          THE COURT:  You didn't.  Okay.

19          MS. EATON:  I mean, it would depend on -- I suppose,

20  on how historical --

21          THE COURT:  Interesting that you didn't file a proof

22  of claim.

23          MS. EATON:  I don't think that we were -- I don't know

24  the details of that, Your Honor.  But I don't think that we

25  were in a position to do that.  But in any case, the answer to

1   Your Honor's question is it depends on how historical it is,

2   because certain of these documents, in reviewing the documents

3   that the debtors and the trustees have requested, documents

4   that were responsive to their requests as written, there are a

5   number of documents that are responsive, they do deal with

6   decisions whether to buy or sell the securities at issue, but

7   they also contain a host of -- a variety of other information

8   about trading strategies and the like which we think, frankly,

9   aren't relevant here at all, and if they do need to be

10  produced, should be protected as attorneys'-eyes-only.

11          That is the only category at issue.  That issue,

12  parenthetically, did not arise until two day before -- I guess,

13  it would be more accurate to say it did not crystallize, that

14  dispute over whether those documents should be produced or not,

15  until two days before the proposed order was submitted by the

16  debtors.  And that's why the whole dispute about whether to

17  include an attorney's eyes only category came up --

18          THE COURT:  I'm less concerned about --

19          MS. EATON:  -- late in the game.

20          THE COURT:  -- the timing, but I've got to decide

21  it -- I'm deciding it now.  That's --

22          MS. EATON:  So in brief, Your Honor, we understand the

23  need not to overdesignate.  We don't have any intention of

24  overdesignating.

25          THE COURT:  So when were these -- when's the most

1    recent trade that would be covered by the discovery request?

2            MS. EATON:  I believe they're still trading to this

3    day, Your Honor.  So, I mean, again, you may be right about

4    historical information.  It's perhaps stale and it would not be

5    harmful if it were disclosed to others, but --

6            THE COURT:  Well, the problem I have is that you can

7    just go ahead and designate it all attorneys'-eyes-only, and

8    then I'm going to have a fight about -- because I don't think

9    that's appropriate, okay?  I want to make that crystal clear.

10           MS. EATON:  Understood, Your Honor.

11           THE COURT:  Mr. Kerr, what's your view on the

12   attorneys'-eyes-only provision?

13           MR. KERR:  Your Honor --

14           THE COURT:  Their current trading strategy, whether

15   it's attorneys'-eyes-only, but maybe professionals'-eyes-only.

16   I mean, if you're using a financial advisor in connection with

17   the preparation for the hearing, restricting it to attorneys is

18   not right.

19           MR. KERR:  Your Honor, our view is -- for the very

20   same reason as you, Your Honor, it shouldn't be restricted that

21   way.  But here's our concern.  This -- it was really just

22   getting an order in place.

23           THE COURT:  Sure.

24           MR. KERR:  This -- we have been trading drafts for

25   weeks that have not been -- have been --

1          THE COURT:  Well, just address specifically the

2    attorneys'-eyes-only limitation?

3          MR. KERR:  Excuse me, Your Honor?

4          THE COURT:  Just address specifically the --

5          MR. KERR:  I --

6          THE COURT:  -- attorneys -- the appropriateness of an

7    attorneys'-eyes-only restriction.

8          MR. KERR:  With respect to the documents she's

9    identified, Your Honor, I don't necessarily believe that that

10   has to be attorneys'-eyes-only.  If we build in an attorneys'

11   eyes -- I agree with Your Honor, it should be extremely narrow.

12   We've not designated anything --

13         THE COURT:  I've entered orders before --

14         MR. KERR:  -- attorneys'-eyes-only.

15         THE COURT:  -- and you all have these documents in

16   your precedent files that have confidential and highly

17   confidential.

18         MR. KERR:  We --

19         THE COURT:  Highly confidential doesn't mean

20   attorneys'-eyes-only.  It may be more restrictive about who can

21   see it.  I'm not -- Ms. Eaton, I'm -- if you really mean

22   attorneys'-eyes-only, I'm not going to approve that.  Okay?

23   Because on a matter of this complexity -- potential

24   complexity -- it may not -- everybody may say it's simple, but

25   I don't want to find a week from now that this fight is back

1   again.

2           You all have financial advisors and other litigation

3   support professionals.  And if you really mean attorneys'-eyes-

4   only, no.  Okay?  If you want to designate a category of highly

5   confidential and so that counsel can have an appropriate person

6   at their client and a professional to review it with tighter

7   restrictions, that would seem appropriate to me.  But I'm not

8   going to approve attorneys'-eyes-only, okay, for this .

9           MR. KERR:  And, Your Honor, we would be fine with

10  that.  It's just then a question of building that into this

11  agreement --

12          THE COURT:  Yes, I understand.

13          MR. KERR:  - and --

14          THE COURT:  Quickly too.

15          MR. KERR:  Quickly.  But that will just take some --

16  take a day or something like that.  But we're --

17          THE COURT:  It shouldn't take more than that.

18          MR. KERR:  -- willing to take it --

19          THE COURT:  Okay?  You all have copies in your

20  precedent files of confidentiality orders that have -- that

21  they usually -- they'll have three:  confidential, highly

22  confidential, and some attorneys'-eyes-only.  I don't like the

23  attorneys'-eyes-only.  Okay?  Because it can hamstring lawyers.

24  It may be wholly appropriate to restrict who besides the

25  lawyers gets to see it.

1         MR. KERR:  Your Honor, we can quickly put a highly

2    confidential designation into the form of the agreement as it

3    is right now.

4         THE COURT:  Okay.  All right.  Anybody else want to be

5    heard on this issue?  Ms. Eaton, is there anything else you

6    want to say on this point?  You -- I'm sure you've got

7    precedent files that have confidential, highly confidential,

8    that restrict -- have somewhat greater limitations or

9    restrictions on highly confidential, but it doesn't say only

10   the lawyers.

11        MS. EATON:  I think the answer to your question, Your

12   Honor, is of course that the definition -- and it was by -- I

13   suppose in my haste to get a draft to you, I could have used

14   more precise language.  But if you look at the definitions that

15   we included, it is professional-eyes-only, or attorneys'-eyes-

16   only, meaning --

17        THE COURT:  All right.

18        MS. EATON:  -- the same thing.  So it's already in

19   there.  And the principle that it should be shared with

20   professionals, obviously, we don't disagree with that.  We can

21   simply change it to highly confidential, professionals' --

22        THE COURT:  Okay, I'm going to leave it --

23        MS. EATON:  -- eyes only.  It makes no difference to

24   us.

25        THE COURT:  Okay.  You all need to go back to the

1   drawing board.  I don't view these as major changes.  Okay?

2   And I'm not hung up.  If it says -- I mean, I wish you wouldn't

3   just call it attorneys' eyes -- if it's professional-eyes-only

4   or high -- this you'll fix, okay?

5            MS. EATON:  We will, Your Honor.

6            THE COURT:  All right.  Now, let me hear from anybody

7   about the discovery being used in the state court.

8            MR. CARNEY:  Good morning, Your Honor.  Michael Carney

9   from McKool Smith on behalf of Freddie Mac.  I think the first

10  thing that I --

11           THE COURT:  And I read your correspondence with both

12  me and the state court judge.

13           MR. CARNEY:  Thank you.  And so I -- the first thing I

14  would like to point out is that we are not asking you to

15  approve the use of 9019 motion discovery in the state court.

16  All we're asking for is that if --

17           THE COURT:  Yes, you are.

18           MR. CARNEY:  -- Judge --

19           THE COURT:  You're asking me to approve it subject to

20  what Judge Ling-Cohan does.  Okay?  That's what you've asked

21  for.  All right.

22           MR. CARNEY:  Well, I don't view it as that.  I just

23  think -- I mean, I view it as a time saver.  Because if she

24  says we can use this discovery in her court, then do we just

25  have to come back to you and say, Your Honor --

1           THE COURT:  No, you don't.  You have to go to the

2   parties who produced the information and get it from them.

3   Okay?

4           Let me make it clear.  I'm not entering an order that

5   approves the use of confidential -- of anything subject to a

6   confidentiality order that I enter, for use in any other

7   proceeding.  Okay?  That doesn't stop Justice Ling-Cohan from

8   permitting any parties before her to take discovery, and to

9   take discovery from exactly the same parties and ask for

10  exactly the same documents or different documents.

11          You agree that the standard -- I think you

12  acknowledged this in your correspondence -- the standard

13  applicable to approval of a 9019 settlement in this court, and

14  the approval of the FGIC settlement in the rehabilitation court

15  are different?

16          MR. CARNEY:  We disagree.  We disagree.  How they're

17  different with FGIC and the rehabilitator obviously.  But we

18  think the issues significantly overlap --

19          THE COURT:  Well, then --

20          MR. CARNEY:  -- in a lot of different ways.

21          THE COURT:  -- wait.  You think it's the same standard

22  in both courts?

23          MR. CARNEY:  No, it's not the same standard.

24          THE COURT:  Okay, different standard.

25          MR. CARNEY:  But I think the issues -- different

 1   standard, but the standard in this -- there's a standard in

 2   each court, the issues can overlap, that we're discussing here.

 3           THE COURT:  You can convince Justice Ling-Cohan what

 4   you believe the standard is before her, and she'll decide that.

 5   Okay?

 6           All right, anybody else want to be heard on this

 7   issue?

 8           All right.  Here's what I'm going to do.  I'm going to

 9   enter a written order addressing solely the issue of use in the

10   other proceeding.  Okay.  And along the lines that I've just

11   said.  Basically, I'm not permitting it.  If Justice Ling-Cohan

12   believes discovery is appropriate in her proceeding, she'll

13   permit it.  And any -- if she wants the same scope or different

14   scope, that's up to her.  And anybody who produced documents in

15   the discovery here can't hold up the confidentiality order or

16   my order and say but Judge Glenn said no.  I mean, she'll do

17   what she wants to do.

18           So I'm going to enter a written order about that.

19   It's not going to address the other issues that were raised

20   here.  Mr. Kerr, you and Ms. Eaton -- you ought to be able to

21   resolve this issue.  Because it's going to be an order I'm

22   entering, the ethical screen issue can go in the order.  It's

23   my order.  All right?  So satisfy yourselves that the

24   language -- you said you didn't have a problem about the

25   particular language other than the reference back to language

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1  that was deleted or something.

2          Make sure that that's in a form satisfactory to both

3  of you.  You ought to be able to do that.  You ought to be able

4  to show confidential documents to a deponent who signs the

5  Exhibit A agreement.  That's pretty standard.  All right?

6          MR. KERR:  We will do that, Your Honor.

7          THE COURT:  Okay.  So I'll enter this written order

8  with respect to the one issue about use in the two proceedings

9  today.  And as soon as you get a form of order in a consent

10  form, that will get entered.

11         MR. KERR:  We will try to do that as quickly as we

12  possibly can --

13         THE COURT:  Okay.

14         MR. KERR:  -- Your Honor.

15         THE COURT:  All right.  Thank you very much.

16         MR. KERR:  Your Honor, if there's anything else about

17  the FGIC proceeding you'd like to hear about, I'm more than

18  willing to tell you.  But I don't think there's anything else

19  at issue right now.

20         THE COURT:  I read Freddie Mac's letter -- or the

21  McKool Smith letter, and they've asked Justice Ling-Cohan to

22  extend her objection date.  And she can do what she wants to

23  do.  I know I did have a request yesterday to extend your time

24  to respond, and I declined to do that.

25         MR. KERR:  We saw that, Your Honor.  We understand

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1   that.

2           THE COURT:  Okay, thank you, Mr. Kerr.

3           MR. JOHNSON:  Good morning, Your Honor.  Michael

4   Johnson from Wells Fargo -- excuse me -- from Alston & Bird on

5   behalf of Wells Fargo.

6           We do have one issue related to the FGIC settlement

7   discovery that's going on right now.  And I hate to have to

8   raise with Your Honor a scheduling issue, but time is running

9   out, quite frankly, Your Honor.  Under the order that you have

10  recently entered, discovery -- fact discovery, that is -- is

11  set to close next Wednesday.  And the settling parties have

12  been trying for the past two weeks to set a deposition

13  schedule.  And we had a fair amount of difficulty doing that.

14  But we are making progress, I'm pleased to report, Your Honor.

15          There is one issue, though, where it appears we have

16  come to heads and we can't seem to get it resolved.  We have

17  requested the depositions of each of the objecting parties, and

18  we only just this week got information on their availability.

19  And we were told that two of Ms. Eaton's clients are only going

20  to be made available on Monday.

21          Now, of course, under Your Honor's order, each

22  deposition is only four hours each.  We're not happy about

23  having to take two of those witnesses on the exact same day,

24  even though we have been asking for two weeks for dates for

25  these depositions.  But we are prepared to do it.  All we have

RESIDENTIAL CAPITAL, LLC, ET AL.                                38

1    asked Ms. Eaton is that she agree that they could go

2    sequentially, four hours each, on Monday, so that we don't have

3    to do them simultaneously, and ramp up two teams unnecessarily

4    to take what in essence will be very similar depositions.

5           Unfortunately, we have not been able to reach

6    agreement on that, Your Honor.  And I'm only raising it today,

7    because time is running out.

8           THE COURT:  Okay, Ms. Eaton?

9           MS. EATON:  We were presented with the proposed

10   deposition schedule slotting in dates for all four of my

11   clients.  I went back to all four of them trying to get dates

12   within the limited time period.  I was told by two of my

13   clients that they were both available on Monday.  I never in my

14   wildest dreams imagined that double tracking was going to pose

15   such an issue.  But I proposed those dates.  Just yesterday or

16   the day before I received word that that posed a problem for

17   the trustees.

18          I went back to my clients to see if they were

19   available on different days.  It turns out that that is not the

20   case.  I learned just before --

21          THE COURT:  That what is not --

22          MS. EATON:  -- the hearing --

23          THE COURT:  -- they are or are not available on

24   different dates?

25          MS. EATON:  They are not available on different days.

1  They're both available on the Monday.  I learned just before

2  the hearing that the trustees would be amenable to having them

3  on the same date at different times.  I'm not trying to be

4  obstructionist.  I did not understand that that was acceptable

5  to them.  I told Mr. Johnson before the hearing began that I

6  would --

7           THE COURT:  It sounds like you've worked it out --

8           MS. EATON:  -- go back to my clients --

9           THE COURT:  -- you'll do one in the --

10          MS. EATON:  -- and ask --

11          THE COURT:  -- morning and one in the afternoon,

12  right?

13          MS. EATON:  That's what I'm going to ask as soon as

14  were done.

15          So I think teeing up --

16          THE COURT:  Not ask.  That's what's going to happen.

17  They're not going to be -- you can -- you'll work out -- it's a

18  long day.  And you can work it out so each of them has four

19  hours in the same day, but not the same four hours.

20          MS. EATON:  Understood, Your Honor.

21          THE COURT:  Okay?  All right.  Mr. Johnson, is that

22  satisfactory?

23          MR. JOHNSON:  Thank you, Your Honor.

24          THE COURT:  Okay.

25          MS. EATON:  May I just briefly raise --

1          THE COURT:  Yes, sure.

2          MS. EATON:  -- one thing as well, Your Honor.

3          THE COURT:  Yes.

4          MS. EATON:  I'm, like Mr. Johnson, sort of hesitant to

5    bring up any kind of discovery stuff.  But there have been a

6    number of issues that we've been grappling with over the last

7    couple of weeks with respect to document production and

8    whatnot.  I'll cut to the chase which is --

9          THE COURT:  Did you meet and confer and you can't

10   resolve it?

11         MS. EATON:  We have met and conferred many times, and

12   we haven't been able to --

13         THE COURT:  Okay.  What's the issue?

14         MS. EATON:  -- resolve these things.  The issues

15   center on the application of various privileges.  As things

16   stand now, we have not received, except for the Duff & Phelps

17   report that we had once and then had to give back and then got

18   again, and a prior version of that, essentially all we received

19   are publicly available documents.

20         So we have nothing -- we have nothing --

21         THE COURT:  I don't understand what you're saying.

22         MS. EATON:  We don't have -- no documents have been

23   produced to use apart from the Duff & Phelps report that's shed

24   any light on the basis for the trustees' determination that the

25   FGIC settlement agreement was in the best interests of the

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1    investors, including my clients, or that they acted in good

2    faith in approving it.  There have been many papers produced,

3    but not papers that go to that issue, including, for example,

4    there are no resolutions from any of these entities indicating

5    that whoever their governing bodies are approved the settlement

6    and for the reasons set forth in minutes or what have you.  A

7    big nothing.  And it seems --

8          THE COURT:  Have you been told they -- the documents

9    don't exist?  What have you been told?

10         MS. EATON:  It would appear that --

11         THE COURT:  Don't tell me what it appears.  Just tell

12   me what you've been -- have you asked that specific question?

13         MS. EATON:  We've been -- yeah.  I've asked --

14   certainly asked that --

15         THE COURT:  Did you ask that specific question?  Are

16   there any resolutions --

17         MS. EATON:  Yes, I asked that question --

18         THE COURT:  And what were you told?

19         MS. EATON:  -- yesterday -- yesterday at our last --

20         THE COURT:  And what were you told?

21         MS. EATON:  -- meet and confer.  I did not receive a

22   response.

23         THE COURT:  Okay, all right.

24         MS. EATON:  So the issue is that it appears that a

25   wide variety of documents -- I don't know what, because I've

1    never seen them -- are being withheld on the basis of various

2    privileges, whether it's the attorney-client privilege, work

3    product privilege, or the mediation privilege.  And we've

4    raised this issue with Your Honor before.  We have concerns

5    that the attorney-client privilege, at least, does not apply in

6    these circumstances, because the trustees in negotiating --

7    that's what they were doing -- the FGIC settlement agreement,

8    were acting on behalf of the beneficiaries of the trust, that

9    is, my clients.

10           And under the fiduciary exception to the attorney-

11   client privilege, it's our view that therefore they are not

12   entitled to withhold advice about the discharge of those

13   fiduciary duties.  And we've raised it before.  And what we're

14   requesting, Your Honor, is that we have an opportunity to

15   address that issue in whatever way Your Honor chooses, but more

16   formally, so that we can draw the Court's attention to what we

17   believe to be the relevant case law and get this issue

18   resolved.

19           Because it's those documents -- essentially we don't

20   have any more information apart from the Duff & Phelps report,

21   that we had at the beginning of discovery.

22           THE COURT:  Okay.  Mr. Johnson, what documents did the

23   trustees rely upon in -- consider or rely upon in determining

24   to approve the settlement?  And are you withholding any of them

25   on privilege grounds?

1          MR. JOHNSON:  Your Honor, the trustees certainly did

2     consider the Duff report.  It's not the case that we -- the

3     trustees have only produced public documents, as Ms. Eaton has

4     represented to the Court.  The trustees have disclosed

5     nonpublic documents as well.

6          THE COURT:  This --

7          MR. JOHNSON:  There have been no resolutions --

8          THE COURT:  But my question is this.  What documents

9     did the -- are there documents that the trustees considered in

10    reaching their decision to approve the settlement which you are

11    withholding on grounds of privilege?

12         MR. JOHNSON:  Your Honor, I think the answer to that

13    question would be yes.

14         THE COURT:  Okay.

15         MR. JOHNSON:  But they have been logged pursuant to

16    the directive that Your Honor gave I think the last time we

17    were in front of you.

18         THE COURT:  Okay.

19         MR. JOHNSON:  And Ms. Eaton pointedly did not mention

20    to Your Honor that she has those logs now.

21         THE COURT:  Okay.

22         MR. JOHNSON:  If she would like to tee up and issue

23    about the attorney-client privilege, we agree that a more

24    formal setting than this is appropriate, so we're not sure why

25    it's being raised now.  She has the logs.  She's already cited

1   to us some authority that she thinks stands for the proposition

2   that she gets to pierce the attorney-client privilege here.

3   We've cited our authority to her that we think it doesn't.

4           So the issue is ripe for her to tee up.  This, I don't

5   think, Your Honor, is the forum.

6           THE COURT:  I'm not deciding it now.  I'm just -- when

7   I'm going to decide it -- if you -- you obviously -- she's

8   raised the issue with you.  You've each cited authority to each

9   other.  You're not bending from your position that -- what's

10  the volume of documents?  First let me ask you that.

11          MR. JOHNSON:  Your Honor, I can only speak for Wells

12  Fargo.  I don't think the volume for Wells Fargo is very

13  significant in terms of what has been logged.  So I don't think

14  Your Honor --

15          THE COURT:  Can you tell me approximately how many

16  pages?

17          MR. JOHNSON:  Your Honor, I can only hazard a guess.

18  I'm afraid I can't.  But I don't think, Your Honor, this is an

19  issue where the Court would be obligated to look at individual

20  documents.  This is an issue --

21          THE COURT:  Oh, I usually do.  I mean, I -- I will

22  ask -- all this happens very quickly here.  Okay?  I'm going to

23  give you a date next week when I expect letter briefs

24  addressing -- if the only issue is the fiduciary exception --

25          MR. JOHNSON:  I believe that's the case, Your Honor.

1            THE COURT:  Okay.

2            MR. JOHNSON:  Which is why I don't think it would be

3    necessary for Your Honor to review individual documents.  I

4    think it's, in essence, an overarching issue that can be

5    briefed without the need to review --

6            THE COURT:  I don't know.  I typically --

7            MR. JOHNSON:  -- many --

8            THE COURT:  -- look -- wind up looking at the

9    documents in camera as well when --

10           MR. JOHNSON:  Sure, we can make them available.

11           THE COURT:  This gets resolved very, very quickly.

12   How many days do you want to get your letters out to -- each of

13   you.  Is there any -- who else -- are the two of you involved

14   in this too?  Come on up.

15           MS. KAHAN:  Your Honor, Rebecca Kahan from Dechert,

16   for Bank of New York Mellon.

17           MR. KOTWICK:  And Mark Kotwick of Seward & Kissel, on

18   behalf of U.S. Bank.

19           THE COURT:  And you've created a privilege log?  Are

20   there documents that your trustees considered in reaching their

21   decision, which you've also withheld on grounds of privilege?

22           MR. KOTWICK:  We logged all the communications between

23   our client and ourselves regarding the FGIC settlement, to the

24   extent --

25           THE COURT:  I know.  But can you answer my question?

1    Are there documents that your client considered in determining

2    to approve the settlement that you're withholding on grounds of

3    privilege?

4            MR. KOTWICK:  There would probably be some documents

5    that yes, they considered.

6            THE COURT:  Okay.

7            MS. KAHAN:  Yes, Your Honor, there are.

8            THE COURT:  Okay.

9        (Pause)

10           THE COURT:  Okay.  I'm going to give -- I want

11   simultaneous letter briefs not to -- and to extent the trustees

12   can join in one letter brief, that would be appreciated --

13   simultaneous letter briefs not to exceed ten pages in length.

14   They can be single spaced letters, by noon Tuesday, July 16th.

15   And trustee's counsel shall provide the Court with the

16   documents that are being withheld on this privilege for in

17   camera review at the same time that they deliver their letters.

18   And then you can all appear on Wednesday the 17th at 3 o'clock,

19   and I'll resolve the issue then.

20           Am I clear?

21           MR. KOTWICK:  You are clear and we'll work with

22   Willkie to meet that schedule.  The only --

23           THE COURT:  I don't know what you have to meet with

24   the -- work with them to meet the schedule.  You have to get a

25   letter brief addressing the issue.  You say you've exchanged --

1   you've had a meet-and-confer.  You've each shared citations

2   with each other.  You need to give me -- when I said a maximum

3   length of a letter, it certainly can be shorter.

4          It's not the first time I've dealt with the fiduciary

5   exception to attorney-client privilege.  But I want the

6   documents delivered for in camera review.  I'll look at the

7   letters first and decide if I need to look at the documents.

8   But we're on a fast schedule.  This all needs to get resolved

9   very quickly.

10          MR. KOTWICK:  I understand that.  My only point, Your

11  Honor, was that we've got double tracked depositions next

12  Wednesday, including --

13          THE COURT:  You've got a big firms.

14          MR. KOTWICK:  -- stuff out of town.

15          THE COURT:  You've got big firms.

16          MR. KOTWICK:  No, no, no.  That's -- and I said we

17  will work with them and make sure that we get everything

18  covered.

19          THE COURT:  Okay.  That's going to be the schedule.

20          All right.  Any other issues on FGIC?  Mr. Kerr?

21          MR. KERR:  Your Honor, if there's no other issues and

22  I don't think there are, I'd just simply request that I can be

23  excused so that I can turn this over to --

24          THE COURT:  You --

25          MR. KERR:  -- my --

1          THE COURT:  -- you certainly can.

2          MR. KERR:  -- partner.  Thank you very much, Your

3   Honor.

4          THE COURT:  Anybody who wants to be excused is

5   excused.  Okay?

6          MR. KERR:  Thank you, Your Honor.

7          THE COURT:  All right, Mr. Goren, what's next?  Mr.

8   Engelhardt.

9          MR. ENGELHARDT:  Good morning, Your Honor.  Stefan

10  Engelhardt of Morrison & Foerster on behalf of the debtors.

11  The next item on the agenda is a status conference on the

12  motion -- Ally Financial's motion for an order enforcing the

13  automatic stay relating to the Rothstein class action.

14         THE COURT:  Let me just make myself a note.

15      (Pause)

16         THE COURT:  Go ahead, Mr. Engelhardt.

17         MR. ENGELHARDT:  Your Honor, if I may, we just

18  received word that unfortunately counsel for Rothstein got late

19  notification of this.  Apparently there was an error in

20  communication.  They only received notice of this through the

21  agenda that was filed.  So they are on their way to court now.

22  So if we can defer --

23         THE COURT:  Absolutely.

24         MR. ENGELHARDT:  -- to the end.  Thank you, Your

25  Honor.  And to the extent that the communication was our fault,

1    we apologize to the Court.

2              THE COURT:  And I -- I know I had one of my law clerks

3    call and ask it to be put on the agenda.  It was late.  And

4    ordinarily I try to give more notice than this.  So I fully

5    understand.

6              MR. ENGELHARDT:  Thank you, Your Honor.

7              THE COURT:  Okay.

8              MR. NEWTON:  Good morning, Your Honor.  James Newton

9    of Morrison & Foerster on behalf of the debtors.  The next

10   items on the agenda are the continued matters related to

11   professionals for the foreclosure review.  This is dockets

12   number 1357, 1426 and 1427 related to the retentions of

13   PricewaterhouseCoopers, Pepper Hamilton, and Hudson Cook.

14             As Your Honor is aware, the debtors have reached an

15   agreement on the terms of a -- and a settlement with the Fed

16   under which they would pay 230 million dollars in satisfaction

17   of their foreclosure review obligations.  They put the money

18   into escrow, and work has been suspended.

19             This suspension is scheduled to last thirty days.  And

20   we plan on filing a motion this week to seek approval of that

21   settlement.  But if the motion is not approved or the thirty

22   days not extended, then we'll have to restart the review.  And

23   so we've requested that the interim retentions be carried over

24   through July 26th.  And we've circulated a proposed order to

25   chambers, counsel for the committee, Wilmington Trust and to

1    AFI as well.

2              THE COURT:  Anybody else want to be heard on this?

3    That's fine.  I'll grant the order.

4              MR. NEWTON:  The next item on the agenda is a motion

5    for annulment of the automatic stay filed by RBS Citizens Bank.

6    This is docket number 3848.  I'll cede the podium to counsel

7    for RBS.

8              THE COURT:  Thank you.

9              MR. PERAL:  Good morning, Your Honor.  Eloy Peral with

10   Shapiro, DiCaro & Barak on behalf the movant, RBS Citizens

11   Bank.  This is the motion pursuant to Section 362(d)(1) for

12   retroactive relief from the automatic stay to the point -- to

13   the date of a foreclosure sale of real property in Michigan

14   that was held July -- a post-petition sale that was held July

15   20th, 2012.  The property was subsequently conveyed to Fannie

16   Mae.

17             RBS held or holds a first mortgage on the property,

18   and the debtors hold a junior mortgage on the property.  Your

19   Honor, whether to --

20             THE COURT:  Do you agree that the automatic stay was

21   in place and effective and barred foreclosure absent the stay

22   being lifted?

23             MR. PERAL:  Yes, Your Honor.  That's why we're seeking

24   an annulment of the stay to that date, in order to validate the

25   sale.

1        THE COURT:  Do you have any authority for retroactive

2   annulment of the automatic stay?

3        MR. PERAL:  Your Honor, there quite a bit of

4   authority.  For example, In re Market XT, 428 B.R. 579.  There

5   are numerous factors that courts apply in order to -- when

6   evaluating one of these motions.  There is -- there are a

7   number of other cases that relate specifically to foreclosure

8   sales.  These factors include whether the creditor had actual

9   or constructive knowledge, whether the debtor had acted in bad

10  faith, whether there was equity in the property for the estate,

11  if a property was necessary for an effective organization.  In

12  this case a property would be the debtors' subordinate lien.

13  If the grounds for relief from the stay --

14       THE COURT:  Any of those cases involve a case where

15  there are thousands of properties that were in various states

16  of foreclosure when the automatic stay went into place?

17       MR. PERAL:  Your Honor --

18       THE COURT:  The debtors' limited objection basically

19  was that this has the potential to work havoc in this case,

20  basically reopening or opening the door on many, many things

21  that have happened.

22       MR. PERAL:  Your Honor, I understand the limited

23  objection.  I don't know if any of those concerns would

24  actually materialize.  The debtors are certainly free not

25  consent to this, as they consented to other requests for relief

1   from the stay through the procedures order.  But --

2          THE COURT:  They've consented, and the Court has

3   entered orders that have limited the effect of the stay or

4   lifted the stay, but not retroactively lifted the stay.

5          MR. PERAL:  Right.  But notwithstanding that procedure

6   order, Your Honor, it appears that based on these factors and

7   based on this authority, RBS should be granted the relief

8   requested --

9          THE COURT:  Okay.

10          MR. PERAL:  -- apart from the condition requested by

11   the debtors.

12          THE COURT:  Okay.  Thank you.  Mr. Newton, do you want

13   to be heard?

14          MR. NEWTON:  Yes, Your Honor.

15          Your Honor, James Newton of Morrison & Foerster on

16   behalf of the debtors.

17          I think you correctly recognized the issue.  This is

18   not the only type of a -- the only request that we received

19   under the procedures order requesting retroactive relief, and

20   we've communicated the same concerns to each party that has

21   submitted those requests.  And I think a couple other points to

22   make.

23          There is certainly no absolute right to -- or absolute

24   right to retroactive annulment of the automatic stay.  We think

25   it's appropriate for Your Honor to condition the relief that's

1    being requested upon something that can protect the debtors

2    from the need to expend what could end up being a fairly large

3    amount of money in any number of proceedings in the future.

4              THE COURT:  Such as?

5              MR. NEWTON:  Well --

6              THE COURT:  You're saying that I could, what, grant

7    them relief but condition it on what?

8              MR. NEWTON:  Well, our limited relief as req -- and

9    we've actually requested informally that --

10             THE COURT:  Look, unless the stay is annulled

11   retroactively, they got a problem.  They went ahead and

12   foreclosed on property that was subject to the automatic stay.

13   So what are you --

14             MR. NEWTON:  Correct.

15             THE COURT:  -- describing?

16             MR. NEWTON:  And in this situation, the debtors

17   actually don't have an interest in this property or the lien

18   that was on the property anymore.  It was one of the liens that

19   was transferred over.  And so as stated in our limited

20   objection, we wouldn't have any issue with prospective relief.

21             THE COURT:  It doesn't do them any good.

22             MR. NEWTON:  If there's going to be retroactive relief

23   then we think --

24             THE COURT:  Prospective relief doesn't do them any

25   good.  They've already foreclosed on the property.

1          MR. NEWTON:  Well, then they could go and unwind and

2    reforeclose on the property.  But if there's going to be any

3    retroactive relief, we think it's appropriate for the movant to

4    provide the debtors with some sort of indemnity.  In case the

5    third-party borrower who is not present here is -- drags the

6    debtors into court on the basis of the improper post-petition

7    foreclosure.

8          THE COURT:  All right.  All right.

9          Counsel, what's your position about providing the

10   debtors with indemnity?

11         MR. PERAL:  Your Honor, simply, I don't think it's

12   necessary.  It would also be helpful if the debtor could --

13         THE COURT:  Whether you think it's necessary or not --

14         MR. PERAL:  Well, I -- we --

15         THE COURT:  -- is your client prepared to provide --

16         MR. PERAL:  -- we --

17         THE COURT:  -- the debtors with an indemnity against

18   any loss, harm, damages, attorneys' fees that result if this

19   Court retroactively annuls the automatic stay?

20         MR. PERAL:  No, Your Honor.

21         THE COURT:  Okay.  Motion's denied.

22         I considered all the facts and circumstances of the

23   case and in the exercise of the Court's discretion the Court

24   determines that it would be inappropriate in these

25   circumstances to retroactively annul the automatic stay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1        If RBS had been prepared to provide the debtor -- it

2   is their own conduct that the existence of the automatic stay

3   was open and notorious and available to everyone.  RBS went

4   ahead, conducted a foreclosure sale in the face of the

5   automatic stay despite the debtors' interest in the property.

6   The automatic stay -- counsel has acknowledged, the automatic

7   stay applied.  The debtors should not be at any risk of any

8   harm.  If RBS is unwilling to provide the debtor with a

9   satisfactory indemnity against any harm, loss, attorneys' fees,

10  et cetera, under all of the circumstances the Court denies the

11  motion.

12        Mr. Newton, prepare an order that indicates that for

13  the reasons stated on the record the motion is denied.

14        MR. NEWTON:  Will do so, Your Honor.

15        THE COURT:  All right.  If subsequently, if -- the

16  only thing I would say, subsequently before you send the order

17  if RBS wants to reconsider the issue of indemnity you can work

18  out a form of consent order that's satisfactory and I'll look

19  at it.  But that's -- when I get your order it's getting

20  entered so it's something that's going to have to happen very

21  quickly.

22        MR. NEWTON:  All right.  Thank you, Your Honor.

23        THE COURT:  Okay.

24        MR. NEWTON:  I'll turn the podium over the Paul

25  Galante.

1              THE COURT:  Okay.

2              MR. GALANTE:  Good morning, Your Honor.  Paul Galante

3    from Morrison & Foerster on behalf of the debtor/defendant here

4    for the --

5              THE COURT:  I haven't seen you here before.

6              MR. GALANTE:  No, first time.  It's for the case

7    status conference in the adversary proceeding filed by Bruce

8    DeMustchine.  I'm not sure if Mr. DeMustchine's counsel is on

9    the phone.

10             THE COURT:  Is anybody on the phone for De -- Mr.

11   DeMustchine?  No.  Go ahead.

12             MR. GALANTE:  I can give you a brief --

13             THE COURT:  So what's the -- has the First Circuit

14   done anything yet?

15             MR. GALANTE:  First Circuit hasn't done anything yet.

16   It's still pending.

17             THE COURT:  Is it fully briefed in the First Circuit?

18             MR. GALANTE:  It is fully briefed in the First

19   Circuit.

20             THE COURT:  Has an argument been scheduled?

21             MR. GALANTE:  I do not believe so.  As far as the

22   adversary proceeding, the current status is both sides have

23   served discovery requests; we're in the process of gathering

24   documents and we should serve those responses to the document

25   request and the interrogatories next week and I believe they

RESIDENTIAL CAPITAL, LLC, ET AL.                    57

1   will be doing the same in response to our requests.  And that's

2   the current status of the case.

3              THE COURT:  Okay.

4              MR. GALANTE:  There were some early settlement

5   discussions.  Those have somewhat broken down but --

6              THE COURT:  Have you considered mediation?  Not with

7   Judge Peck.

8              MR. MASON:  Hello, Your Honor?

9              THE COURT:  Yes.

10             MR. MASON:  Hi.  This is Attorney Mason.  I'm sorry;

11  we had some type of a glitch with the phone.

12             THE COURT:  Oh, okay.  Go ahead.

13             MR. MASON:  I'm representing Mr. DeMustchine.

14             THE COURT:  Go ahead.  Let me hear from you.

15             MR. MASON:  Yes, I agree with Attorney Galante about

16  the status of the case.  We've had some brief discussions about

17  the -- settling the case.  And to be honest with you, Your

18  Honor, we'd really like to settle this case.  Right now, it's

19  at the First Circuit Court of Appeals.

20             One of the big issues is whether or not the -- whether

21  RAHI has ever owned -- has ever owned a mortgage for this

22  property.

23             What's happened, Your Honor, is that RAHI apparently

24  has sold the note and the mortgage to another company.  So

25  currently, it's pursuing this action without having any

1   ability -- in the First Circuit Court of Appeals without having

2   any right to pursue this action -- apparently having no right

3   to pursue this action.  So part --

4           THE COURT:  Well, look if --

5           MR. MASON:  -- of the reason we why thought --

6           THE COURT:  Okay.  Let me ask you this, if they had

7   standing in the district court, is that affected by if they've

8   sold the note subsequently?  I mean, look, I'm -- if I could be

9   euphemistic about it, this is one way the debtor really screwed

10  up or the debtors' prior counsel -- do I have the right case?

11          MR. GALANTE:  You have the right case.

12          MR. MASON:  Yes, Your Honor.

13          THE COURT:  Okay.  And this is their Hail Mary pass to

14  hope that the First Circuit bails them out, speaking

15  euphemistically.  Is that a fair statement, counsel?

16          MR. GALANTE:  It's fair.

17          MR. MASON:  Yes, Your Honor.

18          THE COURT:  Okay.

19          MR. MASON:  I'd have to say so.

20          THE COURT:  All right.

21          So I -- look, I'm sure -- are all the briefs in the

22  First Circuit or have you moved to dismiss the appeal on the

23  grounds they don't have standing to appeal or --

24          MR. MASON:  Yes, Your Honor, I have.

25          THE COURT:  Okay.  Is everything fully briefed in the

1  First Circuit?

2          MR. MASON:  I believe so, Your Honor.  Yes.

3          THE COURT:  Okay.  Have the two of you considered

4  trying to mediate?  I don't know, I'm not -- look, either

5  you'll settle or you won't settle.  This isn't all that

6  complicated, frankly, unless you need a mediator but --

7          MR. MASON:  Your Honor, pretty much what we want is

8  pretty simple.  All we want is we want the appeal to the

9  judgment in the first district court to be withdrawn and for

10  some attorneys' fees to be paid.  It doesn't seem like the --

11  RAHI is willing to negotiate this or even talk about

12  withdrawing this -- withdrawing this whole appeal.

13          THE COURT:  So the Second Circuit has a mediation

14  program.  I don't know whether the First Circuit has one or

15  not.  Have either of you explored that?

16          MR. GALANTE:  We have, Your Honor.

17          MR. MASON:  It does, Your Honor.  When the appeal was

18  originally filed, the -- we were supposed to have a mediation

19  conference.  However, there was a stay put on the case so that

20  was never -- that was never held.  There's a retired judge who

21  basically is the settlement counsel for the First Circuit Court

22  of Appeals.

23          THE COURT:  So what I would -- look, here -- I lifted

24  the stay so the appeal could go forward.  I'm going to direct

25  counsel to endeavor to get the First Circuit's mediation

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1   rescheduled.  They'll either do it or they won't but I can't
2   believe you're pursuing this case; but okay, that's fine.  But
3   try and get this scheduled for mediation in the First Circuit.
4   I know the Second Circuit's program is quite effective and I
5   assume, hopefully, the First Circuit's program is similarly
6   effective.
7           If you don't settle it, you don't settle it and if
8   they made a motion to dismiss the appeal, the Court will decide
9   it -- either grant it or deny it.
10          MR. MASON:  Right.
11          THE COURT:  But in terms of the schedule before me,
12  everything has proceeded apace.  Is that correct?
13          MR. GALANTE:  It has.
14          THE COURT:  Okay.
15          MR. MASON:  Yes, Your Honor.  The only thing is that
16  we may ask for a brief extension because I'm in Boston and the
17  attorneys who are representing RAHI are in New York so there's
18  some logistical difficulties.  But we have agreement on
19  discovery.  We have agreement, at least, on my clients being
20  deposed.  So we seem to be moving along.
21          THE COURT:  Okay.  In the case management and
22  scheduling order that gets entered, I didn't go back to look at
23  this one -- actually, I did look at this one specifically -- in
24  the last paragraph, it has a provision that the parties can't
25  unilaterally agree to extend the schedule and if anybody's

1   going to seek to extend it, they have to make an application --

2   and it can be by letter -- more than five days before the dates

3   expire.  I'll just tell you now, I'm not inflexible.  If -- you

4   need to establish that there's been a good faith effort to

5   conduct all discovery and there are a few items that remain to

6   be done and because you're in Boston and they're here and if

7   people -- witnesses are on vacation or whatever.  But in order

8   for me to extend the schedule, the parties have to demonstrate

9   that they've made a good-faith effort to complete discovery but

10  there are a few things that need to be done.  In which case, I

11  ordinarily will extend the deadline.  Okay?  And you can do it

12  by letter.

13          MR. MASON:  Thank you, Your Honor.

14          THE COURT:  I don't require a formal motion.  You can

15  do it by letters.

16          MR. MASON:  Okay.

17          MR. GALANTE:  Understood.

18          THE COURT:  And --

19          MR. MASON:  Thank you very much, Your Honor.

20          THE COURT:  -- you can do it by letter and if -- I

21  need the letter even if the two of you agree; but if you're

22  requesting an extension, you ought to indicate what the

23  opposing counsel's position is on it.  If they consent to it,

24  I'll certainly take that into account.  You still need to

25  demonstrate to me that the parties have made a good-faith

1  effort to complete their discovery and there are some things

2  that need to be done yet.  Okay?

3         MR. MASON:  Understood, Your Honor,

4         THE COURT:  All right.  Thank you very much.

5         So what I would like you to do, Mr. Newton or Mr.

6  Goren, get this back on an agenda for September just for a

7  status report.  And I do want to find out whether they've --

8  whether the parties have endeavored to get the First Circuit

9  mediation in place, either have completed it or have a date or

10 were turned down in requesting it.  Okay?  But let's get it on

11 for a status conference in September.

12        MR. NEWTON:  Will do.

13        THE COURT:  Okay?  Thank you very much.

14        MR. NEWTON:  Okay.

15        MR. MASON:  Thank you.

16        THE COURT:  Thank you very much.  And you're excused

17 from the phone if you want to be.  Okay?

18        MR. MASON:  Thank you, Your Honor.

19        THE COURT:  All right.  Mr. Newton or Mr. Goren are we

20 still waiting for the Rothstein plaintiff's counsel, Mr.

21 Engelhardt?

22        MR. ENGELHARDT:  Yes, Your Honor.  Stefan Engelhardt.

23        It appears that the Rothstein counsel has not arrived

24 yet.  We received an e-mail at approximately 10:40 that he was

25 on his way, would be here momentarily but --

RESIDENTIAL CAPITAL, LLC, ET AL.                    63

1        THE COURT:  So look, let's -- is there anything else

2  on the agenda for today, Mr. Goren.

3        MR. GOREN:  That's it, Your Honor.

4        THE COURT:  Okay.  So anybody wants to be excused is

5  excused.  Let's take a recess until 11:30.  Knock on my

6  chambers door and let me -- in fact, we'll -- let me know if

7  they're here by then.  We'll definitely break until 11:30,

8  though.  Okay. So our ECRO operator doesn't have to sit around

9  waiting.  Okay?

10       MR. GOREN:  Thank you very much, Your Honor.

11       THE COURT:  All right.  We're in recess.  Thank you.

12     (Recess from 11:12 a.m. until 11:33 a.m.)

13       THE COURT:  All right.  Please be seated.  We're back

14  on the record in Residential Capital number 12-12020.  Mr.

15  Engelhardt.

16       MR. ENGELHARDT:  Hello again, Your Honor, Stefan

17  Engelhardt of Morrison & Foerster on behalf of the debtors.

18  Your Honor, we're here on docket number 2511 status conference

19  on the motion by Ally Financial for an order enforcing the

20  automatic stay relating to the Rothstein class action.  After

21  consultation with counsel for Kirkland, I respectfully -- as

22  it's their motion, I'll turn the podium over to Mr. Schrock.

23       THE COURT:  Thank you.  Who's appearing on the

24  Rothstein -- for the plaintiffs?

25       MR. STRAUSS:  I am.

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1            THE COURT:  Why don't you come on up?

2            MR. STRAUSS:  Thank you, Your Honor.

3            MR. SCHROCK:  Good morning, Your Honor.  Ray Schrock.

4            THE COURT:  Let him make his appearance.

5            MR. SCHROCK:  Sure.

6            MR. STRAUSS:  Mark Strauss from Kirby McInerney --

7            THE COURT:  Okay.

8            MR. STRAUSS:  -- for the Rothstein plaintiffs.

9            THE COURT:  And, Mr. Strauss, let me apologize to you

10    because this was added to the agenda late, and I ordinarily try

11    not to do that but when I -- I had your letter and Mr.

12    Schrock's letter and I hadn't said anything and then I looked

13    at the agenda for today and figured well, let's add it on.  So

14    I apologize to you.  I appreciate your coming down; and next

15    time if we do it again, I'll make sure I give you more notice.

16    Okay?

17            MR. STRAUSS:  Thank you, Your Honor.

18            THE COURT:  Okay.  Go ahead, Mr. Schrock.

19            MR. SCHROCK:  Okay.  Thank you again, Your Honor.

20    Again, good morning.  For the record, Ray Schrock of Kirkland &

21    Ellis on behalf of AFI and Ally Bank.

22            Your Honor, we're here on a status conference.  I know

23    Your Honor has received letters from Mr. Strauss and myself.  I

24    think the sole nature of the disagreement at the moment is just

25    whether or not the Court should make a determination at this

1    stage in the cases in light of the plan support agreement, the

2    pending plan, as to whether or not the Rothstein causes of

3    action are property of the estate.  And after conferring with

4    committee counsel, conferring with the debtors' counsel, our

5    concern, and we saw this before and we let the district court

6    and the stipulation back in December know that there may be an

7    amendment to the motion to seek to extend the automatic stay.

8    Our sole concern is --

9            THE COURT:  Who has it in the district court?

10           MR. SCHROCK:  Judge Nathan.

11           THE COURT:  All right.

12           MR. SCHROCK:  Our concern, Your Honor, is that these

13   are tricky issues around what's property of the estate.  We

14   wanted to raise the issue because we did see the complaint was

15   amended to add Ally post-petition, and there's been

16   subsequently a second amendment.  But this has law by case

17   implications that goes directly to the debtor release as well

18   as the third-party release in the cases.  I believe Mr. Strauss

19   can speak for himself but I believe there's not a fundamental

20   disagreement around staying the matter through the pendency of

21   the action.  Our belief was --

22           THE COURT:  Through the pendency of --

23           MR. SCHROCK:  Pendency of the Chapter 11, at least,

24   for the near term.  But if we make this determination now, we'd

25   rather do it in the context of confirmation when Your Honor can

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

1   consider that this action -- this particular question is not

2   just applicable to Mr. Rothstein and his action, it's

3   applicable to several other lawsuits that are pending in this

4   case.  And so if we make a determination here, how is that

5   going to affect all of the other actions and the scope of the

6   releases that are contemplated under the plan?

7            THE COURT:  Okay.  Mr. Strauss?

8            MR. STRAUSS:  Judge, we -- there's a fairly narrow

9   issue to be resolved, and that is whether the claims that we've

10  alleged against Ally Bank --

11           THE COURT:  East for you to say.

12           MR. STRAUSS:  -- are direct or derivative.  And this

13  is an issue that Mr. Schrock's clients raised in their own

14  motion that was filed in December of 2012.  We spent a lot of

15  time briefing it.  All the parties have weighed in; and I --

16  the matter is ripe for determination.  This is a --

17           THE COURT:  Let me -- tell me who are the defendants

18  in the district court and what's the status of the district

19  court action?

20           MR. STRAUSS:  The status of the district court action

21  is that there are motions to dismiss that are fully briefed and

22  pending.

23           THE COURT:  Have they been argued?

24           MR. STRAUSS:  They have not been argued yet.

25           The defendants in the district court are Balboa

RESIDENTIAL CAPITAL, LLC, ET AL.                    67

1  Insurance Company, Meritplan Insurance Company and Newport

2  Management --

3          THE COURT:  This is the force-placed insurance issue?

4          MR. STRAUSS:  Correct.  And we've also named Ally Bank

5  and Ally Financial.  So those are the defendants.  The claims

6  are based upon RICO and RESPA and there are a handful of state

7  law claims as well, but the main claims are RICO and RESPA.

8          THE COURT:  Has discovery been proceeding while the

9  motions to dismiss are pending?

10          MR. STRAUSS:  Limited discovery has been proceeding

11  against Balboa.

12          THE COURT:  And has Judge Nathan entered a scheduling

13  order in the case?

14          MR. STRAUSS:  No.  We see this as a -- the resolution

15  of our derivative/direct issue as a threshold issue for us

16  going into confirmation.  We -- if the claims are, as they

17  allege, derivative then we don't have to raise any issues as to

18  the third-party releases, otherwise we do.  So we think that it

19  will streamline the litigation once we get to confirmation.

20  And as I said, all of the issues have been teased out in the

21  papers.  Everything is ready to be resolved.

22          THE COURT:  Everything other than me.

23          MR. STRAUSS:  Yes.

24          THE COURT:  And I only say that half in jest.  I don't

25  know the extent to which you're following what's going on in

1  the ResCap case.  There is a lot of stuff scheduled over the

2  next few months; it's very busy.

3         MR. STRAUSS:  I noticed.  I'm sure, Your Honor.  I'm

4  sure that chambers is bustling with activity.  But this is a

5  motion that was brought on by Ally.

6         THE COURT:  Yes, I understand.

7         MR. STRAUSS:  So --

8         THE COURT:  Well, I'm not -- and you'll correct me or

9  Mr. Schrock will correct me but the issue of whether I grant a

10  105 stay doesn't hinge on whether the claims are direct or

11  derivative.  Okay.  So earlier in this case, I entered a stay

12  of quite a few actions that named AFI where I don't really

13  think there was -- I don't remember this issue being teed up in

14  terms of that these are derivative claims.  It was even

15  assuming that they're -- if they're derivative claims, end of

16  subject -- subject to appeal, right.  But if they're derivative

17  claims, you just can't assert them, they belong to the debtor,

18  et cetera.  But if they're -- even if they're direct claims, if

19  AFI has a right -- has asserted a right to indemnification

20  against the debtor, it affects the res of the estate, the

21  property of the estate.  And the Second Circuit's most recent

22  decision on this is the Quigley case, and it would clearly

23  indicate that the bankruptcy court has the power under 105 to

24  stay actions against nondebtors if it would affect the property

25  of the estate; if there's common insurance, if there's a right

1    to indemnification.  So do you disagree with that?

2              MR. STRAUSS:  Unless I'm incorrect, the stays that the

3    Court -- the 105 stays that the Court granted earlier in the

4    case weren't open-ended.

5              THE COURT:  They weren't.

6              MR. STRAUSS:  They expired.  Some of them were

7    consensually extended.

8              THE COURT:  I had -- there was one that I actually had

9    that I heard evidence, Western something, I can't remember

10   the --

11             MR. STRAUSS:  Western & Southern.

12             THE COURT:  -- name of it now -- where they were

13   perfectly entitled not to consent, they didn't consent.  I

14   had -- there was an evidentiary hearing and I delivered a

15   ruling from the bench.  I read a decision into the record, and

16   I'm sure there's a transcript of it.  But all the others

17   consented.  They were, on several occasions they were -- the

18   stays were extended by stipulation.

19             In -- I've usually -- I'm not making a decision on

20   this now, okay, but I mean I believe that with restrictions on

21   the exercises of discretion, limits to the exercises of

22   discretion, the bankruptcy court has discretion in the

23   appropriate circumstances to extend -- to stay even direct

24   claims against a nondebtor if it would affect the property of

25   the estate, certainly, through confirmation.

RESIDENTIAL CAPITAL, LLC, ET AL.                    70

1    I've usually done it in chunks, okay.  So I wrote an

2    opinion in a case called McHale v. Alvarez, In re the 1031 Tax

3    Group, and in that case I did go through the analysis of which

4    were direct claims and which were derivative claims.  Some were

5    derivative, and I said you're just -- you plaintiffs are batter

6    out,  you can't pursue those.  Some of your claims, as alleged

7    in the state court complaints in Colorado, are direct claims.

8    And as to those, I extended a 105 stay, okay.  I did it for --

9    my practice has been to do it for finite periods of time,

10   because it was earlier in the life of that case, I didn't know

11   how quickly other things were going to progress, I could always

12   extend the stay, and I think I did and it all ultimately went

13   away.  The case -- everything got resolved.

14       So I'm not sure that even if I go ahead and hear the

15   motion now that I would have to decide the issue of whether

16   your claims are direct or derivative.  I could decide that even

17   if they are direct, I, nevertheless, extend a stay through

18   confirmation.  We now have a proposed plan on file, there's a

19   plan support agreement, you know about all of that.

20       I am very mindful of and respectful of the proceedings

21   in other courts.  So when the matter came before me earlier in

22   ResCap about staying stayed in federal court cases elsewhere, I

23   asked for the permission of counsel to speak with -- not

24   permission, I asked them does anybody have any objections to me

25   speaking with the judges who had those matters.  Ao I'm going

1    to ask you the same que -- I've not spoken to Judge Nathan

2    about it and I would like to speak to Judge Nathan about it.

3    And I'll ask both you, Mr. Strauss and Mr. Schrock, whether you

4    have any objections to my speaking with Judge Nathan about it?

5                MR. SCHROCK:  We have no objection.

6                MR. STRAUSS:  No objection.

7                THE COURT:  Okay.  I have two basic problems right

8    now.  I have got just an enormous amount going on so -- you're

9    entitled, I'm not saying you're not entitled to a decision but

10   I'm -- the point that I'm not clear -- you may want a decision

11   now as to whether these are direct or derivative claims, and I

12   may just not decide that.  I may just decide for now I don't

13   have to decide whether it's direct or derivative because I'm

14   going to go ahead and extend a stay under 105 because sure, it

15   may force you to come in and object to confirmation to the

16   third-party nondebtor releases that are part of the plan.  If

17   you do you do.  I mean, I can't -- I'm not ruling now, I'm

18   just -- I'd like to talk to Judge Nathan.  I don't want to

19   screw up her case.

20               When you say it's -- limited discovery is -- well, for

21   instance, Mr. Schrock, have you moved to dismiss?

22               MR. SCHROCK:  No, we haven't, Your Honor.  We have the

23   stay.  I mean there's a stipulation in place in the district

24   court that stays all of the actions against the Ally nondebtors

25   until this Court makes a ruling on whether or not the stay is

RESIDENTIAL CAPITAL, LLC, ET AL.                                    72

1  applicable or whether or not the -- if the debtor makes a

2  motion to amend the relief to extend the stay under 105, in

3  that case, whether or not this Court would rule to extend the

4  stay.

5              THE COURT:  So do you have -- your motion to extend

6  the stay is it dependent on whether the claims are direct or

7  derivative?

8              MR. SCHROCK:  No.  Your Honor, we initially -- just to

9  back up -- in December of last year after Ally -- there was an

10 initial action filed against -- I'm just going to say ResCap in

11 short -- the petitions were filed.  Ally and Ally Bank were

12 added in September.  We discussed these issues with the

13 debtors, the committee; brought to their attention that,

14 listen, some of these actions appear to be estate actions.  We

15 filed the motion, entered the stipulation in the district court

16 to stop the actions.  And subsequent to that, we've been

17 working with the debtors.  The debtors have joined the motion.

18 The committee is now joining the motion.  We have the plan

19 support agreement.  And all of us on the plan support side have

20 said listen, now that we have this plan on file, we really

21 don't need a determination.  We were just a nondebtor; that's

22 why we moved to enforce the stay, because moving to extend the

23 stay as a nondebtor probably wouldn't have been the most

24 successful tactic in terms of bringing a motion before the

25 Court.

1        But we do not need a determination on whether it's

2   direct or derivative.  The committee has said in their papers

3   they'd rather just have the stay extended.  We had the colloquy

4   with the Court at the last status conference.  We're simply

5   seeking to have the motion amended to reflect the relief that

6   we really want which is the stay extended.

7            THE COURT:  Mr. Strauss?

8            MR. STRAUSS:  The --

9            THE COURT:  And here's what I'd be inclined to do.

10           MR. STRAUSS:  The --

11           THE COURT:  Go ahead.

12           MR. STRAUSS:  Just to correct, the stipulation only

13  covers motions made prior to the end of December of 2012.  So

14  the stipulation -- if Mr. Schrock amended his papers to seek

15  105 --

16           THE COURT:  Um-hum.

17           MR. STRAUSS:  -- that wouldn't fall under the

18  stipulation.

19           THE COURT:  Okay.  Well --

20           MR. STRAUSS:  Just his motion to --

21           THE COURT:  Right.

22           MR. STRAUSS:  -- on the automatic stay is under the

23  stipulation.

24           THE COURT:  So, Mr. Schrock, I am going to permit you

25  to amend your motion --

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1          MR. SCHROCK:  Yes.

2          THE COURT:  -- to add 105 -- to extend the stay, to --

3    it's not ex -- to stay the action against AFI and Ally Bank

4    under Section 105.  Okay.  So that -- you asked that in your

5    letter and yes I want to --

6          MR. SCHROCK:  And, Your Honor -- sorry to interrupt --

7          THE COURT:  No, go ahead.

8          MR. SCHROCK:  -- but and I don't think there's an

9    objection on the part of the Rothstein plaintiffs.  He's

10   correct as to the wording in the stay but there's not an

11   objection to continuing the stay at this time.

12         THE COURT:  But I do want to talk to Judge Nathan.

13         MR. SCHROCK:  Okay.

14         THE COURT:  What's Balboa been doing in all of this,

15   Mr. Strauss?

16         MR. STRAUSS:  Balboa has been taking the position that

17   the bankruptcy does not affect their claims, the claims that we

18   have against them, and they've been litigating the case.

19         THE COURT:  Okay.  So how many cases, because this

20   is -- yours is not the only one against Balboa on a force --

21   and some of the debtors are nondebtor affiliates.  Do you know

22   how many cases there are?

23         MR. STRAUSS:  As to --

24         THE COURT:  Because I have one other -- this issue has

25   come up before me --

1          MR. STRAUSS:  -- as to force-placed insurance, I

2    believe that this is the only case.  There was another case

3    involving the debtors and Balboa and a different type of

4    insurance in Florida that recently settled.

5          THE COURT:  I thought that was -- it's settled?

6          MR. STRAUSS:  It's settled but I believe that that was

7    only estate class and only related --

8          THE COURT:  But I thought it was force-placed

9    insurance?

10          MR. STRAUSS:  It was a different type of force-placed

11    insurance.  This is general hazard -- our case involves general

12    hazard insurance, and that was a windstorm case and that only

13    affected a few thousand bar orders. It was at a very specific

14    type of insurance that was obtained for waterfront communities.

15          THE COURT:  Mr. Engelhardt, what's the debtors'

16    position to any of this?

17          MR. ENGELHARDT:  Your Honor, the debtor would echo

18    Ally's position here.  It appears to the debtors that the

19    Rothstein plaintiffs have agreed to a stay through

20    confirmation.  We don't think whether the --

21          THE COURT:  I didn't hear that.

22          MR. ENGELHARDT:  And I believe it's in your -- in the

23    correspondence to Your Honor that they sent.

24          THE COURT:  Is that correct, Mr. Strauss?  Do you

25    consent to a stay through confirmation?

1           MR. STRAUSS:  We offered that for an agreement to a

2     hearing date.  If we don't have a hearing date --

3           THE COURT:  Come up to the microphone just so I can --

4           MR. STRAUSS:  Sorry.  We offered that to the debtors

5     and to Ally as a quid pro quo for an agreement on a hearing

6     date for the issue of derivative versus direct.

7           We think resolving that issue is important

8     irrespective of what happens between now and confirmation in

9     terms of whether our case is stayed or not stayed, because we

10    need to -- we would like to get a resolution of that so we know

11    whether we should be objecting to the releases or not.

12          THE COURT:  Of course, if you object to the releases,

13    you're going to be joining a not particularly exclusive or

14    select club.  I've heard lots of complaints about the releases,

15    so you'll be -- I'm not suggesting that the objections won't be

16    well-taken, but I mean in opposition to approval of the PSA,

17    there were many objections that were filed, many of which

18    raised the third-party nondebtor releases.  So you're not going

19    to be injecting an issue that's novel.

20          MR. STRAUSS:  Well, I think we have -- we have unique

21    claims.  We have the only --

22          THE COURT:  Well, everybody thinks they have unique

23    claims.

24          MR. STRAUSS:  Sorry?

25          THE COURT:  Everybody thinks they have unique claims.

1          MR. STRAUSS:  And the claims that we're asserting,

2     they're respondeat superior claims against Ally Bank, and Ally

3     Bank is not a parent company.  This is not remotely a veil-

4     piercing type of a claim.  Ally Bank is, at best, a cousin

5     company.

6          THE COURT:  Mr. Mannal?

7          MR. MANNAL:  Your Honor, if I may?  Doug Mannal on

8     behalf of the creditors committee.

9          Your Honor, I rise only to add we'd like to give peace

10    a chance, we'd like to sit down with the Rothstein plaintiff's

11    counsel and see if there isn't something we can work out with

12    respect to their claims.  We recently filed a plan and

13    disclosure statement that discusses treatment of creditors of

14    GMAC-M which I believe the original complaint identified them

15    as the actual defendant here.  So we'd like, over the course of

16    the next few weeks, to sit down with them and try to work

17    things out.

18          If that's not successful, we have the plan.  If the

19    plan is not confirmed then we can -- there are next steps.  We

20    don't see this issue of direct or derivative as being a

21    requirement or a condition to plan confirmation.

22          THE COURT:  Okay.  All right.  Mr. Strauss, are you --

23    I'm confident you'll be willing to sit down with the debtor and

24    the committee to see whether you can reach a satisfactory

25    resolution; you either will or you won't but are you prepared

1    to do that?

2            MR. STRAUSS:  Yes, we are, Judge.

3            THE COURT:  Okay.

4            MR. STRAUSS:  But we don't think that that should

5    forestall a hearing --

6            THE COURT:  Well --

7            MR. STRAUSS:  -- on this issue.  The debtors were free

8    to approach us to negotiate something for months and months and

9    we haven't been invited.

10           THE COURT:  They were engaged in a -- for about five

11   or six months in intense mediation that didn't involve

12   everybody.  Okay.  Many parties -- it was a very difficult,

13   tough mediation supervised by my colleague, Judge Peck, and

14   they reached the plan support agreement with two term sheets

15   that have now been approved.  So don't be insulted that they

16   didn't get to you yet.  The issue is whether they're prepared

17   to sit down with you now.  Mr. Engelhardt and Mr. Goren, I

18   assume you are.

19           MR. GOREN:  Yes, Your Honor.

20           THE COURT:  Okay.  What -- look, I'm -- between now

21   and the end of July, I've got no time for anything.  I'm on

22   vacation from the end of July through middle of August, and I

23   come back to a very heavy ResCap schedule.  So it would be my

24   preference that you try to spend the next couple of weeks

25   seeing whether you can resolve your issues.  You will or you

1   won't.  Okay.  If you can't, then, I think that Mr. Schrock

2   should file an amended motion.  Okay.  I will speak with Judge

3   Nathan before I leave on vacation sometime within the next two

4   weeks; I'll speak with her.

5           And I'll hear the motion, but no guarantees I'm going

6   to decide the -- your direct/derivative issue because I don't

7   have to.  All right.  I'll see, but I haven't gone back to

8   review the papers.  Okay.  And I want to see what any amended

9   motion, if necessary, looks like.  But I'm going to have --

10  assuming this case moves to confirmation, we just set a

11  disclosure statement hearing -- assuming the case moves to

12  confirmation, there's going to be an issue about the validity

13  of the third-party nondebtor releases.  That's going to be --

14  and that's going to happen no matter what.  So here's what I

15  would ask you to do.

16          Confer with the other counsel.  Some -- within two

17  weeks, somebody send me a status letter to let me know -- I

18  don't want to know details of settlement negotiations,

19  obviously, but where things stand.  If you can't reach an

20  agreement or agree to continue talking about it, Mr. Schrock,

21  file your amended motion.

22          MR. SCHROCK:  Okay.  Thank you, Your Honor.

23          THE COURT:  It's -- in terms of giving you a hearing

24  date, I may be able to give you a hearing date in late August.

25  I mean I already have two days scheduled for the FGIC

 1    settlement, contested settlement, August 16th and 19th, it's a

 2    Friday and a Monday right after I get back from vacation, and I

 3    just -- the calendar's pretty crowded.

 4            You're entitled -- Mr. Schrock is entitled to a

 5    decision on his motion.  It may not be the decision you want in

 6    the sense that it may not get to the issue of whether these

 7    claims are direct -- your claims are direct or derivative but

 8    we'll just -- we'll take it one step at a time.  Okay?

 9            MR. SCHROCK:  Thank you.

10            THE COURT:  All right.  In the meantime, I will talk

11    with Judge Nathan.  We won't talk about the merits but I do

12    want to talk -- get a better understanding of the status of her

13    case and tell me -- let me tell her the status of my case.

14    Okay?

15            MR. STRAUSS:  Okay.  Thank you.

16            THE COURT:  And again, I apologize to you that you got

17    such late notice but you managed to get down here anyway.

18            MR. STRAUSS:  No apologies necessary.

19            THE COURT:  Okay.  Thank you very much.

20            IN UNISON:  Thank you, Your Honor.

21        (Whereupon these proceedings were concluded at 11:59 AM)

22

23

24

25

1

2                                   **I N D E X**

3

4                                   RULINGS

5                                                        Page      Line

6    The Court will enter an order not permitting 35          9

7    use of 9019 discovery with FGIC in other

8    proceedings.

9    The parties will submit an order regarding   35         21

10   confidentiality on FGIC discovery

11   Motion to extend retentions granted.         50          4

12   Motion by RBS to annul the                   54         21

13   automatic stay denied

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14

15   eScribers

16   700 West 192nd Street, Suite #607

17   New York, NY 10040

18   Date:  July 11, 2013

19

20

21

22

23

24

25