1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 12-12020-mg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    RESIDENTIAL CAPITAL, LLC, et al.

9

10              Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              July 17, 2013

19              3:05 PM

20

21

22

23    B E F O R E:

24    HON. MARTIN GLENN

25    U.S. BANKRUPTCY JUDGE

**eScribers, LLC | (973) 406-2250**
**operations@escribers.net | www.escribers.net**

1

2   On the record, status conference re: FGIC 9019 settlement

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Sharona Shapiro

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

3

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4           Attorneys for Debtors

5           1290 Avenue of the Americas

6           New York, NY 10104

7

8   BY:   CHARLES L. KERR, ESQ.

9

10

11   ALSTON & BIRD LLP

12           Attorneys for Wells Fargo Bank N.A.

13           1201 West Peachtree Street

14           Suite 4200

15           Atlanta, GA 30309

16

17   BY:   JOHN C. "KIT" WEITNAUER, ESQ.

18

19

20   ALSTON & BIRD LLP

21           Attorneys for Wells Fargo Bank N.A.

22           90 Park Avenue

23           New York, NY 10016

24

25   BY:   MICHAEL E. JOHNSON, ESQ.

4

WILLKIE FARR & GALLAGHER LLP

    Attorneys for Stonehill Capital Management LLC and

     Monarch Alternative Capital LP

    787 Seventh Avenue

    New York, NY 10019


BY:  ARTHUR BILLER, ESQ.

    MARY EATON, ESQ.

    EMMA J. JAMES, ESQ.



MCKOOL SMITH PC

    Attorneys for Freddie Mac

    One Bryant Park

    47th Floor

    New York, NY 10036


BY: MICHAEL R. CARNEY, ESQ.

5

1    WHITE & CASE LLP

2         Attorneys for Ad Hoc Group of Junior Secured Noteholders

3         1155 Avenue of the Americas

4         New York, NY 10036

5

6    BY:   HARRISON DENMAN, ESQ.

7         J. CHRISTOPHER SHORE, ESQ.

8         VANESSA SODERBERG, ESQ.

9

10

11   DECHERT LLP

12        Attorneys for Bank of New York Mellon

13        1095 Avenue of the Americas

14        New York, NY 10036

15

16   BY:   GLENN E. SIEGEL, ESQ.

17

18

19   JONES DAY

20        Attorneys for FGIC

21        222 East 41st Street

22        New York, NY 10017

23

24   BY:   HOWARD F. SIDMAN, ESQ.

25        RICHARD L. WYNNE, ESQ.

6

1

2  SEWARD & KISSEL LLP

3      Attorneys for U.S. Bank, N.A. as RMBS Trustee

4      One Battery Park Plaza

5      New York, NY 10004

6

7  BY:   ARLENE R. ALVES, ESQ.

8

9

10  KIRKLAND & ELLIS LLP

11      Attorneys for Ally Financial Inc. & Ally Bank

12      601 Lexington Avenue

13      New York, NY 10022

14

15  BY:   NOAH JEFFREY ORENSTEIN, ESQ. (TELEPHONICALLY)

16

17  MUNGER TOLLES & OLSON LLP

18      Attorneys for Berkshire Hathaway, Inc.

19      355 South Grand Avenue

20      35th Floor

21      Los Angeles, CA 90071

22

23  BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

7

1                       P R O C E E D I N G S

2              THE COURT:  Please be seated.  All right.  We're here

3    in Residential Capital, number 12-12020.  This is a hearing

4    with respect to the discovery dispute regarding the investors

5    represented by Willkie Farr, their motion to -- or application

6    to compel production of privileged information from the RMBS

7    trustees of the trusts that are wrapped with FGIC insurance.

8              Mr. Kerr?

9              MR. KERR:  Your Honor, it's Charles Kerr of Morrison &

10   Foerster on behalf of the debtors.

11             I'm just here to say I'm here.

12             THE COURT:  You're the master of ceremonies?  Is

13   that --

14             MR. KERR:  I'm the master of ceremonies.  I'm going to

15   turn it over the parties of interest.

16             THE COURT:  Okay.

17             MR. KERR:  But so I know Ms. Eaton's here and Mr.

18   Weitnauer's here, so I don't know who you want to start with,

19   but I'll turn it over to you.

20             THE COURT:  Well, I guess Ms. Eaton, because she's the

21   one who's trying to get this stuff.

22             MS. EATON:  Good afternoon, Your Honor.  Just to put

23   the dispute in context somewhat, the Court will remember,

24   perhaps, that the dispute really centers on the findings

25   contained in the proposed order submitted in connection with

1    the debtors' motion for approval of the FGIC settlement

2    agreement that our clients, my clients take issue with.  And

3    those findings provide that the FGIC settlement agreement is in

4    the best interest of my clients, the investors and the FGIC

5    wrapped trusts, among other things, that the agreement is in

6    the best interest of the trusts, and moreover, that it's in the

7    best interest of the trustees, who are fiduciaries to those

8    trusts.  The findings also provide that the trustees acted

9    reasonably and in good faith in agreeing to the FGIC settlement

10   agreement and binding the FGIC wrap trust investors to its

11   terms.

12          When this matter comes on for hearing, we intend to

13   try and prove that in fact the settlement agreement was not in

14   the best interests of the investors, from an economic point of

15   view, and that in fact, there was a pre-existing plan, to which

16   the trustees did not object, that was pending before the state

17   rehabilitation court, that provided for recoveries that were

18   economically superior --

19          THE COURT:  Well, that's your position, that over,

20   what, the next fifty years, the present value of the

21   recoveries, you believe, would be superior to the lump sum

22   payment that will be paid pursuant to the settlement, if it's

23   approved.  Is that a fair statement?

24          MS. EATON:  I hate to argue with the Court, but

25   somewhat, not entirely, fair.  The great -- the vast bulk of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

9

1  the payments will be --

2       THE COURT:  Oh, not fifty years?

3       MS. EATON:  Not fifty years, and that's part of what's

4  in dispute here.  So --

5       THE COURT:  But --

6       MS. EATON:  -- but yes and no, Your Honor.

7       THE COURT:  Okay.  The fundamental point that you're

8  challenging is the fairness of the settlement from an economic

9  point of view, based on  your client's assessment that they

10  will do better under the FGIC rehabilitation plan, with

11  payments received over time, than they will by the trustees

12  settling for a lump sum payment.  That's fundamentally what

13  you're disputing, isn't it?

14       MS. EATON:  Fundamentally, there was a pre-existing

15  plan that provided for superior economic recovery.

16       THE COURT:  Pre-existing or otherwise, I mean, you say

17  there's a plan which doesn't pay, today, what would be paid if

18  this settlement's approved; do you agree with that?

19       MS. EATON:  We'd be paid on different terms.

20       THE COURT:  Right.  And so -- and of course, the

21  standard in this court -- I don't know about in the state

22  court, but the standard here for approval of a settlement is,

23  you know, is the settlement in the range of reasonableness,

24  have the trustees -- has the debtor and others established --

25  satisfied a best interest test that this settlement is fair and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

10

1    reasonable.  And you challenge that; I understand that.  But

2    you're -- I guess the point is your point is really an economic

3    issue, that you think you do better under the previously

4    approved FGIC rehabilitation plan than you would here.  That's

5    something of a bet, don't you agree with that?

6          MS. EATON:  I would not agree with that, Your Honor.

7          THE COURT:  You don't.

8          MS. EATON:  That's what the expert testimony is --

9          THE COURT:  All right.  I guess we'll --

10          MS. EATON:  -- hopefully going to show and convince

11    the Court.

12          THE COURT:  Let me ask you a couple of questions.  Are

13    there current defaults in the trust in which your client holds

14    certificate -- they're certificates; is that what they're

15    called?

16          MS. EATON:  Yes, Your Honor.

17          THE COURT:  Okay.  Are there current defaults?

18          MS. EATON:  Has there been an event of default?

19          THE COURT:  Yes, has there been?

20          MS. EATON:  According to the testimony of the Wells

21    Fargo trustee yesterday, the answer to that question is yes --

22          THE COURT:  Okay.

23          MS. EATON:  -- at least with respect to some of them.

24          THE COURT:  So a different answer with respect to a

25    different trust?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

11

1         MS. EATON:  So it would appear, according to that.

2         THE COURT:  How many trusts do you believe there's a

3 current event of default?

4         MS. EATON:  I don't know the answer to that question,

5 Your Honor, but I could certainly find out.

6         THE COURT:  The event of default which you say has

7 occurred, is it a payment default, or is it some other default?

8         MS. EATON:  I believe it was a payment default, Your

9 Honor, yes.

10        THE COURT:  And which of your -- which trusts and

11 which of your clients?

12        MS. EATON:  I beg your pardon, Your Honor, I didn't

13 bring those details with me.

14        THE COURT:  Okay.

15        MS. EATON:  But I'm certain --

16        THE COURT:  All right.

17        MS. EATON:  I do have the details, not at my

18 fingertips --

19        THE COURT:  All right.

20        MS. EATON:  -- and I'd certainly be able to get --

21        THE COURT:  I guess the reason I'm asking these

22 questions is, my reading of the case law is that an indenture

23 trustee's obligations are different pre-default and after a

24 default.  You agree with that?  I think so.

25        MS. EATON:  I agree that that is one reading of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

12

1    cases, Your Honor.  But I don't think --

2         THE COURT:  Is there a different reading of the cases?

3         MS. EATON:  Well, in --

4         THE COURT:  I mean, I haven't found a case that said

5    anything other than that.

6         MS. EATON:  I --

7         THE COURT:  I most heavily -- I can't say I've done

8    the most exhaustive research around, but Judge Mukasey's

9    decision in LNC Investments -- and he relies on the Beck case

10   from the First Department -- I mean, he clearly draws a

11   distinction and says cases do -- he goes back to Learned Hand's

12   decision and basically the cases draw a distinction between

13   what the pre and post-default obligation are of the trustee.

14   The cases seem to say after a default, to some extent, unclear

15   to what extent, the common law, New York common law fiduciary

16   duties apply to an indenture trustee.

17        MS. EATON:  Right, and it is quite correct that the

18   cases that are out there say that.  The only reason I qualified

19   my answer is that there are a number of different deal

20   structures at issue here.  And there is certainly an argument

21   to be made that the distinction drawn in the existing case law

22   about the duties of an indenture trustee, pre and post default,

23   really, or arguably, don't apply when the deal documentation --

24   depending on the deal documentation --

25        THE COURT:  Yeah.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

13

1           MS. EATON:  -- is the answer.  And I hate to try and

2   drag you through it right now, but there's a very complicated

3   analysis that would lead one to the conclusion that that

4   distinction does not necessarily apply to all of the trust at

5   issue.  But I think the larger --

6           THE COURT:  Okay.

7           MS. EATON:  -- point, Your Honor --

8           THE COURT:  So let me -- well, let me follow up my

9   questions and let me see whether -- I'm trying to see if I can

10  narrow some of the difference.

11          Mr. Weitnauer's letter -- I don't know whether you

12  signed it or Mr. Johnson signed it.

13          MR. WEITNAUER:  I was away, so I had one of my

14  colleagues sign it for me.

15          THE COURT:  Oh, I see --

16          MR. WEITNAUER:  But I am --

17          THE COURT:  -- your initials next to your name.

18          MR. WEITNAUER:  -- the person responsible for the

19  words in it.

20          THE COURT:  Okay.  So in footnote 5, on page 2 -- I

21  won't read it all, but it says, "solely for the purposes of

22  resolving this dispute, the FGIC trustees stipulate that (i)

23  they are obligated to act in the best interests of the

24  investors with respect to the settlement agreement and (ii)

25  that stipulated level of obligation is sufficient to invoke the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

14

1  fiduciary exception in this context - but only when good cause

2  in the other elements of the fiduciary exception can be shown."

3        Do you agree with that statement?  Well, it's their

4  stipulation, but do you -- let me ask you this, do you agree --

5  they're willing to stipulate, for purposes of this dispute,

6  that the fiduciary exception applies.  They add the proviso

7  "but only when good cause" and other requirements are shown.

8  Do you agree that good cause is an element of the showing that

9  you're required to make to invoke the fiduciary exception?

10        MS. EATON:  No, I don't agree, but I think that

11  it's --

12        THE COURT:  Well, I want you to tell me why you don't

13  agree.

14        MS. EATON:  Because I don't think that it's required

15  as a matter of federal --

16        THE COURT:  Okay.  Show me --

17        MS. EATON:  -- common law.

18        THE COURT:  Show me what cases say that, because I

19  think this is a very fundamental point in the decision.

20        MS. EATON:  I'm going to get that decision for you --

21        THE COURT:  Yeah, I want you to get it now because I

22  want to address this issue right now, because I think it sets

23  the framework for our discussion.  Okay.  Alston & Bird's

24  position is -- and they stipulate, so they don't get into a

25  lengthy discussion of it, but you know, this is a fundamental

**RESIDENTIAL CAPITAL, LLC, ET AL.**

15

1    point: do you have to show good cause, and if so, have you done

2    so?  And if you've done so, with respect to what issues?

3            I will -- so I make no mystery about it, I mean, I

4    think that Justice Kapnick's decision in Bank of New York

5    Mellon is -- you know, it's the most closely analogous case

6    that I have found, called to my attention by Alston & Bird.

7    And I think it's a very thoughtful opinion that she wrote.  And

8    she obviously believed that good cause was a requirement, and

9    she found it as to some issues and not as to others.

10           And so I want to get through -- if you don't believe

11   good cause is a requirement, you show me the authority that

12   supports your conclusion.

13           MS. EATON:  I'm digging up the cases now, but the two

14   cases we cited in our letter, Your Honor, are the Martin case

15   and Lawrence v. Cohn at page --

16           THE COURT:  What's the second one?

17           MS. EATON:  Lawrence v. Cohn.

18           THE COURT:  Yeah, so both of those cases are by

19   Magistrate Judge Dolinger.  And Martin involves an ERISA

20   fiduciary, and Lawrence, I believe, involved an executor of an

21   estate; neither involves an indenture trustee.  And so why are

22   those -- why do you think those are the guiding principles?

23   Magistrate Judge Dolinger is about the only one I've seen who

24   said I don't think the good cause requirement applies outside

25   of shareholder suits.  And I don't think that's right.  I mean,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

16

1    Judge Sweet, in the Quintel opinion in the Southern District,

2    which certainly comes later than Magistrate Judge Dolinger's

3    decisions -- Judge Sweet specifically applied the good cause

4    requirement.

5            So what -- do you have any authority, other than

6    Magistrate -- and I respect Magistrate Judge Dolinger; that's

7    not the issue.  But the context in which his two decisions

8    arise are not this context.

9            MS. EATON:  Indeed --

10           THE COURT:  And they are -- I mean, at most, it's

11   dicta, because he dealt with -- and there are other cases that

12   would, arguably -- say, in the fiduciary context, there's

13   another ERISA case I read, and in the estate context, although

14   I have to say that there are other even estate context, which

15   seemed to impose good faith (sic).  But Judge Sweet, in -- let

16   me find his case.  Yeah, in G-I Holdings v. Heyman, Judge Sweet

17   says there's no difference between New York law and federal law

18   with respect to the fiduciary exception, so he doesn't have to

19   resolve the conflict issue.  I think it's not a clear question

20   whether New York law would govern here or whether federal law

21   would govern here.  Judge Sweet, in Heyman, concludes it

22   doesn't make any difference; there's no difference.  And I've

23   read all -- I've read both of Magistrate Judge Dolinger's

24   opinion, I just don't see why they would apply in this

25   circumstance.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

17

1          MS. EATON:  Well, and I -- well, I agree, Your Honor,

2     in different circumstances, the courts seem to be applying --

3          THE COURT:  Do you have any authority, in the context

4     of a an indenture trustee, that says the good faith --

5     excuse -- the good cause requirement for invoking the fiduciary

6     exception, that that requirement doesn't apply?

7          MS. EATON:  The short answer to that question is no,

8     Your Honor.

9          THE COURT:  Okay.

10          MS. EATON:  I would like to point out one thing that

11     goes back to an issue that the Court raised a couple of minutes

12     ago, and that was with respect to whether there was an event of

13     default.  Yesterday we took the deposition of the

14     representative of Wells Fargo, who is one of the RMBS trustees

15     for the trust in question.  And that representative testified

16     to two things, one of which I've already mentioned, i.e., that

17     Wells Fargo did determine that there had been an event of

18     default with respect to one trust.  With respect to the

19     remaining trusts, they were unable to ascertain, according to

20     the testimony, whether an event of default had occurred or had

21     not occurred, and elected, on that basis, to treat all of the

22     trusts in the same fashion and conceded, during deposition,

23     that Wells Fargo did indeed owe a fiduciary duty to the

24     investors --

25          THE COURT:  Well, that's one of the trustees.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

18

1          MS. EATON:  -- in the FGIC-repped trust, so --

2          THE COURT:  That's one of the trustees.  It's not --

3    that's -- I mean, that's a position that I guess would be

4    consistent with the footnote from the Alston & Bird letter that

5    I just read; they're saying they're stipulating.  But that's

6    why I want to focus in, what does that mean, okay?

7          I will, for purposes of this hearing, without going

8    further, since the trustees are not disputing it -- they say

9    that the fiduciary exception -- that the facts are sufficient

10   to invoke the fiduciary exception in this context.  They, of

11   course, argue that the good faith -- the good cause; I keep

12   saying good faith -- the good cause requirement must be

13   satisfied, and they say you haven't done that.  And that's why

14   I'm trying to -- so I think I got an answer now; you have no

15   authority, other than Magistrate Judge Dolin's (sic) two

16   decisions, one involving an ERISA fiduciary, and one involving

17   an estate matter.

18         MS. EATON:  And the United States Supreme Court in

19   what we would say is an analogous circumstance.  You're quite

20   right, Your Honor.  Nothing --

21         THE COURT:  Okay.

22         MS. EATON:  -- on all fours in the context of --

23         THE COURT:  So you think that Justice Kapnick got it

24   wrong in Bank of New York Mellon?

25         MS. EATON:  Well, she was applying New York law.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

19

1          THE COURT:  Well, but you know, and Judge Sweet has

2     said he doesn't see any difference between the two.  There's no

3     definitive -- Second Circuit hasn't ruled on it.

4          MS. EATON:  Correct.

5          THE COURT:  There is no binding authority on this

6     court that I found.

7          MS. EATON:  Correct.

8          THE COURT:  And so what do I find persuasive?  Because

9     Judge Mukasey, in LNC Investments, doesn't say post-default the

10     indenture trustee has exactly the same obligations that might

11     be the obligations of an express trustee of an express trust.

12     This does seem different.

13          How many investors are there in the trusts wrapped by

14     FGIC?

15          MS. EATON:  The total number of investors?

16          THE COURT:  Yes.

17          MS. EATON:  That information is not available to us,

18     Your Honor, I don't believe.

19          THE COURT:  Mr. Weitnauer, can you provide me with

20     that information, an estimate on the number?

21          MR. WEITNAUER:  Your Honor, Kit Weitnauer on behalf of

22     Wells Fargo, and speaking on --

23          THE COURT:  I'm mispronouncing your name, and I

24     apologize.

25          MR. WEITNAUER:  Oh, that's all right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1        THE COURT:  Okay.

2        MR. WEITNAUER:  Everybody does.  And speaking also on

3   behalf of the FGIC trustees --

4        THE COURT:  Okay.

5        MR. WEITNAUER:  -- as enumerated in my letter.

6        We do not know the number of the investors.  It may be

7   we could get that for you if it's important.

8        I think all we need to point out at this point is that

9   Ms. Eaton represents a group of investors who have holdings in

10  some of the FGIC-repped trusts.  There are others, of course,

11  that support the deal, and then some we've not heard from.

12        THE COURT:  All right.  Okay.  Go ahead, Ms. Eaton.

13        MS. EATON:  So focusing on the good cause requirement,

14  Your Honor, I think that we have established that good cause

15  exists for the application of the fiduciary exception.

16        THE COURT:  May I ask you this question?  In what, if

17  any, way do you contend the trustees engaged in self-dealing or

18  that they have a conflict of interest.

19        MS. EATON:  Well, one of the ways is, Your Honor,

20  they've sought a ruling from this Court that the settlement

21  agreement was in their best interest.  Now, that's not --

22        THE COURT:  And you think that establishes a conflict?

23        MS. EATON:  No, and that -- I was going to say, that

24  is not a direct -- that is not a direct conflict --

25        THE COURT:  So let me ask --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

21

1        MS. EATON:  -- although --

2        THE COURT:  -- my question again, and I want a direct

3    answer to my direct question.  In what, if any, way do you

4    contend that the trustees engaged in self-dealing?  Let me

5    break it down into two parts.

6        MS. EATON:  We don't have any basis to believe that

7    the trustees engaged in self-dealing, Your Honor.

8        THE COURT:  And in what, if any, way do you contend

9    that the trustees have a conflict of interest?

10        MS. EATON:  If You look at page 6 of our letter to the

11    Court, and in particular, footnote 15, we drew the Court's

12    attention there to some filings that the -- certain trustees,

13    at least, had made in the FGIC rehabilitation action where they

14    objected to the rehabilitation plan on the basis that it would,

15    essentially, require them to continue shouldering the burdens

16    of being trustees for these particular trusts for longer --

17        THE COURT:  Okay.  And that --

18        MS. EATON:  -- than they wanted --

19        THE COURT:  -- that objection was overruled, and the

20    rehabilitation plan was approved, correct?

21        MS. EATON:  Well, I believe that they withdrew their

22    objections --

23        THE COURT:  Okay --

24        MS. EATON:  -- ultimately --

25        THE COURT:  -- they withdrew their objections.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

22

1        MS. EATON:  -- Your Honor, after certain other details

2   were --

3        THE COURT:  The fact that they objected, that they

4   could thereby be signed on as trustees for a very, very long

5   time, fifty years, or long -- or shorter, you think that

6   establishes a conflict of interest?

7        MS. EATON:  I don't think that it establishes a

8   conflict of interest; I think that the --

9        THE COURT:  What are your facts that support a

10  colorable claim that the trustees have a conflict of interest?

11  Specifically, what are the facts that establish a colorable

12  claim that the trustees have a conflict of interest in seeking

13  approval of this settlement?

14       MS. EATON:  We don't have those facts, Your Honor,

15  because we have been denied --

16       THE COURT:  Well, you don't --

17       MS. EATON:  -- discovery in its --

18       THE COURT:  -- privileged information.  If the good

19  cause requirement applies, and the cases, such as Bank of New

20  York Mellon and the Hoops (ph.) case from the Third Department,

21  written by Judge Levine -- who went on to serve with

22  distinction on the New York Court of Appeals for many years;

23  this is when he was on the Third Department -- self-dealing and

24  conflict were central to the application to triggering the

25  fiduciary exception there.  And that's why -- if I were --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

23

1   that's why I wanted to know.  If I conclude -- and you can

2   disagree with this, but if I conclude that to trigger the good

3   cause -- in order to trigger the fiduciary exception, you have

4   to have a colorable -- articulated colorable claim of self-

5   interest, self-dealing -- self-dealing or conflict of interest,

6   and what you're telling me is you don't have any specific

7   facts.  You don't get discovery to find out whether you have

8   a -- can do it.  Otherwise -- the privilege would be

9   meaningless if all you had to do is come in and say, I think

10  we -- if we get this discovery, we think we'll be able to show

11  self-dealing or conflict of interest.  Okay.  That can't be the

12  law, it just can't be.

13          MS. EATON:  I thought that the question Your Honor had

14  posed to me is whether we had facts that established self-

15  dealing --

16          THE COURT:  Support.

17          MS. EATON:  -- or a conflict of --

18          THE COURT:  Do you have any evidence that supports a

19  contention that the trustees engaged in self-dealing?  Break

20  that down.

21          MS. EATON:  Not in self-dealing, Your Honor, no.

22          THE COURT:  Okay.  Do you have any evidence to support

23  a contention that the trustees have a conflict of interest in

24  seeking approval of the FGIC settlement?

25          MS. EATON:  Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

24

1          THE COURT:  What is that?  Tell me specifically.

2          MS. EATON:  The evidence is that there was the

3   pre-existing arrangement to which the trustees agreed that

4   provided a economically superior recovery to the effect --

5          THE COURT:  Well, we don't know whether it provides an

6   economically su -- you say it provides an economically superior

7   result.  That, I suppose, will be one of the issues that I'll

8   hear.  So you say a -- I cut you off, but I think you said it

9   before, a pre-existing arrangement for what you believe is an

10  economically superior result for the investors?

11         MS. EATON:  I think in order to meet the test

12  articulated by Justice Kapnick in the Bank of New York case,

13  I'm trying to lay out all of the factors that we believe, in

14  combination, meet the standard for establishing that we have a

15  colorable claim of a conflict of interest.  One of them is, why

16  is it that the trustees engaged in a long, drawn out process to

17  negotiate the terms of the FGIC rehabilitation plan, and once

18  that process had concluded, for reasons that they have never

19  disclosed to us, decided to engage in a different settlement

20  agreement that we contend -- yes, it's subject to proof at

21  trial -- was economically far inferior to the deal that had

22  already been hammered out.  That's --

23         THE COURT:  Well, FGIC didn't --

24         MS. EATON:  -- point number one.

25         THE COURT:  -- wrap only ResCap trusts, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

25

1           MS. EATON:  I beg your pardon?

2           THE COURT:  FGIC did not wrap only ResCap trusts.

3           MS. EATON:  That is correct, Your Honor.

4           THE COURT:  So the fact that they have a

5    rehabilitation plan that provides a result, not all of the

6    sponsors of the trusts that they wrap are in a bankruptcy

7    proceeding, agreed?

8           MS. EATON:  Yes.

9           THE COURT:  Okay.  And you don't think those

10   circumstances could lead trustees to conclude that we think the

11   trusts, for which we act as trustees, would be better off if we

12   negotiate a settlement that results in a lump-sum payment

13   today, versus the uncertainty of collecting over a long period

14   of time?  You don't think they can do that?

15          MS. EATON:  I think it would depend on the facts, Your

16   Honor.

17          THE COURT:  All right.

18          MS. EATON:  What other evidence do you have to support

19   a contention that the trustees have a conflict of interest in

20   seeking approval of the FGIC settlement?

21          MS. EATON:  That against that background, on the same

22   day that the PSA was signed, the FGIC settlement agreement was

23   signed.  A motion was made for approval of the PSA, for reas --

24          THE COURT:  It's included in the term sheet of the

25   PSA.  I mean, it's embodied -- it's a requirement --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

26

1          MS. EATON:  It --

2          THE COURT:  -- of the PSA.

3          MS. EATON:  Right, and it was a final executed

4    settlement agreement, and for reasons unknown, it was not

5    disclosed to any of the investors.  In fact, it took --

6          THE COURT:  But how does that show a conflict of

7    interest on the part of the trustees?

8          MS. EATON:  Because at the same time that the trustees

9    were doing these things, cutting a deal on -- let's say on the

10   side, not disclosing to investors that they were embarking on

11   settlement discussions for a different deal, whereas everybody

12   thought they were negotiating over the terms of the

13   rehabilitation agreement, they provided no notice to any

14   investors.  They failed to disclose the fact that they had

15   already reached an agreement and signed an agreement, and it

16   was not publicly disclosed, for no reason that we can think of,

17   for a great many days after that, and in the meantime, joined

18   in a motion that sought findings that they had acted in good

19   faith, in the best interests of my clients, and in the best

20   interests --

21          THE COURT:  They filed --

22          MS. EATON:  -- of themselves.

23          THE COURT:  You think it shows a conflict of interest

24   because they filed a motion in court asking two courts to

25   approve the settlement?  I mean, it's another major distinction

**RESIDENTIAL CAPITAL, LLC, ET AL.**

27

1   between Magistrate Judge Dolinger's two decisions.  Here the

2   settlement will require approval of two courts, at which you

3   can air your arguments as to why the settlement should not be

4   approved.  This is not unilateral or secret action by the

5   trustees; it requires two courts to approve it.

6           MS. EATON:  And I certainly wasn't suggesting that --

7           THE COURT:  May I ask this?  This is for tomorrow, I

8   think -- I think I set it for tomorrow, but did Mr. Abrams sign

9   a confidentiality agreement and participate in the mediation?

10          MS. EATON:  Mr. Abrams signed an NDA that I negotiated

11  with the lawyers -- myself and my partner, Mr. Abrams,

12  negotiated with the lawyers at Morrison & Foerster over a

13  period of many, many months.  That is an undisputed fact.

14          THE COURT:  Okay.  So your clients were not -- did not

15  sign on, were not restricted.  So Mr. Abrams was not free to

16  disclose to your clients information that he gained in the

17  mediation; is that correct?

18          MS. EATON:  He was -- right.  Under the terms --

19          THE COURT:  And did Mr. Abrams learn, during the

20  course of the mediation, that there was a settlement being

21  negotiated with FGIC that was going to be part and parcel of

22  the PSA?

23          MS. EATON:  Not to my knowledge, Your Honor.  And to

24  be clear, over the course of those negotiations, we were

25  seeking an included term in a confidentiality agreement, or an

**RESIDENTIAL CAPITAL, LLC, ET AL.**

28

1    NDA, that would have permitted us to put up a screening wall so

2    that we could share information --

3           THE COURT:  I'm not --

4           MS. EATON:  -- with our clients.

5           THE COURT:  I'm not focusing on whether -- the reality

6    is there was no provision that permitted him to disclose -- as

7    I understand it, that would have permitted him to disclose

8    information he learned in the mediation.  I'm not faulting that

9    at all.  There's somebody else sitting in the courtroom whose

10   clients had that same issue where he participated in mediation

11   sessions but could not disclose to his clients because there

12   was no such provision.  Okay?  But the point is -- and that's

13   why -- and I'll ask this; maybe one of the other lawyers can

14   tell me this, as to whether -- and I understand he wouldn't be

15   able to disclose the information to your client, but did he

16   know that the FGIC settlement was an issue that was being

17   considered as part of the PSA and the two term sheets?

18          MS. EATON:  I don't believe so, Your Honor.

19          THE COURT:  Okay.  All right.

20          MS. EATON:  I don't have --

21          THE COURT:  Do you have any -- you've given me two

22   things that -- you say the pre-existing arrangement for

23   superior economic result, signing the settlement agreement

24   without disclosing it to your -- to --

25          MS. EATON:  To any investor, inexplicably for --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

29

1    THE COURT:  Anything else?

2    MS. EATON:  -- about a week?

3    THE COURT:  Well, okay, without disclosing for a week.

4  Go head.  Anything else?

5    MS. EATON:  No notice.  And that no real mechanism has

6  been put in place to allow investors a full and fair

7  opportunity to object to the agreement.

8    THE COURT:  What are you doing here?

9    MS. EATON:  This is the only mechanism there is, Your

10  Honor, and --

11    THE COURT:  What's wrong with this mechanism?

12    MS. EATON:  Well, that's the -- the basis for the

13  motion is that, yes, we've been allowed to participate, yes,

14  we've been allowed to seek the production of documents.  I

15  think if you look at the schedule that is attached to our

16  letter, we've essentially been given publicly filed documents

17  and a bunch of confidentiality agreements, with very few

18  exceptions.  In terms of the depositions that we've been

19  permitted to take, the witnesses have answered virtually every

20  question of substance with either an instruction not to answer

21  from counsel, on the basis of the mediation privilege, an

22  instruction not to answer from counsel, on the basis that the

23  information is subject to the attorney-client privilege, or an

24  I don't know, including --

25    THE COURT:  Did you inquire of the trustees'

**RESIDENTIAL CAPITAL, LLC, ET AL.**

30

1 representatives about their consideration of the Duff & Phelps

2 report?

3          MS. EATON:  Yes.

4          THE COURT:  And were you restricted from doing that?

5          MS. EATON:  We were not restricted from asking them

6 what they considered about the Duff & Phelps report; at the

7 same time, we have not been provided with the underlying

8 assumptions and data that -- well, assumptions and data that

9 underlie the Duff & Phelps report, so it's very difficult to

10 sort of get behind it and ask --

11          THE COURT:  Have you asked for that?

12          MS. EATON:  Yes, indeed.

13          THE COURT:  That's not the privilege log.  You know, I

14 should tell you, when I directed the letter briefs, I directed

15 the trustees to provide the Court, for in camera review, with

16 the documents that they withheld on the basis of privilege.

17 And sitting in front of me here are three binders that were

18 delivered to chambers yesterday at noon, and I reviewed every

19 page of every one of them.  Okay.  I didn't see any underlying

20 information from Duff & Phelps.  What is the status of -- are

21 there outstanding requests for the data that Duff & Phelps

22 considered in preparing its report?

23          MS. EATON:  Yes.  We have a dispute about that, if the

24 Court will give me a moment.  We took the position, and have

25 had several discussions about this, that in serving the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1    trustees with a document request, that they were required to

2    produce documents within their possession, custody, and

3    control, and that would include, obviously, the law firms

4    representing them and their agents, which is what we did and

5    what I understand --

6              THE COURT:  Just tell me --

7              MS. EATON:  -- the debtors did.

8              THE COURT:  -- what the status --

9              MS. EATON:  They took the --

10             THE COURT:  Mr. Johnson, what's the status of the Duff

11   & Phelps underlying --

12             MR. JOHNSON:  Yeah, I have no idea what -- anyway, we,

13   Your Honor, did produce underlying information that Duff relied

14   on in preparing their report.  Your Honor, there have been at

15   least four or five meet and confer phone calls, and this has

16   never been raised --

17             THE COURT:  I just want --

18             MR. JOHNSON:  -- by Ms. Eaton's client as a

19   shortcoming --

20             THE COURT:  I'm going to have --

21             MR. JOHNSON:  -- in our production.

22             THE COURT:  I want to make it clear, I'm going to have

23   no patience if anything that was provided to Duff & Phelps that

24   they considered in preparing their report is not provided.  I

25   mean, it's just -- that should have been done already.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1        MR. JOHNSON:  Your Honor, that is my understanding.

2  If Ms. Eaton has a particular issue with --

3        THE COURT:  No privilege has been asserted, has there?

4        MR. JOHNSON:  No, Your Honor, that is correct.  With

5  respect to what they relied on and their analysis, we have

6  turned that over; that is my understanding.  I can confirm that

7  with my colleagues.  But if Ms. Eaton has a particular gap or

8  deficiency that has been identified, I would request that she

9  raise it with us --

10        THE COURT:  Okay.

11        MR. JOHNSON:  -- rather than spring it on us in open

12  court.

13        THE COURT:  I'm not making any decision about it.

14  It's just that it strikes me that something that has to be

15  produced.  I mean --

16        MS. EATON:  And on the issue --

17        THE COURT:  Tell me, I've got three things listed now,

18  are there any other -- is there any other evidence that you

19  believe supports your contention that the trustees have a

20  conflict of interest in seeking approval -- in entering into

21  and seeking approval of the settlement?

22        MS. EATON:  Not that we're aware of at --

23        THE COURT:  Okay.

24        MS. EATON:  -- this point.

25        THE COURT:  All right.  So three things.  All right,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1    go ahead with your argument.

2              MS. EATON:  With respect to the question of need,

3    which is something we've addressed, in part, already, and one

4    of the primary considerations that the courts apply and the

5    good cause requirement turn to, the trustees have argued that

6    we can make a determination as to whether the agreement was in

7    our best interest on the basis of the contract alone.  We don't

8    think that is a fair or reasonable assertion.  Indeed, if that

9    were the case, one questions why the trustees felt the need to

10   put in declarations attesting to their --

11             THE COURT:  Look --

12             MS. EATON:  -- the reasonableness --

13             THE COURT:  -- you're getting --

14             MS. EATON:  -- in the first place.

15             THE COURT:  You either have taken or you're taking the

16   depositions of the trustees about their decision to enter into

17   the settlement, correct?

18             MS. EATON:  Yes, Your Honor.

19             THE COURT:  Okay.  And have you taken the Duff &

20   Phelps deposition yet?

21             MS. EATON:  Not yet, Your Honor.

22             THE COURT:  Okay.  I'm assuming that the trustees are

23   not using a reliance on advice-of-counsel defense.  Justice

24   Kapnick, in the first part of her opinion, addresses the

25   at-issue doctrine.  That's not before me today; nobody's raised

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1    that.   The two things that were raised in the correspondence

2    are the fiduciary exception and, to some extent, the mediation

3    privilege, although not quite as clearly, but -- and that's

4    what I've prepared for and considered.

5         Tell me -- lay out for me why you believe -- assuming

6    that I conclude that you have to establish good cause in order

7    to invoke the fiduciary exception, tell me specifically why you

8    believe you have established good cause.  And as Justice

9    Kapnick did, she didn't look at just either there is  -- the

10   fiduciary exception applies or it doesn't; she looked question

11   by question.  And so it's a little unclear to me, with respect

12   to those things as to self-dealing or conflict, where she did

13   invoke the exception, she found that there were colorable

14   claims that were asserted.  That's why I've asked you the

15   questions I've asked.  And as to others, she concluded they

16   hadn't.  So the others were -- I think she talked about the

17   reasonableness of the amount of the settlement.  That sounds

18   very much like your argument that the amount of this settlement

19   is unreasonable because you would have done better under the

20   FGIC rehabilitation plan.

21        MS. EATON:  Well, the difference -- the factual

22   difference between the two cases is there was a pre-existing

23   arrangement in place that the trustees decided to jettison in

24   favor of an inferior proposal.

25        THE COURT:  That's your position that it's inferior.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1    The trustees' position is it's not inferior, and that's what, I

2    guess, I'm going -- part of what I'm going to hear.  I mean,

3    you think any time you just say you think there was a better

4    deal, and if they do anything else, that triggers the fiduciary

5    exception to attorney-client privilege and you're entitled to

6    everything they've --

7            MS. EATON:  That's --

8            THE COURT:  -- whatever communications there were with

9    counsel?

10           MS. EATON:  I certainly didn't make that contention,

11   Your Honor.  As I said --

12           THE COURT:  I thought you did.

13           MS. EATON:  -- at the beginning, what I'm trying to

14   focus on here is the findings that the trustees have sought.

15   That is our only -- that's the only reason that we're here, and

16   that is what we dispute:  why do we think the good cause

17   exception applies.  When you address the first element under

18   Justice Kapnick's decision, with respect to need, the fact of

19   the matter is we are not -- although we've been permitted an

20   opportunity to participate in discovery, we're not getting any

21   information, even though the witnesses -- at least one witness,

22   I should say, has testified that the basis for their conclusion

23   that the FGIC settlement agreement was in our client's best

24   interest was on the advice that they got from their legal

25   advisors.  So --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1          THE COURT:  Somebody said that?

2          MS. EATON:  And yet -- and yet, we're not permitted to

3     inquire into what that advice was.  That's an obvious --

4          THE COURT:  Which --

5          MS. EATON:  -- problem.

6          THE COURT:  Which trustee was that?

7          MS. EATON:  That was this morning at Mr. Major's

8     deposition on behalf of the Bank of New York, 30(b)(6) witness

9     on behalf of the Bank of New York.  I only have the citations

10    from the rough transcript, which I'd be happy to give to Your

11    Honor, if you'd find that useful.

12         THE COURT:  Do you have -- was there a transcript

13    being -- you know, a rough transcript being prepared

14    immediately or --

15         MS. EATON:  Yes.

16         THE COURT:  Can I see it?

17         MS. EATON:  It has my handwriting on it, Your Honor.

18         THE COURT:  Oh.

19         MS. EATON:  Is that --

20         THE COURT:  Well, you don't have to give it to me

21    then.

22         MS. EATON:  I could read the question --

23         THE COURT:  Go ahead, read --

24         MS. EATON:  -- and answer for you.

25         THE COURT:  Go ahead.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

37

1        MS. EATON:  The question was -- one of the findings

2   was read out to the witness, and the question was:

3   "Q. Do you believe that the settlement agreement and the

4   transactions contemplated thereby, including the releases

5   therein, are in the best interests of the investors in each

6   trust?

7   "A. Yes.

8   "Q. And what do you base that conclusion on?

9   "A. I base that conclusion on the recommendation of our

10  financial advisor, the recommendation of our legal advisor, and

11  the analysis of our financial advisor."

12        So clearly, the financial advisor -- the advice of the

13  financial advisor was one of the reasons why the trustees

14  concluded that the FGIC settlement agreement was in my client's

15  best interest, but that was not the only reason.  And we have

16  been, as I say, precluded from getting discovery into the --

17  that part of the foundation for their decision.  It can -- in

18  terms of the need test, it can only come from the, allegedly,

19  privileged information.  I can't think of another place where

20  it would come from.

21        The other part --

22        THE COURT:  Well, if Bank of New York is going to have

23  a reliance on advice-of-counsel defense, they're going to have

24  to produce the advice they gave.  I mean, it's as simple as

25  that.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1        Do we have Bank of New York's lawyer here?  Mr.

2   Siegel?

3        MR. SIEGEL:  Your Honor, I was actually at the

4   deposition this morning.  It's been a full day.  It's one thing

5   for him to say that he actually consulted with his lawyers in

6   this process, which I don't think --

7        THE COURT:  That's not what Ms. Eaton just read to me.

8        MR. SIEGEL:  I understand what you're saying, but he

9   had an obligation to do a whole bunch of things and check

10  boxes.  That doesn't mean that this is a matter of reliance on

11  the attorney advice here.

12       THE COURT:  You're saying that, but Ms. Eaton just

13  read me from a transcript; I assume it's accurate.

14       MR. SIEGEL:  Your Honor, if you want to read the

15  entire section of the transcript, I think you should do that.

16       THE COURT:  I'm not particularly interested in doing

17  that unless I have to.

18       MR. SIEGEL:  No, I know, but I'm just saying to you

19  that that is one line in a four-plus hour deposition that was

20  taken this morning.  And it says what it says --

21       THE COURT:  Okay.

22       MR. SIEGEL:  -- but we -- we don't really think that's

23  the basis, the gravamen of this thing.

24       THE COURT:  I don't know what -- was he the decision

25  maker for Bank of New York?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

39

1    MR. SIEGEL:  By himself?  No.  He was the line

2    officer, he consulted with his superiors.  But you know, he's

3    not the only person.

4         THE COURT:  Okay.  Whatever I rule today may change.

5         MR. SIEGEL:  I understand.

6         THE COURT:  Go ahead, Ms. Eaton.

7         MS. EATON:  In terms of the last element, I suppose,

8    Your Honor, it's the sufficiency of my client's interest here.

9         THE COURT:  See, that element -- and I do want to hear

10   you on this, because I'm -- you know, the Alston & Bird letter

11   makes a lot of the fact that you're a subset of some tranches

12   of some trust, and that's of concern to me.  Look, in some of

13   these fiduciary cases where this is -- the ERISA cases where

14   it's come up, it's been dealing with a specific person or

15   institution's account or in the executor cases.  So to me, this

16   seems to me more analogous to the shareholder context.  Your

17   client's own certificates, they're like -- you know, these are

18   -- there's lots of securities cases pending everywhere

19   involving RMBS trust certificates.  So these are all -- you

20   know, so I -- these do seem more analogous to me -- it's one of

21   the reasons that I think the good cause requirement applies,

22   but whether it's satisfied or not is a different issue.

23        MS. EATON:  And I believe it may have come from the

24   securities context, Your Honor, and in particular from the

25   Garner case, which addressed the sufficiency of the interest

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1   element.  And it was -- if you look at -- I didn't cite all the

2   cases or bring them with me, for that matter, but if you look

3   at the genesis of that test, it was really meant to filter out

4   so-called busy body shareholders, people who held a minute

5   number of shares --

6           THE COURT:  So now you're focusing on why I

7   asked my question about what was the total amount of the

8   certificates issued by --

9       MS. EATON:  Well, I can -- I can -- I'm sorry.  I

10  didn't mean to interrupt you, Your Honor.

11      THE COURT:  No, that's why I asked the question

12  about -- you said about how much your clients own.  I don't

13  know which trusts and what tranches, but that was why I asked

14  my question about what's the total amount of certificates

15  represented by trusts that were wrapped by FGIC.  I'm trying to

16  get a sense for how big is your client's interest.

17      MS. EATON:  That information -- that, unfortunately, I

18  don't believe that information is publicly available.  But

19  here's what I can tell you, is that our clients together with

20  Freddie Mac hold in excess of a billion dollars' worth of these

21  FGIC-repped securities, and that based on what we've been able

22  to ascertain, the members -- I think it was of the Kathy

23  Patrick group who signed the FGIC settlement agreement by

24  contrast had a position that was just south of the 350 million

25  dollars in those securities.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

41

1        So I don't think that it would be fair or reasonable

2   to conclude that we qualify as busybody interlopers here;

3   there's a significant amount of money at stake and --

4        THE COURT:  I'm sure your hedge fund clients are only

5   looking out for the interests of all those certificate holders

6   and all of the trusts, and not their own self-interest.  So --

7        MS. EATON:  Welcome to America, Your Honor.

8        THE COURT:  Yeah.

9        MS. EATON:  And the other point that I wanted to make

10  vis-a-vis the holdings issue is that the other investors had

11  positions in trusts that were not repped by FGIC and therefore

12  stood to gain significantly more from if the FGIC settlement

13  were approved than if it were not.  So --

14       THE COURT:  Look.  Let me just put this out on the

15  table now and I'm reluctant to ever see this as part of the

16  standard that ought to apply in determining in whether to

17  trigger the fiduciary exception, but I spent a lot of hours

18  going through the privileged  material.  Some of it was

19  redacted and where they had the redacted stuff, they had the

20  unredacted with it.  So I saw what was redacted; I saw the

21  unredacted.  And I saw everything else.  And I can't block that

22  out when I analyze the issue of need.

23       MS. EATON:  May I be heard on that issue?

24       THE COURT:  Well, let me finish my statement and then

25  I'll hear you on it.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1          I can't -- and I don't think in every instance where

2    this is raised that the Court should have to do an in camera

3    review.  I did it because we're on such a tight time frame, I

4    didn't want to have a hearing today and then conclude I need to

5    review materials in camera.  And my clerks didn't do it; I did

6    it myself.  And my assessment, based on all that I've read, is

7    that I don't see that you've, based on what I've read in your

8    papers, that you've established need for anything that's here.

9          The trustees' counsel have said repeatedly in court

10   that the Duff & Phelps report, the analysis of the economics,

11   was the driving factor of the decision to enter into the FGIC

12   settlement.  And everything I read in here supports that

13   contention, okay?  Everything I read in here supports that

14   contention.  Yeah, there's a lot of drafts of -- and this would

15   go to the mediation privileges -- there's a lot of drafts of

16   the PSA and the term sheet and the FGIC settlement and comments

17   on it and all of that, but with respect to the approval of the

18   FGIC settlement, these three binders that I went through have

19   not established -- and there was nothing that I read in your

20   material, and after reviewing this, I was more convinced than

21   ever -- there's nothing that establishes your need to break

22   privilege; something I'm very reluctant to do.

23          Now tell me why you think you've established need.

24          MS. EATON:  Well, I don't think, first of all, that

25   the logs present a full picture.  I mean, for example --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

43

1          THE COURT:  I know.  That's why I read all this

2     stuff -- that does present the full picture.

3          MS. EATON:  I do not know what the --

4          THE COURT:  I know.

5          MS. EATON:  -- trustees have chosen not to log.  I can

6     tell you why I suspect that there are materials that have not

7     been logged.

8          THE COURT:  And I see you've raised a question about

9     the time period that they covered.  I want to hear from them

10    about it.  All I could review was what I received, and what I

11    received was on their privileged logs.  And I personally looked

12    at it all.

13         MS. EATON:  With respect to the date range, it's a

14    mystery to us why the testimony is that negotiations began over

15    this agreement in January and yet, for whatever reason, they

16    chose only to produce documents and therefore to log documents

17    beginning on March the 18th of this year.  The agreement,

18    according to the testimony, was signed on May 23rd, and that

19    was the end date that they chose, both for their production and

20    for logging purposes.  But of course, they didn't file their

21    joinder in this court until the 10th of June.

22         So there are pieced both before their date range and

23    after their date range that are plainly relevant here, that's

24    one reason.  As I mentioned before, they restricted their

25    search to their client files, per se.  Our understanding is

**RESIDENTIAL CAPITAL, LLC, ET AL.**

44

1  that to the extent that there were negotiations going on here,

2  they were being conducted by the lawyers, and therefore it's

3  the documents within their lawyers' files would presumably be

4  responsive --

5      THE COURT:  Lawyers' files -- well, I don't know where

6  they came from.  I mean, there's numerous e-mails.  They're all

7  between lawyers.  I mean, it's just --

8      MS. EATON:  They made a representation to us, Your

9  Honor, that they did not search their own files for responsive

10  documents.  And then in those --

11     THE COURT:  I kept their clients kept all the lawyer

12  communications, so --

13     MS. EATON:  I don't know that --

14     THE COURT:  I don't whether it's all -- I'm just -- I

15  don't mean to be flippant about it --

16     MS. EATON:  I don't think either one of us knows the

17  answer to this --

18     THE COURT:  Okay.

19     MS. EATON:  The point that I'm making is --

20     THE COURT:  That's a fair point.

21     MS. EATON:  -- that the parameters that they imposed

22  on what was relevant, what they were going to search for, how

23  they were going to search for, what date ranger they were going

24  to use, has resulted in a set of materials both produced and

25  logged that seems self-evidently to be a subset.  Because, if

**RESIDENTIAL CAPITAL, LLC, ET AL.**

45

1    for no other reason, it does not include the period when the

2    decision was made to seek findings from this Court that they

3    had acted in the best interest --

4         THE COURT:  You're all excited about them seeking

5    findings.  It doesn't excite me at all.  I mean, I just -- if

6    they demonstrate that they acted in good faith -- if I approve

7    the settlement, not clear, if I approve the settlement, and the

8    factual record supports the finding of good faith, I'll make

9    the finding of good faith.  If it doesn't, I won't.

10         MS. EATON:  Then that's the issue, but the --

11         THE COURT:  But I don't see why that results in

12    triggering the fiduciary exception.  I mean, I just don't.  I

13    mean, I -- let me hear from Mr. Weitnauer.  I'll give you a

14    chance to reply.

15         So tell me first, Ms. Eaton says that you haven't

16    logged documents from the relevant period and you haven't

17    produced documents from the lawyers' files.  Is that an

18    accurate statement?

19         MR. WEITNAUER:  Well, part of that question, Mr.

20    Johnson may have to answer because he's been closely involved

21    in the production of documents.  With respect to the time

22    period, the trustees picked the day before we got before the

23    first e-mail that had anything to do with anything that was

24    close to a suggestion of a deal with FGIC.  Mr. --

25         THE COURT:  What about Ms. Eaton's statement that as

**RESIDENTIAL CAPITAL, LLC, ET AL.**

46

1  early as January, there were negotiations?

2      MR. WEITNAUER:  There's -- apparently she's referring

3  to testimony by Mr. Dubel at FGIC about negotiations he was

4  having over at -- not with us.

5      THE COURT:  Who were they having -- do you know?

6      MR. WEITNAUER:  With the debtors, is what I'm told.

7      THE COURT:  Okay.

8      MR. JOHNSON:  No.

9      MR. WEITNAUER:   Not the debtors.  Okay, well --

10     MR. JOHNSON:  Well, with the institutional investors.

11     MR. WEITNAUER:  Institutional investors.

12     THE COURT:  But not with your client --

13     MR. WEITNAUER:  Yes, sir,

14     THE COURT:  -- not with the trustees?

15     MR. WEITNAUER:  Right, the --

16     THE COURT:  You're speaking; I assume somebody will

17 pop up --

18     MR. WEITNAUER:  Right.  We were brought into the tent

19 later, Your Honor, on or about the 19th.

20     THE COURT:  Mr. Johnson wants to whisper in your ear.

21 Go ahead.  You can tell me or you can tell him, I don't care.

22     MR. WEITNAUER:  Go ahead.

23     MR. JOHNSON:  I'm sorry, Your Honor; you've sort of

24 probably picked up on that in our shop, I've sort of taken

25 charge of the responsibility matters and this is the brain

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   trust on the law, so that's why he wrote the letter to you on

2   this particular issue.

3          THE COURT:  But he didn't sign it.

4          MR. JOHNSON:  We have an expert on signatures as well,

5   Your Honor.

6          MR. WEITNAUER:  I directed it.

7          MR. JOHNSON:  Your Honor, Mr. Weitnauer is correct

8   that --

9          THE COURT:  See, I see Mr. Shore sitting in the back

10  and I get his letters.  He doesn't even sign -- nobody even

11  signs, so he -- go ahead, I'm sorry.

12         MR. JOHNSON:  Your Honor, Mr. Weitnauer is correct

13  that our clients were first brought into the settlement

14  negotiations around March 19th, I think it is --

15         THE COURT:  That's for all the trustees; not just the

16  specific ones that you represent?

17         MR. JOHNSON:  Yes.  And, Your Honor, I believe that is

18  entirely -- in fact, I know it's consistent because I've

19  participated or listened in on the depositions so far -- it's

20  consistent with the testimony of the trustees' witnesses so far

21  as well.

22         THE COURT:  And what about the cutoff date?

23         MR. JOHNSON:  Your Honor, we -- yeah, Your Honor, we

24  made the cutoff date the date that we executed the FGIC

25  settlement agreement.  We're not sure why anything after that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

48

1    date would be relevant since it's our understanding that this

2    dispute really should be about --

3              THE COURT:  Well, somebody's --

4              MR. JOHNSON:  -- the settlement agreement.

5              THE COURT:  -- could have written an e-mail, boy, we

6    really pulled the wool over their eyes on this one.

7              MR. JOHNSON:  I don't think that type of document

8    exist, but --

9              THE COURT:  Well, that may be true and it may not be

10   true.  I don't know.

11             MR. JOHNSON:  But, Your Honor, the relevant time

12   period in terms of considering whether this settlement

13   agreement is in the best interest and the good faith basis upon

14   which the trustees decided to enter into this settlement

15   agreement, all of that is going to date as of May 23rd, 2013,

16   and prior to that.

17             THE COURT:  Okay.

18             MR. JOHNSON:  So that's the basis for that, Your

19   Honor.

20             THE COURT:  All right.

21             MR. JOHNSON:  While I'm up, I'll just address it

22   before we get back to the brain trust, I guess, and the law.

23   In terms of the files that were searched, lawyer files were

24   searched; at least the trustees searched lawyer files, internal

25   lawyer files.  The trustees did not search their outside

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**49**

1   counsels' files.  There's been no evidence so far, at least

2   developed in the depositions, that there's any reason to

3   believe that the files of the clients would, for any reason, be

4   incomplete and not contain those communications --

5           THE COURT:  Let me ask this.  Did you search your

6   files?

7           MR. JOHNSON:  No, Your Honor.  Well, excuse me; Wells

8   Fargo did.  Alston & Bird's counsel did not.  And there is

9   certainly authority, Your Honor, for limiting discovery just to

10  the actual parties, not having the outside counsel who

11  represented the parties in the underlying transaction and who

12  represent the party in the disputed issue, also serve their

13  files.

14          THE COURT:  Well, the disputed issues is a different

15  issue than -- you represented Wells Fargo in the negotiations?

16          MR. JOHNSON:  Your Honor, this firm did.  Yes.

17          THE COURT:  So why shouldn't you have to search your

18  firm's files for files during the negotiation?

19          MR. JOHNSON:  Because, Your Honor, the only thing that

20  could be relevant -- I mean, there would be nothing that would

21  be discoverable, is the short answer.  I --

22          THE COURT:  I don't know whether that's true or not.

23  I mean, look, if I were to -- if Ms. Eaton persuaded me that

24  the fiduciary exception was triggered, why wouldn't that, if

25  you had privileged documents in your file, wouldn't you have to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

50

1   produce them, then?

2           MR. JOHNSON:  Your Honor, yes.  Under that assumption,

3   attorney-client-privileged communications would be

4   discoverable.  But again, Your Honor, there's no showing that

5   those communications form the client's side are incomplete.

6   And of course, in every litigat -- excuse me; every discovery

7   scenario, it is always appropriate to consider whether the

8   burden and cost associated with the search is commensurate with

9   any potential benefit.

10          THE COURT:  Well, usually you sort that out with

11  opposing counsel because it's what's good for you is good for

12  them.

13          MR. JOHNSON:  We never asked, Your Honor, that the

14  Willkie Farr firm, which apparently has been --

15          THE COURT:  You just want to take Mr. Abrams'

16  deposition now.

17          MR. JOHNSON:  Yes, Your Honor, as to non-privileged

18  matters only, as to which he has knowledge but his client has

19  not.  That's the difference, Your Honor.  Our clients are in

20  possession of those attorney-client communications that are at

21  issue here.  Mr. Abrams is in possession because of this

22  confidentiality agreement that his clients allowed him to sign

23  up, is the only one who knows precisely what he found out about

24  this settlement agreement.  That's not the case here.

25          Alston & Bird doesn't know anything about these

**RESIDENTIAL CAPITAL, LLC, ET AL.**

51

1    attorney-client communications that its clients doesn't know

2    about because its client is necessarily part of that

3    communication.

4              THE COURT:  Let's --

5              MR. JOHNSON:  Do you want to get back to the brain

6    trust -- okay.  Thank you, Your Honor.

7              MR. WEITNAUER:  I really hate being characterized that

8    way, but here I am.

9              THE COURT:  Take it, you know, I mean --

10             MR. WEITNAUER:  Okay.  Well, Your Honor, I think that

11   what I would focus on is that while Ms. Eaton was concerned

12   about this being a final agreement agreed to in secret and

13   something she couldn't do anything about and she's faced with

14   findings about our behavior in coming to that agreement, if you

15   look at the settlement agreement itself, you'll see that we

16   very carefully said that a condition to its effectiveness was

17   the entry, among other things, of this Court's order approving

18   it.  And it will terminate if that order's not entered by

19   August 19th, I think it is.

20             THE COURT:  But they're -- look, they're opposing it.

21             MR. WEITNAUER:  Um-hum.

22             THE COURT:  And they're entitled to a fair opportunity

23   to oppose it.

24             MR. WEITNAUER:  Absolutely.

25             THE COURT:  All right.  It doesn't mean that

1  automatically means that they get attorney-client-privileged

2  communication.

3       MR. WEITNAUER:  All right.

4       THE COURT:  Bank of New York may have a problem after

5  Mr. Major's deposition, but we'll see.  Okay.  If Bank of New

6  York, for example, is putting at issue the advice of counsel as

7  supporting their decision to approve the settlement, we'll --

8  that's going to get revisited.  But we won't dwell on that now.

9       So Ms. Eaton, in response I pressed her about this,

10  first to ask in what, if any way, do you contend the trustees

11  engaged in self-dealing and have a conflict of interest.  And

12  then I asked what evidence do you have to support such

13  contentions.  Okay.  And she identified three things.  The pre-

14  existing arrangement for superior economic result: tell me why

15  you disagree that that is evidence that supports the contention

16  of conflict of interest.

17       MR. WEITNAUER:  Your Honor, the fact of the matter is

18  that people can disagree about economic terms, whether they're

19  good, bad or indifferent.  I do not think it could ever be the

20  rule that just because someone disagreed about the merits of a

21  particular settlement, and the business terms contained within

22  it, that a party entering into that agreement must necessarily

23  have a conflict or a lack of good faith.

24       With respect to the economic merits of the settlement,

25  I guess two things.  Justice Kapnick noted the difference

**RESIDENTIAL CAPITAL, LLC, ET AL.**

53

1    between allegations of conflict of interest versus whether or

2    not a particular transaction was reasonable.

3         THE COURT:  She didn't permit -- she didn't invoke the

4    fiduciary exception with respect to the amount of the

5    settlement.

6         MR. WEITNAUER:  Correct.

7         THE COURT:  That's -- but --

8         MR. WEITNAUER:  And so I do think the fundamental

9    disagreement is that the objecting parties, as is their right,

10   don't think it's a good deal.  And that gets back to, really,

11   how this was set up.  In order for the settlement to become

12   effective, this Court and the rehabilitation court have to

13   approve it.  The orders that have to be entered that cannot be

14   waived have to include an affirmative finding that the

15   transactions contemplated by the settlement agreement are in

16   the best interest of the investors.

17        You may disagree with the trustees' view that this is

18   in the best interest.  You may disagree with Duff.  You may

19   disagree with institutional investors who also think it was in

20   the best interest.  You may agree with them.  And if that's the

21   case, it won't be approved and we won't get any findings.  It

22   is not as though we were asking for findings that we acted in

23   their best interest even though you thought the deal was a bad

24   deal.  There's a complete consistency between a finding that we

25   think you'll be justified in coming to that it is in the best

**RESIDENTIAL CAPITAL, LLC, ET AL.**

54

1   interest of the investors, and that, therefore, we acted in

2   their best interest.

3         So, to me, the fact that there's a disagreement about

4   the merits of the economics, just could never get to a point of

5   conflict of interest.

6         THE COURT:  And what about, she raised that there was

7   a signed settlement agreement without disclosure for one week?

8         MR. WEITNAUER:  Your Honor, it would have been

9   impossible for everybody who might be economically affected by

10  this settlement to be in the room.  And it fell to the trustees

11  to do their part in deciding whether or not the settlement was

12  in the best interest of all the investors.  The settlement

13  itself provides that within, I think it said seven days, the

14  debtors would be obligated to file it in this court and seek

15  approval of it.  And I didn't count the days, but I think the

16  debtors promptly filed it --

17        THE COURT:  They did.  I think that, as I recall, I

18  remember Mr. Lee and Mr. Eckstein complaining -- not

19  complaining, but they came in absolutely bleary because they

20  got the PSA filed -- I gave them a deadline and they begged for

21  a couple more days and when I gave the deadline -- so I agreed

22  to the couple more days and they literally, they got it in

23  minutes before the deadline.  So it was around -- I take them

24  at their word that it was a many-days, round-the-clock effort

25  to get -- because it involved a lot more than just the FGIC

**RESIDENTIAL CAPITAL, LLC, ET AL.**

55

1    settlement, obviously.

2            MR. WEITNAUER:  Correct.

3            THE COURT:  It was a major undertaking.

4            MR. WEITNAUER:  Hundreds of folks would substantiate

5    their position that they were round-the-clock.

6            THE COURT:  Yes.  Okay, so the last point was no

7    mechanism to allow the investors to object.

8            MR. WEITNAUER:  Well, and that seems odd to me because

9    we specifically required that the agreement be conditioned on

10   two courts' finding it to be in their best interest, that the

11   debtors in this court give a motion to get it approved.  They

12   are here; they are objecting.  And I don't know any other

13   mechanical way to move this case forward except for the

14   trustees to act as they must and then give folks an opportunity

15   to complain about it.  And we will see whether or not it was in

16   fact in the best interest of the investors after you hear from

17   their experts and their clients on why it's a terrible deal, if

18   that's what their experts say, and the evidence that's put up

19   by the debtors and the trustees.

20           THE COURT:  Have you taken their expert depositions

21   yet?

22           MR. WEITNAUER:  No, declarations of experts, I think,

23   are due Friday and then depositions will be next week.

24           THE COURT:  All right.

25           All right, anything else you want to raise at this

**RESIDENTIAL CAPITAL, LLC, ET AL.**

56

1    point?

2          MR. WEITNAUER:  I would just add, at the very end, if

3    you look at their letter, the types of things they say they

4    would like to find out, what could have been gained which --

5    what was given up as part of the negotiations, that goes

6    straight to the mediation privilege which would just be on top

7    of other arguments.

8          Thank you.

9          THE COURT:  All right, thank you.

10          Ms. Eaton -- well, let me see, anybody else want to be

11    heard?  And then I'll give you a chance to reply.

12          All right, Ms. Eaton?

13          MS. EATON:  Just a couple of points, Your Honor.  With

14    respect to the argument that this is no different than any run-

15    of-the-mill dispute about valuation or economic value of the

16    deal --

17          THE COURT:  I'm not sure he said that, but it's an

18    economic dispute about valuation.

19          MS. EATON:  At bottom, certainly, it is, at bottom

20    it's that.  The standard to be applied by the Court on this

21    motion is whether the agreement is outside the range of

22    reasonableness from the point of view of the estate, with

23    respect to the trustees, however.  So it's quite possible that

24    the Court could approve the settlement agreement.  But what's

25    been baked in here is a walk right on behalf of the trustees

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**57**

1    that if they do not get the findings that they have sought from

2    this Court, that they can walk away from the deal, which is one

3    of the reasons why we think this is not just a

4    straightforward --

5           THE COURT:  The terms of the deal require the Court to

6    make additional findings, no mistake about it --

7           MS. EATON:  Right.

8           THE COURT:  -- that go beyond the normal findings on a

9    9019 motion.  There's no question about that.

10          MS. EATON:  Right, Your Honor.  And then with respect

11   to the mechanism to object, it's been said well, the investors

12   have the opportunity to object here and they have the

13   opportunity to object in the state court.  But, of course, you

14   may remember that they've taken the position that we lack

15   standing to object --

16          THE COURT:  Not here, they haven't.

17          MS. EATON:  -- to lodge any objection in the state

18   court.

19          THE COURT:  Not here.  I can only deal with my court,

20   and I'm not sure whether they've taken that position in the

21   state court.  But they clearly haven't taken the position here.

22   And I've already, in the short time this has been in the works,

23   I've had numerous in-court hearings, some of them haven't been

24   on the record because they've been after 5 o'clock; I've had

25   telephone hearings; you're here today.  So other than the fact

**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1    that you asked for considerably more time for the dispute, I

2    think I've allowed sufficient time to -- there's a lot of work

3    for everybody to do; there's no question about it.  Very

4    expedited discovery and that's why I've had as many hearings as

5    required to deal with these issues.

6          MS. EATON:  Right, Your Honor.  The only point is that

7    if there were -- the agreement did not build in any other kind

8    of, or more efficient, or easier mechanism for the investors to

9    be heard.  There was no advance notice to the investors that

10   was publicly made that this was -- and this is an issue that

11   came up in Justice Kapnick's decision --

12         THE COURT:  Where do you find an obligation that the

13   trustee tell you before it signs a settlement agreement that

14   requirements court approval that they're negotiating?  You've

15   cited no authority for that.  You're complaining about it.

16   That's fine, okay.  But there's no legal authority that says

17   the trustee can't go ahead and negotiate a settlement agreement

18   where it -- I mean, any putback claims belong to the trustees'

19   they don't belong to investors.  Other claims that could be

20   asserted belong to the trustee, not the investors.  They have

21   it, at a point at least, where there's a default, they owe

22   common-low fiduciary duties as well as whatever the indenture

23   requires.

24         But you've, other than complaining about it, you've

25   pointed to no authority that says they had to tell you before

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   they did it.  Do you have any authority for that?

2   　　　　　MS. EATON:  No, not -- no, I don't, Your Honor.  The

3   point is that once the prudence standard applies, they had a

4   duty to treat the property as if, to manage the property as

5   if -- which, our property -- as if it were their own.

6   　　　　　THE COURT:  Other than your disagreement as to whether

7   the existing rehabilitation plan is superior to this

8   settlement, you've pointed to nothing to suggest that the

9   trustees did not act solely for the benefit of the investors.

10   　　　　　MS. EATON:  With respect, Your Honor, I disagree.  We

11   don't -- I've given you -- laid out the facts that we are aware

12   of based on the information that we've been able to gain access

13   to.  And I think the circumstances taken as of --

14   　　　　　THE COURT:  And you'll get an opportunity to get all

15   nonprivileged information that supports your claims, but you

16   don't break privilege because you think if you're able to do

17   it, maybe you'll be able to come up with some facts to support

18   an argument why you can.  Privilege doesn't go away that

19   easily.

20   　　　　　MS. EATON:  I'm not -- we're not --

21   　　　　　THE COURT:  All right.  Anything else -- new points

22   you want to raise?

23   　　　　　MS. EATON:  The only new point I wanted to raise, Your

24   Honor, is with respect to the mediation privilege, which we've

25   discussed before.  We're here, Your Honor, with respect to --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1   the respect to be afforded to the mediation privilege.  I think

2   one of the issues here is, just how far it's being applied is

3   pretty unclear to us.  It's certainly -- our view is that it

4   certainly cannot cover everything that happened that was

5   remotely related to the bankruptcy or any negotiations or

6   discussions that were going on --

7        THE COURT:  That's not what the documents that I've

8   reviewed that -- they're not remote; they're very specific.

9   They relate --

10        MS. EATON:  Those weren't to be logged, Your Honor,

11   under --

12        THE COURT:  I'm sorry?

13        MS. EATON:  Those items weren't to be logged.  When we

14   discussed --

15        THE COURT:  Well, I can only review what was logged.

16        MS. EATON:  When we discussed -- well, the issue --

17   that's why I'm raising it, is that what's out there, I don't

18   know what all is out there, but when we were discussing the

19   obligation to log privileged documents -- I don't remember when

20   it was -- but it was some time back, you indicated that

21   discussions -- communications between attorney and client

22   needed to be logged, but other items with respect to the

23   "mediation privilege" did not need to be logged.

24        And therefore, those logs -- and that's what I

25   understand the trustees to have done -- and therefore those

**RESIDENTIAL CAPITAL, LLC, ET AL.**

61

1   logs don't reflect any of those other materials.  And that may

2   be fair game, but it depends on how you construe the mediation

3   privilege.

4           THE COURT:  What -- did you ask for any document that

5   relates to the bankruptcy?  What was the documents -- what did

6   you ask for in your request?

7           MS. EATON:  No, no, we didn't ask for those things.

8   I'm basing my comments on questions not -- to be fair, not of

9   the trustees, but of Mr. Kruger, who took the position that

10  everything that happened from X date to Y date was part of the

11  mediation process, and therefore, covered by the mediation

12  privilege.

13          THE COURT:  If you want to make a motion to compel

14  with Mr. Kruger -- about Mr. Kruger, you have a meet-and-confer

15  with the debtors' counsel, and then you come back to me, after

16  you've -- that's not before me today.  What I have before me

17  today is your application to compel the trustees to produce

18  attorney-client privileged documents.  That's what I have

19  before me.  And your arguments relate to the fiduciary

20  exception in the mediation privilege.

21          Anything else you want to say on that subject?

22          MS. EATON:  I don't have anything further to add --

23          THE COURT:  Okay.

24          MS. EATON:  -- unless Your Honor has any questions.

25          THE COURT:  All right, I don't.  Mr. Shore?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. SHORE:  I'll be very quick.  I just wanted to be

2     heard on that last point on the mediation, and then how we're

3     going to be approaching that, because I certainly don't want to

4     file a motion to compel.

5          So, for the record, Chris Shore, from White & Case on

6     behalf of the ad hoc group.  First, let me tell you, we sent a

7     letter down just around 3 o'clock on the JSN adversary

8     proceeding.  We resolved the statement of issues; that's

9     consensual now.  And the --

10          THE COURT:  You're still coming in tomorrow, though.

11          MR. SHORE:  -- and the scheduling order, we're still

12     coming into deal -- and we're talking through the issues on

13     whether or not there'll be a consensual amendment.  I don't

14     think there are going to be big distinctions.

15          THE COURT:  I hope there will be.  I mean, I -- if

16     there's debtors' counsel here, I hope -- and committee counsel,

17     I hope there'll be a consensual agreement.

18          MR. SHORE:  We're also, and I think Ms. Eaton just

19     expressed it.

20          THE COURT:  Let me put your mind through.  I'm not

21     making a decision on the mediation privilege today, so nothing

22     I'm saying today is going to affect what positions you're going

23     to take, okay.

24          MR. SHORE:  Good.  I -- it's then a question of

25     procedure, which is, there're two ways, it seems to us, to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

63

1   approach it in connection with FGIC, because there have been

2   some blanket assertions of mediation privilege.  One is to file

3   a motion to compel, have that heard --

4           THE COURT:  I don't allow them to be filed.

5           MR. SHORE:  Well, they have a meet-and-confer --

6           THE COURT:  I mean, you'll follow my procedures.

7           MR. SHORE:  And then try to resolve that issue through

8   that process, or through a process that was discussed in the

9   JSN adversary proceeding is if they're not going to produce the

10  documents, they're not going to get findings of fact on it.

11          So I would propose that our supplemental responses are

12  due on the 29th, I think, and we were intending on just saying,

13  with respect to findings of fact they're seeking, or Iridium

14  factors they want the Court to rule in their favor on, that

15  require looking into the mediation, that is, for example, that

16  it's arms-length, that we just -- that they not be permitted to

17  proceed on those.  So it's just I don't want to be in a --

18          THE COURT:  I don't want to take those up now.  I have

19  enough -- I'm sorry, Mr. Shore, but --

20          MR. SHORE:  We'll discuss it --

21          THE COURT:  Okay.

22          MR. SHORE:  We'll discuss it with the debtors and try

23  to come to some arrangement.

24          THE COURT:  Yeah, I got enough to deal with, okay?

25          MR. SHORE:  All right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

64

1              THE COURT:  All right, thank you.

2              MR. SHORE:  Thank you, Your Honor.

3              THE COURT:  Anybody else wish to be heard?  All right.

4              Pending before the Court is a discovery dispute

5     between certain investors and RMBS Trust that are wrapped with

6     insurance provided by FGIC.  The debtors, the rehabilitator,

7     FGIC, and the RMBS Trustees have entered into a proposed

8     settlement that will result, among other things, in a lump sum

9     payment from FGIC in satisfaction of claims asserted by the

10    trustees and the debtor.

11             The settlement also includes a commutation,

12    essentially capping FGIC's liability for insured claims.

13    Because FGIC is subject of a rehabilitation proceeding in state

14    court, the proposed settlement requires approval of both the

15    state court and the bankruptcy court.  The settlement hearing

16    in this court is scheduled for August 16 and 19, 2013.

17             The investors represented by Willkie Farr oppose

18    approval of the settlement, essentially arguing that the

19    settlement is not fair and reasonable to the investors, because

20    the commutation substantially reduces the amount the investors

21    would recover from FGIC under its already-approved

22    rehabilitation plan.

23             As part of the expedited discovery in this case, the

24    investors argue that the trustees' assertion of attorney-client

25    privilege must be set aside on the basis of the fiduciary

**RESIDENTIAL CAPITAL, LLC, ET AL.**

65

exception to the privilege.  The Court directed counsel for the

investors and for the trustees to submit simultaneous briefs,

addressing the privilege issues on or before noon yesterday,

July 16.  The Court also directed the trustees to provide the

Court, for in-camera review, the documents that have been

withheld on the basis of privilege.  The Court set a hearing on

the matter for Wednesday, that's today, July 17 at 3 p.m.  All

submissions to the Court were timely made.

Time is of the essence in resolving this dispute,

because of the tight time schedule leading to the settlement

approval hearing.  As I said earlier, because of that very

tight time schedule, I required the trustees' counsel to

provide, for in-camera review, the documents as to which these

privileges were asserted.  And in my ruling today, I don't mean

to suggest that that is a requirement in order for the Court to

reach the decision.  It bolsters my decision, as I said

earlier, by having reviewed these documents, specifically with

respect to the need.

Treating the Willkie Farr letter as a motion to compel

the production of documents, the Court denies the motion for

the following reasons.  First, for purposes of the motion, the

Court will treat the duties owed by the trustees to the

investors as extending beyond the four corners of the

indentures, pursuant to which the trustees act.

The trustees have stipulated, for purposes of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

motion, that they are obligated to act in the best interest of the investors, with respect to the settlement agreement, and that the stipulated level of obligation is sufficient to invoke the fiduciary exception in this context, and then "but only when good cause and other elements of fiduciary exception can be shown."

Ms. Eaton has disagreed as to the issue of whether -- the legal requirement of whether good cause is a requirement. In support of her argument that good cause is not required, Ms. Eaton points to two decisions, both by Magistrate Judge Dolinger.  First, Martin v. Valley National Bank of Arizona, 140 F.R.D. 291, Southern District of New York, 1991.  The second case is Lawrence v. Cohn, 2002 WL 109530, Southern District of New York, January 25th, 2002.

In the Martin case, it arose in the context of a fiduciary trustee in a DOL action for breach of fiduciary duty. In the case of Lawrence's case, I believe it involved an executor or estate beneficiary conflict.  Neither of those cases involve the circumstance of an indenture trustee.

Case law establishes that before an event of default occurs, an indenture trustee's obligations are limited to those set forth in the indenture.  And I quote, "After an event of default, however, the loyalties of the indenture trustee no longer are divided between the issuer and the investors.  As a consequence, New York law reallocates indenture trustees'

1  fiduciary duties to reflect the change."  See LNC Investment

2  Co. v. First Fidelity Bank, National Association, 935 F.Supp

3  1333, Southern District of New York, 1996; that's the decision

4  by Judge Mukasey.

5        After an event of default, "It is clear that the

6  indenture trustee's obligations come more closely to resemble

7  those of an ordinary fiduciary, regardless of any limitations

8  or exculpatory provisions contained in the indenture."  See

9  Beck v. Manufacturers Hanover Trust Co., 632 N.Y.S.2d 520 at

10  527, First Department 1995.  While Beck and LNC indicate that

11  the indenture trustee's obligations more closely resemble the

12  obligations of a trustee -- of an expressed trustee, the

13  obligations are not identical.

14        The Court concludes that those cases which

15  specifically requiring a good -- a showing of good cause to

16  invoke the fiduciary acceptance or other requirements as well,

17  but I'm going to focus on the good cause requirement.  The

18  cases that the circumstances of an indenture trustee in the

19  case such as this one, much more closer resemble those from

20  Garner v. Wolfinbarger, which is at 430 F.2d 1093, Fifth

21  Circuit, 1970.  It's sort of the progenitor of this fiduciary

22  exception doctrine.

23        Other cases have likewise recognized that under both

24  federal law and New York law.  In Quintel Corp. v. Citibank,

25  567 F.Supp. 1357, Southern District of New York, 1983; I

1    believe it's an opinion by Judge Sweet.  He certainly

2    considered the -- and analyzed and applied the good cause

3    requirement.  So the Court concludes that the good cause

4    requirement applies in this case.

5           And it's unnecessary for me to consider each of the

6    elements of the requirement to establish that the fiduciary

7    exception is triggered, because I believe on the record before

8    me, and including the argument today, that investors

9    represented by Willkie Farr have failed to show good cause to

10   invoke the fiduciary exception.

11          While it's a state court decision, I rely

12   substantially on Justice Kapnick's decision in the Bank of New

13   York Mellon Matter.  As I commented earlier, it's a decision, I

14   think, from May 20th, 2013; it's quite recent.  Justice Kapnick

15   in an RMBS case analyzes both the at-issue waiver doctrine --

16   which the Court doesn't have to consider today, but might have

17   to -- and also the fiduciary exception.  And in a careful

18   analysis, she parsed the specific issues as to which the

19   investors sought discovery of attorney-client privileged

20   communications.

21          First she concluded that the fiduciary exception is

22   potentially applicable in such a case of an indenture trustee,

23   but Justice Kapnick after carefully analyzing prior case law --

24   and I won't go through those cases now, but I agree with her

25   analysis of the case law -- concluded that among the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    requirements for application of the exception is a showing of

2    good cause for required disclosure of otherwise privileged

3    information.

4         Justice Kapnick concluded that the investor had

5    established good cause with respect to disclosures specifically

6    related to a colorable claim of self-dealing and conflict-of-

7    interest by the trustees.  On other issues, however, such as

8    communications at and surrounding the trustees' meeting at

9    which they determined to support the settlement and

10   communications regarding the settlement amount, the investors

11   had not established good cause.

12        I reach a similar conclusion here, except that when

13   pressed, Ms. Eaton identified three matters, when I asked for,

14   in what way she contended that the trustees engaged in self-

15   dealing and have a conflict of interest.  I followed it up with

16   a question of what, if any, evidence do you have to support

17   such contentions?  She identified three items.  One, a pre-

18   existing arrangement for, what she described as, a superior

19   economic result with the FGIC rehabilitation agreement.  That

20   is fundamentally an economic issue as to which there will be

21   expert testimony at the hearing.

22        The circumstances of the FGIC rehabilitation plan and

23   its approval, and the negotiation of the settlement and

24   presentation of the settlement before me and before Justice

25   Ling-Cohan are very different.  The proposed settlement would

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    result in a lump-sum payment and a commutation of FGIC's

2    insurance that the amount of its exposure is capped, versus the

3    FGIC rehabilitation plan would have a long term payout, which

4    may or may not exceed the net present value of the lump sum

5    payment today, an issue as to which expert testimony will be

6    provided.

7         So I don't believe that that issue establishes a

8    conflict of interest on part of the trustees or any self-

9    dealing on the part of the trustees.  There's no -- and I

10   should say, Ms. Eaton did not identify any alleged self-dealing

11   on the part of the trustees.  The focus has been on the

12   conflict-of-interest issue.

13        The second issue she raised was signing the settlement

14   agreement without disclosure for a one-week period.  Now I

15   suppose I'd add to that, disclosure that -- without disclosure

16   that the trustees were negotiating the settlement, and then

17   once it was signed, disclosure for one week.  The Court does

18   not believe that that matter supports a colorable claim of

19   conflict of interest on the part of the trustee.  Many or most

20   settlements are negotiated without disclosure to third parties.

21   The major point is that the settlement requires approval of two

22   courts, this court and the State Supreme Court.  And the issue

23   of whether approved, it'll be decided on the merits.

24        The third issue that Ms. Eaton raised was that there's

25   no mechanism to allow the investors to object.  And it's very

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   precisely in this Court what -- that the settlement required

2   it, and this Court has established a schedule for expedited

3   discovery, briefing and hearing, and there very much is a

4   mechanism, and as I commented earlier, this Court has already

5   had numerous hearings on the record and off the record.  And

6   off-record is related to either discovery disputes or

7   scheduling matters, as to which I frequently do it after

8   regular court hours, but the Court has had numerous hearings

9   about it.

10          And so, the Court concludes that the three issues

11   raised by Ms. Eaton do not raise a colorable claim of self-

12   dealing or conflict-of-interest sufficient to trigger the

13   fiduciary exception to the attorney-client privilege.

14          I'm not going to go through -- I've read, I think, all

15   of the cases that Justice Kapnick cited in her opinion.  I've

16   mentioned specifically Hoops, which I -- is a Third Department

17   decision by then Judge Levine, subsequent -- then Justice

18   Levine, subsequently Judge Levine on the New York Court of

19   Appeals, and obviously Garner v. Wolfinbarger, which is the

20   leading case on fiduciary exception.  I'm not going to go

21   through each of the cases that have been discussed, but in

22   applying the law to the facts as presented to me, the motion to

23   compel the trustees to disclose documents or deposition

24   testimony regarding attorney-client privilege matters is

25   denied.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1        But let me make clear that, to the extent that any of

2   the trustees are relying of advice of counsel as a basis for

3   their decision to approve the settlement, I'm not going to rule

4   on it today, but it obviously puts the "at-issue" doctrine,

5   which the state court addressed and other courts have

6   addressed.  I think I addressed them in one opinion, in ResCap

7   in fact.  So I'm only ruling on what's before me today.  Let me

8   just say, I thought the submissions of both parties, the

9   briefs, were very well done in a relatively short period of

10  time.  It was very helpful to the Court.

11       My decision is not in any way based on the mediation

12  privilege.  That raises no particular reluctance; I just don't

13  need to get there today.  There may be other matters as to

14  which the mediation privilege needs to be addressed.  And with

15  respect to mediation privilege, there are at least three

16  sources that need to be consulted:  one, the Court's general

17  order with respect to the mediation program; two, the specific

18  order I entered when Judge Peck was appointed as the mediator;

19  and third, the case law with respect to the scope of mediation

20  privilege.  But I don't need -- for my decision today -- I

21  don't need to reach any of those.

22       What I would like to do, is return the binders with --

23  that I reviewed in-camera to counsel who provided them.

24  Obviously, they're all -- everything was bates numbered;

25  everything is on the log.  I just don't choose to keep

**RESIDENTIAL CAPITAL, LLC, ET AL.**

73

1   privileged documents that haven't been disclosed in my

2   chambers.

3            Do we have counsel for each of those parties here?

4   Mr. Siegel, I know you provided what Bank of New York Mellon.

5   I got U.S. Bank National Association, I don't know who -- can't

6   remember who's that was.

7            So here's yours.

8            Which one is yours?  The biggest of the binders.

9            Okay, so let the record reflect that I've returned the

10  binders containing the privileged documents which I reviewed

11  in-camera.

12           Court is adjourned.

13       (Whereupon these proceedings were concluded at 4:37 PM)

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**RULINGS**

|                                              | Page | Line |
|----------------------------------------------|------|------|
| Willkie Farr motion to compel the production of documents denied | 65   | 19   |

75

1

2                    C E R T I F I C A T I O N

3

4   I, Sharona Shapiro, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

    _Sharona Shapiro_

9

10  _____

11  SHARONA SHAPIRO

12  AAERT Certified Electronic Transcriber CET**D-492

13

14  eScribers

15  700 West 192nd Street, Suite #607

16  New York, NY 10040

17

18  Date:  July 18, 2013

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

July 17, 2013

**A**

**able (7)**
11:20;23:10;28:15;
40:21;59:12,16,17
**Abrams (6)**
27:8,10,11,15,19;
50:21
**Abrams' (1)**
50:15
**Absolutely (2)**
51:24;54:19
**acceptance (1)**
67:16
**access (1)**
59:12
**According (4)**
10:20;11:1;17:19;
43:18
**account (1)**
39:15
**accurate (2)**
38:13;45:18
**act (6)**
13:23;25:11;55:14;
59:9;65:24;66:1
**acted (6)**
8:8;26:18;45:3,6;
53:22;54:1
**action (3)**
21:13;27:4;66:16
**actual (1)**
49:10
**actually (2)**
38:3,5
**Ad (2)**
5:2;62:6
**add (4)**
14:6;56:2;61:22;
70:15
**additional (1)**
57:6
**address (3)**
14:22;35:17;48:21
**addressed (6)**
33:3;39:25;72:5,6,
6,14
**addresses (1)**
33:24
**addressing (1)**
65:3
**adjourned (1)**
73:12
**advance (1)**
58:9
**adversary (2)**
62:7;63:9
**advice (7)**
35:24;36:3;37:12,
24;38:11;52:6;72:2
**advice-of-counsel (2)**
33:23;37:23

**advisor (5)**
37:10,10,11,12,13
**advisors (1)**
35:25
**affect (1)**
62:22
**affected (1)**
54:9
**affirmative (1)**
53:14
**afforded (1)**
60:1
**afternoon (1)**
7:22
**again (2)**
21:2;50:4
**against (1)**
25:21
**agents (1)**
31:4
**ago (1)**
17:12
**agree (13)**
9:18;10:5,6;11:24,
25;14:3,4,8,10,13;
17:1;53:20;68:24
**agreed (4)**
24:3;25:7;51:12;
54:21
**agreeing (1)**
8:9
**agreement (46)**
8:2,3,5,10,13;
13:24;20:21;24:20;
25:22;26:4,13,15,15;
27:9,25;28:23;29:7;
33:6;35:23;37:3,14;
40:23;43:15,17;
47:25;48:4,13,15;
50:22,24;51:12,14,
15;52:22;53:15;54:7;
55:9;56:21,24;58:7,
13,17;62:17;66:2;
69:19;70:14
**agreements (1)**
29:17
**ahead (9)**
20:12;33:1;36:23,
25;39:6;46:21,22;
47:11;58:17
**air (1)**
27:3
**allegations (1)**
53:1
**alleged (1)**
70:10
**allegedly (1)**
37:18
**allow (4)**
29:6;55:7;63:4;
70:25
**allowed (4)**
29:13,14;50:22;

**58:2**
**Ally (2)**
6:11,11
**alone (1)**
33:7
**already-approved (1)**
64:21
**Alston (6)**
14:23;15:6;18:4;
39:10;49:8;50:25
**Alternative (1)**
4:4
**although (4)**
16:13;21:1;34:3;
35:19
**ALVES (1)**
6:7
**always (1)**
50:7
**amendment (1)**
62:13
**America (1)**
41:7
**Americas (2)**
5:3,13
**among (4)**
8:5;51:17;64:8;
68:25
**amount (9)**
34:17,18;40:7,14;
41:3;53:4;64:20;
69:10;70:2
**analogous (4)**
15:5;18:19;39:16,
20
**analysis (6)**
13:3;32:5;37:11;
42:10;68:18,25
**analyze (1)**
41:22
**analyzed (1)**
68:2
**analyzes (1)**
68:15
**analyzing (1)**
68:23
**Angeles (1)**
6:21
**answered (1)**
29:19
**apologize (1)**
19:24
**apparently (2)**
46:2;50:14
**Appeals (2)**
22:22;71:19
**appear (1)**
11:1
**applicable (1)**
68:22
**application (5)**
7:5;20:15;22:24;
61:17;69:1

**applied (4)**
16:3;56:20;60:2;
68:2
**applies (8)**
14:6;15:24;22:19;
34:10;35:17;39:21;
59:3;68:4
**apply (7)**
12:16,23;13:4;
16:24;17:6;33:4;
41:16
**applying (3)**
17:2;18:25;71:22
**appointed (1)**
72:18
**approach (1)**
63:1
**approaching (1)**
62:3
**appropriate (1)**
50:7
**approval (17)**
8:1;9:22;22:13;
23:24;25:20,23;27:2;
32:20,21;42:17;
54:15;58:14;64:14,
18;65:11;69:23;
70:21
**approve (8)**
26:25;27:5;45:6,7;
52:7;53:13;56:24;
72:3
**approved (9)**
8:23;9:18;10:4;
21:20;27:4;41:13;
53:21;55:11;70:23
**approving (1)**
51:17
**arguably (2)**
12:23;16:12
**argue (3)**
8:24;18:11;64:24
**argued (1)**
33:5
**arguing (1)**
64:18
**argument (7)**
12:20;33:1;34:18;
56:14;59:18;66:9;
68:8
**arguments (3)**
27:3;56:7;61:19
**arise (1)**
16:8
**Arizona (1)**
66:11
**ARLENE (1)**
6:7
**arms-length (1)**
63:16
**arose (1)**
66:15
**around (4)**

**12:8;47:14;54:23;
62:7**
**arrangement (7)**
24:3,9;28:22;
34:23;52:14;63:23;
69:18
**ARTHUR (1)**
4:8
**articulated (2)**
23:4;24:12
**ascertain (2)**
17:19;40:22
**aside (1)**
64:25
**asserted (5)**
32:3;34:14;58:20;
64:9;65:14
**assertion (2)**
33:8;64:24
**assertions (1)**
63:2
**assessment (2)**
9:9;42:6
**associated (2)**
50:8
**Association (2)**
67:2;73:5
**assume (2)**
38:13;46:16
**assuming (2)**
33:22;34:5
**assumption (1)**
50:2
**assumptions (2)**
30:8,8
**at-issue (3)**
33:25;68:15;72:4
**attached (1)**
29:15
**attention (2)**
15:6;21:12
**attesting (1)**
33:10
**attorney (2)**
38:11;60:21
**attorney-client (9)**
29:23;35:5;50:20;
51:1;61:18;64:24;
68:19;71:13,24
**attorney-client-privileged (2)**
50:3;52:1
**Attorneys (8)**
4:3,14;5:2,12,20;
6:3,11,18
**August (2)**
51:19;64:16
**authority (10)**
15:11;16:5;17:3;
18:15;19:5;49:9;
58:15,16,25;59:1
**automatically (1)**
52:1
**available (2)**

19:17;40:18
**Avenue (5)**
    4:5;5:3,13;6:12,19
**aware (2)**
    32:22;59:11
**away (2)**
    13:13;57:2;59:18

**B**

**back (8)**
    12:11;17:11;47:9;
    48:22;51:5;53:10;
    60:20;61:15
**background (1)**
    25:21
**bad (2)**
    52:19;53:23
**baked (1)**
    56:25
**Bank (19)**
    5:12;6:3,11;15:4;
    18:24;22:19;24:12;
    36:8,9;37:22;38:1,
    25;52:4,5;66:11;
    67:2;68:12;73:4,5
**bankruptcy (4)**
    25:6;60:5;61:5;
    64:15
**base (2)**
    37:8,9
**based (6)**
    9:9;40:21;42:6,7;
    59:12;72:11
**basically (1)**
    12:12
**basing (1)**
    61:8
**basis (15)**
    17:21;21:6,14;
    29:12,21,22;30:16;
    33:7;35:22;38:23;
    48:13,18;64:25;65:6;
    72:2
**bates (1)**
    72:24
**Battery (1)**
    6:4
**Beck (3)**
    12:9;67:9,10
**become (1)**
    53:11
**beg (2)**
    11:12;25:1
**began (1)**
    43:14
**begged (1)**
    54:20
**beginning (2)**
    35:13;43:17
**behalf (7)**
    7:10;19:21;20:3;
    36:8,9;56:25;62:6

**behavior (1)**
    51:14
**behind (1)**
    30:10
**belong (3)**
    58:18,19,20
**beneficiary (1)**
    66:18
**benefit (2)**
    50:9;59:9
**Berkshire (1)**
    6:18
**best (25)**
    8:4,6,7,14;9:25;
    13:23;20:21;26:19,
    19;33:7;35:23;37:5,
    15;45:3;48:13;53:16,
    18,20,23,25;54:2,12;
    55:10,16;66:1
**bet (1)**
    10:5
**better (5)**
    9:10;10:3;25:11;
    34:19;35:3
**beyond (2)**
    57:8;65:23
**big (2)**
    40:16;62:14
**biggest (1)**
    73:8
**BILLER (1)**
    4:8
**billion (1)**
    40:20
**binders (5)**
    30:17;42:18;72:22;
    73:8,10
**binding (2)**
    8:10;19:5
**Bird (4)**
    15:6;18:4;39:10;
    50:25
**Bird's (2)**
    14:23;49:8
**blanket (1)**
    63:2
**bleary (1)**
    54:19
**block (1)**
    41:21
**body (1)**
    40:4
**bolsters (1)**
    65:16
**both (10)**
    15:18;16:23;43:19,
    22;44:24;64:14;
    66:10;67:23;68:15;
    72:8
**bottom (2)**
    56:19,19
**boxes (1)**
    38:10

**boy (1)**
    48:5
**brain (3)**
    46:25;48:22;51:5
**breach (1)**
    66:16
**break (4)**
    21:5;23:19;42:21;
    59:16
**briefing (1)**
    71:3
**briefs (3)**
    30:14;65:2;72:9
**bring (2)**
    11:13;40:2
**brought (2)**
    46:18;47:13
**Bryant (1)**
    4:15
**build (1)**
    58:7
**bulk (1)**
    8:25
**bunch (2)**
    29:17;38:9
**burden (1)**
    50:8
**burdens (1)**
    21:15
**business (1)**
    52:21
**busy (1)**
    40:4
**busybody (1)**
    41:2

**C**

**CA (1)**
    6:21
**called (2)**
    10:15;15:6
**calls (1)**
    31:15
**came (3)**
    44:6;54:19;58:11
**camera (3)**
    30:15;42:2,5
**can (26)**
    13:9;14:2;19:19;
    23:1,8;25:14;26:16;
    27:3;28:13;32:6;
    33:6;36:16;37:17,18;
    40:9,9,19;43:5;46:21,
    21;52:18;57:2,19;
    59:18;60:15;66:5
**Capital (3)**
    4:3,4;7:3
**capped (1)**
    70:2
**capping (1)**
    64:12
**care (1)**

46:21
**careful (1)**
    68:17
**carefully (2)**
    51:16;68:23
**CARNEY (1)**
    4:19
**CASE (31)**
    5:1;11:22;12:4,9,
    21;15:5,14;16:13,16;
    22:20;24:12;33:9;
    39:25;50:24;53:21;
    55:13;62:5;64:23;
    66:13,15,17,17,20;
    67:19;68:4,15,22,23,
    25;71:20;72:19
**cases (25)**
    12:1,2,11,12,14,18;
    14:18;15:13,14,18;
    16:11;22:19;34:22;
    39:13,13,15,18;40:2;
    66:19;67:14,18,23;
    68:24;71:15,21
**cause (3)**
    14:1,7,8;15:1,8,11,
    24;16:3;17:5;18:11,
    12;20:13,14;22:19;
    23:3;33:5;34:6,8;
    35:16;39:21;66:5,8,
    9;67:15,17;68:2,3,9;
    69:2,5,11
**centers (1)**
    7:24
**central (1)**
    22:24
**ceremonies (2)**
    7:12,14
**certain (4)**
    11:15;21:12;22:1;
    64:5
**certainly (4)**
    11:5,20;12:20;
    16:2;27:6;35:10;
    49:9;56:19;60:3,4;
    62:3;68:1
**certificate (2)**
    10:14;41:5
**certificates (5)**
    10:14;39:17,19;
    40:8,14
**challenge (1)**
    10:1
**challenging (1)**
    9:8
**chambers (2)**
    30:18;73:2
**chance (2)**
    45:14;56:11
**change (2)**
    39:4;67:1
**characterized (1)**
    51:7
**charge (1)**

46:25
**Charles (1)**
    7:9
**check (1)**
    38:9
**choose (1)**
    72:25
**chose (2)**
    43:16,19
**chosen (1)**
    43:5
**Chris (1)**
    62:5
**CHRISTOPHER (1)**
    5:7
**Circuit (2)**
    19:3;67:21
**circumstance (3)**
    16:25;18:19;66:19
**circumstances (5)**
    17:2;25:10;59:13;
    67:18;69:22
**citations (1)**
    36:9
**cite (1)**
    40:1
**cited (3)**
    15:14;58:15;71:15
**Citibank (1)**
    67:24
**claim (7)**
    22:10,12;23:4;
    24:15;69:6;70:18;
    71:11
**claims (6)**
    34:14;58:18,19;
    59:15;64:9,12
**clear (6)**
    16:19;27:24;31:22;
    45:7;67:5;72:1
**clearly (4)**
    12:10;34:3;37:12;
    57:21
**clerks (1)**
    42:5
**client (8)**
    10:13;28:15;31:18;
    43:25;46:12;50:18;
    51:2;60:21
**clients (20)**
    8:2,2,4;11:11;
    26:19;27:14,16;28:4,
    10,11;40:12,19;41:4;
    44:11;47:13;49:3;
    50:19,22;51:1;55:17
**client's (7)**
    9:9;35:23;37:14;
    39:8,17;40:16;50:5
**close (1)**
    45:24
**closely (4)**
    15:5;45:20;67:6,11
**closer (1)**

67:19
**Co (2)**
67:2,9
**Cohn (3)**
15:15,17;66:13
**colleagues (2)**
13:14;32:7
**collecting (1)**
25:13
**colorable (9)**
22:10,11;23:4,4;
24:15;34:13;69:6;
70:18;71:11
**combination (1)**
24:14
**coming (4)**
51:14;53:25;62:10,
12
**commensurate (1)**
50:8
**commented (2)**
68:13;71:4
**comments (2)**
42:16;61:8
**committee (1)**
62:16
**common (3)**
12:15,15;14:17
**common-low (1)**
58:22
**communication (2)**
51:3;52:2
**communications (11)**
35:8;44:12;49:4;
50:3,5,20;51:1;
60:21;68:20;69:8,10
**commutation (3)**
64:11,20;70:1
**compel (7)**
7:6;61:13,17;62:4;
63:3;65:19;71:23
**complain (1)**
55:15
**complaining (4)**
54:18,19;58:15,24
**complete (1)**
53:24
**complicated (1)**
13:2
**conceded (1)**
17:22
**concern (1)**
39:12
**concerned (1)**
51:11
**conclude (6)**
23:1,2;25:10;34:6;
41:2;42:4
**concluded (7)**
24:18;34:15;37:14;
68:21,25;69:4;73:13
**concludes (4)**
16:21;67:14;68:3;

71:10
**conclusion (6)**
13:3;15:12;35:22;
37:8,9;69:12
**condition (1)**
51:16
**conditioned (1)**
55:9
**conducted (1)**
44:2
**confer (1)**
31:15
**confidentiality (4)**
27:9,25;29:17;
50:22
**confirm (1)**
32:6
**conflict (29)**
16:19;20:18,22,24;
21:9;22:6,8,10,12,24;
23:5,11,17,23;24:15;
25:19;26:6,23;32:20;
34:12;52:11,16,23;
53:1;54:5;66:18;
69:15;70:8,19
**conflict-of- (1)**
69:6
**conflict-of-interest (2)**
70:12;71:12
**connection (2)**
7:25;63:1
**consensual (3)**
62:9,13,17
**consequence (1)**
66:25
**consider (3)**
50:7;68:5,16
**considerably (1)**
58:1
**consideration (1)**
30:1
**considerations (1)**
33:4
**considered (6)**
28:17;30:6,22;
31:24;34:4;68:2
**considering (1)**
48:12
**consistency (1)**
53:24
**consistent (3)**
18:4;47:18,20
**construe (1)**
61:2
**consulted (3)**
38:5;39:2;72:16
**contain (1)**
49:4
**contained (3)**
7:25;52:21;67:8
**containing (1)**
73:10
**contemplated (2)**

37:4;53:15
**contend (5)**
20:17;21:4,8;
24:20;52:10
**contended (1)**
69:14
**contention (8)**
23:19,23;25:19;
32:19;35:10;42:13,
14;52:15
**contentions (2)**
52:13;69:17
**context (14)**
7:23;14:1;16:7,8,
12,13,14;17:3;18:10,
22;39:16,24;66:4,15
**continue (1)**
21:15
**contract (1)**
33:7
**contrast (1)**
40:24
**control (1)**
31:3
**convince (1)**
10:10
**convinced (1)**
42:20
**corners (1)**
65:23
**Corp (1)**
67:24
**correspondence (1)**
34:1
**cost (1)**
50:8
**counsel (16)**
29:21,22;35:9;
42:9;49:8,10;50:11;
52:6;61:15;62:16,16;
65:1,12;72:2,23;73:3
**counsels' (1)**
49:1
**count (1)**
54:15
**couple (5)**
10:12;17:11;54:21,
22;56:13
**course (8)**
9:20;18:11;20:10;
27:20,24;43:20;50:6;
57:13
**COURT (280)**
7:2,12,16,20,23;
8:17,19,24;9:2,5,7,
16,20,21,22;10:7,9,
11,12,17,19,22,24;
11:2,6,10,14,16,19,
21;12:2,4,7,25;13:6,
8,15,17,20;14:12,16,
18,21;15:16,18;
16:10;17:3,9,11,25;
18:2,18,21,23;19:1,5,

6,8,16,19,23;20:1,4,
12,16,20,22,25;21:2,
8,11,17,19,23,25;
22:3,9,16,18,22;
23:16,18,22;24:1,5,
23,25;25:2,4,9,17,24;
26:2,6,21,23,24;27:7,
14,19;28:3,5,19,21;
29:1,3,8,11,25;30:4,
11,13,15,24;31:6,8,
10,17,20,22;32:3,10,
12,13,17,23,25;
33:11,13,15,19,22;
34:25;35:8,12;36:1,4,
6,12,16,18,20,23,25;
37:22;38:7,12,16,21,
24;39:4,6,9;40:6,11;
41:4,8,14,24;42:2,9;
43:1,4,8,21;44:5,11,
14,18,20;45:2,4,11,
25;46:5,7,12,14,16,
20;47:3,9,15,22;48:3,
5,9,17,20;49:5,14,17,
22;50:10,15;51:4,9,
20,22,25;52:4;53:3,7,
12,12;54:6,14,17;
55:3,6,11,20,24;56:9,
17,20,24;57:2,5,5,8,
13,16,18,19,19,21;
58:12,14;59:6,14,21;
60:7,12,15;61:4,13,
23,25;62:10,15,20;
63:4,6,14,18,21,24;
64:1,3,4,14,15,15,16;
65:1,4,5,6,8,15,20,22;
67:14;68:3,11,16;
70:17,22,22;71:1,2,4,
8,8,10,18;72:5,10;
73:12
**courtroom (1)**
28:9
**courts (7)**
17:2;26:24;27:2,5;
33:4;70:22;72:5
**courts' (1)**
55:10
**Court's (3)**
21:11;51:17;72:16
**cover (1)**
60:4
**covered (2)**
43:9;61:11
**current (3)**
10:13,17;11:3
**custody (1)**
31:2
**cut (1)**
24:8
**cutoff (2)**
47:22,24
**cutting (1)**
26:9

**D**

**data (3)**
30:8,8,21
**date (12)**
43:13,19,22,23;
44:23;47:22,24,24;
48:1,15;61:10,10
**DAY (4)**
5:19;25:22;38:4;
45:22
**days (5)**
26:17;54:13,15,21,
22
**deadline (3)**
54:20,21,23
**deal (20)**
12:19,23,24;20:11;
24:21;26:9,11;35:4;
45:24;53:10,23,24;
55:17;56:16;57:2,5,
19;58:5;62:12;63:24
**dealing (5)**
23:15;39:14;69:15;
70:9;71:12
**dealt (1)**
16:11
**debtor (2)**
9:24;64:10
**debtors (10)**
7:10;31:7;46:6,9;
54:14,16;55:11,19;
63:22;64:6
**debtors' (3)**
8:1;61:15;62:16
**DECHERT (1)**
5:11
**decided (4)**
24:19;34:23;48:14;
70:23
**deciding (1)**
54:11
**decision (25)**
12:9,12;14:19,20;
15:4;32:13;33:16;
35:18;37:17;38:24;
42:11;45:2;52:7;
58:11;62:21;65:16,
16;67:3;68:11,12,13;
71:17;72:3,11,20
**decisions (5)**
16:3;7;18:16;27:1;
66:10
**declarations (2)**
33:10;55:22
**default (16)**
10:18;11:3,6,7,7,8,
24;12:14,22;17:13,
18,20;58:21;66:20,
23;67:5
**defaults (2)**
10:13,17

**defense (2)**
33:23;37:23
**deficiency (1)**
32:8
**definitive (1)**
19:3
**delivered (1)**
30:18
**demonstrate (1)**
45:6
**denied (2)**
22:15;71:25
**denies (1)**
65:20
**DENMAN (1)**
5:6
**Department (5)**
12:10;22:20,23;
67:10;71:16
**depend (1)**
25:15
**depending (1)**
12:24
**depends (1)**
61:2
**deposition (9)**
17:13,22;33:20;
36:8;38:4,19;50:16;
52:5;71:23
**depositions (6)**
29:18;33:16;47:19;
49:2;55:20,23
**described (1)**
69:18
**details (3)**
11:13,17;22:1
**determination (1)**
33:6
**determine (1)**
17:17
**determined (1)**
69:9
**determining (1)**
41:16
**developed (1)**
49:2
**dicta (1)**
16:11
**difference (9)**
13:10;16:17,22,22;
19:2;34:21,22;50:19;
52:25
**different (14)**
9:19;10:24,25;
11:23;12:2,19;17:2;
19:12;24:19;56:14;
39:22;49:14;56:14;
69:25
**difficult (1)**
30:9
**digging (1)**
15:13
**direct (4)**

20:24,24;21:2,3
**directed (5)**
30:14,14;47:6;
65:1,4
**disagree (7)**
23:2;52:15,18;
53:17,18,19;59:10
**disagreed (2)**
52:20;66:7
**disagreement (3)**
53:9;54:3;59:6
**disclose (7)**
26:14;27:16;28:6,
7,11,15;71:23
**disclosed (4)**
24:19;26:5,16;73:1
**disclosing (3)**
26:10;28:24;29:3
**disclosure (7)**
54:7;69:2;70:14,
15,15,17,20
**disclosures (1)**
69:5
**discoverable (2)**
49:21;50:4
**discovery (12)**
7:4;22:17;23:7,10;
35:20;37:16;49:9;
50:6;58:4;64:4,23;
68:19;71:3,6
**discuss (2)**
63:20,22
**discussed (5)**
59:25;60:14,16;
63:8;71:21
**discussing (1)**
60:18
**discussion (2)**
14:23,25
**discussions (4)**
26:11;30:25;60:6,
21
**dispute (14)**
7:4,23,24;9:4;
13:22;14:5;30:23;
35:16;48:2;56:15,18;
58:1;64:4;65:9
**disputed (2)**
49:12,14
**disputes (1)**
71:6
**disputing (2)**
9:13;18:8
**distinction (6)**
12:11,12,21;13:4;
22:22;26:25
**distinctions (1)**
62:14
**District (5)**
16:1;66:12,14;
67:3,25
**divided (1)**
66:24

**doctrine (4)**
33:25;67:22;68:15;
72:4
**document (3)**
31:1;48:7;61:4
**documentation (2)**
12:23,24
**documents (24)**
29:14,16;30:16;
31:2;43:16,16;44:3,
10;45:16,17,21;
49:25;60:7,19;61:5,
18;63:10;65:5,13,17,
20;71:23;73:1,10
**DOL (1)**
66:16
**Dolinger (4)**
15:19,23;16:6;
66:11
**Dolinger's (3)**
16:2,23;27:1
**Dolin's (1)**
18:15
**dollars (1)**
40:25
**dollars' (1)**
40:20
**done (8)**
12:7;15:1,2;18:13;
31:25;34:19;60:25;
72:9
**down (3)**
21:5;23:20;62:7
**drafts (2)**
42:14,15
**drag (1)**
13:2
**draw (1)**
12:12
**drawn (2)**
12:21;24:16
**draws (1)**
12:10
**drew (1)**
21:11
**driving (1)**
42:11
**Dubel (1)**
46:3
**due (2)**
55:23;63:12
**Duff (11)**
30:1,6,9,20,21;
31:10,13,23;33:19;
42:10;53:18
**during (3)**
17:22;27:19;49:18
**duties (5)**
12:16,22;58:22;
65:22;67:1
**duty (3)**
17:23;59:4;66:16
**dwell (1)**

52:8

─────────
**E**
─────────

**ear (1)**
46:20
**earlier (2)**
65:11;17;68:13;
71:4
**early (1)**
46:1
**easier (1)**
58:8
**easily (1)**
59:19
**East (1)**
5:21
**EATON (168)**
4:9;7:20,22;8:24;
9:3,6,14,19;10:6,8,
10,16,18,20,23;11:1,
4,8,12,15,17,20,25;
12:3,6,17;13:1,7;
14:10,14,17,20;
15:13,17;16:9;17:1,7,
10;18:1,18,22,25;
19:4,7,15,17;20:9,12,
13,19,23;21:1,6,10,
18,21,24;22:1,7,14,
17;23:13,17,21,25;
24:2,11,24;25:1,3,8,
15,18,21;26:1,3,8,22;
27:6,10,18,23;28:4,
18,20,25;29:2,5,9,12;
30:3,5,12,23;31:7,9;
32:2,7,16,22,24;33:2,
12,14,18,21;34:21;
35:7,10,13;36:2,5,7,
15,17,19,22,24;37:1;
38:7,12;39:6,7,23;
40:9,17;41:7,9,23;
42:24;43:3,5,13;44:8,
13,16,19,21;45:10,
15;49:23;51:11;52:9;
56:10,12,13,19;57:7,
10,17;58:6;59:2,10,
20,23;60:10,13,16;
61:7,22,24;62:18;
66:7,10;69:13;70:10,
24;71:11
**Eaton's (3)**
7:17;31:18;45:25
**Eckstein (1)**
54:18
**economic (12)**
8:14;9:8,15;10:2;
28:23;52:14,18,24;
56:15,18;69:19,20
**economically (7)**
8:18;24:4,6,6,10,
21;54:9
**economics (2)**
42:10;54:4

**effect (1)**
24:4
**effective (1)**
53:12
**effectiveness (1)**
51:16
**efficient (1)**
58:8
**effort (1)**
54:24
**either (5)**
29:20;33:15;34:9;
44:16;71:6
**elected (1)**
17:21
**element (5)**
14:8;35:17;39:7,9;
40:1
**elements (3)**
14:2;66:5;68:6
**ELLIS (1)**
6:10
**else (10)**
28:9;29:1,4;35:4;
41:21;55:25;56:10;
59:21;61:21;64:3
**e-mail (2)**
45:23;48:5
**e-mails (1)**
44:6
**embarking (1)**
26:10
**embodied (1)**
25:25
**EMMA (1)**
4:10
**end (2)**
43:19;56:2
**engage (1)**
24:19
**engaged (7)**
20:17;21:4,7;
23:19;24:16;52:11;
69:14
**enough (2)**
63:19,24
**enter (3)**
33:16;42:11;48:14
**entered (4)**
51:18;53:13;64:7;
72:18
**entering (2)**
32:20;52:22
**entire (1)**
38:15
**entirely (1)**
8:25;47:18
**entitled (2)**
35:5;51:22
**entry (1)**
51:17
**enumerated (1)**
20:5

**ERISA (4)**
15:19;16:13;18:16;
39:13

**ESQ (13)**
4:8,9,10,19;5:6,7,8,
16,24,25;6:7,15,23

**essence (1)**
65:9

**essentially (4)**
21:15;29:16;64:12,
18

**establish (3)**
22:11;34:6;68:6

**established (10)**
9:24;20:14;23:14;
34:8;42:8,19,23;69:5,
11;71:2

**establishes (6)**
20:22;22:6,7;
42:21;66:20;70:7

**establishing (1)**
24:14

**estate (6)**
15:21;16:13,14;
18:17;56:22;66:18

**estimate (1)**
19:20

**even (5)**
16:14;35:21;47:10,
10;53:23

**event (9)**
10:18;11:3,6;
17:12,17,20;66:20,
22;67:5

**Everybody (4)**
20:2;26:11;54:9;
58:3

**everywhere (1)**
39:18

**evidence (10)**
23:18,22;24:2;
25:18;32:18;49:1;
52:12,15;55:18;
69:16

**exactly (1)**
19:10

**example (3)**
42:25;52:6;63:15

**exceed (1)**
70:4

**except (2)**
55:13;69:12

**exception (33)**
14:1,2,6,9;16:18;
17:6;18:9,10;20:15;
22:25;23:3;34:2,7,10,
13;35:5,17;41:17;
45:12;49:24;53:4;
61:20;65:1;66:4,5;
67:22;68:7,10,17,21;
69:1;71:13,20

**exceptions (1)**
29:18

**excess (1)**
40:20

**excite (1)**
45:5

**excited (1)**
45:4

**exculpatory (1)**
67:8

**excuse (3)**
17:5;49:7;50:6

**executed (2)**
26:3;47:24

**executor (3)**
15:20;39:15;66:18

**exhaustive (1)**
12:8

**exist (1)**
48:8

**existing (4)**
12:21;52:14;59:7;
69:18

**exists (1)**
20:15

**expedited (3)**
58:4;64:23;71:2

**expert (5)**
10:8;47:4;55:20;
69:21;70:5

**experts (3)**
55:17,18,22

**exposure (1)**
70:2

**express (2)**
19:11,11

**expressed (2)**
62:19;67:12

**extending (1)**
65:23

**extent (5)**
12:14,15;34:2;
44:1;72:1

**eyes (1)**
48:6

**F**

**F2d (1)**
67:20

**faced (1)**
51:13

**fact (17)**
8:13,15;22:3;25:4;
26:5,14;27:13;35:18;
39:11;47:18;52:17;
54:3;55:16;57:25;
63:10,13;72:7

**factor (1)**
42:11

**factors (2)**
24:13;63:14

**facts (10)**
18:9;22:9,11,14;
23:7,14;25:15;59:11,

17;71:22

**factual (2)**
34:21;45:8

**failed (2)**
26:14;68:9

**fair (5)**
8:23,25;9:25;29:6;
33:8;41:1;44:20;
51:22;61:2,8;64:19

**Fifth (1)**
67:20

**fifty (4)**
8:20;9:2,3;22:5

**file (5)**
43:20;49:25;54:14;
62:4;63:2

**filed (6)**
26:21,24;29:16;
54:16,20;63:4

**files (5)**
43:25;44:3,5,9;
45:17;48:23,23,24,
25;49:1,3,6,13,18,18

**filings (1)**
21:12

**filter (1)**
40:3

**final (2)**
26:3;51:12

**Financial (5)**
6:11;37:10,11,12,
13

**find (7)**
11:5;16:16;19:8;
23:7;36:11;56:4;
58:12

**finding (5)**
45:8,9;53:14,24;
55:10

**findings (16)**
7:24;8:3,8;26:18;
35:14;37:1;45:2,5;
51:14;53:21,22;57:1,
6,8;63:10,13

**fine (1)**
58:16

**fingertips (1)**
11:18

**finish (1)**
41:24

**firm (2)**
49:16;50:14

**firms (1)**
31:3

**firm's (1)**
49:18

**First (15)**
12:10;33:14,24;
35:17;42:24;45:15,
23;47:13;52:10;62:6;
65:21;66:11;67:2,10;
68:21

**five (1)**
31:15

**flippant (1)**

22:25;23:3;34:2,7,
10;35:4;39:13;41:17;
45:12;49:24;53:4;
58:22;61:19;64:25;
66:4,5,16,16;67:1,7,
16,21;68:6,10,17,21;
71:13,20

**Fifth (1)**
67:20

**fifty (4)**
8:20;9:2,3;22:5

**file (5)**
43:20;49:25;54:14;
62:4;63:2

**filed (6)**
26:21,24;29:16;
54:16,20;63:4

**files (5)**
43:25;44:3,5,9;
45:17;48:23,23,24,
25;49:1,3,6,13,18,18

**filings (1)**
21:12

**filter (1)**
40:3

**final (2)**
26:3;51:12

**Financial (5)**
6:11;37:10,11,12,
13

**find (7)**
11:5;16:16;19:8;
23:7;36:11;56:4;
58:12

**finding (5)**
45:8,9;53:14,24;
55:10

**findings (16)**
7:24;8:3,8;26:18;
35:14;37:1;45:2,5;
51:14;53:21,22;57:1,
6,8;63:10,13

**fine (1)**
58:16

**fingertips (1)**
11:18

**finish (1)**
41:24

**firm (2)**
49:16;50:14

**firms (1)**
31:3

**firm's (1)**
49:18

**First (15)**
12:10;33:14,24;
35:17;42:24;45:15,
23;47:13;52:10;62:6;
65:21;66:11;67:2,10;
68:21

**five (1)**
31:15

**flippant (1)**

44:15

**Floor (2)**
4:16;6:20

**focus (5)**
18:6;35:14;51:11;
65:17;70:11

**focusing (3)**
20:13;28:5;40:6

**Foerster (3)**
7:10;27:12

**folks (2)**
55:4,14

**follow (2)**
13:8;63:6

**followed (1)**
69:15

**following (1)**
65:21

**footnote (3)**
13:20;18:4;21:11

**form (1)**
50:5

**forth (1)**
66:22

**forward (1)**
55:13

**found (6)**
12:4;15:6,9;19:6;
34:13;50:23

**foundation (1)**
37:17

**four (2)**
31:15;65:23

**four-plus (1)**
38:19

**fours (1)**
18:22

**frame (1)**
42:3

**framework (1)**
14:23

**FRD (1)**
66:12

**Freddie (2)**
4:14;40:20

**free (1)**
27:15

**frequently (1)**
71:7

**Friday (1)**
55:23

**front (1)**
30:17

**FSupp (2)**
67:2,25

**full (4)**
29:6;38:4;42:25;
43:2

**fund (1)**
41:4

**fundamental (4)**
9:7;14:19,25;53:8

**fundamentally (3)**

(partial)
17;71:22
factual (2) ...
FGIC (44)
5:20;7:7;8:1,3,4,9,
10;9:10;10:4;13:22;
19:14;20:3;21:13;
23:24;24:17,23;25:2,
20,22;27:21;28:16;
34:20;35:23;37:14;
40:15,23;41:11,12;
42:11,16,18;45:24;
46:3;47:24;54:25;
63:1;64:6,7,9,13,21;
69:19,22;70:3

**FGIC-repped (3)**
18:1;20:10;40:21

**FGIC's (2)**
64:12;70:1

**Fidelity (1)**
67:2

**fiduciaries (1)**
8:7

**fiduciary (42)**
12:15;14:1,2,6,9;
15:20;16:12,18;17:5,
23;18:9,10,16;20:15;

9:12,14;69:20
**further (2)**
18:8;61:22

**G**

**gain (2)**
41:12;59:12
**gained (2)**
27:16;56:4
**GALLAGHER (1)**
4:2
**game (1)**
61:2
**gap (1)**
32:7
**Garner (3)**
39:25;67:20;71:19
**gave (3)**
37:24;54:20,21
**general (1)**
72:16
**genesis (1)**
40:3
**gets (1)**
53:10
**G-I (1)**
16:16
**given (4)**
28:21;29:16;56:5;
59:11
**GLENN (1)**
5:16
**goes (3)**
12:11;17:11;56:5
**Good (49)**
7:22;8:9;14:1,7,8;
15:1,8,11,24;16:3,15;
17:4,5;18:11,11,12,
12;20:13,14;22:18;
23:2;26:18;33:5;
34:6,8;35:16;39:21;
45:6,8,9;48:13;50:11,
11;52:19,23;53:10;
62:24;66:5,8,9;67:15,
15,17;68:2,3,9;69:2,
5,11
**govern (2)**
16:20,21
**Grand (1)**
6:19
**gravamen (1)**
38:23
**great (2)**
8:25;26:17
**Group (4)**
5:2;20:9;40:23;
62:6
**guess (8)**
7:20;10:2,9;11:21;
18:3;35:2;48:22;
52:25
**guiding (1)**

15:22

**H**

**hammered (1)**
24:22
**Hand's (1)**
12:11
**handwriting (1)**
36:17
**Hanover (1)**
67:9
**happened (2)**
60:4;61:10
**happy (1)**
36:10
**HARRISON (1)**
5:6
**hate (3)**
8:24;13:1;51:7
**Hathaway (1)**
6:18
**head (1)**
29:4
**hear (7)**
24:8;35:2;39:9;
41:25;43:9;45:13;
55:16
**heard (7)**
20:11;41:23;56:11;
58:9;62:2;63:3;64:3
**hearing (9)**
7:3;8:12;18:7;
42:4;64:15;65:6,11;
69:21;71:3
**hearings (5)**
57:23,25;58:4;
71:5,8
**heavily (1)**
12:7
**hedge (1)**
41:4
**held (1)**
40:4
**helpful (1)**
72:10
**here's (2)**
40:19;73:7
**Heyman (2)**
16:16,21
**himself (1)**
39:1
**Hoc (2)**
5:2;62:6
**hold (1)**
40:20
**holders (1)**
41:5
**Holdings (3)**
16:16;20:9;41:10
**holds (1)**
10:13
**Honor (77)**

7:9,22;9:6;10:6,16;
11:5,9,12;12:1;13:7;
15:14;17:1,8;18:20;
19:18,21;20:14,19;
21:7;22:1,14;23:13,
21;25:3,16;27:23;
28:18;29:10;31:13,
14;32:1,4;33:18,21;
35:11;36:11,17;38:3,
14;39:8,24;40:10;
41:7;44:9;46:19,23;
47:5,7,12,17,23,23;
48:11,19;49:7,9,16,
19;50:2,4,13,17,19;
51:6,10;52:17;54:8;
56:13;57:10;58:6;
59:2,10,24,25;60:10;
61:24;64:2
**Hoops (2)**
22:20;71:16
**hope (3)**
62:15,16,17
**hopefully (1)**
10:10
**hour (1)**
38:19
**hours (2)**
41:17;71:8
**HOWARD (1)**
5:24
**Hundreds (1)**
55:4

**I**

**idea (1)**
31:12
**identical (1)**
67:13
**identified (4)**
32:8;52:13;69:13,
17
**identify (1)**
70:10
**ie (1)**
17:16
**ii (1)**
13:24
**immediately (1)**
36:14
**important (1)**
20:7
**impose (1)**
16:15
**imposed (1)**
44:21
**impossible (1)**
54:9
**Inc (2)**
6:11,18
**in-camera (4)**
65:5,13;72:23;
73:11

**include (3)**
31:3;45:1;53:14
**included (2)**
25:24;27:25
**includes (1)**
64:11
**including (3)**
29:24;37:4;68:8
**incomplete (2)**
49:4;50:5
**in-court (1)**
57:23
**Indeed (4)**
16:9;17:23;30:12;
33:8
**indenture (17)**
11:22;12:16,22;
15:21;17:4;19:10;
58:22;66:19,21,22,
23,25;67:6,8,11,18;
68:22
**indentures (1)**
65:24
**indicate (1)**
67:10
**indicated (1)**
60:20
**indifferent (1)**
52:19
**inexplicably (1)**
28:25
**inferior (4)**
24:21;34:24,25;
35:1
**information (18)**
7:6;19:17,20;
22:18;27:16;28:2,8,
15;29:23;30:20;
31:13;35:21;37:19;
40:17,18;59:12,15;
69:3
**initials (1)**
13:17
**inquire (2)**
29:25;36:3
**instance (1)**
42:1
**institutional (3)**
46:10,11;53:19
**institution's (1)**
39:15
**instruction (2)**
29:20,22
**insurance (3)**
7:7;64:6;70:2
**insured (1)**
64:12
**intend (1)**
8:12
**intending (1)**
63:12
**interest (47)**
7:15;8:4,6,7;9:25;

20:18,21;21:9;22:6,8,
10,12;23:5,5,11,23;
24:15;25:19;26:7,23;
32:20;33:7;35:24;
37:15;39:8,25;40:16;
45:3;48:13;52:11,16;
53:1,16,18,20,23;
54:1,2,5,12;55:10,16;
66:1;69:7,15;70:8,19
**interested (1)**
38:16
**interests (6)**
8:14;13:23;26:19,
20;37:5;41:5
**interlopers (1)**
41:2
**internal (1)**
48:24
**interrupt (1)**
40:10
**into (14)**
14:24;21:5;32:20;
33:16;36:3;37:16;
42:11;46:18;47:13;
48:14;52:22;62:12;
63:15;64:7
**Investment (1)**
67:1
**Investments (2)**
12:9;19:9
**investor (2)**
28:25;69:4
**investors (44)**
7:4;8:4,10,14;
13:24;17:24;19:13,
15;20:6,9;24:10;
26:5,10,14;29:6;
37:5;41:10;46:10,11;
53:16,19;54:1,12;
55:7,16;57:11;58:8,9,
19,20;59:9;64:5,17,
19,20,24;65:2,23;
66:2,24;68:8,19;
69:10;70:25
**invoke (9)**
13:25;14:9;18:10;
34:7,13;53:3;66:3;
67:16;68:10
**invoking (1)**
17:5
**involve (1)**
66:19
**involved (4)**
15:20;45:20;54:25;
66:17
**involves (2)**
15:19,21
**involving (3)**
18:16,16;39:19
**Iridium (1)**
63:13
**issue (33)**
8:2;10:3;12:20;

13:5;14:22;16:7,19;
17:11;28:10,16;32:2,
16;39:22;41:10,22,
23;45:10;47:2;49:12,
15;50:21;52:6;58:10;
60:16;63:7;66:7;
69:20;70:5,7,12,13,
22,24
**issued (1)**
40:8
**issuer (1)**
66:24
**issues (12)**
15:2,9;24:7;49:14;
58:5;60:2;62:8,12;
65:3;68:18;69:7;
71:10
**items (3)**
60:13,22;69:17

## J

**JAMES (1)**
4:10
**January (3)**
43:15;46:1;66:14
**JEFFREY (1)**
6:15
**jettison (1)**
34:23
**Johnson (30)**
13:12;31:10,12,18,
21;32:1,4,11;45:20;
46:8,10,20,23;47:4,7,
12,17,23;48:4,7,11,
18,21;49:7,16,19;
50:2,13,17;51:5
**joinder (1)**
43:21
**joined (1)**
26:17
**JONES (1)**
5:19
**JSN (2)**
62:7;63:9
**Judge (22)**
12:8;15:19,23;
16:1,2,3,6,15,16,21,
23;18:15;19:1,9;
22:21;27:1;66:10;
67:4;68:1;71:17,18;
72:18
**July (2)**
65:4,7
**June (1)**
43:21
**Junior (1)**
5:2
**Justice (15)**
15:4;18:23;24:12;
33:23;34:8;35:18;
52:25;58:11;68:12,
14,23;69:4,24;71:15,

17
**justified (1)**
53:25

## K

**Kapnick (9)**
18:23;24:12;33:24;
34:9;52:25;68:14,23;
69:4;71:15
**Kapnick's (4)**
15:4;35:18;58:11;
68:12
**Kathy (1)**
40:22
**keep (2)**
18:11;72:25
**kept (2)**
44:11,11
**Kerr (5)**
7:8,9,9,14,17
**kind (1)**
58:7
**KIRKLAND (1)**
6:10
**KISSEL (1)**
6:2
**Kit (1)**
19:21
**knowledge (2)**
27:23;50:18
**knows (2)**
44:16;50:23
**Kruger (3)**
61:9,14,14

## L

**lack (2)**
52:23;57:14
**laid (1)**
59:11
**larger (1)**
13:5
**last (3)**
39:7;55:6;62:2
**later (2)**
16:2;46:19
**law (22)**
11:22;12:15,15,21;
14:17;16:17,17,20,
20;18:25;23:12;31:3;
47:1;48:22;66:20,25;
67:24,24;68:23,25;
71:22;72:19
**Lawrence (4)**
15:15,17,20;66:13
**Lawrence's (1)**
66:17
**lawyer (5)**
38:1;44:11;48:23,
24,25
**lawyers (6)**

27:11,12;28:13;
38:5;44:2,7
**lawyers' (3)**
44:3,5;45:17
**lay (2)**
24:13;34:5
**lead (2)**
13:3;25:10
**leading (2)**
65:10;71:20
**learn (1)**
27:19
**Learned (2)**
12:11;28:8
**least (8)**
10:23;21:13;31:15;
35:21;48:24;49:1;
58:21;72:15
**Lee (1)**
54:18
**legal (4)**
35:24;37:10;58:16;
66:8
**lengthy (1)**
14:25
**letter (12)**
13:11;15:14;18:4;
20:5;21:10;29:16;
30:14;39:10;47:1;
56:3;62:7;65:19
**letters (1)**
47:10
**level (2)**
13:25;66:3
**Levine (4)**
22:21;71:17,18,18
**Lexington (1)**
6:12
**liability (1)**
64:12
**likewise (1)**
67:23
**limitations (1)**
67:7
**limited (1)**
66:21
**limiting (1)**
49:9
**line (2)**
38:19;39:1
**Ling-Cohan (1)**
69:25
**listed (1)**
32:17
**listened (1)**
47:19
**literally (1)**
54:22
**litigat (1)**
50:6
**little (1)**
34:11
**LLC (1)**

4:3
**LLP (6)**
4:2;5:1,11;6:2,10,
17
**LNC (4)**
12:9;19:9;67:1,10
**lodge (1)**
57:17
**log (5)**
30:13;43:5,16;
60:19;72:25
**logged (8)**
43:7;44:25;45:16;
60:10,13,15,22,23
**logging (1)**
43:20
**logs (4)**
42:25;43:11;60:24;
61:1
**long (5)**
22:4,5;24:16;
25:13;70:3
**longer (2)**
21:16;66:24
**look (12)**
21:10;29:15;33:11;
34:9;39:12;40:1,2;
41:14;49:23;51:15,
20;56:3
**looked (2)**
34:10;43:11
**looking (2)**
41:5;63:15
**Los (1)**
6:21
**lot (6)**
39:11;41:17;42:14,
15;54:25;58:2
**lots (1)**
39:18
**loyalties (1)**
66:23
**LP (1)**
4:4
**lump (4)**
8:21;9:12;64:8;
70:4
**lump-sum (2)**
25:12;70:1

## M

**Mac (2)**
4:14;40:20
**Magistrate (9)**
15:19,23;16:2,6,6,
23;18:15;27:1;66:10
**major (3)**
26:25;55:3;70:21
**Major's (2)**
36:7;52:5
**maker (1)**
38:25

**makes (1)**
39:11
**making (3)**
32:13;44:19;62:21
**manage (1)**
59:4
**Management (1)**
4:3
**Manufacturers (1)**
67:9
**many (8)**
11:2;19:13;22:22;
26:17;27:13,13;58:4;
70:19
**many-days (1)**
54:24
**March (2)**
43:17;47:14
**Martin (4)**
15:14,19;66:11,15
**MARY (1)**
4:9
**master (2)**
7:12,14
**material (2)**
41:18;42:20
**materials (4)**
42:5;43:6;44:24;
61:1
**matter (10)**
8:12;14:15;18:17;
35:19;38:10;40:2;
52:17;65:7;68:13;
70:18
**matters (6)**
46:25;50:18;69:13;
71:7,24;72:13
**may (22)**
20:6,16;27:7;39:4,
23;41:23;43:18;
45:20;48:9,9,15;
52:4;53:17,18,18,20;
57:14;61:1;68:14;
70:4,4;72:13
**maybe (2)**
28:13;59:17
**MCKOOL (1)**
4:13
**mean (31)**
9:16;12:4,10;15:3,
25;16:10;18:3,6;
25:25;26:25;31:25;
32:15;35:2;37:24;
38:10;40:10;42:25;
44:6,7,15;45:5,12,13;
49:20,23;51:9,25;
58:18;62:15;63:6;
65:14
**meaningless (1)**
23:9
**means (1)**
52:1
**meant (1)**

40:3
**meantime (1)**
26:17
**mechanical (1)**
55:13
**mechanism (8)**
29:5,9,11;55:7;
57:11;58:8;70:25;
71:4
**mediation (25)**
27:9,17,20;28:8,
10;29:21;34:2;42:15;
56:6;59:24;60:1,23;
61:2,11,11,20;62:2,
21;63:2,15;72:11,14,
15,17,19
**mediator (1)**
72:18
**meet (3)**
24:11,14;31:15
**meet-and-confer (2)**
61:14;63:5
**meeting (1)**
69:8
**Mellon (6)**
5:12;15:5;18:24;
22:20;68:13;73:4
**members (1)**
40:22
**mentioned (3)**
17:16;43:24;71:16
**merits (4)**
52:20,24;54:4;
70:23
**MICHAEL (1)**
4:19
**might (3)**
19:10;54:9;68:16
**million (1)**
40:24
**mind (1)**
62:20
**minute (1)**
40:4
**minutes (2)**
17:11;54:23
**mispronouncing (1)**
19:23
**mistake (1)**
57:6
**moment (1)**
30:24
**Monarch (1)**
4:4
**money (1)**
41:3
**months (1)**
27:13
**more (12)**
39:16,20;41:12;
42:20;54:21,22,25;
58:1,8;67:6,11,19
**moreover (1)**

8:6
**morning (3)**
36:7;38:4,20
**Morrison (2)**
7:9;27:12
**most (5)**
12:7,8;15:5;16:10;
70:19
**motion (17)**
7:5;8:1;25:23;
26:18,24;29:13;
55:11;56:21;57:9;
61:13;62:4;63:3;
65:19,20,21;66:1;
71:22
**move (1)**
55:13
**much (4)**
34:18;40:12;67:19;
71:3
**Mukasey (2)**
19:9;67:4
**Mukasey's (1)**
12:8
**MUNGER (1)**
6:17
**must (4)**
18:12;52:22;55:14;
64:25
**myself (2)**
27:11;42:6
**mystery (2)**
15:3;43:14

## N

**NA (1)**
6:3
**name (2)**
13:17;19:23
**narrow (1)**
13:10
**National (3)**
66:11;67:2;73:5
**NDA (2)**
27:10;28:1
**necessarily (3)**
13:4;51:2;52:22
**need (16)**
20:8;33:2,9;35:18;
37:18;41:22;42:4,8,
21,23;60:23;65:18;
72:13,16,20,21
**needed (1)**
60:22
**needs (1)**
72:14
**negotiate (3)**
24:17;25:12;58:17
**negotiated (4)**
27:10,12,21;70:20
**negotiating (3)**
26:12;58:14;70:16

**negotiation (2)**
49:18;69:23
**negotiations (9)**
27:24;43:14;44:1;
46:1,3;47:14;49:15;
56:5;60:5
**neither (2)**
15:21;66:18
**net (1)**
70:4
**New (35)**
4:6,17;5:4,12,14,
22;6:5,13;12:15;
15:4;16:17,20;18:24,
25;22:19,22;24:12;
36:8,9;37:22;38:1,
25;52:4,5;59:21,23;
66:12,14,25;67:3,24,
25;68:12;71:18;73:4
**next (3)**
8:20;13:17;55:23
**NOAH (1)**
6:15
**nobody (1)**
47:10
**nobody's (1)**
33:25
**nonprivileged (1)**
59:15
**non-privileged (1)**
50:17
**noon (2)**
30:18;65:3
**normal (1)**
57:8
**noted (1)**
52:25
**Noteholders (1)**
5:2
**notice (3)**
26:13;29:5;58:9
**number (7)**
7:3;12:19;19:15,
20;20:6;24:24;40:5
**numbered (1)**
72:24
**numerous (4)**
44:6;57:23;71:5,8
**NY (7)**
4:6,17;5:4,14,22;
6:5,13
**NYS2d (1)**
67:9

## O

**object (8)**
8:16;29:7;55:7;
57:11,12,13,15;70:25
**objected (2)**
21:14;22:3
**objecting (2)**
53:9;55:12

**objection (2)**
21:19;57:17
**objections (2)**
21:22,25
**obligated (3)**
13:23;54:14;66:1
**obligation (6)**
12:13;13:25;38:9;
58:12;60:19;66:3
**obligations (8)**
11:23;19:10,11;
66:21;67:6,11,12,13
**obvious (1)**
36:3
**obviously (6)**
15:8;31:3;55:1;
71:19;72:4,24
**occurred (3)**
11:7;17:20,21
**occurs (1)**
66:21
**o'clock (2)**
57:24;62:7
**odd (1)**
55:8
**off (3)**
24:8;25:11;71:5
**officer (1)**
39:2
**off-record (1)**
71:6
**of-the-mill (1)**
56:15
**OLSON (1)**
6:17
**once (3)**
24:17;59:3;70:17
**One (44)**
4:15;6:4;7:21;
11:25;13:3,13;15:16,
23;17:10,14,16,18,
25;18:2,16,16;20:19;
24:7,15,24;28:13;
30:19;33:3,9;35:21;
37:1,13;38:4,19;
39:20;43:24;44:16;
48:6;50:23;54:7;
57:2;60:2;63:2;
67:19;69:17;70:17;
72:6,16;73:8
**ones (1)**
47:16
**one-week (1)**
70:14
**only (24)**
12:18;14:1,7;
15:23;24:25;25:2;
29:9;35:15,15;36:9;
37:15,18;39:3;41:4;
43:16;49:19;50:18,
23;57:19;58:6;59:23;
60:15;66:4;72:7
**open (1)**

32:11
**opinion (7)**
15:7;16:1,24;
33:24;68:1;71:15;
72:6
**opportunity (7)**
29:7;35:20;51:22;
55:14;57:12,13;
59:14
**oppose (2)**
51:23;64:17
**opposing (2)**
50:11;51:20
**order (10)**
7:25;23:3;24:11;
34:6;51:17;53:11;
62:11;65:15;72:17,
18
**orders (1)**
53:13
**order's (1)**
51:18
**ordinary (1)**
67:7
**ORENSTEIN (1)**
6:15
**others (5)**
9:24;15:9;20:10;
34:15,16
**otherwise (3)**
9:16;23:8;69:2
**ought (1)**
41:16
**out (20)**
11:5;12:18;17:10;
20:8;23:7;24:13,16,
22;34:5;37:2;40:3;
41:5,14,22;50:10,23;
56:4;59:11;60:17,18
**outside (4)**
15:24;48:25;49:10;
56:21
**outstanding (1)**
30:21
**over (12)**
7:15,19;8:19;9:11;
25:13;26:12;27:12,
24;32:6;43:14;46:4;
48:6
**overruled (1)**
21:19
**owe (2)**
17:23;58:21
**owed (1)**
65:22
**own (5)**
39:17;40:12;41:6;
44:9;59:5

## P

**page (4)**
13:20;15:15;21:10;

12-12020-mg   Doc 4276   Filed 07/18/13   Entered 07/18/13 11:39:56   Main Document

RESIDENTIAL CAPITAL, LLC, et al.   Pg 84 of 88

Case No. 12-12020-mg   July 17, 2013

30:19

**paid (3)**
8:22;9:17,19

**papers (1)**
42:8

**parameters (1)**
44:21

**parcel (1)**
27:21

**pardon (2)**
11:12;25:1

**Park (2)**
4:15;6:4

**parsed (1)**
68:18

**part (20)**
9:3;26:7;27:21;
28:17;33:3,24;35:2;
37:17,21;41:15;
45:19;51:2;54:11;
56:5;61:10;64:23;
70:8,9,11,19

**participate (3)**
27:9;29:13;35:20

**participated (2)**
28:10;47:19

**particular (9)**
21:11,16;32:2,7;
39:24;47:2;52:21;
53:2;72:12

**particularly (1)**
38:16

**parties (7)**
7:15;49:10,11;
53:9;70:20;72:8;73:3

**partner (1)**
27:11

**parts (1)**
21:5

**party (2)**
49:12;52:22

**patience (1)**
31:23

**Patrick (1)**
40:23

**pay (1)**
9:17

**payment (8)**
8:22;9:12;11:7,8;
25:12;64:9;70:1,5

**payments (2)**
9:1,11

**payout (1)**
70:3

**PC (1)**
4:13

**Peck (1)**
72:18

**pending (3)**
8:16;39:18;64:4

**people (2)**
40:4;52:18

**per (1)**

43:25

**perhaps (1)**
7:24

**period (9)**
25:13;27:13;43:9;
45:1,16,22;48:12;
70:14;72:9

**permit (1)**
53:3

**permitted (7)**
28:1,6,7;29:19;
35:19;36:2;63:16

**person (3)**
13:18;39:3,14

**personally (1)**
43:11

**persuaded (1)**
49:23

**persuasive (1)**
19:8

**ph (1)**
22:20

**Phelps (9)**
30:1,6,9,20,21;
31:11,23;33:20;
42:10

**phone (1)**
31:15

**picked (2)**
45:22;46:24

**picture (2)**
42:25;43:2

**pieced (1)**
43:22

**place (4)**
29:6;33:14;34:23;
37:19

**plainly (1)**
43:23

**plan (14)**
8:15;9:10,15,17;
10:4;21:14,20;24:17;
25:5;34:20;59:7;
64:22;69:22;70:3

**Plaza (1)**
6:4

**Please (1)**
7:2

**pm (2)**
65:7;73:13

**point (27)**
8:14;9:7,9;10:2,2;
13:7;14:19;15:1;
17:10;20:8,8;24:24;
28:12;32:24;41:9;
44:19,20;54:4;55:6;
56:1,22;58:6,21;59:3,
23;62:2;70:21

**pointed (2)**
58:25;59:8

**points (3)**
56:13;59:21;66:10

**pop (1)**

46:17

**posed (1)**
23:14

**position (12)**
8:19;14:24;18:3;
30:24;34:25;35:1;
40:24;55:5;57:14,20,
21;61:9

**positions (2)**
41:11;62:22

**possession (3)**
31:2;50:20,21

**possible (1)**
56:23

**post (1)**
12:22

**post-default (2)**
12:13;19:9

**potential (1)**
50:9

**potentially (1)**
68:22

**pre (2)**
12:13,22

**pre- (2)**
52:13;69:17

**precisely (2)**
50:23;71:1

**precluded (1)**
37:16

**pre-default (1)**
11:23

**pre-existing (7)**
8:15;9:14,16;24:3,
9;28:22;34:22

**prepared (2)**
34:4;36:13

**preparing (3)**
30:22;31:14,24

**present (4)**
8:20;42:25;43:2;
70:4

**presentation (1)**
69:24

**presented (1)**
71:22

**pressed (2)**
52:9;69:13

**presumably (1)**
44:3

**pretty (1)**
60:3

**previously (1)**
10:3

**primary (1)**
33:4

**principles (1)**
15:22

**prior (2)**
48:16;68:23

**privilege (30)**
23:8;29:21,23;
30:13,16;32:3;34:3;

35:5;42:22;56:6;
59:16,18,24;60:1,23;
61:3,12,20;62:21;
63:2;64:25;65:1,3,6;
71:13,24;72:12,14,
15,20

**privileged (12)**
7:6;22:18;37:19;
41:18;43:11;49:25;
60:19;61:18;68:19;
69:2;73:1,10

**privileges (2)**
42:15;65:14

**probably (1)**
46:24

**problem (2)**
36:5;52:4

**procedure (1)**
62:25

**procedures (1)**
63:6

**proceed (1)**
63:17

**proceeding (4)**
25:7;62:8;63:9;
64:13

**proceedings (1)**
73:13

**process (6)**
24:16,18;38:6;
61:11;63:8,8

**produce (7)**
31:2,13;37:24;
43:16;50:1;61:17;
63:9

**produced (3)**
32:15;44:24;45:17

**production (6)**
7:6;29:14;31:21;
43:19;45:21;65:20

**progenitor (1)**
67:21

**program (1)**
72:17

**promptly (1)**
54:16

**proof (1)**
24:20

**property (3)**
59:4,4,5

**proposal (1)**
34:24

**propose (1)**
63:11

**proposed (4)**
7:25;64:7,14;69:25

**prove (1)**
8:13

**provide (6)**
8:3,8;19:19;30:15;
65:4,13

**provided (11)**
8:17;9:15;24:4;

26:13;30:7;31:23,24;
64:6;70:6;72:23;73:4

**provides (4)**
24:5,6;25:5;54:13

**provision (2)**
28:6,12

**provisions (1)**
67:8

**proviso (1)**
14:6

**prudence (1)**
59:3

**PSA (8)**
25:22,23,25;26:2;
27:22;28:17;42:16;
54:20

**publicly (4)**
26:16;29:16;40:18;
58:10

**pulled (1)**
48:6

**purposes (6)**
13:21;14:5;18:7;
43:20;65:21,25

**pursuant (2)**
8:22;65:24

**put (7)**
7:22;28:1;29:6;
33:10;41:14;55:18;
62:20

**putback (1)**
58:18

**puts (1)**
72:4

**putting (1)**
52:6

---

**Q**

**qualified (1)**
12:18

**qualify (1)**
41:2

**quick (1)**
62:1

**Quintel (2)**
16:1;67:24

**quite (5)**
12:17;18:19;34:3;
56:23;68:14

**quote (1)**
66:22

---

**R**

**raise (5)**
32:9;55:25;59:22,
23;71:11

**raised (10)**
17:11;31:16;33:25;
34:1;42:2;43:8;54:6;
70:13,24;71:11

**raises (1)**

72:12

**raising (1)**
60:17

**range (5)**
9:23;43:13,22,23;
56:21

**ranger (1)**
44:23

**rather (1)**
32:11

**reach (3)**
65:16;69:12;72:21

**reached (1)**
26:15

**read (18)**
13:21;16:13,23,23;
18:5;36:22,23;37:2;
38:7,13,14;42:6,7,12,
13,19;43:1;71:14

**reading (3)**
11:22,25;12:2

**real (1)**
29:5

**reality (1)**
28:5

**reallocates (1)**
66:25

**really (9)**
7:24;10:2;12:23;
38:22;40:3;48:2,6;
51:7;53:10

**reas (1)**
25:23

**reason (10)**
11:21;12:18;26:16;
35:15;37:15;43:15,
24;45:1;49:2,3

**reasonable (5)**
10:1;33:8;41:1;
53:2;64:19

**reasonableness (4)**
9:23;33:12;34:17;
56:22

**reasonably (1)**
8:9

**reasons (6)**
24:18;26:4;37:13;
39:21;57:3;65:21

**recall (1)**
54:17

**received (3)**
9:11;43:10,11

**recent (1)**
68:14

**recognized (1)**
67:23

**recommendation (2)**
37:9,10

**record (7)**
45:8;57:24;62:5;
68:7;71:5,5;73:9

**recover (1)**
64:21

**recoveries (2)**
8:17,21

**recovery (2)**
9:15;24:4

**redacted (3)**
41:19,19,20

**reduces (1)**
64:20

**referring (1)**
46:2

**reflect (3)**
61:1;67:1;73:9

**regarding (3)**
7:4;69:10;71:24

**regardless (1)**
67:7

**regular (1)**
71:8

**rehabilitation (17)**
8:17;9:10;10:4;
21:13,14,20;24:17;
25:5;26:13;34:20;
53:12;59:7;64:13,22;
69:19,22;70:3

**rehabilitator (1)**
64:6

**relate (2)**
60:9;61:19

**related (3)**
60:5;69:6;71:6

**relates (1)**
61:5

**relatively (1)**
72:9

**releases (1)**
37:4

**relevant (6)**
43:23;44:22;45:16;
48:1,11;49:20

**reliance (3)**
33:23;37:23;38:10

**relied (2)**
31:13;32:5

**relies (1)**
12:9

**reluctance (1)**
72:12

**reluctant (2)**
41:15;42:22

**rely (1)**
68:11

**relying (1)**
72:2

**remaining (1)**
17:19

**remember (5)**
7:23;54:18;57:14;
60:19;73:6

**remote (1)**
60:8

**remotely (1)**
60:5

**repeatedly (1)**

42:9

**reply (2)**
45:14;56:11

**report (7)**
30:2,6,9,22;31:14,
24;42:10

**repped (1)**
41:11

**represent (2)**
47:16;49:12

**representation (1)**
44:8

**representative (2)**
17:14,15

**representatives (1)**
30:1

**represented (6)**
7:5;40:15;49:11,
15;64:17;68:9

**representing (1)**
31:4

**represents (1)**
20:9

**request (3)**
31:1;32:8;61:6

**requests (1)**
30:21

**require (4)**
21:15;27:2;57:5;
63:15

**required (9)**
14:9,14;31:1;55:9;
58:5;65:12;66:9;
69:2;71:1

**requirement (19)**
15:8,11,24;16:4;
17:5,6;18:12;20:13;
22:19;25:25;33:5;
39:21;65:15;66:8,8;
67:17;68:3,4,6

**requirements (4)**
14:7;58:14;67:16;
69:1

**requires (4)**
27:5;58:23;64:14;
70:21

**requiring (1)**
67:15

**ResCap (3)**
24:25;25:2;72:6

**research (1)**
12:8

**resemble (3)**
67:6,11,19

**Residential (1)**
7:3

**resolve (2)**
16:19;63:7

**resolved (1)**
62:8

**resolving (2)**
13:22;65:9

**respect (34)**

7:4;10:23,24;
13:24;15:2;16:6,18;
17:12,18,18;32:5;
33:2;34:11;35:18;
42:17;43:13;45:21;
52:24;53:4;56:14,23;
57:10;59:10,24,25;
60:1,22;63:13;65:18;
66:2;69:5;72:15,17,
19

**response (1)**
52:9

**responses (1)**
63:11

**responsibility (1)**
46:25

**responsible (1)**
13:18

**responsive (4)**
44:4,9

**restricted (4)**
27:15;30:4,5;43:24

**result (8)**
24:7,10;25:5;
28:23;52:14;64:8;
69:19;70:1

**resulted (1)**
44:24

**results (2)**
25:12;45:11

**return (1)**
72:22

**returned (1)**
73:9

**review (7)**
30:15;42:3,5;
43:10;60:15;65:5,13

**reviewed (5)**
30:18;60:8;65:17;
72:23;73:10

**reviewing (1)**
42:20

**revisited (1)**
52:8

**RICHARD (1)**
5:25

**right (37)**
7:2;9:20;10:9;
11:16,19;12:17;13:2;
14:22;15:25;18:20;
19:25;20:12;25:17;
26:3;27:18;28:19;
32:25,25;46:15,18;
48:20;51:25;52:3;
53:9;55:24,25;56:9,
12,25;57:7,10;58:6;
59:21;61:25;63:25;
64:1,3

**RMBS (7)**
6:3;7:6;17:14;
39:19;64:5,7;68:15

**room (1)**
54:10

**rough (2)**
36:10,13

**round-the-clock (2)**
54:24;55:5

**rule (4)**
39:4;52:20;63:14;
72:3

**ruled (1)**
19:3

**ruling (3)**
20:20;65:14;72:7

**run- (1)**
56:14

## S

**same (6)**
17:22;19:10;25:21;
26:8;28:10;30:7

**satisfaction (1)**
64:9

**satisfied (3)**
9:25;18:13;39:22

**saw (3)**
41:20,20,21

**saying (7)**
18:5,12;38:8,12,
18;62:22;63:12

**scenario (1)**
50:7

**schedule (4)**
29:15;65:10,12;
71:2

**scheduled (1)**
64:16

**scheduling (2)**
62:11;71:7

**scope (1)**
72:19

**screening (1)**
28:1

**se (1)**
43:25

**search (8)**
43:25;44:9,22,23;
48:25;49:5,17;50:8

**searched (3)**
48:23,24,24

**seated (1)**
7:2

**second (4)**
15:16;19:3;66:13;
70:13

**secret (2)**
27:4;51:12

**section (1)**
38:15

**Secured (1)**
5:2

**securities (4)**
39:18,24;40:21,25

**seek (3)**
29:14;45:2;54:14

**seeking (8)**
22:12;23:24;25:20;
27:25;32:20,21;45:4;
63:13
**seem (4)**
12:14;17:2;19:12;
39:20
**seemed (1)**
16:15
**seems (4)**
39:16;44:25;55:8;
62:25
**self- (5)**
23:4,14;69:14;
70:8;71:11
**self-dealing (13)**
20:17;21:4,7;
22:23;23:5,5,11,19,
21;34:12;52:11;69:6;
70:10
**self-evidently (1)**
44:25
**self-interest (1)**
41:6
**sense (1)**
40:16
**sent (1)**
62:6
**serve (2)**
22:21;49:12
**serving (1)**
30:25
**sessions (1)**
28:11
**set (6)**
27:8;44:24;53:11;
64:25;65:6;66:22
**sets (1)**
14:22
**settlement (79)**
8:1,3,9,13,22;9:8,
22,23,25;13:24;
20:20;22:13;23:24;
24:19;25:12,20,22;
26:4,11,25;27:2,3,20;
28:16,23;32:21;
33:17;34:17,18;
35:23;37:3,14;40:23;
41:12;42:12,16,18;
45:7,7;47:13,25;48:4,
12,14;50:24;51:15;
52:7,21,24;53:5,11,
15;54:7,10,11,12;
55:1;56:24;58:13,17;
59:8;64:8,11,14,15,
18,19;65:10;66:2;
69:9,10,23,24,25;
70:13,16,21;71:1;
72:3
**settlements (1)**
70:20
**settlement's (1)**
9:18

**settling (1)**
9:12
**seven (1)**
54:13
**Seventh (1)**
4:5
**several (1)**
30:25
**SEWARD (1)**
6:2
**share (1)**
28:2
**shareholder (2)**
15:25;39:16
**shareholders (1)**
40:4
**shares (1)**
40:5
**sheet (2)**
25:24;42:16
**sheets (1)**
28:17
**shop (1)**
46:24
**SHORE (15)**
5:7;47:9;61:25;
62:1,5,11,18,24;63:5,
7,19,20,22,25;64:2
**short (4)**
17:7;49:21;57:22;
72:9
**shortcoming (1)**
31:19
**shorter (1)**
22:5
**shouldering (1)**
21:15
**show (8)**
10:10;14:16,18;
15:1,11;23:10;26:6;
68:9
**showing (4)**
14:8;50:4;67:15;
69:1
**shown (3)**
14:2,7;66:6
**shows (1)**
26:23
**sic (2)**
16:15;18:15
**side (2)**
26:10;50:5
**SIDMAN (1)**
5:24
**SIEGEL (10)**
5:16;38:2,3,8,14,
18,22;39:1,5;73:4
**sign (6)**
13:14;27:8,15;
47:3,10;50:22
**signatures (1)**
47:4
**signed (11)**

13:12,12;22:4;
25:22,23;26:15;
27:10;40:23;43:18;
54:7;70:17
**significant (1)**
41:3
**significantly (1)**
41:12
**signing (2)**
28:23;70:13
**signs (2)**
47:11;58:13
**similar (1)**
69:12
**simple (1)**
37:24
**simultaneous (1)**
65:2
**sitting (3)**
28:9;30:17;47:9
**SMITH (1)**
4:13
**so-called (1)**
40:4
**SODERBERG (1)**
5:8
**solely (2)**
13:21;59:9
**somebody (3)**
28:9;36:1;46:16
**somebody's (1)**
48:3
**someone (1)**
52:20
**somewhat (2)**
7:23;8:25
**sorry (5)**
40:9;46:23;47:11;
60:12;63:19
**sort (5)**
30:10;46:23,24;
50:10;67:21
**sought (5)**
20:20;26:18;35:14;
57:1;68:19
**sounds (1)**
34:17
**sources (1)**
72:16
**South (2)**
6:19;40:24
**Southern (5)**
16:1;66:12,13;
67:3,25
**speaking (3)**
19:22;20:2;46:16
**specific (6)**
23:6;39:14;47:16;
60:8;68:18;72:17
**specifically (9)**
16:3;22:11;24:1;
34:7;55:9;65:17;
67:15;69:5;71:16

**spent (1)**
41:17
**sponsors (1)**
25:6
**spring (1)**
32:11
**stake (1)**
41:3
**standard (6)**
9:21,22;24:14;
41:16;56:20;59:3
**standing (1)**
57:15
**start (1)**
7:18
**state (10)**
8:16;9:21;57:13,
17,21;64:13,15;
68:11;70:22;72:5
**statement (6)**
8:23;14:3;41:24;
45:18,25;62:8
**States (1)**
18:18
**status (3)**
30:20;31:8,10
**still (2)**
62:10,11
**stipulate (3)**
13:22;14:5,24
**stipulated (3)**
13:25;65:25;66:3
**stipulating (1)**
18:5
**stipulation (1)**
14:4
**Stonehill (1)**
4:3
**stood (1)**
41:12
**straight (1)**
56:6
**straightforward (1)**
57:4
**Street (1)**
5:21
**strikes (1)**
32:14
**structures (1)**
12:20
**stuff (3)**
7:21;41:19;43:2
**su (1)**
24:6
**subject (4)**
24:20;29:23;61:21;
64:13
**submissions (2)**
65:8;72:8
**submit (1)**
65:2
**submitted (1)**
7:25

**subsequent (1)**
71:17
**subsequently (1)**
71:18
**subset (2)**
39:11;44:25
**substance (1)**
29:20
**substantially (2)**
64:20;68:12
**substantiate (1)**
55:4
**sufficiency (2)**
39:8,25
**sufficient (5)**
13:25;18:9;58:2;
66:3;71:12
**suggest (2)**
59:8;65:15
**suggesting (1)**
27:6
**suggestion (1)**
45:24
**suits (1)**
15:25
**sum (4)**
8:21;9:12;64:8;
70:4
**superior (10)**
8:18,21;9:15;24:4,
6,10;28:23;52:14;
59:7;69:18
**superiors (1)**
39:2
**supplemental (1)**
63:11
**support (10)**
20:11;22:9;23:16,
22;25:18;52:12;
59:17;66:9;69:9,16
**supporting (1)**
52:7
**supports (9)**
15:12;23:18;32:19;
42:12,13;45:8;52:15;
59:15;70:18
**suppose (3)**
24:7;39:7;70:15
**Supreme (2)**
18:18;70:22
**sure (4)**
41:4;47:25;56:17;
57:20
**surrounding (1)**
69:8
**suspect (1)**
43:6
**Sweet (7)**
16:1,3,15,16,21;
19:1;68:1

---

**T**

**table (1)**
41:15
**talked (1)**
34:16
**talking (1)**
62:12
**telephone (1)**
57:25
**TELEPHONICALLY (2)**
6:15,23
**telling (1)**
23:6
**tent (1)**
46:18
**term (5)**
25:24;27:25;28:17;
42:16;70:3
**terminate (1)**
51:18
**terms (13)**
8:11;9:19;24:17;
26:12;27:18;29:18;
37:18;39:7;48:12,23;
52:18,21;57:5
**terrible (1)**
55:17
**test (4)**
9:25;24:11;37:18;
40:3
**testified (2)**
17:15;35:22
**testimony (10)**
10:8,20;17:20;
43:14,18;46:3;47:20;
69:21;70:5;71:24
**thereby (1)**
22:4;37:4
**therefore (7)**
41:11;43:16;44:2;
54:1;60:24,25;61:11
**therein (1)**
37:5
**there'll (2)**
62:13,17
**there're (1)**
62:25
**Third (6)**
22:20,23;70:20,24;
71:16;72:19
**THOMAS (1)**
6:23
**though (4)**
35:21;53:22,23;
62:10
**thought (5)**
23:13;26:12;35:12;
53:23;72:8
**thoughtful (1)**
15:7
**three (9)**
30:17;32:17,25;
42:18;52:13;69:13,
17;71:10;72:15

**tight (3)**
42:3;65:10,12
**timely (1)**
65:8
**today (19)**
9:17;25:13;33:25;
39:4;42:4;57:25;
61:16,17;62:21,22;
65:7,14;68:8,16;
70:5;72:4,7,13,20
**together (1)**
40:19
**told (1)**
46:6
**TOLLES (1)**
6:17
**tomorrow (3)**
27:7,8;62:10
**took (5)**
17:13;26:5;30:24;
31:9;61:9
**top (1)**
56:6
**total (3)**
19:15;40:7,14
**tranches (2)**
39:11;40:13
**transaction (2)**
49:11;53:2
**transactions (2)**
37:4;53:15
**transcript (5)**
36:10,12,13;38:13,
15
**treat (3)**
17:21;59:4;65:22
**Treating (1)**
65:19
**trial (1)**
24:21
**trigger (4)**
23:2,3;41:17;71:12
**triggered (2)**
49:24;68:7
**triggering (2)**
22:24;45:12
**triggers (1)**
35:4
**true (3)**
48:9,10;49:22
**trust (16)**
8:10;10:13,25;
13:4;17:15,18;18:1;
19:11;37:6;39:12,19;
47:1;48:22;51:6;
64:5;67:9
**Trustee (21)**
6:3;10:21;12:13,
16,22;15:21;17:4;
19:10,11;36:6;58:13,
17,20;66:16,19,23;
67:12,12,18;68:22;
70:19

**trustees (73)**
7:7;8:7,8,16;9:11,
24;13:22;17:14,25;
18:2,8;20:3,17;21:4,
7,9,12,16;22:4,10,12;
23:19,23;24:3,16;
25:10,11,19;26:7,8;
32:19;33:5,9,16,22;
34:23;35:14;37:13;
43:5;45:22;46:14;
47:15;48:14,24,25;
52:10;54:10;55:14,
19;56:23,25;59:9;
60:25;61:9,17;64:7,
10;65:2,4,22,24,25;
69:7,14;70:8,9,11,16;
71:23;72:2
**trustees' (10)**
29:25;35:1;42:9;
47:20;53:17;58:18;
64:24;65:12;66:25;
69:8
**trustee's (4)**
11:23;66:21;67:6,
11
**trusts (19)**
7:7;8:5,6,8;11:2,
10;17:19,22;19:13;
20:10;21:16;24:25;
25:2,6,11;40:13,15;
41:6,11
**try (4)**
8:13;13:1;63:7,22
**trying (6)**
7:21;13:9;18:14;
24:13;35:13;40:15
**turn (3)**
7:15,19;33:5
**turned (1)**
32:6
**two (20)**
15:13;16:7;17:16;
18:15;19:2;21:5;
26:24;27:1,2,5;28:17,
21;34:1,22;52:25;
55:10;62:25;66:10;
70:21;72:17
**type (1)**
48:7
**types (1)**
56:3

**U**

**ultimately (1)**
21:24
**Um-hum (1)**
51:21
**unable (1)**
17:19
**uncertainty (1)**
25:13

**unclear (3)**
12:14;34:11;60:3
**under (9)**
9:10;10:3;27:18;
34:19;35:17;50:2;
60:11;64:21;67:23
**underlie (1)**
30:9
**underlying (5)**
30:7,19;31:11,13;
49:11
**undertaking (1)**
55:3
**undisputed (1)**
27:13
**unfortunately (1)**
40:17
**unilateral (1)**
27:4
**United (1)**
18:18
**unknown (1)**
26:4
**unless (2)**
38:17;61:24
**unnecessary (1)**
68:5
**unreasonable (1)**
34:19
**unredacted (2)**
41:20,21
**up (15)**
13:8;15:13;28:1;
39:14;46:17,24;
48:21;50:23;53:11;
55:18;56:5;58:11;
59:17;63:18;69:15
**upon (1)**
48:13
**use (1)**
44:24
**useful (1)**
36:11
**using (1)**
33:23
**usually (1)**
50:10

**V**

**Valley (1)**
66:11
**valuation (2)**
56:15,18
**value (3)**
8:20;56:15;70:4
**VANESSA (1)**
5:8
**vast (1)**
8:25
**versus (3)**
25:13;53:1;70:2
**view (5)**

**8:15;9:9;53:17;**
56:22;60:3
**virtually (1)**
29:19
**vis-a-vis (1)**
41:10

**W**

**waived (1)**
53:14
**waiver (1)**
68:15
**walk (2)**
56:25;57:2
**wall (1)**
28:1
**WALPER (1)**
6:23
**wants (1)**
46:20
**way (8)**
20:17;21:3,8;51:8;
52:10;55:13;69:14;
72:11
**ways (2)**
20:19;62:25
**Wednesday (1)**
65:7
**week (5)**
29:2,3;54:7;55:23;
70:17
**WEITNAUER (36)**
13:13,16,18;19:19,
21,21,25;20:2,5;
45:13,19;46:2,6,9,11,
13,15,18,22;47:6,7,
12;51:7,10,21,24;
52:3,17;53:6,8;54:8;
55:2,4,8,22;56:2
**Weitnauer's (2)**
7:18;13:11
**Welcome (1)**
41:7
**Wells (7)**
10:20;17:14,17,23;
19:22;49:7,15
**weren't (2)**
60:10,13
**what's (9)**
9:3;15:16;29:11;
31:10;40:14;50:11;
56:24;60:17;72:7
**whereas (1)**
26:11
**Whereupon (1)**
73:13
**whisper (1)**
46:20
**WHITE (2)**
5:1;62:5
**whole (1)**
38:9

**who's (2)**
7:21;73:6
**whose (1)**
28:9
**willing (1)**
14:5
**WILLKIE (6)**
4:2;7:5;50:14;
64:17;65:19;68:9
**wish (1)**
64:3
**withdrew (2)**
21:21,25
**withheld (2)**
30:16;65:6
**within (4)**
31:2;44:3;52:21;
54:13
**without (7)**
18:7;28:24;29:3;
54:7;70:14,15,20
**witness (3)**
35:21;36:8;37:2
**witnesses (3)**
29:19;35:21;47:20
**WL (1)**
66:13
**Wolfinbarger (2)**
67:20;71:19
**wool (1)**
48:6
**word (1)**
54:24
**words (1)**
13:19
**work (1)**
58:2
**works (1)**
57:22
**worth (1)**
40:20
**wrap (4)**
8:10;24:25;25:2,6
**wrapped (5)**
7:7;8:5;19:13;
40:15;64:5
**written (2)**
22:21;48:5
**wrong (2)**
18:24;29:11
**wrote (2)**
15:7;47:1
**WYNNE (1)**
5:25

## Y

**year (1)**
43:17
**years (5)**
8:20;9:2,3;22:5,22
**yesterday (4)**
10:21;17:13;30:18;

65:3
**York (32)**
4:6,17;5:4,12,14,
22;6:5,13;12:15;
15:4;16:17,20;18:24,
25;22:20,22;24:12;
36:8,9;37:22;38:25;
52:4,6;66:12,14,25;
67:3,24,25;68:13;
71:18;73:4
**York's (1)**
38:1

## 1

**10004 (1)**
6:5
**10017 (1)**
5:22
**10019 (1)**
4:6
**10022 (1)**
6:13
**10036 (3)**
4:17;5:4,14
**1093 (1)**
67:20
**1095 (1)**
5:13
**109530 (1)**
66:13
**10th (1)**
43:21
**1155 (1)**
5:3
**12-12020 (1)**
7:3
**1333 (1)**
67:3
**1357 (1)**
67:25
**140 (1)**
66:12
**15 (1)**
21:11
**16 (2)**
64:16;65:4
**17 (1)**
65:7
**18th (1)**
43:17
**19 (1)**
64:16
**1970 (1)**
67:21
**1983 (1)**
67:25
**1991 (1)**
66:12
**1995 (1)**
67:10
**1996 (1)**
67:3

**19th (3)**
46:19;47:14;51:19

## 2

**2 (1)**
13:20
**2002 (2)**
66:13,14
**2013 (3)**
48:15;64:16;68:14
**20th (1)**
68:14
**222 (1)**
5:21
**23rd (2)**
43:18;48:15
**25th (1)**
66:14
**291 (1)**
66:12
**29th (1)**
63:12

## 3

**3 (2)**
62:7;65:7
**30b6 (1)**
36:8
**350 (1)**
40:24
**355 (1)**
6:19
**35th (1)**
6:20

## 4

**4:37 (1)**
73:13
**41st (1)**
5:21
**430 (1)**
67:20
**47th (1)**
4:16

## 5

**5 (2)**
13:20;57:24
**520 (1)**
67:9
**527 (1)**
67:10
**567 (1)**
67:25

## 6

**6 (1)**
21:10

**601 (1)**
6:12
**632 (1)**
67:9

## 7

**787 (1)**
4:5

## 9

**90071 (1)**
6:21
**9019 (1)**
57:9
**935 (1)**
67:2