WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore
Harrison L. Denman

-AND-

MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Gerard Uzzi
Dennis C. O'Donnell

Attorneys for the Ad Hoc Group
of Junior Secured Noteholders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**MOTION OF AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS**
**FOR ORDER IN AID OF MEDIATION AND SETTLEMENT**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The ad hoc group (the "Ad Hoc Group") of holders or managers of holders of

9.625% Junior Secured Guaranteed Notes due 2015 (the "Junior Secured Notes") of Residential

Capital, LLC (together with its affiliated debtors in the above-captioned cases, the "Debtors"), by

and through its undersigned counsel, hereby files this motion (the "Motion") for an order in the

form attached as Exhibit A (the "Proposed Order"), pursuant to section 105(a) of title 11 of the

United States Code (as amended, the "Bankruptcy Code"), rule 7016 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), rule 9019-1 of the Local Bankruptcy Rules for

the Southern District of New York (the "Local Rules"), and General Order No. 390 ("General

Order 390") of the United States Bankruptcy Court for the Southern District of New York to aid

in mediation and negotiation.  In support of the relief requested in the Motion, the Ad Hoc Group

respectfully states as follows:

## BACKGROUND

1.      On December 26, 2012, the Court entered an order appointing Judge

James M. Peck as mediator (the "Mediator") in connection with these cases.  Order Appointing

Mediator [Docket No. 2519] (the "Mediator Appointment Order").  Subsequently, the Court

extended Judge Peck's term as Mediator, most recently to October 31, 2013 or such earlier date

as Judge Peck declares in a written order that the mediation is at an impasse and should be

terminated.  Order Extending Appointment of Hon. James M. Peck as Mediator [Docket No.

3101] and Order Further Extending Appointment of Hon. James M. Peck as Mediator [Docket

No. 3877].

2.      On May 19, 2013, the Debtors, the Creditors' Committee and certain

creditors (the "Consenting Creditors") executed a plan support agreement (the "Plan Support

Agreement").  No holder of Junior Secured Notes (the "Junior Secured Noteholders") is a party

to the Plan Support Agreement.  The Ad Hoc Group has asserted that the Junior Secured

Noteholders are entitled to post-petition interest on the Junior Secured Notes and that any non-

consensual plan would need to provide for the payment of such interest.  The Debtors, the

Creditors' Committee and the Consenting Creditors have disputed the entitlement of the Junior

Secured Note to post-petition  interest.

3.      In connection with approval of the Plan Support Agreement, the Court suggested, and the Ad Hoc Group, the Debtors, and the Creditors' Committee agreed, to submit their dispute regarding the Junior Secured Noteholders' entitlement to post-petition interest to mediation, subject to reaching agreement regarding the treatment of confidential information.  To date, however, the members of the Ad Hoc Group have not been able to participate in the mediation because of uncertainty as to whether such participation would expose them to liability.

4.      One trend that has developed to address these concerns is for parties to agree to the disclosure of the results of failed settlement discussions at the conclusion of such discussions.  See, e.g., Energy Future Holdings Corp., Current Report (8-K) (April 15, 2013), a copy of which is annexed hereto as Exhibit B.[1]  Alternatively, at least one other court has entered an order designed to clarify that parties who engage in settlement discussions are not imputed with special status or duties as a consequence of engaging in such discussions.  See In re Vitro S.A.B. de C.V., Case No. 11-33335-hdh-15  (Bankr. N.D. Tex.) (January 26, 2012) [Docket No. 311], a copy of which is annexed hereto as Exhibit C.  The Ad Hoc Group respectfully requests that this Court enter such an order.

5.      Specifically, the Proposed Order is narrowly tailored and would ensure that parties participating in the mediation are not, among other things, deemed to become insiders or temporary insiders of the Debtors or fiduciaries for other parties in interest due to their participation in the mediation and settlement process.  The Proposed Order would also prevent parties in interest from seeking remedies in these cases against any party participating in the mediation based upon such parties engaging in trading of the Debtors' securities while not subject to a confidentiality agreement.  Importantly, the Proposed Order, by its express terms is

---

[1]      In this case, the prepetition confidentiality agreement signed by certain Junior Secured Noteholders required disclosure of failed settlement discussions.

not binding on any governmental entity seeking to enforce securities laws in actions or

proceedings outside the bankruptcy cases.  Accordingly, the Proposed Order does not seek to

immunize parties against violations of federal securities laws.

6.    The Ad Hoc Group has shared the Proposed Order with the Debtors and

Creditors Committee and understands that each supports entry of the order.  The Ad Hoc Group

has also shared and discussed the Proposed Order with the Mediator and will defer to the Court

to obtain the Mediator's views directly from His Honor as the Court determines is appropriate.

7.    As more fully set forth below, the Ad Hoc Group submits that this Court

has ample authority to enter the Proposed Order.

## **RELIEF REQUESTED**

8.    By this Motion, the Ad Hoc Group seeks entry of an order in aid of

mediation and settlement in form and substance as set forth in the Proposed Order that will

enable the principals of the Junior Secured Noteholders to participate in negotiations and

mediation with the other parties in interest without fear that they will be subjecting themselves to

liability for participating in the mediation or negotiations or for keeping settlement offers made

in connection therewith confidential as required by the Mediator Appointment Order and General

Order 390.

## **JURISDICTION**

9.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).  Venue

is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the

relief sought herein is section 105(a) of the Bankruptcy Code, as supplemented by Bankruptcy

Rule 7016, Local Rule 9019-1, and General Order 390.

## BASIS FOR RELIEF REQUESTED

10.    Section 105(a) permits courts to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Code]." 11 U.S.C. § 105(a). Bankruptcy Rule 7016(c)(2)(I) provides that a "court may consider and take appropriate action on . . . settling the case and using special procedures to assist in resolving the case when authorized by statute or local rule."

11.    Courts have authority to issue orders in aid of settlement and negotiation pursuant to the authority granted to them by Section 105(a). See Shearson Lehman Brothers, Inc. v. Munford, Inc. (In re Munford, Inc.), 97 F.3d 449 (11th Cir. 1996) (finding that section 105(a) and Bankruptcy Rule 7016 gave bankruptcy court authority to enter bar order in aid of settlement); see also In re Bambi, 2013 BL 124558 at *4, Case No. 11-36831 (Bankr. S.D.N.Y. May 9, 2013) (finding that procedures requiring parties to engage in "loss mitigation" was "consistent with Congress' and the federal courts' general encouragement of mediation, as well as with section 105(d) of the Bankruptcy Code, Bankruptcy Rules 7016 and 9014, and courts' inherent power to manage their own docket."). Additionally, the court in Vitro has entered an order substantially similar to the Proposed Order to address the very same risks the Proposed Order seeks address. See Ex. C (Vitro S.A.B. de C.V. (January 26, 2012) [Docket No. 311]).

12.    The Proposed Order is intended to clarify the status of mediation participants with respect to the Debtors and other parties in interest as a consequence of participating in the mediation. Specifically, the Proposed Order seeks a determination that no mediation party shall (a) become an insider or temporary insider of the Debtor Parties (as defined in the Proposed Order), (b) be deemed to owe any duty to any of the Debtor Parties, (c) undertake any duty to any party in interest, and (d) be deemed to misappropriate any information of any of the Debtor Parties, each as a result of (x) participating in the mediation, (y) being aware

of settlement proposals, or (z) acting together in a group of other holders of the Debtor Parties'

Securities.

13.    Here, the Junior Secured Noteholders are not insiders of the Debtors under

any traditional standard as they do not exert control over the Debtors and are not underwriters,

accountants, lawyers or other consultants retained by the Debtors to perform services on behalf

of or to the Debtors.  Rather, they are creditors of the Debtor seeking to engage in arms-length

negotiations and mediation with the Debtor and other parties-in-interest in furtherance of their

own economic self-interest to attempt to achieve a consensual resolution of the bankruptcy

proceedings.  Given these facts, the Junior Secured Noteholders are not insiders of the Debtor, or

otherwise owe any fiduciary obligations or similar duties to the Debtor.  See Dirks v. SEC, 463

U.S. 646, 655 n.14 (1983) (insiders of a corporation for purposes of the federal securities laws

may include "temporary insiders" who are defined as those persons or entities who have "entered

into a special confidential relationship in the conduct of the business of the enterprise and are

given access to information solely for corporate purposes."); United States v. O'Hagan, 521 U.S.

642, 652 (1997) (corporate insiders include "not only . . . officers, directors, and other permanent

insiders of a corporation, but also . . . attorneys, accountants, consultants, and others who

temporarily become fiduciaries of a corporation.").

14.    Nor do the Junior Secured Noteholders become insiders of the Debtor by

participating in the proposed settlement process.  See, e.g., Walter v. Morgan Stanley & Co., 623

F.2d 796, 799 (2d Cir. 1980) (receipt of confidential information does not create a fiduciary

duty); Sawant v. Ramsey, 742 F. Supp. 2d 219, 238 (D. Conn. 2010) (large shareholder who was

"not a professional advisor or consultant, and was not employed by. . ." the company does not

become insider of that company as a result of receipt of confidential information); Nolan Bros. of

<u>Tex., Inc. v. WhiteRaven, L.L.C.</u>, Case No. 99-CV-10256, 2004 U.S. Dist. LEXIS 3053, at *3-4 (S.D.N.Y. Feb. 27, 2004) ("The communication of confidential information does not by itself create a fiduciary relationship.").  The Proposed Order would serve to foster the policies in favor of mediation and encouraging creditor participation in chapter 11 cases by allowing principals from the Junior Secured Noteholders to participate in mediation and settlement negotiations without the risk that such participation would subject such Junior Secured Noteholder to liability. Without entry of the Proposed Order the Junior Secured Noteholder principals will be unable to participate in the mediation under the construct demanded by the Debtors and the Creditors' Committee.

## NOTICE

15.    Notice of this Motion has been given to:  (a) Counsel to the Debtors, (b) the Office of the United States Trustee for the Southern District of New York; (c) counsel to the Committee; and (d) all parties who have timely filed requests for notice pursuant to Bankruptcy Rule 2002.  The Ad Hoc Group submits that no other or further notice is necessary under the circumstances.

## NO PRIOR REQUEST

16.    No prior request for the relief sought in the Motion has been made to this or any other court.

**WHEREFORE**, the Ad Hoc Group respectfully requests that the Court enter an

order:  (i)  in aid of mediation and negotiation; and (ii) granting such other and further relief as is

just and proper.

Dated:  July 18, 2013

<div style="margin-left: 40%;">

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
J.  Christopher Shore
Harrison L. Denman

- and -

By:    Gerard Uzzi
_____
        MILBANK, TWEED, HADLEY &
        M<sup>c</sup>CLOY LLP
        1 Chase Manhattan Plaza
        New York, New York 10005
        Telephone:  (212) 530-5000
        Facsimile:  (212) 530-5219
        Gerard Uzzi
        Dennis C. O'Donnell

        Attorneys for the Ad Hoc Group
        of Junior Secured Noteholders

</div>

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) Case No. 12-12020 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## ORDER IN AID OF MEDIATION AND SETTLEMENT

On December 26, 2012, the Court entered that certain Order Appointing Mediator

[Docket No. 2519],[1] appointing the Honorable James M. Peck as mediator (the "**Mediator**") (as

extended by the Orders Extending Appointment of Honorable James M. Peck as Mediator, dated

March 5, 2013 and June 4, 2013 [Docket Nos. 3101 and 3877]) (the "**Mediation Order**"); and

on June 26, 2013, the Court entered that certain Order Granting Debtors' Motion for an Order

Under Bankruptcy Code Sections 105(A) and 363(B) Authorizing the Debtors to Enter into a

Plan Support Agreement with Ally Financial Inc., the Creditors' Committee and Certain

Consenting Claimants [Docket No. 4098] (the "**PSA Order**"); and it appearing that, pursuant to

the PSA Order, the above-captioned debtors and debtors in possession (the "**Debtors**") and the

statutory committee of creditors appointed in these cases (the "**Committee**") intend to pursue

implementation of a "Global Settlement" through confirmation of a plan; and it appearing that

certain parties in interest or any trustee, affiliate or agent acting on behalf of any such party in

interest, including the holders of certain Junior Secured Notes[2] (the "**Junior Secured**

**Noteholders**"), are not party to the Global Settlement (collectively, the "**Non-Settling**

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Mediation
Order.

[2]     The 9.625% Junior Secured Guaranteed Notes due 2015 issued under that certain Indenture dated as of
June 6, 2008.

Parties"); and it appearing that entry of this order (the **"Supplemental Mediation Order"**) will facilitate mediation and settlement discussions among the Debtors, the Committee, the Consenting Claimants and the Non-Settling Parties (collectively, the **"Mediation Parties"** and each a **"Mediation Party"**); and the Debtors, the Committee, the Ad Hoc Group of Junior Secured Noteholders (the **"Ad Hoc Group"**), and the Mediator having reviewed the terms of this Supplemental Mediation Order; and the Ad Hoc Group having moved for entry of this Supplemental Mediation Order (the **"Motion"**); and this Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and sufficient cause appearing therefor, it is hereby

## ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is **GRANTED** solely to the extent set forth below.

2.      The Supplemental Mediation Order supplements the Mediation Order, as set forth herein.

3.      No Mediation Party, including any Junior Secured Noteholder, shall (a) be or become an insider, a temporary insider or fiduciary of any Debtor, any affiliate of any Debtor, or any residential mortgage backed securitization trust for which any of the Debtors or affiliates thereof act or acted as sponsor, depositor, servicer, master servicer, or other similar capacity (an "**RMBS Trust**" and collectively with the Debtors and any affiliates of the Debtors, the "**Debtor Parties**"), (b) be deemed to owe any duty to any of the Debtor Parties, (c) undertake any duty to any party in interest, (d) be deemed to misappropriate any information of any of the Debtor Parties, with respect to each of foregoing clauses (a) through (d), as a result of (x) participating in any mediation conference conducted pursuant to the Mediation Order (a

2

"**Mediation Conference**") or settlement conference without reliance on the Mediation Order (a

"**Settlement Conference**"), or (y) being aware, or in possession, of any settlement proposal or

counterproposal (each, a "**Settlement Proposal**") delivered or received by any party in interest

or their agents or advisors in connection with a Mediation Conference or Settlement Conference,

or (z) acting together in a group with other holders of securities of the Debtor Parties ("**Debtor**

**Party Securities**").

4.      No party in interest in these bankruptcy cases, including each of the

Debtors or any successor to the Debtors, shall have any claim, defense, objection, or cause of

action of any nature against a Mediation Party or any other basis to withhold, subordinate,

disallow, or delay payment or issuance of any consideration to a Mediation Party on account of a

claim based on such Mediation Party's trading in Debtor Party Securities by reason of a

Mediation Party's participation in any Mediation Conference or Settlement Conference or while

having knowledge of (a) information that, at the time of such trading, such Mediation Party has

no duty of confidentiality with respect to pursuant a Confidentiality Agreement (as defined

below), or (b) a Settlement Proposal, whether or not such Settlement Proposal is confidential;

provided, however, that nothing herein shall be deemed to waive any claims for non-compliance

with this Supplemental Mediation Order or any other contractual confidentiality obligations.

5.      The terms of any confidentiality agreement entered into between any

Mediation Party and the Debtors (each, a "**Confidentiality Agreement**") and the Mediation

Order shall govern any issues with respect to any party's disclosure of any material non-public

information of the Debtor Parties to a Mediation Party, including the Junior Secured

Noteholders.  A Mediation Party shall have no duty of confidentiality or otherwise with respect

to material non-public information except as expressly set forth in a Confidentiality Agreement;

provided, however, that, notwithstanding the foregoing, any Mediation Party that participated in

mediation sessions prior to the date of entry of this Supplemental Mediation Order shall remain

bound by the terms of the Mediation Order and/or any Confidentiality Agreement it entered into

with the Debtors.  In the event that, from and after the date of entry of this Supplemental

Mediation Order, a party shares material non-public information of the Debtor Parties with a

Mediation Party other than pursuant to a Confidentiality Agreement, the Debtors shall promptly,

but in no event less than twenty-four (24) hours after receipt of a demand by a Mediation Party,

make such material non-public information public; provided, however, that such disclosure by

the Debtors shall not in any way relieve any party of liability on account of having shared such

material non-public information of the Debtor Parties with a Mediation Party other than pursuant

to a Confidentiality Agreement.  Absent such disclosure, each Mediation Party is authorized to

disclose such material non-public information.

   6. Solely with respect to the Junior Secured Noteholders, such Mediation

Conference shall be deemed terminated on August 16, 2013 at the time at which the Debtors

make the Public Disclosure (as defined in a Confidentiality Agreement) unless extended with the

consent of the Debtors, the Committee, and a majority of the Junior Secured Noteholders

participating in a Mediation Conference.

   7. Nothing in this Supplemental Mediation Order is intended to, nor

shall it, waive, release, compromise, or impair in any way whatsoever, any claims or defenses

that any party has or may have, whether now known or unknown, in connection with or

relating to acts or omissions that took place prior to the entry of this Supplemental

Mediation Order.

4

8.      This Court shall retain jurisdiction with respect to all matters arising or related to the implementation of this Supplemental Mediation Order.

9.      Settlement Proposals shall remain confidential unless each of the Mediation Parties agrees in writing to the disclosure of any Settlement Proposal.

10.     Settlement Proposals shall be subject to protection under Rule 408 of the Federal Rules of Evidence.

11.     Nothing in this Supplemental Mediation Order shall be binding on any governmental entity seeking to enforce the securities laws in actions or proceedings outside of these bankruptcy cases.

New York, New York
July __, 2013

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit B**

8-K 1 d521970d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 8-K

### Current Report

**Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934**

**Date of Report (date of earliest event reported) – April 15, 2013**

## Energy Future Holdings Corp.
#### (Exact name of registrant as specified in its charter)

| Texas | 1-12833 | 46-2488810 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

## Energy Future Intermediate Holding Company LLC
#### (Exact name of registrant as specified in its charter)

| Delaware | 1-34544 | 26-1191638 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

## Energy Future Competitive Holdings Company LLC
#### (Exact name of registrant as specified in its charter)

| Delaware | 1-34543 | 75-1837355 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**Energy Plaza, 1601 Bryan Street, Dallas, Texas 75201**
(Address of principal executive offices, including zip code)

**214-812-4600**
(Registrants' telephone number, including Area Code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrants under any of the following provisions (see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Item 7.01 Regulation FD Disclosure.

### Introduction

Energy Future Holdings Corp. ("EFH Corp."), Energy Future Competitive Holdings Company ("EFCH"), Texas Competitive Electric Holdings Company LLC ("TCEH"), and Energy Future Intermediate Holding Company LLC ("EFIH" and together with EFH Corp., EFCH and TCEH, the "Companies") executed confidentiality agreements (the "Confidentiality Agreements") on March 18, 2013 with certain unaffiliated holders of first lien senior secured claims against EFCH, TCEH and certain of TCEH's subsidiaries (the "Creditors"), to facilitate discussions with the Creditors concerning the Companies' capital structure. Pursuant to the Confidentiality Agreements, the Companies agreed to disclose publicly after the expiration of a period set forth in the Confidentiality Agreements the fact that the Companies and the Creditors have engaged in discussions concerning the Companies' capital structure, as well as certain confidential information concerning the Companies that the Companies have provided to the Creditors. The information included in this Current Report on Form 8-K is being furnished to satisfy the Companies' public disclosure obligations under the Confidentiality Agreements.

### Discussions with Creditors

As part of an ongoing liability management program commenced in late 2009, EFH Corp. and its subsidiaries (excluding Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") and its subsidiaries) have explored ways to reduce the amount and extend the maturity of their outstanding debt. Since 2009, as previously disclosed, the Companies (collectively and individually) have captured $2.5 billion of debt discount and extended the maturities of approximately $25.7 billion of debt to 2017-2021. Although the Companies do not have material debt maturities until October 2014, the Companies have continued to consider and evaluate a number of transactions and initiatives to address their highly leveraged balance sheets and significant cash interest requirements.

Consistent with the ongoing liability management program, the Companies and the Creditors recently engaged in discussions with respect to the Companies' capital structure, including the possibility of a restructuring transaction. In these discussions, the Companies shared with the Creditors non-public information, including prospective financial information. During the discussions, proposed changes to the Companies' capital structure described below were presented to the Creditors. The Companies' objectives in presenting these proposed changes were to create a sustainable capital structure and maximize enterprise value by, among other things, minimizing time spent in a restructuring through a proactive and organized solution; minimizing any potential tax impacts of a restructuring; maintaining the Companies in one consolidated group; maintaining focus on operating EFH Corp.'s businesses; and maintaining the Companies' high-performing work force. The Companies and the Creditors have not reached agreement on the terms of any change in the Companies' capital structure. The principals of the Companies and the Creditors are currently not engaged in ongoing negotiations. The Companies (collectively and individually) will continue to consider and evaluate a range of future changes to their capital structure, in addition to the proposed change described below, as part of their liability management program. In addition, the Companies and EFH Corp.'s existing equity holders (the "Sponsors") may engage from time to time in additional discussions with the Creditors, other creditors of the Companies, including creditors of TCEH, EFIH and EFH Corp., and their professional advisors. Such discussions may include proposed changes to the Companies' capital structures. There can be no guarantee that any future changes in the Companies' capital structures will occur or, if any changes occur, that they will occur as described below, ultimately be successful, or produce the desired outcome.

The proposed changes to the Companies' capital structure discussed with the Creditors (the "Restructuring Proposal") included a consensual restructuring of TCEH's approximately $32 billion of debt (as of December 31, 2012). Specifically, to effect the Restructuring Proposal, EFCH, TCEH, and certain of TCEH's subsidiaries would implement a prepackaged plan of reorganization by commencing voluntary cases under Chapter 11 of the United States Bankruptcy Code. Under this proposed plan of reorganization, the TCEH first lien creditors would exchange their claims for a combination of EFH Corp. equity, in an amount to be negotiated, and their pro rata share of $5.0 billion of cash or new long-term debt of TCEH and its subsidiaries on market terms. Following the issuance of EFH Corp. equity interests to the TCEH first lien lenders under the proposed plan of reorganization, the Sponsors would hold a to-be-negotiated amount of the equity interests in EFH Corp. Following implementation of the Restructuring Proposal, EFH Corp. would continue to hold all of the equity interests in EFCH and EFIH, EFCH would continue to hold all of the equity interests in TCEH, and EFIH would continue to hold all of the equity interests of Oncor Holdings. TCEH also would obtain access to $3.0 billion of new liquidity through a $2.0 billion first lien revolver and a $1.0 billion letter of credit facility. TCEH would also issue $5.0 billion of new long-term debt.

1

Substantially contemporaneously with the Companies' transmittal of the Restructuring Proposal to the Creditors, the Sponsors informed the Creditors that they would support the Restructuring Proposal if the Sponsors retained 15% of EFH Corp.'s equity interests, with the TCEH first lien creditors receiving, in the aggregate, the remaining 85% of EFH Corp.'s equity interests, in each case subject to dilution from any agreed-upon employee equity incentive plan. The Sponsors also indicated, in connection with the Creditors' consideration of the Restructuring Proposal, that the Sponsors would be willing to contribute new equity capital to EFH Corp. on customary terms for an investment of this type to facilitate implementation of the Restructuring Proposal in an amount that would provide substantial additional liquidity to EFH Corp. and EFIH, provided that in such circumstances the Sponsors would receive additional equity of EFH Corp. on account of such new capital consistent with the relative valuations of TCEH and EFH Corp. implied above (the "Sponsor Proposal").

As noted above, the Companies and the Creditors have not reached agreement on the terms of any change in the Companies' capital structure. However, the Creditors conveyed to the Companies that they would be willing to consider the Restructuring Proposal, if among other things, (i) the Restructuring Proposal adequately addresses and compensates Creditors for the risks and consequences of exchanging a portion of the Creditors' senior secured claims against TCEH into EFH Corp. equity, (ii) the amount of post-reorganization debt at TCEH to be distributed to TCEH first lien creditors were materially increased, (iii) in the allocation of EFH Corp.'s equity between TCEH and EFH Corp. stated in the Sponsor Proposal, the value of TCEH and EFH Corp. were materially modified such that the TCEH first lien creditors would receive materially greater value, and (iv) EFIH's negative free cash flow is addressed and a sustainable debt capital structure is achieved for EFIH and EFH Corp. without reliance on TCEH's cash flows.

The Companies expect to continue to explore all available restructuring alternatives to facilitate the creation of sustainable capital structures for the Companies and to otherwise attempt to address the Creditors' concerns with the Restructuring Proposal and Sponsor Proposal. The Creditors have directed their advisors to continue to work with the Companies and their advisors to explore further whether the parties can reach an agreement on the terms of a consensual restructuring.

The Companies have retained Kirkland & Ellis LLP and Evercore Partners to advise the Companies with respect to the potential changes to the Companies' capital structure described above and to assist in the evaluation and implementation of other potential restructuring options. The Creditors have retained Paul, Weiss, Rifkind, Wharton & Garrison LLP and Millstein & Co., L.P. to advise the Creditors and to assist in the Creditors' evaluation of potential restructuring options involving the Companies.

Financial Information

EFH Corp. and its subsidiaries generally do not publicly disclose detailed prospective financial information. However, in connection with their discussions with the Creditors, the Companies provided certain financial information, consisting largely of forecasts, to the Creditors pursuant to the Confidentiality Agreements. Management of the Companies prepared the forecasts from certain internal financial projections based on reasonable expectations, beliefs, opinions, and assumptions of the Companies' management at the time they were made. EFH Corp. also provided certain financial forecasts for Oncor Electric Delivery Company LLC ("Oncor") based upon information originally provided to EFH Corp. by Oncor in the fourth quarter of 2012. The forecasts were not prepared with a view towards public disclosure and were not prepared in accordance with generally accepted accounting principles ("GAAP") or published guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of "prospective financial information".

The inclusion of the forecasts in this Current Report on Form 8-K should not be regarded as an indication that the Companies and Oncor or any other person considered, or now consider, this information to be necessarily predictive of actual future results, and does not constitute an admission or representation by any person that such information is material, or that the expectations, beliefs, opinions, and assumptions that underlie such forecasts remain the same as of the date of this Current Report on Form 8-K, and readers are cautioned not to place undue reliance on the prospective financial information.

2

None of the independent auditor of the Companies, the independent auditor of Oncor, or any other independent accountant has examined, compiled, or performed any procedures with respect to the prospective financial information contained herein and, accordingly, none has expressed any opinion or any other form of assurance on such information or its achievability and none assumes any responsibility for the prospective financial information.

The prospective financial information:

- was originally prepared in the third or fourth quarter of 2012, except for the assumptions regarding commodity prices, which are as of February 1, 2013;

- is speculative by its nature and was based upon numerous expectations, beliefs, opinions, and assumptions, as further described below, which are inherently uncertain and many of which are beyond the control of the Companies, Oncor, and their respective subsidiaries and may not prove to be accurate;

- does not necessarily reflect current estimates or expectations, beliefs, opinions, or assumptions that the respective management of the Companies and Oncor may have about prospects for the Companies', Oncor's, and their respective subsidiaries' businesses, changes in general business or economic conditions, or any other transaction or event that has occurred or that may occur and that was not anticipated at the time the information was prepared;

- may not reflect current results or future performance, which may be significantly more favorable or less favorable than as set forth below; and

- is not, and should not be regarded as, a representation that any of the expectations contained in, or forming a part of, the forecasts will be achieved.

All of the financial information contained in this section entitled "Financial Information" is forward-looking in nature. The information is subjective in many respects and thus subject to interpretation. Further, the information relates to multiple future years and such information by its nature becomes less predictive with each succeeding year. Neither the Companies nor Oncor can provide assurance that the financial projections will be realized; rather, actual future financial results may vary materially from the forward-looking information presented herein. Except as required by law, none of EFH Corp., EFCH or EFIH currently intends to update or revise publicly any of the information presented herein to reflect circumstances or other events occurring after the date the financial projections were prepared or to reflect the occurrence of future events. These considerations should be taken into account in reviewing the financial projections, which were prepared as of an earlier date. For additional information on factors that may cause actual future financial results to vary materially from the information presented herein, see the section entitled "Cautionary Note Regarding Forward-Looking Statements" below.

3

The Companies provided the Creditors with the projected financial data regarding TCEH set forth in the table below.

*$ amounts in millions*

| TCEH Projections Summary (2013-2017) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| TCEH Consolidated Adjusted EBITDA[1] | $2,752 | $2,455 | $2,035 | $1,870 | $1,832 |
| TCEH Hedge Value[2] | $1,018 | $ 577 | — | — | — |
| TCEH Open EBITDA[3] | $1,734 | $1,878 | $2,035 | $1,870 | $1,832 |
| TCEH Capital Expenditures[4] | $ 690 | $ 594 | $ 684 | $ 685 | $ 628 |

[1]    EBITDA means net income (loss) before interest expense and related charges, income tax expense (benefit) and depreciation and amortization. TCEH Consolidated Adjusted EBITDA means EBITDA adjusted to exclude interest income, noncash items, unusual items, results of discontinued operations and other adjustments. The more significant adjustments include unrealized gain/loss on commodity hedging and trading transactions, impairments of goodwill and other assets, amortization of nuclear fuel, charges related to pension plan actions, and purchase accounting adjustments, primarily related to amortization of intangible assets created as a result of the application of purchase accounting for EFH Corp.'s 2007 merger. TCEH Consolidated Adjusted EBITDA is essentially the same as defined per the TCEH Senior Secured Credit Facilities except no adjustment is made for expenses to upgrade or expand, or for unplanned outages at, generation facilities. EBITDA and Adjusted EBITDA are financial measures not calculated in accordance with GAAP. Adjusted EBITDA is not intended to be an alternative to net income as a measure of operating performance, an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP, nor is it intended to be used as a measure of free cash flow available for discretionary use, because the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, Adjusted EBITDA may not be comparable to similarly titled measures of other companies.

[2]    Because wholesale electricity prices in ERCOT have generally moved with natural gas prices, TCEH has a natural gas price hedging program designed to mitigate the effect of natural gas price changes on future electricity revenues. Under the program, at December 31, 2012, TCEH and its subsidiaries were parties to market transactions effectively selling forward approximately 360 million MMBtu of natural gas at weighted average annual hedge prices as previously disclosed in EFCH's Annual Report on Form 10-K for the year ended December 31, 2012. The amounts presented for TCEH Hedge Value represent unrealized mark-to-market hedging gains (pretax) associated with this program that increase TCEH Consolidated Adjusted EBITDA. TCEH and its subsidiaries do not have any significant amounts of hedges in place under the natural gas hedging program for periods after 2014.

[3]    TCEH Open EBITDA refers to TCEH Consolidated Adjusted EBITDA as adjusted to remove the effects of the TCEH natural gas hedging program by deducting the amounts for TCEH Hedge Value.

[4]    TCEH Capital Expenditures include expenditures for major maintenance, primarily in existing generation operations, environmental expenditures related to generation units, nuclear fuel purchases and expenditures for information technology, nuclear generation development and other corporate investments.

4

The information set forth below describes the key drivers of the year-to-year changes in the forecasted TCEH Consolidated Adjusted EBITDA amounts provided in the table above.

| Key Drivers | 2012A vs 2013E in millions | Assumptions |
|---|---|---|
| Generation Power Price[5]<br>Gas Price[5] | N/A | • 2013: 70 TWh[6] net generation<br>• $34.28/MWh[7]<br>• $3.45/MMBtu[8] |
| Commodity /<br>Fuel /<br>Operational | ($630) – ($530) | • Year-over-year hedge roll-off and change in average hedge price<br>• New power sales at higher expected heat rate net of lower implied market gas prices<br>• Higher operations and maintenance spending due to nuclear outage spend/scope, property tax and other |
| Retail | ($105) – ($45) | • Lower volumes, weather, and continued competitive pricing environment in 2013 |

| Key Drivers | 2013E vs 2014E in millions | Assumptions |
|---|---|---|
| Generation Power Price[5]<br>Gas Price[5] | N/A | • 2014: 69 TWh[6] net generation<br>• $40.04/MWh[7]<br>• $3.95/MMBtu[8] |
| Commodity /<br>Fuel /<br>Operational | ($250) – ($150) | • Year-over-year hedge roll-off<br>• Higher power prices<br>• Higher operations and maintenance spending due to two nuclear plant refueling outages |
| Retail | ($125) – ($75) | • Competitive pricing, higher commodity price environment |

| Key Drivers | 2014E vs 2015E in millions | Assumptions |
|---|---|---|
| Generation Power Price[5]<br>Gas Price[5] | N/A | • 2015: 75 TWh[6] net generation<br>• $42.34/MWh[7]<br>• $4.16/MMBtu[8] |
| Commodity /<br>Fuel /<br>Operational | ($460) – ($310) | • Year-over-year hedge roll-off<br>• Higher power prices and Monticello full-year operations<br>• Lower operations and maintenance spending due to single nuclear plant refueling outage |
| Retail | ($60) – $0 | • Competitive pricing, higher commodity price environment |

---

[5]   Power prices are as of February 1, 2013, reflecting market for 2013-15E (2015E does not trade material volumes) and New Entry Pricing Model for 2016-17E. Gas prices are market as of February 1, 2013, reflecting Houston Ship Channel Natural Gas Index.

[6]   terawatt hours

[7]   megawatt-hours

[8]   million British thermal units

| Key Drivers | 2015E vs 2016E in millions | Assumptions |
|---|---|---|
| Generation Power Price[5] Gas Price [5] | N/A | • 2016: 77 TWh[6] net generation<br>• $42.35/MWh[7]<br>• $4.31/MMBtu[8] |
| Commodity / Fuel / Operational | ($210) – ($60) | • Higher fuel cost due to higher Powder River Basin blend and prices |
| Retail | ($60) – $0 | • Competitive pricing, higher commodity price environment |

| Key Drivers | 2016E vs 2017E in millions | Assumptions |
|---|---|---|
| Generation Power Price[5] Gas Price [5] | N/A | • 2017: 76 TWh[6] net generation;<br>• $43.85/MWh[7]<br>• $4.47/MMBtu[8] |
| Commodity / Fuel / Operational | ($100) – $50 | • Higher power price offset by higher fuel price and Powder River Basin blend<br>• Higher operations and maintenance spending due to two nuclear plant refueling outages<br>• Higher fossil-fuel plants operations and maintenance |
| Retail | ($45) – $15 | • Competitive pricing, higher commodity price environment |

6

The financial information provided to the Creditors also included certain financial forecasts for Oncor based upon information originally provided to EFH Corp. by Oncor in the fourth quarter of 2012. EFIH's wholly-owned subsidiary Oncor Holdings owns approximately 80% of the equity interests of Oncor. Certain amounts in the table below are presented as without or including "Securitization." "Securitization" refers to revenue, expenses and debt related to securitization (transition) bonds issued by Oncor Electric Delivery Transition Bond Company LLC, a wholly-owned consolidated bankruptcy-remote financing subsidiary of Oncor, to recover certain regulatory assets and other costs.

As noted above, the financial forecasts for Oncor that were provided to the Creditors by EFH Corp. were based upon information prepared by Oncor and provided to EFH Corp. during the fourth quarter of 2012. Such information was provided to the Creditors subject to internal review and revision by Oncor to account for, among other things, changes in market conditions and other developments in Oncor's business. In this regard, Oncor has informed the Companies and the Creditors that certain adjustments to its financial forecasts should be reflected. EBITDA of Oncor could be 2-3% lower based on higher operating expenses in 2014 and beyond, which would have corresponding impacts on net income and distributions to owners. Other prudent adjustments could also include higher capital expenditures and/or changes to the capital structure. Higher capital expenditures could increase EBITDA and net income, while changes to the capital structure could increase net income, but both adjustments would also impact distributions.

*$ amounts in millions*

| Certain Financial Forecasts for Oncor (2013-2017) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Revenue (including Securitization) | $ 3,535 | $ 3,834 | $ 3,903 | $ 3,925 | $ 3,993 |
| EBITDA[9] (without Securitization) | $ 1,744 | $ 1,863 | $ 1,925 | $ 1,985 | $ 2,019 |
| EBITDA[9] impact of Securitization | $ 146 | $ 145 | $ 91 | $ 18 | — |
| EBITDA[9] (including Securitization) | $ 1,890 | $ 2,008 | $ 2,016 | $ 2,003 | $ 2,019 |
| Depreciation & Amortization (without Securitization) | $ 690 | $ 726 | $ 758 | $ 780 | $ 780 |
| Depreciation & Amortization impact of Securitization | $ 126 | $ 132 | $ 85 | $ 18 | — |
| Depreciation & Amortization (including Securitization) | $ 816 | $ 858 | $ 843 | $ 798 | $ 780 |
| Net income | $ 395 | $ 453 | $ 492 | $ 507 | $ 524 |
| Distribution to owners[10] | $ 310 | $ 280 | $ 400 | $ 417 | $ 458 |
| Capital expenditures[11] | $ 1,054 | $ 1,008 | $ 1,002 | $ 1,022 | $ 1,059 |
| Net debt (without Securitization) | $ 5,933 | $ 6,109 | $ 6,253 | $ 6,386 | $ 6,540 |
| Net debt (including Securitization) | $ 6,172 | $ 6,219 | $ 6,273 | $ 6,386 | $ 6,540 |

---

[9]   EBITDA means net income (loss) before interest expense and related charges, income tax expense (benefit) and depreciation and amortization (including amortization of regulatory assets reported in operation and maintenance expense) and other income related to purchase accounting. EBITDA is also adjusted for certain noncash and unusual items, none of which is material in the years presented. EBITDA is a financial measure not calculated in accordance with GAAP. EBITDA is not intended to be an alternative to net income as a measure of operating performance, an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP, nor is it intended to be used as a measure of free cash flow available for discretionary use, because the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. EBITDA as presented in the table reflects EFH Corp.'s calculations of EBITDA for Oncor on a basis consistent with EFH Corp.'s prior public disclosures, except for the exclusion of amortization of regulatory assets reported in operation and maintenance expense. Accordingly, and because not all companies use identical calculations, EBITDA may not be comparable to EBITDA as calculated by Oncor or to similarly titled measures of other companies.

[10]   Reflects 100% of distributions from Oncor. EFIH's wholly-owned subsidiary Oncor Holdings owns approximately 80% of the equity interests of Oncor. Accordingly, distributions to EFIH will be approximately 80% of each distribution.

[11]   Capital expenditures include expenditures for transmission facilities, infrastructure maintenance, information technology initiatives, distribution facilities to serve new customers and other general investments.

7

The financial information provided by the Companies to the Creditors also included forecasts of EFH Corp.'s and EFIH's cash flow on a combined basis, assuming the proposed capital structure changes were not executed.

*$ amounts in millions*

| Cash Flow | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| EFH/EFIH Cash Flow | $(377) | $(178) | $(123) | $(374) | $(346) |

8

The information provided by the Companies to the Creditors also included financial forecasts for TCEH and its subsidiaries, assuming the proposed changes to the Companies' capital structure described above were executed through a pre-packaged Chapter 11 filing of EFCH and its subsidiaries on May 1, 2013. In general terms, the financial information provided below assumes the execution of transactions pursuant to which, as a result of the restructuring, (i) holders of TCEH first lien claims would receive equity interests in EFH Corp. and $5.0 billion in cash in exchange for their first lien claims and (ii) TCEH would exit the restructuring with a $3.0 billion revolving credit facility and issue $5.0 billion of new debt. The amounts are in millions of dollars and may not foot due to rounding.

| TCEH | 1/1/2013 - 4/30/2013 | At Filing 5/1/2013 | 5/2/2013 - 12/31/2013 | At Emergence[12] | 2014 FY | 2015 FY | 2016 FY | 2017 FY |
|---|---|---|---|---|---|---|---|---|
| **CASH FLOWS** | | | | | | | | |
| Open EBITDA | $ 376 | $ — | $ 1,358 | $ — | $ 1,878 | $ 2,035 | $ 1,870 | $ 1,832 |
| Hedge Value | 335 | — | — | — | — | — | — | — |
| Cash Impact of adjustments to EBITDA | (22) | — | (26) | — | (54) | (36) | (37) | (55) |
| Subtotal | $ 689 | $ — | $ 1,331 | $ — | $ 1,824 | $ 1,999 | $ 1,833 | $ 1,777 |
| Capital Expenditures | (210) | — | (479) | — | (594) | (684) | (685) | (628) |
| Working Capital | 164 | — | (139) | — | 23 | 69 | 6 | (8) |
| Margin Deposits | (71) | — | — | — | — | — | — | — |
| Other Cash Flow Items | (369) | (1,993) | (1) | — | 2,468 | (31) | (38) | (38) |
| External Tax Payment to EFH Corp. | — | — | 67 | — | (200) | (247) | (206) | (198) |
| **Free Cashflow – Unlevered** | $ 203 | ($ 1,993) | $ 779 | $ — | $ 3,520 | $ 1,106 | $ 909 | $ 906 |
| *Cumulative* | $ 1,572 | ($ 421) | $ 359 | $ 359 | $ 3,879 | $ 4,985 | $ 5,894 | $ 6,800 |
| **FINANCING & OTHER** | | | | | | | | |
| Interest Payments | ($ 591) | ($ 103) | ($ 33) | $ — | ($ 467) | ($ 436) | ($ 431) | ($ 431) |
| Repayment of I/C Note | 698 | — | — | — | — | — | — | — |
| Debt Maturities | (77) | (379) | (7) | — | (8) | (9) | (6) | (35) |
| Debt Issuances | 175 | — | 0 | — | 0 | 0 | 0 | 0 |
| Revolver Draw / (Repayment) | — | — | — | 1,075 | (1,075) | — | — | — |
| Swap Settlements | (169) | — | — | — | — | — | — | — |
| Sale A/R Program | (29) | (53) | — | — | — | — | — | — |
| **TRANSACTION RELATED** | | | | | | | | |
| Change in Restricted Cash | $ — | $ 947 | $ 0 | ($ 1,000) | $ — | $ — | $ — | $ — |
| Restructuring Fees / Business Impacts | (58) | — | (422) | — | — | — | — | — |
| Adequate Protection | — | — | (884) | — | — | — | — | — |
| Debtor-in-Possession Facility | — | 347 | 568 | (915) | — | — | — | — |
| New Debt Proceeds | — | — | — | 6,000 | — | — | — | — |
| Debt Issuance Costs | (3) | (40) | 0 | (160) | (0) | (0) | (0) | 0 |
| Cash Distribution to TCEH 1st Lien | — | — | — | (5,000) | — | — | — | — |
| **Total** | ($ 53) | $ 719 | ($ 780) | $ — | ($ 1,550) | ($ 445) | ($ 437) | ($ 466) |
| **Free Cashflow – Levered** | $ 149 | ($ 1,274) | ($ 1) | $ — | $ 1,970 | $ 661 | $ 473 | $ 440 |
| *Cumulative* | $ 1,204 | ($ 69) | ($ 70) | ($ 70) | $ 1,900 | $ 2,560 | $ 3,033 | $ 3,473 |
| **LIQUIDITY (ex. Restricted Cash)** | | | | | | | | |
| Cash Beginning Balance | $ 1,175 | $ 1,324 | $ 50 | $ 50 | $ 50 | $ 2,020 | $ 2,680 | $ 3,153 |
| Free Cashflow | 149 | (1,274) | (1) | — | 1,970 | 661 | 473 | 440 |
| **Cash Ending Balance** | $ 1,324 | $ 50 | $ 50 | $ 50 | $ 2,020 | $ 2,680 | $ 3,153 | $ 3,593 |

---

[12]  Assumes a January 1, 2014 emergence from bankruptcy.

9

Tax Information

Finally, the Companies provided the following tax information to the Creditors:

- The Internal Revenue Service ("IRS") audit of the consolidated EFH Corp. tax returns for taxable years 2003 through 2006 was concluded in June 2011. The IRS proposed a significant number of adjustments to the originally filed returns for such years. These adjustments (which related to the timing and/or deductibility of approximately $4.3 billion of deductions) are in appeals with the IRS. The adjustments relate to one significant accounting method issue and a variety of other, less significant issues. On March 21, 2013, EFH Corp. and the IRS agreed on terms to resolve the disputed adjustments. Any cash income tax liability related to this agreement is expected to be immaterial. There will be a corresponding reduction of net operating loss carryforwards of approximately $4 billion generated through 2013, as well as a reduction of alternative minimum tax credit carryforwards of approximately $380 million.

- As previously disclosed, on April 1, 2013, EFH Corp. received a private letter ruling from the IRS in which the IRS ruled that upon the consummation of certain internal corporate transactions involving EFH Corp. and EFCH, the excess loss account (the "ELA") and a deferred intercompany gain (the "DIG") that were reflected in the tax basis of the EFCH stock held by its parent company, EFH Corp., would be eliminated without causing the recognition of tax gain or loss. As a result of the consummation of the internal corporate transactions involving EFH Corp. and EFCH to eliminate the ELA and the DIG, EFH Corp. believes that a negotiated debt restructuring should be achievable with little-to-no cash tax impact. Although a debt restructuring should result in the utilization or elimination of EFH Corp.'s net operating losses, the restructuring is expected to produce a significant amount of cancellation of debt income that will not reduce or eliminate any tax attributes and should not cause the recognition of taxable income, based on an in-court negotiated debt restructuring of EFCH and its subsidiaries with a 2014 effective date.

- A separation of the TCEH business from the EFH Corp. consolidated tax group in a debt restructuring would have an inefficient tax outcome, and based on certain assumptions relating to the enterprise value of TCEH and other matters, could produce a gain on sale of assets with a cash tax liability in excess of $2 billion.

- Because EFH Corp. has a negative capital account of approximately $1.7 billion in Oncor, a separation of EFIH or Oncor Holdings from the EFH Corp. consolidated tax group could result in a taxable event to EFH Corp.

\* \* \* \* \*

### *Cautionary Note Regarding Forward-Looking Statements*

This Current Report on Form 8-K includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, which are subject to risks and uncertainties. All statements, other than statements of historical facts, are forward-looking statements. The projected financial information included herein constitutes forward-looking statements. Readers are cautioned not to place undue reliance on forward-looking statements. Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under Item 1A, "Risk Factors" and the discussion under Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Annual Reports on Form 10-K filed by each of EFH Corp., EFIH, EFCH and Oncor and the following important factors, among others, that could cause actual results to differ materially from those projected in such forward-looking statements:

- prevailing governmental policies and regulatory actions with respect to, among other things:

    - allowed prices;

10

- allowed rates of return;

- permitted capital structure;

- industry, market and rate structure;

- purchased power and recovery of investments;

- operations of nuclear generation facilities;

- operations of fossil-fueled generation facilities;

- operations of mines;

- acquisition and disposal of assets and facilities;

- development, construction and operation of facilities;

- decommissioning costs;

- present or prospective wholesale and retail competition;

- changes in tax laws and policies;

- changes in and compliance with environmental and safety laws and policies, and

- clearing over the counter derivatives through exchanges and posting of cash collateral therewith;

- legal and administrative proceedings and settlements;

- general industry trends;

- economic conditions, including the impact of an economic downturn;

- our ability to collect trade receivables from counterparties;

- our ability to attract and retain profitable customers;

- our ability to profitably serve our customers;

- restrictions on competitive retail pricing;

- changes in wholesale electricity prices or energy commodity prices, including the price of natural gas;

- changes in prices of transportation of natural gas, coal, crude oil and refined products;

- changes in market heat rates in the Electric Reliability Council of Texas, Inc. electricity market (ERCOT);

- our ability to effectively hedge against unfavorable commodity prices, including the price of natural gas, market heat rates and interest rates;

- weather conditions, including drought and limitations on access to water, and other natural phenomena, and acts of sabotage, wars or terrorist or cybersecurity threats or activities;

11

- population growth or decline, or changes in market supply or demand and demographic patterns, particularly in ERCOT;

- changes in business strategy, development plans or vendor relationships;

- access to adequate transmission facilities to meet changing demands;

- changes in interest rates, commodity prices, rates of inflation or foreign exchange rates;

- changes in operating expenses, liquidity needs and capital expenditures;

- commercial bank market and capital market conditions and the potential impact of disruptions in US and international credit markets;

- the willingness of our lenders to extend the maturities of our debt instruments and the terms and conditions of any such extensions;

- access to capital, the cost of such capital, and the results of financing and refinancing efforts, including availability of funds in capital markets;

- activity in the credit default swap market related to our debt instruments;

- restrictions placed on us by the agreements governing our debt instruments;

- our ability to generate sufficient cash flow to make interest payments on, or refinance, our debt instruments;

- our ability to successfully execute our liability management program or otherwise address our debt maturities, including the potential exchange of debt securities into equity securities;

- any defaults under certain of our financing arrangements that could trigger cross default or cross acceleration provisions under other financing arrangements;

- our ability to make intercompany loans or otherwise transfer funds among different entities in our corporate structure;

- competition for new energy development and other business opportunities;

- inability of various counterparties to meet their obligations with respect to our financial instruments;

- changes in technology used by and services offered by us;

- changes in electricity transmission that allow additional electricity generation to compete with our generation assets;

- significant changes in our relationship with our employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;

- changes in assumptions used to estimate costs of providing employee benefits and future funding requirements related thereto;

- changes in assumptions used to estimate future executive compensation payments;

- hazards customary to the industry and the possibility that we may not have adequate insurance to cover losses resulting from such hazards;

12

- significant changes in critical accounting policies;

- actions by credit rating agencies;

- adverse claims by our creditors or holders of our debt securities;

- our ability to effectively execute our operational strategy, and

- our ability to implement cost reduction initiatives.

Any forward-looking statement speaks only at the date on which it is made, and except as may be required by law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. As such, readers should not unduly rely on such forward-looking statements.

13

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, each registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**ENERGY FUTURE HOLDINGS CORP.**

/s/ Stan J. Szlauderbach
Name: Stan J. Szlauderbach
Title: Senior Vice President & Controller

**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**

/s/ Stan J. Szlauderbach
Name: Stan J. Szlauderbach
Title: Senior Vice President & Controller

**ENERGY FUTURE COMPETITIVE
HOLDINGS COMPANY LLC**

/s/ Stan J. Szlauderbach
Name: Stan J. Szlauderbach
Title: Senior Vice President & Controller

April 15, 2013

14

# **Exhibit C**



U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Harlin DeWayne Hale*

**United States Bankruptcy Judge**

**Signed January 26, 2012**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 15 |
| | § | |
| VITRO, S.A.B. de C.V. | § | Case No. 11-33335-hdh-15 |
| | § | |
| Debtor in a Foreign Proceeding | § | |
| | § | |

### ORDER IN AID OF SETTLEMENT DISCUSSIONS

Upon the motion (the "Motion")[1] of the members of the Ad Hoc Group of Vitro

Noteholders (the "Noteholders"), as holders of or managers of entities that hold beneficial

interests in three series of Notes issued by Vitro, S.A.B. de C.V. ("Vitro"), and parties in interest

in the above-captioned chapter 15 case, for an order in aid of settlement discussions pursuant to

the *Sua Sponte* Order Regarding Settlement Discussions, dated December 22, 2011 [Docket No.

252] (the "Settlement Conferences Order"); and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and the

consideration of the Motion and the relief requested therein being a core proceeding in

accordance with 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the
Motion.

U.S.C. §§ 1408 and 1409; and the Court having considered the papers filed in support of the

Motion and all responses or objections to the Motion; and the Court having found that

appropriate and adequate notice and an opportunity for hearing on the Motion have been given as

required by the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules; and

after due deliberation and sufficient cause appearing therefor;

Now, therefore, it is hereby **ORDERED** as follows:

1.    The Motion is **GRANTED**, as modified herein.

2.    The Court hereby **FINDS, DETERMINES, ADJUDICATES AND DECREES**

that:

(a)    "Settlement Proposal" shall mean: (i) ***on and after March 1, 2012***, any and all settlement proposals and counterproposals, other than an agreement in principle acceptable to all Participating Parties (as defined below) and subject to definitive documentation (an "Agreement in Principle"), delivered or received by any Participating Party during a Settlement Conference (as defined below) and (ii) ***prior to March 1, 2012***, any and all settlement proposals and counterproposals, delivered or received by any Participating Party (as defined below) during a Settlement Conference (as defined below) other than (y) any settlement proposal or counterproposal that has neither been accepted or rejected by the party receiving it nor has expired by its terms, thereby remaining capable of being accepted by the party receiving it (a "Live Proposal"), and (z) an Agreement in Principle;

(b)    Settlement Proposals shall not constitute material nonpublic information;

(c)    Settlement Proposals, Live Proposals and Agreements in Principle shall remain confidential unless each of the Participating Parties agrees in writing to the disclosure of any Settlement Proposal, Live Proposal or Agreement in Principle;

(d)    Settlement Proposals shall be subject to protection under Rule 408 of the Federal Rules of Evidence;

(e)    no Participating Party shall (i) be or become an insider or fiduciary of Vitro or any Vitro Party (as defined below) or any other party in interest, (ii) undertake any duty to any party in interest, including, without limitation, to any Vitro Party, or (iii) be limited in its ability to buy, sell, or trade any security, including, without limitation, any security issued by

2

any Vitro Party, in each case:  (x) by virtue of such Participating Party's status as a holder of notes issued by Vitro, (y) by acting together in a group with other holders of notes issued by Vitro, or (z) by participating in any Settlement Conference or receiving information in connection therewith, with or without a Settlement Conference Confidentiality Agreement (as defined below) in place;

(f)     if any Participating Party buys, sells, or trades any security of any Vitro Party, such Participating Party shall not be deemed to be violating any duty to any Vitro Party or misappropriating any information of any Vitro Party as a result of such Participating Party's being in possession of any Settlement Proposal received during a Settlement Conference or as a result of being a Participating Party.

3.     The Court supplements the Settlement Conferences Order as set forth herein.

4.     The following provisions shall apply to any and all settlement conferences pursuant to the Settlement Conferences Order and any and all settlement discussions by and among any party-in-interest or their agents or representatives (with respect to each Settlement Conference, a "Participating Party") participating in such settlement conference or outside of any settlement conference but related thereto (each, a "Settlement Conference"), notwithstanding anything to the contrary contained in the Settlement Conferences Order:

(a)     In connection with any Settlement Conference, if a Participating Party does not enter into a written confidentiality, non-disclosure, or similar agreement (a "Settlement Conference Confidentiality Agreement") with the other Participating Parties,

(i) Vitro and each of its representatives participating in such Settlement Conference (including any attorneys, financial advisors, investment bankers, consultants and other professionals retained by it and any other advisors or experts with whom Vitro consults) and its affiliates, subsidiaries, officers, directors, employees, and agents (collectively, the "Vitro Parties") and the *Conciliador* and each of its representatives participating in such Settlement Conference (including any attorneys, financial advisors, investment bankers, consultants and other professionals retained by it and any other advisors or experts with whom the *Conciliador* consults) (collectively, the "*Conciliador*") shall not disclose any material nonpublic information to any Participating Party; provided, however, to the extent that any such party does provide material nonpublic information to a Participating Party and a Vitro Party does not make such information public, such Participating Party is hereby authorized, on or after March 1, 2012, to disclose publicly such material nonpublic information, except

3

that no Agreement in Principle shall be disclosed unless each of the Participating Parties agrees in writing; and

(ii) the fact of a Participating Party's participation in any Settlement Conference and any Settlement Proposal delivered or received by any Participating Party during a Settlement Conference shall not (x) constitute material nonpublic information, (y) give rise to any duty owed by the Participating Party to any party in interest, including, without limitation, to any Vitro Party, or (z) limit the Participating Party's ability to buy, sell, or trade any security, including, without limitation, any security issued by any Vitro Party.

(b)     If a Participating Party enters into a Settlement Conference Confidentiality Agreement, the terms of that agreement shall govern any issues with respect to any Participating Party's disclosure of any material nonpublic or confidential information.

(c)     No party in interest within the meaning of section 1109(b) of the Bankruptcy Code, including without limitation the Vitro Parties, Fintech Investments Ltd., and each of the guarantors of the Vitro Notes, shall have any claim, defense, objection, or cause of action of any nature whatsoever, including without limitation any objection to a claim or any other basis to withhold, subordinate, disallow, or delay payment, or issuance of any consideration including any new instruments, on account of a claim, against a Participating Party (or any trustee or agent acting on behalf of a Participating Party) by reason of the Participating Party's participation in any Settlement Conference, including without limitation, as a result of receiving any information as part of any Settlement Conference or trading in any security of any Vitro Party while in possession of any undisclosed Settlement Proposal or other settlement information, provided that in the event there is a Settlement Conference Confidentiality Agreement in place, nothing herein shall be deemed to waive any claims for default or non-compliance therewith. For the avoidance of doubt, the preceding sentence does not bind a governmental entity having jurisdiction to enforce securities laws. Nothing in this Order is intended to, nor shall it, waive, release, compromise, or impair in any way whatsoever, any claims or defenses that any party has or may have, whether now known or unknown, in connection with or relating to acts or omissions that took place prior to the entry of this Order, including but not limited to the claims and defenses asserted in the action captioned Vitro SAB de CV v. Aurelius Capital Management, L.P., et al. pending in the Supreme Court of the State of New York (Index No. 650997/2011).

(d)     Nothing in this Order or the Settlement Conferences Order shall require any Participating Party to keep confidential any information provided by Vitro's members, shareholders, or creditors, in each case who is not a Vitro Party, to such Participating Party.

5.     The Court shall retain jurisdiction to hear and determine all matters arising from the implementation and/or interpretation of this Order.

## END OF ORDER ##

4