**Hearing Date: August 21, 2013 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: July 29, 2013 at 4:00 p.m. (prevailing Eastern Time)**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore
Dwight A. Healy

        - and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi
Dennis O'Donnell

*Attorneys for the Ad Hoc Group*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | Case No. 12-12020 (MG) |
| Debtors. | (Jointly Administered) |

**MOTION OF THE AD HOC GROUP OF**
**JUNIOR SECURED NOTEHOLDERS FOR ENTRY OF AN ORDER (i) DIRECTING**
**EACH OF DEBTORS' COUNSEL, INCLUDING MORRISON & FOERSTER LLP,**
**OFFICIAL COMMITTEE COUNSEL, INCLUDING KRAMER LEVIN NAFTALIS &**
**FRANKEL LLP, AND THE DEBTORS' MANAGEMENT TO REMAIN STRICTLY**
**NEUTRAL IN ANY DISPUTE REGARDING CLAIMS BY AND BETWEEN ANY**
**DEBTORS, (ii) ORDERING THE LIMITED DISQUALIFICATION OF EACH OF THE**
**FOREGOING TO THE EXTENT NECESSARY TO EFFECTUATE THE FOREGOING,**
**<u>AND (iii) GRANTING RELATED RELIEF</u>**

TO:    THE HONORABLE MARTIN GLENN,
        UNITED STATES BANKRUPTCY JUDGE:

        The Ad Hoc Group of Junior Secured Noteholders (the "<u>Ad Hoc Group</u>"), by and through

its undersigned counsel, hereby files this motion (the "<u>Motion</u>") for entry of an order in the above-captioned chapter 11 cases (the "<u>Cases</u>") pursuant to 11 U.S.C. §§ 105, 327, and 363, (a) directing each of the Debtors' counsel, including  Morrison & Foerster LLP  ("<u>MoFo</u>"), counsel to the Official Committee of Unsecured Creditors (the "<u>Committee</u>"), including Kramer Levin Naftalis & Frankel LLP ("<u>Kramer</u>"), and the Debtors' management to remain strictly neutral in any dispute in this Court regarding claims by and between any Debtors; (b) ordering the limited disqualification of each of the foregoing solely to the extent necessary to effectuate the foregoing, and (c) granting related relief.  In support of the Motion, the Ad Hoc Group respectfully represents as follows:

<strong><u>PRELIMINARY STATEMENT</u></strong>

By this Motion, the Ad Hoc Group seeks to have this Court set the ground rules pursuant to which the Debtors, the Committee, and their respective counsel may appear and be heard with respect to any disputes, transactions, or proposed settlements of prepetition or postpetition claims and causes of action by and between one or more Debtors in these Cases.  Because the Debtors and their advisors have not yet responded to the Ad Hoc Group's repeated inquiries regarding how each intends to protect estate assets that could be adversely affected by the litigation positions the Debtors have made clear that they will pursue, and are pursuing, in these Cases, the Ad Hoc Group has little choice but to file this Motion.

While it still remains unclear what determinations the Debtors and the Committee will in fact be seeking with respect to the treatment of intercompany claims and causes of action in their joint plan on file, the Debtors and the Committee are currently advocating in multiple pleadings that such claims lack substantive legal merit.  Obviously, this position is prejudicial and adverse to any Debtor that is the beneficiary of a claim against another Debtor.  As a consequence, the Ad Hoc Group has attempted to gain clarity from the Debtors and their counsel as to how they

2

intend to protect each individual Debtor's rights that could be adversely impacted by positions

being taken with respect to all Debtors.  Rather than respond directly to the Ad Hoc Group's

inquiry, the Debtors submitted a letter to, and scheduled a conference with, this Court seeking

guidance on how to proceed.  While the Court declined to provide such guidance, the Court did

suggest that, if the Ad Hoc Group believed that relief was required, it should seek such relief

quickly.  Since the status conference, the Debtors still have not provided any response to the

basic questions asked by the Ad Hoc Group regarding how the Debtors intend to proceed, and

instead have continued to advance litigation positions that are adverse to particular Debtors.

That state of play should not continue.

        The relief requested herein—that counsel and management remain neutral in any

litigation concerning inter-Debtor disputes—should be non-controversial and consensual.  The

Ad Hoc Group is not seeking the wholesale disqualification of MoFo, Kramer, Lewis Kruger

("Mr. Kruger"), the Debtors' other management, or any of the other advisors to the Debtors or

the Committee in these Cases.  The Ad Hoc Group is seeking a direction from this Court that the

foregoing individuals and firms do what the law requires: remain neutral on the issues that they

are in conflict on.  All should be willing to do so without this Court's direction, but none have

been willing to agree to this standard voluntarily.

        Although the issue of inter-Debtor conflicts has been raised with the Court in the context

of litigation over the Debtors' "Scheduled Intercompany Claims" (as defined herein), this

Motion is not solely the result of there being scheduled prepetition intercompany claims between

the Debtors in these Cases.  Nor is it solely the result of there being material legal and factual

disputes with respect to the legitimacy of those filed claims or other potential unscheduled claims

and causes of action relating to other prepetition conduct between the Debtors.  Rather, this

Motion arises from one troubling and impermissible proposition advanced by the estate fiduciaries in these cases: that one law firm—MoFo—has and will provide legal advice to the individuals responsible for decision making on behalf of Debtors—primarily, if not exclusively, Mr. Kruger—who will, in reliance on that advice, advance legal positions in pleadings and take corporate action on behalf of each Debtor on numerous matters, including intercompany claim litigation, as to which the Debtors are in direct conflict.

In almost all multi-debtor chapter 11 cases, "claims" within the meaning of section 101(5) of the Code exist by and between debtors. Often, those claims are the subject of potential disputes. On occasion, the contest over the allowance and priority of inter-debtor claims can have material implications for creditor distributions. In the rarest of cases, disputes over inter-debtor claims can actually become outcome determinative on one or more key issues affecting an estate's distributable value. These Cases now fit into this last category, in that the issue of whether or not pre- and postpetition claims between Debtors are allowed, disallowed, or even settled as part of a plan of reorganization will affect (a) the distribution of at least $500 million and likely in excess of a billion dollars to creditors throughout the ResCap enterprise, (b) the ability of each of the Debtors to accede to a global settlement which compromises those claims, and (c) whether or not the JSNs are oversecured for purposes of section 506(b) of the Code. In other similar Chapter 11 cases, debtors and their professionals have effectively and appropriately managed to navigate their way through thorny conflict issues without giving in to the cries of ruin and chaos that this Motion may engender. Examiners have been appointed to manage conflicts. Debtors have proceeded with conflicts counsel and independent trustees employed by adverse estates. Creditors on opposite sides of disputes have been deputized to take up the conflicting debtors' burdens. In some cases, debtors have proposed a resolution in a plan of

reorganization, attempted to describe the dispute neutrally and openly in a disclosure statement, and left it to affected creditors alone to ratify a plan settlement of inter-debtor disputes.  None of these avenues have been employed here.

Unfortunately, MoFo and the Debtors' officers and directors responsible for the Debtors' restructuring are taking no steps to manage their conflict.  They have, for example, signed onto a plan which apparently requires MoFo to provide substantive legal advice to Debtors' management, on behalf of each Debtor, to support a waiver and cancellation of any and all claims asserted by the Debtors against other Debtors represented by MoFo.  It is highly unlikely that any court would ever allow an estate fiduciary or estate counsel to waive an estate's rights or claims if the beneficiary of that waiver was a third-party advised or managed by the same debtor counsel or officer.  Analytically, there is no difference whether the beneficiary of the waiver is unrelated to the debtor or shares common prepetition management and ownership—the duties of loyalty, maximization of value, and zealous advocacy remain in place.

Indeed, we are aware of no case, big or small, in which a debtor's section 327(a) counsel was permitted to provide substantive legal advice on both sides of a material inter-debtor dispute and then to advocate for a particular result in public pleadings.  The Ad Hoc Group is concerned that MoFo and the Debtors' management involved in the decision making seem unattuned to the conflict position they are in, and are attempting to assume away their conflicts in the belief that all estates in conflict will be benefitted by what MoFo and the Debtors' management persistently, but inaccurately, seek to portray as a "global settlement."

That proposed "settlement," however, is not a bilateral, arms'-length settlement of inter-Debtor claims and causes of action between well-represented adverse estates.  Instead, the chosen course of MoFo and the Debtors' officers and directors has been to waive and extinguish

all such claims based on a unilateral determination, alleged to be in reliance on advice from conflicted counsel (and supposedly blessed by advisors of the Committee, who are equally conflicted), that no Debtor has a valid debt claim against any other Debtor.  The alleged justification that the claims are, in fact, without merit misses the point—whether or not the claims are valid or invalid is a determination that cannot be made by one set of management and one set of counsel.  The Debtors should not be asking this Court to sanction that result because the party providing the justification is another Debtor.

The Committee and its counsel are similarly conflicted here.  For the first six months of these Cases, they pressed for control of the Debtors' claims against Ally, almost entirely on the basis that one set of management with ties (but no formal duties) to Ally had input on whether or not to sue Ally.  The Committee insisted on obtaining <u>STN</u> standing to bring those claims and forced as part of a compromise on exclusivity that the Debtors appoint an independent fiduciary (Mr. Kruger) to have sole control over claims against the Debtors' non-debtor affiliates.  When their constituents' recoveries were at risk, the Committee was intolerant of even the appearance of impropriety.  Now, however, the Committee and its counsel are proponents of a plan that not only requires the resolution of over $8 billion in prepetition inter-Debtor claims for no consideration and without independent oversight, but also requires that the resolution be effectuated by one fiduciary, advised by one set of counsel.  Given the Committee's insistence on the ceding of all plan control to Mr. Kruger in its earlier fight for strict neutrality, the Debtors have no present ability even to appoint other fiduciaries to manage them through the conflict position that now exists.  The simple fact is that the Committee represents and owes duties to unsecured creditors who would benefit from the waiver of Scheduled Intercompany Claims and others who would not—as such, it cannot solve the problem for the Debtors, even if the

Committee had sought authority to act on behalf of conflicted Debtor management and counsel.

Fundamentally, the Debtors and the Committee have left the parties-in-interest in these Cases in a potentially difficult situation by proceeding as if confirmation of their joint plan is a foregone conclusion.   If the proposed plan is not confirmed, there will be an entire set of Debtors who have admitted they have no valid claims against other Debtors or, to the extent they are valid, that the claims are worthless.  How is each of these Debtors going to negotiate those claims under a new plan?  How can those claims be fairly resolved after such an admission? Appropriate protections and precautions have to be put in place.

In that regard, the existence of material, unresolved conflicts does not mandate that the Cases come to a halt, or that no plan can be formulated to take into consideration the inter-Debtor conflicts that exist.  Nor does it mean that the Debtors, the Committee and their counsel must abandon ship.  The Cases, however, cannot proceed on the path currently proposed, in which the Debtors, for example, will seek authority from this Court to waive and cancel all inter-Debtor claims in reliance on MoFo's advice.  As a result of the lack of any voluntary remedial action by the Debtors or their counsel, the Ad Hoc Group reluctantly asks the Court to address the problem, and hereby respectfully requests that the Court (a) direct each of the Debtors' counsel, including MoFo, counsel to the Committee, including Kramer, and the Debtors' management to remain strictly neutral in any dispute in this Court regarding claims by and between any Debtors; and (b) order the limited disqualification of each of the foregoing to the extent necessary to effectuate the foregoing.

## JURISDICTION AND VENUE

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief requested herein are §§ 105(a), 327 and 363 of the Bankruptcy Code.

## RELEVANT FACTUAL BACKGROUND

1.      On June 30, 2012, each Debtor filed publicly its Statement of Assets and

Liabilities listing all of its books and records claims against each Debtor (collectively, the

"Intercompany Claims").[1]  See, e.g., Statement of Assets and Liabilities ("SOALs"), dated June

30, 2012, for Passive Asset Transactions, LLC ("PATI")  [Docket No. 582] (listing

intercompany receivables from GMAC Mortgage ("GMACM"), LLC); SOAL, dated June 30,

2012, of Executive Trustee Services, LLC ("ETS") [Docket No. 561] (listing intercompany

receivable from GMACM and Residential Funding Company, LLC ("RFC").  Each of those

SOALs, which list more than $8.3 billion in aggregate general unsecured Intercompany Claims,

notes that the Debtors "made every attempt to properly characterize, prioritize and classify all

intercompany transactions."  See Healy Decl. at ¶ 8.  As the Debtors recognized the correlation

between any plan recovery on Intercompany Claims and the JSNs' claim for postpetition interest,

the Debtors began to shift their approach to the legitimacy of their Intercompany Claims listed in

the SOALs.  Counsel for the Ad Hoc Group on numerous occasions engaged in communications

with MoFo thereafter concerning the Debtors' evolving positions concerning Intercompany

Claims and the conflicts issues involved.  Those shifts are described in the Healy Declaration at

¶¶ 7-17. As it became clear that MoFo and Mr. Kruger did not recognize, or intended to ignore

the conflicts created by their actions, the Ad Hoc Group's counsel wrote to MoFo on June 26,

2013, setting forth a series of questions intended to confirm that MoFo and the Debtors

---

[1] For a more detailed overview of the relevant factual background, please see the accompanying declaration of
Dwight A. Healy ("Healy Decl.").  In this Motion, we refer to "Intercompany Claims" generally to describe the
inter-Debtor claims scheduled in the SOALs as well as any unscheduled intercompany claims underlying the SOALs
that arise from the Debtors prepetition business interactions.  There are in addition a wide array of other inter-Debtor
disputes, referred to generally as "Inter-Debtor Disputes," that go beyond the Intercompany Claims, such as disputes
over how the estates will allocate postpetition expenses and allocate recoveries from Ally Financial, Inc. and its
affiliated non-Debtor entities (collectively, "Ally") in connection with the "Global Settlement" outlined in the
Debtors' Joint Proposed Plan, dated July 3, 2013, [Docket No. 4153] (the "Plan").

understood there was a conflict and to elicit how MoFo and the Debtors intended to deal with the conflict issues in the contexts in which they were presented.  See Healy Decl. at ¶ 28.

2.      Rather than respond, MoFo and the Debtors immediately requested a conference with the Court in which they sought to have the Court peremptorily relieve them of the conflict issue and bar any discovery into their conduct.  At a July 3, 2013 conference, the Court rejected the contention that any conflict issue had been waived by the Court's approval of the PSA, but the Court directed that if, following receipt of the Debtors' proposed Disclosure Statement and Plan, the Ad Hoc Group intended to move to disqualify, it do so quickly.  The Debtors filed the Plan and Proposed Disclosure Statement on July 3 and 4, 2013, but have still failed to respond to any of the questions and issues raised in the June 26 letter.

3.      Based on the pleadings they have now filed with the Court, the Debtors apparently intend to continue to move forward with litigation in which the Debtor estates are in conflict.  The Plan provides that "Intercompany Balances, as well as any subrogation claims and fraudulent conveyance claims related to the forgiveness of intercompany debt, will be compromised as part of the Global Settlement, and waived, cancelled, and discharged on the Effective date, and holders of Intercompany Balances will receive no recovery on account of such claims."  Healy Decl. at ¶ 16 (emphasis added).  In addition, the proposed Disclosure Statement explains that, in committing to the plan treatment of intercompany claims, the Debtors have evaluated the intercompany claims and have determined that "the Intercompany Balances reflected in the Schedules lack many of the indicia of true debt and likely would not be enforceable Intercompany Balances."  Healy Decl. at ¶ 15.  The Disclosure Statement further states that "in light of the analysis of the Intercompany Balances, in addition to the cost and delay that could result from litigating these issues, the Plan Proponents believe that the

compromise of Intercompany Balances embodied in the Plan is in the best interest of the Estates

and creditors." Healy Decl. at ¶ 15.  Any lingering doubts as to whether MoFo and management

intended to litigate actively over the Inter-Debtor Disputes were put to rest in the answer filed by

MoFo in the Consolidated Adversary Proceedings.  In that answer, each of the Debtors, all of

whom are represented by the same counsel, denied the allowability of the Intercompany Claims

listed in the SOALs.  Healy Decl. at ¶ 17.  In light of the Debtors' publicly filed statements, the

likelihood that litigation in which estates are in conflict will proceed, and the silence of the

Debtors with respect to the questions and issues raised in the Ad Hoc Group's June 26 letter, the

Ad Hoc Group has been left with no choice but to file this Motion.

### ARGUMENT

4.       By this Motion, the Ad Hoc Group seeks an order (a) directing each of the

Debtors' counsel, MoFo, counsel to the Committee, including  Kramer, and the Debtors'

management to remain strictly neutral in any dispute in this Court regarding claims by and

between any Debtors; (b) ordering the limited disqualification of each of the foregoing to the

extent necessary to effectuate the foregoing; (c) granting related relief; and (d) awarding the Ad

Hoc Group such other and further relief as the Court deems appropriate.

**A.       The Debtor Estates Are Entitled To Be Represented By Counsel That Are Unconflicted Under Both Section 327 Of The Code And The New York Rules Of Professional Conduct**

5.       It is fundamental that in a corporate reorganization, competent counsel for each

debtor is essential.  See In re Whet, Inc., 33 B.R. 438, 442 (Bankr. Mass. 1983); see also Fed. R.

Bankr. P. 9010, Notes of Advisory Committee on Rules-1983.  Section 327 of the Bankruptcy

Code mandates that counsel must be free of conflicts of interest in its representation of an estate.

11 U.S.C. § 327(a).  Section 327 imposes a two-pronged test for the initial retention and

continued employment of professionals.  The professional (1) must not hold or represent any

interest adverse to the estate and (2) must be a "distinterested person." Bank Brussels Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610, 620-21 (2d Cir. 1999); Bergrin v. Eerie World Entm't, LLC, No. 03 Civ. 4501 (SAS), 2003 WL 22861948, at *1 (S.D.N.Y. Dec. 2, 2003); In re Vebeliunas, 231 B.R. 181, 188 (Bankr. S.D.N.Y. 1999); In re Granite Partners, L.P., 219 B.R. 22, 32-34 (Bankr. S.D.N.Y. 1998). When read in conjunction with the definition of "disinterested person" contained in section 101(14)(C), which includes the requirement that the person not have an interest materially adverse to the estate or any class of creditors or equity holders, however, section 327(a) provides a single test to assess conflict. In re JMK Constr. Grp., Ltd., 441 B.R. 222, 229 (Bankr. S.D.N.Y. 2010). That test is whether the professional holds or represents "an interest adverse to the estate." AroChem Corp., 176 F.3d at 622-23.

6.      An "adverse interest" is either (1) the possession or assertion of any economic interest that would tend to lessen the value of the bankruptcy estate or create an actual or potential dispute with the estate as a rival claimant, or (2) a predisposition of bias against the estate. See AroChem Corp., 176 F.3d at 623 (quotation and citations omitted); JMK Constr. Grp., Ltd., 441 B.R. at 229 (quotation and citations omitted); Granite Partners, L.P., 219 B.R. at 33 (citations omitted). The determination of "adverse interest" is objective and is concerned with the appearance of impropriety. JMK Constr. Grp., Ltd., 441 B.R. at 229. A professional has a disabling conflict if it has "either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one." Granite Partners, L.P., 219 B.R. at 33 (internal quotation omitted).

7.      The determination of whether a disqualifying conflict exists is fact specific, and may include consideration of the interests of the estate and the debtor's creditors. But the

"requirements of section 327 [must be taken] seriously, as they ensure that a professional fulfills his duties in accordance with his fiduciary duties to the estate." JMK Constr. Grp., Ltd., 441 B.R. at 230. As this Court further noted in JMK, "courts lack the power to authorize the employment of a professional who has a conflict of interest." Id. (quotation and citation omitted).

8.       Similarly, the New York Rules of Professional Conduct (and the predecessor Code of Professional Responsibility) provides that a lawyer may not both appear for and oppose a client on substantially related matters when the interests of competing clients are directly adverse. See Greene v. Greene, 47 N.Y.2d 447, 451, 418 N.Y.S.2d 379, 381 (N.Y. 1979);[2] see also 22 N.Y. COMP. CODES R. & REGS. 1200.0 R. 1.7(a) (2009) ("Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either: (1) the representation will involve the lawyer in representing differing interests; or (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests."[3]).

In Greene, the New York Court of Appeals noted:

Perhaps the clearest instance of impermissible conflict occurs when a lawyer represents two adverse parties in a legal proceeding. In such a case, the lawyer owes a duty to each client to advocate the client's interests zealously. Yet, to properly represent either one of the parties, he must forsake his obligation to the other. Because dual representation is fraught with the potential for irreconcilable conflict, it will rarely be sanctioned even after full disclosure has been made and the consent of the clients obtained. Particularly is this so . . . where the conflict extends to the very subject matter of the litigation.

---

[2] The cases decided under the current rules of the Rules of Professional Conduct, adopted in 2009, have continued to look to Greene and other cases decided under the previous professional conduct rules as authoritative. See Marinozzi v. Saunders, 37 Misc.3d 1225(A), at *2, *4 (N.Y. Sup. Ct. Oct. 19, 2012) (citing Greene); Glacken v. Inc. Vill. of Freeport, No. 09-4832, 2010 WL 3943527, at *3-5 (E.D.N.Y. Oct. 6, 2010).
[3] The exception in paragraph (b) does not apply where the representation involves "the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal."

47 N.Y.2d at 451-52 (internal citations omitted); see also In re Kelly, 23 N.Y.2d 368, 378, 296 N.Y.S.2d 937, 945-46 (N.Y. 1968) ("where a lawyer represents parties whose interests conflict as to the particular subject matter, the likelihood of prejudice to one party may be so great that misconduct will be found despite disclosure and consent."); Shaikh v. Waiters, 710 N.Y.S.2d 873, 877 (N.Y. Sup. Ct. 2000) ("an attorney who undertakes the joint representation of two parties in a lawsuit [should] not continue as counsel for either one after an actual conflict of interest has arisen since continued representation of either plaintiff would necessarily result in a violation of an attorney's fiduciary obligations of preserving his or her client's confidentiality, as well as the duty to pursue a client's interest vigorously") (internal citation and quotations omitted).

**B.    MoFo May Not Represent The Debtors In Connection With Litigation Over Inter-Debtor Disputes**

9.    Although the mere existence of intercompany claims between Chapter 11 debtors does not automatically require disqualification, "[t]he existence of [such] claims among debtor individuals or entities is scrutinized closely as it relates to representation of multiple parties (creditors and debtors) in reorganization proceedings." JMK Constr. Grp., Ltd., 441 B.R. at 230. The problem has become acute in these Cases because the Debtors with Intercompany Claims have different creditors, and the determination of the validity, and value, of the Intercompany Claims under present circumstances will have a direct and material impact on the recoveries of those different creditor groups within the enterprise.

10.    Where, as here, there are legitimate inter-debtor disputes that must be resolved as part of a reorganization, the debtor's attorney is conflicted and cannot act.  See id. (denying the applications of counsel to represent more than one of four debtors, where the debtors may have had a right of contribution against each other for a judgment that found the debtors jointly and

severally liable); In re Interwest Bus. Equip., Inc., 23 F.3d 311, 316 (10th Cir. 1994) (affirming bankruptcy court's determination that there must be "separate counsel who can fairly and fully advise each debtor as to its rights and responsibilities.") (emphasis added); In re Coal River Res., Inc., 321 B.R. 184, 188-89 (W.D. Va. 2005) (finding that a firm was not qualified to represent two of four debtors because some of the debtors had filed schedules indicating that they were creditors of other debtors and there was intercompany indebtedness); In re Star Broad., Inc., 81 B.R. 835, 841 (Bankr. D.N.J. 1988) (concluding that dual representation "[w]here one estate is indebted to the other, there exists two groups of creditors which have conflicting claims and payment for one group is necessarily at the expense of the other" warrants disqualification.); In re Jennings, 199 Fed. App'x 845, 849 (11th Cir. 2006) (affirming bankruptcy court's decision that law firm was disqualified from representing multiple debtors where there were conflicting claims between the debtors); In re Straughn, 428 B.R. 618, 625-26 (Bankr. W.D. Pa. 2010) (disqualifying law firm and finding that "because one estate is indebted to the other, there is an actual conflict of interest which prohibits the dual representation….").

11.    Inter-debtor conflicts cannot be avoided by having counsel (or the debtors, advised by the same counsel) disavow the existence of one debtor's valid right of recovery against another.  See JMK Constr. Grp., Ltd., 441 B.R. at 231 (rejecting counsel's effort to "mitigate any actual conflict by disavowing the Debtors' continuing right to seek contributions from one another….").  This is true regardless of whether the disavowal follows an "investigation" by conflicted counsel that purports to conclude that the claim involved is meritless.  Counsel who is conflicted can no more conduct an investigation of the merits of claims between concurrent clients than actually stand on both sides of litigation as to such claims.  Granite Partners, L.P., 219 B.R. at 22.  See also Examiner's Report at Section III-248

("Morrison & Foerster's decision that it could perform an 'independent' review on the 'financial and operational course of dealing between [Ally] and ResCap' is questionable in light of the firm's significant involvement in that very course of dealing during the preceding years.").  The results of any such investigation are tainted, regardless of whether counsel actually failed to properly perform the investigation.  See Granite Partners, L.P., 219 B.R. at 38 (concluding that "like Caesar's wife, trustee's counsel must be above suspicion.  Bankruptcy is concerned as much with appearances as with reality . . . . No matter how thoroughly or fairly [counsel] conducted the investigation, the question will always linger whether it held back, or failed to bite the hand that feeds it quite as hard as the circumstances warranted.").

12.    Nor can a proposed waiver of the conflict or of the underlying claim between clients cure the conflict.  This Court has found that "conflict waivers are not effective for purposes of satisfying the 'adverse interest' requirement of section 327(a) of the Bankruptcy Code."  JMK Constr. Grp., Ltd., 441 B.R. at 237 (citing additional cases including In re Project Orange Assocs., LLC, 431 B.R. 363, 374-75 (Bankr. S.D.N.Y. 2010)).  Even less effective to remove the conflict is a purported waiver of the underlying inter-debtor claim.  See JMK Constr. Grp., Ltd., 441 B.R. at 238 ("the debt from JMK is property of the estate in Kopf's individual chapter 11 case.  Kopf clearly disposed of property 'other than in the ordinary course of business,' something that cannot be done without court approval."); In re Straughn, 428 B.R. at 625-26 (debtor's proposal to waive claim against another debtor "does not resolve the actual conflict. [Straughn's] agreement to waive the claim is a detriment to her personal creditors … [which would benefit the creditors of the other debtor's estate] while the creditors of her individual estate would suffer in the reverse degree.  Proposed Counsel would be faced with the dilemma of advising Straughn to choose between conflicting duties which exist in her capacity as

president of the corporation in the corporate bankruptcy and as a fiduciary for the individual

estate.).

13.    To the same effect is In re Shore, No. 03-43072, 2004 WL 2357992 (Bankr. D.

Kan. May 14, 2004).  In Shore, counsel for the debtor also represented the debtor's wife and one

of the debtors' creditors, Western Production Co., with whom the debtor had executed a lease.

2004 WL 2357992, at *1-2.  The court noted that the relationships created an actual conflict that

placed the law firm "in the position of trying to determine whether to represent the interests of

Debtor Shore, or the interests of Western and Janet Shore, when they conflict." Id. at *5.  Under

the debtor's original plan of reorganization, the debtor proposed that a lease between the two

would continue. Id.  But, "[a]pparently finally recognizing the actual conflict of interest," the

law firm proposed an amended plan whereby the Western lease would be rejected. Id. at *6.

The law firm argued that the rejection of the lease cured the actual conflict. Id.  Rejecting the

law firm's argument, which the court summarized as "basically, everything is going to turn out

alright," the court disqualified the debtor's counsel because the conflict was an actual one and

that it would be an "impossible task for [counsel] to undertake this multiple representation and

recommend decisions for one of its clients that would not be at the expense of another." Id.  at

*7, *8.  Like the debtor's counsel in Shore, MoFo's and Mr. Kruger's pre-ordained confirmation

of the plan is their very own "everything is going to turn out alright" defense to all the myriad of

inter-Debtor conflicts.  However, the Debtors cannot settle their way out of the actual conflict

that has arisen between the Debtors, no matter how "alright" they will be if the Global

Settlement is consummated.

14.    As noted above, the Ad Hoc Group is not seeking the drastic remedy imposed in

many of the above cases—the wholesale disqualification of section 327(a) counsel.  The courts

in this and other circuits have identified remedial steps that can be taken by counsel for a debtor-in-possession or trustee when faced with a conflict regarding inter-debtor claims that are disputed and outcome determinative.  One potential remedy is the appointment of special counsel and independent fiduciaries.  See, e.g., In re O.P.M. Leasing Servs., Inc., 16 B.R. 932, 938 (Bankr. S.D.N.Y. 1982) (suggesting that the appointment of special counsel could resolve a potential conflict); Katz v. Kilsheimer, 327 F.2d 633, 635-36 (2d Cir. 1964); In re Global Marine, Inc., 108 B.R. 998, 1004 (Bankr. S.D. Tex. 1987) (noting that should [a] conflict become "open and ongoing as opposed to dormant," the conflict could be resolved by appointment of special counsel); see also In re AbitibiBowater Inc., No. 09-11296 (KJC) (Bankr. D. Del. June 25, 2010) [Docket No. 2497] (court approving motion appointing conflicts counsel where intercompany claims and inter-debtor issues existed); In re AbitibiBowater Inc., No. 09-11296 (KJC) (Bankr. D. Del. July 7, 2010) [Docket No. 2614] (where intercompany claims and inter-debtor issues existed, bankruptcy court approved motion to appoint a special advisor and investigator).

15.    Moreover, a plan of reorganization that proposes the 100% payment of all creditors eliminates prejudice to the estates and thus the conflict.  In re Guy Apple Masonry Contractor, Inc., 45 B.R. 160, 166 (D. Ariz. 1984) (concluding that conflict may be voidable "where creditors would be paid in full").  Another alternative, approved by the court in Adelphia, is for the debtors-in-possession and their counsel to "tee up the Interdebtor Disputes for Court determination, and to step aside while affected creditors [fight] the issues out…."  336 B.R. 610, 671 (Bankr. S.D.N.Y. 2006).

16.    What counsel cannot do, however, is continue to appear and act on behalf of debtors in connection with any disputes over inter-debtor disputes.  Once those disputes become

a "prominent feature of these chapter 11 cases," counsel "must withdraw from acting against, or for," debtors in such disputes. Id. at 672-73. They cannot weigh in on the merits of the disputes or otherwise take sides in the disputes. In short, they must remain strictly neutral. Consistent with those precepts, the court in Adelphia granted motions to "require the debtors to recuse themselves in the Interdebtor Disputes, and to disqualify [counsel] from acting for or against any debtor in the Interdebtor Disputes—i.e., to make their neutrality in such disputes mandatory." Id. at 678.

17.     MoFo has moved beyond neutrality in these Cases. It has purportedly evaluated the merits of disputes between the Debtor estates and taken a view on the merits of those disputes which is set forth in the Disclosure Statement. For example, in connection with their legal representation, they have opined that the Intercompany Claims "lack many of the indicia of true debt and likely would not be enforceable Intercompany Balances …." Disclosure Statement at 35. The Disclosure Statement goes further, stating that the Debtors will waive the claims. MoFo has also filed an answer in the Consolidated Adversary Proceedings which unqualifiedly denies the existence and/or legal merit of claims that the Debtors have scheduled against others. Healy Decl. at ¶ 17. In doing so without any qualification or reservation, MoFo has taken sides in a way that may have "injured one or another of the estates to whom [it] owed their duties of loyalty…." Adelphia Commc'ns Corp., 336 B.R. at 671.

18.     In Adelphia, Judge Gerber made clear that such expressions in the disclosure statement were inappropriate. Noting that he would not permit the debtors to express their view on the outcome of the dispute in the disclosure statement, Judge Gerber stated:

> [I]f a fiduciary were to act contrary to the interest of an entity to whom it owes the fiduciary duty, that could be materially prejudicial, and I think we need to avoid that, absent consent from those who might be hurt thereby. I don't know whose ox would be gored by the debtors' expression of views, but one or the other, and

likely both[,] of the stakeholders in the Arahova and [P]arent groups might well be troubled, prejudiced, and/or damaged by aspects of what the debtors or their counsel might say.  And that might be regarded or alleged by some as inconsistent with the fiduciary duties the debtors' management[,] board and professionals hold to individual debtors, one or more of the 230 of them.

Id. at 670.  Such is the neutrality that is sorely lacking and required here.

### C.    There Is An Actual Conflict Inherent In The Roles Of Mr. Kruger As Chief Restructuring Officer And The Debtors' Other Officers And Directors In Connection With Inter-Debtor Disputes

19.    Mr. Kruger, as well as the Debtors' other officers and directors, should also be restricted from engaging in litigation over, or acting in connection with, inter-Debtor disputes for the same reasons as MoFo.  Even if Mr. Kruger is not considered a professional under section 327(a), and therefore not subject to the strictures of that rule, he expressly acknowledged in his retention agreement that he owes fiduciary duties to each of the Debtors.  Kruger Amended Engagement Letter [Docket No. 3074, Ex. 1] at 2.  The Court approved his retention on the basis of the terms of that agreement.  Kruger Amended Engagement Letter [Docket No. 3074, Ex. 1].  Although Mr. Kruger may be free of conflict with respect to non-debtor affiliates of the Debtors, as to legal disputes between his estates, he is clearly conflicted because he serves as a fiduciary for each.

20.    Even without the explicit acknowledgement contained in Mr. Kruger's retention letter, Mr. Kruger and other officers and directors of the Debtors have fiduciary duties that preclude them from purporting to simultaneously act for multiple Debtors with conflicting claims.  A debtor-in-possession owes fiduciary duties to its estate and creditors  See, e.g., In re Hampton Hotel Investors, L.P., 270 B.R. 346, 361-62 (Bankr. S.D.N.Y. 2001).  Since each estate is a separate and distinct entity, in related multi-debtor cases, the fiduciary duties of each debtor-in-possession runs to its own estate and creditors, not to some amorphous combination of the estates of all related debtors.  See Interwest Bus. Equip., 23 F.3d at 316, n. 9.

19

21.     As the court in <u>Adelphia</u> recognized in requiring the officers and directors of the debtors to recuse themselves on inter-debtor issues, "the Debtors also have the duty to avoid conflicts of interest and the appearance of impropriety, and to treat all parties to the case fairly." <u>Adelphia Commc'ns Corp.</u>, 336 B.R. at 670-71.  Thus,

> [t]he Debtors' decision to tee up the Interdebtor Disputes for Court determination, and to step to the side while affected creditors fought the issues out, was sensible, and hardly a breach of fiduciary duty.  But if the Debtors actually took sides in a way that injured one or another of the estates to whom they owed their duties of loyalty, that would result in at least the appearance of impropriety, and, the Court fears, the reality as well.

<u>Id.</u> at 671 (granting motion to require Debtor officers and directors to recuse themselves on inter-debtor issues).  As set forth above, the positions taken on behalf of the Debtors, all approved or to be approved by Mr. Kruger, are fundamentally inconsistent with the fiduciary duties owed by Mr. Kruger to Debtor participants in intercompany transactions.

22.     The conflict here cannot be explained away by the argument that Intercompany Claims and Inter-Debtor Disputes are to be resolved as part of an overall settlement that benefits all Debtors.  The Debtors do not propose to have creditors compromise Inter-Debtor Disputes as one component of a complex deal.  Rather, the Plan and Disclosure Statement reflect that the Debtors will waive and cancel them based on a unilateral determination by MoFo (supposedly blessed by advisors to the conflicted Committee) that the claims are invalid.

23.     More fundamentally, management of the "Debtors" cannot openly prejudice one estate to support a transaction in which the estates as a whole might benefit, even if that benefit is substantial and apparent.  A manager of a debtor-in-possession owes a fiduciary duty to the estate of that debtor and its creditors to maximize the value of the estate of the debtor for which he is a fiduciary.  <u>See</u> <u>In re Interwest</u>, 23 F.3d at 311, n.9.  Where, as here, a single individual acts as a fiduciary for multiple debtors, he owes a duty to each debtor to maximize the value of

the estate of each debtor. That principle is reflected in Mr. Kruger's retention letter, which expressly recites that he owes a fiduciary duty to each Debtor's estates, and is firmly embedded in the law of this Circuit. In particular, in evaluating the propriety of a settlement of a multi-debtor jointly administered case, the Second Circuit made clear that the effect of the settlement on the creditors of each estate had to be considered. See In re Augie/Restivo Baking Co., Ltd., 860 F.2d 515 (2d Cir. 1988). In that seminal case, the Second Circuit reversed a bankruptcy court decision ordering substantive consolidation as a means to confirm a joint plan that "would benefit the creditors of both companies." Id. at 520. In reversing, the Second Circuit found a "benefit for all" approach was inappropriate even in a jointly-administered case, noting that creditors of one estate should not be made to sacrifice the priority of their claims to creditors of another estate based upon a bankruptcy court's speculation that it knows the creditors' interests better than the creditors themselves. Id. Citing to a decision authored by Judge Friendly, the Augie/Restivo court highlighted that, while substantive consolidation might permit "the quick consummation" of a restructuring, that desirable consequence cannot come "at the cost of sacrificing the rights" of creditors. See id. at 520-21 (quoting In re Flora Mir Candy Corp., 432 F.2d 1060, 1063 (2d Cir. 1970)). Augie/Restivo stands for the important proposition that each of the debtors and their respective creditor bodies must be considered when analyzing a transaction involving multiple debtors. Cf. Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) ("The court also held that 'the Debtors [had] advanced good business reasons' for the sale and that it was 'a reasonable exercise of each of the Debtors' business judgment to consummate a transfer of the Transferred Assets on the terms and conditions set forth in the Agreement.'") (emphasis added) (internal citations omitted); In re

21

Raytech Corp., 261 B.R. 350, 359-61 (Bankr. D.Conn. 2001) (analyzing the impact of

settlement between jointly administered estates on each of the settling estates).

24.    The Debtors and MoFo have made no effort to show—indeed, have refused to

even address the issue—that the proposed plan to extinguish all Intercompany Claims and

compromise all Inter-Debtor Disputes for no value meets this standard, and it is transparent that

it does not.  For example, although the Debtors justify their plan treatment of Intercompany

Claims on the ground that a wholesale waiver is necessary to achieve an overall settlement that

will benefit all Debtors, the Debtors have steadfastly refused to allocate any part of the supposed

benefit of the resolution to individual Debtor estates.

25.    The unfairness of this approach to benefit all estates at the expense of individual

Debtors is highlighted by the effect of the proposed plan on Debtors such as Homecomings

Financial, LLC. ("Homecomings").  The JSNs have an "all asset" lien on Homecomings' assets

as well as a lien on its equity interests held by RFC.  Given this, the JSNs are harmed by any

extinguishment of Homecomings' Intercompany Claims.  Specifically, Homecomings has a

scheduled intercompany claim against RFC in the amount of $1,251,460,102.30.  See Amended

SOALs for RFC [Docket No. 684] at 5 (listing intercompany claim payable to Homecomings).

That claim and a second Intercompany Claim are essentially the only assets of Homecomings,

and virtually the sole source for any distribution to the creditors of Homecomings, including

scheduled unsecured claims.  See Amended SOALs for Homecomings [Docket No. 688] at 2

(Summary of Schedules showing intercompany claims are the bulk of Homecomings' assets).

While the Ad Hoc Group expects that the Debtors will contend that all Intercompany Claims are

extinguished, including those owed to Homecomings, as part of a global settlement which

consolidates Homecomings into RFC for distribution purposes (which the Ad Hoc Group

disputes), the Debtors are actively prejudicing Homecomings <u>prior to</u> obtaining approval for that

settlement.  Specifically, in connection with their answer in the Consolidated Adversary

Proceedings, the Debtors and the Committee, without reservation, answered "denied" to an

allegation that RFC owes Homecomings $1.252 billion as listed in the SOALs, presumably to

support their proposed plan treatment.  <u>Healy Decl.</u> at ¶ 17.  This type of "horse trading"—

swapping the present interests of one debtor and its creditors to facilitate a potential resolution of

a plan for all debtors—is fundamentally inconsistent with the fiduciary duties owed by

management to each Debtor and cannot be squared with the governing Second Circuit authority.

> **D.    The Committee Is No Less Conflicted And Should Be Ordered To Remain Neutral**

26.    In the Disclosure Statement, the Debtors recite that they "shared their analysis and

supporting materials" relating to the Intercompany Claims "with advisors for the Creditors

Committee," who allegedly reviewed those analyses and materials and purportedly reached a

view as to the Intercompany Claims consistent with that of the MoFo.  Disclosure Statement at

35.  Neither MoFo nor the Debtors derive any substantive or procedural benefit from any such

review.

27.    There has been no request for Court approval to have the Committee's advisors

undertake any such assessment for, or on behalf of, any Debtors or to grant the Committee

standing to assert claims and defenses belonging to the Debtors.  Even assuming that the

Committee's counsel could fulfill the role of special counsel in a setting where Debtors' counsel

is conflicted (we are not aware of a case where it has actually been done), the Committee clearly

could not do so here.  The Committee here owes fiduciary duties to all unsecured creditors,

including creditors whose recoveries either benefit from, or are harmed by, Intercompany Claim

recognition.  In addition, the Committee is composed of members holding claims that are all

benefitted by the disallowance of Intercompany Claims and would be expected to negotiate for that result in any mediation.  Given the Debtors' capital structure, the Court has previously expressed concern about the Committee's ability to represent all of its constituencies on all matters.  See May 7, 2013 H'rg. Tr. 20:24-21:16.  Similar concerns led the court in Adelphia to require the creditors committee to remain neutral.  See Adelphia Commc'ns Corp., 336 B.R. at 626, n.18.

28.    Moreover, the Committee and its advisors cannot be considered neutral parties in the circumstances here.  Almost all of the Committee members' meaningful economic recovery will come from claims asserted against entities that are obligors on Intercompany Claims.  See Healy Decl. at ¶¶ 18-22.  Consequently, the Committee and its advisors are conflicted and cannot perform an objective investigation, or provide an untainted analysis, of the Inter-Debtor Disputes.

## CONCLUSION

29.    WHEREFORE, the Ad Hoc Group respectfully requests that the Court enter an order substantially in the form attached hereto as Exhibit A (a) directing each of the Debtors' counsel, MoFo, counsel to the Committee, including  Kramer, and the Debtors' management to remain strictly neutral in any dispute regarding claims by and between any Debtors; (b) ordering the limited disqualification of each of the foregoing to the extent necessary to effectuate the foregoing; (c) granting related relief; and (d) awarding the Ad Hoc Group such other and further relief as the Court deems appropriate.

Dated: July 18, 2013
New York, New York                          By:    /s/   J. Christopher Shore

J. Christopher Shore
Dwight Healy
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

and

MILBANK, TWEED, HADLEY &
McCLOY LLP
Gerard Uzzi
Dennis O'Donnell
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219


*Attorneys for the Ad Hoc Group*