WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore
Dwight A. Healy

- and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Gerard Uzzi
Dennis O'Donnell

*Attorneys for the Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) Case No. 12-12020 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF DWIGHT A. HEALY IN SUPPORT OF MOTION OF THE AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS FOR ENTRY OF AN ORDER (i) DIRECTING EACH OF DEBTORS' COUNSEL, INCLUDING MORRISON & FOERSTER LLP, OFFICIAL COMMITTEE COUNSEL, INCLUDING KRAMER LEVIN NAFTALIS & FRANKEL LLP, AND THE DEBTORS' MANAGEMENT TO REMAIN STRICTLY NEUTRAL IN ANY DISPUTE REGARDING CLAIMS BY AND BETWEEN ANY DEBTORS, (ii) ORDERING THE LIMITED DISQUALIFICATION OF EACH OF THE FOREGOING TO THE EXTENT NECESSARY TO EFFECTUATE THE FOREGOING, AND (iii) GRANTING RELATED RELIEF**

I, Dwight A. Healy, declare as follows:

      1.     I am a Partner with the firm of White & Case LLP, counsel for the Ad Hoc Group

of Junior Secured Noteholders (the "<u>Ad Hoc Group</u>"). I submit this declaration in support of the

Motion by the Ad Hoc Group of Junior Secured Noteholders ("JSNs") for entry of an order in

the above-captioned Chapter 11 cases (the "Cases") pursuant to 11 U.S.C. §§ 105, 327, and 363,

(a) directing each of the Debtors' counsel, including Morrison & Foerster LLP ("MoFo"),

counsel to the Official Committee of Unsecured Creditors (the "Committee"), including Kramer

Levin Naftalis & Frankel LLP ("Kramer"), and the Debtors' management to remain strictly

neutral in any dispute regarding claims by and between any Debtors; (b) ordering the limited

disqualification of each of the foregoing to the extent necessary to effectuate the foregoing; and

(c) granting related relief.  Except as noted herein, this declaration is based on the documents

referenced herein and the record in these Cases.

### A.    Documents With Respect To The Debtors' Intercompany Claims And Causes Of Action

2.      In their Statements of Assets and Liabilities (the "SOALs") filed in these Cases

on June 30, 2012, the Debtors list over $8.3 billion in aggregate prepetition claims between

Debtors ("Intercompany Claims").  See, e.g., Answer, Affirmative Defenses and Counterclaims

of Defendants UMB Bank, N.A. and the Ad Hoc Group of Junior Secured Noteholders to

Debtors' First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment

(the "Ad Hoc Group's Answer and Counterclaims") [Docket No. 14] at Ex. A; Amended SOALs

for ResCap, LLC [Docket No. 683] at 5 (listing intercompany claim payable to RFC in the

amount of $1,955,105,299.08).

3.      According to other pleadings filed by the Debtors in these Cases, there are also

potential unscheduled intercompany causes of action and inter-debtor disputes arising from the

Debtors' prepetition and postpetition activities that could lead to the allowance of additional

claims between the Debtors (collectively, the "Inter-Debtor Disputes").  For example, the

Debtors have stated that the enforcement of Intercompany Claims would "result in litigation

relating to, among other things, (i) potential avoidance of historical debt forgiveness; (ii) failure to charge Debtor entities with allocable expenses; and (iii) substantive consolidation." Disclosure Statement For the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors (the "Disclosure Statement") [Docket No. 4157] at 35.  The Disclosure Statement further states that "[o]n numerous occasions, where the existence of an intercompany payable on a Debtor's balance sheet threatened the solvency and net worth thresholds required under external funding agreements, or by federal and state regulators, the putative debt obligations were forgiven." Id.  In addition to historical debt forgiveness where the solvency of a Debtor entity was threatened, "putative debt obligations were forgiven among the Debtors and certain non-Debtor subsidiaries in connection with the Debtors' international transactions and the dissolution of entities.  Approximately $16.6 billion of debt was forgiven without consideration from 2007 through the Petition Date." Id.  According to the Debtors, these Inter-Debtor Disputes "are highly complex and factually intensive, requiring extensive discovery and expert testimony addressing solvency, valuation, contemporaneous exchange of value, arms-length terms, accounting practices, allocation issues, and so forth." Id. at 36.

   **B.**  **Documents Related To The Impact Of Recovery On Intercompany Claims On Secured And Unsecured Creditors Of Debtors With Intercompany Claims**

   4.  The Amended Third Priority Security Agreement executed by Residential Capital, LLC ("ResCap") and certain of its affiliates[1] grants a security interest in, among other things,

---

[1]  These affiliates—the "Guarantor Debtors"—are: GMAC Mortgage, LLC ("GMACM"); Residential Funding Company, LLC ("RFC"); GMAC-RFC Holding Company, LLC; Homecomings Financial, LLC ("Homecomings"); and GMAC Residential Holding Company, LLC ("Res Holding").  Amended Third Priority Security Agreement p. 1.

"Accounts" and "General Intangibles."[2]  The Amended and Restated Third Priority Pledge and

Security Agreement and Irrevocable Proxy, dated December 30, 2009, among Residential

Capital, LLC and certain of its Affiliates from time to time parties hereto, as Grantors, U.S. Bank

National Association, as Trustee and Wells Fargo Bank, N.A., as Third Priority Collateral Agent

and Collateral Control Agent (the "Amended Third Priority Security Agreement") § 2(i) (A true

and correct copy of selected pages of the Amended Third Priority Security Agreement is attached

to this Declaration as Exhibit A).  In the Final Cash Collateral Order, the Debtors stipulated to

among other things the validity, enforceability, and priority of the liens of the Junior Secured

Notes on "the personal and real property constituting 'Collateral' under, and as defined in, the

Junior Secured Notes Documents…."  Final Order Under Sections 105, 361, 362, 363, and 364

of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 (I) Authorizing the

Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the

Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection

Parties [Docket No. 491] (as subsequently amended, the "Final Cash Collateral Order") at ¶ 5(g).

     5.      Prior to the interim partial distribution by the Debtors of $800 million in principal

and prepetition interest on the Junior Secured Notes on or around June 13, 2013, the JSNs' claim

for unpaid principal and accrued prepetition interest totaled approximately $2.223 billion.

Disclosure Statement at 91.  The Debtors have conceded that the value of the collateral securing

the Junior Secured Notes is approximately $1.69 billion, which, upon information and belief,

represents collateral currently valued at $1.87 billion less approximately $180 million in

projected wind-down expenses which the Debtors propose to be allocated to the collateral.  See

---

[2]   In addition to the lien on Intercompany Claims of ResCap and the Guarantor Debtors, the Amended Third Priority
Security Agreement grants to the JSNs a lien on the equity interests of a number of Debtors including Executive
Trust Services, LLC ("ETS") and Passive Asset Transactions LLC ("PATI").  Amended Third Priority Security
Agreement § 3 and p. 55.

Disclosure Statement at 91, 375.  The Debtors' conceded collateral balance suggests a collateral

shortfall of approximately $352 million needed to secure payment in full of the prepetition

claims of the JSNs.  As set forth in the Ad Hoc Group's Answer and Counterclaims, the

anticipated amount of postpetition interest and fees through December 15, 2013 is approximately

$354 million.  Ad Hoc Group's Answer and Counterclaims at ¶ 16.  Thus, the math reflects that a

recovery of less than 10% of the total Intercompany Claims in which the JSNs have a direct or

indirect interest would be sufficient to establish that the Junior Secured Notes are over-secured

for the entire amount of principal and prepetition, postpetition and default interest through

December 15, 2013.

      6.     According to the documents filed by the Debtors in these Cases, there are also

unsecured creditors at various Debtors which hold Intercompany Claims.  For example,

according to the Debtors' Schedules, various subsidiaries of GMACM, such as PATI and ETS,

possess intercompany claims against GMACM and have at least some scheduled third-party

creditors.  See, e.g., SOALs for PATI [Docket No. 582] at 32 (identifying intercompany claims

held by PATI against GMACM in the amounts of $689,191,786.68 and $7,768,304.09) and 15

(listing $380,676,376.90 in liabilities, $380,329,509.69 of which was the now-retired Ally LOC);

SOALs for ETS [Docket No. 561] at 31 (identifying an intercompany claim held by ETS against

GMACM in the amount of $276,515,932.65) and 15 (listing $12,427,241.39 in liabilities);

SOALs for Homecomings [Docket No. 579] at 31 (identifying three intercompany claims held

by Homecomings, the largest against RFC in the amount of $1,251,460,102.26); Amended

SOALs for Homecomings [Docket No. 688] at 2 (listing $1,146,205,741.75 in liabilities of

which $1,128,264,150.59 was the now-retired Ally LOC and Ally Revolver).[3]

---

[3]  As noted above (footnote 2) the JSNs have a lien in the equity interests of PATI and ETS.  The listed liabilities of
Homecomings are in addition to the claims of the JSNs against Homecomings.

### C.    Documents Relating To The Debtors' Evolving Treatment of Intercompany Claims in Bankruptcy

7.    Upon information and belief, the Intercompany Claims represent transfers of value among the Debtors.  See, e.g., Statement of Financial Affairs for RAHI [Docket No. 639] at 5 ("Prior to the Petition Date (and subsequent to the Petition Date but only pursuant to Bankruptcy Court approval), the Debtors routinely engaged (and continue to engage) in intercompany transactions with both Debtor and non-Debtor subsidiaries and affiliates…[w]ith respect to prepetition transactions between Debtors, such intercompany accounts payable and receivable, if any, are reflected in the respective Debtor's Schedules and Statements…"); Disclosure Statement at 35 ("[T]he Intercompany Balances generally were the result of the Debtors' shared cash management system…").  Prior to the commencement of these Cases, the Debtors had reported intercompany claims in, among other places, their consolidated financial statements reported to the SEC.  See, e.g., ResCap LLC Form 10K/A for the year ended Dec. 31, 2008, dated August 25, 2009 at 216 (disclosing line items "investment in subsidiaries" and "borrowings from parent").

8.    In the Global Notes to the Schedules, the Debtors noted that, although each Debtor reserved rights with respect to the characterization, priority and classification of the Scheduled Intercompany Claims, the Debtors "made every attempt to properly characterize, prioritize and classify all intercompany transactions."  See, e.g., SOALs for GMACM [Docket No. 550] at 6.

9.    On May 3, 2013, the Debtors filed a complaint against, among other defendants, the Ad Hoc Group (the "JSN Adversary Proceeding").  See Complaint to Determine Extent of Liens and for Declaratory Judgment, Adv. Pro. No. 13-01343 [Docket No. 1].  Footnote 8 to the Debtors' complaint referenced the Ad Hoc Group's positions to date with respect to the

Scheduled Intercompany Claims and then noted that "the Debtors" desired to amend the

Schedules to list the claims as "contingent, disputed and unliquidated" and of "little, if any,

value." Id. at 7, n.8.  The Debtors never amended those Schedules.

10.     Thereafter, the Debtors entered into a Plan Support Agreement (the "PSA") which

appears to contemplate that each of the Debtors, as plan proponents, will affirmatively seek a

substantive resolution on the merits of all inter-Debtor claims and causes of action as part of the

plan process.  See Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and

363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with

Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants (the "PSA

Motion") [Docket No. 3814].  Specifically, the Supplemental Term Sheet attached as Exhibit B

to the Plan Support Agreement (the "PSA Supplemental Term Sheet") provided that all of the

scheduled Intercompany Claims will be "waived, cancelled, and discharged on the Effective

Date."  PSA Supplemental Term Sheet at 13, 14, 16.

11.     In support of the PSA and the proposed plan, the Debtors have identified the

compromise of substantive consolidation issues as one of the benefits of the global settlement.

See June 26, 2013 H'rg. Tr. at 27:14-16 (Mr. Lee) ("The plan support agreement also resolves

questions concerning the substantive consolidation of the Debtors' estates."); Disclosure

Statement at 35 ("…even if the Intercompany Balances reflected on the Debtors' books and

records were accurate enforceable debts, any attempt to enforce such claims would inevitably

result in litigation relating to, among other things…(iii) substantive consolidation").  Upon

information and belief, prior to negotiation of the global settlement, no party-in-interest filed a

motion or pleading seeking to substantively consolidate any Debtor estates.

12.     The proposed plan does contemplate that the Court will merge various Debtors into three separate estates for purposes of distributions and voting.  See Disclosure Statement at 6, 34 ("Although the Plan does not substantively consolidate any of the Debtors, the Plan provides for partial consolidation of the Debtors into three (3) Debtor Groups, as described above, solely for purposes of describing their treatment under the Plan, confirmation of the Plan, and making distributions under the Plan.").  Certain of the Intercompany Claims are held by and between Debtor entities within what the Debtors describe as a "Debtors Group"—including, for example, the claims by PATI and ETS against their parent GMACM.  See Disclosure Statement at 6, Ex. 3; Amended SOALs for GMACM, LLC [Docket No. 685] at 20, 40 (identifying intercompany claims held by PATI against GMACM in the amounts of $689,191,786.68 and $7,768,304.09 and an intercompany claim held by ETS against GMACM in the amount of $276,515,932.65).

13.     Footnote 11 of Debtors' amended complaint in the JSN Adversary Proceeding, filed on June 19, 2013, states that Intercompany Claims and causes of action had been waived by the Debtors in connection with a global settlement.

> The JSNs have also asserted that their lien on intercompany claims provides additional security for their claims.  To the contrary, each of the Debtors waived their intercompany claims in connection with the global settlement embodied by the Plan Support Agreement and associated Term Sheet and Supplemental Term Sheet.  See Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363 (b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants [Docket No. 3814].  As part of determining to waive their intercompany claims, each Debtor determined that prior to implementation of the global settlement the intercompany claims had little value, even assuming arguendo the validity of the claims.  Accordingly, any determination regarding the intercompany claims should be resolved under Bankruptcy Rule 9019 and in connection with plan confirmation.

See First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment, Adv. Pro. No. 13-01343 [Docket No. 8] at n.11.

14.    Thereafter, in their consolidated reply in support of the PSA Motion, filed on June

24, 2013, the Debtors described their proposed treatment of Intercompany Claims in connection

with the anticipated plan process as follows:

> The [PSA] contemplates the resolution of intercompany claims between the
> Debtors' estates.  As will be described in greater detail in the contemplated
> disclosure statement, while there may be a few factors with respect to any
> individual intercompany balance that could indicate valid debt, the majority of
> factors weighed against a determination that the balances represent valid claims.
> Recognizing the infirmities of the claims and the prospect of years of litigation
> ensuing, each of the Debtors with intercompany claims determined to waive those
> intercompany claims in connection with the Plan as part of the compromises
> reached by the parties through the Agreement.

See Debtors' Omnibus Reply in Further Support of Debtors' Motion for an Order Under

Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform

Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee, and Certain

Consenting Claimants [Docket No. 4066] at ¶ 3.

15.    The Debtors' Disclosure Statement filed in connection with the joint plan of

reorganization premised on the PSA, states that the Debtors have evaluated the Intercompany

Claims and determined that "the Intercompany Balances reflected in the Schedules lack many of

the indicia of true debt and likely would not be enforceable Intercompany Balances."  Disclosure

Statement at 35.  The Disclosure Statement further states that "in light of the analysis of the

Intercompany Balances, in addition to the cost and delay that could result from litigating these

issues, the Plan Proponents believe that the compromise of Intercompany Balances embodied in

the Plan is in the best interest of the Estates and creditors."  Id.

16.    The proposed Plan on file with the Court provides that "Intercompany Balances,

as well as any subrogation claims and fraudulent conveyance claims related to the forgiveness of

intercompany debt, will be compromised as part of the Global Settlement, and waived, cancelled,

and discharged on the Effective date, and holders of Intercompany Balances will receive no

recovery on account of such claims." Id. at 36.

17.    On July 16, 2013, Debtors filed an answer to the Ad Hoc Group's Answer and

Counterclaims.  In that answer, the Debtors denied the allegations that the Scheduled

Intercompany Claims were valid.  See Plaintiffs' Answer and Affirmative Defenses to the

Counterclaims of Defendants UMB Bank, N.A. and the Ad Hoc Group of Junior Secured

Creditors, Adv. Proc. No. 13-01343 [Docket No. 20] at ¶ 45; Ad Hoc Group's Answer and

Counterclaims at ¶ 45.  Among others, the Debtors denied that RFC owes Homecomings $1.252

billion as set forth in the Schedules.  Id.

### D.    Documents Relating To Effects Of Extinguishing Intercompany Claims

18.    The largest Intercompany Claims include:  Intercompany Claims of ResCap

against ResHolding in the amount of $3.334 billion; Intercompany Claim of Homecomings

against RFC in the amount of $1.251 billion; Intercompany Claim of PATI against GMACM in

the amount of $697 million; and Intercompany Claim of ETS against GMACM in the amount of

$277 million.  See Ad Hoc Group's Answer and Counterclaims ¶ 42 and Ex. A; Amended

SOALs for GMACM [Docket No. 685] at 20, 40 (identifying intercompany claims held by PATI

in the amounts of $689,191,786.68 and $7,768,304.09 and an intercompany claim held by ETS

in the amount of $276,515,932.65); Amended SOALs for RFC [Docket No. 684] at 11 (listing

intercompany claim held by Homecomings in the amount of $1,251,521,436.97).  For several of

the Debtors holding those Intercompany Claims, such claims represent the majority of their

assets.  See SOALs for PATI [Docket No. 582] at 15, 32 (listing assets in the amount

$751,597,643.26 and intercompany receivables in the amounts of $689,191,786.68 and

$7,768,304.09); SOALs for ETS [Docket No. 561] at 15, 31 (listing assets in the amount of

$276,910,840.70 and intercompany receivables in the amounts of $276,515,932.65 and

$372,549.11); Amended SOALs for Homecomings [Docket No. 688] at 2 (listing assets in the

amount of $1,263,527,058.84); SOALs for Homecomings [Docket No. 579] at 31 (listing

intercompany receivables in the amounts of $1,251,460,102.26, $11,859,528.36, and $500.00).

19.     In addition to Intercompany Claims, GMACM and RFC are the subject of

substantial other non-Debtor claims.  The Debtors have stated that GMACM and RFC are the

entities that were directly involved in the prepetition mortgage securitization and services

businesses and are, therefore, primarily liable for the bulk of prepetition general unsecured

claims.  See Debtors' Reply Brief re Non-Iridium Issues in Support of Motion for Approval of

RMBS Settlement Agreements [Docket No. 2804] at 20 ("The Debtors by contrast have

consistently maintained that their potential liability for representations and warranties claims lies

primarily with RFC and GMACM, the two subsidiaries directly involved in the origination and

sale of mortgage-backed securities").  These general unsecured litigation claims include potential

claims by the RMBS Trustees for breach of representation and warranties in connection with the

securitization of residential mortgage-backed securities, which claims the plan purports to fix in

allowed amounts to be allocated against RFC (approximately $7.1 billion) and GMACM

(approximately $200 million).  See generally Notice of Hearing and Debtors' Second

Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust

Settlement Agreements [Docket No. 1887] at 2-3 (describing claims as representation and

warranty claims); PSA Supplemental Term Sheet at 5; Disclosure Statement at 73.

20.     The Debtors have also stated that monoline insurer claimants such as FGIC and

MBIA assert general unsecured claims against the operating entities that are derivative of the

RMBS Trustees' claims.  See Debtors' Reply Brief re Non-Iridium Issues in Support of Motion

for Approval of RMBS Settlement Agreements [Docket No. 2804] at 16-17 ("MBIA's and

FGIC's rights, then, are based upon the governing agreements.  They are not independent of the

rights created by those agreements and are, in essence, derivative of the investor's and RMBS

Trustee's claims").  See also Objection of MBIA Insurance Corp. to Debtors' Motion Pursuant to

Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreement [Docket No.

2810] at 4-5 (recounting how MBIA filed prepetition complaints against GMACM and RFC for

fraudulent inducement in the issuance of the insurance contract as well as breach of contractual

representations and warranties).

  21. According to the Debtors, the representation and warranty claims asserted by

RMBS Trustees arise from the Pooling and Servicing Agreements.  See Disclosure Statement at

53 (Debtors describe RMBS Settlement as resolving representation and warranty claims against

GMACM and RFC); id. at 92 (Debtors describe monoline litigations as alleging breach of

contractual representations and warranties); id. at 53 (Debtors describe representation and

warranty claims as arising from Pooling and Servicing Agreements).

  22. Upon information and belief, eight of the nine Committee members have asserted

contingent litigation claims directed primarily against operating companies GMACM and RFC.

See Appointment of Official Creditors' Committee of Unsecured Creditors [Docket No. 102];

Sept. 27, 2012 H'rg. Tr. at 104 20-22 (Mr. Mannal) ("[T]he committee is comprised, as Your

Honor knows, of Rowena Drennan, the borrower, an indenture trustee, three RMBS trustees, two

security claimants, and two monolines."); Motion of AIG Asset Management (U.S.), LLC, the

Allstate Entities, Massachusetts Mutual Life Insurance Company, and the Prudential Entities for

an Order under Bankruptcy Rule 3103 (i) Classifying RMBS Fraud Claims in the Same Class as

the Securitization Trusts' Claims for Purposes of Any Chapter 11 Plan for the Debtors and (ii)

Directing that Misrepresentation Claims Cannot be Placed in a Class that will be Subordinated

Under Bankruptcy Code Section 510(b) [Docket No. 2284] at 2 ("The Investors [including AIG

and Allstate] hold residential mortgage-backed securities (the 'RMBS Certificates') that were

marketed by the Debtors and issued by bankruptcy remote trusts established by, but not affiliated

with, the Debtors."); Disclosure Statement at 27 (describing resolution in Plan of alleged and

potential claims held by the RMBS Trusts); id. at 28 (describing resolution in Plan of claims of

monoline insurers FGIC and MBIA arising generally from alleged breaches by the Debtors of

representations, warranties and/or covenants in various governing documents and offering

documents related to RMBS and insurance agreements).  According to the PSA, some of those

Committee members are to receive fixed allocations of value (subject to adjustment) on claims

allowed against various Debtors.  See PSA at 5 (defining "Consenting Claimants" to include

Committee members); Supplemental Plan Term Sheet Annex (itemizing each Committee

Member's fixed allocation of value subject to adjustment and granting FGIC and MBIA allowed

claims against ResCap).

> ### E.    Documents Relating To The Terms of MoFo's And The Debtors' Chief Restructuring Officer's Retention

23.    In support of its retention as counsel for each of the Debtors in the Cases, MoFo

affirmatively represented that it "does not hold or represent any interest adverse to the Debtors'

estates."  Declaration of Larren M. Nashelsky in Further Support of Debtors' Application for

Entry of An Order Authorizing the Retention and Employment of Morrison & Foerster LLP as

Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition Date (the "Nashelsky Decl.")

[Docket No. 506, Ex. 2] at ¶ 18.  MoFo further stated that it is a "disinterested person," as that

term is defined in section 101(14) of the Bankruptcy Code as modified by Section 1107(b), and

MoFo's employment is necessary and in the best interests of the Debtors and the Debtors'

estates.  Id.  On July 16, 2012, the Court entered an order authorizing the Debtors to retain MoFo

as counsel in the Cases.  See Order Authorizing the Retention and Employment of Morrison &

Foerster LLP as Bankruptcy Counsel to the Debtors, nunc pro tunc to the Petition Date [Docket

No. 786].  Among the services that the Court ordered MoFo to provide to the Debtors was the

task of "taking all necessary action to protect and preserve the Debtors' estates, including

prosecuting actions on the Debtors' behalf, defending any action commenced against the

Debtors, and representing the Debtors' interests in negotiations concerning all litigation in which

the Debtors are involved, including but not limited to, objections to claims filed against the

Debtors or their estates."  Id. at ¶ 8.

24.    The Court authorized the appointment of Mr. Kruger as Chief Restructuring

Officer ("CRO") pursuant to the terms of his engagement letter.  See Order Granting Debtors'

Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing

the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer [Docket No. 3103].  Mr.

Kruger's engagement letter, in turn, charged him to "make decisions on behalf of each Debtor

with respect to Chapter 11 plan negotiations and formulation, in such a manner as is consistent

with the business judgment rule, the provision of applicable law, taking into account the

respective fiduciary duties of the CRO to each Debtor's respective estate."  Kruger Amended

Engagement Letter [Docket No. 3074, Ex. 1] at 2.  That engagement letter further authorized Mr.

Kruger to "direct the litigation strategy of the Debtors including the investigation, prosecution,

settlement and compromise of claims filed against the Debtors and of estate causes of action."

Id.

F.    The Examiner's Report

25.    The Examiner's Report states that beginning in December 2011, MoFo, on behalf

of the Special Review Committee consisting of independent directors Jonathan Ilany and John

Mack, performed an "independent review" of the "financial and operational course of dealing

between AFI and ResCap."  Report of Arthur J. Gonzalez, as Examiner [Docket No. 3698] (the

"Examiner's Report"), Section III at 248.  The Examiner's Report further states that MoFo

provided this advice even though it was involved in the course of dealing that was the subject of

its later investigation, given its position as counsel to ResCap's board of directors from

September 2008 to November 2011.  Id.

26.    The Examiner raised concerns about this course of conduct.  See Examiner's

Report, Section III at 248 (MoFo's decision to take on its representation was "questionable");

Section III at 96 (same); Section IV at 21 (decision to retain conflicted counsel is "troubling" and

speculating that the failure to address MoFo's conflict was "attributable to the fact that both

Ilany and Mack were recruited to the ResCap board by Tanenbaum, a Morrison & Foerster

attorney who had a multi-decade professional and social relationship with both men leading up to

their appointments to the Board").  Among other things, the Examiner also noted that a "practice

guide" presented to the ResCap board by Gary Lee, when he advised the board about "best

practices" for conducting an internal investigation, stated that "the firm that was involved in the

underlying conduct [under investigation] is not the appropriate firm to do an internal

investigation."  Examiner's Report., Section IV at 22-23 (footnote omitted).  MoFo did in fact

undertake an investigation of transactions in which it was directly involved prepetition and

presumably has continued to represent the Debtors postpetition on those very matters.  See

Examiner's Report, Section III at 248 ("Morrison and Foerster's decision that it could perform

an 'independent' review on the 'financial and operational course of dealing between [AFI] and ResCap' is questionable in light of the firm's significant involvement in that very course of dealing during the preceding years").

### G.    The Ad Hoc Committee's Attention To The Conflict Concern

27.    Upon information and belief, following receipt of the Debtors' complaint in the JSN Adversary Proceeding (see supra ¶ 9), attorneys for the Ad Hoc Group engaged in communications with MoFo concerning the Debtors' evolving positions.  When MoFo and the Debtors failed to address the conflict issues, the Ad Hoc Group's counsel wrote to MoFo by letter dated June 26, 2013, which letter set forth a series of questions seeking to elicit how MoFo intended to deal with the conflict issues in the contexts in which they were presented.  (A true and correct copy of the letter, dated June 26, 2013, from J. Christopher Shore to Gary S. Lee, is attached to this Declaration as Exhibit B).  MoFo requested a conference with the Court in which it sought guidance from the Court on the conflict issue.  (A true and correct copy of the letter, dated July 2, 2013, from Gary S. Lee to The Honorable Martin Glenn is attached to this Declaration as Exhibit C).  At the July 3, 2013 conference, the Court directed that if, following receipt of the Debtors' proposed Disclosure Statement and Plan, the Ad Hoc Group intended to move to disqualify it do so promptly.  See July 3, 2013 Tr. at 36:13-37:24 (the Court) ("[I]f you really think that I should enter an order that recuses, in whole or in part, the debtor's counsel or the CRO . . . go ahead and make your motion, and do it quickly.").  To date, MoFo has not responded to the questions and issues raised in the June 26 letter.  It has, however, filed the proposed Disclosure Statement and Plan and, most recently, its answer to the Ad Hoc Group's Answer and Counterclaims in which the Debtors deny the validity of the Scheduled Intercompany Claims.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:    July 18, 2013
          New York, New York

/s/       *Dwight A. Healy*

Dwight A. Healy