# EXHIBIT 11

COPY

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number: **Residential Accredit Loans, Inc., Case No. 12-12052**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**National Credit Union Administration Board, Liquidating Agent for Western Corporate Federal Credit Union**

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

Nelson C. Cohen
Zuckerman Spaeder LLP
1800 M Street, N.W. Suite 1000
Washington, D.C. 20036

Telephone number: (202) 778-1800    email: ncohen@zuckerman.com

Court Claim
Number: _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above):
National Credit Union Administration Board, Liquidating Agent for Western Corporate Federal Credit Union
4807 Spicewood Springs Road
Suite 5100
Austin, TX 78759
Telephone number: (512) 342-5600    email: Region4@ncua.gov

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

1. Amount of Claim as of Date Case Filed: $ **11,519,468**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Damages for violations of Section 11 of the Securities Act of 1933
(See instruction #2)

3. Last four digits of any number by which creditor identifies debtor:
CUSIP #74922JAC2

3a. Debtor may have scheduled account as:
(See instruction #3a)

3b. Uniform Claim Identifier (optional):
(See instruction #3b)

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

Value of Property: $ _____    Annual Interest Rate _____ % ☐ Fixed ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $ _____    Basis for perfection: _____

Amount of Secured Claim: $ _____    Amount Unsecured: $ **11,519,468**

*Handwritten: Claim # 2636    Initials: [illegible]*

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**

$ _____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ _____    (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

9. Signature: (See instruction #9) Check the appropriate box.
☐ I am the creditor.    ☑ I am the creditor's authorized agent.
(Attach copy of power of attorney, if any.)
☐ I am the trustee, or the debtor, or their authorized agent.
(See Bankruptcy Rule 3004.)
☐ I am a guarantor, surety, indorser, or other codebtor.
(See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Nelson C. Cohen
Title: Counsel for National Credit Union Administration Board
Company: Zuckerman Spaeder LLP
Address and telephone number (if different from notice address above):

(Signature)    11 / 7 / 12
(Date)

**RECEIVED**
**NOV 0 8 2012**
**KURTZMAN CARSON CONSULTANTS**
COURT USE ONLY

Telephone number: _____    Email: _____

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 Modified (Official Form 10) (12/11) cont.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any one category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Claim Pursuant to 11 U.S.C. §503(b)(9):**
Check this box if you have a claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim. (See DEFINITIONS, below.)

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**9. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

---

### DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

---

### INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://www.kccllc.net/ResCap.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## RESIDENTIAL ACCREDIT LOANS, INC.

### CASE NO.:  12-12052

## ATTACHMENT TO PROOF OF CLAIM FILED BY

## NATIONAL CREDIT UNION ADMINISTRATION BOARD

CUSIP NUMBER:    74922JAC2

ISSUER :             RALI Series 2007-QH2 Trust

PURCHASER:      Western Corporate Federal Credit Union

CLAIM AGAINST:  Residential Accredit Loans, Inc.

AMOUNT OF CLAIM:  $11,519,468

### Documentation

Attached is Complaint entitled National Credit Union Administration Board v. Goldman Sachs & Co., et al., Case No.  LACV11-6521 (U.S. District Court for the Central District of California, Western Division) Count V (pages 140-142, Paragraphs 346-354) which  alleges violation of Section 11 of Securities Act of 1933.

3927851.1

1  Terry W. Bird – State Bar No. 49038
      twb@birdmarella.com
2  Peter J. Shakow – State Bar No. 198633
      psc@birdmarella.com
3  BIRD, MARELLA, BOXER, WOLPERT,
      NESSIM, DROOKS & LINCENBERG, P.C.
4  1875 Century Park East, 23rd Floor
   Los Angeles, California  90067-2561
5  Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
6
7  George A. Zelcs
      gzelcs@koreintillery.com
   Douglas R. Sprong
8  Peter H. Rachman
   Robert L. King
9  Diane Moore Heitman
   KOREIN TILLERY LLC
10 205 North Michigan Avenue, Suite 1950
   Chicago, IL  60601
11 Tel: (312) 641-9760
   Fax: (312) 641-9751
12
   Attorneys for Plaintiff National Credit
13 Union Administration Board
14 (See Signature Plage for Names and
   Addresses of Additional Counsel for
15 Plaintiffs)



FILED
CLERK, U.S. DISTRICT COURT

AUG – 9 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

16          **UNITED STATES DISTRICT COURT**

17   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

18  NATIONAL CREDIT UNION            CASE NO. **CV11-6521 HK (PLA)**
    ADMINISTRATION BOARD, as
19  Liquidating Agent of U.S. Central   **COMPLAINT FOR DAMAGES**
    Federal Credit Union and of Western  **FOR VIOLATION OF THE**
20  Corporate Federal Credit Union,     **SECURITIES ACT OF 1933, THE**
                                        **CALIFORNIA CORPORATE**
21             Plaintiff,              **SECURITIES LAW OF 1968, AND**
                                        **THE KANSAS UNIFORM**
22      vs.                            **SECURITIES ACT**

23  GOLDMAN, SACHS & CO.;             **JURY TRIAL DEMANDED**
    FREMONT MORTGAGE
24  SECURITIES CORP.; GS
    MORTGAGE SECURITIES CORP.;
25  and RESIDENTIAL ACCREDIT
    LOANS, INC.,
26
               Defendant.
27
28

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ........................................................................ 1

      Table 1 ............................................................................................ 3

      Table 2 ............................................................................................ 5

II.   PARTIES AND RELEVANT NON-PARTIES ............................................ 4

III.  JURISDICTION AND VENUE ................................................................... 9

IV.   MORTGAGE ORIGINATION AND THE PROCESS OF
      SECURITIZATION ................................................................................. 10

V.    RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT ................. 13

      Table 3 .......................................................................................... 14

VI.   U.S. CENTRAL'S AND WESCORP'S PURCHASES ............................. 17

      Table 4 .......................................................................................... 17

VII.  THE ORIGINATORS SYSTEMATICALLY DISREGARDED
      THE UNDERWRITING GUIDELINES STATED IN THE
      OFFERING DOCUMENTS ..................................................................... 18

      A.    The Surge in Mortgage Delinquency and Defaults Shortly
            After the Offerings and the High OTD Practices of the
            Originators Demonstrate Systematic Disregard of
            Underwriting Standards ......................................................... 19

      Table 5 .......................................................................................... 21

      Table 6 .......................................................................................... 25

      B.    The Surge in Actual Versus Expected Cumulative Losses is
            Evidence of the Originators' Systematic Disregard of
            Underwriting Standards ......................................................... 25

      Figure 2 ......................................................................................... 29

i

C.   The Collapse of the Certificates' Credit Ratings is Evidence
     of Systematic Disregard of Underwriting Guidelines ..................... 36

D.   Revelations Subsequent to the Offerings Show That the
     Originators Systematically Disregarded Underwriting
     Standards ................................................................................ 37

     1.   The Systematic Disregard of Underwriting
          Standards Was Pervasive as Revealed After the
          Collapse ......................................................................... 37

     2.   American Home's Systematic Disregard of
          Underwriting Standards ................................................... 44

     3.   Countrywide Home Loans, Inc.'s Systematic
          Disregard of Underwriting Standards ............................... 48

     4.   First Franklin Financial Corporation's Systematic
          Disregard of Underwriting Standards ............................... 58

     5.   Fremont Investment and Loan's Systematic
          Disregard of Underwriting Standards ............................... 61

     6.   GreenPoint Mortgage Funding Inc.'s Systematic
          Disregard of of Underwriting Standards ........................... 64

     7.   Homecomings's Systematic Disregard of
          Underwriting Standards ................................................... 66

     8.   IndyMac Bank, FSB's Systematic Disregard of
          Underwriting ................................................................... 69

     9.   WaMu's and Long Beach Mortgage's Systematic
          Disregard of Underwriting Standards ............................... 75

VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE
       STATEMENTS OF MATERIAL FACT ................................................ 89

   A.   Untrue Statements Concerning Evaluation of the Borrower's
        Capacity and Likelihood To Repay the Mortgage Loan ................... 92

   B.   Untrue Statements Concerning Reduced Documentation
        Programs ......................................................................... 112

ii

C.    Untrue Statements Concerning Loan-to-Value Ratios.................... 121

D.    Untrue Statements Concerning Credit Enhancement...................... 127

IX.    THE CLAIMS ARE TIMELY ................................................................. 130

Table 7 ............................................................................................... 132

X.    CLAIMS FOR RELIEF ........................................................................... 134

FIRST CLAIM FOR RELIEF ............................................................................ 134

SECOND CLAIM FOR RELIEF ....................................................................... 135

THIRD CLAIM FOR RELIEF .......................................................................... 137

FOURTH CLAIM FOR RELIEF ....................................................................... 139

FIFTH CLAIM FOR RELIEF ............................................................................ 140

SIXTH CLAIM FOR RELIEF ........................................................................... 142

SEVENTH CLAIM FOR RELIEF ...................................................................... 144

EIGHTH CLAIM FOR RELIEF......................................................................... 146

A.    For judgment against the Defendants in accordance with the
prayers for relief set forth in each of the foregoing Claims
for Relief;........................................................................................... 147

B.    For Plaintiff's costs of suit; and ...................................................... 148

C.    For any other relief the Court deems just and proper..................... 149

APPENDIX A ................................................................................................... 150

Table 1 ............................................................................................... 150

Table 2 ............................................................................................... 151

Table 3 ............................................................................................... 151

Table 4 ............................................................................................... 151

Table 5 ............................................................................................... 153

Table 6 .................................................................................... 155

Table 7 .................................................................................... 156

APPENDIX B ........................................................................... 158

Figure 1 .................................................................................. 158

Figure 2 .................................................................................. 159

1    Plaintiff, the National Credit Union Administration Board ("NCUA Board"),

2    brings this action in its capacity as Liquidating Agent of U.S. Central Federal Credit

3

4    Union ("U.S. Central") and Western Corporate Federal Credit Union ("WesCorp")

5    against Goldman, Sachs & Co. ("Goldman Sachs") as underwriter and seller, and

6    against Fremont Mortgage Securities Corp., GS Mortgage Securities Corp., Long

7

8    Beach Securities Corp. and Residential Accredit Loans, Inc. (collectively, the "Issuer

9    Defendants"), as issuers, of certain residential mortgage-backed securities ("RMBS")

10   purchased by U.S. Central and WesCorp, and alleges as follows:

11

12   **I.    NATURE OF THE ACTION**

13       1.    This action arises out of the sale of RMBS to U.S. Central and WesCorp

14   where Goldman Sachs acted as underwriter and/or seller of the RMBS.

15       2.    Virtually all of the RMBS sold to U.S. Central and WesCorp were rated as

16
17   triple-A (the same rating as U.S. Treasury bonds) at the time of issuance.

18       3.    The Issuer Defendants issued and Goldman Sachs underwrote and sold the

19   RMBS pursuant to registration statements, prospectuses, and/or prospectus supplements

20

21   (collectively, the "Offering Documents"). The Offering Documents contained untrue

22   statements of material fact or omitted to state material facts in violation of Sections 11

23
24   and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k,

25   77$l$(a)(2) ("Section 11" and "Section 12(a)(2)," respectively), and the California

26   Corporate Securities Law of 1968 ("California Corporate Securities Law"), Cal. Corp.

27

28                                      **I**

1    Code §§ 25401, 25501 and the Kansas Uniform Securities Act, Kan. Stat. Ann. § 17-

2    12a509.

3

4        4.      The NCUA Board expressly disclaims and disavows any allegation in this

5    Complaint that could be construed as alleging fraud.

6

7        5.      The Offering Documents described, among other things, the mortgage

8    underwriting standards of the originators (the "Originators") who made the mortgages

9    that were pooled and served as the collateral for the RMBS purchased by U.S. Central

10    and WesCorp.

11

12        6.      The Offering Documents represented that the Originators adhered to the

13    underwriting guidelines set out in the Offering Documents for the mortgages in the

14    pools collateralizing the RMBS. In fact, the Originators had systematically abandoned

15    the stated underwriting guidelines in the Offering Documents. Because the mortgages

16

17    in the pools collateralizing the RMBS were largely underwritten without adherence to

18    the underwriting standards in the Offering Documents, the RMBS were significantly

19

20    riskier than represented in the Offering Documents. Indeed, a material percentage of

21    the borrowers whose mortgages comprised the RMBS were all but certain to become

22

23    delinquent or default shortly after origination. As a result, the RMBS were destined

24    from inception to perform poorly.

25        7.      These untrue statements and omissions were material because the value of

26

27    RMBS is largely a function of the cash flow from the principal and interest payments

28

on the mortgage loans collateralizing the RMBS. Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

8.    U.S. Central and WesCorp purchased the RMBS listed in Table 1 (*infra*) through initial offerings directly from Goldman Sachs by means of prospectuses or oral communications. Thus, Goldman Sachs is liable for material untrue statements and omissions of fact under Section 11, Section 12(a)(2), the California Corporate Securities Law and the Kansas Uniform Securities Act for the RMBS listed in Table 1.

**Table 1**

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | CWALT, Inc. | WesCorp | 20-Mar-07 | $97,947,000 |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 | GS Mortgage Securities Corp. | U.S. Central | 3-Mar-06 | $29,360,000 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | GS Mortgage Securities Corp. | WesCorp | 4-May-07 | $73,547,938 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | GS Mortgage Securities Corp. | WesCorp | 4-May-07 | $59,442,800 |
| 751153AC1 | RALI Series 2006-QO10 Trust | Residential Accredit Loans, Inc. | WesCorp | 14-Dec-06 | $122,963,336 |
| 74922JAC2 | RALI Series 2007-QH2 Trust | Residential Accredit Loans, Inc. | WesCorp | 16-Feb-07 | $19,454,000 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | Residential Accredit Loans, Inc. | WesCorp | 28-Mar-07 | $62,785,038 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | Residential Accredit Loans, Inc. | WesCorp | 28-Mar-07 | $29,673,510 |

[1] "CUSIP" stands for "Committee on Uniform Securities Identification Procedures." A CUSIP number is used to identify most securities, including certificates of RMBS. *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

**3**

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 75116EAB8 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 24-May-07 | $20,000,000 |
| 75116EAC6 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 24-May-07 | $48,788,000 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | Residential Accredit Loans, Inc. | WesCorp | 21-Jun-07 | $70,102,000 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | Residential Accredit Loans, Inc. | WesCorp | 21-Jun-07 | $84,062,000 |

9.    U.S. Central or WesCorp purchased each RMBS listed in Table 2 *(infra)* pursuant to and traceable to registration statements containing untrue statements of material fact or that omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  Goldman Sachs was an underwriter for each of the securities listed in Table 2 and is therefore liable under Section 11.

## Table 2

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 35729VAE7 | Fremont Home Loan Trust 2006-D | Fremont Mortgage Securities Corp. | U.S. Central | 25-Oct-06 | $18,000,000 |
| 35729VAF4 | Fremont Home Loan Trust 2006-D | Fremont Mortgage Securities Corp. | U.S. Central | 25-Oct-06 | $32,000,000 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | GS Mortgage Securities Corp. | WesCorp | 5-Feb-07 | $26,708,366 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | GS Mortgage Securities Corp. | WesCorp | 8-Mar-07 | $26,689,604 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | GS Mortgage Securities Corp. | WesCorp | 26-Sep-06 | $61,086,962 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | GS Mortgage Securities Corp. | WesCorp | 28-Sep-06 | $73,779,370 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | Long Beach Securities Corp. | U.S. Central | 8-Dec-06 | $57,000,000 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | Residential Accredit Loans, Inc. | WesCorp | 11-Oct-06 | $49,783,783 |

4

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|-------|----------------|-----------|-------|-----------|------------|
| 75116EAA0 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 30-May-07 | $115,119,708 |

10.    The RMBS U.S. Central and WesCorp purchased suffered a significant drop in market value. U.S. Central and WesCorp have suffered significant losses from those RMBS purchased despite the NCUA Board's mitigation efforts.

## II.    PARTIES AND RELEVANT NON-PARTIES

11.    The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA is under the

5

management of the NCUA Board. *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

12. U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas. As a corporate credit union, U.S. Central provided investment and financial services to other corporate credit unions.

13. WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California. As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

14. The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant to the FCU Act, 12 U.S.C. § 1751 *et seq*. On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation pursuant to 12 U.S.C. §§ 1766(a), 1787(a)(1)(A) and appointed itself Liquidating Agent.

15. Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of U.S. Central and WesCorp and of any member, account holder, officer or director of U.S. Central and WesCorp, with respect to U.S. Central and WesCorp and their assets, including the right to bring the claims asserted by them in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of

**6**

1  U.S. Central and WesCorp, *see* 12 U.S.C. § 1786(h)(8), and succeeds to all rights, titles,

2  powers, and privileges of U.S. Central and WesCorp, *see* 12 U.S.C. § 1787(b)(2)(A).

3
4  The NCUA Board may also sue on U.S. Central's and WesCorp's behalf. *See* 12

5  U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

6      16.    Prior to being placed into conservatorship and involuntary liquidation,

7
8  U.S. Central and WesCorp were the two largest corporate credit unions in the United

9  States.

10     17.    Any recoveries from this legal action will reduce the total losses resulting

11
12  from the failure of U.S. Central and WesCorp.  Losses from U.S. Central and

13  WesCorp's failures must be paid from the NCUSIF or the TCCUSF.  Expenditures.

14
15  from these funds must be repaid through assessments against all federally insured credit

16  unions.  Because of the expenditures resulting from U.S. Central and WesCorp's

17  failures, federally insured credit unions will experience larger assessments, thereby

18
19  reducing federally insured credit unions' net worth.  Reductions in net worth can

20  adversely affect the dividends that individual members of credit unions receive for the

21  savings on deposit at their credit union.  Reductions in net worth can also make loans

22
23  for home mortgages and automobile purchases more expensive and difficult to

24  obtain.  Any recoveries from this action will help to reduce the amount of any future

25  assessments on federally insured credit unions throughout the system, reducing the

26
27  negative impact on federally insured credit unions' net worth.  Recoveries from this

28

1   action will benefit credit unions and their individual members by increasing net worth,

2   resulting in more efficient and lower-cost lending practices.

3

4       18.    Defendant Goldman Sachs is a U.S. Securities and Exchange Commission

5   ("SEC") registered broker-dealer and was an underwriter of all the RMBS that are the

6   subject of this Complaint and that are listed in Tables 1 and 2 (*supra*).  Goldman Sachs

7   is a New York corporation with its principal place of business in New York.

8

9       19.    Fremont Mortgage Securities Corp. is the depositor and the issuer for the

10  Fremont Home Loan Trust 2006-D offering.  Fremont Mortgage Securities Corporation

11  is a Delaware corporation with its principal place of business in Anaheim, California.

12

13      20.    GS Mortgage Securities Corp. is the depositor and the issuer for the GSR

14  Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, First Franklin

15  Mortgage Loan Trust 2006-FF4, and GreenPoint Mortgage Funding Trust 2006-OH1

16

17  offerings.  GS Mortgage Securities Corp. is a Delaware corporation with its principal

18  place of business in New York.

19

20      21.    Long Beach Securities Corp. is the depositor and the issuer for the Long

21  Beach Mortgage Loan Trust 2006-11 offering.  Long Beach Securities Corp. is a

22  Delaware corporation with its principal place of business in Anaheim, California.

23

24      22.    Residential Accredit Loans, Inc. is the depositor and the issuer for the

25  RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2

26  Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and the RALI

27

28

**8**

---

**COMPLAINT FOR DAMAGES**

1  Series 2007-QH6 Trust offerings (collectively, "the RALI Series offerings").

2
3  Residential Accredit Loans, Inc. is a Delaware corporation with its principal place of

4  business in Minnesota.

5  **III.    JURISDICTION AND VENUE**

6      23.    This Court has subject matter jurisdiction pursuant to: (a) 12 U.S.C. §

7  1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity
8
9  to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of

10  the United States, and the United States district courts shall have original jurisdiction

11  thereof, without regard to the amount in controversy"; and (b) 28 U.S.C. § 1345, which
12
13  provides that "the district courts shall have original jurisdiction of all civil actions, suits

14  or proceedings commenced by the United States, or by any agency or officer thereof

15  expressly authorized to sue by Act of Congress."
16
17      24.    Venue is proper in this District under Section 22 of the Securities Act, 15

18  U.S.C. § 77v(a), because many of the transactions at issue occurred in San Dimas,
19
20  California, the headquarters of WesCorp.  This Court has personal jurisdiction over

21  each Defendant because they offered/sold the RMBS at issue in this Complaint to

22  WesCorp in this District; prepared/disseminated the Offering Documents containing
23
24  untrue statements or omissions of material fact as alleged herein to WesCorp in this

25  District; and/or are residents of/conduct business in this District.

26  / / /

27  / / /

28

**9**

COMPLAINT FOR DAMAGES

IV.   MORTGAGE ORIGINATION AND THE PROCESS OF
SECURITIZATION

25.    RMBS are asset-backed securities.   A pool or pools of residential mortgages are the assets that back or collateralize the RMBS certificates purchased by investors.

26.    Because residential mortgages are the assets collateralizing RMBS, the origination of the mortgages commences the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting. The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property. The underwriting guidelines consist of a variety of metrics, including:  the borrower's debt, income, savings, credit history and credit score; whether the property will be owner-occupied; and the amount of the loan compared to the value of the property at issue (the "loan-to-value" or "LTV" ratio), among other things.  Underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

27.    Historically, originators made mortgage loans to borrowers and held the loans on their own books for the duration of the loan.  Originators profited as they

**10**

1    collected monthly principal and interest payments directly from the borrower.

2    Originators also retained the risk that the borrower would default on the loan.

3

4    28.    This changed in the 1970s when the Government National Mortgage

5    Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie

6    Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") began

7    purchasing "conforming loans" (loans underwritten in accordance with Fannie Mae and

8

9    Freddie Mac underwriting guidelines) from originators and "securitizing" them for

10    resale to investors as RMBS.

11

12    29.    More recently, originators, usually working with investment banks, began

13    securitizing "non-conforming loans."  Non-conforming loans (loans not written in

14    compliance with Fannie Mae or Freddie Mac guidelines) are also known as "nonprime"

15

16    or "private label" loans and include "Alt-A" and "subprime" loans.  Despite the non-

17    conforming nature of the underlying mortgages, the securitizers of such RMBS were

18

19    able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*)

20    when they securitized the non-conforming loans.

21    30.    On information and belief, all of the loans collateralizing the RMBS at

22    issue in this Complaint are non-conforming mortgage loans.

23

24    31.    The issuance of RMBS collateralized by non-conforming loans peaked in

25    2006. The securitization process shifted the originators' focus from ensuring the ability

26    of borrowers to repay their mortgages, to ensuring that the originator could process (and

27

28

**11**

COMPLAINT FOR DAMAGES

1   obtain fees from) an ever-larger loan volume for distribution as RMBS. This practice is

2   known as "originate-to-distribute" ("OTD").

3

4      32.     Securitization begins with a "sponsor" who purchases loans in bulk from

5   one or more originators. The sponsor transfers title of the loans to an entity called the

6   "depositor."

7

8      33.     The depositor transfers the loans to a trust called the "issuing entity."

9      34.     The issuing entity issues "notes" and/or "certificates," representing an

10  ownership interest in the cash flow from the mortgage pool underlying the securities

11  (*i.e.*, the principal and interest generated as borrowers make monthly payments on the

12

13  mortgages in the pool).

14     35.     The depositor files required documents (such as registration statements

15  and prospectuses) with the SEC so that the certificates can be offered to the public.

16

17     36.     One or more "underwriters"—like Goldman Sachs—then sell the notes or

18  certificates to investors.

19

20     37.     A loan "servicer" collects payments from borrowers on individual

21  mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes

22

23  the income stream generated from the mortgage loan payments to the RMBS investors.

24     38.     Figure 1 (*infra*) depicts a typical securitization process.

25  ///

26  ///

27  ///

28                              **12**

1

**Figure 1**



18    39.    Because securitization, as a practical matter, shifts the risk of default on

20  the mortgage loans from the originator of the loan to the RMBS investor, the

21  originator's adherence to mortgage underwriting guidelines as represented in the

22  offering documents with respect to the underlying mortgage loans is critical to the

24  investors' ability to evaluate the expected performance of the RMBS.

25  **V.    RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT**

26    40.    RMBS offerings are generally divided into slices or "tranches," each of

**13**

which represents a different level of risk. RMBS certificates denote the particular tranches of the security purchased by the investor.

41. The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS. Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit ratings agencies that assigned credit ratings to the RMBS in this case.

42. The credit rating agencies use letter-grade rating systems as shown in Table 3 (*infra*).

## Table 3

### *Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | Prime (Maximum Safety) | INVESTMENT GRADE |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | High Grade, High Quality | |
| A1<br>A2<br>A3 | A+<br>A<br>A- | Upper Medium Grade | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | Medium Grade | |
| Ba2<br>Ba3 | BB<br>BB- | Non-Investment Grade, or Speculative | SPECULATIVE GRADE |
| B1<br>B2<br>B3 | B+<br>B<br>B- | Highly Speculative, or Substantial Risk | |
| Caa2<br>Caa3 | CCC+ | In Poor Standing | |
| Ca | CCC<br>CCC- | Extremely Speculative | |
| C | - | May be in Default | |
| - | D | Default | |

COMPLAINT FOR DAMAGES

43.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk." Moody's Investors Services, Inc., *Moody's Rating Symbols & Definitions* at 6 (August 2003), *available at*: http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf. Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment on the obligation is extremely strong." Standard & Poor's, *Ratings Definitions*, *available at*:http://www.standardandpoors.com/ratings/articles/en/us/?assetID=1245303711350.

44.     In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because the primary market for RMBS is institutional investors, such as U.S. Central and WesCorp, which are generally limited to buying only securities with the highest credit ratings.  *See, e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities rated below AA-); *but see, e.g.*, Removing References to Credit Ratings in Regulations; Proposing Alternatives to the Use of Credit Ratings, 76 Fed. Reg. 11,164 (proposed Mar. 1, 2011) (to be codified at 12 C.F.R. pts. 703, 704, 709, and 742) (the NCUA's proposed rule eliminating the use of credit ratings for guidance in investment decisions by credit unions).

45.     While the pool of mortgages underlying the RMBS may not have been sufficient to warrant a triple-A credit rating, various forms of "credit enhancement" were used to obtain a triple-A rating on the higher tranches of RMBS.

46.     One form of credit enhancement is "structural subordination."  The tranches, and their risk characteristics relative to each other, are often analogized to a

**15**

waterfall. Investors in the higher or "senior" tranches are the first to be paid as income is generated when borrowers make their monthly payments. After investors in the most senior tranche are paid, investors in the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

47.    In the event mortgages in the pool default, the resulting loss is absorbed by the subordinate tranches first.

48.    Accordingly, senior tranches are deemed less risky than subordinate tranches and therefore receive higher credit ratings.

49.    Another form of credit enhancement is overcollateralization. Overcollateralization is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security. The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

50.    Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization." "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages. Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults. Finally, some RMBS are "cross-collateralized," *i.e.*, when a tranche in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal

16

COMPLAINT FOR DAMAGES

or interest, or both, to the senior certificates in the loan group experiencing rapid

prepayment or disproportionate losses.

## VI.  U.S. CENTRAL'S AND WESCORP'S PURCHASES

51.    U.S. Central and WesCorp purchased only the highest-rated tranches of

RMBS.  All but one were rated triple-A at the time of issuance.  These securities have

since been downgraded below investment grade just a few years after they were sold

(*see infra* Table 4).

### Table 4

| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATINGS S&P | ORIGINAL RATINGS MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | WesCorp | AAA | Aaa | CCC 9/2/2009 | C 11/23/2010 |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 | U.S. Central | AAA | Aaa | BBB+ 3/2/2010 | Caa3 4/6/2010 |
| 35729VAE7 | Fremont Home Loan Trust 2006-D | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Ca 4/29/2010 |
| 35729VAF4 | Fremont Home Loan Trust 2006-D | U.S. Central | AA+ | Aa1 | D 2/25/2011 | C 3/17/2009 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | WesCorp | AAA | Aaa | D 4/19/2010 | C 12/9/2010 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | WesCorp | AAA | Aaa | CCC 9/2/2009 | C 12/14/2010 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/14/2010 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/14/2010 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Ca 3/20/2009 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | WesCorp | AAA | Aaa | CCC 4/15/2009 | C 12/1/2010 |
| 751153AC1 | RALI Series 2006-QO10 Trust | WesCorp | AAA | Aaa | D 3/23/2010 | C 12/1/2010 |
| 74922JAC2 | RALI Series 2007-QH2 Trust | WesCorp | AAA | Aaa | D 6/23/2010 | C 12/1/2010 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | WesCorp | AAA | Aaa | CCC 2/16/2010 | C 12/1/2010 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | WesCorp | AAA | Aaa | D 5/25/2010 | C 12/1/2010 |
| 75116EAA0 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | Caa3 12/1/2010 |
| 75116EAB8 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/1/2010 |

**17**

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 75116EAC6 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | D 12/17/2010 | C 12/1/2010 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/1/2010 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | WesCorp | AAA | Aaa | D 9/24/2010 | C 12/1/2010 |

52.    At the time of purchase, U.S. Central and WesCorp were not aware of the untrue statements or omissions of material facts in the Offering Documents of the RMBS. If U.S. Central and WesCorp had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering Documents—U.S. Central and WesCorp would not have purchased the certificates.

53.    The securities' substantial loss of market value has injured U.S. Central, WesCorp and the NCUA Board.

## VII. THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS.

54.    The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages. The loan underwriting guidelines ensure that the borrower has the means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of reasonably anticipated defaults on underlying mortgage loans.

55.    With respect to RMBS collateralized by loans written by originators who systematically disregarded their stated underwriting standards, the following pattern is

**18**

present:

    (a)   A surge in borrower delinquencies and defaults on the mortgages in the pools (see infra Section VII.A and Table 5);

    (b)   Actual losses to the underlying mortgage pools within the first 12 months after the offerings exceeded expected losses (see infra Section VII.B and Figure 2); and

    (c)   A high percentage of the underlying mortgage loans were originated for distribution, as explained below (see infra Table 6 and accompanying allegations).

56.    These factors support a finding that the Originators failed to originate the mortgages in accordance with the underwriting standards stated in the Offering Documents.

57.    This conclusion is further corroborated by reports that the Originators who contributed mortgage loans to the RMBS at issue in this Complaint abandoned the underwriting standards described in the RMBS Offering Documents (*see infra* Section VII.D).

**A.**    **The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards.**

58.    Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after payment is due. Residential mortgages

19

1   where no payment has been received for more than 90 days (or three payment cycles)

2   are generally considered to be in default.

3

4        59.    The surge of delinquencies and defaults following the offerings evidence

5   the systematic flaws in the Originators' underwriting process (*see infra* Table 5).

6

7        60.    The Offering Documents reported zero or near zero delinquencies and

8   defaults at the time of the offerings (*see infra* Table 5).

9        61.    The pools of mortgages collateralizing the RMBS experienced

10  delinquency and default rates up to 5.21% within the first three months, up to 14.81%

11

12  at six months, and up to 34.09% at one year (*see infra* Table 5).

13       62.    As of June 2011, approximately half (51.29% on average) of the mortgage

14

15  collateral across all of the RMBS that U.S. Central and WesCorp purchased was in

16  delinquency, bankruptcy, foreclosure, or was real estate owned ("REO"), which means

17  that a bank or lending institution owns the property after a failed sale at a foreclosure

18  auction (*see infra* Table 5).

19

20       63.    Table 5 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO

21  rates on the RMBS as to which claims are asserted in this Complaint.    The data

22  presented in the last five columns are from the trustee reports (dates and page

23  references as indicated in the parentheticals).  The shadowed rows reflect the group of

24  mortgages in the pool underlying the specific tranches purchased by U.S. Central and

25  WesCorp; however, some trustee reports include only the aggregate data.  For RMBS

26

27

28                                    **20**

with multiple groups, aggregate information on all the groups is included because the

tranches are cross-collateralized.

## Table 5

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 (P.S. dated March 28, 2007) | zero (S-67-S-70) | 2.36% (Apr., p.9) | 3.11% (June, p.9) | 5.39% (Sept., p.9) | 16.45% (Mar. 2008, p.7) | 60.91% (June 2011, p.13) |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 (P.S. dated March 27, 2006) | 0.03% were 30-59 days delinquent. Zero were two or more payments delinquent. (S-32) | .42% (Apr. p.11) | 2.5% (June, p.11) | 5.73% (Sept., p.10) | 14.35% (Mar. 2007, p.10) | 51.63% (June 2011, p.11) |
| 35729VAF4 | Fremont Home Loan Trust 2006-D: Aggregate *Class M1 certificates represent interests in all of the mortgage loans in the trust fund. (3) (P.S. dated November 1, 2006) | Zero more than 30 days delinquent on 10/1/06 (19) | .79% (Dec., p.10) | 5.21% (Feb., p.10) | 12.45% (May., p.10) | 26.17% (Nov., p.10) | 51.61% (June 2011, p.9) |
|  | Fremont Home Loan Trust 2006-D: Group 1 | Zero more than 30 days delinquent on 10/1/06 (19) | 1% (Dec. p.12) | 4.42% (Feb., p.12) | 10.19% (May., p.12) | 24.12% (Nov., p.12) | 56.01% (June 2011, p.10) |
| 35729VAE7 | Fremont Home Loan Trust 2006-D: Group 2 *The Class 2-A-4 in Group 2.(3) | Zero more than 30 days delinquent on 10/1/06 (19) | .52% (Dec., p.12) | -1.59% (Feb., p.12) | 4.03% (May., p.12) | 9.84% (Nov., p.12) | 37.62% (June 2011, p.10) |
|  | Fremont Home Loan Trust 2006-D: Group 3 | Zero more than 30 days delinquent on 10/1/06 (19) | .78% (Dec., p.13) | 7.23% (Feb., p.13) | 17.55% (May., p.13) | 35.42% (Nov., p.13) | 60.15% (June 2011, p.13) |
|  | Fremont Home Loan Trust 2006-D: Group 4 | Zero were more than 30 days delinquent as of 10/1/06. (19) | .51% (Dec., p.13) | 4.86% (Feb., p.13) | 11.47% (May., p.13) | 19.17% (Nov., p.13) | 33.47% (June 2011, p.11) |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 (P.S. dated December 23, 2006) | 0.51% were 30 to 59 days delinquent. (S-44) | 1.05% (Jan., p.9) | 3.48% (Mar., p.9) | 2.55% (Jun., p.9) | 8.36% (Dec., p.9) | 55.60% (June 2011, p.9) |
|  | GSR Mortgage Loan Trust 2006-OA1: Aggregate (P.S. dated August 23, 2006) | 0.94% were 30 to 59 days delinquent. (S-45) | 1.68% (Sept., p.11) | 2.34% (Nov., p.11) | 3.84% (Feb., p.10) | 10.12% (Aug. 2007, p.9) | 53.90% (June 2011, p.11) |
|  | GSR Mortgage Loan Trust 2006-OA1: Group 1 | 0.94% were 30 to 59 days delinquent. (S-45) | 1.59% (Sept., p.12) | 2.38% (Nov., p.12) | 3.39% (Feb., p.11) | 9.41% (Aug. 2007, p.10) | 49.31% (June 2011, p.12) |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1: Group 2 *The Class 2-A-3 in Group 2 (S-13). | 0.94% were 30 to 59 days delinquent. (S-45) (S-45) | 1.86% (Sept., p.12) | 2.49% (Nov., p.12) | 4.10% (Feb., p.11) | 10.72% (Aug. 2007, p.10) | 33.41% (June 2011, p.12) |
|  | GSR Mortgage Loan Trust 2006-OA1: Group 3 | 0.94% were 30 to 59 days delinquent. (S-45) (S-45) | .70% (Sept., p.13) | 1.00% (Nov., p.13) | 3.59% (Feb., p.12) | 8.34% (Aug. 2007, p.11) | 70.84% (June 2011, p.13) |
|  | GSR Mortgage Loan Trust 2007-OA1: Aggregate (P.S. dated May 7, 2007) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.58% (May, p.9) | 3.00% (July, p.9) | 5.55% (Oct., p.9) | 12.45% (Apr. 2008, p.10) | 51.79% (June 2011, p.10) |

**COMPLAINT FOR DAMAGES**

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1: Group 1 *Class 1A-2 in Group 1 (S-14-15) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.23% (May, p.10) | 2.67% (July, p.10) | 5.30% (Oct., p.10) | 11.97% (Apr. 2008, p.11) | 47.67% (June 2011, p.11) |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1: Group 2 *Class 2A-M in Group 2 (S-14-15) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.86% (May, p.10) | 3.28% (July, p.10) | 5.76% (Oct., p.10) | 12.85% (Apr. 2008, p.11) | 55.16% (June 2011, p.11) |
| | Long Beach Mortgage Loan Trust 2006-11: Aggregate (P.S. dated December 11, 2006) | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan., p.12) | 3.38% (Mar., p.12) | 12.43% (June, p.12) | 29.89% (Dec., p.12) | 52.65% (June 2011, p.14) |
| | Long Beach Mortgage Loan Trust 2006-11: Group 1 | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan. p.12) | 1.8% (Mar., p.13) | 7.65% (June, p.13) | 21.53% (Dec., p.13) | 52.03% (June 2011, p.19) |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11: Group 2 *Class II-A-4 in Group 2 (S-72) | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan. p.12) | 4.17% (Mar., p.14) | 14.81% (June, p.14) | 34.09% (Dec., p.14) | 53.08% (June 2011, p.24) |
| 75114NAC8 | RALI Series 2006-QO6 Trust (P.S. dated June 28, 2006) | zero (S-42) | 1.42% (July, p.8) | 1.61% (Sept., p.7) | 2.79% (Dec., p.8) | 6.13% (June, p.8) | 48.08% (June 2011, p.8) |
| 751153AC1 | RALI Series 2006-QO10 Trust (P.S. dated December 27, 2006) | zero (S-45) | 2.42% (Jan., p.8) | 4.94% (Mar., p.8) | 4.97% (June, p.8) | 13.54% (Dec., p.8) | 47.89% (June 2011, p.8) |
| 74922JAC2 | RALI Series 2007-QH2 Trust (P.S. dated February 23, 2007) | zero (S-43) | .89% (Mar., p.7) | 3.14% (May, p.7) | 3.09% (Aug., p.7) | 9.32% (Feb. 2008, p.7) | 55.03% (June 2011, p.8) |
| 74922WAC3 74922WAB5 | RALI Series 2007-QH3 Trust (P.S. dated March 28, 2007) | zero (S-45) | .81% (Apr., p.8) | 4.08% (June, p.8) | 2.84% (Sept., p.8) | 10.88% (Mar. 2008, p.8) | 49.71% (June 2011, p.8) |
| | RALI Series 2007-QH5 Trust: Aggregate (P.S. dated May 29, 2007) | zero (S-51) | 1.55% (June, p.9) | 2.59% (Aug., p.9) | 5.26% (Nov., p.9) | 16.31% (May 2008, p.14) | 51.88% (June 2011, p.9) |
| 75116EAA0 75116EAB8 75116EAC6 | RALI Series 2007-QH5 Trust: Group 1 *Class A11, A12, and A13 in Group 1 (S-12-13) | zero (S-51) | 1.65% (June, p.10) | 2.58% (Aug., p.10) | 5.73% (Nov., p.10) | 16.55% (May 2008, p.12) | 52.04% (June 2011, p.10) |
| | RALI Series 2007-QH5 Trust: Group 2 | zero (S-51) | 1.32% (June, p.11) | 2.64% (July, p.11) | 4.18% (Nov., p.11) | 15.74% (May 2008, p.13) | 51.52% (June 2011, p.11) |
| 74922AAB3 74922AAC1 | RALI Series 2007-QH6 Trust (P.S. dated June 27, 2007) | zero (S-45) | 1.10% (July, p.8) | 2.84% (Sept., p.8) | 5.57% (Dec., p.7) | 15.81% (June 2008, p.10) | 50.60% (June 2011, p.8) |

64.    This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by U.S. Central and WesCorp, was later discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

22

COMPLAINT FOR DAMAGES

65.    The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default."  Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process, resulting from systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

66.    A November 2008 Federal Reserve Board study attributed the rise in defaults, in part, to "[d]eteriorating lending standards" and posits that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher J. Mayer *et al.*, *The Rise in Mortgage Defaults* at 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

67.    In January 2011, the Financial Stability Oversight Council ("FSOC"), chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy. *See* FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report").  The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent better lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have on the economy." *Id.* at 2.

**23**

68.    The FSOC Risk Retention Report observed that the securitization process often incentivizes poor underwriting by shifting the risk of default from the originators to the investors, while obscuring critical information concerning the actual nature of the risk. The FSOC Risk Retention Report stated:

> The securitization process involves multiple parties with varying incentives and information, thereby breaking down the traditional direct relationship between borrower and lender. The party setting underwriting standards and making lending decisions (the originator) and the party making structuring decisions (the securitizer) are often exposed to minimal or no credit risk. By contrast, the party that is most exposed to credit risk (the investor) often has less influence over underwriting standards and may have less information about the borrower. As a result, originators and securitizers that do not retain risk can, at least in the short run, maximize their own returns by lowering loan underwriting standards in ways that investors may have difficulty detecting. The originate-to-distribute model, as it was conducted, exacerbated this weakness by compensating originators and securitizers based on volume, rather than on quality.

*Id.* at 3.

69.    Indeed, originators that wrote a high percentage of their loans for distribution were more likely to disregard underwriting standards, resulting in poorly performing mortgages, in contrast to originators that originated and then held most of their loans.

70.    High OTD originators profited from mortgage origination fees without bearing the risks of borrower default or insufficient collateral in the event of default. Divorced from these risks, high OTD originators were incentivized to push loan quantity over quality.

24

71.    Table 6 (*infra*) shows the percentage of loans originated for distribution relative to all the loans made by the Originators for the years 2005, 2006 and 2007, for those Originators in this Complaint with high OTD percentages.  The data was obtained from the Home Mortgage Disclosure Act database.

**Table 6**

| Originator Name | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |
| First Franklin Financial Corporation | | | 98.7 |
| Fremont Investment & Loan | 91.2 | 85.2 | 94.0 |
| GreenPoint Mortgage Funding Inc. | 89.0 | 87.1 | 95.6 |
| Homecomings Financial, LLC | 97.4 | 97.9 | 99.9 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| Long Beach Mortgage | | 80.2 | |
| Quicken Loans | 89.5 | 86.7 | 91.3 |
| SunTrust Mortgage, Inc. | 62.6 | 71.1 | 74.4 |

**B.    The Surge in Actual Versus Expected Cumulative Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards.**

72.    The actual losses to the mortgage pools underlying the RMBS U.S. Central and WesCorp purchased have exceeded expected losses so quickly and by so wide a margin (*see infra* Figure 2) that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents.

25

73.   "Loss" is different than and should be distinguished from default and delinquency rates. Loss either attempts to predict ("expected loss") or reflects ("actual loss") losses to the collateral pool by reason of borrower default, less any amounts recovered by the mortgage holder on a defaulted loan by sale of the subject property after foreclosure (which amounts may be less than 100% of the balance of the outstanding mortgage if the property is sold for less than the balance).

74.   While the short term price of a security may be influenced by broader market or liquidity forces, actual versus expected loss is a gauge of the health or the performance of an RMBS based on factors particular to that security.

75.   Expected loss is a statistical estimate of the total cumulative shortfall in principal payments on a mortgage pool over its 30-year life, expressed as a percentage of the original principal balance of the pool.  Expected loss is based on historical data for similar mortgage pools.

76.   The amount of expected loss is used to determine the amount of credit enhancement needed to achieve a desired credit rating.  Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected loss (in equation form: $CE/EL = RF$).  Thus, the rating factor expresses how many times the expected loss is covered by credit enhancement.  A triple-A rated security would have a rating factor of "5," so would require credit enhancement of five times the amount of the expected loss. A "double-A rating" would have a rating factor

**26**

of "4", and thus would require credit enhancement equaling four times the expected loss. A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times expected loss. A "Baa" rating would require credit enhancement of 2 - 1.5 times expected loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected loss.

77.   Again credit enhancement over expected loss equals the rating factor. So, by way of example, if cumulative expected losses on an asset pool are calculated to be $1 million, and the desired rating is triple-A (rating factor 5), the amount of credit enhancement provided will have to equal $5 million, or $1 million multiplied by five.

78.   Accordingly, if the analysis of expected loss is flawed, so too is the calculation of the amount of credit enhancement. For instance, on a triple-A rated security, if actual cumulative losses exceed five times expected losses, the credit enhancement will be insufficient, and the principal of the senior tranche will be impaired. This is because, again, the amount of credit enhancement was determined based on the assumed amount of expected loss.

79.   The following hypothetical illustrates how, working backwards, expected loss can be inferred in an already-issued offering. Assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million. This means the non-senior (subordinate) tranches, in aggregate, have a principal balance of $25 million. The $25 million amount of the non-

27

senior or subordinated tranches in this hypothetical offering serves as the credit enhancement for the senior tranche. Therefore, on our hypothetical $100 million offering, the expected loss would be $5 million, or the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5. The following equation illustrates: $25,000,000/5 = $5,000,000.

80.    "Actual losses" are the economic losses that were, in fact, suffered by the mortgage pools due to defaults and resulting foreclosures and any related inability of the mortgage holder or servicer to recoup the full principal amount of the mortgages. The actual loss data in Figure 2, (*infra*), is from ABSNET, a provider of asset-backed securities related data.

81.    The path of cumulative losses can be plotted on a line graph representing loss (either expected or actual) from origination to maturity, as shown in Figure 2 (*infra*).

82.    For the RMBS U.S. Central and WesCorp purchased, Figure 2 (*infra*) depicts a series of graphs illustrating the losses the RMBS actually experienced in the first 12 months after issuance in comparison to the losses the RMBS were expected to experience during the same time period. As the graphs show, the actual losses (the solid line) far exceeded the expected losses (the dotted line) for the period analyzed.

/ / /

28

## Figure 2

| Deal Name | ABSNetDeal_id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Alternative Loan Trust 2007-OA4 | 40782 | 1 | $ - | $ 1,721,048 |
| Alternative Loan Trust 2007-OA4 | 40782 | 2 | $ - | $ 1,879,815 |
| Alternative Loan Trust 2007-OA4 | 40782 | 3 | $ - | $ 2,052,895 |
| Alternative Loan Trust 2007-OA4 | 40782 | 4 | $ 5,552,496 | $ 2,241,515 |
| Alternative Loan Trust 2007-OA4 | 40782 | 5 | $ 8,256,396 | $ 2,446,993 |
| Alternative Loan Trust 2007-OA4 | 40782 | 6 | $ 9,843,413 | $ 2,670,748 |
| Alternative Loan Trust 2007-OA4 | 40782 | 7 | $ 11,117,391 | $ 2,914,296 |
| Alternative Loan Trust 2007-OA4 | 40782 | 8 | $ 11,443,511 | $ 3,179,264 |
| Alternative Loan Trust 2007-OA4 | 40782 | 9 | $ 13,077,444 | $ 3,467,385 |
| Alternative Loan Trust 2007-OA4 | 40782 | 10 | $ 16,955,124 | $ 3,780,506 |
| Alternative Loan Trust 2007-OA4 | 40782 | 11 | $ 18,593,680 | $ 4,120,586 |
| Alternative Loan Trust 2007-OA4 | 40782 | 12 | $ 21,253,642 | $ 4,489,703 |



| Deal Name | ABSNetDeal_id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 1 | $ 299,800 | $ 7,015,627 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 2 | $ 1,860,071 | $ 7,662,819 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 3 | $ 3,294,072 | $ 8,368,358 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 4 | $ 11,208,529 | $ 9,137,241 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 5 | $ 15,952,584 | $ 9,974,848 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 6 | $ 26,732,902 | $ 10,886,953 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 7 | $ 41,253,367 | $ 11,879,747 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 8 | $ 41,421,650 | $ 12,959,853 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 9 | $ 44,920,449 | $ 14,134,341 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 10 | $ 53,575,411 | $ 15,410,736 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 11 | $ 65,836,028 | $ 16,797,031 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 12 | $ 69,896,152 | $ 18,301,685 |

**29**



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Fremont Home Loan Trust 2006-D | 39741 | 1 | $ . | $ 8,287,486 |
| Fremont Home Loan Trust 2006-D | 39741 | 2 | $ 3,753,135 | $ 9,052,007 |
| Fremont Home Loan Trust 2006-D | 39741 | 3 | $ 6,212,973 | $ 9,885,452 |
| Fremont Home Loan Trust 2006-D | 39741 | 4 | $ 20,765,954 | $ 10,793,726 |
| Fremont Home Loan Trust 2006-D | 39741 | 5 | $ 36,520,130 | $ 11,783,182 |
| Fremont Home Loan Trust 2006-D | 39741 | 6 | $ 58,203,553 | $ 12,860,642 |
| Fremont Home Loan Trust 2006-D | 39741 | 7 | $ 81,810,437 | $ 14,033,419 |
| Fremont Home Loan Trust 2006-D | 39741 | 8 | $ 107,497,063 | $ 15,309,337 |
| Fremont Home Loan Trust 2006-D | 39741 | 9 | $ 118,828,404 | $ 16,696,747 |
| Fremont Home Loan Trust 2006-D | 39741 | 10 | $ 122,788,975 | $ 18,204,539 |
| Fremont Home Loan Trust 2006-D | 39741 | 11 | $ 120,044,997 | $ 19,842,154 |
| Fremont Home Loan Trust 2006-D | 39741 | 12 | $ 118,165,126 | $ 21,619,586 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 1 | $ - | $ 802,726 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 2 | $ - | $ 876,777 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 3 | $ - | $ 957,505 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 4 | $ - | $ 1,045,480 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 5 | $ 1,066,439 | $ 1,141,319 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 6 | $ 2,202,733 | $ 1,245,681 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 7 | $ 1,999,286 | $ 1,359,277 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 8 | $ 3,557,154 | $ 1,482,862 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 9 | $ 3,344,056 | $ 1,617,247 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 10 | $ 3,721,155 | $ 1,763,291 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 11 | $ 5,959,259 | $ 1,921,911 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 12 | $ 7,845,777 | $ 2,094,073 |

COMPLAINT FOR DAMAGES



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 1 | $ - | $ 5,494,102 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 2 | $ - | $ 6,000,933 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 3 | $ - | $ 6,553,457 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 4 | $ 1,358,347 | $ 7,155,588 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 5 | $ 4,282,540 | $ 7,811,537 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 6 | $ 6,429,963 | $ 8,525,828 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 7 | $ 8,637,375 | $ 9,303,308 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 8 | $ 12,644,175 | $ 10,149,165 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 9 | $ 14,733,906 | $ 11,068,933 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 10 | $ 18,092,798 | $ 12,068,508 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 11 | $ 25,912,308 | $ 13,154,148 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 12 | $ 35,241,988 | $ 14,332,479 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 1 | $ - | $ 2,096,434 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 2 | $ 138,000 | $ 2,289,830 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 3 | $ 548,083 | $ 2,500,662 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 4 | $ 1,970,334 | $ 2,730,422 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 5 | $ 2,555,411 | $ 2,980,719 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 6 | $ 5,789,933 | $ 3,253,277 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 7 | $ 8,674,548 | $ 3,549,947 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 8 | $ 10,980,315 | $ 3,872,708 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 9 | $ 15,810,760 | $ 4,223,673 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 10 | $ 17,540,976 | $ 4,605,090 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 11 | $ 21,894,799 | $ 5,019,347 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 12 | $ 27,470,029 | $ 5,468,973 |

**31**

**COMPLAINT FOR DAMAGES**



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 1 | $ - | $ 6,553,966 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 2 | $ - | $ 7,158,570 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 3 | $ 890,051 | $ 7,817,680 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 4 | $ 8,357,534 | $ 8,535,968 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 5 | $ 12,840,288 | $ 9,318,456 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 6 | $ 32,937,163 | $ 10,170,540 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 7 | $ 47,453,779 | $ 11,098,004 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 8 | $ 77,814,855 | $ 12,107,034 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 9 | $ 111,775,253 | $ 13,204,235 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 10 | $ 146,284,958 | $ 14,396,637 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 11 | $ 170,179,730 | $ 15,691,707 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 12 | $ 184,780,135 | $ 17,097,348 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2006-QO6 Trust | 38111 | 1 | $ - | $ 2,048,115 |
| RALI Series 2006-QO6 Trust | 38111 | 2 | $ - | $ 2,237,054 |
| RALI Series 2006-QO6 Trust | 38111 | 3 | $ - | $ 2,443,026 |
| RALI Series 2006-QO6 Trust | 38111 | 4 | $ 282,856 | $ 2,667,491 |
| RALI Series 2006-QO6 Trust | 38111 | 5 | $ 1,873,291 | $ 2,912,019 |
| RALI Series 2006-QO6 Trust | 38111 | 6 | $ 4,017,608 | $ 3,178,295 |
| RALI Series 2006-QO6 Trust | 38111 | 7 | $ 6,135,151 | $ 3,468,128 |
| RALI Series 2006-QO6 Trust | 38111 | 8 | $ 8,393,609 | $ 3,783,450 |
| RALI Series 2006-QO6 Trust | 38111 | 9 | $ 9,394,454 | $ 4,126,325 |
| RALI Series 2006-QO6 Trust | 38111 | 10 | $ 9,244,872 | $ 4,498,951 |
| RALI Series 2006-QO6 Trust | 38111 | 11 | $ 11,623,527 | $ 4,903,661 |
| RALI Series 2006-QO6 Trust | 38111 | 12 | $ 14,913,305 | $ 5,342,924 |

**COMPLAINT FOR DAMAGES**



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2006-QO10 Trust | 40250 | 1 | $ - | $ 1,895,544 |
| RALI Series 2006-QO10 Trust | 40250 | 2 | $ - | $ 2,070,408 |
| RALI Series 2006-QO10 Trust | 40250 | 3 | $ 157,654 | $ 2,261,037 |
| RALI Series 2006-QO10 Trust | 40250 | 4 | $ 397,104 | $ 2,468,780 |
| RALI Series 2006-QO10 Trust | 40250 | 5 | $ 1,774,851 | $ 2,695,092 |
| RALI Series 2006-QO10 Trust | 40250 | 6 | $ 4,416,022 | $ 2,941,533 |
| RALI Series 2006-QO10 Trust | 40250 | 7 | $ 5,707,788 | $ 3,209,775 |
| RALI Series 2006-QO10 Trust | 40250 | 8 | $ 7,455,454 | $ 3,501,607 |
| RALI Series 2006-QO10 Trust | 40250 | 9 | $ 12,901,438 | $ 3,818,941 |
| RALI Series 2006-QO10 Trust | 40250 | 10 | $ 14,654,350 | $ 4,163,808 |
| RALI Series 2006-QO10 Trust | 40250 | 11 | $ 19,022,850 | $ 4,538,370 |
| RALI Series 2006-QO10 Trust | 40250 | 12 | $ 18,742,305 | $ 4,944,911 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH2 Trust | 40843 | 1 | $ - | $ 469,637 |
| RALI Series 2007-QH2 Trust | 40843 | 2 | $ - | $ 512,961 |
| RALI Series 2007-QH2 Trust | 40843 | 3 | $ - | $ 560,191 |
| RALI Series 2007-QH2 Trust | 40843 | 4 | $ - | $ 611,661 |
| RALI Series 2007-QH2 Trust | 40843 | 5 | $ 1,242,652 | $ 667,732 |
| RALI Series 2007-QH2 Trust | 40843 | 6 | $ 1,246,124 | $ 728,790 |
| RALI Series 2007-QH2 Trust | 40843 | 7 | $ 1,592,534 | $ 795,249 |
| RALI Series 2007-QH2 Trust | 40843 | 8 | $ 1,936,176 | $ 867,553 |
| RALI Series 2007-QH2 Trust | 40843 | 9 | $ 4,191,926 | $ 946,175 |
| RALI Series 2007-QH2 Trust | 40843 | 10 | $ 5,000,625 | $ 1,031,619 |
| RALI Series 2007-QH2 Trust | 40843 | 11 | $ 6,300,968 | $ 1,124,419 |
| RALI Series 2007-QH2 Trust | 40843 | 12 | $ 8,182,211 | $ 1,225,143 |

**COMPLAINT FOR DAMAGES**



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH3 Trust | 40800 | 1 | $ - | $ 457,831 |
| RALI Series 2007-QH3 Trust | 40800 | 2 | $ - | $ 500,066 |
| RALI Series 2007-QH3 Trust | 40800 | 3 | $ - | $ 546,109 |
| RALI Series 2007-QH3 Trust | 40800 | 4 | $ - | $ 596,285 |
| RALI Series 2007-QH3 Trust | 40800 | 5 | $ - | $ 650,946 |
| RALI Series 2007-QH3 Trust | 40800 | 6 | $ 192,738 | $ 710,469 |
| RALI Series 2007-QH3 Trust | 40800 | 7 | $ 1,331,462 | $ 775,258 |
| RALI Series 2007-QH3 Trust | 40800 | 8 | $ 3,556,839 | $ 845,744 |
| RALI Series 2007-QH3 Trust | 40800 | 9 | $ 4,617,339 | $ 922,390 |
| RALI Series 2007-QH3 Trust | 40800 | 10 | $ 4,628,201 | $ 1,005,686 |
| RALI Series 2007-QH3 Trust | 40800 | 11 | $ 8,532,214 | $ 1,096,154 |
| RALI Series 2007-QH3 Trust | 40800 | 12 | $ 13,454,920 | $ 1,194,346 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH5 Trust | 41380 | 1 | $ - | $ 733,221 |
| RALI Series 2007-QH5 Trust | 41380 | 2 | $ - | $ 800,861 |
| RALI Series 2007-QH5 Trust | 41380 | 3 | $ - | $ 874,599 |
| RALI Series 2007-QH5 Trust | 41380 | 4 | $ 303,402 | $ 954,957 |
| RALI Series 2007-QH5 Trust | 41380 | 5 | $ 304,095 | $ 1,042,497 |
| RALI Series 2007-QH5 Trust | 41380 | 6 | $ 551,599 | $ 1,137,824 |
| RALI Series 2007-QH5 Trust | 41380 | 7 | $ 3,713,937 | $ 1,241,583 |
| RALI Series 2007-QH5 Trust | 41380 | 8 | $ 5,481,623 | $ 1,354,468 |
| RALI Series 2007-QH5 Trust | 41380 | 9 | $ 11,203,237 | $ 1,477,217 |
| RALI Series 2007-QH5 Trust | 41380 | 10 | $ 18,346,412 | $ 1,610,616 |
| RALI Series 2007-QH5 Trust | 41380 | 11 | $ 17,414,436 | $ 1,755,501 |
| RALI Series 2007-QH5 Trust | 41380 | 12 | $ 20,855,638 | $ 1,912,756 |

**COMPLAINT FOR DAMAGES**



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH6 Trust | 41979 | 1 | $ - | $ 917,466.16 |
| RALI Series 2007-QH6 Trust | 41979 | 2 | $ - | $ 1,002,102.50 |
| RALI Series 2007-QH6 Trust | 41979 | 3 | $ - | $ 1,094,369.02 |
| RALI Series 2007-QH6 Trust | 41979 | 4 | $ - | $ 1,194,919.49 |
| RALI Series 2007-QH6 Trust | 41979 | 5 | $ - | $ 1,304,457.20 |
| RALI Series 2007-QH6 Trust | 41979 | 6 | $ 1,463,785.37 | $ 1,423,737.41 |
| RALI Series 2007-QH6 Trust | 41979 | 7 | $ 4,291,610.29 | $ 1,553,569.73 |
| RALI Series 2007-QH6 Trust | 41979 | 8 | $ 10,720,429.00 | $ 1,694,820.25 |
| RALI Series 2007-QH6 Trust | 41979 | 9 | $ 17,886,574.54 | $ 1,848,413.43 |
| RALI Series 2007-QH6 Trust | 41979 | 10 | $ 18,896,190.65 | $ 2,015,333.56 |
| RALI Series 2007-QH6 Trust | 41979 | 11 | $ 24,666,980.73 | $ 2,196,625.78 |
| RALI Series 2007-QH6 Trust | 41979 | 12 | $ 27,779,856.42 | $ 2,393,396.45 |

83.    As clearly shown in Figure 2 (*supra*), actual losses spiked almost immediately after issuance of the RMBS.  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the RMBS's credit enhancement.  For example, in the RALI 2007-QH3 Trust offering, actual losses at

35

month 12 exceeded $13 million, or more than 10 times the expected losses of approximately $1.19 million (*see supra* Figure 2).

84.    This immediate increase in actual losses—at a rate far greater than expected losses—is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

85.    Because credit enhancement is designed to ensure triple-A performance of triple-A rated RMBS, the evidence that credit enhancement has failed (*i.e.*, actual losses swiftly surged past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the Offering Documents.

**C.    The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines.**

86.    Virtually all of the RMBS U.S. Central and WesCorp purchased were rated triple-A at issuance.

87.    Moody's and S&P have since downgraded the RMBS U.S. Central and WesCorp purchased to well below investment grade (*see supra* Table 4).

88.    A rating downgrade is material. The total collapse in the credit ratings of the RMBS U.S. Central and WesCorp purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these securities were impaired from the outset.

36

**D.**    **Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards.**

89.    Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

**1.**    **The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse.**

90.    Mortgage originators experienced unprecedented success during the mortgage boom. Yet, their success was illusory. As the loans they originated began to significantly underperform, the demand for their products subsided. It became evident that originators had systematically disregarded their underwriting standards.

91.    The Office of the Comptroller of the Currency (the "OCC"), an office within the Treasury Department, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report, the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

37

92.   Recently government reports and investigations and newspaper reports have uncovered the extent of the pervasive abandonment of underwriting standards. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") recently released its report detailing the causes of the financial crisis.   Using Washington Mutual Bank ("WaMu") as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets.   The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans.   These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011) ("PSI Wall Street Report").

93.   Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.   *See* FIN. CRISIS INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

38

94.    The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics" during the housing and financial crisis. "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found that the current economic crisis had its genesis in the housing boom:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

95.    During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. Early Payment Default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards. . . ." *Id*.

96.    In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

**39**

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id.*

97.    LENDERS and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards.  The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id.* at xxiii.

98.    In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id.* at 12-13 (internal quotation marks omitted).

99.    Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that

**40**

COMPLAINT FOR DAMAGES

of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures sometimes often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

100. Investment banks securitized loans that were not originated in accordance with underwriting guidelines and failed to disclose this fact in RMBS offering documents. As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

101. The lack of disclosure regarding the true underwriting practices of the Originators in the Offering Documents at issue in this Complaint put U.S. Central and

**41**

WesCorp at a severe disadvantage. The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS. The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

> One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

102.   Because investors had limited or no access to information concerning the actual quality of loans underlying the RMBS, the OTD model created a situation where the origination of low quality mortgages through poor underwriting thrived. The FSOC found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully. Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with

42

credit scores below the threshold. By lowering underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

*Id.* at 11 (footnote omitted).

103.   The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry. The FSOC Risk Retention Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans. . . ." *Id.*

104.   In sum, the disregard of underwriting standards was pervasive across originators. The failure to adhere to underwriting standards directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS. The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials. The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

105.   As discussed below, facts have recently come to light that show many of the Originators that contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

**43**

2.    **American Home's Systematic Disregard of Underwriting Standards.**

106.    American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated and serviced by its subsidiaries. It was the parent of American Home Mortgage Holdings, Inc., which in turn was the parent of American Home Mortgage Corp., a retail lender of mortgage loans. Collectively, these entities are referred to herein as "American Home." American Home originated or contributed loans to the mortgage pools underlying the GSR Mortgage Loan Trust 2006-OA1 offering.

107.    Edmund Andrews, an economics reporter for the New York Times, recounted his own experience using American Home as a lender. According to Andrews, he was looking to purchase a home in 2004, and his real estate agent referred him to a loan officer at American Home. The American Home loan officer began the ordeal by asking Andrews how large of a loan he needed. Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife. Andrews would be relying on his then-unemployed fiancée to earn enough money to meet his monthly obligations—including the mortgage. Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country. One of its specialties was serving people just like me: borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify. In industry jargon, we were "Alt-A" customers, and we usually

44

1    paid slightly higher rates for the privilege of concealing our financial
2    weaknesses.

3    I thought I knew a lot about go-go mortgages. I had already written
4    several articles about the explosive growth of liar's loans, no-money-
     down loans, interest-only loans and other even more exotic mortgages. I
5    had interviewed people with very modest incomes who had taken out big
6    loans. Yet for all that, I was stunned at how much money people were
7    willing to throw at me.

8    [The American Home loan officer] called back the next morning. "Your
     credit scores are almost perfect," he said happily. "Based on your income,
9    you can qualify for a mortgage of about $500,000."

10   What about my alimony and child-support obligations? No need to
11   mention them. What would happen when they saw the automatic
     withholdings in my paycheck? No need to show them. If I wanted to buy
12   a house, [the American Home loan officer] figured, it was my job to
13   decide whether I could afford it. His job was to make it happen.

14   "I am here to enable dreams," he explained to me long afterward. [The
15   American Home loan officer]'s view was that if I'd been unemployed for
16   seven years and didn't have a dime to my name but I wanted a house, he
     wouldn't question my prudence. "Who am I to tell you that you shouldn't
17   do what you want to do? I am here to sell money and to help you do what
18   you want to do. At the end of the day, it's your signature on the
     mortgage—not mine."
19

20   Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at
21   MM46.

22   108. The American Home loan officer steered Andrews to a stated-income

23   loan so that he would not have to produce paychecks or tax returns that would reveal

24   his alimony and child support obligations. The loan officer wanted to limit
25
26   disclosure of Andrews's alimony and child support payments when an existing
27   mortgage showed up under Andrews's name. Although his ex-wife was solely
28
                                    **45**

responsible for that mortgage under the terms of the couple's separation agreement,
the only way Andrews could explain that fact would be to produce the agreement,
which would also reveal his alimony and child support obligations. According to
Andrews:

> [The American Home loan officer] didn't get flustered. If Plan A didn't work, he would simply move down another step on the ladder of credibility. Instead of "stating" my income without documenting it, I would take out a "no ratio" mortgage and not state my income at all. For the price of a slightly higher interest rate, American Home would verify my assets, but that was it. Because I wasn't stating my income, I couldn't have a debt-to-income ratio, and therefore, I couldn't have too much debt. I could have had four other mortgages, and it wouldn't have mattered. American Home was practically begging me to take the money.

*Id.*

109.   American Home ultimately approved Andrews's application.   Not surprisingly, Andrews was unable to afford his monthly mortgage payments.

110.   American Home's lack of adherence to underwriting guidelines was set forth in detail in a 165-page amended class action complaint filed June 4, 2008, in *In re American Home Mortgage Sec Litig*, No. 07-md-1898 (TCP) (E.D.N.Y.). Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from more than 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. *See* Am.

**46**

1   Class Action Compl., *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898

2   (E.D.N.Y. filed June 4, 2008) ("American Home ACC").

3

4   111.    According to the American Home ACC, former American Home

5   employees recounted that underwriters were consistently bullied by sales staff when

6   underwriters challenged questionable loans, while exceptions to American Home's

7

8   underwriting guidelines were routinely applied. *See id.* at 43.

9   112.    The American Home ACC cited to witnesses who were former American

10  Home employees. These witnesses reported that American Home management told

11

12  underwriters not to decline a loan, regardless of whether the loan application included

13  fraud. *See id.*

14

15  113.    Another former American Home employee stated that American Home

16  routinely made exceptions to its underwriting guidelines to be able to close loans.

17  When American Home mortgage underwriters raised concerns to the sales department

18

19  about the pervasive use of exceptions to American Home's mortgage underwriting

20  practices, the sales department contacted American Home headquarters to get approval

21  for the use of exceptions.    Indeed, it was commonplace to overrule mortgage

22

23  underwriters' objections to approving a loan to facilitate loan approval. *See id.* at 44.

24  114.    A former American Home auditor confirmed this account that American

25  Home mortgage underwriters were regularly overruled when they objected to loan

26

27  originations. *See id.*

28

**47**

---

**COMPLAINT FOR DAMAGES**

115.   The parties settled the litigation on January 14, 2010, for $37.25 million.

116.   American Home's lax lending practices landed it in the 2008 "Worst Ten in the Worst Ten" Report. American Home came in 8th in Las Vegas, Nevada, and 9th in both Detroit, Michigan, and Miami, Florida. *See* 2008 "Worst Ten in the Worst Ten" Report. When the OCC issued the 2009 "Worst Ten in the Worst Ten" Report, American Home again featured prominently, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida, and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas, Nevada; 9th in Stockton-Lodi, California; and 10th in Bakersfield, California). *See* 2009 "Worst Ten in the Worst Ten" Report.

### 3.   Countrywide Home Loans, Inc.'s Systematic Disregard of Underwriting Standards

117.   Countrywide Home Loans, Inc. ("Countrywide") was one of the largest originators of residential mortgages in the United States during the time period at issue in this Complaint. Countrywide originated or contributed a critical portion of the loans in the mortgage pool underlying the Alternative Loan Trust 2007-OA4 Offering and loans in the mortgage pools underlying the GSR Mortgage Loan Trust 2006-OA1 and GSR Mortgage Loan Trust 2007-OA1.

118.   In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and

48

predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis." Press Release, Comm. on Oversight & Government Reform, Statement of Chairman Towns on Committee Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks omitted).

119.  On May 9, 2008, the New York Times noted that minimal documentation and stated income loans—Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program—have "bec[o]me known [within the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their income." Floyd Norris, *A Little Pity, Please, for Lenders*, N.Y. Times, May 9, 2008 at C1.

120.  In a television special titled, "If You Had a Pulse, We Gave You a Loan," Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."
>
> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.
>
> He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."
>
> He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."
>
> But it turned out to be no laughing matter for Partow. Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.
>
> In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was

**49**

common and was known by top company officials. "It's impossible they didn't know."

...

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

121.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives, alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled investors about the credit risks that Countrywide created with its mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See* Compl. for Violations of the Federal Securities Laws, *SEC v. Mozilo*, No. CV 09-3994-JFW (C.D. Cal. filed June 4, 2009). Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16,

COMPLAINT FOR DAMAGES

2010, at A1.

122.   Internal Countrywide e-mails the SEC released in connection with its lawsuit show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." E-mail from Angelo Mozilo to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT). Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." *Id.* (internal quotation marks omitted).

123.   Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals." E-mail from Angelo Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept. 1, 2004 8:17 PM PDT).

**51**

**COMPLAINT FOR DAMAGES**

124.   To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

125.   In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract.  In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate."  E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing Director and Chief of Mortgage Banking and Capital Markets at Countrywide Financial (Apr. 17, 2006 5:55 PM PST).  Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct.
> [sic]  It's not only subordinated to the first, but the first is subprime.  In
> addition, the [FICOs] are below 600, below 500 and some below 400 . .
> . With real estate values coming down. . .the product will become
> increasingly worse.  There has [sic] to be major changes in this
> program, including substantial increases in the minimum [FICO].

*Id.*

126.   Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated

**52**

income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records." E-mail from Angelo Mozilo to Carlos Garcia, former CFO of Countrywide Financial and Jim Furash, former President of Countrywide Bank (June 1, 2006 10:38 PM PST).

127. An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application. *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PDT).

128. Countrywide, apparently, was "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet." E-mail from Angelo Mozilo to Dave Sambol, Managing Director Countrywide (Sept. 26, 2006 10:15 AM PDT). Yet such loans were securitized and passed on to unsuspecting investors such as U.S. Central and WesCorp.

129. With growing concern over the performance of Pay Option ARM loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated for the Bank." E-mail from Angelo Mozilo Countrywide to Carlos Garcia, former Managing Director, Countrywide (Nov. 3, 2007 5:33 PM PST). In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not

**53**

to hold onto the loans. Mozilo's concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys." *Id.*

130.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances." E-mail from Angelo Mozilo to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM PST).

131.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." E-mail from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing Director, Countrywide (Apr. 14, 2005 12:14 PM PDT).

**COMPLAINT FOR DAMAGES**

1  Aguilera continued: "The continued concentration in these same categories indicates

2

3  either a) inadequate controls in place to mange [sic] rogue production units or b)

4  general disregard for corporate program policies and guidelines." *Id.*  Aguilera

5  observed that pervasive use of the exceptions policy was an industry-wide practice:

6
> It appears that [Countrywide Home Loans]' loan exception policy is

7  > more loosely interpreted at [Specialty Lending Group] than at the other
> divisions.  I understand that [Correspondent Lending Division] has

8  > decided to proceed with a similar strategy to appease their complaint
> customers. . . . [Specialty Lending Group] has clearly made a market in

9  > this unauthorized product by employing a strategy that Blackwell has
> suggested is prevalent in the industry. . . .

10

11  *Id.*

12       132.   Internal reports months after an initial push to rein in the excessive use of

13

14  exceptions with a "zero tolerance" policy showed the use of exceptions remained

15  excessive.  E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian

16  Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM

17
PDT).

18

19       133.   In February 2007, nearly a year after pressing for a reduction in the

20  overuse of exceptions and as Countrywide claimed to be tightening lending standards,

21
Countrywide executives found that exceptions continued to be used at an unacceptably

22

23  high rate.  Frank Aguilera stated that any "[g]uideline tightening should be considered

24  purely optics with little change in overall execution unless these exceptions can be

25
contained."  E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark

26

27  Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST).

28                                              55

134.   John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 e-mail that "the exception process has never worked properly".   E-mail from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

135.   Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed that its high combined loan-to-value ratio ("CLTV") stated income loans were performing worse than those of its competitors.  After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."  E-mail from Russ Smith, Countrywide to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

136.   On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

137.   On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

138.   According to Zachary, Countrywide pressured employees to approve

56

COMPLAINT FOR DAMAGES

unqualified borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there [i.e., how the employee closes the deal]. . . ." NBC Nightly News, Countrywide Whistleblower Reports "Liar Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly News"). Zachary also stated that the practices were not the work of a few bad apples, but rather: "It comes down, I think from the very top that you get a loan done at any cost." *Id.*

139. Zachary also told of a pattern of: 1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income in order to qualify for loans.

140. NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices. Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans. NBC News quoted a former loan officer: "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'" July 1, 2008 NBC Nightly News.

141. Not surprisingly, Countrywide's default rates reflected its approach to

COMPLAINT FOR DAMAGES

underwriting. *See* 2008 "Worst Ten in the Worst Ten" Report. Countrywide appeared on the top ten list in six of the ten markets: 4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in Stockton, California and Riverside, California; and 10th in Bakersfield, California and Miami, Florida. When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, Countrywide appeared on the top ten list in every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in Bakersfield, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 4. First Franklin Financial Corporation's Systematic Disregard of Underwriting Standards.

142. First Franklin Financial Corporation ("First Franklin") originated or contributed a critical portion of the loans in the mortgage pool underlying the First Franklin Mortgage Loan Trust 2006-FF4 offering.

143. First Franklin faces a class action suit that alleges First Franklin systematically disregarded its underwriting guidelines when originating mortgages that were subsequently securitized into RMBS. *See Federal Home Loan Bank of Chicago v. Banc of America*, No. 10-ch-45003 (Ill. Cir. Ct.) ("FHLB Chicago Complaint").

144. Statements from confidential witnesses in the FHLB Chicago Complaint represented that First Franklin originated mortgage loans in violation of its

58

1  underwriting standards.

2    145.   According to one confidential witness in the complaint, account executives
3
4  at First Franklin were making "$100,000 a month in commissions," which was based off
5  of the number and dollar amount of loans processed.  Due to this incentive structure,
6
7  account executives would often pressure underwriters to approve loans that should not
8  have been approved.  The executives would simply override the underwriter's decision
9  so that, according to this confidential witness, "Nine out of ten times, the loan went
10
11  through."  *See* FHLB Chicago Complaint ¶ 308-309.

12    146.   Another confidential witness stated that "account executives paid
13  processors cash under the table to help them get loans closed," and went on to describe
14
15  how one loan processor was caught manipulating the loan documents in order to close
16  more loans. *See id.* ¶311.

17    147.   One confidential witness described how the systematic disregard for
18
19  underwriting guidelines grew worse after First Franklin purchased OwnIt Mortgage,
20  and OwnIt employees began working with the confidential witness.  She stated that
21  OwnIt employees "were used to approving anything.  They'd say, 'if we don't approve
22
23  it, somebody else will.  So why lose the money?'"  *See id.* ¶312.

24    148.   Another confidential witness represented that there was enormous pressure
25  from management to close loans at any cost.  "[P]eople were working until 8 p.m. on
26
27  Saturdays and Sundays" in order to close the loans, stated the witness.  As a result, "a

28

59

lot of loans slipped through. People were tired of being beat up. With the rush of loans, stuff could have been overlooked. Maybe the conditions didn't exactly meet the guidelines." During the last few days of the month, a drove of employees would go to the branch manager "begging for exceptions to close their loans." The witness recalls one instance where the branch manager came out of his office and yelled: "Oh f*** it! Just close the f***ing loans." *See id.* ¶317.

149.    Another confidential witness noted that account executives would often approach branch managers about overturning an underwriter's decision to reject a loan and said that "some loans were approved that were not compliant with guidelines." *See id.* ¶318.

150.    When First Franklin began downsizing its mortgage operation in late 2007, it ordered all of its remaining underwriters to assist in loss mitigation. One of these underwriters was a confidential witness, who reported that the loss mitigation group was tasked with reviewing the quality of a number of First Franklin's loans: she reported that among the loans she reviewed, fifty percent were not compliant with First Franklin's guidelines. *See id.* ¶320.

151.    According to another confidential witness, loan document manipulation at First Franklin grew to disconcerting levels. The witness stated that "a lot of fraudulent loans were going through. There was tons of fraud going on." *See id.* ¶323.

152.    As shown by statements from former employers, First Franklin's actual

**60**

1  mortgage underwriting practices deviated widely from its stated guidelines.   This

2  systematic disregard of underwriting standards led to toxic loans being bundled into

3

4  securities and sold to investors who did not know, and could not have known, about the

5  true nature of the loans backing their securities.

6
              5.      **Fremont Investment and Loan's Systematic Disregard of**
7                          **Underwriting Standards.**

8    153.  Fremont Investment and Loan ("Fremont") was the primary originator of
9
10  the loans underlying the Fremont Home Loan Trust 2006-D Offering.

11   154.  Senator Carl Levin, at a hearing before the Senate PSI, singled out

12
13  Fremont as a lender "'known for poor quality loans.'" Opening Statement of Sen. Carl

14  Levin, Chairman, Permanent S. Comm. on Investigations, Hearing on *Wall Street and*

15  *the Financial Crisis:  The Role of Credit Rating Agencies* (Apr. 23, 2010).  Senator

16
17  Levin recounted how an analyst with S&P raised concerns about the quality of

18  Fremont-originated loans in a Goldman Sachs RMBS offering:

19       In January 2007, S&P was asked to rate an RMBS being assembled by
20       Goldman Sachs using subprime loans from Fremont Investment and Loan, *a*
          *subprime lender known for loans with high rates of delinquency.*  On January
21       24, 2007, an analyst wrote seeking advice from two senior analysts: "I have a
         Goldman deal with subprime Fremont collateral. *Since Fremont collateral has*
22       *been performing not so good, is there anything special I should be aware of?*"
         One analyst responded:  *"No, we don't treat their collateral any differently."*
23       The other asked: "are the FICO scores current?" "Yup," came the reply.  Then
24       "You are good to go."  In other words, *the analyst didn't have to factor in any*
         *greater credit risk for an issuer known for poor quality loans, even though three*
25       *weeks earlier S&P analysts had circulated an article about how Fremont had*
         *severed ties with 8,000 brokers due to loans with some of the highest*
26       *delinquency rates in the industry.*  In the spring of 2007, Moody's and S&P
27       provided AAA ratings for 5 tranches of RMBS securities backed by Fremont

                                              61

28

mortgages.  By October, both companies began downgrading the CDO.  Today
all five AAA tranches have been downgraded to junk status.\

*Id.* (emphasis added).

155.   Fremont was subject to a cease and desist order from the Federal Deposit

Insurance Corporation ("FDIC") in 2007.  A July 1, 2008 article in the BCD News

reported:

> Ever since the FDIC slapped Fremont Investment & Loan with a cease
> and desist order in March 2007, a Chapter 11 filing seemed likely.
> . . .
>
> When the subprime mortgage market collapsed, Fremont Investment &
> Loan, once one of the top 10 subprime mortgage originators, found itself
> mired in financial disaster.  To make matters worse, it also faced scrutiny
> from the FDIC, and was the subject of numerous lawsuits alleging that
> Fremont engaged in deceptive practices in connection with its origination
> and servicing of residential mortgage[s]…
>
> In March 2007, the company exited the residential subprime loan business
> in light of an FDIC cease and desist order.  The FDIC determined, among
> other things, that Fremont had been operating without adequate subprime
> mortgage loan underwriting criteria, and that it was marketing and
> extending subprime mortgage loans in a way that substantially increased
> the likelihood of borrower default.

Former Subprime Lender's Parent Throws in the Towel, *50 BCD NEWS & COMMENT,
July 1, 2008.*

156.   In July 2009, *The New Yorker reported that Sheila Bair, Chairman of the

FDIC, initiated the first federal government action against Fremont in 2007 that

culminated in the cease and desist order to Fremont:*

> In March, 2007, she initiated the first government action against a
> subprime lender, instructing Fremont Investment & Loan, a California

**62**

bank, to cease operations. Fremont was among the worst of the subprime offenders, using all the now familiar practices: targeting people with bad credit, *ignoring traditional standards for underwriting home loans*, paying third-party brokers handsomely to bring in gullible customers, and then infecting the larger financial system by selling off the hazardous loans. "We ordered them out of the business," she said. "And they weren't happy about it."

Ryan Lizza, *The Contrarian; Sheila Bair and the White House financial debate*, NEW YORKER, July 6, 2009, at 30 (emphasis added).

157.    Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc., which is mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.

Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.

Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*, MYRTLE BEACH SUN-NEWS, Jan. 13, 2011, at A.

158.    Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis,

COMPLAINT FOR DAMAGES

Tennessee. *See* 2008 "Worst Ten in the Worst Ten" Report. In the 2009 "Worst Ten of the Worst Ten" Report, Fremont holds the following positions: 2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th in Bakersfield, California and Merced, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 6.    GreenPoint Mortgage Funding Inc.'s Systematic Disregard of of Underwriting Standards

159.    GreenPoint Mortgage Funding Inc. ("GreenPoint") was the primary originator of the loans underlying the GreenPoint Mortgage Funding Trust 2006-OH1.

160.    GreenPoint, based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One"). Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year later on August 21, 2007.

161.    According to a press release issued by Capital One on August 20, 2007, GreenPoint had an "originate and sell" (*i.e.*, OTD) business model with a focus on "prime non-conforming and near-prime markets, especially the Alt-A mortgage sector." Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

**64**

1    162.   When originating stated income loans, GreenPoint often inflated the

2  borrowers' income by as much as 5%.  A September 12, 2008, article on Bloomberg

3  reports on GreenPoint's underwriting practices:

4

5

6       Many Alt-A loans go to borrowers with credit scores higher than subprime
        and lower than prime, and carried lower interest rates than subprime
7       mortgages.

8
        So-called no-doc or stated-income loans, for which borrowers didn't have to
9       furnish pay stubs or tax returns to document their earnings, were offered by
        lenders such as GreenPoint Mortgage and Citigroup Inc. to small business
10      owners who might have found it difficult to verify their salaries.

11
        . . .
12

13      "To grow, the market had to embrace more borrowers, and the obvious
        way to do that was to move down the credit scale," said Guy Cecala,
14      publisher of Inside Mortgage Finance. "Once the door was opened, it was
        abused."
15

16      . . .

17
        Almost all stated-income loans exaggerated the borrower's actual income
18      by 5 percent or more, and more than half increased the amount by more
        than 50 percent, according to a study cited by Mortgage Asset Research
19      Institute in its 2006 report to the Washington-based Mortgage Bankers
        Association.
20

21
   Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults*
22
   *Surge*, BLOOMBERG, Sept. 12, 2008, *available at*
23
   http://www.bloomberg.com/apps/news?pid=newsarchive&sid=arb3xM3SHBVk.
24
        163.   GreenPoint is the defendant in private litigation regarding its origination
25
   practices.   The allegations concern GreenPoint's adherence to its underwriting
26

27
                                        **65**
28  ──────────────────────────────────────────────

guidelines in the mortgage loan origination process, and the plaintiff seeks to have GreenPoint repurchase 30,000 loans it issued that allegedly were not in compliance with GreenPoint's own underwriting guidelines. *See U.S. Bank Nat'l Ass'n v. GreenPoint Mortgage Funding, Inc.*, No. 09-600352 (N.Y. Sup. Ct. filed Apr. 22, 2009). On March 3, 2010, the court denied GreenPoint's motion to dismiss this claim, holding that discovery would be required to determine whether GreenPoint would be required under the parties' contract to repurchase all 30,000 loans based on the deficiencies in individual loans identified by U.S. Bank.

164. GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada. *See* 2008 "Worst Ten in the Worst Ten" Report. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California; 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 7. Homecomings's Systematic Disregard of Underwriting Standards.

165. Homecomings Financial Network, Inc. was a major originator for the RALI Series 2006-QO6 Trust and is a wholly-owned subsidiary of the sponsor of that offering, Residential Funding Corp. Homecomings Financial, LLC was a major

66

1 originator for all the RALI Series Offerings except the RALI Series 2006-QO6 Trust.

2
3 Homecomings Financial, LLC is a wholly-owned subsidiary of Residential Funding

4 Company LLC, the sponsor of the RALI Series Offerings at issue in this Complaint

5 other than the RALI Series 2006-Q06 Trust. Homecomings Financial Network, Inc.

6
7 and Homecomings Financial, LLC are collectively referred to herein as

8 "Homecomings."

9     166.   Following the purchase of the certificates in the RALI Series Offerings by

10 WesCorp, public disclosures revealed that Homecomings systematically disregarded its

11
12 underwriting guidelines in favor of riskier, fee-driven mortgage lending practices

13 including subprime, Alt-A and option-ARM loans, and engaged in predatory lending.

14
15     167.   The Federal Trade Commission opened an investigation into

16 Homecomings mortgage lending and underwriting practices, closing the investigation

17 in January 2009, after Homecomings ceased mortgage loan origination. *See* Letter

18
19 from Peggy L. Twohig, Associate Dir., Div. of Fin. Practices, Bur. of Consumer

20 Protection, Federal Trade Commission, to Andrew Sandler, Skadden, Arps (counsel for

21 Homecomings) (Jan. 22, 2009).

22
23     168.   In March 2009, the Portland Tribune reported that Homecomings lending

24 practices allowed for the origination of shaky loans that precipitated a wave of

25 foreclosures. The article reported:

26
27     "In order to keep your market share, you had to be more aggressive," said
      Tim Boyd, who sold subprime loans in the Portland area for six years and

28

67

---

then Alt A loans for seven years for Homecomings Financial.

"The main focus was doing Alt A because that's where the money was," said Boyd, who left the industry.  A loan officer arranging a $300,000 Option ARM loan could collect $10,500 in fees, he said.

Lenders could unload shaky loans by selling them to investors, who often resold them in what amounted to a worldwide game of financial musical chairs.  Wall Street's insatiable appetite for more loans kept the pipeline filled, even if the deals weren't always sound.

"The V.P.s came down to the office beating the drums about Option ARMs," urging mortgage brokers to sell them to customers, [Bill Ridge, owner of Ridge Mortgage Services] said.  "I had Wachovia march through there; I had GMAC."

. . . .

He said he knows of loan officers who'd tell title agents to keep quiet about Option ARM loan provisions during document-signing time.

"They'd tell the title officer, 'Don't go over this; just glean through it quickly and get the thing signed.'"

Tim Boyd said he drew the line at selling Option ARMs because he saw how that could get people into trouble.  "It made me sick," he said.

Steve Law, *Shaky Loans May Spur New Foreclosure Wave*; *Unraveling 'Alt A' Mortgages Could Keep Portland Housing Market Dismal*, PORTLAND TRIB., Mar. 5, 2009 *available at* http://www.portlandtribune.com/news/story.php?story_id 23620453702532400.

169.   Offering Documents in the RALI Series Offerings indicate that the underlying pools of mortgages were primarily comprised of "payment-option, hybrid adjustable-rate mortgage loans" and/or Alt-A loans.

8.  **IndyMac Bank, FSB's Systematic Disregard of Underwriting Standards.**

170.  IndyMac Bank, FSB ("IndyMac") was a principal originator of the loans underlying the GSR Mortgage Loan Trust 2006-OA1 Offering.

171.  On July 11, 2008, just four months after IndyMac filed its 2007 Annual Report, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac filed for bankruptcy on July 31, 2008.

172.  On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac. The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

173.  According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were ... associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale." IndyMac OIG Report at 2. The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well." *Id.*

**69**

174.  IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id.* at 11, 21.  The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id.* at 11.

175.  IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id.* at 2-3.

176.  IndyMac's "risk from its loan products. . .was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id.* at 31.

177.  Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market." *Id.* at 3.  This proved to be a weight it could not bear, and IndyMac ultimately failed. *See id.*

178.  In June 2008, the Center for Responsible Lending ("CRL") published a report entitled *IndyMac:  What Went Wrong?  How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending* (June 30, 2008) ("CRL Report"),

**70**

COMPLAINT FOR DAMAGES

*available at http://www.responsiblelending.org/mortgage-lending/research-analysis/*

indymac_what_went_wrong.pdf. The CRL Report detailed the results of the CRL's

investigation into IndyMac's lending practices. CRL based its report on interviews

with former IndyMac employees and reviewed numerous lawsuits filed against

IndyMac. The CRL Report summarized the results of its investigation as follows:

> IndyMac's story offers a body of evidence that discredits the notion
> that the mortgage crisis was caused by rogue brokers or by borrowers
> who lied to bankroll the purchase of bigger homes or investment
> properties. CRL's investigation indicates many of the problems at
> IndyMac were spawned by top-down pressures that valued short-term
> growth over protecting borrowers and shareholders' interests over the
> long haul.

CRL Report at 1.

179. CRL reported that its investigation "uncovered substantial evidence that

[IndyMac] engaged in unsound and abusive lending during the mortgage boom,

routinely making loans without regard to borrowers' ability to repay [the mortgage

loans]." *Id.* at 2.

180. The CRL Report stated that "IndyMac pushed through loans with fudged

or falsified information or simply lowered standards so dramatically that shaky loans

were easy to approve." *Id.*

181. The CRL Report noted that "[a]s IndyMac lowered standards and pushed

for more volume," "the quality of [IndyMac's] loans became a running joke among its

employees." *Id.* at 3.

182. Former IndyMac mortgage underwriters explained that "loans that

**71**

required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id.* at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans' – in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id.* at 3.

183. The CRL also found evidence that: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it."
>
> The refrain from managers, Miller recalls, was simple: "Find a way to make this work."

*Id.* at 9 (footnote omitted).

184. Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated: "I would reject a loan and the insanity would begin. It would go to upper management and the next thing you know it's going to closing." *Id.* at 1, 3.

---

1    Streater also said the "prevailing attitude" at IndyMac was that underwriting was

2    "window dressing – a procedural annoyance that was tolerated because loans needed an

3

4    underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

5        185.    Scott Montilla, who was an IndyMac mortgage loan underwriter in

6    Arizona during the same time period, told the CRL that IndyMac management would

7

8    override his decision to reject loans about 50% of the time. *See id.* at 9.    According to

9    Montilla:

10          "I would tell them: 'If you want to approve this, let another
              underwriter do it, I won't touch it – I'm not putting my name on it,'"
11          Montilla says. "There were some loans that were just blatantly
              overstated. . . . Some of these loans are very questionable. They're not
12          going to perform."

13    *Id.* at 10.

14        186.    Montilla and another IndyMac mortgage underwriter told the CRL that

15

16    borrowers did not know their stated incomes were being inflated as part of the

17    application process. *See id.* at 14.

18        187.    On July 2, 2010, the FDIC sued certain former officers of IndyMac's

19

20    Homebuilder Division ("HBD"), alleging that IndyMac disregarded its underwriting

21    practices, among other things, and approved loans to borrowers who were not

22

23    creditworthy or for projects with insufficient collateral. *See* Compl. ¶ 6, *FDIC v. Van

24    Dellen*, No. 2:10-cv-04915-DSF (C.D. Cal. filed July 2, 2010).    This case is set for trial

25    in September 2012.

26        188.    IndyMac currently faces a class action lawsuit alleging disregard of

27

28                                              **73**

underwriting standards that adversely affected the value of the purchased RMBS. *See* Class Action Compl., *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y. filed May 14, 2009). On June 21, 2010, the class action suit survived a motion to dismiss.

189.   Like loan purchasers, insurers of RMBS also typically require the insured party to repurchase loans suffering Early Payment Default in order to protect themselves against fraud and poor underwriting.

190.   MBIA filed a breach of contract claim against IndyMac (with the FDIC representing IndyMac as conservator and receiver) in May 2009, claiming that IndyMac made contractual misrepresentations concerning its adherence to its underwriting standards in processing mortgage loan applications. *See* Compl., *MBIA Ins. Corp. v. IndyMac Bank, FSB*, No. 1:09-cv-01011-CKK (D.D.C. filed May 29, 2009). A motion to dismiss is pending.

191.   IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities. As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's 2008 "Worst Ten in the Worst Ten" Report. IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009. *See* 2008 "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

**COMPLAINT FOR DAMAGES**

9.    **WaMu's and Long Beach Mortgage's Systematic Disregard
of Underwriting Standards**

192.    WaMu affiliate Long Beach Mortgage ("Long Beach") was the primary originator of loans in the Long Beach Mortgage Loan Trust 2006-11 offering.

193.    WaMu was a Seattle-based bank that rapidly grew from a regional to a national mortgage lender during the period from 1991 to 2006. At over $300 billion in total assets, WaMu was at one time the largest institution regulated by the Office of Thrift Supervision ("OTS"). On September 25, 2008, however, federal regulators closed WaMu when loan losses, borrowing capacity limitations, a plummeting stock price, and rumors of WaMu's problems led to a run on the thrift by depositors. Federal regulators facilitated the sale of WaMu to J.P. Morgan Chase & Co., in September 2008.

194.    In April 2010, the Treasury OIG, issued a report titled "Evaluation of Federal Regulatory Oversight of Washington Mutual Bank," Report No. EVAL-10-002 (the "WaMu OIG Report"), discussing the reasons for WaMu's meteoric rise and consequent collapse. The WaMu OIG Report found, "WaMu failed primarily because of management's pursuit of a high-risk lending strategy that included liberal underwriting standards and inadequate risk controls." WaMu OIG Report at 2. The report elaborated on how WaMu adopted this new strategy to compete with Countrywide and maximize profits:

75

In 2005, WaMu management made a decision to shift its business strategy away from originating traditional fixed-rate and conforming single family residential loans, towards riskier nontraditional loan products and subprime loans. WaMu pursued the new strategy in anticipation of increased earnings and to compete with Countrywide...

. . . .

WaMu estimated in 2006 that its internal profit margin from subprime loans could be more than 10 times the amount for a government-backed loan product and more than 7 times the amount for a fixed-rate loan product.

*Id.* at 8 (footnote omitted).

195.   As previously noted in this Complaint, the PSI issued its report on the causes of the economic crisis. The PSI Wall Street Report used WaMu as its case study into lending practices of the mortgage industry during the housing bubble.   Citing internal e-mails and correspondence the PSI obtained as part of its investigation, the PSI made the following factual findings:

(1) High Risk Lending Strategy. [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) Shoddy Lending Practices. WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) Steering Borrowers to High Risk Loans. WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

(4) Polluting the Financial System. WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and

76

1    polluted the financial system with mortgage backed securities which later
2    incurred high rates of delinquency and loss.

3    (5) Securitizing Delinquency-Prone and Fraudulent Loans. At times, WaMu
     selected and securitized loans that it had identified as likely to go delinquent,
4    without disclosing its analysis to investors who bought the securities, and also
     securitized loans tainted by fraudulent information, without notifying
5    purchasers of the fraud that was discovered.

6
     (6) Destructive Compensation. WaMu's compensation system rewarded loan
7    officers and loan processors for originating large volumes of high risk loans,
     paid extra to loan officers who overcharged borrowers or added stiff
8    prepayment penalties, and gave executives millions of dollars even when their
     High Risk Lending Strategy placed the bank in financial jeopardy.
9    PSI Wall Street Report at 50-51.

10   196.   In particular, the PSI Wall Street Report noted that WaMu had engaged in

11   internal reviews of its lending practices and the lending practices of its subsidiary, Long

12
13   Beach. WaMu's Chief Risk Officer, Ron Cathcart commissioned a study to look into

14   the quality of loans originated by Long Beach. The review found that the "top five

15   priority issues" were as follows:
16

17   "Appraisal deficiencies that could impact value and were not addressed[;]
     Material misrepresentations relating to credit evaluation were confirmed[;]
18   Legal documents were missing or contained errors or discrepancies[;]
     Credit evaluation or loan decision errors[; and]
19   Required credit documentation was insufficient or missing from the file."
20

21   *Id.* at 82 (quoting e-mail from Ron Cathcart, Chief Risk Officer, WaMu, to Cory

22   Gunderson (Dec. 11, 2006 9:21 AM PST)).

23
24   197.   Pushing "Option ARMs" was a major part of WaMu's new "high risk"

25   lending strategy. In a bipartisan memorandum from Senators Carl Levin and Tom

26   Coburn to the Members of the PSI, dated April 13, 2010, Option ARMs are labeled
27

28                                         77

1   WaMu's "flagship" product.   Senate Exhibit 1.a, at 3.   The WaMu OIG Report

2   describes the inherently dangerous nature of WaMu's Option ARMs:

3

4   > WaMu's Option ARMs provided borrowers with the choice to pay their
>   monthly mortgages in amounts equal to monthly principal and interest,
5   > interest-only, or a minimum monthly payment.   Borrowers selected the
>   minimum monthly payment option for 56 percent of the Option ARM
6   > portfolio in 2005.

7   > The minimum monthly payment was based on an introductory rate, also
>   known as a teaser rate, which was significantly below the market
8   > interest rate and was usually in place for only 1 month.   After the
>   introductory rate expired, the minimum monthly payment feature
9   > introduced two significant risks to WaMu's portfolio:  payment shock
>   and negative amortization.   WaMu projected that, on average, payment
10  > shock increased monthly mortgage amounts by 60 percent.   At the end
>   of 2007, 84 percent of the total value of Option ARMs on WaMu's
11  > financial statements was negatively amortizing.

12  WaMu OIG Report at 9.

13      198.   The WaMu OIG Report notes that "Option ARMs represented as much as

14  half of all loan originations from 2003 to 2007 and approximately $59 billion, or 47

15

16  percent, of the home loans on WaMu's balance sheet at the end of 2007."   *Id.*

17      199.   The OIG also notes that WaMu's "new strategy included underwriting

18  subprime loans, home equity loans, and home equity lines of credit to high-risk

19

20  borrowers. In line with that strategy, WaMu purchased and originated subprime loans,

21  which represented approximately $16 billion, or 13 percent, of WaMu's 2007 home

22  loan portfolio."   *Id.* at 10.

23

24      200.   WaMu's careless underwriting practices rendered these already high risk

25  loan products even more risky. *See id.*   The WaMu OIG Report stated that the OTS and

26

27  the FDIC repeatedly "identified concerns with WaMu's high-risk lending strategy" and

28                                   **78**

1  loan underwriting, weaknesses in management and "inadequate internal controls." *Id.*

2  at 3-4. Those concerns included "questions about the reasonableness of stated incomes

3  contained in loan documents, numerous underwriting exceptions, miscalculations of

4

5  loan-to-value ratios, and missing or inadequate documentation." *Hearing on Wall*

6  *Street & the Fin. Crisis: The Role of Bank Regulators Before the United States S.*

7  *Homeland Sec. and Governmental Affairs Comm., Permanent Subcomm. on*

8

9  *Investigations*, 111th Cong. 9 (Apr. 16, 2010) (statement of the Hon. Eric M. Thorson,

10  Inspector General, Dep't of the Treasury) ("Thorson Statement").

11

12  201. WaMu management began to notice the pattern of "first payment default"

13  ("FPD") for loans its Long Beach subsidiary originated. In June 2007, WaMu closed

14  Long Beach as a separate entity and placed its subprime lending operations in a new

15

16  division called "Wholesale Specialty Lending."

17  202. In late 2007, WaMu performed an internal review to determine whether its

18  plans to address its poor underwriting practices were effective. The review focused on

19

20  187 loans that experienced FPD, originated from November 2006 to March 2007. As

21  an initial matter, the review found:

22

23  The overall system of credit risk management activities and process has
major weaknesses resulting in unacceptable level of credit risk. Exposure

24  is considerable and immediate corrective action is essential in order to
limit or avoid considerable losses, reputation damage, or financial

25  statement errors.

26

27  PSI High Risk Home Loans Hearing, Senate Ex. 21, "WaMu Corporate Credit Review:

28

79

---
COMPLAINT FOR DAMAGES

1    Wholesale Specialty Lending-FPD" at 2 (Sept. 28, 2007).

2        203.    Specifically, the WaMu internal review reported the following findings

3

4    regarding the 187 FPD loans:

5    • (High) Ineffectiveness of fraud detection tools – 132 of the 187 (71%)
6      files were reviewed by Risk Mitigation for fraud.  Risk Mitigation
       confirmed fraud on 115 files and could not confirm on 17 of the files,
7      but listed them as "highly suspect."  This issue is a repeat finding with
8      CCR.

9    • (High) Weak credit risk infrastructure impacting credit quality.  Credit
10     weakness and underwriting deficiencies is a repeat finding with CCR.
       It was also identified as a repeat finding and Criticism in the OTS
11     Asset Quality memo 3 issued May 17, 2007.  Internal Audit in their
12     August 20, 2007 Loan Origination & Underwriting report identified it
       as a repeat issue.  Findings from the CCR FPD review in relation to
13     credit quality:

14
       o 132 of the 187 loans sampled were identified with red flags that
15       were not addressed by the business unit
16     o 80 of the 112 (71%) stated income loans were identified for lack
         of reasonableness of income
17     o 87 files (47%) exceeded program parameters in place at the time
18       of approval
19     o 133 (71%) had credit evaluation or loan decision errors present
       o 25 (13%) had the title report issues that were not addressed
20     o 28 (14%) had income calculation errors and 35 (19%) had
         income documentation errors
21     o 58 (31%) had appraisal discrepancies that raised concerns that
22       the value was not supported

23    *Id.* at 3.

24        204.    An OTS memorandum on Loan Fraud Investigation, dated June 19, 2008,

25

26    observes the systematic nature of the problem: "[T]he review defines an origination

27

28                                    **80**