culture focused more heavily on production volume rather than quality. An example of

this was a finding that production personnel were allowed to participate in aspects of

the income, employment, or asset verification process, a clear conflict of interest. . . .

Prior OTS examinations have raised similar issues including the need to implement

incentive compensation programs to place greater emphasis on loan quality." PSI High

Risk Home Loans Hearing, Senate Ex. 25, Memorandum from D. Schneider, President

Home Loans, to A. Hedger, OTS Examiner and B. Franklin, OTS EIC at 1 (June 19,

2008).

205.   A WaMu Significant Incident Notification, Date Incident Reported –

04/01/2008, Loss Type - Mortgage Loan, stated:

> One Sales Associate admitted that during that crunch time some of the
> Associates would 'manufacture' assets statements from previous loan
> docs and submit them to the [Loan Fulfillment Center ('LFC')]. She said
> the pressure was tremendous from the LFC to get them the docs since the
> loan had already funded and pressure from the Loan Consultants to get the
> loans funded.

PSI High Risk Home Loans Hearing, Senate Ex. 30, "Significant Incident Notification

(SIN)" at 1 (Apr. 1, 2008).

206.   A New York Times article described WaMu's underwriting practices as

follows: "On a financial landscape littered with wreckage, WaMu, a Seattle-based bank

**81**

that opened branches at a clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending." Peter S. Goodman & Gretchen Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans*, N.Y. TIMES, Dec. 27, 2008 at A1.

207. Sherri Zaback, a former underwriter at a WaMu branch in San Diego, California, stated that "[m]ost of the loans she . . . handled merely required borrowers to provide an address and Social Security number, and to state their income and assets." *Id.* On one occasion, Zaback asked a loan officer for verification of a potential borrower's assets. The officer sent her a letter from a bank showing a balance of about $150,000 in the borrower's account. Zaback called the bank to confirm and was told the balance was only $5,000. The loan officer yelled at her, Ms. Zaback recalled. "She said, 'We don't call the bank to verify.'" *Id.*

208. Zaback also recalled that the sheer volume of loans precluded WaMu employees from adhering to underwriting standards. According to Zaback, she would typically spend a maximum of 35 minutes per file: "'Just spit it out and get it done. That's what they wanted us to do. Garbage in, and garbage out.'" *Id.* Another WaMu agent in Irvine, California told the New York Times that she "coached brokers to leave parts of applications blank to avoid prompting verification if the borrower's job or income was sketchy." *Id.*

209. WaMu's underwriting also critically failed with respect to appraisals as well. An accurate appraisal of a property's market value is crucial to the underwriting

82

1   process as the property provides collateral for the loan in case of default.

> WaMu's review of appraisals establishing the value of single family
> homes did not always follow standard residential appraisal methods
> because WaMu allowed a homeowner's estimate of the value of the
> home to be included on the form sent from WaMu to third-party
> appraisers, thereby biasing the appraiser's evaluation.

WaMu OIG Report at 11.

210.   The New York Times reported, "WaMu pressured appraisers to provide inflated property values that made loans appear less risky, enabling Wall Street to bundle them more easily for sale to investors." Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.   The article quoted the founder of one appraisal company that did business with WaMu until 2007 as saying, "'It was the Wild West,' . . . . 'If you were alive, they would give you a loan.  Actually, I think if you were dead, they would still give you a loan.'" *Id.* (quoting Steven Knoble, founder Mitchell, Maxwell & Jackson).

211.   Nor did WaMu adequately monitor third-party brokers (non-employees) who originated most of WaMu's loans.  As Eric Thorson explained before the PSI:

> In addition to originating retail loans with its own employees, WaMu
> 
> began originating and purchasing wholesale loans through a network of
> 
> brokers and correspondents.  From 2003 to 2007, wholesale loan channels
> 
> represented 48 to 70 percent of WaMu's total single family residential
> 
> loan production.  WaMu saw the financial incentive to use wholesale loan

**83**

channels for production as significant.  According to an April 2006 internal presentation to the WaMu Board, it cost WaMu about 66 percent less to close a wholesale loan ($1,809 per loan) than it did to close a retail loan ($5,273).  So while WaMu profitability increased through the use of third-party originators, it had far less oversight and control over the quality of the originations.

Thorson Statement at 5.  According to the WaMu OIG Report, WaMu had only 14 employees monitoring the actions of 34,000 third-party brokers.  *See* WaMu OIG Report at 11.  This lack of oversight led to WaMu "identif[ying] fraud losses attributable to third-party brokers of $51 million for subprime loans and $27 million for prime loans" in 2007.  *Id.*

212.  Federal regulators also noted that "WaMu acquired 11 institutions and merged with 2 affiliates" from 1991 to 2006, yet failed to "fully integrate . . . information technology systems, risk controls, and policies and procedures" from its acquisitions and institute "a single enterprise-wide risk management system." Thorson Statement at 5.  An integrated risk management system was critically important in light of WaMu's high-risk lending strategy.  *See id.*

213.  Based on interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers, Goodman and Morgenson of the New York Times noted the "relentless pressure to churn out loans" "while disregarding borrowers' incomes and assets" that came from WaMu's top executives. Goodman & Morgenson,

84

*Saying Yes, WaMu Built Empire on Shaky Loans* at A1. According to Dana Zweibel, a former financial representative at a WaMu branch in Tampa, Florida, even if she doubted whether a borrower could repay the loan, she was told by WaMu management that it was not her concern: her concern was "'just to write the loan.'" *Id.* Said Zweibel, "'[i]t was a disgrace'. . . . 'We were giving loans to people that never should have had loans.'" *Id.*

214. In November 2008, the New York Times, quoting Keysha Cooper, a Senior Mortgage Underwriter at WaMu from 2003 to 2007, recounted "'[a]t WaMu it wasn't about the quality of the loans; it was about the numbers'. . . . 'They didn't care if we were giving loans to people that didn't qualify. Instead, it was how many loans did you guys close and fund?'" Gretchen Morgenson, *Was There a Loan It Didn't Like?*, N.Y. TIMES, Nov. 1, 2008. According to the article, "[i]n February 2007 . . . the pressure became intense. WaMu executives told employees they were not making enough loans and had to get their numbers up. . . ." Cooper concluded, "'I swear 60 percent of the loans I approved I was made to.' . . . 'If I could get everyone's name, I would write them apology letters.'" *Id.*

215. WaMu inflated salaries of baby sitters and mariachi singers to the six-figure range. Indeed, the only verification of the mariachi singer's income was a photograph of the mariachi singer in his outfit included in the loan application file. The New York Times reported:

85

As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'. He rarely questioned them. A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.

Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows. The borrower was claiming a six-figure income and an unusual profession: mariachi singer.

Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit. The photo went into a WaMu file. Approved.

"I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons.

. . .

At WaMu, getting the job done meant lending money to nearly anyone who asked for it — the force behind the bank's meteoric rise and its precipitous collapse this year in the biggest bank failure in American history.

. . .

Interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers reveal the relentless pressure to churn out loans that produced such results.

Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.

216. Long Beach, a WaMu affiliate, specialized in the riskiest of loans—subprime mortgages. Internal WaMu documents reveal a well-documented pattern of underwriting deficiencies at Long Beach. A memorandum to the Washington Mutual, Inc. and WaMu Board of Directors' Audit Committees, dated April 17, 2006, re: *Long Beach Mortgage Company -Repurchase Reserve Root Cause Analysis* states: "[Long Beach] experienced a dramatic increase in EPDs[] during the third quarter of 2005. . . . [R]elaxed credit guidelines, breakdowns in manual underwriting processes, and

86

inexperienced subprime personnel . . . coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan quality." Senate Exhibit 10 at 1-2.

217.   A WaMu Audit Report titled *Long Beach Mortgage Loan Origination & Underwriting*, dated August 20, 2007, states:   "[T]he overall system of risk management and internal controls has deficiencies related to multiple, critical origination and underwriting processes. . . .   These deficiencies require immediate effective corrective action to limit continued exposure to losses." Senate Exhibit 19 at 2. In its "Executive Summary" section, this Audit Report states:

> In response to challenges resulting from the softening housing market, rising interest rates, tightening capital markets, poor portfolio performance and underwriting deficiencies, [Long Beach] continually refines their processes and guidelines. While management has been responsive to these challenges by identifying and implementing corrective actions, actual underwriting practices have not been consistent to achieve the desired levels of improvement. Continued patterns of loans being underwritten outside of established underwriting and documentation guidelines have been previously identified.

Id. at 2. It also identifies the following as the number one high rated "repeat issue" to correct: "Underwriting guidelines established to mitigate the risk of unsound underwriting decisions are not always followed and the decisioning methodology is not always fully documented." Id. at 8.   The number two "repeat issue" was identified as "[p]olicies and procedures defined to allow and monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently followed." Id. at 10.   An e-mail from a WaMu executive describes the Long Beach audit report as "the ultimate in bayonetting the wounded, if not the dead." Senate Exhibit 20 at 1.

87

218.    In a WaMu internal report titled "[Long Beach] Post Mortem – Early Findings Read Out," dated November 1, 2005, the authors note the following "common theme" surfacing:    "Underwriting guidelines are not consistently followed and conditions are not consistently or effectively met." Senate Exhibit 9 at 1.  The report goes on to note that 60% of First Payment Default cases could have been prevented "had current policy, procedures and guidelines been better executed." *Id.* at 2.

219.    In Gretchen Morgenson's July 9, 2010, article titled *Mortgage Investors Turn to State Courts for Relief*, Morgenson of The New York Times reported on a lawsuit filed by Cambridge Place Investment Management, an investment management firm that lost over a billion dollars in RMBS it bought for clients, against 15 banks, for abetting fraud.   The complaint alleges that management at Long Beach directed underwriters to "'approve, approve, approve'" and highlights the "anything-goes" lending practices at Long Beach:

> One Long Beach program made loans to self-employed borrowers based on three letters of reference from past employers.  A former worker said some letters amounted to "So-and-so cuts my lawn and does a good job," adding that the company made no attempt to verify the information, the complaint stated.

220.    The OTS also reported concerns with subprime underwriting practices by Long Beach from 2006 to 2007. *See* Thorson Statement at 9-10.

221.    As a result of its systematic disregard of underwriting standards, Long Beach also appeared in the 2008 "Worst Ten in the Worst Ten" Report.  In fact, Long Beach was in the top five in every city other than Las Vegas, Nevada (1st in Stockton,

COMPLAINT FOR DAMAGES

California, Sacramento, California, Denver, Colorado, and Memphis, Tennessee; 2nd in Bakersfield, California and Detroit, Michigan; 3rd in Cleveland, Ohio and Miami, Florida; and 4th in Riverside, California).  *See* 2008 "Worst Ten in the Worst Ten" Report.  Long Beach again ranked near the top in nearly every city in the 2009 "Worst Ten in the Worst Ten" Report (1st in Stockton-Lodi, California, Merced, California, and Vallejo-Fairfield-Napa, California; 5th in Fort Pierce-Port St. Lucie, Florida; and 6th in Riverside-San Bernardino, California).  *See* 2009 "Worst Ten in the Worst Ten" Report.

## VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT

222.   The Offering Documents included material untrue statements or omitted facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

223.   For purposes of Section 11 liability, the prospectus supplements are part of and included in the registration statements of the offerings pursuant to 17 C.F.R. §§ 230.158, 230.430B (2008); *see also* Securities Offering Reform, 70 Fed. Reg. 44,722-01, 44,768-69 (Aug. 3, 2005).

224.   Statements in the Offering Documents concerning the following subjects were material and untrue at the time they were made: (1) the Originators' evaluation of the borrower's likelihood and capacity to repay the loan through application of the stated underwriting standards, including the calculation and use of an accurate "debt-to-

89

income" ratio and the frequency and use of exceptions to those standards; (2) adherence to stated underwriting standards for reduced documentation programs; (3) the accurate calculation of the "loan-to-value" ratio for the mortgaged property and the accuracy of appraisals; and (4) the existence of credit enhancement to minimize the risk of loss.

225.   Countrywide originated 100% of the loans in the Alternative Loan Trust 2007-OA4 offering.  Alternative Loan Trust 2007-OA4 Prospectus Supplement, Mar. 28, 2007, at S-33.  Countrywide's systematic disregard of its underwriting standards is detailed in Section VII.D.3 (*supra*).

226.   First Franklin originated all of the loans in the First Franklin Mortgage Loan Trust 2006-FF4 offering.   First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement, Mar. 27, 2006, at S-34.  First Franklin's systematic disregard of its underwriting standards is detailed in Section VII.D.4 (*supra*).

227.   Fremont originated all of the loans in the Fremont Home Loan Trust 2006-D offering.  Fremont Home Loan Trust 2006-D Prospectus Supplement, Nov. 1, 2006, at 1.  Fremont's systematic disregard of its underwriting standards is detailed in Section VII.D.5 (*supra*).

228.   GreenPoint originated 100% of the loans in the GreenPoint Mortgage Funding Trust 2006-OH1 offering.  GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement, December 21, 2006, at S-9.  GreenPoint's systematic disregard of its underwriting standards is detailed in Section VII.D.6 (*supra*).

COMPLAINT FOR DAMAGES

229.    The originators who contributed loans to the pool in the GSR Mortgage Loan Trust 2006-OA1 offering were American Home, Countrywide, IndyMac and SunTrust Mortgage, Inc.    GSR Mortgage Loan Trust 2006-OA1 Prospectus Supplement, Aug. 23, 2006, at S-9-10.    The systematic disregard of underwriting standards by American Home, Countrywide and IndyMac is detailed in Sections VII.D.2, VII.D.3 and VII.D.8 (*supra*).

230.    Countrywide, Residential Funding Company, LLC and Quicken Loans Inc. are identified as the primary originators in the GSR Mortgage Loan Trust 2007-OA1 offering.  GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement, May 7, 2007, at S-9-10.  Countrywide's systematic disregard of its underwriting standards is detailed in Section VII.D.3 (*supra*).

231.    Long Beach originated every loan in the pool in the Long Beach Mortgage Loan Trust 2006-11 offering.  Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement, Dec. 11, 2006, at S-34.  Long Beach's systematic disregard of its underwriting standards is detailed in Section VII.D.9 (*supra*).

232.    Homecomings contributed the most significant percentage of the loans in the RALI Series offerings. RALI Series 2006-QO6 Trust Prospectus Supplement, June 28, 2006, at S-47 (40.5%); RALI Series 2006-QO10 Trust Prospectus Supplement, Dec. 27, 2006, at S-50 (35.4%); RALI Series 2007-QH2 Trust Prospectus Supplement, Feb. 23, 2007, at S-4 (19.9%); RALI Series 2007-QH3 Trust Prospectus Supplement,

**91**

Mar. 28, 2007, at S-4 (29.9%); RALI Series 2007-QH5 Trust Prospectus Supplement,

May 29, 2007, at S-4 (33%); RALI Series 2007-QH6 Trust Prospectus Supplement,

June 27, 2007, at S-5 (43%). Homecomings's systematic disregard of its underwriting

standards is detailed in Section VII.D.7 (*supra*).

233.    Examples of material untrue statements and/or omissions of fact from the

RMBS listed above follow.

**A.    Untrue Statements Concerning Evaluation of the Borrower's
Capacity and Likelihood To Repay the Mortgage Loan.**

234.    The Alternative Loan Trust 2007-OA4 Prospectus Supplement stated:

All of the Mortgage Loans will have been originated or acquired by
Countrywide Home Loans in accordance with its credit, appraisal and
underwriting standards. Countrywide Home Loans has been originating
mortgage loans since 1969. Countrywide Home Loans' underwriting
process are applied in accordance with applicable federal and state laws
and regulations. Except as otherwise provided in this prospectus
supplement, the underwriting procedures are consistent with those
identified under "Loan Program — Underwriting Standards" in the
prospectus.

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-33; *see* Alternative

Loan Trust 2007-OA4 Registration Statement, Feb. 7, 2006, at S-52.

235.    The Alternative Loan Trust 2007-OA4 Prospectus Supplement also stated:

Countrywide Home Loans' underwriting standards are applied by or on
behalf of Countrywide Home Loans to evaluate the prospective
borrower's credit standing and repayment ability and the value and
adequacy of the mortgaged property as collateral. Under those standards,
a prospective borrower must generally demonstrate that the ratio of the
borrower's monthly housing expenses (including principal and interest on
the proposed mortgage loan and, as applicable, the related monthly

92

**COMPLAINT FOR DAMAGES**

portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-33-34; *see* Alternative Loan Trust 2007-OA4 Registration Statement, Feb. 7, 2006, at S-53.

236.   The Alternative Loan Trust 2007-OA4 Prospectus stated:

Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral.

Alternative Loan Trust 2007-OA4 Prospectus, Nov. 14, 2006, at 25; *see* Alternative Loan Trust 2007-OA4 Registration Statement, Feb. 7, 2006, at 25; *see id.* ("Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance[]. The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist.").

**93**

237.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement stated:

The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in this prospectus supplement. S-31

Since January 1, 2005, all of the mortgage loans of a type similar to mortgage loans that were acquired by the responsible party were required to meet the underwriting criteria described in this prospectus supplement. S-34

The responsible party's acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  S-34

Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-31, S-34; *see* First Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-32, S-35.

238.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus stated:

The lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's credit standing and repayment ability, and to evaluate the value and adequacy of the mortgaged property as collateral.

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus, Nov. 17, 2005, at 26.

239.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement stated:

While each underwriting program is intended to assess the risk of default, the Direct Access Program makes use of credit bureau risk scores (the "Credit Bureau Risk Score").

**94**



1  First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-35; *see* First

2  Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-

3

4  36.

5       240.   The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement

6

7  and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No.

8  1 to Registration Statement stated:

9       All mortgage loans [_____] originates or acquires are generally
10      underwritten by [_____] according to its credit, appraisal and
        underwriting standards. [_____], or its agents, apply such underwriting
11      standards to evaluate the prospective borrower's credit standing and
        repayment ability and the value and adequacy of the mortgaged property
12      as collateral.  These standards are applied in accordance with applicable
13      federal and state laws and regulations.  [_____] permits exceptions to the
        underwriting standards where compensating factors are present.
14

15  First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17,

16

17  2005, at S-10; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective

18  Amendment No. 1 to Registration Statement, Nov. 2, 2005, at S-10.

19       241.   The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement

20

21  stated:

22      The mortgage loans were originated or acquired generally in accordance
        with the underwriting guidelines described in this prospectus supplement.
23      See "The Underwriting Guidelines" below.

24  First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17,

25

26  2005, at S-25.

27       242.   The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement

28

**95**

---

**COMPLAINT FOR DAMAGES**

1   and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No.

2   1 to Registration Statement stated:

> In the case of single family loans, cooperative loans and manufactured
> housing contracts, once all applicable employment, credit and property
> information is received, the lender makes a determination as to whether
> the prospective borrower has sufficient monthly income available (as to
> meet the borrower's monthly obligations on the proposed mortgage loan
> and other expenses related to the mortgaged property such as property
> taxes and hazard insurance).

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005,

at 27; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1

to Registration Statement, Nov. 2, 2005, at 27; *see* First Franklin Mortgage Loan Trust

2006-FF4 Prospectus, Nov. 17, 2005, at 27.

243.   The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement

and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No.

1 to Registration Statement stated:

> The [_____] mortgage loans were originated generally in
> accordance with one of the following income documentation types: "Full
> Documentation," "Limited Documentation" or "Stated Income." The
> Underwriting Guidelines are primarily intended to evaluate:  (1) the
> applicant's credit standing and repayment ability and (2) the value and
> adequacy of the mortgaged property as collateral.

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17,

2005, at S-28; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective

Amendment No. 1 to Registration Statement, Nov. 2, 2005, at S-28.

COMPLAINT FOR DAMAGES

12-12020-mg    Doc 4297-12    Filed 07/19/13    Entered 07/19/13 16:06:10    Exhibit 11
Case 2:11-cv-06521-GW-JEM    Document 1    Filed 08/09/11    Page 102 of 175    Page ID #:113

Part 2    Pg 17 of 91

244.    The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement stated:

> Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan.

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-37; *see* First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, August 17, 2005, at S-29.

245.    The Fremont Home Loan Trust 2006-D Prospectus stated:

> Fremont Investment & Loan provides underwriters with specific underwriting guidelines and maintains strict control procedures to manage the quality of its originations at all locations.

Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 74; *see* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 74.

246.    The Fremont Home Loan Trust 2006-D Prospectus stated:

> Generally, Fremont Investment & Loan's guidelines require an analysis of the following

> • a borrower's creditworthiness, as reflected in particular by the borrower's credit history and employment stability,

> • a borrower's "debt-to-income ratio," which measures a borrower's projected income relative to the proposed mortgage payment and to other fixed obligations, and

> • the "loan-to-value ratio" of the proposed loan, which measures the adequacy of the mortgaged property to serve as the collateral for a mortgage loan.

Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 74; *see* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 74.

**97**

247. The Fremont Home Loan Trust 2006-D Prospectus stated:

A borrower's lack of credit payment history and/or relatively low Credit Score, however, will not necessarily preclude Fremont Investment & Loan from making a loan if other favorable borrower characteristics exist, including an adequate debt-to-income ratio or sufficient equity in the property.

Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 75; *see* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 75.

248. The Fremont Home Loan Trust 2006-D Prospectus stated:

Fremont Investment & Loan's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. Fremont Investment & Loan considers, among other things, a mortgagor's Credit Score, past payment history, repayment ability and debt service-to-income ratio, as well as the value, type and use of the mortgaged property.

The mortgage loans were underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ("Scored Programs"). Fremont Investment & Loan began originating mortgage loans pursuant to Scored Programs in 2001 and the Scored Programs have been the exclusive type of origination programs beginning in 2004. Within the Scored Programs, there are three documentation types, Full Documentation, Easy Documentation, and Stated Income. All of the mortgage loans were originated in accordance with Fremont Investment & Loan's underwriting guidelines, subject to various exceptions as described in this section. A Credit Score is used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, loan-to-value ratio as an aid to, not a substitute for, the underwriter's judgment. Fremont Investment & Loan's underwriting staff fully reviews each loan to determine whether it's underwriting guidelines for income, assets, employment and collateral are met.

COMPLAINT FOR DAMAGES

1    Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 76-77; *see* Fremont

2    Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 76-77.

3

4        249.   The Fremont Home Loan Trust 2006-D Prospectus stated:

5        Fremont Investment & Loan conducts a number of quality control
         procedures, including a post-funding compliance audit as well as a full
6        re-underwriting of a random selection of loans to assure asset quality.

7

8    Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 78; *see* Fremont Home

9    Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 78.

10       250.   The Fremont Home Loan Trust 2006-D Free Writing Prospectus stated:
11

12       All of the mortgage loans were underwritten by Fremont's underwriters
         having the appropriate approval authority. Each underwriter is granted a
13       level of authority commensurate with their proven judgment, experience
         and credit skills. On a case by case basis, Fremont may determine that,
14       based upon compensating factors, a prospective mortgagor not strictly
         qualifying under the underwriting risk category guidelines described
15       below is nonetheless qualified to receive a loan, i.e., an underwriting
         exception. Compensating factors may include, but are not limited to, low
16       loan-to-value ratio, low debt to income ratio, substantial liquid assets,
17       good credit history, stable employment and time in residence at the
         applicant's current address. It is expected that a substantial portion of the
18       mortgage loans may represent such underwriting exceptions.
19

20   Fremont Home Loan Trust 2006-D Free Writing Prospectus, Oct. 24, 2006, at 41; *see*
21

22   Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at S-38.

23       251.   The Fremont Home Loan Trust 2006-D Free Writing Prospectus stated:
24

25       Fremont conducts a number of quality control procedures, including a
         post-funding review as well as a full re-underwriting of a random
26       selection of loans to assure asset quality. Under the funding review, all
         loans are reviewed to verify credit grading, documentation compliance
27       and data accuracy. Under the asset quality procedure, a random selection

28                                             **99**

of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing review findings and level of error is sent monthly to each loan production office for response. The review findings and branch responses are then reviewed by Fremont's senior management. Adverse findings are tracked monthly. This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

Fremont Home Loan Trust 2006-D Free Writing Prospectus, Oct. 24, 2006, at 42; *see* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at S-38-39.

252.    The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:

In general, each lender or loan seller will represent and warrant that all mortgage loans originated and/or sold by it to us or one of our affiliates will have been underwritten in accordance with standards consistent with those used by mortgage lenders or manufactured home lenders during the period of origination or such other standards as we have required of such lender or loan seller, in any case, as specified in the applicable prospectus supplement.

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 28-29; *see* GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29, 2006, at 28-29.

253.    The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus further stated:

The lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's credit standing and repayment ability, and to evaluate the value and adequacy of the mortgaged property as collateral. In general, the lender may require that a prospective borrower fill out a detailed application designed to provide to the underwriting officer pertinent credit information.

**100**

1   GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 29; *see*

2
    GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29, 2006,
3
    at 29; GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 29
4

5   ("As a part of the description of the borrower's financial condition, the lender may

6
    require the borrower to provide a current list of assets and liabilities and a statement of
7

8   income and expense as well as an authorization to apply for a credit report, which

9   summarizes the borrower's credit history with local merchants and lenders and any

10
    record of bankruptcy.   The lender may obtain employment verification from an
11

12  independent source (typically the borrower's employer).  The employment verification

13  reports the length of employment with that organization, the current salary and whether

14
    it is expected that the borrower will continue such employment in the future.  If a
15

16  prospective borrower is self employed, the lender may require the borrower to submit

17  copies of signed tax returns.   The lender may require the borrower to authorize

18
    verification of deposits at financial institutions where the borrower has demand or
19

20  savings accounts. In determining the adequacy of the mortgaged property as collateral,

21  the lender will generally obtain an appraisal to determine the fair market value of each

22
    property considered for financing.").
23

24       254.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:

25       In the case of single family loans, cooperative loans and manufactured
26       housing contracts, once all applicable employment, credit and property
         information is received, the lender makes a determination as to whether
27       the prospective borrower has sufficient monthly income available (as to
         meet the borrower's monthly obligations on the proposed mortgage
28                                     **101**

1    loan and other expenses related to the mortgaged property such as
     property taxes and hazard insurance).  The underwriting standards
2    applied by lenders may be varied in appropriate cases where factors
     such as low Loan-to-Value Ratios or other favorable credit factors
3    exist.

4    GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 29; *see*

5    GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29, 2006,

6

7    at 29.

8         255.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:

9

10   "All of the mortgage loans that GSMC may acquire through its conduit program will be

11   acquired  generally  in  accordance  with  the  underwriting  criteria  described  in  this

12   section." GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at

13   30.

14

15        256.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:

16   Generally, each borrower applying for a mortgage loan must complete
     a credit application.  The credit application is designed to provide the
17   originating lender with relevant credit information about the
     prospective borrower such as information with respect to the
18   borrower's assets, liabilities, income (except as described below), credit
     history, employment history and personal information.  In addition,
19   prospective borrowers generally must provide an authorization to apply
     for a credit report.  A credit report summarizes the borrower's past
20   credit experience with lenders and other debtors, including any record
     of bankruptcy.  Sometimes, the borrower is required to authorize the
21   originating lender to verify deposits at financial institutions identified
     by the borrower as institutions at which the borrower maintains demand
22   or savings accounts.  The originating lender may also consider certain
     non-wage income of the borrower in the underwriting process,
23   including income derived from mortgaged properties that are
     investment properties or two- to four-unit dwellings.  Generally, the
24   originating lender will not consider income derived from vacation or
     second homes in the underwriting process.  Certain borrowers with
25   acceptable payment histories are not required to state their income on
     their loan application and, as a result, the originating lender does not
26   verify their income.

27   Based on the data referred to above (and verification of that data, to the

28                                  **102**

     **COMPLAINT FOR DAMAGES**

1
2
3
4
5
6
7
8

extent required), the originating lender makes a determination about
whether the borrower's monthly income (if required to be stated) will
be sufficient to enable the borrower to meet its monthly obligations on
the mortgage loan and other expenses related to the property, including
property taxes, utility costs, standard hazard insurance and other fixed
and revolving obligations other than housing expenses. Generally,
scheduled payments on a mortgage loan during the first twelve months
of its term plus taxes and insurance and all scheduled payments on
obligations that extend beyond ten months may equal no more than a
specified percentage of the prospective borrower's gross income. The
permitted percentage is determined on the basis of various underwriting
criteria, including the LTV ratio of the mortgage loan and, in certain
instances, the amount of liquid assets available to the borrower after
origination.

9
GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 30; *see*

10
GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29, 2006,

11
at 30.

12
13    257.    The    GreenPoint    Mortgage    Funding    Trust    2006-OH1    Prospectus

14    Supplement provided:

15
16
17
18
19
20
21

*Underwriting Methodology*. The methodology used in underwriting
the extension of credit for each Mortgage Loan does not rely solely on
the extent of the Mortgagor's equity in the collateral as the principal
determining factor in approving such extension of credit. The
methodology employed objective criteria, such as the Mortgagor's
income, assets and liabilities, to the proposed mortgage payment and,
based on such methodology, the Mortgage Loan's originator made a
reasonable determination that at the time of origination the Mortgagor
had the ability to make timely payments on the Mortgage Loan. Such
underwriting methodology confirmed that at the time of origination
(application/approval) the Mortgagor had a reasonable ability to make
timely payments on the Mortgage Loan[.]

22
GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-58.

23
24    258.    The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus

25    Supplement provided:

26
27

*Acceptable Investment*. There are no circumstances or conditions with
respect to the mortgage, the Mortgaged Property, the Mortgagor, the
mortgage file or the Mortgagor's credit standing that can reasonably be

28

**103**

expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan, or cause the Mortgage Loans to prepay during any period materially faster or slower than the mortgage loans originated by the Seller generally[.]

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-56.

259.    The GSR Mortgage Loan Trust 2007-OA1 Prospectus stated:

The lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's credit standing and repayment ability, and to evaluate the value and adequacy of the mortgaged property as collateral.

GSR Mortgage Loan Trust 2007-OA1 Prospectus, Feb. 13, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Prospectus, Aug. 3, 2006, at 29; *see* GSR Mortgage Loan Trust 2007-OA1 Registration Statement, Jan. 5, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Registration Statement, Mar. 29, 2006, at 29.

260.    The GSR Mortgage Loan Trust 2007-OA1 Prospectus stated:

In the case of single family loans, cooperative loans and manufactured housing contracts, once all applicable employment, credit and property information is received, the lender makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the mortgaged property such as property taxes and hazard insurance).

GSR Mortgage Loan Trust 2007-OA1 Prospectus, Feb. 13, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Prospectus, Aug. 3, 2006, at 29; *see also* GSR Mortgage Loan Trust 2007-OA1 Registration Statement, Jan. 5, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Registration Statement, Mar. 29, 2006, at 29.

**104**

---

**COMPLAINT FOR DAMAGES**

261.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus stated:

All of the mortgage loans that GSMC may acquire through its conduit program will be acquired generally in accordance with the underwriting criteria described in this section.
...

Generally, each borrower applying for a mortgage loan must complete a credit application. The credit application is designed to provide the originating lender with relevant credit information about the prospective borrower such as information with respect to the borrower's assets, liabilities, income (except as described below), credit history, employment history and personal information. In addition, prospective borrowers generally must provide an authorization to apply for a credit report. . . . Certain borrowers with acceptable payment histories are not required to state their income on their loan application and, as a result, the originating lender does not verify their income.

Based on the data referred to above (and verification of that data, to the extent required), the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed and revolving obligations other than housing expenses. . . . The permitted percentage is determined on the basis of various underwriting criteria. . . .

GSR Mortgage Loan Trust 2007-OA1 Prospectus, Feb. 13, 2007, at 29-30; GSR

Mortgage Loan Trust 2006-OA1 Prospectus, Aug. 3, 2006, at 30; *see* GSR Mortgage

Loan Trust 2007-OA1 Registration Statement, Jan. 5, 2007, at 30; GSR Mortgage Loan

Trust 2006-OA1 Registration Statement, Mar. 29, 2006, at 30.

262.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses . . . are within acceptable limits. . . .
In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay

**105**

the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-60; GSR Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-51-52; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-50.

263.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

Quicken Loans' underwriting standards for the Secure Advantage program follow prudent and generally accepted mortgage industry underwriting standards and are intended to evaluate the borrower's credit standing, repayment ability, and the value and adequacy of the proposed mortgaged property as collateral.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-65; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-55.

264.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement represented:

Although borrowers are assessed against Quicken Loans' underwriting standards, prudent exceptions may be made on a case by case basis. Exceptions may be allowed if the application reflects strong compensating factors, such as, a lower debt-to-income ratio, higher credit scores, low loan-to-value ratio, significant asset reserves, stable employment or ownership at current residence.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-67; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-57.

265.   The Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement stated: "The sponsor's underwriting guidelines are primarily

**106**

intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral." Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement, Mar. 21, 2006, at S-38.

266.    The Amendment No. 1 to Registration Statement also stated:

> The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related mortgaged property as collateral.

Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement, Mar. 21, 2006, at 26; *see id.* at 2 ("Each mortgage loan to be transferred to a trust will have been originated in accordance with the underwriting guidelines applied by the originator of that mortgage loan."); Long Beach Mortgage Loan Trust 2006-11 Prospectus, July 21, 2006, at 28 ("The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related mortgaged property as collateral.").

267.    The Long Beach Mortgage Loan Trust 2006-11 Amendment No. 1 to Registration Statement stated:

> During the underwriting or re-underwriting process, the sponsor reviews and verifies the prospective borrower's sources of income (only under the full documentation residential loan program), calculates the amount of income

**107**

from all such sources indicated on the loan application, reviews the credit history and credit score(s) of the prospective borrower and calculates the debt-to-income ratio to determine the prospective borrower's ability to repay the loan, and determines whether the mortgaged property complies with the sponsor's underwriting guidelines.

Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement, Mar. 21, 2006, at S-38; see Long Beach Mortgage Loan Trust 2006 11 Prospectus, July 21, 2006, at 29:

Initially, a prospective borrower is required to complete an application with respect to the applicant's liabilities, income and credit history and personal information, as well as an authorization to apply for a credit report that summarizes the borrower's reported credit history with local merchants and lenders and any record of bankruptcy. In addition, an employment verification is obtained that reports the borrower's current salary and may contain information regarding length of employment. If a prospective borrower is self-employed, the borrower is required to submit copies of signed tax returns or other proof of business income. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts. In the case of a multifamily loan, commercial loan or mixed-use loan, the mortgagor will also be required to provide certain information regarding the related mortgaged property, including a current rent roll and operating income statements which may be pro forma and unaudited. In addition, the originator will generally also consider the location of the mortgaged property, the availability of competitive lease space and rental income of comparable properties in the relevant market area, the overall economy and demographic features of the geographic area and the mortgagor's prior experience in owning and operating properties similar to the multifamily properties or commercial properties, as the case may be.

268.  The Long Beach Mortgage Loan Trust 2006-11 Amendment No. 1 to Registration Statement stated:

While the underwriting guidelines of each originator will have been approved by an affiliate of the depositor, the underwriting guidelines, including documentation requirements, of some originators may be less restrictive than those of other originators. Moreover, some underwriting guidelines may result in a less accurate assessment of the borrower's credit standing and repayment ability and/or the value and adequacy of the related mortgaged property as collateral.

**108**

---

1   Long Beach Mortgage Loan Trust 2006-11 Amendment No. 1 to Registration

2

3   Statement, Mar. 21, 2006, at 2; *see* Long Beach Mortgage Loan Trust 2006-11

4   Prospectus, July 21, 2006, at 3.

5       269.   The RALI Series 2007-QH6 Trust Prospectus stated:

6
        The depositor expects that the originator of each of the mortgage loans
7       will have applied, consistent with applicable federal and state laws and
        regulations, underwriting procedures intended to evaluate the
8       borrower's credit standing and repayment ability and/or the value and
        adequacy of the related property as collateral.
9

10   RALI Series 2007-QH6 Trust Prospectus, Apr. 9, 2007, at 17; RALI Series 2006-

11   QO10 Trust Prospectus, Dec. 6, 2006, at 12; RALI Series 2007-QH2 Trust Prospectus,

12
     Dec/ 6, 2006, at 12; RALI Series 2007-QH3 Trust Prospectus, Dec. 6, 2006, at 12;
13

14   RALI Series 2007-QH5 Trust Prospectus, Apr. 9, 2007, at 17; RALI Series 2006-QO6

15
     Trust Prospectus, Mar. 3, 2006, at 12; *see also* RALI Series 2007-QH6 Trust
16

17   Registration Statement, Feb. 12, 2007, at 17; RALI Series 2006-QO10 Trust

18   Registration Statement, Jan. 23, 2006, at 13; RALI Series 2007-QH2 Trust Registration

19
     Statement, Jan. 23, 2006, at 13; RALI Series 2007-QH3 Trust Registration Statement,
20

21   Jan. 23, 2006, at 13; RALI Series 2007-QH5 Trust Registration Statement, Feb. 12,

22   2007, at 17; RALI Series 2006-QO6 Trust Registration Statement, Jan. 23, 2006, at 13.

23
        270.   The RALI Series 2007-QH6 Trust Prospectus Supplement stated:
24

25       Program Underwriting Standards. In accordance with the Seller Guide,
         the Expanded Criteria Program Seller is required to review an application
26       designed to provide the original lender pertinent credit information
27       concerning the mortgagor. As part of the description of the mortgagor's

28                                          **109**
                               ───────────────────────────
                               **COMPLAINT FOR DAMAGES**

financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.

RALI Series 2007-QH6 Trust Prospectus Supplement at S-47; RALI Series 2006-QO10 Trust Prospectus Supplement at S-48; RALI Series 2007-QH2 Trust Prospectus Supplement at S-44; RALI Series 2007-QH3 Trust Prospectus Supplement at S-47; RALI Series 2007-QH5 Trust Prospectus Supplement at S-53; RALI Series 2006-QO6 Trust Prospectus Supplement at S-45; *see* RALI Series 2007-QH6 Trust Registration Statement, Feb.12, 2007, at S-42; RALI Series 2006-QO10 Trust Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH2 Trust Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH3 Trust Registration Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH5 Trust Registration Statement, Feb. 12, 2007, at S-42; RALI Series 2006-QO6 Trust Registration Statement, Jan. 23, 2006, at S-43.

271.    The RALI Series 2007-QH6 Trust Prospectus Supplement represented:

Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.

**110**

1   RALI Series 2007-QH6 Trust Prospectus Supplement at S-48; RALI Series 2006-QO10

2   Trust Prospectus Supplement at S-48; RALI Series 2007-QH2 Trust Prospectus

3

4   Supplement at S-44; RALI Series 2007-QH3 Trust Prospectus Supplement, at S-47-48;

5   RALI Series 2007-QH5 Trust Prospectus Supplement at S-54; RALI Series 2006-QO6

6   Trust Prospectus Supplement at S-45; *see* RALI Series 2007-QH6 Trust Registration

7

8   Statement, Feb. 12, 2007, at S-42; RALI Series 2006-QO10 Trust Registration

9   Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH2 Trust Registration

10

11   Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH3 Trust Registration

12   Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH5 Trust Registration

13   Statement, Feb. 12, 2007, at S-42; RALI Series 2006-QO6 Trust Registration

14

15   Statement, Jan. 23, 2006, at S-43.

16   272.   UNTRUE STATEMENTS AND OMITTED INFORMATION:   The

17   preceding statements were material at the time they were made, because the quality o

18

19   the loans in the mortgage pool directly affects the riskiness of the RMBS investment,

20   and the quality of the loans is dependent upon the underwriting process employed.  The

21   preceding statements were untrue at the time they were made because, as alleged

22

23   herein, the Originators did not adhere to the stated underwriting guidelines, did not

24   effectively evaluate the borrowers' ability or likelihood to repay the loans, did not

25   properly evaluate whether the borrower's debt-to-income ratio supported a conclusion

26

27   that the borrower had the means to meet his/her monthly obligations, and did not ensure

28                                    **111**

that adequate compensating factors justified the granting of exceptions to guidelines.

Rather, as alleged herein, the Originators systematically disregarded the stated underwriting guidelines in order to increase the volume of mortgages originated (*see supra* Section VII.D). Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the rate at which actual losses outpaced expected losses within the first year after the offerings (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

## B.    Untrue Statements Concerning Reduced Documentation Programs.

273.    The Alternative Loan Trust 2007-OA4 Prospectus Supplement represented:

> In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.

> The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

> Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the

**112**

---

**COMPLAINT FOR DAMAGES**

borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Generally, cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-35-36; *see*

Alternative Loan Trust 2007-OA4 Registration Statement, February 7, 2006, at

S-55.

274.   The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement

**113**

1   and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No.

2   1 to Registration Statement stated:

3

4       The no income/no asset verification program, emphasizes the value and
5       adequacy of the mortgaged property as collateral and credit history rather
6       than the borrower's verified income and assets. *Only borrowers with*
        *excellent credit histories may obtain mortgage loans underwritten under*
7       *no income/no asset verification.*

8   First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005,

9

10  at S-12; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No.

11  1 to Registration Statement, Nov. 2, 2005, at S-12. (Emphasis added.)

12      275.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement

13
14  stated:

15      . . . under the [No Income Verification] Program, applicants are qualified
16      based on monthly income as stated on the mortgage application and the
        underwriter will determine that the stated income is reasonable and
17      realistic when compared to borrower's employment type, assets and credit
        history.
18

19  First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-36; *see* First

20
    Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-
21
22  37.

23      276.   The Fremont Home Loan Trust 2006-D Prospectus Supplement

24  represented:
25

26      There are three documentation types, Full Documentation ("Full
        Documentation"), Easy Documentation ("Easy Documentation") and
27      Stated Income ("Stated Income"). Fremont's underwriters verify the
28                                      **114**

1     income of each applicant under various documentation types as follows:
2  under Full Documentation, applicants are generally required to submit
   verification of stable income for the periods of one to two years preceding
3  the application dependent on credit profile; under Easy Documentation,
4  the borrower is qualified based on verification of adequate cash flow by
   means of personal or business bank statements; under Stated Income,
5  applicants are qualified based on monthly income as stated on the
6  mortgage application. The income is not verified under the Stated Income
   program; however, the income stated must be reasonable and customary
7  for the applicant's line of work.

8
9  Fremont Home Loan Trust 2006-D Prospectus Supplement at 41; *see* Fremont

10  Home Loan Trust 2006-D Prospectus, July 11, 2006, at 78.

11     277.  The  GreenPoint  Mortgage  Funding  Trust  2006-OH1  Prospectus
12
13  Supplement stated:

14     GreenPoint acquires or originates many mortgage loans under "limited
   documentation" or "no documentation" programs. Under limited
15  documentation programs, more emphasis is placed on the value and
16  adequacy of the mortgaged property as collateral, credit history and other
   assets of the borrower, than on verified income of the borrower. Mortgage
17  loans underwritten under this type of program are generally limited to
18  borrowers with credit histories that demonstrate an established ability to
   repay indebtedness in a timely fashion, and certain credit underwriting
19  documentation concerning income or income verification and/or
20  employment verification is waived. Mortgage loans originated and
   acquired with limited documentation programs include cash-out refinance
21  loans, super-jumbo mortgage loans and mortgage loans secured by
22  investor-owned properties. Permitted maximum loan-to-value ratios
   (including secondary financing) under limited documentation programs
23  are generally more restrictive than mortgage loans originated with full
24  documentation requirements. Under no documentation programs, income
   ratios for the prospective borrower are not calculated. Emphasis is placed
25  on the value and adequacy of the mortgaged property as collateral and the
26  credit history of the prospective borrower, rather than on verified income
27  and assets of the borrower. Documentation concerning income,

28                  **115**

employment verification and asset verification is not required and income ratios are not calculated. Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-47.

278. With respect to Countrywide's documentation programs, the GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-64-65; GSR Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-56; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-54.

279. The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement continued:

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-65; GSR Mortgage

**116**

1   Loan Trust 2006-OA1 Prospectus Supplement at S-56; *see* GSR Mortgage Loan Trust

2   2007-OA1 Free Writing Prospectus, May 3, 2007, at S-55.

4        280.   With respect to Quicken Loan's documentation programs, the GSR

5   Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

> Quicken Loans originates the Secure Advantage product under two
> documentation programs: full and stated income/verified asset. Quicken
> Loans' full documentation program requires the verification of liabilities,
> income and assets. Acceptable documentation for income verification may
> include, but is not limited to, the borrower's most recent pay stubs,
> previous two years of W2 forms and a verbal verification of employment.
> The borrower's assets are generally verified by obtaining two consecutive
> months of bank account statements and such statements are reviewed to
> ensure that sufficient funds are available to meet the asset reserve
> requirements of the program.
>
> Generally, under the stated income/verified assets program, the borrower
> states his/her income and provides Quicken Loans with two years of
> employment history. Quicken Loans verbally verifies the borrower's
> employment history without confirmation of income. In determining the
> borrower's ability to meet their monthly obligations, the stated income
> amount is assessed relative to the borrower's current employment status
> and tenure. Quicken Loans may also use various online sources to ensure
> the borrower's stated income is reasonable relative to their employment
> position. To verify a borrower's assets, Quicken Loans obtains bank
> statements from the two most recent months and verifies that sufficient
> funds are available to meet the asset reserve requirements of the program.

22   GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-68; *see* GSR

23   Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-58.

25        281.   The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement

26   stated:

**117**

The mortgage loans have been, or will be, originated or re-underwritten upon acquisition, generally in accordance with the Long Beach guidelines under the Long Beach full documentation, limited documentation or stated income documentation residential loan programs.

Under the full documentation residential loan program, salaried prospective borrowers are generally required to submit their most recent W-2s and pay stubs and self-employed prospective borrowers are generally required to submit their most recent federal income tax return. Under the stated income documentation residential loan program, prospective borrowers are required to state their income on the application but are not required to submit any documents in support. Under the limited documentation residential loan program, salaried prospective borrowers or self-employed prospective borrowers are generally required to submit their most recent six months of personal bank statements or business bank statements. Under the limited documentation and stated income documentation residential loan programs, the prospective borrower's employment and income sources must be stated on the prospective borrower's application. The prospective borrower's income as stated must be reasonable for the related occupation and such determination as to reasonableness is subject to the loan underwriter's discretion. However, the prospective borrower's income as stated on the application is not independently verified. Verification of employment is required for salaried prospective borrowers. Maximum loan-to-value ratios under the stated income documentation residential loan programs are generally lower than those permitted under the full documentation and limited documentation residential loan programs. Generally, the same underwriting guidelines that apply to the full documentation and limited documentation residential loan programs, except as noted in this section, apply to the stated income documentation residential loan programs.

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-38.

282.  The RALI Series 2007-QH6 Trust Prospectus stated:

General Standards

In most cases, under a traditional "full documentation" program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the

**118**

mortgagor.   As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand [f]or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to mortgaged property consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable payment histories, no income will be required to be stated, or verified, in connection with the loan application.

If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program.  Such program permits some mortgage loans to be refinanced with only limited verification or updating of the underwriting information that was obtained at the time that the original mortgage loan was originated.  For example, a new appraisal of a mortgaged property may not be required if the related original mortgage loan was originated up to 24 months prior to the refinancing.  In addition, a mortgagor's income may not be verified, although continued employment is required to be verified.   In certain circumstances, a mortgagor may be permitted to borrow up to 100% of the outstanding principal amount of the original mortgage loan.  Each mortgage loan underwritten pursuant to this program will be treated as having been underwritten pursuant to the same underwriting documentation program as the mortgage loan that it refinanced, including for purposes of the disclosure in the accompanying prospectus supplement.

If specified in the accompanying prospectus supplement, some mortgage loans may have been originated under "limited documentation," "stated documentation" or "no documentation" programs that require less documentation and verification than do traditional "full documentation" programs.  Under a limited documentation, stated documentation or no

119

documentation program, minimal investigation into the mortgagor's credit history and income profile is undertaken by the originator and the underwriting may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

RALI Series 2007-QH6 Trust Prospectus, April 9, 2007 at 18; RALI Series 2006-QO10 Trust Prospectus, Dec. 6, 2006, at 12-13; RALI Series 2007-QH2 Trust Prospectus, Dec. 6, 2006, at 12-13; RALI Series 2007-QH3 Trust Prospectus, Dec. 6, 2006, at 12-13; RALI Series 2007-QH5 Trust Prospectus, April 9, 2007, at 18; RALI Series 2006-QO6 Trust Prospectus, Mar. 3, 2006, at 12-13; *see also* RALI Series 2007-QH6 Trust Registration Statement, Feb. 12, 2007, at 18; RALI Series 2006-QO10 Trust Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2007-QH2 Trust Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2007-QH3 Trust Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2007-QH5 Trust Registration Statement, Feb. 12, 2007, at 18; RALI Series 2006-QO6 Trust Registration Statement, Jan. 23, 2006, at 13-14.

283.  UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed. The preceding statements were untrue at the time they were made, because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines in order to increase the volume of mortgages

**120**

originated, emphasizing quantity of loans rather than the quality of those loans (*see supra* Section VII.D). Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

## C.    Untrue Statements Concerning Loan-to-Value Ratios.

284.    The Alternative Loan Trust 2007-OA4 Prospectus Supplement stated:

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 75% and original principal balances ranging up to $650,000. The maximum "cash-out" amount permitted is $200,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan. As used in this prospectus supplement, a refinance mortgage loan is classified as a cash-out refinance mortgage loan by Countrywide Home Loans if the borrower retains an amount greater than the lesser of 2% of the entire amount of the proceeds from the refinancing of the existing loan, or $2,000.

Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios

**121**

at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-35. At S-36, the Prospectus Supplement also included similar descriptions of the maximum loan-to-value ratios permitted under Countrywide's "Expanded Underwriting Guidelines."

285.  The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement represented:

Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio. In general, higher credit risk mortgage loans are graded in categories which permit higher Debt Ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however these loan programs establish lower maximum loan-to-value ratios and lower maximum loan amounts for loans graded in

122

1    such categories.

2    Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-37; *see* Franklin

3

4    Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-38.

5    286.   The Fremont Home Loan Trust 2006-D Prospectus Supplement stated:

6
7    "A+." Under the "A+" category, an applicant must have no 30-day late
     mortgage payments within the last 12 months and it must be at least 24
8    months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or
     foreclosure. The maximum loan-to-value ratio is 100% with a minimum
9    Credit Score of 600. The maximum permitted loan-to-value ratio is
10   reduced for: reduced income documentation, non-owner occupied
     properties, properties with 3-4 units, properties with rural characteristics
11   or credit scores below 600.

12
     "A." Under the "A" category, an applicant must have not more than one
13   30-day late mortgage payment within the last 12 months and it must be at
14   least 24 months since discharge of any Chapter 7 or Chapter 13
     bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 100%
15   with a minimum Credit Score of 600. The maximum permitted loan-to-
16   value ratio is reduced for: reduced income documentation, non-owner
     occupied properties, properties with 3-4 units, properties with rural
17   characteristics or credit scores below 600.

18
     "A-." Under the "A-" category, an applicant must have not more than
19   three 30-day late mortgage payments within the last 12 months and it must
20   be at least 24 months since discharge of any Chapter 7 or Chapter 13
     bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90%
21   with a minimum Credit Score of 550. The maximum permitted loan-to-
22   value ratio is reduced for: reduced income documentation, non-owner
     occupied properties, properties with 3-4 units, properties with rural
23   characteristics or credit scores below 550.

24
     "B." Under the "B" category, an applicant must have not more than one
25   60-day late mortgage payment within the last 12 months and it must be at
26   least 18 months since discharge of any Chapter 7 or Chapter 13
     bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90%
27   with a Credit Score of 550. The maximum permitted loan-to-value ratio is

28                                          **123**

reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics or credit scores under 550.

"C." Under the "C" category, an applicant must not be more than 90 days delinquent with respect to its current mortgage payment and it must be at least 12 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value ratio is 85% with a minimum Credit Score of 580. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"C-." Under the "C-" category, an applicant must not be more than 150 days delinquent with respect to its current mortgage payment and it must not be subject of a Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value ratio is 70% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"D." Under the "D" category, an applicant must not be more than 180 days delinquent with respect to its current mortgage payment. Any Chapter 7 or Chapter 13 bankruptcy proceedings and/or foreclosure actions must be paid in connection with closing. The maximum permitted loan-to-value ratio is 65% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced to 60% if the property is currently subject to foreclosure proceedings.

Fremont Home Loan Trust 2006-D Prospectus Supplement at 43-44; *see* Fremont Home Loan Trust 2006-D Free Writing Prospectus, Oct. 24, 2006, at 43-44.

287. The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement represented:

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally

124

COMPLAINT FOR DAMAGES

allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-62; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, Apr. 26, 2007, at S-51.

288.    The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement continued:

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-63; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, Apr. 26, 2007, at S-53.

289.    The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement stated:

The Long Beach underwriting guidelines permit first lien mortgage loans with loan-to-value ratios at origination of up to 100%, or 80% if

**125**

at the time of origination of the first lien mortgage loan, the sponsor also originated a second lien mortgage loan. The Long Beach second lien mortgage loan underwriting guidelines permit second lien mortgage loans with a combined loan-to-value ratios at origination of up to 100%. The maximum allowable loan-to-value ratio varies based upon the residential loan program, income documentation, property type, creditworthiness and debt service-to-income ratio of the prospective borrower and the overall risks associated with the loan decision. The maximum combined loan-to-value ratio, including any second lien mortgage subordinate to the sponsor's first lien mortgage, is generally 100% under the "Premium A," "A," "A-," "B+" and "B" risk categories, and 95% under the "C" risk category. Noninstitutional (private party) second lien loans are not permitted.

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-37.

290.    UNTRUE STATEMENTS AND OMITTED INFORMATION:    The preceding statements were material at the time they were made because the riskiness of the RMBS investment is directly dependent on the quality of the underwriting process and adequate assessment and limits on loan-to-value ratios (in addition to accurate appraisals) is key to that process.    The preceding statements were untrue at the time they were made because the Originators did not adhere to the maximum loan-to-value ratios as represented in the Offering Documents, encouraged inflated appraisals and frequently granted loans with high loan-to-value ratios with no meaningful assessment of the borrower's ability to repay the loan based on the borrower's credit profile (*see supra* Section VII.D). Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

**126**

**D.    Untrue Statements Concerning Credit Enhancement.**

291.  The Alternative Loan Trust 2007-OA4 Prospectus Supplement represented:

> Credit enhancement provides limited protection to holders of certain certificates against shortfalls in payments received on the mortgage loans. This transaction employs the following forms of credit enhancement . . . .

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-12; *see* Alternative Loan Trust 2007-OA4 Amended Registration Statement, Mar. 6, 2006, at S-14-15.

292.  The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement represented:

> The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the Class A certificates, and to a limited extent, the holders of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 certificates and, to a lesser degree, the holders of the Class B-1 and Class B-2 certificates, will receive regular payments of interest and principal.

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-19; *see* First Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-20.

293.  The Fremont Home Loan Trust 2006-D Prospectus stated:

> The amount of any applicable credit enhancement supporting one or more classes of offered securities, including the subordination of one or more classes of securities, will be determined on the basis of criteria established by each rating agency rating such classes of securities based on an assumed level of defaults, delinquencies, other losses or other factors. We cannot assure you, however, that the loss experience on the related assets will not exceed these assumed levels.

127

Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 17; *see also* Fremont

Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 17.

294.    The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus

Supplement stated:

> The credit enhancement features described in this prospectus supplement
> are intended to enhance the likelihood that holders of the class A
> certificates, and to a limited extent, the holders of the class M-1, class M-
> 2, class M-3, class M-4, class M-5, class M-6, class M-7 and class M-8
> certificates, will receive regular payments of interest and principal.

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-26-
27.

295.    The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

> The credit enhancement features described in this prospectus supplement
> are intended to enhance the likelihood that holders of the senior
> certificates, and to a limited extent, the holders of the subordinate
> certificates, will receive regular payments of interest and principal.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-32; *see* GSR

Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-28; GSR Mortgage Loan

Trust 2007-OA1 Free Writing Prospectus, Apr. 27, 2007, at S-25.

296.    The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement

stated:

> The credit enhancement features described in the summary of this
> prospectus supplement are intended to enhance the likelihood that holders
> of the Class A Certificates, and to a limited extent, the holders of the
> Mezzanine Certificates and the Class B Certificates, will receive regular
> payments of interest and principal.

**128**

---

**COMPLAINT FOR DAMAGES**

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-19; *see* Long

Beach Mortgage Loan Trust 2006-11 Registration Statement, Jan. 24, 2006, at the

"Risk Factors" section.

297.  The RALI Series 2007-QH6 Trust Prospectus Supplement stated:

The credit enhancement for the benefit of the offered certificates consists
of:

Excess Cash Flow.  Because more interest with respect to the mortgage
loans is payable by the mortgagors than is expected to be necessary to pay
the interest on the Class A, Class M and Class B Certificates each month
and related expenses, there may be excess cash flow.  Some of this excess
cash flow may be used to protect the offered certificates against some
realized losses by making an additional payment of principal up to the
amount of the realized losses.

RALI Series 2007-QH6 Trust Prospectus Supplement at S-15; *see* RALI Series 2006-

QO10 Trust Prospectus Supplement at S-14; RALI Series 2007-QH2 Trust Prospectus

Supplement at S-13; RALI Series 2007-QH3 Trust Prospectus Supplement at S-13;

RALI Series 2007-QH5 Trust Prospectus Supplement at S-15; RALI Series 2006-QO6

Trust Prospectus Supplement at S-13.

298.  UNTRUE STATEMENTS AND OMITTED INFORMATION:  The

preceding statements were material at the time they were made, because U.S. Central

and WesCorp nearly always purchased the highest rated tranches of the RMBS, and

those highly rated tranches relied on the credit enhancement, which purportedly

afforded protection against financial loss. The preceding statements were untrue at the

time they were made, because, due to the Originators' systematic disregard of

129

underwriting standards, the mortgages in the pools were fatally impaired at the outset and destined to fail (*see supra* Section VII.D). This rendered the protection allegedly afforded by the credit enhancement in the highest tranches illusory. Further evidence of the Originators' pervasive disregard of underwriting standards is found in the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5); the huge discrepancy between expected and actual losses (*see supra* Figure 2); the collapse of the credit ratings (*see supra* Table 4); and the Originators' high OTD lending (*see supra* Table 6).

## IX.    THE CLAIMS ARE TIMELY

299.    For actions brought by the NCUA Board as Liquidating Agent, the FCU Act extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent. *See* 12 U.S.C. § 1787(b)(14)(B)(i).

300.    The NCUA Board placed U.S. Central and WesCorp under conservatorship and appointed itself as conservator on March 20, 2009. On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into liquidation and appointed itself as Liquidating Agent.

301.    Actions brought under Sections 11 and 12(a)(2) of the Securities Act must be:

brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action

130

1    be brought to enforce a liability created under section 77k or 77*l*(a)(1)
2    of this title more than three years after the security was bona fide
     offered to the public, or under section 77*l*(a)(2) of this title more than
3    three years after the sale.

4    15 U.S.C. § 77m.

5    302.  Actions brought under section 17-12a509 of the Kansas Uniform
6
7    Securities Act must be brought within "within the earlier of two years after discovery of
8    the facts constituting the violation or five years after the violation."  Kan. Stat. Ann.
9    § 17-12a509(j).

10    303.  Actions brought under section 25501 of the California Corporate
11
12    Securities Law must be brought within "five years after the act or transaction
13    constituting the violation or the expiration of two years after the discovery by the
14
15    plaintiff of the facts constituting the violation, whichever shall first expire." Cal. Corp.
16    Code § 25506(b).

17    304.  As the Federal Reserve Board noted in November 2008, the
18    "[d]eteriorating lending standards" and "the surge in early payment defaults suggests
19
20    that underwriting . . . deteriorated on dimensions that were less readily apparent to
21    investors."  Mayer, *The Rise in Mortgage Defaults* at 15-16; *see also* FSOC Risk
22    Retention Report at 9.
23
24    305.  Accordingly, U.S. Central and WesCorp did not discover and could not
25    have discovered the untrue statements and/or misleading omissions in the Offering
26    Documents more than one year prior to March 20, 2009, the date on which the NCUA
27
28                                          **131**

1    Board placed U.S. Central and WesCorp into conservatorship.

2        306.   In addition, U.S. Central and/or the NCUA Board as their Liquidating

3
4    Agent are or were members of putative classes in the cases listed in Table 7, below.

5    Therefore, the NCUA Board's claims are subject to legal tolling of the statute of

6
     limitations and statute of repose under the doctrine announced in *American Pipe &*
7
8    *Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("American Pipe") and its progeny.

9                                    **Table 7**

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date |
|-------|----------------|-------|------------|------------------------------------------|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | WesCorp | 20-Mar-07 | *Luther v. Countrywide.* BC380698 (Cal. Superior Court L.A. County) Complaint Filed: November 14, 2007, <br> *Maine v. Countrywide.* No. 10-302 (C.D.C.A.) Complaint Filed: January 14, 2010. <br> *Washington v. Countrywide,* BC 392571 (Cal. Superior Court L.A. County) Complaint Filed: June 12, 2008, consolidated into *Luther v. Countrywide,* BC380698 (Cal. Superior Court L.A. County) |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | 4-May-07 | *NECA-IBEW v. Goldman.* No. 08-10783 (S.D.N.Y) Complaint Filed: December 11, 2008 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | 4-May-07 | *NECA-IBEW v. Goldman.* No. 08-10783 (S.D.N.Y) Complaint Filed: December 11, 2008 |
| 751153AC1 | RALI Series 2006-QO10 Trust | WesCorp | 14-Dec-06 | *New Jersey Carpenters v. RALI* No. 08-602727 (New York State Supreme Ct.) Class Action Complaint Filed: September 22, 2008, Removed to No. 08-8781 (S.D.N.Y.) |
| 74922JAC2 | RALI Series 2007-QH2 Trust | WesCorp | 16-Feb-07 | *New Jersey Carpenters v. RALI.* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | WesCorp | 28-Mar-07 | *New Jersey Carpenters v. RALI.* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |

**COMPLAINT FOR DAMAGES**

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date |
|---|---|---|---|---|
| 74922WAC3 | RALI Series 2007-QH3 Trust | WesCorp | 28-Mar-07 | *New Jersey Carpenters v. RALI*, No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 75116EAB8 | RALI Series 2007-QH5 Trust | WesCorp | 24-May-07 | *New Jersey Carpenters v. RALI*, No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 75116EAC6 | RALI Series 2007-QH5 Trust | WesCorp | 24-May-07 | *New Jersey Carpenters v. RALI*, No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | WesCorp | 21-Jun-07 | *New Jersey Carpenters v. RALI*, No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | WesCorp | 21-Jun-07 | *New Jersey Carpenters v. RALI*, No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | WesCorp | 11-Oct-06 | *New Jersey Carpenters v. RALI*, 08-602727 (New York State Supreme Ct.) Class Action Complaint Filed: September 22, 2008, Removed to No. 08-8781 (S.D.N.Y.) |
| 75116EAA0 | RALI Series 2007-QH5 Trust | WesCorp | 30-May-07 | *New Jersey Carpenters v. RALI*, No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |

307.    With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 11 of the Securities Act (Claims One through Five), the earliest date they were bona fide offered to the public was June 28, 2006, or not more than three years prior to March 20, 2009. Accordingly, the NCUA Board's Section 11 claims are not time-barred.

308.    With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 12(a)(2) (Claim Six), the earliest sale was December 14, 2006, or not more than three years prior to March 20, 2009. Accordingly, the NCUA Board's

**133**

1    Section 12(a)(2) claims are not time-barred.

2    309.    With respect to those RMBS purchases for which the NCUA Board asserts

3

4    claims under state law (Claims Seven and Eight), the earliest purchase date/offering

5    date with respect to those claims was  March 3, 2006, or not more than five years prior

6
     to March 20, 2009. Accordingly, the NCUA Board's state law claims are not time-
7
8    barred.

9    **X.    CLAIMS FOR RELIEF**

10                     **FIRST CLAIM FOR RELIEF**
11                   **Section 11 of the Securities Act of 1933**
                     **(Alternative Loan Trust 2007-OA4)**
12

13    310.    The NCUA Board realleges paragraphs 1 through 309 of this Complaint,

14    as though fully set forth here, except those paragraphs specific to offerings other than

15
      the Alternative Loan Trust 2007-OA4 Offering.
16

17    311.    The NCUA Board brings this cause of action pursuant to Section 11 of the

18    Securities Act, with respect to WesCorp's purchases of the Alternative Loan Trust

19
      2007-OA4 certificates against Defendant Goldman Sachs as the underwriter.
20

21    312.    The NCUA Board expressly disclaims and disavows any allegation that

22    could be construed as alleging fraud.

23

24    313.    At the time the registration statement became effective, it (including the

25    prospectus and any prospectus supplements) contained untrue statements and omitted

26    facts that were necessary to make the statements made not misleading, as alleged

27

28                                    **134**

1  above.

2  314.   The untrue statements and omitted facts were material because a
3
4  reasonably prudent investor deciding whether to purchase the certificates would have
5  viewed them as important and as substantially altering the total mix of information
6
7  available, as alleged above.

8  315.   WesCorp purchased the certificates pursuant to and traceable to a defective
9  registration statement, as alleged above.

10  316.   At the time WesCorp purchased the certificates, it did not know of the
11
12  untrue statements and omissions contained in the registration statement.

13  317.   Defendant Goldman Sachs's conduct as alleged above violated Section 11.

14  318.   WesCorp and Plaintiff sustained damages as a result of Defendant
15
16  Goldman Sachs's violations of Section 11.

17  WHEREFORE, the NCUA Board requests the Court to enter judgment in its
18  favor against Defendant Goldman Sachs awarding all damages, in an amount to be
19  proven at trial, costs, and such other relief as the Court deems appropriate and just.

20  ## SECOND CLAIM FOR RELIEF
21  ### Section 11 of the Securities Act of 1933
     ### (Fremont Home Loan Trust 2006-D)
22

23  319.   The NCUA Board realleges paragraphs 1 through 309 of this Complaint,
24  as though fully set forth here, except those paragraphs specific to the Issuer Defendants
25  other than Fremont Mortgage Securities Corporation or specific to offerings other than
26
27  the Fremont Home Loan Trust 2006-D Offering.

28  **135**

320.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the Fremont Home Loan Trust 2006-D certificates against Defendant Goldman Sachs, as the underwriter, and against Defendant Fremont Mortgage Securities Corporation as the issuer.

321.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

322.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

323.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

324.    U.S. Central purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

325.    At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

326.    Defendant Goldman Sachs's and Defendant Fremont Mortgage Securities Corporation's conduct as alleged above violated Section 11.

**136**

327.   U.S. Central and Plaintiff sustained damages as a result of Defendant Goldman Sachs's and Defendant Fremont Mortgage Securities Corporation's violations of Section 11.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs and Defendant Fremont Mortgage Securities Corporation, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### THIRD CLAIM FOR RELIEF
### Section 11 of the Securities Act of 1933
**(GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, GreenPoint Mortgage Funding Trust 2006-OH1)**

328.   The NCUA Board realleges paragraphs 1 through 309 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than GS Mortgage Securities Corp., or specific to offerings other than the GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, and GreenPoint Mortgage Funding Trust 2006-OH1 Offerings.

329.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchases of the GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, and GreenPoint Mortgage Funding Trust 2006-OH1 certificates against Defendant Goldman Sachs, as the underwriter, and against Defendant GS Mortgage Securities Corp., as the issuer.

330.   The NCUA Board expressly disclaims and disavows any allegation that

137

1  could be construed as alleging fraud.

2  331.  At the time the registration statement became effective, it (including the

3  prospectus and any prospectus supplements) contained untrue statements and omitted

4

5  facts that were necessary to make the statements made not misleading, as alleged

6  above.

7

8  332.  The untrue statements and omitted facts were material because a

9  reasonably prudent investor deciding whether to purchase the certificates would have

10  viewed them as important and as substantially altering the total mix of information

11  available, as alleged above.

12

13  333.  WesCorp purchased the certificates pursuant to and traceable to a defective

14  registration statement, as alleged above.

15

16  334.  At the time WesCorp purchased the certificates, it did not know of the

17  untrue statements and omissions contained in the registration statement.

18  335.  Defendant Goldman Sachs's and Defendant GS Mortgage Securities

19  Corp.'s conduct as alleged above violated Section 11.

20

21  336.  WesCorp and Plaintiff sustained damages as a result of Defendant

22  Goldman Sachs's and Defendant GS Mortgage Securities Corp.'s violations of Section

23

24  11.

25  WHEREFORE, the NCUA Board requests the Court to enter judgment in its

26  favor against Defendant Goldman Sachs and Defendant GS Mortgage Securities

27  Corp., jointly and severally, awarding all damages, in an amount to be proven at

28

**138**

---

1  trial, costs, and such other relief as the Court deems appropriate and just.

2  ## FOURTH CLAIM FOR RELIEF

3  ### Section 11 of the Securities Act of 1933
### (Long Beach Mortgage Loan Trust 2006-11)

4

5  337.    The NCUA Board realleges paragraphs 1 through 309 of this Complaint,

6  as though fully set forth here, except those paragraphs specific to the Issuer Defendants

7  other than Long Beach Securities Corp. or specific to offerings other than the Long

8

9  Beach Mortgage Loan Trust 2006-11 Offering.

10  338.    The NCUA Board brings this cause of action pursuant to Section 11 of the

11  Securities Act, with respect to U.S. Central's purchases of the Long Beach Mortgage

12  Loan Trust 2006-11 certificates against Defendant Goldman Sachs, as the underwriter,

13

14  and against Defendant Long Beach Securities Corp. as the issuer.

15  339.    The NCUA Board expressly disclaims and disavows any allegation that

16  could be construed as alleging fraud.

17

18  340.    At the time the registration statement became effective, it (including the

19  prospectus and any prospectus supplements) contained untrue statements and omitted

20  facts that were necessary to make the statements made not misleading, as alleged

21  above.

22

23  341.    The untrue statements and omitted facts were material because a

24  reasonably prudent investor deciding whether to purchase the certificates would have

25

26  viewed them as important and as substantially altering the total mix of information

27

28  **139**

1    available, as alleged above.

2        342.   U.S. Central purchased the certificates pursuant to and traceable to a
3
4    defective registration statement, as alleged above.

5        343.   At the time U.S. Central purchased the certificates, it did not know of the
6
7    untrue statements and omissions contained in the registration statement.

8        344.   Defendant Goldman Sachs's and Defendant Long Beach Securities Corp.'s
9    conduct as alleged above violated Section 11.

10       345.   U.S. Central and Plaintiff sustained damages as a result of Defendant
11
12   Goldman Sachs's and Defendant Long Beach Securities Corp.'s violations of Section
13   11.

14       WHEREFORE, the NCUA Board requests the Court to enter judgment in its
15
16   favor against Defendant Goldman Sachs and Defendant Long Beach Securities
     Corp., jointly and severally, awarding all damages, in an amount to be proven at
17
     trial, costs, and such other relief as the Court deems appropriate and just.
18
                        **FIFTH CLAIM FOR RELIEF**
19                  **Section 11 of the Securities Act of 1933**
20        **(RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust,**
            **RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust,**
21          **RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)**

22       346.   The NCUA Board realleges paragraphs 1 through 309 of this Complaint,
23
24   as though fully set forth here, except those paragraphs specific to the Issuer Defendants

25   other than Residential Accredit Loans, Inc., or specific to offerings other than the RALI
26
27   Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust,

28                                    **140**
                            _____

1   RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-

2   QH6 Trust Offerings.

3

4       347.   The NCUA Board brings this cause of action pursuant to Section 11 of the

5   Securities Act, with respect to WesCorp's purchases of the RALI Series 2006-QO6

6   Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series

7

8   2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust

9   certificates against Defendant Goldman Sachs, as the underwriter, and against

10  Defendant Residential Accredit Loans, Inc., as the issuer.

11

12      348.   The NCUA Board expressly disclaims and disavows any allegation that

13  could be construed as alleging fraud.

14

15      349.   At the time the registration statement became effective, it (including the

16  prospectus and any prospectus supplements) contained untrue statements and omitted

17  facts that were necessary to make the statements made not misleading, as alleged

18  above.

19

20      350.   The untrue statements and omitted facts were material because a

21  reasonably prudent investor deciding whether to purchase the certificates would have

22  viewed them as important and as substantially altering the total mix of information

23

24  available, as alleged above.

25      351.   WesCorp purchased the certificates pursuant to and traceable to a defective

26  registration statement, as alleged above.

27

28                              **141**

352.   At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

353.   Defendant Goldman Sachs's and Defendant Residential Accredit Loans, Inc.'s conduct as alleged above violated Section 11.

354.   WesCorp and Plaintiff sustained damages as a result of Defendant Goldman Sachs's and Defendant Residential Accredit Loans, Inc.'s violations of Section 11.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs and Defendant Residential Accredit Loans, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### SIXTH CLAIM FOR RELIEF
**Section 12(a)(2) of the Securities Act of 1933**
**(Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)**

355.   The NCUA Board realleges paragraphs 1 through 309 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust offerings.

356.   The NCUA Board brings this cause of action pursuant to Section 12(a)(2)

142

of the Securities Act, with respect to WesCorp's purchases of the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust certificates against Defendant Goldman Sachs, as the underwriter and seller of those certificates.

357.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

358.    Defendant Goldman Sachs offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

359.    Defendant Goldman Sachs offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectuses and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

360.    The prospectuses and/or prospectus supplements contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

361.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information

**143**

available, as alleged above.

362.    WesCorp purchased the certificates on the initial offering pursuant to the prospectuses and/or prospectus supplements.

363.    At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

364.    Defendant Goldman Sachs's conduct as alleged above violated Section 12(a)(2).

365.    WesCorp and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Section 12(a)(2).

366.    Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration WesCorp paid for the certificates, minus principal and interest received.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

## SEVENTH CLAIM FOR RELIEF
### Violation of the California Corporate Securities Law of 1968
### Cal. Corp. Code §§ 25401 and 25501
### (Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series

144

2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)

367. The NCUA Board realleges paragraphs 1 through 309 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust offerings.

368. The NCUA Board brings this cause of action pursuant to Sections 25401 and 25501 of the California Corporate Securities Law, with respect to WesCorp's purchases of the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust certificates against Defendant Goldman Sachs, as the seller of those certificates.

369. Defendant Goldman Sachs offered to sell and sold the securities to WesCorp by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

370. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

145

371.    At the time WesCorp purchased the certificates, it did not know of these untruths or omissions.

372.    Defendant Goldman Sachs sold the certificates to WesCorp in California.

373.    Defendant Goldman Sachs's sales of the certificates violated Cal. Corp. Code § 25401.

374.    WesCorp and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Cal. Corp. Code § 25401, and WesCorp and the NCUA Board are entitled to the remedies provided by Cal. Corp. Code § 25501.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### EIGHTH CLAIM FOR RELIEF
#### Violation of the Kansas Uniform Securities Act
#### Kan. Stat. Ann. § 17-12a509
#### (First Franklin Mortgage Loan Trust 2006-FF4)

375.    The NCUA Board realleges paragraphs 1 through 309 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the First Franklin Mortgage Loan Trust 2006-FF4 offering.

376.    The NCUA Board brings this cause of action pursuant to Section 17-12a509 of the Kansas Uniform Securities Act, with respect to U.S. Central's purchases of the First Franklin Mortgage Loan Trust 2006-FF4 certificates against Defendant Goldman Sachs, as the seller of those certificates.

377.    Defendant Goldman Sachs offered to sell and sold the securities to

146

WesCorp by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

378.  The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

379.  Defendant Goldman Sachs sold the certificates to U.S. Central in Kansas.

380.  U.S. Central did not know of these untruths and omissions.

381.  If U.S. Central had known about these untruths and omissions, it would not have purchased the securities from Defendant Goldman Sachs.

382.  Defendant Goldman Sachs's sales of the certificates violated Kan. Stat. Ann. § 17-12a509(b).

383.  U.S. Central and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Kan. Stat. Ann. § 17-12a509(b).

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    For judgment against the Defendants in accordance with the prayers for

147

1  relief set forth in each of the foregoing Claims for Relief;

2      B.      For Plaintiff's costs of suit; and

3

4      C.      For any other relief the Court deems just and proper.

5

6  Dated: August 8, 2011                         Terry W. Bird
                                                  BIRD, MARELLA, BOXER, WOLPERT,
7                                                   NESSIM, DROOKS & LINCENBERG, PC

8                                                 George A Zelcs
                                                  KOREIN TILLERY LLC
9

10                                                Mark C Hansen
                                                  David C Frederick
11                                                 dfrederick@khhte.com
                                                  Wan J. Kim
12                                                Joseph S. Hall
13                                                KELLOGG, HUBER, HANSEN, TODD,
                                                   EVANS & FIGEL, P.L.L.C.
14                                                1615 M Street, N.W., Suite 400
15                                                Washington, D.C. 20036
                                                  Telephone: (202) 326-7900
16                                                Fax: (202) 326-7999

17
                                                  Michael J. McKenna, General Counsel
18                                                John K. Ianno, Associate General Counsel
                                                  NATIONAL CREDIT UNION
19                                                  ADMINISTRATION
20                                                1775 Duke Street
                                                  Alexandria, Virginia 22314-3428
21                                                Telephone: (703) 518-6350

22

23                                                By: _Terry W. Bird_____
24                                                     Terry W. Bird
25                                                Attorneys for Plaintiff National Credit Union
                                                  Administration Board
26

27  307143.1

28                                        **148**

**COMPLAINT FOR DAMAGES**

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the

claims asserted in this Complaint so triable.

Dated:  August 8, 2011              Terry W. Bird
                                    BIRD, MARELLA, BOXER, WOLPERT,
                                      NESSIM, DROOKS & LINCENBERG, PC

                                    George A Zelcs
                                    KOREIN TILLERY LLC

                                    Mark C Hansen
                                    David C Frederick
                                      dfrederick@khhte.com
                                    Wan J. Kim
                                    Joseph S. Hall
                                    KELLOGG, HUBER, HANSEN, TODD,
                                      EVANS & FIGEL, P.L.L.C.
                                    1615 M Street, N.W., Suite 400
                                    Washington, D.C. 20036
                                    Telephone: (202) 326-7900
                                    Fax: (202) 326-7999

                                    Michael J. McKenna, General Counsel
                                    John K. Ianno, Associate General Counsel
                                    NATIONAL CREDIT UNION
                                      ADMINISTRATION
                                    1775 Duke Street
                                    Alexandria, Virginia 22314-3428
                                    Telephone: (703) 518-6350


                                    By: _Terry W. Bird_
                                       Terry W. Bird
                                    Attorneys for Plaintiff National Credit Union
                                    Administration Board

307143.1

**149**

## APPENDIX A
### Table 1

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | CWALT. Inc. | WesCorp | 20-Mar-07 | $97,947,000 |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 | GS Mortgage Securities Corp. | U.S. Central | 3-Mar-06 | $29,360,000 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | GS Mortgage Securities Corp. | WesCorp | 4-May-07 | $73,547,938 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | GS Mortgage Securities Corp. | WesCorp | 4-May-07 | $59,442,800 |
| 751153AC1 | RALI Series 2006-QO10 Trust | Residential Accredit Loans, Inc. | WesCorp | 14-Dec-06 | $122,963,336 |
| 74922JAC2 | RALI Series 2007-QH2 Trust | Residential Accredit Loans, Inc. | WesCorp | 16-Feb-07 | $19,454,000 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | Residential Accredit Loans, Inc. | WesCorp | 28-Mar-07 | $62,785,038 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | Residential Accredit Loans, Inc. | WesCorp | 28-Mar-07 | $29,673,510 |
| 75116EAB8 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 24-May-07 | $20,000,000 |
| 75116EAC6 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 24-May-07 | $48,788,000 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | Residential Accredit Loans, Inc. | WesCorp | 21-Jun-07 | $70,102,000 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | Residential Accredit Loans, Inc. | WesCorp | 21-Jun-07 | $84,062,000 |

**COMPLAINT FOR DAMAGES**

**Table 2**

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 35729VAE7 | Fremont Home Loan Trust 2006-D | Fremont Mortgage Securities Corp. | U.S. Central | 25-Oct-06 | $18,000,000 |
| 35729VAF4 | Fremont Home Loan Trust 2006-D | Fremont Mortgage Securities Corp. | U.S. Central | 25-Oct-06 | $32,000,000 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | GS Mortgage Securities Corp. | WesCorp | 5-Feb-07 | $26,708,366 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | GS Mortgage Securities Corp. | WesCorp | 8-Mar-07 | $26,689,604 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | GS Mortgage Securities Corp. | WesCorp | 26-Sep-06 | $61,086,962 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | GS Mortgage Securities Corp. | WesCorp | 28-Sep-06 | $73,779,370 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | Long Beach Securities Corp. | U.S. Central | 8-Dec-06 | $57,000,000 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | Residential Accredit Loans, Inc. | WesCorp | 11-Oct-06 | $49,783,783 |
| 75116EAA0 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 30-May-07 | $115,119,708 |

**Table 3**
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---|---|---|---|
| Aaa | AAA | **Prime (Maximum Safety)** | |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | **High Grade, High Quality** | |
| A1<br>A2<br>A3 | A+<br>A<br>A- | **Upper Medium Grade** | **INVESTMENT GRADE** |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | **Medium Grade** | |
| Ba2<br>Ba3 | BB<br>BB- | **Non-Investment Grade, or Speculative** | |
| B1<br>B2<br>B3 | B+<br>B<br>B- | **Highly Speculative, or Substantial Risk** | |
| Caa2<br>Caa3 | CCC+ | **In Poor Standing** | **SPECULATIVE GRADE** |
| Ca | CCC<br>CCC- | **Extremely Speculative** | |
| C | - | **May be in Default** | |
| - | D | **Default** | |

**151**

**Table 4**

| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|
| | | | | CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | |
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | WesCorp | AAA | Aaa | CCC 9/2/2009 | C 11/23/2010 |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 | U.S. Central | AAA | Aaa | BBB+ 3/2/2010 | Caa3 4/6/2010 |
| 35729VAE7 | Fremont Home Loan Trust 2006-D | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Ca 4/29/2010 |
| 35729VAF4 | Fremont Home Loan Trust 2006-D | U.S. Central | AA+ | Aa1 | D 2/25/2011 | C 3/17/2009 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | WesCorp | AAA | Aaa | C 4/19/2010 | C 12/9/2010 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | WesCorp | AAA | Aaa | CCC 9/2/2009 | C 12/14/2010 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/14/2010 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/14/2010 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Ca 3/20/2009 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | WesCorp | AAA | Aaa | CCC 4/15/2009 | C 12/1/2010 |
| 751153AC1 | RALI Series 2006-QO10 Trust | WesCorp | AAA | Aaa | D 3/23/2010 | C 12/1/2010 |
| 74922JAC2 | RALI Series 2007-QH2 | WesCorp | AAA | Aaa | D 6/23/2010 | C 12/1/2010 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | WesCorp | AAA | Aaa | CCC 2/16/2010 | C 12/1/2010 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | WesCorp | AAA | Aaa | D 5/25/2010 | C 12/1/2010 |
| 75116EAA0 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | Caa3 12/1/2010 |
| 75116EAB8 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/1/2010 |
| 75116EAC6 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | CCC 12/17/2010 | C 12/1/2010 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/1/2010 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | WesCorp | AAA | Aaa | D 9/24/2010 | C 12/1/2010 |

**152**

12-12020-mg   Doc 4297-12   Filed 07/19/13   Entered 07/19/13 16:06:10   Exhibit 11
Case 2:11-cv-06521-GW-JEM   Document 1   Filed 08/09/11   Page 158 of 175   Page ID #:169

Part 2   Pg 73 of 91

## Table 5

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 (P.S. dated March 28, 2007) | zero (S-67-S-70) | 2.36% (Apr., p.9) | 3.11% (June, p.9) | 5.39% (Sept., p.9) | 16.45% (Mar. 2008, p.7) | 60.91% (June 2011, p.12) |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 (P.S. dated March 27, 2006) | 0.03% were 30-59 days delinquent. Zero were two or more payments delinquent. (S-32) | .42% (Apr., p.11) | 2.5% (June, p.11) | 5.73% (Sept., p.10) | 14.35% (Mar. 2007, p.10) | 51.63% (June 2011, p.11) |
| 35729VAF4 | Fremont Home Loan Trust 2006-D: Aggregate *Class M1 certificates represent interests in all of the mortgage loans in the trust fund. (3) (P.S. dated November 1, 2006) | Zero more than 30 days delinquent on 10/1/06 (19) | .79% (Dec., p.10) | 5.21% (Feb., p.10) | 12.45% (May, p.10) | 26.17% (Nov., p.10) | 51.61% (June 2011, p.9) |
|  | Fremont Home Loan Trust 2006-D: Group 1 | Zero more than 30 days delinquent on 10/1/06 (19) | 1% (Dec., p.12) | 4.42% (Feb., p.12) | 10.19% (May, p.12) | 24.12% (Nov., p.12) | 56.01% (June 2011, p.10) |
| 35729VAE7 | Fremont Home Loan Trust 2006-D: Group 2 *The Class 2-A-4 in Group 2 (3) | Zero more than 30 days delinquent on 10/1/06 (19) | .52% (Dec., p.12) | 1.59% (Feb., p.12) | 4.03% (May, p.12) | 9.84% (Nov., p.12) | 37.62% (June 2011, p.10) |
|  | Fremont Home Loan Trust 2006-D: Group 3 | Zero more than 30 days delinquent on 10/1/06 (19) | .78% (Dec., p.13) | 7.23% (Feb., p.13) | 17.55% (May, p.13) | 35.42% (Nov., p.13) | 60.15% (June 2011, p.11) |
|  | Fremont Home Loan Trust 2006-D: Group 4 | Zero were more than 30 days delinquent as of 10/1/06. (19) | .51% (Dec., p.13) | 4.86% (Feb., p.13) | 11.47% (May, p.13) | 19.17% (Nov., p.13) | 33.47% (June 2011, p.11) |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 (P.S. dated December 21, 2006) | 0.51% were 30 to 59 days delinquent. (S-44) | 1.05% (Jan., p.9) | 3.48% (Mar., p.9) | 2.55% (Jun., p.9) | 8.36% (Dec., p.9) | 55.60% (June 2011, p.9) |
|  | GSR Mortgage Loan Trust 2006-OA1: Aggregate (P.S. dated August 23, 2006) | 0.94% were 30 to 59 days delinquent. (S-45) | 1.68% (Sept., p.11) | 2.34% (Nov., p.11) | 3.84% (Feb., p.10) | 10.12% (Aug. 2007, p.9) | 53.90% (June 2011, p.11) |
|  | GSR Mortgage Loan Trust 2006-OA1: Group 1 | 0.94% were 30 to 59 days delinquent. (S-45) | 1.59% (Sept., p.12) | 2.38% (Nov., p.12) | 3.39% (Feb., p.11) | 9.41% (Aug. 2007, p.10) | 49.31% (June 2011, p.12) |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1: Group 2 *The Class 2-A-3 in Group 2 (S-13) | 0.94% were 30 to 59 days delinquent. (S-45) (S-45) | 1.86% (Sept., p.12) | 2.49% (Nov., p.12) | 4.10% (Feb., p.11) | 10.72% (Aug. 2007, p.10) | 53.41% (June 2011, p.12) |
|  | GSR Mortgage Loan Trust 2006-OA1: Group 3 | 0.94% were 30 to 59 days delinquent. (S-45) (S-45) | .70% (Sept., p.13) | 1.00% (Nov., p.13) | 3.59% (Feb., p.12) | 8.34% (Aug. 2007, p.11) | 70.84% (June 2011, p.13) |
|  | GSR Mortgage Loan Trust 2007-OA1: Aggregate (P.S. dated May 7, 2007) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.58% (May. p.9) | 3.00% (July. p.9) | 5.55% (Oct., p.9) | 12.45% (Apr. 2008, p.10) | 51.79% (June 2011, p.10) |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1: Group 1 *Class 1A-2 in Group 1 (S-14-15) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.23% (May, p.10) | 2.67% (July, p.10) | 5.30% (Oct., p.10) | 11.97% (Apr. 2008, p.11) | 47.67% (June 2011, p.11) |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1: Group 2 *Class 2A-M in Group 2 (S-14-15) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.86% (May, p.10) | 3.28% (July, p.10) | 5.76% (Oct., p.10) | 12.85% (Apr. 2008, p.11) | 55.16% (June 2011, p.11) |

153

**COMPLAINT FOR DAMAGES**

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Long Beach Mortgage Loan Trust 2006-11: Aggregate (P.S. dated December 11. 2006) | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan., p.12) | 3.38% (Mar., p.12) | 12.43% (June, p.12) | 29.89% (Dec., p.12) | 52.65% (June 2011, p.14) |
| | Long Beach Mortgage Loan Trust 2006-11: Group 1 | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan., p.12) | 1.8% (Mar., p.13) | 7.65% (June, p.13) | 21.53% (Dec., p.13) | 52.03% (June 2011, p.19) |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11: Group 2 *Class II-A-4 in Group 2 (S-72) | 2.25% of Group I and 4.20% of Group II were delinquent, (S-17) | 0% (Jan., p.12) | 4.17% (Mar., p.14) | 14.81% (June, p.14) | 34.09% (Dec., p.14) | 53.08% (June 2011, p.24) |
| 75114NAC8 | RALI Series 2006-QO6 Trust (P.S. dated June 28, 2006) | zero (S-42) | 1.42% (July, p.8) | 1.61% (Sept., p.7) | 2.79% (Dec., p.8) | 6.13% (June, p.8) | 48.08% (June 2011, p.8) |
| 751153AC1 | RALI Series 2006-QO10 Trust (P.S. dated December 27, 2006) | zero (S-45) | 2.42% (Jan., p.8) | 4.94% (Mar., p.8) | 4.97% (June, p.8) | 13.54% (Dec., p.8) | 47.89% (June 2011, p.8) |
| 74922JAC2 | RALI Series 2007-QH2 Trust (P.S. dated February 23, 2007) | zero (S-43) | .89% (Mar., p.7) | 3.14% (May, p.7) | 3.09% (Aug., p.7) | 9.32% (Feb. 2008, p.7) | 55.03% (June 2011, p.8) |
| 74922WAC3 74922WAB5 | RALI Series 2007-QH3 Trust (P.S. dated March 28, 2007) | zero (S-45) | .81% (Apr., p.8) | 4.08% (June, p.8) | 2.84% (Sept., p.8) | 10.88% (Mar. 2008, p.7) | 49.71% (June 2011, p.8) |
| | RALI Series 2007-QH5 Trust: Aggregate (P.S. dated May 29, 2007) | zero (S-51) | 1.55% (June, p.9) | 2.59% (Aug., p.9) | 5.26% (Nov., p.9) | 16.31% (May 2008, p.14) | 51.88% (June 2011, p.9) |
| 75116EAA0 75116EAB8 75116EAC6 | RALI Series 2007-QH5 Trust: Group 1 *Class AI1, AI2, and AI3 in Group 1 (S-12-13) | zero (S-51) | 1.65% (June, p.10) | 2.58% (Aug., p.10) | 5.73% (Nov., p.10) | 16.55% (May 2008, p.12) | 52.04% (June 2011, p.10) |
| | RALI Series 2007-QH5 Trust: Group 2 | zero (S-51) | 1.32% (June, p.11) | 2.64% (July. p.11) | 4.18% (Nov., p.11) | 15.74% (May 2008, p.13) | 51.52% (June 2011, p.11) |
| 74922AAB3 74922AAC1 | RALI Series 2007-QH6 Trust (P.S. dated June 27, 2007) | zero (S-45) | 1.10% (July, p.8) | 2.84% (Sept., p.8) | 5.57% (Dec., p.7) | 15.83% (June 2008, p.10) | 50.60% (June 2011, p.8) |

**154**

**COMPLAINT FOR DAMAGES**

**Table 6**

| Originator Name | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| Countrywide Home Loans | 98.5 | 96.5 | 98.4 |
| First Franklin Financial Corporation | | | 98.7 |
| Fremont Investment & Loan | 91.2 | 85.2 | 94.0 |
| GreenPoint Mortgage Funding Inc. | 89.0 | 87.1 | 95.6 |
| Homecomings Financial, LLC | 97.4 | 97.9 | 99.9 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| Long Beach Mortgage | | 80.2 | |
| Quicken Loans | 89.5 | 86.7 | 91.3 |
| SunTrust Mortgage, Inc. | 62.6 | 71.1 | 74.4 |

**COMPLAINT FOR DAMAGES**

**Table 7**

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date |
|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | WesCorp | 20-Mar-07 | *Luther v. Countrywide.* BC380698  (Cal. Super. Ct. L.A. County) Complaint Filed:  November 14, 2007, <br><br> *Maine v. Countrywide.* No. 10-302 (C.D.C.A.) Complaint Filed:  January 14, 2010. <br><br> *Washington v. Countrywide.* BC 392571 (Cal. Super. Ct. L.A. County) Complaint Filed:  June 12, 2008, consolidated into *Luther v. Countrywide.* BC380698  (Cal. Super. Ct. L.A. County) |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | 4-May-07 | *NECA-IBEW v. Goldman* No. 08-10783 (S.D.N.Y) Complaint Filed:  December 11, 2008 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | 4-May-07 | *NECA-IBEW v. Goldman* No. 08-10783 (S.D.N.Y) Complaint Filed:  December 11, 2008 |
| 751153AC1 | RALI Series 2006-QO10 Trust | WesCorp | 14-Dec-06 | *New Jersey Carpenters v. RALI* 08-602727 (New York State Supreme Ct.) Class Action Complaint Filed:  September 22, 2008, Removed to No. 08-8781 (S.D.N.Y.) |
| 74922JAC2 | RALI Series 2007-QH2 Trust | WesCorp | 16-Feb-07 | *New Jersey Carpenters v. RALI* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed:  May 18, 2009 |

**156**

**COMPLAINT FOR DAMAGES**

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date |
|---|---|---|---|---|
| 74922WAB5 | RALI Series 2007-QH3 Trust | WesCorp | 28-Mar-07 | *New Jersey Carpenters v. RALI* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | WesCorp | 28-Mar-07 | *New Jersey Carpenters v. RALI* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 75116EAB8 | RALI Series 2007-QH5 Trust | WesCorp | 24-May-07 | *New Jersey Carpenters v. RALI* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 75116EAC6 | RALI Series 2007-QH5 Trust | WesCorp | 24-May-07 | *New Jersey Carpenters v. RALI* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | WesCorp | 21-Jun-07 | *New Jersey Carpenters v. RALI* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | WesCorp | 21-Jun-07 | *New Jersey Carpenters v. RALI* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | WesCorp | 11-Oct-06 | *New Jersey Carpenters v. RALI* 08-602727 (New York State Supreme Ct.) Class Action Complaint Filed: September 22, 2008, Removed to No. 08-8781 (S.D.N.Y.) |
| 75116EAA0 | RALI Series 2007-QH5 Trust | WesCorp | 30-May-07 | *New Jersey Carpenters v. RALI* No. 08-8781 (S.D.N.Y.) Consolidated Amended Complaint Filed: May 18, 2009 |

**157**



**APPENDIX B**

Figure 1

**COMPLAINT FOR DAMAGES**

## Figure 2

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Alternative Loan Trust 2007-OA4 | 40782 | 1 | $          - | $    1,721,048 |
| Alternative Loan Trust 2007-OA4 | 40782 | 2 | $          - | $    1,879,815 |
| Alternative Loan Trust 2007-OA4 | 40782 | 3 | $          - | $    2,052,895 |
| Alternative Loan Trust 2007-OA4 | 40782 | 4 | $    5,552,496 | $    2,241,515 |
| Alternative Loan Trust 2007-OA4 | 40782 | 5 | $    8,256,396 | $    2,446,993 |
| Alternative Loan Trust 2007-OA4 | 40782 | 6 | $    9,843,413 | $    2,670,748 |
| Alternative Loan Trust 2007-OA4 | 40782 | 7 | $   11,117,391 | $    2,914,296 |
| Alternative Loan Trust 2007-OA4 | 40782 | 8 | $   11,443,511 | $    3,179,264 |
| Alternative Loan Trust 2007-OA4 | 40782 | 9 | $   13,077,444 | $    3,467,385 |
| Alternative Loan Trust 2007-OA4 | 40782 | 10 | $   16,955,124 | $    3,780,506 |
| Alternative Loan Trust 2007-OA4 | 40782 | 11 | $   18,593,680 | $    4,120,586 |
| Alternative Loan Trust 2007-OA4 | 40782 | 12 | $   21,253,642 | $    4,489,703 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 1 | $      299,800 | $    7,015,627 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 2 | $    1,860,071 | $    7,662,819 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 3 | $    3,294,072 | $    8,368,358 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 4 | $   11,208,529 | $    9,137,241 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 5 | $   15,952,584 | $    9,974,848 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 6 | $   26,732,902 | $   10,886,953 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 7 | $   41,253,367 | $   11,879,747 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 8 | $   41,421,650 | $   12,959,853 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 9 | $   44,920,449 | $   14,134,341 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 10 | $   53,575,411 | $   15,410,736 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 11 | $   65,836,028 | $   16,797,031 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 12 | $   69,896,152 | $   18,301,685 |



159

**COMPLAINT FOR DAMAGES**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Fremont Home Loan Trust 2006-D | 39741 | 1 | $ - | $ 8,287,486 |
| Fremont Home Loan Trust 2006-D | 39741 | 2 | $ 3,753,135 | $ 9,052,007 |
| Fremont Home Loan Trust 2006-D | 39741 | 3 | $ 6,212,973 | $ 9,885,452 |
| Fremont Home Loan Trust 2006-D | 39741 | 4 | $ 20,765,954 | $ 10,793,726 |
| Fremont Home Loan Trust 2006-D | 39741 | 5 | $ 36,520,130 | $ 11,783,182 |
| Fremont Home Loan Trust 2006-D | 39741 | 6 | $ 58,203,553 | $ 12,860,642 |
| Fremont Home Loan Trust 2006-D | 39741 | 7 | $ 81,810,437 | $ 14,033,419 |
| Fremont Home Loan Trust 2006-D | 39741 | 8 | $ 107,497,063 | $ 15,309,337 |
| Fremont Home Loan Trust 2006-D | 39741 | 9 | $ 118,828,404 | $ 16,696,747 |
| Fremont Home Loan Trust 2006-D | 39741 | 10 | $ 122,788,975 | $ 18,204,539 |
| Fremont Home Loan Trust 2006-D | 39741 | 11 | $ 120,044,997 | $ 19,842,154 |
| Fremont Home Loan Trust 2006-D | 39741 | 12 | $ 118,165,126 | $ 21,619,586 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 1 | $ - | $ 802,726 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 2 | $ - | $ 876,777 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 3 | $ - | $ 957,505 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 4 | $ - | $ 1,045,480 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 5 | $ 1,066,439 | $ 1,141,319 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 6 | $ 2,202,733 | $ 1,245,681 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 7 | $ 1,999,286 | $ 1,359,277 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 8 | $ 3,557,154 | $ 1,482,862 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 9 | $ 3,344,056 | $ 1,617,247 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 10 | $ 3,721,155 | $ 1,763,291 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 11 | $ 5,959,259 | $ 1,921,911 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 12 | $ 7,845,777 | $ 2,094,073 |



160

COMPLAINT FOR DAMAGES



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 1 | $ - | $ 5,494,102 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 2 | $ - | $ 6,000,933 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 3 | $ - | $ 6,553,457 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 4 | $ 1,358,347 | $ 7,155,588 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 5 | $ 4,282,540 | $ 7,811,537 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 6 | $ 6,429,963 | $ 8,525,828 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 7 | $ 8,637,375 | $ 9,303,308 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 8 | $ 12,644,175 | $ 10,149,165 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 9 | $ 14,733,906 | $ 11,068,933 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 10 | $ 18,092,798 | $ 12,068,508 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 11 | $ 25,912,308 | $ 13,154,148 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 12 | $ 35,241,988 | $ 14,332,479 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 1 | $ - | $ 2,096,434 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 2 | $ 138,000 | $ 2,289,830 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 3 | $ 548,083 | $ 2,500,662 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 4 | $ 1,970,334 | $ 2,730,422 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 5 | $ 2,555,411 | $ 2,980,719 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 6 | $ 5,789,933 | $ 3,253,277 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 7 | $ 8,674,548 | $ 3,549,947 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 8 | $ 10,980,315 | $ 3,872,708 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 9 | $ 15,810,760 | $ 4,223,673 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 10 | $ 17,540,976 | $ 4,605,090 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 11 | $ 21,894,799 | $ 5,019,347 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 12 | $ 27,470,029 | $ 5,468,973 |

**161**

**COMPLAINT FOR DAMAGES**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|-----------|----------------|-------|---------------------|------------------------|
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 1 | $ - | $ 6,553,966 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 2 | $ - | $ 7,158,570 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 3 | $ 890,051 | $ 7,817,680 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 4 | $ 8,357,534 | $ 8,535,968 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 5 | $ 12,840,288 | $ 9,318,456 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 6 | $ 32,937,163 | $ 10,170,540 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 7 | $ 47,453,779 | $ 11,098,004 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 8 | $ 77,814,855 | $ 12,107,034 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 9 | $ 111,775,253 | $ 13,204,235 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 10 | $ 146,284,958 | $ 14,396,637 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 11 | $ 170,179,730 | $ 15,691,707 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 12 | $ 184,780,135 | $ 17,097,348 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|-----------|----------------|-------|---------------------|------------------------|
| RALI Series 2006-QO6 Trust | 38111 | 1 | $ - | $ 2,048,115 |
| RALI Series 2006-QO6 Trust | 38111 | 2 | $ - | $ 2,237,054 |
| RALI Series 2006-QO6 Trust | 38111 | 3 | $ - | $ 2,443,026 |
| RALI Series 2006-QO6 Trust | 38111 | 4 | $ 282,856 | $ 2,667,491 |
| RALI Series 2006-QO6 Trust | 38111 | 5 | $ 1,873,291 | $ 2,912,019 |
| RALI Series 2006-QO6 Trust | 38111 | 6 | $ 4,017,608 | $ 3,178,295 |
| RALI Series 2006-QO6 Trust | 38111 | 7 | $ 6,135,151 | $ 3,468,128 |
| RALI Series 2006-QO6 Trust | 38111 | 8 | $ 8,393,609 | $ 3,783,450 |
| RALI Series 2006-QO6 Trust | 38111 | 9 | $ 9,394,454 | $ 4,126,325 |
| RALI Series 2006-QO6 Trust | 38111 | 10 | $ 9,244,872 | $ 4,498,951 |
| RALI Series 2006-QO6 Trust | 38111 | 11 | $ 11,623,527 | $ 4,903,661 |
| RALI Series 2006-QO6 Trust | 38111 | 12 | $ 14,913,305 | $ 5,342,924 |



**162**

**COMPLAINT FOR DAMAGES**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2006-QO10 Trust | 40250 | 1 | $ - | $ 1,895,544 |
| RALI Series 2006-QO10 Trust | 40250 | 2 | $ - | $ 2,070,408 |
| RALI Series 2006-QO10 Trust | 40250 | 3 | $ 157,654 | $ 2,261,037 |
| RALI Series 2006-QO10 Trust | 40250 | 4 | $ 397,104 | $ 2,468,780 |
| RALI Series 2006-QO10 Trust | 40250 | 5 | $ 1,774,851 | $ 2,695,092 |
| RALI Series 2006-QO10 Trust | 40250 | 6 | $ 4,416,022 | $ 2,941,533 |
| RALI Series 2006-QO10 Trust | 40250 | 7 | $ 5,707,788 | $ 3,209,775 |
| RALI Series 2006-QO10 Trust | 40250 | 8 | $ 7,455,454 | $ 3,501,607 |
| RALI Series 2006-QO10 Trust | 40250 | 9 | $ 12,901,438 | $ 3,818,941 |
| RALI Series 2006-QO10 Trust | 40250 | 10 | $ 14,654,350 | $ 4,163,808 |
| RALI Series 2006-QO10 Trust | 40250 | 11 | $ 19,022,850 | $ 4,538,370 |
| RALI Series 2006-QO10 Trust | 40250 | 12 | $ 18,742,305 | $ 4,944,911 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH2 Trust | 40843 | 1 | $ - | $ 469,637 |
| RALI Series 2007-QH2 Trust | 40843 | 2 | $ - | $ 512,961 |
| RALI Series 2007-QH2 Trust | 40843 | 3 | $ - | $ 560,191 |
| RALI Series 2007-QH2 Trust | 40843 | 4 | $ - | $ 611,661 |
| RALI Series 2007-QH2 Trust | 40843 | 5 | $ 1,242,652 | $ 667,732 |
| RALI Series 2007-QH2 Trust | 40843 | 6 | $ 1,246,124 | $ 728,790 |
| RALI Series 2007-QH2 Trust | 40843 | 7 | $ 1,592,534 | $ 795,249 |
| RALI Series 2007-QH2 Trust | 40843 | 8 | $ 1,936,176 | $ 867,553 |
| RALI Series 2007-QH2 Trust | 40843 | 9 | $ 4,191,926 | $ 946,175 |
| RALI Series 2007-QH2 Trust | 40843 | 10 | $ 5,000,625 | $ 1,031,619 |
| RALI Series 2007-QH2 Trust | 40843 | 11 | $ 6,300,968 | $ 1,124,419 |
| RALI Series 2007-QH2 Trust | 40843 | 12 | $ 8,182,211 | $ 1,225,143 |



163

COMPLAINT FOR DAMAGES



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH3 Trust | 40800 | 1 | $ - | $ 457,831 |
| RALI Series 2007-QH3 Trust | 40800 | 2 | $ - | $ 500,066 |
| RALI Series 2007-QH3 Trust | 40800 | 3 | $ - | $ 546,109 |
| RALI Series 2007-QH3 Trust | 40800 | 4 | $ - | $ 596,285 |
| RALI Series 2007-QH3 Trust | 40800 | 5 | $ - | $ 650,946 |
| RALI Series 2007-QH3 Trust | 40800 | 6 | $ 192,738 | $ 710,469 |
| RALI Series 2007-QH3 Trust | 40800 | 7 | $ 1,331,462 | $ 775,258 |
| RALI Series 2007-QH3 Trust | 40800 | 8 | $ 3,556,839 | $ 845,744 |
| RALI Series 2007-QH3 Trust | 40800 | 9 | $ 4,617,339 | $ 922,390 |
| RALI Series 2007-QH3 Trust | 40800 | 10 | $ 4,628,201 | $ 1,005,686 |
| RALI Series 2007-QH3 Trust | 40800 | 11 | $ 8,532,214 | $ 1,096,154 |
| RALI Series 2007-QH3 Trust | 40800 | 12 | $ 13,454,920 | $ 1,194,346 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH5 Trust | 41380 | 1 | $ - | $ 733,221 |
| RALI Series 2007-QH5 Trust | 41380 | 2 | $ - | $ 800,861 |
| RALI Series 2007-QH5 Trust | 41380 | 3 | $ - | $ 874,599 |
| RALI Series 2007-QH5 Trust | 41380 | 4 | $ 303,402 | $ 954,957 |
| RALI Series 2007-QH5 Trust | 41380 | 5 | $ 304,095 | $ 1,042,497 |
| RALI Series 2007-QH5 Trust | 41380 | 6 | $ 551,599 | $ 1,137,824 |
| RALI Series 2007-QH5 Trust | 41380 | 7 | $ 3,713,937 | $ 1,241,583 |
| RALI Series 2007-QH5 Trust | 41380 | 8 | $ 5,481,623 | $ 1,354,468 |
| RALI Series 2007-QH5 Trust | 41380 | 9 | $ 11,203,237 | $ 1,477,217 |
| RALI Series 2007-QH5 Trust | 41380 | 10 | $ 18,346,412 | $ 1,610,616 |
| RALI Series 2007-QH5 Trust | 41380 | 11 | $ 17,414,436 | $ 1,755,501 |
| RALI Series 2007-QH5 Trust | 41380 | 12 | $ 20,855,638 | $ 1,912,756 |

**164**

COMPLAINT FOR DAMAGES

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH6 Trust | 41979 | 1 | $ - | $ 917,466.16 |
| RALI Series 2007-QH6 Trust | 41979 | 2 | $ - | $ 1,002,102.50 |
| RALI Series 2007-QH6 Trust | 41979 | 3 | $ - | $ 1,094,369.02 |
| RALI Series 2007-QH6 Trust | 41979 | 4 | $ - | $ 1,194,919.49 |
| RALI Series 2007-QH6 Trust | 41979 | 5 | $ - | $ 1,304,457.20 |
| RALI Series 2007-QH6 Trust | 41979 | 6 | $ 1,463,785.37 | $ 1,423,737.41 |
| RALI Series 2007-QH6 Trust | 41979 | 7 | $ 4,291,610.29 | $ 1,553,569.73 |
| RALI Series 2007-QH6 Trust | 41979 | 8 | $ 10,720,429.00 | $ 1,694,820.25 |
| RALI Series 2007-QH6 Trust | 41979 | 9 | $ 17,886,574.54 | $ 1,848,413.43 |
| RALI Series 2007-QH6 Trust | 41979 | 10 | $ 18,896,190.65 | $ 2,015,333.56 |
| RALI Series 2007-QH6 Trust | 41979 | 11 | $ 24,666,980.73 | $ 2,196,625.78 |
| RALI Series 2007-QH6 Trust | 41979 | 12 | $ 27,779,856.42 | $ 2,393,396.45 |



**165**

Name & Address:
Terry W. Bird - SBN 49038
Bird, Marella, Boxer, Wolpert, Nessim, Drooks &
   Lincenberg, P.C.
1875 Century Park East, 23rd Floor'
Los Angeles, CA 90067

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, a Liquidating Agent of U.S. Central Federal
Credit Union [see attachment for complete caption]
                                    PLAINTIFF(S)

v.

GOLDMAN, SACHS & CO.; FREMONT
MORTGAGE SECURITIES CORP.;
[see attachment for complete caption]
                                    DEFENDANT(S).

CASE NUMBER

**LACV11-6521**GHK(RAx)

**SUMMONS**

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Terry W. Bird_____, whose address is _1875 Century Park East, 23rd Floor, Los Angeles, CA 90067, Tel: 310-201-2100_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___AUG - 9 2011___

By: ___**SUSANA P. BUSTAMANTE**___
          Deputy Clerk

          *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

1   <u>**ATTACHMENT TO SUMMONS**</u>

2

3   NATIONAL CREDIT UNION
    ADMINISTRATION BOARD, as
4   Liquidating Agent of U.S. Central Federal
    Credit Union and of Western Corporate
5   Federal Credit Union,

6
              Plaintiff,
7
         vs.
8
    GOLDMAN, SACHS & CO.; FREMONT
9   MORTGAGE SECURITIES CORP.; GS
    MORTGAGE SECURITIES CORP.; and
10  RESIDENTIAL ACCREDIT LOANS,
    INC.,
11
              Defendant.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COPY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| | |
|---|---|
| **(a) PLAINTIFFS** (Check box if you are representing yourself ☐) <br><br> [NA]TIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union and of Western Corporate Federal Credit Union | **DEFENDANTS** <br><br> GOLDMAN, SACHS & CO.; FREMONT MORTGAGE SECURITIES CORP.; GS MORTGAGE SECURITIES CORP.; AND RESIDENTIAL ACCREDIT LOANS, INC. |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br><br> Terry W. Bird - SBN 49038 <br> Bird, Marella, Boxer, Wolper, et al. <br> 1875 Century Park East, 23rd Floor <br> Los Angeles, CA 90067 <br> Tel: (310) 201-2100 <br> Fax: (310) 201-2110 | Attorneys (If Known) |

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

---

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT:** $ to be proven at trial

---

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

15 U.S.C. Sections 77k and 77(a)(2) violation of Securities Laws

---

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | ☐ 465 Other Immigration Actions | | ☐ 871 IRS - Third Party 26 USC 7609 |

**LACV11-6521**

**FOR OFFICE USE ONLY:** Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

VIII(a).  **IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  [X] No   [ ] Yes

If yes, list case number(s): _____

VIII(b).  **RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  [ ] No   [X] Yes

If yes, list case number(s):  LACV11-5887-MMM

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  [X]  A. Arise from the same or closely related transactions, happenings, or events; or

      [X]  B. Call for determination of the same or substantially related or similar questions of law and fact; or

      [X]  C. For other reasons would entail substantial duplication of labor if heard by different judges; or

      [ ]  D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

[ ] Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Virginia |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

[ ] Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Delaware, New York |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties

Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER):  _Terry W. Bird_   Date  August 8, 2011

Terry W. Bird

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George King and the assigned discovery Magistrate Judge is Paul Abrams.

The case number on all documents filed with the Court should read as follows:

## CV11- 6521 GHK (PLAx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.