# EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 11-cv-2340-RDR-KGS |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| RBS SECURITIES, INC., f/k/a GREENWICH CAPITAL MARKETS, INC., RBS ACCEPTANCE, INC., f/k/a GREENWICH CAPITAL ACCEPTANCE, INC., FINANCIAL ASSET SECURITIES CORP., FREMONT MORTGAGE SECURITIES CORP., RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC., INDYMAC MBS, INC., NOVASTAR MORTGAGE FUNDING CORP., NOMURA HOME EQUITY LOAN, INC., LARES ASSET SECURITIZATION, INC, and WACHOVIA MORTGAGE LOAN TRUST, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## **FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ........................................................................ 1

       Table 1 ......................................................................................................... 4

       Table 2 ......................................................................................................... 7

II.    PARTIES AND RELEVANT NON-PARTIES ............................................ 7

III.   JURISDICTION AND VENUE ................................................................. 11

IV.    MORTGAGE ORIGINATION AND SECURITIZATION PROCESS.......... 11

       Figure 1 ...................................................................................................... 14

V.     RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT .................... 14

       Table 3 ....................................................................................................... 15

VI.    U.S. CENTRAL'S PURCHASES ............................................................ 17

       Table 4 ....................................................................................................... 17

VII.   THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE
       UNDERWRITING GUIDELINES STATED IN THE OFFERING
       DOCUMENTS............................................................................................ 20

       A.     The Surge in Mortgage Delinquency and Defaults Shortly After the
              Offerings and the High OTD Practices of the Originators
              Demonstrates Systematic Disregard of Underwriting Standards......... 20

       Table 5 ....................................................................................................... 22

       Table 6 ....................................................................................................... 29

       B.     The Surge in Actual Versus Expected Cumulative Losses is Evidence
              of the Originators' Systematic Disregard of Underwriting Standards.... 29

       Figure 2 ...................................................................................................... 32

       C.     The Collapse of the Certificates' Credit Ratings is Evidence of
              Systematic Disregard of Underwriting Guidelines ............................... 42

       D.     Revelations Subsequent to the Offerings Show That the Originators
              Systematically Disregarded Underwriting Standards ........................... 42

1.    The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse ................................................................ 43

2.    American Home's Systematic Disregard of Underwriting Standards ...... 47

3.    BankUnited's Systematic Disregard of Underwriting Standards ............. 51

4.    Countrywide's Systematic Disregard of Underwriting Standards............ 54

5.    First Franklin's Systematic Disregard of Underwriting Standards........... 62

6.    First National Bank of Nevada's Systematic Disregard of Underwriting Standards................................................................................................. 64

7.    Fremont's Systematic Disregard of Underwriting Standards .................. 65

8.    Homecomings Financial Network's Systematic Disregard of Underwriting Standards................................................................................................. 67

9.    IndyMac Bank's Systematic Disregard of Underwriting Standards......... 69

10.   Option One Mortgage Corporation's Systematic Disregard of Underwriting Standards .......................................................................... 73

11.   NovaStar's Systematic Disregard of Underwriting Standards................. 75

12.   Silver State Mortgage's Systematic Disregard of Underwriting Standards ................................................................................................. 78

13.   WaMu's Systematic Disregard of Underwriting Standards..................... 79

VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT................................................................................... 88

A.    Offering Documents Misrepresented Weighted Average LTV Ratios and Weighed Average Combined LTV Ratios .................................... 89

B.    Untrue Statements in the Offering Documents About Owner-Occupancy Ratios ................................................................................. 92

C.    Other Untrue Statements in the Offering Documents........................... 94

D.    Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood to Repay the Mortgage Loan ....................................... 96

E.    Untrue Statements Concerning Reduced Documentation Programs .................. 114

F.    Untrue Statements Concerning Loan-to-Value Ratios ....................... 120

IX.     THE CLAIMS ARE TIMELY....................................................................... 123

         Table 7 ....................................................................................................... 125

X.      CLAIMS FOR RELIEF ............................................................................... 128

         COUNT ONE Section 11 of the Securities Act (FFMLT 2006-FF16, FHLT
                 2006-3, SVHE 2006-WF2, and SVHE 2007-OPT1)........................................ 128

         COUNT TWO Section 11 of the Securities Act (FHLT 2006-D)................................... 129

         COUNT THREE Section 11 of the Securities Act (HVMLT 2006-14,
                 HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HarborView
                 2006-SB1, and HVMLT 2006-6)......................................................................... 130

         COUNT FOUR Section 11 of the Securities Act (NHELI 2007-1) ............................... 132

         COUNT FIVE Section 11 of the Securities Act (RFMS2 2007-HSA2) ........................ 133

         COUNT SIX Section 11 of the Securities Act.................................................................. 134

         (INDX 2006-AR35 and INDX 2006-AR6 ) ..................................................................... 134

         COUNT SEVEN Section 11 of the Securities Act (LUM 2007-1) ................................ 136

         COUNT EIGHT Section 11 of the Securities Act (NHEL 2006-5) ............................... 137

         COUNT NINE Section 11 of the Securities Act (SAST 2006-3).................................... 138

         COUNT TEN Section 11 of the Securities Act (WMLT 2006-ALT1) ......................... 139

         COUNT ELEVEN Section 12(a)(2) of the Securities Act (FFMLT 2006-
                 FF16, FHLT 2006-3, FHLT 2006-D, HVMLT 2006-14, HVMLT
                 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-SB1,
                 RFMS2-HSA2, INDX 2006-AR35, INDX 2006-AR6, LUM 2007-1,
                 NHELI 2007-1, NHEL 2006-5, SVHE 2006-WF2, and SVHE 2007-
                 OPT1)........................................................................................................... 141

         COUNT TWELVE Violation of the Kansas Uniform Securities Act Kan. Stat.
                 Ann. § 17-12a509 (FFMLT 2006-FF16, FHLT 2006-3, FHLT 2006-D,
                 HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT
                 2006-10, HVMLT 2006-SB1, HVMLT 2006-6, RFMS2 2006-HSA2,
                 INDX 2006-AR35, INDX 2006-AR6, LUM 2006-2, LUM 2007-1,
                 NHELI 2007-1, NHEL 2006-5, SVHE 2006-WF2, and SVHE 2007-
                 OPT1)........................................................................................................... 142

Plaintiff, the National Credit Union Administration Board ("NCUA Board"), brings this action in its capacity as Liquidating Agent of U.S. Central Federal Credit Union ("U.S. Central") against RBS Securities, Inc. ("RBS"), (f/k/a Greenwich Capital Markets, Inc.) as underwriter and seller, and against RBS Acceptance, Inc. (f/k/a Greenwich Capital Acceptance, Inc.); Financial Asset Securities Corp.; Fremont Mortgage Securities Corp.[1]; Residential Funding Mortgage Securities II, Inc.; IndyMac MBS, Inc.; NovaStar Mortgage Funding Corp.; Nomura Home Equity Loan, Inc., Lares Asset Securitization, Inc.; and Wachovia Mortgage Loan Trust, LLC (collectively, the "Issuer Defendants") as issuers, of certain residential mortgage-backed securities ("RMBS") purchased by U.S. Central, and alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action arises out of the sale of RMBS to U.S. Central where RBS acted as underwriter and/or seller of the RMBS.

2.    Virtually all of the RMBS sold to U.S. Central were rated as triple-A (the same rating as U.S. Treasury bonds) at the time of issuance.

3.    The Issuer Defendants issued and RBS underwrote and sold the RMBS pursuant to registration statements, prospectuses, and/or prospectus supplements (collectively, the "Offering Documents"). These Offering Documents contained untrue statements of material fact or omitted to state material facts in violation of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2) ("Section 11" and "Section 12(a)(2)," respectively), and Article 5 of the Kansas Uniform Securities Act, Kan. Stat. Ann. § 17-12a509 ("Kansas Blue Sky law").

---

[1] NCUA Board includes dismissed claims in this Amended Complaint to preserve these claims for appeal. *See Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991); *Mooring Capital Fund, LLC v. Knight*, 388 Fed. Appx. 814 (10th Cir. 2010).

4.     The NCUA Board expressly disclaims and disavows any allegation in this Complaint that could be construed as alleging fraud.

5.     The Offering Documents described, among other things, the mortgage underwriting standards of the originators (the "Originators") who made the mortgages that were pooled and served as the collateral for the RMBS purchased by U.S. Central.

6.     The Offering Documents represented that the Originators adhered to the underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.  The Offering Documents also represented that the loan pools underlying the RMBS had certain characteristics, such as the weighted average loan-to-value ("LTV") ratio, weighted average combined loan-to-value ("CLTV") ratio, and the percentage of borrowers who occupied the purchased properties.

7.     In fact, the Originators had systematically abandoned the stated underwriting guidelines in the Offering Documents.  Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards in the Offering Documents, the RMBS were significantly riskier than represented in the Offering Documents.  The property values supporting the average LTV and CLTV ratios were routinely overvalued at the time of origination, rendering the average LTV and CLTV ratios inaccurate.  The Offering Documents also represented that a significant number of properties were owner-occupied, but in fact they were not.  Indeed, a material percentage of the borrowers whose mortgages comprised the RMBS were all but certain to become delinquent or default shortly after origination.  As a result, the RMBS were destined from inception to perform poorly.

8.     These untrue statements and omissions were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans

collateralizing the RMBS.  Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

9.      U.S. Central purchased the RMBS listed in Table 1 (*infra*) through initial offerings directly from RBS by means of prospectuses or oral communications.  Thus, RBS is liable for material untrue statements and omissions of fact under Section 11, Section 12(a)(2), and/or Article 5 of the Kansas Blue Sky law.

**Table 1**

| CUSIP[2] | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 320275AD2 | First Franklin Mortgage Loan Trust 2006-FF16 ("**FFMLT 2006-FF16**") | Financial Asset Securities Corp. | U.S. Central | 11/6/06 | $70,833,000 |
| 320275AE0 | First Franklin Mortgage Loan Trust 2006-FF16 | Financial Asset Securities Corp. | U.S. Central | 11/6/06 | $30,000,000 |
| 320275AF7 | First Franklin Mortgage Loan Trust 2006-FF16 | Financial Asset Securities Corp. | U.S. Central | 11/6/06 | $20,000,000 |
| 35729MAF4 | Fremont Home Loan Trust 2006-3 ("**FHLT 2006-3**") | Financial Asset Securities Corp. | U.S. Central | 9/29/06 | $75,830,000 |
| 35729VAE7 | Fremont Home Loan Trust 2006-D ("**FHLT 2006-D**") | Fremont Mortgage Securities Corporation | U.S. Central | 10/25/06 | $18,000,000 |
| 35729VAF4 | Fremont Home Loan Trust 2006-D | Fremont Mortgage Securities Corporation | U.S. Central | 10/25/06 | $32,000,000 |
| 41162CAD3 | HarborView 2006-10 ("**HVMLT 2006-10**") | RBS Acceptance, Inc. | U.S. Central | 10/18/06 | $50,000,000 |
| 41162CAE1 | HarborView 2006-10 | RBS Acceptance, Inc. | U.S. Central | 10/18/06 | $60,000,000 |

---

[2] "CUSIP" stands for "Committee on Uniform Securities Identification Procedures."  A CUSIP number is used to identify most securities, including certificates of RMBS. *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

| 41162GAA0 | HarborView 2006-11 ("**HVMLT 2006-11**") | RBS Acceptance, Inc. | U.S. Central | 10/27/06 | $100,000,000 |
| 41162DAE9 | HarborView 2006-12 ("**HVMLT 2006-12**") | RBS Acceptance, Inc. | U.S. Central | 10/19/06 | $182,700,000 |
| 41162DAH2 | HarborView 2006-12 | RBS Acceptance, Inc. | U.S. Central | 10/19/06 | $200,000,000 |
| 41162NAE7 | HarborView 2006-14 ("**HVMLT 2006-14**") | RBS Acceptance, Inc. | U.S. Central | 12/5/06 | $50,000,000 |
| 41162BAB9 | HarborView 2006-SB1 ("**HVMLT 2006-SB1**") | RBS Acceptance, Inc. | U.S. Central | 9/25/06 | $54,467,000 |
| 43710RAG6 | Home Equity Loan Trust 2007-HSA2 ("**RFMS2-HSA2**") | Residential Funding Mortgage Securities II, Inc. | U.S. Central | 4/24/07 | $20,000,000 |
| 45667SAA5 | IndyMac INDX Mortgage Loan Trust 2006-AR35 ("**INDX 2006-AR35**") | IndyMac MBS, Inc. | U.S. Central | 11/28/06 | $75,000,000 |
| 456612AC4 | IndyMac INDX Mortgage Loan Trust 2006-AR6 ("**INDX 2006-AR6**") | IndyMac MBS, Inc. | U.S. Central | 4/24/06 | $125,000,000 |
| 550279BC6 | Luminent Mortgage Trust 2006-2 ("**LUM 2006-2**") | RBS Acceptance, Inc. | U.S. Central | 2/14/06 | $52,598,000 |
| 55028CAA3 | Luminent Mortgage Trust 2007-1 ("**LUM 2007-1**") | Lares Asset Securitization, Inc. | U.S. Central | 1/23/07 | $50,000,000 |

| 65537KAY6 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 ("**NHELI 2007-1**") | Nomura Home Equity Loan, Inc. | U.S. Central | 1/25/07 | $50,000,000 |
|-----------|------------------------------------------------------------------------------------------|-------------------------------|--------------|---------|-------------|
| 66988YAE2 | NovaStar Mortgage Funding Trust, Series 2006-5 ("**NHEL 2006-5**") | NovaStar Mortgage Funding Corporation | U.S. Central | 9/22/06 | $15,169,000 |
| 66988YAF9 | NovaStar Mortgage Funding Trust, Series 2006-5 | NovaStar Mortgage Funding Corporation | U.S. Central | 9/22/06 | $63,050,000 |
| 66988YAG7 | NovaStar Mortgage Funding Trust, Series 2006-5 | NovaStar Mortgage Funding Corporation | U.S. Central | 9/22/06 | $34,300,000 |
| 83612MAF4 | Soundview Home Loan Trust 2006-WF2 ("**SVHE 2006-WF2**") | Financial Asset Securities Corp. | U.S. Central | 12/13/06 | $25,000,000 |
| 83612TAD4 | Soundview Home Loan Trust 2007-OPT1 ("**SVHE 2007-OPT1**") | Financial Asset Securities Corp. | U.S. Central | 5/4/07 | $100,000,000 |

10.     U.S. Central purchased each RMBS listed in Table 2 (*infra*) pursuant to and traceable to registration statements containing untrue statements of material fact or that omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  RBS was an underwriter for each of the securities listed in Table 2 and is therefore liable under Section 11.  RBS acted as seller for the HarborView 2006-6 and HarborView 2006-12 Certificates listed in Table 2 (*infra*).  RBS is therefore liable under the Kansas Blue Sky law for any

misrepresentations made in connection with the sale of the HarborView 2006-6 and HarborView 2006-12 Certificates listed below.

**Table 2**

| CUSIP | ISSUING ENTITY | SELLER | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|---|
| 41161UAD4 | HarborView 2006-6 ("**HVMLT 2006-6**") | RBS | RBS Acceptance, Inc. | U.S. Central | 9/19/06 | $12,540,000 |
| 41161UAF9 | HarborView 2006-6 | RBS | RBS Acceptance, Inc. | U.S. Central | 9/19/06 | $23,065,000 |
| 41162DAH2 | HarborView 2006-12 | RBS | RBS Acceptance, Inc. | U.S. Central | 5/16/07 | $33,580,000 |
| 80556AAD9 | Saxon Asset Securities Trust 2006-3 ("**SAST 2006-3**") | | Saxon Asset Securities Company | U.S. Central | 9/28/06 | $25,000,000 |
| 92978GAB5 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 ("**WMLT 2006-ALT1**") | | Wachovia Mortgage Loan Trust, LLC | U.S. Central | 11/30/06 | $43,995,000 |

11.     The RMBS U.S. Central purchased suffered a significant drop in market value. U.S. Central has suffered significant losses from those RMBS' purchased despite the NCUA Board's mitigation efforts.

## II.     PARTIES AND RELEVANT NON-PARTIES

12.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and

regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA is under the management of the NCUA Board. *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

13.     U.S. Central was a federally-chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas. As a corporate credit union, U.S. Central provided investment and financial services to other corporate credit unions.

14.     The NCUA Board placed U.S. Central into conservatorship on March 20, 2009, pursuant to its authority under the FCU Act, 12 U.S.C. § 1786(h). On October 1, 2010, the NCUA Board placed U.S. Central into involuntary liquidation pursuant to 12 U.S.C. §§ 1766(a), 1787(a)(1)(A), and appointed itself Liquidating Agent. Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board, as Liquidating Agent, has succeeded to all rights, titles, powers, and privileges of U.S. Central and of any member, account holder, officer, or director of U.S. Central, with respect to U.S. Central and its assets, including the right to bring the claims asserted by them in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of U.S. Central, *see* 12 U.S.C. § 1786(h)(8), and succeeds to all rights, titles, powers, and privileges of U.S. Central, *see* 12 U.S.C. § 1787(b)(2)(A). The NCUA Board may also sue on U.S. Central's behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

15.     Prior to being placed into conservatorship and involuntary liquidation, U.S. Central was the largest corporate credit union in the United States.

16.     Any recoveries from this legal action will reduce the total losses resulting from the failure of U.S. Central.  Losses from U.S. Central's failure must be paid from the NCUSIF or the TCCUSF.  Expenditures from these funds must be repaid through assessments against all federally-insured credit unions.  Because of the expenditures resulting from U.S. Central's failure federally-insured credit unions will experience larger assessments, thereby reducing federally-insured credit unions' net worth.  Reductions in net worth can adversely affect the dividends that individual members of credit unions receive for the savings on deposit at their credit union.  Reductions in net worth can also make loans for home mortgages and automobile purchases more expensive and difficult to obtain.  Any recoveries from this action will help to reduce the amount of any future assessments on federally-insured credit unions throughout the system, reducing the negative impact on federally-insured credit unions' net worth.  Recoveries from this action will benefit credit unions and their individual members by increasing net worth resulting in more efficient and lower-cost lending practices.

17.     Defendant RBS is a United States Securities and Exchange Commission ("SEC") registered broker-dealer.  RBS acted as an underwriter of all 29 Certificates that are the subject of this Complaint and as seller of 26 of the Certificates that are listed in Tables 1 and 2 (*supra*).  RBS is a Delaware corporation with its principal place of business in Connecticut.  Prior to 2009, RBS was known as "RBS Greenwich Capital Markets, Inc."

18.     RBS Acceptance, Inc. is the depositor and issuer of the HarborView 2006-14, HarborView 2006-12, HarborView 2006-11, HarborView 2006-10, HarborView 2006-6, HarborView 2006-SB1, and the Luminent Mortgage Trust 2006-2 offerings.  RBS Acceptance, Inc. is a Delaware corporation with its principal place of business in Maryland.  RBS Acceptance, Inc. is a subsidiary of RBS.  Prior to 2009, RBS Acceptance, Inc. was known as "Greenwich Capital Acceptance, Inc."

9

19.     Financial Asset Securities Corp. is the depositor and issuer of the First Franklin Mortgage Loan Trust 2006-FF16, Soundview Home Loan Trust 2006-WF2, and Soundview Home Loan Trust 2007-OPT1 offerings.  Financial Asset Securities Corp. is a Delaware corporation with its principal place of business in Connecticut.  Financial Asset Securities Corp. is a subsidiary of RBS.

20.     Residential Funding Mortgage Securities II, Inc. is the depositor and issuer of the Home Equity Loan Trust 2007-HSA2 offering.  Residential Funding Mortgage Securities II, Inc. is a Delaware corporation with its principal place of business in Minnesota.

21.     IndyMac MBS, Inc. is the depositor and issuer of the IndyMac INDX Mortgage Loan Trust 2006-AR35 and IndyMac INDX Mortgage Loan Trust 2006-AR6 offerings.  IndyMac MBS, Inc. is a Delaware corporation with its principal place of business in California.

22.     Lares Asset Securitization, Inc. is the depositor and issuer of the Luminent Mortgage Trust 2006-2 and Luminent Mortgage Trust 2007-1 offerings.  Lares Asset Securitization, Inc. is a Delaware corporation with its principal place of business in California.

23.     Nomura Home Equity Loan, Inc. is the depositor and issuer of the Nomura Home Equity Loan, Inc. Home Equity Loan Trust, Series 2007-1 offering.  Nomura Home Equity Loan, Inc. is a Delaware corporation with its principal place of business in New York.

24.     NovaStar Mortgage Funding Corp. is the depositor and issuer of NovaStar Mortgage Funding Trust, Series 2006-5 offering.  NovaStar Mortgage Funding Corp. is a Delaware corporation with its principal place of business in Missouri.

25.     Wachovia Mortgage Loan Trust, LLC is the depositor and issuer of the Wachovia Mortgage Loan Trust, Series 2006-ALT1 offering.  Wachovia Mortgage Loan Trust, LLC is a Delaware corporation with its principal place of business in North Carolina.

### III.      JURISDICTION AND VENUE

26.      This Court has subject matter jurisdiction pursuant to:  (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; and (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

27.      Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a), because many of the transactions at issue occurred in Lenexa, Kansas, the headquarters of U.S. Central.  This Court has personal jurisdiction over each Defendant because they offered/sold the RMBS at issue in this Complaint to U.S. Central in this District; prepared/disseminated the Offering Documents containing untrue statements or omissions of material fact as alleged herein to U.S. Central in this District; and/or are residents of/conduct business in this District.

### IV.      MORTGAGE ORIGINATION AND SECURITIZATION PROCESS

28.      RMBS are asset-backed securities.  A pool or pools of residential mortgages are the assets that back or collateralize the RMBS certificates purchased by investors.

29.      Because residential mortgages are the assets collateralizing RMBS, the origination of the mortgages commences the process that leads to the creation of RMBS.  Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting.  The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property. The underwriting guidelines consist of a variety of metrics, including:  the borrower's debt, income, savings, credit history, and credit score; whether the property will be owner-occupied; and the LTV

ratio, among other things.  Underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

30.     Historically, most originators made mortgage loans to borrowers and held the loans on their own books for the duration of the loan.  Originators profited as they collected monthly principal and interest payments directly from the borrower.  Originators also retained the risk that the borrower would default on the loan.

31.     This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively government sponsored enterprises "GSEs") began purchasing "conforming loans" or "prime"—so-called because they conformed to guidelines set by the GSEs.  The GSEs either sponsored the RMBS issuance (Ginnie Mae) or issued the RMBS themselves after purchasing the conforming loans (Fannie Mae and Freddie Mac).  The GSEs securitized the mortgage loans by grouping mortgages into "loan pools," then repackaging the loan pools into RMBS where investors received the cash flow from the mortgage payments.  The GSEs guarantee the monthly cash flow to investors on the agency RMBS.

32.     More recently, originators, usually working with investment banks, began securitizing "non-conforming loans"—loans originated (in theory) according to private guidelines adopted by the originators.  Non-conforming loans are also known as "nonprime" or "private label" loans and include "Alt-A" and "subprime" loans.  Despite the non-conforming nature of the underlying mortgages, the securitizers of such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

33.     All of the loans collateralizing the RMBS at issue in this Complaint are private label mortgage loans.

34.    The issuance of RMBS collateralized by private label loans peaked in 2006.  The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution as RMBS.  This practice is known as "originate-to-distribute" ("OTD").

35.    Securitization begins with a "sponsor" who purchases loans in bulk from one or more originators.  The sponsor transfers title of the loans to an entity called the "depositor."

36.    The depositor transfers the loans to a trust called the "issuing entity."

37.    The issuing entity issues "notes" and/or "certificates" representing an ownership interest in the cash flow from the mortgage pool underlying the securities (i.e., the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

38.    The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

39.    One or more "underwriters"—like RBS—then sell the notes or certificates to investors.

40.    A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors.

41.    Figure 1 (*infra*) depicts a typical securitization process.

**Figure 1**



42.     Because securitization, as a practical matter, shifts the risk of default on the mortgage loans from the originator of the loan to the RMBS investor, the originator's adherence to mortgage underwriting guidelines as represented in the offering documents with respect to the underlying mortgage loans is critical to the investors' ability to evaluate the expected performance of the RMBS.

## V.     RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT

43.     RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of risk.  RMBS certificates denote the particular tranches of the security purchased by the investor.  Each tranche represents a different level of risk.

44.     The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.  Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's"), are the credit ratings agencies that assigned credit ratings to the RMBS in this case.

45.     The credit rating agencies use letter-grade rating systems as shown in Table 3 (*infra*).

**Table 3**
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | **Prime (Maximum Safety)** | |
| Aa1 Aa2 Aa3 | AA+ AA AA- | **High Grade, High Quality** | **INVESTMENT GRADE** |
| A1 A2 A3 | A+ A A- | **Upper Medium Grade** | |
| Baa1 Baa2 Baa3 | BBB+ BBB BBB- | **Medium Grade** | |
| Ba2 Ba3 | BB BB- | **Non-Investment Grade, or Speculative** | |
| B1 B2 B3 | B+ B B- | **Highly Speculative, or Substantial Risk** | **SPECULATIVE GRADE** |
| Caa2 Caa3 | CCC+ | **In Poor Standing** | |
| Ca | CCC CCC- | **Extremely Speculative** | |
| C | - | **May be in Default** | |
| - | D | **Default** | |

46.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk."  Moody's Investors Service, Inc., *Moody's Rating Symbols & Definitions* at 8 (June 2009), *available at* http://v2.moodys.com/cust/content/Content.ashx?source=StaticContent/Free%20Pages/Product

s%20and%20Services/Downloadable%20Files/Rating_Symbols_Definitions.pdf.    Likewise, S&P

rates a product "AAA" when the "obligor's capacity to meet its financial commitment on the

obligation is extremely strong."    Standard & Poor's, *Ratings Definitions*, *available at*

http://www.standardandpoors.com/ratings/articles/en/us/?assetID=1245303711350.

47.    In fact, RMBS could not be sold unless they received one of the highest "investment

grade" ratings on most tranches from one or more credit rating agencies, because the primary

market for RMBS is institutional investors, such as U.S. Central, which are generally limited to

buying only securities with the highest credit ratings.  *See, e.g.*, NCUA Credit Risk Management Rule,

12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities rated

below AA-); *but see, e.g.*, Removing References to Credit Ratings in Regulations; Proposing

Alternatives to the Use of Credit Ratings, 76 Fed. Reg. 11,164 (proposed Mar. 1, 2011) (to be

codified at 12 C.F.R. pts. 703, 704, 709, and 742) (the NCUA's proposed rule eliminating the use of

credit ratings for guidance in investment decisions by credit unions).

48.    While the pool of mortgages underlying the RMBS may not have been sufficient to

warrant a triple-A credit rating, the use of various forms of "credit enhancement" were used to

obtain a triple-A rating on the higher tranches of RMBS.

49.    One form of credit enhancement is "structural subordination."  The tranches, and

their risk characteristics relative to each other, are often analogized to a waterfall.  Investors in the

higher or "senior" tranches are the first to be paid as income is generated when borrowers make

their monthly payments.  After investors in the most senior tranche are paid, investors in the next

subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

50.    In the event mortgages in the pool default, the resulting loss is absorbed by the

subordinate tranches first.

51.     Accordingly, senior tranches are deemed less risky than subordinate tranches and therefore receive higher credit ratings.

52.     Another form of credit enhancement is overcollateralization.  Overcollateralization is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security. The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

53.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."  "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.  Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.  Letters of credit can also be purchased to cover defaults.  Finally, some RMBS are "cross-collateralized," *i.e.*, when a tranche in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI.   U.S. CENTRAL'S PURCHASES

54.     U.S. Central purchased only the highest rated tranches of RMBS.  All but four were rated triple-A at the time of issuance.  These securities have since been downgraded below investment grade just a few years after they were sold (*see infra* Table 4).

**Table 4**

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| **CUSIP** | **RMBS** | **BUYER** | **ORIGINAL RATING S&P** | **ORIGINAL RATING MOODY'S** | **RECENT RATING S&P** | **RECENT RATING MOODY'S** |
| 320275AF7 | FFMLT 2006-FF16 | U.S. Central | AA+ 12/5/2006 | Aa1 12/12/2006 | D 8/24/2011 | C 3/19/2009 |

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | RMBS | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 320275AD2 | FFMLT 2006-FF16 | U.S. Central | AAA 12/5/2006 | Aaa 11/30/2006 | CCC 8/4/2009 | Caa3 3/19/2009 |
| 320275AE0 | FFMLT 2006-FF16 | U.S. Central | AAA 12/5/2006 | Aaa 11/30/2006 | CCC 2/19/2009 | Caa3 3/19/2009 |
| 35729MAF4 | FHLT 2006-3 | U.S. Central | AA+ 10/24/2006 | Aa1 10/30/2006 | D 10/21/2011 | C 10/16/2008 |
| 35729VAF4 | FHLT 2006-D | U.S. Central | AA+ 11/16/2006 | Aa1 11/10/2006 | D 2/25/2011 | C 3/17/2009 |
| 35729VAE7 | FHLT 2006-D | U.S. Central | AAA 11/16/2006 | Aaa 11/3/2006 | CCC 8/4/2009 | Ca 4/29/2010 |
| 41162CAD3 | HVMLT 2006-10 | U.S. Central | AAA 11/22/2006 | Aaa 11/21/2006 | CC 5/11/2011 | C 12/05/2010 |
| 41162CAE1 | HVMLT 2006-10 | U.S. Central | AAA 12/22/2006 | Aaa 12/21/2006 | AA+ 11/08/2010 | Aa3 2/20/2009 |
| 41162GAA0 | HVMLT 2006-11 | U.S. Central | AAA 12/22/2006 | Aaa 12/20/2006 | CCC 2/16/2010 | Caa3 11/19/2010 |
| 41162DAE9 | HVMLT 2006-12 | U.S. Central | AAA 12/19/2006 | Aaa 12/13/2006 | AA- 1/12/2012 | Aa3 11/23/2008 |
| 41162DAH2 | HVMLT 2006-12 | U.S. Central | AAA 12/19/2006 | Aaa 12/13/2006 | AA- 1/12/2012 | Aa3 11/23/2008 |
| 41162NAE7 | HVMLT 2006-14 | U.S. Central | AAA 12/27/2006 | Aaa 12/22/2006 | D 6/23/2010 | C 11/19/2010 |
| 41162BAB9 | HVMLT 2006-SB1 | U.S. Central | AAA 11/10/2006 | Aaa 11/2/2006 | D 11/25/2009 | C 12/5/2010 |
| 43710RAG6 | RFMS2 2007-HSA2 | U.S. Central | AAA 5/1/2007 | Aaa 5/8/2007 | B 1/14/2011 | B3 2/18/2009 |
| 45667SAA5 | INDX 2006-AR35 | U.S. Central | AAA 12/1/2006 | Aaa 11/29/2006 | D 3/18/2011 | Caa3 1/29/2009 |
| 456612AC4 | INDX 2006-AR6 | U.S. Central | AAA 5/2/2006 | Aaa 5/24/2006 | CCC 8/14/2009 | Caa2 2/20/2009 |
| 550279BC6 | LUM 2006-2 | U.S. Central | AAA 2/28/2006 | Aaa 3/6/2006 | AA+ 11/08/2010 | Aa3 11/23/2008 |
| 55028CAA3 | LUM 2007-1 | U.S. Central | AAA 2/1/2007 | Aaa 1/25/2007 | CCC 7/24/2009 | Caa2 12/14/2010 |

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | RMBS | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 65537KAY6 | NHELI 2007-1 | U.S. Central | AAA 2/2/2007 | Aaa 1/31/2007 | CCC 7/24/2009 | Ca 9/2/2010 |
| 66988YAF9 | NHEL 2006-5 | U.S. Central | AA+ 10/3/2006 | Aa1 9/28/2006 | D 3/18/2010 | C 3/13/2009 |
| 66988YAG7 | NHEL 2006-5 | U.S. Central | AA 10/3/2006 | Aa2 9/28/2006 | D 10/22/2010 | WR 10/30/2008 |
| 66988YAE2 | NHEL 2006-5 | U.S. Central | AAA 10/3/2006 | Aaa 9/28/2006 | CCC 8/4/2009 | Ca 3/13/2009 |
| 83612MAF4 | SVHE 2006-WF2 | U.S. Central | AA+ 12/28/2006 | Aa1 1/3/2007 | CCC 8/4/2009 | Ca 6/17/2010 |
| 83612TAD4 | SVHE 2007-OPT1 | U.S. Central | AAA 5/18/2007 | Aaa 5/15/2007 | CCC 8/11/2011 | Ca 6/17/2010 |
| 41161UAD4 | HVMLT 2006-6 | U.S. Central | AAA 7/6/2006 | | D 6/23/2010 | |
| 41161UAF9 | HVMLT 2006-6 | U.S. Central | AAA 7/6/2006 | | D 6/23/2010 | |
| 80556AAD9 | SAST 2006-3 | U.S. Central | AAA 10/13/2006 | Aaa 10/10/2006 | CCC 8/4/2009 | Caa3 7/16/2010 |
| 92978GAB5 | WMLT 2006-ALT1 | U.S. Central | AAA 1/3/2007 | Aaa 12/27/2006 | CCC 2/16/2010 | Caa3 11/5/2010 |

55.     At the time of purchase, U.S. Central was not aware of the untrue statements or omissions of material facts in the Offering Documents of the RMBS.  If U.S. Central had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering Documents—U.S. Central would not have purchased the certificates.

56.     The securities' substantial loss of market value has injured U.S. Central and the NCUA Board.

**VII.   THE   ORIGINATORS   SYSTEMATICALLY   DISREGARDED   THE UNDERWRITING   GUIDELINES   STATED   IN   THE   OFFERING DOCUMENTS**

57.      The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages. The loan underwriting guidelines ensure that the borrower has the means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of reasonably anticipated defaults on underlying mortgage loans.

58.      With respect to RMBS collateralized by loans written by originators who systematically disregarded their stated underwriting standards, the following pattern is present:

     a.      a surge in borrower delinquencies and defaults on the mortgages in the pools (*see infra* Section I.A and Table 5);

     b.      actual losses to the underlying mortgage pools within the first 12 months after the offerings exceeded expected losses (*see infra* Section VII.B and Figure 2); and

     c.      a high percentage of the underlying mortgage loans were originated for distribution, as explained below (*see infra* Table 6 and accompanying allegations).

59.      These factors support a finding that the Originators failed to originate the mortgages in accordance with the underwriting standards stated in the Offering Documents.

60.      This conclusion is further corroborated by reports that the Originators who contributed mortgage loans to the RMBS at issue in this Complaint abandoned the underwriting standards described in the RMBS Offering Documents (*see infra* Section VII.D).

     **A.      The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrates Systematic Disregard of Underwriting Standards**

61.     Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after the payment is due.  Residential mortgages where no payment has been received for more than 90 days (or three payment cycles) are generally considered to be in default.

62.     The surge in delinquencies and defaults following the offerings evidences the systematic flaws in the Originators' underwriting process (*see infra* Table 5).

63.     The Offering Documents reported zero or near zero delinquencies and defaults at the time of the offerings (*see infra* Table 5).

64.     The pools of mortgages collateralizing the RMBS experienced delinquency and default rates as high as 7.23% within the first three months, up to 17.55% at six months, and reaching 35.42% at one year (s*ee infra* Table 5).

65.     As of July 2012, nearly half (40%) of the mortgage collateral across all of the RMBS that U.S. Central purchased was in delinquency, bankruptcy, foreclosure, or was real estate owned ("REO"), which means that a bank or lending institution owns the property after a failed sale at a foreclosure auction (*see infra* Table 5).

66.     Table 5 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates on the RMBS as to which claims are asserted in this Complaint.  The data presented in the last five columns are from the trustee reports (dates and page references as indicated in the parentheticals). The shadowed rows reflect the group of mortgages in the pool underlying the specific tranches purchased by U.S. Central; however, some trustee reports include only the aggregate data.  For RMBS with multiple groups, aggregate information on all the groups is included because the tranches are cross-collateralized.

**Table 5**

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | FFMLT 2006-FF16 Aggregate (P.S. dated November 16, 2006) | Zero (S-16) | .29% (Dec., p.10) | 4.77% (Feb., p.10) | 8.46% (May, p.10) | 22.65% (Nov., p.11) | 55.47% (July 2012, p.12) |
| 320275AF7 | FFMLT 2006-FF16 Group 1 *Class M-1 in Group 1 and 2 (S-86) | Zero (S-16) | .05% (Dec., p.11) | 3.00% (Feb., p.11) | 5.31% (May, p.11) | 17.32% (Nov., p.12) | 51.07% (July 2012, p.17) |
| 320275AD2 320275AE0 320275AF7 | FFMLT 2006-FF16 Group 2 *Class II-A3 and II-A4 in Group 2 (S-6) *Class M-1 in Group 1 and 2 (S-86) | Zero (S-16) | .41% (Dec., p.12) | 5.63% (Feb., p.12) | 10.02% (May, p.12) | 25.29% (Nov., p.13) | 58.05% (July 2012, p.23) |
| | FHLT 2006-3 Aggregate (P.S. dated September 29, 2006) | Except with respect to one Initial Mortgage Loan, none of the Initial Mortgage Loans are 30-59 days delinquent (S-16) | .24% (Oct., p.11) | 3.95% (Dec., p.12) | 11.55% (Mar., p.12) | 27.44% (Sept., p.12) | 55.67% (July 2012, p.11) |
| 35729MAF4 | FHLT 2006-3 Group 1 *Class M1 in Groups 1 and 2 (S-92) | Except with respect to one Initial Mortgage Loan, none of the Initial Mortgage Loans are 30-59 days delinquent (S-16) | .05% (Oct., p.12) | 2.63% (Dec., p.13) | 8.73% (Mar., p.13) | 22.02% (Sept., p.13) | 52.83% (July 2012, p.16) |
| 35729MAF4 | FHLT 2006-3 Group 2 *Class M1 in Groups 1 and 2 (S-92) | Except with respect to one Initial Mortgage Loan, none of the Initial Mortgage Loans are 30-59 days delinquent (S-16) | .37% (Oct., p.13) | 4.89% (Dec., p.14) | 13.55% (Mar., p.14) | 31.12% (Sept., p.14) | 58.07% (July 2012, p.22) |
| | FHLT 2006-D Aggregate (P.S. dated November 1, 2006) | Zero (19) | .79% (Dec., p.10) | 5.21% (Feb., p.10) | 12.45% (May, p.10) | 26.17% (Nov., p.10) | 43.74% (July 2012, p.9) |
| 35729VAF4 | FHLT 2006-D Group 1 *Class M1 in all Loan Groups (3) | Zero (19) | 1% (Dec., p.12) | 4.42% (Feb., p.12) | 10.19% (May, p.12) | 24.12% (Nov., p.12) | 46.58% (July 2012, p.10) |
| 35729VAE7 35729VAF4 | FHLT 2006-D Group 2 *The Class 2-A-4 in Group 2 (3) *Class M1 in all Loan Groups (3) | Zero (19) | .52% (Dec., p.12) | 1.59% (Feb., p.12) | 4.03% (May, p.12) | 9.84% (Nov., p.12) | 31.52% (July 2012, p.10) |

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 35729VAF4 | FHLT 2006-D Group 3 *Class M1 in all Loan Group (3) | Zero (19) | .78% (Dec., p.13) | 7.23% (Feb., p.13) | 17.55% (May, p.13) | 35.42% (Nov., p.13) | 51.65% (July 2012, p.11) |
| 35729VAF4 | FHLT 2006-D Group 4 *Class M1 in all Loan Groups (3) | Zero (19) | .51% (Dec., p.13) | 4.86% (Feb., p.13) | 11.47% (May, p.13) | 19.17% (Nov., p.13) | 31.52% (July 2012, p.11) |
|  | HVMLT 2006-10 Aggregate (P.S. dated November 10, 2006) | .15% of the mortgage loans were 30-59 days delinquent (S-27) | .14% (Nov., p.10) | .67% (Jan., p.10) | 1.12% (Apr., p.10) | 5.47% (Apr., p.10) | 20.07% (July 2012, p.10) |
|  | HVMLT 2006-10 Group 1 | .15% of the mortgage loans were 30-59 days delinquent (S-27) | .07% (Nov., p.11) | .55% (Jan., p.11) | .56% (Apr., p.11) | 5.38% (Apr., p.11) | 30.09% (July 2012, p.11) |
| 41162CAD3 41162CAE1 | HVMLT 2006-10 Group 2 *Class 2A-1B and 2A-1C in Group 2 (S-6) | .15% of the mortgage loans were 30-59 days delinquent (S-27) | .19% (Nov., p.11) | .74% (Jan., p.11) | 1.44% (Apr., p.11) | 5.52% (Apr., p.11) | 25.39% (July 2012, p.11) |
| 41162GAA0 | HVMLT 2006-11 (P.S. dated November 10, 2006) | Zero (S-20) | .38% (Nov., p.9) | 1.46% (Jan., p.9) | 2.44% (Apr., p.9) | 9.07% (Apr., p.9) | 48.79% (July 2012, p.9) |
|  | HVMLT 2006-12 Aggregate (P.S. dated December 11, 2006) | Zero (S-28) | 0% (Dec., p.11) | .57% (Feb., p.11) | 1.41% (May, p.10) | 7.37% (Nov., p.10) | 55.11% (July 2012, p.10) |
|  | HVMLT 2006-12 Group 1 | Zero (S-28) | 0.00% (Dec., p.12) | .46% (Feb., p.13) | 1.01% (May, p.11) | 6.88% (Nov., p.11) | 53.79% (July 2012, p.11) |
| 41162DAE9 41162DAH2 | HVMLT 2006-12 Group 2 *Class 2A-1B, 2A-2B and 2A-2C in Group 2 (S-7) | Zero (S-28) | 0% (Dec., p.12) | .61% (Feb., p.13) | 1.53% (May, p.11) | 7.55% (Nov., p.11) | 55.59% (July 2012, p.11) |
|  | HVMLT 2006-14 Aggregate (December 20, 2006) | Zero (S-26) | .17% (Jan., p.11) | .78% (Mar., p.10) | 1.97% (June, p.10) | 8.61% (Dec., p.10) | 35.85% (July 2012, p.10) |

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | HVMLT 2006-14 Group 1 | Zero (S-26) | .20% (Jan., p.13) | .39% (Mar., p.12) | .74% (June, p.12) | 6.45% (Dec., p.12) | 33.93% (July 2012, p.11) |
| 41162NAE7 | HVMLT 2006-14 Group 2 *Class 2A-1B, 2A-1C and 2A-2C in Group 2 (S-7) | Zero (S-26) | .16% (Jan., p.13) | .90% (Mar., p.12) | 2.36% (June, p.12) | 9.29% (Dec., p.12) | 36.46% (July 2012, p.12) |
| 41162BAB9 | HVMLT 2006-SB1 (P.S. dated October 30, 2006) | Zero (S-22) | 0% (Nov., p.11) | .39% (Jan., p.10) | 1.11% (Apr., p.10) | 4.87% (Oct., p.10) | 25.54% (July 2012, p.10) |
| 43710RAG6 | RFMS2 2007-HSA2 (P.S. dated April 25, 2007) | Zero (S-35) | .41% (May, p.3) | 3.85% (July, p.3) | 8.69% (Oct., p.3) | 13.48% (Apr., p.3) | 13.03% (Oct. 2009, p.3) |
| | INDX 2006-AR6 Aggregate (P.S. dated April 27, 2006) | Zero (S-32) | 2.16% (May, p.10) | 2.20% (July, p.10) | 2.89% (Oct., p.10) | 5.39% (Apr., p.10) | 37.84% (July 2012, p.10) |
| | INDX 2006-AR6 Group 1 | Zero (S-32) | 1.81% (May, p.11) | 2.21% (July, p.11) | 2.76% (Oct., p.11) | 5.03% (Apr., p.11) | 35.37% (July 2012, p.15) |
| 456612AC4 | INDX 2006-AR6 Group 2 *Class 2-A-1A in Group 2 (S-9) | Zero (S-32) | 2.46% (May, p.12) | 2.19% (July, p.12) | 3.01% (Oct., p.12) | 5.69% (Apr., p.12) | 40.03% (July 2012, p.21) |
| | INDX 2006-AR35 Aggregate (P.S. dated November 29, 2006) | Zero (S-36) | 2.42% (Dec., p.10) | 3.76% (Feb., p.10) | 6.42% (May, p.10) | 16.16% (Nov., p.10) | 33.92% (July 2012, p.10) |
| | INDX 2006-AR35 Group 1 | Zero (S-36) | 1.67% (Dec., p.11) | 2.99% (Feb., p.11) | 6.16% (May, p.11) | 15.58% (Nov., p.11) | 35.59% (July 2012, p.15) |
| 45667SAA5 | INDX 2006-AR35 Group 2 *Classes 2-A-1A, 2-A-3A and 2-A-3B in Group 2 (S-11) | Zero (S-36) | 2.89% (Dec., p.12) | 4.25% (Feb., p.12) | 6.58% (May, p.12) | 16.54% (Nov., p.12) | 32.81% (July 2012, p.21) |

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 550279BC6 | LUM 2006-2 (P.S. dated February 14, 2006) | Zero (S-25) | 1.44% (Mar., p.9) | 1.40% (May, p.9) | 1.88% (Aug., p.9) | 5.75% (Feb., p.9) | 56.89% (July 2012, p.9) |
| | LUM 2007-1 Aggregate (P.S. dated January 24, 2007) | Zero (S-24) | 1.24% (Feb., p.11) | 2.56% (Apr., p.11) | 4.82% (July, p.11) | 11.32% (Jan., p.11) | 40.56% (July 2012, p.11) |
| 55028CAA3 | LUM 2007-1 Group 1 *Classes I-A-1 and I-A-2 in Group 1 (S-7) | Zero (S-24) | 1.14% (Feb., p.13) | 2.54% (Apr., p.13) | 4.32% (July, p.13) | 9.95% (Jan., p.13) | 34.45% (July 2012, p.12) |
| | NHELI 2007-1 Aggregate (P.S. dated January 29, 2007) | Zero (S-57) | .16% (Feb., p.13) | 5.05% (Apr., p.13) | 11.90% (July, p.13) | 24.01% (Jan., p.13) | 48.12% (July 2012, p.13) |
| 65537KAY6 | NHELI 2007-1 Group 1 *Class I-A-4 in Group 1 (S-i) | Zero (S-57) | .11% (Feb., p.14) | 2.21% (Apr., p.15) | 8.49% (July, p.15) | 18.80% (Jan., p.15) | 47.43% (July 2012, p.14) |
| | NHEL 2006-5 Aggregate (P.S. dated September 22, 2006) | .95% of the mortgage loans were 30 or more days delinquent (S-23) | 2.31% (Oct., p.14) | 4.90% (Dec., p.14) | 10.38% (Mar., p.14) | 22.59% (Sept., p.14) | 41.75% (July 2012, p.15) |
| 66988YAF9 66988YAG7 | NHEL 2006-5 Group 1 *Classes M-1 and M-2 are in Groups 1 and 2 (S-98) | .95% of the mortgage loans were 30 or more days delinquent (S-23) | 1.75% (Oct., p.15) | 3.58% (Dec., p.15) | 6.93% (Mar., p.15) | 17.98% (Sept., p.15) | 38.19% (July 2012, p.20) |
| 66988YAE2 66988YAF9 66988YAG7 | NHEL 2006-5 Group 2 *Classes A-2D in Group 2 (S-1) *Classes M-1 and M-2 are in Groups 1 and 2 (S-98) | .95% of the mortgage loans were 30 or more days delinquent (S-23) | 3.19% (Oct., p.16) | 6.95% (Dec., p.16) | 15.75% (Mar., p.16) | 29.64% (Sept., p.16) | 48.58% (July 2012, p.25) |
| 83612MAF4 | SVHE 2006-WF2 (P.S. dated December 12, 2006) | Zero (S-14) | 2.17% (Jan., p.10) | 1.57% (Mar., p.10) | 6.00% (June, p.10) | 19.52% (Dec., p.10) | 39.19% (July 2012, p.11) |
| | SVHE 2007-OPT1 Aggregate (P.S. dated May 4, 2007) | Zero (S-17) | .28% (May, p.9) | 2.03% (July, p.9) | 10.17% (Oct., p.9) | 24.28% (Apr., p.9) | 39.43% (July 2012, p.9) |

25

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | SVHE 2007-OPT1 Group 1 Fixed | Zero (S-17) | .43% (May, p.10) | 1.14% (July, p.10) | 5.48% (Oct., p.10) | 14.28% (Apr., p.10) | 30.60% (July 2012, p.10) |
| | SVHE 2007-OPT1 Group 1 ARM | Zero (S-17) | .23% (May, p.10) | 1.70% (July, p.10) | 9.63% (Oct., p.10) | 24.80% (Apr., p.10) | 41.66% (July 2012, p.10) |
| 83612TAD4 | SVHE 2007-OPT1 Group 2 Fixed *Class II-A-3 in Group 2 (S-6) | Zero (S-17) | .55% (May, p.11) | 3.08% (July, p.11) | 9.56% (Oct., p.11) | 19.30% (Apr., p.11) | 34.36% (July 2012, p.11) |
| 83612TAD4 | SVHE 2007-OPT1 Group 2 ARM *Class II-A-3 in Group 2 (S-6) | Zero (S-17) | .18% (May, p.11) | 2.47% (July, p.11) | 13.00% (Oct., p.11) | 29.55% (Apr., p.11) | 43.22% (July 2012, p.11) |
| | HVMLT 2006-6 Aggregate (P.S. dated June 27, 2006) | .85% of the mortgage loans were 30 days or more delinquent (S-25) | 1.20% (July, p.11) | 2.79% (Sept., p.12) | 3.27% (Dec., p.11) | 7.05% (June, p.11) | 29.79% (July 2012, p.11) |
| | HVMLT 2006-6 Group 1 | .85% of the mortgage loans were 30 days or more delinquent (S-25) | .28% (July, p.13) | .68% (Sept., p.14) | 2.28% (Dec., p.13) | 3.59% (June, p.12) | 21.19% (July 2012, p.12) |
| 41161UAD4 | HVMLT 2006-6 Group 2 *Class 2A-1B in Group 2 (S-9) | .85% of the mortgage loans were 30 days or more delinquent (S-25) | 1.20% (July, p.13) | 1.03% (Sept., p.14) | 1.82% (Dec., p.13) | 4.93% (June, p.12) | 28.77% (July 2012, p.12) |
| 41161UAF9 | HVMLT 2006-6 Group 3 *Class 3A-1B in Group 3 (S-9) | .85% of the mortgage loans were 30 days or more delinquent (S-25) | 1.24% (July, p.14) | 4.31% (Sept., p.15) | 4.01% (Dec., p.14) | 10.43% (June, p.13) | 31.22% (July 2012, p.13) |
| | HVMLT 2006-6 Group 4 | .85% of the mortgage loans were 30 days or more delinquent (S-25) | 2.12% (July, p.14) | 4.01% (Sept., p.15) | 3.11% (Dec., p.14) | 7.14% (June, p.13) | 39.81% (July 2012, p.13) |
| | HVMLT 2006-6 Group 5 | .85% of the mortgage loans were 30 days or more delinquent (S-25) | 0% (July, p.15) | 0.00% (Sept., p.16) | 5.03% (Dec., p.15) | 2.59% (June, p.14) | 16.20% (July 2012, p.14) |

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 80556AAD9 | SAST 2006-3 (P.S. dated October 5, 2006) | 1.50% of the mortgage loans were 30 or more days delinquent (S-48) | 0% (Oct., p.10) | 3.14% (Dec., p.10) | 9.44% (Mar., p.10) | 21.62% (Sept., p.10) | 31.47% (July 2012, p.11) |
| 92978GAB5 | WMLT 2006-ALT1 (P.S. dated December 19, 2006) | Zero (S-32) | .94% (Jan., p.14) | 2.13% (Mar., p.14) | 4.14% (June, p.14) | 10.84% (Dec., p.14) | 27.80% (July 2012, p.13) |

67.     This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by U.S. Central, was later discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

68.     The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default." Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process, resulting from the systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

69.     A November 2008 Federal Reserve Board study attributed the rise in defaults, in part, to "[d]eteriorating lending standards," and posits that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors." Christopher J. Mayer *et al.*, *The Rise in Mortgage Defaults* at 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

70.     In January 2011, the Financial Stability Oversight Council ("FSOC"), chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy. *See* FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report"). The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent

better lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have on the economy." *Id.* at 2.

71.     The FSOC Risk Retention Report observed that the securitization process often incentivizes poor underwriting by shifting the risk of default from the originators to the investors, while obscuring critical information concerning the actual nature of the risk.  The report stated:

> The securitization process involves multiple parties with varying incentives and information, thereby breaking down the traditional direct relationship between borrower and lender.  The party setting underwriting standards and making lending decisions (the originator) and the party making structuring decisions (the securitizer) are often exposed to minimal or no credit risk.  By contrast, the party that is most exposed to credit risk (the investor) often has less influence over underwriting standards and may have less information about the borrower.  As a result, originators and securitizers that do not retain risk can, at least in the short run, maximize their own returns by lowering loan underwriting standards in ways that investors may have difficulty detecting.   The originate-to-distribute model, as it was conducted, exacerbated this weakness by compensating originators and securitizers based on volume, rather than on quality.

*Id.* at 3.

72.     Indeed, originators that wrote a high percentage of their loans for distribution were more likely to disregard underwriting standards, resulting in poorly performing mortgages, in contrast to originators that originated and then held most of their loans.

73.     High OTD originators profited from mortgage origination fees without bearing the risks of borrower default or insufficient collateral in the event of a default.  Divorced from these risks, high OTD originators were incentivized to push loan quantity over quality.

74.     Table 6 (*infra*) shows the percentage of loans originated for distribution relative to all the loans made by the Originators for the years 2005, 2006 and 2007, for those Originators in this Complaint with high OTD percentages.   The data was obtained from the Home Mortgage Disclosure Act database.

**Table 6**

| Originator | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| Accredited Home Lenders, Inc. | 100 | 100 | 100 |
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| American Home Mortgage Investment Corp. | 100 | 100 | 100 |
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |
| Downey Savings and Loan Association, F.A. | 49.5 | 42.4 | 49.7 |
| First Franklin Financial Corporation | | | 98.7 |
| First National Bank of Nevada | 88.0 | 79.8 | 89.4 |
| Fremont Investment & Loan | 91.2 | 85.2 | 93.9 |
| Homecomings Financial Network, Inc. | 97.4 | 97.9 | 99.9 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| NovaStar Mortgage, Inc. | 89.3 | 80.0 | 98.5 |
| Option One Mortgage Corporation | 92.2 | 72.7 | 58.2 |
| Paul Financial, LLC | 85.2 | 83.4 | 99.1 |
| Residential Mortgage Capital | 99.9 | 100 | 100 |
| Saxon Funding Management, Inc. | 94.8 | 91 | 98.4 |
| Secured Bankers Mortgage Company | 99.7 | 100 | 100 |
| Wachovia Mortgage Corp. | 82.6 | 74.1 | 69.6 |
| Wells Fargo Bank, N.A. | 73.5 | 67.1 | 61.6 |

**B.    The Surge in Actual Versus Expected Cumulative Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

75.    The actual defaults in the mortgage pools underlying the RMBS U.S. Central purchased exceeded expected defaults so quickly and by so wide a margin that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents.

76.    Every month, the RMBS trustee reports the number and outstanding balance of all loans in the mortgage pools that have defaulted.  The running total of this cumulative default balance is referred to as the "gross loss."

77.     When defaulted loans are foreclosed upon, the proceeds from the foreclosures are distributed to the investors and any shortfall on the defaulted loan balances is realized as a loss.  The running total of this cumulative realized loss (defaulted loan balance minus recovery in foreclosure) is referred to as the "net loss."

78.     "Actual loss" is the economic loss the mortgage pool experiences in fact.  So "actual gross loss" is the actual cumulative sum of the balance of the loans in default for a particular security.  Likewise, "actual net loss" is the actual cumulative realized loss on defaulted loans after foreclosure.

79.     At the time a security is rated, the rating agency calculates an amount of "expected loss" using a model based on historical performance of similar securities.  So "expected gross loss" is the expected cumulative sum of the balance of the loans in default for a particular security.  Likewise, "expected net loss" is the expected cumulative realized loss on defaulted loans after foreclosure.  The amount of expected net loss drives the credit ratings assigned to the various tranches of RMBS.

80.     Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected net loss (in equation form:  $CE/ENL = RF$).  Thus, the rating factor expresses how many times the expected net loss is covered by credit enhancement. A triple-A rated security would have a rating factor of "5," so would require credit enhancement of five times the amount of the expected net loss.  A "double-A rating" would have a rating factor of "4," and thus would require credit enhancement equaling four times the expected net loss.  A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times expected net loss.  A "Baa" rating would require credit enhancement of  2—1.5 times expected net loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected net loss.

81.     Accordingly, by working backwards from this equation, one can infer expected net loss in an already-issued offering.  For example, assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million. This means the non-senior tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior tranches in this hypothetical offering serves as the credit enhancement for the senior tranche.  Therefore, on our hypothetical $100 million offering, the expected net loss would be $5 million, which is the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5. The following equation illustrates: $25,000,000/5 = $5,000,000.

82.     Expected gross loss can be then mathematically derived by applying an "expected recovery rate" to the expected net loss (EGL = ENL/(1 − ERR).

83.     A comparison of actual gross losses to expected gross losses for a particular security can be made graphically by plotting the actual versus expected loss data on a line graph.  Figure 2 (*infra*) is a series of such line graphs.  Figure 2 illustrates the actual gross loss (again, actual defaults) the pools backing the RMBS purchased by U.S. Central experienced in the first 12 months after issuance compared to the expected gross loss (again, expected defaults) for those pools during the same time period.

84.     The actual gross loss data in Figure 2 (*infra*) was obtained from ABSNET, a resource for asset-backed securities related data.  The expected gross losses were calculated by "grossing up" the rating-implied expected net losses using an expected recovery rate of 85%.

85.     As the graphs show, the actual gross losses (the solid lines) far exceeded the expected gross losses (the dotted lines) for the period analyzed.  That means that the actual balance of defaulted loans in the first 12 months following issuance far exceeded the expected balance of defaulted loans based on historical performance.

## Figure 2

| Deal Name | ABSNet Deal | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 1 | $ 206,255 | $ 4,440,319 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 2 | $ 1,252,743 | $ 4,849,938 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 3 | $ 15,965,380 | $ 5,296,486 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 4 | $ 23,231,116 | $ 5,783,127 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 5 | $ 15,835,378 | $ 6,313,263 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 6 | $ 25,826,890 | $ 6,890,551 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 7 | $ 43,056,593 | $ 7,518,909 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 8 | $ 60,149,130 | $ 8,202,528 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 9 | $ 74,530,001 | $ 8,945,883 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 10 | $ 80,282,322 | $ 9,753,736 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 11 | $ 98,458,456 | $ 10,631,148 |
| First Franklin Mortgage Loan Trust 2006-FF16 | 39691 | 12 | $ 105,876,663 | $ 11,583,471 |



| Deal Name | ABSNet Deal | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Fremont Home Loan Trust 2006-3 | 39106 | 1 | $ 1,256,271 | $ 5,262,057 |
| Fremont Home Loan Trust 2006-3 | 39106 | 2 | $ 1,494,777 | $ 5,747,482 |
| Fremont Home Loan Trust 2006-3 | 39106 | 3 | $ 7,526,884 | $ 6,276,670 |
| Fremont Home Loan Trust 2006-3 | 39106 | 4 | $ 21,888,740 | $ 6,853,369 |
| Fremont Home Loan Trust 2006-3 | 39106 | 5 | $ 7,900,943 | $ 7,481,614 |
| Fremont Home Loan Trust 2006-3 | 39106 | 6 | $ 8,313,463 | $ 8,165,737 |
| Fremont Home Loan Trust 2006-3 | 39106 | 7 | $ 52,621,537 | $ 8,910,380 |
| Fremont Home Loan Trust 2006-3 | 39106 | 8 | $ 80,617,461 | $ 9,720,512 |
| Fremont Home Loan Trust 2006-3 | 39106 | 9 | $ 103,490,110 | $ 10,601,434 |
| Fremont Home Loan Trust 2006-3 | 39106 | 10 | $ 138,270,512 | $ 11,558,791 |
| Fremont Home Loan Trust 2006-3 | 39106 | 11 | $ 156,624,286 | $ 12,598,579 |
| Fremont Home Loan Trust 2006-3 | 39106 | 12 | $ 199,612,422 | $ 13,727,142 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Fremont Home Loan Trust 2006-D | 39741 | 1 | $          - | $        8,287,486 |
| Fremont Home Loan Trust 2006-D | 39741 | 2 | $   3,753,135 | $        9,052,007 |
| Fremont Home Loan Trust 2006-D | 39741 | 3 | $   6,212,973 | $        9,885,452 |
| Fremont Home Loan Trust 2006-D | 39741 | 4 | $  20,765,954 | $       10,793,726 |
| Fremont Home Loan Trust 2006-D | 39741 | 5 | $  36,520,130 | $       11,783,182 |
| Fremont Home Loan Trust 2006-D | 39741 | 6 | $  58,203,553 | $       12,860,642 |
| Fremont Home Loan Trust 2006-D | 39741 | 7 | $  81,810,437 | $       14,033,419 |
| Fremont Home Loan Trust 2006-D | 39741 | 8 | $ 107,497,063 | $       15,309,337 |
| Fremont Home Loan Trust 2006-D | 39741 | 9 | $ 118,828,404 | $       16,696,747 |
| Fremont Home Loan Trust 2006-D | 39741 | 10 | $ 122,788,975 | $       18,204,539 |
| Fremont Home Loan Trust 2006-D | 39741 | 11 | $ 120,044,997 | $       19,842,154 |
| Fremont Home Loan Trust 2006-D | 39741 | 12 | $ 118,165,126 | $       21,619,586 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 1 | $          - | $        4,146,641 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 2 | $          - | $        4,529,169 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 3 | $          - | $        4,946,182 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 4 | $          - | $        5,400,637 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 5 | $          - | $        5,895,711 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 6 | $          - | $        6,434,818 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 7 | $   8,680,070 | $        7,021,616 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 8 | $  11,141,881 | $        7,660,021 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 9 | $  14,725,771 | $        8,354,211 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 10 | $  20,454,135 | $        9,108,634 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 11 | $  24,280,421 | $        9,928,015 |
| HarborView Mortgage Loan Trust 2006-10 | 39466 | 12 | $  32,908,115 | $       10,817,352 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 1 | $ - | $ 620,128 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 2 | $ - | $ 677,335 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 3 | $ 1,541,596 | $ 739,700 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 4 | $ 2,586,325 | $ 807,663 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 5 | $ 1,614,729 | $ 881,701 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 6 | $ 2,697,387 | $ 962,324 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 7 | $ 5,548,956 | $ 1,050,080 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 8 | $ 8,395,221 | $ 1,145,553 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 9 | $ 10,039,321 | $ 1,249,369 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 10 | $ 10,546,521 | $ 1,362,193 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 11 | $ 12,059,557 | $ 1,484,731 |
| HarborView Mortgage Loan Trust 2006-11 | 39604 | 12 | $ 11,489,433 | $ 1,617,731 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 1 | $ - | $ 6,998,409 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 2 | $ - | $ 7,644,013 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 3 | $ - | $ 8,347,820 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 4 | $ 4,084,060 | $ 9,114,816 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 5 | $ 11,094,460 | $ 9,950,367 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 6 | $ 19,896,280 | $ 10,860,234 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 7 | $ 31,022,567 | $ 11,850,591 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 8 | $ 40,963,688 | $ 12,928,047 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 9 | $ 60,192,493 | $ 14,099,652 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 10 | $ 88,526,405 | $ 15,372,914 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 11 | $ 96,055,571 | $ 16,755,807 |
| HarborView Mortgage Loan Trust 2006-12 | 39654 | 12 | $ 96,131,151 | $ 18,256,769 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 1 | $ - | $ 3,574,654 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 2 | $ - | $ 3,904,416 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 3 | $ 368,396 | $ 4,263,907 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 4 | $ 6,858,408 | $ 4,655,674 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 5 | $ 13,473,277 | $ 5,082,458 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 6 | $ 16,771,582 | $ 5,547,200 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 7 | $ 21,587,406 | $ 6,053,056 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 8 | $ 28,030,117 | $ 6,603,399 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 9 | $ 39,750,069 | $ 7,201,833 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 10 | $ 44,347,316 | $ 7,852,191 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 11 | $ 59,770,494 | $ 8,558,546 |
| HarborView Mortgage Loan Trust 2006-14 | 39668 | 12 | $ 74,945,944 | $ 9,325,209 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 1 | $ - | $ 698,526 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 2 | $ - | $ 762,965 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 3 | $ - | $ 833,213 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 4 | $ 1,167,337 | $ 909,769 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 5 | $ - | $ 993,167 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 6 | $ 477,277 | $ 1,083,983 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 7 | $ 1,899,806 | $ 1,182,832 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 8 | $ 3,186,042 | $ 1,290,376 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 9 | $ 3,199,660 | $ 1,407,316 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 10 | $ 4,649,980 | $ 1,534,403 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 11 | $ 4,741,830 | $ 1,672,432 |
| HarborView Mortgage Loan Trust 2006-SB1 | 39104 | 12 | $ 4,658,378 | $ 1,822,246 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 1 | $ - | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 2 | $ - | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 3 | $ 157,471 | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 4 | $ 483,727 | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 5 | $ 2,081,066 | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 6 | $ 4,572,506 | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 7 | $ 19,343,381 | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 8 | $ 35,109,800 | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 9 | $ 51,664,606 | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 10 | $ 69,818,898 | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 11 | $ 69,818,898 | $ - |
| Residential Funding Mortgage Securities II 2007-HSA2 | 41393 | 12 | $ 96,847,167 | $ - |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 1 | $ - | $ 1,734,368 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 2 | $ - | $ 1,894,364 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 3 | $ - | $ 2,068,783 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 4 | $ - | $ 2,258,863 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 5 | $ 1,848,000 | $ 2,465,932 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 6 | $ 3,866,023 | $ 2,691,418 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 7 | $ 13,740,659 | $ 2,936,851 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 8 | $ 21,838,012 | $ 3,203,870 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 9 | $ 27,603,649 | $ 3,494,221 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 10 | $ 31,428,103 | $ 3,809,765 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 11 | $ 34,423,595 | $ 4,152,477 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 12 | $ 43,899,521 | $ 4,524,450 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 1 | $          - | $        3,273,303 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 2 | $          - | $        3,575,265 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 3 | $          - | $        3,904,451 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 4 | $          - | $        4,263,191 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 5 | $     346,709 | $        4,653,996 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 6 | $     743,047 | $        5,079,559 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 7 | $  2,146,440 | $        5,542,771 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 8 | $  5,500,716 | $        6,046,719 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 9 | $  5,884,436 | $        6,594,703 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 10 | $  9,091,102 | $        7,190,235 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 11 | $ 12,924,144 | $        7,837,043 |
| IndyMac INDX Mortgage Loan Trust 2006-AR6 | 37740 | 12 | $ 16,320,490 | $        8,539,074 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 1 | $          - | $        2,098,962 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 2 | $          - | $        2,292,591 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 3 | $          - | $        2,503,677 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 4 | $          - | $        2,733,714 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 5 | $     837,630 | $        2,984,313 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 6 | $  2,077,465 | $        3,257,200 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 7 | $  3,729,555 | $        3,554,228 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 8 | $  4,392,665 | $        3,877,378 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 9 | $  6,427,141 | $        4,228,765 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 10 | $  5,347,433 | $        4,610,642 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 11 | $  8,096,837 | $        5,025,399 |
| Luminent Mortgage Loan Trust 2006-2 | 36822 | 12 | $  7,697,746 | $        5,475,567 |

| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 1 | $ - | $ 837,607 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 2 | $ - | $ 914,876 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 3 | $ - | $ 999,112 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 4 | $ 1,982,522 | $ 1,090,910 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 5 | $ 3,098,851 | $ 1,190,913 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 6 | $ 7,535,538 | $ 1,299,811 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 7 | $ 8,877,706 | $ 1,418,342 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 8 | $ 7,269,659 | $ 1,547,298 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 9 | $ 7,809,257 | $ 1,687,522 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 10 | $ 6,135,975 | $ 1,839,912 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 11 | $ 11,639,877 | $ 2,005,424 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 12 | $ 13,374,400 | $ 2,185,068 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 1 | $ 159,200 | $ 1,737,954 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 2 | $ 619,200 | $ 1,898,280 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 3 | $ 23,542,962 | $ 2,073,060 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 4 | $ 42,794,130 | $ 2,263,533 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 5 | $ 36,287,162 | $ 2,471,030 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 6 | $ 37,717,522 | $ 2,696,982 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 7 | $ 69,224,811 | $ 2,942,923 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 8 | $ 86,609,785 | $ 3,210,493 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 9 | $ 90,655,311 | $ 3,501,444 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 10 | $ 112,784,673 | $ 3,817,641 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 11 | $ 96,635,919 | $ 4,161,062 |
| Nomura Home Equity Loan Trust 2007-1 | 40291 | 12 | $ 105,724,469 | $ 4,533,804 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 1 | $ 1,435,238 | $ 3,388,172 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 2 | $ 15,009,169 | $ 3,700,731 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 3 | $ 22,047,992 | $ 4,041,468 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 4 | $ 27,040,822 | $ 4,412,797 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 5 | $ 47,552,372 | $ 4,817,316 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 6 | $ 56,075,866 | $ 5,257,814 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 7 | $ 74,438,517 | $ 5,737,281 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 8 | $ 84,681,723 | $ 6,258,914 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 9 | $ 95,762,561 | $ 6,826,128 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 10 | $ 108,010,395 | $ 7,442,559 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 11 | $ 119,855,905 | $ 8,112,065 |
| Novastar Mortgage Funding Trust 2006-5 | 39379 | 12 | $ 127,523,639 | $ 8,838,732 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Soundview Home Loan Trust 2006-WF2 | 39809 | 1 | $ 911,226 | $ 7,534,203 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 2 | $ 18,341,078 | $ 8,229,234 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 3 | $ 1,138,334 | $ 8,986,923 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 4 | $ 1,424,842 | $ 9,812,640 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 5 | $ 7,863,434 | $ 10,712,161 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 6 | $ 23,244,822 | $ 11,691,686 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 7 | $ 25,514,396 | $ 12,757,865 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 8 | $ 33,685,212 | $ 13,917,809 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 9 | $ 39,983,224 | $ 15,179,112 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 10 | $ 52,966,055 | $ 16,549,854 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 11 | $ 63,985,702 | $ 18,038,620 |
| Soundview Home Loan Trust 2006-WF2 | 39809 | 12 | $ 70,535,110 | $ 19,654,495 |



| Deal Name | ABSNet Deal I | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 1 | $ 800,320 | $ 12,708,263 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 2 | $ 1,990,324 | $ 13,880,602 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 3 | $ 5,897,021 | $ 15,158,629 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 4 | $ 24,033,717 | $ 16,551,402 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 5 | $ 39,360,198 | $ 18,068,661 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 6 | $ 65,417,195 | $ 19,720,869 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 7 | $ 97,194,480 | $ 21,519,238 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 8 | $ 140,868,344 | $ 23,475,767 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 9 | $ 187,021,181 | $ 25,603,259 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 10 | $ 223,791,685 | $ 27,915,350 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 11 | $ 247,584,484 | $ 30,426,515 |
| Soundview Home Loan Trust 2007-OPT1 | 41477 | 12 | $ 268,000,765 | $ 33,152,080 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 1 | $ - | $ 950,549 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 2 | $ 640,000 | $ 1,038,237 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 3 | $ 640,000 | $ 1,133,831 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 4 | $ 1,240,000 | $ 1,238,007 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 5 | $ 964,000 | $ 1,351,494 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 6 | $ 5,622,523 | $ 1,475,076 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 7 | $ 5,302,523 | $ 1,609,590 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 8 | $ 7,653,841 | $ 1,755,934 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 9 | $ 8,302,329 | $ 1,915,065 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 10 | $ 8,233,635 | $ 2,088,004 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 11 | $ 8,675,973 | $ 2,275,834 |
| HarborView Mortgage Loan Trust 2006-6 | 38212 | 12 | $ 7,094,052 | $ 2,479,700 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Saxon Asset Securities Trust 2006-3 | 39060 | 1 | $ - | $ 4,408,723 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 2 | $ 327,276 | $ 4,815,428 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 3 | $ 4,305,699 | $ 5,258,798 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 4 | $ 9,014,672 | $ 5,741,976 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 5 | $ 22,639,805 | $ 6,268,340 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 6 | $ 37,466,366 | $ 6,841,520 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 7 | $ 50,358,141 | $ 7,465,407 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 8 | $ 57,544,690 | $ 8,144,161 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 9 | $ 65,001,402 | $ 8,882,226 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 10 | $ 69,665,443 | $ 9,684,331 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 11 | $ 76,468,069 | $ 10,555,499 |
| Saxon Asset Securities Trust 2006-3 | 39060 | 12 | $ 88,802,996 | $ 11,501,046 |



| Deal Name | ABSNet Deal ID | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 1 | $ - | $ 571,225 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 2 | $ 907,000 | $ 623,920 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 3 | $ 3,477,778 | $ 681,366 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 4 | $ 3,865,958 | $ 743,970 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 5 | $ 4,775,290 | $ 812,169 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 6 | $ 8,398,870 | $ 886,435 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 7 | $ 8,047,724 | $ 967,270 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 8 | $ 8,645,036 | $ 1,055,214 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 9 | $ 11,762,701 | $ 1,150,843 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 10 | $ 17,071,099 | $ 1,254,769 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 11 | $ 21,346,144 | $ 1,367,643 |
| Wachovia Mortgage Loan Trust 2006-ALT1 | 40065 | 12 | $ 23,684,214 | $ 1,490,155 |



86.     As clearly shown in Figure 2 (*supra*), actual losses spiked almost immediately after issuance of the RMBS.  For example, in the Nomura Home Equity Loan Trust 2007-1 offering (shown in Figure 2), actual losses at month 12 exceeded $105 million, 23 times the expected losses of approximately $4.5 million.

87.     This dramatic spike in actual versus expected defaults in the securities' mortgage pools during the first 12 months following issuance very strongly evidences that the Originators systematically disregarded the underwriting standards in the Offering Documents.

88.     In addition, credit enhancement is designed to ensure that RMBS rated at the highest investment grades perform as rated.  The fact that the credit enhancement failed for U.S. Central's investments in senior tranches shows that a substantial number of mortgages in the pool were not originated in accordance with underwriting guidelines.

### C.     The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines

89.     Virtually all of the RMBS U.S. Central purchased were rated triple-A at issuance.

90.     Moody's and S&P have since downgraded the RMBS U.S. Central purchased to well below investment grade (*see supra* Table 4).

91.     A rating downgrade is material.  The total collapse in the credit ratings of the RMBS U.S. Central purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these securities were impaired from the outset.

### D.     Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards

92.     Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

      1.     **The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse**

93.    Mortgage originators experienced unprecedented success during the mortgage boom. Yet, their success was illusory. As the loans they originated began to significantly underperform, the demand for their products subsided. It became evident that originators had systematically disregarded their underwriting standards.

94.    The Office of the Comptroller of the Currency (the "OCC"), an office within the United States Department of the Treasury, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report, the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

95.    Recently, government reports and investigations, and newspaper reports have uncovered the extent of the pervasive abandonment of underwriting standards. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") recently released its report detailing the causes of the financial crisis. Using Washington Mutual Bank ("WaMu") as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011) ("PSI Wall Street Report").

96.     Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy. *See* FIN. CRISIS INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

97.     The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics" during the housing and financial crisis.  "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id.* at xxii.  The FCIC found that the current economic crisis had its genesis in the housing boom:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id.* at xvi.

98.     During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan.  The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id.* at xxii.  Early Payment Default is a significant indicator of pervasive disregard for underwriting standards.  The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards. . . ." *Id.*

99.     In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities.  As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences."  Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm.  But they did not stop.

*Id.*

100.     Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards.  The FCIC Report observed:  "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay."  *Id.* at xxiii.

101.     In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job."  *Id.* at 12-13 (internal quotation marks omitted).

102.     Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in this speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised.  The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories.  To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay.  In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators.  Notably, the incentive structures sometimes often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain.  Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process.  However, in the recent

episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

103.    Investment banks securitized loans that were not originated in accordance with underwriting guidelines, and failed to disclose this fact in RMBS offering documents.  As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.  Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities.  These problems appear to have been significant.

FCIC Report at 187.

104.    The lack of disclosure regarding the true underwriting practices of the Originators in the Offering Documents at issue in this Complaint put U.S. Central at a severe disadvantage.

105.    Because investors had limited or no access to information concerning the actual quality of loans underlying the RMBS, the "originate-to-distribute" model created a situation where the origination of low quality mortgages through poor underwriting thrived.  The FSOC found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan.  This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully.  Some research indicates that securitization was associated with lower quality loans in the financial crisis.  For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold.  By lowering underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

*Id.* at 11 (footnote omitted).

106.    The FSOC reported that as the "originate-to-distribute" model became more pervasive in the mortgage industry, underwriting practices weakened across the industry.  The FSOC Risk Retention Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans. . . ." *Id.*

107.    In sum, the disregard of underwriting standards was pervasive across originators. The failure to adhere to underwriting standards directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS.  The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials.  The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

108.    As discussed below, facts have recently come to light that show many of the Originators who contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

### 2.    American Home's Systematic Disregard of Underwriting Standards

109.    American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated and serviced by its subsidiaries.  It was the parent of American Home Mortgage Holdings, Inc., which in turn was the parent of American Home Mortgage Corp., a retail lender of mortgage loans.  Collectively, these entities are referred to herein as "American Home."  American Home originated or contributed a critical number of loans to the mortgage pool underlying the HVMLT 2006-14, and HVMLT 2006-6 offerings.

110.    Edmund Andrews, an economics reporter for the New York Times, recounted his own experience using American Home as a lender.  According to Andrews, he was looking to

purchase a home in 2004, and his real estate agent referred him to a loan officer at American Home. The American Home loan officer began the ordeal by asking Andrews how large of a loan he needed. Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife. Andrews would be relying on his then-unemployed fiancée to earn enough money to meet his monthly obligations—including the mortgage. Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country. One of its specialties was serving people just like me: borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify. In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.

> I thought I knew a lot about go-go mortgages. I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages. I had interviewed people with very modest incomes who had taken out big loans. Yet for all that, I was stunned at how much money people were willing to throw at me.

> [The American Home loan officer] called back the next morning. "Your credit scores are almost perfect," he said happily. "Based on your income, you can qualify for a mortgage of about $500,000."

> What about my alimony and child-support obligations? No need to mention them. What would happen when they saw the automatic withholdings in my paycheck? No need to show them. If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it. His job was to make it happen.

> "I am here to enable dreams," he explained to me long afterward. [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence. "Who am I to tell you that you shouldn't do what you want to do? I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage — not mine."

Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at MM46.

111.    The American Home loan officer steered Andrews to a stated-income loan so that he would not have to produce paychecks or tax returns that would reveal his alimony and child

support obligations.  The loan officer wanted to limit disclosure of Andrews's alimony and child

support payments when an existing mortgage showed up under Andrews's name.  Although his ex-

wife was solely responsible for that mortgage under the terms of the couple's separation agreement,

the only way Andrews could explain that fact would be to produce the agreement, which would also

reveal his alimony and child support obligations.  According to Andrews:

> [The American Home loan officer] didn't get flustered.  If Plan A didn't work, he
> would simply move down another step on the ladder of credibility.  Instead of
> "stating" my income without documenting it, I would take out a "no ratio" mortgage
> and not state my income at all.  For the price of a slightly higher interest rate,
> American Home would verify my assets, but that was it.  Because I wasn't stating my
> income, I couldn't have a debt-to-income ratio, and therefore, I couldn't have too
> much debt.  I could have had four other mortgages, and it wouldn't have mattered.
> American Home was practically begging me to take the money.

*Id.*

112.    American Home ultimately approved Andrews's application.  Not surprisingly,

Andrews was unable to afford his monthly mortgage payments.

113.    American Home's lack of adherence to underwriting guidelines was set forth in detail

in a 165-page amended class action complaint filed June 4, 2008, in *In re American Home Mortgage Sec.*

*Litig.*, No. 07-md-1898 (TCP) (E.D.N.Y.).  Investors in American Home common/preferred stock

alleged that the company misrepresented itself as a conservative lender, when, based on statements

from over 33 confidential witnesses and internal company documents, American Home in reality

was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor

credit, violating company underwriting guidelines, and providing incentives for employees to sell

risky loans, regardless of the borrowers' creditworthiness.  *See* Amended Class Action Complaint, *In*

*re American Home Mortgage Sec. Litig.*, No. 07-md-1898, Doc. 17 (E.D.N.Y. filed June 4, 2008)

("American Home ACC").

114.    According to the American Home ACC, former American Home employees

recounted underwriters consistently bullied by sales staff when underwriters challenged questionable

loans, while exceptions to American Home's underwriting guidelines were routinely applied.  *See id.* at 43.

115.    The American Home ACC cited to witnesses who were former American Home employees.  These witnesses reported that American Home management told underwriters to not decline a loan, regardless of whether the loan application included fraud.  *See id.*

116.    Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans.  When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions for loan approval.  Indeed, it was commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval.  *See id.* at 44.

117.    A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when they objected to loan originations.  *See id.*

118.    The parties settled the litigation on January 14, 2010 for $37.25 million.

119.    American Home's lax lending practices landed it in the 2008 "Worst Ten in the Worst Ten" Report.  American Home came in 8th in Las Vegas, Nevada, and 9th in both Detroit, Michigan, and Miami, Florida.  *See* 2008 "Worst Ten in the Worst Ten" Report.  When the OCC issued the 2009 "Worst Ten in the Worst Ten" Report, American Home again featured prominently, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas, Nevada, 9th in Stockton-Lodi, California; and 10th in Bakersfield, California).  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 3.    BankUnited's Systematic Disregard of Underwriting Standards

120.    BankUnited was the largest originator of loans backing the HVMLT 2006-10 offering.

121.    BankUnited FSB was a federal savings bank headquartered in Coral Gables, Florida. BankUnited FSB became BankUnited in 2009 after being seized by the FDIC and sold to a group of investors.

122.    BankUnited actively participated in the nonprime and option ARM mortgage lending boom from 2005 to 2007.  In its 10-Q quarterly report filed with the SEC on August 25, 2008, BankUnited acknowledged that it had been

> advised by the [Office of Thrift Supervision ("OTS")] of certain concerns that BankUnited has agreed to address. Several of the measures addressing these concerns were already in progress at the time the Company and the Bank entered into agreements with the OTS to address the concerns. At this time, some of the measures have been completed and others are in progress. These measures include efforts to seek to raise at least $400 million of capital and to submit an alternative capital plan to be applicable if the Company is unable to raise the $400 million; termination of the option ARM loan program (other than in the wealth management area and, in certain limited circumstances, for loan modifications); termination of reduced and no documentation loan programs; reduction of the portfolio of negative amortization loans; and enhanced monitoring and internal reporting, as well as reporting to regulators on option ARM loan reduction efforts, preservation and enhancement of capital, mortgage insurance and liquidity strength. The Bank also agreed to enhance its policies and procedures regarding the Bank's allowance for loan losses, including increasing the allowance to a level which has already been attained. The Bank has also agreed to maintain capital ratios substantially in excess of the minimum required ratios to be deemed well-capitalized upon raising the agreed upon amount of capital.

BankUnited Form 10-Q Quarterly Report for the SEC, Aug. 25, 2008, at 22.  OTS, the agency that regulates banks focusing on mortgage lending, advised BankUnited that it must cease issuing loans under reduced or no documentation programs, and the pay-option ARM programs.  OTS required BankUnited to enhance its monitoring and internal reporting.

123.    OTS eventually issued a cease and desist order in April 2009.  An April 16, 2009 article in the South Florida Business Journal reported:

51

[Payment option adjustable-rate mortgages], which are the main source of BankUnited's problems, allow borrowers to pay less than the monthly interest accruing on their mortgages so that the balance grows. At a time when home values have declined, that can leave borrowers with high payments on a home that's worth less than they owe on their mortgage.

BankUnited's $5.89 billion in option ARMs accounted for 51 percent of its loan portfolio on Dec. 31.

"I wouldn't be surprised to see the institution shut down tomorrow, but I have said that so many times about BankUnited coming into a Friday – that it's no sure thing,"

Brian Bandell, *BankUnited Given 20 Days to Strike Deal*, S. Fla. Bus. J., Apr. 16, 2009, available at

http://www.bizjournals.com/southflorida/stories/2009/04/13/daily53.html. The cease and desist

order prohibited BankUnited from issuing any new loans under its reduced documentation

programs.

124.    The FDIC reprimanded BankUnited in a November 2009 letter, according to this

Dec. 11, 2009 article in the Palm Beach Post:

In a scathing letter, the Federal Deposit Insurance Corp. accuses former Chairman Alfred Camner, former Chief Executive Ramiro Ortiz and 13 others of "negligence, gross negligence and/or breach of fiduciary duties related to certain residential loans."

The FDIC letter focuses on BankUnited's fatal attraction to Option ARMs, the risky mortgages that gave boom-time borrowers three choices each month: Make a full payment of principal and interest, make a minimum payment that results in the loan balance growing, or pay some amount in between. As South Florida home prices plummeted and jobless rates soared, Option ARMs have gone bad in droves.

In a Nov. 5 letter that's now part of the BankUnited bankruptcy court file, the FDIC lambastes the bankers for their "loose lending policies" and demands civil damages. Among other things, the FDIC accuses the bankers of:

- "Encouraging an extremely liberal and aggressive lending mentality to 'make the loan as long as the borrower has a pulse.'
- "Engaging in reckless, high-risk, and limited-scrutiny lending to fuel the bank's aggressive and rapid growth — in direct contradiction to public representations of the bank's conservative lending and strict underwriting policies.
- "Approving and putting in place a compensation structure that drove the bank's directors and officers to pursue recklessly risky lending and business practices."

The FDIC says those practices caused $227 million in loan losses in addition to the $4 billion hit the FDIC took.

Jeff Ostrowski, *FDIC Moves Against BankUnited Execs*, The Palm Beach Post (Dec. 11, 2009). http://www.palmbeachpost.com/news/business/fdic-moves-against-bankunited-execs/nLn6H/

125.    BankUnited originated risky and toxic loan products, which were in turn sold to

unsuspecting investors.  These hazardous loan products, and BankUnited's role in producing them,

are described in this August 29, 2008 article from Seeking Alpha:

> None of these long-shot saviors exist for the three small banks that I like to call the Option Arm Triplets: Downey Financial; FirstFed Financial and BankUnited. These banks are all loaded to the gills with perhaps the most risky and insane mortgage product ever devised in the recent speculative bubble: The negative-amortization ARMs, more commonly referred to by the more cheerful industry euphemism "Option Arm" or "OA."

Greg Weston, The Option Arm Triplets: Dead Banks Walking, Law.com (August 29, 2008) http://seekingalpha.com/article/93167-the-option-arm-triplets-dead-banks-walking.

126.    After OTS placed BankUnited into receivership, the Office of the Inspector General

("OIG") of the Department of Treasury released a Material Loss Review of BankUnited in June

2010. The Material Loss Review concluded:

> The primary cause of BankUnited's failure was a high-risk growth strategy with excessive <u>concentration</u> in option adjustable-rate mortgages (option ARM) without implementing adequate controls to manage the associated risks. Option ARMs are high-risk loans that feature, among other things, the possibility of <u>negative amortization</u> and payment shock as rates reset. Deficient underwriting and credit administration, combined with the rapid decline in the real estate market, resulted in the deterioration of the thrift's asset quality, including a substantial volume of problem loans and significant loan losses.

OIG, Audit Report: *Safety and Soundness, Material Loss Review of BankUnited, FSB* (OIG-10-042), at 2

(June 22, 2010) (emphasis in original).

127.    The BankUnited Material Loss Review found that BankUnited did not have any

instructions on how to determine whether a stated income was reasonable:

> Additionally, until October 2007 BankUnited did not have any formal guidelines to document its reasonableness tests of borrowers' reported income for stated income

loans. This was a significant deficiency in that more than 65 percent of BankUnited's option ARMs were made based on (1) stated income or (2) stated income and stated assets. Therefore, approximately 75 percent of BankUnited's option ARMs originated between 2006 and 2007 were not prudently underwritten in a safe and sound manner based on existing OTS guidance.

*Id.* at 16

128.    BankUnited originated risky mortgages without adhering to its underwriting standards.  It failed to implement controls to ensure that incomes reported in stated income loans were reasonable.

### 4.    Countrywide's Systematic Disregard of Underwriting Standards

129.    Countrywide Home Loans, Inc. ("Countrywide") was one of the largest originators of residential mortgages in the United States and originated or contributed a critical portion of the loans in the mortgage pool underlying the HVMLT 2006-11, HVMLT 2006-12, HVMLT 2006-6, and LUM 2006-2 offerings.

130.    In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis."  Press Release, Comm. on Oversight & Government Reform, Statement of Chairman Towns on Committee Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks omitted).

131.    On May 9, 2008, the New York Times noted that minimal documentation and stated income loans—Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program—have "bec[o]me known [within the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their income."  Floyd Norris, *A Little Pity, Please, for Lenders*, N.Y. Times, May 9, 2008, at C1.

132.     In a television special titled, "If You Had a Pulse, We Gave You a Loan," Dateline

NBC reported on March 27, 2009:

>    To highlight just how simple it could be to borrow money, Countrywide marketed
>    one of its stated-income products as the "Fast and Easy loan."
>
>    As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and
>    Easy loans and became one of the company's top producers.
>
>    He said the loans were "an invitation to lie" because there was so little scrutiny of
>    lenders.   "We told them the income that you are giving us will not be verified.   The
>    asset that you are stating will not be verified."
>
>    He said they joked about it:   "If you had a pulse, we gave you a loan.   If you fog the
>    mirror, give you a loan."
>
>    But it turned out to be no laughing matter for Partow.   Countrywide fired him for
>    processing so-called "liar loans" and federal prosecutors charged him with crimes.
>    On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a
>    real estate speculator; he spent 18 months in prison.
>
>    In an interview shortly after he completed his sentence, Partow said that the practice
>    of pushing through loans with false information was common and was known by
>    top company officials.   "It's impossible they didn't know."
>     . . .
>
>    During the criminal proceedings in federal court, Countrywide executives portrayed
>    Partow as a rogue who violated company standards.
>
>    But former senior account executive Bob Feinberg, who was with the company for
>    12 years, said the problem was not isolated.   "I don't buy the rogue.   I think it was
>    infested."
>
>    He lamented the decline of what he saw as a great place to work, suggesting a push
>    to be number one in the business led Countrywide astray.   He blamed Angelo
>    Mozilo, a man he long admired, for taking the company down the wrong path.   It
>    was not just the matter of stated income loans, said Feinberg.   Countrywide also
>    became a purveyor of loans that many consumer experts contend were a bad deal for
>    borrowers, with low introductory interest rates that later could skyrocket.
>
>    In many instances, Feinberg said, that meant borrowers were getting loans that were
>    "guaranteed to fail."

133.     On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud.   Specifically, the SEC alleged that Mozilo and the others misled investors

about the credit risks that Countrywide created with its mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See SEC v. Mozilo*, No. CV 09-3994-JFW (C.D. Cal. filed June 4, 2009). The SEC defeated a motion to dismiss in that case. Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

134.   Internal Countrywide e-mails the SEC released in connection with its lawsuit show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo, to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." E-mail from Angelo Mozilo to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT). Mozilo wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." *Id* (internal quotation marks omitted).

135.   Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals." E-mail from Angelo Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept. 1, 2004 8:17 PM PDT).

136.    To protect themselves against poorly underwritten loans, parties who purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

137.    In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract.  In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate."  E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing Director and Chief of Mortgage Banking and Capital Markets, Countrywide Financial (Apr. 17, 2006 5:55 PM PST).  Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct.  [sic] It's not only subordinated to the first, but the first is subprime.  In addition, the FICOs are below 600, below 500 and some below 400. . . . With real estate values coming down . . . the product will become increasingly worse.  There has [sic] to be major changes in this program, including substantial increases in the minimum FICO.

*Id.*

138.    Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."  E-mail from Angelo Mozilo to Carlos Garcia, former CFO, Countrywide Financial and Jim Furash, former President, Countrywide Bank (June 1, 2006 10:38 PM PST).

139.    An internal quality control report, e-mailed on June 2, 2006, showed that for Stated Income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.  *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PDT).

140.    Countrywide, apparently, was "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."  E-mail from Angelo Mozilo to Dave Sambol, Managing Director, Countrywide (Sept. 26, 2006 10:15 AM PDT).  Yet, such loans were securitized and passed on to unsuspecting investors such as U.S. Central.

141.    With growing concern over the performance of Pay Option ARM loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated for the Bank."  E-mail from Angelo Mozilo to Carlos Garcia, former Managing Director, Countrywide (Nov. 3, 2007 5:33 PM PST).  In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans.  Mozilo's concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."  *Id.*

142.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product.  This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the

circumstances." E-mail from Angelo Mozilo, former Chairman and CEO, Countrywide Financial, to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM PST).

143.    Yet, Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide Managing Director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines." Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry, it may not be published but they do it.

E-mail from Frank Aguilera, Managing Director, Countrywide to John McMurray, Managing Director, Countrywide (Apr. 14, 2005 12:14 PM PDT).

144.    Internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive. E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PDT).

145.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate. Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution

59

unless these exceptions can be contained."  E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST).

146.    John McMurray, a former Countrywide Managing Director, expressed his opinion that "the exception process has never worked properly" in a September 2007 e-mail.  E-mail from John McMurray, Managing Director, Countrywide, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

147.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed that its high combined loan-to-value ratio ("CLTV") stated income loans were performing worse than those of its competitors. After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."  E-mail from Russ Smith, Countrywide, to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

148.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

149.    Like loan purchasers, insurers of RMBS also typically require the insured party to repurchase loans suffering Early Payment Default in order to protect themselves against fraud and poor underwriting.

150.    On September 30, 2008, MBIA Insurance Corp. ("MBIA"), an insurer of certain RMBS backed by pools of loans originated by Countrywide, filed a complaint against Countrywide alleging, in part, that Countrywide misrepresented the quality of its underwriting process.  *See* Complaint, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 08/602825 (N.Y. Sup. Ct. filed Sept.

30, 2008). After several motions to dismiss and an amended complaint, the court allowed MBIA's claims of fraud and breach of covenant of fair dealing against Countrywide to proceed.

151. On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

152. According to Zachary, Countrywide pressured employees to approve unqualified borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there [i.e., how the employee closes the deal]. . . ." NBC Nightly News, Countrywide Whistleblower Reports "Liar Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly News"). Zachary also stated that the practices were not the work of a few bad apples, but rather: "It comes down, I think from the very top that you get a loan done at any cost." *Id.*

153. Zachary also told of a pattern of: 1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income in order to qualify for loans.

154. NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices. Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans. NBC News quoted a former loan officer: "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'" July 1, 2008 NBC Nightly News.

155. Not surprisingly, Countrywide's default rates reflected its approach to underwriting. *See* 2008 "Worst Ten in the Worst Ten" Report. Countrywide appeared on the top ten list in six of

the ten markets: 4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in Stockton,

California and Riverside, California; and 10th in Bakersfield, California and Miami, Florida. When

the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, Countrywide appeared on

the top ten list in every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in

Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and Stockton-Lodi,

California; 7th in Riverside-San Bernardino, California and Fort Pierce-Port St. Lucie, Florida; 8th in

Vallejo-Fairfield-Napa, California; and 9th in Bakersfield, California. 2009 "Worst Ten in the Worst

Ten" Report.

### 5. First Franklin's Systematic Disregard of Underwriting Standards

156.    First Franklin originated or contributed a 100% of the loans in the mortgage pool

underlying the FFMLT 2006-FF16 offering.

157.    First Franklin faces a class action suit that alleges First Franklin systemically

disregarded its underwriting guidelines when originating mortgages that were subsequently

securitized into RMBS. *See* Compl., *Federal Home Loan Bank of Chicago v. Banc of Am.*, No. 10-ch-

45003 (Ill. Cir. Ct. Oct. 15, 2010) ("FHLB Chicago Compl.").

158.    Statements from confidential witnesses in the FHLB Chicago Complaint represented

that First Franklin originated mortgage loans in violation of its stated underwriting standards.

159.    According to one confidential witness in the complaint, account executives at First

Franklin were making "$100,000 a month in commissions," which was based off of the number and

dollar amount of loans processed. Due to this incentive structure, account executives would often

pressure underwriters to approve loans that should not have been approved. The executives would

simply override the underwriter's decision so that, according to this confidential witness, "Nine out

of ten times, the loan went through." *Id.* ¶¶ 308-309.

160.     Another confidential witness stated that "account executives paid processors cash under the table to help them get loans closed," and went on to describe how one loan processor was caught manipulating the loan documents in order to close more loans. *Id.* ¶ 311.

161.     One confidential witness described how the systematic disregard for underwriting standards grew worse after First Franklin purchased OwnIt Mortgage and OwnIt employees began working with the confidential witness.  She stated that OwnIt employees "were used to approving anything. They'd say, 'If we don't' approve it, somebody else will. So why lose the money?'" *Id.* ¶ 312.

162.     Another confidential witness represented that there was enormous pressure from management to close loans at any cost. "[P]eople were working until 8 p.m. on Saturdays and Sundays" in order to close the loans, stated the witness.  As a result, "a lot of loans slipped through. People were tired of being beat up. With the rush of loans, stuff could have been overlooked. Maybe the conditions didn't exactly meet the guidelines."  During the last few days of the month, a drove of employees would go to the branch manager "begging for exceptions to close their loans."  The witness recalls one instance where the branch manager came out of his office and yelled: "Ohf*** it! Just close the f***ing loans." *Id.* ¶ 317.

163.     Another confidential witness noted that account executives would often approach branch managers about overturning an underwriter's decision to reject a loan, and said that "some loans were approved that were not compliant with guidelines." *Id.* ¶ 318.

164.     When First Franklin began downsizing its mortgage operation in late 2007, it ordered all of its remaining underwriters to assist in loss mitigation.  One of these underwriters was a confidential witness, who reported that the loss mitigation group was tasked with reviewing the quality of a number of First Franklin's loans: she reported that among the loans she reviewed, fifty percent were not compliant with First Franklin's guidelines. *See id.* ¶ 320.

165.     According to another confidential witness, loan document manipulation at First Franklin grew to disconcerting levels.  The witness stated that "a lot of fraudulent loans were going through. There was tons of fraud going on."  *Id.* ¶ 323.

166.     As shown by statements from former employees, First Franklin's actual mortgage underwriting practices deviated widely from its stated guidelines.  This systematic disregard of underwriting standards led to toxic loans being bundled into securities and sold to investors who did not know, and could not have known, about the true nature of the loans backing their securities.

      **6.**    **First National Bank of Nevada's Systematic Disregard of Underwriting Standards**

167.     First National Bank of Nevada ("FNBN") originated or contributed a critical portion of loans in the mortgage pool underlying the NHELI 2007-1 offering.   The Federal Deposit Insurance Corporation ("FDIC") wound down FNBN's operations in July 2008, among the largest bank failures of that year.

168.     FNBN faces a class action suit that alleges FNBN systematically disregarded its underwriting guidelines when originating mortgages that were subsequently securitized into RMBS. *See* Consolidated Amended Class Action Complaint, *Plumber's Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-cv-10446 (D. Mass. filed Jan. 20, 2009) ("Plumber's Union ACC").

169.     According to the Plumber's Union ACC, one of FNBN's underwriters approached her Underwriting Supervisor about a loan application where the borrower—a hotel housekeeper— stated a monthly income of $5,000.

170.     The mortgage underwriter informed her supervisor of her intention to deny the loan on the grounds that the unverified income of the borrower appeared to be inflated. The Underwriting Supervisor pushed back on the underwriter's decision, assuring her that the loan could be worked out.   The underwriter told the Underwriting Supervisor that it was "absolutely

impossible" for the application information to be true, but the Underwriting Supervisor refused to "back-down." The underwriter refused to close the loan, but the Underwriting Supervisor eventually signed the necessary forms and the loan was closed. *See id.* ¶ 92.

171. The complaint described FNBN's use of "loan scrubbing" when originating loans. *See id.* ¶ 87.

172. According to the complaint, the Warm Springs office in Las Vegas, Nevada, employed eight or nine Loan Coordinators whose primary job was to "scrub" the loan applications received from a broker. This consisted of removing any and all information for the loan application that would disqualify the borrower from FNBN's loan programs. FNBN Loan Coordinators were often fired for failing to alter the loan package information to eliminate disqualifying information. *See id.* ¶ 87.

173. FNBN originated a large number of Alt-A loans, many of which were made to borrowers who were "obviously unqualified to be able to repay them," although FNBN would make the loans pass by "creating the numbers to make things work." *See id.* ¶ 88.

### 7. Fremont's Systematic Disregard of Underwriting Standards

174. Fremont was the primary originator of the loans underlying the FHLT 2006-3 and FHLT 2006-D offerings.

175. Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a lender "'known for poor quality loans.'" Opening Statement of Sen. Carl Levin, Chairman, Permanent S. Comm. on Investigations, Hearing on *Wall Street and the Financial Crisis: The Role of Credit Rating Agencies* (Apr. 23, 2010). Senator Levin recounted how an analyst with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, *a subprime lender known for loans with high rates of delinquency.* On January 24, 2007, an analyst wrote seeking advice from two senior analysts: "I have a Goldman deal with subprime

Fremont collateral. *Since Fremont collateral has been performing not so good, is there anything special I should be aware of?*" One analyst responded: "*No, we don't treat their collateral any differently.*" The other asked: "are the FICO scores current?" "Yup," came the reply. Then "You are good to go." In other words, *the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry.* In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages. By October, both companies began downgrading the CDO. Today all five AAA tranches have been downgraded to junk status.

*Id.* (emphases added).

176.    Fremont was subject to a cease and desist order from the FDIC in 2007. A July 1,

2008 article in the BCD News reported:

Ever since the FDIC slapped Fremont Investment & Loan with a cease and desist order in March 2007, a Chapter 11 filing seemed likely.
. . .

When the subprime mortgage market collapsed, Fremont Investment & Loan, once one of the top 10 subprime mortgage originators, found itself mired in financial disaster. To make matters worse, it also faced scrutiny from the FDIC, and was the subject of numerous lawsuits alleging that Fremont engaged in deceptive practices in connection with its origination and servicing of residential mortgage[s]..

In March 2007, the company exited the residential subprime loan business in light of an FDIC cease and desist order. The FDIC determined, among other things, that Fremont had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default.

*Former Subprime Lender's Parent Throws in the Towel*, 50 BCD NEWS & COMMENT, July 1, 2008.

177.    In July 2009, The New Yorker reported that Sheila Bair, Chairman of the FDIC,

initiated the first federal government action against Fremont in 2007 that culminated in the cease

and desist order to Fremont:

In March, 2007, she initiated the first government action against a subprime lender, instructing Fremont Investment & Loan, a California bank, to cease operations. Fremont was among the worst of the subprime offenders, using all the now familiar practices:  targeting people with bad credit, *ignoring traditional standards for underwriting home loans*, paying third-party brokers handsomely to bring in gullible customers, and then infecting the larger financial system by selling off the hazardous loans. "We ordered them out of the business," she said. "And they weren't happy about it."

Ryan Lizza, *The Contrarian; Sheila Bair and the White House financial debate*, NEW YORKER, July 6, 2009, at 30 (emphasis added).

178.    Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc., which is mentioned in this January 13, 2011 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.
>
> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.
>
> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*, MYRTLE BEACH SUN-NEWS, Jan. 13, 2011, at A.

179.    Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee.  *See* 2008 "Worst Ten in the Worst Ten" Report.  In the 2009 "Worst Ten of the Worst Ten" Report, Fremont holds the following positions: 2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th in Bakersfield, California and Merced, California.  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 8.    Homecomings Financial Network's Systematic Disregard of Underwriting Standards

180.    Homecomings Financial Network, Inc. ("Homecomings") was a major originator of residential mortgage loans during the mortgage boom.  Homecomings was a wholly-owned

subsidiary of Residential Funding Corporation, and contributed a critical number of mortgage loans to the RFMS2 2007-HSA2 and offering.   Lending practices at Homecomings and Residential Funding Corp., were largely indistinguishable.

181.   Following U.S. Central's purchase of the certificates in the Home Equity Loan Trust 2007-HSA2 offering, public disclosures revealed that Homecomings systematically disregarded its underwriting guidelines in favor of riskier, fee-driven mortgage lending practices including subprime, Alt-A and option-ARM loans, and engaged in predatory lending.

182.   The Federal Trade Commission opened an investigation into Homecomings mortgage lending and underwriting practices, closing the investigation in January 2009, after Homecomings ceased mortgage loan origination.   *See* Letter from Peggy L. Twohig, Associate Dir., Div. of Fin. Practices, Bur. of Consumer Protection, Federal Trade Commission, to Andrew Sandler, Skadden, Arps (counsel for Homecomings) (Jan. 22, 2009).

183.   In March 2009, the Portland Tribune reported that Homecomings lending practices allowed for the origination of shaky loans that precipitated a wave of foreclosures.   The article reported:

> "In order to keep your market share, you had to be more aggressive," said Tim Boyd, who sold subprime loans in the Portland area for six years and then Alt A loans for seven years for Homecomings Financial.
>
> "The main focus was doing Alt A because that's where the money was," said Boyd, who left the industry.  A loan officer arranging a $300,000 Option ARM loan could collect $10,500 in fees, he said.
>
> Lenders could unload shaky loans by selling them to investors, who often resold them in what amounted to a worldwide game of financial musical chairs.  Wall Street's insatiable appetite for more loans kept the pipeline filled, even if the deals weren't always sound.
>
> "The V.P.s came down to the office beating the drums about Option ARMs," urging mortgage brokers to sell them to customers, [Bill Ridge, owner of Ridge Mortgage Services] said.  "I had Wachovia march through there; I had GMAC."
> . . .

He said he knows of loan officers who'd tell title agents to keep quiet about Option ARM loan provisions during document-signing time.

"They'd tell the title officer, 'Don't go over this; just glean through it quickly and get the thing signed.'"

Tim Boyd said he drew the line at selling Option ARMs because he saw how that could get people into trouble.  "It made me sick," he said.

Steve Law, *Shaky Loans May Spur New Foreclosure Wave; Unraveling 'Alt A' Mortgages Could Keep Portland Housing Market Dismal*, PORTLAND TRIBUNE, Mar. 5, 2009 (updated Oct. 30, 2009), *available at* http://www.portlandtribune.com/news/ story.php?story_id=123620453702532400.

### 9.    IndyMac Bank's Systematic Disregard of Underwriting Standards

184.    IndyMac Bank F.S.B. ("IndyMac") was a principal originator of the loans underlying the INDX 2006-AR6, INDX 2006-AR35, HVMLT 2006-14, and LUM 2007-1 offerings.

185.    On July 11, 2008, just four months after IndyMac filed its 2007 Annual Report, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac filed for bankruptcy on July 31, 2008.

186.    On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness:  Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac.  The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

187.    According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale."  IndyMac OIG Report at 2.  The report found, "IndyMac often made loans

without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well." *Id.*

188. IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices," and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id.* at 11, 21. The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id.* at 11.

189. IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id.* at 2-3.

190. IndyMac's "risk from its loan products . . . was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id.* at 31.

191. Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market." *Id.* at 3. This proved to be a weight it could not bear, and IndyMac ultimately failed. *See id.*

192. In June 2008, the Center for Responsible Lending ("CRL") published a report entitled *IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending* (June 30, 2008) ("CRL Report"), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/indymac_what_went_wrong.pdf. The CRL Report detailed the results of the CRL's investigation into IndyMac's lending practices. CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac. The CRL Report summarized the results of its investigation as follows:

> IndyMac's story offers a body of evidence that discredits the notion that the
> mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll
> the purchase of bigger homes or investment properties.   CRL's investigation
> indicates many of the problems at IndyMac were spawned by top-down pressures
> that valued short-term growth over protecting borrowers and shareholders' interests
> over the long haul.

CRL Report at 1.

193.    CRL reported that its investigation "uncovered substantial evidence that [IndyMac]

engaged in unsound and abusive lending during the mortgage boom, routinely making loans without

regard to borrowers' ability to repay [the mortgage loans]." *Id.* at 2.

194.    The CRL Report stated that "IndyMac pushed through loans with fudged or falsified

information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id.*

195.    The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more

volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id.* at 3.

196.    Former IndyMac mortgage underwriters explained that "loans that required no

documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed

outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . .

and make them look like better credit risks." *Id.* at 8.  These "shoddily documented loans were

known inside the company as 'Disneyland loans' – in honor of a mortgage issued to a Disneyland

cashier whose loan application claimed an income of $90,000 a year." *Id.* at 3.

197.    The CRL also found evidence that:  (1) managers pressured underwriters to approve

shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled

underwriters' decisions to deny loans that were based upon falsified paperwork and inflated

appraisals.  For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in

California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line
> to a senior vice president and got it okayed.  "There's a lot of pressure when you're

> doing a deal and you know it's wrong from the get-go – that the guy can't afford it,"
> Miller told CRL. "And then they pressure you to approve it."
>
> The refrain from managers, Miller recalls, was simple: "Find a way to make this
> work."

*Id.* at 9 (footnote omitted).

198.    Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader,

stated:

> I would reject a loan and the insanity would begin. It would go to upper
> management and the next thing you know it's going to closing.

*Id.* at 1, 3. Streater also said the "prevailing attitude" at IndyMac was that underwriting was

"window dressing—a procedural annoyance that was tolerated because loans needed an

underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

199.    Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during

the same time period, told the CRL that IndyMac management would override his decision to reject

loans about 50% of the time. *See id.* at 9. According to Montilla:

> "I would tell them: 'If you want to approve this, let another underwriter do it, I
> won't touch it—I'm not putting my name on it,'" Montilla says. "There were some
> loans that were just blatantly overstated. . . . Some of these loans are very
> questionable. They're not going to perform."

*Id.* at 10.

200.    Montilla and another IndyMac mortgage underwriter told the CRL that borrowers

did not know their stated incomes were being inflated as part of the application process. *See id.* at

14.

201.    On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder

Division ("HBD"), alleging that IndyMac disregarded its underwriting practices, among other things,

and approved loans to borrowers who were not creditworthy or for projects with insufficient

collateral.  *See* Complaint, *FDIC v. Van Dellen*, No. 2:10-cv-04915-DSF, ¶ 6 (C.D. Cal. filed July 2,

2010).  This case is set for trial in September 2012.

202.     IndyMac currently faces a class action lawsuit alleging disregard of underwriting

standards that adversely affected the value of the purchased RMBS.  *See In re IndyMac Mortgage-Backed*

*Sec. Litig.*, No. 09-4583 (S.D.N.Y. filed May 14, 2009).  On June 21, 2010, the class action suit

survived a motion to dismiss.

203.     IndyMac's failure to abide by its underwriting standards left investors holding

severely downgraded junk securities.  As a result of IndyMac's systematic disregard of its

underwriting standards, the OCC included IndyMac in the OCC's 2008 "Worst Ten in the Worst

Ten" Report.  IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in

at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009.

*See* 2008 "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

### 10.     Option One Mortgage Corporation's Systematic Disregard of Underwriting Standards

204.     Option One Mortgage Corporation ("Option One") was a California corporation

headquartered in Irvine, California.  Option One originated, serviced, acquired, and sold non-prime

residential mortgages.  The company was founded in 1992 and, from June 1997 until April 2008, was

a subsidiary of Block Financial Corporation.  In April 2008, Option One's assets were sold to

American Home Mortgage Servicing, Inc.

205.     Option One originated or contributed loans in the mortgage pool underlying the

SVHE 2007-OPT1 offering.

206.     Option One disregarded its underwriting practices while focusing on selling the loans

it originated to Wall Street banks for securitization, according to the complaint in *Cambridge Place Inv.*

*Mgmt. v. Morgan Stanley & Co.*, No. 1:10-cv-11376-NMG (D. Mass. filed Aug. 13, 2010); *see also* Tom

Hals, *Fund Sues Banks for $1.2 Billion Loss Tied to Subprime*, REUTERS, July 12, 2010, *available at*

http://www.reuters.com/article/2010/07/12/us-cambridgeplace-subprime-lawsuit-

idUSTRE66B61220100712.

207.    The Massachusetts Attorney General sued Option One, alleging, among other

things, that Option One failed to follow its own underwriting standards in processing mortgage loan

applications.  *See Massachusetts v. H&R Block, Inc.*, No. 08-2474-BLS (Mass. Super. Ct. filed June 3,

2008); *see also* Tim McLaughlin, *Caturano Being Acquired by RSM McGladrey*, BOSTON BUS. J., June 24,

2010.  Trial is set for 2011.

208.    In October 2010, the Federal Home Loan Bank of Chicago ("FHLB Chicago") sued

Bank of America, among others, alleging that the offering documents for RMBS that the FHLB

Chicago purchased included material misstatements.   Based on statements from confidential

witnesses, the FHLB Chicago Complaint alleges that Option One systematically disregarded its

underwriting guidelines when originating mortgages that were subsequently securitized into RMBS.

*See* FHLB Chicago Compl..

209.    According to one confidential witness in the complaint, Option One "watered

down" the appraisal process, allowing loans with inflated appraisals to be approved.  *See id.* ¶ 298.

210.    The same confidential witness explained how Option One told its employees to "be

more aggressive"; it was made clear that the main objective of the company was to generate

loans— "[a]s long as they could sell it, that's what mattered."  *See id.* ¶ 296.

211.    Another confidential witness stated that one particular broker who worked with

Option One "was given preferential treatment and his loans were always pushed through" because

he provided the company with "lots and lots of loans"; loans that this confidential witness said were

often absent the necessary documentation.  *See id.*

11.    **NovaStar's Systematic Disregard of Underwriting Standards**

212.    NovaStar Mortgage, Inc. ("NovaStar"), a former Missouri subprime lender with offices in several states, originated numerous subprime loans that later defaulted.   NovaStar routinely and systematically disregarded its own underwriting standards and guidelines in order to generate more loan origination business, from which it reaped enormous profits.   NovaStar originated or contributed a critical portion of loans in the mortgage pool underlying the NHEL 2006-5 offering.

213.    The Wall Street Journal reported that, among other things, NovaStar touted its "Credit Score Override Program" for loan approval where it "ignored the rules" to qualify more borrowers:

> Deutsche's disparate dealings with two investor clients in February 2007 illustrate how it played both sides of the mortgage-securities market.
>
> That month, a time when the U.S. housing and mortgage markets were beginning to crack, Deutsche was helping put together bond deals backed by subprime mortgages.
>
> They included loans originated by NovaStar Financial Inc., a Missouri subprime lender that Deutsche had financed.  A promotional flier from NovaStar in 2003 said, "Ignore the Rules and Qualify More Borrowers with our Credit Score Override Program!"  As housing boomed, NovaStar thrived.
>
> But on Feb. 20, 2007, NovaStar reported a quarterly loss and said it was tightening the spigot on new loans.  It was another piece of evidence the long-rising housing market was headed the other way.  That evening, a senior Deutsche trader received an email from a hedge-fund manager with the subject line "Novastar" and the message:  "It is like the plague."

Carrick MollenKamp and Serena Ng, *Dual Role in Housing Deals Puts Spotlight on Deutsche*, WALL ST. J., Aug. 3, 2010, *available at*

http://online.wsj.com/article/SB10001424052748703900004575325232441982598.html.

214.    NovaStar regularly originated loans for borrowers who did not have a realistic capacity to repay the loans, as illustrated in this report from the New York Times:

The Jordans are fighting a foreclosure on their home of 25 years that they say was a result of an abusive and predatory loan made by NovaStar Mortgage Inc.  A lender that had been cited by the Department of Housing and Urban Development for improprieties, like widely hiring outside contractors as loan officers, NovaStar ran out of cash in 2007 and is no longer making loans.

. . .

The facts surrounding the Jordans' case are depressingly familiar.  In 2004, interested in refinancing their adjustable-rate mortgage as a fixed-rate loan, they said they were promised by NovaStar that they would receive one.  In actuality, their lawsuit says, they received a $124,000 loan with an initial interest rate of 10.45 percent that could rise as high as 17.45 percent over the life of the loan.

Mrs. Jordan, 66, said that she and her husband, who is disabled, provided NovaStar with full documentation of their pension, annuity and Social Security statements showing that their net monthly income was $2,697.  That meant that the initial mortgage payment on the new loan—$1,215—amounted to 45 percent of the Jordans' monthly net income.

The Jordans were charged $5,934 when they took on the mortgage, almost 5 percent of the loan amount.  The loan proceeds paid off the previous mortgage, $11,000 in debts and provided them with $9,616 in cash.

Neither of the Jordans knew the loan was adjustable until two years after the closing, according to the lawsuit.  That was when they began getting notices of an interest-rate increase from Nova- Star.  The monthly payment is now $1,385.

"I got duped," Mrs. Jordan said.  "They knew how much money we got each month. Next thing I know I couldn't buy anything to eat and I couldn't pay my other bills."

Gretchen Morgenson, *Looking for The Lenders' Little Helpers*, N.Y. TIMES, July 12, 2009.

215.    Investor Michael Burry studied NovaStar's underwriting practices, as reported by

The Pitch in this May 13, 2010 article:

One of the subprime-loan originators that Burry studied was NovaStar, a company that started in Westwood and later moved into an office building off Ward Parkway. NovaStar specialized in making home loans to people with shaky credit.

Burry noticed when NovaStar began issuing loans of increasingly crappy quality. From early 2004 to late 2005, the number of NovaStar borrowers taking out interest-only loans - no money down! - nearly quintupled.

The charade lasted until home prices stopped growing at an unprecedented clip and sketchy borrowers began to default on their tricked-out loans.

. . .

NovaStar, a company that the New York Times labeled "Exhibit A" for anyone interested in the goofy lending practices which precipitated the housing collapse, was eventually delisted from the New York Stock Exchange.

David Martin, *Hailed as a Rebel Reformer, KC Fed Chief Tom Hoenig is Really Neither*, THE PITCH, May 13, 2010, *available at* http://www.pitch.com/2010-05-13/news/kc-fed-chief-tom-hoenig-is-no-rebel/.

216.    NovaStar faces a class action suit that alleges NovaStar systematically disregarded its underwriting guidelines when originating mortgages in 2006 and 2007 that were subsequently securitized into RMBS.  *See* Second Amended Class Action Complaint, *N.J. Carpenters Health Fund v. NovaStar Mortgage, Inc.*, No. 08-cv-5310, Doc. 117 (S.D.N.Y. filed May 18, 2011) ("N.J. Carpenters SAC").

217.    The N.J. Carpenters SAC includes statements concerning NovaStar's systematic disregard of its underwriting guidelines from former NovaStar employees who worked in the NovaStar mortgage origination business.  These former employees include a former Vice President of Operations, Quality Control Auditors and Supervisors, Senior Underwriters, Account Managers, and Account Executives.  *See id.* ¶ 57.

218.    Former Account Managers, Underwriters, and Quality Control Auditors reported that the pressure to increase the volume of loan production led to the systematic disregard of NovaStar's underwriting guidelines in mortgage loan origination.  *See id.* ¶ 70.

219.    When NovaStar Underwriters and Quality Control Auditors alerted supervisors about loans that were initially rejected because of suspicious or fraudulent documentation, NovaStar management would routinely override these initial loan rejections and approve the loans.  *See id.*

220.    For Full Documentation loans, NovaStar Underwriters would reject loan applications where employment could not be adequately verified.  In many cases, NovaStar management overrode the initial rejection, disregarding the questionable verification of employment in order to approve the loan application.  *See id.* ¶ 75.

221. The N.J. Carpenters SAC noted that Full Documentation loan applications regularly included unreasonably inflated income. For instance, many loan application files reported income for several housekeepers in South Florida upwards of $200,000 a year. *See id.* ¶ 77.

222. For Stated Income loans, inflated income was commonplace. Reported income in Stated Income loans was apparently far from reasonable in relation to the applicant's employment. *See id.* ¶ 80. When underwriters denied loan applications because of unreasonable stated income, NovaStar management disregarded the initial rejection and subsequently approved in spite of the unreasonable reported income. *See id.* ¶ 81.

### 12. Silver State Mortgage's Systematic Disregard of Underwriting Standards

223. Silver State Mortgage Company ("Silver State") was a national wholesale and residential mortgage lender headquartered in Las Vegas, Nevada. Silver State ceased operations in February 2007 amid the turmoil of the subprime mortgage crisis. The details of Silver State's mortgage lending practices slowly emerged after it ceased operations. Silver State originated or contributed a critical portion of loans in the mortgage pool underlying the NHELI 2007-1 offering.

224. A former Silver State employee recounted his experiences as a loan officer with Silver State in a May 9, 2008 This American Life story on NPR entitled "The Giant Pool of Money." Mike Garner, the former Silver State employee, related how Silver State did not adequately assess whether the income of borrowers under Silver State's "stated income" product was reasonable compared to the borrowers' line of work:

> Garner:  The next guideline lower is just stated income, stated assets. Then you state what you make and state what's in your bank account. They call and make sure you work where you say you work. Then an accountant has to say for your field it is possible to make what you said you make. But they don't say what you make, they just say it's possible that they could make that.

Alex Blumberg & Adam Davidson, *The Giant Pool of Money* (National Public Radio broadcast May 9, 2008), *transcript available at* http://www.thisamericanlife.org/sites/default/files/355_transcript.pdf.

225.   Alex Blumberg, one of the NPR interviewers, commented on how easy it could have been to simply provide a W-2.  Garner responded by describing the means by which loan officers would determine whether the income was reasonable for the occupation:

> Blumberg:  It's just so funny that instead of just asking people to prove what they make, there's this theater in place of you have to find an accountant sitting right in front of me who could very easily provide a W2, but we're not asking for a W2 form, but we do want this accountant to say yeah, what they're saying is plausible in some universe.
>
> Garner:  Yeah, and loan officers would have an accountant they could call up and say "Can you write a statement saying a truck driver can make this much money?"  Then the next one, came along, and it was no income, verified assets.  So you don't have to tell the people what you do for a living.  You don't have to tell the people what you do for work.  All you have to do is state you have a certain amount of money in your bank account.  And then, the next one, is just no income, no asset.  You don't have to state anything.  Just have to have a credit score and a pulse.

*Id.*

226.   Garner recounted how his boss at Silver State despised these types of loan products that permitted such wanton disregard of underwriting standards.  Garner concluded:

> Garner:  Yeah.  And my boss was in the business for 25 years.  He hated those loans.  He hated them and used to rant and say, "It makes me sick to my stomach the kind of loans that we do."  He fought the owners and sales force tooth and neck about these guidelines.  He got [the] same answer.  Nope, other people are offering it.  We're going to offer them too.  We're going to get more market share this way.  House prices are booming, everything's gonna [sic] be good.  And . . . the company was just rolling in the cash.  The owners and the production staff were just raking it in.

*Id.*

227.   Instead, Silver State, like many other originators, focused on keeping up with the competition, sacrificing adherence to underwriting guidelines.  This quixotic quest for higher profits and more market share ultimately failed as Silver State ceased operations in 2007, no longer maintaining any share of the mortgage market.

### 13.   WaMu's Systematic Disregard of Underwriting Standards

228.   WaMu contributed a substantial portion of loans to the LUM 2007-1 offering.

229.    WaMu was a Seattle-based thrift that rapidly grew from a regional to a national

mortgage lender from 1991 to 2006.  At over $300 billion in total assets, WaMu was at one time the

largest institution regulated by the OTS.  On September 25, 2008, however, federal regulators closed

WaMu when loan losses, borrowing capacity limitations, a plummeting stock price, and rumors of

WaMu's problems led to a run on the thrift by depositors.  Federal regulators facilitated the sale of

WaMu to J.P. Morgan Chase & Co., in September 2008.

230.    In April 2010, the Treasury OIG issued a report entitled, "Evaluation of Federal

Regulatory Oversight of Washington Mutual Bank," Report No. EVAL-10-002 (the "WaMu OIG

Report"), discussing the reasons for WaMu's meteoric rise and consequent collapse.  The WaMu

OIG Report found, "WaMu failed primarily because of management's pursuit of a high-risk lending

strategy that included liberal underwriting standards and inadequate risk controls."  WaMu OIG

Report at 2.  The report elaborated on how WaMu adopted this new strategy to compete with

Countrywide and maximize profits:

> In 2005, WaMu management made a decision to shift its business strategy away from
> originating traditional fixed-rate and conforming single family residential loans,
> towards riskier nontraditional loan products and subprime loans.  WaMu pursued the
> new strategy in anticipation of increased earnings and to compete with Countrywide.
> . . .
>
> WaMu estimated in 2006 that its internal profit margin from subprime loans could
> be more than 10 times the amount for a government-backed loan product and more
> than 7 times the amount for a fixed-rate loan product.

*Id.* at 8 (footnote omitted).

231.    As previously noted in this Complaint, the Senate PSI issued its report on the causes

of the economic crisis.  The PSI Wall Street Report used WaMu as its case study into lending

practices of the mortgage industry during the housing bubble.  Citing internal e-mails and

correspondence the PSI obtained as part of its investigation, the PSI made the following factual

findings:

(1) High Risk Lending Strategy.  [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) Shoddy Lending Practices.  WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) Steering Borrowers to High Risk Loans.  WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

(4) Polluting the Financial System.  WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

(5) Securitizing Delinquency-Prone and Fraudulent Loans.  At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6) Destructive Compensation.  WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when its high risk lending strategy placed the bank in financial jeopardy.

PSI Wall Street Report at 50-51.

232.    In particular, the PSI Wall Street Report noted that WaMu had engaged in internal reviews of its lending practices and the lending practices of its mortgage lending subsidiary, Long Beach.  WaMu's Chief Risk Officer, Ron Cathcart, commissioned a study to look into the quality of loans originated by Long Beach.  The review found that the "top five priority issues" were as follows:

"Appraisal deficiencies that could impact value and were not addressed[;]
Material misrepresentations relating to credit evaluation were confirmed[;]

> Legal documents were missing or contained errors or discrepancies[;]
> Credit evaluation or loan decision errors[; and]
> Required credit documentation was insufficient or missing from the file."

*Id.* at 82 (quoting e-mail from Ron Cathcart, Chief Risk Officer, WaMu, to Cory Gunderson (Dec.

11, 2006 9:21 AM PST)).

233.    Pushing "Option ARMs" was a major part of WaMu's new "high risk" lending

strategy.  In a bipartisan memorandum from Senators Carl Levin and Tom Coburn to the Members

of the PSI, dated April 13, 2010, Option ARMS were labeled WaMu's "flagship" product. *Wall Street*

*and the Financial Crisis: The Role of High Risk Home Loans, Hearing Before S. Permanent Subcomm. on*

*Investigations*, 112th Cong. (2010) ("PSI High Risk Home Loans Hearing"), Senate Ex. 1.a, at 3.  The

WaMu OIG Report describes the inherently dangerous nature of WaMu's Option ARMs:

> WaMu's Option ARMs provided borrowers with the choice to pay their monthly
> mortgages in amounts equal to monthly principal and interest, interest-only, or a
> minimum monthly payment.  Borrowers selected the minimum monthly payment
> option for 56 percent of the Option ARM portfolio in 2005.
>
> The minimum monthly payment was based on an introductory rate, also known as a
> teaser rate, which was significantly below the market interest rate and was usually in
> place for only 1 month.  After the introductory rate expired, the minimum monthly
> payment feature introduced two significant risks to WaMu's portfolio:  payment
> shock and negative amortization.  WaMu projected that, on average, payment shock
> increased monthly mortgage amounts by 60 percent.  At the end of 2007, 84 percent
> of the total value of Option ARMs on WaMu's financial statements was negatively
> amortizing.

WaMu OIG Report at 9.

234.    The WaMu OIG Report notes that "Option ARMs represented as much as half of

all loan originations from 2003 to 2007 and approximately $59 billion, or 47 percent, of the home

loans on WaMu's balance sheet at the end of 2007." *Id.*

235.    The OIG also notes that WaMu's "new strategy included underwriting subprime

loans, home equity loans, and home equity lines of credit to high-risk borrowers.  In line with that

strategy, WaMu purchased and originated subprime loans, which represented approximately $16 billion, or 13 percent, of WaMu's 2007 home loan portfolio." *Id.* at 10.

236.    WaMu's careless underwriting practices rendered these already high risk loan products even more risky. *See id.* The WaMu OIG Report stated that the OTS and the FDIC repeatedly "identified concerns with WaMu's high-risk lending strategy" and loan underwriting, weaknesses in management and "inadequate internal controls." *Id.* at 3-4. Those concerns included "questions about the reasonableness of stated incomes contained in loan documents, numerous underwriting exceptions, miscalculations of loan-to-value ratios, and missing or inadequate documentation." *Hearing on Wall Street & the Fin. Crisis: The Role of Bank Regulators Before the United States S. Homeland Security and Governmental Affairs Comm., Permanent Subcomm. on Investigations*, 111th Cong. 9 (Apr. 16, 2010) (statement of the Hon. Eric M. Thorson, Inspector General, Dep't of the Treasury ) ("Thorson Statement").

237.    WaMu management began to notice the pattern of "first payment default" ("FPD") for loans its Long Beach subsidiary originated. In June 2007, WaMu closed Long Beach as a separate entity and placed its subprime lending operations in a new division called "Wholesale Specialty Lending."

238.    In late 2007, WaMu performed an internal review to determine whether its plans to address its poor underwriting practices were effective. The review focused on 187 loans that experienced FPD, originated from November 2006 to March 2007. As an initial matter, the review found:

> The overall system of credit risk management activities and process has major weaknesses resulting in unacceptable level of credit risk. Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors.

PSI High Risk Home Loans Hearing, Senate Ex. 21, "WaMu Corporate Credit Review: Wholesale Specialty Lending-FPD" at 2 (Sept. 28, 2007).

239.    Specifically, WaMu internally reported the following findings regarding the 187 FPD loans:

- (High) Ineffectiveness of fraud detection tools – 132 of the 187 (71%) files were reviewed by Risk Mitigation for fraud.  Risk Mitigation confirmed fraud on 115 files and could not confirm on 17 of the files, but listed them as "highly suspect."  This issue is a repeat finding with CCR.
- (High) Weak credit risk infrastructure impacting credit quality.  Credit weakness and underwriting deficiencies is a repeat finding with CCR.  It was also identified as a repeat finding and Criticism in the OTS Asset Quality memo 3 issued May 17, 2007.  Internal Audit in their August 20, 2007 Loan Origination & Underwriting report identified it as a repeat issue.  Findings from the CCR FPD review in relation to credit quality:
  - 132 of the 187 loans sampled were identified with red flags that were not addressed by the business unit
  - 80 of the 112 (71%) stated income loans were identified for lack of reasonableness of income
  - 87 files (47%) exceeded program parameters in place at the time of approval
  - 133 (71%) had credit evaluation or loan decision erros present
  - 25 (13%) had the title report issues that were not addressed
  - 28 (14%) had income calculation erros and 35 (19%) had income documentation errors
  - 58 (31%) had appraisal discrepancies that raised concerns that the value was not supported

*Id.* at 3.

240.    An OTS memorandum on Loan Fraud Investigation, dated June 19, 2008, noted the systematic nature of the problem:  "[T]he review defines an origination culture focused more heavily on production volume rather than quality.  An example of this was a finding that production personnel were allowed to participate in aspects of the income, employment, or asset verification process, a clear conflict of interest. . . .  Prior OTS examinations have raised similar issues including the need to implement incentive compensation programs to place greater emphasis on loan quality."  PSI High Risk Home Loans Hearing, Senate Ex. 25, Memorandum from D. Schneider, President Home Loans to A. Hedger, OTS Examiner and B. Franklin, OTS EIC at 1 (June 19, 2008).

241.    A WaMu Significant Incident Notification, Date Incident Reported – 04/01/2008, Loss Type – Mortgage Loan, stated:

> One Sales Associate admitted that during that crunch time some of the Associates would "manufacture" assets statements from previous loan docs and submit them to the [Loan Fulfillment Center ("LFC")]. She said the pressure was tremendous from the LFC to get them the docs since the loan had already funded and pressure from the Loan Consultants to get the loans funded.

PSI High Risk Home Loans Hearing, Senate Ex. 30, "Significant Incident Notification (SIN)" at 1 (Apr. 1, 2008).

242. A New York Times article described WaMu's underwriting practices as follows: "On a financial landscape littered with wreckage, WaMu, a Seattle-based bank that opened branches at a clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending." Peter S. Goodman & Gretchen Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans*, N.Y. TIMES, Dec. 27, 2008, at A1.

243. Sherri Zaback, a former underwriter at a WaMu branch in San Diego, California, stated that "[m]ost of the loans she . . . handled merely required borrowers to provide an address and Social Security number, and to state their income and assets." *Id.* On one occasion, Zaback asked a loan officer for verification of a potential borrower's assets. The officer sent her a letter from a bank showing a balance of approximately $150,000 in the borrower's account. Zaback called the bank to confirm and was told the balance was only $5,000. The loan officer yelled at her, Ms. Zaback recalled. "She said, '[w]e don't call the bank to verify.'" *Id.*

244. Zaback also recalled that the sheer volume of loans precluded WaMu employees from adhering to underwriting standards. According to Zaback, she would typically spend a maximum of 35 minutes per file: "'Just spit it out and get it done. That's what they wanted us to do. Garbage in, and garbage out.'" *Id.* Another WaMu agent in Irvine, California, told the New York Times that she "coached brokers to leave parts of applications blank to avoid prompting verification if the borrower's job or income was sketchy." *Id.*

245.     WaMu's underwriting critically failed with respect to appraisals as well.  An accurate appraisal of a property's market value is as crucial to the underwriting process as the property provides collateral for the loan in case of default.

> WaMu's review of appraisals establishing the value of single family homes did not always follow standard residential appraisal methods because WaMu allowed a homeowner's estimate of the value of the home to be included on the form sent from WaMu to third-party appraisers, thereby biasing the appraiser's evaluation.

WaMu OIG Report at 11.

246.     The New York Times reported, "WaMu pressured appraisers to provide inflated property values that made loans appear less risky, enabling Wall Street to bundle them more easily for sale to investors."  Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1. The article quoted the founder of one appraisal company that did business with WaMu until 2007 as saying, "'It was the Wild West'. . . .  'If you were alive, they would give you a loan.  Actually, I think if you were dead, they would still give you a loan.'"  *Id.* (quoting Steven Knoble, founder Mitchell, Maxwell & Jackson).

247.     Nor did WaMu adequately monitor non-employee third-party brokers who originated most of WaMu's loans.  As Eric Thorson explained before the Senate PSI:

> In addition to originating retail loans with its own employees, WaMu began originating and purchasing wholesale loans through a network of brokers and correspondents.  From 2003 to 2007, wholesale loan channels represented 48 to 70 percent of WaMu's total single family residential loan production.  WaMu saw the financial incentive to use wholesale loan channels for production as significant. According to an April 2006 internal presentation to the WaMu Board, it cost WaMu about 66 percent less to close a wholesale loan ($1,809 per loan) than it did to close a retail loan ($5,273).  So while WaMu profitability increased through the use of third-party originators, it had far less oversight and control over the quality of the originations.

Thorson Statement at 5.  According to the WaMu OIG Report, WaMu had only 14 employees monitoring the actions of 34,000 third-party brokers.  *See* WaMu OIG Report at 11.  This lack of

oversight led to WaMu "identif[ying] fraud losses attributable to third-party brokers of $51 million for subprime loans and $27 million for prime loans" in 2007.  *Id.*

248.     Federal regulators also noted that "WaMu acquired 11 institutions and merged with 2 affiliates" from 1991 to 2006, yet failed to "fully integrate . . . information technology systems, risk controls, and policies and procedures" from its acquisitions and institute "a single enterprise-wide risk management system."  Thorson Statement at 5.  An integrated risk management system was critically important in light of WaMu's high-risk lending strategy.  *See id.*

249.     Based on interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers, Goodman and Morgenson of the New York Times noted the "relentless pressure to churn out loans" while "disregarding borrowers' incomes and assets" that came from WaMu's top executives.  Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.  According to Dana Zweibel, a former financial representative at a WaMu branch in Tampa, even if she doubted whether a borrower could repay the loan, she was told by WaMu management that it was not her concern; her concern was "'just to write the loan.'"  *Id.*  Said Zweibel, "'[i]t was a disgrace'. . . . 'We were giving loans to people that never should have had loans.'"  *Id.*

250.     In November 2008 the New York Times, quoting Keysha Cooper, a Senior Mortgage Underwriter at WaMu from 2003 to 2007, recounted "'[a]t WaMu it wasn't about the quality of the loans; it was about the numbers.' . . . 'They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?'"  Gretchen Morgenson, *Was There a Loan It Didn't Like?*, N.Y. TIMES, Nov. 1, 2008.  According to the article, "[i]n February 2007 . . . the pressure became intense.  WaMu executives told employees they were not making enough loans and had to get their numbers up."  Cooper concluded, "'I swear 60 percent of the loans I approved I was made to.'. . . 'If I could get everyone's name, I would write them apology letters.'"  *Id.*

251.    WaMu blatantly inflated salaries of baby sitters and mariachi singers to the six-figure range.  Indeed, the only verification of the mariachi singer's income was a photograph of the mariachi singer in his outfit included in the loan application file.  The New York Times reported:

> As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'.  He rarely questioned them.  A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.

> Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows.  The borrower was claiming a six-figure income and an unusual profession:  mariachi singer.

> Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit.  The photo went into a WaMu file.  Approved.

> "I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons.
> . . .

> At WaMu, getting the job done meant lending money to nearly anyone who asked for it — the force behind the bank's meteoric rise and its precipitous collapse this year in the biggest bank failure in American history.

> On a financial landscape littered with wreckage, WaMu, a Seattle-based bank that opened branches at a clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending.  By the first half of this year, the value of its bad loans had reached $11.5 billion, nearly tripling from $4.2 billion a year earlier.

> Interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers reveal the relentless pressure to churn out loans that produced such results.

Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.

## VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT

252.    The Offering Documents included material untrue statements or omitted facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

253.    For purposes of Section 11 liability, the prospectus supplements are part of and included in the registration statements of the offerings pursuant to 17 C.F.R. §§ 230.158, 230.430B (2008).  *See also* Securities Offering Reform, 70 Fed. Reg. 44,722-01, 44,768-69 (Aug. 3, 2005).

A.    **Offering Documents Misrepresented Weighted Average LTV Ratios and Weighed Average Combined LTV Ratios**

254.    The Offering Documents  included detailed representations regarding the weighted average LTV ratios and weighted average CLTV ratios for the pools underlying the RMBS.

255.    The LTV ratio is the ratio of a mortgage loan's original principal balance to the appraised value of the mortgaged property.  For instance, if a borrower borrows $130,000 to purchase a house estimated to be worth $150,000, the LTV ratio is $130,000/$150,000 or 87%.

256.    A "weighted average" is an average in which each value to be averaged is assigned a weight that determines the relative importance of each value to the average.  A weighted average can be contrasted with a straight arithmetic mean in which each of the values to be averaged contributes equally to the average.  In the context of LTVs, the higher the balance of the loan(s) secured by the property, the more "weight" it is given in relation to the average.  To calculate the weighted average LTV ratio, each loan's LTV ratio is multiplied by the loan balance, and the sum of those numbers is divided by the total loan balance of the pool.  The weighted average LTV ratio is a factor in describing the risk of a particular RMBS.

257.    The NCUA Board commissioned a forensic review that calculated LTV ratios for the loans underlying six RMBS (FFMLT 2006-FF16, HVMLT 2006-10, HVMLT 2006-SB1, SAST 2006-3, SVHE 2006-WF2, and WMLTS 2006-ALT1).  The forensic review used a retrospective automated valuation model ("AVM") to estimate the value of the property generally using data regarding comparable property values, comparable sales, and home price indices at the time of  loan origination.  Retrospective AVMs inserts these data points into an algorithm that generates the estimated property value.  In contrast to human appraisals, which are inherently subjective, AVMs

estimate the market value of a property through more objective means. The AVM in the forensic review uses stringent criteria in determining an estimated property value (for instance, properties used as "comparables" must truly resemble the subject property) and thus enhancing accuracy.

258. For these six RMBS, the forensic review analyzed 13,708 mortgage loans.

259. The forensic review demonstrated that the Offering Documents materially understated the LTV ratios, and thus the risks, of the mortgage pools. The appraised values given to the mortgaged properties were significantly higher than what the properties were actually worth at the time of origination.

260. For four of the six RMBS tested, the Offering Documents contained representations about the purported weighted average LTV ratio for the loan pools. The forensic review found that on average, the actual weighted average LTV ratio was 15.35% higher than the weighted average LTV ratio reported in the Offering Documents. The chart below shows the difference between the weighted average LTV ratios represented in the Offering Documents, and the actual weighted average LTV ratios as revealed by the forensic review.

**Untrue Statements in the Offering Documents About Weighted Average LTV Ratios**

| RMBS | Represented Weighted Average LTV Ratio | Actual Weighted Average LTV Ratio | Actual Weighted Average LTV ___% Higher than Represented |
|---|---|---|---|
| FFMLT 2006-FF16 | N/A | N/A | N/A |
| HVMLT 2006-10 | 76.04% | 87.56% | 15.15% |
| HVMLT 2006-SB1 | 72.22% | 81.8% | 13.27% |
| SVHE 2006-WF2 | N/A | N/A | N/A |
| SAST 2006-3 | 77.32% | 89.13% | 15.27% |
| WMLTS 2006-ALT1 | 76.12% | 89.07% | 17% |

261. The Offering Documents contained aggregated loan-by-loan statistics about the weighted average CLTV ratios for the pools underlying the RMBS. The related CLTV ratio takes into account other liens on the property, such as a second mortgage. The CLTV ratio adds additional specificity to the basic LTV ratio by indicating that additional liens on the property have

been considered in the calculation of the ratio. Like LTV ratio, CLTV ratio is a key statistic for investors in evaluating both the price and the risk of RMBS.

262. Because the representations in the Offering Documents regarding CLTV ratios were based on false loan-level information, the aggregated statistics were also false.

263. Across all six of the tested RMBS, the forensic review shows that on average, the actual weighted average CLTV ratio was 21.65% higher than the weighted average CLTV ratio represented in the Offering Documents. The table below shows the difference between the weighted average CLTV ratios that the Offering Documents represented for the relevant RMBS, and the actual weighted average CLTV ratios as revealed by forensic review.

**Untrue Statements in the Offering Documents About Weighted Average CLTV**

| RMBS | Represented Weighted Average CLTV Ratio | Actual Weighted Average CLTV Ratio | Actual Weighted Average CLTV ___% Higher than Represented |
|------|----------------------------------------|-----------------------------------|----------------------------------------------------------|
| FFMLT 2006-FF16 | 83.39% | 108.77% | 30.44% |
| HVMLT 2006-10 | 79.41% | 94.16% | 18.57% |
| HVMLT 2006-SB1 | 73.47% | 87.79% | 19.49% |
| SVHE 2006-WF2 | 84.34% | 100.07% | 18.65% |
| SAST 2006-3 | 79.92% | 98.96% | 23.82% |
| WMLTS 2006-ALT1 | 85.72% | 102.64% | 19.7% |

264. The discrepancy between the reported weighted average original LTV and weighted average CLTV ratios and the ratios calculated using the retroactive AVM provides additional evidence that the Originators' systematically disregarded underwriting standards contrary to representations in the Offering Documents. Where the weighted average CLTV is close to or exceeds 100% for the RMBS, the borrowers collectively had virtually no equity in the mortgaged properties, increasing the risk of losses when the borrowers defaulted on the mortgaged properties. The actual weighted CLTV ratio shows that the RMBS were significantly riskier than represented in the Offering Documents.

**B.**   **Untrue Statements in the Offering Documents About Owner-Occupancy Ratios**

265.   The Offering Documents represented the percentage of properties that would be occupied by the borrower for the loans underlying each RMBS.   RBS performed due diligence regarding the occupancy status of the underlying properties.

266.   Representations regarding the occupancy type of a mortgaged property are material because borrowers are less likely to default on mortgages on their primary residences.   Barclays Capital explained:

> Most home owners become anchored to their communities through the schools their children attend and the friends they make. As a result, defaulting on the mortgage backing one's primary residence can be a jarring experience, one that most people would choose to avoid. By contrast, an investment property primarily represents a stream of income or speculative opportunity, making the decision to default more one of dollars and cents than of a major life change. As a result, all else being equal, borrowers are less likely to default on a mortgage backed by their primary residence than on one backed by an investment property.

Barclays Capital, *Barclays Loan Transition Model*, at 9 (Nov. 30, 2010).

267.   The forensic review used borrower- and property-specific public records to test loan-level occupancy data for each of the ten RMBS at issue.   The Offering Documents reported the aggregated the loan-level occupancy data for the mortgage pools backing each RMBS.

268.   First, the forensic review analyzed contemporaneous property tax records to determine whether: (1) borrowers received their property tax bill for the mortgaged property at the address of the mortgaged property; and (2) borrowers took a property tax exemption on the mortgaged property that is only available for owner-occupied properties.   Borrowers are likely to have a tax bill sent to their primary residence to ensure their ability to make timely payment. However, if borrowers have tax records sent to a different address, then they probably do not actually reside at the mortgaged property.   And if borrowers declined to make certain tax exemption

elections dependent on the borrowers residing at the property, then the borrowers probably do not reside at the mortgaged property.

269. Second, the the forensic review analyzed public records to determine whether borrowers owned any other properties during the same time period in which they owned the securitized property. The forensic review then examined whether the borrowers consistently identified the securitized property as their mailing address for property tax bills on each concurrently owned property. Inconsistencies in tax bill mailing addresses for concurrently-owned properties also strongly suggest that the securitized property was not, in fact, owner-occupied.

270. Third, the forensic review conducted a review of lien records on concurrently-owned properties to determine whether borrowers indicated that any property other than the securitized property was owner-occupied. This test examines all liens originated after the securitized mortgage and compares owner-occupancy representations with those in the loan tapes. If liens on concurrently-owned properties indicate that those properties are owner-occupied, then the borrower probably does not reside at the mortgaged property.

271. Fourth, the forensic review examined the mailing addresses identified for liens on concurrently-owned properties to determine whether the address of the securitized property was listed as the mailing address for bills and other correspondence between borrowers and the lienholders. If the securitized property address is not identified, then the securitized property is probably not owner-occupied.

272. Finally, the forensic review reviewed credit records to help determine whether a given borrower occupied the mortgaged property. Specifically, the forensic review investigated whether creditors were reporting the securitized property's address as the borrower's mailing address six months after the origination of the loan. Within six months of closing on a mortgage, one would expect borrowers to have changed their billing address with each of their creditors. If a borrower

was telling creditors to send bills to another address even six months after buying the property, it is likely the borrower was living at a different location.

273.    In assessing the accuracy of the Offering Documents' representations about owner-occupancy, the forensic review considered mortgages that failed multiple owner-occupancy tests to not have actually have been backed by owner-occupied properties.  Even with this high threshold, the forensic review revealed systemic overstatements of owner-occupancy rates within each of the RMBS at issue.

274.    The results of the forensic review's loan-level analysis of actual owner-occupancy rates are set forth in the chart below.  The forensic review's analysis demonstrates that, for the six RMBS tested, the Offering Documents drastically overstated the percentage of owner-occupied properties in the collateral pools.  Overall, the Offering Documents overstated the number of owner-occupied properties in each RMBS by 13.9% to 20.4%, with an average overstatement of 15.88%.

**Misrepresentations in Offering Documents About Owner-Occupancy Status**

| RMBS | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Percentage Overstatement |
|---|---|---|---|
| FFMLT 2006-FF16 | 95.7% | 84.0% | 13.9% |
| HVMLT 2006-10 | 72.1% | 61.5% | 17.2% |
| HVMLT 2006-SB1 | 91.7% | 79.8% | 14.9% |
| SAST 2006-3 | 94.6% | 83.0% | 14.0% |
| SVHE 2006-WF2 | 88.9% | 77.5% | 14.7% |
| WMLT 2006-ALT1 | 67.8% | 56.3% | 20.4% |

C.    **Other Untrue Statements in the Offering Documents**

275.    Statements in the Offering Documents concerning the following subjects were material and untrue at the time they were made:  (1) the Originators' evaluation of the borrower's likelihood and capacity to repay the loan through application of the stated underwriting standards, including the calculation and use of an accurate "debt-to-income" ratio and the frequency and use of

exceptions to those standards; (2) adherence to stated underwriting standards for reduced documentation programs; and (3) the accurate calculation of the "loan-to-value" ratio for the mortgaged property and the accuracy of appraisals.

276.   The following chart lists which originators contributed loans to each RMBS.  Under SEC's Regulation AB, the Offering Documents must disclose the originators that contributed more than 10% of the loans underlying the RMBS, and the Offering Documents must include underwriting guidelines for the originators that contributed more than 20% of the loans underlying the RMBS.  *See* 17 C.F.R. § 229.1110 (2005).  In the RMBS listed below, the Offering Documents included only those underwriting guidelines for the Originators that contributed more than 20% of the loans to the RMBS.

| CUSIP(S) | RMBS | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 320275AD2<br>320275AE0<br>320275AF7 | FFMLT 2006-FF16 | 2A3<br>2A4<br>M1 | First Franklin (100%) |
| 35729MAF4 | FHLT 2006-3 | M1 | Fremont Investment & Loan (100%) |
| 35729VAE7<br>35729VAF4 | FHLT 2006-D | 2A4<br>M1 | Fremont Investment & Loan (100%) |
| 41162CAD3<br>41162CAE1 | HVMLT 2006-10 | 2A1B<br>2A1C | Paul Financial, LLC (17.26%,), BankUnited, FSB, (16.85%), Residential Mortgage Capital (15.92%), Loan Center of California, Inc. (12.78%), NL Inc. dba Residential Pacific Mortgage (10.89%), and First Federal Bank of California (10.77%). |
| 41162GAA0 | HVMLT 2006-11 | A1A | Countrywide (100%) |
| 41162DAE9<br>41162DAH2 | HVMLT 2006-12 | 2A1B<br>2A2C | Countrywide (100%) |
| 41162NAE7 | HVMLT 2006-14 | 2A1C | IndyMac Bank, FSB (64.12%), American Home Mortgage Corp. (12.66%) |
| 41162BAB9 | HVMLT 2006-SB1 | A1B | Secured Bankers Mortgage Company (100%) |
| 43710RAG6 | RFMS2 2007-HSA2 | A6 | Homecomings Financial, LLC (22.4%) |
| 45667SAA5 | INDX 2006-AR35 | 2A1A | IndyMac Bank, FSB (100%) |
| 456612AC4 | INDX 2006-AR6 | 2A1A | IndyMac Bank, FSB (100%) |
| 550279BC6 | LUM 2006-2 | A1C | Countrywide Home Loans, Inc. (87.42%), Paul Financial, LLC (12.58%) |

| 55028CAA3 | LUM 2007-1 | 1A1 | Washington Mutual Mortgage Securities Corp. (Group I) |
| 65537KAY6 | NHELI 2007-1 | 1A4 | First National Bank of Nevada (35.88%) (Group I) |
| 66988YAE2 66988YAF9 66988YAG7 | NHEL 2006-5 | A2D M1 M2 | NovaStar Mortgage, Inc. (100%) |
| 83612MAF4 | SVHE 2006-WF2 | M1 | Wells Fargo (100%) |
| 83612TAD4 | SVHE 2007-OPT1 | 2A3 | Option One Mortgage Corp (100%) |
| 41161UAD4 41161UAF9 | HVMLT 2006-6 | 2A1B 3A1B | American Home Mortgage Corp (25.75%) Countrywide Home Loans, Inc. (50.23%) Downey Savings & Loan Assoc., F.A. (10.61%) |
| 80556AAD9 | SAST 2006-3 | A4 | Saxon Mortgage, Inc. (100%) |
| 92978GAB5 92978GAC3 | WMLT 2006-ALT1 | A2 A3 | National City (65.93%) Accredited (18.88%) WMC (12.44%) AmNet (2.75%) |

277.    Examples of material untrue statements and/or omissions of fact in the Offering Documents of the RMBS listed above follow.

**D.    Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood to Repay the Mortgage Loan**

278.    The FFMLT 2006-FF16 Prospectus Supplement represented:  "[A]ll of the mortgage loans . . . were required to meet the underwriting criteria described in this prospectus supplement." FFMLT 2006-FF16 Prospectus Supplement at S-31.

279.    The FFMLT 2006-FF16 Prospectus Supplement represented:  "Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan."  FFMLT 2006-FF16 Prospectus Supplement at S-66; s*ee* FFMLT 2006-FF16 Registration Statement, Jan. 11, 2006, at "The Originators" section.

280.    The FFMLT 2006-FF16 Prospectus Supplement represented:

All of the Mortgage Loans were acquired by First Franklin Financial under the Direct Access Program. While each underwriting program is intended to assess the risk of default, the Direct Access Program makes use of credit bureau risk scores (the "Credit Bureau Risk Score"). The Credit Bureau Risk Score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company ("Fair, Isaac") and the three national credit repositories Equifax, Trans Union and First American (formerly Experian which was formerly TRW). . . . The Credit Bureau Risk Score is used as an aid to, not a substitute for, the underwriter's judgment.

The Direct Access Program was developed to simplify the origination process for third party originators. In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, Direct Access relies upon a borrower's Credit Bureau Risk Score initially to determine a borrower's likely future credit performance. . . . First Franklin Financial's acquisition guidelines require that the third party originator approve the Mortgage Loan using the Direct Access Program risk-based pricing matrix.

FFMLT 2006-FF16 Prospectus Supplement at S-63-64; *see* FFMLT 2006-FF16 Registration

Statement, Jan. 11, 2006, at "The Originators" section.

281.    The FFMLT 2006-FF16 Prospectus Supplement represented:

First Franklin Financial's acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.

FFMLT 2006-FF16 Prospectus Supplement at S-63; *see* FFMLT 2006-FF16 Registration Statement,

Jan. 11, 2006, at "The Originators" section.

282.    The FFMLT 2006-FF16 Prospectus Supplement represented:

In accordance with First Franklin Financial's guidelines for acquisition, all of the mortgage loans of a type similar to the Mortgage Loans were required to be underwritten by the third party originator's underwriters having the appropriate signature authority. Each underwriter is granted a level of authority commensurate with their proven judgment, maturity and credit skills. On a case by case basis, a third party originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a substantial portion of the Mortgage Loans may represent such underwriting exceptions.

FFMLT 2006-FF16 Prospectus Supplement at S-64; *see* FFMLT 2006-FF16 Registration Statement,

Jan. 11, 2006, at "The Originators" section.

> 283.   The FFMLT 2006-FF16 Prospectus Supplement represented:

> In accordance with First Franklin Financial's guidelines for acquisition, the third party originators must consider, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio ("Debt Ratio"), as well as the value, type and use of the mortgaged property.

FFMLT 2006-FF16 Prospectus Supplement at S-63; *see* FFMLT 2006-FF16 Registration Statement,

Jan. 11, 2006, at "The Originators" section.

> 284.   The FHLT 2006-D Prospectus Supplement represented:

> Fremont Investment & Loan provides underwriters with specific underwriting guidelines and maintains strict control procedures to manage the quality of its originations at all locations.

FHLT 2006-D Prospectus Supplement at 74; *see* FHLT 2006-D Registration Statement, Mar. 17,

2006, at 74.

> 285.   The Fremont Home Loan Trust 2006-D Prospectus Supplement represented:

> The mortgage loans were underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ("Scored Programs"). Fremont Investment & Loan began originating mortgage loans pursuant to Scored Programs in 2001 and the Scored Programs have been the exclusive type of origination programs beginning in 2004. Within the Scored Programs, there are three documentation types, Full Documentation, Easy Documentation, and Stated Income. All of the mortgage loans were originated in accordance with Fremont Investment & Loan's underwriting guidelines, subject to various exceptions as described in this section. A Credit Score is used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, loan-to-value ratio as an aid to, not a substitute for, the underwriter's judgment. Fremont Investment & Loan's underwriting staff fully reviews each loan to determine whether it's underwriting guidelines for income, assets, employment and collateral are met.

FHLT 2006-D Prospectus Supplement at 76-77; *see* FHLT  2006-3 Prospectus Supplement at S-64;

FHLT 2006-D Registration Statement, Mar. 17, 2006, at 76-77.

> 286.   The FHLT 2006-3 Prospectus Supplement represented:

> All of the Mortgage Loans were originated or acquired by Fremont generally in accordance with the underwriting criteria described in this section. The following is a summary of the underwriting guidelines believed by the Depositor to have been applied, with some variation, by Fremont.

FHLT 2006-3 Prospectus Supplement at S-64.

287. The FHLT 2006-D Prospectus Supplement represented:

> Fremont Investment & Loan's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. Fremont Investment & Loan considers, among other things, a mortgagor's Credit Score, past payment history, repayment ability and debt service-to-income ratio, as well as the value, type and use of the mortgaged property.

FHLT 2006-D Prospectus Supplement at 76; *see* FHLT 2006-3 Prospectus Supplement at S-64;

FHLT 2006-D Registration Statement, Mar. 17, 2006, at 76; FHLT 2006-3 Registration Statement,

Jan. 11, 2006, at "The Originators" section.

288. The FHLT 2006-D Prospectus Supplement represented:

> A borrower's lack of credit payment history and/or relatively low Credit Score, however, will not necessarily preclude Fremont Investment & Loan from making a loan if other favorable borrower characteristics exist, including an adequate debt-to-income ratio or sufficient equity in the property.

FHLT 2006-D Prospectus Supplement at 75; *see* FHLT 2006-D Registration Statement, Mar. 17,

2006, at 75.

289. The FHLT 2006-D Free Writing Prospectus represented:

> On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions.

FHLT 2006-D Free Writing Prospectus, Oct. 24, 2006, at 41; FHLT 2006-3 Prospectus Supplement

at S-65; *see* FHLT 2006-D Registration Statement, Mar. 17, 2006, at 77-78; FHLT 2006-3

Registration Statement, Jan. 11, 2006, at "The Originators" section.

      290.    The FHLT 2006-D Prospectus Supplement represented:

> Generally, Fremont Investment & Loan's guidelines require an analysis of the
> following
> . . .
>
> a borrower's "debt-to-income ratio," which measures a borrower's projected income
> relative to the proposed mortgage payment and to other fixed obligations. . . .

FHLT 2006-D Prospectus Supplement at 74; *see* Fremont Home Loan Trust 2006-D Registration

Statement, Mar. 17, 2006, at 74.

      291.    The HVMLT 2006-6 Prospectus Supplement represented:  "American Home

underwrites a borrower's creditworthiness based solely on information that American Home

believes is indicative of the applicant's willingness and ability to pay the debt they would be

incurring."  HVMLT 2006-6 Prospectus Supplement at S-96.

      292.    The HVMLT 2006-6 Prospectus Supplement represented:

> American Home's underwriting philosophy is to weigh all risk factors inherent in the
> loan file, giving consideration to the individual transaction, borrower profile, the
> level of documentation provided and the property used to collateralize the debt.
> These standards are applied in accordance with applicable federal and state laws and
> regulations.  Exceptions to the underwriting standards may be permitted where
> compensating factors are present. . . .  Because each loan is different, American
> Home expects and encourages underwriters to use professional judgment based on
> their experience in making a lending decision.

HVMLT 2006-6 Prospectus Supplement at S-96.

      293.    The HVMLT 2006-6 Prospectus Supplement represented:

> American Home realizes that there may be some acceptable quality loans that fall
> outside published guidelines and encourages "common sense" underwriting.
> Because a multitude of factors are involved in a loan transaction, no set of guidelines
> can contemplate every potential situation.  Therefore, each case is weighed
> individually on its own merits and exceptions to American Home's underwriting

guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

HVMLT 2006-6 Prospectus Supplement at S-98.

294.    The HVMLT 2006-6 Prospectus Supplement represented:

All of the mortgage loans sold to the seller by Downey (the "Downey Mortgage Loans") were originated or acquired by Downey generally in accordance with the underwriting criteria described in this section.

Downey's underwriting guidelines are applied to evaluate the applicant, the property and the applicant's income, employment and credit history, as applicable in the context of the loan program and documentation requirements.  These are guidelines only and each loan is evaluated based upon its merits.  Exceptions to the guidelines may be acceptable if there are mitigating factors.

HVMLT 2006-6 Prospectus Supplement at S-104.

295.    The HVMLT 2006-10 Prospectus Supplement represented:   "Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Exceptions to the underwriting standards are permitted where compensating factors are present."  HVMLT 2006-10 Prospectus Supplement at S-63 (stating BankUnited's underwriting guidelines);  HVMLT 2006-14 Prospectus Supplement at S-65.

296.    The HVMLT 2006-10 Prospectus Supplement represented:

In determining whether a prospective borrower has sufficient monthly income available to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, BankUnited generally considers, when required by the applicable documentation type, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.  Such ratio varies depending on a number of underwriting criteria, including loan-to-value ratios, and is determined on a loan-by-loan basis.  Under its One Month MTA Guidelines, BankUnited generally permits a debt-to-income ratio based on the borrower's total monthly debt of 42%.  Higher debt-to-income ratios may also be acceptable with evidence of specific compensating factors.

HVMLT 2006-10 Prospectus Supplement at S-64; HVMLT 2006-14 Prospectus Supplement at S-66.

297.    The HVMLT 2006-12 Prospectus Supplement represented:   "Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%."   HVMLT 2006-12 Prospectus Supplement at S-70; HVMLT 2006-11 Prospectus Supplement at S-36; HVMLT 2006-6 Prospectus Supplement at S-101.

298.    The HVMLT 2006-12 Prospectus Supplement represented:

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income.   If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation.   Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization.   Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

HVMLT 2006-12 Prospectus Supplement at S-68; HVMLT 2006-11 Prospectus Supplement at S-34;

HVMLT 2006-6 Prospectus Supplement at S-99.

299.    The HVMLT 2006-SB1 Prospectus Supplement represented:

The mortgage loans sold to the Seller by SBMC Mortgage were originated by independent mortgage loan brokers approved by SBMC.   SBMC employees have analyzed the borrower's credit standing, repayment ability and the adequacy of the mortgaged property used as collateral.   All loans have been evaluated in accordance with the underwriting criteria described in this section.

HVMLT 2006-SB1 Prospectus Supplement at S-33.

300.    The HVMLT 2006-SB1 Prospectus Supplement represented:

SMBC's underwriting guidelines for the MTA Option ARM loans are generally consistent with those of large originators of similar option ARM loans.   SBMC applies its underwriting guidelines to evaluate the property and the applicant's income, employment, assets, and credit history in the context of the applicable loan program and documentation requirements.   SBMC determines an applicant's creditworthiness based on the borrower's ability and willingness to repay the loan. The loan decision is based upon the applicant's financial information (if applicable), employment and income stability, credit history and collateral value.

HVMLT 2006-SB1 Prospectus Supplement at S-34.

301.    The RFMS2 2007-HSA2 Prospectus represented:

The depositor's underwriting standards, as well as any other underwriting standards that may be applicable to any loans, generally include a set of specific criteria under which the underwriting evaluation is made.   However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually.  Rather, a loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards.  For example, a loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied.

RFMS2 2007-HSA2 Prospectus, Apr. 23, 2007, at 14; *see*   RFMS2 2007-HSA2 Registration

Statement, Feb. 12, 2007, at S-53.

302.    The RFMS2 2007-HSA2 Prospectus Supplement represented:

In determining the adequacy of the mortgaged property as collateral for a mortgage loan, an appraisal is made of each property considered for financing or, if permitted by the underwriting standards, the value of the related mortgaged property will be determined by the purchase price of the mortgaged property, a statistical valuation, or the stated value.  In most cases, the underwriting standards of Residential Funding as to the mortgage loans originated or purchased by it place a greater emphasis on the creditworthiness and debt service capacity of the borrower than on the underlying collateral in evaluating the likelihood that a borrower will be able to repay the related mortgage loan.

RFMS2 2007-HSA2 Prospectus Supplement at S-38; *see* RFMS2 2007-HSA2 Registration Statement,

Feb. 12, 2007, at S-50.

303.    The RFMS2 2007-HSA2 Prospectus represented:

Once all applicable employment, credit and property information is received, a determination is made by the original lender as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the home if applicable, such as property taxes, hazard insurance and maintenance fees or other levies assessed by a Cooperative, if applicable, as well as other financial obligations, including debt service on any loan secured by a senior lien on the related mortgaged property.

RFMS2 2007-HSA2 Prospects at 18; *see* RFMS2 2007-HSA2 Registration Statement, Feb. 12, 2007,

at 18.

> 304.    The RFMS2 2007-HSA2 Prospectus Supplement represented:

> Residential Funding relies on a number of guidelines to assist underwriters in the credit review and decision process.  The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant.   Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns.   The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements.  For two- to four- family unit properties, rental income derived from the property may be considered.

RFMS2 2007-HSA2 Prospectus Supplement at S-38; *see* RFMS2 2007-HSA2 Registration Statement,

Feb. 12, 2007, at S-50.

> 305.    The INDX 2006-AR35 Prospectus Supplement represented:

> Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions.   Conventional mortgage loans are loans that are not insured by the FHA or partially guaranteed by the VA.  Conforming mortgage loans are loans that qualify for sale to Fannie Mae and Freddie Mac, whereas non-conforming mortgage loans are loans that do not so qualify.   Non-conforming mortgage loans originated or purchased by IndyMac Bank pursuant to its underwriting programs typically differ from conforming loans primarily with respect to loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types.   To the extent that these programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of loans made pursuant to these different underwriting standards may reflect higher delinquency rates and/or credit losses.

INDX 2006-AR35 Prospectus Supplement at S-67; INDX 2006-AR6 Prospectus Supplement at S-

51; *see* INDX 2006-AR35 Registration Statement,  Feb. 24, 2006, at S-28; INDX 2006-AR6

Registration Statement, Feb. 24, 2006, at S-28.

> 306.    The INDX 2006-AR35 Prospectus Supplement represented:

IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

INDX 2006-AR35 Prospectus Supplement at S-67; INDX 2006-AR6 Prospectus Supplement at S-51; *see* INDX 2006-AR35 Registration Statement, Feb. 24, 2006, at S-28; INDX 2006-AR6 Registration Statement, Feb. 24, 2006, at S-28.

307. The INDX 2006-AR35 Prospectus Supplement represented:

Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.

INDX 2006-AR35 Prospectus Supplement at S-69; INDX 2006-AR6 Prospectus Supplement at S-53; *see* INDX 2006-AR35 Registration Statement, Feb. 24, 2006, at S-31; INDX 2006-AR6 Registration Statement, Feb. 24, 2006, at S-31.

308. The INDX 2006-AR35 Prospectus Supplement represented:

Additionally, maximum total monthly debt payments-to-income ratios and cash-out limits may be applied. Other factors may be considered in determining loan eligibility such as a borrower's residency and immigration status, whether a non-occupying borrower will be included for qualification purposes, sales or financing concessions included in any purchase contract, the acquisition cost of the property in the case of a refinance transaction, the number of properties owned by the borrower, the type and amount of any subordinate mortgage, the amount of any increase in the borrower's monthly mortgage payment compared to previous mortgage or rent payments and the amount of disposable monthly income after payment of all monthly expenses.

INDX 2006-AR35 Prospectus Supplement at S-68; INDX 2006-AR6 Prospectus Supplement at S-52; *see* INDX 2006-AR35 Registration Statement, Feb. 24, 2006, at S-30; INDX 2006-AR6 Registration Statement, Feb. 24, 2006, at S-30.

309. The LUM 2006-2 Prospectus Supplement represented:

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income.  If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation.  Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization.  Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

LUM 2006-2 Prospectus Supplement at S-39.

310.    The LUM 2006-2 Prospectus Supplement represented:

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

LUM 2006-2 Prospectus Supplement at S-39-40.

311.    The LUM 2006-2 Prospectus Supplement represented:

The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower.  In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.  Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

LUM 2006-2 Prospectus Supplement at S-40.

312.    The LUM 2006-2 Prospectus Supplement represented:

For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company.  The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession,

suits or judgments.  All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

LUM 2006-2 Prospectus Supplement at S-40.

313.    The LUM 2007-1 Prospectus Supplement represented:

The mortgage loans have been originated generally in accordance with the following underwriting standards established by WMMSC or underwriting guidelines established by WaMu.  The following is a summary of the underwriting standards or guidelines generally applied by WMMSC or WaMu and does not purport to be a complete description of the underwriting standards of WMMSC or WaMu.  Such underwriting standards or guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Some mortgage loans are manually underwritten, in which case an underwriter reviews a loan application and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms stated in the loan application.  Some mortgage loans may be underwritten through an automated underwriting system, including WaMu's automated underwriting system, described below.

LUM 2007-1 Prospectus Supplement at S-32.

314.    The LUM 2007-1 Prospectus Supplement represented:

Exceptions to underwriting standards described above may be made on a case-by-case basis if compensating factors are present.  In those cases, the basis for the exception is documented.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

LUM 2007-1 Prospectus Supplement at S-34.

315.    The LUM 2007-1 Prospectus Supplement represented:

Under all documentation programs other than the no ratio programs and the no documentation programs, in evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including certain non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio").  The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets.  Exceptions to the ratio guidelines may be made when compensating factors are present.

LUM 2007-1 Prospectus Supplement at S-33.

316.    The NHELI 2007-1 Prospectus Supplement represented:

All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section.

NHELI 2007-1 Prospectus Supplement at S-108.

317.    The NHELI 2007-1 Prospectus Supplement represented:

FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed Mortgaged Property as collateral.  A prospective borrower applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired.

NHELI 2007-1 Prospectus Supplement at S-105.

318.    The NHELI 2007-1 Prospectus Supplement represented:

Based on the data provided in the application and certain verifications (if required), a determination will have been made that the borrower's monthly income (if required to be stated or verified) should be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the Mortgaged Property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses).

NHELI 2007-1 Prospectus Supplement at S-105.

319.    The NHELI 2007-1 Prospectus Supplement represented:

Silver State Mortgage's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed Mortgaged Property as collateral.  A prospective borrower applying for a mortgage loan is required to complete an application which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired.

NHELI 2007-1 Prospectus Supplement at S-107.

320.    The NHELI 2007-1 Prospectus Supplement represented:

FNBN's underwriting guidelines are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations.  However, the application of FNBN's underwriting guidelines does not imply that each specific criterion was satisfied individually.  FNBN will have considered a mortgage loan to be originated in accordance with a given set of underwriting guidelines if, based on an overall qualitative evaluation, in FNBN's discretion such mortgage loan is in substantial compliance with such underwriting guidelines or if the borrower can document compensating factors.  A mortgage loan may be considered to comply with a set of underwriting guidelines, even if one or more specific criteria included in such underwriting guidelines were not satisfied, if other factors compensated for the criteria that were not satisfied or the mortgage loan is considered to be in substantial compliance with the underwriting guidelines.

NHELI 2007-1 Prospectus Supplement at S-105-106.

321.    The NHELI 2007-1 Prospectus Supplement represented:

Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and other fixed obligations equal no more than a specified percentage of the prospective borrower's gross income.  The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ratio of the mortgage loan or the amount of liquid assets available to the borrower after origination.

NHELI 2007-1 Prospectus Supplement at S-105.

322.    The NHEL2006-5 Prospectus Supplement represented:

The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan.

NHEL 2006-5 Prospectus Supplement at S-77; *see* NHEL 2006-5 Registration Statement, May 25, 2006, at S-57.

323.    The NHEL 2006-5 Prospectus Supplement represented:

Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history.  Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report or pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date.

NHEL 2006-5 Prospectus Supplement at S-77; *see* NHEL 2006-5 Registration Statement, May 25,

2006, at S-57.

324.    The NHEL 2006-5 Prospectus Supplement represented:

On a case-by-case basis, exceptions to the underwriting guidelines are made where the sponsor believes compensating factors exist. Compensating factors may consist of factors like length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception. All loans in excess of $350,000 currently require the approval of the underwriting supervisor or designee approved by the supervisor. All loans over $650,000 require the approval of the VP of Operations and Corporate Credit Department or its approved designees. In addition, the President of the sponsor approves all loans in excess of $1,100,000.

NHEL 2006-5 Prospectus Supplement at S-78; *see* NHEL 2006-5 Registration Statement, May 25,

2006, at S-58.

325.    The SAST 2006-3 Prospectus Supplement represented:

Saxon Mortgage underwrites each loan individually. The underwriting decision is based on the risk profile of the loan, even in instances where a group of mortgage loans is purchased in bulk. In some of these bulk purchases, contract underwriters may be engaged to underwrite individual mortgage loans under the direct supervision of the senior underwriting staff of Saxon Mortgage.

SAST 2006-3 Prospectus Supplement at S-37; *see* SAST 2006-3 Registration Statement, Feb. 9, 2006,

at the "Underwriting Standards" section.

326.    The SAST 2006-3 Prospectus Supplement represented:

Saxon Mortgage customarily employs underwriting guidelines to aid in assessing:
- the borrower's ability and willingness to repay a loan according to its terms; and
- whether the value of the property securing the loan will allow the lender to recover its investment if a loan default occurs

SAST 2006-3 Prospectus Supplement at S-37-38; *see* SAST 2006-3 Registration Statement, Feb. 9,

2006, at the "Underwriting Standards" section.

327.    The SAST 2006-3 Prospectus Supplement represented:

The Saxon Mortgage underwriting guidelines provide for an analysis of the overall situation of the borrower and take into account compensating factors which may be used to offset certain areas of weakness.  Specific compensating factors include:

- loan-to-value ratio;
- mortgage payment history;
- disposable income;
- employment stability; and
- number of years at residence

SAST 2006-3 Prospectus Supplement at S-37; *see* SAST 2006-3 Registration Statement, Feb. 9, 2006,

at the "Underwriting Standards" section.

328.    The SAST 2006-3 Prospectus Supplement represented:

On a case by case basis, such third party originators may determine that, based upon compensating factors, a prospective mortgagor to strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, relatively low ratio, relatively low debt-to-income ratio, good credit history, stable employment, financial reserves, and time in residence at the applicant's current address.  A portion of the mortgage loans may represent such underwriting exceptions.

SAST 2006-3 Prospectus Supplement at S-42.

329.    The SVHE 2007-OPT1 Prospectus Supplement represented:

The Mortgage Loans will have been originated generally in accordance with Option One's Non-Prime Guidelines (the "Option One Underwriting Guidelines").  The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan. The Mortgage Loans were also generally underwritten with a view toward resale in the secondary market.  The Mortgage Loans generally bear higher rates of interest than mortgage loans that are originated in accordance with customary Fannie Mae and Freddie Mac standards.

SVHE 2007-OPT1 Prospectus Supplement at S-72.

330.    The SVHE 2007-OPT1 Prospectus Supplement represented:

On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist.  Except as specifically stated herein, the Option One Underwriting Guidelines are the same for first lien mortgage loans and second lien mortgage loans.

SVHE 2007-OPT1 Prospectus Supplement at S-72.

331.     The SVHE 2007-OPT1 Prospectus Supplement represented:

Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan.  Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed.

SVHE 2007-OPT1 Prospectus Supplement at S-73.

332.     The SVHE 2006-WF2 Prospectus Supplement represented:

The underwriting guidelines used by Wells Fargo are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral.  A prospective borrower applying for a mortgage loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant including, depending on the program, the applicant's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. With respect to every applicant, a credit report summarizing the applicant's credit history with merchants and lenders is obtained.   Significant unfavorable credit information reported by the applicant or by a credit reporting agency is taken into account in the credit decision.

SVHE 2006-WF2 Prospectus Supplement at S-39.

333.     The SVHE 2006-WF2 Prospectus Supplement represented:

Wells Fargo permits debt-to-income ratios to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines such as documented excess funds in reserves after closing, a history of making a similar sized monthly debt payment on a timely basis, substantial residual income after monthly obligations are met, evidence that ratios will be reduced shortly after closing when a financed property under contract for sale is sold, or additional income has been verified for one or more applicants that is ineligible for consideration as qualifying income.

SVHE 2006-WF2 Prospectus Supplement at S-46.

334.     The WMLT 2006-ALT1 Prospectus Supplement stated:  "National City Mortgage's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." Wachovia MLTS 2006-ALT1 Prospectus Supplement at S-34.

335.    The WMLT 2006-ALT1 Prospectus Supplement represented:

National City Mortgage's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  These standards are applied in accordance with the applicable federal and state laws and regulations.  Exceptions to the underwriting standards are permitted where compensating factors are present.

WMLT 2006-ALT1 Prospectus Supplement at S-34.

336.    The WMLT 2006-ALT1 Prospectus Supplement represented:

In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligation on the proposed mortgage loan, the originator generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.  Such ratios vary depending on a number of underwriting criteria, including loan-to-value ratios, and are determined on a loan-by-loan basis.

WMLT 2006-ALT1 Prospectus Supplement at S-35.

337.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed.  The preceding statements were untrue at the time they were made because, as alleged herein, the Originators did not adhere to the stated underwriting guidelines, did not effectively evaluate the borrowers' ability or likelihood to repay the loans, did not properly evaluate whether the borrower's debt-to-income ratio supported a conclusion that the borrower had the means to meet his/her monthly obligations, and did not ensure that adequate compensating factors justified the granting of exceptions to guidelines.  Rather, as alleged herein, the Originators systematically disregarded the stated underwriting guidelines in order to increase the volume of mortgages originated (see supra Section VII.D).  Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offering (see supra Table 5), the rate at which actual losses outpaced expected losses within the first

year after the offering (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the

fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

### E.    Untrue Statements Concerning Reduced Documentation Programs

338.    The FFMLT 2006-FF16 Prospectus Supplement represented:

> In accordance with First Franklin Financial's guidelines for acquisition, the third
> party originators' underwriters are required to verify the income of each applicant
> under various documentation programs as follows:  under the Full Documentation
> Program, applicants are generally required to submit verification of stable income for
> the periods of six months to two years preceding the application dependent on credit
> score range; under the LIV Program, the borrower is qualified based on the income
> stated on the application and applicants are generally required to submit verification
> of adequate cash flow to meet credit obligations for the six month period preceding
> the application; the Stated Plus Program allows income to be stated, but requires
> borrowers to provide verification of liquid assets equaling three months of income
> stated on the mortgage application; under the NIV Program, applicants are qualified
> based on monthly income as stated on the mortgage application and the underwriter
> will determine that the stated income is reasonable and realistic when compared to
> borrower's employment type, assets and credit history.  For Direct Access first lien
> mortgage loans from self-employed or 1099 borrowers with a credit score greater
> than or equal to 540 and not originated in conjunction with a second lien mortgage,
> bank statements (for 12 months) are acceptable as full documentation.  For Direct
> Access first lien mortgage loans from self-employed or 1099 borrowers with credit
> scores greater than or equal to 600, regardless of being originated with a
> corresponding second lien mortgage, twelve months of bank statements are
> acceptable as full documentation.  In all cases, the income stated must be reasonable
> and customary for the applicant's line of work.  Although the income is not verified
> under the LIV and NIV programs, a preclosing audit should be conducted to
> confirm that the business exists.  Verification may be made through phone contact
> to the place of business, obtaining a valid business license, CPA/Enrolled Agent
> letter or through Dun and Bradstreet Information Services.

FFMLT 2006-FF16 Prospectus Supplement at S-64-65; *see* FFMLT 2006-FF16 Registration

Statement, Jan 11, 2006, at "The Originators" section.

339.    The FHLT 2006-3 Prospectus Supplement represented:

> There are three documentation types, Full Documentation ("Full Documentation"),
> Easy Documentation ("Easy Documentation") and Stated Income ("Stated
> Income").  Fremont's underwriters verify the income of each applicant under various
> documentation types as follows:  under Full Documentation, applicants are generally
> required to submit verification of stable income for the periods of one to two years
> preceding the application dependent on credit profile; under Easy Documentation,
> the borrower is qualified based on verification of adequate cash flow by means of

personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work.

FHLT 2006-3 Prospectus Supplement at S-65; FHLT 2006-D Prospectus Supplement at S-38; *see*

FHLT 2006-D Registration Statement, Mar. 17, 2006, at S-38.

340.    The HVMLT 2006-SB1 Prospectus Supplement represented:

Stated Income/Verified Assets ("SIVA"): The guidelines for this program do not require verification of a borrower's income. Employment must be verified for two full years. Verbal verification of employment is required prior to closing. Assets are verified for reserves, closing costs and down payment. Debt-to-Income Ratios are calculated based on stated income.

HVMLT 2006-SB1 Prospectus Supplement at S-34.

341.    The HVMLT 2006-11 Prospectus Supplement represented:

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%.

HVMLT 2006-11 Prospectus Supplement at S-38; HVMLT 2006-12 Prospectus Supplement

at S-72; HVMLT 2006-6 Prospectus Supplement at S-103.

342.    The HVMLT 2006-14 Prospectus Supplement represented:

Under the Stated Income Verified Asset Documentation type, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the assets are consistent with the borrower's income. BankUnited obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment.

HVMLT 2006-14 Prospectus Supplement at S-66; HVMLT 2006-10 Prospectus Supplement at S-64.

343.    The HVMLT 2006-14 Prospectus Supplement represented:

Under the Stated Income Documentation Program and the No Ratio Program, more emphasis is is placed on the prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income underwriting. The Stated Income Documentation

Program requires prospective borrowers to provide information regarding their assets and income. Information regarding assets is verified through written communications. Information regarding income is not verified. The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications. The No Ratio Program does not require prospective borrowers to provide information regarding their income. Employment is orally verified under both programs.

HVMLT 2006-14 Prospectus Supplement at S-70.

344.    The RFMS2 2007-HSA2 Prospectus represented:

The underwriting standards contained in the Guide may be varied in appropriate cases, including in "limited" or "reduced loan documentation" loan programs. Limited documentation programs normally permit fewer supporting documents to be obtained or waive income, asset and employment documentation requirements, and normally compensate for increased credit risk by placing greater emphasis on either the review of the property to be financed or the borrower's ability to repay the loan. For example, under Residential Funding Company, LLC's stated income limited loan documentation program, some submission requirements regarding income verification and debt-to-income ratios are removed, but the seller is still required to perform a thorough credit underwriting of the loan. Normally, in order to be eligible for a reduced loan documentation program, a borrower must have a good credit history, and other compensating factors, including a relatively low combined LTV ratio or other favorable underwriting factors, must be present. The borrower's eligibility for the program may also be determined by use of a credit scoring model.

RFMS2 2007-HSA2 Prospectus at 16-17; *see* RFMS2 2007-HSA2 Registration Statement, Feb. 12, 2007, at 16-17.

345.    The INDX 2006-AR35 Prospectus Supplement represented:

Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding a borrower's assets, if applicable, is verified through written communications. Information regarding income is not verified and employment verification may not be written.

INDX 2006-AR35 Prospectus Supplement at S-68; INDX 2006-AR6 Prospectus Supplement at S-52; *see* INDX  2006-AR35 Registration Statement, Feb. 24, 2006, at S-29; INDX 2006-AR6 Registration Statement, Feb. 24, 2006, at S-29.

346.    The LUM 2007-1 Prospectus Supplement represented:

Each mortgage loan has been underwritten under one of the following documentation programs. Under a full/alternative documentation program, a borrower's employment and income are verified. The employment and income as stated in the prospective borrower's loan application are verified either directly with the borrower's stated employer(s) or through receipt of alternative documentation such as the borrower's recent pay stub(s) and/or W-2 form(s) reflecting a minimum of 12 months of employment and income or, in the case of self-employed borrowers or borrowers who derive a substantial portion of their income from commissions, receipt of the borrower's personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required. Generally, under a full/alternative documentation program, the borrower's stated assets are also verified either directly with the stated financial institution holding the stated asset or through receipt of alternative documentation such as the borrower's recent bank and/or brokerage statement(s). In addition, the borrower's employment may be verified with the employer by telephone or by other independent means.

LUM 2007-1 Prospectus Supplement at S-33-34.

347.    The NHELI, Series 2007-1 Prospectus Supplement represented:

All of the mortgage loans have been originated either under FNBN's "full" or "alternative" underwriting guidelines (i.e., the underwriting guidelines applicable to the mortgage loans typically are less stringent than the underwriting guidelines established by Fannie Mae or Freddie Mac primarily with respect to the income and/or asset documentation which borrower is required to provide). To the extent the programs reflect underwriting guidelines different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans there under may reflect relatively higher delinquency rates and/or credit losses. In addition, FNBN may make certain exceptions to the underwriting guidelines described herein if, in FNBN's discretion, compensating factors are demonstrated by a prospective borrower.

NHELI, Series 2007-1 Prospectus Supplement at S-104.

348.    The NHEL 2006-5 Prospectus Supplement represented:

The underwriting guidelines include six [sic] levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation", "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement." Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay stub or up to prior two years W-2 forms and most recent pay stub. Under the Limited Documentation program, no such verification is required, however, bank statements for the most recent consecutive 6-month period are required to evidence cash flow.

NHEL Series 2006-5 Prospectus Supplement at S-78; *see* NHEL 2006-5 Registration Statement, May

25, 2006, at S-57.

349.    The NHEL 2006-5 Prospectus Supplement represented:

Under the Stated Income program, an applicant may be qualified based on monthly
income as stated in the loan application.  Under the "No Documentation" program,
an applicant provides no information as it relates to their income.  Under the "No
Income/No Asset" program, the applicant's income and assets are not verified,
however the applicant's employment is verified.

NHEL 2006-5 Prospectus Supplement at S-78; *see* NHEL 2006-5 Registration Statement, May 25,

2006, at S-57.

350.    The SAST 2006-3 Prospectus Supplement represented:

Saxon Mortgage may, from time to time, apply underwriting criteria that are either
more stringent or more flexible than the general guidelines of the underwriting
programs outlined below depending on the economic conditions of a particular
market.

SAST 2006-3 Prospectus Supplement at S-38; *see* SAST 2006-3 Registration Statement, February 9,

2006, at the "Underwriting Standards" section.

351.    The SAST 2006-3 Prospectus Supplement represented:

Substantially all of the mortgage loans were originated consistent with and generally
conform to "Full Documentation," "Limited Documentation," or "Stated
Documentation" residential loan programs.  Under each of such programs, the
related originator generally reviews the applicant's source of income, calculates the
amount of income from sources indicated on the loan application or similar
documentation, reviews the credit history of the applicant, calculates the debt-to-
income ratio to determine the applicant's ability to repay the loan, and reviews the
type and use of the property being financed.

SAST 2006-3 Prospectus Supplement at S-44.

352.    The SVHE 2007-OPT1 Prospectus Supplement represented:

Except with respect to the No Documentation program that is described below, the
Option One Underwriting Guidelines require verification or evaluation of the
income of each applicant and, for purchase transactions, verification of the seasoning
or source of funds (in excess of $2,500) required for closing.  The income
verification required under Option One's various mortgage loan programs is as
follows:

Full Documentation, the highest level of income documentation, generally requires applicants to submit one written form of verification from the employer of stable income for at least 12 months. A wage-earner may document income by a current pay stub reflecting year to date income and applicant's most recent W-2 or IRS Form 1040. A self-employed applicant may document income with either the most recent federal tax returns or bank statements.

Lite Documentation is for applicants who otherwise cannot meet the requirements of the Full Documentation program and requires applicants to submit 3 to 6 months' bank statements or a pay stub as verification of income.

Stated Income Documentation applicants are qualified based upon monthly income as stated on the mortgage loan application.

SVHE 2007-OPT1 Prospectus Supplement at S-73.

353.    The SVHE 2006-WF2 Prospectus Supplement represented:

Under Wells Fargo's "lite" documentation program, the applicant's income must be stated on the initial signed application. The applicant's income as stated must be reasonable and consistent for the applicant's occupation and reflect an overall ability of the applicant to repay all its debt as determined in the discretion of the loan underwriter. Income is calculated using the most recent and consecutive six-month average of personal bank statements. Maximum loan-to-value ratios within each credit level are lower under the lite documentation program than under the full documentation program.

SVHE 2006-WF2 Prospectus Supplement at S-47.

354.    The WMLT 2006-ALT1 Prospectus Supplement represented:

*Stated Documentation.* Under a stated income documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. Employment stability is a critical component in evaluating the borrower's continuing ability to meet obligations. Borrower's assets may or may not be verified.

WMLT 2006-ALT1 Prospectus Supplement at S-36.

355.    UNTRUE STATEMENTS AND OMITTED INFORMATION: The preceding

statements were material at the time they were made, because the quality of the loans in the

mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is

dependent upon the underwriting process employed.  The preceding statements were untrue at the time they were made, because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines in order to increase the volume of mortgages originated, emphasizing quantity of loans rather than the quality of those loans (*see supra* Section VII.D).  Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offering (*see supra* Table 5), the huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

### F.    Untrue Statements Concerning Loan-to-Value Ratios

356.    The FFMLT 2006-FF16 Prospectus Supplement represented:

Except as otherwise specified in the related prospectus supplement, the loans will have the following characteristics:

• no loan will have had a loan-to-value ratio at origination in excess of 95%;

• each Single Family Loan secured by a mortgaged property having a loan-to-value ratio in excess of 80% at origination will be covered by a primary mortgage insurance policy.

FFMLT 2006-FF16 Prospectus Supplement at 58; *see* FFMLT 2006-FF16 Registration Statement, Jan. 11, 2006, at "The Trust Fund" section.

357.    The FHLT 2006-D Prospectus Supplement represented:

Generally, Fremont Investment & Loan's guidelines require an analysis of the following
. . .

the "loan-to-value ratio" of the proposed loan, which measures the adequacy of the mortgaged property to serve as the collateral for a mortgage loan.

FHLT 2006-D Prospectus Supplement at 74; *see* FHLT Registration Statement, Mar. 17, 2006, at 74.

358.    The HVMLT 2006-11 Prospectus Supplement represented:

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value

Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

HVMLT 2006-11 Prospectus Supplement at S-36; HVMLT 2006-12 Prospectus Supplement at S-70;

HVMLT 2006-6 Prospectus Supplement at S-100.

359.    The HVMLT 2006-SB1 Prospectus Supplement represented:

SBMC conducts pre-funding and post-funding audits on approximately 10% to 15% of all originations.  Pre-funding audits are determined based on overall risk score provided by a third party vendor.  The vendor will identify borrowed phone numbers that conflict with the subject's mailing address, occupation and income disparities, social security number discrepancies, collateral value exceptions and various other risk factors.  Post-close audits are completed based upon new independent broker relationships, loan-to-value ratios, combined LTV's (which take into account any secondary financing), documentation type, property type, credit scores and other independent risk factors.

HVMLT 2006-SB1 Prospectus Supplement at S-34.

360.    The INDX 2006-AR35 Prospectus Supplement represented:

Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO Credit Score, number of previous late mortgage payments, and the age of any bankruptcy or foreclosure actions.

INDX 2006-AR35 Prospectus Supplement at S-68; *see* INDX 2006-AR35 Registration Statement,

Feb. 24, 2006, at S-30.

361.    The LUM 2007-1 Prospectus Supplement represented:

Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO credit score, number of previous late mortgage payments, and the age of any bankruptcy or foreclosure actions.

LUM 2007-1 Prospectus Supplement at S-38.

362.    The NHELI 2007-1 Prospectus Supplement represented:

In comparison to the "general" underwriting standards described above, the underwriting standards applicable to mortgage loans under an "alternative" mortgage loan underwriting program permit different underwriting criteria, additional types of mortgaged properties or categories of borrowers such as "foreign nationals" without a credit score who hold certain types of visas and have acceptable credit references (such Mortgage Loans, "Foreign National Loans"), and include certain other less restrictive parameters.  Generally, relative to the "general" underwriting standards, these standards include higher loan amounts, higher maximum loan-to-value ratios, higher maximum "combined" loan-to-value ratios (in each case, relative to mortgage loans with otherwise similar characteristics) in cases of simultaneous primary and secondary financings, less restrictive requirements for "equity take out" refinancings, the removal of limitations on the number of permissible mortgage loans that may be extended to one borrower and the ability to originate mortgage loans with loan-to-value ratios in excess of 80% without the requirement to obtain mortgage insurance if such loans are secured by investment properties.

NHELI 2007-1 Prospectus Supplement at S-110.

363.    The WMLT 2006-ALT1 Prospectus Supplement represented:

In general, Accredited's LTV maximums decrease with credit quality, and, within each credit classification, the LTV maximums vary depending on the property type. LTV maximums for mortgage loans secured by owner-occupied properties are higher than for mortgage loans secured by properties that are not owner-occupied. LTV maximums for Lite Documentation and Stated Income programs are generally lower than the LTV maximums for corresponding Full Documentation programs. Our maximum debt-to-income ratios range from 50% to 55% for Full Documentation programs, and maximum 50% for Lite Documentation and Stated Income Programs.

WMLT 2006-ALT1 Prospectus Supplement at S-39.

364.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made because the riskiness of the RMBS investment is directly dependent on the quality of the underwriting process and adequate assessment and limits on loan-to-value ratios (in addition to accurate appraisals) is key to that process.  The preceding statements were untrue at the time they were made because the Originators did not adhere to the maximum loan-to-value ratios as represented in the Offering Documents, encouraged inflated appraisals and frequently granted loans with high loan-to-value ratios with no meaningful assessment of the borrower's ability to repay the loan based on the  borrower's credit profile (*see supra* Section

VII.D).  Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offering (*see supra* Table 5), the huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

## IX.    THE CLAIMS ARE TIMELY

365.    For actions brought by the NCUA Board as Liquidating Agent, the FCU Act extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent.  *See* 12 U.S.C. § 1787(b)(14)(B)(i).

366.    The NCUA Board placed U.S. Central under conservatorship and appointed itself as conservator on March 20, 2009.  On October 1, 2010, the NCUA Board placed U.S. Central in liquidation and appointed itself Liquidating Agent.

367.    Actions brought under Sections 11 and 12 of the Securities Act must be:

> brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . .  In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m.

368.    Actions brought under § 17-12a509 of the Kansas Uniform Securities Act, must be brought within "the earlier of two years after discovery of the facts constituting the violation or five years after the violation."  Kan. Stat. Ann. § 17-12a509(j)(2).

369.    As the Federal Reserve Board noted in November 2008, the "deteriorating lending standards" and "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher Mayer *et al.*, *The Rise in Mortgage Defaults* at 15-16; *see also* FSOC Risk Retention Report at 9.

370.     The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS.  The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

> One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor.  An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan.  Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information.    Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

371.     Accordingly, U.S. Central did not discover and could not have discovered the material untrue statements and/or misleading omissions in the Offering Documents more than one year prior to March 20, 2009, the date on which the NCUA Board placed U.S. Central into conservatorship.

372.     In addition, U.S. Central and/or the NCUA Board, as Liquidating Agent of U.S. Central, is or was a member of putative classes in the cases listed below.  Therefore, the NCUA Board's claims are subject to legal tolling of the statute of limitations and statute of repose under the doctrine announced in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ("American Pipe doctrine"), and its progeny.

## Table 7

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | AMERICAN PIPE TOLLING COMMENCEMENT DATE |
|---|---|---|---|---|
| 41162CAD3 | HVMLT 2006-10 | U.S. Central | 10/18/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland* No. 08-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** |
| 41162CAE1 | HVMLT 2006-10 | U.S. Central | 10/18/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland* No. 08-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** |
| 41162GAA0 | HVMLT 2006-11 | U.S. Central | 10/27/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland* No. 08-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** |
| 41162DAE9 | HVMLT 2006-12 | U.S. Central | 10/19/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland* No. 08-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** |
| 41162DAH2 | HVMLT 2006-12 | U.S. Central | 10/19/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland* No. 08-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** |
| 41162NAE7 | HVMLT 2006-14 | U.S. Central | 12/5/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland* No. 08-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** |

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | AMERICAN PIPE TOLLING COMMENCEMENT DATE |
|-------|----------------|-------|------------|------------------------------------------|
| 45667SAA5 | INDX 2006-AR35 | U.S. Central | 11/28/06 | *IBEW Local 103 v. IndyMac*<br>No. BC405843 (Cal. Super. Ct. L.A. County)<br>Complaint **Filed: January 20, 2009**<br>(Removed to No. 09-1520 (C.D.C.A.));<br><br>*Police and Fire Retirement System of the City of Detroit v. IndyMac*<br>No. 09-4583 (S.D.N.Y.)<br>Complaint **Filed: May 14, 2009;**<br><br>*Wyoming State Treasurer v. John Olinski*<br>No. 09-5933 (S.D.N.Y.)<br>Complaint **Filed: June 29, 2009**<br>(Consolidated with No. 09-4583 (S.D.N.Y.)) |
| 456612AC4 | INDX 2006-AR6 | U.S. Central | 4/24/06 | *IBEW Local 103 v. IndyMac*<br>No. BC405843 (Cal. Super. Ct. L.A. County)<br>Complaint **Filed: January 20, 2009**<br>(Removed to No. 09-1520 (C.D.C.A.));<br><br>*Police and Fire Retirement System of the City of Detroit v. IndyMac*<br>No. 09-4583 (S.D.N.Y.)<br>Complaint **Filed: May 14, 2009** |
| 66988YAE2 | NHEL 2006-5 | U.S. Central | 9/22/06 | *New Jersey Carpenters Health Fund v. NovaStar Mortgage Funding*<br>No. 08-601563 (Sup. Ct. of the State of NY)<br>Complaint **Filed: May 21, 2008** (Removed to No. 08-5310 (S.D.N.Y.)) |
| 66988YAF9 | NHEL 2006-5 | U.S. Central | 9/22/06 | *New Jersey Carpenters Health Fund v. NovaStar Mortgage Funding*<br>No. 08-601563 (Sup. Ct. of the State of NY)<br>Complaint **Filed: May 21, 2008** (Removed to No. 08-5310 (S.D.N.Y.)) |
| 66988YAG7 | NHEL 2006-5 | U.S. Central | 9/22/06 | *New Jersey Carpenters Health Fund v. NovaStar Mortgage Funding*<br>No. 08-601563 (Sup. Ct. of the State of NY)<br>Complaint **Filed: May 21, 2008** (Removed to No. 08-5310 (S.D.N.Y.)) |

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | AMERICAN PIPE TOLLING COMMENCEMENT DATE |
|---|---|---|---|---|
| 41161UAD4 | HVMLT 2006-6 | U.S. Central | 9/19/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland* No. 08-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** |
| 41161UAF9 | HVMLT 2006-6 | U.S. Central | 9/19/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland* No. 08-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** |
| 41162DAH2 | HVMLT 2006-12 | U.S. Central | 5/16/07 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland* No. 08-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** |

373.    With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 11 of the Securities Act (Counts 1-9), the earliest date they were bona fide offered to the public was April 27, 2006, or not more than three years prior to March 20, 2009.  Accordingly, the NCUA Board's Section 11 claims are not time-barred.

374.    With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 12(a)(2) (Count 10), the earliest sale was April 24, 2006, or not more than three years prior to March 20, 2009.  Accordingly, the NCUA Board's Section 12 claims are not time-barred.

375.    With respect to those RMBS purchases for which the NCUA Board asserts claims under state law (Count 11), the earliest purchase date/offering date with respect to those claims was February 14, 2006, or not more than five years prior to March 20, 2009.  Accordingly, the NCUA Board's state law claims are not time-barred.

## X.     CLAIMS FOR RELIEF

### COUNT ONE
### Section 11 of the Securities Act
### (FFMLT 2006-FF16, FHLT 2006-3, SVHE 2006-WF2, and SVHE 2007-OPT1)

376.     The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Financial Asset Securities Corp., or specific to offerings other than the FFMLT 2006-FF16, FHLT 2006-3, SVHE 2006-WF2, and SVHE 2007-OPT1 offerings.

377.     The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the FFMLT 2006-FF16, FHLT 2006-3, SVHE 2006-WF2, and SVHE 2007-OPT1 certificates against Defendant RBS, as the underwriter, and against Defendant Financial Asset Securities Corp., as the issuer of the registration statement for those certificates.

378.     The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on Defendant Financial Asset Securities Corp.'s virtually absolute liability as issuer, and Defendant RBS's liability as underwriter under Section 11 of the Securities Act.

379.     At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

380.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

381.     U.S. Central purchased the certificates pursuant to and traceable to the defective Registration Statement, as alleged above.

382.     At the time U.S. Central purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

383.     RBS's and Financial Asset Securities Corp.'s conduct as alleged above violated Section 11.

384.     U.S. Central sustained damages as a result of Defendants' violations of Section 11.

385.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Financial Asset Securities Corp., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT TWO
## Section 11 of the Securities Act
## (FHLT 2006-D)

386.     The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Fremont Mortgage Securities Corp., or specific to offerings other than the Fremont Home Loan Trust 2006-D offering.

387.     The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchase of the Fremont Home Loan Trust 2006-D certificate against Defendant RBS, as the underwriter, and against Defendant Fremont Mortgage Securities Corp., as the issuer of the registration statement for that certificate.

388.     The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on Defendant Fremont Mortgage Securities Corp.'s virtually absolute liability as issuer, and Defendant RBS's liability as underwriter under Section 11 of the Securities Act.

389.     At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

390.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

391.     U.S. Central purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

392.     At the time U.S. Central purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

393.     RBS's and Fremont Mortgage Securities Corp.'s conduct as alleged above violated Section 11.

394.     U.S. Central sustained damages as a result of Defendants' violations of Section 11.

395.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Fremont Home Loan Trust 2006-D, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**COUNT THREE**
**Section 11 of the Securities Act**
**(HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HarborView 2006-SB1, and HVMLT 2006-6)**

396.     The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Greenwich Capital Acceptance, Inc., or specific to offerings other than the HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HarborView 2006-SB1, and HVMLT 2006-6offerings.

397.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HarborView 2006-SB1, and HVMLT 2006-6 certificates against Defendant RBS, as the underwriter, and against Defendant Greenwich Capital Acceptance, Inc., as the issuer of the registration statement for those certificates.

398.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on Defendant Greenwich Capital Acceptance, Inc.'s virtually absolute liability as issuer, and Defendant RBS's liability as underwriter under Section 11 of the Securities Act.

399.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

400.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

401.    U.S. Central purchased the Certificates pursuant to and traceable to a defective registration statement, as alleged above.

402.    At the time U.S. Central purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

403.    RBS's and Greenwich Capital Acceptance, Inc.'s conduct as alleged above violated Section 11.

404.    U.S. Central sustained damages as a result of Defendants' violations of Section 11.

405.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Greenwich Capital Acceptance, Inc., jointly and severally,

awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court

deems appropriate and just.

## COUNT FOUR
## Section 11 of the Securities Act
## (NHELI 2007-1)

406.   The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though

fully set forth here, except those paragraphs specific to the Issuer Defendants other than Nomura

Home Equity Loan, Inc., or specific to offerings other than the NHELI 2007-1 offering.

407.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities

Act, with respect to U.S. Central's purchase of the NHELI 2007-1 certificate against Defendant

RBS, as the underwriter, and against Defendant Nomura Home Equity Loan, Inc., as the issuer of

the registration statement for that certificate.

408.   The NCUA Board expressly disclaims and disavows any allegation that could be

construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on

Defendant Nomura Home Equity Loan, Inc.'s virtually absolute liability as issuer, and Defendant

RBS's liability as underwriter under Section 11 of the Securities Act.

409.   At the time the registration statement became effective, it (including the prospectus

and any prospectus supplements) contained untrue statements and omitted facts that were necessary

to make the statements made not misleading, as alleged above.

410.   The untrue statements and omitted facts were material because a reasonably prudent

investor deciding whether to purchase the Certificates would have viewed them as important and as

substantially altering the total mix of information available, as alleged above.

411.   U.S. Central purchased the Certificates pursuant to and traceable to the defective

registration statement, as alleged above.

412.     At the time U.S. Central purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

413.     RBS's and Nomura Home Equity Loan, Inc.'s conduct as alleged above violated Section 11.

414.     U.S. Central sustained damages as a result of Defendants' violations of Section 11.

415.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Nomura Home Equity Loan, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT FIVE
### Section 11 of the Securities Act
### (RFMS2 2007-HSA2)

416.     The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Residential Funding Mortgage Securities II, Inc., or specific to offerings other than the RFMS2 2007-HSA2 offering.

417.     The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchase of the RFMS2 2007-HSA2 certificate against Defendant RBS, as the underwriter, and against Defendant Residential Funding Mortgage Securities II, Inc., as the issuer of the registration statement for that certificate.

418.     The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on Defendant Residential Funding Mortgage Securities II, Inc.'s virtually absolute liability as issuer, and Defendant RBS's liability as underwriter under Section 11 of the Securities Act.

419.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

420.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

421.    U.S. Central purchased the Certificates pursuant to and traceable to the defective registration statement, as alleged above.

422.    At the time U.S. Central purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

423.    RBS's and Residential Funding Mortgage Securities II, Inc.'s conduct as alleged above violated Section 11.

424.    U.S. Central sustained damages as a result of Defendants' violations of Section 11.

425.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Residential Funding Mortgage Securities II, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**COUNT SIX**
**Section 11 of the Securities Act**
**(INDX 2006-AR35 and INDX 2006-AR6 )**

426.    The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than IndyMac MBS, Inc., or specific to offerings other than the INDX 2006-AR35 and INDX 2006-AR6 offerings.

427.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the INDX 2006-AR35 and INDX 2006-AR6 certificates against Defendant RBS, as the underwriter, and against Defendant IndyMac MBS, Inc., as the issuer of the registration statement for those certificates.

428.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on Defendant IndyMac MBS, Inc.'s virtually absolute liability as issuer, and Defendant RBS's liability as underwriter under Section 11 of the Securities Act.

429.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

430.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

431.    U.S. Central purchased the Certificates pursuant to and traceable to the defective , as alleged above.

432.    At the time U.S. Central purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

433.    RBS's and IndyMac MBS, Inc.'s conduct as alleged above violated Section 11.

434.    U.S. Central sustained damages as a result of Defendants' violations of Section 11.

435.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant IndyMac MBS, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT SEVEN
### Section 11 of the Securities Act
### (LUM 2007-1)

436.    The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though

fully set forth here, except those paragraphs specific to the Issuer Defendants other than Lares Asset

Securitization, Inc., or specific to offerings other than the LUM 2007-1 offering.

437.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities

Act, with respect to U.S. Central's purchase of the LUM 2007-1 certificate against Defendant RBS,

as the underwriter, and against Defendant Lares Asset Securitization, Inc., as the issuer of the

registration statement for that certificate.

438.    The NCUA Board expressly disclaims and disavows any allegation that could be

construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on

Defendant Lares Asset Securitization, Inc.'s virtually absolute liability as issuer, and Defendant

RBS's liability as underwriter under Section 11 of the Securities Act.

439.    At the time the registration statement became effective, it (including the prospectus

and any prospectus supplements) contained untrue statements and omitted facts that were necessary

to make the statements made not misleading, as alleged above.

440.    The untrue statements and omitted facts were material because a reasonably prudent

investor deciding whether to purchase the Certificates would have viewed them as important and as

substantially altering the total mix of information available, as alleged above.

441.    U.S. Central purchased the Certifcates pursuant to and traceable to the defective

registration statement, as alleged above.

442.    At the time U.S. Central purchased the Certificates, it did not know of the untrue

statements and omissions contained in the registration statement.

443.   RBS's and Lares Asset Securitization, Inc.'s conduct as alleged above violated Section 11.

444.   U.S. Central sustained damages as a result of Defendants' violations of Section 11.

445.   WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Lares Asset Securitization, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT EIGHT
## Section 11 of the Securities Act
### (NHEL 2006-5)

446.   The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than NovaStar Mortgage Funding Corp., or specific to offerings other than the NHEL 2006-5 offering.

447.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchase of the NHEL 2006-5 certificate against Defendant RBS, as the underwriter, and against Defendant NovaStar Mortgage Funding Corp., as the issuer of the registration statement for that certificate.

448.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on Defendant NovaStar Mortgage Funding Corp.'s virtually absolute liability as issuer, and Defendant RBS's liability as underwriter under Section 11 of the Securities Act.

449.   At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

450.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

451.    U.S. Central purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

452.    At the time U.S. Central purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

453.    RBS's and NovaStar Mortgage Funding Corp.'s conduct as alleged above violated Section 11.

454.    U.S. Central sustained damages as a result of Defendants' violations of Section 11.

455.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant NovaStar Mortgage Funding Corp., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT NINE
## Section 11 of the Securities Act
## (SAST 2006-3)

456.    The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants, or specific to offerings other than the SAST 2006-3 offering.

457.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the SAST 2006-3 certificate against Defendant RBS as the underwriter.

458.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on Defendant RBS's liability as underwriter under Section 11 of the Securities Act.

459.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

460.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

461.    U.S. Central purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

462.    At the time U.S. Central purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

463.    RBS's conduct as alleged above violated Section 11.

464.    U.S. Central sustained damages as a result of Defendants' violations of Section 11.

465.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS,awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT TEN
## Section 11 of the Securities Act
## (WMLT 2006-ALT1)

466.    The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Wachovia Mortgage Assets Trust, LLC, or specific to offerings other than the WMLT 2006-ALT1 offering.

467.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchase of the WMLT 2006-ALT1 certificate against Defendant RBS, as the underwriter, and against Defendant Wachova Mortgage Assets Trust, LLC, as the issuer.

468.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

469.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

470.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

471.    U.S. Central purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

472.    At the time U.S. Central purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

473.    RBS's and Wachovia Mortgage Assets Trust, LLC's conduct as alleged above violated Section 11.

474.    U.S. Central and the NCUA Board sustained damages as a result of Defendants' violations of Section 11.

475.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Wachovia Mortgage Assets Trust, LLC, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**COUNT ELEVEN**
**Section 12(a)(2) of the Securities Act**
**(FFMLT 2006-FF16, FHLT 2006-3, FHLT 2006-D, HVMLT 2006-14, HVMLT 2006-12,**
**HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-SB1, RFMS2-HSA2, INDX 2006-AR35,**
**INDX 2006-AR6, LUM 2007-1, NHELI 2007-1, NHEL 2006-5, SVHE 2006-WF2, and SVHE**
**2007-OPT1)**

476.    The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than FFMLT 2006-FF16, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-SB1, RFMS2-HSA2, INDX 2006-AR35, INDX 2006-AR6, LUM 2007-1, NHELI 2007-1, NHEL 2006-5, SVHE 2006-WF2, and SVHE 2007-OPT1 offerings.

477.    The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act, with respect to U.S.Central's purchases of the FFMLT 2006-FF16, FHLT 2006-3, FHLT 2006-D, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-SB1, RFMS2-HSA2, INDX 2006-AR35, INDX 2006-AR6, LUM 2007-1, NHELI 2007-1, NHEL 2006-5, SVHE 2006-WF2, and SVHE 2007-OPT1 certificates against Defendant RBS, as the underwriter and seller of those certificates.

478.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on Defendants' virtually absolute liability under the Securities Act.

479.    Defendant RBS offered to sell and sold the securities to U.S. Central through one or more instrumentalities of interstate commerce (i.e., telephone, mails, or e-mail).

480.    Defendant RBS offered to sell and sold the securities to U.S. Central by means of the prospectus and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

481.    The prospectuses and/or prospectus supplements contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

482.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

483.    U.S. Central purchased the certificates on the initial offering pursuant to the prospectus and/or prospectus supplements.

484.    At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

485.    Defendant's conduct as alleged above violated Section 12(a)(2).

486.    U.S. Central sustained damages as a result of Defendant's violations of Section 12(a)(2).

487.    The NCUA Board is entitled to rescind and recover the consideration U.S. Central paid for the certificates under Section 12(a)(2).

488.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

## COUNT TWELVE
### Violation of the Kansas Uniform Securities Act
### Kan. Stat. Ann. § 17-12a509
### (FFMLT 2006-FF16, FHLT 2006-3, FHLT 2006-D, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-SB1, HVMLT 2006-6, RFMS2 2007-HSA2, INDX 2006-AR35, INDX 2006-AR6, LUM 2006-2, LUM 2007-1, NHELI 2007-1, NHEL 2006-5, SVHE 2006-WF2, and SVHE 2007-OPT1)

489.    The NCUA Board realleges paragraphs 1 through 375 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the FFMLT 2006-FF16, FHLT 2006-3, FHLT 2006-D, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-SB1, HVMLT 2006-6, RFMS2 2007-HSA2, INDX 2006-AR35, INDX

2006-AR6, LUM 2006-2, LUM 2007-1, NHELI 2007-1, NHEL 2006-5, SVHE 2006-WF2, and

SVHE 2007-OPT1 offerings.

490.     The NCUA Board brings this cause of action pursuant to Section 17-12a509 of the

Kansas Uniform Securities Act, with respect to U.S. Central's purchases of the FFMLT 2006-FF16,

FHLT 2006-3, FHLT 2006-D, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT

2006-10, HVMLT 2006-SB1, HVMLT 2006-6, RFMS2 2007-HSA2, INDX 2006-AR35, INDX

2006-AR6, LUM 2006-2, LUM 2007-1, NHELI 2007-1, NHEL 2006-5, SVHE 2006-WF2, and

SVHE 2007-OPT1 certificates against Defendant RBS, as the seller of those certificates.

491.     Defendant offered to sell and sold the securities to U.S. Central by means of written

and/or oral communications which included untrue statements of material fact and/or omissions of

material facts that were necessary to make the statements made not misleading, as alleged above.

492.     The untrue statements and omitted facts were material because a reasonably prudent

investor deciding whether to purchase the Certificates would have viewed them as important and as

substantially altering the total mix of information available, as alleged above.

493.     Defendant sold the Certificates to U.S. Central in Kansas.

494.     U.S. Central did not know of these untruths and omissions.

495.     If U.S. Central had known about these untruths and omissions, it would not have

purchased the securities from Defendant.

496.     Defendant's sales of the Certificates violated Kan. Stat. Ann. § 17-12a509(b).

497.     U.S. Central sustained damages as a result of Defendant's violations of Kan. Stat.

Ann. § 17-12a509(b).

498.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor

against Defendant RBS, awarding rescission or a rescissory measure of damages, or in the alternative

compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court

deems appropriate and just.

### Jury Demand and Designation of Place of Trial

Plaintiff hereby demands a trial by jury of all issues properly triable.  Pursuant to Local Rule 40.2(a),

Plaintiff hereby designates Kansas City, Kansas as the place of trial of this action.

Dated: August 24, 2012

NATIONAL CREDIT UNION
ADMINISTRATION BOARD, as Liquidating
Agent of U.S. Central Federal Credit Union and
Western Corporate Federal Credit Union

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751
GZelcs@koreintillery.com

Of Counsel
Michael J. McKenna, General Counsel
John K. Ianno, Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314

/s/ Norman E. Siegel
Norman E. Siegel (D. Kan. # 70354)
Rachel E. Schwartz (Kan. # 21782)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: (816) 714-7100
Fax: (816) 714-7101
siegel@stuevesiegel.com
schwartz@stuevesiegel.com

David C. Frederick
Wan J. Kim
Mark C. Hansen
Joseph S. Hall
Scott K. Attaway
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dfrederick@khhte.com
wkim@khhte.com
mhansen@khhte.com
jhall@khhte.com
sattaway@khhte.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2012, I electronically filed the foregoing with the Clerk of

the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of

record.

/s/ Norman E. Siegel
Attorney for Plaintiff