EXHIBIT 7



TERRY W. BIRD
twb@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
  NESSIM, DROOKS & LINCENBERG, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Fax: (310) 201-2110

GEORGE A. ZELCS
gzelcs@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9760
Fax: (312) 641-9751

Attorneys for Plaintiff National Credit Union
Administration Board
(See Signature Page for Names and Addresses
of Additional Counsel for Plaintiffs)

FILED
CLERK, U.S. DISTRICT COURT

OCT 2 9 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                               DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

|  |  |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union and of Western Corporate Federal Credit Union, <br><br> Plaintiff, <br><br> vs. <br><br> GOLDMAN, SACHS & CO., GS MORTGAGE SECURITIES CORP., and RESIDENTIAL ACCREDIT LOANS, INC., <br><br> Defendants. | Case No.   CV-11-6521 GW(JEMx) <br><br> **FIRST AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

i

**FIRST AMENDED COMPLAINT**

COPY

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................ 1

       Table 1 ........................................................................ 4

       Table 2 ........................................................................ 5

II.    PARTIES AND RELEVANT NON-PARTIES ................................ 6

III.   JURISDICTION AND VENUE ........................................................ 8

IV.   MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION .......................................................................... 9

       Figure 1 ...................................................................... 12

V.     RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT ................... 12

       Table 3 ...................................................................... 13

VI.   U.S. CENTRAL'S AND WESCORP'S PURCHASES ...................... 15

       Table 4 ...................................................................... 16

VII.   THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS ................................................ 17

    A.    The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards ............ 18

       Table 5 ...................................................................... 20

       Table 6 ...................................................................... 24

    B.    The Surge in Actual Versus Expected Cumulative Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards ...................................................... 24

       Figure 2 ...................................................................... 27

**FIRST AMENDED COMPLAINT**

C.     The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines....................................34

D.     Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards ...........34

     1.     The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse .........................................................................34

     2.     American Home's Systematic Disregard of Underwriting Standards.............................................40

     3.     Countrywide Home Loans, Inc.'s Systematic Disregard of Underwriting Standards....................45

     4.     First Franklin Financial Corporation's Systematic Disregard of Underwriting Standards....................54

     5.     First Magnus Financial Corporation's Systematic Disregard of Underwriting Standards....................60

     6.     First National Bank of Arizona's Systematic Disregard of Underwriting Standards....................64

     7.     Fremont Investment and Loan's Systematic Disregard of Underwriting Standards....................69

     8.     GreenPoint Mortgage Funding Inc.'s Systematic Disregard of Underwriting Standards....................73

     9.     Homecomings's Systematic Disregard of Underwriting Standards.............................................79

     10.     IndyMac Bank, FSB's Systematic Disregard of Underwriting Standards.............................................86

     11.     SCME Mortgage Banker's Systematic Disregard of Underwriting Standards.............................................91

     12.     WaMu's and Long Beach Mortgage's Systematic Disregard of Underwriting Standards.............................................92

2909358.1

iii

**FIRST AMENDED COMPLAINT**

|  |  | E. | Loans That Did Not Meet the Originators' Underwriting Guidelines Were Routinely Collateral for Goldman Sachs-Underwritten RMBS ...................................................................... 106 |
|  |  | F. | Additional Evidence Confirms that Defective Loans Were Routinely Packaged into Goldman Sachs's RMBS ................................. 108 |
| VIII. |  |  | THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT .......................................... 111 |
|  |  | A. | Offering Documents Misrepresented Weighted Average Loan-To-Value Ratios ...................................................................... 111 |
|  |  |  | Table 7 ........................................................................................ 112 |
|  |  | B. | Untrue Statements in the Offering Documents About Owner-Occupancy Ratios ........................................................................ 113 |
|  |  |  | Table 8 ........................................................................................ 116 |
|  |  | C. | Other Untrue Statements in the Offering Statements ............................ 116 |
|  |  |  | Table 9 ........................................................................................ 117 |
|  |  | D. | Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood To Repay the Mortgage Loan .......................... 118 |
|  |  | E. | Untrue Statements Concerning Reduced Documentation Programs ................................................................................. 140 |
|  |  | F. | Untrue Statements Concerning Loan-to-Value Ratios ......................... 151 |
|  |  | G. | Untrue Statements Concerning Credit Enhancement ........................... 158 |
| IX. |  |  | THE CLAIMS ARE TIMELY ........................................................ 161 |
| X. |  |  | NUMEROUS CLAIMS ARE INDEPENDENTLY TIMELY BY VIRTUE OF *AMERICAN PIPE* ........................................................ 164 |
| XI. |  |  | CLAIMS FOR RELIEF ................................................................. 168 |
|  |  |  | FIRST CLAIM FOR RELIEF ....................................................... 168 |
|  |  |  | Section 11 of the Securities Act of 1933 (Alternative Loan Trust 2007-OA4) ......................................................................... 168 |

2909358.1

iv

**FIRST AMENDED COMPLAINT**

SECOND CLAIM FOR RELIEF ............................................................169

    Section 11 of the Securities Act of 1933 (Fremont Home Loan Trust 2006-D)..........................................................................................170

THIRD CLAIM FOR RELIEF ..............................................................171

    Section 11 of the Securities Act of 1933 (GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, GreenPoint Mortgage Funding Trust 2006-OH1) .......................................171

FOURTH CLAIM FOR RELIEF ...........................................................172

    Section 11 of the Securities Act of 1933 (First Franklin Mortgage Loan Trust 2006-FF4) ...............................................................172

FIFTH CLAIM FOR RELIEF ................................................................173

    Section 11 of the Securities Act of 1933 (Long Beach Mortgage Loan Trust 2006-11) ....................................................................173

SIXTH CLAIM FOR RELIEF ...............................................................174

    Section 11 of the Securities Act of 1933 (RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)............................................174

SEVENTH CLAIM FOR RELIEF .........................................................176

    Section 12(a)(2) of the Securities Act of 1933 (Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)............................................................................176

EIGHTH CLAIM FOR RELIEF .............................................................178

    Violation of the California Corporate Securities Law of 1968 Cal. Corp. Code §§ 25401 and 25501 (Alternative Loan Trust 2007-OA4, GreenPoint Mortgage Funding Trust 2006-OH1, GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-

2909358.1

v

**FIRST AMENDED COMPLAINT**

QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)..............................................178

NINTH CLAIM FOR RELIEF ..............................................179

Violation of the Kansas Uniform Securities Act Kan. Stat. Ann. § 17-12a509 (First Franklin Mortgage Loan Trust 2006-FF4) ......................179

APPENDIX..............................................1

Table 10..............................................A-1

Table 11..............................................A-3

**FIRST AMENDED COMPLAINT**

Plaintiff, the National Credit Union Administration Board ("NCUA Board"), brings this action in its capacity as Liquidating Agent of U.S. Central Federal Credit Union ("U.S. Central") and Western Corporate Federal Credit Union ("WesCorp") against Goldman, Sachs & Co. ("Goldman Sachs") as underwriter and seller, and against GS Mortgage Securities Corp., and Residential Accredit Loans, Inc. (collectively, the "Issuer Defendants"), as issuers, of certain residential mortgage-backed securities ("RMBS") purchased by U.S. Central and WesCorp, and alleges as follows in this First Amended Complaint:[1]

## I.     NATURE OF THE ACTION

1.     This action arises out of the sale of RMBS to U.S. Central and WesCorp where Goldman Sachs acted as underwriter and/or seller of the RMBS.

2.     Virtually all of the RMBS sold to U.S. Central and WesCorp were rated as triple-A (the same rating as U.S. Treasury bonds) at the time of issuance.

3.     The Issuer Defendants issued and Goldman Sachs underwrote and sold the RMBS pursuant to registration statements, prospectuses, and/or prospectus supplements (collectively, the "Offering Documents"). The Offering Documents contained untrue statements of material fact or omitted to state material facts in violation of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) ("Section 11" and "Section 12(a)(2)," respectively), and the California Corporate Securities Law of 1968 ("California Blue Sky law"), Cal. Corp. Code §§ 25401, 25501 and the Kansas Uniform Securities Act, Kan. Stat. Ann. § 17-12a509 ("Kansas Blue Sky law").

---

[1]   Plaintiff acknowledges and respects the rulings issued by the Court. Certain claims and allegations are repled herein to preserve such issues for appeal.

2909358.1

**1**

**FIRST AMENDED COMPLAINT**

4. The NCUA Board expressly disclaims and disavows any allegation in this Complaint that could be construed as alleging fraud.

5. The Offering Documents described, among other things, the mortgage underwriting standards of the originators (the "Originators") who made the mortgages that were pooled and served as the collateral for the RMBS purchased by U.S. Central and WesCorp.

6. The Offering Documents represented that the Originators adhered to the underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.

7. The Offering Documents also represented that the loan pools underlying the RMBS had certain characteristics. These material representations included the weighted average loan-to-value ("LTV") ratio and owner occupancy rates ("OOR").

8. LTV represents the amount of the loans as a percentage of the value of the mortgaged properties. A lower LTV number indicated that the loans were less likely to default because the borrower had greater equity, and in the event of default, that the balance of the loans could be recovered by selling the properties.

9. OOR represents the percentage of borrowers who occupied the mortgaged properties. A higher OOR number indicated that the loans were less likely to default, as borrowers are much less likely to default on their primary residence than an investment property or vacation home.

10. In fact, the Originators had systematically abandoned the stated underwriting guidelines in the Offering Documents. Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards in the Offering Documents, the RMBS were significantly riskier than represented. Also, properties were routinely overvalued at the time of origination, rendering the average LTV ratios inaccurate. And the Offering Documents represented that a significant number of properties were owner-occupied,

2909358.1

2

1  when in fact, they were not. Indeed, a material percentage of the loans collateralizing

2  the RMBS were all but certain to become delinquent or default shortly after

3  origination. As a result, the RMBS were destined from inception to perform poorly.

4      11.    These untrue statements and omissions were material because the value

5  of RMBS is largely a function of the cash flow from the principal and interest

6  payments on the mortgage loans collateralizing the RMBS. Thus, the performance of

7  the RMBS is tied to the borrower's ability to repay the loan.

8      12.    U.S. Central and WesCorp purchased the RMBS listed in Table 1 (*infra*)

9  through initial offerings directly from Goldman Sachs by means of prospectuses or

10  oral communications. Thus, Goldman Sachs is liable for material untrue statements

11  and omissions of fact under Section 11, Section 12(a)(2), and/or the California and

12  Kansas Blue Sky laws for the RMBS listed in Table 1 (*infra*).

2909358.1

**3**

**FIRST AMENDED COMPLAINT**

**Table 1**

| CUSIP[2] | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | | WesCorp | 20-Mar-07 | $97,947,000 |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 | GS Mortgage Securities Corp. | U.S. Central | 3-Mar-06 | $29,360,000 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | GS Mortgage Securities Corp. | WesCorp | 4-May-07 | $73,547,938 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | GS Mortgage Securities Corp. | WesCorp | 4-May-07 | $59,442,800 |
| 751153AC1 | RALI Series 2006-QO10 Trust | Residential Accredit Loans, Inc. | WesCorp | 14-Dec-06 | $122,963,336 |
| 74922JAC2 | RALI Series 2007-QH2 Trust | Residential Accredit Loans, Inc. | WesCorp | 16-Feb-07 | $19,454,000 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | Residential Accredit Loans, Inc. | WesCorp | 28-Mar-07 | $62,785,038 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | Residential Accredit Loans, Inc. | WesCorp | 28-Mar-07 | $29,673,510 |
| 75116EAB8 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 24-May-07 | $20,000,000 |
| 75116EAC6 | RALI Series 2007-QH5 Trust | Residential Accredit Loans, Inc. | WesCorp | 24-May-07 | $48,788,000 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | Residential Accredit Loans, Inc. | WesCorp | 21-Jun-07 | $70,102,000 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | Residential Accredit Loans, Inc. | WesCorp | 21-Jun-07 | $84,062,000 |

13.     U.S. Central or WesCorp purchased each RMBS listed in Table 2 (*infra*) pursuant to and traceable to registration statements containing untrue statements of

---

2     "CUSIP" stands for "Committee on Uniform Securities Identification Procedures." A CUSIP number is used to identify most securities, including certificates of RMBS.  *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

2909358.1

4

**FIRST AMENDED COMPLAINT**

1 material fact or that omitted to state material facts required to be stated therein or

2 necessary to make the statements therein not misleading. Goldman Sachs was an

3 underwriter for each of the securities listed in Table 2. Goldman Sachs also acted as

4 seller for the GreenPoint Mortgage Funding Trust 2006-OH1, GSR Mortgage Loan

5 Trust 2006-OA1, and RALI Series 2007-QH5 Trust Certificates listed in Table 2.

6 Thus, Goldman Sachs is liable for material untrue statements and omissions of fact

7 under Section 11 for the RMBS listed in Table 2 and for material untrue statements

8 and omissions of fact under the California Blue Sky law for the GreenPoint Mortgage

9 Funding Trust 2006-OH1, GSR Mortgage Loan Trust 2006-OA1, and RALI Series

10 2007-QH5 Certificates.

## Table 2

| CUSIP | ISSUING ENTITY | SELLER | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|---|
| 35729VAE7 | Fremont Home Loan Trust 2006-D | | | U.S. Central | 25-Oct-06 | $18,000,000 |
| 35729VAF4 | Fremont Home Loan Trust 2006-D | | | U.S. Central | 25-Oct-06 | $32,000,000 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | | GS Mortgage Securities Corp. | WesCorp | 5-Feb-07 | $26,708,366 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | Goldman Sachs | GS Mortgage Securities Corp. | WesCorp | 8-Mar-07 | $26,689,604 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | Goldman Sachs | GS Mortgage Securities Corp. | WesCorp | 26-Sep-06 | $61,086,962 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | | GS Mortgage Securities Corp. | WesCorp | 28-Sep-06 | $73,779,370 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | | | U.S. Central | 8-Dec-06 | $57,000,000 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | | Residential Accredit Loans, Inc. | WesCorp | 11-Oct-06 | $49,783,783 |
| 75116EAA0 | RALI Series 2007-QH5 Trust | Goldman Sachs | Residential Accredit Loans, Inc. | WesCorp | 30-May-07 | $115,119,708 |

25      14.    The RMBS U.S. Central and WesCorp purchased suffered a significant

26 drop in market value. U.S. Central and WesCorp have suffered significant losses from

27 those RMBS purchased despite the NCUA Board's mitigation efforts.

28 2909358.1

5

**FIRST AMENDED COMPLAINT**

## II.    PARTIES AND RELEVANT NON-PARTIES

15.    The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. The NCUA must repay all monies borrowed from the Treasury Department by 2021 through assessments against all federally-insured credit unions. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA is under the management of the NCUA Board. *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

16.    U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas. As a corporate credit union, U.S. Central provided investment and financial services to other corporate credit unions.

17.    WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California. As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

18.    The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant to the FCU Act, 12 U.S.C. § 1751 *et seq*. On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into

**FIRST AMENDED COMPLAINT**

involuntary liquidation pursuant to 12 U.S.C. §§ 1766(a), 1787(a)(1)(A) and appointed itself Liquidating Agent.

19. Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of U.S. Central and WesCorp and of any member, account holder, officer or director of U.S. Central and WesCorp, with respect to U.S. Central and WesCorp and their assets, including the right to bring the claims asserted by them in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of U.S. Central and WesCorp and succeeds to all rights, titles, powers, and privileges of U.S. Central and WesCorp. *See* 12 U.S.C. § 1787(b)(2)(A). The NCUA Board may also sue on U.S. Central's and WesCorp's behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

20. Prior to being placed into conservatorship and involuntary liquidation, U.S. Central and WesCorp were the two largest corporate credit unions in the United States.

21. Any recoveries from this legal action will reduce the total losses resulting from the failure of U.S. Central and WesCorp. Losses from U.S. Central and WesCorp's failures must be paid from the NCUSIF or the TCCUSF. Expenditures from these funds must be repaid through assessments against all federally insured credit unions. Because of the expenditures resulting from U.S. Central and WesCorp's failures, federally insured credit unions will experience larger assessments, thereby reducing federally insured credit unions' net worth. Reductions in net worth can adversely affect the dividends that individual members of credit unions receive for the savings on deposit at their credit union. Reductions in net worth can also make loans for home mortgages and automobile purchases more expensive and difficult to obtain. Any recoveries from this action will help to reduce the amount of any future assessments on federally insured credit unions throughout the system, reducing the

2909358.1

**7**

negative impact on federally insured credit unions' net worth.  Recoveries from this action will benefit credit unions and their individual members by increasing net worth, resulting in more efficient and lower-cost lending practices.

22.    Defendant Goldman Sachs is a U.S. Securities and Exchange Commission ("SEC") registered broker-dealer and was an underwriter of all the RMBS that are the subject of this Complaint and that are listed in Tables 1 and 2 (*supra*).  Goldman Sachs is a New York corporation with its principal place of business in New York.

23.    GS Mortgage Securities Corp. is the depositor and the issuer for the GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, First Franklin Mortgage Loan Trust 2006-FF4, and GreenPoint Mortgage Funding Trust 2006-OH1 offerings.  GS Mortgage Securities Corp. is a Delaware corporation with its principal place of business in New York.

24.    Residential Accredit Loans, Inc. is the depositor and the issuer for the RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, and the RALI Series 2007-QH6 Trust offerings (collectively, "the RALI Series offerings").  Residential Accredit Loans, Inc. is a Delaware corporation with its principal place of business in Minnesota.

## III.    JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction pursuant to:  (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; and (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil

2909358.1

8

**FIRST AMENDED COMPLAINT**

1   actions, suits or proceedings commenced by the United States, or by any agency or

2   officer thereof expressly authorized to sue by Act of Congress."

3       26.     Venue is proper in this District under Section 22 of the Securities Act, 15

4   U.S.C. § 77v(a), because many of the transactions at issue occurred in San Dimas,

5   California, the headquarters of WesCorp.  This Court has personal jurisdiction over

6   each Defendant because they offered/sold the RMBS at issue in this Complaint to

7   WesCorp in this District; prepared/disseminated the Offering Documents containing

8   untrue statements or omissions of material fact as alleged herein to WesCorp in this

9   District; and/or are residents of/conduct business in this District.

10  **IV.   MORTGAGE   ORIGINATION   AND   THE   PROCESS   OF**

11  **SECURITIZATION**

12      27.     RMBS are asset-backed securities.  A pool or pools of residential

13  mortgages are the assets that back or collateralize the RMBS certificates purchased by

14  investors.

15      28.     Because residential mortgages are the assets collateralizing RMBS, the

16  origination of the mortgages commences the process that leads to the creation of

17  RMBS.  Originators decide whether to loan potential borrowers money to purchase

18  residential real estate through a process called mortgage underwriting.  The originator

19  applies its underwriting standards or guidelines to determine whether a particular

20  borrower is qualified to receive a mortgage for a particular property.  The underwriting

21  guidelines consist of a variety of metrics, including:  the borrower's debt, income,

22  savings, credit history and credit score; whether the property will be owner-occupied;

23  and the amount of the loan compared to the value of the property at issue (the "loan-

24  to-value" or "LTV" ratio), among other things.  Loan underwriting guidelines are

25  designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the

26  borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in

27  the event of default.

28  2909358.1

**FIRST AMENDED COMPLAINT**

29.     Historically, originators made mortgage loans to borrowers and held the loans on their own books for the duration of the loan.  Originators profited as they collected monthly principal and interest payments directly from the borrower. Originators also retained the risk that the borrower would default on the loan.

30.     This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively "government sponsored enterprises" or "GSEs") began purchasing "conforming loans" or "prime loans"—so-called because they conformed to guidelines set by the GSEs.  The GSEs either sponsored the RMBS issuance (Ginnie Mae) or issued the RMBS themselves after purchasing the conforming loans (Fannie Mae and Freddie Mac).  The GSEs securitized the mortgage loans by grouping mortgages into "loan pools," then repackaging the loan pools into RMBS where investors received the cash flow from the mortgage payments.  The GSEs guarantee the monthly cash flow to investors on the agency RMBS.

31.     More recently, originators, often working with investment banks, began securitizing "non-conforming loans"—loans originated (in theory) according to private guidelines adopted by the originators.  Non-conforming loans are also known as "nonprime" or "private label" loans and include "Alt-A" and "subprime" loans. Despite the non-conforming nature of the underlying mortgages, the securitizers of such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

32.     All of the loans collateralizing the RMBS at issue in this Complaint are private-label mortgage loans.

33.     The issuance of RMBS collateralized by non-conforming loans peaked in 2006.  The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages, to ensuring that the originator could

process (and obtain fees from) an ever-larger loan volume for distribution as RMBS. This practice is known as "originate-to-distribute" ("OTD").

34. Securitization begins with a "sponsor" who purchases loans in bulk from one or more originators.  The sponsor transfers title of the loans to an entity called the "depositor."

35. The depositor transfers the loans to a trust called the "issuing entity."

36. The issuing entity issues "notes" and/or "certificates," representing an ownership interest in the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

37. The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

38. One or more "underwriters"—like Goldman Sachs—then sell the notes or certificates to investors.

39. A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors.

40. Figure 1 (*infra*) depicts a typical securitization process.

# Figure 1



41. Because securitization, as a practical matter, shifts the risk of default on the mortgage loans from the originator of the loan to the RMBS investor, the originator's adherence to mortgage underwriting guidelines as represented in the offering documents with respect to the underlying mortgage loans is critical to the investors' ability to evaluate the expected performance of the RMBS.

## V. RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT

42. RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of risk. RMBS certificates denote the particular tranches of the security purchased by the investor.

43. The credit rating for an RMBS reflects an assessment of the

2909358.1

**12**

creditworthiness of that RMBS and indicates the level of risk associated with that RMBS. Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit ratings agencies that assigned credit ratings to the RMBS in this case.

44.    The credit rating agencies use letter-grade rating systems as shown in Table 3 (*infra*).

**Table 3**
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | Prime (Maximum Safety) | |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | High Grade, High Quality | |
| A1<br>A2<br>A3 | A+<br>A<br>A- | Upper Medium Grade | INVESTMENT GRADE |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | Medium Grade | |
| Ba2<br>Ba3 | BB<br>BB- | Non-Investment Grade,<br>or Speculative | |
| B1<br>B2<br>B3 | B+<br>B<br>B- | Highly Speculative, or<br>Substantial Risk | |
| Caa2<br>Caa3 | CCC+ | In Poor Standing | SPECULATIVE GRADE |
| Ca | CCC<br>CCC- | Extremely Speculative | |
| C | - | May be in Default | |
| - | D | Default | |

45.    Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk." Moody's Investors Services, Inc., *Moody's Rating Symbols & Definitions* at 6 (August 2003), *available at*: http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf. Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment on

the obligation is extremely strong." Standard & Poor's, *Ratings Definitions*, *available at* http://www.standardandpoors.com/ratings/articles/ en/us/?assetID=1245303711350.

46.     In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because the primary market for RMBS is institutional investors, such as U.S. Central and WesCorp, which are generally limited to buying only securities with the highest credit ratings. *See, e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities with long-term ratings below AA-); *but see, e.g.*, Removing References to Credit Ratings in Regulations; Proposing Alternatives to the Use of Credit Ratings, 76 Fed. Reg. 11,164 (proposed Mar. 1, 2011) (to be codified at 12 C.F.R. pts. 703, 704, 709, and 742) (the NCUA's proposed rule eliminating the use of credit ratings for guidance in investment decisions by credit unions).

47.     While the pool of mortgages underlying the RMBS may not have been sufficient to warrant a triple-A credit rating, various forms of "credit enhancement" were used to obtain a triple-A rating on the higher tranches of RMBS.

48.     One form of credit enhancement is "structural subordination." The tranches, and their risk characteristics relative to each other, are often analogized to a waterfall. Investors in the higher or "senior" tranches are the first to be paid as income is generated when borrowers make their monthly payments. After investors in the most senior tranche are paid, investors in the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

49.     In the event mortgages in the pool default, the resulting loss is absorbed by the subordinate tranches first.

50.     Accordingly, senior tranches are deemed less risky than subordinate tranches and therefore receive higher credit ratings.

**FIRST AMENDED COMPLAINT**

51.     Another     form     of     credit     enhancement     is     overcollateralization. Overcollateralization is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security.  The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

52.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."  "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.   Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.  Finally, some RMBS are "cross-collateralized," *i.e.*, when a tranche in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI.   U.S. CENTRAL'S AND WESCORP'S PURCHASES

53.     U.S. Central and WesCorp purchased only the highest-rated tranches of RMBS.   All but one were rated triple-A at the time of issuance.  These securities have since been downgraded below investment grade just a few years after they were sold (*see infra* Table 4).

2909358.1

**15**

**FIRST AMENDED COMPLAINT**

## Table 4

| Credit Ratings of RMBS Purchases Original/Recent | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | WesCorp | AAA | Aaa | D 8/30/2012 | C 11/23/2010 |
| 36233AFT6 | First Franklin Mortgage Loan Trust 2006-FF4 | U.S. Central | AAA | Aaa | B 9/23/2011 | Caa3 4/6/2010 |
| 35729VAE7 | Fremont Home Loan Trust 2006-D | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Ca 4/29/2010 |
| 35729VAF4 | Fremont Home Loan Trust 2006-D | U.S. Central | AA+ | Aa1 | D 2/25/2011 | C 3/17/2009 |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | WesCorp | AAA | Aaa | D 4/19/2010 | C 12/9/2010 |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1 | WesCorp | AAA | Aaa | CCC 9/2/2009 | C 12/14/2010 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | AAA | Aaa | D 2/22/2012 | C 12/14/2010 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | WesCorp | AAA | Aaa | D 2/22/2012 | C 12/14/2010 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | U.S. Central | AAA | Aaa | CCC 8/4/2009 | Ca 3/20/2009 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | WesCorp | AAA | Aaa | CCC 4/15/2009 | C 12/1/2010 |
| 751153AC1 | RALI Series 2006-QO10 Trust | WesCorp | AAA | Aaa | D 3/23/2010 | C 12/1/2010 |
| 74922JAC2 | RALI Series 2007-QH2 Trust | WesCorp | AAA | Aaa | D 6/23/2010 | C 12/1/2010 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | WesCorp | AAA | Aaa | D 9/25/2012 | C 12/1/2010 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | WesCorp | AAA | Aaa | D 5/25/2010 | C 12/1/2010 |
| 75116EAA0 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | Caa3 12/1/2010 |
| 75116EAB8 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | CCC 7/24/2009 | C 12/1/2010 |
| 75116EAC6 | RALI Series 2007-QH5 Trust | WesCorp | AAA | Aaa | D 12/17/2010 | C 12/1/2010 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | WesCorp | AAA | Aaa | CC 8/11/2011 | C 12/1/2010 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | WesCorp | AAA | Aaa | D 9/24/2010 | C 12/1/2010 |

54.   At the time of purchase, U.S. Central and WesCorp were not aware of the untrue statements or omissions of material facts in the Offering Documents of the RMBS.   If U.S. Central and WesCorp had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering

**FIRST AMENDED COMPLAINT**

Documents—U.S. Central and WesCorp would not have purchased the certificates.

55.   The securities' substantial loss of market value has injured U.S. Central, WesCorp and the NCUA Board.

## VII.   THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS

56.   The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages.  The loan underwriting guidelines ensure that the borrower has the means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of reasonably anticipated defaults on underlying mortgage loans.

57.   With respect to RMBS collateralized by loans written by originators who systematically disregarded their stated underwriting standards, the following pattern is present:

  a.   a surge in borrower delinquencies and defaults on the mortgages in the pools (*see infra* Section VII.A and Table 5);

  b.   actual losses to the underlying mortgage pools within the first 12 months  after the offerings exceeded expected losses (*see infra* Section VII.B and Figure 2);

  c.   a high percentage of the underlying mortgage loans were originated for distribution, as explained below (*see infra* Table 6 and accompanying allegations); and

  d.   downgrades of the RMBS by credit rating agencies from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings (*see infra* Section VII.C and *supra* Table 4).

58.   These factors support a finding that the Originators failed to originate the

**17**

mortgages in accordance with the underwriting standards stated in the Offering Documents.

59.   This conclusion is corroborated by reports that the Originators whose mortgage loans collateralize the RMBS at issue in this Complaint abandoned the underwriting standards described in the Offering Documents (*see infra* Section VII.D).

60.   This conclusion is further corroborated by evidence that the RMBS underwritten by Goldman Sachs at issue in this Complaint were collateralized by a substantial number of defective loans that were originated contrary to the stated underwriting standards (*see infra* Sections VII.E-F).

**A.   The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards**

61.   Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after payment is due.  Residential mortgages where no payment has been received for more than 90 days (or three payment cycles) are generally considered to be in default.

62.   The surge of delinquencies and defaults following the offerings evidence the systematic flaws in the Originators' underwriting process (*see infra* Table 5).

63.   The Offering Documents reported zero or near zero delinquencies and defaults at the time of the offerings (*see infra* Table 5).

64.   The pools of mortgages collateralizing the RMBS experienced delinquency and default rates up to 5.21% within the first three months, up to 14.81% at six months, and up to 34.09% at one year (*see infra* Table 5).

65.   As of September 2012, approximately half (49.3% on average) of the mortgage collateral across all of the RMBS that U.S. Central and WesCorp purchased was in delinquency, bankruptcy, foreclosure, or was real estate owned ("REO"), which

means that the noteholder owns the property after foreclosure (*see infra* Table 5).

66. Table 5 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates on the RMBS as to which claims are asserted in this Complaint. The data presented in the last five columns are from the trustee reports (dates and page references as indicated in the parentheticals). The shadowed rows reflect the group of mortgages in the pool underlying the specific tranches purchased by U.S. Central and WesCorp; however, some trustee reports include only the aggregate data. For RMBS with multiple groups, aggregate information on all the groups is included because the tranches are cross-collateralized.

Case 2:12-cv-06501-CW-JEM   Document 129   Filed 07/19/13   Page 10 of 87   Page ID #:2552
Case 1:12-cv-12020-rgs   Doc #298-7   Filed 07/19/13   Entered 07/19/13 16:22:47   Exhibit 7
Part 1   Pg 27 of 60

### Table 5

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 (P.S. dated March 28, 2007) | zero (S-67-S-70) | 2.36% (Apr., p.9) | 3.11% (June, p.9) | 5.39% (Sept., p.9) | 16.45% (Mar. 2008, p.7) | 57.88% (Sept. 2012, p.13) |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 (P.S. dated March 27, 2006) | 0.03% were 30-59 days delinquent. Zero were two or more payments delinquent. (S-32) | .42% (Apr., p.11) | 2.5% (June, p.11) | 5.73% (Sept., p.10) | 14.35% (Mar. 2007, p.10) | 51.47% (September 2012, p. 10) |
| 35729VAF4 | Fremont Home Loan Trust 2006-D: Aggregate *Class M1 certificates represent interests in all of the mortgage loans in the trust fund. (3) (P.S. dated November 1, 2006) | Zero more than 30 days delinquent on 10/1/06 (19) | .79% (Dec., p.10) | 5.21% (Feb., p.10) | 12.45% (May, p.10) | 26.17% (Nov., p.10) | 42.73% (Sept. 2012, p.9) |
|  | Fremont Home Loan Trust 2006-D: Group 1 | Zero more than 30 days delinquent on 10/1/06 (19) | 1% (Dec., p.12) | 4.42% (Feb., p.12) | 10.19% (May, p.12) | 24.12% (Nov., p.12) | 45.41% (Sept. 2012, p.10) |
| 35729VAE7 | Fremont Home Loan Trust 2006-D: Group 2 *The Class 2-A-4 in Group 2 (3) | Zero more than 30 days delinquent on 10/1/06 (19) | .52% (Dec., p.12) | 1.59% (Feb., p.12) | 4.03% (May, p.12) | 9.84% (Nov., p.12) | 32.33% (Sept. 2012, p.10) |
|  | Fremont Home Loan Trust 2006-D: Group 3 | Zero more than 30 days delinquent on 10/1/06 (19) | .78% (Dec., p.13) | 7.23% (Feb., p.13) | 17.55% (May, p.13) | 35.42% (Nov., p.13) | 49.75% (Sept. 2012, p.11) |
|  | Fremont Home Loan Trust 2006-D: Group 4 | Zero were more than 30 days delinquent as of 10/1/06. (19) | .51% (Dec., p.13) | 4.86% (Feb., p.13) | 11.47% (May, p.13) | 19.17% (Nov., p.13) | 30.81% (Sept. 2012, p.11) |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 (P.S. dated December 21, 2006) | 0.51% were 30 to 59 days delinquent. (S-44) | 1.05% (Jan., p.9) | 3.48% (Mar., p.9) | 2.55% (Jun., p.9) | 8.36% (Dec., p.9) | 39.15% (Sept. 2012, p. 9) |
|  | GSR Mortgage Loan Trust 2006-OA1: Aggregate (P.S. dated August 23, 2006) | 0.94% were 30 to 59 days delinquent. (S-45) | 1.68% (Sept., p.11) | 2.34% (Nov., p.11) | 3.84% (Feb., p.10) | 10.12% (Aug. 2007, p.9) | 51.14% (Sept. 2012, p.11) |
|  | GSR Mortgage Loan Trust 2006-OA1: Group 1 | 0.94% were 30 to 59 days delinquent. (S-45) | 1.59% (Sept., p.12) | 2.38% (Nov., p.12) | 3.39% (Feb., p.11) | 9.41% (Aug. 2007, p.10) | 47.73% (Sept. 2012, p.12) |
| 362631AD5 | GSR Mortgage Loan Trust 2006-OA1: Group 2 *The Class 2-A-3 in Group 2 (S-13) | 0.94% were 30 to 59 days delinquent. (S-45) (S-45) | 1.86% (Sept., p.12) | 2.49% (Nov., p.12) | 4.10% (Feb., p.11) | 10.72% (Aug. 2007, p.10) | 49.84% (Sept. 2012, p.12) |
|  | GSR Mortgage Loan Trust 2006-OA1: Group 3 | 0.94% were 30 to 59 days delinquent. (S-45) (S-45) | .70% (Sept., p.13) | 1.00% (Nov., p.13) | 3.59% (Feb., p.12) | 8.34% (Aug. 2007, p.11) | 69.56% (Sept. 2012, p.13) |
|  | GSR Mortgage Loan Trust 2007-OA1: Aggregate (P.S. dated May 7, 2007) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.58% (May, p.9) | 3.00% (July, p.9) | 5.55% (Oct., p.9) | 12.45% (Apr. 2008, p.10) | 49.33% (Sept. 2012, p. 10) |

**FIRST AMENDED COMPLAINT**

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1: Group 1 *Class 1A-2 in Group 1 (S-14-15) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.23% (May, p.10) | 2.67% (July, p.10) | 5.30% (Oct., p.10) | 11.97% (Apr. 2008, p.11) | 46.43% (Sept. 2012, p. 11) |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1: Group 2 *Class 2A-M in Group 2 (S-14-15) | 0.67% were 30 to 59 days delinquent. Zero were 60 days or more delinquent. (S-54) | 2.86% (May, p.10) | 3.28% (July, p.10) | 5.76% (Oct., p.10) | 12.85% (Apr. 2008, p.11) | 51.69% (Sept. 2012, p. 11) |
|  | Long Beach Mortgage Loan Trust 2006-11: Aggregate (P.S. dated December 11, 2006) | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan., p.12) | 3.38% (Mar., p.12) | 12.43% (June, p.12) | 29.89% (Dec., p.12) | 43.45% (Sept. 2012, p.14) |
|  | Long Beach Mortgage Loan Trust 2006-11: Group 1 | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan., p.12) | 1.8% (Mar., p.13) | 7.65% (June, p.13) | 21.53% (Dec., p.13) | 44.75% (Sept. 2012, p.19) |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11: Group 2 *Class II-A-4 in Group 2 (S-72) | 2.25% of Group I and 4.20% of Group II were delinquent. (S-17) | 0% (Jan., p.12) | 4.17% (Mar., p.14) | 14.81% (June, p.14) | 34.09% (Dec., p.14) | 42.55% (Sept. 2012, p.24) |
| 75114NAC8 | RALI Series 2006-QO6 Trust (P.S. dated June 28, 2006) | zero (S-42) | 1.42% (July, p.8) | 1.61% (Sept., p.7) | 2.79% (Dec., p.8) | 6.13% (June, p.8) | 46.13% (Sept. 2012, p. 8) |
| 751153AC1 | RALI Series 2006-QO10 Trust (P.S. dated December 27, 2006) | zero (S-45) | 2.42% (Jan., p.8) | 4.94% (Mar., p.8) | 4.97% (June, p.8) | 13.54% (Dec., p.8) | 44.16 (Sept., 2012 p. 8) |
| 74922JAC2 | RALI Series 2007-QH2 Trust (P.S. dated February 23, 2007) | zero (S-43) | .89% (Mar., p.7) | 3.14% (May, p.7) | 3.09% (Aug., p.7) | 9.32% (Feb. 2008, p.7) | 54.73 (Sept. 2012, p.8) |
| 74922WAC3 74922WAB5 | RALI Series 2007-QH3 Trust (P.S. dated March 28, 2007) | zero (S-45) | .81% (Apr., p.8) | 4.08% (June, p.8) | 2.84% (Sept., p.8) | 10.88% (Mar. 2008, p.7) | 47.81 (Sept. 2012, p. 8) |
|  | RALI Series 2007-QH5 Trust: Aggregate (P.S. dated May 29, 2007) | zero (S-51) | 1.55% (June, p.9) | 2.59% (Aug., p.9) | 5.26% (Nov., p.9) | 16.31% (May 2008, p.14) | 51.48% (Sept. 2012, p. 9) |
| 75116EAA075 116EAB8 75116EAC6 | RALI Series 2007-QH5 Trust: Group 1 *Class AI1, AI2, and AI3 in Group 1 (S-12-13) | zero (S-51) | 1.65% (June, p.10) | 2.58% (Aug., p.10) | 5.73% (Nov., p.10) | 16.55% (May 2008, p.12) | 52.58% (Sept. 2012, p. 10) |
|  | RALI Series 2007-QH5 Trust: Group 2 | zero (S-51) | 1.32% (June, p.11) | 2.64% (July, p.11) | 4.18% (Nov., p.11) | 15.74% (May 2008, p.13) | 49.06% (Sept. 2012, p. 11) |
| 74922AAB3 74922AAC1 | RALI Series 2007-QH6 Trust (P.S. dated June 27, 2007) | zero (S-45) | 1.10% (July, p.8) | 2.84% (Sept., p.8) | 5.57% (Dec., p.7) | 15.81% (June 2008, p.10) | 50.25 (Sept. 2012, p. 8) |

67.     This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by U.S. Central and WesCorp, was later

1   discovered to be indicative of the Originators' systematic disregard of their stated

2   underwriting guidelines.

3       68.    The phenomenon of borrower default shortly after origination of the

4   loans is known as "Early Payment Default."   Early Payment Default evidences

5   borrower misrepresentations and other misinformation in the origination process,

6   resulting from systematic failure of the Originators to apply the underwriting

7   guidelines described in the Offering Documents.

8       69.    A November 2008 Federal Reserve Board study attributed the rise in

9   defaults, in part, to "[d]eteriorating lending standards" and posits that "the surge in

10  early payment defaults suggests that underwriting . . . deteriorated on dimensions that

11  were less readily apparent to investors." Christopher J. Mayer *et al.*, *The Rise in Mortgage*

12  *Defaults* at 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-

13  59).

14      70.    In January 2011, the Financial Stability Oversight Council ("FSOC"),

15  chaired by United States Treasury Secretary Timothy Geithner, issued a report

16  analyzing the effects of risk retention requirements in mortgage lending on the broader

17  economy. *See* FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF

18  RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report"). The

19  FSOC Risk Retention Report focused on stabilizing the mortgage lending industry

20  through larger risk retention requirements in the industry that can "incent better

21  lending decisions" and "help to mitigate some of the pro-cyclical effects securitization

22  may have on the economy." *Id.* at 2.

23      71.    The FSOC Risk Retention Report observed that the securitization

24  process often incentivizes poor underwriting by shifting the risk of default from the

25  originators to the investors, while obscuring critical information concerning the actual

26  nature of the risk. The FSOC Risk Retention Report stated:

27

28  2909358.1

22

**FIRST AMENDED COMPLAINT**

1       The securitization process involves multiple parties with varying

2   incentives and information, thereby breaking down the traditional direct

3   relationship between borrower and lender. The party setting

4   underwriting standards and making lending decisions (the originator) and

5   the party making structuring decisions (the securitizer) are often exposed

6   to minimal or no credit risk. By contrast, the party that is most exposed

7   to credit risk (the investor) often has less influence over underwriting

8   standards and may have less information about the borrower. As a result,

9   originators and securitizers that do not retain risk can, at least in the short

10  run, maximize their own returns by lowering loan underwriting standards

11  in ways that investors may have difficulty detecting. The originate-to-

12  distribute model, as it was conducted, exacerbated this weakness by

13  compensating originators and securitizers based on volume, rather than

14  on quality.

15  *Id.* at 3.

16      72.    Indeed, originators that wrote a high percentage of their loans for

17  distribution were more likely to disregard underwriting standards, resulting in poorly

18  performing mortgages, in contrast to originators that originated and then held most of

19  their loans.

20      73.    High OTD originators profited from mortgage origination fees without

21  bearing the risks of borrower default or insufficient collateral in the event of default.

22  Divorced from these risks, high OTD originators were incentivized to push loan

23  quantity over quality.

24      74.    Table 6 (*infra*) shows the percentage of loans originated for distribution

25  relative to all the loans made by the Originators for the years 2005, 2006 and 2007, for

26  those Originators in this Complaint with high OTD percentages. The data was

27  obtained from the Home Mortgage Disclosure Act database.

28  2909358.1

23

**FIRST AMENDED COMPLAINT**

Table 6

| Originator Name | OTD % 2005 | OTD % 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |
| First Franklin Financial Corporation | | | 98.7 |
| First Magnus Financial Corp. | 100 | 100 | |
| First National Bank Arizona | 88.0 | 79.9 | 89.4 |
| Fremont Investment & Loan | 91.2 | 85.2 | 94.0 |
| GreenPoint Mortgage Funding Inc. | 89.0 | 87.1 | 95.6 |
| Homecomings Financial, LLC | 97.4 | 97.9 | 99.9 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| Long Beach Mortgage | | 80.2 | |
| Quicken Loans | 89.5 | 86.7 | 91.3 |
| SCME Mortgage Bankers Inc. | 100 | 90.9 | |
| SunTrust Mortgage, Inc. | 62.6 | 71.1 | 74.4 |

**B.     The Surge in Actual Versus Expected Cumulative Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

75.     The actual defaults in the mortgage pools underlying the RMBS U.S. Central and WesCorp purchased exceeded expected defaults so quickly and by so wide a margin that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents.

76.     Every month, the RMBS trustee reports the number and outstanding balance of all loans in the mortgage pools that have defaulted. The running total of this cumulative default balance is referred to as the "gross loss."

77.     When defaulted loans are foreclosed upon, the proceeds from the foreclosures are distributed to the investors and any shortfall on the defaulted loan balances is realized as a loss. The running total of this cumulative realized loss (defaulted loan balance minus recovery in foreclosure) is referred to as the "net loss."

2909358.1

24

FIRST AMENDED COMPLAINT

78.     "Actual loss" is the economic loss the mortgage pool experiences in fact. So "actual gross loss" is the actual cumulative sum of the balance of the loans in default for a particular security.  Likewise, "actual net loss" is the actual cumulative realized loss on defaulted loans after foreclosure.

79.     At the time a security is rated, the rating agency calculates an amount of "expected loss" using a model based on historical performance of similar securities. So "expected gross loss" is the expected cumulative sum of the balance of the loans in default for a particular security.  Likewise, "expected net loss" is the expected cumulative realized loss on defaulted loans after foreclosure.  The amount of expected net loss drives the credit ratings assigned to the various tranches of RMBS.

80.     Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected net loss (in equation form:  $CE/ENL = RF$).  Thus, the rating factor expresses how many times the expected net loss is covered by credit enhancement.  A "triple-A" rated security would have a rating factor of "5," so would require credit enhancement of five times the amount of the expected net loss.  A "double-A rating" would have a rating factor of "4," and thus would require credit enhancement equaling four times the expected net loss.  A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times expected net loss.  A "Baa" rating would require credit enhancement of  2—1.5 times expected net loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected net loss.

81.     Accordingly, by working backwards from this equation, one can infer expected net loss in an already-issued offering.  For example, assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million.  This means the non-senior tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior tranches in this hypothetical offering serves as the credit enhancement for

**FIRST AMENDED COMPLAINT**

Case 2:11-cv-06531-GW-JEM   Document 128-7   Filed 02/29/12   Page 33 of 60   Page ID #:2558
Case 2:12-cv-02020-msg   Doc 1298-7   Filed 07/19/13   Entered 07/19/13 16:22:47   Exhibit 7
Part 1   Pg 33 of 60

the senior tranche. Therefore, on our hypothetical $100 million offering, the expected net loss would be $5 million, which is the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5. The following equation illustrates: $25,000,000/5 = $5,000,000.

82.    Expected gross loss can be then mathematically derived by applying an "expected recovery rate" to the expected net loss (EGL = ENL/(1 − ERR).

83.    A comparison of actual gross losses to expected gross losses for a particular security can be made graphically by plotting the actual versus expected loss data on a line graph. Figure 2 (*infra*) is a series of such line graphs. Figure 2 illustrates the actual gross loss (again, actual defaults) for the pools backing the RMBS purchased by U.S. Central and WesCorp experienced in the first 12 months after issuance compared to the expected gross loss (again, expected defaults) for those pools during the same time period.

84.    The actual gross loss data in Figure 2 (*infra*) was obtained from ABSNET, a resource for asset-backed securities related data. The expected gross losses were calculated by "grossing up" the rating-implied expected net losses using an expected recovery rate of 85%.

85.    As the graphs show, the actual gross losses (the solid lines) far exceeded the expected gross losses (the dotted lines) for the period analyzed. That means that the actual balance of defaulted loans in the first 12 months following issuance far exceeded the expected balance of defaulted loans based on historical performance.

## Figure 2

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Alternative Loan Trust 2007-OA4 | 40782 | 1 | $           - | $      1,721,048 |
| Alternative Loan Trust 2007-OA4 | 40782 | 2 | $           - | $      1,879,815 |
| Alternative Loan Trust 2007-OA4 | 40782 | 3 | $           - | $      2,052,895 |
| Alternative Loan Trust 2007-OA4 | 40782 | 4 | $      5,552,496 | $      2,241,515 |
| Alternative Loan Trust 2007-OA4 | 40782 | 5 | $      8,256,396 | $      2,446,993 |
| Alternative Loan Trust 2007-OA4 | 40782 | 6 | $      9,843,413 | $      2,670,748 |
| Alternative Loan Trust 2007-OA4 | 40782 | 7 | $     11,117,391 | $      2,914,296 |
| Alternative Loan Trust 2007-OA4 | 40782 | 8 | $     11,443,511 | $      3,179,264 |
| Alternative Loan Trust 2007-OA4 | 40782 | 9 | $     13,077,444 | $      3,467,385 |
| Alternative Loan Trust 2007-OA4 | 40782 | 10 | $     16,955,124 | $      3,780,506 |
| Alternative Loan Trust 2007-OA4 | 40782 | 11 | $     18,593,680 | $      4,120,586 |
| Alternative Loan Trust 2007-OA4 | 40782 | 12 | $     21,253,642 | $      4,489,703 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 1 | $         299,800 | $      7,015,627 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 2 | $      1,860,071 | $      7,662,819 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 3 | $      3,294,072 | $      8,368,358 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 4 | $     11,208,529 | $      9,137,241 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 5 | $     15,952,584 | $      9,974,848 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 6 | $     26,732,902 | $     10,886,953 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 7 | $     41,253,367 | $     11,879,747 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 8 | $     41,421,650 | $     12,959,853 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 9 | $     44,920,449 | $     14,134,341 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 10 | $     53,575,411 | $     15,410,736 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 11 | $     65,836,028 | $     16,797,031 |
| First Franklin Mortgage Loan Trust 2006-FF4 | 37107 | 12 | $     69,896,152 | $     18,301,685 |



2909358.1

**FIRST AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Fremont Home Loan Trust 2006-D | 39741 | 1 | $ - | $ 8,287,486 |
| Fremont Home Loan Trust 2006-D | 39741 | 2 | $ 3,753,135 | $ 9,052,007 |
| Fremont Home Loan Trust 2006-D | 39741 | 3 | $ 6,212,973 | $ 9,885,452 |
| Fremont Home Loan Trust 2006-D | 39741 | 4 | $ 20,765,954 | $ 10,793,726 |
| Fremont Home Loan Trust 2006-D | 39741 | 5 | $ 36,520,130 | $ 11,783,182 |
| Fremont Home Loan Trust 2006-D | 39741 | 6 | $ 58,203,553 | $ 12,860,642 |
| Fremont Home Loan Trust 2006-D | 39741 | 7 | $ 81,810,437 | $ 14,033,419 |
| Fremont Home Loan Trust 2006-D | 39741 | 8 | $ 107,497,063 | $ 15,309,337 |
| Fremont Home Loan Trust 2006-D | 39741 | 9 | $ 118,828,404 | $ 16,696,747 |
| Fremont Home Loan Trust 2006-D | 39741 | 10 | $ 122,788,975 | $ 18,204,539 |
| Fremont Home Loan Trust 2006-D | 39741 | 11 | $ 120,044,997 | $ 19,842,154 |
| Fremont Home Loan Trust 2006-D | 39741 | 12 | $ 118,165,126 | $ 21,619,586 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 1 | $ - | $ 802,726 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 2 | $ - | $ 876,777 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 3 | $ - | $ 957,505 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 4 | $ - | $ 1,045,480 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 5 | $ 1,066,439 | $ 1,141,319 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 6 | $ 2,202,733 | $ 1,245,681 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 7 | $ 1,999,286 | $ 1,359,277 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 8 | $ 3,557,154 | $ 1,482,862 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 9 | $ 3,344,056 | $ 1,617,247 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 10 | $ 3,721,155 | $ 1,763,291 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 11 | $ 5,959,259 | $ 1,921,911 |
| GreenPoint Mortgage Funding Trust 2006-OH1 | 40080 | 12 | $ 7,845,777 | $ 2,094,073 |



2909358.1

28

**FIRST AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 1 | $ - | $ 5,494,102 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 2 | $ - | $ 6,000,933 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 3 | $ - | $ 6,553,457 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 4 | $ 1,358,347 | $ 7,155,588 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 5 | $ 4,282,540 | $ 7,811,537 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 6 | $ 6,429,963 | $ 8,525,828 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 7 | $ 8,637,375 | $ 9,303,308 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 8 | $ 12,644,175 | $ 10,149,165 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 9 | $ 14,733,906 | $ 11,068,933 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 10 | $ 18,092,798 | $ 12,068,508 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 11 | $ 25,912,308 | $ 13,154,148 |
| GSR Mortgage Loan Trust 2006-OA1 | 38785 | 12 | $ 35,241,988 | $ 14,332,479 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 1 | $ - | $ 2,096,434 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 2 | $ 138,000 | $ 2,289,830 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 3 | $ 548,083 | $ 2,500,662 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 4 | $ 1,970,334 | $ 2,730,422 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 5 | $ 2,555,411 | $ 2,980,719 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 6 | $ 5,789,933 | $ 3,253,277 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 7 | $ 8,674,548 | $ 3,549,947 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 8 | $ 10,980,315 | $ 3,872,708 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 9 | $ 15,810,760 | $ 4,223,673 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 10 | $ 17,540,976 | $ 4,605,090 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 11 | $ 21,894,799 | $ 5,019,347 |
| GSR Mortgage Loan Trust 2007-OA1 | 41687 | 12 | $ 27,470,029 | $ 5,468,973 |

**FIRST AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 1 | $ - | $ 6,553,966 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 2 | $ - | $ 7,158,570 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 3 | $ 890,051 | $ 7,817,680 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 4 | $ 8,357,534 | $ 8,535,968 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 5 | $ 12,840,288 | $ 9,318,456 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 6 | $ 32,937,163 | $ 10,170,540 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 7 | $ 47,453,779 | $ 11,098,004 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 8 | $ 77,814,855 | $ 12,107,034 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 9 | $ 111,775,253 | $ 13,204,235 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 10 | $ 146,284,958 | $ 14,396,637 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 11 | $ 170,179,730 | $ 15,691,707 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 12 | $ 184,780,135 | $ 17,097,348 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2006-QO6 Trust | 38111 | 1 | $ - | $ 2,048,115 |
| RALI Series 2006-QO6 Trust | 38111 | 2 | $ - | $ 2,237,054 |
| RALI Series 2006-QO6 Trust | 38111 | 3 | $ - | $ 2,443,026 |
| RALI Series 2006-QO6 Trust | 38111 | 4 | $ 282,856 | $ 2,667,491 |
| RALI Series 2006-QO6 Trust | 38111 | 5 | $ 1,873,291 | $ 2,912,019 |
| RALI Series 2006-QO6 Trust | 38111 | 6 | $ 4,017,608 | $ 3,178,295 |
| RALI Series 2006-QO6 Trust | 38111 | 7 | $ 6,135,151 | $ 3,468,128 |
| RALI Series 2006-QO6 Trust | 38111 | 8 | $ 8,393,609 | $ 3,783,450 |
| RALI Series 2006-QO6 Trust | 38111 | 9 | $ 9,394,454 | $ 4,126,325 |
| RALI Series 2006-QO6 Trust | 38111 | 10 | $ 9,244,872 | $ 4,498,951 |
| RALI Series 2006-QO6 Trust | 38111 | 11 | $ 11,623,527 | $ 4,903,661 |
| RALI Series 2006-QO6 Trust | 38111 | 12 | $ 14,913,305 | $ 5,342,924 |



2909358.1

30

**FIRST AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2006-QO10 Trust | 40250 | 1 | $ - | $ 1,895,544 |
| RALI Series 2006-QO10 Trust | 40250 | 2 | $ - | $ 2,070,408 |
| RALI Series 2006-QO10 Trust | 40250 | 3 | $ 157,654 | $ 2,261,037 |
| RALI Series 2006-QO10 Trust | 40250 | 4 | $ 397,104 | $ 2,468,780 |
| RALI Series 2006-QO10 Trust | 40250 | 5 | $ 1,774,851 | $ 2,695,092 |
| RALI Series 2006-QO10 Trust | 40250 | 6 | $ 4,416,022 | $ 2,941,533 |
| RALI Series 2006-QO10 Trust | 40250 | 7 | $ 5,707,788 | $ 3,209,775 |
| RALI Series 2006-QO10 Trust | 40250 | 8 | $ 7,455,454 | $ 3,501,607 |
| RALI Series 2006-QO10 Trust | 40250 | 9 | $ 12,901,438 | $ 3,818,941 |
| RALI Series 2006-QO10 Trust | 40250 | 10 | $ 14,654,350 | $ 4,163,808 |
| RALI Series 2006-QO10 Trust | 40250 | 11 | $ 19,022,850 | $ 4,538,370 |
| RALI Series 2006-QO10 Trust | 40250 | 12 | $ 18,742,305 | $ 4,944,911 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH2 Trust | 40843 | 1 | $ - | $ 469,637 |
| RALI Series 2007-QH2 Trust | 40843 | 2 | $ - | $ 512,961 |
| RALI Series 2007-QH2 Trust | 40843 | 3 | $ - | $ 560,191 |
| RALI Series 2007-QH2 Trust | 40843 | 4 | $ - | $ 611,661 |
| RALI Series 2007-QH2 Trust | 40843 | 5 | $ 1,242,652 | $ 667,732 |
| RALI Series 2007-QH2 Trust | 40843 | 6 | $ 1,246,124 | $ 728,790 |
| RALI Series 2007-QH2 Trust | 40843 | 7 | $ 1,592,534 | $ 795,249 |
| RALI Series 2007-QH2 Trust | 40843 | 8 | $ 1,936,176 | $ 867,553 |
| RALI Series 2007-QH2 Trust | 40843 | 9 | $ 4,191,926 | $ 946,175 |
| RALI Series 2007-QH2 Trust | 40843 | 10 | $ 5,000,625 | $ 1,031,619 |
| RALI Series 2007-QH2 Trust | 40843 | 11 | $ 6,300,968 | $ 1,124,419 |
| RALI Series 2007-QH2 Trust | 40843 | 12 | $ 8,182,211 | $ 1,225,143 |



2909358.1

31

**FIRST AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH3 Trust | 40800 | 1 | $ - | $ 457,831 |
| RALI Series 2007-QH3 Trust | 40800 | 2 | $ - | $ 500,066 |
| RALI Series 2007-QH3 Trust | 40800 | 3 | $ - | $ 546,109 |
| RALI Series 2007-QH3 Trust | 40800 | 4 | $ - | $ 596,285 |
| RALI Series 2007-QH3 Trust | 40800 | 5 | $ - | $ 650,946 |
| RALI Series 2007-QH3 Trust | 40800 | 6 | $ 192,738 | $ 710,469 |
| RALI Series 2007-QH3 Trust | 40800 | 7 | $ 1,331,462 | $ 775,258 |
| RALI Series 2007-QH3 Trust | 40800 | 8 | $ 3,556,839 | $ 845,744 |
| RALI Series 2007-QH3 Trust | 40800 | 9 | $ 4,617,339 | $ 922,390 |
| RALI Series 2007-QH3 Trust | 40800 | 10 | $ 4,628,201 | $ 1,005,686 |
| RALI Series 2007-QH3 Trust | 40800 | 11 | $ 8,532,214 | $ 1,096,154 |
| RALI Series 2007-QH3 Trust | 40800 | 12 | $ 13,454,920 | $ 1,194,346 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH5 Trust | 41380 | 1 | $ - | $ 733,221 |
| RALI Series 2007-QH5 Trust | 41380 | 2 | $ - | $ 800,861 |
| RALI Series 2007-QH5 Trust | 41380 | 3 | $ - | $ 874,599 |
| RALI Series 2007-QH5 Trust | 41380 | 4 | $ 303,402 | $ 954,957 |
| RALI Series 2007-QH5 Trust | 41380 | 5 | $ 304,095 | $ 1,042,497 |
| RALI Series 2007-QH5 Trust | 41380 | 6 | $ 551,599 | $ 1,137,824 |
| RALI Series 2007-QH5 Trust | 41380 | 7 | $ 3,713,937 | $ 1,241,583 |
| RALI Series 2007-QH5 Trust | 41380 | 8 | $ 5,481,623 | $ 1,354,468 |
| RALI Series 2007-QH5 Trust | 41380 | 9 | $ 11,203,237 | $ 1,477,217 |
| RALI Series 2007-QH5 Trust | 41380 | 10 | $ 18,346,412 | $ 1,610,616 |
| RALI Series 2007-QH5 Trust | 41380 | 11 | $ 17,414,436 | $ 1,755,501 |
| RALI Series 2007-QH5 Trust | 41380 | 12 | $ 20,855,638 | $ 1,912,756 |



2909358.1

32

**FIRST AMENDED COMPLAINT**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| RALI Series 2007-QH6 Trust | 41979 | 1 | $ - | $ 917,466.16 |
| RALI Series 2007-QH6 Trust | 41979 | 2 | $ - | $ 1,002,102.50 |
| RALI Series 2007-QH6 Trust | 41979 | 3 | $ - | $ 1,094,369.02 |
| RALI Series 2007-QH6 Trust | 41979 | 4 | $ - | $ 1,194,919.49 |
| RALI Series 2007-QH6 Trust | 41979 | 5 | $ - | $ 1,304,457.20 |
| RALI Series 2007-QH6 Trust | 41979 | 6 | $ 1,463,785.37 | $ 1,423,737.41 |
| RALI Series 2007-QH6 Trust | 41979 | 7 | $ 4,291,610.29 | $ 1,553,569.73 |
| RALI Series 2007-QH6 Trust | 41979 | 8 | $ 10,720,429.00 | $ 1,694,820.25 |
| RALI Series 2007-QH6 Trust | 41979 | 9 | $ 17,886,574.54 | $ 1,848,413.43 |
| RALI Series 2007-QH6 Trust | 41979 | 10 | $ 18,896,190.65 | $ 2,015,333.56 |
| RALI Series 2007-QH6 Trust | 41979 | 11 | $ 24,666,980.73 | $ 2,196,625.78 |
| RALI Series 2007-QH6 Trust | 41979 | 12 | $ 27,779,856.42 | $ 2,393,396.45 |



86.     As clearly shown in Figure 2 (*supra*), actual losses spiked almost immediately after issuance of the RMBS.  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the RMBS's credit enhancement.  For example, in the RALI 2007-QH3 Trust offering, actual losses at month 12 exceeded $13 million, or more than 10 times the expected losses of approximately $1.19 million (*see supra* Figure 2).

87.     This immediate increase in actual losses—at a rate far greater than expected losses—is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

88.     Because credit enhancement is designed to ensure triple-A performance of triple-A rated RMBS, the evidence that credit enhancement has failed (*i.e.*, actual losses swiftly surged past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the Offering Documents.

2909358.1

33

C.   **The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines**

89.   Virtually all of the RMBS U.S. Central and WesCorp purchased were rated triple-A at issuance.

90.   Moody's and S&P have since downgraded the RMBS U.S. Central and WesCorp purchased to well below investment grade (*see supra* Table 4).

91.   A rating downgrade is material.  The total collapse in the credit ratings of the RMBS  U.S. Central and WesCorp purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these securities were impaired from the outset.

D.   **Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards**

92.   Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

1.   **The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse**

93.   Mortgage originators experienced unprecedented success during the mortgage boom.  Yet, their success was illusory.  As the loans they originated began to significantly underperform, the demand for their products subsided.  It became evident that originators had systematically disregarded their underwriting standards.

94.   The Office of the Comptroller of the Currency (the "OCC"), an office within the Treasury Department, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst

2909358.1

**34**

FIRST AMENDED COMPLAINT

Ten in the Worst Ten' Report"). In this report, the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

95.    Recent government reports and investigations and newspaper reports have uncovered the extent of the pervasive abandonment of underwriting standards. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") recently released its report detailing the causes of the financial crisis. Using Washington Mutual Bank ("WaMu") as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011) ("PSI Wall Street Report").

2909358.1

**35**

---

**FIRST AMENDED COMPLAINT**

96.     Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.   *See* FIN. CRISIS INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

97.     The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics" during the housing and financial crisis. "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id.* at xxii. The FCIC found that the current economic crisis had its genesis in the housing boom:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id.* at xvi.

98.     During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan.   The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id.* at xxii.   Early Payment Default is a significant indicator of pervasive disregard for underwriting standards.   The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards. . . ." *Id.*

2909358.1

99.   In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm.  But they did not stop.

*Id.*

100.   Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards.  The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id.* at xxiii.

101.   In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job."  *Id.* at 12-13 (internal quotation marks omitted).

102.   Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised.  The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker

2909358.1

**37**

credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures sometimes often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

103. Investment banks securitized loans that were not originated in accordance with underwriting guidelines and failed to disclose this fact in RMBS offering documents. As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

104. The lack of disclosure regarding the true underwriting practices of the Originators in the Offering Documents at issue in this Complaint put U.S. Central and

2909358.1

38

**FIRST AMENDED COMPLAINT**

1  WesCorp at a severe disadvantage. The FSOC explained that the origination and

2  securitization process contains inherent "information asymmetries" that put investors

3  at a disadvantage regarding critical information concerning the quality and

4  performance of RMBS. The FSOC Risk Retention Report described the information

5  disadvantage for investors of RMBS:

6  > One important informational friction highlighted during the recent

7  > financial crisis has aspects of a "lemons" problem that exists between the

8  > issuer and investor. An originator has more information about the ability

9  > of a borrower to repay than an investor, because the originator is the

10 > party making the loan. Because the investor is several steps removed

11 > from the borrower, the investor may receive less robust loan

12 > performance information. Additionally, the large number of assets and

13 > the disclosures provided to investors may not include sufficient

14 > information on the quality of the underlying financial assets for investors

15 > to undertake full due diligence on each asset that backs the security.

16 FSOC Risk Retention Report at 9 (footnote omitted).

17      105. Because investors had limited or no access to information concerning the

18 actual quality of loans underlying the RMBS, the OTD model created a situation where

19 the origination of low quality mortgages through poor underwriting thrived. The

20 FSOC found:

21 > In the originate-to-distribute model, originators receive significant

22 > compensation upfront without retaining a material ongoing economic

23 > interest in the performance of the loan. This reduces the economic

24 > incentive of originators and securitizers to evaluate the credit quality of

25 > the underlying loans carefully. Some research indicates that securitization

26 > was associated with lower quality loans in the financial crisis. For

27 > instance, one study found that subprime borrowers with credit scores just

28  2909358.1

39

---

**FIRST AMENDED COMPLAINT**

above a threshold commonly used by securitizers to determine which
loans to purchase defaulted at significantly higher rates than those with
credit scores below the threshold.  By lowering underwriting standards,
securitization may have increased the amount of credit extended,
resulting in riskier and unsustainable loans that otherwise may not have
been originated.

*Id.* at 11 (footnote omitted).

106.   The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry.  The FSOC Risk Retention Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans. . . ." *Id.*

107.   In sum, the disregard of underwriting standards was pervasive across originators.  The failure to adhere to underwriting standards directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS.  The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials.  The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

108.   As discussed below, facts have recently come to light that show many of the Originators that contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

### 2. American Home's Systematic Disregard of Underwriting Standards

109.   American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated and serviced by its

2909358.1

**40**

FIRST AMENDED COMPLAINT

1    subsidiaries.  It was the parent of American Home Mortgage Holdings, Inc., which in

2    turn was the parent of American Home Mortgage Corp., a retail lender of mortgage

3    loans.    Collectively,  these  entities  are  referred  to  herein  as  "American  Home."

4    American  Home  originated  or  contributed  a  material  portion  of  the  loans  in  the

5    mortgage pool underlying the GSR Mortgage Loan Trust 2006-OA1 offering.  *See infra*

6    Table 9.  Accordingly, a reasonable investor would have considered information that

7    this originator systematically disregarded underwriting standards to be material to the

8    decision whether to purchase from these offerings.  In addition, a reasonable investor

9    would also have considered information that this originator systematically disregarded

10   underwriting standards to be material to the decision whether to purchase from these

11   offerings because that information would have cast doubt on the quality of the loan

12   pool as a whole and the reliability of the procedures used in connection with these

13   offerings.

14        110.    Edmund Andrews, an economics reporter for the New York Times,

15   recounted his own experience using American Home as a lender.   According to

16   Andrews, he was looking to purchase a home in 2004, and his real estate agent referred

17   him to a loan officer at American Home.  The American Home loan officer began the

18   ordeal by asking Andrews how large of a loan he needed.   Andrews, who had a

19   monthly take home pay of $2,777, advised the loan officer that he had hefty child

20   support and alimony payments to an ex-wife.  Andrews would be relying on his then-

21   unemployed fiancée to earn enough money to meet his monthly obligations—

22   including the mortgage.  Andrews reported:

23        As I quickly found out, American Home Mortgage had become one of
24        the fastest-growing mortgage lenders in the country.   One of its
25        specialties was serving people just like me:  borrowers with good credit
26        scores who wanted to stretch their finances far beyond what our incomes
27        could justify.  In industry jargon, we were "Alt-A" customers, and we

1  usually paid slightly higher rates for the privilege of concealing our
2  financial weaknesses.

3

4  I thought I knew a lot about go-go mortgages. I had already written
5  several articles about the explosive growth of liar's loans, no-money-
6  down loans, interest-only loans and other even more exotic mortgages. I
7  had interviewed people with very modest incomes who had taken out big
8  loans. Yet for all that, I was stunned at how much money people were
9  willing to throw at me.

10

11  [The American Home loan officer] called back the next morning. "Your
12  credit scores are almost perfect," he said happily. "Based on your
13  income, you can qualify for a mortgage of about $500,000."

14

15  What about my alimony and child-support obligations? No need to
16  mention them. What would happen when they saw the automatic
17  withholdings in my paycheck? No need to show them. If I wanted to
18  buy a house, [the American Home loan officer] figured, it was my job to
19  decide whether I could afford it. His job was to make it happen.

20

21  "I am here to enable dreams," he explained to me long afterward. [The
22  American Home loan officer]'s view was that if I'd been unemployed for
23  seven years and didn't have a dime to my name but I wanted a house, he
24  wouldn't question my prudence. "Who am I to tell you that you
25  shouldn't do what you want to do? I am here to sell money and to help
26  you do what you want to do. At the end of the day, it's your signature on
27  the mortgage—not mine."

28

**42**

---

**FIRST AMENDED COMPLAINT**

1  Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at MM46.

2      111.  The American Home loan officer steered Andrews to a stated-income

3  loan so that he would not have to produce paychecks or tax returns that would reveal

4  his alimony and child support obligations.  The loan officer wanted to limit disclosure

5  of Andrews's alimony and child support payments when an existing mortgage showed

6  up under Andrews's name.  Although his ex-wife was solely responsible for that

7  mortgage under the terms of the couple's separation agreement, the only way Andrews

8  could explain that fact would be to produce the agreement, which would also reveal

9  his alimony and child support obligations.  According to Andrews:

10      [The American Home loan officer] didn't get flustered.  If Plan A didn't

11      work, he would simply move down another step on the ladder of

12      credibility.  Instead of "stating" my income without documenting it, I

13      would take out a "no ratio" mortgage and not state my income at all.  For

14      the price of a slightly higher interest rate, American Home would verify

15      my assets, but that was it.  Because I wasn't stating my income, I couldn't

16      have a debt-to-income ratio, and therefore, I couldn't have too much

17      debt.  I could have had four other mortgages, and it wouldn't have

18      mattered.  American Home was practically begging me to take the

19      money.

20  *Id.*

21      112.  American Home ultimately approved Andrews's application.  Not

22  surprisingly, Andrews was unable to afford his monthly mortgage payments.

23      113.  American Home's lack of adherence to underwriting guidelines was set

24  forth in detail in a 165-page amended class action complaint filed June 4, 2008, in *In re*

25  *American Home Mortgage Sec Litig*, No. 07-md-1898 (TCP) (E.D.N.Y.).  Investors in

26  American Home common/preferred stock alleged that the company misrepresented

27  itself as a conservative lender, when, based on statements from more than 33

28                         **43**

---

**FIRST AMENDED COMPLAINT**

confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. *See* Am. Class Action Compl., *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. filed June 4, 2008) ("American Home ACC").

114.    According to the American Home ACC, former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied. *See id.* at 43.

115.    The American Home ACC cited to witnesses who were former American Home employees. These witnesses reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud. *See id.*

116.    Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions. Indeed, it was commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval. *See id.* at 44.

117.    A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id.*

118.    The parties settled the litigation on January 14, 2010, for $37.25 million.

119.    American Home's lax lending practices landed it in the 2008 "Worst Ten in the Worst Ten" Report. American Home came in 8th in Las Vegas, Nevada, and

44

9th in both Detroit, Michigan, and Miami, Florida. *See* 2008 "Worst Ten in the Worst Ten" Report. When the OCC issued the 2009 "Worst Ten in the Worst Ten" Report, American Home again featured prominently, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida, and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas, Nevada; 9th in Stockton-Lodi, California; and 10th in Bakersfield, California). *See* 2009 "Worst Ten in the Worst Ten" Report.

### 3. Countrywide Home Loans, Inc.'s Systematic Disregard of Underwriting Standards

120.    Countrywide Home Loans, Inc. ("Countrywide") was one of the largest originators of residential mortgages in the United States during the time period at issue in this Complaint. Countrywide originated or contributed a material portion of the loans in the mortgage pools underlying the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2006-OA1, and GSR Mortgage Loan Trust 2007-OA1 offerings. *See infra* Table 9. Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings. In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

121.    In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis." Press Release, Comm. on

45

**FIRST AMENDED COMPLAINT**

1    Oversight & Government Reform, Statement of Chairman Towns on Committee

2    Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks

3    omitted).

4         122.  On May 9, 2008, the New York Times noted that minimal

5    documentation and stated income loans—Countrywide's No Income/No Assets

6    Program and Stated Income/Stated Assets Program—have "bec[o]me known [within

7    the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their

8    income." Floyd Norris, *A Little Pity, Please, for Lenders*, N.Y. Times, May 9, 2008 at C1.

9         123.  In a television special titled, "If You Had a Pulse, We Gave You a Loan,"

10   Dateline NBC reported on March 27, 2009:

11        To highlight just how simple it could be to borrow money, Countrywide

12        marketed one of its stated-income products as the "Fast and Easy loan."

13

14        As manager of Countrywide's office in Alaska, Kourosh Partow pushed

15        Fast and Easy loans and became one of the company's top producers.

16

17        He said the loans were "an invitation to lie" because there was so little

18        scrutiny of lenders.  "We told them the income that you are giving us will

19        not be verified.  The asset that you are stating will not be verified."

20

21        He said they joked about it:  "If you had a pulse, we gave you a loan.  If

22        you fog the mirror, give you a loan."

23

24        But it turned out to be no laughing matter for Partow.  Countrywide fired

25        him for processing so-called "liar loans" and federal prosecutors charged

26        him with crimes.  On April 20, 2007, he pleaded guilty to two counts of

27

28                                        **46**

                                 **FIRST AMENDED COMPLAINT**

1    wire fraud involving loans to a real estate speculator; he spent 18 months

2    in prison.

3

4    In an interview shortly after he completed his sentence, Partow said that

5    the practice of pushing through loans with false information was

6    common and was known by top company officials. "It's impossible they

7    didn't know."

8    …

9    During the criminal proceedings in federal court, Countrywide executives

10   portrayed Partow as a rogue who violated company standards.

11

12   But former senior account executive Bob Feinberg, who was with the

13   company for 12 years, said the problem was not isolated. "I don't buy

14   the rogue. I think it was infested."

15

16   He lamented the decline of what he saw as a great place to work,

17   suggesting a push to be number one in the business led Countrywide

18   astray. He blamed Angelo Mozilo, a man he long admired, for taking the

19   company down the wrong path. It was not just the matter of stated

20   income loans, said Feinberg. Countrywide also became a purveyor of

21   loans that many consumer experts contend were a bad deal for

22   borrowers, with low introductory interest rates that later could skyrocket.

23

24   In many instances, Feinberg said, that meant borrowers were getting

25   loans that were "guaranteed to fail."

26       124.   On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide

27   executives, alleging securities fraud. Specifically, the SEC alleged that Mozilo and the

28

47

---

**FIRST AMENDED COMPLAINT**

1    others misled investors about the credit risks that Countrywide created with its

2    mortgage origination business, telling investors that Countrywide was primarily

3    involved in prime mortgage lending, when it was actually heavily involved in risky sub-

4    prime loans with expanded underwriting guidelines. *See* Compl. for Violations of the

5    Federal Securities Laws, *SEC v. Mozilo*, No. CV 09-3994-JFW (C.D. Cal. filed June 4,

6    2009).   Mozilo and the other executives settled the charges with the SEC for $73

7    million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo,*

8    *Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

9        125.   Internal Countrywide e-mails the SEC released in connection with its

10   lawsuit show the extent to which Countrywide systematically deviated from its

11   underwriting guidelines.   For instance, in an April 13, 2006 e-mail from Mozilo to

12   other top Countrywide executives, Mozilo stated that Countrywide was originating

13   home mortgage loans with "serious disregard for process, compliance with guidelines

14   and irresponsible behavior relative to meeting timelines." E-mail from Angelo Mozilo

15   to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT).

16   Mozilo also wrote that he had "personally observed a serious lack of compliance

17   within our origination system as it relates to documentation and generally a

18   deterioration in the quality of loans originated versus the pricing of those loan[s]." *Id.*

19   (internal quotation marks omitted).

20       126.   Indeed, in September 2004, Mozilo had voiced his concern over the

21   "clear deterioration in the credit quality of loans being originated," observing that "the

22   trend is getting worse" because of competition in the non-conforming loans market.

23   With this in mind, Mozilo argued that Countrywide should "seriously consider

24   securitizing and selling ([Net Interest Margin Securities]) a substantial portion of

25   [Countrywide's] current and future sub prime [sic] residuals." E-mail from Angelo

26   Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept.

27   1, 2004 8:17 PM PDT).

28

**48**

**FIRST AMENDED COMPLAINT**

127.   To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

128.   In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract. In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate." E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing Director and Chief of Mortgage Banking and Capital Markets at Countrywide Financial (Apr. 17, 2006 5:55 PM PST). Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic] It's not only subordinated to the first, but the first is subprime. In addition, the [FICOs] are below 600, below 500 and some below 400 . . . . With real estate values coming down . . . the product will become increasingly worse. There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

*Id.*

129.   Countrywide sold a product called the "Pay Option ARM." This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records." E-mail from Angelo Mozilo to Carlos Garcia, former CFO of Countrywide

**49**

---

**FIRST AMENDED COMPLAINT**

1   Financial and Jim Furash, former President of Countrywide Bank (June 1, 2006 10:38

2   PM PST).

3       130.   An internal quality control report e-mailed on June 2, 2006, showed that

4   for stated income loans, 50.3% of loans indicated a variance of 10% or more from the

5   stated income in the loan application.  *See* E-mail from Clifford Rossi, Chief Risk

6   Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A.,

7   among others (June 2, 2006 12:28 PM PDT).

8       131.   Countrywide, apparently, was "flying blind" on how one of its popular

9   loan products, the Pay Option ARM loan, would perform, and admittedly, had "no

10  way, with any reasonable certainty, to assess the real risk of holding these loans on [its]

11  balance sheet."  E-mail from Angelo Mozilo to Dave Sambol, Managing Director

12  Countrywide (Sept. 26, 2006 10:15 AM PDT).  Yet such loans were securitized and

13  passed on to unsuspecting investors such as U.S. Central and WesCorp.

14      132.   With growing concern over the performance of Pay Option ARM loans

15  in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay

16  Options originated for the Bank."  E-mail from Angelo Mozilo Countrywide to Carlos

17  Garcia, former Managing Director, Countrywide (Nov. 3, 2007 5:33 PM PST).  In

18  other words, if Countrywide was to continue to originate Pay Option ARM loans, it

19  was not to hold onto the loans.  Mozilo's concerns about Pay Option ARM loans were

20  rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined

21  with the fact that these loans [we]re inherently unsound unless they are full doc, no

22  more than 75% LTV and no piggys." *Id.*

23      133.   In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of

24  the corrective processes that will be put into effect to permanently avoid the errors of

25  both judgement [sic] and protocol that have led to the issues that we face today" and

26  that "the people responsible for the origination process understand the necessity for

27  adhering to the guidelines for 100% LTV sub-prime product.  This is the most

                                          **50**

28

---

**FIRST AMENDED COMPLAINT**

1   dangerous product in existence and there can be nothing more toxic and therefore

2   requires that no deviation from guidelines be permitted irrespective of the

3   circumstances." E-mail from Angelo Mozilo to the former Countrywide Managing

4   Directors (Mar. 27, 2006 8:53 PM PST).

5       134.   Yet Countrywide routinely found exceptions to its underwriting

6   guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank

7   Aguilera, a Countrywide managing director, explained that the "spirit" of

8   Countrywide's exception policy was not being followed. He noted a "significant

9   concentration of similar exceptions" that "denote[d] a divisional or branch exception

10  policy that is out side [sic] the spirit of the policy." E-mail from Frank Aguilera,

11  Managing Director, Countrywide, to John McMurray, Managing Director,

12  Countrywide (Apr. 14, 2005 12:14 PM PDT). Aguilera continued: "The continued

13  concentration in these same categories indicates either a) inadequate controls in place

14  to mange [sic] rogue production units or b) general disregard for corporate program

15  policies and guidelines." *Id.* Aguilera observed that pervasive use of the exceptions

16  policy was an industry-wide practice:

17      It appears that [Countrywide Home Loans]' loan exception policy is more

18      loosely interpreted at [Specialty Lending Group] than at the other

19      divisions. I understand that [Correspondent Lending Division] has

20      decided to proceed with a similar strategy to appease their complaint

21      customers. . . . [Specialty Lending Group] has clearly made a market in

22      this unauthorized product by employing a strategy that Blackwell has

23      suggested is prevalent in the industry. . . .

24  *Id.*

25      135.   Internal reports months after an initial push to rein in the excessive use

26  of exceptions with a "zero tolerance" policy showed the use of exceptions remained

27  excessive. E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian

28                                          51

**FIRST AMENDED COMPLAINT**

Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PDT).

136. In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate. Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained." E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST).

137. John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 e-mail that "the exception process has never worked properly". E-mail from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

138. Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high combined loan-to-value ratio ("CLTV") stated income loans were performing worse than those of its competitors. After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income." E-mail from Russ Smith, Countrywide to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

139. On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

140. On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he

52

**FIRST AMENDED COMPLAINT**

was fired for questioning his supervisors about Countrywide's poor underwriting practices.

141.   According to Zachary, Countrywide pressured employees to approve unqualified borrowers.  Countrywide's mentality, he said, was "what do we do to get one more deal done.  It doesn't matter how you get there [i.e., how the employee closes the deal] . . . ."  NBC Nightly News, Countrywide Whistleblower Reports "Liar Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly News").  Zachary also stated that the practices were not the work of a few bad apples, but rather:  "It comes down, I think from the very top that you get a loan done at any cost." *Id.*

142.   Zachary also told of a pattern of:  1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income in order to qualify for loans.

143.   NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices.   Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans.  NBC News quoted a former loan officer:  "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'" July 1, 2008 NBC Nightly News.

144.   Not surprisingly, Countrywide's default rates reflected its approach to underwriting. *See* 2008 "Worst Ten in the Worst Ten" Report.  Countrywide appeared on the top ten list in six of the ten markets: 4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in Stockton, California and Riverside, California; and 10th in Bakersfield, California and Miami, Florida.  When the OCC issued its updated 2009

53

---

**FIRST AMENDED COMPLAINT**