Case 2:11-cv-06591-CW-JEM  Document 129  Filed 07/19/12  Page 60 of 87  Page ID #:2586
Case 2:12-cv-02020-mrp-JEM  Doc. #298-8  Filed 07/19/13  Entered 07/19/13 16:22:47  Exhibit 7
Part 2   Pg 1 of 60

1   "Worst Ten in the Worst Ten" Report, Countrywide appeared on the top ten list in

2   every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in

3   Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and

4   Stockton-Lodi, California; 7th in Riverside-San Bernardino, California and Fort Pierce-

5   Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in Bakersfield,

6   California. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 4. First Franklin Financial Corporation's Systematic Disregard of Underwriting Standards

9   145. First Franklin Financial Corporation ("First Franklin") originated or

10   contributed a material portion of the loans in the mortgage pool underlying the First

11   Franklin Mortgage Loan Trust 2006-FF4 offering. *See infra* Table 9. Accordingly, a

12   reasonable investor would have considered information that this originator

13   systematically disregarded underwriting standards to be material to the decision

14   whether to purchase from this offering. In addition, a reasonable investor would also

15   have considered information that this originator systematically disregarded

16   underwriting standards to be material to the decision whether to purchase from these

17   offerings because that information would have cast doubt on the quality of the loan

18   pool as a whole and the reliability of the procedures used in connection with this

19   offering.

20   146. First Franklin faces a suit that alleges it systematically disregarded its

21   underwriting guidelines when originating mortgages that were subsequently securitized

22   into RMBS. *See* Corrected Am. Compl. For Rescission and Damages, *Federal Home*

23   *Loan Bank of Chicago v. Banc of America*, No. 10-ch-45033 (Ill. Cir. Ct. filed Apr. 8, 2011)

24   ("FHLB Chicago Am. Compl.").

25   147. Statements from confidential witnesses in the FHLB Chicago Am.

26   Complaint represented that First Franklin originated mortgage loans in violation of its

27   underwriting standards.

28

**54**

**FIRST AMENDED COMPLAINT**

148. According to a confidential witness who was an underwriter at a First Franklin branch in Georgia from March 2004 to November 2007, account executives at First Franklin were making "$100,000 a month in commissions," which was based off of the number and dollar amount of loans approved. Due to this incentive structure, account executives would often pressure underwriters to approve loans that should not have been approved. The executives would simply override the underwriter's decision so that, according to this confidential witness, "Nine out of ten times, the loan went through." *Id.* ¶¶ 387-88.

149. That same confidential witness explained that First Franklin used contract appraisers who inflated property values. "The[r]e were homes with busted out windows and the meter boxes [] missing" that appraised for $300,000. He also knew that many fake W-2s had been attached to loan applications because the tax withholdings did not match the income. Further, he knew that mortgage brokers who referred loan applications to First Franklin were "whiting out or faxing over" the actual numbers and writing in new numbers so that the loans would work. *Id.* ¶¶ 400, 402.

150. Another confidential witness was an underwriter and account executive at a First Franklin branch in Ohio from 2000 until 2007. Account executives were responsible for maintaining relationships with mortgage brokers that referred loan applications to the originating banks. This confidential witness stated that "account executives paid processors cash under the table to help them get loans closed," and went on to describe how one loan processor was caught manipulating the loan documents in order to close more loans. *Id.* ¶ 389.

151. One confidential witness, who was an underwriter at a First Franklin Branch in Washington from 2005 until November 2007, described how the systematic disregard for underwriting guidelines grew worse after First Franklin purchased OwnIt Mortgage, and OwnIt employees began working with the confidential witness. She

**FIRST AMENDED COMPLAINT**

1     stated that OwnIt employees "were used to approving anything. They'd say, 'If we

2     don't approve it, somebody else will. So why lose the money?'" This witness's

3     manager was a former OwnIt employee who would often override her employees'

4     decisions to decline loans in order to meet performance goals. The witness also noted

5     that First Franklin employees manipulated applications so that they would be

6     approved. *See id.* ¶¶ 390, 406.

7        152. The confidential witness who worked at the Ohio branch represented

8     that there was enormous pressure from management to close loans at any cost.

9     "[P]eople were working until 8 p.m. on Saturdays and Sundays" in order to close the

10    loans, stated the witness. As a result, "a lot of loans slipped through. People were

11    tired of being beat up. With the rush of loans, stuff could have been overlooked.

12    Maybe the conditions didn't exactly meet the guidelines." During the last few days of

13    the month, a drove of employees would go to the branch manager "begging for

14    exceptions to close their loans." The witness recalls one instance where the branch

15    manager came out of his office and yelled: "Oh f*** it! Just close the f***ing loans."

16    *Id.* ¶ 395.

17        153. Another confidential witness, who was, among other things, an account

18    executive and underwriter at a First Franklin Branch in Utah from 1996 until 2008,

19    noted that account executives would often approach branch managers about

20    overturning an underwriter's decision to reject a loan and said that "some loans were

21    approved that were not compliant with guidelines." *Id.* ¶ 396.

22        154. That same confidential witness also encountered the "blatant fraud" first

23    hand. She recalled a $500,000 loan application for a home that was supposed to be

24    owner occupied even though the same borrower had purchased a $1,000,000 home in

25    the same neighborhood a month earlier and also claimed that it would be owner

26    occupied. Although the underwriter was successful in blocking that particular

27    application, her manager was mad at her for catching it. Other similar loans were

28

56

---

**FIRST AMENDED COMPLAINT**

1  approved. *See id.* ¶ 404.

2        155.    When First Franklin began downsizing its mortgage operation in late

3  2007, it ordered all of its remaining underwriters to assist in loss mitigation. The

4  confidential witness from the Utah branch was one of them. She reported that the

5  loss mitigation group was tasked with reviewing the quality of a number of First

6  Franklin's loans: she reported that among the loans she reviewed, fifty percent were

7  not compliant with First Franklin's guidelines, citing problems such as inflated

8  appraisal values, insufficient employment verification, and disqualifying credit scores.

9  *See id.* ¶ 398.

10       156.    According to another confidential witness, who was an underwriter at a

11 First Franklin branch in Florida from 1999 until 2007, loan document manipulation at

12 First Franklin grew to disconcerting levels. The witness stated that "a lot of fraudulent

13 loans were going through. There was tons of fraud going on." *Id.* ¶ 401.

14       157.    FHLB's complaint survived the defendants' motion to dismiss, with the

15 court stating "the Bank has provided evidentiary facts, such as testimony, AVM

16 analysis of appraisal values, delinquency and foreclosure rates, and pleadings from

17 other civil actions involving the defendants, which demonstrate the strength of the

18 Bank's case" that the originators systematically disregarded their underwriting

19 standards. Order, *FHLB*, No. 10-45033 (Ill. Cir. Ct. Sept. 19, 2012) ("FHLB Ill.

20 Order").

21       158.    Statements from confidential witnesses in a lawsuit brought by American

22 International Group ("AIG") against Bank of America provide further evidence of

23 First Franklin's systematic disregard of its underwriting guidelines. *See* Compl., *Am.

24 Int'l Grp. v. Bank of Am. Corp.*, No. 652199/2011 (N.Y. Sup. Ct., N.Y. Cnty. filed Aug.

25 8, 2011), *removed to* No. 11-cv-10549 (C.D. Cal.).

26       159.    In that suit, a former First Franklin underwriter from 2005 to 2007, said

27 First Franklin's lending practices were "basically criminal." Underwriters were

28                                          **57**

required to depart from underwriting guidelines in ways "that we did not agree with, but had to do" in order to keep their jobs. That former employee also divulged that managers would call appraisers directly "if they didn't get exactly what they wanted" and would request re-appraisal until a satisfactory number was returned. When she and another employee "spoke out" about these practices, they were fired. *Id.* ¶ 301.

160.  Another former senior underwriter at First Franklin until 2005, said her manager would override her decisions not to fund problematic loans, believing that the defects would not be discovered since First Franklin only audited 5% of its loans. She recalled several instances when she rejected unreasonable stated income loans only to be overturned by her managers. One such instance involved a cocktail waitress who claimed to make $5,000 per month while working at the equivalent of an IHOP. *See id.* ¶ 302.

161.  That same senior underwriter revealed that her manager would routinely "sign off" on appraisals that used "crazy" comparable properties that were over a mile away. The manager would also pick appraisers who he knew would give favorable appraisals: "He would pick the appraiser who would do what he wanted . . . he'd say, 'don't use that guy, use this guy.'" The manager even instructed the senior underwriter to change appraisals and to omit key details about properties. *Id.* ¶ 303.

162.  That same senior underwriter further explained how First Franklin's bonus structure motivated the behavior she witnessed. She received a $50 bonus for every approved loan, ultimately bringing in $150,000 a year even though her base salary was $55,000. *See id.*

163.  Another First Franklin underwriter corroborated the problems caused by First Franklin's bonus structure. She claimed some of her fellow underwriters "would approve anything" in order to be paid more. She explained that the bonus structure was not based on loans *reviewed* but only on loans *approved*. Even if an underwriter

resisted the temptation to approve a faulty loan, his or her manager would redirect the
loan application to someone else who would "sign behind your back." *Id.* ¶ 304.

    164.  First Franklin has also been sued by Ambac Assurance Corporation, a
company that provided monoline insurance, a form of credit enhancement for certain
certificates in a RMBS.  After paying hundreds of millions of dollars to certificate
holders as a result of the many defaults and delinquencies on First Franklin-originated
loans, Ambac reviewed 1,750 First Franklin loans.  It found that 94% had material
defects, including:

- Rampant fraud, primarily involving misrepresentation of the
  borrower's income, assets, employment, or intent to occupy the
  property;

- Failure by the borrower to accurately disclose his or her liabilities,
  including multiple other mortgage loans taken out to purchase
  additional investment property;

- Inflated appraisals; and

- Pervasive violations of the loan originator's own underwriting
  guidelines and prudent mortgage-lending practices, including loans
  made to borrowers (i) who made unreasonable claims as to their
  income, (ii) with debt-to-income and loan-to-value ratios above
  the allowed maximums, or (iii) with relationships to the applicable
  originator or other non-arm's-length relationships.

Compl., *Ambac Assurance Corp. v. First Franklin Fin. Corp.*, ¶¶ 82-83, 651217/2012 (N.Y.
Sup. Ct. filed Apr. 16, 2012).

    165.  As shown by statements from former employees and a forensic analysis
of a monoline insurer, First Franklin's actual mortgage underwriting practices deviated
widely from its stated guidelines.  This systematic disregard of underwriting standards
led to toxic loans being bundled into securities and sold to investors who did not

59

---

**FIRST AMENDED COMPLAINT**

1    know, and could not have known, about the true nature of the loans backing their

2    securities.

3                **5.    First Magnus Financial Corporation's Systematic**

4                      **Disregard of Underwriting Standards**

5          166.   First Magnus Financial Corporation ("First Magnus") originated or

6    contributed a material portion of the loans in the mortgage pool underlying the RALI

7    Series 2006-QO6, RALI Series 2006-QO10, the RALI Series 2007-QH2, the RALI

8    Series 2007-QH3, the RALI Series 2007-QH5, and the RALI Series 2007-QH6

9    offerings. *See infra* Table 9. Accordingly, a reasonable investor would have considered

10   information that this originator systematically disregarded underwriting standards to be

11   material to the decision whether to purchase from these offerings.   In addition, a

12   reasonable investor would also have considered information that this originator

13   systematically disregarded underwriting standards to be material to the decision

14   whether to purchase from these offerings because that information would have cast

15   doubt on the quality of the loan pool as a whole and the reliability of the procedures

16   used in connection with these offerings.

17         167.   A September 9th, 2007 article in the Arizona Daily Times reported:

18         The data suggest that First Magnus contributed to the nationwide

19         proliferation of subprime and limited-documentation, "Alt-A," loans,

20         which led to this year's mortgage crisis and in turn brought about the

21         company's collapse [sic] Aug. 16. At least 550 Tucsonans lost their jobs

22         in the failure, as did about 5,000 employees outside this area, and Tucson

23         lost    its     biggest    locally    based,    nationwide    company.

24         …

25         "We jokingly called them 'liar loans,'" said Anita Luciano, a former First

26         Magnus underwriting manager in Houston.  "A borrower can state their

27         income and state their assets—and you approve their loans."

28                                          **60**

...

"There were people getting into houses where no way under the normal lending practices could they get a loan," said Beryl Poole, a former First Magnus underwriting manager in Fort Lauderdale, Fla.

*Poole said it wasn't uncommon for some First Magnus employees in her office to intentionally overstate incomes or assets on Alt-A applications to qualify.*

"I had many people say that to me, 'Just change the income. It's OK. We've always done that,'" she said. "I was very, very afraid of the misrepresentation that was there."

...

"We are all guilty of pushing crazy stated and NO DOC loans that were time bombs ready to go off and kill the borrower but leave the house standing," First Magnus Mid-Atlantic Regional Manager Raymond H. Fraser Jr. said in an Aug. 3 e-mail, forwarded by a former First Magnus employee. "The market is now realizing that we and others should have been a little suspect of some of these products we all sold and loved."

Jack Gillum & Christie Smythe, *First Magnus Made Many Risky Loans in Arizona*, Arizona Daily Star (Sept. 9, 2007) (emphasis added), *available at* http://azstarnet.com/business/article_c3b73c08-beef-57aa-b056-fac952a52e51.html.

168.    The Illinois Department of Financial of Professional Regulation Division of Banking investigated First Magnus and found significant inconsistencies in certain of its loan originator files from July 2006, including:

        a)    Falsified employment and income information. No file contained any income tax returns, pay stubs or W-2 forms for any borrower

**61**

**FIRST AMENDED COMPLAINT**

despite the fact that all the loans were structured as a first loan for 80% loan to value ("LTV") and a second loan at 20% LTV, thus resulting in a total loan of 100% LTV. In the file for Unit 1201, the Verification of Employment came from a different company than the one stated by the borrower on the [loan application];

b) Buyers of multiple units stated th[at] each one would be their principal residence. In some cases, ownership of multiple units was not disclosed on the [loan application] or elsewhere;

c) The use of fraudulent and inflated appraisals to support the sale prices and loan amounts. Some of these units were used as comparables for the appraisals of later units, thus perpetuating the inflated values and creating a closed circuit of comparables which were used to aid and abet the aforementioned flipping scheme.

State of Illinois, Dept. of Financial and Professional Regulation: Division of Banking, *In Matter of First Magnus Fin. Corp.*, at 2, No. 2007-34 (Aug. 7, 2007).

169. Another article in the Arizona Daily News concerning First Magnus revealed the details of audits performed by the U.S. Department of Housing and Urban Development and the Arizona Department of Financial Institutions:

In the months leading up to the meltdown, the 10-year-old company was writing $2.5 billion a month in home loans—three times the business it was doing just five years ago. First Magnus was setting new internal records for loan volume, opening dozens of new branches and hiring 300 new employees.

…

Spot audits done in 2005 and 2006 by the U.S. Department of Housing and Urban Development and the Arizona Department of Financial Institutions revealed several problems with First Magnus loans:

62

---

**FIRST AMENDED COMPLAINT**

- A Scottsdale branch manager made "false promises and misrepresentations" that "resulted in 10 fraudulent loan transactions," an Arizona Department of Financial Institutions report said.

- A loan was approved with false employment verification, pay stubs and tax forms.

- A loan was approved with a false lease form for a borrower's previous residence.

- Three loans were approved with overstated income and high debt-to-income ratios.

- A refinance loan was approved without information about debt carried by the borrower's spouse.

- "Insufficient justifications" were used in some loan approvals, including one case in which the borrower was listed as a "minimal user of credit." He had six accounts, and four had gone into collection.

Becky Pallack, *First Magnus: Boom to Bust in Three Weeks*, Arizona Daily Star (Aug. 19, 2007), *available at* http://www.eller.arizona.edu/docs/press/2007/08/ ArizonaDailyStar_First_Magnus_Boom_to_bust_in_three_weeks_Aug19_2007.pdf.

170.   In 2007, Lehman Brothers and other banks requested that First Magnus repurchase $100 million of non-performing loans which First Magnus had sold to the banks. This drove First Magnus into Chapter 11 Bankruptcy. Josh Brodesky, *Suit Says First Magnus Officers Fueled Crisis; Their Reply: "Absurd"*, Arizona Daily Star A1 (Feb. 28, 2009), *available at* http://azstarnet.com/article_169e26ed-3c23-5ff7-8e2c-b765b02f8da6.html.

**63**

**FIRST AMENDED COMPLAINT**

1    171. The bankruptcy trustee subsequently filed suit against former First

2    Magnus directors and officers. The trustee alleged that First Magnus employees

3    "would overstate incomes or assets to qualify potential borrowers." *Id.*

4    172. The trustee's complaint also detailed First Magnus's compensation

5    structure. Starting in January 2005, approximately 60-65% of the loans that First

6    Magnus originated were referred by mortgage brokers. First Magnus paid these

7    brokers a fee for approved loans, creating an incentive for brokers to falsify

8    information in the loan applications and for underwriters to ignore underwriting

9    guidelines. *See* Compl. in Adversary No. 09-211, *In re First Magnus Fin. Corp.*, ¶ 88, No.

10   07-1578 (D. Ariz. Bankr. filed Feb. 26, 2009).

11   173. After a lengthy battle, the trustee settled its claims against First Magnus's

12   directors and officers on confidential terms. *See* Josh Brodesky, *First Magnus Saga's End*

13   *Shouldn't Surprise You*, Arizona Daily Star (Apr. 10, 2011), *available at*

14   http://azstarnet.com/news/local/josh-brodesky-first-magnus-saga-s-end-shouldn-t-

15   surprise/article_b3e3d446-e111-51d7-8303-c4316de15dfa.html.

16   **6.    First National Bank of Arizona's Systematic Disregard**

17   **of Underwriting Standards**

18   174. First National Bank of Arizona ("FNB Arizona") was a large subprime

19   mortgage lender. It originated or contributed a material portion of the loans in the

20   mortgage pool underlying the RALI Series 2006-QO6, RALI Series 2006-QO10, RALI

21   Series 2007-QH2, RALI Series 2007-QH3, RALI Series 2007-QH5, and RALI Series

22   2007-QH6 offerings. *See infra* Table 9. Accordingly, a reasonable investor would have

23   considered information that this originator systematically disregarded underwriting

24   standards to be material to the decision whether to purchase from these offerings. In

25   addition, a reasonable investor would also have considered information that this

26   originator systematically disregarded underwriting standards to be material to the

27   decision whether to purchase from these offerings because that information would

28                                         **64**

1   have cast doubt on the quality of the loan pool as a whole and the reliability of the
2   procedures used in connection with these offerings.

3       175.   FNB Arizona, First National Bank of Nevada ("FNB Nevada"), and First
4   Heritage Bank were controlled by First National Bank Holding Company ("FNB
5   Holding"), collectively ("FNB Group").  All were under common management.  *See*
6   Department of the Treasury, Office of the Inspector General, *Audit Report: Safety and*
7   *Soundness: Material Loss Review of First National Bank of Nevada and First Heritage Bank,*
8   *National Association* at 4 (Feb. 27, 2009) ("FNB Arizona OIG Report"), *available at*
9   http://www.treasury.gov/about/organizational-structure/ig/Documents/
10  oig09033.pdf; David Enrich and Damian Paletta, *Failed Lender Played Regulatory Angles,*
11  Wall  St.  J.  (Oct.  3,  2008),  *available  at*  http://online.wsj.com/article/
12  SB122298993937000343.html.

13      176.   FNB Arizona ran the FNB Group's residential mortgage lending
14  operation.  *See* FNB Arizona OIG Report at 4.

15      177.   The amount of mortgage loans originated by FNB Arizona grew from
16  $1.5 billion in 2001 to $7 billion in 2006.  *See* Enrich and Paletta, *Failed Lender Played*
17  *Regulatory Angles.*  FNB Arizona was an OTD lender; in 2006, $6.9 billion of its loans
18  were packaged into RMBS.  *See* FNB Arizona OIG Report at 5.

19      178.   A series of investigations by the Treasury Department's Office of the
20  Comptroller of Currency ("OCC") detail how FNB Arizona achieved its rapid growth
21  by pervasively disregarding its underwriting guidelines.

22      179.   In 2004, the OCC inspected FNB Arizona and determined that it needed
23  better "[p]rocedures to reduce underwriting exceptions" and better "[p]olicies and
24  internal controls over the use of appraisers."  FNB Arizona OIG Report at 44.

25      180.   A 2005 OCC investigation found that "[c]redit underwriting and
26  administration need improvement.  The quickness of loan production has had priority
27  over quality.  Issues include loan appraisal violations (repeat issue) and inadequate

28                                       **65**

practices over standby letters of credit."  It recommended FNB Arizona "develop and implement procedures and accountability that are effective in reducing the high level of underwriting exceptions (repeat issue)" and reduce the number of employee and vendor errors in loan origination.  It also cited FNB Arizona for two regulatory violations—failing to appraise properties prior to closing and failing to use independent appraisers. *Id.* at 44-46.

181.  A 2006 investigation found that FNB Arizona still had not implemented "effective procedures and processes to reduce the level and number of underwriting exceptions."  The OCC also noted that appraisers' reports were often missing or incomplete. *Id.* at 47

182.  In 2007, FNB Arizona's liquidity problems prompted the OCC to initiate an informal enforcement action.  It cited several matters requiring the direct attention of the bank's board, including internal loan review that lacked independence due to executive management influence, understaffed internal loan review, staffing levels and expertise that were not commensurate with the complexities of the bank's operations, and (yet again) the need to reduce underwriting exceptions. *See id.* at 48-50.

183.  FNB Arizona's underwriting practices became so poor that in 2007 it was unable to sell $683 million of residential mortgages to securitizers.  It was also forced to repurchase a number of its poorly underwritten mortgages.  This contributed to a liquidity crisis for the entire FNB Group. *See id.* at 2, 6.

184.  On June 30, 2008 FNB Arizona merged into FNB Nevada.  Shortly thereafter, the OCC closed FNB Nevada and appointed the FDIC as its receiver.  Press Release, *OCC Closes First National Bank of Nevada and Appoints FDIC Receiver* (July 25, 2008), *available at* http://www.occ.gov/news-issuances/news-releases/2008/nr-occ-2008-87.html.

185.  In its capacity as receiver for FNB Nevada, the FDIC sued the former directors and officers of the FNB Group. Compl., *FDIC v. Dorris*, No. 11-1652 (D.

66

**FIRST AMENDED COMPLAINT**

Ariz. filed Aug. 23, 2011).   The FDIC alleged the same pervasive disregard of underwriting guidelines described above. *See id.* ¶¶ 38-42.

186.   That complaint detailed how the bank's compensation structure was tied to the volume of loans originated, creating an incentive for bank employees to disregard the underwriting guidelines. *See id.* ¶ 30.  FNB Arizona also used many mortgage brokers who had the same volume-based incentive to disregard underwriting guidelines and to inflate appraisals. *See id.* ¶¶ 33-34

187.   The suit settled less than two months after it was filed.  Final Judgment Order, *FDIC v. Dorris*, Doc. 15., No 11-1652 (D. Ariz. Oct. 13, 2011).

188.   Evidence uncovered in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-10446 (D. Mass. filed Oct. 1, 2012) further highlights FNB Arizona's disregard of its underwriting guidelines.  There, the Court allowed the Plumber's Union to engage in limited discovery, which uncovered four pertinent pieces of evidence:

> (1)   "[T]hree 'representative' no-document loans that [FNB Nevada] originated.   In each of these 'No Doc' loans, the borrower's income was either unknown or unverified, or inadequate to make payments on the underlying mortgage, or if not, the borrower's debt to income ratio (DTI) belied any realistic probability that the borrower could keep up with mortgage payments over the life of the loan."

> (2)   "[T]he declaration of Susan Wright, who underwrote loans at [FNB Nevada] in 2006 and 2007 and generally corroborates the Complaint's allegations about [FNB Nevada]'s underwriting practices."  "Wright describes [FNB Nevada]'s business model as trying to 'make as many loans as possible and then sell them as quickly as possible' and explains that their underwriting practices

67

---

**FIRST AMENDED COMPLAINT**

instructed underwriters to remove income and asset information already in the possession of [FNB Nevada] from 'No Doc' loans. She states that [FNB Nevada] regularly made loans to borrowers whom '[FNB Nevada] knowingly qualified on the basis of what appeared to be obviously false information [and] [FNB Nevada] did not appear to reasonably expect that the borrowers would be able to repay these loans.'"

(3) "[S]everal emails generated by [FNB Nevada] employees, including Mortgage Division President Pat Lamb; Vice President of Risk Management Renea Aderhold; 'SVP Ops/Communication Manager' Beth Rothmuller; Senior Vice President Lisa Sleeper; and Senior Vice President and Risk Officer Eric Meschen, which collectively paint a picture of a devil-may-care underwriting culture."

(4) "[T]he expert report of Ira Holt, an accountant who performed a forensic analysis of 408 of the Trusts' loans using the [FNB Nevada] guidelines that were in place when they were originated. Holt found that 108 (26.5%) had material defects that violated even [FNB Nevada]'s slack underwriting standards."  "According to Holt, he was unable to 're-underwrite' some of the 408 loans because of the lack of documentation, as well as the 'scrubbing' of the applicant's disqualifying data by [FNB Nevada].  According to plaintiffs, the number of loans in the sample with material defects may be considerably higher than Holt's estimates."

*Plumber's Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 08-10446-RGS, 2012 WL 4480735, at *3 & nn. 6, 8 (D. Mass. Oct. 1, 2012).

**68**

**FIRST AMENDED COMPLAINT**

189.  The Court held allegations based on that evidence were sufficient to survive a motion to dismiss.  *See id.* at *3 ("[D]efendants' efforts to impugn plaintiffs' evidence is largely factual in nature and better fitted to a summary judgment motion than the relaxed pleading standard that attaches to a Rule 12(b)(6) motion.").

190.  Lehman Brothers has also sued FNB Arizona for selling mortgages containing misrepresentations about borrowers' finances, employment, and the nature of the property.  That case settled for an undisclosed amount.  *See* Philip Shiskin, *Bankers Escape Big Penalties in FDIC Failed Bank Case* (Feb. 23, 2012), *available at* http://www.reuters.com/article/2012/02/23/us-bankers-fdic-idUSTRE81M1UH20120223; Compl., *Lehman Mortg. Trust Mortg. v. First Nat'l Bank of Nev.*, Nos. CV2006-018929 (AZ Super. Ct., Maricopa Cnty. filed Dec. 12, 2006).

**7.      Fremont Investment and Loan's Systematic Disregard of Underwriting Standards**

191.  Fremont Investment and Loan ("Fremont") originated or contributed a material portion of the loans in the mortgage pool underlying the Fremont Home Loan Trust 2006-D Offering.  *See infra* Table 9.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

192.  Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a lender "'known for poor quality loans.'"  Opening Statement of Sen. Carl Levin, Chairman, Permanent S. Comm. on Investigations, Hearing on *Wall Street and the Financial Crisis: The Role of Credit Rating Agencies* (Apr. 23, 2010).  Senator Levin

69

recounted how an analyst with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, *a subprime lender known for loans with high rates of delinquency.* On January 24, 2007, an analyst wrote seeking advice from two senior analysts: "I have a Goldman deal with subprime Fremont collateral. *Since Fremont collateral has been performing not so good, is there anything special I should be aware of?*" One analyst responded: "*No, we don't treat their collateral any differently.*" The other asked: "are the FICO scores current?" "Yup," came the reply. Then "You are good to go." In other words, *the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry.* In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages. By October, both companies began downgrading the CDO. Today all five AAA tranches have been downgraded to junk status.

*Id.* (emphasis added).

193.   Fremont was subject to a cease and desist order from the Federal Deposit Insurance Corporation ("FDIC") in 2007. A July 1, 2008 article in the BCD News reported:

> Ever since the FDIC slapped Fremont Investment & Loan with a cease and desist order in March 2007, a Chapter 11 filing seemed likely.
>
> . . .
>
> When the subprime mortgage market collapsed, Fremont Investment &

**70**

---

**FIRST AMENDED COMPLAINT**

1 Loan, once one of the top 10 subprime mortgage originators, found itself

2 mired in financial disaster.  To make matters worse, it also faced scrutiny

3 from the FDIC, and was the subject of numerous lawsuits alleging that

4 Fremont engaged in deceptive practices in connection with its origination

5 and servicing of residential mortgage[s]...

6

7 In March 2007, the company exited the residential subprime loan

8 business in light of an FDIC cease and desist order.  The FDIC

9 determined, among other things, that Fremont had been operating

10 without adequate subprime mortgage loan underwriting criteria, and that

11 it was marketing and extending subprime mortgage loans in a way that

12 substantially increased the likelihood of borrower default.

13 *Former Subprime Lender's Parent Throws in the Towel*, 50 BCD News & Comment, July 1,

14 2008.

15 194. In July 2009, The New Yorker reported that Sheila Bair, Chairman of the

16 FDIC, initiated the first federal government action against Fremont in 2007 that

17 culminated in the cease and desist order to Fremont:

18 In March, 2007, she initiated the first government action against a

19 subprime lender, instructing Fremont Investment & Loan, a California

20 bank, to cease operations.  Fremont was among the worst of the

21 subprime offenders, using all the now familiar practices:  targeting people

22 with bad credit, *ignoring traditional standards for underwriting home loans*, paying

23 third-party brokers handsomely to bring in gullible customers, and then

24 infecting the larger financial system by selling off the hazardous loans.

25 "We ordered them out of the business," she said. "And they weren't

26 happy about it."

27 Ryan Lizza, *The Contrarian; Sheila Bair and the White House financial debate*, New Yorker,

28

**71**

---

**FIRST AMENDED COMPLAINT**

July 6, 2009, at 30 (emphasis added).

195.   Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc., which is mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.

> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.

> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*, MYRTLE BEACH SUN-NEWS, Jan. 13, 2011, at A.

196.   Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee. *See* 2008 "Worst Ten in the Worst Ten" Report. In the 2009 "Worst Ten of the Worst Ten" Report, Fremont holds the following positions: 2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th in Bakersfield, California and Merced, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

**FIRST AMENDED COMPLAINT**

### 8. GreenPoint Mortgage Funding Inc.'s Systematic Disregard of Underwriting Standards

197. GreenPoint Mortgage Funding Inc. ("GreenPoint") originated or contributed a material portion of the loans in the mortgage pool underlying the GreenPoint Mortgage Funding Trust 2006-OH1 offering. *See infra* Table 9. Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from this offering. In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with this offering.

198. GreenPoint, based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One"). Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year later on August 21, 2007.

199. According to a press release issued by Capital One on August 20, 2007, GreenPoint had an "originate and sell" (*i.e.*, OTD) business model with a focus on "prime non-conforming and near-prime markets, especially the Alt-A mortgage sector." Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

200. When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5%. A September 12, 2008, article on Bloomberg reports on GreenPoint's underwriting practices:

73

---

<strong>FIRST AMENDED COMPLAINT</strong>

Many Alt-A loans go to borrowers with credit scores higher than subprime and lower than prime, and carried lower interest rates than subprime mortgages.

So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay stubs or tax returns to document their earnings, were offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found it difficult to verify their salaries.

. . .

"To grow, the market had to embrace more borrowers, and the obvious way to do that was to move down the credit scale," said Guy Cecala, publisher of Inside Mortgage Finance. "Once the door was opened, it was abused."

. . .

Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent, according to a study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*, BLOOMBERG, Sept. 12, 2008, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=arb3xM3SHBVk.

201.    U.S. Bank, the indenture trustee of GreenPoint Mortgage Funding Trust 2006-HE1, sued GreenPoint in order to force GreenPoint to repurchase the loans that GreenPoint had contributed to the RMBS.   U.S. Bank alleged that GreenPoint "pervasive[ly] fail[ed] to follow its underwriting guidelines during the

74

**FIRST AMENDED COMPLAINT**

1  origination of the Loans." *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, No.

2  600352/09, 2010 WL 841367, at *7 (N.Y. Sup. Ct. Mar. 3, 2010); *see also* Compl., *U.S.*

3  *Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, 2009 WL 6084150, ¶ 35 (N.Y. Sup.

4  Ct. Feb. 5, 2009) (alleging pervasive misrepresentations of borrowers' income, assets,

5  employment, intent to occupy the property, inflated appraisal values, and violations of

6  GreenPoint's underwriting guidelines regarding credit scores, debt-to-income ratios,

7  and loan-to-value ratios).

8       202.   U.S. Bank based its allegations on its forensic analysis of GreenPoint-

9  originated loans.   Of 1,030 randomly sampled loans, U.S. Bank found that 93% were

10  in violation of GreenPoint's underwriting guidelines. *See id.* at *7 n.4.   Its complaint

11  survived a motion to dismiss. *See id.* at *8.

12       203.   Syncora Guarantee, a monoline insurer, sued JP Morgan as successor to

13  Bear Stearns in connection with an RMBS underwritten by Bear Stearns and

14  exclusively collateralized by GreenPoint-originated loans.   After sustaining large losses

15  due to the poor performance of GreenPoint loans, Syncora hired an independent

16  consultant to "reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly

17  selected without regard to payment status.   Over 92% of the 1,431 loans contained

18  misrepresentations, and over 85% of the randomly selected 400 loans contained

19  misrepresentations.   The misrepresentations uncovered include:

20          •   Rampant fraud, primarily involving misrepresentation of the

21             borrower's income, assets, employment, or intent to occupy the

22             property as the borrower's residence (rather than as an

23             investment), and subsequent failure to so occupy the property;

24          •   Failure by the borrower to accurately disclose his or her liabilities,

25             including multiple other mortgage loans taken out to purchase

26             additional investment property;

27          •   Inflated and fraudulent appraisals; and,

28

75

---

**FIRST AMENDED COMPLAINT**

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

*See* Compl., *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, ¶¶ 7, 181-82, No. 651566/2011 (N.Y. Sup. Ct. filed June 6, 2011).   Syncora's suit against JP Morgan survived a combined motion to dismiss and motion for summary judgment.   *See* Decision and Order, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, Doc. 50, No. 651566/2011 (N.Y. Sup. Ct. May 2, 2012).

204.   GreenPoint's own employees have corroborated the findings of U.S. Bank and Syncora.  A confidential witness in the *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities, Inc.*, confirmed that (1) GreenPoint employees faced intense pressure to close loans at any cost; (2) GreenPoint managers overrode employees' decisions to reject loans and approved loans based upon inflated incomes; (3) GreenPoint approved loans that contained exceptions for which there were no reasonable compensating factors; and (4) GreenPoint failed to adhere to sound underwriting guidelines.   This confidential witness was a senior loan underwriter at GreenPoint from October 1997 through August 2007.   *See* Compl., *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Secs., Inc.*, ¶ 265, No. 49D051010PL045071 (Ind. Sup. Ct., Marion Cnty. filed Oct. 15, 2010) ("FHLB Indianapolis").

205.   According to that confidential witness, sales staff and managers at GreenPoint Mortgage received bonuses based on the number of loans closed.  As she

**FIRST AMENDED COMPLAINT**

1   said, "sales had tremendous authority" at GreenPoint Mortgage, and "[t]hey were in

2   business to make more money.  They would try to find any way to close a loan." *Id.*

3   ¶ 266.

4       206.   Between 2005 and 2007, the confidential witness said that stated income

5   loans became increasingly popular and GreenPoint managers approved loans based

6   upon inflated incomes that she believed should not have been approved.  She saw a lot

7   of loans with stated "income that was more than could be justified by the borrower's

8   employment."  When she denied loans because she believed the income was inflated,

9   sometimes the underwriting managers, operations managers, and the regional

10   operations manager overrode her decisions.  *Id.* ¶ 267.

11       207.   More often than not, the confidential witness believed that her managers

12   overrode her denials due to the incentives that they received based upon loan volume.

13   As she said, "They were making the decision because they had to hit certain sales

14   numbers."  She was aware of such targets because of comments made in operations

15   meetings about the company needing to meet certain goals.  *Id.* ¶ 268.

16       208.   The *FHLB Indianapolis* suit survived a motion to dismiss, with the Court

17   holding, "the plaintiff has, indeed, stated a claim upon which relief can be granted on

18   the issue of underwriting guidelines."  *Fed. Home Loan Bank of Indianapolics v. Bank of*

19   *Am. Mortg. Secs., Inc.*, No. 49D051010PL045071, 2012 WL 2844690 (Ind. Sup. Ct.,

20   Marion Cnty. July 3, 2012).

21       209.   In *Allstate Bank v. J.P. Morgan Case, N.A.*, Allstate, an RMBS investor,

22   sued J.P. Morgan, the RMBS underwriter, for misrepresentations.  Allstate's complaint

23   relied on several confidential witnesses.   One confidential witness, who was an

24   underwriting analyst at GreenPoint from 2003 to 2007, stated that GreenPoint

25   reviewed only 10% of the loans it originated for fraud.   He thought this was a

26   "mistake" because the fraud and misrepresentation uncovered in the 10% sample

27   indicated that many more loans likely contained fraud.  But the remaining 90% of the

28                                              77

**FIRST AMENDED COMPLAINT**

1   loans were not reviewed.  Am. Compl., *Allstate Bank v. JP Morgan Chase, N.A.*, ¶ 485,

2   No. 11-1869 (S.D.N.Y. filed May 10, 2012).

3         210.   That confidential witness also stated that sales personnel ran GreenPoint,

4   and senior management was comprised of people from sales who were incentivized to

5   push the volume of mortgage loans, not adherence to the underwriting guidelines or

6   due diligence.  Managers' bonuses were tied to production volume, and they were not

7   penalized if loans were later found to be fraudulent or if the borrower defaulted on the

8   first payment.   He stated that GreenPoint's management deliberately overlooked

9   misrepresentations from mortgage loan brokers, particularly if the broker brought in a

10  high volume of loans.  Problem brokers were rarely suspended, and even when they

11  were, there was never a review of the loans they originated that were already in the

12  pipeline. *Id.* ¶ 486.

13        211.   Another confidential witness was a Wholesale Account Manager at

14  GreenPoint from 2004 to 2006.  That confidential witness stated that GreenPoint

15  employees understood that if a mortgage loan could eventually be sold to Wall Street,

16  GreenPoint was to approve and fund the mortgage loan.  The majority of the loan

17  products originated in the confidential witness's office were stated income-stated asset

18  loans and pay-option ARMs.  Despite the risk inherent in these products, the sales

19  force "never learned of negative loan performance" and their compensation was in no

20  way tied to loan performance. *Id.* ¶ 487.

21        212.   Another confidential witness was an Underwriting Supervisor at

22  GreenPoint from 2005 to 2006 and witness supervised five Underwriters and three

23  Conditions Specialists.  That confidential witness stated that GreenPoint management

24  authorized exceptions to loan underwriting guidelines in order to approve applications,

25  even when there were no compensating factors justifying the exceptions.    The

26  confidential witness was aware that management overrode decisions to refuse funding

27  in locations known for fraud and property flipping, even when evidence of fraud was

28                                      78

1   found.  According to the confidential witness, "if the borrower is breathing and could

2   sign loan documents, they could get a loan" from GreenPoint.  *Id.* at ¶ 488.

3       213.  *Allstate's* complaint also alleged that many of GreenPoint's loans were

4   granted by the over 18,000 brokers that were approved to transact with GreenPoint –

5   a large enough number that GreenPoint could not exercise any realistic degree of

6   control.  Typically, new brokers were actively monitored for only the first five to seven

7   loans submitted, usually during only the first 90 days of being approved.  *Id.* ¶ 490.

8       214.  This was problematic because mortgage brokers were known to commit

9   fraud in order to get loan applications approved by originators.  As one former

10  mortgage wholesaler put it, "I'd walk into mortgage shops and see brokers openly

11  cutting and pasting income documents and pay stubs, getting out the Wite-Out and

12  changing Social Security numbers."  Mara Der Hovanesian, *Sex, Lies, and Subprime*

13  *Mortgages*,  Bloomberg  Businessweek  (Nov.  12,  2008),  *available  at*

14  http://www.businessweek.com/stories/2008-11-12/sex-lies-and-subprime-mortgages.

15      215.  GreenPoint's pervasive disregard of underwriting standards resulted in its

16  inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten"

17  Report.  GreenPoint was identified 7th worst in Stockton, California, and 9th worst in

18  both Sacramento, California, and Las Vegas, Nevada.  *See* 2008 "Worst Ten in the

19  Worst Ten" Report.  In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint

20  was listed as 3rd worst in Modesto, California; 4th worst in Stockton, Merced, and

21  Vallejo-Fairfield-Napa, California; 6th worst in Las Vegas, Nevada; and 9th in Reno,

22  Nevada.  *See* 2009 "Worst Ten in the Worst Ten" Report.

23          **9.    Homecomings's Systematic Disregard of Underwriting**

24                 **Standards**

25      216.  Homecomings Financial, LLC f/k/a Homecomings Financial Network,

26  Inc. ("Homecomings") originated or contributed a material portion of the loans in the

27  mortgage pool underlying each RALI Series offering at issue and is a wholly-owned

28                                      79

subsidiary of the sponsor of those offerings, Residential Funding Co., LLC f/k/a Residential Funding Corp. ("RFC"). *See infra* Table 9. Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from this offering. In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with this offering.

217.   Following the purchase of the certificates in the RALI Series Offerings by WesCorp, public disclosures revealed that Homecomings systematically disregarded its underwriting guidelines in favor of riskier, fee-driven mortgage lending practices including subprime, Alt-A and option-ARM loans, and engaged in predatory lending.

218.   The Federal Trade Commission opened an investigation into Homecomings mortgage lending and underwriting practices, closing the investigation in January 2009, after Homecomings ceased mortgage loan origination. *See* Letter from Peggy L. Twohig, Associate Dir., Div. of Fin. Practices, Bur. of Consumer Protection, Federal Trade Commission, to Andrew Sandler, Skadden, Arps (counsel for Homecomings) (Jan. 22, 2009).

219.   In March 2009, the Portland Tribune reported that Homecomings lending practices allowed for the origination of shaky loans that precipitated a wave of foreclosures. The article reported:

> "In order to keep your market share, you had to be more aggressive," said Tim Boyd, who sold subprime loans in the Portland area for six years and then Alt A loans for seven years for Homecomings Financial.

**FIRST AMENDED COMPLAINT**

1    "The main focus was doing Alt A because that's where the money was,"

2    said Boyd, who left the industry.   A loan officer arranging a $300,000

3    Option ARM loan could collect $10,500 in fees, he said.

4

5    Lenders could unload shaky loans by selling them to investors, who often

6    resold them in what amounted to a worldwide game of financial musical

7    chairs.  Wall Street's insatiable appetite for more loans kept the pipeline

8    filled, even if the deals weren't always sound.

9

10   "The V.P.s came down to the office beating the drums about Option

11   ARMs," urging mortgage brokers to sell them to customers, [Bill Ridge,

12   owner of Ridge Mortgage Services] said.    "I had Wachovia march

13   through there; I had GMAC."

14   . . . .

15   He said he knows of loan officers who'd tell title agents to keep quiet

16   about Option ARM loan provisions during document-signing time.

17

18   "They'd tell the title officer, 'Don't go over this; just glean through it

19   quickly and get the thing signed.'"

20

21   Tim Boyd said he drew the line at selling Option ARMs because he saw

22   how that could get people into trouble.  "It made me sick," he said.

23   Steve Law, *Shaky Loans May Spur New Foreclosure Wave; Unraveling 'Alt A' Mortgages Could*

24   *Keep Portland Housing Market Dismal*, PORTLAND TRIB., Mar. 5, 2009.

25           220.   The Offering Documents in the RALI Series Offerings indicate that the

26   underlying pools of mortgages were primarily comprised of "payment-option, hybrid

27   adjustable-rate mortgage loans" ("Option ARMs") and/or Alt-A loans.

28                                              **81**

**FIRST AMENDED COMPLAINT**

221. Homecomings' origination practices are also at issue in the *Federal Home Loan Bank of Chicago v. Banc of America Securities, LLC* action in state court in Illinois. There, the Federal Home Loan Bank of Chicago ("FHLB Chicago") alleges that Homecomings systemically disregarded its underwriting guidelines when originating mortgages that were subsequently collateralized RMBS. *See* FHLB Chicago Am. Compl.

222. Statements from confidential witnesses in the FHLB Chicago Complaint represented that Homecomings originated mortgage loans in violation of its stated underwriting standards.

223. According to two confidential witnesses in the FHLB Chicago Complaint, the first who was a Homecomings underwriter from January 2006 until December 2006 and the second who was a Homecomings underwriter from May 2005 until October 2007, Homecomings made loans to borrowers who clearly could not make the monthly payments, approved high-risk low-doc or no-documentation loans, approved exceptions with no reasonable compensating factors, and widely abandoned underwriting practices. *See id.* ¶ 447.

224. Those two confidential witnesses described the two different automatic underwriting systems that Homecomings employed to underwrite loans: (1) Desktop Underwriter, and (2) Assetwise. According to the second confidential witness, Homecomings' employees purposefully chose to use Desktop Underwriter for subprime loan applications from low-income applicants because it approved loans with a higher debt-to-income ratio than Assetwise would approve. *See id.* ¶ 450.

225. The first confidential witness described how the Assetwise program required an employee to simply enter in a borrower's information and the program would yield its findings. The confidential witness explained that "one of [her] problems was that [a loan application] would fit inside the guidelines, but if you read between the lines, you could see that the borrower was not going to be able to make

82

the payments." When the confidential witness raised these pressing concerns to her supervisor, she received unambiguous directions: "It fits, you do the loan. We're going to do this deal." *Id.* ¶ 451.

226. The second confidential witness reported that no matter which automated underwriting system employees chose to use, nearly all of the loan applications were approved. Once the loan application was approved by the automated underwriting system, the underwriters could not reverse the approval. *See id.* ¶ 452.

227. The first confidential witness described how mortgage brokers would appeal loans initially denied until Homecomings supervisors signed off on the loans. The second confidential witness said loan officers were instructed to search for compensating factors that would enable them to approve the loan despite the presence of "red flags." *Id.* ¶¶ 453-54.

228. The FHLB complaint survived the defendants' motion to dismiss. FHLB Ill. Order.

229. Homecomings' underwriting practices are implicated in three lawsuits filed by MBIA, Inc. MBIA provided monoline insurance, a form of credit enhancement, for RMBS containing Homecomings-originated loans. In its suits, MBIA alleges misrepresentations regarding the quality of the loans underlying the RMBS that it insured. Except for one, the RMBS in MBIA's suits were issued in 2006 and 2007. *See* Compl., *MBIA Ins. Corp. v. Ally Fin., Inc.*, No. 12-18889 (MN Ct., Hennepin Cnty. filed Sept. 17, 2012) ("*MBIA v. Ally* Compl."); Compl., *MBIA Ins. Corp. v. GMAC Mortg., LLC*, No. 600837/2010 (N.Y. Sup. Ct. filed Apr. 1, 2010) ("*MBIA v. GMAC* Compl."); Compl., *MBIA Ins. Corp. v. Residential Funding Co.*, No. 603552/2008 (N.Y. Sup. Ct. filed Dec. 4, 2008) ("*MBIA v. RFC* Compl.").

230. The defendants in those suits include Ally Financial, Inc., RFC, and GMAC Mortgage, LLC ("GMAC Mortgage"). RFC, GMAC Mortgage, and

83

1    Homecomings were all subsidiaries of GMAC Mortgage Group, LLC, which is now a

2    subsidiary of Ally Financial.   *See* Ally Financial, Inc., Form 10-K, Ex. 21 (2011);

3    GMAC LLC, Form 10-K, Ex. 21 (2006).

4         231.   RFC and GMAC Mortgage sponsored the RMBS that MBIA insured.

5    RFC also sponsored each of the RALI Series RMBS at issue in this suit.

6         232.   Homecomings originated many of the loans underlying the RMBS at

7    issue in MBIA's suits.   *See also MBIA v. Ally* Compl. ¶¶ 5, 25 (alleging Homecomings

8    originated many of the loans in RMBS sponsored by RFC and GMAC Mortgage).

9         233.   After sustaining large losses, MBIA conducted forensic analyses of

10   several thousand loans underlying the RMBS sponsored by RFC and GMAC, many of

11   which were originated by Homecomings.   MBIA found material misrepresentations in

12   over 89% of those loans from GMAC-sponsored RMBS and over 93% of those loans

13   from RFC-sponsored RMBS.   The material misrepresentations included, among other

14   things, routine disregard of underwriting guidelines, debt-to-income and combined

15   loan-to-value ratios that exceeded the amounts allowed in the underwriting guidelines,

16   failure to verify employment as required by underwriting guidelines, and improper

17   reliance on the Assetwise program.   *See MBIA v. Ally* Compl. ¶¶ 76-83; *MBIA v.*

18   *GMAC* Compl. ¶¶ 70-79; *MBIA v. RFC* Compl. ¶¶ 42-48.

19        234.   Representative examples of the misrepresentations MBIA uncovered

20   include (1) a loan that had a debt-to-income ("DTI") ratio of 65.56% and a CLTV

21   ratio of 125.68% when the underwriting guidelines imposed a maximum DTI ratio of

22   50% and a maximum CLTV ratio of 100%, and (2) a loan for a borrower with a stated

23   income of $3700 per month and a CLTV of 94.2% when the underwriting guidelines

24   required an income of $4000 per month and a CLTV not exceeding 80%.   *See MBIA v.*

25   *GMAC* Compl. ¶ 78; *MBIA v. RFC* Compl. ¶ 47.

26        235.   All three of MBIA's suits are still pending.   Two have survived motions

27   to dismiss.   *See MBIA v. GMAC,* 914 N.Y.S.2d 604 (N.Y. Sup. Ct. 2010); *MBIA v.*

28                                           84

1   *RFC*, Order, No. 603552/08 (N.Y. Sup. Ct. Dec. 22, 2009).   There have been no

2   rulings in the recently filed *MBIA v. Ally* suit.

3       236.   A confidential witness, who was an account executive at Homecomings

4   from August 2001 to September 2008, corroborated the allegations in the *MBIA*

5   complaints regarding improper use of Assetwise.   As a subsidiary of RFC,

6   Homecomings used Assetwise in its mortgage origination.   According to the

7   confidential witness, Homecomings employees would "game" Assetwise.   Assetwise

8   was programmed to make "automated exceptions" that were purportedly within the

9   RFC and Homecomings underwriting guidelines.   Homecomings did not monitor

10   what information a loan officer could input in Assetwise, and Assetwise required only

11   a limited amount of information to process and approve a loan.   If possible, loan

12   officers would sometimes not submit detrimental information to Assetwise in order to

13   gain approval for a loan that would not have been approved if all known information

14   had been input into Assetwise.

15       237.   The confidential witness also stated that Homecomings' employees

16   would run the same loan through Assetwise several times, making a slight adjustment

17   to the loan application each time until Assetwise approved the loan.   This was possible

18   because Homecomings did not place limits on the number of times a loan application

19   could be submitted to Assetwise, and the software itself had no internal limits on the

20   number of times a loan application could be submitted.

21       238.   The confidential witness also corroborated the statements made by the

22   confidential witnesses in the FHLB Chicago Complaint, stating that the lack of

23   following underwriting guidelines at Homecomings was much more severe than what

24   was related in the FHLB Chicago Complaint.   The confidential witness sometimes

25   processed as many as 130 to 200 loans per month and received pervasive pressure to

26   get loans approved.

27       239.   RFC is also the defendant in several other cases brought by the Financial

28

85

---

**FIRST AMENDED COMPLAINT**

1   Guaranty Insurance Company ("FGIC"), alleging material misrepresentations in the

2   offering documents concerning the characteristics of the mortgages underlying the

3   securities at issue. *See* Compl., *Fin. Guar. Ins. Co. v. Residential Funding Co*, No.

4   653304/2011 (N.Y. Sup. Ct. filed Nov. 29, 2011). *See also* Nos. 653493/2011,

5   653621/2011, 653622/2011, 653623/2011, 653303/2011 (related FGIC cases). The

6   complaints allege that Homecomings originated and serviced many of the deficient

7   loans underlying the securities at issue in the FGIC complaints, and that disregard of

8   underwriting standards at Homecomings directly led to the losses incurred by FGIC.

9       240.   As shown by statements from confidential witnesses, former employees

10   in the FHLB Chicago Complaint, and MBIA's forensic analyses of Homecomings'

11   loans, Homecomings' actual mortgage underwriting practices deviated widely from its

12   stated guidelines. This systematic disregard of underwriting standards led to toxic

13   loans being bundled into securities and sold to investors who did not know, and could

14   not have known, about the true nature of the loans backing their securities.

15       **10.   IndyMac Bank, FSB's Systematic Disregard of**

16       **Underwriting Standards**

17       241.   IndyMac Bank, FSB ("IndyMac") originated or contributed a material

18   portion of the loans in the mortgage pool underlying the GSR Mortgage Loan Trust

19   2006-OA1 Offering. *See infra* Table 9. Accordingly, a reasonable investor would have

20   considered information that this originator systematically disregarded underwriting

21   standards to be material to the decision whether to purchase from these offerings. In

22   addition, a reasonable investor would also have considered information that this

23   originator systematically disregarded underwriting standards to be material to the

24   decision whether to purchase from these offerings because that information would

25   have cast doubt on the quality of the loan pool as a whole and the reliability of the

26   procedures used in connection with these offerings.

27       242.   On July 11, 2008, just four months after IndyMac filed its 2007 Annual

28                                      86

**FIRST AMENDED COMPLAINT**

Case 2:12-cv-06552-GW-PLM   Document 123-1   Filed 07/29/12   Page 6 of 95   Page ID
Case 2:12-cv-06552-GW-PLM   Document 123-1   Filed 07/29/12   Page 6 of 95   Page ID
12-12020-mg   Doc 4298-9   Filed 07/19/13   Entered 07/19/13 16:22:47   Exhibit 7
Part 2   Pg 34 of 60

Report, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac filed for bankruptcy on July 31, 2008.

243. On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac. The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

244. According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were … associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale." IndyMac OIG Report at 2. The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well." *Id.*

245. IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id.* at 11, 21. The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id.* at 11.

246. IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id.* at 2-3.

247. IndyMac's "risk from its loan products…was not sufficiently offset by

87

1   other underwriting parameters, primarily higher FICO scores and lower LTV ratios."

2   *Id.* at 31.

3       248.   Unprepared for the downturn in the mortgage market and the sharp

4   decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing]

5   $10.7 billion of loans it could not sell in the secondary market." *Id.* at 3. This proved

6   to be a weight it could not bear, and IndyMac ultimately failed. *See id.*

7       249.   In June 2008, the Center for Responsible Lending ("CRL") published a

8   report entitled *IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with*

9   *Unsound and Abusive Mortgage Lending* (June 30, 2008) ("CRL Report"), *available at*

10   http://www.responsiblelending.org/mortgage-lending/research-

11   analysis/indymac_what_went_wrong.pdf. The CRL Report detailed the results of the

12   CRL's investigation into IndyMac's lending practices. CRL based its report on

13   interviews with former IndyMac employees and reviewed numerous lawsuits filed

14   against IndyMac. The CRL Report summarized the results of its investigation as

15   follows:

16       IndyMac's story offers a body of evidence that discredits the notion that

17       the mortgage crisis was caused by rogue brokers or by borrowers who

18       lied to bankroll the purchase of bigger homes or investment properties.

19       CRL's investigation indicates many of the problems at IndyMac were

20       spawned by top-down pressures that valued short-term growth over

21       protecting borrowers and shareholders' interests over the long haul.

22   CRL Report at 1.

23       250.   CRL reported that its investigation "uncovered substantial evidence that

24   [IndyMac] engaged in unsound and abusive lending during the mortgage boom,

25   routinely making loans without regard to borrowers' ability to repay [the mortgage

26   loans]." *Id.* at 2.

27       251.   The CRL Report stated that "IndyMac pushed through loans with fudged

28                                  88

---

**FIRST AMENDED COMPLAINT**

or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id.*

252. The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id.* at 3.

253. Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id.* at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans' – in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id.* at 3.

254. The CRL also found evidence that: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it."
>
> The refrain from managers, Miller recalls, was simple: "Find a way to make this work."

*Id.* at 9 (footnote omitted).

**FIRST AMENDED COMPLAINT**

255.   Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated: "I would reject a loan and the insanity would begin. It would go to upper management and the next thing you know it's going to closing." *Id.* at 1, 3. Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

256.   Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time. *See id.* at 9. According to Montilla:

> "I would tell them: 'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says. "There were some loans that were just blatantly overstated. . . . Some of these loans are very questionable. They're not going to perform."

*Id.* at 10.

257.   Montilla and another IndyMac mortgage underwriter told the CRL that borrowers did not know their stated incomes were being inflated as part of the application process. *See id.* at 14.

258.   On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division ("HBD"), alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral. *See* Compl. ¶ 6, *FDIC v. Van Dellen*, No. 2:10-cv-04915-DSF (C.D. Cal. filed July 2, 2010). This case is set for trial in September 2012.

259.   IndyMac currently faces a class action lawsuit alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS. *See* Class Action Compl., *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y.

**FIRST AMENDED COMPLAINT**

1   filed May 14, 2009).   On June 21, 2010, the class action suit survived a motion to
2   dismiss.

3       260.   Like loan purchasers, insurers of RMBS also typically require the insured
4   party to repurchase loans suffering Early Payment Default in order to protect
5   themselves against fraud and poor underwriting.

6       261.   MBIA filed a breach of contract claim against IndyMac (with the FDIC
7   representing IndyMac as conservator and receiver) in May 2009, claiming that
8   IndyMac made contractual misrepresentations concerning its adherence to its
9   underwriting standards in processing mortgage loan applications.   *See* Compl., *MBIA*
10  *Ins. Corp. v. IndyMac Bank, FSB*, No. 1:09-cv-01011-CKK (D.D.C. filed May 29, 2009).
11  A motion to dismiss is pending.

12      262.   IndyMac's failure to abide by its underwriting standards left investors
13  holding severely downgraded junk securities.   As a result of IndyMac's systematic
14  disregard of its underwriting standards, the OCC included IndyMac in the OCC's 2008
15  "Worst Ten in the Worst Ten" Report.   IndyMac ranked 10th in Las Vegas, Nevada in
16  both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San
17  Bernardino, California, and Modesto, California in 2009.   *See* 2008 "Worst Ten in the
18  Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

19  **11.   SCME Mortgage Banker's Systematic Disregard of**
20  **Underwriting Standards**

21      263.   SCME Mortgage Bankers Inc. originated or contributed a material
22  portion of the loans in the mortgage pool underlying the RALI Series 2006-QO6,
23  RALI Series 2006-QO10, RALI Series 2007-QH2, RALI Series 2007-QH3, RALI
24  Series 2007-QH5, and RALI Series 2007-QH6 offerings.   *See infra* Table 9.
25  Accordingly, a reasonable investor would have considered information that this
26  originator systematically disregarded underwriting standards to be material to the
27  decision whether to purchase from these offerings.   In addition, a reasonable investor

28   **91**

---

**FIRST AMENDED COMPLAINT**

1    would also have considered information that this originator systematically disregarded

2    underwriting standards to be material to the decision whether to purchase from these

3    offerings because that information would have cast doubt on the quality of the loan

4    pool as a whole and the reliability of the procedures used in connection with these

5    offerings.

6        264.   SCME had one of the largest originate-to-distribute percentages in the

7    nation.   In 2006, half of all mortgage lenders sold barely any of their loans for

8    securitization (4%).   The next quartile of mortgage lenders packaged less than 68% of

9    their loans into RMBS.   SCME was near the top of the final quartile, with nearly 91%

10   of its loans being packaged into RMBS.

11       265.   SCME's   originate-to-distribute   business   model   created   perverse

12   incentives for its employees and management.   The company profited according to the

13   volume of loans it originated with no regard for their quality.   It offloaded the high risk

14   of default for poorly underwritten loans onto unsuspecting third parties.

15       266.   Because of this incentive structure, SCME originated numerous loans

16   that did not meet its own stated underwriting guidelines.   These faulty loans were

17   packaged into RMBS that were ultimately purchased by WesCorp and U.S. Central.

18       **12.   WaMu's   and   Long   Beach   Mortgage's   Systematic**

19       **Disregard of Underwriting Standards**

20       267.   WaMu affiliate Long Beach Mortgage ("Long Beach") originated or

21   contributed a material portion of the loans in the mortgage pool underlying Long

22   Beach Mortgage Loan Trust 2006-11 Offering.   *See infra* Table 9.   Accordingly, a

23   reasonable investor would have considered information that this originator

24   systematically disregarded underwriting standards to be material to the decision

25   whether to purchase from these offerings.   In addition, a reasonable investor would

26   also have considered information that this originator systematically disregarded

27   underwriting standards to be material to the decision whether to purchase from these

28           **92**

---

**FIRST AMENDED COMPLAINT**

1    offerings because that information would have cast doubt on the quality of the loan

2    pool as a whole and the reliability of the procedures used in connection with these

3    offerings.

4          268.  WaMu was a Seattle-based bank that rapidly grew from a regional to a

5    national mortgage lender during the period from 1991 to 2006. At over $300 billion in

6    total assets, WaMu was at one time the largest institution regulated by the Office of

7    Thrift Supervision ("OTS"). On September 25, 2008, however, federal regulators

8    closed WaMu when loan losses, borrowing capacity limitations, a plummeting stock

9    price, and rumors of WaMu's problems led to a run on the thrift by depositors.

10    Federal regulators facilitated the sale of WaMu to J.P. Morgan Chase & Co., in

11    September 2008.

12          269.  In April 2010, the Treasury OIG, issued a report titled "Evaluation of

13    Federal Regulatory Oversight of Washington Mutual Bank," Report No. EVAL-10-

14    002 (the "WaMu OIG Report"), discussing the reasons for WaMu's meteoric rise and

15    consequent collapse. The WaMu OIG Report found, "WaMu failed primarily because

16    of management's pursuit of a high-risk lending strategy that included liberal

17    underwriting standards and inadequate risk controls." WaMu OIG Report at 2. The

18    report elaborated on how WaMu adopted this new strategy to compete with

19    Countrywide and maximize profits:

20          In 2005, WaMu management made a decision to shift its business

21          strategy away from originating traditional fixed-rate and conforming

22          single family residential loans, towards riskier nontraditional loan

23          products and subprime loans. WaMu pursued the new strategy in

24          anticipation of increased earnings and to compete with Countrywide…

25          . . . .

26          WaMu estimated in 2006 that its internal profit margin from subprime

27          loans could be more than 10 times the amount for a government-backed

28

93

---

**FIRST AMENDED COMPLAINT**

loan product and more than 7 times the amount for a fixed-rate loan product.

*Id.* at 8 (footnote omitted).

270.   As previously noted in this Complaint, the PSI issued its report on the causes of the economic crisis.  The PSI Wall Street Report used WaMu as its case study into lending practices of the mortgage industry during the housing bubble.  Citing internal e-mails and correspondence the PSI obtained as part of its investigation, the PSI made the following factual findings:

(1) High Risk Lending Strategy.  [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) Shoddy Lending Practices.  WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) Steering Borrowers to High Risk Loans.  WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

**FIRST AMENDED COMPLAINT**

(4) Polluting the Financial System.  WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

(5) Securitizing Delinquency-Prone and Fraudulent Loans.   At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6) Destructive Compensation.  WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when their High Risk Lending Strategy placed the bank in financial jeopardy.

PSI Wall Street Report at 50-51.

271.    In particular, the PSI Wall Street Report noted that WaMu had engaged in internal reviews of its lending practices and the lending practices of its subsidiary, Long Beach.  WaMu's Chief Risk Officer, Ron Cathcart commissioned a study to look into the quality of loans originated by Long Beach.  The review found that the "top five priority issues" were as follows:

"Appraisal deficiencies that could impact value and were not addressed[;]

**95**

---

**FIRST AMENDED COMPLAINT**

Material misrepresentations relating to credit evaluation were confirmed[;]

Legal documents were missing or contained errors or discrepancies[;]
Credit evaluation or loan decision errors[; and]

Required credit documentation was insufficient or missing from the file."
*Id.* at 82 (quoting e-mail from Ron Cathcart, Chief Risk Officer, WaMu, to Cory Gunderson (Dec. 11, 2006 9:21 AM PST)).

272.   Pushing "Option ARMs" was a major part of WaMu's new "high risk" lending strategy.   In a bipartisan memorandum from Senators Carl Levin and Tom Coburn to the Members of the PSI, dated April 13, 2010, Option ARMs are labeled WaMu's "flagship" product.   Senate Exhibit 1.a, at 3.   The WaMu OIG Report describes the inherently dangerous nature of WaMu's Option ARMs:

WaMu's Option ARMs provided borrowers with the choice to pay their monthly mortgages in amounts equal to monthly principal and interest, interest-only, or a minimum monthly payment.   Borrowers selected the minimum monthly payment option for 56 percent of the Option ARM portfolio in 2005.

The minimum monthly payment was based on an introductory rate, also known as a teaser rate, which was significantly below the market interest rate and was usually in place for only 1 month.   After the introductory rate expired, the minimum monthly payment feature introduced two significant risks to WaMu's portfolio:   payment shock and negative amortization.   WaMu projected that, on average, payment shock increased monthly mortgage amounts by 60 percent.   At the end of 2007,

96

---

**FIRST AMENDED COMPLAINT**

1    84 percent of the total value of Option ARMs on WaMu's financial

2    statements was negatively amortizing.

3    WaMu OIG Report at 9.

4        273.   The WaMu OIG Report notes that "Option ARMs represented as much

5    as half of all loan originations from 2003 to 2007 and approximately $59 billion, or 47

6    percent, of the home loans on WaMu's balance sheet at the end of 2007." *Id.*

7        274.   The OIG also notes that WaMu's "new strategy included underwriting

8    subprime loans, home equity loans, and home equity lines of credit to high-risk

9    borrowers. In line with that strategy, WaMu purchased and originated subprime loans,

10   which represented approximately $16 billion, or 13 percent, of WaMu's 2007 home

11   loan portfolio." *Id.* at 10.

12       275.   WaMu's careless underwriting practices rendered these already high risk

13   loan products even more risky. *See id.* The WaMu OIG Report stated that the OTS

14   and the FDIC repeatedly "identified concerns with WaMu's high-risk lending strategy"

15   and loan underwriting, weaknesses in management and "inadequate internal controls."

16   *Id.* at 3-4. Those concerns included "questions about the reasonableness of stated

17   incomes contained in loan documents, numerous underwriting exceptions,

18   miscalculations of loan-to-value ratios, and missing or inadequate documentation."

19   *Hearing on Wall Street & the Fin. Crisis: The Role of Bank Regulators Before the United States S.*

20   *Homeland Sec. and Governmental Affairs Comm., Permanent Subcomm. on Investigations,* 111th

21   Cong. 9 (Apr. 16, 2010) (statement of the Hon. Eric M. Thorson, Inspector General,

22   Dep't of the Treasury) ("Thorson Statement").

23       276.   WaMu management began to notice the pattern of "first payment

24   default" ("FPD") for loans its Long Beach subsidiary originated. In June 2007, WaMu

25   closed Long Beach as a separate entity and placed its subprime lending operations in a

26   new division called "Wholesale Specialty Lending."

27       277.   In late 2007, WaMu performed an internal review to determine whether

28

97

---

**FIRST AMENDED COMPLAINT**

1    its plans to address its poor underwriting practices were effective.  The review focused

2    on 187 loans that experienced FPD, originated from November 2006 to March 2007.

3    As an initial matter, the review found:

4           The overall system of credit risk management activities and process has

5           major weaknesses resulting in unacceptable level of credit risk.  Exposure

6           is considerable and immediate corrective action is essential in order to

7           limit or avoid considerable losses, reputation damage, or financial

8           statement errors.

9    PSI High Risk Home Loans Hearing, Senate Ex. 21, "WaMu Corporate Credit

10   Review: Wholesale Specialty Lending-FPD" at 2 (Sept. 28, 2007).

11          278.    Specifically, the WaMu internal review reported the following findings

12   regarding the 187 FPD loans:

13   •    (High) Ineffectiveness of fraud detection tools – 132 of the 187

14        (71%) files were reviewed by Risk Mitigation for fraud.  Risk

15        Mitigation confirmed fraud on 115 files and could not confirm on

16        17 of the files, but listed them as "highly suspect."  This issue is a

17        repeat finding with CCR.

18   •    (High) Weak credit risk infrastructure impacting credit quality.

19        Credit weakness and underwriting deficiencies is a repeat finding

20        with CCR.  It was also identified as a repeat finding and Criticism

21        in the OTS Asset Quality memo 3 issued May 17, 2007.  Internal

22        Audit in their August 20, 2007 Loan Origination & Underwriting

23        report identified it as a repeat issue.  Findings from the CCR FPD

24        review in relation to credit quality:

25        o    132 of the 187 loans sampled were identified with red flags

26             that were not addressed by the business unit

27

28                                    **98**

1        o   80 of the 112 (71%) stated income loans were identified for

2            lack of reasonableness of income

3        o   87 files (47%) exceeded program parameters in place at the

4            time of approval

5        o   133 (71%) had credit evaluation or loan decision errors

6            present

7        o   25 (13%) had the title report issues that were not addressed

8        o   28 (14%) had income calculation errors and 35 (19%) had

9            income documentation errors

10       o   58 (31%) had appraisal discrepancies that raised concerns

11           that the value was not supported

12   *Id.* at 3.

13       279.   An OTS memorandum on Loan Fraud Investigation, dated June 19,

14   2008, observes the systematic nature of the problem: "[T]he review defines an

15   origination culture focused more heavily on production volume rather than quality.

16   An example of this was a finding that production personnel were allowed to

17   participate in aspects of the income, employment, or asset verification process, a clear

18   conflict of interest. . . .   Prior OTS examinations have raised similar issues including

19   the need to implement incentive compensation programs to place greater emphasis on

20   loan quality." PSI High Risk Home Loans Hearing, Senate Ex. 25, Memorandum

21   from D. Schneider, President Home Loans, to A. Hedger, OTS Examiner and B.

22   Franklin, OTS EIC at 1 (June 19, 2008).

23       280.   A WaMu Significant Incident Notification, Date Incident Reported –

24   04/01/2008, Loss Type - Mortgage Loan, stated:

25       One Sales Associate admitted that during that crunch time some of the

26       Associates would 'manufacture' assets statements from previous loan

27       docs and submit them to the [Loan Fulfillment Center ('LFC')].  She said

28   **99**

1        the pressure was tremendous from the LFC to get them the docs since

2        the loan had already funded and pressure from the Loan Consultants to

3        get the loans funded.

4  PSI High Risk Home Loans Hearing, Senate Ex. 30, "Significant Incident

5  Notification (SIN)" at 1 (Apr. 1, 2008).

6        281.   A New York Times article described WaMu's underwriting practices as

7  follows: "On a financial landscape littered with wreckage, WaMu, a Seattle-based bank

8  that opened branches at a clip worthy of a fast-food chain, stands out as a singularly

9  brazen case of lax lending." Peter S. Goodman & Gretchen Morgenson, *Saying Yes,*

10 *WaMu Built Empire on Shaky Loans,* N.Y. TIMES, Dec. 27, 2008 at A1.

11       282.   Sherri Zaback, a former underwriter at a WaMu branch in San Diego,

12 California, stated that "[m]ost of the loans she . . . handled merely required borrowers

13 to provide an address and Social Security number, and to state their income and

14 assets." *Id.* On one occasion, Zaback asked a loan officer for verification of a

15 potential borrower's assets.  The officer sent her a letter from a bank showing a

16 balance of about $150,000 in the borrower's account.  Zaback called the bank to

17 confirm and was told the balance was only $5,000.  The loan officer yelled at her, Ms.

18 Zaback recalled.  "She said, 'We don't call the bank to verify.'" *Id.*

19       283.   Zaback also recalled that the sheer volume of loans precluded WaMu

20 employees from adhering to underwriting standards.  According to Zaback, she would

21 typically spend a maximum of 35 minutes per file: "'Just spit it out and get it done.

22 That's what they wanted us to do.  Garbage in, and garbage out.'" *Id.* Another WaMu

23 agent in Irvine, California told the New York Times that she "coached brokers to

24 leave parts of applications blank to avoid prompting verification if the borrower's job

25 or income was sketchy." *Id.*

26       284.   WaMu's underwriting also critically failed with respect to appraisals as

27 well.  An accurate appraisal of a property's market value is crucial to the underwriting

28                                     **100**

---

**FIRST AMENDED COMPLAINT**

1    process as the property provides collateral for the loan in case of default.

2        WaMu's review of appraisals establishing the value of single family homes

3        did not always follow standard residential appraisal methods because

4        WaMu allowed a homeowner's estimate of the value of the home to be

5        included on the form sent from WaMu to third-party appraisers, thereby

6        biasing the appraiser's evaluation.

7    WaMu OIG Report at 11.

8        285.   The New York Times reported, "WaMu pressured appraisers to provide

9    inflated property values that made loans appear less risky, enabling Wall Street to

10   bundle them more easily for sale to investors."  Goodman & Morgenson, *Saying Yes,*

11   *WaMu Built Empire on Shaky Loans* at A1.  The article quoted the founder of one

12   appraisal company that did business with WaMu until 2007 as saying, "'It was the Wild

13   West,'. . . .  'If you were alive, they would give you a loan.  Actually, I think if you

14   were dead, they would still give you a loan.'"  *Id.*  (quoting Steven Knoble, founder

15   Mitchell, Maxwell & Jackson).

16       286.   Nor did WaMu adequately monitor third-party brokers (non-employees)

17   who originated most of WaMu's loans.  As Eric Thorson explained before the PSI:

18       In addition to originating retail loans with its own employees, WaMu

19       began originating and purchasing wholesale loans through a network of

20       brokers and correspondents.  From 2003 to 2007, wholesale loan

21       channels represented 48 to 70 percent of WaMu's total single family

22       residential loan production.  WaMu saw the financial incentive to use

23       wholesale loan channels for production as significant.  According to an

24       April 2006 internal presentation to the WaMu Board, it cost WaMu about

25       66 percent less to close a wholesale loan ($1,809 per loan) than it did to

26       close a retail loan ($5,273).  So while WaMu profitability increased

27

28                                       **101**

**FIRST AMENDED COMPLAINT**

1    through the use of third-party originators, it had far less oversight and

2    control over the quality of the originations.

3  Thorson Statement at 5.  According to the WaMu OIG Report, WaMu had only 14

4  employees monitoring the actions of 34,000 third-party brokers.  *See* WaMu OIG

5  Report at 11.  This lack of oversight led to WaMu "identif[ying] fraud losses

6  attributable to third-party brokers of $51 million for subprime loans and $27 million

7  for prime loans" in 2007.  *Id.*

8          287.  Federal regulators also noted that "WaMu acquired 11 institutions and

9  merged with 2 affiliates" from 1991 to 2006, yet failed to "fully integrate

10  . . . information technology systems, risk controls, and policies and procedures" from

11  its acquisitions and institute "a single enterprise-wide risk management system."

12  Thorson Statement at 5.  An integrated risk management system was critically

13  important in light of WaMu's high-risk lending strategy.  *See id.*

14          288.  Based on interviews with two dozen former employees, mortgage

15  brokers, real estate agents and appraisers, Goodman and Morgenson of the New York

16  Times noted the "relentless pressure to churn out loans" "while disregarding

17  borrowers' incomes and assets" that came from WaMu's top executives.  Goodman &

18  Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.  According to Dana

19  Zweibel, a former financial representative at a WaMu branch in Tampa, Florida, even

20  if she doubted whether a borrower could repay the loan, she was told by WaMu

21  management that it was not her concern:  her concern was "'just to write the loan.'"

22  *Id.*  Said Zweibel, "'[i]t was a disgrace'. . . .  'We were giving loans to people that never

23  should have had loans.'"  *Id.*

24          289.  In November 2008, the New York Times, quoting Keysha Cooper, a

25  Senior Mortgage Underwriter at WaMu from 2003 to 2007, recounted "'[a]t WaMu it

26  wasn't about the quality of the loans; it was about the numbers'. . . .  'They didn't care

27  if we were giving loans to people that didn't qualify.  Instead, it was how many loans

28                                        **102**

**FIRST AMENDED COMPLAINT**

did you guys close and fund?'"  Gretchen Morgenson, *Was There a Loan It Didn't Like?*, N.Y. TIMES, Nov. 1, 2008.  According to the article, "[i]n February 2007 . . . the pressure became intense.  WaMu executives told employees they were not making enough loans and had to get their numbers up. . . ."  Cooper concluded, "'I swear 60 percent of the loans I approved I was made to.' . . . 'If I could get everyone's name, I would write them apology letters.'"  *Id.*

290.  WaMu inflated salaries of baby sitters and mariachi singers to the six-figure range.  Indeed, the only verification of the mariachi singer's income was a photograph of the mariachi singer in his outfit included in the loan application file.  The New York Times reported:

> As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'.  He rarely questioned them.  A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.
>
> Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows.  The borrower was claiming a six-figure income and an unusual profession:  mariachi singer.
>
> Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit.  The photo went into a WaMu file.  Approved.
>
> "I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons.
>
> . . .

**103**

---

**FIRST AMENDED COMPLAINT**

1  At WaMu, getting the job done meant lending money to nearly anyone

2  who asked for it — the force behind the bank's meteoric rise and its

3  precipitous collapse this year in the biggest bank failure in American

4  history.

5  . . .

6  Interviews with two dozen former employees, mortgage brokers, real

7  estate agents and appraisers reveal the relentless pressure to churn out

8  loans that produced such results.

9 Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.

10  291. Long Beach, a WaMu affiliate, specialized in the riskiest of loans—

11 subprime mortgages.  Internal WaMu documents reveal a well-documented pattern of

12 underwriting deficiencies at Long Beach.  A memorandum to the Washington Mutual,

13 Inc. and WaMu Board of Directors' Audit Committees, dated April 17, 2006, re:  *Long*

14 *Beach Mortgage Company -Repurchase Reserve Root Cause Analysis* states:  "[Long Beach]

15 experienced a dramatic increase in EPDs[] during the third quarter of 2005. . . .

16 [R]elaxed credit guidelines, breakdowns in manual underwriting processes, and

17 inexperienced subprime personnel . . . coupled with a push to increase loan volume

18 and the lack of an automated fraud monitoring tool, exacerbated the deterioration in

19 loan quality."  Senate Exhibit 10 at 1-2.

20  292. A WaMu Audit Report titled *Long Beach Mortgage Loan Origination &*

21 *Underwriting,* dated August 20, 2007, states:  "[T]he overall system of risk management

22 and internal controls has deficiencies related to multiple, critical origination and

23 underwriting processes. . . .  These deficiencies require immediate effective corrective

24 action to limit continued exposure to losses."  Senate Exhibit 19 at 2.   In its

25 "Executive Summary" section, this Audit Report states:

26  In response to challenges resulting from the softening housing market,

27  rising   interest   rates,   tightening   capital   markets,   poor   portfolio

28        **104**

---

**FIRST AMENDED COMPLAINT**

1    performance and underwriting deficiencies, [Long Beach] continually

2    refines their processes and guidelines.   While management has been

3    responsive to these challenges by identifying and implementing corrective

4    actions, actual underwriting practices have not been consistent to achieve

5    the desired levels of improvement.   Continued patterns of loans being

6    underwritten outside of established underwriting and documentation

7    guidelines have been previously identified.

8    *Id.* at 2.   It also identifies the following as the number one high rated "repeat issue" to

9    correct:   "Underwriting guidelines established to mitigate the risk of unsound

10   underwriting decisions are not always followed and the decisioning methodology is not

11   always fully documented."   *Id.* at 8.   The number two "repeat issue" was identified as

12   "[p]olicies and procedures defined to allow and monitor reasonable and appropriate

13   exceptions to underwriting guidelines are not consistently followed."   *Id.* at 10.   An e-

14   mail from a WaMu executive describes the Long Beach audit report as "the ultimate in

15   bayonetting the wounded, if not the dead."   Senate Exhibit 20 at 1.

16       293.   In a WaMu internal report titled "[Long Beach] Post Mortem – Early

17   Findings Read Out," dated November 1, 2005, the authors note the following

18   "common theme" surfacing:   "Underwriting guidelines are not consistently followed

19   and conditions are not consistently or effectively met."   Senate Exhibit 9 at 1.   The

20   report goes on to note that 60% of First Payment Default cases could have been

21   prevented "had current policy, procedures and guidelines been better executed."   *Id.* at

22   2.

23       294.   In Gretchen Morgenson's July 9, 2010, article titled *Mortgage Investors Turn*

24   *to State Courts for Relief,* Morgenson of The New York Times reported on a lawsuit filed

25   by Cambridge Place Investment Management, an investment management firm that

26   lost over a billion dollars in RMBS it bought for clients, against 15 banks, for abetting

27   fraud.   The complaint alleges that management at Long Beach directed underwriters to

28

**105**

**FIRST AMENDED COMPLAINT**

"'approve, approve, approve'" and highlights the "anything-goes" lending practices at Long Beach:

> One Long Beach program made loans to self-employed borrowers based
> on three letters of reference from past employers. A former worker said
> some letters amounted to "So-and-so cuts my lawn and does a good job,"
> adding that the company made no attempt to verify the information, the
> complaint stated.

295. The OTS also reported concerns with subprime underwriting practices by Long Beach from 2006 to 2007. *See* Thorson Statement at 9-10.

296. As a result of its systematic disregard of underwriting standards, Long Beach also appeared in the 2008 "Worst Ten in the Worst Ten" Report. In fact, Long Beach was in the top five in every city other than Las Vegas, Nevada (1st in Stockton, California, Sacramento, California, Denver, Colorado, and Memphis, Tennessee; 2nd in Bakersfield, California and Detroit, Michigan; 3rd in Cleveland, Ohio and Miami, Florida; and 4th in Riverside, California). *See* 2008 "Worst Ten in the Worst Ten" Report. Long Beach again ranked near the top in nearly every city in the 2009 "Worst Ten in the Worst Ten" Report (1st in Stockton-Lodi, California, Merced, California, and Vallejo-Fairfield-Napa, California; 5th in Fort Pierce-Port St. Lucie, Florida; and 6th in Riverside-San Bernardino, California). *See* 2009 "Worst Ten in the Worst Ten" Report.

**E.     Loans That Did Not Meet the Originators' Underwriting Guidelines Were Routinely Collateral for Goldman Sachs-Underwritten RMBS**

297. A February 2010 report from J.P. Morgan noted that "[t]he outstanding balance of [private-label] mortgages grew from roughly $600 billion at the end of 2003 to $2.2 trillion at its peak in 2007." Gary J. Madich et al, *Non-Agency Mortgage-Backed Securities: Managing Opportunities and Risks*, J.P. Morgan Asset Management at 2 (Feb.

106

---

<strong>FIRST AMENDED COMPLAINT</strong>

2010), *available at* http://www.jpmorganinstitutional.com/cm/BlobServer/Non-Agency_Mortgage-Backed_Securities.pdf?blobkey=id&blobwhere=1321487765101&blobheader=application%2Fpdf&blobcol=urldata&blobtable=MungoBlobs&isAMIA=yes. While unknown to reasonable investors at that time, it now is apparent that this massive expansion in the origination of loans over a short period of time was accomplished by ignoring underwriting standards. The J.P. Morgan report also noted that home prices rose, requiring larger loans: "[private-label] mortgage providers initially met this need for larger loans while maintaining stringent qualifications. However, investment banks were willing to buy lower quality mortgages and bundle them for issuance into new and innovative forms of Asset Backed Securities (ABS) and Collateralized Debt Obligations (CDOs)." *Id.*

298. During the FCIC investigation referenced above (*supra* at Section VII.D.1), Clayton Holdings provided evidence about the originators' pervasive disregard of their stated underwriting guidelines. Clayton was the leading provider of due diligence services for RMBS offerings during the relevant time period. This gave Clayton "a unique inside view of the underwriting standards that originators were actually applying." FCIC Report at 166.

299. Banks routinely hired Clayton to inspect the mortgage loans that the banks securitized into RMBS. Clayton would determine whether the loans complied with the originators' stated underwriting guidelines, and prepare a report of its findings for the bank. *See* FCIC Testimony of Vicki Beal, Senior Vice President of Clayton Holdings (Sept. 23, 2010), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Beal.pdf.

300. From January 1, 2006 through June 30, 2007, Clayton reviewed 911,039 loans. Only 54% of those met the originators' underwriting guidelines. Clayton's former President and CEO, Keith Johnson, testified that the "54% says there [was] a quality control issue in the [originators]." FCIC Report at 166; Audiotape of FCIC

107

1   Interview with Keith Johnson, former President of Clayton ("Johnson FCIC

2   Interview") (Sept. 2, 2010) ("Even if the guideline was bad, [the loans] didn't adhere to

3   the guideline . . . . To me in hindsight, [the data] just said there was a . . . fundamental

4   breakdown."), *available at* http://fcic.law.stanford.edu/interviews/view/220.  Another

5   18% of the loans failed the underwriting guidelines but were deemed to have adequate

6   compensating factors.  That left a large number – 28% – that did not meet the

7   underwriting guidelines and had no compensating factors.  *See* All Clayton Trending

8   Reports, 1st Quarter 2006 – 2nd Quarter 2007, at 1 (2007), *available at* http://fcic-

9   static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-

10  Report.pdf ("All Clayton Trending Report").

11          301.   Clayton confirmed that the RMBS sold by Goldman Sachs from the

12  beginning of 2006 through the middle of 2007—which includes all of the RMBS listed

13  in Tables 1 and 2 of this Complaint—contained a substantial number of loans that

14  were not originated in conformity with underwriting guidelines.

15          302.   As revealed during the FCIC investigation in 2010, Clayton routinely

16  found large numbers of loans that were not properly originated under the applicable

17  underwriting guidelines.  Despite identifying these defectively originated loans, Clayton

18  stated that they often were included into the RMBS that was being sold to investors.

19  According to the statistics maintained by Clayton, a large number of the loans that

20  Clayton found did not meet underwriting guidelines and did not have adequate

21  compensating factors nonetheless were included into RMBS.  Specifically, Clayton

22  found that 29% of such loans were included in RMBS underwritten by Goldman

23  Sachs. *See* FCIC Report at 167; All Clayton Trending Report at 1.

24      **F.     Additional Evidence Confirms that Defective Loans Were**

25              **Routinely Packaged into Goldman Sachs's RMBS**

26          303.   Clayton officials offered an explanation for why so many defective loans

27  were packaged into RMBS.  When asked what caused the financial crisis, one pointed

28                                          **108**

**FIRST AMENDED COMPLAINT**

1  to the banks belief that they had no liability for loans' compliance with underwriting

2  guidelines: "When it came to the underwriting [guidelines] . . . and [securitizers] could

3  perhaps distribute that risk quickly, then that wasn't as high on their priorities."

4  Johnson FCIC Interview.

5      304.    During the course of the FCIC investigation, Clayton also explained that

6  the practice of putting rejected loans into RMBS was particularly prevalent among

7  banks, such as Goldman Sachs, that extended warehouse lines of credit to originators.

8  Warehouse lending is a short-term revolving line of credit provided to an originator to

9  fund the closing of mortgages.  Clayton's former president stated "I think our data

10  would show that, you know, we saw bigger exceptions to any client that had

11  warehouse lines." *Id.*  This was so because if the investment bank forced an originator

12  to take back too many defective loans, the originator would go bankrupt and default

13  on the warehouse line of credit.  On the other hand, the bank could waive the loan

14  into the RMBS pool, and thereby pass the risk of default onto the RMBS investors.

15  As Johnson explained:  "if Bob was originating for me as the client and I had a

16  warehouse line to you, I think what happened is a conflict of interest.  That if I put

17  back loans to you, Bob and you don't have the financial capability to honor those, then

18  I'm kind of caught; right? [. . .] I'm going to take a loss on the warehouse line." *Id.*

19      305.    Goldman Sachs provided warehouse lines of credit to several originators

20  at issue in this suit, including Long Beach, Fremont, and Countrywide.  Because of

21  those warehouse lines of credit, Goldman Sachs had an incentive to accept loans that

22  did not meet the applicable underwriting guidelines.  *See* FCIC Report at 142.

23      306.    A number of loan originators had an express policy of attempting to sell

24  loans that had already been rejected.  Because only a small percentage of the pools

25  were reviewed by a due diligence firm like Clayton (or its chief competitor, Bohan),

26  there was a very strong likelihood that those defective loans would enter the pool on

27  the second or third attempt.  Clayton referred to this practice as the "three strikes,

28

109

---

FIRST AMENDED COMPLAINT

1    you're out rule." Transcript, FCIC Hearing, *The Financial Crisis at the Community Level—*

2    *Sacramento, CA* at 178 (Sept. 23, 2010) (testimony of D. Keith Johnson, former

3    President of Clayton), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-

4    testimony/2010-0923-transcript.pdf.

5        307.    The FCIC Report also concluded that banks like Goldman Sachs that

6    securitized RMBS "were reluctant to review or reject loans in greater numbers because

7    doing so would endanger their relationship with originators." FCIC Report at 166

8    ("[Clayton's former CEO] concluded that his clients often waived in loans to preserve

9    their business relationship with the loan originator—a high number of rejections might

10    lead the originator to sell the loans to a competitor."); Paul Muolo and Matthew

11    Padilla, *Chain of Blame* 228 (2010) ("There were two reasons the [Wall] Street firms

12    reviewed only a small sample of the loans they were buying . . . . The most important

13    reason was the relationship with the lender. 'The lower the sample you requested [of

14    the lender], the more likely it was that you'd win the bid.'").

15        308.    Like Clayton, Bohan confirmed that Goldman Sachs did little to weed

16    out bad loans from its RMBS. Bohan loan evaluators explained that their supervisors

17    overrode the bulk of their challenges to specific loans on behalf of Goldman Sachs,

18    and "cleared half-million-dollar loans to a gardener, a housekeeper and a hairdresser."

19    According to the evaluators, the loan reviews were mostly for appearances because

20    Goldman Sachs planned to quickly securitize the loans and pass any future liabilities

21    on to investors—playing "hot potato," trying to pass the risks before they got burned.

22    As one of them explained, "There was nobody involved in this who didn't know what

23    was going on, no matter what they say ... We all knew." Greg Gordon, *Why Did*

24    *Goldman Stop Scrutinizing Loans It Bought?*, McClatchy Newspapers (Nov. 1, 2009),

25    *available at* http://www.mcclatchydc.com/2009/11/01/77788/why-did-goldman-stop-

26    scrutinizing.html.

27

28                                  **110**

**FIRST AMENDED COMPLAINT**

# VIII. THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT

309.   The Offering Documents included material untrue statements or omitted facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

310.   For purposes of Section 11 liability, the prospectus supplements are part of and included in the registration statements of the offerings pursuant to 17 C.F.R. §§ 230.158, 230.430B (2008); *see also* Securities Offering Reform, 70 Fed. Reg. 44,722-01, 44,768-69 (Aug. 3, 2005).

## A.   Offering Documents Misrepresented Weighted Average Loan-To-Value Ratios

311.   The Offering Documents included detailed representations regarding the weighted average LTV for the pools underlying the RMBS.

312.   The LTV ratio is the ratio of a mortgage loan's original principal balance to the appraised value of the mortgaged property.  For instance, if a borrower borrows $130,000 to purchase a house estimated to be worth $150,000, the LTV ratio is $130,000/$150,000 or 87%.

313.   A "weighted average" is an average in which each value to be averaged is assigned a weight that determines the relative importance of each value to the average. A weighted average can be contrasted with a straight arithmetic mean in which each of the values to be averaged contributes equally to the average.  In the context of LTVs, the higher the balance of the loan(s) secured by the property, the more "weight" it is given in relation to the average.  To calculate the weighted average LTV ratio for a pool of loans, each loan's LTV ratio is multiplied by the loan balance, and the sum of those numbers is divided by the total loan balance of the pool.  The weighted average LTV ratio is a factor in describing the risk of a particular RMBS.

**111**

314.   The NCUA Board commissioned a forensic review that calculated LTV ratios for the loans underlying the RALI Series of offerings.   The forensic review used a retrospective automated valuation model ("AVM").   A retrospective AVM calculates the value of a property at a point in time in the past using data that was available at that time, such as comparable property values, comparable sales, and home price indices at the time of loan origination.   That is, a retrospective AVM is able to calculate the value of a property in 2006 using the data that was available in 2006.

315.   The forensic review commissioned by the NCUA Board calculated the value of the mortgaged properties underlying the RMBS at the time the mortgage loans were originated.   In total, 9,957 loans were analyzed.

316.   The forensic review demonstrated that the Offering Documents materially understated the LTV ratios, and thus the risks, of the mortgage pools.   The appraised values given to the mortgaged properties were significantly higher than what the properties were actually worth at the time of origination.

317.   For the six RMBS tested, the Offering Documents contained representations about the purported weighted average LTV ratio for the loan pools.   The forensic review found that on average, the actual weighted average LTV ratio was 21.88% higher than the weighted average LTV ratio reported in the Offering Documents.   *See infra* Table 7.

### Table 7

| RMBS | Represented Weighted Average LTV Ratio | Actual Weighted Average LTV Ratio | Actual Weighted Average LTV ____% Higher than Represented |
|---|---|---|---|
| RALI Series 2006-QO6 Trust | 74.66% | 86.87% | 16.35% |
| RALI Series 2006-QO10 Trust | 74.76% | 91.20% | 21.99% |
| RALI Series 2007-QH2 Trust | 73.54% | 90.91% | 23.62% |
| RALI Series 2007-QH3 | 72.85% | 89.25% | 22.51% |

**FIRST AMENDED COMPLAINT**

| Trust | | | |
|---|---|---|---|
| RALI Series 2007-QH5 Trust | 73.93% | 90.83% | 22.86% |
| RALI Series 2007-QH6 Trust | 73.89% | 91.58% | 23.93% |

318.    The discrepancy between the reported weighted average LTV ratio and the ratio calculated using the retroactive AVM provides additional evidence that the Originators systematically disregarded underwriting standards contrary to representations in the Offering Documents.  Where the weighted average LTV is close to or exceeds 100% for the RMBS, the borrowers collectively had virtually no equity in the mortgaged properties, increasing the risk of losses when the borrowers defaulted on the mortgaged properties.  The actual weighted LTV ratio shows that the RMBS were significantly riskier than represented in the Offering Documents.

**B.    Untrue Statements in the Offering Documents About Owner-Occupancy Ratios**

319.    The Offering Documents represented the percentage of properties that would be occupied by the borrower for the loans underlying each RMBS.  Goldman Sachs performed due diligence regarding the occupancy status of the underlying properties.

320.    Representations regarding the occupancy type of a mortgaged property are material because borrowers are less likely to default on mortgages on their primary residences.  Barclays Capital explained:

> Most home owners become anchored to their communities through the schools their children attend and the friends they make.  As a result, defaulting on the mortgage backing one's primary residence can be a jarring experience, one that most people would choose to avoid.  By contrast, an investment property primarily represents a stream of income or speculative opportunity, making the decision to default more one of

**113**