dollars and cents than of a major life change.  As a result, all else being

equal, borrowers are less likely to default on a mortgage backed by their

primary residence than on one backed by an investment property.

Barclays Capital, Barclays Loan Transition Model, at 9 (Nov. 30, 2010).

321.   The forensic review used borrower- and property-specific public records to test loan-level occupancy data for each of the RALI Series offerings.

322.   First, the forensic review analyzed contemporaneous property tax records to determine whether: (1) borrowers received their property tax bill for the mortgaged property at the address of the mortgaged property; and (2) borrowers took a property tax exemption on the mortgaged property that is only available for owner-occupied properties.  Borrowers are likely to have a tax bill sent to their primary residence to ensure their ability to make timely payment.  However, if borrowers have tax records sent to a different address, then they probably do not actually reside at the mortgaged property.  And if borrowers decline to take certain tax exemptions dependent on the borrowers residing at their mortgaged properties, then the borrowers probably do not reside at those properties.

323.   Second, the forensic review analyzed public records to determine whether borrowers owned any other properties during the same time period in which they owned the securitized property.  The forensic review then examined whether the borrowers consistently identified the securitized property as their mailing address for property tax bills on each concurrently owned property.  Inconsistencies in tax bill mailing addresses for concurrently-owned properties strongly suggest that the securitized property was not, in fact, owner-occupied.

324.   Third, the forensic review conducted a review of lien records on concurrently-owned properties to determine whether borrowers indicated that any property other than the securitized property was owner-occupied.  This test examines all liens originated after the securitized mortgage and compares owner-occupancy

114

**FIRST AMENDED COMPLAINT**

1   representations with those in the loan tapes.  If liens on concurrently-owned properties

2   indicate that those properties are owner-occupied, then the borrower probably does

3   not reside at the mortgaged property.

4        325.   Fourth, the forensic review examined the mailing addresses identified for

5   liens on concurrently-owned properties to determine whether the address of the

6   securitized property was listed as the mailing address for bills and other

7   correspondence between borrowers and the lienholders.  If the securitized property

8   address is not identified, then the securitized property is probably not owner-occupied.

9        326.   Finally, the forensic review reviewed credit records to help determine

10   whether a given borrower occupied the mortgaged property.  Specifically, the forensic

11   review investigated whether creditors were reporting the securitized property's address

12   as the borrower's mailing address six months after the origination of the loan.  Within

13   six months of closing on a mortgage, one would expect borrowers to have changed

14   their billing address with each of their creditors.  If a borrower was telling creditors to

15   send bills to another address even six months after buying the property, it is likely the

16   borrower was living at a different location.

17        327.   In assessing the accuracy of the Offering Documents' representations

18   about owner-occupancy, the forensic review considered mortgages that failed multiple

19   owner-occupancy tests to not have actually have been backed by owner-occupied

20   properties.  Even with this high threshold, the forensic review revealed systemic

21   overstatements of owner-occupancy rates within each of the RMBS at issue.

22        328.   The forensic review's analysis demonstrates that, for the six RMBS

23   tested, the Offering Documents drastically overstated the percentage of owner-

24   occupied properties in the collateral pools.  *See infra* Table 8.  Overall, the Offering

25   Documents overstated the number of owner-occupied properties in each RMBS by

26   17.3% to 26.2%, with an average overstatement of 21.81%.

27

28

**115**

**FIRST AMENDED COMPLAINT**

### Table 8

| RMBS | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Percentage Overstatement |
|---|---|---|---|
| RALI Series 2006-QO6 Trust | 85.6% | 73% | 17.3% |
| RALI Series 2006-QO10 Trust | 82.9% | 70.3% | 17.9% |
| RALI Series 2007-QH2 Trust | 85.5% | 69.0% | 23.9% |
| RALI Series 2007-QH3 Trust | 81.8% | 68.2% | 19.9% |
| RALI Series 2007-QH5 Trust | 85.3% | 70.0% | 21.9% |
| RALI Series 2007-QH6 Trust | 82.8% | 65.6% | 26.2% |

### C.   Other Untrue Statements in the Offering Statements

329.   Statements in the Offering Documents concerning the following subjects were material and untrue at the time they were made: (1) the Originators' evaluation of the borrower's likelihood and capacity to repay the loan through application of the stated underwriting standards, including the calculation and use of an accurate "debt-to-income" ratio and the frequency and use of exceptions to those standards; (2) adherence to stated underwriting standards for reduced documentation programs; (3) the accurate calculation of the "loan-to-value" ratio for the mortgaged property and the accuracy of appraisals; and (4) the existence of credit enhancement to minimize the risk of loss.

330.   The following chart, Table 9, lists the originators that contributed loans to each RMBS, as identified in the Offering Documents or through an independent analysis of these RMBS commissioned by the NCUA.   With the exception of the RALI Series offerings, the Offering Documents disclosed the underwriting guidelines for the Originators that contributed more than 20% of the loan collateral.   For the RALI Series offerings, the Offering Documents disclosed only RFC's underwriting guidelines, stating that "[a]ll of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding."   *See, e.g.*, RALI Series 2006-QO6 Trust Prospectus Supplement at S-47.   RFC acted as the sponsor for all of the RALI Series offerings.

**Table 9**

| CUSIP(S) | RMBS | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 02150DAC9 | Alternative Loan Trust 2007-OA4 | A3 | Countrywide Home Loans and affiliated entities (100%) |
| 362334FT6 | First Franklin Mortgage Loan Trust 2006-FF4 | A3 | First Franklin Financial Corporation (100%) |
| 35729VAE7 35729VAF4 | Fremont Home Loan Trust 2006-D | 2A4 M1 | Fremont Investment & Loan (100%) |
| 362631AD59 | GSR Mortgage Loan Trust 2006-OA1 | 2A3 | American Home Mortgage Corp., Countrywide Home Loans, Inc., IndyMac, F.S.B., SunTrust Mortgage, Inc. |
| 3622NAAB6 3622NAAG5 | GSR Mortgage Loan Trust 2007-OAl | 1A2 2AM | Countrywide Home Loans, Inc., Residential Funding Company, LLC, Quicken Loans Inc. |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | II-A4 | Long Beach Mortgage (100%) |
| 751153AC1 | RALI Series 2006-QO10 Trust | A3 | Homecomings Financial, LLC (35%), First Magnus Financial Corp. (11%), FNB Arizona (7%), SCME (4%) |
| 74922JAC2 | RALI Series 2007-QH2 Trust | A3 | Homecomings Financial, LLC (20%), First Magnus Financial Corp. (21%), FNB Arizona (11%), SCME (9%) |
| 74922WAB5 74922WAC3 | RALI Series 2007-QH3 Trust | A2 A3 | Homecomings Financial, LLC (30%), First Magnus Financial Corp. (13%), FNB Arizona (10%), SCME (12%) |
| 75116EAA0 75116EAB8 75116EAC6 | RALI Series 2007-QH5 Trust | AI1 AI2 AI3 | Homecomings Financial, LLC (33%), First Magnus Financial Corp. (10%), FNB Arizona (4%), SCME (21%) |
| 74922AAB3 74922AAC1 | RALI Series 2007-QH6 Trust | A2 A3 | Homecomings Financial, LLC (43%), First Magnus Financial Corp. (16%), FNB Arizona (4%), SCME (10%) |
| 39539GAC6 | GreenPoint Mortgage Funding Trust 2006-OH1 | A3 | GreenPoint Mortgage Funding, Inc. |
| 75114NAC8 | RALI Series 2006-QO6 Trust | A3 | Homecomings Financial Network, LLC, (41%), First Magnus Financial Corp. (3%), FNB Arizona (8%), SCME (10%) |

331.  For certain RMBS, Table 9 reflects the percentage of loans that was contributed by certain originators, rounded to the nearest whole number, as reflected in the Offering Documents or determined by forensic analysis.  Such information was

**117**

**FIRST AMENDED COMPLAINT**

1   not available for every RMBS. An originator responsible for 10% or more of the loans

2   in a particular mortgage pool should have been disclosed in the Offering Documents.

3   *See* 17 C.F.R. § 229.1110. While certain such originators were not disclosed, NCUA

4   alleges that they did in fact contribute the percentage of the loans in the mortgage pool

5   listed herein based upon a forensic review commissioned by NCUA to determine the

6   originators for the loans in the RALI Series of offerings. NCUA's investigation could

7   not conclude whether, and NCUA does not allege that, any Defendant knowingly or

8   intentionally excluded any originators in violation of any applicable regulation.

9       332.   Examples of material untrue statements and/or omissions of fact from

10  the RMBS listed above follow.

11      **D.   Untrue Statements Concerning Evaluation of the Borrower's**

12          **Capacity and Likelihood To Repay the Mortgage Loan**

13      333.   The Alternative Loan Trust 2007-OA4 Prospectus Supplement stated:

14      All of the Mortgage Loans will have been originated or acquired by

15      Countrywide Home Loans in accordance with its credit, appraisal and

16      underwriting standards. Countrywide Home Loans has been originating

17      mortgage loans since 1969. Countrywide Home Loans' underwriting

18      process are applied in accordance with applicable federal and state laws

19      and regulations. Except as otherwise provided in this prospectus

20      supplement, the underwriting procedures are consistent with those

21      identified under "Loan Program — Underwriting Standards" in the

22      prospectus.

23  Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-33; *see* Alternative Loan

24  Trust 2007-OA4 Registration Statement, Feb. 7, 2006, at S-52.

25      334.   The Alternative Loan Trust 2007-OA4 Prospectus Supplement also

26  stated:

27

28                                  **118**

                        **FIRST AMENDED COMPLAINT**

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-33-34; *see* Alternative Loan Trust 2007-OA4 Registration Statement, Feb. 7, 2006, at S-53.

335.   The Alternative Loan Trust 2007-OA4 Prospectus stated:

Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral.

Alternative Loan Trust 2007-OA4 Prospectus, Nov. 14, 2006, at 25; *see* Alternative Loan Trust 2007-OA4 Registration Statement, Feb. 7, 2006, at 25; *see id.* ("Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance[]. The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the

**119**

FIRST AMENDED COMPLAINT

1   mortgagor's income and credit history, may be varied in appropriate cases where

2   factors as low Loan-to-Value Ratios or other favorable credit factors exist.").

3        336.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus

4   Supplement stated:

5        The mortgage loans were originated or acquired generally in accordance

6        with the underwriting guidelines described in this prospectus supplement.

7        S-31

8

9        Since January 1, 2005, all of the mortgage loans of a type similar to

10       mortgage loans that were acquired by the responsible party were required

11       to meet the underwriting criteria described in this prospectus supplement.

12       S-34

13

14       The responsible party's acquisition underwriting standards are primarily

15       intended to assess the ability and willingness of the borrower to repay the

16       debt and to evaluate the adequacy of the mortgaged property as collateral

17       for the mortgage loan.

18   Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-31, S-34; *see*

19   First Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006,

20   at S-32, S-35.

21        337.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus stated:

22       The lender or an agent acting on the lender's behalf applies the

23       underwriting standards to evaluate the borrower's credit standing and

24       repayment ability, and to evaluate the value and adequacy of the

25       mortgaged property as collateral.

26   First Franklin Mortgage Loan Trust 2006-FF4 Prospectus, Nov. 17, 2005, at 26.

27

28                                    **120**

                          **FIRST AMENDED COMPLAINT**

338.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus
Supplement stated:

> While each underwriting program is intended to assess the risk of default,
> the Direct Access Program makes use of credit bureau risk scores (the
> "Credit Bureau Risk Score").

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-35; *see* First
Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-
36.

339.   The First Franklin Mortgage Loan Trust 2006-FF4 Registration
Statement and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective
Amendment No. 1 to Registration Statement stated:

> All mortgage loans [_____] originates or acquires are generally
> underwritten by [_____] according to its credit, appraisal and
> underwriting standards.  [_____], or its agents, apply such underwriting
> standards to evaluate the prospective borrower's credit standing and
> repayment ability and the value and adequacy of the mortgaged property
> as collateral.  These standards are applied in accordance with applicable
> federal and state laws and regulations.  [_____] permits exceptions to
> the underwriting standards where compensating factors are present.

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005,
at S-10; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No.
1 to Registration Statement, Nov. 2, 2005, at S-10.

340.   The First Franklin Mortgage Loan Trust 2006-FF4 Registration
Statement stated:

> The mortgage loans were originated or acquired generally in accordance
> with the underwriting guidelines described in this prospectus supplement.
> See "The Underwriting Guidelines" below.

**FIRST AMENDED COMPLAINT**

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005, at S-25.

341. The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement stated:

> In the case of single family loans, cooperative loans and manufactured housing contracts, once all applicable employment, credit and property information is received, the lender makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the mortgaged property such as property taxes and hazard insurance).

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005, at 27; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement, Nov. 2, 2005, at 27; *see* First Franklin Mortgage Loan Trust 2006-FF4 Prospectus, Nov. 17, 2005, at 27.

342. The First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement stated:

> The [_____] mortgage loans were originated generally in accordance with one of the following income documentation types: "Full Documentation," "Limited Documentation" or "Stated Income." The Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral.

**122**

---

**FIRST AMENDED COMPLAINT**

First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005, at S-28; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No. 1 to Registration Statement, Nov. 2, 2005, at S-28.

343. The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement stated:

> Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan.

First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-37; *see* First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, August 17, 2005, at S-29.

344. The Fremont Home Loan Trust 2006-D Prospectus stated:

> Fremont Investment & Loan provides underwriters with specific underwriting guidelines and maintains strict control procedures to manage the quality of its originations at all locations.

Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 74; *see* Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 74.

345. The Fremont Home Loan Trust 2006-D Prospectus stated:

> Generally, Fremont Investment & Loan's guidelines require an analysis of the following
>
> • a borrower's creditworthiness, as reflected in particular by the borrower's credit history and employment stability,

**123**

---

**FIRST AMENDED COMPLAINT**

1        • a borrower's "debt-to-income ratio," which measures a borrower's

2        projected income relative to the proposed mortgage payment and to

3        other fixed obligations, and

4        • the "loan-to-value ratio" of the proposed loan, which measures the

5        adequacy of the mortgaged property to serve as the collateral for a

6        mortgage loan.

7    Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 74; *see* Fremont

8    Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 74.

9        346.   The Fremont Home Loan Trust 2006-D Prospectus stated:

10        A borrower's lack of credit payment history and/or relatively low Credit

11        Score, however, will not necessarily preclude Fremont Investment &

12        Loan from making a loan if other favorable borrower characteristics

13        exist, including an adequate debt-to-income ratio or sufficient equity in

14        the property.

15    Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 75; *see* Fremont

16    Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 75.

17        347.   The Fremont Home Loan Trust 2006-D Prospectus stated:

18        Fremont Investment & Loan's underwriting standards are primarily

19        intended to assess the ability and willingness of the borrower to repay the

20        debt and to evaluate the adequacy of the mortgaged property as collateral

21        for the mortgage loan.  All of the mortgage loans in the mortgage pool

22        were underwritten with a view toward the resale of the mortgage loans in

23        the secondary mortgage market.  Fremont Investment & Loan considers,

24        among other things, a mortgagor's Credit Score, past payment history,

25        repayment ability and debt service-to-income ratio, as well as the value,

26        type and use of the mortgaged property.

27

28                          **124**

**FIRST AMENDED COMPLAINT**

1    The mortgage loans were underwritten in accordance with Fremont's
2    current underwriting programs, referred to as the Scored Programs
3    ("Scored Programs"). Fremont Investment & Loan began originating
4    mortgage loans pursuant to Scored Programs in 2001 and the Scored
5    Programs have been the exclusive type of origination programs beginning
6    in 2004. Within the Scored Programs, there are three documentation
7    types, Full Documentation, Easy Documentation, and Stated Income.
8    All of the mortgage loans were originated in accordance with Fremont
9    Investment & Loan's underwriting guidelines, subject to various
10   exceptions as described in this section. A Credit Score is used along
11   with, but not limited to, mortgage payment history, seasoning on
12   bankruptcy and/or foreclosure, loan-to-value ratio as an aid to, not a
13   substitute for, the underwriter's judgment. Fremont Investment &
14   Loan's underwriting staff fully reviews each loan to determine whether
15   it's underwriting guidelines for income, assets, employment and collateral
16   are met.

17   Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 76-77; *see* Fremont
18   Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 76-77.

19       348.   The Fremont Home Loan Trust 2006-D Prospectus stated:
20       Fremont Investment & Loan conducts a number of quality control
21       procedures, including a post-funding compliance audit as well as a full re-
22       underwriting of a random selection of loans to assure asset quality.

23   Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 78; *see* Fremont
24   Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 78.

25       349.   The Fremont Home Loan Trust 2006-D Free Writing Prospectus stated:
26       All of the mortgage loans were underwritten by Fremont's underwriters
27       having the appropriate approval authority. Each underwriter is granted a

28

125

---

**FIRST AMENDED COMPLAINT**

1       level of authority commensurate with their proven judgment, experience

2       and credit skills.  On a case by case basis, Fremont may determine that,

3       based upon compensating factors, a prospective mortgagor not strictly

4       qualifying under the underwriting risk category guidelines described

5       below is nonetheless qualified to receive a loan, i.e., an underwriting

6       exception.  Compensating factors may include, but are not limited to, low

7       loan-to-value ratio, low debt to income ratio, substantial liquid assets,

8       good credit history, stable employment and time in residence at the

9       applicant's current address.  It is expected that a substantial portion of

10      the mortgage loans may represent such underwriting exceptions.

11   Fremont Home Loan Trust 2006-D Free Writing Prospectus, Oct. 24, 2006, at 41; *see*

12   Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at S-38.

13       350.   The Fremont Home Loan Trust 2006-D Free Writing Prospectus stated:

14      Fremont conducts a number of quality control procedures, including a

15      post-funding review as well as a full re-underwriting of a random

16      selection of loans to assure asset quality.  Under the funding review, all

17      loans are reviewed to verify credit grading, documentation compliance

18      and data accuracy.  Under the asset quality procedure, a random selection

19      of each month's originations is reviewed.  The loan review confirms the

20      existence and accuracy of legal documents, credit documentation,

21      appraisal analysis and underwriting decision.  A report detailing review

22      findings and level of error is sent monthly to each loan production office

23      for response.   The review findings and branch responses are then

24      reviewed by Fremont's senior management.  Adverse findings are tracked

25      monthly.  This review procedure allows Fremont to assess programs for

26      potential guideline changes, program enhancements, appraisal policies,

27

28                                   **126**

**FIRST AMENDED COMPLAINT**

1    areas of risk to be reduced or eliminated and the need for additional staff

2    training.

3  Fremont Home Loan Trust 2006-D Free Writing Prospectus, Oct. 24, 2006, at 42; *see*

4  Fremont Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at S-38-39.

5        351.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:

6    In general, each lender or loan seller will represent and warrant that all

7    mortgage loans originated and/or sold by it to us or one of our affiliates

8    will have been underwritten in accordance with standards consistent with

9    those used by mortgage lenders or manufactured home lenders during

10   the period of origination or such other standards as we have required of

11   such lender or loan seller, in any case, as specified in the applicable

12   prospectus supplement.

13  GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 28-29; *see*

14  GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29,

15  2006, at 28-29.

16       352.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus further

17  stated:

18   The lender or an agent acting on the lender's behalf applies the

19   underwriting standards to evaluate the borrower's credit standing and

20   repayment ability, and to evaluate the value and adequacy of the

21   mortgaged property as collateral.  In general, the lender may require that

22   a prospective borrower fill out a detailed application designed to provide

23   to the underwriting officer pertinent credit information.

24  GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 29;

25  *see* GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement,

26  Mar. 29, 2006, at 29; GreenPoint Mortgage Funding Trust 2006-OH1

27  Prospectus, Oct. 6, 2006, at 29 ("As a part of the description of the borrower's

28                              127

**FIRST AMENDED COMPLAINT**

1  financial condition, the lender may require the borrower to provide a current list
2  of assets and liabilities and a statement of income and expense as well as an
3  authorization to apply for a credit report, which summarizes the borrower's
4  credit history with local merchants and lenders and any record of bankruptcy.
5  The lender may obtain employment verification from an independent source
6  (typically the borrower's employer).  The employment verification reports the
7  length of employment with that organization, the current salary and whether it
8  is expected that the borrower will continue such employment in the future.  If a
9  prospective borrower is self employed, the lender may require the borrower to
10  submit copies of signed tax returns.  The lender may require the borrower to
11  authorize verification of deposits at financial institutions where the borrower
12  has demand or savings accounts.  In determining the adequacy of the mortgaged
13  property as collateral, the lender will generally obtain an appraisal to determine
14  the fair market value of each property considered for financing.").

15      353.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:
16          In the case of single family loans, cooperative loans and manufactured
17          housing contracts, once all applicable employment, credit and property
18          information is received, the lender makes a determination as to whether
19          the prospective borrower has sufficient monthly income available (as to
20          meet the borrower's monthly obligations on the proposed mortgage loan
21          and other expenses related to the mortgaged property such as property
22          taxes and hazard insurance).  The underwriting standards applied by
23          lenders may be varied in appropriate cases where factors such as low
24          Loan-to-Value Ratios or other favorable credit factors exist.

25  GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 29; *see*
26  GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29, 2006,
27  at 29.

28                                    **128**

                            **FIRST AMENDED COMPLAINT**

354. The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated: "All of the mortgage loans that GSMC may acquire through its conduit program will be acquired generally in accordance with the underwriting criteria described in this section." GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 30.

355. The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus stated:

Generally, each borrower applying for a mortgage loan must complete a credit application. The credit application is designed to provide the originating lender with relevant credit information about the prospective borrower such as information with respect to the borrower's assets, liabilities, income (except as described below), credit history, employment history and personal information. In addition, prospective borrowers generally must provide an authorization to apply for a credit report. A credit report summarizes the borrower's past credit experience with lenders and other debtors, including any record of bankruptcy. Sometimes, the borrower is required to authorize the originating lender to verify deposits at financial institutions identified by the borrower as institutions at which the borrower maintains demand or savings accounts. The originating lender may also consider certain non-wage income of the borrower in the underwriting process, including income derived from mortgaged properties that are investment properties or two- to four-unit dwellings. Generally, the originating lender will not consider income derived from vacation or second homes in the underwriting process. Certain borrowers with acceptable payment histories are not required to state their income on their loan application and, as a result, the originating lender does not verify their income.

**FIRST AMENDED COMPLAINT**

Based on the data referred to above (and verification of that data, to the extent required), the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed and revolving obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first twelve months of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months may equal no more than a specified percentage of the prospective borrower's gross income. The permitted percentage is determined on the basis of various underwriting criteria, including the LTV ratio of the mortgage loan and, in certain instances, the amount of liquid assets available to the borrower after origination.

GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus, Oct. 6, 2006, at 30; *see* GreenPoint Mortgage Funding Trust 2006-OH1 Registration Statement, Mar. 29, 2006, at 30.

356. The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement provided:

*Underwriting Methodology.* The methodology used in underwriting the extension of credit for each Mortgage Loan does not rely solely on the extent of the Mortgagor's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed objective criteria, such as the Mortgagor's income, assets and liabilities, to the proposed mortgage payment and, based on such methodology, the Mortgage Loan's originator made a

**130**

---

**FIRST AMENDED COMPLAINT**

1    reasonable determination that at the time of origination the Mortgagor

2    had the ability to make timely payments on the Mortgage Loan.  Such

3    underwriting methodology confirmed that at the time of origination

4    (application/approval) the Mortgagor had a reasonable ability to make

5    timely payments on the Mortgage Loan[.]

6    GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-58.

7         357.   The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus

8    Supplement provided:

9         *Acceptable Investment.*   There are no circumstances or conditions with

10        respect to the mortgage, the Mortgaged Property, the Mortgagor, the

11        mortgage file or the Mortgagor's credit standing that can reasonably be

12        expected to cause private institutional investors to regard the Mortgage

13        Loan as an unacceptable investment, cause the Mortgage Loan to become

14        delinquent, or adversely affect the value or marketability of the Mortgage

15        Loan, or cause the Mortgage Loans to prepay during any period

16        materially faster or slower than the mortgage loans originated by the

17        Seller generally[.]

18   GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-56.

19        358.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus stated:

20        The lender or an agent acting on the lender's behalf applies the

21        underwriting standards to evaluate the borrower's credit standing and

22        repayment ability, and to evaluate the value and adequacy of the

23        mortgaged property as collateral.

24   GSR Mortgage Loan Trust 2007-OA1 Prospectus, Feb. 13, 2007, at 29; GSR Mortgage

25   Loan Trust 2006-OA1 Prospectus, Aug. 3, 2006, at 29; *see* GSR Mortgage Loan Trust

26   2007-OA1 Registration Statement, Jan. 5, 2007, at 29; GSR Mortgage Loan Trust

27   2006-OA1 Registration Statement, Mar. 29, 2006, at 29.

28                                      **131**

                          **FIRST AMENDED COMPLAINT**

359.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus stated:

In the case of single family loans, cooperative loans and manufactured housing contracts, once all applicable employment, credit and property information is received, the lender makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the mortgaged property such as property taxes and hazard insurance).

GSR Mortgage Loan Trust 2007-OA1 Prospectus, Feb. 13, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Prospectus, Aug. 3, 2006, at 29; *see also* GSR Mortgage Loan Trust 2007-OA1 Registration Statement, Jan. 5, 2007, at 29; GSR Mortgage Loan Trust 2006-OA1 Registration Statement, Mar. 29, 2006, at 29.

360.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus stated:

All of the mortgage loans that GSMC may acquire through its conduit program will be acquired generally in accordance with the underwriting criteria described in this section.

…

Generally, each borrower applying for a mortgage loan must complete a credit application.   The credit application is designed to provide the originating lender with relevant credit information about the prospective borrower such as information with respect to the borrower's assets, liabilities, income (except as described below), credit history, employment history and personal information.   In addition, prospective borrowers generally must provide an authorization to apply for a credit report. . . . Certain borrowers with acceptable payment histories are not required to state their income on their loan application and, as a result, the originating lender does not verify their income.

**132**

---

**FIRST AMENDED COMPLAINT**

<blockquote>
Based on the data referred to above (and verification of that data, to the extent required), the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed and revolving obligations other than housing expenses. ...   The permitted percentage is determined on the basis of various underwriting criteria. . . .
</blockquote>

GSR Mortgage Loan Trust 2007-OA1 Prospectus, Feb. 13, 2007, at 29-30; GSR Mortgage Loan Trust 2006-OA1 Prospectus, Aug. 3, 2006, at 30; *see* GSR Mortgage Loan Trust 2007-OA1 Registration Statement, Jan. 5, 2007, at 30; GSR Mortgage Loan Trust 2006-OA1 Registration Statement, Mar. 29, 2006, at 30.

361.  The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

<blockquote>
Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses . . . are within acceptable limits. . . . In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.  Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.
</blockquote>

**FIRST AMENDED COMPLAINT**

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-60; GSR Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-51-52; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-50.

362.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

> Quicken Loans' underwriting standards for the Secure Advantage program follow prudent and generally accepted mortgage industry underwriting standards and are intended to evaluate the borrower's credit standing, repayment ability, and the value and adequacy of the proposed mortgaged property as collateral.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-65; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-55.

363.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement represented:

> Although borrowers are assessed against Quicken Loans' underwriting standards, prudent exceptions may be made on a case by case basis. Exceptions may be allowed if the application reflects strong compensating factors, such as, a lower debt-to-income ratio, higher credit scores, low loan-to-value ratio, significant asset reserves, stable employment or ownership at current residence.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-67; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-57.

364.   The Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement stated: "The sponsor's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral."   Long

**134**

**FIRST AMENDED COMPLAINT**

Case 2:12-cv-08522-CW-JEM   Document 1298-9   Filed 07/19/13   Entered 07/19/13 16:22:47   Exhibit 7
Part 3   Page 64 of 93   Page ID
#:2272

12-12020-mg   Doc 4298-9   Filed 07/19/13   Page 22 of 76

1  Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration
2  Statement, Mar. 21, 2006, at S-38.

3      365.   The Amendment No. 1 to Registration Statement also stated:

4          The depositor expects that the originator of each of the mortgage loans
5          will have applied, consistent with applicable federal and state laws and
6          regulations, underwriting procedures intended to evaluate the borrower's
7          credit standing and repayment ability and/or the value and adequacy of
8          the related mortgaged property as collateral.

9  Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration
10  Statement, Mar. 21, 2006, at 26; *see id.* at 2 ("Each mortgage loan to be transferred to a
11  trust will have been originated in accordance with the underwriting guidelines applied
12  by the originator of that mortgage loan."); Long Beach Mortgage Loan Trust 2006-11
13  Prospectus, July 21, 2006, at 28 ("The depositor expects that the originator of each of
14  the mortgage loans will have applied, consistent with applicable federal and state laws
15  and regulations, underwriting procedures intended to evaluate the borrower's credit
16  standing and repayment ability and/or the value and adequacy of the related
17  mortgaged property as collateral.").

18      366.   The Long Beach Mortgage Loan Trust 2006-11 Amendment No. 1 to
19  Registration Statement stated:

20          During the underwriting or re-underwriting process, the sponsor reviews
21          and verifies the prospective borrower's sources of income (only under
22          the full documentation residential loan program), calculates the amount
23          of income from all such sources indicated on the loan application,
24          reviews the credit history and credit score(s) of the prospective borrower
25          and calculates the debt-to-income ratio to determine the prospective
26          borrower's ability to repay the loan, and determines whether the
27          mortgaged property complies with the sponsor's underwriting guidelines.

28                                    **135**

**FIRST AMENDED COMPLAINT**

Long Beach Mortgage Loan Trust Series 2006-11 Amendment No. 1 to Registration Statement, Mar. 21, 2006, at S-38; *see* Long Beach Mortgage Loan Trust 2006-11 Prospectus, July 21, 2006, at 29:

> Initially, a prospective borrower is required to complete an application with respect to the applicant's liabilities, income and credit history and personal information, as well as an authorization to apply for a credit report that summarizes the borrower's reported credit history with local merchants and lenders and any record of bankruptcy. In addition, an employment verification is obtained that reports the borrower's current salary and may contain information regarding length of employment. If a prospective borrower is self-employed, the borrower is required to submit copies of signed tax returns or other proof of business income. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts. In the case of a multifamily loan, commercial loan or mixed-use loan, the mortgagor will also be required to provide certain information regarding the related mortgaged property, including a current rent roll and operating income statements which may be pro forma and unaudited. In addition, the originator will generally also consider the location of the mortgaged property, the availability of competitive lease space and rental income of comparable properties in the relevant market area, the overall economy and demographic features of the geographic area and the mortgagor's prior experience in owning and operating properties similar to the multifamily properties or commercial properties, as the case may be.

367. The Long Beach Mortgage Loan Trust 2006-11 Amendment No. 1 to

**FIRST AMENDED COMPLAINT**

Registration Statement stated:

> While the underwriting guidelines of each originator will have been
> approved by an affiliate of the depositor, the underwriting guidelines,
> including documentation requirements, of some originators may be less
> restrictive than those of other originators. Moreover, some underwriting
> guidelines may result in a less accurate assessment of the borrower's
> credit standing and repayment ability and/or the value and adequacy of
> the related mortgaged property as collateral.

Long Beach Mortgage Loan Trust 2006-11 Amendment No. 1 to Registration
Statement, Mar. 21, 2006, at 2; *see* Long Beach Mortgage Loan Trust 2006-11
Prospectus, July 21, 2006, at 3.

368. The RALI Series offerings represented the following underwriting
guidelines set by RFC would apply to every originator contributing loans to the
offering:

> The depositor expects that the originator of each of the mortgage loans
> will have applied, consistent with applicable federal and state laws and
> regulations, underwriting procedures intended to evaluate the borrower's
> credit standing and repayment ability and/or the value and adequacy of
> the related property as collateral.

RALI Series 2007-QH6 Trust Prospectus, Apr. 9, 2007, at 17; RALI Series 2006-
QO10 Trust Prospectus, Dec. 6, 2006, at 12; RALI Series 2007-QH2 Trust
Prospectus, Dec/ 6, 2006, at 12; RALI Series 2007-QH3 Trust Prospectus, Dec. 6,
2006, at 12; RALI Series 2007-QH5 Trust Prospectus, Apr. 9, 2007, at 17; RALI Series
2006-QO6 Trust Prospectus, Mar. 3, 2006, at 12; *see also* RALI Series 2007-QH6 Trust
Registration Statement, Feb. 12, 2007, at 17; RALI Series 2006-QO10 Trust
Registration Statement, Jan. 23, 2006, at 13; RALI Series 2007-QH2 Trust Registration
Statement, Jan. 23, 2006, at 13; RALI Series 2007-QH3 Trust Registration Statement,

137

1    Jan. 23, 2006, at 13; RALI Series 2007-QH5 Trust Registration Statement, Feb. 12,

2    2007, at 17; RALI Series 2006-QO6 Trust Registration Statement, Jan. 23, 2006, at 13.

3    369.    The RALI Series offerings represented the following underwriting

4    guidelines set by RFC would apply to every originator contributing loans to the

5    offering:

6    > Program Underwriting Standards.  In accordance with the Seller Guide,

7    > the Expanded Criteria Program Seller is required to review an application

8    > designed to provide the original lender pertinent credit information

9    > concerning the mortgagor.  As part of the description of the mortgagor's

10   > financial condition, each mortgagor is required to furnish information,

11   > which may have been supplied solely in the application, regarding its

12   > assets, liabilities, income (except as described below), credit history and

13   > employment history, and to furnish an authorization to apply for a credit

14   > report which summarizes the borrower's credit history with local

15   > merchants and lenders and any record of bankruptcy.

16   RALI Series 2007-QH6 Trust Prospectus Supplement at S-47; RALI Series 2006-QO10

17   Trust Prospectus Supplement at S-48; RALI Series 2007-QH2 Trust Prospectus

18   Supplement at S-44; RALI Series 2007-QH3 Trust Prospectus Supplement at S-47;

19   RALI Series 2007-QH5 Trust Prospectus Supplement at S-53; RALI Series 2006-QO6

20   Trust Prospectus Supplement at S-45;  *see* RALI Series 2007-QH6 Trust Registration

21   Statement, Feb.12, 2007, at S-42; RALI Series 2006-QO10 Trust Registration

22   Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH2 Trust Registration Statement,

23   Jan. 23, 2006, at S-43; RALI Series 2007-QH3 Trust Registration Statement, Jan. 23,

24   2006, at S-43; RALI Series 2007-QH5 Trust Registration Statement, Feb. 12, 2007, at S-

25   42; RALI Series 2006-QO6 Trust Registration Statement, Jan. 23, 2006, at S-43.

28                                         **138**

                          **FIRST AMENDED COMPLAINT**

1    370.   The RALI Series offerings represented the following underwriting
2    guidelines set by RFC would apply to every originator contributing loans to the
3    offering:

> Based on the data provided in the application and certain verifications, if
> required, a determination is made by the original lender that the
> mortgagor's monthly income, if required to be stated, will be sufficient to
> enable the mortgagor to meet its monthly obligations on the mortgage
> loan and other expenses related to the property, including property taxes,
> utility costs, standard hazard insurance and other fixed obligations.

10   RALI Series 2007-QH6 Trust Prospectus Supplement at S-48; RALI Series 2006-
11   QO10 Trust Prospectus Supplement at S-48; RALI Series 2007-QH2 Trust Prospectus
12   Supplement at S-44; RALI Series 2007-QH3 Trust Prospectus Supplement, at S-47-48;
13   RALI Series 2007-QH5 Trust Prospectus Supplement at S-54; RALI Series 2006-QO6
14   Trust Prospectus Supplement at S-45;  *see* RALI Series 2007-QH6 Trust Registration
15   Statement, Feb. 12, 2007, at S-42; RALI Series 2006-QO10 Trust Registration
16   Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH2 Trust Registration
17   Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH3 Trust Registration
18   Statement, Jan. 23, 2006, at S-43; RALI Series 2007-QH5 Trust Registration
19   Statement, Feb. 12, 2007, at S-42; RALI Series 2006-QO6 Trust Registration
20   Statement, Jan. 23, 2006, at S-43.

21   371.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The
22   preceding statements were material at the time they were made, because the quality of
23   the loans in the mortgage pool directly affects the riskiness of the RMBS investment,
24   and the quality of the loans is dependent upon the underwriting process employed.
25   The preceding statements were untrue at the time they were made because, as alleged
26   herein, the Originators did not adhere to the stated underwriting guidelines, did not
27   effectively evaluate the borrowers' ability or likelihood to repay the loans, did not

28                                          139

                              **FIRST AMENDED COMPLAINT**

1   properly evaluate whether the borrower's debt-to-income ratio supported a conclusion
2   that the borrower had the means to meet his/her monthly obligations, and did not
3   ensure that adequate compensating factors justified the granting of exceptions to
4   guidelines. Rather, as alleged herein, the Originators systematically disregarded the
5   stated underwriting guidelines in order to increase the volume of mortgages originated
6   (*see supra* Section VII.D). Further evidence of this fact is found in, among other things,
7   the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the
8   rate at which actual losses outpaced expected losses within the first year after the
9   offerings (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and
10  the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

11      **E.    Untrue Statements Concerning Reduced Documentation**
12          **Programs**

13      372.   The  Alternative  Loan  Trust  2007-OA4  Prospectus  Supplement
14  represented:

15          In connection with the Standard Underwriting Guidelines, Countrywide

16          Home Loans originates or acquires mortgage loans under the Full

17          Documentation Program, the Alternative Documentation Program, the

18          Reduced Documentation Program, the CLUES Plus Documentation

19          Program or the Streamlined Documentation Program.

20

21          The Alternative Documentation Program permits a borrower to provide

22          W-2 forms instead of tax returns covering the most recent two years,

23          permits bank statements in lieu of verification of deposits and permits

24          alternative methods of employment verification.

25

26          Under the Reduced Documentation Program, some underwriting

27          documentation concerning income, employment and asset verification is

28                                      **140**

                           **FIRST AMENDED COMPLAINT**

waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Generally, cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment

141

**FIRST AMENDED COMPLAINT**

1    during the previous twelve-month period. Under the Streamlined

2    Documentation Program, appraisals are obtained only if the loan amount

3    of the loan being refinanced had a Loan-to-Value Ratio at the time of

4    origination in excess of 80% or if the loan amount of the new loan being

5    originated is greater than $650,000. In addition, under the Streamlined

6    Documentation Program, a credit report is obtained but only a limited

7    credit review is conducted, no income or asset verification is required,

8    and telephonic verification of employment is permitted. The maximum

9    Loan-to-Value Ratio under the Streamlined Documentation Program

10    ranges up to 95%.

11  Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-35-36; *see* Alternative

12  Loan Trust 2007-OA4 Registration Statement, February 7, 2006, at S-55.

13       373.  The First Franklin Mortgage Loan Trust 2006-FF4 Registration

14  Statement and the First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective

15  Amendment No. 1 to Registration Statement stated:

16    The no income/no asset verification program, emphasizes the value and

17    adequacy of the mortgaged property as collateral and credit history rather

18    than the borrower's verified income and assets. ***Only borrowers with***

19    ***excellent credit histories may obtain mortgage loans underwritten***

20    ***under no income/no asset verification.***

21  First Franklin Mortgage Loan Trust 2006-FF4 Registration Statement, Aug. 17, 2005,

22  at S-12; First Franklin Mortgage Loan Trust 2006-FF4 Post-Effective Amendment No.

23  1 to Registration Statement, Nov. 2, 2005, at S-12. (Emphasis added.)

24       374.  The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus

25  Supplement stated:

26    . . . under the [No Income Verification] Program, applicants are qualified

27    based on monthly income as stated on the mortgage application and the

28                        142

1    underwriter will determine that the stated income is reasonable and
2    realistic when compared to borrower's employment type, assets and
3    credit history.

4  First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-36; *see* First
5  Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-
6  37.

7       375.    The Fremont Home Loan Trust 2006-D Prospectus Supplement
8  represented:

9    There are three documentation types, Full Documentation ("**Full**
10   **Documentation**"), Easy Documentation ("**Easy Documentation**") and
11   Stated Income ("**Stated Income**"). Fremont's underwriters verify the
12   income of each applicant under various documentation types as follows:
13   under Full Documentation, applicants are generally required to submit
14   verification of stable income for the periods of one to two years
15   preceding the application dependent on credit profile; under Easy
16   Documentation, the borrower is qualified based on verification of
17   adequate cash flow by means of personal or business bank statements;
18   under Stated Income, applicants are qualified based on monthly income
19   as stated on the mortgage application. The income is not verified under
20   the Stated Income program; however, the income stated must be
21   reasonable and customary for the applicant's line of work.

22  Fremont Home Loan Trust 2006-D Prospectus Supplement at 41; *see* Fremont Home
23  Loan Trust 2006-D Prospectus, July 11, 2006, at 78.

24       376.    The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus
25  Supplement stated:

26   GreenPoint acquires or originates many mortgage loans under "limited
27   documentation" or "no documentation" programs. Under limited

28                                    **143**

                          **FIRST AMENDED COMPLAINT**

1    documentation programs, more emphasis is placed on the value and

2    adequacy of the mortgaged property as collateral, credit history and other

3    assets of the borrower, than on verified income of the borrower.

4    Mortgage loans underwritten under this type of program are generally

5    limited to borrowers with credit histories that demonstrate an established

6    ability to repay indebtedness in a timely fashion, and certain credit

7    underwriting documentation concerning income or income verification

8    and/or employment verification is waived. Mortgage loans originated and

9    acquired with limited documentation programs include cash-out

10   refinance loans, super-jumbo mortgage loans and mortgage loans secured

11   by investor-owned properties. Permitted maximum loan-to-value ratios

12   (including secondary financing) under limited documentation programs

13   are generally more restrictive than mortgage loans originated with full

14   documentation requirements. Under no documentation programs,

15   income ratios for the prospective borrower are not calculated. Emphasis

16   is placed on the value and adequacy of the mortgaged property as

17   collateral and the credit history of the prospective borrower, rather than

18   on verified income and assets of the borrower. Documentation

19   concerning income, employment verification and asset verification is not

20   required and income ratios are not calculated. Mortgage loans

21   underwritten under no documentation programs are generally limited to

22   borrowers with favorable credit histories and who satisfy other standards

23   for limited documentation programs.

24   GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-47.

25   377. With respect to Countrywide's documentation programs, the GSR

26   Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:

27

28                                      144

**FIRST AMENDED COMPLAINT**

1    Under the No Income/No Asset Documentation Program, no
2    documentation relating to a prospective borrower's income, employment
3    or assets is required and therefore debt-to-income ratios are not
4    calculated or included in the underwriting analysis, or if the
5    documentation or calculations are included in a mortgage loan file, they
6    are not taken into account for purposes of the underwriting analysis.
7    This program is limited to borrowers with excellent credit histories.
8    Under the No Income/No Asset Documentation Program, the
9    maximum Loan-to-Value Ratio, including secondary financing, ranges up
10    to 95%. Mortgage loans originated under the No Income/No Asset
11    Documentation Program are generally eligible for sale to Fannie Mae or
12    Freddie Mac.

13    GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-64-65; GSR
14    Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-56; *see* GSR Mortgage
15    Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-54.

16    378.    The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement
17    continued:
18    Under the Stated Income/Stated Asset Documentation Program, the
19    mortgage loan application is reviewed to determine that the stated
20    income is reasonable for the borrower's employment and that the stated
21    assets are consistent with the borrower's income.

22    GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-65; GSR Mortgage
23    Loan Trust 2006-OA1 Prospectus Supplement at S-56; *see* GSR Mortgage Loan Trust
24    2007-OA1 Free Writing Prospectus, May 3, 2007, at S-55.

25    379.    With respect to Quicken Loan's documentation programs, the GSR
26    Mortgage Loan Trust 2007-OA1 Prospectus Supplement stated:
27
28                                    **145**
                           **FIRST AMENDED COMPLAINT**

Quicken Loans originates the Secure Advantage product under two documentation programs: full and stated income/verified asset. Quicken Loans' full documentation program requires the verification of liabilities, income and assets. Acceptable documentation for income verification may include, but is not limited to, the borrower's most recent pay stubs, previous two years of W2 forms and a verbal verification of employment.

The borrower's assets are generally verified by obtaining two consecutive months of bank account statements and such statements are reviewed to ensure that sufficient funds are available to meet the asset reserve requirements of the program.

Generally, under the stated income/verified assets program, the borrower states his/her income and provides Quicken Loans with two years of employment history. Quicken Loans verbally verifies the borrower's employment history without confirmation of income. In determining the borrower's ability to meet their monthly obligations, the stated income amount is assessed relative to the borrower's current employment status and tenure. Quicken Loans may also use various online sources to ensure the borrower's stated income is reasonable relative to their employment position. To verify a borrower's assets, Quicken Loans obtains bank statements from the two most recent months and verifies that sufficient funds are available to meet the asset reserve requirements of the program.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-68; *see* GSR Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, May 3, 2007, at S-58.

380.   The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement

FIRST AMENDED COMPLAINT

1    stated:

2           The mortgage loans have been, or will be, originated or re-underwritten

3           upon acquisition, generally in accordance with the Long Beach guidelines

4           under the Long Beach full documentation, limited documentation or

5           stated income documentation residential loan programs.

6

7           Under the full documentation residential loan program, salaried

8           prospective borrowers are generally required to submit their most recent

9           W-2s and pay stubs and self-employed prospective borrowers are

10          generally required to submit their most recent federal income tax return.

11          Under the stated income documentation residential loan program,

12          prospective borrowers are required to state their income on the

13          application but are not required to submit any documents in support.

14          Under the limited documentation residential loan program, salaried

15          prospective borrowers or self-employed prospective borrowers are

16          generally required to submit their most recent six months of personal

17          bank statements or business bank statements. Under the limited

18          documentation and stated income documentation residential loan

19          programs, the prospective borrower's employment and income sources

20          must be stated on the prospective borrower's application. The

21          prospective borrower's income as stated must be reasonable for the

22          related occupation and such determination as to reasonableness is subject

23          to the loan underwriter's discretion. However, the prospective borrower's

24          income as stated on the application is not independently verified.

25          Verification of employment is required for salaried prospective

26          borrowers. Maximum loan-to-value ratios under the stated income

27          documentation residential loan programs are generally lower than those

28                                        147

---

**FIRST AMENDED COMPLAINT**

permitted under the full documentation and limited documentation
residential loan programs. Generally, the same underwriting guidelines
that apply to the full documentation and limited documentation
residential loan programs, except as noted in this section, apply to the
stated income documentation residential loan programs.

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-38.

381.   The RALI Series offerings represented the following underwriting
guidelines set by RFC would apply to every originator contributing loans to the
offering:

General Standards

In most cases, under a traditional "full documentation" program, each
mortgagor will have been required to complete an application designed to
provide to the original lender pertinent credit information concerning the
mortgagor.   As part of the description of the mortgagor's financial
condition, the mortgagor will have furnished information, which may be
supplied solely in the application, with respect to its assets, liabilities,
income (except as described below), credit history, employment history
and personal information, and furnished an authorization to apply for a
credit report that summarizes the borrower's credit history with local
merchants and lenders and any record of bankruptcy.   The mortgagor
may also have been required to authorize verifications of deposits at
financial institutions where the mortgagor had demand [f]or savings
accounts.   In the case of investment properties and two- to four-unit
dwellings, income derived from the mortgaged property may have been
considered for underwriting purposes, in addition to the income of the
mortgagor from other sources.   With respect to mortgaged property

148

---

**FIRST AMENDED COMPLAINT**

consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated, or verified, in connection with the loan application.

If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program. Such program permits some mortgage loans to be refinanced with only limited verification or updating of the underwriting information that was obtained at the time that the original mortgage loan was originated. For example, a new appraisal of a mortgaged property may not be required if the related original mortgage loan was originated up to 24 months prior to the refinancing. In addition, a mortgagor's income may not be verified, although continued employment is required to be verified. In certain circumstances, a mortgagor may be permitted to borrow up to 100% of the outstanding principal amount of the original mortgage loan. Each mortgage loan underwritten pursuant to this program will be treated as having been underwritten pursuant to the same underwriting documentation program as the mortgage loan that it refinanced, including for purposes of the disclosure in the accompanying prospectus supplement.

If specified in the accompanying prospectus supplement, some mortgage loans may have been originated under "limited documentation," "stated documentation" or "no documentation" programs that require less

149

**FIRST AMENDED COMPLAINT**

1        documentation and verification than do traditional "full documentation"

2        programs. Under a limited documentation, stated documentation or no

3        documentation program, minimal investigation into the mortgagor's

4        credit history and income profile is undertaken by the originator and the

5        underwriting may be based primarily or entirely on an appraisal of the

6        mortgaged property and the LTV ratio at origination.

7  RALI Series 2007-QH6 Trust Prospectus, April 9, 2007 at 18; RALI Series 2006-

8  QO10 Trust Prospectus, Dec. 6, 2006, at 12-13; RALI Series 2007-QH2 Trust

9  Prospectus, Dec. 6, 2006, at 12-13; RALI Series 2007-QH3 Trust Prospectus, Dec. 6,

10  2006, at 12-13; RALI Series 2007-QH5 Trust Prospectus, April 9, 2007, at 18; RALI

11  Series 2006-QO6 Trust Prospectus, Mar. 3, 2006, at 12-13; *see also* RALI Series 2007-

12  QH6 Trust Registration Statement, Feb. 12, 2007, at 18; RALI Series 2006-QO10

13  Trust Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2007-QH2 Trust

14  Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2007-QH3 Trust

15  Registration Statement, Jan. 23, 2006, at 13-14; RALI Series 2007-QH5 Trust

16  Registration Statement, Feb. 12, 2007, at 18; RALI Series 2006-QO6 Trust

17  Registration Statement, Jan. 23, 2006, at 13-14.

18       382.  UNTRUE STATEMENTS AND OMITTED INFORMATION: The

19  preceding statements were material at the time they were made, because the quality of

20  the loans in the mortgage pool directly affects the riskiness of the RMBS investment,

21  and the quality of the loans is dependent upon the underwriting process employed.

22  The preceding statements were untrue at the time they were made, because regardless

23  of the documentation program purportedly employed, the Originators systematically

24  disregarded their underwriting guidelines in order to increase the volume of mortgages

25  originated, emphasizing quantity of loans rather than the quality of those loans (*see*

26  *supra* Section VII.D). Further evidence of this fact is found in, among other things, the

27  surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the

28                 **150**

huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse
of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged
in high OTD lending (*see supra* Table 6).

### F.   Untrue Statements Concerning Loan-to-Value Ratios

383.   The Alternative Loan Trust 2007-OA4 Prospectus Supplement stated:

Countrywide Home Loans' Standard Underwriting Guidelines for
mortgage loans with non-conforming original principal balances generally
allow Loan-to-Value Ratios at origination of up to 95% for purchase
money or rate and term refinance mortgage loans with original principal
balances of up to $400,000, up to 90% for mortgage loans with original
principal balances of up to $650,000, up to 75% for mortgage loans with
original principal balances of up to $1,000,000, up to 65% for mortgage
loans with original principal balances of up to $1,500,000, and up to 60%
for mortgage loans with original principal balances of up to $2,000,000.

For cash-out refinance mortgage loans, Countrywide Home Loans'
Standard Underwriting Guidelines for mortgage loans with non-
conforming original principal balances generally allow Loan-to-Value
Ratios at origination of up to 75% and original principal balances ranging
up to $650,000. The maximum "cash-out" amount permitted is $200,000
and is based in part on the original Loan-to-Value Ratio of the related
mortgage loan. As used in this prospectus supplement, a refinance
mortgage loan is classified as a cash-out refinance mortgage loan by
Countrywide Home Loans if the borrower retains an amount greater than
the lesser of 2% of the entire amount of the proceeds from the
refinancing of the existing loan, or $2,000.

**151**

Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-35. At S-36, the Prospectus Supplement also included similar descriptions of the maximum loan-to-value ratios permitted under Countrywide's "Expanded Underwriting Guidelines."

384. The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement represented:

152

**FIRST AMENDED COMPLAINT**

Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio. In general, higher credit risk mortgage loans are graded in categories which permit higher Debt Ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however these loan programs establish lower maximum loan-to-value ratios and lower maximum loan amounts for loans graded in such categories.

Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-37; see Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-38.

385.   The Fremont Home Loan Trust 2006-D Prospectus Supplement stated: "A+." Under the "A+" category, an applicant must have no 30-day late mortgage payments within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 100% with a minimum Credit Score of 600. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics or credit scores below 600.

"A." Under the "A" category, an applicant must have not more than one 30-day late mortgage payment within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is

153

100% with a minimum Credit Score of 600. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics or credit scores below 600.

"A-." Under the "A-" category, an applicant must have not more than three 30-day late mortgage payments within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90% with a minimum Credit Score of 550. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics or credit scores below 550.

"B." Under the "B" category, an applicant must have not more than one 60-day late mortgage payment within the last 12 months and it must be at least 18 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90% with a Credit Score of 550. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, properties with rural characteristics or credit scores under 550.

"C." Under the "C" category, an applicant must not be more than 90 days delinquent with respect to its current mortgage payment and it must be at least 12 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value

154

**FIRST AMENDED COMPLAINT**

ratio is 85% with a minimum Credit Score of 580. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"C-." Under the "C-" category, an applicant must not be more than 150 days delinquent with respect to its current mortgage payment and it must not be subject of a Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value ratio is 70% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"D." Under the "D" category, an applicant must not be more than 180 days delinquent with respect to its current mortgage payment. Any Chapter 7 or Chapter 13 bankruptcy proceedings and/or foreclosure actions must be paid in connection with closing. The maximum permitted loan-to-value ratio is 65% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced to 60% if the property is currently subject to foreclosure proceedings.

Fremont Home Loan Trust 2006-D Prospectus Supplement at 43-44; *see* Fremont Home Loan Trust 2006-D Free Writing Prospectus, Oct. 24, 2006, at 43-44.

386.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement represented:

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally

**155**

---

**FIRST AMENDED COMPLAINT**

allow Loan-to-Value Ratios at origination of up to 95% for purchase

money or rate and term refinance mortgage loans with original principal

balances of up to $400,000, up to 90% for mortgage loans with original

principal balances of up to $650,000, up to 75% for mortgage loans with

original principal balances of up to $1,000,000, up to 65% for mortgage

loans with original principal balances of up to $1,500,000, and up to 60%

for mortgage loans with original principal balances of up to $2,000,000.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-62; *see* GSR
Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, Apr. 26, 2007, at S-51.

387.   The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement
continued:

Countrywide Home Loans' Expanded Underwriting Guidelines for

mortgage loans with non-conforming original principal balances generally

allow Loan-to-Value Ratios at origination of up to 95% for purchase

money or rate and term refinance mortgage loans with original principal

balances of up to $400,000, up to 90% for mortgage loans with original

principal balances of up to $650,000, up to 80% for mortgage loans with

original principal balances of up to $1,000,000, up to 75% for mortgage

loans with original principal balances of up to $1,500,000 and up to 70%

for mortgage loans with original principal balances of up to $3,000,000.

Under certain circumstances, however, Countrywide Home Loans'

Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up

to 100% for purchase money mortgage loans with original principal

balances of up to $375,000.

GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-63; *see* GSR
Mortgage Loan Trust 2007-OA1 Free Writing Prospectus, Apr. 26, 2007, at S-53.

388.   The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement

156

**FIRST AMENDED COMPLAINT**

1    stated:

2       The Long Beach underwriting guidelines permit first lien mortgage loans

3       with loan-to-value ratios at origination of up to 100%, or 80% if at the

4       time of origination of the first lien mortgage loan, the sponsor also

5       originated a second lien mortgage loan. The Long Beach second lien

6       mortgage loan underwriting guidelines permit second lien mortgage loans

7       with a combined loan-to-value ratios at origination of up to 100%. The

8       maximum allowable loan-to-value ratio varies based upon the residential

9       loan program, income documentation, property type, creditworthiness

10      and debt service-to-income ratio of the prospective borrower and the

11      overall risks associated with the loan decision. The maximum combined

12      loan-to-value ratio, including any second lien mortgage subordinate to the

13      sponsor's first lien mortgage, is generally 100% under the "Premium A,"

14      "A," "A-," "B+" and "B" risk categories, and 95% under the "C" risk

15      category. Noninstitutional (private party) second lien loans are not

16      permitted.

17 Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-37.

18      389.   UNTRUE STATEMENTS AND OMITTED INFORMATION: The

19 preceding statements were material at the time they were made because the riskiness of

20 the RMBS investment is directly dependent on the quality of the underwriting process

21 and adequate assessment and limits on loan-to-value ratios (in addition to accurate

22 appraisals) is key to that process. The preceding statements were untrue at the time

23 they were made because the Originators did not adhere to the maximum loan-to-value

24 ratios as represented in the Offering Documents, encouraged inflated appraisals and

25 frequently granted loans with high loan-to-value ratios with no meaningful assessment

26 of the borrower's ability to repay the loan based on the borrower's credit profile (*see*

27 *supra* Section VII.D). Further evidence of this fact is found in, among other things, the

28                              **157**

1  surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the

2  huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse

3  of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged

4  in high OTD lending (*see supra* Table 6).

5  **G.   Untrue Statements Concerning Credit Enhancement**

6  390.   The Alternative Loan Trust 2007-OA4 Prospectus Supplement

7  represented:

8  > Credit enhancement provides limited protection to holders of certain

9  > certificates against shortfalls in payments received on the mortgage loans.

10 > This transaction employs the following forms of credit enhancement

11 > . . . .

12 Alternative Loan Trust 2007-OA4 Prospectus Supplement at S-12; *see* Alternative Loan

13 Trust 2007-OA4 Amended Registration Statement, Mar. 6, 2006, at S-14-15.

14 391.   The First Franklin Mortgage Loan Trust 2006-FF4 Prospectus

15 Supplement represented:

16 > The credit enhancement features described in this prospectus supplement

17 > are intended to enhance the likelihood that holders of the Class A

18 > certificates, and to a limited extent, the holders of the Class M-1, Class

19 > M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class

20 > M-8 certificates and, to a lesser degree, the holders of the Class B-1 and

21 > Class B-2 certificates, will receive regular payments of interest and

22 > principal.

23 First Franklin Mortgage Loan Trust 2006-FF4 Prospectus Supplement at S-19; *see* First

24 Franklin Mortgage Loan Trust 2006-FF4 Free Writing Prospectus, Mar. 3, 2006, at S-

25 20.

26 392.   The Fremont Home Loan Trust 2006-D Prospectus stated:

27

28                                          **158**

**FIRST AMENDED COMPLAINT**

1    The amount of any applicable credit enhancement supporting one or

2    more classes of offered securities, including the subordination of one or

3    more classes of securities, will be determined on the basis of criteria

4    established by each rating agency rating such classes of securities based

5    on an assumed level of defaults, delinquencies, other losses or other

6    factors. We cannot assure you, however, that the loss experience on the

7    related assets will not exceed these assumed levels.

8    Fremont Home Loan Trust 2006-D Prospectus, July 11, 2006, at 17; *see also* Fremont

9    Home Loan Trust 2006-D Registration Statement, Mar. 17, 2006, at 17.

10       393. The GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus

11   Supplement stated:

12       The credit enhancement features described in this prospectus supplement

13       are intended to enhance the likelihood that holders of the class A

14       certificates, and to a limited extent, the holders of the class M-1, class M-

15       2, class M-3, class M-4, class M-5, class M-6, class M-7 and class M-8

16       certificates, will receive regular payments of interest and principal.

17   GreenPoint Mortgage Funding Trust 2006-OH1 Prospectus Supplement at S-26-27.

18       394. The GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement

19   stated:

20       The credit enhancement features described in this prospectus supplement

21       are intended to enhance the likelihood that holders of the senior

22       certificates, and to a limited extent, the holders of the subordinate

23       certificates, will receive regular payments of interest and principal.

24   GSR Mortgage Loan Trust 2007-OA1 Prospectus Supplement at S-32; *see* GSR

25   Mortgage Loan Trust 2006-OA1 Prospectus Supplement at S-28; GSR Mortgage Loan

26   Trust 2007-OA1 Free Writing Prospectus, Apr. 27, 2007, at S-25.

27       395. The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement

28                                         159

---

**FIRST AMENDED COMPLAINT**

1   stated:

2     The credit enhancement features described in the summary of this

3     prospectus supplement are intended to enhance the likelihood that

4     holders of the Class A Certificates, and to a limited extent, the holders of

5     the Mezzanine Certificates and the Class B Certificates, will receive

6     regular payments of interest and principal.

7   Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-19; *see* Long

8   Beach Mortgage Loan Trust 2006-11 Registration Statement, Jan. 24, 2006, at the

9   "Risk Factors" section.

10     396.   The RALI Series offerings represented the following underwriting

11   guidelines set by RFC would apply to every originator contributing loans to the

12   offering:

13     The credit enhancement for the benefit of the offered certificates

14     consists of:

15

16     Excess Cash Flow.  Because more interest with respect to the mortgage

17     loans is payable by the mortgagors than is expected to be necessary to

18     pay the interest on the Class A, Class M and Class B Certificates each

19     month and related expenses, there may be excess cash flow.  Some of this

20     excess cash flow may be used to protect the offered certificates against

21     some realized losses by making an additional payment of principal up to

22     the amount of the realized losses.

23   RALI Series 2007-QH6 Trust Prospectus Supplement at S-15; *see* RALI Series 2006-

24   QO10 Trust Prospectus Supplement at S-14; RALI Series 2007-QH2 Trust Prospectus

25   Supplement at S-13; RALI Series 2007-QH3 Trust Prospectus Supplement at S-13;

26   RALI Series 2007-QH5 Trust Prospectus Supplement at S-15; RALI Series 2006-QO6

27   Trust Prospectus Supplement at S-13.

28   **160**

**FIRST AMENDED COMPLAINT**

397.   UNTRUE STATEMENTS AND OMITTED INFORMATION:   The preceding statements were material at the time they were made, because U.S. Central and WesCorp nearly always purchased the highest rated tranches of the RMBS, and those highly rated tranches relied on the credit enhancement, which purportedly afforded protection against financial loss.   The preceding statements were untrue at the time they were made, because, due to the Originators' systematic disregard of underwriting standards, the mortgages in the pools were fatally impaired at the outset and destined to fail (*see supra* Section VII.D).   This rendered the protection allegedly afforded by the credit enhancement in the highest tranches illusory.   Further evidence of the Originators' pervasive disregard of underwriting standards is found in the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5); the huge discrepancy between expected and actual losses (*see supra* Figure 2); the collapse of the credit ratings (*see supra* Table 4); and the Originators' high OTD lending (*see supra* Table 6).

## IX.   THE CLAIMS ARE TIMELY

398.   For actions brought by the NCUA Board as Liquidating Agent, the FCU Act extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent.   *See* 12 U.S.C. § 1787(b)(14)(B)(i).

399.   The NCUA Board placed U.S. Central and WesCorp under conservatorship and appointed itself as conservator on March 20, 2009.   On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into liquidation and appointed itself as Liquidating Agent.

400.   Actions brought under Sections 11 and 12(a)(2) of the Securities Act must be:

brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the

**161**

FIRST AMENDED COMPLAINT

1    exercise of reasonable diligence. . . .   In no event shall any such action be

2    brought to enforce a liability created under section 77k or 77*l*(a)(1) of this

3    title more than three years after the security was bona fide offered to the

4    public, or under section 77*l*(a)(2) of this title more than three years after

5    the sale.

6    15 U.S.C. § 77m.

7        401.   Actions brought under section 17-12a509 of the Kansas Uniform

8    Securities Act must be brought within "within the earlier of two years after discovery

9    of the facts constituting the violation or five years after the violation."  Kan. Stat. Ann.

10   § 17-12a509(j).

11       402.   Actions brought under section 25501 of the California Corporate

12   Securities Law must be brought within "five years after the act or transaction

13   constituting the violation or the expiration of two years after the discovery by the

14   plaintiff of the facts constituting the violation, whichever shall first expire."  Cal. Corp.

15   Code § 25506(b).

16       403.   As the Federal Reserve Board noted in November 2008, the

17   "[d]eteriorating lending standards" and "the surge in early payment defaults suggests

18   that underwriting . . . deteriorated on dimensions that were less readily apparent to

19   investors."  Mayer, *The Rise in Mortgage Defaults* at 15-16; *see also* FSOC Risk Retention

20   Report at 9.

21       404.   The FSOC explained that the origination and securitization process

22   contains inherent "information asymmetries" that put investors at a disadvantage

23   regarding critical information concerning the quality and performance of RMBS.  The

24   FSOC Risk Retention Report described the information disadvantage for investors of

25   RMBS:

26       One important informational friction highlighted during the recent

27       financial crisis has aspects of a "lemons" problem that exists between the

28                                    **162**

1    issuer and investor. An originator has more information about the ability
2    of a borrower to repay than an investor, because the originator is the
3    party making the loan. Because the investor is several steps removed
4    from the borrower, the investor may receive less robust loan
5    performance information. Additionally, the large number of assets and
6    the disclosures provided to investors may not include sufficient
7    information on the quality of the underlying financial assets for investors
8    to undertake full due diligence on each asset that backs the security.

9    FSOC Risk Retention Report at 9 (footnote omitted).

10    405.    Accordingly, U.S. Central and WesCorp did not discover and could not
11    have discovered the untrue statements and/or misleading omissions in the Offering
12    Documents more than one year prior to March 20, 2009, the date on which the
13    NCUA Board placed U.S. Central and WesCorp into conservatorship.

14    406.    With respect to those RMBS purchases for which the NCUA Board
15    asserts claims under Section 11 of the Securities Act (Claims One through Six), the
16    earliest date they were bona fide offered to the public was March 27, 2006, or not
17    more than three years prior to March 20, 2009. Accordingly, the NCUA Board's
18    Section 11 claims are not time-barred.

19    407.    With respect to those RMBS purchases for which the NCUA Board
20    asserts claims under Section 12(a)(2) (Claim Seven), the earliest sale was December 14,
21    2006, or not more than three years prior to March 20, 2009. Accordingly, the NCUA
22    Board's Section 12(a)(2) claims are not time-barred.

23    408.    With respect to those RMBS purchases for which the NCUA Board
24    asserts claims under state law (Claims Eight and Nine), the earliest purchase
25    date/offering date with respect to those claims was  March 3, 2006, or not more than
26    five years prior to March 20, 2009. Accordingly, the NCUA Board's state law claims
27    are not time-barred.

28                                **163**

1    409.   In addition, NCUA entered into a tolling agreement with Goldman Sachs

2    for the period between August 19, 2010 until May 31, 2011.

3    **X.    NUMEROUS CLAIMS ARE INDEPENDENTLY TIMELY BY**

4    **VIRTUE OF *AMERICAN PIPE***

5    410.   U.S. Central, WesCorp, and/or the NCUA Board as their Liquidating

6    Agent are or were members of putative classes asserting claims on their behalf for

7    certificates in the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-

8    OA1, RALI Series 2006-QO6, RALI Series 2006-QO10, RALI Series 2007-QH2,

9    RALI Series 2007-QH3, RALI Series 2007-QH5, and RALI Series 2007-QH6

10   Offerings.   Accordingly, the NCUA Board's claims relating to those offerings are

11   subject to legal tolling of the statute of limitations and statute of repose under the

12   doctrine announced in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)

13   ("American Pipe") and its progeny.   *See* Tables 10, 11 (attached as Appendix to

14   Complaint).

15   411.   GSR Mortgage Loan Trust 2007-OA1 offering:   *American Pipe* tolling

16   applies to this offering from December 11, 2008 through January 28, 2010.   The

17   Prospectus and Prospectus Supplement for this offering issued on February 13, 2007

18   and May 7, 2007, respectively.   On May 4, 2007, WesCorp purchased the 1A2 and

19   2AM tranches of this offering from Goldman Sachs.   The case which supplies this

20   tolling is Complaint, *NECA-IBEW v. Goldman*, No. 08-10783 (S.D.N.Y filed Dec. 11,

21   2008).   The named plaintiff, NECA-IBEW, asserted Section 11 claims against

22   Goldman Sachs in its role as RMBS underwriter for misstatements and omissions in

23   RMBS offering documents, such as the supposed compliance with stated underwriting

24   guidelines.   NECA-IBEW purported to represent a class of all individuals who

25   purchased RMBS certificates in 2007 and 2008 for which GS Mortgage Securities

26   Corporation served as the depositor.   That purported class included purchasers of the

27   GSR Mortgage Loan Trust 2007-OA1 offering.   *See id.* ¶¶ 1, 13.   NECA-IBEW did not

28                                          **164**

**FIRST AMENDED COMPLAINT**

1    disclose which certificates it had purchased until February 9, 2009, when it disclosed

2    that it had purchased certificates in the GSAA Home Equity Trust 2007-5 and GSAA

3    Home Equity Trust 2007-10 offerings. *See id.* ¶ 10; *NECA-IBEW*, Doc. 5-2 at 4, No.

4    08-10783 (S.D.N.Y. Feb. 9, 2009).

5       412. <u>RALI Series 2006-QO6 offering</u>: *American Pipe* tolling applies to the

6    RALI Series 2006-QO6 offering from September 22, 2008 until January 18, 2011. The

7    Prospectus and Prospectus Supplement for this offering issued on March 3, 2006 and

8    June 28, 2006, respectively. On October 11, 2006, WesCorp purchased the A3 tranche

9    of this offering from Credit Suisse First Boston. The case which supplies this tolling is

10    Complaint, *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781

11    (S.D.N.Y. filed Sept. 22, 2008) ("N.J. Carpenters Compl."). The named plaintiff, New

12    Jersey Carpenters Health Fund, asserted Section 11 and Section 12 claims against

13    Goldman Sachs in its role as RMBS underwriter for misstatements and omissions in

14    RMBS offering documents, such as the supposed compliance with stated underwriting

15    guidelines. The Health Fund purported to represent a class of all individuals who

16    purchased certificates from several RALI Series offerings, including RALI Series 2006-

17    QO6 and RALI Series-QO10. *See id.* ¶ 1. The Health Fund did not disclose which

18    certificates it had purchased until January 12, 2009, when it disclosed that it had

19    purchased certificates in the RALI Series 2006-QO7 offering. *See id.* ¶ 7; *N.J.*

20    *Carpenters*, Doc. 10-2 at 4 (S.D.N.Y. Jan. 12, 2009); *see also* Consol. First Am. Compl.,

21    *N.J. Carpenters*, ¶¶ 19-20 (S.D.N.Y. filed May 18, 2009) ("N.J. Carpenters Am.

22    Compl.") (adding new named plaintiffs and disclosing that the named plaintiffs group

23    had purchased the following certificates: RALI Series 2006-QO7, Class M1; RALI

24    Series 2007-QS1, Class 1A1; RALI Series 2007-QS1, Class 2A10; RALI Series 2007-

25    QH4, Class A1; and RALI Series 2007-QO4, Class A1A). On July 30, 2010, the

26    Orange County Employees' Retirement System ("OCERS") and the Iowa Public

27    Employees' Retirement System ("IPERS") moved to intervene and disclosed that they

28                                   **165**

1   had purchased certificates in the RALI Series 2006-QO6 and RALI Series 2006-QO10

2   offerings. *See N.J. Carpenters*, Doc. 100-1 at 3 and Doc. 100-2 at 3 (S.D.N.Y. July 30,

3   2010); *see also N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781, 2010

4   WL 5222127 (S.D.N.Y. Dec. 22, 2010) (granting motion to intervene).

5          413.   RALI Series 2006-QO10 offering:   *American Pipe* tolling applies to the

6   RALI Series 2006-QO10 offering from September 22, 2008 until January 18, 2011.

7   The Prospectus and Prospectus Supplement for this offering issued on December 6,

8   2006 and December 27, 2006.   On December 14, 2006, WesCorp purchased the A3

9   tranche of this offering from Goldman Sachs.   The case which supplies this tolling is

10   Complaint, *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781

11   (S.D.N.Y. filed Sept. 22, 2008).   The facts regarding this case from paragraph 412 are

12   incorporated here.

13          414.   RALI Series 2007-QH2 offering:   *American Pipe* tolling applies to the

14   RALI Series 2007-QH2 offering from May 18, 2009 until March 31, 2010.   The

15   Prospectus and Prospectus Supplement for this offering issued on December 6, 2006

16   and February 23, 2007, respectively.   On February 16, 2007, WesCorp purchased the

17   A3 tranche of this offering from Goldman Sachs.   The case which supplies this tolling

18   is Consolidated First Amended Complaint, *New Jersey Carpenters Health Fund v.*

19   *Residential Capital, LLC*, No. 08-8781 (S.D.N.Y. filed May 18, 2009).   The named

20   plaintiffs asserted Section 11 and Section 12 claims against Goldman Sachs in its role

21   as RMBS underwriter for misstatements and omissions in RMBS offering documents,

22   such as the supposed compliance with stated underwriting guidelines.   The named

23   plaintiffs purported to represent a class of all individuals who purchased certificates

24   from RMBS traceable to two shelf registration statements.   *See id.* ¶ 1.   That class

25   included purchasers of certificates from the RALI Series 2007-QH2, 2007-QH3, 2007-

26   QH5, and 2007-QH6 offerings.   *See id.* ¶¶ 27-28.   The named plaintiffs had purchased

27   the following certificates: RALI Series 2006-QO7, Class M1; RALI Series 2007-QS1,

28                                        166

---

**FIRST AMENDED COMPLAINT**

1   Class 1A1; RALI Series 2007-QS1, Class 2A10; RALI Series 2007-QH4, Class A1; and

2   RALI Series 2007-QO4, Class A1A. *See id.* ¶¶ 19-20.

3       415.   RALI Series 2007-QH3 offering: *American Pipe* tolling applies to the

4   RALI Series 2007-QH3 offering from May 18, 2009 until March 31, 2010.   The

5   Prospectus and Prospectus Supplement for this offering issued on December 6, 2006

6   and March 28, 2007, respectively.   On March 28, 2007, WesCorp purchased the A2

7   and A3 tranches of this offering from Goldman Sachs.   The case which supplies this

8   tolling is *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Consolidated First

9   Amended Complaint, No. 08-8781 (S.D.N.Y. May 18, 2009).   The facts regarding this

10   case from paragraph 414 are incorporated here.

11       416.   RALI Series 2007-QH5 offering: *American Pipe* tolling applies to the

12   RALI Series 2007-QH5 offering from May 18, 2009 until March 31, 2010.   The

13   Prospectus and Prospectus Supplement for this offering issued on April 9, 2007 and

14   May 29, 2007.   On May 24, 2007 and May 30, 2007, WesCorp purchased the AI1, AI2,

15   and AI3 tranches of this offering from Goldman Sachs.   The case which supplies this

16   tolling is *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Consolidated First

17   Amended Complaint, No. 08-8781 (S.D.N.Y. May 18, 2009).   The facts regarding this

18   case from paragraph 414 are incorporated here.

19       417.   RALI Series 2007-QH6 offering: *American Pipe* tolling applies to the

20   RALI Series 2007-QH6 offering from May 18, 2009 until March 31, 2010.   The

21   Prospectus and Prospectus Supplement for this offering issued on April 9, 2007 and

22   June 27, 2007.   On June 21, 2007, WesCorp purchased the A2 and A3 tranches of this

23   offering from Goldman Sachs.   The case which supplies this tolling is *New Jersey

24   Carpenters Health Fund v. Residential Capital, LLC*, Consolidated First Amended

25   Complaint, No. 08-8781 (S.D.N.Y. May 18, 2009).   The facts regarding this case from

26   paragraph 414 are incorporated here.

27

28                                    **167**

                            **FIRST AMENDED COMPLAINT**

1    418.  <u>Alternative Loan Trust 2007-OA4 offering</u>: *American Pipe* tolling applies
2  to this offering from November 14, 2007 through January 6, 2010.  The Prospectus
3  and Prospectus Supplement for this offering issued on November 14, 2006 and March
4  28, 2007.  On March 20, 2007, WesCorp purchased the A3 tranche of this offering
5  from Goldman Sachs.  The cases which supply this tolling are Complaint, *Wash. State*
6  *Plumbing & Pipefitting Pension Trust v. Countrywide Fin. Corp.*, No. BC392571 (CA Sup. Ct.,
7  L.A. Cnty. filed June 12, 2008) ("WSPPPT Compl."), and Complaint, *Luther v.*
8  *Countrywide Home Loans Servicing LP*, No. BC380698 (CA Sup. Ct., L.A. Cnty. filed Nov.
9  14, 2007) ("Luther Compl.").   In both of those suits, the named plaintiff asserted
10  Section 11 and Section 12 claims against Goldman Sachs in its role as RMBS
11  underwriter for misstatements and omissions in RMBS offering documents, such as
12  the supposed compliance with stated underwriting guidelines.  The named plaintiffs
13  purported to represent purchasers of RMBS certificates traceable to certain shelf
14  registration statements issued by CWALT, a subsidiary of Countrywide.  That class
15  included purchasers of certificates from the Alternative Loan Trust 2007-OA4
16  offering.   In their initial complaints, the named plaintiffs did not disclose which
17  certificates they had purchased.  *See* WSPPPT Compl. ¶¶ 1, 13, 37; *Luther* Compl. ¶¶ 1,
18  12, 14.

19    419.  *American Pipe* and the tolling agreement between the NCUA Board and
20  Goldman Sachs independently make timely all of the NCUA Board's Section 11 and
21  Section 12 claims.  *See* Tables 10, 11 (attached as Appendix to Complaint).

22  **XI.    CLAIMS FOR RELIEF**

23  **FIRST CLAIM FOR RELIEF**

24  Section 11 of the Securities Act of 1933

25  **(Alternative Loan Trust 2007-OA4)**

26    420.  The NCUA Board realleges paragraphs 1 through 419 of this Complaint,
27  as though fully set forth here, except those paragraphs specific to offerings other than

28  168

**FIRST AMENDED COMPLAINT**

1 the Alternative Loan Trust 2007-OA4 Offering.

2   421. The NCUA Board brings this cause of action pursuant to Section 11 of

3 the Securities Act, with respect to WesCorp's purchases of the Alternative Loan Trust

4 2007-OA4 certificates against Defendant Goldman Sachs as the underwriter.

5   422. The NCUA Board expressly disclaims and disavows any allegation that

6 could be construed as alleging fraud.

7   423. At the time the registration statement became effective, it (including the

8 prospectus and any prospectus supplements) contained untrue statements and omitted

9 facts that were necessary to make the statements made not misleading, as alleged

10 above.

11   424. The untrue statements and omitted facts were material because a

12 reasonably prudent investor deciding whether to purchase the certificates would have

13 viewed them as important and as substantially altering the total mix of information

14 available, as alleged above.

15   425. WesCorp purchased the certificates pursuant to and traceable to a

16 defective registration statement, as alleged above.

17   426. At the time WesCorp purchased the certificates, it did not know of the

18 untrue statements and omissions contained in the registration statement.

19   427. Defendant Goldman Sachs's conduct as alleged above violated Section

20 11.

21   428. WesCorp and Plaintiff sustained damages as a result of Defendant

22 Goldman Sachs's violations of Section 11.

23   WHEREFORE, the NCUA Board requests the Court to enter judgment in its

24 favor against Defendant Goldman Sachs awarding all damages, in an amount to be

25 proven at trial, costs, and such other relief as the Court deems appropriate and just.

26       **SECOND CLAIM FOR RELIEF**

27

28          **169**

**FIRST AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Section 11 of the Securities Act of 1933

### (Fremont Home Loan Trust 2006-D)

429.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific specific to offerings other than the Fremont Home Loan Trust 2006-D Offering.

430.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the Fremont Home Loan Trust 2006-D certificates against Defendant Goldman Sachs as the underwriter.

431.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

432.   At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

433.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

434.   U.S. Central purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

435.   At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

436.   Defendant Goldman Sachs's conduct as alleged above violated Section 11.

437.   U.S. Central and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Section 11.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its

170

1  favor against Defendant Goldman Sachs, awarding all damages, in an amount to be

2  proven at trial, costs, and such other relief as the Court deems appropriate and just.

3  ### THIRD CLAIM FOR RELIEF

4  ### Section 11 of the Securities Act of 1933

5  ### (GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1,

6  ### GreenPoint Mortgage Funding Trust 2006-OH1)

7  438.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint,

8  as though fully set forth here, except those paragraphs specific to the Issuer

9  Defendants other than GS Mortgage Securities Corp., or specific to offerings other

10  than the GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1,

11  and GreenPoint Mortgage Funding Trust 2006-OH1 Offerings.

12  439.   The NCUA Board brings this cause of action pursuant to Section 11 of

13  the Securities Act, with respect to WesCorp's purchases of the GSR Mortgage Loan

14  Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1, and GreenPoint Mortgage

15  Funding Trust 2006-OH1 certificates against Defendant Goldman Sachs, as the

16  underwriter, and against Defendant GS Mortgage Securities Corp., as the issuer.

17  440.   The NCUA Board expressly disclaims and disavows any allegation that

18  could be construed as alleging fraud.

19  441.   At the time the registration statement became effective, it (including the

20  prospectus and any prospectus supplements) contained untrue statements and omitted

21  facts that were necessary to make the statements made not misleading, as alleged

22  above.

23  442.   The untrue statements and omitted facts were material because a

24  reasonably prudent investor deciding whether to purchase the certificates would have

25  viewed them as important and as substantially altering the total mix of information

26  available, as alleged above.

27  443.   WesCorp purchased the certificates pursuant to and traceable to a

28  **171**

---

**FIRST AMENDED COMPLAINT**

1    defective registration statement, as alleged above.

2         444.   At the time WesCorp purchased the certificates, it did not know of the

3    untrue statements and omissions contained in the registration statement.

4         445.   Defendant Goldman Sachs's and Defendant GS Mortgage Securities

5    Corp.'s conduct as alleged above violated Section 11.

6         446.   WesCorp and Plaintiff sustained damages as a result of Defendant

7    Goldman Sachs's and Defendant GS Mortgage Securities Corp.'s violations of Section

8    11.

9         WHEREFORE, the NCUA Board requests the Court to enter judgment in its

10   favor against Defendant Goldman Sachs and Defendant GS Mortgage Securities

11   Corp., jointly and severally, awarding all damages, in an amount to be proven at trial,

12   costs, and such other relief as the Court deems appropriate and just.

13                   **FOURTH CLAIM FOR RELIEF**

14              **Section 11 of the Securities Act of 1933**

15         **(First Franklin Mortgage Loan Trust 2006-FF4)**

16        447.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint,

17   as though fully set forth here, except those paragraphs specific to the Issuer

18   Defendants other than GS Mortgage Securities Corp., or specific to offerings other

19   than the First Franklin Mortgage Loan Trust 2006-FF4 Offering.

20        448.   The NCUA Board brings this cause of action pursuant to Section 11 of

21   the Securities Act, with respect to U.S. Central's purchase of the First Franklin

22   Mortgage Loan Trust 2006-FF4 certificate against Defendant Goldman Sachs, as the

23   underwriter, and against Defendant GS Mortgage Securities Corp., as the issuer.

24        449.   The NCUA Board expressly disclaims and disavows any allegation that

25   could be construed as alleging fraud.

26        450.   At the time the registration statement became effective, it (including the

27   prospectus and any prospectus supplements) contained untrue statements and omitted

28                          172

1  facts that were necessary to make the statements made not misleading, as alleged

2  above.

3      451.   The untrue statements and omitted facts were material because a

4  reasonably prudent investor deciding whether to purchase the certificates would have

5  viewed them as important and as substantially altering the total mix of information

6  available, as alleged above.

7      452.   U.S. Central purchased the certificate pursuant to and traceable to a

8  defective registration statement, as alleged above.

9      453.   At the time U.S. Central purchased the certificate, it did not know of the

10  untrue statements and omissions contained in the registration statement.

11      454.   Defendant Goldman Sachs's and Defendant GS Mortgage Securities

12  Corp.'s conduct as alleged above violated Section 11.

13      455.   U.S. Central and Plaintiff sustained damages as a result of Defendant

14  Goldman Sachs's and Defendant GS Mortgage Securities Corp.'s violations of Section

15  11.

16      WHEREFORE, the NCUA Board requests the Court to enter judgment in its

17  favor against Defendant Goldman Sachs and Defendant GS Mortgage Securities

18  Corp., jointly and severally, awarding all damages, in an amount to be proven at trial,

19  costs, and such other relief as the Court deems appropriate and just.

20                          **FIFTH CLAIM FOR RELIEF**

21                  **Section 11 of the Securities Act of 1933**

22                  **(Long Beach Mortgage Loan Trust 2006-11)**

23      456.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint,

24  as though fully set forth here, except those paragraphs specific to offerings other than

25  the Long Beach Mortgage Loan Trust 2006-11 Offering.

26      457.   The NCUA Board brings this cause of action pursuant to Section 11 of

27  the Securities Act, with respect to U.S. Central's purchases of the Long Beach

28                                  **173**

1   Mortgage Loan Trust 2006-11 certificates against Defendant Goldman Sachs as the
2   underwriter.

3       458.   The NCUA Board expressly disclaims and disavows any allegation that
4   could be construed as alleging fraud.

5       459.   At the time the registration statement became effective, it (including the
6   prospectus and any prospectus supplements) contained untrue statements and omitted
7   facts that were necessary to make the statements made not misleading, as alleged
8   above.

9       460.   The untrue statements and omitted facts were material because a
10  reasonably prudent investor deciding whether to purchase the certificates would have
11  viewed them as important and as substantially altering the total mix of information
12  available, as alleged above.

13      461.   U.S. Central purchased the certificates pursuant to and traceable to a
14  defective registration statement, as alleged above.

15      462.   At the time U.S. Central purchased the certificates, it did not know of the
16  untrue statements and omissions contained in the registration statement.

17      463.   Defendant Goldman Sachs's conduct as alleged above violated Section
18  11.

19      464.   U.S. Central and Plaintiff sustained damages as a result of Defendant
20  Goldman Sachs's violations of Section 11.

21      WHEREFORE, the NCUA Board requests the Court to enter judgment in its
22  favor against Defendant Goldman Sachs, awarding all damages, in an amount to be
23  proven at trial, costs, and such other relief as the Court deems appropriate and just.

24  ### SIXTH CLAIM FOR RELIEF

25  **Section 11 of the Securities Act of 1933**

26  **(RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-**

27

28  **174**

**QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)**

465.    The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Residential Accredit Loans, Inc., or specific to offerings other than the RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust Offerings.

466.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchases of the RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust certificates against Defendant Goldman Sachs, as the underwriter, and against Defendant Residential Accredit Loans, Inc., as the issuer.

467.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

468.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

469.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

470.    WesCorp purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

471.    At the time WesCorp purchased the certificates, it did not know of the

175

1   untrue statements and omissions contained in the registration statement.

2       472.  Defendant Goldman Sachs's and Defendant Residential Accredit Loans,

3   Inc.'s conduct as alleged above violated Section 11.

4       473.  WesCorp and Plaintiff sustained damages as a result of Defendant

5   Goldman Sachs's and Defendant Residential Accredit Loans, Inc.'s violations of

6   Section 11.

7       WHEREFORE, the NCUA Board requests the Court to enter judgment in its

8   favor against Defendant Goldman Sachs and Defendant Residential Accredit Loans,

9   Inc., jointly and severally, awarding all damages, in an amount to be proven at trial,

10   costs, and such other relief as the Court deems appropriate and just.

11   ### SEVENTH CLAIM FOR RELIEF

12   **Section 12(a)(2) of the Securities Act of 1933**

13   **(Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI**

14   **Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3**

15   **Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)**

16       474.  The NCUA Board realleges paragraphs 1 through 419 of this Complaint,

17   as though fully set forth here, except those paragraphs specific to offerings other than

18   the Alternative Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI

19   Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust,

20   RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust offerings.

21       475.  The NCUA Board brings this cause of action pursuant to Section

22   12(a)(2) of the Securities Act, with respect to WesCorp's purchases of the Alternative

23   Loan Trust 2007-OA4, GSR Mortgage Loan Trust 2007-OA1, RALI Series 2006-

24   QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust, RALI

25   Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust certificates against

26   Defendant Goldman Sachs, as the underwriter and seller of those certificates.

27       476.  The NCUA Board expressly disclaims and disavows any allegation that

28   **176**

**FIRST AMENDED COMPLAINT**

1    could be construed as alleging fraud.

2        477.   Defendant Goldman Sachs offered to sell and sold the securities to

3    WesCorp through one or more instrumentalities of interstate commerce (*i.e.*,

4    telephone, faxes, mails, e-mail, or other means of electronic communication).

5        478.   Defendant Goldman Sachs offered to sell and sold the securities, for its

6    own financial gain, to WesCorp by means of the prospectuses and/or prospectus

7    supplements, as alleged above, and/or oral communications related to the

8    prospectuses and/or prospectus supplements.

9        479.   The prospectuses and/or prospectus supplements contained untrue

10   statements and omitted facts that were necessary to make the statements made not

11   misleading, as alleged above.

12       480.   The untrue statements and omitted facts were material because a

13   reasonably prudent investor deciding whether to purchase the certificates would have

14   viewed them as important and as substantially altering the total mix of information

15   available, as alleged above.

16       481.   WesCorp purchased the certificates on the initial offering pursuant to the

17   prospectuses and/or prospectus supplements.

18       482.   At the time WesCorp purchased the certificates, it did not know of the

19   untrue statements and omissions contained in the prospectuses and/or prospectus

20   supplements.

21       483.   Defendant Goldman Sachs's conduct as alleged above violated Section

22   12(a)(2).

23       484.   WesCorp and Plaintiff sustained damages as a result of Defendant

24   Goldman Sachs's violations of Section 12(a)(2).

25       485.   Under Section 12(a)(2), the NCUA Board is entitled to rescind and

26   recover the consideration WesCorp paid for the certificates, minus principal and

27   interest received.

28

**FIRST AMENDED COMPLAINT**

1    WHEREFORE, the NCUA Board requests the Court to enter judgment in its

2    favor against Defendant Goldman Sachs, awarding a rescissory measure of damages,

3    or in the alternative compensatory damages, in an amount to be proven at trial; costs,

4    and such other relief as the Court deems appropriate and just.

5    **EIGHTH CLAIM FOR RELIEF**

6    **Violation of the California Corporate Securities Law of 1968**

7    **Cal. Corp. Code §§ 25401 and 25501**

8    **(Alternative Loan Trust 2007-OA4, GreenPoint Mortgage Funding Trust 2006-**

9    **OH1, GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-**

10   **OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series**

11   **2007-QH3 Trust, RALI Series 2007-QH5 Trust, RALI Series 2007-QH6 Trust)**

12   486.   The NCUA Board realleges paragraphs 1 through 419 of this Complaint,

13   as though fully set forth here, except those paragraphs specific to offerings other than

14   the Alternative Loan Trust 2007-OA4, GreenPoint Mortgage Funding Trust 2006-

15   OH1, GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust 2007-OA1,

16   RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3

17   Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6 Trust offerings.

18   487.   The NCUA Board brings this cause of action pursuant to Sections 25401

19   and 25501 of the California Corporate Securities Law, with respect to WesCorp's

20   purchases of the Alternative Loan Trust 2007-OA4, GreenPoint Mortgage Funding

21   Trust 2006-OH1, GSR Mortgage Loan Trust 2006-OA1, GSR Mortgage Loan Trust

22   2007-OA1, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI

23   Series 2007-QH3 Trust, RALI Series 2007-QH5 Trust and RALI Series 2007-QH6

24   Trust certificates against Defendant Goldman Sachs, as the seller of those certificates.

25   488.   Defendant Goldman Sachs offered to sell and sold the securities to

26   WesCorp by means of written and/or oral communications which included untrue

27   statements of material fact and/or omissions of material facts that were necessary to

28

178

**FIRST AMENDED COMPLAINT**

make the statements made not misleading, as alleged above.

489. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

490. At the time WesCorp purchased the certificates, it did not know of these untruths or omissions.

491. Defendant Goldman Sachs sold the certificates to WesCorp in California.

492. Defendant Goldman Sachs's sales of the certificates violated Cal. Corp. Code § 25401.

493. WesCorp and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Cal. Corp. Code § 25401, and WesCorp and the NCUA Board are entitled to the remedies provided by Cal. Corp. Code § 25501.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## NINTH CLAIM FOR RELIEF

### Violation of the Kansas Uniform Securities Act

### Kan. Stat. Ann. § 17-12a509

### (First Franklin Mortgage Loan Trust 2006-FF4)

494. The NCUA Board realleges paragraphs 1 through 419 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the First Franklin Mortgage Loan Trust 2006-FF4 offering.

495. The NCUA Board brings this cause of action pursuant to Section 17-12a509 of the Kansas Uniform Securities Act, with respect to U.S. Central's purchases of the First Franklin Mortgage Loan Trust 2006-FF4 certificates against Defendant Goldman Sachs, as the seller of those certificates.

**179**

496.   Defendant Goldman Sachs offered to sell and sold the securities to WesCorp by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

497.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

498.   Defendant Goldman Sachs sold the certificates to U.S. Central in Kansas.

499.   U.S. Central did not know of these untruths and omissions.

500.   If U.S. Central had known about these untruths and omissions, it would not have purchased the securities from Defendant Goldman Sachs.

501.   Defendant Goldman Sachs's sales of the certificates violated Kan. Stat. Ann. § 17-12a509(b).

502.   U.S. Central and Plaintiff sustained damages as a result of Defendant Goldman Sachs's violations of Kan. Stat. Ann. § 17-12a509(b).

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Goldman Sachs, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   For judgment against the Defendants in accordance with the prayers for relief set forth in each of the foregoing Claims for Relief;

B.   For Plaintiff's costs of suit; and

C.   For any other relief the Court deems just and proper.

**180**

FIRST AMENDED COMPLAINT

| | | |
|---|---|---|
| 1 | Dated:  October 29, 2012 | TERRY W. BIRD |
| 2 | | BIRD, MARELLA, BOXER, |
| | GEORGE A. ZELCS | WOLPERT, NESSIM, DROOKS |
| 3 | KOREIN TILLERY LLC | & LINCENBERG, P.C. |
| 4 | STEPHEN M. TILLERY | MARK C. HANSEN |
| 5 | DOULGAS R. SPRONG | DAVID C. FREDERICK |
| | PETER H. RACHMAN | dfrederick@khhte.com |
| 6 | ROBERT L. KING | WAN J. KIM |
| 7 | DIANE E. MOORE | JOSEPH S. HALL |
| | KOREIN TILLERY LLC | KELLOGG, HUBER, HANSEN, |
| 8 | 505 North Seventh Street, Suite 3600 | TODD, EVANS & FIGEL, P.L.L.C. |
| 9 | St. Louis, Missouri 63101-1625 | Sumner Square |
| | Telephone: (314) 241-4844 | 1615 M Street, N.W., Suite 400 |
| 10 | Fax: (314) 241-3525 | Washington, D.C. 20036 |
| 11 | | Telephone: (202) 326-7900 |
| | MICHAEL J. MCKENNA, | Fax: (202) 326-7999 |
| 12 | General Counsel | |
| 13 | JOHN K. IANNO, Associate | |
| | General Counsel | |
| 14 | NATIONAL CREDIT UNION | By:  /s/ Terry W. Bird |
| 15 |   ADMINISTRATION | |
| | 1775 Duke Street |     Terry W. Bird |
| 16 | Alexandria, Virginia 22314-3428 | Attorneys for Plaintiff |
| 17 | Telephone: (703) 518-6350 | National Credit Union |
| | Fax: (703) 518-6569 | Administration Board |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

**181**

**FIRST AMENDED COMPLAINT**

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury
of all of the claims asserted in this Complaint so triable.

Dated:  October 29, 2012

GEORGE A. ZELCS
KOREIN TILLERY LLC

STEPHEN M. TILLERY
DOUGLAS R. SPRONG
PETER H. RACHMAN
ROBERT L. KING
DIANE E. MOORE
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Fax: (314) 241-3525

MICHAEL J. MCKENNA, General
Counsel
JOHN K. IANNO, Associate General
Counsel
NATIONAL CREDIT UNION
   ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314-3428
Telephone: (703) 518-6350
Fax: (703) 518-6569

TERRY W. BIRD
BIRD, MARELLA, BOXER,
   WOLPERT, NESSIM, DROOKS &
   LINCENBERG, P.C.

MARK C. HANSEN
DAVID C. FREDERICK
dfrederick@khhte.com
WAN J. KIM
JOSEPH S. HALL
KELLOGG, HUBER, HANSEN,
   TODD, EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Fax: (202) 326-7999


By:   /s/ Terry W. Bird
_____
        Terry W. Bird
Attorneys for Plaintiff
National Credit Union Administration
Board

**182**

# APPENDIX

### Table 10

| CUSIP | Issuing Entity | Date of Prospectus Supplement | Trade Date | Case That Supplies American Pipe Tolling | American Pipe tolling start date | American Pipe Tolling End Date |
|---|---|---|---|---|---|---|
| 02150DAC9 | ALT Loan Trust 2007-OA4 | 3/28/2007 | 3/20/2007 | *Luther v. Countrywide*, Complaint, BC380698 (Cal. Super. Ct., L.A. Cnty. Nov. 14, 2007) | 11/14/2007 | 1/6/2010 |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | 5/7/2007 | 5/4/2007 | *NECA-IBEW v. Goldman Sachs*, No. 08-10783 (S.D.N.Y. Dec. 11, 2008) | 12/11/2008 | 1/28/2010 |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | 5/7/2007 | 5/4/2007 | *NECA-IBEW, supra* | 12/11/2008 | 1/28/2010 |
| 75114NAC8 | RALI Series 2006-QO6 Trust | 6/28/2006 | 10/11/2006 | *New Jersey Carpenters v. RALI*, Complaint, No. 08-602727 (N.Y. Sup. Ct. Sept. 22, 2008), *removed to* No. 08-8781 (S.D.N.Y.) | 9/22/2008 | 1/18/2011 |
| 751153AC1 | RALI Series 2006-QO10 Trust | 12/27/2006 | 12/14/2006 | *New Jersey Carpenters v. RALI, supra* | 9/22/2008 | 1/18/2011 |
| 74922JAC2 | RALI Series 2007-QH2 Trust | 2/23/2007 | 2/16/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |
| 74922WAB5 | RALI Series 2007-QH3 Trust | 3/28/2007 | 3/28/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |
| 74922WAC3 | RALI Series 2007-QH3 Trust | 3/28/2007 | 3/28/2007 | *New Jersey Carpenters v. RALI, supra* | 5/18/2009 | 3/31/2010 |
| 75116EAB8 | RALI Series 2007-QH5 | 5/29/2007 | 5/24/2007 | *New Jersey Carpenters v.* | 5/18/2009 | 3/31/2010 |

**A-1**

| | Trust | | | RALI, supra | | |
|---|---|---|---|---|---|---|
| 75116EAC6 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/24/2007 | New Jersey Carpenters v. RALI, supra | 5/18/2009 | 3/31/2010 |
| 75116EAA0 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/30/2007 | New Jersey Carpenters v. RALI, supra | 5/18/2009 | 3/31/2010 |
| 74922AAB3 | RALI Series 2007-QH6 Trust | 6/27/2007 | 6/21/2007 | New Jersey Carpenters v. RALI, supra | 5/18/2009 | 3/31/2010 |
| 74922AAC1 | RALI Series 2007-QH6 Trust | 6/27/2007 | 6/21/2007 | New Jersey Carpenters v. RALI, supra | 5/18/2009 | 3/31/2010 |

A-2

**FIRST AMENDED COMPLAINT – APPENDIX**

Table 11

| CUSIP | Issuing Entity | Date of Prospectus Supplement | Trade Date | American Pipe tolling start date | Case That Supplies American Pipe Tolling | American Pipe Tolling End Date | Federal Claims Timely with American Pipe Tolling? | Additional Tolling Based on Tolling Agreement – Aug. 19, 2010 to May 31, 2011 | Federal Claims Timely with American Pipe + Tolling Agreement? |
|---|---|---|---|---|---|---|---|---|---|
| 02150DAC9 | ALT Loan Trust 2007-OA4 | 3/28/2007 | 3/20/07 | 11/14/07 | *Luther v Countrywide*, Complaint, BC380698 (Cal. Cnty. Super. Ct., L.A. Cnty. Nov. 14, 2007) | 1/6/10 | Yes | | |
| 3622NAAB6 | GSR Mortgage Loan Trust 2007-OA1 | 5/7/2007 | 5/4/07 | 12/11/08 | *NECA-IBEW v. Goldman Sachs*, Complaint, No. 08-10783 (S.D.N.Y. Dec. 11, 2008) | 1/28/10 | N/A | Yes | Yes |
| 3622NAAG5 | GSR Mortgage Loan Trust 2007-OA1 | 5/7/2007 | 5/4/07 | 12/11/08 | *NECA-IBEW*, Complaint, *supra* | 1/28/10 | N/A | Yes | Yes |
| 75114NAC8 | RALI Series 2006-QO6 Trust | 6/28/2006 | 10/11/06 | 9/22/08 | *New Jersey Carpenters v. RALI*, Complaint, No. 08-602727 (N.Y. Sup. Ct. Sept. 22, 2008), *removed to* No. 08-8781 (S.D.N.Y.) | 1/18/11 | Yes | | |
| 751153AC1 | RALI Series 2006-QO10 Trust | 12/27/2006 | 12/14/06 | 9/22/08 | *New Jersey Carpenters v. RALI*, Complaint, *supra* | 1/18/11 | Yes | Yes | Yes |

A-3

FIRST AMENDED COMPLAINT – APPENDIX

| 74922JAC2 | RALI Series 2007-QH2 Trust | 2/23/2007 | 2/16/07 | 5/18/09 | *New Jersey Carpenters v. R-ALI*, Consolidated Amended Complaint, No. 08-8781 (S.D.N.Y. May 18, 2009) | 3/31/10 | N/A | Yes | Yes |
| 74922WAB5 | RALI Series 2007-QH3 Trust | 3/28/2007 | 3/28/07 | 5/18/09 | *New Jersey Carpenters v. R-ALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 74922WAC3 | RALI Series 2007-QH3 Trust | 3/28/2007 | 3/28/07 | 5/18/09 | *New Jersey Carpenters v. R-ALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 75116EAB8 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/24/07 | 5/18/09 | *New Jersey Carpenters v. R-ALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 75116EAC6 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/24/07 | 5/18/09 | *New Jersey Carpenters v. R-ALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 75116EAA0 | RALI Series 2007-QH5 Trust | 5/29/2007 | 5/30/07 | 5/18/09 | *New Jersey Carpenters v. R-ALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
| 74922AAB3 | RALI Series 2007-QH6 Trust | 6/27/2007 | 6/21/07 | 5/18/09 | *New Jersey Carpenters v. R-ALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |

FIRST AMENDED COMPLAINT – APPENDIX

A-4

| 74922AAC1 | RALI Series 2007-QH6 Trust | 6/27/2007 | 6/21/07 | 5/18/09 | *New Jersey Carpenters v. RALI*, Consolidated Amended Complaint, *supra* | 3/31/10 | N/A | Yes | Yes |
|-----------|----------------------------|-----------|---------|---------|---------------------------------------------------------------------------|---------|-----|-----|-----|

**A-5**

FIRST AMENDED COMPLAINT – APPENDIX

1                          <u>**PROOF OF SERVICE**</u>

2   **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3           I am employed in the County of Los Angeles, State of California.  I am over the age
    of 18 and not a party to the within action; my business address is 1875 Century Park East,
4   23rd Floor, Los Angeles, California 90067-2561.

5           On October 30, 2012, I served the following document(s) described as **FIRST
    AMENDED COMPLAINT** on the interested parties in this action as follows:
6
                          **SEE ATTACHED SERVICE LIST**
7
    **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused the document(s) to be
8   sent from e-mail address dh@birdmarella.com to the persons at the e-mail addresses listed
    in the Service List.  I did not receive, within a reasonable time after the transmission, any
9   electronic message or other indication that the transmission was unsuccessful.

10          I declare under penalty of perjury under the laws of the United States of America
    that the foregoing is true and correct and of my own personal knowledge.
11
            Executed on October 30, 2012, at Los Angeles, California.
12

13
                                          /s/ Diane Hunsaker
14                                        Diane Hunsaker

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### SERVICE LIST
### NCUA v. Goldman Sachs & Co.
### Case No. LACV11-6521-GW(JEMx)

2

3  Brendan P Cullen
cullenb@sullcrom.com, pierrej@sullcrom.com, s&cmanagingclerk@sullcrom.com

4

5  Laura Kabler Oswell
oswelll@sullcrom.com, tekielj@sullcrom.com

6  Nathaniel Lyon Green
greenn@sullcrom.com

7

8  Richard H Klapper
klapperr@sullcrom.com

9  Theodore Edelman
edelmant@sullcrom.com

10

11  William B Monahan
monahanw@sullcrom.com, s&cmanagingclerk@sullcrom.com

12  Rory Price Culver
culverr@sullcrom.com, acklandr@sullcrom.com, baginskie@sullcrom.com,
13  quintansb@sullcrom.com, s&cmanagingclerk@sullcrom.com

14  J Matthew Goodin
jmgoodin@lockelord.com, chicagodocket@lockelord.com, kmorehouse@lockelord.com,
15  ttill@lockelord.com

16  Kevin A Wisniewski
kwisniewski@lockelord.com

17

18  Thomas Justin Cunningham
tcunningham@lockelord.com, chicagodocket@lockelord.com,
kmorehouse@lockelord.com, ttill@lockelord.com

19

20

21

22

23

24

25

26

27

28