**Hearing Date:  July 26, 2013 at 10:00 am (ET)**
**Response Deadline:  July 19, 2013 at 4:00 pm (ET)**

**Zuckerman Spaeder LLP**
Laura E. Neish
1185 Avenue of the Americas, 31st Floor
New York, NY 10036-2603
(212) 704-9600

**Zuckerman Spaeder LLP**
Nelson C. Cohen (*pro hac vice*)
Graeme Bush (*pro hac vice*)
1800 M Street, NW, Suite 1000
Washington, DC 20036
(202) 778-1800

*Attorneys for National Credit Union Administration Board*
*as Liquidating Agent for Western Corp. Federal Credit Union*
*and U.S. Central Federal Credit Union*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| **Debtors.** | ) | Jointly Administered |
| | ) | |

**RESPONSE OF NATIONAL CREDIT UNION ADMINISTRATION BOARD TO DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED BY THE NATIONAL CREDIT UNION ADMINISTRATION BOARD AS LIQUIDATING AGENT FOR WESTERN CORPORATE FEDERAL CREDIT UNION AND U.S. CENTRAL FEDERAL CREDIT UNION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... i

PRELIMINARY STATEMENT ...................................................................... 1

FACTUAL BACKGROUND .......................................................................... 4

ARGUMENT ............................................................................................... 9

I.      LEGAL STANDARD GOVERNING THIS OBJECTION ................................... 9

II.     NCUAB'S FEDERAL SECURITIES CLAIMS ARE TIMELY ....................... 10

        A.      The Statute Of Limitations Begins To Run When A Reasonably Diligent .......... 11

        B.      Generalized Press Reports And Investigations Into Third Parties' Conduct
                In The RMBS Market Did Not Put the Credit Unions On Actual Or
                Constructive Notice Of Misleading Statements Or Omissions In the RMBS
                Offering Documents ............................................................................... 13

        C.      NCUAB's Securities Claims Are Timely Even Under Debtors' Incorrect
                "Inquiry Notice" Standard ..................................................................... 18

        D.      *American Pipe* Tolling Applies To NCUAB's Securities Claims. ....................... 20

III.    NCUAB WILL BE ABLE TO PROVE MATERIAL MISSTATEMENTS IN THE
        OFFERING DOCUMENTS. ............................................................................ 21

        A.      The Complaints Adequately Allege Misstatements In The Offering ................... 21

        B.      NCUAB Will Be Able To Prove Its Claims. ............................................... 23

        C.      The Misstatements In the RMBS Offering Documents Were Material ................. 25

IV.     DEBTORS CANNOT MEET THE HEAVY BURDEN OF PROVING THAT
        MISREPRESENTATIONS IN THE RMBS OFFERING DOCUMENTS PLAYED
        NO PART IN THE CREDIT UNIONS' LOSS. ................................................... 27

4179803.1

# TABLE OF AUTHORITIES

## CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  888 F. Supp. 2d 431 (S.D.N.Y. 2012) ................................................................. 36

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987) .............................................................................. 35

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
  -- F. Supp. 2d --, No. 11 Civ. 2375 JSR, 2013 WL 440114 (S.D.N.Y. Feb. 5, 2013)... 30-32, 37

*City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011) .............................................................................. 14

*Credit Suisse Secs.*,
  2013 WL 1411769 .............................................................................................. 25

*Dodds v. Cigna Secs., Inc.*,
  12 F.3d 346 (2d Cir. 1993) ................................................................................ 15

*FDIC v. Countrywide Fin. Corp.*,
  2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ..................................................... 14

*FHFA v. UBS Ams., Inc.*,
  712 F.3d 136 (2d Cir. 2013) ............................................................................ 1, 24

*FHFA v. UBS Ams., Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) ......................................................... *passim*

*Hutchison v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011) .............................................................................. 32

*In re Allegheny Int'l, Inc.*,
  954 F.2d 167 (3d Cir. 1992) ......................................................................... 11, 12

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) .......................................................... 6, 19, 21

*In re Hemingway Transp., Inc.*,
  993 F.2d 915 (1st Cir. 1991) .............................................................................. 11

*In re Holm*,
  931 F.2d 620 (9th Cir.1991) .............................................................................. 11

*In re IndyMac Mortgage-Backed Sec. Litig.*, 793 F. Supp. 2d 637 (S.D.N.Y. 2011) ............. 15, 23

4179803.1

*In re Jorczak*,
   314 B.R. 474 (Bankr. D. Conn. 2004) ................................................... 12

*In re Lehman Bros. Secs. and ERISA Litig.*,
   800 F. Supp. 2d 477 (S.D.N.Y. 2011) ..................................................... 5

*In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347 (2d Cir. 2010) ................................ 27

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
   2012 U.S. Dist. LEXIS 98669 (S.D.N.Y. July 16, 2012) ................................. 19, 21

*In re Openwave Sys. Sec. Litig.*,
   528 F. Supp. 2d 236 (S.D.N.Y. 2007) ................................................... 17

*In re ProShares Trust Sec. Litig.*,
   889 F. Supp. 2d 644 (S.D.N.Y. 2012) ................................................... 35

*In re Radnor Holdings Corp.*,
   353 B.R. 820 (Bankr. D. Del. 2006) ..................................................... 12

*In re Wash. Mut. Mortg. Backed Sec. Litig.*,
   No. C09-37 MJP, 2012 WL 2995046 (W.D. Wash. July 23, 2012) ......................... 36

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
   970 F.2d 1030 (2d Cir. 1992) ........................................................... 15

*Kronfeld v. Trans World Airlines, Inc.*,
   832 F.2d 726 (2d Cir.1987) ............................................................. 33

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ............................................................. 37

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011) ............................................................. 34

*Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*,
   843 F. Supp. 2d 191 (D. Mass. 2012) ................................................. 24, 30

*Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*,
   843 F. Supp. 2d 191 (D. Mass. 2012) ................................................... 23

*McMahan & Co. v. Wherehouse Entm't*,
   65 F.3d 1044 (2d Cir. 1995) ............................................................. 35

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010) ............................................................. 3, 13, 14, 16

*N.J. Carpenters Health Fund v. Novastar Mortg.*,
   2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011) ............................................. 28

4179803.1

*N.J. Carpenters Health Fund v. Residential Accredit Loans, Inc.*,
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) .................................................... 26, 28

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013) ............................................................................. 27, 32

*NCUAB v. Credit Suisse Secs. (USA) LLC*,
  2013 WL 1411769  (D. Kan. Apr. 8, 2013) .......................................................... 22

*NCUAB v. Goldman Sachs & Co.*,
  No. 11-6521, ECF No. 119 (C.D. Cal. Sept. 4, 2012) ......................................... 9, 32

*NCUAB v. Goldman Sachs & Co.*,
  No. 11-6521, ECF No. 153 (C.D. Cal. June 17, 2013) ................................... 3, 8, 28

*NCUAB v. RBS Sec., Inc.*,
  900 F. Supp. 2d 12222 (D. Kan. 2012) ........................................................... *passim*

*Plumbers' & Pipefitters' Local No. 562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp. I*,
  2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) .......................................................... 24

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
  632 F.3d 762 (1st Cir. 2011) ................................................................................. 29

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*,
  No. 09-cv-1110-HB, 2011 WL 135821 (S.D.N.Y. Jan. 12, 2011) .......................... 23

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) .................................................................................. 23

*Sterlin v. Biomunie Sys.*,
  154 F.3d 1191 (10th Cir. 1998) ............................................................................. 14

*TSC Indus. Inv. v. Northway, Inc.*,
  426 U.S. 438 (1976) .............................................................................................. 32

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
  985 F.2d 1190 (2d Cir. 1993) ................................................................................ 34

**STATUTES**
11 U.S.C. § 502(a) .................................................................................................. 9

12 U.S.C. § 1787(b)(14) ......................................................................................... 1

12 U.S.C. § 1787(b)(14)(A), (B) ............................................................................. 11

15 U.S.C. § 77m ............................................................................................... 11, 12

28 U.S.C. § 1658 .................................................................................................... 12

iv

414 U.S. 538, 554 (1974)...................................................................................................... 21

**OTHER AUTHORITIES**

3 L. King, *Collier on Bankruptcy* § 502.02, at 502-22 (15th ed. 1991)........................................ 10

Christopher J. Mayer, *et al.*, *The Rise in Mortgage Defaults*, Fed. Reserve Bd. Fin. & Econ.
    Discussion Series, Paper No. 2008-59, at 16 (Nov. 2008) ...................................... 17

Moody's Rating Symbols & Definitions at 6 (Aug. 2003) ............................................................ 6

S&P, Guide to Credit Ratings Criteria 7 (2010) ......................................................................... 6

S. Perm. Subcomm. on Investigations, 111th Cong. vol. 3, at 162 (Apr. 23, 2010)...................... 6

Section 13 of the Securities Act of 1933 ................................................................................... 2

Section 362 of the Bankruptcy Code, 11 U.S.C. §362(a) ........................................................... 3

Section 502 of the Bankruptcy Code ........................................................................................ 9

Securities Act of 1933, 15 U.S.C. §77*o*(a) ................................................................................ 9

Steven M. Davidoff, *For Bank of America, Countrywide Bankruptcy Is Still an Option*, NY
    Times Deal Book (Aug. 11, 2011).......................................................................... 16

Timothy F. Geithner, *Macroeconomic Effects of Risk Retention Requirements*, Fin. Stability
    Oversight Council, at 9 (Jan. 2011) ...................................................................... 17

4179803.1

The National Credit Union Administration Board ("NCUAB"), as Liquidating Agent for Western Corporate Federal Credit Union ("WesCorp") and U.S. Central Federal Credit Union ("U.S. Central," and together with WesCorp, the "Credit Unions"), hereby files this response to the Debtors' Objection To Proofs Of Claim Filed By The National Credit Union Administration Board As Liquidating Agent For Western Corporate Federal Credit Union And U.S. Central Federal Credit Union (the "Objection") [D.E. 4050].  The securities claims against two Debtors, Residential Accredit Loans, Inc. ("RALI") and Residential Funding Mortgage Securities II, Inc. ("RFMS II"; together with RALI, the "ResCap Parties"), that underlie NCUAB's eleven proofs of claim (the "Claims") were timely filed in 2011.  NCUAB's Claims, which have a collective value of about $293 million, are unliquidated because (i) the automatic stay suspended NCUAB's litigation against the ResCap Parties, and (ii) discovery has not begun in the two cases in which NCUAB asserted claims against the ResCap Parties.  However, should the underlying securities claims be litigated, NCUAB will be able to prove its claims entitling it to damages. Accordingly, the Objection should be overruled.

## PRELIMINARY STATEMENT

NCUAB's securities claims that underlie the Claims relate to eleven residential mortgage-backed securities ("RMBS") certificates (the "Certificates").  NCUAB filed the securities claims in 2011, well before the March 20, 2012 expiration of the limitations period established by the NCUA's "Extender Statute," 12 U.S.C. § 1787(b)(14).  The Extender Statute provides NCUAB with at least three years from the date it places a credit union into conservatorship in which to bring suit on behalf of that credit union.  *See id.*; *FHFA v. UBS Ams., Inc.*, 712 F.3d 136 (2d Cir. 2013) (interpreting a materially identical extender statute).

Debtors fail to carry their burden to show that NCUAB's securities claims are time-barred. They argue (incorrectly) that the one-year limitations period for the federal securities claims set out in Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m ("Section 13"), expired before the Extender Statute took effect on March 20, 2009, because the Credit Unions had inquiry notice of their claims by March 20, 2008. At the time of purchase, all of the Certificates were given the highest triple-A rating by the two leading credit rating agencies, Standard & Poor's ("S&P") and Moody's. The 11 Certificates retained their top ratings well after the Credit Unions bought them. In fact, none of the 11 Certificates was downgraded by either of the credit rating agencies before June 2008, just nine months before NCUAB placed the Credit Unions into conservatorship, and none of them was downgraded to below investment grade until September 2008. As courts have routinely held, "[w]hatever questions [the Credit Unions] might have harbored in 2007 about the quality of the securitizations they bought from defendants, it cannot be said that they should have 'discovered' that those securitizations in fact contained loans that failed to meet the standards set out in the offering materials until they were alerted to this possibility by the ratings agencies in early 2008." *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 321-22 (S.D.N.Y. 2012). Debtors offer no evidence to support a different conclusion here.

Debtors' argument that NCUAB's claims are untimely fails for additional reasons. Most importantly, the courts in which these claims were filed have already rejected the same arguments. Defendants in those cases submitted substantially similar materials as Debtors to no avail. *See NCUAB v. RBS Sec., Inc.*, 900 F. Supp. 2d 1222, 1235-37, 1246-52 (D. Kan. 2012) (detailing the extensive materials submitted by defendants and holding that it did not show the Credit Unions should have discovered their claims by March 20, 2008, except as to three isolated

2

Certificates not at issue here); Minute Order, *NCUAB v. Goldman Sachs & Co.*, No. 11-6521, ECF No. 153 (C.D. Cal. June 17, 2013) (denying motion to dismiss amended complaint). There is no basis for a different result here; nor are there grounds for believing discovery would reveal additional materials to support Debtors' position.

Further, Debtors apply the wrong legal standard in arguing that general public statements put NCUAB on "inquiry notice" sufficient to trigger the one-year statute of limitations in Section 13. The Supreme Court confirmed in 2010 that the statute of limitations on securities claims does not begin to run until the plaintiff did in fact discover, or a reasonably diligent plaintiff would have actually discovered, the facts constituting the violation. *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010). None of the evidence submitted by Debtors shows that the Credit Unions discovered or should have discovered the facts constituting the ResCap Parties' securities violations by March 20, 2008. Even under Debtors' incorrect "inquiry notice" standard, the credit rating agencies' continued assignment of triple-A ratings to the Certificates until mid-2008 at the earliest, and post-hoc reports that concluded that the problems in the RMBS market were not apparent to investors in 2007, refute Debtors' charge that NCUAB's claims expired before March 20, 2009.

NCUAB's prosecution of its claims against the ResCap Parties was halted by their May 2012 petition for relief, which triggered the automatic stay under Section 362 of the Bankruptcy Code, 11 U.S.C. §362(a). Discovery has not yet started against any of the other defendants in the two cases in which NCUAB asserted the securities claims underlying their Claims. Thus, NCUAB has not yet had the opportunity to gather the evidence that will enable it to prove its securities claims. As discussed further herein, Debtors' conclusory statements about the materiality of their representations and omissions, and about the cause of NCUAB's losses rest

on isolated statements plucked from various documents, and do not establish as a matter of law

that NCUAB's securities claims are legally groundless.  The two courts considering NCUAB's

securities claims on these Certificates have both denied the other defendants' motions to dismiss

the claims; Debtors offer no reason why their bid to dismiss the claims warrants a different

result.  Accordingly, the Objection should be denied.

## FACTUAL BACKGROUND

NCUAB's Claims arise out of the ResCap Parties' role in creating and selling certain

RMBS.  One court has described mortgage securitizations as follows:

> In a mortgage securitization, mortgage loans are acquired, pooled
> together, and then sold to a trust which in turn issues certificates to
> purchasers who become the beneficiaries of the trust and who then
> receive distributions from the trustee from the cash flow generated
> by the pool of mortgages and in accordance with the specifications
> of the rights of the respective classes of certificate holders set out
> in the trust instrument.

*In re Lehman Bros. Secs. and ERISA Litig.,* 800 F. Supp. 2d 477, 479 (S.D.N.Y. 2011).  Each

RMBS has within it different classes of certificates ("tranches") which have different levels of

credit protection, and therefore different risk profiles and different credit ratings.  *RBS,* 900 F.

Supp. 2d at 1227.  Each tranche has its own unique identifying number known as a "CUSIP."[1]

RMBS are sold to the public through "offering documents" – registration statements,

prospectuses, and prospectus supplements that provide information about the RMBS.

Between October 2006 and June 2007, the Credit Unions purchased the 11 Certificates at

issue here.  WesCorp purchased 10 of the 11 Certificates, for which it paid a total of almost $623

million.  In April 2007, U.S. Central purchased the 11th offering for $20 million.  Declaration of

Laura E. Neish, Esq., ¶ 3.  Exhibit 1 to the Neish Declaration is a chart of the 11 Certificates that

---

[1] CUSIP stands for "Committee on Uniform Security Identification Procedures."

4

identifies the CUSIP and issuing entity, the trade date, purchase price, and the claim amount listed on the proof of claim.

The investment quality of the Certificates was evaluated and rated by two of the leading credit rating agencies, S&P and Moody's.  S&P's stated purpose is "to provide investors who want to make better informed investment decisions with market intelligence in the form of credit ratings, indices, investment research and risk evaluations and solutions." Abouthttp://www.standard andpoors.com/about-sp/main/en/us.  Similarly, Moody's credit rating systems are intended "to provide investors with a simple system of gradation by which future relative creditworthiness of securities may be gauged."  *See* http://www.moodys.com/ ratings-process/Ratings-Definitions/ 002002.  Courts have recognized the importance of the credit rating agencies' ratings to investors as a measure of creditworthiness, including in the context of RMBS suits.  *See, e.g.*, *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 764-65 (S.D.N.Y. 2012).[2]

At the time of the Credit Unions' purchases, all of the Certificates held the highest rating from both of the rating agencies – Aaa from Moody's and AAA from S&P.[3]  The first credit downgrade of any of the 11 Certificates did not occur until June 2008, when Moody's changed its rating for U.S. Central's purchase to an "A2" rating, which it defines as "upper-medium grade and are subject to low credit risk."  *Moody's Rating Symbols & Definitions,* MOODY'S

[2] While much later the credit rating agencies' approach to its ratings of RMBS came under scrutiny, *id.* at 758, Debtors have not shown, nor could they, that NCUAB was or should have been aware of such potential problems at the time.
[3] Moody's "Aaa" rating denotes finance products "of the highest quality, with minimal credit risk." Moody's, Moody's Rating Symbols & Definitions at 6 (Aug. 2003). S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment . . . is extremely strong." S&P, Rating Definitions, http://www.standardandpoors.com/ratings/articles/en/us/?assetID=1245303711350; *see also* S&P, Guide to Credit Ratings Criteria 7 (2010) ("[W]e typically would not expect a 'AAA' rated issue or issuer to default even under extreme stress conditions such as the Great Depression of 1929."); Wall Street & the Fin. Crisis: The Role of Credit Rating Agencies: Hr'g Before the S. Perm. Subcomm. on Investigations, 111th Cong. vol. 3, at 162 (Apr. 23, 2010) (statement of Susan Barnes, Managing Dir., S&P's Ratings Services) ("To determine the amount of credit enhancement that could support an 'AAA' rating, we use our most stressful economic scenario, including economic conditions from the Great Depression.").

5

INVESTORS                    SERVICE,                    8            (Jun.                    2009),
http://www.moodys.com/sites/products/AboutMoodysRatingsAttachments/MoodysRatingsSymb
olsand%20Definitions.pdf.  S&P altered the rating for that offering in August 2008, changing the
rating from AAA to AA, S&P's second-highest investment-grade rating that indicates a "very
strong capacity to meet financial commitments."   Thus, only nine months before the Credit
Unions went into conservatorship, all 11 Certificates held the credit rating agencies' highest
rating except for one, which was still rated as a solid, low-risk investment.

On September 2008, Moody's downgraded many of the 11 Certificates significantly.  In
October 2008, S&P did so as well.  Neish Decl. Exhibit 1 contains the credit ratings, date of the
first credit rating downgrade for the 11 Certificates, and the date of the credit rating downgrade
below investment grade.

On March 20, 2009, NCUAB put the Credit Unions into conservatorship.

On October 1, 2010, NCUAB appointed itself as Liquidating Agent for the Credit
Unions.  On June 20, 2011, NCUAB filed a complaint against RBS Securities, Inc., RFMS II,
and other parties in federal district court in Kansas, *NCUAB v. RBS Securities, Inc., et al.*, No.
11-cv-2340-RDR (D. Kan.) (the "Kansas action").  For the Home Equity Loan Trust 2007-HSA2
Certificate, the subject of Claim No. 2635, RFMS II was the "depositor"/issuer for each of the
Certificates – RFMS II acquired title to the underlying mortgages, transferred them to the trust
referred to as the "issuing entity," and filed required documents (such as registration statements
and prospectuses) with the Securities and Exchange Commission so that the certificates could be
offered to the public.  NCUAB asserted a claim under Section 11, alleging that the offering
documents contained materially untrue statements and omitted material facts that were necessary

4179803.1

to make the statements therein not misleading in that the offering documents misrepresented that the loans were originated according to certain underwriting guidelines, but in fact, they were not.

The RFMS II Chapter 11 petition triggered the automatic stay before the court could rule on RFMS II's motion to dismiss. Other defendants moved to dismiss on substantially the same grounds that Debtors advance for rejecting NCUAB's Claims; the district court rejected these arguments. *See RBS*, 900 F. Supp. 2d at 1222. NCUAB filed an amended complaint in the Kansas action in August 2012.

On August 9, 2011, NCUAB filed an action against RALI, Goldman, Sachs & Co., and other parties in the Central District of California, *NCUAB v. Goldman Sachs, et al.*, No. 11-6521-GW (C.D. Cal.) (the "California action"). NCUAB asserted federal securities claims under Section 11 for 10 Certificates from the RALI Series 2006-QO6 Trust, RALI Series 2006-QO10 Trust, RALI Series 2007-QH2 Trust, RALI Series 2007-QH3 Trust (2 CUSIPs), RALI Series 2007-QH5 Trust (3 CUSIPs), and RALI Series 2007-QH6Trust (2 CUSIPs). RALI was the depositor and issuer for these Certificates. As in the Kansas action, the thrust of the complaint in the California action is that the offering documents for the RMBS at issue misrepresented that the loans had been originated according to certain underwriting guidelines. The May 2012 bankruptcy filing by Debtors triggered the automatic stay prior to the California court's resolution of RALI's motion to dismiss. However, as to both the original complaint and the amended complaint filed in October 2012, the court denied Goldman's motion to dismiss the federal claims as to the 10 Certificates. The Goldman defendants raised arguments identical to those that RALI raised in its motion to dismiss and that Debtors raise again in the Objection.[4] *See* Minute Order, *NCUAB v. Goldman Sachs & Co.*, No. 11-6521, ECF No. 153 (C.D. Cal. June

---

[4] NCUAB's opposition to the motion to dismiss responded to both the motions of other defendants and RALI, often citing them side-by-side for the same propositions.

4179803.1

17, 2013) (Ex. 2 to Neish Decl.); Minute Order, *NCUAB v. Goldman Sachs & Co.*, No. 11-6521,

ECF No. 119 (C.D. Cal. Sept. 4, 2012) (Ex. 3 to Neish Decl.).  Debtors provide no reason this

Court should reach a different result from those of the courts in the Kansas and California

actions.

After Debtors filed for bankruptcy in May 2012, NCUAB timely filed the Claims against

RALI (Claim Nos. 2626, 2627, 2628, 2629, 2630, 2631, 2632, 2633, 2634, and 2636) and RFMS

II (Claim No. 2635).  *See* Exhibits 1-11 to Declaration of Nelson C. Cohen, Esq.  The Claims

have a total value of about $293 million.  Each of the Claims attached or incorporated by

reference the applicable complaint from the California or Kansas actions, and included the

excerpt of the complaint setting out the Section 11 claim for the Certificate specified in the

Claim.

On May 23, 2013, Debtors filed a motion authorizing them to enter a plan support

agreement (the "PSA Motion") in connection with a term sheet agreed to by Debtors, the

Creditors Committee, and certain holders of securities claims against debtor and nondebtor

parties.  D.E. 3814.  NCUAB did not participate in the confidential mediation and negotiations

that led to the agreement.

On June 19, 2013, NCUAB filed an objection and reservation of rights as to the PSA

Motion, arguing that it held pending securities claims against Debtors and unexpired securities

claims against Ally Financial, Inc. and Ally Securities LLC, and thus should be treated under the

term sheet and proposed plan of reorganization similarly to other, similarly situated unsecured

creditors who were classified as "Private Securities Claimants."  D.E. 4020.[5]

---

[5] In mid-May 2013, NCUAB counsel had informed counsel for the Creditors Committee and the Consenting
Creditors that NCUAB held unexpired claims against Ally Financial and Ally Securities.  Cohen Decl. ¶ 8.
NCUAB's claims against non-debtor Ally Financial, which are not time-barred and which NCUAB is prepared to
assert, arise out of violations of Section 15 of the Securities Act of 1933, 15 U.S.C. §77*o*(a).  NCUAB's unexpired

8

Two days later, Debtors filed the instant Objection.  D.E. 4050.  The Objection does not

challenge the Claims as procedurally defective in any respect, but rather argues that the

underlying securities claims are "untimely and without merit."

On June 27, the Court granted the PSA Motion and overruled NCUAB's objections for

purposes of the PSA Motion only.  D.E. 4102.

## ARGUMENT

## I.    LEGAL STANDARD GOVERNING THIS OBJECTION

Under Section 502 of the Bankruptcy Code, a claim is "deemed allowed" unless a party

objects.  11 U.S.C. § 502(a).  Bankruptcy Rule 3001(f) states that "[a] proof of claim executed

and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and

amount of the claim."  Fed. R. Bankr. P. 3001(f).

A claim is *prima facie* valid if the creditor alleges facts sufficient to support a legal

liability to the claimant.  *See, e.g.*, *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991) (citing 3 L.

King, *Collier on Bankruptcy* § 502.02, at 502-22 (15th ed. 1991)).  Once the claimant has met its

initial obligation, the burden shifts to the objector to produce "substantial evidence" sufficient to

negate the presumptive validity of the claim.  *In re Hemingway Transp., Inc.*, 993 F.2d 915, 925

(1st Cir. 1991) (citations omitted).  The objector must produce evidence "equal in force" to the

*prima facie* case.  *See, e.g.*, *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992); *In re*

*Jorczak*, 314 B.R. 474, 481 (Bankr. D. Conn. 2004).

As demonstrated herein, the two complaints underlying the Claims have alleged facts to

support legal liability to NCUAB for federal securities violations.  The courts in both cases have

denied Rule 12(b)(6) motions to dismiss the securities claims.  Debtors have failed in the

---

claims against Ally Securities are based on Section 11 of the Securities Act and the Kansas Uniform Securities Act.
The value of NCUAB's claims against Ally Financial is over $390 million, and the value of the claims against Ally
Securities is about $200 million.  Neish Decl. ¶ 6.

4179803.1

Objection to present substantial evidence that is "equal in force" to NCUAB's *prima facie* showing, and thus have failed to negate the *prima facie* validity of the Claims.  *E.g.*, *In re Radnor Holdings Corp.*, 353 B.R. 820, 846 (Bankr. D. Del. 2006) (overruling objection to proof of claim not supported by substantial evidence).  Nor have Debtors presented arguments different from those rejected by the courts in the California and Kansas actions.[6]  Thus, the Claims should be allowed under Section 502.

## II.    NCUAB'S FEDERAL SECURITIES CLAIMS ARE TIMELY

The relevant statute of limitations in the Securities Act provides that Section 11 claims must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," and, in any event, within three years of when the Certificate was "bona fide offered to the public."  15 U.S.C. § 77m.  For claims that were timely as of the date of conservatorship (March 20, 2009), NCUA's Extender Statute provides NCUAB with at least three years from that date in which to bring suit.  *See* 12 U.S.C. § 1787(b)(14)(A), (B).  Thus, by virtue of the Extender Statute, any of NCUAB's federal claims that were viable on March 20, 2009 remained viable until at least March 20, 2012.  NCUAB's federal claims were filed well before that date.

Debtors do not contest that the Extender Statute applies to NCUAB's claims.  *See* Obj. ¶ 29, n.5 (noting that "the extender extends the limitation period for three years for claims that were live on the date of appointment").  Instead, they argue that NCUAB's claims were time barred before NCUAB placed the Credit Unions into conservatorship (March 20, 2009) because various news articles and reports put the Credit Unions on notice of their claims in mid-2007.  *See* Obj. ¶ 27.  The argument that public information put the Credit Unions and others on notice

---

[6] The burden of persuasion to establish its claims does not shift back to the claimant until the objector satisfies its burden of presenting substantial evidence rebutting the claim.  *In re Allegheny*, 954 F. 2d at 174.

4179803.1

of their claims in 2007 has been raised and rejected in numerous RMBS lawsuits, including the
Kansas and California actions in which NCUAB originally filed the claims.  There is no reason
for a different result here.

     **A.**     **The Statute Of Limitations Begins To Run When A Reasonably Diligent
Plaintiff Would Have Discovered The Facts Constituting The Violation.**

Debtors use the wrong legal standard for when the statute of limitations begins running
for federal securities claims.  Debtors assert that the limitations period begins to run upon
"inquiry notice" – when public information would lead an investor to begin investigating.
However, Debtors' authority for that standard predates the Supreme Court's 2010 decision in
*Merck*.  In *Merck*, the Supreme Court construed the discovery standard in the statute of
limitations in the Exchange Act and held that "inquiry notice," without more, does not trigger the
limitations period for securities claims.  Instead, the limitations period begins to run when a
plaintiff did in fact discover or when a reasonably diligent plaintiff would have actually
discovered the facts constituting the violation.  *Id.* at 1798; *see also, e.g.*, *City of Pontiac Gen.
Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) ("Only after a plaintiff can
adequately plead his claim can that claim be said to have accrued, and only after a claim has
accrued can the statute of limitations on that claim begin to run."); *Sterlin v. Biomunie Sys.*, 154
F.3d 1191, 1205 (10th Cir. 1998); *RBS*, 900 F. Supp. 2d at 1244-45; *UBS Ams.*, 858 F. Supp. 2d
at 319; *FDIC v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *3 (C.D. Cal. Nov. 21, 2012).

The majority of district courts that have considered whether *Merck*'s holding extends to
claims under the Securities Act have concluded that it does.  *UBS Ams.*, 858 F. Supp. 2d at 319.
Contrary holdings, *e.g.*, *In re IndyMac Mortgage-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 648
(S.D.N.Y. 2011), are outliers.  The majority position is the better reasoned outcome given that

the *Merck* Court interpreted the word "discovery," which is common to the statutes of limitation in both the Securities Act and the Exchange Act.

The Securities Act provides in part that actions under Sections 11 may not be maintained "unless brought within one year of the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ." 15 U.S.C. § 77m (2002).  The Exchange Act provides, in relevant part, that claims "may be brought not later than . . . 2 years after the discovery of facts constituting the violation." 28 U.S.C. § 1658. Thus, the primary difference is that the Exchange Act does not reference circumstances under which the discovery of the basis for the claim "should have been made by the exercise of reasonable diligence."

Despite this difference, prior to *Merck*, the Second Circuit held that "the accrual standards under the two statutes were identical." *UBS Ams.*, 858 F. Supp. 2d at 319-20 (citing *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 349-50 (2d Cir. 1993); *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992)).  In *Merck*, the Supreme Court interpreted the Exchange Act's use of the term "discover" to encompass the diligence requirement made explicit in the Securities Act.  130 S. Ct. at 1798.  Thus, "there appears to be no principled reason to depart from the precedents of [the Second] Circuit holding that the accrual standards under the [Exchange Act and the Securities Act] are to be interpreted identically." *UBS Ams.*, 858 F. Supp. 2d at 319-20.

Under the foregoing authority, and as set forth *infra*, the statute of limitations for NCUAB's federal securities claims did not begin to run until the second half of 2008 at the earliest because the Credit Unions did not actually discover, and would not reasonably have been able to discover, the facts constituting the basis for its securities claims before then.

12

**B.     Generalized Press Reports And Investigations Into Third Parties' Conduct
In The RMBS Market Did Not Put the Credit Unions On Actual Or
Constructive Notice Of Misleading Statements Or Omissions In the RMBS
Offering Documents.**

No reasonably diligent plaintiff would have discovered sufficient facts to plead an

adequate claim based on the pervasive and systematic disregard of underwriting guidelines for

the loans underlying the Certificates at issue here at least until the second half of 2008.  In 2007

and the first half of 2008, the RMBS market was still strong, Debtors were still issuing and

selling RMBS, and credit ratings agencies were still granting and maintaining AAA ratings for

RMBS certificates, including the Certificates at issue.

Debtors point to a set of 2007 newspaper articles which, according to Debtors, should

have put the Credit Unions on notice of their claims "by June 2007, at the latest."  Obj. ¶ 27.

These articles primarily report generalized concerns about the relaxation of underwriting

guidelines in the context of subprime loans.  They do not relate to NCUAB's claims, which

concern the disregard of underwriting guidelines no matter how relaxed the guidelines had

become.   Moreover, NCUAB's claims are premised on specific misrepresentations in the

securities offering documents that the specific loans underlying the Certificates complied with

the underwriting guidelines.  There is no indication in the materials cited by Debtors that the

actual loans underlying the Certificates did not comply with the underwriting guidelines, let

alone any indication that the originators of those loans had a practice of disregarding their

underwriting guidelines.[7]  Accordingly, these materials did not put the Credit Unions on notice

---

[7] *See* Beha Decl. Ex. 14 (Gretchen Morgenson, *Crisis Looms in Mortgages*, N.Y. Times, Mar. 11, 2007, at A1
(noting general and not company-specific concerns about "increasingly lax lending standards" in the mortgage
securities market); Ex. 15 (*Subprime lenders made record exceptions: analysts*, Reuters, Apr. 20, 2007) (noting that
subprime mortgage lenders "repeatedly [broke] their own underwriting guidelines to capture business" and that
these "exceptions" represented the "relaxation of underwriting practices" but saying nothing about the specific
originators at issue or a systematic disregard of any underwriting criteria); Ex. 16 (David Cho, *Pressure at Mortgage
Firm Led to Mass Approval of Bad Loans*, Wash. Post., May 7, 2007, at A01) (reporting on the pressure at a
company called New Century Financial and other unspecified subprime lenders to approve mortgage applications;

4179803.1

of their claims. *Cf.* Examiner's Report, at VIII-85 (noting that "several courts have found evidence of public knowledge of general problems in the housing or RMBS markets to be insufficient, without more, to warrant dismissal on statute of limitations grounds of Securities Act claims").

Debtors also quote the NCUAB Inspector General's 2010 conclusion that NCUAB "should have recognized the risk exposure that U.S. Central's significant concentration in mortgage-backed securities represented earlier than 2007 and 2008" as evidence that the Credit Unions should have been on notice of their claims in 2007. *See* Beha Decl. Ex. 4 at 4. But this statement about "risk exposure" is not relevant to NCUAB's securities claims – the Inspector General was addressing U.S. Central's concentration in RMBS. *See id*. (discussing the credit union's "exposure to significant *concentration risk* due to the *lack of diversification in their investments*" (emphases added)). The statement has nothing to do with whether the offering documents for the RMBS contained misrepresentations nor does it shed light on whether the Credit Unions reasonably would have been able to discover those misrepresentations before March 20, 2008.[8]

---

New Century Financial is not involved in any of the certificates underlying the Claims at issue); Ex. 17 (Patrick Rucker, *Clayton Holdings Subpoenaed in Subprime Probe*, Reuters, July 13, 2007) (reporting that a mortgage loan analysis company, Clayton Holdings, Inc., was subpoenaed in a "wide-ranging" investigation into the subprime mortgage crisis that "involves many 'due-diligence' companies"). With regard to Exhibit 17, Debtors suggest that the government investigations into RMBS mortgage underwriting should have put the Credit Unions on notice of their claims and cite *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 246 (S.D.N.Y. 2007), for the proposition that "government investigation into underlying issues triggers inquiry notice." The government investigation held to trigger inquiry notice in *In re Openwave* was into the backdating practices of the specific company that plaintiffs later attempted to sue. Here, Exhibit 17 does not establish the existence of a government investigation into the specific entities at issue for systematic disregard of underwriting standards, but rather a general "wide-ranging" investigation into unspecified entities, including but not limited to Clayton Holdings, and unspecified practices.

[8] Debtors mischaracterize other documents that they claim evidence NCUAB's early awareness of the facts that underlie its securities claims. For example, Beha Exhibit 1, a document providing home equity lending guidance to credit unions for their own customers, raised the general issue of whether credit risk management practices were keeping pace with loosening underwriting standards, but did not refer to the wholesale disregard for underwriting standards that occurred for RMBS Certificates purchased by the Credit Unions. The quotation that Debtors attribute to NCUAB in Beha Ex. 1 does not appear in that document (or any of the Beha Exhibits). Beha Ex. 2 is simply the press release announcing the issuance of the guidance. Nor does Beha Ex. 3, a letter addressing the trend toward

4179803.1

Moreover, the public information pointed to by Debtors was also available to experienced credit rating agencies, the parties relied upon by institutional investors like the Credit Unions to monitor market developments and gauge the continuing creditworthiness of securities. Yet that information did not dissuade those agencies from issuing and maintaining triple-A ratings for these Certificates into the second half of 2008. Neither S&P nor Moody's downgraded any of the Certificates below its highest rating until mid- to late-2008. In late June 2008, Moody's changed the rating for one Certificate, Home Equity Loan Trust 2007-HSA2, to A2, its upper medium investment grade rating. *Id.* The rest were not downgraded for the first time until September or October 2008.

"Whatever questions [the Credit Unions] might have harbored in 2007 about the quality of the securitizations they bought from defendants, it cannot be said that they should have 'discovered' that those securitizations in fact contained loans that failed to meet the standards set out in the offering materials until they were alerted to this possibility by the ratings agencies in early 2008.". *UBS Ams.*, 858 F. Supp. 2d at 321-22. *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 764-65 ("The fact that the Certificates retained their ratings amidst growing concerns about the MBS industry is significant" because "absent a decline in the Certificates' ratings," a plaintiff could not plead facts sufficient to state a claim.); *see also In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2012 U.S. Dist. LEXIS 98669, at *7-8 (S.D.N.Y. July 16, 2012). Thus, the one-year statute of limitations for Securities Act claims did not begin running until after March 20, 2008.

In addition, in early 2008, Countrywide — the largest mortgage lender in the country and notorious for its systematic disregard of underwriting guidelines — was acquired by Bank of

---

newer mortgage products and "more liberal underwriting standards," contain the quotations about lenders "loosening their credit standards" or "default rates" that Debtors attribute to that document.

America after purportedly passing an "extensive due diligence" process.  *See* BofA Makes Risky Bet With Countrywide Purchase, CNBC.com (Jan. 11, 2008), http://www.cnbc.com/id/22606808/BofA_Makes_Risky_Bet_With_Countrywide_Purchase (internal quotations omitted).  The deal was disastrous for Bank of America because of liability stemming from Countrywide's mortgage origination and servicing practices:  "The Countrywide acquisition will go down in history as a deal from hell.  It has already cost Bank of America tens of billions of dollars in litigation settlements."  *See* Steven M. Davidoff, *For Bank of America, Countrywide Bankruptcy Is Still an Option*, NY Times Deal Book (Aug. 11, 2011), available at http://dealbook.nytimes.com/2011/08/11/for-bank-of-america-countrywide-bankruptcy-is-still-an-option.  It is implausible for Debtors to suggest that the Credit Unions should have discovered these claims by March 20, 2008, when even Bank of America did not discover the scope of Countrywide's mortgage origination problems through its "extensive due diligence."

Subsequent government reports have confirmed that publicly available information in 2007 would not have put investors on notice of the systematic disregard of underwriting guidelines.  The Federal Reserve Board noted in November 2008 that the "surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher J. Mayer, *et al*., *The Rise in Mortgage Defaults*, Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59, at 16 (Nov. 2008); *see also* Timothy F. Geithner, *Macroeconomic Effects of Risk Retention Requirements*, Fin. Stability Oversight Council, at 9 (Jan. 2011) ("Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information.  Additionally, the large number of assets and the disclosures provided to investors may not include sufficient

4179803.1

information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.").

Recognizing this reality, courts have rejected the notion that public information available in 2007 was sufficient for purchasers in RMBS offerings to plead facts supporting their claims. *See, e.g.*, *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2012 U.S. Dist. LEXIS 98669, at *7-8 ("Defendants' exhibits do not persuade the Court that, by December 8, 2007, there was enough information in the public domain for Plaintiffs to have filed . . . a complaint that could survive a 12(b)(6) motion. The exhibits paint a vivid picture of a distressed MBS industry, but not one references by name any of the entities that were involved in the origination, packaging, and sale of the Certificates at issue here."); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 762; *RBS*, 900 F. Supp. 2d at 1246 (rejecting claim that articles and press reports triggered the limitations period prior to March 2008); *NCUAB v. Credit Suisse Secs. (USA) LLC*, No. 12-2648-JWL, 2013 WL 1411769 at *6  (D. Kan. Apr. 8, 2013) (holding that "the credit unions' notice of general problems, poor performance of these investments, spikes in default and delinquency rates, the particular risks disclosed in the offering documents, and the class-action lawsuits filed" did not mean "that a reasonable investor would have discovered sufficient evidence to bring these claims before March 2007 or even March 2008").

Nonetheless, Debtors claim, without support, that "the factual record will show that the NCUA Claims are untimely."  Obj. ¶ 28.  Defendants in the many RMBS cases around the country have left no stone unturned in searching for materials to show that RMBS plaintiffs should have been aware of their claims at an early date.  They have submitted voluminous

4179803.1

materials and have yet to persuade courts to adopt their positions.  There is no indication that discovery would reveal new facts that would materially alter the statute of limitations analysis.

The Independent Examiner in this case reached the same conclusion.  The Examiner noted that courts have been "reluctan[t]" to find that statutes of limitations on RMBS claims began to run in 2007.  *See* Examiner's Report, at VIII-87; *see also id.* at VIII-89 ("Although the law in this area continues to evolve, it may pose obstacles to [Debtors] prevailing on statute of limitations defenses . . . premised upon arguments that general 'public scrutiny and numerous critical media and government reports' started limitations periods running in 2007.").

## C.    NCUAB's Securities Claims Are Timely Even Under Debtors' Incorrect "Inquiry Notice" Standard

In fact, even under the incorrect "inquiry notice" standard that Debtors invoke, "courts have been reluctant to conclude that purchasers of mortgage-backed securities were on inquiry notice of [potential securities] claims as late as mid–2008, let alone as early as 2007."  *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 208-09 (D. Mass. 2012); *see also In re IndyMac Mortgage–Backed Sec. Litig.*, 718 F. Supp. 2d 495, 505 (S.D.N.Y. 2010) (finding no inquiry notice as of May 2008); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*, No. 09-cv-1110-HB, 2011 WL 135821, at *8-9 (S.D.N.Y. Jan. 12, 2011). That is because "[f]or inquiry notice to exist, the triggering information must relate *directly* to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (emphasis added).

None of the public information on which Debtors rely satisfies this standard.  The articles and reports cited by Debtors are general reports about the state of mortgage underwriting.  These materials do not relate to the alleged misrepresentations in the offering documents that the

4179803.1

underlying loans failed to comply with the stated underwriting guidelines.    Under like circumstances, courts have rejected arguments that general news reports or investigations constituted inquiry notice.  *See, e.g.*, *UBS Ams.*, 858 F. Supp. 2d at 321 ("even under the pre-*Merck*, duty-of-inquiry standard for accrual, generalized reports like those relied upon by defendants are insufficient to trigger the statute of limitations"); *Plumbers' & Pipefitters' Local No. 562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-cv-1713-ERK, 2012 WL 601448, at *11 (E.D.N.Y. Feb. 23, 2012) (denying motion to dismiss where defendants referenced 70 news stories, none of which "refer to the offerings, the Certificates, or tie the originators to securities offered by the defendants"); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 208 (D. Mass. 2012).[9]

Debtors are simply wrong that NCUAB bases its claims only "on facts about market-wide trends that were well known by June 2007."  Obj. ¶ 28.  The NCUAB based its claims on specific misrepresentations about the specific loans underlying the Certificates.  California Am. Compl. ¶ 329 & Parts VIII.D-F; Kansas Am. Compl. ¶ 275 & Parts VIII.D-F.  To support the plausibility of these claims, NCUA alleged that the specific originators of the loans underlying the Certificates had systematically disregarded their underwriting guidelines.  *See, e.g.*, California Compl. ¶¶ 166-173 (First Magnus), 174-190 (First National Bank of Arizona), 216-240 (Homecomings); Kan. Compl. ¶¶ 180-183 (Homecomings).[10]    NCUAB also included

---

[9] Debtors implicitly concede that if the one-year statute of limitations in Section 13 was not triggered by notice by March 20, 2008, then NCUAB's federal claims are all timely because the extender statute applies to the three-year limitations period in Section 13, and all of the Certificates were first offered,  and sold to NCUAB, within three years of March 20, 2009.  Obj. ¶ 13 n.5.  *See also FHFA v. UBS Ams., Inc.*, 712 F.3d 136, 142-44 (2d Cir. 2013); *RBS Secs.*, 900 F. Supp. 2d at 1237-42.

[10] While certain of the allegations against First Magnus and First National Bank of Arizona are based on articles and reports beginning in the second half of 2007, those publications did not put NCUAB on notice to trigger the Section 13 period running because the offering documents for the RALI RMBS did not disclose that either originator had contributed mortgages to the pools underlying those offerings.  Thus, NCUAB did not and could not know that these originators' conduct might apply to these certificates until it independently learned of that fact years later.

4179803.1

allegations about the extremely poor performance of the Certificates (including the drastic credit

rating downgrades), thus giving rise to the inference that such defective loans had been included

in the RMBS.  California Am. Compl., Part VII.A-C.; Kansas Am. Compl. Part VII.A-C.  Thus,

as Judge Cote summarized:

> [W]hen [the Credit Unions] learned of the loan originators' dubious underwriting
> practices says little about when they discovered the facts that form the basis of
> this complaint.  [NCUAB's] claim here is not that the *originators* failed to
> scrutinize loan applicants adequately *in general;* it is that *defendants* failed to act
> diligently to ensure that, consistent with the representations in the offering
> materials, the originators' questionable practices did not lead to the inclusion of
> non-conforming loans in the *particular* securitizations sold to the [Credit Unions].
> The downgrade of the securities' credit ratings . . . are crucial to the [NCUAB's]
> claim in this regard, since they are the only facts that connect the originators'
> general practices to particular securities that the [Credit Unions] bought from
> defendants.

*UBS Ams.*, 858 F. Supp. 2d at 321 (emphasis in original); *see also RBS*, 900 F. Supp. 2d.

at 1262 (rejecting the Hobson's choice argument made by Debtors); *Credit Suisse Secs.*,

2013 WL 1411769, at *14 n.14 (same).

## D.   *American Pipe* Tolling Applies To NCUAB's Securities Claims.

Two of NCUAB's securities claims (concerning the Certificates from the RALI Series

2006-QO6 Trust and RALI Series 2006-QO10 Trust) are also timely for the additional reason

that they are subject to the tolling doctrine under *American Pipe & Constr. Co. v. Utah*, which

held that "the commencement of a class action suspends the applicable statute of limitations as to

all asserted members of the class," 414 U.S. 538, 554 (1974).  Those two Certificates were the

subject of claims in a class action complaint against Debtors filed on September 22, 2008 in *N.J.*

*Carpenters Health Fund v. Residential Accredit Loans, Inc.*, No. 08-cv-8781-HB, 2010 WL

1257528 (S.D.N.Y. Mar. 31, 2010).[11]  NCUA's claims for these two Certificates are timely so

long as the claims were viable at the time *American Pipe* tolling began.  Accordingly, Debtors

---

[11] The Objection states that three offerings were part of the original *N.J. Carpenters* complaint.

20

need to establish that the Credit Unions should have discovered their claims by September 22,

2007.  For the reasons given above, the Credit Unions could not have discovered their claims at

such an early date.

## III.    NCUAB WILL BE ABLE TO PROVE MATERIAL MISSTATEMENTS IN THE OFFERING DOCUMENTS.

To prevail on its Section 11 claims, NCUAB must show "1) purchase of a registered

security either directly from the issuer or in the aftermarket; 2) defendant's participation in the

offering as set forth in §11; and 3) the registration statement contained an untrue statement of

material fact or omitted to state a material fact required to be stated therein or necessary to make

the statements therein not misleading."  *RBS,* 900 F. Supp. 2d at 1229 (citing *In re Morgan*

*Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010)).  Debtors challenge only the

third of these elements, claiming that NCUAB's complaints inadequately allege material

misstatements in the RMBS offering documents and that NCUAB will be unable to prove the

misstatements.  Both arguments are wrong.

### A.    The Complaints Adequately Allege Misstatements In The Offering Documents.

Over a dozen courts have recognized that the allegations by NCUAB and other RMBS

investors state valid securities claims against Debtors.  *See*, *e.g.*, *N.J. Carpenters Health Fund v.*

*Royal Bank of Scot. Grp., PLC*, 709 F.3d 109 (2d Cir. 2013); *see also* Examiner's Report, docket

No. 3698-32, at VIII-54-55 (citing cases).  Moreover, the courts in which the securities claims

were originally filed – the California and Kansas actions – have already held that NCUAB stated

plausible claims relating to the Certificates at issue here.  *See RBS*, 900 F. Supp. 2d at 1253-54;

Tentative Ruling, *NCUAB v. Goldman Sachs*, No. 11-6521, ECF No. 144, at 9-12 (C.D. Cal.

Mar. 14, 2013) (Ex. 4 to Neish Decl.), *finalized by* Minute Order, *NCUAB v. Goldman Sachs*, No. 11-6521, ECF No. 153 (C.D. Cal. June 17, 2013) (Ex. 2 to Neish Decl.).

Debtors fail to mention any of these decisions in their Objection, and do not identify any meaningful challenge to NCUAB's claims. Contrary to the contentions in the Objection, the complaints in both the Kansas and California actions allege how "the specific mortgage originators for the RMBS certificates … 'abandoned' their underwriting standards" (Obj. ¶ 34), and these allegations are tied to the specific Certificates at issue by virtue of the allegations concerning the Certificates' extremely poor performance and credit rating downgrades. *See* Kansas First Am. Compl. ¶¶ 54-91; California First Am. Compl. ¶¶ 53-91. Moreover, the Second Circuit has reversed (in relevant part) the only decision cited by Defendants, *N.J. Carpenters Health Fund v. Novastar Mortg.,* No. 08-Civ.-5310 (DAB), 2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011). *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC,* 709 F.3d 109, 122 (2d Cir. 2013) (reversing *N.J. Carpenters Health Fund v. NovaStar Mortg. Inc.,* No. 08 Civ. 5310 (DAB), 2012 WL 1076143 (S.D.N.Y. Mar. 29, 2012), which was subsequent to and built on the case cited by Debtors).

Courts have also explicitly rejected Debtors' argument that the RMBS offering documents provided adequate disclosures regarding the originators' deviation from underwriting guidelines. *See, e.g., N.J. Carpenters Health Fund v. Residential Capital, LLC,* No. CV 8781 (HB), 2010 WL 1257528 at *5 (S.D.N.Y. Mar. 31, 2010) (ruling that alleged misrepresentations regarding underwriting practices were "not cured by the risk disclosures … in the Offering Documents"); Examiner's Report at 54-55 (citing cases upholding securities claims against Debtors and affiliates "notwithstanding the risk disclosures in the offering materials at issue"). Debtors' misleadingly claim that the offering documents stated the "originators had discretion to

22

deviate from those guidelines, and that *some* loans in the loan pools *might* not comply with the

stated guidelines."  (Obj. ¶ 35 (emphasis added)).  The offering documents actually represented

that deviations from the underwriting guidelines were allowed if there were sufficient

compensating factors.  Beha Exhibit 13 at S-39 (noting that a loan may be approved if "the loan

is in substantial compliance with the underwriting standards," *e.g.*, where one specific criterion

was not satisfied, but "other factors positively compensated for [that] criteri[on]").  NCUAB

alleges that such compensating factors were absent.  *See RBS*, 900 F. Supp. 2d at 1253-54, 1257,

1260; *see also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,

632 F.3d 762, 773 (1st Cir. 2011) ("[S]aying that exceptions occur when borrowers demonstrate

other 'compensating factors' [does not] reveal[] what plaintiffs allege, namely, a wholesale

abandonment of underwriting standards.").  Nothing in the Objection casts any doubt on the

sufficiency of the allegations supporting NCUAB's claims.

### B.    NCUAB Will Be Able To Prove Its Claims.

NCUAB will prevail on the merits of its securities claims.  Debtors contend, without

evidentiary support, that the facts will show that they "fully and accurately disclosed the material

aspects of the loan underwriting process" (Obj. ¶ 34), but evidence discussed in the Examiner's

Report supports NCUAB's claim that the opposite is true.  The Examiner noted that other RMBS

investors asserting claims against Debtors and their affiliates have already "devoted several years

of discovery to investigating" the accuracy of the statements in the RMBS offering documents.

Examiner's Report at VIII-122-23.  These parties have prepared expert reports documenting

"significant evidence of the systematic abandonment of underwriting standards."  *Id.*at 123; *see

also id.* at 116.  In particular, the Examiner cited one review concluding that "over 90% of the

loans failed to comply with underwriting guidelines" and another finding "'breach rates of 88

23

4179803.1

and 89%' across a sample of 'thousands of mortgages'" *Id.* at 123 n. 64 (citing AIG, Allstate, MassMutual and Prudential Joint Reply submission paper). *See also Mass. Mut. Life Ins. Co.,* 843 F. Supp. 2d at 200-01 (citing plaintiff's description of review by insurer finding that "over eighty percent of the loans were originated in violation of the represented standards").

Furthermore, the viability of NCUAB's securities claims has already been proven by a three-week bench trial before Judge Rakoff in the Southern District of New York. *See Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, -- F. Supp. 2d --, No. 11 Civ. 2375 JSR, 2013 WL 440114 (S.D.N.Y. Feb. 5, 2013) (bench trial ruling). In that case, Assured Guaranty, an insurer for payments from RMBS certificates, sued Flagstar Bank, an originator of loans, for material misrepresentations regarding the underwriting of the loans underlying RMBS that Assured Guaranty had insured. Assured retained an expert to take a sample of the loans and then to "re-underwrite" those loans to determine whether they were properly underwritten.[12] Assured's expert concluded that 606 of the 800 loans (76%) were not properly underwritten. *Id.* at *11. Despite a vigorous defense questioning the "reunderwriting" methodology and whether the underwriting defects were material, Judge Rakoff found that the vast majority of loans had material underwriting defects:

> The Court finds that, with minor exceptions, [Assured's expert's] conclusions in these respects were fully credible and corroborated in numerous ways. To begin with, the representative instances described by the parties at trial (and illustrated in findings of fact above), were, for the most part, exactly as [Assured's expert] had categorized them. Indeed, the Court's own independent review of several of the loan files completely bore this out. Furthermore, Flagstar, while repeatedly attacking [Assured's expert's] methodology, was notably unable to show actual

---

[12] "Re-underwriting" is a common method of proof in RMBS cases concerning the systematic disregard of underwriting guidelines. Although *Assured Guaranty* is the only case so far to go to trial, plaintiffs in numerous other cases have performed similar analyses and have found that vast majorities of the loans were not properly underwritten (typically, 75-90%). NCUAB cites to some of those analyses in its California and Kansas amended complaints.

4179803.1

instances where the loan files themselves did not contain material breaches of the guidelines.

*See id.* at \*34.  He awarded Assured the full amount of damages it sought ($89.2 million plus interest).  *Id.* at \*39-40.  Flagstar subsequently settled with Assured for $105 million, rather than appeal.[13]

NCUAB did not have the opportunity to take discovery against the ResCap Parties in the Kansas or California actions prior to imposition of the automatic stay, and discovery against the other defendants in those cases has not started.  In discovery, NCUAB will seek production of the loan files underlying the securities it purchased and perform its own analysis of the files.  The analyses performed to date by other RMBS investors strongly suggest that NCUAB will be able to prove the facts alleged in its claims with the same level of success as the plaintiff in the *Assured Guaranty* trial.

### C.      The Misstatements In the RMBS Offering Documents Were Material.

In a single paragraph, Debtors assert that facts regarding the loan originators' wholesale disregard of underwriting standards would have been "immaterial" to purchasers of RMBS made up of these loans.  (Obj. ¶ 36).  This argument too has been made dozens of times by RMBS defendants and has been overwhelmingly rejected, including by the Second Circuit and the courts in the California and Kansas actions.  *See N.J. Carpenters*, 709 F.3d at 125-28; *RBS*, 900 F. Supp. 2d 1255-56; Tentative Ruling, *NCUAB v. Goldman Sachs*, No. 11-6521, ECF No. 88, at 13 (C.D. Cal. Mar. 15, 2012) (Ex. 5 to Neish Decl.), *finalized by* Minute Order, *NCUAB v. Goldman Sachs*, No. 11-6521, ECF No. 119 (C.D. Cal. Sept. 4, 2012) (Ex. 3 to Neish Decl.).

The test for materiality in a Section 11 claim is a fact-bound, objective one.  *See TSC Indus. Inv. v. Northway, Inc.,* 426 U.S. 438, 445 (1976).  "A fact is material for the purposes of

---

[13] *See* Saabira Chaudhuri, *Flagstar Bancorp Agrees to Pay $105 Million to Assured to Terminate Lawsuit*, Wall Street J., June 21 2013 *available at* http://online.wsj.com/article/BT-CO-20130621-711498.html.

Section 11 if 'there is a substantial likelihood that a *reasonable shareholder* would consider it important in deciding how to act." *UBS Ams.*, 858 F. Supp. 2d at 323 (citing *Hutchison v. Deutsche Bank Sec. Inc.,* 647 F.3d 479, 485 (2d Cir. 2011)) (emphasis added). Debtors' claim that the Credit Unions were "highly sophisticated RMBS investors" is thus irrelevant to the materiality analysis. *See id.*

Because the value of an RMBS depends on the quality of its underlying loans, the accuracy of disclosures concerning the underwriting of those loans is of paramount importance to investors. In *N.J. Carpenters*, the Second Circuit recognized that a "reasonable investor" in RMBS "would want to know whether those underwriting the loans had adhered to the procedures in place for evaluating the capacity and willingness of the borrower[s] to repay the loan[s] and the adequacy of the collateral securing the loan[s]." 709 F.3d at 126 (alterations in original) (record citation omitted). The misrepresentations and omissions underlying the NCUAB's securities claims concern precisely these issues.

Debtors' argument that publicly available information revealed "the truth allegedly concealed" from the Credit Unions is groundless. "There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a ... prospectus on the basis that the information is public knowledge." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir.1987). News articles discussing a general decline in mortgage underwriting practices cannot overcome the specific misstatements in the offering documents describing the RMBS Certificates that the Credit Unions purchased. Courts have recognized that such "sporadic news reports" should not be included in the "total mix of information that would clarify or place in proper context" a company's direct representations

26

about its securities.  *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1199 (2d Cir. 1993); *see also Litwin v. Blackstone Grp.*, *L.P.*, 634 F.3d 706, 718 (2d Cir. 2011).

Debtors also point to allegations from a lawsuit against former officers of WesCorp for breaching their fiduciary duties to WesCorp by continuing to increase its concentration in RMBS investments despite their awareness of a general decline in the housing market.  *See* Beha Dec. Ex. 18 at 13.  But knowledge that RMBS faced certain risks due to the housing market is entirely distinct from knowledge that the loans underlying the Certificates were not originated properly, contrary to representations made in the offering documents.  As the Second Circuit explained in *N.J. Carpenters*, "A reasonable investor can independently analyze how a security will perform in the market, but she cannot compensate for the fact that she has not received what she was told to expect."  709 F.3d at 126.  Debtors have presented no evidence that the Credit Unions knew that the loans underlying the Certificates were not underwritten properly; there is none.  The misstatements alleged in NCUAB's complaints concerning those underwriting guidelines were material for the purposes of Section 11.

## IV.   DEBTORS CANNOT MEET THE HEAVY BURDEN OF PROVING THAT MISREPRESENTATIONS IN THE RMBS OFFERING DOCUMENTS PLAYED NO PART IN THE CREDIT UNIONS' LOSS.

As Debtors acknowledge, the NCUAB need not prove – or even allege, *see In re ProShares Trust Sec. Litig.*, 889 F. Supp. 2d 644, 652 (S.D.N.Y. 2012) – loss causation. (Obj. ¶ 37.)  Rather, it is Debtors' "heavy burden" to prove that the losses suffered by NCUAB were unrelated to the material misstatements in the registration statements.  *See Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 340-41 (2d Cir. 1987); *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048-49 (2d Cir. 1995).  Unless Debtors can carry this burden, "any decline in value is presumed to be caused by the misrepresentation in the registration statement." *McMahan*

4179803.1

& *Co.*, 65 F.3d at 1048. Thus, in order to defeat NCUAB's claims, Debtors must prove that the *entirety* of the Credit Unions' losses were due to factors independent of the material misstatements. Debtors cannot meet this standard.

Debtors claim the housing market decline was the sole and independent cause of the Credit Unions' and NCUAB's losses. But Debtors' own actions – securitizing and creating a market for loans that were given to borrowers who had no chance of meeting their payments – contributed to the housing market decline. Debtors cannot separate these causal factors.

Nor can Debtors cite any cases finding that RMBS investors' losses were caused entirely by independent market events. The court in *In re Wash. Mut. Mortg. Backed Sec. Litig.*, No. C09-37 MJP, 2012 WL 2995046, at *12 (W.D. Wash. July 23, 2012) specifically rejected this theory when denying defendants' summary judgment motion on a Section 11 claim. The court noted that "the decline in the overall MBS market is potentially one of many proximate causes for the losses in the certificates at issue," but this did not mean that "the disregard for the underwriting guidelines at WaMu was not also a cause of Plaintiffs' losses." *Id.* at *13. Courts have reached similar conclusions even in cases arising under statutes where the plaintiff bears the burden of proving loss causation. *See, e.g., Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 472 (S.D.N.Y. 2012) (denying summary judgment on securities fraud claim because jury could "reasonably infer from the available evidence that *some* portion of plaintiffs' losses were caused by defendants' fraud").

The substantial settlements entered into by financial institutions involved in these cases further belie Debtors' contention that they will be able to dispose of NCUAB's claims as unrelated, "market-driven" losses. NCUAB itself has already secured more than $335 million in settlements arising out of credit unions' purchase of RMBS. *See* NCUAB Press Release, *NCUA*

4179803.1

*Recoveries for Corporate Credit Union Losses Top $335 Million* (Apr. 2, 2013), *available at* http://www.ncua.gov/News/Pages/NW20130402BOA.aspx; *see also Assured Guar.*, 2013 WL 440114 (bench trial ruling awarding the RMBS plaintiff the entirety of damages sought).

Debtors' reliance on *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005), only underscores the implausibility of their negative "loss causation" theory.  In *Lentell*, plaintiffs alleged defendants made material misstatements regarding specific Internet stocks, which ultimately lost their value during the 2001 dot-com crash.  *See id.* at 164-67.  The court found that plaintiffs failed to allege loss causation under Section 10(b) of the Exchange Act, because they did not plead that defendants misstated or omitted the risks that led to their loss.  *Id.* at 175.  Here, by contrast, NCUAB – which does not have the burden of pleading or proving loss causation under Section 11 – alleges that because the loans underlying the Certificates were defective, the Certificates themselves were far riskier than the offering documents disclosed.  When the borrowers began to default in massive numbers, this undisclosed risk materialized and caused the Credit Unions' losses.  *See id.* at 177.  Although NCUAB does not assert Section 10(b) claims here, its allegations are sufficient to meet the standard set forth in *Lentell,* and Debtors cannot meet their heavy burden to prove the contrary.

Debtors' citation to a NCUAB video presentation[14] and two Material Loss Reviews prepared by the NCUAB Inspector General[15] does not support Debtors' argument.  (*See* Obj. ¶ 39.)  The cited materials do not purport to analyze the role of third parties such as Debtors in the Credit Unions' collapse, and expressly note this exception.  *See* Beha Decl. Ex. 4 at 9 ("In determining why NCUAB placed U.S. Central in conservatorship, we did not analyze any potential impact the actions of third party providers may have had on the losses sustained by U.S.

---

[14] NCUAB Presentation, *Corporate Credit Unions: How Did We Get Here* (Apr. 12, 2011), *available at* http://www.youtube.com/watch?v=IjvUngJzQYI.
[15] Beha Decl. Ex. 4; Beha Decl. Ex. 5.

4179803.1

Central and the NCUSIF."); Beha Decl. Ex. 5 at 12 ("We did not analyze the role that third party

conduct, including but not limited to, the conduct of underwriters, issuers, and raters, may have

played in WesCorp's losses…."); NCUAB Presentation at 1:58-2:10 (noting that "many separate

but interlinked actions … led to the economic problems that emerged in 2007 and 2008" and that

"many different actors" were involved).   In fact, contrary to Debtors' argument, the video

presentation specifically cites mortgage loans made to borrowers that could not afford them as a

cause of the crises:

> More and more consumers wanted to be part of the real estate boom.  More and
> more investors wanted to purchase mortgage-backed securities.  However, most
> consumers with good credit had already purchased real estate.  There were fewer
> and fewer consumers seeking mortgage loans that could demonstrate a good
> credit history and the ability to repay.  *Some financial institutions began to extend
> credit for real estate purchases beyond the creditworthiness of the borrower. In
> other words, the borrower could not document the financial ability to make the
> loan payments.*

*Id.* at 30:29-31:05 (emphasis added).

Debtors have offered no evidence in their Objection that suggests they will be able to

prove that none of NCUAB's losses derived from misstatements in the securities they purchased.

Accordingly, the Objection should be denied.


**WHEREFORE,** NCUAB respectfully requests that the Court enter an order overruling

Debtor's Objection and granting such other relief as may be just and proper.

Dated: July 19, 2013
New York, NY                                          ZUCKERMAN SPAEDER LLP


*/s/ Laura E. Neish*_____
Laura E. Neish
1185 Avenue of the Americas, 31st Floor
New York, NY 10036-2603
(212) 704-9600
Nelson C. Cohen (admitted *pro hac vice*)

4179803.1

Graeme Bush (admitted *pro hac vice*)
1800 M Street, NW
Washington, DC 20036
(202) 778-1800

*Counsel for the National Credit Union
Administration Board as Liquidating Agent for
Western Corp. Federal Credit Union and U.S.
Central Federal Credit Union*

4179803.1