CLAIM # 4702

# EXHIBIT    3

MIN: 1000866-0010500352-1                                          Loan Number: 10500353

# ADJUSTABLE RATE NOTE

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

APRIL 27, 2006                          IRVINE                          CALIFORNIA
[Date]                                  [City]                          [State]

5200 SOUTHWEST 122ND AVENUE, MIAMI, FLORIDA 33175
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 1,000,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is PLATINUM CAPITAL GROUP, A CALIFORNIA CORPORATION.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

**(A) Interest Rate**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.500 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the 1st day of JULY, 2006, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

**(C) Interest Rate Limit**

My interest rate will never be greater than 9.950 %.

**(D) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE NOTE
RFC FORM 3524 (10/05) MODIFIED INSTRUMENT
For Use in FLORIDA Only                                Page 1 of 5

DocMagic *eForms* 800-649-1362
www.docmagic.com




CLAIM # 4702

PAY TO THE ORDER OF
RESIDENTIAL FUNDING CORPORATION
WITHOUT RECOURSE
PLATINUM CAPITAL GROUP
A CALIFORNIA CORPORATION
BY _____
ASST. SECRETARY
Celeste Pyburn II

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation
By _____
Judy Faber, Vice President

## Judy Faber - improper GMAC Affidavits Leading to Charges of Document Fabrication to Change Title

Ah, what a tangled web we weave when first we practice to deceive, said the bard.

And the web emanating from the GMAC affidavit improprieties extend much further than most may realize. Although GMAC continues to maintain that having its "robot signor" officers like Jeffrey Stephan provide affidavits on matters they know nothing about is a mere technical problem that they can remedy. In fact, an affidavit is a statement of someone with personal knowledge of a matter. Stephan signed as many as 10,000 documents a month and clearly could not have personal knowledge of the underlying situations. Deliberately preparing and submitting inaccurate documents in a legal proceeding is a fraud on the court, something most judges really do not like.

Predictably, lawyers who are contesting foreclosures are jumping on the affidavit issue and using it to open up broader issues with foreclosures where GMAC was the servicer of the loan. For instance, this letter to a judge in South Carolina, a judicial foreclosure state, discusses not only the role of an apparent fellow robot signor of Stephan, one Jack Kerr, but more critically, another document provided in this case stamped (not signed) by one Judy Faber, also of GMAC. **The Faber document transferred title to the party foreclosing in the case, so if the document is invalid, the plaintiff, in this case a Deutsche Bank trust, will lack standing to foreclose (legalese for "no tickie, no laundry"). Here is the critical section of the letter (on page 2):**

**Upon information and believe, Judy Faber has instructed document custodians in thousands of foreclosure cases to apply her stamped endorsement bearing her name after foreclosure commenced to an allonge and after a consumer had challenged the chain of title in the case. Upon information and belief, Ms. Faber and her document custodian team at facilities described in the Washington Post article attached to this letter have fabricated and changed title in thousands of foreclosure cases.**

This takes a wee bit of unpacking. The pooling and servicing agreement, which governs who does what when in a mortgage securitization, requires the note to be endorsed (just like a check, signed by one party over to the next), showing the full chain of title, and the minimum conveyance chain is A (originator) => B (sponsor) => C (depositor) => D (trust). The note, which is the borrower's IOU, is the critical document in 45 states. The mortgage, which is the lien, is a mere accessory to the note and can be enforced only by the proper note holder (the legalese is "real party of interest"). The required endorsements were never done.



```
                                                              Page 1
 1   STATE OF INDIANA          MARION COUNTY SUPERIOR COURT

 2   COUNTY OF MARION      CAUSE NO.: 49D06-0703-MF-013045
                       consolidated with: 49D10-0609-PL-40167
 3   ----------------------------------------------------------

 4   U.S. Bank, NA as Trustee,

 5              Plaintiff(s),

 6        vs.

 7   Mamie Robinson, Individually
     and as Personal Representative
 8   of Jessie Robinson,

 9              Defendant.
     ----------------------------------------------------------
10

11                  DEPOSITION TRANSCRIPT OF

12                        JUDY FABER

13                     August 14, 2009

14                       10:10 A.M.

15                           at

16
                          GMAC RFC, LLC
17                     One Meridian Crossings
                    Minneapolis, Minnesota  55423
18

19

20

21

22

23

24

25   REPORTED BY:  Janet D. Winberg, RPR
```

## Page 1

```
STATE OF INDIANA          MARION COUNTY SUPERIOR COURT
COUNTY OF MARION     CAUSE NO.: 49D06-0703-MF-013045
                     consolidated with: 49D10-0609-PL-40167
-----------------------------------------------------
U.S. Bank, NA as Trustee,

          Plaintiff(s),

     vs.

Mamie Robinson, Individually
and as Personal Representative
of Jessie Robinson,

          Defendant.
-----------------------------------------------------

              DEPOSITION TRANSCRIPT OF

                     JUDY FABER

                   August 14, 2009

                     10:30 A.M.

                         at

                    GMAC RFC, LLC
                 One Meridian Crossings
               Minneapolis, Minnesota 55423




REPORTED BY: Janet D. Winberg, RPR
```

CHASER COURT REPORTING
Phone (612) 968-5960 ** Fax (952) 226-1784 ** chaserreporting@aol.com

## Page 2

**APPEARANCES:**

On Behalf of the Plaintiff(s):

Christine M. Jackson
Chris Jackson Law, LLC
8555 Cedar Place Drive
Suite 111-A
Indianapolis, IN 46240
chris@chrisjacksonlaw.com

On Behalf of the Defendant:

James M. Boyers
Wooden & McLaughlin, LLP
211 North Pennsylvania
One Indiana Square
Suite 1800
Indianapolis, IN 46204
jboyers@woodmclaw.com

Also Present:

Kathy Priore
Christine Boen

NOTE: Pursuant to Minnesota Rule of Civil Procedure 30.06, the original transcript will be delivered to the noticing party.

NOTE: Exhibits 1 - 8 were marked.

CHASER COURT REPORTING
Phone (612) 968-5960 ** Fax (952) 226-1784 ** chaserreporting@aol.com

## Page 3

**EXAMINATION INDEX**

By Mr. Boyers: 174 - 178, 181 - 181

By Ms. Jackson: 4 - 174, 77 - 181

**OBJECTION INDEX**

Mr. Boyers: 9, 16, 18, 58, 68, 77, 88, 99, 107, 115, 124, 128, 129, 135, 142, 150, 152, 154, 164, 166

**EXHIBIT INDEX**

Exhibit No. 1
(Purchase Advice)
Marked..................................4

Exhibit No. 2
(Interim Certification/Exception Report)
Marked..................................4

Exhibit No. 3
(Corporation Assignment of Mortgage)
Marked..................................4

Exhibit No. 4
(Complaint on Note and to Foreclose Mortgage...)
Marked..................................4

Exhibit No. 5
(Complaint on Note and to Foreclose Mortgage...)
Marked..................................4

Exhibit No. 6
(Note)
Marked..................................4

Exhibit No. 7
(Note)
Marked..................................4

Exhibit No. 8
(Affidavit of Judy Faber)
Marked..................................4

Phone (612) 968-5960 ** Fax (952) 226-1784 ** chaserreporting@aol.com

## Page 4

PROCEEDINGS

(Exhibits 1 - 8 marked.)

...

(Witness sworn.)

JUDY FABER,

called as a witness, being first duly sworn, was examined and testified as follows:

...

EXAMINATION

BY MS. JACKSON:

Q. Can you please say and spell your name for the record?

A. Judy Faber, F as in Frank. A. B as in Boy. E-R.

Q. And what is your current job position?

A. I am a Vice President and a Director of Residential Funding Corporation or Residential Funding Company, LLC and GMAC Mortgage Company, LLC.

Q. Wow.

A. Pretty impressive.

Q. Does it all fit on your card?

A. No. I don't have cards. Too expensive.

Q. Really.

## Page 5

1  And how long have you worked for Residential
2  Funding Corporation?
3  A.  A little over 13 years.
4  Q.  Okay. And when you first started with
5  Residential Funding Corporation what was your
6  first job?
7  A.  A Records Services Manager.
8  Q.  Okay. And then at what time period did you move
9  to your new position?
10 A.  Well, it's the same position.
11 Q.  Okay.
12 A.  I received the title probably about a year after
13  I started.
14 Q.  Okay. Did your job duties change?
15 A.  No.
16 Q.  Okay. That makes it much easier.
17    Okay. And then I just want to ask just a
18  little bit...
19    First of all, have you ever been deposed
20  before?
21 A.  Yes.
22 Q.  Okay. So just briefly, if I say anything and
23  you don't understand it, --
24 A.  Uh-huh.
25 Q.  -- like I said, tell me and let me know.

## Page 6

1  I'm struggling, trying to understand some of
2  your terminology and stuff. At times I'm just
3  trying to figure out how the process works.
4  A.  Okay.
5  Q.  If you need a restroom break, water break, any
6  kind of break, just let us know. If I've asked
7  you a question I would just like you to finish
8  answering the question before you go.
9  A.  Okay.
10 Q.  And yesterday I forgot to tell the witness, but
11  make sure that you try to always answer either
12  Yes or No because the court reporter can't do
13  the Uh-huhs and, --
14 A.  Okay.
15 Q.  -- you know, head bobs.
16    So can you tell me just a little bit about
17  your educational background?
18 A.  I have an undergraduate degree from the
19  University of Minnesota --
20 Q.  Uh-huh.
21 A.  -- in business.
22 Q.  Okay.
23 A.  High school?
24 Q.  Well, yeah. And did you have any other
25  education beyond your undergraduate?

## Page 7

1  A.  I do have a 2-year certificate, legal assistant
2  certificate --
3  Q.  Good.
4  A.  -- from North Hennepin Community College.
5  Q.  Okay. And part of the reason that you have been
6  offered to testify today is that you are
7  supposed to have knowledge of how the documents
8  are handled from the beginning of the loan
9  process when the documents first come into RFC
10  and then through the point they may be
11  transferred over to another entity; --
12 A.  Right.
13 Q.  -- is that correct?
14    MR. BOYERS: I'd just note an
15  objection --
16    MS. JACKSON: Uh-huh.
17    MR. BOYERS: -- because you talked about
18  the beginning of the loan process.
19    MS. JACKSON: Uh-huh.
20    MR. BOYERS: The beginning of the loan
21  process occurs before anything comes in to GMAC.
22  Just for clarity.
23    So if you're asking about the process from
24  the time it comes in to RFC, that's fine, but
25  the way you asked it suggested that the

## Page 8

1  beginning of the loan process itself started
2  with RFC and that's a fact not in evidence.
3    MS. JACKSON: Absolutely.
4  BY MS. JACKSON:
5  Q.  You don't think I was asking you about what
6  another company did that you have no knowledge
7  of, did you?
8  A.  (Nodding.)
9  Q.  Okay.
10    So we are talking about just your duties at
11  Residential Funding Corporation.
12 A.  Okay.
13 Q.  And if I get any acronyms mixed up, please stop
14  and correct me; okay?
15 A.  (Nodding.)
16 Q.  So if you could tell me your job...
17    Have your job duties changed from 2005 from
18  what you do now?
19 A.  Um...
20    MR. BOYERS: Asked and answered.
21    MS. JACKSON: Well, she said she did the
22  same thing for 13 years. I don't know...
23    MR. BOYERS: If you can answer, --
24    THE WITNESS: Um...
25    MR. BOYERS: -- you can answer.

### Page 9

1   THE WITNESS: They have changed. I
2   guess I would say Yes.
3   MS. JACKSON: Okay.
4   BY MS. JACKSON:
5   Q.  This is the other Pre thing we need to tell you
6       about depositions.
7       At various points in time Jim Boyers, with
8       an S, may go ahead and object and that has to do
9       with literally if we can use the information
10      later on, when everybody is basically noting it
11      for the objection.
12      Most of the time he's going to allow you to
13      answer the question. I mean he will tell you
14      specifically, "Do not answer that," if not. So
15      a lot of times there will be objections, but we
16      will just kind of continue on.
17  BY MS. JACKSON:
18  Q.  So can you tell me what your job duties were in
19      2005?
20  A.  Well, in 2005 I directly managed people that did
21      the work.
22      In 2007 all those people were released and
23      the functions went to a vendor who does the work
24      for us now. So I now manage the vendor as
25      opposed to directly managing people.

### Page 10

1   Q.  And when you say you managed people who did the
2       work, what type of work are we talking about?
3   A.  Work around managing both the origination files,
4       as they were received by the organization and
5       the collateral files as they were received by
6       the organization. And then also fulfillment of
7       requests, internal requests, external requests
8       for those documents or files.
9   Q.  Okay. And you just made a distinction between
10      original files and custodial files. Can you
11      explain to me...
12  A.  I don't think I --
13      MR. BOYERS: Could you read back her
14      answer, please?
15      (Record read.)
16      MS. JACKSON: Thank you.
17  BY MS. JACKSON:
18  Q.  The difference between the origination files and
19      the collateral files.
20  A.  Uh-huh.
21  Q.  Can you explain to me -- I mean you made a
22      distinction between the two, --
23  A.  Okay.
24  Q.  -- so can you tell me what the difference is?
25  A.  An origination file, which we also call a credit

### Page 11

1   file, would be the documents that are used by
2   the underwriter, by the processor, to make the
3   decision as to whether they want to fund the
4   loan or not.
5   Q.  Okay.
6   A.  The collateral file/legal file we refer to as
7       the folder that contains the original Note and
8       copies of the mortgage and assignments, if any.
9       The legal file/collateral file is what is
10      held at the custodian.
11      The legal -- or the credit file is what's
12      held at off-site storage.
13  Q.  And was -- in 2005 was the legal file held off
14      site or was it still here at this location?
15      MR. BOYERS: At what point in the --
16      MS. JACKSON: 2005.
17      MR. BOYERS: In the process, though. At
18      what point in the process are you asking about?
19      MS. JACKSON: In 2005.
20  BY MS. JACKSON:
21  Q.  In 2005 were the collateral files still
22      maintained here at Residential Funding
23      Corporation by the custodian, as opposed to
24      off site?
25      MR. BOYERS: If you understand the

### Page 12

1   question, you can answer.
2       My objection is not to the year you're
3       asking about, --
4       MS. JACKSON: Uh-huh.
5       MR. BOYERS: -- but to at what point in
6       the process are you talking about.
7       MS. JACKSON: At what point in the
8       process.
9   BY MS. JACKSON:
10  Q.  Well, let's just start at the beginning.
11      So a file comes in from -- and how do you
12      want me to refer to -- in this particular case
13      the loan originator was Mercantile Mortgage. So
14      I want to refer to that type of entity.
15  A.  Okay.
16  Q.  Do you call them loan originators? Or what do
17      you --
18  A.  Or clients.
19  Q.  Clients. Okay.
20      Okay. So when a client file comes in...
21  A.  (Gesturing.)
22  Q.  No, that doesn't?
23  A.  No -- yeah, it's very difficult to answer to the
24      extent that we had different processes for
25      different clients and it's hard -- I didn't

Page 145

1  or the signing of the endorsements and then the
2  date that they actually completed it.
3  Q. Okay. All right. The Interim Certification
4     would also provide information about exceptions
5     to Notes?
6  A. Um...
7  Q. And just --
8  A. Correct. Right.
9  Q. And just for your ease, I'm going to --
10 A. I think that was Exhibit 2.
11         MS. JACKSON: Exhibit 2.
12         MR. BOYERS: Yes.
13 BY MR. BOYERS:
14 Q. Exhibit 2 is a copy of the Interim
15    Certification, which...
16       When you were talking about the Interim
17    Certification, is this an example of that?
18 A. This is the detail behind it. There was another
19    piece of the Interim Certification that talked
20    about the stamping and endorsing piece that's
21    not included here.
22 Q. Okay. Okay.
23 A. But again, that was a summary, it wasn't a
24    detail.
25 Q. Okay. Now this Exception Report, though, only

Page 146

1  identified those -- it identified those loans
2  for which something had not been completed?
3  A. Correct.
4        MS. JACKSON: Objection. She didn't
5  prepare that document, so...
6  BY MR. BOYERS:
7  Q. Your understanding of what this report provides
8     from Wells Fargo, as part of the standard
9     procedure, was the loans in which exceptions
10    remained to be resolved?
11 A. Correct.
12 Q. Okay. And then with respect to Exhibit 9, you
13    again testified that you didn't recall the
14    specific act of signing this affidavit; is that
15    your signature?
16 A. Correct, it is.
17 Q. And is that your handwriting --
18 A. Yes.
19 Q. -- with the date there?
20 A. Yes.
21 Q. And would you have signed this if the
22    information was not true and correct?
23 A. No, I would not.
24 Q. Okay. Ms. Jackson asked you some questions
25    about the use of the name of the actual trust on

Page 147

1  some mortgage assignments and the use of the
2  trustee's name on mortgage assignments; do you
3  recall that?
4  A. Yes.
5  Q. Okay. To this day does Residential Funding
6     Company continue to endorse -- or I'm sorry --
7     prepare assignments which show the name of the
8     trustee?
9  A. Yes.
10 Q. Okay. And you testified earlier only in a few
11    limited jurisdictions is the actual security
12    identified by name?
13 A. Correct.
14 Q. Okay.
15 A. And that's a very recent development.
16 Q. Okay. Now she also asked you some questions
17    about assignments, preparing the assignments
18    and asked about the information that was put in
19    the mortgage assignment.
20       Whoever requested that an assignment be
21    prepared, was your department responsible for
22    independently verifying that the information
23    provided in that assignment was correct?
24 A. Yes.
25 Q. And that verification was based on the data

Page 148

1  maintained on the specific loan?
2  A. Yes.
3        MR. BOYERS: I don't have any further
4  questions.
5        MS. JACKSON: I just have a real quick
6  follow-up, since you introduced Exhibit 2. I
7  think we referred to that as an *Exception Sheet*,
8  *Exception Log*.
9        MR. BOYERS: I think it was called an
10 *Interim* --
11        MS. JACKSON: No, that was --
12        MR. BOYERS: -- *Certification Report*.
13        MS. JACKSON: But that's not -- you said
14 that was the backup -- backup information and
15 there was another document that went to it that
16 was the Interim Certification.
17    I think she said -- she said this was a
18 detail...
19        THE WITNESS: The --
20        FURTHER EXAMINATION
21 BY MS. JACKSON:
22 Q. I guess what is this report?
23 A. This is a -- I would call this the *Exception*,
24    the *Interim Exception Report*.
25 Q. Okay.

Page 149

1  A. What Wells calls it, I'm not sure. That's what
2     I would call it.
3  Q. Okay. That's how we'll call it, too.
      This *Interim Exception Report*, when your
      department received it, did it require that you
6     do anything with that information?
7  A. This was not in my department.
8  Q. Okay. Do you know what department it went to?
9  A. It was another area within Records.
10 Q. Do you know what they called it?
11 A. Deal Support.
12 Q. Deal Support?
13 A. Well, no. Panel Certification.
14 Q. Okay. Okay. And when you said that Wells Fargo
15    provided you Interim Certifications, were you
16    required to do anything with that information?
17 A. Again, what they provided to me --
18 Q. Uh-huh.
19 A. -- was the report that showed them where they
20    were at as far as the endorsement stamping. It
21    was tied to the *Interim*. They did the stamping
22    and endorsing when they reviewed the file for
23    the Interim Certification.
24 Q. Okay. And is that the report that you were
25    talking about where they told you if there was a

Page 150

1  percentage done for it?
2  A. Correct.
3  Q. Okay. And was there any way to determine from
4     the report whether a specific loan was stamped
5     or not?
6     MR. BOYERS: Object to the form of the
7     question. You're asking her if there's any way.
8     MS. JACKSON: Right.
9     MR. BOYERS: I think you're asking her
10    about her personal knowledge; right? And
11    you're -- therefore, if you're saying is there
12    any way, you're asking for opinion.
13    MS. JACKSON: Okay.
14    MR. BOYERS: She can answer, but I'm
15    just going to object.
16    Go ahead.
17    MS. JACKSON: On this particular
18    report --
19    MR. BOYERS: Pointing to Exhibit 2.
20 BY MS. JACKSON:
21 Q. Exhibit 2. Is there any way to tell which one
22    has the Notes endorsed and which one does not?
23 A. If they were not endorsed, --
24 Q. Uh-huh.
25 A. -- they would have shown up as an exception on

Page 151

1  here.
2  Q. Okay.
3  A. So, yes, there is a way.
4  Q. Okay. And outside of receiving the Interim
5     Certificate and noting the progress, was there
6     anything else you had to do with that
7     information, your department, your Records
8     Department?
9  A. No.
10 Q. Okay.
11    MS. JACKSON: (Nodding.)
12    THE WITNESS: That's it?
13    MS. JACKSON: That's it.
14    (Discussion had off the record.)
15    MR. BOYERS: The witness will read and
16 sign her transcript.
17    (Concluded at 2:48 P.M.)
18    * * *

Page 152

STATE OF MINNESOTA )
                   : ss  CERTIFICATE
COUNTY OF WASHINGTON )

I, Janet D. Winberg, hereby certify
that I reported the deposition of JUDY FABER, on
the 14th day of August, 2009, in Minneapolis,
Minnesota, and that the witness was, by me,
first duly sworn to tell the truth;

That the testimony was transcribed by me and is
a true record of the testimony of the witness;

That I am not a relative, or employee, or
attorney, or counsel of any of the parties; or a
relative or employee of such attorney or
counsel;

That I am not financially interested in the
action and have no contract with the parties,
attorneys or persons with an interest in the
action that affects or has a substantial
tendency to affect my impartiality;

That the right to read and sign the transcript
by the witness was reserved.

WITNESS MY HAND AND SEAL THIS 31st day of
August, 2009.

_____
JANET D. WINBERG
Registered Professional Reporter
Notary Public
Washington County, Minnesota.