Claim #4702

# EXHIBIT 7



IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE COUNTY, FLORIDA

DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS TRUSTEE

    Plaintiff,

-vs.-

TOMAS DIAZ

    Defendant,

CASE NO.: **2007-16754 CA 01**
DIVISION (10)

_____/

# **DECLARATION**



I, Alexis Mesa, subscribe to A Professional Data Service and I have been trained to do Mortgage Security Audits and have the Certification & knowledge on how to perform these searches.

On April 6, 2012, I researched the Bloomberg online Database at the request of Tomas Diaz. He allegedly signed a Note in favor of Platinum Capital Group, Corp. On April 27, 2006 with a loan #0010500352, then the mortgage was assigned to Deutsche Bank Trust Company Americas on October 26, 2006 the loan was identified as RALI Series 2006-QO6 Trust with a loan # 0010624849. The loan was assigned to Aurora Loan Services, LLC with a loan no.: 0021953252. After a Thorough search of Miami-Dade public records it results that no assignments were filed/recorded from Deutsche Bank National Trust Company Americas to Aurora Loan Services, LLC. The clarifying code and abbreviation on the Bloomberg Terminal is **RALI 2006-QO6**.

Pursuant to a thorough search I have found the aforementioned loan in the ACTIVE CLASS of the RALI 2006-QO6. My research has showed that the loan level detail of this Trust which has a total of 3,651 loans and 2,293 which are Inactive Loans. This loan also shows that it was **paid off** in 10 Tranches / Classes and appears to still be receiving periodic cash flows in 3 Tranches/ Classes. There are a total of 15 Tranches / Classes in this Trust.



1

I, Alexis Mesa hereby certify all the following is true obtained by my first hand investigation into this matter. I'm available for court appearance or via phone for further clarification or explanation. Please refer to the exhibits A, B, and C for more detailed information.

I Alexis Mesa declare, verify and state under penalty of perjury that the foregoing is true and correct.

BY: _____ EXECUTED ON: 4/6/2012

Alexis Mesa
11901 SW 45th ST
Miami, FL 33175
PH: 305-219-5670
FAX: 786-999-0990
mvrinter@aol.com

State of Florida County of Miami-Dade

Subscribed and sworn to (or affirmed) before me, Xiomara Endara, Notary Public, on this _6_ day of April, 2012 by Alexis Mesa, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS my hand and official seal

_____
Notary Public

[Notary Seal: XIOMARA G. ENDARA, MY COMMISSION EXPIRES June 16, 2015, #EE 104010, Bonded thru Budget Notary Services, NOTARY PUBLIC, STATE OF FLORIDA]

2

CLAIM #4702

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS TRUSTEE

    Plaintiff,

-vs.-　　　　　　　　　　　　　　　　　　　　　CASE NO.: 2007-16754 CA 01
　　　　　　　　　　　　　　　　　　　　　　　　DIVISION (10)
TOMAS DIAZ

    Defendant,

_____/

## AFFIDAVIT OF ALEXIS MESA
## IN OPPOSITION TO TRUSTEES LEGAL STANDING

---

| | |
|---|---|
| BORROWER: | TOMAS DIAZ |
| LOAN NO.: | 10500352 / 0010624849/ 0021953252 |
| PROPERTY ADDRESS: | 5200 SW 122ND AVE |
| | MIAMI, FL 33175 |

I, Alexis Mesa, hereby swear and affirm as follows:

1. I am a subject matter expert on foreclosure litigation, the secondary mortgage market, Foreclosure Litigation, and Mortgage Asset-Backed Securitization and its effects and applications in Foreclosure and Loss Mitigation.

2. I subscribe to Bloomberg Professional Service and I have been trained at the Bloomberg Institute in New York City. I am certified to do Mortgage Security Audits and have knowledge on how to perform these searches.

1



3. I perform regular, ongoing searches into the securitization, sale and transfer aspect of residential mortgage loans and mortgage backed securities and am proficient in applying that research to the particular facts in a given foreclosure case.

4. This declaration is based upon my personal knowledge grounded in a thorough and complete review of the loan documents, servicing documents, trust documents and the other documents related to the instant case. If called upon as a factual witness in this matter I could and would competently testify to the facts as set forth below.

5. On April 6, 2012, I was retained by the Borrowers to conduct an investigation and audit of the securitization aspects of this mortgage loan transaction, conduct due diligence inquiries on the Special Purpose Vehicle (the "SPV and/or the "Issuer") known as RALI Series 2006-QO6 Trust along with the chain of ownership that all assets (i.e. Notes), relative to this specific Trust, have gone through as compared to the alleged chain of ownership by the Lender.

6. In conducting the investigation, I reviewed various documents that were filed with the Securities and Exchange Commission specific to this Trust and which are the operative documents governing the Trust and all parties acting on behalf of the trust in their various roles such as Trustee, Master Servicer, Sponsor, Depositor, etc.



7. I reviewed various documents filed with the Miami-Dade County Recorder's Office

8. I also specifically reviewed and analyzed the Adjustable Rate Note and the Mortgage dated April 27, 2006 recorded on May 15, 2006, between the Borrower and Platinum Capital Group, Corp.

9. My examination below reveals that the Borrowers' loan was securitized into the RALI Series 2006-QO6 Trust on or about June 29, 2006 and that DEUTSCHE BANK TRUST COMPANY AMERICAS attorney misrepresented Platinum Capital Group, Corp. status as owner and holder of the Borrowers' loan.

10. The form 424B prospectus Supplement governing this specific Trust outlines with absolute clarity and with particularity the entities that are and were involved in this trust from inception. **Exhibit A** attached to this Affidavit provides the exact chain of title and ownership of every Note and Mortgage that was selected for inclusion in this specific Trust.

11. This specific trust, as with all trust, is governed by certain operative documents that dictate the actions of any and all agents for the trust, their powers and how they may act

2

on behalf of the trust. An agent for the trust, such as the trustee, has absolutely no power to act outside of the powers and authority vested in it by these documents.

12. The governing documents for this trust are the Prospectus, Prospectus Supplement, Pooling and Servicing Agreement and the Mortgage Loan Purchase Agreement referred to in the Pooling and Servicing Agreement.

13. Through access to the Electronic Data Gathering Analysis and Retrieval (EDGAR) System with the Securities and Exchange Commission (SEC), I was able to retrieve these governing documents which were filed with the SEC back in 2006

14. *Issuing Entity* of the Pooling and Servicing Agreement, attached as **Exhibit A to** this Affidavit clearly states on S-28 that "The pooling and servicing agreement provides that the depositor assigns to the trustee for the benefit of the certificateholders without recourse all the right, title and interest of the depositor in and to the mortgage loans. Furthermore, the pooling and servicing agreement states that, although it is intended that the conveyance by the depositor to the trustee of the mortgage
loans be construed as a sale, the conveyance of the mortgage loans shall also be deemed to be a grant by the depositor to the trustee of a security interest in the mortgage loans and related collateral."(Emphasis mine).

15. What this clause clearly stipulates is that the Depositor, Residential Accredit Loans, Inc., is the only entity that can assign, transfer and convey the mortgage loans to the Trustee for this Trust.

16. The Originator for Borrowers' loan was Platinum Capital Group, Corp. Platinum Capital Group, Corp. sold the Borrowers' loan into the trust on or about June 29, 2006. Therefore, it is entirely impossible, short of specific documentation to substantiate a claim that Platinum Capital Group, Corp. could assign anything after June 29, 2006.

17. There are enormous consequences, if any Assignment are not authentic, in that this Trust has elected to be a REMIC Trust (REMIC short Real Estate Mortgage Investment Conduit). According to the Prospectus on page. 73 under the heading " Federal Income Tax Consequences" the RALI Series 2006-QO6 Trust that this loan was deposited into elected to be treated as a REMIC , which provides for pass-through tax treatment of the income generated by the Trust assets, thus the name RALI Series 2006-QO6 Trust, Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO6.

18. A REMIC trust has a special tax status with the Internal Revenue Status which allows the cash flow on the pool of loans to "pass through' to the individual certificate holders

3

thereby avoiding double taxation on the cash flow – a significant profit advantage for the investors of that trust and which can easily translate into millions of dollars in taxes saved.

19. Election by the Trust to be treated as one or more REMIC's impose strict and absolute requirements regarding transfers of assets (i.e. Mortgage loans or notes) to the Trust and IRC Section 860 outlines and governs these strict requirements.

20. According to 26 CFR § 1.860D-1 (c)(2) *Identification of assets*. Formation of the REMIC does not occur until-(i) The sponsor identifies the assets of the REMIC, such as through execution of indenture with respect to the assets; and (ii) The REMIC issues the regular and residual interest in the REMIC.

21. In other words, the REMIC is not officially formed until the Sponsor/Seller identifies the specific assets of the REMIC (the specific loans) and the REMIC subsequently issues the regular and residual interest in the REMIC.

22. The Prospectus and PSA specifically identify a Closing Date which is the last day that an asset (mortgage loan) can be "identified" for inclusion in the Trust/REMIC. The Closing Date also serves as the Startup Day for the REMIC. According to the Internal Revenue Code, Section 860G, "All of a REMIC's loans must be acquired on the startup day of the REMIC or within three months thereafter." Any contributions of an asset(other than cash) that is contributed to the REMIC after the Startup Day (or within the allowable 90 day window) is deemed an "unqualified contribution" and can cause the entire REMIC Trust to lose its tax-free status which would be catastrophic to the Trust (and all the individual beneficiaries, shareholders or Certificateholder) because the Trust cash flow would be subject to double-taxation or at a minimum, the prohibited transaction is taxed at 100% to the Trust.

23. For this reason, all parties serving as agents for the Trust must strictly adhere to the guidelines and conveyance clauses specifically delineated in *Prohibited Transactions and Other Possible REMIC Taxes* of the PSA on page. 92, The Internal Revenue Code imposes a prohibited transactions tax, which is a tax on REMICs equal to 100% of the net income derived from prohibited transactions.

24. The Closing Date/ Startup Day for this Trust/REMIC was: on or about June 29, 2006.

25. Also, in order for the Trust to qualify as a REMIC, all steps in the 'contribution" and transfer process (of the mortgage notes) must be true and complete sales between parties

4

and <u>within the three month time limit from the Startup Day.</u> Therefore, every transfer of the Note(s) for inclusion in the Trust *must be a true purchase and sale,* and consequently the Note must be endorsed from one entity to another and the corresponding mortgage must be assigned in the exact same chain.

26. Residential Funding Corporation is the Seller for this particular trust so it would have been Residential Funding Corporation that would have had to select the subject Note and Mortgage for inclusion into this trust to begin with.

27. Thus, Platinum Capital Group, Corp would have endorsed the Note to Residential Funding Corporation.

28. By virtue of that fact, there would have to be a corresponding Assignment, there would be a break in the chain of title and the Note and Mortgage would have been bifurcated or separated creating an unsecure debt (the Note without a Security Instrument).

29. If, in fact, Residential Funding Corporation, selected this loan to be included in this specific trust, then four very distinct actions would have been taken:

   i. It would have included this mortgage loan on the Mortgage Loan Schedule as per ***Description of the Mortgage Pool*** of the Pooling and Servicing Agreement and this schedule would still, to this day, identify this loan directly.

   ii. It would have specifically endorsed the Note to Residential Accredit Loans, Inc. – the depositor for this Trust; and,

   iii. It would have drafted an Assignment of Mortgage, as Assignor, to Residential Accredit Loans, Inc. as Assignee

   iv. Residential Accredit Loans, Inc. would have endorsed the note in blank and would have drafted an Assignment as Assignor to DEUTSCHE BANK TRUST COMPANY AMERICAS.

30. All four of these actions are specifically required by the governing document, Pooling and Servicing Agreement ***Issuing Entity*** of the pooling and servicing agreement states that, although it is intended that the conveyance by the depositor to the trustee of the mortgage loans be construed as a sale, the conveyance of the mortgage loans shall also be deemed to be a grant by the depositor to the trustee of a security interest in the mortgage loans and related collateral.

31. **THE TRUSTS** of the PSA in the instant case specifically requires the Depositor (*and only the Depositor*) to convey the mortgage loans to the Trustee. Simply put, the PSA allows for absolutely no other form, method or chain of conveyances of mortgage loans to the Trust.

32. Any Assignments or Notices filed by the Lender in the instant case must meet these specific requirements or the notice is either (a) a fraud, or (b) an Assignment for this Trust which thus separated the Note from the Mortgage thereby likely rendering the Note an unsecured obligation or, in the alternative, indicating that this Note was in fact deposited into this Trust after the Closing Date/ Startup Day and is thereby an "unqualified contribution" into this Trust pursuant to IRC § 860 and thus subjects this entire Trust to a revocation of its REMIC tax status and possibly would subject all cash flow received by this Trust to be double taxation.

33. Due to the history of Borrowers' loan, I believe that nothing short of producing the original note with the proper endorsements will suffice to accurately clarify ownership of note and proper legal standing.

34. The Mortgage always follows the note unless they are purposefully separated for some obscure reason.

35. Given these issues, Platinum Capital Group, Corp. could not have assigned the Mortgage to anyone after the Closing Date/ Startup Day of on or about June 29, 2006.

36. These are all serious issues of fact that need to meted out properly to determine the authenticity of any mortgage assignment and the Lender's standing in the instant case.

37. In my investigative work for various attorneys, it has become highly evident that these "Assignments" are being called into question more and more by presiding judges, state attorney generals and the like.

38. These assignments seem to appear out of nowhere and usually have highly suspect dates appearing on them. Their authenticity have been called into question on numerous occasions; many questions have been asked of the Lenders supplying these purported assignments and the answers have only created more doubt about their validity.

39. The pooling and Servicing Agreement is the governing document for this Trust and all parties. The PSA clearly defines the conveyances method and order for all mortgage loans in this Trust. The Trustee cannot violate page S-28 of the PSA when it accepts the Note and Mortgage via any Assignment of Mortgage, together with the Note.

6

40. The Lender would only have the right of enforcement of this Note if it had taken possession of this Note in the manner described in the PSA. No other manner of possession or conveyances is authorized and therefore if the Lender took possession of the Note after the Closing Date/Startup Day then it could not have the right of enforcement as Trustee for this Trust.

41. It is my opinion, after careful consideration of all the facts of this case along with a thorough review of the Trust documents filed with the SEC, that the Trustee's' legal standing in the instant case is not authentic and that it was merely fabricated at the request of the Lender or Lender's counsel to present an "appearance" of the legal ownership of the Note and Mortgage and the right to foreclose on the Borrowers. AURORA LOAN SERVICES, LLC is acting in the role of Servicer to Borrowers' loan and is not the true owner and holder of the Note and AURORA LOAN SERVICES, LLC is not a Servicer in this Trust and has no affiliation to this Trust and is attempting to collect on a debt that was never acquired properly. Any Assignments or Notices filed in the instant case must recognize the process of securitization that has occurred to Borrowers' loan and follow the requirements outlined above. The Lender can and is only acting in the capacity as Servicer for another entity. There is no authority the Lender has or would have to create any assignments and if Borrowers' loan was sold into this particular trust, the closing date was on or about June 29, 2006.

42. Another entity is likely to be found to be the true and actual owner and holder of the Note and Mortgage, however further discovery would need to be conducted to make a final determination of exactly who at this point does own the subject Note and Mortgage and to determine if the Note and Mortgage have been bifurcated or not.

43. Finally, I recommend that the activities by the Lender be reported to the Internal Revenue Service and the Securities and Exchange Commission for, what I deem to be violations of federal law, acceptance of a prohibited transaction for this trust and for breach of trust.

**I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this petition and that the punishment for knowingly making a false statement includes fines and/or imprisonment.**

_____
Alexis Mesa

STATE OF FLORIDA

COUNTY OF MIAMI-DADE ss.

On the __6__ day of __April__ in the year 2012, **Alexis Mesa** personally appeared before me, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individuals acted, executed the instrument, and that such individual made such appearance before the undersigned in **Miami, Florida.**

_____
NOTARY

_4/6/12_____
DATE

8