be "identified" for inclusion in the Trust/REMIC. The Closing Date also serves as the Startup Day for the REMIC. According to the Internal Revenue Code, Section 860G, "<u>All of a REMIC's loans must be acquired on the startup day of the REMIC or within three months thereafter.</u>" Any contributions of an asset (other than cash) that is contributed to the REMIC after the Startup Day (or within the allowable 90 day window) is deemed an "unqualified contribution" and causes the entire REMIC Trust to lose its tax-free status which would create tax liabilities to the Trust (and all the individual beneficiaries, shareholders or Certificate holders) because the Trust cash flow would be subject to double-taxation, or, at a minimum, the prohibited transaction is taxed at 100% to the Trust. Due to the fabricated assignments of mortgage notes, fabricated assignments of mortgages, there is no evidence of proper transfer of mortgage notes to the RALI Series 2006-QO6.

16. **Failed Securitization of Trust(s).** Since the parties serving as agents for the Trust did not strictly adhere to the guidelines and conveyance clauses specifically delineated in the PSA the Trust herein never obtained its special REMIC tax status, which results in double taxation on all trust income, and, subjects the Trust to a 100% tax on any and all prohibited transactions.

17. The Closing Date for this Trust/REMIC was: on or about June 29, 2006. The foreclosure litigation and assignments demonstrate non compliance with this IRS qualification requirement.

18. Additionally, the creation of the trust is flawed due to the fact that all steps in the 'contribution" and transfer process (of the mortgage notes) must be true and complete sales between parties and <u>within the three month time limit from the Startup Day.</u> Therefore, every transfer of the Note(s) for inclusion in the Trust *must be a true purchase and sale,* and

consequently the Note must be endorsed from one entity to another and the corresponding mortgage must be assigned in the exact same chain. The exhibits submitted indicate that this did not happen. Claimants contend that the transactions involved herein constitute a failed securitization of the relevant mortgage notes and the paperwork contradicts the claimed tax status of the named remics.

19. The Pooling and Servicing Agreement (PSA), specifically requires the Depositor Residential Accredit Loans, Inc. (*and only the Depositor*) to convey the mortgage loans to the Trustee in a timely manner. Simply put, the PSA allows for absolutely no other form, method or chain of conveyances of mortgage loans to the Trust.

20. **The Assignments filed by MERS as nominee for the Platinum Capital Group Corp. (see exhibit N) indicate that this Note was in fact deposited into this Trust after the Closing Date and is thereby an "unqualified contribution" into this Trust pursuant to IRC § 860, also constitutes a prohibited transaction, and thus subjects this entire Trust to a revocation of its REMIC tax status, taxation of the prohibited transaction, and subjects all cash flow received by this Trust to double taxation at corporate levels.**

21. The pooling and Servicing Agreement is the governing document for this Trust and all parties. The PSA clearly defines the conveyances method and order for all mortgage loans in this Trust. The Trustee cannot violate the PSA when it accepts the Note and Mortgage via any Assignment of Mortgage, together with the Note.

22. **The term "tax evasion" can be reserved for conduct that entails deception, concealment, destruction of records and the like, while tax avoidance refers to behavior that the taxpayer hopes will serve to reduce his tax liability but that he is prepared to disclose fully to the IRS.** The submitters herein, believe this is a case of tax

13 | Page

evasion due to the lack of any reasonable business purposes to explain the conduct of all relevant parties herein, other than to avoid double taxation on the income of the alleged named trust entity. The conduct of Judy Faber, Cheryl Samons, and the Law Offices of David J. Stern P.A., etc., is beyond reasonable explanation.

23. **Filing of false forms 8811.** A REMIC is required to elect REMIC status by filing under the penalties of perjury an irrevocable election to be taxed as a non taxable remic. Claimants submit that all forms 8811 filed by all of the named taxpayers herein were false and fraudulent.

24. **IRS has ample authority to properly reflect this transaction correctly and subject it to U.S. Taxation at corporate rates.** Sections 61 & 482 of the Internal Revenue Code are the controlling authorities for the IRS to correct this tax avoidance scam. The substance vs. the form of this transaction lends itself not as a qualified REMIC, but, solely to being characterized as a corporate money lending operation, or, an insurance operation, and should be adjusted under Section 482 of the Internal Revenue Code so that these parties are taxed as a corporation since they began operations in 2007, or, the earliest date these activities began. Delinquent corporate tax returns are now due from 2007 forward and all related taxpayers should also file delinquent tax returns as this appears to be the custom and practice of Residential Accredit Loans, Inc., etc.

25. **Mortgage of Rev. Tomas Diaz or others, may have implicitly been satisfied\paid in full due to credit enhancements without the mortgagors knowledge thereof.** The prospectus indicates that there are credit enhancements to insure against loss to the investors.

14 | Page

Prospectus supplement dated June 28, 2006 (to prospectus dated March 3, 2006)

# $1,290,297,000
# RALI Series 2006-QO6 Trust
### Issuing Entity

## Residential Accredit Loans, Inc.
### Depositor

## Residential Funding Corporation
### Master Servicer and Sponsor

### Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO6

The trust will hold a pool of one- to four-family residential, payment-option, adjustable-rate first lien mortgage loans with a negative amortization feature.

**Offered Certificates**

The trust will issue these classes of certificates that are offered under this prospectus supplement:

- 3 classes of senior certificates designated Class A-1, Class A-2 and Class A-3 Certificates; and
- 9 classes of subordinated certificates designated Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates

all as more fully described in the table on page S-6 of this prospectus supplement.

**Credit Enhancement**

Credit enhancement for the offered certificates consists of:

- excess cash flow;
- overcollateralization; and
- subordination provided to the Class A Certificates by the Class M Certificates, and subordination provided to the Class M Certificates by each class of Class M Certificates with a lower payment priority.

Distributions on the certificates will be on the 25th of each month or, if the 25th is not a business day, on the next business day, beginning July 25, 2006.

---

**You should consider carefully the risk factors beginning on page S-16 in this prospectus supplement.**

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.

The certificates represent interests only in the trust, as the issuing entity, and do not represent interests in or obligations of Residential Accredit Loans, Inc., as the depositor, Residential Funding Corporation, as the sponsor, or any of their affiliates.

Goldman, Sachs & Co., as underwriter, will purchase all of the offered certificates from the depositor. The certificates are offered by the issuing entity through the underwriters to prospective purchasers from time to time in negotiated transactions at varying prices to be determined at the time of sale. The net proceeds to the depositor from the sale of the underwritten certificates will be approximately 99.99% of the certificate principal balance of the underwritten certificates, plus accrued interest, before deducting expenses.

### Goldman, Sachs & Co.
**Underwriter**

# Table of Contents

| | Page |
|---|---|
| SUMMARY | S-4 |
| RISK FACTORS | S-16 |
|    Negative Amortization Loans and Deferred Interest | S-16 |
|    Risk of Loss | S-17 |
|    Risks Relating to Primary Mortgage Insurers | S-21 |
|    Limited Obligations | S-22 |
|    Liquidity Risks | S-22 |
|    Bankruptcy Risks | S-22 |
|    Special Yield and Prepayment Considerations | S-23 |
| ISSUING ENTITY | S-28 |
| SPONSOR AND MASTER SERVICER | S-28 |
|    Sponsor Securitization Experience | S-29 |
|    Master Servicer Servicing Experience | S-32 |
| AFFILIATIONS AMONG TRANSACTION PARTIES | S-35 |
| DESCRIPTION OF THE MORTGAGE POOL | S-36 |
|    General | S-36 |
|    Mortgage Pool Characteristics | S-36 |
|    Compliance with Local, State and Federal Laws | S-38 |
|    Mortgage Rate Adjustment | S-38 |
|    Characteristics of the Mortgage Loans | S-41 |
|    Balloon Mortgage Loans | S-43 |
|    Static Pool Information | S-43 |
|    Standard Hazard Insurance and Primary Mortgage Insurance | S-44 |
|    The Program | S-45 |
|    Underwriting Standards | S-47 |
|    Originators | S-47 |
|    Additional Information | S-47 |
| DESCRIPTION OF THE CERTIFICATES | S-49 |
|    General | S-49 |
|    Glossary of Terms | S-50 |
|    Interest Distributions | S-65 |
|    Basis Risk Shortfall Reserve Fund | S-66 |
|    Determination of One-Month LIBOR | S-66 |
|    Principal Distributions | S-67 |
|    Excess Cash Flow and Overcollateralization | S-69 |
|    Allocation of Losses | S-71 |
|    Advances | S-72 |
|    Residual Interests | S-73 |
| CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS | S-74 |
|    General | S-74 |
|    Prepayment Considerations | S-74 |
|    Allocation of Principal Payments | S-77 |
|    Realized Losses and Interest Shortfalls | S-78 |
|    Pass-Through Rates | S-79 |
|    Purchase Price | S-80 |
|    Assumed Final Distribution Date | S-80 |
|    Weighted Average Life | S-80 |
| POOLING AND SERVICING AGREEMENT | S-91 |
|    General | S-91 |
|    Custodial Arrangements | S-91 |
|    The Master Servicer and Subservicer | S-91 |
|    Servicing and Other Compensation and Payment of Expenses | S-96 |
|    Reports to Certificateholders | S-97 |
|    Voting Rights | S-97 |
|    Termination | S-98 |
|    The Trustee | S-99 |
| LEGAL PROCEEDINGS | S-100 |
| MATERIAL FEDERAL INCOME TAX CONSEQUENCES | S-100 |
|    Tax Return Disclosure and Investor List Requirements | S-104 |
|    Penalty Protection | S-104 |
| METHOD OF DISTRIBUTION | S-105 |
| USE OF PROCEEDS | S-106 |
| LEGAL OPINIONS | S-106 |
| RATINGS | S-106 |
| LEGAL INVESTMENT | S-107 |
| ERISA CONSIDERATIONS | S-108 |
| ANNEX I — MORTGAGE LOAN STATISTICAL INFORMATION | I-1 |

*Claim #4702*

## Summary

The following summary provides a brief description of material aspects of this offering, and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the offered certificates, you should read carefully this entire document and the prospectus.

| | |
|---|---|
| Issuing Entity | RALI Series 2006-QO6 Trust. |
| Title of securities | Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO6. |
| Depositor | Residential Accredit Loans, Inc., an affiliate of Residential Funding Corporation. |
| Master servicer and sponsor | Residential Funding Corporation. |
| Subservicer | Homecomings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding Corporation, will subservice substantially all of the mortgage loans. |
| Trustee | Deutsche Bank Trust Company Americas. |
| Mortgage pool | 3,651 payment-option, adjustable-rate mortgage loans with a negative amortization feature. The mortgage loans have an aggregate principal balance of approximately $1,302,015,741 as of the cut-off date, and are secured by first liens on one- to four- family residential properties. |
| Originators | Approximately 40.5% by principal amount of the mortgage loans were originated by Homecomings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding Corporation. |
| Cut-off date | June 1, 2006. |
| Closing date | On or about June 29, 2006. |
| Distribution dates | The 25th of each month or, if the 25th is not a business day, on the next business day beginning in July 2006. |
| Scheduled final distribution date | The distribution date in June 2046. The actual final distribution date could be substantially earlier. See *"Certain Yield and Prepayment Considerations"* in this prospectus supplement. |

### Issuing Entity

The depositor will establish a trust with respect to Series 2006-QO6 on the closing date, under a series supplement, dated as of June 1, 2006, to the standard terms of pooling and servicing agreement, dated as of March 1, 2006, among the depositor, the master servicer and the trustee. The pooling and servicing agreement is governed by the laws of the State of New York. On the closing date, the depositor will deposit into the trust a pool of mortgage loans that in the aggregate will constitute a mortgage pool, secured by first liens on one- to four-family residential properties with terms to maturity of not more than 40 years. The trust will not have any additional equity. The pooling and servicing agreement authorizes the trust to engage only in selling the certificates in exchange for the mortgage loans, entering into and performing its obligations under the pooling and servicing agreement, activities necessary, suitable or convenient to such actions and other activities as may be required in connection with the conservation of the trust fund and making distributions to certificateholders.

The pooling and servicing agreement provides that the depositor assigns to the trustee for the benefit of the certificateholders without recourse all the right, title and interest of the depositor in and to the mortgage loans. Furthermore, the pooling and servicing agreement states that, although it is intended that the conveyance by the depositor to the trustee of the mortgage loans be construed as a sale, the conveyance of the mortgage loans shall also be deemed to be a grant by the depositor to the trustee of a security interest in the mortgage loans and related collateral.

Some capitalized terms used in this prospectus supplement have the meanings given below under "*Description of the Certificates—Glossary of Terms*" or in the prospectus under "*Glossary.*"

### Sponsor and Master Servicer

Residential Funding Corporation, a Delaware corporation, buys residential mortgage loans under several loan purchase programs from mortgage loan originators or sellers nationwide, including affiliates, that meet its seller/servicer eligibility requirements and services mortgage loans for its own account and for others. See "*The Trusts—Mortgage Collateral Sellers*" and "*—Qualifications of Sellers*" in the prospectus for a general description of applicable seller/servicer eligibility requirements. Residential Funding Corporation's principal executive offices are located at 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437. Its telephone number is (952) 857-7000. Residential Funding Corporation conducts operations from its headquarters in Minneapolis and from offices located primarily in California, Texas, Maryland, Pennsylvania and New York. Residential Funding Corporation finances its operations primarily through its securitization program.

Residential Funding Corporation was founded in 1982 and began operations in 1986, acquiring, servicing and securitizing residential jumbo mortgage loans secured by first liens on one- to four-family residential properties. General Motors Acceptance Corporation purchased Residential Funding Corporation in 1990. In 1995, Residential Funding Corporation expanded its business to include "Alt-A" first lien mortgage loans, such as some of the mortgage loans described in this prospectus supplement. Residential Funding Corporation also began to acquire and service "subprime", closed-end and revolving loans secured by second liens in 1995.

*Claim # 4702*

## Sponsor Securitization Experience

The following tables set forth the aggregate principal amount of publicly offered securitizations of mortgage loans sponsored by Residential Funding Corporation for the past five years and for the first three months ended March 31, 2006. Residential Funding Corporation sponsored approximately $23.9 billion and $2.4 billion in initial aggregate principal amount of mortgage-backed securities in the 2001 calendar year backed by first lien mortgage loans and junior lien mortgage loans, respectively. Residential Funding Corporation sponsored approximately $52.1 billion and $2.4 billion in initial aggregate principal amount of mortgage-backed securities in the 2005 calendar year backed by first lien mortgage loans and junior lien mortgage loans, respectively. The percentages shown under "Percentage Change from Prior Year" represent the ratio of (a) the difference between the current and prior year volume over (b) the prior year volume.

### Sponsor Securitization Experience

### First Lien Mortgage Loans

| Volume by Principal Balance | 2001 | 2002 | 2003 | 2004 | 2005 | Three Months Ended 3/31/06 |
|---|---|---|---|---|---|---|
| Prime Mortgages(1) | $16,387,846,100 | $16,177,753,813 | $18,964,072,062 | $11,953,278,792 | $24,149,038,614 | $ 7,135,030,878 |
| Non-Prime Mortgages(2) | $ 7,566,949,253 | $15,475,700,554 | $27,931,235,627 | $24,408,531,445 | $27,928,496,334 | $ 8,748,631,665 |
| Total | $23,954,795,353 | $31,653,454,367 | $46,895,307,689 | $36,361,810,237 | $52,077,534,948 | $15,883,662,543 |
| Prime Mortgages(1) | 68.41% | 51.11% | 40.44% | 32.87% | 46.37% | 44.92% |
| Non-Prime Mortgages(2) | 31.59% | 48.89% | 59.56% | 67.13% | 53.63% | 55.08% |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| **Percentage Change from Prior Year(3)** | | | | | | |
| Prime Mortgages(1) | 98.71% | (1.28)% | 17.22% | (36.97)% | 102.03% | - |
| Non-Prime Mortgages(2) | 2.60% | 104.52% | 80.48% | (12.61)% | 14.42% | - |
| Total Volume | 53.34% | 32.14% | 48.15% | (22.46)% | 43.22% | - |

*Claim # 4702*

## Description of the Mortgage Pool

**General**

The mortgage pool will consist of 3,651 payment-option, adjustable-rate mortgage loans with a negative amortization feature, with an aggregate principal balance outstanding as of the cut-off date after deducting payments of principal due during the month of the cut-off date, of approximately $1,302,015,741. The mortgage loans are secured by first liens on fee simple or leasehold interests in one- to four-family residential real properties.

None of the mortgage loans have a due date other than the first of each month. The mortgage loans will consist of mortgage loans with terms to maturity of not more than 40 years from the date of origination.

All percentages of the mortgage loans described in this prospectus supplement are approximate percentages by aggregate principal balance as of the cut-off date after deducting payments of principal due during the month of the cut-off date, unless otherwise indicated.

All of the mortgage loans were purchased by the depositor through its affiliate, Residential Funding. No unaffiliated seller sold more than 9.7% of the mortgage loans to Residential Funding Corporation. Approximately 40.5% of the mortgage loans were purchased from Homecomings Financial Network, Inc., which is an affiliate of Residential Funding Corporation and is referred to in this prospectus supplement as Homecomings. Substantially all of the mortgage loans are being subserviced by Homecomings.

The mortgage loans were selected for inclusion in the mortgage pool from among mortgage loans purchased in connection with the Expanded Criteria Program described below based on the Sponsor's assessment of investor preferences and rating agency criteria.

The depositor and Residential Funding will make certain limited representations and warranties regarding the mortgage loans as of the date of issuance of the certificates. The depositor and Residential Funding will be required to repurchase or substitute for any mortgage loan as to which a breach of its representations and warranties with respect to that mortgage loan occurs, if such breach materially and adversely affects the interests of the certificateholders in any of those mortgage loans. Residential Funding will not assign to the depositor, and consequently the depositor will not assign to the trustee for the benefit of the certificateholders, any of the representations and warranties made by the sellers or the right to require the related seller to repurchase any such mortgage loan in the event of a breach of any of its representations and warranties. Accordingly, the only representations and warranties regarding the mortgage loans that will be made for the benefit of the certificateholders will be the limited representations and warranties made by Residential Funding and the depositor to the limited extent described above. See "*The Trusts—Representations with Respect to Mortgage Collateral*" in the prospectus.

**Mortgage Pool Characteristics**

None of the mortgage loans will have been originated prior to May 6, 2005 or will have a maturity date later than June 1, 2046. No mortgage loan will have a remaining term to stated maturity as of the cut-off date of less than 348 months. The weighted average remaining term to

S-36

stated maturity of the mortgage loans as of the cut-off date will be approximately 387 months. The weighted average original term to maturity of the mortgage loans as of the cut-off date will be approximately 387 months. As used in this prospectus supplement the remaining term to maturity means, as of any date of determination and with respect to any mortgage loan, the number of months equaling the number of scheduled monthly payments necessary to reduce the then-current stated principal balance of that mortgage loan to zero, assuming the related mortgagor will make all scheduled monthly payments but no prepayments, on the mortgage loan thereafter.

The original mortgages for many of the mortgage loans have been, or in the future may be, at the sole discretion of the master servicer, recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns, and subsequent assignments of those mortgages have been, or in the future may be, at the sole discretion of the master servicer, registered electronically through the MERS® System. In some other cases, the original mortgage was recorded in the name of the originator of the mortgage loan, record ownership was later assigned to MERS, solely as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the sole discretion of the master servicer, registered electronically through the MERS® System. For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan. As of the cut-off date, approximately 96.5% of the mortgage loans were recorded in the name of MERS. For additional information regarding the recording of mortgages in the name of MERS see "*Yield and Prepayment Considerations—General*" in this prospectus supplement and "*Description of the Certificates—Assignment of Mortgage Loans*" in the prospectus.

92.7% of the mortgage loans provide for payment of a prepayment charge. With respect to some of these mortgage loans, the prepayment charge provisions provide for payment of a prepayment charge for partial prepayments and full prepayments made within up to three years following the origination of that mortgage loan, in an amount not to exceed the maximum amount permitted by state law. Generally, such amount is equal to six months' interest on any amounts prepaid during any twelve-month period in excess of 20% of the original principal balance of the related mortgage loan or a specified percentage of the amounts prepaid. The amount of the applicable prepayment charge, to the extent permitted under applicable law, is as provided in the related mortgage note. Applicable law may impose limitations on the amount of the prepayment charge or render such prepayment charge unenforceable. In addition, under certain circumstances the master servicer may waive a prepayment charge. The holders of the Class SB Certificates will be entitled to all prepayment charges received on the mortgage loans, and these amounts will not be available for distribution on the offered certificates. See "*Certain Legal Aspects of Mortgage Loans and Contracts—Default Interest and Limitations on Prepayments*" in the prospectus.

As used in this prospectus supplement, a loan is considered to be "30 to 59 days" or "30 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the next following monthly scheduled due date; "60 to 89 days" or "60 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the second following monthly scheduled due date; and so on. The

S-37

*Claim # 4702*

determination as to whether a mortgage falls into these categories is made as of the close of business on the last business day of each month.

**Compliance with Local, State and Federal Laws**

Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti predatory lending laws.

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994. None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees. See *"Certain Legal Aspects of the Mortgage Loans – The Mortgage Loans – Homeownership Act and Similar State Laws"* in the prospectus.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the mortgage loans contain prepayment charges that extend beyond three years after the date of origination.

Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan. Residential Funding maintains policies and procedures that are designed to ensure that it does not purchase mortgage loans subject to the Homeownership Act. However, there can be no assurance that these policies and procedures will assure that each and every mortgage loan complies with all applicable origination laws in all material respects. Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires that each subservicer accurately and fully report its borrower credit files to credit repositories in a timely manner.

See *"Certain Legal Aspects of Mortgage Loans and Contracts"* in the prospectus.

**Mortgage Rate Adjustment**

The interest rates on the mortgage loans adjust monthly, after an initial fixed rate period of one month. The mortgage rate for each mortgage loan will be adjusted to equal the sum of the index applicable to that mortgage loan and a fixed percentage amount, or note margin, for the mortgage loan, subject to rounding and the limitations described in this prospectus supplement. Subject to the maximum mortgage rate specified in the related mortgage note, none of the mortgage loans have a cap on the amount by which the interest rate may be adjusted on any adjustment date.

*Claim # 4702*

## Description of the Certificates

**General**

The Series 2006-QO6 Mortgage Asset-Backed Pass-Through Certificates will include the following fifteen classes:

- Class A-1 Certificates;

- Class A-2 Certificates;

- Class A-3 Certificates, which together with the Class A-1 Certificates and Class A-2 Certificates are sometimes referred to as the Class A Certificates;

- Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates, which together are sometimes referred to as the Class M Certificates;

- Class SB Certificates; and

- Class R-I Certificates and Class R-II Certificates, which together are sometimes referred to as the Residual Certificates, or Class R Certificates.

Only the Class A Certificates and Class M Certificates are offered hereby. See "*Glossary*" in the prospectus for the meanings of capitalized terms and acronyms not otherwise defined in this prospectus supplement.

The certificates, in the aggregate, will evidence the entire beneficial ownership interest in the trust. The trust will consist of:

- the mortgage loans;

- the cash deposited in respect of the mortgage loans in the Custodial Account and in the Certificate Account and belonging to the trust;

- property acquired by foreclosure of the mortgage loans or deed in lieu of foreclosure;

- any applicable primary insurance policies and standard hazard insurance policies;

- the Basis Risk Shortfall Reserve Fund; and

- all proceeds of any of the foregoing.

The offered certificates will be available only in book-entry form through facilities of The Depository Trust Company, and are collectively referred to as the DTC registered certificates. The Class A Certificates and the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates will be issued in minimum denominations of $100,000 and integral multiples of $1 in excess of $100,000. The Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9

## Pooling and Servicing Agreement

**General**

The certificates will be issued under a series supplement, dated as of June 1, 2006, to the standard terms of pooling and servicing agreement, dated as of March 1, 2006, together referred to as the pooling and servicing agreement, among the depositor, the master servicer, and Deutsche Bank Trust Company Americas, as trustee. Reference is made to the prospectus for important information in addition to that described herein regarding the terms and conditions of the pooling and servicing agreement and the offered certificates. The trustee, or any of its affiliates, in its individual capacity or any other capacity, may become the owner or pledgee of certificates with the same rights as it would have if it were not trustee.

The offered certificates will be transferable and exchangeable at the corporate trust office of the trustee, which will serve as certificate registrar and paying agent. The depositor will provide a prospective or actual certificateholder without charge, on written request, a copy, without exhibits, of the pooling and servicing agreement. Requests should be addressed to the President, Residential Accredit Loans, Inc., 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437. In addition to the circumstances described in the prospectus, the depositor may terminate the trustee for cause under specified circumstances. See "*The Pooling and Servicing Agreement—The Trustee*" in the prospectus.

**Custodial Arrangements**

The trustee will be directed to appoint Wells Fargo Bank, N.A., to serve as custodian of the mortgage loans. The custodian is not an affiliate of the depositor, the master servicer or the sponsor. No servicer will have custodial responsibility for the mortgage notes. Residential Funding is required to deliver only the notes to the custodian. The custodian will maintain mortgage loan files that contain originals of the notes and, to the extent delivered to the custodian by Residential Funding, the mortgages, assignments and allonges, in vaults that may be located at the premises of the sponsor or an affiliate. Only the custodian has access to these vaults. A shelving and filing system segregates the files relating to the mortgage loans from other assets serviced by the master servicer.

**The Master Servicer and Subservicer**

*Master Servicer.* The master servicer, an affiliate of the depositor, will be responsible for master servicing the mortgage loans. Master servicing responsibilities include:

- receiving funds from subservicers;
- reconciling servicing activity with respect to the mortgage loans;
- calculating remittance amounts to certificateholders;
- sending remittances to the trustee for distributions to certificateholders;
- investor and tax reporting;
- coordinating loan repurchases;
- oversight of all servicing activity, including subservicers;
- following up with subservicers with respect to mortgage loans that are delinquent or for which servicing decisions may need to be made;
- approval of loss mitigation strategies;

- management and liquidation of mortgaged properties acquired by foreclosure or deed in lieu of foreclosure; and
- providing certain notices and other responsibilities as detailed in the pooling and servicing agreement.

The master servicer may, from time to time, outsource certain of its servicing functions, such as foreclosure management, although any such outsourcing will not relieve the master servicer of any of its responsibilities or liabilities under the pooling and servicing agreement.

For a general description of the master servicer and its activities, see "*Sponsor and Master Servicer*" in this prospectus supplement. For a general description of material terms relating to the master servicer's removal or replacement, see "*The Pooling and Servicing Agreement Rights Upon Event of Default*" in the prospectus.

*Subservicer Responsibilities.* Subservicers are generally responsible for the following duties:

communicating with borrowers;
sending monthly remittance statements to borrowers;
collecting payments from borrowers;
recommending a loss mitigation strategy for borrowers who have defaulted on their loans (i.e. repayment plan, modification, foreclosure, etc.);
accurate and timely accounting, reporting and remittance of the principal and interest portions of monthly installment payments to the master servicer, together with any other sums paid by borrowers that are required to be remitted;
accurate and timely accounting and administration of escrow and impound accounts, if applicable;
accurate and timely reporting of negative amortization amounts, if any;
paying escrows for borrowers, if applicable;
calculating and reporting payoffs and liquidations;
maintaining an individual file for each loan; and
maintaining primary mortgage insurance commitments or certificates if required, and filing any primary mortgage insurance claims.

*Homecomings Financial Network, Inc.* Homecomings will subservice substantially all of the mortgage loans pursuant to the terms of a subservicing agreement with the master servicer. The subservicing agreement provides that Homecomings will provide all of the services described in the preceding paragraph. Homecomings is a Delaware corporation and has been servicing mortgage loans secured by first liens on one-to four-family residential properties since 1996. Homecomings was incorporated as a wholly-owned subsidiary of Residential Funding Corporation in 1995 to service and originate mortgage loans. In 1996, Homecomings acquired American Custody Corporation to begin servicing subprime mortgage loans, and in 1999 Homecomings acquired Capstead Inc. to focus on servicing prime loans such as the mortgage loans described herein. After Capstead Inc. was acquired, Homecomings' total servicing portfolio was 164,000 loans with an aggregate principal balance of $25 billion with 20% being subprime. The three servicing locations were integrated onto one servicing system/platform by the end of 2001 becoming one of the first servicing operations to service all loan products on one servicing system. The operations of each of the acquired companies have been integrated into Homecomings' servicing operations. Approximately 85% of the mortgage loans currently

master serviced by Residential Funding Corporation are subserviced by Homecomings. As of December 31, 2005, Homecomings serviced approximately 782,000 mortgage loans with an aggregate principal balance of approximately $104 billion. In addition to servicing mortgage loans secured by first liens on one-to-four family residential properties, Homecomings services mortgage loans secured by more junior second liens on residential properties, and mortgage loans made to borrowers with imperfect credit histories, and subprime mortgage loans. Homecomings also performs special servicing functions where the servicing responsibilities with respect to delinquent mortgage loans that have been serviced by third parties is transferred to Homecomings. Homecomings' servicing activities have included the activities specified above under "—Subservicer responsibilities."

Homecomings may, from time to time, outsource certain of its subservicing functions, such as contacting delinquent borrowers, property tax administration and hazard insurance administration, although any such outsourcing will not relieve Homecomings of any of its responsibilities or liabilities as a subservicer. If Homecomings engages any subservicer to subservice 10% or more of the mortgage loans, or any subservicer performs the types of services requiring additional disclosures, the issuing entity will file a Report on Form 8-K providing any required additional disclosure regarding such subservicer.

The following table sets forth the aggregate principal amount of mortgage loans serviced by Homecomings for the past five years and the three months ended March 31, 2006. The percentages shown under "Percentage Change from Prior Year" for years 2001 through 2005 represent the ratio of (a) the difference between the current and prior year volume over (b) the prior year volume.

*Claim # 4702*

My name is Tomas Diaz and I'm one of the many victims, of criminal bank fraud. The purpose of this letter is to establish a claim against: Case # 12-12042, 12-12019, 12-12020 Residential Funding Company LLC, Home Comings Financial LLC.

The criminal act of these delinquents, such as signature falsifications, robosigner, assignment fabrication and false testimonials under judgment are among the things they're capable of.
Breaking the chain of title and note and mortgage would have been fabricated or separated creating an insecure debt (the note without a security instrument   endorsed the note in Blank (&) Fraud of the trust documents, (filed with the sec.)   Fraudulent and fabricated (criminal hands) the to right foreclosure to my house

Fraudulent tax avoidance scheme involving platinum capital group corp. aurora loan services, residential funding company LLC, residential accredit loans inc, residential funding corp., homecomings financial LLC. Deutsche bank, trust company Americas, Nationstar, Wells Fargo Bank N, A Mers, Goldman, Sachs Co.

I know, I'm fighting against a "Goliath" with this claim and that these banking predators and their attorneys implied in my case are liars, thieves, and delinquents, now they've filed for Chapter 11 bankruptcy. Case # 12-12020, violating all the laws of IRS, SEC, OCC federal reservation, State and federal laws.
The matter with these Agents, bankers, and Service agencies is the change of semantics = such as changing the signatures, and false documentation.

I want to be able to redeem my property, reverse my mortgage, and hopefully receive the reimbursement of $400,000.00 that I've e spent on my home and the case here presented. I am a farmer and I have plans to stay in my home for a very long time. All I want is justice to be done, these heinous acts cannot continue to take place in our society, it is required to stand up for what is just and right. I respectfully direct myself to you and hope that we have a mutual agreement on these beliefs.

Cordially,

Tomas Diaz    07/15/2013