Frank Reed
817 Matlack Drive
Moorestown, NJ 08057
Telephone: (856) 956-6950
E-Mail: FrankReedVA@aol.com

*Creditor, Pro Se*

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

## CREDITOR PRO SE'S OBJECTION TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTION 363(b)(1) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER AMENDMENT TO CONSENT ORDER

1. I, Frank Reed, creditor pro se, do hereby submit the following objection to

DEBTORS' MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND

BANKRUPTCY CODE SECTION 363(b)(1) AUTHORIZING THE DEBTORS TO ENTER INTO

AND PERFORM UNDER AMENDMENT TO CONSENT ORDERCOMMITTEE, AND CERTAIN

CONSENTING CLAIMANTS.

### I. BACKGROUND

2. The Debtors' along with Ally bank have negotiated an Amendment to their Consent Order

with the Federal Reserve, (the "Amendment"), and now the Debtor's come before this Court seeking its

approval to voluntarily enter into and perform under the terms of the Amendment.

3. This Amendment substantially and materially changes the obligations the Debtors have under

the existing FRB Consent Order. he Amendment

4. However, before Debtors can voluntarily enter into the Amendment it must be determined by this Court if the Debtors possess the requisite "Legal Capacity" to enter into the Amendment.

## II. LEGAL CAPACITY – The Definition

5. Legal capacity is the attribute of a person who can acquire new rights, or transfer rights, or assume duties, according to the mere dictates of his own will, as manifested in juristic acts, without any restraint or hindrance arising from his status or legal condition. Ability; qualification; legal power or right. Applied in this sense to the attribute of persons (natural or artificial) growing out of their status or juristic condition, which enables them to perform civil acts; as capacity to hold lands, capacity to devise, etc. Burgett v. Barriclt, 25 Kan. 530; Sargent v. Bur- dett, 90 Ga. Ill, 22 S. E. COT.

Law Dictionary: What is CAPACITY? definition of CAPACITY (Black's Law Dictionary)

http://thelawdictionary.org/capacity/#ixzz2ZaNdj283

## III. DEBTORS' OBLIGATIONS – CONSENT ORDER versus AMENDMENT

6. Prior to the Debtors' filing of their petition, the Debtors' VOLUNTARILY committed themselves to a multi-lateral agreement with their primary regulator, the Federal Reserve Bank, (the FRB). This voluntary multi-lateral agreement is commonly referred to in this instant case as the Consent Order.

7. It is the many provisions contained within the Consent Order which spell out in detail the numerous prescribed OBLIGATIONS of the Debtors. Contained therein, are components of the Consent Order which call for specific performance of the Debtors. In particular it is the "foreclosure review obligations" which are a concern of this objection and which are materially and substantially different than those being proposed under the Amendment.. (Note: The details of the specific obligations are numerous and complex and as such will not be recounted herein, but can be readily found in the Consent Order and the Amendment).

## III. IRREVOCABILITY OF BINDING OBLIGATIONS
## (THE MOMENT OF CREATION AND ITS CONSEQUENCES)

8. Now, since the Amendment before the Court requires the Debtors to voluntarily agree to undertake actions which are in direct contradiction to those the Debtors have previously

obligated themselves to perform under the Consent Order, the Amendment is in fact Void Ab

Initio, as the **Debtors lack the requisite Legal Capacity to alter their obligations**.

9. In the United States any legally competent individual, corporation, partnership, etc. can be

bound to a course of action, inaction, payment or other obligation via numerous legal and equitable

contrivances which come in a wide variety of forms. The following is a partial list of these forms:

contracts, quasi contracts, judicial decrees, regulatory actions, assumption, waiver, and a variety of

estoppels. (Note: The Consent Order and the proposed Amendment fall well within this spectrum of

contrivances.[1])

10. The methods and preconditions which wind up binding a party under these contrivances are as

varied as the contrivances themselves. However, there is one thing that they all share in common –

TIME. In every one of these contrivances which can bind a party, there is a specific, discrete, moment in

time where all the requirements of the contrivance coalesce to a point of no return. It is at that exact

moment in time, that point of no return which is defined by one singular characteristic shared by all. The

party bound can no longer act in on its own behalf to alter its obligation(s) now so fixed as required.

11. Central to this position is the crucial reality that the **debtor became subsequently re-bound**

to the Consent Order obligations by its acts **post petition**. This Court must take note, and should not

deny, the significant fact that the very first day these cases were filed, ResCap CEO James Whitlinger

unequivocally acknowledged that the Consent Order had imposed a myriad of ongoing obligations on the

Debtors and significantly, the **Debtor's DID NOT reject those obligations.** In fact, Debtor's did the

exact opposite. At that moment in time, **CEO James Whitlinger EXPRESSLY and *WITHOUT ANY***

***RESERVATION OF RIGHTS,* ASSUMED THE OBLIGATIONS MANDATED BY THE**

**CONSENT ORDER IN THEIR ENTIRETY.** CEO James Whitlinger did this by stating to the Court

---

[1]Consent judgments and decrees are "to be construed for enforcement purposes basically as a contract."
United States v. ITT Cont. Baking Co., 420 U.S. 223, 238 (1975); see also Thompson v. U.S. Dep't of Housing &
Urban Dev. , 404 F.3d 821, 821, 832 (4th Cir. 2005) ("Issues of interpretation and enforcement of a consent
decree typically are subject to traditional rules of contract interpretation . . . ."); Bell v. Countrywide Bank,
No. 2:llcv271, 2012 U.S. Dist. LEXIS 104728, at *7-8 (D. Utah July 26, 2012) (analyzing the National
Mortgage Settlement as a contract).

and all parties in interest, UNDER THE PENALTY of PURGERY that "[t]he Debtors intend to comply

with and adhere to the terms of the Consent Order to the best of their abilities."[2] The operational import of

this fact is that from *__that__* moment forward, debtors have lost their LEGAL CAPACITY to modify their

obligations under the Consent Order. **Debtors' did not reserve their rights to alter or "otherwise**

**settle" their obligations.** Debtors' attempt at reservations, if at all, came in subsequent points in time

and all parties in interest did not grant their respective approvals to debtor to modify its obligations. This

singular occurrence alone is sufficient invoke and enforce the very binding legal contrivances known as

Judicial Estoppel, Equitable Estoppel, Waiver and Assumption, and this creditor pro se does hereby assert

them.

### IV. JUDICIAL ESTOPPEL – THE DOCTRINE

12. Immediately below, is the Second Circuit Court of Appeals most recent articulation of the

doctrine of Judicial Estoppel:

The Supreme Court has described the doctrine of judicial estoppel in the following terms:

> *Where a party assumes a certain position in a legal proceeding, and succeeds in
> maintaining that position, he may not thereafter, simply because his interests have
> changed, assume a contrary position, especially if it be to the prejudice of the party who
> has acquiesced in the position formerly taken by him. This rule, known as judicial
> estoppel, generally prevents a party from prevailing in one phase of a case on an
> argument and then relying on a contradictory argument to prevail in another phase.*

New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (internal quotation marks, brackets,

and citation omitted). "[C]ourts have uniformly recognized" that the purpose of the doctrine "is to

protect the integrity of the judicial process by prohibiting parties from deliberately changing

positions according to the exigencies of the moment," and because judicial estoppel is designed

"to prevent improper use of judicial machinery," it is "an equitable doctrine invoked by a court at

its discretion." Id. at 749-50 (internal quotation marks omitted). Courts have also recognized "that

the circumstances under which judicial estoppel may appropriately be invoked are probably not

reducible to any general formulation of principle." Id. at 750 (internal quotation marks and

brackets omitted); see also Young v. U.S. Dep't of Justice, 882 F.2d 633, 639 (2d Cir. 1989)

---

[1] Whitlinger First Day Affidavit, ¶ 87.

("The circumstances under which the doctrine could be applied are far from clear.").

Nevertheless, in evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is "clearly inconsistent" with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." See New Hampshire, 532 U.S. at 750-51. But the Supreme Court has made clear that these factors do not constitute "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," and that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." Id. at 751; see also DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (noting that "[t]ypically, judicial estoppel will apply if" these factors are present). Our Court has "further limit[ed] judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." Id. (internal quotation marks omitted); see also Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011).

(INTELLIVISION v. MICROSOFT CORPORATION No. 11-1657-cv. United States Court of Appeals, Second Circuit. June 11, 2012.)

## V. JUDICIAL ESTOPPEL – PRESENT APPLICATION

13. As articulated by the Second Circuit Court of Appeals, and presented herein above, the doctrine of judicial estoppel may be invoked if there exists facts which satisfy the three basic prongs of the doctrine. In the case at hand it is clear that all three prongs are satisfied.

### PRONG 1 – Debtor's Contradictory Positions

14. As stated above, since the commencement of these cases, the Debtors have repeatedly represented both to this Court and to all parties in interest through their court filings and public statements that they would continue to comply with their obligations under the Consent Order. The very first day these cases were filed, ResCap CEO James Whitlinger unequivocally acknowledged that the Consent Order had imposed a myriad of ongoing obligations on the Debtors and significantly, the **Debtor's DID**

**NOT reject those obligations.** In fact, Debtor's did the exact opposite. **CEO James Whitlinger**

**EXPRESSLY and *WITHOUT ANY RESERVATION OF RIGHTS,* ASSUMED THE**

**OBLIGATIONS MANDATED BY THE CONSENT ORDER.** CEO James Whitlinger did this by

stating to the Court and all parties in interest, UNDER THE PENALTY of PURGERY that "[t]he

Debtors intend to comply with and adhere to the terms of the Consent Order to the best of their abilities."[1]

Debtor's instant motion is in direct contradiction to its previous assertions. Debtor's implication that they

could now do anything but complete their obligations would be and abrogation of very obligations under

the Consent Order which it agreed to complete.

### PRONG 2 – This Court's Acceptance of Debtor's First Position

15. The Debtors affirmed the debtor's express intent, clearly and indisputably asking this Court

for authorization to continue to comply with the Consent Order, proclaiming that they "are fully

committed to complying with and adhering to the terms of the Consent Order ... to the best of their

abilities."[3] And the Court granted the Debtors' request.[4]

### PRONG 3 – Unfair Advantage and Unfair Detriment

16. Currently, over 27,000 borrowers have filed for and are awaiting results of the Independent

Foreclosure Review (IFR) being conducted by the debtor that is mandated by the Consent Order. That

number, 27,000, is strikingly different from another number, the number of borrowers who filed proofs of

claim in debtors' bankruptcy cases; that number is approximately 2,800. There is a clear and logical

inference that can be drawn from those drastically different numbers: tens of thousands of borrowers may

very well have specifically relied on the explicit position that debtors' took on day one of this bankruptcy

that they would complete their obligations under the Consent Order, which includes the IFR.

17. Now, since the time for filing proofs of claim in this case has long passed, it would clearly be

of a colossal unfair detriment to the THOUSANDS of borrowers who would have NO OTHER remedy

available to them to seek the justice so promised. Conversely, debtors would be granted a massive unfair

---

[2] GA Servicing Motion, ¶ 42.

[3] *See Final Order (I) Authorizing the Debtors to Continue in the Ordinary Course of Bus. (A) Servicing Governmental Ass'n Loans & (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, & Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors & Foreclosure Prof'ls; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Direct Claims & Related Counter-Claims in Foreclosure & Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; & (V) Granting Related Relief* (June 15, 2012) [ECF No. 401].

advantage by purging themselves of tens of thousands of potential claimants. Claimants, one must add,

that undoubtedly would have cost the debtors estate money to process if they all filed individual proofs of

claim. So, if debtors prevail in their instant motion, they stand to reap a double unjust windfall, 1) the

elimination of the administrative expense of processing tens of thousands of claims (prevailing or non-

prevailing), and 2) the elimination of the burden of the remediation of those prevailing claims themselves.


## VI. EQUITABLE ESTOPPEL – THE DOCTRINE

18. As the Second Circuit has explained, a "bankruptcy court is essentially a court of

equity." In re Ionosphere Clubs, Inc., 85 F.3d 992, 999 (2d Cir. 1996). As such, "[i]ts

proceedings are inherently proceedings in equity, and it applies the principles and rules of equity

jurisprudence, including principles of estoppel." Id. (quotation marks, alterations, and citations

omitted). "The doctrine of equitable estoppel is properly invoked where the enforcement of the

rights of one party would work an injustice upon the other party due to the latter's justifiable

reliance upon the former's words or conduct." Kosakow v. New Rochelle Radiology Assocs.,

P.C., 274 F.3d 706, 725 (2d Cir. 2001). Courts—including in the bankruptcy context—have not

hesitated to invoke the doctrine to prevent a party that has made a representation and induced

another party to rely on that representation to its detriment, from acting contrary to its prior

representation. See, e.g., Ionosphere Clubs, 85 F.3d at 1001-02 (holding that debtor who

promised to perform obligations under a contract with a modification in order to induce creditor

to accept that contractual modification was estopped from subsequently opposing enforcement of

its obligations under that contract); In re Momentum Mfg. Corp., 25 F.3d 1132, 1136-37 (2d Cir.

1994) (holding that debtor who represented that employees would receive severance payments

under reorganization plan and thereby obtained votes needed to confirm the plan was estopped

from subsequently seeking to amend plan to eliminate severance payments).

## VII.  EQUITABLES ESTOPPEL – PRESENT APPLICATION

19.  Since the commencement of these bankruptcy cases, the Debtors have repeatedly represented to this Court and to all parties in interest that they would continue to comply with and complete their obligations under the Consent Order, including the Foreclosure Review.

20.  There are close to 3,000 borrowers covered by the Consent Order who could have potentially filed proofs of claim in this bankruptcy case preserving, and in pursuit of, their respective rights against debtors, (including their rights to object to the various sales of assets and motions presented in these proceedings). It is likely that they did not do so as they **specifically relied** on the open and notorious assertions that the foreclosure review would be completed.  If the foreclosure review were to be settled instead of completed, it is clear by the public record, that any such settlement would be to the detriment of the those borrowers who relied on debtors assertions.

21.  Congress, (both the the House and the Senate), in bipartisan actions, are in fact investigating the FRB in its role in the settling of the Foreclosure Review obligations of other Loan Servicers similarly situated to debtors.  It is clear by both the written record and oral inquiry at Congressional hearings that settling the Foreclosure Review obligations is bad policy and harmful to borrowers, and this Court should not aid or abet any similar behavior by the debtors.  The Court's proper application of the doctrine of Equitable Estoppel will prevent just such an occurrence.

## VIII.  ASSUMPTION AND WAIVER – CONTROLLING LEGAL DOCTINES

22.  The doctrines of assumption and waiver are legal doctrines as opposed to equitable and therefore they do not require a weighing by the Court of the prejudices to the various parties. They shall be invoked and applied if the facts support their application.

23. As stated above, since the commencement of these cases, the Debtors have repeatedly represented both to this Court and to all parties in interest through their court filings and public

statements that they would continue to comply with their obligations under the Consent Order.
The very first day these cases were filed, ResCap CEO James Whitlinger unequivocally
acknowledged that the Consent Order had imposed a myriad of ongoing obligations on the
Debtors and significantly, the Debtor's DID NOT reject those obligations. In fact, Debtor's did
the exact opposite. CEO James Whitlinger EXPRESSLY and WITHOUT ANY
RESERVATION OF RIGHTS, ASSUMED THE OBLIGATIONS MANDATED BY THE
CONSENT ORDER. CEO James Whitlinger did this by stating to the Court and all parties in
interest, UNDER THE PENALTY of PURGERY that "[t]he Debtors intend to comply with and
adhere to the terms of the Consent Order to the best of their abilities."[2]

24. CEO Whitlinger is clearly an officer of the debtor and as such he has either actual or
apparent authority to bind the debtors by his actions and statements. CEO Whitlinger's
statements in writing to this Court are a clear and shining textbook example of assumption post
petition and waiver.

25. Therefore this Court has no alternative but to enforce the legal doctrines of
assumption and waiver upon debtors.

## IX. PROMOTING EQUITABLE RESOLUTION

26. The Bankruptcy Court's role in bankruptcy proceedings is to assure and promote the
equitable resolution to debtors obligations and the various disputes over those obligations.
Debtors are aware of this fact and imply it in their motion in support of the plan agreement by
stating the following:

> The Agreement, which was facilitated in large part by the efforts of the Plan Mediator,
> Mr. Kruger, and counsel for the Creditors' Committee, represents a remarkable
> achievement given the complexity of the Debtors' capital structure, and the complexity
> and breadth of the disputed issues posed in these cases, and signals an end to the
> litigation, infighting, and potential "nuclear war" in these cases.

> (DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE
> SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS TO ENTER INTO
> AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY
> FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN
> CONSENTING CLAIMANTS, para 3. P. 3)

27. However, this statement could be premature. This creditor pro se has been in discussion with class action counsel regarding the filing of a class action against debtors if the Foreclosure Review is settled.

28. The class action would be based on the post petition actions of the debtors, which would make the ultimate award of the class action an administrative priority expense of the debtors. This possible outcome would therefore both delay the adoption of a plan and most likely greatly affect the current plan being assembled, if it survives at all.

29. In the interest of all parties involved, the Court should deny Debtor's instant motion, preventing legally explosive events at the 11th hour of these proceedings.

## X. CONCLUSION

30. Now, whereas there have been presented herein numerous legal and equitable controlling doctrines proving that Debtors lack the Legal Capacity to enter into an Amendment of their FRB Consent Order which would contradict the obligations Debtors have under the Consent Order, this Court should declare the proposed Amendment Void Ab Initio and bar the Debtors from entering into and performing under its provisions.

**Respectfully submitted, this 20th day of July, 2013.**

**Frank Reed**
**Creditor, Pro Se**