July 11, 2013

3415 N. Odell ave.
Chicago, Il 60634

Honorable Martin Glenn.
One Bowling Green
New York, New York 10004

ATTN: Gary S. Lee, ESQ.

Gentlemen:

This is with reference to the Case#12-12020 (MG) (See attached). Our claim to this case should not de disallowed. All my signature to the bank United Mortgage note was forged, I was not present when the  Bank United  statement was made.

The Bank United Mortgate was taken over or either transferred to GMAC.

Claimant Name: 1) Patricio sulit, 3415 N. Odell ave., Chicago, Il 60634. Tel#773-836-9306, and fax#773-836-9307

2)Debtor Name –
Bank United and or GMAC

Respectfully,

PATRICIO SULIT



***THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION. THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS DISCLOSURE STATEMENT.***

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
Samantha Martin
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000

Alexandra Steinberg Barrage
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
Telephone: (202) 887-1500

*Counsel to the Debtors and Debtors in Possession*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for the Official Committee of Unsecured Creditors*

Dated: July [3], 2013
New York, New York



**IMPORTANT INFORMATION FOR YOU TO READ**

**THE DEADLINE TO VOTE ON THE PLAN IS [ ], 2013, AT 5:00 P.M. EASTERN TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT ARTICLE V OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER.**

**The Plan Proponents (defined herein) are providing the information in this Disclosure Statement (defined herein) to holders of Claims and Equity Interests entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.**

**This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax, or business advice. The Plan Proponents urge any holder of a Claim or Equity Interest to consult with its own advisors with respect to any such legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby. The Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee of the accuracy or completeness of the information contained herein. The Plan Proponents have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the value of their property other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement, in the Plan, or in the Plan Supplement should not be relied upon by any holder of a Claim or Equity Interest entitled to vote to accept or reject the Plan.**

**The Plan Proponents urge every holder of a Claim or Equity Interest entitled to vote on the Plan to (1) read the entire Disclosure Statement and the Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article [•] of this Disclosure Statement, and (3) consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan, all documents annexed hereto or filed in connection herewith, and the proposed transactions contemplated under the Plan before deciding whether to vote to accept or reject the Plan.**

**This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Debtors' Chapter 11 Cases, and certain documents related to the Plan. In the event of any inconsistency or discrepancy between a description in this**

**Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Plan Proponents do not represent or warrant that the information contained herein or annexed hereto is without any material inaccuracy or omission.**

**Although the Plan Proponents have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise. The Plan Proponents are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Plan Proponents may subsequently update the information in this Disclosure Statement, the Plan Proponents have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.**

**Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation, or waiver. No reliance should be placed on the fact that a particular Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Plan Proponents may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.**

## QUESTIONS AND ADDITIONAL INFORMATION

**If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents annexed hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' notice and claims agent by: (i) visiting http://www.KCCllc.net/rescap; (ii) writing to Residential Capital, LLC c/o Kurtzman Carson Consultants LLC, 2335 Alaska Ave, El Segundo, CA, 90245; or (iii) calling (888) 251-2914.**

## TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION AND PLAN SUMMARY ..... 1

A. Introduction and Overview ..... 1

B. General Information ..... 4

C. Overview of Chapter 11 ..... 5

D. Summary of Classification and Voting Rights of Allowed Claims and Equity Interests ..... 6

E. Summary of Solicitation Package and Voting Instructions ..... 13

F. Summary of Treatment of Allowed Claims and Equity Interests ..... 14

G. Implementation of the Plan ..... 17

H. Confirming and Consummating the Plan ..... 20

ARTICLE II. THE GLOBAL SETTLEMENT ..... 21

B. The Plan Includes a Settlement of RMBS Trust Claims ..... 27

C. The Plan Settles the Claims of FGIC and MBIA ..... 28

D. The Plan Resolves Certain Securities Claims Against the Debtors and Ally ..... 31

E. The Plan Resolves the Claims of NJ Carpenters ..... 31

F. The Plan Resolves the Claims in the Kessler Class Action ..... 32

G. The Plan Provides a Trust to Allow for Payment in Cash to Holders of Borrower Claims ..... 32

H. The Plan Provides Junior Secured Noteholders with Payment in Full ..... 33

I. The Plan Resolves Claims of the Senior Unsecured Noteholders and the Senior Unsecured Noteholder Trustee ..... 33

J. The Plan Resolves Issues Relating to Substantive Consolidation of the Debtors' Estates ..... 33

K. The Plan Contains a Compromise of Intercompany Balances and Resolves Subrogation and Other Disputed Intercompany Issues ..... 34

L. The Plan Allocates the Estate Assets and Administrative Expenses among Debtor Groups and Creditor Constituencies ..... 36

ARTICLE III. BACKGROUND ..... 38

A. The Debtors' Businesses and Operations ..... 38

B. The Debtors' Organizational Structure ..... 41

**TABLE OF CONTENTS**
(continued)

**Page**

C. The Debtors' Assets and Capital Structure ..... 41
D. Events Leading to the Filing of the Chapter 11 Cases ..... 46

ARTICLE IV. THE CHAPTER 11 CASES ..... 56
A. Commencement of the Chapter 11 Cases ..... 56

ARTICLE V. OTHER PLAN PROVISIONS ..... 96
A. Unclassified Claims ..... 96
B. Classification, Treatment, and Voting of Claims and Equity Interests ..... 99
C. Establishment of Trusts and Provisions Governing Issuance of Units and Distributions ..... 99
D. Cancellation of Securities, Indentures, and Other Documents Evidencing Claims and Equity Interests ..... 107
E. Senior Unsecured Notes; Fees and Expenses ..... 108
F. Corporate Action ..... 109
G. Dissolution of the Debtors ..... 110
H. Exemption from Certain Taxes and Fees ..... 110
I. Preservation of Causes of Action ..... 111
J. Nonconsensual Confirmation ..... 112
K. Treatment of Executory Contracts and Unexpired Leases ..... 112
L. Surrender of Existing Publicly Traded Securities ..... 115
M. Minimum Distributions; Foreign Exchange Rate; and Other Distribution Limitations ..... 116
N. Undeliverable Distributions and Unclaimed Property ..... 117
O. Compliance with Tax Requirements ..... 117
P. Setoffs and Recoupment ..... 118
Q. Interest on Claims ..... 118
R. Claims Paid or Payable by Third Parties ..... 118
S. Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable ..... 119
T. Distributions Free and Clear ..... 119
U. Procedures for Resolving Disputed Claims ..... 120

**TABLE OF CONTENTS**
(continued)

**Page**

V. Claims Estimation; Allowance ... 120
W. Settlement, Release, Injunction, and Related Provisions ... 122
X. Conditions Precedent to Confirmation and Consummation of the Plan ... 126
Y. Modification, Revocation, or Withdrawal of the Plan ... 129
Z. Retention of Jurisdiction ... 130
AA. Miscellaneous Plan Provisions ... 130
BB. Plan Supplement ... 133

ARTICLE VI. VOTING PROCEDURES ... 134
A. Voting Deadline ... 134
B. Holders of Claims or Interests Entitled to Vote ... 135
D. Vote Required for Acceptance by a Class ... 136
E. Returning Your Ballot ... 137

ARTICLE VII. RECOVERY ANALYSIS ... 138

ARTICLE VIII. CONFIRMATION OF THE PLAN ... 139
A. Confirmation Hearing ... 139
B. Deadline to Object to Confirmation ... 139
C. Confirmation Standards ... 140
D. Persons to Contact for More Information ... 145
E. Disclaimer ... 145

ARTICLE IX. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING THE PLAN ... 146
A. General ... 146
B. Certain Bankruptcy Law Considerations ... 146
C. Disclosure Statement Disclaimer ... 149
D. Additional Factors to Be Considered ... 150

ARTICLE X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ... 152
A. Certain U.S. Federal Income Tax Consequences to the Debtors ... 153

**TABLE OF CONTENTS**
(continued)

**Page**

B. Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims ..... 154
C. Tax Treatment of the Liquidating and Holders of Beneficial Interests ..... 158
D. Treatment of the Disputed Claims Reserve ..... 160
E. Tax Treatment of the Private Securities Claims Trust and the Borrowers Claims Trust ..... 160

ARTICLE XI. SECURITIES LAW MATTERS ..... 161

ARTICLE XII. RULES OF INTERPRETATION ..... 163
A. Rules of Construction ..... 163
B. Computation of Time ..... 164
C. Governing Law ..... 164

ARTICLE XIII. CONCLUSION AND RECOMMENDATION ..... 164

Cook County #21762

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CHANCERY DIVISION

GMAC Mortgage, LLC
PLAINTIFF

Vs.

Leilani I. Sulit a/k/a Leilani Sulit; Patricio I. Sulit a/k/a Patricio Sulit; Wiczer & Associates, LLC; Unknown Owners and Nonrecord Claimants
DEFENDANTS

No. 10CH04211

**COMPLAINT TO FORECLOSE MORTGAGE**

NOW COMES the Plaintiff, GMAC MORTGAGE, LLC, by and through its attorneys, CODILIS & ASSOCIATES, P.C., complaining of the defendants herein and, pursuant to 735 ILCS 5/15-1101, states as follows:

1. Plaintiff files this Complaint to Foreclose the mortgage, trust deed or other conveyance in the nature of a mortgage (hereinafter called "Mortgage") hereinafter described, and names the persons identified in the above caption as "Defendants", as parties hereto.

2. Attached as "EXHIBIT A" is a copy of the Mortgage. Attached as "EXHIBIT B" is a copy of the Note.

3. Information concerning said Mortgage:

(A) Nature of the instrument: Mortgage.

(B) Date of the Mortgage: 10/17/2006

(C) Name of mortgagor(s):

Leilani I. Sulit a/k/a Leilani Sulit
Patricio I. Sulit a/k/a Patricio Sulit

(D) Name of the mortgagee:

BankUnited, FSB

(E) Date and Place of Recording or Registering:

11/01/2005
Office of the Recorder of Deeds of Cook County Illinois

(F) Identification of Recording: Document No. 0630549130

(G) Interest subject to the mortgage: Fee Simple.

2010 FEB -1 PM 11:48

(H) Amount of original indebtedness:

(1) Original Indebtedness: $424,000.00

(I) Both the legal description of the mortgaged real estate and the common address or other information sufficient to identify it with reasonable certainty:

LOT 70 (EXCEPT THE NORTH 82 FEET THEREOF) IN COLLINS AND GAUNTLETT'S FIRST GARDENS SUBDIVISION IN THE EAST 1/2 OF FRACTIONAL SECTION 24, TOWNSHIP 40 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS..

**COMMONLY KNOWN AS:** 3415 N. Odell Avenue
Chicago, IL 60634

**TAX PARCEL NUMBER:** 12-24-413-038

(J) Statement as to defaults: Mortgagors have not paid the monthly installments of principal, taxes, interest and insurance for 10/01/2009, through the present; the principal balance due on the Note and the Mortgage is $430,207.21, plus interest, costs, advances and fees. Interest accrues pursuant to the note.

(K) Name of present owner(s) of said premises:
Leilani I. Sulit a/k/a Leilani Sulit
Patricio I. Sulit a/k/a Patricio Sulit

(L) Names of other persons who are joined as defendants and whose interest in or lien on the mortgaged real estate is sought to be terminated and alleged to be subordinate and inferior to the mortgage of the Plaintiff:

Wiczer & Associates, LLC, by virtue of a Memorandum of Judgment against Leilani Sulit, rendered in Case No. 2007M2 001236, in the Circuit Court of Cook County, Illinois, and filed in the office of the Recorder/Registrar of Deeds of Cook County, Illinois on 11/12/09 as Document No. 0931650003 in the sum of $8,849.18 plus $150 costs. The interest of this Defendant is subordinate to that of Plaintiff.

(M) Names of persons who executed the Note, Assumption Agreement(s), or Personal Guarantee:
Leilani I. Sulit a/k/a Leilani Sulit
Please note that no personal deficiency will be sought against any party who has received a Chapter 7 discharge or who are personally protected by the automatic stay at sale confirmation.

(N) Capacity in which Plaintiff brings this foreclosure: Plaintiff is the Mortgagee under 735 ILCS 5/15-1208.

## A. SETTLEMENT STATEMENT

**U.S. Department of Housing and Urban Development**

OMB No. 2502-0265

| B. Type of Loan | | | |
|---|---|---|---|
| 1 __ FHA 2 __ RHS 3 X Conv Unins 4 __ VA 5 __ Conv Ins | 6 File Number 06-1480 | 7 Loan Number 000506580-0 | 8 Mortgage Insurance Case Number |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked (P.O.C.) were paid outside the closing, they are shown here for information purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| LEILANI I. SULIT<br>3415 N. ODELL AVE.<br>CHICAGO, IL 60634 | | BANK UNITED, FSB<br>7815 NW 148 STREET<br>MIAMI LAKES, FL 33016 |

| G. Property Location | H. Settlement Agent | I. Settlement Date |
|---|---|---|
| 3415 N. ODELL AVE.<br>CHICAGO, IL 60634 | CAMBRIDGE TITLE COMPANY<br>Place of Settlement<br>400 CENTRAL AVENUE<br>NORTHFIELD, IL 60093 | 10/17/06<br>DD: 10/23/06 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 8,456.74 | 403. | |
| 104. PAYOFF WELLS FARGO HOME MORTGAGE | 244,033.36 | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes to | | 406 City/town taxes to | |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411 | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 252,490.10 | 420. GROSS AMOUNT DUE TO SELLER | |
| **200. Amounts Paid By or In Behalf of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 424,000.00 | 502. Settlement charges to seller (line 1400) | 0.00 |
| 203. Existing loan(s) taken subject to | | 503 Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210 City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes to | | 511. County taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218 | | 518. | |
| 219 | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER | 424,000.00 | 520 TOTAL REDUCTION AMOUNT DUE SELLER | |
| **300. Cash At Settlement From or To Borrower** | | **600 Cash At Settlement To or From Seller** | |
| 301. Gross amount due from borrower (line 120) | 252,490.10 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | 424,000.00 | 602. Less reduction amount due seller (line 520) | |
| 303. CASH TO BORROWER | 171,509.90 | 603 CASH TO SELLER | 0.00 |

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT **SETTLEMENT STATEMENT** PAGE 2

| L. SETTLEMENT CHARGES: FILE #: 06-1480 | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $ @ = | | |
| Division of commission (line 700) as follows: | | |
| 701. $ to | | |
| 702. $ to | | |
| 703. Commission paid at Settlement | | |
| 704. | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** P.O.C. | | |
| 801. Loan Origination Fee % | | |
| 802. Loan Discount % | | |
| 803. Appraisal Fee to FIRST CHICAGO | 225.00 | |
| 804. Credit Report to | | |
| 805. Lender's Inspection Fee to | | |
| 806. Mtg Ins Application Fee to | | |
| 807. to | | |
| 808 UNDERWRITING FEE BANK UNITED, FSB | 288.00 | |
| 809. PROCESSING FEE FIRST CHICAGO | 720.00 | |
| 810 YSP PAID BY BANKUNITED, FSB $14840 POC TO FIRST CHICAGO | | |
| 811 MORTGAGE BROKER FEE FIRST CHICAGO | 4,240.00 | |
| 812 DOCUMENT PREPARATION BANK UNITED, FSB | 250.00 | |
| 813. FLOOD CERTIFICATION FIRST AMERICAN FLOOD DATA SERVICES | 14.00 | |
| 814. TAX SERVICE FEE FCIS | 62.00 | |
| 815. WIRE FEE BANK UNITED, FSB | 30.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Interest from 10/23/06 to 11/01/06 @ $ 94.2222 /day 9 Days | 848.00 | |
| 902. Mortgage Insurance Premium for to | | |
| 903 Hazard Insurance Premium for yrs to $864.34 POC TO ALLSTATE | | |
| 904. | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | |
| 1001. Hazard Insurance 5 mo.@$ 72.03 /mo. | 360.15 | |
| 1002. Mortgage Insurance mo.@$ /mo. | | |
| 1003. City property taxes mo.@$ /mo. | | |
| 1004. County property taxes 4 mo.@$ 232.91 /mo. | 931.64 | |
| 1005. Annual Assessments mo.@$ /mo. | | |
| 1006. mo.@$ /mo. | | |
| 1007. mo.@$ /mo. | | |
| 1008. AGGREGATE ADJUSTMENT | -72.05 | |
| **1100. TITLE CHARGES** | | |
| 1101. Settlement or closing fee to | | |
| 1102. Abstract or title search to | | |
| 1103. Title examination to | | |
| 1104. Title insurance binder to | | |
| 1105. Document preparation to | | |
| 1106. Notary fees to | | |
| 1107. Attorney's fees to | | |
| (includes above items No: ) | | |
| 1108. Title insurance to CAMBRIDGE TITLE COMPANY | 550.00 | |
| (includes above items No: ) | | |
| 1109. Lender's coverage $ 487,600.00 ---- 550.00 | | |
| 1110. Owner's coverage $ | | |
| 1111 EPA ENDORSEMENT | | |
| 1112. 6.2 NEG ARM ENDORSEMENT | | |
| 1113. ALTA 8.1 & ALTA 9 ENDORSEMENT | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. Recording fees Deed $ Mortgage $ Releases $ 0.00 | | |
| 1202. City/county/stamps Deed $ Mortgage $ | | |
| 1203. State tax/stamps Deed $ Mortgage $ | | |
| 1204. | | |
| 1205. ASSIGNMENT OF MORTGAGE RECORDING FEE | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. Survey to | | |
| 1302. Pest inspection to | | |
| 1303. RENTAL HOUSING SURCHARGE COOK COUNTY RECORDER | 10.00 | |
| 1304. | | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| **1400. TOTAL SETTLEMENT CHARGES** (enter on lines 103 and 502, Sections J and K) | 8,456.74 | 0.00 |

[signature] 10/17/06
LEIDANN SUUT Buyer/Borrower

Seller

Buyer/Borrower

Seller

[signature]
CAMBRIDGE TITLE COMPANY

10-17-06
Date



Exhibit: B

# Adjustable Rate Note

**(1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate)**
**(1 Month MTA ARM)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT, AND MY PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED. BOTH MY MAXIMUM INTEREST RATE AND MINIMUM INTEREST RATE ARE LIMITED. MY INITIAL REQUIRED MONTHLY PAYMENT AMOUNT WILL NOT BE SUFFICIENT TO PAY THE INTEREST THAT ACCRUES UNDER THIS NOTE. THE PRINCIPAL BALANCE OF THIS NOTE MAY INCREASE TO AN AMOUNT THAT IS LARGER THAN THE AMOUNT THAT I ORIGINALLY BORROWED.**

| October 17, 2006 | NORTHFIELD | Illinois |
|---|---|---|
| [Date] | [City] | [State] |

3415 NORTH ODELL AVENUE
CHICAGO, IL 60634

[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 424,000.00 plus any amounts added in accordance with Section 3(E) of this Note (this amount is collectively called "Principal"), plus interest, to the order of Lender. Lender is BankUnited, FSB

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2. INTEREST**

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.0000 %. The interest rate I will pay will change as provided in this Section 2.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Change Dates**

The interest rate I will pay may change on the first day of December 2006 and on that same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".

**(C) Interest Rate Limits**

My interest rate will never be greater than 10.9500 %. My interest rate will never be less than the amount of the then applicable Margin described in Section 2(E) below.

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the monthly yields (the "Monthly Yields") on actively traded United States Treasury securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Statistical Release entitled "Selected Interest Rate (H.15)." The Twelve-onth Average is determined by adding together the Monthly Yields for the most recently available twelve months, dividing that sum by 12, and then rounding the resulting number to four decimal places. The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index, or any substitute Index, is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding Three and 2900/10000 percentage points ( 3.2900 %) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%). Subject to the limits stated in Section 2(C) above, the rounded amount will be my new interest rate, which will become effective on the Interest Change Date. That interest rate will remain in effect until the next Interest Change Date.

In the event a new Index is selected in accordance with Section 2(D) above, a new Margin may be established. The new Index and Margin will result in an interest rate that is substantially similar to the interest rate that was in effect at the time that the old Index became unavailable.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make my monthly payments on the first day of every month, beginning on December 2006. I will make a payment every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on November 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".



I will make monthly payments at 7815 NW 148 ST., MIAMI LAKES, FL 33016

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payment**

My initial monthly payment will be in the amount of U.S. $ 1,403.05 . My initial monthly payment was calculated using a rate of 1.2000 %, the original Principal, and the Maturity Date. This rate is lower than the initial interest rate stated in Section 2(A) above.

The amount of my initial monthly payment will change as provided in this Section 3.

**(C) Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the due date of my thirteenth (13th) payment, which is due on December 1, 2007 and on that same day every twelfth (12th) month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change as provided under Section 3(F) below.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date until the next Payment Change Date, unless my monthly payments are changed earlier as provided in Section 3(F) below.

**(D) Calculation of Monthly Payment Changes; Limitations**

On each Payment Change Date, my monthly payment will change to the amount that would be sufficient to repay the Principal that I am expected to owe at the Payment Change Date, together with interest at the rate in effect during the preceding month, in full in substantially equal monthly installments through the Maturity Date. However, unless Section 3(F) or Section 3(G) below apply, the amount of my new monthly payment, beginning on each Payment Change Date, will be limited to an amount that is no more than 7 1/2% greater than the amount I am required to pay under this Note immediately prior to that Payment Change Date. The Note Holder's monthly billing statement may disclose other payment options that I may have, if I should wish to pay a monthly payment that is larger than this amount.

**(E) Changes in My Unpaid Principal**

My initial required monthly payment amount will not be sufficient to pay the interest that will accrue under this Note at the initial interest rate stated in Section 2(A) of this Note, and may be lesser or greater than the amount sufficient to pay the interest that will accrue under this Note at the interest rates that thereafter are in effect under this Note. In addition, since my monthly payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 3(D) above, my subsequent monthly payments could be lesser or greater than the amount sufficient to pay the interest that will accrue under this Note at the interest rates that are in effect under this Note from time to time. For each month that my monthly payment is less than the interest that accrues under this Note, the Note Holder will subtract the monthly payment from the amount of the accrued interest and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate that is in effect under this Note from time to time. For each month that the monthly payment is greater than the interest that accrues under this Note, the Note Holder will apply the excess towards a Principal reduction of this Note.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that 115% limitation on a monthly payment due date, I will begin paying a new monthly payment on that due date, and will continue to make this payment each month until the next Payment Change Date, subject at all times to a further increase in my monthly payment under this Section 3(F) if my unpaid Principal would again otherwise exceed the 115% limitation. The new monthly payment will be the amount that would be sufficient to repay my then unpaid Principal, together with interest at the rate in effect during the month prior to the payment due date, in full in substantially equal monthly installments through the Maturity Date. The new monthly payment will be determined without applying the 7 1/2% payment limitation described in Section 3(D) of this Note.

**(G) Required Full Monthly Payment**

On the 5th Payment Change Date, on each succeeding 5th Payment Change Date thereafter, and on the final Payment Change Date, the monthly payment will be determined without regard to the 7 1/2% payment limitation described in Section 3(D) of this Note.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me, and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payments unless the Note Holder agrees in writing to those changes.

My partial Prepayment may reduce the amount of my monthly payments after the first Interest Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase or other factors.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0000 % of such monthly payment due. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least thirty (30) days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

> "**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that

Pg 16 of 35

Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

Borrower has executed and acknowledges receipt of pages 1 through 4 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

[signature] (Seal) -Borrower
LEILANI I. SULIT

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

[Sign Original Only]

MFCD6063 0005066680-0

Multistate Adjustable Rate Note – 1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate – Monthly Rate Change

Page 4 of 4 Initials: [initials]

**BankUnited**

# Adjustable Rate Rider

**(1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate) (1 Month MTA ARM)**

THIS ADJUSTABLE RATE RIDER is made this 17th day of October 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note, as modified or amended (the "Note") to **BankUnited, FSB**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**3415 NORTH ODELL AVENUE**
**CHICAGO, IL 60634**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT, AND THE PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED. BOTH MY MAXIMUM INTEREST RATE AND MINIMUM INTEREST RATE ARE LIMITED. MY INITIAL REQUIRED MONTHLY PAYMENT AMOUNT WILL NOT BE SUFFICIENT TO PAY THE INTEREST THAT ACCRUES UNDER THE NOTE. THE PRINCIPAL BALANCE OF THE NOTE MAY INCREASE TO AN AMOUNT THAT IS LARGER THAN THE AMOUNT THAT I ORIGINALLY BORROWED.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for changes in the interest rate and the monthly payments, as follows:

**"2. INTEREST**

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.0000 %. The interest rate I will pay will change as provided in this Section 2.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Change Dates**

The interest rate I will pay may change on the first day of December 2006, and on that same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".

**(C) Interest Rate Limits**

My interest rate will never be greater than 10.9500 %. My interest rate will never be less than the amount of the then applicable Margin described in Section 2(E) below.

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the monthly yields (the "Monthly Yields") on actively traded United States Treasury securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Statistical Release entitled "Selected Interest Rate (H.15)." The Twelve-onth Average is determined by adding together the Monthly Yields for the most recently available twelve months, dividing that sum by 12, and then rounding the resulting number to four decimal places. The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index, or any substitute Index, is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 2900/10000** percentage points ( 3.2900 %) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%). Subject to the limits stated in Section 2(C) above, the rounded amount will be my new interest rate, which will become effective on the Interest Change Date. That interest rate will remain in effect until the next Interest Change Date.

In the event a new Index is selected in accordance with Section 2(D) above, a new Margin may be established. The new Index and Margin will result in an interest rate that is substantially similar to the interest rate that was in effect at the time that the old Index became unavailable.

Multistate Adjustable Rate Rider – 1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate Monthly Rate Change

Page 1 of 3

Initials:

MFCD5064 000506580-0 

Pg 18 of 35
0630549130 Page: 11 of 15

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 11 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

LEILANI I. SULIT (Seal) -Borrower

(Seal) -Borrower

PATRICIO T. SULIT (Seal) -Borrower

(Seal) -Borrower

(Seal) -Borrower

(Seal) Borrower

Witness:

Witness:

State of Illinois ILLINOIS
County of COOK

This instrument was acknowledged before me on October 17, 2006 (date) by LEILANI I SULIT PATRICIO T SULIT (name[s] of person[s]).

Notary Public

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
ITEM 1876L11 (0011)
(Page 11 of 11 pages)
Form 3014 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 Fax 616-791-1131
MFIL3112
000500500-0

NOTE# Not my Signature

This instrument was prepared by:

Name: KIM C. NIEKRASZ

Address:
BANKUNITED, FSB
1900 E. GOLF ROAD, SUITE 1200,
SCHAUMBURG, IL 60173

After Recording Return To:
BANKUNITED, FSB
ATTN: POST CLOSING
7815 NW 148 STREET
MIAMI LAKES, FL 33016

06-1480

Exhibit: A

Doc#: 0630549130 Fee: $52.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 11/01/2006 01:21 PM Pg: 1 of 15

[Space Above This Line For Recording Data]

CAMBRIDGE TITLE COMPANY
400 Central Avenue
Northfield, IL 60093

# MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated October 17, 2006, together with all Riders to this document.

(B) "Borrower" is PATRICIO I. SULIT AND LEILANI I SULIT, HUSBAND AND WIFE

Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is BankUnited, FSB

Lender is a CORPORATION organized and existing under the laws of UNITED STATES OF AMERICA. Lender's address is 7815 NW 148 STREET, MIAMI LAKES, Florida 33016

. Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated October 17, 2006. The Note states that Borrower owes Lender Four Hundred Twenty Four Thousand and no/100 Dollars (U.S. $ 424,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than November 01, 2036

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider [ ] Condominium Rider [ ] Second Home Rider
[ ] Balloon Rider [ ] Planned Unit Development Rider [X] Other(s) [specify] LEGAL DESCRIPTION
[ ] 1-4 Family Rider [ ] Biweekly Payment Rider

15X

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.



24

(I) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(J) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) **"Escrow Items"** means those items that are described in Section 3.
(L) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(M) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(N) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(P) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns the following described property located in the COUNTY [Type of Recording Jurisdiction] of COOK [Name of Recording Jurisdiction]:

**SEE ATTACHED LEGAL DESCRIPTION MADE A PART HERETO.**

**PIN#12-24-413-038-0000**

which currently has the address of 3415 NORTH ODELL AVENUE [Street]
CHICAGO [City], Illinois 60634 [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower

fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was

previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

28

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Pg 25 of 35
0630549130 Page: 7 of 15

**(b) Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

ILLINOIS—Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3014 1/01
ITEM 1876L7 (0011) (Page 7 of 11 pages) To Order Call 1-800-530-5393 GREATLAND
MFIL3112
000508580-0
30

Pg 26 of 35
0630549130 Page: 8 of 15

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3014 1/01
ITEM 1876L8 (0011) (Page 8 of 11 pages) GREATLAND ■ To Order Call: 1-800-530-9393 Fax: 616-791-1131
MFIL3112 C00506580-0
31

immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

Commitment No.: 06-1480

EXHIBIT A

LEGAL DESCRIPTION

LOT 70 (EXCEPT THE NORTH 82 FEET THEREOF) IN COLLINS AND GAUNLETT'S FIRST GARDENS SUBDIVISION IN THE EAST 1/2 OF FRACTIONAL SECTION 24, TOWNSHIP 40 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Commonly known as: 3415 N. ODELL AVE., CHICAGO, IL 60634

Permanent Index No.: 12-24-413-038-0000

35

**BankUnited**

# Adjustable Rate Rider

**(1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate)**
**(1 Month MTA ARM)**

THIS ADJUSTABLE RATE RIDER is made this 17th day of October 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note, as modified or amended (the "Note") to BankUnited, FSB

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

3415 NORTH ODELL AVENUE
CHICAGO, IL 60634

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT, AND THE PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED. BOTH MY MAXIMUM INTEREST RATE AND MINIMUM INTEREST RATE ARE LIMITED. MY INITIAL REQUIRED MONTHLY PAYMENT AMOUNT WILL NOT BE SUFFICIENT TO PAY THE INTEREST THAT ACCRUES UNDER THE NOTE. THE PRINCIPAL BALANCE OF THE NOTE MAY INCREASE TO AN AMOUNT THAT IS LARGER THAN THE AMOUNT THAT I ORIGINALLY BORROWED.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for changes in the interest rate and the monthly payments, as follows:

**2. INTEREST**

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.0000 %. The interest rate I will pay will change as provided in this Section 2.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Change Dates**

The interest rate I will pay may change on the first day of December 2006 and on that same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".

**(C) Interest Rate Limits**

My interest rate will never be greater than 10.9500 %. My interest rate will never be less than the amount of the then applicable Margin described in Section 2(E) below.

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the monthly yields (the "Monthly Yields") on actively traded United States Treasury securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Statistical Release entitled "Selected Interest Rate (H.15)". The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months, dividing that sum by 12, and then rounding the resulting number to four decimal places. The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index, or any substitute Index, is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding Three and 2900/10000 percentage points ( 3.2900 %) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 2(C) above, the rounded amount will be my new interest rate, which will become effective on the Interest Change Date. That interest rate will remain in effect until the next Interest Change Date.

In the event a new Index is selected in accordance with Section 2(D) above, a new Margin may be established. The new Index and Margin will result in an interest rate that is substantially similar to the interest rate that was in effect at the time that the old Index became unavailable.

Initials [illegible]

36

**(A) Time and Place of Payments**

I will make my monthly payments on the first day of every month, beginning on December 2006. I will make a payment every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on November 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date"

I will make monthly payments at 7815 NW 148 ST., MIAMI LAKES, FL 33016

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payment**

My initial monthly payment will be in the amount of U.S. $ 1,400.05. My initial monthly payment was calculated using a rate of 1.2500 %, the original Principal, and the Maturity Date. This rate is lower than the initial interest rate stated in Section 2(A) above.

The amount of my initial monthly payment will change as provided in this Section 3

**(C) Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the due date of my thirteenth (13th) payment, which is due on December 1, 2007 and on that same day every twelfth (12th) month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change as provided under Section 3(F) below.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date until the next Payment Change Date, unless my monthly payments are changed earlier as provided in Section 3(F) below.

**(D) Calculation of Monthly Payment Changes; Limitations**

On each Payment Change Date, my monthly payment will change to the amount that would be sufficient to repay the Principal that I am expected to owe at the Payment Change Date, together with interest at the rate in effect during the preceding month, in full in substantially equal monthly installments through the Maturity Date. However, unless Section 3(F) or Section 3(G) below apply, the amount of my new monthly payment, beginning on each Payment Change Date, will be limited to an amount that is no more than 7 1/2% greater than the amount I am required to pay under this Note immediately prior to that Payment Change Date. The Note Holder's monthly billing statement may disclose other payment options that I may have, if I should wish to pay a monthly payment that is larger than this amount.

**(E) Changes in My Unpaid Principal**

My initial required monthly payment amount will not be sufficient to pay the interest that will accrue under this Note at the initial interest rate stated in Section 2(A) of this Note, and may be lesser or greater than the amount sufficient to pay the interest that will accrue under this Note at the interest rates that thereafter are in effect under this Note. In addition, since my monthly payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 3(D) above, my subsequent monthly payments could be lesser or greater than the amount sufficient to pay the interest that will accrue under this Note at the interest rates that are in effect under this Note from time to time. For each month that my monthly payment is less than the interest that accrues under this Note, the Note Holder will subtract the monthly payment from the amount of the accrued interest and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate that is in effect under this Note from time to time. For each month that the monthly payment is greater than the interest that accrues under this Note, the Note Holder will apply the excess towards a Principal reduction of this Note.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that 115% limitation on a monthly payment due date, I will begin paying a new monthly payment on that due date, and will continue to make this payment each month until the next Payment Change Date, subject at all times to a further increase in my monthly payment under this Section 3(F) if my unpaid Principal would again otherwise exceed the 115% limitation. The new monthly payment will be the amount that would be sufficient to repay my then unpaid Principal, together with interest at the rate in effect during the month prior to the payment due date, in full in substantially equal monthly installments through the Maturity Date. The new monthly payment will be determined without applying the 7 1/2% payment limitation described in Section 3(D) of this Note.

**(G) Required Full Monthly Payment**

On the 5th Payment Change Date, on each succeeding 5th Payment Change Date thereafter, and on the final Payment Change Date, the monthly payment will be determined without regard to the 7 1/2% payment limitation described in Section 3(D) of this Note.

4. **NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me, and also the title and telephone number of a person who will answer any question I may have regarding the notice."

B. **TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read, in its entirety, as follows:

"**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed,

contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 3 of this Adjustable Rate Rider.

LEILANI L. SULIT (Seal) -Borrower ____ (Seal) -Borrower

☆ PATRICIO L. SULIT (Seal) -Borrower ____ (Seal) -Borrower

____ (Seal) -Borrower ____ (Seal) -Borrower

[Sign Original Only]

NOTE

☆ THIS WAS NOT MY SIGNATURE
MY SIGNATURE WAS FORGED

38

**THIS IS A NOTICE REGARDING YOUR CLAIM. YOU MUST READ IT AND TAKE ACTION IF YOU DISAGREE WITH THE OBJECTION.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**NOTICE OF HEARING ON TWENTIETH OMNIBUS OBJECTION TO CLAIMS (BORROWER CLAIMS WITH INSUFFICIENT DOCUMENTATION)**

**Leilani R. Sulit**

| **Proposed Claim(s) to be Disallowed and Expunged** | | | | **Reason for Disallowance** |
|---|---|---|---|---|
| Claim No(s); Date Filed | Debtor | Classification | Amount | |
| 1397<br>10/18/12 | Residential Capital, LLC | Administrative Priority | N/A | Claimant does not include sufficient supporting documents |
| | | Administrative Secured | N/A | |
| | | Secured | $280,000.00 | |
| | | Priority | N/A | |
| | | General Unsecured | N/A | |

PLEASE TAKE NOTICE that, on July 3, 2013, Residential Capital, LLC and certain of its affiliates (collectively, the "**Debtors**") filed their Twentieth Omnibus Objection to Claims (Borrower Claims with Insufficient Documentation) (the "**Objection**") with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").[1] The category of claim objection applicable to you is identified in the table above in the column entitled "**Reason for Disallowance**".

The Objection requests that the Bankruptcy Court expunge, and/or disallow one or more of your claims listed above under PROPOSED CLAIM(S) TO BE DISALLOWED AND EXPUNGED on the ground that the claim(s) does not contain sufficient documentation to substantiate the claim. **Any claim that the Bankruptcy Court expunges and disallows will be treated as if it had not been filed and you will not be entitled to any distribution on account thereof.**

[1] A list of the Debtors, along with the last four digits of each Debtor's federal tax identification number, is available on the Debtors' website at http://www.kccllc.net/rescap.

If you do NOT oppose the expungement, and/or disallowance of your claim(s) listed above under PROPOSED CLAIM(S) TO BE DISALLOWED AND EXPUNGED, then you do NOT need to file a written response to the Objection and you do NOT need to appear at the hearing.

If you DO oppose the expungement, and/or disallowance of your claim(s) listed above under PROPOSED CLAIM(S) TO BE DISALLOWED AND EXPUNGED, then you MUST file with the Bankruptcy Court and serve on the parties listed below a written response to the Objection that is received on or before 4:00 p.m. Prevailing Eastern Time on August 5, 2013 (the "**Response Deadline**").

Your response, if any, must contain at a minimum the following: (i) a caption setting forth the name of the Bankruptcy Court, the names of the Debtors, the case number and the title of the Objection to which the response is directed; (ii) the name of the claimant and description of the basis for the amount of the claim; (iii) a concise statement setting forth the reasons why the claim should not be disallowed, and/or expunged for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which you will rely in opposing the Objection; (iv) all documentation or other evidence of the claim, to the extent not included with the proof of claim previously filed with the Bankruptcy Court, upon which you will rely in opposing the Objection; (v) the address(es) to which the Debtors must return any reply to your response, if different from that presented in the proof of claim; and (vi) the name, address, and telephone number of the person (which may be you or your legal representative) possessing ultimate authority to reconcile, settle, or otherwise resolve the claim on your behalf.

The Bankruptcy Court will consider a response only if the response is timely filed, served, and received. A response will be deemed timely filed, served, and received only if the original response is actually received on or before the Response Deadline by (i) the chambers of the Honorable Martin Glenn, One Bowling Green, New York, New York 10004, Courtroom 501; (ii) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Gary S. Lee, Esq., Norman S. Rosenbaum, Esq. and Jordan A. Wishnew, Esq., attorneys for the Debtors; and (iii) Kramer Levin Naftalis & Frankel LLP, 1117 Avenue of the Americas, New York, NY 10036, Attn: Kenneth H. Eckstein, Esq. and Douglas H. Mannal, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases.

A hearing will be held on August 21, 2013 to consider the Objection. The hearing will be held at 10:00 a.m. Prevailing Eastern Time in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, Courtroom 501. If you file a written response to the Objection, you should plan to appear at the hearing. The Debtors, however, reserve the right to continue the hearing on the Objection with respect to your claim(s). If the Debtors do continue the hearing with respect to your claim(s), then the hearing will be held at a later date. If the Debtors do not continue the hearing with respect to your claim(s), then a hearing on the Objection will be conducted on the above date.

Whether or not the Bankruptcy Court disallows, and/or expunges your claim(s) listed above under PROPOSED CLAIM(S) TO BE DISALLOWED AND EXPUNGED, the Debtors have the right to object on other grounds to the claim(s) (or to any other claims you may

have filed, including any SURVIVING CLAIM(S) listed above) at a later date. You will receive a separate notice of any such objections.

You may participate in a hearing telephonically provided that you comply with the Bankruptcy Court's instructions, which can be found on the Bankruptcy Court's website at www.nysb.uscourts.gov.

If you wish to view the complete Objection, you can do so on the Bankruptcy Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the internet at www.nysb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov), or for free at http://www.kccllc.net/rescap. If you have any questions about this notice or the Objection, or if you would like to request a complete copy of the Objection at the Debtors' expense, please contact the Debtors' approved claims agent Kurtzman Carson Consultants, LLC at (888) 926-3479. CLAIMANTS SHOULD NOT CONTACT THE CLERK OF THE BANKRUPTCY COURT TO DISCUSS THE MERITS OF THEIR CLAIMS.

DATED: July 5, 2013
New York, New York

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION