**Reply Deadline:  July 29, 2013 at 12:00 p.m. (prevailing Eastern Time)**
**Hearing Date and Time:  July 30, 2013 at 10:00 a.m. (prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Gary S. Lee
Todd M. Goren
Jennifer L. Marines
*Counsel to the Debtors and Debtors in Possession*

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559
Steven J. Reisman
Michael Moscato
Theresa A. Foudy
*Conflicts Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DEBTORS' OBJECTION TO THE MOTION OF THE AD HOC GROUP OF
JUNIOR SECURED NOTEHOLDERS FOR ENTRY OF AN ORDER
(I) DIRECTING EACH OF DEBTORS' COUNSEL, INCLUDING MORRISON
& FOERSTER LLP, OFFICIAL COMMITTEE COUNSEL, INCLUDING KRAMER
LEVIN NAFTALIS & FRANKEL LLP, AND THE DEBTORS' MANAGEMENT TO
REMAIN STRICTLY NETURAL IN ANY DISPUTE REGARDING CLAIMS BY AND
BETWEEN ANY DEBTORS, (II) ORDERING THE LIMITED DISQUALIFICATION
OF EACH OF THE FOREGOING TO THE EXTENT NECESSARY TO
<u>EFFECTUATE THE FOREGOING, AND (III) GRANTING RELATED RELIEF</u>**

# TABLE OF CONTENTS

**Page #**

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND.................................................................................. 5

ARGUMENT ....................................................................................................... 13

    I.    The Debtors' Decision To Enter into the PSA Was the Product of Months of Negotiations Spearheaded by Their CRO and Supported by Numerous Creditors Throughout the Capital Structure....................................................... 14

    II.    Settlement of the Intercompany Balances Does Not Require that the Debtors Have Separate Representation............................................................. 17

    III.    The Motion Is a Transparent Attempt to Gain an Advantage in Pending Litigation............................................................................................................. 21

    IV.    The Requested Relief Is Untenable.................................................................... 24

CONCLUSION.................................................................................................... 25

15589156

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Altschul v. Paine Webber, Inc.*,
   488 F. Supp. 858 (S.D.N.Y. 1980) ........................................................................ 16

*Bank Brussels Lambert v. Coan (In re AroChem Corp.)*,
   176 F.3d 610 (2d Cir. 1999) ............................................................................... 21

*Hamilton v. Merrill Lynch*,
   645 F. Supp. 60 (E.D. Pa. 1986) ..................................................................... 15-16

*Hassett v. McColley (In re O.P.M. Leasing Servs., Inc.)*,
   16 B.R. 932 (Bankr. S.D.N.Y. 1982) ........................................................ 16, 18, 23

*In re Adelphia Communications Corp.*,
   336 B.R. 610 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ................... 4, 18

*In re Betts*,
   165 B.R. 233 (Bankr. N.D. Ill. 1994) ................................................................. 15

*In re BH & P Inc.*,
   949 F.2d 1300 (3d Cir. 1991) ........................................................................... 17

*In re Coal River Res., Inc.*,
   321 B.R. 184 (W.D. Va. 2005) ......................................................................... 20

*In re Enron Corp.*,
   No. 01-16034 (AJG) 2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002) ........................ 22

*In re Enron Corp.*,
   No. 02 Civ. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) ............................... 23

*In re Global Marine, Inc.*,
   108 B.R. 998 (Bankr. S.D. Tex. 1987) ............................................................. 17-18

*In re Granite Partners, L.P.*,
   219 B.R. 22 (Bankr. S.D.N.Y. 1998) .................................................................. 21

*In re Guy Apple Masonry Contractor*,
   B.R. 160 (Bankr. D. Ariz. 1984) ....................................................................... 18

*In re Int'l Oil Co.*,
   427 F.2d 186 (2d Cir. 1970) ............................................................................ 17

*In re Interwest Bus. Equip., Inc.*,
   23 F.3d 311 (10th Cir. 1994) ........................................................................... 20

*In re Jennings*,
   199 F. App'x 845 (11th Cir. 2006) ..................................................................... 20

*In re JMK Construction Group., Ltd.*,
   441 B.R. 222 (Bankr. S.D.N.Y. 2010) ................................................................. 21

*In re Project Orange Assocs., LLC*,
 431 B.R. 363 (Bankr. S.D.N.Y. 2010)...............................................................20-21

*In re Shore*,
 No. 03-43072, 2004 WL 2357992 (Bankr. D. Kan. May 14, 2004).......................21

*In re Star Broad., Inc.*,
 81 B.R. 835 (Bankr. D.N.J. 1988) .........................................................................21

*In re Straughn*,
 428 B.R. 618 (Bankr. W.D. Pa. 2010) ..............................................................20-21

*In re WorldCom, Inc.*,
 311 B.R. 151 (Bankr. S.D.N.Y. 2004) ...................................................................23

*In re WorldCom, Inc.*,
 No. 02-13533 (ALG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...................19-20

*Rome v. Braunstein*,
 19 F.3d 54 (1st Cir. 1994)......................................................................................20

## **Miscellaneous**

Hr'g Tr.  May 20, 2009, *In re General Growth Props., Inc.*,
 No. 09-11977  (ALG) (Bankr. S.D.N.Y.) [Docket No. 72].....................................18

*In re Enron Corp.*,
 No. 01-16034 (AJG) (Bankr. S.D.N.Y. Jul. 15, 2004) [Docket No. 19758] ...........19

EXHIBIT 1 — Hr'g Tr.,  May 20, 2009, *In re General Growth Props., Inc.*, No. 09-11977
            (ALG) (Bankr. S.D.N.Y.) [Docket No. 72]

EXHIBIT 1 — Findings of Fact and Conclusions of Law Confirming Supplemental Modified
            Fifth Am. Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United
            States Bankruptcy Code, and Related Relief, *In re Enron Corp.,* No. 01-16034
            (AJG) (Bankr. S.D.N.Y. Jul. 15, 2004) [Docket No. 19758]

15589156

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors-in-possession (each a "Debtor" and collectively, the

"Debtors")[1] in the above-captioned jointly administered Chapter 11 cases (the "Chapter 11

Cases") respectfully submit this objection (the "Objection") to the *Motion of the Ad Hoc Group*

*of Junior Secured Noteholders for Entry of an Order (i) Directing Each of Debtors' Counsel,*

*Including Morrison & Foerster LLP, Official Committee Counsel, Including Kramer Levin*

*Naftalis & Frankel LLP, and the Debtors' Management To Remain Strictly Neutral in Any*

*Dispute Regarding Claims By and Between Any Debtors, (ii) Ordering the Limited*

*Disqualification of Each of the Foregoing to the Extent Necessary To Effectuate the Foregoing,*

*and (iii) Granting Related Relief* [Docket No. 4289] (the "Motion").  In support of the Objection,

the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The latest motion by the Ad Hoc Group of Junior Secured Noteholders (the "Ad

Hoc Group" or the "JSNs") raises the specter of interdebtor conflicts where none exists.  Nearly

five months ago, the Court granted the Debtors' motion to appoint Lewis Kruger as their Chief

Restructuring Officer (the "CRO") for the specific purpose of representing all of the Debtors in

mediating the host of intercreditor and interdebtor issues that needed to be resolved to form a

Chapter 11 plan.[2]  Pursuant to the terms of his engagement, the CRO has been charged with

acting "on behalf of each Debtor . . . taking into account the respective fiduciary duties of the

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified in Exhibit 1
to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11
Petitions and First Day Pleadings* [Docket No. 6].

[2] *See Order Granting Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order
Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Office* [Docket No. 3103].

CRO to each Debtor's respective estate."[3]  In that role, Mr. Kruger guided the Debtors through

months of mediation that resulted in the Global Settlement.  All the Debtors signed the PSA,

which embodies the terms of the Global Settlement and the proposed Chapter 11 plan (the

"Plan").  This Court approved the Debtors' entry into the PSA, and their performance of their

obligations thereunder, after having specifically found that entry into the PSA was in the "best

interests" of the Debtors.  PSA Order ¶ 3.[4]  There thus is no interdebtor conflict; the Debtors'

interests are perfectly aligned in performing their obligations under the PSA and seeking

confirmation of the Plan whose terms are embodied in the PSA.

2.        While the Ad Hoc Group characterizes its request for relief as "limited," in

actuality, the requested relief would have devastating effects.  Specifically, the Ad Hoc Group

seeks an order requiring the Debtors' counsel, counsel for the Official Committee of Unsecured

Creditors (the "Committee," and collectively with the Debtors, the "Plan Proponents"), and the

CRO, as well as the rest of the Debtors' management, to maintain "strict neutrality" on the topic

of the intercompany balances that existed on the books and records of the Debtors as of the

Petition Date (the "Intercompany Balances").  However, because the proposed Plan treatment of

Intercompany Balances is an integral part of the Global Settlement, granting the Motion would

effectively mean that the Plan Proponents could not proceed to Plan confirmation, or with

seeking approval of the Global Settlement pursuant to Rule 9019 of the Federal Rules of

Bankruptcy Procedure ("Rule 9019"), or with challenging the Ad Hoc Group's position that the

---

[3] Amendment No. 1 to Engagement Letter, attached as Ex. 1 to the *Debtors' Omnibus Reply in Responses to (I) Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer and (II) Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 3074].

[4] Capitalized terms otherwise not defined in the Preliminary Statement shall have the meanings ascribed to them later on in the Objection.

15589156

JSNs are oversecured – results that would be convenient for the Ad Hoc Group as there would be no one able to litigate against it, but that are hardly in the best interests of the Debtors or their estates. The Debtors would be "back to square one" – without the complex layers of agreement that bound numerous creditor constituencies throughout the capital structure to the PSA, and without the guarantee of a $2.1 billion contribution from Ally Financial Inc. and its non-debtor affiliates (collectively, "Ally") – but with ever-increasing administrative costs and the prolonging of the ability to confirm a Chapter 11 plan by months or years (if ever).

3.      Alternatively, if the Plan Proponents still wanted to salvage the ability to proceed toward Plan confirmation, the Ad Hoc Group's position as stated in its Motion would mean that each Debtor's estate would first need to hire new independent management, retain its own counsel, and form its own creditors' committee, which committee would also need to retain new counsel. Then, presumably, each of these 51 new sets of professionals would, in the Ad Hoc Group's scenario, perform their own independent assessment of the Intercompany Balances and decide anew whether they believe that the Global Settlement is in that particular Debtor's interests. The problem with this approach, of course – aside from skyrocketing costs to the estates and extensive delay in recovery to creditors – *is that all the Debtors already determined that the global settlement was in their best interests, all the Debtors already signed the PSA, and the Court already authorized all the Debtors' entry into the PSA and found such entry to be in the Debtors' best interests. See* PSA Order ¶ 3.

4.      If the Ad Hoc Group believed that conflicts prevented the Debtors from proposing a plan that compromised Intercompany Balances, the Ad Hoc Group should have moved for separate counsel or fiduciaries 14 months ago, when both MoFo was retained and the Debtors and the JSNs negotiated a prepetition plan support agreement that proposed a compromise of the

Intercompany Balances.  At the very least, the Ad Hoc Group should have made its motion when

Mr. Kruger was appointed as CRO for each of the Debtors' estates five months ago for the

specific purpose of mediating a host of intercreditor and interdebtor issues.  Instead, the Ad Hoc

Group waited to make this Motion until after dozens of parties-in-interest spent several months

and countless hours in mediation, with the help of the Honorable James M. Peck, to reach the

Global Settlement; until after Mr. Kruger exercised his business judgment as a fiduciary to each

of the Debtors to enter into the PSA; and until after this Court approved the Debtors' entry into

the PSA and the Debtors thus became contractually bound to seek confirmation of the Plan.  The

time for the challenge the JSNs are making has long since passed.

     5.     Particularly coming at the time that it does,[5] the Motion appears solely designed

to derail the Plan Proponents' ability to meet the Plan Milestones and, ultimately, to obtain

confirmation of the Plan, by trying to infuse into these Chapter 11 Cases the type of interdebtor

litigation that was present in *In re Adelphia Communications Corp.*, 336 B.R. 610 (Bankr.

S.D.N.Y.), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006).  However, this case is not *Adelphia*.  Here, if

the Plan is confirmed and the Global Settlement approved, the *Adelphia* type of interdebtor

litigation will have been avoided.  In fact, as the *Adelphia* Court stated:  "The presence of

interdebtor conflicts, which is characteristic of nearly every large multi-debtor chapter 11 case,

does not by itself require the appointment of trustees or nonstatutory fiduciaries for each of the

affected debtors.  If there ever were such a rule, it would paralyze Chapter 11 practice, and result

in untold damage to the recoveries of creditors."  *Id.* at 678.  Such "untold damage" would occur

here if, in its single-minded quest for postpetition interest, the Ad Hoc Group were to succeed in

---

[5] Notably, it was just a few hours after filing the proposed *Order in Aid of Mediation and Settlement* [Docket No. 4286, Ex. A] to facilitate participation by the Ad Hoc Group members in the mediation that the Ad Hoc Group filed the instant Motion seeking to disqualify the very same professionals with whom they purportedly are now willing to negotiate as part of the mediation – a mediation which, according to them, is tainted by inappropriate conflicts.

15589156

manufacturing conflicts to prevent the Plan Proponents from being able to proceed with seeking approval of the Global Settlement and confirmation of the Plan.

6.      The Ad Hoc Group will have its opportunity to challenge the reasonableness of the treatment of the Intercompany Balances embodied in the PSA and the Plan as part of the Plan confirmation process.[6] That is the proper avenue for challenging the Plan's treatment of Intercompany Balances – not by raising the specter of invented conflicts as a means to prevent the Debtors' counsel, Committee counsel, and the Debtors' management from advocating for the confirmation of the Plan and seeking approval of the Global Settlement. If the Plan is not confirmed, both the PSA and the Plan make clear that the Debtors will no longer be bound by the representations that are embodied in the Global Settlement nor by anything in the Plan. PSA § 6; Plan, Article X.D, at 101. Thus, there is no basis for the Ad Hoc Group's argument that failure to maintain "strict neutrality" in seeking approval of Global Settlement and confirmation of the Plan will prejudice the Debtors should the Plan not be confirmed.

7.      In sum, there is no interdebtor conflict. Under the PSA, the Debtors' interests are all aligned. The Ad Hoc Group's Motion is as meritless as it is belated and self-serving. It should be denied.

## FACTUAL BACKGROUND

8.      The Ad Hoc Group's decision to move for "strict neutrality" and "limited disqualification" at this late juncture should be seen for what it is – a disgruntled creditor group trying to maneuver its way into postpetition interest. In this regard, a short review of the course of these Chapter 11 Cases is instructive.

---

[6] *See, e.g.*, Transcript of July 3, 2013 Status Conference at 33:20-34:3.

15589156

9.       Over 14 months ago, on May 14, 2012 (the "Petition Date"), each of the 51

Debtors filed voluntary petitions with this Court for relief under Chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").  Shortly thereafter, the Court authorized the

Debtors' retention of, among others, Morrison & Foerster LLP ("MoFo"), *nunc pro tunc* to the

Petition Date pursuant to section 327(a) of the Bankruptcy Code.[7]  No party objected to the

Debtors' retention of MoFo to represent all of the Debtors despite the number of Debtors being

jointly represented and the presence of the Intercompany Balances.  Nor did any party seek to

appoint separate counsel or fiduciaries to represent individual Debtor entities with respect to any

interdebtor issues.

10.      On June 30, 2012, MoFo publicly filed each of the Debtors' schedules of assets

and liabilities ("SOALs") on the case docket.  Some of the SOALs listed Intercompany Balances,

which were subject to certain disclaimers regarding the potential value and recovery on any such

balances.  *See, e.g., Schedules of Assets and Liabilities for Residential Capital, LLC (Case

No. 12-12020)* [Docket No. 549], at 5.  While the SOALs stated that, "[t]he Debtors have made

every attempt to properly characterize, prioritize and classify all intercompany transactions," the

SOALs also stated that the scheduled claims "are not necessarily indicative of the ultimate

recovery on any inter-Debtor receivable or the impairment or claim status of any inter-company

payable."  *Id.*  The SOALs further expressly reserved the Debtors' "rights to dispute or assert

offsets, setoffs or defenses to any claim reflected on the Schedules as to the nature, amount,

liability, or status or to otherwise subsequently designate any claim as disputed, contingent or

unliquidated."  *Id.* at 2-3 ("Nothing contained in the Schedules and Statements or these Global

Notes shall constitute an admission or a waiver of rights with respect to these Chapter 11 cases,

---

[7] *See Order Authorizing the Retention and Employment of Morrison & Foerster LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 786].

15589156

including, but not limited to, any issues involving substantive consolidation for plan purposes,

subordination and/or causes of action arising under the provisions of Chapter 5 of the

Bankruptcy Code and other relevant non-bankruptcy laws to recover assets or avoid transfers.

For the avoidance of doubt, listing a claim . . . does not constitute an admission by the Debtors of

the legal rights of the claimant, or a waiver of a Debtor's right to recharacterize or reclassify such

claim or contract.").

11.    Eight months ago, following the completion of the Debtors' highly successful

asset sales, the Debtors sought the appointment of a sitting Bankruptcy Judge to oversee

mediation among the Debtors and their key creditor constituencies.[8]  On December 26, 2012, the

Court appointed the Honorable James M. Peck to serve in this role.[9]

12.    In addition, in February 2013, the Debtors sought, and the Court approved,[10] the

retention of Lewis Kruger to act as an "independent CRO" in order to "direct plan discussions

and lead the Debtors in ongoing mediation." *Debtors' Motion Pursuant to Sections 105(a) and

363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as

Chief Restructuring Officer* [Docket No. 2887] (the "CRO Motion") ¶ 3; *see also* Engagement

Letter [Docket No. 2887, Ex. 4] at 1 ("Mr. Kruger will act as CRO in his capacity as an

independent party.").  As the retention papers made clear, the Debtors believed it was important

to appoint an independent CRO to spearhead plan negotiations and lead the Debtors in mediating

critical, "gating" intercreditor issues including the Intercompany Balances. *See* CRO Motion ¶

---

[8] *Debtors' Motion for Appointment of a Mediator* [Docket No. 2357].

[9] *See Order Appointing Mediator* [Docket No. 2519].  The Court recently further extended Judge Peck's term as mediator through October 31, 2013.  *See Order Further Extending Appointment of Hon. James M. Peck as Mediator* [Docket No. 3877].

[10] *See Order Granting Debtors' Motion for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No. 3103].

15589156

23 (noting that a number of stakeholders viewed the historical experience of present management

as an "impediment to tackling matters such as the AFI Settlement *and the allowance of*

*intercompany claims*.  Putting aside the merits of such views, an *independent CRO eliminates*

*these concerns*.") (emphasis added).  In accordance with these objectives, the Engagement

Letter, which sets forth the duties and obligations of the CRO, provides that the CRO was to act

as an independent fiduciary on behalf of each of the Debtors' estates:

> [T]he CRO shall be vested with . . . the authority to:  (vi) make
> decisions *on behalf of each Debtor* with respect to chapter 11 plan
> negotiations and formulation, in such manner as is consistent with
> the business judgment rule, the provision of applicable law, *taking*
> *into account the respective fiduciary duties of the CRO to each*
> *Debtor's respective estate*[.]

Amendment No. 1 to Engagement Letter [Docket No. 3074, Ex. 1] (emphasis added).

13.    On May 23, 2013, following months of mediation, the Debtors filed the motion to

approve entry into and performance under the Plan Support Agreement (the "PSA").[11]  The PSA

is signed by Mr. Kruger on behalf of "Residential Capital, LLC, for itself and its Debtor

subsidiaries," by Kenneth H. Eckstein on behalf of the Committee, and by 19 other of the

Debtors' major creditor constituencies from across the capital structure.  The PSA embodies the

near-global resolution reached through the mediation process and resolves a host of competing

creditor claims.  Just as importantly, the PSA guarantees a contribution from Ally of $2.1 billion

should the Plan be confirmed.

14.    Pursuant to the PSA, the Debtors contractually obligated themselves to "take any

and all Agreed Efforts to effectuate the terms of [the PSA], including prosecuting the terms of

[the PSA] in accordance with the Milestones . . . ."  PSA § 3.1(b).  Such Milestones include:  (i)

---

[11] *See Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to
Enter Into and Perform Under a Plan Support Agreement with Ally Financial, Inc., the Creditors' Committee, and
Certain Consenting Claimants* [Docket No. 3814] (the "PSA Motion").  A copy of the PSA is attached as Exhibit 3
to the PSA Motion.  *See also* PSA Ex. A ("Plan Term Sheet") & PSA Ex. B ("Supplemental Term Sheet").

15589156

filing the plan and disclosure statement contemplated by the PSA by July 3, 2013; (ii) Court

approval of the disclosure statement by August 30, 2013; and (iii) an effective date of 30 days

following the confirmation of the Plan, in any event no later than December 15, 2013.  *See* Plan

Term Sheet at 4 (the "Milestones").  In the event a Milestone is not met, the parties may seek to

terminate their obligations under the PSA.  *See* PSA § 6.1(i).

15.    The Supplemental Term Sheet filed with the PSA provides the structure for, and

sets forth the key details of, a proposed Chapter 11 plan.  With respect to the Intercompany

Balances, the Supplemental Term Sheet provides that they will be "waived, cancelled, and

discharged on the Effective Date."  Supplemental Term Sheet at 13, 14, 16.  The treatment of the

Intercompany Balances contemplated by the Supplemental Term Sheet is exactly the same as the

Plan's treatment of those balances of which the JSNs now complain.

16.    On June 26, 2013, at the hearing on the Debtors' motion to enter into the PSA, the

Debtors introduced unrebutted evidence establishing that all of the Debtors believed it was in

their best interests to proceed with a plan containing a number of compromises, including with

respect to substantive consolidation and the treatment of Intercompany Balances.[12]  The Court

thereafter entered an order (the "PSA Order") approving the Debtors' entry into and performance

---

[12] *See Declaration of Lewis Kruger in Support of Debtors' Motion for an Order Under Bankruptcy Code Sections
105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally
Financial, Inc., the Creditors' Committee, and Certain Consenting Claimants* [Docket No. 3814, Ex. 2] ¶ 13 (the
PSA "is in the best interests of the Debtors' estates, will maximize distributions to creditors, and will avoid a 'free-
for-all' with significant plan-related litigation that would deplete the limited remaining resources available for
distribution to creditors"); ¶¶ 14, 20, 22, 26 ("[A]fter careful consideration, the Debtors determined that entry into
the Agreement, including the Plan Support Agreement, was beneficial to the Debtors, their estates, and their
stakeholders, and was appropriate under the circumstances in which this Agreement was made.  The Agreement
reflects the heavily-negotiated settlement and compromise of the Parties' respective positions and provides for
support for the Plan during a critical phase of the Debtors' Chapter 11 cases.").

15589156

under the PSA and thus the prosecution of a plan on the terms set forth in the PSA and attached

Supplemental Term Sheet.[13]  In doing so, the Court found:

> The [PSA] is the result of many months of mediation led by Judge
> Peck and it reflects a heavily negotiated resolution supported by a
> substantial majority of the Debtors' major claimant constituencies.
> . . . The PSA is not manifestly unreasonable, nor has there been a
> showing of bad faith, self-interest or gross negligence.  The Court
> finds that a preponderance of the evidence introduced at the
> hearing supports approval of the PSA.  *The findings of fact that
> each of the parties, including the RMBS Trustees, have acted in
> good faith and in the best interests of its respective constituencies
> in entering into the PSA are appropriate now and supported by the
> record.*  The PSA resulted from nearly seven months of mediation
> addressing scores of issues.

PSA Opinion at 43-44 (emphasis added).  The PSA Opinion also made clear that "the Court's

findings . . . do not preclude a challenge to a plan that includes the proposed settlements

embodied in the PSA and term sheets."  *Id.* at 45.

17.    On July 3, 2013, the Debtors filed the *Joint Chapter 11 Plan Proposed by

Residential Capital, LLC, et al., and the Official Committee of Unsecured Creditors* [Docket

No. 4153] (the "Plan").  The Plan provides for treatment of the Intercompany Balances as set

forth in the Supplemental Term Sheet filed with the PSA.  The Intercompany Balances "shall be

waived, cancelled and discharged," and Debtors holding claims arising from the Intercompany

Balances will be deemed to have rejected the Plan.  *See* Plan at 43, 47-48, 52.

18.    The proposed Plan also contemplates that the JSNs will receive full payment on

account of their allowed claims as determined by the Court in the consolidated adversary

proceeding commenced by each of the Debtors and the Committee (the "JSN Adversary

---

[13] *See Order Granting Debtors' Motion Authorizing the Debtors to Enter Into a Plan Support Agreement with Ally
Financial, Inc., the Creditors' Committee, and Certain Consenting Claimants* [Docket No. 4098].  The following
day, the Court issued its *Memorandum Opinion Approving the Plan Support Agreement* [Docket No. 4102] (the
"PSA Opinion").

15589156

Proceeding").[14]  *See* Plan at 41, 45-46, 50 (explaining treatment of Junior Secured Notes

Claims).  In the event the Court determines that the JSNs are oversecured and entitled to

postpetition interest, the Plan provides for full payment of such postpetition interest.  *See id.*

19.    The Plan makes clear that if it is not consummated or the confirmation order is

vacated, the Plan will no longer be binding on the Debtors.  Specifically, if at any point the Plan

has been withdrawn or confirmation does not occur, the Plan clarifies that the settlements

embodied in the plan, including the fixing or limiting of claims and interests, shall be null and

void, and shall not "(1) constitute a waiver or release of any Claims, Interests or Causes of

Action; (ii) prejudice in any manner the rights of any Debtor or any other Entity; or (iii)

constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or

any other Entity."  Plan, Article X.D, at 101; *see also* Plan, Article XI.C, at 102 (explaining that

in the event the Plan is revoked or withdrawn, "any settlement or compromise embodied in the

Plan [including the fixing or limiting of claims or interests] shall be deemed null and void" and

that "nothing contained in the Plan shall constitute a waiver or release of any Claims or Equity

Interests [or] prejudice in any manner the rights of the Plan Proponents, the Settling Parties, or

any other Entity." ).

20.    Contemporaneously with the filing of the Plan, the Plan Proponents filed the

proposed *Disclosure Statement for the Joint Chapter 11 Plan of Residential Capital, LLC, et al.*

*and the Official Committee of Unsecured Creditors* [Docket No. 4157] (the "Disclosure

Statement"), which further details the bases for the treatment of the Intercompany Balances as

set forth in the PSA and the Plan.  As the Disclosure Statement explains, through their

independent review and analysis, the Debtors and the Committee each concluded that the

---

[14] *See Official Committee of Unsecured Creditors v. UMB Bank, N.A. et al.*, Adv. Pro. No. 13-01277 (MG);
*Residential Capital, LLC, et al. v. UMB Bank, N.A., et al.*, Adv. Pro. No. 13-01343 (MG).

compromise of the Intercompany Balances was reasonable based on, among other factors: (i) the fact that certain Intercompany Balances reflected on the SOALs suffer from evidentiary issues that cause them to lack indicia of true debt; (ii) the extremely costly and time-consuming litigation, including potential substantive consolidation, that would inevitably result from any attempt to enforce the putative Intercompany Balances; (iii) the inability to reach agreement with numerous creditor constituencies absent a consensual resolution of the Intercompany Balances and inextricably related issues; and (iv) the substantial benefits to all creditor constituencies from the Global Settlement. *See* Disclosure Statement at 35 & Ex. 5 (detailing analysis of top seven Intercompany Balances). Thus, the Plan Proponents and the consenting claimants "believe that the compromise of Intercompany Balances embodied in the Plan is in the best interest of the Estates and creditors." Disclosure Statement at 35.[15]

21.    On July 18, 2013, the Ad Hoc Group filed the Motion, which: (1) challenges the estate professionals retained from the start of these Chapter 11 Cases over 14 months ago with respect to issues present from the start of these Chapter 11 Cases; (2) challenges the express terms of the Court's PSA Order and PSA Opinion; (3) seeks to prematurely assert Plan confirmation issues; and (4) serves only to impede confirmation of a Plan that is in the best interests of all creditors. The Ad Hoc Group is the only one of the Debtors' constituencies to argue that there is a conflict of interest that requires the Debtors' and Committee's counsel, along with the Debtors' CRO, to be "strictly neutral" with respect to the Intercompany Balances. For the reasons that follow, the Motion should be denied.

---

[15] Consistent with the proposed Plan treatment of the Intercompany Balances, on July 16, 2013, the Plan Proponents filed an answer to the Counterclaims in the JSN Adversary Proceeding which denied that the Intercompany Balances were allowable in the full amounts in which they had been scheduled on the SOALs. *See Plaintiffs' Answer and Affirmative Defenses to the Counterclaims of Defendants UMB Bank, N.A. and the Ad Hoc Group of Junior Secured Noteholders* [Adv. Pro. 13-01277 Docket No. 51; Adv. Pro. 13-01343 Docket No. 20].

## ARGUMENT

22.    The Ad Hoc Group's Motion hinges on the fiction that the existence of the

Intercompany Balances places certain Debtors in adverse litigation positions with respect to one

another, and thus counsel and management who jointly represent the Debtors cannot act on

behalf of the Debtors with respect to the Intercompany Balances.  *See*, *e.g.*, Motion at 5-7.  To

the contrary, the Debtors are not in litigation against or otherwise adverse to one another.

Instead, the Debtors' interests are completely aligned under the PSA, which their independent

fiduciary CRO determined was in all of the Debtors' best interests and which the Court

approved.  The Debtors are all committed to seeking confirmation of the Plan that embodies the

Global Settlement and the treatment of the Intercompany Balances agreed to therein.  Thus, there

is no adversity between the Debtors, and no conflict of interest for the Debtors' counsel,

Committee counsel, or the Debtors' CRO and other management.

23.    Requiring the Debtors' counsel, CRO and management, as well as the

Committee's counsel, to adopt a "strictly neutral" stance with respect to the Intercompany

Balances would undo all the parties' hard work in reaching this point for no purpose.  If the Ad

Hoc Group's requested relief were granted, either the interests of the Debtors in supporting an

integral part of the Global Settlement and Plan to which they have committed themselves would

go entirely unrepresented, or each of the 51 Debtors would be faced with the additional expense,

administrative burden, and delay involved in identifying and retaining new and independent

management and counsel.  Either result would prolong – if not entirely scuttle – the Plan

confirmation process. What tasks or decisions would there be left to make for these 51 new

independent sets of professionals?  Do the JSNs envision that there should be new professionals

to now re-evaluate and re-open the settlement?  The JSNs will have the opportunity to challenge

the settlement at Plan confirmation.  This end-run attempt to challenge it should be denied.

15589156

I.      **The Debtors' Decision To Enter into the PSA Was the Product
of Months of Negotiations Spearheaded by Their CRO and
Supported by Numerous Creditors Throughout the Capital Structure**

24.      Five months ago, the Court approved the retention of Mr. Kruger to act as an

independent fiduciary in order to "direct plan discussions and lead the Debtors in ongoing

mediation," that would tackle "intercompany claims," among other issues.  CRO Motion ¶¶ 3,

23.  As the amended Engagement Letter made clear, the CRO was retained with the stated

purposed of resolving competing creditor claims and acting as an independent fiduciary on

behalf of *each* of the Debtors' estates in his independent business judgment.  *See* Amendment

No. 1 to Engagement Letter.  Following months of mediation, Mr. Kruger made the decision in

his business judgment to enter into the PSA on behalf of all the Debtors.

25.      The Ad Hoc Group's assertion that "the Plan and Disclosure Statement reflect that

the Debtors will waive and cancel [the Intercompany Balances] based on a unilateral

determination by MoFo (supposedly blessed by advisors to the conflicted Committee) that the

claims are invalid" (Motion ¶ 22), not only misrepresents the Disclosure Statement (*see*

Disclosure Statement at 34-36), it also completely downplays or ignores the roles of Mr. Kruger

and numerous other actors.  The Global Settlement contemplated by the Plan is the product of

extensive negotiations between the Debtors, the Committee, and the Consenting Claimants (as

defined in the PSA).  Debtors' counsel was not the lone party to review and advise on these

issues.  Major creditor constituencies and their advisors, from throughout the Debtors' capital

structure, in the context of a mediation overseen by Judge Peck, were well placed to ensure all

the Debtors' estates were protected.  The Debtors' management, including the CRO, Lewis

Kruger – himself a restructuring and insolvency attorney with many years' experience – were

involved in this analysis and mediation, along with the Debtors' financial advisors.

15589156

26.    Through the process culminating in the PSA, the Debtors have considered their

potential claims against one another, balanced the benefits of the Global Settlement against those

claims, and determined that it is in their best interests to refrain from pursuing those claims.[16]

The Ad Hoc Committee will have the ability to challenge that Global Settlement at Plan

confirmation pursuant to Rule 9019.  The Motion is nothing but an attempt to circumvent that

process, by either causing the Debtors to be unable to perform under the PSA or by causing them

to have to retain new counsel and management to re-visit the decision to enter into the PSA.

This tactic should be rejected.

27.    The decision to enter into the PSA was approved after a full and fair hearing,

pursuant to which the Court found that the entry into the PSA was in the best interests of the

Debtors' estates.  *See* PSA Order ¶ 3 ("The [PSA]… is in the best interests of the Debtors'

estates.").  The PSA thus contractually binds each of the Debtors to support confirmation of the

Plan, including the treatment of the Intercompany Balances as set forth in the Plan whose terms

were embodied in the PSA.  Accordingly, no conflict exists because no Debtor is adverse to any

other Debtor with respect to the Intercompany Balances.  *See, e.g., In re Betts*, 165 B.R. 233, 240

(Bankr. N.D. Ill. 1994) (holding that "[n]o actual conflict ha[d] been shown" because the conflict

parties had agreed not to pursue potential claims should they arise); *Hamilton v. Merrill Lynch*,

645 F. Supp. 60, 61-62 (E.D. Pa. 1986) (holding that court will not compel jointly represented

---

[16] The Ad Hoc Group members have no basis, contractual or otherwise, to oppose the Debtors' settlement of their Intercompany Balances outside of the Plan confirmation context.  *See, e.g.,* Transcript of July 3, 2013 Status Conference at 20:21-21:07 (counsel for the Ad Hoc Group recognized that "[t]here's nothing that says [Intercompany Balance claims] can't be settled . . . without" the Ad Hoc Group's consent or approval); *see also* Indenture dated as of June 6, 2008 among Residential Capital, LLC, as issuer, each of the guarantors, and U.S. Bank, N.A., a national banking association, as original indenture trustee [Docket No. 3592, Ex. 1] § 4.11(a), (b)(4) (permitting the Debtors to "make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of related transactions, contract, agreement, loan advance or guarantee" involving "transactions between or among the [Debtors]").

15589156

parties to "forfeit their choice of counsel so that they are free to pursue potential claims which they have no interest or obligation to pursue"); *Altschul v. Paine Webber, Inc.*, 488 F. Supp. 858, 860 (S.D.N.Y. 1980) (holding that no conflict was present where parties swore in an affidavit that they had "no wish to sue" a co-represented party); *Hassett v. McColley (In re O.P.M. Leasing Servs., Inc.)*, 16 B.R. 932, 941 (Bankr. S.D.N.Y. 1982) (where there was a "unity of interest" between the debtors, counsel was "not faced with representing adverse interests").[17]

28.     Notwithstanding the Debtors' support of the Plan, the Ad Hoc Group will have a full and fair opportunity to contest the reasonableness of the settlement of the Intercompany Balances in connection with Plan confirmation.  Any suggestion by the Ad Hoc Group that the JSNs' rights are now being prejudiced ignores the fact that they will have their day in court to challenge the settlement of the Intercompany Balances.

29.     Contrary to the Ad Hoc Group's multiple assertions that the Debtors have taken the position that the Intercompany Balances are "invalid" and "worthless" (Motion at 6-7 & ¶ 22), that is not what the Disclosure Statement says.  Rather, the Disclosure Statement describes why there are litigable questions as to whether the Intercompany Balances could be enforced in their scheduled amounts and explains that, in weighing the costs and risks inherent in litigation against the ability to reach a consensual agreement with substantial benefits for all creditors, the Debtors decided to compromise the Intercompany Balances.  *See* Disclosure Statement at 34-36. Moreover, the Debtors have never taken a position, in their Answer, Disclosure Statement or

---

[17] The Ad Hoc Group claims that this Court "rejected the contention that any conflict issue had been waived by the Court's approval of the PSA" at the conference held on July 3, 2013.  Motion ¶ 2.  This is not true.  First, the Debtors did not make a "waiver" argument at the hearing; their counsel argued that the Court's approval of the PSA resolved "interdebtor conflicts," not that the PSA approval was tantamount to a waiver of those conflicts.  July 3, 2013 Hearing Tr. at 6:08-10.  Second, the Court did not reject the Debtors' argument.  Rather, the Court stated that if the Ad Hoc Group felt that there was a conflict of interest, the Court would not "allow this issue to fester" but rather would require that the Ad Hoc Group "make [its] motion, and do it quickly."  *Id.* at 37:03-12.

15589156

elsewhere, that would preclude the Debtors from taking any future action that they deem

appropriate with respect to the Intercompany Balances in the event the Plan is not confirmed.

30.      In fact, the Plan makes clear that, if it is not confirmed, it will no longer be

binding on the Debtors, and that nothing contained in the Plan or Disclosure Statement will

prejudice the rights of any Debtor or any other party.  *See* Plan, Article X.D, at 100.

Specifically, the Plan states that the settlements embodied in the Plan shall not "constitute an

admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponents or any

other entity."  Plan, Article XI.C, at 102.  This provision applies not only to the Intercompany

Balances; it applies to the settlement of *all* claims, including those asserted by the monoline

insurers, the RMBS trusts, and the securities law claims asserted by the RMBS certificateholders.

Thus, there is no merit to the Ad Hoc Group's assertions that the Plan Proponents' statements in

regards to the Intercompany Balances will come back to haunt individual Debtors should the

Plan not be confirmed.

**II.    Settlement of the Intercompany Balances Does Not
        Require that the Debtors Have Separate Representation**

31.      As the Ad Hoc Group itself recognizes (*see* Motion ¶ 9), it is standard practice to

allow one law firm to represent multiple debtors, even when intercompany claims exist, in order

to conserve estate assets.  *See, e.g., In re Int'l Oil Co.*, 427 F.2d 186, 187 (2d Cir. 1970) (the

existence of intercompany claims by itself is not a basis "to saddle these estates with the expense

of separate trustees and trustees' attorneys"); *In re BH & P Inc.*, 949 F.2d 1300, 1310 (3d Cir.

1991) (recognizing that a single representative of multiple estates "is often able to maximize the

return to jointly administered estates through increased economy and efficiency"); *In re Global

Marine, Inc.*, 108 B.R. 998, 1004 (Bankr. S.D. Tex. 1987) (holding that "the mere existence of

an intercompany claim does not in and of itself constitute an impermissible conflict of interest

that would justify disqualification").

32.     In *Adelphia*, the Honorable Robert E. Gerber reviewed 16 different multi-debtor

cases where interdebtor disputes existed, and found that representation by a single firm in such

circumstances was a common, appropriate practice.  *See* 336 B.R. at 645-53; *see also* Hr'g Tr.

May 20, 2009 at 38, *In re General Growth Props., Inc.*, No. 09-11977 (ALG) (Bankr. S.D.N.Y.)

[Docket No. 72] (court referred to proposition that requiring each separate debtor to have

separate counsel "would be an absurdity").[18]  The mere fact that interdebtor claims may exist

among debtors is not a *per se* reason to prevent counsel from representing multiple debtors.  *See*

*Adelphia*, 336 B.R. at 673 (citing *In re O.P.M. Leasing Servs.*, 16 B.R. at 939; *In re Guy Apple*

*Masonry Contractor*, 45 B.R. 160, 166 (Bankr. D. Ariz. 1984)).

33.     As recognized by the *Adelphia* court, consensual resolution of interdebtor claims

is the "normal (and preferred) practice."  *Id.* at 620.  In addition, as stated by the Ad Hoc Group

itself, "a plan of reorganization that proposes the 100% payment of all creditors eliminates

prejudice to the estates and thus the conflict."  Motion ¶ 15.  Both circumstances apply here:  the

Intercompany Balances are the subject of a consensual resolution that is being presented to the

Court for approval pursuant to Rule 9019 as part of Plan confirmation, and the settlement and

proposed Plan provides for the complaining creditors (the JSNs) to be paid in full.  If the JSNs

want to challenge the settlement, their vehicle for doing so is Plan confirmation and not a

disqualification challenge after the settlement has already been reached.

34.     Moreover, bankruptcy courts consistently have approved settlements that

eliminate or cancel intercompany claims out of a recognition that the prospect of extremely

---

[18] A copy of the hearing transcript from *General Growth* is attached hereto as <u>Exhibit 1</u>.

15589156

costly litigation to resolve interdebtor claims does not ordinarily serve the best interests of

debtors or their creditors. *See In re WorldCom, Inc.,* No. 02-13533 (ALG), 2003 WL 23861928,

at *32 (Bankr. S.D.N.Y. Oct. 31, 2003) ("*WorldCom I*") (confirming the debtors' Chapter 11

plan that eliminated majority of intercompany claims, stating that "resolution of these disputes

by virtue of the differing treatment of differently situated classes of unsecured creditors, as

provided in the Plan, avoids potentially massive and protracted litigation over the following

issues:  the precise allocation of assets and liabilities among entities; the enforcement or validity

of different types of intercompany claims; [and] the amount of intercompany claims"); *see also*

*Enron I*[19] at 78-79 (confirming debtors' Chapter 11 plan and settlement of intercompany claims,

stating "[t]he global compromise benefits all Creditors by, inter alia, reducing the potential costs

of litigation, including the costs of performing diligence regarding a multitude of underlying

facts and transactions, the professional fees associated with litigation, the delay and uncertainty

associated with litigation, the prolonged costs of administering the estates, the resulting depletion

of the estates' assets, as well as Creditors' lost time-value of money resulting from later

distributions").

     35.     In these cases, the respective courts did not require that each individual debtor

retain separate counsel prior to resolving the interdebtor claims involved; rather, the courts

recognized the benefits realized by the debtors' estates through the timely resolution of the

claims. *See WorldCom I,* 2003 WL 23861928, at *16 (noting the risk that "massive intercreditor

litigation regarding the validity and enforceability of intercompany claims" would have

significant costs to the debtors' estates, "both in terms of out of pocket transactional costs and

---

[19] Findings of Fact and Conclusions of Law Confirming Supplemental Modified Fifth Am. Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, and Related Relief at 78-79, *In re Enron Corp.,* No. 01-16034 (AJG) (Bankr. S.D.N.Y. Jul. 15, 2004) [Docket No. 19758].  A copy of *Enron I* is attached hereto as Exhibit 2.

15589156

the diminution of enterprise value that likely would result from a prolonged stay in Chapter 11");

*Enron I* at 111 (approving settlement of intercompany claims without requiring separate counsel,

because "[t]he global compromise provide[d] Creditors an assurance of recovery that inter-estate

litigation [did] not provide"); *see also Rome v. Braunstein*, 19 F.3d 54, 59 n.3 (1st Cir. 1994)

(noting that a "bankruptcy court could determine, in the sound exercise of its discretion, that any

potential impairment of its institutional integrity, or risk of divided loyalty by counsel, was

substantially outweighed by the benefits to be derived from counsel's continued representation of

multiple entities or the impracticability of disentangling multiple interests without unreasonable

delay and expense") (internal citations and quotations omitted).

36.    The Debtors face a similar situation.  The PSA maximizes stakeholder recovery

(including payment in full of the JSNs), without the added untold millions in administrative

expenses and extraordinary delay that would accompany litigation of the Intercompany Balances.

Where, as here, the benefits of an exhaustively negotiated global resolution of intercompany

claims so clearly outweigh the costs and delay involved in litigating them, it would be ill-advised

(to say the least) to start from scratch with dozens of law firms draining the estates.

37.    None of the cases cited by the Ad Hoc Group deals with a situation such as the

one we have here, where the Debtors and the majority of their creditors have reached a

consensual resolution of the Intercompany Balances, as embodied in the proposed Plan, so that

there simply is no conflict among the Debtors on that issue.[20]  *See In re Project Orange Assocs.,*

---

[20] *See In re Jennings*, 199 F. App'x 845, 848 (11th Cir. 2006) (affirming disqualification and denial of any
compensation to law firm found to have "violated Rule 2014 by failing to disclose fully the connections between the
firm and its eleven debtor clients"); *In re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 314 (10th Cir. 1994) (affirming
bankruptcy court's rejection of multi-debtor representation at the outset of the cases where potential interdebtor
claims had not yet been resolved and where proposed counsel did not provide the court with information about the
"validity or amount of intercompany debts"); *In re Coal River Res., Inc.*, 321 B.R. 184, 188-89 (W.D. Va. 2005)
(affirming rejection of counsel's application to represent two debtors where U.S. Trustee objected at the outset of the
cases and interdebtor claims had not been resolved); *In re Straughn*, 428 B.R. 618, 625-28 (Bankr. W.D. Pa. 2010)
(denying motions by both debtors to employ the same counsel where one debtor was a creditor and majority

15589156

*LLC,* 431 B.R. 363, 370 (Bankr. S.D.N.Y. 2010) ("The test is not retrospective; courts only examine present interests when determining whether a party has an adverse interest." (citing *Bank Brussels Lambert v. Coan* (*In re AroChem Corp.*), 176 F.3d 610, 623-24 (2d Cir. 1999))).

38.    On the contrary, the majority of the cases cited by the Ad Hoc Group address conflict issues at the retention stage – not after there has been a four-month mediation that resulted in a compromise of intercompany claims.  For example, in *In re JMK Construction Group., Ltd.*, 441 B.R. 222, 228 (Bankr. S.D.N.Y. 2010), the Court rejected a joint retention at an early stage of the case, when there was a potential interdebtor claim for which "there [had] been no waiver . . . ."  *JMK* underscores the fact that the Ad Hoc Group has waited far too long to file its motion.  The decision in *In re Granite Partners, L.P.*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998), also relied upon by the Ad Hoc Group, addressed vastly different circumstances, where a law firm improperly represented a trustee for purposes of investigating another client, and failed to disclose its relationship with that client.

III.    **The Motion Is a Transparent Attempt to Gain an Advantage in Pending Litigation**

39.    The Ad Hoc Group has been extremely litigious in the Chapter 11 Cases, filing numerous motions, objections, and statements.  *See, e.g.*, Docket Nos. 295, 1338, 1870, 1995, 2406, 2824, 2957, 2997, 3087, 3553, 3563, 3625, 3691, 4018, 4027, 4055, 4286, 4289, 4296. Under such circumstances, it is inexplicable that the Ad Hoc Group would have waited until this juncture to make its Motion.  Even though the Ad Hoc Group has been well aware of the issues giving rise to this Motion for more than a year, it waited until the Plan approval process was well underway to file the Motion.  While the Ad Hoc Group was on notice of the facts giving rise to

---

shareholder of the debtor and interdebtor claims had not been resolved); *In re Shore*, No. 03-43072, 2004 WL 2357992, at *5 (Bankr. D. Kan. May 14, 2004) (disqualifying law firm whose application for retention reflected "a total failure . . . to disclose its relationships" with parties holding "an economically adverse relationship" to the debtor); *In re Star Broad., Inc.*, 81 B.R. 835, 845 (Bankr. D.N.J. 1988) (rejecting firm's application to represent two debtors where one debtor was 100% shareholder of the other debtor and interdebtor claims had not been resolved).

15589156

its Motion, dozens of parties spent months in mediation, and the Debtors sought and achieved

approval of the PSA and filed a proposed Chapter 11 disclosure statement and Plan.  If the Ad

Hoc Group in fact found the situation presented in the Chapter 11 Cases so "troubling and

impermissible" (Motion at 4), it defies logic that it would have waited over a year to file the

Motion.  The Ad Hoc Group's failure to seek the requested relief sooner undermines any

contention that their objective in filing the Motion was to protect the integrity of the process or to

serve as any individual Debtor's champion.  Instead, it reveals the Ad Hoc Group's ulterior

motive to gain a strategic advantage in the JSN Adversary Proceeding.  The JSNs want to be able

to argue for the value they ascribe to the Intercompany Balances, while leaving no one to argue

against them.

40.    Courts have consistently rejected similar tactics.  For example, in *In re Enron

Corp.*, No. 01-16034 (AJG) 2002 WL 32034346, at *2 (Bankr. S.D.N.Y. May 23, 2002) ("*Enron

II*"), a party sought the disqualification of counsel to the creditors' committee due to an alleged

failure to satisfy the "adverse interest" and "disinterested person" standards of the Bankruptcy

Code.  Like the Ad Hoc Group, the party seeking disqualification in *Enron II* was active in the

bankruptcy proceedings, and was aware of the alleged conflict for more than three months (far

shorter than the more than 14 months that the JSNs waited to file this Motion).  The *Enron II*

court denied the disqualification motion, and specifically noted that "[d]elay in bringing any

action to disqualify counsel is generally frowned upon because of the disruption it would cause

to the case."  *Id.* at *4.  Further, the court stated, "[t]his is especially so in a bankruptcy

reorganization in which a disruption, in addition to causing delay . . . causes a loss of value—

value that cannot be regained."  *Id.*  On appeal the district court affirmed, holding that the

bankruptcy court was correct in finding that there was an unjustified delay in bringing the

disqualification motion, and this delay provided grounds to deny the requested disqualification. *See In re Enron Corp.*, No. 02 Civ. 5638 (BSJ), 2003 WL 223455, at *4 n.2 (S.D.N.Y. Feb. 3, 2003). *See also In re O.P.M. Leasing Serv., Inc.*, 16 B.R. at 938-41 (declining to remove trustee from stewardship of consolidated bankruptcy proceedings despite existence of an inter-debtor claim as the case was a well-progressed, complex bankruptcy proceeding where disclosure of potential conflicts had been made at the time of appointment without objection, and it appeared that defendants' later removal motion was a litigation tactic).

41.    Likewise, in *In re WorldCom, Inc.,* 311 B.R. 151 (Bankr. S.D.N.Y. 2004) ("*WorldCom II*"), the court rejected a similar attempt to gain a litigation advantage. In *WorldCom II*, on the eve of the debtors' emergence from bankruptcy, an active creditor in the case filed a motion to disqualify the debtors' auditors and tax advisors. The facts underlying the disqualification motion were well known to the parties for more than ten months. In denying the motion, the court specifically stated that, "by filing the Disqualification Motion, the [creditors] acted in connection with a litigation strategy that served their own pecuniary interest. Any argument by the [creditors] that they have pursued the disqualification of [the auditor] to protect the public interest 'rings hollow.'" *Id.* at 168. The court further stated that, "the delay in bringing the Disqualification Motion until the eve of the Debtors' emergence from bankruptcy was potentially disruptive to the Debtors' reorganization; the interests of all creditors in these Chapter 11 cases would have been hindered by the disqualification, as emergence could have been delayed without any foreseeable benefit to the Debtors' estates." *Id.*

42.    The Ad Hoc Group's failure to bring this motion earlier is a sufficient ground *per se* to deny the motion. The delay should be a clear indication to the Court that the Motion is a tactical maneuver. Considering the Ad Hoc Group's transparent motive to gain an advantage in

the JSN Adversary Proceeding, and the detriment any disqualification would have on the

Debtors' creditors, there is no question that the Ad Hoc Group is not entitled to the relief it

belatedly seeks.

### IV.    The Requested Relief Is Untenable

43.    Contrary to the Ad Hoc Group's assertions, the relief it seeks is not "limited."

Because the Plan treatment of the Intercompany Balances is an integral part of the Global

Settlement and Plan, it would in practical effect be extremely difficult (if not impossible) for the

Plan Proponents to go forward with seeking confirmation of the Plan and approval of the Global

Settlement while being "strictly neutral" on the subject of the Intercompany Balances.

44.    If the current set of counsel and management cannot move for Plan confirmation

and Global Settlement approval, then each of the 51 Debtors will need new management,

counsel, and creditors' committees – which is what the Ad Hoc Committee suggests would be

sufficient to cure the alleged conflict. *See* Motion ¶ 14 (suggesting appointment of "special

counsel and independent fiduciaries" to cure alleged conflict, even though the CRO they seek to

disqualify was already appointed as just such an independent fiduciary).  The Ad Hoc Committee

thus suggests that these new professionals will need to second-guess from each Debtor's

perspective whether to adhere to the contractual commitments embodied in the PSA.  Whatever

the new 51 sets of professionals decide, it will be impossible for the PSA Milestones to be met.

45.    Thus, granting the relief requested would effectively undo all of the progress

made by the Debtors toward confirmation of a largely consensual Chapter 11 Plan that was

agreed to – not just by all the Debtors through their independent fiduciary CRO – but also by the

Committee and numerous creditors throughout the capital structure after months and countless

hours participating in a mediation.  This result would lead to extremely adverse consequences for

the estates, including (i) the loss of Ally's commitment to make a $2.1 billion contribution, (ii)

15589156

the accrual of additional millions, if not tens of millions, of dollars in plan administration

expenses, and (iii) a delay of months, if not years, in the ability to confirm a Chapter 11 plan (if

ever).

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order

denying the Ad Hoc Group's Motion.

Dated:  July 26, 2013            Respectfully submitted,
        New York, New York

                                 /s/ Gary S. Lee
                                 Gary S. Lee
                                 Todd M. Goren
                                 Jennifer L. Marines

                                 MORRISON & FOERSTER LLP
                                 1290 Avenue of the Americas
                                 New York, New York 10104
                                 Telephone:  (212) 468-8000
                                 Facsimile:  (212) 468-7900

                                 *Counsel to the Debtors*
                                 *and Debtors in Possession*

                                 /s/ Steven J. Reisman
                                 Steven J. Reisman
                                 Michael Moscato
                                 Theresa A. Foudy

                                 CURTIS, MALLET-PREVOST,
                                   COLT & MOSLE LLP
                                 101 Park Avenue
                                 New York, New York 10178-0061
                                 Telephone:  (212) 696-6000
                                 Facsimile:  (212) 697-1559

                                 *Conflicts Counsel to the Debtors*
                                 *and Debtors in Possession*

15589156

## Exhibit 1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11977

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL GROWTH PROPERTIES, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                May 20, 2009

                2:42 PM


B E F O R E:

HON. ALLAN L. GROPPER

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Application for Authorization to Employ and Retain

3    Weil, Gotshal & Manges LLP as Attorneys for the Debtors Nunc

4    Pro Tunc to the Commencement Date

5

6    HEARING re Application for Authorization to Employ and Retain

7    Kirkland & Ellis LLP as Co-Attorneys for the Debtors Nunc Pro

8    Tunc to the Commencement Date

9

10   HEARING re Application for Authorization to Employ and Retain

11   AlixPartners, LLP as Restructuring Advisors to the Debtors Nunc

12   Pro Tunc to the Commencement Date

13

14   HEARING re Application for Authorization to Employ and Retain

15   Miller Buckfire & Co., LLC as Financial Advisor and Investment

16   Banker for the Debtors Nunc Pro Tunc to the Commencement Date

17

18

19

20

21

22

23

24

25   Transcribed By:  Sharona Shapiro

3

1

2        A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4          Attorneys to the Debtors and Debtors-in-Possession

5          767 Fifth Avenue

6          New York, NY 10153

7

8    BY:   GARY T. HOLTZER, ESQ.

9

10   KIRKLAND & ELLIS LLP

11         Co-Counsel to Certain Subsidiary Debtors and

12          Debtors in Possession

13          300 North LaSalle Street

14          Chicago, IL 60654

15

16   BY:   ANUP SATHY, ESQ.

17         JAMES H.M. SPRAYREGEN, ESQ.

18

19   AKIN GUMP STRAUSS HAUER & FELD LLP

20         Attorneys for the Official Committee of Unsecured

21          Creditors

22          One Bryant Park

23          New York, NY 10036

24

25   BY:   MICHAEL S. STAMER, ESQ.

4

1

2      AKIN GUMP STRAUSS HAUER & FELD LLP

3              Attorneys for Official Committee of Unsecured

4              Creditors

5              Robert S. Strauss Building

6              1333 New Hampshire Avenue, N.W.

7              Washington, DC 20036

8

9      BY:   DAVID N. DUNN, ESQ.

10

11     UNITED STATES DEPARTMENT OF JUSTICE

12             Office of the United States Trustee

13             33 Whitehall Street

14             Suite 2100

15             New York, NY 10004

16

17     BY:   BRIAN MASUMOTO, ESQ.

18             GREG ZIPES, ESQ.

19             TRACY HOPE DAVIS, ESQ.

20             SUSAN GOLDEN, ESQ.

21

22

23

24

25

5

1

2    GENOVESE JOBLOVE & BATTISTA P.A.

3         Attorneys for Creditors, GAP, Old Navy and

4            Banana Republic

5         Bank of America Tower at International Place

6         100 Southeast Second Street, 44th Floor

7         Miami, Florida 33131

8

9    BY:   MONIQUE D. HAYES, ESQ.

10        (TELEPHONICALLY)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  We need to get a few

4    parties on the telephone.  It's nice to see a courtroom that's

5    not jammed, I have to say.

6              THE CLERK:  This is Judge Gropper's courtroom.

7              MS. HAYES:  Hello.

8              THE COURT:  All right, I'll take appearances from

9    those in the courtroom and then from those on the telephone.

10             MR. HOLTZER:  Thank you, Your Honor.  Gary Holtzer,

11   Weil, Gotshal & Manges for General Growth.

12             MR. SATHY:  Good afternoon, Your Honor.  Anup Sathy

13   on behalf of the subsidiaries.

14             MR. SPRAYREGEN:  James Sprayregen from Kirkland, also

15   on behalf of the GGP subs.

16             MR. STAMER:  Good afternoon, Your Honor.  Michael

17   Stamer and David Dunn from Akin Gump Strauss Hauer & Feld here

18   on behalf of the official committee.

19             MR. ZIPES:  Good afternoon, Your Honor.  Greg Zipes

20   from the U.S. Trustee's Office.

21             MS. DAVIS:  Your Honor, Tracy Hope Davis, Office of

22   the U.S. Trustee.

23             MR. MASUMOTO:  Brian Masumoto for the Office of the

24   United States Trustee.

25             MS. GOLDEN:  Susan Golden for the Office of the U.S.

7

1    Trustee.

2            THE COURT:  All right, anyone else going to appear

3    today?  All right, on the telephone?  Just the lawyers who wish

4    to note their appearance, those who expect to speak.  All

5    right.

6            Mr. Holtzer, where would you like to start?

7            MR. HOLTZER:  Thank you, Your Honor.  Actually, at

8    the outset, Your Honor, we've discussed with U.S. Trustee and

9    counsel for the committee and co-counsel with Kirkland the

10   potential for having a very brief chambers conference before we

11   begin in order to iron out some process that may make the

12   hearing a little more smooth as we move forward.  So at the

13   outset we thought we would make that request and see whether

14   the Court would entertain that brief chambers conference.

15           THE COURT:  All right, any objections?  All right.

16   Then we'll have a brief -- we'll try to keep it short --

17           MR. HOLTZER:  Yes, sir.

18           THE COURT:  -- because there are people who are

19   listening.

20           MR. HOLTZER:  Yes, Your Honor, thank you.

21      (Recess from 2:44 p.m. to 3:01 p.m.)

22           THE COURT:  Please be seated.  All right.

23           Mr. Holtzer, where do you want to start today?

24           MR. HOLTZER:  Thank you, Your Honor.  Gary Holtzer,

25   Weil, Gotshal & Manges for General Growth.  Your Honor, perhaps

8

1    a brief background will set the stage.  There are five

2    engagements on for approval --

3            THE COURT:  Is the phone line still open?  Anyone on

4    the phone?

5            UNIDENTIFIED SPEAKER:  Yes, Your Honor.

6            THE COURT:  All right, good.  Okay, please go ahead.

7            MR. HOLTZER:  Sure.  There are five engagements on

8    for approval today, Your Honor.  They are the AlixPartners

9    firm, Miller Buckfire, Weil Gotshal, Jenner & Block, and

10   Kirkland.  Of those five, Your Honor, four of them are not

11   contested.  One of them there is an objection by the Office of

12   the United States  Trustee to, that's the Kirkland firm.  We

13   would propose, Your Honor, to start out by addressing the four

14   uncontested ones.  We have had a series of discussions and

15   negotiations concerning information and provisions in all of

16   the engagements with the Office of the United States  Trustee

17   and with the counsel for the official committee of unsecured

18   creditors.

19           Today, Your Honor, in the courtroom, is Jim

20   Mesterharm from the AlixPartners firm; Ronen Bojmel from the

21   Miller Buckfire firm; Ron Gern, the general counsel of General

22   Growth is here as well; I believe counsel for Jenner & Block

23   should be here; and of course the Kirkland firm, Your Honor.

24           With respect to the uncontested engagements, taking

25   them in order, the first one, Your Honor, is the AlixPartners

9

1    engagement.  The discussions with the Office of the United

2    States  Trustee and with the creditors' committee resulted in

3    our agreement to go forward with respect to both AlixPartners

4    and the Miller Buckfire engagement on the condition that the

5    success fees contained in those engagements not go forward

6    today, and that we set those down for a separate hearing so

7    that we can have further discussions with the creditors'

8    committee and they can continue their review of those success

9    fees.  We have agreed to that, and the orders that we have

10   submitted to Your Honor with respect to both of those

11   engagements provide for a hearing date for those particular

12   items.  So Your Honor, we would be asking for a date for those

13   two engagements with respect to their success fees.  Otherwise,

14   both of those engagements, Your Honor, we would be asking for

15   approval on.

16          THE COURT:  Right.  Now, does anyone wish to be

17   heard?  All right.  Are we giving all creditors notice of these

18   success fees as we do in some cases?  I think there's a forty-

19   five day notice rule -- not rule, but a practice that the U.S.

20   Trustee has endorsed?

21          MR. ZIPES:  Yes, Your Honor, there's two different

22   fee structures encompassed Jay Alix and  Miller Buckfire.  Jay

23   Alix is an hourly rate --

24          THE COURT:  Oh, no, I know that.  That's on for

25   today.

10

1           MR. ZIPES:  So the bottom line is there is, I think,

2    an agreement of forty-five -- I don't know what the date is,

3    but we've agreed to put that off and get notice as appropriate.

4           THE COURT:  For the success fees?

5           MR. ZIPES:  Yes.

6           THE COURT:  Right.  And who is that notice going out

7    to?  That's my first question.

8           MR. HOLTZER:  Your Honor, to date it has not gone out

9    to all creditors.

10          THE COURT:  Well, all creditors is an enormous number

11   of parties in these cases, but there might be some rule of

12   reason.  I'm not suggesting what it should be, I'm just asking.

13   That was my only question.  I understood that when you have

14   success fees, particularly of the enormity of the Miller

15   Buckfire success fee, you notice a lot of creditors.

16          MR. HOLTZER:  Yes, Your Honor, we can notice the

17   service list in the case so far.

18          THE COURT:  Certainly at least the service list.

19          MR. HOLTZER:  Right.  And the service list has

20   already gotten notice of the Miller Buckfire and AlixPartners

21   fee -- sorry, retention applications.  And so the forty-five

22   days is clicking away, if you will, with respect to that

23   universe.  The question is whether we would give a larger group

24   of creditors notice.

25          THE COURT:  Well, I think that's something you should

1    discuss with the U.S. Trustee and decide what further notice is

2    needed.  Obviously there are no objections today, but in order

3    to consider the Miller Buckfire success fee, I'm going to need

4    more of a record than I have.

5              MR. HOLTZER:  Of course, Your Honor.

6              THE COURT:  Much more of a record than I have.

7              MR. HOLTZER:  We understand, Your Honor.  So what we

8    would propose is that we will discuss with the U.S. Trustee

9    whether we need to broaden the notice or simply afford more

10   time to meet the forty-five days.  And when we reach agreement

11   with them, which I expect we'll be able to do today before the

12   end of the hearing, we will get a date from Your Honor --

13             THE COURT:  All right.

14             MR. HOLTZER:  -- to put in the order with respect to

15   Miller Buckfire and Alix.

16             THE COURT:  All right.

17             MR. HOLTZER:  Separately, Your Honor, the Weil

18   Gotshal application had an initial request for additional

19   information from the Office of the United States  Trustee.  We

20   filed a supplemental affidavit with respect to our engagement.

21   And my understanding from the U.S. Trustee is that our

22   supplemental engagement satisfied the U.S. Trustee's questions

23   concerning our engagement, and I'd like for them to confirm

24   that now because that's where I believe our engagement is.

25             MR. ZIPES:  That's correct, Your Honor --

12

1          THE COURT:  All right.

2          MR. ZIPES:  -- as far as the U.S. Trustee's Office.

3          THE COURT:  All right.  And Jenner & Block had no

4     objections?

5          MR. HOLTZER:  That's correct, Your Honor.

6          THE COURT:  So then I have the Jenner & Block

7     application, the Weil Gotshal application, and the hourly

8     and -- if I can put it that way, basic fees for Miller Buckfire

9     and Jay Alix, other than the success or completion fees,

10    financing fees, which will be on for another day.  And I do

11    have orders, revised orders that appropriately set forth the

12    scope of the order being entered today on the Jay Alix and

13    Miller Buckfire fees.

14         So does anybody wish to be heard or wish to review

15    the revised orders with regard to those representations?  Well,

16    then I'll enter those orders.  I note that in the Jenner &

17    Block order there was a reference to 328 snuck in there -- not

18    snuck in, it found its way in there, and I'll remove that.

19         MR. HOLTZER:  Yes, Your Honor, and you'll notice in

20    the blackline for the --

21         THE COURT:  In Weil Gotshal it was removed?

22         MR. HOLTZER:  Yes, Your Honor.

23         THE COURT:  Yes.  Okay.  Now, that leaves us today

24    with the question as to the retention by the debtors of

25    Kirkland & Ellis.

13

1          MR. HOLTZER:  Yes, Your Honor.  And at the outset,

2    before I turn the podium over to our co-counsel, Kirkland &

3    Ellis, to make the presentation with respect to their

4    engagement, I would say at the outset, as Your Honor has noted

5    for the record from the bench in a much more packed courtroom

6    than we have today, these are very large and complicated cases.

7    And our submissions to Your Honor in this court indicate, we

8    have had extensive coordination efforts among, not only Weil

9    Gotshal and Kirkland, but also from the debtors' side with the

10   creditors' committee and coordinating counsel for the secured

11   lenders.  And that process, we think, has allowed these cases

12   to proceed very smoothly, given the complexity.  And so I'll

13   turn the podium over to Mr. Sathy from Kirkland & Ellis.

14          MR. SATHY:  Good afternoon, Your Honor, Anup Sathy

15   from Kirkland & Ellis.  Your Honor, last night we filed a

16   responsive pleading which we had hoped would address some of

17   the issues and concerns raised by the Office of the United

18   States  Trustee.  And with respect to our application, Your

19   Honor, we are mindful of some of the issues and concerns that

20   have been raised.  Our discussions with the Office have been

21   ongoing for many weeks, even starting before the filing of

22   these cases.  And I think through the response and the

23   supplemental affidavit that my partner Mr. Sprayregen filed

24   last night, I think we've at least narrowed some of the issues.

25   Your Honor, I believe that the things that are no longer at

14

1   issue include the disclosure we made with respect to the Caruso

2   litigation.  That litigation was disclosed in our engagement

3   letter back in December.  It wasn't disclosed in our retention

4   application because it had been settled, dismissed and resolved

5   in between.  I don't believe that's an issue for the Trustee

6   any longer.  Your Honor, we also did submit our supplemental

7   affidavit last night.  And again, I believe that addresses the

8   disclosure issues that are raised by the Trustee.

9          And Your Honor, finally, with respect to the response

10  last night, we did attach two affidavits, one from our CEO,

11  Adam Metz, one from our general counsel, Ronald Gern.  Mr.

12  Gern, as Mr. Holtzer said, is in the courtroom today.  I don't

13  believe that the U.S. Trustee intends to cross-examine or

14  question any of the statements made in either of the

15  affidavits.  These are all statements that we've made to the

16  Office over the last couple of weeks, and I know Mr. Metz has

17  been on calls and had met with the Trustee in the course of the

18  last several weeks.  Again, Your Honor, we are mindful of some

19  of the concerns that are raised, but we do believe that we have

20  satisfied the relevant standards applicable under 327(a) and

21  the corollary 101(14) with respect to disinterest in this.

22         And Your Honor, I would like to just raise two

23  issues, just principally emphasizing that our firm has, we

24  believe, developed a distinct expertise knowledge base with

25  respect to the GGP entities.  And it focuses primarily on the

15

1    project-level entities.  If Your Honor recalls, the corporate

2    chart in this case is over twenty pages long.  Many of those

3    entities are project-level entities, and these are entities

4    that have their own organizational documents, their own loan

5    documents, and their own malls that are sort of tied to these

6    documents.  We've developed an expertise with respect to those

7    locations, in particular.  And mindful of the risks of

8    duplication, we've developed several protocols that have been

9    in place since December to address the issues of duplication.

10   We've summarized some of those in the papers, but candidly, it

11   really is a coordination process that includes the company, all

12   of the advisors, the creditors' committee, and certainly

13   something that would occur, I think, in a case this size,

14   regardless of the number of advisors.

15            Your Honor, we believe that from the perspective of

16   the work that it's really just an allocation issue, that the

17   amount of work that's being done is the amount of work that

18   needs to be done.  And whether that's handled by one firm, two,

19   or more, that the amount of work remains the same.

20            And Your Honor, I would not also that given what I

21   believe is a substantial amount of effort, thousands of hours

22   that my firm has spent, and millions of dollars that the

23   clients have incurred, that duplicating that effort and that

24   knowledge base would be, in fact, more inefficient than the

25   risks of additional inefficiency or duplication.  Your Honor,

16

1    so as we said in the papers, we believe that the decision by

2    the debtors to have both firms be employed should be given

3    deference and is consistent with the provisions of 327.

4           Your Honor, the second point I would like to make is

5    with respect to the Urban (ph.) litigation.  It is disclosed in

6    our original affidavit.  It's disclosed in the supplemental

7    affidavit and also Mr. Gern's affidavit as well as in our

8    supplemental brief.  Your Honor, I think that it's important to

9    recognize that we identified this issue at the very beginning

10   back in December, and our engagement letter even references the

11   litigation, so we understood the complexities.  And while

12   nobody expected or anticipated at the time that there might be

13   a Chapter 11 filing, the engagements between Weil and Kirkland

14   were structured and tailored so that the company would have the

15   benefit of both advisors in anticipation of a Chapter 11.

16          And with respect to that, Your Honor, the engagement

17   with my firm does not include the four debtors that are

18   defendants in that litigation, and out of an abundance of

19   caution, Your Honor, two additional debtors that are not

20   defendants, but intermediate companies.  So of the 300 -- I

21   believe the number is 388 total entities that have filed, six

22   of them are not Kirkland clients.  They've been structured and

23   the engagement has been structured in that way.  The Weil firm

24   handles those clients in totality, and issues that come up with

25   respect to, for example, the debt of those entities or the

1    obligations or restructuring or plan issues are going to be

2    addressed.  The way that the entities work in this sort of

3    Byzantine structure, is that the four defendants are the four

4    top co-entities in the capital structure with respect to the

5    defendants, and the two that are debtors but not defendants are

6    just slightly below.

7         And so the way we structured the engagement, Your

8    Honor, we believe we have satisfied 327(a) and the

9    disinterested test.  And out of an abundance of caution, we've

10   also established screening mechanisms -- and screening

11   mechanisms that prevent any communication between the Kirkland

12   attorneys working on GGP and the Kirkland attorneys working on

13   this litigation on the one side; and then the Kirkland

14   attorneys working on GGP as a company on the other side; and

15   Weil Gotshal on the other side as well.  So I think we've

16   established what we believe are super protocols in place to

17   ensure the maintenance of the client confidences and we believe

18   that that is appropriate as well.

19        To the extent, Your Honor, issues come up with

20   respect to Urban in this court, the Weil firm will handle it;

21   the Kirkland firm will not.  We're not privy to it.  We don't

22   have confidences with respect to it.  And in fact, the

23   bankruptcy part of the team at Kirkland only has access to

24   public records and so our view of the matter is only with the

25   public eye.

18

1          Your Honor, one of the statements that we make in the

2     papers is that the litigation has never been disclosed as

3     material litigation.  Whether that's relevant or not is -- I

4     think in our view it's actually not, because we don't represent

5     any of the estates that are subject to the litigation.  But

6     given, I think, the broad level of scope that someone might

7     consider the disinterested test, and with respect to

8     connections generally, even indirect connections, we thought it

9     was useful to make that point clear.  But again, none of the

10    defendants themselves are represented -- the debtors of those

11    defendants are not represented by my firm.

12         So Your Honor, we wanted to make those two points

13    clear and of course answer any questions the Court has with

14    respect to the proposed engagement.

15         THE COURT:  Do you believe that if you were retained

16    under 327(e), your firm, you could do everything that is

17    proposed in the representation?

18         MR. SATHY:  Your Honor, we addressed in our papers

19    the concept of 327(e), and we've had discussions with the

20    client and with the U.S. Trustee about it.  Our view is that

21    327(a) works better, it's more consistent with our role.  And

22    of course, 327(e), because of limited scope of representations

23    allowed, we think that it works but that 327(a) is a better fit

24    for us.  And because we've satisfied the test, we believe the

25    327(a) standard gives us the flexibility within the framework

19

1    of our engagement to address the issues that the client would

2    like us to address.

3            THE COURT:  All right.  Thank you.

4        MR. STAMER:  Your Honor, I'll be brief.  For the record,

5    Michael Stamer from Akin Gump Strauss Hauer & Feld here on

6    behalf of the official committee.  Your Honor, as you saw in

7    our pleading that we filed last night, we are supportive of the

8    debtors' application to retain both Weil Gotshal and Kirkland.

9    And we filed a pleading and I stand here today before the Court

10   addressing the issue for one simple reason: principally, Your

11   Honor, the committee feels it's our money.  It will be

12   unsecured creditor's money that is spent if the application is

13   not granted and Kirkland needs to be replaced.  It is also,

14   Your Honor, we believe, unsecured creditor's money that will be

15   spent on Weil Gotshal and Kirkland & Ellis if they are both

16   retained as co-counsel.  And Your Honor, with that in mind, it

17   is the committee's firm view that allowing Kirkland to be

18   retained is in the best interest of the estates and its

19   creditors.

20       Your Honor, we believe that Kirkland does in fact satisfy

21   the standards of Section 327(a).  We do not believe they have a

22   disqualifying conflict.  We believe that based on the work that

23   has been done by Kirkland to date, based upon the money, the

24   investment by the company in Kirkland, that it would be

25   extremely detrimental for Kirkland to be replaced at this stage

20

1    in the process.

2         Your Honor, as you have seen on the docket -- in fact,

3    the Court has entered a scheduling order, there is likely to be

4    very high stakes litigation taking place in the middle of June

5    which Kirkland has been working for months on.  If they were to

6    be replaced, in addition to the costs, it's the committee's

7    view that the estates and their creditors would be harmed by

8    Kirkland not being retained.

9         And Your Honor, the last point, again, and I won't go

10    into much detail because it's all in our papers, is the

11    committee's concern about duplication of effort.  But the

12    committee is of the view that the safeguards put in place will

13    protect the estates and will minimize, to the extent possible,

14    any type of duplication.  And as I think the parties, and in

15    fact Kirkland has acknowledged, to the extent there is

16    duplication of effort, it's a risk that Kirkland and Weil will

17    bear.  Nothing in the retention order will in any way curb the

18    Court's ability to review fees for reasonableness and will not

19    curb the parties' ability to review, and if necessary, to

20    object to duplicative fees.  So based upon all of the facts and

21    circumstances, again, Your Honor, the committee is supportive

22    of the debtors' application to retain Kirkland.  Thank you,

23    Judge.

24         THE COURT:  Thank you.  Anyone else in support?

25         MR. HOLTZER:  Your Honor, Gary Holtzer, Weil Gotshal

21

1    & Manges, for the record.  Your Honor, I rise because first, we

2    very much appreciate the official committee's support for the

3    engagement both of Weil Gotshal and of Kirkland & Ellis.  And

4    we observe, Your Honor, though, that while Mr. Stamer indicates

5    that the funds that he's identifying as at risk, for example,

6    if there in fact is not an engagement in favor of Kirkland, as

7    being funds that are the money of the unsecured creditors, I

8    don't think the case has developed yet, Your Honor, to a point

9    where we've decided that.  It may well be that it's the money

10   that is associated with the distribution to equity.  That's

11   where this case -- mainly, we'll have to determine that as we

12   go forward.  So while we appreciate counsel's comments, it's

13   not at all clear yet that that's where this case is headed.

14   And so as a matter of where the company's perspective is, we

15   wanted to make sure that was clear on the record today.

16           THE COURT:  I'm sure counsel would say, "would that

17   it were so".

18           MR. ZIPES:  Good afternoon, Your Honor.  Greg Zipes

19   from the U.S. Trustee's Office.  You're obviously going to hear

20   a slightly different angle from me.  The United States Trustee

21   objects to the proposed retention of Kirkland & Ellis as co-

22   counsel under 327(a) to represent all but six of the debtors in

23   these cases.

24           I want to address the general reasons why co-counsel

25   is inappropriate generally -- co-counsel under 327(a), such as

22

1   over-billing and potential confusion as to the chain of

2   command, all of which are present here.  And then the specific

3   reasons why in this case in particular, and in addition

4   retention of co-counsel under 327(a) is inappropriate.  The

5   chances of over-billing and duplication are overwhelming in any

6   case with co-counsel.  Here, obviously, that is a

7   consideration.

8            And let's look specifically at this case, Your Honor.

9   Regardless of how the work is divvied up between Weil Gotshal

10  and K&E, the highest paid attorneys, with billing rates of

11  close to 1,000 dollars an hour, both K&E and Weil must have a

12  good overview of the cases.  In order to competently manage its

13  own workload, whatever that might be, K&E must know the entire

14  case to some extent.  The same applies to Weil.

15           THE COURT:  Why is that?  I gather from the papers

16  that I have that Weil is particularly responsible for plan

17  formulation matters and K&E is particularly responsible for

18  handling the secured debt at the various property level

19  debtors.  Is that wrong or right?

20           MR. ZIPES:  Your Honor, that is an interpretation of

21  what the roles are --

22           THE COURT:  Well, I'm not trying to interpret.  This

23  isn't the Bible or --

24           MR. ZIPES:  I've got the retention application --

25           THE COURT:  Yes.

23

1       MR. ZIPES:  -- of K&E, and K&E "will advise the

2  debtors with respect to matters relevant to GGP's group's

3  international affiliates, transactional work related to

4  project-level assets and various restructuring matters."

5       THE COURT:  And I thought that's what I just said.  I

6  didn't mention the international work.

7       MR. ZIPES:  But Your Honor, to do that, there

8  necessarily needs to be someone at K&E who has access or

9  information about the case as a whole.

10      And Your Honor, if I could just give one example of

11  where the inefficiencies occur here, because if there was one

12  counsel under 327(a), it would be one set of attorneys with an

13  overview of the case.  Here there's two.

14      THE COURT:  Are you telling me, as a matter of

15  certainty, that you know that if there were one law firm that

16  there would be any fewer number of lawyers on this case?  Can

17  you swear to that, Mr. Zipes?

18      MR. ZIPES:  Your Honor, as a per se matter, we would

19  not say that.  And --

20      THE COURT:  Okay.  I know I practiced for over twenty

21  years, and I practiced many years in bankruptcy.

22      MR. ZIPES:  Right.

23      THE COURT:  And I'm certainly very glad you raised

24  the issue.  I certainly would agree that in almost all cases

25  the prospect of more than one firm is highly inadvisable.  But

24

1    in this case with -- how many debtors do we have?  Almost 400?

2    And there are others who are nondebtors out there, I gather.

3    In this case do we know that any fewer lawyers would actually

4    be running up time if we had one rather than two?  I mean, do

5    you think one partner from one law firm could necessarily

6    handle this case himself or herself?

7        MR. ZIPES:  Your Honor, I would never make a

8    statement like that, and I understand your point.  My point

9    simply is that with co-counsel, which is not a usual

10   circumstance in the Southern District, there is the possibility

11   that there are two sets of attorneys that need to be --

12       THE COURT:  Absolutely.

13       MR. ZIPES:  -- on top of the procedure.  And I'll

14   give you a specific example.  At the May 13th hearing, the DIP

15   financing, which was a very involved hearing as we're aware,

16   there were at least two K&E attorneys there.  And they weren't

17   a part of the proceeding, they were there to -- they were there

18   partly -- probably if this Court had asked some question that

19   they had access to they might have been able to answer it, but

20   they were taking notes, and they were taking notes that they

21   would have -- their team would have sufficient information in

22   their fiduciary duties to be able to tell what's going on in

23   the case.  So that's a basic problem with co-counsel and we

24   think it's present in this case, this idea of duplication.  I

25   understand they've done this -- they provided some information

25

1    that they would split up roles in the case, but the fact is

2    we're --

3              THE COURT:  Isn't there always -- I mean, when you

4    have a DIP hearing and you have a team of lawyers from one

5    firm, you sometimes do have multiple parties attending.

6              MR. ZIPES:  Yes, and in fact --

7              THE COURT:  And I realize that law firms have to use

8    a discretion in their billing when lawyers are brought to

9    hearings so they have general background in the matter, and

10   they have to use billing judgment.  And I appreciate very much

11   the fact that you review fee applications, at enormous personal

12   sacrifice sometimes, a thankless job if there ever was one.

13   But I just don't share your certainty that the total costs

14   would be less if there was just one firm.  For example, you

15   have four people here from the government here today, and I'm

16   not willing to draw the conclusion that that's an improvident

17   use of personnel.

18             MR. ZIPES:  And Your Honor, absolutely, if there's a

19   hearing in a big case, my office is not going to object to more

20   than one attorney being present in the courtroom.  And that

21   really doesn't --

22             THE COURT:  Well, you certainly can.  I have seen

23   such objections.

24             MR. ZIPES:  Well, okay.

25             THE COURT:  I understand them.

26

1        MR. ZIPES:  It depends.  Everything depends, Your

2  Honor.

3        THE COURT:  You're right, everything depends.

4        MR. ZIPES:  We're just pointing out that in this case

5  that, as in any co-counsel situation, and we might start seeing

6  more after this case, or not, but that is a consideration under

7  327(a), which is what they're moving under.

8        The second is, and I understand that they're trying

9  to make a chain of command argument that there's not going to

10 be any confusion in the chain of command.  But with one

11 attorney or law firm under 327(a), there's no question who's

12 giving general and overall advice about the bankruptcy case.

13 And we do have Metz's affidavit.  We have the officers'

14 affidavits in this case stating that this is a lot like outside

15 of bankruptcy, we know how to monitor our litigation teams

16 outside of bankruptcy the same as here.  We can make the final

17 call.  But the truth is in bankruptcy it's a case.  And you

18 need an overall law firm that's guiding the officers.  We don't

19 think it's necessarily relevant that outside of bankruptcy

20 there are different law firms that are retained to do discrete

21 tasks.  327(a) is about general counsel.  And --

22        THE COURT:  What do you do with all of the cases

23 where you have one counsel brought in as so-called corporate

24 counsel.  But are those retentions under 327(a)?

25        MR. ZIPES:  Well, Your Honor, they aren't.  And

27

1    they're under (e).  But --

2              THE COURT:  Are they all under (e)?  What did we do

3    with Davis Polk and Levin & Weintraub?

4              MR. ZIPES:  That one I can't tell you about, Your

5    Honor.  But I can recite at least recent cases we put them in.

6    Obviously in a big case like Lehman Brothers or various cases

7    that are before you, Northwestern, there's conflict counsel,

8    for example, that could be put in.  There's various special

9    counsel that's put in.  But --

10             THE COURT:  Is conflict counsel put in under (e)

11   always?

12             MR. ZIPES:  That could be under (a).  Conflicts

13   counsel can be put under (a).  And I want to just address the

14   specific reasons here why -- and again, we didn't argue in our

15   rule that there's a per se rule.  I don't think that would be

16   appropriate, and we don't take that --

17             THE COURT:  But I do think that whatever is done

18   today or whatever is done on this motion, we should put a

19   specific statement in the order, either in the Whereas clauses

20   or in a separate clause that says that the retention today

21   shall not be a precedent for any other case, because I

22   recognize that whatever's done today, we're going to see it in

23   a list of other retentions and we're going to hear in another

24   case, where dual counsel would not be appropriate under any

25   circumstances, we'll hear the argument, well, it was done in

28

1    General Growth Properties.  And I recognize you'll have to deal

2    with that.  So we should, I think, perhaps recite that if it's

3    done here it isn't necessarily appropriate in any other case.

4              MR. ZIPES:  All right, Your Honor.

5              THE COURT:  I'm not saying it's appropriate.  I'm

6    listening.

7              MR. ZIPES:  No, Your Honor, I appreciate -- I --

8              THE COURT:  I recognize that it would be appropriate

9    in very, very few cases.

10             MR. ZIPES:  And we recited cases -- in fact, K&E

11   meticulously researched on their own, you can see from their

12   papers, cases that -- at least in the near past they weren't

13   able to find any cases in the Southern District where this sort

14   of arrangement has happened.  So we're talking about 327(a).

15   This is what they're retained to do.

16             Let me turn to the facts of this case, because again,

17   it's not a per se rule.  I tried to outline at least two

18   general reasons why it's not a good idea generally and why it's

19   not done.

20             THE COURT:  I agree it's not a good idea generally.

21             MR. ZIPES:  But in this case, let's just point to a

22   few factors that might have tilted my office -- whether it's

23   327(a) or (e) -- if the facts had been different.  And these

24   were some of the areas of inquiry that we had over the last

25   couple of weeks.  We realized at some point last week that

29

1    (a) -- we weren't going to be able to work this out.  And in

2    fairness to Kirkland & Ellis, and the fact that this Court has

3    very many important items on, we want this as much as anybody

4    else to have this issue resolved.

5         One thing here is that neither Kirkland & Ellis or

6    Weil Gotshal had a pre-existing relationship with General

7    Growth.  And that might be a difference, for example, with

8    corporate counsel.  And I don't want to mention other cases as

9    precedent, but for example, in Chrysler, Schulte, which was

10   special counsel and which was cited by K&E, they did have a

11   pre-existing relationship and they had specialized information,

12   at least as of the time of the retention.  They were retained

13   ultimately under 327(e).  That is not the case here.

14        The other thing that I wanted to bring to the Court's

15   attention is that there's no specialized knowledge base or

16   inability to perform the work, because those were questions by

17   my office as well.  If Weil Gotshal or K&E somehow had a

18   specialized knowledge with respect to the CMBS, the mortgage-

19   backed securities, if one or the other had it that might also

20   be a reason to work something out with respect to 327(e) or

21   (a).  Or in fact, if one was just too busy.  I mean, it might

22   surprise people but neither of them were willing to say that

23   they're either too busy or that they don't have the ability to

24   take on everything in this case.  So it's not like a case where

25   one law firm just can't do it because there's some special

30

1    issue involved, and they concede that.  And it's not -- getting

2    back to the --

3         THE COURT:  When you said there was no pre-existing

4    relationship, I think I understand by that that there was no

5    long term relationship, that neither firm did the underlying

6    documents.  But there is a relationship, at least going back

7    three or four months, and apparently hundreds of hours of

8    work --

9         MR. ZIPES:  I think that --

10         THE COURT:  -- in terms of preparing for the issues

11    that would inevitably rise in this bankruptcy case -- in these

12    bankruptcy cases, I should say.

13         MR. ZIPES:  I think I have two responses to that,

14    Your Honor.  One is that counsel stated that at the time of the

15    filing there wasn't an anticipation of a bankruptcy filing.

16    And, you know, that might also be another reason to allow it to

17    happen here, if there was a conflict, which we've been

18    discussing, but somehow that wasn't known to the professional

19    at the time, they then spent a lot of time on the case, and

20    it's clear that that was accidental and they walked into a case

21    not knowing they spent a lot of time on it.

22         Two things.  One is that in December 28, 2088, the

23    engagement letter which was attached to the retention

24    application, that specifically refers to the possibility of a

25    bankruptcy filing.  So I don't think they can say that they did

1    a lot of work outside of bankruptcy and then bankruptcy all of

2    a sudden became an option and they find themselves in a

3    bankruptcy.  That's not a fair statement from the record.

4           The second is this conflict, Your Honor, which we've

5    discussed.  And leaving aside Caruso, because the engagement

6    letter did refer to the Caruso matter, but it's clear by the

7    representations of Kirkland & Ellis that that's over and that's

8    not really an issue.  But we are left with this state court

9    litigation that was around at the time of the retention.  And

10   it really is not a fair argument to say, "We spent thousands of

11   hours or spent millions of dollars on this case" when it was

12   something they knew about in the first place, and for that

13   matter the debtor knew about it.  The debtor signed off on it.

14   Everybody went in with their eyes open.  They assumed the risk

15   that this would be an issue.

16          In fact, it has been an issue.  No one is stating,

17   for example, that K&E can get out of this engagement as a way

18   of resolving the issue.  No one's saying that it might not

19   become more material in the future, that there might be an

20   issue before this Court where, for example, K&E is coming in

21   with its team of lawyers that are separate and apart from the

22   team here, coming in and arguing that these debtors are

23   violating discovery and saying all sorts of things about this

24   debtor that would be directly adverse to the debtors' interests

25   in this case and would create a problem.

1          And the question would be why are we taking this

2     chance in this case when, at best, the debtors are saying they

3     want this arrangement, but there's no necessity for it.  We

4     have counsel, Weil Gotshal, that is -- admittedly would

5     probably have to bring itself up to speed, but there's no

6     allegation by anybody that Weil couldn't handle this completely

7     on their own.  The whole arrangement has the feel of a

8     gerrymandered solution here that there was a conflict,

9     everybody knew about it and they said we're going to impose our

10    own solution, and we're going to tell, actually, the bankruptcy

11    court that he or she has no ability to revisit this because by

12    the time anybody has a chance to revisit this in bankruptcy,

13    it'll be a fait accompli, we can then say we spent thousands of

14    hours on it.

15          So Your Honor, our focus is different, and we

16    appreciate everybody's comments about where we are right now

17    and being practical.  But if there is a conflict that can be

18    avoided in this case, we should avoid it.  And no one's able to

19    say that we will not even have a bigger issue seven months from

20    now with Kirkland & Ellis where this litigation gets more

21    litigious and then what will the argument be at that point, now

22    we're seven months in.

23          And my office was diligent in bringing this

24    objection.  I don't think anybody will say that we didn't try

25    to work this out.  Your Honor, I understand your comments about

33

1    327(e), and all I can say is the application is (a) and (a) has

2    a meaning under the Bankruptcy Code: that's general counsel and

3    not for a specified purpose.  So Judge, we're here because

4    we've analyzed this case in depth and we believe that it's just

5    an inappropriate case to have counsel that -- under 327(a) co-

6    counsel.

7            In summary, Your Honor, this is a case that the

8    debtors may want, but with all the problems it's not one that

9    they need.  And this Court is the final arbiter of this, and in

10   bankruptcy the debtors don't have a final say over this.

11   Again, we are aware of the realities of big cases and complex

12   cases.  Your Honor, has been, in your former life, involved

13   with large cases.  And we would fully expect that you apply

14   your own experiences to everything.  It goes without saying

15   when you do that.  But we're focused on the implications if

16   this retention goes through.  And we've brought it to your

17   attention as quickly as we --

18           THE COURT:  I very much appreciate that.  Do you want

19   any -- there have been affidavits put in.  I'm not sure there

20   is a factual dispute.  There is a dispute over the implications

21   that should be drawn from what happened, but I don't know if

22   there's a factual dispute.  But if you want some testimony and

23   if you want to examine the affiants or the general counsel, who

24   I believe is here, you certainly may do so.

25           MR. ZIPES:  Well, we actually discussed -- we don't

34

1  find a reason to cross-examine, but we did have one issue we

2  were potentially going to cross-examine the debtor on, and that

3  was the issue of materiality under SEC guidelines.  But we're

4  satisfied that that's --

5          THE COURT:  Well, I think in terms of -- you're

6  talking about the other litigation.

7          MR. ZIPES:  Right.

8          THE COURT:  And it seems to me that obviously one

9  always takes all aspects into account.  It doesn't seem to me

10  that there's any question that the debtors would have to

11  exclude Kirkland from representing the six debtors that are

12  affected by that litigation and have to have other counsel as

13  bankruptcy counsel in those particular cases.  And from that

14  perspective, it is certainly Weil Gotshal, necessarily, that is

15  the bankruptcy counsel for the entire group.  And so, I'm not

16  trying to create a pecking order, but I read from the papers

17  the fact that the parties have basically divided the work down

18  in something of that fashion.

19          MR. ZIPES:  And Your Honor, our only point in having

20  that be part of the factual record is to make clear that there

21  shouldn't be an inference that this is not a material

22  litigation in the context of this case.  And that's --

23          THE COURT:  Any litigation would raise the same legal

24  issue.

25          MR. ZIPES:  That's right, Your Honor.

1        THE COURT:  Maybe if it was de minimis, but I'm not

2    even sure de minimis litigation would avoid raising the same

3    legal issue.  It's still a legal issue not dependent on there

4    being a de minimis matter.  And as you state, one can never

5    tell how things are going to develop.  Thank you.

6        MR. ZIPES:  Thank you, Your Honor.

7        THE COURT:  Anything further?

8        MR. SATHY:  Just briefly, Your Honor.  We appreciate

9    the U.S. Trustee's concerns.  It's the same concerns that we've

10    been discussing with them for weeks.  We also do believe that

11    this situation is unusual in many respects.  But given the size

12    and complexity, given what the client has requested, and I

13    think given the expertise that we have developed and the

14    desires of the client as expressed in the two affidavits as

15    well as the support of the committee, we think that we've

16    satisfied 327(a).

17        Your Honor, with respect to the structuring point, it

18    was intended to be structured so that we would be able to

19    satisfy 327(a).  It wasn't gerrymandered.  I think the idea of

20    maybe if we had represented the top co-entities and we said we

21    spent a whole bunch of time on that, and therefore you should

22    look over the litigation, I think that would maybe be an

23    argument that would be persuasive.  But we didn't do that.  We

24    made it clear that this silo of entities is just not going to

25    be part of where we spend our time.

36

1          But I do want to make it clear that, as we set forth

2     in the applications, this isn't a top co-, project-level co-

3     division.  I mean, there are going to be aspects of the

4     representations that cross, and I think the DIP and cash

5     collateral was a perfect example of that where it implicated

6     both the project level and the top co-level, and the Weil firm

7     handled that.  My firm had extraordinarily limited involvement

8     in all of the DIP negotiations.  We didn't review the DIP

9     agreements.  We didn't review the DIP orders.  We didn't have

10    negotiations with the creditors.

11          THE COURT:  You're very lucky.

12          MR. SATHY:  Yes.  Apparently we were told there was

13    five versions of it, and candidly, we didn't review any of

14    them.

15          UNIDENTIFIED SPEAKER:  You'll get there.

16          MR. SATHY:  But to make the point, and Mr. Zipes did

17    make the point in his papers, we didn't address it, but because

18    he raised it here, we were here because part of the allegation

19    involved specific project-level issues, and whether the

20    governance documents specifically allowed for the certain types

21    of filings.  There was motions to dismiss issues that were

22    raised and some of the objections as well.  We were here in

23    case those issues were raised.  We drafted the part of the

24    response that dealt with those issues and we were prepared to

25    put testimony on for that issue if that issue came up.  That

37

1   was the role that we played here with respect to the DIP

2   hearing, which I think Your Honor, it's a harbinger of the

3   things that we'll see at the motions to dismiss.

4           THE COURT:  All right.  Anything further?  All right,

5   give me a few minutes and I'll give you a -- you need a

6   decision immediately, and I'll give you one in a few minutes.

7           MR. SATHY:  Thank you, Your Honor.

8       (Recess from 3:47 p.m. to 4:12 p.m.)

9           THE COURT:  Please be seated.

10          The debtors in these jointly administered cases, who

11  number almost 400, have moved to retain two firms as counsel

12  under Section 327(a) of the Bankruptcy Code.  The application

13  is supported by the official committee of unsecured creditors

14  and opposed by the U.S. Trustee.  No other creditor has

15  appeared in opposition.

16          I am very glad that the U.S. Trustee has raised the

17  issues in the papers because it is a very rare case in which it

18  would be appropriate for there to be two separate firms

19  retained to represent a debtor or a group of debtors in related

20  bankruptcy proceedings.  In some jurisdictions, I can think of

21  Denver in particular, it has been practice to require separate

22  bankruptcy counsel for affiliated debtors, perhaps not for

23  every debtor but certainly for most groups.  I am personally

24  familiar with how badly that works in practice and how it

25  increases costs without improving the administration of cases.

38

1          I am very pleased that the U.S. Trustee in this

2     district has never insisted on a separate lawyer for each

3     separate debtor.  We'd need, perhaps, 400 lawyers in these

4     cases, and that obviously would be an absurdity.  Indeed, the

5     U.S. Trustee in this district has taken a very constructive

6     approach to limiting the number of counsel who appear in cases

7     filed by affiliated groups, and also in limiting the number of

8     committees and the number of professionals generally.

9          As I believe the parties agree in their presentations

10    today, every case or every group of cases is unique.  It seems

11    to me that this is the extremely rare case or group of cases

12    that justify the requested retention.

13         As I understand it, Kirkland & Ellis will be dealing

14    particularly with the following matters.  This is what they

15    have stated in their joint reply with Weil Gotshal, and I take

16    it very seriously.  "The jointly represented debtors have asked

17    K&E to advise on (a) filing and corporate governance issues

18    with respect to certain subsidiaries; (b) matters relevant to

19    international affiliates; (c) transactional work related to the

20    project-level assets, including potential sales of project-

21    level assets; (d) various restructuring matters for mortgage

22    level debt other than the 2008 facility, including issues and

23    restructuring alternatives relating to commercial mortgage

24    backed securities; and (e) the plan of reorganization relating

25    to project-level issues and mortgage level indebtedness."

39

1          The focus of the K&E representation will be on these

2     issues and appears to be exactly what is needed to provide more

3     assurance to the project-level lenders who have certainly been

4     vocal in prior proceedings in these cases that their rights

5     will not be ignored and that we will not have the de facto

6     substantive consolidation that some of them have already

7     adverted to in their papers, sometimes with quite florid

8     overstatement.

9          Obviously, I'm not making any long term statements

10    with regard to how these cases should proceed, but I do think

11    that in these cases the fact that we have a group of lawyers

12    dealing with the project-level issues, particularly, will have

13    a beneficial impact, and that's the way to organize these cases

14    effectively for the benefit of all parties-in-interest.

15         Obviously, the K&E work will have to be coordinated

16    with the work of Weil Gotshal.  But that too has been stated as

17    follows in paragraph 6 of the joint reply.

18         Section (A) is obtaining first-day relief.  That's

19    passed.  And indeed, it was obvious that Weil Gotshal was in

20    charge of that aspect of the matter, and I don't believe the

21    K&E lawyers even showed up at the second hearing. (B), for Weil

22    Gotshal, "Negotiating with holders of existing corporate-level

23    debt and equity, including holders of the Rouse bonds, T-R-U-P-

24    S, the GGP LP notes and the 2008 facility."  (C), "Various

25    project-level restructuring matters"; and (D), "Related

40

1   litigation affecting the jointly represented debtors and other

2   debtors."

3          There is no reason to presume that the total hours

4   billed by the top-level attorneys in the two firms will be any

5   greater than if we had one firm involved.  There may be

6   overlap.  There may be some duplication.  But that can clearly

7   be dealt with in connection with the actual fee applications.

8          It is true, as the U.S. Trustee argues, that it is

9   not appropriate for a debtor or a prospective debtor to hire

10  two firms and then argue that the expense already incurred in

11  educating the two firms justifies hiring both of them in

12  connection with the case.  But at the same time, we should not

13  lightly waste a firm's expertise, which would be the result of

14  rejecting the K&E application.

15         In any event, the division of labor that the company

16  apparently directed at the outset, or the division of labor

17  that has been agreed to, makes sense under the precise facts of

18  these extremely complicated and difficult cases.  Concerns

19  about potential confusion and complexity can be dealt with in

20  good faith.  Concerns about over-billing can obviously be dealt

21  with in connection with the applications, as I said a few

22  moments ago.

23         I would note that we may need some special procedures

24  in these complex cases to deal with the fee applications.

25  Perhaps the debtors internally can put those in place, or

41

1    perhaps something more formal will be needed.  I'm not making

2    any finding or any prediction.  I believe we've entered an

3    interim fee application order in these cases.  Our usual form

4    does not require monthly filing of the bills by various

5    counsel, but I understand that Judge Gonzalez requires this in

6    some of the largest cases, and perhaps that would be a good

7    idea.  We'll follow the interim fee applications, but the

8    firms, as they send the bills to the debtors, and I gather the

9    committee and the parties who get the bills, firms should

10   simply put them on line as well so that they'll be available to

11   parties-in-interest who are interested.  And as I said, the

12   company should consider what procedures we need in cases as

13   large as these to review the fee applications on an ongoing

14   basis.  And that, obviously, is something the U.S. Trustee may

15   have some views on.

16        As to the conflict of interest, K&E can have no role

17   in connection with the six debtors to which they are adverse,

18   or any aspect of that litigation.  That, however, would be true

19   even if K&E were retained under Section 327(e) of the

20   Bankruptcy Code.  And the existence of this litigation for

21   separable debtors, and the fact that we do have Weil Gotshal as

22   counsel for those debtors for all purposes, makes the K&E

23   representation appropriate and possible.

24        Because the fact that we cannot foresee the future,

25   it would seem to me that it might make sense for K&E to be

42

1   retained under both 327(a) and 327(e), but I'll leave that up

2   to the parties in preparing the final order.  I don't know

3   whether that would be a better precedent, but I do think the

4   order should contain a clause that says that the joint

5   representation permitted in these complex cases will not serve

6   as a precedent in any other case.  I wouldn't want any other

7   debtor to think that it would be a good idea in the future.

8          So I would ask the parties to discuss the form of an

9   order and to submit it or settle it on three days' notice, if

10  there is any disagreement as to the form of the order.

11         Thank you very much.

12         IN UNISON:  Thank you, Your Honor.

13         THE COURT:  When is our next hearing, Mr. Holtzer?

14         MR. HOLTZER:  We have an omnibus hearing, I think, on

15  the 27th.

16         THE COURT:  27th we have an omnibus hearing, but the

17  motions to dismiss that were scheduled for that day have been

18  adjourned?

19         MR. HOLTZER:  Yes, Your Honor.

20         UNIDENTIFIED SPEAKER:  To June 17th.

21         THE COURT:  To June 17th.  And the motions for relief

22  from the stay, have they been adjourned as well?

23         MR. HOLTZER:  I believe so, Your Honor.  We'll

24  confirm that with chambers.

25         THE COURT:  All right, very good.

43

1          MR. HOLTZER:  One item of housekeeping that we had

2     from the first part of the hearing had to do with the notice

3     for the success fee portions of Miller Buckfire and

4     AlixPartners.

5          THE COURT:  Yes.

6          MR. HOLTZER:  We've had discussions with the Office

7     of the United States  Trustee.  The facts are that the matrix

8     of creditors in the case is 80,000 strong.  The list of parties

9     on the core service list who filed notices of appearance are

10    somewhere around 200 or so.  They've already received notice.

11    I don't believe the U.S. Trustee is of the view that we are

12    obligated to serve the success fee notice on the 80,000.  I

13    think they'd leave it to the company and the company's

14    professionals as to whether or not we would do that.  There is,

15    of course, a significant expense associated with serving 80,000

16    people with notice of the success fee.

17         And so right now the orders for Miller Buckfire and

18    AlixPartners have blanks in them with respect to the date for

19    those hearings to approve their engagement features that

20    include the success fee.  We would ask Your Honor if we can

21    simply contact chambers, perhaps tomorrow, once we've decided

22    exactly how we would propose to proceed with respect to notice.

23    We would be, of course, happy if Your Honor has any guidance

24    with respect to this, considering the significant number of

25    creditors in the matrix.

44

1          THE COURT:  No, I'll wait to hear from the parties as

2    to how broad the notice should be and then we'll set a date for

3    the hearing.

4          MR. HOLTZER:  That's fine.  We'll work it out.

5          THE COURT:  Very good.  Thank you.

6          IN UNISON:  Thank you, Your Honor.

7       (Whereupon these proceedings were concluded at 5:16 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

1                           I N D E X

2

3                           RULINGS

4                                    Page            Line

5    Orders entered regarding          12              15

6    AlixPartners and

7    Miller Buckfire fees

8

9    Parties to submit order for       42               8

10   retention of Weil Gotshal and

11   Kirkland & Ellis as counsel

12   to the debtors

13

14

15

16

17

18

19

20

21

22

23

24

25

46

1

2                    C E R T I F I C a T I O N

3

4      I, Sharona Shapiro, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      SHARONA SHAPIRO

9

10     Veritext LLC

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  May 22, 2009

16

17

18

19

20

21

22

23

24

25

**Exhibit 2**

UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

_____
                                       :
In re:                                 :        Chapter 11
                                       :
ENRON CORP., *et al.*,                 :        Case No. 01-16034 (AJG)
                                       :
                      Debtors.         :        (Jointly Administered)
_____:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW CONFIRMNG
## SUPPLEMENTAL MODIFIED FIFTH AMENDED JOINT PLAN OF
## AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF
## THE UNITED STATES BANKRUPTCY CODE, AND RELATED RELIEF

On June 3, 4, 7, 8, 9, 10, 14, 16, 17 and 18, 2004, this Court held[1] a confirmation hearing

(the "Confirmation Hearing") to consider a plan of reorganization under chapter 11 of title 11 of

the United States Code (the "Bankruptcy Code") proposed by Enron Corp. and certain of its

direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the

"Debtors").  Specifically, the Debtors sought confirmation of the Debtors' Fifth Amended Joint

Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated

January 9, 2004 (the "Fifth Amended Plan"), as thereafter amended pursuant to that certain (a)

Modification of Fifth Amended Plan, dated June 1, 2004 (the "Initial Modification"), and (b)

Supplemental Modification of Fifth Amended Plan, dated July 2, 2004 (the "Supplemental

Modification, and together with the Fifth Amended Plan and the Initial Modification, the

---

[1] This Court has subject matter jurisdiction over these cases under 28 U.S.C. §§ 157(a) and 1334(b) and under the
July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the
Southern District of New York (Ward, Acting C.J.).  This is a core matter under 28 U.S.C. § 157(b)(2)(L).  This
decision constitutes findings of fact and conclusions of law under FED. R. CIV. P. 52, as made applicable by FED. R.
BANKR. P. 7052 and FED. R. BANKR. P. 9014.  To the extent any of the findings of fact constitute conclusions of
law, they are adopted as such.  To the extent any of the conclusions of law constitute findings of fact, they are
adopted as such.

"Plan").[2]  In the context of approval of the Plan, the Debtors also sought (a) approval of the settlements embodied in the Plan, (b) consideration of the Debtors' Motion Pursuant to Bankruptcy Rule 9019 and Section 105 and 363 of the Bankruptcy Code Seeking Approval of the Global Compromise of Inter-Estate Issues (the "Global Compromise Motion"), dated May 4, 2004 (Docket No. 18198), and (c) consideration of the Motion of Debtors Pursuant to Section 363 of the Bankruptcy Code for Order approving and Authorizing Post-Confirmation Allocation Formula for Overhead and Expenses (the "Overhead Allocation Motion"), dated March 24, 2004 (Docket No. 17283).

The Court has reviewed and considered the Plan, all affidavits submitted, as well as the testimony proffered and adduced, the exhibits admitted into evidence at the Confirmation Hearing and the arguments of counsel presented at the Confirmation Hearing.  The Court has also considered all objections to confirmation of the Plan.  This Court is cognizant of the compromises and settlements of the parties and other relevant factors affecting these Chapter 11 Cases and takes judicial notice of the entire record.  Based upon the following findings of fact and conclusions of law, the Court will confirm the Plan, including approval of the settlements contained therein and approval of the Global Compromise Motion and will approve the Overhead Allocation Motion.  In addition, the Court herein disposes of all objections to confirmation not otherwise previously resolved or withdrawn.

## I.  INTRODUCTION

The Confirmation Hearing, including the presentation of evidence and legal argument, consumed nine trial days, not including scheduling conferences.  Ninety-nine (99) objectors filed objections (including supplemental objections and reservations of rights) to confirmation prior to

---

[2] Capitalized terms used in this decision that are not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

and during the Confirmation Hearing. Additionally, six (6) Plan objectors also filed separate

objections to the Global Compromise Motion. Objections to confirmation by seventy-five (75)

objectors and one (1) objection to the Global Compromise Motion, have been fully and

consensually resolved. These resolutions are documented by: (a) filed notices of withdrawal;

(b) announcements on the record as to the withdrawal and/or other appropriate disposition; or (c)

the entry of stipulations or settlement agreements that withdraw, moot or otherwise terminate an

objection.

The Court reviewed and considered:

(a)    The Plan and its several modifications and supplements;

(b)    All evidence submitted in support of confirmation by the Debtors, the Creditors'
       Committee and the ENA Examiner, consisting of: (i) direct testimony by way of
       affidavits of Robert Bingham (the "Bingham Affidavit"), Jane Sullivan (the
       "Sullivan Affidavit") and Raymond Bowen (the "Bowen Affidavit") (Docket Nos.
       18777, 18779 and 18778, respectively), (ii) direct written testimony of Steven
       Zelin, the Debtors' expert on valuation, regarding the valuation of PGE,
       CrossCountry and Prisma (Debtors' Trial Exs. 24 and 25), (iii) direct live
       testimony of Steven Zelin, Debtors' expert, on the Distribution Model and
       Liquidation Analysis, (iv) direct live testimony of Stephen Cooper, and (v) the
       Debtors' trial exhibits admitted into evidence (Debtors' Trial Exs. 1 – 26);

(c)    The entire record[3] in these Chapter 11 Cases, including, but not limited to, such
       items specifically identified in the attachment to the Debtors proposed finds of
       fact as to the matters of which the Court can take judicial notice (Docket Nos.
       19307 and 19533) and Citations To The Record Respecting Statements Made By
       Counsel To The Enron North America Corp. Examiner At The June 16, 2004
       Confirmation Hearing (Docket No. 19283);

(d)    Legal argument on behalf of the Debtors, the Creditors' Committee, the ENA
       Examiner and the supporting argument of Baupost and Racepoint Partners;

(e)    The Global Compromise Motion;

(f)    The Overhead Allocation Motion; and

(g)    Written submissions in support of Plan confirmation and the Global Compromise
       Motion.

---

[3] Although the Court has presided over these cases since the filing and is familiar with all aspects of these Chapter
11 cases, the Court did not specifically review all of the more than 19,750 docket entries and more than 1,200
related adversary proceedings for these findings of fact and conclusions of law.

The Court also reviewed and considered the following in connection with Plan confirmation, the Global Compromise Motion and the Overhead Allocation Motion: (a) the testimony of the Debtors' five witnesses on cross-examination, redirect examination and re-cross examination; (b) legal argument on behalf of all objectors who timely sought leave to present arguments; (c) trial exhibits admitted into evidence (Exs. AV1-AV10); (d) written submissions in opposition to Plan confirmation and the Global Compromise Motion; (e) all objections filed in opposition to confirmation or the Global Compromise Motion and not withdrawn or otherwise resolved; and (f) the lack of any objections to the Overhead Allocation Motion.

Each of the Debtors' witnesses was credible, reliable and qualified to testify as to the topics addressed in his or her testimony. Among other things, Stephen Cooper and Robert Bingham brought their extensive experience as restructuring professionals involved in complex chapter 11 cases and, with respect to these cases, their knowledge of the facts and circumstances surrounding the negotiation and development of the global compromise and the Plan. Raymond Bowen contributed his knowledge of the Enron Companies' prepetition and postpetition business activities and, in particular, his knowledge and experience gained postpetition while serving as Chief Financial Officer and Treasurer. The Debtors' expert witness, Steven Zelin, was qualified to testify as an expert (without objection) as to valuation (relating to both going concern value under the Plan and liquidation value under a chapter 7) and as to the Distribution Model. Jane Sullivan, who certified the vote in these Chapter 11 Cases, has extensive experience in this field and is well qualified.

With the exception of Ms. Sullivan, each of the Debtors' witnesses has testified before the Court on prior occasions in these Chapter 11 Cases. The Court has found their testimony credible and reliable on each occasion, including, without limitation, in approving postpetition

financing, extensions of exclusivity, asset sales and the formation and implementation of

CrossCountry. Ms. Sullivan has testified before the Court previously in the context of certifying

the vote in *In re WorldCom, Inc.*, Case No. 02-13533 (AJG), where her testimony was found to

be credible and reliable.

The parties objecting to confirmation of the Plan presented no witnesses, whether fact or

expert.[4]  The objecting parties' efforts to attack the credibility of the Debtors' witnesses were

unpersuasive.  Further, they presented no credible contraverting evidence in any form or manner

nor did they successfully call into question the views expressed by the witnesses.

In conjunction with a status conference held regarding the Confirmation Hearing, the

Debtors sought a ruling from the Court that, due to the absence of any objections as to the

valuation of PGE, CrossCountry and Prisma, Debtors' Trial Exhibits 24 and 25 (comprising the

Blackstone Report and Blackstone Report Supplement) shall be admitted as part of the Debtors'

case in chief in lieu of the presentation of direct testimony, affidavit, proffer or deposition.

Further, the Debtors sought a ruling that cross-examination as to the Blackstone Report and

Blackstone Report Supplement be limited to the Distribution Model and the Liquidation Analysis

as set forth in the Blackstone Report and the Blackstone Report Supplement.  (Notice, Docket

No. 18616, at 2; Docket No. 18670, at 4).  No party objected to any of the foregoing ruling

requests.  The Court granted such requests.  Accordingly, Debtors' Trial Exhibits 24 and 25 were

admitted into evidence, the going concern valuation of PGE, CrossCountry and Prisma as set

forth therein was uncontroverted and accepted by the Court and no evidence was adduced by any

---

[4] The PBGC attempted to offer the testimony of Karen Justesen as an expert to testify as to the PBGC's calculation
of the Debtors' unfunded pension plan liabilities.  The Court ruled that Ms. Justesen would not be qualified as an
expert witness on a procedural basis for purposes of the Confirmation Hearing and further that her testimony as a
non-expert was not relevant to any objection to confirmation of the Plan.  The Court did not rely upon any part of
Ms. Justesen's brief testimony in considering confirmation of the Plan.

of the objecting parties on valuation issues except insofar as liquidation analysis is concerned. (6/7/04 Zelin Tr. at 12:17 – 14:17).

Based upon the above and the further findings of fact and conclusions of law set forth below, the Court will issue orders:  (a) approving the settlements and compromises embodied in the Plan, including the global compromise; (b) granting the Global Compromise Motion; provided, however, that, should confirmation of the Plan be reversed on appeal, approval of the Global Compromise Motion shall not remain in effect; (c) granting the Overhead Allocation Motion; (d) confirming the Plan; and (e) disposing of all objections to confirmation and the Global Compromise Motion not otherwise previously resolved or withdrawn.  The Debtors satisfied all procedural and due process requirements with regard to the Plan, the Global Compromise Motion and the Overhead Allocation Motion.  Due and proper notice and opportunity to be heard have been given as to such motions, the relief requested therein and the Plan.

As reflected in the findings of fact set forth herein, the evidence before the Court amply supports confirmation of the Plan, including the global compromise embodied therein, approval of the Global Compromise Motion and the Overhead Allocation Motion.  Among other considerations set forth herein, it is particularly compelling that:  (a) the Plan is supported by the Debtors, the Creditors' Committee and the ENA Examiner; (b) all Plan Classes in which votes were cast (other than the Portland Debtors, for which the Confirmation Hearing has been adjourned) voted in favor of the Plan; (c) even if the claims asserted by the Vanguard Group, Inc., f/k/a the Ad Hoc Committee of Yosemite Noteholders ("Vanguard") and Appaloosa Management LLP ("Appaloosa") and Angelo, Gordon & Co., L.P. ("Angelo Gordon" and

together with Vanguard and Appaloosa, the "CLN Noteholders")[5] were temporarily allowed for voting purposes, the classes in which such votes would be counted (Class 5 and Class 185) would not alter the outcome of the vote; and (d) none of the parties objecting to confirmation of the Plan has offered a single lay or expert witness or expert report to contradict any evidence presented by the Debtors at the Confirmation Hearing or in support of their objections.

## II. FINDINGS OF FACT[6]

### A. Background, the Plan, Solicitation and Voting

*1). Background*

Commencing December 2, 2001, and periodically thereafter, each of the Debtors filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. (Bingham Affidavit ¶ 9; Docket No. 1 in each of these Chapter 11 Cases). By order, dated December 3, 2001, as supplemented by orders entered following the Petition Date for each Debtor filing its Chapter 11 Case after December 2, 2001, the Debtors' cases were consolidated for procedural purposes and are being jointly administered. (Bingham Affidavit ¶ 9).

The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. (Bingham Affidavit ¶ 10). The Chapter 11 Cases involve most of the major institutional investors in the United States, as well as many from around the world. Similarly, these Chapter 11 Cases involve thousands of trade creditors, energy traders, former employees and other creditor and equity constituencies located domestically and worldwide. (Bingham Affidavit ¶ 9).

---

[5] Any reference herein to "creditors," "parties" or "beneficial holders of claims" in connection with the CLN Noteholders is for ease of reference only and does not mean that the CLN Noteholders are in fact creditors, parties in interest or beneficial holders of claims.

[6] Citations contained herein to Debtors' Trial Ex. 1 refer to the Fifth Amended Plan. Citations contained herein to Debtors' Trial Ex. 5 refer to the Modified Fifth Amended Plan. Citations to certain transcripts are taken from the rough drafts of such transcripts and the pagination and/or line references may change in the final transcript.

On December 12, 2001, the United States Trustee for the Southern District of New York

(the "U.S. Trustee") appointed a statutory unsecured creditors' committee to serve in all of these

Chapter 11 Cases (as reconstituted from time to time, the "Creditors' Committee").  (Docket No.

195, as amended, modified and/or supplemented by Docket Nos. 490, 6359 and 12594).[7]

On March 27, 2002, the U.S. Trustee appointed an employment-related issues committee

(as reconstituted from time to time, the "Employee Related Issues Committee") (Docket No.

2464, as amended, modified and/or supplemented by Docket Nos. 2548 and 5255).

On June 21, 2002, the Court issued a memorandum decision denying (a) requests for an

additional energy traders' committee and a separate ENA creditors' committee and (b) a motion

to require ENA to obtain separate counsel.  *See generally In re Enron Corp.*, 279 B.R. 671

(Bankr. S.D.N.Y. 2002), *aff'd sub. nom Mirant Americas Energy Mktg., L.P. v. Official Comm.*

*Of Unsecured Creditors Of Enron Corp.*, 2003 WL 22327118 (S.D.N.Y. Oct. 10, 2003).  At that

time, the Court found that the Creditors' Committee had fiduciary duties to all Creditors,

including ENA creditors, and that the ENA Examiner had a fiduciary duty solely to the ENA

creditors.  *See id.*  As evidenced by the level of negotiation regarding the Plan, the global

compromise embodied in the Plan and the Global Compromise Motion, the Creditors'

Committee and the ENA Examiner have acted on behalf of the Creditors in these Chapter 11

Cases.  Accordingly, the interests of ENA creditors have been and continue to be adequately

represented.

---

[7] By virtue of the U.S. Trustee's action, the Creditors' Committee was appointed for each of the Debtors.  According to the Debtors, there are a number of Debtors that do not have any unsecured creditors.  (This issue will be discussed more fully in the discussion of the "96 Debtors.")  However, the Debtors state that proofs of claims that allege an unsecured claim have been filed against each and every estate.  Therefore, because such claims have yet to be adjudicated, the Creditors' Committee represents each and every Debtor in that, as of this date, unsecured claims are outstanding as to each estate.

During the course of these Chapter 11 Cases, and often in consultation with the

Creditors' Committee, the Debtors have endeavored to maximize recoveries to Creditors in a

variety of ways, including, but not limited to, selling a substantial portion of their asset portfolio,

thereby generating billions of dollars of cash available for distribution to Creditors, settling a

substantial percentage of the most significant liabilities of the Debtors' estates, thereby

consensually reducing and resolving billions of dollars in Claims against the estates and

prosecuting litigation against a number of Creditors and other parties seeking affirmative

recovery on behalf of these estates.  (Bingham Affidavit ¶ 11).  Despite being forced to reduce

the workforce in certain instances, the Debtors have preserved approximately 24,000 jobs.

(6/8/04 Cooper Tr. at 23:20 – 24:2).  As part of their efforts to maximize value, the Debtors

stabilized and preserved their operations, including operations of non-Debtors.  (6/8/04 Cooper

Tr. at 12:5 – 12, 12:17 – 16:16).

In February 2002, the Debtors employed Stephen Cooper and Stephen Forbes Cooper,

LLC ("Cooper LLC") to provide and perform management services for all Debtors on the terms

and conditions set forth in such agreement.  With various changes made to the employment

agreement in response to filed objections, all objections were resolved prior to the Court's

issuance of the order approving the Cooper LLC employment, dated April 4, 2002.  (Docket No.

2725).

On June 6, 2002, the Board of ENE announced its intention to compose the Board of, at

least a majority – and, preferably, entirely – new independent directors.  (Form 8-K of ENE, filed

6/13/02; Debtors' Trial Ex. 2, § IV.A.10).  In furtherance of this objective, on June 6, 2002, the

four remaining long-standing directors, Robert A. Belfer, Norman P. Blake, Dr. Wendy L.

Gramm and Herbert, S. Winokur Jr., resigned from the Board.  (Form 8-K of ENE, filed 6/13/02;

Debtors' Trial Ex. 2, § IV.A.10).  As of this date, the reconstituted Board of ENE consists of

John A. Ballantine, Corbin A. McNeill, Jr., Raymond S. Troubh and Ron W. Haddock.  (Forms

8-K of ENE, filed 6/13/02, with regard to Messrs. Ballantine, McNeill and Troubh and filed

8/5/02, with regard to Mr. Haddock; Debtors' Trial Ex. 2, § IV.A.10).

During January and February 2002, approximately ten (10) different creditors, primarily

trading creditors and sureties, moved for appointment of a trustee or examiner for ENA.  No

trustee has been appointed in these Chapter 11 Cases.  Pursuant to an order, dated March 12,

2002 consensually resolving a pending motion for appointment of an examiner, Harrison J.

Goldin was appointed to serve as the ENA Examiner with respect to cash management and

overhead allocations.  (Docket No. 2066).  The ENA Examiner's role was later expanded and

refined through a series of orders, including an order, dated April 24, 2002, appointing the ENA

Examiner to serve as a "facilitator of a chapter 11 plan in the ENA chapter 11 case."  (Bingham

Affidavit ¶ 12; Docket Nos. 3302, 3599 and 10993).

As acknowledged by the CLN Noteholders in their Objection to the Debtors' Proposed

Disclosure Statement and Balloting Procedures (Docket No. 13556), the ENA Examiner's role

expanded to include, *inter alia*, serving as a fiduciary protecting the interests of the ENA estate

and as a plan facilitator for ENA, working with the Debtors and the Creditors' Committee to

facilitate the chapter 11 plan process for ENA and its subsidiaries.  (6/17/04 Draft Tr. at 146:8 –

24).

In addition to the appointment of the ENA Examiner, the Court also appointed an ENE

Examiner, by order dated April 8, 2002.  (Docket No. 2838).  The order granted the ENE

Examiner authority and power to investigate transactions involving special purpose vehicles or

entities created or structured by the Debtors or at the behest of the Debtors, that are, *inter alia*,

not reflected on the ENE balance sheets. (Docket No. 2838). The Court's approval order

occurred subsequent to the Debtors' agreement to the appointment of the ENE Examiner in

response to Creditors' motions (and joinders) seeking the appointment of a trustee, appointment

of either a trustee or examiner, or appointment of an examiner for ENE.[8] The terms of the

appointment order were a result of many negotiating sessions with divergent creditor groups and

the SEC. (Debtors' Trial Ex. 2, § IV.A.4.b.). On May 22, 2002, the U.S. Trustee appointed Neal

Batson as the ENE Examiner. (Docket No. 3924). The Court, by order dated May 24, 2002,

approved the appointment. (Docket No. 4003). The ENE Examiner has filed a series of reports

wherein he reported and commented upon the transactions identified above. (Docket Nos. 6615,

9551, 11960 and 14455). By order dated October 7, 2002, the Court expanded the scope of the

ENE Examiner's role to address issues raised by several NEPCO customers and creditors of

customers. (Docket No. 6959).

*2). Bar Date and Proofs of Claim*

On August 1, 2002, the Court entered an Order Pursuant to Bankruptcy Rules 2002(a)(7),

2002(l), and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Approving the

Form and Manner of Providing Notice Thereof (as modified on October 23, 2003, the "Bar Date

Order"). (Docket Nos. 5518 and 13669).

The Bar Date Order established a deadline (the "Bar Date") for filing proofs of claim in

each of the Debtors' Chapter 11 Cases. The Court established October 15, 2002 as the Bar Date

for the first fifty-seven (57) Debtors. The Bar Date Order established the Bar Date for

subsequently filed Debtors as the last business day of the month that is two (2) months after the

---

[8] No hearing was ever held regarding these motions and joinders, as the parties sought to consensually resolve the issues. A resolution was reached whereby an ENE Examiner would be appointed and the motions and joinders would be adjourned without date, subject to renewal at the requests of any of the parties. To date, no such request has been made.

date such Debtor filed its schedules of assets and liabilities and statement of financial affairs
(collectively, the "Schedules").  On October 23, 2003, the Court entered a Supplemental Order
Pursuant to Bankruptcy Rules 2002(a)(7), 2002(l) and 3003(c)(3) Modifying Deadlines for Filing
Proofs of Claim and Approving the Form and Manner of Providing Notice Thereof, establishing
the Bar Date for any Debtor that filed its Schedules after October 23, 2003 as the last business
day of the month that is one (1) month after the date such Schedules were filed.  (Docket No.
13669).

    In excess of 24,500 proofs of claim have been filed in these Chapter 11 Cases.
Approximately 5,000 of these claims are contingent or unliquidated.  As of June 23, 2004, the
Debtors had filed thirty-seven (37) omnibus objections to proofs of claim, as well as over fifty
(50) individual objections to proofs of claim and have successfully expunged or reclassified over
12,500 claims in the amount of $694 billion (excluding the value of unliquidated claims).
(Docket No. 12506; Docket No. 18663, at 18 – 21, Ex. G, Docket Nos. 19154, 19213 and
19217).  A substantial amount of work, however, remains to resolve the outstanding proofs of
claim to a level consistent with what the Debtors believe to be the proper amount of liabilities
against the estate.  (6/3/04 p.m. Bingham Tr. at 91:24 – 92:8; 6/8/04 Cooper Tr. at 24:18 – 25:8,
65:25 – 66:6).

    While the Court does not directly maintain a Claims Register for the Debtors' cases, the
Court entered an order, *inter alia*, (a) authorizing the Debtors to employ Bankruptcy Services
LLC ("BSI") as the Court's noticing and claims agent, (b) appointing BSI as agent for the Clerk
of the Court and custodian of court records and, thus, the authorized repository for all proofs of
claims filed in these Chapter 11 Cases, and (c) authorizing and directing BSI to maintain the

official Claims Registers for each of the Debtors.  (Docket No. 1191).  Such order was entered

pursuant to section 156(c) of title 28 of the United States Code.

The Claims Register, as maintained by BSI, the Court-approved claims agent for the

Debtors (Docket No. 1191), reveals that each of the Debtors has at least two (2) proofs of claim

filed against them by non-insiders asserting unsecured claims against such Debtor and many

Debtors have significantly more than two general unsecured claims filed against them.  FTI

Consulting, Inc. ("FTI") was retained by the Debtors to work with BSI and to assist with claims

management.  (Docket No. 8201).

Despite the fact that proofs of claim have been filed against each of the Debtors,

Appendix C to the Disclosure Statement (Debtors' Trial Ex. 8) sets forth the estimated assets and

claims against each of the Debtors.  In accordance with the Debtors' books and records, the

Debtors estimate that there are no non-insider unsecured creditors (other than the PBGC) for 51

of the Debtors.

*3).  Certain Debtors*

As set forth in Section 7.9 of the Initial Modification, pursuant to the Court's order, dated

April 8, 2004, and the notice, dated May 17, 2004, in connection therewith (Docket Nos. 17625

and 18434), (a) a majority of the equity interests of Enron Mauritius Company, Enron India

Holdings Ltd. and Offshore Power Production C.V. (collectively, the "Dabhol Debtors") were

sold, (b) such entities were, *inter alia*, removed as Debtors and Proponents of the Plan, and

(c) Classes 58, 59, 60, 246, 247 and 248 of the Plan have been rendered unnecessary and

inoperative.

In addition, as stated on the record at the Confirmation Hearing, the Debtors and the

Creditors' Committee have reached a settlement in principal, subject to definitive documentation

and Court approval, with certain former employees of Portland General Holdings ("PGH").

Consequently, the Confirmation Hearing was adjourned with respect to the Portland Debtors and

the Debtors may move to dismiss one or both of the Portland Debtors' cases upon approval of

the settlement by the Court.

Although not excluded from the Plan, Enron Development Funding Limited ("EDF"), a

Debtor, is also the subject of insolvency proceedings in the Cayman Islands.  (Stipulation,

Docket No. 11953).  In light of the joint proceedings, until such time as the Cayman scheme of

arrangement proceedings has been concluded, no distributions of assets held by or attributed to

EDF will be made to Creditors holding Allowed Claims pursuant to the Plan.  The Court has

been advised that it is currently anticipated that the Cayman proceedings will conclude in August

2004.

*4).  The Plan and Disclosure Statement*

In October 2002, Enron presented a chapter 11 plan structure with potential economic

outcomes to the Creditors' Committee.  (Debtors' Trial Ex. 13).  On July 11, 2003, the Debtors

filed their Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States

Bankruptcy Code and the accompanying disclosure statement.  (Docket Nos. 11698 and 11699).

The Debtors filed an Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the

United States Bankruptcy Code and the accompanying disclosure statement on September 18,

2003.  (Docket Nos. 12822 and 12823).  Thereafter, on November 13, 2003, the Debtors further

amended their Plan by filing a Second Amended Joint Plan of Affiliated Debtors Pursuant

Chapter 11 of the United States Bankruptcy Code and the disclosure statement thereto.  (Docket

Nos. 14154 and 14155).  The Debtors filed their Third Amended Joint Plan of Affiliated Debtors

Pursuant to Chapter 11 of the United States Bankruptcy Code and the disclosure statement

14

thereto on December 17, 2003.  (Docket Nos. 14893 and 14894).  On January 4, 2004, the

Debtors filed their Fourth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of

the United States Bankruptcy Code and its accompanying Disclosure Statement.  (Docket Nos.

15153 and 15154).

With respect to the Plan, the Debtors also filed (a) Modification of Fifth Amended Plan,

dated June 1, 2004 (the "Initial Modification"), and (b) Supplemental Modification of Fifth

Amended Plan, dated July 2, 2004.  (Docket No. 18793 and 19477).

On January 9, 2004, after due notice and a hearing, the Court entered, pursuant to, *inter*

*alia*, section 1125 of the Bankruptcy Code and Rule 3017(b) of the Federal Rules of Bankruptcy

Procedure ("Bankruptcy Rule"), an order approving the Debtors' Disclosure Statement, which,

*inter alia*, approved the Disclosure Statement, finding that it contained "adequate information"

within the meaning of section 1125 of the Bankruptcy Code and established procedures for the

Debtors' solicitation and tabulation of votes on the Plan (the "Solicitation Procedures Order")

(Docket No. 15303).

Various objectors, including The Bank of New York, as indenture trustee for the CLN

Noteholders, objected to the Solicitation Procedures Order as initially proposed because, among

other reasons, such order did not provide for a mechanism for the direct solicitation of indirect

noteholders of financing transactions.  In order to resolve these objections, the Debtors modified

paragraphs 17 – 19 of the Solicitation Procedures Order to include a process for direct

solicitation of indirect noteholders pursuant to Fiduciary Stipulations.  Based largely on such

modifications, the objectors withdrew their objections to the Solicitation Procedures Order.

(1/7/04 Hearing Tr. at 34 – 40).

*5). Solicitation Procedures and Voting Extensions*

The final Solicitation Procedures Order established March 24, 2004 at 5:00 p.m. (New York Time) (the "Voting Deadline") as the deadline to submit ballots on the Plan to the Solicitation and Tabulation Agent and established March 24, 2004 at 4:00 p.m. (New York Time) as the deadline to file and serve objections to confirmation of the Plan. (Debtors' Trial Ex. 3).

On January 9, 2004, the Court also entered an order, pursuant to sections 105(a), 502(c), 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3003, 3017 and 3018, establishing voting procedures in connection with the Plan process and temporary allowance of claims procedures related thereto (the "Voting Procedures Order"). (Docket No. 15296).

On February 13, 2004, after due notice, a hearing and opportunity to be heard, the Court entered an Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith. (the "Confirmation Discovery Procedures Order," Docket No. 16233). The Confirmation Discovery Procedures Order directed the Debtors to establish and staff an electronic document depository (the "Depository") to include the documents identified therein relating to confirmation of the Plan and the global compromise and settlement, which depository was established and staffed on or before March 3, 2004, in compliance with the Confirmation Discovery Procedures Order. The Confirmation Discovery Procedures Order also provided that any party in interest which, on or before March 3, 2004, filed an objection to confirmation of the Plan setting forth the legal and factual basis in support thereof, would be entitled to review documents contained in the Depository and to seek further discovery of the Debtors, the Creditors' Committee, or the ENA Examiner in connection with confirmation of the Plan and the global compromise and settlement

16

underlying the Plan, subject to the restrictions set forth therein. Several parties in interest filed

objections to confirmation on or before March 3, 2004, including, but not limited to, the CLN

Noteholders, thus providing those parties with a reasonable opportunity to access the Depository

and seek further discovery of the Debtors, the Creditors' Committee and the ENA Examiner

concerning confirmation of the Plan and the global compromise and settlement. The

Confirmation Discovery Procedures Order further provided that, in the event a dispute arose

concerning any request for discovery in connection with confirmation of the Plan, the Court

would schedule a chambers conference to discuss and resolve such dispute as soon as possible.

Prior to the commencement of the Confirmation Hearing, the Court resolved all such disputes.

None of the Creditors that filed objections to confirmation of the Plan after March 3,

2004 sought discovery or requested reconsideration of the Confirmation Discovery Procedures

Order. Additional discovery disputes were addressed by the Court on various matters related to

the Confirmation Hearing, including, but not limited to, the following:

(a)    In conjunction with the Confirmation Discovery Procedures Order, the Court held a conference to address discovery disputes between Baupost and the ENA Examiner and issued a ruling addressing such issues.

(b)    Outside of the context of the Confirmation Discovery Procedures Order, Hiroo Awano requested a discovery conference seeking to compel responses to his discovery requests over the Debtors' objections (including an objection that Mr. Awano failed to follow the procedures set forth in the Confirmation Discovery Procedures Order). The parties initially agreed to postpone a scheduled conference so as to enable them to explore a consensual resolution of the issues. When a settlement was not forthcoming, Mr. Awano renewed his request for the discovery conference and the Court held a telephonic hearing on May 18, 2004. Thereafter, the matter was consensually resolved.

(c)    Although not arising under the Confirmation Discovery Procedures Order, but during this same time period, the Court held two (2) discovery conferences in connection with the Motion of the EDO Creditors for Order Granting Temporary Allowance of Claims for Voting Purposes. (Docket No. 16313). At the first conference, Appaloosa advised the Court that it would not be seeking any discovery in connection with its motion. Despite this representation, Appaloosa then noticed the deposition of The Bank of New York. The Debtors objected and

17

the Court held a discovery conference and overruled the Debtors' objection --
allowing the deposition to go forward.

As evidenced by the foregoing, all parties in interest had numerous opportunities to raise with the

Court any concerns relating to discovery or the trial process.

Appaloosa served additional discovery requests seeking certain documents and

communications related to temporary allowance of claims for voting purposes and voting on the

Plan.  The Debtors and Creditors' Committee objected to these discovery requests, *inter alia*,

because they asserted that the requests were overly broad and burdensome, as they were entitled

to do under the Confirmation Discovery Procedures Order.  (Confirmation Discovery Procedures

Order at ¶ 12, Docket No. 16233; Docket No. 18557, Exs. C and D; and Docket No. 18781, Ex.

B).  Appaloosa did not file a motion to compel the Debtors or the Creditors' Committee to

produce these documents.  At Ms. Sullivan's deposition on May 28, 2004, Appaloosa first

requested the production of preliminary voting results provided to the Debtors by Innisfree and

the applicable correspondences between the Debtors and Innisfree.  Because the Debtors viewed

this subsequent request as specific, not overly broad or burdensome, the Debtors voluntarily

produced these documents on the next business day, June 1, 2004, even though the new request

was untimely under the Confirmation Discovery Procedures Order and the Debtors' objection to

the first request was not the subject of a motion to compel or any request for a discovery

conference.

Although it was argued that discovery was sought from the Creditors' Committee in

connection with voting-related correspondence and documents that were not produced, there is

no evidence in the record that the Creditors' Committee was in possession of voting-related

correspondence and documents between the Debtors and third parties.  Even if the Creditors'

Committee was in possession of these documents, Appaloosa did not file a motion to compel the

Creditors' Committee to produce such documents and Appaloosa did not raise any issues related

to its discovery requests with respect to the Creditors' Committee until the Confirmation

Hearing.  In addition, the record does not support a finding that Vanguard ever requested that the

Debtors or the Creditors' Committee produce documents related to voting and solicitation as part

of its discovery requests.

On April 1, 2004, the Court held a status conference regarding confirmation of the Plan at

which counsel for the Debtors, Creditors' Committee and CLN Noteholders, among others, were

present.  During this hearing, counsel for the Debtors requested a continuance of the

Confirmation Hearing so that the Debtors, the Creditors' Committee and all objectors could

commence and conclude discovery and for the Debtors to submit relevant expert reports.  (4/1/04

Hearing Tr. at 183:16 – 187:4).  Counsel for the Debtors also informed the Court that, in

connection with the adjournment of the Confirmation Hearing, several dates in the Voting

Procedures Order, Solicitation Procedures Order and the Confirmation Discovery Procedures

Order would also be extended and the Debtors would submit an order to the Court providing for

such extensions.  (4/1/04 Hearing Tr. at 187:5 – 188:7, 188:22 – 189:8).

On April 5, 2004, the Debtors submitted and the Court entered an Order Adjourning

Confirmation Hearing and Adjusting Deadlines in Connection Therewith (the "Adjournment

Order").[9]  (Docket No. 17528).  Pursuant to the Adjournment Order, *inter alia*, certain deadlines

with regard to voting on the Plan were extended to May 24, 2004, solely in conjunction with a

---

[9] Certain deadlines in the Adjournment Order were further extended pursuant to the (a) Amended Supplemental
Order Adjusting Deadlines in Connection With the Debtors' Chapter 11 Plan dated May 7, 2004 (the "Amended
Adjournment Order," Docket No. 18290), (b) Second Amended Supplemental Order Adjusting Deadlines in
Connection with the Debtors' Chapter 11 Plan dated May 20, 2004 (the "Second Amended Adjournment Order,"
Docket No. 18491), and (c) Third Amended Supplemental Order Adjusting Deadlines in Connection with the
Debtors' Chapter 11 Plan dated May 27, 2004 (the "Third Amended Adjournment Order," Docket No. 18693).  For
convenience, the Adjournment Order, Amended Adjournment Order, Second Amended Adjournment Order and
Third Amended Adjournment Order are collectively referred to as the "Adjournment Orders."

settlement of an Allowed Claim, temporary allowance motion, or resolution of an objection to

confirmation of the Plan, without prejudice to further extensions by agreement of the Debtors

and the party entitled to vote on the Plan.

The CLN Noteholders did not "directly" complain about or otherwise object to the

extension of such deadlines under the Adjournment Order until May 7, 2004. Even though the

CLN Noteholders "indirectly" raised the issue of their objection to the Adjournment Order in

their objections to various Voting Stipulations heard on May 7, 2004, they never requested that

the Court vacate or reconsider the Adjournment Order.

Although the Solicitation Procedures Order established the Voting Deadline of March 24,

2004 as the date by which Creditors were required to submit ballots to vote on the Plan, this

deadline was never designed nor intended to be the final date for votes to be counted. (Debtors'

Trial Ex. 3 at ¶ 27). *See generally In re OBT Partners, Ill. Ltd. P'ship*, 214 B.R. 863 (N.D. Ill.

1997) (noting that "[t]he voting deadline is not a line drawn in the sand."). As set forth in

paragraph 3(m) of the Voting Procedures Order, claims that are allowed pursuant to a Court-

approved settlement agreement on or before April 14, 2004 would be "entitled to vote on the

Plan in accordance with the terms of such settlement." (Debtors' Trial Ex. 20). Paragraphs 4(b)

and 6(c) of the Voting Procedures Order further provide that hearings on temporary allowance

and ballot correction motions would conclude on April 8, 2004 and orders related to such

motions shall be entered by April 14, 2004.[10] (Debtors' Trial Ex. 20 at ¶ 4).

Further, the Adjournment Orders extended certain dates related to deadlines for hearings

and orders on temporary allowance motions and Court-approved settlements that affected voting.

(Docket Nos. 17528, 18290, 18491 and 18693). The Debtors did not include any votes in the

---

[10] Appaloosa withdrew its objection to the Voting Procedures Order in early January 2004 and did not contest any of the provisions in such order.

Vote Certification that were received after the Voting Deadline, unless they were approved by

order of the Court as expressly contemplated by paragraphs 3(m), 4(b) and 6(c) of the Voting

Procedures Order.  (Sullivan Affidavit ¶¶ 8, 10; Initial Vote Certification ¶¶ 13, 18 and Ex. E,

Debtors' Trial Ex. 19).

Despite receiving (a) initial notice at the April 1, 2004 hearing that certain deadlines

under the Voting Procedures Order and Solicitation Procedures Order would be extended, and

(b) subsequent notice of entry of the Adjournment Order on April 5, 2004, as stated previously,

the first time the CLN Noteholders "directly" objected to the Adjournment Order was at the May

7, 2004 hearing in oral argument in opposition to the approval of the Voting Stipulations.

Although Appaloosa did mention in its objection (Docket No. 17734) to the J. Aron temporary

allowance stipulation (the "J. Aron Stipulation," Docket No. 17597) that Appaloosa did not have

notice that the Voting Deadline was going to be extended, any such mention is procedurally

defective to constitute an objection to the Adjournment Order.[11]

To the extent that the CLN Noteholders sought to challenge the effectiveness of the

Adjournment Order, they needed to do so by seeking to have that order, as noted above, vacated

or reconsidered, or by seeking leave to appeal.  Although objections and comments were raised

by the CLN Noteholders regarding entry of the Adjournment Order, at the conclusion of the May

7, 2004 hearing on the Voting Stipulations, the CLN Noteholders informed the Court that they

had no objections to entry of the Amended Adjournment Order that extended the deadlines in the

Adjournment Order.  (5/7/04 Hearing Tr. at 137:20 – 139:7, 166:24 – 167:6).  While the CLN

Noteholders reserved the right, at the May 7, 2004 hearing, to object to future deadline

---

[11] Vanguard filed a joinder to Appaloosa's objection that did not raise any specific legal challenges to the J. Aron Stipulation. (Docket No. 17893).

extensions, they never objected to any extensions of the dates made by subsequent Adjournment
Orders.

Further, and more importantly, the Adjournment Order did not generally extend the
Voting Deadline regarding the casting of ballots.  Rather, as such deadline applies to the casting
of ballots by a party in conjunction with a settlement of an Allowed Claim, temporary allowance
motion, or resolution of objection to confirmation under the Voting Procedures Order that could
be filed by April 14, 2004, the Adjournment Order extended such deadline to May 24, 2004.
(Docket No. 17528).  Moreover, at the time of the entry of any Voting Stipulations under which
a vote was cast after March 24, 2004, the Adjournment Orders were in effect and, therefore, any
issue as to the timing of the casting of any ballot related thereto is without merit.

As to the CLN Noteholders' alleged requirement of notice of an extension, Exhibit D to
the Solicitation Procedures Order specifically provides that "[t]he Debtors[,] in consultation with
the Creditors= Committee, may extend the Voting Deadline *in their discretion and without
further notice*" (emphasis added).  In addition, there was no prohibition in any of the various
voting and solicitation orders that restricted the Debtors' ability to agree to extend the deadline to
cast a ballot for a particular Creditor during settlement negotiations.  The Court also determined
that sufficient cause existed to enter the Adjournment Orders and no notice or motion was
required prior to the entry of such orders.

Accordingly, based upon all of foregoing, the CLN Noteholders have waived all
objections to the entry of the Adjournment Orders.

*6).  Vote Solicitation*

On August 12, 2003, an order was entered retaining Innisfree M&A Incorporated
("Innisfree") as the Debtors' solicitation and tabulation agent.  (Docket No. 12250).  Jane

Sullivan is a Director of Innisfree.  (Sullivan Affidavit ¶ 1).  Innisfree and Ms. Sullivan, in

particular, are highly experienced in bankruptcy solicitation matters.  Ms. Sullivan has over

twenty (20) years of experience in public securities solicitations and over thirteen (13) years of

experience in bankruptcy matters.  Ms. Sullivan has worked on over ninety (90) bankruptcy

solicitations, tabulations and certifications of the vote, including, among others, *In re WorldCom*.

(6/5/04 Sullivan Tr. at 167:4 – 12; Sullivan Affidavit ¶ 2).  Ms. Sullivan and Innisfree also have

substantial experience regarding the solicitation of securities Creditors.  (Sullivan Affidavit

¶ 23).

In accordance with the Solicitation Procedures Order, Innisfree began mailing the

Solicitation Materials to Creditors in late January of 2004.  Innisfree completed the general

mailing of Solicitation Packages and Non-Voting Solicitation Packages on February 3, 2004.[12]

(Sullivan Affidavit ¶ 27).  During the solicitation process, Innisfree mailed approximately 36,000

Solicitation Packages and 473,000 Non-Voting Solicitation Packages.  (Sullivan Affidavit ¶ 33).

In addition to the general mailing, Innisfree conducted a mailing for beneficial holders of

claims related to "Financing Transactions," as that term is used in the Disclosure Statement,

which allowed the beneficial holders of certain claims to be solicited directly with Solicitation

Materials pursuant to a Court-approved stipulation with the beneficial holder's agent or trustee

(the "Fiduciary Stipulations").  (Sullivan Affidavit ¶ 28).

Pursuant to the Fiduciary Stipulations, these beneficial holders were solicited directly

with either "live" ballots or provisional ballots, depending on whether the claim was disputed as

---

[12] *See* Affidavit of Service of Voting and Non-Voting Documents by Innisfree (Docket No. 16349); Amended
Affidavit of Service of Voting and Non-Voting Documents by Innisfree (Docket No. 16897); Supplemental
Affidavit of Service of Voting and Non-Voting Documents by Innisfree (Docket No. 16826); Second Supplemental
Affidavit of Service of Voting and Non-Voting Documents by Innisfree (Docket No. 18418); and Second Amended
Affidavit of Service of Voting and Non-Voting Documents by Innisfree (Docket No. 18419).

of January 9, 2004. (Sullivan Affidavit ¶ 29). Paragraph 18(f) of the Solicitation Procedures Order provides that the Debtors and the Creditors' Committee reserved their rights to contest the direct tabulation of any allowed votes cast in connection with the Fiduciary Stipulations. (Docket No. 15303).

There were a total of nine Fiduciary Stipulations relating to financing transactions commonly known as (a) Osprey/Whitewing ("Whitewing"); (b) E-NEXT; (c) Choctaw, Zephyrus and Sequoia ("Choctaw"); (d) Enron Teeside Operations Limited ("ETOL"); (e) Deutsche Trust Company Limited ("DTCL"); (f) Brazos LP ("Brazos"); (g) Flagstaff Capital Corporation ("Flagstaff"); (h) Yosemite and Credit-Linked Notes ("CLN"); and (i) Margaux.[13]

Innisfree completed the mailing of Solicitation Packages to voting beneficial holders pursuant to the Fiduciary Stipulations on February 20, 2004. (Docket No. 16826; Sullivan Affidavit ¶ 29).

*7). Temporary Claim Allowance for Voting Purposes*

The deadline for Creditors to file temporary allowance motions and ballot correction motions was February 17, 2004. (Sullivan Affidavit ¶ 30, Debtors' Trial Ex. 20, ¶¶ 4, 6). Numerous parties, including some provisionally allowed to submit ballots pursuant to Fiduciary Stipulations, filed motions to temporarily allow their claims for voting purposes because their claims were not entitled to vote pursuant to the Voting Procedures Order. (Sullivan Affidavit ¶ 30). Innisfree complied with the solicitation procedures for Creditors that filed temporary allowance motions. (Sullivan Affidavit ¶¶ 30 – 31).

---

[13] *See* Affidavit of Service of Jane Sullivan Regarding CLN, Whitewing, Margaux and Marlin (Docket No. 16061); Affidavit of Service of Jane Sullivan Regarding Flagstaff, Brazos and Choctaw (Docket No. 16062); Affidavit of Service of Jane Sullivan Regarding ETOL and DTCL (Docket No. 16063); Affidavit of Service of Jane Sullivan Regarding E-NEXT (Docket No. 16064); Affidavit of Service of Jane Sullivan Regarding Amended CLN (Docket No. 16065); Affidavit of Service of Jane Sullivan Regarding Amended Margaux (Docket No. 16413); Affidavit of Service of Jane Sullivan Regarding Amended CLN, Whitewing, Margaux and Marlin (Docket No. 18416).

After reviewing the Sullivan Affidavit and hearing the testimony of Ms. Sullivan, the Court finds Ms. Sullivan to be a credible witness. Because Ms. Sullivan was traveling out of the country on the day the Sullivan Affidavit was to be filed, Ms. Sullivan delivered an executed and notarized signature page to the Debtors' counsel with instructions that such signature page was to be held in escrow until Ms. Sullivan had reviewed and approved the final form of the Sullivan Affidavit. (6/4/04 Sullivan Tr. at 125:11 – 126:22, 164:9 – 165:18). Further, because the signature page was only attached to the Sullivan Affidavit after Ms. Sullivan reviewed and approved the final form of the Sullivan Affidavit and no credible evidence has been adduced to contradict Ms. Sullivan's testimony and Ms. Sullivan adopted the contents of the Sullivan Affidavit during her testimony, the Court accepts the Sullivan Affidavit in its entirety as a valid and truthful affidavit that was not fraudulently submitted.

As described in the affidavits of service of Innisfree, sworn to by Ms. Sullivan on February 17, 2004, March 10, 2004 and March 11, 2004 (each a "Sullivan Service Affidavit" and collectively, the "Sullivan Service Affidavits," Docket Nos. 16349, 16826 and 16897), (a) the transmittal and service of the Solicitation Packages were adequate and sufficient under the circumstances of these Chapter 11 Cases and (b) adequate and sufficient notice of the Confirmation Hearing (including the March 24, 2004 deadline for filing and serving objections to confirmation) and other requirements, deadlines, hearings and matters described in the Solicitation Procedures Order was provided in compliance with the Bankruptcy Rules and the Solicitation Procedures Order and no other or further notice is required. No evidence was submitted by any objector sufficient to rebut the Debtors' evidence regarding solicitation of the vote.

25

*8). Vote Tabulation*

Innisfree carefully monitored whether ballots were received by the Voting Deadline. (Sullivan Affidavit ¶ 40). Innisfree began receiving ballots in late February 2004. (Sullivan Affidavit ¶ 41). Innisfree also received provisional ballots from Creditors that had filed a motion to temporarily allow their claims for voting purposes. (Sullivan Affidavit ¶ 45). Innisfree time- and date-stamped, or hand-marked, these provisional ballots upon receipt, updated the voting information in Innisfree's computer system and filed these claims separately until they were either allowed, or not allowed, to vote pursuant to an order by the Court. (Sullivan Affidavit ¶ 45).

Whenever the Court entered an order temporarily allowing, or not allowing, a claim, the Debtors' counsel would advise FTI and Innisfree of the entry of the order and the impact of the order on how the specific claim was to be treated. (Sullivan Affidavit ¶ 46). Additionally, other claims were withdrawn by Creditors or expunged by Court orders through May 24, 2004. (Sullivan Affidavit ¶ 53). Because FTI provided updated data files to Innisfree reflecting these changes, Innisfree also ran periodic audit reports with FTI to ensure that the updated data received from FTI was consistent with the voting records compiled by Innisfree. If any discrepancies were found, Innisfree made corrections to its database as needed. (Sullivan Affidavit ¶ 53).

Innisfree is a neutral party retained as an agent to solicit and tabulate ballots. (Sullivan Affidavit ¶ 54). Neither Innisfree's retention nor its compensation is based on whether the certified results reflect acceptance or rejection of the Plan or whether the Plan is confirmed. (Sullivan Affidavit ¶ 54). Innisfree followed the procedures set forth in the Voting Procedures Order and the Solicitation Procedures Order. (Sullivan Affidavit ¶¶ 6, 10). Innisfree's internal

26

process for compiling and organizing voting data, including the computer programs used in such

process and quality control process are reasonable and were designed and used to support the

vote certification. (Sullivan Affidavit ¶¶ 16 – 21, 23, 24).  The only objectors that challenged the

voting and tabulation process were the CLN Noteholders.

 Innisfree undertook quality control measures designed to ensure the accuracy of the vote

tabulation and certification.  (Sullivan Affidavit ¶¶  22, 25).  As part of the quality control

process, Innisfree:  (a) worked closely with FTI to address questions and issues related to the

non-securities data that was provided to Innisfree; (b) received regular updates from FTI related

to non-securities claims; and (c) participated in weekly conference calls beginning in September

2003 with the Debtors, the Debtors' counsel, FTI and BSI to address any issues related to the

non-securities data provided by FTI, the solicitation and voting process for all claims.  (Sullivan

Affidavit ¶¶  22, 25).

 Innisfree performed several audits of the ballot tabulations.  (Sullivan Affidavit ¶ 53).

Innisfree conducted an initial audit following the Voting Deadline and, shortly thereafter,

conducted a second complete audit of the ballots to verify the results of the initial audit.

(Sullivan Affidavit ¶ 53).  The cumulative effect of Innisfree's quality control measures helped

to resolve potential and open issues and increased the accuracy of the databases used by Innisfree

in tabulating the vote.  (Sullivan Affidavit ¶¶  22, 25).  Innisfree periodically provided interim

voting reports to the Debtors and advised the Debtors that such interim voting reports were

unaudited and subject to further revision.  (6/4/04 Sullivan Tr. at 110:21 – 111:3).  In fact, Ms.

Sullivan testified that, as is true in most cases, the initial voting report was completely

inaccurate.  (6/4/04 Sullivan Tr. at 135:23 – 136:6, 166:8 – 21).  Certain ballots and provisional

ballots were allowed to vote after the Voting Deadline pursuant to Court orders.  (Sullivan

Affidavit ¶ 53).

*9).  Plan Elections*

Innisfree also tabulated whether Creditors made certain elections under Sections 7.3, 7.4,

7.7, 7.8 and 28.2 of the Plan (the "Plan Elections").  The Plan Elections were made either on the

ballot or the provisional ballot that was sent to Creditors.  (Sullivan Affidavit ¶ 34).  All of the

Plan Elections and Provisional Plan Elections that were not properly made were separately

tracked and recorded by Innisfree and the Debtors mailed a notice to the affected Creditors

informing them that their Plan Election was not properly executed.  (Sullivan Affidavit ¶ 51).

The Election Procedures Order allowed the Debtors to solicit Creditors for the limited

purpose of making the Plan Elections (the "Provisional Plan Elections").  (Docket No. 17296;

Sullivan Affidavit ¶ 38).  If a Creditor's claim is later allowed for distribution purposes, the

Provisional Plan Elections will be applied to the Creditor's claim as long as it complies with the

Election Procedures Order.  (Docket No. 17296; Sullivan Affidavit ¶ 38).  No evidence was

submitted by any objector to rebut the Debtors' evidence concerning Plan Elections.  The vote in

*WorldCom* was certified by Ms. Sullivan and accepted by the Court.  (6/4/04 Sullivan Tr. at

167:10 – 14).  Ms. Sullivan has never had a vote certification rejected by a court based upon the

fact that it contained errors.  (6/4/04 Sullivan Tr. at 167:16 – 19).

*10).  Vote Certification*

As set forth in detail in the Vote Certification, the procedures used to distribute

Solicitation Packages and tabulate Ballots were fair, properly conducted and in accordance with

the Solicitation Procedures Order, the Voting Procedures Order and all applicable Federal and

local Bankruptcy Rules.  (Debtors' Trial Ex. 19).  In accordance with Local Rule 3018-1, on

May 26, 2004, the Affidavit of Jane Sullivan Certifying Tabulation of Acceptances and

Rejections of Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the

United States Bankruptcy Code (the "Initial Vote Certification") (Docket No. 18671; Debtors'

Trial Ex. 19), was filed with the Court.

　　　　Based on orders entered on or after May 26, 2004, on June 2, 2004, the Supplemental

Affidavit of Jane Sullivan Certifying Tabulation of Acceptances and Rejections of Fifth

Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States

Bankruptcy Code (Docket No. 18863) (the "Amended Vote Certification" and, together with the

Initial Vote Certification, the "Vote Certification") was filed with the Court.

　　　　As set forth in Article XXX of the Plan, Claims in Classes 1 and 2 of the Plan are not

impaired.  Pursuant to section 1126(f) of the Bankruptcy Code, Classes 1 and 2 are deemed to

have accepted the Plan and were not entitled to vote.  As set forth in Article XXX of the Plan and

consistent with the Voting Procedures Order, Class 190 was deemed to have accepted the Plan.

Classes 183 and 376 through 385 are impaired and anticipated to receive no distributions under

the Plan.  (Bingham Affidavit ¶ 64).  Pursuant to section 1126(g) of the Bankruptcy Code,

Classes 183 and 376 through 385 are deemed to have rejected the Plan and were not entitled to

vote.

　　　　Of the remaining 372 impaired Classes, four (4) Classes relate to the Portland Debtors for

which confirmation has been adjourned and six (6) Classes relate to the Dabhol Debtors, which

have since been severed from these jointly administered cases and withdrawn as proponents of

the Plan.  In addition, ten (10) Classes relate to EREC Subsidiary I (Classes 49 and 237), EREC

Subsidiary II (Classes 50 and 238), EREC Subsidiary III (Classes 51 and 239), EREC Subsidiary

IV (Classes 52 and 240) and EREC Subsidiary V (Classes 53 and 241).  These five (5) entities

were created immediately prior to the bankruptcy filing for the Wind Entities as limited liability

companies to succeed the Wind Entities in conjunction with the asset sale to GE Power Systems.

(Debtors' Trial Ex. 10 at M-5). Accordingly, these Classes are duplicative of the Classes for the

Wind Entities and no ballots were cast in these Classes.

Of the remaining 352 impaired Classes, ballots were cast in 110 Classes by non-insiders.

(Debtors' Trial Ex. 19, Exhibit F). With the exception of 2 Classes for PGH (a Debtor for which

confirmation has been adjourned), each of these Classes voted to accept the Plan. (Debtors'

Trial Ex. 19, Exhibit F). Of the 110 Classes, 52 are Convenience Classes under the Plan. With

the exception of the Convenience Class for PGH (a Debtor for which confirmation has been

adjourned), the 51 other Classes voted to accept the Plan. (Debtors' Trial Ex. 19, Ex. F). With

respect to the Convenience Class for ENA, of the total of 134 votes cast totaling $1,752,014.66,

126, ballots totaling $1,623,038.26, representing 93.15% of the total amount voted to accept the

Plan and seven ballots totaling $119,976.40, representing 6.85% of the total amount voted to

reject the Plan. (Debtors' Trial Ex. 19, Ex. F).

Six Classes voted to accept the Plan based on ballots cast by insiders, where such ballots

were the only votes cast in those Classes. (Debtors' Trial Ex. 19, Ex. G). Of the 237 impaired

Classes for which no ballots were cast, 141 of these Classes are Classes of impaired Claims

against a Debtor for which at least one other impaired Class has accepted the Plan. There are 96

Debtors for which no ballots were cast, whether insider or non-insider, in any impaired Class for

each of those specific Debtors.[14] (Debtors' Trial Ex. 19, Exs. F and G).

---

[14] The 96 Debtors for which no votes were received are as follows: PBOG Corp.; Palm Beach Development
Company, LLC; Tenant Services, Inc.; EESO Merchant Investments, Inc.; Enron Federal Solutions, Inc.; Enron
LNG Marketing LLC; Enron International Fuel Management Company; Enron Communications Leasing Corp.;
Intratex Gas Company; Enron Processing Properties, Inc.; The New Energy Trading Company; EES Service
Holdings, Inc.; ZWHC LLC; Zond Pacific, LLC; Enron Fuels International, Inc.; Artemis Associates, LLC; EGS
New Ventures Corp.; Louisiana Gas Marketing Company; Louisiana Resources Company; LGMI, Inc.; LRCI, Inc.;
Enron Communications Group, Inc.; Enrock Management, LLC; ECI Texas, L.P.; Enrock, L.P.; ECI-Nevada Corp.;

Excluding the Portland Debtors (for which confirmation has been adjourned), all of the

Debtors are included in the global compromise embodied in the Plan and also the subject of the

Global Compromise Motion.  More specifically, each of the 96 Debtors for which no ballots

were cast, are all included in the substantive consolidation component of the global compromise.

(Bingham Affidavit ¶ 82).

        As reflected on Appendix C-I, the Debtors estimate that there are no third party creditors

against 51 of the 96 Debtors for which no votes were received.  These 51 Debtors have directly

held assets totaling approximately $68.5 million.  The Debtors further estimate the remaining 45

Debtors have third-party unsecured claims of approximately $910 million and directly held

assets totaling approximately $296.5 million.  In the aggregate, these 96 Debtors hold less than

4.5% of the assets directly held by all of the Debtors and have estimated third party claims

against the Debtors representing only approximately 1.5% of the aggregate estimated claims.

The summary contained in this paragraph regarding assets and claims is based on the information

contained in the "Total Directly Held Assets" and "Pre Petition General Unsecured Claims" in

Appendix C-I to the Disclosure Statement.  (Debtors' Trial Ex. 8).  Across all voting Classes,

---

St. Charles Development Company, LLC; Calcasieu Development Company, LLC; Calvert City Power I, LLC;
Enron ACS, Inc.; LOA, Inc.; Enron India LLC; Enron International Holdings Corp.; Enron Warpspeed Services,
Inc.; Modulus Technologies, Inc.; Enron Telecommunications, Inc.; Datasystems Group, Inc.; Omicron Enterprises,
Inc.; EFS I, Inc.; EFS II, Inc.; EFS III, Inc.; EFS V, Inc.; EFS VI, L.P.; EFS VII, Inc.; EFS IX, Inc.; EFS X, Inc.;
EFS XII, Inc.; EFS XV, Inc; EFS XVII, Inc.; Jovinole Associates; EFS Holdings, Inc.; Green Power Partners I LLC;
TLS Investors, LLC; ECT Securities Limited Partnership; ECT Securities LP Corp.; Enron International Asset
Management Corp.; Enron Brazil Power Holdings XI Ltd.; Enron Holding Company LLC; Enron Development
Management Ltd.; Enron International Korea Holdings Corp.; Enron Caribe VI Holdings Ltd.; Enron International
Asia Corp.; Enron Brazil Power Investments XI Ltd.; Paulista Electrical Distribution, LLC; Enron Pipeline
Construction Services Company; Enron Pipeline Services Company; Enron Trailblazer Pipeline Company; Enron
Liquid Services Corp.; Enron Machine and Mechanical Services, Inc.; Enron Permian Gathering Inc.; Transwestern
Gathering Company; Enron Gathering Company; EGP Fuels Company; Enron Asset Management Resources, Inc.;
Enron Brazil Power Holdings I Ltd.; Enron do Brazil Holdings Ltd.; Enron Renewable Energy Corp.; Enron
Acquisition III Corp.; EFS IV, Inc.; EFS VIII, Inc.; EFS XIII, Inc.; Enron Credit Inc.; Richmond Power Enterprises,
L.P.; ECT Strategic Value Corp.; Atlantic Commercial Finance, Inc.; ET Power 3 LLC; Nowa Sarzyna Holding
B.V.; Enron South America LLC; Enron Global Power & Pipelines LLC; Cabazon Power Partners LLC; Cabazon
Holdings LLC; Victory Garden Power Partners I LLC; Oswego Cogen Company, LLC;  and Enron Equipment
Procurement Company.

over 9,400 ballots aggregating approximately $26.6 billion were cast and included in the Vote

Certification, with each Class in which ballots were cast (excluding PGH) voting to accept the

Plan. (Debtors' Trial Ex. 19 at Ex. F).

All Classes of impaired Claims and Equity Interests either have accepted the Plan or will

receive fair and equitable treatment in accordance with section 1129(b) of the Bankruptcy Code.

(Debtors' Trial Ex. 1, § 29.3; Bingham Affidavit ¶ 79).

On May 7, 2004, the Court approved the following stipulations regarding temporary

allowance of claims (the "Voting Stipulations"):

(a)     Stipulation and Order Regarding Temporary Allowance of Bank of Tokyo-
        Mitsubishi, Ltd. claims for voting purposes. (Docket No. 18273).

(b)     Stipulation and Order Regarding (A) Temporary Allowance of Certain Claims of
        AEP Energy Services Gas Holding Company and Houston Pipeline Company LP
        for Voting Purposes and (B) Withdrawal of the AEP Parties' Supplement to Initial
        Objection to Confirmation of the Fifth Amended Joint Plan. (Docket No. 18275).

(c)     Stipulation and Order Regarding Temporary allowance of AEP Energy Services,
        Inc. Claims for Voting Purposes. (Docket No. 18277).

(d)     Stipulation and Order Regarding Temporary Allowance of Claims Filed by
        Deutsche Trustee Company Limited. (Docket No. 18279).

(e)     Stipulation and Order Regarding Temporary Allowance of Claims of ETOL.
        (Docket No. 18280).

(f)     Stipulation and Order Regarding Temporary Allowance of Claims Filed by
        Barclays Bank PLC. (Docket No. 18281).

(g)     Stipulation and Order Regarding Temporary Allowance of Toronto Dominion
        (Texas), Inc. Claims for Voting Purposes. (Docket No. 18282).

(h)     Stipulation and Order Regarding Temporary Allowance of Claims Related to the
        E-Next Financing Transaction. (Docket No. 18283).

(i)     Stipulation and Order Regarding Temporary Allowance of Claims J. Aron &
        Company and European Power Source Company (UK) Limited for Voting
        Purposes. (Docket No. 18284).

Stipulation and Order Regarding Temporary Allowance of Reliant Claims for Voting Purposes.

(Docket No. 18285).

The CLN Noteholders objected to all of the Voting Stipulations. Such objections alleged

only that: (a) claims that are disputed on grounds similar to the CLN Claims cannot be

temporarily allowed; (b) the Debtors cannot contend that Bankruptcy Rule 3018 is unenforceable

and then temporarily allow claims under Bankruptcy Rule 9019; and (c) the Debtors engaged in

a scheme to gain additional acceptances by waiting until after the voting deadline to confirm that

Creditors voted in favor of the Plan and then agreed to temporarily allow such claims.

The CLN Noteholders did not attempt to designate any votes as being solicited or cast in

bad faith pursuant to section 1126(e) of the Bankruptcy Code. The CLN Noteholders instead

argued at the Confirmation Hearing that all votes to accept or reject the Plan should not be

counted because the Debtors acted in bad faith with respect to Voting Stipulations and certain

other stipulations that affect voting. The CLN Noteholders have not put forth evidence sufficient

to support their allegations and the record in these cases clearly refutes any such allegations.

The CLN Noteholders were the only parties that litigated the temporary allowance of

claims in Classes 5 and 185. In accordance with the Voting Procedures Order and a Fiduciary

Stipulation entered with respect to such claims, the CLN Noteholders were entitled to submit

provisional ballots pending determination of their entitlement to vote. (Debtors' Trial Exs. 3 and

20). Of the provisional ballots cast by all holders of Yosemite and Credit-Linked Notes, of

which the CLN Noteholders are some, (a) 89 accepting votes were cast in Class 5 in the

aggregate amount of $549,440,162.50, (b) 104 rejecting votes were cast in Class 5 in the

aggregate amount of $1,315,861,765.55, (c) 50 accepting votes were cast in Class 185 in the

aggregate amount of $339,987,249.50, and (d) 62 rejecting votes were cast in Class 185 in the

aggregate amount of $764,181,540.55.  (Debtors' Trial Ex. 19).

Prior to resolution of the temporary allowance requests with respect to the CLN

Noteholders' claims (the "CLN Claims"), an order was entered providing that, if the CLN

Claims were temporarily allowed to vote on the Plan, holders of notes related to the Mahonia

Financing Transaction would also be entitled to vote on the Plan.  (Docket No. 16739).

Accordingly, holders of claims related to the Mahonia Financing Transaction submitted

provisional ballots.  Thereafter, the holders of these claims entered into a stipulated order to vote

these claims in favor of the Plan in the event these claims were temporarily allowed for voting

purposes.  (Docket No. 18650).  Of the provisional ballots cast by the holders of notes related to

the Mahonia Financing Transaction, two (2) accepting votes were cast in Class 5 in the aggregate

amount of $939,832,064.00 and two (2) accepting votes were cast in Class 185 in the aggregate

amount of $1,377,774,191.00.  (Debtors' Trial Ex. 19).

Based on the information set forth on Exhibits E and F to the Vote Certification, even if

the Court had temporarily allowed the claims of all holders of Yosemite and Credit-Linked Notes

for voting purposes, Classes 5 and 185 would still have voted to accept the Plan.  Including these

votes, without consideration of votes cast in connection with the Mahonia Financing Transaction,

would have resulted in Class 5 having accepting votes representing 70.16% of the dollar amounts

voted and 92.04% numerosity and Class 185 having accepting votes representing 72.30% of the

dollar amounts voted and 60.78% numerosity.  (Debtors' Trial Ex. 19).  Inclusion of votes on

behalf of holders of claims related to the Mahonia Financing Transaction would have further

increased the acceptance rates for both of these Classes.  (Debtors' Trial Ex. 19).

On May 24, 2004, the Court rendered its decision with respect to the request of the

holders of Yosemite and Credit-Linked Notes for temporary allowance of their claims for voting

purposes. As set forth in the recitation of decision on the record of May 24, 2004, the Court

ruled that:

(a)     As of the Petition Date, the claims of the holders of Yosemite and Credit-Linked
        Notes were held by defendants in the MegaClaim Litigation. (May 24, 2004
        Transcript at page 25). The holders of Yosemite and Credit-Linked Notes took
        the Disputed Claims subject to the Debtors' section 502(d) objections. (5/24/04
        Hearing Tr. at 24).

(b)     In light of the objections raised by the Debtors and the extensive findings by the
        ENE Examiner, the holders of Yosemite and Credit-Linked Notes had the burden
        of proof to present sufficient evidence that they have colorable claims capable of
        temporary allowance. (5/24/04 Hearing Tr. at 17).

(c)     After considering all of the evidence in the record as well as applicable pleadings,
        adversary proceedings, answers and other filings with the Court, the holders of
        Yosemite and Credit-Linked Notes provided no argument in defense of the claims
        in the MegaClaim Litigation against Citibank that would undermine the basis for
        the section 502(d) objection. The holders of Yosemite and Credit-Linked Notes
        have failed to establish any basis under Bankruptcy Rule 3018 to temporarily
        allow their alleged claims to vote in full or in part based upon any other
        considerations. (5/24/04 Hearing Tr. at 27).

The claims of the holders of Yosemite and Credit-Linked Notes were temporarily allowed for

purposes of voting in the amount of zero dollars and the Court would issue its opinion as to

whether equitable subordination constitutes a proper claims objection upon (a) notification by

May 27, 2004 that a bond or cash-equivalent collateral in the amount of $350 million had been

posted to secure the Debtors' interests in the claims against Citibank in the MegaClaim

Litigation, and (b) the request of the holders of Yosemite and Credit-Linked Notes by May 27,

2004 that the Court reconsider their temporary allowance motions. (5/24/04 Hearing Tr. at 27 –

29).

The due process rights of the holders of Yosemite and Credit-Linked Notes with regard to

temporary allowance of their claims have been protected throughout the temporary allowance

process.  The holders of Yosemite and Credit-Linked Notes filed several pleadings related to

temporary allowance, hearings were held to consider the merits of arguments raised therein, and,

at the conclusion of the May 24, 2004 hearing, the Court allowed the holders of Yosemite and

Credit-Linked Notes to further pursue temporary allowance of their claims provided a bond or

cash equivalent collateral in the amount of $350 million was posted by May 27, 2004.  (5/24/04

Hearing Tr. at 27 – 29; Docket No. 18711).  The holders of Yosemite and Credit-Linked Notes

did not post this collateral.

Pursuant to an order, dated May 27, 2004, the Court memorialized its May 24, 2004

decision and denied the request of the holders of Yosemite and Credit-Linked Notes to have their

claims temporarily allowed for voting purposes as claims in Classes 5 and 185 of the Plan.

(Docket No. 18711).

Innisfree provided a true and accurate certification of the vote.  No evidence was

submitted by any objector to rebut the accuracy of the Vote Certification.

Counsel for the Debtors announced certain technical and immaterial modifications to the

Plan at the Confirmation Hearing.  (Confirmation Hearing Tr. *passim*).  Some of these

modifications were filed and served on June 1, 2004 (Docket No. 18793; Affidavit of Service

Docket No. 18960, dated June 8, 2004).  Such modifications will have no impact on the

treatment of any claims and interests and thus, pursuant to Bankruptcy Rule 3019, all

acceptances of the Plan are deemed acceptances of the Plan as modified at the Confirmation

Hearing.  (Bingham Affidavit ¶ 73).

**B. The Global Compromise**

*1). History of Negotiations Leading Up To Global Compromise*

In accordance with the Court's orders, Cooper LLC was retained by all Debtors to
provide and perform management services on the terms and conditions set forth in such
agreement. (Docket No. 2725). Mr. Cooper testified his fiduciary duties and responsibilities
were owed to each of the Debtors' estates. (6/8/04 Cooper Tr. at 17:25 – 18:2).

In addition to being a member of Cooper LLC, Stephen Cooper is a founding member of
Zolfo Cooper, LLC ("ZC"), an affiliate of Cooper LLC. (Docket No. 1497).[15] ZC has provided
crisis management and restructuring services to troubled companies since 1982. (Docket No.
1497). On September 5, 2002, all of the membership interests of Zolfo Cooper Management,
LLC and Zolfo Cooper Capital, LLC were transferred to ZC. (Docket No. 7686). The members
of ZC then transferred all of the membership interests in ZC to Kroll, Inc., a publicly traded
Delaware corporation. (Docket No. 7686). As a result, ZC became a wholly owned subsidiary
of Kroll, Inc. and subsequently changed its name to Kroll Zolfo Cooper, LLC. (Docket No.
8058). Kroll, Inc. did not purchase the membership interests of Cooper LLC, however, through a
series of agreements, Kroll, Inc. became the beneficial recipient of all proceeds paid to Cooper
LLC. (Docket No. 8058).

In November 2001, the Debtors retained The Blackstone Group ("Blackstone") as their
financial advisors to assist in the evaluation of restructuring alternatives and options. In
December 2001, the Debtors asked Blackstone to develop an approach for the structuring of a
chapter 11 plan. (Debtors' Trial Ex. 24 at 8).

---

[15] ZC subsequently changed its name to Kroll Zolfo Cooper, LLC.

Mr. Cooper saw as his primary fiduciary duty maximizing the value of the Debtors'
estates in the aggregate so that value could also be maximized on an individual Debtor basis.
(6/9/04 Cooper Tr. at 62:13 – 18).  Shortly after Mr. Cooper was retained by the Debtors in
February 2002, he made clear to the Creditors' Committee that he intended to work in an open
and productive manner with them to maximize value for all economic stakeholders.  (6/8/04
Cooper Tr. at 27:3 – 18).

Because these Chapter 11 Cases raise numerous complex issues arising principally from
the interrelationships among the Debtors and their approximately 2,400 subsidiaries, these
interrelationships required examination of the Debtors' respective liabilities, rights to assets,
extensive intercompany claims and varying degrees of entanglement.  (Bingham Affidavit ¶ 13,
6/8/04 Cooper Tr. at 27:19 – 28:9).  To prevent these issues from posing a barrier to the efficient
conclusion of these Chapter 11 Cases, the Debtors and the Creditors' Committee determined that
a resolution was necessary if a chapter 11 plan for any Debtor were to succeed and before any
distribution to Creditors could be made.  (Bingham Affidavit ¶ 13; 6/8/04 Cooper Tr. at 32:22 –
33:10).

The Debtors' efforts to negotiate the global compromise and the Plan were aimed at
maximizing Creditors' recoveries and minimizing the risks and costs of litigation.  (Bingham
Affidavit ¶ 11).  There was no need for the Debtors to negotiate with and among each other
because of various other mechanisms in place – including, but not limited to, the Distribution
Model, the postpetition overhead allocation formula and the Bankruptcy Transaction Review
Committee (the "BTRC").  (6/8/04 Cooper Tr. at 18:3 – 19:11, 26:10 – 27:2; Debtors' Trial Ex.
24 at 23, 130 – 156; 6/7/04 Zelin Tr. at 20:25 – 21:23).  These mechanisms helped to ensure
fairness and reasonableness between and among the various Debtor estates.  Moreover, the

Creditors' Committee and its advisor – who represented the economic stakeholders of all of the

Debtors – were involved in formulation of the Plan. (6/8/04 Cooper Tr. at 27:3 – 5; Bingham

Affidavit ¶¶ 14, 16; 6/4/04 Bingham Tr. at 26:2 – 10). There was a very wide range of views

amongst the members of the Creditors' Committee as to whether the global compromise should

include a 0/100 or a 100/0 distribution formula reflecting a resolution of a variety of inter-estate

issues, including substantive consolidation. (6/8/04 Cooper Tr. at 117:24 – 118:6).

    Given the diverse creditor body and the many complex issues posed by these Chapter 11

Cases and mindful of their respective fiduciary duties to Creditors, the Debtors and the

Creditors' Committee engaged in intensive analysis and spirited discussions and debate

regarding the terms of a chapter 11 plan and related matters. (Bingham Affidavit ¶ 14; 6/4/04

Bingham Tr. at 52:24 – 53:15; 6/8/04 Cooper Tr. at 28:10 – 23; 5/16/02 Hearing Tr. at 164 – 72).

    The discussions or negotiations with the Creditors' Committee began as early as February

2002. (6/9/04 Cooper Tr. at 85:15 – 17). These negotiations involved discussions on a variety of

issues that led to the development of the Plan, including (a) maximizing value to Creditors,

(b) resolving issues regarding substantive consolidation and other inter-estate and inter-creditor

disputes, and (c) facilitating an orderly and efficient distribution of value to Creditors. (Bingham

Affidavit ¶ 14). The Plan and the global compromise and settlement embodied therein represent

the culmination of these efforts, which included the joint substantive consolidation analysis

discussed below. (Bingham Affidavit ¶ 14).

    Commencing in February 2002, Mr. Bingham began to interface with representatives of

Blackstone to discuss the formulation of a computerized model to synthesize estimates and

projections regarding assets and liabilities, as well as to calculate Creditor recoveries under a

chapter 11 plan depending on various assumptions and variables. (Bingham Affidavit ¶ 15;

6/7/04 Zelin Tr. at 21:3 – 23; 6/3/04 a.m. Bingham Tr. at 67:18 – 68:6).  Blackstone devised the

Distribution Model, which is described in Appendix C of the Disclosure Statement.  (Debtors'

Trial Ex. 8; 6/7/04 Zelin Tr. at 27:23 – 26:4; Debtors' Trial Ex. 24 at 23, 130 – 156; Bingham

Affidavit ¶ 15).  Mr. Zelin, the Debtors' expert, has supervised the creation of financial models

in many other chapter 11 cases.  (6/7/04 Zelin Tr. at 20:8 – 16).  The Distribution Model has

been extensively diligenced by the Debtors, the Creditors' Committee and its advisors and the

ENA Examiner and his professionals.  (6/7/04 Zelin Tr. at 25:16 – 26:11; Debtors' Trial Ex. 24

at 23).  Moreover, the well-diligenced Distribution Model allowed the Debtors to evaluate the

various potential inter-estate issues that might exist and determine the economic consequences of

various positions and the potential impact on creditor recoveries.  (Debtors' Trial Ex. 24 at 132).

On October 29, 2002, the Debtors made a presentation to the Creditors' Committee

regarding a plan structure, which considered a variety of scenarios.  (Bingham Affidavit ¶ 16;

Debtors' Trial Ex. 13).  Between October 29, 2002 and January 15, 2003, the Debtors and their

professionals and professionals for the Creditors' Committee met three or four times to further

analyze the Distribution Model in connection with the development of the Plan.  (6/4/04

Bingham Tr. at 26:2 – 16).

On January 15, 2003, the Debtors made a presentation to the Creditors' Committee

suggesting an approach to consider the treatment of Claims and the mechanics of distributions.

(Bingham Affidavit ¶ 16; Debtors' Trial Ex. 14).  The Debtors and the Creditors' Committee

continued to engage in substantive discussions regarding the outlines of a plan and subsequently

agreed to a 30/70 distribution formula included in the global compromise and the Plan to resolve

a variety of inter-estate issues, including substantive consolidation.  (Bingham Affidavit ¶ 16).

Thereafter, the Debtors and their professionals met with the professionals of the Creditors'
Committee on a weekly basis.  (6/4/04 Bingham Tr. at 26:12 – 16).

Consistent with the expanded role of the ENA Examiner as plan facilitator for the ENA
Creditors, the ENA Examiner and his professionals were also involved in the Plan negotiations
on behalf of stakeholders of ENA and its subsidiaries, particularly those stakeholders that held
guaranties issued by ENE and other entities.  (6/8/04 Cooper Tr. at 30:15 – 31:16).

On February 14, 2003, the Debtors made a detailed presentation to the ENA Examiner
and certain Creditors of ENA and its subsidiaries, which represented a cross-section of Creditors
(including traders, insurers and institutional investors), with respect to the concepts underlying
the global compromise embodied in the Plan.  (Bingham Affidavit ¶ 16; Debtors' Trial Ex. 15).

Attendees at the February 14, 2003 meeting included either principals or counsel for the
CLN Noteholders, specifically Mr. David Tepper of Appaloosa and Ms. Hollace Cohen, counsel
for Vanguard.  Confidential information was provided to attendees at this meeting that would not
have been provided unless the parties had signed confidentiality agreements.  (6/4/04 Bingham
Tr. at 18:10 – 15, 20:11 – 22:20).

The ENA Examiner's report stated that the confidentiality agreement was executed
before the end of January 2003, and that for several months before that the Debtors had
numerous meetings and conversations with the ENA Examiner and his professionals to review
the Debtors' proposed structure for a plan and that the Debtors provided written materials to the
ENA Examiner even prior to the execution of the confidentiality agreement.  (2/10/03 ENA
Examiner's Report, at 5 – 7).

Using estimated claims and asset values available at that time, the presentation included a
broad spectrum of potential estimated creditor recoveries using approximately fifteen (15)

different sets of assumptions regarding a number of inter-estate issues. The alternative scenarios were provided to demonstrate the disparity of results depending upon the ultimate resolution of these contested issues. The presentation explained the need for a consensual resolution of certain inter-estate issues to conserve the resources of the Debtors' estates and maximize returns to Creditors. (Bingham Affidavit ¶ 16).

At the February 14, 2003 meeting, the Debtors proposed a distribution calculation based on 30% of the recovery under a substantive consolidation scenario and 70% of the recovery based on a non-consolidation scenario. (Debtors' Trial Ex. 15 at 23). On May 7, 2003, the ENA Examiner made a counter-proposal to the Debtors and the Creditors' Committee. (Bingham Affidavit ¶ 17; Debtors' Trial Ex. 16). Rather than the 30/70 distribution formula suggested by the Debtors and the Creditors' Committee, in the May 7, 2003 presentation, the ENA Examiner advocated a 10/90 formula. In addition, the counter-proposal advocated, among other proposals, a reallocation of certain assets to ENA. (Bingham Affidavit ¶ 17; Debtors' Trial Ex. 16). On May 30, 2003, the ENA Examiner made another counter-proposal raising a number of additional concerns. (Bingham Affidavit ¶ 18; Debtors' Trial Ex. 17). On May 30, 2003, the Debtors and the Creditors' Committee issued an analysis of the ENA Examiner's May 7, 2003 counter-proposal. (Bingham Affidavit ¶ 19; Debtors' Trial Ex. 18).

In the summer of 2003, the Debtors and the Creditors' Committee reached a compromise with the ENA Examiner, which was incorporated into the Initial Plan filed on July 11, 2003, along with the disclosure statement filed in connection therewith. (Bingham Affidavit ¶ 20). As reflected in the Initial Plan, as modified by, the First Amended Plan, these terms included:

(a)     Recoveries to Creditors holding Allowed Unsecured Claims would be equal to 30% of their recoveries in a modified substantive consolidation scenario plus 70% of their recoveries in a scenario where there is no consolidation;

    (b)    Holders of Allowed Guaranty Claims would be entitled to participate in the modified substantive consolidation scenario to the extent of 50% of their Allowed Guaranty Claims (rather than the 0% that a holder of an Allowed Guaranty Claim might otherwise receive in a complete substantive consolidation scenario);

    (c)    The net economic equity value of the following assets attributed to ENE on the Debtors' books and records would be reallocated for the benefit of ENA and its Creditors –

        (i)    the value attributable to Enron Canada,

        (ii)    50% of the value attributable to CPS, and

        (iii)    the value attributable to Bridgeline Holdings;

    (d)    Distributions to Creditors on account of their Allowed Unsecured Claims would be made from a common currency of pooled assets, except that holders of Allowed Unsecured Claims Against ENA and certain of its subsidiaries would be entitled to receive Cash in lieu of up to $125 million in Plan Securities; and

    (e)    The ENA Examiner would be consulted with respect to one of the five Persons and the Creditors' Committee would be consulted with respect to four of the five Persons to be appointed by the Debtors to the Board of Directors of Reorganized ENE and, to the extent that the Litigation Trust and Remaining Asset Trusts are created, the Litigation Trust Board and the Remaining Asset Trust Boards.

(Debtors' Trial Ex. 2, § I.B.1.c.).

At that time, the ENA Examiner executed and delivered a letter agreement, dated July 10, 2003, wherein he informed the Debtors and the Creditors' Committee that he believed the compromises and settlements incorporated into the Initial Plan were reasonable and that the economic treatment to Creditors of ENA and its subsidiaries was fair and worthy of being accepted by such Creditors. (Bingham Affidavit ¶ 20). As acknowledged by Appaloosa in its Objection to the Motion of The Baupost Group, L.L.C. and Racepoint Partners, L.P. for an Order Directing the Appointment of an Examiner to Investigate and Report on (1) the Fairness to the Estate and Creditors of Enron Corp. of the Proposed Settlement Between Enron Corp. and Enron North America Corp. That is Contained in the Debtors' Joint Plan and (2) Related Matters, filed in August 2003, the ENA Examiner became an active participant in the plan formulation process

as a fiduciary for the ENA estate.  (Docket No. 12523 at 10, 15 – 16).  Appaloosa and Angelo

Gordon further asserted that

> [t]he Committee and the Debtors have conducted an exhaustive investigation of
> substantive consolidation issues, again at considerable expense to the estates.  The
> plan formulation process undertaken by the Debtors and the Committee began
> nearly a year ago and, since January 2003, included the extensive efforts of the
> ENA Examiner, producing a fragile consensus through a difficult, protracted
> negotiation.

(Docket No. 12523 at 10).  Moreover, the objection recognized that the plan negotiation process

directed by the Court "produced a negotiated consensus among the Debtors, the [Creditors']

Committee and the ENA Examiner concerning complex issues. . . ."  (Docket No. 12523 at 3 – 4;

6/17/04 Draft Hearing Tr. at 172 – 74).  Vanguard similarly objected to the relief requested by

Baupost and stated that the Baupost motion was

> a blatant and belated attempt by Baupost to delay and derail confirmation of the
> thoroughly negotiated and well vetted Joint Plan and the fair and carefully crafted
> compromises contained therein, regardless of the harm that would be caused to
> the Debtors and their creditors from the inherent cost and delay if the relief
> requested [by Baupost] were granted.

(Docket No. 12526 at 3).

    In October 2003, the ENA Examiner notified the Court, the Debtors and the Creditors'

Committee that he was withdrawing his support for the Initial Plan and the First Amended Plan

due to certain misunderstandings between the ENA Examiner, on the one hand and the Debtors

and the Creditors' Committee, on the other hand, regarding the terms of the global compromise,

including, among others, (a) whether and to what extent the Debtors intended to challenge Enron

Guaranty Claims held by Creditors of ENA and its subsidiaries on the basis of constructive

fraudulent conveyances, and (b) the allocation of ownership of certain affirmative claims and

causes of action that may be commenced by or on behalf of the Debtors' estates against third

parties.  (Bingham Affidavit ¶ 22).

In an effort to preserve the global compromise, the Debtors, the Creditors' Committee and the ENA Examiner resumed discussions and negotiations over the terms of a joint chapter 11 plan in October and November 2003. At that time, the parties could not reach a mutual understanding and, on November 13, 2003, the Debtors, with the support of the Creditors' Committee, but without the support of the ENA Examiner, filed the Second Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Second Amended Plan"), as well as the disclosure statement filed in connection therewith. (Bingham Affidavit ¶ 22). The ENA Examiner objected to the disclosure statement for the Second Amended Plan. (Docket No. 14085). On November 13, 2003, the Debtors and the Creditors' Committee filed a joint reply to the ENA Examiner's objection. (Docket No. 14181).

After the filing of the Second Amended Plan on November 13, 2003, the Court convened a chambers' conference among the Debtors, Creditors' Committee, ENA Examiner and their respective professionals and strongly urged the parties to continue to attempt to achieve a global resolution satisfactory to the Debtors, the Creditors' Committee and the ENA Examiner. (Bingham Affidavit ¶ 23). Following additional negotiations, on December 5, 2003, the Debtors, the Creditors' Committee and the ENA Examiner agreed to modify certain provisions of the previous global compromise. (Bingham Affidavit ¶ 23). These modifications were incorporated in the Debtors' Third Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Third Amended Plan"), filed on December 17, 2003, along with the disclosure statement filed in connection therewith. (Bingham Affidavit ¶ 23).

On January 4, 2004, the Debtors filed the Fourth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Fourth Amended Plan") and disclosure statement (Docket Nos. 15153 and 15154 ) filed in connection therewith.

The Fourth Amended Plan addressed certain objections that had been interposed to the adequacy

of the information contained in the disclosure statement and Third Amended Plan.  (Bingham

Affidavit ¶ 24).  The evolution of the Plan terms and the extensive negotiations and discussions

between the ENA Examiner, the Creditors' Committee and the Debtors is further evidenced by

the periodic reports filed by the ENA Examiner regarding the status of the chapter 11 plan

developments and recommendations related to exclusivity.  (Docket Nos. 5415, 7539, 9181,

10577, 15193 and 18167).  In particular, the report filed on or about January 5, 2004 (Docket No.

15193) contains the ENA Examiner's recitation of the circumstances and events related to

withdrawal of his support for the First Amended Plan.  In addition, changes and modifications to

the Plan as a result of the discussion and negotiations between the Debtors, the Creditors'

Committee, the ENA Examiner and other parties in interest are evidenced by the prior filings of

the Plan on July 11, 2003, September 18, 2003, November 13, 2003, December 17, 2003 and

January 4, 2004 (Docket Nos. 11698, 12822, 14154, 14893 and 15153) and the disclosure

statements related thereto.  (Docket Nos. 11699, 12823, 14155, 14894 and 15154).

The Plan has been proposed in good faith and not by any means forbidden by law.  The

Plan is the result of extensive arm's-length discussions, debate and/or negotiations among the

Debtors, the Creditors' Committee and the ENA Examiner.  (Bingham Affidavit  ¶ 74).

The Plan is supported by substantially all of the major economic parties in interest in the

Chapter 11 Cases, including (a) unanimous support of the Creditors' Committee, which

represents all unsecured claimholders of the Debtors' estates, (b) the various parties with whom

the Debtors negotiated settlements and which now support, or do not object to confirmation of,

the Plan, including National City Bank and Baupost Group, and (c) the ENA Examiner on behalf

of ENA's Creditors.  (Bingham Affidavit ¶ 74).  Both the Creditors' Committee and the ENA

Examiner submitted letters in support of the Plan, which were transmitted to Creditors along with their solicitation packages. (Debtors' Trial Exs. 6 and 7). No evidence was submitted by any objector sufficient to rebut the Debtors' evidence concerning the good faith, arm's-length nature of negotiations regarding the Plan.

### 2). Terms of the Global Compromise Embodied in the Plan

On May 4, 2004, the Debtors filed the Global Compromise Motion, seeking approval of the terms of the global compromise, as set forth below, which set forth the terms analyzed, discussed and debated by the Debtors, Creditors' Committee and the ENA Examiner. The various integrated elements of the global compromise (Bingham Affidavit ¶ 63) are:

(a)    Distributions to Creditors based upon a formula pursuant to which, for Creditors other than those of the Portland Debtors, distributions will be made as if holders of an Allowed Claim were given the sum of (i) 70% of the distribution such holder would receive if the Debtors, other than the Portland Debtors, were not substantively consolidated, and (ii) 30% of the distribution such holder would receive if all of the Debtors' estates, other than those of the Portland Debtors, were substantively consolidated in a hypothetical scenario, but notwithstanding this distribution formula, one-half of Allowed Guaranty Claims were included in such calculation (Bingham Affidavit ¶ 38);

(b)    The resolution of Intercompany Claims and other inter-estate issues to give holders of Allowed Intercompany Claims 70% of the distribution such Debtor would receive if the Debtors were not substantively consolidated and no distribution under the hypothetical substantive consolidation scenario;

(c)    The waiver of potential inter-Debtor remedies;

(d)    The resolution of certain asset-ownership disputes between ENE and ENA, whereby:

(i)    the net economic equity value of Enron Canada will be deemed to be an asset of ENA,

(ii)    the net economic preferred equity value of RMTC will be deemed to be an asset of ENE,

(iii)    50% of the net economic value of CPS will be deemed to be an asset of ENE and 50% will be deemed to be an asset of ENA, and

      (iv)    the net economic equity value of Bridgeline Holdings will be deemed to be an asset of ENA;

(e)    The resolution of inter-estate issues regarding rights to certain claims and causes of action, including that:

      (i)    each Debtor will retain the benefits of its single-Debtor claims or causes of action for its respective Creditors subject to the 30/70 distribution formula;

      (ii)    proceeds from avoidance actions involving two Debtors, other than those included in the definition of Litigation Trust Claims or Special Litigation Trust Claims, will be shared 50/50 between the transferor Debtor and the Debtor whose antecedent debt was satisfied. (Debtors' Trial Ex. 2, § I.B.1.c.);

      (iii)    certain significant claims and causes of action (that is, the Litigation Trust Claims and Special Litigation Trust Claims) will be deemed to be owned by ENE, subject to the 30/70 distribution formula; and

      (iv)    a portion of the distributions to be made on account of Allowed Enron Guaranty Claims resulting from recoveries on Litigation Trust Claims and Special Litigation Trust Claims will be reallocated in accordance with the following formula:  (a) 80% of such distributions will be retained by holders of such Allowed Enron Guaranty Claims and (b) 20% of such distributions will be deemed redistributed to holders of General Unsecured Claims, if any, against the subsidiary Debtor that is the primary obligor corresponding to such Allowed Enron Guaranty Claims; provided, however, that, to the extent a holder of an Allowed Enron Guaranty Claim also holds a General Unsecured Claim for the primary obligation against the subsidiary Debtor, such General Unsecured Claim will be excluded from the redistribution under part (b); and

(f)    Creation of Plan Currency—a blend of Creditor Cash and the equity interests of Prisma, PGE and CrossCountry—to pay General Unsecured Claims against each Debtor's estate.

### 3).  Factors Supporting the Global Compromise and Substantive Consolidation

From mid-2002 and continuing into 2003, the Debtors and the Creditors' Committee undertook a diligence process to ascertain whether substantive consolidation would be an appropriate remedy for some or all of the Debtors in these Chapter 11 Cases.  (Bingham Affidavit ¶ 33; 6/3/04 p.m. Bingham Tr. at 71:19 – 72:3).  In that regard, the Debtors and their professionals, as well as the Creditors' Committee and its professionals, each undertook an

evaluation of the merits of substantive consolidation from both a legal and a business standpoint. (6/8/04 Cooper Tr. at 27:23 – 28:9). The Debtors and the Creditors' Committee, together with their professionals, separately reviewed and considered the Debtors' books and records, public filings, key contracts and other documents, as well as the facts and legal theories underlying various related inter-estate issues (Bingham Affidavit ¶ 33; 6/3/04 Bingham Tr. at 71:10 – 72:10) and conducted numerous joint interviews of current and former employees, analyzed the relevant legal standards and evaluated the relationships between certain of the Debtors and their largest Creditors. (Bingham Affidavit ¶ 33). The Debtors and the Creditors' Committee concluded that, for each of the Debtors, there are relevant facts weighing both for and against substantive consolidation. (Bingham Affidavit ¶ 34). Appendix M to the Disclosure Statement summarizes the conclusions reached by the Debtors and the Creditors' Committee as a result of their diligence. (Debtors' Trial Ex. 10).

The Debtors considered numerous factors relevant to the issue of substantive consolidation for each Debtor, including, but not limited to, the following:

(a)    Many of the Debtors' financial transactions and statements have been found fraudulent, avoidable or misstated by numerous investigators, including court-appointed examiners and governmental task forces;

(b)    Each of the Debtors was able to prepare and file separate Schedules listing their prepetition assets and liabilities;

(c)    Separate books and records were maintained for each of the Debtors prepetition;

(d)    Prepetition, a consolidated federal tax return was filed that included most of the Debtors, but, to the extent applicable, individual state tax returns were prepared and filed for each of the Debtors;

(e)    Prepetition, each of the Debtors observed corporate formalities including conducting periodic board meetings and annual shareholder meetings; other than the meetings held for ENE, the vast majority of these meetings were by written consent, rather than through in-person meetings involving debate and discussion;

49

(f)     For substantially all of the Debtors, overlap existed as to the officers and directors of each Debtor and the officers and directors of other Debtors;

(g)     Substantially all of the Debtors directly or indirectly participated in the centralized cash management system maintained by ENE prepetition;

(h)     Substantially all of the Debtors received direct or indirect prepetition credit support from ENE through intercompany loans (whether directly to the Debtor or indirectly to the Debtor through the Debtor's parent(s)), guaranties, indemnities, total return swaps or other means of support;

(i)     With very few exceptions, prior to the Initial Petition Date, none of the Debtors disseminated financial information to Creditors or potential creditors or otherwise made such information available other than the consolidated financial statements for ENE and its subsidiaries;

(j)     Of the Debtors, ENE was the only entity with a credit rating by the major domestic rating agencies and ENA became unable to continue its business operations upon the downgrade of ENE's credit rating;

(k)     Although some costs were allocated to subsidiaries, prepetition, ENE absorbed substantial overhead costs for most (if not all) of the Debtors;

(l)     Substantially all of the Debtors utilized ENE's centralized services for risk management, insurance procurement, legal, benefits and similar services;

(m)     Although the internal transaction approval process for all of the Debtors did not expressly require approval of the board of the entity engaged in the transaction, it did require, depending on the dollar amount and type of transaction, approval by the head of the applicable business unit (who might not be an officer or director of that entity), the head of the applicable business segment (who might not be an officer or director of that entity), the Office of the Chair of ENE and/or the Board of Directors of ENE; and

(n)     The Debtors' accounting policies permitted non-cash settlements and novations of intercompany obligations by allowing subsidiaries to either (i) transfer their intercompany receivables owed by other subsidiaries to ENE, in exchange for a receivable from ENE or (ii) transfer their intercompany payables owed to other subsidiaries to ENE with ENE assuming the obligation, in exchange for a payable owed by the subsidiary to ENE.  After the completion of a non-cash settlement, the entity with the original payable would have a payable to ENE and ENE would have a payable to the other subsidiary.  The entity with the original receivable from a subsidiary of ENE would have a receivable from ENE.

(Bingham Affidavit ¶ 34; Debtors' Trial Ex. 10).

50

Based upon the Debtors' review, at least one of the foregoing factors that would support

substantive consolidation is present for each one of the Debtors, other than the Portland Debtors.

(6/4/04 Bingham Tr. at 38:7 – 19; Debtors' Trial Ex. 10).  In addition, there was extensive

entanglement between some or all of the Debtors arising principally from Intercompany Claims,

as summarized in Appendix N of the Disclosure Statement and in the Blackstone Report.

(Debtors' Trial Ex. 11; Debtors' Trial Ex. 24 at 152).  A prime example of such entanglement is

the fact that ENA is ENE's single largest Creditor and ENA's Claim against ENE is ENA's

single largest asset.  (Bingham Affidavit ¶ 35).  Similar intercompany entanglement exists

among Debtors within particular business units, such as Retail Services and the Wind businesses

and often extends to include ENE because the business units often operated on a negative cash

flow basis and relied heavily on significant cash infusions from ENE (recorded by both Debtors

as intercompany loans) to maintain their business operations.  (Bingham Affidavit ¶ 35).

In addition to entanglement issues, the evidence indicates that at least some Creditors

may have dealt with the Debtors as a single economic unit.  For example, the Debtors did not

issue separate financial statements, but relied, instead, on ENE's consolidated financial

statements in dealing with creditors.  (Bingham Affidavit ¶ 36).  Similarly, although the CLN

Noteholders have alleged that they hold among the largest claims against ENA, the transactions

surrounding issuance of the Yosemite and Credit-Linked Notes were marketed based on the

creditworthiness of ENE, not ENA.  (Debtors' Trial Ex. 10).  In particular, the terms of such

transactions provided that upon an event of default, which included ENE's bankruptcy filing,

senior unsecured obligations of ENE (not ENA) would be delivered to the relevant indenture

trustee for the Yosemite and Credit-Linked Note trusts.  (Debtors' Trial Ex. 2, § III.F.51; Proof

of Claim No. 11735).  Although the CLN Noteholders oppose the global compromise regarding

substantive consolidation, they have adduced no evidence to show that any Creditor of ENA
relied on the separate creditworthiness of ENA.

The downgrade of ENE's credit ratings following the events in the Fall of 2001 also
negatively impacted the other Debtors' ability to obtain credit and meet their financial
obligations.  Similarly, ENA's ability to continue its trading operations was adversely affected
by ENE's credit downgrades.  (Bingham Affidavit ¶ 36).  As a result, the Debtors concluded that
a compromise of the issue of substantive consolidation would be appropriate and fair from the
vantage point of Creditors' expectations.  (Bingham Affidavit ¶ 36).  The overwhelming
incidence of common facts relevant to this analysis provides the basis for inclusion of all the
Debtors (other than the Portland Debtors) in the global compromise.  (Bingham Affidavit ¶ 37;
Debtors' Trial Ex. 10).

The 30/70 distribution formula is not a precise mathematical quantification of the
likelihood of substantive consolidation of each Debtor into each of the other Debtors, which
would be impossible to calculate.  Rather, the formula represents a negotiated compromise of
numerous inter-estate issues, including substantive consolidation.  (Bingham Affidavit ¶ 38).
The 30/70 distribution formula is an integral element of the global compromise and it cannot be
separated from the other elements in the compromise.  (6/9/04 Cooper Tr. at 55:24 – 56:14;
6/3/04 p.m. Bingham Tr. at 162:13 – 17; Bingham Affidavit ¶ 63).  Creditors, such as those of
EPMI and ENA, benefit from the global compromise because the pooling of claims under the
30% scenario reduces the impact of liability on an individual estate as a result of potentially
massive claims, such as those relating to alleged market manipulation.  Therefore, the 30%
scenario ensures that any such liability is spread among the Debtors.  (6/8/04 Cooper Tr. at 84:4
– 21; Proof of Claim No. 12172; Bingham Affidavit ¶ 38).  No evidence was submitted by any

objector to sufficiently rebut the Debtors' evidence concerning the factors relating to the global

compromise as it relates to issues of substantive consolidation.

*4). Guaranty Claims and the Global Compromise*

As an integral part of the global compromise and its settlement of inter-estate issues, for

purposes of calculating recoveries, Guaranty Claims are included in the substantive consolidation

scenario at 50% of the amount that would be allowed in the stand-alone scenario. (Debtors'

Trial Ex. 24 at 153). Guaranty Claims are thereby treated better than the 30/70 formula would

otherwise treat them because the 30% component would yield a zero distribution on a guaranty

in a substantive consolidation scenario. Section 28.2 of the Plan provides an option to

compromise and settle any constructive fraudulent transfer actions that have already been

commenced, or for which Debtors have executed a tolling agreement, with respect to Claims

against ENE predicated upon guaranties issued, amended, or replaced during the one-year period

preceding the Initial Petition Date. (Debtors' Trial Ex. 1, § 28.2). Creditors whose Claims have

been challenged on these grounds have the opportunity to accept a discount to the allowed

amount of such Claims at varying percentages based upon the proximity of the execution of the

guaranty to the Initial Petition Date. (Debtors' Trial Ex. 1, § 28.2). No evidence was submitted

by any objector sufficient to rebut the Debtors' evidence concerning the treatment of Guaranty

Claims under the global compromise embodied in the Plan and set forth in the Global

Compromise Motion.

*5). Intercompany Claims and the Global Compromise*

As an integral part of the global compromise and its settlement of inter-estate issues,

except with respect to the Portland Debtors, the Debtors holding Allowed Intercompany Claims

(that is, accounts and notes owed by one Debtor to another Debtor) will receive 70% of the

distribution such Debtor would receive if the Debtors were not substantively consolidated.

(Bingham Affidavit ¶ 47; 6/7/04 Zelin Tr. at 218:7 – 14, 266:7 – 13).  As the 30% scenario is

based on the hypothetical substantive consolidation of all Debtors (excluding the Portland

Debtors), no distribution will be made on Intercompany Claims under this scenario.  (Bingham

Affidavit ¶ 47; Debtors' Trial Ex. 1, §§ 1.157, 2.1).

The Debtors' accounting policies permitted non-cash settlements of intercompany

obligations by allowing subsidiaries to either (1) transfer their intercompany receivables owed by

other subsidiaries to ENE, in exchange for a receivable from ENE, or (2) transfer their

intercompany payables owed to other subsidiaries to ENE with ENE assuming the obligation, in

exchange for a payable owed by the subsidiary to ENE.  After the completion of a non-cash

settlement, the entity with the original payable would have a payable to ENE and ENE would

have a payable to the other subsidiary.  The entity with the original receivable from a subsidiary

of ENE would have a receivable from ENE.  (Bingham Affidavit ¶ 46).

Because of the scope and breadth of the intercompany transactions between the Debtors,

there is some degree of inescapable entanglement.  (Debtors' Trial Ex. 11).  For example, ENA

holds the single largest claim against ENE and ENA's Claim against ENE is ENA's single

largest asset.  (Bingham Affidavit ¶ 35; 6/9/04 Cooper Tr. at 107:25 – 108:3; 6/7/04 Zelin Tr. at

78:15 – 80:3).  However, the entanglement is not "hopeless" in that the Debtors believe that,

with sufficient time and resources, substantially all the material  entries to the intercompany

accounts could be reviewed, evaluated and potential challenges identified.  (Bingham Affidavit

¶ 47).

The Intercompany Claims that would be allowed pursuant to the global compromise

result from millions, if not hundreds of millions, of individual debits and credits arising from the

Debtors' business operations.  (Bingham Affidavit ¶ 48).  Although it is theoretically possible to

investigate each transaction, it is neither necessary nor cost-effective to do so.  Professionals for

the Debtors, the Creditors' Committee and the ENA Examiner sampled entries, particularly those

between ENE and ENA and determined that the Debtors' books and records are sufficiently

reliable to justify the allowance of Intercompany Claims as incorporated into the global

compromise.  (Bingham Affidavit ¶¶ 35, 48; 6/3/04 p.m. Bingham Tr. at 155:17 – 156:6, 156:23

– 157:18).

　　　　Pursuant to the global compromise, all other potential inter-Debtor remedies, such as the

potential disallowance, subordination or re-characterization of Intercompany Claims, and certain

affirmative claims or causes of action against any other Debtor, will be waived.  (Bingham

Affidavit ¶ 49; Debtors' Trial Ex. 1, § 28.3).  The Distribution Model identified the assets and

liabilities of each Debtor's estate.  (6/8/04 Cooper Tr. at 18:12 – 17).  Calculation of recoveries

on intercompany claims is part of the Distribution Model.  (6/7/04 Zelin Tr. at 21:17 – 23).  The

Distribution Model allows the evaluation of the impact on value allocations of various potential

inter-estate issues that might be pursued in a chapter 11 case, including substantive

consolidation.  (6/7/04 Zelin Tr. at 24:20 – 25:10).

　　　　The Distribution Model calculates the value that flows through intercompany receivables

or payables and reflects movement of value from one estate to another.  (6/8/04 Cooper Tr. at

197:25 – 198:5; Debtors' Trial Ex. 11).  The Distribution Model resolves the circular nature of

many of the intercompany relationships and settles at the optimal resolution.  (Debtors' Trial Ex.

24 at 131 – 32; 6/7/04 Zelin Tr. at 24:25 – 25:13).  The Distribution Model calculates how an

increase in incremental value in one estate would benefit all Debtors in both the stand-alone and

consolidated portions of the 30/70 distribution formula.  (6/7/04 Zelin Tr. at 302:6 – 303:23).

Under the 70% component, incremental value to one estate benefits other estates as a result of the intercompany relationships by virtue of the added value flowing through the intercompany accounts. (6/7/04 Zelin Tr. at 302:6 – 303:23). Under the 30% component, the increase in value directly increases the recovery to the consolidated estate. (6/7/04 Zelin Tr. at 302:6 – 303:23). No evidence was submitted by any objector sufficient to rebut the Debtors' evidence concerning treatment of Intercompany Claims under the global compromise embodied in the Plan and set forth in the Global Compromise Motion.

*6). Inter-Debtor Waivers and the Global Compromise*

Given that millions of entries were made in intercompany accounts, a thorough analysis of each of the factors in support of or against subordination or re-characterization would be prohibitively expensive and contrary to the goal of maximizing Creditors' recoveries. (Bingham Affidavit ¶ 48). Section 28.3(a) of the Plan applies only to claims and causes of action that are property of the respective Debtors' estates. (Bingham Affidavit ¶ 50). These inter-Debtor waivers were negotiated as an integral part of the global compromise to ensure that the efficient resolution of these Chapter 11 Cases would not be jeopardized by ongoing inter-estate disputes. (Bingham Affidavit ¶ 51).

The inter-Debtor waivers will not affect the Debtors' ability to pursue third parties (including non-Debtor affiliates) on any claims, causes of action, or challenges available to any of the Debtors in the absence of substantive consolidation, including any avoidance actions or defenses to setoff for lack of mutuality. (Bingham Affidavit ¶ 51). Nor will such waivers inhibit the assertion of any defense in the MegaClaim Litigation, the Montgomery County Litigation, or any other litigation commenced by or on behalf of the Debtors, the Debtors in Possession, or the Reorganized Debtors. (Bingham Affidavit ¶ 51). No evidence was submitted by any objector

sufficient to rebut the Debtors' evidence concerning inter-Debtor waivers under the global

compromise embodied in the Plan and set forth in the Global Compromise Motion.

7). *Resolution of Asset-Ownership Disputes and the Global Compromise*

As an integral part of the global compromise and its settlement of inter-estate issues, for

purposes of calculating distributions pursuant to the Plan, the net economic ownership of Enron

Canada, RMTC, CPS and Bridgeline Holdings will be resolved, and to a certain extent

reallocated, as follows (Bingham Affidavit ¶ 54):

> (a)    The net economic equity value of Enron Canada will be deemed to be an asset of
>         ENA;
>
> (b)    The net economic preferred equity value of RMTC will be deemed to be an asset
>         of ENE;
>
> (c)    50% of the net economic value of CPS will be deemed to be an asset of ENE and
>         50% will be deemed to be an asset of ENA;
>
> (d)    Allocation of the net economic ownership of CPS will be made only to the extent
>         it is ultimately determined or otherwise agreed that the value in CPS constitutes
>         property of the Debtors' estates; and
>
> (e)    The net economic equity value of Bridgeline Holdings will be deemed to be an
>         asset of ENA.

Given that ownership of these assets was ambiguous and hotly contested, in the Debtors'

judgment, a negotiated compromise was preferable to full-blown litigation.  (Bingham Affidavit

¶ 54).

The Debtors, the Creditors' Committee and the ENA Examiner believe there are factual

and legal issues arising from the relative impact of these transactions on ENE and ENA,

including whether all or part of these transactions should be avoided, unwound or otherwise

challenged and the treatment of any intercompany claims or equity interests related thereto.  The

Debtors concluded that some of those issues favor ENE, while others favor ENA and its

subsidiaries.  Such conclusion was reasonable.  Among the arguments that could be asserted by

or on behalf of ENE and ENA are:  (a) whether the net economic equity value of Enron Canada

should be attributed to ENE or ENA; (b) whether the net economic preferred equity value of

RMTC should be attributed to ENE or ENA; (c) whether the net economic value of CPS should

be attributed to ENE or ENA; and (d) whether the net economic equity value of Bridgeline

Holdings should be attributed to ENE or ENA.  (Bingham Affidavit ¶ 53).

The dispute over the ownership of the net economic equity value of Enron Canada arose

from the Slapshot financing transaction, which caused a potential shift of economic interest in

Enron Canada from ENA to ENE.  In the Slapshot transaction, ENE received $1 billion in

preferred stock (ahead of ENA's common stock) in return for a $1 billion increase in its payable

to ENA.  (Bingham Affidavit ¶ 53).

The arguments favoring ownership of the net economic equity value of Enron Canada by

ENE may include the fact that:  (a) the transaction was properly authorized, documented,

recorded and supported by consideration; (b) even if meritorious, such litigation would

potentially produce additional prepetition unsecured Intercompany Claims and not a transfer of

ownership of such assets; and (c) the measurement of damages, if any, to ENA from the addition

of the preferred stock should be measure at the date the preferred stock was issued, not at the

Initial Petition Date and any loss in value to the receivable from ENE as of the Initial Petition

Date would not be recoverable.  (Bingham Affidavit ¶ 53).

The arguments favoring ownership by ENA may include the fact that (a) ENA did not

receive adequate consideration for this transfer of economic interest, and (b) Slapshot was a "tax

fiction" and a fraudulent conveyance, pursuant to which, in the course of a single day,

approximately $1 billion (a portion of the Slapshot funding) circled through Enron Canada and

the process of this flow arguably removed debt and equity interests in Enron Canada (a solvent,

non-Debtor entity) owned by ENA and replaced them with a claim against ENE. (Bingham

Affidavit ¶ 53). It should be noted that, under the global compromise, ENA benefits both from

its deemed economic equity interest in Enron Canada and allowance of a $1.039 billion

intercompany claim of ENA against ENE representing the funds advanced by ENA to ENE to

enable ENE to purchase the Enron Canada preferred stock. (6/4/04 Bingham. Tr. at 31:22 –

32:14, 32:24 –33:5, 33:12 – 15).

     The dispute over the ownership of the net economic preferred equity value of RMTC

arose out of the Valhalla financing transaction, which resulted in a shift of economic interest in

RMTC from ENA to ENE. An entity that is currently beneficially owned by ENE invested $2.2

billion to acquire all of the preferred stock of RMTC. The $2.2 billion was subsequently loaned

by RMTC to ENE. RMTC and ENE entered into an agreement whereby RMTC could engage in

multiparty setoffs of obligations (the "RMTC Setoff Letter"). ENA owns the common stock in

RMTC. ENA and EPMI owe substantial amounts to RMTC due to trading activity. In addition

to the $2.2 billion arising from Valhalla, ENE owes $3.4 billion to RMTC arising from Project

NOLy. An indirect subsidiary of RMTC, New Energy Trading Co. ("NETCO") received a

transfer of $250 million from ENE shortly before the Initial Petition Date. ENE's consideration

for this transfer was an increase in its investment in ENA, which did not have any value.

(Bingham Affidavit ¶ 53).

     Among the arguments that favor ownership by ENE are: (a) the Valhalla transaction was

properly authorized, documented, recorded and supported by consideration; (b) the RMTC Setoff

Letter does not apply to the preferred stock because preferred stock is not an "obligation"; (c)

even if meritorious, such litigation would potentially produce additional prepetition unsecured

Intercompany Claims and not a transfer of ownership of such assets; and (d) the measurement of

the damages, if any, to ENA from the addition of the preferred stock should be measured at the

date the preferred stock was issued, not at the Initial Petition Date and any loss in value to the

receivable from ENE as of the Initial Petition Date would not be recoverable.  (Bingham

Affidavit ¶ 53).

If litigated, ENA may assert that it is entitled to ownership of the net preferred equity

value of RMTC because (a) ENA did not have receive adequate consideration for this transfer of

economic interest, (b) Valhalla may be deemed to be a "tax fiction" and a fraudulent

conveyance, and (c) the RMTC Setoff Letter must have been intended to permit RMTC to satisfy

the preferred stock via setoff against the note receivable from ENE.  If the setoff were

effectuated, ENA would become the beneficial owner of the value in RMTC including the

receivable created under Project NOLy.  (Bingham Affidavit ¶ 53).

ENE and ENA dispute the ownership of the net economic value of CPS because prior to

the Slapshot transaction, the parent of Stadacona owed ENE approximately $400 million (which

is in excess of the fair value of Stadacona).  The essentially worthless common equity was

owned through the Sundance structure, with ENA owning 90% of the value and the remaining

10% owned by ENE.  The Slapshot transaction replaced the ENE debt with debt into the

structure.  The banks "put" their position in the structure to ENE immediately prior to the Initial

Petition Date.  (Bingham Affidavit ¶ 53).

If litigated, ENE may assert that the net economic value of CPS should be attributed to

ENE because, as between ENE and ENA, under any reasonable scenario, the net economic value

of CPS would belong to ENE.  If the banks' "put" remains effective, CPS's value would flow to

ENE because it stepped into the banks' position.  If the Slapshot transaction were to be voided,

CPS's payable to ENE, which was satisfied via the Slapshot transaction, would be reinstated and therefore the value of CPS would flow to ENE.  (Bingham Affidavit ¶ 53).

Conversely, if litigated, ENA may assert that Slapshot created a cloud over ENE's beneficial ownership of CPS, potentially altering it to a shared ownership with ENA.  (Bingham Affidavit ¶ 53).

ENE's interests in Bridgeline Holdings resulted from a transfer of intercompany liabilities shortly before ENE's bankruptcy.  A "cash circle" involving Bridgeline Holdings was cleared in the month prior to the Initial Petition Date, to the benefit of ENE and the detriment of ENA.  Enron accounting policies allowed but did not require non-cash settlement of intercompany accounts.  Some group controllers effectuated such settlements, while some did not.  (Bingham Affidavit ¶ 53).

Arguments favoring attribution of ownership of the net equity value of Bridgeline Holdings to ENE are that (a) the intercompany accounts should remain as they were unless there was an error, (b) there is nothing in GAAP or the law that requires such settlements to be made or not made, and (c) even if meritorious, such litigation would potentially produce additional prepetition unsecured Intercompany Claims and not a transfer of ownership of such assets. (Bingham Affidavit ¶ 53).

Arguments in favor of ownership by ENA may include the fact that the transfers may be deemed to be fraudulent conveyances and that other cash circles involving ENE-ENA-EPMI and ENE-ENA-ENGMC were not cleared at all during two years prior to the Initial Petition Date, also to the benefit of ENE and the detriment of ENA.  And, therefore, it would be inconsistent to leave the major cash circles in place and allow Bridgeline Holding's cash circle to be eliminated. (Bingham Affidavit ¶ 53)

In March 2004, in vigorous opposition to the Plan, Baupost Group and Racepoint Partners ("Baupost/Racepoint") filed with the Court (a) First Objection of the Baupost Group and Racepoint Partners, as Class 4 Creditors, to Confirmation of Fifth Amended Plan of Reorganization, dated March 2, 2004, (b) First Objection of the Baupost Group, as a Class 185 Creditor, to Confirmation of Fifth Amended Plan of Reorganization, dated March 2, 2004, and (c) Supplemental Objection of the Baupost Group and Racepoint Partners, as Class 4 Creditors, to Confirmation of Fifth Amended Plan of Reorganization, dated March 23, 2004 (collectively, the "Baupost Plan Objections").  The Baupost Plan Objections raised issues regarding proposed asset transfers under the Plan and the release of avoidance actions affecting Enron Guaranty Claims on the basis that such Plan components were unduly prejudicial to ENE creditors in favor of ENA creditors.  Baupost/Racepoint also indicated an intention to file a Second Supplemental Objection to the Plan and the May 14, 2004 deadline for doing so was extended by agreement of Baupost/Racepoint, the Debtors and the Creditors' Committee, pending ongoing efforts to resolve certain matters set forth in the Baupost Plan Objections.

The Baupost Plan Objections were ultimately resolved by the entry of a negotiated Stipulation and Order, Pursuant to 11 U.S.C. §§ 105(a), 502, 1126 and 1127, FED. R. BANKR. P. 3018, 3019, 9014 and 9019 and LBR 3020-1(b), By and Among Debtors, Creditors' Committee and The Baupost Group and The Racepoint Group Regarding Withdrawal of Confirmation Objections, Chapter 11 Plan Voting, and Certain Clarifications to Chapter 11 Plan and Related Matters, dated May 24, 2004 (Docket No. 18757) (the "Baupost Stipulation"), in which Baupost/Racepoint agreed to withdraw the Baupost Plan Objections and to cast their votes in favor of the Plan.

Subsequent to the Baupost Stipulation, Baupost/Racepoint filed a Comment of the
Baupost Group and Racepoint Partners in Response to Objections Interposed by Certain Parties
to Confirmation of Fifth Amended Joint Plan of Affiliated Debtors, dated June 1, 2004 (the
"Baupost Comment").  (Docket No. 18786).  As stated in the Baupost Comment, Baupost
believes that the Plan is particularly beneficial to ENA creditors because under the global
compromise, in addition to taking from ENE the value of Enron Canada (represented by the
preferred stock in Enron Canada owned by ENE), ENA is also allowed to keep a $1.039 billion
intercompany claim that represents the funds advanced to ENE by ENA, which ENE used to
purchase the Enron Canada preferred stock.  (Baupost Comment at ¶ 17).  This intercompany
claim is included in the Allowed Intercompany Claim held by ENA against ENE pursuant to the
global compromise embodied and set forth in the Global Compromise Motion.  (6/4/04 Bingham
Tr. at 31:22 – 32:14, 32:24 – 33:5, 33:12 – 33:15).

No evidence was submitted by any objector sufficient to rebut the Debtors' evidence
concerning the resolution of asset ownership disputes under the global compromise embodied in
the Plan and set forth in the Global Compromise Motion.

*8).  Ownership of Certain Claims and Causes of Action and the Global Compromise*

As an integral part of the global compromise and its settlement of inter-estate issues,
other than Litigation Trust Claims or Special Litigation Trust Claims, each Debtor will retain the
benefits of its single-Debtor claims or causes of action for its respective Creditors, subject to the
30/70 distribution formula.  (Bingham Affidavit ¶ 55; Debtors' Trial Ex. 1, § 28.1).  To eliminate
inter-estate disputes where the ownership of avoidance actions is unclear, pursuant to the Plan
and the global compromise, such claims will be jointly prosecuted by each of the Debtors that
could assert a cause of action on account of the subject transfer and the net proceeds realized

from such litigation (whether by settlement or judgment) will be allocated equally between each

of the plaintiff Debtors.  (Bingham Affidavit ¶ 56; Debtors' Trial Ex. 1, § 28.1).  To the extent

that a Claim arising under section 502(h) of the Bankruptcy Code is allowed solely against ENE

or the relevant subsidiary as a result of the voided transfer, an adjustment will be made to the

amount of Intercompany Claims, as reflected on Exhibit F to the Plan, between ENE and such

subsidiary pursuant to the methodology agreed upon by the Debtors, the Creditors' Committee

and the ENA Examiner, as set forth in the Plan Supplement.  (Bingham Affidavit ¶ 56; Debtors'

Trial Ex. 1, §§ 1.21 and 1.195; Debtors' Trial Ex. 4, Schedule X).

      Litigation Trust Claims and Special Litigation Trust Claims will be deemed to be owned

by ENE, subject to the 30/70 distribution formula, notwithstanding the inclusion of other Debtors

as plaintiffs in such actions.  (Bingham Affidavit ¶ 57; Debtors' Trial Ex. 1, §§ 1.168, 1.257,

2.1(b)(iv)).  The Debtors or the Creditors' Committee have already commenced certain such

actions, including the MegaClaim Litigation and the Montgomery County Litigation.  (Bingham

Affidavit ¶ 57).

      Any recoveries from the MegaClaim Litigation will be deemed to be assets of ENE.

(6/8/04 Cooper Tr. at 194:14 – 17; 6/3/04 p.m. Bingham Tr. at 103:21 – 104:6; Debtors' Trial

Ex. 1, § 2.1(iv)).  If ENE recovers any money from the MegaClaim Litigation, ENA will benefit

as a result of its receivable from ENE.  In addition, the 30/70 component of the global

compromise enables ENA (and all other Debtors) to benefit from the assets of ENE.  (6/9/04

Cooper Tr. at 110:6 – 14).  Furthermore, Creditors of ENE's Debtor subsidiaries that hold

Allowed Enron Guaranty Claims will benefit from such litigation on account of their claims

against ENE.

Neither the Debtors nor any other party can accurately determine the value of the

MegaClaim Litigation to any of the Debtors, including the value of ENA's interests as plaintiff,

given the ambiguity as to who is entitled to the actions and the fact that discovery has only just

begun and the actions have not been adjudicated.  (6/3/04 p.m. Bingham Tr. at 105:9 – 107:7,

107:25 – 108:10, 166:11 – 18).  Nonetheless, ENA benefits from the treatment of the MegaClaim

Litigation and Montgomery County Litigation under the Plan and the global compromise

because, *inter alia*, ENA receives additional benefits in the global compromise such as the asset

transfers from ENE.  (6/3/04 p.m. Bingham Tr. at 162:3 – 18).

Deeming the Litigation Trust Claims and the Special Litigation Trust Claims as Assets of

ENE is an integral part of the global compromise (including substantive consolidation and the

asset-ownership issues discussed above) and is reasonable given the exchange of value through

the asset transfers in favor of ENA, the difficulty of proving the relative harm to different Debtor

entities with any degree of precision, the disputes over legal ownership of such Claims and

causes of action and the central role of the validity of ENE's financial statements in these

actions.  (Bingham Affidavit ¶ 58; 6/3/04 p.m. Bingham Tr. at 162:3 – 18).

The Plan and the Global Compromise Motion also provide that Creditors of ENE's

Debtor subsidiaries that do not have Enron Guaranty Claims will nevertheless share in potential

recoveries from Litigation Trust Claims and Special Litigation Trust Claims.  Specifically,

Section 10.1 of the Plan provides that a portion of the distributions to be made on account of

Allowed Enron Guaranty Claims resulting from recoveries on Litigation Trust Claims or Special

Litigation Trust Claims will be reallocated in accordance with the following formula:  (a) 80% of

such distributions will be retained by holders of such Allowed Enron Guaranty Claims; and (b)

20% of such distributions will be deemed redistributed to holders of General Unsecured Claims

against the subsidiary Debtor that is the primary obligor corresponding to such Allowed Enron

Guaranty Claims; provided, however, that, to the extent a holder of an Allowed Enron Guaranty

Claim also holds a General Unsecured Claim for the primary obligation against the subsidiary

Debtor, such General Unsecured Claim will be excluded from the redistribution under part (b).

(Bingham Affidavit ¶ 59; Debtors Trial Ex. 1, § 10.1).

      If a compromise and settlement of, or a Final Order with respect to, a Litigation Trust

Claim or a Special Litigation Trust Claim provides for the waiver, subordination or disallowance

of a defendant's Claim or Claims against a Debtor other than ENE, such waived, subordinated or

disallowed Claim(s) will be deemed allowed at the lesser of (a) the "Estimated Allowed

Amount" of such Claim on the Debtors' claim management system, and (b) the filed proof of

claim in respect of such Claim and such distribution will be assigned to ENE; provided that, if

such proof of claim is filed as contingent or unliquidated, or at zero dollars, the Claim will be

allowed at the "Estimated Allowed Amount."  (Bingham Affidavit ¶ 60; Debtors' Trial Ex. 1, §§

22.13, 23.13).

      If the Litigation Trust and the Special Litigation Trust are created, the Debtors or the

Reorganized Debtors, as the case may be, will transfer Cash, in an amount to be jointly

determined by the Debtors or the Reorganized Debtors and the Creditors' Committee, as

necessary to fund the operations of the such trusts.  (Debtors' Trial Ex. 1, Art. XXII and Art.

XXIII; Debtors' Trial Ex. 2, §§ XI.A.3, XI.B.3; Debtors' Trial Ex. 4, Schedule A, § 1.7;

Debtors' Trial Ex. 4, Schedule B, § 1.7).

      The global compromise, therefore, provides for the economic benefits realized from

Litigation Trust Claims and Special Litigation Trust Claims to be allocated to ENE for further

distribution under the Plan independent of whether the recoveries are realized in cash or through

waiver, subordination or disallowance of Claims.  (Bingham Affidavit ¶ 60; 6/9/04 Cooper Tr. at 110:15 – 111:4).

No evidence was submitted by any objector sufficient to rebut the Debtors' evidence regarding the fairness of resolving the ownership of claims and causes of action under the global compromise embodied in the Plan and set forth in the Global Compromise Motion.

9).  *Plan Currency*

Plan Currency, in the context of the Plan, means that all the economic stakeholders of the Debtors receive their *pro rata* share of cash and Plan Securities.  It ensures that value for each Debtor is maximized under the Plan; whereas value would be lost through a separate plan for each Debtor.  The use of a uniform Plan Currency also facilitates the ease of distribution and provides certainty for the marketplace pre-distribution permitting Creditors most easily to value the consideration to be received under the Plan.  (6/8/04 Cooper Tr. at 61:5 – 62:4; Bingham Affidavit ¶ 41).

The alternative to using Plan Currency would have entailed creating a scheme for each of the Debtors providing for distributions of either cash or some type of interest in stock, Intercompany Claims, third party receivables, assets to be liquidated in the future and/or any other potential forms of consideration.  (Bingham Affidavit ¶ 42).  As distributions on Intercompany Claims are a significant element of certain Debtors' asset base, the uncertainty as to the form and manner of distributions on those Intercompany Claims would have led to further uncertainty, complications and delay.  (Bingham Affidavit ¶ 42).

Based on the Debtors' current estimates of asset values and Allowed Claims, Plan Currency is expected to be approximately two-thirds in the form of Creditor Cash and approximately one-third in the form of Plan Securities.  These estimates may vary based on

whether closing of the sales of PGE and CrossCountry occur. Currently, signed contracts exist

for the purchase and sale of PGE and CrossCountry. The Debtors' assets targeted for

contribution to Prisma have not yet been contributed. In the event that the sales of PGE and

CrossCountry are consummated, as currently estimated, the Plan Currency would be

approximately 92% in the form of Creditor Cash and approximately 8% in the form of Prisma

Common Stock. (Bingham Affidavit ¶ 42).

No evidence was submitted by any objector sufficient to rebut the Debtors' evidence

regarding the use of Plan Currency under the global compromise embodied in the Plan and set

forth in the Global Compromise Motion.

*10). ENA Creditors' Option to Exchange Cash for Stock*[16]

As an integral part of the global compromise and its settlement of inter-estate issues,

Creditors of ENA and its affiliates EPMI, EGLI, EGM, EIM, ENGMC, ENA Upstream,

ECTRIC and ERAC may elect to receive up to $125 million in distributions in the form of Cash

instead of Plan Securities, thereby providing more securities to other Debtors' estates. (Bingham

Affidavit ¶ 61; Debtors' Trial Ex. 1, § 7.3). The cash election option is an integral part of the

global compromise of other inter-estate issues and cannot be viewed in a vacuum. (Bingham

Affidavit ¶ 62). No evidence was submitted by any objector sufficient to rebut the Debtors'

evidence regarding the cash election option for ENA Creditors.

*11). Liquidation Analysis and Benefits of the Global Compromise*

It would not be possible under one or more chapter 7 cases to more effectively wind

down the estates and maximize value for creditors than under the Plan. (6/8/04 Cooper Tr. at

---

[16] By orders, dated April 1, 2004 and October 2, 2003, approving compromises and settlements set forth in
stipulations, cash options were also offered for Wind Creditors and for beneficial holders of ETS Debentures,
respectively. (Docket Nos. 17456 and 13269; Debtors' Trial Ex. 1, §§ 7.7 and 7.8)

71:18 – 22).  Even under the most optimistic chapter 7 assumptions, each holder of an Allowed

General Unsecured Claim will receive pursuant to the Plan value that is not less than the amount

such holder would receive in a chapter 7 liquidation.  (Bingham Affidavit ¶ 90; Debtors' Trial

Ex. 9; 6/7/04 Zelin Tr. at 350:5 – 7; 6/3/04 a.m. Bingham Tr. at 42:10 – 23; Debtors' Trial Ex. 24

at errata 127, 128 n.1, 129 n.1).

The Debtors' Liquidation Analysis appropriately assumes the Court will approve the

settlements and compromises embodied in the Plan, including the 30/70 distribution formula and

the other agreements reached under the global compromise, as well as the exclusion of the

Portland Debtors from the global compromise.  Not only does this approach recognize that the

many issues resolved by the global compromise would remain and require resolution in a

conversion to chapter 7, but that practically it is more useful for Creditors to compare estimated

recoveries using the same assumptions regarding these issues.  (Bingham Affidavit ¶ 92; 6/3/04

a.m. Bingham Tr. at 42:10 – 20).

To have a clear understanding of the differences between recoveries under the Plan

compared to a potential chapter 7, Creditors need an "apples to apples" comparison.  (Bingham

Affidavit ¶ 92).  The CLN Noteholders objected to use of such a comparison at the Disclosure

Statement Hearing and the Court overruled their objection recognizing not only the need for an

"apples to apples" comparison, but also the practical limitation that, in order to prepare a

liquidation analysis for each Debtor outside of the global compromise, then a variety of unknown

variables must be resolved that are otherwise resolved by virtue of the compromise.  (1/6/04

Hearing Tr. at 148 – 166).

Moreover, because the "best interests" test compares recoveries under the chapter 11 Plan

to recoveries in a chapter 7 liquidation, the comparison must exclude the effect of outcomes of

legal issues existing in both chapter 11 and chapter 7.  To make that comparison, recoveries must

be compared in the two chapters assuming the common legal issues are resolved the same way in

each chapter.  Further, there is no basis to believe that the legal issues would be resolved in any

different way, whether litigated in chapter 11 or chapter 7.

The Debtors' Liquidation Analysis reflects data output from the Distribution Model as of

December 2003 and summarizes accurately the estimated recoveries to Creditors under a

hypothetical chapter 7, based upon input provided by the sources listed in Debtors' Trial Ex. 24.

(Debtors' Trial Ex. 9; Bingham Affidavit ¶ 89; 6/7/04 Zelin Tr. at 37:15 – 24; Debtors' Trial Ex.

24 at 23, errata 127, 128 n.1, 129 n.1).  Moreover, the well-diligenced Distribution Model

allowed the Debtors to evaluate the various potential inter-estate issues that might exist and

determine the economic consequences of various positions and the potential impact on creditor

recoveries.  (Debtors' Trial Ex. 24 at 132).  The assumptions used in Debtors' Trial Exhibits 9,

24, 25 and 26 were reasonable.

Exhibits AV2A through AV2Q are printed portions of a section of the Blackstone Model

related to ENA and are not "stand-alone" liquidation analyses.  (6/4//04 Bingham, Tr. at 9:20 –

23).  The Debtors have not performed and did not withhold any liquidation analyses that should

have been provided in the Disclosure Statement.  (6/4/04 Bingham Tr. at 11:23 – 12:7; 1/6/04

Hearing Tr. at 150 – 155).

The Blackstone Report includes a sensitivity analysis wherein six alternative outputs

were generated using the Distribution Model.  (Debtors' Trial Ex. 24 at errata 155).  These

different scenarios demonstrate the flexibility of the model.  (Debtors' Trial Ex. 24 at errata 155).

In addition, the different scenarios reflect variations on the terms of the global compromise

assuming different outcomes on certain substantive issues.  (6/7/04 Zelin Tr. at 30:25 – 31:6).

For example, Sensitivity 1 assumes that ENE owned all disputed assets and that all of the

ownership disputes between ENE and ENA were resolved in ENE's favor. (Debtors' Trial Ex.

24 at errata 155; 6/7/04 Zelin Tr. at 33:4 – 13, 138:22 – 139:2). Such resolution is consistent

with the Debtors' books and records as of the Initial Petition Date. (6/7/04 Zelin Tr. at 33:4 –

13). Under Sensitivity 1 (Stand-Alone), the recovery for ENA creditors under a chapter 11 plan

would be only 17.4%, as compared to a Plan recovery of 20.1%. (Debtors' Trial Ex. 23 at errata

155).

In order to illustrate the calculation of the 30/70 distribution formula, Appendix C to the

Disclosure Statement sets forth the assets and liabilities of each Debtor on a "stand alone basis,"

which assumes all elements of the global compromise exist except for the 30/70 split. As a

result, except for the three assumptions for liquidation described by Messrs. Bingham and Zelin

in their testimony, detailed information regarding the assets and liabilities for each Debtor in a

liquidation are disclosed in Appendix C. (Debtors' Trial Ex. 8; Bingham Affidavit ¶ 15).

Exhibit AV1 represents one part of the calculation to determine recovery under the

distribution model with all of the global compromise assumptions in place except the 30/70

distribution formula for purposes of determining the 70% portion of the formula. All of the

testimony supported the finding that this calculation could never represent a stand-alone analysis

of each estate because the settlements embodied in the global compromise were contingent upon

the agreement as to the 30/70 distribution formula, the absence of which would undo all of the

other settlements. The 30/70 distribution formula is an integral and necessary part of the global

settlement.

Exhibit AV1 does not contain a complete analysis of the assets and liabilities of ENA on

a stand-alone basis. Messrs. Bingham and Zelin testified Ex. AV1 is a partial printout of a

section of the Blackstone Model related to ENA that was prepared on a liquidation basis and

used as one of the components for the calculation reflected on Appendix L of the Disclosure

Statement.  (6/4/04 Bingham Tr. at 9:9 – 19; 6/7/04 Zelin Tr. at 68:21 – 23).  Additionally, Mr.

Zelin testified that Ex. AV1 "doesn't take the Liquidation Analysis all the way through to what's

presented in Appendix L."  (6/7/04 Zelin Tr. at 74:20 – 22).

The three primary assumptions that account for the difference between the Plan recovery

percentage in Appendix C and the liquidation recoveries in Appendix L are (a) the diminished

values of CrossCountry, PGE and Prisma, (b) the projected $100 million in incremental overhead

assumed in a consensual or "best case scenario" liquidation, and (c) the 10% present-value

discount for a projected one-year delay in distributions.  (6/7/04 Zelin Tr. at 75:10 – 76:2;

Bingham Affidavit ¶ 90).

The $100 million adjustment to post-confirmation expenses (January 1, 2004 – December

31, 2006) is derived by comparing the estimated expenses set forth in Appendix G to the

Disclosure Statement ($850,899,000) to the expenses set forth in Appendix L to the Disclosure

Statement ($950,900,000).  (Debtors' Trial Exs. 2 and 9).

The estimates included in Appendix L do not include, *inter alia*, the additional potential

costs and further delays to distribution that would result from (a) the appointment of separate

chapter 7 trustees for multiple Enron estates and such trustees retaining their own separate legal

and financial professionals, (b) any requests for a trustee election under section 702 of the

Bankruptcy Code,[17] (c) any requests for the appointment of one or more Creditors' Committees

pursuant to section 705 of the Bankruptcy Code, and (d) any increase in the number of, or

---

[17] While the Debtors did not reference the consideration raised by section 702 of the Bankruptcy Code as a possible consequence in the absence of the global compromise, given the history of these cases, it is extremely likely that, even with a consensually agreed to single trustee, some creditor of one of the 177 Debtors would seek an election under section 702 of the Bankruptcy Code.

change to the nature of, inter-estate litigations.  (6/7/04 Zelin Tr. at 40:7 – 19; Debtors' Trial Ex.
24 at 128 n.1).

The timing of the occurrence of the Effective Date will not impact the conclusion set

forth in Appendix L that Creditors will receive more under the Plan than they would in a case

under chapter 7.  (6/4/04 Bingham Tr. at 35:14 – 22).  In addition, changes in the value of assets

(including through litigation recoveries) and liabilities prior to the Effective Date will also not

impact such conclusion set forth in Appendix L to the Disclosure Statement.  (6/4/04 Bingham

Tr. at 26:22 – 27:15, 34:12 – 36:22).

The structure of the Plan has given, and will continue to give, the Debtors additional

negotiating leverage when negotiating with potential purchasers of the platform entities—PGE,

CrossCountry and Prisma.  If the proposed purchase price is too low, the Debtors have the option

of not selling the entity and instead spinning the stock out to Creditors.  (6/7/04 Zelin Tr. at

42:13 – 43:24; 6/8/04 Cooper Tr. at 19:12 – 21:7; Debtors' Trial Exs. 24 and 25).

Based on this evidence, which the Court finds credible and unrebutted, the value to be

distributed to Creditors on account of Allowed Claims under the Plan, as of the Effective Date, is

not less than the amount that such holder would receive or retain if the Debtors, or any of them,

were liquidated under chapter 7.

Absent the global compromise, Creditors would receive smaller distributions as a result

of the delay and litigation that would occur without the global compromise.  (6/8/04 Cooper Tr.

at 33:16 – 34:5; Debtors' Trial Ex. 26).

Appendix L represents the "best case scenario", assuming that one chapter 7 trustee, after

doing the necessary diligence, would conclude that the global compromise is the best way of

distributing value to Creditors most expeditiously and without protracted inter-estate litigation.

(6/7/04 Zelin Tr. at 39:11 – 40:3; Debtors' Trial Ex. 24 at 128 n.1, 129 n.1).  Under the more

realistic scenario of multiple chapter 7 cases for thirteen (13) different Debtors, it would cost

approximately $1.25 billion to litigate the issues resolved by the global compromise, thereby

substantially reducing the value available for distributions to Creditors as compared with the

"best case scenario."  (Debtors' Trial Ex. 26; 6/8/04 Cooper Tr. at 32:22 – 34:9, 60:14 – 61:4).

In addition, as found under the "best case scenario" there would likely be further costs, delay and

disruption if, as previously discussed, a trustee election were sought under section 702 of the

Bankruptcy Code.

Throughout the Confirmation Hearing, the CLN Noteholders posited that a so-called

"liquidation analysis" should be with the assumption that only ENA converted to chapter 7 to

liquidate, but all the other Debtors confirmed the Plan, including the global compromise for all

Debtors other than ENA.  This theory is illogical and contrary to the entirety of the record before

the Court.  As discussed in detail throughout these findings of fact, the interrelationships between

ENA, ENE and other Debtors are evidenced by, *inter alia*, the asset disputes, allowance of

Intercompany Claims, settlement of substantive consolidation and resolution of other similar

issues through the global compromise.  Moreover, Messrs. Cooper and Zelin both testified as to

the impossibility of this concept in these Chapter 11 Cases.  (6/7/04 Zelin Tr. at 173:18 – 174:15;

6/8/04 Cooper Tr. at 155:5 – 17).

If the global compromise is not approved, the issue of intercompany accounts would be

re-opened, and the accuracy of the balances, the appropriateness of the historical allocations of

overhead to operating entities, and the historical absorption of non-allocated overhead by ENE

would have to be determined.  Additionally, there would have to be a resolution regarding re-

characterization of the intercompany accounts as debt or equity, the impact of various debtor

agreements would have to be reviewed and evaluated for appropriateness and a series of

ownership issues by way of contested assets would have to be resolved.  (6/8/04 Cooper Tr. at

35:3 – 20).

     If the issues that are the subject of the global compromise were to be litigated, the key

inter-Debtor issues that would most likely be investigated and litigated include intercompany

issues, including the accuracy of intercompany accounts and balances, the appropriateness of

historical overhead allocations, potential re-characterization of intercompany accounts as debt or

equity, the impact of various inter-Debtor agreements and the resolution of asset-ownership

issues.  In addition to these intercompany issues, absent the global compromise, the Debtors

would have to address the propriety of substantive consolidation, ownership of third-party

preference and fraudulent conveyance actions, timing of insolvency of each Debtor, impact and

validity of the master netting agreements and other contractual arrangements, impact of RMTC,

ownership of the aiding and abetting actions against third parties and investigation and pursuit of

potential intercompany fraud actions.  (6/8/04 Cooper Tr. at 34:10 – 36:15).

     There will be an increase in cost to obtain new counsel and professional advisors for the

Debtors if separate representation is requested for certain Debtors.  (6/8/04 Cooper Tr. at 37:3 –

20).

     Absent confirmation of the Plan and approval of the global compromise, conversion to

chapter 7 could well require 13 chapter 7 trustees, 13 law firms, 13 financial advisors and

additional conflict attorneys.  Estates for which separate representation would be needed most

likely include ENE, ENA, EPMI, ENGMC, EESI, EEMC, EESO, EBS (Broadband), ECTRIC,

EDF, ETS, NEPCO and the Wind Entities.  (6/8/04 Cooper Tr. at 37:16 – 38:9; Debtors' Trial

Ex. 26).

The trustee and attorneys for each chapter 7 Debtor would have to (a) familiarize themselves with the state of affairs of the Debtor, including locating and organizing resources to manage the day-to-day businesses, (b) assess the current litigation and claims, (c) establish all of the business processes necessary to manage the estate, (d) undertake intercompany evaluations, and (e) file and prosecute litigation.  (6/8/04 Cooper Tr. at 39:3 – 15).

Mr. Cooper assumed that, in the interest of efficiency, the Court would appoint an expert to review, evaluate, and, if necessary, correct the intercompany accounts.  (6/8/04 Cooper Tr. at 38:23 – 39:2).  This assumption is reasonable, as well as conservative, in its impact on costs.

FTI estimated that review and evaluation of intercompany accounts would cost approximately $25 million (6/8/04 Cooper Tr. at 42:7 – 10).  Based upon this estimate, if a review of those intercompany accounts had to go back to 1997, the cost of a court-appointed expert would be at least $200 million.  (6/8/04 Cooper Tr. at 39:25 – 40:6, 41:19 – 42:11).

A credible estimate of the legal, financial and other professional fees that would be incurred in the absence of the global compromise would be as follows:

(a)     $5 million per month for ENE for the first 36 months, $2.5 million per month for the next 24 months and $1.3 million per month for the next 24 months, for a total of $270 million over and above the day-to-day operations of the estate and the budget for post-confirmation operations;

(b)     $2.5 million per month for ENA for the first 36 months, $1.3 million per month for the next 24 months and $0.6 million per month for the next 24 months, for a total of $135 million over and above the day-to-day operations of the estate and the budget for post-confirmation operations;

(c)     $2 million per month for the combined Wind Entities for the first 36 months, $1 million per month for the next 24 months and $0.5 million per month for the next 24 months, for a total of $108 million over and above the day-to-day operations of the estate and the budget for post-confirmation operations;

(d)     $10 million per month for the 10 other estates for the first 36 months, $5 million per month for the next 24 months and $2.5 million per month for the next 24 months, for a total of $540 million over and above the day-to-day operations of the estate and the budget for post-confirmation operations;

(e)     The total legal, financial and other professional fees incurred by the Debtors in the absence of the global compromise would amount to an estimated $1.053 billion, with an additional estimated $200 million for a Court-appointed expert to perform a retrospective analysis of intercompany claims going back to 1997; and

(f)     The grand total in legal, financial and other professional fees that would be incurred in the absence of the global compromise would be an estimated $1.253 billion.

(6/8/04 Cooper Tr. at 40:16 – 42:4; Debtors' Trial Ex. 26).  Absent the global compromise, the

Debtors assembled a plausible time estimate as follows:

(a)     2 to 3 months to engage trustees and professionals;

(b)     2 to 4 months to reach agreement on Court-appointed expert on intercompany accounts and the scope of the expert's review;

(c)     Up to 18 months for investigation by the expert;

(d)     8 to 12 months of discovery following the expert's report;

(e)     1 to 2 years of trying 100 – 200 causes of action; and

(f)     1 to 2 years of appeals if only half of the litigation outcomes are unsatisfactory to specific plaintiffs.

(6/8/04 Cooper Tr. at 39:24 – 40:15).  These estimates are reasonable.[18]

Practical considerations that would make conversion to a chapter 7 in the absence of the

global compromise difficult and costly include finding or developing human resources systems,

cash management systems, internal tax advice and internal claims management on a standalone

basis for each Debtor.  (6/8/04 Cooper Tr. at 42:14 – 23).

The $1.25 billion estimated cost absent the global compromise did not include all of the

other day-to-day costs of running the Debtors' estates.  (6/8/04 Cooper Tr. at 42:12 – 23).  These

---

[18] These cost and timing estimates were developed by Mr. Cooper after his deposition testimony.  They were not submitted in any documentary form prior to the confirmation hearing.  The Court recognizes that the objectors that cross-examined Mr. Cooper at the hearing with respect to these estimates did not have an opportunity to prepare for such examination prior to the hearing because these estimates were first raised by Mr. Cooper at the Hearing. However, upon hearing these estimates, the objectors relied on their cross-examination of Mr. Cooper and did not seek leave to present any contrary evidence regarding the assumptions that underlaid his estimates.  The Court finds that the premises upon which Mr. Cooper relies and the associated estimates are reasonable.

expenses were allocated in accordance with the post-confirmation overhead allocation formula.
(6/8/04 Cooper Tr. at 43:21 − 25).

12).  *Global Compromise Is Fair and Reasonable*

   The divergence in Creditor viewpoints demonstrates that the resolution reached in the global compromise falls well within the reasonable range of litigation outcomes.  The Court has taken judicial notice that, based on the objections, that neither ENE Creditors nor ENA Creditors are fully satisfied with the results.  The fact is that, absent the global compromise, individual Creditors would be mounting offensives to promote their individual agendas and these Chapter 11 Cases would devolve into full-scale estate-wide litigation.  (*See, e.g.,* Docket Nos. 16649, 16650, 16692, 16701, 16702, 16707, 17236, 17244, 17937, 18422, 18426, 18483 and 18490).

   Based on the foregoing, the benefits obtained from avoiding estate-wide litigation by Creditors with conflicting interests are compelling and, absent the global compromise, litigation of the complex inter-estate issues resolved by the global compromise would have resulted in substantially lower recoveries for virtually all Creditors.  (Debtors' Trial Ex. 26).

   The settlement reflected in the global compromise is supported by sound business justifications.  Moreover, the Court has presided over these Chapter 11 Cases for more than two and a half years, and based on the entirety of the record in these proceedings, has independently evaluated and assessed the merits of the issues resolved by the global compromise and concludes that the settlements embodied therein are fair, reasonable, in the best interests of the Debtors' estates and well within the range of reasonable litigation outcomes.

   The benefits of the global compromise for Creditors outweigh the cost.  The global compromise benefits all Creditors by, *inter alia*, reducing the potential cost of litigation, including the cost of performing diligence regarding a multitude of underlying facts and transactions, the professional fees associated with litigation, the delay and uncertainty associated

with litigation, the prolonged cost of administering the estates, the resulting depletion of the

estates' assets, as well as Creditors' lost time-value of money resulting from later distributions.

The global compromise will save Creditors hundreds of millions of dollars and give them the

certainty of distributions now, rather than the uncertainty of any future distributions, which will

be greatly reduced after extended estate-wide litigation.  Most importantly, however, the global

compromise provides Creditors a fair and reasonable alternative to litigation, which, in the

context of the Plan, is supported by the Creditors' Committee and the ENA Examiner, who has

fiduciary duties and obligations to the ENA estate, in the context of the Plan and the result it

reaches falls well within the range of possible litigation outcomes.

Other than cross-examination of the witnesses to challenge the reliability of the premises

put forth by the Debtors' witnesses, there was no independent evidence presented by any

objector refuting any of the Debtors' contentions.

No evidence was submitted by any objector to rebut the Debtors' evidence concerning

the benefits of the global compromise and that the global compromise and Plan are in the best

interest of creditors.

## C.  Other Plan Considerations

### 1).  Classification and Treatment of Claims

The Plan provides for separate classification of Claims and Equity Interests in 385

Classes[19] based upon differences in the legal nature and/or priority of such Claims and Equity

Interests, or in order to implement the provisions of the global compromise.

(a)    Class 1 provides for the separate classification of the Priority Non-Tax Claims.

---

[19] Classes 182 and 364 are expected to receive no distributions under the Plan.  Similarly, General Unsecured
Claims Classes 58, 59, and 60 and Convenience Claims Classes 246, 247 and 248 have been rendered inoperative
given the severance of the Dabhol Debtors from these Chapter 11 Cases.

(b)      Class 2 provides for the separate classification of the Secured Claims.

(c)      Classes 3 through 182 provide for the separate classification of the General
Unsecured Claims on a per Debtor basis.

(d)      Class 183 provides for the separate classification of the Enron Subordinated
Debenture Claims.

(e)      Class 184 provides for the separate classification of the Enron TOPRS Debenture
Claims.

(f)      Classes 185 through 189 provide for the separate classification for Guaranty
Claims against Enron, Wind, ENA, ACFI and EPC, respectively.

(g)      Classes 191 – 372 provide for the separate classification of Convenience Claims
on a per Debtor basis.

(h)      Classes 373 through 375 provide for the separate classification of the
Convenience ENA Guaranty Claims, the Convenience ACFI Guaranty Claims
and the Convenience EPC Guaranty Claims.

(i)      Classes 376 through 382 provide for the separate classification of the
Subordinated Claims.

(j)      Classes 383 and 384 provide for the separate classification of the Enron Preferred
Equity Interests and Enron Common Equity Interest, respectively.

(k)      Class 385 provides for the separate classification of Other Equity Interests.

(Bingham Affidavit ¶ 73; Debtors' Trial Ex. 1, Art. IV).

As required by section 1123(a)(1) of the Bankruptcy Code, Article IV of the Plan

designates Classes of Claims and Classes of Equity Interests.  As required by sections 1123(a)(2)

and 1123(a)(3) of the Bankruptcy Code, Article XXX of the Plan specifies whether each Class of

Claims and Equity Interests is impaired or unimpaired under the Plan.  As provided by Articles

V through XX and XXX of the Plan, Classes 1 and 2 are rendered unimpaired and Classes 3

through 385 are impaired or deemed impaired, as contemplated by section 1123(b)(1).  As

required by section 1123(a)(4) of the Bankruptcy Code, Articles V through XXI of the Plan

specify the treatment of each Class or Equity Interest in each particular Class and provide for the

same as the treatment of each other Claim or Equity Interest in such Class.

The reason for the separate classification for the Enron Guaranty Claims is to give effect to the global compromise embodied in the Plan. (6/3/04 p.m. Bingham Tr. at 66:18 – 67:6; Bingham Affidavit ¶ 73). Given that guaranties presumably were made by the Debtors with full knowledge of each Debtor's corporate separateness, the Debtors believe the case for total substantive consolidation and its typical elimination of guaranty claims altogether is subject to differing interpretations and a recognition of 50% of Allowed Guaranty Claims in the 30% scenario is warranted. (Bingham Affidavit ¶ 39; 6/4/04 Bingham Tr. at 14:2 – 16:19).

The separate classification of the Convenience Claims is based on valid business, factual and legal reasons and is therefore reasonable and proper under the Plan as it avoids thousands of Creditors holding fractional interests in securities in the three business platforms of PGE, Prisma and CrossCountry, if they are not sold prior to distributions under the Plan. (Debtors' Trial Ex. 1, Article XVI). The Convenience Claims within each Convenience Class are substantially similar and the separate classification of the Convenience Claims was for purposes of convenience of implementing the Plan, not for gerrymandering of votes.

Valid business, factual and legal reasons exist for the separate classification of the various Classes of Claims and Equity Interest created under the Plan and such Classes do not unfairly discriminate between or among holders of Claims and Equity Interest. The Debtors' classification scheme has a rational basis because it is based upon the respective legal rights of each holder of a Claim or Equity Interest, as implemented in the Plan. For example, Class 185 (Enron Guaranty Claims) is classified separately from Class 4 (ENE General Unsecured) in order to implement the distribution and treatment of provisions of the global compromise. The classification scheme was not proposed to create a consenting impaired class and, thereby, manipulate class voting. (Bingham Affidavit ¶ 73). Moreover, both Class 4 and Class 185 voted

to accept the Plan. (Debtors' Trial Ex. 19). Thus, the Plan meets the requirements of section
1122(a) of the Bankruptcy Code.

Pursuant to the global compromise and the Plan, a Creditor holding a Guaranty Claim
will receive, in addition to what it will receive on account of its corresponding Allowed General
Unsecured Claim, a distribution that includes (a) 70% of the distribution such holder would
receive if the Debtors were not substantively consolidated, and (b) 30% of the distribution such
holder would receive if all the Debtors' estates, other than the estate of the Portland Debtors,
were substantively consolidated, with one adjustment. Because guaranty claims receive zero in a
substantive consolidation, the Guaranty Claims here would have received 70% of their
distribution without consolidation and 30% of zero. The global compromise, however, provides
they get 70% of their distribution without consolidation *plus* one-half the 30% distribution they
would receive if their allowed guaranty claims were not eliminated in a substantive
consolidation. Thus, the treatment afforded to such Claims is distinct from that provided to
Allowed General Unsecured Claims. (Bingham Affidavit ¶¶ 39 and 63).

Claims in Classes 376 through 382 relating to Subordinated Claims shall be determined
pursuant to a Final Order in accordance with the provisions of the Bankruptcy Code under the
principles of equitable subordination or otherwise. (Debtors' Trial Ex. 1, § 1.179). The Plan
provides the Court with flexibility to determine the amount and extent of subordination of any
claim. (*See, e.g.,* Debtors' Trial Ex. 1, § 1.180).

Schedule S of the Plan Supplement lists the types of claims the Debtors believe are
entitled to the benefits of subordination according to the provisions of the underlying documents.
(Bingham Affidavit ¶ 72; Debtors' Trial Ex. 4, Schedule S). The rights of the Debtors, except as
otherwise expressly provided in the Baupost Stipulation, and of any other party in interest in

these Chapter 11 Cases are expressly reserved until further order of the Court finally approving

the types of claims entitled to the benefits of subordination as currently described in Schedule S

of the Plan Supplement.  (5/28/04 Hearing Tr. at 8:15 – 21).

No evidence was submitted by any objector sufficient to rebut the Debtors' evidence

concerning classification and treatment of claims.

*2). Valuation of Platform Entities*

The Plan provides that the value of the Prisma Common Stock, CrossCountry Common

Equity, Existing PGE Common Stock or PGE Common Stock, as the case may be, will be

determined by the Court as of the Confirmation Date, as the same may be increased or reduced in

accordance with the provisions of the Plan.  To the extent that all of the Prisma Common Stock,

CrossCountry Common Equity, Existing PGE Common Stock or PGE Common Stock, as the

case may be, is converted into Cash, one or more promissory notes, equity interests of the

purchaser thereof or such other form of consideration prior to the later to occur of (a) the

commencement of distributions with respect thereto, and (b) the Effective Date, the value shall

be such amount realized in Cash or the then-fair market value of the consideration received as

determined by the Court.  To the extent that a portion, but not all, of the Prisma Common Stock,

CrossCountry Common Equity, Existing PGE Common Stock or PGE Common Stock, as the

case may be, is converted into Cash, one or more promissory notes, equity interests of the

purchaser thereof or such other form of consideration prior to the later to occur of (a) the

commencement of distributions with respect thereto, and (b) the Effective Date, the value of such

Prisma Common Stock, CrossCountry Common Equity, Existing PGE Common Stock or PGE

Common Stock, as the case may be, the value shall be equal to the sum of (i) the Cash or then-

fair market value of such consideration as determined by the Court realized from such

disposition plus, (ii) the product of (y) such consideration realized per share upon such

disposition of Prisma Common Stock, CrossCountry Common Equity, Existing PGE Common

Stock or PGE Common Stock, as the case may be, times (z) the number of shares Prisma

Common Stock, CrossCountry Common Equity, Existing PGE Common Stock or PGE Common

Stock, respectively, remaining with the Debtors immediately following such disposition.

(Debtors' Trial Ex. 1, § 1.264).

The Debtors' expert, Steven Zelin, submitted unopposed expert opinion on valuation of

PGE, CrossCountry and Prisma.  Hence, pursuant to the Court's prior ruling, Debtors' Trial

Exhibits 24 and 25 (the Blackstone Report and Blackstone Supplement) were admitted into

evidence and the going concern valuation of PGE, CrossCountry and Prisma as set forth therein

was uncontroverted and accepted by the Court.  (Docket No. 18616, page 2).  The evidence of

valuation as to the three platform businesses of the Debtors, as set forth in the Blackstone Report,

uses valuation dates during and at year-end 2003.  (Debtors' Trial Ex. 24 at 15 – 17, errata 55, 85

and 125).

Based on the Blackstone Report, the evidence of the following findings is unrebutted and

accepted by the Court:

(a)     The indicative equity value range for PGE set forth in Debtors' Trial Exhibit 24 is
$1.132 billion to $1.413 billion, with a midpoint of $1.273 billion.  (Debtors'
Trial Ex. 24 at errata 55).

(b)     The indicative equity value range for CrossCountry set forth in Debtors' Trial
Exhibit 24 is $1.417 billion to $1.576 billion with a midpoint of $1.497 billion.
(Debtors' Trial Ex. 25 at 85).

(c)     The indicative equity value range for Prisma set forth in Debtors' Trial Exhibit 24
is $713 million to $918 million with a midpoint of $815 million.  (Debtors' Trial
Ex. 24 at 125).

The Blackstone Report Supplement (Debtors' Trial Ex. 25) was provided solely to

provide updated "bring-down" valuations of PGE, CrossCountry and Prisma from the May 4,

2004 Blackstone Report. (Debtors' Trial Ex. 25 at 6). Although contracts of sale have been entered into for PGE and CrossCountry, because such transactions have not yet closed, the Blackstone valuations of these entities are independent of the contract prices associated with these transactions. (Debtors' Trial Ex. 25 at 6 n.1).

Based on the Blackstone Report Supplement, dated May 31, 2004, the evidence of the following findings is unrebutted and accepted by the Court:

(a)     The indicative equity value range for PGE set forth in Debtors' Trial Exhibit 25 is $1.166 billion to $1.459 billion, with a midpoint of $1.313 billion. (Debtors' Trial Ex. 25 at 18).

(b)     The indicative equity value range for CrossCountry set forth in Debtors' Trial Exhibit 25 is $1.614 billion to $1.770 billion with a midpoint of $1.692 billion. (Debtors' Trial Ex. 25 at 36).

(c)     The indicative equity value range for Prisma set forth in Debtors' Trial Exhibit 25 is $776 million to $989 million with a midpoint of $882 million. (Debtors' Trial Ex. 25 at 41).

The aggregate increase in the midpoint indicative equity value ranges of PGE, CrossCountry and Prisma resulting from the bring down of the valuations of PGE, CrossCountry and Prisma to May 31, 2004 is $302 million. (Debtors' Trial Ex. 25 at 7).

Using the midpoint indicative equity value for each of the Operating Entities, the Court has ample evidence to conclude that:

(a)     The indicative equity value of PGE is $1.312 billion and, assuming 62.5 million shares of PGE Common Stock will be issued pursuant to the Plan, the value of each share of PGE Common Stock will be $21.008. (Debtors' Trial Exhibit 1, § 1.186; Debtors' Trial Ex. 25 at 18; 6/7/04 Zelin Tr. at 128:7 – 11).

(b)     The indicative equity value of CrossCountry is $1.692 billion and, assuming 75.0 million shares of common equity will be issued pursuant to the Plan, the value of each share of CrossCountry Common Stock will be $22.56 per share. (Debtors' Trial Ex. 1, § 1.68; Debtors' Trial Ex. 25 at 36:20).

---

[20] In the event that CrossCountry is an Entity other than a corporation and assuming 75.0 million units of common equity of such Entity will be issued pursuant to the Plan, the value of each such unit of common equity of CrossCountry will be $22.56 per unit. (Debtors' Trial Ex. 1, § 1.68).

(c)    The indicative equity value of Prisma is $882 million and, assuming 40.0 million
shares of Prisma Common Stock will be issued pursuant to the Plan, the value of
each share of Prisma Common Stock will be $22.05. (Debtors' Trial Ex. 1, §
1.209; Debtors' Trial Ex. 25, at 41).

As the testimony regarding the valuation of PGE, CrossCountry and Prisma was neither

questioned nor refuted by any other evidence or party during the Confirmation Hearing, the

Court accepts the Blackstone Report, Blackstone Report Supplement and Mr. Zelin's testimony

as conclusive evidence of the value of these assets for the purposes of Plan confirmation.

If the pending sale contracts for PGE and CrossCountry close, then the going concern

value and the liquidation value would be the same.  (6/7/04 Zelin Tr. at 105:16 – 106:10).

However, as stated by Mr. Zelin, there are certain downward adjustments that would more likely

occur in a chapter 7 contract closing on PGE and CrossCountry than a chapter 11 contract

closing.  (6/7/04 Zelin Tr. at 44:18 – 46:07; 90:06 – 91:19; 206:20 – 207:07).

*3).  Cramdown*

The Distribution Model flows the asset values through a traditional recovery "waterfall,"

paying senior-most Creditors first and allocating value consistent with Bankruptcy Code

priorities.  (Debtors' Trial Ex. 24 at 131).  The Distribution Model assumes that priority claims

are paid in full prior to distributions to any holders of Allowed General Unsecured Claims.

(6/7/04 Zelin Tr. at 298:13 – 24).  The Distribution Model is consistent with the absolute priority

rule.  (6/7/04 Zelin Tr. at 260:24 – 261:3).

The Plan delineates 385 separate classes of Claims and Equity Interests.  Of these, Class

1 (Priority Non-Tax Claims) and Class 2 (Secured Claims) will be paid in full.  Classes 183

(Enron Subordinated Debenture Claims), 184 (Enron TOPRS Debenture Claims) and 376

through 385 (Subordinated Claims, Enron Preferred Equity Interests, Enron Common Equity

Interests and Other Equity Interests) are estimated to receive no distributions under the Plan.

Creditors in Classes 3 through 375 (excepting Classes 182 and 364)[21] are estimated to receive

distributions ranging from 5.1% to 75.7% of the allowed amount of their claims.  The Plan also

provides for payment in full of Allowed Administrative Expense Claims and Allowed Priority

Tax Claims.  (Bingham Affidavit ¶ 64; Debtors' Trial Ex. 1, §§ 3.1 and 3.3).  No party has

objected to the cramdown of the Classes of Equity Interests that are deemed to reject the Plan.

(Bingham Affidavit ¶ 86).

Upon approval of the global compromise embodied in the Plan and set forth in the Global

Compromise Motion, all Classes of impaired Claims and Equity Interests either have accepted

the Plan or will receive fair and equitable treatment in accordance with section 1129(b) of the

Bankruptcy Code.  (Bingham Affidavit ¶ 79).

The Debtors' estimated recoveries on Allowed Equity Interests are reflected in the

Disclosure Statement as $0.  (Debtors' Trial Ex. 2 at 90).  Consistent with the fact that it is

anticipated that holders of Allowed Equity Interests will not receive or retain any property under

the Plan in respect of such interests, notices of non-voting status were sent to the holders of these

interests and they were deemed to have rejected the Plan.  (Debtors' Trial Ex. 3 at 4 – 5, ¶ J).

Nevertheless, in the event that all Allowed Claims are paid in full, with interest, the Plan

provides that excess Plan Currency and Trust Interests are available for redistribution to holders

of Allowed Subordinated Claims, Enron Preferred Equity Interests, Enron Common Equity

Interests and Other Equity Interests.  (Debtors' Trial Ex. 1, §§ 17.2, 18.2, 19.2 and 20.1).  Under

---

[21] Classes 182 and 364 are expected to receive no distributions under the Plan.  Similarly, General Unsecured
Claims Classes 58, 59, and 60 and Convenience Claims Classes 246, 247, and 248 have been rendered inoperative
given the severance of the Dabhol Debtors from these Chapter 11 Cases.

the Plan, no assets are transferred into the trusts for equity interests until all Allowed Claims are

paid in full with interest.  (Debtors' Trial Ex. 1, §§ 18.2 and 19.2).

No evidence was submitted by any objector sufficient to rebut the Debtors' evidence

relating to cramdown of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

*4). Good Faith*

The Plan has been proposed in good faith and not by any means forbidden by law.

(Bingham Affidavit ¶ 74).  The purposes of the Plan, including the disposition or distribution of

all of the Debtors' assets and the prosecution of litigation for the benefit of the Debtors' estates,

is appropriate and value-maximizing.  The global compromise embodied in the Plan and the

Global Compromise Motion was the result of good faith negotiations between the Debtors, the

Creditors' Committee and the ENA Examiner.  (Bingham Affidavit ¶¶ 16 – 18, 20, 22, 23;

Debtors' Trial Exs. 13 – 18).

No credible evidence has been presented by any objector sufficient to rebut the Debtors'

evidence that the voting and solicitation process, including the entry of stipulations and orders

affecting voting and ballots cast on the Plan, was conducted in good faith.  No evidence was

submitted by any objector to rebut the Debtors' evidence relating to the good faith nature of the

Plan and the negotiations leading to the Plan and the voting process.

*5).  Wind-Down and Post-Confirmation Governance*

Except as provided in the Plan, confirmation of the Plan is not likely to be followed by

liquidation or the need for further financial reorganization of the Debtors.  (Bingham Affidavit

¶ 83).

Article XXXVII of the Plan provides that the occurrence of the Effective Date and the

substantial consummation of the Plan are subject to satisfaction of the following conditions

precedent:

(a) <u>Entry of the Confirmation Order</u>:  The Clerk of the Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtors and the Creditors' Committee and the effectiveness of which shall not have been stayed ten (10) days following the entry thereof.

(b) <u>Execution of Documents; Other Actions</u>:  All other actions and documents necessary to implement the Plan shall have been effected or executed.

(c) <u>Prisma Consents Obtained</u>:  The requisite consents to the transfer of the Prisma Assets to Prisma and the issuance of the Prisma Common Stock have been obtained.

(d) <u>CrossCountry Consents Obtained</u>:  The requisite consents to the issuance of the CrossCountry Common Equity have been obtained.

(e) <u>PGE Approval</u>:  The requisite consents for the issuance of the PGE Common Stock have been obtained.

(Debtors' Trial Ex. 1, § 37.1).

The Plan also provides that, to the extent practicable and legally permissible, each of the

above conditions precedent may be waived, in whole or in part, by the Debtors with the consent

of the Creditors' Committee.  (Debtors' Trial Ex. 1, § 37.2).

As required by section 1123(a)(5), Articles XII through XLI of the Plan provide adequate

means for implementation of the Plan through, inter alia, issuance and distribution of Plan

Securities, creation of the various trusts, transfer of certain assets to the trusts and disbursement

of funds to certain parties.  (Debtors' Trial Ex. 1, Arts. XXII through XXXII).

Upon satisfaction of the applicable conditions set forth in Section 32.1(c) of the Plan,

each of PGE, CrossCountry Distributing Company and Prisma intends to issue Plan Securities

pursuant to section 1145(a)(1) of the Bankruptcy Code.  Each of PGE, CrossCountry

Distributing Company and Prisma is an "affiliate participating in a joint plan with [each

Debtor]," as such phrase is used in section 1145(a)(1) of the Bankruptcy Code, and such issuance

of each Plan Security pursuant to the Plan will be "in exchange for a claim against, [or] interest

in . . . [a Debtor]," as such phrase is used in section 1145(a)(1)(A) of the Bankruptcy Code.

(Debtors' Trial Ex. 1, §§ 1.193 and 32.1(c); Debtors' Trial Ex. 24 at 31, 57 – 58 and 87 – 109).

If formed, each of the Litigation Trust and Special Litigation Trust will constitute a "successor to

[a Debtor] under the [P]lan," as such phrase is used in section 1145(a)(1) of the Bankruptcy

Code and any distribution of Trust Interests pursuant to the Plan will be "in exchange for a claim

against, [or] interest in . . . [a Debtor]," as such phrase is used in section 1145(a)(1)(A) of the

Bankruptcy Code.  (Debtors' Trial Ex. 1, §§ 1.88, 22.1 and 23.1).

On the Effective Date of the Plan, the Reorganized Debtor Plan Administrator will (a)

facilitate the prosecution or settlement of objections to and estimations of Claims, (b) prosecute

or settle claims and causes of action held by the Debtors, (c) assist the Litigation Trustee and the

Special Litigation Trustee in performing their duties, (d) calculate and assist the Disbursing

Agent in implementing all distributions in accordance with the Plan, (e) file all required tax

returns and pay taxes and other obligations, (f) report periodically to the Court on the status of

the Claims resolution process, distributions on Allowed Claims and prosecution of causes of

action, (g) liquidate the Remaining Assets and provide for the distribution of the net proceeds

thereof in accordance with the Plan, (h) consult with and provide information to the DCR

Overseers in connection with the voting or sale of the Plan Securities to be deposited into the

Disputed Claims reserve, and (i) perform such other responsibilities as may be vested in the

Reorganized Debtor Administrator pursuant to the Plan, the Reorganized Debtor Plan

Administration Agreement or Court order, or as necessary and proper to carry out the provisions

of the Plan.  (Bingham Affidavit ¶ 93; 6/3/04 p.m. Bingham Tr. at 122:12 – 123:3).

As of the Effective Date, the Reorganized Debtor Plan Administrator will be Cooper LLC, as the fiduciary responsible for, *inter alia*, insuring compliance with the Plan pursuant to and in accordance with the provisions of the Plan and the Reorganized Debtor Plan Administration Agreement, a copy of which was filed as Exhibit O to the Plan Supplement. The responsibilities of the Reorganized Debtor Plan Administrator are set forth in the Plan. (Debtors' Trial Ex. 1 at § 36.2; Debtors' Trial Ex. 4 at Schedule O; Bingham Affidavit ¶ 76). The Reorganized Debtor Plan Administrator will have responsibility for overseeing the administration of the Reorganized Debtors, subject to the supervision of the Board of Directors of the Reorganized Debtors. (Bingham Affidavit ¶ 66).

Pursuant to Article XXXV of the Plan and except to the extent that the responsibility for the same is vested in the Reorganized Debtor Plan Administrator pursuant to the Reorganized Debtor Plan Administration Agreement, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, (d) file all tax returns and pay taxes in connection with the reserves created pursuant to Article XVIII of the Plan, and (e) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan. (Debtors' Trial Ex. 1 at § 35.2).

Pursuant to Article XXII of the Plan, the Litigation Trustee, upon direction by the Litigation Trust Board and the exercise of their collective reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the assets of the Litigation Trust, make timely distributions and not unduly prolong the duration of the Litigation Trust. The liquidation of the Litigation Trust Claims may be accomplished either through the prosecution,

compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action, or otherwise. The Litigation Trustee, upon direction by the Litigation Trust Board, shall have the absolute right to pursue or not to pursue any and all Litigation Trust Claims as it determines is in the best interests of the beneficiaries of the Litigation Trust, and consistent with the purposes of the Litigation Trust and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence. The Litigation Trustee may incur any reasonable and necessary expenses in liquidating and converting the assets to Cash and shall be reimbursed in accordance with the provisions of the Litigation Trust Agreement. (Debtors' Trial Ex. 1 at § 22.6(a)).

The Litigation Trustee shall be named in the Confirmation Order or in the Litigation Trust Agreement and shall have the power (a) to prosecute for the benefit of the Litigation Trust all claims, rights and causes of action transferred to the Litigation Trust (whether such suits are brought in the name of the Litigation Trust or otherwise), and (b) to otherwise perform the functions and take the actions provided for or permitted herein or in any other agreement executed by the Litigation Trustee pursuant to the Plan. Any and all proceeds generated from such claims, rights and causes of action shall be the property of the Litigation Trust. (Debtors' Trial Ex. 1 at § 22.6(b)).

Pursuant to Article XXIII of the Plan, the Special Litigation Trustee, upon direction by the Special Litigation Trust Board and the exercise of their collective reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the assets of the Special Litigation Trust, make timely distributions and not unduly prolong the duration of the Special Litigation Trust. The liquidation of the Special Litigation Trust Claims may be accomplished either through the prosecution, compromise and settlement, abandonment or

dismissal of any or all claims, rights or causes of action, or otherwise.  The Special Litigation

Trustee, upon direction by the Special Litigation Trust Board, shall have the absolute right to

pursue or not to pursue any and all claims, rights or causes of action, as it determines is in the

best interests of the beneficiaries of the Special Litigation Trust and consistent with the purposes

of the Special Litigation Trust, and shall have no liability for the outcome of its decision except

for any damages caused by willful misconduct or gross negligence.  The Special Litigation

Trustee may incur any reasonable and necessary expenses in liquidating and converting the

assets to Cash.  (Debtors' Trial Ex. 1 at § 23.6(a)).

        The Special Litigation Trustee shall be named in the Confirmation Order or in the Special

Litigation Trust Agreement and shall have the power (a) to prosecute for the benefit of the

Special Litigation Trust all claims, rights and causes of action transferred to the Special

Litigation Trust (whether such suits are brought in the name of the Special Litigation Trust or

otherwise), and (b) to otherwise perform the functions and take the actions provided for or

permitted herein or in any other agreement executed by the Special Litigation Trustee pursuant to

the Plan.  Any and all proceeds generated from such claims, rights and causes of action shall be

the property of the Special Litigation Trust.  (Debtors' Trial Ex. 1 at § 23.6(b)).

        Cooper LLC shall assume the duties of the Reorganized Debtor Plan Administrator and

the Litigation Trustee (if such trust(s) is (are) formed).  (Debtors' Trial Ex. 4 at Schedule A,

Schedule B, Schedule O).  Mr. Cooper has had extensive prior experience in Chapter 11

restructurings and informal restructurings spanning 30 years.  Mr. Cooper's experience includes

the following activities and offices:  (a) a founder of what was then Touche Ross's reorganization

advisory services group; (b) a founder of his own firm with one of his former partners in the

early '80s and the balance of his career has been with that firm; (c) the chief restructuring officer

of the Laidlaw corporation for the last five to seven years; (d) the financial advisor for Morrison Knudsen and their successor, the Washington Group; (e) a financial advisor to Sunbeam; and (f) the financial advisor to Polaroid.  Based on Mr. Cooper's extensive prior experience with respect to restructuring activities, the Court finds that the post-confirmation involvement of Cooper LLC is both appropriate and beneficial for the Debtors, their estates and their Creditors.  (6/8/04 Cooper Tr. at 12:15 – 21).

Pursuant to the Plan and except as set forth in Article XXV therein, the Reorganized Debtors will retain all assets not otherwise transferred to the Litigation Trust, the Special Litigation Trust, the Severance Settlement Fund Trust, the Operating Trusts, or the Operating Entities.  (Debtors' Trial Ex. 2, § VII.C; Debtors' Trial Ex. 1, §§ 1.219 and 42.1).  Remaining Assets may include Cash, Claims, avoidance actions and other causes of action against third parties on behalf of the Debtors' estates, proceeds of liquidated assets, the Debtors' stock in the Enron Companies, trading contracts, equity investments, inventory, real property and other miscellaneous assets.  The winding down of the Debtors' estates remains a complicated process as there are a significant number of individual assets that need to be collected or sold, or otherwise handled.  (Debtors' Trial Ex. 2, § VII.C; Debtors' Trial Ex. 1, §§ 36.2 and 42.1).

Some of these assets are currently involved in litigation proceedings and/or complex cross-ownership structures.  In addition, the Reorganized Debtors will have sufficient funds to continue to manage the assets until such assets are liquidated, to pursue the litigation and to make distributions, in each case, as contemplated by the Plan.  (Debtors' Trial Ex. 2, § VII.C; Debtors' Trial Ex. 1, Art. XXXVI; Debtors' Trial Ex. 1, § 42.1).  As set forth in the Blackstone Report, the aggregate assumed value of the Remaining Assets, including Mariner, Sithe and Stadacona, was $2.698 billion.  The Mariner, Sithe and Stadacona assets have been sold,

resulting in a net assumed value of $2.04 billion for the Remaining Assets that have not yet been sold.  (Debtors' Trial Ex. 24 at 139 – 141).

The Debtors intend to ensure that their defined benefit plans are fully funded and that the funding will be sufficient to prevent further harm to current employees and retirees.  (6/8/04 Cooper Tr. at 68:4 – 10).  The Debtors have begun to take the steps necessary to terminate the defined benefit plans pursuant to a standard termination by seeking approval of the board of directors, notifying employees, seeking approval of the PBGC and seeking an appropriate tax ruling from the Internal Revenue Service.  (6/8/04 Cooper Tr. at 96:7 – 12).  The Debtors are current on their minimum contribution obligations with respect to defined benefit plans and premium funding to the PBGC.  (Docket No. 15132 at 3 n.3).  The Debtors have entered into negotiations with the PBGC regarding the amount of shortfalls for the Cash Balance Plan (6/8/04 Cooper Tr. at 96:13 – 16).  The Debtors have the financial means to ensure the full funding of such defined benefit plans.  (6/8/04 Cooper Tr. at 69:11 – 14).

The Plan includes provisions designed to streamline the governance and oversight of these Chapter 11 Cases, including provisions to appoint a five-member board of directors of Reorganized ENE.  (Bingham Affidavit ¶ 67).  The Restated Articles contain a prohibition in the charter of a debtor of issuance of non-voting equity securities.  (Debtors' Trial Ex. 4 at Schedule Q(1), Section 4.1; Debtors' Trial Ex. 4 at Schedule Q(1), Art. 4).  As required by section 1123(a)(7), Article XL of the Plan contains provisions with respect to the manner of selection of directors of the Reorganized Debtors.  (Debtors' Trial Ex. 1, Art. XL).

As set forth in the Schedule U and V to the Plan Supplement, filed on March 9, 2004 and as modified by the Debtors' Notice of Modifications to Scheduled Directors, Officers, and Insiders, filed on June 2, 2004 (the "Governance Modification," Docket No. 18841), the Board

of Directors of Reorganized ENE shall consist of five individuals, including, Stephen D. Bennett,

Rick A. Harrington, James R. Latimer, III and John J. Ray, III.  Due to previously unforeseen

obligations and time constraints, one additional director has removed his name from

consideration regarding the Board of Directors of Reorganized ENE.  (Bingham Affidavit ¶ 76;

Docket No. 18841).  If the Debtors select a replacement person during the period prior to the

Effective Date, such selection shall be made in a manner consistent with the provisions of

Section 40.1 of the Plan and the Debtors shall file a notice thereof with the Court.  If the Debtors

select a replacement person after the Effective Date, such selection shall be made in accordance

with the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors Bylaws,

as the same may be amended.  (Docket No. 18841 at 1 – 2; Debtors' Trial Ex. 4, Schedule O

§ 12).

Three of these individuals were selected by the Debtors after consultation with the

Creditors' Committee and one was selected by the Debtors after consultation with the ENA

Examiner.  The remaining individual to be named shall be selected by the Debtors after

consultation with the Creditors' Committee.  (Bingham Affidavit ¶ 76).  No officer or director of

the proposed Reorganized Debtors has any motivation to favor one Debtor over another.  (6/8/04

Cooper Tr. at 70:19 – 24).  By virtue of ENE's obligation to carry out the Plan and the partial

substantive consolidation embodied therein, all directors and officers of ENE shall have

fiduciary duties to all Creditors of all Debtors to carry it out fairly.

Section 33.4 of the Plan provides that the ENA Examiner's role shall conclude on the

Effective Date and the ENA Examiner and the professionals retained by the ENA Examiner shall

be released and discharged from any remaining obligations outstanding pursuant to the orders of

the Court, with certain limited exceptions.  Pursuant to Section 33.4(b) of the Plan, the term of

the ENA Examiner's involvement in the Chapter 11 Cases may be extended.  In the event that a

motion seeking such extension is timely filed, any party in interest, including, without limitation,

the Debtors or the Creditors' Committee, may interpose an objection or a response with respect

thereto.  (Bingham Affidavit ¶ 67; Debtors' Trial Ex. 1, § 33.4(b)).

As set forth in Schedule A to the Plan Supplement, the Litigation Trust Board will be

comprised of five persons selected by ENE, after consultation with the Creditors' Committee

with respect to four and the ENA Examiner with respect to one.  (Debtors' Trial Ex. 4, Schedule

A, § 4.1).  Consistent with the foregoing, as of the date hereof, the members of the Litigation

Trust Board include Stephen D. Bennett, Rick A. Harrington, James R. Latimer, III and John J.

Ray, III.  The final member of the Litigation Trust Board will consist of the fifth member

appointed by ENE following consultation with the Creditors' Committee.

As set forth in Schedule B to the Plan Supplement, the Special Litigation Trust Board

will  be comprised of no less than three persons and no more than five persons.  Three of the

initial members of the Special Litigation Trust Board shall be representatives from ABN AMRO

Bank, CALYON as successor in interest to Credit Lyonnais and Wells Fargo Bank Minnesota,

N.A. and the remaining two members (if any) will be determined and nominated by the

Creditors' Committee.  (Debtors' Trial Ex. 4, Schedule B, § 4.1).

As set forth in Schedule Y to the Plan Supplement, the Guidelines for the Disputed

Claims Reserve provide that the DCR Overseers will be comprised of five individuals selected

by ENE, after consultation with the Creditors' Committee with respect to four and the ENA

Examiner with respect to one.  (Debtors' Trial Ex. 4, Scheduled Y, § VII.1).  The DCR

Overseers include Stephen D. Bennett, Rick A. Harrington, James R. Latimer, III and John J.

Ray, III.  The final member of the DCR Overseers will consist of the fifth member appointed by

ENE following consultation with the Creditors' Committee.

As set forth in Schedule Z to the Plan Supplement, the Guidelines for the DCR Overseers

provide that (a) in determining how the Disbursing Agent should vote Plan Securities, the DCR

Overseers shall, subject to the remainder of the guidelines set forth in Schedule Z, exercise their

business judgment to vote the Plan Securities in a manner that they believe will maximize the

value of the Plan Securities, or the proceeds thereof, upon their release from the DCR to holders

of Allowed Claims, (b) in fulfillment of their responsibilities, each of the DCR Overseers shall

have the same duties, liabilities, defenses and standards of care of a director of a corporation

chartered under the Delaware General Corporation Law, and (c) in the event that any of the DCR

Overseers has a conflict of interest in any matter or issue, such DCR Overseer must fully

disclose the nature of such conflict or potential conflict and shall not be entitled to vote or take

part in any action with respect to such matter or issue.  (Guidelines for DCR Overseers,

§§ IV.A.1, V.A and VI).

Following consummation of the Plan, the Debtors intend to reorganize internally for the

purposes of managing their assets over the next several years to conduct an orderly winding-

down of their business affairs.  (Bingham Affidavit ¶ 93).  The Plan maximizes value to

Creditors by providing a structure that allows the Debtors to wind-down their affairs over a

number of years, while at the same time maximizing the value of all of their assets and

distributing them to Creditors.  (6/7/04 Zelin Tr. at 38:5 – 39:3; 6/8/04 Cooper Tr. at 64:25 –

66:14).  The Debtors have assumed that the estates would be wound down over a three-year

period, through December 31, 2006, plus several more years to complete the liquidation process.

(6/7/04 Zelin Tr. at 94:21 – 95:10; Debtors' Trial Ex. 9, at L-3, L-4, L-6).

The structure of a value-maximizing wind-down of estates has already begun to benefit

Creditors, as seen by the fact that Debtors have been able to obtain a significantly higher price

for CrossCountry than possible in a chapter 7.  (6/7/04 Zelin Tr. at 42:24 – 43:24).  If the Debtors

were forced to sell assets in a chapter 7, the leverage or balance of power in those sale

negotiations would shift.  As a result, the liquidation values for CrossCountry, Prisma and PGE

would be less than the values of those assets under the Plan.  (6/7/04 Zelin Tr. at 41:17 – 43:24).

Pursuant to Section 42.3 of the Plan, once each Debtor makes its final distribution

pursuant the Plan, it is deemed dissolved.  Thus, the Debtors' corporations cannot be trafficked

in for any tax purpose and there would be no net operating losses available upon discharge.

(Debtors' Trial Ex. 1, § 42.3; 6/8/04 Cooper Tr. at 67:7 – 15).

It would be very chaotic if, on the Effective Date, the automatic stay were to terminate

and all Creditors were free then to enforce their prepetition claims against the Reorganized

Debtors.  It would not be possible to carry out the Plan and have an equitable distribution of

assets if Creditors were able to sue the Reorganized Debtors to collect on their prepetition

claims.  (6/8/04 Cooper Tr. at 55:17 – 56).  No evidence was submitted by any objector sufficient

to rebut the Debtors' evidence concerning wind-down and post-confirmation governance.

*6). Exculpation*

The Debtors are unaware of any valid cause of action, and no party offered any evidence

of any claim, that would be waived as a result of the exculpation provision in Section 42.7 of the

Plan.  (6/9/04 Cooper Tr. at 92:24 – 93:7; 6/3/04 p.m. Bingham Tr. at 171:7 – 22).  However, the

Debtors never investigated whether there are any causes of action that could be asserted against

potential defendants, and that would be released under Section 42.7.  (6/9/04 Cooper Tr. at 139:3

– 8).

The exculpation provision in the Plan is appropriately limited to a qualified immunity for acts of negligence and does not relieve any party of liability for gross negligence or willful misconduct.  As part of their key employee retention program, the Court authorized (Docket No. 3587) the Debtors to provide indemnification to their officers and directors for their postpetition acts, as provided for under the Articles of Incorporation of the Debtors, the Oregon Business Corporation Act and other applicable law and consistent with the scope of the exculpation provision in Section 42.7 of the Plan.

The Debtors' officers and directors, Mr. Cooper and employees of Mr. Cooper have provided services and consideration to the Debtors during the course of these Chapter 11 Cases. (6/8/04 Cooper Tr. at 12:17 – 13:6, 13:10 – 14:2, 14:6 – 18:16, 20:12 – 21:11 and 22:14 – 23:1; Bowen Affidavit ¶¶ 1, 19, 20, 42 and 64; Bingham Affidavit ¶¶ 4, 11, 15 and 16).  Mr. Cooper has served as interim chief executive officer, interim president and chief restructuring officer. (6/8/04 Cooper Tr. at 11:24 – 25).  Upon his employment by the Debtors, he took several immediate steps to address the state of confusion that existed, including rebuilding the entire senior management team, transitioning away from the previous senior management team and centralizing authority and responsibility for the Enron Companies' decision-making processes. (6/8/04 Cooper Tr. at 12:17 – 13:6).

To centralize authority, Mr. Cooper (a) ensured that the appropriate policies and procedures were put in place so that critical decisions flowed to the senior management group of the organization for review, evaluation and approval, and (b) simplified the Enron Companies by organizing the Debtors into simply configured groups organized around core assets, non-core assets, litigation and investigations, wind-down of the trading book, chapter 11 and miscellaneous issues.  (6/8/04 Cooper Tr. at 13:7 – 14).

In addition to the evidence adduced at the Confirmation Hearing and on the full record of these Chapter 11 Cases, the Debtors, the Creditors' Committee and the Employee Committee, including their directors, officers, employees, members, attorneys, consultants, advisors and agents (acting in such capacity) have provided valuable services to the Debtors' estates in satisfaction of their statutory fiduciary duties.  The ENA Examiner has provided valuable services to the estates of ENA and its subsidiaries in satisfaction of his duties imposed by the Court.  The Indenture Trustees have provided valuable services to the applicable Debtors' estates in satisfaction of their duties imposed by their respective indentures and applicable law.

No evidence was submitted by any objector sufficient to rebut the Debtors' evidence concerning exculpation.

### 7). Post-Confirmation Overhead Allocation Formula

Consistent with Section 2.3 of the Plan, on March 24, 2004, the Debtors filed, after consultation with the Creditors' Committee and the ENA Examiner, the Overhead Allocation Motion with the Court and, in connection with the entry of the Confirmation Order, requested that the Court enter an order with respect to the allocation of overhead and expenses among the Debtors and the Reorganized Debtors, as the case may be.  (Debtors' Trial Ex. 1, § 2.3; Docket No. 17283).  The Debtors and their professionals, in consultation with the Creditors' Committee and the ENA Examiner and their professionals, have worked diligently to formulate a method of allocation for overhead and other expenses from and after the Confirmation Date (the "Post-Confirmation Allocation Formula").  In developing the Post-Confirmation Allocation Formula, the Debtors and their advisors reviewed the current allocation formula by which overhead and expenses are allocated to the Enron Companies.  The Debtors initiated numerous discussions with the Debtors' business department heads and top management focusing on financial and

operational allocation strategies. (Bowen Affidavit ¶ 42). No objections have been filed or

asserted as to this Overhead Allocation Motion.

The Post-Confirmation Allocation Formula provides for a methodology for allocation,

from and after the Confirmation Date, of overhead and other expenses among the Enron

Companies that benefit from such expenses. In broad terms, the proposed Post-Confirmation

Allocation Formula is conceptually similar to the allocation formula in place for the postpetition

period. The Post-Confirmation Allocation Formula uses the same cost departments to categorize

overhead expenses. Like the postpetition allocation formula, pursuant to the Post-Confirmation

Allocation Formula, the methodology of allocating expenses within each cost department to a

particular Enron Company is based upon whether there is (a) a direct measure of usage or benefit

between a particular expense and Enron Company, or (b) an indirect measure of usage or benefit.

Where there is a direct measure of usage or benefit between a particular expense and a particular

entity, the Post-Confirmation Allocation Formula uses that direct measure; where no direct

measure of usage or benefit exists or is readily and reasonably available, then an indirect

measure is used to allocate expenses. (Bowen Affidavit ¶ 44; Debtors' Trial Ex. 23).

While similar to the postpetition allocation formula, the Post-Confirmation Allocation

Formula is not identical. Unlike the postpetition allocation formula, the Post-Confirmation

Allocation Formula does not allocate expenses to the Enron Companies included in the Debtors'

operating platforms (that is, PGE, CrossCountry or Prisma) to the extent such operating

platforms have service agreements that have become effective. Instead, those Enron Companies

will be charged in accordance with the terms and conditions of the respective agreements. Also,

in contrast to the postpetition allocation formula's use of a methodology that takes into account

each Enron Company's average assets and revenues and, if such Enron Company is a Debtor, its

average assets and liabilities, the Post-Confirmation Allocation Formula uses assets and claims

as proxies to indirectly measure the benefit of and thereby indirectly allocate, those certain

expenses that cannot readily or otherwise be allocated directly. The Post-Confirmation

Allocation Formula incorporates certain other developments and provisions for allocating

overhead and other expenses, as well as funding such allocated expenses, that are not a part of

the existing postpetition allocation formula. (Bowen Affidavit ¶ 45).

The Post-Confirmation Allocation Formula is in the best interests of the Debtors, their

estates and Creditors. The Post-Confirmation Allocation Formula represents a refinement of the

postpetition allocation formula based upon the information learned by experience during the

pendency of these Chapter 11 Cases. The Post-Confirmation Allocation Formula is the product

of comprehensive and thoughtful exchange between and among the Debtors, the Creditors'

Committee and the ENA Examiner over the course of many negotiations. (Bowen Affidavit

¶ 62).

The Post-Confirmation Allocation Formula is conceptually sound and equitably

distributes corporate overhead without incurring excessive additional expense in order to

perform the allocations. The Post-Confirmation Allocation Formula (a) provides a formula for

allocation, from and after the Confirmation Date, of overhead expenses and other expenses

among the Debtors and their non-Debtor affiliates, (b) takes into consideration the evolving

nature of the Enron Companies' tasks from and after the Confirmation Date, (c) fully and fairly

allocates expenses to such Enron Companies based upon the tasks from and after the

Confirmation Date, and (d) eliminates instances of duplicative allocation of overhead expenses.

(Bowen Affidavit ¶ 63).

Sufficient business justifications exist to merit the approval of the Post-Confirmation

Allocation Formula.  (Bowen Affidavit ¶ 64).  No evidence was submitted by any objector

sufficient to rebut the Debtors' evidence regarding the Post-Confirmation Allocation Formula.

*8). Additional Facts in Support of Confirmation*

The Court is entitled to and has considered the entirety of the record in these Chapter 11

Cases, but takes particular note of the documents listed herein and the additional documents

identified by the Debtors.

Article XXXIV of the Plan provides for the assumption, rejection, or assignment of any

executory contract or unexpired lease of the Debtors not previously assumed or rejected (or

subject to assumption or rejection) under section 365 of the Bankruptcy Code, as contemplated

by section 1123(b)(2) of the Bankruptcy Code.  (Debtors' Trial Ex. 1, Art. XXXIV).

Article II of the Plan provides for the settlement of certain claims of the Debtors pursuant

to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  (Debtors' Trial Ex. 1,

Article II).

ENE is a public-utility holding company registrant by reason of its ownership of PGE.

ENE previously filed the Plan with the SEC.  The SEC has (a) approved the Plan and the

transactions contemplated therein under section 11(f) of PUHCA, and (b) authorized the Debtors

under section 11(g) of PUHCA and related rules to disseminate the Plan and Disclosure

Statement to Creditors and other parties in interest in order to solicit votes to approve the Plan.

(Debtors' Trial Ex. 4, Schedule CC).  The Debtors no longer have, and the Reorganized Debtors

will not have, any rates subject to approval of any governmental regulatory commission; thus,

section 1129(a)(6) of the Bankruptcy Code is inapplicable.  (Bingham Affidavit ¶ 77).

In accordance with sections 1129(a)(9)(A) and (B) of the Bankruptcy Code, the Plan provides that all Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code and all Allowed Priority Claims under section 507(a) of the Bankruptcy Code (excluding Priority Tax Claims under section 507(a)(8) of the Bankruptcy Code) will be paid in full, in Cash, on the later of the Effective Date and the date such Claims become Allowed Claims, or as soon thereafter as is practicable.  (Debtors' Trial Ex. 1, Art. III).

Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, including tax liabilities, or liabilities arising under loans or advances to or other obligations incurred by the Debtors in Possession during the Chapter 11 Cases shall be paid by the Reorganized Debtor Plan Administrator in accordance with the terms and conditions of any particular transaction and any agreements relating thereto.  (Debtors' Trial Ex. 1, Art. III).  The Confirmation Order will establish the bar date for Administrative Expense Claims.  (Bingham Affidavit ¶ 80).

Section 1129(a)(9)(C) permits deferred payment over a period of six years from the date of assessment of the tax so long as the amount so paid has a value, as of the effective date of the plan, equal to the allowed amount of the priority tax claim. 11 U.S.C. 1129(a)(9)(C).  Section 3.3 of the Plan complies with section 1129(a)(9)(C).  (Bingham Affidavit ¶ 81; Debtors' Trial Ex. 1, Art. III, § 3.3).  On May 31, 2004, the Debtors filed and served a Notice of Election of Option with Respect to Payment of Priority Tax Claims.  (Docket No. 18775).  The notice stated that pursuant to the Plan, the Debtors have elected to exercise their option to make distributions to each holder of an Allowed Priority Tax Claim in full, in Cash, on the Effective Date.

In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, the Plan provides that all fees payable pursuant to section 1930 of title 28 of the United States Code, shall

be paid as and when due or otherwise pursuant to an agreement between the Reorganized

Debtors and the U.S. Trustee until such time as a Chapter 11 Case for a Debtor shall be closed in

accordance with the provisions of Section 42.17 of the Plan.  (Debtors' Trial Ex. 5, § 42.10).

The Debtors have budgeted for and have the necessary Cash to pay these fees and charges on the

Effective Date.  (Bingham Affidavit ¶ 84).

The Debtors have no "retiree benefits" within the meaning of section 1114(a) of the

Bankruptcy Code.  (Bingham Affidavit ¶ 85).

Pursuant to the interim application procedures established under section 331 of the

Bankruptcy Code, the Court authorized and approved the payment of certain fees and expenses

of professionals retained in these Chapter 11 Cases.  (Bingham Affidavit ¶ 75).  All such fees

and expenses, as well as all other accrued fees and expenses of professionals through the

Effective Date, remain subject to final review for reasonableness by the Fee Committee and the

Court under section 330 of the Bankruptcy Code.  (Bingham Affidavit ¶ 75).  All payments or

bonuses to be made in connection with the Effective Date or that relate to the success of the

reorganization or that otherwise are required to be disclosed, including any amounts to be paid to

officers and directors, (a) are disclosed in the Disclosure Statement, (b) have been disclosed at or

prior to the Confirmation Hearing, or (c) are subject to the approval of the Court.  (Bingham

Affidavit ¶ 75). [22]

---

[22] As evidenced by the record in these Chapter 11 Cases and disclosed in the Debtors' Memorandum of Law in
Support of Confirmation, special fee arrangements have been approved by the Court with respect to the following
persons: (i) Batchelder & Partners, Inc. (now known as Relational Advisors LLC) – retained pursuant to that certain
Final Order, dated October 10, 2002 (Docket No. 7077), Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing the
Employment and Retention of Batchelder & Partners, Inc. as Financial Advisor for the Debtors and Debtors-in-
Possession; (ii) The Blackstone Group L.P. – retained pursuant to that certain Final Order, dated October 10, 2002
(Docket No. 7080), Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing the Employment and Retention of The
Blackstone Group L.P. as Financial Advisor for the Debtors and Debtors-in-Possession; (iii) Houlihan Lokey Howard
& Zukin Financial Advisors, Inc. – retained pursuant to that certain Order, dated October 10, 2002 (Docket
No. 7075), Pursuant to 11 U.S.C.§§ 328(a) and 1103, FED. R. BANKR. P. 2014 and S.D.N.Y. LBR 2014-1,
Authorizing Employment and Retention of Houlihan Lokey Howard & Zukin Financial Advisors, Inc. as Financial

Pursuant to sections 503(b)(3) and (4) of the Bankruptcy Code, the Court will review any

applications for substantial contribution to ensure compliance with the statutory requirements

and that the fees requested are reasonable.  (Bingham Affidavit ¶ 75).

The Debtors have modified Section 42.12 of the Plan to provide that, unless otherwise

ordered by the Court, the Debtors and each Enron Affiliate will retain and not destroy or

otherwise dispose of Documents.  (Initial Modification, at § 42.12).  As such, the Court finds that

Section 42.12 of the Plan adequately protects Creditors' rights with respect to the preservation of

documents.

On or about March 28, 2002, the Court entered an order authorizing and approving the

settlement of all amounts owed by New Power Holdings, Inc. and NPW to ENE, EESI, ENA and

EPMI pursuant to certain commodities contracts between the parties.  (Docket No. 2532,

amended by Docket No. 3103).  On or about January 13, 2003, Rufus T. Dorsey IV (the

"NewPower Examiner") was appointed in the Chapter 11 Cases of NewPower Holdings, Inc. and

TNPC Holdings, Inc., currently pending in the Court for the Northern District of Georgia,

---

Advisors to Official Committee of Unsecured Creditors *Nunc Pro Tunc* as of December 17, 2001; (iv) Cooper LLC--retained pursuant to that certain Order, dated April 5, 2002 and as modified on October 24, 2002, May 29, 2003, November 20, 2003 (Docket Nos. 2725, 7420, 10942, 14379), Authorizing the Debtors to Enter Into an Agreement to Employ Stephen Forbes Cooper, LLC as an Independent Contractor to Provide Management Services For the Debtors Nunc Pro Tunc to January 28, 2002. (v) Susman Godfrey L.L.P. ("Susman") – retained pursuant to that certain *Nunc Pro Tunc* Order, dated March 14, 2004 (Docket No. 2119), Pursuant to Bankruptcy Code §§ 327(e) and 330 Authorizing Employment of Susman Godfrey L.L.P. as Class Action Defense Counsel for the Debtors in Accordance With Its Normal Hourly Rates and Disbursement Policies, as modified pursuant to that certain Order, dated May 31, 2002 (Docket No. 4169), Modifying Original Order, Pursuant to Sections 327(a) and 330 of the Bankruptcy Code, Authorizing the Expansion of the Employment of Susman in Accordance with the Hourly Rates and Disbursement Policies Previously Approved by the Court and an Order, dated June 26, 2003 (Docket No. 11458), Modifying Order, Pursuant to §§ 327(e) and 330 of the Bankruptcy Code, Authorizing the Expansion of the Retention of Susman.  With respect to the fee arrangements referenced in clauses (i),(ii), (iii), and (iv) hereof, the advisors are paid monthly fees, transaction fees and success fees.  In addition, the advisors listed in clauses (i), (ii) and (iii) are required to file interim and final fee applications with the Court; however, the Fee Committee only is entitled to comment on the reasonableness of expenses (not the monthly fee or success fees).  With respect to the fee arrangements referenced in clause (v), certain of Susman's fees and expenses are subject to Fee Committee review; however, with respect to Susman's retention in connection with the MegaClaim litigation, Susman is to be paid a monthly fee and success fee without further application to the Court.

Newnan Division (the "NewPower Cases"). (Objection, Docket No. 17383). The Court finds

that confirmation of the Plan does not (a) affect such appointment, or (b) interfere with orders

entered in the NewPower Cases.

Pursuant to the Fiduciary Services Agreement dated March 14, 2002, as amended on

April 17, 2002, between the Debtors and State Street, approved by the Court on April 19, 2002

(Docket No. 3174), State Street received a blanket indemnity for all liability incurred in

connection with the provision of its services pursuant to such agreement. (Docket No. 2236 at ¶

6.2). The Fiduciary Services Agreement was entered into at the demand of the DOL, which had

an opportunity to review and comment upon, and to which the DOL consented in writing. The

DOL cannot now claim that a release from liability for one non-Debtor in this case is acceptable

while another is not under the circumstances where there is no evidence that any additional

consideration was provided by State Street to receive such release.[23]

### III.  CONCLUSIONS OF LAW

#### A.  Burden of Proof

To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies

the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *See*

*Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises., Ltd. II (In re Briscoe*

*Enterprises., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative

silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to

conclude that preponderance of the evidence is the debtor's appropriate standard of proof under

---

[23] The payment of fees and expenses pursuant to the Fiduciary Services Agreement, including the payment of any indemnification rights, is subject to ongoing litigation in the Court. It is unclear at this time whether the Debtors or the employee benefit plans for which State Street serves as the independent fiduciary are ultimately obligated to provide the indemnification set forth in such agreement. Nothing contained herein shall constitute an admission by the Debtors with respect to which entity is ultimately liable for such indemnification obligation.

both § 1129(a) and in a cramdown"); *see also In re Kent Terminal Corp.*, 166 B.R. 555, 561

(Bankr. S.D.N.Y. 1994) (holding that, "the final burden of proof at . . . confirmation hearings

remains a preponderance of the evidence."). The Debtors have met that burden, by having

demonstrated, by a preponderance of the evidence, that all of the requirements of section 1129 of

the Bankruptcy Code have been satisfied with respect to the Plan.

**B.  The Global Compromise Is Fair and Equitable and Is Approved**

Bankruptcy courts may approve settlements if they are fair, equitable and do not fall

"below the lowest point in the range of reasonableness." *Protective Comm. for Indep.*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 428 (1968); *Cosoff v.*

*Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *Nellis v. Shugrue*, 165 B.R.

115, 123 (S.D.N.Y. 1994); *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel*

*Burnham Lambert Group, Inc.*), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). The Debtors have

demonstrated that the global compromise embodied in the Plan and set forth in the Global

Compromise Motion is fair and equitable and falls well within the range of reasonable litigation

outcomes.

In addition, section 363(b)(1) of the Bankruptcy Code provides an additional basis to

approve settlement agreements, which frequently involve the disposition of assets of the estate.

*See Martin v. Martin*, 91 F.3d 389, 394 (3d Cir. 1996). The Debtors have shown that sound

business justifications exist for the Debtors to enter into the global compromise.

Section 105(a) of the Bankruptcy Code also provides an additional basis to approve the

global compromise under the Court's broad, equitable principles to achieve fairness and justice

in the reorganization process. *See Momentum Mfg. Corp. v. Employee Creditors Comm. (In re*

*Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994). The Debtors have shown that the

global compromise is fair and just and that it preserves and protects the value of the Debtors'

estates for the benefit of the Creditors.

*1).  The Benefits of Settlement Compared to the Costs of Litigation*

The compromises, settlements and waivers contained in the global compromise are fair

and equitable and fall well within the reasonable range of litigation outcomes.  If the global

compromise is not adopted and the many individual inter-estate issues are litigated to their

conclusion, with vast expense and delay, many Creditors would face greatly reduced recoveries.

Mr. Cooper plausibly estimated that the Debtors would incur an additional $1.25 billion in legal,

financial and other professional fees if the global compromise is not approved, which would

reduce aggregate Creditor recoveries.  (6/8/04 Cooper Tr. at 33:25 – 34:9, 38:10 – 42:11;

Debtors' Trial Ex. 26).[24]  Even the "best case scenario" provided in the Blackstone Report

requires the same conclusion.  (Debtors' Trial Ex. 24 at errata 127-29 n. 1; 6/7/04 Zelin Tr. at

39:4 – 41:16).  In addition, the litigation and attendant cost and delay would be detrimental to the

Debtors' ability to conclude these Chapter 11 Cases.  Accordingly, the global compromise falls

within the range of reasonableness and is fair, equitable, reasonable and in the best interests of

the estates.  For the same reasons, sound business justifications also exist for the Debtors to enter

into the global compromise.

*2).  Prospect of Complex and Protracted Litigation if the Settlement Is Not Approved*

The inter-estate issues and Claims resolved by the global compromise involve numerous

claimants and complicated factual scenarios and legal arguments that make litigation an

undesirable and costly option.  Without the global compromise, it would be necessary to address

---

[24] *Barry v. Smith (In re N.Y., New Haven, & Hartford R. Co.)*, 632 F.2d 955, 961 (2d Cir. 1980) ("If a reasonable outcome of litigation would result in [creditors] receiving less than that afforded them by the Compromise Plan, then the plan should be sustained.").

countless discrete inter-estate transactions and disputes, which could take years to unravel and likely involve extensive litigation.

Significant costs are associated with pursuing litigation rather than compromise, including the cost of performing the necessary litigation diligence regarding a multitude of underlying facts and transactions, the professional fees associated with litigation, the uncertainty and delay associated with litigation, the prolonged costs of administering the estates and the resulting depletion of the estates' assets.  *See Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 587 (7th Cir. 1994) (citing substantial legal fees that would be generated if litigation is continued as support for settlement agreement).  If the Debtors' cases were to be converted to chapter 7 cases and litigation pursued rather than compromise, it is more likely than not that at least thirteen (13) trustees would be required as opposed to the "best case scenario" set forth in the Disclosure Statement.  Such trustees would need to retain their own counsel and professionals to review numerous issues, including evaluating intercompany claims, at a total estimated cost of $1.25 billion in addition to all of the other day-to-day costs of operating the Debtors' estates.  In addition, such litigation would take at least an additional seven (7) years to resolve, delaying any distributions to Creditors.  Implementation of the global compromise will eliminate the inevitable risks and costs that would be associated with full-blown litigation and will help safeguard Creditor recoveries at significantly higher levels at a much earlier point in time.

The global compromise provides Creditors an assurance of recovery that inter-estate litigation does not provide.  *See Shugrue*, 165 B.R. at 124 (discussing the existence of numerous claimants, various claims and complicated facts and legal arguments as factors supporting settlement).

Moreover, litigation of these issues would necessarily require a fact-intensive examination of the many complex intercompany transactions among the Debtors. The great difficulty and cost of unraveling these intercompany transactions is one of the principal reasons that the Debtors and the Creditors' Committee worked together to craft the global compromise in order to maximize Creditor recoveries. (Debtors' Trial Exs. 10 and 11). *See In re Carla Leather, Inc.*, 44 B.R. 457, 471 (Bankr. S.D.N.Y. 1984) (citing considerable expense to reconstruct debtor's books and records in support of finding that settlement was in best interests of creditors). In addition, litigation of the complex and novel legal issues resolved by the global compromise would likely involve lengthy appeals if the compromise is not approved. *See Newman v. Stein*, 464 F.2d 689, 694-95 (2d Cir. 1972) (citing the likelihood of protracted appeals as support for settlement agreement); *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988) (same).[25]

### 3). *Competency and Experience of Counsel Who Support the Settlement*

The Debtors and the Creditors' Committee and their attorneys firmly believe the global compromise is fair to each of the Debtors and their respective Creditors and falls within the range of reasonableness required for approval by the Court. (Debtors' Trial Ex. 6). The ENA Examiner, who has recommended Creditors vote in favor of the Plan, has also agreed that the global compromise is within the range of reasonableness as to Creditors of ENA and its direct and indirect subsidiaries in the context of the Plan. (Debtors' Trial Ex. 7). The Debtors, the Creditors' Committee and the ENA Examiner are represented by attorneys who are recognized as being knowledgeable and experienced in the field of complex chapter 11 bankruptcies. *See In*

---

[25] Although the global compromise itself may be subject to an appeal, absent the global compromise, appeals of the numerous litigations that are resolved under the global compromise would likely continue for longer than any appeal of the global compromise.

*re Dow Corning Corp.*, 192 B.R. 415, 424 (Bankr. E.D. Mich. 1996) (considering counsel's

prominence in field of law as weighing heavily in favor of settlements). Moreover, the ENA

Examiner, members of the Creditors' Committee and the Debtors' officers and directors are

experienced business persons with many years of experience in distressed business situations.

*4). The Settlement Is the Product of Arm's-Length Bargaining*

Over the course of approximately two (2) years, the Debtors and the Creditors'

Committee engaged in intensive analysis and extensive discussions regarding the formulation of

the terms of a chapter 11 plan and the numerous related complex issues. Following the

expansion of the ENA Examiner's duties to include acting as a fiduciary in the role of a plan

facilitator for the ENA Creditors, these negotiations included the ENA Examiner. The intense

and, at times, acrimonious discussions regarding the terms of the global compromise, between

the Debtors and Creditors' Committee on the one hand and the ENA Examiner, on the other

hand, ensued over the next several months and ultimately resulted in the global compromise as

embodied in the Plan and set forth in the Global Compromise Motion. The settlement reflected

in the global compromise is the product of extensive, arm's-length, good faith negotiations

among the Debtors, the Creditors' Committee and the ENA Examiner. *See Dow Corning*, 192

B.R. at 424 (considering the difficulty and contentiousness of negotiations in finding settlements

were products of arm's-length bargaining).

*5). The Inter-Debtor Waivers Are Appropriate*

The global compromise does not seek an improper "hybrid" substantive consolidation, as

some objectors have contended. Rather, the 30/70 formula is a means to an end to the inter-

estate acrimony that the Court sought to resolve when appointing the ENA Examiner as a "plan

facilitator." It is well established that debtors may properly reach a settlement regarding whether

the estates should be substantively consolidated.  *See In re Resorts Int'l, Inc.*, 145 B.R. 412, 418,

459 (Bankr. D. N.J. 1990) (approving as fair and equitable a global settlement contained in plan

settling all potential litigation, including substantive consolidation, fraudulent conveyance,

preference and equitable subordination causes of action); *In re Stoecker*, 125 B.R. 767, 774

(Bankr. N.D. Ill. 1991) (referring to settlement of substantive consolidation motion); *In re Apex

Oil Co.*, 118 B.R. 683, 688 (Bankr. E.D. Mo. 1990) (referring to court's previous approval of

settlement of several significant claims, including substantive consolidation).

As a practical matter, if any Debtor's estate were to retain the right to pursue avoidance

actions against any other Debtor's estate, all the estates would have to retain all their

intercompany claims whether based on avoidance actions, re-characterization of debt to equity or

otherwise.  The Court finds and concludes that the benefits of preserving these actions are

outweighed by the cost and delay entailed thereby.

The provision in Section 28.3(a) of the Plan extinguishing claims that could have been

asserted by the Debtors against one another is consistent with the preclusive effect the Plan will

have if it is confirmed.  Moreover, the inclusion of the specific provision in Section 28.3(a)

regarding the waiver and extinguishment of claims makes these Chapter 11 Cases the converse

of that in *Maxwell Communication Corp. v. Societe Generale (In re Maxwell Corp.)*, 93 F.3d

1036, 1044-45 (2d Cir. 1996), in which the confirmation order and the plan did not address

whether the debtor could maintain an avoidance action to recover prepetition transfers.  In these

Chapter 11 Cases, the Plan is abundantly clear about the waiver and extinguishment of these

claims.  If the Plan is confirmed, any subsequent claim that is inconsistent with this provision

will be barred by section 1141(a) of the Bankruptcy Code and *res judicata.  See In re PWS

Holding Corp.*, 303 F.3d 308, 314-15 (3d Cir. 2002) (upholding plan's extinguishment of state

law creditor causes of action that could have been commenced by the debtors as debtors in

possession).

### 6). ENE's Deemed Ownership of Litigation Trust Claims Is an Integrated Part of the Global Compromise

Pursuant to the Plan, ENE will be deemed the owner of Litigation Trust claims by virtue

of the global compromise.  Deeming these actions to be assets of ENE is an integral part of the

global compromise and is fair and reasonable under the circumstances.  ENE is the plaintiff in

most of these actions, many of which involve the validity of ENE's financial statements and

there is often difficulty in proving the relative harm to different Debtor entities.  Any recoveries

from these actions will benefit all holders of Allowed General Unsecured Claims and Allowed

Guaranty Claims by virtue of ENE's contribution to the modified substantive consolidation

scenario in the 30/70 compromise.  Further, holders of Allowed Intercompany Claims against

ENE and Allowed Enron Guaranty Claims will share in any recoveries on Litigation Trust

Claims as Creditors of ENE.  Additionally, ENA, in particular, obtains many other benefits from

the global compromise, including the resolution of certain issues in favor of ENA in a manner

not otherwise achievable absent the global compromise.  These benefits include:  (a) the deemed

ownership of certain assets by ENA, which were reflected as assets of ENE on the Debtors'

books and records as of the Initial Petition Date; (b) the allowance of ENA's $12.6 billion net

Intercompany Claim against ENE; and (c) despite the agreed deemed assignment of the net

economic equity value of Enron Canada to ENA, the allowance of the $1.039 billion

Intercompany Claim of ENA against ENE arising from funds advanced to ENE by ENA, which

ENE used to purchase the Enron Canada preferred stock.

*7). The Global Compromise Is Not a Sub Rosa Plan*

Under the circumstances of these Chapter 11 Cases, the global compromise does not amount to a *sub rosa* plan. To constitute a *sub rosa* or *de facto* plan, creditors must have been denied the procedural and due process protections afforded under the Bankruptcy Code. However, in these cases, Creditors have already had more than adequate notice of the terms of the global compromise by virtue of service of the Plan, Disclosure Statement and Global Compromise Motion and they have had ample opportunity to provide input by, to the extent applicable, voting on the Plan and/or filing objections to the Plan and the Global Compromise Motion.

Courts have recognized that settlement agreements are not *sub rosa* plans but can serve as an important "building block" to confirmation of a plan. *See Sec. and Exch. Comm'n v. Drexel Burnham Lambert Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 130 B.R. 910, 926-27 (S.D.N.Y. 1991); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990). The global compromise embodied in the Plan and set forth in the Global Compromise Motion is an essential building block to resolution of these Chapter 11 Cases. Without its approval, these Chapter 11 Cases will be mired in protracted, internecine litigation to resolve the many inter-estate issues that must be resolved prior to any resolution of these Chapter 11 Cases. Therefore, the Court concludes that the global compromise contained in the Global Compromise Motion is not a *sub rosa* plan. Alternatively, the Court could approve the global compromise to the extent it establishes the assets of each Debtor's estate and subsequently approve distributions of these assets for those Debtors lacking a confirmed plan.

### 8). Approval of Global Compromise Is Warranted

Approval of the global compromise is warranted based on the foregoing findings of fact and conclusions of law. The global compromise inures to the benefit of all of the Debtors and their respective estates. The Debtors have shown that if the global compromise is not implemented, the resulting inter-estate disputes will lead to protracted and costly litigation. The consequences of this sustained litigation would further increase administrative costs and expenses under a chapter 7 liquidation. Thus, the delay resulting from the inter-estate litigation would further diminish the value that could be derived from the sale of assets. Therefore, absent the global compromise, a chapter 7 liquidation of the Debtors' estates would result in a significant reduction in the present value of the ultimate proceeds available to distribute in the Chapter 11 Cases. Further, if the global compromise is not approved, there is no evidence that any better compromise, from the objectors standpoint, would ever be reached. Indeed, the Baupost settlement is indicative of the fragile nature of the global compromise and the likelihood that were the global compromise not to be approved, the result would be that groups would splinter into various economic factions and increase the contentious nature of these cases—resulting in delay and significant additional costs.

The Court concludes that the global compromise as embodied in the Plan should be approved for all Debtors. As discussed below, the Court concludes that the Plan complies with section 1129 of the Bankruptcy Code and can be confirmed. If, however, the Plan cannot be confirmed as to the 96 Debtors for which no ballots were cast in any impaired Class for each of those specific Debtors, the Global Compromise Motion can be approved as to those Debtors based on the findings of fact and conclusions of law contained herein. As previously noted, although the Court has concluded that the Global Compromise Motion does not constitute a *sub*

*rosa* plan, if for any reason it were subsequently determined to constitute a *sub rosa* plan, then

the Global Compromise Motion may be approved for the limited purpose of determining the

assets and liabilities of the estates, but not for purposes of making distributions to any specific

Creditors in estates of Debtors not having a confirmed plan.

## C. The Plan Complies With Section 1129 of the Bankruptcy Code

*1). Section 1129(a)(1)*

Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with

applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The Court concludes

that the Plan complies fully with the requirements of section 1129(a)(1) of the Bankruptcy Code,

including, as applicable, sections 1121, 1122, 1123, 1141 and 1145 of the Bankruptcy Code.

*(i) Section 1121*

The Court concludes that the Debtors have satisfied section 1121 of the Bankruptcy Code

in that the Debtors have standing to file a plan.

*(ii) Section 1122(a)*

Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an

interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class." 11 U.S.C. § 1122. Under section 1122(a), the relevant inquiry

is whether all claims of a class have substantially similar rights to a portion of each Debtor's

estate. A plan proponent is afforded significant flexibility in classifying claims under

section 1122(a) provided there is a reasonable basis for the classification scheme and all claims

within a particular class are substantially similar. *See Aetna Cas. & Sur. Co. v. Chateaugay*

*Corp. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996); *In re Drexel Burnham*

*Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

Decisions interpreting section 1122(a) generally uphold separate classification of different groups of unsecured claims when a reasonable basis exists for the classification. The Bankruptcy Code only prohibits the identical classification of dissimilar claims and does not require the same classification for claims sharing some attributes. *See In re Chateaugay Corp.*, 155 B.R. 625, 630 (Bankr. S.D.N.Y. 1993); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 151 B.R. 307, 312 (Bankr. N.D.N.Y. 1992).

The Plan provides for separate classification of Claims and Equity Interests for each Debtor in 385 Classes based upon differences in the legal nature and/or priority of such Claims and Equity Interests.

The treatment of Guaranty Claims is appropriate in light of the global compromise embodied in the Plan and such classification and treatment is in accordance therewith. If total substantive consolidation were ordered, any claim against multiple debtor entities for the same liability, whether joint, primary or secondary (including guaranty claims), typically would be deemed to constitute one claim to be satisfied out of the common pool of assets. *See In re Gulfco. Inv. Corp.*, 593 F.2d 921, 928 (10th Cir. 1979); *see also Moran v. Hong Kong & Shanghai Banking Corp. (In re Deltacorp Inc.)*, 179 B.R. 773, 777 (Bankr. S.D.N.Y. 1995).

As a result, the multitude of Guaranty Claims would be extinguished in their entirety. Although substantive consolidation often results in all guaranty claims being eliminated, it is appropriate for a settlement of substantive consolidation to recognize a portion of guaranty claims. *See In re Piece Goods Shops Co.*, 188 B.R. 778, 786 (Bankr. M.D.N.C. 1995); *Drexel*, 138 B.R. at 748 (approving settlement and substantive consolidation contained in plan under which only a portion of guaranty claims were recognized). Therefore, the classification and treatment of Guaranty Claims as provided in the Plan is appropriate.

119

The separate classification of the Convenience Claims and the treatment of such Claims as provided in the Plan is appropriate. The separate classification of the Convenience Claims is valid and appropriate pursuant to section 1122 as it based on valid business, factual and legal reasons.

Claims in Classes 376 through 382 relating to Subordinated Claims shall be determined pursuant to a Final Order in accordance with the provisions of the Bankruptcy Code under the principles of equitable subordination or otherwise. The Plan provides the Court with flexibility to determine the amount and extent of subordination of any claim.

Furthermore, the Plan's classification of the equitably subordinated Claims into a single class does not offend the guidelines set forth by section 1122 because upon Final Order that a Claim is an Other Subordinated Claim, all such Other Subordinated Claims will be substantially similar. In the event that distributions are made to holders of equitably subordinated Claims, such distributions will be made in accordance with the priority scheme set forth in Section 17.2 of the Plan. (Debtors' Trial Ex. 1, § 17.2). Accordingly, the Debtors' classification scheme with respect to Subordinated Claims is reasonable.

The Court concludes that the Plan's classifications conform to the statute and separately classify claims based on reasonable business justifications and not for gerrymandering purposes.

Valid business, factual and legal reasons exist for the separate classification of each of these Classes of Claims and Equity Interests created under the Plan and such Classes do not unfairly discriminate between or among holders of Claims and Equity Interests. The Debtors' classification has a rational basis because it is based on the respective legal rights of each holder of a Claim or Equity Interest against the applicable Debtor's estate. The classification scheme was not proposed to create a consenting impaired class and, thereby, manipulate class voting.

*Cf. John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 161-62 (3d Cir. 1993) (determining that the proposed plan of reorganization had no reasonable prospect of confirmation because the debtor's proposed classification scheme was an improper attempt to manipulate voting). Moreover, with the exception of PGH, all Classes that voted in respect of the Plan have voted in favor of the Plan. Thus, the Plan meets the requirements of section 1122(a).

    *(iii) Section 1123(a)*

    Every chapter 11 plan must comply with the seven requirements set forth in section 1123(a) of the Bankruptcy Code. The Court concludes that the Plan complies fully with each such requirement:

    (a)    The Plan designates Classes of Claims and Classes of Equity Interests as required by section 1123(a)(1). (Debtors' Trial Ex. 1, Art. IV).

    (b)    The Plan specifies whether each Class of Claims and Equity Interests is impaired or unimpaired under the Plan and the treatment of each such impaired Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively. (Debtors' Trial Ex. 1, Art. XXX).

    (c)    The Plan specifies whether each Class of Claims and Equity Interests is impaired or unimpaired under the Plan and the treatment of each such impaired Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively. (Debtors' Trial Ex. 1, Art. XXX).

    (d)    The treatment of each Claim or Equity Interest in each particular Class is the same as the treatment of each other Claim or Equity Interest in such Class as required by section 1123(a)(4). (Debtors' Trial Ex. 1, Art. IV-XXI).

    (e)    The Plan provides adequate means for implementation of the Plan through, *inter alia*, issuance and distribution of Plan Securities, creation of the various trusts, transfer of certain assets to the trusts and disbursement of funds to certain parties as required by section 1123(a)(5). (Debtors' Trial Ex. 1, Arts. XII – XLI).

    (f)    The Restated Articles comply with the requirement of section 1123(a)(6) of the Bankruptcy Code, which requires a prohibition in the charter of a debtor of issuance of non-voting equity securities. (Debtors' Trial Ex. 4, Sched. Q(1), Art. IV, § 4.1).

(g)     The Plan contains provisions with respect to the manner of selection of directors of the Reorganized Debtors that are consistent with the interests of Creditors, Equity Interest holders and public policy in accordance with section 1123(a)(7). (Debtors' Trial Ex. 1, Art. XL).

*(iv)  Section 1123(b)*

Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that may be incorporated into a chapter 11 plan.  Just as the Plan complies with section 1123(a), each provision of the Plan is also consistent with section 1123(b):

(a)     Classes 1 and 2 are rendered unimpaired and Classes 3 through 385 are impaired or deemed impaired, as contemplated by section 1123(b)(1) of the Bankruptcy Code.  (Debtors' Trial Ex. 1, Arts. V – XX, XXX).

(b)     The Plan provides for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases that have not been previously assumed or rejected under section 365 of the Bankruptcy Code, as contemplated by section 1123(b)(2) of the Bankruptcy Code.  (Debtors' Trial Ex. 1, Art. XXXIV).

(c)     The Plan provides for the settlement, or the retention and enforcement, of certain claims of the Debtors pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  (Debtors' Trial Ex. 1, Art. II; Global Compromise Motion, Docket No. 18198).

(d)     The Plan provides for the disposition of all or substantially all of the property of the Debtors' estates and the distribution of the proceeds therefrom to holders of Allowed Claims and Allowed Equity Interests in accordance with section 1123(b)(4) of the Bankruptcy Code.  (Debtors' Trial Ex. 2, § I.B.4).

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors or the Litigation Trust and Special Litigation Trust, as applicable, are authorized representatives of the Debtors' estates.  Enforcement of the Litigation Trust Claims and Special Litigation Trust Claims by the Reorganized Debtors, Litigation Trust, or Special Litigation Trust shall not result in any impairment or lapse of such claims and causes of action, notwithstanding any contrary state law.

*(v) Section 1145*

Any issuance of the Plan Securities or the Trust Interests pursuant to the Plan will comply with section 1145(a)(1) of the Bankruptcy Code.

*2).  Section 1129(a)(2)*

Section 1129(a)(2) of the Bankruptcy Code requires a plan proponent to "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(2).  Section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements under section 1125 of the Bankruptcy Code.  *See In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984); H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").  The Debtors have complied with the applicable provisions of title 11, including, specifically, sections 1125, 1126 and 1141(d)(3) of the Bankruptcy Code.

*(i)  Section 1125*

On January 9, 2004, after due notice and a hearing, the Court entered the Solicitation Procedures Order, which, *inter alia*, approved the Disclosure Statement, finding that it contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and established procedures for the Debtors' solicitation of votes on the Plan.

Nothing in the Bankruptcy Code would require the Debtors to have included with the Disclosure Statement a liquidation analysis for each Debtor on a "stand-alone" basis in the absence of the global compromise.  The Debtors have properly incorporated the global

compromise into the Liquidation Analysis.  The Liquidation Analysis need not be premised on a

non-consolidated scenario, when the Debtors have already submitted one based on the global

compromise, including a settlement of substantive consolidation issues, as embodied in the Plan.

*In re Stone & Webster, Inc.*, 286 B.R. 532, 544 (Bankr. D. Del. 2002).[26]

       The Plan cannot be confirmed if the global compromise is not approved.  The return on

the Plan must be compared to the return in chapter 7 cases.  Because the issues resolved in the

global compromise will also exist in multiple chapter 7 cases, the only rational assumption to

make for purposes of the best interests test is that the issues would be similarly resolved in

chapter 7.  Courts have consistently applied settlements embodied in chapter 11 plans to

liquidation analyses.  *See In Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1159 (5th Cir.

1988) (approving bankruptcy court's application of an important settlement proposed in a joint

plan of reorganization to liquidation analyses of four bankruptcy estates); *In re MCorp Fin., Inc.*,

160 B.R. 941, 961 (S.D. Tex. 1993) (acknowledging that a settlement that was a critical element

of the plan and that was approved by the court should remain to affect a liquidation for the

purposes of the best interests of the creditors test); *In re Ames Dep't Stores, Eastern Retailers*

*Serv. Corp.*, *et al.*, Nos. 90 B 11233 through 90 B 11285 (Bankr. S.D.N.Y. confirmed as of

December 29, 1992) (finding that the assumption of settlements under the plan of reorganization

---

[26] As stated, on January 9, 2004 the Court approved the Disclosure Statement as providing adequate information.
Further, regarding the adequacy of disclosure as to the Liquidation Analysis, there have been no intervening events
that would render the information contained in the Disclosure Statement inadequate.  Therefore, modifications to the
Disclosure Statement and resolicitation of votes are not required.  Mr. Zelin's testimony indicates that the Debtors
have entered into contracts for two of the platforms and that those contract values would increase their liquidation
value, thereby reducing the difference between recoveries to Creditors from a chapter 7 liquidation versus their
treatment under the Plan.  The Court, however, finds that based upon Mr. Zelin's further testimony concerning the
benefits of selling the platforms under chapter 11, the overall net effect in the difference is not significant enough
under the circumstances to warrant a modification to the Disclosure Statement.  Therefore, as previously stated, the
absence of such modification would not render the Disclosure Statement inadequate and require resolicitation of
votes.  This is because a creditor, in these cases, would not need to possess such information to make an informed
judgment about the Plan.  Therefore, the Disclosure Statement, which the Court previously approved, was, and
continues to be, in compliance with section 1125.

with regard to, *inter alia*, substantive consolidation and claims, into the section 1129(a)(7)

liquidation analysis was reasonable).  The plain language of section 1125(a)(1) and the

jurisprudence provide a debtor is not required to disclose information about other possible plans.

*Kirk v. Texaco, Inc.,* 82 B.R. 678 (S.D.N.Y. 1988).

### (ii)  Section 1126

The Debtors have solicited acceptances of the Plan consistent with section 1126(b) of the

Bankruptcy Code.  In accordance with section 1126 of the Bankruptcy Code and pursuant to the

Solicitation Orders, the Debtors solicited acceptances or rejections of the Plan from holders of all

Allowed Claims in each Class of impaired Claims that are to receive distributions under the Plan.

Classes 1 and 2 of the Plan are unimpaired.  As a result, pursuant to section 1126(f) of the

Bankruptcy Code, holders of Claims in those Classes are conclusively presumed to have

accepted the Plan.  Classes 3 through 375 of the Plan are impaired.  As a result, pursuant to

section 1126(a) of the Bankruptcy Code, holders of Claims in such Classes (other than Class

190) were entitled to vote to accept or reject the Plan.[27]  The Debtors do not anticipate that

Classes 376 through 385 of the Plan will receive any distributions under the Plan, therefore, the

holders of Claims and Equity Interests in such Classes were not solicited and are conclusively

presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  The

voting results are set forth above and evidenced by Debtors' Trial Exhibit 19.  The Debtors have

complied with the applicable provisions of section 1126.

### (iii)  Section 1141(d)(3)

In determining whether a debtor should be denied a discharge under section 1141(d)(3),

courts have distinguished a wholesale liquidation of a debtor's assets from a supervised

---

[27] Class 190 (Intercompany Claims) is deemed to have voted to accept the Plan because the holders of such Intercompany Claims are the Plan proponents.

divestiture process.  Specifically, courts have found that, where a debtor's post-confirmation

business consists of managing assets pending their sale to third parties, such debtor was entitled

to a discharge.  *See*, *e.g.*, *In re River Capital Corp.*, 155 B.R. 382, 387 (Bankr. E.D. Va. 1991);

*In re T-H New Orleans Ltd. P'ship*, 188 B.R. 799, 804 (E.D. La. 1995), *aff'd*, *In Matter of T-H*

*New Orleans Ltd. P'ship*, 116 F.3d 790, 803-04 (5th Cir. 1997); *In Matter of First Am. Health*

*Care of Ga., Inc.*, 220 B.R. 720, 726 (Bankr. S.D. Ga. 1998).

 Pursuant to the Plan, the Reorganized Debtors will retain all assets not otherwise

transferred to the Litigation Trust, the Special Litigation Trust, the Severance Settlement Fund

Trust, the Operating Trusts, or the Operating Entities.  The Reorganized Debtors and the

Reorganized Debtor Plan Administrator will continue to manage and operate these assets until a

favorable sale or resolution of each of the Remaining Assets is finalized.  These Remaining

Assets may include Cash, claims, avoidance actions and other causes of action against third

parties on behalf of the Debtors' estates, proceeds of liquidated assets, the Debtors' stock in the

Enron Companies, trading contracts, equity investments, inventory, real property and other

miscellaneous assets.  The wind down of the Debtors' estates remains a complicated process as

there are a significant number of individual assets that need to be collected or sold, or otherwise

handled.  Some of these assets are the subject matter of pending litigation proceedings and/or

complex cross-ownership structures.  Further, the policy underlying section 1143(d)(3)(A) is to

prevent trafficking in empty corporate shells for tax avoidance.  H.R. No. 95-595, 95th Cong. at

384 (1977); *In re Rath Packing Co.*, 55 B.R. 528, 537 (Bankr. N.D. Iowa 1985).

 Based on case law precedents and the Plan's stated purpose of providing a supervised

divestiture of estate assets, section 1141(d)(3) of the Bankruptcy Code does not bar the

application of a discharge to the Debtors.  In fact, the indeterminate period of retention of the

assets after the Effective Date and the clear need for ongoing business operations to maximum

value for all creditors in liquidating the assets necessitates the application of the section 1141

discharge to the Reorganized Debtors.  Based upon the foregoing, the Court concludes that the

requirements of section 1129(a)(2) have been satisfied.  Based upon the foregoing, the Court

concludes that the requirements of section 1129(a)(2) of the Bankruptcy Code have been

satisfied.

*3).  Section 1129(a)(3)*

Section 1129(a)(3) of the Bankruptcy Code requires a plan be "proposed in good faith

and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The United States Court of

Appeals for the Second Circuit has defined the good faith standard as "requiring a showing that

the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a

reorganization can be effected.'"  *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir.

1984) (quoting *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935)); *see also Johns-*

*Manville*, 68 B.R. at 631-32.  In the context of a chapter 11 plan, courts have held that a plan is

considered proposed in good faith "if there is a likelihood that the plan will achieve a result

consistent with the standards prescribed under the [Bankruptcy] Code."  *In re Leslie Fay Cos.*,

207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting *In re Texaco Inc.*, 84 B.R. 893, 907 (Bankr.

S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988)).  "The requirement of good faith

must be viewed in light of the totality of the circumstances surrounding the establishment of a

chapter 11 plan."  *In re Leslie Fay Cos.*, 207 B.R. at 781 (Bankr. S.D.N.Y. 1997) (citations

omitted).

As set forth in the findings of fact, the Plan is the result of extensive arm's-length

discussions, debate and/or negotiations among the Debtors, the Creditors' Committee and the

ENA Examiner. Accordingly, the Court concludes that the Plan satisfies the requirements of 11

U.S.C. § 1129(a)(3).

*4). Section 1129(a)(4)*

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and

expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring

property under the plan, be subject to approval of the court as reasonable.[28] Section 1129(a)(4)

of the Bankruptcy Code has been construed to require that all payments of professional fees

made from estate assets be subject to review and approval by the Court as to their

reasonableness. *See, e.g.*, *In re River Vill. Assocs.*, 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993),

*aff'd*, 181 B.R. 795 (E.D. Pa. 1995).

Pursuant to the interim application procedures established under section 331 of the

Bankruptcy Code, the Court authorized and approved the payment of certain fees and expenses

of professionals retained in the Chapter 11 Cases. All such fees and expenses, as well as all

other accrued fees and expenses of professionals through the Effective Date, remain subject to

final review by the Fee Committee and the Court for reasonableness under section 330 of the

Bankruptcy Code. In addition, pursuant to sections 503(b)(3) and (4) of the Bankruptcy Code,

the Court must review any applications for substantial contribution to ensure compliance with

the statutory requirements and that the fees requested are reasonable. Moreover, all payments or

bonuses to be made in connection with the Effective Date or which relate to the success of the

reorganization or which otherwise are required to be disclosed, including any amounts to be paid

---

[28] Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).

to officers and directors, (a) are disclosed in the Disclosure Statement, (b) have been disclosed at

or prior to the Confirmation Hearing, or (c) are subject to the approval of the Court.  The

foregoing procedures for the Court's review and ultimate determination of the fees and expenses

to be paid by the Debtors satisfy the objectives of section 1129(a)(4) of the Bankruptcy Code.

*5).  Section 1129(a)(5)*

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the

identity and affiliations of the proposed officers and directors of the reorganized debtors; that the

appointment or continuance of such officers and directors be consistent with the interests of

creditors and equity interest holders and with public policy; and that there be disclosure of the

identity and compensation of any insiders to be retained or employed by the reorganized debtors.

Schedule U and V to the Plan Supplement filed on March 9, 2004, as modified by the

Governance Modification, identifies the individuals the Debtors have preliminarily identified to

serve as officers and directors of Reorganized ENE, as well as the other Reorganized Debtors, as

of the Effective Date.

The Reorganized Debtors' employment of Cooper LLC is consistent with the interests of

Creditors.  Mr. Cooper, as the Chief Executive Officer and Chief Restructuring Officer of the

Debtors, is intimately familiar with the business and assets of the Debtors.  Cooper LLC's

appointment as Reorganized Debtor Plan Administrator is consistent with the interests of

Creditors and public policy.  *See In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo.

1990) (where debtors and the creditors' committee believe control of entity by proposed

individuals will be beneficial, the requirements of section 1129(a)(5) are satisfied); *Toy &

Sports*, 37 B.R. at 149-50 (continuation of debtor's president and founder, who had many years

of experience in the debtors' business, satisfied section 1129(a)(5) and enhanced feasibility of

the plan).

Subject to Court approval and pursuant to their respective engagement agreements,

certain professionals of the Debtors and the Creditors, may seek a success fee in connection with

confirmation of the Plan.  Based upon the foregoing, the Court concludes that the Debtors have

satisfied or will be able to satisfy the requirements of section 1129(a)(5).

*6).  Section 1129(a)(6)*

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission

having jurisdiction over the rates charged by the reorganized debtor in the operation of its

businesses approve any rate change provided for in the plan.  The provision is not applicable to

the Debtors and Reorganized Debtors.  The SEC has, however, approved the Plan under section

11(f) of PUHCA and issued a report in connection therewith.

*7).  Section 1129(a)(7)*

Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of

creditors and stockholders, as follows:

With respect to each impaired class of claims or interests–

    (A)    each holder of a claim or interest of such class–

        (i)    has accepted the plan; or

        (ii)    will receive or retain under the plan on account of such
            claim or interest property of a value, as of the effective date
            of the plan, that is not less than the amount that such holder
            would so receive or retain if the debtor were liquidated
            under chapter 7 of this title on such date . . . .

11 U.S.C. § 1129(a)(7)(A).

The "best interests" test focuses on individual dissenting creditors rather than classes of

claims.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 N. 434,

442 (1999). The test requires that each holder of a claim or equity interest either accept the plan

or receive or retain under the plan property having a present value, as of the effective date of the

plan, not less than the amount such holder would receive or retain if the debtor were liquidated

under chapter 7 of the Bankruptcy Code on such date.

Under the "best interests" test, the court must find that each impaired creditor will receive

or retain value not less than the amount he would receive if the debtor were liquidated. *See 203*

*N. LaSalle*, 526 U.S. at 442; *In re Century Glove, Inc.*, No. Civ. A. 90-400-SLR, Civ. A. 90-401-

SLR, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993). As section 1129(a)(7) of the Bankruptcy

Code makes clear, the liquidation analysis applies only to non-accepting impaired claims or

equity interests. If a class of claims or equity interests unanimously accepts the plan, the "best

interests" test automatically is deemed satisfied for all members of that accepting class. *See*

*Drexel*, 138 B.R. at 761.

Moreover, pursuant to section 1126(f) of the Bankruptcy Code, a class that is not

impaired under the plan is conclusively deemed to have accepted the plan. Here, each holder of

a Claim in Classes 1 and 2 is unimpaired and is conclusively deemed to have accepted the Plan.

Therefore, the "best interests" test is satisfied with respect to each of these Classes.

As an initial matter, to determine the value impaired Creditors and impaired Equity

Interest holders would receive if the Debtors were liquidated, the Court must determine the

dollar amount that would be generated from the liquidation of the Debtors' assets and properties

in the context of a chapter 7 liquidation case. The liquidation analysis need not be done on a

"stand-alone," Debtor-by-Debtor basis, but may be done based on certain assumptions (such as

substantive consolidation or a compromise of substantive consolidation) if there is a legitimate

basis for such assumptions. *See Stone & Webster,* 286 B.R. 532, 545. Moreover, it is impossible

to determine what an appropriate "stand alone" assumption for a liquidation analysis would be absent inclusion of the global compromise embodied in the Plan.  Even assuming that an appropriate "stand-alone" chapter 7 case for ENA was based on no global compromise and only on ENA's books and records as of the Initial Petition Date, ENA Creditors would stand to receive less than under the Plan.

The assumptions used by the Debtors in their Liquidation Analysis as set forth in Appendix L to the Disclosure Statement are appropriate and reasonably based on the facts in these Chapter 11 Cases.  In the context of the erosion of proceeds available for distribution associated with a chapter 7 case, confirmation of the Plan provides each non-accepting Creditor or Equity Interest holder with a recovery not less than, and, in fact, more, than what such Creditor or Equity Interest holder would receive in a liquidation of the Debtors' estates under chapter 7 of the Bankruptcy Code.

The Plan provides for a reorganization to allow for an orderly wind-down of the Debtors' business affairs over the next several years.  The Debtors' Liquidation Analysis clearly reflects that holders of Allowed Claims will receive under the Plan not less than such Creditors would receive in a chapter 7.  Under the circumstances, the date of the actual occurrence of the Effective Date under the Plan has no impact on the satisfaction of the "best interests" test.

Nor does the Plan violate the "best interests" of creditors test because Debtors have stated that they have relied upon the Debtors' books and records with respect to the value of certain assets for particular Debtors, intercompany account balances and claims.  ENE has cautioned Creditors that its financial statements filed with the SEC for fiscal years ended 1997 through 2000 and for the first three quarters of 2001 should not be relied upon.  (Bingham Affidavit ¶ 58).  While the Debtors' prepetition financial statements may be unreliable in certain respects,

professionals for the Debtors, the Creditors' Committee and the ENA Examiner sampled

intercompany entries, particularly those between ENE and ENA, and determined that the

Debtors' books and records were generally reliable as they related to intercompany transactions.

Indicating that prepetition financial statements may be unreliable does not amount to the type of

"fanciful assumptions" that have concerned the Second Circuit because they "undermine the

credibility of the entire reorganization proposal." *Pegasus Agency, Inc. v. Grammatikakis (In re*

*Pegasus Agency, Inc.)*, 101 F.3d 882, 887 (2d Cir. 1996).

  If the existence of unreliable prepetition financial statements could preclude the

confirmation of a plan, it would be impossible to confirm any plan in these Chapter 11 Cases or

in any other case with similar facts. Far from relying on speculative or unreliable assumptions,

the global compromise lays to rest the many uncertainties involving intercompany transactions

and potential avoidance claims that would otherwise jeopardize the resolution of these Chapter

11 Cases. (6/8/04 Cooper Tr. at 34:16 – 35:21).

  No objector has challenged the Debtors' proposed means of handling any asset or

business. The sole question is whether the net present value recovery is equal or greater under

the Plan than in chapter 7. No one has claimed "scrap value" is greater than the going concern

value the Debtors are obtaining under the Plan by distributing their businesses to creditors or

selling them as going concerns and distributing their proceeds. The purpose of a best interest

liquidation analysis is to compare recoveries in a chapter 7 liquidation to a chapter 11 plan – not

to compare different legal outcomes to disputed issues. Accordingly, the existence of a stand-

alone liquidation analysis is irrelevant to confirmation of the Plan. As the Plan is premised upon

the approval of the global compromise, no further liquidation analyses are required.

The Debtors' evidence shows that the Plan creates better recovery than a liquidation under chapter 7 would provide. The Plan proposes that the Debtors utilize the assets to maximize value. The Debtors will maintain each business platform as a going concern and will sell the assets if they maximize value, otherwise the assets will be distributed to Creditors through the distribution of shares of the platform entities. The Debtors witnesses testified that there was no other way to maximize value other than as proposed in the Plan. In fact, the witnesses established that the ability of the Debtors to distribute stock instead of being forced to liquidate, as would be the case in chapter 7, enabled the Debtors to withdraw the platforms from the market place when the offering prices were less than "going concern value." Moreover, the ability to withdraw the platforms enhances the Debtors' ability in closing any contract as it increases the Debtors' negotiating leverage. The ability to distribute such "going concern value" through the distribution of stock to creditors is not possible in a chapter 7. Therefore, once a case is converted to chapter 7, the marketplace can take advantage of such limitation. Even under the present circumstances where two of the platform entities are under contract for sale, the testimony supports the finding that these contracts will bring greater value to the estates if they are ultimately closed in chapter 11 rather than chapter 7.

As discussed, under the Plan, Creditors are not limited to receiving only the liquidation value of the various platforms. Rather, Creditors will receive either the liquidation value if it exceeds the going concern value or will receive the going concern value if such is higher than the liquidation value. Therefore, on any given effective date, values under the Plan will always exceed a chapter 7 liquidation value on such dates because of the Debtors' improved negotiating leverage in selling assets under chapter 11.

Based on the evidence, which the Court finds credible and unrebutted, the value to be distributed to Creditors on account of Allowed Claims under the Plan, as of the Effective Date, is not less than the amount that such holder would receive or retain if the Debtors, or any of them, were liquidated under chapter 7. Therefore, the Court concludes that the requirements of section 1129(a)(7) of the Bankruptcy Code have been satisfied.

*8). Section 1129(a)(8)*

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan:

> With respect to each class of claims or interests—
>
> (A)     such class has accepted the plan; or
> (B)     such class is not impaired under the plan

11 U.S.C. § 1129(a)(8).

Classes 1 and 2 are unimpaired under the Plan, are conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, satisfy section 1129(a)(8)(B) of the Bankruptcy Code. As set forth in the Voting Certification, the impaired classes entitled to vote voted to accept the Plan by the requisite majorities that meet the acceptance requirements of section 1126(c). Thus, as to the unimpaired Classes and the impaired classes that vote to accept the Plan, the Court concludes that the requirement of section 1129(a)(8)(A) is satisfied.

Classes of Creditors with respect to the 96 Debtors, referenced in footnote 14, are impaired and the Creditors in those classes did not cast any ballots. Therefore, section 1129(a)(8)(A) is not satisfied as to these 96 Debtors. However, as will be discussed subsequently, the Plan may be confirmed as to those classes under section 1129(b) of the Bankruptcy Code. Classes 376 through 385 are deemed to have voted to reject the Plan. As to

those classes as well, the Plan may be confirmed under the cramdown provisions of section

1129(b) of the Bankruptcy Code.

*9).  Section 1129(a)(9)*

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled

to priority under section 507(a) of the Bankruptcy Code receive specified cash payments under

the plan.  Unless the holder of a particular claim agrees to a different treatment with respect to

such claim, section 1129(a)(9) requires the plan to provide as follows:

> (A)     with respect to a claim of a kind specified in
>         section 507(a)(1) or 507(a)(2) of [the Bankruptcy Code], on
>         the effective date of the plan, the holder of such claim will
>         receive on account of such claim cash equal to the allowed
>         amount of such claim;
>
> (B)     with respect to a class of claims of a kind specified in
>         section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6) or
>         507(a)(7) of [the Bankruptcy Code], each holder of a claim
>         of such class will receive –
>
>> (i)      if such class has accepted the plan, deferred cash payments
>>          of a value, as of the effective date of the plan, equal to the
>>          allowed amount of such claim; or
>>
>> (ii)     if such class has not accepted the plan, cash on the effective
>>          date of the plan equal to the allowed amount of such claim;
>>          and
>
> (C)     with respect to a claim of a kind specified in
>         section 507(a)(8) of [the Bankruptcy Code], the holder of
>         such claim will receive on account of such claim deferred
>         cash payments, over a period not exceeding six years after
>         the date of assessment of such claim, of a value, as of the
>         effective date of the plan, equal to the allowed amount of
>         such claim.

11 U.S.C. § 1129(a)(9).

In accordance with sections 1129(a)(9)(A) and (B) of the Bankruptcy Code, the Plan

provides that all Allowed Administrative Expense Claims under section 503(b) of the

Bankruptcy Code and all Allowed Priority Claims under section 507(a) (excluding Priority Tax

Claims under section 507(a)(8)) will be paid in full, in Cash, on the later of the Effective Date

and the date such Claims become Allowed Claims, or as soon thereafter as is practicable.

(Debtors' Trial Ex. 1, Art. III, V).  Allowed Administrative Expense Claims representing

liabilities incurred in the ordinary course of business by the Debtors, including postpetition tax

liabilities, or liabilities arising under loans or advances to or other obligations incurred by the

Debtors in Possession during the Chapter 11 Cases, which will be paid by the Reorganized

Debtor Plan Administrator in accordance with the terms and conditions of any particular

transaction and any agreements relating thereto.  (Debtors' Trial Ex. 1, Art. III).  The

Confirmation Order establishes a deadline for parties to assert Administrative Expense Claims.

     The Plan also satisfies the requirements of section 1129(a)(9)(C) with respect to the

treatment of Priority Tax Claims under section 507(a)(8).  On May 31, 2004, the Debtors filed

and served a Notice of Election of Option with Respect to Payment of Priority Tax Claims,

stating that, pursuant to the Plan, the Debtors have elected to exercise their option to make

distributions to each holder of an Allowed Priority Tax Claim in full, in Cash, on the Effective

Date.  (Docket No. 18775).  Based upon the foregoing, the Court concludes that the Plan satisfies

the requirements of section 1129(a)(9) of the Bankruptcy Code.

*10).  Section 1129(a)(10)*

     Section 1129(a)(10) provides that, if a class of claims is impaired under a chapter 11

plan, at least one class of impaired claims under such plan must vote to accept the plan.  *See* 11

U.S.C. § 1129(a)(10).  Though the Plan governs the treatment of claims against the 177 jointly

administered Debtors, pursuant to applicable law, the affirmative vote of one impaired class

under the Plan is sufficient to satisfy section 1129(a)(10).  *See In re SGPA, Inc.*, Ch. 11 Case No.

1-01-02609 (Bankr. M.D. Pa. Sept. 28, 2001) (joint chapter 11 plan of reorganization complied

with section 1129(a)(10) because at least one class of impaired creditors accepted the plan,

notwithstanding the fact that each debtor entity did not have an accepting impaired class).  The

plain language and inherent fundamental policy behind section 1129(a)(10) of the Bankruptcy

Code provides that an affirmative vote of one impaired class under a plan is sufficient to satisfy

section 1129(a)(10) of the Bankruptcy Code.

     Further, aside from the plain meaning analysis, by virtue of the substantive consolidation

component of the global compromise, the requirements of section 1129(a)(10) are satisfied as to

each of the Debtors lacking an impaired accepting class because those Debtors are part of the

global compromise embodied in the Plan.  Substantive consolidation is not eliminated when the

returns of creditors are adjusted to take into account their individual equities as they have been

adjusted here.  *See Stone v. Eacho (In re Tiptop Tailors, Inc.)*, 128 F.2d 16, 16 (4th Cir. 1942),

*denying reh'g of* 127 F.2d 284 (4th Cir. 1942).

     In addition, the Court notes that at least one court has confirmed a chapter 11 plan

(without requiring either substantive consolidation or the filing of separate plans) where it

appears that impaired classes of certain (but not all) of the jointly administered debtors vote only

for the one plan before the court.  *See, e.g., In re Resorts Int'l Inc.*, 145 B.R. 412, 416 (Bankr. D.

N.J. 1990).  It is quite common for debtors with a complex corporate structure to file a joint

chapter 11 plan pursuant to which the corporate form is preserved, or in which a "deemed

consolidation" is proposed and approved.  In such circumstances, all debtors are treated as a

single legal entity for voting and distribution purposes.  *See*, *e.g., In re Genesis Health Ventures,

Inc.*, 266 B.R. 591, 619 (Bankr. D. Del. 2001).

Accordingly, the Court concludes that the Plan satisfies section 1129(a)(10).[29]

*11). Section 1129(a)(11)*

Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the

Plan is feasible as a condition precedent to confirmation.  Specifically, the Court must determine

that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the
> need for further financial reorganization, of the debtor or any successor to the
> debtor under the plan, unless such liquidation or reorganization is proposed in the
> plan.

11 U.S.C. § 1129(a)(11).

The Plan is feasible within the meaning of this provision.  The feasibility test set forth in

section 1129(a)(11) requires the Court to determine whether the Plan is workable and has a

reasonable likelihood of success.  *See Leslie Fay*, 207 B.R. at 788.  The Second Circuit has

provided that "the feasibility standard is whether the plan offers a reasonable assurance of

success.  Success need not be guaranteed." *Kane v Johns-Manville Corp.*, 843 F.2d at 649.

Based on the foregoing findings and conclusions of law, the Plan satisfies the feasibility standard

of section 1129(a)(11).

*12). Section 1129(a)(12)*

Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable

under section 1930 [of title 28 of the United States Code], as determined by the court at the

hearing on confirmation of the plan . . . ."  Section 507 of the Bankruptcy Code provides that

---

[29] Alternatively, the Court could confirm the Plan for each Debtor having an actual impaired accepting Class of
Claims and, having found that the global compromise is not a *sub rosa* plan as to the 96 Debtors lacking an impaired
accepting class, approve the global compromise as contained in the Global Compromise Motion as to those 96
Debtors.  Further, even if the Court were to determine that the global compromise were a *sub rosa* plan as to the 96
Debtors (because it determines the distribution scheme as to those Debtors), the Court could confirm the Plan for
each of the Debtors having an actual impaired accepting Class of Claims and approve the global compromise as to
the 96 Debtors, limited to establishing the assets and liabilities of those estates.

"any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28"

are afforded priority as administrative expenses.  In accordance with sections 507 and

1129(a)(12) of the Bankruptcy Code, the Plan provides that all fees payable pursuant to section

1930 of title 28 of the United States Code, shall be paid as and when due or otherwise pursuant

to an agreement between the Reorganized Debtors and the U.S. Trustee until such time as a

Chapter 11 Case for a Debtor shall be closed in accordance with the provisions of Section 42.17

of the Plan.  (Debtors' Trial Ex. 5, § 42.10).  The Debtors have budgeted for and have the

necessary Cash to pay these fees and charges on the Effective Date.  (Bingham Affidavit ¶ 84).

Thus, the Court concludes that the Plan satisfies the requirements of section 1129(a)(12) of the

Bankruptcy Code.

*13).  Section 1129(a)(13)*

    Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the

continuation of retiree benefits at levels established pursuant to section 1114 of the Bankruptcy

Code.  In compliance with section 1129(a)(13) of the Bankruptcy Code, the Plan provides that

from and after the Effective Date, the Reorganized Debtors shall continue to pay all retiree

benefits (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level

established in accordance with subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy

Code, at any time prior to the Confirmation Date and for the duration of the period during which

the Debtors have obligated themselves to provide such benefits.  (Debtors' Trial Ex. 1, Art. XLII,

§ 42.11).  Accordingly, the Court concludes that the Plan satisfies the requirements of section

1129(a)(13) of the Bankruptcy Code.

14).  Section 1129(b)

Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a

plan when the plan is not accepted by all impaired classes of claims and equity interests, as

follows:

> Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable
> requirements of [section 1129(a) of the Bankruptcy Code] other than [the
> requirement contained in section 1129(a)(8) that a plan must be accepted by all
> impaired classes] are met with respect to a plan, the court, on request of the
> proponent of the plan, shall confirm the plan notwithstanding the requirements of
> such paragraph *if the plan does not discriminate unfairly, and is fair and
> equitable, with respect to each class of claims or interests that is impaired under,
> and has not accepted, the plan*.

11 U.S.C. § 1129(b)(1) (emphasis added).

Thus, in accordance with section 1129(b) of the Bankruptcy Code, the Bankruptcy Court

may impose a plan over the dissenting vote of impaired classes of claims or equity interests as

long as the plan (a) does not "discriminate unfairly" and (b) is "fair and equitable" with respect

to the dissenting class or classes.

The Plan was proposed by all of the Debtors as a joint plan.  The ENA Examiner, as an

independent representative of the ENA Creditors, believes that the global compromise and

settlement embodied in the Plan is a reasonable and fair resolution of these issues based upon the

plausible outcomes of litigation.  (Debtors' Trial Ex. 6-7).

With respect to the assertion that the Plan diverts value from ENA for the benefit of ENE,

the Court rejected such position in connection with the hearing on the extension of exclusivity

held on May 6, 2004.  (5/6/04 Hearing Tr., *passim*).  At such hearing, various Creditors argued

that the Court should deny extension of the Debtors' exclusive periods because the Plan was not

market tested to allow for the filing of a competing plan, which was proposed by ENE (ENA's

controlling equity holder), and ENA has not proposed its own plan.  After lengthy argument on

whether exclusivity should be denied, the Court granted the Debtors' motion to extend

exclusivity, thereby overruling the creditors' objections.  (Order Extending Exclusive Period For

Debtors to Solicit Acceptances of their Joint Chapter 11 Plan, dated 5/6/04 (Docket No. 18245)).

The various Creditors' objections to the Plan in this regard have not changed.  For the same

reasons argued at length at the exclusivity hearing, the Plan does not violate section 1129(b) and

the objections relative thereto are overruled.

*(i)  The Plan Does Not Discriminate Unfairly*

A plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only

if similar claims are treated differently by a debtor without a reasonable basis for the disparate

treatment.  *See* 11 U.S.C. § 1129(b).  Pursuant to the Plan, similar Claims receive similar

treatment under the Plan.  The Court already has concluded that the Plan does not discriminate

unfairly with respect to Class 185 Enron Guaranty Claims.  The Plan does not "discriminate

unfairly" with respect to the impaired Classes of Equity Interests that are deemed to reject the

Plan.  No party has objected to the cramdown of these Classes of Equity Interests.

*(ii)  The Plan Does Not Violate the Absolute Priority Rule*

Section 1129(b)(2)(c) of the Bankruptcy Code requires that a plan be "fair and equitable"

to a rejecting class of interests as follows:

(C)  With respect to a class of interests –

(i)  the plan provides that each holder of an interest of such class
receive or retain on account of such interest property of a value,
as of the effective date of the plan, equal to the greatest of the
allowed amount of any fixed liquidation preference to which
such holder is entitled, any fixed redemption price to which
such holder is entitled, or the value of such interest; or

(ii)  the holder of any interest that is junior to the interests of such
class will not receive or retain under the plan on account of such
junior interest any property.

*See* 11 U.S.C. § 1129(b)(2)(C).

Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides:

> (2)  For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (B)  With respect to a class of unsecured claims –
> . . . .
> > (ii)  the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B)(ii).

Distributions made pursuant to the Plan conform with the requirements of section 1129(b)(2)(B)(ii) of the Bankruptcy Code because distributions are made based on an order of priority such that, absent consent, holders of Allowed Claims or Equity Interests in a given Class must be paid in full before a distribution is made to a more junior Class. The Plan's contingent right to payment afforded to the stockholders of ENE is the embodiment of and not a violation of the absolute priority rule. The shareholders receive that which section 1129(b)(2)(B) provides that they may receive—property remaining after creditors are paid in full. The issuance of a certificate representing shareholders contingent right to payment is not itself a distribution of property of the estate and, therefore, the absolute priority scheme is not violated. Classes of Creditors will receive present value distributions of their claims prior to any more junior Classes receiving distributions.

Accordingly, the Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code.

### D.  The Release, Injunction and Exculpation Provisions of the Plan

The Plan includes limited discharge, injunction and exculpation provisions that are necessary and appropriate in the context of these Chapter 11 Cases.

## 1).  Discharge

Section 42.3 provides for a discharge of Claims against and Equity Interests in the

Debtors and Debtors in Possession.  Section 1.46 of the Plan defines Claims as "any right to

payment *from the Debtors* or from property *of the Debtors* or their estates . . . ."  Section 1.139

of the Plan defines Equity Interest as "any equity interest *in any of the Debtors* . . . ."  Therefore,

the discharge set forth in Section 42.3 comports with section 524(e) of the Bankruptcy Code as

not providing for a discharge of non-debtor claims.  In addition, the Debtors have modified

Section 4.3 of the Plan to delete the reference to the "Reorganized Debtors' subsidiaries, the

Reorganized Debtor Plan Administrator, their agents and employees" from the entities against

whom all Persons and Entities are precluded from asserting Claims.  (Debtors' Trial Ex. 5,

§ 42.3).

## 2).  Injunctions

Section 42.4 of the Plan enjoins Persons or Entities who have held, hold or may hold

Claims (or other debt or liability discharged pursuant to the Plan) from commencing or

continuing actions against the Debtors, the Debtors in Possession or the Reorganized Debtors, on

any such Claim or other debt or liability or Equity Interest or other right of equity interest that is

terminated or cancelled pursuant to the Plan.  As Section 42.4 of the Plan is limited in scope to

the Debtors, the Debtors in Possession or the Reorganized Debtors, this injunction is likewise

appropriate.

Several courts have found that governmental authorities are no different from other

creditors in certain situations.  *See In re Pacific Gas & Elec. Co.,* 281 B.R. 1, 27 (Bankr. N.D.

Cal. 2002) (finding that, "where the government acts like a creditor, it is stayed just like other

creditors.").  Accordingly, section 502 of the Bankruptcy Code governs the allowance of claims,

and no exception exists within section 502 for claims based upon the alleged police or regulatory

powers of a governmental unit or agency.

3). *Releases and Exculpations*

The Plan does not provide for broad third-party releases, but rather, limited exculpation

for acts during these Chapter 11 Cases.  The exculpation neither affects liability for prepetition

actions nor absolves parties from liability for gross negligence or willful misconduct.

Bankruptcy law fosters negotiation of plan terms among constituent creditors.  Numerous

parties negotiated the Plan and made various compromises.  Exculpation for participating in the

plan process is appropriate where plan negotiation could not have occurred without protection

from liability.  As recognized by the Second Circuit in *Drexel*, where a debtor's plan requires the

settlement of numerous, complex issues, protection of third parties against legal exposure may be

a key component of such settlement.  *See Sec. and Exch. Comm'n v. Drexel Burnham Lambert

Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285 (2d Cir. 1992).

Moreover, without such exculpation, negotiation of a Plan in these Chapter 11 Cases would not

have been possible – a result in contravention of the purposes of the Bankruptcy Code.  Without

creditor participation in plan formulation, the value of these chapter 11 estates would be

immeasurably depleted by costly and lengthy litigation, thereby injuring all creditors.[30]

---

[30] The DOL interposed an objection to confirmation of the Plan alleging that the exculpatory provisions of the Plan
violate ERISA (Docket No. 17173, ¶¶ 12(C), 23-31.).  The DOL objection, however, fails to consider that not all
releases are precluded under ERISA.  "A release is not an 'agreement or instrument' within the meaning of section
1110(a)." *Leavitt v. Northwestern Bell Telephone Co.*, 921 F.2d 160, 161 (8th Cir.1990).  "Private settlements of
ERISA claims do not compromise the policies underlying ERISA." *Id.* at 162.  This includes settlements containing
releases.  Specifically, "[s]ection 1110(a) prohibits agreements that diminish the statutory obligations of a fiduciary.
A release, however, does not relieve a fiduciary of any responsibility, obligation, or duty imposed by ERISA;
instead, it merely settles a dispute that the fiduciary did not fulfill its responsibility or duty on a given occasion." *Id.*
at 161-62.

In the event of a conflict between ERISA and other federal law, ERISA is subordinated to other federal law.  *PBGC
v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.)*, 150 F.3d 1293, 1301 (10th Cir. 1998),
*cert. denied*, 526 U.S. 1145 (1999) (terms of ERISA not sole measure of determining value of claim for terminated
plan in bankruptcy).  The validity of this argument was recognized (but not decided) by the United States District

The exculpation provisions in Section 42.7 of the Plan are reasonable and customary and in the best interests of the estates.  If the claims for which individuals are exculpated are actually brought, the Debtors and their employees may be asked for discovery and trial testimony. (6/9/04 Cooper Tr. at 90:20 – 25, 92:13 –15).  To the extent any entity or individual cannot be exculpated as provided herein, the Court enjoins all such claims to be filed initially with this Court and only with the Court.  Additionally, the Court is not precluded from hearing actions brought by parties under ERISA.[31]  The Court concludes that the release, injunction and exculpation provisions in Article XLII of the Plan are reasonable and appropriate in these Chapter 11 Cases.

The Court further concludes that the exculpation provision found in Section 42.7 of the Plan is substantially similar to the exculpation provision found in the confirmed chapter 11 plan of *In re WorldCom, Inc.,* Case No. 02-13533 (AJG)), as well as other complex chapter 11 cases. Contrary to certain arguments made during the Confirmation Hearing, nothing contained in the WorldCom Order Confirming the Debtors' Modified Second Amended Joint Plan, entered by the Court on October 31, 2003 (the "WorldCom Order") (Docket No. 9686, order confirming the plan of reorganization in the chapter 11 cases of *In re WorldCom, Inc.,* Case No. 02-13533 (AJG)) contradicts the scope of the exculpation in section 42.7 of the Plan.

---

Court for the Southern District of New York in *PBGC v. LTV Steel Corp. (In re Chateaugay Corp.)*, 87 B.R. 779, 801 n.5 (S.D.N.Y. 1988), *rev'd on other grounds*, 496 U.S. 633 (1990).

[31] As was stated in *Browning v. Levy*, 283 F.3d 761, 779 (6th Cir. 2002):

> [T]he exclusive jurisdiction of the district courts over certain ERISA claims does not preclude such claims from being brought in bankruptcy proceedings, because the "bankruptcy court is not a free standing court," but rather "a 'unit' of the district court." *In re Frontier Airlines, Inc.,* 84 B.R. 724, 727 (Bankr. Colo. 1988) (holding that the bankruptcy court had jurisdiction to hear claims arising under ERISA); *28 U.S.C. § 151.* Because the bankruptcy court is a unit of the district court, and therefore able to share in the district courts' exclusive jurisdiction over ERISA claims, the bankruptcy court has no less power to hear ERISA claims than it does any other non-core bankruptcy proceeding. *Frontier Airlines,* 84 B.R. at 727-28.

**E. Other Plan Issues**

*1). Standing*

Even though the Court has considered and addressed all of the substantive legal

arguments made by Vanguard, Appaloosa and Angelo Gordon in connection with the Plan and

the Global Compromise Motion, the Court makes the following ruling on their standing to

address certain issues.[32]

Section 1128(b) of the Bankruptcy Code provides that "[a] party in interest may object to

confirmation of a plan." 11 U.S.C. § 1128(b). Section 1109(b) of the Bankruptcy Code further

provides that:

> A party in interest, including the debtor, the trustee, a creditors' committee, an
> equity security holders' committee, a creditor, an equity security holder, or any
> indenture trustee, may raise and may appear and be heard on any issue in a case
> under this chapter.

11 U.S.C. § 1109(b). Although section 1109(b) provides that a party in interest may raise and be

heard on any issue in a case, a party in interest must still satisfy the general requirements of the

standing doctrine. *Southern Blvd. Inc. v. Martin Paint Stores (In re Martin Paint Stores)*, 207

B.R. 57, 61 (Bankr. S.D.N.Y. 1997) (citing *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th

Cir. 1992)); *see also In re Tascosa Petroleum Corp.*, 196 B.R. 856, 863 (D. Kan. 1996)

(rejecting argument that 1109(b) would allow a creditor to object to absolutely any issue under

chapter 11 and concluding that section 1109(b) does not waive traditional prudential limitations

on standing).

---

[32] The issue of standing is a jurisdictional predicate and, therefore, there can be no waiver of this issue. *See United States v. Hays*, 515 U.S. 737, 742 (1995) ("The question of standing is not subject to waiver"); *Wight v. Bankamerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) ("[W]e have already held that arguments for or against standing may not be waived"). To the extent that any party suggests that the Court should not address the issue at this stage of the case because of the Creditors' Committees failure to raise the issue any earlier, the Court disagrees and concludes that it is appropriate to address the issue.

Standing addresses the question of "whether [a] litigant is entitled to have a court decide

the merits of a dispute or of particular issues." *Elk Grove Unified Sch. Dist. v. Newdow*, 124

S.Ct. 2301, 2308, 2004 WL 1300159, at *5 (June 14, 2004) (quoting *Warth v. Seldin*, 422 U.S.

490, 498 (1975)). "'The doctrine of standing incorporates both constitutional and prudential

limitations on federal court jurisdiction.'" *Wight*, 219 F.3d at 86 (quoting *Lamont v. Woods*, 948

F.2d 825, 829 (2d Cir. 1991)).

The constitutional component of standing stems from the case or controversy requirement

of Article III of the Constitution. *E.g., id.* Standing in the constitutional sense has three

elements:

> (i) the plaintiff must have sustained an "injury in fact," which means that a
> legally-protected interest must actually have been invaded in a concrete and
> particularized manner; (ii) the injury must be traceable to the defendant's action,
> i.e., there must be a causal connection; and (iii) a ruling in favor of the plaintiff
> will likely redress the injury.

*19 Court Street Assocs., LLC v. Resolution Trust Corp. (In re 19 Court Street Assocs., LLC)*, 190

B.R. 983, 991 (Bankr. S.D.N.Y. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-

61 (1992)).

Prudential standing refers to judicially-created limitations on the exercise of jurisdiction.

*See Elk Grove*, 2004 WL 1300159 at *5 ("prudential standing . . . embodies 'judicially self-

imposed limits on the exercise of federal jurisdiction'"). The standing doctrine's prudential

requirements are rules of self-restraint and are applied to further the proper role of the courts in a

democratic society. *Wight*, 219 F.3d at 86. Foremost of the prudential requirements is the rule

that a party must assert its own legal rights. *See id.*; *see also De Jesus-Keolamphu v. Village of*

*Pelham Manor*, 999 F. Supp. 556, 567 (S.D.N.Y. 1998) ("As a general prudential rule, a plaintiff

may not claim standing to vindicate the constitutional or statutory rights of third parties"). Thus,

even if standing in the Article III sense has been established, a plaintiff must assert their own

legal rights and interests and a plaintiff cannot rest a claim to relief on the legal rights of third

parties. *See Warth*, 422 U.S. at 499; *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643

(2d Cir. 1988) ("Generally, litigants in federal court are barred from asserting the constitutional

and statutory rights of others in an effort to obtain relief for injury to themselves").

The policy justifications for the third-party standing doctrine has been articulated as

follows:

> Federal courts must hesitate before resolving a controversy, even one within their
> constitutional powers to resolve, on the basis of the rights of third persons not
> parties to the litigation. The reasons are two. First, the courts should not
> adjudicate such rights unnecessarily, and it may be that in fact the holders of those
> rights either do not wish to assert them, or will be able to enjoy them regardless of
> whether the in-court litigant is successful or not . . . . Second, third parties
> themselves usually will be the best proponents of their own rights. The courts
> depend on effective advocacy, and therefore should prefer to construe legal rights
> only when the most effective advocates of those rights are before them.

*Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976) as cited in *De Jesus-Keolamphu*, 999 F. Supp. at

567. Based upon these concerns the Supreme Court has narrowly limited when a party will have

standing to assert the rights of another. *See De Jesus-Keolamphu*, 999 F. Supp. at 567. Third-

party standing will be recognized where: "(1) the third parties have suffered an 'injury in fact,'

(2) the plaintiff has a 'close relation' to the third parties such that the plaintiff will effectively

represent the third parties' interests, and (3) the third parties are hindered in their ability to

protect their own interests." *See id.* (citing *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)).

The Creditors' Committee argue that Vanguard, Appaloosa and Angelo Gordon do not

have standing to object to all facets of the Global Compromise Motion. [33]  The Committee argues

---

[33]  In connection with a motion in limine and confirmation, the Court permitted the parties to supplement the record
with briefs on the issue. The Debtors briefed the issue in its memorandum of law in support of the Plan and later
withdrew its objection. The Committee filed a response to the submissions filed by Vanguard, Appaloosa and
Angelo Gordon.

that Vanguard, Appaloosa and Angelo Gordon may not assert the rights of other creditors of

other bankruptcy estates to object to the Global Compromise Motion.[34]

Here, prudential concerns argue against Vanguard, Appaloosa and Angelo Gordon from

asserting rights derived from other creditors of other bankruptcy estates to object to the Global

Compromise Motion.  Specifically, at the Hearing an issue was raised whether the Global

Compromise Motion is a *sub rosa* plan as to the 96 Debtors referenced in footnote 14.  It seemed

apparent to the Court at the Hearing that Vanguard, Appaloosa and Angelo Gordon were

attempting to assert the substantive rights of creditors and parties in interest in these 96 cases in

connection with this issue.  In the Court's view, it is inappropriate for Vanguard, Appaloosa and

Angelo Gordon (or any other party that is not a creditor or party in interest of the 96 Debtors) to

assert the interests of creditors and parties in interest of these 96 Debtors where there has been no

showing that Vanguard, Appaloosa and Angelo Gordon: i) have a 'close relation' to the creditors

and parties in interest of these 96 Debtors; or ii) that the creditors and parties in interest of these

96 estates are hindered in their ability to protect their own interests.  *See De Jesus-Keolamphu*,

999 F. Supp. at 567.  These concerns are underscored by the fact that the record indicates that

each of the 96 Debtors has creditors that appear to be unsecured and that can assert their own

---

In addition to these briefs, the Court received affidavits from Vanguard, Appaloosa and Angelo Gordon disclosing Vanguard, Appaloosa and Angelo Gordon's claims against the Debtors other than claims.  Based upon the affidavits, it appears that Vanguard, Appaloosa and Angelo Gordon all hold direct claims against ENE and ENA; and Angelo Gordon holds direct claims against ENA Upstream.

[34] It is the Court's understanding that in light of the applicability of the Global Compromise Motion to all of the Debtors, including ENE and ENA, the Creditors' Committee later withdrew its objection to the standing of Vanguard, Appaloosa and Angelo Gordon to oppose the global compromise as sought for all Debtors under the Plan.  Thus, to the extent that Vanguard, Appaloosa and Angelo Gordon hold independent claims in any of the Debtors' estates, the Creditors' Committee does not appear to object to Vanguard's, Appaloosa's and Angelo Gordon's asserting their rights.  Apparently, however, the Committee did not withdraw its objection concerning whether Vanguard, Appaloosa and Angelo Gordon have standing to pursue issues regarding approval of the global compromise outside of the Plan as to the 96 Debtors referenced in footnote 14.  As previously noted, the Debtors withdrew the entirety of their objection.

objections to the Global Compromise Motion.  Accordingly, the Court concludes that Vanguard,

Appaloosa and Angelo Gordon may not assert the rights derived from the 96 Debtors.

*2).  Section 1127*

Pursuant to section 1127 of the Bankruptcy Code, a plan proponent may modify a plan at

any time before confirmation so long as the plan, as modified, satisfies the requirements of

sections 1122 and 1123 of the Bankruptcy Code.  In addition, Bankruptcy Rule 3019 provides, in

relevant part, that:

> after a plan has been accepted and before its confirmation, the proponent may file
> a modification to the plan.  If the court finds after hearing on notice to the trustee,
> any committee appointed under the Code, and any other entity designated by the
> court that the proposed modification does not adversely change the treatment of
> the claim of any creditor or the interest of any equity security holder who has not
> accepted in writing the modification, it shall be deemed accepted by all creditors
> and equity security holders who have previously accepted the plan.

FED. R. BANKR. P. 3019.

None of the modifications in the Plan Modification or the documents in the Plan

Supplement constitute an adverse change.  The following definition of adverse change is

instructive on this point:  "The best test is whether the modification so affects any creditor or

interest holder who accepted the plan that such entity, if it knew of the modification, would be

likely to reconsider its acceptance."  9 COLLIER ON BANKRUPTCY ¶ 3019.01 (15th ed. Rev. 2004);

*see also In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) (modification is

not material if "the only adverse impact flowing from this modification is a miniscule dilution of

the stock issue"); *accord In re Century Glove, Inc.*, No. Civ. A. 90-400-SLR, Civ. A. 90-401-

SLR, 1993 WL 239489, *3 (D. Del. Feb. 10, 1993) (citing *Am. Solar King,* 90 B.R. 808, that

modifications only require further disclosure when debtor intends to solicit votes from previously

dissenting creditors or when modification materially and adversely impacts parties who

previously voted for the plan).

Certain technical and minor modifications were made to the Plan at the Confirmation

Hearing.  Such modifications will have no material adverse impact on the treatment of any

claims and interests and thus, pursuant to Bankruptcy Rule 3019, all acceptances to the Plan are

deemed acceptances of the Plan as modified at the Confirmation Hearing.  As set forth above, the

Plan complies fully with section 1122 and 1123 of the Bankruptcy Code.  In addition, the

Debtors have complied with section 1125 with respect to the Plan.  Accordingly, the

requirements of section 1127 of the Bankruptcy Code have been satisfied.

### 3).  *Post-Confirmation Overhead Allocation Formula*

The Post-Confirmation Allocation Formula is in the best interests of the Debtors, their

estates and Creditors.  The Post-Confirmation Allocation Formula is conceptually sound and

equitably distributes corporate overhead without incurring excessive additional expense in order

to perform the allocations.  Sufficient business justifications exist to merit the approval of the

Post-Confirmation Allocation Formula.

### 4).  *Remaining Objections*

#### (i)  *Shareholder Objections*

The objections of Edwin and Helen Doty (Docket No. 15229), Irwin Goldman (Docket

No. 15538), J. Corey Qua (not docketed), Arnold Rahn (not docketed), and Hugo Renda (Docket

No. 17465) (collectively, the "Shareholder Objections") generally allege that the holders of ENE

common stock should receive distributions under the Plan.  The Bankruptcy Code requires that a

holder of any interest that is junior to claims or other interests will not receive or retain under the

plan on account of such junior interest.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).  As set forth above,

the Court finds that the Plan complies with section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

Accordingly, the Shareholder Objections should be overruled.

*(ii) Classification Objections*

The objections of Vanguard (Docket Nos. 18426, 16692 and 17244), Appaloosa (Docket

Nos. 16707, 17236 and 18422), CIBC (Docket No. 17203), CRRA (Docket No. 17225), Reliance

Trust Company ("Reliance") (Docket No. 17221), and State Street Bank and Trust Company

("State Street") (Docket No. 17166) (collectively, the "Classification Objections") generally

object to the classification and/or treatment of (a) guaranty claims, (b) joint liability claims, and

(c) claims subject to contractual and/or equitable subordination.  The Court finds that the

treatment of Guaranty Claims and Joint Liability Claims is appropriate in light of the global

compromise embodied in the Plan and such classification and treatment is in accordance

therewith.  Moreover, a plan proponent is given significant flexibility in classifying claims under

section 1122(a) of the Bankruptcy Code if there is a reasonable basis for the classification

scheme.  *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y.

1992).  Furthermore, given the risk that a Guaranty Claim would not exist if there were

substantive consolidation, it is appropriate to separately classify those claims and adjust the

recovery on the Guaranty Claims to reflect this risk.  With respect to contractual subordination

issues, the Court concludes that all creditors within each class are receiving the same treatment.

The extent to which a creditor is entitled to the benefits of subordination is a matter of inter-

creditor relationships, which is preserved by section 510 of the Bankruptcy Code.  Section 8.1 of

the Plan simply acknowledges that the contractual subordination rights, if any, of the holders of

the "Senior Indebtedness" are preserved.  Claims in Classes 376 through 382 relating to

Subordinated Claims shall be determined pursuant to a Final Order in accordance with the

provisions of the Bankruptcy Code under the principles of equitable subordination or otherwise.

(Debtors' Trial Ex. 1, § 1.179).  The Plan provides the Court with flexibility to determine the amount and extent of subordination of any claim.

   *(iii)  Best Interests/Feasibility Objections*

   The objections of Vanguard (Docket Nos. 18426, 16692 and 17244), American Electric Power Company, Inc., American Electric Power Service Corporation, AEP Energy Services, Inc., AEP Energy Services Ltd., AEP Desert Sky LP, LLC, and AEP Desert Sky GP, LLC (collectively, "AEP") (Docket No. 16701), Appaloosa (Docket Nos. 16707, 17236 and 18422), CRRA (Docket No. 17225), Q-West Energy Company, Cohort Energy Company, Riverside Products & Services, L.L.C., Linder Oil Company, a partnership, Mayne & Mertz, Inc., Stone Energy Corporation, Unimark L.L.C. and ProGas, Inc. (collectively, "Q-West") (Docket No. 17194), Reliance (Docket No. 17221), The State of Oregon, through its Department of Justice (Docket No. 17175), and Toronto Dominion (Texas), Inc. ("Toronto Dominion") (Docket No. 16700) (collectively, the "Best Interests Objections") generally allege that the Plan does not satisfy the bests interests of creditors test or is not feasible under sections 1125, 1129(a)(2), 1129(a)(7), and 1129(a)(11) of the Bankruptcy Code because (a) the Liquidation Analysis is insufficient and/or speculative, (b) a separate liquidation analysis is required for each Debtor, (c) the global compromise embodied in the Plan is not in the best interests of creditors, (d) the Effective Date is not certain, and (e) creditors would receive more under chapter 7.  Based on the findings and conclusions set forth above, the Court concludes that the Best Interests Objections should be overruled.

   *(iv)  Cramdown Objections*

   The objections of Vanguard (Docket Nos. 18426, 16692 and 17244), AEP (Docket No. 16701), Appaloosa (Docket Nos. 16707, 17236 and 18422), Q-West (Docket No. 17194), PBGC

(Docket Nos. 16693 and 17248), Reliance (Docket No. 17221), and Upstream Energy Services,

as Agent for Certain Texas Gas Producers ("Upstream") (Docket No. 17157) (collectively, the

"Cramdown Objections") generally allege that the Plan does not satisfy sections 1129(a)(10)

and/or 1129(b) of the Bankruptcy Code.  As set forth above, the Court concludes that the Plan

satisfies the requirements of sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, and the

Cramdown Objections should be overruled.

    *(v)  Global Compromise Objections*

    The objections of Vanguard (Docket Nos. 18426, 16692 and 17244), AEP (Docket No.

16701), Appaloosa (Docket Nos. 16707, 17236 and 18422), CRRA (Docket No. 17225), Q-West

(Docket No. 17194), Reliance (Docket No. 17221), and Toronto Dominion (Docket No. 16700)

(collectively, the "Global Compromise Objections") generally allege that the partial substantive

consolidation, including the inter-Debtor waivers and the establishment of the Litigation Trust,

embodied in the Plan (a) is not fair, reasonable or equitable, (b) was not subject to higher and

better offers, and (c) constitutes a *sub rosa* plan.  For the reasons set forth above, the Court

concludes that (a) the compromises, settlements and waivers contained in the global compromise

are fair and equitable and fall well within the reasonable range of litigation outcomes, (b) sound

business justifications exist for the Debtors to enter into the global compromise, (c) the global

compromise is not a *sub rosa* plan, and (d) even if the global compromise were found to be a *sub

rosa* plan as to the 96 Debtors referenced in footnote 14, nonetheless, the global compromise

could be approved, limited to establishing the assets and liabilities of those estates.  Accordingly,

the Global Compromise Objections should be overruled.

*(vi)  Discharge, Release, Injunction and Exculpation Objections*

The objections of Vanguard (Docket Nos. 18426, 16692 and 17244), Ash Grove Cement

Company, Inc. ("Ash Grove") (Docket No. 17274), Grupo IMSA, S.A. de C.V. ("Grupo IMSA")

(Docket No. 17280), PBGC (Docket Nos. 16693 and 17248), Reliance (Docket No. 17221),

State Street (Docket No. 17166), Toronto Dominion (Docket No. 16700), Upstream (Docket No.

17157), and the United States Department of Labor ("DOL") (Docket No. 17173) (collectively,

the "Discharge Objections") generally allege that:  (a) the Debtors are not entitled to a discharge

under section 1141(d)(3) of the Bankruptcy Code; (b) Section 42.4 of the Plan may limit the

rights of creditors to assert claims, counterclaims and defenses in certain adversary proceedings;

(c) the release, injunction and exculpation provisions are too broad; and (d) the exculpatory

provisions of the Plan violate ERISA.  As set forth above, the Court concludes that (a) the

Debtors' supervised divestiture of assets over an indeterminate period of time entitle them to a

discharge under section 1141 of the Bankruptcy Code and (b) the release and exculpation

provisions contained in the Plan are in the best interests of the Debtors' estates and do not violate

applicable bankruptcy and nonbankruptcy law, including ERISA.  Furthermore, as stated on the

record at the Confirmation Hearing, nothing set forth in Section 42.4 of the Plan limits the ability

of a Person or Entity that is a plaintiff or defendant in an adversary proceeding or an action

outside the Court from asserting defenses, counterclaims or cross-claims, including against the

Debtors, the Debtors in Possession or the Reorganized Debtors, subject to any limitations

imposed under applicable law upon the assertion of such defenses, counterclaims, or cross-

claims.  Accordingly, the Discharge Objections should be overruled.

*(vii)  Claims Estimation Objections*

The objections of Appaloosa (Docket Nos. 16707, 17236 and 18422), CRRA (Docket No. 17225), Reliance Trust Company (Docket No. 17221), and Upstream (Docket No. 17157) (collectively, the "Claims Estimation Objections") generally allege (a) the claims estimation procedures previously approved by the Court should not apply to claims subject to pending adversary proceedings and (b) Section 21.2 of the Plan improperly eliminates a claimant's right to seek reconsideration under section 502(j) of the Bankruptcy Code.  Section 21.2 of the Plan provides for the estimation of Claims, unless otherwise limited by an order of the Court.  As provided in the Order Pursuant to Sections 105(a), 363(b) and 402(c) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3007, 7042, 9013, 9014 and 9019, (1) Establishing Procedures to Estimate Unliquidated and Contingent Claims, (2) Establishing Procedures to Adjudicate Counterclaims, (3) Establishing Procedures to Compromise Claims and Counterclaims, and (4) Fixing Notice Procedures and Approving Form and Manner of Notice, entered February 18, 2004 (Docket No. 16353), the holder of a fully liquidated claim may elect to exclude such claim from the estimation procedures.  Furthermore, the Debtors have modified Section 21.2 of the Plan to clarify that such provision does not impair a claimant's rights to seek reconsideration under section 502(j) of the Bankruptcy Code.  Thus, Section 21.2 of the Plan does not (a) compel estimation of liquidated, disputed claims or (b) extinguish a claimant's right to seek reconsideration.  Accordingly, the Claims Estimations Objections should be overruled.

*(viii)  Jurisdiction Objections*

The objections of Ash Grove (Docket No. 17274), Grupo IMSA (Docket No. 17280) and PBGC (Docket Nos. 16693 and 17248) (collectively, the "Jurisdiction Objections") generally allege that the retention of jurisdiction by the Court is overly broad.  Section 38.1 of the Plan

provides for the Court's retention of appropriate jurisdiction, and the Plan does not attempt to wrest jurisdiction from other courts or administrative bodies with appropriate jurisdiction or vest jurisdiction in the Court outside of the Court's properly retained jurisdiction. Accordingly, the Court concludes that such retention of jurisdiction is proper, *see In re Friedberg*, 192 B.R. 338, 341 (Bankr. S.D.N.Y. 1996) and *In re Johns-Manville Corp.*, 97 B.R. 174, 180 (Bankr. S.D.N.Y. 1989), and the Jurisdiction Objections should be overruled.

*(ix)  Distribution Issues*

The People of the State of California, ex rel. Bill Lockyer, Attorney General (Docket No. 16676) allege that interim distributions should require Court approval. The Court concludes that this objection should be overruled because creditors are adequately protected by the provisions of the Plan and the order confirming the Plan. Specifically, (a) Section 32 of the Plan governs the time and manner of distributions under the Plan; (b) Section 21.2 of the Plan provides protection to all claimants in that, the Debtors may request the estimation for final distribution purposes of any contingent, unliquidated or Disputed Claim subject to notice and a hearing; (c) Section 21.3 of the Plan provides that the Disbursing Agent shall make adequate reserves for Disputed Claims, and (d) the Confirmation Order will establish (i) a deadline or bar date for creditors and parties in interest to assert Administrative Expense Claims against the Debtors, and (ii) the procedures for filing, resolving and reserving for such Administrative Expense Claims. Therefore, the Plan protects creditors' rights with respect to Court approval of distributions under the Plan.

Longacre Master Fund, Ltd. (Docket Nos. 17226 and 17812), joined by SPCP Group, LLC (Docket No. 19117), asserts that record dates should be established 30 days before any distributions under the Plan to allow for the accurate reflection of holders of Allowed Claims

throughout the post-confirmation period.  Longacre also requests that language be added to the

Plan regarding:  (a) single checks to holders of multiple claims; and (b) utilizing addresses on

notices of transfer.  The Court concludes that these objections should be overruled because (i)

Section 1.218 of the Plan provides that the Record Date will be established by the Court in the

Confirmation Order for the purpose of determining the holders of Allowed Claims and Allowed

Equity Interests entitled to receive distributions pursuant to the Plan; and (ii) the Bankruptcy

Code does not require the Debtors to fashion "floating record dates" to aid claims traders in the

secondary claims market.

### (x)  Guaranty Settlement Objection

Grupo IMSA (Docket No. 17280) alleges that Section 28.2 of the Plan unfairly forces a

premature election to settle Guaranty Claims without the benefit of discovery and adjudication

on the merits.  Section 28.2 of the Plan does not force any party to settle.  Rather, Section 28.2

provides for a settlement election to be made on the Ballot.  This provision does not force a

litigant to make an election; if a litigant needs additional time for discovery, such litigant can

choose not to exercise the election provided for in Section 28.2 of the Plan.  Moreover, if the

Debtors provided for the benefits of discovery and adjudication as well as for the benefit of the

election provided for in Section 28.2 of the Plan, such discovery and adjudication would defeat

the purpose of the settlement election in Section 28.2 of the Plan.  Providing a mechanism for

settlement is consistent with the Bankruptcy Code.  *See* 11 U.S.C. § 1123(b)(3)(A).

Accordingly, the objection should be overruled.

### (xi)  Section 365 Objection

Reliance (Docket No. 17221) objects to the Plan to the extent the Plan's treatment of its

agreement with the Debtors is inconsistent with section 365 of the Bankruptcy Code.  The Plan

provides for the assumption, assumption and assignment, or rejection of executory contracts and

unexpired leases that have not been previously assumed or rejected under section 365 of the

Bankruptcy Code, as contemplated by section 1123(b)(2) of the Bankruptcy Code. (Debtors'

Trial Ex. 1, Art. XXXIV). The Court concludes that the Plan complies with section 365 of the

Bankruptcy Code, and the objection of Reliance Trust Company should be overruled.

### (xii) Administrative Expense Claim Objection

The objection of Grupo IMSA (Docket No. 17280) alleges that the Plan fails to

adequately address Administrative Claims, to the extent that the treatment of Administrative

Claims is not adequately addressed either in the Plan or in an order confirming such Plan, in

violation of section 1129(a)(9). The Court concludes that the objection of Grupo IMSA should

be overruled based on the fact that the Plan satisfies the requirements of section 1129(a)(9).

### (xiii) Document Retention Objection

The objections of Ash Grove (Docket No. 17274) and Toronto Dominion (Docket No.

16700) (the "Document Retention Objections") assert that Section 42.12 of the Plan would

permit the Debtors to improperly destroy Documents in their possession upon the first

anniversary of the Confirmation Date, which documents may be both discoverable and integral

to pending litigation. The Court concludes that the Document Retention Objections should be

overruled based on the modifications to Section 42.12 of the Plan.

### (xiv) NewPower Investigation Objection

The objection of the NewPower Examiner asserts that the Plan, to the extent that the

Debtors seek to impair, alter or otherwise prejudice the NewPower Examiner's investigation in

the NewPower Cases, (a) does not comply with section 1104 of the Bankruptcy Code, (b)

interferes improperly with the effectuation of the NewPower Examiner's orders, and (c) is not

proposed in good faith in violation of section 1129(a)(3) of the Bankruptcy Code.  The Court

concludes that the objection of the NewPower Examiner should be overruled because (a) the

NewPower Examiner was appointed in the NewPower Cases, not the Debtors' Chapter 11 Cases,

and the confirmation of the Plan does not affect such appointment, (b) *res judicata* and collateral

estoppel appear to preclude the NewPower Examiner from pursuing a re-characterization of the

settlement payment, and (c) the claim objection process, and not confirmation of the Plan, is the

appropriate platform for the determination of this dispute.

### (xv)  Plan Governance Objections

The objection of Upstream (Docket No. 17157) suggests that, as a condition of

confirmation, the Court should require a separate fiduciary be installed to provide post

confirmation plan governance for the ENA Plan and the ENA Creditors.  The Court concludes

that the objection of Upstream Energy Services (Docket No. 17157) should be overruled

because, as set forth above, the post confirmation governance provisions set forth in the Plan

(including the ability of Creditors of ENA or its direct or indirect subsidiaries to file a motion

seeking to extend the ENA Examiner's duties post-Effective Date) are appropriate and sufficient

to protect the interests of all creditors.

### (xvi)  Good Faith Objections

The objections of Vanguard (Docket Nos. 18426, 16692 and 17244), Appaloosa (Docket Nos.

16707, 17236 and 18422), Grupo IMSA (Docket No. 17280), and Q-West Energy (Docket No.

17194) (collectively, the "Good Faith Objections") generally allege that the Plan was not

proposed in good faith for the following reasons:  (a) the Debtors failed to solicit higher and

better liquidation transactions (addressed above as "Global Compromise Objections"); (b) the

Debtors attempt to limit the affirmative defenses of setoff and recoupment (addressed above as

"Discharge Objections"); (c) the Debtors have gerrymandered the classes of claims in the Plan

by separately classifying Enron General Unsecured Claims and Enron Guaranty Claims

(addressed above as "Classification Objections"); (d) the Plan fails to maximize the distributions

to ENA's creditors because its distribution scheme, proposed under the guise of a global

compromise, diverts substantial value away from ENA to or for the benefit of ENA's sole

shareholder, ENE, under circumstances where ENE is entitled to no distribution from ENA's

insolvent estate, and to the detriment of ENA's creditors (addressed above as "Global

Compromise Objections"); and (e) the Debtors have failed to establish a good faith process for

resolving the claims of Grupo IMSA and other similarly situated creditors (addressed above as

"Claims Estimation Objections").  As previously addressed herein, each of the Good Faith

Objections should be overruled.

*(xvii)  Additional Objections*

To the extent not withdrawn, resolved or otherwise specifically addressed above, for the

reasons stated herein, the Plan complies with all applicable provisions of the Bankruptcy Code,

and the Court concludes that the remaining objections should be overruled in their entirety.

Each of the objections to the April 27 Plan, July 2 Plan or the Plan not heretofore

withdrawn or resolved by written or oral agreement stated and made a part of the record of the

Confirmation Hearing, is overruled and denied.

## IV.  SUMMARY

The Plan meets all the requirements of chapter 11 and should be confirmed, and the

Global Compromise Motion, to the extent necessary (and subject to the condition that should

confirmation of the Plan be reversed on appeal, approval of the Global Compromise Motion shall

not remain in effect), and the Overhead Allocation Motion satisfy all legal standards, are in the

best interest of the Debtors' estates, and should be approved.

An appropriate Order will be entered.


Dated:  New York, New York
        July 15, 2004


                        s/ Arthur J. Gonzalez
                UNITED STATES BANKRUPTCY JUDGE