Richard M. Cieri
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

*Counsel for Ally Financial Inc. and Ally Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u> | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**ALLY FINANCIAL INC.'S**
**OBJECTION TO THE AD HOC GROUP OF JUNIOR**
**SECURED NOTEHOLDERS' MOTION FOR ENTRY**
**OF AN ORDER (I) DIRECTING EACH OF DEBTORS'**
**COUNSEL, INCLUDING MORRISON & FOERSTER LLP,**
**OFFICIAL COMMITTEE COUNSEL, INCLUDING KRAMER**
**LEVIN NAFTALIS & FRANKEL LLP, AND THE DEBTORS'**
**MANAGEMENT TO REMAIN STRICTLY NEUTRAL IN ANY**
**DISPUTE REGARDING CLAIMS BY AND BETWEEN ANY**
**DEBTORS, (II) ORDERING THE LIMITED DISQUALIFICATION**
**OF EACH OF THE FOREGOING TO THE EXTENT NECESSARY**
**TO EFFECTUATE THE FOREGOING, AND (III) GRANTING RELATED RELIED**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Ally Financial Inc. on behalf of itself and its non-debtor subsidiaries, including Ally

Bank, (collectively, "***Ally***") files this objection (the "***Objection***") to the *Motion of the Ad Hoc*

*Group of Junior Secured Noteholders for Entry of an Order (i) Directing Each of the Debtors'*

*Counsel, Including Morrison & Foerster LLP, Official Committee Counsel, Including Kramer*

*Levin Naftalis & Frankel LLP, and the Debtors' Management to Remain Strictly Neutral in any*

*Dispute Regarding Claims By and Between any Debtors, (ii) Ordering the Limited Disqualification of Each of the Foregoing to the Extent Necessary to Effectuate the Foregoing, and (iii) Granting Related Relief* [ECF No. 4289] (the "***DQ Motion***").[1]

## <u>PRELIMINARY STATEMENT</u>[2]

1.    The DQ Motion is a transparent attempt by the Ad Hoc Group of Junior Secured Noteholders (the "***Ad Hoc Group***") to gain a perceived strategic and tactical advantage to collaterally attack a chapter 11 plan [ECF No. 4153] (the "***Plan***") rather than object to the Plan on the merits.    Notably, the Ad Hoc Group is taking this action despite the fact that the Plan contemplates that the Ad Hoc Group will be paid in full on the effective date of the Plan, including accrued prepetition interest <u>plus</u> any postpetition interest to which the Court determines the Ad Hoc Group are entitled.[3]    There is little doubt that the DQ Motion was filed to attempt to maximize negotiation leverage by making the dispute with the Debtors with respect to the Ad Hoc Group's entitlement to postpetition interest as expensive and disruptive as possible. Moreover, the DQ Motion, if granted, would bring the Debtors' chapter 11 cases to a halt and destroy the settlement embodied in the Plan.

2.    Ally now files this Objection to address the central arguments asserted in the DQ Motion.    *First*, the DQ Motion is not timely.    After signing a plan support agreement prepetition under which they received similar treatment, more than a year after the Debtors' counsel retained under section 327(a) of the Bankruptcy Code ("***Debtors' Counsel***") and counsel to the Committee ("***Committee's Counsel***") were retained, and after this Court approved the Plan

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the DQ Motion.

[2]    Ally joins in the arguments set forth in the objections to the DQ Motion filed by the Debtors and the statutory committee of unsecured creditors (the "***Committee***"), filed substantially contemporaneously with this Objection.

[3]    *See* Plan, Art. III.D.

2

Support Agreement (the "*PSA*"), rather than challenge the Plan on the merits, the Ad Hoc Group has chosen to challenge the Debtors' Counsel's and the Committee's Counsel's roles as fiduciaries of the Debtors' estates for tactical reasons. *Second*, the assertion that a conflict exists with respect to the actions of Debtors' Counsel, Committee's Counsel, or Mr. Kruger, as CRO of <u>all</u> the Debtors, is incorrect, dependent on matter-of-fact statements, and unsupported by any evidence. *Third*, even if a conflict is found to exist despite the lack of evidence, it fails rise to the level necessary for disqualification.

## ARGUMENT

### I.    The DQ Motion Is Not Timely.

3.    The Ad Hoc Group has been aware of the Intercompany Claims for over a year—the decision to pursue disqualification now is untimely and indicates that the DQ Motion was filed for tactical reasons. *See Lamborn v. Dittmer*, 873 F. 2d 552 (2d Cir. 1989) ("[C]ourts must guard against tactical use of motions to disqualify counsel …") (internal citations omitted); *In re Wingspread Corp.*, 152 B.R. 861, 863 (Bankr. S.D.N.Y. 1993) ("Motions to disqualify attorneys are general disfavored and are subject to fairly strict scrutiny to ensure that they are not being interposed for merely tactical reasons."). The retention applications for counsel to the Debtors and the Committee were approved approximately one year ago.[4] Further, each Debtor filed its Statement of Assets and Liabilities listing, among other things, all of its Intercompany Claims, on June 30, 2012.[5] The Ad Hoc Group also signed a plan support agreement prepetition and was aware of and had their counsel participate in the five-month mediation that ultimately culminated

---

[4]    *See Order Authorizing the Retention and Employment of Morrison & Foerster LLP as Bankruptcy Counsel to the Debtors* Nunc Pro Tunc *to the Petition Date* [ECF No. 786]; *Order Approving Retention of Kramer Levin Naftalis & Frankel LLP as Counsel to the Official Committee of Unsecured Creditors,* Nunc Pro Tunc *to May 16, 2012* [ECF No. 777]

[5]    *See* DQ Motion, ¶ 1.

in the PSA.[6]  The record closed on the retention of Debtors' Counsel and Committee's Counsel more than a year ago when these parties were retained and the Ad Hoc Group did not lodge an objection.[7]  The Ad Hoc Group chose not to argue that the Intercompany Claims create a conflict of interest such that Debtors' Counsel, Committee's Counsel, and the Debtors' management, including Mr. Kruger, should be disqualified from participating in negotiations and litigation surrounding such claims until the eve of trial on the status of the Ad Hoc Group's claims.  *See In re WorldCom, Inc.*, 311 B.R. 151, 168 (Bankr. S.D.N.Y. 2004) (denying a motion to disqualify based on facts known to the movant for more than ten months finding the delay in filing the motion was "potentially disruptive to the Debtors' reorganization [and] the interests of all creditors in these chapter 11 cases would have been hindered by the disqualification, as emergence could have been delayed without any foreseeable benefit to the Debtors' estates."); *In re O.P.M. Leasing Serv., Inc.*, 16 B.R. 932 (Bankr. S.D.N.Y. 1982) (rejecting a motion to disqualify trustee of consolidated bankruptcy cases despite existence of an interdebtor claim where motion to remove was a litigation tactic and disclosure of potential conflicts had been made at the time of appointment without objection).  This timing is not coincidental—the DQ Motion was filed for impermissible tactical purposes more than a year after Debtors' Counsel and Committee's Counsel were retained by a final order of this Court.

## II.    No Conflict of Interest Exists.

4.    The Ad Hoc Group has failed to demonstrate that a conflict of interest exists.  The only indicia of a conflict the Ad Hoc Group can muster is the existence of Intercompany Claims

---

[6]    *See Plan Support Agreement* [ECF No. 6, Ex. 9]; *Order Appointing a Mediator* [ECF No. 2519].

[7]    *See* Transcript of Record at 13-16, 39-40, *In re Residential Capital LLC, et al.*, No. 12-12020 (July 13, 2012) attached hereto as Exhibit 1.

and the proposed treatment of such claims in the Plan.[8]  The Ad Hoc Group ignores that Debtors'

Counsel, Committee's Counsel, and Mr. Kruger, on behalf of their respective clients, exercised

their fiduciary duties and engaged in extensive arm's-length negotiations and mediation with

other parties in interest, including Ally, under the guidance of a sitting United States Bankruptcy

Judge that resulted in a global settlement with the Debtors' largest creditors that, among other

things, resolves all Inter-Debtor Disputes, including the treatment of Intercompany Claims and

provides for the payment in full of the Ad Hoc Group.[9]  Such actions are hardly indicative of a

conflict, rather, they suggest that Debtors' Counsel, Committee's Counsel, and Mr. Kruger

performed the very tasks their respective retentions anticipated by aligning the interests of all the

Debtors pursuant to the PSA.  Indeed, this Court found that the Debtors' entry into the PSA,

which contractually binds each of the Debtors to support confirmation of the Plan, including the

treatment of Intercompany Claims contained therein, was in the best interests of the Debtors'

estates.[10]  The PSA exemplifies the good faith resolution of Intercompany Claims to maximize

value for the estates in this Court's mediation process and the Debtors have a unity of purpose to

---

[8]    Ally's counsel, Kirkland & Ellis LLP ("*K&E*"), has been retained as debtor's counsel under section 327(a) of
the Bankruptcy Code in numerous cases and has settled intercompany claims in such cases without
disqualification.  For example, in *Charter*, while certain noteholders threatened to file motions seeking
disqualification of counsel as a result of intercompany claims, the issue of the treatment of such intercompany
claims was ultimately litigated in connection with confirmation of a chapter 11 plan without the disqualification
of counsel.  *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Op., LLC (In re Charter Commc'ns)*, 419
B.R. 221 (Bankr. S.D.N.Y. 2009) (confirming a chapter 11 plan over arguments that the treatment of
intercompany claims violated the debtors' fiduciary duties).

[9]    *See [Proposed] Disclosure Statement for the Joint Chapter 11 Plan of Residential Capital, LLC, et al. and the
Official Committee of Unsecured Creditors* [ECF No. 4157], 34-36; *see also* Letter from Gary S. Lee, Partner,
Morrison & Foerster LLP, to the Honorable Martin Glenn, United States Bankruptcy Judge (July 2, 2013) [ECF
No. 4290, Ex. C] ("The decision to settle the intercompany claims in the context of a Plan resulted from a deep,
considered analysis conducted by a variety of parties, including the Debtors' CRO, the Debtors' counsel, the
Debtors' financial advisors, the Committee's counsel, the Committee's financial advisor, and a myriad of other
business professionals and their respective advisors.  The decision, moreover, was undertaken under the
purview of a mediation conducted by a sitting United States Bankruptcy Court Judge.").

[10]   *See Order Granting the Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b)
Authorizing the Debtors to Enter into a PSA with Ally Financial Inc., the Creditors' Committee, and Certain
Consenting Claimants* [ECF No. 4098] ("The [PSA] . . . is in the best interest of the Debtors' estates").

prosecute the PSA to maximize the value of the estates.  *See In re O.P.M. Leasing Servs., Inc.,* 16 B.R. at 941 (holding where a "unity of interest" exists between debtor estates that share a "common goal . . . there is no impropriety in the same attorney representing multiple related debtors.").  If the Ad Hoc Group has concerns regarding the process leading to the Plan, those issues, to the extent not precluded by this Court's order approving the PSA, should be heard in the context of the confirmation hearing.

5.      Moreover, Mr. Kruger was retained, in part, to address any concerns that the Debtors' senior officers' and management personnel's historical experience with the Debtors' business would be an impediment to tackling matters such as the treatment of Intercompany Claims.[11]  The implication of the DQ Motion is that Mr. Kruger, as the CRO with acknowledged fiduciary obligations to all of the Debtors, while engaged in a court-supervised mediation with the Honorable James M. Peck, is not permitted to determine that the Plan, which embodies a settlement of, among other things, Intercompany Claims, is in the best interest of all of the Debtors and each Debtor's separate estate and is the appropriate resolution of such Intercompany Claims—a result that contradicts a key purpose of Mr. Kruger's retention.

**III.    Disqualification of Debtors' Counsel, Committee's Counsel, and the Debtors' Management Is Unwarranted.**

6.      Even if this Court were to determine that a conflict of interest exists, the Ad Hoc Group has not met the "heavy burden" and "high standard of proof" required for a party seeking disqualification.  *In re Caldor, Inc.-NY*, 193 B.R. 165, 178 (Bankr. S.D.N.Y. 1996); *see also In re Cleveland Trinidad Paving Co.*, 218 B.R. 385, 388 (Bankr. N.D. Ohio 1998) ("The burden of proof is on the movant . . . as the party in interest who seeks disqualification of a professional

---

[11]    *See Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [ECF No. 2887], ¶ 23.

appointed under §327(a).  That burden must be borne by a preponderance of the evidence to show that the standards of § 327(a) and [Bankruptcy] Rule 2014 have been compromised."). Because motions to disqualify counsel are drastic measures that can result in denying a client representation of the attorney of their choice, motions to disqualify are generally disfavored and are subject to "fairly strict scrutiny."  *In re Wingspread Corp.*, 152 B.R. 861, 863 (Bankr. S.D.N.Y. 1993); *In re Allboro Waterproofing Corp. v. Allboro Bldg. Maint. (In re Allboro Waterproofing Corp.)*, 224 B.R. 286, 290 (Bankr. E.D.N.Y. 1998).

7.      As evidence that a conflict of interest exists, the Ad Hoc Group merely points to the existence of Intercompany Claims and the proposed treatment of such claims in the Plan. However, the "presence of intercompan**y** claims between debtors represented by the same counsel does not automatically warrant the disqualification of that counsel."  *In re Adelphia Commc'ns Corp.*, 342 B.R. 122, 128 (S.D.N.Y. 2006).  Note, the Ad Hoc Group's position is contrary to practice in most complex chapter 11 cases because in such cases a unity of interest exists between the debtors and the expense of retaining counsel for each debtor would bring the debtors' estates to their knees.  *See id.* (finding that requiring the appointment of independent professionals to represent each individual debtor in large bankruptcy cases would burden estates with "unjustified and insurmountable costs.").  The implication that the Debtors should be required to retain 51 law firms to serve as conflicts counsel is untenable.  The Ad Hoc Group has submitted no evidence beyond the statements in the DQ Motion.

8.      Further, the determination of whether an adverse interest exists is a fact-specific inquiry that is best determined on a case-by-case basis.  *In re JMK Constr. Group, Ltd.*, 441 B.R. 222, 230 (Bankr. S.D.N.Y. 2010).  Because of this, the cases cited by the Ad Hoc Group are easily distinguishable and are thus unpersuasive.  For example, in *In re JMK Construction*

*Group., Ltd.*, 441 B.R. 222 (Bankr. S.D.N.Y. 2010), this Court rejected a motion seeking joint

retention at an early stage of the case because of potential issues posed by unresolved interdebtor

claims. *JMK* dealt with conflicts raised at the time of retention—not conflicts fourteen months

into a chapter 11 case—and highlights the Ad Hoc Group's failure to timely raise these issues.

Additionally, the decision in *In re Granite Partners, L.P*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998) is

distinguishable because that case addressed improper concealment and failure to disclose

conflicts.[12]  Importantly, no case cited by the Ad Hoc Group addresses the fact that the Debtors

have entered into a settlement with a their largest creditors, now embodied in the Plan, that sets

forth a consensual resolution of the Intercompany Claims such that there is no current conflict

among the Debtors on this issue.[13]  The Ad Hoc Group ignores that the Debtors' largest creditors

have effectively deemed that conflicts, if any, have been resolved by participating in mediation

and subsequently entering into the PSA.  In sum, particularly given that the Plan contemplates

payment of the Ad Hoc Group in full, disqualification of Debtors' Counsel, Committee's

Counsel, and Mr. Kruger is wholly unwarranted.

> 9.    Finally, the practical result of the DQ Motion, if granted, is the effective derailing

---

[12]  The other cases cited by the Ad Hoc Group are equally unpersuasive.  *See In re Interwest Bus. Equp., Inc.*, 23 F.3d 311 (10th Cir. 1994) (affirming bankruptcy court's rejection of multi-debtor representation in connection with a retention application where proposed counsel did not provide adequate information regarding the nature of intercompany claims); *In re Coal River Res., Inc.*, 321 B.R. 184 (W.D. Va. 2005) (affirming rejection of multi-debtor representation in connection with an application to represent four debtors where discrepancies existed with regard to scheduled amounts of intercompany debt); *In re Star Broad., Inc.*, 81 B.R. 835 (Bankr. D.N.J. 1988) (rejecting proposed representation of two debtors where substantial interdebtor claims were asserted and unexplained inconsistencies existed between the debtors' schedules and financial statements); *In re Jennings*, 199 Fed. App'x 845 (11th Cir. 2006) (affirming disqualification of counsel for failure to fully disclose the connections between the firm and its eleven debtor clients); *In re Straughn*, 428 B.R. 618 (Bankr. W.D. Pa. 2010) (rejecting applications for dual representation of closely held corporate debtor and its principal who was liable for debt incurred by the corporate debtor); *In re Shore*, No. 03-43072, 2004 WL 2357992 (Bankr. D. Kan. May 14, 2004) (disqualifying law firm whose retention application failed to disclose relationships with parties economically adverse to the debtor).

[13]  *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610 (Bankr. S.D.N.Y. 2006) ("[C]onsensual resolution [of interdebtor issues] is the normal (and preferred) practice.").

or at least wounding of the Debtors' chapter 11 cases and prosecution of the Plan during the Debtors' exclusive periods.  Pursuant to this Court's instruction, the proper time to hear issues related to the 9019 settlements in the Plan, including the valuation of Intercompany Claims, is in connection with confirmation of the Plan.[14]  Should the Ad Hoc Group or any creditor of the Debtors have concerns about the treatment of Intercompany Claims, they will have an opportunity to raise objections and receive an impartial ruling on the treatment of Intercompany Claims in connection with Plan confirmation.

[*Remainder of page intentionally left blank.*]

---

[14]    *See* Transcript of Record at 17, *In re Residential Capital LLC, et al.*, No. 12-12020 (July 3, 2013) ("[I]f [the Ad Hoc Group] oppose[s] plan confirmation, and if they oppose the global settlement with respect to intercompany claims, I'm going to have to hear the evidence and decide it as part of plan confirmation . . . .") attached hereto as Exhibit 2.

For the foregoing reasons, Ally respectfully requests that this Court deny the DQ Motion.

New York, New York
Dated: July 26, 2013

/s/  Ray C. Schrock
Richard M. Cieri
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900

*Counsel for Ally Financial Inc. and Ally Bank*

## **EXHIBIT 1**

**Transcript of Record at 13-16, 39-40, *In re Residential Capital LLC, et al.*, No. 12-12020**
**(July 13, 2012)**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, ET AL.,


                Debtors.


- - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                July 13, 2012

                10:05 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

(Doc# 90, 47) Status Conference RE: Motion Authorizing The

Debtors To Continue To Perform Under The Ally Bank Servicing

Agreements In The Ordinary Course Of Business.


(CC: Doc no. 509) Debtors' Application Under Section 327(e) of

the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule

2014-1 for Authorization to Employ and Retain Dorsey & Whitney

LLP as Special Securitization and Investigatory Counsel to the

Debtors, Nunc Pro Tunc to May 14, 2012 filed by Larren M.

Nashelsky on behalf of Residential Capital, LLC..


(CC: Doc no. 512) Debtors' Application for Order Authorizing

the Employment and Retention of Rubenstein Associates, Inc. as

Corporate Communications Consultant to the Debtors Nunc Pro

Tunc to the Petition Date.


(CC: Doc no. 511) Debtors' Application for an Order Authorizing

Employment and Retention of Mercer (US) Inc. as Compensation

Consultant to the Debtors Nunc Pro Tunc to the Petition Date

filed by Larren M. Nashelsky on behalf of Residential Capital,

LLC.

3

(CC: Doc no. 508) Debtors' Application Under Section 327(e) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1 for Authorization to Employ and Retain Carpenter Lipps & Leland LLP as Special Litigation Counsel to the Debtors, Nunc Pro Tunc to May 14, 2012 filed by Larren M. Nashelsky on behalf of Residential Capital, LLC.

(CC: Doc no. 510) Debtors' Application Under Section 327(e) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1 for Authorization to Employ and Retain Orrick, Herrington & Sutcliffe LLP as Special Securitization Transactional and Litigation Counsel to the Debtors, Nunc Pro Tunc to May 14, 2012 filed by Larren M. Nashelsky on behalf of Residential Capital, LLC.

(CC: Doc no. 506) Debtors' Application Pursuant to Section 327(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and Local Rules 2014-1 and 2016-1, for Entry of an Order Authorizing the Retention and Employment of Morrison & Foerster LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition Date filed by Larren M. Nashelsky on behalf of Residential Capital, LLC.

4

1    (CC: Doc no. 528) Application Pursuant to Sections 328 and 1103

2    of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure

3    2014 for an Order to Retain and Employ Kramer Levin Naftalis &

4    Frankel LLP as Counsel to the Official Committee of Unsecured

5    Creditors of the Debtors, Nunc Pro Tunc, to May 16, 2012 filed

6    by Kenneth H. Eckstein on behalf of Official Committee Of

7    Unsecured Creditors.

8

9    (Doc no. 527) Debtors' Application for Order Under Bankruptcy

10   Code Sections 327(a) and 328(a), Bankruptcy Rule 2014(a) and

11   Local Rule 2014-1 Authorizing the Employment and Retention of

12   Curtis, Mallet-Prevost, Colt & Mosle LLP as Conflicts Counsel

13   Nunc Pro Tunc to the Petition Date filed by Larren M. Nashelsky

14   on behalf of Residential Capital, LLC.

15

16   (CC: Doc# 513) Debtors Motion for Order Pursuant to Bankruptcy

17   Code Sections 105(a) and 331 Establishing Procedures for

18   Interim Compensation and Reimbursement of Expenses of

19   Professionals.

20

21   (CC: Doc# 514) Debtors Motion for Order Under Bankruptcy Code

22   Sections 105(a), 327 and 330 and Bankruptcy Rule 2014

23   Authorizing Employment and Payment of Professionals Utilized in

24   the Ordinary Course of Business Nunc Pro Tunc to the Petition

25   Date.

Doc# 531 Debtors' Application Pursuant to 11 U.S.C. Section

327(a) and Fed. R. Bankr. P. 2014 for Authorization to Employ

and Retain Kurtzman Carson Consultants LLC as Administrative

Agent Nunc Pro Tunc to the Petition Date filed by Larren M.

Nashelsky on behalf of Residential Capital, LLC.

Transcribed by:  Penina Wolicki

eScribers, LLC

700 West 192nd Street, Suite #607

New York, NY 10040

(973)406-2250

operations@escribers.net

**eScribers, LLC | (973) 406-2250**
**operations@escribers.net | www.escribers.net**

6

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER, LLP

4          Attorneys for Debtors

5          1290 Avenue of the Americas

6          New York, NY 10104

7

8   BY:    LORENZO MARINUZZI, ESQ.

9          GARY S. LEE, ESQ.

10

11

12  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

13          Conflicts Counsel for Debtors

14          101 Park Avenue

15          New York, NY 10178

16

17  BY:    MICHAEL A. COHEN, ESQ.

18          STEVEN J. REISMAN, ESQ.

19

20

21

22

23

24

25

7

1

2  U.S. DEPARTMENT OF JUSTICE

3        Office of the U.S. Trustee

4        33 Whitehall Street

5        21st Floor

6        New York, NY 10004

7

8  BY:   BRIAN S. MASUMOTO, ESQ.

9

10

11  KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for Official Creditors' Committee

13        1177 Avenue of THE Americas

14        New York, NY 10036

15

16  BY:   KENNETH H. ECKSTEIN, ESQ.

17        DOUGLAS MANNAL, ESQ.

18        RACHAEL L. RINGER, ESQ.

19        P. BRADLEY O'NEILL, ESQ.

20

21

22

23

24

25

8

1

2  KIRKLAND & ELLIS LLP

3        Attorneys for Ally Financial Inc. and Ally Bank

4        601 Lexington Avenue

5        New York, NY 10022

6

7  BY:   CRAIG A. BRUENS, ESQ.

8

9

10  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

11        Attorneys for Barclays Bank PLC

12        Four Times Square

13        New York, NY 10036

14

15  BY:   JONATHAN H. HOFER, ESQ.

16

17

18  SIDLEY AUSTIN

19        Attorneys for Nationstar Mortgage

20        One South Dearborn

21        Chicago, IL 60603

22

23  BY:   JESSICA BOELTER, ESQ. (TELEPHONICALLY)

24        LARRY NYHAN, ESQ. (TELEPHONICALLY)

25

9

FREEBORN & PETERS LLP

    Attorneys for Mercer

    311 South Wacker Drive

    Suite 3000

    Chicago, IL 60606

BY:   DEVON J. EGGERT, ESQ. (TELEPHONICALLY)

DORSEY & WHITNEY LLP

    Proposed Investigatory Counsel to Debtors

    50 South Sixth Street

    Suite 1500

    Minneapolis, MN 55402

BY:   THOMAS O. KELLY, III, ESQ.

ALSO PRESENT:

    CORLA JACKSON, Pro Se

    JOHN DEMPSEY, Mercer (TELEPHONICALLY)

    ALAN TESSLER, Rubenstein & Associates (TELEPHONICALLY)

RESIDENTIAL CAPITAL, LLC, ET AL.                    10
P R O C E E D I N G S

1

2          THE COURT:  Please be seated.  We're here in

3   Residential Capital, LLC, number 12-12020.  Mr. Marinuzzi?

4          MR. MARINUZZI:  Good morning, Your Honor.  For the

5   record, Lorenzo Marinuzzi, Morrison & Foerster, proposed

6   bankruptcy counsel for the debtors.

7          Your Honor, first of all, thank you for making

8   yourself and your staff available this morning for a hearing.

9   And I promise to do my best to move as quickly as possible.

10         Your Honor, we're here on a number of mostly

11  uncontested retention applications filed by the debtors and one

12  filed by the committee, as well as a status conference on the

13  subservicing matter.  And if I proceed in the order in which

14  matters are listed in the agenda, Your Honor, you'll note that

15  the retention applications filed by the committee and the

16  debtors for the financial advisors FTI and Centerview, Moelis

17  and AlixPartners, have been adjourned to the hearing on the

18  24th.  And Your Honor, if it's okay, we'll skip the status

19  conference and deal with the retentions, so the professionals

20  that are here can leave.

21         Your Honor under uncontested matters is the motion to

22  approve interim compensation and reimbursement of expenses.

23  There were changes requested by the committee, which we've

24  incorporated into the order.  I believe chambers has seen a

25  copy of the marked order, but I'm happy to walk through the

1  changes if Your Honor would like.

2          THE COURT:  No, that is okay.  Let me ask, does

3  anybody else wish to be heard with respect to the interim

4  compensation order.

5          All right.  It's approved.

6          MR. MARINUZZI:  Thank you, Your Honor.  The next item

7  on the agenda is the debtors' application to retain under

8  327(a) Kurtzman Carson Consultants, as administrative agents,

9  nunc pro tunc.  Your Honor, there was one change requested by

10  the committee to the order.  KCC's been retained as the

11  noticing agent, and they have a retainer for expenses, as is

12  provided in the general order.  We picked up that retainer

13  concept unintentionally in the order for 327(a), so we just

14  deleted it.

15          THE COURT:  Okay.

16          MR. MARINUZZI:  There were no objections.

17          THE COURT:  Does anybody wish to be heard with respect

18  to the Kurtzman Carson retention?

19          It's approved.

20          MR. MARINUZZI:  Thank you, Your Honor.  The next item

21  is the motion requesting the -- authorizing the preliminary

22  payment of ordinary-course professionals.  Your Honor, there

23  was an objection to the motion filed by the United States

24  Trustee, in particular with respect to the amounts, because we

25  had proposed 75,000 and 750.  And in revisiting and scrubbing

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    12

1   the numbers with the company again, we decided that we can work

2   within the request of the U.S. Trustee for 50,000 per month and

3   500,000 dollars over the course of the case.  So we've made

4   those changes to the order.

5          There's one other concept that was not in the motion

6   as filed, but it was raised in discussions regarding

7   retentions.  And as I'll get to, the professionals on the

8   debtors' side have agreed, whatever retainers they have,

9   they're going to apply to the first fees paid out.  And we want

10  to incorporate that concept with respect to ordinary-course

11  professionals, to the extent that they're holding retainers.

12  We'd like them to apply the retainers against the first fees

13  paid; and we've built that into the order.

14         THE COURT:  Anybody wish to be heard with respect to

15  the retention of ordinary course professionals?

16         All right, that's granted.

17         MR. MARINUZZI:  Your Honor, the next item on the

18  agenda is the debtors' application to retain Curtis Mallet as

19  conflicts counsel.

20         THE COURT:  Yes.

21         MR. MARINUZZI:  No objections to that motion, Your

22  Honor.  Unless Your Honor has any questions, we'd ask that that

23  application be granted.

24         THE COURT:  Anybody wish to be heard with respect to

25  the Curtis Mallet retention application?

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1        All right, it's granted.

2            MR. MARINUZZI:  Thank you, Your Honor.  Under

3   contested matters is the application to retain Morrison &

4   Foerster.  The U.S. Trustee filed an objection raising

5   duplication issues that we'll talk about, as it pertains to the

6   327(e) professionals as well, and asked for additional

7   disclosures, which we've made, as did the other professionals.

8            We believe, subject to negotiating a form of order for

9   the United States Trustee that satisfies them on the

10  duplication issue, and we think that a template for that is

11  really set forth in the supplemental declarations provided by

12  the 327(e) professionals, that provides a finer point on the

13  services they're going to be provided, we think we've resolved

14  the U.S. Trustee's objection.

15           THE COURT:  Mr. Masumoto?

16           MR. MASUMOTO:  Good morning, Your Honor.  Brian

17  Masumoto for the Office of the United States Trustee.  Counsel

18  is correct.  But if I may state for the record, some of the

19  concepts that we had wanted to incorporate.  One is with

20  respect to the catchall provision that exists.  We're hoping to

21  narrow it down to indicate that any of the, at the moment,

22  undefined services that may be provided for by the

23  professionals would be within the scope of the services that

24  they're hired at this point.  Anything beyond that scope,

25  they'd have to get a separate order of the Court.

RESIDENTIAL CAPITAL, LLC, ET AL.                    14

1      In addition, we're asking that as they expand their

2  services within the scope of the area for which they're

3  retained, they would file supplemental declarations to indicate

4  that they're doing these additional services.

5      What we're also hoping to work out and include in the

6  order is the concept that with respect -- between and among

7  debtors' counsel and the special counsel, that project

8  categories be as uniform as possible, to allow for a -- to

9  facilitate the review of any potential duplication.

10     THE COURT:  I think that's the key.  Because at least

11 one -- certainly one of the keys from our standpoint -- "our

12 standpoint" meaning my chambers' -- we do review fee

13 applications quite carefully.  When it becomes most difficult

14 is when there's no uniform set of project categories among

15 professionals.  So to the extent possible, that should be done.

16 Because it does really help facilitate our review.

17     MR. MASUMOTO:  Yes, Your Honor.  And we're hoping to

18 incorporate that within the context of the order.

19     THE COURT:  All right.  Mr. Marinuzzi, where do things

20 stand in terms of trying to negotiate language for the order?

21     MR. MARINUZZI:  We just had a conversation this

22 morning, Your Honor.

23     THE COURT:  Okay.

24     MR. MARINUZZI:  We knew conceptually that we were

25 going to get to the point of just finding the right language.

1    But I think we've resolved it, subject to the language that

2    we're going to negotiate after the hearing.

3              THE COURT:  All right.  Anybody else wish to be heard

4    with respect to the Morrison & Foerster retention application?

5              Mr. Eckstein?

6              MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

7    Eckstein, proposed counsel for the creditors' committee.

8    Judge, generally, we had filed a reservation of rights on a

9    similar point with respect to avoiding duplication.  It's a

10   complicated case.  There are the need for a lot of different

11   professionals and expertise.  And we thought it was just worth

12   noting that I think all parties are going to have to work both

13   on the legal and the financial side to really ensure that there

14   is no duplication and that there's efficiency.  I think that's

15   something we have to focus on prospectively.

16             THE COURT:  Okay.  I mean, one of the things that's a

17   little unusual or a little different in this case is that the

18   debtors expressed from the start, I think with the support of

19   the committee, that ResCap be able to conduct business as

20   usual.  Part of their business as usual involves a lot of

21   litigation around the country.  The Court's already entered an

22   order lifting the stay as to various types of claims and

23   things.  And there are lawyers representing ResCap in those

24   cases.  And when I reviewed the retention applications, a

25   number of them are involved in the representation of the

1  debtors in ongoing litigation.

2       So I certainly -- while the Court is always concerned

3  about proliferation of professionals in a case, I certainly

4  fully understand that the nature of this case requires it, but

5  it also requires the effort to monitor that there isn't

6  unnecessary -- there isn't duplication of effort and that Mr.

7  Marinuzzi, you know, at the end of the day, from the debtors'

8  side, the buck stops with your firm.  And if the U.S. Trustee

9  or the Court begins to raise questions about duplication, you

10 and your colleagues are the ones who are going to have to make

11 sure that that doesn't happen.  Okay?

12      MR. ECKSTEIN:  We're all counting on Morrison &

13 Foerster.

14      THE COURT:  Yes, I know.

15      MR. MARINUZZI:  Thank you, Your Honor.

16      THE COURT:  All right.  Anybody else wish to be heard?

17      All right, the Morrison & Foerster retention is

18 approved subject to the Court's review of a proposed order when

19 that's submitted.

20      MR. MARINUZZI:  Thank you, Your Honor.

21      THE COURT:  Okay.

22      MR. MARINUZZI:  The next application is the debtors'

23 application to retain Carpenter Lipps & Leland as special

24 counsel under 327 --

25      THE COURT:  That's one of the firms I had specifically

1   in mind, because they're representing the debtors in

2   litigation.

3          MR. MARINUZZI:  Yes.  On litigation that's been

4   ongoing for years.

5          THE COURT:  Right.

6          MR. MARINUZZI:  There was one objection.  And we'll

7   deal the same way we'll deal with Morrison & Foerster and the

8   other 327(e), with crafting language with the U.S. Trustee.

9   The same resolution will apply to Carpenter --

10          THE COURT:  There's also the Lewis application --

11          MR. MARINUZZI:  Exactly.

12          THE COURT:  -- Lewis objection.  It's overruled.

13          MR. MARINUZZI:  Thank you, Your Honor.

14          THE COURT:  Does anybody else wish to be heard with

15   respect to the Carpenter Lipps & Leland retention application?

16          All right, it's approved, subject again, to reviewing

17   the order.

18          MR. MARINUZZI:  Thank you, Your Honor.  And that

19   brings us to the debtors' application to retain Dorsey &

20   Whitney as special securitization and investigatory counsel

21   under Section 327(e).  Same resolution with the U.S. Trustee,

22   Your Honor.

23          THE COURT:  Explain to me a little bit more about what

24   is -- in terms of investigations, what's -- who's doing what

25   among the professionals for the debtor?

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1    MR. MARINUZZI:  Your Honor, there were investigations

2   and actions that commenced before the petition date where the

3   company retained, in this case, Dorsey & Whitney.  And

4   depending upon how long ago these proceedings began, there was

5   either a great deal of work done or not so much work done.  And

6   whatever work had been done, is work that, to the extent

7   Morrison & Foerster is going to take over the work -- now many

8   of these are stayed, but who knows what might happen in the

9   future and how we have to resolve these claims as part of a

10   plan process -- as we progress in the case, I anticipate with

11   respect to the activities and Dorsey & Whitney, that they'll

12   become Morrison & Foerster activities.

13    But we're going to need their cooperation.  We're

14   going to need the information they've already obtained,

15   whatever progress has happened in the case to date, for us to

16   actually have a smooth transition from Dorsey & Whitney to

17   Morrison & Foerster.

18    In court today is Tom Kelly, to the extent that Your

19   Honor has any specific questions that I can't answer.

20    THE COURT:  Well, one --

21    MR. MARINUZZI:  I'm sure he'd be happy to answer them.

22    THE COURT:  -- question I have, and this may apply to

23   others.  Dorsey & Whitney had a pre-petition retainer at

24   250,000 dollars.  What's not clear to the Court is how much of

25   that remains.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    19

1    MR. MARINUZZI:  Your Honor, I don't know.  I'll defer

2  to Dorsey & Whitney.  I thought it might have been addressed in

3  the supplemental declaration.  But if it's not --

4          THE COURT:  Maybe it was and I missed it.

5          I guess it is, because I see Mr. Masumoto pointing to

6  it.

7          MR. KELLY:  It was addressed, Your Honor --

8          THE COURT:  Okay.

9          MR. KELLY:  -- in the supplemental declaration.  We

10  have not applied any of it, because the case was filed and we

11  hadn't --

12          THE COURT:  Right.

13          MR. KELLY:  -- done so.  We have 227,000 dollars'

14  worth of pre-petition fees and disbursements that we want to

15  apply.

16          THE COURT:  Against the 250,000 dollar retainer?

17          MR. KELLY:  Right.  So we'll have 22,000 left

18  afterwards.

19          THE COURT:  Okay.  All right, thank you very much.

20          Does anybody else wish to be heard with respect to the

21  Dorsey & Whitney retention application?

22          All right, it's granted.

23          MR. MARINUZZI:  Thank you, Your Honor.  That brings us

24  to the debtors' application to retain Orrick, Herrington &

25  Sutcliffe under 327(e).  Your Honor, the simplest way I could

RESIDENTIAL CAPITAL, LLC, ET AL.                                    20

1   describe Orrick is that they wrote many of the securitization

2   documents that we're going to need some help analyzing during

3   the case.

4          THE COURT:  Okay.  Anybody wish to be heard with

5   respect to the Orrick, Herrington & Sutcliffe retention

6   application?

7          All right, it's granted.

8          MR. MARINUZZI:  Thank you very much, Your Honor.  Your

9   Honor, that brings us to the debtors' application to retain

10  Mercer as compensation consultant.  Your Honor, the objection

11  was filed by the U.S. Trustee regarding the payment of

12  attorneys' fees, which was the subject of Your Honor's decision

13  in Borders.  I'll turn over the podium to Mr. Masumoto to

14  prosecute his objection.

15         THE COURT:  Okay.

16         MR. MASUMOTO:  Good morning, Your Honor.  Brian

17  Masumoto for the Office of the United States Trustee.  Your

18  Honor, with respect to the Mercer application, we had several

19  objections, all of which have been resolved.  I just wanted to

20  mention the two, sort of, that remained at the end, were the

21  concept that they're hourly compensa -- their quarter-hour

22  increment in terms of their records.  The supplement addresses

23  it in somewhat of a convoluted fashion, but it seems --

24         THE COURT:  They ought to change their system to

25  tenths of an hour, but --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    21

1          MR. MASUMOTO:  I understand, Your Honor.  But it

2    appears that over fifteen minutes, they'll be rounding down for

3    the first ten, and for the last five, they would round up,

4    which seems to be consistent with the tenths of an hour

5    increment, and avoiding the concern of overbilling to the

6    estate.  So that appears to have been resolved.

7          The remaining issue is the one that Mr. Marinuzzi

8    alluded to.  And as we have indicated in our papers, as we

9    understand the Court's decision in Borders --

10         THE COURT:  Well, I think -- you know, I read your

11   objection.  You obviously continued the objection.  But I

12   thought you actually went a little too light on it, in the

13   sense that the Borders decision first -- I mean, it was

14   distinguishable from this case, because Borders makes clear

15   that the objection to the Mercer application did not arise

16   until the first fee application.  That at the time of the

17   retention the Office of the U.S. Trustee had asserted a general

18   reservation of rights but had not specifically objected to the

19   expense reimbursement provision as being the source of

20   authority for counsel retention.

21         So I think there's more to your objection here than

22   there was in Borders.  Now, that, of course, isn't the end of

23   the story.  The supplemental declaration submitted answers

24   maybe part of the question.  But in the Borders opinion, which

25   I reread again this morning, I focused on let's deal solely

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                          22

1   with the reimbursement of outside counsel in connection with

2   retention.  I asked, in that opinion, a series of questions

3   about whether the professional in that case and in this case,

4   Mercer, charges its clients both for bankruptcy matters and

5   nonbankruptcy matters for counsel fees in connection with

6   retention.  I specifically raised the question in the Borders

7   decision whether it is or should be considered part of

8   overhead.  There were a whole -- there were a series of

9   questions that I raised.

10              Certainly, here you've raised the objection, and it is

11  at the retention stage, not at the fee application stage.  I

12  guess the one thing that I said and would still adhere to here

13  is that 327 is not the issue.  And I guess the supplemental

14  declaration says that -- the supplemental declaration of John

15  Dempsey, paragraph 8:  "Mercer customarily requests and

16  receives similar reimbursement rights from its clients."

17              That same paragraph 8 says that, "To date, Mercer's

18  outside legal fees are estimated at less than $6,000.  Mercer

19  will only seek reimbursement from the debtors of those legal

20  fees that were performed solely on behalf of Mercer."

21              I guess -- I'll let you -- you can say more if you

22  want.  I don't know how far you explored this.  I mean, I don't

23  think -- the Borders -- I adhere to what I said in Borders.

24  But what I said in Borders is more complicated in a situation

25  such as the one where you've raised your objection now.

RESIDENTIAL CAPITAL, LLC, ET AL.                                  23

1          MR. MASUMOTO:  Well, Your Honor, as to -- it seems

2   that the issue of inquiry as to whether it would be part of

3   overhead is actually part of the objection that the U.S.

4   Trustee has raised --

5          THE COURT:  I know.

6          MR. MASUMOTO:  -- in the past.  And I don't know

7   whether or not, again, within the parameters of the judge's

8   decision in Borders, indicating that if they customarily bill

9   it outside, whether that disposes of the inquiry as to whether

10  or not it's treated as part of their overhead.

11         In addition, we assume that even in accordance with

12  the Borders decision, going forward, to the extent that they

13  have -- if they use outside counsel to review their time

14  records and so forth, within the prohibited categories, that

15  that would still be subject to an objection and disallowance at

16  the fee application stage.

17         THE COURT:  All right.

18         MR. MASUMOTO:  As to whether or not fee app

19  preparation, on the other hand, I think that may be probably

20  the most outstanding issue related to going forward, the issue

21  of whether or not outside counsel could prepare their fee

22  application and include that as reimbursement, is a frequent

23  concern that arises.

24         At this stage, the services for being retained are

25  identified at 6,000.  But going forward, the ones that we've

1  seen to be included among the permissible services argued by

2  the financial advisors is that fee application preparation

3  should also be included and permitted by outside counsel.  If

4  the Court's inclined to clarify that point at the outset, I

5  think it might help the parties.  I think they're on notice

6  with respect to the impermissible types of services.

7           THE COURT:  Well, let me say, if I approve the

8  retention as presented, I believe, and I'm making it clear now,

9  that because it's -- it then becomes part of actual necessary

10 expenses, and the issue under actual and necessary expenses

11 leaves it to the Court to review the detailed application.  As

12 occurred in Borders, I think initially it was just listed as an

13 expense item and the Court requested and received detailed fee

14 statement from Freeborn & Peters, which I guess is also the

15 same counsel here.

16          MR. MASUMOTO:  Same firm.

17          THE COURT:  And we reviewed that in detail for

18 reasonableness; also looked at it and disallowed a very small

19 portion of the fees because it appeared to the Court to be work

20 for the estate as opposed solely for Mercer.  And the

21 engagement letter here, I think make clear.  It says on page 3,

22 "In addition to such compensation, we also bill for necessary

23 travel and other expenses related to the services requested,

24 including legal fees associated with our retention, subsequent

25 fee application with the U.S. Bankruptcy Court, if required,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                     25

1   and any request of participation in contested matters of

2   litigation, such as depositions, responding to subpoenas or

3   discovery requests and court testimony."

4         So I mean, in Borders I decided, and would adhere to,

5   that because lawyers can charge for preparation of their fee

6   applications that other professionals can.  And it would

7   frequently be the case that lawyers would be used in connection

8   with retaining it.  When I review the fees to conclude whether

9   they're reasonable, and I'm definitely going to -- assuming I

10  approve the application -- everybody ought to understand,

11  Mercer needs to understand, I would do it expressly with the

12  understanding, the Court reserve the right to review the

13  specific amount of fees sought in connection with preparation

14  of fee applications.

15        In Borders I think I cited some cases that

16  distinguished between preparation of fee applications and the

17  cost of "defending" a fee application if it's challenged.  That

18  may or may not -- Judge Bernstein -- I cited to one of Judge

19  Bernstein's decisions on that.  And I do see that distinction

20  and would adhere to that distinction.

21        And Mr. Masumoto, are you objecting to the indemnity

22  concept?

23        MR. MASUMOTO:  No.  With respect to indemnity,

24  usually, in fact, explicitly the provisions under the indemnity

25  provisions allow attorneys representing the professional with

RESIDENTIAL CAPITAL, LLC, ET AL.                                      26

1  respect to indemnification issues.  That is one attorneys' fees

2  that we explicitly allow, subject to, again, all of the normal

3  guideline restrictions that apply.

4          THE COURT:  You know, I said in Borders at 456 B.R.

5  208, "Professionals may only be compensated in bankruptcy cases

6  for reasonable fees and expenses, taking into consideration

7  customary fees in bankruptcy and nonbankruptcy matters,"

8  referring to General Order M-389.  "If a professional does not

9  charge for counsel fees for negotiating retention in

10 nonbankruptcy matters, then such charges are inappropriate in

11 bankruptcy cases.  Expense reimbursement should also bear a

12 reasonable relationship to the likely amount of the

13 professional's compensation.  Caps on the amount of

14 reimbursable expenses can also be negotiated.  But where the

15 fees are incurred in representing the professionals and not in

16 performing work for the debtor, Section 327 does not apply."

17         Mr. Marinuzzi, is there an estimate of what the total

18 fees for Mercer are likely to be in the case?  I mean, nobody

19 took me up on my invitation to negotiate a cap for what -- I

20 mean, I don't know.  Has the clock stopped running on the fees

21 on retention?

22         MR. MARINUZZI:  Well, Your Honor, I think in theory --

23 well, actually no, insofar as counsel is on the phone right

24 now.  I --

25         THE COURT:  Well, I hope they like listening.  But I'm

RESIDENTIAL CAPITAL, LLC, ET AL.                                   27

1  not sure I would reimburse them for the expenses of listening

2  in today.  Okay?

3           MR. MARINUZZI:  Okay.  I guess --

4           THE COURT:  They might take that into account when

5  then put in a fee application.

6           MR. MARINUZZI:  -- I guess, Your Honor, my response

7  is, it will depend in large measure on how much work is done in

8  connection with the KEIP KERP and frankly how much opposition

9  there is to the KEIP KERP.

10          THE COURT:  Well, the U.S. Trustee always objects to a

11  KEIP KERP.

12          MR. MARINUZZI:  And we hope to work through those

13  issues before we actually file the motion.  We intend to

14  provide them with a draft.  We hope to work through the issues

15  with the committee.  We really want to try to minimize the time

16  in front of the Court as well as deposition time.

17          In the context of this case, Your Honor, obviously,

18  this is not going to be a large expense.  Having said that, I

19  don't know that I can suggest a cap.  I just don't know.

20  They've incurred 6,000 to date.  If they have to attend and

21  prepare for depositions --

22          THE COURT:  I'm just talking about retention right

23  now.

24          MR. MARINUZZI:  Retention?  I --

25          THE COURT:  The indemnification issue, I think Mr.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                              28

1  Masumoto has already indicated -- if Mercer's going to be

2  deposed in connection with a KEIP and KERP, for example, Mr.

3  Masumoto, I guess you wouldn't disagree they're entitled to

4  have counsel represent their people at a deposition?

5              MR. MASUMOTO:  That's correct, Your Honor.

6              THE COURT:  Okay.

7              MR. MASUMOTO:  To the extent that they need to

8  represent --

9              THE COURT:  So that's not the issue, Mr. Marinuzzi.

10             MR. MARINUZZI:  Okay.  All right.  Your Honor, if

11 we're talking specifically about retention issues, I would just

12 defer to counsel for Mercer, who is on the phone now.

13             THE COURT:  Okay.

14             MR. EGGERT:  Yes, Your Honor.  This is Devon Eggert of

15 Freeborn & Peters on behalf of Mercer.  In the supplemental

16 declaration, we indicated that to date for retention the amount

17 was less than 6,000.  And assuming the retention application

18 would be granted today, there would be no more time for

19 retention.  And we're mindful of the Court's request to not

20 seek reimbursement for the time spent for this hearing.

21             THE COURT:  Thank you.  You could seek it, but --

22             MR. MARINUZZI:  Your Honor, we agreed that they

23 wouldn't fly out here for this hearing to save expense.

24             THE COURT:  Is someone here from Mercer?

25             MR. MARINUZZI:  Your Honor, the declarant, John

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    29

1  Dempsey is on the phone.

2          THE COURT:  All right.  Mr. Dempsey, what I would like

3  to know is, you say in your supplemental declaration that

4  Mercer customarily requests and receives similar reimbursement

5  rights from its clients.  What I'd like to know is, outside of

6  bankruptcy matters, do you regularly receive -- not request,

7  but receive reimbursement for counsel fees in connection with

8  your engagement?

9          MR. DEMPSEY:  We receive reimbursement for our -- for

10 when we engage outside counsel in connection with litigation.

11         THE COURT:  That wasn't my question.  That wasn't my

12 question.  My question -- I'm focusing -- the issue in my mind,

13 Mr. Dempsey, is whether retention is really built into

14 overhead.  And so my question specifically is with respect to

15 your retention, whether you regularly charge for and receive

16 reimburse -- do you use outside counsel for retention in

17 nonbankruptcy matters?

18         MR. DEMPSEY:  No we do not.  But --

19         THE COURT:  Do you --

20         MR. EGGERT:  Your Honor, this is --

21         THE COURT:  Just a second.

22         MR. EGGERT:  -- Devon Eggert of --

23         THE COURT:  No.  Let's -- answer my questions.  Then

24 I'll let you say what you want.

25         Do you have inside counsel?

RESIDENTIAL CAPITAL, LLC, ET AL.                                  30

1       MR. DEMPSEY:  We do.  Which is corporate counsel.

2   They're not specialists in bankruptcy.

3       THE COURT:  Well, but do they review -- your

4   engagement letter is boilerplate.  Does your inside counsel

5   review retention applications before they're signed in

6   nonbankruptcy matters?

7       MR. DEMPSEY:  Only -- well, there are not retention

8   applications --

9       THE COURT:  Well, not applications.  Engagement

10  letters.  I mean, look, Mr. Marinuzzi, here's the thing that's

11  bothering me, and I said this in the Borders opinion.  I wanted

12  to know -- in order to get reimbursed for counsel expenses in

13  connection with retention, you have to look to both bankruptcy

14  and nonbankruptcy matters.  And I mean their engagement letter

15  is pure boilerplate, okay.  And I don't -- yes, engagement in a

16  bankruptcy matter, retention in a bankruptcy matter, requires

17  more work than in a nonbankruptcy matter.  But it seems -- do

18  you know whether they have been reimbursed for their outside

19  counsel fee -- do they use outside counsel, Mr. Marinuzzi, in

20  their retention in all bankruptcy matters?

21      MR. MARINUZZI:  Your Honor, I don't know the answer to

22  that.

23      THE COURT:  So I want to see another supplemental

24  declaration.  I want to know whether they use outside counsel

25  in retentions in all bankruptcy matters; whether they have

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                          31

1   received reimbursement for outside counsel fees in all

2   bankruptcy matters.  I don't want it to become automatic that

3   if they apply for retention in the Southern District of New

4   York, they simply get it.  That was -- I mean, in Borders I

5   made clear, it would be a different -- it was a different issue

6   if the objection was raised at the time of retention.  That's

7   what's happened here.

8          And so I'm not satisfied -- I mean, the 6,000 dollars

9   standing alone is not an inordinately high figure.  That's not

10  my problem with it.  But I don't understand why it's not built

11  into their overhead.  Are they using the same rates -- do they

12  use the same rates in bankruptcy and nonbankruptcy matters?  I

13  want to know more.

14          MR. MARINUZZI:  That's fine, Your Honor.

15          THE COURT:  Okay.

16          MR. MARINUZZI:  We'll work with Mercer to provide --

17          MR. EGGERT:  Your Honor, this is Devon Eggert.  May I

18  just add just a small point of clarification?

19          THE COURT:  Go ahead.

20          MR. EGGERT:  If I may?  The question about if Mercer

21  uses outside counsel outside of bankruptcy.  The amounts

22  incurred to date relating to retention, that does not have any

23  time with respect to negotiating the engagement letter.  That

24  deals only with the retention application.  So if Mr. Dempsey

25  is negotiating with a potential client on an engagement letter

RESIDENTIAL CAPITAL, LLC, ET AL.                                    32

1   for compensation services, we are typically not involved at

2   that point.

3         THE COURT:  Does Mercer have a different fee structure

4   for matters involving companies that are in a Chapter 11

5   proceeding versus nonbankruptcy matters?

6         MR. EGGERT:  I think I would have to defer to John

7   Dempsey on that question.

8         THE COURT:  Mr. Dempsey?

9         MR. DEMPSEY:  Yes, this is John Dempsey.  No, we

10  charge the same hourly rates inside and outside of bankruptcy.

11  And we charge -- we are reimbursed for legal expenses

12  associated with work on behalf of the client.  And the contract

13  negotiation of engagement letters, as Devon has noted, is a

14  separate process from this process of getting retained in

15  Court, which is unique to bankruptcy.  And we have -- we always

16  have this provision for seeking reimbursement, because it's a

17  special thing we do on behalf of our clients because we are

18  asked by the debtor's counsel to go down this process of

19  getting retained.

20        THE COURT:  So --

21        MR. DEMPSEY:  This is something the client is

22  triggering that we have to do.

23        THE COURT:  Mr. Marinuzzi, I specifically said in the

24  Borders decision at 456 B.R. 208, "If a professional does not

25  charge for counsel fees for negotiating retention in

RESIDENTIAL CAPITAL, LLC, ET AL.                    33

1  nonbankruptcy matters, then such charges are inappropriate in

2  bankruptcy cases."

3       MR. MARINUZZI:  What I think I heard is they're not

4  charging for negotiation of the engagement letter; it's the

5  retention application that they're charging for.

6       THE COURT:  And this said retention, it didn't say

7  engagement letters.  So --

8       MR. EGGERT:  Well, Your Honor, Devon Eggert for

9  Mercer.  Just one last point.  I mean, there really aren't any

10 charges for retention outside of bankruptcy.  And I think that

11 was what Mr. Dempsey was getting at, is that the unique nature

12 of a bankruptcy case and needing to be retained is why there's

13 a charge for retention in a bankruptcy case, but there's no

14 charge for retention outside of bankruptcy.

15      And when he enters into these engagements before a

16 company files for bankruptcy, this provision is in here in the

17 event the bankruptcy actually occurs.  There are engagements

18 where he has this provision but the company does not file for

19 bankruptcy.  But that provision is still in those engagement

20 letters.

21      MR. MASUMOTO:  Excuse me, Your Honor.  If I may?  I

22 believe you quoted to the supplement previously in paragraph 8

23 where it says, "Mercer customarily requests and receives

24 similar reimbursement rights from its clients," which seems to

25 suggest that they are asking for reimbursement for attorneys'

1    fees outside of bankruptcy, contrary to, I guess, what was just

2    stated.  So maybe just a --

3         THE COURT:  Well, I think what they're saying is they

4    don't -- the language may be there, but outside of bankruptcy

5    they don't need -- they have the right, but outside of

6    bankruptcy they don't use outside counsel, because they don't

7    have to do a retention application.  So --

8         MR. EGGERT:  That's correct, Your Honor.  It's never

9    triggered.

10        THE COURT:  -- right, it's not triggered.  The

11   language is there, it's just not triggered.  And look, I'm

12   mindful of that.  I guess -- is there somewhere in the

13   declarations that it indicates that Mercer charges the same

14   hourly rates for matters that are in bankruptcy and outside of

15   bankruptcy?

16        MR. EGGERT:  Your Honor, in paragraph 15 of the

17   original declaration, it says, "The fee structure and other

18   provisions of the engagement letter are consistent with the

19   terms of other Mercer engagements, both in and out of

20   bankruptcy court proceedings."

21        THE COURT:  Okay, thank you.  Mr. Masumoto?

22        MR. MASUMOTO:  Your Honor, if Your Honor is satisfied

23   that the overhead issue has been resolved, we'll defer to the

24   Court's order.  But if they're only charging for the retention

25   application, which does not exist outside of bankruptcy, the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    35

1  issue of overhead is not fully addressed.

2         From our standpoint, we believe that it should be,

3  even in the bankruptcy context, part of the cost of doing

4  business.  I mean, many people interview before committees and

5  they incur the cost of what we refer to as a "beauty contest".

6  And if they're not, obviously, selected, they can't apply to

7  the estate for the cost of seeking to be retained.  Similarly,

8  the cost of being retained in the bankruptcy context, we

9  believe, should be absorbed by the professional.

10         And particularly so in cases, as with Mercer, where

11  you have a sometimes not strictly an hourly rate.  Particularly

12  with financial advisors, there's always the concern that in

13  essence, they're sort of farming off the cost of the expense.

14         THE COURT:  I think the financial advisor, because the

15  fee structure is different, it's not an hourly basis, raises a

16  bigger issue about whether it's part of overhead or not, than a

17  professional that's billing strictly on an hourly basis.

18         MR. MASUMOTO:  Understood, Your Honor.  It's just

19  that, from our standpoint, we believe that even with hourly

20  professionals -- as Your Honor indicated, we're particularly

21  concerned with the financial advisors and fixed monthly

22  compensation -- but even with the hourly professionals, as

23  indicated, we believe that the cost of being retained should be

24  borne by the professional.

25         Many times, Your Honor, especially in the large cases,

1  you have complex issues.  And some of those complexities and

2  conflicts arise because of the nature of the professionals

3  themselves.  It's not the bankruptcy per se, but the nature of

4  their relationships to other parties and so forth.  And if they

5  undertake to be retained under that circumstance, it seems only

6  fair that they should bear the cost, and not the estate.  It's

7  not the estate that has established those connections, it's the

8  professionals.

9          And so whatever is unique to that professional -- if a

10 professional comes in with no conflicts at all, there should be

11 very little cost to that professional and presumptively to the

12 estate, if the estate bears the cost.  So from our standpoint,

13 it should be, for all professionals, hourly or not, a matter of

14 their costs.

15         MR. MARINUZZI:  Your Honor --

16         THE COURT:  Go ahead, Mr. Marinuzzi.

17         MR. MARINUZZI:  -- if I could just respond to that?  I

18 also, obviously, read the Borders decision.  And what I took

19 away from it on the overhead issue is that it wasn't overhead

20 for Mercer, as the Court ruled last time, notwithstanding the

21 context.  I don't know that it made a difference whether the

22 objection was asserted at the beginning or the end, for

23 purposes of determining whether these fees are overhead.  And

24 Your Honor concluded it wasn't overhead for the same firm, less

25 than a year ago.  I don't know that the fact that it's being

RESIDENTIAL CAPITAL, LLC, ET AL.                                    37

1  asserted now versus at the fee application time changes that

2  conclusion.  But obviously, it's Your Honor's decision.

3            THE COURT:  Anybody else wish to be heard with respect

4  to the Mercer retention?

5        (Pause)

6            THE COURT:  I'm going to approve the Mercer retention

7  application with the following caveats.  I intend to review the

8  fees incurred, as will be with expenses, very carefully.  So

9  because simply saying that fees in connection with retention

10 should be reimbursable expenses, I am very mindful of the issue

11 that Mr. Masumoto raises about conflicts.  So where protracted

12 work is required in connection with retention, because of the

13 professional's connections and contacts and potential

14 conflicts, I might well disallow those fees.

15          There's no question that because bankruptcy requires a

16 retention application for professionals such as Mercer, and

17 that this is a legal context, and therefore it does seem

18 appropriate to the Court for them to use professionals in doing

19 so, I'm not categorically excluding reimbursement for those

20 expenses.  It becomes a question of why don't they use their

21 own inside counsel for doing it versus outside counsel.

22 Mercer's been using outside counsel for it.

23          But when I review the fee application, I don't know at

24 this stage -- I know they've said it's approximately less than

25 6,000 dollars that's been incurred to date -- I don't know

RESIDENTIAL CAPITAL, LLC, ET AL.                                    38

1    without looking at the detailed time entries what that 6,000

2    dollars was incurred for doing -- what did they do for that.

3         So if the Court subsequently determines that the

4    issues in a particular retention arose because of conflicts

5    issues, for example, I might well conclude no, that shouldn't

6    be a reimbursable expense.  If the professional decides they

7    want this engagement and their other -- work for other clients

8    presents complications for them, and they're seeking advice

9    from counsel on that, I might well just disallow it.  I'm not

10   categorically -- in saying I will approve the engagement that

11   includes reimbursement for their expenses in connection with

12   retention, that should not be taken as a categorical approval

13   of whatever shows up in a fee application.

14        And if the fee application is not sufficiently

15   revealing of what they did, I'm going to ask for more detail

16   about it.  Okay?  So that will be -- I will approve the

17   retention application.

18        I think, just so we're clear, the preparation of fee

19   applications, there, as I said in the Borders decision, subject

20   to reviewing the fees for reasonableness, I think that's

21   appropriate.  And Mr. Masumoto's raised no question about the

22   indemnity issue.  Okay.

23        MR. MARINUZZI:  Thank you, Your Honor.

24        THE COURT:  Thank you, Mr. Masumoto.  Thank you, Mr.

25   Marinuzzi.

## RESIDENTIAL CAPITAL, LLC, ET AL.                                    39

1    MR. MARINUZZI:  Thank you, Your Honor.  Your Honor,

2   the last retention application on the calendar today is the

3   committee's application to retain counsel, Kramer Levin.  I'd

4   cede the podium to Kramer Levin.

5        THE COURT:  Is Rubenstein on?

6        MR. MARINUZZI:  Oh, I apologize, I missed it.  You're

7   right.  Thank you.  Your Honor, the last retention application

8   on the debtors' side is the debtors' application to retain

9   Rubenstein Associates as corporate communications consultants.

10   There was an objection by the U.S. Trustee regarding billing in

11   quarter hour increments, and they've decided to bill in tenths

12   of an hour increments to satisfy that objection.

13        THE COURT:  And the Court noted that with respect to

14   the reimbursement for counsel fees, it did not include -- in

15   connection with retention -- it was essentially the indemnity.

16        MR. MARINUZZI:  Indemnity, right.

17        THE COURT:  Mr. Masumoto, anything that you want --

18        MR. MASUMOTO:  No, thank you, Your Honor.

19        THE COURT:  All right.  That's approved.

20        MR. MARINUZZI:  Thank you, Your Honor.  And now I'll

21   cede the podium to Kramer Levin.

22        THE COURT:  Okay.

23        MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

24   Eckstein, Kramer Levin, proposed counsel for the creditors'

25   committee.  I was hoping I could rely on Mr. Marinuzzi, but I

RESIDENTIAL CAPITAL, LLC, ET AL.                                40

1   guess I couldn't on this one, so I'll present it myself.

2           Your Honor, we submitted our retention application in

3   connection with our representation of the creditors' committee.

4   We reviewed it with the U.S. Trustee.  We didn't receive any

5   objections.  So unless Your Honor has any questions, we would

6   respectfully request approval of the motion.

7           THE COURT:  Does anybody wish to be heard with respect

8   to the Kramer Levin retention application?

9           All right.  It's approved as well.

10          MR. ECKSTEIN:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. LEE:  Good morning, Your Honor.  Gary Lee from

13  Morrison & Foerster, counsel for the debtors.  I think I can

14  say that now, subject to the order.  The last item, I think, on

15  the agenda, is the status conference on our motion for a final

16  order approving the servicing agreement between the debtors and

17  Ally Bank.

18          Your Honor, there have been very serious discussions

19  between the debtors, the committee, and Ally, regarding this

20  motion.  And the parties have agreed that it would be the

21  professionally responsible thing to do to give the business

22  principals some time to talk here about the motion.  It's an

23  important motion.  I think, as we said, it's one of the

24  cornerstones of the entire case.  And so in that regard, the

25  proposal, Your Honor, is, that the debtors will adjourn the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    41

1   status conference until July the 24th, and the hearing until

2   August the 8th.

3          The debtors are going to file a supplemental

4   declaration, Your Honor on Monday.  We've shared a draft of

5   that declaration with the committee.  And it will set out

6   further details regarding the motion and why it's a critical

7   component of the case.

8          We are working on a discovery schedule with the

9   committee.  If there is a need for an evidentiary hearing on

10  August the 8th -- and in the meantime there have been informal

11  productions of documents.  We've received a formal request, and

12  we're in the process of compiling that.  So in the event there

13  is a hearing, nobody is caught by surprise and loses any time.

14         THE COURT:  Mr. Lee, tell me, the anticipated schedule

15  is that it'll come before the Court when?

16         MR. LEE:  On August the 8th.

17         THE COURT:  And are you requesting that the August 8th

18  hearing be an evidentiary hearing if necessary?

19         MR. LEE:  Your Honor, in the event that the parties

20  are unable to reach any kind of resolution -- and we hope to be

21  at a report on that by July the 24th -- the committee's

22  indicated that they believe the next hearing will need to be an

23  evidentiary hearing.  The intend to call witnesses.  And I

24  believe the debtors will need to do the same.  So, yes, Your

25  Honor, if possible, August the 8th would be an evidentiary

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      42

1    hearing.

2              THE COURT:  I don't think so.  Because I have MF

3    Global in the morning and the ResCap KEIP KERP motion --

4              MR. LEE:  Which is also mine, Your Honor.

5              THE COURT:  -- is scheduled for 2 o'clock.  It's on

6    the calendar for 2 o'clock.  I don't want to anticipate whether

7    the U.S. Trustee or the creditors' committee will object to the

8    KEIP KERP motion, but I haven't seen a KEIP or KERP that hasn't

9    been objected to -- I don't think ever, but --

10             MR. LEE:  Well, Your Honor, we'll work very hard

11   between now and then to ensure that there aren't any.  We've

12   actually had discussions with the committee regarding the KEIP

13   and KERP, and we are in the process of engaging with the U.S.

14   Trustee on that too.  But you're right, it might be ambitious.

15             But for various reasons, Your Honor -- I apologize for

16   interrupting -- there are some fairly important reasons why it

17   can't slip much beyond August the 8th.  The reason is because

18   the bank, which is the counterparty to this agreement, is a

19   regulated entity.  And the FDIC is watching what we're doing

20   quite carefully and we wanted to get the --

21             THE COURT:  Yes --

22             MR. LEE:  -- I appreciate -- every regulator under the

23   sun is watching what we're doing quite carefully.  But we are

24   under a certain amount of pressure to get the first hearing

25   date that we can.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                                43

1      THE COURT:  Well, I don't find that to be -- the fact

2  that the FDIC is keeping a close watch is not necessarily

3  persuasive of having an evidentiary hearing on it.  Part of my

4  problem is that I'm out of town the week before.  I'm committed

5  to always being prepared when I have a hearing in advance.

6      MR. LEE:  I have had that experience, Your Honor, yes.

7      THE COURT:  And so the question is, will the schedule

8  allow enough time for me to feel fully prepared.  I'm not sure

9  if I can do that.  I'm not asking you to give me a preview all

10 of the issues, but what issue do you -- if there has to be an

11 evidentiary hearing, what issues do you anticipate will require

12 an evidentiary hearing?

13     MR. LEE:  I'm going to try and keep my comments

14 neutral, because the parties are engaged in --

15     THE COURT:  I understand that.

16     MR. LEE:  -- fairly sensitive negotiations.  I think,

17 Your Honor, the principal issues --

18     THE COURT:  Well, let me stop you for a second.

19     MR. LEE:  Yes.

20     THE COURT:  I don't want to do anything to upset --

21     MR. LEE:  Thank you, Your Honor.

22     THE COURT:  -- delicate discussions in an effort to

23 work this out..  You're going to be back here on July 24th?

24     MR. LEE:  Yes, Your Honor.

25     THE COURT:  We're going to put this on for a status

RESIDENTIAL CAPITAL, LLC, ET AL.                                    44

1    conference on July 24th.

2            MR. LEE:  Yes, Your Honor.

3            THE COURT:  And at that time, I expect a fuller

4    discussion.  And if necessary, we'll talk about exactly what

5    the Court requires if there's going to be an evidentiary

6    hearing, and what that will -- you're also on the calendar for

7    August 14th.

8            MR. LEE:  Yes.

9            THE COURT:  I don't know -- I mean I see a lot of

10   matters listed on the calendar for August 14th.  There's a lot

11   of stay relief motions.  I don't know if we will have them or

12   not it or not, or whether -- what those will entail.

13           So it's possible, Mr. Lee, that August 14th will be

14   the date for an evidentiary hearing.  And if necessary, start

15   thinking now about which of the ResCap matters that are on the

16   calendar for August 14th can be moved.  Right now there's

17   nothing on the calendar on August 14th other than lift stays.

18           MR. LEE:  Your Honor, may I ask a quick question?  Did

19   we have a holding date on the 9th, or has that gone already?

20           THE COURT:  You're on the calendar for the 9th.  You

21   have retention applications for Deloitte, KPMG, continued

22   hearing if necessary for KEIP and KERP.

23           MR. LEE:  I hope not, Your Honor.

24           THE COURT:  I didn't put these entries in there.  I've

25   got Borders for the 10th.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    45

1    MR. LEE:  Would it be possible, Your Honor, just to

2    tentatively set it for the 9th?

3            THE COURT:  Well, it comes back --

4            MR. LEE:  Or is that --

5            THE COURT:  -- to the same problem.

6            MR. LEE:  Okay.

7            THE COURT:  How much preparation is going to be

8    required for me.

9            MR. LEE:  I understand, Your Honor.

10           THE COURT:  And I'm away the prior week.  It's -- I'm

11   not -- let's talk about it on the 24th.

12           MR. LEE:  Okay.  And I'll commit, there'll be a full

13   preview of the issues on the 24th.  We would have done it

14   today, but for the fact that the parties are engaged.

15           THE COURT:  That's fine.

16           MR. LEE:  Thank you.

17           THE COURT:  I don't want to upset discussions that are

18   constructive discussions.

19           Just, ordinarily, Mr. Lee, on anything that's a

20   contested matter requiring an evidentiary hearing that's at all

21   complicated, I want papers a week in advance.

22           MR. LEE:  I see.

23           THE COURT:  And that may be possible for you, but I

24   won't be here for -- I'll be here for part of the week, but not

25   all of the week.  And it limits my preparation.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    46

1          MR. LEE:  And I can guarantee it will be complicated,

2    so.

3          THE COURT:  We'll see on the 24th.

4          MR. LEE:  Okay, thank you, Your Honor.

5          THE COURT:  Thank you.  Mr. Eckstein?

6          MR. ECKSTEIN:  Your Honor, Kenneth Eckstein, of Kramer

7    Levin, counsel for the creditors' committee.  I'm going to

8    begin by concurring with Mr. Lee that this will be complicated.

9    And I think it will be --

10         THE COURT:  Sufficiently complicated that if there's

11   an evidentiary hearing, it's going to be more than one day?

12         MR. ECKSTEIN:  Potentially, yes.  I think that in the

13   first instance, we concur with the judgment to adjourn today's

14   status conference.  There were fairly significant discussions

15   that took place this week among the professionals about this

16   motion.  And I think all parties have concurred that it would

17   be appropriate for the principals to meet.

18         THE COURT:  And I'm not pressing the issue --

19         MR. ECKSTEIN:  I understand.  I do think, Your Honor,

20   that there are issues about this motion that do require

21   significant additional disclosure.  And we have been assured by

22   Mr. Lee that a significant additional submission is going to be

23   made, which we think will be very important, and obviously

24   would be something that all parties are going to want to react

25   to.  And I think that would also justify adjourning the motion.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                          47

1     The issue does go to the heart of the relationships

2    between ResCap and Ally and the operations of the business and

3    what is and is not appropriate in terms of payments during the

4    Chapter 11 case, in contrast to what might be appropriate to be

5    dealt with in connection with a plan, both in terms of pre-

6    petition obligations and post-petition obligations and how

7    those should be allocated.

8          We think it would be useful if we can bring to the

9    Court a resolution.  We think that would be worthwhile to

10   pursue.  We think that we should use the 24th as a date to

11   review the issues.  And I think that that could advance the

12   ball quite significantly, because I think Your Honor will hear

13   the issues.  And my sense is that without an evidentiary

14   hearing we can probably frame a lot of the factual issues,

15   which are, I think, more important in many respects, and more

16   difficult than the legal issues.  I think the legal issues are

17   important, obviously, but I don't think that's where the big

18   controversy and complexity arises.

19         So I think using the 24th will allow everybody to

20   assess what is necessary.  And there's obviously a real

21   possibility that by the 24th we'll have made business progress.

22   And I imagine if we can make progress, maybe we'll be able to

23   arrange to submit an order earlier and get the matter resolved

24   without the need for a lengthy and contentious hearing.

25         But at this point, I think, we're prepared to proceed

1  along the lines of let's have the discussions.  They're going

2  to be scheduled for next week.  And I think, for now, it would

3  probably be useful if we could use a response holding date for

4  either August 1st or August 2nd, which would be a week in

5  advance of August 8th or August 9th, which is what we were

6  anticipating.  I think the intention was to work out a

7  discovery schedule with Mr. Lee, which I imagine we'll have in

8  place, certainly before the 24th.  We haven't had any problems

9  in working out discovery.  And we can bring back the specific

10  issues to Your Honor on the 24th, depending upon where the

11  matter stands.

12         THE COURT:  Okay.  Let's see where things stand on the

13  24th.  Okay?

14         MR. ECKSTEIN:  Thank you.

15         THE COURT:  Thank you, Mr. Eckstein.

16         Mr. Marinuzzi?  I'm sorry.  Go ahead, Mr. Lee.

17         MR. LEE:  Apologies, Your Honor.  Just one additional

18  point.  Gary Lee from Morrison & Foerster.  Ally has agreed to

19  extend the provision in the DIP that would otherwise

20  automatically default by virtue of the fact that we won't have

21  gotten approval for this agreement by, I believe it's the end

22  of the month.  So we're able to carry over.  I just wanted to

23  bring that to the Court's attention, that they've agreed to

24  work with us on that, too.

25         THE COURT:  Thank you, Mr. Lee.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    49

1          MR. LEE:  Thank you.

2          THE COURT:  All right.  Anything else, anybody wants

3    to raise?  Mr. Marinuzzi?

4          MR. LEE:  No, Your Honor.  Thank you very much, again.

5          THE COURT:  All right.  We're adjourned.  Thank you

6    very much.  Everybody have a good weekend.

7          (Whereupon these proceedings were concluded at 11:04 AM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

50

1

2                                    I N D E X

3

4                                    RULINGS

5                                                       Page        Line

6    Debtors' interim compensation order granted.      11          5

7    Debtors' application to retain Rubenstein          39          19

8    Associates as corporate communications

9    consultants is granted

10   Application of creditors' committee to retain  40          9

11   Kramer Levin as counsel is approved.

12   Debtors' motion for retention of Kurtzman        11          19

13   Carson Consultants, granted.

14   Debtors' retention of ordinary course            12          16

15   professionals motion, granted.

16   Debtors' application to retain Curtis Mallet    13          1

17   as conflicts counsel, granted.

18   Morrison & Foerster retention application        16          17

19   approved subject to Court's review of

20   proposed order.

21   Debtors' application to retain Carpenter         17          16

22   Lipps & Leland approved subject to review of

23   proposed order.

24

25

51

1                                 RULINGS

2                                             Page        Line

3    Dorsey & Whitney retention application is      19          22

4    granted.

5    Orrick, Herrington & Sutcliffe retention       20          7

6    application is granted.

7    Application to retain Mercer is granted with   37          6

8    the limitations as delineated on the record.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

52

1

2                          C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    ![signature: Penina Wolicki]

9

10

11   _____

12   PENINA WOLICKI

     AAERT Certified Electronic Transcriber CET**D-569

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  July 16, 2012

19

20

21

22

23

24

25

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
July 13, 2012

**#**

**#607 (1)**
5:22

**$**

**$6,000 (1)**
22:18

**A**

**able (3)**
15:19;47:22;48:22
**absorbed (1)**
35:9
**accordance (1)**
23:11
**account (1)**
27:4
**actions (1)**
18:2
**activities (2)**
18:11,12
**actual (2)**
24:9,10
**actually (7)**
18:16;21:12;23:3;
26:23;27:13;33:17;
42:12
**add (1)**
31:18
**addition (3)**
14:1;23:11;24:22
**additional (5)**
13:6;14:4;46:21,
22;48:17
**addressed (3)**
19:2,7;35:1
**addresses (1)**
20:22
**adhere (4)**
22:12,23;25:4,20
**adjourn (2)**
40:25;46:13
**adjourned (2)**
10:17;49:5
**adjourning (1)**
46:25
**Administrative (2)**
5:4;11:8
**advance (4)**
43:5;45:21;47:11;
48:5
**advice (1)**
38:8
**advisor (1)**
35:14
**advisors (4)**
10:16;24:2;35:12,
21
**afterwards (1)**

**19:18**

**again (6)**
12:1;17:16;21:25;
23:7;26:2;49:4
**against (2)**
12:12;19:16
**agenda (4)**
10:14;11:7;12:18;
40:15
**Agent (2)**
5:5;11:11
**agents (1)**
11:8
**ago (2)**
18:4;36:25
**agreed (5)**
12:8;28:22;40:20;
48:18,23
**agreement (3)**
40:16;42:18;48:21
**Agreements (1)**
2:4
**ahead (3)**
31:19;36:16;48:16
**ALAN (1)**
9:23
**AlixPartners (1)**
10:17
**allocated (1)**
47:7
**allow (5)**
14:8;25:25;26:2;
43:8;47:19
**alluded (1)**
21:8
**Ally (7)**
2:3;8:3,3;40:17,19;
47:2;48:18
**alone (1)**
31:9
**along (1)**
48:1
**always (5)**
16:2;27:10;32:15;
35:12;43:5
**ambitious (1)**
42:14
**Americas (1)**
7:13
**among (5)**
14:6,14;17:25;
24:1;46:15
**amount (5)**
25:13;26:12,13;
28:16;42:24
**amounts (2)**
11:24;31:21
**analyzing (1)**
20:2
**anticipate (3)**
18:10;42:6;43:11
**anticipated (1)**
41:14

**anticipating (1)**
48:6
**Apologies (1)**
48:17
**apologize (2)**
39:6;42:15
**app (1)**
23:18
**appeared (1)**
24:19
**appears (2)**
21:2,6
**Application (54)**
2:6,13,18;3:2,9,18;
4:1,9;5:2;11:7;12:18,
23,25;13:3;15:4;
16:22,23;17:10,15,
19;19:21,24;20:6,9,
18;21:15,16;22:11;
23:16,22;24:2,11,25;
25:10,17;27:5;28:17;
31:24;33:5;34:7,25;
37:1,7,16,23;38:13,
14,17;39:2,3,7,8;
40:2,8
**applications (12)**
10:11,15;14:13;
15:24;25:6,14,16;
30:5,8,9;38:19;44:21
**applied (1)**
19:10
**apply (9)**
12:9,12;17:9;
18:22;19:15;26:3,16;
31:3;35:6
**appreciate (1)**
42:22
**appropriate (5)**
37:18;38:21;46:17;
47:3,4
**approval (3)**
38:12;40:6;48:21
**approve (6)**
10:22;24:7;25:10;
37:6;38:10,16
**approved (6)**
11:5,19;16:18;
17:16;39:19;40:9
**approving (1)**
40:16
**approximately (1)**
37:24
**area (1)**
14:2
**argued (1)**
24:1
**arise (2)**
21:15;36:2
**arises (2)**
23:23;47:18
**arose (1)**
38:4
**around (1)**

**15:21**

**ARPS (1)**
8:10
**arrange (1)**
47:23
**asserted (3)**
21:17;36:22;37:1
**assess (1)**
47:20
**associated (2)**
24:24;32:12
**Associates (3)**
2:14;9:23;39:9
**assume (1)**
23:11
**assuming (2)**
25:9;28:17
**assured (1)**
46:21
**attend (1)**
27:20
**attention (1)**
48:23
**Attorneys (6)**
7:12;8:3,11,19;9:3;
25:25
**attorneys' (3)**
20:12;26:1;33:25
**August (15)**
41:2,10,16,17,25;
42:17;44:7,10,13,16,
17;48:4,4,5,5
**AUSTIN (1)**
8:18
**authority (1)**
21:20
**Authorization (4)**
2:8;3:4,11;5:3
**Authorizing (7)**
2:2,13,18;3:21;
4:11,23;11:21
**automatic (1)**
31:2
**automatically (1)**
48:20
**available (1)**
10:8
**Avenue (2)**
7:13;8:4
**avoiding (2)**
15:9;21:5
**away (2)**
36:19;45:10

**B**

**back (3)**
43:23;45:3;48:9
**ball (1)**
47:12
**Bank (3)**
2:3;8:3,11;40:17;
42:18

**Bankr (1)**
5:3
**Bankruptcy (53)**
2:7,7;3:3,3,10,10,
19,19,22;4:2,2,9,10,
16,21,22;10:6;22:4;
24:25;26:5,7,11;
29:6;30:2,13,16,16,
20,25;31:2,12,21;
32:10,15;33:2,10,12,
13,14,16,17,19;34:1,
4,6,14,15,20,25;35:3,
8;36:3;37:15
**Barclays (1)**
8:11
**basis (1)**
35:15,17
**bear (2)**
26:11;36:6
**bears (1)**
36:12
**beauty (1)**
35:5
**become (2)**
18:12;31:2
**becomes (5)**
14:13;24:9;37:20
**began (1)**
18:4
**begin (2)**
46:8
**beginning (1)**
36:22
**begins (1)**
16:9
**behalf (12)**
2:11,21;3:6,14,23;
4:6,14;5:6;22:20;
28:15;32:12,17
**Bernstein (1)**
25:18
**Bernstein's (1)**
25:19
**best (1)**
10:9
**beyond (1)**
13:24;42:17
**big (1)**
47:17
**bigger (1)**
35:16
**bill (3)**
23:8;24:22;39:11
**billing (2)**
35:17;39:10
**bit (1)**
17:23
**BOELTER (1)**
8:23
**boilerplate (2)**
30:4,15
**Borders (22)**
20:13;21:9,13,14,

12-12020-mg    Doc 4369    Filed 07/26/13    Entered 07/26/13 11:55:59    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.                Pg 65 of 122
Case No. 12-12020(MG)
July 13, 2012

22,24;22:6,23,23,24;
23:8,12;24:12;25:4,
15;26:4;30:11;31:4;
32:24;36:18;38:19;
44:25
**borne (1)**
35:24
**both (5)**
15:12;22:4;30:13;
34:19;47:5
**bothering (1)**
30:11
**BR (2)**
26:4;32:24
**BRADLEY (1)**
7:19
**BRIAN (3)**
7:8;13:16;20:16
**bring (3)**
47:8;48:9,23
**brings (3)**
17:19;19:23;20:9
**BRUENS (1)**
8:7
**buck (1)**
16:8
**built (3)**
12:13;29:13;31:10
**Business (8)**
2:4;4:24;15:19,20;
35:4;40:21;47:2,21

**C**

**calendar (7)**
39:2;42:6;44:6,10,
16,17,20
**call (1)**
41:23
**can (16)**
10:20;12:1;22:21;
25:5,6;26:14;27:19;
40:13;42:25;43:9;
44:16;46:1;47:8,14,
22;48:9
**cap (2)**
26:19;27:19
**Capital (8)**
2:11,21;3:7,15,24;
4:14;5:6;10:3
**Caps (1)**
26:13
**carefully (4)**
14:13;37:8;42:20,
23
**Carpenter (4)**
3:4;16:23;17:9,15
**carry (1)**
48:22
**Carson (3)**
5:4;11:8,18
**case (21)**
12:3;15:10,17;

16:3,4;18:3,10,15;
19:10;20:3;21:14;
22:3,3;25:7;26:18;
27:17;33:12,13;
40:24;41:7;47:4
**cases (7)**
15:24;25:15;26:5,
11;33:2;35:10,25
**catchall (1)**
13:20
**categorical (1)**
38:12
**categorically (2)**
37:19;38:10
**categories (3)**
14:8,14;23:14
**caught (1)**
41:13
**caveats (1)**
37:7
**CC (9)**
2:6,13,18;3:2,9,18;
4:1,16,21
**cede (2)**
39:4,21
**Centerview (1)**
10:16
**certain (1)**
42:24
**certainly (5)**
14:11;16:2,3;
22:10;48:8
**challenged (1)**
25:17
**chambers (1)**
10:24
**chambers' (1)**
14:12
**change (2)**
11:9;20:24
**changes (4)**
10:23;11:1;12:4;
37:1
**Chapter (2)**
32:4;47:4
**charge (8)**
25:5;26:9;29:15;
32:10,11,25;33:13,14
**charges (5)**
22:4;26:10;33:1,
10;34:13
**charging (3)**
33:4,5;34:24
**Chicago (1)**
8:21;9:6
**circumstance (1)**
36:5
**cited (2)**
25:15,18
**claims (2)**
15:22;18:9
**clarification (1)**
31:18

**clarify (1)**
24:4
**clear (6)**
18:24;21:14;24:8,
21;31:5;38:18
**client (3)**
31:25;32:12,21
**clients (6)**
22:4,16;29:5;
32:17;33:24;38:7
**clock (1)**
26:20
**close (1)**
43:2
**Code (8)**
2:7;3:3,10,19;4:2,
10,17,21
**colleagues (1)**
16:10
**Colt (1)**
4:12
**commenced (1)**
18:2
**comments (1)**
43:13
**commit (1)**
45:12
**committed (1)**
43:4
**Committee (18)**
4:4,6;7:12;10:12,
15,23;11:10;15:7,19;
27:15;39:25;40:3,19;
41:5,9;42:7,12;46:7
**committees (1)**
35:4
**committee's (2)**
39:3;41:21
**Communications (2)**
2:15;39:9
**companies (1)**
32:4
**company (4)**
12:1;18:3;33:16,18
**compensa (1)**
20:21
**compensated (1)**
26:5
**Compensation (9)**
2:19;4:18;10:22;
11:4;20:10;24:22;
26:13;32:1;35:22
**compiling (1)**
41:12
**complex (1)**
36:1
**complexities (1)**
36:1
**complexity (1)**
47:18
**complicated (6)**
15:10;22:24;45:21;
46:1,8,10

**complications (1)**
38:8
**component (1)**
41:7
**concept (6)**
11:13;12:5,10;
14:6;20:21;25:22
**concepts (1)**
13:19
**conceptually (1)**
14:24
**concern (3)**
21:5;23:23;35:12
**concerned (2)**
16:2;35:21
**conclude (2)**
25:8;38:5
**concluded (2)**
36:24;49:7
**conclusion (1)**
37:2
**concur (1)**
46:13
**concurred (1)**
46:16
**concurring (1)**
46:8
**conduct (1)**
15:19
**Conference (7)**
2:2;10:12,19;
40:15;41:1;44:1;
46:14
**Conflicts (7)**
4:12;12:19;36:2,
10;37:11,14;38:4
**connection (15)**
22:1,5;25:7,13;
27:8;28:2;29:7,10;
30:13;37:9,12;38:11;
39:15;40:3;47:5
**connections (2)**
36:7;37:13
**consideration (1)**
26:6
**considered (1)**
22:7
**consistent (2)**
21:4;34:18
**constructive (1)**
45:18
**Consultant (3)**
2:15,20;20:10
**Consultants (3)**
5:4;11:8;39:9
**contacts (1)**
37:13
**contentious (1)**
47:24
**contest (1)**
35:5
**contested (3)**
13:3;25:1;45:20

**context (6)**
14:18;27:17;35:3,
8;36:21;37:17
**Continue (1)**
2:3
**continued (2)**
21:11;44:21
**contract (1)**
32:12
**contrary (1)**
34:1
**contrast (1)**
47:4
**controversy (1)**
47:18
**conversation (1)**
14:21
**convoluted (1)**
20:23
**cooperation (1)**
18:13
**copy (1)**
10:25
**CORLA (1)**
9:21
**cornerstones (1)**
40:24
**Corporate (3)**
2:15;30:1;39:9
**cost (10)**
25:17;35:3,5,7,8,
13,23;36:6,11,12
**costs (1)**
36:14
**Counsel (50)**
2:9;3:5,13,22;4:4,
12;9:12;10:6;12:19;
13:17;14:7,7;15:7;
16:24;17:20;21:20;
22:1,5;23:13,21;24:3,
15;26:9,23;28:4,12;
29:7,10,16,25;30:1,4,
12,19,19,24;31:1,21;
32:18,25;34:6;37:21,
21,22;38:9;39:3,14,
24;40:13;46:7
**counterparty (1)**
42:18
**counting (1)**
16:12
**country (1)**
15:21
**Course (5)**
2:4;4:24;12:3,15;
21:22
**COURT (131)**
10:2;11:2,15,17;
12:14,20,24;13:15,
25;14:10,19,23;15:3,
16;16:2,9,14,16,21,
25;17:5,10,12,14,23;
18:18,20,22,24;19:4,
8,12,16,19;20:4,15,

12-12020-mg    Doc 4369    Filed 07/26/13    Entered 07/26/13 11:55:59    Main Document
Pg 66 of 122
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020(MG)
July 13, 2012

24;21:10;23:5,17;
24:7,11,13,17,19,25;
25:3,12;26:4,25;27:4,
10,16,22,25;28:6,9,
13,21,24;29:2,11,19,
21,23;30:3,9,23;
31:15,19;32:3,8,15,
20,23;33:6;34:3,10,
20,21;35:14;36:16,
20;37:3,6,18;38:3,24;
39:5,13,13,17,19,22;
40:7,11;41:14,15,17;
42:2,5,21;43:1,7,15,
18,20,22,25;44:3,5,9,
20,24;45:3,5,7,10,15,
17,23;46:3,5,10,18;
47:9;48:12,15,25;
49:2,5
**Court's (7)**
15:21;16:18;21:9;
24:4;28:19;34:24;
48:23
**crafting (1)**
17:8
**CRAIG (1)**
8:7
**Creditors (2)**
4:5,7
**Creditors' (6)**
7:12;15:7;39:24;
40:3;42:7;46:7
**critical (1)**
41:6
**Curtis (3)**
4:12;12:18,25
**customarily (4)**
22:15;23:8;29:4;
33:23
**customary (1)**
26:7

**D**

**Date (18)**
2:16,20;3:23;4:13,
25;5:5;18:2,15;
22:17;27:20;28:16;
31:22;37:25;42:25;
44:14,19;47:10;48:3
**day (2)**
16:7;46:11
**deal (5)**
10:19;17:7,7;18:5;
21:25
**deals (1)**
31:24
**dealt (1)**
47:5
**Dearborn (1)**
8:20
**debtor (2)**
17:25;26:16
**Debtors (24)**

2:3,10,15,20;3:5,
13,22;4:5,16,21;9:12;
10:6,11,16;15:18;
16:1;17:1;22:19;
40:13,16,19,25;41:3,
24
**Debtors' (19)**
2:6,13,18;3:2,9,18;
4:9;5:2;11:7;12:8,18;
14:7;16:7,22;17:19;
19:24;20:9;39:8,8
**debtor's (1)**
32:18
**decided (3)**
12:1;25:4;39:11
**decides (1)**
38:6
**decision (10)**
20:12;21:9,13;
22:7;23:8,12;32:24;
36:18;37:2;38:19
**decisions (1)**
25:19
**declarant (1)**
28:25
**declaration (11)**
19:3,9;21:23;
22:14,14;28:16;29:3;
30:24;34:17;41:4,5
**declarations (3)**
13:11;14:3;34:13
**default (1)**
48:20
**defending (1)**
25:17
**defer (4)**
19:1;28:12;32:6;
34:23
**definitely (1)**
25:9
**deleted (1)**
11:14
**delicate (1)**
43:22
**Deloitte (1)**
44:21
**DEMPSEY (16)**
9:22;22:15;29:1,2,
9,13,18;30:1,7;31:24;
32:7,8,9,9,21;33:11
**DEPARTMENT (1)**
7:2
**depend (1)**
27:7
**depending (2)**
18:4;48:10
**deposed (1)**
28:2
**deposition (2)**
27:16;28:4
**depositions (2)**
25:2;27:21
**describe (1)**

20:1
**detail (2)**
24:17;38:15
**detailed (3)**
24:11,13;38:1
**details (1)**
41:6
**determines (1)**
38:3
**determining (1)**
36:23
**DEVON (6)**
9:8;28:14;29:22;
31:17;32:13;33:8
**difference (1)**
36:21
**different (6)**
15:10,17;31:5,5;
32:3;35:15
**difficult (2)**
14:13;47:16
**DIP (1)**
48:19
**disagree (1)**
28:3
**disallow (2)**
37:14;38:9
**disallowance (1)**
23:15
**disallowed (1)**
24:18
**disbursements (1)**
19:14
**disclosure (1)**
46:21
**disclosures (1)**
13:7
**discovery (4)**
25:3;41:8;48:7,9
**discussion (1)**
44:4
**discussions (8)**
12:6;40:18;42:12;
43:22;45:17,18;
46:14;48:1
**disposes (1)**
23:9
**distinction (2)**
25:19,20
**distinguishable (1)**
21:14
**distinguished (1)**
25:16
**District (1)**
31:3
**Doc (8)**
2:6,13,18;3:2,9,18;
4:1,9
**Doc# (4)**
2:2;4:16,21;5:2
**documents (2)**
20:2;41:11
**dollar (1)**

19:16
**dollars (5)**
12:3;18:24;31:8;
37:25;38:2
**dollars' (1)**
19:13
**done (7)**
14:15;18:5,5,6;
19:13;27:7;45:13
**Dorsey (9)**
2:8;9:11;17:19;
18:3,11,16,23;19:2,
21
**DOUGLAS (1)**
7:17
**down (2)**
13:21;21:2;32:18
**draft (2)**
27:14;41:4
**Drive (1)**
9:4
**duplication (7)**
13:5,10;14:9;15:9,
14;16:6,9
**during (2)**
20:2;47:3

**E**

**earlier (1)**
47:23
**Eckstein (16)**
4:6;7:16;15:5,6,7;
16:12;39:23,24;
40:10;46:5,6,6,12,19;
48:14,15
**efficiency (1)**
15:14
**effort (3)**
16:5,6;43:22
**EGGERT (14)**
9:8;28:14,14;
29:20,22,22;31:17,
17,20;32:6;33:8,8;
34:8,16
**either (2)**
18:5;48:4
**ELLIS (1)**
8:2
**else (7)**
11:3;15:3;16:16;
17:14;19:20;37:3;
49:2
**Employ (5)**
2:8;3:4,11;4:3;5:3
**Employment (5)**
2:14,19;3:21;4:11,
23
**end (5)**
16:7;20:20;21:22;
36:22;48:21
**engage (1)**
29:10

**engaged (2)**
43:14;45:14
**engagement (15)**
24:21;29:8;30:4,9,
14,15;31:23,25;
32:13;33:4,7,19;
34:18;38:7,10
**engagements (2)**
33:15,17;34:19
**engaging (1)**
42:13
**enough (1)**
43:8
**ensure (2)**
15:13;42:11
**entail (1)**
44:12
**entered (1)**
15:21
**enters (1)**
33:15
**entire (1)**
40:24
**entitled (1)**
28:3
**entity (1)**
42:19
**entries (2)**
38:1;44:24
**Entry (1)**
3:20
**eScribers (1)**
5:21
**especially (1)**
35:25
**ESQ (11)**
7:8,16,17,18,19;
8:7,15,23,24;9:8,17
**essence (1)**
35:13
**essentially (1)**
39:15
**established (1)**
36:7
**Establishing (1)**
4:17
**estate (7)**
21:6;24:20;35:7;
36:6,7,12,12
**estimate (1)**
26:17
**estimated (1)**
22:18
**even (4)**
23:11;35:3,19,22
**event (3)**
33:17;41:12,19
**everybody (3)**
25:10;47:19;49:6
**evidentiary (12)**
41:9,18,23,25;43:3,
11,12;44:5,14;45:20;
46:11;47:13

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(3) Court's - evidentiary

12-12020-mg    Doc 4369    Filed 07/26/13    Entered 07/26/13 11:55:59    Main Document
Pg 67 of 122

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
July 13, 2012

**Exactly (2)**
17:11;44:4
**example (2)**
28:2;38:5
**excluding (1)**
37:19
**Excuse (1)**
33:21
**exist (1)**
34:25
**exists (1)**
13:20
**expand (1)**
14:1
**expect (1)**
44:3
**expense (7)**
21:19;24:13;26:11;
27:18;28:23;35:13;
38:6
**Expenses (15)**
4:18;10:22;11:11;
24:10,10,23;26:6,14;
27:1;30:12;32:11;
37:8,10,20;38:11
**experience (1)**
43:6
**expertise (1)**
15:11
**Explain (1)**
17:23
**explicitly (2)**
25:24;26:2
**explored (1)**
22:22
**expressed (1)**
15:18
**expressly (1)**
25:11
**extend (1)**
48:19
**extent (6)**
12:11;14:15;18:6,
18;23:12;28:7

**F**

**facilitate (2)**
14:9,16
**fact (5)**
25:24;36:25;43:1;
45:14;48:20
**factual (1)**
47:14
**fair (1)**
36:6
**fairly (3)**
42:16;43:16;46:14
**far (1)**
22:22
**farming (1)**
35:13
**fashion (1)**

20:23
**FDIC (2)**
42:19;43:2
**Fed (1)**
5:3
**Federal (1)**
4:2
**fee (23)**
14:12;21:16;22:11;
23:16,18,21;24:2,13,
25;25:5,14,16,17;
27:5;30:19;32:3;
34:17;35:15;37:1,23;
38:13,14,18
**feel (1)**
43:8
**fees (28)**
12:9,12;19:14;
20:12;22:5,18,20;
24:19,24;25:8,13;
26:1,6,7,9,15,18,20;
29:7;31:1;32:25;
34:1;36:23;37:8,9,
14;38:20;39:14
**fifteen (1)**
21:2
**figure (1)**
31:9
**file (4)**
14:3;27:13;33:18;
41:3
**filed (17)**
2:10,21;3:6,14,23;
4:5,13;5:5;10:11,12,
15;11:23;12:6;13:4;
15:8;19:10;20:11
**files (1)**
33:16
**final (1)**
40:15
**Financial (7)**
8:3;10:16;15:13;
24:2;35:12,14,21
**find (1)**
43:1
**finding (1)**
14:25
**fine (2)**
31:14;45:15
**finer (1)**
13:12
**firm (3)**
16:8;24:16;36:24
**firms (1)**
16:25
**first (8)**
10:7;12:9,12;21:3,
13,16;42:24;46:13
**five (1)**
21:3
**fixed (1)**
35:21
**FLOM (1)**

8:10
**Floor (1)**
7:5
**fly (1)**
28:23
**focus (1)**
15:15
**focused (1)**
21:25
**focusing (1)**
29:12
**Foerster (12)**
3:21;10:5;13:4;
15:4;16:13,17;17:7;
18:7,12,17;40:13;
48:18
**following (1)**
37:7
**form (1)**
13:8
**formal (1)**
41:11
**forth (3)**
13:11;23:14;36:4
**forward (3)**
23:12,20,25
**Four (1)**
8:12
**frame (1)**
47:14
**Frankel (2)**
4:4;7:11
**frankly (1)**
27:8
**FREEBORN (3)**
9:2;24:14;28:15
**frequent (1)**
23:22
**frequently (1)**
25:7
**front (1)**
27:16
**FTI (1)**
10:16
**full (1)**
45:12
**fuller (1)**
44:3
**fully (3)**
16:4;35:1;43:8
**further (1)**
41:6
**future (1)**
18:9

**G**

**Gary (2)**
40:12;48:18
**general (3)**
11:12;21:17;26:8
**generally (1)**
15:8

**Global (1)**
42:3
**Good (7)**
10:4;13:16;15:6;
20:16;39:23;40:12;
49:6
**granted (6)**
12:16,23;13:1;
19:22;20:7;28:18
**great (1)**
18:5
**guarantee (1)**
46:1
**guess (11)**
19:5;22:12,13,21;
24:14;27:3,6;28:3;
34:1,12;40:1
**guideline (1)**
26:3

**H**

**hand (1)**
23:19
**happen (2)**
16:11;18:8
**happened (2)**
18:15;31:7
**happy (2)**
10:25;18:21
**hard (1)**
42:10
**hear (1)**
47:12
**heard (12)**
11:3,17;12:14,24;
15:3;16:16;17:14;
19:20;20:4;33:3;
37:3;40:7
**hearing (25)**
10:8,17;15:2;
28:20,23;41:1,9,13,
18,18,22,23;42:1,24;
43:3,5,11,12;44:6,14,
22;45:20;46:11;
47:14,24
**heart (1)**
47:1
**help (3)**
14:16;20:2;24:5
**here's (1)**
30:10
**Herrington (3)**
3:12;19:24;20:5
**high (1)**
31:9
**hired (1)**
13:24
**HOFER (1)**
8:15
**holding (3)**
12:11;44:19;48:3
**Honor (95)**

10:4,7,10,14,18,21;
11:1,6,9,20,22;12:17,
22,22;13:2,16;14:17,
22;15:6;16:15,20;
17:13,18,22;18:1,19;
19:1,7,23,25;20:8,9,
10,16,18;21:1;23:1;
26:22;27:6,17;28:5,
10,14,22,25;29:20;
30:21;31:14,17;33:8,
21;34:8,16,22,22;
35:18,20,25;36:15,
24;38:23;39:1,1,7,18,
20,23;40:2,5,10,12,
18,25;41:4,19,25;
42:4,10,15;43:6,17,
21,24;44:2,18,23;
45:1;9:46:4,6,19;
47:12;48:10,17;49:4
**Honor's (2)**
20:12;37:2
**hope (5)**
26:25;27:12,14;
41:20;44:23
**hoping (4)**
13:20;14:5,17;
39:25
**hour (4)**
20:25;21:4;39:11,
12
**hourly (9)**
20:21;32:10;34:14;
35:11,15,17,19,22;
36:13

**I**

**I'm (2)**
10:25;48:16
**identified (1)**
23:25
**III (1)**
9:17
**IL (2)**
8:21;9:6
**imagine (2)**
47:22;48:7
**impermissible (1)**
24:6
**important (5)**
40:23;42:16;46:23;
47:15,17
**inappropriate (2)**
26:10;33:1
**Inc (3)**
2:14,19;8:3
**inclined (1)**
24:4
**include (3)**
14:5;23:22;39:14
**included (2)**
24:1,3
**includes (1)**

12-12020-mg    Doc 4369    Filed 07/26/13    Entered 07/26/13 11:55:59    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 68 of 122
Case No. 12-12020(MG)
July 13, 2012

38:11
**including (1)**
24:24
**incorporate (3)**
12:10;13:19;14:18
**incorporated (1)**
10:24
**increment (2)**
20:22;21:5
**increments (2)**
39:11,12
**incur (1)**
35:5
**incurred (6)**
26:15;27:20;31:22;
37:8,25;38:2
**indemnification (2)**
26:1;27:25
**indemnity (6)**
25:21,23,24;38:22;
39:15,16
**indicate (2)**
13:21;14:3
**indicated (6)**
21:8;28:1,16;
35:20,23;41:22
**indicates (1)**
34:13
**indicating (1)**
23:8
**informal (1)**
41:10
**information (1)**
18:14
**initially (1)**
24:12
**inordinately (1)**
31:9
**inquiry (2)**
23:2,9
**inside (1)**
29:25;30:4;32:10;
37:21
**insofar (1)**
26:23
**instance (1)**
46:13
**intend (3)**
27:13;37:7;41:23
**intention (1)**
48:6
**Interim (3)**
4:18;10:22;11:3
**interrupting (1)**
42:16
**interview (1)**
35:4
**into (7)**
10:24;12:13;26:6;
27:4;29:13;31:11;
33:15
**investigations (2)**
17:24;18:1

**Investigatory (3)**
2:9;9:12;17:20
**invitation (1)**
26:19
**involved (2)**
15:25;32:1
**involves (1)**
15:20
**involving (1)**
32:4
**issue (20)**
13:10;21:7;22:13;
23:2,20,20;24:10;
27:25;28:9;29:12;
31:5;34:23;35:1,16;
36:19;37:10;38:22;
43:10;46:18;47:1
**issues (19)**
13:5;26:1;27:13,
14;28:11;36:1;38:4,
5;43:10,11,17;45:13;
46:20;47:11,13,14,
16,16;48:10
**item (5)**
11:6,20;12:17;
24:13;40:14

**J**

**JACKSON (1)**
9:21
**JESSICA (1)**
8:23
**JOHN (5)**
9:22;22:14;28:25;
32:6,9
**JONATHAN (1)**
8:15
**Judge (3)**
15:8;25:18,18
**judge's (1)**
23:7
**judgment (1)**
46:13
**July (4)**
41:1,21;43:23;44:1
**JUSTICE (1)**
7:2
**justify (1)**
46:25

**K**

**KCC's (1)**
11:10
**keep (1)**
43:13
**keeping (1)**
43:2
**KEIP (9)**
27:8,9,11;28:2;
42:3,8,8,12;44:22
**KELLY (6)**

9:17;18:18;19:7,9,
13,17
**Kenneth (5)**
4:6;7:16;15:6;
39:23;46:6
**KERP (9)**
27:8,9,11;28:2;
42:3,8,8,13;44:22
**key (1)**
14:10
**keys (1)**
14:11
**kind (1)**
41:20
**KIRKLAND (1)**
8:2
**knew (1)**
14:24
**knows (1)**
18:8
**KPMG (1)**
44:21
**Kramer (8)**
4:3;7:11;39:3,4,21,
24;40:8;46:6
**Kurtzman (2)**
5:4;11:8,18

**L**

**language (6)**
14:20,25;15:1;
17:8;34:4,11
**large (3)**
27:7,18;35:25
**Larren (5)**
2:10,21;3:6,14,23;
4:13;5:5
**LARRY (1)**
8:24
**last (6)**
21:3;33:9;36:20;
39:2,7;40:14
**lawyers (3)**
15:23;25:5,7
**least (1)**
14:10
**leave (1)**
10:20
**leaves (1)**
24:11
**LEE (38)**
40:12,12;41:14,16,
19;42:4,10,22;43:6,
13,16,19,21,24;44:2,
8,13,18,23;45:1,4,6,9,
12,16,19,22;46:1,4,8,
22;48:7,16,17,18,25;
49:1,4
**left (1)**
19:17
**legal (8)**
15:13;22:18,19;

24:24;32:11;37:17;
47:16,16
**Leland (3)**
3:5;16:23;17:15
**lengthy (1)**
47:24
**less (4)**
22:18;28:17;36:24;
37:24
**letter (7)**
24:21;30:4,14;
31:23,25;33:4;34:18
**letters (4)**
30:10;32:13;33:7,
20
**Levin (8)**
4:3;7:11;39:3,4,21,
24;40:8;46:7
**Lewis (2)**
17:10,12
**Lexington (1)**
8:4
**lift (1)**
44:17
**lifting (1)**
15:22
**light (1)**
21:12
**likely (2)**
26:12,18
**limits (1)**
45:25
**lines (1)**
48:1
**Lipps (3)**
3:4;16:23;17:15
**listed (3)**
10:14;24:12;44:10
**listening (2)**
26:25;27:1
**Litigation (8)**
3:5,13;15:21;16:1;
17:2,3;25:2;29:10
**little (5)**
15:17,17;17:23;
21:12;36:11
**LLC (10)**
2:11,22;3:7,15,24;
4:14;5:4,6,21;10:3
**LLP (11)**
2:9;3:5,12,22;4:4,
12;7:11;8:2,10;9:2,
11
**Local (5)**
2:7;3:3,10,20;4:11
**long (1)**
18:4
**look (3)**
30:10,13;34:11
**looked (1)**
24:18
**looking (1)**
38:1

**Lorenzo (1)**
10:5
**loses (1)**
41:13
**lot (5)**
15:10,20;44:9,10;
47:14

**M**

**M-389 (1)**
26:8
**makes (1)**
21:14
**making (2)**
10:7;24:8
**Mallet (2)**
12:18,25
**Mallet-Prevost (1)**
4:12
**MANNAL (1)**
7:17
**many (5)**
18:7;20:1;35:4,25;
47:15
**Marinuzzi (56)**
10:3,4,5;11:6,16,
20;12:17,21;13:2;
14:19,21,24;16:7,15,
20,22;17:3,6,11,13,
18;18:1,21;19:1,23;
20:8;21:7;26:17,22;
27:3,6,12,24;28:9,10,
22,25;30:10,19,21;
31:14,16;32:23;33:3;
36:15,16,17;38:23,
25;39:1,6,16,20,25;
48:16;49:3
**marked (1)**
10:25
**MASUMOTO (28)**
7:8;13:15,16,17;
14:17;19:5;20:13,16,
17;21:1;23:1,6,18;
24:16;25:21,23;28:1,
3,5,7;33:21;34:21,22;
35:18;37:11;38:24;
39:17,18
**Masumoto's (1)**
38:21
**matter (8)**
10:13;30:16,16,17;
36:13;45:20;47:23;
48:11
**matters (22)**
10:14,21;13:3;
22:4,5;25:1;26:7,10;
29:6,17;30:6,14,20,
25;31:2,12;32:5,7;
33:1;34:14;44:10,15
**May (17)**
2:10;3:6,14;4:5;
13:18,22;18:22;

12-12020-mg    Doc 4369    Filed 07/26/13    Entered 07/26/13 11:55:59    Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 69 of 122
Case No. 12-12020(MG)
July 13, 2012

23:19;25:18,18;26:5;
31:17,20;33:21;34:4;
44:18;45:23
**Maybe (4)**
19:4;21:24;34:2;
47:22
**MEAGHER (1)**
8:10
**mean (13)**
15:16;21:13;22:22;
25:4;26:18,20;30:10,
14;31:4,8;33:9;35:4;
44:9
**meaning (1)**
14:12
**meantime (1)**
41:10
**measure (1)**
27:7
**meet (1)**
46:17
**mention (1)**
20:20
**Mercer (29)**
2:19;9:3,22;20:10,
18;21:15;22:4,15,18,
20;24:20;25:11;
26:18;28:12,15,24;
29:4;31:16,20;32:3;
33:9,23;34:13,19;
35:10;36:20;37:4,6,
16
**Mercer's (1)**
22:17
**Mercer's (2)**
28:1;37:22
**MF (1)**
42:2
**might (9)**
18:8;19:2;24:5;
27:4;37:14;38:5,9;
42:14;47:4
**mind (2)**
17:1;29:12
**mindful (3)**
28:19;34:12;37:10
**mine (1)**
42:4
**minimize (1)**
27:15
**Minneapolis (1)**
9:15
**minutes (1)**
21:2
**missed (2)**
19:4;39:6
**MN (1)**
9:15
**Moelis (1)**
10:16
**moment (1)**
13:21
**Monday (1)**

41:4
**monitor (1)**
16:5
**month (2)**
12:2;48:22
**monthly (1)**
35:21
**more (11)**
17:23;21:21;22:21,
24;28:18;30:17;
31:13;38:15;46:11;
47:15,15
**morning (10)**
10:4,8;13:16;
14:22;15:6;20:16;
21:25;39:23;40:12;
42:3
**Morrison (12)**
3:21;10:5;13:3;
15:4;16:12,17;17:7;
18:7,12,17;40:13;
48:18
**Mortgage (1)**
8:19
**Mosle (1)**
4:12
**most (2)**
14:13;23:20
**mostly (1)**
10:10
**Motion (20)**
2:2;4:16,21;10:21;
11:21,23;12:5,21;
27:13;40:6,15,20,22,
23;41:6;42:3,8;
46:16,20,25
**motions (1)**
44:11
**move (1)**
10:9
**moved (1)**
44:16
**much (10)**
18:5,24;19:19;
20:8;27:7,8;42:17;
45:7;49:4,6
**myself (1)**
40:1

**N**

**Naftalis (2)**
4:3;7:11
**narrow (1)**
13:21
**Nashelsky (7)**
2:11,21;3:6,14,23;
4:13;5:6
**Nationstar (1)**
8:19
**nature (4)**
16:4;33:11;36:2,3
**necessarily (1)**

43:2
**necessary (8)**
24:9,10,22;41:18;
44:4,14,22;47:20
**need (10)**
15:10;18:13,14;
20:2;28:7;34:5;41:9,
22,24;47:24
**needing (1)**
33:12
**needs (1)**
25:11
**negotiate (3)**
14:20;15:2;26:19
**negotiated (1)**
26:14
**negotiating (5)**
13:8;26:9;31:23,
25;32:25
**negotiation (2)**
32:13;33:4
**negotiations (1)**
43:16
**neutral (1)**
43:14
**New (6)**
5:23;7:6,14;8:5,13;
31:3
**next (6)**
11:6,20;12:17;
16:22;41:22;48:2
**nobody (2)**
26:18;41:13
**nonbankruptcy (10)**
22:5;26:7,10;
29:17;30:6,14,17;
31:12;32:5;33:1
**normal (1)**
26:2
**note (1)**
10:14
**noted (2)**
32:13;39:13
**notice (1)**
24:5
**noticing (1)**
11:11
**noting (1)**
15:12
**notwithstanding (1)**
36:20
**number (3)**
10:3,10;15:25
**numbers (1)**
12:1
**Nunc (11)**
2:10,15,20;3:5,13,
22;4:5,13,24;5:5;
11:9
**NY (5)**
5:23;7:6,14;8:5,13
**NYHAN (1)**
8:24

**O**

**object (1)**
42:7
**objected (2)**
21:18;42:9
**objecting (1)**
25:21
**objection (19)**
11:23;13:4,14;
17:6,12;20:10,14;
21:11,11,15,21;
22:10,25;23:3,15;
31:6;36:22;39:10,12
**objections (4)**
11:16;12:21;20:19;
40:5
**objects (1)**
27:10
**obligations (2)**
47:6,6
**obtained (1)**
18:14
**obviously (8)**
21:11;27:17;35:6;
36:18;37:2;46:23;
47:17,20
**occurred (1)**
24:12
**occurs (1)**
33:17
**o'clock (2)**
42:5,6
**off (1)**
35:13
**Office (4)**
7:3;13:17;20:17;
21:17
**Official (3)**
4:4,6;7:12
**One (21)**
8:20;10:11;11:9;
12:5;13:19;14:11,11;
15:16;16:25;17:6;
18:20;21:7;22:12,25;
25:18;26:1;33:9;
40:1,23;46:11;48:17
**O'NEILL (1)**
7:19
**ones (2)**
16:10;23:25
**ongoing (2)**
16:1;17:4
**only (6)**
22:19;26:5;30:7;
31:24;34:24;36:5
**operations (1)**
47:2
operations@escribersnet (1)
5:25
**opinion (3)**
21:24;22:2;30:11

**opposed (1)**
24:20
**opposition (1)**
27:8
**Order (30)**
2:13,18;3:20;4:3,9,
16,21;10:13,24,25;
11:4,10,12,13;12:4,
13;13:8,25;14:6,18,
20;15:22;16:18;
17:17;26:8;30:12;
34:24;40:14,16;
47:23
**ordinarily (1)**
45:19
**Ordinary (3)**
2:4;4:24;12:15
**ordinary-course (2)**
11:22;12:10
**original (1)**
34:17
**Orrick (4)**
3:11;19:24;20:1,5
**others (1)**
18:23
**otherwise (1)**
48:19
**ought (2)**
20:24;25:10
**out (9)**
12:9;14:5;28:23;
34:19;41:5;43:4,23;
48:6,9
**outset (1)**
24:4
**outside (26)**
22:1,18;23:9,13,
21;24:3;29:5,10,16;
30:18,19,24;31:1,21,
21;32:10;33:10,14;
34:1,4,5,6,14,25;
37:21,22
**outstanding (1)**
23:20
**over (5)**
12:3;18:7;20:13;
21:2;48:22
**overbilling (1)**
21:5
**overhead (12)**
22:8;23:3,10;
29:14;31:11;34:23;
35:1,16;36:19,19,23,
24
**overruled (1)**
17:12
**own (1)**
37:21

**P**

**page (1)**
24:21

12-12020-mg    Doc 4369    Filed 07/26/13    Entered 07/26/13 11:55:59    Main Document
Pg 70 of 122

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
July 13, 2012

**paid (2)**
12:9,13
**papers (2)**
21:8;45:21
**paragraph (4)**
22:15,17;33:22;
34:16
**parameters (1)**
23:7
**Part (12)**
15:20;18:9;21:24;
22:7;23:2,3,10;24:9;
35:3,16;43:3;45:24
**participation (1)**
25:1
**particular (2)**
11:24;38:4
**particularly (3)**
35:10,11,20
**parties (9)**
15:12;24:5;36:4;
40:20;41:19;43:14;
45:14;46:16,24
**past (1)**
23:6
**Pause (1)**
37:5
**Payment (3)**
4:23;11:22;20:11
**payments (1)**
47:3
**Penina (1)**
5:20
**people (2)**
28:4;35:4
**per (2)**
12:2;36:3
**Perform (1)**
2:3
**performed (1)**
22:20
**performing (1)**
26:16
**permissible (1)**
24:1
**permitted (1)**
24:3
**persuasive (1)**
43:3
**pertains (1)**
13:5
**PETERS (3)**
9:2;24:14;28:15
**Petition (8)**
2:16,20;3:23;4:13,
24;5:5;18:2;47:6
**phone (3)**
26:23;28:12;29:1
**picked (1)**
11:12
**place (2)**
46:15;48:8
**plan (2)**

18:10;47:5
**PLC (1)**
8:11
**Please (1)**
10:2
**podium (3)**
20:13;39:4,21
**point (10)**
13:12,24;14:25;
15:9;24:4;31:18;
32:2;33:9;47:25;
48:18
**pointing (1)**
19:5
**portion (1)**
24:19
**possibility (1)**
47:21
**possible (7)**
10:9;14:8,15;
41:25;44:13;45:1,23
**post-petition (1)**
47:6
**potential (3)**
14:9;31:25;37:13
**Potentially (1)**
46:12
**pre- (1)**
47:5
**preliminary (1)**
11:21
**preparation (8)**
23:19;24:2;25:5,
13,16;38:18;45:7,25
**prepare (2)**
23:21;27:21
**prepared (3)**
43:5,8;47:25
**pre-petition (2)**
18:23;19:14
**PRESENT (2)**
9:20;40:1
**presented (1)**
24:8
**presents (1)**
38:8
**pressing (1)**
46:18
**pressure (1)**
42:24
**presumptively (1)**
36:11
**preview (2)**
43:9;45:13
**previously (1)**
33:22
**principal (1)**
43:17
**principals (2)**
40:22;46:17
**prior (1)**
45:10
**Pro (12)**

2:10,15,20;3:6,13,
22;4:5,13,24;5:5;
9:21;11:9
**probably (3)**
23:19;47:14;48:3
**problem (3)**
31:10;43:4;45:5
**problems (1)**
48:8
**Procedure (1)**
4:2
**Procedures (1)**
4:17
**proceed (2)**
10:13;47:25
**proceeding (1)**
32:5
**proceedings (3)**
18:4;34:20;49:7
**process (6)**
18:10;32:14,14,18;
41:12;42:13
**productions (1)**
41:11
**professional (11)**
22:3;25:25;26:8;
32:24;35:9,17,24;
36:9,10,11;38:6
**professionally (1)**
40:21
**Professionals (26)**
4:19,23;10:19;
11:22;12:7,11,15;
13:6,7,12,23;14:15;
15:11;16:3;17:25;
25:6;26:5,15;35:20,
22;36:2,8,13;37:16,
18;46:15
**professional's (2)**
26:13;37:13
**progress (4)**
18:10,15;47:21,22
**prohibited (1)**
23:14
**project (2)**
14:7,14
**proliferation (1)**
16:3
**promise (1)**
10:9
**proposal (1)**
40:25
**Proposed (6)**
9:12;10:5;11:25;
15:7;16:18;39:24
**prosecute (1)**
20:14
**prospectively (1)**
15:15
**protracted (1)**
37:11
**provide (2)**
27:14;31:16

**provided (4)**
11:12;13:11,13,22
**provides (1)**
13:12
**provision (7)**
13:20;21:19;32:16;
33:16,18,19;48:19
**provisions (3)**
25:24,25;34:18
**pure (1)**
30:15
**purposes (1)**
36:23
**Pursuant (4)**
3:18;4:1,16;5:2
**pursue (1)**
47:10
**put (3)**
27:5;43:25;44:24

**Q**

**quarter (1)**
39:11
**quarter-hour (1)**
20:21
**quick (1)**
44:18
**quickly (1)**
10:9
**quite (4)**
14:13;42:20,23;
47:12
**quoted (1)**
33:22

**R**

**RACHAEL (1)**
7:18
**raise (2)**
16:9;49:3
**raised (8)**
12:6;22:6,9,10,25;
23:4;31:6;38:21
**raises (2)**
35:15;37:11
**raising (1)**
13:4
**rate (1)**
35:11
**rates (4)**
31:11,12;32:10;
34:14
**RE (1)**
2:2
**reach (1)**
41:20
**react (1)**
46:24
**read (2)**
21:10;36:18
**real (1)**

47:20
**really (6)**
13:11;14:16;15:13;
27:15;29:13;33:9
**reason (1)**
42:17
**reasonable (3)**
25:9;26:6,12
**reasonableness (2)**
24:18;38:20
**reasons (2)**
42:15,16
**receive (3)**
29:6,7,9,15;40:4
**received (3)**
24:13;31:1;41:11
**receives (3)**
22:16;29:4;33:23
**record (2)**
10:5;13:18
**records (1)**
20:22;23:14
**refer (1)**
35:5
**referring (1)**
26:8
**regard (1)**
40:24
**regarding (6)**
12:6;20:11;39:10;
40:19;41:6;42:12
**regularly (1)**
29:6,15
**regulated (1)**
42:19
**regulator (1)**
42:22
**reimbursable (3)**
26:14;37:10;38:6
**reimburse (2)**
27:1;29:16
**reimbursed (3)**
30:12,18;32:11
**Reimbursement (19)**
4:18;10:22;21:19;
22:1,16,19;23:22;
26:11;28:20;29:4,7,
9;31:1;32:16;33:24,
25;37:19;38:11;
39:14
**related (2)**
23:20;24:23
**relating (1)**
31:22
**relationship (1)**
26:12
**relationships (2)**
36:4;47:1
**relief (1)**
44:11
**rely (1)**
39:25
**remained (1)**

12-12020-mg   Doc 4369   Filed 07/26/13   Entered 07/26/13 11:55:59   Main Document
In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.
Pg 71 of 122
Case No. 12-12020(MG)
July 13, 2012

20:20

**remaining (1)**
21:7

**remains (1)**
18:25

**report (1)**
41:21

**represent (2)**
28:4,8

**representation (2)**
15:25;40:3

**representing (4)**
15:23;17:1;25:25;
26:15

**request (6)**
12:2;25:1;28:19;
29:6;40:6;41:11

**requested (4)**
10:23;11:9;24:13,
23

**requesting (2)**
11:21;41:17

**requests (4)**
22:15;25:3;29:4;
33:23

**require (2)**
43:11;46:20

**required (3)**
24:25;37:12;45:8

**requires (5)**
16:4,5;30:16;
37:15;44:5

**requiring (1)**
45:20

**reread (1)**
21:25

**ResCap (5)**
15:19,23;42:3;
44:15;47:2

**reservation (2)**
15:8;21:18

**reserve (1)**
25:12

**Residential (8)**
2:11,21;3:7,15,24;
4:14;5:6;10:3

**resolution (4)**
17:9,21;41:20;47:9

**resolve (1)**
18:9

**resolved (6)**
13:13;15:1;20:19;
21:6;34:23;47:23

**respect (23)**
11:3,17,24;12:10,
14,24;13:20;14:6;
15:4,9;17:15;18:11;
19:20;20:5,18;24:6;
25:23;26:1;29:14;
31:23;37:3;39:13;
40:7

**respectfully (1)**
40:6

**respects (1)**
47:15

**respond (1)**
36:17

**responding (1)**
25:2

**response (2)**
27:6;48:3

**responsible (1)**
40:21

**restrictions (1)**
26:3

**Retain (14)**
2:8;3:4,11;4:3;5:4;
11:7;12:18;13:3;
16:23;17:19;19:24;
20:9;39:3,8

**retained (11)**
11:10;14:3;18:3;
23:24;32:14,19;
33:12;35:7,8,23;36:5

**retainer (4)**
11:11,12;18:23;
19:16

**retainers (3)**
12:8,11,12

**retaining (1)**
25:8

**Retention (64)**
2:14,19;3:21;4:11;
10:11,15;11:18;
12:15,25;15:4,24;
16:17;17:15;19:21;
20:5;21:17,20;22:2,6,
11;24:8,24;26:9,21;
27:22,24;28:11,16,
17,19;29:13,15,16;
30:5,7,13,16,20;31:3,
6,22,24;32:25;33:5,6,
10,13,14;34:7,24;
37:4,6,9,12,16;38:4,
12,17;39:2,7,15;40:2,
8;44:21

**retentions (3)**
10:19;12:7;30:25

**revealing (1)**
38:15

**review (13)**
14:9,12,16;16:18;
23:13;24:11;25:8,12;
30:3,5;37:7,23;47:11

**reviewed (3)**
15:24;24:17;40:4

**reviewing (2)**
17:16;38:20

**revisiting (1)**
11:25

**right (31)**
11:5;12:16;13:1;
14:19,25;15:3;16:16,
17;17:5,16;19:12,17,
19,22;20:7;23:17;
25:12;26:23;27:22;

28:10;29:2;34:5,10;
39:7,16,19;40:9;
42:14;44:16;49:2,5

**rights (5)**
15:8;21:18;22:16;
29:5;33:24

**RINGER (1)**
7:18

**round (1)**
21:3

**rounding (1)**
21:2

**Rubenstein (4)**
2:14;9:23;39:5,9

**Rule (10)**
2:7,7;3:3,3,10,10;
4:2,10,11,22

**ruled (1)**
36:20

**Rules (2)**
3:19,20

**running (1)**
26:20

## S

**same (13)**
17:7,9,21;22:17;
24:15,16;31:11,12;
32:10;34:13;36:24;
41:24;45:5

**satisfied (2)**
31:8;34:22

**satisfies (1)**
13:9

**satisfy (1)**
39:12

**save (1)**
28:23

**saying (3)**
34:3;37:9;38:10

**schedule (4)**
41:8,14;43:7;48:7

**scheduled (2)**
42:5;48:2

**scope (3)**
13:23,24;14:2

**scrubbing (1)**
11:25

**Se (2)**
9:21;36:3

**seated (1)**
10:2

**second (2)**
29:21;43:18

**Section (7)**
2:6;3:2,9,18;5:2;
17:21;26:16

**Sections (4)**
4:1,10,17,22

**Securitization (4)**
2:9;3:12;17:20;
20:1

**seek (3)**
22:19;28:20,21

**seeking (3)**
32:16;35:7;38:8

**seem (1)**
37:17

**seems (6)**
20:23;21:4;23:1;
30:17;33:24;36:5

**selected (1)**
35:6

**sense (2)**
21:13;47:13

**sensitive (1)**
43:16

**separate (2)**
13:25;32:14

**series (2)**
22:2,8

**serious (1)**
40:18

**services (10)**
13:13,22,23;14:2,
4;23:24;24:1,6,23;
32:1

**Servicing (2)**
2:3;40:16

**set (4)**
13:11;14:14;41:5;
45:2

**several (1)**
20:18

**shared (1)**
41:4

**shows (1)**
38:13

**side (4)**
12:8;15:13;16:8;
39:8

**SIDLEY (1)**
8:18

**signed (1)**
30:5

**significant (3)**
46:14,21,22

**significantly (1)**
47:12

**similar (4)**
15:9;22:16;29:4;
33:24

**Similarly (1)**
35:7

**simplest (1)**
19:25

**simply (2)**
31:4;37:9

**situation (1)**
22:24

**Sixth (1)**
9:13

**SKADDEN (1)**
8:10

**skip (1)**

10:18

**SLATE (1)**
8:10

**slip (1)**
42:17

**small (2)**
24:18;31:18

**smooth (1)**
18:16

**solely (3)**
21:25;22:20;24:20

**someone (1)**
28:24

**sometimes (1)**
35:11

**somewhat (1)**
20:23

**somewhere (1)**
34:12

**sorry (1)**
48:16

**sort (2)**
20:20;35:13

**sought (1)**
25:13

**source (1)**
21:19

**South (3)**
8:20;9:4,13

**Southern (1)**
31:3

**Special (7)**
2:9;3:5,12;14:7;
16:23;17:20;32:17

**specialists (1)**
30:2

**specific (3)**
18:19;25:13;48:9

**specifically (6)**
16:25;21:18;22:6;
28:11;29:14;32:23

**spent (1)**
28:20

**Square (1)**
8:12

**staff (1)**
10:8

**stage (5)**
22:11,11;23:16,24;
37:24

**stand (2)**
14:20;48:12

**standing (1)**
31:9

**standpoint (5)**
14:11,12;35:2,19;
36:12

**stands (1)**
48:11

**start (2)**
15:18;44:14

**state (1)**
13:18

12-12020-mg    Doc 4369    Filed 07/26/13    Entered 07/26/13 11:55:59    Main Document
In the Matter of:                                Pg 72 of 122                              Case No. 12-12020(MG)
RESIDENTIAL CAPITAL, LLC, et al.                                                          July 13, 2012

stated (1)
34:2

statement (1)
24:14

States (4)
11:23;13:9,17;
20:17

Status (7)
2:2;10:12,18;
40:15;41:1;43:25;
46:14

stay (2)
15:22;44:11

stayed (1)
18:8

stays (1)
44:17

still (3)
22:12;23:15;33:19

stop (1)
43:18

stopped (1)
26:20

stops (1)
16:8

story (1)
21:23

Street (3)
5:22;7:4;9:13

strictly (2)
35:11,17

structure (3)
32:3;34:17;35:15

subject (9)
13:8;15:1;16:18;
17:16;20:12;23:15;
26:2;38:19;40:14

submission (1)
46:22

submit (1)
47:23

submitted (3)
16:19;21:23;40:2

subpoenas (1)
25:2

subsequent (1)
24:24

subsequently (1)
38:3

subservicing (1)
10:13

sufficiently (2)
38:14;46:10

suggest (2)
27:19;33:25

Suite (3)
5:22;9:5,14

sun (1)
42:23

supplement (2)
20:22;33:22

supplemental (11)
13:11;14:3;19:3,9;

21:23;22:13,14;
28:15;29:3;30:23;
41:3

support (1)
15:18

sure (4)
16:11;18:21;27:1;
43:8

surprise (1)
41:13

Sutcliffe (3)
3:12;19:25;20:5

system (1)
20:24

### T

talk (4)
13:5;40:22;44:4;
45:11

talking (2)
27:22;28:11

TELEPHONICALLY (5)
8:23,24;9:8,22,23

template (1)
13:10

ten (1)
21:3

tentatively (1)
45:2

tenths (3)
20:25;21:4;39:11

terms (6)
14:20;17:24;20:22;
34:19;47:3,5

TESSLER (1)
9:23

testimony (1)
25:3

theory (1)
26:22

therefore (1)
37:17

there'll (1)
45:12

thinking (1)
44:15

THOMAS (1)
9:17

thought (3)
15:11;19:2;21:12

Times (2)
8:12;35:25

today (5)
18:18;27:2;28:18;
39:2;45:14

today's (1)
46:13

Tom (1)
18:18

took (3)
26:19;36:18;46:15

total (1)

26:17

town (1)
43:4

Transactional (1)
3:13

Transcribed (1)
5:20

transition (1)
18:16

travel (1)
24:23

treated (1)
23:10

triggered (3)
34:9,10,11

triggering (1)
32:22

Trustee (18)
7:3;11:24;12:2;
13:4,9,17;16:8;17:8,
21;20:11,17;21:17;
23:4;27:10;39:10;
40:4;42:7,14

Trustee's (1)
13:14

try (2)
27:15;43:13

trying (1)
14:20

Tunc (11)
2:10,16,20;3:6,14,
22;4:5,13,24;5:5;
11:9

turn (1)
20:13

two (1)
20:20

types (2)
15:22;24:6

typically (1)
32:1

### U

unable (1)
41:20

uncontested (2)
10:11,21

undefined (1)
13:22

Under (17)
2:3,6;3:2,9;4:9,21;
10:21;11:7;13:2;
16:24;17:21;19:25;
24:10;25:24;36:5;
42:22,24

Understood (1)
35:18

undertake (1)
36:5

uniform (2)
14:8,14

unintentionally (1)

11:13

unique (3)
32:15;33:11;36:9

United (4)
11:23;13:9,17;
20:17

Unless (2)
12:22;40:5

unnecessary (1)
16:6

Unsecured (2)
4:4,7

unusual (1)
15:17

up (4)
11:12;21:3;26:19;
38:13

upon (2)
18:4;48:10

upset (2)
43:20;45:17

USC (1)
5:2

use (10)
23:13;29:16;30:19,
24;31:12;34:6;37:18,
20;47:10;48:3

used (1)
25:7

useful (2)
47:8;48:3

uses (1)
31:21

using (3)
31:11;37:22;47:19

usual (2)
15:20,20

usually (1)
25:24

Utilized (1)
4:23

### V

various (2)
15:22;42:15

versus (3)
32:5;37:1,21

virtue (1)
48:20

### W

Wacker (1)
9:4

walk (1)
10:25

wants (1)
49:2

watch (1)
43:2

watching (2)
42:19,23

way (2)
17:7;19:25

week (8)
43:4;45:10,21,24,
25;46:15;48:2,4

weekend (1)
49:6

West (1)
5:22

what's (3)
17:24;18:24;31:7

Whereupon (1)
49:7

Whitehall (1)
7:4

Whitney (9)
2:8;9:11;17:20;
18:3,11,16,23;19:2,
21

whole (1)
22:8

who's (1)
17:24

wish (11)
11:3,17;12:14,24;
13:5;16:16;17:14;
19:20;20:4;37:3;40:7

within (6)
12:2;13:23;14:2,
18;23:7,14

without (3)
38:1;47:13,24

witnesses (1)
41:23

Wolicki (1)
5:20

work (22)
12:1;14:5;15:12;
18:5,5,6,6,7;24:19;
26:16;27:7,12,14;
30:17;31:16;32:12;
37:12;38:7;42:10;
43:23;48:6,24

working (2)
41:8;48:9

worth (2)
15:11;19:14

worthwhile (1)
47:9

wrote (1)
20:1

### Y

year (1)
36:25

years (1)
17:4

York (6)
5:23;7:6,14;8:5,13;
31:4

12-12020-mg    Doc 4369    Filed 07/26/13    Entered 07/26/13 11:55:59    Main Document
Pg 73 of 122

In the Matter of:
RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020(MG)
July 13, 2012

**1**

**10004 (1)**
7:6
**10022 (1)**
8:5
**10036 (2)**
7:14;8:13
**10040 (1)**
5:23
**105a (2)**
4:17,22
**10th (1)**
44:25
**11 (3)**
5:2;32:4;47:4
**11:04 (1)**
49:7
**1103 (1)**
4:1
**1177 (1)**
7:13
**12-12020 (1)**
10:3
**14 (3)**
2:10;3:6,14
**14th (5)**
44:7,10,13,16,17
**15 (1)**
34:16
**1500 (1)**
9:14
**16 (1)**
4:5
**192nd (1)**
5:22
**1st (1)**
48:4

**2**

**2 (2)**
42:5,6
**2012 (4)**
2:10;3:6,14;4:5
**2014 (4)**
3:19;4:3,22;5:3
**2014-1 (5)**
2:8;3:4,11,20;4:11
**2014a (4)**
2:7;3:3,10;4:10
**2016 (1)**
3:19
**2016-1 (1)**
3:20
**208 (2)**
26:5;32:24
**21st (1)**
7:5
**22,000 (1)**
19:17
**227,000 (1)**

19:13
**24th (14)**
10:18;41:1,21;
43:23;44:1;45:11,13;
46:3;47:10,19,21;
48:8,10,13
**250,000 (2)**
18:24;19:16
**2nd (1)**
48:4

**3**

**3 (1)**
24:21
**3000 (1)**
9:5
**311 (1)**
9:4
**327 (4)**
4:22;16:24;22:13;
26:16
**327a (5)**
3:19;4:10;5:3;11:8,
13
**327e (8)**
2:6;3:2,9;13:6,12;
17:8,21;19:25
**328 (1)**
4:1
**328a (1)**
4:10
**33 (1)**
7:4
**330 (1)**
4:22
**331 (1)**
4:17

**4**

**456 (2)**
26:4;32:24
**47 (1)**
2:2

**5**

**50 (1)**
9:13
**50,000 (1)**
12:2
**500,000 (1)**
12:3
**506 (1)**
3:18
**508 (1)**
3:2
**509 (1)**
2:6
**510 (1)**
3:9
**511 (1)**

2:18
**512 (1)**
2:13
**513 (1)**
4:16
**514 (1)**
4:21
**527 (1)**
4:9
**528 (1)**
4:1
**531 (1)**
5:2
**55402 (1)**
9:15

**6**

**6,000 (6)**
23:25;27:20;28:17;
31:8;37:25;38:1
**601 (1)**
8:4
**60603 (1)**
8:21
**60606 (1)**
9:6

**7**

**700 (1)**
5:22
**75,000 (1)**
11:25
**750 (1)**
11:25

**8**

**8 (3)**
22:15,17;33:22
**8th (7)**
41:2,10,16,17,25;
42:17;48:5

**9**

**90 (1)**
2:2
**973406-2250 (1)**
5:24
**9th (4)**
44:19,20;45:2;48:5

## **<u>EXHIBIT 2</u>**

**Transcript of Record at 13-16, 39-40, *In re Residential Capital LLC, et al.*, No. 12-12020**
**(July 3, 2013)**

1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              July 3, 2013

19              10:02 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

2

1

2   Status conference

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  David Rutt

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

3

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4           Attorneys for Debtors

5           1290 Avenue of the Americas

6           New York, NY 10104

7

8   BY:   GARY S. LEE, ESQ.

9

10

11   KRAMER LEVIN NAFTALIS & FRANKEL, LLP

12          Attorneys for Official Creditors' Committee

13          1177 Avenue of the Americas

14          New York, NY 10036

15

16   BY:   KENNETH ECKSTEIN, ESQ.

17

18

19   AKIN GUMP STRAUSS HAUER & FELD LLP

20          Attorneys for UMB Bank

21          One Bryant Park

22          New York, NY 10036

23

24   BY:   DANIEL H. GOLDEN, ESQ.

25

4

1

2  WHITE & CASE LLP

3       Attorneys for Ad Hoc Group of Junior Unsecured

4       Noteholders

5       1155 Avenue of the Americas

6       New York, NY 10036

7

8  BY:   J. CHRISTOPHER SHORE, ESQ.

9

10

11  MUNGER TOLLES & OLSON

12       Attorneys for Berkshire Hathaway

13       355 South Grand Avenue

14       35th Floor

15       Los Angeles, CA 90071

16

17  BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

5

1                          P R O C E E D I N G S

2              THE COURT:  All right.  Please be seated.

3              We are in Residential Capital number 12-12020 and also

4     in connection with two adversary proceedings, 13-01343 and 13-

5     01277.

6              Mr. Lee.

7              MR. LEE:  Good morning, Your Honor.  Gary Lee from

8     Morrison and Foerster for the debtors.

9              THE COURT:  Let me just say before you proceed, this

10    is on the record.  Go ahead.

11             MR. LEE:  Thank you, Your Honor.  And thank you for

12    seeing us on short notice.

13             Your Honor, I just want to be clear from the outset

14    that this is not about discovery.  There is a telephonic

15    conference scheduled for next Tuesday.

16             THE COURT:  Well, I'll tell you now, that conference

17    is going to be in court rather than on the telephone.  Mr.

18    Walper, who is in California, can participate by telephone, but

19    we're going to -- I want everybody here at 5 o'clock.

20             MR. LEE:  Thank you, Your Honor.

21             What this is about, Your Honor, is getting Your

22    Honor's guidance on how we should respond to the noteholders'

23    attempts, second round, third round, to raise plan issues in

24    the context of the adversary proceeding.

25             Your Honor, there are three things I want to address.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

6

1  First, we think Your Honor was abundantly clear at the last

2  status conference that the adversary proceeding related to

3  nonplan issues.  We believe, and I'll go through this in some

4  more detail, that the noteholders ignores that direction.

5  Second, just to cut through some of the letter writing or at

6  least the three letters, we're not here to prejudice any

7  confirmation objections they can conjure up.  We'll be

8  absolutely clear about that.  Third, we do believe that the

9  notion of interdebtor conflicts was revolved when Your Honor

10  approved the plan support agreement.  And if I may, Your Honor,

11  I'd like to go through those three points in a little bit more

12  detail.

13          Later today, we will be filing a plan and disclosure

14  statement.  It's a plan that has the support of creditors with

15  claims throughout the debtor's capital structure, and we expect

16  overwhelming support for that plan from impaired creditors at

17  the principal debtors.  The plan embodies a number of

18  compromises, the product of Judge Peck's mediation, and one of

19  those compromises relates to intercompany claims.  For the

20  noteholders, Your Honor, this case -- because we're paying them

21  post -- sorry -- we're paying them par plus accrued, this case

22  now comes down to one issue, post-petition interest and post-

23  petition interest alone.

24          The reason we requested this status conference, Your

25  Honor, is to seek some direction on how and to what extent the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

7

1  noteholders are going to be able to disrupt the schedule set by

2  Your Honor in relation to the consolidated adversary

3  proceeding.  And Your Honor suggested that we would -- should

4  come back to the court, that we shouldn't let these sorts of

5  issues fester, so that's why we're here.

6       We provided Your Honor with a copy of the junior

7  secured noteholders' letter which comes out of a unsuccessful

8  playbook that we've seen in other cases pending and resolved in

9  the southern district of New York.  Refer Your Honor to Charter

10  and Adelphia.

11       Now, as I said, Your Honor was abundantly clear during

12  the chambers conference on scheduling that the allowable scope

13  of the adversary proceeding was nonplan matters.  I don't know

14  if Your Honor has seen a copy of the junior secured

15  noteholders' counterclaims that were filed, I believe, this

16  week -- or last week.  I think they speak for themselves as to

17  where the junior secured noteholders intend to go with the

18  adversary proceeding.  Somebody on the noteholder side decided

19  to ignore Your Honor's direction because something like over a

20  dozen of the declarations sought by the counterclaims relate to

21  the global settlement that's embodied in the plan support

22  agreement and will be embodied in the plan.

23       And although I don't intend to address discovery

24  matters, and I didn't have enough time to actually go through

25  the 247 document requests we received, I just note for the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

8

1   record that ten alone go to the ability of the debtors to

2   resolve intercompany claims.  So just to give you a flavor of

3   the counterclaims, Your Honor, ten of them seek a determination

4   of the exact distributable value of each of the intercompany

5   claims.  That, Your Honor, is a plan issue because the

6   intercompany claims have been settled as part of the plan.

7        Second, Your Honor, several more seek to subordinate

8   the RMBS trustee claims, the monoline claims, and the

9   securities claims.  Again, Your Honor, the exact claims that

10  are resolved as part of the plan.  And there's something more

11  to this playbook as well, Your Honor.  The junior secured

12  noteholders also objected to the FGIC settlement that resolves

13  the FGIC and the trustee's claims.  Now, they're free to do so,

14  and we'll address that at the appropriate time, but I just,

15  again, note for the record that that 9019 settlement addresses

16  not the plan or the plan-related issues but rather settles

17  nearly ten billion dollars of claims, the claims totally 596

18  million dollar split between two debtors.  And I can't fathom

19  why anybody would object to that.

20       Your Honor, we're not asking you for anything new

21  here.  Your Honor was very clear to Mr. Uzzi what the adversary

22  proceeding will cover, and I don't think that message has come

23  through.

24       The other part of the playbook, which I think was

25  particularly disconcerting to the debtors because it came the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   same day Your Honor approved the plan support agreement, is the

2   attack on the process run by Judge Peck, the attack on Mr.

3   Kruger and on us as counsel.  And we made it very clear when we

4   sought Judge Peck's appointment as mediator that one of the

5   things he would mediate was going to be intercompany claims.

6   The junior secured noteholders refused to participate in that

7   mediation based on the rules Judge Peck set.  Those are not

8   rules that the debtor set.  We also made it clear in the

9   application to appoint Mr. Kruger as the CRO that he would

10  assist in resolving interdebtor and intercreditor disputes and

11  that he was vested with authority to make decisions on behalf

12  of each debtor.

13          So, Your Honor, we think it's totally unfair fourteen

14  months into this case after Your Honor approved the plan

15  support agreement as being in the best interest of each of the

16  debtors, after we agreed to pay the junior secured noteholders

17  par plus accrued, after we agreed to pay post-petition interest

18  if they prevail in the adversary for them to take this tack.

19  I've just come back from England, Your Honor, and the

20  expression is, "it just isn't cricket."

21          They can attack the transactions embodied in the plan.

22  We've given them that right.  It's been reserved.  They can

23  attack good faith at confirmation if they want to.  We are not

24  going to, nor do we believe we can prejudice their confirmation

25  objections.  What they can't do, Your Honor, is create

1    interdebtor conflicts or disagreements where there are none and

2    make those part of the adversary proceeding.  Again, Your

3    Honor, that's beyond what you told them.  The adversary

4    proceeding relates to the junior secured note issues and not

5    the plan.

6        So what we're asking Your Honor for is for some

7    direction and perhaps repeat direction with respect to two

8    matters.  First, that allegations regarding conflicts have no

9    part of the adversary proceeding.  If the junior secured

10   noteholders insist on challenging the bona fides of plan

11   settlements under 9019, they can do so at confirmation, but the

12   notion of interdebtor conflicts went out the window when the

13   plan support agreement was approved.

14       Second, Your Honor, that issues that are at the core

15   of the global settlement, the priority of claims, the amount of

16   claims, the intercompany settlement, the AFI settlement

17   allocation are exactly those things, plan issues.  Your Honor

18   said it once, but it doesn't appear to have taken.  They're not

19   part of the adversary proceeding.

20       Your Honor, our view is that it will defeat the entire

21   purpose of the mediation if we have to litigate those issues

22   outside of a plan.

23       THE COURT:  Thank you, Mr. Lee.

24       MR. LEE:  Thank you.

25       THE COURT:  Mr. Shore.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

11

1           MR. SHORE:  Yes, Your Honor, Chris Shore from White &

2   Case on behalf of the Ad Hoc Group.

3           Let me state at the outset as set forth in the letter

4   that got sent to you either late last night or early this

5   morning, we object to the setting on this kind of notice and on

6   the circumstances under which it arose, and in particular now,

7   since what Mr. Lee said is the letter which pertains to

8   discovery issues really isn't doubt discovery issues at all but

9   rather is an open-ended request for this Court's guidance on

10  how to deal with issues.  I'm not going to address the

11  extraneous issues in the letter or what were said today with

12  respect to the mediation or the discovery.  We'll handle those

13  either in the mediation or in the discovery conference unless

14  Your Honor wants to hear from me on that.

15          Fundamentally, the issue in this case arises out of

16  the debtor's very demonstrable shift in positions with respect

17  to what they're doing with respect to interdebtor conflicts in

18  these cases.  They started out saying that it's all going to be

19  proposed for a settlement.  Then they came back and said, well,

20  it's not being proposed for a settlement, it's being -- we've

21  determined that they have no mathematical value.  Then they

22  came back and said, actually, what we want to do -- and this

23  was the statement that was made on the report at the PSA

24  hearing and in their PSA reply -- what we intend to do is to

25  waive intercompany claims based upon a legal determination

**RESIDENTIAL CAPITAL, LLC, ET AL.**

12

1    that's been made that those claims have no merit.  We had a

2    call --

3             THE COURT:  What they've said, I bought, was that they

4    propose a settlement which must be approved under 9019 and plan

5    confirmation standards that would value the intercompany claims

6    at zero, but it's a settlement, it's not a determination --

7    it's -- a settlement is a compromise.

8             MR. SHORE:  We thought as much as well, Your Honor,

9    and that's where the problem lies.  We can all have our views

10   as to whether a plan which throws up interdebtor conflicts in

11   the air and says you all creditors resolve it makes sense.  I

12   happen to think that it just takes the fiduciary out of the

13   seat, but that's a process which works.  That's not what the

14   debtors are proposing, Your Honor.  That's what they had

15   proposed.  And then we went to them and said first, there's a

16   problem with a settlement like this, you're settling everything

17   at zero, their -- please explain to us how, when you have one

18   intercompany claim is at 2.6 billion dollars running from one

19   debtor to another, that gets settled at zero, same with a 35

20   million dollar claim that runs from this debtor.  They didn't

21   have an answer to that and --

22            THE COURT:  Well, the time -- the time for the answers

23   to those questions will be when the Court considers the

24   settlements -- if the Court gets to that point of considering

25   the settlements embodied in the plan.  It's not today.  I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

13

1   understand your views --

2           MR. SHORE:  Um-hum.

3           THE COURT:  -- and I understand the views of the

4   debtor -- debtors.  That's not today's issue.

5           MR. SHORE:  I didn't -- I didn't make it today's

6   issue, Your Honor.  What they're saying is that this issue is

7   not going to be litigated, and let me respond to that in two

8   respects.

9           First, the notion that this got resolved in the PSA is

10  contrary to everything in the record on that PSA.  As we set

11  forth in our supplemental response, the first time they said,

12  we're seeking to waive intercompany claims because we believe

13  they have no value, we called them up immediately -- and this

14  is in the supplemental response -- and said, you don't really

15  mean that, do you, that you're making a determination that

16  these claims have no legal merit?  They said, no, we're not,

17  we're just saying that the math doesn't work, that the math

18  doesn't provide value.  That's why we filed the supplemental

19  response.

20          But in that, we said we preserve all rights with

21  respect to this, and there were statements made on the record,

22  we're concerned that what the debtors are doing here is losing

23  any sensitivity to the issue of how to handle interdebtor

24  conflicts.  You want to propose it for a settlement, fine, but

25  you can't come in as an advocate and say, on behalf of one

**RESIDENTIAL CAPITAL, LLC, ET AL.**

14

1    client, these intercompany claims are good, those enter company

2    claims are bad.  You also can't say, in between the clients,

3    this is how we think the Ally settlement should be allocated.

4    You can't do what they want to do on another interdebtor

5    conflict, which is how to allocate expense and push all the

6    expense of these cases down OpCo's --

7            THE COURT:  Are you suggesting, Mr. Lee, that the

8    debtor unilaterally decided those issues or that those were

9    issues that at this stage were resolved among the parties to

10   the PSA?  It's not -- this is not a debtor-only issue.  The two

11   term sheets that are attached to the PSA, which the Court has

12   approved the PSA at least as to those parties who've signed the

13   PSA, they've agreed to support a plan consistent with the term

14   set forth in the two term sheets.

15           So I've seen nothing to suggest that those were

16   unilateral decisions by the debtor or the CRO.  Whether they

17   get approved by the Court is a different issue, but you make it

18   sound as if the debtor unilaterally decided how those issues

19   would be resolved.

20           MR. SHORE:  I --

21           THE COURT:  It doesn't appear to the Court to be that

22   way.

23           MR. SHORE:  Okay.  Well, then maybe we can get a --

24   we'll certainly get --

25           THE COURT:  Well, just address me.  Don't --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

15

```
 1            MR. SHORE:  Sure.

 2            THE COURT:  Don't address questions to --

 3            MR. SHORE:  No, I'm saying I think we're going to get

 4    an answer, a definitive answer, from the debtors on how they're

 5    dealing with these intercompany claims in the context of the

 6    plan and disclosure statement that are going to be filed, which

 7    is why I didn't want to have this proceeding today.  We will

 8    get the definitive view.

 9            My point is, it sure sounds to us like what the

10    debtors want to do, to avoid an issue that we raised with

11    respect to adequate protection, is say the reason the

12    settlement works and the reason the Court can approve the

13    settlement is because the debtors have already determined,

14    based upon Mr. Kruger's negotiation with himself, and advice by

15    Morrison & Foerster, that all the intercompany claims are

16    without legal merit.  If that's the position they're taking,

17    that, I think, is going to be a surprise to Your Honor and it's

18    going to meet with questions from me, which is, how do you plan

19    to do that, which was the purpose of the letter.  We still have

20    not gotten a response.

21            If Mr. Lee stands up and says there's nothing about

22    our plan which will seek a determination from this Court that

23    our waiver of intercompany claims in connection with the

24    settlement was supportable by the law and by legal

25    determination of the respective rights and obligations of our
```

**RESIDENTIAL CAPITAL, LLC, ET AL.**

16

1  many debtors, that's one thing.  That's not what they're

2  saying.

3          THE COURT:  Well, I guess we can all -- you can spend

4  your weekend reading the plan and disclosure statement.

5          MR. SHORE:  Now, with respect to the counterclaims and

6  the injection of issues in this case, as Your Honor pointed out

7  on the PSA, there is no plan on file.  The debtors requested,

8  and Your Honor ordered, that we file our answer and

9  counterclaims with respect to all issues relating to the

10 allowance of post-petition interest.  There is no --

11         THE COURT:  Let me see if I can put this aspect of it

12 to rest, okay?  I don't view anything that this Court has done,

13 or the order that was entered approving the PSA, or what

14 occurred at any prior conference in the court, as limiting the

15 JSNs as to what would be an appropriate pleading, what would be

16 an appropriate counterclaim under applicable Federal Rules of

17 Civil Procedure.  They can and should and did assert claims

18 that they believe are supported by the facts and the law.

19 Whether that's true or not, we'll see.  Approval of the PSA, to

20 which the JSNs were not parties, cannot alter the JSN's rights.

21         With that said, however, not all issues necessarily

22 raised by the counterclaims need to be resolved at one time.

23 And what I've been clear about and what I want to be clear

24 about is that I intend -- I think I referred to it as the phase

25 one trial, the trial of the issues -- well, of issues, we'll

**RESIDENTIAL CAPITAL, LLC, ET AL.**

17

1  say, not the issues -- of issues with respect to the JSNs, the

2  extent the issues are included within the 9019 that's going to

3  be embodied in the plan.  It seems to me that those will be

4  heard, tried, to the extent they're contested, in the

5  confirmation hearing.

6         Specifically, this issue of valuing intercompany

7  claims at zero, it's an issue that affects many creditor

8  constituencies, not just the JSNs.  And I don't intend to hear

9  or resolve the evidence or arguments with respect to that issue

10  at a trial of the adversary proceedings.

11         To the extent that the JSNs raise issues in their

12  counterclaims that the debtors believe -- and we'll see whether

13  the parties can agree on this or not -- that are what the

14  debtor describes as plan confirmation issues, they can be

15  bifurcated from the issues that'll be tried.  I mean, this is

16  not -- I mean, the procedures are pretty clear about this.  I

17  have great discretion about what issues -- if I bifurcate here

18  and resolve particular issues, I can do that, and I will do

19  that.  To the extent that issues raised by the JSNs are covered

20  by the 9019, I'll go ahead and hear and decide it.

21         I mean, you know, the proponents of the plan --

22  proponents of the 9019 settlement, have a larger hurdle when

23  the objectors are not part -- claim that a settlement is

24  improperly affecting their rights.  But certainly there is

25  authority for a court to go ahead and approve it, unless

**RESIDENTIAL CAPITAL, LLC, ET AL.**

18

1   there's an agreement with the JSNs, and if they oppose plan

2   confirmation, and if they oppose the global settlement with

3   respect to intercompany claims, I'm going to have to hear the

4   evidence and decide it as part of plan confirmation, and I

5   will.

6           And to the extent they raise those issues, if properly

7   raised -- I don't believe, Mr. Lee, that anything I've said

8   from the bench or any order I've entered, including the order

9   approving the PSA, has affected, substantively, the rights of

10  the JSNs.  Okay.  So did they have to assert them?  Is this

11  compulsory counterclaims that they had to assert?  I'm not

12  going to get into that.  I don't know.  I'll tell you right

13  now, I haven't read the most recent round of pleadings, okay?

14  It may well be their position is that these are compulsory

15  counterclaims and they had to assert them.  And fine, so

16  they've asserted them.  Okay.

17          So anything else you want to add?

18          MR. SHORE:  Yeah, let me just respond to that last

19  piece, to make our position clear on this.  We heard Your Honor

20  loud and clear with respect to affecting rights of the others.

21  We have offered multiple mechanisms, procedural mechanisms for

22  handling our issues, independent of any issues that relate to

23  the global settlement or other parties.  That's just been

24  soundly rejected.  We're still trying to work through that.

25          Second, our counterclaims, actually, what we're trying

**RESIDENTIAL CAPITAL, LLC, ET AL.**

19

1   to do is, independent of the global settlement, there are

2   issues that have to be resolved.  For example, if they want to

3   settle the inter -- intercompany claims are our collateral;

4   there's no dispute about that.  If they want to settle those

5   claims at zero, they can do that --

6           THE COURT:  Well, when you say that's part of your

7   collateral, what I had understood your position to be is, for

8   example, you have a pledge of the equity of various ResCap

9   affiliates, and your position is if they have -- if they are

10  creditors on a substantial intercompany claim, that would

11  make -- which it paid in full or in substantial part, would

12  make that entity solvent, such that the equity had value.  You

13  claim you have the equity as part of your collateral package.

14  Do I understand that correctly?

15          MR. SHORE:  That's one issue.  The other issue is

16  intercompany claims.  So for example, RFC has a two billion

17  dollar claim scheduled -- plus billion dollar claim into

18  ResCap, LLC, which is pursuant to a notes agreement.  If value

19  flows, that is, if the 2.6 billion dollar claim is --

20          THE COURT:  May I ask you this?  Do you have a pledge

21  specifically of that intercompany claim or --

22          MR. SHORE:  Yes, on that one, we have various pledges

23  that -- or sorry, various grants --

24          THE COURT:  You have a pledge --

25          MR. SHORE:  -- of security interests.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1          THE COURT:  -- of a note?

2          MR. SHORE:  We do not.  We have a lien on the general

3   intangible of RFC.  If value flows on that -- and this is a

4   stipulated lien at this point; the debtors have agreed to it

5   and the committee is estopped, at this point, because they

6   didn't challenge it.  If value flows on that, so let's say the

7   two billion dollar claim gets paid at ten cents on the dollar

8   at ResCap, LLC, 200 million dollars flows, subject to our lien.

9   What they're doing here is they're saying there are no

10  intercompany claims.

11         THE COURT:  Oh, I understand what they're doing --

12         MR. SHORE:  Right.

13         THE COURT:  -- Mr. --

14         MR. SHORE:  So --

15         THE COURT:  -- Mr. Shore.

16         MR. SHORE:  So those are the counterclaims.  So let's

17  say they want to settle that claim at zero.  If Your Honor

18  determines, though, that that collateral was worth 200 million

19  dollars, we have a diminution in value, because the debtors

20  have disposed of the collateral of 200 million dollars.

21         THE COURT:  Well, if I determine that there are

22  disputed issues as to whether debt should be recharacterized as

23  equity, for example, and they've settled that issue, I don't --

24  what is it that says it can't be settled without your consent

25  or agreement?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

21

1           MR. SHORE:  There's nothing that says it can't be

2     settled --

3                THE COURT:  Right.

4           MR. SHORE:  -- without --

5                THE COURT:  And so what the issue for the 9019 is:

6     Does the settlement pass muster?  It may or it may not.

7           MR. SHORE:  Right.  There are two issues --

8                THE COURT:  But that's not an issue for this phase one

9     trial.

10          MR. SHORE:  There are two issues there.  First of all,

11    the RFC one we understand.  There are other debtors there who

12    are not represented, even virtually, by any creditors who are

13    part of that negotiation.  So the notion that the OpCos below

14    waive their intercompany claims into the parent, as approved by

15    everybody who's sitting at those top levels, I think is one of

16    the problems with the 9019.  But more importantly --

17               THE COURT:  You'll attack it; if that's what you

18    believe --

19          MR. SHORE:  Right.

20               THE COURT:  -- that's what you'll -- you'll make that

21    argument.

22          MR. SHORE:  Even if it's settled, though, even if it's

23    settled at zero, if Your Honor says that the claims, the

24    particular claims had value but were settled at zero --

25               THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

22

1          MR. SHORE:  -- as part of the --

2          THE COURT:  Mr. Shore?

3          MR. SHORE:  -- global compromise --

4          THE COURT:  How can I make this any clearer?  I said

5   it at the prior hearings.  This one's on the record; you can

6   get a transcript.  Okay?  If you have objections to plan

7   confirmation, if you have an objection to the settlements that

8   will be embodied in the plan, you will file your objection, and

9   I will hear them then.  Because the issue of the interdebtor

10  claims affects many constituencies, okay, they all have a right

11  to be heard, either in support of the settlement or in

12  opposition to the settlement.  Okay?

13         MR. SHORE:  And as a matter --

14         THE COURT:  And I plan to do that as part of the plan

15  confirmation, okay?  I've said it before; it may have been on

16  the transcript before.  Some of these hearings on scheduling

17  have not been on the record.  I wanted this one on the record,

18  okay?  You can order a transcript.  Okay.  Anything else you

19  want to say?

20         MR. SHORE:  Only this.  We have a procedure set in

21  place.  We have counterclaims that are filed in the adversary.

22  They have a time to respond to those.  I assume that what

23  they're going to do, after we see the plan and disclosure

24  statement, is move to have the Court abstain from hearing these

25  twelve --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

23

1           THE COURT:  I don't think it's an abstention.  It's

2    not an abstention, I'm telling you.  It may be that I will

3    bifurcate the issues.

4           MR. SHORE:  That may be another proposal as to how

5    they plan on dealing with it, which is bifurcating the issues.

6    That's fine.  But we need to have some procedure that sets in

7    place as to exactly --

8           THE COURT:  Okay.  I'm going to --

9           MR. SHORE:  -- what's happening.

10          THE COURT:  That is what I'm going to give some

11   guidance about.  Anything else you want to add, Mr. Shore?

12          MR. SHORE:  Nothing, Your Honor.

13          THE COURT:  All right.  Anybody else want to be heard?

14          Mr. Golden?

15          MR. GOLDEN:  Your Honor, UMB, as the indenture trustee

16   for all the junior secured noteholders, has heard the Court

17   loud and clear.  We understand, always understood, that it was

18   the intention of this Court to handle the settlement of the

19   intercompany claims as part of the global settlement in

20   connection with the plan process.  We don't have a problem with

21   that, per se.  But the debtor, in its adversary proceeding, in

22   its amended adversary proceeding, specifically Count 5 of that

23   adversary proceeding, puts into direct issue those intercompany

24   claims.  Count 5, paraphrasing, says they want a declaration

25   that the junior secured noteholders are undersecured.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

24

1    Everybody here understands undersecured; the value of the

2    collateral is less than the amount of the claim.

3           Now, leaving aside the shaky legal proposition that

4    they're asserting, and we'll get to that in due course, that

5    claim, that count requires the junior secured noteholders and

6    UMB, as the fiduciary, to defend against that.  It is nobody --

7    it's not going to come as a surprise to anybody that a large

8    part of the collateral that the junior secured noteholders

9    assert they had are the intercompany claims.  And --

10           THE COURT:  You don't have a pledge of the

11    intercompany claims, do you?

12           MR. GOLDEN:  Your --

13           THE COURT:  Show me a piece of paper that says you

14    have a -- that your collateral specifically includes the

15    intercompany claims.  I've never understood that to be the

16    case.  You may -- Mr. Shore raises an issue about a pledge of

17    intangibles.  It may cover it; it may not cover.  Those as to

18    which you have a pledge of the equity of subsidiaries or

19    affiliates, if they're solvent, if the intercompany -- if

20    payment on the intercompany claims would mean they're solvent,

21    then there's value for you if you have a pledge of the equity.

22           But do you have a piece of paper that is a pledge of a

23    note or another piece of paper that reflects an intercompany

24    claim?

25           MR. GOLDEN:  As Mr. Shore explained, Your Honor, we

**RESIDENTIAL CAPITAL, LLC, ET AL.**

25

1    don't.  But it is --

2         THE COURT:  Okay.

3         MR. GOLDEN:  But it is our position --

4         THE COURT:  I understand your position --

5         MR. GOLDEN:  Okay.

6         THE COURT:  -- Mr. Golden.

7         MR. GOLDEN:  So having that as our position, we need

8    to defend against Count V which says we're undersecured.

9         THE COURT:  And the -- well, my understanding is they

10    claim you're undersecured, for a whole variety of reasons.  And

11    it may be that, in trying this first phase and this -- the

12    adversary, all issues aren't going to be resolved, because I

13    understand your point about if intercompany claims are not

14    valued at zero, you believe that that's enough for you to win.

15    And it may be that -- say RFC -- what, two billion dollars,

16    same intercompany claim -- I don't know what the -- what

17    creditor claims have been filed against RFC.

18         I mean, you may be able to deal with this issue --

19    we'll talk a little bit about discovery and trial even at

20    confirmation -- with a rifle shot and not a blunderbuss.  If

21    you pick -- if you think that you've got -- that there are

22    three of the intercompany claims that you believe beyond

23    question are what they purport to be and there's no basis to

24    settle them at zero, you'll focus on those at trial and not

25    have to go through fifty-one affiliates and -- I'm not going to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

26

1   tell you right now -- I may tell you later but I'm not going to

2   tell you right now how the trial ought to proceed.  Okay.  But

3   what I am telling everybody -- and so -- look, you raise the

4   issue in counterclaims that -- and look, I'm telling you, I

5   didn't read them yet, okay?  I will, okay?  But I haven't

6   read -- I got a lot going on.  I haven't read the latest round

7   of pleadings, okay?  I will take you at your word and, I think,

8   Mr. Shore's word, that you've raised issues in counterclaims.

9   And again, I don't know whether they're compulsory or not.  I

10  don't get particularly excited that you raised issues in the

11  counterclaims, that are going to ultimately get resolved as

12  part of a plan confirmation trial rather than this trial, okay?

13          What I want to avoid is -- if possible, is injecting

14  issues into this first trial that are going to necessarily

15  bring to the table every other creditor constituency, because

16  these are issues that apply across the board and not unique to

17  you.  The same applies to the debtor:  If they amended their

18  complaint and they added a Count V that you believe -- just a

19  count to say -- determine that you're undersecured, I don't

20  think is the problem, Mr. Golden.  It may be, if there are

21  three reasons they think that certain collateral isn't part of

22  your collateral package, for example -- I don't see what

23  prevents the Court from resolving that issue, okay?

24          MR. GOLDEN:  But they haven't pled it that way, Your

25  Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

27

1        THE COURT:  Well --

2        MR. GOLDEN:  That's how the committee --

3        THE COURT:  Good, and you didn't plead your

4  counterclaims in such a way as to exclude from the trial -- the

5  first-phase trial of the adversary proceedings, a range of

6  issues.  That's fine.  Okay.  I -- we'll deal with it.  I

7  understand your point.

8        Anything else?  Any other point you have, Mr. Golden?

9        MR. GOLDEN:  Well, Your Honor, I do want to point out

10 that, while we understand the process, we understand the

11 procedures, this is asking the JSNs basically to defend against

12 the debtor's lawsuit with its left hand tied behind its back.

13       If you allow me to continue, Your Honor.

14       We think -- I know it's a matter of dispute; we've

15 laid it out -- that we have a claim on the intercompany claims.

16       THE COURT:  And you'll get a chance --

17       MR. GOLDEN:  I --

18       THE COURT:  Can you -- are you listening --

19       MR. GOLDEN:  I am.

20       THE COURT:  -- at all?

21       MR. GOLDEN:  Your Honor --

22       THE COURT:  Are you listening?

23       MR. GOLDEN:  Your Honor, I am.

24       THE COURT:  You'll get your chance to raise that

25 issue.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

28

1           MR. GOLDEN:  I appreciate that, Your Honor.  I'm --

2           THE COURT:  You're not going to get a chance to raise

3    it in this phase-one trial, Mr. Golden.

4           MR. GOLDEN:  I understand that, Your Honor.  What I

5    wanted to point out is, if this was simply in a vacuum an

6    adversary proceeding brought by the debtors to determine

7    whether we're undersecured or not, we would assert all of our

8    defenses and there'd be a certain burden of proof on both

9    sides.  Having manipulated the process --

10          THE COURT:  Oh, come on --

11          MR. GOLDEN:  Your Honor, can I --

12          THE COURT:  -- Mr. Golden, spare me.

13          MR. GOLDEN:  Okay.  Your Honor, the 9019 has a much

14   different, as the Court is well aware, burden of proof --

15          THE COURT:  Yes, and if they get it approved, then

16   you're going to come out on the short end, and what can I tell

17   you?  We'll deal with that when I get to decide whether the

18   9019 gets approved.  You don't try the merits of the issues on

19   a 9019.  Okay, you don't have a mini-trial.  The law in the

20   Second Circuit is quite clear on that.  There's a very

21   different standard.  You may not like it; that's the standard.

22          MR. GOLDEN:  That's fine, Your Honor, and we are well

23   aware of that.  But, for example, Your Honor, if we claimed we

24   had a truck as a piece of our collateral, and the debtor said,

25   as part of their plan process, they've determined, as a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

29

1   settlement, that there is no value in that truck --

2          THE COURT:  You don't have a pledge.  You told me

3   already you do not have a pledge of a note that reflects an

4   intercompany claim.  Okay?  You can't tie the hands of the

5   debtor in resolving all issues that relate to disputed issues

6   between all creditor constituencies and among all debtors.  You

7   may not like that, but that's the way it goes, Mr. Golden.

8   You'll make those arguments at the time of plan confirmation,

9   and you may prevail on it and you may not.  The debtors have --

10  the debtors are going to have a hard time -- a harder time when

11  it comes to a contested confirmation hearing over approval of

12  plan -- of settlements incorporated in the plan, as to which

13  you're not consenting creditors.  But I'll deal with it then.

14         Anything else at this point?

15         MR. GOLDEN:  No, sir.

16         THE COURT:  Anybody else wish to be heard?

17  Mr. Eckstein.

18         MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

19  Eckstein on behalf of the creditors' committee.  I don't think

20  there's a lot more to say.  I think the process, Your Honor, as

21  confirmed, is the process that we had understood was the way to

22  proceed.  I think we need to make sure we appreciate that there

23  are many issues that we hear from the JSNs are -- need to be

24  resolved; and they believe, if they're resolved, it will

25  demonstrate that they were oversecured.  And I believe that the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    adversary proceeding that's scheduled to be tried in October is

2    intended to deal with several issues, that have nothing to do

3    with intercompany claims, that we agree should be resolved.

4    And as we have said time and again, the plan will provide that,

5    in the event the Court rules that they are oversecured based

6    upon their theory, the plan will provide for them to receive

7    post-petition interest.

8         We wholeheartedly believe that the resolution of the

9    intercompany claims is not being done in a vacuum.  The

10   resolution of the intercompany claims is being done in the

11   context of a global plan that pays the JSNs in full, in cash,

12   on the effective date of their pre-petition claim.  That's very

13   important because what will become clear, I believe, at the

14   October trial is that, separate and apart from the AFI

15   settlement, all the other assets of the estate, even if the

16   JSNs' views of intercompany claims were given complete credit

17   the way they view them, the JSNs ultimately would not be

18   oversecured.  But that's something the Court can hear, and we

19   can arm-wrestle over even that in connection with the trial.

20        But the resolution of the intercompany claims in the

21   plan, as the plan, the disclosure statement and the PSA all lay

22   out, is being done in the context of a resolution of a myriad

23   of issues in this case, including subs, the consolidation,

24   including the litigations over waivers of billions of dollars

25   of claims -- of intercompany claims that were on the books and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1    have now been expunged, and all of the litigations that would

2    have to get dealt with absent the global settlement.

3           And the question will be whether or not -- in the

4    context of the plan where the JSNs are being paid in full their

5    entire pre-petition debt plus accrued pre-petition interest, is

6    the resolution reasonable.  And that's something that the Court

7    can determine in connection with confirmation.  And if we can't

8    resolve the matter between now and confirmation -- needless to

9    say, a contested confirmation is difficult, and -- but there's

10   no other way to deal with it; either we're going to resolve the

11   issues or we're going to deal with them at confirmation.

12          But I think it's important to make clear, number one,

13   that we're not going to litigate the intercompany claim dispute

14   in connection with the adversary proceeding, which I think that

15   is clear, and number two, we think it is important to confirm

16   that we're not going to have to constantly shadowbox with

17   suggestions that there are conflicts and that the debtor can't

18   proceed and the debtor's counsel can't proceed to deal with

19   confirmation.  That was a suggestion that was raised in the

20   correspondence and, as I understood it, that's what provoked in

21   part the need for the conference was to eliminate the

22   suggestion that somehow there is a conflict that is overhanging

23   the debtor's ability to proceed.

24          The reality is, the PSA, as the JSNs know, has the

25   support of the constituencies of every debtor.  We expect, and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1  the plan contemplates, that the plan will have the support of

2  all of the unsecured creditors of each of the debtors.  And the

3  JSNs are being paid in full.  This is a case where there are no

4  debtor conflicts; and to suggest them, we think, is injecting

5  an improper --

6           THE COURT:  Well, if the --

7           MR. ECKSTEIN:  -- issue.

8           THE COURT:  -- if the JSNs are entitled to post-

9  petition interest, they're not being paid in full.

10          MR. ECKSTEIN:  But --

11          THE COURT:  Okay, so we'll --

12          MR. ECKSTEIN:  And that'll be provided for.

13          THE COURT:  -- the Court'll decide it.

14          MR. ECKSTEIN:  And that'll be provided for.

15          THE COURT:  Okay.  All right.

16          MR. ECKSTEIN:  But I think that's what we just --

17          THE COURT:  All right.

18          MR. ECKSTEIN:  -- wanted to clarify.

19          THE COURT:  Anything else -- anybody else want to be

20  heard?

21          MR. ECKSTEIN:  Thank you, Your Honor.

22          THE COURT:  Mr. Walper, do you want to be heard?  You

23  got up early for this.  Mr. Walper, are you on the phone?

24          MR. WALPER:  Yes, I am, Your Honor.  And I have

25  nothing to addl.  And thank you for your time.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1          THE COURT:  Okay.  Mr. Shore, briefly.

2          MR. SHORE:  Just hopefully something constructive,

3    Your Honor.  We'll make a proposal for the debtors to deal with

4    the phase-one case --

5          THE COURT:  I'm going to give you some very specific

6    instructions about how we're going to proceed.

7          MR. SHORE:  Very good, Your Honor.

8          THE COURT:  Okay?  All right, the Court has reviewed:

9    the June 26th letter from Mr. Shore to Mr. Lee; the June 2nd

10   letter from Mr. Lee to the Court that attached the June 26

11   letter; and the July letter from Mr. Shore to the Court.

12   First, I don't intend to resolve any discovery disputes during

13   this conference.  During this conference, which is on the

14   record -- I want -- I have explored briefly each side's view

15   about the issues that should be addressed in the phase-one

16   trial of the two adversary proceedings, and what should be

17   addressed during the plan confirmation hearing.  As I said

18   before, I haven't had an opportunity to review the latest round

19   of pleadings yet.

20          What I previously stated at other hearings, and I

21   don't know whether there was a transcript, is that the phase-

22   one trial should deal with issues specific to the junior

23   secured noteholders, while the confirmation trial should

24   address issues relating to all creditor constituencies,

25   including the issues arising from the proposed global

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1    settlement in the plan term sheet but not yet reflected in the

2    plan, which is supposed to be filed this afternoon.  That's my

3    desire about how to proceed.  And I understand the devil may be

4    in the details.  Also because of the compressed time frame in

5    which all this is occurring, I want to avoid duplication of

6    discovery in connection with the phase-one trial and the

7    confirmation hearing.

8         All right.  The proposed global settlement included in

9    the plan term sheets will have to satisfy the Rule 9019

10   standards for approval of settlements as well as plan

11   confirmation standards.  In connection with approval of a 9019

12   settlement, the Court does not try the merits of the issues

13   that have been settled.  As a result, the discovery in

14   connection with a 9019 motion should not involve the same scope

15   of discovery as if issues were being tried on the merits.

16   Since no plan has yet been filed, it's premature to address the

17   details of the discovery plan in connection with a contested

18   plan confirmation hearing; that'll have to be addressed in the

19   first instance by the parties and, to the extent they can't

20   agree, by the Court.

21        With respect to a discovery plan for the adversary

22   proceedings, the parties need promptly to address a proposed

23   discovery plan to present to the Court.  I've already set forth

24   a schedule in the case management and scheduling order that's

25   been entered.  In connection with the discovery plan, I want

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

the parties to negotiate -- this is -- and there're two things
I'm going to want from you all:  I want you to negotiate a
statement of the issues to be adjudicated in the phase-one
trial.  The issues for the phase-one trial should be issues
specific to the issues with the junior secured noteholders.
The interdebtor claims, as I said, will be part of the plan
confirmation hearing.

           To the extent the parties cannot agree on a statement
of issues for the phase-one trial, the parties need to submit
counterstatements.  Additionally, to the extent the parties
can't agree on a discovery plan for phase one, the parties
should submit proposed counterplans.  All plans should be
consistent with the time schedule set forth in the Court's
prior case management order.  The fact that issues have been
raised by counterclaims does not mean the issues will be part
of the phase-one trial.  I can bifurcate, okay?  Whether all
the counterclaims had to be asserted now, I don't know.  Okay?
They have been asserted.  That doesn't particularly trouble me.
The fact the debtors amended the adversary complaint to add
additional claims doesn't particularly trouble me.  It doesn't
mean that those issues all get resolved as part of this phase-
one trial.

           So you need, in the first instance, to try and
agree -- and I think this is where you were headed,
Mr. Shore -- to try and agree on the statement of the issues

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1   that are going to be resolved as part -- addressed and resolved

2   as part of the phase-one trial.  And if you can't agree, you'll

3   submit counterstatements and I'll decide what's going to be

4   heard, so everybody's on the same page.

5        Okay.  I want to impose a deadline for submitting the

6   statement of issues and a discovery plan.  Rather than simply

7   picking a date -- and I have but I'm not going to give it -- I

8   want you to try and do that.  I'm mindful of the fact we're on

9   a compressed time frame for the whole case.  This is the 4th of

10  July Weekend.  But in the first instance, why don't you see if

11  you can agree on when you can sit down, exchange drafts, see if

12  you can resolve the statement of issues.

13       Okay.  Now, with respect to the exchange of views in

14  the correspondence regarding alleged conflicts, I don't intend

15  to address the issues in the absence of any properly filed

16  motions.  But I find the length and tone of the correspondence

17  I've been receiving troubling.  I don't intend to allow the

18  progress of this case to be slowed down by the exchange of six-

19  page single-spaced letters.  Issues in this case will be

20  resolved on the merits.  I don't intend to permit any party to

21  create a smokescreen or a sideshow that detracts from resolving

22  the issues in the case.  If any party believes that counsel or

23  professionals should be disqualified or recused in whole or in

24  part, the parties will either resolve the issues consensually

25  now, or raise the issues with the Court in a properly filed

**RESIDENTIAL CAPITAL, LLC, ET AL.**

37

1   motion.  Because of the compressed time schedule, I'm prepared

2   to hear such motion on shortened notice.

3           If you sleep on your rights, you're going to lose

4   those rights.  I don't plan to allow this issue to fester in

5   the case.  So if you're going to raise them, Mr. Shore, you

6   better -- you've raised them already but, if you're going to --

7   if you really think that I should enter an order that recuses,

8   in whole or in part, the debtor's counsel or the CRO who was

9   appointed as an independent fiduciary not beholden to the

10  creditors of any particular one of the fifty-one debtors, go

11  ahead and make your motion, and do it quickly.  And those who

12  are opposing it will respond.

13          The fact of the matter is that the proposed plan is

14  not solely being proposed by the debtors; it's also being

15  proposed by the committee.  And I know you've taken your

16  potshots at the committee as well, Mr. Shore, in your

17  correspondence, but there are lots of creditor constituencies,

18  lots of folks who've signed on to the PSA reflecting many

19  different constituencies.

20          But, okay, the sniping has got to stop, okay?  As far

21  as I'm concerned, for now, the debtor, it's business as usual,

22  Mr. Lee, for Mr. Kruger and Morrison & Foerster.  If the junior

23  secured noteholders' counsel -- the ad hoc committee's counsel

24  is going to raise this issue, they better do it soon.

25          With respect to issues concerning the mediation,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1    including the scope and content of any confidentiality

2    agreement order, as I've said before, this is a matter properly

3    raised with Judge Peck.  I will not enter any order in

4    connection with the mediation that is not in form and substance

5    acceptable to him.  All right?  I indicated at the last

6    conference that I wanted to be able to speak with Judge Peck

7    regarding the proposed confidentiality order, the so-called

8    VITRA order that was submitted.  I had a brief conversation

9    with Judge Peck about it; he made his views quite clear, and I

10    know he did so in the e-mail response that he -- I think was

11    circulated to all of you.

12           So I said, when I first appointed him as the mediator,

13    I was leaving those issues to him.  And I believe, as a judge

14    sitting on this court, he's perfectly approp -- he is the

15    appropriate one to decide what confidentiality order should be

16    entered in connection with the mediation.  I know in

17    Mr. Shore's reply from last night that he at least addresses

18    that some of the holders are -- of the junior secured notes,

19    are apparently prepared to participate in the mediation even if

20    it restricts their ability to trade.  I'm not getting involved

21    in the issues regarding the mediation.  Judge Peck is able and

22    willing to continue his role as a mediator.  A lot's been

23    accomplished.  Much more remains to be done.

24           Okay.  The only other thing I said is that the

25    conference on the 9th, instead of being on the phone, I want it

**RESIDENTIAL CAPITAL, LLC, ET AL.**

39

1   here.  Ordinarily, as you know, I do discovery conferences on

2   the phone.  Hopefully you will all resolve the discovery

3   disputes before then; today was not the time to do it.  But I

4   did want to address the issues about -- to make clear what the

5   phase-one trial should encompass and what should be encompassed

6   within the confirmation hearing.

7          We're adjourned.

8       (Whereupon these proceedings were concluded at 10:51 AM)

40

# C E R T I F I C A T I O N

I, David Rutt, certify that the foregoing transcript is a true
and accurate record of the proceedings.


DAVID RUTT

AAERT Certified Electronic Transcriber CET**D-635


eScribers

700 West 192nd Street, Suite #607

New York, NY 10040


Date:  July 3, 2013

## A

**ability (3)**
8:1;31:23;38:20
**able (4)**
7:1;25:18;38:6,21
**absence (1)**
36:15
**absent (1)**
31:2
**absolutely (1)**
6:8
**abstain (1)**
22:24
**abstention (2)**
23:1,2
**abundantly (2)**
6:1;7:11
**acceptable (1)**
38:5
**accomplished (1)**
38:23
**accrued (3)**
6:21;9:17;31:5
**across (1)**
26:16
**actually (3)**
7:24;11:22;18:25
**Ad (3)**
4:3;11:2;37:23
**add (3)**
18:17;23:11;35:19
**added (1)**
26:18
**additional (1)**
35:20
**Additionally (1)**
35:10
**addl (1)**
32:25
**address (11)**
5:25;7:23;8:14;
11:10;14:25;15:2;
33:24;34:16,22;
36:15;39:4
**addressed (4)**
33:15,17;34:18;
36:1
**addresses (2)**
8:15;38:17
**Adelphia (1)**
7:10
**adequate (1)**
15:11
**adjourned (1)**
39:7
**adjudicated (1)**
35:3
**adversary (25)**
5:4,24;6:2;7:2,13,
18;8:21;9:18;10:2,3,
9,19;17:10;22:21;

**23:21,22,23;25:12;
27:5;28:6;30:1;
31:14;33:16;34:21;
35:19**
**advice (1)**
15:14
**advocate (1)**
13:25
**affected (1)**
18:9
**affecting (2)**
17:24;18:20
**affects (2)**
17:7;22:10
**affiliates (3)**
19:9;24:19;25:25
**AFI (2)**
10:16;30:14
**afternoon (1)**
34:2
**Again (5)**
8:9,15;10:2;26:9;
30:4
**against (3)**
24:6;25:8,17;27:11
**agree (3)**
17:13;30:3;34:20;
35:8,11,24,25;36:2,
11
**agreed (4)**
9:16,17;14:13;20:4
**agreement (9)**
6:10;7:22;9:1,15;
10:13;18:1;19:18;
20:25;38:2
**ahead (4)**
5:10;17:20,25;
37:11
**air (1)**
12:11
**allegations (1)**
10:8
**alleged (1)**
36:14
**allocate (1)**
14:5
**allocated (1)**
14:3
**allocation (1)**
10:17
**allow (3)**
27:13;36:17;37:4
**allowable (1)**
7:12
**allowance (1)**
16:10
**Ally (1)**
14:3
**alone (2)**
6:23;8:1
**alter (1)**
16:20
**although (1)**

**7:23**
**always (1)**
23:17
**amended (3)**
23:22;26:17;35:19
**Americas (1)**
4:5
**among (1)**
14:9;29:6
**amount (2)**
10:15;24:2
**Angeles (1)**
4:15
**apart (1)**
30:14
**apparently (1)**
38:19
**appear (2)**
10:18;14:21
**applicable (1)**
16:16
**application (1)**
9:9
**applies (1)**
26:17
**apply (1)**
26:16
**appoint (1)**
9:9
**appointed (2)**
37:9;38:12
**appointment (1)**
9:4
**appreciate (2)**
28:1;29:22
**approp (1)**
38:14
**appropriate (4)**
8:14;16:15,16;
38:15
**Approval (4)**
16:19;29:11;34:10,
11
**approve (2)**
15:12;17:25
**approved (10)**
6:10;9:1,14;10:13;
12:4;14:12,17;21:14;
28:15,18
**approving (2)**
16:13;18:9
**argument (1)**
21:21
**arguments (2)**
17:9;29:8
**arises (1)**
11:15
**arising (1)**
33:25
**arm-wrestle (1)**
30:19
**arose (1)**
11:6

**aside (1)**
24:3
**aspect (1)**
16:11
**assert (6)**
16:17;18:10,11,15;
24:9;28:7
**asserted (3)**
18:16;35:17,18
**asserting (1)**
24:4
**assets (1)**
30:15
**assist (1)**
9:10
**assume (1)**
22:22
**attached (2)**
14:11;33:10
**attack (5)**
9:2,2,21,23;21:17
**attempts (1)**
5:23
**Attorneys (2)**
4:3,12
**authority (2)**
9:11;17:25
**Avenue (2)**
4:5,13
**avoid (3)**
15:10;26:13;34:5
**aware (2)**
28:14,23

## B

**back (5)**
7:4;9:19;11:19,22;
27:12
**bad (1)**
14:2
**based (4)**
9:7;11:25;15:14;
30:5
**basically (1)**
27:11
**basis (1)**
25:23
**become (1)**
30:13
**behalf (4)**
9:11;11:2;13:25;
29:19
**behind (1)**
27:12
**beholden (1)**
37:9
**believes (1)**
36:22
**below (1)**
21:13
**bench (1)**
18:8

**Berkshire (1)**
4:12
**best (1)**
9:15
**better (2)**
37:6,24
**beyond (2)**
10:3;25:22
**bifurcate (3)**
17:17;23:3;35:16
**bifurcated (1)**
17:15
**bifurcating (1)**
23:5
**billion (7)**
8:17;12:18;19:16,
17,19;20:7;25:15
**billions (1)**
30:24
**bit (1)**
6:11;25:19
**blunderbuss (1)**
25:20
**board (1)**
26:16
**bona (1)**
10:10
**books (1)**
30:25
**both (1)**
28:8
**bought (1)**
12:3
**brief (1)**
38:8
**briefly (2)**
33:1,14
**bring (1)**
26:15
**brought (1)**
28:6
**burden (2)**
28:8,14
**business (1)**
37:21

## C

**CA (1)**
4:15
**California (1)**
5:18
**call (1)**
12:2
**called (1)**
13:13
**came (3)**
8:25;11:19,22
**can (30)**
5:18;6:7;9:21,22,
24;10:11;12:9;14:23;
15:12;16:3,3,11,17;
17:13,14,18;19:5;

12-12020-mg    Doc 4369    Filed 07/26/13    Entered 07/26/13 11:55:59    Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg
Pg 116 of 122
July 3, 2013

22:4,5,18;27:18;
28:11,16;30:18,19;
31:7;35:16;36:11,11,
12
**Capital (2)**
5:3;6:15
**CASE (18)**
4:2;6:20,21;9:14;
11:2,15;16:6;24:16;
30:23;32:3;33:4;
34:24;35:14;36:9,18,
19,22;37:5
**cases (3)**
7:8;11:18;14:6
**cash (1)**
30:11
**cents (1)**
20:7
**certain (2)**
26:21;28:8
**certainly (2)**
14:24;17:24
**challenge (1)**
20:6
**challenging (1)**
10:10
**chambers (1)**
7:12
**chance (3)**
27:16,24;28:2
**Charter (1)**
7:9
**Chris (1)**
11:1
**CHRISTOPHER (1)**
4:8
**Circuit (1)**
28:20
**circulated (1)**
38:11
**circumstances (1)**
11:6
**Civil (1)**
16:17
**claim (20)**
12:18,20;17:23;
19:10,13,17,17,19,
21;20:7,17;24:2,5,24;
25:10,16;27:15;29:4;
30:12;31:13
**claimed (1)**
28:23
**claims (55)**
6:15,19;8:2,5,6,8,8,
9,9,13,17,17;9:5;
10:15,16;11:25;12:1,
5;13:12,16;14:1,2;
15:5,15,23;16:17;
17:7;18:3;19:3,5,16;
20:10;21:14,23,24;
22:10;23:19,24;24:9,
11,15,20;25:13,17,
22;27:15;30:3,9,10,

16,20,25,25;35:6,20
**clarify (1)**
32:18
**clear (19)**
5:13;6:1,8;7:11;
8:21;9:3,8;16:23,23;
17:16;18:19,20;
23:17;28:20;30:13;
31:12,15;38:9;39:4
**clearer (1)**
22:4
**client (1)**
14:1
**clients (1)**
14:2
**collateral (11)**
19:3,7,13;20:18,
20;24:2,8,14;26:21,
22;28:24
**committee (5)**
20:5;27:2;29:19;
37:15,16
**committee's (1)**
37:23
**company (1)**
14:1
**complaint (2)**
26:18;35:19
**complete (1)**
30:16
**compressed (3)**
34:4;36:9;37:1
**compromise (2)**
12:7;22:3
**compromises (2)**
6:18,19
**compulsory (3)**
18:11,14;26:9
**concerned (2)**
13:22;37:21
**concerning (1)**
37:25
**concluded (1)**
39:8
**conference (12)**
5:15,16;6:2,24;
7:12;11:13;16:14;
31:21;33:13,13;38:6,
25
**conferences (1)**
39:1
**confidentiality (3)**
38:1,7,15
**confirm (1)**
31:15
**confirmation (27)**
6:7;9:23,24;10:11;
12:5;17:5,14;18:2,4;
22:7,15;25:20;26:12;
29:8,11;31:7,8,9,11,
19;33:17,23;34:7,11,
18;35:7;39:6
**confirmed (1)**

29:21
**conflict (2)**
14:5;31:22
**conflicts (10)**
6:9;10:1,8,12;
11:17;12:10;13:24;
31:17;32:4;36:14
**conjure (1)**
6:7
**connection (13)**
5:4;15:23;23:20;
30:19;31:7,14;34:6,
11,14,17,25;38:4,16
**consensually (1)**
36:24
**consent (1)**
20:24
**consenting (1)**
29:13
**considering (1)**
12:24
**considers (1)**
12:23
**consistent (2)**
14:13;35:13
**consolidated (1)**
7:2
**consolidation (1)**
30:23
**constantly (1)**
31:16
**constituencies (7)**
17:8;22:10;29:6;
31:25;33:24;37:17,
19
**constituency (1)**
26:15
**constructive (1)**
33:2
**contemplates (1)**
32:1
**content (1)**
38:1
**contested (4)**
17:4;29:11;31:9;
34:17
**context (5)**
5:24;15:5;30:11,
22;31:4
**continue (2)**
27:13;38:22
**contrary (1)**
13:10
**conversation (1)**
38:8
**copy (2)**
7:6,14
**core (1)**
10:14
**correctly (1)**
19:14
**correspondence (4)**
31:20;36:14,16;

37:17
**counsel (6)**
9:3;31:18;36:22;
37:8,23,23
**Count (6)**
23:22,24;24:5;
25:8;26:18,19
**counterclaim (1)**
16:16
**counterclaims (18)**
7:15,20;8:3;16:5,9,
22;17:12;18:11,15,
25;20:16;22:21;26:4,
8,11;27:4;35:15,17
**counterplans (1)**
35:12
**counterstatements (2)**
35:10;36:3
**course (1)**
24:4
**COURT (93)**
5:2,9,16,17;7:4;
10:23,25;12:3,22,23,
24;13:3;14:7,11,17,
21,21,25;15:2,12,22;
16:3,11,12,14;17:25;
19:6,20,24;20:1,11,
13,15,21;21:3,5,8,17,
20,25;22:2,4,14,24;
23:1,8,10,13,16,18;
24:10,13;25:2,4,6,9;
26:23;27:1,3,16,18,
20,22,24;28:2,10,12,
14,15;29:2,16;30:5,
18;31:6;32:6,8,11,13,
15,17,19,22;33:1,5,8,
8,10,11;34:12,20,23;
36:25;38:14
**Court'll (1)**
32:13
**Court's (2)**
11:9;35:13
**cover (3)**
8:22;24:17,17
**covered (1)**
17:19
**create (2)**
9:25;36:21
**credit (1)**
30:16
**creditor (6)**
17:7;25:17;26:15;
29:6;33:24;37:17
**creditors (8)**
6:14,16;12:11;
19:10;21:12;29:13;
32:2;37:10
**creditors' (1)**
29:19
**cricket (1)**
9:20
**CRO (3)**
9:9;14:16;37:8

37:17
**cut (1)**
6:5

**D**

**date (2)**
30:12;36:7
**day (1)**
9:1
**deadline (1)**
36:5
**deal (11)**
11:10;25:18;27:6;
28:17;29:13;30:2;
31:10,11,18;33:3,22
**dealing (2)**
15:5;23:5
**dealt (1)**
31:2
**debt (2)**
20:22;31:5
**debtor (17)**
9:8,12;12:19,20;
13:4;14:8,16,18;
17:14;23:21;26:17;
28:24;29:5;31:17,25;
32:4;37:21
**debtor-only (1)**
14:10
**debtors (27)**
5:8;6:17;8:1,18,25;
9:16;12:14;13:4,22;
15:4,10,13;16:1,7;
17:12;20:4,19;21:11;
28:6;29:6,9,10;32:2;
33:3;35:19;37:10,14
**debtor's (6)**
6:15;11:16;27:12;
31:18,23;37:8
**decide (6)**
17:20;18:4;28:17;
32:13;36:3;38:15
**decided (3)**
7:18;14:8,18
**decisions (2)**
9:11;14:16
**declaration (1)**
23:24
**declarations (1)**
7:20
**defeat (1)**
10:20
**defend (3)**
24:6;25:8;27:11
**defenses (1)**
28:8
**definitive (2)**
15:4,8
**demonstrable (1)**
11:16
**demonstrate (1)**
29:25
**describes (1)**

17:14
**desire (1)**
  34:3
**detail (2)**
  6:4,12
**details (2)**
  34:4,17
**determination (6)**
  8:3;11:25;12:6;
  13:15;15:22,25
**determine (4)**
  20:21;26:19;28:6;
  31:7
**determined (3)**
  11:21;15:13;28:25
**determines (1)**
  20:18
**detracts (1)**
  36:21
**devil (1)**
  34:3
**different (4)**
  14:17;28:14,21;
  37:19
**difficult (1)**
  31:9
**diminution (1)**
  20:19
**direct (1)**
  23:23
**direction (5)**
  6:4,25;7:19;10:7,7
**disagreements (1)**
  10:1
**disclosure (5)**
  6:13;15:6;16:4;
  22:23;30:21
**disconcerting (1)**
  8:25
**discovery (19)**
  5:14;7:23;11:8,8,
  12,13;25:19;33:12;
  34:6,13,15,17,21,23,
  25;35:11;36:6;39:1,2
**discretion (1)**
  17:17
**disposed (1)**
  20:20
**dispute (3)**
  19:4;27:14;31:13
**disputed (2)**
  20:22;29:5
**disputes (3)**
  9:10;33:12;39:3
**disqualified (1)**
  36:23
**disrupt (1)**
  7:1
**distributable (1)**
  8:4
**district (1)**
  7:9
**document (1)**

7:25
**dollar (7)**
  8:18;12:20;19:17,
  17,19;20:7,7
**dollars (7)**
  8:17;12:18;20:8,
  19,20;25:15;30:24
**done (6)**
  16:12;30:9,10,22;
  38:23
**doubt (1)**
  11:8
**down (4)**
  6:22;14:6;36:11,18
**dozen (1)**
  7:20
**drafts (1)**
  36:11
**due (1)**
  24:4
**duplication (1)**
  34:5
**during (4)**
  7:11;33:12,13,17

E

**early (2)**
  11:4;32:23
**Eckstein (10)**
  29:17,18,19;32:7,
  10,12,14,16,18,21
**effective (1)**
  30:12
**either (5)**
  11:4,13;22:11;
  31:10;36:24
**eliminate (1)**
  31:21
**else (9)**
  18:17;22:18;23:11,
  13;27:8;29:14,16;
  32:19,19
**e-mail (1)**
  38:10
**embodied (6)**
  7:21,22;9:21;
  12:25;17:3;22:8
**embodies (1)**
  6:17
**encompass (1)**
  39:5
**encompassed (1)**
  39:5
**end (1)**
  28:16
**England (1)**
  9:19
**enough (2)**
  7:24;25:14
**enter (3)**
  14:1;37:7;38:3
**entered (4)**

16:13;18:8;34:25;
  38:16
**entire (2)**
  10:20;31:5
**entitled (1)**
  32:8
**entity (1)**
  19:12
**equity (6)**
  19:8,12,13;20:23;
  24:18,21
**ESQ (2)**
  4:8,17
**estate (1)**
  30:15
**estopped (1)**
  20:5
**even (7)**
  21:12,22,22;25:19;
  30:15,19;38:19
**event (1)**
  30:5
**everybody (4)**
  5:19;21:15;24:1;
  26:3
**everybody's (1)**
  36:4
**evidence (2)**
  17:9;18:4
**exact (2)**
  8:4,9
**exactly (2)**
  10:17;23:7
**example (6)**
  19:2,8,16;20:23;
  26:22;28:23
**exchange (3)**
  36:11,13,18
**excited (1)**
  26:10
**exclude (1)**
  27:4
**expect (2)**
  6:15;31:25
**expense (2)**
  14:5,6
**explain (1)**
  12:17
**explained (1)**
  24:25
**explored (1)**
  33:14
**expression (1)**
  9:20
**expunged (1)**
  31:1
**extent (9)**
  6:25;17:2,4,11,19;
  18:6;34:19;35:8,10
**extraneous (1)**
  11:11

F

**fact (4)**
  35:14,19;36:8;
  37:13
**facts (1)**
  16:18
**faith (1)**
  9:23
**far (1)**
  37:20
**fathom (1)**
  8:18
**Federal (1)**
  16:16
**fester (2)**
  7:5;37:4
**FGIC (2)**
  8:12,13
**fides (1)**
  10:10
**fiduciary (3)**
  12:12;24:6;37:9
**fifty-one (2)**
  25:25;37:10
**file (3)**
  16:7,8;22:8
**filed (9)**
  7:15;13:18;15:6;
  22:21;25:17;34:2,16;
  36:15,25
**filing (1)**
  6:13
**find (1)**
  36:16
**fine (5)**
  13:24;18:15;23:6;
  27:6;28:22
**First (13)**
  6:1;10:8;12:15;
  13:9,11;21:10;25:11;
  26:14;33:12;34:19;
  35:23;36:10;38:12
**first-phase (1)**
  27:5
**flavor (1)**
  8:2
**Floor (1)**
  4:14
**flows (4)**
  19:19;20:3,6,8
**focus (1)**
  25:24
**Foerster (3)**
  5:8;15:15;37:22
**folks (1)**
  37:18
**form (1)**
  38:4
**forth (5)**
  11:3;13:11;14:14;
  34:23;35:13

**fourteen (1)**
  9:13
**frame (2)**
  34:4;36:9
**free (1)**
  8:13
**full (5)**
  19:11;30:11;31:4;
  32:3,9
**Fundamentally (1)**
  11:15

G

**Gary (1)**
  5:7
**general (1)**
  20:2
**gets (4)**
  12:19,24;20:7;
  28:18
**given (2)**
  9:22;30:16
**global (11)**
  7:21;10:15;18:2,
  23;19:1;22:3;23:19;
  30:11;31:2;33:25;
  34:8
**goes (1)**
  29:7
**Golden (26)**
  23:14,15;24:12,25;
  25:3,5,6,7;26:20,24;
  27:2,8,9,17,19,21,23;
  28:1,3,4,11,12,13,22;
  29:7,15
**Good (6)**
  5:7;9:23;14:1;
  27:3;29:18;33:7
**Grand (1)**
  4:13
**grants (1)**
  19:23
**great (1)**
  17:17
**Group (2)**
  4:3;11:2
**guess (1)**
  16:3
**guidance (3)**
  5:22;11:9;23:11

H

**hand (1)**
  27:12
**handle (3)**
  11:12;13:23;23:18
**handling (1)**
  18:22
**hands (1)**
  29:4
**happen (1)**

12:12

**happening (1)**
23:9
**hard (1)**
29:10
**harder (1)**
29:10
**Hathaway (1)**
4:12
**headed (1)**
35:24
**hear (8)**
11:14;17:8,20;
18:3;22:9;29:23;
30:18;37:2
**heard (9)**
17:4;18:19;22:11;
23:13,16;29:16;
32:20,22;36:4
**hearing (9)**
11:24;17:5;22:24;
29:11;33:17;34:7,18;
35:7;39:6
**hearings (3)**
22:5,16;33:20
**himself (1)**
15:14
**Hoc (3)**
4:3;11:2;37:23
**holders (1)**
38:18
**Honor (65)**
5:7,11,13,20,21,25;
6:1,9,10,20,25;7:2,3,
6,9,11,14;8:3,5,7,9,
11,20,21;9:1,13,14,
19,25;10:3,6,14,17,
20;11:1,14;12:8,14;
13:6;15:17;16:6,8;
18:19;20:17;21:23;
23:12,15;24:25;
26:25;27:9,13,21,23;
28:1,4,11,13,22,23;
29:18,20;32:21,24;
33:3,7
**Honor's (2)**
5:22;7:19
**hopefully (2)**
33:2;39:2
**hurdle (1)**
17:22

I

**ignore (1)**
7:19
**ignores (1)**
6:4
**immediately (1)**
13:13
**impaired (1)**
6:16
**important (3)**

30:13;31:12,15
**importantly (1)**
21:16
**impose (1)**
36:5
**improper (1)**
32:5
**improperly (1)**
17:24
**included (2)**
17:2;34:8
**includes (1)**
24:14
**including (5)**
18:8;30:23,24;
33:25;38:1
**incorporated (1)**
29:12
**indenture (1)**
23:15
**independent (3)**
18:22;19:1;37:9
**indicated (1)**
38:5
**injecting (2)**
26:13;32:4
**injection (1)**
16:6
**insist (1)**
10:10
**instance (3)**
34:19;35:23;36:10
**instead (1)**
38:25
**instructions (1)**
33:6
**intangible (1)**
20:3
**intangibles (1)**
24:17
**intend (9)**
7:17,23;11:24;
16:24;17:8;33:12;
36:14,17,20
**intended (1)**
30:2
**intention (1)**
23:18
**inter (1)**
19:3
**intercompany (42)**
6:19;8:2,4,6;9:5;
10:16;11:25;12:5,18;
13:12;14:1;15:5,15,
23;17:6;18:3;19:3,
10,16,21;20:10;
21:14;23:19,23;24:9,
11,15,19,20,23;
25:13,16,22;27:15;
29:4;30:3,9,10,16,20,
25;31:13
**intercreditor (1)**
9:10

**interdebtor (10)**
6:9;9:10;10:1,12;
11:17;12:10;13:23;
14:4;22:9;35:6
**interest (8)**
6:22,23;9:15,17;
16:10;30:7;31:5;32:9
**interests (1)**
19:25
**into (6)**
9:14;18:12;19:17;
21:14;23:23;26:14
**involve (1)**
34:14
**involved (1)**
38:20
**issue (28)**
6:22;8:5;11:15;
13:4,6,6,23;14:10,17;
15:10;17:6,7,9;19:15,
15;20:23;21:5,8;
22:9;23:23;24:16;
25:18;26:4,23;27:25;
32:7;37:4,24
**issues (77)**
5:23;6:3;7:5;8:16;
10:4,14,17,21;11:8,8,
10,11;14:8,9,18;16:6,
9,21,25,25;17:1,1,2,
11,14,15,17,18,19;
18:6,22,22;19:2;
20:22;21:7,10;23:3,
5;25:12;26:8,10,14,
16;27:6;28:18;29:5,
5,23;30:2,2,23;31:11;
33:15,22,24,25;
34:12,15;35:3,4,4,5,
9,14,15,21,25;36:6,
12,15,19,22,24,25;
37:25;38:13,21;39:4

J

**JSNs (16)**
16:15,20;17:1,8,11,
19;18:1,10;27:11;
29:23;30:11,17;31:4,
24;32:3,8
**JSNs' (1)**
30:16
**JSN's (1)**
16:20
**Judge (9)**
6:18;9:2,4,7;38:3,
6,9,13,21
**July (2)**
33:11;36:10
**June (3)**
33:9,9,10
**Junior (17)**
4:3;7:6,14,17;8:11;
9:6,16;10:4,9;23:16,
25;24:5,8;33:22;

35:5;37:22;38:18

K

**Kenneth (1)**
29:18
**kind (1)**
11:5
**Kruger (3)**
9:3,9;37:22
**Kruger's (1)**
15:14

L

**laid (1)**
27:15
**large (1)**
24:7
**larger (1)**
17:22
**last (6)**
6:1;7:16;11:4;
18:18;38:5,17
**late (1)**
11:4
**Later (2)**
6:13;26:1
**latest (2)**
26:6;33:18
**law (3)**
15:24;16:18;28:19
**lawsuit (1)**
27:12
**lay (1)**
30:21
**least (3)**
6:6;14:12;38:17
**leaving (2)**
24:3;38:13
**Lee (14)**
5:6,7,7,11,20;
10:23,24;11:7;14:7;
15:21;18:7;33:9,10;
37:22
**left (1)**
27:12
**legal (5)**
11:25;13:16;15:16,
24;24:3
**length (1)**
36:16
**less (1)**
24:2
**letter (10)**
6:5;7:7;11:3,7,11;
15:19;33:9,10,11,11
**letters (2)**
6:6;36:19
**levels (1)**
21:15
**lien (3)**
20:2,4,8

**lies (1)**
12:9
**limiting (1)**
16:14
**listening (2)**
27:18,22
**litigate (2)**
10:21;31:13
**litigated (1)**
13:7
**litigations (2)**
30:24;31:1
**little (2)**
6:11;25:19
**LLC (2)**
19:18;20:8
**LLP (1)**
4:2
**look (2)**
26:3,4
**Los (1)**
4:15
**lose (1)**
37:3
**losing (1)**
13:22
**lot (2)**
26:6;29:20
**lots (2)**
37:17,18
**lot's (1)**
38:22
**loud (2)**
18:20;23:17

M

**makes (1)**
12:11
**making (1)**
13:15
**management (2)**
34:24;35:14
**manipulated (1)**
28:9
**many (5)**
16:1;17:7;22:10;
29:23;37:18
**math (2)**
13:17,17
**mathematical (1)**
11:21
**matter (5)**
22:13;27:14;31:8;
37:13;38:2
**matters (3)**
7:13,24;10:8
**may (21)**
6:10;18:14;19:20;
21:6,6;22:15;23:2,4;
24:16,17,17;25:11,
15,18;26:1,20;28:21;
29:7,9,9;34:3

**maybe (1)**
14:23
**mean (8)**
13:15;17:15,16,21;
24:20;25:18;35:15,
21
**mechanisms (2)**
18:21,21
**mediate (1)**
9:5
**mediation (10)**
6:18;9:7;10:21;
11:12,13;37:25;38:4,
16,19,21
**mediator (3)**
9:4;38:12,22
**meet (1)**
15:18
**merit (3)**
12:1;13:16;15:16
**merits (4)**
28:18;34:12,15;
36:20
**message (1)**
8:22
**million (5)**
8:18;12:20;20:8,
18,20
**mindful (1)**
36:8
**mini-trial (1)**
28:19
**monoline (1)**
8:8
**months (1)**
9:14
**more (7)**
6:4,11;8:7,10;
21:16;29:20;38:23
**morning (3)**
5:7;11:5;29:18
**Morrison (3)**
5:8;15:15;37:22
**most (1)**
18:13
**motion (4)**
34:14;37:1,2,11
**motions (1)**
36:16
**move (1)**
22:24
**much (3)**
12:8;28:13;38:23
**multiple (1)**
18:21
**MUNGER (1)**
4:11
**must (1)**
12:4
**muster (1)**
21:6
**myriad (1)**
30:22

**N**

**nearly (1)**
8:17
**necessarily (2)**
16:21;26:14
**need (9)**
16:22;23:6;25:7;
29:22,23;31:21;
34:22;35:9,23
**needless (1)**
31:8
**negotiate (2)**
35:1,2
**negotiation (2)**
15:14;21:13
**New (3)**
4:6;7:9;8:20
**next (1)**
5:15
**night (2)**
11:4;38:17
**nobody (1)**
24:6
**none (1)**
10:1
**nonplan (2)**
6:3;7:13
**nor (1)**
9:24
**note (6)**
7:25;8:15;10:4;
20:1;24:23;29:3
**noteholder (1)**
7:18
**Noteholders (15)**
4:4;6:4,20;7:1,17;
8:12;9:6,16;10:10;
23:16,25;24:5,8;
33:23;35:5
**noteholders' (4)**
5:22;7:7,15;37:23
**notes (2)**
19:18;38:18
**notice (1)**
5:12;11:5;37:2
**notion (4)**
6:9;10:12;13:9;
21:13
**number (4)**
5:3;6:17;31:12,15
**NY (1)**
4:6

**O**

**object (2)**
8:19;11:5
**objected (1)**
8:12
**objection (2)**
22:7,8

**objections (3)**
6:7;9:25;22:6
**objectors (1)**
17:23
**obligations (1)**
15:25
**occurred (1)**
16:14
**occurring (1)**
34:5
**o'clock (1)**
5:19
**October (2)**
30:1,14
**offered (1)**
18:21
**OLSON (1)**
4:11
**once (1)**
10:18
**one (21)**
6:18,22;9:4;12:17,
18;13:25;16:1,22,25;
19:15,22;21:8,11,15;
22:17;31:12;33:22;
35:11,22;37:10;
38:15
**one's (1)**
22:5
**Only (2)**
22:20;38:24
**OpCos (1)**
21:13
**OpCo's (1)**
14:6
**open-ended (1)**
11:9
**opportunity (1)**
33:18
**oppose (2)**
18:1,2
**opposing (1)**
37:12
**opposition (1)**
22:12
**order (12)**
16:13;18:8,8;
22:18;34:24;35:14;
37:7;38:2,3,7,8,15
**ordered (1)**
16:8
**Ordinarily (1)**
39:1
**others (1)**
18:20
**ought (1)**
26:2
**out (11)**
7:7;10:12;11:15,
18;12:12;16:6;27:9,
15;28:5,16;30:22
**outset (1)**
5:13;11:3

**outside (1)**
10:22
**over (4)**
7:19;29:11;30:19,
24
**overhanging (1)**
31:22
**oversecured (3)**
29:25;30:5,18
**overwhelming (1)**
6:16

**P**

**package (2)**
19:13;26:22
**page (2)**
36:4,19
**paid (5)**
19:11;20:7;31:4;
32:3,9
**paper (3)**
24:13,22,23
**par (2)**
6:21;9:17
**paraphrasing (1)**
23:24
**parent (1)**
21:14
**part (27)**
8:6,10,24;10:2,9,
19;17:23;18:4;19:6,
11,13;21:13;22:1,14;
23:19;24:8;26:12,21;
28:25;31:21;35:6,15,
21;36:1,2,24;37:8
**participate (3)**
5:18;9:6;38:19
**particular (4)**
11:6;17:18;21:24;
37:10
**particularly (4)**
8:25;26:10;35:18,
20
**parties (13)**
14:9,12;16:20;
17:13;18:23;34:19,
22;35:1,8,9,10,11;
36:24
**party (2)**
36:20,22
**pass (1)**
21:6
**pay (2)**
9:16,17
**paying (1)**
6:20,21
**payment (1)**
24:20
**pays (1)**
30:11
**Peck (6)**
9:2,7;38:3,6,9,21

**Peck's (2)**
6:18;9:4
**pending (1)**
7:8
**per (1)**
23:21
**perfectly (1)**
38:14
**perhaps (1)**
10:7
**permit (1)**
36:20
**pertains (1)**
11:7
**petition (2)**
6:23;32:9
**phase (4)**
16:24;21:8;25:11;
35:11
**phase- (2)**
33:21;35:21
**phase-one (10)**
28:3;33:4,15;34:6;
35:3,4,9,16;36:2;39:5
**phone (3)**
32:23;38:25;39:2
**pick (1)**
25:21
**picking (1)**
36:7
**piece (5)**
18:19;24:13,22,23;
28:24
**place (2)**
22:21;23:7
**plan (70)**
5:23;6:10,13,14,16,
17;7:21,22;8:5,6,10,
16;9:1,14,21;10:5,10,
13,17,22;12:4,10,25;
14:13;15:6,18,22;
16:4,7;17:3,14,21;
18:1,4;22:6,8,14,14,
23;23:5,20;26:12;
28:25;29:8,12,12;
30:4,6,11,21,21;31:4;
32:1,1;33:17;34:1,2,
9,10,16,17,18,21,23,
25;35:6,11;36:6;
37:4,13
**plan-related (1)**
8:16
**plans (1)**
35:12
**playbook (3)**
7:8;8:11,24
**plead (1)**
27:3
**pleading (1)**
16:15
**pleadings (3)**
18:13;26:7;33:19
**Please (2)**

5:2;12:17

**pled (1)**
26:24

**pledge (10)**
19:8,20,24;24:10,
16,18,21,22;29:2,3

**pledges (1)**
19:22

**plus (4)**
6:21;9:17;19:17;
31:5

**point (10)**
12:24;15:9;20:4,5;
25:13;27:7,8,9;28:5;
29:14

**pointed (1)**
16:6

**points (1)**
6:11

**position (8)**
15:16;18:14,19;
19:7,9;25:3,4,7

**positions (1)**
11:16

**possible (1)**
26:13

**post (1)**
6:21

**post- (2)**
6:22;32:8

**post-petition (4)**
6:22;9:17;16:10;
30:7

**potshots (1)**
37:16

**prejudice (2)**
6:6;9:24

**premature (1)**
34:16

**prepared (2)**
37:1;38:19

**pre-petition (3)**
30:12;31:5,5

**present (1)**
34:23

**preserve (1)**
13:20

**pretty (1)**
17:16

**prevail (2)**
9:18;29:9

**prevents (1)**
26:23

**previously (1)**
33:20

**principal (1)**
6:17

**prior (3)**
16:14;22:5;35:14

**priority (1)**
10:15

**problem (4)**
12:9,16;23:20;

26:20

**problems (1)**
21:16

**procedural (1)**
18:21

**Procedure (3)**
16:17;22:20;23:6

**procedures (2)**
17:16;27:11

**proceed (8)**
5:9;26:2;29:22;
31:18,18,23;33:6;
34:3

**proceeding (17)**
5:24;6:2;7:3,13,18;
8:22;10:2,4,9,19;
15:7;23:21,22,23;
28:6;30:1;31:14

**proceedings (6)**
5:4;17:10;27:5;
33:16;34:22;39:8

**process (8)**
9:2;12:13;23:20;
27:10;28:9,25;29:20,
21

**product (1)**
6:18

**professionals (1)**
36:23

**progress (1)**
36:18

**promptly (1)**
34:22

**proof (2)**
28:8,14

**properly (4)**
18:6;36:15,25;38:2

**proponents (2)**
17:21,22

**proposal (2)**
23:4;33:3

**propose (1)**
12:4;13:24

**proposed (11)**
11:19,20;12:15;
33:25;34:8,22;35:12;
37:13,14,15;38:7

**proposing (1)**
12:14

**proposition (1)**
24:3

**protection (1)**
15:11

**provide (3)**
13:18;30:4,6

**provided (3)**
7:6;32:12,14

**provoked (1)**
31:20

**PSA (15)**
11:23,24;13:9,10;
14:10,11,12,13;16:7,
13,19;18:9;30:21;

31:24;37:18

**purport (1)**
25:23

**purpose (2)**
10:21;15:19

**pursuant (1)**
19:18

**push (1)**
14:5

**put (1)**
16:11

**puts (1)**
23:23

---

## Q

**quickly (1)**
37:11

**quite (2)**
28:20;38:9

---

## R

**raise (9)**
5:23;17:11;18:6;
26:3;27:24;28:2;
36:25;37:5,24

**raised (10)**
15:10;16:22;17:19;
18:7;26:8,10;31:19;
35:15;37:6;38:3

**raises (1)**
24:16

**range (1)**
27:5

**rather (5)**
5:17;8:16;11:9;
26:12;36:6

**read (4)**
18:13;26:5,6,6

**reading (1)**
16:4

**reality (1)**
31:24

**really (3)**
11:8;13:14;37:7

**reason (3)**
6:24;15:11,12

**reasonable (1)**
31:6

**reasons (2)**
25:10;26:21

**receive (1)**
30:6

**received (1)**
7:25

**receiving (1)**
36:17

**recent (1)**
18:13

**recharacterized (1)**
20:22

**record (9)**

5:10;8:1,15;13:10,
21;22:5,17,17;33:14

**recused (1)**
36:23

**recuses (1)**
37:7

**Refer (1)**
7:9

**referred (1)**
16:24

**reflected (1)**
34:1

**reflecting (1)**
37:18

**reflects (2)**
24:23;29:3

**refused (1)**
9:6

**regarding (4)**
10:8;36:14;38:7,21

**rejected (1)**
18:24

**relate (3)**
7:20;18:22;29:5

**related (1)**
6:2

**relates (2)**
6:19;10:4

**relating (2)**
16:9;33:24

**relation (1)**
7:2

**remains (1)**
38:23

**repeat (1)**
10:7

**reply (2)**
11:24;38:17

**report (1)**
11:23

**represented (1)**
21:12

**request (1)**
11:9

**requested (2)**
6:24;16:7

**requests (1)**
7:25

**requires (1)**
24:5

**ResCap (3)**
19:8,18;20:8

**reserved (1)**
9:22

**Residential (1)**
5:3

**resolution (5)**
30:8,10,20,22;31:6

**resolve (10)**
8:2;12:11;17:9,18;
31:8,10;33:12;36:12,
24;39:2

**resolved (16)**

7:8;8:10;13:9;14:9,
19;16:22;19:2;25:12;
26:11;29:24,24;30:3;
35:21;36:1,1,20

**resolves (1)**
8:12

**resolving (4)**
9:10;26:23;29:5;
36:21

**respect (15)**
10:7;11:12,16,17;
13:21;15:11;16:5,9;
17:1,9;18:3,20;
34:21;36:13;37:25

**respective (1)**
15:25

**respects (1)**
13:8

**respond (5)**
5:22;13:7;18:18;
22:22;37:12

**response (5)**
13:11,14,19;15:20;
38:10

**rest (1)**
16:12

**restricts (1)**
38:20

**result (1)**
34:13

**review (1)**
33:18

**reviewed (1)**
33:8

**revolved (1)**
6:9

**RFC (5)**
19:16;20:3;21:11;
25:15,17

**rifle (1)**
25:20

**right (16)**
5:2;9:22;18:12;
20:12;21:3,7,19;
22:10;23:13;26:1,2;
32:15,17;33:8;34:8;
38:5

**rights (8)**
13:20;15:25;16:20;
17:24;18:9,20;37:3,4

**RMBS (1)**
8:8

**role (1)**
38:22

**round (5)**
5:23,23;18:13;
26:6;33:18

**Rule (1)**
34:9

**rules (4)**
9:7;8;16:16;30:5

**run (1)**
9:2

**running (1)**
    12:18
**runs (1)**
    12:20

## S

**same (6)**
    9:1;12:19;25:16;
    26:17;34:14;36:4
**satisfy (1)**
    34:9
**saying (6)**
    11:18;13:6,17;
    15:3;16:2;20:9
**schedule (4)**
    7:1;34:24;35:13;
    37:1
**scheduled (3)**
    5:15;19:17;30:1
**scheduling (3)**
    7:12;22:16;34:24
**scope (3)**
    7:12;34:14;38:1
**se (1)**
    23:21
**seat (1)**
    12:13
**seated (1)**
    5:2
**second (6)**
    5:23;6:5;8:7;
    10:14;18:25;28:20
**secured (16)**
    7:7,14,17;8:11;9:6,
    16;10:4,9;23:16,25;
    24:5,8;33:23;35:5;
    37:23;38:18
**securities (1)**
    8:9
**security (1)**
    19:25
**seeing (1)**
    5:12
**seek (4)**
    6:25;8:3,7;15:22
**seeking (1)**
    13:12
**seems (1)**
    17:3
**sense (1)**
    12:11
**sensitivity (1)**
    13:23
**sent (1)**
    11:4
**separate (1)**
    30:14
**set (9)**
    7:1;9:7,8;11:3;
    13:10;14:14;22:20;
    34:23;35:13
**sets (1)**

23:6
**setting (1)**
    11:5
**settle (4)**
    19:3,4;20:17;25:24
**settled (9)**
    8:6;12:19;20:23,
    24;21:2,22,23,24;
    34:13
**settlement (33)**
    7:21;8:12,15;
    10:15,16,16;11:19,
    20;12:4,6,7,16;13:24;
    14:3;15:12,13,24;
    17:22,23;18:2,23;
    19:1;21:6;22:11,12;
    23:18,19;29:1;30:15;
    31:2;34:1,8,12
**settlements (6)**
    10:11;12:24,25;
    22:7;29:12;34:10
**settles (1)**
    8:16
**settling (1)**
    12:16
**several (2)**
    8:7;30:2
**shadowbox (1)**
    31:16
**shaky (1)**
    24:3
**sheet (1)**
    34:1
**sheets (3)**
    14:11,14;34:9
**shift (1)**
    11:16
**SHORE (46)**
    4:8;10:25;11:1,1;
    12:8;13:2,5;14:20,
    23;15:1,3;16:5;
    18:18;19:15,22,25;
    20:2,12,14,15,16;
    21:1,4,7,10,19,22;
    22:1,2,3,13,20;23:4,
    9,11,12;24:16,25;
    33:1,2,7,9,11;35:25;
    37:5,16
**Shore's (2)**
    26:8;38:17
**short (2)**
    5:12;28:16
**shortened (1)**
    37:2
**shot (1)**
    25:20
**Show (1)**
    24:13
**side (1)**
    7:18
**sides (1)**
    28:9
**side's (1)**

33:14
**sideshow (1)**
    36:21
**signed (2)**
    14:12;37:18
**simply (2)**
    28:5;36:6
**single-spaced (1)**
    36:19
**sit (1)**
    36:11
**sitting (2)**
    21:15;38:14
**six- (1)**
    36:18
**sleep (1)**
    37:3
**slowed (1)**
    36:18
**smokescreen (1)**
    36:21
**sniping (1)**
    37:20
**so-called (1)**
    38:7
**solely (1)**
    37:14
**solvent (3)**
    19:12;24:19,20
**Somebody (1)**
    7:18
**somehow (1)**
    31:22
**soon (1)**
    37:24
**sorry (2)**
    6:21;19:23
**sorts (1)**
    7:4
**sought (2)**
    7:20;9:4
**sound (1)**
    14:18
**soundly (1)**
    18:24
**sounds (1)**
    15:9
**South (1)**
    4:13
**southern (1)**
    7:9
**spare (1)**
    28:12
**speak (2)**
    7:16;38:6
**specific (3)**
    33:5,22;35:5
**Specifically (4)**
    17:6;19:21;23:22;
    24:14
**spend (1)**
    16:3
**split (1)**

8:18
**stage (1)**
    14:9
**standard (2)**
    28:21,21
**standards (3)**
    12:5;34:10,11
**stands (1)**
    15:21
**started (1)**
    11:18
**state (1)**
    11:3
**stated (1)**
    33:20
**statement (11)**
    6:14;11:23;15:6;
    16:4;22:24;30:21;
    35:3,8,25;36:6,12
**statements (1)**
    13:21
**status (2)**
    6:2,24
**still (2)**
    15:19;18:24
**stipulated (1)**
    20:4
**stop (1)**
    37:20
**structure (1)**
    6:15
**subject (1)**
    20:8
**submit (3)**
    35:9,12;36:3
**submitted (1)**
    38:8
**submitting (1)**
    36:5
**subordinate (1)**
    8:7
**subs (1)**
    30:23
**subsidiaries (1)**
    24:18
**substance (1)**
    38:4
**substantial (2)**
    19:10,11
**substantively (1)**
    18:9
**suggest (2)**
    14:15;32:4
**suggested (1)**
    7:3
**suggesting (1)**
    14:7
**suggestion (2)**
    31:19,22
**suggestions (1)**
    31:17
**supplemental (3)**
    13:11,14,18

**support (11)**
    6:10,14,16;7:21;
    9:1,15;10:13;14:13;
    22:11;31:25;32:1
**supportable (1)**
    15:24
**supported (1)**
    16:18
**supposed (1)**
    34:2
**Sure (1)**
    15:1,9;29:22
**surprise (2)**
    15:17;24:7

## T

**table (1)**
    26:15
**tack (1)**
    9:18
**talk (1)**
    25:19
**telephone (2)**
    5:17,18
**telephonic (1)**
    5:14
**TELEPHONICALLY (1)**
    4:17
**telling (3)**
    23:2;26:3,4
**ten (4)**
    8:1,3,17;20:7
**term (5)**
    14:11,13,14;34:1,9
**that'll (4)**
    17:15;32:12,14;
    34:18
**theory (1)**
    30:6
**there'd (1)**
    28:8
**there're (1)**
    35:1
**third (2)**
    5:23;6:8
**THOMAS (1)**
    4:17
**though (2)**
    20:18;21:22
**thought (1)**
    12:8
**three (5)**
    5:25;6:6,11;25:22;
    26:21
**throughout (1)**
    6:15
**throws (1)**
    12:10
**tie (1)**
    29:4
**tied (1)**
    27:12

**today (5)**
6:13;11:11;12:25;
15:7;39:3
**today's (2)**
13:4,5
**told (2)**
10:3;29:2
**TOLLES (1)**
4:11
**tone (1)**
36:16
**top (1)**
21:15
**totally (2)**
8:17;9:13
**trade (1)**
38:20
**transactions (1)**
9:21
**transcript (4)**
22:6,16,18;33:21
**trial (26)**
16:25,25;17:10;
21:9;25:19,24;26:2,
12,12,14;27:4,5;28:3;
30:14,19;33:16,22,
23;34:6;35:4,4,9,16,
22;36:2;39:5
**tried (4)**
17:4,15;30:1;34:15
**trouble (2)**
35:18,20
**troubling (1)**
36:17
**truck (2)**
28:24;29:1
**true (1)**
16:19
**trustee (2)**
8:8;23:15
**trustee's (1)**
8:13
**try (5)**
28:18;34:12;35:23,
25;36:8
**trying (3)**
18:24,25;25:11
**Tuesday (1)**
5:15
**twelve (1)**
22:25
**two (14)**
5:4;8:18;10:7;
13:7;14:10,14;19:16;
20:7;21:7,10;25:15;
31:15;33:16;35:1

## U

**ultimately (2)**
26:11;30:17
**UMB (2)**
23:15;24:6

**Um-hum (1)**
13:2
**under (4)**
10:11;11:6;12:4;
16:16
**undersecured (6)**
23:25;24:1;25:8,
10;26:19;28:7
**understands (1)**
24:1
**understood (5)**
19:7;23:17;24:15;
29:21;31:20
**unfair (1)**
9:13
**unilateral (1)**
14:16
**unilaterally (2)**
14:8,18
**unique (1)**
26:16
**unless (2)**
11:13;17:25
**Unsecured (2)**
4:3;32:2
**unsuccessful (1)**
7:7
**up (5)**
6:7;12:10;13:13;
15:21;32:23
**upon (3)**
11:25;15:14;30:6
**usual (1)**
37:21
**Uzzi (1)**
8:21

## V

**vacuum (2)**
28:5;30:9
**value (14)**
8:4;11:21;12:5;
13:13,18;19:12,18;
20:3,6,19;21:24;24:1,
21;29:1
**valued (1)**
25:14
**valuing (1)**
17:6
**variety (1)**
25:10
**various (3)**
19:8,22,23
**vested (1)**
9:11
**view (5)**
10:20;15:8;16:12;
30:17;33:14
**views (6)**
12:9;13:1,3;30:16;
36:13;38:9
**virtually (1)**

21:12
**VITRA (1)**
38:8

## W

**waive (3)**
11:25;13:12;21:14
**waiver (1)**
15:23
**waivers (1)**
30:24
**WALPER (5)**
4:17;5:18;32:22,
23,24
**wants (1)**
11:14
**way (7)**
14:22;26:24;27:4;
29:7,21;30:17;31:10
**week (2)**
7:16,16
**weekend (2)**
16:4;36:10
**what's (2)**
23:9;36:3
**Whereupon (1)**
39:8
**WHITE (2)**
4:2;11:1
**whole (4)**
25:10;36:9,23;37:8
**wholeheartedly (1)**
30:8
**who's (1)**
21:15
**who've (2)**
14:12;37:18
**willing (1)**
38:22
**win (1)**
25:14
**window (1)**
10:12
**wish (1)**
29:16
**within (2)**
17:2;39:6
**without (3)**
15:16;20:24;21:4
**word (2)**
26:7,8
**work (2)**
13:17;18:24
**works (2)**
12:13;15:12
**worth (1)**
20:18
**writing (1)**
6:5

## Y

**York (2)**
4:6;7:9

## Z

**zero (10)**
12:6,17,19;17:7;
19:5;20:17;21:23,24;
25:14,24

## 0

**01277 (1)**
5:5

## 1

**10:51 (1)**
39:8
**10036 (1)**
4:6
**1155 (1)**
4:5
**12-12020 (1)**
5:3
**13- (1)**
5:4
**13-01343 (1)**
5:4

## 2

**2.6 (2)**
12:18;19:19
**200 (3)**
20:8,18,20
**247 (1)**
7:25
**26 (1)**
33:10
**26th (1)**
33:9
**2nd (1)**
33:9

## 3

**35 (1)**
12:19
**355 (1)**
4:13
**35th (1)**
4:14

## 4

**4th (1)**
36:9

## 5

**5 (3)**
5:19;23:22,24

**596 (1)**
8:17

## 9

**90071 (1)**
4:15
**9019 (14)**
8:15;10:11;12:4;
17:2,20,22;21:5,16;
28:13,18,19;34:9,11,
14
**9th (1)**
38:25