**Hearing Date: July 30, 2013 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: July 26, 2013 at 12:00 p.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Gregory A. Horowitz
Jeffrey S. Trachtman
David E. Blabey Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for the Official Committee
of Unsecured Creditors*

PACHULSKI STANG ZIEHL & JONES LLP
Robert J. Feinstein
John A. Morris
Jason H. Rosell
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:    (212) 561-7700
Facsimile:    (212) 561-7777
*Co-Counsel to the
Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

-------------------------------------------------------- x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO AD HOC**
**<u>GROUP OF JUNIOR SECURED NOTEHOLDERS' DISQUALIFICATION MOTION</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 4

    A.    The Ad Hoc Group and the Original Plan Term Sheet ........................................... 4

    B.    Events Leading to Proposal of the Current Plan ..................................................... 5

    C.    The Chapter 11 Plan ............................................................................................... 7

    D.    The JSNs' Disqualification Motion ........................................................................ 9

OBJECTION ........................................................................................................................ 10

    A.    The Motion Should be Rejected As Untimely and Tactically Motivated ............. 10

    B.    The Motion is Foreclosed by the PSA Order ....................................................... 13

    C.    The Motion Should be Denied Because There is No Conflict as All Debtors
           Support the Settlement .......................................................................................... 14

    D.    In Any Event, the Allegations of Conflict Are Completely Meritless ................. 15

         i.    The Debtors are Not Conflicted .............................................................. 15

        ii.    The Committee is Not Conflicted ........................................................... 20

CONCLUSION ..................................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*,
  210 B.R. 508 (Bankr. S.D.N.Y. 1997) ................................................................21

*In re Adelphia Commc'ns Corp.*,
  336 B.R. 610 (Bankr. S.D.N.Y. 2006) ....................................................... *Passim*

*In re Adelphia Commc'ns Corp.*,
  342 B.R. 122 (S.D.N.Y. 2006) ............................................................................15

*In re Adelphia Commc'ns Corp.*,
  441 B.R. 6 (Bankr. S.D.N.Y. 2010) ....................................................................13

*In re Barney's, Inc.*,
  197 B.R. 431 (Bankr. S.D.N.Y. 1996) ................................................................20

*In re Bradlees Stores, Inc.*,
  209 B.R. 36 (Bankr. S.D.N.Y. 1997) ............................................................ 11-12

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 717 (Bankr. S.D.N.Y. 1992) ................................................................21

*In re Enron Corp.*,
  279 B.R. 671 (Bankr. S.D.N.Y. 2002) ................................................................21

*In re Global Marine, Inc.*,
  108 B.R. 998 (Bankr. S.D. Tex. 1987) ................................................................18

*In re Guy Apple Masonry Contractor, Inc.*,
  45 B.R. 160 (Bankr. D. Ariz. 1984) ....................................................................18

*Hassett v. McColley (In re O.P.M. Leasing Servs., Inc.)*,
  16 B.R. 932 (Bankr. S.D.N.Y. 1982) .............................................................11, 18

*In re JMK Constr. Grp. Ltd.*,
  441 B.R. 222 (Bankr. S.D.N.Y. 2010) ........................................................... 18-19

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Op., LLC (In re Charter Commc'ns)*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ........................................................... 16-17

*Katz v. Kilsheimer*,
  327 F.2d 633 (2d Cir. 1964) ................................................................................18

*In re Levy*,
    54 B.R. 805 (Bankr. S.D.N.Y. 1985) .................................................................................10, 21

*Mirant Americas Energy Marketing, L.P. v. Off. Comm. of Unsecured Creds. of Enron Corp.*,
    No. 02-cv-6274, 2003 WL 22327118 (S.D.N.Y. Oct. 10, 2003) .............................................21

*In re Residential Capital, LLC*,
    Case No. 12-12020 (Bankr. S.D.N.Y.) .....................................................................6, 9, 13, 20

*In re WorldCom, Inc.*,
    Case No. 02-13533 (Bankr. S.D.N.Y. May 28, 2003) ............................................................11

**STATUTES**

11 U.S.C. § 1103(c) ....................................................................................................................22

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of Residential

Capital LLC ("ResCap") and its affiliated debtors and debtors-in-possession (collectively, the

"Debtors") hereby files this objection to the motion (the "Motion" or the "Disqualification

Motion") filed by the ad hoc group (the "Ad Hoc Group" or the "JSNs") of holders of those

certain 9.625% Junior Secured Notes due 2015 (the "Notes") seeking, among other things, the

limited disqualification of counsel to the Committee and the Debtors.

## PRELIMINARY STATEMENT

The Disqualification Motion seeks to impose a destructive remedy for a non-

existent problem.  The Plan now on file nearly triples AFI's prior-negotiated contribution to the

estates, permitting significant increases in the previously anticipated recoveries for all creditors,

including the JSNs.  The Plan is the result of an intense, five-month Mediation involving the

Committee, the Debtors (led by their CRO), and the Consenting Claimants under the guidance of

Judge Peck.  Although the JSNs chose not to participate in the Mediation, their treatment under

the resulting Plan is favorable: they would receive a 100% recovery in cash on their allowed

prepetition claims, plus the opportunity to receive postpetition interest if found to be

oversecured.  The Court has established a pre-confirmation litigation track that, together with the

confirmation hearing, fully protects the JSNs' rights to litigate every issue affecting them.

The JSNs' dissatisfaction with their treatment is ironic given that just over a year

ago, an ad hoc group of the noteholders and their legal and financial professionals signed off on a

plan support agreement based on a much smaller $750 million settlement with AFI that did *not*

assure them of full recovery of the principal amount of their claims.  To obtain this result, the

group supported an expedited plan and asset sale timeline that would have yielded unsecured

creditors a *de minimis* recovery, waived postpetition interest, and disallowed intercompany claims in the event the JSNs received full payment of their prepetition claim. Needless to say, the JSNs at the time expressed no concerns about the Debtors' professionals or management negotiating or prosecuting a plan on behalf of all estates.

Despite their significantly improved treatment under the current Plan, the JSNs have now filed a motion that is nothing less than reckless. The relief sought would render prosecution of the Plan impossible, cause milestones to be missed, and likely disrupt the unprecedented settlement with AFI and the Consenting Claimants that made possible a largely consensual plan with substantially increased payments to all creditors, including full recovery for the JSNs. With the current professionals disabled and a platoon of new ones dispatched to represent each of the 51 Debtors (and, presumably, separate creditors' committees for each Debtor), these cases would be plunged into hopeless warfare over numerous intercreditor and interdebtor issues, all of which will be settled in connection with the Plan. For example, the parties would have to revisit billions of dollars of prepetition debt forgiveness and other intercompany transactions that could not be resolved without risking the estates becoming administratively insolvent – much as the JSNs predicted in the days before announcement of the global deal. Substantive consolidation would become a real possibility, in which case intercompany claims would be eliminated, the JSNs' guarantees would be extinguished, and the JSNs would receive far *less* than the principal amount of their claims.

The JSNs know all this, yet free of the fiduciary duties they purport to prize in others, they filed the Motion anyway, to threaten the estates with a doomsday scenario and attempt to extract postpetition interest without having to prove their entitlement thereto. It should be denied for several independent reasons.

- 2 -

- First, the Motion should be denied as untimely and transparently tactical. The JSNs have known for months that the Debtors and the Committee were acting globally for their respective constituencies in negotiating a potential resolution of all of the interdebtor and intercreditor issues that have burdened these estates since the petition date. They stood by through the appointment of a mediator and a CRO and never pursued a claim that the Debtors were conflicted. It is simply too late – and reflects a lack of good faith – for the JSNs to allege false conflicts at this advanced stage.

- Second, while the JSNs will have a full opportunity to litigate their substantive objections to the Plan, they cannot now object to the Debtors and the Committee *prosecuting* the Plan in light of the Court's findings, in approving the Plan Support Agreement (the "PSA"), that the Debtors and the Committee acted in good faith in entering into the PSA and that they should be authorized to file and prosecute the Plan.

- Third, the Motion ignores that there is no present conflict among the Debtors because – following extensive input from creditor constituencies and the leadership of the CRO – all of the Debtors support the settlement and Plan. Any argument that the settlement *process* was tainted by conflicts, to the extent not foreclosed by the PSA order, constitutes a confirmation objection, not a ground for disqualification going forward.

- In any event, the underlying conflict allegations are entirely phony. The settlement was not unilaterally imposed by the Debtors or the Committee but hammered out through intense negotiations among numerous real parties in interest under the supervision of Judge Peck. The Debtors and the Committee reasonably concluded, with the concurrence of all the parties to the mediation, that the intercompany claims suffered significant infirmities, were vulnerable to substantial defenses and setoffs, and would be hugely burdensome and impractical to litigate. Those claims were not simply waived, but resolved as part of a comprehensive settlement that compensated the JSNs for any value conceivably lost by offering them payment in full in cash on the effective date. This is better than any result they could hope to obtain if they litigated their alleged right to enforce liens against intercompany claim proceeds rather than accepting the AFI settlement.

- Finally, the JSNs do not coherently allege *any* conflict on the part of the Committee, which did not settle the claims or purport to act on behalf of any Debtors, but is merely advocating for a settlement overwhelmingly supported by every major unsecured creditor constituency.

- 3 -

In short, the JSNs neither identify an actual problem nor prescribe a workable solution, and they do not articulate a rational path for this case after they blow up the current settlement.  The Motion should be denied.

## BACKGROUND

### A.    The Ad Hoc Group and the Original Plan Term Sheet

1.      The members of the Ad Hoc Group, according to the group's most recently filed Rule 2019 Statement [Dkt. No. 3770], are holders of approximately $1.05 billion in Notes.  The Notes were issued by ResCap and are guaranteed by certain other Debtors, including Residential Funding Company LLC ("RFC") and GMAC Mortgage LLC ("GMACM").  The Notes are secured, though the extent of the liens securing the Notes (among other issues) is currently the subject of litigation among the Debtors, the Committee, and the Ad Hoc Group. *See generally* Adv. Case Nos. 13-01343, 13-01277.

2.      Prior to the commencement of these chapter 11 cases, certain holders of the Notes, represented by the same legal and financial advisors to the Ad Hoc Group as currently constituted, entered into a plan support agreement (the "JSN PSA") with the Debtors and their corporate parent, Ally Financial Inc. ("AFI").[1]  Eight of the original twelve members of the Ad Hoc Group remain with the group, which has also added seven new members (for a total of fifteen) since the group's initial Rule 2019 Statement was filed.  *Compare* Rule 2019 Statement dated 6/14/2012 [Dkt. No. 378] *with* Rule 2019 Statement dated 5/17/2013 [Dkt. No. 3770].[2]

---

[1] The JSN PSA is attached as Exhibit 9 to the first-day affidavit of James Whitlinger (the "Whitlinger Affidavit") [Dkt. No. 6].

[2] The group's holdings have increased slightly, from $918.8 million to $1.05 billion.  *Id.*

- 4 -

3.     The JSN PSA contained several key elements.   First, the consenting

holders of the Notes (the "Consenting Holders") agreed to waive postpetition interest through

December 31, 2012.  JSN PSA § 5.4(a).  Second, the Consenting Holders agreed to a plan term

sheet (the "Original Plan Term Sheet") under which intercompany claims against the

consolidated "RFC Debtors" would be disallowed entirely and intercompany claims against the

consolidated "ResCap Debtors" and "GMACM Debtors" would be disallowed if the Notes were

otherwise paid.  *See* Original Plan Term Sheet at 7, 10, 12.[3]  Third, the JSN PSA imposed

aggressive milestones contemplating the filing of a plan and disclosure statement a month into

the case, approval of a disclosure statement and solicitation procedures within three months, and

confirmation of a plan or approval of proposed asset sales by year end.  *See* Exhibit B to JSN

PSA (listing milestones).   Finally, the plan the Consenting Holders agreed to support was

premised on an AFI contribution of $750 million, to be allocated in the Debtors' sole discretion

in a manner consistent with the various plan support agreements.  Original Plan Term Sheet at 4.

### B.     Events Leading to Proposal of the Current Plan

4.     As the Court is well aware, following the Petition Date, the Committee

initiated extensive investigations of a variety of issues, including potential claims against AFI

and the merits of the Debtors' proposed settlement with certain institutional investors in the

Debtors' RMBS Trusts.  In addition, at the request of Berkshire Hathaway, Inc., a major holder

of the Notes, an Examiner was appointed to investigate prepetition transactions among the

Debtors and AFI.  *See* Dkt. No. 536.  As a result of these investigations, the Committee

concluded that the proposed $750 million contribution from AFI was woefully inadequate.  The

Committee further determined to object to the RMBS Trust Settlement, concluding, among other

---

[3] The Original Plan Term Sheet is included in Exhibit 8 to the Whitlinger Affidavit.

things, that issues concerning the size and allocation of the Trusts' claims were more appropriately resolved in the context of a global settlement and plan.

5.      As the case progressed and the full extent of the intercreditor disputes became more apparent, the Debtors' initial hopes of confirming a plan by the end of 2012 became increasingly unrealistic and the Debtors were forced to seek several extensions of exclusivity.  The Court noted at a December hearing that the cases threatened to devolve into "nuclear war."  Transcript of Hearing at 45:3, *In re Residential Capital, LLC*, Case No. 12-12020 (Bankr. S.D.N.Y. Dec. 20, 2012).  To avert this crisis and foster development of a consensual chapter 11 plan, the Court appointed the Honorable James M. Peck as Mediator in December 2012 and Lewis Kruger as CRO in March 2013.  *See* Dkt. Nos. 2519 & 3103.

6.      Following Judge Peck's appointment, all of the major constituencies in these cases – with the exception of the JSNs – engaged in extensive negotiations concerning the development of a consensual chapter 11 plan.[4]  Spanning nearly five months, the negotiations consisted of near-daily calls among the parties and between individual parties and Judge Peck, as well as dozens of in-person meetings at the offices of Morrison & Foerster and Kramer Levin involving all parties and the Debtors' CRO.  The JSNs elected not to participate.

7.      On May 13, 2013, the parties to the Mediation announced that they had agreed on the terms of a global settlement pursuant to which AFI would increase its contribution to the Debtors' estates by $1.35 billion, to $2.1 billion.  The agreement was memorialized in a Plan Support Agreement, a Plan Term Sheet, and a Supplemental Term Sheet, which were presented to the Court for approval by motion dated May 23, 2013.  The parties to the agreement

---

[4] The negotiations are described in the Declaration of Lewis Kruger submitted in connection with the Debtors' motion to approve their entry into the PSA.  *See* Dkt. No. 3814-3.

included AFI, the Debtors, the Committee, and certain Consenting Claimants representing every major constituency in these cases other than the JSNs.  The Court entered an order approving the Debtors' entry into the Plan Support Agreement on June 26, 2013 [Dkt. No. 4098], and the Debtors and the Committee, as co-proponents, filed their Joint Chapter 11 Plan (the "<u>Plan</u>") and accompanying proposed disclosure statement (the "<u>Disclosure Statement</u>") on July 3, 2013.  *See* Dkt. Nos. 4153 & 4157.

> C.    **<u>The Chapter 11 Plan</u>**

8.    The Plan resolves, on a consensual basis, nearly all of the major intercreditor disputes that have plagued these cases and provides for greatly enhanced distributions to creditors in comparison to the plan contemplated by the Original Plan Term Sheet that the JSNs had supported at the outset of these cases.  The Plan calls for dramatically improved treatment for the JSNs over their prepetition deal: payment, in cash, of the full principal amount of the JSNs' claims (including accrued prepetition interest).  To the extent the JSNs establish entitlement to postpetition interest, the Plan calls for it to be paid as well.

9.    Like the plan contemplated by the Original Plan Term Sheet, the Plan calls for the partial consolidation of the Debtors into three Debtor groups: the ResCap Debtors, the GMACM Debtors, and the RFC Debtors.  As explained in the Disclosure Statement:

> The majority of the assets of the Debtors' Estates reside at ResCap, GMACM, and RFC, with the Debtor subsidiaries within each Debtor Group having little to no assets available for distribution to Creditors.  In addition, the majority of Claims asserted against the Debtors are asserted against ResCap, GMACM, and RFC, with, in limited circumstances, de minimis Claims asserted against the other Debtor subsidiaries within a Debtor Group.  Accordingly, based upon the Plan Proponents' analysis, no creditors are harmed by the proposed limited consolidation of the Debtors into the Debtor Groups for distribution purposes under the Plan.

Disclosure Statement at 34.

- 7 -

10.     As part of the global settlement under the Plan, intercompany claims are waived but any value thereby allegedly lost by the JSNs is more than compensated for through their Plan treatment.   As set forth in the Disclosure Statement, the Debtors conducted an extensive analysis of intercompany balances, considering such issues as subordination, set-off, recharacterization, substantive consolidation, and fraudulent conveyance.   The Committee independently reviewed the Debtors' analyses and supporting materials and performed additional due diligence – confirming the Debtors' conclusion that the intercompany balances were of questionable enforceability and that avoiding massive litigation costs through settlement was in the best interest of the Debtors' estates and creditors.  *See* Disclosure Statement at 34-36.  This outcome was endorsed by all major unsecured creditor constituencies (with differing interests in the treatment of intercompany claims and other interdebtor disputes) and does not harm the JSNs, because the Plan provides them with full recovery, in cash, of all prepetition claims – a better result than they could get even by succeeding in enforcing all prepetition intercompany claims.

11.     Contrary to the JSNs' assertions (Motion at 4), the Plan does not call for "intercompany claim litigation."   Like most other classes of claims, intercompany claims are settled, not adjudicated, as part of the global settlement.  If the Plan is not confirmed, it will have no impact on the treatment of the claims, and the JSNs will be free to propose the appropriate parties and methods for adjudicating them.  The Plan contains standard disclaimers preserving all parties' rights in connection with the claims.  *See, e.g.*, Plan §§ X.D, XI.C.[5]

---

[5] Indeed, the Plan, in this regard, mirrors an approach the JSNs describe as appropriate in their Motion:  one in which "debtors have proposed a resolution in a plan of reorganization, attempted to describe the dispute neutrally and openly in a disclosure statement, and left it to affected creditors alone to ratify a plan settlement of inter-debtor disputes."  Motion at 4-5.  The JSNs' assertion that this avenue has not been employed here is mystifying.

D.    **The JSNs' Disqualification Motion**

12.    On June 26, 2013, the day that the Court approved the Debtors' entry into the Plan Support Agreement, counsel to the Ad Hoc Group sent a letter to Debtors' counsel asserting the existence of certain alleged "inter-Debtor conflicts of interest." Thereafter, at the Debtors' request, the Court convened a hearing to address the issues raised in the June 26 letter. At the hearing the Court advised counsel to the Ad Hoc Group that it would not allow the issue of conflicts to "fester" in the case, urging the JSNs, if they believed relief was necessary, to "go ahead and make your motion, and do it quickly." Transcript of Hearing at 37:3-11, *In re Residential Capital, LLC*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Jul. 3, 2013). The JSNs subsequently filed the Motion on July 18, 2013.

13.    While the Motion came over a year into these chapter 11 cases – and only after the global settlement was announced – the facts underlying the allegations in the Motion have been known by the JSNs for some time. Among other things:

- On September 24, 2012, the Committee filed its motion seeking authority to prosecute certain claims against the JSNs, in which it noted that the Debtors' valuation of the JSNs' collateral "does not include any value on account of the Debtors' intercompany claims" and that according to the Debtors "the intercompany claims are subject to recharacterization and will not be a source of recovery for the Junior Secured Noteholders." Dkt. No. 1546, n.5.

- On December 6, 2012, the Debtors filed their motion seeking appointment of the Mediator, in which they noted their intent to engage in plan negotiations with all key stakeholders concerning, among other things, "intercreditor and interdebtor issues" including "the treatment of intercompany claims under a plan" and "the allocation of proceeds from the sale of the Debtors' assets," as well as "the allocation of administrative claims among the Debtor entities." Dkt. No. 2357 ¶¶ 4-6, 22.

- On February 11, 2013, the Debtors filed their motion seeking appointment of the CRO, in which they noted that the CRO would "work with creditors to resolve interdebtor and intercreditor disputes, including the allocation of assets among the Debtors." Dkt. No. 2887 ¶ 3.

- 9 -

The JSNs have thus been aware for *months* of the Debtors' and Committee's intent to negotiate a resolution of intercompany claims, and their preliminary views on such issues, but never pursued a conflict claim before now.

## **OBJECTION**

**A.**     **The Motion Should be Rejected As Untimely and Tactically Motivated**

14.     As noted above, rather than acting promptly to address any purported conflict concerns, the JSNs waited to bring their Disqualification Motion until after the Debtors, the Committee, AFI, and the Consenting Claimants representing nearly all major constituencies in these cases had spent five months negotiating and agreeing upon the terms of a consensual chapter 11 plan – all through a Court-supervised Mediation overseen by a sitting United States Bankruptcy Judge.  It is apparent that the belated Motion was motivated not by any legitimate concerns over potential conflicts of interest, but by a desire to create maximum disruption, and gain maximum leverage, in these cases.

15.     The Court should not, and need not, tolerate such behavior.  As an initial matter, "[m]otions for the disqualification of attorneys are not generally viewed with favor by the courts because 'disqualification has an immediate adverse effect on the client by separating him from counsel of his choice [and because such] motions are often interposed for tactical reasons.'" *In re Levy*, 54 B.R. 805, 806 (Bankr. S.D.N.Y. 1985) (quoting *Bd. of Educ. of the City of N.Y. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).  *See also In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 678 (Bankr. S.D.N.Y. 2006) ("Motions that would bring on intolerable consequences for an estate should not be used as a tactic to augment a particular constituency's recovery.").

16.     In keeping with this principle, courts have not hesitated to deny motions of this sort, brought after undue and prejudicial delay and with the transparent goal of seeking a

litigation advantage.  Judge Gonzalez's decision in *WorldCom* is instructive.  *In re WorldCom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y. May 28, 2003).  There, following proposal of a chapter 11 plan, creditors of MCI Communications Corp., an affiliate of WorldCom, sought the appointment of a separate creditors' committee, arguing that issues concerning substantive consolidation and intercompany claims precluded the existing committee, which was supposedly controlled by creditors of other debtors, from representing the interests of holders of claims against MCI.  Judge Gonzalez denied the motion in a lengthy bench decision on the ground, among others, that "the movants did not file their motion for a separate committee until after the plan negotiation process had concluded and the parties had reached consensus on the issue of substantive consolidation."  Transcript of Hearing at 144:3-7, *In re WorldCom, Inc.* (Bankr. S.D.N.Y. May 28, 2003) (transcript and related order attached as **Exhibits A** and **B** hereto); *see also id.* at 151-53 (expanding on lack of timeliness).

17.    In *O.P.M. Leasing*, Judge Lifland denied as untimely and tactically motivated a motion seeking to preclude, in part because of the existence of an intercompany claim, the same individual from serving as chapter 11 trustee for both a subsidiary and its corporate parent.  *See Hassett v. McColley (In re O.P.M. Leasing Servs., Inc.)*, 16 B.R. 932, 937-38 (Bankr. S.D.N.Y. 1982).  The court noted that "the U.S. Trustee's Report of Selection for Appointment as Trustee, the application of Hassett and the affidavit of his counsel were more than sufficient to put interested parties on notice of apparent or potential conflicts of interest," and that the "inference is inescapable that the motions have a tactical intendment and insipid regard for the genuineness of the conflict issue"[6]

---

[6] Similarly, in *Bradlees Stores*, Judge Lifland denied a motion for the appointment of an examiner to investigate intercompany claims where the debtors' professionals had already conducted an investigation of such claims and had concluded, in a lengthy report, that such claims might be subject to equitable subordination or

18.    Here, as in each of these cases, the Court should reject the JSNs' rope-a-dope tactic of hanging back and surfacing with a belated disqualification motion tactically timed for maximum disruptive effect. *Adelphia*, the case on which the JSNs most heavily rely, showcases strikingly similar scorched earth litigation tactics.  In *Adelphia*, the parties and the court agreed that the debtors should remain neutral because the central issues in the bankruptcy were the division of asset sale proceeds among separate operating debtors and intercompany accounting issues that had fostered actual litigation from the outset of the case.  *See, e.g.*, 336 B.R. at 625 (noting "sharp dispute" among creditors of different debtors over early task of restating financial statements and finding debtors "approached the task with neutrality").  Accordingly, when disqualification of counsel was sought, the court recognized that "mandatory neutrality" would not prejudice creditors, other stakeholders, or the debtors, as the affected creditors were already poised to litigate the relevant issues themselves.  *See id.* at 641.  The court rejected the request for additional relief (*e.g.*, the appointment of independent fiduciaries) that *would* have disrupted the case – criticizing the tactic in the strongest terms.  *See, e.g.*, *id.* at 618.[7]  Even after the case was globally settled and the parties agreed, through a plan, to pay the

---

recharacterization, and the movants had waited until eight months after receipt of the debtors' report to bring their motion.  *See In re Bradlees Stores, Inc.*, 209 B.R. 36, 38-39 (Bankr. S.D.N.Y. 1997) (right to examiner waived where movants had "allowed the entire thirteen-month investigation surrounding the Acquisition to be conducted by the Debtors' professionals, at significant cost to the estates, without seeking the appointment of an independent third party," and it was "simply inappropriate, at this late date, to take issue with the conclusions set forth in the [debtors' report]" when the movants received the report eight months ago").  The court went on to note that it might at some point become necessary to appoint "an objective third party, such as a plan facilitator/mediator" to help resolve issues concerning the intercompany claims, *id.* at 40 – which, notably, is exactly what was done in these cases.

[7] In an admonition eerily applicable here, Judge Gerber recognized "the compelling inference that these motions were filed as part of a scorched earth litigation strategy that would provide the Arahova Debtors with little benefit that they do not already have (trumped, dramatically, by a resulting prejudice to the Arahova Debtors themselves, along with all of the other Debtors), and which would have the effect (and, the Court believes, the purpose) of imperiling the pending Time Warner/Comcast transaction and the Debtors' DIP financing in an effort to extract a greater distribution, sidestepping the Court-approved process for determining the Intercreditor Dispute issues on their respective merits."  336 B.R. at 618-19.

movants' professional fees as an estate expense, the court prohibited reimbursement, denouncing the disqualification motion as the "paradigmatic example of outrageous conduct in this case." *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 20 (Bankr. S.D.N.Y. 2010). The JSNs' similar conduct here warrants denial of the Motion, among other consequences.

### B.    The Motion is Foreclosed by the PSA Order

19.    The relief sought in the Disqualification Motion is also foreclosed by two separate aspects of the Court's order (the "PSA Order") and opinion (the "PSA Opinion") approving the Debtors' motion (the "PSA Motion") for authority to enter into the PSA, which was entered over the objection of UMB Bank, N.A., the indenture trustee for the Notes.

20.    First, in granting the PSA Motion, the Court found that "the relief requested in the Motion is in the best interests of the Debtors' estates" and that "each of the parties to the Agreement . . . have acted reasonably, in good faith, and in the best interests of their respective constituencies in entering into the Agreement." PSA Order at 1-2 [Dkt. No. 4098].[8] These findings were entered over the objection of UMB, which had requested that any findings concerning the Debtors be stricken and that the findings be limited to the RMBS Trustees. *See* Transcript of Hearing at 100-06, *In re Residential Capital, LLC*, Case No. 12-12020 (Bankr. S.D.N.Y. June 26, 2013). The Court having found that the Debtors and the Committee acted in good faith and in the best interests of their respective constituencies in entering into the Plan Support Agreement, the JSNs can hardly argue that the parties breached their fiduciary duties in negotiating the terms of that agreement.

---

[8] *See also* PSA Opinion at 44 [Dkt. No. 4102] ("The findings of fact that each of the parties, including the RMBS Trustees, have acted in good faith and in the best interests of its respective constituencies in entering into the PSA are appropriate now and supported by the record. The PSA resulted from nearly seven months of mediation addressing scores of issues.").

21.    Second, the PSA Order authorized the Debtors to "enter into and perform under the Plan Support Agreement."  PSA Order ¶ 2.  The Plan Support Agreement, in turn, obligates the Debtors and the Committee to pursue confirmation of the Plan, *see generally* Plan Support Agreement § 3, and under the terms of the Plan Term Sheet, the Plan will release intercompany claims.  *See* Supplemental Term Sheet at 2.[9]  The Court's explicit authorization for the Debtors to "enter into and perform under the Plan Support Agreement" precludes the JSNs from now asking the Court to prevent the Debtors from doing precisely that by disabling their lead counsel and CRO.

C.    **The Motion Should be Denied Because There is
No Conflict as All Debtors Support the Settlement**

22.    The Disqualification Motion ignores that the Debtors, the Committee, and the Consenting Claimants representing all major constituencies other than the JSNs have already entered into a comprehensive settlement of all claims, including the intercompany claims, and are aligned in support of the Plan.  This settlement compensates the JSNs for any value they could have realized from the intercompany claims by providing them with payment in full.  As a result of the settlement, there is no *current* conflict among the Debtors that could conceivably require disqualification of counsel.  To the extent the Motion raises any cognizable conflict issues regarding the process *leading to* the settlement that are not otherwise precluded by the Court's approval of the PSA Motion, such issues should be heard, if at all, in the context of the confirmation hearing, along with any substantive Plan objections.

23.    In contrast, *Adelphia* was in an entirely different posture when Judge Gerber ordered the debtors to "tee up the Interdebtor Disputes for Court determination" and "step

---

[9] Copies of the Plan Support Agreement and Supplemental Term Sheet are attached to the PSA Motion [Dkt. No. 3814].

- 14 -

to the side while affected creditors [fight] the issues out."  336 B.R. at 671.  At the time of the

cited decision, the parties in interest were embarked on an elaborate multi-step litigation track to

determine the allocation of asset sale proceeds among separate operating debtors and resolve

hotly contested issues with respect to intercompany claims between the Adelphia parent

company and its subsidiaries.  *See id.* at 633-36.  The global settlement here eliminates any

similar need for recusal, if such a need ever existed in these cases.

### D.    In Any Event, the Allegations of Conflict Are Completely Meritless

24.    Even if the Disqualification Motion were not barred for the reasons

described above, the underlying alleged "conflict" is a fiction.  As the JSNs concede, putative

intercompany claims are a hallmark of sizeable multi-debtor bankruptcies.  *See* Motion at 4;

*Adelphia*, 336 B.R. at 617 ("In multi-debtor cases, individual debtors frequently, if not always,

have actual or arguable obligations to each other…").  Accordingly, courts routinely permit dual

legal representation absent a manifest conflict that threatens to harm the estates or creditors more

than the cost and complication that would be caused by requiring separate counsel.  *See In re*

*Adelphia Commc'ns Corp.*, 342 B.R. 122, 128 (S.D.N.Y. 2006) ("[T]he presence of

intercompany claims between debtors represented by the same counsel does not automatically

warrant the disqualification of that counsel.").  Here, the JSNs fail to identify *any* harm caused

by alleged conflicts, much less harm severe enough to warrant the expense and inconvenience of

requiring separate counsel for up to 51 separate Debtors.

### i.    The Debtors are Not Conflicted

25.    The intercompany claims were settled as part of a global resolution that

protected the rights of all parties.  The treatment of intercompany claims in these cases was, from

the start, secondary to the core issue that *united* all creditor constituencies: obtaining a more

- 15 -

appropriate plan contribution from AFI.  However, the treatment of intercompany claims, among various other interdebtor and intercreditor issues, was recognized as a plan issue from the outset and included as a mediation issue without objection from the JSNs.  The Debtors undertook an analysis demonstrating that the intercompany claims in these cases were subject to serious challenge and that resolving these claims could take years of expensive, self-defeating litigation.  The Committee reviewed and validated these conclusions.   In the ensuing mediation, all participating parties ultimately agreed that avoiding litigation of the intercompany claims through settlement provided substantial benefits for the estates and their respective creditors.  Indeed, the allocation of the AFI Contribution was premised on the understanding that intercompany claims would not be enforced – the settling parties holding claims at each of the different Debtor groups factored that understanding into the allocation of value.  If, instead, the Plan had proposed that intercompany claims would be litigated to conclusion, the allocation of value from the AFI Contribution would likely have been very different.

26.    However, the JSNs were not injured by the agreement to waive intercompany claims.  The settling parties compensated the JSNs for whatever value the claims could have had to them by providing a better recovery than the JSNs would receive if they defeated the AFI settlement and then litigated and won all intercompany claim disputes: payment in full, in cash, of their full prepetition claims.  Obviously, the JSNs cannot have it both ways by accepting the benefit of the increased AFI payment while insisting on litigating claims that were waived as a condition of the settlement and its agreed allocation.

27.    This type of agreement to avoid endless litigation by globally settling intercompany claims is hardly uncommon.  For example, in *Charter*, Judge Peck approved such a plan despite the vocal objections of certain noteholders that argued, as the Ad Hoc Group does

here, that the treatment of intercompany claims, and in particular the debtors' voting of such claims in favor of the plan, violated the debtors' fiduciary duties.  Overruling the noteholders' objections, Judge Peck held that the "decision by the Debtors' board of directors to vote in favor of the Plan without considering each Debtor's individual interests does not suffice to establish an *ultra vires* act," and concluded that the "Debtors' board of directors appropriately evaluated the Plan on a companywide basis rather than a debtor by debtor basis."  *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Op., LLC (In re Charter Commc'ns)*, 419 B.R. 221, 270-271 (Bankr. S.D.N.Y. 2009) (citations omitted).

28.    The lack of any harm flowing from the "conflict" stands in contrast to the severe damage to these cases that would result from the aggressive relief sought through the Motion.  The JSNs cite no case in which a party was permitted to surface at this stage in the process and disarm its adversaries by objecting to a "conflict" that had been common knowledge for months.  *Adelphia* is the only cited example of a large-scale bankruptcy in which comprehensive limits were placed on counsel with respect to intercompany disputes, but that mandate followed from a common recognition that interdebtor claims were the chief drivers of value distribution in the cases, and bondholder groups representing each of the key estates had thus already stepped to the fore to litigate the issues at the time Debtors' counsel was more formally sidelined.  *See* above at ¶ 18.  While conflicts counsel is sometimes appointed to prosecute a single intercompany claim, *see, e.g.*, *In re AbitibiBowater, Inc.*, Debtors' App. ¶¶ 9-10, Case No. 09-11296 (Bankr. D. Del.) (KJC) [Dkt. No. 2302], imposing such a mechanism here, where hundreds if not thousands of individual intercompany claims would have to be litigated, would create precisely the type of litigation meltdown that the parties and the Court have been seeking to avoid.  Indeed, the JSNs themselves recently warned, in connection with

- 17 -

the extension of exclusivity, that absent prompt settlement and confirmation of a plan, the

Debtors would become administratively insolvent before year end.[10]

29.     In all of the other cases the JSNs cite to illustrate their requested relief, *see*

Motion at 17, disqualification of existing counsel was *denied. See O.P.M. Leasing*, 16 B.R. at

941 (denying disqualification of counsel, along with motion to remove trustee); *Katz v.*

*Kilsheimer*, 327 F.2d 633, 636 (2d Cir. 1964) (finding it "not at all clear" special counsel

needed); *In re Global Marine, Inc.*, 108 B.R. 998, 1004 (Bankr. S.D. Tex. 1987) (noting

movant's failure to show "any instance in which the dual representation has caused any injury to

the estate" and denying disqualification); *In re Guy Apple Masonry Contractor, Inc.*, 45 B.R.

160, 166 (Bankr. D. Ariz. 1984) (finding conflicts of interest, but nevertheless denying

disqualification). These cases cut *against* the Disqualification Motion.

30.     Finally, the JSNs' reliance on *In re JMK Constr. Grp. Ltd.*, 441 B.R. 222

(Bankr. S.D.N.Y. 2010), *see* Motion at 13-15, in which the court declined to approve the

appointment of common advisors to multiple debtors with claims against one another, only

highlights the JSNs' failure to raise these issues at retention.   Significantly, the *JMK*

appointments were opposed by the U.S. Trustee and a judgment creditor whose claim was the

"primary motivation" for filing the cases and the very basis of interdebtor liabilities. *Id.* at 226.

While the JSNs disclaim "the wholesale disqualification of section 327(a) counsel," Motion ¶ 14,

they make no effort to explain how conflicts concerns involving 51 Debtors – in contrast to the

*four* debtors involved in *JMK* – could be resolved without appointing a massively burdensome

array of separate professionals.

---

[10] *See* Declaration of Reid Snellenbarger in Support of Ad Hoc Group's Objection to Debtors' Motion for the Entry
of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof,
dated April 29, 2013, at ¶¶ 6-20 [Dkt. No. 3597].

- 18 -

31.    The JSNs largely fail to identify specific Debtors allegedly being disadvantaged by the purported conflicts.  That is not surprising since this is really an inter-creditor dispute – pitting the JSNs, whose interests cut across multiple Debtors, against unsecured constituencies with claims throughout the capital structure.  This stands in contrast to *Adelphia*, in which specific disputes were joined between different operating debtors.

32.    The JSNs identify only a single specific Debtor supposedly injured by the purported conflict:  Homecomings Financial, LLC, which holds a potential claim against RFC. *See* Motion ¶ 25.  But this cherry-picked example is unavailing for several reasons.  *First*, no discrete interdebtor or intercreditor issue should be considered in isolation – and certainly not outside the confirmation process through which such plan issues can be comprehensively assessed.  *Second*, this very claim would have been disallowed under the JSN PSA, as the purported debtor and creditor both sit within the "RFC Group," within which intercompany claims were to be expunged without condition.  *See* above at ¶ 3.  *Third*, the Homecomings claim highlights the risk of substantive consolidation, particularly consolidation within the RFC group, which is avoided by the global settlement and the Plan.  Substantive consolidation would become a real possibility in these cases if the estates and their creditors were forced to fully litigate the panoply of complicated intercompany issues.[11]  By the JSNs' logic, with the global settlement and Plan rejected, a separate fiduciary would have to be appointed to litigate all issues potentially affecting this claim against separate estate fiduciaries for each of the other RFC debtors,

---

[11] Additionally, while beyond the scope of this Motion, the Homecomings claim is vulnerable to substantial challenges in its own right.  Among other things, it is held by a shell entity that has been dormant for years, is not evidenced by a note, has no schedule or history of repayment, and was on a list to be released by the Debtors prior to the petition date.  *See* Disclosure Statement Exh. 5.

multiplying delay and expense and almost guaranteeing administrative insolvency. This cannot be a productive course for any constituency.

### ii.    The Committee is Not Conflicted

33.    The JSNs' arguments in favor of disqualification of the Committee – buried in three short paragraphs at the end of the Disqualification Motion – are completely baseless. As an initial matter, the JSNs, which claim to be fully secured and have disavowed membership in the Committee's constituency, have no standing to complain of alleged conflicts in the Committee's representation of unsecured creditors.[12] Not a single unsecured creditor has objected to the Committee's role in the Mediation or Plan process, and, indeed, most of the Committee's constituencies participated actively in the negotiation and formulation of the Plan.

34.    Even if the JSNs were a proper party to raise conflict concerns, they allege no conflict here. Official committees, as the JSNs themselves have pointed out, represent creditors, not debtors. *See* Transcript of Hearing at 48:6-7 *In re Residential Capital, LLC*, Case No. 12-12020 (Bankr. S.D.N.Y. Mar. 5, 2013) (counsel to JSNs noting that committee members "are not fiduciaries to the estate" but rather "are fiduciaries to the unsecured creditors"); *see also, e.g.*, *In re Barney's, Inc.*, 197 B.R. 431, 442 (Bankr. S.D.N.Y. 1996) ("A creditors' committee and its members owe no duty to the debtor or its estate."). Conflicts among debtors, therefore, are relevant only to the extent they implicate a committee's duties to its constituents, *i.e.*, the unsecured creditors.

35.    Here, the JSNs identify no conflicts affecting unsecured creditors, and there are none. The Committee, representing the unsecured creditor body, has determined that

---

[12] In their statement regarding the appointment of the CRO, the JSNs wrote that the Committee "has limited fiduciary duties that do not run to all stakeholders and certainly do not run to the Junior Secured Notes." Dkt. No. 3087, at 4.

the treatment of intercompany claims in the proposed Plan is reasonable and appropriate.  To properly make that determination, the Committee need not find that the settlement is beneficial to each and every individual creditor – it need only determine that it benefits its constituents as a whole.  *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (committee's fiduciary duty "extends to the class as a whole, not to its individual members").[13]  Thus, even if the JSNs had identified an unsecured creditor who objects to, or would be harmed by, the settlement of intercompany claims proposed in the Plan – and they have not – that would not prevent the Committee from pursuing confirmation of the Plan.

36.    *Enron* is closely on point.  There, Judge Gonzalez denied a motion to appoint a separate creditors' committee consisting of creditors of certain debtor subsidiaries.  *See In re Enron Corp.*, 279 B.R. 671 (Bankr. S.D.N.Y. 2002).  The movants appealed, arguing, as they had below, that the "diametrically opposed" interests of two "classes" of creditors in the case led to an "inherent conflict" and made it impossible for a single committee to represent the interests of both groups "with the loyalty and vigilance required [by the law of fiduciary duties]." *Mirant Americas Energy Marketing, L.P. v. Off. Comm. of Unsecured Creds. of Enron Corp.*, No. 02-cv-6274, 2003 WL 22327118, *4 (S.D.N.Y. Oct. 10, 2003).  Despite movants' assertions that the conflict was more than a "routine squabble" among creditors, *id.*, the district court affirmed, noting that "creditors will necessarily have varying and frequently conflicting interests," and that "conflicts of interest, even among different 'classes', neither implicate the committee's fiduciary duties nor inevitably necessitate additional committees." *Id.* at *6-8.

---

[13] *See also In re Levy*, 54 B.R. 805, 807 (Bankr. S.D.N.Y. 1985) ("Counsel for the creditors' committee do not represent any individual creditor's interest in this case; they were retained to represent the entire unsecured creditor class."); *ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 516 (Bankr. S.D.N.Y. 1997) ("The committee and its members owe a fiduciary duty to the class of creditors that the committee represents (i.e., its constituency). . . . They do not, however, owe a fiduciary duty to any particular creditor . . . or any other party, including the estate.") (citations omitted).

37.     The same principles apply here, and the JSNs cite no authority compelling a different result.  The JSNs cite only to a single footnote in *Adelphia* in which the court noted that it had "expressed the view," in a chambers conference, that the committee in that case should remain neutral on intercreditor disputes.  *See Adelphia*, 336 B.R. at 627 n.18 (cited at ¶ 28 of the Disqualification Motion).  Leaving aside whether such a passing observation could qualify as a holding, the facts in *Adelphia* were starkly different than here, as discussed above at ¶¶ 18, 23.  Moreover, unlike the Committee here, the committee in *Adelphia* was hopelessly split, with committee members holding, and vocally asserting, violently opposing views as to the merits of intercreditor and interdebtor disputes.  *See, e.g.*, *Adelphia*, 336 B.R. at 618 n.4, 631-32 (describing opposing interests)  The opposite is true here, where the membership of the Committee – and, indeed, all major unsecured creditors – are united in supporting the Plan.

38.     The JSNs' remaining contentions regarding the Committee, premised on the mistaken view that the Committee seeks to act "for, or on behalf of" the estates, Disqualification Motion ¶ 27, are likewise misplaced.  The Committee, in seeking confirmation of the Plan and its settlement of intercompany claims, will be advocating solely its own interests and those of its constituents.  It has not sought standing to prosecute or settle the intercompany claims and has no intention to speak for the Debtors in connection with Plan confirmation.[14]  Moreover, contrary to the JSNs' suggestion, *id.*, there is no requirement that the Committee seek Court approval before assessing or taking positions with respect to intercompany claims on behalf of unsecured creditors as a whole.  Such analyses are part of a Committee's core duties under section 1103(c) of the Bankruptcy Code.

---

[14] For this reason, the JSNs' citation (at ¶ 27) to comments made by the Court at the May 7, 2013 hearing in connection with the Committee's motion for standing to bring claims against *AFI* are irrelevant.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court deny the

Disqualification Motion and grant such other relief as the Court deems just and proper.

Dated: New York, New York
      July 26, 2013

                    KRAMER LEVIN NAFTALIS & FRANKEL LLP

                    /s/ Kenneth H. Eckstein
                    Kenneth H. Eckstein
                    Gregory A. Horowitz
                    Jeffrey S. Trachtman
                    David E. Blabey Jr.
                    1177 Avenue of the Americas
                    New York, New York 10036
                    Telephone: (212) 715-9100
                    Facsimile: (212) 715-8000
                    *Counsel for the Official Committee*
                    *of Unsecured Creditors*

                    *- and –*

                    PACHULSKI STANG ZIEHL & JONES LLP
                    Robert J. Feinstein
                    John A. Morris
                    Jason H. Rosell
                    780 Third Avenue, 36th Floor
                    New York, New York 10017
                    Telephone:    (212) 561-7700
                    Facsimile:    (212) 561-7777
                    *Co-Counsel to the*
                    *Official Committee of Unsecured Creditors*

# EXHIBIT A

#6418

1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4

- - - - - - - - - - - - - - - - - - x
5                        In the Matter

6                             of            Case No.
                                            02-B-13533
7              WORLDCOM INC., et al

8                           Debtor.
- - - - - - - - - - - - - - - - - - x
9
                        May 28, 2003
10
                        United States Custom House
11                      One Bowling Green
                        New York, New York 10004
12

13   Motion filed by HSBC Bank USA for an order
     directing the appointment of an Official
14   Committee of Creditors for MCI Communications
     and its subsidiaries.    Joinder of Aerotel Ltd.
15   to above motion.   Objection of the UST filed to
     above motion.   Joinder of Wilmington Trust
16   Company to motion. Objection filed by the
     Debtor's to the above motion.

17

18

19   B E F O R E :
                HON. ARTHUR J. GONZALEZ,
20                        Bankruptcy Judge

21

22

23

24

25

2

1

2

3    A P P E A R A N C E S :

4

5        PRYOR, CASHMAN, SHERMAN & FLYNN, LLP

6            Attorneys for HSBC Bank USA

7            410 Park Avenue

8            New York, New York 10022

9

10       BY: TINA NIEHOLD MOSS, ESQ. of Counsel

11               -and-

12           KATHRYN E. WAGNER, ESQ. Of Counsel

13                   .

14

15       AKIN GUMP STRAUSS HAUER & FELD LLP

16           Attorneys for Official Committee

17           590 Madison Avenue

18           New York, New York 10022

19

20       BY: DANIEL H. GOLDEN, ESQ. of Counsel

21               -and-

22           NANCY CHUNG, ESQ. Of Counsel

23

24

25

3

1

2

3          KARMER LEVIN NAFTALIS & FRANKEL, LLP

4              Attorneys for Dissenting MCI

5              Creditors

6              919 Third Avenue

7              New York, New York 10022

8

9          BY: PHILIP BENTLEY, ESQ. of Counsel

10

11

12         GERON & ASSOCIATES, P.C.

13             Attorneys for Wilmington Trust

14             Company as Guarantee and Property

15             Trustee

16             13 East 37th Street

17             New York, New York 10016

18

19         BY: YANN GERON, ESQ. of Counsel

20

21

22

23

24

25

4

1

2

3          WEIL GOTSHAL & MANGES, LLP

4              Attorneys for World Com, Inc.

5              767 Fifth Avenue

6              New York, New York 10153

7

8          BY: ADAM P. STROCHAK, ESQ. of Counsel

9                  -and-

10             SHARON YOUDELMAN, ESQ., of Counsel

11                 -and-

12             MARCIA GOLDSTEIN, ESQ., of Counsel

13

14

15         BROWN RUDNICK BERLACK ISRAELS, LLP

16             Attorneys for Ad Hoc MCI Trade

17             Claim Committee

18             120 West 45th Street

19             New York, New York 10036

20

21         BY: LESLIE H. SCHARF, ESQ. of Counsel

22

23

24

25

5

1

2

3          KASOWITZ BENSON TORRES & FRIEDMAN, LLP

4              Attorneys for World Com

5              1633 Broadway

6              New York, New York 10019

7

8          BY: DAVID S. ROSNER, ESQ. of Counsel

9

10

11         UNITED STATES DEPARTMENT OF JUSTICE

12         OFFICE OF THE UNITED STATES TRUSTEE

13             33 Whitehall Street

14             New York, New York 10004

15

16         BY: GREG ZIPES, ESQ., of Counsel

17                  -and-

18              MARY ELIZABETH TOM, ESQ., of

19                              Counsel

20

21

22

23

24

25

6

1

2                    P R O C E E D I N G S

3

4                    (Exhibits 1 through 7 premarked for

5       identification.)

6                    THE COURT:  We have made some

7       changes with respect to the speaker system

8       because there was a problem earlier picking up

9       the sound, so if anyone is going to make their

10      presentation, et cetera, we will make it from

11      the podium if you want to take a few seconds to

12      go over to the podium to do so.

13                   Go ahead.  Let me hear from.

14                   MS. MOSS:  Good afternoon, your

15      Honor.  Tina Moss of Pryor Cashman, Sherman and

16      Flynn on behalf of HSBC Bank, USA as indenture

17      trustee.

18                   Your Honor, HSBC appears before the

19      Court today on its motion in its capacity as

20      indenture trustee to appoint a separate

21      committee of creditors for MCI Communications

22      Corp. and its debtors' subsidiaries.

23                   HSBC is the successor indenture

24      trustee for the approximately $773 million in

25      aggregate principal amount of subordinated

1

2  debentures issued by MCI Communications

3  Corporation.

4  　　　　In support of its motion, HSBC

5  relies upon the evidentiary record before the

6  Court on the two motions recently heard on May

7  15th to appoint a trustee, as well as on the

8  additional evidence submitted by my affidavit

9  filed in support of this motion.

10  　　　　Your Honor, I trust that you've

11  received my affidavit as well as our memorandum

12  of law which were filed with the Court on

13  Friday?

14  　　　　THE COURT:  Yes, I do.  I have

15  both.

16  　　　　MS. MOSS:  The evidence put before

17  the Court in connection with the motions to

18  appoint a trustee includes a set of documents

19  that were submitted by stipulated list of the

20  exhibits for the hearing, which I believe the

21  Court has, or should have, contained in a set

22  of several binders that were submitted on those

23  motions, your Honor.

24  　　　　Just to be clear, there was a

25  stipulated set of exhibits that were submitted

8

1

2      on the trustee motions that were provided to

3      the Court --

4              THE COURT:  All right.

5              MS. MOSS:  Binders, as well as a

6      number of depositions testimony and the

7      complete copies of the depositions I believe

8      were submitted to the court as well.

9              THE COURT:  Yes, they were.

10             MS. MOSS:  This Court is familiar

11     with the legal authorities regarding the

12     appointment of a separate committee in a

13     bankruptcy case, and this issue has been

14     thoroughly briefed by all the parties, so I'm

15     not going to discuss all the details of the

16     case law that's described in our brief, and we

17     will rely upon our brief in connection with the

18     finer points of some of the cases, but to

19     highlight the overarching legal standards under

20     Section 1102 I would like to at least draw the

21     Court's attention to the adequacy of

22     representation determination that the Court is

23     called upon to make.

24             Most importantly, this is a factual

25     determination that is to be made on a

1

2    case-by-case basis and, in our view, the facts

3    in this case present a compelling set of

4    circumstances for the appointment of a separate

5    MCI committee.

6          As your Honor is aware, the size and

7    the complexity of this case simply cannot be

8    overstated.  This is the largest bankruptcy

9    case ever filed and it was a case that was

10   precipitated with allegations of fraud of

11   tremendous magnitude.

12         That initially is one factor that

13   the Court should consider in making its

14   determination of adequacy of representation of

15   the current committee structure.

16         THE COURT:  When did you realize the

17   current committee structure did not adequately

18   represent the interest that you represent

19   today?

20         MS. MOSS:  Your Honor, HSBC was

21   appointed successor and indenture trustee on

22   January 23rd.

23         THE COURT:  What about the prior

24   entity?  Did they raise issues with respect to

25   the adequacy?  I mean, you take the role as

10

1

2    indenture trustee that's left to you from the

3    prior indenture trustee.

4           When did the indentured trustee,

5    when in the name of your client or predecessor

6    indenture trustee come to realize that the

7    representation on the Creditors' Committee was

8    not adequate in their view?

9           MS. MOSS:  Your Honor, I can't speak

10   for the prior indenture trustee on that issue.

11   I believe that Wilmington Trust Company is

12   represented here today by counsel and has

13   joined in this motion and, to the extent that

14   it can respond to that question, I would defer

15   to Wilmington.

16           I can discuss the knowledge of HSBC

17   post January 23rd and its involvement in the

18   case, but prior to that time, I couldn't

19   comment on what Wilmington knew or what its

20   view was at that point.

21           THE COURT:  Can you comment, did

22   Wilmington take any steps to bring to the

23   Court's attention or the U.S. Trustee's

24   attention anything along the line that the

25   representation on the Committee was not

11

1

2      adequate?   Are you aware of any pleadings

3      filed?

4                MS. MOSS:   I'm aware of none, your

5      Honor.

6                THE COURT:   All right.

7                MS. MOSS:   Your Honor, the plan in

8      this case calls for substantive consolidation

9      of the debtors which include a number of MCI,

10     what I will describe as MCI entities with a

11     number of World Com entities, and I think the

12     Court is somewhat familiar with the corporate

13     structure as it has been put before the Court

14     in the context of the trustee's motion.

15                Going forward I would refer to the

16     MCI's Communications Corporation and its

17     subsidiaries as the MCI debtors and World Com

18     Incorporated and its subsidiaries, its other

19     subsidiaries as the World Com debtors.

20                The Court has set a confirmation

21     hearing in this case for the week of August

22     25th, during which it is going to consider the

23     issues of substantive consolidation.

24                The debtor's entire plan rests upon

25     substantive consolidation and brand win that

1

2    rest upon the validity and enforceability of

3    billion of dollars of intercompany claims

4    allegedly owed by the MCI debtors to the World

5    Com debtors.

6            Your Honor, a lot of argument and

7    testimony was given or presented to the Court

8    in connection with the trustee's motions on the

9    issue of these intercompany claims and, in

10   fact, again, I believe in connection with the

11   adequacy of the disclosure statement that the

12   Court recently heard as well.

13           I don't intend to restate or

14   reiterate a lot of the same issues that were

15   brought before the Court.

16           I believe that as far as the

17   trustee's motion are concerned that a lot of

18   information regarding what was done and what

19   was not done with respect to an analysis of the

20   intercompany claims is before the Court on that

21   evidentiary record.

22           It would suffice it to say at this

23   point the investigation of the validity and

24   enforceability of those intercompany claims is

25   crucial to the outcome of this case.

13

1

2              What we learned from the

3     presentations that were made to the Court on

4     the trustee's motion is that the professionals

5     who are retained by both the debtor and the

6     Committee, the accounting professionals, I

7     should say, did not, and that includes FTI

8     Consulting, Lazard Freres, Houlihan and Lokey,

9     and Alex Partners did not set out to and did

10    not, in fact, review or analyze the validity or

11    enforceability of these insider claims in the

12    context of this bankruptcy proceeding.

13              THE COURT:  Let me take you back

14    though to the adequacy of representation.

15              Would I be correct in stating that

16    your position about the adequacy of

17    representation really doesn't arise or didn't

18    arise until you saw the plan?

19              Prior to that, there seems to be, in

20    my understanding, no record of any reaction to

21    the Creditors' Committee and the members of the

22    Creditors' Committee with respect to adequacy

23    of representation, but when you question the

24    structure of the Committee and the motion for

25    the appointment of a trustee, it really is

14

1

2    focused on when a plan came out it appeared to

3    your client, I think, and other some MCI

4    creditors, that their interest really weren't

5    taken to heart as evidenced by the plan.

6              MS. MOSS:  I think that's a

7    generally fair summary of what occurred, but I

8    would say slightly earlier on when HSBC

9    requested appointment to the Committee, it

10    recognized that there was, it believed or

11    understood, that there was not a holder of the

12    subordinated debenture, a significant holder

13    sitting on the committee and for that reason

14    requested appointment and also made efforts to

15    engage in the negotiation process with the

16    debtor and others.

17              I had, although honestly I've not

18    set out all of these details in my papers, I

19    think counsel would agree that I did have a

20    number of conversations with counsel for the

21    debtor, counsel for the Committee, counsel for

22    the MCI ad hoc committee regarding the case and

23    our efforts to become or to inject ourselves

24    into the process, and I believe that, also,

25    what was occurring to some extent was

15

1

2      telegraphed by Mr. Rosner's letter to the U.S.

3      Trustee back in February where he said that the

4      senior MCI bond holders sitting on the official

5      committee were not representative of the junior

6      MCI bond holders as between senior and junior

7      issues.

8            I think he drew that clarification

9      for the U.S. Trustee and in some way I think

10     that that may have telegraphed what their view

11     was of their role, and we continued our efforts

12     then to engage with any parties who would speak

13     to us and to continue our request and renew our

14     request to the U.S. Trustee again at the end of

15     plan to be placed on the committee, and all of

16     that occurred prior to the filing of the plan.

17            MS. CHUNG:  Your Honor, if I may.

18            THE COURT:  No.  You will have your

19     opportunity.

20            MR. CHUNG:  Yes, your Honor.

21            THE COURT:  Let me come back to the

22     statement you just made.

23            You are saying in a letter from

24     Mr. Rosner, which I presume is Exhibit C,

25     February 11, 2003, what do you believe was

16

1

2    stated in that letter?

3              MS. MOSS:  If I may have a moment to

4    turn to the letter myself, your Honor.

5              Your Honor, if you look at page 3 of

6    the letter, the paragraph that begins at the

7    top "As is usually the case."

8              THE COURT:  That's basically the

9    facts.  That's page 2 of the letter.

10             MS. MOSS:  I'm sorry.  That's right.

11             Mr. Rosner states, "As is usually

12   the case between senior and junior debt

13   holders, on some interests the interest of the

14   senior and junior notes will be aligned but on

15   many they will not.

16             On those in which they differ, the

17   MCI noteholders committee represents the senior

18   interests and those members on the World Com

19   committee are representative of these senior

20   interests."

21             And I believe in that sentence he's

22   referring to those members of the MCI

23   noteholder committees who sit on the World Com

24   official committee, and there are three, and

25   then he goes on to say, "So the MCI junior

1

2    notes lack representation on the World Com

3    committees as to these matters.  To be clear,

4    the three MCI members of the World Com

5    committee are representative of the MCI junior

6    notes on, for example, MCI versus World Com

7    issues but are not on MCI senior versus MCI

8    junior issues."

9             He then goes on to say that, of

10   course, they recognize their fiduciary

11   obligations for all creditors but in terms of

12   representative members the MCI junior notes

13   have none.

14             THE COURT:  So would it be fair to

15   say that your argument is that there was a

16   breach of fiduciary duty by either committee

17   with respect to the MCI junior noteholders?

18             MS. MOSS:  Your Honor, we are not

19   alleging a breach of duties on the part of

20   anyone at this juncture.

21             THE COURT:  Although you are not

22   alleging it, it seems to me that these parties

23   have a fiduciary obligation to all creditors

24   and you're saying in various ways in all the

25   papers that are filed and the papers for the

18

1

2    trustee, et cetera, that the MCI junior

3    noteholders somehow were ignored and their

4    interests were not taken into consideration.

5              How other than through some

6    accident, negligence, I mean, how else are you

7    not arguing that there is a breach of fiduciary

8    duties?  Because you do have a recognition in

9    this letter at least that the official

10   committee is charged with acting as fiduciary

11   for all clerks.

12             MS. MOSS:  That's correct, your

13   Honor.  I don't think that this Court needs to

14   determine on this motion whether there has been

15   a breach of fiduciary duty by any committee

16   member and we don't urge the Court to do so at

17   this point.

18              In order for the Court to make a

19   determination as to whether there should be an

20   appointment of a separate committee, it need

21   only to look to whether the representation is

22   adequate and making that determination I don't

23   believe subsumes a finding of breach of

24   fiduciary duty.

25             THE COURT:  I don't think it does.

19

1

2    But most cases you see with adequacy you don't

3    have a plan already filed.  You don't have a

4    situation where this issue only has arisen

5    before the Court in any formal manner before

6    anyone after a plan is done and someone looks

7    at it and says, "Wait a minute, our interests

8    weren't taken into consideration."

9        MS. MOSS:  Well, it is through

10   discovery, in fact, your Honor, post filing of

11   the plan that we learned, and I can point the

12   Court to the various deposition testimony

13   that's relevant through Mr. Savage and also

14   through Mr. Capellas, that at no time during

15   the negotiation process did anyone, any

16   committee member or anyone for that matter,

17   including the debtor, take the position that

18   there should be a distribution to the MCI

19   subordinated noteholders.

20       THE COURT:  This is what I want you

21   to come back to, this whole concept of

22   fiduciary duty.

23       Once the Committee in its

24   negotiation, once there is 100 cents on the

25   dollar going to the senior and they negotiated

1

2    for that, that's apparently a consensual

3    resolution.  By contractual subordination, the

4    juniors are going to have to pay the seniors

5    anyway.

6              MS. MOSS:  It is because it is a

7    settlement though, your Honor, that the

8    contractual subordination issue doesn't apply

9    in the same respect.

10             THE COURT:  It may not.  I don't

11   think you focus on the point I'm trying to

12   raise is that once there was a negotiation for

13   less than 100 cents on the dollar, to the

14   extent the juniors interests were not taken

15   into consideration, it happens right there

16   because once that happens and the seniors are

17   getting less than 100 cents on the dollar, I

18   agree with you, you could have a settlement

19   that would incorporate anything in terms of

20   juniors getting something while seniors aren't

21   paid in full.  I understand that.

22             MS. MOSS:  Right.

23             THE COURT:  But, nonetheless, the

24   seniors were looking at and still had fiduciary

25   duties to all creditors.

1

2           MS. MOSS:  I understand that they

3    do, your Honor.  I guess my point is that I

4    don't think it is our burden on this motion to

5    prove or to attempt to prove that there was a

6    breach of fiduciary duty.  I don't think the

7    Court needs to get there.

8           I think there are a lot of issues of

9    conflicting interests on the part of some of

10   the committee members, like those I described

11   and, also, like with the trade, the two MCI

12   trade members that were brought to the Court's

13   attention on the trustee's motion.

14          But I don't think we have that

15   burden in connection with this motion and we

16   aren't urging the Court to make that sort of a

17   finding in connection with this motion.

18          We think that there is ample

19   evidence that the adequacy of the

20   representation with the structure of the

21   Committee the way it was without the

22   subordinated debenture holders were entitled to

23   a meaningful voice in the process.

24          To the extent that their voice was

25   not heard through other members of the

22

1

2    Committee, whether that is or isn't their

3    obligation to negotiate for a separate recovery

4    for a subordinated group of creditors when they

5    have agreed to accept less than 100 percent,

6    I'm not asking the Court to draw that

7    conclusion at this point.

8              I think, like I said, there is ample

9    evidence that the representation simply was not

10   there and the mind set of the various committee

11   members and their conflicting interest I think

12   are enough to warrant the appointment of a

13   committee without a direct finding of any

14   breach.

15             Should I just proceed?

16             THE COURT:  Go ahead.

17             MS. MOSS:  Your Honor, getting back

18   to the issue of the intercompany claims, I

19   would refer the Court to the deposition of

20   Mr. D'Amico, in the deposition transcript of

21   Mr. D'Amico in pages 64 to 67 as well as the

22   deposition of Mr. Savage at page 231 to 235 and

23   the deposition of Mr. Capellas, at pages 99

24   through 101 regarding what was or wasn't done,

25   and this was all evidence that was highlighted

23

1

2    for the Court in connection with the trustee

3    motion, what was or wasn't done with respect to

4    the intercompany claims.

5           Essentially, the debtor has asserted

6    that its counsel is the only professional that

7    has investigated the validity of these claims

8    but the debtor has also asserted the

9    attorney/client privilege in connection with

10   the results of that investigation.  However,

11   the same law firm has represented both the

12   World Com and the MCI debtors in connection

13   with that investigation or there has been no

14   separate counsel and there is no separate board

15   of directors for the MCI debtors.

16          The Committee by its own admission

17   or the admission of its accounting

18   professionals has not set out the

19   enforceability and the legal validity of the

20   intercompany claims but its inquiry was limited

21   by its attempt to identify claims and its

22   intercompany matrix with respect to its

23   balances.

24          Your Honor, that's indicated in the

25   committee's brief in opposition to this motion

24

1

2      on pages 14 to 15.

3              The Committee confirms that it did

4      not.  It lists what it did in this case and

5      what it was charged with doing and I don't see

6      anywhere a description of an investigation into

7      the legal validity and enforceability of these

8      intercompany claims.

9              Your Honor, we don't find this

10     necessarily surprising since the Committee was

11     dominated by World Com and Intermedia creditors

12     and these claims are the entire basis for their

13     leverage against the MCI debtors.

14             These claims are highly suspect and

15     they are subject to rigorous scrutiny under

16     Supreme Court precedent that we are all

17     familiar with, starting with the United States

18     Supreme Court's opinion in Pepper versus Litton

19     in 1939.

20             A shareholder, World Com in this

21     case, has the burden of demonstrating good

22     faith of these transactions and also to show

23     the inherit fairness of them from the viewpoint

24     of MCI and its creditors.

25             The question is who will take MCI's

1

2    position at the confirmation hearing with

3    respect to these intercompany claims.  There is

4    no board of directors there.  There is no

5    separate counsel.  There is no separate

6    committee.  This questions remains unanswered.

7              We submit that this burden should

8    not fall on ad hoc groups of creditors and/or

9    the indenture trustees as suggested by the

10   debtor and the Committee.

11             Certainly MCI as a thriving company

12   is entitled to its own estate funded fiduciary

13   to test these claims.

14             Only this will level the playing

15   field so that these intercompany claims could

16   be properly tested on MCI on its own behalf and

17   on behalf of its creditors.

18             Your Honor, I would like to discuss

19   our view of the structure of the Committee and

20   why we believe, and we have touched on some of

21   this already, why we believe as currently

22   structured it is inadequate to represent the

23   interests of not just the subordinated holders

24   but MCI creditors as a whole.

25             Eight of the 14 members of the

1

2    Creditors' Committee, a 60 percent majority,

3    are either World Com or Intermedia debt

4    holders, yet according to the committee on

5    professionals of the 12 billion enterprise

6    value assigned to these debtors, the value of

7    MCI is approximately 90 percent of that.

8         All the other debtors combine make

9    up the other 10 percent.  This information was

10   adduced at the hearing on the trustee's motion

11   and it was consistent with the testimony of

12   Mr. Fragen at page 119 and of Mr. Capellas at

13   page 111.

14        The interest of the MCI creditors

15   have been completely overshadowed by the

16   interest of World Com and Intermedia creditors

17   who hold large debt claims against entities

18   with a disproportionately small value.

19        And, your Honor, as for the three,

20   as I mentioned previously, as for the three MCI

21   members of the Committee, the senior

22   noteholders, there is but one who holds any

23   subordinated debentures at all and this amount

24   pails in comparison to the creditors senior

25   debt claim.

1

2          You Honor, I indicated in my papers

3    I may submit to the Court information regarding

4    the holdings of the various committee members.

5    I don't believe it is necessary.  I think the

6    Court has in front of it enough information to

7    determine what the various interests of the

8    Committee members are without specific

9    information as to their holdings.

10         So I won't offer that to the Court

11   at this time unless for any reason the Court

12   feels that that would be necessary, and under

13   those circumstances I would ask for the Court's

14   guidance in how to go about doing that.

15         THE COURT:  All right.

16         MS. MOSS:  I think Mr. Rosner's

17   letter, which we discussed earlier, supports

18   this proposition and as for the two MCI trade

19   creditors, AOL and EDS, they have complex

20   contractual relationship with the debtors and

21   they have negotiations ongoing with these

22   relationships with the debtor and this is

23   evident by the proof of claim they filed and

24   the various settlement agreement --

25         THE COURT:  What does that mean?

28

1

2    You redirected me towards adequacy of

3    representation and then I questioned about

4    breaches of fiduciary duty.  I mean, I'm not

5    quite clear.

6              Are you talking about adequacy of

7    representation?

8              MS. MOSS:  Yes.

9              THE COURT:  And so you are saying

10   that the MCI trade creditor.

11             MS. MOSS:  Your Honor, this goes to

12   the ability of a committee to function and

13   which is really one of the considerations that

14   a court may take into account in reaching a

15   determination as to when there is adequate

16   representation.

17             It entails an inquiry into the

18   existence of any adverse or conflicting

19   interests of committee members who are in

20   agreement with the plan.

21             I don't think that to say someone

22   may have other interests or conflicting views

23   is to say that they have breached a fiduciary

24   duty.  I don't think that one necessarily leads

25   to the other conclusion.

1

2          I think that the point is to the

3    extent that they have interests in this case of

4    their decision making process, you can't always

5    separate one side of your brain from the

6    other.

7          Their decision making process is

8    going to be colored by their own relationship

9    with the debtor and to pretend that we can all

10   divorce ourselves from those interests is

11   really, it is a fiction, and I think it happens

12   in every bankruptcy case with respect to

13   certain -- there are times of certain

14   conflicting interests, but that's why a

15   committee is supposed to be representative of

16   the various creditor constituencies.  This

17   committee was not.

18          THE COURT:  But is it representative

19   of the trade creditors or are you saying it is

20   only representative of the trade creditors who

21   want to continue to do business with the

22   debtor?

23          MS. MOSS:  Well, it is true that

24   there are no trade creditors on the committee

25   that I'm aware of on the MCI side who do not

30

1

2     want to do business with the debtor.

3              So, to the extent that there are

4     none from that group, I would have to say the

5     Committee doesn't include all of the various

6     constituencies from a trade creditors

7     perspective.

8              But those arguments were made to the

9     Court by Mr. Weisfelner in connection with the

10    trustee's motion.  I'm not attempting to

11    restate those at this point.

12             Only to point out to the Court that

13    although there may be several creditors on the

14    committee, a minority, however, of MCI

15    creditors, that there are various interests

16    that they have that are not necessarily

17    representative of the, certainly not of the

18    subordinated debenture holders, your Honor, who

19    we represent.

20             THE COURT:  To a certain extent, if

21    the trade creditors on the committee had no

22    other interests other than business, even if

23    they weren't going to continue business with

24    the debtor, how does that help the junior note

25    holders in the context of representation?  The

 1

 2    junior noteholders have an entirely different

 3    position.

 4              MS. MOSS:   That's true, your Honor.

 5    I'm not suggesting it does.   I'm not suggesting

 6    the Court replace trade creditors evidenced on

 7    one side with another.

 8              I'm saying if you look at the

 9    composition of the commission as a whole and

10    you look at the MCI side and scrutinize who was

11    on the committee, clearly the subordinated, the

12    specific interests of the subordinated holders

13    are not represented as a constituency by this

14    group of creditors.

15              THE COURT:   All right.

16              MS. MOSS:   And as a result of the

17    structure it's apparent there is a whole

18    conceded value of MCI debtors otherwise solvent

19    set to the World Com debtors who were seriously

20    insolvent but for these alleged intercompany

21    claims, and the plan that is proposed

22    represents a settlement with the holder of the

23    senior debt claims which completely circumvents

24    holders of the subordinated debentures, and we

25    have a committee that seems to be refusing to

32

1

2    challenge the billions of dollars of insider

3    claims of shareholders against MCI.  I think

4    that in itself speaks to the issues.

5            There is no one other than these ad

6    hoc group of creditors who has sought to take a

7    position, at least not yet at this juncture, in

8    opposition to these billions of dollars of

9    intercompany claims.

10           The decision of David Matland to

11   drive the negotiation process at the request of

12   Mr. Capellas, and Mr. Capellas testified to

13   that at his deposition on pages 43 to 47, only

14   intensified the imbalance of power in this

15   case.

16           Mr. Matland's leading role in plan

17   negotiations, which is highlighted by the

18   drafting of, his counsel's drafting of the plan

19   term sheet, which was submitted to the Court as

20   Exhibit U to Mr. Pole's affidavit in connection

21   with the trustee's motion highlights the

22   intensity of Mr. Matland's involvement in this

23   process.

24           Mr. Matland is not a member of the

25   committee with fiduciary responsibilities to

1

2    all creditors but he represents the interest

3    associated with his groups holdings, which are

4    World Com and not MCI interests.

5            Here he acted with the imprimatur of

6    the debtors which gave added weight to his

7    negotiation position.

8            Your Honor, a brief contains a

9    detailed discussion of the fact of the denial

10   of HSBC's appointment to the Committee at pages

11   3 to 9.

12           I would highlight for the Court as

13   I've said previously that there is no

14   significant holder of the MCI subordinated

15   debentures on the Committee.

16           The U.S. Trustee's denial of

17   appointment of HSBC as indentured trustee to

18   the Committee, although it was made not until

19   May 9th, only underscores the fact that its

20   creditors constituency was excluded from

21   participation and the MCI senior holders made

22   it clear in Mr. Rosner's letter as to their

23   views on their representation of subordinated

24   holders with respect to senior and junior

25   issues, senior versus junior issues I should

34

1
2    say.
3            The denial of appointment of HSBC by
4    the U.S. Trustee was based in part, and we
5    included the U.S. Trustee letter to me
6    explaining the basis for her decision in my
7    affidavit.
8            I don't know, your Honor, if you've
9    had an opportunity to review it, but --
10           THE COURT:  Exhibit E?
11           MS. MOSS:  Exhibit E.
12           THE COURT:  Go ahead.
13           MS. MOSS:  -- that decision was
14   based in part on an erroneous characterization
15   of HSBC's role as indenture trustee by the
16   Creditors' Committee, and in its letter, which
17   Miss Tom attached in her May 9th letter to me,
18   she attached a letter from Ira Dizengoff from
19   Akin Gump, counsel to the Committee, that was
20   dated March 3, 2003.
21           That letter implies, if it doesn't
22   even state directly, that the MCI subordinated
23   debenture holders had an equity interest and
24   not a claim based on a debt.
25           The Committee did not provide HSBC

35

1

2    with a copy of its letter to the U.S. Trustee

3    back in March and the U.S. Trustee did not

4    request HSBC to respond to that letter.  This

5    motion was filed on April 30th.

6         It wasn't until May 9th that I

7    received a response from the U.S. Trustee to

8    our request for appointment to the Committee

9    that was made back in February and renewed

10   again back in March, and that response included

11   Mr. Dizengoff's letter of March 3rd.

12        That was the first time I had ever

13   seen it and, therefore, had no opportunity to

14   respond to a lot of the inaccuracies that were

15   in it, both with respect to HSBC's role because

16   Mr. Dizengoff erroneously stated he believed,

17   he believed HSBC was both indenture trustee and

18   property trustee and that was not, in fact,

19   true and to this day is not true and, also, the

20   mischaracterization of the claim by the

21   debenture holders that HSBC represents.

22        To the extent that the U.S. Trustee

23   believed in making her decision that this is an

24   equity claim or equity interest and not a debt

25   claim, I mean, that's just flat out wrong.

1

2            So, to the extent that that was part

3     of the determination, it clearly excluded HSBC

4     as indenture trustee on a basis that was

5     improper.

6            Further, your Honor, we were not

7     included in any of the planned negotiations,

8     any of the various meetings that occurred that

9     also included noncommittee members.

10           Information was widely shared with

11    members of the MCI ad hoc committees,

12    Intermedia ad hoc committee, I guess the World

13    Com add hoc committee and members of those

14    committees I believe were involved and

15    participated in planned negotiations.

16           The debtor was aware of HSBC's role

17    as successor and indenture trustee back on

18    January 23rd because the debtor is a party to a

19    tri-party agreement that appointed HSBC as

20    successor.

21           I made direct contact with debtors

22    counsel, both by phone and by letter, in an

23    attempt to open up the channels of

24    communication; however, we were not included in

25    any of the negotiations and there was no

37

1

2    participant in the negotiations on the account

3    of the debentures.  No significant holder that

4    participated.

5            And, again, your Honor as we've seen

6    from the testimony of Mr. Savage and Capellas,

7    no committee member ever took a position with

8    that debt that there should be a distribution

9    on the account of claims of the unsubordinated

10    debenture holders, rather the debtor insisted

11    on the committee members undivided support on

12    the plan and the members apparently agreed,

13    notwithstanding any other claims that they may

14    hold.

15            And this goes back to the testimony

16    of Mr. Savage that was highlighted for the

17    Court with respect to the support agreement or

18    the concerns regarding potential lock up of

19    votes with respect to the plan, and that would

20    direct the Court's attention back to

21    Mr. Savage's deposition at pages 244 to 45 and

22    275 to 276, and 278 to 279 and also Exhibit D

23    to Mr. Paul's affidavit showing a draft support

24    agreement that was proposed.

25            Your Honor, we believe that all this

38

1

2      evidence taken together warrants the separate

3      committee of MCI creditors under Section 1102.

4             The discretionary factors to be

5      considered by the Court in making this

6      determination don't alter this analysis.

7             Your Honor, there are certain

8      considerations that the Court may also make

9      with respect to determination of adequacy of

10     representation and, for example, the issue of

11     costs, which I'm sure will be raised and has

12     been raised by the objectors to the motion.

13            The potential and the cost of

14     another committee is not a sufficient reason to

15     deprive creditors of adequate representation on

16     additional events and we have cited cases in

17     our brief for that proposition.

18            The costs of adding a committee of

19     MCI creditors in this case pails in comparison

20     to the size of the debtors businesses and the

21     overall cost in administration of these

22     bankruptcy cases, not to mention the fact that

23     to the extent confirmation proceedings is

24     defeated going forward, the costs associated

25     with that or with a potential appeal and all

39

1

2    the various discovery that is going to take

3    place between now and that time.

4             As far as timeliness goes, your

5    Honor, it is our view that the objectant should

6    not be able to necessary as a word in

7    opposition to this motion.

8             The interests of those represented

9    by HSBC's indenture trustee were excluded from

10   the planned negotiation process despite their

11   efforts to be included, and to the extent that

12   the filing of the plan brought to light the

13   circumstances, although possibly foreshadowed

14   by some of the events that occurred prior to

15   that, should not work as a detriment in making

16   a determination with respect to this motion on

17   HSBC's part.

18            Certainly the addition of a

19   committee has no complexity to this case that

20   the courts and the parties who are

21   sophisticated in this matter cannot manage.

22            And as long as the Committee

23   maintains its current structure, our view is

24   that there is no meaningful avenue for

25   participation by an advocate and a fiduciary

40

1

2    who is solely beholden to the interests of the

3    MCI creditors.

4            THE COURT:    I want to go back to

5    something.    I mean, I'm a little confused.

6            I think with the adequacy of

7    representation I think your case stems from

8    depositions that the junior noteholders, and

9    you have a couple of them in Mr. Rosner's

10   letter, did not have a representative on the

11   committee; and, to the extent somebody may have

12   held some junior notes, they really acted for

13   the interest of the larger holdings they may

14   have had, whether they be World Com or the

15   senior notes; is that correct?

16           MS. MOSS:    That's not all of it.    It

17   is also the fact that the Committee was

18   dominated by a majority of World Com and

19   Intermedia holders as well.

20           THE COURT:    That may be.    Let's just

21   deal with adequacy of representation.

22           You can't be arguing because MCI

23   didn't have a majority on the committee that

24   MCI was not adequately represented?

25           You have honed in on one part, and

41

1

2    that is the juniors, and then you switched to

3    what I talked about earlier, an issue of

4    fiduciary obligation because now you are in a

5    situation with saying I want an MCI committee

6    because MCI's interests as evidenced by the

7    trade creditors that are interested in

8    continued business, the noteholders who may

9    have named MCI, in fact, were driven to a great

10    extent by other holdings, whether they be

11    Intermedia or World Com and the seniors who

12    were in the committee basically took care of

13    themselves.

14          So we now have a request for a

15    committee, for an MCI committee when it really

16    is only one interest that arguably can make its

17    case that it wasn't adequately represented.

18          The other interests are there and

19    what we are left with is an argument that those

20    interests were present but the holders of those

21    interests didn't fulfill their obligations as

22    committee members because how else could you

23    end up where we are, either you are adequately

24    represented or you are not.

25          And you said there was no one on

42

1

2   there from the juniors alone, and, certainly,

3   it would have held junior notes, wasn't

4   interested in recovery from the juniors.

5          MS. MOSS:  I'm not sure I said that

6   we are not adequately represented solely for

7   that reason.

8          I'm saying that the composition of

9   the Committee as a whole included a majority of

10  nonMCI creditors when the majority of the

11  assets of the company, the overwhelming

12  majority, in fact over 90 percent of the value

13  of this company which is now supposed to be

14  substantively consolidated with a serious

15  insolvent set of debtors was dominated by

16  nonMCI creditors.  That's the starting point.

17         THE COURT:  And that starting point

18  goes back to approximately a week or two weeks

19  after the case was filed.  A week or two weeks

20  after the case was filed the Creditors'

21  Committee was formed and the structure of that

22  committee and the structure of the alleged debt

23  as to be distributed among debtors' entities

24  can be ruled out where the asset base lies or

25  the asset value lies is no different today than

43

1

2    it is then.

3         MS. MOSS:   That may be, your Honor,

4    but who knew when the case started that there

5    was going to be a determination by the debtors

6    or at least a presumption by the debtors that

7    billions of dollars of intercompany claims were

8    going to be treated as valid and that the

9    debtors should be substantively consolidated.

10        And, in fact, I think the Enron

11   decision is instructive on this point, that is,

12   in the Enron case the Court determined that it

13   was premature to appoint a committee where

14   there's not yet been a determination that

15   substantive consolidation is going to occur. So

16   we are kind of painted into a corner.

17        If we say that you are too early or

18   you are too late, when is the exact moment to

19   ask for this relief?

20        I think that the swell of activity

21   leading up to the formulation of the plan and

22   our attempts to get involved and be included in

23   the way that things turn out and the deal that

24   was struck by MCI noteholders less than 100

25   percent on the dollar which we truly believe

44

1

2    they are clearly entitled to if you invalidate

3    these intercompany claims.

4            Who knew is the point.  And I don't

5    think we can be accused of being too late when

6    we may have been accused back then of being

7    much, much too early.

8            THE COURT:  I'm not so sure, and I

9    want to go back to the Enron decision, I think

10   there were different arguments being made as to

11   why there should be a separate committee, but

12   there was an entire decision there should be a

13   separate entity for the alleged values --

14   issues that you allow as well.

15           But there was a different

16   composition there and then I see before me

17   today, and I still don't buy it, your motion is

18   not the substantive consolidation.  It was for

19   the representation that was present; that those

20   representatives moved in a decision that you

21   didn't expect they were going to meet.

22           MS. MOSS:  Well, in responding to

23   the debtors' conclusion that the subsequent

24   recording is why the report is going to be and

25   one would expect the MCI, and I'm sure they did

45

1

2     in some respect, I'm sure that's the basis for

3     the settlement that they struck, that they

4     would have challenged the intercompany claims

5     on which the debtor relies.

6           However, the fact that they have

7     permitted there to be no recovery to other

8     creditors of MCI and permitted there to be a

9     clearly reduced recovery to other creditors of

10    MCI, referring to the trade creditors who have

11    rejected this as well, or as for the

12    appointment of a trustee, I think that it's

13    clear that that is the swell of activity at all

14    those meetings that occurred and the plan

15    negotiation process, starting with the debtors'

16    consolidation with subsequent consolidation,

17    and moving on from there it seems to me that

18    there was a time that it started to become

19    apparent that there would need to be a separate

20    committee.

21           I think that, as you Honor knows, we

22    requested to have this relief heard in

23    connection with the trustee's motion.  We

24    thought that would be the appropriate venue for

25    it.

46

1

2          I understand your Honor procedural

3    concerns with respect to that request and we

4    were asked to file a separate motion and now,

5    in fact, we have a separate hearing date.

6          But if your Honor had, if that would

7    have been considered with the trustee's motion,

8    it would have been heard two weeks earlier than

9    today.

10         So I don't know if timeliness is an

11   appropriate basis for this Court to determine

12   that a separate committee is not appropriate.

13         We also have 90 days between today

14   and the confirmation hearing during which a

15   separate committee could actively become

16   involved in the discovery process and I don't

17   think that it needs to be delayed to what your

18   Honor has set out as a schedule.

19         THE COURT:  Thank you.  I will hear

20   from other parties in support of the movants

21   first before I hear the opposition.

22         MR. BENTLEY:  Good afternoon, your

23   Honor.  Philip Bentley of Kramer Levin on

24   behalf of the dissenting MCI bond holders.

25         Your Honor, I would like to address

47

1

2    myself to the issue that the Court raised with

3    Miss Moss, specifically when did it become

4    apparent that the Committee's representation of

5    MCI was inadequate.

6            And, your Honor, without repeating

7    the evidence that was explored at great length

8    at the recent trustee hearing, our position is,

9    the answer is that it became very apparent that

10   this was the case last month in April when the

11   plan was filed and when discovery was taken in

12   connection with that plan and in connection

13   with the trustee hearing.

14           And three critical points, your

15   Honor, came out at that time, which your Honor

16   will recall from the evidence of a few weeks

17   ago, but I think it is helpful to briefly

18   review them here.

19           Prior to last month, there had been

20   disclosure that there were intercompany claim

21   issues, significant intercompany claims.

22   However, prior to last month there was no

23   inkling at all in the public what had been

24   publicly disclosed; that the intercompany plans

25   might be anywhere close to the magnitude that

48

1

2    we now understand they are asserted to be, that

3    is, a magnitude that would be sufficient to

4    invert the structural superiority that,

5    according to everything that had been publicly

6    disclosed up to that time, should have been

7    enjoyed by MCI creditors.

8            Intercompany claims that we are now

9    told are of a magnitude to warrant a

10   substantial recovery to World Com bond holders

11   at the same time that MCI creditors are

12   receiving only about, under the proposed plan,

13   only about $3 billion for their roughly 6

14   billion dollars of debt.

15           So roughly $3 billion is being paid

16   in connection with MCI creditors, given to

17   creditors of the parent in an inversion of the

18   usual structure of superiority, and the

19   rationale that's been given for that and that

20   the Creditors' Committee has endorsed in

21   endorsing the plan is this enormous magnitude

22   of intercompany claims, but the entanglement

23   that we heard about in the creditors view and

24   the committee's view subsequent to

25   consolidation.

49

1

2               This was not something that was

3    apparent.  This was not something that was

4    disclosed prior to last month and there were

5    two other critical facts that weren't disclosed

6    prior to last month.

7               The first was that as you came out

8    of the record of the trustee hearing, the great

9    bulk of the intercompany claims consist of a

10   single type of claim, these royalty charges

11   that your Honor heard about.  Some

12   19-and-a-half billion out of a total --

13               THE COURT:  Isn't that the great

14   bulk of the net difference between the

15   intercompany claims and not the great bulk of

16   the claims themselves?

17               MR. BENTLEY:  It is the great bulk

18   of the net intercompany claims that have been

19   identified to by date by the Committee's

20   professionals owed by the committee's companies

21   in aggregate to the other debtors, 19.5

22   billion, the total of all intercompany claims

23   that have been identified to date that run from

24   the MCI companies collectively to other

25   debtors, the Committees's professional has said

50

1

2      it is 24 billion.  So you have 19-and-a-half

3      out of 24.

4              But also what wasn't disclosed

5      before last month is that these royalty claims

6      are really extraordinary and it doesn't take a

7      lot of looking at them to see that there are

8      issues that jump off the page as being suspect

9      and is crying out for investigation.

10             Just to tick off two of the more

11     salient points that jump off the page,

12     19-and-a-half billion dollars in debt based on

13     royalties for a consolidated World Com

14     enterprise that is now being valued at $12

15     billion, substantially more than the whole

16     value of the enterprise even though these

17     royalty charges accrued over a period of just

18     four years.

19             And the reason the royalties get to

20     that incredible magnitude is that they are

21     being assessed at a rate, your Honor, I've

22     never heard.

23             We have done some digging and the

24     Court will hear expert testimony on this at

25     confirmation.  We never heard of royalty

51

1

2      charges getting anywhere close to the magnitude

3      of this if you compare them to the gross

4      revenues of the debtors 19-and-a-half billion

5      figure, equate that to 15 percent of the gross

6      net that the debtors earned over the three-year

7      period the royalty accrued, 15 percent of gross

8      revenues, it's an extraordinary numbers.

9              But we learned last month the

10     Committee and its professionals has not begun

11     any serious look at the royalties.  We heard

12     they may have had their lawyers look at the

13     royalty charges but we learned they didn't ask

14     FTI to look at the royalty charges even though

15     someone who wants to look at them seriously

16     would have to look at very detailed

17     calculations that were viewed by the debtor

18     each year to justify the royalty charges and

19     that's not something that lawyers are asked to

20     do.

21             That's something that FTI or the

22     other nonlawyer professionals also would have

23     done.  So, as your Honor heard, the debt has

24     not been done.

25             So that was another recent

52

1

2    disclosure in which the Committee has not

3    adequately represented the interest of MCI.

4            Clearly if MCI had its own committee

5    it is no question they would have selected

6    their people on this issue.  There would have

7    been in depth discussions of this issue.

8            Finally, your Honor, the third

9    category issues did not come out until it was

10   known until last month relates to the

11   entanglement justification that has been given

12   for just consolidation.

13           Your Honor heard testimony about

14   that from the depositions.  FTI or Alex

15   Partners concluded they come up with an exact

16   figure to consolidate all the intercompanies

17   accounts between all the debtors it would take

18   211 person years.

19           It is a very precise figure and it

20   suggests someone spent time figuring it out,

21   giving it real thought to backing out that

22   number and giving it continue with the was not

23   done at the same time.

24           That was a computation that was

25   apparently done to back up, to defend the

53

1

2  position that MCI should be consolidated with

3  World Com but wasn't.

4          What we are looking at is there any

5  way to cut through how the Gordian knot to

6  solve this problem that we are being told can't

7  be valid, and we have heard evidence and you

8  will hear a lot more confirmation that there

9  are serious ways to cut through the Gordian

10  knot.

11          In following the supposed Gordian

12  knot really a red herring, your Honor, and in a

13  nut sell, the illusion and the error that is

14  being put forward is that one has to look

15  transaction by transaction.

16          You heard there is a trillion

17  dollars of intercompany transaction. I think

18  25 million in transactions. The illusion wants

19  you to look at each transaction one by one.

20          The solution that nobody has looked

21  at, the Committee has not, the debtors have

22  not, looked at the net balances that are owed

23  by the MCI to the other World Com debtors and

24  that, we believe, your Honor, is why will

25  explore this more, but what you heard two weeks

54

1

2     ago that has not been done.

3          The Committee has not done any

4     looking on that issue and that, your Honor,

5     together with the other points that I

6     mentioned, those are all new disclosures and

7     none of those were out there in the public

8     record prior to last month as reasons why it is

9     urgently needed that a fiduciary be brought in

10    to represent the MCI creditors.

11         I would note that the MCI debtors if

12    looked at alone would by themselves be the

13    largest bankruptcy ever, I believe, other than

14    World Com.  We just took Red Lobster

15    separately, so it would be the largest

16    bankruptcy.

17         Only so, the cost of consideration

18    should not be a major ground, a sufficient

19    ground for denying entry of those entities.

20         I understand your Honor has a

21    significant concern about bringing the case to

22    conclusion, and we understand that appointing a

23    committee at this late point it would be a

24    concern.  It could slow down proceedings.

25         We think, your Honor, there is a way

55

1

2      that could be done; that a committee could

3      retain professionals who are up to speed on

4      this issue who could be prepared to take these

5      issues and have them at objection.

6           We submit this is the best outcome,

7      and we submit if the Court were to appoint a

8      MCI committee you would probably see rather

9      quickly MCI's settlement that would probably

10     reflect the MCI creditors and that would bring

11     this case we think to a quicker, smoother, more

12     consensual conclusion that would be less at

13     risk of holding up that confirmation or more

14     than the Court concluding in August that the

15     plan cannot be confirmed.  That, your Honor, we

16     submit is the preferable way to go.

17          THE COURT:  Anyone else?

18          MR. GERON:  You Honor, Yann Geron.

19     My name is Yann Geron.  I was retained only

20     recently by Wilmington Trust Company.

21          As your Honor knows, we have filed a

22     joinder to HSBC's motion.  Wilmington Trust

23     Company is serving as property and guarantee

24     trustee and for the same trust where HSBC is

25     serving as the indenture trustee.

56

1

2             As the Committee noted in its

3    papers, in a footnote of its papers, there has

4    been a screening wall as the Committee called

5    it put in set up between Wilmington Trust's

6    role as the property and guarantee trustee and

7    Wilmington Trust's separate role as a member on

8    the Creditors' Committee on behalf of a

9    different trust, and on January 23, 2003

10   Wilmington resigned its indenture role in the

11   trust as a result is called MCI Trust and HSBC

12   assumed that role.

13             Wilmington Trust, and we noted in

14   our papers as well, is in the process of

15   resigning as property and guarantee trust to

16   the Capital MCI Trust, and it is expected,

17   although not yet confirmed because I think it

18   has to be done by an act of a court in

19   Delaware, that HSBC may be appointed as

20   successor in those two capacities.

21             During this interim period,

22   Wilmington Trust again as property and

23   guarantee trustee has joined in HSBC's motions

24   as the indenture trustee mostly or largely as a

25   precautionary measure to enforce any of MCI

57

1

2      actions as indenture trustee.

3              I will not belabor the record by

4      adding anything on the substantive

5      consolidation argument made by Miss Moss and

6      other counsel.

7              I will just note, your Honor, in

8      earlier colloquy by counsel the Court asked

9      whether Wilmington Trust formally as indenture

10     trustee took any objection or steps with

11     respect to the committee membership, and I can

12     only tell you that since I've come on to the

13     scene, I have not been made aware of any steps

14     or actions taken by Wilmington Trust or papers

15     filed by Wilmington Trust in that regard.

16             THE COURT:  Thank you.

17             MS. SCHARF:  Good afternoon, your

18     Honor.  Leslie Scharf from Brown, Rudnick,

19     Berlack and Israels on behalf of the MCI ad hoc

20     committee.

21             THE COURT:  Restate the name of your

22     firm.

23             MS. SCHARF:  Brown, Rudnick, Berlack

24     and Israels.

25             Just simply for the record we would

58

1

2    like to state that we appreciate the motion of

3    the indenture trustee for the reasons set forth

4    in her papers.

5           THE COURT:  Do you believe that the

6    MCI trade creditors are not adequately

7    represented on the committee?

8           MS. SCHARF:  I think that given the

9    structure of this case, your Honor, I think a

10   separate committee should be implemented and

11   put in place.

12          THE COURT:  All right.  Anyone

13   else?

14          MR. CHUNG:  Good afternoon, your

15   Honor.  Nancy Chung from Akin Gump on behalf of

16   the official committee.

17          THE COURT:  You didn't rise in

18   support?

19          MS. CHUNG:  No, your Honor.

20          THE COURT:  Let me finish that

21   first.

22          MR. CHUNG:  I'm putting on

23   objections.

24          THE COURT:  It will be next.  Anyone

25   else want to be heard?  I will hear the

59

1

2     opposition.

3           MR. CHUNG:   Thank you, your Honor.

4     Before turning the floor over to Mr. Golden for

5     his presentation on behalf of the Committee's

6     motion, we wanted to raise two matters for the

7     Court.

8           First, the Committee seeks to move

9     exhibits into evidence which are contained in

10    two bound volumes premarked by the court

11    reporter as committee Exhibits 1 through 7

12    containing the full deposition transcripts of

13    Mr. Capellas, Mr. Savage, Mr. D'Amico and

14    Mr. Fragen that were taken in connection with

15    the trustee's motion hearing, as well as the

16    three reports prepared by FTI Consulting, the

17    Committee's forensic accountant.

18          Second, Miss Moss referred in her

19    presentation to certain statements made in Mr.

20    Rosner's letter which were attached as Exhibit

21    C to her affidavit.

22          In addition, there is reference in

23    HSBC's memorandum of law to other letters by

24    counsel attached as Exhibits A through F to her

25    affidavit.   The Committee is not objecting to

1

2     the admissibility of those exhibits for

3     purposes of this hearing.

4              However, we wanted to note for the

5     record that these letters are letters of

6     counsel advocating the positions of their

7     perspective clients and are fraught with

8     opinions and assertions that are not

9     necessarily statements of fact and, therefore,

10    we ask that the Court take that into account in

11    giving those letters as part of the evidentiary

12    record the appropriate weight.

13             THE COURT:  Thank you.

14             Is there any objection to the

15    admission of the documents identified by

16    counsel for the Committee?

17             MS. MOSS:  No, your Honor.  I

18    believe those documents are already in the

19    record but to the extent --

20             THE COURT:  They are in the record

21    from the prior hearing?

22             MS. MOSS:  All the items are in the

23    record and I believe the FTI items are in the

24    record as well.

25             If I could just respond to Miss

61

1

2    Chung's comments with respect to the letter.

3                I just want the record to be clear

4    to either the authenticity or the admissibility

5    of those documents.

6                The Committee appears to be

7    commenting or characterizing their view of the

8    evidence, and to the extent they would like to

9    argue that to the Court, I have no problem with

10   that, but I just want the record to be clear

11   that they have agreed to the authenticity and

12   admissibility.

13               MR. STROCHAK:  We would like all the

14   deposition transcripts in their entirety from

15   the trustee hearing put into evidence in this

16   proceeding.

17               I'm not quite sure if counsel from

18   Akin tends to put them all in or if the Court

19   has copies of all of them.  I can supply copies

20   if you need it.

21               MS. MOSS:  I have no objection to

22   you putting all copies in.  We contacted

23   chambers so, apparently, we are not clear

24   whether they have them or not.  We have a set

25   for the Court and we have an additional set to

1

2     the extent anyone needs one.

3               MS. CHUNG:  Your Honor, to clarify

4     the record further, our understanding was that

5     all of the exhibits that were submitted in

6     evidence in connection with the trustee's

7     motion were committed for purposes only of that

8     hearing; therefore, for the Court's eyes we

9     submit additional exhibits for the purposes of

10    the hearing today.

11              MS. MOSS:  As I stated in the

12    beginning of my presentation --

13              THE COURT:  You moved into evidence

14    the exhibits from the prior hearing.

15              MS. MOSS:  And if the Committee is

16    objecting to that, I would ask that the Court

17    hear that objection and discuss it because I

18    think I made clear in my moving papers and in

19    my memorandum our intention to rely upon that

20    record and, in fact, as I pointed out, the

21    report would have been one of the same if the

22    court had heard our motion simultaneous, which

23    was our original request, and for procedural

24    reasons I believe that the motion was put on

25    separately.

63

 1

 2                    THE COURT:  It was your request.

 3     But it was your request put in the context of a

 4     joinder with the appointment of a limited

 5     trustee; is that correct?

 6                    MS. MOSS:  Yes, your Honor.  It was

 7     request for additional leave.

 8                    THE COURT:  All right.  Let me hear

 9     then from the Committee.

10                    Was there any objection to the

11     admission of the original statement by counsel

12     for the ruling to admit the prior documents?

13                    MR. GOLDEN:  To move this along, we

14     are not going to raise an objection to the

15     submission of the entire record.  We think it

16     is properly overbroad.  We are not going to

17     waylay this proceeding by going through each

18     and every exhibit that was produced in

19     connection with the trustee's motion and we

20     will not raise any objections at this time.

21                    THE COURT:  All right.  They are

22     admitted.  Go ahead.

23                    MR. GOLDEN:  Shortly after the

24     filings of this Chapter 11 cases, the U.S.

25     Trustee held an organization meeting to appoint

64

1

2   the official Creditors' Committee pursuant to

3   Section 1102 of the Bankruptcy Code.

4           It's consistant with her mandate of

5   U.S. Trustee at that time appointed a 15 entity

6   committee consisting of representatives of the

7   various debt claims of the debtor.

8           The official committee consisted of

9   World Com Bank debt holders, World Com public

10  debt holders and its indentured trustee, MCI

11  public debt holders and its indentured trustee,

12  MCI trade creditors, Intermedia and its

13  indenture trustee, and as this Court has

14  recently found in connection with its decision

15  on the trustee's motion, the current

16  composition of the Committee consists of 14

17  members, six of which hold or represent MCI

18  indebtedness, or to say it in another way, more

19  than 40 percent of the entire committee

20  represents MCI committee.

21          Now nine months later from inception

22  of the cases, an indenture trustee for the MCI

23  subordinated debt has moved for appointment of

24  a separate committee for all MCI creditors.

25  That's what the pleadings say, your Honor.

65

1

2          But to hear Miss Moss' presentation

3     it was unclear whether she was seeking a

4     committee for all MCI creditors or simply a

5     Creditors' Committee for only the MCI

6     subordinated debt.

7          And I think your Honor zeroed in on

8     that point and I'm not sure we got a

9     clarification because I think it is beyond

10    question that the current composition of the

11    Committee does adequately represent all MCI

12    creditors, especially those that hold MCI trade

13    debt and certain other debt, and the issue

14    seems to be is there adequate representation

15    with respect to the MCI sub debt.

16          In order to put this motion and the

17    case of interpreting Section 1102(a)-2 in its

18    proper context, I think it is important for

19    there to be a review of the Committee's efforts

20    over the last nine months of this case, and

21    during that time the Committee has met

22    regularly both with its own professionals and

23    the debtor professionals on nearly a daily

24    basis to discuss, probe, evaluate, pending

25    legal and business matters related to these

66

1

2    matters.

3              The Committee analyzed and evaluated

4    the debtors one year and three-year business

5    plan.

6              At that time, the Committee

7    analyzed, evaluated and took issue with over

8    400 motions and various motions filed in

9    connection with these debtor cases.

10             The Committee through its efforts

11   obtained a forensic accountant who analyzed the

12   companies 25 million pre-petition intercompany

13   transaction totaling approximately one trillion

14   dollars in debt in order to try to make sense

15   of that intercompany arrangement.

16             And in that regard the Committee

17   specifically negotiated a mandate for the work

18   product of FTI so that there would be no

19   allegation that their conclusions were

20   prejudged by taking sides within the membership

21   of the Creditors' Committee.

22             Through Houlihan, Lokey, Howard and

23   Zukin the Committee obtained financial advisors

24   and there was a development of an enterprise

25   model.

67

1

2          Based upon the intercompany matrix,

3     which models we utilized in various

4     constituencies in the planned negotiation we

5     had leading up to the planned file, the

6     committee worked with this examiner in his

7     inquiry into the debtors' premotion fraudulent

8     conduct.

9          The contract analyzed, the major

10     contract committee analyzed, evaluated the FCC

11     and other regulatory issues before and

12     impacting the debtors' business, analyzed

13     complex tax issues in relation to other things,

14     with the utilization or ability to avail

15     themselves of the net prepetition operating

16     losses.

17          The committee evaluated numerous

18     access petitions between debtors and their

19     former officers and directors and the committee

20     played an integral role in the negotiation of

21     debtor end financing, negotiated debtor key

22     employee retention program, the hiring of

23     Michael Capellas, debtor's new CEO or

24     relatively new CEO, he played an active role in

25     the negotiation of the penalty phase of the FCC

68

1
2  enforcement action; and, finally, and perhaps
3  most importantly, the Committee placed a very
4  significant role in the negotiation and
5  formulation of the debtors present plan and
6  organization and the complex issues underlying
7  that plan of organization.
8          It is against that factual backdrop
9  that the indenture trustee for the MCI
10  subordinated note comes to this Court almost 10
11  months after the inception of the Chapter 11
12  case in an effort to seek to bring all of that
13  process and progress to a crashing holt saying
14  I'm seeking a separate committee for the MCI
15  creditors, and I think you need to ask why, and
16  the answer to that question from our
17  perspective is evident.
18          It is the same reason that the
19  dissenting MCI bond holders and the ad hoc
20  trade creditors just brought their motion.
21          They are dissatisfied with this plan
22  treatment, and that reason and that reason
23  alone sometimes seems to be the motivating
24  force for both the trustee's motion and the
25  current motion for the appointment of an MCI

69

1

2    Creditors' Committee.

3          But as this Court has recently

4    determined in connection with the trustee's

5    motion, both is simply not valid for the

6    appointment of an MCI creditor and it is not

7    the appropriate rationale for the appointment

8    of an MCI Creditor Committee if you review the

9    legal standards underlying 1102 A-2 which we

10   think is key here.

11         That section provides on request of

12   a party's interest the Court may order the

13   appointment or additional Creditors' Committee

14   or of equity security holders if necessary to

15   ensure adequate representation of creditors or

16   equity security holders.

17         And your Honor has recently had the

18   opportunity in the Enron case to have an added

19   in depth review of the case law that has

20   interpreted it, Section 1102(A)-2 of the

21   Bankruptcy code.

22         I think it is very clear from the

23   prior case, and you Honor held in the Enron

24   case, it is primarily three factors the Court

25   looks to in trying to assess whether there was

70

1

2    adequate representation or not.

3              First, the ability of the existing

4    committee to function effectively.

5              Two, the nature of the case and,

6    third, the standing and desires of the various

7    constituencies.

8              As your Honor noted, and continuing

9    on in the Enron decision, there are additional

10   but related factors, including the ability of

11   creditors to participate in a case without the

12   official committee with the power to covers

13   expenses pursuant to Section 504(B) of the

14   Bankruptcy Code, motivation of the movant, the

15   Court to be induced by the additional committee

16   and the presence of other avenues for creditor

17   participation.

18              There has been significant case law

19   in interpreting these factors, much of it cited

20   in the opposition filed by both the official

21   Creditors' Committee, the debtors and the

22   Office of the United States Trustee.

23              A review of this case laws makes

24   several things perfectly clear.

25              First, the first aim of a single

1

2    Creditors' Committee is the norm in Chapter 11

3    cases as the Court intended the different

4    problems to be resolved within the context of a

5    separate committee.

6            Two, the appointment of a separate

7    committee especially so late in the game,

8    especially after a plan has already been filed,

9    is an extraordinary remedy and, therefore, a

10   very high burden for the movants to sustain.

11           In attempting to determine whether

12   there was adequate representation, we reviewed

13   MCI and HSBC's motion and their subsequent

14   memorandum of law, which I will mention in a

15   moment, to try and claim the factor that they

16   were relying upon to determine that there was

17   no adequate representation by the existing

18   committee.

19           Essentially, those factors could be

20   summarized as follows:  First, that MCI had no

21   fiduciary.

22           Two, creditors of MCI has been

23   disenfranchised.

24           Third, since the Committee selects

25   the plan which has recently been filed by the

1

2    debtor and the plan group has no plan for MCI

3    debt, MCI needs a separate Creditors'

4    Committee.

5             Fourth, indenture was not added to

6    the official Creditors' Committee at its

7    request.

8             Next, HSBC was not invited to the

9    plan investigations and, finally, that the MCI

10   creditors on the committee do not represent all

11   MCI creditors.

12            Just as an aside, your Honor, HSBC

13   filed its motion on April 30th and in that

14   motion it stated at paragraph 17, and I will

15   quote, "Because this motion does not raise any

16   novel issue of loss to HSBC that this court

17   weigh that the requirement contained in rule

18   1930-1(b) of the local bankruptcy rules that a

19   separate memorandum of law be submitted in

20   support of the motion."

21            And yet 25 days here on the eve of a

22   holiday weekend at approximately 5:15 this

23   afternoon and only one business day before this

24   hearing was to convene HSBC filed a memorandum

25   of law and an attorney affidavit annexing 11

1

2    exhibits.

3            I guess this is the appointment you

4    would be looking for on behalf of the MCI

5    creditors.

6            In Miss Moss' commentary before,

7    your Honor, which I assume understood lack of

8    adequate representation, one, was the alleged

9    characterization of a letter drafted by my

10   partner, Ira Dizengoff, regarding the legal

11   characteristics of the preferred quips, or

12   quizzes as they are commonly referred to, in an

13   effort just to put that off to the side and get

14   the record straight, MCIC has issued face

15   amount $750 million of subordinated debenture

16   to one holder, MCI Capital One, in a back to

17   back transaction.  MCI Capital One has issued

18   to the public preferred instruments.

19           I would acknowledge to the holders

20   of those interests indicating debentures issued

21   by MCIC to MCI Capital One, but the actual

22   holdings that are out in the hand of the public

23   are a preferred instrument, and that is the

24   point that Mr. Dizengoff made in his response

25   to his request of the U.S. Trustee as to his

74

1

2    opinion which HSBC saw as an admission to the

3    state.

4              I'm sure the Court is interested in

5    tis topic.  The U.S. trustee can take a big a

6    role that is.

7              And Miss Moss continued that no

8    party, not the debtors or the Creditors'

9    Committee sought a distribution for the holders

10   of the MCI subordinated debt.

11             Your Honor asked I thought a very

12   insightful question:  Why when MCI senior debt

13   is not getting paid in full and, in fact, is

14   taking a substantial hair cut of more than 20

15   percent, would there be some kind of suggestion

16   that MCI subordinated would be entitled to any

17   recovery other than in the context that she

18   wants settlement.

19             And further on that same point,

20   Mr. Savage did indicate in testimony that I

21   will refer to that it was a view of the debtors

22   that the subordinated debt work at getting

23   recoverage was simply as a result of

24   contractual determination that that recovery

25   had to be returned back to the holders of the

1

2    MCI subordinated debt into the hands of the

3    senior debt held by the MCI senior holders, and

4    I refer your Honor to the Savage deposition at

5    page 237, line 12 to page 28, line 2 and again

6    on page 27, line 15, to page 248 to line 9, and

7    finally page 252, lines 8 through 19.

8           In the complaints raised by HSBC,

9    both in its pleading and oral presentation, you

10   never once hear that any of the obligations of

11   the existing Creditors' Committee based

12   breached in any way its fiduciary duty.

13          The reason for this is clear.  They

14   never did.  This committee has worked arduously

15   to maximize credit for all creditors and to

16   make sure of an adequate distribution of those

17   assets.

18          HSBC complains that they were never

19   invited to participate in the planned

20   negotiation.

21          That's hard to imagine given the

22   fact that they concede in their papers they

23   signed a confidentiality agreement.  They were

24   given access to the settlement agreement and

25   they were accompanied by our sophisticated

1

2    reconstruction counsel.

3              I am quite certain that if they

4    wanted to find their way to the bargaining

5    table they would have known how to do so.

6              As the Court determined in

7    connection with the trustee's motion is that

8    HSBC simply wrote why the ad hoc committee

9    should protect the individual's interest, and

10   this court found it to be of little incidence

11   to its trustee position.

12             In fact, there were at least five

13   other instances when parties were asked either

14   for admission to this, I believe, Creditors'

15   Committee or for the appointment of a separate

16   equity committee.

17             In fact, a group of special counsel,

18   supervisors, a group of former employees,

19   Aerotel, one of the joinders do today's motion

20   and a proposed request was made by one for this

21   trustee.

22             In each transaction the United

23   States trustee acting in its powers and under

24   its mandates has determined that this official

25   Creditors' Committee does, in fact, represent

1

2    the various credit creditors of the case which

3    says all of those requests can be denied.

4        So HSBC has failed to file a single

5    motion regarding the inability of this

6    Creditors' Committee function to success to

7    deliver efficiently and discharge after duties

8    to all creditors.  I won't repeat the litany of

9    actions taken over the nine months.

10       Suffice it to say I cannot recall

11   one episode, one instance where any committee

12   member has come to this Court and complained

13   that its view was not taken seriously by the

14   Committee.

15       The nature of a case, your Honor, as

16   you noted in the Enron decision size and

17   complex alone does not mandate an appointment

18   of a separate Creditors' Committee.

19       In fact, I think it is quite easier

20   to say the appointment of a separate committee

21   would maximize not minimize it.

22       It has been made clear by two HSBC

23   motion and the other behind the premise of

24   consolidation, but, as your Honor made clear at

25   the consolidation, that fight is not before

78

1

2      us.  That will have to await the confirmation.

3              With respect to the parties standing

4      and desires of various constituencies, HSBC has

5      asserted once again without factual or legal

6      support that this case and this Creditors'

7      Committee has been dominated by parties

8      motivated only to further the interest of World

9      Com and Intermedia creditors.  This assertion

10     simply cannot sustain scrutiny.

11             The total department obligations of

12     these debtors is in excess of $36 billion

13     dollars exclusive of intercompany claims, which

14     MCI has funded and claims only approximately 20

15     percent, and yet as I stated more than 40

16     percent of the Committee consists of MCI

17     creditors.

18             The MCI creditors under the proposed

19     plan is receiving a discovery with par and the

20     MCI senior debt is receiving a recovery, a

21     substantial premium over that which is being

22     researched by the World Com creditors.

23             I don't think there's been any

24     actual definition of this Creditors' Committee

25     and creditors to the disadvantage of the MCI

79

1

2    creditors.

3         What HSBC really appears to be

4    arguing about or is unhappy about is the

5    contractual insubordination contained in its

6    indenture and the fact that it cannot receive

7    payment until its senior creditors are paid in

8    full, a fact that is not going to happen with

9    the debtors current plan of reorganization, and

10   HSBC makes much of the fact that there is no

11   MCI debt holder.  As your Honor knows, there

12   are no shoes not wet.

13        The Creditors' Committee is an exact

14   replica of the creditors' body.  Whether it is

15   the other factors generally considered by

16   courts in making an 1102 determination strongly

17   suggest that the request for a separate MCI

18   Creditors' Committee is unwarranted and

19   unnecessary.

20        The creditors represented by HSBC,

21   the sub debt holders, the group of creditors

22   calling themselves the dissenting MCI bond

23   holders, a group of trade creditors, I don't

24   know if they are getting MCI's creditors, are

25   all represented differently by different

80

1

2    counsel from their firm.

3         Mr. Weisfelner firm and Miss Moss'

4    firm know how to advocate the interest of their

5    clients, and you've already heard time and time

6    again in both these and presentations how they

7    intend to do so leading up to the confirmation

8    really.

9         And each of these counsel has

10   resorted to 503(B) under the Bankruptcy Code so

11   they don't have to carry the financial burden

12   if they can sustain the standards set forth in

13   that section.

14        The motivation of HSBC that brings

15   this motion at this time we believe is

16   self-evident.  They are seeking a funded estate

17   representative to oppose confirmation.

18        But the case law is clear under

19   Section 1102 that the debtor's estate should

20   not be compelled to fund a direct group of

21   creditors to litigate an issue that would

22   appear not to be in their interest alone and

23   would provide an interest to the debtor's

24   estate.

25        I think it is also clear that the

81

1

2    appointment of an additional Creditors'

3    Committee would increase the amount of these

4    cases and would jeopardize and delay the

5    substantial progress that has been made to

6    date.

7              The cost benefit analysis that your

8    Honor alluded to on page 23 of your decision

9    with respect to the trustee motion we believe

10   is equally true with respect to the current

11   motion.

12             The time for delay in making a few

13   cases is over.  These debtors with the very

14   able assistance of a dedicated group of

15   official creditor members, despite the

16   compensation, suggest the most significant

17   turnover in U.S. history.

18             It is unfortunate but not surprising

19   all seeing that debtors and the committee

20   cannot reach a full 100 percent plan

21   reorganization with each and every one of the

22   creditors, but having reached in court with

23   creditors well over 90 percent of the total

24   debt structures appears to us to be quite a

25   remarkable feat.

1

2          It is time to let this process

3     unfold.  It is time to allow confirmation to

4     begin without the intervention of new trustees

5     or new official committee, Creditors' Committee

6     whose sole purpose is to deny the plan for the

7     reorganization.  That is in our opinion and our

8     view does not call for an additional creditors

9     committee, we believe the motion must be

10    denied.

11         THE COURT:  Before I hear, I assume

12    I'm going to hear from the debtor and the U.S.

13    Trustee office and I don't know who else wants

14    to be heard.  Miss Moss.  That's fine.  I'm

15    going to take a ten-minute break, 20 after five

16    by that clock.  We will come back and

17    continue.

18         (A break from the record was taken.)

19         MR. STROCHAK:  Good afternoon, your

20    Honor.  Adam Strochak for the debtors.

21         The issue here, your Honor, the

22    complaint here is not about the abdication of

23    fiduciary duties, but it is really a complaint

24    about the way those duties are exercised.

25         The fundamental issue here, HSBC's

1

2    fundamental complaint is that it doesn't like

3    the result of the process, a plan that emerged

4    from the process that was undertaken when these

5    cases commenced in July of last year.

6            Mr. Golden has gone through the law

7    and I won't repeat what he's done here.  What I

8    want to do is take a little time to focus on

9    the specifics, the evidence that's before the

10   Court from the record on the trustee motion and

11   focus specifically on the particular areas in

12   which the movants and the folks who filed

13   joinders contend that the representation here

14   was inadequate, and the first area raised is

15   the size and complexity of these cases.

16           The easy answer to that, your Honor,

17   is that there is a 14 member committee that's

18   been appointed in these cases.

19           You have a situation where there

20   certainly is no dispute this is a complex case

21   and a large one, but as the Court indicated in

22   the Enron opinion, size and complexity are not

23   determinative of whether additional committee

24   should be appointed and were when you really

25   look at it closely, we have what is

1

2    fundamentally a one issue dispute, it going to

3    be hotly contested as we have seen over the

4    past couple of weeks in this court room.

5             It is a one issue dispute, does the

6    plan the debtors propose properly focus on

7    consolidation and can it be confirmed on such

8    confirmation?  That's the issue.

9             It is not such an issue that would

10   require an additional committee to start

11   investigating.  Everybody knows what the issues

12   are.  They have been explored at length in

13   eight depositions that are before the Court

14   already.

15            They have been pursued.  The

16   arguments have been pursued and investigated by

17   able counsel on behalf of the dissenting

18   creditors from at least three different law

19   firms and probably more and there simply is no

20   complexity here that can't be dealt with

21   through the ordinary confirmation objection

22   process, and that's really what they are

23   complaining about is that this plan, the plan

24   the debtors proposed, doesn't give the

25   distribution to the MCI sub debt, and that's

85

1

2    why the bankruptcy code allows any creditors to

3    object to the plan of reorganization.

4            If an elected plan, they can object

5    to it.  The code doesn't limit committees to

6    objecting to a plan.  They have standing.  They

7    can object and there is no reason that they

8    can't pursue those objections at confirmation.

9            So that factor we will submit, your

10   Honor, simply does not support the allegation

11   that there's been a lack of adequate

12   representation in this matter, and that, of

13   course is the movants burden to establish.

14           The threshold issue here is has the

15   movant demonstrated through record evidence

16   that there's been a failure of representation,

17   a lack of adequate representation.  If they

18   don't cross that hurdle, we don't even get to

19   the discretionary analysis.

20           The second factor alleged is that in

21   less than a year the debtors have proposed the

22   plan.  That the plan is based on substantive

23   consolidation and the presumed validity of the

24   MCI World Com intercompany claims, that is,

25   between the two groups of companies.

86

1

2          We heard a lot about this in

3     connection with the trustee's motion, your

4     Honor, that somehow it was a bad thing that the

5     debtors in conjunction with the committee have

6     moved expeditiously through the Chapter 11

7     process and have proposed a plan relatively

8     quickly after these cases commenced.  I would

9     submit your Honor that's laudable, not

10    something that should be criticized.

11         Again, though, this is a

12    confirmation issue.

13         The record from the trustee hearing

14    demonstrates unequivocally that the debtors and

15    the Committee have investigated intercompany

16    claims and reached an informed decision as to

17    an appropriate plan to propose in light of all

18    the facts and circumstances that existed

19    surrounding those plans.

20         Simple disagreement with that

21    decision does not constitute a failure of the

22    representation of the members of the Committee

23    warranting appointment of an additional

24    committee, and I would direct the Court's

25    attention to page 15 of the decision issued on

1

2     the trustee's motion where the Court indicated

3     its conclusion that it appears that the

4     movants, that is, the movants and the trustee

5     motion simply disagreed with the conclusions

6     drawn by the debtors after the debtors

7     extensive investigation and analysis of issues

8     concerning substantive consolidation and

9     intercompany claims.

10          There is no evidence that suggests

11     that those issues, the existence of those

12     issues, constitutes a failure of the

13     representation of the Committee members.

14          The evidence moreover introduced at

15     the trustee hearing demonstrates unequivocally

16     it wasn't debtors alone looking at the issues.

17     It was the debtors hand and hand with the

18     Committee.

19          The evidence is unambiguous and

20     undisputed that FTI, the Committee's forensic

21     consultants, played a prominent role in

22     investigating the intercompany claims, worked

23     co-objectively with the debtors to share

24     information and that the Committee's

25     professionals provided extensive information to

1

2    members of the Committee participants in the

3    negotiation so that everyone would have a

4    common knowledge base going into the

5    negotiations as to what the critical issues

6    were.

7            With respect to the speed in which

8    we moved to the plan process, your Honor, I

9    don't see how we could have given people more

10   notice.

11           Mr. Capellas announced in January in

12   a press conference to the world that the

13   debtors intended to propose a plan by April

14   15th.

15           That we stuck to that schedule

16   should not surprise anybody.

17           My partners and I have advised the

18   Court at various status conferences, case

19   status conferences over the last several months

20   that the debtor intended to stick to that

21   schedule, if at all possible.  So the fact that

22   we actually did it should not be thrown back at

23   us and somehow a factor that demonstrates that

24   there was inadequate representation with

25   respect to various creditor groups.

89

1

2           The world new about it and to the

3    extent anybody wanted to propose a plan to us

4    for consideration we were available.

5           The third point, your Honor, is that

6    the official committee structure is inadequate

7    to represent the interests of MCI creditors,

8    and I think, as the Court has noted, the

9    complaint here is really that it is inadequate

10   to represent the sub debt.  That's the

11   fundamental premise of this motion.

12          But even looking at it in the

13   broader context with respect to all MCI

14   creditors, the fundamental argument is that the

15   MCI companies have 90 percent of the asset

16   value but only 40 percent of the seats on the

17   Creditors' Committee, membership of the

18   creditors committee.

19          That, your Honor, respectfully turns

20   the inquiry on its head.

21          We think the appropriate analysis is

22   to look at the debt, that is, who holds the

23   debt, and if you look at where the debt lies,

24   you have a substantial portion of the debt at

25   the World Com entities.

1

2          So it should hardly be a surprise to

3  anyone that 60 percent or so of the members of

4  the Creditors' Committee were nonMCI creditors,

5  that is World Com creditors or Intermedia

6  creditors because a substantial portion of the

7  debt is at World Com.

8          And if you look at how much of the

9  debt is real as stated with respect to the

10  subordinated upon holders there, is $750

11  million in total out of 38 or so billion

12  dollars in bond debt.

13          Maybe the number is 36 total.  Maybe

14  the number is 40 totally amount.  I misspoke.

15  I didn't mean to say bond debt.  I meant total

16  debt for the entire enterprise.

17          I did the math this morning quickly

18  and it is about 2 percent.  They represent

19  about 2 percent, probably less than 2 percent

20  of the entire debt.

21          The standard is not proportional

22  representation.  It is not the Committee must

23  have exactly the same percentage of MCI

24  creditors as either asset value or total MCI

25  debt exists. The idea is that the key is

1

2     representation.

3              It is what folks actually do, not

4     who they might be slotted to in terms of

5     particular seats on the committee.

6              They have made no showing that the

7     Committee in this case is not functioning, that

8     it is hopelessly deadlocked.   Simply no

9     evidence whatsoever.   In fact, just the

10    opposite.

11             We have a committee that largely

12    supports the plan that the debtors have

13    proposed.   We have moved quickly and

14    cooperatively through the plan process and the

15    Chapter 11 process and are now on the eve of

16    confirmation a few months ahead of us.

17             The second point that they raise

18    with respect to the structure of the Committee

19    is the allegation that the trade creditor

20    representatives on the committee, the MCI trade

21    creditors representatives, AOL and EDS, have

22    somehow no fulfilled their fiduciary duties.

23    This has been a lurking issue with respect to

24    the trustee motion.

25             There is absolutely no evidence in

1

2   the record whatsoever to the effect that those

3   two members of the committee failed in any way

4   to fulfill their fiduciary duties or have not

5   adequately represented the creditor

6   constituencies.

7        We have had nothing but innuendo

8   about it but no evidence at all that there's

9   been any breach of fiduciary duty or anything

10  to that effect.

11       The only evidence that they cite,

12  that the movants cite is that the result is a

13  plan that provides for no distribution to the

14  subordinated bond holders on account of the

15  roll up to the senior debt due to the

16  contractual subordination provision.

17       The next point they make with

18  respect to adequate representation is the

19  allegation that somehow the entire plan process

20  was handed over to the Matland Paterson Group

21  and David Matland, who somehow co-opted the

22  whole process and slanted it toward World Com

23  bond holders.  That, your Honor, is not

24  supported at all in the evidentiary record.

25       HSBC misleadingly in our view cites

1
2    to a snippet of deposition testimony from
3    Mr. Capellas's deposition and kind of slights
4    it for the proposition that Mr. Matland and his
5    group was driving the plan negotiation process
6    at the behest of the debtors.
7            That is simply not what the record
8    demonstrates.
9            The deposition of David Matland
10   himself on page 33 through 36 and again at 39
11   through 40 indicate that Mr. Matland got
12   involved in the planned process at the behest
13   of Mr. Savage in order to try and get the
14   constituents to the table in order to get a
15   deal done.
16           Mr. Capellas himself testified that
17   Mr. Matland was the catalyst for serious
18   negotiations among bond holder groups but not
19   in any way that this plan process was given
20   over to Mr. Matland as a representative of
21   World Com bond holders.
22           Again, Mr. Capellas's deposition at
23   pages 45 and 46, I will just paraphrase,
24   Mr. Capellas's testimony was that he had
25   exactly a one-on-one meeting with Mr. Matland.

94

1

2      It was an introductory meeting.

3              They discussed primarily the

4      telecommunications business.  They probably

5      talked a little bit about the plan.  He

6      stressed, Mr. Capella stressed to Mr. Matland

7      the importance of a quick emergence from

8      Chapter 11 due to competitor pressure and

9      essentially just asked Mr. Matland, said to

10     Mr. Matland that anything he could do to drive

11     the plan process toward conclusion would be

12     appreciated.

13              And, simply, there's simply no

14     evidence in the record that this process was

15     co-opted in any way by any one creditor or any

16     one creditor group.

17              Turning to the next point, the next

18     point is that the entire creditor constituency

19     somehow was excluded from the planned

20     development and negotiation process, and there

21     are a couple of subpoints here.

22              HSBC argues that, well, it is

23     requested.  It's formal request to join the

24     official committee was rejected and there is no

25     explicit representative of the subordinated

95

1

2      debt invited to join in the planned

3      negotiations.

4              They argue that neither the debtor

5      or any committee member ever took the position

6      that there should be a distribution to the sub

7      debt and essentially argue in conclusion that

8      creditors of MCI were left with no meaningful

9      role in the process.

10             Again, your Honor this is not

11     supported by the record in this case.

12             The record indicates Exhibit F, Miss

13     Moss' letter to my partner Marcia Goldstein of

14     March 26th.  It was just a request for

15     information.

16             They had contacted us a couple of

17     days before, indicated they wanted some

18     information to facilitate their analysis of

19     plan issues.  We, subject to an execution of a

20     confidentiality agreement, provided information

21     to them and, essentially, never heard back from

22     HSBC.

23             HSBC never came back and said,

24     here's a proposal.  Would you please consider

25     it.  They never came back and asked to

1

2    participate directly in the negotiations and

3    the idea that somehow we are at fault and the

4    representation has failed because an explicit

5    invitation to the process was not issued is

6    simply incorrect.  They are represented by able

7    counsel.

8         They certainly could have asked to

9    participate.  They could have made proposals.

10   They could have entered directly into

11   negotiations with us.  That simply did not

12   happen in this case with respect to the

13   subordinated debt holder.

14        Contrary to HSBC's assertion, there

15   were, in fact, some discussions of some sub

16   debt issues in negotiation with the planned

17   negotiation.

18        Mr. Capellas testified at page 112

19   through 113 of his deposition that, in fact, he

20   did recall somebody mentioning the sub debt

21   issues.

22        Mr. Savage testified at page 252 of

23   his deposition that it was his impression that,

24   in fact, the negotiations did take into account

25   the interests of the subordinated debt, but

97

1
2    they took it into account because it rolled up
3    to the senior debt, that is, everyone came to
4    these negotiations with a basic understanding
5    and premise that the positions on the table
6    were for less than a 100 cents recovery for the
7    senior debt, so it is only a natural
8    inclination on everybody's part if any of the
9    subordinated debt got any recovery that it was
10   going to roll up to the senior debt and the
11   assertion that somehow this warrant the
12   appointment of an additional committee with all
13   its expense, the risk of delay and the risk of
14   substantial complication of these proceedings
15   it is just simply incorrect, your Honor.
16           It is as if an equity holder stepped
17   up and said an equity holder equally well could
18   have asked the same questions in the deposition
19   and gotten the same answer?  Did you distribute
20   a distribution to equity?
21           And, of course, the very easy
22   response to that would be, well, everyone
23   looked at it and thought the value was
24   insufficient to distribution to equity so,
25   therefore, to that extent it was considered and

1

2    immediately disposed of that issue.  The same

3    thing applies in this circumstance.

4            It is very clear that the only

5    adequate representation that these movants

6    would ever find is representation that came out

7    and opposed the plan that we had proposed.

8    That's what they want.

9            They want a committee to pursue the

10    plan objection that they are capable themselves

11    of pursuing and I'm quite certain will be

12    pursued by other able counsel in these

13    proceedings as we have seen over the last

14    several weeks.

15            Let me address a couple of issues in

16    closing that arose from argument of the

17    parties.

18            First of all, there has been

19    perpetuated here and carried over from the

20    trustee hearing a very misleading

21    characterization of the intercompany claims.

22            Mr. Bentley has argued and Miss Moss

23    has argued that this is not such a hard issue.

24            If you just look at it a little

25    differently, you'd come to the conclusion that

1

2    they advocate, and I assume will advocate at

3    confirmation, that is, you don't have to look

4    at the trillion dollars in intercompany

5    claims.  You don't have to worry about the $300

6    billion of intercompany claims where the

7    debtors have determined that they can't at this

8    juncture determine exactly who the counter

9    parties are on both sides of those transactions

10   and properly analyze all them.

11          They say you don't have to worry

12   about all the intercompany claims between the

13   MCI entities.  All you have to do is look at

14   the net intercompany claim owing from the

15   consolidated MCI entities to the consolidated

16   World Com entities and they contend, well,

17   that's only about $24 billion of which 19

18   million or so, 19 billion or so is the royalty

19   claims that the Court has heard so much about.

20          That is an exceedingly misleading

21   characterization, your Honor, of the analysis

22   that the debtor and the committee undertook and

23   is spelled out at length in the exhibits and

24   deposition testimony the Court has before it

25   from the record of the trustee hearing.

1

2          It would be wholly inappropriate,

3   your Honor, to simply look at that little slice

4   and just look at the net owed by MCI to World

5   Com and disregard everything else.

6          We don't think that's the

7   appropriate analysis.  We think it is a gross

8   oversimplification of the matter and, at the

9   end of the day, we will demonstrate to this

10  court at confirmation that the entanglement

11  that exists warrants the substantive

12  consolidation that we have proposed.

13          It is not a simple exercise. Mr.

14  Bentley essentially wants to relitigate the

15  trustee motion.

16          Now, the record in that case, your

17  Honor, that is, the factual basis for the

18  assertions that the intercompany claims are

19  effectively a simple problem that can be

20  resolved simply through a little triage

21  thoroughly discredits the affidavit and

22  deposition testimony from the expert that was

23  adduced by the movant on the trustee motion,

24  Mr. Walsh, David Walsh, based on the most

25  cursory analysis, based on a process under

101

1

2   which they got together, the lawyers put

3   together a draft of the affidavit, wrote the

4   conclusion and the purported expert then

5   reviewed the conclusion, went out and tried to

6   find some data to support it.

7          THE COURT:  Just to clarify the

8   record, I don't think he was ever offered up as

9   an expert.

10          MR. STROCHAK:  I think that that's

11   correct, your Honor.  I think that's correct.

12          So we don't think it is appropriate

13   to relitigate the trustee motion here and we

14   think for all the reasons that the Court

15   concluded on the trustee motion that the

16   debtors have looked at these issues, had

17   investigated them thoroughly; that the same

18   facts pertain here and demonstrate that there

19   has not been a failure of representation and

20   that no appointment of an additional committee

21   is warranted.

22          I wanted to just draw the Court's

23   attention to one small detail and the develop

24   is in the detail in these matters.

25          HSBC has asserted that the existence

1

2    of a plan term sheet ostensibly drafted by

3    counsel to Mr. Matland is somehow again

4    evidence that the plan process was taken over

5    by limited groups of creditors who were not

6    representative of the entire creditor

7    constituency.

8              That was Exhibit U to the Pole

9    affidavit and I don't know if the court has it

10   in front.  I'm happy to provide a copy if you

11   don't.

12             THE COURT:  I'm not sure why we are

13   referencing the Pole affidavits.

14             MR. STROCHAK:  Your Honor, I

15   referenced it only for identification

16   purposes.

17             This document was offered by HSBC in

18   connection with this motion.  It was simply

19   identified as Exhibit U to the Pole affidavit

20   previously submitted in connection with the

21   trustee motion.  I don't know that it has been

22   assigned a separate identifying motion with

23   respect to these proceedings.

24             MS. MOSS:  Your Honor, if I could

25   just clarify, I did not have a copy of the

1

2    stipulated list of exhibits at the time that I

3    referenced that.   I do now and I believe that

4    that document was included in the stipulated

5    list of exhibits as were all the documents in

6    the Pole affidavit.   I apologize for the

7    confusion.

8              THE COURT:   I understand but the

9    pole affidavit by itself was never admitted

10   into evidence?

11             MS. MOSS:   That's correct.

12             MR. STROCHAK:   That's correct, your

13   Honor, and I'm happy to find the exact exhibit

14   and assist the Court.

15             THE COURT:   That's all right.

16             MR. STROCHAK:   The only thing I want

17   to bring the Court's attention to is the

18   footer.

19             I don't think there was any

20   testimony adduced at the trustee hearing but

21   the footer indicates that it was prepared on

22   April 15, 2003, which is, in fact, after the

23   debtor's promulgated the plan.

24             So I don't know what purpose this

25   document served, but it certainly did not serve

104

1

2    as the foundation for planned discussions which

3    occurred and, indeed, were concluded before

4    this document was apparently even created, and

5    the point is to simply illustrate there is a

6    lot of evidence in this record and much of it

7    is being miscited and misleadingly urged upon

8    the Court as a basis for a conclusion that

9    there has been inadequate representation in

10   this case and we simply think that that is not

11   the case here.  So we would urge the Court to

12   deny the motion.  Thank you, your Honor.

13           THE COURT:  Anyone else?

14           MR. ZIPES:  Good afternoon, Gregg

15   Zipes from the Office of the United States

16   Trustee representing Carolyn Schwartz, United

17   States Trustee who isn't here today.

18           The United States Trustee is a

19   component of the Department of Justice.  As

20   part of her duties, the U.S. Trustee is

21   required to appoint a committee of unsecured

22   creditors in every case under 1102 of the

23   Bankruptcy Code.

24           1102 of the Bankruptcy Code requires

25   the U.S. Trustee to appoint a representative

105

1

2    committee.  It is clear in these cases the U.S.

3    Trustee succeeded and no additional committee

4    need be appointed under the two part test

5    articulated by this court in the case of Enron

6    and by other courts.

7         With respect to the first part of

8    the two part case, the Court reviewing adequate

9    representation looks at several nonexclusivity

10   factors, which everybody has gone over:  The

11   composition of the committee, which is the

12   nature of the case, the desires of the parties

13   in the case and the ability of the Committee to

14   properly function.

15        THE COURT:  Who in your view

16   represents the interests on the Committee as it

17   currently stands?  Who is representative of the

18   junior subordinated noteholders?

19        MR. ZIPES:  In analyzing this

20   question in the motion, the U.S. Trustee tried

21   to ensure that MCI had adequate representation

22   on the Committee, so the answer to your

23   question is the MCI holders of debt, and one of

24   the considerations that the U.S. Trustee had to

25   do initially in appointing a committee in this

106

1

2    case was that it was very little pure MCI

3    subordinated debt to creditors out there, if

4    any, to consider for appointment to the

5    Committee.

6              This request for a subordinated debt

7    committee was only made very recently, your

8    Honor, and there was some reference to a

9    letter, to the U.S. Trustee and a response by

10   the U.S. Trustee.

11             That was a request with respect to

12   appointment to the current committee.  It

13   wasn't a request for an additional committee

14   and in a way that letter and the response,

15   which we believe was mischaracterized, was a

16   bit of a red herring because even assuming HSBC

17   was added to the Committee at that time in

18   response to the letter, the vote on this motion

19   would have been 14 to one.

20             The Committee indicates in this

21   motion in its objections to this motion it was

22   unanimous in objecting to the motion, and the

23   record is clear in the case that MCI debt is

24   well represented on the committee.

25             There is some part about what that

1

2    debt is exactly, but the number of 47 percent

3    of the number of the committees holding MCI

4    claims is a number that I think this court

5    accepted in its memorandum decision with

6    respect to the trustee motion.

7            If anything, MCI debt is

8    overrepresented in this case, and the case law

9    does not require that every subgroup within a

10    debtor, subgroup within the creditor

11    constituencies be represented on a committee.

12    It doesn't require those who have a minority

13    position in a case to get their own committee.

14            The United States Trustee certainly

15    would have been concerned if we had heard

16    allegations that members of the committee had

17    breached its fiduciary duties and had not

18    adequately reviewed the financial affairs of

19    the debtors.

20            No group has been disenfranchised

21    there and the U.S. Trustee has not heard

22    anything from the committee informally or

23    formally that MCI's interest have not been

24    considered by this committee.

25            And assuming for the sake of

1

2   argument that MCI creditors are not adequately

3   represented or evenly within this subgroup

4   within MCI is not adequately represented, this

5   court may still exercise its discretion in

6   denying the motion under the second part of the

7   two-part test articulated by this test in Enron

8   and Dow Corning and that was effected by the

9   party as well the cost associated and the time

10   of the application, and your Honor asks the

11   movant to focus on the timing of this motion.

12            This motion was filed after the plan

13   and disclosure statement was filed, and there

14   is some reference, specific reference, in cases

15   to the timing in Dow Corning, the Court at page

16   143 stated, "Of course, timing is a

17   discretionary factor" and it stated, "Courts

18   are especially sceptical of motions after the

19   debtor has filed a plan of reorganization," and

20   they gave a string of cases that deal with

21   motions filed after the plan of disclosure

22   statement is filed.

23            So that discretionary element

24   certainly does work against the movants

25   position in this case.

109

1

2          Mr. Bentley stated that it was his

3     opinion that in the event a committee was

4     formed, that, in fact, its attorneys,

5     accountant and financial advisors could be

6     brought up to speed very quickly because they

7     might come from attorneys already associated

8     with the case, and the fact is that that may or

9     may not be the case, your Honor.  And in the

10    case of this magnitude and this complexity,

11    appointing another committee at this late stage

12    may, in fact, lead to do a lot of delay in the

13    case and unnecessary delay.

14          The appointment of an additional

15    committee would increase the complexity, your

16    Honor, and this additional committee would be a

17    coequal to the Committee already in place with

18    the statutory rights and fiduciary duties in

19    this case and it would probably not foster

20    cooperation with respect to the formulation of

21    a plan.

22          Your Honor, HSBC's interests have

23    obviously been represent in this case both

24    through the active involvement of its own

25    counsel and through the participation of

110

1

2     several informal committees with similar points

3     of view.  Even without an official committee,

4     HSBC's rights appear to be protected and this

5     court should not exercise its discretion,

6     assuming we get by the adequate representation

7     factors that we discussed earlier, the first

8     step of the two part test, it should not

9     exercise its discretion to directly appoint any

10    additional committee.

11            THE COURT:  Anyone else in

12    opposition that has yet to be heard from?  Miss

13    Moss.

14            MS. MOSS:  Your Honor, could I ask

15    for five minutes, please.

16            THE COURT:  Sure.

17            (A break from the record was taken.)

18            MS. MOSS:  Thank you, your Honor.

19            THE COURT:  You're welcome.

20            MS. MOSS:  Your Honor, first as to

21    the characterization of our motion by the

22    objectors, we are not requesting a separate

23    committee for the subordinated debenture

24    holders to be clear.

25            We will take one if the Court finds

111

1

2    that that's appropriate and if that's what the

3    Committee and the debtor and the U.S. Trustee

4    would offer to us, but that is not the basis

5    for relief that we requested and, in fact, the

6    reason, the essential underlying reason for the

7    appointment of a Creditors' Committee

8    separately for all MCI creditors is that it is

9    our view that MCI creditors in this case, all

10   of them, should recover 100 percent.

11           We should not be prejudiced because

12   the senior holders on the committee determined

13   that they would be willing to take something

14   less than that.

15           THE COURT:  And the answer junior

16   creditors would be willing to take something

17   less than that as well.

18           MS. MOSS:  That's right.  But it is

19   the senior's determination to which the

20   objectors point for the proposition that our

21   holders are entitled to nothing because of the

22   contractual subordination.

23           It is not, in effect, it is not

24   affected necessarily by the trade committee's

25   distribution.

112

1

2          It is to that that they point and

3     say because there is less than 100 percent

4     distribution to the senior holders that the

5     subordinated holders are entitled to nothing.

6          If they made that determination that

7     they are willing to take, for whatever

8     financial reasons, they are willing to take

9     less than 100 percent all MCI creditors should

10    not be prejudiced by that, particularly the

11    subordinate holders which we represent.

12          With respect to the issue of breach

13    of fiduciary duties, Mr. Golden makes much of

14    the fact that no allegation of breach of

15    fiduciary duties has been made.

16          Your Honor, that is not what I have

17    stated before.  I'm offering today it is not

18    our claim.  It is our claim of the indenture

19    trustee.  It is the claim of others and we

20    fully expect that that claim may at some time

21    be brought and I'm sure that the Committee has

22    its own concerns about whether such a claim

23    might be brought.

24          In fact, they've asked for

25    exculpation in the amended disclosure statement

1

2    from such claims, so to say we have not alleged

3    a breach of fiduciary duties is really an

4    inappropriate objection to this motion.

5              THE COURT:  That goes back to where

6    we started from, if MCI creditors put aside the

7    junior noteholders for a moment, if MCI

8    creditors are adequately represented on a

9    committee, then what would the rationale be for

10   a separate committee but for some breach of

11   fiduciary duty?

12             MS. MOSS:  Your Honor, I think the

13   cases say that there does not have to be

14   conduct that rises to what someone might

15   characterize as a breach of fiduciary duty.  I

16   think that the cases look to the issue of

17   conflicting interests.

18             THE COURT:  In terms of adequacy of

19   representation?

20             MS. MOSS:  Yes.

21             THE COURT:  So you are saying and,

22   again, just for argument saying, put aside the

23   junior noteholders, that you believe that the

24   conflicting interests as in the trade creditors

25   who have desire or willingness to continue to

114

1

2    do business with the debtor taints their

3    judgment somewhat so that it constitutes a

4    conflicting interest?

5         MS. MOSS:  I am saying -- I'm trying

6    to be careful not to say that any particular

7    committee member has acted in such a way that

8    we presented evidence of any particular

9    committee members conduct in such a way as to

10   taint the process.

11        What I'm saying is that taken as a

12   whole, when you look at the entire picture,

13   which is how you have to look at it, that the

14   composition of the Committee is ineffective to

15   carry forward the rights of the MCI creditors

16   as an entire creditor body.

17        I'm not saying this particular

18   creditor did X or Y and breached the fiduciary

19   duty.  I'm saying look at the composition of

20   the entire committee and you can draw but one

21   conclusion.

22        When you look at not just that, but

23   then you add on top of it the involvement of

24   Mr. Matland and the process, you come to the

25   conclusion that you've got domination by

1

2    creditors who have claims against the World

3    Com, enormous claims against the World Com and

4    Intermedia debtors, overshadowing the creditors

5    whose debtors hold virtually all of the

6    assets.

7         THE COURT:  Wouldn't you expect that

8    those creditors would resist and in the context

9    of the plan negotiation and Creditors'

10   Committee negotiation if the MCI creditors who

11   are sitting on the committee were being hurt in

12   any way or dominated to the extent that they

13   were relinquishing some of their rights or they

14   were being harmed in general by this plan,

15   don't you think that they would react?

16        MS. MOSS:  Your Honor, the statute

17   doesn't require a member of the committee to

18   come forward and say, you know, something is

19   wrong in River City.  Okay.  Anyone can bring

20   this motion.

21        THE COURT:  I didn't suggest you

22   couldn't.  I'm trying to get at least you to

23   respond to my question and see what makes

24   sense.

25        It makes sense to me that when

116

1

2    committee members who may represent debtors who

3    allegedly have 90 percent of the assets end up

4    with 33 percent of the recovery it is one or

5    two conclusions you can draw, or three

6    conclusions.

7          Either they really don't believe

8    they have 97 percent of the assets or if they

9    do have 90 percent of the assets and that those

10   debtors entities have some other reason for

11   entering into this agreement where they get 33

12   cents or 36 cents on the dollar, and then you

13   have to consider whether there was a breach of

14   fiduciary duty.

15         You don't want to the come out and

16   say it but that's all that's really -- if you

17   take outside the juniors, you have the seniors

18   and you have the MCI trade creditors and any

19   other holders, I may not be clear about now

20   that is sitting on the committee.

21         Now one says, if they have 90

22   percent of the assets, why did they settle for

23   anything less than 90 percent of the recovery

24   and,.

25         Obviously they did, then why did

1

2    they do it?  To whose detriment did they do

3    it?

4              And I think your motion, whether you

5    say it or not, is to the detriment, the overall

6    detriment to MCI, not just the juniors.

7              And, again, to put the juniors

8    aside, you are seeking a committee for the MCI

9    creditors when the MCI creditors are sitting on

10   a committee that currently exist and are not

11   complaining that they are not being heard and

12   certainly when you made this motion and sought

13   a committee for MCI creditors, one would have

14   thought, even if they were silent as they were

15   sitting on a committee and they were dominated

16   in every way, they would rise up today and say,

17   you know, you're right.  We are sitting on this

18   committee.  We have 40 percent representation.

19   We have 90 percent of the assets.  You know,

20   this is not a bad idea that we have separate

21   representation and pursue the interest of MCI.

22             MS. MOSS:  Your Honor, they clearly

23   have other interests.  There is no -- I don't

24   think anyone disputes that the creditors who

25   are sitting on the committee have other

118

1

2    interests.

3           Now, they may have for whatever

4    reason thought that based upon their claim and

5    the nature of their claim or how they acquired

6    their claim that the present plan for them is a

7    wise deal.  That does not mean that when you

8    look at the assets of these debtors, the MCI

9    debtors and you look at the debt --

10          (An interruption in the record.)

11          THE COURT:  Let's take a five-minute

12   break.)

13          MS. MOSS:  Your Honor, to respond to

14   your question, I think that the Court is making

15   some unwarranted assumptions about the

16   behaviors of committees and committee members.

17          The MCI senior holders that we are

18   discussing are distressed investors like the

19   creditors who sit on many credit committees

20   are --

21          MR. ROSNER:  Your Honor, I have to

22   interrupt.  There's been a lot of

23   mischaracterization.

24          THE COURT:  You will have your

25   opportunity.

1

2              MR. ROSNER:  That's just wrong.

3              THE COURT:  Excuse me.  It is wrong

4    for you to speak out.  Sit down.  Thank you.

5              Finish what you are saying, please.

6              MS. MOSS:  Your Honor, these

7    creditors have other interests obviously

8    besides their broader duties to the credit body

9    as a whole.

10             Why do people go to sit on a

11   committee?  They want to sit on a committee, to

12   start with, so that they can maximize the value

13   of the return on their own investment, whatever

14   it is.

15             To these creditors, for whatever

16   reason, 80 cents or 70 cents or 90 cents may be

17   a good recovery.  That doesn't mean --

18             THE COURT:  That may not.  But I

19   think you may think that I or as I stated have

20   a misconception about committees.

21             I think you may have a misconception

22   of the fiduciary obligation of committee

23   members and I'm not interested on whether they

24   want to continue to do business with the debtor

25   or not, whether they all or they bought the

120

 1

 2    bond for less than value, original value

 3    whatever they are, they still have a fiduciary

 4    obligation, and the ad quasi of representation

 5    comes from what vantage point, what view do you

 6    have of this case as a creditor?

 7             That's the adequacy and the attempt

 8    to integrate these various parties into the

 9    Committee process.

10             But the fiduciary obligation still

11    requires the person to step back, say what's in

12    the interest of these estates, and you can't

13    just, I think, just ignore that and say, well,

14    because the trade creditors want to do business

15    with the debtor.

16             If that were the case, then one

17    would wonder how you could ever have a

18    committee until they were pure.  They would

19    have to be trade committees on the creditors on

20    the committee that continue to do business with

21    the debtors creditors that aren't going to do

22    business with the debtors.  Banks who want to

23    have a continued relationship with the debtor.

24    Banks who just want their loan paid.

25             You'd have to have landlords on

121

1

2    whose leases get rejected and landlords on that

3    may get their leases assumed.

4            How in the world would you ever have

5    a committee composed to reflect the debtors

6    creditors constituency unless you superimposed

7    on all of them the fiduciary obligation to act

8    in accordance with the interest of the estate?

9            MS. MOSS:  Your Honor, we obviously

10   don't disagree that there is a superimposed

11   fiduciary obligation.

12           To the extent that this court can

13   determine based upon the facts that have been

14   presented on this motion and in connection with

15   the trustee motion that the creditors, the only

16   creditors committee may have breached the

17   fiduciary committee in the way they do.

18           We assert they acted in a certain

19   way so as to not advance the interest of MCI

20   creditors as a creditors body.

21           THE COURT:  Didn't they have a

22   fiduciary obligation to consider the interests

23   of the MCI creditors?

24           MS. MOSS:  Yes, they did.

25           THE COURT:  You are saying their

122

1

2    actions whether intentional or not didn't

3    fulfill that obligation?

4            MS. MOSS:  We are saying that their

5    action did not appropriately or adequately

6    represent the interests in accordance with the

7    requirements of Section 1102, yes.

8            THE COURT:  Okay.

9            MS. MOSS:  To the extent the Court's

10   view that subsumes some other issue is a breach

11   of fiduciaries duties, we are saying there is a

12   confluence of factors here that have occurred,

13   not just a fact that trade members on the

14   committee are getting a cure amount.

15           So maybe their view is if somebody

16   gets 30 cents or 35 cents that that's okay for

17   them.  Not just that the MCI seniors have, you

18   know, perhaps as investors made a determination

19   that 80 cents is good for them, not just that

20   there was a domination by creditors of World

21   Com and Intermedia on the committee, not just

22   that there was somebody leading the charge for

23   the plan development who wasn't on the

24   committee and who was a World Com bond holder,

25   one of the largest claims in the case, what I'm

123

1

2    saying is that when you put all of those things

3    together, the process failed, and to the extent

4    -- and as a result, it excluded and it did not

5    appropriately carry forward the rights and the

6    interests of MCI creditors.

7                    THE COURT:  Mr. Rosner, did you want

8    to say anything?

9                    MS. MOSS:  I had a few other points

10   I would like to meet unless you would like to

11   hear from him.

12                    THE COURT:  No.  Go ahead.  Finish

13   your presentation.

14                    MS. MOSS:  Your Honor, I would also

15   add to that, in the debtors presentation, Mr.

16   Strochak made a remark that everyone came to

17   the table with the understanding.

18                    Everyone came to the table with the

19   understanding that less than 100 percent would

20   be paid to the MCI creditors.  That is evidence

21   of my point, okay.

22                    That if that is the understanding

23   everyone came to the table with to start with

24   without even investigating the validity and

25   enforceability of these intercompany claims

124

1

2    there is already a fracture in the process as

3    far as the MCI creditors are concerned.

4                  As for the timeliness issue, when is

5    the right time?

6                  Maybe the Court can tell us exactly

7    when and under circumstances like this would be

8    the right time?

9                  How could we know what is going on

10   in a committee from which we were excluded and

11   the statute is, as I pointed out before, does

12   not require a committee member to come forward

13   and say something is going wrong.  How does

14   anybody else know that something is going wrong

15   until a plan is filed and a plan that provides

16   for substantive consolidation?

17                  We did everything or HSBC should be

18   entitled to a different standard than a

19   committee member who sits by idly on the

20   committee while something is going wrong with

21   the process and says nothing.  That's not what

22   happened here.

23                  We weren't on the inside of the

24   process.  We were observing from the outside

25   and doing everything we could to try to get on

125

1

2     the inside.

3              THE COURT:  Well, when you observe

4     from the outside I think you are certainly

5     limited to your perception of what the people

6     on the inside are doing and whether or not they

7     fairly and adequately represent your

8     interests.

9              And what I've said earlier, and I

10    will say it again, for a long period of time,

11    nobody did anything to challenge the

12    composition and now that that composition

13    produced a result different than what the

14    parties thought would be the interaction on the

15    committee, I question whether or not that

16    warrants a separate committee as much as it

17    warrants to continue to raise issues with

18    respect to the main issue, which is really the

19    substantive consolidation issue.

20             MS. MOSS:  Your Honor, we made two

21    very timely requests to the U.S. Trustee to be

22    appointed to the Committee, timely because no

23    plan had yet been proposed and, in fact --

24             THE COURT:  And when you didn't get

25    the answer, what did you do about it?

126

```
 1
 2          First of all, I question this
 3    timeliness because you can't escape the reality
 4    that you don't inherit greater rights than
 5    whose place you took.
 6          And if the first indenture trustee
 7    did not think it was warranted to act in August
 8    and September and all the other months leading
 9    up to the appointment of the change in who the
10    indenture trustee was, you just can't walk away
11    and say, well, they didn't do it.  I just first
12    came on the scene and I acted promptly.
13          You take that position as it was and
14    it was vacated and, not vacated, but when you
15    took their place.
16          And, second, if you say that you
17    requested the U.S. Trustee and they denied your
18    request, they didn't respond to your request,
19    you still have recourse here, but no recourse
20    was taken and you knew -- let me just finish.
21          Everyone knew 100 days prior to
22    April 15th or April 14th that a plan was coming
23    out, and it was a statement made by the new CEO
24    on the 100 day plan, and when you knew that 100
25    day plan began, if you didn't think that you
```

127

1

2    were adequately represented on that committee

3    and you had requested the U.S. Trustee to put

4    you on that committee and either you didn't get

5    an answer or you didn't get the answer you

6    wanted to, I still didn't hear from you until

7    after the plan is promulgated and you are told

8    when it is going to be promulgated.

9              MS. MOSS:  Your Honor, there was no

10   plan promulgated at the time that we became

11   appointed as successor and in indentured

12   trustee.

13             In fact, there was no settlement

14   even reached at that point in addition to

15   requesting appointment to the Committee by the

16   U.S. Trustee and, of course, there were a

17   number of follow-up phone calls made to the

18   U.S. Trustee in conjunction with our letters.

19             We haven't put all that information

20   in before the Court today in the form of an

21   affidavit, but I will represent to the Court I

22   personally made several telephone calls in an

23   effort to follow up on those requests and there

24   was no response given and at that point we did

25   contact the debtor.

128

1

2          We signed a confidentiality

3    agreement.  We gave them the opportunity to

4    open the channels of communication.

5          To imply that, as the debtor

6    implied, that we could have submitted a plan

7    proposal to the debtors firm is really kind of

8    silly, I think.

9          Under the circumstances of this

10   case, I hardly think it would have been given

11   much deference by the debtor.

12         We did everything we could to

13   interject ourself into the process, by

14   communicating with counsel on various parties

15   and making an attempt to be included in the

16   discussions.

17         It was only at the time that the

18   plan was filed that it became apparent that

19   there was no intention on the part of anyone to

20   include us in that process.

21         Mr. Strochak cited some testimony by

22   Mr. Savage to the effect that in his view,

23   Mr. Savage's view, the quips were getting a

24   recovery of the subordinated members were

25   getting a recovery.

1

2          I really couldn't quite believe my

3     ears when I heard that before, since we went

4     through this with several changes post petition

5     with the debtor, several debtors disclosure

6     statement as to whether quips were or weren't

7     getting recovery and what I thought we were

8     getting the other day was Ms. Goldstein's

9     assertion that the committee's disclosure

10    statement would make clear there is no

11    distribution to us quips.

12          So Mr. Strochak to cite testimony of

13    Mr. Savage that is inconsistent with the

14    position that the debtor has not confirmed with

15    the Court to clarify all of this confusion is

16    really kind of absurd.

17          Your Honor, in terms of the issue of

18    what a committee could do at this point and

19    moving forward towards confirmation, in any

20    case the main purpose of a committee ultimately

21    is to deal with the issue of plan treatment.

22    There is nothing nefarious about that.

23          That if a committee was appointed

24    now that it would be involved or maybe object

25    to the plan process.  We don't know what that

130

1

2    committee is going to do.

3          As the Court has pointed out, that

4    committee would have fiduciary duty to all the

5    MCI creditors.  No one can say what position

6    they would have to take.

7          We certainly know that they will be

8    charged with investigating what the proper

9    recovery is to MCI creditors in the case, but

10   to say that, you know, or to somehow

11   characterize their potential objection to

12   confirmation as some reason why they shouldn't

13   be, there shouldn't be a committee appointed is

14   really just turning the whole process just

15   upside down.

16         And, finally, your Honor, the U.S.

17   Trustee made an interesting or Mr. Zipes on

18   behalf of the U.S. Trustee made an interesting

19   comment.

20         He said if we had been appointed to

21   the Committee, if HSBC had been appointed to

22   the Committee then our involvement would not

23   have made any difference on this committee,

24   and, honestly, that's the whole point of this

25   motion.  That our involvement clearly would not

131

1

2   have made any difference on this committee as

3   it is presently constituted, so we agree with

4   that point.

5        THE COURT:  I think he said it

6   wouldn't have made any difference with respect

7   to, and I'm not sure if it was his view or

8   someone on the Committee, I think it was his

9   analysis with respect to this motion and not

10  that it would have any impact on the committee

11  because his view was that this motion was

12  opposed by the Committee 14 to zero so had you

13  been placed on the committee in sort of a

14  separate committee.

15       He then took the position that it

16  would be 14-1 for a separate committee.  That

17  assumes a lot of things, whether or not he

18  would have sought a separate committee had you

19  been put on a committee, but --

20       MS. MOSS:  Well, your Honor to the

21  extent that the U.S. Trustee did not make

22  appointments, and I think it is clear that if

23  we had been on this committee as it is

24  presently structured, chances are pretty good

25  that it would not have made a difference.

132

1

2          THE COURT: Mrs. Rosner, do you want

3     to make a statement?

4          MR. ROSNER: David Rosner from

5     Kasowitz, Benson. I'm attorney for MCI

6     noteholders committee.

7          Your Honor, number one, I'm sorry

8     for yelling out. That was disrespectful and

9     inappropriate.

10         Number two, the three members of the

11    MCI noteholders committee that sit on the

12    official World Com committee, two of those

13    holders, New York Life and Met life are par

14    holders and are not secondary purchasers. One

15    member Elliot Associates is a secondary

16    purchaser.

17         Number three, to the extent that the

18    Court attaches any significance to the February

19    11th letter to this proceeding to which I

20    don't, I would just suggest that there are two

21    places in that letter in which I confirm that

22    all members of the World Com committee act as

23    fiduciary for all creditors of this estates,

24    both MCI as well as World Com creditors.

25         And number four, I would just simply

133

1

2      suggest that the Creditors' Committee was but

3      one party to the planned negotiations that

4      resulted in the plan that is currently before

5      the Court.

6              Neither their adherence to their

7      fiduciary duty nor the application of fiduciary

8      duty was the sole generator of the plan that is

9      before the Court.  There were many parties that

10     negotiated.  The Creditors' Committee was one.

11     Thank you, your Honor.

12              THE COURT:  All right.  Thank you.

13     Anyone else?  Go ahead.  Very briefly.

14              MR. BENTLEY:  I would like to

15     respond to a couple of points made by

16     Mr. Strochak.

17              Two basic points that he addressed.

18     First what natural issues the Court should look

19     at in crafting its decision and rulings on this

20     motion.

21              Second, what the evidence shows on

22     those couple of key points that he felt was

23     most particularly on, and I would note that at

24     the outset that what's significant about

25     Mr. Strochak is that of the several objectors

134

1

2   that spoke, Mr. Strochak is the one that

3   ventured to address the record evidence of what

4   has happened here.

5          First, as to what the Court should

6   look at in the record evidence, we agree with

7   the basic point he made, and that is, and it is

8   a point that the Court was picking up on and

9   addressing with Miss Moss, in ruling on the

10  motion like this, the Court should not be

11  focusing principally on what are the particular

12  holdings of each committee member and do they

13  match the particular constituencies in the case

14  because as the Court has noted that can never

15  be gotten exactly right in a committee.

16          What really matters and what the

17  Court should focus principally on, as

18  Mr. Strochak said, is not what debt the

19  representatives hold but what the

20  representatives have done during a case, or by

21  extension what they have not done.

22          Mr. Strochak then turned to what

23  does the evidence show on that, and what's most

24  significant, your Honor, I listened very

25  closely to see if he challenged or rebutted the

135

1

2  key factual points that we have been making

3  that I summarized in my presentation and Miss

4  Moss did as well as to the what the committee

5  failed to do, and most of our key points he

6  just didn't dispute because we think he can't.

7         He didn't dispute that there was no

8  serious attempts to look at these enormous

9  royalty claims, the 19.5 out of the total 24.

10         He didn't dispute that those

11  accounts account for the great bulk of the

12  intercompany claims or even that there is so

13  little left of intercompany debt if you knock

14  out the royalties in their entirety what

15  remains is small enough that the MCI companies

16  are solvent and can pay their creditors in

17  full.

18         He didn't dispute any of that simply

19  because he can't I think.

20         He made one basic point, one basic

21  point to defend the Committee's conduct in not

22  looking at these central issues, and that is he

23  said, in conclusory fashion, he said it is very

24  misleading the way my clients have

25  characterized the intercompany claims.

136

1

2          He said it is very misleading to

3    look, as we urge, only at the net balance, the

4    net debt that is owed by the MCI companies

5    rather than go transaction by transaction.

6          But what's striking your Honor, what

7    I think is most significant and that I urge the

8    Court to take note of is that he didn't give

9    any explanation whatsoever.  He didn't even try

10   to explain why this is supposedly a misleading

11   or wrong way to look at these claims.

12          We think that it is self-evident

13   that this is a proper way to look at the

14   claims.

15          For example, an auditor would look

16   at the net balance and would not examine every

17   single underlying transaction, which is the

18   approach the Committee has focused on.  They

19   would sample.  They would sample representative

20   or random.

21          THE COURT:  They would but they

22   would sample from the entire base, not from a

23   difference.

24          If you are going to do an audit, you

25   do it of the transactions and then you would

137

1

2    draw a conclusion based on your sampling, but

3    if you're saying to me that once one statement

4    indicated $100 going one way and the other was

5    one 120 coming back you would only look at the

6    $20 difference and sample that you still have

7    to look at would you look at every one of them

8    or sample.  You are not just focusing on the

9    net.

10           MR. BENTLEY:  I agree with what your

11    Honor just said.  I think we are saying the

12    same thing.

13           Your Honor would look it what's the

14    net balance and then to probe beneath it he

15    would pull out or sample certain of the

16    underlying transactions.  Not every single one

17    but he would pick whatever in the book of

18    auditing principles is considered to be a

19    proper number of randomly selected samples, and

20    you Honor may be familiar with auditing.  The

21    samples that are selected are a very small

22    fraction of the total number.

23           And what's striking in this case is

24    that no consideration appears to have been

25    given.  There is absolutely nothing in the

138

1

2    record, nor did Mr. Strochak make any

3    assertions that any consideration was given to

4    any approach short of looking at every single

5    transaction.

6              Now, the final point that

7    Mr. Strochak made on this subject is that he

8    suggested to the Court that our position, the

9    objector's position, rests entirely on the

10   affidavit that was the presented by David Walsh

11   of Alvarez and Marshall as having been

12   characterized as being thoroughly discredited.

13             Now, I think we can put aside for

14   today's purpose when Mr. Walsh was thoroughly

15   discredited and if would were to look at the

16   entirety of the deposition transcript rather

17   than excerpts that is pulled out of the hearing

18   I think one could reach a very different

19   conclusion.

20             But for today's purposes the

21   important point is these are not conclusions

22   that are supported only by Mr. Walsh or only by

23   his firm.  These are conclusions that our

24   clients experts have reached.

25             We have retained independent experts

139

 1

 2    who have credentials that will be presented to

 3    the Court down the road and cannot be

 4    impeached, and they have reached the same basic

 5    conclusions that the approach is to look at the

 6    net balance and then do appropriate sampling

 7    but not by any stretch look at every single

 8    transaction.

 9            And this is a point that even though

10    it is a point that in some way is self-evident

11    and it is consistent with generally auditing

12    principles we have not heard one word from Mr.

13    Strochak or any one on his side explain why

14    that's not the proper approach or why the

15    Committee chose not to pursue that approach at

16    all.

17            And just to sum up, your Honor, that

18    failure, the failure to look into that or to

19    look into the royalties or to look into the

20    other ways in which the MCI creditors were

21    being unfairly treated under the plan, that is

22    the central failure of what the Committees

23    representative failed to do then in our view

24    warrants the appointment of a new committee.

25    Thank you, your Honor.

140

1

2          THE COURT:  Anyone else?  I want to

3    try to rule by 7:30 tonight.  If I'm not able

4    to do that, I will let you know at or around

5    that time.

6          (A break from the record was taken.)

7          THE COURT:  Case 1102(a)(2) of the

8    Bankruptcy Code permits the Court to order the

9    appointment of an additional committee to

10   ensure adequate representation.  Therefore,

11   this court must determine whether the movants

12   are adequately represented by the existing

13   committee.

14          Courts have generally applied the

15   following factors on a case-by-case basis

16   analyzing had adequacy of representation, the

17   ability of the committee to function, the

18   nature of the case and the standing and the

19   desires of the various constituencies, see

20   McLean 70 B.R. 852.

21          Other considerations include the

22   ability for creditors to participate in a case

23   even without an official committee and the

24   potential to recover expenses pursuant to

25   Section 503(b) whether the different classes

141

1
2    may be treated differently under a plan and
3    need representation, the motivation of the
4    movants, the cost incurred by the appointment
5    of additional committees and the tasks that a
6    committee or separate committee is to perform,
7    in re Enron Corp. 279 B.R. 671 and cases cited
8    therein.
9              Some courts have found inappropriate
10   to divide its consideration into two
11   components.
12             First, the Court must decide whether
13   the appointment of an additional committee is
14   necessary to assure the movants are adequately
15   represented.
16             Second, if the answer to the first
17   question is yes, then the Court must decide
18   whether it should exercise its discretion and
19   order the appointment, in re Dow Corning Corp.,
20   194 B.R. 121, in re Wang Labs, Inc., 149 B.R.
21   1, 2.
22             Discretionary considerations include
23   the cost associated with the appointment, the
24   time of the application, the potential for
25   added complexity and the presence of other

142

1

2     avenues for a creditor participation, Dow

3     Corning 194 B.R. in re Hills Stores, 137 B.R.

4     4, 5 through 8 ad hoc bondholders Group versus

5     Interco, Inc. 141 B.R. 422, 424.

6               The burden is on the moving party to

7     prove that the existing committee does not

8     provide adequate representation, Dow Corning

9     194 B.R. at 144.

10              The decision concerning an

11    additional committee involves a delicate

12    balancing of various and sometimes diverging

13    interests.  The formation of a Creditors'

14    Committee is "Purposely intended to represent

15    the necessarily different interests and

16    concerns of the creditors it represents,"

17    Andrew Denatale et al., Powers Functions and

18    Duties of Creditors' Committee, 767 PLI/Comm

19    791, 1998.

20              Moreover, ordering the appointment

21    of additional committees is an extraordinary

22    remedy, Sharon Steel Corp., 100 B.R. 767 in re

23    Texaco, Inc. 79 B.R. 560, (Bankruptcy Southern

24    district of New York, 1987).

25              An indication of whether a committee

143

1

2   adequately represents its constituents is its

3   ability to function.  A committee that is

4   hopelessly divided, unable to take a position

5   on important matters and ineffective would

6   clearly support an argument for a separate

7   committee.  See Enron 279 B.R. at 686.

8        The movants have not referenced any

9   incident where the Creditors' Committee has not

10  been able to function.  The Committee opposes

11  the appointment of an additional committee.  In

12  addition, the Creditors' Committee supports the

13  proposed plan of reorganization.

14       Nevertheless, even a functional

15  committee may not adequately represent a

16  particular group of creditors where one group

17  of creditors is so controlling that the other

18  group has no voice in decision making.

19       Therefore, courts also look to see

20  whether conflicts of interest on a committee

21  effectively disenfranchise particular groups of

22  creditors, Dow Corning 194 B.R. at 142.

23       In these cases, these debtor cases,

24  there have been no claims made by the

25  Creditor's Committee that the Creditors'

144

1

2    Committee has not permitted the MCI creditors

3    to be heard.   In addition, the movants did not

4    file their motion for a separate committee

5    until after the plan negotiation process had

6    concluded and the parties had reached consensus

7    on the issue of substantive consolidation.

8              Thus, the real complaint is with the

9    result of the negotiation process and a

10   consensus reached by the Committee members, not

11   that other committee members controlled the MCI

12   creditors on the committee.

13             The second factor that courts often

14   use in analyzing the adequacy of representation

15   is the nature of the case, such as where it is

16   a large complex case, see in re Beker industry

17   Corp., 55 B.R. 945.

18             While certain complex multi-debtor,

19   multi-business cases lend support for the

20   appointment of additional Creditors' Committee,

21   see in re Hills Store 137 B.R. at 6, McLean, 70

22   B.R. At 862, the size of the case alone is not

23   determinative, Enron 279 B.R. 688.

24             Where there are a variety of parties

25   and interest in a debtors case, the nature of a

1

2    case may be that appointing additional

3    committees may not provide a solution.    Indeed,

4    adding additional committee might intensify

5    conflict and lead to further complication.

6            Courts are reluctant to add a

7    committee to please one group of creditors if

8    that group is already represented on a

9    Creditors' Committee and additional committees

10   will only create further discord, litigation

11   and delay, Enron 279 B.R. at 688.

12           In such cases, the appointment of an

13   additional committee will not eliminate

14   tensions but would rather 'will only weaken the

15   impetus to compromise'. Sharon Steel 100 B.R.

16   at 779.

17           The Committee members are charged

18   with the responsibility of acting as

19   fiduciaries to all creditors represented by the

20   Committee and the successive cases often

21   depends on the members of the Committee

22   negotiating to reconcile their disagreements

23   and reach a consensus within that single

24   committee.

25           Indeed, the conflict among creditors

146

1

2      and among members of Creditors' Committee is

3      common and may actually facilitate negotiation,

4      see Dow Corning 194 B.R. at 145.

5              These conflicts only become an issue

6      if they hinder adequate representation, Orfa,

7      121 B.R. at 295; McLean, 70 B.R. at 861.

8              However, the fact that certain

9      creditors represented by a committee are unable

10     to 'protect all their interests and achieve all

11     their goals is not paramount, as the ultimate

12     aim is to strike a proper balance between the

13     parties such that an effective and viable

14     reorganization of the debtor may be

15     accomplished.'  See Hills store 137 B.R. at 7.

16             The fact that all creditors do not

17     have identical interests is recognized by the

18     Bankruptcy Code's procedural framework for

19     dealing with 'various divergent interests,' see

20     Official Unsecured Creditors' Committee versus

21     Stern 984 Fed second 1305 First Circuit, 1993.

22             The standing and desires of various

23     constituencies is a third factor to consider

24     when determining whether there is adequate

25     representation.  The issue is not whether a

147

1

2    Creditors' Committee is an exact replica of the

3    creditors body but whether representation of

4    various creditors type is adequate. See hills

5    store 137 B.R. at 7.

6              As this Court found in its decision

7    denying the motions to appointment a trustee to

8    the MCI debtors, the Committee is currently

9    comprised of 14 members representative of the

10   broad spectrum of debtors' creditors, including

11   bond holders and indentured trustees of World

12   Com, Inc., MCIC Intermedia as well as MCI trade

13   creditors.  Further, at least six of the 14

14   members of the committee are creditors of MCI.

15   Thus over 40 percent of the committee in number

16   is made up of MCI creditors. Thus, over 40

17   percent of the Committee in number is made up

18   of MCI creditors.

19              It has been argued that the concern

20   regarding adequate representation is not that

21   there are not sufficient number of MCI

22   creditors on the committee.  Rather, the

23   complaints stems from the fact that the MCI

24   creditors who are members of the Committee seem

25   to have acted in interests of the World Com

148

1

2      creditors to the detriment of the MCI

3      creditors, either because they advanced the

4      interests of certain of their holdings other

5      than MCI interests or because their desire to

6      continue post confirmation business

7      relationship with the debtors, or because they

8      were solely concerned with MCI's senior

9      interests.

10              However, it appears that the

11     dissenting MCI creditors primary concern is the

12     consensus reached regarding substantive

13     consolidation and the intercompany debts.

14              These issues will be fully addressed

15     during the confirmation hearings and all

16     parties have the ability to be heard and

17     participate in those hearings.

18              Nevertheless, it is almost always

19     true that various creditors have distinct

20     interests from those of other creditors, but

21     those interests are protected by the fiduciary

22     duties committee members have to all creditors

23     and by the active participation of creditors

24     with sophisticated counsel.  See Sharon Steel,

25     100 B.R. at 779.

1

2          The Committee's decision to support

3    substantive consolidation of these cases is at

4    the forefront of creditors' argument.  However,

5    the positions of the parties on substantive

6    consolidation will be heard through their able

7    counsel at planned confirmation hearing.

8    Moreover, in addition to the MCI creditors on

9    the Creditors' Committee, there are additional

10   MCI creditors that have actively participated

11   in these cases, as well as representation of

12   MCI creditors by ad hoc committees.

13          In considering the factors utilized

14   by courts in determining whether the current

15   committee is providing adequate representation,

16   as well as the particular facts and

17   circumstances of this case, the Court finds

18   here that the Creditors' Committee

19   representation of the MCI estates is adequate.

20          However, with respect to the movant,

21   the indenture trustee for the MCI junior

22   noteholders, it has to present a more

23   compelling argument that the MCI junior

24   noteholders may not be adequately represented

25   on the committee.  No member of the Committee

150

1

2      represents this type of subordinated debt.

3              Other than the general fiduciary

4      duty the committee members owe to all

5      creditors, the junior noteholders are not

6      represented on the committee, at least with

7      respect to a hold or only MCI junior notes.

8              Further, the fact that certain MCI

9      creditors who are on a committee may hold a

10     small amount of junior interests does not

11     necessarily provide the junior noteholders with

12     adequate representation under the facts of this

13     case.

14              Nevertheless, the movants have not

15     pointed to any requirement of every sub-debt

16     group would need separate representation on a

17     committee.

18              In any case, even assuming that the

19     junior noteholders are not adequately

20     represented, the relief sought by the MCI

21     junior noteholders for a separate committee for

22     all MCI creditors is far too broad and

23     unnecessary.

24              As already noted, the general credit

25     body of the MCI states has been adequately

151

1

2    represented.

3         More on the committee. Moreover,

4    based on the consideration of the discretionary

5    factors that the Court must evaluate to

6    consider whether to point an additional

7    committee, whether it be for the junior

8    noteholders or for all the MCI estates, the

9    Court concludes that the motion should be

10   denied.

11        The movants waited until negotiation

12   for a plan of reorganization was concluded

13   before filing the motion.

14        Now, as this court found in its

15   decision two weeks about concerning the

16   appointment of a trustee, many of the issues

17   raised in the motion were known to the parties

18   in interest at the start of these cases.

19        Certainly, with respect to a planned

20   negotiation process, it was publicly

21   disseminated that the debtors were on a 100 day

22   plan leading to the filing of the

23   reorganization plan.

24        To the extent that junior

25   noteholders believed that their interests were

152

1

2    not adequately represented at that stage,

3    clearly they were obligated to seek proper

4    relief or be subject to criticism for their

5    inaction.

6              Further, although they may have made

7    a timely request to the U.S. Trustee's office

8    with respect to the planned negotiation

9    process, nothing was brought to this Court's

10   attention until the planned negotiation was

11   concluded. Thus, the movants waited until

12   learning of the compromise reached as a result

13   of the negotiations to bring their complaint to

14   the court.

15             The disclosure statement concerning

16   the plan of reorganization has been approved,

17   and the court has scheduled a hearing for

18   consideration of confirmation of that plan for

19   August.

20             The formation of a separate

21   committee for the MCI estates at this stage

22   would cause upheaval in the existing committee

23   in that the MCI members would likely seek

24   appointment to a separate MCI committee, which

25   would not necessarily advance the junior

153

1

2    noteholders interest. The debtors

3    reorganization would likely be delayed.

4               In addition, the underlying issue of

5    fairness of substantive consolidation would

6    still have to be litigated.

7               Moreover, an additional committee

8    will add cost to the estate as the Committee

9    will retain its own professionals paid for by

10    the estate.

11               Further, the movants have an avenue

12    to participate at the planned confirmation

13    hearing and if their contentions are correct

14    concerning substantive consolidation and

15    intercompany debt, they have a basis for

16    compensation under Section 503(b).

17               Thus, considering the costs

18    associated with the appointment, the timing of

19    the application and the potential for added

20    complexity, as well as the presence of other

21    avenues for the movants to participate at the

22    hearing concerning planned confirmation, the

23    Court concludes that the appointment of a

24    separate committee for the MCI creditors is not

25    warranted.

154

1

2              Further, a separate committee for

3      the junior noteholders, although raised for the

4      first time at the hearing in colloquy with the

5      court, would do little to advance these cases

6      at this time.

7              Debtors counsel is directed to

8      submit an order consistent with this court's

9      ruling.

10             (Time noted:  8:25 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4              I, MICHAEL WILLIAMS, a Certified

5     Shorthand Reporter and Notary Public of the

6     State of New York do hereby certify that the

7     foregoing is a true and accurate transcript of

8     the within proceedings, to the best of my

9     ability.

10

11

12

13

14

15

16

17

18

19

20

21

22              _michael williams_____
                MICHAEL WILLIAMS, CSR
23              License No. XIO1991
                Notary Public of the
24              State of New York

25

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
In re                                          :
                                               :       **Chapter 11 Case No.**
**WORLDCOM, INC., et al.,**                    :       **02-13533 (AJG)**
                                               :
                                               :       **(Jointly Administered)**
                     **Debtors.**              :
--------------------------------------------------------------x

### ORDER DENYING MOTION OF HSBC BANK USA, AS INDENTURE TRUSTEE, FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF CREDITORS FOR MCI COMMUNICATIONS CORPORATION AND ITS SUBSIDIARIES

A hearing having been held on May 28, 2003 (the "Hearing") to consider the motion, dated April 30, 2003, of HSBC Bank USA, as indenture trustee, for entry of an order directing the appointment of an official committee of creditors for MCI Communications Corporation ("MCIC") and its subsidiaries (together with MCIC, "MCI"), dated April 30, 2003, 2003 (the "HSBC Motion"); and joinders in the HSBC Motion, dated May 21, 2003, May 22, 2003, and May 27, 2003 having been filed with the Court by Wilmington Trust Company, as property trustee and guarantee trustee, Aerotel LTD., and the Dissenting MCI Bondholders, respectively (the "Joinders," and together with the HSBC Motion, the "Motion"); and the affidavit of Tina Niehold Moss, dated May 23, 2003, in Support of the HSBC Motion (the "Moss Affidavit"), having been filed with the Court; and the memorandum of law in support of the HSBC Motion, dated May 23, 2003 (the "HSBC Memorandum") having been filed with the Court; and the objections to the Motion, dated May 22, 2003, May 23, 2003, and May 26, 2003 of the United States Trustee, WorldCom, Inc. and its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), and the Statutory Committee of

Unsecured Creditors, respectively (collectively, the "Objections") having been filed with

the Court; and the Court having jurisdiction to consider the Motion and the relief

requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern

District of New York, dated July 19, 1984 (Ward, Acting C.J.); and venue being proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the appearances of all

interested parties having been noted in the record of the Hearing; and the Court having

considered the HSBC Motion, the Joinders, the Moss Affidavit, the HSBC Memorandum,

the Objections, and the evidence adduced and arguments of counsel at the Hearing; and

upon the HSBC Motion, the Joinders, the Moss Affidavit, the HSBC Memorandum, the

Objections, and the record of the Hearing; and the Court having made findings of fact and

conclusions of law as set forth in the record of the Hearing; and the Court having found

and determined that the representation of the creditors of MCI by the extant Statutory

Committee of Unsecured Creditors is adequate  as required by section 1102 of title 11,

United States Code (the "Bankruptcy Code") and that the appointment of an additional

committee pursuant to section 1102 of the Bankruptcy Code is not necessary to assure

adequate representation of creditors of MCI; and for the additional reasons set forth in the

record of the Hearing, it is therefor hereby

        ORDERED that the Motion is denied.

Dated:  New York, New York
       May 30, 2003

                                  **s/Arthur J. Gonzalez**
                                  United States Bankruptcy Judge