Wendy Alison Nora                                    Hearing Date: Not known
ACCESS LEGAL SERVICES                                Hearing Time: Not known
310 Fourth Avenue South, Suite 5010
Minneapolis, Minnesota 55415
Telephone: (612) 333-4144
Facsimile: (608) 497-1026

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------
In re

Residential Capital, LLC *et al.,*                   Chapter 11
                                                     Case No. 12-12020 (MG)

                              Debtors.               Administratively Consolidated

-----------------------------------------------------------------

## FIRST OBJECTION TO CONSOLIDATED DEBTORS' DISCLOSURE STATEMENT (ALL RIGHTS RESERVED)

Wendy Alison Nora ("Claimant"), individually and on behalf of all homeowners similarly situated whose real estate has been confiscated based upon forged and/or perjured documents uttered in judicial and nonjudicial foreclosure proceedings or who are being subjected to judicial and nonjudicial foreclosure proceedings in which forged and/or perjured documents have been and continue to be uttered in the foreclosure process, respectfully objects to the Debtors' Disclosure Statement filed on July 4, 2013 upon the grounds set forth below:

1.    Debtors' Disclosure Statement wholly fails to disclose to the Court and the interested parties that the real estate assets listed on the Debtors' Schedules A consist largely of homes and other real property which Debtors have obtained by a claim of a right to the remedy of foreclosure founded upon forged and/or perjured documents created by DOCX, a division of

1

Lender Processing Services, Inc. (LPS) or manufactured at the offices of GMAC Mortgage, LLC

(GMACM) in Pennsylvania and Residential Funding Company, LLC (RFC) in Minnesota.

2.  Debtors' Disclosure Statement wholly fails to disclose to the Court and the interested

parties that thousands of pending judicial and nonjudicial foreclosure proceedings throughout the

nation have been undertaken and continue to be pursued upon forged and/or perjured documents

created by DOCX, a division of Lender Processing Services, Inc. (LPS) or manufactured at the

offices of GMAC Mortgage, LLC (GMACM) in Pennsylvania and Residential Funding

Company, LLC (RFC) in Minnesota.

3.  Debtors' Disclosure Statement wholly fails to account for the funds which Debtors

have obtained through the liquidation of the illegally confiscated real estate assets during the

pendency of these proceedings.

4.  Debtors failed to provide this Claimant with adequate advance notice that her home

was being sold in order to prevent her from paying an amount greater than the third party offered

in an effort to launder her title by its transfer to a "bona fide purchaser" in good faith and without

notice of her right to recover possession and control of her home.

5.  Debtors' Disclosure Statement fails to disclose that it intends to pay other creditors in

these proceedings with the proceeds of sale of illegally confiscated real estate assets belonging to

the class of homeowner claimants, many of whom received no notice of these proceedings.

6.  Debtors used their servicing platform to obtain access to images of notes and

mortgages scanned into a computer database after the documents were signed by persons who

were defrauded into believing they were borrowing mortgage funds from "originating lenders,"

when the "originating lenders" appeared at the real estate closings to obtain the notes and

mortgage securities for immediate resale by undisclosed entities providing warehouse lines of credit to facilitate the sale of the notes and mortgages to government sponsored entities (GSEs) and sponsors of private label securities offerings to pension funds.

7.  Debtors operated largely as loan servicers for the concealed real parties in interest and had no ownership interest in the notes and mortgages taken from parties who have been fraudulently identified as "borrowers"[1] of the Debtors in these proceedings.  Debtors were merely the loan servicers for the real parties in interest, GSEs and holders of certificates on beneficial interest consisting of "private label" securities.  The private label securities were issued by Real Estate Mortgage Investment Conduit (REMIC) Trusts.

8.  The mortgage notes were not transferred by delivery to the GSEs or the REMIC Trusts as required by the Uniform Commercial Code in the various states of the United States of America.  Rather, the mortgage notes were scanned into a central computer data base and available to be viewed on computer screens accessed by employees of the Debtors as servicers for the GSEs and REMIC Trusts and the notes were either destroyed after they were scanned or the notes were placed in a vault without being endorsed in blank or by special endorsement to the GSEs or the REMIC Trusts.

---

[1]  The Debtors use the term "borrowers" to imply that members of the class obtained funds from the Debtors for the financing of real estate assets.  As used in this objection the term "borrowers" is defined as the owners of interests in real estate who were entitled, by law, to the use, occupancy and possession of the real estate, subject to claims for repayment of funds to the real party in interest which advanced the funds.  The class of "borrowers" is further defined in this objection as the class of individuals and entities whose are victims of the forgery/perjury operation by which their real estate assets were and are being confiscated by the Debtors and their successors in interest on false claims brought by servicers to foreclose on the "borrowers" real estate interests.   The relationship of the Debtors to the class of "borrowers" in these proceedings is generally that of loan servicing fiscal intermediary between the owners and occupants of real estate and the entities which are entitled to receive a stream of income from the owners' and occupants' loan payments.

9.   The mortgages or deeds of trust either named another computer data base, Mortgage

Electronic Registration Systems, Inc. (MERS) as mortgagee or beneficiary or maintained the

name of the "originating lender" as the mortgagee or beneficiary in order to fraudulently conceal

the true nature of the loan transaction which they almost uniformly believed were conventional

mortgages to be paid according to the terms appearing on the notes and mortgages or in

accordance with the terms of notes and deeds of trust.  The mortgagors and holders of the

possessory interest in the subject real estate under the deeds of trust were actually deceived by

their reliance on the terms of the loan documents because the essential terms of the transactions:

that the loan documents were being used to create securities and that the securities were being

sold to obtain the loan funds from undisclosed third parties and that the Debtors did not have a

financial interest in the loan transactions, except for the right to receive servicing fees.

10.   When the United States Congress authorized funds for the Troubled Asset Relief

Program (TARP) in October, 2008, the Debtors, as servicers, sought to foreclose on real estate

assets throughout the nation in order to obtain payment in full for long-term mortgages under 12

USC sec. 5212 and, commencing in January, 2009, a massive enterprise popularly known as

"robo-signing" began.

11.   "Robo-signing" is the popular name for forgery and perjury on a massive scale by

which the Debtors and other servicers of mortgage loans uttered forged and perjured documents

in order to make it appear that the servicers were lawfully entitled to foreclose on real estate

throughout the nation.   The foreclosure "crisis" is nothing more than an effort to obtain double

payments on loan instruments not owned by the Debtors, first, by the claim for TARP payments

4

and, second, by the liquidation of the real estate by the servicers.[2]

12.    Debtors, the Committee of Unsecured Creditors, the unsecured creditor class represented by Trustees of REMIC Trusts, the classes of super-priority and priority claimants all seek to benefit from the liquidation of the real estate assets confiscated by forged and perjured documents.  Even the detailed investigation by the Examiner in these proceedings entirely disregards the claims of the defrauded owners of real estate assets taken by the Debtors on forged and perjured documents.  There is no mention[3] in the Examiner's report of the 17 Billion Dollars in TARP funds paid to the Debtors' parent, Ally Financial, Inc. (AFI) by the United States Treasury, which is the core reason why the Debtors, as wholly owned subsidiaries of AFI, were forced by its parent into Chapter 11–that AFI seeks to "ring-fence" its legacy liabilities for the forgery/perjury operation by which thousands of homes have been confiscated and are still being confiscated.

13.    The Debtors' Disclosure Statement is wholly deficient because it fails to disclose the flaws in its claims to real estate titles listed on their various Schedules A (most particularly those of GMACM and RFC) which were obtained by forged and perjured documents which it has been

---

[2]  There were often multiple payments in full of the mortgage loans procured from unsuspecting real estate owners whose loan documents were fraudulently procured without disclosure of the true nature of the transaction.  The first payment in full was upon the sale of the loan to the REMIC Trust. Often mortgage insurance was also claimed and received as well as credit default swaps, culminating with the TARP payment.

[3]  If the Examiner did mention the TARP funds paid to Ally Financial, Inc. (AFI) this Claimant was unable to find any mention of the TARP payments in the Examiner's Report.

liquidating in these proceedings.

14.  The Debtors' Disclosure Statement is wholly deficient because it fails to disclose the treatment of the claims of the class which it designates as "borrowers" who have claims for "robo-signing" against AFI, which seeks to be released from liability for the forgery/perjury operations of its Debtor subsidiaries, of which its CEO, Michael Carpenter, was specifically and personally placed on notice by the United States Department of Justice, 49 State Attorneys General and financial regulators in the investigations which culminated in the National Mortgage Settlement and the Independent Foreclosure Review.

15.  No where in the Disclosure Statement do the Debtors inform the interested parties how they intend to meet the obligations imposed by the National Mortgage Settlement and the Independent Foreclosure Review for which AFI is liable.

16.  Throughout these proceedings, Debtors have given lip service to their obligations under the National Mortgage Settlement under which AFI is jointly and severally liable.  AFI seeks to impose its obligations under the National Mortgage Settlement on the Debtors in exchange for a payment of 2.1 Billion Dollars, for which the Committee of Unsecured Creditors (Committee) superciliously congratulates itself for having "increased" above the original proposed payment of 750 Million Dollars in exchange for a proposed release of all Debtors' claims against AFI.  The problem with this proposed arrangement is that the National Mortgage Settlement imposes an obligation in excess of 1.4 Billion Dollars on AFI and the Debtors and AFI is seeking payment of priority claims for the continuing funding of the Debtors' operations

of their "ongoing business" in these proceedings[4] in excess of One Billion Dollars.

17.   In their proposed Chapter 11 Plan, Debtors propose a "borrowers" claims trust in the amount of a mere 57 Million Dollars, a vague "true up" of "borrowers" claims and a payment of up to 300 Million Dollars to satisfy the obligations of, it appears, AFI (which proposes to be released) under the National Mortgage Settlement and the Independent Foreclosure Review.  On July 26, 2013, this Court approved payment of 230 Million Dollars by the Debtors to "borrowers" under the Independent Foreclosure Review, leaving a mere 70 Million Dollars to cover the joint liability of AFI and the Debtors under the National Mortgage Settlement, according to the Debtors' footnote to the term sheet in their Chapter 11 Plan filed on July 2, 2013, or five cents on the dollar.

18.   Debtors imply that Ocwen Financial Corporation (Ocwen) and Walter Investment Management Corporation (Walter) will make up the deficiency between the obligations of AFI/RESCAP under the National Mortgage Settlement and the amount proposed to be paid under the Chapter 11 Plan, but if that is what they are implying, no such obligation was undertaken under the terms of the Ocwen and Walter Purchase and Assumption Agreement, according to the public filings of Ocwen and Walter and the plain terms of the Purchase and Assumption Agreement because neither Ocwen nor Walter has informed the United States District Court for the District of Columbia in Case No. 2012-cv-361 (the National Mortgage Settlement case) that they are assuming the liabilities of AFI and the Debtors under the Consent Judgment entered in

---

[4]  The "ongoing business" consisted of continuing to foreclose on real estate using forged and perjured documents, the sale of the servicing platform to third-party loan servicer Ocwen Financial Corporation and Walter Investment Management Corporation, the sale of its whole loan portfolio to Berkshire Hathaway, and the attempt to liquidate the illegally confiscated real estate assets as assets of these Debtors.

that case on or about April 4, 2012.

19.  It is the Debtors' obligation and is not the obligation of this or any other interested

party, to provide adequate information for claimants to make an informed judgment about the

plan.

20.  11 USC sec. 1125(a) provides:

(a) In this section—
(1) <u>"adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case,</u> **that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan**, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information; and
(2) "investor typical of holders of claims or interests of the relevant class" means investor having—
(A) a claim or interest of the relevant class;
(B) such a relationship with the debtor as the holders of other claims or interests of such class generally have; and
(C) such ability to obtain such information from sources other than the disclosure required by this section as holders of claims or interests in such class generally have.

21.  Debtors appear to be proposing different treatment for the class of "borrowers"

claims, which are contingent and unliquidated unsecured claims, than they are proposing to the

class of other contingent, unliquidated and unsecured claims of the REMIC Trustees and the

mortgage insurers.  They do not disclose why they have created a separate class of unsecured,

contingent claims for "borrower" claims, how they arrived at the proposed distribution of 57

Million Dollars to the class of "borrower" claimants as compared to the sums proposed to be

distributed to the unsecured, contingent claimants in the proposed differential categories of

REMIC Trustees and mortgage insurers.   Specifically, the Debtors do not disclose the total value

8

of the REMIC claims, claims of the mortgage insurers, and the "borrowers" to enable what is actually a single class of creditors: contingent, unliquidated, unsecured creditors to receive pro rata payments of a percentage of the value of the claims.

22.  If the mortgage insurers have subrogation rights, they should be taking the causes of action against the defaulted "borrowers" and not a distribution of the Debtors' assets for settlement of such claims.  If the mortgage insurers do not have subrogation rights, then their claims against the Debtors are contingent, unliquidated and unsecured in these proceedings as claims for misrepresentation as to the quality of the mortgage loans being insured, which are claims against the Debtors for fraud.

23.  The REMIC Trusts, according to the private label securities sold under Pooling and Servicing Agreements, are presumed to be the real parties in interest holding mortgage securities backed by notes and mortgages executed by the "borrowers."  As such, if the notes were lawfully endorsed and delivered and the mortgages were lawfully assigned under the Pooling and Servicing Agreements, their claims would lie against the defaulted "borrowers" and not against the Debtors.   The holders of the certificates of beneficial interest in the REMIC Trusts have claims for breach of fiduciary duty against the Trustees if the notes were not lawfully endorsed and delivered and the mortgages were not assigned to the Trusts, but they have no claims against the "borrowers."  It appears that the Debtors are proposing to pay the REMIC Trustees on fraud claims because the Debtors failed to assure the delivery of the endorsed notes and mortgage assignments when they sponsored the private label securities.  This, too, is a fraud claim.

24.  The "borrowers" have fraud claims; conversion claims; racketeering claims; claims for violations of FDCPA, RESPA, TILA;  breaches of contract under the Home Affordable

9

Modification Program (HAMP); wrongful foreclosure claims and quiet title claims, all of which

the Debtors seek to roll into a class of claims separate from the contingent, unliquidated,

unsecured claims for fraud brought by the mortgage insurers and the REMIC Trustees for five (5)

cents on the dollar, while they propose to pay far more to the other fraud claimants in the same

category of claims, all of which are contingent, unliquidated and unsecured claims.

25.  This claimant has long been concerned that the Debtors would be unable to provide

adequate information to enable the class they designate as "borrowers" in these proceedings to

make an informed judgment about the plan.  Due to the Debtors' intentional concealment of the

nature of the "borrowers'" claims, combined with repeated lip service of the their intention to

abide by the terms of the National Mortgage Settlement, which they and their parent company,

AFI, apparently attempt to avoid, there is no information given in the Disclosure Statement upon

which the class of "borrowers" can evaluate the proposed treatment of their claims.  The almost

complete failure of the Committee and the Examiner to investigate the nature of the claims of the

"borrowers," combined with the failure to address the 1.4 Billion Dollar National Mortgage

Settlement joint obligation of AFI, Ally Bank (known as GMAC Bank in the Examiner's Report)

and these Debtors results in a gaping hole in the Disclosure Statement and the Chapter 11 Plan.

Not only is there inadequate information as to the treatment of the claims of the "borrowers," it

appears that AFI, Ally Bank and the Debtors are attempting to cram down that joint liability via a

release to AFI to five (5) cents on the dollar and treat "borrower" claims as a separate category

unrecognized by bankruptcy law.    The category of contingent, unliquidated and unsecured

claims are to be treated identically in the Chapter 11 Plan, but the Debtors are attempting to

create a separate classes within the allowed category without any explanation for the different

10

treatment of the groups they have created within the single category.

26.   This First Objection to Debtors' Disclosure Statement should not have to go any farther at this time than to object to the approval of the Disclosure Statement because (a) there is inadequate information upon which this claimant can ascertain how AFI/RESCAP will meet their joint obligations under the National Mortgage Settlement and (b) because there is no information as to how the Debtors arrived at the 57 Million Dollar figure for payment to the "borrower" class of claimants as opposed to the claims of the other contingent, unsecured and unliquidated claims which are the only category allowed by law.   Therefore, because the "borrower" class of claimants has inadequate information as to how their claims are to be treated and how the National Mortgage Settlement payments will be made, the Disclosure Statement cannot be approved.

27.   It is the obligation of the Debtors in the complex case which they filed in collaboration with their nonbankrupt parent, AFI, for the purpose of  "ring-fencing" their joint liabilities to the "borrowers" directly and under the National Mortgage Settlement, to account for the funds illegally obtained through the confiscation and liquidation of real estate assets on forged and perjured documents.   They must further be required to account for damages to the real estate owners whose properties were and are being illegally confiscated on forged and perjured documents.   Debtors must propose to disgorge themselves of the funds illegally obtained by liquidation of real estate assets in which Debtors had no interest except as the fiscal intermediary for undisclosed third parties to the extent that those funds have been converted by the Debtors to their own use or taken by their parent company under TARP.   They must be required to account for all payments to the real parties in interest that were entitled to received the payments of the

liquidation proceeds or disgorge the payments they converted to their own use or transferred to

AFI.   The extent to which the REMIC Trusts have been paid by TARP funds, credit default

swaps, mortgage insurance and liquidation of real estate assets must be calculated to reduce the

claims of the REMIC Trustees.  The extent to which the mortgage insurers have subrogation

rights must be disclosed because those claims would be required to be made against the real

estate assets of the "borrowers" in default and cannot be paid from Debtors' assets.  To the extent

that the claims of the mortgage insurers are not subrogated in the real estate assets, they are fraud

claims no different that the "borrowers" claims: contingent, unliquidated and unsecured.

WHEREFORE, the undersigned objects to the Disclosure Statement and respectfully

requests that the Court require the Debtors to prepare a First Amended Disclosure Statement

which, at a minimum, explains how the National Mortgage Settlement obligations are to be met

by Debtors and by AFI and  how the proposed release of AFI will affect the payment of the joint

obligations under the National Mortgage Settlement.   The Disclosure Statement must be

amended and the Debtors must be required to provide adequate information as to how the

amount proposed to be paid to the "borrower" class of claimants was determined relative to the

other contingent, unsecured claims in these proceedings, including the claims of the Trustees of

the REMIC Trusts, the claims (unsecured or subrogated) of the mortgage insurance companies,

and the claims (unsecured or subrogated) of the United States Treasury under TARP.  The

Debtors must be required to explain the basis for treating the "borrowers" claims as different

from the claims of the other contingent, unliquidated and unsecured claimants, what the total

estimated value of the "borrower" claims are, and what the pro rata share of distribution to the

"borrower[5]" class is proposed to be.

       Dated at Madison, Wisconsin this 28th day of July, 2013.

*/s/ Wendy Alison Nora*

_____

Wendy Alison Nora, Claimant
Holder of Claims Numbered 1 and 440
310 Fourth Avenue South,  Suite 5010
Minneapolis, Minnesota 55415
(612) 333-4414
FAX: (608) 497-1026
accesslegalservices@gmail.com

UNSWORN DECLARATION OF SERVICE

       Wendy Alison Nora declares, under penalty of perjury, that she filed the above-captioned document with the United States Bankruptcy Court for the Southern District of New York  on July 28, 2013 by CM/ECF and thereby served the same on all counsel of record and all parties capable of service by CM/ECFin the above-captioned matter.

*/s/ Wendy Alison Nora*
Wendy Alison Nora
accesslegalservices@gmail.com

---

    [5]  This claimant does not waive her right and the rights of the "borrower" class to the return of the illegally confiscated real estate titles and restoration of the "borrowers" to the use, occupancy and possession of the real estate taken by forged and perjured documents, which is a separate issue for the treatment of the "borrower" class by objection to confirmation of the Chapter 11 Plan.