Hearing Date: July 30, 2013 at 10:00 a.m. (prevailing Eastern Time)

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore
Dwight A. Healy

    - and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Gerard Uzzi
Dennis O'Donnell

*Attorneys for the Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OMNIBUS REPLY OF THE AD HOC GROUP
OF JUNIOR SECURED NOTEHOLDERS TO OBJECTIONS FILED
IN RESPONSE TO THE MOTION FOR ENTRY OF AN ORDER (i) DIRECTING
EACH OF DEBTORS' COUNSEL, INCLUDING MORRISON & FOERSTER LLP,
OFFICIAL COMMITTEE COUNSEL, INCLUDING KRAMER LEVIN NAFTALIS &
FRANKEL LLP, AND THE DEBTORS' MANAGEMENT TO REMAIN STRICTLY
NEUTRAL IN ANY DISPUTE REGARDING CLAIMS BY AND BETWEEN ANY
DEBTORS, (ii) ORDERING THE LIMITED DISQUALIFICATION OF EACH OF THE
FOREGOING TO THE EXTENT NECESSARY TO EFFECTUATE THE FOREGOING,
<u>AND (iii) GRANTING RELATED RELIEF</u>**

TO: THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"), by and through its undersigned counsel, hereby files this omnibus reply (the "Reply") to objections filed in response to the Ad Hoc Group's Motion.[1]

## PRELIMINARY STATEMENT

The Ad Hoc Group made a limited application to this Court due to the simple fact that it believes—and continues to believe—that rules prohibiting counsel and estate fiduciaries from representing both sides of an inter-debtor dispute are being broken at the expense of individual Debtor estates and creditor constituencies in these Cases. The narrow relief sought will not upend the current plan process as capable, non-conflicted, third parties exist (e.g., ResCap LLC bondholders, RMBS bondholders and Monolines) who can ably litigate these issues. The Debtors' and the Committee's current process does not work. The rules are clear—counsel and management cannot represent two adverse parties in an actively litigated dispute. Here, the Debtors' counsel, the Committee's counsel, and the Debtors' management are currently advocating that intercompany claims and causes of action lack substantive legal merit and should be waived and cancelled. This position is prejudicial and adverse to any Debtor and its creditors that is the beneficiary of an intercompany claim or cause of action and must stop.

Without any basis in law for those actions, no Objecting Party meaningfully addresses this prejudice and sets forth a solution to the conflict. Rather, the Objecting Parties disparage the Ad Hoc Group and offer a series of excuses and justifications in an attempt to sweep their rule-breaking under the proverbial rug. The Objecting Parties' claim the Ad Hoc Group should have

---

[1] This Reply responds to the objections filed by the Debtors, the Committee, the Consenting Creditors, and Ally Financial Inc. (collectively, the "Objecting Parties"). Capitalized terms not otherwise defined herein shall the meaning ascribed to them in the Motion [Docket No. 4289] and Healy Declaration [Docket No. 4290].

1

moved for the relief being sought over a year ago, notwithstanding that the conflicts here arose not from the mere retention of professionals at the commencement of the Cases, but rather from the actions taken by those professionals and management within the past month. The Objecting Parties assert that the PSA and mediation process somehow sanitize the conflicts at issue here, even though the Court itself already recognized that PSA approval does not prejudice any party's rights to challenge the underlying conflicts. The Objecting Parties disparage the Ad Hoc Group's motion as a "tactic" to blow up the proposed plan, while the Ad Hoc Group's motion simply responded to the Court's directive not to sit on its rights that are currently being prejudiced by the actions of the Debtors' counsel, the Committee's counsel, and the Debtors' management. Lastly, the Objecting Parties offer a "no harm, no foul" justification for proceeding in the face of conflict—namely, that in the event the proposed plan is not confirmed, none of the Objecting Parties will be bound by the representations in the PSA. This position highlights the necessity of the Ad Hoc Group's Motion. The Ad Hoc Group is entitled to know the rules governing this litigation now, not at some hypothetical time in the future. For example, given the Debtors' adversity on inter-debtor disputes, there is no basis for the Debtors to assert any privilege over advice admittedly given by MoFo concerning the Intercompany Claims. But what happens if the proposed plan is not confirmed? Can the Debtors assert privilege over the Intercompany Claim advice then? If Mr. Kruger testifies at the confirmation hearing that the Intercompany Claims lack legal merit, can he then testify later that he did not really mean what he said in his prior testimony? Again, these are very basic and real questions that the Objecting Parties ignore.

The fundamental issue presented by the Motion is not whether conflicts exists (they do), but rather how to avoid prejudicing any individual Debtor estate from the positions being taken

by the Debtors' counsel, the Committee's counsel, and the Debtors' management concerning Intercompany Claims while in conflict—an issue that the Debtors have refused to even engage on, but which is their responsibility to address. The Debtors and the Committee deny the existence of the conflict—arguing, circularly, that no two estates could be conflicted with respect to the allowance of Intercompany Claims because the conflicted professionals and management have already determined to abandon such claims. Accordingly, the Debtors, the Committee, and the Debtors' management propose to seek an order from this Court waiving and extinguishing all Intercompany Claims (and have, in fact, denied the validity of the Intercompany Claims notwithstanding their prior sworn representations in the SOALs). The Objecting Parties, however, do not and cannot cite to a single case allowing section 327(a) counsel to appear and be heard on both sides of Intercompany Claims under similar circumstances or allow an estate fiduciary to represent both sides in what is, in essence, a claims dispute.

**No one** has suggested that this conflict be resolved through the appointment of 50+ sets of separate professionals or trustees. Nor has the Ad Hoc Group suggested that counsel be wholly disqualified or the Debtors' management removed. Or that the Ad Hoc Group should not have an adversary in any Intercompany Claim litigation, as there are other creditors who have both the incentive and ability to litigate the other side of the dispute who are not suffering from a conflict, e.g., the ResCap LLC bondholders, the RMBS bondholders, and the Monolines. What the Ad Hoc Group has stated is that the conflicted parties (i) can be proponents of a plan that proposes an inter-estate settlement subject to the material acceptance by creditors who are economically affected thereby provided that (ii) the Debtors' counsel, the Committee's counsel, and the Debtors' management comply with the relevant standards of professional responsibility

3

and remain neutral in any dispute in this Court regarding Inter-Debtor Disputes. The Cases cannot proceed on any other path.

## ARGUMENT

### I. The Actions Of The Debtors' Counsel, The Committee's Counsel, And The Debtors' Management Have No Basis In Law

#### A. The Law Is Clear: Counsel Cannot Represent Two Parties That Are Adverse To One Another In A Dispute

1. Based upon the Objections and discussions related thereto, the Debtors and the Committee as joint plan proponents propose to proceed to confirmation and litigate the merit and value of the Intercompany Claims. At confirmation, those parties will jointly put on evidence about the lack of validity of the Intercompany Claims.[2] They will then seek a determination from the Court that the Intercompany Claims have no value and, thus, the settlement of such claims for $0 is appropriate. There is nothing in the Code, Rules, or case law which sanctions the proposed actions to be taken by the Debtors' counsel, the Committee's counsel, and the Debtors' management concerning Inter-Debtor Disputes. The Objecting Parties cite no cases where professionals or debtor officers who owe fiduciary duties to adverse debtor estates can negotiate a settlement of inter-debtor claims providing for no value to be paid for such claims and then actually litigate the validity of the claims.[3]

2. The decision to waive and extinguish all Intercompany Claims without any value flowing to the holders of those claims, materially and adversely affects a number of Debtor

---

[2] The Debtors' assertion that the positions the Debtors take, and statements they make, under MoFo and Mr. Kruger's direction to support the global settlement will somehow not hurt the Debtors if the proposed plan is not confirmed is myopic at best. The statements that the Intercompany Claims are invalid, and have no value, are at the very least evidentiary admissions that can be used against the Debtors in later litigation.

[3] None of the cases cited by the Debtors (see Debtors' Objection at ¶ 31) hold that a single firm can represent multiple debtors when an active dispute about intercompany claims has assumed prominence in the cases. WorldCom I did not involve a motion to disqualify, and did not present the situation, present here, where counsel and officers owing duties to each debtor propose to resolve intercompany claims for nothing and then litigate on behalf of all debtors the validity (or lack of validity) of such claims.

4

estates and creditors of those estates, including of course, the JSNs, which have the largest economic interest at stake here. Debtors such as RFC, Homecomings, and others hold significant receivables under the Scheduled Intercompany Claims. Simply dispatching every single claim for no value is prejudicial to an array of creditors who have not negotiated a beneficial recovery and signed on to the PSA.[4] And where, as here, the conflict arose over the course of the chapter 11 proceedings, the Court must act to prevent the conflict from prejudicing any Debtor. See In re Adelphia Commc'ns Corp., 336 B.R. 610, 672-73 (Bankr. S.D.N.Y. 2006).

3.  The fact that shifting value from estates of net holders of Intercompany Claims to other entities in the group will, in the view of the proponents of the Global Settlement, somehow foster the greatest overall good cannot serve as a basis for disregarding the interests of the creditors of the adversely affected estates. Indeed, that approach is precisely what the Second Circuit rejected in In re Augie/Restivo Baking Co., Ltd., 860 F.2d 515 (2d Cir. 1988) which rejected the "benefit for all" approach to settlement and noted an opinion by Judge Friendly which stated that the benefits of substantive consolidation cannot be at the expense of creditors' rights. Here, no party harmed by the waiver of Intercompany Claims is supporting the PSA. Moreover, to the extent that the Objecting Parties argue that the JSNs are somehow benefitted by the waiver of the Intercompany Claims, the argument is seriously misplaced. Extinguishing the

---

[4] To induce a number of creditors, including several members of the Creditors' Committee, at the operating company level (i.e., RFC and GMACM) to support the proposed plan, the Debtors' representatives agreed to give those entities legally unjustifiable claims at the ResCap LLC level, which enables much higher levels of recovery for those creditors than at the operating companies alone. This is true even though the only possible claim of such creditors against ResCap LLC would be a piercing the veil claim. See Debtors' Reply Brief re Objection of Junior Secured Noteholders to Motion for Approval of RMBS Settlement Agreements [Docket No. 3221] at 2 ("ResCap LLC, of course, has little exposure to liability (only on alter ego or corporate veil-piercing theories) and also has no assets, and so likely will not face future litigation. The settlement thus eliminates most risks of future litigation and benefits ResCap LLC without costing it anything of value."). The granting of these claims prejudices the JSNs, who are the largest creditor at ResCap LLC.

5

Intercompany Claims, which are the JSNs' Collateral, has a direct effect on the JSNs' claim that they are oversecured and entitled to postpetition interest.[5]

### B. The Conflict Exists and Must Be Remedied

4. The Debtors' contention that there is no longer any conflict because the Debtors, based on the advice of their conflicted counsel (MoFo) and management, have already "considered the potential claims against one another, balanced the benefits of the Global Settlement against those claims, and determined that it is in their best interests to refrain from pursuing those claims" is hopelessly circular. See Debtors' Objection [Docket No. 4368] at ¶¶ 25-27. This position is also meritless. In JMK, this Court found that counsel could not avoid a disabling conflict by having one of the debtors disavow a claim against another. See JMK Constr. Grp., Ltd., 441 B.R. 222, 237 (Bankr. S.D.N.Y. 2010) (waiver of claims did not eliminate conflict and noting that "a waiver of conflicts by one party does not trump the requirement that a professional not represent an interest adverse to the estate.").[6] Straughn and In re Shore are to the same effect. See Motion at ¶¶ 12-13.

5. Faced with the existence of a clear conflict, MoFo and the Debtors' management have done nothing to protect against the real prejudice that exists by their continued representation of all Debtors in connection with the Intercompany Claims issues. Ignoring the

---

[5] Contrary to the Debtors' claim, the proposed plan does not provide that the JSNs receive postpetition interest if they are entitled to it, but rather only if the JSNs are entitled to it on certain issues the Debtors choose to litigate.
[6] The cases cited by the Debtors (Debtors' Objection at ¶ 27) are not to the contrary. Three of the four did not involve section 327, and none addressed an effort by counsel and fiduciaries representing multiple entities to waive or extinguish intercompany claims. In the one case involving potential intercompany claims, Hasset v. McColley (In re O.P.M. Leasing Servs., Inc.), 16 B.R. 932, 941 (Bankr. S.D.N.Y. 1982), the court found no adversity between two debtors pursuing a claim to recover an asset from a third party, but recognized that a conflict could arise if the action was successful and a dispute arose as to which debtor was entitled to the asset. In Charter, cited by the Committee, Judge Peck was not addressing a disqualification motion. JPMorgan Chase Bank, N.A. v. Charter Commc'ns Op., LLC (In re Charter Commc'ns), 419 B.R. 221 (Bankr. S.D.N.Y. 2009). Rather, the central issue in Charter was whether a settlement negotiated with the parent's controlling shareholder was ultra vires. Id. at 270. The case did not pose the issue of whether a court appointed officer who had expressly assumed a fiduciary duty to each debtor entity could make decisions to extinguish large, scheduled intercompany claims for no consideration, thereby prejudicing some debtors at the expense of others.

limited nature of the Ad Hoc Group's Motion, all of the Objecting Parties argue that granting relief will be impractical or, worse, catastrophic. The Ad Hoc Group does not seek the appointment of separate counsel for every Debtor that is a party to an Intercompany Claim or to "blow up" the proposed plan. Rather, the Ad Hoc Group is merely requesting that the Debtors' counsel, the Committee's counsel,[7] and the Debtors' management remain neutral concerning Intercompany Claims in any dispute in this Court by and between Debtors. The Ad Hoc Group is not saying that the Debtors cannot proceed to confirmation. Or that the Ad Hoc Group should not have an adversary in any litigation over Intercompany Claims—the ResCap LLC bondholders, RMBS bondholders and Monolines who benefit from the proposed waiver of such claims can litigate the other side. The Ad Hoc Group just wants neutrality—exactly the relief granted by other courts faced with similar issues. See Adelphia, 336 B.R. at 671. In another large chapter 11 case before this Court, the fiduciaries recognized that the conflicts rules require neutrality in circumstances such as these. See In re MF Global Holdings Ltd., No. 11-15059 (Bankr. S.D.N.Y. Feb. 26, 2013) (Chapter 11 Trustee's Statement [Docket No. 1125] at 2-3 ("[w]hen the Trustee entered into discussions with the Creditor Co-Proponents with regard to becoming a co-proponent of the Plan, he made it clear that he could not take sides if inter-Debtor disputes regarding such claims arose . . .").

---

[7] The Committee asserts that it "did not settle the claims or purport to act on behalf of any Debtors, but is merely advocating for a settlement. . . ." See Committee's Objection [Docket No. 4372] at 3. However, the Committee then asserts (as the Debtors have) that the Committee "validated" MoFo's analysis of the Intercompany Claims. Id. at ¶ 25. If the Committee were truly not purporting to act for the Debtors or provide some independent objective assessment of the claims that intended to cure MoFo's conflict, then there might not be a need for the relief the Ad Hoc Group is seeking vis-à-vis the Committee—but, the Committee's "have your cake and eat it too" approach highlights the need for an order requiring the Committee's neutrality.

7

## II. With No Law To Support Their Actions, The Objecting Parties Resort To Excuses In An Attempt To Explain Away Their Conflict

### A. There Has Been No Waiver Of The Conflict By Delay

6. The Objecting Parties' argument that the Motion is untimely is belied by the facts and the law. The Ad Hoc Group did not delay in seeking to assert its rights once the conflict of the Debtors' counsel, the Committee's counsel, and the Debtors' management became apparent. No party can rationally argue that the Ad Hoc Group should have brought its Motion over one year ago when the Debtors retained MoFo in the Case—and any such suggestion ignores both the contents of MoFo's retention submissions and the relevant case law. Courts have repeatedly highlighted the importance of a professional's disclosure in assessing conflicts. See In re eToys, Inc., 331 B.R. 176, 189 (Bankr. D. Del. 2005) ("the duty to disclose is considered sacrosanct because the complete and candid disclosure of a professional seeking retention under Section 327 is indispensable to the court's discharge of its duty to ensure eligibility . . . .") (citation omitted); In re Leslie Fay Cos., Inc., 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (noting the importance of the duty of disclosure). MoFo made no disclosure that it represented adverse interests; instead, it asserted that it was "disinterested." See Healy Decl. at ¶ 23. Under these circumstances, MoFo is hardly in a position to argue that the JSNs should have recognized that MoFo was conflicted at the time it sought to be retained.[8]

7. Moreover, as the Debtors argue, the cases have concluded that unless it is clear that Intercompany Claims will play a significant role in the case at the outset, the mere fact that such claims exist does not create a conflict. See Debtors' Objection at ¶ 31. The conflict issue

---

[8] It is equally unpersuasive to argue that the Ad Hoc Group should have made its Motion at the time the Debtors sought approval of Lewis Kruger as CRO. Indeed, Mr. Kruger's engagement letter explicitly states that he owes fiduciary duties "to each Debtors' respective estate[.]" See Debtors' Objection at ¶ 12. Given that his fiduciary duties run to both estates involved in an Intercompany Claim, Mr. Kruger cannot settle such a claim since such a settlement by definition adversely affects one of the estates to which he owes fiduciary duties. Thus, any suggestion that the Ad Hoc Group should have been on notice that Mr. Kruger was free to resolve inter-Debtor conflicts is belied by the explicit terms of his engagement.

8

arises when the proposed treatment of the Intercompany Claims becomes central to creditor recoveries. See Adelphia, 336 B.R. at 672-73; In re Global Marine, Inc., 108 B.R. 998, 1004 (Bankr. S.D.Tex. 1987).

8. Here, the conflict did not manifest itself until the Debtors, the Committee, and the Debtors' management purportedly decided—just over two months ago—that the Intercompany Claims should be waived as part of plan confirmation on the basis that such claims have no legal merit. Once the Ad Hoc Group learned of the effects of this conflict, it immediately took steps to raise the issue and when its informal approaches to MoFo were ignored, promptly raised the issue by motion. See Healy Decl. at ¶ 27. The Ad Hoc Group's approach to the conflicts issue is consistent with the "wait and see" approach followed by the courts. See In re White Glove, Inc., No. 98-12493, 1998 WL 226781, at *3-4 (Bankr. E.D. Pa. Apr. 29, 1998); In re Gilbertson's Rests. LLC, No. 04-00385, 2004 WL 1724878, at *3-5 (Bankr. N.D. Iowa May 3, 2004). Cases cited by Debtors are to the same effect. See, e.g., Global Marine, Inc., 108 B.R. at 1004.

**B.    The Ad Hoc Group's Alleged "Tactics" Are Not A Defense To Conflict**

9. No matter how vocally voiced, the contention that the Ad Hoc Group is bringing this Motion for tactical reasons adds nothing to the Objecting Parties' opposition. Facing what has now become a standard line of the conflicted, the courts have looked to the basis of the motion to remain neutral or disqualify regardless of the actual (or imputed) motivation of the movant. See Adelphia, 336 B.R. at 672, n. 165; Fierro v. Gallucci, No. 06-CV-5189, 2007 WL 4287707, at *9 (E.D.N.Y. Dec. 4, 2007) ("[d]elay in bringing an application to disqualify counsel, whether tactical or inadvertent, cannot defeat the motion . . . .") (quotation omitted);

9

Leslie Fay, 175 B.R. at 531 (court addressed the merits despite a claim that the motion was a "pressure tactic" and vindictive).[9]

10.    The Objecting Parties' reliance on In re Enron Corporation, No. 01-16034, 2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002) ("Enron II") and In re WorldCom Incorporation, 311 B.R. 151 (Bankr. S.D.N.Y. 2004) ("WorldCom II"), to support their opposition is misplaced. Neither case denied the relief sought on the basis of untimeliness, but instead addressed the merits of the respective motions. See Enron II, 2002 WL 32034346, at * 4 (despite unexcused delay, absent here, the court addressed the merits given the "seriousness of the allegations"). In WorldCom II, the motion was made long after the plan had been approved and put into effect, and after issues that formed the basis of the disqualification motion had been actively disputed in the context of the proposed disclosure statement. WorldCom II, 311 B.R. at 155-58. Here, there can be no dispute that the Ad Hoc Group moved quickly to remedy the Objecting Parties' conflict once it manifested itself.[10]

---

9. In language that has force in this case as well, the Leslie Fay court stated that "[t]his [pressure tactic charge] is somewhat startling given the existence of a report by an independent examiner which concluded that there was substance to the [conflict] concerns first voiced by the Creditors' Committee." Here, the Ad Hoc Group's Motion was preceded by Judge Gonzalez's Examiner Report that noted serious questions as to MoFo's sensitivity to conflicts issues even before the Cases were filed. See Healy Decl. at ¶¶ 25-26.

[10] The Debtors mischaracterize their contractual rights under the JSN Indenture in an effort to confine the JSNs' ability to challenge the Intercompany Claims waiver to the chapter 11 plan confirmation context. According to the Debtors, the Indenture permits them to dispose of JSN collateral over the JSNs' objection. See Debtors' Objection n. 16 (quoting Indenture § 4.11(a) and § 4.11(b)(4)). In fact, that contractual ability to dispose of JSN collateral only exists pre-default, not post-default. Once the JSN Security Documents went into default, as happened here, control over JSN Non-Tangible Collateral—including the Intercompany Claims—shifted from each Debtor to the Collateral Agent for the benefit of the JSNs. See Amended Third Priority Security Agreement § 9 (collateral agent may "notify any party obligated on any of the Non-Tangible Collateral to make payment or otherwise render performance to or for the benefit of the [Collateral Agent] and enforce, by suit or otherwise, the obligations of any such party obligated on any Non-Tangible Collateral. In connection therewith, the [Collateral Agent] may surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby."); Id. § 13 (permitting Collateral Agent to take action following an event of default). The Ad Hoc Group reserves its rights to request that its trustee move to lift the automatic stay to protect the JSNs' collateral. Furthermore, the Ad Hoc Group reserves all rights with respect to the proposed confirmation of the Plan and approval of the Global Settlement, including, without limitation, that the Debtors and the Committee lack the appropriate statutory authority to compromise any of the JSN Collateral, including the Intercompany Claims.

### C. The Objecting Parties Cannot Hide Behind the PSA and the Mediation

11.  The Objecting Parties' assertions that the PSA somehow moots the conflict issue is puzzling given the parties' and the Court's positions on that issue to date. On June 18, 2013, the Ad Hoc Group filed a statement and reservation of rights in connection with the Debtors' PSA Motion.[11] The Ad Hoc Group filed a statement—not an objection—based on explicit assurances from the Debtors that approval of the PSA would in no way affect the rights of the Ad Hoc Group to challenge or object to any agreements or transactions described in the PSA.

12.  Following receipt of the Debtors' amended complaint in the Consolidated Adversary Proceeding, in which the Debtors alluded to already having waived Intercompany Claims (see Healy Decl. at ¶ 13), the Ad Hoc Group filed a supplemental statement regarding the PSA Motion.[12] There, the Ad Hoc Group again "expressly reserve[d] all rights [] to address all issues relating to any Debtor's actual or prospective waiver or abandonment of any intercompany claim, including seeking the right to foreclose on any intercompany claim prior to any waiver or abandonment thereof." Id. at ¶ 4 (emphasis added).

13.  Making the Objecting Parties' misplaced reliance on the PSA even more perplexing, the Court has explicitly stated that the Ad Hoc Group reserved all rights concerning the PSA. Specifically, at the July 3 status conference, the Court stated that "[a]pproval of the PSA, to which the JSNs were not parties, cannot alter the JSN[s'] rights."[13] See July 3, 2013 Tr.

---

[11] See Statement and Reservation of Rights of the Ad Hoc Group of Junior Secured Noteholders in Connection with the Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing The Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee, and Certain Consenting Creditors [Docket No. 4018].

[12] See Supplemental Statement of Ad Hoc Group of Junior Secured Noteholders in Connection With Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing The Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee, and Certain Consenting Creditors [Docket No. 4055].

[13] Notwithstanding the Debtors' hairsplitting about the Court's language at the July 3 conference, it is clear the Court rejected the Debtors' contention that the approval of the PSA somehow foreclosed any objection to MoFo's conflicted position. See Motion at ¶ 2.

11

at 16:19-20. In light of this, the Objecting Parties' reliance on the PSA being "approved after a full and fair hearing" as somehow absolving them of their conflict is irrelevant at best and disingenuous at worst.[14]

14.    Equally unavailing is the contention that, because the negotiations that led to the PSA were overseen by a sitting bankruptcy judge it is somehow dispositive of the conflicts issue. There is no showing that the substance of any Inter-Debtor Dispute or any conflict issues related thereto was ever raised with Judge Peck. This is hardly surprising given that none of the parties to the PSA are harmed by the waiver of Intercompany Claims, while those that are harmed—the JSNs and certain other general unsecured creditors who are outside of the PSA deal—were not represented at the mediation.[15]

## CONCLUSION

15.    For all the foregoing reasons, this Court should grant the relief requested in the Motion.

---

[14] The Objecting Parties mischaracterize the terms of the prepetition plan support agreement with certain JSNs in an attempt to discredit the Motion. See Ally Objection [Docket No. 4369] at ¶ 2; Committee Objection [Docket Nos. 4372] at 1-2. In fact, that prepetition PSA expressly preserved all JSNs rights with respect to value arising from intercompany claims, and required the Debtors to seek to provide payment to the JSNs in fall 2012, a full year earlier than the supposedly "improved" treatment touted by the Objecting Parties. Plan Support Agreement [Docket Nos. 6-8] at § 5.5 and p. 120. In any event, almost 70% of the Junior Secured Notes are currently held by entities that were not parties to that prepetition agreement.

[15] Contrary to the Committee's assertion, the Ad Hoc Group did not "elect[] not to participate" in the mediation. See Committee's Objection [Docket No. 4372] at ¶ 6. Rather, the Ad Hoc Group could not participate without the Order in Aid of Mediation and Settlement [Docket No. 4379], which was entered on July 26, 2013.

Dated: July 29, 2013  
New York, New York

By:   /s/  *J. Christopher Shore*
    J. Christopher Shore
    Dwight Healy
    WHITE & CASE LLP
    1155 Avenue of the Americas
    New York, New York 10036-2787
    Telephone: (212) 819-8200
    Facsimile: (212) 354-8113

    and

    MILBANK, TWEED, HADLEY & McCLOY LLP
    Gerard Uzzi
    Dennis O'Donnell
    1 Chase Manhattan Plaza
    New York, New York 10005
    Telephone: (212) 530-5000
    Facsimile: (212) 530-5219

    *Attorneys for the Ad Hoc Group*