1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg   Adv. Proc. No. 13-01277-mg

5 - - - - - - - - - - - - - - - - - - - -x

6 In the Matters of:

7 RESIDENTIAL CAPITAL, LLC, et al.,

8                 Debtors.

9 - - - - - - - - - - - - - - - - - - - -x

10 OFFICIAL COMMITTEE OF UNSECURED CREDITORS, et al.,

11                 Plaintiffs,

12                 - against-

13 UMB BANK, N.A., et al.,

14                 Defendants,

15 - - - - - - - - - - - - - - - - - - - -x

16                 United States Bankruptcy Court

17                 One Bowling Green

18                 New York, New York

19

20                 July 26, 2013

21                 10:06 AM

22

23 B E F O R E:

24 HON. MARTIN GLENN

25 U.S. BANKRUPTCY JUDGE

2

1

2  (CC: Doc# 4228, 4296) Debtors' Motion for an Order Pursuant to

3  Bankruptcy Rule 9019 and Bankruptcy Code Section 363(b)(1)

4  Authorizing the Debtors to Enter Into and Perform Under

5  Amendment to Consent Order. (related document(s)4226, 4225)

6

7  (CC: Doc# 4050, 4051) Preliminary Hearing RE: Debtors'

8  Objection to Proofs of Claim Filed By The National Credit Union

9  Administration Board as Liquidating Agent for Western Corporate

10  Federal Credit Union and U.S. Central Federal Credit Union.

11

12  (CC: Doc# 4217) Debtors' Motion for Order Under 11 U.S.C.

13  105(a) and 554(a) Authorizing Abandonment of Certain Real

14  Estate Owned by DOA Properties IX (Lots-Other), LLC.

15

16  Doc# 4286 Motion of Ad Hoc Group of Junior Secured Noteholders

17  for Order in Aid of Mediation and Settlement.

18

19  Doc# 4277 Case Management Conference on the Ad Hoc Group of

20  Junior Secured Noteholders' Request to Bring Supplemental or

21  New Claims or Counterclaims Based Solely on Information set

22  Forth in the Examiner's Report.

23

24

25

3

1

2  (CC: Doc# 3924) Motion for Omnibus Objection to Claim(s) /

3  Debtors' Fifth Omnibus Objection to Claims (Late-Filed Borrower

4  Claims) The hearing on the matters relating to the Opposition

5  of Tracey J. Marshall, Response of Norma G. Green, and Response

6  of Todd Phelps will be going forward. [Tracey J. Marshall - to

7  be withdrawn].

8

9  (CC: Doc# 3923) Motion for Omnibus Objection to Claim(s) /

10 Debtors' Fourth Omnibus Objection to Claims (Late-Filed

11 Borrower Claims).  Hrg Going Fwd re: Responses of Mahnaz

12 Rahbar, Christine and Harris Davis, Mark and Lynn Ostreicher,

13 Kenneth and Kristi Walker, Aisha M. Harris, and James R. and

14 Terri L. Fox, and Mr. & Mrs. Norbert Bartosz. Hrg Adj. RE: Beth

15 M. Tsounakas and Nancy Kisting.

16

17

18

19

20

21

22

23

24

25

4

1

2   Adversary proceeding: 13-01277-mg Official Committee of

3   Unsecured Creditors, et al. v. UMB Bank, N.A,. et al.

4   (CC: Doc# 20, 21, 23, 28, 29) Adj. Hearing RE: Notice of

5   Defendant UMB Bank, N.A.s Partial Motion to Dismiss Pursuant to

6   FRCP 12(b)(6).

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

5

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4         Attorneys for Debtors

5         1290 Avenue of the Americas

6         New York, NY 10104

7

8   BY:   LORENZO MARINUZZI, ESQ.

9         JAMES J. BEHA, II, ESQ.

10        JENNIFER L. MARINES, ESQ.

11        JOEL C. HAIMS, ESQ.

12        JORDAN A. WISHNEW, ESQ.

13        JAMIE A. LEVITT, ESQ.

14

15

16   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

17        Conflicts Counsel to Debtors

18        101 Park Avenue

19        New York, NY 10178

20

21   BY:   THERESA A. FOUDY, ESQ.

22

23

24

25

6

1

2    KRAMER LEVIN NAFTALIS & FRANKEL LLP

3         Attorneys for Official Creditors' Committee

4         1177 Avenue of the Americas

5         New York, NY 10036

6

7    BY:   GREGORY A. HOROWITZ, ESQ.

8         RACHAEL L. RINGER, ESQ.

9         KENNETH H. ECKSTEIN, ESQ.

10        DOUGLAS MANNAL, ESQ.

11        STEPHEN D. ZIDE, ESQ.

12

13

14   WILMER CUTLER PICKERING HALE AND DORR LLP

15        Attorneys for Official Creditors' Committee

16        250 Greenwich Street

17        New York, NY 10007

18

19   BY:   WILLIAM J. PERLSTEIN, ESQ.

20

21

22

23

24

25

7

1  PACHULSKI STANG ZIEHL & JONES LLP

2         Conflicts Counsel to Creditors' Committee

3         780 Third Avenue

4         36th Floor

5         New York, NY 10017

6

7  BY:   JOHN A. MORRIS, ESQ.

8         ROBERT J. FEINSTEIN, ESQ.

9

10

11  WHITE & CASE LLP

12         Attorneys for Ad Hoc Group of Junior Secured Noteholders

13         1155 Avenue of the Americas

14         New York, NY 10036

15

16  BY:   J. CHRISTOPHER SHORE, ESQ.

17         HARRISON DENMAN, ESQ.

18

19

20  MILBANK, TWEED, HADLEY & MCCLOY LLP

21         Attorneys for Ad Hoc Group of Junior Secured Noteholders

22         One Chase Manhattan Plaza

23         New York, NY 10005

24

25  BY:   GERARD UZZI, ESQ.

8

1  KIRKLAND & ELLIS LLP

2        Attorneys for Ally Financial Inc. & Ally Bank

3        601 Lexington Avenue

4        New York, NY 10022

5

6  BY:   RAY C. SCHROCK, ESQ.

7

8

9  AKIN GUMP STRAUSS HAUER & FELD LLP

10        Special Litigation Counsel to UMB Bank, N.A.

11        One Bryant Park

12        New York, NY 10036

13

14  BY:   DAVID M. ZENSKY, ESQ.

15        BRIAN T. CARNEY, ESQ.

16        DANIEL H. GOLDEN, ESQ.

17        RACHEL EHRLICH ALBANESE, ESQ.

18

19

20  CLEARY GOTTLIEB STEEN & HAMILTON LLP

21        Attorneys for Wilmington Trust

22        One Liberty Plaza

23        New York, NY 10006

24

25  BY:   THOMAS J. MOLONEY, ESQ.

1

2    HALPERIN BATTAGLIA RAICHT, LLP

3         Attorneys for Redwood Recovery Services & Elevenhome Ltd.

4         40 Wall Street

5         37th Floor

6         New York, NY 10005

7

8    BY:   DONNA H. LIEBERMAN, ESQ.

9

10

11   REED SMITH LLP

12        Attorneys for Wells Fargo Bank as Collateral Agent

13        599 Lexington Avenue

14        22nd Floor

15        New York, NY 10022

16

17   BY:   ERIC A. SCHAFFER, ESQ.

18        DAVID M. SCHLECKER, ESQ.

19

20

21   FRANK REED

22        Pro Se

23

24

25

1

2  ZUCKERMAN SPAEDER LLP

3       Attorneys for National Credit Union Administration Board

4       1800 M Street NW

5       Washington, DC 20036

6

7  BY:   NELSON COHEN, ESQ. (TELEPHONICALLY)

8       ANDREW N. GOLDFARB, ESQ.

9

10

11  MUNGER, TOLLES & OLSON LLP

12       Attorneys for Berkshire Hathaway, Inc.

13       355 South Grand Avenue

14       35th Floor

15       Los Angeles, CA 90071

16

17  BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

18

19

20  GMAC RESCAP

21       General Counsel

22

23  BY:   TAMMY HAMZEHPOUR, ESQ. (TELEPHONICALLY)

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

11

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  We're here in

3    Residential Capital, number 12-12020.  Mr. Marinuzzi?

4            MR. MARINUZZI:  Good morning, Your Honor.  For the

5    record, Lorenzo Marinuzzi, Morrison & Foerster, on behalf of

6    the debtors.

7            Your Honor, we have several pages of continued and

8    settled matters on the agenda.  But there's one matter I've

9    been asked to highlight for the Court, and that's on page 9 of

10   the agenda.

11           THE COURT:  All right, just give me a second.

12           MR. MARINUZZI:  And it's the 2004 motion filed by

13   Redwood Recovery Services.

14           THE COURT:  Hold on a second.  I'm sorry, page 9?

15           MR. MARINUZZI:  Page 9 of the agenda.

16           THE COURT:  I'm looking at the amended --

17           MR. MARINUZZI:  At number 2.

18           THE COURT:  -- proposed agenda.  Is that --

19           MR. MARINUZZI:  The amended agenda from last night.

20           THE COURT:  Okay, go ahead.

21           MR. MARINUZZI:  I've been asked by counsel to Redwood

22   Recovery Services to indicate to the Court that we've resolved

23   their 2004 motion and we'll be submitting a stipulation and

24   order for the Court.

25           THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. MARINUZZI:  That brings us, Your Honor, to

2     contested matter number 1 on page 9.

3          THE COURT:  Yes.

4          MR. MARINUZZI:  And I'm pleased to present to the

5     Court, the debtor's motion, pursuant to Rule 9019 and Section

6     363(b)(1) for approval of entry into an amendment to the

7     consent order with the Federal Reserve Board.  As the Court is

8     aware, this settlement was a long time coming, and we're happy

9     to present it.  And in particular, we're thankful for the Court

10    allowing it to be heard on shortened notice.  We have a tight

11    time frame under the term sheet entered into with the FRB and

12    approved on June 26th.

13         Your Honor has heard a great deal in this case about

14    the foreclosure review and the expense.  And we've seen the

15    escalation of costs over time for the projected costs of

16    completing the foreclosure review.  And last month, before the

17    foreclosure review was put on a temporary hiatus, it was

18    costing the estate 300,000 dollars per day in professional

19    fees.  It was the largest single administrative expenses of

20    these estates.

21         Your Honor, just a bit of history to set the stage.

22    Your Honor may recall in January of this year, the Fed

23    announced that it had reached settlements with ten major

24    servicing companies in a manner that allowed those servicers to

25    replace the foreclosure review obligations with a lump sum cash

**RESIDENTIAL CAPITAL, LLC, ET AL.**

13

1    payment.  And since then, there were three additional servicers

2    that entered into similar settlements with the Fed.  And when

3    that happened, from the debtors' perspective, it changed the

4    nature, in our view, of the obligations, and rendered it one

5    that was capable of being treated as an unsecured claim.  And

6    we filed a motion asking the Court to so rule.

7            And it was clear, given the opposition, the

8    jurisdictional issues, the legal and factual disputes, that

9    resolution of that motion was far from certain, and when we

10   would have a final order was far from certain, because

11   certainly there would be appeals on the horizon, regardless of

12   if we were successful in the motion.

13           To the credit of all the parties involved, I think

14   everybody realized after the March 21st hearing on that motion,

15   that we needed to figure out how to settle this, to stop the

16   bleeding and move forward.  And we all recognized the costs

17   were astronomical, and we needed to put a cap on them.  Every

18   dollar leaving the estate was a dollar that was leaving the

19   unsecured creditors' recoveries.  And the committee and the

20   debtors agreed that it was time to figure out how to settle

21   this.

22           And ultimately, in June of this year, the debtors were

23   able to enter into a term sheet with the Fed, and it was

24   presented to Your Honor and approved on June 26th.  And under

25   that term sheet, the debtors deposited approximately 230

**RESIDENTIAL CAPITAL, LLC, ET AL.**

14

1    million dollars, which is the settlement amount, into an escrow

2    account.  Of this 230 million dollars, 31 million of it relates

3    to the cash value of certain foreclosure prevention measures

4    that the debtors simply can't perform, because we no longer

5    service.  So we cashed out that portion to get to the 230.  The

6    actual total amount of the settlement, Your Honor, for the

7    record, is 229,769,899 dollars.

8        Now, importantly, when the debtors executed the term

9    sheet, as I mentioned, it stopped the foreclosure review.  And

10   it stopped the foreclosure review for a period of thirty days.

11   And if within thirty days, the debtors don't sign the amendment

12   to the consent order, the Fed could turn it back on again.  And

13   the money that's in escrow goes back to the debtors and we have

14   to start over again.  The Fed could extend the deadline, but I

15   don't know whether they will or won't.

16       The thirty-day clock expires today.  And so we would

17   ask that, to the extent the Court were to approve the motion,

18   it would do so early during the day so we can start the process

19   of releasing the funds from escrow into the qualified

20   settlement account.

21       So, as Your Honor recalls, the foreclosure review is

22   being conducted by PwC.  And that review was not complete.

23   This settlement puts an end to that.  And instead of spending

24   potentially hundreds of millions of dollars of additional cash

25   to complete the review and then figure out what remediation was

**RESIDENTIAL CAPITAL, LLC, ET AL.**

15

1   due to borrowers, this settlement puts 230 million dollars into

2   borrowers' pockets for a fund to be redistributed for the

3   borrowers.  They'll be distributed pursuant to a waterfall.

4   The amounts are going to be established by the Fed -- we don't

5   know them as of yet -- and under certain guidelines that were

6   established under a national mortgage settlement, to which the

7   debtors are a party.

8       I want to be careful, because there are some aspects

9   of the waterfall that may be confidential.  There's a lot of

10   information I know, but I'm not sure that everyone in the

11   public knows it, and we understand the Fed is protective of

12   some of this information for many reasons.

13       But generally, at the top of the waterfall, you've got

14   violations of the Service Members Civil Relief Act, which we

15   refer to as the SCRA.  And under the amendment, the debtors

16   were permitted to utilize PwC to complete the review of those

17   files.  And there were a total of 1,970 loan files reviewed for

18   violations of the SCRA.  And there were errors in between five

19   and six percent of those files.  So with respect to the SCRA

20   file review, that the payments to borrowers would be the

21   greatest.  And we understand that PwC will have completed, if

22   they haven't completed, that review by the end of next week.

23       Then behind that, there's a tiered waterfall that has

24   categories based on particular alleged violations.  And the

25   company, using identifiers and search codes, searches their

**RESIDENTIAL CAPITAL, LLC, ET AL.**

16

1    loan files and places borrowers in the highest possible tier

2    that the Fed establishes.  PwC audits and is in the process

3    right now of auditing the search mechanism and the search

4    results; will tell the Fed what it finds, assuming it signs off

5    on what was done; and then the Fed has to sign off.  So there's

6    levels of protection.  It's not simply left to the debtors to

7    pick and choose where people go.

8          The key to this settlement, Your Honor, and the real

9    benefit, is that under the original consent order, borrowers

10   had been paid by the debtors after the review was completed,

11   and only if it was determined that there was, in fact, a loan

12   violation.  With the amendment, that's no longer the case.  And

13   without actually having to show an error or harm, approximately

14   232,000 borrowers will receive a payment from this fund.

15         Like I said, payments are going to be established by

16   the Fed.  I don't know what they are.  But at the end of the

17   day, this settlement puts more money into the pockets of more

18   borrowers than would have been the case, had we completed the

19   foreclosure review.

20         PwC, which is just about done with what I'll call the

21   original foreclosure review, is going to do some cleanup work.

22   We anticipate it's going to cost the estate 65,000 dollars to

23   complete that, which is, compared to 300,000 dollars a day, not

24   much money.  In addition, the debtors are entering into a new

25   engagement letter with PwC to perform the work required under

**RESIDENTIAL CAPITAL, LLC, ET AL.**

17

1   the amendment and under the term sheet.  It's largely been done

2   already.  I understand that that engagement letter is still

3   subject to Fed sign-off.  We've circulated a copy to the

4   committee.  The debtors anticipate that the cost of completing

5   the audit and the bucketing verification is going to be

6   approximately a million dollars.

7          Third, as required under the amendment and under the

8   term sheet, the debtors will be retaining Rust Consulting to be

9   the paying agent for making the distributions.

10          THE COURT:  And I hope they do better than they have

11   so far with others.

12          MR. MARINUZZI:  Hopefully they will.  And Your Honor,

13   they'll be setting up a hotline for borrowers, a Web site for

14   borrowers, mailing out the notifications, mailing out the

15   payments.  And the debtors anticipate that the cost of

16   retaining Rust Consulting is going to be just shy of three

17   million dollars.  And these amounts, these administrative costs

18   of Rust and PwC, they're not coming out of the 230 million

19   dollars.  That's the fund that goes into the qualified

20   settlement account.  The rest is paid by the estates.

21          So Your Honor, we really believe that this amendment

22   is a great accomplishment.  We think it's in the best interests

23   of the estates.  We frankly believe it's the best for borrowers

24   as well.  It puts to rest what we believe could have been a

25   significantly larger administrative expense burden on the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

18

 1  estates, and it provides a benefit to borrowers, as I

 2  mentioned.  It also --

 3          THE COURT:  Are the payments to PwC under the

 4  engagement that's being finalized, and the payments to Rust,

 5  are they subject to Court approval?

 6          MR. MARINUZZI:  Your Honor, I don't believe they are.

 7  Certainly we can -- Your Honor can condition the payments being

 8  subject to Court approval.  For Rust, we're talking about a

 9  period that's going to extend beyond the effective date of any

10  plan.

11          THE COURT:  Well, at least until the effective date of

12  a plan, given the publicly disclosed problems that Rust has had

13  in administering the amended consent orders with the Fed, I

14  want to specifically -- it's not that I'm looking for more work

15  to review fee applications -- but if there are more problems

16  such as they've had in the past, I want to know about it.  And

17  so I do want to condition the payments to Rust, at least until

18  a plan has gone effective, to approval by the Court.  And I

19  guess that would be true of PwC.

20          I'm not looking to -- just as I've had applications

21  from the lawyers an PwC so far, that ought to continue until --

22  unless and until a plan becomes effective in the case.

23          MR. MARINUZZI:  Your Honor, from the debtors'

24  perspective, that's perfectly fine.

25          THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

19

1        MR. MARINUZZI:  Now, in response to the motion -- by

2   the way, Your Honor, this settlement is also in compliance with

3   the debtors' plan support agreement.  Just wanted to note that

4   for the record.

5        In response to the motion, the debtors received two

6   objections from two borrowers and a reservation of rights from

7   the ad hoc committee of junior secured noteholders.  First the

8   ad hoc committee's reservation of rights.  Their issue is they

9   want to ensure that the payment of the 230 is not coming from

10   their cash collateral.  I can confirm, and our papers do, that

11   it's paid out of unencumbered cash.

12        Now, with respect to the objections by borrowers --

13   and I know two -- one was from Mr. Wiener, and one was from Mr.

14   Reed.  And their position is, effectively, I don't like this

15   settlement because it may not put enough money into a borrower

16   account, and I may not receive as much as I would have under

17   the original consent order.  And I think from the perspective a

18   9019 settlement, which addresses it from the perspective of

19   whether it's beneficial to the estate, I don't know that that's

20   the proper approach or lens through which to view this 9019

21   settlement.

22        In particular, the consent order itself, in paragraph

23   30, says that there shall be no third-party beneficiary and no

24   entity could claim any rights under this consent order except

25   the parties to it.  So from the perspective of a possible

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1    beneficiary -- and who knows whether they would have received

2    anything under the original consent order -- they shouldn't be

3    able to make that argument in front of this Court.

4          THE COURT:  Isn't it -- I think I'm correct that in

5    papers filed with the Court, the debtor previously estimated

6    that after the completion of the independent foreclosure

7    review, payments to borrowers were likely to be in the fifty-

8    or sixty-million-dollar range?

9          MR. MARINUZZI:  That's correct, Your Honor.  And

10   sitting behind me is Scott Goldman, VP of default operations at

11   the company.  So if I'm wrong, he'll correct me.

12         THE COURT:  And under the amended FRB settlement, the

13   payments to borrowers are going to be 230 million dollars?

14         MR. MARINUZZI:  That's correct.

15         THE COURT:  It seems self-evident which is a better

16   deal from borrowers' standpoint.

17         MR. MARINUZZI:  We would agree, Your Honor.

18         Now, Your Honor, I could go through the waiver and

19   estoppel arguments raised by Mr. Reed, but I think our papers

20   address --

21         THE COURT:  I'll hear -- I see Mr. Reed in the

22   courtroom.  And after you've finished, I'll give the objectors

23   a chance to speak.

24         MR. MARINUZZI:  All right.  Your Honor, seated to my

25   right, is Lewis Kruger, whose declaration was submitted in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

21

1  support of this motion, for any cross-examination or questions

2  the Court has.  And as I mentioned, Mr. Goldman's sitting

3  behind me as well.

4         THE COURT:  Right.

5         MR. MARINUZZI:  But unless the Court has questions for

6  me, I'll cede the podium to Mr. Eckstein or --

7         THE COURT:  All right.  Anybody else in support of the

8  9019 motion want to be heard?  Mr. Eckstein?

9         MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

10  Eckstein of Kramer Levin on behalf of the creditors' committee.

11         As Your Honor, I believe, is well aware, this was one

12  of many contested issues that we were able to resolve as part

13  of the global settlement that was achieved this past May.

14  There had been a fair amount of litigation that had percolated

15  around responsibility for the foreclosure review.  And

16  fortunately, by arriving at the global settlement, we were able

17  to incorporate a resolution of this issue, which we feel is

18  very advantageous for the estate, since it eliminates the

19  ongoing foreclosure review and converts this into a lower

20  payment.

21         As we just noted, it also facilitates a very

22  substantial payment for the benefit of the borrowers.  And

23  while the plan that is on file includes a separate recovery for

24  borrowers, it was noted by all the parties that the 230 million

25  dollars that is being made available to borrowers is a very

**RESIDENTIAL CAPITAL, LLC, ET AL.**

22

1    substantial additional payment coming from the estate, which we

2    felt was extremely advantageous in connection with the global

3    resolution of the case.

4          We agreed, in order to accommodate the needs of the

5    federal government, that this motion would get presented and

6    the payment would get made in advance of the Court's

7    consideration of the plan.  And there are reservations of

8    rights in the event the plan ultimately is not confirmed and

9    the global settlement is not approved.  Rights are being

10   reserved, but we agreed that the payments needed to be made,

11   and we support the Court's entry of the order and the payments

12   that are contemplated under the order, which we believe are

13   fully consistent with the plan that is on file today and

14   hopefully will ultimately be presented for confirmation.

15         But today, we believe that this in the best interests

16   of the estate.  It's in the best interests of borrowers.  And

17   we would urge the Court to approve the settlement.

18         I do want to note that in the Court today is Mr. Bill

19   Perlstein from the Wilmer Hale firm.  He worked extensively

20   with the committee and assisted the committee and was quite

21   valuable in terms of helping the committee and I believe the

22   estate achieve what we think if a very favorable and smooth

23   outcome of this process.

24         THE COURT:  Thank you, Mr. Eckstein.  Anybody else

25   want to speak in support of the motion?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

23

1          All right.  The objections.  Mr. Reed, do you want to

2     be heard?

3          MR. REED: Good morning, Your Honor, Frank Reed,

4     creditor pro se.  I'd like to first say just briefly that the

5     standing or grounds on which I've raised my objection are not

6     as a third-party beneficiary to the consent decree.  I am a

7     claimant in this case, a party-in-interest.  My proof of claim

8     in the case that I am a partially secured claimant, that would

9     mean that in this case, in particular --

10          THE COURT:  That wouldn't be affected by whether this

11     settlement is approved or not.  This doesn't affect your proof

12     of claim.  If your claim is ultimately allowed, it is what it

13     is.

14          MR. REED:  Oh, I agree with that, Your Honor.  But the

15     plaintiff -- I mean debtors' counsel said that we shouldn't be

16     able to argue or I should not be able to argue my motion or my

17     objection because --

18          THE COURT:  Let's not deal with the standing issue.

19     Why don't you argue your objection.

20          MR. REED:  Okay.

21          THE COURT:  Let's assume -- assume for purposes of the

22     discussion that you have standing.

23          MR. REED:  Well, Your Honor, I don't have much more to

24     add other than the papers that I had filed.  I'd like to say

25     that I am not the only one that thinks that this is a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

24

1    necessarily bad idea, perhaps in this room.  But in Senate

2    testimony in a hearing on April 11th, 2013, which I ordered

3    transcripts of but do not have at this time, senators roundly

4    criticized these amended orders as not being sufficient,

5    because the payments are nominal for those were harmed.

6         As we'll see in my proof of claim, it's a substantial

7    proof of claim.  It does mirror the application I made under

8    the independent foreclosure review.  The payments that I

9    suspect I will receive will be similar to those other borrowers

10   received in the other amended consent orders, which would

11   probably be in the range of 300 dollars.

12        THE COURT:  Your criticism is of the Federal Reserve

13   Board, for its willingness to modify the consent orders it

14   entered with many loan servicers.

15        MR. REED:  I agree with that also, Your Honor.  But

16   I --

17        THE COURT:  I may have some power.  I have no power

18   over what the Federal Reserve Board does, Mr. Reed.

19        MR. REED:  And as -- and speaking to that, the papers

20   that I filed, and I tried to best articulate, that the power

21   that you do have is over the debtors and their voluntarily --

22   or their voluntary affirmative actions.  And it is my position,

23   and I'm assuming no one agrees with it -- but my position is --

24        THE COURT:  Mr. Reed, your position is that the

25   debtors should have to expend 350 to 450 million dollars for an

**RESIDENTIAL CAPITAL, LLC, ET AL.**

25

1  independent foreclosure review, not a dollar of which will go

2  to borrowers, and after that independent foreclosure review is

3  completed, assuming that the Fed agrees with the result,

4  somewhere in the neighborhood of 50 or 60 million dollars

5  would -- is estimated to be paid to borrowers.  That's what you

6  prefer than having 230 million dollars go into a fund to be

7  distributed to borrowers.  That's essentially what you're

8  arguing, Mr. Reed.

9         MR. REED:  It's essentially what I'm arguing, and what

10  the senators in the April 11th hearing said was more

11  appropriate.  And so I --

12         THE COURT:  They'd rather have the money go to

13  consultants?  Is that what they said?

14         MR. REED:  They'd rather have it --

15         THE COURT:  Is that what they said?  Was the testimony

16  that members of the senate would prefer that 350 to 450 million

17  dollars would be paid to lawyers and consultants and not a

18  penny to borrowers?

19         MR. REED:  That -- what was said, Your Honor, and what

20  I just said, I hope I said clearly, is that the wrongs that

21  actually occurred would be redressed.

22         THE COURT:  Okay.  All right.  What else do you have

23  to say?

24         MR. REED:  Your Honor, that's it.

25         THE COURT:  Okay.  All right, thank you, Mr. Reed.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

26

1          All right, Mr. Wiener, are you present?  Do you want

2     to be heard?  Gerard Wiener, an objection was filed on his

3     behalf.

4          Okay.  Anybody else wish to be heard?

5          All right.  Pending before the Court is the debtors'

6     motion for an order pursuant to Bankruptcy Rule 9019 and

7     Bankruptcy Code Section 363(b)(1), authorizing the debtors to

8     enter into and perform under amendment to consent order.  It's

9     at ECF docket number 4228.

10         The junior secured noteholders filed a reservation of

11     rights which is at ECF 4296.  Gerard Wiener filed an objection

12     which is at 4292.  And Frank Reed filed an objection -- it

13     hadn't yet hit the docket when I reviewed the filing, so I'm

14     not sure what the docket number is.  The debtors filed a reply

15     which is at ECF 4327.  And the committee filed a brief

16     statement in support.  That's at ECF 4329.

17         The motion of the debtors for approval of the

18     settlement is approved.  The objections of Mr. Wiener and Mr.

19     Reed are overruled.

20         The Court is very familiar with the FRB initial

21     consent order and the amended consent order that's before me

22     for approval today.  Settlements and compromises are favored in

23     bankruptcy, as they minimize costly litigation and further

24     parties' interests in expediting the administration of the

25     bankruptcy case.  See In re Martin 91 F.3d 389 (3d Cir. 1997).

**RESIDENTIAL CAPITAL, LLC, ET AL.**

27

1          Under Rule 9019, the Court has authority to approve a
2   compromise or settlement.  A court must determine that a
3   settlement under Bankruptcy Rule 9019 is fair, equitable, and
4   in the best interests of the estate before it may approve a
5   settlement.

6          The framework for approval of the settlement is set
7   forth in the Supreme Court's decision in TMT Trailer Ferry,
8   which is at 390 U.S. 414 (1968).  The Court, as is customary,
9   applies the standards set forth by the Second Circuit in
10  Motorola Inc. v. Official Committee of Unsecured Creditors, In
11  re Iridium Operating LLC, 478 F.3d 452 (2d Cir. 2007).

12         Iridium sets forth seven nonexclusive factors for
13  courts to consider in determining whether to approve a
14  settlement.  I won't go through each of those factors
15  separately, other than to indicate that the Court has
16  considered each to the extent applicable in the circumstances.

17         The objections are misplaced with respect to their
18  criticisms of this proposed settlement.  The settlement will
19  not dispose of the concept of independence featured in the
20  original consent order.  Although initially the debtors will
21  place the borrowers into waterfall categories, the placement
22  process will be a mechanical one based on loan file
23  characteristics determined by the Federal Reserve Board.
24  Moreover, an independent third party will conduct the
25  validation of waterfall payments required by the FRB, and the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    FRB will also review and verify the waterfall placement before

2    any settlement funds are disbursed to borrowers.

3            Additionally, under the amendment, the debtors could

4    have chosen certain limited categories of borrower files

5    reviewed by an independent third party, and they've elected to

6    do so.

7            The motion before me is supported by the declaration

8    of Mr. Kruger, and provides that the settlement amount was

9    calculated in a manner consistent with the settlement payments

10   made under the nondebtor settlements.  Various aspects of the

11   settlement and waterfall approach taken by the FRB are

12   confidential -- confidential with the FRB and can't be

13   disclosed publicly in connection with the hearing.

14           The debtors' total administrative cost for the

15   settlement will be reduced under the amendment.  The amount of

16   money available to a larger group of borrowers will be

17   somewhere between 270 and 560 percent of the aggregate

18   projected restitution payments had the FRB independent

19   foreclosure review be -- had been completed.  And it's largely

20   because an extraordinary sum was being expended for an

21   independent foreclosure review.

22           Mr. Reed reviewed to recent testimony in Congress.

23   There were earlier hearings in Congress that established that

24   while perhaps initially well-conceived, the independent

25   foreclosure review structured by the Federal Reserve and the

1    Office of the Comptroller of the Currency, were not working in

2    practice, because enormous sums were being paid to lawyers and

3    consultants in connection with the review, which was extending

4    a very, very lengthy period of time, and little or no money was

5    going to borrowers.  And that seemed to be a misplaced outcome.

6            Contrary to Mr. Reed's arguments in his papers, the

7    debtors are not trying to escape compliance with the consent

8    order.  Indeed, the amendment is consistent with the amended

9    consent orders that the FRB has now entered with most of the

10   loan servicers who were originally parties to consent orders.

11           For the foregoing reasons, the Court approves the

12   motion to approve the 9019 settlement.  In addition, as Mr.

13   Marinuzzi had indicated, the debtors had originally filed the

14   debtors' motion pursuant to Bankruptcy Rule 3013 and Bankruptcy

15   Code Section 362(a) for a determination that GMAC Mortgage's

16   FRB foreclosure review obligation is a general unsecured claim,

17   and the automatic stay prevents enforcement of the FRB

18   foreclosure review obligation.  That motion was at docket

19   number 3055.

20           Various objections and responses were filed with

21   respect to that motion, and the Court heard argument on the

22   classification motion on March 21, 2013.  To date, no decision

23   had been issued by the Court in connection with the

24   classification motion.  In light of the Court's approval of the

25   amended consent order, the classification motion is denied as

**RESIDENTIAL CAPITAL, LLC, ET AL.**

30

1   moot.  And just a short order to that effect will be entered as

2   well.  Mr. Marinuzzi?

3          MR. MARINUZZI:  Thank you, Your Honor.

4          With respect to Rust Consulting, we'll present a

5   separate order on Rust Consulting.  We'll discuss it with the

6   committee.

7          THE COURT:  That's fine.

8          MR. MARINUZZI:  Okay.  Your Honor, the next several

9   pages --

10          THE COURT:  Let me just say, you wanted an order

11   entered as soon as possible.

12          MR. MARINUZZI:  As soon as possible.

13          THE COURT:  Do you have it on disc?

14          MR. MARINUZZI:  I believe it was sent to chambers.

15          THE COURT:  Do we have it?  All right.  And we'll try

16   and get that entered promptly.  Okay?

17          MR. MARINUZZI:  Thank you very much.

18          THE COURT:  All right.

19          MR. MARINUZZI:  Your Honor, the next several pages of

20   the agenda are with respect to the consultants and lawyers

21   associated with the foreclosure review.

22          THE COURT:  I take it we can pass on that?

23          MR. MARINUZZI:  Well, we're going to submit interim

24   orders continuing the interim relief --

25          THE COURT:  All right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1        MR. MARINUZZI:  -- through August 21st.  I think we'll

2   try to build in this new PwC engagement into that order, maybe

3   present it for final hearing in August.  We'll obviously

4   discuss it with the committee.  And with respect to the other

5   professionals, they're simple 327(e) orders that I think we can

6   let them go final, but we'll have that discussion and address

7   it at the next hearing.

8        THE COURT:  Okay.

9        MR. MARINUZZI:  Your Honor, that brings us to page 17

10  of the agenda.  And it's item number 5 on page 17; the debtors'

11  objection to the proofs of claim filed by National Credit Union

12  Administration Board.  That's docket number 4050.  And I will

13  cede the podium to my colleague James Beha who will address the

14  motion.

15       THE COURT:  All right. Thank you.

16       MR. MARINUZZI:  Thank you, Your Honor.

17       MR. BEHA:  Good morning, Your Honor.  As Mr. Marinuzzi

18  said, I'm James Beha from Morrison & Foerster on behalf of the

19  debtors, and we're here for a preliminary status conference on

20  the debtors' objection to proofs of claim filed by the National

21  Credit Union Administration Board as liquidating agent for the

22  Western Corporate Federal Credit Union and U.S. Central

23  Corporate -- excuse me -- U.S. Central Federal Credit Union.

24       The credit unions were RMBS investors who invested in

25  debtor-issued RMBS securities.  Their claims are against

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1   Residential Funding Mortgage Securities II and Residential

2   Credit Loans, Inc.

3          After the entity UAB became conservator and then

4   liquidating agent for the failed credit unions, it filed suits

5   against the debtors under Section 11 of the Securities Act in

6   federal court in Kansas and in the Central District of

7   California.  Those actions were stayed when this case began.

8   And the NCUAB's claims just assert the Section 11 claims in

9   those actions.

10          Neither of those actions --

11          THE COURT:  Wait.  Just let me -- the proofs of claims

12   filed here assert Section 11 claims?

13          MR. BEHA:  Yes.  That's right.

14          The previous federal court actions did not name any

15   nondebtor Ally entities, and that is the reason that these

16   claims are not part of the private securities litigation trust

17   that is part of the plan.  And the debtors have objected to the

18   NCUAB's proof of claims for several reasons which we can get

19   into if Your Honor would like to discuss the basis for the

20   objections.  But at this point, it's a preliminary conference.

21          We expect to work out consensually with the NCUAB a

22   discovery schedule and then a schedule for a hearing on the

23   merits.  And we will present that to Your Honor; that is in the

24   event that we're not able to settle the objection and the

25   claims.  And we're hopeful that we will be able to do so.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1       THE COURT:  May I ask whether these proof of claims

2   have been a subject of the mediation before Judge Peck?

3       MR. BEHA:  These proof of claims were not the subject

4   of the mediation.

5       THE COURT:  Mr. Eckstein?

6       MR. ECKSTEIN:  Your Honor, if I may?  In fact, the

7   NCUAB has been party to discussions with the committee, and I

8   believe Judge Peck has spent some time dealing with it.

9   Everybody's well aware of the NCUAB claims.  And as Mr. Beha

10  said, efforts are being made to try to resolve the claim.  We

11  may or may not succeed; but it's something that is very much on

12  the radar screen.  And discussions are ongoing with the NCUAB.

13      THE COURT:  Well, I certainly encourage the parties to

14  continue to try and resolve these claims.  Judge Peck remains

15  available as the mediator.  The parties are sophisticated;

16  sophisticated counsel, and may be able to resolve these issues

17  without having to add to Judge Peck's burdens in the mediation.

18      You ought to carry forward with that.  I think your

19  efforts are all better spent trying to resolve the issues now.

20  To the extent you can't you should endeavor to -- just remind

21  me.  Did you file objections to the claims?  I didn't go back

22  and look at the pleadings.  Have you filed, at this point, an

23  objection to the claims?

24      MR. BEHA:  Yes.  Yes, Your Honor.  We have.

25      THE COURT:  All right.  You should endeavor to, if you

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1  can't resolve them, draft a scheduling order -- case management

2  and scheduling order consistent with the template I use.  And

3  we can take that up at a future hearing, either in an omnibus

4  hearing or a separate hearing, if appropriate.  I do -- as I

5  think you know, I do telephone scheduling conferences, and we

6  can do it in that context.  But I think at this stage,

7  everybody ought to make a full effort to see whether you can

8  resolve the claims.  Okay?

9          MR. BEHA:  Thank you, Your Honor.

10          THE COURT:  All right.  Does anybody else wish to be

11  heard with respect to these claims?

12          MR. GOLDFARB:  Good morning, Your Honor.  Andrew

13  Goldfarb of Zuckerman Spaeder, for the NCUAB.  We have engaged

14  in some preliminary discussions with the debtors.  And as Mr.

15  Eckstein referenced, we have also been in consultation with him

16  to try to resolve it.  Our interest is, as well, to resolve --

17          THE COURT:  How much are the proof --

18          MR. GOLDFARB:  -- our claims --

19          THE COURT:  -- how much are the proofs of claim for?

20          MR. GOLDFARB:  Collectively, eleven proofs of claim

21  for 293 million dollars.  So it's our preference to resolve

22  them consensually.  And we will continue to work with debtors

23  to hopefully get a scheduling order in place as early as next

24  week, and if we are unable to resolve our proofs of claim, to

25  engage in discovery on an expedited fashion and proceed that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1    way.

2           THE COURT:  All right.  Okay.  Thank you very much.

3           MR. GOLDFARB:  Thank you, Your Honor.

4           THE COURT:  Mr. Marinuzzi, what do we have next?

5           MR. WISHNEW:  Good morning, Your Honor.  Jordan

6    Wishnew, Morrison & Foerster, for the debtors.  We're here on

7    page 18, Roman numeral V, uncontested matters, the debtors'

8    motion for abandonment of certain real estate owned by DOA

9    Properties IX.

10          Your Honor, this is an uncontested motion.  Simply,

11   the real property at issue is sixty-eight acres of undeveloped

12   real estate in St. Johns County, Florida.  It's a residual

13   asset of one of the debtors' former business units.  The liens

14   on the property -- tax liens -- greatly exceed the value of the

15   real property.  And at this point, we believe it's best to

16   abandon the property to Durbin Crossing.  And in exchange, they

17   will agreedto withdraw their twelve million dollars of proofs

18   of claims.  So we think it certainly provides a benefit to the

19   estate, given its minimal value to the estates.  The matter is

20   uncontested, and if Your Honor pleases, we can submit --

21          THE COURT:  They're prepared to accept the abandonment

22   of the property?

23          MR. WISHNEW:  They are, Your Honor, yes.

24          THE COURT:  All right.  Anybody wish to be heard with

25   respect to this motion?  It's at ECF 4217.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1              The motion is granted.

2              MR. WISHNEW:  Thank you, Your Honor.

3              MR. MARINUZZI:  Your Honor, the next item on the

4    agenda is the motion of ad hoc group of junior secured

5    noteholders for order in aid of mediation and settlement; and

6    presenting that motion will be Mr. Uzzi.

7              THE COURT:  Okay.  Good morning, Mr. Uzzi.

8              MR. UZZI:  Good morning, Your Honor.  For the record,

9    Gerard Uzzi of Milbank, Tweed, Hadley & McCloy, for the ad hoc

10   group.

11             Your Honor, we are here on the motion for an order in

12   aid of mediation.  The purpose of this order is to provide

13   clarity to the parties participating in the mediation that

14   other parties cannot attack them under a premise that such

15   participation in mediation somehow impliedly altered the

16   participants' status relative to other parties -- the debtors

17   and other parties in the case.

18             As an example, Your Honor, in the order, we're seeking

19   a clarification that participating in the mediation does not

20   impliedly render the participant an insider or temporary

21   insider of the debtors.

22             While that may seem like an obvious proposition to

23   some, in at least one other very high-profile Chapter 11 case,

24   Your Honor, such argument was made.  It was given legs.  And

25   the consequence was then to allow parties to bootstrap

1  allegations of violations of Federal Securities laws.  So

2  unfortunately, as we've been before you, Your Honor, and have

3  discussed, and we've seen play out in this very case, this

4  issue has now become a very real impediment to secondary market

5  participants participating in settlement discussions.

6  　　　　Your Honor, we were before you about a month ago, I

7  believe, with what we refer to -- people have come to know as

8  the proposed Vitro order, which was designed to address these

9  issues and was entered in the Chapter 11 cases in Vitro, to in

10  fact, address these issues.  We subsequently had some

11  discussions with Judge Peck.  And as a consequence of those

12  discussions, we have made substantial modifications to the

13  proposed order.  And we submit that the order that was attached

14  to the motion is very narrowly tailored to achieve its stated

15  goals.

16  　　　　I think what is very important, Your Honor, is to

17  address and highlight what the order doesn't in fact do.  It

18  doesn't immunize anyone against insider trading.  It doesn't

19  bind any governmental entity with respect to enforcement

20  actions.  And it doesn't even exculpate any mediation

21  participants for misconduct in the mediation process.  What it

22  does do is exculpate them against claims that would be premised

23  upon an implied change in their relationship with other parties

24  based upon being a mediation participant.

25  　　　　Your Honor, we spent a good deal of time with Judge

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1  Peck on this.  I know one of Judge Peck's general concerns with

2  the mediation process is that parties don't represent what his

3  views are.  So for that reason, we didn't state that in the

4  papers, and I'll -- and I won't state it here.  But we do

5  invite Your Honor to check --

6          THE COURT:  I've already had a conversation with Judge

7  Peck about the motion.

8          MR. UZZI:  Okay.  Thank you, Your Honor.

9          I would say we worked very cooperatively with the

10  debtors and committee.  And I particularly appreciate Mr.

11  Eckstein's efforts in trying to get this into a shape where we

12  could present to you.  Your Honor, I think otherwise the motion

13  sets forth the reasons and the basis for this Court's

14  jurisdiction to do this.

15          If you have any questions of me, I'm happy to answer

16  them.

17          THE COURT:  I do.  The order refers to a

18  confidentiality agreement.

19          MR. UZZI:  Yes.

20          THE COURT:  It wasn't attached.  I don't know -- I had

21  my chambers contact your office yesterday, and we did get a

22  copy.

23          MR. UZZI:  Yes.

24          THE COURT:  And I have that.  Is that the same form of

25  confidentiality order that others have entered into, or is it

**RESIDENTIAL CAPITAL, LLC, ET AL.**

39

1    specifically crafted to deal with the JSNs?

2                MR. UZZI:  It's a hybrid, Your Honor.  It's based upon

3    other orders -- other agreements, I should say -- but it is

4    also customized for the fact that there is going to be --

5    there's a lockup in there as far as trading goes during the

6    mediation process itself, that there is going to be a

7    disclosure at a specific time in that regard --

8                THE COURT:  And that's what I wanted to ask about --

9                MR. UZZI:  Yes.

10               THE COURT:  -- the disclosure time of August 16th of

11   2013.  It's right around the corner.  How was that selected?

12               MR. UZZI:  That is the response date for the

13   disclosure statement objections -- the debtors' response date.

14   So, Your Honor, in his particular case, if I may just --

15   there's probably very limited to almost no confidential

16   information at this point that really needs to get blown out.

17   There are a few numbers that are not in the public domain.

18   People kind of have a general idea of where they are.

19               We're going to try and get that information out there.

20   For instance, the actual amount of allocated cost to the JSN's

21   collateral as proposed by the debtors.  So that number has not

22   been disclosed yet.  It's that type of stuff.  It's not a lot.

23   And it just seemed to make sense that we lined this up with

24   their response date.

25               THE COURT:  Okay.  Anybody else wish to be heard?  Mr.

1  Eckstein?

2          MR. ECKSTEIN:  Your Honor, Kenneth Eckstein on behalf

3  of the committee.  A couple of observations.  I rise to speak

4  to this motion both from a perspective of the committee and

5  having spent most of the summer of 2011 in court in Delaware in

6  the WaMu litigation.  I still recall firsthand the precise

7  issues that were so difficult to deal with in that case.  And I

8  actually believe that what's being proposed here is useful for

9  this case, because it will finally facilitate direct

10  discussions between the principals for the various estate

11  fiduciaries and the JSNs, and in fact, a meeting is scheduled

12  for Tuesday afternoon, next week, where there will be a face-

13  to-face discussion with Judge Peck.

14          Your Honor correctly points out that the August 16th

15  date is right around the corner.  But there is a meeting, as I

16  said, on July 30th, and there is certainly opportunities

17  between then and August 16th to have continued dialog.  And

18  that's the expectation.

19          We think that this is a constructive order for this

20  case, and we think it's a constructive order generally, because

21  this is a problem that burdens large complex reorganization

22  cases generally.  And as Mr. Uzzi points out, it is coordinated

23  with an NDA, and it does not eliminate what we think needs to

24  be governed by an NDA.  And we think an NDA is going to be

25  appropriate in any of these situations.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

41

1              In this case, it does contemplate that there is going

2    to be a disclosure of specific business information, but it

3    allows both sides not to have to disclose settlement

4    negotiations which we think is counterproductive to forthright

5    proposals by both sides.  And it also provides a greater level

6    of confidence that parties will be able to engage in mediations

7    without being at risk of subsequent litigation as a result of

8    that participation.

9              So toward that end, we think this is actually a very

10   constructive and important order, and in fact, will probably

11   get referenced again in other cases, and probably be called the

12   ResCap order, in this case.

13             But we do think this is well tailored, and we would

14   recommend that it be entered and hopefully it will actually be

15   helpful to both the case and to investors in the debtors'

16   securities to be able to try to resolve rather than litigate

17   issues.

18             THE COURT:  Thank you, Mr. Eckstein.

19             Does anybody else wish to be heard?

20             MS. MARINES:  Good morning, Your Honor.  Jennifer

21   Marines from Morrison & Foerster, for the debtors.

22             I would just like to start out by saying that the

23   debtors are extraordinarily supportive of the mediation process

24   that's gone on to date.  And as Mr. Eckstein noted, we have a

25   mediation session with Judge Peck:  the debtors, the UCC, and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1    the principals of the JSNs, scheduled for next Tuesday.

2         I think everyone here recognizes that in order for

3    that mediation session to be fruitful, it's really necessary to

4    have the principals being active participants in the mediation.

5    The obvious problem is that the principals would like to

6    continue trading while being engaged in the mediation, and that

7    poses a significant risk for them while having certain of the

8    debtors' confidential information.

9         So the noteholders did ask the debtors to make public

10   any material nonpublic information that's exchanged during

11   those mediation sessions.  And I think that the debtors'

12   obvious concern, and everyone's obvious concern, including

13   Judge Peck, is disclosing the bids and asks that got exchanged

14   during that .

15        So in order to protect those and keep those exchanges

16   confidential, as well as giving the noteholders and their

17   principals some level of protection, the notes are asking this

18   Court to enter the order today.  Again, we think the mediation

19   has been an extraordinary success to date.  And we really hope

20   that Judge Peck can continue working his magic, hopefully, if

21   it's possible, to resolve the JSN disputes.  So if Your Honor

22   enters the order, we look forward to sitting across the table

23   on Tuesday.

24        THE COURT:  Thank you.  Anybody else wish to be heard?

25   Mr. Uzzi?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

43

1          MR. UZZI:  Yeah, I just want to clarify one point,

2    because I don't want there to be a misunderstanding.  This has

3    never been about wanting to continue trading during the

4    mediation.  In fact, we've contractually locked up under the

5    confidentiality agreement.  This is about what somebody can do

6    and say about somebody's participation in the mediation after

7    the fact, if it otherwise fails.

8          So I just want to make that --

9          THE COURT:  Well, let me understand.  I mean, the NDA

10   permits an ethical screen --

11         MR. UZZI:  It does, Your Honor.

12         THE COURT:  -- and so your clients won't be precluded

13   from trading.  It's just anyone who is involved, there has to

14   be a separation between traders and those involved in the

15   mediation.

16         MR. UZZI:  That's correct, Your Honor.  But not all

17   institutions are able to put up an ethical screen.

18         THE COURT:  No, I understand.

19         MR. UZZI:  And even after -- again, what this order

20   goes to is a change in -- an implied change in a relationship

21   of a party that would impose a duty that's otherwise not

22   imposable under the contract, Your Honor.

23         THE COURT:  All right.  Thank you.

24         MR. UZZI:  Your Honor, I would say, we do have the

25   meeting scheduled for Tuesday --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

44

1        THE COURT:  I'm going to rule now, Mr. Uzzi.

2        MR. UZZI:  Okay.

3        THE COURT:  It won't take until Tuesday.

4        MR. UZZI:  No.  I was going to -- what I was going to

5   say, Your Honor, is if you are prepared to rule, I do have a

6   disc here, actually -- we are anxious -- so that we can start

7   preparing for Tuesday.

8        THE COURT:  Okay.

9        MR. UZZI:  And one other thing, Your Honor.  If you do

10  enter it, I will refer to it as the Eckstein order for future

11  reference.

12        THE COURT:  All right.  Pending before the Court is

13  the motion of the ad hoc group of junior secured noteholders

14  for order in aid of mediation and settlement.  It's at ECF

15  docket number 4286.  The Court shortened the notice period for

16  the motion.  That's at ECF 4304.  No responses have been filed.

17        The motion is granted.  Section 105(a) permits courts

18  to issue any order, process or judgment that is necessary or

19  appropriate to carry out provisions of the Code.  Bankruptcy

20  Rule 7016(c)(2)(I) provides that a court may consider and take

21  appropriate action on settling the case in using special

22  procedures to assist in resolving the case, when authorized by

23  statute or local rule.

24        Courts have authority to issue orders in aid of

25  settlement negotiation, pursuant to the authority granted to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

45

1    them by Section 105(a).  See Shearson Lehman Brothers Inc. v.

2    Munford Inc., In re Munford Inc. 97 F.3d 449 (11th Cir. 1996),

3    finding that Section 105 and Bankruptcy Rule 7016 gave

4    bankruptcy -- gave the bankruptcy court authority to enter a

5    bar order in aid of settlement.  There are other authorities to

6    similar effect.

7         Additionally, the court in Vitro has entered an order

8    substantially similar to the proposed order to address the very

9    same risks the proposed order seeks to address.  That order was

10   entered in the Vitro case on January 26th, 2012.  And within

11   that case, it's docket number 311.  And it's in re Vitro S.A.D

12   de C.V. case number 11-33335-hdh-15, Bankruptcy Court Northern

13   District of Texas.

14        The proposed order is intended to clarify the status

15   of mediation participants with respect to the debtors and other

16   parties in interest as a consequence of participating in the

17   mediation.  Specifically, the proposed order seeks a

18   determination that no mediation parties shall become an insider

19   or temporary insider of the debtor parties.  And they shall not

20   be deemed to owe any duty to any of the debtor parties.  And

21   they do not undertake any duty to any party in interest.  And

22   they're not deemed to misappropriate any information of the

23   debtor as a result of participating in the mediation, being

24   aware of settlement proposals, or acting together in a group of

25   other holders of the debtors' parties' securities.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1       Here, the junior secured noteholders are not insiders

2   of the debtors under any traditional standard, as they do not

3   exert control over the debtors, and are not underwriters,

4   accountants, lawyers, or other consultants retained by the

5   debtors to perform services on behalf of or to the debtors.

6   Rather, they are creditors of the debtor seeking to engage in

7   arm's-length negotiations and mediation with the debtor and

8   other parties-in-interest, in furtherance of their own economic

9   self interest to attempt to achieve a consensual resolution of

10  the bankruptcy proceedings.  Given these facts, the junior

11  secured noteholders are not insiders of the debtor and they do

12  not otherwise owe any fiduciary obligations or similar duties

13  to the debtor.  See Dirks v. SEC, 463 U.S. 646, 655, note 14,

14  1983; United States v. O'Hagan, 521 U.S. 642, 652 (1997).

15      Nor do the junior secured noteholders become insiders

16  of the debtor by participating in the proposed settlement

17  process.  See Walter v. Morgan Stanley & Co., 623 F.2d 796, 799

18  (2d Cir. 1980).

19      The proposed order serves to foster the policies in

20  favor of mediation and encouraging creditor participation in

21  Chapter 11 cases by allowing principals from the junior secured

22  noteholders to participate in mediation and settlement

23  negotiations, without the risk that such participation would

24  subject such junior secured noteholders to liability.  Without

25  entry of the proposed order, the junior secured noteholders'

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   principal will be unable to participate in the mediation under

2   the construct demanded by the debtors and the creditors'

3   committee.

4           For the forgoing reasons, the motion is granted.

5           MR. UZZI:  Your Honor, may I approach.

6           THE COURT:  Yeah, please.  Why don't you hand it to

7   one of my law clerks.

8           MR. UZZI:  Thank you, Your Honor.

9           THE COURT:  Thank you, Mr. Uzzi.

10          MR. UZZI:  I'd also like to thank Judge Peck for all

11  the effort he put in with this.

12          THE COURT:  I would like to thank Judge Peck for the

13  effort he has in the past, and continues to put in, in trying

14  to bring about a consensual resolution of this very difficult

15  case.

16          MR. UZZI:  Thank you, Your Honor.

17          MR. MARINUZZI:  Your Honor, we're all very thankful

18  for Judge Peck's efforts in this case.

19          The next item on the agenda is the ad hoc group of

20  junior secured noteholders' request to bring supplemental or

21  new claims or counterclaims based solely on information set

22  forth in the examiner's report.

23          THE COURT:  All right.

24          MR. MARINUZZI:  Mr. Shore --

25          THE COURT:  Mr. Shore, if you want to --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

48

1          MR. MARINUZZI:  -- I guess, will address the Court on

2     it.

3          THE COURT:  While Mr. Shore is coming up, I just

4     wanted to, on the -- in connection with the FGIC 9019

5     settlement hearing, which is scheduled for August 16 and 19;

6     this morning, the Court entered an order denominated FGIC

7     settlement supplemental scheduling and trial procedures order.

8     It's at ECF docket number 4363.  It leaves intact the existing

9     schedule; it supplements it with trial procedures.  People will

10    be able to read the order, but in short, the hearing will be a

11    timed trial with a total of twelve hours allocated; six hours

12    to the settlement proponents and six hours to the settlement

13    objectors.  It has various other provisions consistent with my

14    general trial procedures, so people can look out for that.

15          Mr. Shore?

16          MR. SHORE:  Thank you, Your Honor.  And while we're

17    talking about FGIC, I learned this morning that last week there

18    were numerous correspondence with the Court, and a hearing in

19    front of the Court on the FGIC mediation privilege.

20    Notwithstanding Your Honor's directive in two e-mails that they

21    advise all relevant parties that that was going on, we never

22    received anything on that.  We'll raise it in our FGIC

23    objection and we'll have to address it, but I did want to not

24    let that go on the record -- without going on the record this

25    morning.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

49

1          THE COURT:  That's fine.  I think -- I mean, you can

2     order the transcript from yesterday.  There was a hearing

3     yesterday morning at 9 o'clock in which, basically, I

4     determined that the mediation privilege wasn't waived.  I

5     didn't really -- it didn't determine the scope of the mediation

6     privilege; it dealt with one specific document that was

7     produced during the deposition of the FGIC trustee's expert

8     witness.  I don't look at the -- to see who got served with

9     papers, Mr. Shore --

10          MR. SHORE:  I was not suggesting at all that it was

11     your -- that it was a problem with Your Honor.  But there's

12     clearly, and there has been, a lack of communication in the

13     past.  We'll address it as best we can.

14          THE COURT:  Okay.

15          MR. SHORE:  With respect to this, we have requested,

16     pursuant to the scheduling order in the consolidated adversary

17     proceedings, from the debtors and the committee, consent to

18     file one new counterclaim which addresses specific causes of

19     action that were identified in the examiner's report, seeking

20     determinations that specific claims are subject to our liens,

21     and a determination as to the value of the claims being

22     settled.

23          The debtors and the committee have consented to allow

24     that amendment to occur subject to the following.  One, that

25     they be able to file a short-form answer in -- within two weeks

**RESIDENTIAL CAPITAL, LLC, ET AL.**

50

1    is what Ms. Levitt has proposed.  I assume that's okay with the

2    committee.

3           Two, that it doesn't change any of the timing on the

4    existing motion to dismiss.  That is, that if they prevail on

5    the portion of the motion to dismiss which seeks to determine

6    that we do not have liens on avoidance actions or commercial

7    tort claims, that would apply to the new counterclaim as well,

8    without having to refile a motion.  We've agreed to that.

9           And we have to reach an accommodation on the statement

10   of issues.  It was proposed to me yesterday that we would --

11   it's going to straddle phase 1 and phase 2 -- I think I have

12   confirmation on that now.  I don't perceive it's going to be a

13   problem.  I'm just waiting for an e-mail, unfortunately.  But

14   that would then just require that we submit to the Court the

15   agreed revision of the statement of issues and the new

16   complaint with a black-line to show the Court what's been

17   added.  And I think that resolves the issue with respect to the

18   status conference that we had requested.

19           THE COURT:  Okay.  Thank you.

20           MS. LEVITT:  Your Honor, if I could.

21           THE COURT:  Go ahead, Ms. Levitt.

22           MS. LEVITT:  Thank you, Your Honor.  Good morning.

23   Jamie Levitt from Morrison & Foerster on behalf of the debtors.

24   Mr. Shore has correctly represented the discussions we have.  I

25   just need to note two things that we really do need to reach

**RESIDENTIAL CAPITAL, LLC, ET AL.**

51

1   agreement on the statement issues, how this straddles phase 1,

2   and what has been defined as phase 2.  Because if not, it is

3   hard --

4              THE COURT:  What's the cause of action?

5              MS. LEVITT:   The cause of action is that they have a

6   lien on recoveries from and specific claims identified by the

7   examiner.  So they've added a certain number of allegations,

8   Your Honor.  We would note that those are hearsay; they've

9   taken -- cut and pasted from the examiner report.  I know Your

10  Honor stated numerous times and the law is clear that this

11  is -- these are a statement of the investigation; they are not

12  findings.

13             And then, in addition to adding allegations that state

14  claims the examiner has come up with, they ask specifically for

15  a lien on the recoveries and a lien on the specific claims.

16  What Chris and I -- Mr. Shore and I discussed is that this is

17  really an overlap of what was their counterclaim 7 and

18  counterclaim 10.  We had hoped that they could incorporate this

19  therein as opposed to creating a new counterclaim.  But we

20  don't need to bother Your Honor with those sorts of details,

21  except that the new claim that has to be able to be fit into

22  our statement of issues.  That was, as you know, a hard

23  negotiation.  I think that what we've proposed does that, but

24  we would just ask that the Court wait to hear that we've been

25  able to resolve that.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  I won't wait too long because I'm

2     leaving --

3          MS. LEVITT:  Right.

4          MR. SHORE:  No, I --

5          THE COURT:  -- on vacation --

6          MR. SHORE:  -- I just got confirmation.

7          THE COURT:  -- on the 31st.

8          MS. LEVITT:  Oh.  Sounds like we've got confirmation.

9          MR. SHORE:  I've got confirmation.  So we will

10     submit -- I'm not going to comment on the counterclaim or

11     anything else like that --

12          THE COURT:  That's --

13          MR. SHORE:  -- but we will submit a -- the revised

14     statement of issues and the new set of counterclaims and the

15     new -- and a red-line of that.  I don't think we need to change

16     the existing scheduling order based on what we've just said on

17     the record today.

18          THE COURT:  All right.  Thank you, Mr. Shore.

19          MR. SHORE:  You're welcome.

20          MR. HOROWITZ:  Good morning, Your Honor.  Greg

21     Horowitz on behalf of the committee.  I just wanted to clarify

22     what Mr. Shore said with regard to the motion to dismiss.  It's

23     our view, the committee's and I think the debtors' view, that

24     this proposed counterclaim is redundant; that the relief that

25     it requests was already encompassed within several of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

53

1   counterclaims that were already out there, and that we had

2   understood them to be seeking a declaration with regard to

3   whether they had a lien on each of the causes of action

4   identified in the examiner's report.

5        So understanding that, in our partial motion to

6   dismiss filed a week ago Tuesday, we specifically mentioned

7   several of the issues raised in the examiner's report.  And so

8   our concern was we do not want this amended counterclaim, which

9   we view as irrelevant, to force us to do any other work or to

10  in any way mess up the time table that we have, this very tight

11  timetable.  So our understanding of the agreement is that our

12  existing motion to dismiss will be deemed to be a motion to

13  dismiss this existing counterclaim, to the extent that we've

14  already addressed that in our motion to dismiss.

15       MS. LEVITT:  And I believe that's the agreement that

16  we reached with Mr. Shore.

17       THE COURT:  Mr. Shore, is that an accurate statement?

18       MR. SHORE:  That's fine, Your Honor.

19       THE COURT:  All right.  Thank you, Mr. Horowitz.

20       MR. MARINUZZI:  Your Honor, the matters on the next

21  two or so pages to -- three pages have been adjourned which

22  brings us to page 22.  And it's the debtor's fourth omnibus

23  objection of claims, and I'll cede the podium to my colleague,

24  Jordan Wishnew.

25       MR. WISHNEW:  Good morning, Your Honor.  For the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

54

1   record, Jordan Wishnew, Morrison & Foerster for the debtors.

2   Your Honor, this is a carryover of some previously filed

3   omnibus objections.  It deals with eight claims in the fourth

4   and fifth omnibus objections which are late filed claims.  We

5   have -- there were responses filed by eight borrower claimants.

6   We submitted our reply on Wednesday.  We've notified the

7   parties of their ability to participate telephonically.  I

8   don't know if anyone has actually participated or chosen to

9   participate today.  But if you'd like, I can offer our

10   arguments, if you have any questions, Your Honor.

11        THE COURT:  Well, let me ask.  Does anybody who filed

12   a response to either the fourth or fifth omnibus objections

13   wish to be heard?  If so, you need to speak up now.

14        All right.  Let me see if I have any questions for

15   you.

16     (Pause)

17        THE COURT:  In the fourth omnibus objection --

18        MR. WISHNEW:  Yes, Your Honor.

19        THE COURT:  -- I'd like for you to address the

20   objection to the claim of Mahnaz Rahbar, who filed a response,

21   which is at ECF 4165.  As I understand it, the claim was

22   received on November 20th, 2012, four days after the amended

23   bar date.  And so I want you to address that one.  Let me see.

24   Hold on.  That's the only one in the fourth omnibus objection.

25   These are all late claims.  This one just missed.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

55

1          MR. WISHNEW:  Right.  This was one, according to the

2     claimant's response, where they intended to submit it timely,

3     pulled back based upon their conversations, as we understand

4     it, with their family, and then resent it in after the bar

5     date.  So clearly, I believe, Ms. Rahbar knew of the bar date,

6     chose not to file it, and then chose to file it late.  I mean,

7     I don't believe this rises necessarily to the level of

8     excusable neglect.  It was totally under her control as

9     evidenced by her pulling the filing back.  So, I mean, that

10    under the Second Circuit precedent in Pioneer, in our opinion,

11    did not rise, necessarily, to excusable neglect.

12          THE COURT:  You would agree, I take it though, the

13    debtor would suffer no prejudice if this claim would go

14    forward.

15          MR. WISHNEW:  Understood, Your Honor.

16          THE COURT:  You know, I'm going to skip ahead to the

17    fifth omnibus objection.  The opposition by Tracey Marshall,

18    which is at ECF 4167.

19          MR. WISHNEW:  I believe -- not to cut Your Honor off,

20    I believe we actually withdrew our objection --

21          THE COURT:  Did you?  Okay.

22          MR. WISHNEW:  -- as to that one.  So we are not

23    seeking to have that claim disallowed.  We will deal with that

24    in due course.

25          THE COURT:  How do you distinguish between the two?  I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

56

1    mean, Marshall missed by fewer days than Rahbar.

2             MR. WISHNEW:  Your Honor, we'd, at this point --

3             THE COURT:  I mean Marshall missed by -- what,

4    Marshall's was received one day before.  The Marshall claim, as

5    I understand it, was received by the debtor on November 19th --

6             MR. WISHNEW:  Um-hum.

7             THE COURT:  -- and the Rahbar claim was received on

8    November 20th.

9             MR. WISHNEW:  Your Honor, the debtors would be willing

10   to withdraw the objection as to Ms. Rahbar --

11            THE COURT:  Thank you.

12            MR. WISHNEW:  -- reconsider the claim --

13            THE COURT:  All right.

14            MR. WISHNEW:  -- and --

15            THE COURT:  The objection is deemed withdrawn.  The

16   fourth and fifth omnibus objections are sustained with respect

17   to the rest of the claims.

18            MR. WISHNEW:  Thank you for your time, Your Honor.

19            THE COURT:  All right.  Thank you.

20            MR. MARINUZZI:  Your Honor, that brings us to the last

21   item on the agenda, item number 1 on page 24.  And this in the

22   adversary proceeding, Official Committee of Unsecured Creditors

23   v UMB Bank.

24            THE COURT:  And what I'd like to do, is I'd like to

25   give ten-minute recess before I hear argument on the motion to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

57

1    dismiss.

2         MR. MARINUZZI:  That's fine, Your Honor.

3         THE COURT:  Okay?

4         MR. MARINUZZI:  Thank you.

5         THE COURT:  All right.  Thank you.  Obviously, anybody

6    who doesn't want to be here for that is excused.

7         (Recess from 11:13 a.m. until 11:26 a.m.)

8         THE COURT:  All right.  Please be seated.

9         All right, we're back on the record in Residential

10   Capital, and we're going to hear argument on the motion to

11   dismiss in the adversary proceeding, Official Committee of

12   Unsecured Creditors v. UMB Bank.  It's adversary proceeding

13   number 13-01277.

14        MR. ZENSKY:  Good morning, Your Honor.  David Zensky,

15   Akin Gump Strauss Hauer & Feld, for UMB Bank, successor

16   indenture trustee to the junior secured notes.  This is, as you

17   said, Your Honor, the motion to dismiss, or partial motion to

18   dismiss, filed by UMB and joined in by Wells Fargo, with

19   respect to the committee complaint that is now part of the

20   consolidated adversary.

21        Your Honor, I have a very short handout, if I may hand

22   up, I've --

23        THE COURT:  Sure.

24        MR. ZENSKY:  -- shared it with my adversary during --

25        THE COURT:  That's fine.

12-12020-mg   Doc 4397   Filed 07/29/13   Entered 07/29/13 15:51:08   Main Document
Pg 58 of 173
**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1          MR. ZENSKY:  -- the break.  Just, it has some of the

2     cases we want to talk to about, language of the relevant

3     documents, and some of the facts.

4          THE COURT:  Please.

5          MR. ZENSKY:  May I approach, Your Honor?

6          THE COURT:  Yeah.  Let me move some this stuff out of

7     my way.

8          MR. ZENSKY:  Your Honor, as you know, after filing a

9     reply brief, we're down to a challenge to four counts of the

10    committee action on really three basic issues.  First, whether

11    the claim of the junior secured noteholders has any sort of

12    unmatured interest imbedded in it that be disallowed under Code

13    Section 502.  Second, whether the committee can attempt to

14    recharacterize the debtors' repo agreement with BMMZ, which

15    existed pre-petition.  And third, whether assets that at one

16    time were excluded assets within the definition of the junior

17    secured note pledge and UCC-1 filings, whether they remain

18    excluded for all times, even if they cease to satisfy the

19    status of an excluded asset.

20         And in each instance, Your Honor, in each of these

21    claims, the committee is trying to attack a claim amount and/or

22    an item of collateral that debtors have stipulated to as --

23    that are -- is proper as far as claim amount, and is part of

24    the JSN collateral package.  So this is the committee trying to

25    go around the debtors, so to speak --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

59

1          THE COURT:  Well --

2          MR. ZENSKY:  -- and the cash collateral order.

3          THE COURT:  -- there was a challenge period, as there

4    always is, and they brought their complaint within the

5    challenge period.

6          MR. ZENSKY:  They did, Your Honor --

7          THE COURT:  So the fact that the debtors stipulated is

8    of no moment whatsoever to me.

9          MR. ZENSKY:  It -- we believe it is of moment in terms

10   of whether the collateral impact is our collateral.  But I

11   don't disagree they have standing to make the challenge, Your

12   Honor.  There's no question about that.

13          In any event, in all the instances we're going to

14   discuss today, the debtors see the world the way we do.

15   Second, we feel the committee lacks any legal support for the

16   claims that we are --

17          THE COURT:  Well, they saw the world the way you did

18   for purposes of entering into a stipulation that permitted them

19   to use cash collateral in the case.  Not the first time it's

20   been known that a debtor, for what it perceived as good and

21   sufficient reasons, entered into a stipulation that

22   subsequently gets challenged during the challenge period by a

23   creditors' committee.

24          MR. ZENSKY:  Your Honor, no question about it.  But I

25   don't believe there was a lot of arm twisting with respect to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1    the items we're talking about today.

2          Second, Your Honor, as I started to say, we don't feel

3    the committee has any legal support to back up the claims that

4    we're going to talk about momentarily.  And in fact, they're

5    trying to make new law and bad law with bad consequences for

6    the capital markets and for the possibility of consent --

7          THE COURT:  Well, with respect to OID, you're both

8    trying to make law, because there is no binding precedent

9    either way, correct?

10          MR. ZENSKY:  I wouldn't agree with that, Your Honor.

11    I wouldn't say that there is an --

12          THE COURT:  Gee, you acknowledged in your papers --

13          MR. ZENSKY:  I --

14          THE COURT:  -- that there is no controlling

15    authority --

16          MR. ZENSKY:  Right.  In the --

17          THE COURT:  -- it's a question -- you acknowledge it's

18    a question of first impression.

19          MR. ZENSKY:  In the narrowest of senses, Your Honor,

20    because of --

21          THE COURT:  I didn't see that in your papers.

22          MR. ZENSKY:  It -- well --

23          THE COURT:  You didn't say in the narrowest of

24    senses --

25          MR. ZENSKY:  --well --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**61**

1          THE COURT:  -- this a question of --

2          MR. ZENSKY:  -- that --

3          THE COURT:  -- first impression.

4          MR. ZENSKY:  -- that's why we have oral argument, Your

5     Honor, to flesh out the issues.  Only by virtue of a single

6     indecipherable sentence in the Chateaugay decision would it be

7     appropriate, as we did, to conclude that there is no

8     controlling precedent.  But everything about that decision and

9     the facts --

10          THE COURT:  You think that was just an accident that

11     the sentence was put --

12          MR. ZENSKY:  I think --

13          THE COURT:  -- in the Chateaugay --

14          MR. ZENSKY:  I think it was at best, a throwaway

15     sentence that no one focused on.  And if you read the rest of

16     that paragraph, I think I can put in context what they were

17     trying to say to the say to the extent they knew what they were

18     trying to say, Your Honor, with that sentence.

19          So that is where I want to begin with respect to the

20     unmatured interest issue.  And as I said, the debtors have

21     stipulated that the JSNs are entitled, at a minimum, to the

22     face amount of their claim to the extent it remains unpaid,

23     and --

24          THE COURT:  Well, the committee is --

25          MR. ZENSKY:  -- the face amount of their note --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1      THE COURT:  The committee, as a co-proponent of a

2  plan, has proposed a plan that would pay the junior secured

3  noteholders all pre-petition interest and principal.

4      MR. ZENSKY:  I understand that, Your Honor.  But the

5  committee also is challenging part of the claim amount in Count

6  XIII on the ground that they contend there's unmatured

7  interest.

8      Now, we don't think unmatured interest exists, and we

9  don't think they've identified a single case that has ever

10  found unmatured interest to arise from an exchange offer.  Let

11  me start --

12      THE COURT:  Is there any case that says that OID is

13  not created in a fair-market-value exchange?

14      MR. ZENSKY:  Phrased that way, Your Honor, the answer

15  is no.

16      THE COURT:  Okay.

17      MR. ZENSKY:  Let me turn, if -- or direct the Court to

18  the first page of our handout, and just deal with some of the

19  facts that relate to this claim; what's, I think, agreed, and

20  what's disputed.  There's no question that the original set of

21  notes, not the current notes, but the original notes that were

22  exchanged were sold for par.  The debtors actually got 1,000

23  dollars for each 1,000-dollar note.  Okay.  There's no OID or

24  unmatured interest latent from that time period, which was the

25  facts of Chateaugay, that the original note did have some

**RESIDENTIAL CAPITAL, LLC, ET AL.**

63

1    discount built into it.

2          In 2008 there was an exchange offer, and the debtors

3    were able to exchange new notes for the old notes.  But they

4    only gave 800 dollars of value towards the face amount of the

5    new note in exchange for every thousand they got back of the

6    old notes --

7          THE COURT:  And enhancement of the security position

8    and other things.

9          MR. ZENSKY:  That's correct.  There were other changes

10   in terms.  The maturity was pushed out in some respects.  The

11   earlier notes had varying maturity dates, and everything was

12   now put on a schedule with the last payment culminating in

13   2015.  And there was no --- this part of the exchange offer,

14   there was no cash exchange in either direction.  And as is

15   obvious, the debtors were able to shed billions of dollars from

16   their balance sheet by deleveraging and engaging in this

17   exchange; something, obviously that was important to the

18   debtors at the time.

19          So as I said, UMB, Wells Fargo, and the debtors

20   believe that the proper claim amount is the full remaining

21   unpaid face amount, plus pre-petition interest.  Of course, we

22   believe there's post-petition interest as well; that's not

23   implicated in this claim.  The committee says that's not right,

24   that we have something short of that, and we need to do a

25   calculation as to what the new notes traded at in the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    aftermarket after they were issued, and figure out what alleged

2    inferred interest is built in as a result of a market discount.

3    And then we have to work backwards and calculate how much is

4    left.

5        Now, we don't think that that's right, for several

6    reasons, Your Honor.  The Code talks about unmatured interest.

7    There is no phrase in there, "market discount", "exchange

8    discount", "subsequent exchange discount".  We're talking about

9    unmatured interest.  And we know as a basic tenet of bankruptcy

10   law, when you come to bankruptcy court, you come with your

11   claim amount based on the face amount of the bond or note.  It

12   doesn't turn on what you paid for it in the secondary market,

13   distressed market.  It doesn't turn on what it traded for after

14   you bought it as part of an original issue or in a secondary

15   market.  It doesn't matter if you paid more than the face

16   amount of the note.  You show up in bankruptcy court with a

17   bond or note and your claim is for the face amount.  So that's

18   a first point I'll go back to in a minute.

19       Second, when you think about this from the perspective

20   of the balance sheet of the debtor and basic notions of

21   equality of distribution, which are clearly the policies that

22   drive 502(b)(2) -- why we disallow unmatured interest -- none

23   of those are implicated in any respect and in fact, the

24   opposite would be true if the Court were to sustain this claim

25   and reduce the JSN claim amount because of some alleged

**RESIDENTIAL CAPITAL, LLC, ET AL.**

65

1   original-issue discount.

2          Third, all the policy reasons that the Second Circuit

3   talked about in Chateaugay and the Fifth Circuit in Pengo,

4   which adopted Chateaugay, pretty much, are all equally present,

5   if not more present in a fair-value exchange --

6          THE COURT:  Well, let me as you this.  Is the issue of

7   whether there is unmatured interest built in to the notes an

8   issue of fact?

9          MR. ZENSKY:  I don't think it's an issue -- it's a

10  fact at all, unless the Court accepts the claim and says, I now

11  need to determine what --

12         THE COURT:  No --

13         MR. ZENSKY:  -- the amount of the unmatured interest

14  in.  But whether --

15         THE COURT:  But whether -- you may be correct.  In

16  other words, the Court could agree with your position that for

17  purposes of 502(b) there is no unmatured interest.  But that

18  seems to me, perhaps, to be a different issue than whether, as

19  an economic matter, there is unmatured interest in the new

20  notes that were issued.  It may be either for tax purposes or

21  for bankruptcy claim purposes that unmatured interest is of no

22  moment; it makes no difference.  But as an economic matter, is

23  that a factual issue?

24         MR. ZENSKY:  Well, I'm struggling to understand the

25  Court's distinction between an economic matter and for Code

**RESIDENTIAL CAPITAL, LLC, ET AL.**

66

1    purposes.

2            THE COURT:  Um-hum.

3            MR. ZENSKY:  We're only concerned today, Your Honor,

4    with whether they can disallow a portion of the claim under

5    502(b)(2).  That's a statutory question for the Court.

6            THE COURT:  It is --

7            MR. ZENSKY:  For tax purposes it's agreed; there could

8    be OID in -- that was triggered when this exchange occurred --

9            THE COURT:  But when I look at the Code, it

10   doesn't -- it has some very simple words in 502(b).  It doesn't

11   define it.  And, I mean, I have to wonder, even in Chateaugay,

12   which was a face-value exchange, when the Second Circuit

13   reversed Judge Lifland, and did so on policy grounds, whether

14   subsequent Second Circuit and Supreme Court authority on the

15   rules for statutory construction would -- whether the same

16   result would be reached today; whether you look beyond the

17   plain language of the statute.  Certainly for the face-value

18   exchange, Chateaugay remains binding precedent, and the Court

19   would be obligated to follow it, whether I agreed with it or

20   disagreed with it.  I'm not saying -- I don't have a position

21   whether I agree or disagree.

22           But this is a question -- an issue acknowledged by

23   both sides to be a question of first impression.  And in

24   interpreting such claim is for unmatured interest in 502(b),

25   and applying the rules for statutory construction as the courts

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   have subsequently elaborated on since Chateaugay, I'm not sure

2   that you -- what the result is.

3         MR. ZENSKY:  I --

4         THE COURT:  And that's why when I asked the question,

5   is -- and maybe I don't ask it artfully -- but as an economic

6   matter -- for example is the committee going to be able to

7   offer evidence -- if this issue were to go trial, is the

8   committee going to be able to offer evidence that the new notes

9   include unmatured interest?  Okay.  That, to me, is what --

10  that's a question I have for both sides.  I mean, what evidence

11  can be offered on the issue of whether these notes included, at

12  the time they were issued -- that's the relevant time, you

13  agree with that --

14        MR. ZENSKY:  I do.

15        THE COURT:  -- at the time they were issued, include

16  unmatured interest?

17        MR. ZENSKY:  Okay.  A couple of points, Your Honor.

18  The question is whether there was unmatured interest as far as

19  the debtors' balance sheet go.  The question is not whether as

20  an economic matter or a tax matter that the instrument you got

21  when you exchanged had a lesser value and therefore --

22        THE COURT:  Easy for you to say --

23        MR. ZENSKY:  -- has a lesser market value.

24        THE COURT:  Easy for you to say --

25        MR. ZENSKY:  Well, I believe that's --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

68

1          THE COURT:  -- but I don't see that in Code --

2          MR. ZENSKY:  I -- well --

3          THE COURT:  I mean, that may be -- we're --

4          MR. ZENSKY:  I'm going to -- I'm going to try to

5   help --

6          THE COURT:  Don't interrupt.  Okay?

7          MR. ZENSKY:  Sorry.

8          THE COURT:  That may be your position, but I don't see

9   it in the language.  In the simple language of 502(b), where do

10  you find that?

11         MR. ZENSKY:  Okay.  I think I can help the Court get

12  there with the remainder of my presentation, Your Honor.  And I

13  would also suggest that Chateaugay was not based solely on

14  policy arguments, but was based on the Second Circuit's

15  impression of how it should interpret the words "unmatured

16  interest" which of course, we all agree --

17         THE COURT:  Is --

18         MR. ZENSKY:  -- is not defined in the Code.

19         THE COURT:  Is that -- I didn't know that a Court's

20  impressions about how -- I mean, you know, you can go to the --

21  there's stuff about legislative history, there's -- so if the

22  statutory language is ambiguous, the rules of construction

23  say -- sort of rank what you'd look at, all right?  But

24  Chateaugay seems to me, the decision with respect to face-value

25  exchange seems to have been decided on -- I'm not saying that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**69**

1    the policy grounds aren't compelling, that Congress couldn't

2    decide to write a statute to accomplish the policy -- a good

3    policy that the Second Circuit identified -- whether that

4    policy applies in the context of a fair-market exchange is a

5    different issue, but -- go ahead.

6             MR. ZENSKY:  I agree that policy arguments were front

7    and center.  I was simply suggesting that I believe the court

8    also, by reference and legislative history, thought about the

9    statutory interpretation questions, Your Honor.  And that was

10   simply my point.

11            Okay.  To continue, Your Honor, I think that, as we

12   talked about already, you come to bankruptcy court, ordinarily,

13   with the face amount of your claim, and we think there is but

14   one exception.  And that is when there is an original-issue

15   discount, and by that I mean when the debtor originally issues

16   an instrument for a face amount of 1,000 but gets less than

17   that amount.

18            THE COURT:  And where --

19            MR. ZENSKY:  And that --

20            THE COURT:  -- do you derive that from?

21            MR. ZENSKY:  And that -- I derive that from the

22   legislative history, which was cited with authority and relied

23   upon in Chateaugay.  The example that the court cites from the

24   legislative history is where a debtor -- an eventual debtor

25   issues a note for a 1,000, gets 900 dollars, so there's a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  discount to the debtor itself on the debtor's balance sheet, in

2  effect, as of day one.  The company files for bankruptcy two

3  days later.  The holders of those instruments come to

4  bankruptcy court with a 900-dollar claim, not a 1,000-dollar

5  claim.  That is the example I believe the court found most

6  telling.  And you can search the legislative history; there's

7  no other example where they say, of course you can do an

8  exchange, and if the original instrument is --

9        THE COURT:  There's nothing in the legislative history

10 that deals with a fair-market-value exchange.  Isn't that true?

11       MR. ZENSKY:  I don't think there's anything that deals

12 with exchanges, period.  It's talking about a discount to the

13 debtor at the time the note is originally issued.

14       So here, as I've said, there was no such discount with

15 the original note.  The debtors got 1,000 for 1,000.  And

16 later, when they exchange, they did better.  They delever; they

17 reduce their balance sheet.

18       So when we come to unmatured interest, we've already

19 discussed together, Your Honor; it's not defined and that the

20 Chateaugay court was forced to look at legislative history,

21 which I've said, the legislative history doesn't support any

22 interpretation that would expand to include OID that's created

23 for tax purposes in a secondary exchange.  And let me go back

24 to the balance-sheet perspective.

25       It makes sense, of course, as I said in the example in

1    the legislative history, that that holder should come to court

2    with something less than a 1,000-dollar claim.  The debtor got

3    900, and if those holders were able to come to court with a

4    1,000-dollar claim, that would be unfair to the debtor, and

5    equally, if not more important, unfair to the debtor's other

6    creditors, because the debtor only got 900; it was supposed to

7    mature the rest of the ten percent over the life of the

8    instrument.  And if the company files two days later, it would

9    be unfair to the other creditors, because the balance sheet, in

10   effect, is diluted if you recognize that claim at a full 1,000.

11          Here, the only difference is the note which the

12   debtors got for 1,000 -- got 1,000 for at the outset, was

13   exchanged in a distressed setting, where those notes were

14   trading down.  They gave a note of a smaller amount; the

15   allegation in the complaint is that even that smaller note,

16   where the holders traded 1,000 of original for 800 face of new

17   was actually worth less than 800 in the market, okay?  There's

18   no question that the debtors were able to write off their

19   balance sheet the full 1,000 of the original notes that were

20   changed.

21          And if the Court were to say that that now creates

22   unmatured interest for 502(d) because in their alle -- the

23   complaint's allegation, the new notes had a value of less than

24   the 800 --

25          THE COURT:  You agree that they have a value of less

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    than 800?

2            MR. ZENSKY:  Well, I have to agree with that for

3    purposes of the motion to dismiss.  Okay.  They allege that

4    they traded for less or had some market discount, Your Honor.

5    But if the Court were to now rule -- again thinking about this

6    from the balance-sheet perspective of the debtor and fairness

7    to it and its other creditors, you reduce the JSN claim because

8    the note that it took was trading for less in the market after

9    they were issued; that's a windfall to the debtor and its other

10   creditors.  It's the opposite of the situation that unmatured

11   interest is trying to police against, which is prejudice to the

12   company and other creditors.

13           And that's exactly right out of Chateaugay, Your

14   Honor.  If you look at the decision at page 382, the court

15   said -- of course, this was face value, but for this purposes,

16   I don't see any difference at all between face value and fair

17   value -- the Second Circuit said, "The bankruptcy court's

18   ruling finding unmatured interest in an exchange, grants a

19   corresponding windfall both to holdouts who refused to

20   cooperate, and to an issuer that files for bankruptcy

21   subsequent to a debt exchange."  So they're saying there'd be

22   no reason to give the debtor and its other creditors a windfall

23   just because the new instrument traded below its face value.

24           So --

25           THE COURT:  If the Court were to determine,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

73

1  ultimately, that there was OID for claim purposes, would it

2  result in a windfall for holdouts?

3       MR. ZENSKY:  In this case, that's a factual question,

4  whether holdouts would have been better off trading or not.  I

5  suppose each situation where an exchange occurs, parties have

6  to make that decision.  But one thing I am relatively sure of,

7  if this Court were to rule that a fair-value exchange is

8  capable of creating unmatured interest, there aren't going to

9  be any more fair-value exchanges; this'll be the last time

10  we'll have to address that issue.

11       THE COURT:  Gee, I don't know --

12       MR. ZENSKY:  Because --

13       THE COURT:  I mean, your clients, arguably,

14  significantly enhanced their ultimate recovery by improving

15  their collateral position with the debtor.  So it doesn't do

16  you a lot of good to have bonds trading at a -- bonds with a

17  face value of 1,000, if they would fall lower in the waterfall

18  than the 800-face-value bonds, whether there's OID or not, that

19  have an enhanced position.  You'd have to look -- you can't

20  automatically say which is better or which is worse.  You'd

21  have to look at the particulars of it.

22       MR. ZENSKY:  I agree with that, Your Honor.  And you

23  have to look at the particulars, as you said earlier, back at

24  the time of the exchange --

25       THE COURT:  So this isn't going to kill --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

74

1          MR. ZENSKY:  -- but --

2          THE COURT:  -- fair-value exchange, because the

3 sophisticated noteholders are going to make an educated

4 judgment whether, assuming a bankruptcy, they're going to be

5 better off with the new notes versus the old notes.  And it's

6 not just what the value of the face amount of the note is.

7 It's much more complicated than that.

8          MR. ZENSKY:  Your Honor, in the committee's --

9          THE COURT:  Do you agree with that?

10          MR. ZENSKY:  I don't, Your Honor.  In the committee's

11 paradigm, the party being asked to exchange, in recognition of

12 this Court's theoretical ruling, that this could create --

13          THE COURT:  I haven't made any theoretical ruling.

14          MR. ZENSKY:  I said, theoretical, all right.  You

15 wouldn't know what your claim would be.  Yes, you could weigh,

16 I might be getting security, I get a little better interest

17 rate, I push out the maturity.  But under their allegation, you

18 still wouldn't know what --

19          THE COURT:  I bet your clients --

20          MR. ZENSKY:  -- their note is worth --

21          THE COURT:  -- have a pretty good idea --

22          MR. ZENSKY:  -- in --

23          THE COURT:  -- what these notes would trade at in the

24 market as soon as they were issued.  They wouldn't know for

25 sure; they'd have very, very good idea what the trading value

**RESIDENTIAL CAPITAL, LLC, ET AL.**

75

1  of these new bonds would be.  And they'd know pretty well,

2  right on day one, what it is that they've got.  They'd know

3  before day one, before --

4          MR. ZENSKY:  Maybe --

5          THE COURT:  Maybe?

6          MR. ZENSKY:  Maybe if -- these notes were exchanged in

7  2008, Your Honor, June -- a relatively volatile time in the

8  capital markets.  I don't know anyone who's going to stand here

9  and tell you they could predict sixty days out from any day in

10  2008 what debt was going to be trading at, or what a particular

11  note with a particular collateral package of a mortgage issuer

12  was going to be worth.

13          So you're creating a liquidity issue, an uncertainty

14  issue, and then we're injecting into bankruptcy cases now every

15  time a party lets us take the Court's position that parties

16  will still engage in this issue.  We're going to have a

17  collateral litigation every time about what the notes were

18  worth or should have been worth, or what the fair market value

19  was, and then have to determine the unmatured interest.

20          I don't think any of that is called for by the Code,

21  and the policy reasons, which I think are compelling, all

22  dictate that the Court should not go --

23          THE COURT:  Well, what --

24          MR. ZENSKY:  -- in that direction here.

25          THE COURT:  So how is 502(b)(2) -- it doesn't have a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    formula or a measure.  How do you determine -- obviously, the

2    Code felt that a claim should be reduced to the extent it

3    contained unmatured interest.  So the Code builds in something

4    that necessarily is going to require a determination of how

5    much unmatured interest there is.  So you have a face amount of

6    a note; it's not that simple.

7            MR. ZENSKY:  I --

8            THE COURT:  So it's not as if -- if I accept your

9    argument that this -- the complexity of the issue just simply

10   goes away, it doesn't.

11           MR. ZENSKY:  Well, it goes away from arising in

12   exchanges, whether denominated fair value or face value.  It

13   remains present in the one scenario I believe the Code

14   contemplated, where there's an original issue, where the issuer

15   gets less proceeds than the note it is issuing.  That is the

16   example that the --

17           THE COURT:  So you're saying --

18           MR. ZENSKY:  -- Congress gave.

19           THE COURT:  -- anytime there's an exchange, it doesn't

20   matter what the -- whether it's fair value or face value,

21   there's just simply -- you don't look to see whether, from an

22   economic standpoint, there's unmatured interest.

23           MR. ZENSKY:  I -- one -- it's not our facts, Your

24   Honor, but one could hypothesize that if you increase the face

25   amount of your note, if you got 120 of new notes in exchange

**RESIDENTIAL CAPITAL, LLC, ET AL.**

77

1    for each 100, then maybe there's some interest built in to the

2    debtor or the eventual debtor on its balance sheet, but in

3    either a one-for-one --

4            THE COURT:  And why is that any different in --

5    because the -- it seems to me that the collateral for the new

6    note -- let's assume you had a 1,000 dollar unsecured note, and

7    it gets -- and the debtor is deeply distressed, and it's

8    restructured, and I don't care whether it's for less than 1,000

9    or more than 1,000, but now it's secured.  You're going to tell

10   me you wouldn't -- if it's an exchange, you don't look any

11   further to determine whether there is unmatured interest.

12           MR. ZENSKY:  You don't look any further if the debtor

13   exchanges 1,000 for 1,000.  We know from Chateaugay that

14   creates no unmatured interest.

15           THE COURT:  What if it exchanges 1,000 for 1,200?

16           MR. ZENSKY:  It's -- as I said, it's not our facts,

17   but it's --

18           THE COURT:  Well, just answer with respect to that

19   hypothetical.

20           MR. ZENSKY:  I think there, because on the debtor's

21   balance sheet, it has now increased its liability.

22           THE COURT:  It's just more obvious --

23           MR. ZENSKY:  It has retired --

24           THE COURT:  -- that there's unmatured interest built

25   into it in that circumstance.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1        MR. ZENSKY:  I think it's not only more obvious, it's

2   the only situation, I would say, that an exchange could create

3   a facet of unmatured interest as contemplated by the --

4        THE COURT:  And where do you derive that from the

5   language of the Code?

6        MR. ZENSKY:  I derive it from the fact that we have

7   naked words "unmatured interest", the example.  The --

8        THE COURT:  Well, you're not -- you can't find it in

9   the language.  You're going outside the language of the Code,

10  bringing a policy or economic argument to play in determining

11  whether there's unmatured interest.

12        MR. ZENSKY:  Right.

13        THE COURT:  You can't look solely at the language of

14  the Code --

15        MR. ZENSKY:  Okay.

16        THE COURT:  -- to make that determination.  Agreed?

17        MR. ZENSKY:  I agree with that, but I am bringing in

18  those arguments based on the Second Circuit's decision and the

19  Fifth Circuit's decision.  I'm not smart enough to have thought

20  of those things on my own, Your Honor.  So I think that they

21  are well founded, the arguments that we're presenting, for

22  ruling out that this exchange could create unmatured interest.

23        So if I can continue with --

24        THE COURT:  Go ahead.

25        MR. ZENSKY:  Okay, so sticking with Chateaugay, since

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    we've been discussing it, so as we know, Judge Lifland and then

2    Judge Kram, who affirmed him, were reversed, and as the Second

3    Circuit described Judge Lifland's ruling, what he held was that

4    the issue price of the new note in the LTD exchange was the

5    market value of the old note.

6            So if the old notes were trading at twenty or thirty

7    or forty-whatever distressed price they were trading at, and

8    there was a one-for-one exchange, that the new note would come

9    in and really have an issue price of twenty, thirty or forty,

10   and that the discount was the difference between that price and

11   a hundred.  And the Second Circuit said that they were

12   completely unpersuaded with that.  It didn't make sense if one

13   takes into account the bankruptcy policies in favor of

14   consensual resolution of disputes and workouts.  And as I've

15   tried to suggest, I think everything about that decision

16   supports our position here.

17           And if we flip to page 2, Your Honor, of our handout,

18   we've excerpted, I think, what are the key passages from the

19   Chateaugay decision and the Pengo decision, both of which were

20   cited in the papers.  So the first point that I'd like the

21   Court to take away, and I don't think there's any dispute about

22   is that, whatever tax treatment might have applied back in 2008

23   to the exchange and the holders who swapped is not relevant to

24   Code purposes and interpretation of unmatured interest.  The

25   Second Circuit held as much in LTV or Chateaugay, and the Fifth

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Circuit --

2           THE COURT:  Has there been any determination of the

3    tax treatment?

4           MR. ZENSKY:  Excuse me, Your Honor?

5           THE COURT:  Has there been any determination of the

6    tax treatment?

7           MR. ZENSKY:  I don't know if there's been an IRS

8    determination, if that's the Court's question.

9           THE COURT:  That's the -- that's my question.

10          MR. ZENSKY:  I don't know the answer to it.  I think

11   it's been agreed that there could have -- that that could have

12   been a taxable event.  And our position is that that doesn't

13   drive --

14          THE COURT:  Well, look, I don't -- I see this is a

15   very challenging issue.  And what I'm struggling with, it seems

16   to me that resolution of this issue, whether you're right or

17   they're right, would be enhanced by a full record, and I

18   question whether I can resolve this issue as a matter of law

19   based on your motion to dismiss the allegations of a complaint.

20   And one has to think that the sophisticated parties in their

21   negotiations regarding the exchange focused keenly on the OID

22   issue.  And certainly for tax purposes, but I dare say -- since

23   it was a troubled company at the time -- that I have to believe

24   they focused on it from a bankruptcy standpoint, as well.

25          So when I think, and this is a question really to both

1    sides, if the matter goes forward to trial, what evidence would

2    you anticipate offering to support your interpretation and

3    application of the Code to the facts here?  Is it custom and

4    usage to trade?  Is it parol evidence with respect to the terms

5    of the notes?  I don't know.  What I -- you may ultimately -- I

6    may ultimately decide it in your way, but what I'm focused on

7    is, will any decision be enhanced by a full factual record?

8    Chateaugay, as I understand it, was on summary judgment.

9            MR. ZENSKY:  That's not right, Your Honor.  It is -- I

10   apologize.  I'm thinking of another decision; you're correct.

11           THE COURT:  Chateaugay was on summary judgment.

12           MR. ZENSKY:  You're correct.

13           THE COURT:  Okay, I don't anticipate this coming

14   before me on summary judgment.  There's -- there is little room

15   left in the scheduling order for summary judgment motions.  I

16   made it fairly well known what my view about summary judgment

17   motions are, but we'll reserve that for another day.  It does

18   seem to me that the decision, either way, would benefit from a

19   full evidentiary record.  That's --

20           MR. ZENSKY:  Right.

21           THE COURT:  So I may ultimately agree with the

22   argument -- I'm giving you a hard time about it, focusing on

23   what's troubling me.  There's a lot of merit to the argument

24   you make, all right, and I do appreciate that.  I'm reluctant

25   to make a decision in the absence of a full factual record.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

82

1          MR. ZENSKY:  Okay, let me see if I can respond, Your

2     Honor.  I don't think there's any factual issue that precludes

3     the granting of our motions, and since there's no dispute that

4     the original notes had no discount built in, and there's no

5     dispute as to how the exchange operated, and we've accepted for

6     purposes of the motion the allegation that the new notes traded

7     at something less than the deemed value.  Obviously, Your Honor

8     will decide how the Court decides, and if it believes that --

9          THE COURT:  You --

10          MR. ZENSKY:  -- other evidence is --

11          THE COURT:  And I know it's not before me now, but I

12     don't know.  If there were evidence offered, I would even

13     suspect that the investment bankers involved forecasted what

14     the trading range for these notes would be at the time they

15     were issued, so that the -- whether the OID that the committee

16     claims of 377 million I think is the number they use, is the

17     right number or not, I have a feeling that there's documents

18     that show that the bankers hit that number pretty closely on

19     the head, that it was -- that they knew that that's what was

20     likely --

21          MR. ZENSKY:  Well --

22          THE COURT:  -- to be the trading --

23          MR. ZENSKY:  The committee actually says that the

24     original discount was 1.5 billion at the time of this, so that

25     if the company had filed much earlier on, there'd be a huge

**RESIDENTIAL CAPITAL, LLC, ET AL.**

83

1    piece of unmatured interest they'd be attacking here.  The 377

2    is their allegation as to what existed at the petition date.

3            THE COURT:  Okay.  All right.

4            MR. ZENSKY:  I'm still struggling a little, Your

5    Honor, as to how that discovery would ultimately be relevant

6    because I don't know -- the parties can't contract, I think,

7    around the Code, so if --

8            THE COURT:  No, you can't, but where I have --

9            MR. ZENSKY:  On this particular issue.

10           THE COURT:  Look, there's no definition in the Code.

11   So you're -- both sides -- and there's no binding -- whatever

12   you want to argue, there is no binding authority on this Court.

13   It's -- you both acknowledged in your papers it's a question of

14   first impression.  So I have to decide how the language in

15   502(b)(2) applies to the facts of this case.  All right.

16           MR. ZENSKY:  We're all agreed on that, Your Honor.

17           THE COURT:  And on that score, I think I would rather

18   have an evidentiary record, and not simply a complaint and a

19   motion to dismiss.

20           MR. ZENSKY:  Okay.  If --

21           THE COURT:  I don't know.  I'm --

22           MR. ZENSKY:  I'd like the Court to think about it

23   more.

24           THE COURT:  Yeah, okay.

25           MR. ZENSKY:  And I would turn next to the -- what the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Court identified as the driving force of Chateaugay, the policy

2  arguments that the Court developed, and --

3      THE COURT:  You --

4      MR. ZENSKY:  -- we've excerpted, I think, the key

5  portions, again, on slide 2, about why the Second Circuit was

6  reluctant -- exceedingly reluctant -- to say that an exchange

7  of that type would create unmatured interest.  They talked

8  about how creditors would be disinclined.  They didn't say

9  creditors will be disinclined unless they get security or other

10  better terms.  They just said creditors will be disinclined to

11  participate in an exchange if they're going to come in with a

12  smaller claim than they had the day before the exchange.

13      THE COURT:  Yeah, were they exchanged for 1,000

14  dollars for 1,000 dollars, they'd be really unhappy if two days

15  later they suddenly found they had a 800 dollar claim --

16      MR. ZENSKY:  Right.

17      THE COURT:  -- when two days before they had 1,000

18  dollar claim.

19      MR. ZENSKY:  Okay, and let's go -- why would they be

20  any unhappier if they traded 1,000 for 800, and found out the

21  next day they had a 600 dollar claim.  There's no reason to --

22      THE COURT:  Because they got more collateral.  They

23  got other -- you focus only on the dollar -- the face amount of

24  the two notes before and after.  And you can't focus on -- it

25  seems to me you can't focus only on that.  You have to look at

1    all the other terms, particularly collateral.

2        MR. ZENSKY:  Okay, I don't think you can take that

3    away from any of the decisions in this area, or the concept of

4    unmatured interest that whether you improved your collateral

5    package, first got collateral, that we're going to start

6    balancing those against extension of the maturity date, change

7    of interest rate, change of interest rate environment, and have

8    a -- every time there's an exchange, inject an incredible

9    amount of uncertainty into the market as to what claim you will

10   have the next day, if you participate in an exchange.

11       THE COURT:  So look, isn't it somewhat arbitrary in a

12   sense, what the face value is placed on the note -- on the new

13   exchanged note at the time it's issued?  If everybody knows

14   that the 800 dollar face value of the note is going to be

15   trading at 500 dollars immediately -- I mean, there's no un --

16   I mean, essentially there's no uncertainty about that.

17       MR. ZENSKY:  I think there is.  Your Honor just said

18   we have to take into account whether you get collateral and

19   improve your position.  Every exchange is going to have

20   different facts associated with it.

21       THE COURT:  Are you telling me that on the terms of

22   this note, that investment bankers did not -- before the notes

23   were issued -- project what the fair value of the note would

24   be?

25       MR. ZENSKY:  The true answer is I don't know the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

86

1    answer --

2              THE COURT:  Okay.

3              MR. ZENSKY:  -- to that question, Your Honor.

4              THE COURT:  And that's a question that it seems to me

5    I'd like to know before I decide the issue, because you are

6    arguing that this is terribly unfair.  Who, in their right

7    mind, would exchange a note for one of lesser value, if they

8    would also wind up, if there's an immediate bankruptcy, with

9    even less, because of OID?

10             And it seems to me that if the evidence demonstrated

11   that -- for example, that the investment banks that were

12   running this deal projected what the trade -- what the fair

13   value -- what the trading value of these notes would be, over

14   what period that would be amortized, okay.  Then I have to

15   believe that the sophisticated investors, who were making this

16   exchange, knew exactly what they were doing, knew exactly --

17   they knew the risks of -- in the event of a bankruptcy.  They

18   knew the risks from a tax standpoint of the OID.  And they went

19   ahead, because they believed on balance, they were better off

20   with these notes with the terms, including the collateral.

21             MR. ZENSKY:  They certainly knew the risk that they

22   would come to Court with an 800 dollar note, rather than 1,000

23   or 800 dollars worth.  I doubt very much that they knew that

24   they were undertaking the risk that they would have a 600

25   dollar claim --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  I'm not so sure.

2          MR. ZENSKY:  -- and not the face amount of the new

3   note they received, Your Honor.

4          THE COURT:  I'm not so sure about that one, but I

5   don't have a record.

6          MR. ZENSKY:  Okay.  We certainly know what law was out

7   there at the time this exchange was engaged in.

8          And again, to finish up on slide 2, all the reasons

9   that the court found -- necessitated that they not -- Second

10  Circuit and the Fifth Circuit -- that they not throw a monkey

11  wrench into the ability of a company and its creditors to

12  engage in a consensual workout -- all apply here.  Basically, I

13  understand the Court's view.  You think sophisticated people

14  will predict, and they'll take into account that there's going

15  to be an unmatured interest component.

16          I think that no one will engage in anything but a

17  one-for-one and you're -- and then you're limiting the tools of

18  a company and a would-be debtor into how to structure an

19  exchange.  You're basically saying they can't delever.  They're

20  going to have to only offer one-for-one, and that will limit

21  the types of terms that they can engage in --

22          THE COURT:  I --

23          MR. ZENSKY:  -- because no one's going to accept it.

24          THE COURT:  I must -- on that argument I disagree with

25  you completely.  I don't know that that's going to be

**RESIDENTIAL CAPITAL, LLC, ET AL.**

88

1    dispositive of anything, but I find it extremely hard to

2    believe that the result would be that no one would exchange --

3    no one would enter into a fair value exchange.  Sweeten the

4    interest rate, sweeten the -- particularly the collateral

5    position, and they may be very willing to.  And if they think

6    the debtor's going to get beyond ninety days past the issuance

7    of the notes, they may be extremely happy with the new notes.

8           MR. ZENSKY:  Your Honor said a moment ago, I'm sure

9    investment bankers could predict what the note will trade at,

10   and then sophisticated parties could take that into account.

11   What if they're wrong?  What if the prediction is wrong by ten

12   points on what it's going to trade at?

13          THE COURT:  It's like -- like they're wrong on

14   everything else they do.

15          MR. ZENSKY:  Then what's going to control, the

16   investment banker or the market?  And I think that what we're

17   advocating for is not only the right outcome as a matter of

18   policy, as a matter of the cleanest way to --

19          THE COURT:  Let's move on to your next argument.

20          MR. ZENSKY:  Okay.  The last -- Your Honor, and if we

21   just flip to page 3 quickly, this was just intended for

22   illustrative purposes to show what we think is the illogic and

23   incorrect theory that the committee is espousing here.  The

24   face value exchange is the paradigm that was before the Court

25   in Chateaugay, where there is 400 worth of tax OID created, but

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   those bondholders came to the LTV bankruptcy with the full

2   1,000 claim, because it was a one-for-one.

3          And what they're arguing here is where the bondholders

4   take a haircut, reduce their claim.  They -- the trading price

5   is the same after the bankruptcy of the second note in a fair

6   value exchange.  There's less tax OID, but this bondholder

7   comes to court with the reduced amount of the claim, the market

8   value.  We don't think that's right.

9          THE COURT:  With enhanced security.

10          MR. ZENSKY:  In this case, yes, Your Honor.  It was

11   all part of the package and equation, and, again, it doesn't

12   seem to make any sense and it's not called for by the rulings

13   that are out there, that we start --

14          THE COURT:  Look, you could have a 1,000 dollar

15   unsecured claim.  Would you rather have a 1,000 dollar

16   unsecured claim, or a 600 secured claim?

17          MR. ZENSKY:  In 2008, the answer may be different than

18   it is today.

19          THE COURT:  I doubt it.

20          MR. ZENSKY:  I don't know what the answer was in 2008.

21          THE COURT:  I doubt it.

22          MR. ZENSKY:  The debtors' prospects as viewed by

23   everyone at the time.  And the last question I think we could

24   pose, if the committee says that when you engage in a fair

25   value exchange, the market value controls, well, what happens

**RESIDENTIAL CAPITAL, LLC, ET AL.**

90

1   if these new notes traded up?  If something happened in the

2   intervening time between the exchange and the first trade date,

3   and interest rates changed, or the debtors' prospects changed,

4   and now these notes traded above par, is that going to be the

5   size of your claim when you come to court because the market

6   set that price?  That's not how the bankruptcy process works.

7          Okay, let me turn then to the second issue, Your

8   Honor, which is the --

9          THE COURT:  Let me just -- just give me one second,

10  counsel.  I just want to see whether I -- I think I covered all

11  my questions for you, but let me just see.

12         Go ahead.

13         MR. ZENSKY:  Okay, I'm going to focus next on Count V

14  of the committee complaint, Your Honor, and this deals with

15  their recharacterization claim.

16         So the facts that are alleged in the complaint, I

17  believe, are undisputed in regard to Count V are as follows,

18  that in May of 2010, ResCap requested that the indenture

19  trustee and collateral agent for the junior secured notes

20  release a parcel of notes so they could be sold to Citi and

21  Goldman under an earlier repo transaction.  And the release

22  request, which the committee attached to their complaint,

23  identifies that the purpose of the release is to sell them into

24  a repo transaction.

25         Those facilities were extinguished and replaced

**RESIDENTIAL CAPITAL, LLC, ET AL.**

91

1    simultaneously with the BMMZ repo facility, which is the one

2    we're going to talk about now, on December 21st, 2011, and that

3    is an agreement that is between two of the debtors as sellers,

4    GMAC Mortgage LLC, Residential Funding Company, both the

5    sellers, and ResCap itself as guarantor.

6          Now, as of the petition date, we believe that the

7    debtors' contractual repurchase rights under that facility,

8    which existed up until the petition date, were valuable in

9    excess of a hundred million dollars.  And that the junior

10   secured noteholders had a lien -- a security interest -- in

11   that contractual right -- that repurchase right -- and the

12   value associated with it.  That would be by virtue of the

13   pledge agreement and the UCC-1s that were filed and here --

14         THE COURT:  The all-assets -- you're focusing on the

15   all-assets clause?

16         MR. ZENSKY:  All-assets, yes, and intangibles, Your

17   Honor.  And the debtors, again here, have stipulated that

18   was -- is part of the collateral package as of the petition

19   date.

20         Now, there's no claim here by the committee that -- so

21   far -- that any of what I've said is wrong, that if a repo is a

22   repo, and if there's value in those repurchase rights, that

23   that is, in fact, part of the JSN collateral package as of the

24   petition date.  Instead, what they are asking you to do,

25   without citing anything other than the declaratory judgment

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    statute, is to say that a repo is not a repo, and --

2            THE COURT:  Well, what they're -- no, they're not

3    really saying that.  They're saying that while the

4    characterization of the transaction with the original parties

5    couldn't be challenged -- the Safe Harbor prevents that.

6    That's not what they're attempting to do.

7            Once the repo is unwound and the issue is whether

8    JSNs, under the all assets granting clause, sweep within their

9    collateral, this former package of assets, whether in that

10   context they can challenge whether it was a repo or a financing

11   transaction.  It's not an awfully appealing argument for the

12   Court to have to deal with, frankly, but I don't think -- I

13   mean, if what was before me were the repo counterparties, I

14   mean, it would -- the committee acknowledges they couldn't

15   challenge the characterization of it.

16           MR. ZENSKY:  I think what they've acknowledged is that

17   they couldn't challenge it for purposes of the Safe Harbors.  I

18   don't think that they have said that they would not somehow be

19   able to challenge it, vis-a-vis, the debtor and BMMZ, if that

20   facility still existed.

21           THE COURT:  You know, to me the issue here is whether

22   the excluded assets automatically become subject to the JSN

23   security interest, when the excluded assets are released from

24   another --

25           MR. ZENSKY:  Right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

93

1        THE COURT:  -- permissible security interest.  And

2    security -- I'll tell you.  The security interest appears

3    ambiguous to me in this regard.  At a minimum, the question I

4    have is whether the Court can resolve the issue as a matter of

5    law on the motion to dismiss.

6        MR. ZENSKY:  Okay.

7        THE COURT:  And I have the same questions here --

8    similar questions -- to what I did with respect to the OID.  Is

9    parol evidence permissible to support the interpretation of the

10   all-assets clause?  Is custom and usage admissible with respect

11   to interpretation of the clause?

12       MR. ZENSKY:  Let me --

13       THE COURT:  You may ultimately be right, but I'm -- my

14   question is whether I can resolve this issue on a motion to

15   dismiss.

16       MR. ZENSKY:  Right.  With all due respect, Your Honor,

17   I think that your question conflates Count I and Count V.

18       THE COURT:  Okay.

19       MR. ZENSKY:  I'm going to turn to Count I --

20       THE COURT:  All right.

21       MR. ZENSKY:  -- afterwards.

22       THE COURT:  Okay.

23       MR. ZENSKY:  For Count V purposes, if you look at

24   paragraphs 138, 141, 153 and 156 of the committee complaint,

25   it's very clear that what they're saying is that this repo,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

94

1  purported to be a purchase and sale transaction, but in

2  substance, the Court should find it to be a financing, because

3  if it's a financing, then the JSNs don't have a lien on it, but

4  if it's a repo, it --

5          THE COURT:  Well, I --

6          MR. ZENSKY:  -- we obviously do have a value -- a lien

7  on the value in the contract right that existed on the petition

8  date.  So I would -- the question you asked about whether an

9  asset that is excluded when it ceases to be excluded --

10         THE COURT:  Well, that's sort of question two, I

11 guess.  First I'd have to decide whether the committee is free

12 to challenge whether it's a repo or a financing.

13         MR. ZENSKY:  Right, so let me start with that

14 question --

15         THE COURT:  Okay.

16         MR. ZENSKY:  -- if I may, Your Honor.  So here again,

17 I believe the committee is asking you to go where no court has

18 gone, and that is to say a repo is not a repo for --

19         THE COURT:  Well, are there any cases that challenge

20 this issue -- attack the issue in this context?  Not with

21 respect -- yeah, you're right with respect to the original

22 parties to the transaction, but I didn't see cases that dealt

23 with it arising in this context.

24         MR. ZENSKY:  Your Honor is correct.  In the two lead

25 cases I want to discuss, the Granite decision by Judge Sweet,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    and the American Home decision by Judge Sontchi, those were

2    efforts by the debtor itself to change the characterization,

3    but there's no law or principled reason why, where our clients

4    are asked to release security specifically to go into a repo --

5    and I'll get into the economics of that in a moment -- why

6    we -- they should have any greater right to say, we couldn't

7    challenge it, vis-a-vis BMMZ, but we can rip up the agreement

8    vis-a-vis the JSNs and their reliance on the fact that they

9    would have a lien on the repurchase rights.

10           So the governing law here is New York law, and what we

11   know about New York law from both of the decisions I cited is

12   that the expressed intent of the parties controls, and if the

13   parties intended the transactions to be purchases and sales for

14   purposes of this issue, they should be deemed purchases and

15   sales.

16           In the sum total of the factual allegations that the

17   committee makes in support of its plea that the Court

18   recharacterize BMMZ, are found beginning at paragraph 142 of

19   the committee complaint.  And they are basically as follows:

20   they allege that the sellers, i.e., the two debtor entities who

21   were the sellers, continue to bear the economic risks of

22   ownership and that they had a contractual -- albeit deferred

23   contractual -- right to receive some cash flow, even after the

24   sale.

25           Second, the committee alleges that on information and

belief, the loans were sold to BMMZ for something less than

their then current market value.  Third, the repurchase rights

was not based on market value; it was based on a formula that

would provide a return to the purchaser.

THE COURT:  As they usually are.

MR. ZENSKY:  Yeah, right.  And fourth, they contend --

and this is the piece of extrinsic evidence, which I think the

Court asked about a few moments ago, they claim that on the

debtors' balance sheet, that in certain respects, it was

characterized as debt and not as a purchase and sale.  Now, I

believe that the two cases that I've mentioned to you, Granite

and American Home establish, without doubt, that none of those

allegations, even if they were true, can, as a matter of law,

overcome the plain meaning of the master repurchase agreement,

which I handed up to Your Honor before we started today.

So if we start with Granite, and the facts, as I said

there, were that the three bankrupt funds had entered a repo

pre-petition and missed the margin call, and the repo buyer

sold off the collateral, and the issue was -- for Judge

Sweet -- whether the agreements could be recharacterized as a

secured financing, because then Article 9 of the UCC would

apply, and the estate could argue that the liquidation was

deficient under Article 9 standards.

And the terms of that repurchase agreement and in

American Home are very similar, if not identical, to the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    repurchase agreement here.  Bonds are sold; bonds are bought

2    back.  And apropos of the point the Court made, Judge Sweet

3    started his discussion in Granite by acknowledging that repo

4    agreements are a hydra.  They're a hybrid of many types of

5    transactional forms, and that they do, in fact, have some

6    aspects of secured financing or loans built in to them, but at

7    the same time, said these are vital mechanisms for the capital

8    markets and they're used in an enumerable number of contexts

9    and create liquidity and all types of salient things for the

10   functioning of the market.

11         And he said, beginning at page 300 of his decision,

12   that the key to assessing a recharacterization claim, it lies

13   in the intention of the parties.  That's the controlling

14   consideration, and he determined that the intent expressed in

15   that repurchase agreement was that these transactions be deemed

16   sales and purchases, not loans.

17         The Court dealt with the very argument that the

18   committee makes here, that because the agreements had some

19   characteristics that are ordinarily associated with a financing

20   that that was enough to get past the motion to dismiss.  And

21   this was the decision I was referring to, Your Honor, when I

22   mixed up for a moment the procedural posture of Chateaugay and

23   this.

24         This was a 12(b)(6) motion, Your Honor.  It was on the

25   face of the pleading.  And on this issue as to whether the mere

1   fact that the repurchase agreement had some characteristics in

2   common with a secured financing, was not enough to raise a

3   triable issue for Judge Sweet as to whether the agreement could

4   be recharacterized.  He said the similarities between repos and

5   loans is not a basis for construing a repo agreement as a

6   secured loan, and he said, "The mere presence of secured loan

7   characteristics in repo and reverse repo agreements is not

8   enough to negate the parties' voluntary decision to structure

9   the transactions as a purchase and sale."

10          The Court also acknowledged that tax consequences,

11   accounting treatment were not the issue.  It was the expressed

12   intention of the parties.  And he said that if you ignore the

13   intent of the parties that would inject unpredictability into

14   the markets and that would be a bad thing.

15          And here, as I said, Your Honor, the agreement is

16   clearly a repo agreement.  I'll get to the language in a

17   minute.  The debtors told the JSNs they were entering a repo

18   agreement and asked us to release the collateral on that basis,

19   and the committee's claim is no more sufficient than the claim

20   that was made in Granite.

21          Very quickly, in American Home it was the same

22   procedural setup.  A series of companies that went into

23   bankruptcy didn't like the way in which notes that they had

24   sold under repo were liquidated, and they tried to argue that

25   even if the transaction fell within the safe harbors that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    somehow the debtors there should get the benefit of Article 9

2    and be able to attack the way in which Lehman liquidated the

3    instruments; and that case was dismissed, as well, by Judge

4    Sontchi.

5            Now, if you look at the next slide, Your Honor, I

6    think we tried to compare the terms that are in the BMMZ

7    facility to the terms that we know were present in the Granite

8    instrument and the American Home instrument, because they're

9    reflected on the face of the decision.

10            So, the first column, of course, is the -- does the

11    Court have the slide I'm referring to?

12            THE COURT:  This is number 4?

13            MR. ZENSKY:  Yes, Your Honor.  Thank you.

14            So, the left-hand column deals with the words right

15    out of the master repurchase agreement between the two debtor

16    entities and BMMZ, and the most important is the top box.

17            "The parties intend that all transactions hereunder be

18    sales and purchases and not loans."  And if you look across,

19    Your Honor, it's funny.  Those exact words appeared in each of

20    the other repo agreements.  It's standard industry language,

21    and that is the phraseology that both Judge Sweet and Judge

22    Sontchi found sufficiently compelling to grant the motion to

23    dismiss.  The exact same words are in our agreement.  Okay?

24            When you go down the left-hand column you'll see that

25    everything about it talks about it as a purchase and sale.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

100

1　　There's a buyer.  There's a seller.  There's purchase dates.

2　　There's purchased mortgage loans.  There's repurchase rights.

3　　There's the purchasing date, the repurchasing date.  The

4　　agreement is consistent in discussing it as a purchase and

5　　sale.  It talks about what is supposed to happen on the

6　　purchase date.

7　　　　　　And then, at the bottom, we get to a very important

8　　point that was also very important to Judge Sweet and his

9　　reliance on the Second Circuit case, that under the master

10　　repurchase agreement once BMMZ acquired these mortgage loans

11　　they could deal with them as they see fit.  They were their

12　　property.  They could repledge them, resell them, lien them,

13　　hypothecate them, rip them up, do whatever they want, provided

14　　that on the repurchase date they had an instrument that they

15　　could sell back to the company.  So that is a hallmark of

16　　ownership.

17　　　　　　THE COURT:  Let me just inter -- if I understand, the

18　　JSNs consented to release this collateral to permit the debtors

19　　to engage in this repo financing.  Is that correct?

20　　　　　　MR. ZENSKY:  That's correct, Your Honor.  At the time

21　　it was the Citi and Goldman, and then it was replaced with

22　　BMMZ.

23　　　　　　THE COURT:  And I don't know.  I don't know whether a

24　　full or a factual record would show that in doing so the

25　　parties discussed and agreed that in the event the repo was

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    unwound that what had previously been collateral for the JSNs

2    would, once again, automatically, without any further action,

3    become collateral for the JSNs.

4            MR. ZENSKY:  See, that's not the issue in Count V,

5    Your Honor.  In Count V the BMMZ facility was in existence up

6    until the petition date.

7            THE COURT:  It was released.  I know.  I understand it

8    was --

9            MR. ZENSKY:  It was released post-petition --

10           THE COURT:  Post-petition.

11           MR. ZENSKY:  -- as part of the DIP.  But the issue is

12   whether -- if it is a repo there is no claim that on the

13   petition date the equity or the value in the contractual

14   repurchase right is part of our collateral package.  This claim

15   doesn't turn on what happened after the petition date and

16   whether something that once was released or once was excluded

17   springs back.  This claim, Count V, turns on whether this Court

18   believes, with these documents and the two cases that have

19   dealt with the exact same issue, is going to have a trial on

20   whether this was a repo agreement or not a repo agreement.  And

21   both of those cases were 12(b)(6) motions and were decided

22   based on the face of the instrument that the estates, in those

23   cases, were trying to recharacterize; and this Court should not

24   come to any different ruling as far as we're concerned.

25           THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

102

1        MR. ZENSKY:  Okay.  Let me see if I had anything else

2   on that before turning to the last issue.

3        Just very briefly.  The one case that the committee

4   has cited to you in support of this claim is the Endico

5   Potatoes case.

6        THE COURT:  You're on slide 5.

7        MR. ZENSKY:  Yes.  And they don't explain how they

8   think it helps them.  They just drop it into their papers.  And

9   Endico Potatoes did not involve a repo agreement.  It involved

10  a factoring arrangement between a lender to a debtor and

11  parties who sold agricultural commodities, so it was a tug of

12  war between those two entities.  And there was no language

13  anything like the language in our standard repo agreement here.

14  In fact, all the language described the instrument at issue in

15  Endico Potatoes as a loan and security agreement, which we've

16  excerpted, and we don't see that there's any basis for the

17  Court to take any guidance or instruction away from that with

18  respect to the facts of this case.

19        THE COURT:  Okay.

20        MR. ZENSKY:  Count IV, which also touches on BMMZ and

21  then blends into the last issue, deals with this question of

22  whether a security that is released and then comes back to the

23  debtor is part of our collateral package, so let me touch on

24  that briefly.  In Count IV the argument is that there were some

25  loans that were originally released and sold off to the BMMZ

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   repo that came back pre-petition, and the claim they want is

2   declaratory judgment that those loans, which are also

3   acknowledged to be part of our collateral by the debtor, are

4   not part of our collateral.  And this turns on the argument

5   that the Court started to ask about, whether there's any sort

6   of need to do anything further to perfect the security interest

7   in something that once was released comes back into the

8   debtor's estates after they repurchase it.  This is a little

9   different from the excluded asset one, but the same concepts

10  are at play.  And the answer is no.  We have an all asset lien

11  in the pledge agreement which applies to all assets however

12  they arise, whenever they arise, in existence in 2008, coming

13  into existence in 2010, 2011, or at any time, pre-petition

14  obviously.

15          So, Your Honor, the claim they want to pursue, that a

16  loan that is not an excluded loan but was released and then

17  comes back into the estate is not collateral, we think that

18  claim should be dismissed under the plain language of the

19  security agreement and that you can --

20          THE COURT:  That's what I found.  I mean, the question

21  to me is whether the language of the security agreement is

22  ambiguous about this.

23          MR. ZENSKY:  Okay.  So let's talk about what this is.

24  So this that I'm talking about now is not an excluded loan

25  issue.  It's an issue where the company sold it to BMMZ and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    then got it back, okay?  And if they got it back their argument

2    in Count IV is that there was some further act of perfection

3    that was needed.  They don't say what that is.  They just

4    allege that we don't have a security interest, because they'd

5    like that to be the outcome.  But we believe, as a matter of

6    law, the pledge agreement that is excerpted on page 6, coupled

7    with the UCC-1s which are attached to our motion, are all that

8    is necessary for an after-acquired loan to be part of the lien

9    established in connection with the junior secured notes.

10           So that's Count IV, and that brings me to the last,

11   which is, I think, the issue the Court's been dying to get to,

12   the question of the excluded asset status or temporarily or

13   temporally excluded.

14           So, we know that the pledge agreement provides a broad

15   lien over all assets, and we've excerpted that on slide 6, Your

16   Honor.  I've highlighted, I think, some of the words that were

17   important for the Court to focus on, that the JSNs and the

18   collateral trustee are given a continuing security interest in

19   the company's assets under "whether now or hereafter existing,

20   owned or acquired and wherever located and howsoever created,

21   arising or evidenced," and then there's a long list, and we've

22   just provided subsection (a), which are all assets, which

23   include financial asset-backed securities, mortgage loans, a

24   little further down, and then the agreement, of course, goes on

25   to list many types of assets.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          It also says at the very end that we have a lien on

2   the "proceeds, products, offspring, rents, issues of all of the

3   foregoing," and then it says that "provided, notwithstanding

4   the foregoing, the collateral described in this Section 2

5   doesn't include excluded assets."

6          And the excluded assets that Count I is focused on are

7   assets that were excluded because they were pledged to what I

8   referred to as bilateral facilities.  And the next page, where

9   we have the definition of excluded asset says that, that if

10  there is an asset, the pledge of which to the JSNs would

11  violate applicable law or give rise to a termination right or

12  default with respect to another financing agreement then it's

13  excluded from our collateral package.

14          At the time the indenture was entered and the security

15  agreement was issued there were, I think, more than fifty

16  bilateral facilities, so there was a lot of collateral that

17  would have been subject, potentially, to being excluded.  But

18  over time most of those were unwound, and, I think, the last

19  schedule that was filed there were only nine such bilateral

20  facilities, and, indeed, the whole reason for their complaint

21  is they acknowledge that lots of collateral that at one time

22  was excluded now is scheduled as being our collateral by the

23  debtors, because those facilities are unwound.  So the basis

24  for considering them excluded has terminated.

25          Now, I know Your Honor believes that in the DIP

1  negotiations debtors give up all kinds of things, but in this

2  case I think it was obvious the debtors agreed that these loans

3  were part of our collateral and all we scheduled, based on the

4  plain language of the pledge agreement that they voluntarily

5  entered back in 2008.  And Count I is, of course, an effort by

6  the committee to take issue with that.

7          I think, Your Honor, when you look at excluded assets

8  in the context of the purpose of the pledge agreement, the

9  UCC-1s, and the way this was supposed to function, that it's

10  talking about something being excluded for the duration of the

11  period that it satisfies the definition of an excluded asset.

12  And if you look at slide 7 it talks about an asset being

13  excluded where the pledge to the extent that the grant of a

14  security interest in that would violate, so, as of that time,

15  would violate requirements of law or would provide termination

16  rights or default rights with respect to these bilateral

17  facilities.  But once a bilateral facility ends, Your Honor, or

18  a loan ceases to satisfy that definition, there really seems to

19  be no reason why --

20          THE COURT:  It would have been very easy to write a

21  sentence that said that upon the termination of any bilateral

22  security facility the collateral shall become part of the

23  collateral of the JSNs.  Somebody could have very easily

24  written that.

25          MR. ZENSKY:  Your Honor, we could probably write a lot

1  of passages of a lot of documents better, but I think the

2  parties did write that sentence.

3            THE COURT:  Well they didn't -- where?

4            MR. ZENSKY:  It's --

5            THE COURT:  Show me where they wrote that sentence.

6            MR. ZENSKY:  It's the language that says --

7            THE COURT:  That's the point.

8            MR. ZENSKY:  -- that our liens are continuing, and it

9  applies to assets wherever, now, or hereafter --

10            THE COURT:  So your liens continue on that which you

11  have a lien on, but if it's excluded assets you don't have a

12  lien on them.  So the continuing lien doesn't work for you.

13            MR. ZENSKY:  Yes.  But, Your Honor, it's only excluded

14  out of protection to the debtors.  It's not to steal away a

15  basket of collateral for all times from us.  It's to the

16  extent -- for their functioning of their business they can't

17  give us a lien because it would create problems with other

18  facilities.  Fine.  It should be excluded.  When those

19  facilities terminate, why shouldn't that loan --

20            THE COURT:  Somebody could have written --

21            MR. ZENSKY:  -- be part of our collateral?

22            THE COURT:  Somebody could have written a clause that

23  said pretty much what you just said, but they didn't.

24            MR. ZENSKY:  I don't believe that that's the law, that

25  when courts and parties can --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1      THE COURT:  Do you have a case that says --

2      MR. ZENSKY:  -- think of better ways to --

3      THE COURT:  Do you have a case that says that when a

4  lien on excluded assets is terminated the assets become part of

5  the collateral for any prior lien subject to in all assets?

6      MR. ZENSKY:  Right.  I don't have a case on that, but

7  the committee doesn't have a case that says the opposite of

8  that may --

9      THE COURT:  I know.  That's why I'm wondering whether

10  this loan -- this is another example of a claim that can be

11  better resolved on a full evidentiary record and not on a

12  motion to dismiss.

13      MR. ZENSKY:  It could also be because no one ever

14  thought to have the chutzpah to say that an all-asset lien

15  that's supposed to float over a company as White and Summers

16  says, which we cited to, Your Honor, about how an all-asset

17  lien works, where a company has things going in and out, minute

18  by minute, it's supposed to work.  It's supposed to attach to

19  all the assets whenever they come in.

20      So, just to give you an example, the way, I think,

21  it's supposed to work, if ResCap owns a loan; let's say it's a

22  loan on Mr. Shore's house, and they decide at that point in

23  time it's part of our collateral package.  It's not pledged to

24  a bilateral facility.  The debtors then need to pledge it to a

25  bilateral facility, but they get something exchanged.  They get

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   new financing that they use to -- so it becomes part of our

2   cash collateral, or they buy another loan and that new loan

3   becomes part of our collateral.  So that's the relationship.

4   Things come.  Things go.  Okay?

5          If that bilateral facility terminates because the

6   debtors pay it off and they get back some of the loans or the

7   liens they had given disappear, again, it -- I understand Your

8   Honor's point that we could write some more words into it, but

9   for the purpose of the financing agreement and however arising,

10  wherever arising, when the bilateral facility ends that loan

11  should now again be part of the JSN security package and

12  there'd be no reason to create a forfeiture here with an all-

13  asset lien with a UCC --

14         THE COURT:  You say forfeiture but whether there's a

15  forfeiture or not depends whether it become part of your

16  collateral again.  I mean, you're --

17         MR. ZENSKY:  Yes, but I --

18         THE COURT:  If you state your conclusion, sure, that's

19  what follows from it.

20         MR. ZENSKY:  Right.

21         THE COURT:  But I --

22         MR. ZENSKY:  Okay.  So, if we go further with that

23  example --

24         THE COURT:  So what was --

25         MR. ZENSKY:  If the company's --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

110

1          THE COURT:  The debtor -- stop.  The debtor maintained

2     records of your collateral, right, what was part of your

3     collateral?

4          MR. ZENSKY:  They maintained some records, yes.

5          THE COURT:  Okay.  Well, were they -- would the

6     evidence show that contemporaneously with the release of

7     collateral from one security agreement the debtor transferred a

8     record on their books and records to show that it was your

9     collateral?  Would the evidence show that?  I don't know how

10    they maintained their records of what was collateral, whose

11    collateral, okay?

12          Your arguments would be enhanced if what the evidence

13    at trial established was how the debtor maintained its records

14    of what assets were collateral of which parties, and that

15    immediately upon the release of particular assets from one

16    security agreement, either because it was paid off or for

17    whatever reason, it was transferred on the debtors' books and

18    records to the collateral account for the JSNs.

19          MR. ZENSKY:  I believe the committee complaint alleges

20    that that, in fact, occurred, that asset release -- that loans

21    released from bilateral facilities were scheduled as our

22    collateral.

23          THE COURT:  When?  When were they scheduled?  I know

24    they were scheduled at the end of the case, but were they

25    scheduled contemporaneously with the release?  What's the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  section of the complaint?

2          MR. ZENSKY:  I'm getting that back up, Your Honor.

3          THE COURT:  Okay.

4          MR. ZENSKY:  Well, what I was thinking of, Your Honor,

5  it may not answer entirely the question.  They say that

6  collateral was released from the bilateral facilities and came

7  back into the estate, and then they allege that there was no

8  new act of perfection associated with that.  So that may not

9  have been the paragraph.

10          THE COURT:  Yes.  So my point is -- look, you may well

11  be right on this argument, and it's, once again, an issue as to

12  which it would seem to me that a full factual record would

13  enable me to reach a decision, which is -- what I'm reluctant

14  to do is decide on the basis of the complaint and the motion to

15  dismiss resolve this issue as a matter of law.  You may

16  ultimately be right on it.

17          MR. ZENSKY:  Let me turn, also, then, to two other

18  points, and I'll --

19          THE COURT:  Okay.

20          MR. ZENSKY:  -- I think, be completed on this, Your

21  Honor.

22          Again, I know the Court has indicated the degree to

23  which it places stock in the debtors' stipulation, cash

24  collateral order here, but in paragraph 20 of their complaint

25  against the JSNs in this action they characterize the way the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    excluded assets works as only excluding that which is currently

2    pledged to a bilateral facility, and they say in paragraph 20

3    that, "the assets that are currently collateral for bilateral

4    facilities that were in existence on June 6, 2008 are what is

5    excluded from our collateral package".

6            Second, if you go to the text of the agreement, again,

7    Your Honor, the very bottom of slide 6 -- excuse me -- slide 7,

8    Your Honor.  I apologize.

9            THE COURT:  Okay.

10           MR. ZENSKY:  This is the definition of excluded

11   assets, and we've talked about sub (c), about what we believe

12   creates a clear temporal requirement, and if it doesn't satisfy

13   that it shouldn't be excluded.  And when we turn to (f), (f)

14   says that proceeds and products of excluded assets are excluded

15   not per se, because they were the produce of an excluded asset,

16   but only if they independently would satisfy the grounds for

17   being excluded.  So only if giving us a lien on the proceeds of

18   the sale of an excluded asset would that violate applicable law

19   or give rise to a termination right do we lose our lien on

20   that.  So that, to me, Your Honor, it may not be as clear as

21   the sentence you hypothesized the parties could have written,

22   but it shows that excluded assets is not a permanent death

23   knell, so to speak, because if it were then the proceeds would

24   also be excluded.

25           THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

113

1          MR. ZENSKY:  The last point is on that issue there is

2     a little discussion in the briefing about the portion of Count

3     I that says that they want a declaration that we have no lien

4     on the proceeds of the sale of excluded assets.  We've

5     challenged that, in the alternative or independent of the main

6     argument that you and I have just discussed, Your Honor,

7     because there is no allegation that the proceeds that they're

8     trying to attack independently qualify as excluded assets, and

9     the section that I've just referred the Court to, sub (f), very

10    clearly says that proceeds and products of excluded assets are

11    not excluded unless there's an independent basis for qualifying

12    them as such or categorizing them as such.  And there is no

13    allegation in the complaint as to any particular proceeds or as

14    to why any such proceeds themselves qualify as excluded assets.

15    So we have asked, in the alternative, for that portion of Count

16    I to be dismissed.

17          I think that's all I have for the moment.

18          THE COURT:  Let me just ask, because --

19          MR. ZENSKY:  Yes?

20          THE COURT:  -- I think you moved to dismiss Count XIV.

21    Did you withdraw that?  I'm just trying to keep track of

22    what --

23          MR. ZENSKY:  Yes.  I think Count XIV kind of got bound

24    up in the consolidation of the action now with the

25    counterclaims and the debtor action.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Okay.  I just want to be clear, because

2     that was the count that dealt with --

3          MR. ZENSKY:  Yes.  I'm --

4          THE COURT:  -- payment of fees, costs and expenses.

5     where they ask for declaratory judgment that should be -- are

6     you still moving to dismiss that or not?

7          MR. ZENSKY:  I don't think so, Your Honor.  Yes.  We

8     are not, Your Honor.

9          THE COURT:  You're not.  Okay.  Thank you.

10         MR. ZENSKY:  Thank you.

11         THE COURT:  All right.  Who's going to argue for the

12    plaintiff?

13         MR. HOROWITZ:  Good afternoon, Your Honor.  Gregory

14    Horowitz from Kramer Levin on behalf of the committee.

15         Your Honor, with Court's permission we'd like to

16    divide the argument between myself -- I'll be handling the OID

17    issues -- and my colleague, Mr. Morris, who will handle the

18    rest.

19         THE COURT:  Okay.

20         MR. HOROWITZ:  And I do have a very short handout

21    myself.

22         THE COURT:  Thank you.

23         MR. HOROWITZ:  Thank you, Your Honor.  The OID issue

24    is an important issue.  It's, as Mr. Zensky said, the committee

25    believes that as of the petition date, 377 million dollars of

1    original issue discount had not yet amortized and should be

2    disallowed as unmatured interest.

3         We agree with Your Honor that this is not an issue

4    that can be decided on a motion to dismiss.

5         THE COURT:  So tell me, and I'm really -- you need to

6    tell me what evidence you believe you would likely seek to

7    introduce at a trial on the issue of whether there's unmatured

8    interest with respect to the JSN notes.

9         MR. HOROWITZ:  I will, Your Honor.  I think my

10   presentation's going to be brief, but it will amount to a

11   preview of the evidence, much of which, I believe, is

12   undisputed, is alleged in the complaint or shown in the

13   exhibits, so I do not -- while I say I do not believe this

14   could be decided on the pleadings, I do think it probably could

15   be decided on a summary judgment motion in a different context.

16   In this context I understand it doesn't make much sense to do

17   that.  But I think it will be a relatively small portion of the

18   phase 1 trial evidentiary presentation, to the extent that the

19   issues or the facts that I'm about to go through are truly

20   disputed.

21        I'll start with the facts that I don't think could

22   truly be disputed, Your Honor, or could reasonably be disputed.

23   First, I don't think it could reasonably be disputed that the

24   2008 exchange offer, as a matter of economics, gave rise to

25   OID, OID being the difference between the value that the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    company issuer received -- the old notes -- and the obligation

2    that the issuer incurred.  As a matter of economics OID is a

3    form of return on the lender's investment, and it is a form of

4    interest.

5            I'll pause for a minute with regard to how you

6    establish the value of that original issue discount.  It's in

7    the record, Your Honor.  It's in the 8-K, among other things,

8    that's Exhibit B to the complaint, that simultaneously, as part

9    of this exchange offer, ResCap was purchasing old notes in a

10    modified Dutch auction.  So holders were given the option of

11    retaining their old notes, tendering for new notes, or seeking

12    the cash-out.  That modified Dutch auction was oversubscribed

13    at fifty-two cents on the dollar of old claims.  The evidence

14    will also show that immediately after the exchange offer -- I

15    said it was oversubscribed -- the actual trading value was

16    closer to forty-nine cents on the dollar, and that's how OID is

17    determined.

18            Your Honor made a good point.  Of course investment

19    bankers, in connection with exchange offers, predict what the

20    value of the newly issued notes are.  They have to.  The

21    purpose of the exchange offer is to design a new instrument

22    that will be sufficiently attractive to incur enough people to

23    tender so that the exchange offer is successful, but you don't

24    want to offer too much.  Otherwise you're paying more than the

25    value you received.  So if investment bankers don't get it

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   right they're not doing their jobs correctly, and it was the

2   pre-exchange offer trading price of the old notes that dictated

3   the OID and dictated how this whole exchange offer was

4   designed.

5          Since the exchange offer it's not going to be disputed

6   that the issuer has treated there as being OID for tax

7   purposes, for their own tax purposes, and they've been issuing

8   1099s to holders showing the amount of interest accruing as a

9   result of the OID over time, and I don't believe that any

10  holder --

11         THE COURT:  Based on what price?

12         MR. HOROWITZ:  Well, I think that the method is

13  defined by the tax regulations.  And the 377 million amortized

14  as of the petition date that we used in our complaint was based

15  on the tax treatment that the debtors had used.  I can't tell

16  you the exact price.  I think it's close to what I just

17  described, Your Honor.  But it is dictated by the tax rates is

18  my understanding.

19         Now, it's also undisputed that under 502(b)(2)

20  unamortized OID as of a petition date is disallowed as

21  unmatured interest.  That's clear in the legislative history.

22  The note actually makes it clear that the term "unmatured

23  interest" refers to little else but OID.  I mean, it does refer

24  to post-petition interest, but that's hardly a notable thing to

25  say that post-petition interest is not allowed as of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

118

1   petition date.

2            There's also consistent case law, and it's not just

3   limited, as Mr. Zensky suggested, to original -- true original

4   issues for cash.  For example, the Allegheny International case

5   that was discussed by the Second Circuit in Chateaugay was an

6   exchange offer.  It was an exchange of new debt for old

7   preferred equity, but you had all of the same issues with

8   regard to valuation for purposes of determining what the OID

9   is.  And it's a case that, to my knowledge, has never been

10  questioned.

11           So the only question here, Your Honor, is whether --

12  and the only question on this motion to dismiss, is whether the

13  narrow public policy exception that was created in Chateaugay

14  should apply here.  Chateaugay involved a base value exchange

15  offer where there was no change in claim amount.  There was no

16  change in the claim status.  It was an unsecured claim before

17  on the old notes, unsecured claim in the new notes.  No change

18  in claim priority.

19           Judge Lifland had held that as a matter of economic

20  logic, because an exchange is a purchase and sale, OID had been

21  created.  The Second Circuit said that the logic was

22  irrefutable at first glance but found that Judge Lifland had

23  "ignored the importance of context and of the bankruptcy policy

24  favoring restructuring."

25           The context that the Second Circuit was referring to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    was the fact that while this was necessarily done as an

2    exchange offer, because they were publicly held notes, and they

3    couldn't just sit down and agree to modify each holder's note,

4    the transaction was really nothing more than a modification of

5    terms that -- this was the quote-- "does not change the

6    character of the underlying debt, but reaffirms and modifies

7    it."  So, the Second Circuit basically found that the

8    Chateaugay exchange was basically akin to a company going to

9    its bank lender and negotiating an extension to maturity,

10   modifying a few terms, or you going to your bank and

11   renegotiate -- and negotiating a modification in a mortgage.

12          The policy that the Second Circuit was concerned

13   about, very expressly, was the problem of incentive and penalty

14   for participants in exchange offer.  And this is where the

15   first slide that I handed Your Honor may help illustrate really

16   a very simple point; it hardly needs a visual.

17          The incentive and penalty problem in the Chateaugay

18   exchange offer was clear-cut.  If OID was disallowed as

19   unmatured interest in the Chateaugay exchange offer, then

20   participants in the exchange offer would, at any point, if a

21   bankruptcy occurred at any point following the exchange offer,

22   have been penalized; have a lower, unsecured claim than the

23   holdouts.  Holdouts had a 1,000-dollar unsecured claim; by

24   virtue of holding out, retained 1,000-dollar unsecured claim.

25   Participants would start out with -- these are illustrative

1   numbers, Your Honor, they don't take into account that there

2   was built-in OID prior to the exchange offer.  But say that the

3   participants had a 700-dollar claim as a result of OID, if

4   bankruptcy had occurred on day one.  Yes, that number would

5   amortize over time.  But they'd never catch up until maturity.

6   And certainly, they would never do better as a result of having

7   participated in the exchange offer; where the holdouts would

8   indeed have suffered -- have enjoyed a windfall because they

9   would have retained their full, unsecured claim, in a company

10  that is now somewhat healthier as a result of the

11  restructuring.

12          So, the Second Circuit found that under those

13  circumstances disallowing OID would create a disincentive and

14  so forth.  I think Mr. Zensky read the quote, so I don't want

15  to be repetitious here.

16          Your Honor made reference to the post-Chateaugay

17  Supreme Court law and I was going to make reference to it

18  myself.  It is clear that when a court departs from the clear

19  language of a statute on the basis of policy concerns, that

20  departure has to be on the narrowest possible basis.  The

21  language from, I think, probably one of the cases Your Honor

22  was talking about, Hartford Underwriters 530 U.S. 1, 6 is "When

23  a statute's language is plain, the sole function of the courts,

24  at least where the disposition required by the text is not

25  absurd, is to enforce it, according to its terms."

**RESIDENTIAL CAPITAL, LLC, ET AL.**

121

1          The second -- well, it was post-Chateaugay.  I think

2     the Chateaugay decision can be understood as a reasonable

3     reflection of the fact that under that specific situation,

4     where application of 502(b)(2) would necessarily penalize

5     holders under any circumstances, applying 502(b)(2) on its

6     terms would lead to an absurd result.  But, the Second Circuit

7     recognized that the holding had to be expressly limited to that

8     context, expressly reserved the question of what happens in a

9     market-value exchange.

10          The exchange offer here was a fair-market-value

11     exchange, and moreover; could not possibly be more different

12     than the exchange offer in Chateaugay.  The exchange offer here

13     fundamentally changed the character of the underlying debt,

14     Second Circuit's terms.

15          Debt obligations at maturity were reduced from 1,000

16     to 80.  The debt obligations became secured; extremely valuable

17     liens were granted; and the debt obligations were rendered

18     structurally senior to the old notes.  Mr. Zensky made

19     reference to some notion that the holdouts would receive a

20     windfall if OID was disallowed here.  Far from receiving a

21     windfall, the old notes, which are now the senior unsecured

22     notes, the sons, they had their guarantees -- their subsidiary

23     guarantees stripped, which gave the new JSN notes not only

24     security, but structural seniority over the old notes; so no

25     windfall by any stretch of the imagination.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1           And the incentive-penalty issue also could not have

2    been more different.  And that brings me to the second slide,

3    Your Honor.  Here, we don't have to speculate about whether the

4    JSNs, the folks who participated in the exchange offer and

5    became the JSNs, were adequately incentivized to participate in

6    the exchange offer and did better in the bankruptcy.  We know

7    what they stand to do.

8           The left side of this slide shows what the holdouts in

9    the exchange offer now stand to receive.  The senior unsecured

10   note holders, who had 1,000 dollars before the unsecured claim,

11   before the exchange, 1,000-dollar unsecured claim now, under

12   the proposed plan, stand to recover approximately 360 dollars.

13          The JSNs, who had 1,000-dollar claim before the

14   exchange offer, exchanged it for an 800-dollar base-value claim

15   with which -- which, with OID, was at a 491-dollar principal

16   amount on day one, but it has accreted over time -- so it was

17   658 dollars at the petition date -- under the proposed plan,

18   and excluding accrued pre-petition interest, stand to get one

19   hundred percent recovery on that 658-dollar claim, and they

20   have the possibility of recovering post-petition interest.  We

21   don't think they're going to make it, just have to say that,

22   but they have the possibility.

23          And by the way, OID treated as unmatured interest is

24   then therefore treated as post-petition interest after the

25   petition date.  If somehow the JSNs are over secured, then they

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    will be entitled to the portion of OID that continues to

2    amortize through the case.  That's a point of information, Your

3    Honor.

4        If -- through November 30th of this year, the

5    amortization throughout the case of OID is such that if the

6    JSNs were fully secured there would only be -- there would --

7    not only, it's still a significant number -- there would be

8    approximately 136 million dollars of unamortized OID remaining

9    that they would not recover.  So this is an issue that is

10   important and it's important under any cir -- under either

11   circumstance, whether the JSNs are undersecured or oversecured.

12       So, what this slide shows, Your Honor, is that it's

13   clear the situation, the absurd situation in Chateaugay does

14   not exist here.  And to this point, Your Honor, I believe that

15   every fact I've referred to, while I do have to put in evidence

16   on it, is going to be straightforward, and I doubt that many

17   of -- much of it is going to be subject to legitimate dispute.

18       The question, I suppose, remains was it possible, were

19   they incentivized -- adequately incentivized under any

20   circumstance?  Well, first of all Your Honor, one of the

21   ironies here is that where, in Chateaugay the question -- the

22   court was concerned with penalizing folks who participated in

23   an exchange offer in the hopes of allowing the company to avoid

24   bankruptcy, here the only context -- and the JSNs knew that at

25   the time of the exchange offer -- the only circumstance in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    which they would recover more --

2            THE COURT:  Was a bankruptcy.

3            MR. HOROWITZ:  -- is in a bankruptcy, exactly.  They'd

4    already sacrificed 200 dollars in upside.  And in a bankruptcy,

5    it is very hard to imagine a circumstance in which they would

6    do worse than the holdout sums.  The only circumstance where

7    that could happen is if the bankruptcy had occurred so early

8    that there was a significant amount of unmatured interest, and

9    the recoveries to unsecured were so high that the sons would

10   get a very high percentage of their unsecured claim.  And in a

11   circumstance like that, it's almost certain that the JSNs would

12   be oversecured, would get whatever interest had accrued, and

13   would get the benefit of their bargain.  So, the notion of

14   getting a benefit of a bargain is hardly something that would

15   disincentivize someone from participating.

16           In sum, Your Honor then, the Second Circuit in

17   Chateaugay recognized that it would be possible that some

18   exchange offers merit recognizing OID.  The Supreme Court has

19   since made it clear that departures from the statutory language

20   have to be construed in the narrow -- to the narrowest possible

21   situations.  If it was ever inappropriate to apply the

22   Chateaugay rule to an exchange offer, it's in this

23   circumstance, and it's not just ever inappropriate.  It's

24   inappropriate unless it's absolutely necessary to apply the

25   Chateaugay rule.  We think this presentation will be extremely

**RESIDENTIAL CAPITAL, LLC, ET AL.**

125

1    straightforward.

2         THE COURT:  So, would investors who were asked to

3    exchange -- what would they know at the time that they were

4    making the exchange?  What would be the analysis?  I think what

5    I heard from counsel is they'd never do it because they would

6    never know what their situation is.

7         MR. HOROWITZ:  Well, I think it's clear from just what

8    I've shown now, that they would do it, because they would see

9    that even with OID treated -- the way OID is typically treated

10   in an investment, they're getting something that in a

11   bankruptcy puts -- makes them significantly better off.  The --

12   I'm sorry, Your Honor, I just lost my train of thought there.

13   There is a question, I suppose; would -- well, withdrawn.

14        This is what I wanted to say, Your Honor.  There is an

15   empirical question that I think you suggested may be relevant

16   for -- for -- factual development as to what investors actually

17   did expect as of the time of the exchange.  I think just as a

18   logical matter, Chateaugay was out there; Chateaugay made it

19   clear that the Court had not yet reached the issue of what

20   happens in a fair-market value exchange.  Everyone knew this

21   was a fair-market value exchange.  Nobody was making any

22   representations that -- about OID not being disallowed in

23   bankruptcy.  So what their reasonable expectations could only

24   be is that maybe they'd have an argument against disallowing

25   OID.

1           THE COURT:  Tell me what evidence you anticipate

2      offering at trial if this claim goes forward to trial.

3           MR. HOROWITZ:  I think I've just summarized it, Your

4      Honor.  I will put on an expert to calculate the OID, to show

5      how it was calculated for tax purposes, to show the Second

6      Circuit, because of the built-in OID issue has definitively

7      resolved the method for amortizing OID over time.  So we'd put

8      that in.

9           I doubt any of that will be controversial.  And I will

10     put in testimony -- expert testimony showing what the

11     incentives were with OID treated the way it should be in

12     connection with the exchange offer.  I may put in some evidence

13     about what people were told about OID at the time.  From what I

14     can tell the answer is they were told that there would be OID

15     for tax purposes.  I don't think that there was anything else.

16          THE COURT:  All right, thank you.

17          MR. HOROWITZ:  Thank Your Honor.

18          THE COURT:  Mr. Morris?

19          MR. MORRIS:  John Morris, Pachulski Stang Ziehl &

20     Jones for the committee.  I was actually hoping to say good

21     morning, Your Honor.  I think that passed.  I'm going to

22     address counsel --

23          THE COURT:  Are you blaming me for that, Mr. Morris?

24          MR. MORRIS:  Not at all, not at all.  I'm going to

25     address Counts I, IV, and V, and I'm going to do it in reverse

**RESIDENTIAL CAPITAL, LLC, ET AL.**

127

1    order.  I'd like to start with Count I.  And I want to do so

2    not with what I had prepared, but in the context of the

3    arguments that have been made, and the comments that have been

4    provided by the Court.

5            Count I addresses the question of excluded assets.

6    The committee contends and has alleged that we're entitled to a

7    declaratory judgment, essentially, that once an excluded asset,

8    always an excluded asset.  We base that on the structure of the

9    security agreement itself.  The structure of the security

10   agreement says that the secured parties have a lien on all

11   assets now owned or hereafter acquired.  But there's an

12   exception at the end.  And the exception is very explicit.  And

13   it says, "Notwithstanding the foregoing provisions."  In other

14   words, let's pretend that they don't have a lien on all assets.

15   Let's pretend that they don't have a lien on after-acquired

16   property.  Then, the excluded assets are not part of the

17   collateral pool.  That's our argument.

18           THE COURT:  Let me --

19           MR. MORRIS:  And that's what --

20           THE COURT:  -- just stop, stop.  Having read all of

21   the briefs and the agreement, I came to the bench believing

22   that the clause is ambiguous, which would raise the issue of

23   what evidence each side could offer in construing the language:

24   parol evidence, custom and usage evidence.  If I deny the

25   motion, what evidence do you anticipate offering to support

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    your interpretation of the excluded-assets language?

2            MR. MORRIS:  I would anticipate offering the following

3    evidence:

4            Number one, I think I would establish for Your Honor

5    not what happened in the months immediately preceding the

6    bankruptcy filing, but at an earlier, contemporaneous point in

7    time, how the loans were recorded on the debtors' books after

8    they were released by the bilateral co-party.

9            THE COURT:  That was a question that I really asked

10   earlier about how did the debtor treat -- I don't know whether

11   they kept accurate collateral records.  And how did the debtor,

12   prior to bankruptcy, how -- contemporaneously with assets being

13   released from collateral, how did the debtor deal with it in

14   its books and records?  Because they would have to be able to

15   know whether -- at least they should know what's coll -- who

16   the -- is it collateral?  Whose collateral is it?  Are they

17   free to buy and sell it, et cetera?

18           MR. MORRIS:  That would be one area that we would --

19           THE COURT:  Do you --

20           MR. MORRIS:  -- take discovery on, you bet.

21           THE COURT:  All right, do you have any -- are you able

22   to shed light on how the debtor -- I mean, there's a lot of

23   investigation that went on by the committee, and before this

24   complaint was brought.  Can you represent to the Court what you

25   believe the evidence will show with respect to the debtors'

1  collateral recordkeeping?

2          MR. MORRIS:  I don't want to make a representation.

3          THE COURT:  Okay.

4          MR. MORRIS:  What I'd like to do is say my

5  recollection is, based on the standing motion, and based on the

6  work that was done in the fall of 2012, that the collateral or

7  the assets that are subject to Count I had not been

8  characterized as the secured party's collateral until the eve

9  of the bankruptcy filing.

10          THE COURT:  All right.

11          MR. MORRIS:  That's what -- that's what I believe it

12  will show, but I don't want to represent that that's a fact --

13          THE COURT:  All right.

14          MR. MORRIS:  -- because I just don't recall.

15          THE COURT:  I mean --

16          MR. MORRIS:  I would also --

17          THE COURT:  -- that would be perhaps not

18  determinative, but that would be significant, how to me -- it's

19  what I pondered about, is how did the -- because it, look, I

20  start as I said earlier, when I read all this, it seemed to me

21  the language was not sufficiently clear that it required a

22  decision your way or the JSNs way.  All right, if it's

23  ambiguous, what evidence is each -- what kind of evidence is

24  each side going to offer?  And one of the things that I focused

25  on was well, how did the debtor treat these issues before

 1    bankruptcy was imminent?

 2            MR. MORRIS:  I think we would also, whether it's a

 3    factual matter in terms of the negotiation of the agreement

 4    itself, or whether it's expert testimony on custom and usage; I

 5    would certainly -- this I can't even tell you what I believe

 6    the evidence will show.  But we would certainly take

 7    discovery --

 8            THE COURT:  I don't know, these may all be one-off

 9    agreements, and --

10            MR. MORRIS:  It may be, Your Honor --

11            THE COURT:  -- so I don't know --

12            MR. MORRIS:  -- but we do -- we do point out that

13    things like savings clauses and clawback clauses, which are

14    completely omitted from section 2 of the security agreement,

15    are pretty standard industry terms.  Their omission here is a

16    question that I have.  And it's -- and frankly it's that

17    omission that I think is causing Your Honor to believe that

18    there's an ambiguity here.  We have the same view.

19            THE COURT:  All right.  Go ahead with your argument.

20            MR. MORRIS:  So, that's really the argument on

21    argument I -- on Count I.  Nobody has talked about it today.

22    And I'm certain that the Court is well aware of the standard of

23    a motion to dismiss.  But we believe --

24            THE COURT:  Don't go through the standards.

25            MR. MORRIS:  -- except it is true, this is a plausible

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    plan.  I'd like to move on to Count IV.

2          Count IV basically says that a release in a

3    termination statement ought to mean what it says.  It seeks to

4    have a declaration that each of the assets that were the

5    subject of the UCC-3 termination statement and the pledge

6    release by the collateral agent are assets that today are free

7    and clear.

8          THE COURT:  Under what circumstances does an all-

9    assets clause pick up assets that may previously have been

10   somebody else's security, and are no longer encumbered by that

11   prior security agreement?

12         MR. MORRIS:  I think that if -- I'm just going to, off

13   the top of my head, use the simplest example that I can.  If an

14   employee of ResCap went into let's say BestBuy to buy office

15   furniture for their office at ResCap on ResCap's dime, and

16   BestBuy's lender had a lien in that furniture, but the ResCap

17   employee exchanged cash for the furniture; took the furniture;

18   brought it back to the office, I would think that the secured

19   lenders would have a lien on that furniture.  They had a lien

20   on the cash.  They had a lien on the furniture.

21         The difference in Count IV is that there was actually

22   an affirmative, intentional, conscious release.  What does that

23   mean?  And I don't think that the security agreement, kind of

24   parallel to the issue of excluded assets, says anything about

25   what would happen if upon the execution of a release, what was

**RESIDENTIAL CAPITAL, LLC, ET AL.**

132

1    the purpose of that.  And I think that that would be an area

2    that I would want to pursue in discovery; course of dealing.

3    There are evidentiary issues that surround Count IV, as well.

4             And finally, with respect to Count V, Your Honor, what

5    was the substance of the transaction is about as fact intensive

6    an issue as there can be.

7             THE COURT:  This one I had the greatest problem with

8    your argument.

9             MR. MORRIS:  Uh-huh.

10            THE COURT:  I don't see how -- you concede this was a

11   repo transaction as between the original counterparties,

12   correct?

13            MR. MORRIS:  I concede that it was described as a repo

14   counter --

15            THE COURT:  Well, --

16            MR. MORRIS:  -- repo transaction, yes.

17            THE COURT:  -- to the extent that for example Judge

18   Sweet said that intent is the key issue, the agreement

19   specifically provided the statement of intent, the other

20   indicia that it was a repo are arguably satisfied, you're not

21   in a position where you have to attack that underlying

22   transaction because it was unwound, subsequently unwound.  But

23   I am struggling with how it's a repo for these purposes, but

24   all bets are off now that you're attacking the JSNs rather than

25   the original counterparties.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

133

1          MR. MORRIS:  You raise an interesting point, Your

2     Honor, and I think it's a function more of the unique factual

3     circumstances that we find ourselves in today, than anything

4     else.  And those unique factual findings -- factual

5     circumstances include the fact that the facility has been paid

6     off.  It doesn't even exist today, and so there are a number of

7     alarms that UMB has set off, both in their papers and today,

8     that simply don't exist.  There's going to be no impact on a

9     repo counterparty.  There's going to be therefore --

10          THE COURT:  Oh, I know that.

11          MR. MORRIS:  -- right?  And so this is a very

12     different situation than the one Judge Sweet found himself in.

13     But even in a case like Wells Fargo, the court didn't just --

14     the court went through a very detailed, factual analysis to

15     determine the character of the transaction itself.

16          THE COURT:  And what's the evidence you would offer to

17     establish that for these purposes now the transaction should be

18     characterized as a financing rather than a repurchase note?

19          MR. MORRIS:  There are six or seven paragraphs in our

20     complaint that highlight certain of the characteristics of a

21     secured financing.  We would, indeed, go back to custom and

22     usage.  We would certainly be seeking expert testimony on the

23     issue of whether the characteristics of this particular

24     facility are one which really support our view that it should

25     be characterized as secured financing or not.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

134

1          THE COURT:  What's the dollar value of this claim?

2          MR. MORRIS:  I think it's twenty to thirty million

3    dollars.  And remember this is, Your Honor, an alternative

4    argument to Count IV because if we prevail on Count IV, Count V

5    really just becomes superfluous.  The assets that are the

6    subject of Count V are a subset of the assets --

7          THE COURT:  I think I was getting -- well, Mr.

8    Zensky -- he's saying -- shaking his head no, I think.  But

9    I -- that's what I thought, and that's why I had, in my own

10   mind had perhaps, incorrectly lumped Counts IV -- the arguments

11   on Counts IV and V together.

12         MR. ZENSKY:  We certainly don't see Count V as

13   redundant if they were to prevail on Count IV.  Count IV deals

14   with I think assets released pre-petition that were not part of

15   the BMMZ repurchase rights as of the petition date, which is

16   the Count V issue; or, what the status is of those assets that

17   got unwound post-petition.  So we think that Count V is a

18   critical count that needs to be dealt with, irrespective of

19   where they go with Count IV.

20         THE COURT:  Go ahead, Mr. Morris.

21         MR. MORRIS:  Your Honor, the bottom line is that Count

22   V does state a viable cause of action.  We believe that with

23   discovery we'll be able to show not only custom and usage; we

24   do think that we ought to figure out what the intent of the

25   parties was, both on Count IV when --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

135

1          THE COURT:  The intent of the parties?

2          MR. MORRIS:  On the --

3          THE COURT:  Ordinarily one would look to what they

4    said in the agreement, and if the agreement was clear you

5    wouldn't go beyond that.

6          MR. MORRIS:  Correct, and --

7          THE COURT:  The agreement is clear in stating the

8    intent of the parties to the repo transaction, whether it was a

9    repo and not a financing.  They may have filed the UCC

10   statement to protect themselves, as is customarily done.

11         MR. MORRIS:  I guess I'm thinking of two ways, Your

12   Honor.  The first is really -- and I guess it relates more to

13   Count IV -- what happens to released collateral.  The point

14   that you're making, Your Honor, I guess is the custom and usage

15   between the repo parties.

16         THE COURT:  I mean, you'd have to look to the -- isn't

17   it -- well, let me ask.  Custom and usage of which -- with

18   respect to which transaction and which parties?  So, if it's --

19   if the focus necessarily must be on the parties to the

20   underlying transaction, repo or financing, is that the correct

21   focus, Mr. Morris?

22         MR. MORRIS:  I'll focus on the case that UMB cited,

23   and that's Wells Fargo.  In Wells Fargo, and again it's -- to

24   me, it's not particularly relevant because it was a case under

25   555/559, and I just don't see what application that has to this

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**136**

1   case.  But nevertheless, even when the Court was looking at how

2   to characterize the transaction in Wells Fargo, they looked at

3   the e-mails between the parties.

4           THE COURT:  Let me ask you this.  What facts have you

5   alleged in the complaint that would support your argument that

6   the transaction was a secured financing rather than a repo

7   transaction?

8           MR. MORRIS:  The facts in the complaint are laid out

9   in paragraphs 141 to 147.

10          THE COURT:  And what's the -- just give me the head

11  notes of it, okay?

12          MR. MORRIS:  BMMZ facility establishes that the

13  debtors continue to bear the risks and benefit of ownership of

14  the mortgage loans, despite their purported sale.  The

15  facility -- under the facility, the purchase price for each

16  loan was significantly discounted from the fair-market value.

17          THE COURT:  Wouldn't that be true in a repo

18  transaction?

19          MR. MORRIS:  It might be, Your Honor.

20          THE COURT:  Not might; it would.  I mean, nobody would

21  engage in a repo transaction unless it was a substantial

22  discount.  That's the nature of the transaction.

23          MR. MORRIS:  And following from that, the facility

24  computes --

25          THE COURT:  Nor, would they do a financing transaction

1    that didn't discount it substantially, either, but that's --

2        MR. MORRIS:  Right.  The debtors' prepetition balance

3    sheet, I think counsel really qualified the statement in the

4    complaint that's really much more explicit.  The balance sheet,

5    in their consolidated quarterly financial statements

6    characterized the facility as a debt, and the mortgage loans as

7    collateral.  So that is certainly not anything that's related

8    to a repo.  The debtors retained significant rights, even

9    though they had purported to sell the loans, including the

10   right to the excess cash flow.  That's what's in the complaint.

11       THE COURT:  Is there anything about that that's

12   inconsistent with it being a repo transaction?

13       MR. MORRIS:  You know, off the top of my head,

14   certainly the way the debtors carried it on their books and

15   records.  I would start with that.  The rest of it, I'll be

16   honest with you, Your Honor, I don't know off the top of my

17   head.

18       THE COURT:  Okay, all right.  Thank you.

19       MR. MORRIS:  Okay, thank you, Your Honor.

20       THE COURT:  All right, very brief.

21       MR. ZENSKY:  Very brief, but I think important points,

22   Your Honor.  The question that you were just discussing with

23   Mr. Morris; first the allegation of how the debtors treated it

24   on their books is extrinsic to an unambiguous agreement.  It's

25   outside the four corners, but was also considered by Judge

1    Sweet, where he said that "Accounting treatment and tax

2    treatment are not relevant when I'm trying to divine the

3    intent."

4          Second, Mr. Morris started by saying, "A release and

5    termination should mean what it says."  Well, I think a repo

6    should mean what it says, Your Honor.  And he dodged your

7    question as to whether there's any argument here that BMMZ and

8    the debtors intended to do anything other than create a repo.

9    And there was no allegation in the complaint that they had any

10   such intent.

11         The allegations that counsel just took you through are

12   exactly the type I indicated are always present in a repo.  The

13   Court indicated, and Judge Sweet acknowledged at the outset of

14   his decision:  "A repo is a hybrid, but it doesn't mean that

15   I'm going to let someone recharacterize it because it has

16   aspects of a financing."  That was a 12(b)(6) motion --

17   American Home a 12(b)(6) motion.

18         In American Home, Judge Sontchi was offered parol

19   evidence, a mound of e-mails and other documents.  He said, I'm

20   not looking at any of this because it's clear and unambiguous

21   on its face; and Your Honor should do the same.

22         THE COURT:  What's your understanding of the dollar

23   amount of Count V?

24         MR. ZENSKY:  I think it's in excess of the amount Mr.

25   Morris said.  It's not in the record.  It's not in the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    complaint.

2            THE COURT:  No, I understand that.

3            MR. ZENSKY: But our belief is that the repurchase

4    rights, as of the petition date, were worth a hundred million

5    dollars or more.

6            THE COURT:  Okay.

7            MR. ZENSKY:  Okay, finally on the chart that you were

8    showed with respect to OID, a couple of points, Your Honor.

9    First, the argument was made that the parties who exchanged are

10   all going to be better off, even if you were to sustain this.

11   The fact is, that some parties who didn't exchange, their notes

12   matured before the petition date, and they got full payment.

13   So, not everyone is better off.

14           Number two, if what the Court is suggesting and

15   counsel is suggesting that relevant facts --

16           THE COURT:  Don't say what the Court is suggesting.

17   I've asked questions.

18           MR. ZENSKY:  I apologize, Your Honor.  If what counsel

19   is suggesting is that what might be relevant here is the intent

20   or expectation of the parties to the exchange, does that mean

21   we're going to now have to subpoena fifty people to come in

22   here and tell you whether they thought OID was created or not

23   when they exchanged their note?  Are we going to interrogate

24   the investment bankers about how good their prediction was

25   about what the trading value is?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1           And the last and most important point is -- and I

2    really come back to it -- is that no one is ever going to do it

3    if the Court rules that you have unmatured interest, and here's

4    why.  If you look at the chart, this is prepared five years

5    down the road and I don't know if it's right or not, but it

6    purports to reflect the comparable treatment five years after

7    the exchange.  It doesn't show you what the comparable

8    treatment was six months after the exchange, a year, a year and

9    a half after.  It doesn't show you what the comparable

10   treatment would be if ResCap's business went up, sideways, or

11   down.  It doesn't tell you anything like that.  And parties

12   don't have that perfect information and ability to predict, on

13   the date of an exchange, whether they're going to be better off

14   under seventy-two different economic hypotheticals.

15           And if they know that they're going to run the risk,

16   the real risk of unmatured interest in an exchange where they

17   are helping the debtor delever, no one is going to do it.  And

18   there will be no liquidity with respect to these type of

19   instruments.  There's -- this doesn't prove anything.

20           THE COURT:  Do you agree that those investors that did

21   the exchange pretty well knew that they were going to have OID

22   for tax purposes?

23           MR. ZENSKY:  That's not in the record, Your Honor.

24   I'm not going to --

25           THE COURT:  I'm asking you a question.  The --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1      MR. ZENSKY:  My guess is that for tax purposes that

2   holders probably were aware of tax OID.

3      THE COURT:  Yeah, and they went ahead and did the deal

4   anyway, right?

5      MR. ZENSKY:  Okay, but tax OID, Your Honor, is

6   completely different from whether the claim that they got in

7   exchange --

8      THE COURT:  All right, you make an economic argument

9   as to why nobody would ever do a deal like this.  I -- it

10  doesn't -- it really doesn't matter.  I don't think you're

11  right; I think you're wrong.  And I think the biggest factor

12  was the change in their collateral position.  And I think

13  that's what -- but all right, I've heard enough.

14      MR. ZENSKY:  Okay, I'm sorry.  I just have to say the

15  last thing.  We're setting up a situation where no one will

16  know the size of their claim until we get to bankruptcy court,

17  because if the JSNs were not better off who exchanged, I think

18  their argument is you should find that there's unmatured

19  interest because we're better off.  Well, what if the company

20  did well enough that unsecureds were going to recover the same

21  amount --

22      THE COURT:  Look if they --

23      MR. ZENSKY:  -- and they wouldn't be better off --

24      THE COURT:  If they filed --

25      MR. ZENSKY:  -- then --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  -- bankruptcy five or six years down the

2     road, some of that unamortized interest will have been

3     amortized.  So, the amount of the claim in bankruptcy, yes, is

4     going to vary.

5          MR. ZENSKY:  Right.

6          THE COURT:  It's going to change.

7          MR. ZENSKY:  But you're setting up a situation where

8     at the time of an exchange no one's going to know --

9          THE COURT:  All right.  I have your --

10         MR. ZENSKY: -- what the size of their claim is.

11         THE COURT:  -- arguments.  I have your arguments.

12         MR. ZENSKY:  Okay.  On the size of BMMZ, Your Honor, I

13    assumed you were asking me what the value was of the lien, not

14    the total value of the --

15         THE COURT:  Correct.

16         MR. ZENSKY:  -- okay.  One housekeeping matter, Your

17    Honor, before I sit down?

18         THE COURT:  Yeah.

19         MR. ZENSKY:  On the --

20         THE COURT:  And you think it's a hundred million

21    dollars?

22         MR. ZENSKY:  I believe the repurchase rights were

23    worth that amount, or more.

24         THE COURT:  Okay, you had one other point you wanted

25    to raise.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

143

1          MR. ZENSKY:  Yes, just on briefing, Your Honor.  I

2  believe that the committee and the debtors received an

3  extension of the page limits for their motion to dismiss.  And

4  we would ask for the same page limits in our opposition, if

5  that's acceptable.

6          THE COURT:  What did I agree to do?

7          MR. ZENSKY:  I believe that they were given forty

8  pages for their motion.

9          THE COURT:  Okay, I will treat you fairly and the

10  same.  Okay?

11          Mr. Morris, you had another point you wanted to raise?

12          MR. MORRIS:  Just to follow up on that question, Your

13  Honor.  I think the eighty to one-hundred-million-dollar number

14  is actually what I'm told is the right number.

15          THE COURT:  Okay.

16          MR. MORRIS:  The number that I gave was the overlap

17  between the two causes of action.

18          THE COURT:  All right.  All right, I'm going to take

19  the matter under submission.  My expectation is that I'm not

20  going to do a full-blow opinion dealing with the motion to

21  dismiss.  I'm leaving on vacation next week, so don't expect

22  anything too soon, in any event.

23          On most, but perhaps not all of the issues, I believe

24  my ultimate decision will benefit from an evidentiary record.

25  And consequently, nobody should be surprised if the motions to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   dismiss are denied without prejudice.  The one count in

2   particular that I am -- don't take that as a ruling because I

3   may change my mind after I do some more work on it.  But the

4   one count that I am -- was struggling with when I took the

5   bench, and still am, is Count V. I don't find particularly

6   appealing the argument that it's a repo for one purpose but now

7   that it's been unwound, the committee can challenge it as

8   having been a financing agreement.  But I'm going to spend some

9   more time focusing on a number of the counts.

10        I appreciated the fact in particular that after the

11   motion to dismiss was made and the committee responded, that

12   UMB in their reply withdrew the motion as to some of the -- as

13   to a lot of the counts.  Obviously, they were preserving all of

14   their arguments and I understand that.  But there was plenty

15   for the Court to digest without having to deal with that, so I

16   appreciate that.  I thought the briefing was very good on both

17   sides, and I appreciate it.

18        All right, we're adjourned.  Thank you very much.

19      (Whereupon these proceedings were concluded at 1:25 PM)

20

21

22

23

24

25

145

**I N D E X**

RULINGS

|  | Page | Line |
|---|---|---|

Debtors' Motion for an Order Pursuant to        26        18
Bankruptcy Rule 9019 and Bankruptcy Code
Section 363(b)(1) Authorizing the Debtors to
Enter Into and Perform Under Amendment to
Consent Order Granted

In light of approval of amended consent order 29        25
Debtors' Motion pursuant to Bankruptcy Rule
3013 and Bankruptcy Code Section 362(a) for
a determination that GMAC Mortgage's FRB
foreclosure review obligation is a general
unsecured claim, and the automatic stay
prevents enforcement of the FRB foreclosure
review obligation is denied as moot.

Debtors' Motion for Order Under 11 U.S.C.        36         2
105(a) and 554(a) Authorizing Abandonment of
Certain Real Estate Owned by DOA Properties
IX Granted.

Motion of Ad Hoc Group of Junior Secured        44        18
Noteholders for Order in Aid of Mediation
and Settlement Granted

146

|   | | Page | Line |
|---|---|------|------|
| **RULINGS** | | | |
| The fourth and fifth omnibus objections | | 56 | 16 |
| are sustained with respect to the claims | | | |
| listed. | | | |

147

1

2                       C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _Penina Wolicki_

10

11   _____

12   PENINA WOLICKI

13   AAERT Certified Electronic Transcriber CET**D-569

14

15   eScribers

16   700 West 192nd Street, Suite #607

17   New York, NY 10040

18

19   Date:  July 28, 2013

20

21

22

23

24

25

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document

RESIDENTIAL CAPITAL, LLC, et al.    Pg 148 of 173

Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg

July 26, 2013

**#**

**#607 (1)**
4:22

**[**

**[Tracey (1)**
3:6

**A**

**abandon (1)**
35:16
**Abandonment (3)**
2:13;35:8,21
**ability (3)**
54:7;87:11;140:12
**able (27)**
13:23;20:3;21:12,
16;23:16,16;32:24,
25;33:16;41:6,16;
43:17;48:10;49:25;
51:21,25;63:3,15;
67:6,8;71:3,18;
92:19;99:2;128:14,
21;134:23
**above (1)**
90:4
**absence (1)**
81:25
**absolutely (1)**
124:24
**absurd (3)**
120:25;121:6;
123:13
**accept (3)**
35:21;76:8;87:23
**acceptable (1)**
143:5
**accepted (1)**
82:5
**accepts (1)**
65:10
**accident (1)**
61:10
**accommodate (1)**
22:4
**accommodation (1)**
50:9
**accomplish (1)**
69:2
**accomplishment (1)**
17:22
**according (2)**
55:1;120:25
**account (10)**
14:2,20;17:20;
19:16;79:13;85:18;
87:14;88:10;110:18;
120:1
**accountants (1)**

**46:4**
**accounting (2)**
98:11;138:1
**accreted (1)**
122:16
**accrued (2)**
122:18;124:12
**accruing (1)**
117:8
**accurate (2)**
53:17;128:11
**achieve (3)**
22:22;37:14;46:9
**achieved (1)**
21:13
**acknowledge (2)**
60:17;105:21
**acknowledged (7)**
60:12;66:22;83:13;
92:16;98:10;103:3;
138:13
**acknowledges (1)**
92:14
**acknowledging (1)**
97:3
**acquired (3)**
100:10;104:20;
127:11
**acres (1)**
35:11
**across (1)**
42:22;99:18
**Act (4)**
15:14;32:5;104:2;
111:8
**acting (1)**
45:24
**action (12)**
44:21;49:19;51:4,
5;53:3;58:10;101:2;
111:25;113:24,25;
134:22;143:17
**actions (7)**
24:22;32:7,9,10,
14;37:20;50:6
**active (1)**
42:4
**actual (3)**
14:6;39:20;116:15
**actually (16)**
16:13;25:21;40:8;
41:9,14;44:6;54:8;
55:20;62:22;71:17;
82:23;117:22;
125:16;126:20;
131:21;143:14
**Ad (10)**
2:16,19;7:12,21;
19:7,8;36:4,9;44:13;
47:19
**add (2)**
23:24;33:17
**added (2)**

**50:17;51:7**
**adding (1)**
51:13
**addition (3)**
16:24;29:12;51:13
**additional (3)**
13:1;14:24;22:1
**Additionally (2)**
28:3;45:7
**address (16)**
20:20;31:6,13;
37:8,10,17;45:8,9;
48:1,23;49:13;54:19,
23;73:10;126:22,25
**addressed (1)**
53:14
**addresses (3)**
19:18;49:18;127:5
**adequately (2)**
122:5;123:19
**Adj (2)**
3:14;4:4
**adjourned (2)**
53:21;144:18
**administering (1)**
18:13
**Administration (5)**
2:9;10:3;26:24;
31:12,21
**administrative (4)**
12:19;17:17,25;
28:14
**admissible (1)**
93:10
**adopted (1)**
65:4
**advance (1)**
22:6
**advantageous (2)**
21:18;22:2
**Adversary (7)**
4:2;49:16;56:22;
57:11,12,20,24
**advise (1)**
48:21
**advocating (1)**
88:17
**affect (1)**
23:11
**affected (1)**
23:10
**affirmative (2)**
24:22;131:22
**affirmed (1)**
79:2
**after-acquired (2)**
104:8;127:15
**aftermarket (1)**
64:1
**afternoon (2)**
40:12;114:13
**afterwards (1)**
93:21

**again (19)**
14:12,14;41:11;
42:18;43:19;72:5;
84:5;87:8;89:11;
91:17;94:16;101:2;
109:7,11,16;111:11,
22;112:6;135:23
**against (8)**
31:25;32:5;37:18,
22;72:11;85:6;
111:25;125:24
**agenda (10)**
11:8,10,15,18,19;
30:20;31:10;36:4;
47:19;56:21
**Agent (7)**
2:9;9:12;17:9;
31:21;32:4;90:19;
131:6
**aggregate (1)**
28:17
**ago (4)**
37:6;53:6;88:8;
96:8
**agree (20)**
20:17;23:14;24:15;
55:12;60:10;65:16;
66:21;67:13;68:16;
69:6;71:25;72:2;
73:22;74:9;78:17;
81:21;115:3;119:3;
140:20;143:6
**agreed (13)**
13:20;22:4,10;
50:8,15;62:19;66:7,
19;78:16;80:11;
83:16;100:25;106:2
**agreedto (1)**
35:17
**agreement (56)**
19:3;38:18;43:5;
51:1;53:11,15;58:14;
91:3,13;95:7;96:14,
24;97:1,15;98:1,3,5,
15,16,18;99:15,23;
100:4,10;101:20,20;
102:9,13,15;103:11,
19,21;104:6,14,24;
105:12,15;106:4,8;
109:9;110:7,16;
112:6;127:9,10,21;
130:3,14;131:11,23;
132:18;135:4,4,7;
137:24;144:8
**agreements (7)**
39:3;96:20;97:4,
18;98:7;99:20;130:9
**agrees (2)**
24:23;25:3
**agricultural (1)**
102:11
**ahead (10)**
11:20;50:21;55:16;

**69:5;78:24;86:19;**
**90:12;130:19;**
**134:20;141:3**
**Aid (6)**
2:17;36:5,12;
44:14,24;45:5
**Aisha (1)**
3:13
**AKIN (3)**
8:9;57:15;119:8
**al (2)**
4:3,3
**alarms (1)**
133:7
**ALBANESE (1)**
8:17
**albeit (1)**
95:22
**all- (2)**
109:12;131:8
**all-asset (1)**
108:14,16
**all-assets (4)**
91:14,15,16;93:10
**alle (1)**
71:22
**allegation (9)**
71:15,23;74:17;
82:6;83:2;113:7,13;
137:23;138:9
**allegations (7)**
37:1;51:7,13;
80:19;95:16;96:13;
138:11
**allege (4)**
72:3;95:20;104:4;
111:7
**alleged (7)**
15:24;64:1,25;
90:16;115:12;127:6;
136:5
**alleges (2)**
95:25;110:19
**Allegheny (1)**
118:4
**allocated (2)**
39:20;48:11
**allow (2)**
36:25;49:23
**allowed (3)**
12:24;23:12;
117:25
**allowing (3)**
12:10;46:21;
123:23
**allows (1)**
41:3
**Ally (3)**
8:2,2;32:15
**almost (2)**
39:15;124:11
**altered (1)**
36:15

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 149 of 173
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg
July 26, 2013

**alternative (3)**
113:5,15;134:3
**Although (1)**
27:20
**always (3)**
59:4;127:8;138:12
**ambiguity (1)**
130:18
**ambiguous (5)**
68:22;93:3;103:22;
127:22;129:23
**amended (11)**
11:16,19;18:13;
20:12;24:4,10;26:21;
29:8,25;53:8;54:22
**Amendment (13)**
2:5;12:6;14:11;
15:15;16:12;17:1,7,
21;26:8;28:3,15;
29:8;49:24
**American (7)**
95:1;96:12,25;
98:21;99:8;138:17,
18
**Americas (2)**
6:4;7:13
**among (1)**
116:7
**amortization (1)**
123:5
**amortize (2)**
120:5;123:2
**amortized (4)**
86:14;115:1;
117:13;142:3
**amortizing (1)**
126:7
**amount (41)**
14:1,6;21:14;28:8,
15;39:20;58:21,23;
61:22,25;62:5;63:4,
20,21;64:11,11,16,
17,25;65:13;69:13,
16,17;71:14;74:6;
76:5,25;84:23;85:9;
87:2;89:7;115:10;
117:8;118:15;
122:16;124:8;
138:23,24;141:21;
142:3,23
**amounts (2)**
15:4;17:17
**analysis (2)**
125:4;133:14
**and/or (1)**
58:21
**ANDREW (2)**
10:8;34:12
**Angeles (1)**
10:15
**announced (1)**
12:23
**anticipate (8)**

16:22;17:4,15;
81:2,13;126:1;
127:25;128:2
**anxious (1)**
44:6
**apologize (3)**
81:10;112:8;
139:18
**appealing (2)**
92:11;144:6
**appeals (1)**
13:11
**appeared (1)**
99:19
**appears (1)**
93:2
**applicable (3)**
27:16;105:11;
112:18
**application (4)**
24:7;81:3;121:4;
135:25
**applications (2)**
18:15,20
**applied (1)**
79:22
**applies (5)**
27:9;69:4;83:15;
103:11;107:9
**apply (6)**
50:7;87:12;96:22;
118:14;124:21,24
**applying (2)**
66:25;121:5
**appreciate (4)**
38:10;81:24;
144:16,17
**appreciated (1)**
144:10
**approach (4)**
19:20;28:11;47:5;
58:5
**appropriate (6)**
25:11;34:4;40:25;
44:19,21;61:7
**approval (8)**
12:6;18:5,8,18;
26:17,22;27:6;29:24
**approve (6)**
14:17;22:17;27:1,
4,13;29:12
**approved (5)**
12:12;13:24;22:9;
23:11;26:18
**approves (1)**
29:11
**approximately (5)**
13:25;16:13;17:6;
122:12;123:8
**April (2)**
24:2;25:10
**apropos (1)**
97:2

**arbitrary (1)**
85:11
**area (3)**
85:3;128:18;132:1
**arguably (2)**
73:13;132:20
**argue (7)**
23:16,16,19;83:12;
96:22;98:24;114:11
**arguing (4)**
25:8,9;86:6;89:3
**argument (33)**
20:3;29:21;36:24;
56:25;57:10;61:4;
76:9;78:10;81:22,23;
87:24;88:19;92:11;
97:17;102:24;103:4;
104:1;111:11;113:6;
114:16;125:24;
127:17;130:19,20,21;
132:8;134:4;136:5;
138:7;139:9;141:8,
18;144:6
**arguments (14)**
20:19;29:6;54:10;
68:14;69:6;78:18,21;
84:2;110:12;127:3;
134:10;142:11,11;
144:14
**arise (3)**
62:10;103:12,12
**arising (5)**
76:11;94:23;
104:21;109:9,10
**arm (1)**
59:25
**arm's-length (1)**
46:7
**around (5)**
21:15;39:11;40:15;
58:25;83:7
**arrangement (1)**
102:10
**arriving (1)**
21:16
**artfully (1)**
67:5
**Article (1)**
96:21,23;99:1
**articulate (1)**
24:20
**aspects (4)**
15:8;28:10;97:6;
138:16
**assert (2)**
32:8,12
**assessing (1)**
97:12
**asset (16)**
35:13;58:19;94:9;
103:9,10;104:12;
105:9,10;106:11,12;
109:13;110:20;

112:15,18;127:7,8
**asset-backed (1)**
104:23
**assets (47)**
58:15,16;92:8,9,22,
23;103:11;104:15,19,
22,25;105:5,6,7;
106:7;107:9,11;
108:4,4,5,19;110:14,
15;112:1,3,11,14,22;
113:4,8,10,14;127:5,
11,14,16;128:12;
129:7;131:4,6,9,9,24;
134:5,6,14,16
**assist (1)**
44:22
**assisted (1)**
22:20
**associated (5)**
30:21;85:20;91:12;
97:19;111:8
**assume (4)**
23:21,21;50:1;77:6
**assumed (1)**
142:13
**assuming (4)**
16:4;24:23;25:3;
74:4
**astronomical (1)**
13:17
**attach (1)**
108:18
**attached (4)**
37:13;38:20;90:22;
104:7
**attack (7)**
36:14;58:21;94:20;
99:2;113:8;132:21
**attacking (2)**
83:1;132:24
**attempt (2)**
46:9;58:13
**attempting (1)**
92:6
**Attorneys (10)**
6:3,15;7:12,21;8:2,
21;9:3,12;10:3,12
**attractive (1)**
116:22
**auction (2)**
116:10,12
**audit (1)**
17:5
**auditing (1)**
16:3
**audits (1)**
16:2
**August (6)**
31:1,3;39:10;
40:14,17;48:5
**authorities (1)**
45:5
**authority (8)**

112:15,18;127:7,8
27:1;44:24,25;
45:4;60:15;66:14;
69:22;83:12
**authorized (1)**
44:22
**Authorizing (3)**
2:4,13;26:7
**automatic (1)**
29:17
**automatically (3)**
73:20;92:22;101:2
**available (3)**
21:25;28:16;33:15
**Avenue (6)**
6:4;7:3,13;8:3;
9:13;10:13
**avoid (1)**
123:23
**avoidance (1)**
50:6
**aware (6)**
12:8;21:11;33:9;
45:24;130:22;141:2
**away (6)**
76:10,11;79:21;
85:3;102:17;107:14
**awfully (1)**
92:11

**B**

**back (28)**
14:12,13;33:21;
55:3,9;57:9;60:3;
63:5;64:18;70:23;
73:23;79:22;97:2;
100:15;101:17;
102:22;103:1,7,17;
104:1,1;106:5;109:6;
111:2,7;131:18;
133:21;140:2
**backwards (1)**
64:3
**bad (4)**
24:1;60:5,5;98:14
**balance (13)**
63:16;64:20;67:19;
70:1,17;71:9,19;77:2,
21;86:19;96:9;137:2,
4
**balance-sheet (2)**
70:24;72:6
**balancing (1)**
85:6
**Bank (10)**
4:3,5;8:2,10;9:12;
56:23;57:12,15;
119:9,10
**banker (1)**
88:16
**bankers (7)**
82:13,18;85:22;
88:9;116:19,25;

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 150 of 173
Case No. 12-12020-mg,    Adv. Proc. No. 13-01277-mg    July 26, 2013

139:24
**bankrupt (1)**
  96:17
**Bankruptcy (52)**
  2:3,3;26:6,7,23,25;
  27:3;29:14,14;44:19;
  45:3,4,4,12;46:10;
  64:9,10,16;65:21;
  69:12;70:2,4;72:17,
  20;74:4;75:14;79:13;
  80:24;86:8,17;89:1,
  5;90:6;98:23;118:23;
  119:21;120:4;122:6;
  123:24;124:2,3,4,7;
  125:11,23;128:6,12;
  129:9;130:1;141:16;
  142:1,3
**banks (1)**
  86:11
**bar (4)**
  45:5;54:23;55:4,5
**bargain (2)**
  124:13,14
**Bartosz (1)**
  3:14
**base (2)**
  118:14;127:8
**Based (21)**
  2:21;15:24;27:22;
  37:24;39:2;47:21;
  52:16;55:3;64:11;
  68:13,14;78:18;
  80:19;96:3,3;101:22;
  106:3;117:11,14;
  129:5,5
**base-value (1)**
  122:14
**basic (3)**
  58:10;64:9,20
**basically (7)**
  49:3;87:12,19;
  95:19;119:7,8;131:2
**basis (10)**
  32:19;38:13;98:5,
  18;102:16;105:23;
  111:14;113:11;
  120:19,20
**basket (1)**
  107:15
**BATTAGLIA (1)**
  9:2
**bear (2)**
  95:21;136:13
**became (3)**
  32:3;121:16;122:5
**become (8)**
  37:4;45:18;46:15;
  92:22;101:3;106:22;
  108:4;109:15
**becomes (4)**
  18:22;109:1,3;
  134:5
**began (1)**

32:7
**begin (1)**
  61:19
**beginning (2)**
  95:18;97:11
**Beha (8)**
  31:13,17,18;32:13;
  33:3,9,24;34:9
**behalf (9)**
  11:5;21:10;26:3;
  31:18;40:2;46:5;
  50:23;52:21;114:14
**behind (3)**
  15:23;20:10;21:3
**belief (2)**
  96:1;139:3
**believes (4)**
  82:8;101:18;
  105:25;114:25
**believing (1)**
  127:21
**below (1)**
  72:23
**bench (2)**
  127:21;144:5
**beneficial (1)**
  19:19
**beneficiary (3)**
  19:23;20:1;23:6
**benefit (10)**
  16:9;18:1;21:22;
  35:18;81:18;99:1;
  124:13,14;136:13;
  143:24
**Berkshire (1)**
  10:12
**best (9)**
  17:22,23;22:15,16;
  24:20;27:4;35:15;
  49:13;61:14
**BestBuy (1)**
  131:14
**BestBuy's (1)**
  131:16
**bet (2)**
  74:19;128:20
**Beth (1)**
  3:14
**bets (1)**
  132:24
**better (22)**
  17:10;20:15;33:19;
  70:16;73:4,20;74:5,
  16;84:10;86:19;
  107:1;108:2,11;
  120:6;122:6;125:11;
  139:10,13;140:13;
  141:17,19,23
**beyond (4)**
  18:9;66:16;88:6;
  135:5
**bids (1)**
  42:13

**biggest (1)**
  141:11
**bilateral (15)**
  105:8,16,19;
  106:16,17,21;108:24,
  25;109:5,10;110:21;
  111:6;112:2,3;128:8
**Bill (1)**
  22:18
**billion (1)**
  82:24
**billions (1)**
  63:15
**bind (1)**
  37:19
**binding (4)**
  60:8;66:18;83:11,
  12
**bit (1)**
  12:21
**black-line (1)**
  50:16
**blaming (1)**
  126:23
**bleeding (1)**
  13:16
**blends (1)**
  102:21
**blown (1)**
  39:16
**BMMZ (18)**
  58:14;91:1;92:19;
  95:7,18;96:1;99:6,
  16;100:10,22;101:5;
  102:20,25;103:25;
  134:15;136:12;
  138:7;142:12
**Board (8)**
  2:9;10:3;12:7;
  24:13,18;27:23;
  31:12,21
**bond (2)**
  64:11,17
**bondholder (1)**
  89:6
**bondholders (2)**
  89:1,3
**bonds (6)**
  73:16,16,18;75:1;
  97:1,1
**books (6)**
  110:8,17;128:7,14;
  137:14,24
**bootstrap (1)**
  36:25
**Borrower (5)**
  3:3,11;19:15;28:4;
  54:5
**borrowers (28)**
  15:1,3,20;16:1,9,
  14,18;17:13,14,23;
  18:1;19:6,12;20:7,
  13;21:22,24,25;

22:16;24:9;25:2,5,7,
  18;27:21;28:2,16;
  29:5
**borrowers' (2)**
  15:2;20:16
**both (19)**
  40:4;41:3,5,15;
  60:7;66:23;67:10;
  72:19;79:19;80:25;
  83:11,13;91:4;95:11;
  99:21;101:21;133:7;
  134:25;144:16
**bother (1)**
  51:20
**bottom (3)**
  100:7;112:7;
  134:21
**bought (2)**
  64:14;97:1
**bound (1)**
  113:23
**box (1)**
  99:16
**break (1)**
  58:1
**BRIAN (1)**
  8:15
**brief (5)**
  26:15;58:9;115:10;
  137:20,21
**briefing (3)**
  113:2;143:1;
  144:16
**briefly (3)**
  23:4;102:3,24
**briefs (1)**
  127:21
**Bring (3)**
  2:20;47:14,20
**bringing (2)**
  78:10,17
**brings (6)**
  12:1;31:9;53:22;
  56:20;104:10;122:2
**broad (1)**
  104:14
**Brothers (1)**
  45:1
**brought (3)**
  59:4;128:24;
  131:18
**Bryant (1)**
  8:11
**bucketing (1)**
  17:5
**build (1)**
  31:2
**builds (1)**
  76:3
**built (7)**
  63:1;64:2;65:7;
  77:1,24;82:4;97:6
**built-in (2)**

120:2;126:6
**burden (1)**
  17:25
**burdens (2)**
  33:17;40:21
**business (4)**
  35:13;41:2;107:16;
  140:10
**buy (3)**
  109:2;128:17;
  131:14
**buyer (2)**
  96:18;100:1

**C**

**CA (1)**
  10:15
**calculate (2)**
  64:3;126:4
**calculated (2)**
  28:9;126:5
**calculation (1)**
  63:25
**California (1)**
  32:7
**call (2)**
  16:20;96:18
**called (3)**
  41:11;75:20;89:12
**came (4)**
  89:1;103:1;111:6;
  127:21
**can (46)**
  14:18;18:7,7;
  19:10;30:22;31:5;
  32:18;34:3,6,7;
  35:20;42:20;43:5;
  44:6;48:14;49:1,13;
  54:9;58:13;61:16;
  66:4;67:11;68:11,20;
  70:6,7;78:23;80:18;
  82:1;85:2;87:21;
  92:10;93:4,14;95:7;
  96:13;103:19;
  107:25;108:10;
  115:4;121:2;126:14;
  128:24;131:13;
  132:6;144:7
**cap (1)**
  13:17
**capable (2)**
  13:5;73:8
**Capital (5)**
  11:3;57:10;60:6;
  75:8;97:7
**care (1)**
  77:8
**careful (1)**
  15:8
**CARNEY (1)**
  8:15
**carried (1)**

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 151 of 173
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg                                                    July 26, 2013

137:14
**carry (2)**
33:18;44:19
**carryover (1)**
54:2
**Case (56)**
2:19;7:11;12:13;
16:12,18;18:22;22:3;
23:7,8,9;26:25;32:7;
34:1;36:17,23;37:3;
39:14;40:7,9,20;41:1,
12,15;44:21,22;
45:10,11,12;47:15,
18;59:19;62:9,12;
73:3;83:15;89:10;
99:3;100:9;102:3,5,
18;106:2;108:1,3,6,7;
110:24;118:2,4,9;
123:2,5;133:13;
135:22,24;136:1
**cases (14)**
37:9;40:22;41:11;
46:21;58:2;75:14;
94:19,22,25;96:11;
101:18,21,23;120:21
**cash (15)**
12:25;14:3,24;
19:10,11;59:2,19;
63:14;95:23;109:2;
111:23;118:4;
131:17,20;137:10
**cashed (1)**
14:5
**cash-out (1)**
116:12
**catch (1)**
120:5
**categories (3)**
15:24;27:21;28:4
**categorizing (1)**
113:12
**cause (3)**
51:4,5;134:22
**causes (3)**
49:18;53:3;143:17
**causing (1)**
130:17
**CC (6)**
2:2,7,12;3:2,9;4:4
**cease (1)**
58:18
**ceases (2)**
94:9;106:18
**cede (3)**
21:6;31:13;53:23
**center (1)**
69:7
**Central (4)**
2:10;31:22,23;32:6
**cents (2)**
116:13,16
**Certain (13)**
2:13;13:9,10;14:3;

15:5;28:4;35:8;42:7;
51:7;96:9;124:11;
130:22;133:20
**certainly (16)**
13:11;18:7;33:13;
35:18;40:16;66:17;
80:22;86:21;87:6;
120:6;130:5,6;
133:22;134:12;
137:7,14
**cetera (1)**
128:17
**challenge (13)**
58:9;59:3,5,11,22;
92:10,15,17,19;
94:12,19;95:7;144:7
**challenged (3)**
59:22;92:5;113:5
**challenging (2)**
62:5;80:15
**chambers (2)**
30:14;38:21
**chance (1)**
20:23
**change (15)**
37:23;43:20,20;
50:3;52:15;85:6,7;
95:2;118:15,16,17;
119:5;141:12;142:6;
144:3
**changed (5)**
13:3;71:20;90:3,3;
121:13
**changes (1)**
63:9
**Chapter (3)**
36:23;37:9;46:21
**character (3)**
119:6;121:13;
133:15
**characteristics (6)**
27:23;97:19;98:1,
7;133:20,23
**characterization (3)**
92:4,15;95:2
**characterize (2)**
111:25;136:2
**characterized (5)**
96:10;129:8;
133:18,25;137:6
**chart (2)**
139:7;140:4
**Chase (1)**
7:22
**Chateaugay (37)**
61:6,13;62:25;
65:3,4;66:11,18;
67:1;68:13,24;69:23;
70:20;72:13;77:13;
78:25;79:19,25;81:8,
11;84:1;88:25;97:22;
118:5,13,14;119:8,
17,19;121:2,12;

123:13,21;124:17,22,
25;125:18,18
**check (1)**
38:5
**choose (1)**
16:7
**chose (2)**
55:6,6
**chosen (2)**
28:4;54:8
**Chris (1)**
51:16
**Christine (1)**
3:12
**CHRISTOPHER (1)**
7:16
**chutzpah (1)**
108:14
**Cir (5)**
26:25;27:11;45:2;
46:18;123:10
**Circuit (25)**
27:9;55:10;65:2,3;
66:12,14;69:3;72:17;
79:3,11,25;80:1;
84:5;87:10,10;100:9;
118:5,21,25;119:7,
12;120:12;121:6;
124:16;126:6
**Circuit's (4)**
68:14;78:18,19;
121:14
**circulated (1)**
17:3
**circumstance (8)**
77:25;123:11,20,
25;124:5,6,11,23
**circumstances (6)**
27:16;120:13;
121:5;131:8;133:3,5
**cited (6)**
69:22;79:20;95:11;
102:4;108:16;135:22
**cites (1)**
69:23
**Citi (2)**
90:20;100:21
**citing (1)**
91:25
**Civil (1)**
15:14
**Claim (98)**
2:8;13:5;19:24;
23:7,12,12;24:6,7;
29:16;31:11,20;
33:10;34:19,20,24;
51:21;54:20,21;
55:13,23;56:4,7,12;
58:11,21,23;61:22;
62:5,19;63:20,23;
64:11,17,24,25;
65:10,21;66:4,24;
69:13;70:4,5;71:2,4,

10;72:7;73:1;74:15;
76:2;84:12,15,18,21;
85:9;86:25;89:2,4,7,
15,16,16;90:5,15;
91:20;96:8;97:12;
98:19,19;101:12,14,
17;102:4;103:1,15,
18;108:10;118:15,16,
16,17,18;119:22,23,
24;120:3,9;122:10,
11,13,14,19;124:10;
126:2;134:1;141:6,
16;142:3,10
**claimant (2)**
23:7,8
**claimants (1)**
54:5
**claimant's (1)**
55:2
**Claims (43)**
2:21;3:2,3,4,9,10,
11;31:25;32:8,8,11,
12,16,18,25;33:1,3,9,
14,21,23;34:8,11,18;
35:18;37:22;47:21;
49:20,21;50:7;51:6,
14,15;53:23;54:3,4,
25;56:17;58:21;
59:16;60:3;82:16;
116:13
**clarification (1)**
36:19
**clarify (3)**
43:1;45:14;52:21
**clarity (1)**
36:13
**classification (3)**
29:22,24,25
**clause (7)**
91:15;92:8;93:10,
11;107:22;127:22;
131:9
**clauses (2)**
130:13,13
**clawback (1)**
130:13
**cleanest (1)**
88:18
**cleanup (1)**
16:21
**clear (19)**
13:7;51:10;93:25;
112:12,20;114:1;
117:21,22;120:18,18;
123:13;124:19;
125:7,19;129:21;
131:7;135:4,7;
138:20
**clear-cut (1)**
119:18
**clearly (6)**
25:20;49:12;55:5;
64:21;98:16;113:10

**CLEARY (1)**
8:20
**clerks (1)**
47:7
**clients (4)**
43:12;73:13;74:19;
95:3
**clock (1)**
14:16
**close (1)**
117:16
**closely (1)**
82:18
**closer (1)**
116:16
**Co (1)**
46:17
**Code (21)**
2:3;26:7;29:15;
44:19;58:12;64:6;
65:25;66:9;68:1,18;
75:20;76:2,3,13;78:5,
9,14;79:24;81:3;
83:7,10
**codes (1)**
15:25
**COHEN (1)**
10:7
**coll (1)**
128:15
**Collateral (75)**
9:12;19:10;39:21;
58:22,24;59:2,10,10,
19;73:15;75:11,17;
77:5;84:22;85:1,4,5,
18;86:20;88:4;90:19;
91:18,23;92:9;96:19;
98:18;100:18;101:1,
3,14;102:23;103:3,4,
17;104:18;105:4,13,
16,21,22;106:3,22,
23;107:15,21;108:5,
23;109:2,3,16;110:2,
3,7,9,10,11,14,18,22;
111:6,24;112:3,5;
127:17;128:11,13,16,
16;129:1,6,8;131:6;
135:13;137:7;141:12
**colleague (3)**
31:13;53:23;
114:17
**Collectively (1)**
34:20
**column (3)**
99:10,14,24
**coming (7)**
12:8;17:18;19:9;
22:1;48:3;81:13;
103:12
**comment (1)**
52:10
**comments (1)**
127:3

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 152 of 173
Case No. 12-12020-mg,  Adv. Proc. No. 13-01277-mg                                July 26, 2013

commercial (1)
50:6
**Committee (67)**
4:2;6:3,15;7:2;
13:19;17:4;19:7;
21:10;22:20,20,21;
26:15;27:10;30:6;
31:4;33:7;38:10;
40:3,4;47:3;49:17,
23;50:2;52:21;56:22;
57:11,19;58:10,13,
21,24;59:15,23;60:3;
61:24;62:1,5;63:23;
67:6,8;82:15,23;
88:23;89:24;90:14,
22;91:20;92:14;
93:24;94:11,17;
95:17,19,25;97:18;
102:3;106:6;108:7;
110:19;114:14,24;
126:20;127:6;
128:23;143:2;144:7,
11
**committee's (5)**
19:8;52:23;74:8,
10;98:19
**commodities (1)**
102:11
**common (1)**
98:2
**communication (1)**
49:12
**companies (2)**
12:24;98:22
**company (19)**
15:25;20:11;70:2;
71:8;72:12;80:23;
82:25;87:11,18;91:4;
100:15;103:25;
108:15,17;116:1;
119:8;120:9;123:23;
141:19
**company's (2)**
104:19;109:25
**comparable (3)**
140:6,7,9
**compare (1)**
99:6
**compared (1)**
16:23
**compelling (3)**
69:1;75:21;99:22
**complaint (28)**
50:16;57:19;59:4;
71:15;80:19;83:18;
90:14,16,22;93:24;
95:19;105:20;
110:19;111:1,14,24;
113:13;115:12;
116:8;117:14;
128:24;133:20;
136:5,8;137:4,10;
138:9;139:1

**complaint's (1)**
71:23
**complete (4)**
14:22,25;15:16;
16:23
**completed (7)**
15:21,22;16:10,18;
25:3,28;19;111:20
**completely (4)**
79:12;87:25;
130:14;141:6
**completing (2)**
12:16;17:4
**completion (1)**
20:6
**complex (1)**
40:21
**complexity (1)**
76:9
**compliance (2)**
19:2;29:7
**complicated (1)**
74:7
**component (1)**
87:15
**compromise (1)**
27:2
**compromises (1)**
26:22
**Comptroller (1)**
29:1
**computes (1)**
136:24
**concede (2)**
132:10,13
**concept (2)**
27:19;85:3
**concepts (1)**
103:9
**concern (3)**
42:12,12;53:8
**concerned (4)**
66:3;101:24;
119:12;123:22
**concerns (2)**
38:1;120:19
**conclude (1)**
61:7
**concluded (1)**
144:19
**conclusion (1)**
109:18
**condition (2)**
18:7,17
**conduct (1)**
27:24
**conducted (1)**
14:22
**Conference (4)**
2:19;31:19;32:20;
50:18
**conferences (1)**
34:5

**confidence (1)**
41:6
**confidential (6)**
15:9;28:12,12;
39:15;42:8,16
**confidentiality (3)**
38:18,25;43:5
**confirm (1)**
19:10
**confirmation (5)**
22:14;50:12;52:6,
8,9
**confirmed (1)**
22:8
**conflates (1)**
93:17
**Conflicts (1)**
7:2
**Congress (4)**
28:22,23;69:1;
76:18
**connection (8)**
22:2;28:13;29:3,
23;48:4;104:9;
116:19;126:12
**conscious (1)**
131:22
**consensual (4)**
46:9;47:14;79:14;
87:12
**consensually (2)**
32:21;34:22
**Consent (22)**
2:5;12:7;14:12;
16:9;18:13;19:17,22,
24;20:2;23:6;24:10,
13;26:8,21,21;27:20;
29:7,9,10,25;49:17;
60:6
**consented (2)**
49:23;100:18
**consequence (3)**
36:25;37:11;45:16
**consequences (2)**
60:5;98:10
**consequently (1)**
143:25
**conservator (1)**
32:3
**consider (2)**
27:13;44:20
**consideration (2)**
22:7;97:14
**considered (2)**
27:16;137:25
**considering (1)**
105:24
**consistent (7)**
22:13;28:9;29:8;
34:2;48:13;100:4;
118:2
**consolidated (3)**
49:16;57:20;137:5

**consolidation (1)**
113:24
**construct (1)**
47:2
**construction (3)**
66:15,25;68:22
**constructive (3)**
40:19,20;41:10
**construed (1)**
124:20
**construing (2)**
98:5;127:23
**consultants (5)**
25:13,17;29:3;
30:20;46:4
**consultation (1)**
34:15
**Consulting (4)**
17:8,16;30:4,5
**contact (1)**
38:21
**contained (1)**
76:3
**contemplate (1)**
41:1
**contemplated (3)**
22:12;76:14;78:3
**contemporaneous (1)**
128:6
**contemporaneously (3)**
110:6,25;128:12
**contend (2)**
62:6;96:6
**contends (1)**
127:6
**contested (2)**
12:2;21:12
**context (14)**
34:6;61:16;69:4;
92:10;94:20,23;
106:8;115:15,16;
118:23,25;121:8;
123:24;127:2
**contexts (1)**
97:8
**continue (11)**
18:21;33:14;34:22;
42:6,20;43:3;69:11;
78:23;95:21;107:10;
136:13
**continued (2)**
11:7;40:17
**continues (2)**
47:13;123:1
**continuing (4)**
30:24;104:18;
107:8,12
**contract (3)**
43:22;83:6;94:7
**contractual (5)**
91:7,11;95:22,23;
101:13
**contractually (1)**

43:4
**Contrary (1)**
29:6
**control (3)**
46:3;55:8;88:15
**controlling (3)**
60:14;61:8;97:13
**controls (2)**
89:25;95:12
**controversial (1)**
126:9
**conversation (1)**
38:6
**conversations (1)**
55:3
**converts (1)**
21:19
**cooperate (1)**
72:20
**cooperatively (1)**
38:9
**coordinated (1)**
40:22
**co-party (1)**
128:8
**co-proponent (1)**
62:1
**copy (1)**
17:3;38:22
**corner (2)**
39:11;40:15
**corners (1)**
137:25
**Corporate (3)**
2:9;31:22,23
**correctly (3)**
40:14;50:24;117:1
**correspondence (1)**
48:18
**corresponding (1)**
72:19
**cost (5)**
16:22;17:4,15;
28:14;39:20
**costing (1)**
12:18
**costly (1)**
26:23
**costs (5)**
12:15,15;13:16;
17:17;114:4
**Counsel (13)**
7:2;8:10;10:21;
11:21,23;15:33:16;
90:10;125:5;126:22;
137:3;138:11;
139:15,18
**Count (48)**
62:5;90:13,17;
93:17,17,19,23;
101:4,5,17;102:20,
24;104:2,10;105:6;
106:5;113:2,15,20,

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg,  Adv. Proc. No. 13-01277-mg

July 26, 2013

23;114:2;127:1,5;
129:7;130:21;131:1,
2,21;132:3,4;134:4,4,
4,6,12,13,13,16,17,
18,19,21,25;135:13;
138:23;144:1,4,5
**counter (1)**
132:14
**counterclaim (9)**
49:18;50:7;51:17,
18,19;52:10,24;53:8,
13
**Counterclaims (5)**
2:21;47:21;52:14;
53:1;113:25
**counterparties (3)**
92:13;132:11,25
**counterparty (1)**
133:9
**counterproductive (1)**
41:4
**counts (6)**
58:9;126:25;
134:10,11;144:9,13
**County (1)**
35:12
**couple (3)**
40:3;67:17;139:8
**coupled (1)**
104:6
**course (11)**
55:24;63:21;68:16;
70:7,25;72:15;99:10;
104:24;106:5;
116:18;132:2
**COURT (438)**
11:2,9,11,14,16,18,
20,22,24,25;12:3,5,7,
9;13:6;14:17;17:10;
18:3,5,8,11,18,25;
20:3,4,5,12,15,21;
21:2,4,5,7;22:17,18,
24;23:10,18,21;
24:12,17,24;25:12,
15,22,25;26:5,20;
27:1,2,8,15;29:11,21,
23;30:7,10,13,15,18,
22,25;31:8,15;32:6,
11,14;33:1,5,13,25;
34:10,17,19;35:2,4,
21,24;36:7;38:6,17,
20,24;39:8,10,25;
40:5;41:18;42:18,24;
43:9,12,18,23;44:1,3,
8,12,12,15,20;45:4,7,
12;47:6,9,12,23,25;
48:1,3,6,18,19;49:1,
14;50:14,16,19,21;
51:4,24;52:1,5,7,12,
18;53:17,19;54:11,
17,19;55:12,16,21,
25;56:3,7,11,13,15,
19,24;57:3,5,8,23,25;

58:4,6;59:1,3,7,17;
60:7,12,14,17,21,23;
61:1,3,10,13,24;62:1,
12,16,17;63:7;64:10,
16,24;65:6,10,12,15,
16;66:2,5,6,9,14,18;
67:4,15,22,24;68:1,3,
6,8,11,17,19;69:7,12,
18,20,23;70:4,5,9,20;
71:1,3,21,25;72:5,14,
25,25;73:7,11,13,25;
74:2,9,13,19,21,23;
75:5,22,23,25;76:8,
17,19;77:4,15,18,22,
24;78:4,8,13,16,24;
79:21;80:2,5,9,14;
81:11,13,21;82:8,9,
11,22;83:3,8,10,12,
17,21,22,24;84:1,2,3,
13,17,22;85:11,21;
86:2,4,22;87:1,4,9,
22,24;88:13,19,24;
89:7,9,14,19,21;90:5,
9;91:14;92:2,12,21;
93:1,4,7,13,18,20,22;
94:2,5,10,15,17,19;
95:17;96:5,8;97:2,
17;98:10;99:11,12;
100:17,23;101:7,10,
17,23,25;102:6,17,
19;103:5,20;104:17;
106:20;107:3,5,7,10,
20,22;108:1,3,9;
109:14,18,21,24;
110:1,5,23;111:3,10,
19,22;112:9,25;
113:9,18,20;114:1,4,
9,11,19,22;115:5;
117:11;120:17,18;
123:22;124:2,18;
125:2,19;126:1,16,
18,23;127:4,18,20;
128:9,19,21,24;
129:3,10,13,15,17;
130:8,11,19,22,24;
131:8;132:7,10,15,
17;133:10,13,14,16;
134:1,7,20;135:1,3,7,
16;136:1,4,10,17,20,
25;137:11,18,20;
138:13,22;139:2,6,
14,16,16;140:3,20,
25;141:3,8,16,22,24;
142:1,6,9,11,15,18,
20,24;143:6,9,15,18;
144:15
**courtroom (1)**
20:22
**courts (6)**
27:13;44:17,24;
66:25;107:25;120:23
**Court's (14)**
22:6,11;27:7;

29:24;38:13;65:25;
68:19;72:17;74:12;
75:15;80:8;87:13;
104:11;114:15
**covered (1)**
90:10
**crafted (1)**
39:1
**create (9)**
74:12;78:2,22;
84:7;97:9;107:17;
109:12;120:13;138:8
**created (7)**
62:13;70:22;88:25;
104:20;118:13,21;
139:22
**creates (3)**
71:21;77:14;
112:12
**creating (3)**
51:19;73:8;75:13
**Credit (12)**
2:8,10,10;10:3;
13:13;31:11,21,22,
23,24;32:2,4
**creditor (2)**
23:4;46:20
**Creditors (15)**
4:3;27:10;46:6;
56:22;57:12;71:6,9;
72:7,10,12,22;84:8,9,
10;87:11
**Creditors' (7)**
6:3,15;7:2;13:19;
21:10;47:2;59:23
**critical (1)**
134:18
**criticism (1)**
24:12
**criticisms (1)**
27:18
**criticized (1)**
24:4
**cross-examination (1)**
21:1
**Crossing (1)**
35:16
**culminating (1)**
63:12
**Currency (1)**
29:1
**current (2)**
62:21;96:2
**currently (2)**
112:1,3
**custom (8)**
81:3;93:10;127:24;
130:4;133:21;
134:23;135:14,17
**customarily (1)**
135:10
**customary (1)**
27:8

**customized (1)**
39:4
**cut (2)**
51:9;55:19
**CUTLER (1)**
6:14
**CV (1)**
45:12

# D

**DANIEL (1)**
8:16
**dare (1)**
80:22
**date (37)**
18:9,11;29:22;
39:12,13,24;40:15;
41:24;42:19;54:23;
55:5,5;83:2;85:6;
90:2;91:6,8,19,24;
94:8;100:3,3,6,14;
101:6,13,15;114:25;
117:14,20;118:1;
122:17,25;134:15;
139:4,12;140:13
**dates (2)**
63:11;100:1
**DAVID (3)**
8:14;9:18;57:14
**Davis (1)**
3:12
**day (15)**
12:18;14:18;16:17,
23;56:4;70:2;75:2,3,
9;81:17;84:12,21;
85:10;120:4;122:16
**days (10)**
14:10,11;54:22;
56:1;70:3;71:8;75:9;
84:14,17;88:6
**DC (1)**
10:5
**de (1)**
45:12
**deadline (1)**
14:14
**deal (15)**
12:13;20:16;23:18;
37:25;39:1;40:7;
55:23;62:18;86:12;
92:12;100:11;
128:13;141:3,9;
144:15
**dealing (3)**
33:8;132:2;143:20
**deals (7)**
54:3;70:10,11;
90:14;99:14;102:21;
134:13
**dealt (6)**
49:6;94:22;97:17;
101:19;114:2;134:18

**death (1)**
112:22
**debt (10)**
72:21;75:10;96:10;
118:6;119:6;121:13,
15,16,17;137:6
**debtor (48)**
20:5;45:19,20,23;
46:6,7,11,13,16;
55:13;56:5;59:20;
64:20;69:15,24,24;
70:1,13;71:2,4,6;
72:6,9,22;73:15;77:2,
2,7,12;87:18;92:19;
95:2,20;99:15;
102:10,23;103:3;
110:1,1,7,13;113:25;
128:10,11,13,22;
129:25;140:17
**debtor-issued (1)**
31:25
**Debtors (83)**
2:4;11:6;13:20,22,
25;14:4,8,11,13;15:7,
15;16:6,10,24;17:4,8,
15;19:5;24:21,25;
26:7,14,17;27:20;
28:3;29:7,13;31:19;
32:5,17;34:14,22;
35:6;36:16,21;38:10;
39:21;41:21,23,25;
42:9;45:15;46:2,3,5,
5;47:2;49:17,23;
50:23;54:1;56:9;
58:22,25;59:7,14;
61:20;62:22;63:2,15,
18,19;70:15;71:12,
18;91:3,17;98:17;
99:1;100:18;105:23;
106:1,2;107:14;
108:24;109:6;
117:15;136:13;
137:8,14,23;138:8;
143:2
**Debtors' (33)**
2:2,7,12;3:3,10;
13:3;18:23;19:3;
23:15;26:5;28:14;
29:14;31:10,20;35:7,
13;39:13;41:15;42:8,
11;45:25;52:23;
58:14;67:19;89:22;
90:3;91:7;96:9;
110:17;111:23;
128:7,25;137:2
**debtor's (7)**
12:5;53:22;70:1;
71:5;77:20;88:6;
103:8
**December (1)**
91:2
**decide (8)**
69:2;81:6;82:8;

83:14;86:5;94:11;
108:22;111:14
**decided (5)**
68:25;101:21;
115:4,14,15
**decides (1)**
82:8
**decision (27)**
27:7;29:22;61:6,8;
68:24;72:14;73:6;
78:18,19;79:15,19,
19;81:7,10,18,25;
94:25;95:1;97:11,21;
98:8;99:9;111:13;
121:2;129:22;
138:14;143:24
**decisions (2)**
85:3;95:11
**declaration (5)**
20:25;28:7;53:2;
113:3;131:4
**declaratory (4)**
91:25;103:2;114:5;
127:7
**decree (1)**
23:6
**deemed (7)**
45:20,22;53:12;
56:15;82:7;95:14;
97:15
**deeply (1)**
77:7
**default (3)**
20:10;105:12;
106:16
**Defendant (1)**
4:5
**deferred (1)**
95:22
**deficient (1)**
96:23
**define (1)**
66:11
**defined (4)**
51:2;68:18;70:19;
117:13
**definition (6)**
58:16;83:10;105:9;
106:11,18;112:10
**definitively (1)**
126:6
**degree (1)**
111:22
**Delaware (1)**
40:5
**delever (3)**
70:16;87:19;
140:17
**deleveraging (1)**
63:16
**demanded (1)**
47:2
**demonstrated (1)**

86:10
**denied (2)**
29:25;144:1
**DENMAN (1)**
7:17
**denominated (2)**
48:6;76:12
**deny (1)**
127:24
**departs (1)**
120:18
**departure (1)**
120:20
**departures (1)**
124:19
**depends (1)**
109:15
**deposited (1)**
13:25
**deposition (1)**
49:7
**derive (4)**
69:20,21;78:4,6
**described (5)**
79:3;102:14;105:4;
117:17;132:13
**design (1)**
116:21
**designed (2)**
37:8;117:4
**despite (1)**
136:14
**detailed (1)**
133:14
**details (1)**
51:20
**determination (8)**
29:15;45:18;49:21;
76:4;78:16;80:2,5,8
**determinations (1)**
49:20
**determinative (1)**
129:18
**determine (9)**
27:2;49:5;50:5;
65:11;72:25;75:19;
76:1;77:11;133:15
**determined (5)**
16:11;27:23;49:4;
97:14;116:17
**determining (3)**
27:13;78:10;118:8
**developed (1)**
84:2
**development (1)**
125:16
**dialog (1)**
40:17
**dictate (1)**
75:22
**dictated (3)**
117:2,3,17
**difference (6)**

65:22;71:11;72:16;
79:10;115:25;131:21
**different (13)**
65:18;69:5;77:4;
85:20;89:17;101:24;
103:9;115:15;
121:11;122:2;
133:12;140:14;141:6
**difficult (2)**
40:7;47:14
**digest (1)**
144:15
**diluted (1)**
71:10
**dime (1)**
131:15
**DIP (2)**
101:11;105:25
**direct (2)**
40:9;62:17
**direction (2)**
63:14;75:24
**directive (1)**
48:20
**Dirks (1)**
46:13
**disagree (3)**
59:11;66:21;87:24
**disagreed (1)**
66:20
**disallow (2)**
64:22;66:4
**disallowed (7)**
55:23;58:12;115:2;
117:20;119:18;
121:20;125:22
**disallowing (2)**
120:13;125:24
**disappear (1)**
109:7
**disbursed (1)**
28:2
**disc (2)**
30:13;44:6
**disclose (1)**
41:3
**disclosed (3)**
18:12;28:13;39:22
**disclosing (1)**
42:13
**disclosure (4)**
39:7,10,13;41:2
**discount (18)**
63:1;64:2,7,8,8;
65:1;69:15;70:1,12,
14;72:4;79:10;82:4,
24;115:1;116:6;
136:22;137:1
**discounted (1)**
136:16
**discovery (7)**
32:22;34:25;83:5;
128:20;130:7;132:2;

134:23
**discuss (5)**
30:5;31:4;32:19;
59:14;94:25
**discussed (6)**
37:3;51:16;70:19;
100:25;113:6;118:5
**discussing (3)**
79:1;100:4;137:22
**discussion (5)**
23:22;31:6;40:13;
97:3;113:2
**discussions (8)**
33:7,12;34:14;
37:5,11,12;40:10;
50:24
**disincentive (1)**
120:13
**disincentivize (1)**
124:15
**disinclined (3)**
84:8,9,10
**Dismiss (30)**
4:5;50:4,5;52:22;
53:6,12,13,14;57:1,
11,17,18;72:3;80:19;
83:19;93:5,15;97:20;
99:23;108:12;
111:15;113:20;
114:6;115:4;118:12;
130:23;143:3,21;
144:1,11
**dismissed (3)**
99:3;103:18;
113:16
**dispose (1)**
27:19
**disposition (1)**
120:24
**dispositive (1)**
88:1
**dispute (4)**
79:21;82:3,5;
123:17
**disputed (6)**
62:20;115:20,22,
22,23;117:5
**disputes (3)**
13:8;42:21;79:14
**distinction (1)**
65:25
**distinguish (1)**
55:25
**distressed (4)**
64:13;71:13;77:7;
79:7
**distributed (2)**
15:3;25:7
**distribution (1)**
64:21
**distributions (1)**
17:9
**District (2)**

32:6;45:13
**divide (1)**
114:16
**divine (1)**
138:2
**DOA (1)**
2:14;35:8
**Doc# (8)**
2:2,7,12,16,19;3:2,
9;4:4
**docket (8)**
26:9,13,14;29:18;
31:12;44:15;45:11;
48:8
**document (1)**
49:6
**documents (5)**
58:3;82:17;101:18;
107:1;138:19
**documents4226 (1)**
2:5
**dodged (1)**
138:6
**dollar (17)**
13:18,18;25:1;
77:6;84:15,18,21,23;
85:14;86:22,25;
89:14,15;116:13,16;
134:1;138:22
**dollars (38)**
12:18;14:1,2,7,24;
15:1;16:22,23;17:6,
17,19;20:13;21:25;
24:11,25;25:4,6,17;
34:21;35:17;62:23;
63:4,15;69:25;84:14,
14;85:15;86:23;91:9;
114:25;122:10,12,17;
123:8;124:4;134:3;
139:5;142:21
**domain (1)**
39:17
**done (6)**
16:5,20;17:1;
119:1;129:6;135:10
**DONNA (1)**
9:8
**DORR (1)**
6:14
**doubt (6)**
86:23;89:19,21;
96:12;123:16;126:9
**DOUGLAS (1)**
6:10
**down (9)**
58:9;71:14;99:24;
104:24;119:3;140:5,
11;142:1,17
**draft (1)**
34:1
**drive (2)**
64:22;80:13
**driving (1)**

12-12020-mg  Doc 4397  Filed 07/29/13  Entered 07/29/13 15:51:08  Main Document
Pg 155 of 173

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg

July 26, 2013

84:1
**drop (1)**
102:8
**due (3)**
15:1;55:24;93:16
**duration (1)**
106:10
**Durbin (1)**
35:16
**during (8)**
14:18;39:5;42:10,
14;43:3;49:7;57:24;
59:22
**Dutch (2)**
116:10,12
**duties (1)**
46:12
**duty (3)**
43:21;45:20,21
**dying (1)**
104:11

**E**

**earlier (8)**
28:23;63:11;73:23;
82:25;90:21;128:6,
10;129:20
**early (3)**
14:18;34:23;124:7
**easily (1)**
106:23
**Easy (3)**
67:22,24;106:20
**ECF (10)**
26:9,11,15,16;
35:25;44:14,16;48:8;
54:21;55:18
**ECKSTEIN (15)**
6:9;21:6,8,9,10;
22:24;33:5,6;34:15;
40:1,2,2;41:18,24;
44:10
**Eckstein's (1)**
38:11
**economic (12)**
46:8;65:19,22,25;
67:5,20;76:22;78:10;
95:21;118:19;
140:14;141:8
**economics (3)**
95:5;115:24;116:2
**educated (1)**
74:3
**effect (4)**
30:1;45:6;70:2;
71:10
**effective (4)**
18:9,11,18,22
**effectively (1)**
19:14
**effort (4)**
34:7;47:11,13;

106:5
**efforts (5)**
33:10,19;38:11;
47:18;95:2
**EHRLICH (1)**
8:17
**eight (2)**
54:3,5
**eighty (1)**
143:13
**either (10)**
34:3;54:12;60:9;
63:14;65:20;77:3;
81:18;110:16;
123:10;137:1
**elaborated (1)**
67:1
**elected (1)**
28:5
**eleven (1)**
34:20
**Elevenhome (1)**
9:3
**eliminate (1)**
40:23
**eliminates (1)**
21:18
**ELLIS (1)**
8:1
**else (14)**
21:7;22:24;25:22;
26:4;34:10;39:25;
41:19;42:24;52:11;
88:14;102:1;117:23;
126:15;133:4
**else's (1)**
131:10
**e-mail (1)**
50:13
**e-mails (3)**
48:20;136:3;
138:19
**empirical (1)**
125:15
**employee (2)**
131:14,17
**enable (1)**
111:13
**encompassed (1)**
52:25
**encourage (1)**
33:13
**encouraging (1)**
46:20
**encumbered (1)**
131:10
**end (7)**
14:23;15:22;16:16;
41:9;105:1;110:24;
127:12
**endeavor (2)**
33:20,25
**Endico (3)**

102:4,9,15
**ends (2)**
106:17;109:10
**enforce (1)**
120:25
**enforcement (2)**
29:17;37:19
**engage (10)**
34:25;41:6;46:6;
75:16;87:12,16,21;
89:24;100:19;136:21
**engaged (3)**
34:13;42:6;87:7
**engagement (4)**
16:25;17:2;18:4;
31:2
**engaging (1)**
63:16
**enhanced (6)**
73:14,19;80:17;
81:7;89:9;110:12
**enhancement (1)**
63:7
**enjoyed (1)**
120:8
**enormous (1)**
29:2
**enough (8)**
19:15;78:19;97:20;
98:2,8;116:22;
141:13,20
**ensure (1)**
19:9
**Enter (7)**
2:4;13:23;26:8;
42:18;44:10;45:4;
88:3
**entered (17)**
12:11;13:2;24:14;
29:9;30:1,11,16;
37:9;38:25;41:14;
45:7,10;48:6;59:21;
96:17;105:14;106:5
**entering (3)**
16:24;59:18;98:17
**enters (1)**
42:22
**entirely (1)**
111:5
**entities (4)**
32:15;95:20;99:16;
102:12
**entitled (3)**
61:21;123:1;127:6
**entity (3)**
19:24;32:3;37:19
**entry (3)**
12:6;22:11;46:25
**enumerable (1)**
97:8
**environment (1)**
85:7
**equality (1)**

64:21
**equally (2)**
65:4;71:5
**equation (1)**
89:11
**equitable (1)**
27:3
**equity (2)**
101:13;118:7
**ERIC (1)**
9:17
**error (1)**
16:13
**errors (1)**
15:18
**escalation (1)**
12:15
**escape (1)**
29:7
**eScribers (1)**
4:21
**escrow (3)**
14:1,13,19
**espousing (1)**
88:23
**ESQ (24)**
6:7,8,9,10,11,19;
7:7,8,16,17,25;8:6,
14,15,16,17,25;9:8,
17,18;10:7,8,17,23
**essentially (4)**
25:7,9;85:16;127:7
**establish (4)**
96:12;116:6;128:4;
133:17
**established (6)**
15:4,6;16:15;
28:23;104:9;110:13
**establishes (2)**
16:2;136:12
**Estate (17)**
2:14;12:18;13:18;
16:22;19:19;21:18;
22:1,16,22;27:4;35:8,
12,19;40:10;96:22;
103:17;111:7
**estates (7)**
12:20;17:20,23;
18:1;35:19;101:22;
103:8
**estimated (2)**
20:5;25:5
**estoppel (1)**
20:19
**et (3)**
4:3,3;128:17
**ethical (2)**
43:10,17
**eve (1)**
129:8
**even (17)**
37:20;43:19;58:18;
66:11;71:15;82:12;

86:9;95:23;96:13;
98:25;125:9;130:5;
133:6,13;136:1;
137:8;139:10
**event (7)**
22:8;32:24;59:13;
80:12;86:17;100:25;
143:22
**eventual (2)**
69:24;77:2
**everybody (3)**
13:14;34:7;85:13
**Everybody's (1)**
33:9
**everyone (5)**
15:10;42:2;89:23;
125:20;139:13
**everyone's (1)**
42:12
**evidence (30)**
67:7,8,10;81:1,4;
82:10,12;86:10;93:9;
96:7;110:6,9,12;
115:6,11;116:13;
123:15;126:1,12;
127:23,24,24,25;
128:3,25;129:23,23;
130:6;133:16;138:19
**evidenced (2)**
55:9;104:21
**evidentiary (6)**
81:19;83:18;
108:11;115:18;
132:3;143:24
**exact (4)**
99:19,23;101:19;
117:16
**exactly (5)**
72:13;86:16,16;
124:3;138:12
**examiner (3)**
51:7,9,14
**Examiner's (5)**
2:22;47:22;49:19;
53:4,7
**example (15)**
36:18;67:6;69:23;
70:5,7,25;76:16;
78:7;86:11;108:10,
20;109:23;118:4;
131:13;132:17
**exceed (1)**
35:14
**exceedingly (1)**
84:6
**except (3)**
19:24;51:21;
130:25
**exception (4)**
69:14;118:13;
127:12,12
**excerpted (5)**
79:18;84:4;102:16;

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 156 of 173
Case No. 12-12020-mg,  Adv. Proc. No. 13-01277-mg                                    July 26, 2013

104:6,15
**excess (3)**
  91:9;137:10;
  138:24
**exchange (104)**
  35:16;62:10,13;
  63:2,3,5,13,14,17;
  64:7,8;65:5;66:8,12,
  18;68:25;69:4;70:8,
  10,16,23;72:18,21;
  73:5,7,24;74:2,11;
  76:19,25;77:10;78:2,
  22;79:4,8,23;80:21;
  82:5;84:6,11,12;85:8,
  10,19;86:7,16;87:7,
  19;88:2,3,24;89:6,25;
  90:2;115:24;116:9,
  14,19,21,23;117:3,5;
  118:6,6,14,20;119:2,
  8,14,18,19,20,21;
  120:2,7;121:9,10,11,
  12,12;122:4,6,9,11,
  14;123:23,25;124:18,
  22;125:3,4,17,20,21;
  126:12;139:11,20;
  140:7,8,13,16,21;
  141:7;142:8
**exchanged (14)**
  42:10,13;62:22;
  67:21;71:13;75:6;
  84:13;85:13;108:25;
  122:14;131:17;
  139:9,23;141:17
**exchanges (6)**
  42:15;70:12;73:9;
  76:12;77:13,15
**excluded (50)**
  58:16,18,19;92:22,
  23;94:9,9;101:16;
  103:9,16,24;104:12,
  13;105:5,6,7,9,13,17,
  22,24;106:7,10,11,
  13;107:11,13,18;
  108:4;112:1,5,10,13,
  14,14,15,17,18,22,24;
  113:4,8,10,11,14;
  127:5,7,8,16;131:24
**excluded-assets (1)**
  128:1
**excluding (2)**
  112:1;122:18
**exculpate (2)**
  37:20,22
**excusable (1)**
  55:8,11
**excuse (3)**
  31:23;80:4;112:7
**excused (1)**
  57:6
**executed (1)**
  14:8
**execution (1)**
  131:25

**exert (1)**
  46:3
**Exhibit (1)**
  116:8
**exhibits (1)**
  115:13
**exist (3)**
  123:14;133:6,8
**existed (5)**
  58:15;83:2;91:8;
  92:20;94:7
**existence (4)**
  101:5;103:12,13;
  112:4
**existing (6)**
  48:8;50:4;52:16;
  53:12,13;104:19
**exists (1)**
  62:8
**expand (1)**
  70:22
**expect (3)**
  32:21;125:17;
  143:21
**expectation (3)**
  40:18;139:20;
  143:19
**expectations (1)**
  125:23
**expedited (1)**
  34:25
**expediting (1)**
  26:24
**expend (1)**
  24:25
**expended (1)**
  28:20
**expense (2)**
  12:14;17:25
**expenses (2)**
  12:19;114:4
**expert (5)**
  49:7;126:4,10;
  130:4;133:22
**expires (1)**
  14:16
**explain (1)**
  102:7
**explicit (2)**
  127:12;137:4
**expressed (3)**
  95:12;97:14;98:11
**expressly (3)**
  119:13;121:7,8
**extend (2)**
  14:14;18:9
**extending (1)**
  29:3
**extension (3)**
  85:6;119:9;143:3
**extensively (1)**
  22:19
**extent (11)**

14:17;27:16;33:20;
  53:13;61:17,22;76:2;
  106:13;107:16;
  115:18;132:17
**extinguished (1)**
  90:25
**extraordinarily (1)**
  41:23
**extraordinary (2)**
  28:20;42:19
**extremely (5)**
  22:2;88:1,7;
  121:16;124:25
**extrinsic (2)**
  96:7;137:24

## F

**F2d (1)**
  46:17
**F3d (3)**
  26:25;27:11;45:2
**face (28)**
  61:22,25;63:4,21;
  64:11,15,17;69:13,
  16;71:16;72:15,16,
  23;73:17;74:6;76:5,
  12,20,24;84:23;
  85:12,14;87:2;88:24;
  97:25;99:9;101:22;
  138:21
**face- (1)**
  40:12
**facet (1)**
  78:3
**face-value (3)**
  66:12,17;68:24
**facilitate (1)**
  40:9
**facilitates (1)**
  21:21
**facilities (11)**
  90:25;105:8,16,20,
  23;106:17;107:18,
  19;110:21;111:6;
  112:4
**facility (19)**
  91:1,7;92:20;99:7;
  101:5;106:17,22;
  108:24,25;109:5,10;
  112:2;133:5,24;
  136:12,15,15,23;
  137:6
**fact (29)**
  16:11;33:6;37:10,
  17;39:4;40:11;41:10;
  43:4,7;59:7;60:4;
  64:23;65:8,10;78:6;
  91:23;95:8;97:5;
  98:1;102:14;110:20;
  119:1;121:3;123:15;
  129:12;132:5;133:5;
  139:11;144:10

**factor (1)**
  141:11
**factoring (1)**
  102:10
**factors (2)**
  27:12,14
**facts (18)**
  46:10;58:3;61:9;
  62:19,25;76:23;
  77:16;81:3;83:15;
  85:20;90:16;96:16;
  102:18;115:19,21;
  136:4,8;139:15
**factual (15)**
  13:8;65:23;73:3;
  81:7,25;82:2;95:16;
  100:24;111:12;
  125:16;130:3;133:2,
  4,4,14
**failed (1)**
  32:4
**fails (1)**
  43:7
**fair (11)**
  21:14;27:3;72:16;
  75:18;76:12,20;
  85:23;86:12;88:3;
  89:5,24
**fairly (2)**
  81:16;143:9
**fair-market (4)**
  69:4;125:20,21;
  136:16
**fair-market-value (3)**
  62:13;70:10;
  121:10
**fairness (1)**
  72:6
**fair-value (4)**
  65:5;73:7,9;74:2
**fall (2)**
  73:17;129:6
**familiar (1)**
  26:20
**family (1)**
  55:4
**far (10)**
  13:9,10;17:11;
  18:21;39:5;58:23;
  67:18;91:21;101:24;
  121:20
**Fargo (7)**
  9:12;57:18;63:19;
  133:13;135:23,23;
  136:2
**fashion (1)**
  34:25
**favor (2)**
  46:20;79:13
**favorable (1)**
  22:22
**favored (1)**
  26:22

**favoring (1)**
  118:24
**featured (1)**
  27:19
**Fed (14)**
  12:22;13:2,23;
  14:12,14;15:4,11;
  16:2,4,5,16;17:3;
  18:13;25:3
**Federal (13)**
  2:10,10;12:7;22:5;
  24:12,18;27:23;
  28:25;31:22,23;32:6,
  14;37:1
**fee (1)**
  18:15
**feel (3)**
  21:17;59:15;60:2
**feeling (1)**
  82:17
**fees (2)**
  12:19;114:4
**FEINSTEIN (1)**
  7:8
**FELD (2)**
  8:9;57:15
**fell (1)**
  98:25
**felt (2)**
  22:2;76:2
**Ferry (1)**
  27:7
**few (3)**
  39:17;96:8;119:10
**fewer (1)**
  56:1
**FGIC (6)**
  48:4,6,17,19,22;
  49:7
**fiduciaries (1)**
  40:11
**fiduciary (1)**
  46:12
**Fifth (9)**
  3:3;54:4,12;55:17;
  56:16;65:3;78:19;
  79:25;87:10
**fifty (2)**
  105:15;139:21
**fifty- (1)**
  20:7
**fifty-two (1)**
  116:13
**figure (5)**
  13:15,20;14:25;
  64:1;134:24
**file (9)**
  15:20;21:23;22:13;
  27:22;33:21;49:18,
  25;55:6,6
**Filed (32)**
  2:8;11:12;13:6;
  20:5;23:24;24:20;

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 157 of 173
Case No. 12-12020-mg,    Adv. Proc. No. 13-01277-mg    July 26, 2013

26:2,10,11,12,14,15;
29:13,20;31:11,20;
32:4,12;33:22;44:16;
53:6;54:2,4,5,11,20;
57:18;82:25;91:13;
105:19;135:9;141:24
**files (8)**
15:17,17,19;16:1;
28:4;70:2;71:8;72:20
**filing (5)**
26:13;55:9;58:8;
128:6;129:9
**filings (1)**
58:17
**final (3)**
13:10;31:3,6
**finalized (1)**
18:4
**finally (3)**
40:9;132:4;139:7
**Financial (3)**
8:2;104:23;137:5
**financing (21)**
92:10;94:2,3,12;
96:21;97:6,19;98:2;
100:19;105:12;
109:1,9;133:18,21,
25;135:9,20;136:6,
25;138:16;144:8
**find (7)**
68:10;78:8;88:1;
94:2;133:3;141:18;
144:5
**finding (2)**
45:3;72:18
**findings (2)**
51:12;133:4
**finds (1)**
16:4
**fine (7)**
18:24;30:7;49:1;
53:18;57:2,25;
107:18
**finish (1)**
87:8
**finished (1)**
20:22
**firm (1)**
22:19
**First (22)**
19:7;23:4;58:10;
59:19;60:18;61:3;
62:18;64:18;66:23;
79:20;83:14;85:5;
90:2;94:11;99:10;
115:23;118:22;
119:15;123:20;
135:12;137:23;139:9
**firsthand (1)**
40:6
**fit (2)**
51:21;100:11
**five (4)**

15:18;140:4,6;
142:1
**flesh (1)**
61:5
**flip (2)**
79:17;88:21
**float (1)**
108:15
**Floor (4)**
7:4;9:5,14;10:14
**Florida (1)**
35:12
**flow (2)**
95:23;137:10
**focus (8)**
84:23,24,25;90:13;
104:17;135:19,21,22
**focused (6)**
61:15;80:21,24;
81:6;105:6;129:24
**focusing (3)**
81:22;91:14;144:9
**Foerster (6)**
11:5;31:18;35:6;
41:21;50:23;54:1
**folks (2)**
122:4;123:22
**follow (2)**
66:19;143:12
**following (4)**
49:24;119:21;
128:2;136:23
**follows (3)**
90:17;95:19;
109:19
**force (2)**
53:9;84:1
**forced (1)**
70:20
**forecasted (1)**
82:13
**foreclosure (22)**
12:14,16,17,25;
14:3,9,10,21;16:19,
21;20:6;21:15,19;
24:8;25:1,2;28:19,21,
25;29:16,18;30:21
**foregoing (4)**
29:11;105:3,4;
127:13
**forfeiture (1)**
109:12,14,15
**forgoing (1)**
47:4
**form (3)**
38:24;116:3,3
**former (2)**
35:13;92:9
**forms (1)**
97:5
**formula (2)**
76:1;96:3
**Forth (7)**

2:22;27:7,9,12;
38:13;47:22;120:14
**forthright (1)**
41:4
**fortunately (1)**
21:16
**forty (2)**
79:9;143:7
**forty-nine (1)**
116:16
**forty-whatever (1)**
79:7
**forward (7)**
3:6;13:16;33:18;
42:22;55:14;81:1;
126:2
**foster (1)**
46:19
**found (12)**
62:10;70:5;84:15,
20;87:9;95:18;99:22;
103:20;118:22;
119:7;120:12;133:12
**founded (1)**
78:21
**four (3)**
54:22;58:9;137:25
**Fourth (8)**
3:10;53:22;54:3,
12,17,24;56:16;96:6
**Fox (1)**
3:14
**frame (1)**
12:11
**framework (1)**
27:6
**FRANK (3)**
9:21;23:3;26:12
**FRANKEL (1)**
6:2
**frankly (3)**
17:23;92:12;
130:16
**FRB (11)**
12:11;20:12;26:20;
27:25;28:1,11,12,18;
29:9,16,17
**FRCP (1)**
4:6
**free (3)**
94:11;128:17;
131:6
**front (3)**
20:3;48:19;69:6
**fruitful (1)**
42:3
**full (14)**
34:7;63:20;71:10,
19;80:17;81:7,19,25;
89:1;100:24;108:11;
111:12;120:9;139:12
**full-blow (1)**
143:20

**fully (2)**
22:13;123:6
**function (3)**
106:9;120:23;
133:2
**functioning (2)**
97:10;107:16
**fund (4)**
15:2;16:14;17:19;
25:6
**fundamentally (1)**
121:13
**Funding (2)**
32:1;91:4
**funds (3)**
14:19;28:2;96:17
**funny (1)**
99:19
**furniture (6)**
131:15,16,17,17,
19,20
**further (8)**
26:23;77:11,12;
101:2;103:6;104:2,
24;109:22
**furtherance (1)**
46:8
**future (2)**
34:3;44:10
**Fwd (1)**
3:11

## G

**gave (8)**
45:3,4;63:4;71:14;
76:18;115:24;
121:23;143:16
**Gee (2)**
60:12;73:11
**General (5)**
10:21;29:16;38:1;
39:18;48:14
**generally (3)**
15:13;40:20,22
**GERARD (4)**
7:25;26:2,11;36:9
**gets (5)**
59:22;69:16,25;
76:15;77:7
**given (9)**
13:7;18:12;35:19;
36:24;46:10;104:18;
109:7;116:10;143:7
**giving (3)**
42:16;81:22;
112:17
**glance (1)**
118:22
**global (4)**
21:13,16;22:2,9
**GMAC (3)**
10:20;29:15;91:4

**goals (1)**
37:15
**goes (9)**
14:13;17:19;39:5;
43:20;76:10,11;81:1;
104:24;126:2
**GOLDEN (1)**
8:16
**GOLDFARB (6)**
10:8;34:12,13,18,
20;35:3
**Goldman (3)**
20:10;90:21;
100:21
**Goldman's (1)**
21:2
**Good (24)**
11:4;21:9;23:3;
31:17;34:12;35:5;
36:7,8;37:25;41:20;
50:22;52:20;53:25;
57:14;59:20;69:2;
73:16;74:21,25;
114:13;116:18;
126:20;139:24;
144:16
**GOTTLIEB (1)**
8:20
**governed (1)**
40:24
**governing (1)**
95:10
**government (1)**
22:5
**governmental (1)**
37:19
**Grand (1)**
10:13
**Granite (6)**
94:25;96:11,16;
97:3;98:20;99:7
**grant (1)**
99:22;106:13
**granted (5)**
36:1;44:17,25;
47:4;121:17
**granting (2)**
82:3;92:8
**grants (1)**
72:18
**great (2)**
12:13;17:22
**greater (2)**
41:5;95:6
**greatest (2)**
15:21;132:7
**greatly (1)**
35:14
**Green (1)**
3:5
**Greenwich (1)**
6:16
**Greg (1)**

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 158 of 173
Case No. 12-12020-mg,  Adv. Proc. No. 13-01277-mg                                July 26, 2013

52:20
**GREGORY (2)**
6:7;114:13
**ground (1)**
62:6
**grounds (4)**
23:5;66:13;69:1;
112:16
**Group (10)**
2:16,19;7:12,21;
28:16;36:4,10;44:13;
45:24;47:19
**guarantees (2)**
121:22,23
**guarantor (1)**
91:5
**guess (7)**
18:19;48:1;94:11;
135:11,12,14;141:1
**guidance (1)**
102:17
**guidelines (1)**
15:5
**GUMP (2)**
8:9;57:15

**H**

**HADLEY (2)**
7:20;36:9
**haircut (1)**
89:4
**HALE (2)**
6:14;22:19
**half (1)**
140:9
**hallmark (1)**
100:15
**HALPERIN (1)**
9:2
**HAMILTON (1)**
8:20
**HAMZEHPOUR (1)**
10:23
**hand (2)**
47:6;57:21
**handed (2)**
96:15;119:15
**handle (1)**
114:17
**handling (1)**
114:16
**handout (4)**
57:21;62:18;79:17;
114:20
**happen (3)**
100:5;124:7;
131:25
**happened (4)**
13:3;90:1;101:15;
128:5
**happens (4)**
89:25;121:8;

125:20;135:13
**happy (3)**
12:8;38:15;88:7
**Harbor (1)**
92:5
**Harbors (2)**
92:17;98:25
**hard (5)**
51:3,22;81:22;
88:1;124:5
**hardly (3)**
117:24;119:16;
124:14
**harm (1)**
16:13
**harmed (1)**
24:5
**Harris (2)**
3:12,13
**HARRISON (1)**
7:17
**Hartford (1)**
120:22
**Hathaway (1)**
10:12
**HAUER (2)**
8:9;57:15
**head (6)**
82:19;131:13;
134:8;136:10;
137:13,17
**healthier (1)**
120:10
**hear (4)**
20:21;51:24;56:25;
57:10
**heard (15)**
12:10,13;21:8;
23:2;26:2,4;29:21;
34:11;35:24;39:25;
41:19;42:24;54:13;
125:5;141:13
**Hearing (17)**
2:7;3:4;4:4;13:14;
24:2;25:10;28:13;
31:3,7;32:22;34:3,4,
4;48:5,10,18;49:2
**hearings (1)**
28:23
**hearsay (1)**
51:8
**held (4)**
79:3,25;118:19;
119:2
**help (3)**
68:5,11;119:15
**helpful (1)**
41:15
**helping (2)**
22:21;140:17
**helps (1)**
102:8
**hereafter (3)**

104:19;107:9;
127:11
**here's (1)**
140:3
**hereunder (1)**
99:17
**hiatus (1)**
12:17
**high (2)**
124:9,10
**highest (1)**
16:1
**highlight (3)**
11:9;37:17;133:20
**highlighted (1)**
104:16
**high-profile (1)**
36:23
**himself (1)**
133:12
**history (11)**
12:21;68:21;69:8,
22,24;70:6,9,20,21;
71:1;117:21
**hit (2)**
26:13;82:18
**Hoc (10)**
2:16,19;7:12,21;
19:7,8;36:4,9;44:13;
47:19
**Hold (2)**
11:14;54:24
**holder (2)**
71:1;117:10
**holders (10)**
45:25;70:3;71:3,
16;79:23;116:10;
117:8;121:5;122:10;
141:2
**holder's (1)**
119:3
**holding (2)**
119:24;121:7
**holdout (1)**
124:6
**holdouts (8)**
72:19;73:2,4;
119:23,23;120:7;
121:19;122:8
**Home (7)**
95:1;96:12,25;
98:21;99:8;138:17,
18
**honest (1)**
137:16
**Honor (219)**
11:4,7;12:1,13,21,
22;13:24;14:6,21;
16:8;17:12,21;18:6,7,
23;19:2;20:9,17,18,
24;21:9,11;23:3,14,
23;24:15;25:19,24;
30:3,8,19;31:9,16,17;

32:19,23;33:6,24;
34:9,12;35:3,5,10,20,
23;36:2,3,8,11,18,24;
37:2,6,16,25;38:5,8,
12;39:2,14;40:2,14;
41:20;42:21;43:11,
16,22,24;44:5,9;47:5,
8,16,17;48:16;49:11;
50:20,22;51:8,10,20;
52:20;53:18,20,25;
54:2,10,18;55:15,19;
56:2,9,18,20;57:2,14,
17,21;58:5,8,20;59:6,
12,24;60:2,10,19;
61:5,18;62:4,14;
64:6;66:3;67:17;
68:12;69:9,11;70:19;
72:4,14;73:22;74:8,
10;75:7;76:24;78:20;
79:17;80:4;81:9;
82:2,7;83:5,16;
85:17;86:3;87:3;
88:8,20;89:10;90:8,
14;91:17;93:16;
94:16,24;96:15;
97:21,24;98:15;99:5,
13,19;100:20;101:5;
103:15;104:16;
105:25;106:7,17,25;
107:13;108:16;
111:2,4,21;112:7,8,
20;113:6;114:7,8,13,
15,23;115:3,9,22;
116:7,18;117:17;
118:11;119:15;
120:1,16,21;122:3;
123:3,12,14,20;
124:16;125:12,14;
126:4,17,21;128:4;
130:10,17;132:4;
133:2;134:3,21;
135:12,14;136:19;
137:16,19,22;138:6,
21;139:8,18;140:23;
141:5;142:12,17;
143:1,13
**Honor's (2)**
48:20;109:8
**hope (3)**
17:10;25:20;42:19
**hoped (1)**
51:18
**hopeful (1)**
32:25
**Hopefully (5)**
17:12;22:14;34:23;
41:14;42:20
**hopes (1)**
123:23
**hoping (1)**
126:20
**horizon (1)**
13:11

**HOROWITZ (14)**
6:7;52:20,21;
53:19;114:13,14,20,
23;115:9;117:12;
124:3;125:7;126:3,
17
**hotline (1)**
17:13
**hours (3)**
48:11,11,12
**house (1)**
108:22
**housekeeping (1)**
142:16
**howsoever (1)**
104:20
**Hrg (2)**
3:11,14
**huge (1)**
82:25
**hundred (5)**
79:11;91:9;122:19;
139:4;142:20
**hundreds (3)**
14:24
**hybrid (3)**
39:2;97:4;138:14
**hydra (1)**
97:4
**hypothecate (1)**
100:13
**hypothesize (1)**
76:24
**hypothesized (1)**
112:21
**hypothetical (1)**
77:19
**hypotheticals (1)**
140:14

**I**

**idea (4)**
24:1;39:18;74:21,
25
**identical (1)**
96:25
**identified (6)**
49:19;51:6;53:4;
62:9;69:3;84:1
**identifiers (1)**
15:25
**identifies (1)**
90:23
**ie (1)**
95:20
**ignore (1)**
98:12
**ignored (1)**
118:23
**II (1)**
32:1
**illogic (1)**

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 159 of 173
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg                                    July 26, 2013

88:22
**illustrate (1)**
119:15
**illustrative (2)**
88:22;119:25
**imagination (1)**
121:25
**imagine (1)**
124:5
**imbedded (1)**
58:12
**immediate (1)**
86:8
**immediately (4)**
85:15;110:15;
116:14;128:5
**imminent (1)**
130:1
**immunize (1)**
37:18
**impact (2)**
59:10;133:8
**impediment (1)**
37:4
**implicated (2)**
63:23;64:23
**implied (1)**
37:23;43:20
**impliedly (2)**
36:15,20
**importance (1)**
118:23
**important (13)**
37:16;41:10;63:17;
71:5;99:16;100:7,8;
104:17;114:24;
123:10,10;137:21;
140:1
**importantly (1)**
14:8
**imposable (1)**
43:22
**impose (1)**
43:21
**impression (5)**
60:18;61:3;66:23;
68:15;83:14
**impressions (1)**
68:20
**improve (1)**
85:19
**improved (1)**
85:4
**improving (1)**
73:14
**inappropriate (3)**
124:21,23,24
**Inc (7)**
8:2;10:12;27:10;
32:2;45:1,2,2
**incentive (2)**
119:13,17
**incentive-penalty (1)**

122:1
**incentives (1)**
126:11
**incentivized (3)**
122:5;123:19,19
**include (6)**
67:9,15;70:22;
104:23;105:5;133:5
**included (1)**
67:11
**includes (1)**
21:23
**including (3)**
42:12;86:20;137:9
**inconsistent (1)**
137:12
**incorporate (2)**
21:17;51:18
**incorrect (1)**
88:23
**incorrectly (1)**
134:10
**increase (1)**
76:24
**increased (1)**
77:21
**incredible (1)**
85:8
**incur (1)**
116:22
**incurred (1)**
116:2
**indecipherable (1)**
61:6
**Indeed (4)**
29:8;105:20;120:8;
133:21
**indenture (3)**
57:16;90:18;
105:14
**independence (1)**
27:19
**independent (11)**
20:6;24:8;25:1,2;
27:24;28:5,18,21,24;
113:5,11
**independently (2)**
112:16;113:8
**indicate (2)**
11:22;27:15
**indicated (4)**
29:13;111:22;
138:12,13
**indicia (1)**
132:20
**industry (2)**
99:20;130:15
**inferred (1)**
64:2
**Information (13)**
2:21;15:10,12;
39:16,19;41:2;42:8,
10;45:22;47:21;

95:25;123:2;140:12
**initial (1)**
26:20
**initially (2)**
27:20;28:24
**inject (2)**
85:8;98:13
**injecting (1)**
75:14
**insider (5)**
36:20,21;37:18;
45:18,19
**insiders (3)**
46:1,11,15
**instance (2)**
39:20;58:20
**instances (1)**
59:13
**instead (2)**
14:23;91:24
**institutions (1)**
43:17
**instruction (1)**
102:17
**instrument (11)**
67:20;69:16;70:8;
71:8;72:23;99:8,8;
100:14;101:22;
102:14;116:21
**instruments (3)**
70:3;99:3;140:19
**intact (1)**
48:8
**intangibles (1)**
91:16
**intend (1)**
99:17
**intended (5)**
45:14;55:2;88:21;
95:13;138:8
**intensive (1)**
132:5
**intent (11)**
95:12;97:14;98:13;
132:18,19;134:24;
135:1,8;138:3,10;
139:19
**intention (2)**
97:13;98:12
**intentional (1)**
131:22
**inter (1)**
100:17
**interest (81)**
34:16;45:16,21;
46:9;58:12;61:20;
62:3,7,8,10,24;63:21,
22;64:2,6,9,22;65:7,
13,17,19,21;66:24;
67:9,16,18;68:16;
70:18;71:22;72:11,
18;73:8;74:16;75:19;
76:3,5,22;77:1,11,14,

24;78:3,7,11,22;
79:24;83:1;84:7;
85:4,7,7;87:15;88:4;
90:3;91:10;92:23;
93:1,2;103:6;104:4,
18;106:14;115:2,8;
116:4;117:8,21,23,
24,25;119:19;122:18,
20,23,24;124:8,12;
140:3;16;141:19;
142:2
**interesting (1)**
133:1
**interests (5)**
17:22;22:15,16;
26:24;27:4
**interim (2)**
30:23,24
**International (1)**
118:4
**interpret (1)**
68:15
**interpretation (7)**
69:9;70:22;79:24;
81:2;93:9,11;128:1
**interpreting (1)**
66:24
**interrogate (1)**
139:23
**interrupt (1)**
68:6
**intervening (1)**
90:2
**Into (48)**
2:4;12:6,11;13:2,
23;14:1,19;15:1;
16:17,24;17:19;
19:15;21:19;25:6;
26:8;27:21;31:2;
32:19;38:11,25;
51:21;59:18,21;63:1;
75:14;77:25;79:13;
85:9,18;87:11,14,18;
88:3,10;90:23;95:4,
5;98:13,22;102:8,21;
103:7,13,17;109:8;
111:7;120:1;131:14
**introduce (1)**
115:7
**invested (1)**
31:24
**investigation (2)**
51:11;128:23
**investment (10)**
82:13;85:22;86:11;
88:9,16;116:3,18,25;
125:10;139:24
**investors (6)**
31:24;41:15;86:15;
125:2,16;140:20
**invite (1)**
38:5
**involve (1)**

102:9
**involved (6)**
13:13;43:13,14;
82:13;102:9;118:14
**Iridium (2)**
27:11,12
**ironies (1)**
123:21
**irrefutable (1)**
118:22
**irrelevant (1)**
53:9
**irrespective (1)**
134:18
**IRS (1)**
80:7
**issuance (1)**
88:6
**issue (75)**
19:8;21:17;23:18;
35:11;37:4;44:18,24;
50:17;61:20;64:14;
65:6,8,9,18,23;66:22;
67:7,11;69:5;73:10;
75:13,14,16;76:9,14;
79:4,9;80:15,16,18,
22;82:2;83:9;86:5;
90:7;92:7,21;93:4,
14;94:20,20;95:14;
96:19;97:25;98:3,11;
101:4,11,19;102:2,
14,21;103:25,25;
104:11;106:6;
111:11,15;113:1;
114:23,24;115:1,3,7;
116:6;122:1;123:9;
125:19;126:6;
127:22;131:24;
132:6,18;133:23;
134:16
**issued (3)**
29:23;64:1;65:20;
67:12,15;70:13;72:9;
74:24;82:15;85:13,
23;105:15;116:20
**issuer (6)**
72:20;75:11;76:14;
116:1,2;117:6
**issues (26)**
13:8;21:12;33:16,
19;37:9,10;40:7;
41:17;50:10,15;51:1,
22;52:14;53:7;58:10;
61:5;69:15,25;105:2;
114:17;115:19;
118:4,7;129:25;
132:3;143:23
**issuing (2)**
76:15;117:7
**item (6)**
31:10;36:3;47:19;
56:21,21;58:22
**items (1)**

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 160 of 173
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg    July 26, 2013

60:1
**IV (18)**
102:20,24;104:2,
10;126:25;131:1,2,
21;132:3;134:4,4,10,
11,13,13,19,25;
135:13
**IX (2)**
2:14;35:9

## J

**James (3)**
3:13;31:13,18
**Jamie (1)**
50:23
**January (2)**
12:22;45:10
**Jennifer (1)**
41:20
**jobs (1)**
117:1
**JOHN (2)**
7:7;126:19
**Johns (1)**
35:12
**joined (1)**
57:18
**JONES (2)**
7:1;126:20
**Jordan (3)**
35:5;53:24;54:1
**JSN (9)**
42:21;58:24;64:25;
72:7;91:23;92:22;
109:11;115:8;121:23
**JSNs (27)**
39:1;40:11;42:1;
61:21;92:8;94:3;
95:8;98:17;100:18;
101:1,3;104:17;
105:10;106:23;
110:18;111:25;
122:4,5,13,25;123:6,
11,24;124:11;
129:22;132:24;
141:17
**JSN's (1)**
39:20
**Judge (35)**
33:2,8,14,17;37:11,
25;38:1,6;40:13;
41:25;42:13,20;
47:10,12,18;66:13;
79:1,2,3;94:25;95:1;
96:19;97:2;98:3;
99:3,21,21;100:8;
118:19,22;132:17;
133:12;137:25;
138:13,18
**judgment (12)**
44:18;74:4;81:8,
11,14,15,16;91:25;

103:2;114:5;115:15;
127:7
**July (1)**
40:16
**June (5)**
12:12;13:22,24;
75:7;112:4
**Junior (22)**
2:16,20;7:12,21;
19:7;26:10;36:4;
44:13;46:1,10,15,21,
24,25;47:20;57:16;
58:11,16;62:2;90:19;
91:9;104:9
**jurisdiction (1)**
38:14
**jurisdictional (1)**
13:8

## K

**Kansas (1)**
32:6
**keenly (1)**
80:21
**keep (2)**
42:15;113:21
**Kenneth (1)**
3:13;6:9;21:9;40:2
**kept (1)**
128:11
**key (5)**
16:8;79:18;84:4;
97:12;132:18
**kill (1)**
73:25
**kind (4)**
39:18;113:23;
129:23;131:23
**kinds (1)**
106:1
**KIRKLAND (1)**
8:1
**Kisting (1)**
3:15
**knell (1)**
112:23
**knew (12)**
55:5;61:17;82:19;
86:16,16,17,18,21,
23;123:24;125:20;
140:21
**knowledge (1)**
118:9
**known (2)**
59:20;81:16
**knows (3)**
15:11;20:1;85:13
**Kram (1)**
79:2
**KRAMER (2)**
6:2;21:10;114:14
**Kristi (1)**

3:13
**Kruger (2)**
20:25;28:8

## L

**lack (1)**
49:12
**lacks (1)**
59:15
**laid (1)**
136:8
**language (26)**
58:2;66:17;68:9,9,
22;78:5,9,9,13;83:14;
98:16;99:20;102:12,
13,14;103:18,21;
106:4;107:6;120:19,
21,23;124:19;
127:23;128:1;129:21
**large (1)**
40:21
**largely (2)**
17:1;28:19
**larger (2)**
17:25;28:16
**largest (1)**
12:19
**last (15)**
11:19;12:16;48:17;
56:20;63:12;73:9;
88:20;89:23;102:2,
21;104:10;105:18;
113:1;140:1;141:15
**late (3)**
54:4,25;55:6
**Late-Filed (2)**
3:3,10
**latent (1)**
62:24
**later (4)**
70:3,16;71:8;84:15
**law (22)**
47:7;51:10;60:5,5,
8;64:10;80:18;87:6;
93:5;95:3,10,10,11;
96:13;104:6;105:11;
106:15;107:24;
111:15;112:18;
118:2;120:17
**laws (1)**
37:1
**lawyers (5)**
18:21;25:17;29:2;
30:20;46:4
**lead (2)**
94:24;121:6
**learned (1)**
48:17
**least (5)**
18:11,17;36:23;
120:24;128:15
**leaves (1)**

48:8
**leaving (4)**
13:18,18;52:2;
143:21
**left (4)**
16:6;64:4;81:15;
122:8
**left-hand (2)**
99:14,24
**legal (3)**
13:8;59:15;60:3
**legislative (10)**
68:21;69:8,22,24;
70:6,9,20,21;71:1;
117:21
**legitimate (1)**
123:17
**legs (1)**
36:24
**Lehman (2)**
45:1;99:2
**lender (3)**
102:10;119:9;
131:16
**lenders (1)**
131:19
**lender's (1)**
116:3
**lengthy (1)**
29:4
**lens (1)**
19:20
**less (13)**
69:16;71:2,17,23,
25;72:4,8;76:15;
77:8;82:7;86:9;89:6;
96:1
**lesser (1)**
67:21,23;86:7
**lets (1)**
75:15
**letter (2)**
16:25;17:2
**level (3)**
41:5;42:17;55:7
**levels (1)**
16:6
**LEVIN (3)**
6:2;21:10;114:14
**Levitt (9)**
50:1,20,21,22,23;
51:5;52:3,8;53:15
**Lewis (1)**
20:25
**Lexington (2)**
8:3;9:13
**liability (2)**
46:24;77:21
**Liberty (1)**
8:22
**LIEBERMAN (1)**
9:8
**lien (33)**

51:6,15,15;53:3;
91:10;94:3,6;95:9;
100:12;103:10;
104:8,15;105:1;
107:11,12,12,17;
108:4,5,14,17;
109:13;112:17,19;
113:3;127:10,14,15;
131:16,19,19,20;
142:13
**liens (6)**
35:13,14;49:20;
50:6;107:8,10;109:7;
121:17
**lies (1)**
97:12
**life (1)**
71:7
**Lifland (4)**
66:13;79:1;118:19,
22
**Lifland's (1)**
79:3
**light (2)**
29:24;128:22
**likely (3)**
20:7;82:20;115:6
**limit (1)**
87:20
**limited (4)**
28:4;39:15;118:3;
121:7
**limiting (1)**
87:17
**limits (2)**
143:3,4
**line (1)**
134:21
**lined (1)**
39:23
**liquidated (2)**
98:24;99:2
**Liquidating (3)**
2:9;31:21;32:4
**liquidation (1)**
96:22
**liquidity (3)**
75:13;97:9;140:18
**list (2)**
104:21,25
**litigate (1)**
41:16
**Litigation (7)**
8:10;21:14;26:23;
32:16;40:6;41:7;
75:17
**little (8)**
29:4;74:16;81:14;
83:4;103:8;104:24;
113:2;117:23
**LLC (3)**
2:14;4:21;27:11;
91:4

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 161 of 173
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg                    July 26, 2013

**LLP (12)**
6:2,14;7:1,11,20;
8:1,9,20;9:2,11;10:2,
11
**loan (22)**
15:17;16:1,11;
24:14;27:22;29:10;
98:6,6;102:15;
103:16,16,24;104:8;
106:18;107:19;
108:10,21,22;109:2,
2,10;136:16
**Loans (18)**
32:2;96:1;97:6,16;
98:5;99:18;100:2,10;
102:25;103:2;
104:23;106:2;109:6;
110:20;128:7;
136:14;137:6,9
**local (1)**
44:23
**located (1)**
104:20
**locked (1)**
43:4
**lockup (1)**
39:5
**logic (2)**
118:20,21
**logical (1)**
125:18
**long (3)**
12:8;52:1;104:21
**longer (3)**
14:4;16:12;131:10
**look (32)**
33:22;42:22;48:14;
49:8;66:9,16;68:23;
70:20;72:14;73:19,
21,23;76:21;77:10,
12;78:13;80:14;
83:10;84:25;85:11;
89:14;93:23;99:5,18;
106:7,12;111:10;
129:19;135:3,16;
140:4;141:22
**looked (1)**
136:2
**looking (5)**
11:16;18:14,20;
134:1;138:20
**Lorenzo (1)**
11:5
**Los (1)**
10:15
**lose (1)**
112:19
**lost (1)**
125:12
**lot (10)**
15:9;39:22;59:25;
73:16;81:23;105:16;
106:25;107:1;

128:22;144:13
**lots (1)**
105:21
**Lots-Other (1)**
2:14
**lower (3)**
21:19;73:17;
119:22
**Ltd (2)**
9:3;79:4
**LTV (2)**
79:25;89:1
**lump (1)**
12:25
**lumped (1)**
134:10
**Lynn (1)**
3:12

**M**

**magic (1)**
42:20
**Mahnaz (2)**
3:11;54:20
**mailing (2)**
17:14,14
**main (1)**
113:5
**maintained (4)**
110:1,4,10,13
**major (1)**
12:23
**makes (6)**
65:22;70:25;95:17;
97:18;117:22;125:11
**making (5)**
17:9;86:15;125:4,
21;135:14
**Management (2)**
2:19;34:1
**Manhattan (1)**
7:22
**MANNAL (1)**
6:10
**manner (2)**
12:24;28:9
**many (6)**
15:12;21:12;24:14;
97:4;104:25;123:16
**March (2)**
13:14;29:22
**margin (1)**
96:18
**MARINES (2)**
41:20,21
**Marinuzzi (41)**
11:3,4,5,12,15,17,
19,21;12:1,4,17:12;
18:6,23;19:1;20:9,14,
17,24;21:5;29:13;
30:2,3,8,12,14,17,19,
23;31:1,9,16,17;35:4;

36:3;47:17,24;48:1;
53:20;56:20;57:2,4
**Mark (1)**
3:12
**market (21)**
37:4;64:2,7,12,13,
15;67:23;71:17;72:4,
8;74:24;75:18;79:5;
85:9;88:16;89:7,25;
90:5;96:2,3;97:10
**markets (4)**
60:6;75:8;97:8;
98:14
**market-value (1)**
121:9
**Marshall (6)**
3:5,6;55:17;56:1,3,
4
**Marshall's (1)**
56:4
**Martin (1)**
26:25
**master (3)**
96:14;99:15;100:9
**material (1)**
42:10
**matter (27)**
11:8;12:2;35:19;
64:15;65:19,22,25;
67:6,20,20;76:20;
80:18;81:1;88:17,18;
93:4;96:13;104:5;
111:15;115:24;
116:2;118:19;
125:18;130:3;
141:10;142:16;
143:19
**matters (4)**
3:4;11:8;35:7;
53:20
**mature (1)**
71:7
**matured (1)**
139:12
**maturity (7)**
63:10,11;74:17;
85:6;119:9;120:5;
121:15
**may (45)**
12:22;15:9;19:15,
16;21:13;24:17;27:4;
33:1,6,11,11,16;
36:22;39:14;44:20;
47:5;57:21;58:5;
65:15,20;68:3,8;81:5,
6,21;88:5,7;89:17;
90:18;93:13;94:16;
108:8;111:5,8,10,15;
112:20;119:15;
125:15;126:12;
130:8,10;131:9;
135:9;144:3
**maybe (7)**

31:2;67:5;75:4,5,6;
77:1;125:24
**MCCLOY (2)**
7:20;36:9
**mean (31)**
23:9,15;43:9;49:1;
55:6,9;56:1,3;66:11;
67:10;68:3,20;69:15;
73:13;85:15,16;
92:13,14;103:20;
109:16;117:23;
128:22;129:15;
131:3,23;135:16;
136:20;138:5,6,14;
139:20
**meaning (1)**
96:14
**measure (1)**
76:1
**measures (1)**
14:3
**mechanical (1)**
27:22
**mechanism (1)**
16:3
**mechanisms (1)**
97:7
**Mediation (36)**
2:17;33:2,4,17;
36:5,12,13,15,19;
37:20,21,24;38:2;
39:6;41:23,25;42:3,4,
6,11,18;43:4,6,15;
44:14;45:15,17,18,
23;46:7,20,22;47:1;
48:19;49:4,5
**mediations (1)**
41:6
**mediator (1)**
33:15
**meeting (3)**
40:11,15;43:25
**Members (2)**
15:14;25:16
**mentioned (5)**
14:9;18:2;21:2;
53:6;96:11
**mere (2)**
97:25;98:6
**merit (2)**
81:23;124:18
**merits (1)**
32:23
**mess (1)**
53:10
**method (2)**
117:12;126:7
**might (5)**
74:16;79:22;
136:19,20;139:19
**MILBANK (2)**
7:20;36:9
**million (23)**

14:1,2,2;15:1;17:6,
17,18;20:13;21:24;
24:25;25:4,6,16;
34:21;35:17;82:16;
91:9;114:25;117:13;
123:8;134:2;139:4;
142:20
**millions (1)**
14:24
**mind (3)**
86:7;134:10;144:3
**minimal (1)**
35:19
**minimize (1)**
26:23
**minimum (2)**
61:21;93:3
**minute (5)**
64:18;98:17;
108:17,18;116:5
**mirror (1)**
24:7
**misappropriate (1)**
45:22
**misconduct (1)**
37:21
**misplaced (2)**
27:17;29:5
**missed (4)**
54:25;56:1,3;96:18
**misunderstanding (1)**
43:2
**mixed (1)**
97:22
**modification (2)**
119:4,11
**modifications (1)**
37:12
**modified (2)**
116:10,12
**modifies (1)**
119:6
**modify (2)**
24:13;119:3
**modifying (1)**
119:10
**MOLONEY (1)**
8:25
**moment (7)**
59:8,9;65:22;88:8;
95:5;97:22;113:17
**momentarily (1)**
60:4
**moments (1)**
96:8
**money (7)**
14:13;16:17,24;
19:15;25:12;28:16;
29:4
**monkey (1)**
87:10
**month (2)**
12:16;37:6

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 162 of 173
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg                                July 26, 2013

months (2)
128:5;140:8
moot (1)
30:1
more (31)
16:17,17;18:14,15;
23:23;25:10;64:15;
65:5;71:5;73:9;74:7;
77:9,22;78:1;83:23;
84:22;98:19;105:15;
109:8;116:24;119:4;
121:11;122:2;124:1;
133:2;135:12;137:4;
139:5;142:23;144:3,
9
Moreover (2)
27:24;121:11
Morgan (1)
46:17
morning (18)
11:4;21:9;23:3;
31:17;34:12;35:5;
36:7,8;41:20;48:6,17,
25;49:3;50:22;52:20;
53:25;57:14;126:21
MORRIS (49)
7:7;114:17;126:18,
19,19,23,24;127:19;
128:2,18,20;129:2,4,
11,14,16;130:2,10,
12,20,25;131:12;
132:9,13,16;133:1,
11,19;134:2,20,21;
135:2,6,11,21,22;
136:8,12,19,23;
137:2,13,19,23;
138:4,25;143:11,12,
16
Morrison (6)
11:5;31:18;35:6;
41:21;50:23;54:1
mortgage (10)
15:6;32:1;75:11;
91:4;100:2,10;
104:23;119:11;
136:14;137:6
Mortgage's (1)
29:15
most (7)
29:9;40:5;70:5;
99:16;105:18;140:1;
143:23
Motion (84)
2:2,12,16;3:2,9;
4:5;11:12,23;12:5;
13:6,9,12,14;14:17;
19:1,5;21:1,8;22:5,
25;23:16;26:6,17;
28:7;29:12,14,18,21,
22,24,25;31:14;35:8,
10,25;36:1,4,6,11;
37:14;38:7,12;40:4;
44:13,16,17;47:4;

50:4,5,8;52:22;53:5,
12,12,14;56:25;
57:10,17,17;72:3;
80:19;82:6;83:19;
93:5,14;97:20,24;
99:22;104:7;108:12;
111:14;115:4,15;
118:12;127:25;
129:5;130:23;
138:16,17;143:3,8,
20;144:11,12
motions (5)
81:15,17;82:3;
101:21;143:25
Motorola (1)
27:10
mound (1)
138:19
move (4)
13:16;58:6;88:19;
131:1
moved (1)
113:20
moving (1)
114:6
Mrs (1)
3:14
much (22)
16:24;19:16;23:23;
30:17;33:11;34:17,
19;35:2;64:3;65:4;
74:7;76:5;79:25;
82:25;86:23;107:23;
115:11,16;116:24;
123:17;137:4;144:18
Munford (2)
45:2,2
MUNGER (1)
10:11
must (3)
27:2;87:24;135:19
myself (3)
114:16,21;120:18

## N

NA (2)
4:3;8:10
NAFTALIS (1)
6:2
naked (1)
78:7
name (1)
32:14
Nancy (1)
3:15
narrow (2)
118:13;124:20
narrowest (4)
60:19,23;120:20;
124:20
narrowly (1)
37:14

NAs (1)
4:5
National (5)
2:8;10:3;15:6;
31:11,20
nature (2)
13:4;136:22
NCUAB (5)
32:21;33:7,9,12;
34:13
NCUAB's (2)
32:8,18
NDA (4)
40:23,24,24;43:9
necessarily (7)
24:1;55:7,11;76:4;
119:1;121:4;135:19
necessary (4)
42:3;44:18;104:8;
124:24
necessitated (1)
87:9
need (10)
50:25,25;51:20;
52:15;54:13;63:24;
65:11;103:6;108:24;
115:5
needed (4)
13:15,17;22:10;
104:3
needs (5)
22:4;39:16;40:23;
119:16;134:18
negate (1)
98:8
neglect (2)
55:8,11
negotiating (2)
119:9,11
negotiation (3)
44:25;51:23;130:3
negotiations (5)
41:4;46:7,23;
80:21;106:1
neighborhood (1)
25:4
Neither (1)
32:10
NELSON (1)
10:7
nevertheless (1)
136:1
New (52)
2:21;4:23;6:5,17;
7:5,14,23;8:4,12,23;
9:6,15;16:24;31:2;
47:21;49:18;50:7,15;
51:19,21;52:14,15;
60:5;63:3,5,25;
65:19;67:8;71:16,23;
72:23;74:5;75:1;
76:25;77:5;79:4,8;
82:6;85:12;87:2;

88:7;90:1;95:10,11;
109:1,2;111:8;
116:11,21;118:6,17;
121:23
newly (1)
116:20
next (19)
15:22;30:8,19;
31:7;34:23;35:4;
36:3;40:12;42:1;
47:19;53:20;83:25;
84:21;85:10;88:19;
90:13;99:5;105:8;
143:21
night (1)
11:19
nine (1)
105:19
ninety (1)
88:6
Nobody (5)
125:21;130:21;
136:20;141:9;143:25
nominal (1)
24:5
nondebtor (2)
28:10;32:15
none (2)
64:22;96:12
nonexclusive (1)
27:12
nonpublic (1)
42:10
Nor (2)
46:15;136:25
Norbert (1)
3:14
Norma (1)
3:5
Northern (1)
45:12
notable (1)
117:24
note (46)
19:3;22:18;46:13;
50:25;51:8;58:17;
61:25;62:23,25;63:5;
64:11,16,17;69:25;
70:13,15;71:11,14,
15;72:8;74:6,20;
75:11;76:6,15,25;
77:6,6;79:4,5,8;
85:12,13,14,22,23;
86:7,22;87:3;88:9;
89:5;117:22;119:3;
122:10;133:18;
139:23
noted (3)
21:21,24;41:24
Noteholders (18)
2:16;7:12,21;19:7;
26:10;36:5;42:9,16;
44:13;46:1,11,15,22,

24;58:11;62:3;74:3;
91:10
Noteholders' (3)
2:20;46:25;47:20
notes (57)
42:17;57:16;62:21,
21,21;63:3,3,6,11,25;
65:7,20;67:8,11;
71:13,19,23;74:5,5,
23;75:6,17;76:25;
79:6;81:5;82:4,6,14;
84:24;85:22;86:13,
20;88:7,7;90:1,4,19,
20;98:23;104:9;
115:8;116:1,9,11,11,
20;117:2;118:17,17;
119:2;121:18,21,22,
23,24;136:11;139:11
Notice (3)
4:4;12:10;44:15
notifications (1)
17:14
notified (1)
54:6
notion (2)
121:19;124:13
notions (1)
64:20
Notwithstanding (3)
48:20;105:3;
127:13
November (4)
54:22;56:5,8;123:4
number (30)
11:3;17;12:2;26:9,
14;29:19;31:10,12;
39:21;44:15;45:11,
12;48:8;51:7;56:21;
57:13;82:16,17,18;
97:8;99:12;120:4;
123:7;128:4;133:6;
139:14;143:13,14,16;
144:9
numbers (2)
39:17;120:1
numeral (1)
35:7
numerous (2)
48:18;51:10
NW (1)
10:4
NY (11)
4:23;6:5,17;7:5,14,
23;8:4,12,23;9:6,15

## O

objected (1)
32:17
Objection (24)
2:8;3:2,3,9,10;
23:5,17,19;26:2,11,
12;31:11,20;32:24;

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 163 of 173
Case No. 12-12020-mg,  Adv. Proc. No. 13-01277-mg                                    July 26, 2013

33:23;48:23;53:23;
54:17,20,24;55:17,
20;56:10,15
**objections (13)**
19:6;12;23:1;
26:18;27:17;29:20;
32:20;33:21;39:13;
54:3,4,12;56:16
**objectors (2)**
20:22;48:13
**obligated (1)**
66:19
**obligation (3)**
29:16,18;116:1
**obligations (6)**
12:25;13:4;46:12;
121:15,16,17
**observations (1)**
40:3
**obvious (8)**
36:22;42:5,12,12;
63:15;77:22;78:1;
106:2
**obviously (8)**
31:3;57:5;63:17;
76:1;82:7;94:6;
103:14;144:13
**occur (1)**
49:24
**occurred (6)**
25:21;66:8;110:20;
119:21;120:4;124:7
**occurs (1)**
73:5
**o'clock (1)**
49:3
**off (24)**
16:4,5;55:19;
71:18;73:4;74:5;
86:19;96:19;102:25;
109:6;110:16;
125:11;131:12;
132:24;133:6,7;
137:13,16;139:10,13;
140:13;141:17,19,23
**offer (40)**
54:9;62:10;63:2,
13;67:7,8;87:20;
115:24;116:9,14,21,
23,24;117:2,3,5;
118:6,15;119:2,14,
18,19,20,21;120:2,7;
121:10,12,12;122:4,
6,9,14;123:23,25;
124:22;126:12;
127:23;129:24;
133:16
**offered (3)**
67:11;82:12;
138:18
**offering (4)**
81:2;126:2;127:25;
128:2

**offers (2)**
116:19;124:18
**Office (5)**
29:1;38:21;131:14,
15,18
**Official (6)**
4:2;6:3,15;27:10;
56:22;57:11
**offspring (1)**
105:2
**O'Hagan (1)**
46:14
**OID (53)**
60:7;62:12,23;
66:8;70:22;73:1,18;
80:21;82:15;86:9,18;
88:25;89:6;93:8;
114:16,23;115:25,25;
116:2,16;117:3,6,9,
20,23;118:8,20;
119:18;120:2,3,13;
121:20;122:15,23;
123:1,5,8;124:18;
125:9,9,22,25;126:4,
6,7,11,13,14;139:8,
22;140:21;141:2,5
**old (15)**
63:3,6;74:5;79:5,6;
116:1,9,11,13;117:2;
118:6,17;121:18,21,
24
**OLSON (1)**
10:11
**omission (2)**
130:15,17
**omitted (1)**
130:14
**Omnibus (13)**
3:2,3,9,10;34:3;
53:22;54:3,4,12,17,
24;55:17;56:16
**Once (9)**
92:7;100:10;101:2,
16,16;103:7;106:17;
111:11;127:7
**One (71)**
7:22;8:11,22;11:8;
13:4;19:13,13;21:11;
23:25;24:23;27:22;
35:13;36:23;38:1;
43:1;44:9;47:7;49:6,
18,24;54:23,24,25;
55:1,22;56:4;58:15;
61:15;69:14;70:2;
73:6;75:2,3;76:13,23,
24;79:12;80:20;86:7;
87:4,16;88:2,3;90:9;
91:1;102:3;103:9;
105:21;108:13;
110:7,15;120:4,21;
122:16,18;123:20;
128:4,18;129:24;
132:7;133:12,24;

135:3;140:2,17;
141:15;142:16,24;
144:1,4,6
**one-for-one (5)**
77:3;79:8;87:17,
20;89:2
**one-hundred-million-dollar (1)**
143:13
**one-off (1)**
130:8
**one's (2)**
87:23;142:8
**ongoing (2)**
21:19;33:12
**only (29)**
16:11;23:25;54:24;
61:5;63:4;66:3;71:6,
11;78:1,2;84:23,25;
87:20;88:17;105:19;
107:13;112:1,16,17;
118:11,12;121:23;
123:6,7,24,25;124:6;
125:23;134:23
**operated (1)**
82:5
**Operating (1)**
27:11
**operations (1)**
20:10
**operations@escribersnet (1)**
4:25
**opinion (2)**
55:10;143:20
**opportunities (1)**
40:16
**opposed (1)**
51:19
**opposite (5)**
64:24;72:10;108:7
**Opposition (4)**
3:4;13:7;55:17;
143:4
**option (1)**
116:10
**oral (1)**
61:4
**Order (71)**
2:2,5,12,17;11:24;
12:7;13:10;14:12;
16:9;19:17,22,24;
20:2;22:4,11,12;26:6,
8,21,21;27:20;29:8,
25;30:1,5,10;31:2;
34:1,2,23;36:5,11,12,
18;37:8,13,13,17;
38:17,25;40:19,20;
41:10,12;42:2,15,18,
22;43:19;44:10,14,
18;45:5,7,8,9,9,14,
17;46:19,25;48:6,7,
10;49:2,16;52:16;
59:2;81:15;111:24;
127:1

**ordered (1)**
24:2
**orders (10)**
18:13;24:4,10,13;
29:9,10;30:24;31:5;
39:3;44:24
**ordinarily (3)**
69:12;97:19;135:3
**original (24)**
16:9,21;19:17;
20:2;27:20;62:20,21,
25;64:14;70:8,15;
71:16,19;76:14;82:4,
24;92:4;94:21;115:1;
116:6;118:3,3;
132:11,25
**original-issue (2)**
65:1;69:14
**originally (5)**
29:10,13;69:15;
70:13;102:25
**Ostreicher (1)**
3:12
**others (2)**
17:11;38:25
**otherwise (5)**
38:12;43:7,21;
46:12;116:24
**ought (5)**
18:21;33:18;34:7;
131:3;134:24
**ourselves (1)**
133:3
**out (38)**
13:15,20;14:5,25;
17:14,14,18;19:11;
32:21;37:3;39:16,19;
40:14,22;41:22;
44:19;48:14;53:1;
58:6;61:5;63:10;
64:1;72:13;74:17;
75:9;78:22;84:20;
87:6;89:13;99:15;
107:14;108:17;
119:24,25;125:18;
130:12;134:24;136:8
**outcome (4)**
22:23;29:5;88:17;
104:5
**outset (2)**
71:12;138:13
**outside (2)**
78:9;137:25
**over (16)**
12:15;14:14;24:18,
21;46:3;71:7;86:13;
104:15;105:18;
108:15;117:9;120:5;
121:24;122:16,25;
126:7
**overcome (1)**
96:14
**overlap (2)**

51:17;143:16
**overruled (1)**
26:19
**oversecured (2)**
123:11;124:12
**oversubscribed (2)**
116:12,15
**owe (2)**
45:20;46:12
**own (4)**
46:8;78:20;117:7;
134:9
**Owned (4)**
2:14;35:8;104:20;
127:11
**ownership (3)**
95:22;100:16;
136:13
**owns (1)**
108:21

**P**

**PACHULSKI (2)**
7:1;126:19
**package (13)**
58:24;75:11;85:5;
89:11;91:18,23;92:9;
101:14;102:23;
105:13;108:23;
109:11;112:5
**page (18)**
11:9,14,15;12:2;
31:9,10;35:7;53:22;
56:21;62:18;72:14;
79:17;88:21;97:11;
104:6;105:8;143:3,4
**pages (6)**
11:7;30:9,19;
53:21,21;143:8
**paid (10)**
16:10;17:20;19:11;
25:5,17;29:2;64:12,
15;110:16;133:5
**papers (14)**
19:10;20:5,19;
23:24;24:19;29:6;
38:4;49:9;60:12,21;
79:20;83:13;102:8;
133:7
**par (2)**
62:22;90:4
**paradigm (2)**
74:11;88:24
**paragraph (6)**
19:22;61:16;95:18;
111:9,24;112:2
**paragraphs (3)**
93:24;133:19;
136:9
**parallel (1)**
131:24
**parcel (1)**

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
Pg 164 of 173

RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020-mg,  Adv. Proc. No. 13-01277-mg

July 26, 2013

90:20

**Park (1)**
8:11

**parol (4)**
81:4;93:9;127:24;
138:18

**part (30)**
21:12;32:16,17;
57:19;58:23;62:5;
63:13;64:14;89:11;
91:18,23;101:11,14;
102:23;103:3,4;
104:8;106:3,22;
107:21;108:4,23;
109:1,3,11,15;110:2;
116:8;127:16;134:14

**Partial (3)**
4:5;53:5;57:17

**partially (1)**
23:8

**participant (2)**
36:20;37:24

**participants (8)**
37:5,21;42:4;
45:15;119:14,20,25;
120:3

**participants' (1)**
36:16

**participate (7)**
46:22;47:1;54:7,9;
84:11;85:10;122:5

**participated (4)**
54:8;120:7;122:4;
123:22

**participating (7)**
36:13,19;37:5;
45:16,23;46:16;
124:15

**participation (5)**
36:15;41:8;43:6;
46:20,23

**particular (13)**
12:9;15:24;19:22;
23:9;39:14;75:10,11;
83:9;110:15;113:13;
133:23;144:2,10

**particularly (5)**
38:10;85:1;88:4;
135:24;144:5

**particulars (2)**
73:21,23

**parties (51)**
13:13;19:25;21:24;
29:10;33:13,15;
36:13,14,16,17,25;
37:23;38:2;41:6;
45:16,18,19,20;
48:21;54:7;73:5;
75:15;80:20;83:6;
88:10;92:4;94:22;
95:12,13;97:13;
98:12,13;99:17;
100:25;102:11;

107:2,25;110:14;
112:21;127:10;
134:25;135:1,8,15,
18,19;136:3;139:9,
11,20;140:11

**parties' (3)**
26:24;45:25;98:8

**parties-in-interest (1)**
46:8

**party (8)**
15:7;27:24;28:5;
33:7;43:21;45:21;
74:11;75:15

**party-in-interest (1)**
23:7

**party's (1)**
129:8

**pass (1)**
30:22

**passages (2)**
79:18;107:1

**passed (1)**
126:21

**past (6)**
18:16;21:13;47:13;
49:13;88:6;97:20

**pasted (1)**
51:9

**Pause (1)**
54:16;116:5

**pay (2)**
62:2;109:6

**paying (2)**
17:9;116:24

**payment (10)**
13:1;16:14;19:9;
21:20,22;22:1,6;
63:12;114:4;139:12

**payments (16)**
15:20;16:15;17:15;
18:3,4,7,17;20:7,13;
22:10,11;24:5,8;
27:25;28:9,18

**Peck (12)**
33:2,8,14;37:11;
38:1,7;40:13;41:25;
42:13,20;47:10,12

**Peck's (3)**
33:17;38:1;47:18

**penalize (1)**
121:4

**penalized (1)**
119:22

**penalizing (1)**
123:22

**penalty (2)**
119:13,17

**Pending (2)**
26:5;44:12

**Pengo (2)**
65:3;79:19

**Penina (1)**
4:20

**penny (1)**
25:18

**people (9)**
16:7;37:7;39:18;
48:9,14;87:13;
116:22;126:13;
139:21

**per (2)**
12:18;112:15

**perceive (1)**
50:12

**perceived (1)**
59:20

**percent (4)**
15:19;28:17;71:7;
122:19

**percentage (1)**
124:10

**percolated (1)**
21:14

**perfect (2)**
103:6;140:12

**perfection (2)**
104:2;111:8

**perfectly (1)**
18:24

**Perform (5)**
2:4;14:4;16:25;
26:8;46:5

**perhaps (6)**
24:1;28:24;65:18;
129:17;134:10;
143:23

**period (11)**
14:10;18:9;29:4;
44:15;59:3,5,22;
62:24;70:12;86:14;
106:11

**PERLSTEIN (2)**
6:19;22:19

**permanent (1)**
112:22

**permissible (2)**
93:1,9

**permission (1)**
114:15

**permit (1)**
100:18

**permits (2)**
43:10;44:17

**permitted (2)**
15:16;59:18

**perspective (9)**
13:3;18:24;19:17,
18,25;40:4;64:19;
70:24;72:6

**petition (18)**
83:2;91:6,8,18,24;
94:7;101:6,13,15;
114:25;117:14,20;
118:1;122:17,25;
134:15;139:4,12

**phase (5)**

50:11,11;51:1,2;
115:18

**Phelps (1)**
3:6

**phrase (1)**
64:7

**Phrased (1)**
62:14

**phraseology (1)**
99:21

**pick (2)**
16:7;131:9

**PICKERING (1)**
6:14

**piece (2)**
83:1;96:7

**Pioneer (1)**
55:10

**place (2)**
27:21;34:23

**placed (1)**
85:12

**placement (2)**
27:21;28:1

**places (2)**
16:1;111:23

**plain (5)**
66:17;96:14;
103:18;106:4;120:23

**plaintiff (2)**
23:15;114:12

**plan (15)**
18:10,12,18,22;
19:3;21:23;22:7,8,
13;32:17;62:2,2;
122:12,17;131:1

**plausible (1)**
130:25

**play (3)**
37:3;78:10;103:10

**Plaza (2)**
7:22;8:22

**plea (1)**
95:17

**pleading (1)**
97:25

**pleadings (2)**
33:22;115:14

**Please (4)**
11:2;47:6;57:8;
58:4

**pleased (1)**
12:4

**pleases (1)**
35:20

**pledge (11)**
58:17;91:13;
103:11;104:6,14;
105:10;106:4,8,13;
108:24;131:5

**pledged (3)**
105:7;108:23;
112:2

**plenty (1)**
144:14

**plus (1)**
63:21

**PM (1)**
144:19

**pockets (2)**
15:2;16:17

**podium (1)**
21:6;31:13;53:23

**point (29)**
32:20;33:22;35:15;
39:16;43:1;56:2;
64:18;69:10;79:20;
97:2;100:8;107:7;
108:22;109:8;
111:10;113:1;
116:18;119:16,20,21;
123:2,14;128:6;
130:12;133:1;
135:13;140:1;
142:24;143:11

**points (7)**
40:14,22;67:17;
88:12;111:18;
137:21;139:8

**police (1)**
72:11

**policies (3)**
46:19;64:21;79:13

**policy (16)**
65:2;66:13;68:14;
69:1,2,3,4,6;75:21;
78:10;84:1;88:18;
118:13,23;119:12;
120:19

**pondered (1)**
129:19

**pool (1)**
127:17

**portion (7)**
14:5;50:5;66:4;
113:2,15;115:17;
123:1

**portions (1)**
84:5

**pose (1)**
89:24

**poses (1)**
42:7

**position (17)**
19:14;24:22,23,24;
63:7;65:16;66:20;
68:8;73:15,19;75:15;
79:16;80:12;85:19;
88:5;132:21;141:12

**possibility (3)**
60:6;122:20,22

**possible (5)**
16:1;19:25;30:11,
12;42:21;120:20;
123:18;124:17,20

**possibly (1)**

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
Pg 165 of 173
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg                                                July 26, 2013

121:11
**post-Chateaugay (2)**
120:16;121:1
**post-petition (8)**
63:22;101:9,10;
117:24,25;122:20,24;
134:17
**posture (1)**
97:22
**Potatoes (3)**
102:5,9,15
**potentially (2)**
14:24;105:17
**power (3)**
24:17,17,20
**practice (1)**
29:2
**precedent (4)**
55:10;60:8;61:8;
66:18
**preceding (1)**
128:5
**precise (1)**
40:6
**precluded (1)**
43:12
**precludes (1)**
82:2
**predict (5)**
75:9;87:14;88:9;
116:19;140:12
**prediction (2)**
88:11;139:24
**pre-exchange (1)**
117:2
**prefer (2)**
25:6,16
**preference (1)**
34:21
**preferred (1)**
118:7
**prejudice (3)**
55:13;72:11;144:1
**Preliminary (4)**
2:7;31:19;32:20;
34:14
**premise (1)**
36:14
**premised (1)**
37:22
**prepared (4)**
35:21;44:5;127:2;
140:4
**preparing (1)**
44:7
**prepetition (1)**
137:2
**pre-petition (8)**
58:15;62:3;63:21;
96:18;103:1,13;
122:18;134:14
**presence (1)**
98:6

**present (12)**
12:4,9;26:1;30:4;
31:3;32:23;38:12;
65:4,5;76:13;99:7;
138:12
**presentation (3)**
68:12;115:18;
124:25
**presentation's (1)**
115:10
**presented (3)**
13:24;22:5,14
**presenting (2)**
36:6;78:21
**preserving (1)**
144:13
**pretend (2)**
127:14,15
**pretty (7)**
65:4;74:21;75:1;
82:18;107:23;
130:15;140:21
**prevail (3)**
50:4;134:4,13
**prevention (1)**
14:3
**prevents (2)**
29:17;92:5
**preview (1)**
115:11
**previous (1)**
32:14
**previously (4)**
20:5;54:2;101:1;
131:9
**price (10)**
79:4,7,9,10;89:4;
90:6;117:2,11,16;
136:15
**principal (3)**
47:1;62:3;122:15
**principals (6)**
40:10;42:1,4,5,17;
46:21
**principled (1)**
95:3
**prior (4)**
108:5;120:2;
128:12;131:11
**priority (1)**
118:18
**private (1)**
32:16
**privilege (3)**
48:19;49:4,6
**Pro (2)**
9:22;23:4
**probably (8)**
24:11;39:15;41:10,
11;106:25;115:14;
120:21;141:2
**problem (7)**
40:21;42:5;49:11;

50:13;119:13,17;
132:7
**problems (3)**
18:12,15;107:17
**procedural (2)**
97:22;98:22
**procedures (4)**
44:22;48:7,9,14
**proceed (1)**
34:25
**proceeding (4)**
4:2;56:22;57:11,12
**proceedings (3)**
46:10;49:17;
144:19
**proceeds (10)**
76:15;105:2;
112:14,17,23;113:4,
7,10,13,14
**process (11)**
14:18;16:2;22:23;
27:22;37:21;38:2;
39:6;41:23;44:18;
46:17;90:6
**produce (1)**
112:15
**produced (1)**
49:7
**products (3)**
105:2;112:14;
113:10
**professional (1)**
12:18
**professionals (1)**
31:5
**project (1)**
85:23
**projected (3)**
12:15;28:18;86:12
**promptly (1)**
30:16
**proof (8)**
23:7,11;24:6,7;
32:18;33:1,3;34:17
**Proofs (8)**
2:8;31:11,20;
32:11;34:19,20,24;
35:17
**proper (3)**
19:20;58:23;63:20
**Properties (2)**
2:14;35:9
**property (7)**
35:11,14,15,16,22;
100:12;127:16
**proponents (1)**
48:12
**proposals (2)**
41:5;45:24
**proposed (20)**
11:18;27:18;37:8,
13;39:21;40:8;45:8,
9,14,17;46:16,19,25;

50:1,10;51:23;52:24;
62:2;122:12,17
**proposition (1)**
36:22
**prospects (2)**
89:22;90:3
**protect (2)**
42:15;135:10
**protection (1)**
16:6;42:17;107:14
**protective (1)**
15:11
**prove (1)**
140:19
**provide (3)**
36:12;96:4;106:15
**provided (5)**
100:13;104:22;
105:3;127:4;132:19
**provides (6)**
18:1;28:8;35:18;
41:5;44:20;104:14
**provisions (3)**
44:19;48:13;
127:13
**public (4)**
15:11;39:17;42:9;
118:13
**publicly (3)**
18:12;28:13;119:2
**pulled (1)**
55:3
**pulling (1)**
55:9
**purchase (9)**
94:1;96:10;98:9;
99:25;100:1,4,6;
118:20;136:15
**purchased (1)**
100:2
**purchaser (1)**
96:4
**purchases (4)**
95:13,14;97:16;
99:18
**purchasing (2)**
100:3;116:9
**purported (3)**
94:1;136:14;137:9
**purports (1)**
140:6
**purpose (7)**
36:12;90:23;106:8;
109:9;116:21;132:1;
144:6
**purposes (27)**
23:21;59:18;65:17,
20,21;66:1,7;70:23;
72:3,15;73:1;79:24;
80:22;82:6;88:22;
92:17;93:23;95:14;
117:7,7;118:8;126:5,
15;132:23;133:17;

140:22;141:1
**Pursuant (8)**
2:2;4:5;12:5;15:3;
26:6;29:14;44:25;
49:16
**pursue (2)**
103:15;132:2
**push (1)**
74:17
**pushed (1)**
63:10
**put (14)**
12:17;13:17;19:15;
43:17;47:11,13;
61:11,16;63:12;
123:15;126:4,7,10,12
**puts (5)**
14:23;15:1;16:17;
17:24;125:11
**PwC (11)**
14:22;15:16,21;
16:2,20,25;17:18;
18:3,19,21;31:2

**Q**

**qualified (3)**
14:19;17:19;137:3
**qualify (2)**
113:8,14
**qualifying (1)**
113:11
**quarterly (1)**
137:5
**quickly (2)**
88:21;98:21
**quite (1)**
22:20
**quote (1)**
120:14
**quote- (1)**
119:5

**R**

**RACHAEL (1)**
6:8
**RACHEL (1)**
8:17
**radar (1)**
33:12
**Rahbar (6)**
3:12;54:20;55:5;
56:1,7,10
**RAICHT (1)**
9:2
**raise (6)**
48:22;98:2;127:22;
133:1;142:25;143:11
**raised (3)**
20:19;23:5;53:7
**range (2)**
20:8;24:11;82:14

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
Pg 166 of 173

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg                    July 26, 2013

**rank (1)**
68:23
**rate (4)**
74:17;85:7,7;88:4
**rates (2)**
90:3;117:17
**rather (10)**
25:12,14;41:16;
46:6;83:17;86:22;
89:15;132:24;
133:18;136:6
**RAY (1)**
8:6
**RE (8)**
2:7;3:11,14;4:4;
26:25;27:11;45:2,11
**reach (3)**
50:9,25;111:13
**reached (4)**
12:23;53:16;66:16;
125:19
**read (5)**
48:10;61:15;
120:14;127:20;
129:20
**reaffirms (1)**
119:6
**Real (8)**
2:13;16:8;35:8,11,
12,15;37:4;140:16
**realized (1)**
13:14
**really (25)**
17:21;39:16;42:3,
19;49:5;50:25;51:17;
58:10;79:9;80:25;
84:14;92:3;106:18;
115:5;119:4,15;
128:9;130:20;
133:24;134:5;
135:12;137:3,4;
140:2;141:10
**reason (9)**
32:15;38:3;72:22;
84:21;95:3;105:20;
106:19;109:12;
110:17
**reasonable (2)**
121:2;125:23
**reasonably (2)**
115:22,23
**reasons (10)**
15:12;29:11;32:18;
38:13;47:4;59:21;
64:6;65:2;75:21;87:8
**recall (3)**
12:22;40:6;129:14
**recalls (1)**
14:21
**receive (6)**
16:14;19:16;24:9;
95:23;121:19;122:9
**received (12)**

19:5;20:1;24:10;
48:22;54:22;56:4,5,
7;87:3;116:1,25;
143:2
**receiving (1)**
121:20
**recent (1)**
28:22
**recess (2)**
56:25;57:7
**recharacterization (2)**
90:15;97:12
**recharacterize (4)**
58:14;95:18;
101:23;138:15
**recharacterized (2)**
96:20;98:4
**recognition (1)**
74:11
**recognize (1)**
71:10
**recognized (3)**
13:16;121:7;
124:17
**recognizes (1)**
42:2
**recognizing (1)**
124:18
**recollection (1)**
129:5
**recommend (1)**
41:14
**reconsider (1)**
56:12
**record (23)**
11:5;14:7;19:4;
36:8;48:24,24;52:17;
54:1;57:9;80:17;
81:7,19,25;83:18;
87:5;100:24;108:11;
110:8;111:12;116:7;
138:25;140:23;
143:24
**recorded (1)**
128:7
**recordkeeping (1)**
129:1
**records (9)**
110:2,4,8,10,13,18;
128:11,14;137:15
**recover (4)**
122:12;123:9;
124:1;141:20
**recoveries (4)**
13:19;51:6,15;
124:9
**recovering (1)**
122:20
**Recovery (6)**
9:3;11:13,22;
21:23;73:14;122:19
**redistributed (1)**
15:2

**red-line (1)**
52:15
**redressed (1)**
25:21
**reduce (4)**
64:25;70:17;72:7;
89:4
**reduced (4)**
28:15;76:2;89:7;
121:15
**redundant (2)**
52:24;134:13
**Redwood (3)**
9:3;11:13,21
**REED (24)**
9:11,21;19:14;
20:19,21;23:1,3,3,14,
20,23;24:15,18,19,
24;25:8,9,14,19,24,
25;26:12,19;28:22
**Reed's (1)**
29:6
**refer (4)**
15:15;37:7;44:10;
117:23
**reference (5)**
44:11;69:8;120:16,
17;121:19
**referenced (2)**
34:15;41:11
**referred (3)**
105:8;113:9;
123:15
**referring (3)**
97:21;99:11;
118:25
**refers (2)**
38:17;117:23
**refile (1)**
50:8
**reflect (1)**
140:6
**reflected (1)**
99:9
**reflection (1)**
121:3
**refused (1)**
72:19
**regard (7)**
39:7;52:22;53:2;
90:17;93:3;116:5;
118:8
**regarding (1)**
80:21
**regardless (1)**
13:11
**regulations (1)**
117:13
**relate (1)**
62:19
**related (2)**
2:5;137:7
**relates (2)**

14:2;135:12
**relating (1)**
3:4
**relationship (3)**
37:23;43:20;109:3
**relative (1)**
36:16
**relatively (3)**
73:6;75:7;115:17
**release (15)**
90:20,21,23;95:4;
98:18;100:18;110:6,
15,20,25;131:2,6,22,
25;138:4
**released (14)**
92:23;101:7,9,16;
102:22,25;103:7,16;
110:21;111:6;128:8,
13;134:14;135:13
**releasing (1)**
14:19
**relevant (10)**
48:21;58:2;67:12;
79:23;83:5;125:15;
135:24;138:2;
139:15,19
**reliance (2)**
95:8;100:9
**relied (1)**
69:22
**Relief (7)**
15:14;30:24;52:24
**reluctant (4)**
81:24;84:6,6;
111:13
**remain (1)**
58:17
**remainder (1)**
68:12
**remaining (2)**
63:20;123:8
**remains (5)**
33:14;61:22;66:18;
76:13;123:18
**remediation (1)**
14:25
**remember (1)**
134:3
**remind (1)**
33:20
**render (1)**
36:20
**rendered (2)**
13:4;121:17
**renegotiate (1)**
119:11
**rents (1)**
105:2
**reorganization (1)**
40:21
**repetitious (1)**
120:15
**replace (1)**

12:25
**replaced (2)**
90:25;100:21
**repledge (1)**
100:12
**reply (4)**
26:14;54:6;58:9;
144:12
**repo (55)**
58:14;90:21,24;
91:1,21,22;92:1,1,7,
10,13;93:25;94:4,12,
18,18;95:4;96:17,18;
97:3;98:5,7,7,16,17,
24;99:20;100:19,25;
101:12,20,20;102:9,
13;103:1;132:11,13,
16,20,23;133:9;
135:8,9,15,20;136:6,
17,21;137:8,12;
138:5,8,12,14;144:6
**Report (6)**
2:22;47:22;49:19;
51:9;53:4,7
**repos (1)**
98:4
**represent (3)**
38:2;128:24;
129:12
**representation (1)**
129:2
**representations (1)**
125:22
**represented (1)**
50:24
**repurchase (20)**
91:7,11,22;95:9;
96:2,14,24;97:1,15;
98:1;99:15;100:2,10,
14;101:14;103:8;
133:18;134:15;
139:3;142:22
**repurchasing (1)**
100:3
**Request (3)**
2:20;47:20;90:22
**requested (3)**
49:15;50:18;90:18
**requests (1)**
52:25
**require (2)**
50:14;76:4
**required (5)**
16:25;17:7;27:25;
120:24;129:21
**requirement (1)**
112:12
**requirements (1)**
106:15
**RESCAP (9)**
10:20;41:12;90:18;
91:5;108:21;116:9;
131:14,15,16

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 167 of 173
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg    July 26, 2013

ResCap's (2)
131:15;140:10
resell (1)
100:12
resent (1)
55:4
reservation (3)
19:6,8;26:10
reservations (1)
22:7
Reserve (6)
12:7;24:12,18;
27:23;28:25;81:17
reserved (2)
22:10;121:8
Residential (5)
11:3;32:1,1;57:9;
91:4
residual (1)
35:12
resolution (7)
13:9;21:17;22:3;
46:9;47:14;79:14;
80:16
resolve (18)
21:12;33:10,14,16,
19;34:1,8,16,16,21,
24;41:16;42:21;
51:25;80:18;93:4,14;
111:15
resolved (3)
11:22;108:11;
126:7
resolves (1)
50:17
resolving (1)
44:22
respect (36)
15:19;19:12;27:17;
29:21;30:4,20;31:4;
34:11;35:25;37:19;
45:15;49:15;50:17;
56:16;57:19;59:25;
60:7;61:19;64:23;
68:24;77:18;81:4;
93:8,10,16;94:21,21;
102:18;105:12;
106:16;115:8;
128:25;132:4;
135:18;139:8;140:18
respects (2)
63:10;96:9
respond (1)
82:1
responded (1)
144:11
Response (10)
3:5,5;19:1,5;39:12,
13,24;54:12,20;55:2
Responses (4)
3:11;29:20;44:16;
54:5
responsibility (1)

21:15
rest (7)
17:20,24;56:17;
61:15;71:7;114:18;
137:15
restitution (1)
28:18
restructured (1)
77:8
restructuring (2)
118:24;120:11
result (13)
25:3;41:7;45:23;
64:2;66:16;67:2;
73:2;88:2;117:9;
120:3,6,10;121:6
results (1)
16:4
retained (4)
46:4;119:24;120:9;
137:8
retaining (3)
17:8,16;116:11
retired (1)
77:23
return (2)
96:4;116:3
reverse (2)
98:7;126:25
reversed (2)
66:13;79:2
review (30)
12:14,16,17,25;
14:9,10,21,22,25;
15:16,20,22;16:10,
19,21;18:15;20:7;
21:15,19;24:8;25:1,
2;28:1,19,21,25;29:3,
16,18;30:21
reviewed (4)
15:17;26:13;28:5,
22
revised (1)
52:13
revision (1)
50:15
right (100)
11:11;16:3;20:24,
25;21:4,7;23:1;
25:22,25;26:1,5;
30:15,18,25;31:15;
32:13;33:25;34:10;
35:2,24;39:11;40:15;
43:23;44:12;47:23;
52:3,18;53:19;54:14;
55:1;56:13,19;57:5,8,
9;60:16;63:23;64:5;
68:23;72:13;74:14;
75:2;78:12;80:16,17;
81:9,20,24;82:17;
83:3,15;84:16;86:6;
88:17;89:8;91:11,11;
92:25;93:13,16,20;

94:7,13,21;95:6,23;
96:6;99:14;101:14;
105:11;108:6;
109:20;110:2;
111:11,16;112:19;
114:11;117:1;
126:16;128:21;
129:10,13,22;130:19;
133:11;137:2,10,18,
20;140:5;141:4,8,11,
13;142:5,9;143:14,
18,18;144:18
rights (17)
19:6,8,24;22:8,9;
26:11;91:7,22;95:9;
96:2;100:2;106:16,
16;134:15;137:8;
139:4;142:22
RINGER (1)
6:8
rip (2)
95:7;100:13
rise (5)
40:3;55:11;105:11;
112:19;115:24
rises (1)
55:7
risk (7)
41:7;42:7;46:23;
86:21,24;140:15,16
risks (5)
45:9;86:17,18;
95:21;136:13
RMBS (2)
31:24,25
road (2)
140:5;142:2
ROBERT (1)
7:8
Roman (1)
35:7
room (2)
24:1;81:14
roundly (1)
24:3
Rule (16)
2:3;12:5;13:6;
26:6;27:1,3;29:14;
44:1,5,20,23;45:3;
72:5;73:7;124:22,25
rules (4)
66:15,25;68:22;
140:3
ruling (7)
72:18;74:12,13;
78:22;79:3;101:24;
144:2
rulings (1)
89:12
run (1)
140:15
running (1)
86:12

Rust (9)
17:8,16,18;18:4,8,
12,17;30:4,5

S

sacrificed (1)
124:4
SAD (1)
45:11
Safe (3)
92:5,17;98:25
sale (10)
94:1;95:24;96:10;
98:9;99:25;100:5;
112:18;113:4;
118:20;136:14
sales (4)
95:13,15;97:16;
99:18
salient (1)
97:9
same (16)
38:24;45:9;66:15;
89:5;93:7;97:7;
98:21;99:23;101:19;
103:9;118:7;130:18;
138:21;141:20;
143:4,10
satisfied (1)
132:20
satisfies (1)
106:11
satisfy (4)
58:18;106:18;
112:12,16
savings (1)
130:13
saw (1)
59:17
saying (11)
41:22;66:20;68:25;
72:21;76:17;87:19;
92:3,3;93:25;134:8;
138:4
scenario (1)
76:13
SCHAFFER (1)
9:17
schedule (5)
32:22,22;48:9;
63:12;105:19
scheduled (10)
40:11;42:1;43:25;
48:5;105:22;106:3;
110:21,23,24,25
scheduling (8)
34:1,2,5,23;48:7;
49:16;52:16;81:15
SCHLECKER (1)
9:18
SCHROCK (1)
8:6

scope (1)
49:5
score (1)
83:17
Scott (1)
20:10
SCRA (3)
15:15,18,19
screen (3)
33:12;43:10,17
Se (3)
9:22;23:4;112:15
search (4)
15:25;16:3,3;70:6
searches (1)
15:25
seated (3)
11:2;20:24;57:8
SEC (1)
46:13
second (39)
11:11,14;27:9;
55:10;58:13;59:15;
60:2;64:19;65:2;
66:12,14;68:14;69:3;
72:17;78:18;79:2,11,
25;84:5;87:9;89:5;
90:7,9;95:25;100:9;
112:6;118:5,25,25;
119:7,12;120:12;
121:1,6,14;122:2;
124:16;126:5;138:4
secondary (4)
37:4;64:12,14;
70:23
Section (15)
2:3;12:5;26:7;
29:15;32:5,8,12;
44:17;45:1,3;58:13;
105:4;111:1;113:9;
130:14
Secured (39)
2:16,20;7:12,21;
19:7;23:8;26:10;
36:4;44:13;46:1,11,
15,21,24,25;47:20;
57:16;58:11,17;62:2;
77:9;89:16;90:19;
91:10;96:21;97:6;
98:2,6,6;104:9;
121:16;122:25;
123:6;127:10;129:8;
131:18;133:21,25;
136:6
securities (8)
31:25;32:1,5,16;
37:1;41:16;45:25;
104:23
security (30)
63:7;74:16;84:9;
89:9;91:10;92:23;
93:1,2,2;95:4;102:15,
22;103:6,19,21;

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 168 of 173
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg    July 26, 2013

104:4,18;105:14;
106:14,22;109:11;
110:7,16;121:24;
127:9,9;130:14;
131:10,11,23
**seek (1)**
115:6
**seeking (7)**
36:18;46:6;49:19;
53:2;55:23;116:11;
133:22
**seeks (4)**
45:9,17;50:5;131:3
**seem (4)**
36:22;81:18;89:12;
111:12
**seemed (3)**
29:5;39:23;129:20
**seems (10)**
20:15;65:18;68:24,
25;77:5;80:15;84:25;
86:4,10;106:18
**selected (1)**
39:11
**self (1)**
46:9
**self-evident (1)**
20:15
**sell (4)**
90:23;100:15;
128:17;137:9
**seller (1)**
100:1
**sellers (4)**
91:3,5;95:20,21
**Senate (2)**
24:1;25:16
**senators (2)**
24:3;25:10
**senior (3)**
121:18,21;122:9
**seniority (1)**
121:24
**sense (6)**
39:23;70:25;79:12;
85:12;89:12;115:16
**senses (2)**
60:19,24
**sent (1)**
30:14
**sentence (8)**
61:6,11,15,18;
106:21;107:2,5;
112:21
**separate (3)**
21:23;30:5;34:4
**separately (1)**
27:15
**separation (1)**
43:14
**series (1)**
98:22
**served (1)**

49:8
**serves (1)**
46:19
**service (2)**
14:5;15:14
**servicers (4)**
12:24;13:1;24:14;
29:10
**Services (4)**
9:3;11:13,22;46:5
**servicing (1)**
12:24
**session (2)**
41:25;42:3
**sessions (1)**
42:11
**set (9)**
2:21;12:21;27:6,9;
47:21;52:14;62:20;
90:6;133:7
**sets (2)**
27:12;38:13
**setting (4)**
17:13;71:13;
141:15;142:7
**settle (3)**
13:15,20;32:24
**settled (2)**
11:8;49:22
**Settlement (48)**
2:17;12:8;14:1,6,
20,23;15:1,6;16:8,17;
17:20;19:2,15,18,21;
20:12;21:13,16;22:9,
17;23:11;26:18;27:2,
3,5,6,14,18,18;28:2,8,
9,11,15;29:12;36:5;
37:5;41:3;44:14,25;
45:5,24;46:16,22;
48:5,7,12,12
**settlements (4)**
12:23;13:2;26:22;
28:10
**settling (1)**
44:21
**setup (1)**
98:22
**seven (2)**
27:12;133:19
**seventy-two (1)**
140:14
**several (7)**
11:7;30:8,19;
32:18;52:25;53:7;
64:5
**shaking (1)**
134:8
**shall (4)**
19:23;45:18,19;
106:22
**shape (1)**
38:11
**shared (1)**

57:24
**Shearson (1)**
45:1
**shed (2)**
63:15;128:22
**sheet (18)**
12:11;13:23,25;
14:9;17:1,8;63:16;
64:20;67:19;70:1,17;
71:9,19;77:2,21;
96:9;137:3,4
**SHORE (21)**
7:16;47:24,25;
48:3,15,16;49:9,10,
15;50:24;51:16;52:4,
6,9,13,18,19,22;
53:16,17,18
**Shore's (1)**
108:22
**short (5)**
30:1;48:10;57:21;
63:24;114:20
**shortened (2)**
12:10;44:15
**short-form (1)**
49:25
**show (19)**
16:13;50:16;64:16;
82:18;88:22;100:24;
107:5;110:6,8,9;
116:14;126:4,5;
128:25;129:12;
130:6;134:23;140:7,
9
**showed (1)**
139:8
**showing (2)**
117:8;126:10
**shown (2)**
115:12;125:8
**shows (3)**
112:22;122:8;
123:12
**shy (1)**
17:16
**side (3)**
122:8;127:23;
129:24
**sides (7)**
41:3,5;66:23;
67:10;81:1;83:11;
144:17
**sideways (1)**
140:10
**sign (2)**
14:11;16:5
**significant (5)**
42:7;123:7;124:8;
129:18;137:8
**significantly (4)**
17:25;73:14;
125:11;136:16
**sign-off (1)**

17:3
**signs (1)**
16:4
**similar (7)**
13:2;24:9;45:6,8;
46:12;93:8;96:25
**similarities (1)**
98:4
**simple (5)**
31:5;66:10;68:9;
76:6;119:16
**simplest (1)**
131:13
**simply (9)**
14:4;16:6;35:10;
69:7,10;76:9,21;
83:18;133:8
**simultaneously (2)**
91:1;116:8
**single (3)**
12:19;61:5;62:9
**sit (2)**
119:3;142:17
**site (1)**
17:13
**sitting (3)**
20:10;21:2;42:22
**situation (10)**
72:10;73:5;78:2;
121:3;123:13,13;
125:6;133:12;
141:15;142:7
**situations (2)**
40:25;124:21
**six (6)**
15:19;48:11,12;
133:19;140:8;142:1
**sixty (1)**
75:9
**sixty-eight (1)**
35:11
**sixty-million-dollar (1)**
20:8
**size (4)**
90:5;141:16;
142:10,12
**skip (1)**
55:16
**slide (13)**
84:5;87:8;99:5,11;
102:6;104:15;
106:12;112:7,7;
119:15;122:2,8;
123:12
**small (1)**
115:17
**smaller (3)**
71:14,15;84:12
**smart (1)**
78:19
**SMITH (1)**
9:11
**smooth (1)**

22:22
**sold (9)**
62:22;90:20;96:1,
19;97:1;98:24;
102:11,25;103:25
**sole (1)**
120:23
**Solely (4)**
2:21;47:21;68:13;
78:17
**somebody (5)**
43:5;106:23;
107:20,22;131:10
**somebody's (1)**
43:6
**somehow (4)**
36:15;92:18;99:1;
122:25
**someone (2)**
124:15;138:15
**somewhat (2)**
85:11;120:10
**somewhere (2)**
25:4;28:17
**sons (2)**
121:22;124:9
**Sontchi (4)**
95:1;99:4,22;
138:18
**soon (4)**
30:11;122;74:24;
143:22
**sophisticated (7)**
33:15,16;74:3;
80:20;86:15;87:13;
88:10
**sorry (4)**
11:14;68:7;125:12;
141:14
**sort (4)**
58:11;68:23;94:10;
103:5
**sorts (1)**
51:20
**Sounds (1)**
52:8
**South (1)**
10:13
**SPAEDER (2)**
10:2;34:13
**speak (6)**
20:23;22:25;40:3;
54:13;58:25;112:23
**speaking (1)**
24:19
**Special (2)**
8:10;44:21
**specific (8)**
39:7;41:2;49:6,18,
20;51:6,15;121:3
**specifically (7)**
18:14;39:1;45:17;
51:14;53:6;95:4;

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
Pg 169 of 173

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg

July 26, 2013

132:19
**speculate (1)**
  122:3
**spend (1)**
  144:8
**spending (1)**
  14:23
**spent (4)**
  33:8,19;37:25;40:5
**springs (1)**
  101:17
**St (1)**
  35:12
**stage (2)**
  12:21;34:6
**stand (5)**
  75:8;122:7,9,12,18
**standard (5)**
  46:2;99:20;102:13;
  130:15,22
**standards (3)**
  27:9;96:23;130:24
**standing (5)**
  23:5,18,22;59:11;
  129:5
**standpoint (4)**
  20:16;76:22;80:24;
  86:18
**STANG (2)**
  7:1;126:19
**Stanley (1)**
  46:17
**start (14)**
  14:14,18;41:22;
  44:6;62:11;85:5;
  89:13;94:13;96:16;
  115:21;119:25;
  127:1;129:20;137:15
**started (5)**
  60:2;96:15;97:3;
  103:5;138:4
**state (5)**
  38:3,4;51:13;
  109:18;134:22
**stated (2)**
  37:14;51:10
**statement (14)**
  26:16;39:13;50:9,
  15;51:1,11,22;52:14;
  53:17;131:3,5;
  132:19;135:10;137:3
**statements (1)**
  137:5
**States (1)**
  46:14
**stating (1)**
  135:7
**status (8)**
  31:19;36:16;45:14;
  50:18;58:19;104:12;
  118:16;134:16
**statute (5)**
  44:23;66:17;69:2;

92:1;120:19
**statute's (1)**
  120:23
**statutory (6)**
  66:5,15,25;68:22;
  69:9;124:19
**stay (1)**
  29:17
**stayed (1)**
  32:7
**steal (1)**
  107:14
**STEEN (1)**
  8:20
**STEPHEN (1)**
  6:11
**sticking (1)**
  78:25
**still (9)**
  17:2;40:6;74:18;
  75:16;83:4;92:20;
  114:6;123:7;144:5
**stipulated (4)**
  58:22;59:7;61:21;
  91:17
**stipulation (4)**
  11:23;59:18,21;
  111:23
**stock (1)**
  111:23
**stop (4)**
  13:15;110:1;
  127:20,20
**stopped (2)**
  14:9,10
**straddle (1)**
  50:11
**straddles (1)**
  51:1
**straightforward (2)**
  123:16;125:1
**STRAUSS (2)**
  8:9;57:15
**Street (4)**
  4:22;6:16;9:4;10:4
**stretch (1)**
  121:25
**stripped (1)**
  121:23
**structural (1)**
  121:24
**structurally (1)**
  121:18
**structure (4)**
  87:18;98:8;127:8,9
**structured (1)**
  28:25
**struggling (5)**
  65:24;80:15;83:4;
  132:23;144:4
**stuff (3)**
  39:22;58:6;68:21
**sub (2)**

112:11;113:9
**subject (15)**
  17:3;18:5,8;33:2,3;
  46:24;49:20,24;
  92:22;105:17;108:5;
  123:17;129:7;131:5;
  134:6
**submission (1)**
  143:19
**submit (7)**
  30:23;35:20;37:13;
  50:14;52:10,13;55:2
**submitted (2)**
  20:25;54:6
**submitting (1)**
  11:23
**subpoena (1)**
  139:21
**subsection (1)**
  104:22
**subsequent (4)**
  41:7;64:8;66:14;
  72:21
**subsequently (4)**
  37:10;59:22;67:1;
  132:22
**subset (1)**
  134:6
**subsidiary (1)**
  121:22
**substance (2)**
  94:2;132:5
**substantial (5)**
  21:22;22:1;24:6;
  37:12;136:21
**substantially (2)**
  45:8;137:1
**succeed (1)**
  33:11
**success (1)**
  42:19
**successful (2)**
  13:12;116:23
**successor (1)**
  57:15
**suddenly (1)**
  84:15
**suffer (1)**
  55:13
**suffered (1)**
  120:8
**sufficient (3)**
  24:4;59:21;98:19
**sufficiently (3)**
  99:22;116:22;
  129:21
**suggest (2)**
  68:13;79:15
**suggested (2)**
  118:3;125:15
**suggesting (5)**
  49:10;69:7;139:14,
  15,16,19

Suite (1)
  4:22
**suits (1)**
  32:4
**sum (4)**
  12:25;28:20;95:16;
  124:16
**summarized (1)**
  126:3
**summary (6)**
  81:8,11,14,15,16;
  115:15
**summer (1)**
  40:5
**Summers (1)**
  108:15
**sums (2)**
  29:2;124:6
**superfluous (1)**
  134:5
**Supplemental (3)**
  2:20;47:20;48:7
**supplements (1)**
  48:9
**support (16)**
  19:3;21:1,7;22:11,
  25;26:16;59:15;60:3;
  70:21;81:2;93:9;
  95:17;102:4;127:25;
  133:24;136:5
**supported (1)**
  28:7
**supportive (1)**
  41:23
**supports (1)**
  79:16
**suppose (3)**
  73:5;123:18;
  125:13
**supposed (7)**
  71:6;100:5;106:9;
  108:15,18,18,21
**Supreme (4)**
  27:7;66:14;120:17;
  124:18
**sure (10)**
  15:10;26:14;57:23;
  67:1;73:6;74:25;
  87:1,4;88:8;109:18
**surprised (1)**
  143:25
**surround (1)**
  132:3
**suspect (2)**
  24:9;82:13
**sustain (2)**
  64:24;139:10
**sustained (1)**
  56:16
**swapped (1)**
  79:23
**sweep (1)**
  92:8

**Sweet (10)**
  94:25;96:20;97:2;
  98:3;99:21;100:8;
  132:18;133:12;
  138:1,13
**Sweeten (2)**
  88:3,4

---

**T**

**table (2)**
  42:22;53:10
**tailored (2)**
  37:14;41:13
**talk (4)**
  58:2;60:4;91:2;
  103:23
**talked (4)**
  65:3;69:12;84:7;
  112:11;130:21
**talking (8)**
  18:8;48:17;60:1;
  64:8;70:12;103:24;
  106:10;120:22
**talks (4)**
  64:6;99:25;100:5;
  106:12
**TAMMY (1)**
  10:23
**tax (25)**
  35:14;65:20;66:7;
  67:20;70:23;79:22;
  80:3,6,22;86:18;
  88:25;89:6;98:10;
  117:6,7,13,15,17;
  126:5,15;138:1;
  140:22;141:1,2,5
**taxable (1)**
  80:12
**telephone (1)**
  34:5
**TELEPHONICALLY (4)**
  10:7,17,23;54:7
**telling (2)**
  70:6;85:21
**template (1)**
  34:2
**temporal (1)**
  112:12
**temporally (1)**
  104:13
**temporarily (1)**
  104:12
**temporary (3)**
  12:17;36:20;45:19
**ten (3)**
  12:23;71:7;88:11
**tender (1)**
  116:23
**tendering (1)**
  116:11
**tenet (1)**
  64:9

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 170 of 173
Case No. 12-12020-mg,  Adv. Proc. No. 13-01277-mg                                July 26, 2013

**ten-minute (1)**
  56:25
**term (7)**
  12:11;13:23,25;
  14:8;17:1,8;117:22
**terminate (1)**
  107:19
**terminated (2)**
  105:24;108:4
**terminates (1)**
  109:5
**termination (7)**
  105:11;106:15,21;
  112:19;131:3,5;
  138:5
**terms (19)**
  22:21;59:9;63:10;
  81:4;84:10;85:1,21;
  86:20;87:21;96:24;
  99:6,7;119:5,10;
  120:25;121:6,14;
  130:3,15
**Terri (1)**
  3:14
**terribly (1)**
  86:6
**testimony (7)**
  24:2;25:15;28:22;
  126:10,10;130:4;
  133:22
**Texas (1)**
  45:13
**thankful (2)**
  12:9;47:17
**theoretical (3)**
  74:12,13,14
**theory (1)**
  88:23
**there'd (3)**
  72:21;82:25;
  109:12
**therefore (3)**
  67:21;122:24;
  133:9
**therein (1)**
  51:19
**thinking (4)**
  72:5;81:10;111:4;
  135:11
**Third (7)**
  7:3;17:7;27:24;
  28:5;58:15;65:2;96:2
**third-party (2)**
  19:23;23:6
**thirty (5)**
  14:10,11;79:6,9;
  134:2
**thirty-day (1)**
  14:16
**this'll (1)**
  73:9
**THOMAS (2)**
  8:25;10:17

**though (2)**
  55:12;137:9
**thought (7)**
  69:8;78:19;108:14;
  125:12;134:9;
  139:22;144:16
**thousand (1)**
  63:5
**three (5)**
  13:1;17:16;53:21;
  58:10;96:17
**throughout (1)**
  123:5
**throw (1)**
  87:10
**throwaway (1)**
  61:14
**tier (1)**
  16:1
**tiered (1)**
  15:23
**tight (2)**
  12:10;53:10
**timed (1)**
  48:11
**timely (1)**
  55:2
**times (3)**
  51:10;58:18;
  107:15
**timetable (1)**
  53:11
**timing (1)**
  50:3
**TMT (1)**
  27:7
**today (19)**
  14:16;22:13,15,18;
  26:22;42:18;52:17;
  54:9;59:14;60:1;
  66:3,16;89:18;96:15;
  130:21;131:6;133:3,
  6,7
**Todd (1)**
  3:6
**to-face (1)**
  40:13
**together (3)**
  45:24;70:19;
  134:11
**told (4)**
  98:17;126:13,14;
  143:14
**TOLLES (1)**
  10:11
**took (4)**
  72:8;131:17;
  138:11;144:4
**tools (1)**
  87:17
**top (5)**
  15:13;99:16;
  131:13;137:13,16

**tort (1)**
  50:7
**total (6)**
  14:6;15:17;28:14;
  48:11;95:16;142:14
**totally (1)**
  55:8
**touch (1)**
  102:23
**touches (1)**
  102:20
**toward (1)**
  41:9
**towards (1)**
  63:4
**Tracey (2)**
  3:5;55:17
**track (1)**
  113:21
**trade (6)**
  74:23;81:4;86:12;
  88:9,12;90:2
**traded (9)**
  63:25;64:13;71:16;
  72:4,23;82:6;84:20;
  90:1,4
**traders (1)**
  43:14
**trading (21)**
  37:18;39:5;42:6;
  43:3,13;71:14;72:8;
  73:4,16;74:25;75:10;
  79:6,7;82:14,22;
  85:15;86:13;89:4;
  116:15;117:2;139:25
**traditional (1)**
  46:2
**Trailer (1)**
  27:7
**train (1)**
  125:12
**transaction (25)**
  90:21,24;92:4,11;
  94:1,22;98:25;119:4;
  132:5,11,16,22;
  133:15,17;135:8,18,
  20;136:2,6,7,18,21,
  22,25;137:12
**transactional (1)**
  97:5
**transactions (4)**
  95:13;97:15;98:9;
  99:17
**Transcribed (1)**
  4:20
**transcript (1)**
  49:2
**transcripts (1)**
  24:3
**transferred (2)**
  110:7,17
**treat (3)**
  128:10;129:25;

**143:9**
**treated (8)**
  13:5;117:6;122:23,
  24;125:9,9;126:11;
  137:23
**treatment (10)**
  79:22;80:3,6;
  98:11;117:15;138:1,
  2;140:6,8,10
**triable (1)**
  98:3
**trial (12)**
  48:7,9,11,14;67:7;
  81:1;101:19;110:13;
  115:7,18;126:2,2
**tried (4)**
  24:20;79:15;98:24;
  99:6
**triggered (1)**
  66:8
**troubled (1)**
  80:23
**troubling (1)**
  81:23
**true (8)**
  18:19;64:24;70:10;
  85:25;96:13;118:3;
  130:25;136:17
**truly (2)**
  115:19,22
**Trust (2)**
  8:21;32:16
**trustee (3)**
  57:16;90:19;
  104:18
**trustee's (1)**
  49:7
**try (8)**
  30:15;31:2;33:10,
  14;34:16;39:19;
  41:16;68:4
**trying (15)**
  29:7;33:19;38:11;
  47:13;58:21,24;60:5,
  8;61:17,18;72:11;
  101:23;113:8,21;
  138:2
**Tsounakas (1)**
  3:15
**Tuesday (7)**
  40:12;42:1,23;
  43:25;44:3,7;53:6
**tug (1)**
  102:11
**turn (10)**
  14:12;62:17;64:12,
  13;83:25;90:7;93:19;
  101:15;111:17;
  112:13
**turning (1)**
  102:2
**turns (2)**
  101:17;103:4

**TWEED (2)**
  7:20;36:9
**twelve (2)**
  35:17;48:11
**twenty (3)**
  79:6,9;134:2
**twisting (1)**
  59:25
**two (26)**
  19:5,6,13;48:20;
  49:25;50:3,25;53:21;
  55:25;70:2;71:8;
  84:14,17,24;91:3;
  94:10,24;95:20;
  96:11;99:15;101:18;
  102:12;111:17;
  135:11;139:14;
  143:17
**type (5)**
  39:22;84:7;138:12;
  140:18
**types (4)**
  87:21;97:4,9;
  104:25
**typically (1)**
  125:9

---

## U

**UAB (1)**
  32:3
**UCC (4)**
  41:25;96:21;
  109:13;135:9
**UCC-1 (1)**
  58:17
**UCC-1s (3)**
  91:13;104:7;106:9
**UCC-3 (1)**
  131:5
**ultimate (2)**
  73:14;143:24
**ultimately (11)**
  13:22;22:8,14;
  23:12;73:1;81:5,6,
  21;83:5;93:13;
  111:16
**UMB (11)**
  4:3,5,8:10;56:23;
  57:12,15,18;63:19;
  133:7;135:22;144:12
**Um-hum (1)**
  56:6;66:2
**un (1)**
  85:15
**unable (2)**
  34:24;47:1
**unambiguous (2)**
  137:24;138:20
**unamortized (3)**
  117:20;123:8;
  142:2
**uncertainty (3)**

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
Pg 171 of 173
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg
July 26, 2013

75:13;85:9,16

**uncontested (3)**
35:7,10,20

**Under (58)**
2:4,12;12:11;
13:24;15:5,6,15;16:9,
25;17:1,7,7;18:3;
19:16,24;20:2,12;
22:12;24:7;26:8;
27:1,3;28:3,10,15;
32:5;36:14;43:4,22;
46:2;47:1;55:8,10;
58:12;66:4;74:17;
90:21;91:7;92:8;
96:23;98:24;100:9;
103:18;104:19;
117:19;120:12;
121:3,5;122:11,17;
123:10,10,19;131:8;
135:24;136:15;
140:14;143:19

**underlying (4)**
119:6;121:13;
132:21;135:20

**undersecured (1)**
123:11

**understood (3)**
53:2;55:15;121:2

**undertake (1)**
45:21

**undertaking (1)**
86:24

**underwriters (2)**
46:3;120:22

**undeveloped (1)**
35:11

**undisputed (3)**
90:17;115:12;
117:19

**unencumbered (1)**
19:11

**unfair (4)**
71:4,5,9;86:6

**unfortunately (2)**
37:2;50:13

**unhappier (1)**
84:20

**unhappy (1)**
84:14

**Union (8)**
2:8,10,10;10:3;
31:11,21,22,23

**unions (2)**
31:24;32:4

**unique (2)**
133:2,4

**United (1)**
46:14

**units (1)**
35:13

**unless (7)**
18:22;21:5;65:10;
84:9;113:11;124:24;

136:21

**unmatured (50)**
58:12;61:20;62:6,
8,10,24;64:6,9,22;
65:7,13,17,19,21;
66:24;67:9,16,18;
68:15;70:18;71:22;
72:10,18;73:8;75:19;
76:3,5,22;77:11,14,
24;78:3,7,11,22;
79:24;83:1;84:7;
85:4;87:15;115:2,7;
117:21,22;119:19;
122:23;124:8;140:3,
16;141:18

**unpaid (2)**
61:22;63:21

**unpersuaded (1)**
79:12

**unpredictability (1)**
98:13

**Unsecured (22)**
4:3;13:5,19;27:10;
29:16;56:22;57:12;
77:6;89:15,16;
118:16,17;119:22,23,
24;120:9;121:21;
122:9,10,11;124:9,10

**unsecureds (1)**
141:20

**unwound (8)**
92:7;101:1;105:18,
23;132:22,22;
134:17;144:7

**up (30)**
17:13;34:3;39:23;
43:4,17;48:3;51:14;
53:10;54:13;57:22;
60:3;64:16;86:8;
87:8;90:1;91:8;95:7;
96:15;97:22;100:13;
101:5;106:1;111:2;
113:24;120:5;131:9;
140:10;141:15;
142:7;143:12

**upon (8)**
37:23,24;39:2;
55:3;69:23;106:21;
110:15;131:25

**upside (1)**
124:4

**urge (1)**
22:17

**usage (8)**
81:4;93:10;127:24;
130:4;133:22;
134:23;135:14,17

**USC (1)**
2:12

**use (5)**
34:2;59:19;82:16;
109:1;131:13

**used (3)**

97:8;117:14,15

**useful (1)**
40:8

**using (2)**
15:25;44:21

**usually (1)**
96:5

**utilize (1)**
15:16

**UZZI (27)**
7:25;36:6,7,8,9;
38:8,19,23;39:2,9,12;
40:22;42:25;43:1,11,
16,19,24;44:1,2,4,9;
47:5,8,9,10,16

**V**

**vacation (2)**
52:5;143:21

**validation (1)**
27:25

**valuable (3)**
22:21;91:8;121:16

**valuation (1)**
118:8

**value (55)**
14:3;35:14,19;
49:21;63:4;67:21,23;
71:23,25;72:15,16,
17,23;73:17;74:6,25;
75:18;76:12,12,20,
20;79:5;82:7;85:12,
14,23;86:7,13,13;
88:3,24;89:6,8,25,25;
91:12,22;94:6,7;96:2,
3;101:13;115:25;
116:6,15,20,25;
118:14;125:20,21;
134:1;136:16;
139:25;142:13,14

**Various (4)**
28:10;29:20;40:10;
48:13

**vary (1)**
142:4

**varying (1)**
63:11

**verification (1)**
17:5

**verify (1)**
28:1

**versus (1)**
74:5

**viable (1)**
134:22

**view (9)**
13:4;19:20;52:23,
23;53:9;81:16;87:13;
130:18;133:24

**viewed (1)**
89:22

**views (1)**

38:3

**violate (4)**
105:11;106:14,15;
112:18

**violation (1)**
16:12

**violations (4)**
15:14,18,24;37:1

**virtue (3)**
61:5;91:12;119:24

**vis-a-vis (3)**
92:19;95:7,8

**visual (1)**
119:16

**vital (1)**
97:7

**Vitro (5)**
37:8,9;45:7,10,11

**volatile (1)**
75:7

**voluntarily (2)**
24:21;106:4

**voluntary (2)**
24:22;98:8

**VP (1)**
20:10

**W**

**Wait (3)**
32:11;51:24;52:1

**waiting (1)**
50:13

**waived (1)**
49:4

**waiver (1)**
20:18

**Walker (1)**
3:13

**Wall (1)**
9:4

**WALPER (1)**
10:17

**Walter (1)**
46:17

**WaMu (1)**
40:6

**war (1)**
102:12

**Washington (1)**
10:5

**waterfall (9)**
15:3,9,13,23;27:21,
25;28:1,11;73:17

**way (22)**
19:2;35:1;53:10;
58:7;59:14,17;60:9;
62:14;81:6,18;88:18;
98:23;99:2;106:9;
108:20;111:25;
122:23;125:9;
126:11;129:22,22;
137:14

**ways (2)**
108:2;135:11

**Web (1)**
17:13

**Wednesday (1)**
54:6

**week (6)**
15:22;34:24;40:12;
48:17;53:6;143:21

**weeks (1)**
49:25

**weigh (1)**
74:15

**welcome (1)**
52:19

**well-conceived (1)**
28:24

**Wells (7)**
9:12;57:18;63:19;
133:13;135:23,23;
136:2

**West (1)**
4:22

**Western (2)**
2:9;31:22

**what's (14)**
40:8;50:16;51:4;
62:19,20;81:23;
88:15;110:25;
128:15;133:16;
134:1;136:10;
137:10;138:22

**whatsoever (1)**
59:8

**whenever (2)**
103:12;108:19

**Whereupon (1)**
144:19

**wherever (3)**
104:20;107:9;
109:10

**WHITE (2)**
7:11;108:15

**whole (2)**
105:20;117:3

**who's (2)**
75:8;114:11

**whose (3)**
20:25;110:10;
128:16

**Wiener (5)**
19:13;26:1,2,11,18

**WILLIAM (1)**
6:19

**willing (2)**
56:9;88:5

**willingness (1)**
24:13

**WILMER (2)**
6:14;22:19

**Wilmington (1)**
8:21

**wind (1)**

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg, Adv. Proc. No. 13-01277-mg
July 26, 2013

86:8
**windfall (8)**
72:9,19,22;73:2;
120:8;121:20,21,25
**wish (7)**
26:4;34:10;35:24;
39:25;41:19;42:24;
54:13
**WISHNEW (18)**
35:5,6,23;36:2;
53:24,25;54:1,18;
55:1,15,19,22;56:2,6,
9,12,14,18
**withdraw (3)**
35:17;56:10;
113:21
**withdrawn (2)**
56:15;125:13
**withdrawn] (1)**
3:7
**withdrew (2)**
55:20;144:12
**within (8)**
14:11;45:10;49:25;
52:25;58:16;59:4;
92:8;98:25
**without (12)**
16:13;33:17;41:7;
46:23,24;48:24;50:8;
91:25;96:12;101:2;
144:1,15
**witness (1)**
49:8
**Wolicki (1)**
4:20
**wonder (1)**
66:11
**wondering (1)**
108:9
**words (10)**
65:16;66:10;68:15;
78:7;99:14,19,23;
104:16;109:8;127:14
**work (12)**
16:21,25;18:14;
32:21;34:22;53:9;
64:3;107:12;108:18,
21;129:6;144:3
**worked (2)**
22:19;38:9
**working (2)**
29:1;42:20
**workout (1)**
87:12
**workouts (1)**
79:14
**works (3)**
90:6;108:17;112:1
**world (2)**
59:14,17
**worse (2)**
73:20;124:6
**worth (9)**

71:17;74:20;75:12,
18,18;86:23;88:25;
139:4;142:23
**would-be (1)**
87:18
**wrench (1)**
87:11
**write (6)**
69:2;71:18;106:20,
25;107:2;109:8
**written (4)**
106:24;107:20,22;
112:21
**wrong (6)**
20:11;88:11,11,13;
91:21;141:11
**wrongs (1)**
25:20
**wrote (1)**
107:5

**X**

**XIII (1)**
62:6
**XIV (2)**
113:20,23

**Y**

**year (5)**
12:22;13:22;123:4;
140:8,8
**years (3)**
140:4,6;142:1
**yesterday (4)**
38:21;49:2,3;50:10
**York (13)**
4:23;6:5,17;7:5,14,
23;8:4,12,23;9:6,15;
95:10,11

**Z**

**ZENSKY (183)**
8:14;57:14,14,24;
58:1,5,8;59:2,6,9,24;
60:10,13,16,19,22,
25;61:2,4,12,14,25;
62:4,14,17;63:9;65:9,
13,24;66:3,7;67:3,14,
17,23,25;68:2,4,7,11,
18;69:6,19,21;70:11;
72:2;73:3,12,22;74:1,
8,10,14,20,22;75:4,6,
24;76:7,11,18,23;
77:12,16,20,23;78:1,
6,12,15,17,25;80:4,7,
10;81:9,12,20;82:1,
10,21,23;83:4,9,16,
20,22,25;84:4,16,19;
85:2,17,25;86:3,21;
87:2,6,23;88:8,15,20;

89:10,17,20,22;
90:13;91:16;92:16,
25;93:6,12,16,19,21,
23;94:6,13,16,24;
96:6;99:13;100:20;
101:4,9,11;102:1,7,
20;103:23;106:25;
107:4,6,8,13,21,24;
108:2,6,13;109:17,
20,22,25;110:4,19;
111:2,4,17,20;
112:10;113:1,19,23;
114:3,7,10,24;118:3;
120:14;121:18;
134:8,12;137:21;
138:24;139:3,7,18;
140:23;141:1,5,14,
23,25;142:5,7,10,12,
16,19,22;143:1,7
**ZIDE (1)**
6:11
**ZIEHL (2)**
7:1;126:19
**ZUCKERMAN (2)**
10:2;34:13

**1**

**1 (6)**
12:2;50:11;51:1;
56:21;115:18;120:22
**1,000 (27)**
62:22;69:16,25;
70:15,15;71:10,12,
12,16,19;73:17;77:6,
8,9,13,13,15;84:13,
14,17,20;86:22;89:2,
14,15;121:15;122:10
**1,000-dollar (8)**
62:23;70:4;71:2,4;
119:23,24;122:11,13
**1,200 (1)**
77:15
**1,970 (1)**
15:17
**1.5 (1)**
82:24
**1:25 (1)**
144:19
**10 (1)**
51:18
**100 (1)**
77:1
**10005 (2)**
7:23;9:6
**10006 (1)**
8:23
**10007 (1)**
6:17
**10017 (1)**
7:5
**10022 (2)**
8:4;9:15

**10036 (3)**
6:5;7:14;8:12
**10040 (1)**
4:23
**105 (1)**
45:3
**105a (3)**
2:13;44:17;45:1
**1099s (1)**
117:8
**11 (7)**
2:12;32:5,8,12;
36:23;37:9;46:21
**11:13 (1)**
57:7
**11:26 (1)**
57:7
**11-33335-hdh-15 (1)**
45:12
**1155 (1)**
7:13
**1177 (1)**
6:4
**11th (3)**
24:2;25:10;45:2
**120 (1)**
76:25
**12-12020 (1)**
11:3
**12b6 (5)**
4:6;97:24;101:21;
138:16,17
**13-01277 (1)**
57:13
**13-01277-mg (1)**
4:2
**136 (1)**
123:8
**138 (1)**
93:24
**14 (1)**
46:13
**141 (2)**
93:24;136:9
**142 (1)**
95:18
**147 (1)**
136:9
**153 (1)**
93:24
**156 (1)**
93:24
**16 (1)**
48:5
**16th (3)**
39:10;40:14,17
**17 (2)**
31:9,10
**18 (1)**
35:7
**1800 (1)**
10:4
**19 (1)**

48:5
**192nd (1)**
4:22
**1968 (1)**
27:8
**1980 (1)**
46:18
**1983 (1)**
46:14
**1996 (1)**
45:2
**1997 (2)**
26:25;46:14
**19th (1)**
56:5

**2**

**2 (8)**
11:17;50:11;51:2;
79:17;84:5;87:8;
105:4;130:14
**20 (3)**
4:4;111:24;112:2
**200 (1)**
124:4
**20036 (1)**
10:5
**2004 (2)**
11:12,23
**2007 (1)**
27:11
**2008 (10)**
63:2;75:7,10;
79:22;89:17,20;
103:12;106:5;112:4;
115:24
**2010 (2)**
90:18;103:13
**2011 (3)**
40:5;91:2;103:13
**2012 (3)**
45:10;54:22;129:6
**2013 (3)**
24:2;29:22;39:11
**2015 (1)**
63:13
**20th (2)**
54:22;56:8
**21 (2)**
4:4;29:22
**21st (3)**
13:14;31:1;91:2
**22 (1)**
53:22
**229,769,899 (1)**
14:7
**22nd (1)**
9:14
**23 (1)**
4:4
**230 (9)**
13:25;14:2,5;15:1;

12-12020-mg    Doc 4397    Filed 07/29/13    Entered 07/29/13 15:51:08    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 173 of 173
Case No. 12-12020-mg,  Adv. Proc. No. 13-01277-mg    July 26, 2013

17:18;19:9;20:13;
21:24;25:6
**232,000 (1)**
16:14
**24 (1)**
56:21
**250 (1)**
6:16
**26th (3)**
12:12;13:24;45:10
**270 (1)**
28:17
**28 (1)**
4:4
**29 (1)**
4:4
**293 (1)**
34:21
**2d (2)**
27:11;46:18

### 3

**3 (1)**
88:21
**30 (1)**
19:23
**300 (2)**
24:11;97:11
**300,000 (2)**
12:18;16:23
**3013 (1)**
29:14
**3055 (1)**
29:19
**30th (2)**
40:16;123:4
**31 (1)**
14:2
**311 (1)**
45:11
**31st (1)**
52:7
**327e (1)**
31:5
**350 (2)**
24:25;25:16
**355 (1)**
10:13
**35th (1)**
10:14
**360 (1)**
122:12
**362a (1)**
29:15
**363b1 (3)**
2:3;12:6;26:7
**36th (1)**
7:4
**377 (4)**
82:16;83:1;114:25;
117:13
**37th (1)**

9:5
**382 (1)**
72:14
**389 (1)**
26:25
**390 (1)**
27:8
**3923 (1)**
3:9
**3924 (1)**
3:2
**3d (1)**
26:25

### 4

**4 (1)**
99:12
**40 (1)**
9:4
**400 (1)**
88:25
**4050 (2)**
2:7;31:12
**4051 (1)**
2:7
**414 (1)**
27:8
**4165 (1)**
54:21
**4167 (1)**
55:18
**4217 (2)**
2:12;35:25
**4225 (1)**
2:5
**4228 (2)**
2:2;26:9
**4277 (1)**
2:19
**4286 (2)**
2:16;44:15
**4292 (1)**
26:12
**4296 (2)**
2:2;26:11
**4304 (1)**
44:16
**4327 (1)**
26:15
**4329 (1)**
26:16
**4363 (1)**
48:8
**449 (1)**
45:2
**450 (2)**
24:25;25:16
**452 (1)**
27:11
**463 (1)**
46:13
**478 (1)**

27:11
**491-dollar (1)**
122:15

### 5

**5 (2)**
31:10;102:6
**50 (1)**
25:4
**500 (1)**
85:15
**502 (1)**
58:13
**502b (4)**
65:17;66:10,24;
68:9
**502b2 (7)**
64:22;66:5;75:25;
83:15;117:19;121:4,
5
**502d (1)**
71:22
**521 (1)**
46:14
**530 (1)**
120:22
**554a (1)**
2:13
**555/559 (1)**
135:25
**560 (1)**
28:17
**599 (1)**
9:13

### 6

**6 (5)**
104:6,15;112:4,7;
120:22
**60 (1)**
25:4
**600 (3)**
84:21;86:24;89:16
**601 (1)**
8:3
**623 (1)**
46:17
**642 (1)**
46:14
**646 (1)**
46:13
**65,000 (1)**
16:22
**652 (1)**
46:14
**655 (1)**
46:13
**658 (1)**
122:17
**658-dollar (1)**
122:19

### 7

**7 (3)**
51:17;106:12;
112:7
**700 (1)**
4:22
**700-dollar (1)**
120:3
**7016 (1)**
45:3
**7016c2I (1)**
44:20
**780 (1)**
7:3
**796 (1)**
46:17
**799 (1)**
46:17

### 8

**80 (1)**
121:16
**800 (10)**
63:4;71:16,17,24;
72:1;84:15,20;85:14;
86:22,23
**800-dollar (1)**
122:14
**800-face-value (1)**
73:18
**8-K (1)**
116:7

### 9

**9 (8)**
11:9,14,15;12:2;
49:3;96:21,23;99:1
**900 (3)**
69:25;71:3,6
**90071 (1)**
10:15
**900-dollar (1)**
70:4
**9019 (10)**
2:3;12:5;19:18,20;
21:8;26:6;27:1,3;
29:12;48:4
**91 (1)**
26:25
**97 (1)**
45:2
**973406-2250 (1)**
4:24