WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore
Harrison L. Denman

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Gerard Uzzi

*Attorneys for the Ad Hoc Group of Junior Secured Noteholders*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | Case No. 12-12020 (MG) |
| Debtors. | (Jointly Administered) |

### SUPPLEMENTAL OBJECTION OF THE AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS TO THE DEBTORS' FGIC SETTLEMENT MOTION

TO THE HONORABLE MARTIN GLENN:

The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"), by and through

its undersigned counsel, hereby files this supplemental objection (the "Supplemental Objection")

to its objection (the "Objection") to the FGIC Motion submitted by the above-captioned debtors

(the "Debtors") in these chapter 11 cases (the "Cases") pursuant to Rule 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order approving the

Settlement Agreement (the "Settlement Agreement"), dated May 23, 2013, among the Debtors,

Financial Guaranty Insurance Company ("FGIC"), the FGIC Trustees, and the Institutional

Investors.[1]  In further support of its Objection, the Ad Hoc Group respectfully states as follows:

---

[1] Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors [Docket No. 4027].

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF THE EVIDENCE ........................................................................................... 6

    A.    The Debtors' Limited Production Of Documents ........................................................ 7

    B.    The Deposition Of The Debtors' Chief Restructuring Officer, Lewis Kruger ............. 7

    C.    The Deposition Of The Debtors' Expert, Jeffrey Lipps ............................................. 12

    D.    The Deposition Of The Debtors' Expert, Mr. D'Vari ................................................ 15

    E.    The Deposition Of FGIC's Chief Executive Officer, John Dubel ............................. 16

SUPPLEMENTAL OBJECTION ............................................................................................ 17

CONCLUSION ........................................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

Gen. Elec. Capital Corp. v. Wickard (In re Wickard), 455 B.R. 628 (Bankr. W.D. Mich. 2011) ................................................................................................................................20

In re Adelphia Commc'ns. Corp., 2007 Bankr. LEXIS 660 (Bankr. S.D.N.Y. Feb. 20, 2007) ................................................................................................................................18

In re Bakalis, 199 B.R. 443 (Bankr. E.D.N.Y. 1996) ...................................................19

In re Distrigas Corp., 75 B.R. 770 (Bankr. D. Mass. 1987)...........................................25

In re Residential Capital, LLC, 491 B.R. 63 (Bankr. S.D.N.Y. 2013) ...................................17, 18

In re US Airways, Inc., 2006 Bankr. LEXIS 352 (Bankr. E.D. Va. Mar. 6, 2006) ......................25

Laurel Bay Health & Rehabilitation Ctr. v. Nat'l Labor Relations Board, 666 F.3d 1365 (D.C. Cir. 2012) ................................................................................................................20

U.S. v. Doe, 219 F.3d 175 (2d Cir. 2000).......................................................................19

## PRELIMINARY STATEMENT

1.      By this Supplemental Objection, the Ad Hoc Group seeks to apprise the Court of

certain discovery taken and events occurring after the filing of the Objection and to inform the

Court as to how those developments affect the Court's hearing and disposition of the Motion.[2]

As set forth below, discovery from the Debtors in this contested matter has answered certain

questions raised in the Ad Hoc Group's Objection, has confirmed some concerns raised in the

Objection as to both the process and substance of the proposed settlement, and has raised new

issues that the Court now needs to address in connection with the hearing and disposition of the

Motion.

2.      Fundamentally, the FGIC Settlement Agreement has two moving pieces – the

allowance of at least $596 million in aggregate general unsecured claims by FGIC at GMACM

and RFC and the conditional allowance of a $337 million general unsecured claim by FGIC at

ResCap LLC, the Debtors' ultimate parent entity.  If these claims are allowed, FGIC will become

the second largest stakeholder in these Cases in terms of recoveries (the JSNs are by far the

largest) and the second largest unsecured creditor (behind the Senior Unsecured Notes.)  Because

the elevation of FGIC from a contingent litigation claimant with no liquidated claim to a holder

of as much as a $900 million in allowed general unsecured claims at multiple estates is occurring

outside of a plan, the Ad Hoc Group has been keenly interested in ensuring that the allowance of

claims occurs fairly and in accordance with the law.  Those concerns have been even more

heightened because the Official Committee of Unsecured Creditors (the "Committee"), which

was such a staunch opponent of allowing any RMBS claims outside a plan, has now taken no

position with respect to the Motion, presumably because each of its members is hoping to receive

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.
This Supplemental Objection is filed in accordance with paragraph 11 of the Scheduling Order entered by the Court
on July 8, 2013 [Docket No.4168].

1

a similar treatment at confirmation.  As set forth below, the FGIC Settlement Agreement fails for

many of the same reasons so fervently advocated by the Committee up until the point that its

members obtained their own individual claims allowances.

3.      With respect to the $596 million in claim allowance at GMACM and RFC,

discovery has clarified the mechanics around how those claims will be addressed at those estates

and how the releases of all of FGIC's filed proofs of claim will operate under various scenarios,

all of which can be clarified at the hearing on the Motion.  Discovery has also raised, however,

two troubling facts with respect to the $596 million allowance.

4.      <u>First</u>, in connection with the Motion, the Debtors submitted two declarations—

from Mr. Ron D'Vari and Mr. Jeffrey Lipps—upon which the Debtors base their assertion that

the $596 million settlement is a reasonable compromise of complex and potentially significant

claims asserted against GMACM and RFC.  Discovery has shown that both declarations are, in

fact, post-hoc justifications for the settlement, despite the clear implication of the Motion that the

declarations and analyses were used to support Mr. Kruger's exercise of his business judgment.

Neither the declarations nor the conclusions expressed in them were ever shared with the Debtors

before the FGIC Settlement Agreement was signed.  Nor could they have been—both experts

were hired after the Settlement Agreement was signed and the Debtors and counsel apparently

met to discuss how to support the Motion without having to disclose their actual thought-

processes and negotiations.  To that end, the Debtors have not (a) produced similar analyses

prepared or reviewed prior to signing the agreement, (b) described what they actually relied upon

when agreeing to the claim amount, or (c) demonstrated that they followed any corporate

governance with respect to claims at GMACM or RFC.  Instead, they have insisted that any

inquiry into the reasonableness of, or process related to, the settlement would either be protected

by the attorney-client privilege or a broadly defined concept of a mediation privilege.  In light of

those positions taken in discovery, the record on the Motion lacks any evidence on key issues

relating to the Settlement and is instead premised on the Court accepting the old adage that

"sometimes even a blind squirrel finds a nut."  The FGIC Motion suffers from the very same

deficiencies that the Committee raised in its objection to the RMBS Settlement, that "the Debtors

have presented no reliable evidence to support the reasonableness" of the Settlement and that the

evidence offered "amount[s] to reverse-engineering a desired result, and [the] resulting opinions

as to the Settlement's reasonableness should carry limited weight for this reason alone."  (Comm.

Obj. to RMBS Trust Settlement Motion [Docket No. 2825] at 23.)

     5.    Second, while the Debtors have offered at least flawed post-hoc justifications with

respect to the potential costs, delay and size of potential damages if FGIC's claims against

GMACM and RFC were litigated to conclusion, the Debtors have failed to provide any evidence

with respect to the underlying merits of the asserted claims at those estates, most notably, the

implications of how the subordination provisions in section 510(b) of the Bankruptcy Code

would affect the quantum of recovery on FGIC's Claims.  As set forth in the initial Objection,

FGIC's damage claims, whatever they might be, cannot ever be allowed pari passu with general

unsecured claims at GMACM or RFC and instead have to be subordinated as claims arising out

of the purchase or sale of a security of the Debtors or their affiliates.  Thus, even if there were

admissible evidence to support the conclusion that $596 million is at least an approximation of

what FGIC's damage claim might be in a full-blown litigation, FGIC's recovery of that claim

amount could still be zero if its claims were subordinated.  Without that evidence about how the

Debtors measured the settlement consideration in actual deliberations and negotiations, which

the Debtors have refused to provide in discovery, there is a fatal hole in the factual record

supporting approval of any claims at GMACM and RFC.

6.      The evidence adduced with respect to the $337 million general unsecured claim

being allowed at ResCap, LLC suffers not only from both of the foregoing defects but also raises

significant additional issues with respect to the manner in which the Debtors have generally

approached claims allowance against ResCap, LLC in connection with the Global Settlement.

In the Objection, the Ad Hoc Group raised concerns that the $337 million claim did not appear to

fall anywhere near the range of reasonable recoveries that one could expect if the Debtors

actually litigated FGIC's Claims for alter ego, piercing the corporate veil or other derivative

liability theories expressed in the proofs of claim filed against ResCap LLC were litigated to

conclusion.  That was so, among other reasons, based upon the Debtors' own prior repeated

assertion that those claims lacked merit.  (See Objection at ¶¶ 24-26)  The Debtors' post-hoc

experts confirmed that neither the liability of ResCap, LLC nor the specific costs and delays of

ResCap, LLC defending itself in litigation were considered at all in their reports.  Similarly,

when Mr. Kruger was asked as the Debtors' 30(b)(6) witness on the Motion for the Debtors'

views as to how the $337 million claim relates, if at all, to expected litigation outcomes for

ResCap, LLC, Mr. Kruger responded as follows:

> Q. . . . Does $337 million reflect your understanding of the likely result or within
> the range of results that would occur if independent of the global settlement FGIC
> pressed its [allowed GMACM and RFC claims against ResCap LLC]?
>
> A.  I don't know the answer to that question.

(Kruger Dep. Tr. at 185:2-10.)[3]

7.      Given this and other responses like it in discovery, the record lacks any facts or

law upon which this Court can perform the requisite searching inquiry into the reasonableness of

---

[3] Transcript of the July 11, 2013 Deposition of Lewis Kruger ("Kruger Dep. Tr.").

ResCap, LLC's settlement of assertions that it is derivatively liable for the prepetition actions of

GMACM or RFC.  What discovery has revealed, however, is that the allowance of a $337

million claim at ResCap, LLC has little to do with ResCap, LLC's liability to FGIC.  In his

deposition, Mr. Kruger testified that he has not considered whether a "$337 million claim at

ResCap outside the context of the global settlement would be an appropriate claim amount."

(Kruger Dep. Tr. at 167:7-12.)  When pressed, then, as to the basis for allowing a $337 million

claim at ResCap, LLC (which is anticipated to result in a $100 million recovery to FGIC under

current plan constructs) in the event a plan is confirmed, Mr. Kruger gave a surprising response.

He testified that, in light of the Global Settlement's release of FGIC's claims alleged against

AFI, "[i]t's not inappropriate for part of the proceeds of [AFI's] contribution to be used to satisfy

the FGIC claims."  (Kruger Dep. Tr. at 168:8-13.)  In other words, the allowance of FGIC's

claim at that entity was apparently used as a mechanism by which the Debtors channeled to

FGIC a portion of the Ally Contribution without having to establish a fund for the payment of all

creditors releasing claims against AFI.  That approach is both backwards and legally

unjustifiable.  The quantum of FGIC's claims at ResCap, LLC should have nothing to do with

whether or not AFI settles with the Debtors or obtains third-party releases.  FGIC's damage

claims against the Debtors are what they are, even though its recoveries on those claims could go

up or down depending on one's views of the value of the Ally Contribution.

    8.    Similarly, if certain creditors are entitled to have their claims against AFI satisfied

with legally unjustifiable claims at ResCap, LLC, all creditors should be treated equally and one

estate should not bear the cost of that distribution.  The Debtors cannot prefer certain contingent

creditors like FGIC—holding tenuous claims at best—over ResCap, LLC scheduled creditors

like the JSNs—holding secured claims in an allowed amount of at least $2.2 billion—on the sole

basis that one supports the Global Settlement and the other does not.[4]  Moreover, the Court

certainly cannot endorse the allowance of an unsecured claim at ResCap, LLC that channels AFI

recoveries to FGIC before it addresses the Global Settlement at confirmation or whether FGIC

even has colorable claims against Ally.  Given these facts, there is no legitimate basis for this

Court to allow any FGIC claim at ResCap, LLC at this time.

## SUMMARY OF THE EVIDENCE

9.      In response to the FGIC Motion, the Ad Hoc Group issued document requests on

June 26, 2013 and a notice of deposition seeking a Rule 30(b)(6) witness on June 19, 2013.  (The

Ad Hoc Group's Request to the Debtors for the Production of Documents is attached hereto as

Exhibit A.  The Ad Hoc Group's Notice of Deposition is attached hereto as Exhibit B.)

Specifically, the Ad Hoc Group sought production of all documents reviewed by the Debtors in

connection with any Debtor's consideration and/or determination to enter into the Settlement

Agreement and Term Sheets as they pertain to any FGIC claims and all communications related

thereto, and all corporate records of each of the Debtors, including but not limited to minutes,

consents and agreements, relating to the Settlement Agreement and Term Sheets as they pertain

to any FGIC Claims.  In addition, the Ad Hoc Group requested that the Debtors designate a

30(b)(6) witness to testify on three topics: (a) the FGIC Settlement Motion; (b) any materials or

analysis concerning substantive consolidation in these cases reviewed or prepared in connection

with the Settlement Agreement and/or the FGIC Settlement Motion; and (c) any materials or

analysis concerning the claim that ResCap is derivatively liable for the debts of its subsidiaries

reviewed or prepared in connection with the Settlement Agreement and/or the FGIC Motion.

---

[4] Under a fair and equitable treatment, the JSNs' more than $2 billion claim at ResCap, LLC would be entitled to at least the same 33 cent recovery that FGIC is obtaining, which would thereby render the JSNs entitled to postpetition interest (even assuming the Debtors' collateral value of $1.69 billion).

A.    **The Debtors' Limited Production Of Documents**

10.    The Debtors' production in response to the Document Requests consisted of 595

documents, consisting of (i) a handful of redacted board minutes, (ii) over 200 pages of entirely

redacted board presentations and other attachments, and (iii) over 36,000 pages of publicly filed

pleadings or other publicly available documents, including executed settlement, insurance and

indemnity and assignment and assumption agreements.  The Debtors did not produce a single

substantive email, letter, presentation, spreadsheet, term sheet, or draft agreement relating to the

Settlement Agreement.  Nor did the Debtors produce a single communication with FGIC or its

representatives in these Cases.  The Debtors also provided privilege logs (attached hereto as

Exhibit C), which identified approximately 50 documents, primarily email correspondence,

between Lewis Kruger, the Board of Directors of ResCap, LLC and ResCap, LLC's advisors

attaching materials regarding mediation, the Settlement Agreement and Board meetings.  Indeed,

based on the Debtors' log and the absence of any unprivileged documents it appears that Mr.

Kruger relied solely on privileged materials in deciding to settle and conducted no independent

review or analysis of the claims the Debtors seek to settle.

B.    **The Deposition Of The Debtors' Chief Restructuring
         Officer, Lewis Kruger**

11.    In connection with the Deposition Notice, the Debtors agreed to produce Mr.

Kruger, as the Debtors' representative, for a limited, four-hour deposition, conducted on July 11,

2013.  Mr. Kruger was questioned extensively about his declaration dated June 7, 2013 (the

"Kruger Declaration") [Docket No. 3929-3], submitted in support of the FGIC Motion.  At that

deposition, Debtors' counsel instructed Mr. Kruger over twenty times during the course of the

deposition not to answer questions about certain aspects of his declaration on the grounds of

attorney client privilege and mediation privilege.[5]  With respect to what counsel would let him

speak to, Mr. Kruger provided little testimony supporting the conclusory statements in his

Declaration.

12.    <u>First</u>, Mr. Kruger asserts in his Declaration that despite "strong defenses" to

FGIC's claims, he believes the Debtors "would face substantial litigation uncertainty in

connection with litigating these issues." (Kruger Decl. ¶ 23).  Mr. Kruger's deposition testimony,

however, shed no light on how he came to the conclusion that settling outweighed litigation or

what documents and information he reviewed and analyzed to inform that conclusion.  Mr.

Kruger ultimately testified that he could not disclose <u>anything</u> that he relied upon in making his

determination to enter into the FGIC Settlement Agreement.  (<u>See</u> Kruger Dep. Tr. at 127:11-20

("Q. Okay.  So what of the things you relied upon in making your determination with respect to

the advisability of entering into the FGIC Settlement Agreement do you feel can be appropriately

disclosed without waiving an attorney-client privilege or waiving a mediation privilege? . . . A. I

don't think there's anything.").)  Instead, Mr. Kruger testified with generalities that, in

determining to execute the FGIC Settlement Agreement, he relied upon the fact that the "FGIC

Settlement Agreement was part of the general overall global settlement . . . an outstanding good

result for the various participants in the process and for all creditors of the various estates."

(Kruger Dep. Tr. at 125:10-16.)  Questions with respect to the merits of the Global Settlement,

---

[5] <u>See</u>, <u>e.g.</u>, Kruger Dep. Tr. at 45:2-10 ("Mr. Eggerman: I'm going to interpose an objection, in my view the
dynamics that occurred during the mediation were probably within the ambit of the court's order.  And a lot of the
questions that are being asked seems to be designed to elicit the dynamics which, to me, are not far off from the
substance of the mediation."); <u>Id</u>. at 167:14-25 ("Q. What was the reason you didn't just agree to fix the liability at
337 under all circumstances?  Mr. Kerr: Objection.  Again . . . I don't want you to disclose anything that was
discussed in the mediation, you can answer that question without disclosing what was discussed in mediation.  A. It
was part of the mediation in the global settlement agreement.  It's hard for me to separate out."); <u>Id</u>. at 169:7-13 (". . .
Q. And it's 596, whether or not the plan is confirmed; right? Mr. Kerr: Objection. . . . A. I don't think I can answer
that outside the context of the mediation."); <u>Id</u>. at 207:12-18 ("Q. Is it your understanding that the FGIC
computation was insisted upon as part of that global settlement?  Mr. Kerr Objection.  On that, I will direct – I think
that's covered by the confidential mediation order, and I'll direct the witness not to answer that.").

however, were curtailed as being irrelevant, privileged and premature.  (See, e.g., id. at 50:21-51:3; 170:13-20; 207:12-18).

13.    With respect to the facts and legal issues related specifically to the FGIC Claims and FGIC Trustee Claims, Mr. Kruger read only one of the multiple FGIC complaints, none of the RMBS claims as they related to the FGIC wrapped trusts, conducted no independent factual investigations, and no independent legal research.  (See Kruger Dep. Tr. at 108:9-11; 109:15-18; 110:9–114:11; 109:22-25.)  While Mr. Kruger did read a Carpenter Lipps memorandum on the facts alleged in the FGIC proof of claim, and "some" presentations on the legal issues arising from the monoline claims prepared by Morrison & Foerster, no description of the substance of those presentations or how those presentations informed Mr. Kruger's conclusions have been offered and the Debtors refused to produce any of those documents.  (See Id. at 112:6-13; 114:21–115:9.)  Mr. Kruger never received a presentation from a financial advisor specifically on the FGIC Claims or FGIC Trustee Claims and only received presentations on the amounts of FGIC and FGIC Trustee Claims under various scenarios in the context of the mediation as to which the Debtors claim privilege.  (See Kruger Dep. Tr. at 118:11-21; 190:13–191:7 (stating that he did not use Mr. D'Vari's report on FGIC wrapped trusts in coming to a decision on whether to enter into the Settlement Agreement).)

14.    Moreover, Mr. Kruger was aware of financial presentations showing that, if the FGIC Claims are subordinated to general unsecured creditor claims, such claims would not receive a distribution at any of the Debtors, but apparently gave that defense no weight.  (See Kruger Dep. Tr. at 152:2-153:12.)  Notwithstanding the potential that allowed FGIC claims could ultimately be worthless, Mr. Kruger determined without explanation, that the alternative of the settlement agreement "was far superior to [the Debtors] engaging in litigation." (Id.)

15.    <u>Second</u>, under the heading "The Likelihood of Complex and Protracted

Litigation" in his Declaration, Mr. Kruger asserts that litigation "would almost certainly be

exceedingly complex and could drag on for years, much like other lawsuits of a similar nature

that are currently pending in other state and federal courts." (Kruger Decl. ¶ 28.) Mr. Kruger

offered no testimony, however, of how the costs of litigation with FGIC were determined or

what such costs would be. (Kruger Dep. Tr. at 189:15–190:2 ("Q. Did you have any views, form

any views of what it would take, how much it would cost to litigate the FGIC issues at the time

you entered into the settlement agreement?  A. I was aware that there had been MBIA litigation

against ResCap prior to the filing of the petition and had gone on for three and a half years. So I

assumed this was going to be a lengthy litigation, as well. I believe in the MBIA more than a

million documents were produced.  This looks to me like complex and long-term litigation.").)

Mr. Kruger's conclusion that litigation would be protracted was informed exclusively by his

knowledge of the Debtors' litigation with MBIA in New York state court and the Carpenter

Lipps memorandum that the Debtors refused to produce. (<u>See</u> Kruger Dep. Tr. at 190:4-12 ("Q.

Other than your knowledge that the MBIA litigation had gone on for three and a half years, did

you have any other view, any other basis on which you formed your conclusions that it would be

a complex and protracted litigation?  A. I had read, I think I referred to before, the Carpenter

Lipps report, memorandum.  That's what informed my view.").) Importantly, Mr. Kruger's

understanding as to litigation prospects was not based on a review of FGIC-wrapped RMBS trust

claims, a litigation budget, a timeline, or any independent research into the issues being settled.

(<u>See</u> <u>id.</u> 108:9-11; 109:15-18; 110:10–114:11; 109:22-25; 189:15-190:12)

16.    <u>Third</u>, under the heading "The Paramount Interests of Creditors" in his

Declaration, Mr. Kruger concludes that "the Settlement Agreement represents a compromise that

is in the paramount interests of creditors." (Kruger Decl. ¶ 29.) But Mr. Kruger offered no

testimony as to how the settlement benefits creditors of ResCap, LLC, against which FGIC

holds, at best, tenuous veil piercing and alter ego claims. When asked about the veil piercing and

alter ego theories upon which the FGIC claim against ResCap is based, Mr. Kruger responded

that he had conversations with his counsel and advisors and came to the conclusion that, in the

context of a confirmed plan, "it was not an appropriate for there to be a FGIC claim at ResCap

because they had alleged theories why they should have claims at the ResCap level and theories

why they should have claims against Ally. So it seemed not inappropriate for them to have a

claim against ResCap in the context of a confirmed plan . . . ." (Kruger Dep. Tr. at 165:23–

166:8.) Notably, Mr. Kruger admitted that he had not considered whether the $337 million

allowed claim at ResCap would be appropriate outside the context of the Global Settlement.

(Kruger Dep. Tr. at 167:7-12 ("Q. Do you believe that $337 million claim at ResCap outside the

context of the global settlement would be an appropriate claim amount? A. I haven't considered

that, no.").) As noted above, Mr. Kruger also testified that he did not know whether the $337

million amount was within the range of results that would occur if FGIC pressed its claim against

ResCap. (Id. at 185:4-10.) In short, the only support Mr. Kruger offered for the allowance of the

$337 million claim against ResCap is that such claim amount was reached as a part of the

mediation and results from the Global Settlement. (Id. at 195:15–196:11; 184:20-25 ("$337

million claim in the context of the global settlement agreement is an appropriate resolution").)

The Debtors, however, have offered no evidence that the Global Settlement is a fair one and have

left that issue for confirmation. (Id. at 156:11-157:10; 158:4-159:10; 187:9-12.)

17.    Fourth, in a heading entitled "Arm's-Length Negotiations" in his Declaration, Mr.

Kruger attests to the conduct of negotiations over the Settlement Agreement. (See Kruger Decl.

¶ 34 ("I . . . believe that the Settlement Agreement was the result of arm's-length bargaining.").)

But when asked to testify as to his basis for that belief, Mr. Kruger was instructed not to answer

on the basis of attorney-client privilege and/or mediation protection.  (See, e.g., Kruger Dep. Tr.

at 191:11-192:4 ("Q.  The arm's length negotiations, and just so I'm clear. It's the debtor's

position that the mediation confidentiality order in place prohibits the disclosure of any

substance between FGIC or its counsel, on the one side, and the debtors and their counsel, on the

other side, with respect to the FGIC claims?  Mr. Kerr: . . . the communications, the substance,

the back and forth, is subject to the confidentiality order entered by Judge Glenn, relied upon by

Judge Peck and all the parties.  And so, in terms of the substance of the communications back

and forth, that's confidential.).)  Based on Debtors' counsel's articulated views, Mr. Kruger was

repeatedly instructed not to answer any questions about communications with FGIC.  (See id. at

112:17-113:8 ("Q.  And when did you speak with [John Dubel]? A. During the context of the

mediation over the course of months.  Q. And did you speak with him about underlying facts

asserted in the, either the FGIC proof of claim or the FGIC complaint? Mr. Kerr: Objection.  To

the extent this was during the mediation, I'm going to direct him not to answer.").)

## C.    The Deposition Of The Debtors' Expert, Jeffrey Lipps

18.    In addition to offering Mr. Kruger as a fact witness, the Debtors offered Mr.

Jeffrey Lipps, special counsel to the Debtors, to provide expert testimony on (a) the legal

uncertainty associated with the Debtors litigating FGIC's claims, and (b) the expense and delay

of such litigation.  Mr. Lipps was asked to provide expert opinion on the FGIC Settlement on

May 31, 2013 (eight days after the Settlement Agreement was signed); following a meeting in

which he, Mr. Kruger and Morrison & Foerster met to determine how they would obtain

approval of the Settlement Agreement, apparently without providing evidence of what was

actually considered or discussed.  (See Lipps Dep. Tr. at 14:21-15:21; 127:17-130:17.)

19.     With respect to his lead opinion, the legal uncertainty of litigating with FGIC, Mr.

Lipps' report contains certain statements about New York law on RMBS litigation.  (See Lipps

Dep. Tr. at 143:3-20).  Mr. Lipps is not a licensed New York lawyer, and did not testify to

having ever tried an RMBS claim to resolution in any jurisdiction.  And, more importantly, Mr.

Lipps could not speak to litigation of any RMBS claims in the context of any bankruptcy case.

Outside of his role as special counsel in these cases, Mr. Lipps admitted that he has never

appeared in a Bankruptcy Court in connection with RMBS claims. (Id. at 145:24-146:4.)  Mr.

Lipps has never prosecuted a proof of claim of any sort.  (See Id. at 152:7-25.)  He has never

participated in a claims estimation proceeding and did not factor estimation proceedings, as they

specifically relate to FGIC claims, into his opinion.  (Id. at 153:2-5; 159:4-10.)  Notably, Mr.

Lipps did not analyze subordination under section 510(b) of the Bankruptcy Code or other

bankruptcy specific affirmative defenses for the purposes of offering his opinions in his

declaration.  (Id. at 150:5-151:7.)

20.     Mr. Lipps testified that he was not asked and did not provide an opinion in his

declaration on the range of reasonableness of the Settlement Agreement.  (See Lipps Dep. Tr. at

129:19-130:7; 146:9-21 ("Q. Did anybody at MoFo or at the Debtors ask you informally whether

you had a view as to whether the claims amounts set forth in the FGIC Settlement Agreement

were in the zone of reasonableness as you understood it? . . . A. Not that I recall.").)  In addition,

Mr. Lipps testified that he has not conducted an analysis of FGIC's claims against ResCap, LLC,

because, for the purpose of offering his opinion, he "didn't need to concern [himself] with

allocation between the various entities."  (Id. at 163:25-164:6; 162:18-24 ("Q. Did you perform

any analysis of [aiding and abetting, piercing the corporate veil or alter ego] claims in connection

with forming the opinions you expressed . . . A. I did not get down into an allocation and an

assessment of allocation at various entity levels.  I was looking at the aggregate. . .”).  In fact, prior to the Petition Date, Mr. Lipps had sought leave to dismiss certain FGIC Claims asserted against ResCap, LLC for failure to state an alter ego claim.  (See March 16, 2012 Letter to Judge Crotty at 2-3 (“[I]n some of the cases, FGIC tries to pierce the corporate veil by alleging that ResCap is an ‘alter ego’ of its subsidiaries.  This claim fails because FGIC has not sufficient pled that ResCap exercised complete domination and control over RFC or GMACM, and that its complete domination was used to commit an injustice against FGIC . . . there are few allegations relating to ResCap , and the ones made do not make FGIC’s alter ego claim plausible.”).)

21.    With respect to his second opinion, on the expense and delay of litigating with FGIC over its claims, Mr. Lipps did not quantify the costs to litigate the FGIC Claims.  (Lipps Dep. Tr. at 161:12-14 (“In my declaration I don’t think I put a range in, as I recall, or a specific dollar amount.”).)  Mr. Lipps did not prepare or review any projected budgets or timelines for either litigating FGIC’s Claims in District Court or, more importantly, litigating FGIC’s proofs of claims in Bankruptcy Court. (Id. at 160:22-161:25).  In fact, Mr. Lipps admitted that he had never prepared a budget or created a timeline for the litigation of any proof of claim of any sort. (See id. at 156:12-22.)

22.    Mr. Lipps also admitted that, outside of his role as special counsel in these Cases, he has never prepared a discovery plan for the litigation of a proof of claim and any experience he has preparing a discovery plan did not help form his opinions expressed in his declaration. (See id. at 156:23-158:12.)  As a result, Mr. Lipps based his opinion solely on the assumption that litigation of a proof of claim in a bankruptcy would have the same costs and delay associated with litigating a claim outside of bankruptcy.  (Id. at 154:18-155:16 (“It’s the same range of claims and the same type of discovery”)).

### D.    The Deposition Of The Debtors' Expert, Mr. D'Vari

23.    The Debtors' also offered Mr. Ron D'Vari, the chief executive officer and co-founder of NewOak Capital, LLC ("NewOak") to provide expert testimony on (a) the lifetime expected collateral losses of the RMBS trusts (i.e., the FGIC Insured Trusts), and (b) the extent of any past or future losses to holders of securities issued by the FGIC Insured Trust that were not insured by FGIC and are outside the scope of the Settlement Agreement release. The Debtors' retained Mr. D'Vari on May 24, 2013, after Mr. Kruger had executed the Settlement Agreement and with the knowledge that Mr. D'Vari had previously worked for FGIC analyzing the RMBS trusts at issue in this proceeding.[6]  (See D'Vari Dep. Tr. at 70:19-71:19; 183:3-184:22).

24.    Mr. D'Vari spent "twenty to forty hours" over two weeks conducting his post-hoc analysis.  (See D'Vari Dep. Tr. at 176:15-178:12.)  In the course of preparing his Declaration, Mr. D'Vari did not speak to ResCap management, the board of directors of ResCap, LLC, Lewis Kruger, or any representatives of the Official Committee of Unsecured Creditors or their counsel, Kramer Levin. (Id. at 178:13-179:11).  Mr. D'Vari testified that he does not know who Mr. Kruger is.  (Id. at 178:23-24).  In addition, when forming the opinions expressed in his Declaration, Mr. D'Vari did not study the Settlement Agreement, review any of the FGIC

---

[6] In his deposition, Mr. D'Vari revealed for the first time that, in 2010-2011, he personally provided expert services and advice to FGIC with respect to all of the 47 FGIC-insured trusts that are the subject of the Settlement Agreement.  (D'Vari Dep. Tr. at 70:14-71:19).  FGIC's counsel, however, instructed him not to answer any questions with respect to the substance of his advice or whether that advice contradicted his present opinions.  (Id. at 27:6-28:12;  37:20-42:7; 133:6-22).   That direction, made solely on confidentiality grounds, was interposed despite explicit offers to have counsel hold all answers on an "attorney's eyes only" basis.  (Id. at 33:20-35-6).  The Ad Hoc Group reserves all rights with respect to the Debtors' application to retain NewOak [Docket No. 3953], which states that any advice or services provided by NewOak were not "adverse" to the estates.  (NewOak Retention Appl., ¶ 29.)  If the Debtors were told the substance of the advice, then all parties should get it; if not, then the Debtors had no basis to make that representation to the Court.  In addition, a failure to disclose the advice or additional details raises serious questions as to Mr. D'Vari's ability to be impartial as an expert.

insurance policies or look at the individual representations or warranties that any of the Debtors made in the constituent documents. (See D'Vari Dep. Tr. at 185:5-186:12).

25.      The sum and substance of Mr. D'Vari's testimony was limited to his opinion of the aggregate amount that the FGIC Trustee could claim against the Debtors for any losses with respect to FGIC-insured trusts regardless of who caused those losses. (D'Vari Dep. Tr. at 185:9-19, 187:8-15 ("For us, [$5 billion] is the aggregate amount that the trustee had claimed.  I don't know from who and when and what.  That's a legal question. . . .  [W]e are saying if that is the total number, they are claiming, if, if they release that – I mean, if the rest of this and you subtract it from our total, then that's the number you get.  But there is no other representation or opinion attached to that number.").)  Mr. D'Vari testified that he is not opining that the FGIC trustees could present a valid claim under the policies in the amount of $5 billion against FGIC. (See D'Vari Dep. Tr.  at 185:24-186:3 ("Q.  So you're not opining that the FGIC trustees could make a claim under those policies in the amount of $5 billion?  A. Absolutely not.").  With respect to the claims released by the FGIC Trustees under the Settlement Agreement, Mr. D'Vari admitted that he is not expressing an opinion as to which of the Debtor entities the trustees could assert a claim of $5 billion against, the priority of what that claim would be, or the legal basis for any of those claims, including fraud, contract, aiding and abetting or veil piercing. (Id. at 187:16-188:12).

### E.      The Deposition Of FGIC's Chief Executive Officer, John Dubel

26.      FGIC produced its CEO, John Dubel, for a four-hour deposition on July 10, 2013. Mr. Dubel provided very limited testimony with respect to the FGIC Settlement Agreement and provided no testimony with respect to settlement of FGIC Claims, the allowed claims against RFC, GMACM or ResCap, LLC, including veil piercing, alter ego or aiding and abetting claims.

Mr. Dubel's testimony was also restricted by his counsel's instruction not to answer questions on

the grounds of attorney client and mediation privilege. (<u>See</u>, <u>e.g.</u>, Dubel Dep. Tr. at 138:14-21

("Mr. Slack: Let me -- let me object to only -- only to the extent that whatever analysis he's

thinking about was done in furtherance of either the -- the settlement or -- or the plan, then I

would instruct you not to answer on the basis of work – work product privilege and attorney-

client and the mediation privilege.").)  Mr. Dubel's deposition testimony does not provide any

justification for the allowed claims against GMACM, RFC or ResCap LLC.

## SUPPLEMENTAL OBJECTION

27.     In addition to the grounds in the Objection, the Ad Hoc Group now asserts

the following three additional grounds based upon discovery taken in this contested matter.

## I.     THE DEBTORS CANNOT RELY ON ADVICE OF COUNSEL OR THE MEDIATION TO SUPPORT THE SETTLEMENT AGREEMENT

28.     Discovery has shown that, in making the decision to enter into the Settlement

Agreement, the Debtors relied heavily on communications and information exchanged during the

mediation process and the privileged advice of counsel, none of which have they produced in

discovery.  (<u>See</u> <u>supra</u> ¶¶ 10-17.)

29.     This Court has made very clear that, in the context of a proposed settlement under

Rule 9019, a movant's failure to disclose advice or communication on the grounds that such

advice or communication is privileged will preclude the party asserting the privilege from later

putting forth such privileged or confidential information to support its positions.  <u>See</u> <u>In re</u>

<u>Residential Capital, LLC</u>, 491 B.R. 63, 70 (Bankr. S.D.N.Y. 2013) ("The law does not permit

such cherry-picking of reliance on counsel evidence.  The consequence of failing to make full

disclosure of the advice that was given is that the Debtors are now precluded from offering any

advice provided to the Debtors' officers and directors that was considered in connection with the

decision to enter into the RMBS Trust Settlement."). As the Committee argued in connection

with the RMBS settlement motion, "where a party 'invoke[s] attorney-client privilege throughout

discovery, [this] automatically constitutes a waiver of the advice-of-counsel defense.'" (Comm.

Mot. to Preclude Debtor Evidence [Docket No. 2906] ¶ 24 (quoting Cary Oil Co. v. MG

Refining & Mktg., Inc., 257 F. Supp. 2d 751, 761 (S.D.N.Y. 2003) (citations omitted). And, as

the Committee stressed, the Court should "exclude any testimony or evidentiary presentations by

the Defendants at trial if that same testimony or evidence was withheld from Plaintiffs during

discovery based on attorney-client privilege." (Id. (quoting Cary Oil, 257 F. Supp. 2d at 761).)

30.    In the context of this specific contested matter, this Court has made clear that such

reasoning extends also to a reliance on the mediation defense, stating "I mean, it's just like you

can't assert a reliance on the advice of counsel and then refuse to produce the advice you got."

(July 15, 2013 H'rg Tr. at 24:18-20.) Moreover, counsel to the Debtors has agreed on the record

that they will not assert reliance on counsel or reliance on mediation as a basis for approving the

Settlement Agreement. (See Kruger Dep. Tr. at 126:21-24 (Mr. Kerr) ("We're not asserting a

reliance on counsel, defense or however you want to characterize it here. Mr. Kruger made his

independent judgment."); July 15, 2013 H'rg Tr. at 13:17 ("The Court: So that would include – I

take it you would agree that the proponents of the plan or in the case of FGIC – the FGIC

settlement cannot have a reliance on mediation defense. Ms. Levitt: Correct.").)

31.    Because the Debtors cannot assert attorney-client privilege or mediation

protection as both a shield and a sword, they cannot seek any relief based upon the advice

rendered or the mediation process. See In re Adelphia Commc'ns. Corp., 2007 Bankr. LEXIS

660, 12 (Bankr. S.D.N.Y. Feb. 20, 2007) ("The 'at issue' waiver doctrine prevents unfair use of

the attorney-client privilege as a sword, to disclose only self-serving communications, and as a

shield, to bar discovery of other communications that an adversary could use to challenge the truth of the claim"); In re Bakalis, 199 B.R. 443, 450 (Bankr. E.D.N.Y. 1996) (finding that attorney-client privilege cannot be used as both a shield and a sword and "that it 'may implicitly be waived when [a party] asserts a claim [or defense] that in fairness requires examination of protected communications'") (quoting United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991)); U.S. v. Doe, 219 F.3d 175, 182 (2d Cir. 2000) ("a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party.").

32.    Nor should the settlement proponents be permitted to waive the mediation privilege selectively as to particular documents when it suits them.  Unbeknownst to the Ad Hoc Group, the Debtors, FGIC and other objecting parties sought the Court's guidance on whether one particular mediation document—a FGIC-prepared mediation slide—could be disclosed without violating any mediation privilege.  (See July 25, 2013, H'rg Tr. at 35:17-36:8.)  The Ad Hoc Group was not informed of either the correspondence with the Court or the hearing, despite having repeatedly requested that the Debtors and other parties notify the Group of any such proceedings.  Had the Ad Hoc Group been apprised, it would have objected to the selective nature of the relief granted—if a party can waive confidentiality in order to prevent the exclusion of an expert, they can waive it in order to provide requisite discovery.

## II.    THE EXISTING EVIDENTIARY RECORD REQUIRES THAT THE COURT REFUSE TO ALLOW AN AGGREGATE ALLOWED FGIC CLAIM OF $596.5 MILLION AT GMACM AND RFC

33.    Fundamentally, the Debtors seek final approval of an aggregate allowed general unsecured $596.5 million claim at GMACM and RFC regardless of whether a plan is confirmed. The evidentiary record does not support the allowance of these FGIC claims at these two estates

because the Debtors have presented no evidence of the process by which they determined to

enter into the Settlement and the evidence the Debtors do present does not support the terms of

that deal.

34.     First, the Debtors refused to produce any information concerning the arm's-length

nature of the negotiations between the Debtors and FGIC.  (See Kruger Dep. Tr. at 160:2-20;

191:11-192:11).  The Debtors did not produce a single substantive communication between

parties concerning the Settlement and all of the ResCap, LLC board's deliberations on the matter

were redacted.  (See supra ¶ 9.)  As far as what Mr. Kruger considered in informing himself, the

sum of Mr. Kruger's personal diligence specific to the FGIC Claims was reading one FGIC

complaint, and one Carpenter Lipps memo that the Debtors have refused to produce.  Mr. Kruger

did no independent research into the FGIC Claims, and relied on presentations from Morrison &

Foerster on the subject of the monoline claims as a whole, not the FGIC Claims specifically.

With respect to the FGIC Trustee Claims, Mr. Kruger did not read any of the RMBS claims as

they related to the FGIC wrapped trusts.  (See supra at ¶ 12.)  Thus, the Debtors have provided

no evidence to support the process by which they determined to enter into the Settlement

Agreement.

35.     Second, the evidentiary record that does exist does not support the allowance of

the aggregate FGIC Claims at GMACM and RFC.  As an initial matter, the opinions formed by

the Debtors' experts, Mr. Lipps and Mr. D'Vari, should carry no weight, because both experts

were retained and/or did not form or convey their opinions until after the Debtors entered into the

Settlement Agreement.   See Gen. Elec. Capital Corp. v. Wickard (In re Wickard), 455 B.R. 628,

636 (Bankr. W.D. Mich. 2011) (assigning "little weight" to "post hoc evidence" comprising

retroactive opinions of value offered by adversary plaintiff); cf. Laurel Bay Health &

Rehabilitation Ctr. v. Nat'l Labor Relations Board, 666 F.3d 1365, 1376 n.15 (D.C. Cir. 2012)

(giving no weight to NLRB's reference to subsequent contracts with plaintiff-union, as "[s]uch

post hoc evidence sheds no light on the contemporaneous understanding of the parties as to the

state of negotiations . . . .").  In any event, the Debtors offer no evidence as to why FGIC is

entitled to lock-in its recoveries on the Global Settlement before that settlement is approved and

before any other settling party is allocated a portion of the Ally Contribution.  The Debtors also

offer no evidence as to why the FGIC Claims and FGIC Trustee Claims should receive different

treatment under the Settlement Agreement than other claims asserted by monoline insurers and

other wrapped RMBS parties in these Cases.  Moreover, no corporate governance entity at either

GMACM or RFC met to consider and vote on the Settlement Agreement.  (See Kruger Dep. Tr.

at 105:18-107:24; 134:21-135:7).

36.     The Debtors similarly fail to support their conclusion that the costs of potential

litigation of GMACM and RFC claims justify settling.  Indeed, the Debtors have not produced

any budget or analysis of the hypothetical costs of defending against the FGIC Claims and FGIC

Trustee Claims.  (Id. at 189:15–190:2 ("I was aware that there had been MBIA litigation against

ResCap prior to the filing of the petition and had gone on for three and a half years.  So I

assumed this was going to be a lengthy litigation, as well.").)

37.     Further, the Debtors did not assess the procedural cost savings of bankruptcy

court or bankruptcy-specific defenses in coming to their conclusions.  Indeed, the Debtors'

expert on the cost of the litigation, Mr. Lipps, has never litigated a claim in bankruptcy court, has

never prepared a budget for such a litigation and, like Mr. Kruger, seems to have based his

analysis entirely on the Debtors' experience with the MBIA litigation in state court. (See supra at

¶14.)  The Debtors apparently did not consider subordination under section 510(b), claims

estimation proceedings under section 502(c), or any other potential bankruptcy defense in deciding to allow the FGIC Claims.[7]  Mr. Kruger was, however, aware of financial presentations showing that if the FGIC Claims are subordinated that such claims would not receive a distribution at any of the Debtors, yet determined, without explanation, that, "the alternative of the settlement agreement was far superior to them engaging in litigation."  (Kruger Dep. Tr. at 152:2-18, 153:3-12.)

38.    Finally, discovery provided by the Debtors as to allowance of claims at GMACM and RFC shows that the allowance should not occur outside of a plan resolving all AFI issues. Specifically, it appears that the Debtors gave almost no consideration to the reasonableness of a failed plan scenario to the FGIC Claims.  In the failed plan scenario, the Settlement Agreement allows FGIC to assert any and all of its claims directly against AFI.  But, if FGIC were successful in such claims, AFI could then make a claim for indemnity or contribution against one or more of the Debtors for any amounts FGIC recovered.  Thus, rather than obtaining a release of approximately $6.25 billion against any one Debtor, as Mr. Kruger's Declaration indicates (Kruger Decl. at n. 7), the Settlement Agreement, in the absence of a plan confirming a Global Settlement, leaves the Debtors exposed to indemnification and contribution claims from AFI for up to the full amount of the FGIC Claims.  Indeed, Mr. Kruger admitted in his deposition that the Settlement Agreement allowed for such a possibility.  (Kruger Dep. Tr. at 144:9-16 ("Q. But you agree with me that technically the way the settlement agreement works, FGIC would be able to assert claims against Ally and Ally might be able to assert claims back against the debtors?  A. I have to stop and read the agreement to be sure.  You are correct.").)  Notwithstanding the potential impact of such claims, Mr. Kruger admitted that he had not formed a business view as

---

[7] As set forth in the Objection, the section 510(b) subordination defense, in particular, is a strong one.  (See Objection ¶¶ 32-33.)

to the risk of AFI asserting such claims for contribution or indemnity.  (Id. at 144:6-8 ("Q. And

did you perform a business view as to the level of risk of [such claims] happening?  A. No.").)

### III.    THE EVIDENTIARY RECORD REQUIRES THAT THE COURT REJECT AN ALLOWED FGIC CLAIM OF $337 MILLION AT RESCAP, LLC

39.    Independent of any deficiencies with respect to the $596 million allowance at

GMACM and RFC, the Debtors have failed to produce any documents or testimony showing that

the negotiations or analysis of the Settlement Agreement considered its effect and

appropriateness from the perspective of ResCap, LLC.  Rather, the Settlement Agreement was at

best analyzed and negotiated on a global basis and in the context of the Global Settlement.  (See

FGIC Motion ¶ 50 ("The Debtors have determined, exercising their business judgment, that the

terms of the Settlement Agreement are fair, equitable and eminently reasonable to the Debtors'

estates and creditors, thereby satisfying the standards of Rule 9019."); Kruger Dep. Tr. at

183:12–184:2 ("In my judgment, the arguments . . . all of those I believe are the subject of

litigation that would be time consuming, costly, destroy the global settlement agreement, and

ultimately not be for the benefit of the creditors for this estate or for the estates of which I'm

responsible.  So, in my mind, a global settlement agreement is a far better outcome.").)

40.    Notably, the Debtors failed to conduct any analysis of the merits of a FGIC claim

against ResCap, LLC, or offer any explanation for why the Debtors would settle alter ego and

veil piercing claims that the previously argued were meritless and in any event belong to the

GMACM and RFC estates, not to FGIC.  As noted in the Objection, the Debtors' lawyers have

consistently estimated such claims as speculative throughout these cases.[8]  (See Objection ¶ 25).

---

[8] In a similar context, the Examiner concluded that, "it is unlikely that any pending or potential claims by Third-Party Claimants seeking to hold AFI liable on a veil-piercing or alter ego theory of liability for RMBS Claims asserted against the Debtors would prevail."  (Examiner Report at I-38.)  The Examiner further noted that, "any such veil-piercing claim seeking to hold AFI liable for RMBS Claims against the Debtors would also appear vulnerable to an argument that such claim constitutes property of the Estates and Third-Party Claimants would lack standing to pursue it."  (Id.)

41.    Beyond invoking the benefits of Global Settlement, the Debtors have offered no

basis for (a) allowing a claim at ResCap, LLC under the Settlement Agreement or (b) allowing

such claim in the amount of $337 million.  In the Objection, the Ad Hoc Group expressed

concern that FGIC's claim bore no rational relation to expected recoveries at ResCap, LLC.  (See

Objection ¶¶ 26-29).   As noted above, Mr. Kruger admitted that he did not know whether the

$337 million amount was within the range of results that would occur if FGIC pressed its claim

against ResCap, LLC.  (Id. at 185:4-10.)  Nor did Mr. Kruger consider whether the $337 million

allowed claim at ResCap, LLC would be appropriate outside the context of the Global

Settlement.  (Kruger Dep. Tr. at 167:7-12 ("Q. Do you believe that $337 million claim at ResCap

outside the context of the global settlement would be an appropriate claim amount?  A. I haven't

considered that, no.").)  In fact, the only justification the Debtors have provided for the existence

of any allowed FGIC Claim at ResCap, LLC is that such a claim makes sense in the context of

the Global Settlement and, specifically, to compensate FGIC in part for releasing its claims

against AFI as part of the Global Settlement:

> I came to a conclusion myself that it was not [in]appropriate for there to be a
> FGIC claim at ResCap because they had alleged theories why they should have
> claims at the ResCap level and theories why they should have claims against Ally.
> So it seemed not inappropriate for them to have a claim against ResCap in the
> context of a confirmed plan . . . .

(Kruger Dep. Tr. at 165:23–166:8).  Mr. Kruger shut down any attempts to get further

clarification: "that claim amount results from the global settlement agreement. . . . That's it."

(Id. at 196:7-11; see also 166:17–167:5 ("Well, there is an Ally settlement as part of the global

claim settlement, global claim agreement.  And I think and my thought was that in light of that

and in view of the fact that, in my mind, the prospect of litigating with FGIC . . . the global plan

agreement was a far better outcome.  And part of that global plan agreement was an

acknowledgment that they're entitled to a claim against ResCap.").)

42.    The fundamental problem here is that, according to Mr. Kruger, the Debtors are

providing FGIC with a claim at ResCap, LLC not because that estate actually risks an unsecured,

unsubordinated claim allowance of $337 million, but rather because allowance of a ResCap,

LLC claim is a convenient mechanism for allowing one monoline to get its proverbial "cookies"

out of the Global Settlement.  The Debtors cannot, however, award claims that bear no relation

to the facts or law.  See In re US Airways, Inc., 2006 Bankr. LEXIS 352, *13 (Bankr. E.D. Va.

Mar. 6, 2006) ("A claim is not allowable in bankruptcy to the extent that it 'is unenforceable

against the debtor . . . under applicable law.'") (citation omitted); In re Distrigas Corp., 75 B.R.

770, 772 (Bankr. D. Mass. 1987) ("The bankruptcy court must first determine that the claim is

cognizable as a legal obligation when viewed within the context of nonbankruptcy and

bankruptcy laws, and second that the effect of the allowance of the claim in the bankruptcy

proceedings would be just and fair in relation to other creditors' under principles of equity

jurisprudence.") (citation omitted).   "Reverse-engineering" a claim in order to reward a

settlement proponent an acceptable recovery based on claims against non-debtors is neither fair

nor reasonable.  Creditors are entitled to know that their claims, and those of other creditors, will

be litigated or settled on the merits and not resolved as part of an entirely secret settlement

process.  (Kruger Dep. Tr. at 193:22-194:11 ("Q. And that's the extent of your defense of a

concern that creditors at ResCap, LLC might have that a 330 million, $337 million claim was

given in exchange for a plan support agreement to foster the global settlement which, of course,

is important? . . .  A. Because I believe that if there was no global settlement agreement and there

would be no $337 million claim available at ResCap, there would be no $2.1 billion coming into

the estate, there would be very little recovery for a creditors out of this estate, and ResCap,

GMAC or RFC.").)

## CONCLUSION

WHEREFORE, for the reasons set forth in the Objection and herein, the Ad Hoc Group

respectfully requests that the Court deny the Motion and grant such further relief as it deems just.

Dated: July 29, 2013
      New York, New York

Respectfully submitted,

By: */s/ J. Christopher Shore*
J. Christopher Shore

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore
Harrison L. Denman

    - and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi

*Attorneys for the Ad Hoc Group of Junior*
*Secured Noteholders*