# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| In the Matter of the Rehabilitation of | Index No. 401265/2012 |
| FINANCIAL GUARANTY INSURANCE COMPANY. | Doris Ling-Cohen, J.<br><br>Motion Sequence No. 4<br><br>**AFFIDAVIT OF MICHAEL W. MILLER IN FURTHER SUPPORT OF APPROVAL OF FIRST AMENDED PLAN OF REHABILITATION** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK      )
                                           ) ss.:
COUNTY OF NEW YORK   )

Michael W. Miller, being duly sworn, deposes and says:

1.        I am a Director in the Financial Institutions Group of Lazard Frères & Co. LLC ("**Lazard**"), which maintains offices at 30 Rockefeller Plaza, New York, NY 10020. Lazard is an industry leader, among other areas, in providing financial advice to debtors, creditors, equity constituencies and government agencies in restructuring and reorganization cases and in providing financial advisory services to financial institutions, including insurance companies, worldwide.

2.        I hold a Bachelor's degree from Brigham Young University. I am a Chartered Property and Casualty Underwriter (CPCU). I am registered as an Investment Banking Representative (Series 79) and as a General Securities Representative (Series 7).

3.        I have been employed by Lazard since 2006. Prior to joining Lazard I worked in the insurance industry and also at a boutique investment bank that specialized in insurance advisory services. Since 2004, I have provided financial advisory services to a variety

of financial institution clients located throughout the world on a number of matters.  These matters have included execution of buy-side and sell-side transactions, capital structure and financing advisory, valuations, including fairness opinions, development of operating models, negotiation tactics and matters related to insurance rehabilitations, among other matters.  I have also worked on numerous client engagements including the following selected transactions: PMI's divestiture of various assets, Legion (in Liquidation) sale of various assets, MUFJ's conversion of its preferred stock in Morgan Stanley, Santander's acquisition of Sovereign Bancorp, Tower Insurance's acquisition of Castlepoint, GMAC Insurance's acquisition of MEEMIC, TGA's sale to Hallmark, USI's sale to GS Capital Partners, among others.

4.      Lazard is the U.S. operating subsidiary of a preeminent international financial advisory and asset management firm. Lazard, together with its predecessors and affiliates, has been advising clients around the world for over 150 years.  The current managing directors, directors, vice presidents, associates and analysts at Lazard have extensive experience working with financial services firms worldwide, including troubled companies in complex financial restructurings out-of-court and in chapter 11 proceedings.  We have also served as an advisor to various governments and agencies.  Since 1990, Lazard's professionals have been involved in over 500 restructurings, representing over $1 trillion in debtor assets.

5.      Lazard's Global Financial Institutions practice has advised on some of the most complex and industry defining transactions involving financial companies. Our leading global insurance practice has expertise in property & casualty, monoline, specialty and life insurance sectors. Lazard's senior bankers have advised on more than $100 billion of insurance transactions in recent years.

2

6.      This affidavit is submitted in further support of the Omnibus Reply

Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation

for FGIC dated December 12, 2012 (the "**Plan**").[1]  I am generally familiar with the terms and

provisions of the Plan, the Disclosure Statement and the documents comprising the Plan

Supplement.  Except as otherwise indicated, all statements set forth in this declaration are based

on my personal knowledge, my review of relevant documents, the Lazard team's work on this

project, or my opinion based upon experience, knowledge and information concerning FGIC's

operations.  If called upon to testify, I can and will testify competently to the facts and opinions

set forth herein.

7.      On September 22, 2011, Lazard was engaged as a financial advisor to

assist in providing services for the New York Liquidation Bureau (the "**NYLB**") in connection

with a potential rehabilitation of FGIC.  Since then, under the supervision of Ari Lefkovits, a

Managing Director in the Restructuring Group, I have been an active member of the team of

Lazard professionals who assisted in performing the financial advisory services for which Lazard

was retained.

8.      As part of this engagement, Lazard assisted Weil, Gotshal & Manges and

the NYLB in analyzing the financial aspects of the FGIC plan and developing a plan that met the

NYLB's objectives, including providing for reasonable conservatism.

9.      Specifically, among other tasks, Lazard reviewed and commented on the

Run-Off Projections and the Run-Off Assumptions prepared by FGIC.  In addition, Lazard

---

[1] Where I use terms not otherwise defined herein, I intend those terms to have the same meanings as in
the Plan.

assisted the NYLB in preparation of the Liquidation Analysis which is discussed in more detail below.  In order to consider a liquidation as an alternative to the Plan, a Liquidation Analysis was prepared by the Rehabilitator, assisted by Lazard and other advisors to the Rehabilitator. Comparing indicative recoveries under the Plan to those under the Liquidation Analysis, and taking into account the discount rate analysis below, the Plan provides superior and more immediate recoveries to the policyholders than a liquidation.

10.    Lazard also reviewed and considered input from the independent research firm Municipal Market Advisors ("**MMA**"), which advised Weil and the NYLB on the expected losses under a Base and Stress Case scenario for FGIC's retained U.S. Public Finance book and the book reinsured by National Public Finance.  Lazard also relied on tax analysis provided by FGIC's advisors and the NYLB's advisors.

11.    The Run-Off Projections project FGIC's cash flows from January 1, 2012 through December 31, 2052 (the time at which the last of FGIC's insured risks matures on the basis of the Run-Off Assumptions) (the "**Run-Off Period**").  Among other things, the Run-Off Projections were an important component in estimating the amount of the initial CPP and the ultimate recoveries under the Plan.  Exhibit C to the Disclosure Statement contains a summary of the Run-Off Projections, Run-Off Assumptions and calculation of initial CPP.

12.    Lazard also reviewed run-off projections previously prepared by FGIC in consultation with its advisors, including Blackstone Advisory Partners L.P. ("**Blackstone**"), and stress case assumptions for FGIC's insured portfolio developed by NewOak Capital Advisors LLC ("**NewOak**"), an independent financial advisor retained by counsel to FGIC.

13.    Lazard did not independently verify the projections, assumptions or analyses prepared by FGIC or its advisors, the NYLB or its advisors, Blackstone or MMA in

4

connection with its services, including in connection with the assistance in preparation of the

Run-Off Projections and Run-Off Assumptions.  Lazard assumed that projections, assumptions

and analyses prepared or provided by MMA, FGIC, the NYLB and other parties, as applicable,

were reasonably prepared in good faith and on a basis reflecting the best currently available

estimates and judgments as to the future operating and financial performance of FGIC during the

Run-Off Period.

   14.  Lazard also performed the following tasks:

➢ Reviewed certain recent historical financial information of FGIC;

➢ Reviewed certain internal, projected financial and operating data related to
FGIC's  business and its prospects, including FGIC's income statement, balance
sheet and cash flows as of December 31, 2011;

➢ Met with and discussed FGIC's operations and future prospects with FGIC's
management team and its advisors, including FGIC's advisors and other
constituents;

➢ Considered certain economic and industry information relevant to FGIC's
business;

➢ Reviewed the terms of the Plan, including the Restructured Policy Terms, the
Disclosure Statement, the documents filed as part of the Plan Supplement and
other filings made in the proceedings; and

➢ Performed such other analyses and investigations and considered such other
information as Lazard deemed appropriate under the circumstances, including the
development of two illustrative loss scenarios for the non-US Public Finance
policies.

**Run-Off Analysis**

15.     The Run-Off Assumptions include a level of conservative assumptions reflecting the level of uncertainty as to the expected timing and magnitude of Policy Claims (as detailed in the Plan) that could arise during the Run-Off Period. This uncertainty stems in part from the volatility of the types of risks insured by FGIC, and other plan variations that could arise over such an extended time horizon.

16.     The Run-Off Assumptions include factors relevant to the Run-Off Projections, including:

  ➢ Giving effect to the transactions and other actions contemplated by the Plan, including two CDS Commutation Agreements[2] executed and the Reinsurance Commutation Agreement with the RAM Reinsurance Company Limited ("**AORe**");

  ➢ The expected timing and magnitude of losses under Policies;

  ➢ Returns on FGIC's investment portfolio, collection and recovery of premiums, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs and operating expenses.

17.     As further described in Exhibit C to the Disclosure Statement, the Run-Off Projections were run for both a Stress Scenario and a Base Scenario. The Base Scenario Run-Off Projections included in Exhibit C portray FGIC's expected performance during the Run-Off Period, including expected aggregate payments on Policy Claims. The Stress Scenario Run-Off Projections, included in Exhibit C as well, portray a more conservative loss scenario envisioning a severe economic recession that is characterized by (i) sharp declines in home prices and the

---

[2] As explained in ¶ 21, since the filing of the Disclosure Statement, four additional commutations have been executed.

financial markets, (ii) significant unemployment, (iii) high mortgage default rates and (iv) other

negative economic indicators of potential relevance to FGIC's insured exposures.

18.    Based on the Run-Off Projections and the Stress Scenario utilized by the

Rehabilitator in formulating the Plan, FGIC should be able to pay the initial CPP on forecasted

Permitted Policy Claims, while maintaining a reasonable cash buffer intended to protect against

potential adverse deviations from the Stress Scenario assumptions.

19.    The Plan provides that while the initial CPP and subsequent revisions to

the CPP will be based on a forward looking Stress Scenario, the Run-Off Assumptions will be

adjusted over time (pursuant to the CPP Revaluation process) to reflect FGIC's actual

experience.  Should FGIC's experience prove more favorable than the Stress Scenario utilized by

the Rehabilitator in formulating the Plan, the CPP could increase over time and additional

amounts (including those related to DPO accretion) would be paid out to holders of Permitted

Policy Claims.

**Updated Projections**

20.    In December 2012, FGIC provided an update to the Run-Off Projections

and Run-Off Assumptions (collectively the "**Updated Projections**"), to reflect certain

information that became available to FGIC since filing the Disclosure Statement, reflecting a

revised set of premium projections and certain commutation transactions, including

commutations approved by the Court.

21.    Up to the date of the filing of the Disclosure Statement, two CDS

Commutation Agreements had been executed.  Since the filing of the disclosure statement, four

additional CDS Commutation Agreements have been executed.  The Updated Run-Off

Projections assume these additional CDS Commutation Agreements are approved by the Court

and paid post-Effective Date.  The Updated Run-Off Projections also assume consummation of

the reinsurance commutation agreements executed with Radian Asset Assurance Inc. ("**Radian**")
and Mitsui Sumitomo Insurance Company ("**Sumitomo**") and the termination agreement
executed with AAArdvark II Funding Limited ("**AAArdvark**") and other parties, all three of
which this Court approved after the Rehabilitator filed the Disclosure Statement.  The amount of
premiums FGIC expects to collect was also updated, based on an updated forecast provided by
FGIC.

22.    Based on the Updated Run-Off Projections, the initial CPP is expected to
be 17.25%.  The Updated Run-Off Projections assume that, under the Stress Scenario, the CPP is
held constant at 17.25% until a final distribution of all available assets to holders of policy
claims permitted under the Plan.  Assuming an illustrative discount rate of 10%-20% the present
value to such policyholders of recoveries under the Stress Scenario is 17%-18%.

23.    Based on the Updated Run-Off Projections and the Base Scenario, in
which losses are lower than those projected under the Stress Scenario, the CPP is estimated to
increase every year until 2043, and that by 2022, the CPP is estimated to be 26.3%.

24.    Based on the Updated Run-Off Projections and Base Scenario loss
forecasts, average Permitted Policy Claim recoveries are estimated to be 27%-30% of Permitted
Policy Claims under the Plan using a 10%-20% illustrative discount rate.

25.    A copy of the Updated Run-Off Projections, including the key
assumptions made in connection therewith, is attached hereto as **Exhibit 1**.

## Liquidation Analysis

26.    In order to consider a liquidation as an alternative to the Plan, a
Liquidation Analysis was prepared by the Rehabilitator, assisted by Lazard and other advisors to
the Rehabilitator.  Comparing indicative recoveries under the Plan to those under the Liquidation

Analysis, and taking into account the discount rate analysis below, the Plan provides superior and more immediate recoveries to the policyholders than a liquidation.

27.    Consistent with the Updated Run-Off Projections, the Liquidation Analysis was updated.  The Updated Liquidation Analysis assumes consummation of all six CDS Commutation Agreements, the reinsurance commutation agreements with Radian and Sumitomo, and the termination agreement with AAArdvark.  The amount of premiums that FGIC would receive in a liquidation has also been updated, to reflect the new projections and to assume that policyholders are able to set off premium payments against policy claim payments owed by FGIC pursuant to the Plan.

**TABLE A - RECOVERIES TO POLICYHOLDERS AT ILLUSTRATIVE DISCOUNT RATES**

| Loss Forecast | Base Case | | Stress Case | |
|---|---|---|---|---|
| **Discount Rate** | **20%** | **10%** | **20%** | **10%** |
| Updated Projections (Plan) | 27% | 30% | 17% | 18% |
| Updated Liquidation Analysis | 7% | 14% | 4% | 8% |
| *Recovery Benefit from Plan* | *20%* | *16%* | *13%* | *10%* |

28.    The Updated Liquidation Analysis indicates that under the Base Case, policyholders would receive present value recoveries of approximately 7%-14% of Permitted Policy Claims in a liquidation, compared to approximately 27%-30% of Permitted Policy Claims under the Plan at a 10%-20% illustrative discount rate.

29.    The Updated Liquidation Analysis further indicates that under the Stress Case, policyholders would receive present value recoveries of approximately 4%-8% of Permitted Policy Claims in a liquidation, compared to approximately 17%-18% of Permitted Policy Claims under the Plan at a 10%-20% illustrative discount rate.

30.    As further explained in the Liquidation Analysis attached to the Disclosure Statement as Exhibit D, ¶ C.1., the timing and amount of interim cash distributions in a

hypothetical liquidation of FGIC reflect the NYLB's guidance and assumptions with respect to a hypothetical liquidation.  As such, in a liquidation of FGIC, the first distribution of payments to policyholders occurs in 2027, fifteen years after FGIC is placed into liquidation. Subsequent distributions would occur every five years thereafter, with the final distribution occurring at the end of 2052.  Maximum payments for each distribution are based on FGIC's estimated distributable resources (assets at the time of distribution less projected future claims) at the time of the payments.

31.    A copy of the Updated Liquidation Analysis, including the key assumptions made in connection therewith, is attached hereto as Exhibit 2.

## Required Payments of Premiums to FGIC

32.    Over the Run-Off Period, FGIC expects to collect $353 million in policy premiums, net of envisaged commutations.  If policyholders are permitted to setoff premiums against policy claims not giving effect to the modification pursuant to the Plan, this would reduce FGIC's claims-paying resources by approximately $174 million.

33.    The estimated impact of the reduction in claims paying resources by allowing policyholders to setoff premiums owed to FGIC would lower the initial CPP from 17.25% to 16.25%.  In addition, the present value of recoveries to policyholders as a whole would be reduced in this case to 26%-28% under the Base Scenario (as opposed to 27%-30%) and 16%-17% (as opposed to 17%-18%) under the Stress Scenario.

## Discount Rate Analysis

34.    For purposes of comparing policyholder recoveries under the Plan relative to those under a liquidation, Lazard analyzed the present value of projected claims payment cash flows under each scenario. The present value is calculated by estimating the cash flows to policyholders in each year and discounting them at a discount rate.

35.     A discount rate is used to adjust the riskiness and timing of cash flows. That is, a cash flow that is higher risk would have a greater discount rate than one at lower risk. A cash flow that is farther in the future would have a higher discount factor (but not necessarily a greater discount rate) because of the compounding effect of applying the same discount rate over a longer period of time, reflecting the time value of money.

36.     Based on the Updated Run-Off Projections, cash claims payments to policyholders under the Plan have a weighted average duration of approximately 18 years, whereas under the Updated Liquidation Analysis, cash claims payments to policyholders have a weighted average duration of approximately 36 years.  The duration under the Updated Liquidation Analysis is greater primarily due to the NYLB's assumptions described previously with respect to cash distributions to claimants.

37.     If a discount rate of 3.6% or higher is used in the Base Case (3.5% or higher under the Stress Case), then the comparison shows that the Plan provides superior recoveries to policyholders relative to a liquidation, given the longer weighted average duration of claims payments under the liquidation.  This means that regardless of whether the analysis uses an 8.5% discount rate, as suggested by one objector, or the illustrative 10-20% rate used in the present value analysis in the Disclosure Statement, the relevant conclusion is unchanged: the Plan provides superior recoveries to the policyholders relative to a liquidation.

38.     I believe that applying a discount rate of 3.6% or less would not be appropriate for the claims payments to FGIC policyholders.  Under current market conditions, a discount rate of 3.6% may be appropriate for long-term debt of a strong, investment-grade company, but not for a set of cash flows that are higher risk, such as the FGIC policyholder claims.  For example, a 3.6% discount rate is lower than the average current yield of an A-rated

30-year bond index, which is 4.1%, which is near historical lows. Moreover, 3.6% is lower than the three-year average yield for the same A-rated index, which is 5.2%.

**National Public Novation**

39.     As long as the existing reinsurance agreement with National Public is in place, FGIC remains subject to its legal responsibilities as a primary insurance company with respect to the policies reinsured by National Public Finance. Should National Public Finance be unable to meet its claims paying obligations on these policies, FGIC would have an obligation to make claims payments to these policyholders. The potential exposure under the National Public Finance's Reinsured Policies is relatively large (approximately $138 billion in aggregate par outstanding as of December 31, 2011). Pursuant to the Novation Agreement, FGIC is relieved of any liability under these policies and therefore, any potential claims arising from such policies would be excluded from Stress Case used to calculate the CPP and policyholder recoveries. The Updated Run-Off Projections, and the resulting estimate for the initial CPP, assume this outcome. Assuming that the Court were to deny approval of the Novation Agreement, such potential liabilities would need to be taken into account, and as such, it is estimated that the initial CPP would be reduced to approximately 15.75% (from 17.25%).

By: _____

Michael W. Miller

Sworn to before me this
12 day of December, 2012

Notary Public

LORI A. DOWE
Notary Public, State of New York
No. 4868323
Qualified in New York County
Commission Expires Aug. 18, 2014

13

**Exhibit 1**

**(Updated Run-Off Projections)**

# UPDATED RUN-OFF PROJECTIONS[1]

In developing the Plan and determining whether the Plan is fair and equitable to all of FGIC's Policyholders, the Rehabilitator analyzed FGIC's ability to satisfy its financial obligations while maintaining the minimum policyholders' surplus for a financial guaranty insurance company under Section 6902(b)(1) of the NYIL. The Rehabilitator updated the Run-Off Projections in December 2012 for projecting losses under FGIC-insured Policies under a Base Scenario and a Stress Scenario from January 1, 2012 through the scheduled maturity of FGIC's last Policy in 2052. The Updated Run-Off Projections are based on FGIC's income statement, balance sheet and cash flows as of December 31, 2011. The Updated Run-Off Projections and the key assumptions on which they are based are set forth below.

The Updated Run-Off Projections assume that the Plan will be implemented on its stated terms. The Updated Run-Off Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in housing and financial markets, interest rates and employment rates. Accordingly, the estimates and assumptions underlying the Updated Run-Off Projections are inherently uncertain and subject to significant business, economic and other uncertainties. Therefore, the Updated Run-Off Projections are not necessarily indicative of current values or future performance of FGIC, which may be significantly less or more favorable than set forth herein.

THE REHABILITATOR PREPARED THE UPDATED RUN-OFF PROJECTIONS WITH THE ASSISTANCE OF PROFESSIONAL ADVISORS. THE REHABILITATOR DID NOT PREPARE THE UPDATED RUN-OFF PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.

MOREOVER, THE UPDATED RUN-OFF PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC, INCLUDING RISKS RELATING TO PLAN IMPLEMENTATION, CREDITORS' RECOVERIES UNDER THE PLAN AND CERTAIN OTHER RISK FACTORS, AS DETAILED IN SECTION IX OF THE DISCLOSURE STATEMENT. POLICYHOLDERS AND OTHER PARTIES IN INTEREST ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTIES OF FUTURE PERFORMANCE OR RECOVERIES. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING

---

[1] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO
OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE UPDATED RUN-OFF PROJECTIONS, WHILE PRESENTED WITH
NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF
ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY
THE REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT
TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL,
MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF
WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC. THE
REHABILITATOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE
MADE AS TO THE ACCURACY OF THE UPDATED RUN-OFF PROJECTIONS OR TO
FGIC'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS
INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES
OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR
PREPARED THESE UPDATED RUN-OFF PROJECTIONS MAY BE DIFFERENT FROM
THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND
THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN
A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE
REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE
NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE UPDATED RUN-OFF
PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING
AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO
REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE
UPDATED RUN-OFF PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE
OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN
CONSIDERING THE PROJECTED RECOVERIES UNDER THE PLAN, POLICYHOLDERS
MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF
SUCH ASSUMPTIONS AND THE RELIABILITY OF THE UPDATED RUN-OFF
PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Updated Run-Off Projections should be read in conjunction with the key
assumptions set forth below, as well as the other assumptions, qualifications, explanations and
risk factors set forth in the Disclosure Statement and the Plan (including the Plan Supplement), in
their entirety, and the historical financial statements (including the notes and schedules thereto)
and other financial information posted at www.fgic.com/investorrelations/financialreports/.

***Key Assumptions***

**A.    General**

1.    *Plan Effective Date:* The Updated Run-Off Projections assume the Effective Date will be
December 31, 2012.

2.    *Business Operations:*  The Updated Run-Off Projections assume that FGIC will not write
any new insurance policies throughout the Run-Off Period.

3.      All dollar amounts are in millions, unless otherwise specified.

**B.      Additional Transactions**

1.      *Novation of National Public Reinsured Policies:* The Updated Run-Off Projections
assume consummation of the novation to National Public of the National Public
Reinsured Policies.

2.      *Reinsurance Commutations:* The Updated Run-Off Projections assume consummation of
the Reinsurance Commutation Agreement with AORe, Radian and Sumitomo.

3.      *CDS and Policies Commutations:* The Updated Run-Off Projections assume that
commutations of certain Policies and CDS Policies submitted to Court occur.

**C.      Losses and Claims Payments**

1.      *Losses:* The Updated Run-Off Projections are based on two scenarios for projected losses
under FGIC's Policies: the Base Scenario and the Stress Scenario, each as described in
the Plan, the Disclosure Statement and herein.

2.      *CPP:* Under the Stress Scenario, the Updated Run-Off Projections assume that the CPP is
held constant at 17.25% until final distribution of all available assets to holders of
Permitted Policy Claims. Based on the mechanism described in the Plan, the CPP is
expected to increase in the Base Scenario as losses are realized at levels below those
projected in the Stress Scenario.  Accordingly, the Updated Run-Off Projections assume
that in the Base Scenario, CPP is increased every year until 2043.  By 2022, the CPP is
expected to be 26.3% in the Base Scenario.  If the CDS Commutations pending approval
were not approved, the initial CPP would have to be lowered to 15.5%. By 2022, under a
Base Case, the CPP would be expected to be approximately 22%.

**D.      Revenues and Expenses**

1.      *Investment Income:* The Updated Run-Off Projections assume that gross investment
income post-Effective Date is 2.30% in 2012 and will be 3.25% thereafter.  Management
fees are assumed to be 9.75 basis points of invested assets per year.

2.      *Premiums:* The Updated Run-Off Projections assume premiums on existing installment
Policies are collected as scheduled and that unearned premiums will not be returned.
However, a 10% reduction in expected premium collection is assumed in the Updated
Run-Off Projections to take into consideration potential shortfalls. The Updated Run-Off
Projections assumes that premiums will not be set-off against claims.

3.      *Reinsurance:* The Base Scenario assumes that reinsurance on Policy Claims that is not
commuted will be collected from U.S.-domiciled investment grade Reinsurers in full and
from non-U.S.-domiciled Reinsurers up to the amount of collateral posted if losses on

reinsured policies are realized.  The Stress Scenario assumes that reinsurance on Policy Claims that is not commuted will not be collected due to the implied amount of losses Reinsurers would likely experience under the Stress Scenario and the possibility that the reinsurers would have inadequate claims paying resources.  In both scenarios, it is assumed that FGIC continues paying installment premiums to Reinsurers.

4.      *Commutation Payments*: The Updated Run-Off Projections assume that the CDS Commutation Agreements and the Policies Commutation Agreements that have been executed by December 6th, 2012 and the Reinsurance Commutation Agreement are approved by the Court and are (for the purposes of the Updated Run-Off Projections only, since the commutation agreements may require earlier payment) paid post-Effective Date.

5.      *Taxes:* The Updated Run-Off Projections assume that FGIC will not generate taxable income post-Effective Date.  Income is expected to be generated on the Effective Date, but existing NOL balances are expected to be sufficient to fully offset income recognized on both a regular and AMT tax basis.

6.      *Contribution Amount*: The $11 million payment to FGIC Corp pursuant to the Plan Sponsor Agreement (the "**Contribution Amount**"), which is described in Section IV.B.9 of the Disclosure Statement, is assumed to be made in the Updated Run-Off Projections on the Effective Date.

7.      *Operating Expenses:* The Updated Run-Off Projections assume approximately $592 million of operating expenses through 2052 (this represents net present value of $177 million as of December 2012 at a 15% discount rate), excluding rehabilitation proceeding –related professional fees and other costs.

8.      *Rehabilitation Proceeding-Related Professional Fees and Other Costs:* The Updated Run-Off Projections assume approximately $22 million in non-contingent costs, and $18 million in costs contingent on the occurrence of certain milestones, in each case related to the preparation for and administration of the Rehabilitation Proceeding, including attorneys' fees, financial advisor fees and restructuring incentive bonuses for certain key FGIC employees, all of which were or are assumed to be incurred or paid in 2012.

9.      *Reserves and Valuation Allowances*: For statutory accounting purposes, FGIC will continue to account for the Policies, as restructured, as insurance policies.  Upon the Effective Date, FGIC will reduce its statutory reserves to reflect the ultimate amount of cash payments expected to be made with respect to its Policies less an amount to be determined that will permit FGIC to maintain a certain minimum positive statutory surplus.  In the event that FGIC determines that the ultimate amount of cash payments that are expected to be made with respect to its Policies has increased, FGIC will increase its statutory reserve in accordance with statutory accounting principles.

10.     *Other:*  The Updated Run-Off Projections do not include proceeds from any recoveries from Material Litigation, which are described in Section IV.B.7 of the Disclosure

Statement, due to the uncertainty regarding such recoveries today.  The Projections also do not include any value associated with FGIC's equity interest in FGIC UK.

**E.      Recoveries**

1.       *Calculation of Recoveries:* Recoveries for Policyholders are based on cash flows expected to be received as a result of CPP payments and distributions on account of DPO Accretion.  All cash flows are discounted to the time Policy Claims are expected to be Permitted.  The present value of these cash flows is then shown as a percentage of Permitted Policy Claims to calculate recoveries.  The recoveries shown below are average recoveries for all Permitted Policy Claims, including Permitted Policy Claims that already accrued and are unpaid and all Policy Claims that are expected to be received and Permitted through the maturity of the last policy in 2052.  Expected recoveries are shown in both the Base Scenario and the Stress Scenario.

## *Updated Base Scenario Illustrative Projected Financial*

| KEY FINANCIAL METRICS: BASE CASE | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | | | | |
| Invested Assets Ending Balance | $1,571 | $1,285 | $1,149 | $1,114 | $1,058 | $619 | $256 | $246 | -- | NA |
| **Claim Payments (Cash)** | | | | | | | | | | |
| Initial CPP Payments 1 | ($368) | ($325) | ($146) | ($63) | ($47) | ($315) | ($217) | ($2) | ($0) | ($1,485) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (191) | (151) | (134) | (148) | (221) | (281) | -- | (227) | (1,355) |
| **Other** | | | | | | | | | | |
| Notional Claims | (2,133) | (1,655) | (585) | (229) | (160) | (948) | (600) | (6) | (0) | (6,316) |
| Ending CPP | 17.3% | 23.0% | 26.3% | 28.6% | 30.7% | 33.6% | 36.5% | 36.5% | 38.6% | |

| SUMMARY INCOME STATEMENT: BASE CASE | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Premiums Earned | $50 | $151 | $98 | $65 | $58 | $33 | $16 | $5 | $0 | $475 |
| Net Investment Income | 39 | 224 | 191 | 178 | 174 | 151 | 89 | 40 | 34 | 1,119 |
| **Total Revenue** | **$89** | **$375** | **$289** | **$243** | **$232** | **$184** | **$105** | **$44** | **$34** | **$1,594** |
| Losses & Loss Adjustment Expense | $3,182 | ($248) | ($195) | ($183) | ($167) | ($115) | ($57) | $6 | $19 | $2,241 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| **Total Expenses** | **$3,114** | **($375)** | **($289)** | **($243)** | **($232)** | **($184)** | **($105)** | **($44)** | **($34)** | **$1,609** |
| **Net Income Before Taxes** | **$3,203** | -- | -- | -- | -- | -- | -- | -- | -- | **$3,203** |
| Taxes | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Net Income** | **$3,203** | -- | -- | -- | -- | -- | -- | -- | -- | **$3,203** |

| SUMMARY BALANCE SHEET: BASE CASE | 2011 | 2012 | 2017 | 2022 | 2027 | 2032 | 2037 | 2042 | 2047 | 2052 |
|---|---|---|---|---|---|---|---|---|---|---|
| Invested Assets | $2,033 | $1,571 | $1,285 | $1,149 | $1,114 | $1,058 | $619 | $256 | $246 | -- |
| Other Assets | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | -- |
| **Total Assets** | **$2,049** | **$1,588** | **$1,302** | **$1,166** | **$1,131** | **$1,075** | **$636** | **$273** | **$263** | **--** |
| Unearned Premium Reserve | $171 | $158 | $118 | $82 | $60 | $33 | $14 | $3 | $0 | -- |
| Loss Reserves (expected CPP and DPO distributions) | 5,422 | 1,343 | 1,103 | 1,007 | 997 | 972 | 555 | 205 | 198 | -- |
| Other Liabilities | 24 | 22 | 16 | 11 | 8 | 5 | 2 | 0 | 0 | -- |
| Statutory Surplus | (3,567) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | -- |
| **Liabilities and Equity** | **$2,049** | **$1,588** | **$1,302** | **$1,166** | **$1,131** | **$1,075** | **$636** | **$273** | **$263** | **--** |

| SUMMARY CASH FLOWS: BASE CASE | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash from Net Installment Premiums | $38 | $109 | $62 | $42 | $30 | $14 | $5 | $2 | $0 | $302 |
| Cash from Investment Income | 39 | 224 | 191 | 178 | 174 | 151 | 89 | 40 | 34 | 1,119 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Initial CPP Payments 1 | (368) | (325) | (146) | (63) | (47) | (315) | (217) | (2) | (0) | (1,484) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (191) | (151) | (134) | (148) | (221) | (281) | -- | (227) | (1,355) |
| Commutation Payments | (58) | -- | -- | -- | -- | -- | -- | -- | -- | (58) |
| Reinsurance Payments Received | 34 | 24 | 3 | 1 | 0 | 2 | 90 | 0 | -- | 153 |
| Contribution Amount | (11) | -- | -- | -- | -- | -- | -- | -- | -- | (11) |
| Loss Adjustment Expense | (68) | -- | -- | -- | -- | -- | -- | -- | -- | (68) |
| **Operating Cash Flow** | **($461)** | **($286)** | **($136)** | **($35)** | **($56)** | **($439)** | **($363)** | **($10)** | **($246)** | **($2,033)** |
| **Change in Invested Assets** | **$461** | **$286** | **$136** | **$35** | **$56** | **$439** | **$363** | **$10** | **$246** | **$2,033** |

| ILLUSTRATIVE AVERAGE POLICYHOLDER RECOVERIES: BASE CASE | |
|---|---|
| Nominal Recovery | 45% |
| 10% Discount Rate | 30% |
| 15% Discount Rate | 28% |
| 20% Discount Rate | 27% |

[1]"Initial CPP Payments" are CPP payments on Policy Claims first Permitted in the stated time period.

## *Updated Stress Scenario Illustrative Projected Financials*

### KEY FINANCIAL METRICS: STRESS CASE

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | | | | |
| Invested Assets Ending Balance | $1,491 | $992 | $891 | $898 | $898 | $685 | $555 | $595 | -- | NA |
| **Claim Payments (Cash)** | | | | | | | | | | |
| Initial CPP Payments 1 | ($414) | ($668) | ($215) | ($116) | ($110) | ($293) | ($195) | ($2) | ($80) | ($2,013) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | -- | -- | -- | -- | -- | -- | -- | (629) | (629) |
| **Other** | | | | | | | | | | |
| Notional Claims | (2,399) | (3,874) | (1,247) | (675) | (637) | (1,696) | (1,130) | (12) | (0) | (11,671) |
| Ending CPP | 17.3% | 17.3% | 17.3% | 17.3% | 17.3% | 17.3% | 17.3% | 17.3% | 20.4% | |

### SUMMARY INCOME STATEMENT: STRESS CASE

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Premiums Earned | $50 | $151 | $98 | $65 | $58 | $33 | $16 | $5 | $0 | $475 |
| Net Investment Income | 38 | 187 | 147 | 141 | 144 | 135 | 108 | 91 | 87 | 1,076 |
| **Total Revenue** | **$88** | **$338** | **$245** | **$205** | **$202** | **$168** | **$124** | **$95** | **$87** | **$1,551** |
| Losses & Loss Adjustment Expense | $3,183 | ($211) | ($151) | ($146) | ($137) | ($99) | ($76) | ($45) | ($34) | $2,284 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| **Total Expenses** | **$3,115** | **($338)** | **($245)** | **($205)** | **($202)** | **($168)** | **($124)** | **($95)** | **($87)** | **$1,652** |
| **Net Income Before Taxes** | **$3,203** | -- | -- | -- | -- | -- | -- | -- | -- | **$3,203** |
| Taxes | | | | | | | | | -- | |
| **Net Income** | **$3,203** | -- | -- | -- | -- | -- | -- | -- | -- | **$3,203** |

### SUMMARY BALANCE SHEET: STRESS CASE

| | 2011 | 2012 | 2017 | 2022 | 2027 | 2032 | 2037 | 2042 | 2047 | 2052 |
|---|---|---|---|---|---|---|---|---|---|---|
| Invested Assets | $2,033 | $1,491 | $992 | $891 | $898 | $898 | $685 | $555 | $595 | -- |
| Other Assets | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | -- |
| **Total Assets** | **$2,049** | **$1,508** | **$1,009** | **$908** | **$915** | **$914** | **$702** | **$572** | **$612** | **--** |
| Unearned Premium Reserve | $171 | $158 | $118 | $82 | $60 | $33 | $14 | $3 | $0 | -- |
| Loss Reserves (expected CPP and DPO distributions) | 5,422 | 1,262 | 810 | 749 | 781 | 812 | 621 | 503 | 547 | -- |
| Other Liabilities | 24 | 22 | 16 | 11 | 8 | 5 | 2 | 0 | 0 | -- |
| Statutory Surplus | (3,567) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | -- |
| **Liabilities and Equity** | **$2,049** | **$1,508** | **$1,009** | **$908** | **$915** | **$914** | **$702** | **$572** | **$612** | **--** |

### SUMMARY CASH FLOWS: STRESS CASE

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash from Net Installment Premiums | $38 | $109 | $62 | $42 | $30 | $14 | $5 | $2 | $0 | $302 |
| Cash from Investment Income | 38 | 187 | 147 | 141 | 144 | 135 | 108 | 91 | 87 | 1,076 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Initial CPP Payments 1 | (414) | (668) | (215) | (116) | (110) | (293) | (195) | (2) | (0) | (2,013) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | -- | -- | -- | -- | -- | -- | -- | (629) | (629) |
| Commutation Payments | (58) | -- | -- | -- | -- | -- | -- | -- | -- | (58) |
| Reinsurance Payments Received | -- | -- | -- | -- | -- | -- | -- | -- | -- | |
| Contribution Amount | (11) | -- | -- | -- | -- | -- | -- | -- | -- | (11) |
| Loss Adjustment Expense | (68) | -- | -- | -- | -- | -- | -- | -- | -- | (68) |
| **Operating Cash Flow** | **($542)** | **($499)** | **($101)** | **$7** | **($1)** | **($212)** | **($130)** | **$40** | **($595)** | **($2,033)** |
| **Change in Invested Assets** | **$542** | **$499** | **$101** | **($7)** | **$1** | **$212** | **$130** | **($40)** | **$595** | **$2,033** |

### ILLUSTRATIVE AVERAGE POLICYHOLDER RECOVERIES: STRESS CASE

| | |
|---|---|
| Nominal Recovery | 23% |
| 10% Discount Rate | 18% |
| 15% Discount Rate | 17% |
| 20% Discount Rate | 17% |

1"Initial CPP Payments" are CPP payments on Policy Claims first Permitted in the stated time period.

**Exhibit 2**

**(Updated Liquidation Analysis)**

US_ACTIVE:\44157768\3\65320.0003

## UPDATED LIQUIDATION ANALYSIS[4]

Consistent with the Rehabilitator's goal for the Rehabilitation Proceeding, the Rehabilitator has determined that Policyholders should receive substantially greater recoveries under the Plan than they would receive in a liquidation of FGIC.  To make this determination, the Rehabilitator prepared this Updated Liquidation Analysis, which shows the estimated recoveries Policyholders would receive in a hypothetical liquidation of FGIC in an Article 74 liquidation proceeding.

The Updated Liquidation Analysis is based on FGIC's income statement, balance sheet and cash flows as of December 31, 2011.  The Updated Liquidation Analysis reflects the estimated Cash proceeds, net of liquidation-related costs, available to FGIC's Policyholders if FGIC were liquidated in an Article 74 liquidation proceeding.  The Updated Liquidation Analysis contains estimates and assumptions that, although developed in consultation with FGIC and the Rehabilitator's advisors and considered reasonable by the Rehabilitator, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Rehabilitator or FGIC.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RECOVERIES REFLECTED IN THE UPDATED LIQUIDATION ANALYSIS WOULD BE REALIZED IF FGIC WERE, IN FACT, THE SUBJECT OF AN ARTICLE 74 LIQUIDATION PROCEEDING, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

The Updated Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of generating a good faith estimate of the recoveries that would be realized by FGIC's Policyholders if FGIC were to be liquidated in accordance with Article 74 of the NYIL.  THE UPDATED LIQUIDATION ANALYSIS IS NOT INTENDED TO, AND SHOULD NOT, BE USED FOR ANY OTHER PURPOSE.

THE REHABILITATOR PREPARED THE UPDATED LIQUIDATION ANALYSIS WITH THE ASSISTANCE OF PROFESSIONAL ADVISORS.  THE REHABILITATOR DID NOT PREPARE THE UPDATED LIQUIDATION ANALYSIS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.

MOREOVER, THE UPDATED LIQUIDATION ANALYSIS CONTAINS CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC, INCLUDING RISKS RELATING TO PLAN IMPLEMENTATION, CREDITORS' RECOVERIES UNDER THE PLAN AND CERTAIN OTHER RISK FACTORS, AS DETAILED IN SECTION IX OF THE DISCLOSURE

---

[4] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

STATEMENT.  POLICYHOLDERS AND OTHER PARTIES IN INTEREST ARE
CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE
DATE MADE AND ARE NOT GUARANTIES OF FUTURE PERFORMANCE OR
RECOVERIES.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY
FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING
STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO
OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE UPDATED LIQUIDATION ANALYSIS, WHILE PRESENTED WITH
NUMERICAL SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES
AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE
REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO
SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET
AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE
BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC.  THE REHABILITATOR
CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE
ACCURACY OF THE UPDATED LIQUIDATION ANALYSIS.  SOME ASSUMPTIONS
INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES
OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR
PREPARED THE UPDATED LIQUIDATION ANALYSIS MAY BE DIFFERENT FROM
THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND
THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN
A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE
REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE
NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE UPDATED LIQUIDATION
ANALYSIS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING
AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO
REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE
UPDATED LIQUIDATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE
OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WOULD OCCUR IN A
HYPOTHETICAL LIQUIDATION.  IN CONSIDERING THE PROJECTED RECOVERIES
UNDER THE PLAN AND IN A HYPOTHETICAL LIQUIDATION, POLICYHOLDERS
MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF
SUCH ASSUMPTIONS AND THE RELIABILITY OF THE UPDATED LIQUIDATION
ANALYSIS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Updated Liquidation Analysis should be read in conjunction with the key
assumptions set forth below, as well as the other assumptions, qualifications and explanations set
forth in the Disclosure Statement and the Plan (including the Plan Supplement), in their entirety,
and the historical financial statements (including the notes and schedules thereto) and other
financial information posted at www.fgic.com/investorrelations/financialreports/.

*Key Assumptions*

**A.    General**

1.    *Business Operations:*  The Updated Liquidation Analysis assumes that FGIC will not write any new insurance policies throughout the Run-Off Period.

2.    *Timing of Liquidation:* The Updated Liquidation Analysis assumes that the bar date for Claims and final distribution date are at year end 2052, which coincides with maturity of the longest-dated FGIC Policy.

3.    All dollar amounts are in millions, unless otherwise specified.

**B.    Additional Transactions**

1.    *Novation of National Public Reinsured Policies:* The Updated Liquidation Analysis assumes that the novation to National Public of the National Public Reinsured Policies will take place in a liquidation.

2.    *Reinsurance Commutations:* The Updated Liquidation Analysis assumes consummation of the Reinsurance Commutation Agreement with AORe, Radian and Sumitomo.

3.    *CDS and Policies Commutations:*  The Updated Liquidation Analysis assumes that commutations of certain Policies and CDS Policies submitted to the Court are approved and occur.

**C.    Losses and Claims Payments**

1.    *Claims Payments:* The Updated Liquidation Analysis assumes that all Policy Claims that would have been Permitted under the Plan will be allowed by the liquidator (each, an "**Allowed Policy Claim**") and paid *pari passu*.  Although FGIC's final distribution of assets in the Updated Liquidation Analysis is assumed to occur at the end of 2052, the Updated Liquidation Analysis assumes several payments to Policyholders prior to final liquidation based on the Rehabilitator's experience and practice in other Article 74 liquidation proceedings.  The first distribution is assumed to occur in 2027, 15 years after FGIC is placed into liquidation, and subsequent distributions occur every five years thereafter.  The payments are based on FGIC's distributable resources at the time of the payments.  Distributable resources are based on assets at the time of distribution less projected future expenses.  The maximum payment as a percentage of Allowed Policy Claims is then defined as distributable resources at time of payment divided by the sum of (a) Allowed Policy Claims realized to date and (b) total future Allowed Policy Claims expected to arise under a Stress Scenario.  Distributions are made on Allowed Policy Claims based on the Allowed Policy Claim amount multiplied by 15% of the maximum payment percentage in 2027, 20% of the maximum payment percentage in 2032, 25% of the maximum payment percentage in 2037, 30% of the maximum payment percentage in 2042, and 35% of the maximum payment percentage in 2047.  All remaining assets are distributed in a final liquidation in 2052.  At each distribution date, Allowed Policy Claims that have previously received payments receive the difference between the new

4

payment percentage and the prior payment percentage in effect when their last distribution was received.  Newly arisen Allowed Policy Claims receive the full payment percentage in effect at the time.  All Allowed Policy Claims would receive the same nominal recovery (*i.e.*, undiscounted cash flows received as a percentage of their original Policy Claim) because there is no interest accrual on unpaid Policy Claims.

2.    *Losses:* The Updated Liquidation Analysis is based on two scenarios for determining losses under FGIC Policies, the Base Scenario and the Stress Scenario, each as described in the Plan, the Disclosure Statement and herein.

**D.    Revenues and Expenses**

1.    *Investment Income:* The Updated Liquidation Analysis assumes gross investment income post-transaction to be 2.3% in 2012 and 3.25% thereafter.  Management fees are assumed to be 9.75 basis points of invested assets per year.

2.    *Premiums:* The Updated Liquidation Analysis assumes premiums on existing installment policies to be collected as scheduled if no claim is available to offset premium payment . If claims are available to offset premium payments, the Updated Liquidation Analysis assumes that premiums will not paid in cash and claims will be reduced accordingly. The Updated Liquidation Analysis also assumes that unearned premiums will not be returned. In Addition, a 10% reduction in expected premiums collection is assumed in the Updated Liquidation Analysis to take into consideration potential shortfalls.

3.    *Reinsurance:* The Base Scenario assumes that reinsurance on Policy Claims that is not commuted will be collected from U.S.-domiciled investment grade Reinsurers in full and from non-U.S.-domiciled Reinsurers up to the amount of collateral posted if losses on reinsured policies are realized.  The Stress Scenario assumes that reinsurance on Policy Claims that is not commuted will not be collected due to the implied amount of losses Reinsurers would likely experience under the Stress Scenario and the possibility that the Reinsurers would have inadequate claims-paying resources.

4.    *Taxes:* The Updated Liquidation Analysis assumes that the Contribution Amount - the $11 million payment to FGIC Corp. pursuant to the Plan Sponsor Agreement - will be paid.  Pretax income is expected to be realized in both the Base Scenario and Stress Scenario and the Updated Liquidation Analysis assumes that existing NOLs are available and utilized going forward as income is generated.  NOLs are assumed to expire 20 years after they are generated.  Although NOLs are projected to be sufficient to offset taxable income in the Base Scenario and the Stress Scenario, if actual losses in liquidation are lower than what is projected in these two scenarios, material Cash tax payments may be required.

5.    *Operating Expenses:* The Updated Liquidation Analysis assumes a total of approximately $533 million of operating expenses through 2052 (which amount is 10% less than operating expenses projected to be incurred under the Plan), excluding professional, NYLB and other expenses

6.      *Professional, NYLB and Other Expenses:* The Updated Liquidation Analysis assumes, over the Run-Off Period, approximately $49.5 million for professional expenses (comprised of approximately $30 million paid and to be paid in 2012, the year FGIC would enter liquidation, and approximately $0.5 million per year from 2013 to 2051), approximately $288 million for expenses related to NYLB operations (comprised of approximately $5 million per year for the first 10 years, and then increasing by 3% each year until 2052) and approximately $5 million for other expenses associated with winding down FGIC's business at the end of the Run-Off Period.

7.      *Other:* The Updated Liquidation Analysis does not assume any proceeds from any recoveries from Material Litigation or any value associated with FGIC's equity interest in FGIC UK because the Updated Run-Off Projections do not assume any proceeds from any recoveries from Material Litigation or any value associated with FGIC's equity interest in FGIC UK  under the Plan.

## E.      Recoveries

1.      *Calculation of Recoveries:* Recoveries for Policyholders are based on cash flows received as a result of interim and final distributions.  All cash flows received are discounted to the time the Policy Claim would be allowed by the liquidator.  The recoveries shown below are average recoveries for all Allowed Policy Claims, including Allowed Policy Claims that already accrued and are unpaid and all Policy Claims that the Rehabilitator expects would be received and allowed by the liquidator through maturity of the last Policy in 2052.  Expected recoveries are shown in both the Base Scenario and the Stress Scenario.

Nominal recoveries to Policyholders in a liquidation, as reflected below, are higher than nominal recoveries expected under the Plan because, in a liquidation, most of FGIC's assets would be distributed to Policyholders at the conclusion of the liquidation in 2052, allowing FGIC's assets to accrue investment income for another forty years.  However, using an appropriate discount rate to account for the time value of money reveals that actual recoveries in a liquidation would be significantly lower than under the Plan.

*Updated Illustrative Projected Liquidation Recovery*

| ILLUSTRATIVE AVERAGE POLICYHOLDER LIQUIDATION RECOVERIES | | |
| --- | --- | --- |
| | Base Scenario | Stress Scenario |
| Nominal Recovery | 86% | 43% |
| 10%  Discount Rate | 14% | 8% |
| 15%  Discount Rate | 9% | 5% |
| 20%  Discount Rate | 7% | 4% |