**MOSS & KALISH, PLLC**
David B. Gelfarb
122 East 42nd Street, Suite 2100
New York, New York 10168
Telephone: 212-867-4488
Facsimile: 212-983-5276

*Co-Counsel for Federal Home Loan Mortgage Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Chapter 11 |
| Debtors. | Jointly Administered |

**FEDERAL HOME LOAN MORTGAGE CORPORATION'S OBJECTION TO DEBTORS' MOTION PURSUANT TO FED R. R BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS**

**REDACTED**

<u>TABLE OF **CONTENTS**</u>

PRELIMINARY STATEMENT ............................................................... - 1 -

FACTS ........................................................................................... - 4 -

1.  Freddie Mac's FGIC-Insured Mortgage-Backed
    Securities................................................................. - 4 -

2.  FGIC's New York Insurance Rehabilitation
    Proceeding................................................................ - 6 -

3.  The 9019 Motion......................................................... - 9 -

4.  The Effects of the Settlement Agreement on
    Investor Recovery ...................................................... - 11 -

OBJECTION..................................................................................... - 16 -

1.  This Court Should not Make Findings Regarding
    the Rights and Obligations of Parties in the
    Rehabilitation Proceeding ............................................ - 16 -

2.  The FGIC Trustees Did Not Obtain the Required
    Consent to Enter into the Settlement ............................. - 21 -

3.  There Is No Basis for the Proposed Findings that
    the Settlement Agreement Is in the FGIC
    Beneficiaries' Best Interests ........................................ - 24 -

4.  There Is No Basis for of the Proposed Findings that
    the FGIC Trustees  Acted in Good Faith ........................ - 28 -

JOINDER......................................................................................... - 30 -

RESERVATION OF RIGHTS ............................................................... - 30 -

CONCLUSION .................................................................................. - 31 -

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Cellular Systems, Inc. v. Mayol,*
 235 B.R. 713 (Bankr. D.P.R. 1999) ..................................................................18

*Am. Deposit Corp. v. Schacht,*
 84 F.3d 834 (7th Cir. 1996) ..........................................................................18

*Davister Corp. v. United Republic Life Ins. Co.,*
 152 F.3d 1277 (10th Cir 1998) ........................................................................18

*In re Amwest Ins. Group, Inc.,*
 285 B.R. 447 (Bankr. C.D. Cal. 2002) ....................................................17, 18, 20

*In re Dalen,*
 259 B.R. 586 (Bankr. W.D. Mich. 2001) ............................................................22

*In re Levine,*
 287 B.R. 683 (Bankr. E.D. Mich. 2003) ............................................................22

*In re N.Y. Title & Mortgage Co.,*
 281 N.Y.S. 715 (N.Y. Sup. Ct. 1935) ..............................................................25

*In re Rosenberg,*
 No. 09-46326, 2010 Bankr. LEXIS 371 (Bankr. E.D.N.Y. Feb. 5, 2010) ..............................22

*In re Smith,*
 926 F.2d 1027 (11th Cir. 1991) ......................................................................22

*In re Tronox, Inc.,*
 429 B.R. 73 (Bankr. S.D.N.Y. 2010) ..............................................................29

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC),*
 478 F.3d 452 (2d Cir 2007) ........................................................................17

*Munich Am. Reinsurance Co. v. Crawford,*
 141 F.3d 585 (5th Cir 1998) ........................................................................17

*Policemen's Annuity & Benefit Fund of Chicago v. Bank of Am., N.A.,*
 No. 12-civ-2865, 2013 U.S. Dist. LEXIS 64499 (S.D.N.Y. May 6, 2013) ..............................23

*United States Dept. of Treasury v. Fabe,*
    508 U.S. 491 (1993)......................................................................18, 19, 20

STATUTES

11 U.S.C. § 109(b)(2) ...................................................................18, 19

12 U.S.C. § 4617(b)(2)(A)(i) ...............................................................4

15 U.S.C. 1011-1015 ......................................................................17

15 U.S.C. § 77aaa, *et seq.* ...............................................................22

15 U.S.C. § 77ppp(b) ......................................................................24

15 U.S.C. § 1012(b) .......................................................................17

OTHER AUTHORITIES

Rule 30(b)(6)..............................................................................30

Bankruptcy Rule 9019 ................................................................16, 17, 22

Article VI of the U.S. Constitution ......................................................18

Federal Home Loan Mortgage Corporation in conservatorship ("Freddie Mac"), by and through its undersigned counsel, hereby files this (i) objection (the "Objection") to the *Debtors' Motion Pursuant to Fed. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [ECF No. 3929] (the "9019 Motion").[1]  In support hereof, Freddie Mac respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Freddie Mac does not object to the settlement agreement at issue in the 9019 Motion (the "Settlement Agreement") *per se*.  Rather, Freddie Mac objects to the Settlement Agreement because:

(a)  The Settlement Agreement provides for the termination/commutation of certain policies (the "Policies") issued by Financial Guaranty Insurance Corporation ("FGIC") that insure/guarantee the payment of principal and interest on residential mortgaged backed securities originated and/or serviced by the Debtors (the "FGIC Commutation").  The FGIC Commutation will significantly and negatively impact Freddie Mac's recoveries in the FGIC Rehabilitation Proceeding (defined below).[2]

---

[1] This Objection and accompanying exhibits have been filed publicly in redacted form pursuant to this Court's July 16, 2013, *Order Regarding the Exchange of Confidential Information* (the "Confidentiality Order") [ECF No. 4249]. Non-redacted copies of this Objection will be delivered to the Court and served upon the parties covered by the Confidentiality Order.  Copies of deposition transcripts cited herein will be made available to the parties covered by the Confidentiality Order upon request.

[2] In connection with the Debtors' mortgage servicing and origination businesses, two of the Debtors—GMAC Mortgage, LLC, and Residential Funding, LLC—acted as sponsor, depositor, master servicer, primary servicer, and/or subservicer in various transactions involving the securitization of residential mortgages through securitization trusts and the issuance of residential mortgage-backed securities ("RMBS," and the holders of FGIC-insured/wrapped ResCap RMBS, collectively, the "Investors").  Freddie Mac is one of the Investors.

(b) The findings in the proposed order (the "Proposed Order") include a finding that the trustees (the "FGIC Trustees") of certain trusts (the "FGIC-Insured Trusts") insured by the Policies acted "reasonably, in good faith" and discharged their fiduciary duties to act "in the best interest of" the beneficiaries of the FGIC-issued policies (the "FGIC Beneficiaries," which includes Freddie Mac) when the FGIC Trustees agreed—without the requisite consent of the FGIC Beneficiaries—to the FGIC Commutation (the "Proposed Findings"). The Trustees did not act in good faith or in the best interest of Freddie Mac when they agreed to the FGIC Commutation.

(c) The Proposed Findings are unusual for an indenture trustee to request, particularly where (i) the findings are meant to circumvent the FGIC Trustees' obligations to obtain consent from the FGIC Beneficiaries, as Investors in FGIC-insured RMBS and (ii) where the Court is not being asked to address the commutation itself but rather the propriety of the Debtors entry into the settlement.

(d) The FGIC Trustees cannot meet their burden to have such findings made by this Court. Even after three weeks discovery in this matter, neither the Debtors nor the FGIC Trustees have presented any reliable financial or other analysis to the Court—or to the FGIC Beneficiaries—to establish any net economic benefit from the FGIC Commutation to Freddie Mac or other investors. The FGIC Trustees negotiated the FGIC Commutation in secret, agreed to the proposed terms without providing any notice of their intentions while at the same time they actively worked with Freddie Mac and other large

- 2 -

Investors to better the terms of the Rehabilitation Plan so that it would provide some of the very same benefits that the trustees now seek to take away. To this day, the FGIC Trustees have failed to publically disclose any helpful or detailed financial information that might allow the FGIC Beneficiaries to determine whether the FGIC Commutation makes economic sense. FGIC, in its most illustrative financial disclosures, projected making payments on claims against FGIC-issued policies generally at a present value of 27-30 cents on the dollar, not including potential litigation recoveries.[3]

4

(e) Irrespective of any collateral connection to the Settlement Agreement, the proposed FGIC Commutation implicates the rights and the obligations of the FGIC Beneficiaries, the FGIC Trustees, and FGIC—not the Debtors—in

---

[3] *Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation* (the "Miller Affidavit") ¶ 28, Ex. 1 p. 6. The Miller Affidavit is attached hereto as Exhibit A.

4

FGIC's pending rehabilitation proceeding in New York state court under New York insurance law (the "FGIC Rehabilitation Proceeding"). Such rights and obligations—and how they were (not) satisfied—impact solely the Policies issued by FGIC, and this Court should not enter the Proposed Findings.

2.      In sum, governing law and the evidentiary record compel the Court to not enter the Proposed Findings and to the extent requested by the parties to not approve the commutation.

## FACTS

### 1. Freddie Mac's FGIC-Insured Mortgage-Backed Securities

3.      Freddie Mac is a corporate instrumentality of the United States of America, chartered by Congress under the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§ 1451-59. Congress created Freddie Mac for the purpose of increasing the funds available to homebuyers through the creation of a secondary mortgage market for the purchase and sale of conventional residential mortgage loans. On September 6, 2008, the Director of the Federal Housing Finance Agency (the "FHFA" or the "Conservator") placed Freddie Mac into conservatorship pursuant to express authority granted under the Housing and Economic Recovery Act of 2008 to preserve and conserve Freddie Mac's assets and property. As Conservator, FHFA immediately succeeded to "all rights, titles, powers and privileges" of Freddie Mac. *See* 12 U.S.C. § 4617(b)(2)(A)(i).[5]

4.      Freddie Mac is the single largest FGIC-wrapped security holder. Freddie Mac is also one of the largest—if not the largest—Investor in FGIC-wrapped ResCap RMBS.

---

[5] This Objection does not constitute the submission to this Court's jurisdiction by the FHFA,

5.    Prior to the Debtors' bankruptcy filing, certain of the Debtors originated and/or serviced residential mortgage loans that they contributed or otherwise sold to forty-seven trusts. These trusts then issued RMBS consisting of certificates collateralized by such residential mortgage loans.  FGIC, a monoline financial guaranty insurance company, wrote the Policies, which insured the payment of principal and interest with respect to the securities issued by the FGIC-Insured Trusts.  By "wrapping" the securities the FGIC-Insured Trusts issued, FGIC essentially guaranteed the payment of principal and interest due on such securities.

7.    On account of the underperformance of the trust collateral, Freddie Mac has not received the principal and interest payments that it should have received from the above-listed FGIC-Insured Trusts.  In turn, the trusts presented claims to FGIC to cover the principal and interest shortfalls as required by the Policies.  FGIC, however, has not made any payments under any of the Policies since approximately November of 2009—when the New York State Department of Insurance (now the New York Department of Financial Services) issued a "1310 Order" that prevented FGIC from making payments on any policy claims until FGIC's financial condition improved.  As a result, Freddie Mac has long outstanding claims that remain unpaid under the Policies, and Freddie Mac also expects to have significant and continuing policy claims against FGIC for principal and interest shortfalls in both the near and long-term future.

### 2. FGIC's New York Insurance Rehabilitation Proceeding

8.      Beginning in 2010, a steering committee of long- and short-dated policyholders (the "Steering Committee") commenced negotiations with a then insolvent FGIC concerning a plan of rehabilitation. The proposed plan was unprecedented under New York insurance law in that it was designed as a prepackaged plan that permitted FGIC to emerge from rehabilitation without paying its policyholders in full. Additionally, the plan provided that policyholders would receive the same CPP, whether their claims were long- or short-dated. Freddie Mac participated in these negotiations and was actively in discussions with both the Steering Committee and FGIC. John Dubel, FGIC's Chief Executive Officer, participated in all of these negotiations and was very much concerned that long- and short-dated policyholders' claims be treated equally. The negotiations culminated in January of 2011 in a term sheet specifying the terms and conditions of FGIC's rehabilitation plan (the "Rehabilitation Plan Term Sheet").[6]

9.      Much like the approved rehabilitation plan that the New York state court overseeing FGIC's rehabilitation proceeding eventually approved, the Rehabilitation Plan Term Sheet provided that each FGIC policyholder would receive its *pro rata* share of available cash, which was referred to as a CPP payment, plus a litigation upside to the extent FGIC realized recoveries on its direct claims against sponsors of the FGIC-Insured Trusts and others for, *inter alia*, claims for breach of representations and warranties. As the negotiators, including FGIC, intended, the Rehabilitation Plan Term Sheet was designed so that policyholders would be treated equally whether they were long- or short-dated policyholders. Following the appointment of the Rehabilitator—and after a lengthy period for the Rehabilitator to retain

---

[6] A copy of the Rehabilitation Plan Term Sheet is attached hereto as Exhibit D.

professionals—the discussions between the Rehabilitator/FGIC, Freddie Mac, and the Steering Committee centered primarily upon (i) FGIC's attempt to control put-back rights and breach of representation and warranty claims held by the FGIC-Insured Trusts and (ii) the design and structure of certain deferred payment obligations ("DPOs"). As a result of these negotiations, the Steering Committee was able to preserve the FGIC-Insured Trusts' rights as provided inn Section 3.7 of the plan to assert put-back claims against, among others, certain third-party sponsors and provide investors that held at least 25% of the outstanding FGIC-wrapped securities issue the right to veto any settlement on FGIC's RMBS-related claims that sought to bind the FGIC Trustees.

      10.    On June 11, 2012, after years of FGIC's not making any policy claims payments with respect to the FGIC-Insured Trusts, the Superintendent of Financial Services of the State of New York filed a petition in New York Supreme Court, New York County (the "N.Y. State Court"), seeking an order appointing the Superintendent as FGIC's Rehabilitator pursuant to New York insurance law. The N.Y. State Court granted the petition on June 28, 2012, commencing FGIC's rehabilitation proceeding (the "Rehabilitation Proceeding"). The Rehabilitator, among other things, thereafter submitted to this Court a proposed plan of rehabilitation for FGIC on September 27, 2012, which was amended on December 12, 2012. The plan was subsequently modified, culminating in a version this Court approved on June 11, 2013. Over the course of approximately 2.5 years, Freddie Mac was closely involved in lengthy negotiations surrounding the structure of the eventual Rehabilitation Plan. The Rehabilitation Plan provides that the holders of FGIC policy claims will receive payments of 17.25% of the total amount of their claims against FGIC (the "Cash Payment Percentage" or "CPP"), which will be adjusted over time.

- 7 -

11.    As Mr. Dubel has admitted,

Even the disclosure statement the Rehabilitator filed in conjunction with the Rehabilitation Plan makes reference only the commutation of CDS contracts.[9] In fact as a result of the successful commutation of the CDS holders' and reinsurance claims the Rehabilitator/FGIC informed the Steering Committee and Freddie Mac that the initial CPP amount would be increased from approximately 13 to 14% to 15% and than in December 2012 to 17.25.[10]

12.    Discussions in earnest between the Rehabilitation/FGIC with the FGIC Trustees did not commence until after the Rehabilitation Plan was initially filed in September of 2012. Freddie Mac and other Steering Committee members sought to facilitate these discussions. In order to participate in these discussions, FGIC Trustees requested that Freddie Mac provide them with information concerning Freddie Mac's holdings, which it did in mid-January of 2013.

---

[7] Deposition of John Dubel (the "Dubel Deposition") at 59:23-60:7 (July 10, 2013) (Q "And did—do you recall whether the [steering] committee asked you what you meant by commuting their policies?" A. "As I previously stated, we didn't have discussions about, specific discussions about commuting the RMBS security policies . . .").

[8] *See* Deposition of Gina Healy (the "Healy Deposition") at 15:12-18, 117: 8-19.

[9]The CDS holders claims for treatment as a policyholder entitled to priority treatment is seriously in doubt under New York insurance law. Nonetheless, FGIC negotiated settlements with each all of the CDS holders. This stands in sharp contrast to the unilateral commutation of the Policies. All of the CDS and reinsurance commutations were consensual, which is clearly not the case here with respect to the FGIC Commutation.

[10]

Freddie Mac also signed a confidentiality agreement with Bank of New York ("BONY")and the Rehabilitator. Discussions with BONY centered, for the most part, on the preservation of the FGIC Trustees' setoff rights under the plan. FGIC, in its initial version of the Rehabilitation Plan filed in September of 2012 sought to thwart such setoff rights. Ironically, these negotiations resulted in preserving the FGIC Trustees' setoff rights against FGIC's claims against the FGIC-Insured Trusts and had a positive impact on Investor recoveries. Unfortunately, the FGIC Trustees' annulled any positive gains to the Investors through their clandestine agreement to the FGIC Commutation. Even with Freddie Mac's confidentiality agreement, at no time did BONY, FGIC, or any of the other FGIC Trustees mention anything to Freddie Mac about the FGIC Commutation.

### 3. The 9019 Motion

13.    The 9019 Motion seeks the approval of the Settlement Agreement among (i) the Debtors, (ii) FGIC, (iii) the FGIC Trustees, and a group of various institutional investors holding RMBS. Unlike the Rehabilitation Proceeding, where major stakeholders actively participated in the negotiations surrounding the ultimate form of the Rehabilitation Plan, the negotiations surrounding the Settlement Agreement contemplated in the 9019 Motion were conducted in secret, with only the Debtors, FGIC, the Rehabilitator, and the FGIC Trustees invited to participate. (*See* 9019 Motion at pp. 1, 10.) Freddie Mac—though a major stakeholder in these cases—was not apprised of the negotiations surrounding the Settlement Agreement and was unaware that these parties were negotiating a Settlement Agreement that would substantially affect Freddie Mac's rights under the Policies.[11]  Indeed, Freddie Mac's counsel did not receive

---

[11] In fact, Freddie Mac was in discussions with the very same FGIC Trustees, FGIC, and the Rehabilitator's counsel concerning the FGIC Rehabilitation Plan and was never informed that Freddie Mac's recoveries under the

(continued)

any notice about the settlement until shortly before the 9019 Motion was filed. Freddie Mac

itself did not learn of the settlement until its outside counsel informed the company about it.

14.     The proposed Settlement Agreement contains the following key elements:

- The settlement, discharge, and release of FGIC's obligations under the Policies in exchange for a bulk, cash payment from FGIC to the FGIC Trustees in the amount of $253.3 million and effectively commuted the policies, preventing any further claims against FGIC under the Policies, and eliminating obligations of the FGIC Trustees to pay future premiums. (*See* Settlement Agreement §§ 2.01(a)(i), (b), 2.02.)

- The Proposed Findings.

- The allowance of FGIC's claims against the Debtors for reimbursement under the Policies and on account of certain pre-petition litigation against the Debtors in an amount ranging from a minimum of $596.6 million in the event the Debtors' proposed Chapter 11 plan (the "Proposed Plan") does not go effective or $934 million should the Proposed Plan go effective. (Settlement Agreement § 3.01.)

- The release of the remainder of FGIC's claims against the Debtors' estates and the bulk of the claims asserted by the FGIC Trustees on behalf of the FGIC-Insured Trusts. (Settlement Agreement §§ 2.01-2.02, 3.01-3.03.)

15.     The Settlement Agreement's ultimate effectiveness largely depends on two

conditions precedent: the approval of the Settlement Agreement by this Court and the approval

of the Settlement by the N.Y. State Court in the Rehabilitation Proceeding.[12] (*See* Settlement

Agreement § 3.01; 9019 Motion ¶ 27.)

---

Rehabilitation Plan were being effectively commuted/terminated as part of a settlement with the Debtors. Moreover, despite an agreement by counsel for FGIC/the Rehabilitator to provide Freddie Mac with all papers filed in the Rehabilitation Proceeding, Freddie Mac did not receive notice of various consensual CDS and/or reinsurance commutations, as well as other pleadings filed in the Rehabilitation Proceeding (Unlike the federal courts, pleadings are not, as a rule, available electronically on the N.Y. State Court dockets.) (*See* Exhibit E hereto, which is an email from the Rehabilitator's/FGIC's counsel noting that such documents would be made available to Freddie Mac.)

[12] Although paragraph 22 of the 9019 Motion states that "The first element of the Settlement Agreement is a settlement, discharge and release of FGIC's obligations under the Policies, as approved by the Rehabilitation Court," the N.Y. State Court has *not* approved the Settlement. The hearing on the approval of the Settlement in the Rehabilitation Proceeding is scheduled for August 6, 2013. Freddie Mac filed its objection to the approval of the Settlement Agreement, insofar as it would approve the FGIC Commutation, in the N.Y. State Court on July 16, 2013.

- 10 -

4.  **The Effects of the Settlement Agreement on Investor Recovery**

16.     The Debtors originally scheduled a hearing on the 9019 Motion for June 26, 2013, with an objection deadline of June 19, which was extended with respect to Freddie Mac by agreement with the Debtors.  Freddie Mac found certain key elements of the Settlement Agreement and the 9019 Motion highly problematic within a few days following receipt and analysis.  Specifically, Freddie Mac objected to the FGIC Commutation and the Proposed Findings the FGIC Trustees are demanding this Court make, which would effectively bless their actions in commuting the Policies and confirm that such actions were reasonable, made in good faith, and in the best interest of the Investors.

There has been absolutely no public disclosure by ResCap, FGIC/the Rehabilitator, or the FGIC Trustee in either in the 9019 Motion, submissions to the N.Y. State Court or in the disclosure statement accompanying the Debtors' joint Chapter 11 plan filed on July 4, 2013 [ECF No. 4147] on the dollar or percentage reduction this "haircut" would have on Investor recovery.  In fact, Freddie Mac has only received limited information on this issue—and then only through discovery—on the reduction of its recoveries under the FGIC Commutation versus the Rehabilitation Plan.

19.

20,

15

16

21.      On its own, Freddie Mac's claims are significantly larger than the Institutional
Investors insured claims.   Nevertheless, while the Institutional Investors participated in the
mediation, the FGIC Trustees failed to alert Freddie Mac to the possibility that their claims as
Investors would be commuted and that the FGIC Commutation was under discussion in the
mediation proceedings.[17]   Moreover, while parties have thrown up a wall of silence and dubious
claims of privilege, there is no evidence that the FGIC Trustees even mentioned to the mediator
the need to discuss the FGIC Commutation with Freddie Mac or the Steering Committee.   In
fact, there is no evidence that the FGIC Trustees sought to negotiate the FGIC Commutation.
Rather,   discovery   to   date   demonstrates   that   the

---

[17]

[18]

[19]

23,

Accordingly, Freddie

Mac believes that the FGIC Trustees are not entitled to findings that (i) "The [FGIC] Trustees

acted reasonably, in good faith, without negligence and in the best interests of the Investors in

---

20

21

each Trust and each Such Trust in agreeing to the Settlement Agreement" and (ii) "The Settlement Agreement and the transactions contemplated thereby, including the releases given therein, are in the best interests of . . . the Investors in each such Trust . . . " set forth in Proposed Order ¶¶ C and D.[22]

<u>OBJECTION</u>

### 1. This Court Should not Make Findings Regarding the Rights and Obligations of Parties in the Rehabilitation Proceeding

24.    The Debtors are seeking findings from this Court that the Settlement Agreement is in the best interest of the FGIC Beneficiaries (as Investors).  Such findings are wholly inappropriate here: what is in the best interests of the FGIC Beneficiaries is a matter to be determined by the N.Y. State Court, not this Court.  Moreover, there is nothing in the record to support such findings, and all the evidence uncovered to date suggests exactly the opposite. Indeed, Freddie Mac will show that the evidence compels a conclusion diametrically opposed to the Proposed Findings: the Settlement Agreement is not in the best interests of the FGIC Beneficiaries; and the FGIC Trustees did not act reasonably, in good faith, without negligence and in the FGIC Beneficiaries' best interests.

25.    As an initial matter, the cornerstone of the Settlement Agreement is the N.Y. State Court's approval of the FGIC Commutation, which would prevent any Investor from making claims additional against FGIC.  The FGIC Commutation is a matter solely between FGIC and the FGIC Beneficiaries.  As this Court has recognized, the N.Y. State Court will

---

[22] The Proposed Order, which incorporates the defined in the Settlement Agreement (footnote 1), defines "Trust" as the FGIC-Insured Trusts and the "Investors" in such "Trusts" as the holders of securities in each Trust.  (Settlement Agreement, Preamble, § 1.08.)

evaluate the Settlement Agreement under an entirely different standard than this Court.[23]  This

Court will consider whether the Settlement Agreement is in the best interests of the Debtors and

their creditors; the N.Y. State Court, by contrast, will address whether the Settlement Agreement

and, in particular, the FGIC Commutation, is appropriate with respect to FGIC's policyholders

and is not otherwise in violation of New York Insurance Law and the Rehabilitation Plan.  While

the findings this Court will be called to make with respect to the Debtors and their creditors, the

N.Y. State Court will focus particularly on the rights of the FGIC Beneficiaries.  *Compare*

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478

F.3d 452, 462 (2d Cir 2007) (considering, *inter alia*, the "paramount interests of the [debtor's]

creditors" when determining whether to approve settlement under Bankruptcy Rule 9019), *with*

*Frontier Ins. Co.*, 36 Misc.3d 529, 541-42 (N.Y. Sup. Ct. 2012) (recognizing as relevant

considerations whether a rehabilitation plan will provide claimants less favorable treatment than

liquidation, and whether all policyholders/creditors of similar priority are treated the same).

26.    Furthermore, federal statutes and case law recognize that state statutes (such as

New York's) granting jurisdiction over insurers' rehabilitation or liquidation proceedings

reverse-preempt the exercise of jurisdiction by federal authorities or courts, including bankruptcy

courts, because it would impede or supersede the state processes regulating the business of

insurance.  The McCarran-Ferguson Act, *codified as* 15 U.S.C. 1011-1015, exempts the business

of insurance from most federal regulation, providing that "no Act of Congress shall be construed

to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the

business of insurance . . . ."  15 U.S.C. § 1012(b); *see also, e.g., In re Amwest Ins. Group, Inc.*,

---

[23] *See Order Concerning the Use of Discovery Obtained in Connection with the Rule 9019 FGIC Settlement Hearing* [ECF No. 4191] ("All parties acknowledge that there are different standards for approval of the FGIC Settlement by each court.").

285 B.R. 447, 451 (Bankr. C.D. Cal. 2002); *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d

585, 595 (5th Cir 1998); *Davister Corp. v. United Republic Life Ins. Co.*, 152 F.3d 1277, 1281

(10th Cir 1998); *Advanced Cellular Systems, Inc. v. Mayol*, 235 B.R. 713, 724-25 (Bankr. D.P.R.

1999).

27.    Specifically, the McCarran-Ferguson Act provides states with preemptive

authority over the regulation of "the business of insurance." The McCarran-Ferguson Act

"'overturned the normal legal rules of preemption' by imposing a rule 'that state laws enacted for

the purpose of regulating the business of insurance do not yield to conflicting federal statutes

unless the federal statute specifically provides otherwise.'" *Am. Deposit Corp. v. Schacht*, 84

F.3d 834, 837-38 (7th Cir. 1996) (quoting *United States Dep't. of Treasury v. Fabe*, 508 U.S.

491, 507 (1993)). In other words, the McCarran-Ferguson Act reverses the normal supremacy of

federal law over state law, so long as the activity in question falls under the heading of "the

business of insurance." *Advanced Cellular*, 235 B.R. at 718.[24]

28.    Bankruptcy proceedings and insurance company insolvency proceedings are

indeed similar in that their goal is either to reorganize or liquidate the debtor. *See Advanced

Cellular*, 235 B.R. at 717-18.  The object of both is to group the assets of the debtor or the

insolvent insurance company into one estate for distribution to creditors according to certain

priorities. *Amwest Ins. Group*, 285 B.R. at 452.  But, while the Bankruptcy Code governs

bankruptcy cases, which expressly exempts insurance companies from its reach (Bankruptcy

Code § 109(b)(2)), state law governs insurance insolvency cases. *See id.*  And while the focus of

---

[24] In effect, the McCarran-Ferguson Act reverses the ordinary rules of preemption, which holds that federal law preempts state law by virtue of the supremacy clause in Article VI of the U.S. Constitution. *Fabe*, 508 U.S. at 500.

- 18 -

the Bankruptcy Code is upon *debtors and their creditors*, the focus of state insurance law is upon the relationship between the *insurance company and its policyholders*. *Id.*

29.    Courts consider a federal statue (such as the Bankruptcy Code) to be reverse-preempted under the McCarran-Ferguson Act if (i) the federal statute in question does not specifically relate to the business of insurance, (ii) the state statute was enacted for the purpose of regulating the business of insurance, and (iii) the federal statute would invalidate, impair or supersede the state statute. *Fabe*, 508 U.S. at 501. Courts have consistently held that "it is clear that the Bankruptcy Code in general . . . does not relate to the business of insurance." *Id.* (citing *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25 (1996)) (bankruptcy statutes do not "specifically relate" to insurance). Further, the New York insurance law governing the FGIC Rehabilitation Proceeding does not merely have an impact on the insurance industry; it is aimed at it. As the Supreme Court held in *Fabe*, the liquidation and rehabilitation of insurance companies is "integrally related to the performance of insurance contracts after bankruptcy," and is thus "regulation of the business of insurance." *Fabe*, 508 U.S. at 504. The first two prongs are therefore easily satisfied.

30.    This Court should defer the Proposed Findings related to Freddie Mac's FGIC-insured RMBS to the N.Y. State Court presiding over the Rehabilitation Proceeding. Such claims arise under the Policies and are against FGIC—an insurer who cannot be a debtor under Bankruptcy Code § 109(b)(2)—and therefore must be resolved in the Rehabilitation Proceeding, by the N.Y. State Court. *Fabe* is instructive. In that case, the U.S. Supreme Court dealt with a conflict between application of claim priority contained in a state insurance insolvency law statute and the priorities embedded in the Bankruptcy Code. Specifically, the U.S. Supreme Court questioned whether the state insurance claim priority statute was preempted by the priority

- 19 -

scheme embedded in the Bankruptcy Code.  The U.S. Supreme Court held that the state

insurance insolvency law reverse-preempted the Bankruptcy Code insofar as it protected

policyholders.  *Fabe*, 508 U.S. at 508.  In *Fabe*, the U.S. Supreme Court underscored that the

principal focus of the phrase "business of insurance" should be between the insurance company

and its policyholders.  *Id.* at 501.  Here, if this Court were to decide that the Settlement

Agreement is in the best interests of the FGIC Beneficiaries (and whether the Trustees acted

reasonably and in good faith in making that determination), this Court's determination would

likely conflict with the N.Y. State Court's ruling on the very same issue.  Accordingly, such

findings by this Court would impair the progress of the Rehabilitation Proceeding.

      31.    That is precisely the conclusion the *Amwest Insurance Group* court reached.  In

that case, a bankrupt insurance holding company and its subsidiary insolvent insurance company

were both parties to a tax allocation agreement.  The insurance holding company later became a

debtor under Chapter 11, and the insurance company was placed into rehabilitation under state

law.  The question before the court in *Amwest Insurance Group* was whether it should interpret

the tax allocation agreement at issue and determine the allocation of a tax refund between the

insolvent insurance company and another insurance-company subsidiary of the debtor.  (The tax

refund belonged to the insolvent insurance company—but was property of the holding

company's bankruptcy estate because it was remitted to the holding company as parent.)

*Amwest Ins. Group*, 285 B.R. at 453.

      32.    Citing *Fabe*, the *Amwest Insurance Group* court declined to interpret the tax

allocation agreement and allocate the tax refund because such "determination may conflict with

the Liquidation Court's ruling regarding the tax allocation between Amwest and Far West

[another insurance company subsidiary of the debtor]."  *Id.* at 455.  Accordingly, this Court

should defer the Proposed Findings and FGIC Commutation to the New York State Court. These are matters affecting FGIC and its policyholders and are properly decided by the N.Y. State Court. Any order on the 9019 Motion should, at minimum, not include the Proposed Findings.

33.    The Proposed Findings in connection with the FGIC Trustees' agreeing to the FGIC Commutation are unusual for an indenture trustee to request here: this Court is not being asked to approve the FGIC Commutation. Rather, this Court is called to determine whether entering into the Settlement Agreement is in the best interests of the Debtors and their estates. The merits of the FGIC Commutation is not a matter before this Court, and this Court should defer to the N.Y. State Court on the Proposed Findings. The reality here is that the Proposed Findings have all the indicia of cover and are meant to circumvent the FGIC Trustees' obligations to obtain consent from the FGIC Beneficiaries, as Investors in FGIC-insured RMBS, before endorsing the FGIC Commutation.

### 2. The FGIC Trustees Did Not Obtain the Required Consent to Enter into the Settlement

34.    In any event, the 9019 Motion should be denied and the Settlement Agreement should not be approved insofar as it incorporates the FGIC Commutation because the FGIC Trustees had no authority under the Transaction Documents or Trust Indenture Act § 316(b) to enter into the Settlement Agreement without the consent of the FGIC Beneficiaries.[25] The FGIC Trustees neither obtained nor solicited such consent. This Court should not approve a settlement that was entered into unlawfully or is otherwise contrary to public policy. *In re Rosenberg*, No. 09-46326, 2010 Bankr. LEXIS 371, at *11 (Bankr. E.D.N.Y. Feb. 5, 2010) ("[P]arties cannot enter into a settlement that violates law or public policy"); *In re Levine*, 287 B.R. 683, 691

---

[25] The Trust Indenture Act of 1939 (the "Trust Indenture Act") is codified as 15 U.S.C. § 77aaa, *et seq.*

- 21 -

(Bankr. E.D. Mich. 2003) (declining to approve 9019 settlement because "[a] party simply cannot, through an agreement approved by a court, secure authority to engage in an activity which is not otherwise permitted by law."); *In re Dalen*, 259 B.R. 586, 611-13 (Bankr. W.D. Mich. 2001) (bankruptcy court should not approve settlements under Bankruptcy Rule 9019 that are illegal or against public policy) (citing *Williams v. Vukovich*, 720 F.2d 909, 920-21 (6th Cir. 1983)).    It is well established that "[s]ettlements are void against public policy . . . if they directly contravene a state or federal statute or policy." *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991).

### a)  The Settlement Violates the Transaction Documents

35.    Nine separate FGIC-Insured Trusts issued Freddie Mac's FGIC-insured RMBS and also hold the residential mortgages backing such securities.  The FGIC Trustees for each of the nine FGIC-Insured Trusts have executed either an Indenture (in the case of two of the FGIC Trustees) or are party to a PSA (in the case of the remaining seven).  Each of the Governing Trustee Documents provides that the FGIC Trustees may not take certain actions without the express consent of varying percentages of the applicable Investors.

36.    By way of example, the section 9.02 of the Indenture for the GMACM Home Equity Loan Trust 2001-HE2 § 9.02 provides, in pertinent part:

> Supplemental Indentures With Consent of Noteholders. The Issuer and the Indenture Trustee, when authorized by an Issuer Request, may, with prior notice to the Rating Agencies and with **the consent of** the Enhancer and **the Noteholders of not less than a majority of the Note Balances of each Class of Notes affected thereby**, by Act (as defined in Section 10.03 hereof) of such Noteholders delivered to the Issuer and the Indenture Trustee, **enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Noteholders under this Indenture** [emphasis added] . . . .

37.    The FGIC Beneficiaries were never consulted on the proposed commutation of

their claims against FGIC and no vote has been offered.  Furthermore, the FGIC Trustees have not provided any evidence that the Policies are trust estate property that they have the unilateral right to commute without the consent of each of the FGIC Beneficiaries.

38.    The other seven PSAs contain substantially similar provisions, the FGIC Trustees breached each of those agreements for the same reasons.[26]  In short, the FGIC Trustees willfully took actions expressly prohibited under the Transaction Documents, breaching those documents. The Settlement Agreement should not be approved for that reason alone.

### b)  The Settlement Agreement Contravenes the Trust Indenture Act

39.    The FGIC Trustees also entered the Settlement Agreement in violation of Federal law.  As mentioned above, the relationship between the FGIC Trustees and the Investors is governed by the Indentures or the PSAs.  As such, the Trust Indenture Act governs these documents, whether they are Indentures or PSAs.  *See Policemen's Annuity & Benefit Fund of Chicago v. Bank of Am., N.A.*, No. 12-civ-2865, 2013 U.S. Dist. LEXIS 64499, at *25-26 (S.D.N.Y. May 6, 2013) (PSAs subject to the Trust Indenture Act).  Trust Indenture Act § 316(b) provides, in pertinent part:

> Prohibition of impairment of holder's right to payment.  Notwithstanding any other provision of the indenture to be qualified, **the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security**, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, **shall not be impaired or affected without the consent of such holder** . . . .

15 U.S.C. § 77ppp(b) (emphasis added).

---

[26] *See* PSAs for RASC 2004-KS7A2A, RASC 2007-EMX1A2 §§ 2.06, 3.14(d), and 4.02; PSAs for RAMP 2004-RZ2AII, RAMP 2005-RS9AII, RAMP 2005-NC1AII, RAMP 2005-EFC7A2 §§ 2.06; RAMP 2004-RS7A2A §§ 11.01(b).  The relevant portions of these Transaction Documents will be available upon request.

40.    Here, the FGIC Commutation impairs—or at the very least affects—the rights of Investors to receive the payment of principal and interest thereon.  Further, it is clear from the Rehabilitator's submission to the N.Y. State Court requesting approval of the Settlement Agreement that "[a]lthough the [FGIC] Trustees are the exclusive holders of the Policies, the Settlement Agreement and the proposed Court Order provide that the resolution set forth in the Settlement Agreement (once effective) will be binding on all Investors holding Securities insured by the Policies."[27]  Hence, the Settlement also impairs the rights of the FGIC Beneficiaries from asserting their rights to claim against the Policies to recover the principal and interest owed to them as Investors.

41.    Because of the Settlement Agreement's effects on the rights of the FGIC Beneficiaries, as Investors holding FGIC-insured RMBS, the FGIC Trustees were required to obtain their consent (including Freddie Mac's) it seeks to bind to the Settlement Agreement.  The FGIC Trustees' blanket approval of the Settlement Agreement to bind all Investors violates the Trust Indenture Act, and this Court should not approve a Settlement Agreement that contravenes Federal law.  Any commutation of the Policies and fixing of claims against FGIC should not be effective against those parties that have not consented to such treatment.

### 3.  There Is No Basis for the Proposed Findings that the Settlement Agreement Is in the FGIC Beneficiaries' Best Interests

42.    Even if this Court were to consider opining on the Proposed Findings, which it should not, the record is also devoid of any evidence that the terms of the Settlement Agreement are in the best interests of the Investors.  Not only is it disturbing that the Settlement Agreement was negotiated in secret beginning in April—only to be made public to Freddie Mac shortly

---

[27] Holtzer Affirmation ¶ 5.

before the Debtors filed the 9019 Motion—none of the parties to the Settlement have provided *any* justification for or meaningful information about the economics of the Settlement Agreement; indeed, the discovery taken in this matter has indicated that there is no such justification. Indeed, shortly after the Debtors filed the 9019 Motion, counsel for Freddie Mac contacted the Rehabilitator's counsel directly to inquire why the Settlement was in Freddie Mac's best interests. The Rehabilitator's counsel refused to provide any such justification or analysis. Discovery since taken in this matter has indicated that there is no such economic or other justification for the commutation.

43.     If this Court were inclined to issue findings of fact on whether the FGIC Commutation is in the best interests of the FGIC Beneficiaries, it should use the same framework the N.Y. State Court will use in evaluating that question: whether the FGIC Commutation is "fair and equitable" to all FGIC policyholders. *Frontier Ins. Co.*, 36 Misc.3d at 541-42 (recognizing as relevant considerations whether a rehabilitation plan will provide claimants less favorable treatment than liquidation, and whether all creditors of similar priority are treated the same); *In re N.Y. Title & Mortgage Co.*, 281 N.Y.S. 715, 729 (N.Y. Sup. Ct. 1935). Indeed, throughout the disclosure statement accompanying the Rehabilitation Plan (the "Disclosure Statement"[28]), the Rehabilitator acknowledges that the FGIC Commutation must be "fair and equitable" to all FGIC policyholders:

44.     Indeed, the Rehabilitator has acknowledged that the Rehabilitation Plan (and any modifications thereto) is (and must be) "fair and equitable" to "FGIC Policyholders." Consider

---

[28] The Disclosure Statement accompanying the Rehabilitation Plan is attached hereto as Exhibit F.

- 25 -

Pages 20-21 of the Disclosure Statement, which was meant to provide adequate information on

the terms of the Rehabilitation Plan:

> Provisions of the Plan relevant to the Policy Restructuring are in the Restructured Policy Terms. The Restructured Policy Terms include the mechanism for paying Permitted Policy Claims, as well as procedures for revaluating FGIC's financial condition to determine whether additional Cash payments may be made on account of Permitted Policy Claims. **Consistent with the goal of the Plan, the Rehabilitator developed the Restructured Policy Terms to maximize the extent to which FGIC's Policyholders are treated in a fair and equitable manner. The Restructured Policy Terms are designed to address challenges the Rehabilitator faced in achieving this goal.**

Page 21 of the Disclosure Statement continues:

> First, because FGIC likely will not have sufficient assets to pay in full in Cash all Policy Claims that have arisen but have not been paid or that are expected to arise over the Run-Off Period, which may last 40 years, the Restructured Policy Terms provide for payment of only a portion of each Permitted Policy Claim in Cash. **FGIC will satisfy the remainder of each Permitted Policy Claim through future payments on account of a DPO for the related Policy, to the extent payable under the Plan. FGIC will track DPOs on a Policy-by-Policy basis, and will reduce each DPO by the amount of any Cash payments or Deemed Cash Payments** made with respect to Permitted Policy Claims under the related Policy, as discussed below. These contingent additional payments under DPOs will be payable only if, when and to the extent FGIC determines, in consultation with a third-party firm and with NYSDFS approval, that it has sufficient assets to pay in Cash an increased portion of each previously Permitted Policy Claim and each Policy Claim it expects to permit in a Stress Scenario during the Run-Off Period.
>
> **This approach is designed so that all of FGIC's Policyholders receive the same percentage (or CPP) of Cash on account of their Permitted Policy Claims, whether arising in the next five years or in the next few decades.**

45.    Yet the FGIC Commutation is diametrically opposed to the treatment of FGIC

ResCap Security Holders set forth in the section of the Disclosure Statement quoted above and

proposes to pay investors far less than the present value of their distribution under the

Rehabilitation Plan.

46.    The only available evidence indicates that the Settlement Agreement is patently

*not* in the FGIC Beneficiaries' best interest. As indicated above, FGIC's most recent financial

disclosures in the Rehabilitation Proceeding project that policyholders will receive present-value recoveries on FGIC policy claims in the amount of 27-30 cents on the dollar before any litigation recoveries. Nothing to the contrary was disclosed to the Court at the June 11, 2013 hearing to approve the Rehabilitation Plan. (Miller Affidavit, Ex. 1 at 6.) Under the FGIC Commutation—which contemplates a $253.3 million payment by FGIC to the FGIC-Insured Trusts to cover approximately $1.27 billion of unpaid present and anticipated future claims against FGIC—the FGIC Beneficiaries will only receive approximately 21 cents on the dollar. (*See* Holtzer Aff. ¶¶ 5, 9-10.)

Using the Rehabilitators' and FGIC's estimates of FGIC's total estimated claims exposure set forth in the Holtzer Affidavit[29]

47.    By contrast, FGIC-Wrapped Holders generally would realize the following recoveries under the Rehabilitation Plan, as set forth in the Miller Affidavit:

**FGIC-Wrapped Holders' Aggregate Recoveries under the Rehabilitation Plan**

_____
[29]

49.     Accordingly, even if this Court were to reach the issue of whether the Settlement is in the best interests of the Investors—which it should not—all of the evidence available establishes that the Settlement is clearly *not* in the FGIC Beneficiaries' best interests as Investors.

### 4. There Is No Basis for of the Proposed Findings that the FGIC Trustees Acted in Good Faith

50.     No basis exists for a finding that the FGIC Trustees acted in good faith. The question of good faith is primarily one of fact, *In re Tronox, Inc.*, 429 B.R. 73, 93 (Bankr. S.D.N.Y. 2010), and all the facts here point to a clear lack of good faith on the FGIC Trustees' part. Indeed, as set forth above, their entry into the Settlement Agreement without the requisite approval of the FGIC Beneficiaries is both a breach of the Transaction Documents and a violation of the Trust Indenture Act. Under such circumstances, even if this Court were inclined to assess the FGIC Trustee's good faith the FGIC Trustees' conduct here militates strongly against any finding that the FGIC Trustees acted good faith when they entered into the Settlement Agreement. Likewise, the evidence will show that the FGIC Trustees cannot meet its burden to support the Debtor's requested findings that the FGIC Trustees acted "reasonably," in "good faith" and in the "best interests" of the FGIC Beneficiaries.

51.     The FGIC Trustees negotiated the FGIC Commutation in secret without even attempting to involve major stakeholders (such as Freddie Mac) in the process. The fact that certain Institutional Investors holdings less than 8% of investor claims were permitted to have a place at the table is of no import: there is no indication that any of those Institutional Investors

- 28 -

held significant amounts of FGIC-wrapped securities, and in any case, their involvement still would not justify freezing out other large Investors such as Freddie Mac known to the Trustees at the time of the mediation. The FGIC Trustees—which were (and are) obligated to act as fiduciaries for the Investors—simply agreed to the proposed terms of the Settlement Agreement without providing any notice to or obtaining the requisite consent of the FGIC Beneficiaries. The clandestine deal-making and the breach of their obligations to the FGIC Beneficiaries discuss above—falls well short of "reasonable" and "good faith" conduct.

52.    Had the FGIC Trustees evaluated the Disclosure Statement accompanying the Rehabilitation Plan, they would have understood that nowhere was a commutation of the Policies even discussed. The only reference in the Disclosure Statement accompanying the Rehabilitation regarding the commutation of any FGIC-issued policies pertained to the consensual commutations of CDS policies and novations of reinsurance policies:

> The initial CPP will depend on several factors, including (i) actual or anticipated changes in the assumptions underlying the Run-Off Projections (including those relating to developments in actual or anticipated losses under FGIC's Policies or other financial circumstances or events), (ii) whether the Novation Agreement is approved by the Court, (iii) whether the two CDS Commutation Agreements executed thus far are approved by the Court, (iv) whether additional CDS Commutation Agreements are executed and approved by the Court (and the terms thereof), (v) whether the Reinsurance Commutation Agreement executed with AORe is approved by the Court and, if approved, whether FGIC receives the payment contemplated thereby, (vi) whether additional Reinsurance Commutation Agreements are executed and approved by the Court (and the terms thereof), (vii) whether FGIC receives the payments contemplated by any additional Reinsurance Commutation Agreements and (viii) other events and circumstances that may be beyond the Rehabilitator's control.[30]

Nowhere in is the Commutation of the Policies at issue here referenced or even adumbrated.

53.

---

[30] Disclosure Statement at 23.

Such behavior is the antithesis of what is (and should be) expected of an indenture trustee, and this Court should not give its imprimatur to such conduct by awarding the FGIC Trustees a finding that "The [FGIC] Trustees acted reasonably, in good faith and in the best interests of the Investors in each Trust and each Such Trust in agreeing to the Settlement Agreement."

## JOINDER

54.    Freddie Mac hereby joins all other objections to the 9019 Motion to the extent such objections are not inconsistent herewith.

## RESERVATION OF RIGHTS

55.    Freddie Mac expressly reserves all of its rights to supplement this Objection and to object to the 9019 Motion on any other grounds.

---

31

## CONCLUSION

56.    For the reasons set forth above, Freddie Mac respectfully requests that the Court sustain the Objection, deny the Debtors' 9019 Motion, and decline to approve the Settlement Agreement insofar as it would give effect to the FGIC Commutation.   Freddie Mac also respectfully requests that the Court refrain from making findings that the FGIC Trustees acted in good faith and that the best interests of the FGIC Beneficiaries (as holders of the FGIC-insured RMBS) have been served in any order on the 9019 Motion.

Dated:  July 29, 2013

Respectfully submitted,

**MOSS & KALISH, PLLC**

/s/ David B. Gelfarb
David B. Gelfarb
122 East 42nd Street, Suite 2100
New York, New York 10168
Telephone:  212-867-4488
Facsimile:  212-983-5276

*Co-Counsel for Federal Home Loan Mortgage Corporation*

**MCKOOL SMITH, P.C.**
Peter S. Goodman
Michael R. Carney
One Bryant Park, 47th Floor
New York, New York 10036
Telephone: 212-402-9414
Facsimile: 212-402-9444

*Counsel for Federal Home Loan Mortgage Corporation*

- 31 -