MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
J. Alexander Lawrence
Kayvan B. Sadeghi
James A. Newton

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

-------------------------------------------------------------------

### <u>DIRECT TESTIMONY OF JEFFREY A. LIPPS</u>

I, Jeffrey A. Lipps, under penalty of perjury, testify as follows:

1.       I am an expert in the litigation of complex commercial disputes, with specific

subject matter expertise in the body of law that has developed in disputes regarding the sale of

residential mortgage-backed securities ("RMBS").

2.       I am a partner with Carpenter Lipps & Leland LLP, which, since 2010, has been

the primary counsel representing certain of the Debtors in RMBS litigation, including litigation

brought by monoline insurers.

3.       I submit this expert testimony at the request of the Debtors.

## SUMMARY OF TESTIMONY

4.       I have formed the following opinions concerning the Debtors' motion for

approval of the Settlement Agreement, entered into May 23, 2013 between Residential Capital

LLC and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), Financial

Guaranty Insurance Company ("FGIC"), certain institutional investors (the "Investors") and The

Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law

Debenture Trust Company of New York, U.S. Bank National Association and Wells Fargo Bank

N.A. (the "FGIC Trustees") for 47 separate securitizations with securities insured by FGIC (each

a "FGIC Insured Trust" and collectively, the "FGIC Insured Trusts") (the "FGIC Settlement

Agreement"):

- *Legal Uncertainty*:  The liabilities to be released under the settlement relate to claims
  that pose unique legal and evidentiary challenges, many of which have not fully
  developed in a definitive way in the case law to date, and none of which has been
  litigated to resolution with respect to the Debtors specifically, such that there is
  considerable uncertainty and risk in the outcome.

- *Expense of Resolution*:  In addition to the uncertainty in the outcome, resolving the
  claims and liabilities covered by the FGIC Settlement Agreement would be
  enormously expensive.  I was personally involved in years of prepetition litigation
  concerning the Debtors' securitizations, which showed that simply completing the
  discovery that would be required to resolve these claims would require substantial

time and resources.  A trial to resolve these claims would also be enormously expensive and complex.

## SUMMARY OF QUALIFICATIONS

5.      I am a founding partner of Carpenter Lipps & Leland LLP in Columbus, Ohio (the "Firm"), which is a litigation boutique with a national practice.  I was a partner at Jones Day before becoming a partner in the Firm.

6.      I have over thirty years' experience as a trial lawyer representing and counseling clients in complex commercial litigation matters, including commercial disputes, class action litigation, securities litigation, procurement matters, and bankruptcy litigation.  I have handled cases in state and federal courts in over a dozen states.

7.      I currently represent or have represented over the past several years a number of the debtor entities, including Residential Capital LLC ("ResCap"), Residential Funding Co., LLC ("RFC"), and GMAC Mortgage, LLC ("GMACM"), four non-debtor affiliated entities, and several individual former directors and officers of debtor entities in over a dozen separate lawsuits involving certain debtor entities' issuance of RMBS.  I have been representing various defendants in these matters since the spring of 2010.

8.      Among the suits in which I represented the Debtors in prepetition litigation were the twelve cases brought by FGIC against various debtors and affiliated entities (involving twenty securitizations, and coordinated before Judge Crotty under the lead case *Financial Guaranty Insurance Co. v. GMAC Mortgage, LLC*, No. 11-CV-09729-PAC (S.D.N.Y.)).[1] I had also represented the Debtors in *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No. 603552/2008 (Sup. Ct., N.Y. Cnty.) (involving five securitizations), and *MBIA Insurance Corp.*

---

[1] Debtors' Exhibits 8 through 19 are copies of the complaints and/or amended complaints from those twelve cases, all of which are publicly filed and obtained from the ECF website for the United States District Court for the Southern District of New York.

*v. GMAC Mortgage, LLC*, No. 600837/2010 (Sup. Ct., N.Y. Cnty.) (involving three securitizations). Each of these cases involved claims of breaches of representations and warranties, and related claims of alleged failure to repurchase loans pursuant to the terms of the applicable contracts. Our Firm was counsel of record in all of these cases.

9. In addition, prepetition the Debtors frequently called upon me and my Firm to evaluate various issues relating to repurchase demands or alleged breaches of representations and warranties that were not yet in litigation.

10. My Firm has also been retained as special litigation counsel in these bankruptcy cases. Among the litigation matters for which we were retained was to litigate monoline proofs of claim. In connection with those matters, we analyzed the proofs of claim filed by FGIC and the other monolines and actively participated in developing the strategy to litigate monoline proofs of claim. We collaborated with Morrison & Foerster LLP ("Morrison & Foerster") in making initial document requests to FGIC and responding to FGIC's initial document requests to the Debtors. In connection with the court appointed examiner's investigation of the Debtors, my firm was also asked by Morrison & Foerster to assist in responding to the examiner's questions regarding the Debtors' securitization processes, and his request for submissions regarding the validity of various third-party claims. These included claims that were or would have been asserted by the monolines, trustees, and various investors.

11. I was also proffered by the Debtors as an expert witness in the planned hearing on the Debtors' motion under Bankruptcy Rule 9019 to approve two settlements regarding the Debtors' contractual liabilities to securitization trusts formed between 2004 and 2007, which involved potential liabilities substantially identical to those at issue here.

12.    As part of our Firm's representation of the Debtors in these matters, I have
conducted extensive factual and legal analysis of the claims and defenses in these types of
"representation and warranty" cases, monitored the development of the law around the country in
this area of the law, and assessed the Debtors' exposure in these types of cases.  This analysis has
included close review of the publicly available papers relating to settlements of representation
and warranty claims involving monoline insurers, as well as the Bank of America and Lehman
Brothers settlements of representation and warranty claims brought by trustees.  Over the last
three years of representing the Debtors in RMBS litigation, I have obtained substantial subject
matter expertise in the highly specific legal jurisprudence that has developed around disputes
regarding the sale of RMBS.

13.    I am also deeply familiar with the Debtors' history and practices with respect to
RMBS securitizations.  In the two MBIA Insurance Corp. ("MBIA") cases, which are directly
analogous to the FGIC claims settled here, the parties engaged in extensive fact discovery
involving the exchange and analysis of millions of pages of discovery material and the
completion of dozens of depositions as of the petition date, and had begun expert discovery with
an exchange of initial expert reports in the *MBIA Insurance Corp. v. Residential Funding Co.*
case.  In addition, we had evaluated and made initial letter submissions in the FGIC group of
cases relating to motion to dismiss arguments, and FGIC, likewise, had submitted a letter
outlining a proposed early summary judgment motion.

14.    Because of my experience with these types of representation and warranty claims,
including litigation with monoline insurers, and, specifically, those claims asserted against the
Debtors, I was asked to evaluate the potential risks and expenses of litigating the liabilities
released under the settlement to final resolution.  In conducting my analysis, I considered various

materials, as identified herein, that an attorney in my position would reasonably rely on in

reaching an opinion, including, but not limited to, certain governing agreements for the RMBS

transactions, prospectuses and prospectus supplements filed with the SEC for the securitizations

at issue, and court papers filed by parties and decisions of the courts in similar litigation.  As set

forth below, based on my review of the settlement terms, my extensive knowledge of the types of

claims and defenses at issue and the strengths and weaknesses in the applicable law, and my

familiarity with the strengths and potential weaknesses in the Debtors' defense of the claims, it is

my opinion that the settlement of claims and liabilities released by the FGIC Settlement

Agreement would remove a significant risk of an unfavorable legal outcome and the necessity of

incurring the significant expense of litigating these claims to final resolution.

## <u>OVERVIEW OF POTENTIAL CLAIMS</u>

15.     Claims for breaches of loan-level representations and warranties, such as those to

be resolved by the FGIC Settlement Agreement, generally arise out of the applicable Pooling and

Servicing Agreement, Assignment and Assumption Agreement, or another applicable sale

agreement (the "Sale Agreements") between the appropriate debtor entity and the trust to whom

the debtor entity is selling the loans.

16.     FGIC, as the "Credit Enhancer," would have typically been granted rights as a

third-party beneficiary to the Sale Agreements for any deals it insured.  Moreover, the same

representations and warranties outlined in the Sale Agreements were generally incorporated by

reference into the applicable Insurance & Indemnity Agreements between the Debtors and FGIC,

which governed FGIC's issuance of financial guaranty insurance policies.

17.     The Sale Agreements typically contain or incorporate by reference a list of fairly

standard representations and warranties about the loans in the collateral pool underlying the

securitization.  These may be representations about the pool of loans generally—for example,

"97.5% of the loans in this securitization are actuarial mortgage loans, on which 30 days of interest is owed each month irrespective of the day on which the payment is received" or "no more than 25.0% of the loans are secured by Mortgaged Properties located in California", or they may be representations that apply to each and every loan in the pool, such as "All of the loans in the pool were originated in compliance with applicable state and federal law."

18.    As discussed in greater detail below, additional insight regarding the interpretation of certain representations and warranties may be found in other, related transaction documents, such as the prospectus and prospectus supplement.

19.    The representations and warranties most commonly claimed to have been breached in the various lawsuits that have been filed, both against the Debtors and against others, include:

    a.   Representations relating to compliance with Underwriting Guidelines;

    b.   Representations relating to compliance with state and federal law;

    c.   Representations relating to the accuracy of Loan-to-Value ("LTV") or Combined Loan-to-Value ("CLTV") information;

    d.   Representations relating to appraisals or the qualifications of appraisers;

    e.   Representations relating to the accuracy of Owner/Occupancy information;

    f.   Representations relating to the completeness of Loan Files; and

    g.   Representations relating to the accuracy of loan information on the Mortgage Loan Schedule or loan tapes provided in connection with the securitization.

20.    In addition to these claims for breach of the applicable representations and warranties, plaintiffs in representation and warranty litigation have often engaged in a pre-litigation negotiation process, pursuant to the repurchase process outlined in the applicable contract documents.

21.     Specifically, the Sale Agreements provide that, "upon discovery" of a breach of a representation or warranty, the Seller (here, the debtor entity selling the loans to the trust for each securitization) is obligated to repurchase or substitute Mortgage Loans sold to a trust that breach the stated representations and warranties and "materially and adversely" affect the Certificateholders' interest in those Loans.  The substitution and cure remedies are limited; leaving repurchase of the loan as the primary remedy once the securitization has been in the market for some period of time.

22.     Under the Sale Agreements, the trustee for each trust is the party authorized to pursue claims for breaches of representations and warranties.  FGIC was also granted certain contractual rights as a third-party beneficiary to enforce breaches of representations and warranties regarding the mortgage loans.[2]

23.     Although the right to request repurchase belongs in the first instance to FGIC and the FGIC Trustees, the Sale Agreements provide that investors with substantial holdings in a given class of certificates—typically, 25%—have the ability (subject to certain rights of FGIC) to direct the FGIC Trustees to take action with respect to such repurchase demands.  Such action includes, if necessary, pursuing litigation against the Debtors for alleged breaches of either the

---

[2] Under the transaction documents, FGIC was given certain control rights with respect to the conduct of litigation against the Debtors.  *See, e.g.,* GMACM 2005-HE1 Indenture § 5.11 ("The Enhancer (so long as no Enhancer Default exists) or the Noteholders of a majority of the aggregate Note Balance of notes with the consent of the Enhancer, shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the notes . . .").  While FGIC's payment default would contractually be considered an "Enhancer Default" (*see* GMACM 2005-HE1 Indenture Definitions Appendix at 8), FGIC has asserted that relief granted in its rehabilitation proceeding allows it to continue to control the litigation.

Debtors' Exhibit 27 is a true and correct copy of the GMACM 2005-HE1 Indenture, which was maintained in and collected from the files of the Debtors.

representations and warranties themselves, or the obligation to repurchase a loan "upon

discovery" that it does not comply with the representations and warranties.[3]

## ELEMENTS OF CAUSE OF ACTION

24.    In its prepetition litigation and proofs of claim, FGIC has asserted various claims

against the Debtors.  The principal claims are for breach of contract.[4]  There are two basic

---

[3] The investors themselves are likely barred from pursuing a direct action against the Debtors by contractual "no action" clauses that require them to work through the FGIC Trustees, at least in the first instance. *See, e.g., Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005-S4 v. Nomura Credit & Capital, Inc.*, No. 652341/2011 at 9 (Sup. Ct., N.Y. Cnty. May 10, 2013); *Walnut Place LLC v. Countrywide Home Loans, Inc.*, No. 650497/2011, 2012 N.Y. Misc. LEXIS 1537 (Sup. Ct., N.Y. Cnty. March 28, 2012), *aff'd* 948 N.Y.S.2d 580 (1st Dep't 2012).

[4] FGIC, the Investors, and/or the FGIC Trustees also asserted various tort claims, such as negligent misrepresentation and fraudulent inducement claims.  *See* Claim Nos. 4868, 4870 and 4871 filed by FGIC against three debtor entities; Claim Nos. 6758-6767 and 6772-6779 filed by Bank of New York Mellon Trust Co., N.A or Bank of New York Mellon, against nine debtor entities; Claim Nos. 6604-6654 filed by Law Debenture Trust Company of New York and Wells Fargo Bank, N.A. as Separate Trustee and Trustee, respectively, against fifty-one debtor entities; and Claim Nos. 6655-6705 filed by U.S. Bank N.A, against fifty-one debtor entities. Debtors' Exhibits 2 through 7 are true and correct copies of the aforementioned proofs of claims in these bankruptcy cases, which were filed with the ResCap Claims Processing Center.

As to negligent misrepresentation, New York law requires a showing of a "special relationship of trust" between the parties that would warrant the FGIC Trustees relying on the Debtors' statements without question.  Courts have regularly rejected such claims as to the monoline credit enhancers, which are similarly situated to the FGIC Trustees in terms of the arm's length contractual relationship to the Debtors and the information provided to them by the Debtors.  *See, e.g., MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 928 N.Y.S.2d 229, 235-36 (1st Dep't 2011) (upholding dismissal of negligent misrepresentation claim because no special relationship of trust or uniquely superior knowledge was established); *MBIA Ins. Corp. v. Residential Funding Co., LLC,* No. 603552/2008, 2009 N.Y. Misc. LEXIS 3523 (Sup. Ct., N.Y. Cnty. Dec. 22, 2009) (same).

As to the fraud claims, similarly, the Investors and/or FGIC Trustees (and perhaps FGIC) would need to establish the additional elements of scienter and justifiable reliance.  *See HSH Nordbank AG v. UBS AG,* 941 N.Y.S.2d 59, 65 (1st Dep't 2012) (collecting cases holding no justifiable reliance as to fraud claims arising from sale or agreement to provide insurance for securities where plaintiff was sophisticated, understood and accepted the risks, and could conduct its own independent investigation into the accuracy of defendant's representations before agreeing to purchase or provide insurance); *Ambac Assurance. Corp. v. First Franklin Fin. Corp.*, No. 651217/2012, 2013 N.Y. Misc. LEXIS 3092 (Sup. Ct. N.Y. Cnty., July 18, 2013) (finding monoline adequately alleged all elements of a fraudulent inducement claim in order to survive a motion to dismiss).  It is not entirely clear if a monoline insurer has to show justifiable reliance. *Compare CIFG Assur. N. Am., Inc. v. Goldman, Sachs & Co.,* No. 652286/2011, 2013 N.Y. App. Div. LEXIS 3184 (N.Y. App. Div. 1st Dep't May 7, 2013) ("Under the circumstances, there is a question of fact as to whether plaintiff reasonably relied on defendants' representations.  It was not required, as a matter of law, to audit or sample the underlying loan files.") *with MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *83 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (holding "even if MBIA were required to demonstrate justifiable reliance, taking all inferences in its favor as the non-movant, there are sufficient facts in dispute as to preclude Countrywide's motion for summary judgment.").  Nonetheless, the FGIC Trustees' and Investors' burden of proof (and probably FGIC's) would be greater than it is for breach of contract claims.  Moreover, the Debtors would argue that any tort claims relating to the representations and warranties are duplicative of breach of contract claims.  Accordingly, I have focused my analysis on the riskiest claims for the Debtors, which are the breach of contract claims.

contract causes of action that may be asserted either by FGIC or by the Investors acting through the FGIC Trustees: one for breaches of the representations and warranties made in the Sale Agreements themselves, and one for breach of the obligation to repurchase defective loans that is triggered by the discovery of a breach of representation or warranty.[5] Although distinct causes of action, both types of claims turn on the question of whether a given loan breached one or more contractual representations or warranties.

25.     If FGIC, the Investors, and/or the FGIC Trustees were to pursue litigation of the claims, the elements they would need to prove include that (1) an agreement existed, (2) the agreement was breached, (3) the breach was material, (4) the breach caused harm to the plaintiff, and (5) the plaintiff suffered damages as a result.

26.     Because of the complex structure of the RMBS offerings, each of these elements poses unique legal and evidentiary challenges, many of which have not fully developed in a definitive way in the case law to date, and none of which has been litigated to resolution with respect to the Debtors specifically. I evaluate each element in more detail below, and explain why I have concluded that there is sufficient uncertainty and risk in the outcome of the claims and liabilities released by the FGIC Settlement Agreement and significant expense in litigating these claims and liabilities to support the Debtors' conclusion that the proposed settlement is reasonable.

---

[5] FGIC also asserted breach of contract claims for servicing, denial of access to information and claims based on the alleged improper addition of loans post-closing to the GMACM 2005-HE1 and GMACM 2006-HE1 securitizations. The liabilities arising from these allegations are comparatively small and, in any event, duplicative in many respects of the liabilities arising from the main breach of contract claims. Because the likely claims based on those theories are smaller and the lack of case law on these theories, this testimony focuses on the breach of representation and warranty claims.

**Scope of Representations and Warranties**

27.     Although the representations and warranties for each securitization are spelled out

in a clearly identifiable section of the Sale Agreements, there remains ambiguity and dispute

about the scope of some of the representations.  Accordingly, the fundamental question of

whether the Debtors had even made an actionable representation may be disputed, and subject to

uncertainty as to how a court might rule.

28.     Some of the representations and warranties that pose potential interpretive issues

with respect to the Debtors' Sale Agreements for FGIC Insured Trusts deals include (for

example):

  a.  "The appraisal was made by an appraiser who meets the minimum qualifications
      for appraisers as specified in the Program Guide."  RASC 2007-EMX1
      Assignment and Assumption Agreement, § 4(xi);[6]

  b.  "The information set forth on the Mortgage Loan Schedule with respect to each
      Mortgage Loan is true and correct in all material respects as of the date or dates
      which such information is furnished."  *Id.* at § 4(xv);

  c.  "The weighted average Loan-to-Value Ratio with respect to the Group I Loans,
      and the Group II Loans, in each case by outstanding principal balance at
      origination, are 84.1% and 83.8%, respectively."  *Id.* at § 4(xviii);

  d.  "Approximately 91.8% and 93.8% of the Mortgaged Properties related to the
      Group I Loans and Group II Loans, respectively are secured by the owner's
      primary residence.  Approximately 3.4% and 1.7% of the Mortgaged Properties
      related to the Group I Loans and the Group II Loans, respectively, are secured by
      the owner's second or vacation residence.  Approximately 4.9% and 4.5% of the
      Mortgaged Properties related to the Group I Loans and the Group II Loans,
      respectively, are secured by a non-owner occupied residence."  *Id.* at § 4(xxiii);

  e.  "[T]here is no default, breach, violation or event of acceleration existing under
      any Mortgage Note or Mortgage and no event which, with notice and expiration
      of any grace or cure period, would constitute a default, breach, violation or event
      of acceleration . . . ."  *Id.* at § 4(xxviii);

---

[6] Debtors' Exhibit 20 is a true and correct copy of the RASC 2007-EMX1 Assignment and Assumption Agreement,
which was maintained in and collected from the files of the Debtors.

    f.   "Each Mortgage Loan as of the time of its origination complied in all material respects with all applicable local, state and federal laws, including, but not limited to, all applicable predatory lending laws." *Id.* at § 4(xliii);

    g.   "The originator of [the relevant Loans] offered the related borrower mortgage loan products for which the borrower qualified and we are not aware that the originator encouraged or required the borrower to select a mortgage loan product that is a higher cost product designed for less creditworthy borrowers." *Id.* at § 4(lii);

    h.   "The originator of [the relevant Loans] adequately considered the borrower's ability to make payments by employing underwriting techniques that considered a variety of factors, such as:  the borrower's income, assets and liabilities, and not solely the collateral value, in deciding to extend the credit at the time of origination." *Id.* at § 4(liii);

    i.   "No borrower . . . was charged 'points and fees' in an amount greater than (a) $1,000 or (b) 5% of the principal amount of such Mortgage Loan, whichever is greater." *Id.* at § 4(liv);

    j.   "No fraud or misrepresentation has taken place in connection with the origination of any Mortgage Loan." *Id.* at § 4(lx);

    k.   "There is no right of rescission, valid offset, defense, claim or counterclaim of any obligor under any Mortgage Note or Mortgage . . . ."  RFMSII 2006-HSA2 Home Equity Loan Purchase Agreement, § 3.1(b)(iii);[7]

    l.   "For each [relevant] Loan, the related Mortgage File contains or will contain each of the documents and instruments specified to be included therein." *Id.* at § 3.1(b)(vii);

    m.   "All of the [relevant] Loans have been underwritten in substantial compliance with the criteria set forth in the Program Guide." *Id.* at § 3.1(b)(xxxvii); and

    n.   "Each Subservicer meets all applicable requirements under the Servicing Agreement, is properly qualified to service the [Loans] and has been servicing the [Loans] . . . in accordance with the terms of the respective Subservicing Agreement." *Id.* at § 3.1(b)(xxxvi).

    29.    The representations and warranties cited above are just a sampling of the variety

of loan-level representations and warranties that may be at issue, and they vary from trust to

---

[7] Debtors' Exhibit 23 is a true and correct copy of the RFMSII 2006-HSA2 Home Equity Loan Purchase Agreement, which was maintained in and collected from the files of the Debtors.

trust, requiring that any issues as to their scope be litigated differently for different trusts.  But

the examples above all present interpretive (not to mention evidentiary) issues:

- How will the qualifications of an appraiser be evaluated?

- If some number of the appraisals are deemed flawed because of unqualified appraisers (or for other reasons), how does that impact the weighted average Loan-to-Value Ratio for the collateral pool?

- Did the Debtors warrant the accuracy of the underlying appraisal, or merely the accuracy of the loan-to-value calculation based on it?

- What constitutes "awareness" as to whether an originator may be "encourag[ing]" a borrower to choose one loan product over another?

- What does it mean for an originator to "adequately consider" a borrower's ability to pay, and what are the Debtors actually warranting in that regard?

- What does "substantial compliance" with the underwriting guidelines mean?

- If granting exceptions to the requirements of published underwriting guidelines is common across the industry, should loans with exceptions be considered in "substantial compliance"?

- Will those originators be considered to have "adequately considered" the borrower's ability to pay?

- Is there a threshold number of exceptions that renders the loan not substantially compliant, or demonstrates a failure to adequately consider the borrower's ability to pay?

- Or could a single exception, if the variance is large enough (say, 40 or more points on a FICO score, or 10 or more percentage points for a DTI or LTV), be sufficient to render a given loan out of substantial compliance?

- Do such deviations constitute *prima facie* evidence that an originator has not adequately considered a borrower's ability to pay?

30.    Further complicating the issues, other materials in the package of transaction

documents relating to each trust shed additional light on how potentially ambiguous

representations and warranties should be interpreted, including the extensive risk disclosures

included in the prospectus and prospectus supplement for each securitization.  For example, the

risk disclosures explain:

a.   "Generally, the [Loans] have been originated using underwriting standards that
     are less stringent than the underwriting standards applied by certain other
     [similar] loan purchase programs."  RFMSII 2006-HSA2 Pro. Supp. at S-17.[8]*See
     also* RASC 2007-EMX1 Pro. Supp. at S-19 ("The mortgage loans have been
     originated using underwriting standards that are less restrictive than the
     underwriting requirements used as standards for other first lien and junior lien
     mortgage loan purchase programs, including other programs of Residential
     Funding Company, LLC and the programs of Fannie Mae and Freddie Mac.")[9]

b.   "Applying less stringent underwriting standards creates additional risks that losses
     on the [loans] will be allocated to noteholders.  For example, the . . . loan pool
     includes . . . loans made to borrowers whose income is not required to be
     disclosed or verified."  RFMSII 2006-HSA2 Pro. Supp. at S-17.  *See also* RASC
     2007-EMX1 Pro. Supp. at S-19 ("Applying less restrictive underwriting standards
     creates additional risks that losses on the mortgage loans will be allocated to
     certificateholders.")

c.   "[M]ortgage loans made to borrowers whose income is not verified, including
     borrowers who may not be required to state their income . . . may increase the risk
     that the borrowers' income is less than that represented."  RASC 2007-EMX1
     Pro. Supp. at S-19.

d.   "The basis for any statement that a given percentage of the mortgage loans is
     secured by mortgaged properties that are owner-occupied will be one or more of
     the following:

     •   the making of a representation by the mortgagor at the origination of a
         mortgage loan that the mortgagor intends to use the mortgaged property as a
         primary residence;

     •   a representation by the originator of the mortgage loan, which may be based
         solely on the above clause; or

     •   the fact that the mailing address for the mortgagor is the same as the address
         of the mortgaged property.

---

[8] Debtors' Exhibit 24 is a true and correct copy of the RFMSII 2006-HSA2 Prospectus and Prospectus Supplement,
which was maintained in and collected from the files of the Debtors.

[9] Debtors' Exhibit 22 is a true and correct copy of the RASC 2007-EMX1 Prospectus and Prospectus Supplement,
which was maintained in and collected from the files of the Debtors.

Any representation and warranty in the related pooling and servicing agreement regarding owner-occupancy may be based solely on that information." RASC 2007-EMX1 Prospectus at 9.

e.   "In some cases, in lieu of an appraisal, a valuation of the mortgaged property will be obtained from a service that provides an automated valuation." *Id.* at 10.

f.   "Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator." *Id.* at 11.

g.   "Appraised values may be determined by either:

  • a statistical analysis;

  • a broker's price opinion; or

  • an automated valuation, drive-by appraisal, or other certification of value." *Id.* at 10.

h.   "If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program.  Such program permits some mortgage loans to be refinanced with only limited verification or updating of the underwriting information that was obtained at the time that the original mortgage loan was originated." *Id.* at 11.

i.   "[S]ome mortgage loans may have been originated under 'limited documentation,' 'stated documentation,' or 'no documentation' programs that require less documentation and verification than do traditional 'full documentation' programs.  Under [these programs], minimal investigation into the mortgagor's credit history and income profile is undertaken by the originator . . . ." *Id.*

j.   "The level of review by Residential Funding Company, LLC, if any, will vary . . . [RFC] typically will review a sample of the mortgage loans purchased . . . for conformity with the applicable underwriting standards." *Id.* at 12.

k.   "[A] mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards." *Id.*

l.   "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." *Id.*

14

m. "In the case of a Designated Seller Transaction" —such as the EMX transactions
—"the applicable underwriting standards will be those of the seller or of the
originator of the mortgage loans . . . ." *Id.*

n. "In addition, the depositor purchases loans that do not conform to the
underwriting standards contained in the Guide."  RFMSII 2006-HSA2 Prospectus
at 18.

o. "The underwriting standards used in negotiated transactions and master
commitments and the underwriting standards applicable to loans underlying
private securities may vary substantially from the underwriting standards
contained in the Guide." *Id.*

p. "Due to the variety of underwriting standards and review procedures that may be
applicable to the loans included in any pool, the accompanying prospectus
supplement, in most cases, will not distinguish among the various underwriting
standards applicable to the loans nor describe any review for compliance with
applicable underwriting standards performed by the depositor or Residential
Funding Corporation." *Id.*

q. "Because an automated underwriting system will only consider the information
that it is programmed to review, which may be more limited than the information
that could be considered in the course of a manual review, some mortgage loans
may be approved by an automated system that would have been rejected through
a manual review." *Id.* at 19.

r. "[T]here could be programming inconsistencies between an automated
underwriting system and the underwriting criteria set forth in Residential Funding
Corporation's Seller Guide, which could in turn be applied to numerous mortgage
loans that the system reviews." *Id.*

s. "We cannot assure you that an automated underwriting review will in all cases
result in the same determination as a manual review with respect to whether a
mortgage loan satisfied Residential Funding Corporation's underwriting criteria."
*Id.*

31.    The Debtors would argue that these risk disclosures must be considered when

evaluating the scope and/or interpretation of the applicable representations and warranties, and

that, where the disclosures clearly state the data provided elsewhere in the transaction documents

is less than 100% reliable, the scope and/or interpretation of the corresponding warranties is

therefore more limited.[10]  Thus, for example, the Debtors would argue that because the risk

disclosures make clear that owner-occupancy data is frequently self-reported by borrowers, and

that self-reported data is the basis for the calculations provided by the Debtors, it cannot be a

breach of the owner occupancy representations if it turns out some of the self-reporting was

inaccurate.

32.     FGIC, the Investors, and/or the FGIC Trustees, however, would likely argue that

regardless of their skepticism as to the quality of the underwriting or accuracy of the data

supplied, the very purpose of a warranty is that it obviates the need to do additional investigating,

including by probing the discrepancies between the warranties and the risk disclosures.[11]

33.     To illustrate the complexity of the issue, just one of the many key potential

disputes likely to be litigated for a large number of trusts arises with respect to alleged borrower

fraud.  An agreement governing one of the FGIC Insured Trusts contains an express

representation that "[n]o fraud or misrepresentation has taken place in connection with the

origination of any Mortgage Loan."  *See* RASC 2007-EMX1 Assignment and Assumption

Agreement, § 4(lx).  An agreement governing another FGIC Insured Trust contains a more

limited representation that "[n]o fraud or misrepresentation of a material fact with respect to the

origination of a Mortgage Loan has taken place on the part of GMACM and to the best of

---

[10] *See, e.g., Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 11 Civ. 2375 (JSR), 2011 U.S. Dist. LEXIS 102722, at *13 (S.D.N.Y. Sept. 8, 2011), amended Oct. 27, 2011 (Rakoff, J.) ("[I]t is black letter law that the provisions of a contract or a related set of contracts should be read as a whole and every effort should be made to give them consistent meaning in their overall context") (citing *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002) (it is a "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other," and, accordingly, "all provisions of a contract [should] be read together as a harmonious whole, if possible.")).

[11] *See CBS, Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 504-05 (1990); *see also Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.) ("A warranty . . . is intended precisely to relieve the promise of any duty to ascertain the fact for himself."); *MBIA Ins. Corp. v. Credit Suisse Secs. (USA) LLC*, No. 603751/2009, 2011 N.Y. Misc. LEXIS 4787, at *17 (Sup. Ct., N.Y. Cnty. Oct. 7, 2011), *rev'd and remanded on other grounds*, 102 A.D.3d 488 (1st Dep't 2013) ("[W]here a plaintiff has gone to the trouble to insist on a written representation [or warranty] that certain facts are true, it will often be justified in accepting that representation [or warranty] rather than making its own inquiry") (citation and emphasis omitted)).

GMACM's knowledge, no fraud or misrepresentation of a material fact with respect to the origination of a Mortgage Loan has taken place on the part of any third party, including without limitation the related mortgagor, connected with the origination of a Mortgage Loan." *See* GMACM 2007-HE2 Loan Purchase Agreement, § 3.01(b)(xxxvii). [12]

34.    The Debtors' other securitizations insured by FGIC at issue in the prepetition litigation, however, do not contain an express "fraud representation," but contain language in the representations and warranties that plaintiffs have argued is the equivalent of a fraud representation.

35.    For example, a number of the Debtors' Sale Agreements include warranties as to the accuracy of the Mortgage Loan Schedules accompanying the trust documents. *See, e.g.,* GMACM 2005-HE1 Mortgage Loan Purchase Agreement, § 3.1(b)(i) ("The information set forth in the Mortgage Loan Schedule with respect to each Mortgage Loan or the Mortgage Loans is true and correct in all material respects as of the date or dates respecting which such information is initially furnished").[13]

36.    The Mortgage Loan Schedules vary in complexity from one securitization to the next, but the Schedules frequently include information about debt-to-income ratios, loan-to-value ratios, and owner-occupancy status.

37.    In many cases, particularly for securitizations on the Residential Funding Mortgage Securities II, Inc. ("RFMSII") shelf, the "income" data from which the "debt to income" ratio is derived is based on a borrower's stated income, and not on W-2s or pay stubs collected as part of the loan application process.

---

[12] Debtors' Exhibit 25 is a true and correct copy of the GMACM 2007-HE2 Loan Purchase Agreement, which was maintained in and collected from the files of the Debtors.

[13] Debtors' Exhibit 26 is a true and correct copy of the GMACM 2005-HE1 Mortgage Loan Purchase Agreement, which was maintained in and collected from the files of the Debtors.

38.     Stated income loans were clearly permitted under several of the Debtors' loan programs and did not require verification of the borrower's actual income.  The consequence of not requiring income documentation meant that the incomes stated by borrowers could be inaccurate, inflated, or even fraudulent, and the Debtors may not have any express obligation to investigate them for accuracy.  As described above, these facts were disclosed in the prospectuses for securitizations containing stated income loans.

39.     Plaintiffs in representation and warranty litigation, including FGIC, have alleged that, by representing that the Mortgage Loan Schedules were accurate, the Debtors indirectly represented that the underlying income data were truthful and not fraudulent.[14]

40.     For such securitizations, the Debtors would vigorously dispute plaintiffs' interpretation.  On the contrary, the Debtors' position is that they only warranted that the data in the Schedules was consistent with the data in their records, not that it was actually true; and that if the other transaction documents disclosed a potential reason for inaccuracy in the data, such as the use of stated income underwriting, then there is no basis for interpreting the representation otherwise.

41.     Although I have been unable to locate any case law squarely addressing the correct interpretation of this representation, there is at least some risk that a court will accept plaintiffs' arguments that, by representing the Schedules are "accurate," the Debtors could be found to have warranted the *truth* of the information contained in them.  In *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, for example, MBIA made this argument, but

---

[14] *See, e.g.,* Debtors' Exhibit 8, Complaint, *Fin. Ins. Guar. Corp. v. Residential Funding Co., LLC*, No. 1:11-cv-09736-PAC (S.D.N.Y.), Doc. No. 1-1 at ¶ 81 ("RFC provided information to FGIC concerning Mortgage Loans . . . . This information included schedules that set forth statistics about the loan pool.  The schedules purported to describe key characteristics relevant to the assessment of risk, including weighted averages of FICO scores and DTI and CLTV ratios. . . . In turn, . . . RFC represented that all the information in those schedules 'is true and correct in all material respects as of the date or dates respecting which such information is furnished.'").

Countrywide apparently did not vigorously contest the interpretation, and the court adopted

MBIA's interpretation as a result.[15]  Such a conclusion could find support in general contract

principles applying the "plain meaning" of contractual language, or in extrinsic evidence if the

court deems the contractual language ambiguous.[16]

42.    Likewise, as the various prospectuses and prospectus supplements clearly

disclose, the property value data underlying the calculation of a loan's loan-to-value ratio (as

included on a Mortgage Loan Schedule) may be derived from drive-by appraisals, automated

valuation models, or stated values, depending on the applicable underwriting guidelines for that

loan; and owner-occupancy data is typically based on what the borrower's stated intention is at

the time of loan closing, not what actually occurs (or even what the borrower actually intends).

These other aspects of the Mortgage Loan Schedules may also be subject to attack by FGIC, the

Investors, and/or the FGIC Trustees for alleged breach of the "accuracy" representation,

depending on what re-underwriting of the individual loan files reveals.[17]  Other data on certain

Schedules may be subject to a similar argument.  These issues are starting to be litigated in

different types of RMBS cases around the country, but no consensus has yet emerged from the

courts to review these issues.[18]

---

[15] *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *83 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (finding because MBIA allege[d] "that the [Mortgage Loan Schedules] contained materially false and incorrect information regarding at least 1,416 unique mortgage loans" and "Countrywide ma[de] no argument as to why [those expert] findings as to 1,414 [of the] loans are incorrect . . . there are no issues of fact for trial as to whether [1,414 of] the loans violate the representation").

[16] *See, e.g., LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, 04 Civ. 5452 (PKL), 2007 U.S. Dist. LEXIS 59303, at *21-25 (S.D.N.Y. Aug. 13, 2007).

[17] The Debtors did not re-underwrite substantial numbers of loans in connection with defending the pre-petition litigation matters because the bankruptcy petition was filed on the eve of that work beginning in earnest in the first case to reach the expert phase.

[18] *See, e.g., Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, No. 2:11-ML-02265-MRP (MANx), 2012 U.S. Dist. LEXIS 121702, at *9-10 (C.D. Cal. Aug. 17, 2012) (Pfaelzer, J.) (holding issuer cannot be liable in investor litigation for misrepresentations of owner occupancy data where information was furnished by borrowers); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 204-05 (D. Mass. 2012) (same).

43.    As another example, for a number of trusts, the relevant Sale Agreements

included a representation that:

> [T]here is no material default, breach, violation or event of
> acceleration existing under the terms of any Loan Agreement or
> Mortgage and, to the best of GMACM's knowledge, no event
> which . . . would constitute a material default, breach, violation or
> event of acceleration under the terms of any Loan Agreement or
> Mortgage.

GMACM 2005-HE1 Mortgage Loan Purchase Agreement, § 4(xxix); *see also* RFMSII 2006-

HSA2 Home Equity Loan Purchase Agreement, § 3.1(b)(xix).

44.    Plaintiffs in representation and warranty litigation have argued that certain

commonly-used Notes and Loan Application forms contain a promise by the borrower that the

information provided by the borrower in obtaining the loan is true.  Where borrowers make those

representations, their breach is typically described in the loan documents as a "material event of

default" allowing for the acceleration of the indebtedness.  Thus, plaintiffs argue, if a borrower

lied in his or her loan application, that is a "material event of default" and a breach of the related

representation by the issuer (here, one of the Debtors) for which the issuer should be strictly

liable, regardless of whether applicable underwriting guidelines required it to investigate the

truthfulness of the statements in the loan application and regardless of whether it knew of the

borrower's fraud.

45.    There are a number of counter-arguments the Debtors could mount (and have

mounted) to such an argument, including testimony and expert opinions that such an

interpretation is contrary to the parties' intent and the industry standard interpretation of the

"material event of default" language.  The Debtors could also point to the fact that, in addition to

the standard mortgage note representation, some of their securitizations contained an explicit

representation that no borrower committed fraud or made misrepresentations in connection with

20

a loan application, indicating that the note representation was not meant to be a representation

that all borrower statements were true.  However, at least some courts have agreed with

plaintiffs' view as to this representation.[19]

46.    In *Love Funding*, the Southern District of New York granted summary judgment

to the trust/plaintiff in a commercial mortgage-backed securities case for breach of a virtually

identical "material event of default" representation, concluding that the seller of the loans was

"strictly liable" for an event of acceleration caused by the borrower's fraud, even if the seller

lacked knowledge of the fraud.[20]

47.    Indeed, when MBIA, in its case against RFC, sought to issue subpoenas to

thousands of borrowers' employers to try to determine whether the borrowers had committed

fraud, it successfully relied on this argument to obtain the discovery, notwithstanding the

absence of an express fraud representation in the applicable Sale Agreements.[21]

48.    There are some distinguishing features to the *Love Funding* opinion that render it

not directly applicable to the claims here: the defendant in that case did not dispute either

(1) whether the "material event of default" representation was intended to be limited to non-

payment defaults, or (2) the correctness of a prior Louisiana state court determination that the

borrower's fraud at origination constituted an "event of default" under the terms of the mortgage.

Thus, the arguments the Debtors might advance were not specifically tested in *Love Funding*.

---

[19] *Trust for the Certificate Holders of the Merrill Lynch Mortg. Pass-Through Certificates Series 1991-C1 v. Love Funding Corp.*, 04 Civ. 9890 (SAS), 2005 U.S. Dist. LEXIS 23522, at *26-30 (S.D.N.Y. Oct. 7, 2005), *rev'd and remanded on other grounds*, 591 F.3d 116 (2d Cir. 2010), *judgment entered on remand*, 736 F. Supp. 2d 716 (S.D.N.Y. 2010).  *See also MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *72 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013).

[20] *See also Citimortgage v. OCM Bancorp, Inc.,* No. 4:10CV467CDP, 2011 U.S. Dist. LEXIS 45437, at *19 (E.D. Mo. Apr. 27, 2011) (holding that, regardless of whether applicable guidelines require it, underwriters must evaluate the "reasonableness" of a borrower's income in a stated income transaction).

[21] *See MBIA Ins. Corp. v. Residential Funding Co., LLC*, No. 603552/2008, MBIA Letter To Court, Doc. 83:6-8 (Sup. Ct., N.Y. Cnty. Feb. 17, 2011); *id.*, Hr'g Tr., Doc. 118 at 34:21-26, 35-38 (Sup. Ct., N.Y. Cnty. Mar. 3, 2011).

However, the court in *Love Funding* did find that "the meaning [of the representation at issue] was unambiguous," despite the fact that the parties "urge[d] different interpretations." *Id.* at *27-28.

49.     More recently in *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, Countrywide made the argument "that 'default' refers to the payment status of loans," and presented an affidavit with evidence as to the "'commonly understood meaning of [default]'" and "'industry practice'" as to that term.  No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *71 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (quoting Countrywide Opp. Br. 21-22).  Nevertheless, the trial court held that the language of the "no default" representation was unambiguous, which consequently prohibited Countrywide from "'introduc[ing] evidence of custom or industry practice to subvert the agreement's plain meaning'" and granted summary judgment to MBIA on the question of whether borrower misrepresentations breached the loan representation.  *Id.* at *72 (citation omitted).

50.     Accordingly, there is uncertainty in the developing case law—and certainly with respect to the Debtors' specific transaction documents—as to the correct interpretation of the scope of the representations and warranties at issue in the FGIC Settlement Agreement.

**Existence of a Breach**

51.     The most common way to determine whether a loan in fact complies with an underwriting-related representation or warranty—such as those relating to loan-to-value ratios, debt-to-income ratios, borrower misrepresentations, or compliance with federal or state law, all of which are commonly alleged to have been breached—is to review and re-underwrite the actual loan files.  This task is time-consuming, expensive, and fraught with differences in judgment and opinion, as predicting or assessing a borrower's likely ability to pay in the future is not an empirical exercise.

52.    In addition to the mortgage and the note, loan files typically contain the borrower's loan application, supporting income documentation (if required), credit report, appraisals (if required), Truth In Lending Act disclosure forms, and other documents relating to the evaluation of the borrower's creditworthiness.

53.    Debtor entities RFC and GMACM, who originated and/or acquired the loans prior to securitization, each published underwriting guidelines generally governing the process of evaluating whether a loan met the respective debtor entity's standards.  In addition, RFC sometimes negotiated specific contracts with third party loan sellers, or negotiated purchase terms for a specific portfolio of loans, that included additional underwriting parameters.  For individual loans, RFC or GMACM might also grant an exception to the published guidelines, depending on the circumstances of the particular loan or borrower.  These underwriting standards, including the use of exceptions and other variances from the published guidelines, are described in the prospectus and prospectus supplement for each trust.  *See* Paragraph 30, *infra* (quoting underwriting disclosures from various prospectuses and prospectus supplements). There were also references in the RFC Client Guide to the use of negotiated purchase terms and exceptions.  In addition, RFC and GMACM presentations to investors and credit enhancers also referenced the use of negotiated criteria and/or exceptions in the underwriting process.

54.    There are frequently ambiguities in how to determine when there has been a breach of an underwriting-related representation or warranty, and loan underwriting and the evaluation of a borrower's creditworthiness are often judgment calls.

55.    Thus, litigating the fundamental issue of whether a representation or warranty has even been breached poses evidentiary challenges and injects a high level of uncertainty into the outcome.

56.    By way of example, some of the typical underwriting-related disputes that arise in

attempting to prove a breach include the following (some of which have already arisen in pre-

petition litigation against the Debtors):

a.    **Is the granting of exceptions to underwriting guidelines consistent with representations that the underwriting "substantially complies" with the published guidelines?** *See, e.g.*, First Amended Complaint, *MBIA Ins. Corp. v. Residential Funding Co., LLC*, No. 603552/2008, Doc. 28 at ¶¶ 58, 61, 63, 68-69, 78 (Sup. Ct., N.Y. Cnty. Mar. 19, 2010); Amended Complaint, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, Doc. 9 at ¶¶ 78-79 (Sup. Ct., N.Y. Cnty. Aug. 24, 2009).

b.    **Is the purchase of loans in bulk (a practice that is common in the industry) pursuant to a negotiated set of underwriting criteria consistent with representations that the underwriting "substantially complies" with the published guidelines?** *See, e.g., First Amended Complaint, MBIA Ins. Corp. v. Residential Funding Co., LLC*, No. 603552/2008, Doc. 28 at ¶¶ 62-63, 69, 78 (Sup. Ct., N.Y. Cnty. Mar. 19, 2010); Amended Complaint, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, Doc. 9 at ¶¶ 1-4 (Sup. Ct., N.Y. Cnty. Aug. 24, 2009).

c.    **Can defects in appraisals be accurately demonstrated through the use of retroactive automated valuation tools (essentially, retroactive appraisal models)?** *See, e.g.*, Amended Complaint, *Fed. Home Loan Bank of Boston v. Ally Fin. Inc.*, 1:11-cv-10952-GAO, Doc. 180 at ¶¶ 877-90 (D. Mass. June 29, 2012); Amended Complaint at ¶¶ 628-35, *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Secs. Inc.*, 49D05 10 10 PL 045071 (Marion, Indiana Sup. Ct. July 14, 2011); Corrected Amended Complaint at ¶¶ 619-26, *Fed. Home Loan Bank of Chicago v. Banc of Am. Funding Corp.*, 10 CH 45033 (Circuit Court of Cook County, Illinois Apr. 8, 2011).

d.    **Do issuers who acquire and then sell stated income loans into securitizations have a duty to evaluate whether the borrower committed fraud in stating an inflated income, even where there is no fraud representation in the securitization documents?** *Compare Citimortgage v. OCM Bancorp, Inc.*, No. 4:10CV467CDP, 2011 U.S. Dist. LEXIS 45437, at *19 (E.D. Mo. Apr. 27, 2011) (holding that, regardless of whether applicable guidelines require it, underwriters must evaluate the "reasonableness" of a borrower's income in a stated income transaction) with *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, 08 Civ. 5310 (DAB), 2012 U.S. Dist. LEXIS 56010, at *18-21 (S.D.N.Y. Mar. 29, 2012) (finding it unreasonable for an investor to rely on statements about the underwriting of stated income loans when the same set of transaction documents contained extensive disclosures about the risks of such loans), rev'd and remanded 709 F.3d 109 (2d Cir. 2013).

e.  **Have issuers who conducted "due diligence" on only a sample of loans coming through the process breached their representation that loans were underwritten according to "generally accepted" standards?** *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 580-581 (E.D. Pa. 2009) (in assessing sufficiency of complaint alleging securities fraud arising from sale of RMBS, stating that the "quality of the issuer's due diligence examination was a material characteristic of all the Certificates" and that, "[a]s part of its due diligence, Defendant [] reviewed a large sample of the loan documentation and conducted a detailed statistical analysis to ensure that the quality of the loans was consistent with the expected yields").

f.  **Where issuers have warned that owner-occupancy data is self-reported, can they nonetheless be held liable for owner-occupancy data that turns out to be inaccurate?** *Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, No. 2:11-ML-02265-MRP (MANx), 2012 U.S. Dist. LEXIS 121702, at *6-10 (C.D. Cal. Aug. 17, 2012) (Pfaelzer, J.) (holding issuer cannot be liable in investor litigation for misrepresentations of owner occupancy data where information was furnished by borrowers); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 204-05 (D. Mass. 2012) (same).

g.  **Were points and fees correctly calculated and disclosed to borrowers (in order to comply with state and federal requirements)?**

h.  **Does the absence of certain documents in a loan file—such as a written underwriting approval, exception request form, or Patriot Act disclosure form—constitute a breach of a representation that the loan "substantially complied" with applicable underwriting guidelines, even if irrelevant to the borrower's actual creditworthiness?**

57.    From my experience representing the Debtors in RMBS cases over the past several years, I am aware that the Debtors face a number of factual hurdles in answering these questions, and there is great uncertainty in the outcome of any one of these issues.

58.    By way of example, the parties in the pre-petition RMBS cases involving the Debtors have largely disagreed as to which were the applicable underwriting guidelines and whether the use of "exceptions" as disclosed in the prospectus was permissible.

59.    On the one hand, RFC developed evidence, including the deposition testimony of a number of witnesses and the language of the prospectuses, showing that RFC considered loans with exceptions, loans processed through automated underwriting systems, or loans acquired

pursuant to negotiated criteria agreements all to be in "substantial compliance" with the

applicable guidelines.  The evidence showed that the Debtors' underwriters, quality audit staff,

and those managing the securitization process followed consistent processes, gave considerable

time and attention to individual underwriting decisions, never intended or knowingly allowed

"bad" loans to be securitized, often voluntarily undertook to weed out weak collateral, and made

extensive efforts to fully disclose to counterparties and investors any risks present in the

collateral pool, including through the creation and expansion of the "Vision" website, a best-in-

class tool for tracking historical collateral performance at a loan level for each securitization and

shelf.

60.     On the other hand, FGIC, the Investors, and/or the FGIC Trustees may attempt to

point to the plain language of the published RFC Client Guide to suggest that deviations from it

(including exceptions and negotiated criteria) were not authorized.  They may try to develop

evidence that there were either certain controls lacking in the Debtors' underwriting and

securitization processes, or failures to document underwriting decision-making, that (they will

likely argue) demonstrate the process was flawed.  Underwriting decisions are frequently a

judgment call, so it is likely FGIC, the Investors, and/or the FGIC Trustees will be able to find

examples where reasonable underwriters may disagree, and point to those as examples of

breaches.

61.     For example, FGIC, the Investors, and/or the FGIC Trustees may look to stated

income loan underwriting practices and try to advance the theory that the Debtors had an

affirmative obligation routinely to evaluate the reasonableness of every stated income loan,

notwithstanding the clear language of the Client Guide and the risk disclosures to the contrary.

They may likewise attempt to mount an attack on the Debtors' use of automated decisioning

tools (which were externally available to loan sellers and allowed for a preliminary assessment of

whether the loan was acceptable to the Debtors), arguing that because the Debtors knew that

automated programs might evaluate a loan application differently than a human underwriter

would (despite that this is clearly disclosed in the prospectus and prospectus supplement), their

use of such tools was problematic.  And, as with any document-intensive complex litigation

matter—particularly where the events in question are several years in the past—FGIC, the

Investors, and/or the FGIC Trustees are likely to attempt to point to the absence of

documentation as evidence that proper processes were allegedly not followed.

62.     Finally, it is typical for plaintiffs to focus on the small handful of self-critical

memos or emails that inevitably exist in any business process of this size and complexity, and

attempt to present those out of context.  I considered the potential impact of these types of

random documents on a fact-finder, regardless of the weight of the evidence otherwise

suggesting a generally robust and disciplined underwriting process.

63.     Thus, the Debtors' ability to meet the various representations and warranties

relating to loan underwriting is an issue for which both the law and the facts are likely to be

disputed.  While the Debtors would hotly contest any allegation that underwriting representations

were breached, there is potential risk for the Debtors of an adverse outcome on each of these

issues if a representation and warranty case were to go to trial.

**Materiality of Breach**

64.     Under black-letter contract law, a breach must be "material" to be actionable.

65.     In addition, the applicable contract language for breaches of representations and

warranties in these trusts adds an express materiality component, requiring that the breach be one

that "materially and adversely affects the interests of any Securityholders or the Credit Enhancer

27

. . . in such [Loan]".  *See, e.g.,* RFMSII 2006-HSA2 Home Equity Loan Purchase Agreement § 3.1.

66.     Under general contract principles, whether a "material" breach has occurred is typically a question of fact.  23 Williston on Contracts (4th ed.) § 63.3 (quoted in *Metro. Nat'l Bank v. Adelphi Acad.*, No. 7389/2008, 2009 N.Y. Misc. LEXIS 1261, at *8 (Sup. Ct., Kings Cnty. 2009)).  To be "material," a breach must "go to the root of the agreement" and be "so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform . . . ."  *Id.*

67.     The issue of whether a breach is material or causes a material and adverse effect has been addressed a handful of times in cases involving contracts for the purchase of loans, commercial mortgage-backed securities cases, and in RMBS cases brought by monoline credit enhancers.

68.     Generally, the most significant materiality disputes arise because plaintiffs (whether credit enhancer, trustee, or investor) seek to restrict the materiality analysis to the closing date of the securitization.  Under plaintiffs' analysis, the breach of the representation or warranty has occurred as of the closing date, so, plaintiffs argue, subsequent events are irrelevant to the evaluation of whether the breach was material.

69.     Defendants argue, in contrast, that certain breaches are not material because they do not ultimately have a "material and adverse effect" on the plaintiff, and facts subsequent to the closing date are relevant to that analysis.

70.     For example, some loans may breach a representation or warranty, but if the borrower continues to pay his or her loan timely, there is no "effect" on the investor.  Similarly, if the loan is found to breach an underwriting representation related to stated income,

28

undisclosed debts, property value, etc., but the reason the borrower ultimately stopped paying is

because he passed away, then the breach itself has no "effect" on the investor.

71.    These issues overlap with causation issues, discussed further below.

72.    In the monoline insurance context, Judge Rakoff issued an opinion denying

summary judgment in *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB,* No. 11 Civ.

2375 (JSR), 2012 U.S Dist. LEXIS 138296 (S.D.N.Y. Sept. 25, 2012), in which he relied on the

"dictionary definitions" of "material" and "adverse" to conclude that plaintiffs in breach of

representation and warranty cases need not prove that the breach "causes . . . actual loss" in order

to satisfy the "material and adverse breach" element.  *Id.* at *8-11.[22]  On the other hand, in *MBIA

Insurance Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008, 2013 N.Y. Misc. LEXIS

1774, at *67 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013), the trial court reiterated the court's prior

finding that the "materially and adversely affected" language was ambiguous and a definition

could not be applied as a matter of law.[23]  The trial court therefore denied summary judgment as

to all five categories of breaches alleged to be indisputable by MBIA, and reserved the issue for

trial.  *Id.* at *63-93.

73.    In two commercial mortgage-backed cases to address the issue, the dispute arose

in the context of motions *in limine* to preclude evidence relating to post-closing performance of

the loans.  *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n,* No. CIV-08-1125-C, 2011

U.S. Dist. LEXIS 35343 (W.D. Okla. Apr. 1, 2011); *Wells Fargo Bank, N.A. v. LaSalle Bank*

---

[22] *See Assured Guar. Mun. Corp. v. Flagstar Bank*, FSB, No. 11 Civ. 2375 (JSR), 2013 U.S. Dist. LEXIS 16682, at **100-101 (S.D.N.Y. Feb. 5, 2013) (quoting its summary judgment decision and stating "the Court determined that the further requirement that breaches of these representations and warranties be 'material and adverse' means that 'plaintiff must only show that [Flagstar's] breaches [of the representations and warranties] materially increased its risk of loss' . . . [which] is a function of all the circumstances presented in each unique loan file.").

[23] The trial court quoted its first opinion denying summary judgment in which the court concluded "that the applicable provisions of the SSA and the PSA are subject to varying interpretations regarding 'interest' and affect on interest, as well as varying and equally valid interpretations of how the 'aggregate' in SSA § 2.04(d) must be defined." *MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 936 N.Y.S.2d 513, 526 (Sup. Ct., N.Y. Cnty. 2012).

*Nat'l Ass'n*, 2:08-CV-1448 JCM (RJJ), 2011 U.S Dist. LEXIS 145026 (D. Nev. Dec. 15, 2011).

Both cases were brought by trustees seeking to enforce loan repurchase provisions for breaches

of representations and warranties.

74.    The Oklahoma court addressed Wells Fargo's motion *in limine* to exclude

evidence regarding the decline of the economy and mortgage and real estate markets because "as

of the closing date of the securities, the value of the certificateholders' interests and the

underlying mortgages were materially and adversely affected by Defendant's alleged breaches of

warranties." *Wells Fargo Bank,* 2011 U.S. Dist. LEXIS 35343, at *24.The court held that

"[e]vidence regarding the post-securitization market meltdown is relevant only if Plaintiff asserts

material and adverse effects occurred after the securitization closing date." *Id.* at *24.  Similarly,

the Nevada court held that "[i]f plaintiff limits its material and adverse effects claim to evidence

available as of the closing date, evidence or testimony of general post-closing economic

conditions is irrelevant" and must be excluded.  *Wells Fargo Bank,* 2011 U.S Dist. LEXIS

145026, at *4.

75.    Likewise, courts interpreting loan sale agreements have found evidence that a

buyer would not have purchased the loan "had they known about the negative information" that

was the basis for an alleged breach of representation and warranty sufficient to defeat summary

judgment.  *Lehman Bros. Holdings, Inc. v. Laureate Realty Servs.*, 1:04-cv-1432-RLY-TAB,

2007 U.S. Dist. LEXIS 76940, at *36-37 (S.D. Ind. Sept. 28, 2007).  This again suggests a risk

that a court may find it is the falsity of the information available to the buyer at the time of

closing that gives rise to the "material and adverse effect," and not the subsequent performance

of the loan in question.[24]

---

[24] *See also* Material and Adverse Opinion of Professor Barry E. Adler (relating to the action *In the Matter of the Application of The Bank of New York Mellon*, No. 651786/2011 (Sup. Ct., N.Y. Cnty. June 29, 2011) (Kapnick, J.))

76.     Courts interpreting this type of language in the commercial mortgage-backed securities context have also split on the question of whether plaintiffs can be required to meet a "double materiality" standard; that is, whether plaintiff must prove both that the breach was a material breach *and*, as a separate element, that the breach had a "material and adverse" effect on the Investors.[25]  Thus, it is unclear what burden of proof a court in a case between FGIC, the Investors, and/or the FGIC Trustees might place on plaintiffs regarding materiality.

77.     In addition to the issues discussed above, other, more mundane disputes as to "materiality" are bound to arise in any litigation with FGIC, the Investors, and/or the FGIC Trustees for the FGIC Insured Trusts.  For example, as noted above, it was industry standard during the relevant time period to grant "exceptions" to underwriting guidelines from time to time, based on an overall assessment of the borrower's creditworthiness.  Thus, while published guidelines might require a minimum FICO score of 680 for certain types of loans, an underwriter could approve a borrower with a lower FICO score (say, 640) based on an evaluation of other features of that borrower or loan, such as reserves in excess of the minimum required amount, or a lower debt-to-income ratio than required.  Disputes are bound to arise as to whether a 40-point FICO deviation, in the overall context of that loan, is or is not "material."  With dozens of underwriting parameters to evaluate for thousands of individual loans, any litigation over such issues is certain to be extremely costly and fraught with risk.

---

(discussing interpretation of similar language in light of *Laureate* and *Wells Fargo* decisions and concluding it "is not possible to conclude with any confidence how a court would interpret" such language), *available at* http://www.cwrmbssettlement.com/docs/Opinion%20Regarding%20Material%20and%20Adverse%20Affect.pdf, at 12 (last visited July 30, 2013).

[25] *Compare Wells Fargo Bank NA v. LaSalle Bank Nat'l Ass'n*, 3:07-cv-00449-MRM, Hr'g Tr., Doc. 366 at 5:11-15 (S.D. Ohio Nov. 13, 2009) ("I agree with Defendant's interpretation of the relevant case law, that Plaintiff must prove as required by New York law that there is a material breach of a representation and warranty . . . .") *with Wells Fargo Bank NA v. LaSalle Nat'l Ass'n*, 2:08-CV-1448 JCM (RJJ), 2011 U.S. Dist. LEXIS 145026, at *11 (D. Nev. Dec. 15, 2011) ("[T]he court does not endorse defendant's contention that the double materiality requirement is well-supported by the relevant case law") and *Wells Fargo Bank, N.A. v. LaSalle Nat'l Ass'n*, No. CIV-08-1125-C, Mem. Op. & Order Doc. 323:41 (W.D. Okla. Dec. 10, 2010) (declining to follow *Wells Fargo* S.D. Ohio decision).

## Causation

78.     As noted above, a hotly contested issue in representation and warranty litigation is

proximate cause.  There is limited precedent regarding causation in the monoline context and in

commercial mortgage-backed cases.

79.     The primary legal dispute, which is intertwined with the materiality issues

discussed above, is whether the actual cause of the loan's failure is a defect in the underwriting.

80.     Courts have confirmed that the market collapse can serve as a defense to

securities claims under the federal securities laws, as well as common law claims for fraud and

negligent misrepresentation.[26]

81.     Furthermore, as a general matter, causation is an element of a contract claim

under New York law.  A plaintiff, for example, must show that the alleged breach of contract

was the "direct and proximate" cause of the injuries.[27]  Accordingly, general contract law allows

defendants to present evidence of the market collapse as the cause of a plaintiff's losses in

RMBS cases.

82.     Only a handful of cases, however, have examined this causation issue in the

specific context of contractual breach of representation and warranty claims (or repurchase

claims).  While some of these cases touch on the market collapse as a defense to plaintiffs'

claims, no court has issued a definitive ruling on the issue.

---

[26] *See, e.g., In re Wash. Mut. Mortg. Backed Secs. Litig.*, NO. C09-37 MJP, 2012 U.S. Dist. LEXIS 102064, at *41-42 (W.D. Wash. July 23, 2012) (denying summary judgment on Securities Act claim where factual issues existed regarding, among other things, whether market collapse caused plaintiffs' losses); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 08 Civ. 7508 (SAS), 2012 U.S. Dist. LEXIS 119671, at *101-103 (S.D.N.Y. Aug. 17, 2012) (same as to fraud and negligent misrepresentation claims); *but see MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 235 (1st Dep't 2011) (declining to rule at motion to dismiss stage that MBIA's losses were caused by the housing and credit crisis).

[27] *See Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 379 (1974).

83.     Causation was addressed in the *MBIA Insurance Corp. v. Countrywide Financial Corp.* case.  There, the trial court held that MBIA was "not required to establish a direct causal connection between proven warranty breaches by [defendant] and MBIA's claims payments made pursuant to the insurance policies at issue" in order to prove that a breach was material. 936 N.Y.S.2d 513, 527 (Sup. Ct., N.Y. Cnty. 2012).  In the same opinion, the trial court nonetheless held that MBIA must still "prove that it was damaged as a direct result of the material misrepresentations," and denied MBIA's motion to strike Countrywide's affirmative defenses based on the intervening or superseding cause of the economic crisis.  *Id.* at 522, 527.[28]

84.     The court's ruling—in addition to providing mixed guidance—was based in substantial part on applicable insurance statutes.  New York Insurance Law § 3105 provides that an insurance policy can only be avoided for a misrepresentation that is so material that it would have led to the insurer not issuing a policy if it knew the truth regarding a misrepresented fact. *See id.* at 520.  New York Insurance Law § 3106 further limits materiality to breaches which materially increase the risk of loss, damage, or injury of the kind actually suffered.  *See id.*  The insurance analysis, while obviously relevant to an evaluation of FGIC's claims, are not relevant to the Investors' and/or the FGIC Trustees' claims also at issue here. [29]  It is unclear whether any portion of these rulings can be imported into the Investors' and/or the FGIC Trustees' analysis,

---

[28] On appeal of this decision, the Appellate Division did not disturb that part of the trial court's decision that "pursuant to Insurance Law §§ 3105 and 3106, plaintiff was not required to establish causation in order to prevail on its fraud and breach of contract claims," but the Appellate Division also did not disturb the finding that MBIA must still "prove that it was damaged as a direct result of the material misrepresentations," or the denial of MBIA's motion to strike Countrywide's defenses based on the intervening or superseding cause of the economic crisis. *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008, 2013 N.Y. App. Div. LEXIS 2107 (1st Dep't Apr. 2, 2013).

[29] *See also Syncora Guar. Inc. v. EMC Mortg. Corp.,* 874 F. Supp. 2d 328 (S.D.N.Y. 2012); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, No. 11 Civ. 2375 (JSR), 2012 U.S Dist. LEXIS 138296, at *9-11 (S.D.N.Y. Sept. 25, 2012) (also noting that the contractual repurchase language does not tie the repurchase obligation to default of the loan).

or to what extent courts will look to the monoline insurance litigation for guidance across the types of claimants involved in this settlement.

85.    The only two cases involving trustee repurchase demands discussing causation I am aware of are the two *Wells Fargo* evidentiary decisions discussed above, in which the courts excluded *in limine* any evidence of the market collapse so long as the plaintiff trustee limited its evidence to "material and adverse effects as of the closing date."[30]  In both cases, however, the courts did not provide any legal analysis supporting this conclusion.  Accordingly, these decisions appear to have limited persuasive or precedential value.

86.    In another case, *LaSalle Bank Nat'l Assn. v. Citicorp Real Estate, Inc.*, 01 Civ. 4389 (AGS), 2002 U.S. Dist. LEXIS 1730 (S.D.N.Y. Feb. 5, 2002), which is a non-trustee case involving the sale of a loan, the court stated that plaintiffs had properly pleaded a "material and adverse effect" because the alleged breaches could constitute a "partial cause" or may have "contributed" to the loan's eventual default.  *Id.* at \*13.  Under this analysis, even a court looking to the eventual outcome of the loan may accept a minimal showing of partial causation by plaintiff as sufficient for plaintiff to meet its burden.

87.    Given the relatively undeveloped status of the case law, the outcome of the causation issues remains highly uncertain.

## Harm and Damages

88.    Defendants in representation and warranty litigation, including the Debtors, have consistently maintained that the sole remedy for breaches of representations and warranties is the repurchase of the defective loan.  That conclusion is supported by the plain language of the Debtor's Sale Agreements.  *See, e.g.,* RFMSII 2006-HSA2 Home Equity Loan Purchase

---

[30] *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. CIV-08-1125-C, 2011 U.S. Dist. LEXIS 35343, at \*23-24 (W.D. Okla. April 1, 2011); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 2:08-CV-1448 JCM (RJJ), 2011 U.S Dist. LEXIS 145026, at \*3-4 (D. Nev. Dec. 15, 2011).

Agreement, § 3.1 ("Upon discovery . . . of a breach of any representation and warranty . . . which materially and adversely affects the interests of any Securityholders or the Credit Enhancer . . . the Seller shall, within 90 days of its discovery or receipt of notice of such breach, . . . either (i) cure such breach in all material respects or (ii) . . . either (A) repurchase such [Loan] . . . or (B) substitute one or more Eligible Substitute Loans . . . ; provided that the seller shall have the option to substitute . . . only if such substitution occurs within two years following the Closing Date.

89.     Monolines have argued that they are entitled to the monetary equivalent of rescission of their insurance agreements.[31]  In the trustee context, the only precedent I am aware of regarding damages are the Lehman and Bank of America settlements and a very recent decision in *ACE Securities Corp. v. DB Structured Products, Inc.* which found, with a very short analysis, that a trustee was limited to the repurchase price damages established in the  pooling and servicing agreement.  *See ACE Securities Corp. v. DB Structured Products, Inc.,* Case No. 650980/2012, 2013 N.Y. Misc. Lexis 1979 (Sup. Ct. N.Y. Cnty, May 13, 2013).

90.     In addition to the risk of FGIC raising these arguments, in considering the risk to the Debtors of litigating the claims, I had to take into account the possibility—however remote— that the Investors and/or the FGIC Trustees would also attempt to import the same concepts of rescission likely to be pursued by FGIC into their claims here, in order to maximize or increase their potential recovery.  Such a theory could inflate the claimed damages by attempting to hold the Debtors responsible for all losses suffered by the trusts, regardless of whether they are

---

[31] *See, e.g., MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008, 2013 N.Y. App. Div. LEXIS 2107 (1st Dep't Apr. 2, 2013) (holding "rescission is not warranted" because "Plaintiff voluntarily gave up the right to seek rescission" and "does not actually seek rescission" in the complaint, nor is it "impracticable in any relevant sense"); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008 , 2013 N.Y. Misc. LEXIS 1774, at *27 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (affirming that "[w]hile rescissory damages are unavailing for the reasons explained by the First Department, nothing in the contract language cited above bars other forms of monetary damages, such as compensatory relief").

attributable to breaches of representations and warranties and regardless of whether FGIC paid

claims on those tranches or not, based on the argument that the Investors would never have

purchased the certificates had they known of the alleged breaches.

91.     Even if FGIC, the Investors, and/or the FGIC Trustees are not permitted to obtain

a rescission-like recovery, the parties will undoubtedly dispute the extent to which any losses

suffered by the trusts are actually attributable to breaches of representations and warranties.

92.     In addition, the parties will almost certainly dispute whether FGIC, the Investors,

and/or the FGIC Trustees can recover for loans that breach representations and warranties, but

have not defaulted.  This dispute flows directly from the proximate cause issues discussed above.

If FGIC, the Investors, and/or the FGIC Trustees can recover for loans that have not defaulted—

and perhaps even loans that have been fully paid off, as the Supreme Court of New York,

Appellate Division, First Department has held in the *Countrywide* case—then their damages

could theoretically exceed even the actual and estimated losses to the trusts.[32]

93.     Conversely, another possible defense that renders a damages analysis inquiry

highly uncertain is whether foreclosure cuts off the ability to request repurchase of loans based

on the recent decision in *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage

Corp.,* Case No. 11-CV-02542, 2012 U.S. Dist. LEXIS 142579 (D. Minn. Oct. 1, 2012).  The

court in *MASTR Asset* dismissed repurchase claims brought with respect to foreclosed loans.  A

recent decision by a New York State Court denied a motion to dismiss based on a similar theory

---

[32] *See, e.g., MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008, 2013 N.Y. App. Div. LEXIS
2107 (1st Dep't Apr. 2, 2013) (holding "plaintiff is entitled to a finding that the loan need not be in default to trigger
defendants' obligation to repurchase it"); *see also MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No.
602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *52 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (holding "in the absence of
language restricting Countrywide's repurchase obligation to defaulting loans, the Court concludes that MBIA need
not show that a Securitization loan is in default in order to be repurchased"); *Assured Guar. Mun. Corp. v. Flagstar
Bank*, FSB, No. 11 Civ. 2375 (JSR), 2013 U.S. Dist. LEXIS 16682, at *105 (S.D.N.Y. Feb. 5, 2013) (holding "the
'cure or repurchase' remedy in the Transaction Documents is not limited to defaulted or delinquent loans").

to that considered in *MASTR Asset*. *See ACE Securities Corp. v. DB Structured Products, Inc.*, Case No. 650980/2012, 2013 N.Y. Misc. Lexis 1979 (Sup. Ct. N.Y. Cnty, May 13, 2013) (denying motion to dismiss based on theory that foreclosed loans could not be repurchased because the transaction documents in question appeared to contemplate the repurchase of foreclosed loans).  If litigated, FGIC, the Investors, and/or the FGIC Trustees have credible arguments to distinguish the holding in *MASTR Asset* because the repurchase provisions in the Debtors' transaction documents are significantly different than those in *MASTR Asset* and like those in *Ace Securities* appear to contemplate the repurchase of foreclosed loans.  Moreover, there remains substantial uncertainty whether other courts considering representation and warranty claims would agree with the decision in *MASTR Asset*.  Because the law is still developing around this issue, I do not believe it will likely bar most of the claims of FGIC, the FGIC Trustees and/or the Investors.

94.    Finally, as noted above, FGIC, the Investors, and/or the FGIC Trustees are pursuing some tort claims, which could expose the Debtors to a different potential damages calculation and the prospect of having to litigate punitive damages issues.

95.    These risks and uncertainties as to the basic methodology for calculating damages relating to FGIC, the Investors, and/or the FGIC Trustees' claims are an important factor I considered in reaching my conclusion.

## ADDITIONAL DEFENSES

96.    In addition to the elements of a proposed plaintiff's cause of action for breaches of representations and warranties or breaches of the repurchase obligation, I reviewed various potential affirmative defenses available to the Debtors.  The strengths and weaknesses of these affirmative defenses also were factors in my conclusion.  The three primary affirmative defenses

37

I evaluated were (1) statute of limitations, (2) plaintiff's knowledge of the risk and/or failure to conduct appropriate due diligence, and (3) the intervening cause of the housing crisis.

### Statute of Limitations

97.    The statute of limitations for contract claims in New York is six years, and no discovery rule that would extend the time period is available for contract claims.  N.Y. CPLR § 213(2); *Hernandez v. Bank of Nova Scotia,* 908 N.Y.S.2d 45, 46 (1st Dep't 2010).[33]

98.    Most of the trusts included in the FGIC Settlement Agreement were issued between 2005 and 2007.  Prior to the Debtors filing for bankruptcy, FGIC sued on the GMACM 2005-HE1 and RFMSII 2005-HS1 transaction more than six years after the closing.  The remaining securitizations FGIC sued on prepetition were filed within six years of closing.  Additionally, the FGIC Settlement Agreement includes some FGIC Insured Trusts that were closed within six years of the petition date, and FGIC's, the Investors, and the FGIC Trustees' claims were timely as to those Trusts.

99.    Accordingly, one argument the Debtors likely would have considered making if the claims were litigated is that claims for breach of representation and warranty arising from the GMACM 2005-HE1 and RFMSII 2005-HS1 transaction are time-barred.  In addition, some of the Trusts included in the FGIC Settlement Agreement, but on which FGIC had not sued

---

[33] As previously noted, my analysis focuses on the breach of contract claims because they pose the greatest risk to the Debtors.  However, I note that the statute of limitations for fraud in New York is either six years, or two years from the time the plaintiff discovered or should have discovered the fraud.  N.Y. CPLR § 213.  The analysis as to when the statute was triggered on fraud claims is likely highly factual; however courts have considered the fact of widely-publicized allegations of underwriting problems as evidence that the plaintiff "should have discovered" the fraud at that point.  *See, e.g., Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,* 802 F. Supp. 2d 1125, 1134-39 (C.D. Cal. 2011); *but see In re Countrywide Fin. Corp. Mortgage-Backed Secs.*, No. 2:11-ML-02265-MRP (MANx), 2013 U.S. Dist. LEXIS 40726, at *16 (C.D. Cal. Mar. 21, 2013) ("The Court cannot hold, given the judicially noticeable materials, that a reasonably diligent investor in mortgage-backed securities could have pled a sufficient complaint as of February 27, 2008").The analysis above with respect to the timing of repurchase demands as a trigger will likely apply to tort claims as well.

prepetition, are also older Trusts that closed more than six years before the bankruptcy petition was filed on May 14, 2012.

100.    An argument that such older claims are time-barred is supported by a number of courts in a variety of breach of warranty contexts.[34]

101.    Nonetheless, at least two courts have held that the breach of the contractual repurchase obligation is a separate claim from that for breach of a representation or warranty.[35] Thus, the cause of action for breach of the repurchase obligation is only complete—and the statute of limitations only begins running—once the Debtors fail to repurchase non-conforming loans upon demand.  FGIC did not begin to request repurchase from the Debtors until 2008. Neither the Investors nor the FGIC Trustees have yet made any repurchase demands as to these Trusts.  Thus FGIC, the Investors, and/or the FGIC Trustees may argue, "where a demand is necessary to entitle a person to commence an action, the time within which the action must be commenced shall be computed from the time when the right to make the demand is complete." N.Y. CPLR § 206.[36]

102.    Thus, while the Debtors would have argued that certain of FGIC's claims are time-barred if this dispute were litigated, I must consider as part of my analysis the risk that a court hearing the issues would agree with the *National Bank of Arkansas* court and allow a separate claim for breach of the repurchase obligation to proceed.

---

[34] *See, e.g., Structured Mortg. Trust 1997-2 v. Daiwa Fin. Corp.*, 02 Civ. 3232 (SHS), 2003 U.S. Dist. LEXIS 2677, at *5 (S.D.N.Y. Feb. 25, 2003) (breach occurs at the moment of sale because "the facts warranted in the . . . Agreement were not true when made"); *Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005-S4 v. Nomura Credit & Capital, Inc.*, No. 652341/2011 at 13 (Sup. Ct., N.Y. Cty. May 10, 2013); *see also Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189, 1194 (W.D. Wash. 2011); *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 5140-CS, 2012 Del. Ch. LEXIS 171, at *56 (Del. Ch. Aug. 7, 2012).

[35] *See Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas*, 875 F. Supp. 2d 911, 916-17 (E.D. Ark. 2012); *ACE Sec. Corp. v. DB Structured Prods., Inc.*, No. 650980/2012, 2013 N.Y. Misc. LEXIS 1979 (Sup. Ct., N.Y. Cnty. May 13, 2013).

[36] *See also Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 848-49 (E.D.N.Y. 1981).

103.    FGIC may also raise a similar argument to one that the Investors have advanced

more broadly against the Debtors.  The Investors contend that the Debtors cannot rely on the

statute of limitations defense given the Debtors' dual role as Seller and Master Servicer for the

securitizations because the Debtors, when acting as Master Servicer, were obligated to pursue

repurchase by the Seller of loans that had breached a representation.  According to the Investors,

because the Debtors should have pursued repurchase claims against themselves prior to the

expiration of the statute of limitations, the Debtors cannot rely on the statute of limitations as a

defense.

104.    I am aware of no court that has addressed this argument.  Thus, while the Debtors

would have logical counter-arguments that equitable tolling is inapplicable to trusts' contract

claims against the Debtors, there is no way to predict whether those counter-arguments would

ultimately prevail.

105.    Under the transaction documents for RFC's securitizations, RFC does serve as

both the Seller and Master Servicer.  *See*, *e.g.*, RASC 2007-EMX1 Assignment and Assumption

Agreement at 1.  Under the transaction documents for GMACM's securitizations, GMACM

serves as both the Seller and the Servicer.  *See, e.g.*, GMACM 2005-HE1 Servicing Agreement

at 1.[37]  Under the transaction documents, the Master Servicer (or Servicer) is obligated to request

that the Seller cure or repurchase loans that breach representations:

> ***Upon the discovery*** by the Depositor, ***the Master Servicer***, the
> Certificate Insurer, the Trustee or the Custodian of a breach of any
> of the representations and warranties made in the Assignment
> Agreement in respect of any Mortgage Loan or of any Repurchase
> Event which materially and adversely affects the interests of the
> Certificateholders or the Certificate Insurer in such Mortgage
> Loan, ***the party discovering such breach shall give prompt written***

---

[37] Debtors' Exhibit 29 is a true and correct copy of the GMACM 2005-HE1 Servicing Agreement, which was
maintained in and collected from the files of the Debtors.

> *notice to the other parties and the Certificate Insurer* (the
> Custodian being so obligated under a Custodial Agreement).  ***The
> Master Servicer shall promptly notify Residential Funding of
> such breach or Repurchase Event and request that Residential
> Funding either*** (i) ***cure such breach or Repurchase Event*** in all
> material respects within 90 days from the date the Master Servicer
> was notified of such breach or Repurchase Event or (ii) ***purchase
> such Mortgage Loan*** from the Trust Fund at the Purchase Price
> and in the manner set forth in Section 2.02.

RASC 2007-EMX1 Pooling and Servicing Agreement at 63-64 (emphasis added);[38] RFMSII

2006-HSA1 Pooling and Servicing Agreement at 43 (substantially similar);[39] GMACM 2006

HE-1 Servicing Agreement at 4 ("The Servicer, on behalf of and subject to the direction of the

Indenture Trustee, as pledgee of the Mortgage Loans, or the Issuer, shall enforce the

representations and warranties of the Sellers pursuant to the Purchase Agreement.").

106.    Equitable tolling is recognized by courts in New York and is available to extend

the statute of limitations period for certain claims, including claims for breach of

contract.[40]Moreover, as noted by the Investors, equitable tolling has been used to toll the

limitations period for claims "where the one claiming the benefit of the statute of limitations is

the one charged in law with the duty of asserting and enforcing the claim before the statute runs."

*A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 722 F. Supp. 12, 16 (S.D.N.Y. 1989) (quoting *PET, Inc.

v. Lustig*, 77 A.D.2d 455, 457 (4th Dep't 1980)).

107.    The Debtors would, however, have several counter-arguments against application

of equitable tolling to FGIC, the Investors' and/or the FGIC Trustees' breach of contract claims

for GMACM 2005-HE1 and RFMSII 2005-HS1.  As an initial matter, the doctrine is only

---

[38] Debtors' Exhibit 21 is a true and correct copy of the RASC 2007-EMX1 Pooling and Servicing Agreement, which was maintained in and collected from the files of the Debtors.

[39] Debtors' Exhibit 28 is a true and correct copy of the RFMSII 2006-HSA1 Pooling and Servicing Agreement, which was maintained in and collected from the files of the Debtors.

[40] *See, e.g., First Am. Title Ins. Co. v. Fiserve Fulfillment Servs.* 06 Civ. 7132, 2008 U.S. Dist. LEXIS 7344, at *12 (S.D.N.Y. Jan. 25, 2008).

available in "rare and exceptional circumstances." *Moody v. Morris*, 608 F. Supp. 2d 575, 580

(S.D.N.Y. 2009) (internal citations, alterations, and quotations omitted).  The cases involving

equitable tolling often involve a defendant that controlled the person or entity capable of timely

enforcing the tolled claim.[41]  In such situations, the claim may be tolled while the defendant is

effectively the sole person or entity capable of enforcing the claim.  *See*, *e.g.*, *Croce*, 565 F.

Supp. at 892.  In the securitizations covered by the FGIC Settlement Agreement both FGIC and

the FGIC Trustees (both independently and at the request of the Investors) are empowered to

demand repurchase of loans in breach of a representation or warranty.  *See*, *e.g.* GMACM 2005-

HE1 Mortgage Loan Purchase Agreement at 20.

108.    Moreover, even assuming that the Master Servicer has an obligation to pursue a

repurchase claim against the Seller under the transaction documents, the Debtors could argue that

this obligation only arises "upon the discovery" of a "breach" that "materially and adversely

affects the interests of the Securityholders, the Enhancer or the Purchaser …."  *See id*.  Because

the Debtors have not re-underwritten the overwhelming majority of the loans in the trusts, the

Debtors have an argument that, at this time, they are under no obligation to pursue repurchase of

the vast majority of the loans.

109.    Further, the Debtors would likely argue that the Master Servicer did not, in fact,

have a legal "duty of asserting and enforcing the claim before the statute runs," *see PET, Inc.*, 77

A.D.2d at 457, but instead only had an obligation to request cure or repurchase by the Seller, *see*,

*id.*

---

[41] *See PET, Inc. v. Lustig,* 77 A.D.2d 455, 457 (4th Dep't 1980) (claims of corporation tolled against CEO and
stockholder); *A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 722 F. Supp. 12, 16 (S.D.N.Y. 1989) (claims of corporation
tolled against president and sole shareholder of corporation); *Croce v. Kurnit*, 565 F. Supp. 884, 892 (S.D.N.Y.
1982) (claims of estate tolled against counsel for the estate).

110.    I would expect, however, that FGIC, the Investors, and/or the FGIC Trustees would vigorously dispute these counter-arguments, and some—in particular, the "upon discovery" clause argument—are likely to require extensive fact discovery to resolve.

111.    In short, equitable tolling provides another avenue for an aggressive plaintiff to evade application of the statute of limitations defense.  Because no court has addressed whether a monoline or trust's claims for breaches of representations and warranties can be equitably tolled and because reasonable arguments can be advanced for and against application of the doctrine, equitable tolling injects additional uncertainty into the analysis of the potential outcome of litigation between the Debtors and FGIC, the Investors, and/or the FGIC Trustees.

### Plaintiffs' Due Diligence

112.    A common inquiry in the monoline credit enhancer litigation context, and under federal securities law in the investor litigation context, is whether the plaintiff undertook any diligence before entering the transaction.  For claims arising under the 1933 Securities Act, the relevant inquiry is whether the investor had knowledge of the risks prior to purchasing the securities.  For the monoline litigation matters, the question is whether the credit enhancer justifiably relied on the seller's assurances.

113.    Accordingly, I considered whether any similar analysis might provide a defense in the context of the kinds of claims resolved by the FGIC Settlement Agreement.  Although courts have found disputed questions of fact barred defendants' summary judgment requests in other monoline cases, the due diligence defense could prove dispositive in responding to FGIC's fraudulent inducement claims.  Nonetheless, I found only limited support for importing these concepts into the pure breach of contract analysis.  On the contrary, the bulk of the case law has supported the general rule that because a warranty "is intended precisely to relieve the promise of any duty to ascertain the fact for himself," it relieves the recipient of any obligation to

investigate further. *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.).[42]

114.    The general rule has a critical exception directly applicable here:  "where the seller has disclosed at the outset facts that would constitute a breach of warranty, that is to say, the inaccuracy of certain warranties, and the buyer closes with full knowledge and acceptance of those inaccuracies, the buyer cannot later be said to believe he was purchasing the seller's promise respecting the truth of the warranties."  *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).  In other words, if the counterparty to the contract "candidly disclosed" that the information supplied (and warranted in the contract to be accurate) was actually inaccurate, the allegedly "relying" party cannot assert a claim for breach of warranty. *Id.*[43]

115.    However, this exception has been narrowly construed.  Indeed, the court in *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB* recently rejected a diligence-based argument made by Flagstar on summary judgment, holding that *Ziff-Davis* applied and the *Galli* exception did not, because even though Assured received diligence reports identifying actual examples of problematic loans in the securitization, and had run its own loss models predicting certain losses would occur, that information did not come from the seller/issuer (*i.e.*, Flagstar). *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,* No. 11 Civ. 2375 (JSR), 2012 U.S Dist. LEXIS 138296, at *18-19 (S.D.N.Y. Sept. 25, 2012).  Thus, the court reasoned, "[i]f the buyer

---

[42] *See also CBS, Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 503-06 (1990); *MBIA Ins. Corp. v. Credit Suisse Secs. (USA) LLC*, No. 603751/2009, 2011 N.Y. Misc. LEXIS 4787, at *17 (Sup. Ct., N.Y. Cnty. Oct. 7, 2011) , *rev'd and remanded on other grounds*, 102 A.D.3d 488 (1st Dep't 2013) ("[W]here a plaintiff has gone to the trouble to insist on a written representation [or warranty] that certain facts are true, it will often be justified in accepting that representation [or warranty] rather than making its own inquiry") (citation omitted).

[43] *See also Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992) ("Where a buyer closes on a contract in the full knowledge and acceptance of facts *disclosed by the seller* which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach.  In that situation, unless the buyer expressly preserves his rights under the warranties . . . , we think the buyer has waived the breach.").

'has been informed of the falsity of the facts by some third party,' he has not waived the representations and warranties." *Id.* at *19 (quoting *Rogath v. Siebenmann,* 129 F.3d 261, 265 (2d Cir. 1997)).[44]

116.    The Debtors would argue that their own risk disclosures are so substantial, and so directly warn against reliance on the corresponding statements in the representations and warranties, that the *Galli* exception applies.  The Debtors would also argue that the diligence reports and other information provided to FGIC and the Investors trigger the *Galli* exception. However, there is no clear indication that the Debtors would be successful in making such arguments.

### **"Housing Crisis" Defense**

117.    There is ample evidence that the true cause of the losses to these trusts was the massive economic downturn beginning in late 2007 and escalating through 2008 and into 2009.

118.    As discussed above, the Debtors had developed extensive factual and expert support for this argument.

119.    However, in light of some of the court rulings discussed above with respect to materiality and causation, it is possible a court evaluating such claims against the Debtors would preclude the evidence entirely, require the Debtors to prove these facts as an affirmative defense, rather than considering them part of plaintiff's burden to address as part of the "causation" element its claims, or consider the evidence only as a "partial" cause of the loss.

---

[44] Although it was in the context of justifiable reliance for a fraudulent inducement claim, the court in *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.* similarly concluded in partially denying Countrywide's summary judgment motion that it "cannot find that MBIA's failure to perform the particular type of [individual loan] due diligence that Countrywide suggests makes MBIA's reliance unjustifiable, especially since MBIA did not have a right to access the loan files before closing." No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *15 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013). The court further noted that the type of prospectus supplement "disclaimers identified by Countrywide speak to the future performance of the loans, not the characteristics of the loans at the time the representations were made and the transaction was entered into." *Id.* at *19.

120.    Moreover, FGIC, the Investors, and/or the FGIC Trustees may attempt to argue that the housing crisis itself was propelled in part by the business practices of RMBS issuers like the Debtors.

121.    Accordingly, a key factor to be considered in weighing the potential outcome of the litigating the claims released by the FGIC Settlement Agreement is the possibility that the housing crisis defense may not be permitted or may not be entirely persuasive.

**Other Intervening Causes**

122.    The Debtors also would argue that a number of issues relating to loan attributes and/or non-underwriting events contributed to the Investors' losses.

123.    For example, a number of the trusts involve loans with underwriting characteristics that increase the risk of losses.  These risks are disclosed in the prospectuses and prospectus supplements, and likely contributed to some of the losses experienced by the trusts, reinforcing that breaches of representations and warranties were not the sole cause of losses.  For example, some trusts include loans with adjustable interest rates or "teaser" rate, such that a borrower may be able to afford an introductory or lower interest rate early in the term of the loan, but later encounters difficulty timely paying when the interest rate increases.

124.    In addition, there are a number of causes of delinquencies or defaults that cannot be effectively prevented or controlled through stringent underwriting:  borrowers may become disabled or die; they may unexpectedly lose their jobs; the property may be destroyed due to a fire or natural disaster and they may be unable to refinance or sell the home as a result.  Some amount of the losses to the trusts occurs as a result of these everyday, non-underwriting-related events.

125.    This type of "causation" evidence is likely to face similar challenges to the causation factors described above, because it relates to events occurring after the closing of the

transaction.  I considered the likelihood that these alternative causes actually impacted the trusts'

losses, as well as the possibility that a court might not permit such evidence to be introduced

(either as to causation or damages), in my analysis.

## Evidentiary Issues

126.    In reaching my conclusions, I also had to consider potential evidentiary issues

and, as a trial lawyer, make an assessment of whether and how the proof on either side of the

case would be admitted.

127.    In general, based on my evaluation of the factual record developed so far, I

believe the Debtors have very strong factual defenses and solid witnesses.  None of the over

sixty witnesses deposed in the *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No.

603552/2008 (Sup. Ct., N.Y. Cnty.) case, for example, testified to anything resembling fraud or

knowing misrepresentation in any of the Debtors' practices.  Many described good attention to

internal controls, and a meaningful effort and genuine desire to be transparent with the Investors

about the risks of the investments.

128.    However, there are some practical challenges to the presentation of evidence,

separate from the legal and factual merits discussed above.

129.    For one, there has been tremendous attrition among the Debtors' employees since

the key events occurring from 2004 through about 2008.  For example, of the seventy-six

witnesses deposed in the two MBIA cases as of the petition date, many of whom would also be

witnesses as to the FGIC Insured Trusts, 80% were former employees.  Many who were current

employees at the time of their deposition have since left the company, most recently to go to

Ocwen or Greentree as a result of the Debtors' recent asset sales.  At present, *none* of the key

RFC capital markets employees who worked on the securitizations at issue remains a current

employee of the Debtors.  Most of these former employees reside in Minnesota and

47

Pennsylvania, beyond the reach of a New York court trial subpoena.  A few reside as far away as California and Texas.  Almost none left the company with any ongoing contractual obligation to cooperate with future litigation.

130.    Moreover, most of the former employee witnesses were involuntarily terminated as part of a series of mass layoffs beginning in 2007.  Thus, many have a limited sense of loyalty to the Debtors, and while they may have been willing to appear voluntarily once for a deposition to avoid being served with a deposition subpoena, garnering their cooperation for future depositions, let alone trial testimony in another state, would undoubtedly be challenging.  Thus, presenting evidence live at trial—which, from my perspective as a trial lawyer, is almost always more meaningful than reading a dry transcript or even replaying videotaped testimony—would be a challenge.

131.    Another challenge is posed by the nature of these securitizations, each of which contains thousands of individual loans.  Indeed, over 185,000 loans are at issue in the FGIC Insured Trusts.  As noted above, it has always been the Debtors' position that a repurchase claim requires a loan-by-loan evaluation of *which* loans to repurchase.  Plaintiffs in both securitization and representation and warranty cases have argued, with some limited success to date, that a statistical sampling approach is acceptable.[45]  Regardless of whether statistical sampling can reliably be used to assess breaches and calculate damages, however, it is clear most judges would not permit the presentation of evidence on thousands of individual loans one by one.

132.    Thus, the evidentiary challenge for trial becomes *which* loans to present.  While it is my belief based on the available evidence to date that the overwhelming majority of the loans in each collateral pool did not breach any representations and warranties, it is easy for a

---

[45] *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, 2010 N.Y. Misc. LEXIS 6182, at *8-18 (Sup. Ct., N.Y. Cnty. Dec. 22, 2010) (permitting statistical sampling); *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 11 Civ. 6189 (DLC), 2012 U.S. Dist. LEXIS 173768 (S.D.N.Y. Dec. 3, 2012) (same).

plaintiff's lawyer to focus in on the relatively few loans that present egregious examples of underwriting problems—what I call the "low hanging fruit."

133.    Those examples present a risk to the Debtors that a judge or jury will form an adverse impression based on a small slice of the available evidence, placing the Debtors in the position of attempting to prove a negative.  It is often impractical and difficult to shake those kinds of initial impressions effectively.

## OUTCOMES IN OTHER MONOLINE LITIGATIONS

134.    In assessing the potential outcomes of the Debtors' prospective litigation with FGIC, and with the Investors and/or FGIC Trustees, I have found the outcomes of other monoline litigations not involving the Debtors particularly relevant.  As indicated above, the Debtors believe they have many meritorious defenses and would be prepared, if necessary, to defend these claims vigorously.  However, the only monoline case which has gone to trial resulted in a sizeable verdict for the monoline.  In addition, within the past thirteen months, monolines have obtained significant settlements from other defendants.

135.    In *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, after a twelve-day bench trial, Judge Rakoff awarded Assured Guaranty, another monoline insurer, nearly all damages it sought for breaches of representations and warranties in the underlying agreements. *See Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 11 Civ. 2375 (JSR), 2013 U.S. Dist. LEXIS 16682 (S.D.N.Y. Feb. 5, 2013).  The plaintiff met with this success even after Judge Rakoff had granted a sweeping motion to dismiss limiting the plaintiff's claims in accordance with a sole-remedy provision in the underlying contracts.  There are significant differences between the transactional documents in the *Assured* case and the Debtors' Sale Agreements, as well as differing facts between the cases that I believe provide the Debtors' stronger defenses.  I

have, however, considered that adverse outcome in coming to my opinion that there is a risk of

an unfavorable legal outcome if the claims and liabilities released by the FGIC Settlement

Agreement were litigated.

136.    Several of the monolines have also obtained significant monetary payments in

settlement of pending or unfiled litigation.  For example, *Assured Guaranty Corp. v. DB

Structured Products, Inc.*, 651824/2010 (N.Y. Sup. Ct.), in which Assured initially pled losses of

nearly $60 million in claims it had to pay to certificateholders due to Deutsche Bank's alleged

breach of representations and warranties, was reportedly settled along with other claims that

were not yet in litigation for roughly $165 million in May 2012.  Assured also recently settled its

claims against UBS in *Assured Guaranty Municipal Corp. v. UBS Real Estate Securities Inc.*,

12-cv-01579 (HB) (S.D.N.Y.), reportedly for $358 million, plus additional reimbursement under

a collateralized loss-sharing reinsurance agreement.

137.    In July 2012, shortly after Justice Bransten of the New York Supreme Court ruled

that Syncora Guaranty Inc. only had to prove that Countrywide's alleged breaches of

representations and warranties "increased the risk profile of the issued insurance policies,"[46] the

parties settled for a reported sum of $375 million.  Bank of America later publicly announced

that the settlement resolved roughly $600 million of outstanding put-back claims against

Countrywide.

138.    MBIA's case against Flagstar, *MBIA v. Flagstar ABS, LLC*, 13-cv-00262 (JSR)

(S.D.N.Y.), was reportedly settled in May 2013 for $110 million.  In that case MBIA initially

pled that it had paid more than $165 million in claims arising from Flagstar's alleged breaches of

representations and warranties.  In May 2013, MBIA also settled its case against Countrywide,

---

[46] *Syncora Guar. Inc. v Countrywide Home Loans, Inc.*, 36 Misc. 3d 328, 345 (N.Y. Sup. Ct. N.Y. Cnty. 2012).

*MBIA Ins. Corp. v. Countrywide Home Loans*, 602825/2008 (N.Y. Sup. Ct., NY. Cnty.),

reportedly for $1.6 billion in cash from Bank of America, plus other consideration.  Based on

published reports, I understand that in the latter settlement, Bank of America also released MBIA

from significant claims Bank of America affiliates had against MBIA in connection with credit

default swaps.

139.    There are important distinctions between the terms of the agreements governing

the FGIC Insured Trusts and the agreements at issue in the foregoing cases, as well as the types

of securitizations at issue in these cases and the facts and circumstances surrounding the Debtors'

securitization business.  While I believe these distinctions are generally favorable to the Debtors,

I have considered these settlements as showing that other defendants facing similar allegations

thought they were faced with a significant risk of an adverse outcome if the claims were litigated

on the merits.

## COST OF LITIGATING THE CLAIMS

140.    Finally, any trial to resolve the claims on the securitizations covered by the FGIC

Settlement Agreement, would be lengthy and expensive, involving weeks of evidence and

numerous experts on either side, including experts on the underwriting of the loans, statistical

sampling, the impact of the housing crisis, and damages, to name a few.

141.    The anticipated scope of discovery would likely involve tens of millions of pages

of documents and hundreds of days of deposition testimony from current and former employees

of the debtor entities.  My opinion is based on the Firm's work preparing to litigate with FGIC

(including the initial exchange of document requests between the parties in these bankruptcy

proceedings), my experience in litigation with MBIA on similar claims to those being asserted

by FGIC, and my knowledge regarding the extensive discovery which has occurred in other

cases involving monoline insurers.

142.    The Firm represents debtor entities RFC and GMACM in MBIA's lawsuits against each. *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No. 603552/2008 (Sup. Ct., N.Y. Cnty.) and *MBIA Insurance Corp. v. GMAC Mortgage, LLC*, No. 600837/2010 (Sup. Ct., N.Y. Cnty.)  The enormous fact discovery in MBIA's lawsuits is indicative of the potential discovery burden in litigating these claims.

143.    MBIA's case against RFC was filed in 2008, but discovery was still ongoing on the Petition Date in certain matters.  The case involves just five securitizations made up of loans issued by RFC in less than a year.  Still, RFC has produced more than a million pages of documents, over 63,000 mortgage loan files, and one terabyte of data.

144.    In addition, MBIA has taken over eighty days of depositions of current or former RFC, GMACM, or ResCap personnel.  RFC has taken fifty days of depositions of current or former MBIA personnel.  Ten expert reports have been exchanged, and rebuttal reports were anticipated.

145.    Fact discovery in MBIA's lawsuit against GMACM was also ongoing when the bankruptcy case was filed.  That case involves just three securitizations issued by GMACM. GMACM has already produced more than a million pages of documents and additional electronic records.  The court previously cited to this discovery as showing the likely burden of discovery of other cases in deciding to extend the automatic stay to stop the litigation being pursue pursued by Western & Southern.  *See* July 10, 2012 Transcript in *In re Residential Capital, LLC*, Adv. Proc. No. 12-0167 at 137 ("The debtors have provided specific samples of cases that involved a small number of securitizations, but still produced millions of pages in discovery and upwards of eighty days' worth depositions from the debtors' current and former employees.")

146.    If anything, litigating FGIC's claims would pose a greater burden than the MBIA

cases.  The FGIC Insured Trusts consist of a larger number of securitizations, and a more diverse

array of securitization and loan types than the MBIA cases involved.  Prior to the entry into the

FGIC Settlement Agreement, the Debtors and FGIC had exchanged initial document requests in

these bankruptcy proceedings.  FGIC served the Debtors with no less than **117 document**

**requests**, including a request for all loan files in connection with the twenty (20) FGIC Insured

Trusts at issue in the prepetition litigation and six (6) additional FGIC Insured Trusts.  The

Debtors and FGIC had multiple meet and confers regarding the Debtors' document requests to

FGIC and the Debtors had provided FGIC an initial set of document search terms and custodians

for FGIC to use in searching its materials.  While FGIC had not yet provided the Debtors with

search terms or custodians, the Debtors had started to analyze the likely custodians for FGIC's

discovery requests, and preliminarily identified over sixty potential custodians among the parties.

147.    Additional complications would be posed in comparison to the MBIA litigation

because of the fact that the Investors and the FGIC Trustees also have claims against the Debtors

based on FGIC's failure to make payments since November 2009 on its policies, which could

impose additional demands on the Debtors.  It is quite possible if no settlement is reached with

FGIC that the FGIC Trustees and/or the Investors would serve their own unique document

requests on the Debtors.  Deposition discovery would also likely be more involved, with more

parties actively participating.

148.    As shown in the chart below, considering only the twenty FGIC Insured Trusts at

issue in the prepetition litigation rather than all of the forty-seven FGIC Insured Trusts covered

by the FGIC Settlement Agreement, FGIC's claims involve more securitizations, more loans,

more shelves, a greater timeframe and a far wider variety of mortgage products than were

involved in the MBIA cases

|  | FGIC Cases Filed Prepetition | Combined MBIA Cases |
|---|---|---|
| **No. of Securitizations** | 20 Securitizations | 8 Securitizations |
| **No. of Loans at Closing[47]** | >185,000 Loans | 120,476 Loans |
| **No. of Product Shelves** | 4 Product Shelves (GMACM, RASC, RAMP, and RFMSII) | 2 Product Shelves (GMACM and RFMSII) |
| **Approximate Time Periods For Offerings** | RFC :        1.5 years (9/23/05 – 3/30/07) GMACM:  2 years, 3 months (3/29/05 – 6/28/07) | RFC:        10 months (7/28/06 – 5/30/07) GMACM:  2 years, 5 months (10/28/04 – 3/29/07) |
| **Loan Types** | • Adjustable rate home equity revolving credit line loans (HELOCs) and closed-end home equity loans (CESs)  • Fixed-rate and adjustable-rate first lien and junior lien mortgage loans  • Loans acquired through AlterNet and Negotiated Conduit Asset programs  • Fixed-rate second loans acquired through the 125% home equity loan program | • Fixed and adjustable rate home equity revolving credit line loans (HELOCs) and closed-end home equity loans (CESs) |

Given the over one hundred document requests already served by FGIC and the larger number of

securitizations, mortgage loans and mortgage products involved, discovery regarding the FGIC

Insured Trusts would likely be even more complicated than discovery in the two MBIA cases.

Many of the relevant document custodians and witnesses for litigating the issues covered by the

FGIC Settlement Agreement were not involved in the MBIA cases.  Some of the relevant

---

[47] Certain of the GMACM sponsored securitizations insured by FGIC and MBIA permitted additional loans to be added to a securitization post-closing.  As a result, the number of loans that were part of the securitizations at any point would be greater than the number of loans included at closing.

custodians have never had their emails restored as part of any prior litigation involving the

Debtors.  Restoring documents from backup tapes for these custodians would be a time-

consuming and expensive process.  In addition, producing the loan files for this large number of

securitizations would be time-consuming and expensive, particularly given the complications

posed by the sale of the Debtors' servicing platform.

## EFFECT OF BANKRUPTCY ON LITIGATION COSTS

149.    At my deposition, I was asked if I had prepared a budget regarding the likely

amounts to be expended in litigating the claims of FGIC and the FGIC Trustees.  I have not tried

to ascribe a number to the fees that would be expended in litigating these claims because of the

fact that it is very difficult to accurately forecast these costs given the complicated legal and

factual issues involved and the unpredictability of the discovery process.  However, based on

both my experience in the prepetition litigation with MBIA described above and my experience

with discovery in these bankruptcy cases in my firm's role as special discovery counsel, the fees

are likely to be enormous.

150.    Aside from the complications created by the complex legal and factual issues

described above, it is also difficult to precisely forecast the costs of such litigation because one

of the more significant drivers of the costs would be how many loan files are produced and how

many loan files are reunderwritten by the parties' experts.  FGIC's initial document requests to

the Debtors included a request for all of the relevant loan files —over 185,000 loans.  Complying

with this request would be very expensive; even at a ballpark estimate of $35 per loan file (which

the Debtors have previously used as an average per-file cost) that would be approximately $6.5

million.  Reunderwriting of loan files is also a very expensive exercise.  How many loans the

Debtors would need to reunderwrite would be driven in part by how many loans FGIC decided to

reunderwrite.  Based on the record in other monoline cases, FGIC's experts would likely submit reports analyzing breaches on thousands of individual loans, which the Debtors would need to rebut on an individual basis.

151.    Even the limited file review that was conducted in connection with the prior Rule 9019 RMBS settlement motion with certain institutional investors led to a file review that lasted several months and cost the Debtors millions of dollars.  A file review and associated expert reports of the scope that would likely be required to litigate FGIC's claims would be substantially more expensive.

152.    These expenses do not even include the costs associated with collecting, reviewing for privilege and producing email and other relevant documents, which the Court is well aware can be extremely costly.  *See* July 10, 2012 Hearing Transcript at 136-38, *In re Residential Capital, LLC v. Allstate Insurance Co*, Adv. Proc. 12-01671-mg (Bankr. S.D.N.Y.).  Such discovery could resemble, or even exceed in scope, the expensive discovery conducted in connection with the Examiner's investigation.  That discovery required many months to complete and cost the Debtors' estates many millions of dollars.

153.    An additional factor which complicates the forecasting of litigation expenses is the fact that the Debtors are also faced with the claims of the FGIC Trustees.  This poses a significant complication for the litigation and it is impossible to accurately assess the impact of that on the Debtors' litigation costs based on the available information.  What I can say with certainty is that the participation of another set of claimants is extremely unlikely to *reduce* the litigation expense to the Debtors; on the contrary it will almost certainly increase them.[48]

---

[48] As an added potential expense, both FGIC and FGIC Trustees are likely to cite to contractual provisions supporting their claim that the Debtors must reimburse their fees and expenses in enforcing their contractual rights, meaning the estate may also face claims for the other parties' litigation expenses.

154.    In my deposition, counsel to the Ad Hoc Group asked whether claims estimation under section 502(c) of the Bankruptcy Code could reduce the litigation costs.  Section 502(c) gives a bankruptcy court discretion as to when and how to estimate claims.  *See In re Chemtura Corp.,* 448 B.R. 635, 649 (Bankr. S.D.N.Y. 2011).  In estimating claims, courts in the Southern District of New York have chosen to "estimate the expected value of a claim based on the probability of the success of various potential outcomes if decided on the merits."  *Id.* at 650. Thus, while estimation might streamline somewhat the ultimate hearing and briefing on the claims of FGIC and the FGIC Trustees, getting to that point would still require extensive and expensive fact and expert discovery.

## CONCLUSION

155.    Based on all of the factors described above, as well as my general professional experience, my experience working with the Debtors as my clients, and my experience defending representation and warranty and other RMBS lawsuits, I conclude that settlement of the claims and liabilities released by the FGIC Settlement Agreement would remove a significant risk of an unfavorable legal outcome and the necessity of incurring the significant expense of litigating these claims to final resolution.


I declare under penalty of perjury that the foregoing is true and correct.

Executed the 31st day of July, 2013, at St. Louis, Missouri.


_____/s/ Jeffrey A. Lipps_____
Jeffrey A. Lipps

57