UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| Residential Capital, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

### DECLARATION OF CHARLES R. GOLDSTEIN IN SUPPORT OF OBJECTION OF MONARCH ALTERNATIVE CAPITAL LP, STONEHILL CAPITAL MANAGEMENT LLC, BAYVIEW FUND MANAGEMENT LLC, CQS ABS MASTER FUND LIMITED AND CQS ABS ALPHA MASTER FUND LIMITED TO DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS

I, Charles R. Goldstein, declare as follows:

1. I am a managing director of Protiviti Inc. ("Protiviti"), a professional services firm engaged in the business of providing financial advisory and professional consulting services.

2. I respectfully submit this Declaration in support of the Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited (the "Investors") to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company ("FGIC"), the FGIC Trustees and Certain Institutional Investors, dated July 29, 2013.

3. On July 19, 2013, I submitted the expert report of Charles R. Goldstein (the "Goldstein Report") in this proceeding. I have attached the Goldstein Report as Exhibit A.

4. This declaration includes terms defined in the Goldstein Report, the expert report dated July 19, 2013 prepared by Allen M. Pfeiffer ("Mr. Pfeiffer") on behalf of the Trustees (the "Pfeiffer Report"), and the expert report dated July 19, 2013 prepared by S. P. Kothari ("Dr. Kothari") on behalf of the Trustees (the "Kothari Report").

5. After submitting the Goldstein Report, I received numerous additional documents including the Pfeiffer and Kothari Reports, the deposition transcripts of Dr. Kothari, Mr. Pfeiffer, Mr. Gibson, Mr. D'Vari, and Mr. Lipps, among others, and certain spreadsheets supporting the D&P Report that were not produced prior to the submission of the Goldstein Report. My analysis and understanding of these documents further enhances my opinions stated in the Goldstein Report.

I.    **Summary of Opinions**

6.   Based on the information provided, and in light of, among other things, the size of the initial CPP and subsequent payments, as well as the substantial contingent recoveries that are expected to be available to FGIC that were not included in FGIC's recovery analysis as value available to policyholders, it is my opinion that the FGIC Settlement is not in the best interests of the FGIC-ResCap Policyholders from an economic perspective compared to the recoveries potentially available under the Rehabilitation Plan.

7.   It is my opinion that no third-party would be able to reasonably rely upon the D&P Report to develop a well-founded conclusion regarding the best interests of the FGIC-ResCap Policyholders in comparing the FGIC Settlement to the Rehabilitation Plan without being privy to substantially more complete and clearly sourced financial information. Based on the limited information provided in the D&P Report, it is my opinion that the calculation reflected in that report regarding the FGIC-ResCap Claims Recovery, pursuant to the terms of the Rehabilitation Plan, is structured inadequately, excludes necessary disclosures, and fails to consider the potential upside that is available to the FGIC-ResCap Policyholders in the Rehabilitation Plan.

8.   After analyzing the additional documents provided to me, I confirmed my opinion that the FGIC Settlement is not in the best interests of the FGIC-ResCap Policyholders from an economic perspective. The minimum cash commutation payment should be $405 million, not considering various litigation recoveries and upside performance potential. See chart following paragraph 11.

9.   ███████████████████████████████████████████████████████████

10.  In the Goldstein Report, I provided an illustrative example of how potential litigation recoveries would impact the payout to FGIC-ResCap Policyholders under the terms of the Rehabilitation Plan.    Pursuant to the statutory accounting principles and the information that was made available to me, I assumed the gross projected recoveries included in FGIC's loss reserves as of March 31, 2013 included potential recoveries from loss mitigation activities, including litigation. Although I have not received confirmation that my assumptions were in fact incorrect, for the purpose of this declaration, I now only incorporate the potential proceeds from litigation relating to the FGIC Settlement.

11.  In addition, absent the commutation, FGIC-ResCap Policyholders are entitled to receive proceeds from contingent assets such as litigation recoveries. Pursuant to the terms of the FGIC Settlement, FGIC's litigation claims against the ResCap Debtors' are resolved for an allowed claim which is expected to yield a recovery of $206.5 million for FGIC. Based on the D&P ████████████████████████████████████████    Therefore, in order to calculate the portion of the FGIC Settlement proceeds that would be distributed to FGIC-ResCap Policyholders, ██████████████████████████████████████

---

[1] D&P Report, page 8.



II.

i.


ii.

a)  Both of these scenarios are lower than FGIC's projected claim amounts of $1.3 billion.[3]  The FGIC scenario was presented as a base case scenario, and I would have expected the range of potential outcomes prepared by Mr. Pfeiffer to include a range of potential claims that was both higher and lower than the base case prepared by FGIC.  By D&P preparing a

b)  The D&P Report does not accurately portray the potential recovery percentages under the FGIC Settlement or the various scenarios created by D&P.

present value the future claims.  However, according to the Statement of Statutory Accounting Principles Number 60, "A loss reserve deduction, for the time value of money, shall be computed using a discount rate.  The discount rate is the average rate of return on the assets of the insurer on the date of the computation of the reserve."  Furthermore, pursuant to Note 25 of the FGIC Quarterly Statements, FGIC loss reserves were discounted at 2.78% as of March 31, 2013.

---

[2] D&P Report, page 3.
[3] *Id.* Page 5.



To my knowledge, this information was not presented to the Trustees. In my view, the Trustees should have been made aware of this information before reaching their conclusion to accept the FGIC Settlement.

iii.  Given that testimony, it is my opinion that the D&P Report to the Trustees was misleading:

a) In the deposition of Ms. Scott on behalf of U.S. Bank, she was asked why the FGIC Settlement is in the best interest of the Trustees, the trusts and the FGIC-ResCap Policyholders. Her response was as follows: "When we saw [the settlement] proposal, we engaged Duff to do the analysis, do a comparison of this proposed settlement versus what was being offered in the rehabilitation plan. Duff, you know, provided insight. They provided feedback that the lump sum payment was within a range of reasonableness."[5]

b) In the deposition of Ms. Sohlberg on behalf of Wells Fargo, she states the following: "Our financial expert analyzed and compared the two and concluded that the lump-sum payment was in the best interests of the holders."[6]

c) Lastly, in the deposition of Mr. Major on behalf of Bank of New York

---

[4] Deposition of Allen M. Pfeiffer dated July 24, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, pages 10.

[5] Deposition of Mamta Scott dated July 18, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, pages 38 and 39.

[6] Deposition of Mary Sohlberg dated July 16, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, page 56.

Mellon, he agrees "that the settlement agreement and the transactions contemplated thereby, including the releases therein, are in the best interests of the investors in each trust" based on "the recommendation of our financial advisors", later identified as Duff and Phelps.[7] He further states that the recommendation was provided "orally on May 13 and the written report delivered that they provided…on May 15, 2013."[8]

iv.  Not only did the Trustees rely on D&P as financial experts, they also relied on the methods used in D&P's May 15, 2013 report, including, specifically, the creation of a



a)  In the deposition of Ms. Solhberg, she was asked if Wells Fargo had a view

b)  In the deposition of Ms. Scott, she was asked if she would expect that, along with the status quo scenario and the stress scenario in the D&P



c)  According to Mr. Major's deposition, D&P "opined that the consideration

13.  Mr. Pfeiffer did not conduct sufficient due diligence on the Cash Commutation Payment based on the following points:

[7] Deposition of Robert Major dated July 17, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, pages 14 and 15.
[8] *Id.* Page 18.
[9] Deposition of Mary Sohlberg dated July 16, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, page 143.
[10] *Id.* Page 128.
[11] *Id.* Page 140.
[12] Deposition of Mamta Scott dated July 18, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, page 68.
[13] Deposition of Robert Major dated July 17, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, page 21.

i.   As I mention in the Goldstein Report, the FGIC Settlement Proposal section of the



ii.   Pursuant to the Pfeiffer Report, Mr. Pfeiffer's assignment was to "assess the



deposition testimony, it appears that Mr. Pfeiffer's understanding of the assignment varied from the Trustee's view of his role. In Ms. Sohlberg's deposition, she states

iii.  In order to assess the reasonableness of the FGIC Settlement, it is first important to understand the calculation of the Cash Commutation Payment, as this can uncover issues related to the underlying rationale and fairness of the settlement proposal. Furthermore, it is necessary to understand the calculation to determine if the FGIC Settlement is in the best interest of the FGIC-ResCap Policyholders.

iv.  It is my opinion that D&P did not confirm the key assumptions and components of the Cash Commutation Payment and therefore, the D&P Report cannot be relied upon to determine the best interests of the FGIC-ResCap Policyholders. My opinion is based on the following:

a) **Unsupported Discount Rate** – Mr. Pfeiffer states in the Pfeiffer Report that he reviewed FGIC's explanation of the Cash Commutation Payment calculation and understands that it is based on the base case scenario in the Updated Run-Off Projections and incorporates an overall estimated recovery of 28.5%, "which reflects the time-affected recovery percentage based on the midpoint discount rate of 15 percent."[17] Mr. Pfeiffer does not provide adequate support to suggest that he tried to analyze or validate the discount rate used by FGIC. Furthermore, Mr. Pfeiffer did not adjust his analysis to reflect the change in present value due to the initial CPP date moving from December 31, 2012 to December 31, 2013.

b)

---

[14] Pfeiffer Report, page 6.
[15] Such lump sum is defined in the Goldstein Report and referred to in this report as the Cash Commutation Payment.
[16] *Id.*
[17] Pfeiffer Report, page 15.

7



c) **Exclusion of Contingent Assets** – As previously explained in the Goldstein Report, the Cash Commutation Payment is derived from, among other things, the present value of the base case payout calculated in the Updated Run-Off Projections. The base case payout percentage assumptions contain several conservative components and do not include potential recoveries from pending litigation. Throughout my career, I have served as the fiduciary in countless Chapter 7 and 11 bankruptcy cases. In my capacity as trustee, and in collaboration with my legal representatives, I have performed risk assessments for pending and potential litigation in order to maximize the value of an estate. In my opinion, an appropriate litigation risk assessment should include the following components:

- the current procedural status of a case; including, anticipated motions and discovery, and the existence or absence of settlement discussions; ⊙
- strengths and weaknesses of the factual and legal positions;

---

[18] *Id.* Page 16.
[19] Deposition of Mary Sohlberg dated July 16, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, page 136.

- the outcome or status of similar proceedings and supporting case law;
- developments in the law; and
- the anticipated legal budget.

An assessment of the possible outcomes, including percentage estimates and probabilities, serves as the basis for whether to file suit as well as settlement negotiations. Companies should assess the risk and potential outcomes of litigation prior to filing. Furthermore, attorneys are required to look into the merit of a claim and they continuously assess the advantages, risks, and potential outcomes throughout the course of a case. FGIC is represented in pending litigation matters by experienced and competent counsel.

It is confusing to me as to why no effort was made to fully disclose the existence and details of the litigation matters, or to determine a potential range of outcomes for pending litigation recoveries. For example, in the Pfeiffer Report, Mr. Pfeiffer states that he did not include estimates of recoveries from pending litigation because he "has no knowledge or reliable data available to estimate potential recoveries from RMBS litigation" and "any such estimation would be speculative."[20] I do not understand Mr. Pfeiffer's reasoning behind this statement as the purpose of the D&P Report and the Pfeiffer Report is to assess the proposed $206.5 million recovery from FGIC-ResCap RMBS litigation. In fact, the FGIC Settlement provides a very unbiased and reliable source for an estimate of potential recoveries relating to the FGIC-ResCap RMBS litigation. The $206.5 million FGIC Settlement recovery would increase the total cash payments to FGIC policyholders under the terms of the Rehabilitation Plan and thus result in a higher base case payout and Cash Commutation Payment. It was the duty of D&P, at a minimum, to present these potential future assets to the Trustees in order to decide what was in the best interest of the FGIC-ResCap Policyholders, even if they would choose not to attempt to quantify them.

   v.    In my view the financial advisor should have created negotiating points to arm their client with accretive items that would potentially increase a settlement amount through negotiation.

14. D&P does not opine whether the FGIC Settlement is in the best interest of the FGIC-ResCap Policyholders:

   i.    ████████████████████████████████████████████████████████████

   reports serve as an assessment of the reasonableness of the FGIC Settlement in lieu

---

[20] Pfeiffer Report, page 25.

of payments that the FGIC-ResCap Policyholders may receive under the Rehabilitation Plan. It is my opinion that the comparison of a scenario that incorporates assumptions the have the effect of creating the lowest possible range of reasonableness that would incorporate the Cash Commutation Payment is not adequate to support the acceptance of the FGIC Settlement.

ii. Mr. Pfeiffer references the Memorandum of Law in Support of Approval of Plan of Rehabilitation for FGIC in the Pfeiffer Report, specifically citing that "the stated goal of the Rehabilitation Plan is to treat FGIC's Policyholders in a fair and equitable manner in order to remove the causes and conditions that made the Rehabilitation Proceeding necessary."[21] Mr. Pfeiffer does not conclude that the FGIC Settlement will provide equal or greater financial benefits to the FGIC-ResCap Policyholders when compared to the Rehabilitation Plan.

iii. Mr. Pfeiffer states in his report that he prepared scenario analyses by utilizing roll rate matrices and adjusting the inputs to prepare a high collateral loss scenario and a low collateral loss scenario.[22]



iv. It is my experience, both as the creator and recipient of materials discussing settlement offers, that it is most effective to consider clear, unambiguous presentations of key decision parameters. This was not the case in regards to the



15. The Cash Commutation Payment was not properly analyzed by for the following reasons:

i.

---

[21] *Id.* Page 10.
[22] *Id.* Page 18.
[23] Deposition of S.P. Kothari, Ph.D., dated July 26, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, page 122.
[24] *Id.*

10

ii.    The Rehabilitation Plan sets forth restructured policy terms, which include a provision requiring a policy payee to continue to make premium payments for amounts due before or after June 29, 2012, the date of the Order of Rehabilitation.[25] However, section 4.9(b) of the Rehabilitation Plan allows FGIC policy payees, including trustees, to exercise any setoff rights against a payment obligation relating to such policy, including premiums, fees, or other charges. Section 4.9(b) further provides that setoff may only be exercised against a payment related to such policy then payable by a payee of a FGIC policy. Therefore, the $18.3 million in premium payments could potentially be set off by the trusts against the deficiency related to $1.2 billion in policy claims.

iii.    Mr. Pfeiffer argues that the Cash Commutation Payment has a value of $271.6 million because of the waived policy premiums.[26] However, by reducing the $271.6 million by $18.3 million they removed the benefit of not paying the premiums, which may not have to be paid under the terms of the Rehabilitation Plan.

16.    ██████████████████████████████████████████ insufficient and inadequate for the following reasons:

i.



ii.

iii.

---

[25] Rehabilitation Plan, Restructured Policy Terms, Section 1.4(a).
[26] Pfeiffer Report, page 25.

11

iv.



v.

17. Based on the points noted above, it is my opinion that the Trustees had insufficient and inadequate information to make a decision to accept the FGIC Settlement.

## III.    Assessment of the Kothari Report

18. The Kothari report was inaccurate and misleading based on the following points:

i.    Dr. Kothari's assessment of the discount rate used in the D&P Report was incomplete, cursory, and conflicting with his previous statements. Dr. Kothari stated in his deposition that he looked at one page of the Ibbotson Cost of Capital 2013 Yearbook as a basis for his conclusion that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ However, Ibbotson states, "On an individual company basis, the models utilized in this book may provide information that is inaccurate or misleading."[29]  In addition, Ibbotson's data does not include, in its calculation of the weighted average cost of capital ("WACC"), companies that are in rehabilitation or

---

[27] *Id.* Page 7.
[28] Deposition of S.P. Kothari, Ph.D., dated July 26, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, page 28.
[29] Ibbotson Cost of Capital 2013 Yearbook. Page 5.

liquidating. Ibbotson pre-screens the companies included in its data and specifically states:

> Companies that do not have sales for the most recent year or a market value for the most recent month are excluded, because a lack of these numbers indicates that the company is either not continuing as a [going] concern, or that a financial restructuring may be underway. The financial performance of such a company would probably not be indicative of the financial performance of other companies in the industry.[30]

For the reasons above, I disagree with Dr. Kothari's reliance on Ibbotson to determine ███████████████████████ However, even if I were to rely on Ibbotson to determine a discount rate, I disagree with Dr. Kothari's application of the Ibbotson data. Ibbotson provides five approaches to determine the WACC, which include the capital asset pricing model ("CAPM"), CAPM plus size premium, 3-factor Fama-French, 1-stage discounted cash flow, and 3-stage discounted cash flow. Dr. Kothari utilized all five approaches to prepare a range of discount rates of 9.19% to 18.77%. The 3-factor Fama-French model provides a WACC of 18.77% and the next highest method is the 1-stage discounted cash flow model with a WACC of 13.51%. The 3-factor Fama-French model is clearly an outlier. In addition, Dr. Kothari studied the accuracy of the Fama-French model and concluded that the model was unreliable.[31] Specifically, as stated in the Ibbotson SBBI 2013 Valuation Yearbook, the academic study conducted by Kothari, Shanken, and Sloan "seemed to contradict the findings of Fama and French. Kothari, Shanken, and Sloan concluded…that returns do reflect significant compensation for beta risk, both statistically and economically, when beta is measured on an annual basis."[32]

ii.  Dr. Kothari's opinion regarding Mr. Pfeiffer's range was unsupported as he did not know the range of reasonableness. Dr. Kothari only had knowledge of one component of the range due to the fact that the remainder of Mr. Pfeiffer's range was not quantified and therefore not included in the Kothari Report. Mr. Pfeiffer stated in his deposition:



However, Dr. Kothari stated in his deposition testimony that the range of reasonableness is ██████████████████████

---

[30] *Id.* Page 7.
[31] Another Look at the Cross-Section of Expected Stock Returns. S.P. Kothari, Jay Shanken, and Richard G. Sloan.
[32] Ibbotson SBBI 2013 Valuation Yearbook, pg. 109, Chapter 8 Fama-French Three-Factor Model.
[33] Deposition of Allen M. Pfeiffer dated July 24, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, pages 179 and 180.

iii.  Dr. Kothari's opinion that D&P's Report was reasonable is not supported as he did not independently verify the major components of D&P's calculations or their methodology. Specifically, he did not review work papers, obtain an understanding of the assumptions used in the analysis, or independently verify the source documents included in D&P's calculations. In Dr. Kothari's deposition, he stated that he does not know the specific assumptions that D&P used in generating its analysis.[35]

iv.  Dr. Kothari's opinion that it was reasonable for D&P not to include potential recoveries associated with pending litigation in its model is flawed. Dr. Kothari states that the recoveries from pending litigation would be offset by losses from pending litigation where FGIC is a defendant. However, except for potential recoveries related solely to policy claims under the Rehabilitation Plan, the plaintiff in any ongoing litigation where FGIC is the defendant would gain an unsecured non-policy claim under the Rehabilitation Plan that is junior to the FGIC policyholders; that is: they would not be paid any amount on those claims until all FGIC policyholders are paid in full.

19. Based on the points noted above, it is my opinion that Dr. Kothari does not sufficiently or adequately support the D&P Report and does not provide any support to the Trustees in their decision regarding the FGIC Settlement.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 31, 2013

_____

**Charles R. Goldstein**

---

[34] Deposition of S.P. Kothari, Ph.D., dated July 26, 2013, In re: Residential Capital, LLC, Case No. 12-12020 in the United States Bankruptcy Court in the Southern District of New York, page 119.

[35] *Id.* Page 116.

14

# **<u>EXHIBIT A</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: | Case No. 12-12020 (MG) |
| Residential Capital, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

# EXPERT WITNESS REPORT OF
# CHARLES R. GOLDSTEIN

## PURSUANT TO RULE 26(a)(2) OF THE
## FEDERAL RULES OF CIVIL PROCEDURE

## Table of Contents

I.    Assignment ................................................................................................................. 3

II.   Qualifications .............................................................................................................. 3

III.  Opinions ..................................................................................................................... 4

IV.   Key Points Supporting My Opinions ......................................................................... 4

        Cash Commutation Paid by FGIC ............................................................................. 5

        Comparative Analysis of the Rehabilitation Plan and the FGIC Settlement ............... 8

        ███████████████████ .................................................................... 10

V.    Data & Other Information Considered in Forming Opinions Expressed Herein ................ 13

VI.   Exhibits & Possible Revisions or Supplements to Report ................................................ 13

## EXHIBITS

**EXHIBIT A:**    Curriculum Vitae of Charles R. Goldstein

**EXHIBIT B:**    Documents Relied Upon

2

## I.    Assignment

1. I was retained by Willkie Farr & Gallagher LLP ("Counsel") to provide an independent assessment of whether the FGIC Settlement was in the best interest of those who hold investments in certain ResCap Debtors' trusts (the "FGIC-ResCap Policyholders") from an economic perspective. In addition, I was also asked to assess and evaluate the opinion provided by Duff & Phelps Securities, LLC ("D&P") contained within the FGIC Commutation Proposal Discussion Materials dated May 15, 2013 (the "D&P Report"). ███████████████████
████████████    █████████    ███████████████████
████████████████████████████▲

2. I understand the Trustees relied upon D&P as the sole financial advisor to the Trustees when determining whether to accept or to reject the FGIC Settlement. To my knowledge, the D&P Report was the only financial analysis provided to the Trustees that compared the payment and recovery estimates under the proposed FGIC Settlement with those under the Rehabilitation Plan.

3. A list of information, sources, and documents I considered in formulating my opinion is furnished in Exhibit B of this report ("Report"). Additionally, I have relied upon general consulting standards and principles, and my professional training and work experience to support my conclusions.   These professional standards include Rule 102 Integrity and Objectivity and Rule 201 General Standards promulgated by the American Institute of Certified Public Accountants ("AICPA"), a professional trade organization responsible for establishing quality assurance standards for Certified Public Accountants and professionals involved in the audit, tax, and valuation consulting professions.

## II.   Qualifications

4. I am a Managing Director and lead the Restructuring & Litigation Services practice area of Protiviti Inc. ("Protiviti"), a global consulting and internal audit firm with approximately 70 offices in 20 countries and which employs approximately 2,500 consultants. I have a Bachelor of Arts in Economics, a Masters of Business Administration and Juris Doctorate from University of Maryland.   I am a Certified Public Accountant, a Certified Insolvency and Restructuring Advisor, Certified in Financial Forensics, a member of the American Bankruptcy Institute, a

---

[1] The proposed settlement agreement entered into among Residential Capital, LLC and its fifty direct or indirect subsidiaries listed on Exhibit A to the Settlement Agreement (collectively, the "ResCap Debtors"), Financial Guaranty Insurance Company ("FGIC"), the Trustees of the ResCap Trusts including The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association and Wells Fargo, Bank, N.A., each solely in their respective capacities as trustees, indenture trustees or separate trustees (the "Trustees") and a group of investors that hold securities issued by the ResCap Trusts (collectively, the "Settling Parties"), dated as of May 23, 2013 (the "FGIC Settlement").
[2] The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company (the "Rehabilitation Plan"). April 12, 2013.

member of the American Institute of Certified Public Accountants, and a member of the Association of Insolvency & Restructuring Advisors.

5. During my career, I have performed financial and accounting analyses and testified as an expert in a broad range of litigation matters involving forensic accounting, fraud, fraudulent conveyances, business valuation, breach of contract, lost profits, damages, intellectual property valuation, and bankruptcy. I have provided consulting services for companies and their counsel in a variety of industries including, but not limited to, insurance, financial institutions and funds, energy, healthcare, manufacturing, real estate, retail, technology and telecommunication. I have also served in several fiduciary roles including Chief Restructuring Officer, Chief Financial Officer, and Trustee to troubled companies or debtor organizations.

6. I have attached as <u>Exhibit A</u> my current curriculum vitae providing a more detailed description of my experience and qualifications and a listing of my more recent trial and deposition testimony experience.

7. Under my direction, I received assistance from the professional staff at Protiviti. My firm is compensated for my time at an hourly rate of $650 per hour. Our staff charges between $170 and $650 per hour depending on their level within the firm. Our fees are not contingent on the outcome of this case or any other litigation matter.

## III.  Opinions

8. Based on the information provided and in light of, among other things, the size of the initial CPP payment and the substantial contingent recoveries that are expected to be available to FGIC that were not included in FGIC's recovery analysis as value available to policyholders, the FGIC Settlement is not in the best interests of the FGIC-ResCap Policyholders from an economic perspective compared to the recoveries potentially available under the FGIC Rehabilitation Plan. See paragraphs 29 to 31 for a discussion of this calculation.

9. It is my opinion that no third-party would be able to reasonably rely upon the D&P Report to develop a well-founded conclusion regarding the best interests of the FGIC-ResCap Policyholders in comparing the FGIC Settlement to the Rehabilitation Plan without being privy to substantially more complete and clearly sourced financial information. ██████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

## IV.  Key Points Supporting My Opinions

10. On May 15, 2013 D&P issued the D&P Report evaluating the proposed FGIC Settlement. As referenced above I understand that the Trustees relied upon D&P as the sole financial advisor to the Trustees when determining whether to accept or to reject the FGIC Settlement.

4

11. In my analysis of the D&P Report, I identified inconsistencies, omissions, and the absence of relevant information that is necessary to validate, recompute, and assess the conclusions derived by D&P. ███████████████████████████████████████████████
████████████████████████████

12. ███████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████        ██████ pending litigation matters involve minimal downside, consisting solely of professional fees and a potentially significant upside benefit. The FGIC's own regulatory filings have projected the upside at more than $1 billion in gross recoveries for various loss mitigation activities, such as the pursuit of litigation claims[3].

13. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████ The FGIC Settlement provides an up-front payment of $253.3 million and the Rehabilitation Plan provides an up-front payment of between $150 million and $163 million. The primary differentiating factor between the two options is the FGIC Settlement provides a greater incremental upfront payout of between $90.3 and $103.3 and the Rehabilitation Plan provides the future cash flows in outlying periods (with greater than 70% of claims expected to arise in the first five years)

14. ████████████████████████████████████████████████████
██████████

15. ████████████████████████████████████████████████████ market conditions such as residential home prices, unemployment rates, and residential mortgage default rates have improved indicating that the Rehabilitation Plan projections may have been more conservative than is acknowledged in the materials, provided by FGIC.

Cash Commutation Paid by FGIC

16. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████

17. ████████████████████████████████████████████████████
██████████████

---

[3] See Quarterly Statement of the Financial Guaranty Insurance Company as of March 31, 2013, p. 6.16.



18.

i.    A discount rate, used for valuation purposes, is typically comprised of several components that are added together to determine an appropriate discount rate. The purpose of a discount rate is to reduce the value of projected cash flows to account for risk and uncertainty within the financial projections and can have a significant impact on the overall outcome of the calculation.

ii.



█████It is my opinion that no third-party would be able to reasonably rely upon the D&P Report to develop a well-founded conclusion relating to the best interests of the FGIC-ResCap Policyholders without being privy to additional information.

21. ██████████████████████████████████████████████████████████████

██████████████████████████████ The impact on the net present value of the cash flow stream could vary significantly based on the results of the discount rate ████████████

██████████████

22. ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████ The Miller Affidavit referenced multiple ranges of discount rates in their report from 3.5% to 20% and the only conclusion with regards to proper discount rates that should be utilized within the discounted cash flow calculation is "I believe that applying a discount rate of 3.6% or less would not be appropriate for the claims payment to FGIC policyholders".[4] ████████████████████████████████████████████

████████████████████████████ At no point does the Miller Affidavit draw any conclusions as to the appropriate discount rate to present value the recoveries under the Rehabilitation Plan. As discussed earlier, a discount rate is typically comprised of several incremental components added together to build up to a final discount rate, ████████████

████████████████████████████

23. ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████

## Comparative Analysis of the Rehabilitation Plan and the FGIC Settlement

24. I prepared the following comparative analysis that quantifies the impact of utilizing the notional claims in the FGIC-ResCap Claims Recovery and the base scenario payout percentage contemplated in the Rehabilitation Plan to determine if there is a discernible relationship between the findings contained in the D&P Report and the treatment of FGIC-ResCap Policyholders in the Rehabilitation Plan.

25. For comparative purposes only, I assumed the analyses prepared by D&P and Lazard in support of the FGIC Settlement and Rehabilitation Plan are accurate and correct and are appropriately relied upon in all material respects. As previously explained, I was not provided the information and support necessary to independently verify the analyses or their underlying assumptions.

---

[4] Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation. Page 11.

8



26.

█████████████████████

27. The Cash Commutation Payment is structured as a one-time payment to be distributed to FGIC-ResCap Policyholders no later than three (3) business days after the effective date of the FGIC Settlement. As a result, FGIC-ResCap Policyholders will no longer be able to receive the potential upside benefits associated with the long-term payout structure of the Rehabilitation Plan. It is my understanding that FGIC may receive significant reimbursements from projected cash flows from the mortgage loans underlying the securities on which it has paid. ████████

████████████████████████████████████████████████████

██████████████████████████████

28. The FGIC Settlement excludes contingent assets such as potential recoveries from pending litigation that relate to allegations of fraud and other causes of action in connection with RMBS transactions and the anticipated recovery in the ResCap Debtors' bankruptcy cases. Some of these contingent assets include:

    i.    On December 11, 2009 FGIC filed a complaint against Countrywide Home Loans, and amended the complaint on April 30, 2010, alleging that Countrywide "made material misstatements and omitted to disclose material facts known to them (but unknown to FGIC), concerning [various] securitizations" inducing FGIC to insure those securitizations, and 'breached certain representations and warranties.[5] The complaint goes on to state that "the substantial and excessive default rate on [various] securitizations, and FGIC's resulting damages, are not primarily attributable to any general decline in the overall housing market or the economy, but instead were caused by the fraudulent scheme of Countrywide...and the resulting poor quality of the related Mortgage Loans". FGIC alleges that its total claims paid and liabilities incurred or to be incurred because of Countrywide's fraud and breaches on the various securitizations will be in excess of $1B; with over $640M having been paid by FGIC as of the amended complaint date, plus other costs.

Countrywide Home Loans and Bank of America have recently settled significant lawsuits with financial guaranty insurers on account of similar claims:

- Bank of America Corporation agreed to pay MBIA approximately $1.6 billion in cash during the period ended March 31, 2013.[6]
- Bank of America Corporation agreed to pay Assured Guaranty Ltd. $1.1 billion in cash by March 31, 2012.[7]
- Bank of America agreed to pay Syncora Holdings, Ltd., $375 million in cash.[8]

---

[5] Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc., Supreme Court of New York, Index No. 650736/2009.
[6] Bank of America Corporation, Form 8-K, May 6, 2013, Press Release.
[7] *Assured Guaranty Ltd. Announces Settlement with Bank of America,* Assured Guaranty News, April 15, 2011.

ii.    On March 5, 2012, FGIC sued Ally Financial, Inc. alleging that the defendants
fraudulently induced FGIC to insure $693M in residential mortgage-backed securities
and that they misrepresented the quality of the loans backing the transaction.[9]  FGIC
alleges that the default rate was substantially higher than was anticipated and is now
facing $27M in insurance claims with more expected.

On March 14, 2012, FGIC filed another lawsuit against Ally alleging that Ally
fraudulently induced FGIC into insuring two sets of mortgage-backed securities
worth a total of $1.87B by intentionally misrepresenting the quality of the underlying
mortgage loan collateral.[10]  FGIC alleges it has paid out millions of dollars in claims
due to the delinquencies and defaults in connection with the securities.

The ResCap Debtors filed bankruptcy May 14, 2012, in part due to the magnitude of
the Debtors' potential liability for representation and warranty claims in connection
with mortgage loans sold by the Debtors and the significant time and defense costs in
respect of defending such claims.[11]    The cornerstone of their Chapter 11
reorganization plan is the $2.1 billion which Ally Financial, Inc. will contribute to the
ResCap Debtors in exchange for a release of claims that could be brought by ResCap
creditors.[12]  Under the ResCap Debtors' proposed bankruptcy plan, FGIC is expected
to receive an aggregate recovery on account of FGIC Allowed Claims of
approximately $206.5 million, which amount is not factored into the projected
recoveries used to analyze the Cash Commutation Payment.[13]

iii.    On April 2, 2013, FGIC filed a complaint against Credit Suisse Securities LLC and
DLJ Mortgage Capital.[14]  In this transaction, approximately 3,469 adjustable-rate
home equity lines of credit with an aggregate unpaid principal balance of
approximately $250 million served as collateral for approximately $244 million in
mortgage-backed securities issued, whereby FGIC guaranteed the payment of
principal and interest valued at approximately $240 million.  FGIC's claim states that
"Credit Suisse's pre-closing representations were fraudulent, the warranties it made
in the insurance agreement were false, and it willfully disregarded and frustrated its
contractual covenants" allowing for defaults "at remarkable rates, resulting in

---

[8] *Syncora Guarantee Settles Its Countrywide Litigation*, July 17, 2012, Press Release.
[9] Financial Guaranty Insurance Company v. Ally Financial, Inc. F/K/A GMAC, LLC; Residential Capital, LLC;
Residential Funding Company, LLC, Southern District of New York 12-CV-1601.
[10] Financial Guaranty Insurance Company v. Ally Financial, Inc. F/K/A GMAC, LLC; Residential Capital, LLC
F/K/A Residential Capital Corporation; Ally Bank F/K/A GMAC Bank; GMAC Mortgage, LLC F/K/A GMAC
Mortgage Corporation, Southern District Court of New York 12-CV-1818.
[11] Disclosure Statement. Docket #4157. Page 55.
[12] Disclosure Statement filed July 4, 2013.
[13] If the ResCap Debtors' chapter 11 plan does not become effective, the value of the FGIC recovery from the
ResCap estate is uncertain.
[14] Financial Guaranty Insurance Company v. Credit Suisse Securities LLC and DLJ Mortgage Capital, Supreme
Court of New York, Index No. 651178/2013.

11

losses…of over $67 million.  As a result, FGIC has paid, or is obligated to pay, more than $41 million in claims…and is exposed to substantial future claim liability."

29. According to FGIC's own regulatory filings, FGIC has projected more than $1 billion in gross recoveries from various loss mitigation activities, such as the pursuit of litigation claims.[15] Those projected recoveries were reported by FGIC in its statutory financials filed with the Insurance Department of the State of New York in accordance with the Statement of Statutory Accounting Principles which requires (among other things) that such projections be conservative. ████████████████████████████
████████████████████████████████ the $253.3 million offer is not ████
████████████████████████████████ in the best interest of the FGIC-ResCap Policyholders. See paragraphs 30 and 31 for further explanation of this calculation.

30. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

31. Applying ████████████████████████ to FGIC's projected gross recoveries yields an incremental value to the FGIC ResCap Policyholders between $105.9 million and $254.1 million. ████████████████████████████
████████████████████████ The adjusted Base Scenario ranges from $325 million to $594 million and the adjusted Stress Scenario ranges from $295 million to $504 million. See the following chart for calculations of these amounts.

---

[15] See Quarterly Statement of the Financial Guaranty Insurance Company as of March 31, 2013, p. 6.16.



| | | |
|---|---|---|
| Estimated Gross Expected Recoveries | $ 1,058,632,000 | $ 1,058,632,000 |
| ██████████████ | $ ████████ | $ ████████ |
| **Base Case Analysis** | | |
| ██████ | $ ████████ | $ ████████ |
| Total | $ 325,863,200 | $ 474,071,680 |
| ██████ | ████████ | ████████ |
| Total | $ 445,863,200 | $ 594,071,680 |
| **Stress Scenario Analysis** | | |
| ██████ | ████████ | ████████ |
| Total | $ 295,863,200 | $ 444,071,680 |
| ██████ | ████████ | ████████ |
| Total | $ 355,863,200 | $ 504,071,680 |

32. The FGIC Settlement includes a release of all claims of policyholders under the FGIC Policies and FGIC-ResCap Policyholders would not receive additional upside from contingent assets of FGIC.

## V.    Data & Other Information Considered in Forming Opinions Expressed Herein

33. In arriving at the testimony outlined above, I have based my opinions on my expertise in accounting, finance, and damages analysis, and my assessment of the various documents. Please see Exhibit B for a listing of documents relied upon to formulate my opinion. I reserve the right to supplement, amend, or modify my opinions should further information become available.

## VI.    Exhibits & Possible Revisions or Supplements to Report

34. Exhibit A and Exhibit B are attached herein. I reserve the right to provide additional exhibits as and when they become available. I also reserve the right to supplement, amend, or modify my opinions based upon information that I have received and additional information I may receive

13

in the future, including any opinions expressed by the Investors, their representatives, or their experts.

Respectfully submitted by:

Charles R. Goldstein
July 19, 2013

14

# EXHIBIT A

# Charles R. Goldstein
## Managing Director
*Litigation, Restructuring & Investigative Services*

**Contact Information**

Direct:  410.454.6830
Mobile:  410.200.0557
Fax:  410.454.6801
E-mail:  charles.goldstein@protiviti.com

**Areas of Expertise**

- Litigation & Financial Investigation
- Corporate Restructuring & Recovery

**Industry Expertise**

- Healthcare
- Energy
- Retail
- Manufacturing
- Real Estate
- Technology

**Education & Certifications**

- BA, Economics, University of Maryland
- MBA, University of Maryland
- Juris Doctor, University of Maryland
- Certified Public Accountant (CPA)
- Certified Insolvency & Restructuring Advisor (CIRA)
- Certified in Financial Forensics (CFF)

**Professional Memberships**

- American Bankruptcy Institute
- American Institute of Certified Public Accountants
- Association of Insolvency & Restructuring Advisors
- Maryland Association of Certified Public Accountants

**Professional Experience**

Charles Goldstein is responsible for leading the company's Litigation, Restructuring, and Investigative practice as well as the Corporate Restructuring and Recovery service line. He has more than 20 years experience providing financial consulting services and expert testimony in a variety of areas including corporate restructuring, transaction services, bankruptcy consulting, financial investigations, and complex commercial litigation.

**Principal Areas of Practice**

- Provides restructuring, turnaround and crisis management services. He also provides financial advisory and investigative services to debtors, financial sponsors, secured and unsecured creditors, trustees, and other interested parties.
- Performs business valuations for use in commercial litigation and bankruptcy matters.
- Directs due diligence and consulting services for both buy and sell side engagements as well as loan collateral analysis for lenders.
- Directs financial forensic investigations where he provides investigative services, damage calculations and expert witness testimony in fraud, bankruptcy, and litigation matters.

**Major Litigation Projects**

- Served as financial expert for the Plaintiff in Stanley Goldberg, et al v. The State of Maryland regarding damages related to legislation impacting the value of land subject to ground rents.
- Serving as the financial advisor to the Unsecured Creditors' Committee and Trustee in Financial Mortgage Inc./Vijay K. Taneja a mortgage company/real estate developer. Conducting an extensive investigation into the activities of the debtors including the tracing of over $100 million of cash disbursements and providing expert testimony regarding lien positions.
- Provided an expert report to the Federal Trade Commission with regard to the activities of AmeriDebt, a national debt counseling service. Charges brought by the FTC included misrepresentation and fraudulently transferring funds from a not-for-profit entity to a for-profit enterprise. Protiviti determined that over $170 million had been paid by consumers in Initial and monthly "contributions" and that the owners of AmeriDebt benefited to an amount in excess of $50 million.
- Assisted the Trustee of the St. Vincent's Catholic Medical Center Litigation Trust in litigation against various parties for causes of action including allegations of: failure to properly and reasonably restructure and/or provide for a timely Chapter 11 bankruptcy filing; engaging in improper negotiations and sale during the active engagement; engaging in improper billing practices during the engagement; and improper accounting and/or reporting of financial conditions.
- Served as financial expert for the Plaintiff in Alliance Telecommunications Industry Solutions, Inc. vs. Edward A. Hall et al regarding damage calculation.
- Assisted international insurance company in its review of a criticized commercial loan portfolio.
- Served as financial expert to the defendant in Liberty Mutual et al vs. Citibank regarding internal controls.

**protiviti®**

© 2012 Protiviti Inc.
CONFIDENTIAL

0

## Charles R. Goldstein
### Managing Director
*Litigation, Restructuring & Investigative Services*

**Contact Information**
Direct:   410.454.6830
Mobile:  410.200.0557
Fax:      410.454.6801
E-mail:   charles.goldstein@protiviti.com

**Testimony**

- Hearing Testimony in re: Curtis Dixon Colgate, et al v The Disthene Group, Inc. (Case No. CL11-117) Circuit Court of Buckingham County, Virginia. Subject matter: approval of sale of Cavalier Hotel and settlement agreement (proffered testimony given in 2013).

- Deposition Testimony in re: K Capital Corporation v FDIC (Case No. 1:11-cv-01604-ELH) U.S. District Court, District of Maryland. Subject matter: action for recovery against K Bank receivership (testimony given in 2012).

- Deposition Testimony in re: Rothschild Capital Partners (Case No.    ) Circuit Court of Baltimore City, Maryland. Subject matter: damage analysis (testimony given in 2012).

- Hearing Testimony in re: The Disthene Group, Inc. (Case No. CL11-117) Circuit Court of Buckingham County, Virginia. Subject matter: appointment of receiver (testimony given in 2012).

- Hearing Testimony in re: Vijay K. Taneja, et al, (Bankruptcy Case No. 08-13293) U.S. Bankruptcy Court, Eastern District of Virginia. Subject matter: plan of reorganization testimony including substantive consolidation and support for elements of §1129 (testimony given in 2011).

- Deposition Testimony in re: Harvest Bank of Maryland  v. Countrywide Home Loans, Inc. (Case No. 8:09-cv-00176-RWT), U.S. District Court, District of Maryland Southern Division.  Subject matter: Damages related to the purchase of a residential real estate portfolio (testimony given in 2011).

- Deposition Testimony in re: Stanley Goldberg, et al. v. The State of Maryland (Case No. 02-C-07-126810 RP), Circuit Court for Anne Arundel County, Maryland.  Subject matter: Damages related to ownership of land subject to ground rents (testimony given in 2010).

- Hearing Testimony in re: Universal Marketing, Inc. (Bankruptcy Case No. 09-14504). Eastern District of Pennsylvania Bankruptcy Court. Subject matter: Substantive consolidation of non-debtor entities (testimony given in 2010).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: Settlement with largest unsecured creditor (testimony given in 2010).

- Deposition & Hearing Testimony in re: Black Crow Media Group LLC, et al. (Bankruptcy Case No. 10-00172) U.S. Bankruptcy, Middle District of Florida. Subject matter: motion to dismiss, motion to approve cash collateral, motion to approve debtor-in-possession financing (testimony given in 2010).

- Hearing Testimony in re: ADFITECH, Inc. (Bankruptcy Case No. 09-17788) U.S. Bankruptcy Court, District of Maryland. Subject matter: plan confirmation (testimony given in 2010).

- Hearing Testimony in re: Patterson Park Community Development Corporation (Bankruptcy Case No. 09-12545) U.S. Bankruptcy Court, District of Maryland. Subject matter: plan confirmation (testimony given in 2009).



© 2012 Protiviti Inc.
CONFIDENTIAL

1

## Charles R. Goldstein
### Managing Director
*Litigation, Restructuring & Investigative Services*

**Contact Information**

Direct:  410.454.6830
Mobile:  410.200.0557
Fax:  410.454.6801
E-mail:  charles.goldstein@protiviti.com

**Testimony (continued)**

- Hearing & Deposition Testimony in re: Thornburg Mortgage, Inc. et al (Bankruptcy Case No. 09-17787). U.S. Bankruptcy Court, District of Maryland. Subject matter: motion to appoint a trustee (testimony given in 2009).

- Deposition Testimony in re: Financial Mortgage, Inc. / Vijay K. Taneja, et al. (Bankruptcy Case No. 08-13292). U.S. Bankruptcy Court, Eastern District of Virginia. Subject matter: lien positions (testimony given in 2009).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 05-32141). U.S. Bankruptcy Court, Western District of North Carolina. Subject matter: claims set-off issues (testimony given in 2008).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: valuation of claim. (testimony given in 2008).

- Deposition Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: Contested issues re: Southaven Claims / Case distribution (testimony given in 2007).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: Appropriateness of claims settlement (testimony given in 2007).

- Expert Testimony in re: Alliance for Telecommunications Industry Solutions, Inc. vs. Edward A. Hall et al (Civil Case No. 05-cv-0044-0). U.S. District Court, District of Maryland. Subject matter: Damage calculation (testimony given in 2006).

- Hearing Testimony in re:  Porter-Hayden Company (Bankruptcy Case No. 02-54152).  U.S. Bankruptcy Court, District of Maryland. Subject matter: Confirmation of the Plan of Reorganization for the Debtors (testimony given in 2006).

- Report submitted in re:  Federal Trade Commission vs. AmeriDebt, A. Pukke, et al. (Case No. PJM-03-3317).  U.S. District Court, District of Maryland. Subject matter: Litigation and consultant to Federal Trade Commission (report submitted in 2005).

- Trial and Deposition Testimony in re:  Official Employment-Related Issues Committee of Enron vs. John J. Lavorato, et al (Bankruptcy Case No 03-3721) and Official Employment-Related Issues Committee of Enron vs. John D. Arnold, et al (Bankruptcy Case No.03-3522).  U.S. Bankruptcy Court, Southern District of Texas, Houston Division. Subject matter: Fraudulent transfers and Retention payments (testimony given in 2005).

- Hearing Testimony in re:  Phyamerica Physician Group (Bankruptcy Case No. 02-6-7737).  U.S. Bankruptcy Court, District of Maryland. Subject matter: Fraudulent transfers (testimony given in 2005)

- Hearing Testimony in re:  National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: Plan of Liquidation for ET Debtors and the Quantum Debtors (testimony given in 2005).

protiviti

© 2012 Protiviti Inc.
CONFIDENTIAL

2

## Charles R. Goldstein
## Managing Director
*Litigation, Restructuring & Investigative Services*

**Contact Information**
Direct:  410.454.6830
Mobile:  410.200.0557
Fax:  410.454.6801
E-mail:  charles.goldstein@protiviti.com

### Papers, Publications and Presentations

- "Considerations for Existing and Potential Directors and Officers of Financially Distressed Companies," February 27, 2012, Boardmember.com.

- Board Risk Oversight," November 8, 2011, speaker at the 2011 NACD Directorship Forum

- "Board Leadership During a Crisis Situation," April 8, 2011, presentation to The Directors' Institute at The University of Maryland.

- "Use of Financial Advisors in Chapter 11 Bankruptcy Proceedings," April 2010, April 2009, April 2008, October 2005, April 2004, November 2003, April 2003 and November 2002, Robert H. Smith School of Business, University of Maryland.

- "Corporate Restructuring: Pitfalls and Opportunities," October 2009 edition of The Metropolitan Corporate Counsel.

- "Considerations for General Counsel in an Era of Troubled Companies: Tripwires and Ethical Concerns," February 3, 2009, presentation to Association of Corporate Counsel, Chicago Chapter.

- "Challenges of Growing your Practice," June 4, 2008, presentation to the Association of Insolvency and Restructuring Advisors' 24th Annual Bankruptcy and Restructuring Conference.

- "Liquidation and Litigating Trust," May 2, 2008, presentation to the Maryland Bankruptcy Bar Association.

- "Use of Financial Advisors in Chapter 11 Bankruptcy Proceedings," April 2009 and April 2008, presentation at the University of Baltimore.

- "Maximizing Returns: When to Buy and Sell Distressed Debt," September 17, 2007, presentation to the Global Distressed Debt Investor Forum, New York, NY.

- "Financial Statements – Misstatements and Creditor Committee Reporting," June 8, 2007, presentation to the Association of Insolvency and Restructuring Advisors' 23rd Annual Bankruptcy and Restructuring Conference.

- "Fiduciary Duties of the Turn-Around Professional in the Zone of Insolvency," June 10, 2006, presentation to the Association of Insolvency and Restructuring Advisors' 22nd Annual Bankruptcy and Restructuring Conference.

**protiviti**

© 2012 Protiviti Inc.
CONFIDENTIAL.

3

# EXHIBIT B

**EXHIBIT B**

| Count | Document Description |
|---|---|
| 1 | Disclosure Statement for Plan of Rehabilitation for Financial Guaranty Insurance Company, dated September 27, 2012 |
| 2 | Proposed Plan of Rehabilitation for Financial Guaranty Insurance Company, dated September 27, 2012 |
| 3 | First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013 |
| 4 | Affidavit of Michael Miller in Further Support of Approval of First Amended Plan of Rehabilitation dated December 12, 2012 |
| 5 | Affidavit of Gary Holtzer, dated May 29, 2013 |
| 6 | Affirmation of Paul V. Shalhoub, date July 16, 2013 |
| 7 | Duff & Phelps Report dated May 15, 2013 |
| 8 | Affidavit of John S. Dubel, dated December 12, 2013 |
| 9 | Financial Guaranty Insurance Company Quarterly Statement dated March 31, 2013 |
| 10 | Deposition Transcript of David Williams, July 12, 2013 |
| 11 | Deposition Transcript of Lewis Kruger, July 11, 2013 |
| 12 | Deposition Transcript of Mary Sohlberg, July 16, 2013 |
| 13 | Deposition Transcript of John S. Dubel, July 10, 2013 |
| 14 | Declaration of Ron D'Vari, dated June 7, 2013 |
| 15 | Deposition Transcript of Robert Major, July 17, 2013 |
| 16 | Settlement Agreement between the Debtors, FGIC and Trustees dated May 23, 2013 |
| 17 | Quarterly Statement of the FGIC (in Rehabilitation) as of March 31, 2013 |
| 18 | Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc., Supreme Court of New York, Index No. 650736/2009, Initial Complaint dated December 11, 2009 |
| 19 | Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc., Supreme Court of New York, Index No. 650736/2009, Amended Complaint dated April 30, 2010 |
| 20 | Bank of America Corporation, Form 8-K, May 6, 2013 |
| 21 | Assured Guaranty Ltd. Announces Settlement with Bank of America, Assured Guaranty News, April 15, 2011 |
| 22 | Syncora Guarantee Settles its Countrywide Litigation, July 17, 2012, Press Release |
| 23 | FGIC v. Ally Financial, Inc., Southern District of New York 12-CV-1601 dated March 5, 2012 |
| 24 | FGIC v. Ally Financial, Inc.  Southern District Court of New York 12-CV-1818 dated March 14, 2012 |
| 25 | Disclosure Statement for the Joint CH. 11 Plan Proposed by Residential Capital, LLC, Bankruptcy Court of the Southern District of New York,  Case No. 12-12020 (MG), dated July 4, 2013 |
| 26 | Financial Guaranty Insurance Company v. Credit Suisse Securities LLC and DLJ Mortgage Capital, Supreme Court of New York, Index No. 651178/2013 |