**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) |  |

-------------------------------------------------------- x

## WITNESS STATEMENT OF JOHN S. DUBEL

I, JOHN S. DUBEL, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that

the following is true and correct:

1.      I am Chief Executive Officer of Financial Guaranty Insurance Company

("FGIC").  I provide these services through my company, Dubel & Associates ("DA").  DA

commenced its engagement with FGIC on January 2, 2008.  I have over thirty years of

experience restructuring companies.  Prior to joining FGIC, I was a Managing Director of

Gradient Partners, L.P., a single strategy distressed hedge fund, from 2006 through 2007.  From

2002 to 2006, I was a Principal and Managing Director with AlixPartners, LLC, a firm

specializing in turnaround and crisis management.  While at AlixPartners, I served as Chief

Executive Officer of Cable & Wireless America, President and Chief Operating Officer at RCN

Corporation, Chief Restructuring Officer of Anchor Glass Container Corporation and Acterna

Corporation, and CFO at WorldCom, Inc.  I received a Bachelor in Business Administration

degree from the College of William and Mary.

2.      I respectfully submit this witness statement, in lieu of direct testimony, on behalf

of FGIC and in support of the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval*

*of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain*

1

*Institutional Investors* (Docket No. 3929).  I will make myself available for cross-examination

and further testimony at the hearing on the Debtors' motion.

       3.       FGIC was appointed to the Official Committee of Unsecured Creditors (the

"OCC") in the ResCap chapter 11 cases by the United States Trustee, and I represented FGIC on

the OCC.  I was the principal negotiator for FGIC with respect to the global mediation in the

Residential Capital ("ResCap" and together with its subsidiaries, the "Debtors") bankruptcy case.

The ResCap bankruptcy case is very large in size, and the estimated claims of administrative,

secured and unsecured creditors is almost $18 billion.  *See* Disclosure Statement for the Joint

Chapter 11 Plan Proposed by Residential Capital, LLC, *et al.* and the Official Committee of

Unsecured Creditors (July 4, 2013) (Docket No. 4157) ("Debtors' Disclosure Statement")

(excerpt attached hereto as Exhibit A), Ex. 6 (ResCap Recovery Analysis).

      **The Mediation Process**

       4.       The mediation was conducted pursuant to an order of the Bankruptcy Court

beginning in December 2012.  I was personally involved in all mediation sessions and

negotiations on behalf of FGIC.  I personally participated in the negotiation of the Plan Support

Agreement,[1] signed on or about May 13, 2013, and the related term sheets and agreements

negotiated and signed then and on May 23, 2013, as part of the overall global bankruptcy plan

settlement.  An integral part of the global bankruptcy plan negotiations, and a condition

precedent to the ResCap bankruptcy plan proceeding to confirmation by the Bankruptcy Court,

was negotiation and development of the settlement agreement (the "FGIC Settlement

Agreement"), signed on May 23, 2013, among FGIC, the Debtors, the Trustees (defined below),

the Steering Committee Group (defined below), and the Talcott Franklin Group (defined below).

---

[1] When I use terms not otherwise defined herein, I intend those terms to have the same meanings as in *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (Docket No. 3929).

Even though the signature pages of the FGIC Settlement Agreement are dated May 23, 2013,

minor changes to the language of the agreement were made through May 29, 2013.

5.      The First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013 (the

"Plan"), is not in effect yet.  The authority to settle policy claims is currently and expressly

permitted by the FGIC Order of Rehabilitation, entered more than a year ago, which grants the

Rehabilitator broad powers throughout the duration of the rehabilitation proceeding, including

the power to operate and conduct FGIC's business.  If the Plan were in effect, however, the terms

of the Plan allow FGIC to enter into settlements of potential claims. In particular, section 4.8 of

the Plan provides that FGIC may resolve claims "without further Court approval" through

negotiation, settlement, or "any similar transaction that results in the extinguishment or reduction

of FGIC's liability, in respect of [] all or part of any Policy . . . .".  Section 4.8 (even if applicable

here, which it is not) does not require FGIC to obtain the consent of investors holding securities

of policyholders whose policies are being settled.

6.      The Steering Committee Group and the Talcott Franklin Group were the only two

groups of holders of RMBS securities that both regularly participated in the ResCap chapter 11

cases, and signed confidentiality agreements in order to participate fully in the mediation

process, restricting their ability to trade in ResCap securities during the negotiation period.  They

actively participated in the mediation and in negotiation of the FGIC Settlement Agreement,

along with the Trustees.

7.      The Steering Committee Group[2] includes 18 sophisticated banks and financial

institutions, such as Goldman Sachs, ING, BlackRock, Teachers Insurance and Annuity

---

[2] The investors in the "Steering Committee Group" consist of AEGON USA Investment Management, LLC, Angelo Gordon, Bayerische Landesbank, BlackRock Financial Management Inc., Cascade Investment, LLC, Federal Home Loan Bank of Atlanta, Goldman Sachs Asset Management, L.P., ING Investment Management Co. LLC, ING Investment Management LLC, Kore Advisors, L.P., Pacific Investment Management Company LLC, Maiden Lane LLC and Maiden Lane III LLC (by the Federal Reserve Bank of New York as managing member), Metropolitan Life Insurance Company, Neuberger Berman Europe Limited, SNB StabFund, The TCW Group, Inc.,

Association, TCW, Metropolitan Life, PIMCO, and Western Asset Management.  They hold

approximately $12.1 billion in current amount, and $29.8 billion in original face amount, of

RMBS securities issued by various ResCap related trusts.  Attached hereto as Exhibit B is the

latest Bankruptcy Rule 2019 filing (Docket No. 1741), indicating the holdings of the Steering

Committee Group.  The Talcott Franklin Group[3] is a similar group of 57 banks, financial

institutions and funds, which includes objectors CQS ABS Master Fund Limited and CQS ABS

Alpha Master Fund Limited and holds $17 billion in original face amount, of RMBS securities

issued by various ResCap related trusts.  *Debtors' Second Supplemental Motion Pursuant to Fed.*

*R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* at 30 (Docket No.

1887).

        8.      At the commencement of the ResCap bankruptcy, the Steering Committee Group,

the Talcott Franklin Group, and the Junior Secured Noteholders had negotiated and signed a pre-

bankruptcy agreement with the Debtors and the Debtors' parent company, Ally Financial Inc.

---

(continued…)

Teachers Insurance and Annuity Association of America, Thrivent Financial for Lutherans, Western Asset Management Company, and certain of their affiliates, either in their own capacities or as advisors or investment managers.  *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* at 4 n.8 (Docket No. 1887).

    [3] The investors in the "Talcott Franklin Group" consist of: Anchor Bank, fsb, Bankwest, Inc., Blue Heron Funding V, Caterpillar Life Insurance Company, Caterpillar Insurance Co. Ltd., Caterpillar Product Services Corporation, Cedar Hill Mortgage Opportunity Master Fund, L.P., Citizens Bank & Trust Co., Commerce Bancshares, Inc., Commonwealth Advisors, Inc., CQS ABS Master Fund Limited, CQS Select ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Citizens Bank and Trust Company, DNB National Bank, Doubleline Capital LP, Ellington Management Group, LLC., Everest Reinsurance (Bermuda) Ltd., Everest International Re, Ltd., Farallon Capital Management, L.L.C., Farmers and Merchants Trust Company of Chambersburg, First National Bank and Trust Company of Rochelle, First National Banking Company, First National Bank of Wynne, First Farmers State Bank, First Bank, Gemstone CDO I, Gemstone CDO II, Gemstone CDO V, Gemstone CDO VII, HBK Master Fund L.P., Heartland Bank, Kerndt Brothers Savings Bank, Kleros Preferred Funding V plc, Knights of Columbus, LL Funds LLC, Lea County State Bank, Manichaean Capital, LLC, Mutual Savings Association FSA, Northwestern Bank N.A., Pinnacle Bank of South Carolina, Peoples Independent Bank, Perkins State Bank, Phoenix Light SF Limited, Radian Asset Assurance Inc., Randolph Bank and Trust, Rocky Mountain Bank & Trust, Royal Park Investments SA/NV, SBLI USA Mutual Life Insurance Company, Silver Elms CDO II Limited, Silver Elms CDO plc, South Carolina Medical Malpractice Liability JUA, Summit Credit Union, Thomaston Savings Bank, Union Investment Luxembourg S.A., United Educators Insurance - Reciprocal Risk Retention Group, Wells River Savings Bank, Vertical Capital, LLC, and certain of their affiliates, either in their own capacities or as advisors or investment managers.  *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* at 4 n.8 (Docket No. 1887).

("AFI"), whereby AFI would contribute $750 million to the Debtors in exchange for general releases of all claims, including third party claims, and certain claims held by the Trustees against the Debtors would be compromised for $8.7 billion.  That proposed pre-bankruptcy settlement agreement was opposed by many other parties in the bankruptcy case, including FGIC and the OCC, resulting in substantial litigation and uncertainty. Among the major issues in controversy were (1) the scope and size of the AFI contribution, (2) whether $750 million sufficed to settle and resolve all of the estate and third party claims against AFI, (3) the size and priority of claims asserted with respect to the RMBS trusts, (4) the validity, priority and interrelationship of those claims with respect to claims asserted by the monoline insurers, (5) the amount, priority or possible subordination of security law claims asserted against the Debtors in class actions and other lawsuits, and (6) the claims of various government entities and borrower class actions asserted against the Debtors.

9.       To move the bankruptcy case forward, and forestall potentially years of burdensome and extremely expensive litigation between and among the Debtors, their parent AFI, and all of the competing creditors and creditor groups, the Bankruptcy Court, by order entered on December 26, 2012, appointed the Honorable James M. Peck, a sitting bankruptcy judge with significant experience in complex, multi-party cases (such as the Lehman bankruptcy case) to act as global plan mediator.  *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ¶¶ 34-44 (Docket No. 3929).  As part of the Bankruptcy Court's order, the Bankruptcy Court placed strict confidentiality protections in place, which preclude me from describing the substance of any of the negotiations, or the various proposals or counter-proposals.  Attached as Exhibit C is a copy of the Mediation Order (Docket No. 2519), which

provides that all documents or discussions made or provided in connection with the mediation by

parties participating in the mediation must be kept confidential.  The Mediation Order states:

> [N]o person or party participating in the mediation . . . shall in any
> way *disclose to any non-party* or to any court, including, without
> limitation, in any pleading or other submission to any court, any
> such discussion, mediation statement, other *document or
> information*, correspondence, resolution, offer or counteroffer that
> may be made or provided in connection with the mediation, unless
> otherwise available and not subject to a separate confidentiality
> agreement that would prevent its disclosure *or as authorized by
> this Court.*

¶ 4 (emphasis added).

10.     Without revealing the substance of the negotiations, however, I can describe in

general terms the process of the mediation, the participants, and the good faith, arm's-length

nature of the negotiations.  The mediation in this case was the most complex and lengthy such

process with which I have ever been personally involved, in any capacity.  Judge Peck began by

holding individual meetings with each of the main participants, and the process was very time

intensive for all parties, particularly for Judge Peck.  His initial meeting with FGIC and our

counsel lasted approximately five hours.  There were regular meetings among and between

various parties including FGIC, to discuss the relevant issues, and Judge Peck regularly met with

and communicated with the Debtors, the OCC, and other individual creditors and groups.

11.     In addition to the above parties, the Trustees of the various ResCap related trusts

that issued RMBS securities also actively participated in the mediation.  The Trustees include

The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A, Law

Debenture Trust Company of New York, U.S. Bank National Association, and Wells Fargo

Bank, N.A., who are the Trustees of the trusts that issued RMBS insured by FGIC (the "<u>FGIC

Insured Trusts</u>").  Attorneys from law firms such as Dechert, Seward & Kissel, and Alston &

Bird represented the Trustees during the mediations.  The Trustees also received advice from

Duff & Phelps, a financial advisory firm serving as the Trustees' expert. Various other significant creditor groups, such as the Steering Committee Group and the Talcott Franklin Group, participated both in discussions and meetings with the Trustees and others.

12.    The ResCap bankruptcy involves numerous parties and claims, and there are many complex interdebtor and intercreditor issues that would affect plan distributions. Accordingly, the mediation was necessary to address these complex issues. Specifically, the mediation process was designed by the Debtors and approved by the Court to encompass two major areas, (i) the claims asserted by the Debtors' estates and the third party claims held by individual creditors against AFI, as well as (ii) how the value of any recovery on those claims and the other assets of the Debtors' estates would be allocated among the many competing creditor groups. *See* Debtors' Disclosure Statement at 72. As reflected in the Debtors' Disclosure Statement, some 6,850 proofs of claim were filed, totaling $99.7 billion, although the Debtors estimate that they will end up with approximately $13.4 billion in allowed unsecured claims. *See id.*, Ex. 4 at 1.

13.    The ultimate success of the global mediation was far from a certainty. In fact, on February 21, 2013, a group of Junior Secured Noteholders, who claim to have secured claims of approximately $2 billion, and who were participating in the global plan mediation, objected to the Debtors' motion to extend their exclusive time period to file a bankruptcy plan (where the Debtors in part relied upon the mediation process as cause for the extension) stating:

> For the past two months, the Ad Hoc Group has patiently participated in a plan mediation process that has, to date, not resulted in the global compromise envisioned by the Court at its inception. Perversely, these well-intentioned efforts to achieve consensus through mediation have seemingly emboldened certain parties to harden their negotiating positions, secure in the knowledge that the Debtors' present plan construct – with its non-consensual third party release provisions with Ally – remains the only show in town. Even the best efforts of a sitting bankruptcy

judge and experienced and respected mediator have been unable to
break this impasse.

*Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of*

*an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit*

*Acceptances Thereof* at 2-3 (Docket No. 2997).

14.    From January through the end of May, 2013, I personally participated in dozens

of meetings and innumerable conference calls with various parties to the mediation process, as

well as significant internal work with FGIC's counsel as part of the mediation and negotiation

process.  A partial list of the dates of significant meetings and multi-party external conference

calls is attached hereto on the "Timeline" labeled Exhibit D.[4]

15.    There were a large variety of complex issues to understand and attempt to resolve

through the mediation process.  As reflected in the Timeline, Judge Peck participated in meetings

with the OCC and other significant creditors from January through March, 2013, when he

determined that it was appropriate to convene a series of large group mediation sessions, all of

which I personally attended.

16.    The first global group mediation session occurred on or about April 22, 2013, and

lasted ten hours, and was followed by another session on April 23, 2013, which lasted

approximately nine hours.  I have reviewed the attendance list for the first day's session, and not

including Judge Peck and his two law clerks, there were 140 participants.  There were

representatives from approximately 23 different creditors and creditor groups (groups such as the

Steering Committee Group and the Talcott Franklin Group I count as only one group, even

though they include many institutions).  There were a total of 29 creditors or creditor group

---

[4] The Timeline does not include individual calls between FGIC, the Debtors or other single mediation
participants.

business representatives in attendance, along with 75 attorneys and 36 financial advisors to the various parties.

17.    The mediation was far from a secret or clandestine process.  There were literally dozens of pleadings filed in the Bankruptcy Court and served on the Objectors' counsel that mentioned the mediation, along with extensive discussion at public court hearings, as well as substantial press coverage.  Significantly, attending the mediation were attorneys for the Federal Housing Finance Agency, Freddie Mac's conservator and the federal agency currently exercising legal control over Freddie Mac, and attorneys for the Talcott Franklin Group, of which CQS was a member.  Freddie Mac served special notice requests in the Bankruptcy Court and participated therein through its counsel, the same counsel that recently filed objections in this Court.

18.    Over the next month, in late April and throughout much of May 2013, there were approximately five more large group mediation sessions, as well as many conference calls and smaller group meetings.  The last set of large group negotiations started in the morning of May 22, 2013, and went through the following night, only ending with the signing of documents at approximately 9 a.m. on May 23, 2013.

### The Global Settlement and the FGIC Settlement Agreement

19.    As reflected in the documents signed on May 23, 2013, and the related and supplemental term sheets and agreements, the global mediation successfully resolved the key major issues in the ResCap chapter 11 cases and obviated years of difficult, expensive, protracted and uncertain litigation.  AFI agreed to contribute $2.1 billion to the ResCap bankruptcy estate, nearly tripling its prior agreement, and all of the significant participating creditor groups agreed to provide releases to AFI for all claims asserted against AFI in dozens of state and federal lawsuits.  The parties participating in the Plan Support Agreement also agreed to allocation of the

total cash available for distribution to unsecured creditors, estimated at $2.62 billion.  *See*

Debtors' Disclosure Statement at 38.

20.      The FGIC Settlement Agreement, as reflected in the Plan Support Agreement, is a

key component of this global plan construct, and is a required condition to effectiveness of the

plan.  Although the FGIC Settlement Agreement is a stand-alone settlement agreement, the

global plan construct cannot move forward—and the $2.1 billion AFI settlement contribution

cannot be realized—absent approval by this Court and the State Court overseeing the FGIC

rehabilitation proceeding.

21.      The FGIC Insured Trusts will receive value under the settlement in a number of

different ways.

22.      First, the FGIC Insured Trusts will receive an immediate, lump sum settlement

payment of $253.3 million in lieu of partial cash payments over decades to come on account of

potentially $1.1 billion in policy claims.  FGIC will make this settlement payment in cash

immediately after both court approvals are obtained and the FGIC Settlement Agreement

becomes effective.  The FGIC Insured Trusts and investors therein will not have to wait for

confirmation of the ResCap Chapter 11 plans, which could take many months.

23.      Second, if the FGIC Settlement Agreement becomes effective, FGIC will forgo its

right to collect a gross amount of approximately $40 million in future installment policy

premium payments, which when discounted at a 15% rate, results in approximately $18.3 million

in future policy premiums that FGIC estimates the FGIC Insured Trusts would otherwise be

obligated to pay to FGIC over the life of FGIC's insurance policies.  These amounts will instead

be retained by the FGIC Insured Trusts and likely paid to the investors in the FGIC Insured

Trusts.

24.    Third, if the plan of reorganization contemplated by the Plan Support Agreement is confirmed, and AFI's $2.1 billion settlement payment is realized, the FGIC Insured Trusts will be entitled to a distribution in excess of $90 million from the Trustees.  *See generally* Debtors' Disclosure Statement; *see also* Expert Report of Allen M. Pfeiffer, ¶ 59 (July 19, 2013). Specifically, if the Bankruptcy Court confirms the proposed plan of reorganization, the Trustees collectively will receive an allowed general unsecured claim in the bankruptcy cases of $7.301 billion.  *See* Debtors' Disclosure Statement at 27.  This $7.301 billion allowed general unsecured claim will net the Trustees a distribution under the proposed reorganization plan of approximately $698.7 million (the "RMBS Proceeds").  *See* Debtors' Disclosure Statement, Ex. 6 (ResCap Recovery Analysis).  The Plan Support Agreement (and the reorganization plan) provides that the RMBS Proceeds will be distributed to RMBS trusts in accordance with the RMBS Trust Protocol attached as Annex III to the supplemental term sheet.  The RMBS Trust Protocol provides that insured RMBS trusts that both (i) have made policy claims against a monoline insurer and (ii) have not received full payment on their claims by the plan of reorganization's effective date, will be entitled to receive a distribution of the RMBS Proceeds on the terms provided therein.  The FGIC Insured Trusts—which have made policy claims against FGIC that will not be paid in full at the time of the plan's effective date—will thus, if the reorganization plan is confirmed, be entitled to receive a distribution of RMBS Proceeds on the terms provided in the RMBS Trust Protocol.  I am informed that the Trustees have calculated the amount of RMBS Proceeds to which the FGIC Insured Trusts will be entitled, and I have also reviewed the Disclosure Statement filed in the bankruptcy cases.  I understand the amount of RMBS Proceeds to which the FGIC Insured Trusts will be entitled exceeds $90 million.

25.    Finally, and significantly, if the FGIC Settlement Agreement becomes effective, FGIC will forgo its right to receive any and all reimbursements from the FGIC Insured Trusts

11

pursuant to the waterfall provisions under the governing documents of the various trusts (as such

reimbursement rights may be modified pursuant to the FGIC Rehabilitation Plan). These

amounts will instead be retained by the FGIC Insured Trusts and likely paid to the investors in

the FGIC Insured Trusts.

26.    The Expert Witness Report of Charles R. Goldstein (the "Goldstein Report")

submitted by Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview

Fund Management LLC, CQS ABS Master Fund Limited, and CQS ABS Alpha Master Fund

Limited does not acknowledge this very significant financial benefit to the FGIC Insured Trusts

(and their respective investors), among other errors.  These other errors include, for example, the

failure to account for any possibility for downside risk, including the risks presented by FGIC's

substantial exposure to municipal bonds issuances, which account for one third of FGIC's

portfolio.  The analyses prepared by the objectors' experts ignore the possibility of future

negative adjustments to the cash payment percentage ("CPP") resulting from the poor

performance of certain FGIC-wrapped municipal bonds, including bonds issued by the City of

Detroit and other distressed municipalities.

27.    The Goldstein Report (¶¶ 12, 29) refers to FGIC's March 31, 2013 quarterly

statements as projecting more than $1 billion in gross recoveries from loss mitigation activities.

This statement mischaracterizes the nature of these projected gross recoveries.  FGIC did not

include in its March 31, 2013 quarterly statements any estimate of recoveries from loss

mitigation activities, including litigation claims, as FGIC has not determined them to be probable

and estimable. The approximately $1.06 billion projected recovery amount in FGIC's March 31,

2013 quarterly statements comprises recoveries that FGIC estimated it would receive through the

waterfall provisions under the governing documents of the various trusts insured by FGIC from

funds available from projected collateral cash flows and projected payments from other providers

of credit enhancement in the subject transactions.  These projected recoveries were based on

assumptions used by FGIC for statutory accounting purposes to estimate, among other things,

collateral performance, which assumptions are subject to change; and it is uncertain whether and

to what extent any projected recoveries will be realized.

28.     Also, these projected recoveries did not account for the terms of the FGIC

Rehabilitation Plan, which limit FGIC's right to receive recoveries that otherwise would have

been payable to FGIC pursuant to the waterfall provisions under the governing documents of the

various trusts insured by FGIC.  If such $1.06 billion projected gross recovery is realized, FGIC

would be entitled to receive only approximately $300 million (utilizing the base case present

value payout percentage of 28.5%) and the remainder would be retained by the trusts for

application in accordance with such waterfall provisions, likely for payment to the trusts'

investors.

29.     However, since approximately half of that $1.06 billion projected gross recovery

amount represents FGIC's estimate of the reimbursements that will be due to FGIC in connection

with ResCap-related transactions pursuant to the various trust waterfall provisions under the

governing documents for the FGIC Insured Trusts, approximately half of that projected $300

million recovery will be forgiven by FGIC pursuant to the FGIC Settlement Agreement

(§2.01(b)), which will allow the FGIC Insured Trusts to retain for themselves (and their

investors) the portion of those estimated reimbursements that would otherwise be paid to FGIC.

This is a significant benefit and improvement over the terms of the FGIC Rehabilitation Plan for

the FGIC Insured Trusts (and their investors).  If FGIC's projected gross recovery for the FGIC

Insured Trusts is realized, the FGIC Insured Trusts would be entitled to retain (and pay to their

investors) an additional $140 million (utilizing the base case present value payout percentage of

28.5%) that they would otherwise be required to pay to FGIC in the absence of the FGIC

Settlement Agreement.

Executed on July 31, 2013
New York, New York

_____
John S. Dubel

# Exhibit A

***THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION. THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS DISCLOSURE STATEMENT.***

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
Samantha Martin
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000

Alexandra Steinberg Barrage
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
Telephone: (202) 887-1500

*Counsel to the Debtors and
Debtors in Possession*
 Dated:   July [**3**], 2013
          New York, New York

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for the Official Committee of
Unsecured Creditors*

of the Debtors and these Chapter 11 Cases.  Upon the Effective Date, Ally shall be fully released from the Continuing Obligations and shall have no monetary obligations in respect of the Continuing Obligations under the Consent Order, DOJ/AG Settlement, and the Order of Assessment.

As described above, the consideration provided by the Debtors' current and former officers and directors in exchange for the release discussed in this section includes their forbearance regarding any claims for coverage they may have under any directors & officers or errors & omissions insurance policies covering the Debtors or their Representatives between November 2006 and the Effective Date, and their forbearance regarding any contractual claims for indemnification that they may have against Ally or the Debtors.  In addition, the Plan's release provisions seek to release the Debtors' current and former officers and directors from any post-Effective Date liability, thereby preventing certain of these individuals, as a practical matter, from performing the Continuing Obligations described in this section post-Effective Date.

Notwithstanding anything to the contrary herein, nothing in the Plan shall release, enjoin, or preclude any Representative of the Debtors from pursuing any rights a Representative of the Debtors may have (i) to indemnification or advancement from Ally solely for any claims that are not released by the Plan and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased by Ally or covering Representatives of the Debtors, or against any party (other than the Debtors) arising out of such policies of insurance, solely for any claims that are not released by the Plan and the Confirmation Order.  For the avoidance of doubt, nothing in the Plan expands or reduces any existing indemnification rights or rights as an "insured" for any Representative of the Debtors for claims that are not released by the Plan. No rights of the Consenting Claimants are released under the Plan in their capacity as liability insurance or reinsurance carriers for Ally or the Debtors.

## B.    The Plan Includes a Settlement of RMBS Trust Claims

One element of the overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code, the Plan contemplates approval of a settlement that provides for the allowance, priority, and allocation of claims of residential mortgage backed securities Trusts (the "RMBS Settlement").  The Plan's treatment of those claims is a modification of the Debtors' prior settlement agreement with certain Investors in certain RMBS Trusts (the "Original RMBS Settlement Agreement"), expanded to include the Additional Settling Trusts and modified in a number of additional respects.  The RMBS Settlement embodied in the Plan resolves: (i) alleged and Potential Claims for breaches of representations and warranties held by all RMBS Trusts and (ii) all alleged and Potential Claims for damages arising from servicing, in exchange for Allowed Claims in the aggregate amount of $7.301 billion for the RMBS Trusts, to be allocated as between the GMACM Debtors and the RFC Debtors.  The allocation of distributions received on account of the RMBS Trust Claims is subject to the RMBS Trust Allocation Protocol, as set forth in more detail in Article [●] of the Plan.  A copy of the RMBS Trust Allocation Protocol is attached as Exhibit 8 hereto.

-27-

Upon confirmation of the Plan, no RMBS Trust can opt out of the RMBS Settlement embodied in the Plan.  Consistent with the order approving the Plan Support Agreement, any RMBS Trust that has withdrawn from the Plan Support Agreement preserves its right to object to the Disclosure Statement and Plan.  Upon confirmation of the Plan, distributions to the RMBS Trusts on account of the RMBS Trust Claims will be in accordance with the RMBS Trust Allocation Protocol.

Importantly, the Plan resolves outstanding disputes regarding the claims of the RMBS Trusts that are insured by monoline insurers (the "Insured RMBS Trusts").  The Plan provides that certain monoline insurers will have allowed claims against the Debtors' Estates independent of the claims of the RMBS Trusts, and the Insured RMBS Trusts will have no allowed RMBS Trust Claims but will reserve the ability to enforce their rights against any monoline insurer (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of the applicable RMBS Trust.  In addition, those Insured RMBS Trusts that have made policy claims against an applicable monoline insurer but have not received full payment on account of such claims as of the Effective Date shall receive an allocated distribution that takes into account such partial payment on account of the RMBS Trust Claims, reduced by any partial payments from such monolines, in accordance with the RMBS Trust Allocation Protocol.

The Plan treatment covers all of the RMBS Trusts that have Claims against the Debtors, whether the RMBS Trust was sponsored by the Debtors and their affiliates or was sponsored by a third party.  These claims comprise the single largest set of disputed claims against the Debtors' Estates.  The Plan resolves such claims without the need for protracted and costly litigation that would otherwise result.  By way of example, litigation over the claims asserted by the RMBS Trustees could require a Trust-by-Trust analysis of the claims and could last several years, presenting a significant burden on the Debtors' Estates.  As discussed below, the Plan also avoids the cost of going forward with the trial on the Debtors' motion seeking approval of the Original RMBS Settlement Agreement pursuant to Bankruptcy Rule 9019, as well as likely follow-up litigation regarding the subordination of the RMBS Trust Claims pursuant to Section 510 of the Bankruptcy Code, each of which would have posed a significant burden on the Estates and required a massive amount of time, effort, and expense.

## C.     The Plan Settles the Claims of FGIC and MBIA

The Plan also resolves the allowance, priority and allocation of the Claims of Monoline insurers, arising generally from alleged breaches by the Debtors and their affiliates of representations, warranties, and/or covenants in various governing documents and offering documents related to RMBS and insurance agreements associated with the relevant RMBS transactions.  Specifically, certain monoline insurers, including MBIA Insurance Corporation ("MBIA") and Financial Guaranty Insurance Company ("FGIC"), filed lawsuits against the Debtors and Ally asserting billions of dollars of Claims, and the continued litigation of such Claims would have been costly and could have taken years to resolve.

***MBIA.***  The Plan resolves the allowed amount and allocation of MBIA's claims and avoids the need for further litigation between the Debtors and MBIA.  MBIA has asserted claims against the Debtors for alleged breaches of representations and warranties and fraud in

-28-

Setting aside the cost of reviewing, analyzing, and taking discovery with respect to tens of thousands of transactions, litigation of these and similar claims would be extremely time-consuming and expensive.  Fraudulent conveyance, substantive consolidation, recharacterization, and similar issues are highly complex and factually intensive, requiring extensive discovery and expert testimony addressing solvency, valuation, contemporaneous exchange of value, arms'-length terms, accounting practices, allocation issues, and so forth.  Experience in similar cases demonstrates that, absent consensual resolution, fully litigating these issues would cost the Estates tens of millions of dollars, and substantially delay the ability to confirm any Chapter 11 plan.

Given the numerous inter-related litigations that would arise from any attempt to enforce the Intercompany Balances and any objections thereto, it was clear that the uncertainty and costs associated with litigating the intercompany issues would impact all creditor recoveries.  As part of the Global Settlement, each Debtor, with the support of the Creditors' Committee and the Consenting Claimants, has agreed to compromise the Intercompany Balances.  For purposes of the Plan, Intercompany Balances, as well as any subrogation claims and fraudulent conveyance claims related to the forgiveness of intercompany debt, will be compromised as part of the Global Settlement, and waived, cancelled, and discharged on the Effective Date, and holders of Intercompany Balances will receive no recovery on account of such claims.

The Debtors and the Creditors' Committee have concluded that the compromise of Intercompany Balances is reasonable in consideration of all of the factors discussed above, including (i) the Debtors' and Creditors' Committee's analysis and conclusion that the Intercompany Balances reflected on the Schedules lack indicia of true debt and are not enforceable claims; (ii) the costly and time-consuming litigation that would result from any effort to enforce the putative Intercompany Balances; (iii) the inability to reach consensual agreement with numerous creditor constituencies absent consensual resolution of the Intercompany Balances and inextricably related issues; and (iv) the substantial benefits to all creditor constituencies from the Global Settlement.  For these reasons, the Plan Proponents and the Consenting Claimants agree that it is in the best interest of the Debtors' Estates and their creditors to compromise the Intercompany Balances.

**L.    The Plan Allocates the Estate Assets and Administrative Expenses among Debtor Groups and Creditor Constituencies**

The cornerstone of the Global Settlement is the $2.1 billion contribution by Ally to the Estate assets in exchange for the Debtor Release and Third Party Releases.  Through the negotiation process, the parties determined to allocate the Ally Contribution as follows (which remains subject to adjustment based on amounts reserved for Disputed Claims):

-36-

| Entity | Allocation |
|---|---|
| ResCap Debtors | $782.7 million |
| GMACM Debtors | $462.3 million |
| RFC Debtors | $462.3 million |
| Private Securities Claims Trust | $235.0 million |
| Borrower Claims Trust | $57.6 million |
| NJ Carpenters Claims Distribution | $100.0 million |

The agreed upon allocation of the Ally Contribution was a central focus of the mediation sessions, and reflects a thorough analysis of a number of variables.[31]  First, the parties analyzed the assets available for unsecured Creditors at each of the Debtor Groups, and determined that the GMACM and RFC Debtors held significant unencumbered assets, whereas the ResCap Debtors had little to no unencumbered assets available for distribution to unsecured Creditors at those entities.  Second, the parties then analyzed the secured and unsecured Claims asserted against each of the Debtors, the allocation of Allowed Claims against each Debtor Group, as well as the potential post-petition intercompany claims held by each of the Debtor Groups.  Third, the parties considered the rights and Causes of Action that each of the Debtor Groups could pursue against Ally, as identified by the Debtors and the Committee through their investigations.  After conducting each of these analyses, the parties determined that the proposed allocation of the Estate assets is reasonable and appropriate, and is in the best interest of the Estates and the creditors of each of the Debtor Groups.

The Global Settlement also embodies an allocation of accrued and projected administrative expenses among the Debtor Groups.  The Debtors project that, after April 30, 2013, there will be approximately $1.086 billion in administrative costs.  In light of the fact that the GMACM Debtors and the RFC Debtors were the operating companies and have the greatest amount of unencumbered assets available for unsecured Creditors, in contrast to the ResCap Debtors with limited operations and assets, and as part of the global compromise and settlement, the settling parties agreed to allocate the accrued and projected administrative costs to the GMACM Debtors and the RFC Debtors, with no administrative expenses allocated to the ResCap Debtors, as appropriate under the circumstances.  Specifically, the parties determined that of the projected $1.086 billion in administrative costs, $836.3 million shall be allocated to the GMACM Debtors, and $249.8 million shall be allocated to the RFC Debtors.

After payment of all Allowed secured claims and projected Allowed administrative and priority Claims, the Debtors project that, based upon the allocation of the Ally Contribution and projected Estate assets (including Cash and non-Cash assets) available for distribution to unsecured creditors at each of the Debtors' Estates, the following amounts will be available for distribution to unsecured creditors (subject to adjustment based on amounts reserved for Disputed Claims):

---

[31]  Thus, the Global Settlement does not include an allocation of any portion of the Ally Contribution on account of specific claims or causes of action that could be pursued by the Debtors or third parties.

-37-

| Entity | Allocation |
|---|---|
| ResCap Debtors | $780.2 million |
| GMACM Debtors | $626.0 million |
| RFC Debtors | $820.8 million |
| Private Securities Claims Trust | $235.0 million |
| Borrower Claims Trust | $57.6 million |
| NJ Carpenters Claims Distribution | $100.0 million |

In light of the fact that the amount of Allowed Administrative Expense Claims remains uncertain and the value of certain non-Cash assets held by the Estates will vary as they are liquidated over time, the parties to the Plan Support Agreement determined that any increase or decrease in administrative expenses and/or the value of all of the Debtor Estates from current projections, would be shared among the GMACM Debtors, the RFC Debtors, and the Private Securities Claims Trust, pro rata, regardless of the Debtor Group against which their claims are asserted.

## ARTICLE III.
## BACKGROUND

A.    **The Debtors' Businesses and Operations**

1.    **Overview**

As a result of the commencement of the Chapter 11 Cases and the sale of the Debtors' mortgage loan servicing and origination platform (the "Origination and Servicing Business") to Ocwen and Walter and the Debtors' "whole loan" portfolio (the "Whole Loan Portfolio") to Berkshire Hathaway, Inc. ("Berkshire") for a combined total of approximately $4.1 billion in gross sale proceeds (prior to reduction for payment of assumed liabilities, core costs, and other associated liabilities) (together, the "Asset Sales").  Following the transfer of the majority of the Debtors' business pursuant to the Asset Sales, the Debtors' operations have significantly changed.  A general description of the Debtors' organization and business prior to the Petition Date is set forth below.

Prior to the Petition Date, the Debtors were a leading residential real estate finance company indirectly owned by non-Debtor AFI.  The Debtors, together with their non-debtor subsidiaries, managed their mortgage-related businesses in two business lines:    (i) the Origination and Servicing Business, and (ii) the Whole Loan Portfolio and other business, which the Debtors started to wind down prior to the Petition Date.  As discussed herein, following the Petition Date, the Debtors sold substantially all of the assets associated with the Origination and Servicing Business to Ocwen and Walter and sold the Whole Loan Portfolio to Berkshire.

-38-

### 11. Motions Seeking Standing to Pursue Claims Against Ally

*Committee Standing Motion*. Following its investigation (as described above), the Creditors' Committee believed it identified viable and valuable Claims and Causes of Action against Ally, and that it was best suited to prosecute and settle claims against AFI and certain of AFI's non-debtor affiliates (the "AFI Defendants") arising from those transactions. On April 11, 2013, the Creditors' Committee filed a motion seeking entry of an order authorizing it to prosecute and settle veil-piercing, fraudulent transfer, indemnification, pre-petition preference, and equitable subordination claims on behalf of the Debtors' Estates against the AFI Defendants [Docket No. 3412]. Prior to the filing of this motion, the Debtors consented to the Creditors' Committee's standing to investigate these claims after determining that the Creditors' Committee was best positioned to pursue the claims and causes of action against the AFI Defendants in light of the Pre-Petition AFI-ResCap Settlement Agreement. The motion was heard by the Bankruptcy Court on May 7, 2013, but the Bankruptcy Court reserved decision. The Creditors' Committee's motion is stayed during the term of the Plan Support Agreement.

*Wilmington Trust Standing Motion*. On April 19, 2013, Wilmington Trust, National Association, solely in its capacity as Indenture Trustee for the Senior Unsecured Notes ("Wilmington Trust") filed a motion (the "Wilmington Trust Standing Motion") seeking authority to prosecute claims and other causes of action on behalf of the ResCap Estate [Docket No. 3475]. In particular, Wilmington Trust sought permission to file a complaint to pursue certain Estate claims and claims that Wilmington Trust alleged were third party claims, including constructive and actual fraudulent transfers, in coordination with the Creditors' Committee's efforts to prosecute Estate claims. On May 6, 2013, the Debtors filed a limited objection to the Wilmington Trust Standing Motion [Docket No. 3598]. The Wilmington Trust Standing Motion has not yet been heard by the Bankruptcy Court.

As a result of the Plan Support Agreement, the Wilmington Trust Standing Motion and other motions seeking standing to pursue claims or Causes of Action against AFI or its affiliates on behalf of the Debtors' Estates are stayed during the term of the Plan Support Agreement, and will be rendered moot once the Plan is confirmed.

### 12. Appointment of a Mediator

Recognizing the numerous, divergent interests held by the Debtors' key stakeholders, on December 6, 2012, the Debtors requested the appointment of a Mediator to assist with the plan negotiations process [Docket No. 2357]. Such request was supported by the Creditors' Committee. On December 26, 2012, the Bankruptcy Court entered an order appointing the Honorable James M. Peck as Mediator in these Chapter 11 Cases to assist in plan negotiations, foster a dialogue with key stakeholders, and reach resolution on significant plan issues [Docket No. 2519]. Initially, the Mediator was appointed for a limited period ending February 28, 2013, but as a result of subsequent negotiations amongst parties involved in the mediation, the Court further extended the term of the Mediator's appointment through October 31, 2013, or such earlier date as the Mediator declares that the mediation is at an impasse and should be terminated [Docket Nos. 2519, 3101, 3877] (collectively, the "Mediation Order").

-71-

The Mediator has offered constructive and independent guidance to the Mediation parties (as defined below) on the complex interdebtor and intercreditor issues that necessarily impact plan distributions. In particular, the focus of the mediation to date has been twofold: (1) to settle certain potential Estate and third party claims and causes of action identified against Ally in exchange for a contribution from Ally to the Debtors' Estates, in the form of the Debtor Release and the Third Party Releases, and (2) to address intercreditor issues related to the allocation of the Debtors' assets. Tremendous progress was made under the Mediator's guidance, ultimately culminating in the Plan Support Agreement.

### 13.    Mediation Process

As discussed above, commencing shortly after the Mediator's appointment through the date of the filing of this Disclosure Statement, the Mediator attended numerous mediation sessions with the following parties, both on an individual basis and jointly with different combinations of representative parties: the Debtors, the Creditors' Committee (as well as its individual members), the Ad Hoc Group, Ally, FHFA, the Institutional Investors, Paulson, and certain of the Debtors' other key constituencies (collectively, the "Mediation parties"). In an effort to facilitate these discussions and to guide the Mediation parties in their negotiations, the Debtors and their advisors prepared and provided the Mediator and the Mediation parties with comprehensive business and financial information, including multiple "waterfall" analyses that helped set forth hypothetical returns to creditors based on shifting recovery scenarios. In addition, certain parties provided to each other, as well as to the Mediator, presentations and draft pleadings outlining the strengths and weaknesses of their own, and other parties' claims. Subject to the Mediation Order, materials provided by any party as part of the mediation remain confidential in order to promote progress and protect commercially sensitive information. Ultimately, a global resolution was reached on a consensual plan and embodied in the Plan Support Agreement.

### 14.    The Termination of the Pre-Petition AFI-ResCap Settlement Agreement

Following the Asset Sales, the Debtors engaged in numerous discussions with various parties in interest, including Lewis Kruger, the Debtors' CRO, the Mediator, and the Creditors' Committee, regarding the framework of the Plan and the Potential Claims. Because the Asset Sales successfully closed thus accomplishing the primary objective of the Pre-Petition AFI-ResCap Settlement Agreement, the Debtors, with the support of the Creditors' Committee, allowed the AFI-ResCap Settlement Agreement to expire by its terms. However, the Creditors' Committee determined that negotiations with Ally regarding the resolution of the Potential Claims should continue. As discussed below, after substantial investigation and examination of claims and causes of action against Ally by the Creditors' Committee and the Examiner, the negotiations among the Debtors, Ally, the Creditors' Committee and the Consenting Claimants culminated in the Ally Contribution and the Global Settlement embodied in the Plan.

### 15.    Adjournment of the RMBS Trial

On June 11, 2012, the Debtors filed a motion pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "9019 Motion") for approval of the Original RMBS Settlement Agreements, [see Docket Nos. 320, 1176 and 1887]. When it became clear that the sale of the Debtors'

12-12020-mg    Doc 4157    Filed 07/04/13    Entered 07/04/13 00:39:48    Main Document
Pg 359 of 999

# Exhibit 6

# RECOVERY ANALYSIS

# RESIDENTIAL CAPITAL, LLC

1.      The Recovery Analysis[1] is based on the planned orderly wind-down of the assets remaining in the Estates as of April 30, 2013.  The recovery from these assets, along with cash on hand as of April 30, 2013 and the proceeds from the settlement with Ally Financial, Inc. (the "Ally Contribution"), are then distributed to; i) holders of secured claims, ii) administrative and priority expenses, and iii) general unsecured claims.

2.      Estimates were made of the cash proceeds which might be realized from the orderly liquidation of the Debtors' assets.  The liquidation is based on asset balances as of April 30, 2013 with certain proforma adjustments[2] used to estimate recoveries. Recoveries to creditors are presented on an undiscounted basis and are assumed to occur over the course of 7 years with over 85% of recoveries occurring over the first 3 years.  There can be no assurance that the recoveries assigned to the assets will in fact be realized.

### *Estimate of Costs*

3.      The Recovery Analysis assumes the wind-down of the Estates lasts for a period of approximately 3 years for the settlement of claims, although certain asset realization costs will continue through 7 years. During this time the Debtors will incur administrative expenses for operating expenses, restructuring professional fees, foreclosure file review costs, and other items. There can be no assurance that the administrative expenses will not exceed the estimates included in this analysis.

4.      THE DEBTORS' RECOVERY ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF THE ORDERLY LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the Recovery Analysis are a number of estimates and material assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the Debtors.  In addition, various decisions upon which certain assumptions are based are subject to change.  Therefore, there can be no assurance that the assumptions and estimates employed in determining the

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

[2] The pro-forma adjustments were made to exclude certain assets that are either non-economic or securitized (i.e. assets with offsetting liabilities recorded on the balance sheet).  The asset balances also exclude certain accounting adjustments related to pre-paid expenses and accounts receivable, as well as entries recorded to estimate true-up payments for the asset sale transactions with Ocwen and Walter.

recovery values of the assets will result in an accurate estimate of the proceeds that will be realized. In addition, amounts of Claims against the Estates could vary significantly from the estimate set forth herein. Therefore, the actual recovery received by creditors of the Debtors could vary materially from the estimates provided herein.

5.      THE RECOVERY ANALYSIS SET FORTH HEREIN WAS BASED ON THE VALUES OF THE DEBTORS' ASSETS AS OF APRIL 30, 2013 WITH CERTAIN PROFORMA ADJUSTMENTS. TO THE EXTENT THAT OPERATIONS THROUGH SUCH DATE WERE DIFFERENT THAN ESTIMATED, THE ASSET VALUES MAY CHANGE. DELOITTE TOUCHE TOHMATSU LLP, THE INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR RESCAP, HAS NOT EXAMINED, COMPILED OR OTHERWISE APPLIED PROCEDURES TO THESE VALUES AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE VALUES IN THE RECOVERY ANALYSIS.

## ASSET RECOVERY ASSUMPTIONS

### *Cash and Cash Equivalents*

6.      Cash and cash equivalents include cash in the Debtors' domestic bank accounts and other cash equivalents. The estimated recovery for this category of assets is 100%.

### *Restricted Cash*

7.      Restricted cash primarily consists of cash held at Ally Bank, escrow funds for GNMA pooling agreements and other amounts held in escrow related to the Ocwen APA and Walter Assignment, and other parties. Outstanding amounts are estimated to be fully recovered in the Recovery Analysis scenarios.

### *FHA/VA Mortgage Assets*

8.      Federal Housing Administration and Department of Veterans Affairs ("FHA/VA") mortgage assets consist of mortgage loans, servicer advances, and accrued interest. These assets constitute the bulk of the Estates' remaining assets. The FHA/VA recovery calculation assumes two primary resolution strategies, including: 1) recoveries through delivery of modified loans into GNMA securitizations, and 2) recovery of loan principal, interest and advances through FHA/VA insurance claims. The timing of claim recoveries is driven by the individual loan status and is dependent on foreclosure status, presence of documentation deficiencies and geography. Geography has become particularly important, as some judicial foreclosure states have an average foreclosure timeline of 4 years.

9.      FHA/VA loans are assumed to have a blended net recovery rate of approximately 93% of book value in the Recovery Analysis.

### *Non FHA/VA Mortgage Assets*

10.      The Estates' Non FHA/VA mortgage assets consist primarily of mortgage loans, servicer advances and accrued interest on loans removed from Fannie Mae ("FNMA") and Freddie Mac ("FHLMC") securitizations, loans rejected from the Berkshire Hathaway asset purchase

agreement and other loans deemed to be non-marketable. These assets are not guaranteed by any government agency.

11.     The Recovery Analysis assumes approximately 15% of the loan portfolio will be resolved through foreclosure or real estate owned ("REO") sales. The analysis further assumes a bulk sale of the remaining portfolio by the end of 2013. The Estates are currently preparing to market this portfolio. The blended recovery rate is assumed to be approximately 73% in the Recovery Analysis.

### MSRs and Associated Servicer Advances

12.     Mortgage servicing rights ("MSRs") and the associated servicer advances consist of assets excluded from the asset purchase agreements with Ocwen and Walter, due to various counterparty objections. The Estates are currently negotiating with the counterparties to resolve the objections and intends to sell these MSRs and servicer advances once settlements have been achieved. The blended recovery rate is assumed to be 103% of book value in the Recovery Analysis.

### Other Debtors' Assets

13.     Other Debtors' Assets consist primarily of securitized Home Equity Lines of Credit ("HELOCs"), REO properties, trading securities and derivative assets.

14.     The securitized HELOCs are comprised of current paying home equity lines which are projected to run off over the next 15 months.

15.     REO properties are assumed to be sold in the ordinary course.

16.     The GMAC 2010-01 securitization asset is assumed to continue paying off at historical rates over the first 2 years of the Estates. After the first 2 years, the securitization will be unwound through a cleanup call and the resulting whole loans will be sold at prices consistent with on-balance sheet FHA/VA loans.

17.     Derivative collateral is expected to be collected upon the completion of the delivery of modified loans into GNMA securitizations.

18.     The Other Debtors' Assets are expected to recover at a blended average rate of approximately 61% of book value in the Recovery Analysis.

### Non-Debtors' Assets

19.     Non-Debtors' Assets are comprised primarily of equity interests in the Debtors' foreign affiliates. These affiliates are working to liquidate assets and to resolve claims and litigation. The Debtors assume in the Recovery Analysis that they will be able to recover $24 million from non-Debtor affiliates.

*Other Recoveries*

20.     Additional incremental recoveries are expected to materialize from client recoveries and broker fees from the wind-down of the originations pipeline, however, these fees are expected to be offset by incremental costs for the Berkshire loan repurchase true-up[3]. In total, incremental recoveries are estimated to generate approximately $0 net recovery.

*Ally Contribution*

21.     The Ally Contribution is assumed to result in an additional contribution to the Estates of $2.1 billion in the Recovery Analysis. The Ally Contribution is comprised of $1.95 billion in cash to be paid on the Effective Date and $150 million on account of certain insurance claims. The Recovery Analysis assumes that $783 million of the AFI Contribution will be allocated to ResCap Debtors, $462 million will be allocated to GMACM Debtors, $462 million will be allocated to RFC Debtors and $393 million will be allocated to the Private Securities Claims Trust, Borrowers Claims Trust, and NJ Carpenters Claims Trust based on the plan term sheet.

## ADMINISTRATIVE EXPENSES

22.     Administrative expenses include payments for operating expenses, asset management costs, interest expense, professional fees, foreclosure file review related expenses, and post-petition accounts payable and accrued expenses.  Post-petition intercompany claims, which are subject to administrative priority status, are reflected in the April 30, 2013 cash balances by legal entity. The assumed total administrative expenses in the Recovery Analysis are $1.086 billion.

*Operating Expenses and Compensation and Benefits*

23.     Operating expenses consist of a number of costs necessary to administer the Estates after April 30, 13. These costs are primarily related to compensation and benefits, document storage and destruction costs, transition service agreement expenses, ordinary course professional fees and other operating expenses and are assumed to be $379 million in the Recovery Analysis.

24.     The estimation for compensation and benefits assumes an initial headcount of 257 as of April 30, 2013 which winds down over the forecast period. By the expected Confirmation Date of October 31, 2013, headcount is anticipated to decline to approximately 135.  Compensation and benefits includes severance, retention, and incentive payments.

25.     Document storage and destruction costs include expenses relating to the physical retention and destruction of documents. The Recovery Analysis assumes that all document destruction occurs at the end of the three years.

26.     Transition service agreement ("TSA") costs reflect the current TSA agreements between the Estates and Ocwen, AFI, and Walter. The Recovery Analysis reflects all extensions, modifications, and terminations as currently known and the most recent pricing available.

---

[3] Excludes any adjustments related to Walter and Ocwen sale true-ups.

27.    Ordinary course (non-reorganization) professional fees are projected based on the analysis of historical costs of closed cases, discounted for a reduction in litigation costs due to the AFI Contribution.

28.    Other operating expenses consist primarily of overhead costs necessary to run the Estates. This category includes costs related to facilities, insurance, information technology, and taxes[4], as well as other miscellaneous expenses.

### Direct Asset Management Costs

29.    Direct asset management costs primarily consist of servicing and subservicing fees to Ocwen and custodial fees.

30.    Servicing and subservicing costs are a function of the delinquency status of the individual loans being serviced. Servicing and subservicing costs reflect fees for the full asset disposition period (i.e. 7 years). The Recovery Analysis includes $47 million of direct asset management costs.

### Interest Expense

31.    Interest expense consists of post-petition interest payments made on the senior secured AFI Revolver and AFI LOC facilities. As of the date of the Disclosure Statement, both the AFI Revolver and the AFI LOC have been paid in full and no additional interest expense is assumed in the forecast. Total interest included in the Recovery Analysis is $8 million.

### Foreclosure File Review and Remediation Expenses

32.    Foreclosure file review and remediation costs consist of (i) expenses related to the Debtors' pending final settlement with the Board of Governors of the Federal Reserve of the independent foreclosure review ("IFR") under the Consent Order, as well as (ii) expenses related to ongoing compliance with the DOJ/AG Settlement entered into by the Debtors with the Department of Justice and 49 state attorneys general. These include costs related to the pending IFR settlement, third party professional fee expenses, costs and related to the SCRA file review component of the DOJ/AG Settlement, and a pro-rata share of the ongoing fees and expenses of the Office of Mortgage Settlement Oversight during the DOJ/AG Settlement enforcement period. The $230 million IFR settlement was agreed in June 2013 and bankruptcy court approval will be sought during July 2013. Total foreclosure review and remediation costs are assumed to be $328 million in the Recovery Analysis.

### Restructuring Professional Fee Expenses

33.    Restructuring Professional Fee Expenses include those fees paid to professionals engaged by the Debtors, the Unsecured Creditors Committee ("UCC"), the Junior Secured Noteholders, the Residential Mortgage Backed Securities ("RMBS") trustees, the Examiner, the US Trustee,

---

[4] The Estates have retained advisors for tax matters. The tax estimate is presented based upon preliminary guidance the Estates have received from their tax advisors.  It should be noted that the tax analysis has not been completed, and accordingly the guidance may change and those changes may be material.

and the Chief Restructuring Office ("CRO"). Where applicable, forecasted fees are based on third party vendor forecast submissions. Restructuring professional expenses are assumed to be approximately $310 million in the Recovery Analysis.

**Claims**

*Ally Secured Claims*

34.    Secured claims are given priority under the Bankruptcy Code and are entitled to payment prior to any payment on unsecured claims.  Secured claims from secured facilities include the claims related to the Ally Revolver and the Ally LOC facilities.

*Junior Secured Notes*

35.    The JSNs' claim of $2.223 billion ($2.121 billion of principal plus $102 million of pre-petition interest) is assumed to be satisfied in full in the Recovery Analysis by the residual value of AFI Revolver collateral and pledged equity after the satisfaction of the AFI Revolver.

36.    The allocation of the JSN recoveries among the Debtors is listed below.  The Plan also contemplates that the JSN claims will be paid in full on the Effective Date.

| ResCap Debtors | 8% |
|---|---|
| GMACM Debtors | 62% |
| RFC Debtors | 30% |

*General Unsecured Claims*

37.    General Unsecured Claims include:

(1)    RMBS Trust Claims;

(2)    Monoline Claims;

(3)    Other General Unsecured Claims;

(4)    Borrower Claims; and

(5)    Senior Unsecured Notes

38.    The treatment of many of these claims in the Recovery Analysis is assumed to be subject to the settlement terms agreed upon by the Consenting Claimants.

39.    Per the terms of the settlement, the Monoline Claims held by MBIA Inc. ("MBIA") are assumed to be fully and finally allowed as non-subordinated unsecured claims of $719 million against the ResCap Debtors, $1.450 billion against the GMACM Debtors, and $1.450 billion against the RFC Debtors.  Pursuant to the FGIC Settlement Agreement, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Plan, as of the Effective Date, the Allowed amounts of the General Unsecured

Claims held by FGIC shall be; $337.5 million against the ResCap Debtors, $181.5 million
against the GMACM Debtors, and $415.0 million against the RFC Debtors.  On account of such
Allowed General Unsecured Claims, FGIC shall receive its Pro Rata Share of the GMACM
Debtors Unit Distribution, RFC Debtors Unit Distribution and ResCap Debtors Unit Distribution,
as applicable.  The Monoline Claims held by all other Monolines are assumed to be treated under
the Plan as unsecured claims of the ResCap Debtors, the RFC Debtors or the GMACM Debtors,
as applicable, or as otherwise approved by the Plan Proponents and the Consenting Claimants.

40.      Per the terms of the settlement, the plan incorporates a settlement that provides for the
allowance, priority, and allocation of the RMBS Trust Claims through approval of the Debtors'
prior agreement with the Institutional Investors, which covered 392 RMBS Trusts. The RMBS
Settlement shall provide that all RMBS Trust Claims of the Original Settling Trusts and the
Additional Settling Trusts shall be fully and finally allowed as non-subordinated unsecured
claims in the aggregate amount of $7.051 billion for the Original Settling Trusts and in the
aggregate amount of $250 million for the Additional Settling Trusts. The $7.301 billion of claims
is allocated $210 million to the GMACM Debtors and $7.091 billion to the RFC Debtors;
provided, however, the allowance and allocation of such claims shall not affect the distributions
to be made in accordance with the RMBS Trust Allocation Protocol.

41.      Senior Unsecured Claims of $1.003 billion is assumed to be asserted against Residential
Capital LLC and is assumed to recover pari passu with the general unsecured creditors at
Residential Capital LLC.

42.      Other General Unsecured Claims are comprised of trade claims, lease rejections, and
other unsecured claims and are assumed to be $92 million.

43.      Borrower Claims will be addressed through the establishment of a Borrower Claims Trust
for the benefit of the holders of Borrower Claims at each of the Debtors and shall be funded in an
amount of $57.6 million, subject to the Adjustments as defined in the Supplemental Term Sheet.

### *Additional Securities Claims*

44.      Per the terms of the settlement, the recoveries for Securities Claims have been fixed.
These include the NJ Carpenters Claims totaling $100 million and Private Securities Claims
totaling $226 million, plus a pro-rata share of incremental recoveries beyond amounts
contemplated in the Term Sheet.

12-12020-mg    Doc 4436    Filed 07/31/13    Entered 07/31/13 16:49:07    Main Document
Pg 33 of 50

| | Residential Capital, LLC and Subsidiaries<br>Recovery Analysis<br>($ Millions) | | | |

| | | **Book Value** | | | |
|---|---|---|---|---|---|
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 1 | Restricted Cash | $ 27.9 | $ 39.2 | $ - | $ 67.1 |
| 2 | FHA/VA Mortgage Assets | - | 945.3 | - | 945.3 |
| 3 | Non FHA/VA Mortgage Assets | - | 39.4 | 7.3 | 46.7 |
| 4 | MSRs and Associated Servicer Advances | - | 189.2 | 21.8 | 211.0 |
| 5 | Other Debtors' Assets | 0.1 | 85.3 | 9.7 | 95.1 |
| 6 | Non-Debtor Assets (5) | - | - | - | - |
| 7 | Other Recoveries | - | - | - | - |
| 8 | **Total** | **$ 28.0** | **$ 1,298.3** | **$ 38.9** | **$ 1,365.2** |

| | | **Recoveries ($)** | | | |
|---|---|---|---|---|---|
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 9 | Restricted Cash | $ 27.9 | $ 39.2 | $ - | $ 67.1 |
| 10 | FHA/VA Mortgage Assets | - | 878.3 | - | 878.3 |
| 11 | Non FHA/VA Mortgage Assets | - | 27.6 | 6.4 | 34.0 |
| 12 | MSRs and Associated Servicer Advances | - | 189.5 | 28.4 | 217.9 |
| 13 | Other Debtors' Assets | - | 50.9 | 6.6 | 57.5 |
| 14 | Non-Debtor Assets | - | - | 24.2 | 24.2 |
| 15 | Other Recoveries | - | 5.5 | (6.8) | (1.3) |
| 16 | **Total** | **$ 27.9** | **$ 1,191.0** | **$ 58.8** | **$ 1,277.6** |

| | | **Recoveries (%)** | | | |
|---|---|---|---|---|---|
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 17 | Restricted Cash | 100.0% | 100.0% | n/a | 100.0% |
| 18 | FHA/VA Mortgage Assets | n/a | 92.9% | n/a | 92.9% |
| 19 | Non FHA/VA Mortgage Assets | n/a | 70.1% | 87.1% | 72.8% |
| 20 | MSRs and Associated Servicer Advances | n/a | 100.2% | 130.3% | 103.3% |
| 21 | Other Debtors' Assets | 0.0% | 59.7% | 67.9% | 60.4% |
| 22 | Non-Debtor Assets | n/a | n/a | n/a | n/a |
| 23 | Other Recoveries | n/a | n/a | n/a | n/a |

---

[5] Book values for the recoveries of the non-debtor assets are not shown as these assets for Debtors' represent equity claims.

| | Residential Capital, GMACM and RFC<br>Recovery Analysis<br>($ Millions) | | | | |
|---|---|---|---|---|---|

| | | ResCap<br>Debtors | GMACM<br>Debtors | RFC Debtors | Settlement<br>Payment | Total |
|---|---|---|---|---|---|---|
| | **Distributable Value** | | | | | |
| 1 | Cash | $ 143.5 | $ 2,037.8 | $ 1,496.9 | $ - | $ 3,678.3 |
| 2 | Remaining Assets | 27.9 | 1,191.0 | 58.8 | - | 1,277.6 |
| 3 | AFI Contribution | 782.7 | 462.3 | 462.3 | - | 1,707.4 |
| 4 | Trust Contribution | - | - | - | 392.6 | 392.6 |
| 5 | **Total Distributable Value** | **$ 954.1** | **$ 3,691.1** | **$ 2,018.0** | **$ 392.6** | **$ 7,055.9** |
| | **Paydown of Sec. Debt and JSN** | | | | | |
| 6 | Ally Revolver and Ally Line of Credit | $ - | $ (854.4) | $ (272.7) | $ - | $ (1,127.1) |
| 7 | Total JSN Paydown | (173.9) | (1,374.4) | (674.7) | - | (2,223.0) |
| 8 | **Total Paydown** | **$ (173.9)** | **$ (2,228.8)** | **$ (947.4)** | **$ -** | **$ (3,350.1)** |
| | **Priority/Wind-Down** | | | | | |
| 9 | Priority/Wind-Down | $ - | $ (836.3) | $ (249.8) | $ - | $ (1,086.2) |
| | **Value Available to GUC** | | | | | |
| 10 | Total Value Available to GUC | $ 780.2 | $ 626.0 | $ 820.8 | $ 392.6 | $ 2,619.6 |
| | **GUC Claims** | | | | | |
| 11 | Monolines | $ 1,143.0 | $ 1,806.5 | $ 2,040.0 | $ - | $ 4,989.5 |
| 12 | RMBS Trusts | - | 209.8 | 7,091.2 | - | 7,301.0 |
| 13 | Senior Unsecured Notes | 1,003.3 | - | - | - | 1,003.3 |
| 14 | Other GUCs | 0.9 | 63.7 | 27.5 | - | 92.1 |
| 15 | Securities Claimants | - | - | - | - | - |
| 16 | Borrower Claimants | - | - | - | - | - |
| 17 | **Total GUC Claims** | **$ 2,147.2** | **$ 2,080.0** | **$ 9,158.7** | **$ -** | **$ 13,386.0** |
| | **GUC Recoveries ($)** | | | | | |
| 18 | Monolines | $ 415.3 | $ 543.7 | $ 182.8 | $ - | $ 1,141.8 |
| 19 | RMBS Trusts | - | 63.1 | 635.5 | - | 698.7 |
| 20 | Senior Unsecured Notes | 364.6 | - | - | - | 364.6 |
| 21 | Other GUCs | 0.3 | 19.2 | 2.5 | - | 22.0 |
| 22 | Securities Claimants | - | - | - | 335.0 | 335.0 |
| 23 | Borrower Claimants | - | - | - | 57.6 | 57.6 |
| 24 | **Total GUC Recoveries ($)** | **$ 780.2** | **$ 626.0** | **$ 820.8** | **$ 392.6** | **$ 2,619.6** |
| | **GUC Recoveries (%)** | | | | | |
| 25 | Monolines | 36.3% | 30.1% | 9.0% | n/a | 22.9% |
| 26 | RMBS Trusts | n/a | 30.1% | 9.0% | n/a | 9.6% |
| 27 | Senior Unsecured Notes | 36.3% | n/a | n/a | n/a | 36.3% |
| 28 | Other GUCs | 36.3% | 30.1% | 9.0% | n/a | 23.8% |
| 29 | Securities Claimants | n/a | n/a | n/a | n/a | n/a |
| 30 | Borrower Claimants | n/a | n/a | n/a | n/a | n/a |
| 31 | **Total GUC Recoveries (%)** | **36.3%** | **30.1%** | **9.0%** | **n/a** | **19.6%** |

# Exhibit B

12-12020-mg    Doc 1741    Filed 10/05/12
Pg 9 of 59

GIBBS & BRUNS LLP
Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile:  (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Residential Capital, LLC, *et al.* | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**VERIFIED STATEMENT OF GIBBS AND BRUNS LLP PURSUANT TO FEDERAL**
**RULE OF BANKRUPTCY PROCEDURE 2019**

In connection with the above-captioned chapter 11 cases (the "Chapter 11 Cases")

commenced by the debtors on May 14, 2012, Gibbs & Bruns LLP ("Gibbs & Bruns") hereby

submits this verified statement (the "Statement") pursuant to Rule 2019 of the Federal Rules of

Bankruptcy Procedure ("Bankruptcy Rule 2019") in connection with Gibbs & Bruns'

representation of the Steering Committee Group of RMBS Holders (the "Steering Committee"),

which hold, or manage accounts that hold, Residential Mortgage Backed Securities issued by

1212020121005000000000028

various Debtors and included in the RMBS Trust Settlement Agreement, as amended from time
to time ("RMBS").  Gibbs & Bruns respectfully states as follows:

1.    As of the date of this Statement, Gibbs & Bruns represents the Steering
Committee, which is comprised of each of the entities identified in Exhibit A attached hereto
(each a "Member") in connection with the Chapter 11 Cases.  As of the date of this Statement,
each Member holds, or manages accounts that hold, the RMBS.

2.    In or around September 2011, certain Members engaged Gibbs & Bruns to
represent them to pursue mortgage repurchase and servicing claims against the Debtors and/or
Ally Financial Inc.  In or around late April and early May 2012, certain Members engaged Ropes
& Gray LLP ("Ropes and Gray") as co-counsel to represent them to pursue mortgage repurchase
and servicing claims against the Debtors and/or Ally Financial Inc.  After the RMBS Trust
Settlement was reached, and after the commencement of the Chapter 11 Cases, certain other
Members joined the Steering Committee.  Gibbs & Bruns and Ropes & Gray's legal fees shall be
paid in accordance with Section 6.03 of the RMBS Trust Settlement Agreement and Exhibit C
thereto.

3.    As of the date of this statement, Gibbs & Bruns and Ropes & Gray represent only
the Steering Committee and do not represent or purport to represent any entities other than the
Steering Committee in connection with the Chapter 11 Cases.  In addition, the Steering
Committee represents only the interests of its Members and does not represent or purport to
represent any other entities in connection with the Chapter 11 Cases.

4.    The Steering Committee holds, or manages accounts that hold, approximately
$12.1 billion in aggregate current face amount of the RMBS, or approximately $29.8 billion in

aggregate original face amount of the RMBS.[1]  In accordance with Bankruptcy Rule 2019, the

address and nature and amount of all disclosable economic interests for each Member is set forth

on Exhibit A.  The information contained in Exhibit A is based upon information provided by the

Members to Gibbs & Bruns and is subject to change.

5.    Nothing in this Statement (or Exhibit A hereto) should be construed as a

limitation upon, or waiver of, any Member's rights to assert, file and/or amend its claims in

accordance with applicable law and any orders entered in these cases.

6.    The undersigned, who is a partner at Gibbs & Bruns, verifies that the foregoing is

true and correct to the best of her knowledge.

Dated:  October 5, 2012
        New York, New York

/s/ Kathy D. Patrick

Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile:  (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

---

[1]    As Exhibit A and footnotes 2 through 9 thereto indicate, this figure excludes "Interest-Only" or "IO" holdings.

**EXHIBIT A**

**Nature and Amount of Disclosable Economic Interest** [1]

| | | RMBS Included in RMBS Trust Settlement Agreement | | | |
| | | Holdings as of Sept. 30, 2011 | | Holdings as of Sept. 26, 2012 [9] | |
| Name | Address | Original Face | Current Face | Original Face | Current Face |
| --- | --- | --- | --- | --- | --- |
| AEGON USA Investment Management, LLC | 4333 Edgewood Road NE<br>Cedar Rapids, IO 52499-5110<br>Attn: Renee Montz | $623,897,000 | $366,942,487 | $603,897,000 | $330,397,514 |
| Angelo, Gordon & Co., L.P. [2] | 245 Park Avenue, 42nd Floor<br>New York, NY 10167<br>Attn: Allan N. Krinsman | $316,795,819 | $120,264,216 | $822,174,736 | $323,085,820 |
| Bayerische Landesbank | 560 Lexington Ave<br>New York, NY 10022<br>Attn: Lorraine Briganti | $931,462,000 | $423,278,308 | $931,462,000 | $360,161,278 |
| BlackRock Financial Management Inc. [3] | 40 East 52nd Street<br>New York, NY 10022<br>Attn: Stephen Ahrens | $6,616,820,542 | $2,473,186,738 | $2,929,494,781 | $1,074,063,893 |
| Cascade Investment, LLC | 2365 Carillon Point<br>Kirkland, WA 98033<br>Attn: Laurie Smiley | $513,018,600 | $199,332,370 | $513,018,600 | $175,288,407 |
| Federal Home Loan Bank of Atlanta | 1475 Peachtree Street NE<br>Atlanta, GA 30309<br>Attn: Branden Baltich | $32,000,000 | $6,053,463 | $32,000,000 | $5,386,527 |
| Goldman Sachs Asset Management, L.P. | 200 West Street<br>New York, NY 10282<br>Attn: Caroline Straus | $2,132,989,063 | $1,059,963,595 | $2,156,195,283 | $979,369,120 |
| ING Investment Management Co. LLC [4] | 5780 Powers Ferry Road, NW<br>Atlanta, GA 30327<br>Attn: Kate Ippen | $2,230,369,890 | $946,259,036 | $2,230,369,890 | $813,905,690 |
| ING Investment Management, LLC [5] | 5780 Powers Ferry Road, NW<br>Atlanta, GA 30327<br>Attn: Kate Ippen | $926,184,517 | $406,315,843 | $926,184,517 | $344,937,763 |
| Kore Advisors, L.P. | 1501 Corporate Dr., Ste 230<br>Boynton Beach, FL 33426<br>Attn: Cory Nass | $155,725,598 | $100,247,215 | $210,128,583 | $131,306,131 |
| Metropolitan Life Insurance Company | 1095 Avenue of the Americas<br>New York, NY 10036<br>Attn: Kevin Finnegan | $2,322,117,860 | $1,025,326,497 | $2,759,428,360 | $1,128,036,448 |
| Neuberger Berman Europe Limited | Lansdowne House<br>57 Berkeley Square<br>London W1J 6ER<br>United Kingdom<br>Attn: Paul de Francisci | $558,615,000 | $403,705,776 | $558,615,000 | $363,426,470 |
| Pacific Investment Management Company LLC | 840 Newport Center Drive<br>Newport Beach, CA 92660<br>Attn: Rick LeBrun | $4,853,503,231 | $2,022,960,894 | $6,432,565,824 | $2,828,164,723 |
| SNB StabFund [6] | 1285 Avenue of the America<br>3rd Floor<br>New York, NY 10019<br>Attn: Jeffrey Lavine | $2,402,868,378 | $612,104,393 | $2,392,868,378 | $464,098,342 |
| Teachers Insurance and Annuity Association of America | 8500 Andrew Carnegie Blvd.<br>C2-08-04<br>Charlotte, NC 28262<br>Attn: John D. McCally | $1,791,426,859 | $1,410,181,631 | $2,116,407,442 | $1,346,349,486 |
| The TCW Group, Inc. [7] | 865 S Figueroa Street<br>Los Angeles, CA 90017<br>Attn: Sean Plater | $1,665,339,720 | $864,830,483 | $2,281,512,675 | $845,705,800 |

12-12020-mg   Doc 4741   Filed 08/16/12   Entered 08/16/12 19:25:43   Exhibit A
Pg 2 of 2

**EXHIBIT A**

**Nature and Amount of Disclosable Economic Interest** [1]

| | | RMBS Included in RMBS Trust Settlement Agreement | | | |
| | | Holdings as of Sept. 30, 2011 | | Holdings as of Sept. 26, 2012 [9] | |
| Name | Address | Original Face | Current Face | Original Face | Current Face |
|---|---|---|---|---|---|
| Thrivent Financial for Lutherans | 625 Fourth Ave. S. Minneapolis, MN 55415-1665 Attn: David Royal | $192,592,000 | $77,880,077 | $198,010,000 | $64,038,917 |
| Western Asset Management Company [8] | 385 E. Colorado Blvd. Pasadena, CA 91101 Attn: Stephen Venable | $2,984,143,449 | $1,120,202,439 | $1,682,632,412 | $549,218,291 |
| TOTAL | | $31,249,869,526 | $13,639,035,462 | $29,776,965,481 | $12,126,940,619 |

**Notes**

[1] Holdings for the Steering Committee investors do not include holdings of other securities issued by the Debtor(s) that are not "represented by" the Steering Committee group.

[2] Excludes interest-only holdings as of September 30, 2011 ($549mm in original face, $286mm in current face) and September 26, 2012 ($929mm in original face, $414mm in current face).

[3] Excludes interest-only holdings as of September 30, 2011 ($3.569bb in original face, $999mm in current face) and September 26, 2012 ($1.785bb in original face, $433mm in current face).

[4] In February 2012, beneficial ownership of the RMBS currently managed by ING Investment Management Co. LLC was transferred from ING Bank, fsb to ING Bank, NV.

[5] Excludes interest-only holdings as of September 30, 2011 ($145mm in original face, $49mm in current face) and September 26, 2012 ($145mm in original face, $40mm in current face).

[6] Excludes interest-only holdings as of September 30, 2011 ($10.572bb in original face, $4.689bb in current face) and September 26, 2012 ($10.572bb in original face, $3.990bb in current face).

[7] Excludes interest-only holdings as of September 30, 2011 ($585mm in original face, $257mm in current face) and September 26, 2012 ($10.435bb in original face, $4.403bb in current face).

[8] Excludes interest-only holdings as of September 30, 2011 ($10mm in original face, $3mm in current face) and September 26, 2012 ($10mm in original face, $3mm in current face).

[9] Holdings for ING Investment Management Co. LLC and ING Investment Management LLC are as of September 30, 2012.

# Exhibit C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ─────────────────────────────────── | ) |
| In re: | )  Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al., | )  Chapter 11 |
| | ) |
| Debtors. | )  Jointly Administered |
| ───────────────────────────────────────────────── | ) |

## <u>ORDER APPOINTING MEDIATOR</u>

Upon the motion (the "<u>Motion</u>")[1] of the above-captioned debtors and debtors in

possession in these Chapter 11 cases (collectively, the "<u>Debtors</u>") requesting the appointment of

a mediator (a "<u>Mediator</u>") to assist the parties in resolving certain issues relating to the

formulation and confirmation of a Plan [Docket No. 2357]; and it appearing that this Court has

jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that

venue of these Chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§

1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. §

157(b); and this Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates, their creditors and other parties in interest; and this Court

having found that proper and adequate notice of the Motion and the relief requested therein has

been provided in accordance with the Bankruptcy Rules, the Local Rules, and the Case

Management Procedures Order [Docket No. 141] for these Chapter 11 cases, and that, except as

otherwise ordered herein, no other or further notice is necessary; and any objections (if any) to

the Motion having been withdrawn or overruled on the merits; and after due deliberation thereon;

and good and sufficient cause appearing therefor;

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1212020121226000000000006

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Upon entry of this Order, Judge James M. Peck shall be appointed as Mediator for
an initial period through February 28, 2013.  The Debtors may, in consultation with the relevant
parties involved in the mediation discussions (the "Mediation Parties"), seek to extend such
period.

3.      To the extent it is determined that mediation is appropriate, the Mediation Parties
may (or at the direction of the Court shall) meet and confer with the Mediator to establish
procedures and timing of the mediation.

4.      Without limiting the applicability of Local Rule 9019-1 or General Order M-390,
all (a) discussions among any of the Mediation Parties, including discussions with or in the
presence of the Mediator, (b) any mediation statements and any other documents or information
provided to the Mediator or the Mediation Parties in the course of the mediation, and
(c) correspondence, draft resolutions, offers, and counteroffers produced for or as a result of the
mediation shall be strictly confidential and shall not be admissible for any purpose in any
judicial or administrative proceeding, and no person or party participating in the mediation,
whether a direct participant or member of a committee or group, including counsel for any
Mediation Party or any other party, shall in any way disclose to any non-party or to any court,
including, without limitation, in any pleading or other submission to any court, any such
discussion, mediation statement, other document or information, correspondence, resolution,
offer or counteroffer that may be made or provided in connection with the mediation, unless
otherwise available and not subject to a separate confidentiality agreement that would prevent
its disclosure or as authorized by this Court.

5.    To the extent that any Mediation Party is in possession of privileged or

confidential information provided to such Mediation Party pursuant to the terms and conditions

of a confidentiality agreement executed or order of this Court entered in connection with these

Chapter 11 cases, such information may be disclosed to the Mediator, but shall otherwise

remain privileged and confidential and shall not be disclosed to any other Mediation Party.

6.    For the avoidance of doubt, to the extent any part of this Order shall conflict with

Local Rule 9019-1 or General Order M-390, the terms and provisions of this Order shall govern.

7.    Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062,

9014, or otherwise, this Order shall be in full force and effect upon its entry.

8.    This Court shall retain jurisdiction with respect to all matters arising from or

related to the enforcement of this Order.

New York, New York
Date: December 26, 2012


            **/s/Martin Glenn**
            MARTIN GLENN
        United States Bankruptcy Judge

# Exhibit D



# Timeline of FGIC Settlement Discussions During the Mediation Process

* Defined terms herein shall have the same meanings as they do in the Witness Statement of John S. Dubel.

1



Timeline of FGIC Settlement Discussions During the Mediation Process

# Timeline of FGIC Settlement Discussions During the Mediation Process



3



Timeline of FGIC Settlement Discussions During the Mediation Process

# Timeline of FGIC Settlement Discussions During the Mediation Process



**5/2/13** — All-party mediation session (7 hours)

**5/6/13** — OCC conference call

**5/8/13** — Consenting creditors and OCC conference call

**5/9/13** — All-party mediation session (12 hours)

**5/10/13** — All-party mediation session (6.5 hours)

**5/10/13** — Consenting creditors and OCC conference call

**5/12/13** — Consenting creditors and OCC have two conference calls

**5/13/13** — Plan Support Agreement and Plan Term Sheet executed.**

**5/13/13** — Consenting creditors and OCC have two conference calls

**5/22/13** — All-party mediation session (15 hours)

**5/23/13** — All-party mediation session (9.5 hours – went through the night)

**5/23/13** — Supplemental Term Sheet executed.

**5/29/13** — OCC conference call

5

** The Plan Support Agreement is Exhibit 3 of Docket No. 3814 , and the Plan Term Sheet is attached to the Plan Support Agreement.