**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon
and The Bank of New York Mellon Trust
Company, N.A., as Trustee of Certain
Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as
Trustee of Certain Mortgage Backed
Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association,
as Trustee of Certain Mortgage-Backed
Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

**NOTICE OF FILING OF DIRECT TESTIMONY DECLARATION OF
S.P. KOTHARI, PH.D., REGARDING DEBTORS' MOTION PURSUANT TO
FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT
AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES,
<u>AND CERTAIN INDIVIDUAL INVESTORS</u>**

      **PLEASE TAKE NOTICE** that, pursuant to the *Scheduling Order* [ECF No. 4168],

dated July 8, 2013, entered by the Bankruptcy Court in connection with the *Debtors' Motion*

*Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees, and Certain Individual Investors* [ECF No. 3929] (the "**FGIC 9019 Motion**"), The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A. (collectively, "<u>BNY Mellon</u>"), U.S. Bank National Association ("<u>U.S. Bank</u>"), and Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>"), solely in their respective capacities as trustee or indenture trustee for certain mortgage backed securities trusts (collectively, the "<u>FGIC Trustees</u>") hereby file the *Direct Testimony Declaration of S.P. Kothari, Ph.D.* (the "**Declaration**") regarding the FGIC 9019 Motion, attached hereto as **Exhibit A**.

        **PLEASE TAKE FURTHER NOTICE** that, pursuant to the *Order Regarding Exchange of Confidential Information* [ECF No. 4249] (the "**Confidentiality Order**"), dated July 16, 2013, entered by the Bankruptcy Court in connection with the FGIC 9019 Motion, certain portions of the Declaration are hereby filed in redacted form and under seal. An unredacted copy of the Declaration will be provided to the Bankruptcy Court and served on parties to the Confidentiality Order.

        *[Remainder of page intentionally left blank.]*

- 2 -

Dated:  New York, New York
           July 31, 2013

**DECHERT LLP**
By:  /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon
and The Bank of New York Mellon Trust
Company, N.A., as Trustee of Certain
Mortgage-Backed Securities Trusts*


**ALSTON & BIRD LLP**
By:  /s/ Michael E. Johnson
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as
Trustee of Certain Mortgage Backed
Securities Trusts*

**SEWARD & KISSEL LLP**
By:  /s/ Mark D. Kotwick
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association,
as Trustee of Certain Mortgage-Backed
Securities Trusts*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## <u>DIRECT TESTIMONY DECLARATION OF S.P. KOTHARI, PH.D.</u>

1

I, S.P. Kothari, under penalty of perjury, testify as follows:

## I.    Qualifications

1.    I am the Gordon Y Billard Professor in Management at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT").  I am also currently Deputy Dean of MIT's Sloan School of Management, with responsibility for Faculty.  I have returned to MIT after serving as Global Head of Equity Research with Barclays Global Investors between 2008 and 2010.  I served on the faculty of the University of Rochester between 1986 and 1999, first as an Assistant Professor, then as an Associate Professor, and finally as Professor and Accounting Area Coordinator. During this time, I also held visiting positions at MIT, the University of Technology in Sydney, Baruch College of the City University of New York, and the City University in London.  I received my B.E. degree in Chemical Engineering from the Birla Institute of Technology and Science in 1979, my M.B.A. in Accounting and Finance from the Indian Institute of Management in 1982, and my Ph.D. in Accounting from the University of Iowa in 1986.

2.    I have published numerous academic articles in the areas of accounting, finance, and economics, and co-edited two books – *Financial Statement Analysis*, published by McGraw-Hill, and *Contemporary Accounting Research: Synthesis and Critique*, published by North-Holland Publishing.  My research focuses primarily on the relation between earnings and stock prices, informational efficiency of stock prices, the relation between accounting accruals and cash flows, the effect of institutions on the properties of accounting numbers internationally, and corporate uses of financial derivatives, among other topics.  I am currently an Editor of the *Journal of Accounting &*

2

*Economics*, a leading academic journal in the field of accounting, and have been an editor of this journal since 1997. I have also served as an associate editor and/or referee for other professional journals, including *The Accounting Review*, *The Journal of Finance*, the *Journal of Financial Economics*, the *Journal of Accounting Research*, *Contemporary Accounting Research*, and *The British Accounting Review*.

3.    My publications appear on my *curriculum vitae*, attached as Exhibit 1. Other than in connection with this matter, I have not testified or been deposed in the last four years. My hourly billing rate in this matter is $1,000.

4.    The documents and information that I have considered in connection with this Declaration and in forming my opinions detailed herein are listed in Exhibit 2. I reserve the right to consider additional documents and information between now and the hearing on this matter.

## II.    Retention and Summary of Opinions

5.    On May 23, 2013, Residential Capital, LLC ("ResCap"), Financial Guaranty Insurance Company ("FGIC"), The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association, and Wells Fargo Bank, N.A. (collectively, the "Trustees"), Law Debenture Trust Company of New York, and certain institutional investors entered into a settlement agreement in which holders of policy claims for RMBS trusts sponsored by ResCap ("ResCap Policyholders") would forego expected payouts under FGIC's rehabilitation plan in exchange for a lump sum cash payment.[1] I understand that the Trustees had previously

---

[1] Settlement Agreement, May 23, 2013, Article II.

retained Duff & Phelps, LLC to evaluate the reasonableness of this settlement agreement.

I was retained by counsel for the Trustees to offer an opinion on the following issues:

(i) 

(ii)

(iii)

(iv) to the extent that the prices of certain FGIC-wrapped securities issued by ResCap and GMAC trusts declined around the time of the May 23, 2013 settlement agreement, whether these price declines, taken in isolation, could suggest that the settlement agreement is unfavorable to the holders of these securities.

6. 

4

███ Lastly, to the extent that the prices of certain FGIC-wrapped securities issued by ResCap and GMAC trusts declined around the time of the May 23, 2013 settlement agreement, my opinion is that one cannot conclude from these price declines, taken in isolation, that the settlement agreement is unfavorable to the holders of these securities.

7.    I provided the Trustees with a report detailing my opinions on July 19, 2013 (the "Report"), which I understand was disclosed to certain parties objecting to the May 23, 2013 settlement agreement.    This Declaration is based on that report and contains my current opinions in this matter.    I reserve the right to supplement my opinions if additional relevant information becomes available.

## III.    Duff & Phelps' Discount Rate Assumptions

8.    FGIC's rehabilitation plan provides for all of the company's value, other than administrative expenses and certain other costs, to go to its outstanding policyholders in the form of payments on existing as well as future policy claims.[2]  FGIC does not anticipate that it will have sufficient funds to pay all claims in full.[3]  Therefore, the goal of FGIC's rehabilitation plan is to treat the company's outstanding policyholders in a fair and equitable manner regardless of when their claims arise.[4]  To address the potential competing interests of those policyholders with existing claims or claims likely to be realized in the short term versus others with claims not anticipated for up to as much as 40 years, FGIC's rehabilitation plan defers a portion of claim payments over a 40-year period ending in 2052.[5]

---

[2] Disclosure Statement for Plan of Rehabilitation for Financial Guaranty Insurance Company, September 27, 2012, pp. 1-3.
[3] Ibid.
[4] Ibid.
[5] Ibid.

9. 

To evaluate whether this discount rate range is reasonable, I referred to the 2013 edition of the *Ibbotson Cost of Capital Yearbook* ("Ibbotson"), an annual publication that provides discount rate data for over 400 industries. Based on both my academic research and my experience at Barclays Global Investors, I chose to focus specifically on estimates of the weighted average cost of capital for Standard Industry Classification ("SIC") 635, Surety Insurance, described as establishments primarily engaged with underwriting financial responsibility insurance. Exhibit 3 contains the relevant pages from Ibbotson.

10.     I focused on SIC 635 because companies in this industry classification have operations similar to FGIC's. I focused on the weighted average cost of capital because my opinion is that this measure conservatively captures the riskiness of expected payouts to ResCap Policyholders under FGIC's rehabilitation plan. Since FGIC's rehabilitation is designed as a "run-off" model where FGIC will not be writing new insurance policies but instead will be managed only to pay existing as well as future policy claims, FGIC's outstanding policyholders, including ResCap Policyholders, will be the only class of claimants on its assets and will therefore be exposed to the overall riskiness of FGIC.[8]

---

[6] FGIC Commutation Proposal Discussion Materials, Duff & Phelps, May 15, 2013, p. 9.
[7] Ibid.
[8] Disclosure Statement for Plan of Rehabilitation for Financial Guaranty Insurance Company, September 27, 2012, EX. C-2.

11.    Ibbotson uses five different approaches to estimate the weighted average cost of capital: the capital asset pricing model ("CAPM"), the CAPM plus a size premium, the 3-factor Fama-French model, a 1-stage discounted cash flow model, and a 3-stage discounted cash flow model.    These five approaches represent standard techniques for estimating the weighted average cost of capital.

12.    In 1995, I published a paper in *The Journal of Finance* titled "Another Look at the Cross-Section of Expected Stock Returns," co-authored with Jay Shanken and Richard Sloan, regarding the Fama-French 3-factor model for computing cost of equity capital, which is one of the approaches utilized by Ibbotson to calculate weighted average cost of capital.[9]    In that paper, I explored the magnitude of the effect of book-to-market ratios, which is a factor utilized in the Fama-French 3-factor model, on stock returns. My research did not call into question whether there is an economic basis for or whether there is, in fact, an empirical relation between book-to-market ratios and stock returns. Rather, my research focused on the magnitude of this effect. I explicitly made this point in my 1995 paper with Shanken and Sloan as well as another paper I co-authored with Shanken in 1999 where we concluded, "Having played 'devil's advocate' on the B/M [book-to-market ratio] issues, we still come away with the impression that there is an effect, although one that is smaller and less consistent than suggested by the early evidence."[10]    This viewpoint is consistent with research conducted by other academics.    In a 1997 paper titled "Firm Size, Book-to-Market Ratio, and Security Returns: A Holdout Sample of Financial Firms" and published in *The Journal of Finance*,

---

[9] S.P. Kothari, Jay Shanken, and Richard G. Sloan, Another Look at the Cross-Section of Expected Stock Returns, *The Journal of Finance* 50 (1995), pp. 185-224.

[10] S.P. Kothari and Jay Shanken, Beta and Book-to-Market: Is the Glass Half Full or Half Empty?, in D.B. Keim and W.T. Ziemba, eds: *Security Market Imperfections in Worldwide Equity Markets* (Cambridge, U.K.: Cambridge University Press), 1999, p. 59.

Brad Barber and John Lyon develop an alternative methodology to test the Fama-French 3-factor model in a way that addressed my prior concerns, and they find that book-to-market ratios continue to explain stock returns.[11]  My analysis of book-to-market ratios does not lead me to conclude that the Fama-French 3-factor model should be excluded as one of the approaches utilized by Ibbotson.

13.    Ibbotson's estimates of the weighted average cost of capital for the median company in the surety insurance industry range from 9.19 to 18.77 percent per annum.  I focused on a range because academic research indicates considerable variability around single point estimates of the cost of capital.[12] ██████████████

████████████████████████████████████████████

██████████████████████ my opinion is that FGIC, which is in a rehabilitation proceeding and admittedly insolvent, is likely to be riskier than a representative company in the surety insurance industry for several reasons.

14.    First, FGIC has no cushion to absorb existing as well as future policy claims and is, in fact, expecting substantial shortfalls in funds available to pay permitted claims.  This makes the expected payout on policyholder claims riskier because any unexpected claims will reduce the payouts to all policyholders.  Second, FGIC's inability to underwrite new business restricts its ability to diversify its underwriting risk with new policies entered into after the global financial crisis.  Third, because it will be underwriting no new business, FGIC will be deprived of a future stream of premium income that could be used, in part, to bolster its reserves to make required claim

---

[11] Brad M. Barber and John D. Lyon, Firm Size, Book-to-Market Ratio, and Security Returns: A Holdout Sample of Financial Firms, *The Journal of Finance* 52 (1997), pp. 875-83.
[12] Eugene F. Fama and Kenneth R. French, Industry costs of equity, *Journal of Financial Economics* 43 (1997), pp. 153-193.

payments.    Fourth, while FGIC will be subject to oversight provided by insurance regulators, it will have no outside investors, which serve as a monitor to incentivize accountability and improve performance.    Fifth, the weighted average cost of capital is lower for companies with more debt because of the tax deductibility of interest, but FGIC's rehabilitation plan does not contemplate the company issuing debt or paying taxes so it will be unable to utilize this benefit.[13]    Based on these observations, my opinion is that the weighted average cost of capital estimates from Ibbotson SIC 635 are a conservative measure of the overall riskiness of expected payouts under FGIC's rehabilitation plan.

15.    Based on my analysis of the Ibbotson data from SIC 635 and the preceding considerations that make FGIC riskier than the median company in this industry classification, my opinion is that the ██████████████ discount rate range used by Duff & Phelps in its analysis of the expected payouts to ResCap Policyholders under FGIC's rehabilitation plan is reasonable.

## IV.    Duff & Phelps' ResCap Policyholder Payout Assumptions

16.    ███████████████████████████████████
█████████████████████████████████████████
████████████  ██████████████████[14]  Based on my review of the Disclosure Statement for Plan of Rehabilitation for Financial Guaranty Insurance Company, the First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, the Affidavit of Michael W. Miller in Further Support of Approval of First

---

[13] Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation, December 12, 2012, Exhibit 1, pp. 4 and 6.
[14] FGIC_Settlement Proposal_D&P Analysis_051513.xlsx.

Amended Plan of Rehabilitation ("Miller Affidavit"), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[15]  ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Both FGIC and

Lazard had access to more information than Duff & Phelps, and both parties had

incentives to produce accurate financial projections under FGIC's rehabilitation plan.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮[16]▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[15] Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation, December 12, 2012, Exhibit 1 and FGIC_Settlement Proposal_D&P Analysis_051513.xlsx.

[16] Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation, December 12, 2012, Exhibit 1 and FGIC_Settlement Proposal_D&P Analysis_051513.xlsx, "POR - Detail" tab.

███████████████████████████████████████████████████████

████████████ [17]

18.  ███████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████ [18] ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████  The Intex engine contains a variety of trust-

level information, including capital structure, payment terms, and loans backing a given

trust.  █████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[17] Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation, December 12, 2012, Exhibit 1 and FGIC_Settlement Proposal_D&P Analysis_051513.xlsx, "Plan of Rehab-All" and "POR - Detail" tabs.
[18] FGIC_Settlement Proposal_D&P Analysis_051513.xlsx, "POR - Detail" tab.

11



19.    It is also my opinion that Duff & Phelps made some choices in its model that would tend to result in a less favorable view of the May 23, 2013 settlement agreement from the perspective of ResCap Policyholders, thus biasing against its acceptance. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████[19]██████

████████████████████████████████████████████████

████████████████████████[20]████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████[21] This includes pre- and post-rehabilitation FGIC premiums, expenses, recoveries, and other obligations.[22] While I do not have an estimate of the amounts for expenses, recoveries, and other obligations, the amount of premiums is estimated to be approximately $18.3 million.[23]

---

[19] FGIC Commutation Proposal Discussion Materials, Duff & Phelps, May 15, 2013, p. 3, footnote b) "Note: D&P has not estimated projected losses that correspond to the underlying macro assumptions as assumed under the Stress Scenario (per the Lazard Affidavit)." and p. 8, footnote (a) "D&P has not estimated projected losses that reflect the same underlying macro assumptions as the Stress Scenario included in the Affidavit."
[20] Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation, December 12, 2012, p. 8.
[21] Settlement Agreement, May 23, 2013, p. 4.
[22] First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, April 12, 2013, Exhibit A, pp. A-10-11.
[23] Affirmation of Gary T. Holzer, p. 5.

20. ███████████████████████████████████████

███████████████████████████████████████my

opinion is that it was reasonable for Duff & Phelps to conclude that the $253.3 million

payment under the May 23, 2013 settlement agreement is within the range of present

values of the expected payouts to ResCap Policyholders under FGIC's rehabilitation plan.

## V.    FGIC Litigation Claims

21. ███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

> "The Updated Run-Off Projections do not include proceeds from any recoveries
> from Material Litigation, which are described in Section IV.B.7 of the
> Disclosure Statement, due to the uncertainty regarding such recoveries today."[24]

> "FGIC is currently a defendant in a number of litigations, and may become a
> defendant in additional litigations in the future; an adverse judgment in any such
> litigations could increase the amount of Permitted Claims, thus potentially
> resulting in a decrease of the CPP and significantly lower ultimate recoveries
> for Policyholders than those reflected in the Run-Off Projections."[25]

22. The footnotes in FGIC's March 31, 2013 statutory filing also acknowledge

the existence of litigation against the company but highlight that FGIC is unable to

develop a meaningful estimate of losses from such litigation:

> "It is not possible to predict whether additional suits will be filed against FGIC,
> including suits as to which previously filed claims against FGIC have been
> dismissed, either voluntarily or by an order that has not become final and non-
> appealable, or whether additional inquiries or requests for information will be
> made, and it is also not possible to predict the outcome of litigation, inquiries or
> requests for information. Management is unable to make a meaningful estimate
> of the amount or range of loss that could result from unfavorable outcomes but,

---

[24] Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation,
December 12, 2012, Exhibit 1, pp. 4-5.
[25] Disclosure Statement for Plan of Rehabilitation for Financial Guaranty Insurance Company, September
27, 2012, p. 54.

under some circumstances, adverse results in certain proceedings could have a material and adverse impact on FGIC. Additionally, defending against lawsuits and proceedings and responding to inquiries and requests for information may involve significant expense and diversion of management's attention and other FGIC resources."[26]

23.   ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

24.   I reviewed FGIC's website and its statutory filing for the period ending March 31, 2013 to identify the extent to which FGIC is involved in outstanding litigation.[27] I noted that there are 15 legal proceedings in which FGIC is listed as a plaintiff, twelve of which are related to ResCap, and numerous legal proceedings pending against FGIC.

25.   A declaration prepared by Jeffrey A. Lipps in support of debtors' motion for approval of the May 23, 2013 settlement agreement addresses issues pertaining specifically to FGIC's claims against ResCap, but my opinion is that the opinions in this declaration are generally applicable to all 15 lawsuits in which FGIC is the plaintiff. Lipps indicates that:

> "*Legal Uncertainty:* The liabilities to be released under the settlement relate to claims that pose unique legal and evidentiary challenges, many of which have not fully developed in a definitive way in the case law to date, and none of which has been litigated to resolution with respect to the Debtors specifically, such that there is considerable uncertainty and risk in the outcome."

> "*Expense of Resolution:* In addition to the uncertainty in the outcome, resolving the claims and liabilities covered by the FGIC Settlement Agreement would be enormously expensive. I was personally involved in years of prepetition litigation

---

[26] Statutory-Basis Financial Statements, Financial Guaranty Insurance Company, March 31, 2013, p. 32.
[27] http://www.fgic.com/aboutfgic/legalproceedings/ and Statutory-Basis Financial Statements, Financial Guaranty Insurance Company, March 31, 2013, pp. 30-2.

concerning the Debtors' securitizations, which showed that simply completing the discovery that would be required to resolve these claims would require substantial time and resources. A trial to resolve these claims would also be enormously expensive and complex."[28]

26.    Both FGIC's disclosures and Lipps's observations highlight the difficulties in modeling the expected costs of and recoveries associated with FGIC's outstanding litigation. If FGIC were to aggressively pursue litigation recoveries, the costs would likely represent significant reductions in cash flows over the next five years, and there is considerable uncertainty in the range of potential outcomes. Similarly, the pending and potential future litigation against FGIC could lead to significant losses. ■

███████████████████████████████████████████████

███████████████████████████

27.    Recognizing the speculative nature of any such analysis, I searched for data on the likelihood of receiving recoveries from outstanding litigation. A report by NERA Economic Consulting entitled "Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review" provides statistics on securities class action lawsuits. This report indicates that only 31 percent of all securities class action lawsuits continued past the motion to dismiss stage.[29] A report by Cornerstone Research entitled "Securities Class Action Litigation: 2012 Review and Analysis" also provides statistics on securities class action lawsuits. This report finds that settlements after a ruling on motion to dismiss took between 3.5 and 4.9 years from filing date to reach settlement.[30] While FGIC's outstanding legal proceedings are not directly analogous to securities class action

---

[28] Declaration of Jeffrey A. Lipps in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees, and Certain Institutional Investors, June 7, 2013, p. 2.

[29] Renzo Comolli, Sukaina Klein, Ronald I. Miller, and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2012 Full-Year Review, January 29, 2013, p. 16.

[30] Ellen M. Ryan and Laura E. Simmons, Securities Class Action Litigation: 2012 Review and Analysis, p. 6.

lawsuits, this data nonetheless provides some benchmarks to support the general conclusion that litigation recoveries and losses are uncertain, especially for early stage matters, and that time to settlement can take many years.

28.    I understand that, as a result of claims against ResCap permitted by the May 23, 2013 settlement agreement, FGIC is projected to receive a $206.5 million recovery in the ResCap bankruptcy.[31]   In my opinion, it is appropriate not to consider how this projected recovery would potentially affect FGIC rehabilitation payouts because the projected $206.5 million recovery only arises when the May 23, 2013 settlement agreement is accepted, in which case ResCap Policyholders receive $253.3 million in exchange for giving up their right to participate in FGIC's rehabilitation plan, thus making any potential change to FGIC's rehabilitation plan irrelevant for ResCap Policyholders.  If the May 23, 2013 settlement agreement were not accepted, FGIC would then only have litigation claims against ResCap, the uncertainty of which I have addressed above.

## VI.    Inferences from Security Price Movements

29.    It is my understanding that the prices of certain FGIC-wrapped securities issued by ResCap and GMAC trusts are alleged to have declined around the time of the May 23, 2013 settlement agreement.  I have not undertaken an analysis to verify this assertion because I do not have access to pricing data for these securities, which I understand is primarily obtained through specific quote requests to dealer-contacts.  To the extent that the prices of certain securities issued by ResCap and GMAC trusts did decline around the time of the May 23, 2013 settlement agreement, however, my opinion

---

[31] Affirmation of Gary T. Holzer, p. 6.

is that one cannot conclude from these price declines, taken in isolation, that the settlement agreement is unfavorable to the holders of these securities.  Investor reaction to new material information about the future risk and/or cash flows to a security will depend on the market's expectations at the time of the news announcement.  Instead of conveying negative news about the size of the lump sum payment, the May 23, 2013 settlement agreement could have alternatively informed the market that expected payouts to ResCap Policyholders under FGIC's rehabilitation plan were lower than previously thought.  In addition, security prices can change due to market and industry factors, which must be controlled for before drawing any conclusion about a causal link between information events and security price changes.

[*signature on next page*]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of July, 2013 at Boston, Massachusetts.

_____

S.P. Kothari