# Exhibit 1

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York  10004
Telephone:   (212) 574-1200
Facsimile:    (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee*
*of Certain Mortgage Backed Securities Trusts*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Case No. 12-12020 (MG) |
| **RESIDENTIAL CAPITAL, LLC,** *et al.,* | ) |
| | ) **Chapter 11** |
| **Debtors.** | ) |
| | ) **Jointly Administered** |

## DECLARATION OF MAMTA K. SCOTT,
## AS OFFICER OF U.S. BANK, AS RMBS TRUSTEE

I, Mamta K. Scott, hereby declare, pursuant to 28 U.S.C. § 1746, that the

following is true and correct to the best of my knowledge, information, and belief:

1.      I am employed by U.S. Bank National Association ("**U.S. Bank**"), and my current

title is Vice President and my position is a default group account manager.  I have personal

knowledge of the facts set forth herein, except as to certain matters that I believe to be true based

on (i) information provided by Duff & Phelps, LLC ("**Duff & Phelps**"), (ii) information about

positions of parties in these Chapter 11 Cases contained in pleadings that I reviewed, or reported

to me by counsel, or learned during my participation in the Plan Mediation (defined below); and

(iii) my review of business records of U.S. Bank.

2.      This Declaration is submitted in support of the Debtors' Motion Pursuant to Fed.

R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the

FGIC Trustees, and Certain Individual Investors [ECF No. 3929] (the "**FGIC Motion**").[1] The

FGIC Trustees[2] filed a Joinder to the FGIC Motion [ECF No. 3982]. The FGIC Motion seeks

the entry of an order approving the FGIC Settlement Agreement[3] attached as Exhibit 2 to the

FGIC Motion [ECF No. 3929-2]. The FGIC Settlement Agreement, dated May 23, 2013, is

among the Debtors, FGIC, the FGIC Trustees and the Institutional Investors.

A.    *Introduction and Overview*

**U.S. Bank's Role as Trustee of Certain FGIC Insured Trusts**

3.    The FGIC Trustees serve as trustees or indenture trustees of the FGIC Insured

Trusts, all of which were established before 2008. The FGIC Insured Trusts issued residential

mortgage backed securities ("**RMBS**") or similar securities. FGIC, a monoline financial

guaranty insurance company, issued irrevocable insurance policies (the "**FGIC Policies**") for

certain classes of the securities (the "**Securities**") issued by the FGIC Insured Trusts, thereby

guaranteeing the payment of principal and interest due on the Securities. At the same time,

FGIC entered into an Insurance and Indemnity Agreement with one or more of the Debtors in

connection with each of the FGIC Insured Trusts (the "**Insurance Agreements**"). Pursuant to

the Insurance Agreements, the Debtor party agreed, among other things, to reimburse FGIC for

---

[1]    I have previously submitted a declaration, dated June 10, 2013 (the "**Scott PSA Declaration**") in support of the (a) Joinder of Certain RMBS Trustees to the Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee and Certain Consenting Claimants [ECF No. 3940-6] and (b) Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee and Certain Consenting Claimants [ECF No. 3814].

[2]    The FGIC Trustees are The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. (together, "**BNY Mellon**"), U.S. Bank and Wells Fargo Bank, N.A. ("**Wells Fargo**"), each solely in their respective capacities as trustees or indenture trustees for certain FGIC Insured Trusts.

[3]    Capitalized terms used in this declaration but not defined herein have the meanings ascribed to them in the FGIC Motion. For the convenience of the reader, in some cases, definitions found in the FGIC Motion are repeated here.

certain payments FGIC made under the FGIC Policies that resulted from the applicable Debtor's

failure to repurchase or substitute mortgage loans that breached one or more representations or

warranties contained in the applicable Governing Documents.

4.    U.S. Bank serves as trustee or indenture trustee in respect of eight of the forty-

seven FGIC Insured Trusts that are the subject of the FGIC Settlement Agreement (collectively,

the "**U.S. Bank FGIC Insured Trusts**").[4]

**The FGIC Rehabilitation Proceeding**

5.    In or about June 2012, the Superintendent of Financial Services of the State of

New York filed a rehabilitation petition on behalf of FGIC in the Supreme Court of the State of

New York, County of New York (the "**Rehabilitation Court**"), and was subsequently appointed

by the Rehabilitation Court as rehabilitator (the "**Rehabilitator**") in that proceeding (the "**FGIC

Rehabilitation Proceeding**").  As a result of administrative action and a subsequent injunction

entered by the Rehabilitation Court, the FGIC Insured Trusts were obligated to continue to pay

premiums under the FGIC Policies, but FGIC has been relieved of its obligations to pay claims

made under those same policies since late 2009.

6.    On September 27, 2012, the Rehabilitator filed a proposed Plan of Rehabilitation

for FGIC (as amended, the "**Rehabilitation Plan**"), which was approved by the Rehabilitation

Court on June 11, 2013.  The Rehabilitation Plan does not provide for full payment of the claims

of policyholders; rather, it contemplates partial distributions to all of FGIC's policyholders,

including the FGIC Insured Trusts, on account of present and future claims, over a period of up

---

[4]    A sample Pooling and Servicing Agreement that governs one of the U.S. Bank FGIC Insured Trusts may be
found at Exhibit 114 for identification, attached hereto at Tab A.  Exhibit 114 is indicative of the Pooling
and Servicing Agreements that govern certain of the U.S. Bank FGIC Insured Trusts.  A sample Indenture
that governs one of the U.S. Bank FGIC Insured Trusts may be found at Exhibit 117 for identification,
attached hereto at Tab B.   Exhibit 117 is indicative of the Indentures that govern certain of the U.S. Bank
FGIC Insured Trusts.

to forty years.

### The FGIC Settlement Agreement

7.     During the Plan Mediation in these Chapter 11 Cases, the FGIC Trustees were asked to consider a settlement proposal between the Steering Committee Group,[5] FGIC and MBIA (the "**Settlement Proposal**").  The Settlement Proposal included, among other things, a lump sum payment by FGIC to the FGIC Insured Trusts (the "**Commutation Payment**") in satisfaction of any obligations of FGIC to make payments in the future to the FGIC Insured Trusts under the Rehabilitation Plan (the "**Projected Payments**").  Ultimately, the terms of the Settlement Proposal, including the Commutation Payment, became the basis of the FGIC Settlement Agreement.

8.     The FGIC Trustees requested that their financial advisor in these Chapter 11 Cases, Duff & Phelps, review the financial terms of the Settlement Proposal and, in particular, analyze the value of the Projected Payments under the Rehabilitation Plan with the Commutation Payment and other value to the FGIC Insured Trusts under the FGIC Settlement Agreement. Duff & Phelps did so, and as described in further detail below, in reliance on their analysis and recommendation, U.S. Bank determined in good faith that entering into the FGIC Settlement Agreement was in the best interests of the FGIC Insured Trusts.  U.S. Bank understood that the other FGIC Trustees reached the same conclusion.

9.     While the FGIC Trustees considered the merits of the FGIC Settlement

---

[5]     The Steering Committee Group was a group of institutional investors in the Settling Trusts, including FGIC Insured Trusts, represented by Gibbs & Bruns LLP.  The Talcott Franklin Group was another group of institutional investors in the Settling Trusts, including FGIC Insured Trusts, represented by Talcott Franklin P.C..  The Steering Committee Group, together with the Talcott Franklin Group, are referred to collectively as the "**Institutional Investors**."

Agreement on a stand-alone basis, it is also an integral part of a Plan Support Agreement[6] that

paves the way for confirmation of a Chapter 11 bankruptcy plan that will produce additional

value for investors in the FGIC Insured Trusts.[7]  Specifically, under the Plan Support Agreement

and the global settlement it embodies, the FGIC Insured Trusts will receive a significant

distribution, estimated now to be approximately $92 million, from the Debtors' estates on

account of representation and warranty claims against the Debtors.  The FGIC Trustees

considered this value as well in weighing whether to accept the FGIC Settlement Agreement.

### The RMBS 9019 Motion

10.    Shortly after these Chapter 11 Cases were filed, the Debtors filed a motion (as

amended, the "**RMBS 9019 Motion**"), seeking approval of the Debtors' agreements

(collectively, as amended, the "**RMBS Settlement Agreement**") with the Institutional Investors.

The RMBS Settlement Agreement relates to the Repurchase Claims of 392 RMBS Trusts (the

"**Original Settling Trusts**").

11.    Under the RMBS Settlement Agreement, among other things, AFI would

contribute $750 million to the Debtors' estates and the Original Settling Trusts would be granted

an allowed aggregate claim of up to $8.7 billion (the "**Allowed Claim**").[8]  FGIC, among others,

opposed the RMBS Settlement Agreement, resulting in substantial litigation and uncertainty,

including with respect to the size of the AFI contribution to the Debtors' estates, the size and

priority of the Original Settling Trusts' Repurchase Claims, and the validity, priority and

---

[6]    "**Plan Support Agreement**" means, collectively, the Plan Support Agreement and Plan Term Sheet, each dated May 13, 2013, and the Supplemental Plan Term Sheet, dated May 2013.

[7]    On July 3, 2013, a plan based on the Plan Support Agreement was filed (the "**ResCap Plan**") [ECF No. 4153].

[8]    The RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the Institutional Investors, the Trustees of each of the [Original Settling] Trusts will also evaluate the reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust." *See* ECF No. 320 at ¶4.

relationship of those claims to the claims asserted by FGIC and other monoline insurers.

**B.**     ***The FGIC Trustees Acted Reasonably and in Good Faith
in Agreeing to the FGIC Settlement Agreement***

12.     The process by which the FGIC Trustees, including U.S. Bank, determined to

enter the FGIC Settlement Agreement evidences that they acted reasonably and in good faith.

### U.S. Bank's Retention of Qualified Professionals and Experts

13.     U.S. Bank retained and has been advised throughout these Chapter 11 Cases,

including in connection with its consideration of the FGIC Settlement Agreement, by Seward &

Kissel LLP, an experienced and knowledgeable New York law firm.

14.     The analysis and comparison of the value of the Projected Payments under the

Rehabilitation Plan with the Commutation Payment and other value to the FGIC Insured Trusts

under the FGIC Settlement Agreement involved sophisticated financial modeling and required a

level of expertise beyond that possessed by U.S. Bank as Trustee.  The Governing Documents

expressly contemplate in these circumstances that the FGIC Trustees, including U.S. Bank, are

entitled to rely on the advice of an expert in evaluating the alternatives.

15.     At the outset of these Chapter 11 Cases, U.S. Bank and three other RMBS

Trustees (Deutsche Bank,[9] BNY Mellon and Wells Fargo), after a rigorous selection process, had

retained Duff & Phelps as their financial advisor. Duff & Phelps was selected over four other

qualified candidates based on (a) the firm's experience in handling similar types of engagements

involving the evaluation of mortgage loan servicing agreements and loan origination agreements,

bankruptcy litigation, restructuring, asset valuation, complex securitizations and RMBS loan

---

[9]     **"Deutsche Bank"** means Deutsche Bank National Trust Company and Deutsche Bank Trust Company
Americas, each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator,
paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the Settling
Trusts.

repurchase actions and (b) the depth of resources available to the firm, including advisory services about bankruptcy issues generally.

16.    Duff & Phelps was uniquely situated to provide the FGIC Trustees with advice concerning the economic terms of the Settlement Proposal and the Projected Payments under the Rehabilitation Plan.  Not only is Duff & Phelps a well-respected financial advisor with expertise in financial modeling and cash flow projections, but it had substantial experience in these Chapter 11 Cases through its work on behalf of the RMBS Trustees.  Their work has included:

- Conducting a sampling review of more than 6,500 mortgage loan files provided by the Debtors in an effort to identify breaches of representations and warranties, and using statistical methodologies to estimate the incidence of those breaches across the population of mortgage loans in the Original Trusts.  Duff & Phelps also used historical information and financial analysis to calculate the total present and projected future losses experienced by the Original Settling Trusts, including thirty-seven of the FGIC Insured Trusts.

- Working together with the RMBS Trustees, identifying RMBS trusts in addition to the Original Settling Trusts with RMBS Trust Claims (the "**Additional Settling Trusts**," together with the Original Settling Trusts, the "**Settling Trusts**"), and quantifying those claims so the Additional Settling Trusts, including ten FGIC Insured Trusts, could receive treatment that is consistent with the treatment being accorded to the like claims of the Original Settling Trusts.

- Analyzing potential liabilities arising from Debtors' multiple roles as servicer in the securitization process in order to assist the RMBS Trustees in quantifying potential Servicing Claims so that the Settling Trusts, including all forty-seven of the FGIC Insured Trusts, could receive an allowed claim on account of those claims.

**The Plan Mediation**

17.    The FGIC Settlement Agreement was agreed to as part of an extensive mediation with numerous interested parties in these Chapter 11 Cases in an effort to reach a consensual Chapter 11 plan (the "**Plan Mediation**").  The Plan Mediation occurred over the course of some five months beginning in December 2012 and was overseen by a sitting Bankruptcy Judge, the Honorable James M. Peck.

18.     The communications and analyses relating to negotiations conducted during the Plan Mediation are confidential by law and pursuant to court order,[10] and therefore cannot be disclosed in detail.  In general, however, the integrated global settlement associated with the Plan Support Agreement (including the FGIC Settlement Agreement) and now part of the ResCap Plan, must be understood as the product of intense, arm's-length negotiations conducted among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of a sitting bankruptcy judge.  My view of the Settlement Proposal was shaped, in part, by Judge Peck's involvement in the process of negotiating the FGIC Settlement Agreement.

**Participation of the Institutional Investors**

19.     In evaluating the Settlement Proposal, the FGIC Trustees, including U.S. Bank, considered that the Institutional Investors (which included investors in the FGIC Insured Trusts) actively participated in the Plan Mediation and supported the Settlement Proposal, ultimately becoming signatories to the FGIC Settlement Agreement.  Because of the confidentiality provisions of the Mediation Order, the FGIC Trustees were unable to raise the Settlement Proposal with investors in the FGIC Insured Trusts who were not participants in the Plan Mediation.

**Notice to Investors in the FGIC Insured Trusts of the FGIC Settlement Agreement**

20.     One of the reasons that the FGIC Settlement Agreement is now before this Court is that none of the FGIC Trustees would agree to the Settlement Proposal unless investors in the FGIC Insured Trusts were provided a full and fair opportunity to voice any objections they may have to such a settlement, including that the FGIC Settlement Agreement is not in the best interest of investors, and to be heard with respect to any such objections.  The FGIC Trustees

---

[10]     *See December 26, 2012 Order Appointing Mediator* [ECF No. 2519] (the "**Mediation Order**").

insisted that the FGIC Settlement Agreement require prompt notice be given with respect to the

FGIC Settlement Agreement[11] and require approval of the FGIC Settlement Agreement by the

Bankruptcy Court.[12]

21.    From U.S. Bank's perspective, it was essential for the FGIC Settlement

Agreement to provide investors with notice and the opportunity to object.  Absent such

provisions, U.S. Bank would not have agreed to the FGIC Settlement Agreement, and would not

have determined that it is in the best interests of the FGIC Insured Trusts and their investors.

**Other Factors Evidencing the Reasonableness of U.S. Bank's Conduct**

22.    U.S. Bank also had the benefit of sitting on the Official Committee of Unsecured

Creditors in these Chapter 11 Cases.  My role as U.S. Bank's representative on that committee

gave me an additional perspective of the overall bankruptcy proceedings, allowing me to better

evaluate the Settlement Proposal in the larger picture of the Chapter 11 Cases and understand the

relative risks and benefits of proceeding under the FGIC Settlement Agreement or the

Rehabilitation Plan.

23.    Finally, U.S. Bank and its counsel had the benefit of the views of the other two

---

[11]    Section 4.02 of the FGIC Settlement Agreement provides:

Within seven (7) Business Days following execution by all Parties of this Agreement, the Debtors shall file the 9019 Motion with the Bankruptcy Court and otherwise use commercially reasonable efforts to promptly obtain the Bankruptcy Court Order.  Upon obtaining knowledge of the issuance of the Bankruptcy Court Order, the Debtors shall promptly notify the other Parties.

[12]    Section 6.01 of the FGIC Settlement Agreement provides that a condition precedent to the effectiveness of the FGIC Settlement Agreement is the signing of orders approving the FGIC Settlement Agreement by both the Bankruptcy Court and the Rehabilitation Court and that such orders become final.  The FGIC Settlement Agreement must also be approved by the Rehabilitation Court after notice.  Section 4.01 of the FGIC Settlement Agreement provides:

Within three (3) Business Days following execution by all Parties of this Agreement, the Rehabilitator, on behalf of FGIC, shall file the Affirmation with the Rehabilitation Court and otherwise use commercially reasonable efforts to obtain the Rehabilitation Court Order. The Rehabilitator shall endeavor to schedule the hearing on the Rehabilitation Court Order for a date that is no less than thirty-seven (37) days after the filing of the Affirmation. Upon obtaining knowledge of the issuance of the Rehabilitation Court Order, the Rehabilitator, on behalf of FGIC, shall promptly notify the other Parties.

FGIC Trustees and their counsel in considering the Settlement Proposal. Like U.S. Bank, BNY Mellon and Wells Fargo are two of the largest and most sophisticated financial institutions in the country and were represented by experienced counsel in this matter. The three FGIC Trustees, although similarly situated and assisted by the same financial advisor, independently considered the Settlement Proposal. U.S. Bank took into consideration in forming its views of the Settlement Proposal that BNY Mellon and Wells Fargo and their counsel were coming to similar conclusions regarding the benefits of the FGIC Settlement Agreement as compared to the Projected Payments under the Rehabilitation Plan.

**C.**    ***The FGIC Settlement Agreement is in the Best Interests
of the FGIC Insured Trusts and the Investors in Those Trusts***

**Consideration of the FGIC Settlement Agreement and the Duff Report**

24.    As mentioned above, in the context of the Plan Mediation, the FGIC Trustees were asked to consider the Settlement Proposal that included, among other things, FGIC making the Commutation Payment in lieu of the Projected Payments under the Rehabilitation Plan.

25.    The FGIC Trustees requested that Duff & Phelps analyze the economic terms of the Settlement Proposal against the Projected Payments under the Rehabilitation Plan and provide a recommendation to the FGIC Trustees. Duff & Phelps was not asked to analyze how the amount of the Commutation Payment was determined, but rather how the Commutation Payment and the broader Settlement Proposal compared to the Projected Payments under the Rehabilitation Plan.

26.    In conducting its analysis, I understand that Duff & Phelps reviewed and analyzed publicly available information and also signed a confidentiality agreement with FGIC pursuant to which I understand they had the opportunity to speak to FGIC's Chief Restructuring Officer and Lazard Freres & Co. LLC ("**Lazard**"), the financial advisors to Weil, Gotshal & Manges, LLP,

counsel to the FGIC Rehabilitator and to receive additional information concerning the Rehabilitation Plan.

27.    On or about May 10, 2013, I received from my counsel draft discussion materials prepared by Duff & Phelps setting forth its analysis of the Settlement Proposal. *See* Exhibit 120 for identification, attached hereto at Tab C.

28.    Subsequently, on or about May 13, 2013, Duff & Phelps made a presentation to the FGIC Trustees and their counsel concerning the Settlement Proposal. The presentation took place in New York and lasted over an hour. I work in Chicago, and had recently returned from maternity leave, so I participated in the presentation telephonically and via a "webex." Accordingly, I was able to view the discussion materials Duff had prepared while participating via a conference call. Although I was not physically present at the presentation, U.S. Bank's attorneys attended.

29.    During the presentation, representatives from Duff & Phelps walked the Trustees and their counsel through their analysis, using as a reference its written discussion materials. I do not now recall whether the slides used were the discussion materials I received on May 10, or slides substantially similar. During the presentation, questions were posed to Duff & Phelps, including by U.S. Bank's counsel. To my recollection, Duff & Phelps answered all of the questions asked. I do not recall asking questions myself.

30.    At the time of the presentation, I was able to follow and understand Duff & Phelps' analysis at a high level. I had no previous experience in this type of proposal, and my primary focus was on the conclusions concerning how the Commutation Payment, together with the other value to the FGIC Insured Trusts under the Settlement Proposal, compared to the Projected Payments under the Rehabilitation Plan. At the conclusion of the presentation, I recall

having confidence that Duff & Phelps appeared to have done a thorough analysis.

31.    On or about May 15, 2013, I received a final version of the Duff & Phelps

discussion materials concerning the Settlement Proposal (the "**Duff Report**").  *See* Exhibit 123

for identification, attached hereto at Tab D.  The Duff Report was substantially similar to the

draft discussion materials I had received on May 10 and the discussion materials used during the

May 13 presentation.

32.    The Duff Report, consistent with the May 13 presentation, advises



33.    The Duff Report states

**The Merits of the FGIC Settlement Agreement on a Stand-Alone Basis**

34.    It was significant to me that the $253.3 million Commutation Payment was a

fixed amount, while the estimated $150 million initial Projected Payment to the FGIC Insured

Trusts was estimated and subject to change at the discretion of the Rehabilitator following the

effective date of the Rehabilitation Plan.  In addition, while I understood there was the potential

for future Projected Payments in excess of the Commutation Payment, there was no certainty of

the amount of any future Projected Payments, or the timing of such payments.  In fact, I

understood there was a risk that future Projected Payments may fall short of the amount of the

Commutation Payment. My concern over the uncertainty of payments from FGIC was informed

by the fact that, although the FGIC Insured Trusts continue to pay premiums under the FGIC

Policies, they have received no payment on any claims made under the policies since late 2009.

The FGIC Settlement Agreement eliminates the risk and uncertainty associated with the

Projected Payments in exchange for a certain recovery.

35.    I also found significant that the Commutation Payment, by itself, was within the

reasonable range of the estimated total Projected Payments under the Rehabilitation Plan (



I also understood under the Settlement Proposal that FGIC

would forego its right to receive certain reimbursement amounts from the FGIC Insured Trusts

pursuant to the waterfall provisions under the relevant Governing Documents, which would

provide additional, although at the time unquantified, future value to the FGIC Insured Trusts.

36.    Given Duff & Phelps' expertise and extensive experience in the Chapter 11

Cases, their access to FGIC and Lazard in connection with analyzing the Settlement Proposal

and their May 13 presentation and the Duff Report, I had no reason to question Duff & Phelps'

analysis, and nothing that has transpired since that time has changed my view in that regard.

**The Additional Value to the FGIC Insured Trusts Under the ResCap Plan**

37.    In addition to the stand-alone benefits, the FGIC Settlement Agreement is an

integral component of the Plan Support Agreement (and now proposed ResCap Plan) which

resolves the claims of substantially all of the major constituents in these Chapter 11 Cases and

confers many benefits upon the Debtors' creditors, including the FGIC Insured Trusts. If the

ResCap Plan is confirmed, these benefits include, among other things, that the FGIC Insured

Trusts will receive a distribution from the Debtors' estates, contemplated to be in excess of $90

million, on account of representation and warranty claims against the Debtors.

38.    It is an express condition of the Plan Support Agreement that both the Bankruptcy

Court and the Rehabilitation Court approve the FGIC Settlement Agreement. Without the FGIC

Settlement Agreement, the global settlement embodied in the Plan Support Agreement, including

the favorable claim treatment of the FGIC Insured Trusts, would collapse. The FGIC Insured

Trusts would not receive the contemplated more than $90 million distribution from the Debtors'

estates if the FGIC Settlement Agreement was rejected in favor of proceeding under the

Rehabilitation Plan.

39.    In the absence of the FGIC Settlement Agreement and the global settlement

embodied in the Plan Support Agreement, the value of any future recovery, if any, by the FGIC

Insured Trusts in the Chapter 11 Cases is highly uncertain.

- First, the proposed ResCap Plan secures the contribution by AFI to the Debtors'
  estates of $2.1 billion in value, which is a substantial portion of the assets that will be
  distributed to the creditors of the Debtors' estates (including the FGIC Insured
  Trusts).

- Second, at the time of the Plan Mediation, the Chapter 11 Cases were facing several
  potentially lengthy and expensive litigations that could have significantly diminished
  the recoveries of the Settling Trusts, including the FGIC Insured Trusts.

  - The proposed ResCap Plan fixes claims that the FGIC Trustees expect would
    otherwise be contested in time-consuming and uncertain proceedings. In the
    absence of the global settlement embodied in the Plan Support Agreement, the
    RMBS 9019 Motion would likely require a lengthy and expensive hearing, the
    outcome of which is uncertain. If the Court declined to grant the RMBS 9019
    Motion, the allowance of Repurchase Claims of the Original Settling Trusts
    (including thirty-seven FGIC Insured Trusts) would be left to the expensive

and uncertain process of claims litigation.  Allowance of the RMBS Trust
Claims, as contemplated by the proposed ResCap Plan, offers the benefits of
allowance consistent with the RMBS 9019 Motion without the risks attendant
to that contested matter.

-    The proposed ResCap Plan also allows the Repurchase Claims of the
Additional Settling Trusts, including ten FGIC Insured Trusts, without the
expense, delay and uncertainty associated with analyzing, asserting and
litigating those claims, which otherwise would occur absent a global
settlement.

-    Finally, the proposed ResCap Plan allows the Servicing Claims of the Settling
Trusts, including all forty-seven of the FGIC Insured Trusts.  The presentation
of those claims otherwise would have required further discovery and analysis,
likely leading to litigation over both the quantification of the claims and their
relative priority.

• Third, many of the contentious and complicated inter-creditor issues in these cases
are resolved by the proposed ResCap Plan, including disputes over the priority of
claims asserted by FGIC and the other Monolines and by certain other securities
claimants.  In particular, both the amount of FGIC's claims and the relationship
between those claims and the claims of the FGIC Insured Trusts are the subject of
disputes, and the resolution of all those disputes through litigation presents both a
general risk of delay and expense to all stakeholders as well as a specific risk to the
FGIC Insured Trusts of dilution.

• Finally, the ever mounting costs of administration of these Chapter 11 Cases threaten
to erode any distribution to unsecured creditors (including the FGIC Insured Trusts).
The proposed ResCap Plan effectively abates the continued accrual of such costs,
thus increasing the amount of ultimate recoveries to all creditors, including the FGIC
Insured Trusts.

40.    For the reasons described above, and based on the analysis provided by Duff &

Phelps, U.S. Bank concluded that the FGIC Settlement Agreement was reasonable and in the

best interests of the FGIC Insured Trusts and their investors and agreed to accept it on behalf of

the FGIC Insured Trusts.

**D.    *Notice to Investors in the U.S. Bank FGIC Insured Trusts
of the FGIC Settlement Agreement was Sufficient***

41.    Notice of the FGIC Settlement Agreement, including notice of the FGIC

Settlement Agreement by the FGIC Trustees, including U.S. Bank, is sufficient and effective to

put the parties in interest in these Chapter 11 Cases, including the investors in the FGIC Insured

Trusts, on notice of the FGIC Settlement Agreement.

42.    U.S. Bank has regularly provided to investors in the U.S. Bank RMBS Trusts,

including the U.S. Bank FGIC Insured Trusts, notice of significant events in these Chapter 11

Cases.  Following the filing of the RMBS 9019 Motion, U.S. Bank, together with BNY Mellon,

Deutsche Bank and Wells Fargo, jointly retained an agent, The Garden City Group, Inc.

("**GCG**"), to coordinate and facilitate notice to investors regarding important events in the

Chapter 11 Cases.

43.    On behalf of the RMBS Trustees, GCG provided certain administrative services

in connection with noticing various investors, including the coordination and facilitation of the

dissemination of notices to the various investors at the direction and on behalf of the RMBS

Trustees, and in connection with the creation and maintenance of a website for investors that

provides, among other things, contact information for the RMBS Trustees significant relevant

developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases,

and upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").

44.    GCG distributed to various investors and published on the RMBS Trustee

Website various notices.  Among those notice was a notice dated May 24, 2013 entitled "Time

Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS

Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty

Insurance Company and Certain of the RMBS Trustees." *See* Exhibit 128 for identification,

attached hereto at Tab E.  This notice, among other things, described the terms of the Plan

Support Agreement and the FGIC Settlement Agreement and the process by which investors

could object to them.

45.     In addition, on June 4, 2013, U.S. Bank distributed a "Time Sensitive Notice

Regarding Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance

Company and the FGIC Trustees" (the "**Holder FGIC Settlement Notice**"). *See* Exhibit 129 for

identification, attached hereto at Tab F.  The Holder FGIC Settlement Notice was provided by

U.S. Bank to the investors in the eight U.S. Bank FGIC Insured Trusts.  The Holder FGIC

Settlement Notice provided additional information to those investors regarding the FGIC

Rehabilitation Proceeding, the FGIC Settlement Agreement, their rights thereunder, the process

for investors to object to the FGIC Settlement Agreement in the FGIC Rehabilitation Proceeding

and how to obtain information on the cash amount FGIC will pay to a particular trust.  The

Holder FGIC Settlement Notice and certain pleadings in the FGIC Rehabilitation Proceeding

have also been posted on the RMBS Trustee Website.

46.     As part of the notice process, and in order to provide additional information to

investors in the FGIC Insured Trusts concerning the FGIC Settlement Agreement, the FGIC

Trustees agreed to make available to those investors information concerning the allocable share

of the Commutation Payment that each such FGIC Trust would receive under the FGIC

Settlement Agreement.

47.     Finally, the schedules attached to the Disclosure Statement filed with the ResCap

Plan provide information concerning the estimated recoveries of the FGIC Insured Trusts on

account of Repurchase Claims and Servicing Claims against the Debtors.

**E.**     ***Continued Assessment of the Reasonableness of the FGIC Settlement Agreement***

48.     Shortly after the FGIC Settlement Agreement became public, certain investors

indicated their intent to object to the FGIC Settlement Agreement.  As a result, the FGIC

Trustees have continued to assess the reasonableness of the FGIC Settlement Agreement.  The

Objectors[13] have asserted that the FGIC Settlement Agreement is not in their best interest or in the best interests of the FGIC Insured Trusts because, in their view, the FGIC Insured Trusts would receive greater recoveries under the Rehabilitation Plan.

49.    The FGIC Trustees asked Duff & Phelps to evaluate and consider the assertions of the Objectors.  Duff & Phelps has done so and its conclusions are presented in the Expert Report of Allen M. Pfeiffer, dated July 19, 2013.  In addition, the FGIC Trustees consulted S.P. Kothari, currently the Gordon Y. Billard Professor in Management at the Sloan School of Management at the Massachusetts Institute of Technology ("**MIT**") as well as Deputy Dean of MIT's Sloan School of Management.  Dr. Kothari presented an expert report, also dated July 19, 2013.

50.    The reports of both Mr. Pfeiffer and Dr. Kothari support the conclusions presented by Duff & Phelps during the May 13 presentation and memorialized in the Duff Report.

[signature on following page]

---

[13]    The "Objectors" are CQS ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Bayview Fund Management LLC, Monarch Alternative Capital LP, Stonehill Capital Management LLC and Federal Home Loan Mortgage Corporation in conservatorship.

Dated this 31st day of July, 2013

Mamta K. Scott

SK 03687 0119 1402296 v6

# Tab A

# Trial Exhibit 114

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,

Depositor,

RESIDENTIAL FUNDING CORPORATION,

Master Servicer,

and

U.S. BANK NATIONAL ASSOCIATION,

Trustee

POOLING AND SERVICING AGREEMENT

DATED AS OF DECEMBER 1, 2005

MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES

Series 2005-EFC7

5109327 05161514

## ARTICLE I
## DEFINITIONS

Section 1.01.    Definitions ....................................................................................................3

Section 1.02.    Determination of LIBOR...............................................................................43

## ARTICLE II
## CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF CERTIFICATES

Section 2.01.    Conveyance of Mortgage Loans ..................................................................44

Section 2.02.    Acceptance by Trustee .................................................................................48

Section 2.03.    Representations, Warranties and Covenants of the Master Servicer and the Depositor...............................................................................................49

Section 2.04.    Representations and Warranties of Residential Funding .............................52

Section 2.05.    Execution and Authentication of Certificates; Conveyance of REMIC Regular Interests .........................................................................................54

Section 2.06.    Purposes and Powers of the Trust................................................................54

Section 2.07.    Agreement Regarding Ability to Disclose...................................................55

## ARTICLE III
## ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section 3.01.    Master Servicer to Act as Servicer...............................................................55

Section 3.02.    Subservicing Agreements Between Master Servicer and Subservicers; Enforcement of Subservicers' Obligations...................................................58

Section 3.03.    Successor Subservicers.................................................................................59

Section 3.04.    Liability of the Master Servicer ..................................................................59

Section 3.05.    No Contractual Relationship Between Subservicer and Trustee, Insurer or Certificateholders...................................................................................60

Section 3.06.    Assumption or Termination of Subservicing Agreements by Trustee...........60

Section 3.07.    Collection of Certain Mortgage Loan Payments; Deposits to Custodial Account........................................................................................................60

Section 3.08.    Subservicing Accounts; Servicing Accounts...............................................63

Section 3.09.    Access to Certain Documentation and Information Regarding the Mortgage Loans ..........................................................................................65

Section 3.10.    Permitted Withdrawals from the Custodial Account ...................................65

Section 3.11.    Maintenance of Primary Insurance Coverage..............................................67

Section 3.12.    Maintenance of Fire Insurance and Omissions and Fidelity Coverage.........67

Section 3.13.    Enforcement of Due-on-Sale Clauses; Assumption and Modification Agreements; Certain Assignments................................................................69

Section 3.14.    Realization Upon Defaulted Mortgage Loans .............................................71

CONFIDENTIAL                                                              RC_FGIC9019_00031379

Section 3.15.    Trustee to Cooperate; Release of Mortgage Files ........................................73

Section 3.16.    Servicing and Other Compensation; Eligible Master Servicing
Compensation ........................................................................................75

Section 3.17.    Reports to the Trustee, the Insurer and the Depositor.................................76

Section 3.18.    Annual Statement as to Compliance .........................................................76

Section 3.19.    Annual Independent Public Accountants' Servicing Report.......................77

Section 3.20.    Right of the Depositor in Respect of the Master Servicer...........................77

Section 3.21.    Advance Facility .....................................................................................78

ARTICLE IV
PAYMENTS TO CERTIFICATEHOLDERS

Section 4.01.    Certificate Account ..................................................................................81

Section 4.02.    Distributions............................................................................................82

Section 4.03.    Statements to Certificateholders; Statements to Rating Agencies;
Exchange Act Reporting...........................................................................88

Section 4.04.    Distribution of Reports to the Trustee and the Depositor; Advances by
the Master Servicer.................................................................................91

Section 4.05.    Allocation of Realized Losses ..................................................................93

Section 4.06.    Reports of Foreclosures and Abandonment of Mortgaged Property .............95

Section 4.07.    Optional Purchase of Defaulted Mortgage Loans.......................................95

Section 4.08.    Limited Mortgage Loan Repurchase Right ................................................95

Section 4.09.    The Yield Maintenance Agreement ...........................................................96

Section 4.10.    The Policy................................................................................................97

Section 4.11.    Derivative Contracts.................................................................................98

Section 4.12.    Tax Treatment of Yield Maintenance Payments .........................................99

ARTICLE V
THE CERTIFICATES

Section 5.01.    The Certificates........................................................................................99

Section 5.02.    Registration of Transfer and Exchange of Certificates ..............................101

Section 5.03.    Mutilated, Destroyed, Lost or Stolen Certificates......................................106

Section 5.04.    Persons Deemed Owners ..........................................................................106

Section 5.05.    Appointment of Paying Agent ...................................................................107

ARTICLE VI
THE DEPOSITOR AND THE MASTER SERVICER

Section 6.01.    Respective Liabilities of the Depositor and the Master Servicer.................107

CONFIDENTIAL                                                            RC_FGIC9019_00031380

Section 6.02.    Merger or Consolidation of the Depositor or the Master Servicer; Assignment of Rights and Delegation of Duties by Master Servicer .......... 107

Section 6.03.    Limitation on Liability of the Depositor, the Master Servicer and Others ............................................................................................. 108

Section 6.04.    Depositor and Master Servicer Not to Resign ............................................. 109

## ARTICLE VII
### DEFAULT

Section 7.01.    Events of Default ........................................................................................ 109

Section 7.02.    Trustee or Depositor to Act; Appointment of Successor ........................... 111

Section 7.03.    Notification to Certificateholders ............................................................... 113

Section 7.04.    Waiver of Events of Default ....................................................................... 114

Section 7.05.    Servicing Trigger; Removal of Master Servicer ......................................... 114

## ARTICLE VIII
### CONCERNING THE TRUSTEE

Section 8.01.    Duties of Trustee ........................................................................................ 115

Section 8.02.    Certain Matters Affecting the Trustee ........................................................ 117

Section 8.03.    Trustee Not Liable for Certificates or Mortgage Loans .............................. 118

Section 8.04.    Trustee May Own Certificates .................................................................... 118

Section 8.05.    Master Servicer to Pay Trustee's Fees and Expenses; Indemnification ....... 118

Section 8.06.    Eligibility Requirements for Trustee ........................................................... 119

Section 8.07.    Resignation and Removal of the Trustee ..................................................... 120

Section 8.08.    Successor Trustee ....................................................................................... 121

Section 8.09.    Merger or Consolidation of Trustee ............................................................ 121

Section 8.10.    Appointment of Co-Trustee or Separate Trustee ........................................ 122

Section 8.11.    Appointment of Custodians ........................................................................ 123

Section 8.12.    Appointment of Office or Agency ............................................................... 123

Section 8.13.    DTC Letter of Representations. ................................................................... 123

Section 8.14.    Yield Maintenance Agreement ................................................................... 123

## ARTICLE IX
### TERMINATION

Section 9.01.    Termination Upon Purchase by Residential Funding or Liquidation of All Mortgage Loans ................................................................................. 123

Section 9.02.    Additional Termination Requirements ........................................................ 127

CONFIDENTIAL                                                              RC_FGIC9019_00031381

## ARTICLE X
## REMIC PROVISIONS

| | | |
|---|---|---|
| Section 10.01. | REMIC Administration | 128 |
| Section 10.02. | Master Servicer, REMIC Administrator and Trustee Indemnification | 132 |

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| Section 11.01. | Amendment | 132 |
| Section 11.02. | Recordation of Agreement; Counterparts | 135 |
| Section 11.03. | Limitation on Rights of Certificateholders | 135 |
| Section 11.04. | Governing Law | 136 |
| Section 11.05. | Notices | 136 |
| Section 11.06. | Notices to Rating Agencies | 137 |
| Section 11.07. | Severability of Provisions | 138 |
| Section 11.08. | Supplemental Provisions for Resecuritization | 138 |
| Section 11.09. | Rights of the Insurer | 139 |
| Section 11.10. | Third Party Beneficiaries | 139 |

CONFIDENTIAL                                                      RC_FGIC9019_00031382

## Exhibits

| | |
|---|---|
| Exhibit A | Form of Class A Certificate |
| Exhibit B | [Reserved] |
| Exhibit C | [Reserved] |
| Exhibit D | Form of Class SB Certificate |
| Exhibit E | Form of Class R Certificate |
| Exhibit F | Form of Custodial Agreement |
| Exhibit G-1 | Group I Mortgage Loan Schedule |
| Exhibit G-2 | Group II Mortgage Loan Schedule |
| Exhibit H | Forms of Request for Release |
| Exhibit I-1 | Form of Transfer Affidavit and Agreement |
| Exhibit I-2 | Form of Transferor Certificate |
| Exhibit J | Form of Investor Representation Letter |
| Exhibit K | Form of Transferor Representation Letter |
| Exhibit L | Text of Amendment to Pooling and Servicing Agreement Pursuant to Section 11.01(e) for a Limited Guaranty |
| Exhibit M | Form of Limited Guaranty |
| Exhibit N | Form of Lender Certification for Assignment of Mortgage Loan |
| Exhibit O | Form of Rule 144A Investment Representation |
| Exhibit P | Financial Guaranty Insurance Policy |
| Exhibit Q | [Reserved] |
| Exhibit R-1 | Form 10-K Certification |
| Exhibit R-2 | Form 10-K Back-up Certification |
| Exhibit S | Information to be Provided by the Master Servicer to the Rating Agencies Relating to Reportable Modified Mortgage Loans |
| Exhibit T | [Reserved] |
| Exhibit U | Yield Maintenance Agreement |

CONFIDENTIAL                    RC_FGIC9019_00031383

This Pooling and Servicing Agreement, effective as of December 1, 2005, among RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., as depositor (together with its permitted successors and assigns, the "Depositor"), RESIDENTIAL FUNDING CORPORATION, as master servicer (together with its permitted successors and assigns, the "Master Servicer"), and U.S. BANK NATIONAL ASSOCIATION, a banking association organized under the laws of the United States, as trustee (together with its permitted successors and assigns, the "Trustee").

## PRELIMINARY STATEMENT:

The Depositor intends to sell mortgage asset-backed pass-through certificates (collectively, the "Certificates"), to be issued hereunder in eight Classes, which in the aggregate will evidence the entire beneficial ownership interest in the Mortgage Loans (as defined herein) and certain other related assets.

## REMIC I

As provided herein, the REMIC Administrator will make an election to treat the segregated pool of assets consisting of the Mortgage Loans and certain other related assets (exclusive of the Yield Maintenance Agreement and any payments thereunder) subject to this Agreement as a real estate mortgage investment conduit (a "REMIC") for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC I." The Class R-I Certificates will represent the sole Class of "residual interests" in REMIC I for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, remittance rate (the "Uncertificated REMIC I Pass-Through Rate") and initial Uncertificated Principal Balance for each of the "regular interests" in REMIC I (the "REMIC I Regular Interests"). The "latest possible maturity date" (determined for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii)) for the REMIC I Regular Interests shall be the 360th Distribution Date. The REMIC I Regular Interests will not be certificated.

| Designation | Uncertificated REMIC I Pass-Through Rate | Initial Uncertificated REMIC I Principal Balance | Latest Possible Maturity Date |
|---|---|---|---|
| I-AA | Variable[(1)] | $507,604,194.72 | December 2035 |
| I-A-I-1 | Variable[(1)] | $1,921,770.00 | December 2035 |
| I-A-I-2 | Variable[(1)] | $829,610.00 | December 2035 |
| I-A-I-3 | Variable[(1)] | $1,535,100.00 | December 2035 |
| I-A-I-4 | Variable[(1)] | $701,510.00 | December 2035 |
| I-ZZ | Variable[(1)] | $5,371,279.28 | December 2035 |
| II-AA | Variable[(2)] | $202,895,998.24 | December 2035 |
| II-A-II | Variable[(2)] | $1,993,760.00 | December 2035 |
| II-ZZ | Variable[(2)] | $2,146,987.76 | December 2035 |

[(1)]   Calculated in accordance with the definition of "Uncertificated Group I REMIC I Pass-Through Rate" herein.

[(2)]   Calculated in accordance with the definition of "Uncertificated Group II REMIC I Pass-Through Rate" herein.

5109327 05161514

CONFIDENTIAL

RC_FGIC9019_00031384

<u>REMIC II</u>

As provided herein, the REMIC Administrator will elect to treat the segregated pool of assets consisting of the REMIC I Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC II". The Class R-II Certificates will represent the sole class of "residual interests" in REMIC II for purposes of the REMIC Provisions under federal income tax law. The following table irrevocably sets forth the designation, Pass-Through Rate, aggregate Initial Certificate Principal Balance, certain features, Final Scheduled Distribution Date and initial ratings for each Class of Certificates comprising the interests representing "regular interests" in REMIC II. The "latest possible maturity date" (determined for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii)) for each Class of REMIC II Regular Interests shall be the 360th Distribution Date.

| Designation | Type | Pass-Through Rate | Aggregate Initial Certificate Principal Balance | Final Scheduled Distribution Date | Initial Ratings | |
|---|---|---|---|---|---|---|
| | | | | | Moody's | S&P |
| Class A-I-1[(1)] | Senior | Adjustable[(2) (3)] | $ 192,177,000 | January 2026 | Aaa | AAA |
| Class A-I-2[(1)] | Senior | Adjustable[(2) (3)] | $ 82,961,000 | November 2035 | Aaa | AAA |
| Class A-I-3[(1)] | Senior | Adjustable[(2) (3)] | $ 153,510,000 | November 2035 | Aaa | AAA |
| Class A-I-4[(1)] | Senior | Adjustable[(2) (3)] | $ 70,151,000 | November 2035 | Aaa | AAA |
| Class A-II[(1)] | Senior | Adjustable[(2) (3)] | $ 199,376,000 | November 2035 | Aaa | AAA |
| Class SB Interest | Subordinate | Variable[(4)] | $ 26,825,209.53 | N/A | N/R | N/R |
| Class R-I | Residual | N/A | N/A | N/A | N/R | N/R |
| Class R-II | Residual | N/A | N/A | N/A | N/R | N/R |

(1)     The Class A Certificates will represent ownership of REMIC II Regular Interests together with certain rights to payments to be made from amounts received under the Yield Maintenance Agreement which will be treated as an interest rate cap contract, the payments on which will be deemed made for federal income tax purposes outside of REMIC II.

(2)     The REMIC II Regular Interests ownership of which is represented by the Class A Certificates, will accrue interest at a per annum rate equal to LIBOR plus the applicable Margin, each subject to payment caps as described in the definition of "Pass-Through Rate" and the provisions for the payment of the applicable Group I Basis Risk Shortfall Carry-Forward Amounts or Group II Basis Risk Shortfall Carry-Forward Amounts herein, which payments will not be part of the entitlement of the REMIC II Regular Interests related to such Certificates.

(3)     The Class A Certificates will also entitle their holders to certain payments from the Holder of the Class SB Certificates from amounts to which the related REMIC II Regular Interest is entitled and from amounts received under the Yield Maintenance Agreement, which will not be a part of their ownership of the REMIC II Regular Interests.

(4)     The Class SB Certificates will accrue interest as described in the definition of Accrued Certificate Interest. The Class SB Certificates will not accrue interest on their Certificate Principal Balance.

The Mortgage Loans have an aggregate Cut-off Date Principal Balance equal to $725,000,209.53. The Mortgage Loans are fixed-rate and adjustable-rate, fully amortizing, first and junior lien mortgage loans having terms to maturity at origination or modification of generally not more than 30 years.

CONFIDENTIAL                                                    RC_FGIC9019_00031385

In consideration of the mutual agreements herein contained, the Depositor, the Master Servicer and the Trustee agree as follows:

# ARTICLE I
## DEFINITIONS

Section 1.01.  Definitions.

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

Accrued Certificate Interest:  With respect to each Distribution Date and the Class A Certificates, interest accrued during the related Interest Accrual Period on the Certificate Principal Balance thereof immediately prior to such Distribution Date at the related Pass-Through Rate for that Distribution Date.

The amount of Accrued Certificate Interest on each Class of Certificates shall be reduced by the amount of Prepayment Interest Shortfalls on the related Mortgage Loans during the prior calendar month (to the extent not covered by Eligible Master Servicing Compensation pursuant to Section 3.16) and by the amount of Relief Act Shortfalls on the related Mortgage Loans during the related Due Period, in each case to the extent allocated to that Class of Certificates pursuant to Section 4.02(g).  The portion of any Prepayment Interest Shortfalls or Relief Act Shortfalls on the Group I Loans shall be allocated among the Class A-I Certificates, pro rata, on the basis of Accrued Certificate Interest payable on such Distribution Date absent such reductions, and the portion of any Prepayment Interest Shortfalls or Relief Act Shortfalls on the Group II Loans shall be allocated to the Class A-II Certificates.

Accrued Certificate Interest for each Class on any Distribution Date shall be further reduced by the interest portion of Realized Losses allocated to any Class of Certificates pursuant to Section 4.05.

With respect to each Distribution Date and the Class SB Certificates, interest accrued during the preceding Interest Accrual Period at the related Pass-Through Rate for that Distribution Date on the Uncertificated Notional Amount as specified in the definition of Pass-Through Rate, immediately prior to such Distribution Date, reduced by any interest shortfalls with respect to the related Mortgage Loans, including Prepayment Interest Shortfalls to the extent not covered by Eligible Master Servicing Compensation pursuant to Section 3.16 or by the Excess Cash Flow pursuant to clauses (vii) and (viii) of Section 4.02(c). In addition, Accrued Certificate Interest with respect to each Distribution Date, as to the Class SB Certificates, shall be reduced by an amount equal to the interest portion of Realized Losses allocated to the Overcollateralization Amount pursuant to Section 4.05 hereof. Accrued Certificate Interest on the Class A Certificates shall accrue on the basis of a 360-day year and the actual number of days in the related Interest Accrual Period. Accrued Certificate Interest on the Class SB Certificates shall accrue on the basis of a 360 day year consisting of twelve 30 day months.

Adjusted Mortgage Rate:  With respect to any Mortgage Loan and any date of determination, the Mortgage Rate borne by the related Mortgage Note, less the related Subservicing Fee Rate.

CONFIDENTIAL                                        RC_FGIC9019_00031386

Adjustment Date:  With respect to each adjustable-rate Mortgage Loan, each date set forth in the related Mortgage Note on which an adjustment to the interest rate on such Mortgage Loan becomes effective.

Advance:  With respect to any Mortgage Loan, any advance made by the Master Servicer, pursuant to Section 4.04.

Affiliate:  With respect to any Person, any other Person controlling, controlled by or under common control with such first Person. For the purposes of this definition, "control" means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agreement:  This Pooling and Servicing Agreement and all amendments hereof and supplements hereto.

Amount Held for Future Distribution:  With respect to any Distribution Date, the total of the amounts held in the Custodial Account at the close of business on the preceding Determination Date on account of (i) Liquidation Proceeds, Subsequent Recoveries, REO Proceeds, Insurance Proceeds, Principal Prepayments, Mortgage Loan purchases made pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08 and Mortgage Loan substitutions made pursuant to Section 2.03 or 2.04 received or made in the month of such Distribution Date (other than such Liquidation Proceeds, Insurance Proceeds, REO Proceeds, Subsequent Recoveries and purchases of Mortgage Loans that the Master Servicer has deemed to have been received in the preceding month in accordance with Section 3.07(b)) and (ii) payments which represent early receipt of scheduled payments of principal and interest due on a date or dates subsequent to the Due Date in the related Due Period.

Appraised Value:  With respect to any Mortgaged Property, one of the following:  (i) the lesser of (a) the appraised value of such Mortgaged Property based upon the appraisal made at the time of the origination of the related Mortgage Loan, and (b) the sales price of the Mortgaged Property at such time of origination, (ii) in the case of a Mortgaged Property securing a refinanced or modified Mortgage Loan, one of (1) the appraised value based upon the appraisal made at the time of origination of the loan which was refinanced or modified, (2) the appraised value determined in an appraisal made at the time of refinancing or modification or (3) the sales price of the Mortgaged Property, or (iii) with respect to the Mortgage Loans for which a broker's price opinion was obtained, the value contained in such opinion.

Assignment:  An assignment of the Mortgage, notice of transfer or equivalent instrument, in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale of the Mortgage Loan to the Trustee for the benefit of Certificateholders, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering Mortgages secured by Mortgaged Properties located in the same county, if permitted by law and accompanied by an Opinion of Counsel to that effect.

CONFIDENTIAL                                    RC_FGIC9019_00031387

Assignment Agreement:  The Assignment and Assumption Agreement, dated the Closing Date, between Residential Funding and the Depositor relating to the transfer and assignment of the Mortgage Loans.

Available Distribution Amount:  With respect to any Distribution Date, an amount equal to (a) the sum of (i) the amount relating to the Mortgage Loans on deposit in the Custodial Account as of the close of business on the immediately preceding Determination Date, including any Subsequent Recoveries, and amounts deposited in the Custodial Account in connection with the substitution of Qualified Substitute Mortgage Loans, (ii) the amount of any Advance made on the immediately preceding Certificate Account Deposit Date with respect to the Mortgage Loans, (iii) any amount deposited in the Certificate Account on the related Certificate Account Deposit Date pursuant to Section 3.12(a) in respect of the Mortgage Loans, (iv) any amount that the Master Servicer is not permitted to withdraw from the Custodial Account pursuant to Section 3.16(e) in respect of the Mortgage Loans, (v) any amounts payable under the Policy pursuant to Section 4.10 and (vi) any amount deposited in the Certificate Account pursuant to Section 4.07 or 4.08 and any amounts deposited in the Custodial Account pursuant to Section 9.01, reduced by (b) the sum as of the close of business on the immediately preceding Determination Date of: (w) any payments or collections consisting of prepayment charges on the Mortgage Loans that were received during the related Prepayment Period, (x) the Amount Held for Future Distribution and (y) amounts permitted to be withdrawn by the Master Servicer from the Custodial Account pursuant to clauses (ii)-(x), inclusive, of Section 3.10(a).

Balloon Loan:  Each of the Mortgage Loans having an original term to maturity that is shorter than the related amortization term.

Balloon Payment:  With respect to any Balloon Loan, the related Monthly Payment payable on the stated maturity date of such Balloon Loan.

Bankruptcy Code:  The Bankruptcy Code of 1978, as amended.

Basis Risk Shortfall:  The Group I Basis Risk Shortfall or Group II Basis Risk Shortfall, as applicable.

Basis Risk Shortfall Carry-Forward Amount:  The Group I Basis Risk Shortfall Carry-Forward Amount or Group II Basis Risk Shortfall Carry-Forward Amount, as applicable.

Book-Entry Certificate:  Any Certificate registered in the name of the Depository or its nominee.

Business Day:  Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the States of California, New York, Minnesota or Illinois (and such other state or states in which the Custodial Account or the Certificate Account are at the time located) are required or authorized by law or executive order to be closed.

Call Rights:  As defined in Section 9.01(e).

Capitalization Reimbursement Amount:  With respect to any Distribution Date, the amount of unreimbursed Advances or Servicing Advances that were added to the Stated

CONFIDENTIAL                                                    RC_FGIC9019_00031388

Principal Balance of the related Mortgage Loans during the preceding calendar month and reimbursed to the Master Servicer or Subservicer pursuant to Section 3.10(a)(vii) on or prior to such Distribution Date.

Cash Liquidation:  With respect to any defaulted Mortgage Loan other than a Mortgage Loan as to which an REO Acquisition occurred, a determination by the Master Servicer that it has received all Insurance Proceeds, Liquidation Proceeds and other payments or cash recoveries which the Master Servicer reasonably and in good faith expects to be finally recoverable with respect to such Mortgage Loan.

Certificate:  Any Class A Certificate, Class SB Certificate or Class R Certificate.

Certificate Account:  The account or accounts created and maintained pursuant to Section 4.01, which shall be entitled "U.S. Bank National Association as trustee, in trust for the registered holders of Residential Asset Mortgage Products, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC7" and which account shall be held for the benefit of the Certificateholders and which must be an Eligible Account.  Any such account or accounts created and maintained subsequent to the Closing Date shall be subject to the approval of the Insurer, which approval shall not be unreasonably withheld.

Certificate Account Deposit Date:  With respect to any Distribution Date, the Business Day prior thereto.

Certificateholder or Holder:  The Person in whose name a Certificate is registered in the Certificate Register, except that neither a Disqualified Organization nor a Non-United States Person shall be a holder of a Class R Certificate for any purpose hereof. Solely for the purpose of giving any consent or direction pursuant to this Agreement, any Certificate, other than a Class R Certificate, registered in the name of the Depositor, the Master Servicer or any Subservicer or any Affiliate thereof shall be deemed not to be outstanding and the Percentage Interest or Voting Rights evidenced thereby shall not be taken into account in determining whether the requisite amount of Percentage Interests or Voting Rights necessary to effect any such consent or direction has been obtained. All references herein to "Holders" or "Certificateholders" shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and participating members thereof, except as otherwise specified herein; *provided, however*, that the Trustee shall be required to recognize as a "Holder" or "Certificateholder" only the Person in whose name a Certificate is registered in the Certificate Register.  Unless otherwise indicated in this Agreement, the Custodial Agreement or the Assignment Agreement, whenever reference is made to the actions taken by the Trustee on behalf of the Certificateholders, such reference shall include the Insurer as long as there is no Insurer Default continuing.

Certificate Insurer Premium:  With respect to the Class A Certificates, the premium payable to the Insurer on each Distribution Date in an amount equal to one-twelfth of the product of the Certificate Insurer Premium Rate and the Certificate Principal Balance of the Class A Certificates immediately prior to such Distribution Date.

Certificate Insurer Premium Modified Rate:  With respect to any Mortgage Loan and any date of determination, the Certificate Insurer Premium Rate for the Class A Certificates times a

CONFIDENTIAL                                                              RC_FGIC9019_00031389

fraction equal to (x) the aggregate Certificate Principal Balance of the Class A Certificates as of such date over (y) the aggregate Stated Principal Balance of the Mortgage Loans as of such date.

Certificate Insurer Premium Rate:  With respect to the Mortgage Loans and each class of Class A Certificates and any date of determination, the per annum rate specified in the Insurance Agreement with respect to the Class A Certificates for the purpose of calculating the related Certificate Insurer Premium.

Certificate Owner:  With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Certificate, as reflected on the books of an indirect participating brokerage firm for which a Depository Participant acts as agent, if any, and otherwise on the books of a Depository Participant, if any, and otherwise on the books of the Depository.

Certificate Principal Balance:  With respect to any Class A Certificate, on any date of determination, an amount equal to (i) the Initial Certificate Principal Balance of such Certificate as specified on the face thereof minus (ii) the sum of (x) the aggregate of all amounts previously distributed with respect to such Certificate (or any predecessor Certificate) (including such amounts paid pursuant to the Policy) and applied to reduce the Certificate Principal Balance thereof pursuant to Section 4.02(c), 4.02(d) or 4.02(e) and (y) the aggregate of all reductions in Certificate Principal Balance deemed to have occurred in connection with Realized Losses which were previously allocated to such Certificate (or any predecessor Certificate) pursuant to Section 4.05 (other than any such amounts included in an Insured Payment and paid pursuant to the Policy), provided, that with respect to any Distribution Date, the Certificate Principal Balance of each class of Class A Certificates to which a Realized Loss was previously allocated and remains unreimbursed will be increased as follows:  to the Class A-I Certificates on a pro rata basis, with respect to the Group I Loans and to the Class A-II Certificates with respect to the Group II Loans, to the extent of Realized Losses previously allocated thereto and remaining unreimbursed, but only to the extent of Subsequent Recoveries on the related Mortgage Loans received during the previous calendar month and available for distribution pursuant to Section 4.02(c)(iii), other than amounts that have been paid pursuant to the Policy. With respect to each Class SB Certificate, on any date of determination, an amount equal to the Percentage Interest evidenced by such Certificate times an amount equal to the excess, if any, of (A) the then aggregate Stated Principal Balance of the Mortgage Loans over (B) the then aggregate Certificate Principal Balance of the Class A Certificates then outstanding. The Class R Certificates will not have a Certificate Principal Balance.

Certificate Register and Certificate Registrar:  The register maintained and the registrar appointed pursuant to Section 5.02.

Class:  Collectively, all of the Certificates or uncertificated interests bearing the same designation.

Class A Certificate:  Any one of the Class A-I-1, Class A-I-2, Class A-I-3, Class A-I-4 or Class A-II Certificates.

Class A-I Certificate:  Any one of the Class A-I-1, Class A-I-2, Class A-I-3 or Class A-I-4 Certificates.

CONFIDENTIAL                                                    RC_FGIC9019_00031390

Class A-I Interest Remittance Amount:  With respect to any Distribution Date, the portion of the Available Distribution Amount for that Distribution Date attributable to interest received or advanced with respect to the Group I Loans.

Class A-I-1 Certificate:  Any one of the Class A-I-1 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions and (ii) the right to receive the related Group I Basis Risk Carry-Forward Amount from Excess Cash Flow to the extent described herein.

Class A-I-1 Margin:  0.100% per annum.

Class A-I-2 Certificate:  Any one of the Class A-I-2 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions and (ii) the right to receive the related Group I Basis Risk Carry-Forward Amount from Excess Cash Flow to the extent described herein.

Class A-I-2 Margin:  0.170% per annum.

Class A-I-3 Certificate:  Any one of the Class A-I-3 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions and (ii) the right to receive the related Group I Basis Risk Carry-Forward Amount from Excess Cash Flow to the extent described herein.

Class A-I-3 Margin:  0.250% per annum.

Class A-I-4 Certificate:  Any one of the Class A-I-4 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions and (ii) the right to receive the related Group I Basis Risk Carry-Forward Amount from Excess Cash Flow to the extent described herein.

Class A-I-4 Margin:  Initially, 0.350% per annum, and on any Distribution Date on or after the first Distribution Date after the second possible Optional Termination Date, 0.700% per annum.

Class A-II Certificate:  Any one of the Class A-II Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as

CONFIDENTIAL                                                              RC_FGIC9019_00031391

Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group II Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions, and (ii) the right to receive the related Group II Basis Risk Carry-Forward Amount from Excess Cash Flow to the extent described herein.

Class A-II Interest Remittance Amount:  With respect to any Distribution Date, the portion of the Available Distribution Amount for that Distribution Date attributable to interest received or advanced with respect to the Group II Loans.

Class A-II Margin:  Initially, 0.230% per annum, and on any Distribution Date on or after the first Distribution Date after the second possible Optional Termination Date, 0.460% per annum.

Class A Interest Distribution Priority:  With respect to each Class of Class A Certificates and any Distribution Date, the amount available for payment of Accrued Certificate Interest thereon for that Distribution Date plus Accrued Certificate Interest thereon remaining unpaid from any prior Distribution Date, in the amounts and priority as follows:

- *first*, concurrently, to the Class A-I Certificates, pro rata, from the Class A-I Interest Remittance Amount, and to the Class A-II Certificates, from the Class A-II Interest Remittance Amount;

- *second*, to the Class A-I Certificates, pro rata, from the remaining Class A-II Interest Remittance Amount and to the Class A-II Certificates, from the remaining Class A-I Interest Remittance Amount, as needed after taking into account any distributions in respect of interest on the Class A Certificates made in *first* above;

- *third*, concurrently, from the Principal Remittance Amount related to the Group I Loans, to the Class A-I Certificates, pro rata, and from the Principal Remittance Amount related to the Group II Loans, to the Class A-II Certificates, after taking into account any distributions in respect of interest on the Class A Certificates made in *first* and *second* above; and

- *fourth*, from the remaining Principal Remittance Amount related to the Group II Loans, to the Class A-I Certificates, pro rata, and from the remaining Principal Remittance Amount related to the Group I Loans, to the Class A-II Certificates, as needed after taking into account any distributions in respect of interest on the Class A Certificates made in *first*, *second* and *third* above.

Class R Certificates:  Collectively, the Class R-I Certificates and the Class R-II Certificates.

Class R-I Certificate:  Any one of the Class R-I Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit E and evidencing an interest designated as a "residual interest" in REMIC I for purposes of the REMIC Provisions.

CONFIDENTIAL                                                                    RC_FGIC9019_00031392

Class R-II Certificate:  Any one of the Class R-II Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit E and evidencing an interest designated as a "residual interest" in REMIC II for purposes of the REMIC Provisions.

Class SB Certificate:  Any one of the Class SB Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit D, subordinate to the Class A Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing an interest comprised of "regular interests" in REMIC II together with certain rights to payments under the Yield Maintenance Agreement for purposes of the REMIC Provisions.

Closing Date:  December 28, 2005.

Code:  The Internal Revenue Code of 1986, as amended.

Commission:  The Securities and Exchange Commission.

Corporate Trust Office:  The principal office of the Trustee at which at any particular time its corporate trust business with respect to this Agreement shall be administered, which office at the date of the execution of this instrument is located at U.S. Bank National Association, EP-MN-WS3D, 60 Livingston Avenue, St. Paul, Minnesota 55107, Attn:  RAMP Series 2005-EFC7.

Credit Repository:  Equifax, Transunion and Experian, or their successors in interest.

Cumulative Insurance Payments:  As of any time of determination, the aggregate amount of all Insured Payments previously paid by the Insurer under the Policy in respect of the Class A Certificates minus (a) the aggregate of all payments previously made to the Insurer pursuant to Section 4.02(c) or 4.02(d) hereof as reimbursement for such Insured Payments, plus (b) interest thereon from the date such amounts became due until paid in full, at a rate of interest equal to the applicable Late Payment Rate.

Curtailment:  Any Principal Prepayment made by a Mortgagor which is not a Principal Prepayment in Full.

Custodial Account:  The custodial account or accounts created and maintained pursuant to Section 3.07 in the name of a depository institution, as custodian for the holders of the Certificates and the Insurer, for the holders of certain other interests in mortgage loans serviced or sold by the Master Servicer and for the Master Servicer, into which the amounts set forth in Section 3.07 shall be deposited directly. Any such account or accounts shall be an Eligible Account.

Custodial Agreement:  An agreement that may be entered into among the Depositor, the Master Servicer, the Trustee and a Custodian in substantially the form of Exhibit F hereto.

CONFIDENTIAL                                                    RC_FGIC9019_00031393

Custodian:  A custodian appointed pursuant to a Custodial Agreement and reasonably acceptable to the Insurer.

Cut-off Date:  December 1, 2005.

Cut-off Date Balance:  $725,000,209.53.

Cut-off Date Principal Balance:  With respect to any Mortgage Loan, the unpaid principal balance thereof at the Cut-off Date after giving effect to all installments of principal due on or prior thereto (or due during the month of the Cut-off Date), whether or not received.

Debt Service Reduction:  With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction constituting a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

Deficiency Amount:  With respect to any Distribution Date and each Class of the Class A-I Certificates, an amount, if any, equal to the sum of (1) the excess, if any, of the Accrued Certificate Interest (without taking into account any reduction in the Accrued Certificate Interest in respect of Realized Losses) on the Class of Class A-I Certificates for that Distribution Date over the portion of the amounts on deposit in the Certificate Account on that Distribution Date available for distribution to the Class A-I Certificates pursuant to the Class A Interest Distribution Priority on that Distribution Date and (2) (i) with respect to any Distribution Date that is not the Distribution Date in December 2035, the principal portion of any Realized Losses allocated to the Class A-I Certificates, if any, for that Distribution Date and (ii) on the Distribution Date in December 2035, the aggregate Certificate Principal Balance of the Class A-I Certificates (after giving effect to all distributions to be made thereon on that Distribution Date other than any portion thereof consisting of an Insured Payment payable as principal on the Class A-I Certificates).  With respect to any Distribution Date and the Class A-II Certificates, an amount, if any, equal to the sum of (1) the excess, if any, of the Accrued Certificate Interest (without taking into account any reduction in the Accrued Certificate Interest in respect of Realized Losses) on the Class A-II Certificates for that Distribution Date over the portion of the amounts on deposit in the Certificate Account on that Distribution Date available for distribution to the Class A-II Certificates pursuant to the Class A Interest Distribution Priority on that Distribution Date and (2) (i) with respect to any Distribution Date that is not the Distribution Date in December 2035, the principal portion of any Realized Losses allocated to the Class A-II Certificates, if any, for that Distribution Date and (ii) on the Distribution Date in December 2035, the aggregate Certificate Principal Balance of the Class A-II Certificates (after giving effect to all distributions to be made thereon on that Distribution Date other than any portion thereof consisting of an Insured Payment payable as principal on the Class A-II Certificates). The Deficiency Amount does not include any Group I Basis Risk Shortfall Carry Forward Amounts or Group II Basis Risk Shortfall Carry Forward Amounts.

Deficient Valuation:  With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in

CONFIDENTIAL                                                          RC_FGIC9019_00031394

connection with any scheduled Monthly Payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code.

Definitive Certificate:  Any definitive, fully registered Certificate.

Deleted Mortgage Loan:  A Mortgage Loan replaced or to be replaced with a Qualified Substitute Mortgage Loan.

Delinquency Ratio: With respect to any Distribution Date and the Mortgage Loans, the arithmetic average, of the fraction, expressed as a percentage, equal to (x) the aggregate Stated Principal Balance of the Mortgage Loans that are 60 or more days delinquent in payment of principal and interest for that Distribution Date, including Mortgage Loans in bankruptcy that are 60 or more days delinquent, foreclosure and REO Properties, over (y) the aggregate Stated Principal Balance of all of the Mortgage Loans immediately preceding that Distribution Date.

Delinquent:  As used herein, a Mortgage Loan is considered to be:  "30 to 59 days" or "30 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the next following monthly scheduled due date; "60 to 89 days" or "60 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the second following monthly scheduled due date; and so on. The determination as to whether a Mortgage Loan falls into these categories is made as of the close of business on the last business day of each month. For example, a Mortgage Loan with a payment due on July 1 that remained unpaid as of the close of business on August 31 would then be considered to be 30 to 59 days delinquent. Delinquency information as of the Cut-off Date is determined and prepared as of the close of business on the last business day immediately prior to the Cut-off Date.

Depositor:  As defined in the preamble hereto.

Depository:  The Depository Trust Company, or any successor Depository hereafter named. The nominee of the initial Depository for purposes of registering those Certificates that are to be Book-Entry Certificates is Cede & Co. The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(a)(5) of the Uniform Commercial Code of the State of New York and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.

Depository Participant:  A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

Derivative Contract:  Any ISDA Master Agreement, together with the related Schedule and Confirmation, entered into by the Trustee and a Derivative Counterparty in accordance with Section 4.11.

Derivative Counterparty:  Any counterparty to a Derivative Contract as provided in Section 4.11.

CONFIDENTIAL                                                          RC_FGIC9019_00031395

Destroyed Mortgage Note:  A Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

Determination Date:  With respect to any Distribution Date, the 20th day (or if such 20th day is not a Business Day, the Business Day immediately following such 20th day) of the month of the related Distribution Date.

Disqualified Organization:  Any organization defined as a "disqualified organization" under Section 860E(e)(5) of the Code, which includes any of the following: (i) the United States, any State or political subdivision thereof, any possession of the United States, or any agency or instrumentality of any of the foregoing (other than an instrumentality which is a corporation if all of its activities are subject to tax and, except for Freddie Mac, a majority of its board of directors is not selected by such governmental unit), (ii) a foreign government, any international organization, or any agency or instrumentality of any of the foregoing, (iii) any organization (other than certain farmers' cooperatives described in Section 521 of the Code) which is exempt from the tax imposed by Chapter 1 of the Code (including the tax imposed by Section 511 of the Code on unrelated business taxable income) and (iv) rural electric and telephone cooperatives described in Section 1381(a)(2)(C) of the Code.  A Disqualified Organization also includes any "electing large partnership," as defined in Section 775(a) of the Code and any other Person so designated by the Trustee based upon an Opinion of Counsel that the holding of an Ownership Interest in a Class R Certificate by such Person may cause any REMIC or any Person having an Ownership Interest in any Class of Certificates (other than such Person) to incur a liability for any federal tax imposed under the Code that would not otherwise be imposed but for the Transfer of an Ownership Interest in a Class R Certificate to such Person. The terms "United States", "State" and "international organization" shall have the meanings set forth in Section 7701 of the Code or successor provisions.

Distribution Date:  The 25th day of any month beginning in the month immediately following the month of the initial issuance of the Certificates or, if such 25th day is not a Business Day, the Business Day immediately following such 25th day.

DTC Letter:  The Letter of Representations, dated December 28, 2005, between the Trustee, on behalf of the Trust Fund, and the Depository.

Due Date:  With respect to any Distribution Date and any Mortgage Loan, the day during the related Due Period on which the Monthly Payment is due.

Due Period:  With respect to any Distribution Date, the calendar month of such Distribution Date.

Eligible Account:  An account that is any of the following:  (i) maintained with a depository institution the debt obligations of which have been rated by each Rating Agency in its highest rating available, or (ii) an account or accounts in a depository institution in which such accounts are fully insured to the limits established by the FDIC, provided that any deposits not so insured shall, to the extent acceptable to each Rating Agency, as evidenced in writing, be maintained such that (as evidenced by an Opinion of Counsel delivered to the Trustee and each Rating Agency) the registered Holders of Certificates have a claim with respect to the funds in

CONFIDENTIAL                                                              RC_FGIC9019_00031396

such account or a perfected first security interest against any collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution with which such account is maintained, or (iii) in the case of the Custodial Account, a trust account or accounts maintained in the corporate trust department of U.S. Bank National Association, or (iv) in the case of the Certificate Account and the Insurance Account, a trust account or accounts maintained in the corporate trust department of U.S. Bank National Association, or (v) an account or accounts of a depository institution acceptable to each Rating Agency (as evidenced in writing by each Rating Agency that use of any such account as the Custodial Account or the Certificate Account will not reduce the rating assigned to any Class of Certificates by such Rating Agency below the then-current rating by such Rating Agency).

Eligible Master Servicing Compensation:  With respect to any Distribution Date and each Loan Group, an amount equal to Prepayment Interest Shortfalls resulting from Principal Prepayments in Full or Curtailments during the related Prepayment Period, but not more than the lesser of (a) one-twelfth of 0.125% of the Stated Principal Balance of the related Mortgage Loans immediately preceding such Distribution Date and (b) the sum of the Servicing Fee, all income and gain on amounts held in the Custodial Account and the Certificate Account and amounts payable to the Certificateholders with respect to such Distribution Date and servicing compensation to which the Master Servicer may be entitled pursuant to Section 3.10(a)(v) and (vi) provided that for purposes of this definition the amount of the Servicing Fee will not be reduced pursuant to Section 7.02(a) except as may be required pursuant to the last sentence of such Section 7.02(a), in each case with respect to the related Loan Group.

ERISA:  The Employee Retirement Income Security Act of 1974, as amended.

Event of Default:  As defined in Section 7.01.

Excess Cash Flow:  With respect to the Mortgage Loans and any Distribution Date, an amount equal to the sum of (A) the excess of (1) the Available Distribution Amount for that Distribution Date over (2) the sum of (x) the Interest Distribution Amount for that Distribution Date and (y) the lesser of (i) the aggregate Certificate Principal Balance of the Class A Certificates immediately prior to such Distribution Date and (ii) the Principal Remittance Amount for that Distribution Date to the extent not needed to pay interest on the Class A Certificates on such Distribution Date, (B) the Overcollateralization Reduction Amount, if any, for that Distribution Date and (C) any Yield Maintenance Payment for that Distribution Date.

Excess Overcollateralization Amount:  With respect to any Distribution Date, the excess, if any, of (a) the Overcollateralization Amount on such Distribution Date over (b) the Required Overcollateralization Amount for such Distribution Date.

Exchange Act:  The Securities Exchange Act of 1934, as amended.

Fannie Mae:  Fannie Mae, a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act, or any successor thereto.

FDIC:  The Federal Deposit Insurance Corporation or any successor thereto.

CONFIDENTIAL                                                              RC_FGIC9019_00031397

FHA:  The Federal Housing Administration, or its successor.

Final Certification:  As defined in Section 2.02.

Final Distribution Date:  The Distribution Date on which the final distribution in respect of the Certificates will be made pursuant to Section 9.01, which Final Distribution Date shall in no event be later than the end of the 90-day liquidation period described in Section 9.02.

Final Scheduled Distribution Date:  Solely for purposes of the face of the Certificates, as follows:  with respect to the Class A-I-1 Certificates, the Distribution Date in March 2026; with respect to the Class A-I-2 Certificates, the Distribution Date in August 2029; with respect to the Class A-I-3 Certificates, the Distribution Date in April 2034; with respect to the Class A-I-4 Certificates and the Class A-II Certificates, the Distribution Date in December 2035; and with respect to the Class SB Certificates, the Distribution Date in December 2035.  No event of default under this Agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any Class of Class A Certificates on or before its Final Scheduled Distribution Date.

Foreclosure Profits:  With respect to any Distribution Date or related Determination Date and any Mortgage Loan, the excess, if any, of Liquidation Proceeds, Insurance Proceeds and REO Proceeds (net of all amounts reimbursable therefrom pursuant to Section 3.10(a)(ii)) in respect of each Mortgage Loan or REO Property for which a Cash Liquidation or REO Disposition occurred in the related Prepayment Period over the sum of the unpaid principal balance of such Mortgage Loan or REO Property (determined, in the case of an REO Disposition, in accordance with Section 3.14) plus accrued and unpaid interest at the Mortgage Rate on such unpaid principal balance from the Due Date to which interest was last paid by the Mortgagor to the first day of the month following the month in which such Cash Liquidation or REO Disposition occurred.

Freddie Mac:  The Federal Home Loan Mortgage Corporation, a corporate instrumentality of the United States created and existing under Title III of the Emergency Home Finance Act of 1970, as amended, or any successor thereto.

Gross Margin:  With respect to each adjustable rate Mortgage Loan, the fixed percentage set forth in the related Mortgage Note and indicated in Exhibit G-1 and Exhibit G-2 hereto as the "NOTE MARGIN," which percentage is added to the related Index on each Adjustment Date to determine (subject to rounding in accordance with the related Mortgage Note, the Periodic Cap, the Maximum Mortgage Rate and the Minimum Mortgage Rate) the interest rate to be borne by such Mortgage Loan until the next Adjustment Date.

Group I Basis Risk Shortfall:  With respect to each Class of the Class A-I Certificates and any Distribution Date on which the Group I Net WAC Cap Rate is used to determine the Pass-Through Rate of such Class of the Class A-I Certificates, an amount equal to the excess, if any, of (x) Accrued Certificate Interest for such Class of the Class A-I Certificates, calculated at a rate (not to exceed the Maximum Mortgage Loan Rate) equal to LIBOR plus the related Margin, over (y) Accrued Certificate Interest for such Class of the Class A-I Certificates for such Distribution Date calculated using the Group I Net WAC Cap Rate.

CONFIDENTIAL    RC_FGIC9019_00031398

Group I Basis Risk Shortfall Carry-Forward Amount:  With respect to each Class of Class A-I Certificates and any Distribution Date, the sum of (a) the aggregate amount of Group I Basis Risk Shortfall for such Class on such Distribution Date plus (b) any Group I Basis Risk Shortfall for such Class remaining unpaid from prior Distribution Dates, plus (c) one month's interest on the amount in clause (b) (based on the number of days in the preceding Interest Accrual Period), to the extent previously unreimbursed by Excess Cash Flow, at a rate equal to the related Pass-Through Rate.

Group I Loans:  The Mortgage Loans designated as Group I Loans on the Mortgage Loan Schedule attached hereto as Exhibit G-1.

Group I Net WAC Cap Rate:  With respect to any Distribution Date and the Class A-I Certificates, a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group I Loans using the Net Mortgage Rates (or, if applicable, Modified Net Mortgage Rates) on such Mortgage Loans in effect for the Monthly Payments due on such Mortgage Loans during the related Due Period, multiplied by a fraction equal to 30 divided by the actual number of days in the related Interest Accrual Period. With respect to any Distribution Date and the REMIC II Regular Interests the ownership of which is represented by the A-I Certificates, a per annum rate equal to the weighted average (adjusted for the actual number of days elapsed in the related Interest Accrual Period) of the Uncertificated REMIC I Group I Pass-Through Rate for the REMIC I Group I Regular Interests, weighted on the basis of the Uncertificated Principal Balance of such REMIC I Group I Regular Interests immediately prior to such Distribution Date, multiplied by a fraction, the numerator of which is 30, and the denominator of which is the actual number of days in the related Interest Accrual Period.

Group I Principal Distribution Amount:   On any Distribution Date, the Principal Distribution Amount multiplied by a fraction, the numerator of which is the portion of the Principal Allocation Amount related to the Group I Loans for that Distribution Date and the denominator of which is the Principal Allocation Amount for all of the Mortgage Loans for that Distribution Date.

Group II Basis Risk Shortfall:  With respect to the Class A-II Certificates and any Distribution Date on which the Group II Net WAC Cap Rate is used to determine the Pass-Through Rate of the Class A-II Certificates, an amount equal to the excess, if any, of (x) Accrued Certificate Interest for the Class A-II Certificates, calculated at a rate (not to exceed the Maximum Mortgage Loan Rate) equal to (a) LIBOR plus the Class A-II Margin over (y) Accrued Certificate Interest for the Class A-II Certificates for such Distribution Date calculated using the Group II Net WAC Cap Rate.

Group II Basis Risk Shortfall Carry-Forward Amount:  With respect to the Class A-II Certificates and any Distribution Date, the sum of (a) the aggregate amount of Group II Basis Risk Shortfall on such Distribution Date plus (b) any Group II Basis Risk Shortfall remaining unpaid from prior Distribution Dates, plus (c) one month's interest on the amount in clause (b) (based on the number of days in the preceding Interest Accrual Period), to the extent previously unreimbursed by Excess Cash Flow, at a rate equal to the related Pass-Through Rate.

CONFIDENTIAL                                                                    RC_FGIC9019_00031399

Group II Loans:  The Mortgage Loans designated as Group II Loans on the Mortgage Loan Schedule attached hereto as Exhibit G-2.

Group II Net WAC Cap Rate:  With respect to any Distribution Date and the Class A-II Certificates, a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group II Loans using the Net Mortgage Rates (or, if applicable, Modified Net Mortgage Rates) on such Mortgage Loans in effect for the Monthly Payments due on such Mortgage Loans during the related Due Period, multiplied by a fraction equal to 30 divided by the actual number of days in the related Interest Accrual Period.  With respect to any Distribution Date and the REMIC II Regular Interests the ownership of which is represented by the A-II Certificates, a per annum rate equal to the weighted average (adjusted for the actual number of days elapsed in the related Interest Accrual Period) of the Uncertificated REMIC II Group II Pass-Through Rate for the REMIC I Group II Regular Interests, weighted on the basis of the Uncertificated Principal Balance of such REMIC I Group II Regular Interests immediately prior to such Distribution Date, multiplied by a fraction, the numerator of which is 30, and the denominator of which is the actual number of days in the related Interest Accrual Period.

Group II Principal Distribution Amount:   On any Distribution Date, the Principal Distribution Amount multiplied by a fraction, the numerator of which is the portion of the Principal Allocation Amount related to the Group II Loans for that Distribution Date and the denominator of which is the Principal Allocation Amount for all of the Mortgage Loans for that Distribution Date.

Independent:  When used with respect to any specified Person, means such a Person who (i) is in fact independent of the Depositor, the Master Servicer and the Trustee, or any Affiliate thereof, (ii) does not have any direct financial interest or any material indirect financial interest in the Depositor, the Master Servicer or the Trustee or in an Affiliate thereof, and (iii) is not connected with the Depositor, the Master Servicer or the Trustee as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Index:  With respect to any adjustable rate Mortgage Loan and as to any Adjustment Date therefor, the related index as stated in the related Mortgage Note.

Initial Certificate Principal Balance:  With respect to each Class of Certificates (other than the Class R Certificates), the Certificate Principal Balance of such Class of Certificates as of the Closing Date as set forth in the Preliminary Statement hereto.

Insurance Account:  The account or accounts created and maintained pursuant to Section 4.10, which shall be entitled "U.S. Bank National Association, as trustee, in trust for the registered holders of Residential Asset Mortgage Products, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC7" and which must be an Eligible Account.

Insurance Agreement:  The Insurance and Indemnity Agreement, dated as of December 28, 2005, among the Insurer, the Trustee, the Master Servicer and the Depositor.

Insurance Proceeds:  Proceeds paid in respect of the Mortgage Loans pursuant to any Primary Insurance Policy or any other related insurance policy covering a Mortgage Loan, to the extent such proceeds are payable to the mortgagee under the Mortgage, any Subservicer, the

CONFIDENTIAL                                                                      RC_FGIC9019_00031400

Master Servicer or the Trustee and are not applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Master Servicer would follow in servicing mortgage loans held for its own account.

Insured Payment: With respect to (a) any Distribution Date, (i) the Deficiency Amount and (ii) any Preference Amount and (b) any other date, any Preference Amount.

Insurer: Financial Guaranty Insurance Company, a New York insurance corporation or its successors in interest.

Insurer Account: An account of the Insurer maintained at JPMorgan Chase Bank, N.A. (ABA No. 021000021), Account No. 904951812, Attention: Joanne Murray, or such other account as may be designated by the Insurer to the Trustee in writing not less than five Business Days prior to the related Distribution Date.

Insurer Default: The existence and continuance of any of the following: (a) a failure by the Insurer to make a payment required under the Policy in accordance with its terms; or (b)(i) the Insurer (A) files any petition or commences any case or proceeding under any provision or chapter of the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (B) makes a general assignment for the benefit of its creditors or (C) has an order for relief entered against it under the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization which is final and nonappealable; or (ii) a court of competent jurisdiction, the New York insurance department or other competent regulatory authority enters a final and nonappealable order, judgment or decree (A) appointing a custodian, trustee, agent or receiver for the Insurer or for all or any material portion of its property or (B) authorizing the taking of possession by a custodian, trustee, agent or receiver of the Insurer (or the taking of possession of all or any material portion of the property of the Insurer).

Interest Accrual Period:  With respect to the Class A Certificates, (i) with respect to the Distribution Date in January 2006, the period commencing on the Closing Date and ending on the day preceding the Distribution Date in January 2006, and (ii) with respect to any Distribution Date after the Distribution Date in January 2006, the period commencing on the Distribution Date in the month immediately preceding the month in which such Distribution Date occurs and ending on the day preceding such Distribution Date. With respect to the Class SB Certificates and any Distribution Date, the prior calendar month.

Interest Distribution Amount:  With respect to each Class of Class A Certificates and any Distribution Date, the aggregate amount of Accrued Certificate Interest to be distributed to the holders of such Class of Class A Certificates for such Distribution Date, plus any related Accrued Certificate Interest thereon remaining unpaid from any prior Distribution Date.

Interested Person:  As of any date of determination, the Depositor, the Master Servicer, the Insurer, the Trustee, any Mortgagor, any Manager of a Mortgaged Property, or any Person known to a Responsible Officer of the Trustee to be an Affiliate of any of them.

Interim Certification: As defined in Section 2.02.

CONFIDENTIAL                                                              RC_FGIC9019_00031401

Late Collections:  With respect to any Mortgage Loan, all amounts received during any Due Period, whether as late payments of Monthly Payments or as Insurance Proceeds, Liquidation Proceeds or otherwise, which represent late payments or collections of Monthly Payments due but delinquent for a previous Due Period and not previously recovered.

Late Payment Rate:  As defined in the Insurance Agreement.

LIBOR:  With respect to any Distribution Date, the arithmetic mean of the London interbank offered rate quotations for one-month U.S. Dollar deposits, expressed on a per annum basis, determined in accordance with Section 1.02.

LIBOR Business Day:  Any day other than (i) a Saturday or Sunday or (ii) a day on which banking institutions in London, England are required or authorized to by law to be closed.

LIBOR Rate Adjustment Date:  With respect to each Distribution Date, the second LIBOR Business Day immediately preceding the commencement of the related Interest Accrual Period.

Limited Repurchase Right Holder:  RFC Asset Holdings II, Inc., or its successor.

Liquidation Proceeds:  Amounts (other than Insurance Proceeds) received by the Master Servicer in connection with the taking of an entire Mortgaged Property by exercise of the power of eminent domain or condemnation or in connection with the liquidation of a defaulted Loan through trustee's sale, foreclosure sale or otherwise, other than REO Proceeds and Subsequent Recoveries.

Loan Group:  Group I Loans or Group II Loans, as applicable.

Loan-to-Value Ratio:  As of any date, the fraction, expressed as a percentage, the numerator of which is the current principal balance of the related Mortgage Loan at the date of determination (plus, in the case of a junior lien Mortgage Loan, the principal balance of the senior Mortgage Loan on the related Mortgaged Property) and the denominator of which is the Appraised Value of the related Mortgaged Property.

Margin:  The Class A-I-1 Margin, Class A-I-2 Margin, Class A-I-3 Margin, Class A-I-4 Margin, or Class A-II Margin, as applicable.

Marker Rate:  With respect to the Class SB Certificates and any Distribution Date, a per annum rate equal to two (2) multiplied by the weighted average of the Uncertificated Pass-Through Rates for each REMIC I Regular Interest (other than the REMIC I Regular Interest I-AA and REMIC I Regular Interest II-AA) with the rates on each such REMIC I Regular Interest (other than REMIC I Regular Interest I-ZZ and REMIC I Regular Interest II-ZZ) subject to a cap equal to the Pass-Through Rate for the  REMIC II Regular Interest, the ownership of which is represented by the corresponding Class for such REMIC I Regular Interest, and the rate on REMIC I Regular Interest I-ZZ and REMIC Regular Interest II-ZZ subject to a cap of zero, in each case for purposes of this calculation.

CONFIDENTIAL                                                        RC_FGIC9019_00031402

Maturity Date:  With respect to each Class of Certificates representing ownership of regular interest or Uncertificated Regular Interests issued by each of REMIC I and REMIC II the latest possible maturity date, solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury Regulations, by which the Certificate Principal Balance of each such Class of Certificates representing a regular interest in the Trust Fund would be reduced to zero, which is, for each such regular interest, the Distribution Date in December 2035, which is the Distribution Date occurring in the month following the last scheduled monthly payment of the Mortgage Loans.

Maximum Mortgage Loan Rate:  With respect to the Class A Certificates and any Interest Accrual Period, 14.00% per annum.

Maximum Mortgage Rate:  With respect to any adjustable rate Mortgage Loan, the rate indicated in Exhibit G-1 and Exhibit G-2 hereto as the "NOTE CEILING," which rate is the maximum interest rate that may be applicable to such adjustable rate Mortgage Loan at any time during the life of such Mortgage Loan.

Maximum Net Mortgage Rate:  With respect to any adjustable rate Mortgage Loan and any date of determination, the Maximum Mortgage Rate minus the sum of (i) the Subservicing Fee Rate, (ii) the Servicing Fee Rate and (iii) the Certificate Insurer Premium Modified Rate as of such date.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS® System:  The system of recording transfers of Mortgages electronically maintained by MERS.

MIN:  The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS®System.

Minimum Mortgage Rate:  With respect to any adjustable rate Mortgage Loan, the greater of (i) the Note Margin and (ii) the rate indicated in Exhibit G-1 and G-2 hereto as the "NOTE FLOOR", which rate may be applicable to such adjustable rate Mortgage Loan at any time during the life of such adjustable rate Mortgage Loan.

Modified Mortgage Loan:  Any Mortgage Loan that has been the subject of a Servicing Modification.

Modified Mortgage Rate:  With respect to any Mortgage Loan that is the subject of a Servicing Modification, the Mortgage Rate, minus the rate per annum by which the Mortgage Rate on such Mortgage Loan was reduced.

Modified Net Mortgage Rate:  With respect to any Mortgage Loan that is the subject of a Servicing Modification, the Net Mortgage Rate, minus the rate per annum by which the Mortgage Rate on such Mortgage Loan was reduced.

CONFIDENTIAL                                                    RC_FGIC9019_00031403

MOM Loan:  With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

Monthly Payment:  With respect to any Mortgage Loan (including any REO Property) and the Due Date in any Due Period, the payment of principal and interest due thereon in accordance with the amortization schedule at the time applicable thereto (after adjustment, if any, for Curtailments and for Deficient Valuations occurring prior to such Due Date but before any adjustment to such amortization schedule by reason of any bankruptcy, other than a Deficient Valuation, or similar proceeding or any moratorium or similar waiver or grace period and before any Servicing Modification that constitutes a reduction of the interest rate on such Mortgage Loan).

Moody's:  Moody's Investors Service, Inc., or its successor in interest.

Mortgage:  With respect to each Mortgage Note related to a Mortgage Loan, the mortgage, deed of trust or other comparable instrument creating a first or junior lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note.

Mortgage File:  The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Loan Schedule:    The lists of the Mortgage Loans attached hereto as Exhibit G-1 and Exhibit G-2 (as amended from time to time to reflect the addition of Qualified Substitute Mortgage Loans), which lists shall set forth at a minimum the following information as to each Mortgage Loan:

      (i)        the Mortgage Loan identifying number ("RFC LOAN #");

      (ii)      [reserved];

      (iii)    the maturity of the Mortgage Note ("MATURITY DATE" or "MATURITY DT") for Mortgage Loans;

      (iv)    the Mortgage Rate as of origination ("ORIG RATE");

      (v)     the Mortgage Rate as of the Cut-off Date for an adjustable rate Mortgage Loan ("CURR RATE");

      (vi)    the Net Mortgage Rate as of the Cut-off Date ("CURR NET");

      (vii)   the scheduled monthly payment of principal, if any, and interest as of the Cut-off Date ("ORIGINAL P & I" or "CURRENT P & I" for the adjustable rate Mortgage Loans);

      (viii)  the Cut-off Date Principal Balance ("PRINCIPAL BAL");

CONFIDENTIAL                                                                      RC_FGIC9019_00031404

(ix)    the Loan-to-Value Ratio at origination ("LTV");

(x)    a code "T", "BT" or "CT" under the column "LN FEATURE," indicating that the Mortgage Loan is secured by a second or vacation residence (the absence of any such code means the Mortgage Loan is secured by a primary residence);

(xi)    a code "N" under the column "OCCP CODE", indicating that the Mortgage Loan is secured by a non-owner occupied residence (the absence of any such code means the Mortgage Loan is secured by an owner occupied residence);

(xii)    the Maximum Mortgage Rate for the adjustable rate Mortgage Loans ("NOTE CEILING");

(xiii)    the Maximum Net Mortgage Rate for the adjustable rate Mortgage Loans ("NET CEILING");

(xiv)    the Note Margin for the adjustable rate Mortgage Loans ("NOTE MARGIN");

(xv)    the first Adjustment Date after the Cut-off Date for the adjustable rate Mortgage Loans ("NXT INT CHG DT");

(xvi)    the Periodic Cap for the adjustable rate Mortgage Loans ("PERIODIC DECR" or "PERIODIC INCR"); and

(xvii)    (the rounding of the semi-annual or annual adjustment to the Mortgage Rate with respect to the adjustable rate Mortgage Loans ("NOTE METHOD").

Such schedules may consist of multiple reports that collectively set forth all of the information required.

Mortgage Loans:    Such of the mortgage loans transferred and assigned to the Trustee pursuant to Section 2.01 as from time to time are held or deemed to be held as a part of the Trust Fund, the Mortgage Loans originally so held being identified in the initial Mortgage Loan Schedule, and Qualified Substitute Mortgage Loans held or deemed held as part of the Trust Fund including, without limitation, each related Mortgage Note, Mortgage and Mortgage File and all rights appertaining thereto.

Mortgage Note:    The originally executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan, together with any modification thereto.

Mortgage Rate:    With respect to any Mortgage Loan, the interest rate borne by the related Mortgage Note, or any modification thereto other than a Servicing Modification. The Mortgage Rate on the adjustable rate Mortgage Loans will adjust on each Adjustment Date to equal the sum (rounded to the nearest multiple of one-eighth of one percent (0.125%) or up to the nearest one-eighth of one percent, which are indicated by a "U" on Exhibit G-1 and Exhibit G-2, except in the case of the adjustable rate Mortgage Loans indicated by an "X" on Exhibit G-1 and

CONFIDENTIAL                                    RC_FGIC9019_00031405

Exhibit G-2 or hereto under the heading "NOTE METHOD"), of the related Index plus the Note Margin, in each case subject to the applicable Periodic Cap, Maximum Mortgage Rate and Minimum Mortgage Rate.

Mortgaged Property:  The underlying real property securing a Mortgage Loan.

Mortgagor:  The obligor on a Mortgage Note.

Net Mortgage Rate:  With respect to any Mortgage Loan as of any date of determination, a per annum rate equal to the Mortgage Rate for such Mortgage Loan as of such date minus the sum of (i) the related Servicing Fee Rate, (ii) the related Subservicing Fee Rate, and (iii) the Certificate Insurer Premium Modified Rate.

Net WAC Cap Rate:  The Group I Net WAC Cap Rate or Group II Net WAC Cap Rate, as applicable.

Non-Primary Residence Loans:  The Mortgage Loans designated as secured by second or vacation residences, or by non-owner occupied residences, on the Mortgage Loan Schedule.

Non-United States Person:  Any Person other than a United States Person.

Nonrecoverable Advance:  Any Advance previously made or proposed to be made by the Master Servicer or Subservicer in respect of a Mortgage Loan (other than a Deleted Mortgage Loan) which, in the good faith judgment of the Master Servicer, will not, or, in the case of a proposed Advance, would not, be ultimately recoverable by the Master Servicer from related Late Collections, Insurance Proceeds, Liquidation Proceeds or REO Proceeds. To the extent that any Mortgagor is not obligated under the related Mortgage documents to pay or reimburse any portion of any Servicing Advances that are outstanding with respect to the related Mortgage Loan as a result of a modification of such Mortgage Loan by the Master Servicer, which forgives amounts which the Master Servicer or Subservicer had previously advanced, and the Master Servicer determines that no other source of payment or reimbursement for such advances is available to it, such Servicing Advances shall be deemed to be Nonrecoverable Advances. The determination by the Master Servicer that it has made a Nonrecoverable Advance shall be evidenced by an Officer's Certificate delivered to the Depositor, the Trustee, the Insurer and the Master Servicer setting forth such determination, which shall include any other information or reports obtained by the Master Servicer such as property operating statements, rent rolls, property inspection reports and engineering reports, which may support such determinations. Notwithstanding the above, the Trustee shall be entitled to rely upon any determination by the Master Servicer that any Advance previously made is a Nonrecoverable Advance or that any proposed Advance, if made, would constitute a Nonrecoverable Advance.

Nonsubserviced Mortgage Loan:  Any Mortgage Loan that, at the time of reference thereto, is not subject to a Subservicing Agreement.

Note Margin:  With respect to each adjustable rate Mortgage Loan, the fixed percentage set forth in the related Mortgage Note and indicated in Exhibit G-1 and Exhibit G-2 hereto as the "NOTE MARGIN," which percentage is added to the Index on each Adjustment Date to determine (subject to rounding in accordance with the related Mortgage Note, the Periodic Cap,

CONFIDENTIAL                                                          RC_FGIC9019_00031406

the Maximum Mortgage Rate and the Minimum Mortgage Rate) the interest rate to be borne by such adjustable rate Mortgage Loan until the next Adjustment Date.

Notional Amount:  With respect to the Class SB Certificates immediately prior to any Distribution Date, the aggregate of the Uncertificated Principal Balances of the REMIC II Regular Interests.

Officers' Certificate:  A certificate signed by the Chairman of the Board, the President, a Vice President, Assistant Vice President, Director, Managing Director, the Treasurer, the Secretary, an Assistant Treasurer or an Assistant Secretary of the Depositor or the Master Servicer, as the case may be, and delivered to the Trustee and the Insurer, as required by this Agreement.

Opinion of Counsel:  A written opinion of counsel acceptable to the Trustee and the Master Servicer, who may be counsel for the Depositor or the Master Servicer, provided that any opinion of counsel (i) referred to in the definition of "Disqualified Organization" or (ii) relating to the qualification of REMIC I or REMIC II as REMICs or compliance with the REMIC Provisions must, unless otherwise specified, be an opinion of Independent counsel.

Optional Termination Date:  Any Distribution Date on or after which the Stated Principal Balance (after giving effect to distributions to be made on such Distribution Date) of the Mortgage Loans is less than 10.00% of the Cut-off Date Balance.

Outstanding Mortgage Loan:  With respect to the Due Date in any Due Period, a Mortgage Loan (including an REO Property) that was not the subject of a Principal Prepayment in Full, Cash Liquidation or REO Disposition and that was not purchased, deleted or substituted for prior to such Due Date pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08.

Overcollateralization Amount:  With respect to any Distribution Date, the excess, if any, of (a) the aggregate Stated Principal Balance of the Mortgage Loans before giving effect to distributions of principal to be made on such Distribution Date over (b) the aggregate Certificate Principal Balance of the Class A Certificates as of such date, before taking into account distributions of principal to be made on that Distribution Date.

Overcollateralization Floor:  An amount equal to the product of 0.50% and the Cut-off Date Balance.

Overcollateralization Increase Amount:  With respect to any Distribution Date, an amount equal to the lesser of (i) the Excess Cash Flow for that Distribution Date available to make payments pursuant to Section 4.02(c)(vi) and (ii) the excess, if any, of (x) the Required Overcollateralization Amount for that Distribution Date over (y) the Overcollateralization Amount for that Distribution Date.

Overcollateralization Reduction Amount:  With respect to any Distribution Date for which the Excess Overcollateralization Amount is, or would be, after taking into account all other distributions to be made on such Distribution Date, greater than zero, an amount equal to the lesser of (i) the Excess Overcollateralization Amount for that Distribution Date and (ii) the Principal Remittance Amount for such Distribution Date.

CONFIDENTIAL                                                    RC_FGIC9019_00031407

Ownership Interest:  With respect to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

Pass-Through Rate:  With respect to each Class of the Class A-I Certificates and each Interest Accrual Period, a per annum rate equal to the least of (i) LIBOR plus the related Margin, (ii) the Maximum Mortgage Loan Rate and (iii) the Group I Net WAC Cap Rate. With respect to the Class A-II Certificates and each Interest Accrual Period, a per annum rate equal to the least of (i) LIBOR plus the Class A-II Margin, (ii) the Maximum Mortgage Loan Rate and (iii) the Group II Net WAC Cap Rate.

With respect to the Class SB Certificates, a per annum rate equal to the percentage equivalent of a fraction, the numerator of which is (x) the sum, for each REMIC II Regular Interest, of the excess of the Uncertificated Group I REMIC I Pass-Through Rate or Uncertificated Group II REMIC I Pass-Through Rate, as applicable, for such REMIC I Regular Interest over the Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of such REMIC I Regular Interest and (y) the denominator of which is the aggregate Uncertificated Principal Balance of the REMIC I Regular Interests.

Paying Agent:   U.S. Bank National Association, or any successor Paying Agent appointed by the Trustee.

Percentage Interest:  With respect to any Class A Certificate, the undivided percentage ownership interest in the related Class evidenced by such Certificate, which percentage ownership interest shall be equal to the Initial Certificate Principal Balance thereof divided by the aggregate Initial Certificate Principal Balance of all of the Certificates of the same Class. The Percentage Interest with respect to a Class SB Certificate or Class R Certificate shall be stated on the face thereof.

Periodic Cap:  With respect to each adjustable rate Mortgage Loan, the periodic rate cap that limits the increase or the decrease of the related Mortgage Rate on any Adjustment Date pursuant to the terms of the related Mortgage Note.

Permitted Investments:  One or more of the following:

(i)     obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(ii)     repurchase agreements on obligations specified in clause (i) maturing not more than one month from the date of acquisition thereof, provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by each Rating Agency in its highest short-term rating available;

(iii)     federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days)

CONFIDENTIAL                                                    RC_FGIC9019_00031408

denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company at the date of acquisition thereof have been rated by each Rating Agency in its highest short-term rating available; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of Standard & Poor's if Standard & Poor's is a Rating Agency;

(iv)    commercial paper and demand notes (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition has been rated by each Rating Agency in its highest short-term rating available; provided that such commercial paper and demand notes shall have a remaining maturity of not more than 30 days;

(v)    a money market fund or a qualified investment fund rated by each Rating Agency in its highest long-term rating available (which may be managed by the Trustee or one of its Affiliates); and

(vi)    other obligations or securities that are acceptable to the Insurer and each Rating Agency as a Permitted Investment hereunder and will not reduce the rating assigned to any Class of Certificates by such Rating Agency below the then-current rating by such Rating Agency, as evidenced in writing;

*provided, however*, that no instrument shall be a Permitted Investment if it represents, either (1) the right to receive only interest payments with respect to the underlying debt instrument or (2) the right to receive both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations. References herein to the highest rating available on unsecured long-term debt shall mean AAA in the case of Standard & Poor's and Aaa in the case of Moody's, and for purposes of this Agreement, any references herein to the highest rating available on unsecured commercial paper and short-term debt obligations shall mean the following:  A-1 in the case of Standard & Poor's and P-1 in the case of Moody's; provided, however, that any Permitted Investment that is a short-term debt obligation rated A-1 by Standard & Poor's must satisfy the following additional conditions:  (i) the total amount of debt from A-1 issuers must be limited to the investment of monthly principal and interest payments (assuming fully amortizing collateral); (ii) the total amount of A-1 investments must not represent more than 20% of the aggregate outstanding Certificate Principal Balance of the Certificates and each investment must not mature beyond 30 days; (iii) the terms of the debt must have a predetermined fixed dollar amount of principal due at maturity that cannot vary; and (iv) if the investments may be liquidated prior to their maturity or are being relied on to meet a certain yield, interest must be tied to a single interest rate index plus a single fixed spread (if any) and must move proportionately with that index. Any Permitted Investment may be purchased by or through the Trustee or its Affiliates.

CONFIDENTIAL                                    RC_FGIC9019_00031409

<u>Permitted Transferee</u>:  Any Transferee of a Class R Certificate, other than a Disqualified Organization or Non-United States Person.

<u>Person</u>:    Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

<u>Policy</u>: The Financial Guaranty Insurance Policy No. 05030159 issued by the Insurer in respect of the Class A Certificates, a copy of which is attached hereto as Exhibit P.

<u>Pool Stated Principal Balance</u>:  With respect to any date of determination, the aggregate of the Stated Principal Balances of each Mortgage Loan that was an Outstanding Mortgage Loan on the Due Date immediately preceding the Due Period preceding such date of determination.

<u>Prepayment Assumption</u>:  With respect to the Class A Certificates, the prepayment assumption to be used for determining the accrual of original issue discount and premium and market discount on such Certificates for federal income tax purposes, which assumes a prepayment rate of 23% HEP with respect to the fixed-rate Mortgage Loans, and 100% PPC with respect to the adjustable-rate Mortgage Loans.

<u>Prepayment Interest Shortfall</u>:  With respect to any Distribution Date and any Mortgage Loan (other than a Mortgage Loan relating to an REO Property) that was the subject of (a) a Principal Prepayment in Full during the related Prepayment Period, an amount equal to the excess of one month's interest at the related Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) on the Stated Principal Balance of such Mortgage Loan over the amount of interest (adjusted to the related Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan)) paid by the Mortgagor for such Prepayment Period to the date of such Principal Prepayment in Full or (b) a Curtailment during the prior calendar month, an amount equal to one month's interest at the related Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) on the amount of such Curtailment.

<u>Prepayment Period</u>:  With respect to any Distribution Date, the calendar month preceding the month of distribution.

<u>Primary Insurance Policy</u>:    Each primary policy of mortgage guaranty insurance as indicated by a numeric code on Exhibit G-1 and Exhibit G-2 with the exception of either code "23" or "96" under the column "MI CO CODE".

<u>Principal Allocation Amount</u>:  With respect to any Distribution Date, the sum of (a) the Principal Remittance Amount for such Distribution Date, (b) the amount described in clause (b)(iv) of the definition of Principal Distribution Amount for such Distribution Date, (c) the aggregate amount of the principal portion of Realized Losses on the Mortgage Loans in the calendar month preceding such Distribution Date, to the extent covered by Excess Cash Flow for such Distribution Date, minus (d) the Capitalization Reimbursement Amount for such Distribution Date; provided, that on any Distribution Date on which there is insufficient Excess Cash Flow to cover all Realized Losses on the Mortgage Loans, in determining the Group I Principal Distribution Amount and Group II Principal Distribution Amount, the available Excess

CONFIDENTIAL                                                        RC_FGIC9019_00031410

Cash Flow will be allocated to the Class A-I Certificates and Class A-II Certificates, pro rata, based on the principal portion of Realized Losses on the Group I Loans and the Group II Loans, respectively.

<u>Principal Distribution Amount</u>:   With respect to any Distribution Date, the lesser of (a) the excess of (i) the Available Distribution Amount for such Distribution Date, plus for inclusion in Excess Cash Flow for purposes of clauses (b)(v) and (b)(vi), the amounts received by the trustee under the Yield Maintenance Agreement for such Distribution Date over (ii) the Interest Distribution Amount and (b) the sum of:

(i)      the principal portion of each Monthly Payment received or Advanced with respect to the related Due Period on each Outstanding Mortgage Loan;

(ii)      the Stated Principal Balance of any Mortgage Loan repurchased during the related Prepayment Period (or deemed to have been so repurchased in accordance with Section 3.07(b)) pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08, the amount of any shortfall deposited in the Custodial Account in connection with the substitution of a Deleted Mortgage Loan pursuant to Section 2.03 or 2.04 during the related Prepayment Period and the Stated Principal Balance of Mortgage Loans purchased pursuant to Section 9.01 in connection with such Distribution Date, if applicable;

(iii)      the principal portion of all other unscheduled collections, other than Subsequent Recoveries, on the Mortgage Loans (including, without limitation, Principal Prepayments in Full, Curtailments, Insurance Proceeds, Liquidation Proceeds and REO Proceeds) received during the related Prepayment Period to the extent applied by the Master Servicer as recoveries of principal of the Mortgage Loans pursuant to Section 3.14;

(iv)      the lesser of (a) Subsequent Recoveries for such Distribution Date and (b) the principal portion of any Realized Losses allocated to any Class of Certificates on a prior Distribution Date and remaining unpaid;

(v)      the lesser of (a) Excess Cash Flow for that Distribution Date (to the extent not used pursuant to clause (iv) of this definition on such Distribution Date) and (b) the principal portion of any Realized Losses incurred (or deemed to have been incurred) on any Mortgage Loans in the calendar month preceding such Distribution Date to the extent covered by Excess Cash Flow for that Distribution Date; and

(vi)      the lesser of (a) the Excess Cash Flow for such Distribution Date (to the extent not used to cover Realized Losses pursuant to clause (iv) and (v) of this definition on such Distribution Date) and (b) the Overcollateralization Increase Amount for such Distribution Date to the extent covered by Excess Cash Flow for that Distribution Date;

*minus*

(vii)      any Overcollateralization Reduction Amount for such Distribution Date; and

CONFIDENTIAL                                                                    RC_FGIC9019_00031411

(viii)   any Capitalization Reimbursement Amount for such Distribution Date;

*provided, however,* that the Principal Distribution Amount on any Distribution Date shall not be less than zero or greater than the aggregate Certificate Principal Balance of the Class A Certificates.

Principal Prepayment:  Any payment of principal or other recovery on a Mortgage Loan, including a recovery that takes the form of Liquidation Proceeds or Insurance Proceeds, which is received in advance of its scheduled Due Date and is not accompanied by an amount as to interest representing scheduled interest on such payment due on any date or dates in any month or months subsequent to the month of prepayment.

Principal Prepayment in Full:  Any Principal Prepayment made by a Mortgagor of the entire principal balance of a Mortgage Loan.

Principal Remittance Amount:  With respect to any Distribution Date, the sum of the amounts described in clauses (b)(i), (b)(ii) and (b)(iii) of the definition of Principal Distribution Amount for that Distribution Date.

Program Guide:  The Residential Funding Seller Guide for mortgage collateral sellers that participate in Residential Funding's standard mortgage programs, and Residential Funding's Servicing Guide and any other subservicing arrangements which Residential Funding has arranged to accommodate the servicing of the Mortgage Loans.

Purchase Price:  With respect to any Mortgage Loan (or REO Property) required to be or otherwise purchased on any date pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08, an amount equal to the sum of (i) (a) if such Mortgage Loan (or REO Property) is being purchased pursuant to Sections 2.02, 2.03, 2.04 or 4.07 of this Agreement, 100% of the Stated Principal Balance thereof plus the principal portion of any related unreimbursed Advances or (b) if such Mortgage Loan (or REO Property) is being purchased pursuant to Section 4.08 of this Agreement, the greater of (1) 100% of the Stated Principal Balance thereof plus the principal portion of any related unreimbursed Advances on such Mortgage Loan (or REO Property) and (2) the fair market value thereof plus the principal portion of any related unreimbursed Advances and (ii) unpaid accrued interest at the Adjusted Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) plus the rate per annum at which the Servicing Fee and the Certificate Insurer Premium Modified Rate is calculated, or (b) in the case of a purchase made by the Master Servicer, at the Net Mortgage Rate (or Modified Net Mortgage Rate plus the Certificate Insurer Premium Modified Rate in the case of a Modified Mortgage Loan), in each case on the Stated Principal Balance thereof to, but not including, the first day of the month following the month of purchase from the Due Date to which interest was last paid by the Mortgagor.

Qualified Insurer:  A mortgage guaranty insurance company duly qualified as such under the laws of the state of its principal place of business and each state having jurisdiction over such insurer in connection with the insurance policy issued by such insurer, duly authorized and licensed in such states to transact a mortgage guaranty insurance business in such states and to write the insurance provided by the insurance policy issued by it, approved as a FNMA- or

CONFIDENTIAL                                                        RC_FGIC9019_00031412

FHLMC-approved mortgage insurer or having a claims paying ability rating of at least "AA" or equivalent rating by a nationally recognized statistical rating organization. Any replacement insurer with respect to a Mortgage Loan must have at least as high a claims paying ability rating as the insurer it replaces had on the Closing Date.

Qualified Substitute Mortgage Loan:    A Mortgage Loan substituted by Residential Funding or the Depositor for a Deleted Mortgage Loan which must, on the date of such substitution, as confirmed in an Officers' Certificate delivered to the Trustee, (i) have an outstanding principal balance, after deduction of the principal portion of the monthly payment due in the month of substitution (or in the case of a substitution of more than one Mortgage Loan for a Deleted Mortgage Loan, an aggregate outstanding principal balance, after such deduction), not in excess of the Stated Principal Balance of the Deleted Mortgage Loan (the amount of any shortfall to be deposited by Residential Funding, in the Custodial Account in the month of substitution); (ii) have a Mortgage Rate and a Net Mortgage Rate no lower than and not more than 1% per annum higher than the Mortgage Rate and Net Mortgage Rate, respectively, of the Deleted Mortgage Loan as of the date of substitution; (iii) have a Loan-to-Value Ratio at the time of substitution no higher than that of the Deleted Mortgage Loan at the time of substitution; (iv) have a remaining term to stated maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan; (v) comply with each representation and warranty set forth in Sections 2.03 and 2.04 hereof and Section 4 of the Assignment Agreement; and (vi) in the case of the adjustable rate Mortgage Loans, (w) have a Mortgage Rate that adjusts with the same frequency and based upon the same Index as that of the Deleted Mortgage Loan, (x) have a Note Margin not less than that of the Deleted Mortgage Loan; (y) have a Periodic Rate Cap that is equal to that of the Deleted Mortgage Loan; and (z) have a next Adjustment Date no later than that of the Deleted Mortgage Loan.

Rating Agency:    Moody's and Standard & Poor's. If any agency or a successor is no longer in existence, "Rating Agency" shall be such statistical credit rating agency, or other comparable Person, designated by the Depositor, and with respect to the Class A Certificates, the Insurer, notice of which designation shall be given to the Trustee and the Master Servicer.

Realized Loss:    With respect to each Mortgage Loan (or REO Property) as to which a Cash Liquidation or REO Disposition has occurred, an amount (not less than zero) equal to (i) the Stated Principal Balance of the Mortgage Loan (or REO Property) as of the date of Cash Liquidation or REO Disposition, plus (ii) interest (and REO Imputed Interest, if any) at the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) and the Certificate Insurer Premium Modified Rate from the Due Date as to which interest was last paid or advanced to Certificateholders up to the last day of the month in which the Cash Liquidation (or REO Disposition) occurred on the Stated Principal Balance of such Mortgage Loan (or REO Property) outstanding during each Due Period that such interest was not paid or advanced, minus (iii) the proceeds, if any, received during the month in which such Cash Liquidation (or REO Disposition) occurred, to the extent applied as recoveries of interest at the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) and the Certificate Insurer Premium Modified Rate and to principal of the Mortgage Loan, net of the portion thereof reimbursable to the Master Servicer or any Subservicer with respect to related Advances, Servicing Advances or other expenses as to which the Master Servicer or Subservicer is entitled to reimbursement thereunder but which have not been previously

CONFIDENTIAL                                                        RC_FGIC9019_00031413

reimbursed. With respect to each Mortgage Loan which is the subject of a Servicing Modification, (a) (1) the amount by which the interest portion of a Monthly Payment or the principal balance of such Mortgage Loan was reduced or (2) the sum of any other amounts owing under the Mortgage Loan that were forgiven and that constitute Servicing Advances that are reimbursable to the Master Servicer or a Subservicer, and (b) any such amount with respect to a Monthly Payment that was or would have been due in the month immediately following the month in which a Principal Prepayment or the Purchase Price of such Mortgage Loan is received or is deemed to have been received. With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation. With respect to each Mortgage Loan which has become the object of a Debt Service Reduction, the amount of such Debt Service Reduction attributable to interest. Notwithstanding the above, neither a Deficient Valuation nor a Debt Service Reduction shall be deemed a Realized Loss hereunder so long as the Master Servicer has notified the Trustee and the Insurer in writing that the Master Servicer is diligently pursuing any remedies that may exist in connection with the representations and warranties made regarding the related Mortgage Loan and either (A) the related Mortgage Loan is not in default with regard to payments due thereunder or (B) delinquent payments of principal and interest under the related Mortgage Loan and any premiums on any applicable primary hazard insurance policy and any related escrow payments in respect of such Mortgage Loan are being advanced on a current basis by the Master Servicer or a Subservicer, in either case without giving effect to any Debt Service Reduction.

Realized Losses allocated to the Class SB Certificates shall be allocated first in reduction of the accrued but unpaid interest thereon until such accrued and unpaid interest shall have been reduced to zero and then in reduction of the Principal Balance thereof.

Record Date:  With respect to each Distribution Date and the Class A Certificates which are Book-Entry Certificates, the close of business on the Business Day prior to such Distribution Date.

With respect to each Distribution Date and the Certificates (other than the Class A Certificates), the close of business on the last Business Day of the month next preceding the month in which the related Distribution Date occurs, except in the case of the first Record Date, which shall be the Closing Date.

Reference Bank Rate:  As defined in Section 1.02.

Regular Interest:  Any one of the regular interests in the Trust Fund.

Relief Act:  The Servicemembers Civil Relief Act, as amended.

Relief Act Shortfalls:  Interest shortfalls on the Mortgage Loans resulting from the Relief Act or similar legislation or regulations.

REMIC:  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code. As used herein, the term "REMIC" shall mean REMIC I and REMIC II.

CONFIDENTIAL    RC_FGIC9019_00031414

REMIC Administrator:    Residential Funding Corporation. If Residential Funding Corporation is found by a court of competent jurisdiction to no longer be able to fulfill its obligations as REMIC Administrator under this Agreement the Master Servicer or Trustee acting as successor master servicer shall appoint a successor REMIC Administrator, acceptable to the Insurer subject to assumption of the REMIC Administrator obligations under this Agreement.

REMIC I:    The segregated pool of assets subject hereto (exclusive of the Yield Maintenance Agreement and any payments thereunder, which are not assets of any REMIC), constituting a portion of the primary trust created hereby and to be administered hereunder, with respect to which a separate REMIC election is to be made (other than with respect to the items in clause (v) and the proceeds thereof), consisting of:  (i) the Mortgage Loans and the related Mortgage Files; (ii) all payments on and collections in respect of the Mortgage Loans due after the Cut-off Date (other than Monthly Payments due in the month of the Cut-off Date) as shall be on deposit in the Custodial Account or in the Certificate Account and identified as belonging to the Trust Fund; (iii) property which secured a Mortgage Loan and which has been acquired for the benefit of the Certificateholders by foreclosure or deed in lieu of foreclosure; (iv) the hazard insurance policies and Primary Insurance Policies pertaining to the Mortgage Loans, if any; and (v) all proceeds of clauses (i) through (iv) above.

REMIC I Regular Interest:    Any of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a "regular interest" in REMIC I. Each REMIC I Regular Interest shall accrue interest at the related Uncertificated REMIC I Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto. The designations for the respective REMIC I Regular Interests are set forth in the Preliminary Statement hereto.

REMIC I Group I Interest Loss Allocation Amount:    With respect to any Distribution Date, an amount equal to (a) the product of (i) the aggregate Uncertificated Principal Balance of the REMIC I Group I Regular Interests then outstanding and (ii) the Uncertificated Pass-Through Rate for REMIC I Regular Interest I-AA minus the Marker Rate, divided by (b) 12.

REMIC I Group I Overcollateralized Amount:    With respect to any date of determination, (i) 1% of the aggregate Uncertificated Principal Balances of the REMIC I Group I Regular Interests minus (ii) the aggregate Uncertificated Principal Balances of the REMIC I Group I Regular Interests (other than REMIC I Regular Interests I-A and I-ZZ), in each case as of such date of determination.

REMIC I Group I Principal Loss Allocation Amount:    With respect to any Distribution Date, an amount equal to the product of (i) the aggregate Stated Principal Balance of the Group I Mortgage Loans then outstanding and (ii) 1 minus a fraction, the numerator of which is two times the sum of the Uncertificated Principal Balances of REMIC I Regular Interests A-I-1, A-I-2, A-I-3, and A-I-4 and the denominator of which is the sum of the Uncertificated Principal Balances of REMIC I Regular Interests A-I-1, A-I-2, A-I-3, A-I-4 and I-ZZ.

CONFIDENTIAL                                                    RC_FGIC9019_00031415

REMIC I Group I Regular Interest:  REMIC I Regular Interest I-AA, I-A-I-1, I-A-I-2, I-A-1-3, I-A-I-4 and I-ZZ.

REMIC I Group II Interest Loss Allocation Amount:  With respect to any Distribution Date, an amount equal to (a) the product of (i) the aggregate Uncertificated Principal Balance of the REMIC I Group II Regular Interests then outstanding and (ii) the Uncertificated Pass-Through Rate for REMIC I Regular Interest II-AA minus the Marker Rate, divided by (b) 12.

REMIC I Group II Overcollateralized Amount:  With respect to any date of determination, (i) 1% of the aggregate Uncertificated Principal Balances of the REMIC I Group II Regular Interests minus (ii) the aggregate Uncertificated Principal Balances of the REMIC I Group II Regular Interests (other than REMIC I Regular Interests II-A and II-ZZ), in each case as of such date of determination.

REMIC I Group II Principal Loss Allocation Amount:  With respect to any Distribution Date, an amount equal to the product of (i) the aggregate Stated Principal Balance of the Group II Mortgage Loans then outstanding and (ii) 1 minus a fraction, the numerator of which is two times the sum of the Uncertificated Principal Balances of REMIC I Regular Interests A-II, and the denominator of which is the sum of the Uncertificated Principal Balances of REMIC I Regular Interests A-II and II-ZZ.

REMIC I Group II Regular Interest:  REMIC I Regular Interest II-AA, II-A-II and II-ZZ.

REMIC I Regular Interest I-A-I-1:  A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated Group I REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest I-A-I-2:  A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated Group I REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest I-A-I-3:  A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated Group I REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest I-A-I-4:  A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated Group I REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest I-AA:  A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated Group I REMIC I Pass-Through Rate, and that has such other terms as are described herein.

CONFIDENTIAL                                                    RC_FGIC9019_00031416

REMIC I Regular Interest I-ZZ:  A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated Group I REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest II-AA:  A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated Group II REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest II-A-II:  A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated Group II REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest II-ZZ:  A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated Group II REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest I-ZZ Maximum Interest Deferral Amount:  With respect to any Distribution Date, the excess of (i) Uncertificated Accrued Interest calculated with the REMIC I Regular Interest I-ZZ Uncertificated Pass-Through Rate and an Uncertificated Principal Balance equal to the excess of (x) the Uncertificated Principal Balance of REMIC I Regular Interest I-ZZ over (y) the REMIC I Group I Overcollateralized Amount, in each case for such Distribution Date, over (ii) the sum of Uncertificated Accrued Interest on REMIC I Regular Interest I-A-I-1 through REMIC I Regular Interest I-A-I-4, with the rate on each such REMIC I Regular Interest subject to a cap equal to the Pass-Through Rate for the corresponding Class for the purpose of this calculation.

REMIC I Regular Interest II-ZZ Maximum Interest Deferral Amount:  With respect to any Distribution Date, the excess of (i) Uncertificated Accrued Interest calculated with the REMIC I Regular Interest II-ZZ Uncertificated Pass-Through Rate and an Uncertificated Principal Balance equal to the excess of (x) the Uncertificated Principal Balance of REMIC I Regular Interest II-ZZ over (y) the REMIC I Group II Overcollateralized Amount, in each case for such Distribution Date, over (ii) the sum of Uncertificated Accrued Interest on REMIC I Regular Interest A-II, with the rate on each such REMIC I Regular Interest subject to a cap equal to the Pass-Through Rate for the corresponding Class for the purpose of this calculation.

REMIC II:  The segregated pool of assets described in the Preliminary Statement.

REMIC II Regular Interest:  Any "regular interest" issued by REMIC II the ownership of which is evidenced by a Class A Certificate, or the Class SB Certificate.

REMIC Provisions:  Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Sections 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and temporary and final regulations (or, to the extent not inconsistent with such temporary or final regulations, proposed regulations) and

CONFIDENTIAL                                   RC_FGIC9019_00031417

published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time.

REMIC Regular Interests:  the REMIC I Regular Interests and the REMIC II Regular Interests.

REO Acquisition:  The acquisition by the Master Servicer on behalf of the Trustee for the benefit of the Certificateholders of any REO Property pursuant to Section 3.14.

REO Disposition:  With respect to any REO Property, a determination by the Master Servicer that it has received substantially all Insurance Proceeds, Liquidation Proceeds, REO Proceeds and other payments and recoveries (including proceeds of a final sale) which the Master Servicer expects to be finally recoverable from the sale or other disposition of the REO Property.

REO Imputed Interest:  With respect to any REO Property, for any period, an amount equivalent to interest (at a rate equal to the sum of the Net Mortgage Rate and the Certificate Insurer Premium Modified Rate that would have been applicable to the related Mortgage Loan had it been outstanding) on the unpaid principal balance of the Mortgage Loan as of the date of acquisition thereof for such period.

REO Proceeds:  Proceeds, net of expenses, received in respect of any REO Property (including, without limitation, proceeds from the rental of the related Mortgaged Property) which proceeds are required to be deposited into the Custodial Account only upon the related REO Disposition.

REO Property:  A Mortgaged Property acquired by the Master Servicer, on behalf of the Trust Fund for the benefit of the Certificateholders pursuant to Section 3.14, through foreclosure or deed in lieu of foreclosure in connection with a defaulted Mortgage Loan.

Reportable Modified Mortgage Loan:  Any Mortgage Loan that (i) has been subject to an interest rate reduction, (ii) has been subject to a term extension or (iii) has had amounts owing on such Mortgage Loan capitalized by adding such amount to the Stated Principal Balance of such Mortgage Loan; provided, however, that a Mortgage Loan modified in accordance with clause (i) above for a temporary period shall not be a Reportable Modified Mortgage Loan if such Mortgage Loan has not been delinquent in payments of principal and interest for six months since the date of such modification if that interest rate reduction is not made permanent thereafter.

Repurchase Event:  As defined in the Assignment Agreement.

Request for Release:  A request for release, the form of which is attached as Exhibit H hereto, or an electronic request in a form acceptable to the Custodian.

Required Insurance Policy:  With respect to any Mortgage Loan, any insurance policy which is required to be maintained from time to time under this Agreement, the Program Guide or the related Subservicing Agreement in respect of such Mortgage Loan.

CONFIDENTIAL                                                                RC_FGIC9019_00031418

Required Overcollateralization Amount:  With respect to any Distribution Date, (a) if such Distribution Date is prior to the Stepdown Date, 3.70% of the Cut-off Date Balance, or (b) if such Distribution Date is on or after the Stepdown Date, the greater of (i) 7.40% of the then-current aggregate Stated Principal Balance of the Mortgage Loans as of the end of the related Due Period and (ii) the Overcollateralization Floor; provided, however, that if a Trigger Event is in effect, the Required Overcollateralization Amount shall be equal to the Required Overcollateralization Amount for the immediately preceding Distribution Date. The Required Overcollateralization Amount may be reduced from time to time with notification to the Rating Agencies and with the consent of the Insurer and without the consent of the Certificateholders.

Residential Funding:  Residential Funding Corporation, a Delaware corporation, in its capacity as seller of the Mortgage Loans to the Depositor and not in its capacity as Master Servicer, and any successor thereto.

Responsible Officer:  When used with respect to the Trustee, any officer of the Corporate Trust Department of the Trustee, including any Senior Vice President, any Vice President, any Assistant Vice President, any Assistant Secretary, any Trust Officer or Assistant Trust Officer, or any other officer of the Trustee, in each case with direct responsibility for the administration of this Agreement.

RFC Exemption:  As defined in Section 5.02(e)(ii).

Rolling Six-Month Delinquency Ratio:  As of any Distribution Date, the weighted average of the Delinquency Ratio for each of the six (or one, two, three, four and five in the case of the first, second, third, fourth and fifth Distribution Dates) immediately preceding Due Periods.

Rule 144A:  Rule 144A under the Securities Act of 1933, as in effect from time to time.

Senior Enhancement Percentage:  For any Distribution Date, the fraction, expressed as a percentage, the numerator of which is the Overcollateralization Amount, prior to the distribution of the Principal Distribution Amount on such Distribution Date and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans after giving effect to distributions to be made on that Distribution Date.

Servicing Accounts:  The account or accounts created and maintained pursuant to Section 3.08.

Servicing Advances:  All customary, reasonable and necessary "out of pocket" costs and expenses incurred in connection with a default, delinquency or other unanticipated event by the Master Servicer or a Subservicer in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered on the MERS System, (iii) the management and liquidation of any REO Property, (iv) any mitigation procedures implemented in accordance with Section 3.07 and (v) compliance with the obligations under Sections 3.01, 3.08, 3.11, 3.12(a) and 3.14, including, if the Master Servicer or any Affiliate of the Master Servicer provides services such as appraisals and

CONFIDENTIAL                                                              RC_FGIC9019_00031419

brokerage services that are customarily provided by Persons other than servicers of mortgage loans, reasonable compensation for such services.

Servicing Fee:  With respect to any Mortgage Loan and Distribution Date, the fee payable monthly to the Master Servicer in respect of master servicing compensation that accrues at an annual rate equal to the Servicing Fee Rate multiplied by the Stated Principal Balance of such Mortgage Loan as of the related Due Date in the related Due Period, as may be adjusted pursuant to Section 3.16(e).

Servicing Fee Rate:  With respect to any Mortgage Loan, the per annum rate designated on the Mortgage Loan Schedule as the "MSTR SERV FEE" as may be adjusted with respect to successor Master Servicers as provided in Section 7.02, which rate shall never be greater than the Mortgage Rate of such Mortgage Loan.

Servicing Modification:  Any reduction of the interest rate on or the Stated Principal Balance of a Mortgage Loan, any extension of the final maturity date of a Mortgage Loan, and any increase to the Stated Principal Balance of a Mortgage Loan by adding to the Stated Principal Balance unpaid principal and interest and other amounts owing under the Mortgage Loan, in each case pursuant to a modification of a Mortgage Loan that is in default, or for which, in the judgment of the Master Servicer, default is reasonably foreseeable in accordance with Section 3.07(a).

Servicing Officer:  Any officer of the Master Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name and specimen signature appear on a list of servicing officers furnished to the Trustee and the Insurer on the Closing Date by the Master Servicer, as such list may from time to time be amended.

Servicing Trigger: As of any Distribution Date, for purposes of Section 7.05, "Servicing Trigger; Removal of Master Servicer," the occurrence of any of the following scenarios:

(i)    the aggregate Rolling Six-Month Delinquency Ratio for the Mortgage Loans is greater than 27%; or

(ii)    the aggregate Realized Losses on the Mortgage Loans as a percentage of the Cut-off Date Balance exceeds the applicable amount set forth below:

| | |
|---|---|
| July 2008 to December 2008......... | 2.00% with respect to July 2008, plus an additional 1/6 of 1.50% for each month thereafter |
| January 2009 to December 2009...... | 3.50% with respect to January 2009, plus an additional 1/12 of 2.00% for each month thereafter |
| January 2010 to December 2010...... | 5.50% with respect to January 2010, plus an additional 1/12 of 1.25% for each month thereafter |
| January 2011 to December 2011...... | 6.75% with respect to January 2010, plus an additional 1/12 of 0.75% for each month thereafter |

CONFIDENTIAL                                                              RC_FGIC9019_00031420

January 2012 and thereafter............    7.50%

Standard & Poor's:  Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or its successors in interest.

Startup Date:  The day designated as such pursuant to Article X hereof.

Stated Principal Balance:  With respect to any Mortgage Loan or related REO Property, at any given time, (i) the sum of (a) the Cut-off Date Principal Balance of the Mortgage Loan, (b) any amount by which the Stated Principal Balance of the Mortgage Loan has been increased pursuant to a Servicing Modification, minus (ii) the sum of (a) the principal portion of the Monthly Payments due with respect to such Mortgage Loan or REO Property during each Due Period commencing on the first Due Period after the Cut-Off Date and ending with the Due Period related to the most recent Distribution Date which were received or with respect to which an Advance was made, and (b) all Principal Prepayments with respect to such Mortgage Loan or REO Property, and all Insurance Proceeds, Liquidation Proceeds and REO Proceeds, to the extent applied by the Master Servicer as recoveries of principal in accordance with Section 3.14 with respect to such Mortgage Loan or REO Property, in each case which were distributed pursuant to Section 4.02 or 4.03 on any previous Distribution Date, and (c) any Realized Loss incurred with respect to such Mortgage Loan allocated to Certificateholders with respect thereto for any previous Distribution Date.

Stepdown Date:  The Distribution Date which is the later to occur of (i) the Distribution Date occurring in July 2008 and (ii) the first Distribution Date on which the Senior Enhancement Percentage is equal to or greater than 7.40%.

Subordination:  The provisions described in Section 4.05 relating to the allocation of Realized Losses.

Subsequent Recoveries:  As of any Distribution Date, amounts received by the Master Servicer (net of any related expenses permitted to be reimbursed pursuant to Section 3.10) or surplus amounts held by the Master Servicer to cover estimated expenses (including, but not limited to, recoveries in respect of the representations and warranties made by the related Seller pursuant to the applicable Seller's Agreement and assigned to the Trustee pursuant to Section 2.04) specifically related to a Mortgage Loan that was the subject of a Cash Liquidation or an REO Disposition prior to the related Prepayment Period and that resulted in a Realized Loss.

Subserviced Mortgage Loan:  Any Mortgage Loan that, at the time of reference thereto, is subject to a Subservicing Agreement.

Subservicer:  Any Person with whom the Master Servicer has entered into a Subservicing Agreement and who generally satisfied the requirements set forth in the Program Guide in respect of the qualification of a Subservicer as of the date of its approval as a Subservicer by the Master Servicer.

CONFIDENTIAL    RC_FGIC9019_00031421

Subservicer Advance:   Any delinquent installment of principal and interest on a Mortgage Loan which is advanced by the related Subservicer (net of its Subservicing Fee) pursuant to the Subservicing Agreement.

Subservicing Account:   An account established by a Subservicer in accordance with Section 3.08.

Subservicing Agreement:   The written contract between the Master Servicer and any Subservicer relating to servicing and administration of certain Mortgage Loans as provided in Section 3.02, generally in the form of the servicer contract referred to or contained in the Program Guide or in such other form as has been approved by the Master Servicer and the Depositor.

Subservicing Fee:   With respect to any Mortgage Loan, the fee payable monthly to the related Subservicer (or, in the case of a Nonsubserviced Mortgage Loan, to the Master Servicer) in respect of subservicing and other compensation that accrues with respect to each Distribution Date at an annual rate equal to the Subservicing Fee Rate multiplied by the Stated Principal Balance of such Mortgage Loan as of the related Due Date in the related Due Period.

Subservicing Fee Rate:   The per annum rate designated on the Mortgage Loan Schedule as the "SUBSERV FEE".

Tax Returns:   The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holders of REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed on behalf of any REMIC due to its classification as a REMIC under the REMIC Provisions, together with any and all other information, reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

Telerate Screen Page 3750:   As defined in Section 1.02.

Transfer:   Any direct or indirect transfer, sale, pledge, hypothecation or other form of assignment of any Ownership Interest in a Certificate.

Transferee:   Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

Transferor:   Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

Trigger Event:   A Trigger Event is in effect with respect to any Distribution Date if either (i) the aggregate Rolling Six-Month Delinquency Ratio for the Mortgage Loans is greater than 16%; or (ii) the aggregate Realized Losses on the Mortgage Loans as a percentage of the Cut-off Date Balance exceeds the applicable amount set forth below:

CONFIDENTIAL                                                              RC_FGIC9019_00031422

| | |
|---|---|
| July 2008 to December 2008......... | 1.50% with respect to July 2008, plus an additional 1/6 of 1.00% for each month thereafter. |
| January 2009 to December 2009...... | 2.50% with respect to January 2009, plus additional 1/12 of 1.50% for each month thereafter. |
| January 2010 to December 2010...... | 4.00% with respect to January 2010, plus an additional 1/12 of 1.00% for each month thereafter. |
| January 2011 to December 2011...... | 5.00% with respect to January 2011, plus an additional 1/12 of 0.75% for each month thereafter. |
| January 2012 and thereafter............ | 5.75% |

Trust Fund:  The segregated pool of assets subject hereto, consisting of:  (i) the Mortgage Loans and the related Mortgage Files; (ii) all payments on and collections in respect of the Mortgage Loans due after the Cut-off Date (other than Monthly Payments due in the month of the Cut-off Date) as shall be on deposit in the Custodial Account or in the Certificate Account and identified as belonging to the Trust Fund; (iii) property which secured a Mortgage Loan and which has been acquired for the benefit of the Certificateholders by foreclosure or deed in lieu of foreclosure; (iv) the hazard insurance policies and Primary Insurance Policies pertaining to the Mortgage Loans, if any; (v) rights under the Yield Maintenance Agreement and any payments thereunder; and (vi) all proceeds of clauses (i) through (v) above.

Uncertificated Accrued Interest: With respect to any REMIC I or REMIC II Regular Interest for any Distribution Date, one month's interest at the related Uncertificated REMIC I Pass-Through Rate or Uncertificated REMIC II Pass-Through Rate for such Distribution Date, accrued on its Uncertificated Principal Balance immediately prior to such Distribution Date. Uncertificated Accrued Interest for the REMIC I Regular Interests shall accrue on the basis of a 360-day year consisting of twelve 30-day months.

Uncertificated Group I Regular Interests: The Uncertificated Regular Interests commencing, ending or including with the designation "I".

Uncertificated Group I REMIC I Pass-Through Rate:  With respect to each Uncertificated Group I REMIC I Regular Interest, a per annum rate equal to the weighted average Net Mortgage Rate of the Group I Loans.

Uncertificated Group II Regular Interests: The Uncertificated Regular Interests commencing or ending with the designation "II".

Uncertificated Group II REMIC I Pass-Through Rate:  With respect to each Uncertificated Group II REMIC I Regular Interest, a per annum rate equal to the weighted average Net Mortgage Rate of the Group II Loans.

CONFIDENTIAL                                                                                    RC_FGIC9019_00031423

Uncertificated Notional Amount:  With respect to the Class SB Certificates, immediately prior to any Distribution Date, an amount equal to the aggregate of the Uncertificated Principal Balance of the REMIC I Regular Interests.

Uncertificated Pass-Through Rate: The Uncertificated Group I REMIC I Pass-Through Rate, the Uncertificated Group II REMIC I Pass-Through Rate, as applicable.

Uncertificated Principal Balance: The principal amount of any Uncertificated Regular Interest outstanding as of any date of determination. As of the Closing Date, the Uncertificated Principal Balance of each Uncertificated Regular Interest shall equal the amount set forth in the Preliminary Statement hereto as its initial Uncertificated Principal Balance.  The Uncertificated Principal Balance of the Uncertificated Regular Interests shall be reduced by all distributions of principal made on such Uncertificated Regular Interests on a Distribution Date pursuant to Section 4.02 and, if and to the extent necessary and appropriate, shall be further reduced on such Distribution Date by Realized Losses as principal in Section 4.05, and the Uncertificated Principal Balance of REMIC I Regular Interest I-ZZ and II-ZZ shall be increased by the related interest deferrals as provided in Section 4.02.  The Uncertificated Principal Balance of each REMIC Regular Interest shall never be less than zero.  With respect to the Class SB Certificates, as of any date of determination, an amount equal to the excess, if any, of (A) the then aggregate Uncertificated Principal Balance of the REMIC I Regular Interests over (B) the then aggregate Certificate Principal Balance of the Class A Certificates then outstanding.

Uncertificated Regular Interests: The REMIC I Regular Interests.

Uniform Single Attestation Program for Mortgage Bankers:  The Uniform Single Attestation Program for Mortgage Bankers, as published by the Mortgage Bankers Association of America and effective with respect to fiscal periods ending on or after December 15, 1995.

Uninsured Cause:  Any cause of damage to property subject to a Mortgage such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies.

United States Person:  A citizen or resident of the United States, a corporation, partnership or other entity (treated as a corporation or partnership for United States federal income tax purposes) created or organized in, or under the laws of, the United States, any state thereof, or the District of Columbia (except in the case of a partnership, to the extent provided in Treasury regulations) provided that, for purposes solely of the restrictions on the transfer of Class R Certificates, no partnership or other entity treated as a partnership for United States federal income tax purposes shall be treated as a United States Person unless all persons that own an interest in such partnership either directly or through any entity that is not a corporation for United States federal income tax purposes are required by the applicable operative agreement to be United States Persons, or an estate that is described in Section 7701(a)(30)(D) of the Code, or a trust that is described in Section 7701(a)(30)(E) of the Code.

VA:  The Veterans Administration, or its successor.

Voting Rights:  The portion of the voting rights of all of the Certificates which is allocated to any Certificate. 98.00% of all of the Voting Rights shall be allocated among Holders of the Class A Certificates, in proportion to the outstanding Certificate Principal Balances of

CONFIDENTIAL

their respective Certificates; 1% of all of the Voting Rights shall be allocated among the Holders of the Class SB Certificates; 0.50% and 0.50% of all of the Voting Rights shall be allocated to each of the Holders of the Class R-I and Class R-II Certificates, respectively; in each case to be allocated among the Certificates of such Class in accordance with their respective Percentage Interest.  So long as no Insurer Default has occurred and is continuing, the Insurer will have the right to exercise all voting rights of the holders of the Class A Certificates.

Yield Maintenance Agreement:    The yield maintenance agreement, effective as of December 28, 2005, between the Yield Maintenance Agreement Provider and the Trustee, on behalf of the Trust, which agreement provides for Yield Maintenance Payments and Yield Maintenance Termination Payments to be paid, as provided therein, together with any schedules, confirmations or other agreements relating thereto, attached hereto as Exhibit U.

Yield Maintenance Agreement Notional Balance:  With respect to any Distribution Date specified below and the Yield Maintenance Agreement, the lesser of (1) the aggregate Certificate Principal Balance of the Class A Certificates immediately prior to that Distribution Date and (2) the amount specified below for that Distribution Date:

| Period | Notional Balance ($) | Period | Notional Balance ($) | Period | Notional Balance ($) | Period | Notional Balance ($) |
|---|---|---|---|---|---|---|---|
| 1 | 698,175,000.00 | 16 | 469,688,590.67 | 31 | 208,069,390.18 | 46 | 113,006,491.70 |
| 2 | 694,635,124.32 | 17 | 451,411,795.53 | 32 | 198,227,878.27 | 47 | 108,284,632.83 |
| 3 | 689,513,469.83 | 18 | 433,819,760.72 | 33 | 188,820,524.77 | 48 | 103,767,496.84 |
| 4 | 682,800,650.28 | 19 | 416,886,657.71 | 34 | 179,827,743.38 | 49 | 99,445,958.66 |
| 5 | 673,684,705.02 | 20 | 400,587,637.39 | 35 | 171,230,844.68 | 50 | 95,311,307.79 |
| 6 | 661,364,058.93 | 21 | 384,860,805.66 | 36 | 163,011,994.68 | 51 | 91,355,229.23 |
| 7 | 647,081,183.35 | 22 | 369,336,274.92 | 37 | 155,154,903.68 | 52 | 87,569,785.32 |
| 8 | 630,881,616.68 | 23 | 342,038,932.14 | 38 | 155,154,903.68 | 53 | 83,947,398.34 |
| 9 | 612,828,630.92 | 24 | 316,789,400.45 | 39 | 152,655,015.01 | 54 | 80,480,834.01 |
| 10 | 593,249,725.61 | 25 | 293,487,743.60 | 40 | 146,205,315.00 | 55 | 77,163,185.73 |
| 11 | 572,320,979.65 | 26 | 271,943,645.80 | 41 | 140,037,629.95 | 56 | 73,987,859.49 |
| 12 | 550,196,439.22 | 27 | 252,204,687.35 | 42 | 134,139,314.92 | 57 | 70,948,559.57 |
| 13 | 528,901,339.50 | 28 | 240,409,121.23 | 43 | 128,498,301.69 | 58 | 68,039,274.80 |
| 14 | 508,404,907.24 | 29 | 229,137,982.06 | 44 | 123,103,072.19 | 59 | 65,254,242.96 |
| 15 | 488,676,992.83 | 30 | 218,365,587.21 | 45 | 117,942,633.09 | 60 | 62,584,913.34 |

Yield Maintenance Agreement Provider:    The yield maintenance agreement provider under the Yield Maintenance Agreement required to make payments to the Trustee for payment to the Trust Fund pursuant to the terms of the Yield Maintenance Agreement, and any successor in interest or assign. Initially, the Yield Maintenance Agreement Provider shall be HSBC Bank USA, National Association.

Yield Maintenance Agreement Termination Payment:  Upon the designation of an "Early Termination Date" as defined in the Yield Maintenance Agreement, the payment to be made by the Yield Maintenance Agreement Provider to the Trustee for payment to the Trust Fund pursuant to the terms of the Yield Maintenance Agreement.

CONFIDENTIAL    RC_FGIC9019_00031425

Yield Maintenance Payment:  With respect to each Distribution Date, any payment received by the Trustee, on behalf of the Trust Fund, from the Yield Maintenance Agreement Provider pursuant to the terms of the Yield Maintenance Agreement, with respect to such Distribution Date, provided that such payment shall not include any payment received by the Trustee, on behalf of the Trust Fund, that is a Yield Maintenance Agreement Termination Payment, except as set forth in Section 4.09(e).

Section 1.02.  Determination of LIBOR.

LIBOR applicable to the calculation of the Pass-Through Rate on the Class A Certificates for any Interest Accrual Period will be determined on each LIBOR Rate Adjustment Date. On each LIBOR Rate Adjustment Date, or if such LIBOR Rate Adjustment Date is not a Business Day, then on the next succeeding Business Day, LIBOR shall be established by the Trustee and, as to any Interest Accrual Period, will equal the rate for one month United States dollar deposits that appears on the Telerate Screen Page 3750 as of 11:00 A.M., London time, on such LIBOR Rate Adjustment Date. "Telerate Screen Page 3750" means the display designated as page 3750 on the Bridge Telerate Service (or such other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major banks). If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, LIBOR shall be so established by use of such other service for displaying LIBOR or comparable rates as may be selected by the Trustee after consultation with the Master Servicer and the Insurer), the rate will be the Reference Bank Rate. The "Reference Bank Rate" will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the reference banks (which shall be any three major banks that are engaged in transactions in the London interbank market, selected by the Trustee after consultation with the Master Servicer and the Insurer) as of 11:00 A.M., London time, on the LIBOR Rate Adjustment Date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the Class A Certificates then outstanding. The Trustee shall request the principal London office of each of the reference banks to provide a quotation of its rate. If at least two such quotations are provided, the rate will be the arithmetic mean of the quotations rounded up to the next multiple of 1/16%. If on such date fewer than two quotations are provided as requested, the rate will be the arithmetic mean of the rates quoted by one or more major banks in New York City, selected by the Trustee after consultation with the Master Servicer and the Insurer, as of 11:00 A.M., New York City time, on such date for loans in U.S. Dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the Class A Certificates then outstanding. If no such quotations can be obtained, the rate will be LIBOR for the prior Distribution Date; *provided however*, if, under the priorities described above, LIBOR for a Distribution Date would be based on LIBOR for the previous Distribution Date for the third consecutive Distribution Date, the Trustee, after consultation with the Insurer, shall select an alternative comparable index (over which the Trustee has no control), used for determining one-month Eurodollar lending rates that is calculated and published (or otherwise made available) by an independent party. The establishment of LIBOR by the Trustee on any LIBOR Rate Adjustment Date and the Trustee's subsequent calculation of the Pass-Through Rates applicable to the Class A Certificates for the relevant Interest Accrual Period, in the absence of manifest error, will be final and binding. Promptly following each LIBOR Rate Adjustment Date the Trustee shall supply the Master Servicer with the results of its determination of LIBOR on

CONFIDENTIAL                                                    RC_FGIC9019_00031426

such date. Furthermore, the Trustee shall supply to any Certificateholder so requesting by calling the Trustee at 1-800-934-6802 the Pass-Through Rate on the Class A Certificates for the current and the immediately preceding Interest Accrual Period.

## ARTICLE II
## CONVEYANCE OF MORTGAGE LOANS;
## ORIGINAL ISSUANCE OF CERTIFICATES

Section 2.01.    Conveyance of Mortgage Loans.

(a)    The Depositor, concurrently with the execution and delivery hereof, does hereby assign to the Trustee without recourse all the right, title and interest of the Depositor in and to (i) the Mortgage Loans, including all interest and principal on or with respect to the Mortgage Loans due on or after the Cut-off Date (other than Monthly Payments due on the Mortgage Loans in the month of the Cut-off Date); and (ii) all proceeds of the foregoing. In addition, on the Closing Date, the Trustee is hereby directed to enter into the Yield Maintenance Agreement on behalf of the Trust Fund with the Yield Maintenance Agreement Provider.

The Depositor, the Master Servicer and the Trustee agree that it is not intended that any mortgage loan be included in the Trust Fund that is either (i) a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Security Act effective November 27, 2003, (ii) a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, (iii) a "High Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 or (iv) a "High-Cost Home Loan" as defined in the Indiana Home Loan Practices Act effective as of January 1, 2005.

(b)    In connection with such assignment, and contemporaneously with the delivery of this Agreement, the Depositor delivered or caused to be delivered hereunder to the Trustee, the Yield Maintenance Agreement (the delivery of which shall evidence that the fixed payment for the Yield Maintenance Agreement has been paid and the Trustee and the Trust Fund shall have no further payment obligation thereunder and that such fixed payment has been authorized hereby), the Policy and except as set forth in Section 2.01(c) below and subject to Section 2.01(d) below, the Depositor does hereby deliver to, and deposit with, the Trustee, or to and with one or more Custodians, as the duly appointed agent or agents of the Trustee for such purpose, the following documents or instruments (or copies thereof as permitted by this Section) with respect to each Mortgage Loan so assigned:

(i)    The original Mortgage Note, endorsed without recourse to the order of the Trustee and showing an unbroken chain of endorsements from the originator thereof to the Person endorsing it to the Trustee, or with respect to any Destroyed Mortgage Note, an original lost note affidavit from the related Seller or Residential Funding stating that the original Mortgage Note was lost, misplaced or destroyed, together with a copy of the related Mortgage Note;

(ii)    The original Mortgage, noting the presence of the MIN of the Mortgage Loan (if the Mortgage Loan is registered on the MERS® System) and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM

CONFIDENTIAL                                    RC_FGIC9019_00031427

Loan, with evidence of recording indicated thereon or, if the original Mortgage has not yet been returned from the public recording office, a copy of the original Mortgage with evidence of recording indicated thereon;

(iii)    Unless the Mortgage Loan is registered on the MERS® System, the Assignment (which may be included in one or more blanket assignments if permitted by applicable law) of the Mortgage to the Trustee with evidence of recording indicated thereon or a copy of such assignment with evidence of recording indicated thereon;

(iv)    The original recorded assignment or assignments of the Mortgage showing an unbroken chain of title from the originator to the Person assigning it to the Trustee (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of a MIN) with evidence of recordation noted thereon or attached thereto, or a copy of such assignment or assignments of the Mortgage with evidence of recording indicated thereon; and

(v)    The original of each modification, assumption agreement or preferred loan agreement, if any, relating to such Mortgage Loan, or a copy of each modification, assumption agreement or preferred loan agreement.

The Depositor may, in lieu of delivering the original of the documents set forth in Section 2.01(b)(ii), (iii), (iv) and (v) (or copies thereof as permitted by Section 2.01(b)) to the Trustee or the Custodian, deliver such documents to the Master Servicer, and the Master Servicer shall hold such documents in trust for the use and benefit of all present and future Certificateholders and the Insurer until such time as is set forth in the next sentence. Within thirty Business Days following the earlier of (i) the receipt of the original of all of the documents or instruments set forth in Section 2.01(b)(ii), (iii), (iv) and (v) (or copies thereof as permitted by such Section) for any Mortgage Loan and (ii) a written request by the Trustee to deliver those documents with respect to any or all of the Mortgage Loans then being held by the Master Servicer, the Master Servicer shall deliver a complete set of such documents to the Trustee or the Custodian that is the duly appointed agent of the Trustee.

(c)    Notwithstanding the provisions of Section 2.01(b), in the event that in connection with any Mortgage Loan, if the Depositor cannot deliver the original of the Mortgage, any assignment, modification, assumption agreement or preferred loan agreement (or copy thereof as permitted by Section 2.01(b)) with evidence of recording thereon concurrently with the execution and delivery of this Agreement because of (i) a delay caused by the public recording office where such Mortgage, assignment, modification, assumption agreement or preferred loan agreement as the case may be, has been delivered for recordation, or (ii) a delay in the receipt of certain information necessary to prepare the related assignments, the Depositor shall deliver or cause to be delivered to the Trustee or the respective Custodian a copy of such Mortgage, assignment, modification, assumption agreement or preferred loan agreement.

The Depositor shall promptly cause to be recorded in the appropriate public office for real property records the Assignment referred to in clause (iii) of Section 2.01(b), except (a) in states where, in the Opinion of Counsel acceptable to the Insurer and the Master Servicer, such recording is not required to protect the Trustee's interests in the Mortgage Loan or (b) if MERS

5109327 05161514                                    -45-

CONFIDENTIAL                                    RC_FGIC9019_00031428

is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record solely as nominee for Residential Funding and its successors and assigns. If any Assignment is lost or returned unrecorded to the Depositor because of any defect therein, the Depositor shall prepare a substitute Assignment or cure such defect, as the case may be, and cause such Assignment to be recorded in accordance with this paragraph. The Depositor shall promptly deliver or cause to be delivered to the Trustee or the respective Custodian such Mortgage or Assignment, as applicable (or copy thereof as permitted by Section 2.01(b)), with evidence of recording indicated thereon upon receipt thereof from the public recording office or from the related Subservicer or Seller.

If the Depositor delivers to the Trustee or Custodian any Mortgage Note or Assignment of Mortgage in blank, the Depositor shall, or shall cause the Custodian to, complete the endorsement of the Mortgage Note and the Assignment of Mortgage in the name of the Trustee in conjunction with the Interim Certification issued by the Custodian, as contemplated by Section 2.02.

Any of the items set forth in Sections 2.01(b)(ii), (iii), (iv) and (v) that may be delivered as a copy rather than the original may be delivered to the Trustee or the Custodian.

In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Depositor further agrees that it will cause, at the Depositor's own expense, within 30 Business Days after the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by the Depositor to the Trustee in accordance with this Agreement for the benefit of the Certificateholders and the Insurer by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Depositor further agrees that it will not, and will not permit the Master Servicer to, and the Master Servicer agrees that it will not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

(d)      It is intended that the conveyances by the Depositor to the Trustee of the Mortgage Loans as provided for in this Section 2.01 and the Uncertificated Regular Interests be construed as a sale by the Depositor to the Trustee of the Mortgage Loans for the benefit of the Certificateholders and the Insurer. Further, it is not intended that any such conveyance be deemed to be a pledge of the Mortgage Loans by the Depositor to the Trustee to secure a debt or other obligation of the Depositor. However, in the event that the Mortgage Loans are held to be property of the Depositor or of Residential Funding, or if for any reason this Agreement is held or deemed to create a security interest in the Mortgage Loans, then it is intended that (a) this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the New York Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction; (b) the conveyances provided for in this Section 2.01 shall be deemed to be (1) a grant by the Depositor to the Trustee of a security interest in all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to (A) the Mortgage Loans, including (a) the related Mortgage Note and Mortgage, and (b) any insurance policies and all other documents in the related Mortgage File,

CONFIDENTIAL                                                  RC_FGIC9019_00031429

(B) all amounts payable pursuant to the Mortgage Loans or the Yield Maintenance Agreement in accordance with the terms thereof and (C) any and all general intangibles, payment intangibles, accounts, chattel paper, instruments, documents, money, deposit accounts, certificates of deposit, goods, letters of credit, advices of credit and investment property and other property of whatever kind or description now existing or hereafter acquired consisting of, arising from or relating to any of the foregoing, and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Certificate Account or the Custodial Account, whether in the form of cash, instruments, securities or other property and (2) an assignment by the Depositor to the Trustee of any security interest in any and all of Residential Funding's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the property described in the foregoing clauses (1)(A), (B) and (C) granted by Residential Funding to the Depositor pursuant to the Assignment Agreement; (c) the possession by the Trustee, the Custodian or any other agent of the Trustee of Mortgage Notes or such other items of property as they constitute instruments, money, payment intangibles, negotiable documents, goods, deposit accounts, letters of credit, advices of credit, investment property, certificated securities or chattel paper shall be deemed to be "possession by the secured party," or possession by a purchaser or a person designated by such secured party, for purposes of perfecting the security interest pursuant to the Uniform Commercial Code as in effect in the States of New York and Minnesota and any other applicable jurisdiction; and (d) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, securities intermediaries, bailees or agents of, or persons holding for, (as applicable) the Trustee for the purpose of perfecting such security interest under applicable law.

The Depositor and, at the Depositor's direction, Residential Funding and the Trustee shall, to the extent consistent with this Agreement, take such reasonable actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Mortgage Loans and the other property described above, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement. Without limiting the generality of the foregoing, the Depositor shall prepare and deliver to the Trustee not less than 15 days prior to any filing date and, the Trustee shall forward for filing, or shall cause to be forwarded for filing, at the expense of the Depositor, all filings necessary to maintain the effectiveness of any original filings necessary under the Uniform Commercial Code as in effect in any jurisdiction to perfect the Trustee's security interest in or lien on the Mortgage Loans, as evidenced by an Officers' Certificate of the Depositor with a copy delivered to the Insurer, including without limitation (x) continuation statements, and (y) such other statements as may be occasioned by (1) any change of name of Residential Funding, the Depositor or the Trustee (such preparation and filing shall be at the expense of the Trustee, if occasioned by a change in the Trustee's name), (2) any change of location of the place of business or the chief executive office of Residential Funding or the Depositor or (3) any transfer of any interest of Residential Funding or the Depositor in any Mortgage Loan.

CONFIDENTIAL                                                                    RC_FGIC9019_00031430

Section 2.02.    Acceptance by Trustee.

The Trustee acknowledges receipt (or, with respect to Mortgage Loans subject to a Custodial Agreement, and based solely upon a receipt or certification executed by the Custodian, receipt by the respective Custodian as the duly appointed agent of the Trustee) of the documents referred to in Section 2.01(b)(i) above (except that for purposes of such acknowledgment only, a Mortgage Note may be endorsed in blank and an Assignment of Mortgage may be in blank) and declares that it, or a Custodian as its agent, holds and will hold such documents and the other documents constituting a part of the Mortgage Files delivered to it, or a Custodian as its agent, in trust for the use and benefit of all present and future Certificateholders and the Insurer. The Trustee or Custodian (such Custodian being so obligated under a Custodial Agreement) agrees, for the benefit of Certificateholders and the Insurer, to review each Mortgage File delivered to it pursuant to Section 2.01(b) within 45 days after the Closing Date to ascertain that all required documents (specifically as set forth in Section 2.01(b)), have been executed and received, and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, as supplemented, that have been conveyed to it, and to deliver to the Trustee a certificate (the "Interim Certification") to the effect that all documents required to be delivered pursuant to Section 2.01(b) above have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, except for any exceptions listed on Schedule A attached to such Interim Certification. Upon delivery of the Mortgage Files by the Depositor or the Master Servicer, the Trustee shall acknowledge receipt (or, with respect to Mortgage Loans subject to a Custodial Agreement, and based solely upon a receipt or certification (the "Final Certification") executed by the Custodian, receipt by the respective Custodian as the duly appointed agent of the Trustee) of the documents referred to in Section 2.01(c) above.

If the Custodian, as the Trustee's agent, finds any document or documents constituting a part of a Mortgage File to be missing or defective, upon receipt of notification from the Custodian as specified in the succeeding sentence, the Trustee shall promptly so notify or cause the Custodian to notify the Master Servicer and the Depositor; provided, that if the Mortgage Loan related to such Mortgage File is listed on Schedule A of the Assignment Agreement, no notification shall be necessary. Pursuant to Section 2.3 of the Custodial Agreement, the Custodian will notify the Master Servicer, the Depositor and the Trustee of any such omission or defect found by it in respect of any Mortgage File held by it in respect of the items received by it pursuant to the Custodial Agreement. If such omission or defect materially and adversely affects the interests in the related Mortgage Loan of the Certificateholders or the Insurer, the Master Servicer shall promptly notify the related Subservicer of such omission or defect and request that such Subservicer correct or cure such omission or defect within 60 days from the date the Master Servicer was notified of such omission or defect and, if such Subservicer does not correct or cure such omission or defect within such period, that such Subservicer purchase such Mortgage Loan from the Trust Fund at its Purchase Price, in either case within 90 days from the date the Master Servicer was notified of such omission or defect; provided that if the omission or defect would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or repurchase must occur within 90 days from the date such breach was discovered; and provided further, that no cure, substitution or repurchase shall be required if such omission or defect is in respect of a Mortgage Loan listed on Schedule A of the Assignment Agreement. The Purchase Price for any such Mortgage Loan shall

CONFIDENTIAL                                        RC_FGIC9019_00031431

be deposited or caused to be deposited by the Master Servicer in the Custodial Account maintained by it pursuant to Section 3.07 and, upon receipt by the Trustee of written notification of such deposit signed by a Servicing Officer, the Trustee or any Custodian, as the case may be, shall release to the Master Servicer the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment prepared by the Master Servicer, in each case without recourse, as shall be necessary to vest in the Subservicer or its designee, as the case may be, any Mortgage Loan released pursuant hereto and thereafter such Mortgage Loan shall not be part of the Trust Fund. In furtherance of the foregoing, if Residential Funding or the Subservicer that repurchases the Mortgage Loan is not a member of MERS and the Mortgage is registered on the MERS® System, the Master Servicer, at its own expense and without any right of reimbursement, shall cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to such Subservicer or Residential Funding and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations. It is understood and agreed that the obligation of the Subservicer, to so cure or purchase any Mortgage Loan as to which a material and adverse defect in or omission of a constituent document exists shall constitute the sole remedy respecting such defect or omission available to Certificateholders or the Trustee on behalf of Certificateholders (except for the Insurer's rights under the Insurance Agreement).

Section 2.03.    Representations, Warranties and Covenants of the Master Servicer and the Depositor.

(a)    The Master Servicer hereby represents and warrants to the Trustee for the benefit of the Certificateholders and the Insurer that:

(i)    The Master Servicer is a corporation duly organized, validly existing and in good standing under the laws governing its creation and existence and is or will be in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan in accordance with the terms of this Agreement;

(ii)    The execution and delivery of this Agreement by the Master Servicer and its performance and compliance with the terms of this Agreement will not violate the Master Servicer's Certificate of Incorporation or Bylaws or constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which the Master Servicer is a party or which may be applicable to the Master Servicer or any of its assets;

(iii)    This Agreement, assuming due authorization, execution and delivery by the Trustee and the Depositor, constitutes a valid, legal and binding obligation of the Master Servicer, enforceable against it in accordance with the terms hereof subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law;

CONFIDENTIAL                                    RC_FGIC9019_00031432

(iv)    The Master Servicer is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Master Servicer or its properties or might have consequences that would materially adversely affect its performance hereunder;

(v)    No litigation is pending or, to the best of the Master Servicer's knowledge, threatened against the Master Servicer which would prohibit its entering into this Agreement or performing its obligations under this Agreement;

(vi)    The Master Servicer shall comply in all material respects in the performance of this Agreement with all reasonable rules and requirements of each insurer under each Required Insurance Policy;

(vii)    No information, certificate of an officer, statement furnished in writing or report delivered to the Depositor, any Affiliate of the Depositor or the Trustee by the Master Servicer will, to the knowledge of the Master Servicer, contain any untrue statement of a material fact or omit a material fact necessary to make the information, certificate, statement or report not misleading;

(viii)    The Master Servicer has examined each existing, and will examine each new, Subservicing Agreement and is or will be familiar with the terms thereof. The terms of each existing Subservicing Agreement and each designated Subservicer are acceptable to the Master Servicer and any new Subservicing Agreements will comply with the provisions of Section 3.02; and

(ix)    The Master Servicer is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS.

It is understood and agreed that the representations and warranties set forth in this Section 2.03(a) shall survive delivery of the respective Mortgage Files to the Trustee or any Custodian. Upon discovery by either the Depositor, the Master Servicer, the Insurer, the Trustee or any Custodian of a breach of any representation or warranty set forth in this Section 2.03(a) which materially and adversely affects the interests of the Certificateholders or the Insurer in any Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties (any Custodian being so obligated under a Custodial Agreement). Within 90 days of its discovery or its receipt of notice of such breach, the Master Servicer shall either (i) cure such breach in all material respects or (ii) to the extent that such breach is with respect to a Mortgage Loan or a related document, purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in the manner set forth in Section 2.02; provided that if the breach would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or repurchase must occur within 90 days from the date such breach was discovered. The obligation of the Master Servicer to cure such breach or to so purchase such Mortgage Loan shall constitute the sole remedy in respect of a breach of a representation and warranty set forth in this Section 2.03(a) available to the Certificateholders or the Trustee on

CONFIDENTIAL                                                        RC_FGIC9019_00031433

behalf of the Certificateholders (except for the Insurer's rights under Section 3.03 of the Insurance Agreement).

(b)    The Depositor hereby represents and warrants to the Trustee for the benefit of the Certificateholders and the Insurer that as of the Closing Date (or, if otherwise specified below, as of the date so specified): (i) the information set forth in Exhibit G-1 and Exhibit G-2 hereto with respect to each Mortgage Loan or the Mortgage Loans, as the case may be, is true and correct in all material respects at the respective date or dates which such information is furnished; (ii) immediately prior to the conveyance of the Mortgage Loans to the Trustee, the Depositor had good title to, and was the sole owner of, each Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest (other than rights to servicing and related compensation) and such conveyance validly transfers ownership of the Mortgage Loans to the Trustee free and clear of any pledge, lien, encumbrance or security interest; and (iii) each Mortgage Loan constitutes a qualified mortgage under Section 860G(a)(3)(A) of the Code and Treasury Regulations Section 1.860G-2(a)(1).

It is understood and agreed that the representations and warranties set forth in this Section 2.03(b) shall survive delivery of the respective Mortgage Files to the Trustee or any Custodian.

Upon discovery by any of the Depositor, the Master Servicer, the Insurer, the Trustee or any Custodian of a breach of any of the representations and warranties set forth in this Section 2.03(b) which materially and adversely affects the interests of the Certificateholders or the Insurer in any Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties (including the Insurer) (any Custodian being so obligated under a Custodial Agreement); *provided, however*, that in the event of a breach of the representation and warranty set forth in Section 2.03(b)(iii), the party discovering such breach shall give such notice within five days of discovery. Within 90 days of its discovery or its receipt of notice of breach, the Depositor shall either (i) cure such breach in all material respects or (ii) purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in the manner set forth in Section 2.02; provided that the Depositor shall have the option to substitute a Qualified Substitute Mortgage Loan or Loans for such Mortgage Loan if such substitution occurs within two years following the Closing Date; provided that if the omission or defect would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure, substitution or repurchase must occur within 90 days from the date such breach was discovered. Any such substitution shall be effected by the Depositor under the same terms and conditions as provided in Section 2.04 for substitutions by Residential Funding. It is understood and agreed that the obligation of the Depositor to cure such breach or to so purchase or substitute for any Mortgage Loan as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such breach available to the Certificateholders (other than the Insurer) or the Trustee on behalf of the Certificateholders. Notwithstanding the foregoing, the Depositor shall not be required to cure breaches or purchase or substitute for Mortgage Loans as provided in this Section 2.03(b) if the substance of the breach of a representation set forth above also constitutes fraud in the origination of the Mortgage Loan.

CONFIDENTIAL                                                    RC_FGIC9019_00031434

Section 2.04.    Representations and Warranties of Residential Funding.

The Depositor, as assignee of Residential Funding under the Assignment Agreement, hereby assigns to the Trustee for the benefit of the Certificateholders and the Insurer all of its right, title and interest in respect of the Assignment Agreement applicable to a Mortgage Loan. Insofar as the Assignment Agreement relates to the representations and warranties made by Residential Funding in respect of such Mortgage Loan and any remedies provided thereunder for any breach of such representations and warranties, such right, title and interest may be enforced by the Master Servicer on behalf of the Trustee, the Insurer and the Certificateholders.

Upon the discovery by the Depositor, the Master Servicer, the Insurer, the Trustee or any Custodian of a breach of any of the representations and warranties made in the Assignment Agreement in respect of any Mortgage Loan or of any Repurchase Event which materially and adversely affects the interests of the Certificateholders or the Insurer in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties (including the Insurer) (any Custodian being so obligated under a Custodial Agreement). The Master Servicer shall promptly notify Residential Funding of such breach or Repurchase Event and request that Residential Funding either (i) cure such breach or Repurchase Event in all material respects within 90 days from the date the Master Servicer was notified of such breach or Repurchase Event or (ii) purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in the manner set forth in Section 2.02; provided that, in the case of a breach or Repurchase Event under the Assignment Agreement, Residential Funding shall have the option to substitute a Qualified Substitute Mortgage Loan or Loans for such Mortgage Loan if such substitution occurs within two years following the Closing Date; provided that if the breach would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or substitution must occur within 90 days from the date the breach was discovered. If the breach of representation and warranty that gave rise to the obligation to repurchase or substitute a Mortgage Loan pursuant to Section 4 of the Assignment Agreement was the representation and warranty set forth in clause (bb) of Section 4 thereof, then the Master Servicer shall request that Residential Funding pay to the Trust Fund, concurrently with and in addition to the remedies provided in the preceding sentence, an amount equal to any liability, penalty or expense that was actually incurred and paid out of or on behalf of the Trust Fund, and that directly resulted from such breach, or if incurred and paid by the Trust Fund thereafter, concurrently with such payment. In the event that Residential Funding elects to substitute a Qualified Substitute Mortgage Loan or Loans for a Deleted Mortgage Loan pursuant to this Section 2.04, Residential Funding shall deliver to the Trustee for the benefit of the Certificateholders and the Insurer with respect to such Qualified Substitute Mortgage Loan or Loans, the original Mortgage Note, the Mortgage, an Assignment of the Mortgage in recordable form, and such other documents and agreements as are required by Section 2.01, with the Mortgage Note endorsed as required by Section 2.01. No substitution will be made in any calendar month after the Determination Date for such month. Monthly Payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution shall not be part of the Trust Fund and will be retained by the Master Servicer and remitted by the Master Servicer to Residential Funding on the next succeeding Distribution Date. For the month of substitution, distributions to the Certificateholders will include the Monthly Payment due on a Deleted Mortgage Loan for such month and thereafter Residential Funding shall be entitled to retain all amounts received in respect of such Deleted Mortgage Loan. The Master Servicer shall amend or

CONFIDENTIAL                                                          RC_FGIC9019_00031435

cause to be amended the Mortgage Loan Schedule for the benefit of the Certificateholders to reflect the removal of such Deleted Mortgage Loan and the substitution of the Qualified Substitute Mortgage Loan or Loans and the Master Servicer shall deliver the amended Mortgage Loan Schedule to the Trustee and the Custodian. Upon such substitution, the Qualified Substitute Mortgage Loan or Loans shall be subject to the terms of this Agreement and the related Subservicing Agreement in all respects, and Residential Funding shall be deemed to have made the representations and warranties with respect to the Qualified Substitute Mortgage Loan contained in Section 4 of the Assignment Agreement, as of the date of substitution, and the covenants, representations and warranties set forth in this Section 2.04, and in Section 2.03 hereof and in Section 4 of the Assignment Agreement, and the Master Servicer shall be obligated to repurchase or substitute for any Qualified Substitute Mortgage Loan as to which a Repurchase Event (as defined in the Assignment Agreement) has occurred pursuant to Section 4 of the Assignment Agreement.

In connection with the substitution of one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Master Servicer shall determine the amount (if any) by which the aggregate principal balance of all such Qualified Substitute Mortgage Loans as of the date of substitution is less than the aggregate Stated Principal Balance of all such Deleted Mortgage Loans (in each case after application of the principal portion of the Monthly Payments due in the month of substitution that are to be distributed to the Certificateholders in the month of substitution). Residential Funding shall deposit the amount of such shortfall into the Custodial Account on the day of substitution, without any reimbursement therefor. Residential Funding shall give notice in writing to the Trustee of such event, which notice shall be accompanied by an Officers' Certificate as to the calculation of such shortfall and (subject to Section 10.01(f)) by an Opinion of Counsel to the effect that such substitution will not cause (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code or (b) any portion of any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding.

It is understood and agreed that the obligation of Residential Funding to cure such breach or purchase (or substitute for) such Mortgage Loan as to which such a breach has occurred and is continuing and to make any additional payments required under the Assignment Agreement in connection with a breach of the representation and warranty in clause (bb) of Section 4 thereof shall constitute the sole remedy respecting such breach available to the Certificateholders (other than the Insurer) or the Trustee on behalf of the Certificateholders (other than the Insurer). If the Master Servicer is Residential Funding, then the Trustee shall also have the right and, upon the written direction of the Insurer, the obligation (i) to give the notification and require the purchase or substitution provided for in the second preceding paragraph in the event of such a breach of a representation or warranty made by Residential Funding in the Assignment Agreement or (ii) to give the notification and require the purchase or substitution provided for in Section 6 in the Assignment Agreement. In connection with the purchase of or substitution for any such Mortgage Loan by Residential Funding, the Trustee shall assign to Residential Funding all of the right, title and interest in respect of the Assignment Agreement applicable to such Mortgage Loan.

CONFIDENTIAL                                                        RC_FGIC9019_00031436

Section 2.05.  <u>Execution and Authentication of Certificates; Conveyance of REMIC Regular Interests</u>.

(a)    The Trustee acknowledges the assignment to it of the Mortgage Loans and the delivery of the Mortgage Files to it, or any Custodian on its behalf, subject to any exceptions noted, together with the assignment to it of all other assets included in the Trust Fund, receipt of which is hereby acknowledged. Concurrently with such delivery and in exchange therefor, the Trustee, pursuant to the written request of the Depositor executed by an officer of the Depositor, has executed and caused to be authenticated and delivered to or upon the order of the Depositor the Certificates in authorized denominations which evidence ownership of the entire Trust Fund.

(b)    The Depositor, as of the Closing Date, and concurrently with the execution and delivery hereof, does hereby assign without recourse all the right, title and interest of the Depositor in and to the Uncertificated REMIC I Regular Interests to the Trustee for the benefit of the holders of each Class of Certificates (other than the Class R-I Certificates).  The Trustee acknowledges receipt of the Uncertificated REMIC I Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future holders of each Class of Certificates (other than the Class R-I Certificates).

(c)    The Depositor concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the right, title and interest of the Depositor in and to the REMIC I Regular Interests, and the other assets of REMIC II for the benefit of the holders of the REMIC II Regular Interests and the Class R-II Certificates. The Trustee acknowledges receipt of the REMIC I Regular Interests (which are uncertificated) and the other assets of REMIC II and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the REMIC II Regular Interests and the Class R-II Certificates.

Section 2.06.  <u>Purposes and Powers of the Trust</u>.

The purpose of the trust, as created hereunder, is to engage in the following activities:

(a)    To sell the Certificates to the Depositor in exchange for the Mortgage Loans;

(b)    To enter into and perform its obligations under this Agreement, the Insurance Agreement and the Yield Maintenance Agreement;

(c)    To engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental hereto or connected therewith; and

(d)    Subject to compliance with this Agreement, to engage in such other activities as may be required in connection with conservation of  the Trust Fund and the making of distributions to the Certificateholders.

The trust is hereby authorized to engage in the foregoing activities. Notwithstanding the provisions of Section 11.01, the trust shall not engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Agreement while

CONFIDENTIAL                                                    RC_FGIC9019_00031437

any Certificate is outstanding, and this Section 2.06 may not be amended, without the consent of the Certificateholders evidencing a majority of the aggregate Voting Rights of the Certificates.

Section 2.07.    Agreement Regarding Ability to Disclose.

The Depositor, the Master Servicer and the Trustee hereby agree, notwithstanding any other express or implied agreement to the contrary, that any and all Persons, and any of their respective employees, representatives, and other agents may disclose, immediately upon commencement of discussions, to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to any of them relating to such tax treatment and tax structure. For purposes of this paragraph, the terms "tax treatment" and "tax structure" are defined under Treasury Regulation § 1.6011-4(c).

# ARTICLE III
## ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section 3.01.    Master Servicer to Act as Servicer.

(a)    The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and the respective Mortgage Loans, following such procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities, and shall have full power and authority, acting alone or through Subservicers as provided in Section 3.02, to do any and all things which it may deem necessary or desirable in connection with such servicing and administration. Without limiting the generality of the foregoing, the Master Servicer in its own name or in the name of a Subservicer is hereby authorized and empowered by the Trustee when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment, to execute and deliver, on behalf of the Certificateholders and the Trustee or any of them, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, or of consent to assumption or modification in connection with a proposed conveyance, or of assignment of any Mortgage and Mortgage Note in connection with the repurchase of a Mortgage Loan and all other comparable instruments, or with respect to the modification or re-recording of a Mortgage for the purpose of correcting the Mortgage, the subordination of the lien of the Mortgage in favor of a public utility company or government agency or unit with powers of eminent domain, the taking of a deed in lieu of foreclosure, the commencement, prosecution or completion of judicial or non-judicial foreclosure, the conveyance of a Mortgaged Property to the related insurer, the acquisition of any property acquired by foreclosure or deed in lieu of foreclosure, or the management, marketing and conveyance of any property acquired by foreclosure or deed in lieu of foreclosure with respect to the Mortgage Loans and with respect to the Mortgaged Properties. The Master Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, in its own name or in the name of the Subservicer, when the Master Servicer or the Subservicer, as the case may be, believes it is appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in

CONFIDENTIAL                                    RC_FGIC9019_00031438

the name of MERS, solely as nominee for the Trustee and its successors and assigns. Any expenses incurred in connection with the actions described in the preceding sentence shall be borne by the Master Servicer in accordance with Section 3.16(c), with no right of reimbursement; provided, that if, as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS® System, it becomes necessary to remove any Mortgage Loan from registration on the MERS® System and to arrange for the assignment of the related Mortgages to the Trustee, then any related expenses shall be reimbursable to the Master Servicer as set forth in Section 3.10(a)(ii). Notwithstanding the foregoing, subject to Section 3.07(a), the Master Servicer shall not permit any modification with respect to any Mortgage Loan that would both constitute a sale or exchange of such Mortgage Loan within the meaning of Section 1001 of the Code and any proposed, temporary or final regulations promulgated thereunder (other than in connection with a proposed conveyance or assumption of such Mortgage Loan that is treated as a Principal Prepayment in Full pursuant to Section 3.13(d) hereof) and cause any REMIC created hereunder to fail to qualify as a REMIC under the Code. The Trustee shall furnish the Master Servicer with any powers of attorney and other documents necessary or appropriate to enable the Master Servicer to service and administer the Mortgage Loans. The Trustee shall not be liable for any action taken by the Master Servicer or any Subservicer pursuant to such powers of attorney or other documents. In servicing and administering any Nonsubserviced Mortgage Loan, the Master Servicer shall, to the extent not inconsistent with this Agreement, comply with the Program Guide as if it were the originator of such Mortgage Loan and had retained the servicing rights and obligations in respect thereof.

If the Mortgage relating to a Mortgage Loan did not have a lien senior to the Mortgage Loan on the related Mortgaged Property as of the Cut-off Date, then the Master Servicer, in such capacity, may not consent to the placing of a lien senior to that of the Mortgage on the related Mortgaged Property. If the Mortgage relating to a Mortgage Loan had a lien senior to the Mortgage Loan on the related Mortgaged Property as of the Cut-off Date, then the Master Servicer, in such capacity, may consent to the refinancing of the prior senior lien, provided that the following requirements are met:

(i)     (A)     the Mortgagor's debt-to-income ratio resulting from such refinancing is less than the original debt-to-income ratio as set forth on the Mortgage Loan Schedule; provided, however, that in no instance shall the resulting Loan-to-Value Ratio of such Mortgage Loan be higher than that permitted by the Program Guide; or

(B)     the resulting Loan-to-Value Ratio of such Mortgage Loan is no higher than the Loan-to-Value Ratio prior to such refinancing; provided, however, if such refinanced mortgage loan is a "rate and term" mortgage loan (meaning, the Mortgagor does not receive any cash from the refinancing), the Loan-to-Value Ratio may increase to the extent of either (x) the reasonable closing costs of such refinancing or (y) any decrease in the value of the related Mortgaged Property, if the Mortgagor is in good standing as defined by the Program Guide;

(ii)     the interest rate, or, in the case of an adjustable rate existing senior lien, the maximum interest rate, for the loan evidencing the refinanced senior lien is no more than 2.0% higher than the interest rate or the maximum interest rate, as the case may be, on the loan evidencing the existing senior lien immediately prior to the date of such refinancing; provided,

CONFIDENTIAL                                                                    RC_FGIC9019_00031439

however (A) if the loan evidencing the existing senior lien prior to the date of refinancing has an adjustable rate and the loan evidencing the refinanced senior lien has a fixed rate, then the current interest rate on the loan evidencing the refinanced senior lien may be up to 2.0% higher than the then-current loan rate of the loan evidencing the existing senior lien and (B) if the loan evidencing the existing senior lien prior to the date of refinancing has a fixed rate and the loan evidencing the refinanced senior lien has an adjustable rate, then the maximum interest rate on the loan evidencing the refinanced senior lien shall be less than or equal to (x) the interest rate on the loan evidencing the existing senior lien prior to the date of refinancing plus (y) 2.0%; and

       (iii)    the loan evidencing the refinanced senior lien is not subject to negative amortization.

    (b)    The Master Servicer shall, to the extent consistent with the servicing standards set forth herein, take whatever actions as may be necessary to file a claim under or enforce or allow the Trustee to file a claim under or enforce any title insurance policy with respect to any Mortgage Loan including, without limitation, joining in or causing any Subservicer (or any other party in possession of any title insurance policy) to join in any claims process, negotiations, actions or proceedings necessary to make a claim under or enforce any title insurance policy. Notwithstanding anything in this Agreement to the contrary, the Master Servicer shall not (unless the Mortgagor is in default with respect to the Mortgage Loan or such default is, in the judgment of the Master Servicer, reasonably foreseeable) make or permit any modification, waiver, or amendment of any term of any Mortgage Loan that would both (i) effect an exchange or reissuance of such Mortgage Loan under Section 1001 of the Code (or final, temporary or proposed Treasury regulations promulgated thereunder) (other than in connection with a proposed conveyance or assumption of such Mortgage Loan that is treated as a Principal Prepayment in Full pursuant to Section 3.13(d) hereof) and cause any REMIC created hereunder to fail to qualify as a REMIC under the Code or the imposition of any tax on "prohibited transactions" or "contributions" after the startup date under the REMIC Provisions.

    (c)    In connection with servicing and administering the Mortgage Loans, the Master Servicer and any Affiliate of the Master Servicer (i) may perform services such as appraisals and brokerage services that are customarily provided by Persons other than servicers of mortgage loans, and shall be entitled to reasonable compensation therefor in accordance with Section 3.10 and (ii) may, at its own discretion and on behalf of the Trustee, obtain credit information in the form of a "credit score" from a credit repository.

    (d)    All costs incurred by the Master Servicer or by Subservicers in effecting the timely payment of taxes and assessments on the properties subject to the Mortgage Loans shall not, for the purpose of calculating monthly distributions to the Certificateholders, be added to the amount owing under the related Mortgage Loans, notwithstanding that the terms of such Mortgage Loan so permit, and such costs shall be recoverable to the extent permitted by Section 3.10(a)(ii).

    (e)    The Master Servicer may enter into one or more agreements in connection with the offering of pass-through certificates evidencing interests in one or more of the Certificates providing for the payment by the Master Servicer of amounts received by the Master Servicer as servicing compensation hereunder and required to cover certain Prepayment Interest Shortfalls

CONFIDENTIAL          RC_FGIC9019_00031440

on the Mortgage Loans, which payment obligation will thereafter be an obligation of the Master Servicer hereunder.

(f)    The relationship of the Master Servicer (and of any successor to the Master Servicer) to the Depositor under this Agreement is intended by the parties to be that of an independent contractor and not that of a joint venturer, partner or agent.

Section 3.02.    Subservicing Agreements Between Master Servicer and Subservicers; Enforcement of Subservicers' Obligations.

(a)    The Master Servicer may continue in effect Subservicing Agreements entered into by Residential Funding and Subservicers prior to the execution and delivery of this Agreement, and may enter into new Subservicing Agreements with Subservicers, for the servicing and administration of all or some of the Mortgage Loans. Each Subservicer shall be either (i) an institution the accounts of which are insured by the FDIC or (ii) another entity that engages in the business of originating or servicing mortgage loans, and in either case shall be authorized to transact business in the state or states in which the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Subservicer to perform its obligations hereunder and under the Subservicing Agreement, and in either case shall be a Freddie Mac, Fannie Mae or HUD approved mortgage servicer. In addition, any Subservicer of a Mortgage Loan insured by the FHA must be an FHA-approved servicer, and any Subservicer of a Mortgage Loan guaranteed by the VA must be a VA-approved servicer. Each Subservicer of a Mortgage Loan shall be entitled to receive and retain, as provided in the related Subservicing Agreement and in Section 3.07, the related Subservicing Fee from payments of interest received on such Mortgage Loan after payment of all amounts required to be remitted to the Master Servicer in respect of such Mortgage Loan. For any Mortgage Loan that is a Nonsubserviced Mortgage Loan, the Master Servicer shall be entitled to receive and retain an amount equal to the Subservicing Fee from payments of interest. Unless the context otherwise requires, references in this Agreement to actions taken or to be taken by the Master Servicer in servicing the Mortgage Loans include actions taken or to be taken by a Subservicer on behalf of the Master Servicer. Each Subservicing Agreement will be upon such terms and conditions as are generally required by, permitted by or consistent with the Program Guide and are not inconsistent with this Agreement and as the Master Servicer and the Subservicer have agreed. With the approval of the Master Servicer, a Subservicer may delegate its servicing obligations to third-party servicers, but such Subservicer will remain obligated under the related Subservicing Agreement. The Master Servicer and a Subservicer may enter into amendments thereto or a different form of Subservicing Agreement, and the form referred to or included in the Program Guide is merely provided for information and shall not be deemed to limit in any respect the discretion of the Master Servicer to modify or enter into different Subservicing Agreements; *provided, however*, that any such amendments or different forms shall be consistent with and not violate the provisions of either this Agreement or the Program Guide in a manner which would materially and adversely affect the interests of the Certificateholders or the Insurer. The Program Guide and any other Subservicing Agreement entered into between the Master Servicer and any Subservicer shall require the Subservicer to accurately and fully report its borrower credit files to each of the Credit Repositories in a timely manner.

CONFIDENTIAL    RC_FGIC9019_00031441

(b)      As part of its servicing activities hereunder, the Master Servicer, for the benefit of the Trustee, the Insurer and the Certificateholders, shall use its best reasonable efforts to enforce the obligations of each Subservicer under the related Subservicing Agreement, to the extent that the non-performance of any such obligation would have a material and adverse effect on a Mortgage Loan, including, without limitation, the obligation to purchase a Mortgage Loan on account of defective documentation, as described in Section 2.02, or on account of a breach of a representation or warranty, as described in Section 2.04. Such enforcement, including, without limitation, the legal prosecution of claims, termination of Subservicing Agreements, as appropriate, and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities. The Master Servicer shall pay the costs of such enforcement at its own expense, and shall be reimbursed therefor only (i) from a general recovery resulting from such enforcement to the extent, if any, that such recovery exceeds all amounts due in respect of the related Mortgage Loan or (ii) from a specific recovery of costs, expenses or attorneys' fees against the party against whom such enforcement is directed. For purposes of clarification only, the parties agree that the foregoing is not intended to, and does not, limit the ability of the Master Servicer to be reimbursed for expenses that are incurred in connection with the enforcement of a Seller's obligations and are reimbursable pursuant to Section 3.10(a)(viii).

Section 3.03.    Successor Subservicers.

The Master Servicer shall be entitled to terminate any Subservicing Agreement that may exist in accordance with the terms and conditions of such Subservicing Agreement and without any limitation by virtue of this Agreement; *provided, however*, that in the event of termination of any Subservicing Agreement by the Master Servicer or the Subservicer, the Master Servicer shall either act as servicer of the related Mortgage Loan or enter into a Subservicing Agreement with a successor Subservicer which will be bound by the terms of the related Subservicing Agreement. If the Master Servicer or any Affiliate of Residential Funding acts as servicer, it will not assume liability for the representations and warranties of the Subservicer which it replaces. If the Master Servicer enters into a Subservicing Agreement with a successor Subservicer, the Master Servicer shall use reasonable efforts to have the successor Subservicer assume liability for the representations and warranties made by the terminated Subservicer in respect of the related Mortgage Loans and, in the event of any such assumption by the successor Subservicer, the Master Servicer may, in the exercise of its business judgment, release the terminated Subservicer from liability for such representations and warranties.

Section 3.04.    Liability of the Master Servicer.

Notwithstanding any Subservicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Master Servicer or a Subservicer or reference to actions taken through a Subservicer or otherwise, the Master Servicer shall remain obligated and liable to the Trustee, the Insurer and Certificateholders for the servicing and administering of the Mortgage Loans in accordance with the provisions of Section 3.01 without diminution of such obligation or liability by virtue of such Subservicing Agreements or arrangements or by virtue of indemnification from the Subservicer or the Depositor and to the same extent and under the same terms and conditions as if the Master Servicer alone were

5109327 05161514

CONFIDENTIAL

RC_FGIC9019_00031442

servicing and administering the Mortgage Loans. The Master Servicer shall be entitled to enter into any agreement with a Subservicer for indemnification of the Master Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

Section 3.05.    No Contractual Relationship Between Subservicer and Trustee, Insurer or Certificateholders.

Any Subservicing Agreement that may be entered into and any other transactions or services relating to the Mortgage Loans involving a Subservicer in its capacity as such and not as an originator shall be deemed to be between the Subservicer and the Master Servicer alone and the Trustee, the Insurer and Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Subservicer in its capacity as such except as set forth in Section 3.06. The foregoing provision shall not in any way limit a Subservicer's obligation to cure an omission or defect or to repurchase a Mortgage Loan as referred to in Section 2.02 hereof.

Section 3.06.    Assumption or Termination of Subservicing Agreements by Trustee.

(a)    In the event the Master Servicer shall for any reason no longer be the master servicer (including by reason of an Event of Default), the Trustee, as successor Master Servicer, its designee or its successor shall thereupon assume all of the rights and obligations of the Master Servicer under each Subservicing Agreement that may have been entered into. The Trustee, its designee or the successor servicer for the Trustee shall be deemed to have assumed all of the Master Servicer's interest therein and to have replaced the Master Servicer as a party to the Subservicing Agreement to the same extent as if the Subservicing Agreement had been assigned to the assuming party except that the Master Servicer shall not thereby be relieved of any liability or obligations under the Subservicing Agreement.

(b)    The Master Servicer shall, upon request of the Trustee but at the expense of the Master Servicer, deliver to the assuming party all documents and records relating to each Subservicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by it and otherwise use its best efforts to effect the orderly and efficient transfer of each Subservicing Agreement to the assuming party.

(c)    Unless an Insurer Default exists, the Master Servicer shall, if it is authorized to do so under the relevant Subservicing Agreement, upon request of the Insurer at a time when the Insurer may remove the Master Servicer under the terms hereof, terminate any Subservicing Agreement.

Section 3.07.    Collection of Certain Mortgage Loan Payments; Deposits to Custodial Account.

(a)    The Master Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any related Primary Insurance Policy, follow such collection procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities. Consistent with the foregoing, the Master Servicer may in its discretion (subject to the terms and

CONFIDENTIAL                                                        RC_FGIC9019_00031443

conditions of the Assignment Agreement) (i) waive any late payment charge or any prepayment charge or penalty interest in connection with the prepayment of a Mortgage Loan and (ii) extend the Due Date for payments due on a Mortgage Loan in accordance with the Program Guide, *provided, however*, that the Master Servicer shall first determine that any such waiver or extension will not impair the coverage of any related Primary Insurance Policy or materially adversely affect the lien of the related Mortgage. Notwithstanding anything in this Section to the contrary, the Master Servicer or any Subservicer shall not enforce any prepayment charge to the extent that such enforcement would violate any applicable law. In the event of any such arrangement, the Master Servicer shall make timely advances on the related Mortgage Loan during the scheduled period in accordance with the amortization schedule of such Mortgage Loan without modification thereof by reason of such arrangements unless otherwise agreed to by the Holders of the Classes of Certificates affected thereby; *provided, however*, that no such extension shall be made if any advance would be a Nonrecoverable Advance. Consistent with the terms of this Agreement, the Master Servicer may also waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Master Servicer's determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Certificateholders or the Insurer (taking into account any estimated Realized Loss that might result absent such action), *provided, however*, that the Master Servicer may not modify materially or permit any Subservicer to modify any Mortgage Loan, including without limitation any modification that would change the Mortgage Rate, forgive the payment of any principal or interest (unless in connection with the liquidation of the related Mortgage Loan or except in connection with prepayments to the extent that such reamortization is not inconsistent with the terms of the Mortgage Loan), capitalize any amounts owing on the Mortgage Loan by adding such amount to the outstanding principal balance of the Mortgage Loan, or extend the final maturity date of such Mortgage Loan, unless such Mortgage Loan is in default or, in the judgment of the Master Servicer, such default is reasonably foreseeable. For purposes of delinquency calculations, any capitalized Mortgage Loan shall be deemed to be current as of the date of the related Servicing Modification. No such modification shall reduce the Mortgage Rate (i) with respect to a fixed rate Mortgage Loan, (A) below one-half of the Mortgage Rate as in effect on the Cut-off Date or (B) below the sum of the rates at which the Servicing Fee, the Subservicing Fee and the Certificate Insurer Premium with respect to such Mortgage Loan accrue or (ii) with respect to an adjustable rate Mortgage Loan, (A) below the greater of (1) one-half of the Mortgage Rate as in effect on the Cut-off Date and (2) one-half of the Mortgage Rate as in effect on the date of the Servicing Modification or (B) below the sum of the rates at which the Servicing Fee, the Subservicing Fee and the Certificate Insurer Premium with respect to such Mortgage Loan accrue. The final maturity date for any Mortgage Loan shall not be extended beyond the Maturity Date. Also, the Stated Principal Balance of all Reportable Modified Mortgage Loans subject to Servicing Modifications (measured at the time of the Servicing Modification and after giving effect to any Servicing Modification) can be no more than five percent of the aggregate Cut-off Date Principal Balance of the Mortgage Loans, unless such limit is increased from time to time with the consent of the Rating Agencies and the Insurer. In addition, any amounts owing on a Mortgage Loan added to the outstanding principal balance of such Mortgage Loan must be fully amortized over the term of such Mortgage Loan, and such amounts may be added to the outstanding principal balance of a Mortgage Loan only once during the life of such Mortgage Loan. Also, the addition of such amounts described in the preceding

CONFIDENTIAL                                    RC_FGIC9019_00031444

sentence shall be implemented in accordance with the Program Guide and may be implemented only by Subservicers that have been approved by the Master Servicer for such purposes. In connection with any Curtailment of a Mortgage Loan, the Master Servicer, to the extent not inconsistent with the terms of the Mortgage Note and local law and practice, may permit the Mortgage Loan to be re-amortized such that the Monthly Payment is recalculated as an amount that will fully amortize the remaining Stated Principal Balance thereof by the original Maturity Date based on the original Mortgage Rate; provided, that such reamortization shall not be permitted if it would constitute a reissuance of the Mortgage Loan for federal income tax purposes.

(b)     The Master Servicer shall establish and maintain a Custodial Account in which the Master Servicer shall deposit or cause to be deposited on a daily basis, except as otherwise specifically provided herein, the following payments and collections remitted by Subservicers or received by it in respect of the Mortgage Loans subsequent to the Cut-off Date (other than in respect of Monthly Payments due before or in the month of the Cut-off Date):

(i)     All payments on account of principal, including Principal Prepayments made by Mortgagors on the Mortgage Loans and the principal component of any Subservicer Advance or of any REO Proceeds received in connection with an REO Property for which an REO Disposition has occurred;

(ii)    All payments on account of interest at the Adjusted Mortgage Rate on the Mortgage Loans, including the interest component of any Subservicer Advance or of any REO Proceeds received in connection with an REO Property for which an REO Disposition has occurred;

(iii)   Insurance Proceeds, Subsequent Recoveries and Liquidation Proceeds (net of any related expenses of the Subservicer);

(iv)    All proceeds of any Mortgage Loans purchased pursuant to Section 2.02, 2.03, 2.04, 4.07, 4.08 or 9.01 (including amounts received from Residential Funding pursuant to the last paragraph of Section 4 of the Assignment Agreement in respect of any liability, penalty or expense that resulted from a breach of the representation and warranty set forth in clause (bb) of Section 4 of the Assignment Agreement) and all amounts required to be deposited in connection with the substitution of a Qualified Substitute Mortgage Loan pursuant to Section 2.03 or 2.04; and

(v)     Any amounts required to be deposited pursuant to Section 3.07(c) and any payments or collections received in the nature of prepayment charges.

The foregoing requirements for deposit in the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments on the Mortgage Loans which are not part of the Trust Fund (consisting of Monthly Payments due before or in the month of the Cut-off Date) and payments or collections consisting of late payment charges or assumption fees may but need not be deposited by the Master Servicer in the Custodial Account. In the event any amount not required to be deposited in the Custodial Account is so deposited, the Master Servicer may at any time withdraw such amount from the

CONFIDENTIAL                                                    RC_FGIC9019_00031445

Custodial Account, any provision herein to the contrary notwithstanding. The Custodial Account may contain funds that belong to one or more trust funds created for mortgage pass-through certificates of other series and may contain other funds respecting payments on mortgage loans belonging to the Master Servicer or serviced or master serviced by it on behalf of others. Notwithstanding such commingling of funds, the Master Servicer shall keep records that accurately reflect the funds on deposit in the Custodial Account that have been identified by it as being attributable to the Mortgage Loans. With respect to Insurance Proceeds, Liquidation Proceeds, REO Proceeds, Subsequent Recoveries and the proceeds of the purchase of any Mortgage Loan pursuant to Sections 2.02, 2.03, 2.04, 4.07 and 4.08 received in any calendar month, the Master Servicer may elect to treat such amounts as included in the Available Distribution Amount for the Distribution Date in the month of receipt, but is not obligated to do so. If the Master Servicer so elects, such amounts will be deemed to have been received (and any related Realized Loss shall be deemed to have occurred) on the last day of the month prior to the receipt thereof.

(c)    The Master Servicer shall use its best efforts to cause the institution maintaining the Custodial Account to invest the funds in the Custodial Account attributable to the Mortgage Loans in Permitted Investments which shall mature not later than the Certificate Account Deposit Date next following the date of such investment (with the exception of the Amount Held for Future Distribution) and which shall not be sold or disposed of prior to their maturities. All income and gain realized from any such investment shall be for the benefit of the Master Servicer as additional servicing compensation and shall be subject to its withdrawal or order from time to time. The amount of any losses incurred in respect of any such investments attributable to the investment of amounts in respect of the Mortgage Loans shall be deposited in the Custodial Account by the Master Servicer out of its own funds immediately as realized.

(d)    The Master Servicer shall give written notice to the Trustee, the Insurer and the Depositor of any change in the location of the Custodial Account and the location of the Certificate Account prior to the use thereof.

Section 3.08.    Subservicing Accounts; Servicing Accounts.

(a)    In those cases where a Subservicer is servicing a Mortgage Loan pursuant to a Subservicing Agreement, the Master Servicer shall cause the Subservicer, pursuant to the Subservicing Agreement, to establish and maintain one or more Subservicing Accounts which shall be an Eligible Account or, if such account is not an Eligible Account, shall generally satisfy the requirements of the Program Guide and be otherwise acceptable to the Master Servicer, the Insurer and each Rating Agency. The Subservicer will be required thereby to deposit into the Subservicing Account on a daily basis all proceeds of Mortgage Loans received by the Subservicer, less its Subservicing Fees and unreimbursed advances and expenses, to the extent permitted by the Subservicing Agreement. If the Subservicing Account is not an Eligible Account, the Master Servicer shall be deemed to have received such monies upon receipt thereof by the Subservicer. The Subservicer shall not be required to deposit in the Subservicing Account payments or collections in the nature of late charges or assumption fees, or payments or collections received in the nature of prepayment charges to the extent that the Subservicer is entitled to retain such amounts pursuant to the Subservicing Agreement. On or before the date specified in the Program Guide, but in no event later than the Determination Date, the Master

CONFIDENTIAL                                                    RC_FGIC9019_00031446

Servicer shall cause the Subservicer, pursuant to the Subservicing Agreement, to remit to the Master Servicer for deposit in the Custodial Account all funds held in the Subservicing Account with respect to each Mortgage Loan serviced by such Subservicer that are required to be remitted to the Master Servicer. The Subservicer will also be required, pursuant to the Subservicing Agreement, to advance on such scheduled date of remittance amounts equal to any scheduled monthly installments of principal and interest less its Subservicing Fees on any Mortgage Loans for which payment was not received by the Subservicer. This obligation to advance with respect to each Mortgage Loan will continue up to and including the first of the month following the date on which the related Mortgaged Property is sold at a foreclosure sale or is acquired by the Trust Fund by deed in lieu of foreclosure or otherwise. All such advances received by the Master Servicer shall be deposited promptly by it in the Custodial Account.

(b)   The Subservicer may also be required, pursuant to the Subservicing Agreement, to remit to the Master Servicer for deposit in the Custodial Account interest at the Adjusted Mortgage Rate (or Modified Net Mortgage Rate plus the rate per annum at which the Servicing Fee accrues in the case of a Modified Mortgage Loan and the Certificate Insurer Premium Modified Rate) on any Curtailment received by such Subservicer in respect of a Mortgage Loan from the related Mortgagor during any month that is to be applied by the Subservicer to reduce the unpaid principal balance of the related Mortgage Loan as of the first day of such month, from the date of application of such Curtailment to the first day of the following month. Any amounts paid by a Subservicer pursuant to the preceding sentence shall be for the benefit of the Master Servicer as additional servicing compensation and shall be subject to its withdrawal or order from time to time pursuant to Sections 3.10(a)(iv) and (v).

(c)   In addition to the Custodial Account and the Certificate Account, the Master Servicer shall for any Nonsubserviced Mortgage Loan, and shall cause the Subservicers for Subserviced Mortgage Loans to, establish and maintain one or more Servicing Accounts and deposit and retain therein all collections from the Mortgagors (or advances from Subservicers) for the payment of taxes, assessments, hazard insurance premiums, Primary Insurance Policy premiums, if applicable, or comparable items for the account of the Mortgagors. Each Servicing Account shall satisfy the requirements for a Subservicing Account and, to the extent permitted by the Program Guide or as is otherwise acceptable to the Master Servicer, may also function as a Subservicing Account. Withdrawals of amounts related to the Mortgage Loans from the Servicing Accounts may be made only to effect timely payment of taxes, assessments, hazard insurance premiums, Primary Insurance Policy premiums, if applicable, or comparable items, to reimburse the Master Servicer or Subservicer out of related collections for any payments made pursuant to Sections 3.11 (with respect to the Primary Insurance Policy) and 3.12(a) (with respect to hazard insurance), to refund to any Mortgagors any sums as may be determined to be overages, to pay interest, if required, to Mortgagors on balances in the Servicing Account or to clear and terminate the Servicing Account at the termination of this Agreement in accordance with Section 9.01 or in accordance with the Program Guide. As part of its servicing duties, the Master Servicer shall, and the Subservicers will, pursuant to the Subservicing Agreements, be required to pay to the Mortgagors interest on funds in this account to the extent required by law.

(d)   The Master Servicer shall advance the payments referred to in the preceding subsection that are not timely paid by the Mortgagors or advanced by the Subservicers on the date when the tax, premium or other cost for which such payment is intended is due, but the

CONFIDENTIAL                                                          RC_FGIC9019_00031447

Master Servicer shall be required so to advance only to the extent that such advances, in the good faith judgment of the Master Servicer, will be recoverable by the Master Servicer out of Insurance Proceeds, Liquidation Proceeds or otherwise.

Section 3.09.   <u>Access to Certain Documentation and Information Regarding the Mortgage Loans</u>.

In the event that compliance with this Section 3.09 shall make any Class of Certificates legal for investment by federally insured savings and loan associations, the Master Servicer shall provide, or cause the Subservicers to provide, to the Trustee, the Office of Thrift Supervision or the FDIC and the supervisory agents and examiners thereof access to the documentation regarding the Mortgage Loans required by applicable regulations of the Office of Thrift Supervision, such access being afforded without charge but only upon reasonable request and during normal business hours at the offices designated by the Master Servicer. The Master Servicer shall permit such representatives to photocopy any such documentation and shall provide equipment for that purpose at a charge reasonably approximating the cost of such photocopying to the Master Servicer.

Section 3.10.   <u>Permitted Withdrawals from the Custodial Account</u>.

(a)      The Master Servicer may, from time to time as provided herein, make withdrawals from the Custodial Account of amounts on deposit therein pursuant to Section 3.07 that are attributable to the Mortgage Loans for the following purposes:

(i)      to remit to the Trustee for deposit into the Certificate Account in the amounts and in the manner provided for in Section 4.01;

(ii)      to reimburse itself or the related Subservicer for previously unreimbursed Advances, Servicing Advances or other expenses made pursuant to Sections 3.01, 3.07(a) 3.08, 3.11, 3.12(a), 3.14 and 4.04 or otherwise reimbursable pursuant to the terms of this Agreement, such withdrawal right being limited to amounts received on the related Mortgage Loans (including, for this purpose, REO Proceeds, Insurance Proceeds, Liquidation Proceeds and proceeds from the purchase of a Mortgage Loan pursuant to Section 2.02, 2.03, 2.04, 4.07, 4.08 or 9.01) which represent (A) Late Collections of Monthly Payments for which any such advance was made in the case of Subservicer Advances or Advances pursuant to Section 4.04 and (B) late recoveries of the payments for which such advances were made in the case of Servicing Advances;

(iii)      to pay to itself or the related Subservicer (if not previously retained by such Subservicer) out of each payment received by the Master Servicer on account of interest on a Mortgage Loan as contemplated by Sections 3.14 and 3.16, an amount equal to that remaining portion of any such payment as to interest (but not in excess of the Servicing Fee and the Subservicing Fee, if not previously retained) which, when deducted, will result in the remaining amount of such interest being interest at a rate per annum equal to the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) plus the Certificate Insurer Premium Modified Rate on the amount specified in the amortization schedule of the related Mortgage Loan as the

CONFIDENTIAL                                                           RC_FGIC9019_00031448

principal balance thereof at the beginning of the period respecting which such interest was paid after giving effect to any previous Curtailments;

(iv)    to pay to itself as additional servicing compensation any interest or investment income earned on funds deposited in the Custodial Account that it is entitled to withdraw pursuant to Section 3.07(c);

(v)    to pay to itself as additional servicing compensation any Foreclosure Profits, and any amounts remitted by Subservicers as interest in respect of Curtailments pursuant to Section 3.08(b);

(vi)    to pay to itself, a Subservicer, Residential Funding, the Depositor or any other appropriate Person, as the case may be, with respect to each Mortgage Loan or property acquired in respect thereof that has been purchased or otherwise transferred pursuant to Section 2.02, 2.03, 2.04, 4.07, 4.08 or 9.01, all amounts received thereon and not required to be distributed to Certificateholders as of the date on which the related Stated Principal Balance or Purchase Price is determined;

(vii)    to reimburse itself or the related Subservicer for any Nonrecoverable Advance or Advances in the manner and to the extent provided in subsection (c) below, and any Advance or Servicing Advance made in connection with a modified Mortgage Loan that is in default or, in the judgment of the Master Servicer, default is reasonably foreseeable pursuant to Section 3.07(a), to the extent the amount of the Advance or Servicing Advance was added to the Stated Principal Balance of the Mortgage Loan in the preceding calendar month;

(viii)    to reimburse itself or the Depositor for expenses incurred by and reimbursable to it or the Depositor pursuant to Section 3.14(c), 6.03, 10.01 or otherwise;

(ix)    to reimburse itself for amounts expended by it (a) pursuant to Section 3.14 in good faith in connection with the restoration of property damaged by an Uninsured Cause, and (b), in connection with the liquidation of a Mortgage Loan or disposition of an REO Property to the extent not otherwise reimbursed pursuant to clause (ii) or (viii) above; and

(x)    to withdraw any amount deposited in the Custodial Account that was not required to be deposited therein pursuant to Section 3.07, including any payoff fees or penalties or any other additional amounts payable to the Master Servicer or Subservicer pursuant to the terms of the Mortgage Note.

(b)    Since, in connection with withdrawals pursuant to clauses (ii), (iii), (v) and (vi), the Master Servicer's entitlement thereto is limited to collections or other recoveries on the related Mortgage Loan, the Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Custodial Account pursuant to such clauses.

(c)    The Master Servicer shall be entitled to reimburse itself or the related Subservicer for any advance made in respect of a Mortgage Loan that the Master Servicer determines to be a

CONFIDENTIAL                                                      RC_FGIC9019_00031449

Nonrecoverable Advance by withdrawal from the Custodial Account of amounts on deposit therein attributable to the Mortgage Loans on any Certificate Account Deposit Date succeeding the date of such determination. Such right of reimbursement in respect of a Nonrecoverable Advance relating to an Advance made pursuant to Section 4.04 on any such Certificate Account Deposit Date shall be limited to an amount not exceeding the portion of such advance previously paid to Certificateholders (and not theretofore reimbursed to the Master Servicer or the related Subservicer).

Section 3.11.    Maintenance of Primary Insurance Coverage.

(a)    The Master Servicer shall not take, or permit any Subservicer to take, any action which would result in noncoverage under any applicable Primary Insurance Policy of any loss which, but for the actions of the Master Servicer or Subservicer, would have been covered thereunder. To the extent coverage is available, the Master Servicer shall keep or cause to be kept in full force and effect each such Primary Insurance Policy until the principal balance of the related Mortgage Loan secured by a Mortgaged Property is reduced to 80% or less of the Appraised Value at origination in the case of such a Mortgage Loan having a Loan-to-Value Ratio at origination in excess of 80%, provided that such Primary Insurance Policy was in place as of the Cut-off Date and the Master Servicer had knowledge of such Primary Insurance Policy. The Master Servicer shall not cancel or refuse to renew any such Primary Insurance Policy applicable to a Nonsubserviced Mortgage Loan, or consent to any Subservicer canceling or refusing to renew any such Primary Insurance Policy applicable to a Mortgage Loan subserviced by it, that is in effect at the date of the initial issuance of the Certificates and is required to be kept in force hereunder unless the replacement Primary Insurance Policy for such canceled or non-renewed policy is maintained with an insurer whose claims-paying ability is acceptable to each Rating Agency for mortgage pass-through certificates having a rating equal to or better than the lower of the then-current rating or the rating assigned to the Certificates as of the Closing Date by such Rating Agency.

(b)    In connection with its activities as administrator and servicer of the Mortgage Loans, the Master Servicer agrees to present or to cause the related Subservicer to present, on behalf of the Master Servicer, the Subservicer, if any, the Trustee, the Insurer and Certificateholders, claims to the insurer under any Primary Insurance Policies, in a timely manner in accordance with such policies, and, in this regard, to take or cause to be taken such reasonable action as shall be necessary to permit recovery under any Primary Insurance Policies respecting defaulted Mortgage Loans. Pursuant to Section 3.07, any Insurance Proceeds collected by or remitted to the Master Servicer under any Primary Insurance Policies shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 3.10.

Section 3.12.    Maintenance of Fire Insurance and Omissions and Fidelity Coverage.

(a)    The Master Servicer shall cause to be maintained for each Mortgage Loan fire insurance with extended coverage in an amount which is equal to the lesser of the principal balance owing on such Mortgage Loan (together with the principal balance of any mortgage loan secured by a lien that is senior to the Mortgage Loan) or 100 percent of the insurable value of the improvements; *provided, however*, that such coverage may not be less than the minimum amount required to fully compensate for any loss or damage on a replacement cost basis. To the extent it

CONFIDENTIAL                                                              RC_FGIC9019_00031450

may do so without breaching the related Subservicing Agreement, the Master Servicer shall replace any Subservicer that does not cause such insurance, to the extent it is available, to be maintained. The Master Servicer shall also cause to be maintained on property acquired upon foreclosure, or deed in lieu of foreclosure, of any Mortgage Loan, fire insurance with extended coverage in an amount which is at least equal to the amount necessary to avoid the application of any co-insurance clause contained in the related hazard insurance policy. Pursuant to Section 3.07, any amounts collected by the Master Servicer under any such policies (other than amounts to be applied to the restoration or repair of the related Mortgaged Property or property thus acquired or amounts released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures) shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 3.10. Any cost incurred by the Master Servicer in maintaining any such insurance shall not, for the purpose of calculating monthly distributions to Certificateholders, be added to the amount owing under the Mortgage Loan, notwithstanding that the terms of the Mortgage Loan so permit. Such costs shall be recoverable by the Master Servicer out of related late payments by the Mortgagor or out of Insurance Proceeds and Liquidation Proceeds to the extent permitted by Section 3.10. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor or maintained on property acquired in respect of a Mortgage Loan other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. Whenever the improvements securing a Mortgage Loan are located at the time of origination of such Mortgage Loan in a federally designated special flood hazard area, the Master Servicer shall cause flood insurance (to the extent available) to be maintained in respect thereof. Such flood insurance shall be in an amount equal to the lesser of (i) the amount required to compensate for any loss or damage to the Mortgaged Property on a replacement cost basis and (ii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is participating in such program).In the event that the Master Servicer shall obtain and maintain a blanket fire insurance policy with extended coverage insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first sentence of this Section 3.12(a), it being understood and agreed that such policy may contain a deductible clause, in which case the Master Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with the first sentence of this Section 3.12(a) and there shall have been a loss which would have been covered by such policy, deposit in the Certificate Account the amount not otherwise payable under the blanket policy because of such deductible clause. Any such deposit by the Master Servicer shall be made from its own funds and shall be made on the Certificate Account Deposit Date next preceding the Distribution Date which occurs in the month following the month in which payments under any such policy would have been deposited in the Custodial Account. In connection with its activities as administrator and servicer of the Mortgage Loans, the Master Servicer agrees to present, on behalf of itself, the Trustee and Certificateholders, claims under any such blanket policy.

(b)    The Master Servicer shall obtain and maintain at its own expense and keep in full force and effect throughout the term of this Agreement a blanket fidelity bond and an errors and omissions insurance policy covering the Master Servicer's officers and employees and other persons acting on behalf of the Master Servicer in connection with its activities under this Agreement. The amount of coverage shall be at least equal to the coverage that would be required by Fannie Mae or Freddie Mac, whichever is greater, with respect to the Master

CONFIDENTIAL                                                   RC_FGIC9019_00031451

Servicer if the Master Servicer were servicing and administering the Mortgage Loans for Fannie Mae or Freddie Mac. In the event that any such bond or policy ceases to be in effect, the Master Servicer shall obtain a comparable replacement bond or policy from an issuer or insurer, as the case may be, meeting the requirements, if any, of the Program Guide and acceptable to the Depositor. Coverage of the Master Servicer under a policy or bond obtained by an Affiliate of the Master Servicer and providing the coverage required by this Section 3.12(b) shall satisfy the requirements of this Section 3.12(b).

Section 3.13.    Enforcement of Due-on-Sale Clauses; Assumption and Modification Agreements; Certain Assignments.

(a)    When any Mortgaged Property is conveyed by the Mortgagor, the Master Servicer or Subservicer, to the extent it has knowledge of such conveyance, shall enforce any due-on-sale clause contained in any Mortgage Note or Mortgage, to the extent permitted under applicable law and governmental regulations, but only to the extent that such enforcement will not adversely affect or jeopardize coverage under any Required Insurance Policy. Notwithstanding the foregoing:    (i) the Master Servicer shall not be deemed to be in default under this Section 3.13(a) by reason of any transfer or assumption which the Master Servicer is restricted by law from preventing; and (ii) if the Master Servicer determines that it is reasonably likely that any Mortgagor will bring, or if any Mortgagor does bring, legal action to declare invalid or otherwise avoid enforcement of a due-on-sale clause contained in any Mortgage Note or Mortgage, the Master Servicer shall not be required to enforce the due-on-sale clause or to contest such action.

(b)    Subject to the Master Servicer's duty to enforce any due-on-sale clause to the extent set forth in Section 3.13(a), in any case in which a Mortgaged Property is to be conveyed to a Person by a Mortgagor, and such Person is to enter into an assumption or modification agreement or supplement to the Mortgage Note or Mortgage which requires the signature of the Trustee, or if an instrument of release signed by the Trustee is required releasing the Mortgagor from liability on the Mortgage Loan, the Master Servicer is authorized, subject to the requirements of the sentence next following, to execute and deliver, on behalf of the Trustee, the assumption agreement with the Person to whom the Mortgaged Property is to be conveyed and such modification agreement or supplement to the Mortgage Note or Mortgage or other instruments as are reasonable or necessary to carry out the terms of the Mortgage Note or Mortgage or otherwise to comply with any applicable laws regarding assumptions or the transfer of the Mortgaged Property to such Person; *provided, however*, none of such terms and requirements shall both constitute a "significant modification" effecting an exchange or reissuance of such Mortgage Loan under the Code (or final, temporary or proposed Treasury regulations promulgated thereunder) and cause any REMIC created hereunder to fail to qualify as REMICs under the Code or the imposition of any tax on "prohibited transactions" or "contributions" after the startup date under the REMIC Provisions. The Master Servicer shall execute and deliver such documents only if it reasonably determines that (i) its execution and delivery thereof will not conflict with or violate any terms of this Agreement or cause the unpaid balance and interest on the Mortgage Loan to be uncollectible in whole or in part, (ii) any required consents of insurers under any Required Insurance Policies have been obtained and (iii) subsequent to the closing of the transaction involving the assumption or transfer (A) the Mortgage Loan will continue to be secured by a first mortgage lien (or junior lien of the same

CONFIDENTIAL                                                    RC_FGIC9019_00031452

priority in relation to any senior mortgage loan, with respect to any Mortgage Loan secured by a junior Mortgage) pursuant to the terms of the Mortgage, (B) such transaction will not adversely affect the coverage under any Required Insurance Policies, (C) the Mortgage Loan will fully amortize over the remaining term thereof, (D) no material term of the Mortgage Loan (including the interest rate on the Mortgage Loan) will be altered nor will the term of the Mortgage Loan be changed and (E) if the seller/transferor of the Mortgaged Property is to be released from liability on the Mortgage Loan, the buyer/transferee of the Mortgaged Property would be qualified to assume the Mortgage Loan based on generally comparable credit quality and such release will not (based on the Master Servicer's or Subservicer's good faith determination) adversely affect the collectability of the Mortgage Loan. Upon receipt of appropriate instructions from the Master Servicer in accordance with the foregoing, the Trustee shall execute any necessary instruments for such assumption or substitution of liability as directed by the Master Servicer. Upon the closing of the transactions contemplated by such documents, the Master Servicer shall cause the originals or true and correct copies of the assumption agreement, the release (if any), or the modification or supplement to the Mortgage Note or Mortgage to be delivered to the Trustee or the Custodian and deposited with the Mortgage File for such Mortgage Loan. Any fee collected by the Master Servicer or such related Subservicer for entering into an assumption or substitution of liability agreement will be retained by the Master Servicer or such Subservicer as additional servicing compensation.

(c)    The Master Servicer or the related Subservicer, as the case may be, shall be entitled to approve a request from a Mortgagor for a partial release of the related Mortgaged Property, the granting of an easement thereon in favor of another Person, any alteration or demolition of the related Mortgaged Property without any right of reimbursement or other similar matters if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related Mortgage Loan, that the security for, and the timely and full collectability of, such Mortgage Loan would not be adversely affected thereby and that each REMIC created hereunder would continue to qualify as a REMIC under the Code as a result thereof and that no tax on "prohibited transactions" or "contributions" after the Startup Date would be imposed on any REMIC created hereunder as a result thereof. Any fee collected by the Master Servicer or the related Subservicer for processing such a request will be retained by the Master Servicer or such Subservicer as additional servicing compensation.

(d)    Subject to any other applicable terms and conditions of this Agreement, the Master Servicer shall be entitled to approve an assignment in lieu of satisfaction with respect to any Mortgage Loan, provided the obligee with respect to such Mortgage Loan following such proposed assignment provides the Master Servicer with a "Lender Certification for Assignment of Mortgage Loan" in the form attached hereto as Exhibit N, in form and substance satisfactory to the Master Servicer, providing the following:  (i) that the Mortgage Loan is secured by Mortgaged Property located in a jurisdiction in which an assignment in lieu of satisfaction is required to preserve lien priority, minimize or avoid mortgage recording taxes or otherwise comply with, or facilitate a refinancing under, the laws of such jurisdiction; (ii) that the substance of the assignment is, and is intended to be, a refinancing of such Mortgage Loan and that the form of the transaction is solely to comply with, or facilitate the transaction under, such local laws; (iii) that the Mortgage Loan following the proposed assignment will have a rate of interest at least 0.25 percent below or above the rate of interest on such Mortgage Loan prior to such proposed assignment; and (iv) that such assignment is at the request of the borrower under

CONFIDENTIAL                                                    RC_FGIC9019_00031453

the related Mortgage Loan. Upon approval of an assignment in lieu of satisfaction with respect to any Mortgage Loan, the Master Servicer shall receive cash in an amount equal to the unpaid principal balance of and accrued interest on such Mortgage Loan and the Master Servicer shall treat such amount as a Principal Prepayment in Full with respect to such Mortgage Loan for all purposes hereof.

Section 3.14.    <u>Realization Upon Defaulted Mortgage Loans</u>.

(a)    The Master Servicer shall foreclose upon or otherwise comparably convert (which may include an REO Acquisition) the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.07. Alternatively, the Master Servicer may take other actions in respect of a defaulted Mortgage Loan, which may include (i) accepting a short sale (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate a sale of the Mortgaged Property by the Mortgagor) or permitting a short refinancing (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate refinancing transactions by the Mortgagor not involving a sale of the Mortgaged Property), (ii) arranging for a repayment plan or (iii) agreeing to a modification in accordance with Section 3.07. In connection with such foreclosure or other conversion or action, the Master Servicer shall, consistent with Section 3.11, follow such practices and procedures as it shall deem necessary or advisable, as shall be normal and usual in its general mortgage servicing activities and as shall be required or permitted by the Program Guide; provided that the Master Servicer shall not be liable in any respect hereunder if the Master Servicer is acting in connection with any such foreclosure or other conversion or action in a manner that is consistent with the provisions of this Agreement. The Master Servicer, however, shall not be required to expend its own funds or incur other reimbursable charges in connection with any foreclosure, or attempted foreclosure which is not completed, or towards the correction of any default on a related senior mortgage loan, or towards the restoration of any property unless it shall determine (i) that such restoration and/or foreclosure will increase the proceeds of liquidation of the Mortgage Loan to Holders of Certificates of one or more Classes or the Insurer after reimbursement to itself for such expenses or charges and (ii) that such expenses and charges will be recoverable to it through Liquidation Proceeds, Insurance Proceeds, or REO Proceeds (respecting which it shall have priority for purposes of withdrawals from the Custodial Account pursuant to Section 3.10, whether or not such expenses and charges are actually recoverable from related Liquidation Proceeds, Insurance Proceeds or REO Proceeds). In the event of such a determination by the Master Servicer pursuant to this Section 3.14(a), the Master Servicer shall be entitled to reimbursement of its funds so expended pursuant to Section 3.10. In addition, the Master Servicer may pursue any remedies that may be available in connection with a breach of a representation and warranty with respect to any such Mortgage Loan in accordance with Sections 2.03 and 2.04. However, the Master Servicer is not required to continue to pursue both foreclosure (or similar remedies) with respect to the Mortgage Loans and remedies in connection with a breach of a representation and warranty if the Master Servicer determines in its reasonable discretion that one such remedy is more likely to result in a greater recovery as to the Mortgage Loan. Upon the occurrence of a Cash Liquidation or REO Disposition, following the deposit in the Custodial Account of all Insurance Proceeds, Liquidation Proceeds and other payments and recoveries referred to in the definition of "Cash Liquidation" or "REO Disposition," as applicable, upon receipt by the Trustee of written

CONFIDENTIAL                                        RC_FGIC9019_00031454

notification of such deposit signed by a Servicing Officer, the Trustee or any Custodian, as the case may be, shall release to the Master Servicer the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment prepared by the Master Servicer, in each case without recourse, as shall be necessary to vest in the Master Servicer or its designee, as the case may be, the related Mortgage Loan, and thereafter such Mortgage Loan shall not be part of the Trust Fund. Notwithstanding the foregoing or any other provision of this Agreement, in the Master Servicer's sole discretion with respect to any defaulted Mortgage Loan or REO Property as to either of the following provisions, (i) a Cash Liquidation or REO Disposition may be deemed to have occurred if substantially all amounts expected by the Master Servicer to be received in connection with the related defaulted Mortgage Loan or REO Property have been received, and (ii) for purposes of determining the amount of any Liquidation Proceeds, Insurance Proceeds, REO Proceeds or other unscheduled collections or the amount of any Realized Loss, the Master Servicer may take into account minimal amounts of additional receipts expected to be received or any estimated additional liquidation expenses expected to be incurred in connection with the related defaulted Mortgage Loan or REO Property.

(b)    In the event that title to any Mortgaged Property is acquired by the Trust Fund as an REO Property by foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be issued to the Trustee or to its nominee on behalf of Certificateholders. Notwithstanding any such acquisition of title and cancellation of the related Mortgage Loan, such REO Property shall (except as otherwise expressly provided herein) be considered to be an Outstanding Mortgage Loan held in the Trust Fund until such time as the REO Property shall be sold. Consistent with the foregoing for purposes of all calculations hereunder so long as such REO Property shall be considered to be an Outstanding Mortgage Loan it shall be assumed that, notwithstanding that the indebtedness evidenced by the related Mortgage Note shall have been discharged, such Mortgage Note and the related amortization schedule in effect at the time of any such acquisition of title (after giving effect to any previous Curtailments and before any adjustment thereto by reason of any bankruptcy or similar proceeding or any moratorium or similar waiver or grace period) remain in effect.

(c)    In the event that the Trust Fund acquires any REO Property as aforesaid or otherwise in connection with a default or imminent default on a Mortgage Loan, the Master Servicer on behalf of the Trust Fund shall dispose of such REO Property within three full years after the taxable year of its acquisition by the Trust Fund for purposes of Section 860G(a)(8) of the Code (or such shorter period as may be necessary under applicable state (including any state in which such property is located) law to maintain the status of each REMIC created hereunder as a REMIC under applicable state law and avoid taxes resulting from such property failing to be foreclosure property under applicable state law) or, at the expense of the Trust Fund, request, more than 60 days before the day on which such grace period would otherwise expire, an extension of such grace period unless the Master Servicer obtains for the Trustee and the Insurer an Opinion of Counsel, addressed to the Trustee, the Insurer and the Master Servicer, to the effect that the holding by the Trust Fund of such REO Property subsequent to such period will not result in the imposition of taxes on "prohibited transactions" as defined in Section 860F of the Code or cause any REMIC created hereunder to fail to qualify as a REMIC (for federal (or any applicable State or local) income tax purposes) at any time that any Certificates are outstanding, in which case the Trust Fund may continue to hold such REO Property (subject to any conditions contained in such Opinion of Counsel). The Master Servicer shall be entitled to

CONFIDENTIAL    RC_FGIC9019_00031455

be reimbursed from the Custodial Account for any costs incurred in obtaining such Opinion of Counsel, as provided in Section 3.10. Notwithstanding any other provision of this Agreement, no REO Property acquired by the Trust Fund shall be rented (or allowed to continue to be rented) or otherwise used by or on behalf of the Trust Fund in such a manner or pursuant to any terms that would (i) cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or (ii) any subject REMIC created hereunder to the imposition of any federal income taxes on the income earned from such REO Property, including any taxes imposed by reason of Section 860G(c) of the Code, unless the Master Servicer has agreed to indemnify and hold harmless the Trust Fund with respect to the imposition of any such taxes.

(d)     The proceeds of any Cash Liquidation, REO Disposition or purchase or repurchase of any Mortgage Loan pursuant to the terms of this Agreement, as well as any recovery (other than Subsequent Recoveries) resulting from a collection of Liquidation Proceeds, Insurance Proceeds or REO Proceeds, will be applied in the following order of priority: *first*, to reimburse the Master Servicer or the related Subservicer in accordance with Section 3.10(a)(ii); *second*, to the Certificateholders to the extent of accrued and unpaid interest on the Mortgage Loan, and any related REO Imputed Interest, at the Net Mortgage Rate (or the Modified Net Mortgage Rate in the case of a Modified Mortgage Loan), to the Due Date in the related Due Period prior to the Distribution Date on which such amounts are to be distributed; *third*, to the Certificateholders as a recovery of principal on the Mortgage Loan (or REO Property); *fourth*, to all Servicing Fees and Subservicing Fees payable therefrom (and the Master Servicer and the Subservicer shall have no claims for any deficiencies with respect to such fees which result from the foregoing allocation); *fifth*, to the Insurer for reimbursement for any Cumulative Insurance Payments to the extent not reimbursed pursuant to Section 4.02(c)(v); and *sixth*, to Foreclosure Profits.

(e)     In the event of a default on a Mortgage Loan one or more of whose obligors is not a United States Person, in connection with any foreclosure or acquisition of a deed in lieu of foreclosure (together, "foreclosure") in respect of such Mortgage Loan, the Master Servicer shall cause compliance with the provisions of Treasury Regulation Section 1.1445-2(d)(3) (or any successor thereto) necessary to assure that no withholding tax obligation arises with respect to the proceeds of such foreclosure except to the extent, if any, that proceeds of such foreclosure are required to be remitted to the obligors on such Mortgage Loan.

Section 3.15.    <u>Trustee to Cooperate; Release of Mortgage Files</u>.

(a)     Upon becoming aware of the payment in full of any Mortgage Loan, or upon the receipt by the Master Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Master Servicer shall immediately notify the Trustee (if it holds the related Mortgage File) or the Custodian by a certification of a Servicing Officer (which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Custodial Account pursuant to Section 3.07 have been or will be so deposited), substantially in one of the forms attached hereto as Exhibit H requesting delivery to it of the Mortgage File. Upon receipt of such certification and request, the Trustee shall promptly release, or cause the Custodian to release, the related Mortgage File to the Master Servicer. The Master Servicer is authorized to execute

CONFIDENTIAL                                                                RC_FGIC9019_00031456

and deliver to the Mortgagor the request for reconveyance, deed of reconveyance or release or satisfaction of mortgage or such instrument releasing the lien of the Mortgage, together with the Mortgage Note with, as appropriate, written evidence of cancellation thereon and to cause the removal from the registration on the MERS® System of such Mortgage and to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of satisfaction or cancellation or of partial or full release, including any applicable UCC termination statements. No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Custodial Account or the Certificate Account.

(b)    From time to time as is appropriate for the servicing or foreclosure of any Mortgage Loan, the Master Servicer shall deliver to the Custodian, with a copy to the Trustee, a certificate of a Servicing Officer substantially in one of the forms attached as Exhibit H hereto, requesting that possession of all, or any document constituting part of, the Mortgage File be released to the Master Servicer and certifying as to the reason for such release and that such release will not invalidate any insurance coverage provided in respect of the Mortgage Loan under any Required Insurance Policy. Upon receipt of the foregoing, the Trustee shall deliver, or cause the Custodian to deliver, the Mortgage File or any document therein to the Master Servicer. The Master Servicer shall cause each Mortgage File or any document therein so released to be returned to the Trustee, or the Custodian as agent for the Trustee when the need therefor by the Master Servicer no longer exists, unless (i) the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or (ii) the Mortgage File or such document has been delivered directly or through a Subservicer to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Master Servicer has delivered directly or through a Subservicer to the Trustee a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery. In the event of the liquidation of a Mortgage Loan, the Trustee shall deliver the Request for Release with respect thereto to the Master Servicer upon the Trustee's receipt of notification from the Master Servicer of the deposit of the related Liquidation Proceeds in the Custodial Account.

(c)    The Trustee or the Master Servicer on the Trustee's behalf shall execute and deliver to the Master Servicer, if necessary, any court pleadings, requests for trustee's sale or other documents necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity. Together with such documents or pleadings (if signed by the Trustee), the Master Servicer shall deliver to the Trustee a certificate of a Servicing Officer requesting that such pleadings or documents be executed by the Trustee and certifying as to the reason such documents or pleadings are required and that the execution and delivery thereof by the Trustee shall not invalidate any insurance coverage under any Required Insurance Policy or invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale.

CONFIDENTIAL                                    RC_FGIC9019_00031457

Section 3.16.    Servicing  and  Other  Compensation;  Eligible  Master  Servicing
Compensation.

(a)    The Master Servicer, as compensation for its activities hereunder, shall be entitled
to receive on each Distribution Date the amounts provided for by clauses (iii), (iv), (v) and (vi)
of Section 3.10(a), subject to clause (e) below. The amount of servicing compensation provided
for in such clauses shall be accounted for on a Mortgage Loan-by-Mortgage Loan basis. In the
event that Liquidation Proceeds, Insurance Proceeds and REO Proceeds (net of amounts
reimbursable therefrom pursuant to Section 3.10(a)(ii)) in respect of a Cash Liquidation or REO
Disposition exceed the unpaid principal balance of such Mortgage Loan plus unpaid interest
accrued thereon (including REO Imputed Interest) at a per annum rate equal to the related Net
Mortgage Rate (or the Modified Net Mortgage Rate in the case of a Modified Mortgage Loan),
the Master Servicer shall be entitled to retain therefrom and to pay to itself and/or the related
Subservicer, any Foreclosure Profits and any Servicing Fee or Subservicing Fee considered to be
accrued but unpaid.

(b)    Additional servicing compensation in the form of assumption fees, late payment
charges, investment income on amounts in the Custodial Account or the Certificate Account or
otherwise shall be retained by the Master Servicer or the Subservicer to the extent provided
herein, subject to clause (e) below. Prepayment charges shall be deposited into the Certificate
Account and shall be paid on each Distribution Date to the holders of the Class SB Certificates.

(c)    The Master Servicer shall be required to pay, or cause to be paid, all expenses
incurred by it in connection with its servicing activities hereunder (including payment of
premiums for the Primary Insurance Policies, if any, to the extent such premiums are not
required to be paid by the related Mortgagors, and the fees and expenses of the Trustee and any
Custodian) and shall not be entitled to reimbursement therefor except as specifically provided in
Sections 3.10 and 3.14.

(d)    The Master Servicer's right to receive servicing compensation may not be
transferred in whole or in part except in connection with the transfer of all of its responsibilities
and obligations of the Master Servicer under this Agreement.

(e)    Notwithstanding clauses (a) and (b) above, the amount of servicing compensation
that the Master Servicer shall be entitled to receive for its activities hereunder for the period
ending on each Distribution Date shall be reduced (but not below zero) by an amount equal to
Eligible Master Servicing Compensation (if any) for such Distribution Date. Such reduction shall
be applied during such period as follows: *first*, to any Servicing Fee or Subservicing Fee to
which the Master Servicer is entitled pursuant to Section 3.10(a)(iii); *second*, to any income or
gain realized from any investment of funds held in the Custodial Account or the Certificate
Account to which the Master Servicer is entitled pursuant to Sections 3.07(c) or 4.01(b),
respectively; and *third*, to any amounts of servicing compensation to which the Master Servicer
is entitled pursuant to Section 3.10(a)(v) or (vi). In making such reduction, the Master Servicer
shall not withdraw from the Custodial Account any such amount representing all or a portion of
the Servicing Fee to which it is entitled pursuant to Section 3.10(a)(iii); (ii) shall not withdraw
from the Custodial Account or Certificate Account any such amount to which it is entitled
pursuant to Section 3.07(c) or 4.01(b) and (iii) shall not withdraw from the Custodial Account

CONFIDENTIAL                                                      RC_FGIC9019_00031458

any such amount of servicing compensation to which it is entitled pursuant to Section 3.10(a)(v) or (vi).

On each Distribution Date, Eligible Master Servicing Compensation shall be applied to cover Prepayment Interest Shortfalls on each Loan Group on a pro rata basis in accordance with the amount of Prepayment Interest Shortfalls on each Loan Group for such Distribution Date.

Section 3.17.   Reports to the Trustee, the Insurer and the Depositor.

Not later than fifteen days after each Distribution Date, the Master Servicer shall forward to the Trustee, the Insurer and the Depositor a statement, certified by a Servicing Officer, setting forth the status of the Custodial Account as of the close of business on such Distribution Date as it relates to the Mortgage Loans and showing, for the period covered by such statement, the aggregate of deposits in or withdrawals from the Custodial Account in respect of the Mortgage Loans for each category of deposit specified in Section 3.07 and each category of withdrawal specified in Section 3.10.

Section 3.18.   Annual Statement as to Compliance.

The Master Servicer shall deliver to the Depositor, the Trustee and the Insurer on or before the earlier of (a) March 31 of each year, beginning with the first March 31 that occurs at least six months after the Cut-off Date, or (b) with respect to any calendar year during which the Depositor's annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, on or before the date on which the Depositor's annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission (or, in each case, if such day is not a Business Day, the immediately preceding Business Day), an Officers' Certificate stating, as to each signer thereof, that (i) a review of the activities of the Master Servicer during the preceding calendar year related to its servicing of mortgage loans and of its performance under the pooling and servicing agreements, including this Agreement, has been made under such officers' supervision, (ii) to the best of such officers' knowledge, based on such review, the Master Servicer has complied in all material respects with the minimum servicing standards set forth in the Uniform Single Attestation Program for Mortgage Bankers and has fulfilled all of its material obligations in all material respects throughout such year, or, if there has been material noncompliance with such servicing standards or a default in the fulfillment in all material respects of any such obligation relating to this Agreement, such statement shall include a description of such noncompliance or specify each such default, as the case may be, known to such officer and the nature and status thereof and (iii) to the best of such officers' knowledge, each Subservicer has complied in all material respects with the minimum servicing standards set forth in the Uniform Single Attestation Program for Mortgage Bankers and has fulfilled all of its material obligations under its Subservicing Agreement in all material respects throughout such year, or if there has been material noncompliance with such servicing standards or a material default in the fulfillment of such obligations relating to this Agreement, specifying such statement shall include a description of such noncompliance or specify each such default, as the case may be, known to such officer and the nature and status thereof.

CONFIDENTIAL                                                                        RC_FGIC9019_00031459

Section 3.19.    Annual Independent Public Accountants' Servicing Report.

On or before the earlier of (a) March 31 of each year, beginning with the first March 31 that occurs at least six months after the Cut-off Date, or (b) with respect to any calendar year during which the Depositor's annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, the date on which the Depositor's annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission (or, in each case, if such day is not a Business Day, the immediately preceding Business Day), the Master Servicer at its expense shall cause a firm of independent public accountants which shall be members of the American Institute of Certified Public Accountants to furnish a report to the Depositor, the Insurer and the Trustee stating its opinion that, on the basis of an examination conducted by such firm substantially in accordance with standards established by the American Institute of Certified Public Accountants, the assertions made pursuant to Section 3.18 regarding compliance with the minimum servicing standards set forth in the Uniform Single Attestation Program for Mortgage Bankers during the preceding calendar year are fairly stated in all material respects, subject to such exceptions and other qualifications that, in the opinion of such firm, such accounting standards require it to report. In rendering such statement, such firm may rely, as to matters relating to the direct servicing of mortgage loans by Subservicers, upon comparable statements for examinations conducted by independent public accountants substantially in accordance with standards established by the American Institute of Certified Public Accountants (rendered within one year of such statement) with respect to such Subservicers. In the event such firm requires the Trustee to agree to the procedures performed by such firm, the Master Servicer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee shall deliver such letter of agreement in conclusive reliance upon the direction of the Master Servicer, and the Trustee shall not make any independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

Section 3.20.    Right of the Depositor in Respect of the Master Servicer.

The Master Servicer shall afford the Depositor and the Trustee, upon reasonable notice, during normal business hours access to all records maintained by the Master Servicer in respect of its rights and obligations hereunder and access to officers of the Master Servicer responsible for such obligations. Upon request, the Master Servicer shall furnish the Depositor and the Trustee with its most recent financial statements and such other information as the Master Servicer possesses regarding its business, affairs, property and condition, financial or otherwise. The Master Servicer shall also cooperate with all reasonable requests for information including, but not limited to, notices, tapes and copies of files, regarding itself, the Mortgage Loans or the Certificates from any Person or Persons identified by the Depositor or Residential Funding. The Insurer is hereby so identified.  The Depositor may, but is not obligated to perform, or cause a designee to perform, any defaulted obligation of the Master Servicer hereunder or exercise the rights of the Master Servicer hereunder; provided that the Master Servicer shall not be relieved of any of its obligations hereunder by virtue of such performance by the Depositor or its designee. Neither the Depositor nor the Trustee shall have the responsibility or liability for any action or failure to act by the Master Servicer and is not obligated to supervise the performance of the Master Servicer under this Agreement or otherwise.

CONFIDENTIAL                                                                    RC_FGIC9019_00031460

Section 3.21.   Advance Facility.

(a)    The Master Servicer is hereby authorized to enter into a financing or other facility (any such arrangement, an "Advance Facility") under which (1) the Master Servicer sells, assigns or pledges to another Person (an "Advancing Person") the Master Servicer's rights under this Agreement to be reimbursed for any Advances or Servicing Advances and/or (2) an Advancing Person agrees to fund some or all Advances and/or Servicing Advances required to be made by the Master Servicer pursuant to this Agreement. No consent of the Depositor, the Trustee, the Certificateholders or any other party shall be required before the Master Servicer may enter into an Advance Facility. Notwithstanding the existence of any Advance Facility under which an Advancing Person agrees to fund Advances and/or Servicing Advances on the Master Servicer's behalf, the Master Servicer  shall remain obligated pursuant to this Agreement to make Advances and Servicing Advances pursuant to and as required by this Agreement. If the Master Servicer enters into an Advance Facility, and for so long as an Advancing Person remains entitled to receive reimbursement for any Advances including Nonrecoverable Advances ("Advance Reimbursement Amounts") and/or Servicing Advances including Nonrecoverable Advances ("Servicing Advance Reimbursement Amounts" and together with Advance Reimbursement Amounts, "Reimbursement Amounts") (in each case to the extent such type of Reimbursement Amount is included in the Advance Facility), as applicable, pursuant to this Agreement, then the Master Servicer shall identify such Reimbursement Amounts consistent with the reimbursement rights set forth in Section 3.10(a)(ii) and (vii) and remit such Reimbursement Amounts in accordance with this Section 3.21 or otherwise in accordance with the documentation establishing the Advance Facility to such Advancing Person or to a trustee, agent or custodian (an "Advance Facility Trustee") designated by such Advancing Person in an Advance Facility Notice described below in Section 3.21(b). Notwithstanding the foregoing, if so required pursuant to the terms of the Advance Facility, the Master Servicer may direct, and if so directed in writing the Trustee is hereby authorized to and shall pay to the Advance Facility Trustee the Reimbursement Amounts identified pursuant to the preceding sentence. An Advancing Person whose obligations hereunder are limited to the funding of Advances and/or Servicing Advances shall not be required to meet the qualifications of a Master Servicer or a Subservicer pursuant to Section 3.02(a) or 6.02(c) hereof and shall not be deemed to be a Subservicer under this Agreement. Notwithstanding anything to the contrary herein, in no event shall Advance Reimbursement Amounts or Servicing Advance Reimbursement Amounts be included in the Available Distribution Amount or distributed to Certificateholders.

(b)    If the Master Servicer enters into an Advance Facility and makes the election set forth in Section 3.21(a), the Master Servicer and the related Advancing Person shall deliver to the Trustee a written notice and payment instruction (an "Advance Facility Notice"), providing the Trustee with written payment instructions as to where to remit Advance Reimbursement Amounts and/or Servicing Advance Reimbursement Amounts (each to the extent such type of Reimbursement Amount is included within the Advance Facility) on subsequent Distribution Dates. The payment instruction shall require the applicable Reimbursement Amounts to be distributed to the Advancing Person or to an Advance Facility Trustee designated in the Advance Facility Notice. An Advance Facility Notice may only be terminated by the joint written direction of the Master Servicer and the related Advancing Person (and any related Advance Facility Trustee).  The Master Servicer shall provide the Insurer with notice of any termination of any Advance Facility pursuant to this Section 3.21(b).

CONFIDENTIAL                                                        RC_FGIC9019_00031461

(c)     Reimbursement Amounts shall consist solely of amounts in respect of Advances and/or Servicing Advances made with respect to the Mortgage Loans for which the Master Servicer would be permitted to reimburse itself in accordance with Section 3.10(a)(ii) and (vii) hereof, assuming the Master Servicer or the Advancing Person had made the related Advance(s) and/or Servicing Advance(s). Notwithstanding the foregoing, except with respect to reimbursement of Nonrecoverable Advances as set forth in Section 3.10(c) of this Agreement, no Person shall be entitled to reimbursement from funds held in the Collection Account for future distribution to Certificateholders pursuant to this Agreement. Neither the Depositor nor the Trustee shall have any duty or liability with respect to the calculation of any Reimbursement Amount, nor shall the Depositor or the Trustee have any responsibility to track or monitor the administration of the Advance Facility and the Depositor shall not have any responsibility to track, monitor or verify the payment of Reimbursement Amounts to the related Advancing Person or Advance Facility Trustee. The Master Servicer shall maintain and provide to any Successor Master Servicer (a "Successor Master Servicer") a detailed accounting on a loan-by-loan basis as to amounts advanced by, sold, pledged or assigned to, and reimbursed to any Advancing Person. The Successor Master Servicer shall be entitled to rely on any such information provided by the Master Servicer and the Successor Master Servicer shall not be liable for any errors in such information.

(d)     Upon the direction of and at the expense of the Master Servicer, the Trustee agrees to execute such acknowledgments, certificates, and other documents provided by the Master Servicer and reasonably satisfactory to the Trustee recognizing the interests of any Advancing Person or Advance Facility Trustee in such Reimbursement Amounts as the Master Servicer may cause to be made subject to Advance Facilities pursuant to this Section 3.21, and such other documents in connection with such Advance Facility as may be reasonably requested from time to time by any Advancing Person or Advance Facility Trustee and reasonably satisfactory to the Trustee.

(e)     Reimbursement Amounts collected with respect to each Mortgage Loan shall be allocated to outstanding unreimbursed Advances or Servicing Advances (as the case may be) made with respect to that Mortgage Loan on a "first-in, first out" ("FIFO") basis, subject to the qualifications set forth below:

(i)     Any Successor Master Servicer to Residential Funding and the Advancing Person or Advance Facility Trustee shall be required to apply all amounts available in accordance with this Section 3.21(e) to the reimbursement of Advances and Servicing Advances in the manner provided for herein; provided, however, that after the succession of a Successor Master Servicer, (A) to the extent that any Advances or Servicing Advances with respect to any particular Mortgage Loan are reimbursed from payments or recoveries, if any, from the related Mortgagor, and Liquidation Proceeds or Insurance Proceeds, if any, with respect to that Mortgage Loan, reimbursement shall be made, first, to the Advancing Person or Advance Facility Trustee in respect of Advances and/or Servicing Advances related to that Mortgage Loan to the extent of the interest of the Advancing Person or Advance Facility Trustee in such Advances and/or Servicing Advances, second to the Master Servicer in respect of Advances and/or Servicing Advances related to that Mortgage Loan in excess of those in which the Advancing Person or Advance Facility Trustee Person has an interest, and third, to the Successor

CONFIDENTIAL                                                                      RC_FGIC9019_00031462

Master Servicer in respect of any other Advances and/or Servicing Advances related to that Mortgage Loan, from such sources as and when collected, and (B) reimbursements of Advances and Servicing Advances that are Nonrecoverable Advances shall be made pro rata to the Advancing Person or Advance Facility Trustee, on the one hand, and any such Successor Master Servicer, on the other hand, on the basis of the respective aggregate outstanding unreimbursed Advances and Servicing Advances that are Nonrecoverable Advances owed to the Advancing Person, Advance Facility Trustee or Master Servicer pursuant to this Agreement, on the one hand, and any such Successor Master Servicer, on the other hand, and without regard to the date on which any such Advances or Servicing Advances shall have been made. In the event that, as a result of the FIFO allocation made pursuant to this Section 3.21(e), some or all of a Reimbursement Amount paid to the Advancing Person or Advance Facility Trustee relates to Advances or Servicing Advances that were made by a Person other than Residential Funding or the Advancing Person or Advance Facility Trustee, then the Advancing Person or Advance Facility Trustee shall be required to remit any portion of such Reimbursement Amount to the Person entitled to such portion of such Reimbursement Amount. Without limiting the generality of the foregoing, Residential Funding shall remain entitled to be reimbursed by the Advancing Person or Advance Facility Trustee for all Advances and Servicing Advances funded by Residential Funding to the extent the related Reimbursement Amount(s) have not been assigned or pledged to an Advancing Person or Advance Facility Trustee. The documentation establishing any Advance Facility shall require Residential Funding to provide to the related Advancing Person or Advance Facility Trustee loan by loan information with respect to each Reimbursement Amount distributed to such Advancing Person or Advance Facility Trustee on each date of remittance thereof to such Advancing Person or Advance Facility Trustee, to enable the Advancing Person or Advance Facility Trustee to make the FIFO allocation of each Reimbursement Amount with respect to each Mortgage Loan.

(ii)    By way of illustration, and not by way of limiting the generality of the foregoing, if the Master Servicer resigns or is terminated at a time when the Master Servicer is a party to an Advance Facility, and is replaced by a Successor Master Servicer, and the Successor Master Servicer directly funds Advances or Servicing Advances with respect to a Mortgage Loan and does not assign or pledge the related Reimbursement Amounts to the related Advancing Person or Advance Facility Trustee, then all payments and recoveries received from the related Mortgagor or received in the form of Liquidation Proceeds with respect to such Mortgage Loan (including Insurance Proceeds collected in connection with a liquidation of such Mortgage Loan) will be allocated first to the Advancing Person or Advance Facility Trustee until the related Reimbursement Amounts attributable to such Mortgage Loan that are owed to the Master Servicer and the Advancing Person, which were made prior to any Advances or Servicing Advances made by the Successor Master Servicer, have been reimbursed in full, at which point the Successor Master Servicer shall be entitled to retain all related Reimbursement Amounts subsequently collected with respect to that Mortgage Loan pursuant to Section 3.10 of this Agreement. To the extent that the Advances or Servicing Advances are Nonrecoverable Advances to be reimbursed on an aggregate basis pursuant to Section 3.10 of this Agreement, the reimbursement paid in this manner will be made pro rata to

CONFIDENTIAL                                                    RC_FGIC9019_00031463

the Advancing Person or Advance Facility Trustee, on the one hand, and the Successor Master Servicer, on the other hand, as described in clause (i)(B) above.

(f)     The Master Servicer shall remain entitled to be reimbursed for all Advances and Servicing Advances funded by the Master Servicer to the extent the related rights to be reimbursed therefor have not been sold, assigned or pledged to an Advancing Person.

(g)     Any amendment to this Section 3.21 or to any other provision of this Agreement that may be necessary or appropriate to effect the terms of an Advance Facility as described generally in this Section 3.21, including amendments to add provisions relating to a successor master servicer, may be entered into by the Trustee, the Depositor and the Master Servicer with the consent of the Insurer, but without the consent of any Certificateholder, with written confirmation from each Rating Agency that the amendment will not result in the reduction of the ratings on any class of the Certificates below the then-current ratings on such Certificates (without giving effect to the Policy), and delivery of an Opinion of Counsel as required under Section 11.01(c) notwithstanding anything to the contrary in Section 11.01 of or elsewhere in this Agreement.

(h)     Any rights of set-off that the Trust Fund, the Trustee, the Depositor, any Successor Master Servicer or any other Person might otherwise have against the Master Servicer under this Agreement shall not attach to any rights to be reimbursed for Advances or Servicing Advances that have been sold, transferred, pledged, conveyed or assigned to any Advancing Person.

(i)     At any time when an Advancing Person shall have ceased funding Advances and/or Servicing Advances (as the case may be) and the Advancing Person or related Advance Facility Trustee shall have received Reimbursement Amounts sufficient in the aggregate to reimburse all Advances and/or Servicing Advances (as the case may be) the right to reimbursement for which were assigned to the Advancing Person, then upon the delivery of a written notice signed by the Advancing Person and the Master Servicer or its successor or assign) to the Trustee terminating the Advance Facility Notice (the "Notice of Facility Termination"), the Master Servicer or its Successor Master Servicer shall again be entitled to withdraw and retain the related Reimbursement Amounts from the Custodial Account pursuant to Section 3.10.

(j)     After delivery of any Advance Facility Notice, and until any such Advance Facility Notice has been terminated by a Notice of Facility Termination, this Section 3.21 may not be amended or otherwise modified without the prior written consent of the related Advancing Person.

## ARTICLE IV
## PAYMENTS TO CERTIFICATEHOLDERS

Section 4.01.   Certificate Account.

(a)     The Master Servicer acting as agent of the Trustee shall establish and maintain a Certificate Account in which the Master Servicer shall deposit or cause to be deposited on behalf of the Trustee on or before 2:00 P.M. New York time on each Certificate Account Deposit Date

CONFIDENTIAL                                                        RC_FGIC9019_00031464

by wire transfer of immediately available funds an amount equal to the sum of (i) any Advance for the immediately succeeding Distribution Date, (ii) any amount required to be paid pursuant to Section 3.12(a), (iii) any amount required to be deposited in the Certificate Account pursuant to Section 3.16(e), Section 4.07 or Section 4.08, (iv) any amount required to be paid pursuant to Section 9.01, (v) any prepayment charges on the Mortgage Loans received during the related Prepayment Period, (vi) an amount equal to the Certificate Insurance Premium payable on such Distribution Date, and (vii) all other amounts constituting the Available Distribution Amount for the immediately succeeding Distribution Date.  In addition, as and to the extent required pursuant to Section 4.10(b), the Trustee shall withdraw from the Insurance Account and deposit into the Certificate Account the amount necessary to pay the Insured Payment on each Distribution Date to the extent received from the Insurer.

(b)    On or prior to the Business Day immediately following each Determination Date, the Master Servicer shall determine any amounts owed by the Yield Maintenance Agreement Provider under the Yield Maintenance Agreement and inform the Trustee in writing of the amount so calculated.

(c)    On each Distribution Date, prior to making any other distributions referred to in Section 4.02 herein, the Trustee shall withdraw from the Certificate Account and pay to the Insurer, by wire transfer of immediately available funds to the Insurer Account, the Certificate Insurer Premium as designated by the Master Servicer in the written statement delivered in accordance with Section 4.04(a) for such Distribution Date. The Trustee shall deposit any amounts received from the Insurer pursuant to the Policy into the Insurance Account. The amount necessary to pay any Insured Payment shall be distributed on the immediately following Distribution Date as part of the Available Distribution Amount.

(d)    The Trustee shall, upon written request from the Master Servicer, invest or cause the institution maintaining the Certificate Account to invest the funds in the Certificate Account in Permitted Investments designated in the name of the Trustee for the benefit of the Certificateholders and the Insurer, which shall mature not later than the Business Day next preceding the Distribution Date next following the date of such investment (except that (i) if such Permitted Investment is an obligation of the institution that maintains such account or a fund for which such institution serves as custodian, then such Permitted Investment may mature on such Distribution Date and (ii) any other investment may mature on such Distribution Date if the Trustee shall advance funds on such Distribution Date to the Certificate Account in the amount payable on such investment on such Distribution Date, pending receipt thereof to the extent necessary to make distributions on the Certificates) and shall not be sold or disposed of prior to maturity. All income and gain realized from any such investment shall be for the benefit of the Master Servicer and shall be subject to its withdrawal or order from time to time. The amount of any losses incurred in respect of any such investments shall be deposited in the Certificate Account by the Master Servicer out of its own funds immediately as realized.

Section 4.02.    Distributions.

(a)    On each Distribution Date, the Trustee (or the Paying Agent on behalf of the Trustee) shall allocate and distribute the Available Distribution Amount, if any, for such date to the interests issued in respect of REMIC I and REMIC II, as specified in this Section.

CONFIDENTIAL                                                                RC_FGIC9019_00031465

(b)    (1)    On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC I to REMIC II on account of the REMIC I Group I Regular Interests:

(i)    to the extent of the Group I Available Distribution Amount, to the Holders of each REMIC I Group I Regular Interest, pro rata, in an amount equal to (A) Uncertificated Accrued Interest for such REMIC I Group I Regular Interests for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates. Amounts payable as Uncertificated Accrued Interest in respect of REMIC I Group I Regular Interest I-ZZ shall be reduced when the sum of (i) the REMIC I Group I Overcollateralized Amount and (ii) the REMIC I Group II Overcollateralized Amount is less than the REMIC I Group I Required Overcollateralization Amount, by the lesser of (x) the amount of such difference and (y) the REMIC I Regular Interest I-ZZ Maximum Interest Deferral Amount, and such amount will be payable to the Holders of REMIC I Regular Interests I-A-I-1, I-A-I-2, I-A-I-3, and I-A-I-4 in the same proportion as the Overcollateralization Increase Amount is allocated to the corresponding Class of Certificates, and the Uncertificated Principal Balance of the REMIC I Regular Interest I-ZZ shall be increased by such amount; and

(ii)    on each Distribution Date, to the Holders of REMIC I Group I Regular Interests, in an amount equal to the remainder of the Group I Available Distribution Amount after the distributions made pursuant to clause (i) above, allocated as follows (except as provided below): (A) to the Holders of the REMIC I Regular Interest I-AA, 98.00% of such remainder until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero; (B) 2.00% of such remainder, first to the Holders of REMIC I Regular Interests I-A-I-1, I-A-I-2, I-A-I-3, and I-A-I-4, in an aggregate amount equal to 1.00% of and in the same proportion as principal payments are allocated to the corresponding Class of Certificates for each such REMIC I Group I Regular Interest, respectively, until the Uncertificated Principal Balance of each such REMIC I Group I Regular Interest is reduced to zero; and, second, to the Holders of the REMIC I Regular Interest I-ZZ, until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero; and (C) any remaining amounts to the Holders of the Class R-I Certificates.

(2)    On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC I to REMIC II on account of the REMIC I Group II Regular Interests:

(i)    to the extent of the Group II Available Distribution Amount, to the Holders of each REMIC I Group II  Regular Interest, pro rata, in an amount equal to (A) Uncertificated Accrued Interest for such REMIC I

CONFIDENTIAL                    RC_FGIC9019_00031466

Group II Regular Interests for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates. Amounts payable as Uncertificated Accrued Interest in respect of REMIC I Group II Regular Interest II-ZZ shall be reduced when the sum of (i) the REMIC I Group II Overcollateralized Amount and (ii) the REMIC II Group II Overcollateralized Amount is less than the REMIC I Group II Required Overcollateralization Amount, by the lesser of (x) the amount of such difference and (y) the REMIC I Regular Interest II-ZZ Maximum Interest Deferral Amount, and such amount will be payable to the Holders of REMIC I Regular Interests II-A-II in the same proportion as the Overcollateralization Increase Amount is allocated to the corresponding Class of Certificates, and the Uncertificated Principal Balance of the REMIC I Regular Interest II-ZZ shall be increased by such amount; and

(ii)    on each Distribution Date, to the Holders of REMIC I Group II Regular Interests, in an amount equal to the remainder of the Group II Available Distribution Amount after the distributions made pursuant to clause (i) above, allocated as follows (except as provided below): (A) to the Holders of the REMIC I Regular Interest II-AA, 98.00% of such remainder until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero; (B) 2.00% of such remainder, first to the Holders of REMIC I Regular Interests II-A-II in an aggregate amount equal to 1.00% of and in the same proportion as principal payments are allocated to the corresponding Class of Certificates for each such REMIC I Group II Regular Interest, respectively, until the Uncertificated Principal Balance of each such REMIC I Group II Regular Interest is reduced to zero; and, second, to the Holders of the REMIC I Regular Interest II-ZZ, until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero; and (C) any remaining amounts to the Holders of the Class R-II Certificates.

(3)    Notwithstanding the distributions described in this Section 4.02(b), distribution of funds from the Certificate Account shall be made only in accordance with Section 4.02(c).

(c)    On each Distribution Date (x) the Master Servicer on behalf of the Trustee or (y) the Paying Agent appointed by the Trustee, shall distribute to each Certificateholder of record on the next preceding Record Date (other than as provided in Section 9.01 respecting the final distribution) either in immediately available funds (by wire transfer or otherwise) to the account of such Certificateholder at a bank or other entity having appropriate facilities therefor, if such Certificateholder has so notified the Master Servicer or the Paying Agent, as the case may be, or, if such Certificateholder has not so notified the Master Servicer or the Paying Agent by the Record Date, by check mailed to such Certificateholder at the address of such Holder appearing in the Certificate Register such Certificateholder's share (which share with respect to each Class of Certificates, shall be based on the aggregate of the Percentage Interests represented by Certificates of the applicable Class held by such Holder of the following amounts, in the

CONFIDENTIAL                                    RC_FGIC9019_00031467

following order of priority, subject to the provisions of Section 4.02(d)), to the extent of the Available Distribution Amount on deposit in the Certificate Account with respect to clauses (i) and (ii), and to the extent of the sum of the remaining Available Distribution Amount and the Yield Maintenance Payments on deposit in the Certificate Account with respect to clauses (iii) through (xiii) (and, with respect to clause (xii)(B) below, to the extent of prepayment charges on deposit in the Certificate Account):

     (i)     to the Class A Certificateholders, the Interest Distribution Amount, with such amount allocated among the Class A Certificateholders pursuant to the Class A Interest Distribution Priority;

     (ii)     to the Class A Certificateholders, from the amount, if any, of the Available Distribution Amount remaining after the foregoing distributions, the Principal Distribution Amount (other than the amounts set forth in clauses (b)(iv), (b)(v), and (b)(vi) of the definition thereof), in the order of priority described in Section 4.02(d) hereof, until the Certificate Principal Balances of the Class A Certificates have been reduced to zero;

     (iii)     to the Class A Certificateholders, from the amount, if any, of Excess Cash Flow, an amount equal to the principal portion of Realized Losses previously allocated to reduce the Certificate Principal Balance of any Class of the Class A Certificates and remaining unreimbursed, but only to the extent of Subsequent Recoveries on the related Mortgage Loans for that Distribution Date, which amount shall be included in the Principal Distribution Amount and paid in accordance with Section 4.02(d) hereof, until the Certificate Principal Balances of the Class A Certificates have been reduced to zero;

     (iv)     to the Class A Certificateholders, from the amount, if any, of Excess Cash Flow remaining after the foregoing distributions, an amount equal to the principal portion of Realized Losses on the Mortgage Loans during the immediately preceding Prepayment Period, which amount shall be included in the Principal Distribution Amount and paid in accordance with Section 4.02(d) hereof, until the Certificate Principal Balances of the Class A Certificates have been reduced to zero;

     (v)     to the Insurer, from the amount, if any, of the Excess Cash Flow remaining after the foregoing distributions, an amount equal to the Cumulative Insurance Payments;

     (vi)     to the Class A Certificateholders, from the amount, if any, of the Excess Cash Flow remaining after the foregoing distributions, the Overcollateralization Increase Amount for such Distribution Date, which amount shall be included in the Principal Distribution Amount and paid in accordance with Section 4.02(d) hereof, until the Certificate Principal Balances of the Class A Certificates have been reduced to zero;

     (vii)     to the Class A Certificateholders from the amount, if any, of the Excess Cash Flow remaining after the foregoing distributions, the amount of any Prepayment Interest Shortfalls allocated thereto for such Distribution Date, on a pro rata basis based on Prepayment Interest Shortfalls previously allocated thereto that remain unreimbursed,

CONFIDENTIAL                                                    RC_FGIC9019_00031468

to the extent not covered by Eligible Master Servicing Compensation on such Distribution Date;

(viii)    to the Class A Certificateholders from the amount, if any, of the Excess Cash Flow remaining after the foregoing distributions, the amount of any Prepayment Interest Shortfalls previously allocated thereto on any prior Distribution Date that remain unreimbursed, together with interest thereon at the applicable Pass-Through Rate, on a pro rata basis based on Prepayment Interest Shortfalls previously allocated thereto that remain unreimbursed;

(ix)    from the amount, if any, of the Excess Cash Flow remaining after the foregoing distributions, to pay the Class A Certificates, on a pro rata basis, based on the amount of the Group I Basis Risk Shortfall Carry-Forward Amount and Group II Basis Risk Shortfall Carry-Forward Amount, as applicable, previously allocated thereto that remain unreimbursed, the amount of any Group I Basis Risk Shortfall Carry-Forward Amount and Group II Basis Risk Shortfall Carry-Forward Amount remaining unpaid as of such Distribution Date;

(x)    to the Class A Certificates on a pro rata basis, based on the amount of Relief Act Shortfalls allocated thereto on such Distribution Date, from the amount, if any, of the Excess Cash Flow remaining after the foregoing distributions, the amount of any Relief Act Shortfalls allocated to those Certificates with respect to such Distribution Date;

(xi)    to the Class A Certificateholders, from the amount, if any, of the Excess Cash Flow remaining after the foregoing distributions, the principal portion of any Realized Losses previously allocated to those Certificates and remaining unreimbursed, which amount shall be allocated to the Class A Certificateholders on a pro rata basis, based on their respective principal portion of any Realized Losses previously allocated thereto that remain unreimbursed;

(xii)    to the Class SB Certificates, (A) from the amount, if any, of the Excess Cash Flow remaining after the foregoing distributions, the sum of (I) Accrued Certificate Interest thereon, (II) the amount of any Overcollateralization Reduction Amount for such Distribution Date and (III) for any Distribution Date after the Certificate Principal Balance of each Class of Class A Certificates has been reduced to zero, the Overcollateralization Amount, and (B) from prepayment charges on deposit in the Certificate Account, any prepayment charges received on the Mortgage Loans during the related Prepayment Period; and

(xiii)    to the Class R-II Certificateholders, the balance, if any, of the Excess Cash Flow.

(d)    On each Distribution Date, the Principal Distribution Amount will be distributed as follows:

(i)    the Group I Principal Distribution Amount shall be distributed as follows:

CONFIDENTIAL                                    RC_FGIC9019_00031469

(1)    *first*, to the Class A-I-1, Class A-I-2, Class A-I-3 and Class A-I-4 Certificates, in that order, in each case until the Certificate Principal Balance thereof has been reduced to zero; and (2) *second*, to the Class A-II Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and

(ii)    the Group II Principal Distribution Amount shall be distributed as follows:

(1)    *first*, to the Class A-II Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and (2) *second*, to the Class A-I-1, Class A-I-2, Class A-I-3 and Class A-I-4 Certificates, in that order, in each case until the Certificate Principal Balance thereof has been reduced to zero.

(e)    Notwithstanding the foregoing clauses (c) and (d), upon the reduction of the Certificate Principal Balance of a Class of Class A Certificates to zero, such Class of Certificates will not be entitled to further distributions pursuant to Section 4.02 (other than in respect of Subsequent Recoveries on the related Mortgage Loans).

(f)    Notwithstanding the foregoing, on any Distribution Date, the amounts allocated from Excess Cash Flow pursuant to clauses (c)(iii) through (c)(vi) of this Section 4.02 on such Distribution Date shall be paid first from the Available Distribution Amount for such Distribution Date and second from any Yield Maintenance Payment for such Distribution Date.

(g)    Any Prepayment Interest Shortfalls on the Mortgage Loans which are not covered by Eligible Master Servicing Compensation as described in Section 3.16 and Relief Act Shortfalls on the Mortgage Loans will be allocated among the Class A Certificates pro rata in accordance with the amount of Accrued Certificate Interest payable on such Distribution Date absent such shortfalls. Any such uncovered Prepayment Interest Shortfalls will be paid solely pursuant to Section 4.02(c)(vii) and (viii) to the extent funds are available therefor. Any such Relief Act Shortfalls will be paid solely pursuant to Section 4.02(c)(x) to the extent funds are available therefor.

(h)    In addition to the foregoing distributions, with respect to any Subsequent Recoveries, the Master Servicer shall deposit such funds into the Custodial Account pursuant to Section 3.07(b)(iii).

(i)    Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, as Holder thereof, and the Depository shall be responsible for crediting the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures. Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent. Each brokerage firm shall be responsible for disbursing funds to the Certificate Owners that it represents. None of the Trustee, the Certificate Registrar, the Depositor, the Insurer or the Master Servicer shall have any responsibility therefor except as otherwise provided by this Agreement or applicable law.

(j)    Except as otherwise provided in Section 9.01, if the Master Servicer anticipates that a final distribution with respect to any Class of Certificates will be made on the next Distribution Date, the Master Servicer shall, no later than the Determination Date in the month of

CONFIDENTIAL    RC_FGIC9019_00031470

such final distribution, notify the Trustee and the Trustee shall, no later than two (2) Business Days after such Determination Date, mail on such date to each Holder of such Class of Certificates a notice to the effect that: (i) the Trustee anticipates that the final distribution with respect to such Class of Certificates will be made on such Distribution Date but only upon presentation and surrender of such Certificates at the office of the Trustee or as otherwise specified therein, and (ii) no interest shall accrue on such Certificates from and after the end of the prior calendar month. In the event that Certificateholders required to surrender their Certificates pursuant to Section 9.01(c) do not surrender their Certificates for final cancellation, the Trustee shall cause funds distributable with respect to such Certificates to be held in the Certificate Account for the benefit of such Certificateholders as provided in Section 9.01(d).

Section 4.03.    Statements to Certificateholders; Statements to Rating Agencies; Exchange Act Reporting.

(a)    Concurrently with each distribution charged to the Certificate Account and with respect to each Distribution Date the Master Servicer shall forward to the Trustee and the Trustee shall forward by mail or otherwise make available electronically on its website (which may be obtained by any Certificateholder by telephoning the Trustee at (800) 934-6802) to each Holder, the Insurer and the Depositor a statement setting forth the following information as to each Class of Certificates, in each case to the extent applicable:

(i)    (A)    the amount of such distribution to the Certificateholders of such Class applied to reduce the Certificate Principal Balance thereof, and (B) the aggregate amount included therein representing Principal Prepayments;

(ii)    the amount of such distribution to Holders of such Class of Certificates allocable to interest;

(iii)    if the distribution to the Holders of such Class of Certificates is less than the full amount that would be distributable to such Holders if there were sufficient funds available therefor, the amount of the shortfall;

(iv)    the amount of any Advance by the Master Servicer with respect to the Group I Loans and Group II Loans pursuant to Section 4.04;

(v)    the Stated Principal Balance of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate after giving effect to the distribution of principal on such Distribution Date;

(vi)    the aggregate Certificate Principal Balance of each Class of the Certificates, after giving effect to the amounts distributed on such Distribution Date, separately identifying any reduction thereof due to Realized Losses other than pursuant to an actual distribution of principal;

(vii)    on the basis of the most recent reports furnished to it by Subservicers, (a) the number and aggregate principal balances of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate that are Delinquent (1) one month, (2) two months and (3) three or more months and the number and aggregate principal balance of

CONFIDENTIAL                                                          RC_FGIC9019_00031471

the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate that are in foreclosure, (b) the number and aggregate principal balances of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate that are Reportable Modified Mortgage Loans that are Delinquent (1) one month, (2) two months and (3) three or more months and the number and aggregate principal balance of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate that are Reportable Modified Mortgage Loans that are in foreclosure and are REO Property, indicating in each case capitalized Mortgage Loans, other Servicing Modifications and totals, and (c) for all Mortgage Loans that are Reportable Modified Mortgage Loans, the number and aggregate Stated Principal Balance of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate that are Reportable Modified Mortgage Loans that have been liquidated, the subject of pay-offs and that have been repurchased by the Master Servicer or Seller;

(viii)    the number, aggregate principal balance and book value of any REO Properties with respect to the Group I Loans, the Group II Loans and the Mortgage Loans in the aggregate;

(ix)    the aggregate Accrued Certificate Interest remaining unpaid, if any, for each Class of Certificates, after giving effect to the distribution made on such Distribution Date;

(x)    the aggregate amount of Realized Losses with respect to the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate for such Distribution Date and the aggregate amount of Realized Losses with respect to the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate incurred since the Cut-off Date;

(xi)    the amount of any Insured Payment paid on such Distribution Date, the amount of any reimbursement payment made to the Insurer on such Distribution Date pursuant to Section 4.02(c)(v) and the amount of the Cumulative Insurance Payments, after giving effect to any such Insured Payment or any such reimbursement payment to the Insurer;

(xii)    the Pass-Through Rate on each Class of Certificates and the applicable Net WAC Cap Rate;

(xiii)    the weighted average of the Maximum Net Mortgage Rates with respect to the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate;

(xiv)    the Group I Basis Risk Shortfall, Group I Basis Risk Shortfall Carry-Forward Amount, Group II Basis Risk Shortfall, Group II Basis Risk Shortfall Carry-Forward Amount and Prepayment Interest Shortfalls;

(xv)    the Overcollateralization Amount and the Required Overcollateralization Amount following such Distribution Date;

(xvi)    the number and aggregate principal balance of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate repurchased under Section 4.07 or Section 4.08;

CONFIDENTIAL                                      RC_FGIC9019_00031472

(xvii)   the aggregate amount of any recoveries on previously foreclosed loans with respect to the Group I Loans, the Group II Loans and the Mortgage Loans in the aggregate from Residential Funding due to a breach of representation or warranty;

(xviii) the weighted average remaining term to maturity of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate after giving effect to the amounts distributed on such Distribution Date;

(xix)   the weighted average Mortgage Rates of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate after giving effect to the amounts distributed on such Distribution Date;

(xx)    the amount if any, to be paid by a Derivative Counterparty under a Derivative Contract; and

(xxi)   the amount of any Yield Maintenance Payments payable to the Trustee on behalf of the Trust Fund and any Yield Maintenance Termination Payment payable to the Trustee on behalf of the Trust Fund.

In the case of information furnished pursuant to clauses (i) and (ii) above, the amounts shall be expressed as a dollar amount per Certificate with a $1,000 denomination. In addition to the statement provided to the Trustee as set forth in this Section 4.03(a), the Master Servicer shall provide to any manager of a trust fund consisting of some or all of the Certificates, upon reasonable request, such additional information as is reasonably obtainable by the Master Servicer at no additional expense to the Master Servicer. Also, at the request of a Rating Agency, the Master Servicer shall provide the information relating to the Reportable Modified Mortgage Loans substantially in the form attached hereto as Exhibit S to such Rating Agency within a reasonable period of time; provided, however, that the Master Servicer shall not be required to provide such information more than four times in a calendar year to any Rating Agency.

(b)      Within a reasonable period of time after the end of each calendar year, the Master Servicer shall prepare, or cause to be prepared, and the Trustee shall forward, or cause to be forwarded, upon the Trustee's receipt thereof to each Person who at any time during the calendar year was the Holder of a Certificate, other than a Class R Certificate, a statement containing the information set forth in clauses (i) and (ii) of subsection (a) above aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder. Such obligation of the Master Servicer and Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Master Servicer and Trustee pursuant to any requirements of the Code.

(c)      Within a reasonable period of time after the end of each calendar year, the Master Servicer shall prepare, or cause to be prepared, and the Trustee shall forward, or cause to be forwarded, to each Person who at any time during the calendar year was the Holder of a Class R Certificate, a statement containing the applicable distribution information provided pursuant to this Section 4.03 aggregated for such calendar year or applicable portion thereof during which such Person was the Holder of a Class R Certificate.  Such obligation of the Master Servicer shall be deemed to have been satisfied to the extent that substantially comparable information

CONFIDENTIAL                                                        RC_FGIC9019_00031473

shall be provided by the Master Servicer and forwarded by the Trustee pursuant to any requirements of the Code.

(d)    As soon as reasonably practicable, upon the written request of any Class SB or Class R Certificateholder, the Master Servicer shall provide the requesting Certificateholder with such information as is necessary and appropriate, in the Master Servicer's sole discretion, for purposes of satisfying applicable reporting requirements under Rule 144A.

(e)    The Master Servicer shall, on behalf of the Depositor and in respect of the Trust Fund, sign and cause to be filed with the Commission any periodic reports required to be filed under the provisions of the Exchange Act, and the rules and regulations of the Commission thereunder. In connection with the preparation and filing of such periodic reports, the Trustee shall timely provide to the Master Servicer (I) a list of Certificateholders as shown on the Certificate Register as of the end of each calendar year, (II) copies of all pleadings, other legal process and any other documents relating to any claims, charges or complaints involving the Trustee, as trustee hereunder, or the Trust Fund that are received by the Trustee, (III) notice of all matters that, to the actual knowledge of a Responsible Officer of the Trustee, have been submitted to a vote of the Certificateholders, other than those matters that have been submitted to a vote of the Certificateholders at the request of the Depositor or the Master Servicer, and (IV) notice of any failure of the Trustee to make any distribution to the Certificateholders as required pursuant to this Agreement. Neither the Master Servicer nor the Trustee shall have any liability with respect to the Master Servicer's failure to properly prepare or file such periodic reports resulting from or relating to the Master Servicer's inability or failure to obtain any information not resulting from the Master Servicer's own negligence or willful misconduct. Any Form 10-K filed with the Commission in connection with this clause (d) shall include a certification, signed by the senior officer in charge of the servicing functions of the Master Servicer, in the form attached as Exhibit R-1 hereto or such other form as may be required or permitted by the Commission (the "Form 10-K Certification"), in compliance with Rule 13a-14 and 15d-14 under the Exchange Act and any additional directives of the Commission. In connection with the Form 10-K Certification, the Trustee shall provide the Master Servicer with a back-up certification substantially in the form attached hereto as Exhibit R-2. This Section 4.03(e) may be amended in accordance with this Agreement without the consent of the Certificateholders.

Section 4.04.    <u>Distribution of Reports to the Trustee and the Depositor; Advances by the Master Servicer</u>.

(a)    Prior to the close of business on the Business Day next succeeding each Determination Date, the Master Servicer shall furnish a written statement (which may be in a mutually agreeable electronic format) to the Trustee, the Insurer, any Paying Agent and the Depositor (the information in such statement to be made available to Certificateholders by the Master Servicer on request) (provided that the Master Servicer shall use its best efforts to deliver such written statement not later than 12:00 P.M. New York time on the second Business Day prior to the Distribution Date) setting forth (i) the Available Distribution Amounts, (ii) the amounts required to be withdrawn from the Custodial Account and deposited into the Certificate Account on the immediately succeeding Certificate Account Deposit Date pursuant to clause (iii) of Section 4.01(a), (iii) the amount of Prepayment Interest Shortfalls, Group I Basis Risk

CONFIDENTIAL                                                                RC_FGIC9019_00031474

Shortfall, Group II Basis Risk Shortfall, Group I Basis Risk Shortfall Carry-Forward Amounts and Group II Basis Risk Shortfall Carry-Forward Amounts, (iv) the Certificate Insurer Premium and, if the Master Servicer determines that a Deficiency Amount exists for such Distribution, the amount necessary to complete the notice in the form of Exhibit A to the Policy (the "Notice"), (v) the Yield Maintenance Payment, if any, for such Distribution Date and (vi) the amount payable by the Derivative Counterparties to the Trustee under the Derivative Contracts as provided in Section 4.11. The determination by the Master Servicer of such amounts shall, in the absence of obvious error, be presumptively deemed to be correct for all purposes hereunder and the Trustee shall be protected in relying upon the same without any independent check or verification.

(b)    On or before 2:00 P.M. New York time on each Certificate Account Deposit Date, the Master Servicer shall either (i) remit to the Trustee for deposit in the Certificate Account from its own funds, or funds received therefor from the Subservicers, an amount equal to the Advances to be made by the Master Servicer in respect of the related Distribution Date, which shall be in an aggregate amount equal to the sum of (A) the aggregate amount of Monthly Payments other than Balloon Payments (with each interest portion thereof adjusted to a per annum rate equal to the Net Mortgage Rate, plus the Certificate Insurer Premium Modified Rate), less the amount of any related Servicing Modifications, Debt Service Reductions or reductions in the amount of interest collectable from the Mortgagor pursuant to the Relief Act or similar legislation or regulations then in effect, on the Outstanding Mortgage Loans as of the related Due Date in the related Due Period, which Monthly Payments were due during the related Due Period and not received as of the close of business as of the related Determination Date; provided that no Advance shall be made if it would be a Nonrecoverable Advance and (B) with respect to each Balloon Loan delinquent in respect of its Balloon Payment as of the close of business on the related Determination Date, an amount equal to the assumed Monthly Payment (with each interest portion thereof adjusted to a per annum rate equal to the Net Mortgage Rate, plus the Certificate Insurer Premium Modified Rate) that would have been due on the related Due Date based on the original amortization schedule for such Balloon Loan until such Balloon Loan is finally liquidated, over any payments of interest or principal (with each interest portion thereof adjusted to per annum rate equal to the Net Mortgage Rate) received from the related Mortgagor as of the close of business on the related Determination Date and allocable to the Due Date during the related Due Period for each month until such Balloon Loan is finally liquidated, (ii) withdraw from amounts on deposit in the Custodial Account and deposit in the Certificate Account all or a portion of the Amount Held for Future Distribution in discharge of any such Advance, or (iii) make advances in the form of any combination of clauses (i) and (ii) aggregating the amount of such Advance. Any portion of the Amount Held for Future Distribution so used shall be replaced by the Master Servicer by deposit in the Certificate Account on or before 11:00 A.M. New York time on any future Certificate Account Deposit Date to the extent that funds attributable to the Mortgage Loans that are available in the Custodial Account for deposit in the Certificate Account on such Certificate Account Deposit Date shall be less than payments to Certificateholders required to be made on the following Distribution Date. The Master Servicer shall be entitled to use any Advance made by a Subservicer as described in Section 3.07(b) that has been deposited in the Custodial Account on or before such Distribution Date as part of the Advance made by the Master Servicer pursuant to this Section 4.04. The determination by the Master Servicer that it has made a Nonrecoverable Advance or that any proposed Advance, if made, would constitute a Nonrecoverable Advance,

CONFIDENTIAL                                        RC_FGIC9019_00031475

shall be evidenced by a certificate of a Servicing Officer delivered to the Depositor, the Insurer and the Trustee. In the event that the Master Servicer determines as of the Business Day preceding any Certificate Account Deposit Date that it will be unable to deposit in the Certificate Account an amount equal to the Advance required to be made for the immediately succeeding Distribution Date, it shall give notice to the Trustee and the Insurer of its inability to advance (such notice may be given by telecopy), not later than 3:00 P.M., New York time, on such Business Day, specifying the portion of such amount that it will be unable to deposit. Not later than 3:00 P.M., New York time, on the Certificate Account Deposit Date the Trustee shall, unless by 12:00 Noon, New York time, on such day the Trustee shall have been notified in writing (by telecopy) that the Master Servicer shall have directly or indirectly deposited in the Certificate Account such portion of the amount of the Advance as to which the Master Servicer shall have given notice pursuant to the preceding sentence, pursuant to Section 7.01, (a) terminate all of the rights and obligations of the Master Servicer under this Agreement in accordance with Section 7.01 and (b) assume the rights and obligations of the Master Servicer as successor Master Servicer hereunder, including the obligation to deposit in the Certificate Account an amount equal to the Advance for the immediately succeeding Distribution Date. In connection with the preceding sentence, the Trustee shall deposit all funds it receives pursuant to this Section 4.04(b) into the Certificate Account.

Section 4.05.    Allocation of Realized Losses.

(a)    Prior to each Distribution Date, the Master Servicer shall determine the total amount of Realized Losses, if any, that resulted from any Cash Liquidation, Servicing Modifications, Debt Service Reduction, Deficient Valuation or REO Disposition that occurred during the related Prepayment Period or, in the case of a Servicing Modification that constitutes a reduction of the interest rate on a Mortgage Loan, the amount of the reduction in the interest portion of the Monthly Payment due in the month in which such Distribution Date occurs. The amount of each Realized Loss shall be evidenced by an Officers' Certificate.

(b)    All Realized Losses on the Mortgage Loans shall be allocated or covered as follows:

*first*, by Excess Cash Flow as provided in clause (b)(v) of the definition of "Principal Distribution Amount", to the extent of the Excess Cash Flow for such Distribution Date;

*second*, by the reduction of the Overcollateralization Amount, until such amount has been reduced to zero;

*third*, for any remaining Realized Losses on the Group I Loans, to the Class A-I Certificates on a pro rata basis, and for any remaining Realized Losses on the Group II Loans, to the Class A-II Certificates, in each case until the Certificate Principal Balances thereof have been reduced to zero.

(c)    All allocations of a Realized Loss on a "pro rata basis" among two or more specified Classes of Certificates means an allocation on a pro rata basis, among the various Classes so specified, to each such Class of Certificates on the basis of their then outstanding

CONFIDENTIAL                                                    RC_FGIC9019_00031476

Certificate Principal Balances prior to giving effect to distributions to be made on such Distribution Date in the case of the principal portion of a Realized Loss or based on the Accrued Certificate Interest thereon payable on such Distribution Date in the case of an interest portion of a Realized Loss.  Any allocation of the principal portion of Realized Losses (other than Debt Service Reductions) to the Class A Certificates shall be made by reducing the Certificate Principal Balance thereof by the amount so allocated, which allocation shall be deemed to have occurred on such Distribution Date; provided that no such reduction shall reduce the Certificate Principal Balance of the Class A Certificates below the aggregate Stated Principal Balance of the Mortgage Loans, as applicable. Allocations of the interest portions of Realized Losses (other than any interest rate reduction resulting from a Servicing Modification) shall be made by operation of the definition of "Accrued Certificate Interest" and by operation of the provisions of Section 4.02(c). Allocations of the interest portion of a Realized Loss resulting from an interest rate reduction in connection with a Servicing Modification shall be made by operation of the provisions of Section 4.02(c). All Realized Losses and all other losses allocated to a Class of Certificates hereunder will be allocated among the Certificates of such Class in proportion to the Percentage Interests evidenced thereby.

(d)    (i)    All Realized  Losses on the Group I Loans shall be allocated on each Distribution Date to the following REMIC Regular Interests in the specified percentages, as follows: first, to Uncertificated Accrued Interest payable to the  REMIC I  Regular Interests I-AA and I-ZZ up to an  aggregate amount equal to the excess of (a) the REMIC I Group I Interest Loss  Allocation Amount over (b) Prepayment Interest Shortfalls (to the extent not covered by Eligible Master Servicing Compensation) relating to the Mortgage Loans for such Distribution  Date, 98% and 2%, respectively; second, to the Uncertificated Principal Balances of the REMIC I Regular Interests I-AA and I-ZZ up to an aggregate amount equal to the REMIC I Principal Loss Allocation Amount, 98% and 2%, respectively; third, to the Uncertificated Principal Balances of REMIC I Regular Interests I-AA, 98%, I-A-I-4, 1% and I-ZZ, 1%, until the Uncertificated Principal Balance of REMIC I Regular Interest I-A-I-4 has been reduced to zero; fourth, to the Uncertificated Principal Balances of REMIC I Regular Interests I-AA, 98%, I-A-I-3, 1%, and I-ZZ, 1%, until the Uncertificated Principal Balances of REMIC I Regular Interest I-A-I-3 has been reduced to zero; fifth, to the Uncertificated Principal Balances of REMIC I Regular Interests I-AA, 98%, I-A-I-2, 1%, and I-ZZ, 1%, until the Uncertificated Principal Balances of REMIC I Regular Interest I-A-I-2 has been reduced to zero; and sixth, to the Uncertificated Principal Balances of REMIC I Regular Interests I-AA, 98%, I-A-I-1, 1%, and I-ZZ, 1%, until the Uncertificated Principal Balances of REMIC I Regular Interest I-A-I-1 has been reduced to zero.

(ii)    All Realized Losses on the Group II Loans shall be allocated on each Distribution Date to the following REMIC Regular Interests in the specified percentages, as follows: first, to Uncertificated Accrued Interest payable to the REMIC I Regular Interests II-AA and II-ZZ up to an aggregate amount equal to the excess of (a) the REMIC I Group I Interest Loss Allocation Amount over (b) Prepayment Interest Shortfalls (to the extent not covered by Eligible Master Servicing Compensation) relating to the Mortgage Loans for such Distribution  Date, 98% and 2%, respectively; second, to the Uncertificated Principal Balances of the REMIC I Regular Interests II-A-II and II-ZZ up to an aggregate amount equal to the REMIC I Principal Loss Allocation Amount, 98% and 2%, respectively; and third, to the Uncertificated Principal

CONFIDENTIAL                                                                          RC_FGIC9019_00031477

Balances of REMIC I Regular Interests II-AA, 98%, II-A-II, 1%, and II-ZZ, 1%, until the Uncertificated Principal Balances of REMIC I Regular Interest II-A-II has been reduced to zero.

(e)    Realized Losses allocated to the Excess Cash Flow or the Overcollateralization Amount pursuant to paragraphs (a), (b) or (c) of this Section, the definition of Accrued Certificate Interest and the operation of Section 4.02(c) shall be deemed allocated to the Class SB Certificates. Realized Losses allocated to the Class SB Certificates shall, to the extent such Realized Losses represent Realized Losses on an interest portion, be allocated to the Class SB Certificates, in reduction of the accrued but unpaid interest thereon. Realized Losses allocated to the Excess Cash Flow pursuant to paragraph (b) of this Section shall be deemed to reduce Accrued Certificate Interest on the Class SB Certificates. Realized Losses allocated to the Overcollateralization Amount pursuant to paragraph (b) of this Section shall be deemed first to reduce the principal balance of the Class SB Certificates until such principal balance shall have been reduced to zero and thereafter to reduce accrued and unpaid interest on the Class SB Certificates.

Section 4.06.    Reports of Foreclosures and Abandonment of Mortgaged Property.

The Master Servicer or the Subservicers shall file information returns with respect to the receipt of mortgage interest received in a trade or business, the reports of foreclosures and abandonments of any Mortgaged Property and the informational returns relating to cancellation of indebtedness income with respect to any Mortgaged Property required by Sections 6050H, 6050J and 6050P of the Code, respectively, and deliver to the Trustee an Officers' Certificate on or before March 31 of each year, beginning with the first March 31 that occurs at least six months after the Cut-Off Date, stating that such reports have been filed. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

Section 4.07.    Optional Purchase of Defaulted Mortgage Loans.

As to any Mortgage Loan which is delinquent in payment by 90 days or more, the Master Servicer may, at its option, purchase such Mortgage Loan from the Trustee at the Purchase Price therefor. If at any time the Master Servicer makes a payment to the Certificate Account covering the amount of the Purchase Price for such a Mortgage Loan, and the Master Servicer provides to the Trustee a certification signed by a Servicing Officer stating that the amount of such payment has been deposited in the Certificate Account, then the Trustee shall execute the assignment of such Mortgage Loan at the request of the Master Servicer without recourse to the Master Servicer which shall succeed to all the Trustee's right, title and interest in and to such Mortgage Loan, and all security and documents relative thereto. Such assignment shall be an assignment outright and not for security. The Master Servicer will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Trustee or the Certificateholders with respect thereto.

Section 4.08.    Limited Mortgage Loan Repurchase Right.

The Limited Repurchase Right Holder will have the irrevocable option at any time to purchase any of the Mortgage Loans from the Trustee at the Purchase Price, up to a maximum of

CONFIDENTIAL                                                          RC_FGIC9019_00031478

five Mortgage Loans. In the event that this option is exercised as to any five Mortgage Loans in the aggregate, this option will thereupon terminate. If at any time the Limited Repurchase Right Holder makes a payment to the Certificate Account covering the amount of the Purchase Price for such a Mortgage Loan, and the Limited Repurchase Right Holder provides to the Trustee a certification signed by a Servicing Officer stating that the amount of such payment has been deposited in the Certificate Account, then the Trustee shall execute the assignment of such Mortgage Loan at the request of the Limited Repurchase Right Holder without recourse to the Limited Repurchase Right Holder which shall succeed to all the Trustee's right, title and interest in and to such Mortgage Loan, and all security and documents relative thereto. Such assignment shall be an assignment outright and not for security. The Limited Repurchase Right Holder will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Trustee or the Certificateholders with respect thereto. Any tax on "prohibited transactions" (as defined in Section 860F(a)(2) of the Code) imposed on any REMIC relating to the exercise of the option provided in this Section 4.08 shall in no event be payable by the Trustee.

Section 4.09.    The Yield Maintenance Agreement.

(a)    On the Closing Date, the Trustee shall, on behalf of the Trust Fund, for the benefit of the Class A and Class SB Certificates, enter into the Yield Maintenance Agreement.

(b)    The Trustee shall deposit or cause to be deposited any amount received under the Yield Maintenance Agreement into the Certificate Account on the date such amount is received from the Yield Maintenance Agreement Provider under the Yield Maintenance Agreement (including Yield Maintenance Agreement Termination Payments, if any). All Yield Maintenance Payments received under the Yield Maintenance Agreement shall be distributed as part of Excess Cash Flow in accordance with the priorities set forth in Section 4.02(c) hereof, whereas, all Yield Maintenance Agreement Termination Payments received under the Yield Maintenance Agreement shall be used as set forth in Section 4.09(e) hereof.  Neither the Yield Maintenance Agreement nor any Yield Maintenance Payments (including Yield Maintenance Termination Payments) constitute a part of any REMIC created hereunder and to the extent any Yield Maintenance Payments are included as part of Excess Cash Flow they are so for definition purposes only.

(c)    Subject to Sections 8.01 and 8.02 hereof, the Trustee agrees to comply with the terms of the Yield Maintenance Agreement and to enforce the terms and provisions thereof against the Yield Maintenance Agreement Provider at the written direction of the Holders of Class A Certificates entitled to at least 51% of the Voting Rights of such Classes of Certificates, or if the Trustee does not receive such direction from such Certificateholders, then at the written direction of Residential Funding.

(d)    The Trustee and the Master Servicer shall treat the holders of each Class of Certificates (other than the Class SB Certificates and Class R Certificates) as having entered into a notional principal contract with the holders of the Class SB Certificates.  Pursuant to each such notional principal contract, the holder of the Class SB Certificates shall be treated as having agreed to pay the amounts set forth in Sections 4.02(c)(iv) through (xi) to the holders of the Certificates (other than the Class SB Certificates and Class R Certificates) in accordance with the

CONFIDENTIAL                                                            RC_FGIC9019_00031479

terms of this Agreement. Any payments to the Certificates from amounts deemed received in respect of this notional principal contract shall not be payments with respect to a "regular interest" in a REMIC within the meaning of Code Section 860G(a)(1).

(e)     In the event that the Yield Maintenance Agreement, or any replacement thereof, terminates prior to the Distribution Date in December 2010, the Master Servicer, but at no expense to the Master Servicer, on behalf of the Trustee, to the extent that the termination value under such Yield Maintenance Agreement is sufficient therefor and only to the extent of the Yield Maintenance Agreement Termination Payment received from the Yield Maintenance Agreement Provider, shall (i) cause a new yield maintenance provider to assume the obligations of such terminated yield maintenance agreement provider or (ii) cause a new yield maintenance agreement provider to enter into a new interest rate yield maintenance agreement with the Trust Fund having substantially similar terms as those set forth in the terminated Yield Maintenance Agreement.   Any Yield Maintenance Agreement Termination Payment having a termination value which is not sufficient to comply with clauses (i) and (ii) of this Section 4.09(e) shall be included in the definition of Yield Maintenance Payment herein and may be distributed as Excess Cash Flow pursuant to Section 4.02(c) herein.

Section 4.10.   The Policy.

(a)     If pursuant to Section 4.04(a)(iv), the Master Servicer determines and notifies a Responsible Officer of the Trustee in writing that a Deficiency Amount exists and the amount of the Required Insured Payment for such Distribution Date, the Trustee shall complete the Notice and submit such Notice in accordance with the Policy to the Insurer no later than 12:00 P.M., New York City time, on the second Business Day immediately preceding each Distribution Date, as a claim for an Insured Payment in an amount equal to such Deficiency Amount.

(b)     The Trustee shall establish and maintain the Insurance Account on behalf of the Holders of the Class A Certificates. Upon receipt of an Insured Payment from the Insurer on behalf of the Class A Certificateholders, the Trustee shall deposit such Insured Payment in the Insurance Account. All amounts on deposit in the Insurance Account shall remain uninvested. On each Distribution Date, the Trustee shall transfer any Insured Payment then on deposit in the Insurance Account to the Certificate Account. The Trustee shall distribute on each Distribution Date in accordance with the written statement delivered by the Master Servicer pursuant to Section 4.04(a), the Deficiency Amount for such Distribution Date from the Certificate Account, together with the distributions due to the Class A-I Certificateholders on such Distribution Date, as follows: (i) with respect to the Class A-I Certificates, the portion of any such Deficiency Amount related to clauses (1) and (2)(i) of the definition of Deficiency Amount shall be distributed among the related Class A-I Certificateholders on a pro rata basis in accordance with their respective shortfalls or allocations of Realized Losses; and (ii) the portion of any such Deficiency Amount related to clause (2)(ii) of the definition of Deficiency Amount shall be distributed to the related Class A-I Certificateholders in accordance with Section 9.01(c). The Trustee shall distribute on each Distribution Date the Deficiency Amount for such Distribution Date from the Certificate Account, together with the distributions due to the Class A-II Certificateholders on such Distribution Date, as follows: (i) with respect to the Class A-II Certificates, the portion of any such Deficiency Amount related to clauses (1) and (2)(i) of the definition of Deficiency Amount shall be distributed among the related Class A-II

CONFIDENTIAL                                                                    RC_FGIC9019_00031480

Certificateholders on a pro rata basis in accordance with their respective shortfalls or allocations of Realized Losses; and (ii) the portion of any such Deficiency Amount related to clause (2)(ii) of the definition of Deficiency Amount shall be distributed to the related Class A-II Certificateholders in accordance with Section 9.01(c).

(c)    The Trustee shall (i) receive as attorney-in-fact of each Class A Certificateholder any Insured Payment from the Insurer and (ii) distribute such Insured Payment to such Class A Certificateholders as set forth in subsection (b) above. Insured Payments disbursed by the Trustee from proceeds of the Policy shall not be considered payment by the Trust Fund with respect to the Class A Certificates, nor shall such disbursement of such Insured Payments discharge the obligations of the Trust Fund with respect to the amounts thereof, and the Insurer shall become owner of such amounts to the extent covered by such Insured Payments as the deemed assignee of such Class A Certificateholders. The Trustee hereby agrees on behalf of each Class A Certificateholder (and each Class A Certificateholder, by its acceptance of its Class A Certificates, hereby agrees) for the benefit of the Insurer that the Trustee shall recognize that to the extent the Insurer pays Insured Payments, either directly or indirectly (as by paying through the Trustee), to the Class A Certificateholders, the Insurer will be entitled to be subrogated to the rights of the Class A Certificateholders to the extent of such payments.

Section 4.11.    Derivative Contracts.

(a)    The Trustee shall, at the written direction of the Master Servicer, on behalf of the Trust Fund, enter into Derivative Contracts, solely for the benefit of the Class SB Certificates. Any such Derivative Contract shall constitute a fully prepaid agreement. The Master Servicer shall determine, in its sole discretion, whether any Derivative Contract conforms to the requirements of clauses (b) and (c) of this Section 4.11. Any acquisition of a Derivative Contract shall be accompanied by an appropriate amendment to this Agreement, including an Opinion of Counsel, as provided in Section 11.01, and either (i) an Opinion of Counsel to the effect that the existence of the Derivative Contract will not adversely affect the availability of the exemptive relief afforded under ERISA by U.S. Department of Labor Prohibited Transaction Exemption ("PTE") 94-29, as most recently amended, 67 Fed. Reg. 54487 (Aug. 22, 2002), to the Holders of the Class A Certificates, as of the date the Derivative Contract is acquired by the Trustee; or (ii) the consent of each holder of a Class A Certificate to the acquisition of such Derivative Contract. All collections, proceeds and other amounts in respect of the Derivative Contracts payable by the Derivative Counterparty shall be distributed to the Class SB Certificates on the Distribution Date following receipt thereof by the Trustee on behalf of the Trust Fund. In no event shall such an instrument constitute a part of any REMIC created hereunder. In addition, in the event any such instrument is deposited, the Trust Fund shall be deemed to be divided into two separate and discrete sub-Trusts. The assets of one such sub-Trust shall consist of all the assets of the Trust other than such instrument and the assets of the other sub-Trust shall consist solely of such instrument.

(b)    Any Derivative Contract that provides for any payment obligation on the part of the Trust Fund must (i) be without recourse to the assets of the Trust Fund, (ii) contain a non-petition covenant provision from the Derivative Counterparty, (iii) limit payment dates thereunder to Distribution Dates and (iv) contain a provision limiting any cash payments due to the Derivative Counterparty on any day under such Derivative Contract solely to funds available

CONFIDENTIAL    RC_FGIC9019_00031481

therefor in the Certificate Account available to make payments to the Holders of the Class SB Certificates on such Distribution Date.

(c)    Each Derivative Contract must (i) provide for the direct payment of any amounts by the Derivative Counterparty thereunder to the Certificate Account at least one Business Day prior to the related Distribution Date, (ii) contain an assignment of all of the Trust Fund's rights (but none of its obligations) under such Derivative Contract to the Trustee on behalf the Class SB Certificateholders and shall include an express consent to the Derivative Counterparty to such assignment, (iii) provide that in the event of the occurrence of an Event of Default, such Derivative Contract shall terminate upon the direction of a majority Percentage Interest of the Class SB Certificates, and (iv) prohibit the Derivative Counterparty from "setting-off" or "netting" other obligations of the Trust Fund and its Affiliates against such Derivative Counterparty's payment obligations thereunder.

Section 4.12.    Tax Treatment of Yield Maintenance Payments.

For federal income tax purposes, each holder of a Class A or Class SB Certificate is deemed to own an undivided beneficial ownership interest in a REMIC regular interest and the right to receive payments received by the Trustee, on behalf of the Trust Fund, pursuant to the Yield Maintenance Agreement in respect of the amounts set forth in Section 4.09(b) which right to receive such payments shall not be attributable to any asset or amount owed by any REMIC created hereunder.

## ARTICLE V
## THE CERTIFICATES

Section 5.01.    The Certificates.

(a)    The Class A, Class SB and Class R Certificates shall be substantially in the forms set forth in Exhibits A, D and E, respectively, and shall, on original issue, be executed and delivered by the Trustee to the Certificate Registrar for authentication and delivery to or upon the order of the Depositor upon receipt by the Trustee or one or more Custodians of the documents specified in Section 2.01. The Class A Certificates shall be issuable in minimum dollar denominations of $100,000 and integral multiples of $1 in excess thereof. The Class SB Certificates shall be issuable in registered, certificated form in minimum percentage interests of 5.00% and integral multiples of 0.01% in excess thereof. Each Class of Class R Certificates shall be issued in registered, certificated form in minimum percentage interests of 20.00% and integral multiples of 0.01% in excess thereof; *provided, however*, that one Class R Certificate of each Class will be issuable to the REMIC Administrator as "tax matters person" pursuant to Section 10.01(c) in a minimum denomination representing a Percentage Interest of not less than 0.01%. The Certificates shall be executed by manual or facsimile signature on behalf of an authorized officer of the Trustee. Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Certificate or did not hold such offices at the date of such Certificates. No Certificate shall be entitled to any benefit under this Agreement, or be valid for any purpose, unless there appears on such Certificate a certificate of authentication substantially in the form

CONFIDENTIAL                                                      RC_FGIC9019_00031482

provided for herein executed by the Certificate Registrar by manual signature, and such certificate upon any Certificate shall be conclusive evidence, and the only evidence, that such Certificate has been duly authenticated and delivered hereunder. All Certificates shall be dated the date of their authentication.

(b)    The Class A Certificates shall initially be issued as one or more Certificates registered in the name of the Depository or its nominee and, except as provided below, registration of such Certificates may not be transferred by the Trustee except to another Depository that agrees to hold such Certificates for the respective Certificate Owners with Ownership Interests therein. The Certificate Owners shall hold their respective Ownership Interests in and to each such Class A Certificate through the book-entry facilities of the Depository and, except as provided below, shall not be entitled to Definitive Certificates in respect of such Ownership Interests. All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner. Each Depository Participant shall transfer the Ownership Interests only in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

The Trustee, the Master Servicer and the Depositor may for all purposes (including the making of payments due on the respective Classes of Book-Entry Certificates) deal with the Depository as the authorized representative of the Certificate Owners with respect to the respective Classes of Book-Entry Certificates for the purposes of exercising the rights of Certificateholders hereunder. The rights of Certificate Owners with respect to the respective Classes of Book-Entry Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners. Multiple requests and directions from, and votes of, the Depository as Holder of any Class of Book-Entry Certificates with respect to any particular matter shall not be deemed inconsistent if they are made with respect to different Certificate Owners. The Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Certificateholders and shall give notice to the Depository of such record date.

In addition, if an Event of Default has occurred and is continuing, each Certificate Owner materially adversely affected thereby may at its option request a Definitive Certificate evidencing such Certificate Owner's Percentage Interest in the related Class of Certificates. In order to make such request, such Certificate Owner shall, subject to the rules and procedures of the Depository, provide the Depository or the related Depository Participant with directions for the Trustee to exchange or cause the exchange of the Certificate Owner's interest in such Class of Certificates for an equivalent Percentage Interest in fully registered definitive form. Upon receipt by the Trustee of instruction from the Depository directing the Trustee to effect such exchange (such instructions to contain information regarding the Class of Certificates and the Certificate Principal Balance being exchanged, the Depository Participant account to be debited with the decrease, the registered holder of and delivery instructions for the Definitive Certificates and any other information reasonably required by the Trustee), (i) the Trustee shall instruct the Depository to reduce the related Depository Participant's account by the aggregate Certificate Principal Balance of the Definitive Certificates, (ii) the Trustee shall execute, authenticate and

CONFIDENTIAL                                                        RC_FGIC9019_00031483

deliver, in accordance with the registration and delivery instructions provided by the Depository, a Definitive Certificate evidencing such Certificate Owner's Percentage Interest in such Class of Certificates and (iii) the Trustee shall execute and authenticate a new Book-Entry Certificate reflecting the reduction in the aggregate Certificate Principal Balance of such Class of Certificates by the amount of the Definitive Certificates.

If (i)(A) the Depositor advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository and (B) the Depositor is unable to locate a qualified successor or (ii) the Depositor notifies the Depository of its intent to terminate the book-entry system and, upon receipt of notice of such intent from the Depository, the Depository Participants holding beneficial interest in the Book-Entry Certificates agree to initiate such termination, the Trustee shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners requesting the same. Upon surrender to the Trustee of the Book-Entry Certificates by the Depository, accompanied by registration instructions from the Depository for registration of transfer, the Trustee shall issue the Definitive Certificates. Neither the Depositor, the Master Servicer nor the Trustee shall be liable for any actions taken by the Depository or its nominee, including, without limitation, any delay in delivery of any instruction required under this section and may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates, the Trustee and the Master Servicer shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder.

(c)     Each of the Certificates is intended to be a "security" governed by Article 8 of the Uniform Commercial Code as in effect in the State of New York and any other applicable jurisdiction, to the extent that any of such laws may be applicable.

Section 5.02.    Registration of Transfer and Exchange of Certificates.

(a)     The Trustee shall cause to be kept at one of the offices or agencies to be appointed by the Trustee, in accordance with the provisions of Section 8.12, a Certificate Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Certificates and of transfers and exchanges of Certificates as herein provided. The Trustee is initially appointed Certificate Registrar for the purpose of registering Certificates and transfers and exchanges of Certificates as herein provided. The Certificate Registrar, or the Trustee, shall provide the Master Servicer with a certified list of Certificateholders as of each Record Date prior to the related Determination Date.

(b)     Upon surrender for registration of transfer of any Certificate at any office or agency of the Trustee maintained for such purpose pursuant to Section 8.12 and, in the case of any Class SB or Class R Certificate, upon satisfaction of the conditions set forth below, the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in the name of the designated Transferee or Transferees, one or more new Certificates of a like Class and aggregate Percentage Interest.

(c)     At the option of the Certificateholders, Certificates may be exchanged for other Certificates of authorized denominations of a like Class and aggregate Percentage Interest, upon surrender of the Certificates to be exchanged at any such office or agency. Whenever any

CONFIDENTIAL                                    RC_FGIC9019_00031484

Certificates are so surrendered for exchange the Trustee shall execute and the Certificate Registrar shall authenticate and deliver the Certificates of such Class which the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for transfer or exchange shall (if so required by the Trustee or the Certificate Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by, the Holder thereof or his attorney duly authorized in writing.

(d)      No transfer, sale, pledge or other disposition of a Class SB or Class R Certificate shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act of 1933, as amended (the "1933 Act"), and any applicable state securities laws or is made in accordance with said Act and laws. Except as otherwise provided in this Section 5.02(d), in the event that a transfer of a Class SB or Class R Certificate is to be made, (i) unless the Depositor directs the Trustee otherwise, the Trustee shall require a written Opinion of Counsel addressed to and acceptable to and in form and substance satisfactory to the Trustee and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Trustee, the Trust Fund, the Depositor or the Master Servicer, and (ii) the Trustee shall require the Transferee to execute a representation letter, substantially in the form of Exhibit J hereto, and the Trustee shall require the transferor to execute a representation letter, substantially in the form of Exhibit K hereto, each acceptable to and in form and substance satisfactory to the Depositor and the Trustee certifying to the Depositor and the Trustee the facts surrounding such transfer, which representation letters shall not be an expense of the Trustee, the Trust Fund, the Depositor or the Master Servicer. In lieu of the requirements set forth in the preceding sentence, transfers of Class SB or Class R Certificates may be made in accordance with this Section 5.02(d) if the prospective Transferee of such a Certificate provides the Trustee and the Master Servicer with an investment letter substantially in the form of Exhibit O attached hereto, which investment letter shall not be an expense of the Trustee, the Depositor, or the Master Servicer, and which investment letter states that, among other things, such Transferee (i) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (ii) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the 1933 Act provided by Rule 144A. The Holder of a Class SB or Class R Certificate desiring to effect any transfer, sale, pledge or other disposition shall, and does hereby agree to, indemnify the Trustee, the Depositor, the Master Servicer and the Certificate Registrar against any liability that may result if the transfer, sale, pledge or other disposition is not so exempt or is not made in accordance with such federal and state laws and this Agreement.

(e)      In the case of any Class SB Certificate or Class R Certificate presented for registration in the name of any Person, either (A) the Trustee shall require an Opinion of Counsel acceptable to and in form and substance satisfactory to the Trustee, the Depositor and the Master Servicer to the effect that the purchase and holding of such Class SB or Class R Certificate is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Trustee, the Depositor or the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or

CONFIDENTIAL                                                                    RC_FGIC9019_00031485

Section 4975 of the Code) in addition to those undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Depositor or the Master Servicer, or (B) the prospective Transferee shall be required to provide the Trustee, the Depositor and the Master Servicer with a certification to the effect set forth in Exhibit J (with respect to a Class SB Certificate) or in paragraph fifteen of Exhibit I-1 (with respect to a Class R Certificate), which the Trustee may rely upon without further inquiry or investigation, or such other certifications as the Trustee may deem desirable or necessary in order to establish that such Transferee or the Person in whose name such registration is requested is not an employee benefit plan or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (each, a "Plan"), or any Person (including, without limitation, an insurance company investing its general accounts, an investment manager, a named fiduciary or a trustee of any Plan) who is using "plan assets", within the meaning of the U.S. Department of Labor regulation promulgated at 29 C.F.R. § 2510.3 101, of any Plan (each, a "Plan Investor") to effect such acquisition.

(f) (i) Each Person who has or who acquires any Ownership Interest in a Class R Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions and to have irrevocably authorized the Trustee or its designee under clause (iii)(A) below to deliver payments to a Person other than such Person and to negotiate the terms of any mandatory sale under clause (iii)(B) below and to execute all instruments of transfer and to do all other things necessary in connection with any such sale. The rights of each Person acquiring any Ownership Interest in a Class R Certificate are expressly subject to the following provisions:

(A) Each Person holding or acquiring any Ownership Interest in a Class R Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

(B) In connection with any proposed Transfer of any Ownership Interest in a Class R Certificate, the Trustee shall require delivery to it, and shall not register the Transfer of any Class R Certificate until its receipt of,

(I) an affidavit and agreement (a "Transfer Affidavit and Agreement," in the form attached hereto as Exhibit I-1) from the proposed Transferee, in form and substance satisfactory to the Master Servicer, representing and warranting, among other things, that it is a Permitted Transferee, that it is not acquiring its Ownership Interest in the Class R Certificate that is the subject of the proposed Transfer as a nominee, trustee or agent for any Person who is not a Permitted Transferee, that for so long as it retains its Ownership Interest in a Class R Certificate, it will endeavor to remain a Permitted Transferee, and that it has reviewed the provisions of this Section 5.02(f) and agrees to be bound by them, and

(II) a certificate, in the form attached hereto as Exhibit I-2, from the Holder wishing to transfer the Class R Certificate, in form and substance satisfactory to the Master Servicer, representing and warranting, among other things, that no purpose of the proposed Transfer is to impede the assessment or collection of tax.

CONFIDENTIAL                                                        RC_FGIC9019_00031486

(C)    Notwithstanding the delivery of a Transfer Affidavit and Agreement by a proposed Transferee under clause (B) above, if a Responsible Officer of the Trustee who is assigned to this Agreement has actual knowledge that the proposed Transferee is not a Permitted Transferee, no Transfer of an Ownership Interest in a Class R Certificate to such proposed Transferee shall be effected.

(D)    Each Person holding or acquiring any Ownership Interest in a Class R Certificate shall agree (x) to require a Transfer Affidavit and Agreement from any other Person to whom such Person attempts to transfer its Ownership Interest in a Class R Certificate and (y) not to transfer its Ownership Interest unless it provides a certificate to the Trustee in the form attached hereto as Exhibit I-2.

(E)    Each Person holding or acquiring an Ownership Interest in a Class R Certificate, by purchasing an Ownership Interest in such Certificate, agrees to give the Trustee written notice that it is a "pass-through interest holder" within the meaning of Temporary Treasury Regulations Section 1.67-3T(a)(2)(i)(A) immediately upon acquiring an Ownership Interest in a Class R Certificate, if it is, or is holding an Ownership Interest in a Class R Certificate on behalf of, a "pass-through interest holder."

(ii)    The Trustee shall register the Transfer of any Class R Certificate only if it shall have received the Transfer Affidavit and Agreement, a certificate of the Holder requesting such transfer in the form attached hereto as Exhibit I-2 and all of such other documents as shall have been reasonably required by the Trustee as a condition to such registration. Transfers of the Class R Certificates to Non-United States Persons and Disqualified Organizations (as defined in Section 860E(e)(5) of the Code) are prohibited.

(A)    If any Disqualified Organization shall become a holder of a Class R Certificate, then the last preceding Permitted Transferee shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. If a Non-United States Person shall become a holder of a Class R Certificate, then the last preceding United States Person shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. If a transfer of a Class R Certificate is disregarded pursuant to the provisions of Treasury Regulations Section 1.860E-1 or Section 1.860G-3, then the last preceding Permitted Transferee shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. The Trustee shall be under no liability to any Person for any registration of Transfer of a Class R Certificate that is in fact not permitted by this Section 5.02(f) or for making any payments due on such Certificate to the holder thereof or for taking any other action with respect to such holder under the provisions of this Agreement.

CONFIDENTIAL                                        RC_FGIC9019_00031487

(B)    If any purported Transferee shall become a Holder of a Class R Certificate in violation of the restrictions in this Section 5.02(f) and to the extent that the retroactive restoration of the rights of the Holder of such Class R Certificate as described in clause (ii)(A) above shall be invalid, illegal or unenforceable, then the Master Servicer shall have the right, without notice to the holder or any prior holder of such Class R Certificate, to sell such Class R Certificate to a purchaser selected by the Master Servicer on such terms as the Master Servicer may choose. Such purported Transferee shall promptly endorse and deliver each Class R Certificate in accordance with the instructions of the Master Servicer. Such purchaser may be the Master Servicer itself or any Affiliate of the Master Servicer. The proceeds of such sale, net of the commissions (which may include commissions payable to the Master Servicer or its Affiliates), expenses and taxes due, if any, will be remitted by the Master Servicer to such purported Transferee. The terms and conditions of any sale under this clause (ii)(B) shall be determined in the sole discretion of the Master Servicer, and the Master Servicer shall not be liable to any Person having an Ownership Interest in a Class R Certificate as a result of its exercise of such discretion.

(iii)    The Master Servicer, on behalf of the Trustee, shall make available, upon written request from the Trustee, all information necessary to compute any tax imposed

(A)    as a result of the Transfer of an Ownership Interest in a Class R Certificate to any Person who is a Disqualified Organization, including the information regarding "excess inclusions" of such Class R Certificates required to be provided to the Internal Revenue Service and certain Persons as described in Treasury Regulations Sections 1.860D-1(b)(5) and 1.860E-2(a)(5), and

(B)    as a result of any regulated investment company, real estate investment trust, common trust fund, partnership, trust, estate or organization described in Section 1381 of the Code that holds an Ownership Interest in a Class R Certificate having as among its record holders at any time any Person who is a Disqualified Organization. Reasonable compensation for providing such information may be required by the Master Servicer from such Person.

(iv)    The provisions of this Section 5.02(f) set forth prior to this clause (iv) may be modified, added to or eliminated, provided that there shall have been delivered to the Trustee the following:

(A)    Written consent of the Insurer and written notification from each Rating Agency to the effect that the modification, addition to or elimination of such provisions will not cause such Rating Agency to downgrade its then-current ratings, if any, of the Class A Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date by such Rating Agency; and

(B)    a certificate of the Master Servicer stating that the Master Servicer has received an Opinion of Counsel, in form and substance satisfactory to the

CONFIDENTIAL                                              RC_FGIC9019_00031488

Master Servicer, to the effect that such modification, addition to or absence of such provisions will not cause any REMIC created hereunder to cease to qualify as a REMIC and will not cause (x) any REMIC created hereunder to be subject to an entity-level tax caused by the Transfer of any Class R Certificate to a Person that is a Disqualified Organization or (y) a Certificateholder or another Person to be subject to a REMIC-related tax caused by the Transfer of a Class R Certificate to a Person that is not a Permitted Transferee.

(g)    No service charge shall be made for any transfer or exchange of Certificates of any Class, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

(h)    All Certificates surrendered for transfer and exchange shall be destroyed by the Certificate Registrar.

Section 5.03.    Mutilated, Destroyed, Lost or Stolen Certificates.

If (i) any mutilated Certificate is surrendered to the Certificate Registrar, or the Trustee and the Certificate Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Certificate, and (ii) there is delivered to the Trustee and the Certificate Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Trustee or the Certificate Registrar that such Certificate has been acquired by a bona fide purchaser, the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, Class and Percentage Interest but bearing a number not contemporaneously outstanding. Upon the issuance of any new Certificate under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee and the Certificate Registrar) connected therewith. Any duplicate Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Fund, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

Section 5.04.    Persons Deemed Owners.

Prior to due presentation of a Certificate for registration of transfer, the Depositor, the Master Servicer, the Insurer, the Trustee, the Certificate Registrar and any agent of the Depositor, the Master Servicer, the Insurer, the Trustee or the Certificate Registrar may treat the Person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions pursuant to Section 4.02 and for all other purposes whatsoever, except as and to the extent provided in the definition of "Certificateholder" and neither the Depositor, the Master Servicer, the Insurer, the Trustee, the Certificate Registrar nor any agent of the Depositor, the Master Servicer, the Insurer, the Trustee or the Certificate Registrar shall be affected by notice to the contrary except as provided in Section 5.02(f).

CONFIDENTIAL                                                    RC_FGIC9019_00031489

Section 5.05.   Appointment of Paying Agent.

The Trustee may, with the consent of the Insurer (so long as no Insurer Default exists), which consent shall not be unreasonably withheld, appoint a Paying Agent for the purpose of making distributions to Certificateholders pursuant to Section 4.02. In the event of any such appointment, on or prior to each Distribution Date the Master Servicer on behalf of the Trustee shall deposit or cause to be deposited with the Paying Agent a sum sufficient to make the payments to Certificateholders in the amounts and in the manner provided for in Section 4.02, such sum to be held in trust for the benefit of Certificateholders. The Trustee shall cause each Paying Agent to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee that such Paying Agent will hold all sums held by it for the payment to Certificateholders in trust for the benefit of the Certificateholders entitled thereto until such sums shall be paid to such Certificateholders. Any sums so held by such Paying Agent shall be held only in Eligible Accounts to the extent such sums are not distributed to the Certificateholders on the date of receipt by such Paying Agent.

## ARTICLE VI
## THE DEPOSITOR AND THE MASTER SERVICER

Section 6.01.   Respective Liabilities of the Depositor and the Master Servicer.

The Depositor and the Master Servicer shall each be liable in accordance herewith only to the extent of the obligations specifically and respectively imposed upon and undertaken by the Depositor and the Master Servicer herein. By way of illustration and not limitation, the Depositor is not liable for the servicing and administration of the Mortgage Loans, nor is it obligated by Section 7.01 or 10.01 to assume any obligations of the Master Servicer or to appoint a designee to assume such obligations, nor is it liable for any other obligation hereunder that it may, but is not obligated to, assume unless it elects to assume such obligation in accordance herewith.

Section 6.02.   Merger or Consolidation of the Depositor or the Master Servicer; Assignment of Rights and Delegation of Duties by Master Servicer.

(a)     The Depositor and the Master Servicer shall each keep in full effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation, and will each obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and to perform its respective duties under this Agreement.

(b)     Any Person into which the Depositor or the Master Servicer may be merged or consolidated, or any corporation resulting from any merger or consolidation to which the Depositor or the Master Servicer shall be a party, or any Person succeeding to the business of the Depositor or the Master Servicer, shall be the successor of the Depositor or the Master Servicer, as the case may be, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; *provided, however*, that the successor or surviving Person to the Master Servicer shall be qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac; and provided further that each

CONFIDENTIAL                                                              RC_FGIC9019_00031490

Rating Agency's ratings, if any, of the Class A Certificates (without taking into account the Policy) in effect immediately prior to such merger or consolidation will not be qualified, reduced or withdrawn as a result thereof (as evidenced by a letter to such effect from each Rating Agency).

(c)    Notwithstanding anything else in this Section 6.02 and Section 6.04 to the contrary, the Master Servicer may assign its rights and delegate its duties and obligations under this Agreement; provided that the Person accepting such assignment or delegation shall be a Person which is qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac, is reasonably satisfactory to the Trustee, the Insurer and the Depositor, is willing to service the Mortgage Loans and executes and delivers to the Depositor, the Insurer and the Trustee an agreement, in form and substance reasonably satisfactory to the Depositor, the Insurer and the Trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Master Servicer under this Agreement; provided further that each Rating Agency's rating of the Classes of Certificates (without taking into account the Policy) that have been rated in effect immediately prior to such assignment and delegation will not be qualified, reduced or withdrawn as a result of such assignment and delegation (as evidenced by a letter to such effect from each Rating Agency). In the case of any such assignment and delegation, the Master Servicer shall be released from its obligations under this Agreement, except that the Master Servicer shall remain liable for all liabilities and obligations incurred by it as Master Servicer hereunder prior to the satisfaction of the conditions to such assignment and delegation set forth in the next preceding sentence. This Section 6.02 shall not apply to any sale, transfer, pledge or assignment by Residential Funding of the Call Rights. Notwithstanding the foregoing, in the event of a pledge or assignment by the Master Servicer solely of its rights to purchase all assets of the Trust Fund under Section 9.01(a) (or, if so specified in Section 9.01(a), its rights to purchase the Mortgage Loans and property acquired related to a particular Loan Group or its rights to purchase the Certificates related thereto), the provisos of the first sentence of this paragraph will not apply.

Section 6.03.    <u>Limitation on Liability of the Depositor, the Master Servicer and Others</u>.

None of the Depositor, the Master Servicer or any of the directors, officers, employees or agents of the Depositor or the Master Servicer shall be under any liability to the Trust Fund or the Certificateholders for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; *provided, however*, that this provision shall not protect the Depositor, the Master Servicer or any such Person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder. The Depositor, the Master Servicer and any director, officer, employee or agent of the Depositor or the Master Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Depositor, the Master Servicer and any director, officer, employee or agent of the Depositor or the Master Servicer shall be indemnified by the Trust Fund and held harmless against any loss, liability or expense incurred in connection with any legal action relating to this Agreement or the Certificates, other than any loss, liability or expense related to any specific Mortgage Loan or Mortgage Loans (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this

CONFIDENTIAL                                                                RC_FGIC9019_00031491

Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder. Neither the Depositor nor the Master Servicer shall be under any obligation to appear in, prosecute or defend any legal or administrative action, proceeding, hearing or examination that is not incidental to its respective duties under this Agreement and which in its opinion may involve it in any expense or liability; *provided, however*, that the Depositor or the Master Servicer may in its discretion undertake any such action, proceeding, hearing or examination that it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder. In such event, the legal expenses and costs of such action, proceeding, hearing or examination and any liability resulting therefrom shall be expenses, costs and liabilities of the Trust Fund, and the Depositor and the Master Servicer shall be entitled to be reimbursed therefor out of amounts attributable to the Mortgage Loans on deposit in the Custodial Account as provided by Section 3.10 and, on the Distribution Date(s) following such reimbursement, the aggregate of such expenses and costs shall be allocated in reduction of the Accrued Certificate Interest on each Class entitled thereto in the same manner as if such expenses and costs constituted a Prepayment Interest Shortfall.

Section 6.04.  Depositor and Master Servicer Not to Resign.

Subject to the provisions of Section 6.02, neither the Depositor nor the Master Servicer shall resign from its respective obligations and duties hereby imposed on it except upon determination that its duties hereunder are no longer permissible under applicable law. Any such determination permitting the resignation of the Depositor or the Master Servicer shall be evidenced by an Opinion of Counsel (at the expense of the resigning party) to such effect delivered to the Trustee and the Insurer. No such resignation by the Master Servicer shall become effective until the Trustee or a successor servicer shall have assumed the Master Servicer's responsibilities and obligations in accordance with Section 7.02.

## ARTICLE VII
## DEFAULT

Section 7.01.  Events of Default.

Event of Default, wherever used herein, means any one of the following events (whatever reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

> (i)      the Master Servicer shall fail to distribute or cause to be distributed to Holders of Certificates of any Class any distribution required to be made under the terms of the Certificates of such Class and this Agreement and, in either case, such failure shall continue unremedied for a period of 5 days after the date upon which written notice of such failure, requiring such failure to be remedied, shall have been given to the Master Servicer by the Trustee, the Insurer or the Depositor or to the Master Servicer, the Depositor and the Trustee by the Holders of Certificates of such Class evidencing Percentage Interests aggregating not less than 25%; or

CONFIDENTIAL                                                    RC_FGIC9019_00031492

(ii)    the Master Servicer shall fail to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in the Certificates of any Class or in this Agreement and such failure shall continue unremedied for a period of 30 days (except that such number of days shall be 15 in the case of a failure to pay the premium for any Required Insurance Policy) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee, the Insurer or the Depositor, or to the Master Servicer, the Depositor and the Trustee by the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests aggregating not less than 25%; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or appointing a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(iv)    the Master Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities, or similar proceedings of, or relating to, the Master Servicer or of, or relating to, all or substantially all of the property of the Master Servicer; or

(v)    the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi)    the Master Servicer shall notify the Trustee pursuant to Section 4.04(b) that it is unable to deposit in the Certificate Account an amount equal to the Advance.

If an Event of Default described in clauses (i)-(v) of this Section shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, either the Depositor or the Trustee shall at the written direction of the Insurer (unless an Insurer Default has occurred and is continuing) or, if an Insurer Default has occurred and is continuing, at the direction of Holders of Certificates entitled to at least 51% of the Voting Rights, by notice in writing to the Master Servicer (and to the Depositor and the Insurer if given by the Trustee or to the Trustee and the Insurer if given by the Depositor), terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder; *provided, however*, that a successor to the Master Servicer is appointed pursuant to Section 7.02 and such successor Master Servicer shall have accepted the duties of Master Servicer effective upon the resignation of the Master Servicer. If an Event of Default described in clause (vi) hereof shall occur, the Trustee, with the written consent of the Insurer (unless an Insurer Default has occurred and is continuing) or, if an Insurer Default has occurred and is continuing, with the consent of Holders of Certificates entitled to at least 51% of the Voting Rights, shall, by notice to the Master Servicer and the

CONFIDENTIAL                                                    RC_FGIC9019_00031493

Depositor, immediately terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder as provided in Section 4.04(b). On or after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer under this Agreement, whether with respect to the Certificates (other than as a Holder thereof) or the Mortgage Loans or otherwise, shall subject to Section 7.02 pass to and be vested in the Trustee or the Trustee's designee appointed pursuant to Section 7.02; and, without limitation, the Trustee is hereby authorized and empowered to execute and deliver, on behalf of the Master Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise. The Master Servicer agrees to cooperate with the Trustee in effecting the termination of the Master Servicer's responsibilities and rights hereunder, including, without limitation, the transfer to the Trustee or its designee for administration by it of all cash amounts which shall at the time be credited to the Custodial Account or the Certificate Account or thereafter be received with respect to the Mortgage Loans. No such termination shall release the Master Servicer for any liability that it would otherwise have hereunder for any act or omission prior to the effective time of such termination. Notwithstanding any termination of the activities of Residential Funding in its capacity as Master Servicer hereunder, Residential Funding shall be entitled to receive, out of any late collection of a Monthly Payment on a Mortgage Loan which was due prior to the notice terminating Residential Funding's rights and obligations as Master Servicer hereunder and received after such notice, that portion to which Residential Funding would have been entitled pursuant to Sections 3.10(a)(ii), (vi) and (vii) as well as its Servicing Fee in respect thereof, and any other amounts payable to Residential Funding hereunder the entitlement to which arose prior to the termination of its activities hereunder. Upon the termination of Residential Funding as Master Servicer hereunder the Depositor shall deliver to the Trustee as successor Master Servicer a copy of the Program Guide.  In addition, the Depositor shall make access to the Program Guide available to the Insurer.

Section 7.02.   Trustee or Depositor to Act; Appointment of Successor.

(a)    On and after the time the Trustee, the Insurer and the Master Servicer, as applicable, receive a notice of termination from the Depositor or the Trustee pursuant to Section 7.01 or the Insurer pursuant to Section 7.05, the Depositor or the Trustee shall, at the direction of the Insurer (unless an Insurer Default has occurred and is continuing) or, if an Insurer Default has occurred and is continuing, at the direction of the Insurer with the consent of the Holders of the Class A Certificates in accordance with Section (e) below, select and appoint a successor Master Servicer, and if the Insurer or such Holders of Class A Certificates, as applicable, fails to provide such direction and/or consent, as the case may be, within 30 days, the Trustee or, upon notice to the Insurer and the Depositor and with the Depositor's consent and, so long as no Insurer Default exists, with the Insurer's consent (which consent shall not be unreasonably withheld), a designee (which meets the standards set forth in clause (c) below) of the Trustee, shall be the successor in all respects to the Master Servicer in its capacity as servicer under this Agreement and the transactions set forth or provided for herein.

CONFIDENTIAL                                                    RC_FGIC9019_00031494

(b)     On and after the time the Master Servicer resigns in accordance with Section 6.04, the Trustee or, upon notice to the Depositor and with the Depositor's consent and, so long as no Insurer Default exists, the Insurer's consent (which consent shall not be unreasonably withheld) a designee (which meets the standards set forth in clause (c) below) of the Trustee, shall be the successor in all respects to the Master Servicer in its capacity as servicer under this Agreement and the transactions set forth or provided for herein.

(c)     Any successor Master Servicer appointed pursuant to clause (a) or clause (b) shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer (except for the responsibilities, duties and liabilities contained in Sections 2.02 and 2.03(a), excluding the duty to notify related Subservicers as set forth in such Sections, and its obligations to deposit amounts in respect of losses incurred prior to such notice or termination on the investment of funds in the Custodial Account or the Certificate Account pursuant to Sections 3.07(c) and 4.01(c) by the terms and provisions hereof); provided, however, that any failure to perform such duties or responsibilities caused by the preceding Master Servicer's failure to provide information required by Section 4.04 shall not be considered a default by the Trustee hereunder as successor Master Servicer. As compensation therefor, the Trustee, as successor Master Servicer, shall be entitled to all funds relating to the Mortgage Loans which the Master Servicer would have been entitled to charge to the Custodial Account or the Certificate Account if the Master Servicer had continued to act hereunder and, in addition, shall be entitled to the income from any Permitted Investments made with amounts attributable to the Mortgage Loans held in the Custodial Account or the Certificate Account. If the Trustee has become the successor to the Master Servicer in accordance with Section 6.04 or Section 7.01, then notwithstanding the above, the Depositor shall, at the direction of the Insurer (unless an Insurer Default has occurred and is continuing) or, if an Insurer Default has occurred and is continuing, at the direction of the Insurer with the consent of the Holders of the Class A Certificates in accordance with Section (e) below, select and appoint a successor Master Servicer and if the Insurer or such Holders of Class A Certificates, as applicable, fails to provide such direction and/or consent, as the case may be, within 30 days, the Trustee may, if it shall be unwilling to so act, or shall, if it is unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any established housing and home finance institution, which is also a Fannie Mae or Freddie Mac-approved mortgage servicing institution, having a net worth of not less than $10,000,000 as the successor to the Master Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer hereunder. Pending appointment of a successor to the Master Servicer hereunder, the Trustee shall become successor to the Master Servicer and shall act in such capacity as hereinabove provided. In connection with such appointment and assumption, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree; provided, however, that no such compensation shall be in excess of that permitted the initial Master Servicer hereunder. The Depositor, the Trustee, the Custodian and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. The Servicing Fee for any successor Master Servicer appointed pursuant to this Section 7.02 will be lowered with respect to those Mortgage Loans, if any, where the Subservicing Fee accrues at a rate of less than 0.50% per annum in the event that the successor Master Servicer is not servicing such Mortgage Loans directly and it is necessary to raise the related Subservicing Fee to a rate of 0.50% per annum in order to hire a Subservicer

CONFIDENTIAL                                                                    RC_FGIC9019_00031495

with respect to such Mortgage Loans.  The Master Servicer shall pay the reasonable expenses of the Trustee in connection with any servicing transfer hereunder.

(d)    In connection with the termination or resignation of the Master Servicer hereunder, either (i) the successor Master Servicer, including the Trustee if the Trustee is acting as successor Master Servicer, shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, in which case the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to revise its records to reflect the transfer of servicing to the successor Master Servicer as necessary under MERS' rules and regulations, or (ii) the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS® System to the successor Master Servicer. The predecessor Master Servicer shall file or cause to be filed any such assignment in the appropriate recording office. The predecessor Master Servicer shall bear any and all fees of MERS, costs of preparing any assignments of Mortgage, and fees and costs of filing any assignments of Mortgage that may be required under this subsection (d). The Successor Master Servicer shall cause such assignment to be delivered to the Trustee or the Custodian promptly upon receipt of the original with evidence of recording thereon or a copy certified by the public recording office in which such assignment was recorded.

(e)    Upon notice from the Insurer of the identity of its proposed successor Master Servicer pursuant to clause (a) above, the Trustee shall forward notice of such proposed successor Master Servicer to the Holders of the Class A Certificates; provided, that so long as the Class A Certificates are Book-Entry Certificates, such notice shall be forwarded to the Depository for posting on its system. The Trustee shall also post such notice on its website related to the Trust. For purposes of determining the consent of the Class A-II Certificates pursuant to this clause (e), 51% of the Class A Certificates shall be deemed to have consented to a successor Master Servicer unless the Trustee has received written notice from at least 50% of the Class A Certificates of such Certificateholders' objection to such successor Master Servicer within 30 calendar days after notice of the proposed successor Master Servicer has been sent to the Holders of the Class A Certificates by the Trustee, provided, however, if such proposed Master Servicer is not an approved master servicer by each Rating Agency and each Rating Agency does not confirm the then-current rating in writing to the proposed successor Master Servicer selected by the Insurer, affirmative consent of 51% of the Class A Certificates shall be required.

Section 7.03.    Notification to Certificateholders.

(a)    Upon any such termination or appointment of a successor to the Master Servicer, the Trustee shall give prompt written notice thereof to the Insurer and the Certificateholders at their respective addresses appearing in the Certificate Register.

CONFIDENTIAL                                                    RC_FGIC9019_00031496

(b)    Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Holders of Certificates and the Insurer notice of each such Event of Default hereunder known to the Trustee, unless such Event of Default shall have been cured or waived as provided in Section 7.04 hereof.

Section 7.04.    Waiver of Events of Default.

The Holders representing at least 66% of the Voting Rights of Certificates affected by a default or Event of Default hereunder may waive any default or Event of Default; *provided, however*, that (a) a default or Event of Default under clause (i) of Section 7.01 may be waived only by all of the Holders of Certificates affected by such default or Event of Default and (b) no waiver pursuant to this Section 7.04 shall affect the Holders of Certificates in the manner set forth in Section 11.01(b)(i), (ii) or (iii). Upon any such waiver of a default or Event of Default by the Holders representing the requisite percentage of Voting Rights of Certificates affected by such default or Event of Default, such default or Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder. No such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon except to the extent expressly so waived.

Section 7.05.    Servicing Trigger; Removal of Master Servicer.

(a)    Upon determination by the Insurer that a Servicing Trigger has occurred, the Insurer shall give written notice of such Servicing Trigger to the Master Servicer, the Depositor, the Trustee and to each Rating Agency.

(b)    At any time after such determination and while a Servicing Trigger is continuing, the Insurer may direct the Trustee in writing to remove the Master Servicer if the Insurer makes a determination that the manner of master servicing was a factor contributing to the size of the delinquencies or losses incurred in the Trust Fund.

(c)    Upon receipt of directions to remove the Master Servicer pursuant to the preceding clause (b), the Trustee shall notify the Master Servicer that it has been terminated and the Master Servicer shall be terminated in the same manner as specified in Sections 7.01 and 7.02.

(d)    After notice of occurrence of a Servicing Trigger has been given and while a Servicing Trigger is continuing, until and unless the Master Servicer has been removed as provided in clause (b), the Master Servicer covenants and agrees to act as the Master Servicer for a term from the occurrence of the Servicing Trigger to the end of the calendar quarter in which such Servicing Trigger occurs, which term may at the Insurer's discretion be extended by written notice to the Trustee and the Master Servicer for successive terms of three (3) calendar months each, until the termination of the Trust Fund. The Master Servicer will, upon the receipt of each such notice of extension (a "Master Servicer Extension Notice") become bound for the duration of the term covered by such Master Servicer Extension Notice to continue as Master Servicer subject to and in accordance with this Agreement. If, as of the fifteenth (15th) day prior to the last day of any term as the Master Servicer, the Trustee shall not have received any Master Servicer Extension Notice from the Insurer, the Trustee shall, within five (5) days thereafter,

CONFIDENTIAL                                              RC_FGIC9019_00031497

give written notice of such nonreceipt to the Insurer and the Master Servicer. If any such term expires without a Master Servicer Extension Notice then the Trustee shall act as successor Master Servicer as provided in Section 7.02.

(e)    No provision of this Section 7.05 shall have the effect of limiting the rights of the Depositor, the Trustee, the Certificateholders or the Insurer under Section 7.01

## ARTICLE VIII
## CONCERNING THE TRUSTEE

Section 8.01.    Duties of Trustee.

(a)    The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. In case an Event of Default has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs.

(b)    The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform to the requirements of this Agreement. The Trustee shall notify the Insurer and the Certificateholders of any such documents which do not materially conform to the requirements of this Agreement in the event that the Trustee, after so requesting, does not receive satisfactorily corrected documents in a timely fashion. The Trustee shall forward or cause to be forwarded in a timely fashion the notices, reports and statements required to be forwarded by the Trustee pursuant to Sections 4.03, 7.03, and 10.01. The Trustee shall furnish in a timely fashion to the Master Servicer such information as the Master Servicer may reasonably request from time to time for the Master Servicer to fulfill its duties as set forth in this Agreement and the Trustee shall furnish in a timely fashion to the Insurer such information in its possession as the Insurer may reasonably request from time to time for the Insurer to protect its interests and to fulfill its duties under the Policy.    The Trustee covenants and agrees that it shall perform its obligations hereunder in a manner so as to maintain the status of each REMIC created hereunder as a REMIC under the REMIC Provisions (subject to Section 10.01(f)) and to prevent the imposition of any federal, state or local income, prohibited transaction (except as provided in Section 2.04 herein), contribution or other tax on the Trust Fund to the extent that maintaining such status and avoiding such taxes are reasonably within the control of the Trustee and are reasonably within the scope of its duties under this Agreement.

(c)    No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; *provided, however*, that:

(i)    Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred, the duties and obligations

CONFIDENTIAL
RC_FGIC9019_00031498

of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee by the Depositor or the Master Servicer and which on their face, do not contradict the requirements of this Agreement;

(ii)    The Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Insurer or the Certificateholders holding Certificates which evidence, Percentage Interests aggregating not less than 25% of the affected Classes as to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement;

(iv)    The Trustee shall not be charged with knowledge of any default (other than a default in payment to the Trustee) specified in clauses (i) and (ii) of Section 7.01 or an Event of Default under clauses (iii), (iv) and (v) of Section 7.01 unless a Responsible Officer of the Trustee assigned to and working in the Corporate Trust Office obtains actual knowledge of such failure or event or the Trustee receives written notice of such failure or event at its Corporate Trust Office from the Master Servicer, the Insurer, the Depositor or any Certificateholder; and

(v)    Except to the extent provided in Section 7.02, no provision in this Agreement shall require the Trustee to expend or risk its own funds (including, without limitation, the making of any Advance) or otherwise incur any personal financial liability in the performance of any of its duties as Trustee hereunder, or in the exercise of any of its rights or powers, if the Trustee shall have reasonable grounds for believing that repayment of funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)    The Trustee shall timely pay, from its own funds, the amount of any and all federal, state and local taxes imposed on the Trust Fund or its assets or transactions including, without limitation, (A) "prohibited transaction" penalty taxes as defined in Section 860F of the Code, if, when and as the same shall be due and payable, (B) any tax on contributions to a REMIC after the Closing Date imposed by Section 860G(d) of the Code and (C) any tax on "net income from foreclosure property" as defined in Section 860G(c) of the Code, but only if such taxes arise out of a breach by the Trustee of its obligations hereunder, which breach constitutes negligence or willful misconduct of the Trustee.

CONFIDENTIAL                                                          RC_FGIC9019_00031499

Section 8.02.    Certain Matters Affecting the Trustee.

(a)    Except as otherwise provided in Section 8.01:

(i)    The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)    The Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii)    The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders or the Insurer, pursuant to the provisions of this Agreement or the Yield Maintenance Agreement, unless (a) such Certificateholders or the Insurer shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby and (b) the Insurer has given its consent; nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of an Event of Default (which has not been cured), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs;

(iv)    The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Prior to the occurrence of an Event of Default hereunder and after the curing of all Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the Insurer or the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests, aggregating not less than 50% with the written consent of the Insurer; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Agreement, the Trustee may require reasonable indemnity against such expense or liability as a condition to so proceeding. The reasonable expense of every such examination shall be paid by the Master Servicer, if an Event of Default shall have occurred and is continuing, and otherwise by the Certificateholder or the Insurer requesting the investigation;

CONFIDENTIAL                                                    RC_FGIC9019_00031500

(vi)    The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys provided that the Trustee shall remain liable for any acts of such agents or attorneys; and

(vii)    To the extent authorized under the Code and the regulations promulgated thereunder, each Holder of a Class R Certificate hereby irrevocably appoints and authorizes the Trustee to be its attorney-in-fact for purposes of signing any Tax Returns required to be filed on behalf of the Trust Fund. The Trustee shall sign on behalf of the Trust Fund and deliver to the Master Servicer in a timely manner any Tax Returns prepared by or on behalf of the Master Servicer that the Trustee is required to sign as determined by the Master Servicer pursuant to applicable federal, state or local tax laws, provided that the Master Servicer shall indemnify the Trustee for signing any such Tax Returns that contain errors or omissions.

(b)    Following the issuance of the Certificates (and except as provided for in Section 2.04), the Trustee shall not accept any contribution of assets to the Trust Fund unless subject to Section 10.01(f) it shall have obtained or been furnished with an Opinion of Counsel to the effect that such contribution will not (i) cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding or (ii) cause the Trust Fund to be subject to any federal tax as a result of such contribution (including the imposition of any federal tax on "prohibited transactions" imposed under Section 860F(a) of the Code).

Section 8.03.    <u>Trustee Not Liable for Certificates or Mortgage Loans</u>.

The recitals contained herein and in the Certificates (other than the execution of the Certificates and relating to the acceptance and receipt of the Mortgage Loans) shall be taken as the statements of the Depositor or the Master Servicer as the case may be, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Agreement or of the Certificates (except that the Certificates shall be duly and validly executed and authenticated by it as Certificate Registrar) or of any Mortgage Loan or related document, or of MERS or the MERS® System. Except as otherwise provided herein, the Trustee shall not be accountable for the use or application by the Depositor or the Master Servicer of any of the Certificates or of the proceeds of such Certificates, or for the use or application of any funds paid to the Depositor or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Custodial Account or the Certificate Account by the Depositor or the Master Servicer.

Section 8.04.    <u>Trustee May Own Certificates</u>.

The Trustee in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not Trustee.

Section 8.05.    <u>Master Servicer to Pay Trustee's Fees and Expenses; Indemnification</u>.

(a)    The Master Servicer covenants and agrees to pay to the Trustee and any co-trustee from time to time, and the Trustee and any co-trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of them in the execution of the

5109327 05161514                                    -118-

trusts hereby created and in the exercise and performance of any of the powers and duties hereunder of the Trustee and any co-trustee, and the Master Servicer shall pay or reimburse the Trustee and any co-trustee upon request for all reasonable expenses, disbursements and advances incurred or made by the Trustee or any co-trustee in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ, and the expenses incurred by the Trustee or any co-trustee in connection with the appointment of an office or agency pursuant to Section 8.12) except any such expense, disbursement or advance as may arise from its negligence or bad faith.

(b)    The Master Servicer agrees to indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense incurred without negligence or willful misconduct on its part, arising out of, or in connection with, the acceptance and administration of the Trust Fund, including its obligation to execute the DTC Letter in its individual capacity, the costs and expenses (including reasonable legal fees and expenses) of defending itself against any claim in connection with the exercise or performance of any of its powers or duties under this Agreement or the Yield Maintenance Agreement, and the Master Servicer further agrees to indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense arising out of, or in connection with, the provisions set forth in the second paragraph of Section 2.01(a) hereof, including, without limitation, all costs, liabilities and expenses (including reasonable legal fees and expenses) of investigating and defending itself against any claim, action or proceeding, pending or threatened, relating to the provisions of such paragraph, provided that:

(i)    with respect to any such claim, the Trustee shall have given the Master Servicer written notice thereof promptly after the Trustee shall have actual knowledge thereof;

(ii)    while maintaining control over its own defense, the Trustee shall cooperate and consult fully with the Master Servicer in preparing such defense; and

(iii)    notwithstanding anything in this Agreement to the contrary, the Master Servicer shall not be liable for settlement of any claim by the Trustee entered into without the prior consent of the Master Servicer which consent shall not be unreasonably withheld. No termination of this Agreement shall affect the obligations created by this Section 8.05(b) of the Master Servicer to indemnify the Trustee under the conditions and to the extent set forth herein. Notwithstanding the foregoing, the indemnification provided by the Master Servicer in this Section 8.05(b) shall not pertain to any loss, liability or expense of the Trustee, including the costs and expenses of defending itself against any claim, incurred in connection with any actions taken by the Trustee at the direction of Certificateholders pursuant to the terms of this Agreement.

Section 8.06.    Eligibility Requirements for Trustee.

The Trustee hereunder shall at all times be a national banking association or a New York banking corporation having its principal office in a state and city acceptable to the Depositor and the Insurer and organized and doing business under the laws of such state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined

CONFIDENTIAL                                                RC_FGIC9019_00031502

capital and surplus of at least $50,000,000 and subject to supervision or examination by federal
or state authority. If such corporation or national banking association publishes reports of
condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or
examining authority, then for the purposes of this Section the combined capital and surplus of
such corporation shall be deemed to be its combined capital and surplus as set forth in its most
recent report of condition so published. In case at any time the Trustee shall cease to be eligible
in accordance with the provisions of this Section, the Trustee shall resign immediately in the
manner and with the effect specified in Section 8.07.

Section 8.07.  <u>Resignation and Removal of the Trustee</u>.

(a)    The Trustee may at any time resign and be discharged from the trusts hereby
created by giving written notice thereof to the Depositor, the Master Servicer and the Insurer.
Upon receiving such notice of resignation, the Depositor shall promptly appoint a successor
trustee acceptable to the Insurer by written instrument, in duplicate, one copy of which
instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no
successor trustee shall have been so appointed and have accepted appointment within 30 days
after the giving of such notice of resignation then the Insurer may appoint a successor trustee and
if the Insurer fails to do so within 30 days, the resigning Trustee may petition any court of
competent jurisdiction for the appointment of a successor trustee.

(b)    If at any time the Trustee shall cease to be eligible in accordance with the
provisions of Section 8.06 and shall fail to resign after written request therefor by the Insurer or
the Depositor with the consent of the Insurer (which consent shall not be unreasonably withheld),
or if at any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or
insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer
shall take charge or control of the Trustee or of its property or affairs for the purpose of
rehabilitation, conservation or liquidation, then the Insurer or the Depositor with the consent of
the Insurer (which consent shall not be unreasonably withheld) may remove the Trustee and
appoint a successor trustee by written instrument, in duplicate, one copy of which instrument
shall be delivered to the Trustee so removed and one copy to the successor trustee. In addition, in
the event that the Insurer or the Depositor determines that the Trustee has failed (i) to distribute
or cause to be distributed to Certificateholders any amount required to be distributed hereunder,
if such amount is held by the Trustee or its Paying Agent (other than the Master Servicer or the
Depositor) for distribution or (ii) to otherwise observe or perform in any material respect any of
its covenants, agreements or obligations hereunder, and such failure shall continue unremedied
for a period of 5 days (in respect of clause (i) above) or 30 days (in respect of clause (ii) above)
after the date on which written notice of such failure, requiring that the same be remedied, shall
have been given to the Trustee by the Depositor or the Insurer, then the Depositor with the
consent of the Insurer, which consent shall not be unreasonably withheld, may remove the
Trustee and appoint a successor trustee by written instrument delivered as provided in the
preceding sentence. In connection with the appointment of a successor trustee pursuant to the
preceding sentence, the Depositor shall, on or before the date on which any such appointment
becomes effective, obtain from each Rating Agency written confirmation that the appointment of
any such successor trustee will not result in the reduction of the ratings on any Class of the
Certificates below the lesser of the then-current or original ratings on such Certificates without
taking into account the Policy.

CONFIDENTIAL                                                                    RC_FGIC9019_00031503

(c)    During the continuance of an Insurer Default, the Holders of Certificates entitled to at least 51% of the Voting Rights may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered to the Depositor, one complete set to the Trustee so removed and one complete set to the successor so appointed.

(d)    Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section shall become effective upon acceptance of appointment by the successor trustee as provided in Section 8.08.

Section 8.08.    Successor Trustee.

(a)    Any successor trustee appointed as provided in this Section 8.08 shall execute, acknowledge and deliver to the Depositor and the Insurer and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. The predecessor trustee shall deliver to the successor trustee all Mortgage Files and related documents and statements held by it hereunder (other than any Mortgage Files at the time held by a Custodian, which shall become the agent of any successor trustee hereunder), and the Depositor, the Master Servicer and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)    No successor trustee shall accept appointment as provided in this Section unless (a) at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 8.06 and (b) such appointment of such successor trustee will not result in the reduction of the ratings on any class of the Certificates below the then-current ratings on such Certificates, as evidenced by a letter from each Rating Agency to such effect.

(c)    Upon acceptance of appointment by a successor trustee as provided in this Section, the Depositor shall mail notice of the succession of such trustee hereunder to all Holders of Certificates at their addresses as shown in the Certificate Register. If the Depositor fails to mail such notice within 10 days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Depositor.

Section 8.09.    Merger or Consolidation of Trustee.

Any corporation or national banking association into which the Trustee may be merged or converted or with which it may be consolidated or any corporation or national banking association resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or national banking association succeeding to the business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation or national banking association shall be eligible under the provisions of Section 8.06, without the execution

CONFIDENTIAL                                                      RC_FGIC9019_00031504

or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding. The Trustee shall mail notice of any such merger or consolidation to the Certificateholders at their address as shown in the Certificate Register.

Section 8.10.    Appointment of Co-Trustee or Separate Trustee.

(a)    Notwithstanding any other provisions hereof, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Fund or property securing the same may at the time be located, the Master Servicer and the Trustee acting jointly shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, or separate trustee or separate trustees, of all or any part of the Trust Fund, and to vest in such Person or Persons, in such capacity, such title to the Trust Fund, or any part thereof, and, subject to the other provisions of this Section 8.10, such powers, duties, obligations, rights and trusts as the Master Servicer and the Trustee may consider necessary or desirable. If the Master Servicer shall not have joined in such appointment within 15 days after the receipt by it of a request so to do, or in case an Event of Default shall have occurred and be continuing, the Trustee alone shall have the power to make such appointment. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 8.06 hereunder and no notice to Holders of Certificates of the appointment of co-trustee(s) or separate trustee(s) shall be required under Section 8.08 hereof.

(b)    In the case of any appointment of a co-trustee or separate trustee pursuant to this Section 8.10 all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee, and such separate trustee or co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether as Trustee hereunder or as successor to the Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed by such separate trustee or co-trustee at the direction of the Trustee.

(c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee.

(d)    Any separate trustee or co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates,

CONFIDENTIAL                                                        RC_FGIC9019_00031505

properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 8.11.    <u>Appointment of Custodians</u>.

The Trustee may, with the consent of the Master Servicer, the Insurer and the Depositor, or shall, at the direction of the Master Servicer, the Insurer and the Depositor, appoint one or more Custodians who are not Affiliates of the Depositor or the Master Servicer to hold all or a portion of the Mortgage Files as agent for the Trustee, by entering into a Custodial Agreement. The Trustee is hereby directed to enter into Custodial Agreement with Wells Fargo Bank, N.A. Subject to Article VIII, the Trustee agrees to comply with the terms of each Custodial Agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Certificateholders. Each Custodian shall be a depository institution subject to supervision by federal or state authority, shall have a combined capital and surplus of at least $15,000,000 and shall be qualified to do business in the jurisdiction in which it holds any Mortgage File. Each Custodial Agreement may be amended only as provided in Section 11.01. The Trustee shall notify the Certificateholders of the appointment of any Custodian (other than the Custodian appointed as of the Closing Date) pursuant to this Section 8.11.

Section 8.12.    <u>Appointment of Office or Agency</u>

The Trustee will maintain an office or agency in the City of St. Paul, Minnesota where Certificates may be surrendered for registration of transfer or exchange. The Trustee initially designates its offices located at the Corporate Trust Office for the purpose of keeping the Certificate Register. The Trustee will maintain an office at the address stated in Section 11.05 hereof where notices and demands to or upon the Trustee in respect of this Agreement may be served.

Section 8.13.    <u>DTC Letter of Representations</u>.

The Trustee is hereby authorized and directed to, and agrees that it shall, enter into the DTC Letter on behalf of the Trust Fund and in its individual capacity as agent thereunder.

Section 8.14.    <u>Yield Maintenance Agreement</u>

The Trustee is hereby authorized and directed to, and agrees that it shall, enter into the Yield Maintenance Agreement on behalf of the Trust Fund.

**ARTICLE IX
TERMINATION**

Section 9.01.    <u>Termination Upon Purchase by Residential Funding or Liquidation of All Mortgage Loans</u>.

(a)    Subject to Section 9.02, the respective obligations and responsibilities of the Depositor, the Master Servicer and the Trustee created hereby in respect of the Certificates (other than the obligation of the Trustee to make certain payments after the Final Distribution Date to Certificateholders and the Insurer and the obligation of the Depositor to send certain notices as

CONFIDENTIAL                                                                   RC_FGIC9019_00031506

hereinafter set forth) shall terminate upon the last action required to be taken by the Trustee on the Final Distribution Date pursuant to this Article IX following the earlier of:

       (i)     the later of the final payment or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan, or

       (ii)    the purchase by the Master Servicer or its designee of all Mortgage Loans and all property acquired in respect of any Mortgage Loan remaining in the Trust Fund, at a price equal to 100% of the unpaid principal balance of each Mortgage Loan (or, if less than such unpaid principal balance, the fair market value of the related underlying property of such Mortgage Loan with respect to Mortgage Loans as to which title has been acquired if such fair market value is less than such unpaid principal balance) (net of unreimbursed Advances attributable to principal) on the day of repurchase, plus unpaid accrued interest thereon at the Mortgage Rate (or Modified Net Mortgage Rate in the case of any Modified Mortgage Loan) from the Due Date to which interest was last paid by the Mortgagor to, but not including, the first day of the month in which such repurchase price is distributed plus the amount of any accrued and unpaid Servicing Fees, unreimbursed advances and Servicing Advances, plus any amounts due to the Insurer pursuant to the Insurance Agreement or any Cumulative Insurance Payments, in each case through the date of such option; *provided, however*, that in no event shall the trust created hereby continue beyond the earlier of (i) the Maturity Date or (ii) the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James, living on the date hereof; and provided further, that the purchase price set forth above shall be increased as is necessary, as determined by the Master Servicer, to avoid disqualification of any REMIC created hereunder as a REMIC. The purchase price paid by the Master Servicer or its designee shall also include any amounts owed by the Master Servicer or its designee pursuant to the last paragraph of Section 4 of the Assignment Agreement in respect of any liability, penalty or expense that resulted from a breach of the representation and warranty set forth in clause (bb) of such Section, that remain unpaid on the date of such purchase.

       The right of the Master Servicer or its designee to purchase all the assets of the Trust Fund relating to the Mortgage Loans, pursuant to clause (ii) above is conditioned upon the date of such purchase occurring on or after the Optional Termination Date; *provided, however*, that no such purchase will be permitted if it would result in a draw on the Policy, and no such purchase will be permitted if the Insurer can show a reasonable probability that it would result in a draw on the Policy, unless the Insurer consents in writing to such purchase. If such right is exercised by the Master Servicer or its designee, the Master Servicer shall be entitled to reimbursement for the full amount of any unreimbursed Advances theretofore made by it with respect to the Mortgage Loans being purchased, pursuant to Section 3.10. In addition, the Master Servicer shall provide to the Trustee the certification required by Section 3.15 and the Trustee and any Custodian shall, promptly following payment of the purchase price, release to the Master Servicer or its designee the Mortgage Files pertaining to the Mortgage Loans being purchased.

CONFIDENTIAL                                                                RC_FGIC9019_00031507

In addition, on any Distribution Date on or after the Optional Termination Date, the Master Servicer or its designee shall have the right, at its option or at the option of its designee, respectively, to purchase all of the Certificates in whole, but not in part, at a price equal to the aggregate outstanding Certificate Principal Balance of the Certificates, plus one month's Accrued Certificate Interest on the Certificates, any previously unpaid Accrued Certificate Interest, and any unpaid Prepayment Interest Shortfalls previously allocated thereto (but not including any reimbursement of the principal portion of any Realized Losses previously allocated thereto that remain unreimbursed) and any amounts due to the Insurer pursuant to the Insurance Agreement or any Cumulative Insurance Payments, in each case through the date of exercise of such option; *provided, however*, that no such purchase will be permitted if it would result in a draw on the Policy, and no such purchase will be permitted if the Insurer can show a reasonable probability that it would result in a draw on the Policy, unless the Insurer consents in writing to such purchase.

(b)    The Master Servicer shall give the Trustee and the Insurer not less than 60 days' prior notice of the Distribution Date on which the Master Servicer anticipates that the final distribution will be made to Certificateholders (whether as a result of the exercise by the Master Servicer or its designee of its right to purchase the assets of the Trust Fund or otherwise). Notice of any termination, specifying the anticipated Final Distribution Date (which shall be a date that would otherwise be a Distribution Date) upon which the Certificateholders may surrender their Certificates to the Trustee for payment of the final distribution and cancellation, shall be given promptly by the Master Servicer (if the Master Servicer or its designee is exercising its right to purchase the assets of the Trust Fund), or by the Trustee (in any other case) by letter to Certificateholders mailed not earlier than the 15th day and not later than the 25th day of the month next preceding the month of such final distribution specifying:

(i)    the anticipated Final Distribution Date upon which final payment of the Certificates is anticipated to be made upon presentation and surrender of Certificates at the office or agency of the Trustee therein designated,

(ii)    the amount of any such final payment, if known, and

(iii)    that the Record Date otherwise applicable to such Distribution Date is not applicable, and that payment will be made only upon presentation and surrender of the Certificates at the office or agency of the Trustee therein specified.

If the Master Servicer or the Trustee is obligated to give notice to Certificateholders as aforesaid, it shall give such notice to the Certificate Registrar at the time such notice is given to Certificateholders. In the event such notice is given by the Master Servicer, the Master Servicer or its designee shall deposit in the Custodial Account before the Final Distribution Date in immediately available funds an amount equal to the purchase price for the assets of the Trust Fund computed as above provided. The Master Servicer shall provide to the Trustee written notification of any change to the anticipated Final Distribution Date as soon as practicable. If the Trust Fund is not terminated on the anticipated Final Distribution Date, for any reason, the Trustee shall promptly mail notice thereof to each affected Certificateholder.

CONFIDENTIAL                                                    RC_FGIC9019_00031508

(c)    Upon presentation and surrender of the Class A Certificates and Class SB Certificates by the Certificateholders thereof, the Trustee shall distribute to such Certificateholders and the Insurer (A) the amount otherwise distributable on such Distribution Date, if not in connection with the Master Servicer's election to repurchase the Mortgage Loans or the outstanding Class A Certificates and Class SB Certificates, or (B) if the Master Servicer elected to so repurchase the Mortgage Loans or the outstanding Class A Certificates and Class SB Certificates, an amount equal to the price paid pursuant to Section 9.01(a) as follows:

(i)    *first*, payment of any accrued and unpaid Servicing Fees, unreimbursed advances and Servicing Advances, in each case through the date of such option, to the Master Servicer

(ii)    *second*, with respect to the Class A Certificates, pari passu, the outstanding Certificate Principal Balance thereof, plus Accrued Certificate Interest thereon for the related Interest Accrual Period and any previously unpaid Accrued Certificate Interest,

(iii)    *third*, to the Insurer, any amounts due to the Insurer pursuant to the Insurance Agreement or any Cumulative Insured Payments, in each case through the date of such option;

(iv)    *fourth*, to the Class A Certificates, the amount of any Prepayment Interest Shortfalls allocated thereto for such Distribution Date or remaining unpaid from prior Distribution Dates and accrued interest thereon at the applicable Pass-Through Rate, on a pro rata basis based on Prepayment Interest Shortfalls allocated thereto for such Distribution Date or remaining unpaid from prior Distribution Dates,

(v)    *fifth*, to the Class SB Certificates.

(d)    In the event that any Certificateholders shall not surrender their Certificates for final payment and cancellation on or before the Final Distribution Date, the Trustee shall on such date cause all funds in the Certificate Account not distributed in final distribution to Certificateholders to be withdrawn therefrom and credited to the remaining Certificateholders by depositing such funds in a separate escrow account for the benefit of such Certificateholders, and the Master Servicer (if the Master Servicer or its designee exercised its right to purchase the Mortgage Loans), or the Trustee (in any other case) shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto. If within six months after the second notice any Certificate shall not have been surrendered for cancellation, the Trustee shall take appropriate steps as directed by the Master Servicer to contact the remaining Certificateholders concerning surrender of their Certificates. The costs and expenses of maintaining the Escrow Account and of contacting Certificateholders shall be paid out of the assets which remain in the Escrow Account. If within nine months after the second notice any Certificates shall not have been surrendered for cancellation, the Trustee shall pay to the Master Servicer all amounts distributable to the holders thereof and the Master Servicer shall thereafter hold such amounts until distributed to such holders. No interest shall accrue or be payable to any Certificateholder on any amount held in the Escrow Account or by the Master Servicer as a result of such Certificateholder's failure to

CONFIDENTIAL                                                    RC_FGIC9019_00031509

surrender its Certificate(s) for final payment thereof in accordance with this Section 9.01 and the Certificateholders shall look only to the Master Servicer for such payment.

(e)    All rights of the Master Servicer or its designee to purchase the assets of the Trust Fund, or to purchase specified classes of Certificates, as set forth in Section 9.01(a) are referred to in this Agreement as the "Call Rights". Notwithstanding any other provision of this Agreement, the Master Servicer or its designee shall have the right to sell, transfer, pledge or otherwise assign the Call Rights at any time to any Person. Upon written notice by the Master Servicer or its designee to the Trustee and the Master Servicer of any such assignment of the Call Rights to any assignee, the Trustee and the Master Servicer shall be obligated to recognize such assignee as the holder of the Call Rights. Such entity, if not the Master Servicer or its designee or an affiliate, shall be deemed to represent, at the time of such sale, transfer, pledge or other assignment, that one of the following will be, and at the time the Call Right is exercised is, true and correct:  (i) the exercise of such Call Right shall not result in a non-exempt prohibited transaction under section 406 of ERISA or section 4975 of the Code (including by reason of U.S. Department of Labor ("DOL") Prohibited Transaction Class Exemption ("PTCE") 75-1 (Part I), 84-14, 90-1, 91-38, 95-60 or 96-23 or other applicable exemption) or (ii) such entity is (A) not a party in interest under section 3(14) of ERISA or a disqualified person under section 4975(e)(2) of the Code with respect to any employee benefit plan subject to section 3(3) of ERISA or any plan subject to section 4975 of the Code (other than an employee benefit plan or plan sponsored or maintained by the entity, provided that no assets of such employee benefit plan or plan are invested or deemed to be invested in the Certificates) and (B) not a "benefit plan investor" as described in DOL regulation section 2510.3-101(f)(2). If any such assignee of the Call Right is unable to exercise such Call Right by reason of the preceding sentence, then the Call Right shall revert to the immediately preceding assignor of such Call Right subject to the rights of any secured party therein.

Section 9.02.    Additional Termination Requirements.

(a)    Each of REMIC I and REMIC II as the case may be, shall be terminated in accordance with the following additional requirements, unless the Trustee and the Master Servicer have received an Opinion of Counsel (which Opinion of Counsel shall not be an expense of the Trustee) to the effect that the failure of any REMIC created hereunder, as the case may be, to comply with the requirements of this Section 9.02 will not (i) result in the imposition on the Trust Fund of taxes on "prohibited transactions," as described in Section 860F of the Code, or (ii) cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding:

(i)    The Master Servicer shall establish a 90-day liquidation period for each of REMIC I and REMIC II, and specify the first day of such period in a statement attached to the Trust Fund's final Tax Return pursuant to Treasury regulations Section 1.860F-1. The Master Servicer also shall satisfy all of the requirements of a qualified liquidation for each of REMIC I and REMIC II under Section 860F of the Code and the regulations thereunder;

(ii)    The Master Servicer shall notify the Trustee at the commencement of such 90-day liquidation period and, at or prior to the time of making of the final payment on

CONFIDENTIAL                                                    RC_FGIC9019_00031510

the Certificates, the Trustee shall sell or otherwise dispose of all of the remaining assets of the Trust Fund in accordance with the terms hereof; and

(iii)    If the Master Servicer is exercising its right to purchase the assets of the Trust Fund, the Master Servicer shall, during the 90-day liquidation period and at or prior to the Final Distribution Date, purchase all of the assets of the Trust Fund for cash.

(b)    Each Holder of a Certificate and the Trustee hereby irrevocably approves and appoints the Master Servicer as its attorney-in-fact to adopt a plan of complete liquidation for each of REMIC I and REMIC II at the expense of the Trust Fund in accordance with the terms and conditions of this Agreement.

## ARTICLE X
## REMIC PROVISIONS

Section 10.01. <u>REMIC Administration</u>.

(a)    The REMIC Administrator shall make an election to treat each of REMIC I and REMIC II as a REMIC under the Code and, if necessary, under applicable state law. Such election will be made on Form 1066 or other appropriate federal tax or information return (including Form 8811) or any appropriate state return for the taxable year ending on the last day of the calendar year in which the Certificates are issued. The REMIC I Regular Interests shall be designated as the "regular interests" and the Class R-I Certificates shall be designated as the sole class of "residual interests" in REMIC I. The REMIC II Regular Interests shall be designated as the "regular interests" and the Class R-II Certificates shall be designated as the sole class of "residual interests" in REMIC II. The REMIC Administrator and the Trustee shall not permit the creation of any "interests" (within the meaning of Section 860G of the Code) in REMIC I and REMIC II other than the REMIC I Regular Interests, the REMIC II Regular Interests and the Certificates.

(b)    The Closing Date is hereby designated as the "startup day" of each of REMIC within the meaning of Section 860G(a)(9) of the Code.

(c)    The REMIC Administrator shall hold a Class R Certificate in each REMIC representing a 0.01% Percentage Interest of the Class R Certificates in each REMIC and shall be designated as the "tax matters person" with respect to each of REMIC I and REMIC II in the manner provided under Treasury regulations section 1.860F-4(d) and Treasury regulations section 301.6231(a)(7)-1. The REMIC Administrator, as tax matters person, shall (i) act on behalf of each of REMIC I and REMIC II in relation to any tax matter or controversy involving the Trust Fund and (ii) represent the Trust Fund in any administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority with respect thereto. The legal expenses, including without limitation attorneys' or accountants' fees, and costs of any such proceeding and any liability resulting therefrom shall be expenses of the Trust Fund and the REMIC Administrator shall be entitled to reimbursement therefor out of amounts attributable to the Mortgage Loans on deposit in the Custodial Account as provided by Section 3.10 unless such legal expenses and costs are incurred by reason of the REMIC Administrator's willful misfeasance, bad faith or gross negligence. If the REMIC Administrator is no longer the Master

CONFIDENTIAL                                    RC_FGIC9019_00031511

Servicer hereunder, at its option the REMIC Administrator may continue its duties as REMIC Administrator and shall be paid reasonable compensation not to exceed $3,000 per year by any successor Master Servicer hereunder for so acting as the REMIC Administrator.

(d)    The REMIC Administrator shall prepare or cause to be prepared all of the Tax Returns that it determines are required with respect to the REMICs created hereunder and deliver such Tax Returns in a timely manner to the Trustee and the Trustee shall sign and file such Tax Returns in a timely manner. The expenses of preparing such returns shall be borne by the REMIC Administrator without any right of reimbursement therefor. The REMIC Administrator agrees to indemnify and hold harmless the Trustee with respect to any tax or liability arising from the Trustee's signing of Tax Returns that contain errors or omissions. The Trustee and Master Servicer shall promptly provide the REMIC Administrator with such information as the REMIC Administrator may from time to time request for the purpose of enabling the REMIC Administrator to prepare Tax Returns.

(e)    The REMIC Administrator shall provide (i) to any Transferor of a Class R Certificate such information as is necessary for the application of any tax relating to the transfer of a Class R Certificate to any Person who is not a Permitted Transferee, (ii) to the Trustee and the Trustee shall forward to the Certificateholders such information or reports as are required by the Code or the REMIC Provisions including reports relating to interest, original issue discount, if any, and market discount or premium (using the Prepayment Assumption) and (iii) to the Internal Revenue Service the name, title, address and telephone number of the person who will serve as the representative of each REMIC created hereunder.

(f)    The Master Servicer and the REMIC Administrator shall take such actions and shall cause each REMIC created hereunder to take such actions as are reasonably within the Master Servicer's or the REMIC Administrator's control and the scope of its duties more specifically set forth herein as shall be necessary or desirable to maintain the status thereof as a REMIC under the REMIC Provisions (and the Trustee shall assist the Master Servicer and the REMIC Administrator, to the extent reasonably requested by the Master Servicer and the REMIC Administrator to do so). In performing their duties as more specifically set forth herein, the Master Servicer and the REMIC Administrator shall not knowingly or intentionally take any action, cause the Trust Fund to take any action or fail to take (or fail to cause to be taken) any action reasonably within their respective control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of any REMIC created hereunder as a REMIC or (ii) with the exception of actions taken in connection with Section 4.08 hereof, resulting in the imposition of a tax upon any REMIC created hereunder (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code (except as provided in Section 2.04) and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) (either such event, in the absence of an Opinion of Counsel or the indemnification referred to in this sentence, an "Adverse REMIC Event") unless the Insurer, the Master Servicer or the REMIC Administrator, as applicable, has received an Opinion of Counsel (at the expense of the party seeking to take such action or, if such party fails to pay such expense, and the Master Servicer or the REMIC Administrator, as applicable, determines that taking such action is in the best interest of the Trust Fund and the Certificateholders, at the expense of the Trust Fund, but in no event at the expense of the Master Servicer, the REMIC Administrator or the Trustee) to the effect that the

CONFIDENTIAL                                    RC_FGIC9019_00031512

contemplated action will not, with respect to the Trust Fund created hereunder, endanger such status or, unless the Master Servicer or the REMIC Administrator or both, as applicable, determine in its or their sole discretion to indemnify the Trust Fund against the imposition of such a tax, result in the imposition of such a tax. Wherever in this Agreement a contemplated action may not be taken because the timing of such action might result in the imposition of a tax on the Trust Fund, or may only be taken pursuant to an Opinion of Counsel that such action would not impose a tax on the Trust Fund, such action may nonetheless be taken provided that the indemnity given in the preceding sentence with respect to any taxes that might be imposed on the Trust Fund has been given and that all other preconditions to the taking of such action have been satisfied. The Trustee shall not take or fail to take any action (whether or not authorized hereunder) as to which the Master Servicer or the REMIC Administrator, as applicable, has advised it in writing that it has received an Opinion of Counsel to the effect that an Adverse REMIC Event could occur with respect to such action or inaction, as the case may be. In addition, prior to taking any action with respect to the Trust Fund or its assets, or causing the Trust Fund to take any action, which is not expressly permitted under the terms of this Agreement, the Trustee shall consult with the Master Servicer, the Insurer or the REMIC Administrator, as applicable, or its designee, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to the Trust Fund and the Trustee shall not take any such action or cause the Trust Fund to take any such action as to which the Master Servicer or the REMIC Administrator, as applicable, has advised it in writing that an Adverse REMIC Event could occur. The Master Servicer or the REMIC Administrator, as applicable, may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not expressly permitted by this Agreement, but in no event at the expense of the Master Servicer or the REMIC Administrator. At all times as may be required by the Code, the Master Servicer or the REMIC Administrator, as applicable, will to the extent within its control and the scope of its duties more specifically set forth herein, maintain substantially all of the assets of the REMIC as "qualified mortgages" as defined in Section 860G(a)(3) of the Code and "permitted investments" as defined in Section 860G(a)(5) of the Code.

(g)    In the event that any tax is imposed on "prohibited transactions" of any REMIC created hereunder as defined in Section 860F(a)(2) of the Code, on "net income from foreclosure property" of any REMIC as defined in Section 860G(c) of the Code, on any contributions to any REMIC after the Startup Date therefor pursuant to Section 860G(d) of the Code, or any other tax imposed by the Code or any applicable provisions of state or local tax laws, such tax shall be charged (i) to the Master Servicer, if such tax arises out of or results from a breach by the Master Servicer in its role as Master Servicer or REMIC Administrator of any of its obligations under this Agreement or the Master Servicer has in its sole discretion determined to indemnify the Trust Fund against such tax, (ii) to the Trustee, if such tax arises out of or results from a breach by the Trustee of any of its obligations under this Article X, or (iii) otherwise against amounts on deposit in the Custodial Account as provided by Section 3.10 and on the Distribution Date(s) following such reimbursement the aggregate of such taxes shall be allocated in reduction of the Accrued Certificate Interest on each Class entitled thereto in the same manner as if such taxes constituted a Prepayment Interest Shortfall.

CONFIDENTIAL                                                      RC_FGIC9019_00031513

(h)    The Trustee and the Master Servicer shall, for federal income tax purposes, maintain books and records with respect to each REMIC on a calendar year and on an accrual basis or as otherwise may be required by the REMIC Provisions.

(i)    Following the Startup Date, neither the Master Servicer nor the Trustee shall accept any contributions of assets to any REMIC unless (subject to Section 10.01(f)) the Master Servicer, the Insurer and the Trustee shall have received an Opinion of Counsel (at the expense of the party seeking to make such contribution) to the effect that the inclusion of such assets in any REMIC will not cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding or subject any such REMIC to any tax under the REMIC Provisions or other applicable provisions of federal, state and local law or ordinances.

(j)    Neither the Master Servicer nor the Trustee shall (subject to Section 10.01(f)) enter into any arrangement by which any REMIC created hereunder will receive a fee or other compensation for services nor permit any REMIC created hereunder to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code.

(k)    Solely for the purposes of Section 1.860G-1(a)(4)(iii) of the Treasury Regulations, the "latest possible maturity date" by which the principal balance of each regular interest in each REMIC would be reduced to zero is the Distribution Date in December 2035, which is the Distribution Date in the month following the last scheduled payment on any Mortgage Loan.

(l)    Within 30 days after the Closing Date, the REMIC Administrator shall prepare and file with the Internal Revenue Service Form 8811, "Information Return for Real Estate Mortgage Investment Conduits (REMIC) and Issuers of Collateralized Debt Obligations" for the Trust Fund.

(m)    Neither the Trustee nor the Master Servicer shall sell, dispose of or substitute for any of the Mortgage Loans (except in connection with (i) the default, imminent default or foreclosure of a Mortgage Loan, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by any REMIC pursuant to Article IX of this Agreement or (ii) a purchase of Mortgage Loans pursuant to Article II or III of this Agreement) or acquire any assets for any REMIC or sell or dispose of any investments in the Custodial Account or the Certificate Account for gain, or accept any contributions to any REMIC after the Closing Date unless it has received an Opinion of Counsel that such sale, disposition, substitution or acquisition will not (a) affect adversely the status of any REMIC created hereunder as a REMIC or (b) unless the Master Servicer has determined in its sole discretion to indemnify the Trust Fund against such tax, cause any REMIC to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions.

5109327 05161514

-131-

RC_FGIC9019_00031514

Section 10.02. <u>Master Servicer, REMIC Administrator and Trustee Indemnification</u>.

(a)    The Trustee agrees to indemnify the Trust Fund, the Depositor, the REMIC Administrator and the Master Servicer for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Depositor or the Master Servicer, as a result of a breach of the Trustee's covenants set forth in Article VIII or this Article X. In the event that Residential Funding is no longer the Master Servicer, the Trustee shall indemnify Residential Funding for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by Residential Funding as a result of a breach of the Trustee's covenants set forth in Article VIII or this Article X.

(b)    The REMIC Administrator agrees to indemnify the Trust Fund, the Depositor, the Master Servicer and the Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Fund, the Depositor, the Master Servicer or the Trustee, as a result of a breach of the REMIC Administrator's covenants set forth in this Article X with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Trustee's execution of Tax Returns prepared by the REMIC Administrator that contain errors or omissions; *provided, however*, that such liability will not be imposed to the extent such breach is a result of an error or omission in information provided to the REMIC Administrator by the Master Servicer in which case Section 10.02(c) will apply.

(c)    The Master Servicer agrees to indemnify the Trust Fund, the Depositor, the REMIC Administrator and the Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Fund, the Depositor, the REMIC Administrator or the Trustee, as a result of a breach of the Master Servicer's covenants set forth in this Article X or in Article III with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Trustee's execution of Tax Returns prepared by the Master Servicer that contain errors or omissions.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

Section 11.01. <u>Amendment</u>.

(a)    This Agreement or any Custodial Agreement may be amended from time to time by the Depositor, the Master Servicer and the Trustee, with the consent of the Insurer and without the consent of any of the Certificateholders:

(i)    to cure any ambiguity,

(ii)    to correct or supplement any provisions herein or therein, which may be inconsistent with any other provisions herein or therein or to correct any error,

(iii)    to modify, eliminate or add to any of its provisions to such extent as shall be necessary or desirable to maintain the qualification of any REMIC created hereunder as a REMIC at all times that any Certificate is outstanding or to avoid or minimize the risk of the imposition of any tax on the Trust Fund pursuant to the Code that would be a

5109327 05161514                                    -132-

CONFIDENTIAL                                    RC_FGIC9019_00031515

claim against the Trust Fund, provided that the Trustee has received an Opinion of Counsel to the effect that (A) such action is necessary or desirable to maintain such qualification or to avoid or minimize the risk of the imposition of any such tax and (B) such action will not adversely affect in any material respect the interests of any Certificateholder,

(iv)    to change the timing and/or nature of deposits into the Custodial Account or the Certificate Account or to change the name in which the Custodial Account is maintained, provided that (A) the Certificate Account Deposit Date shall in no event be later than the related Distribution Date, (B) such change shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Certificateholder and (C) such change shall not result in a reduction of the rating assigned to any Class of Certificates below the then-current rating assigned to such Certificates (without taking into account the Policy) as evidenced by a letter from each Rating Agency to such effect,

(v)    to modify, eliminate or add to the provisions of Section 5.02(f) or any other provision hereof restricting transfer of the Class R Certificates by virtue of their being the "residual interests" in the Trust Fund provided that (A) such change shall not result in reduction of the rating assigned to any such Class of Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date, as evidenced by a letter from each Rating Agency to such effect, and (B) such change shall not, as evidenced by an Opinion of Counsel (at the expense of the party seeking so to modify, eliminate or add such provisions), cause the Trust Fund or any of the Certificateholders (other than the transferor) to be subject to a federal tax caused by a transfer to a Person that is not a Permitted Transferee, or

(vi)    to make any other provisions with respect to matters or questions arising under this Agreement or such Custodial Agreement which shall not be materially inconsistent with the provisions of this Agreement, provided that such action shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Certificateholder.

(b)    This Agreement or any Custodial Agreement may also be amended from time to time by the Depositor, the Master Servicer, the Trustee and the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates with a Certificate Principal Balance greater than zero affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or such Custodial Agreement or of modifying in any manner the rights of the Holders of Certificates of such Class; *provided, however*, that no such amendment shall:

(i)    reduce in any manner the amount of, or delay the timing of, payments which are required to be distributed on any Certificate without the consent of the Holder of such Certificate,

CONFIDENTIAL                                    RC_FGIC9019_00031516

(ii)    adversely affect in any material respect the interest of the Holders of Certificates of any Class in a manner other than as described in clause (i) hereof without the consent of Holders of Certificates of such Class evidencing, as to such Class, Percentage Interests aggregating not less than 66%, or

(iii)    reduce the aforesaid percentage of Certificates of any Class the Holders of which are required to consent to any such amendment, in any such case without the consent of the Holders of all Certificates of such Class then outstanding.

(c)    Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless it and the Insurer shall have first received an Opinion of Counsel (at the expense of the party seeking such amendment) to the effect that such amendment is permitted under this Agreement and that such amendment or the exercise of any power granted to the Master Servicer, the Depositor or the Trustee in accordance with such amendment will not result in the imposition of a federal tax on the Trust Fund or cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding. The Trustee may but shall not be obligated to enter into any amendment pursuant to this Section that affects its rights, duties and immunities and this Agreement or otherwise; *provided however*, such consent shall not be unreasonably withheld.

(d)    Promptly after the execution of any such amendment the Trustee shall furnish written notification of the substance of such amendment to each Certificateholder. It shall not be necessary for the consent of Certificateholders under this Section 11.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

(e)    The Depositor shall have the option, in its sole discretion, to obtain and deliver to the Trustee any corporate guaranty, payment obligation, irrevocable letter of credit, surety bond, insurance policy or similar instrument or a reserve fund, or any combination of the foregoing, for the purpose of protecting the Holders of the Class R Certificates against any or all Realized Losses or other shortfalls. Any such instrument or fund shall be held by the Trustee for the benefit of the Class R Certificateholders, but shall not be and shall not be deemed to be under any circumstances included in any REMIC. To the extent that any such instrument or fund constitutes a reserve fund for federal income tax purposes, (i) any reserve fund so established shall be an outside reserve fund and not an asset of such REMIC, (ii) any such reserve fund shall be owned by the Depositor, and (iii) amounts transferred by such REMIC to any such reserve fund shall be treated as amounts distributed by such REMIC to the Depositor or any successor, all within the meaning of Treasury regulations Section 1.860G-2(h). In connection with the provision of any such instrument or fund, this Agreement and any provision hereof may be modified, added to, deleted or otherwise amended in any manner that is related or incidental to such instrument or fund or the establishment or administration thereof, such amendment to be made by written instrument executed or consented to by the Depositor and such related insurer but without the consent of any Certificateholder and without the consent of the Insurer, the Master Servicer or the Trustee being required unless any such amendment would impose any additional obligation on, or otherwise adversely affect the interests of the Certificateholders, the

CONFIDENTIAL                                                              RC_FGIC9019_00031517

Insurer, the Master Servicer or the Trustee, as applicable; provided that the Depositor obtains an Opinion of Counsel (which need not be an opinion of Independent counsel) to the effect that any such amendment will not cause (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code and (b) any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding. In the event that the Depositor elects to provide such coverage in the form of a limited guaranty provided by General Motors Acceptance Corporation, the Depositor may elect that the text of such amendment to this Agreement shall be substantially in the form attached hereto as Exhibit L (in which case Residential Funding's Subordinate Certificate Loss Obligation as described in such exhibit shall be established by Residential Funding's consent to such amendment) and that the limited guaranty shall be executed in the form attached hereto as Exhibit M, with such changes as the Depositor shall deem to be appropriate; it being understood that the Trustee has reviewed and approved the content of such forms and that the Trustee's consent or approval to the use thereof is not required.

(f)    In addition to the foregoing, any amendment of Section 4.08 of this Agreement shall require the consent of the Limited Repurchase Right Holder as third-party beneficiary.

Section 11.02. Recordation of Agreement; Counterparts.

(a)    To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer and at its expense on direction by the Trustee (pursuant to the request of the Holders of Certificates entitled to at least 25% of the Voting Rights), but only upon direction accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

(b)    For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 11.03. Limitation on Rights of Certificateholders.

(a)    The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the Trust Fund, nor entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Fund, nor otherwise affect the rights, obligations and liabilities of any of the parties hereto.

(b)    No Certificateholder shall have any right to vote (except as expressly provided herein) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms

CONFIDENTIAL                                                    RC_FGIC9019_00031518

of the Certificates, be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

(c)    No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates of any Class evidencing in the aggregate not less than 25% of the related Percentage Interests of such Class (in each case, with the consent of the Insurer), shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Insurer shall have given its written consent (so long as no Insurer Default has occurred and is continuing) and the Trustee for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates of any Class shall have any right in any manner whatever by virtue of any provision of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of such Certificates of such Class or any other Class, or to obtain any priority over or preference to any other such Holder, or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of Certificateholders of such Class or all Classes, as the case may be. For the protection and enforcement of the provisions of this Section 11.03, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Section 11.04. <u>Governing Law</u>.

This agreement and the Certificates shall be governed by and construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws, without regard to the conflict of laws principles thereof, other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.

Section 11.05. <u>Notices</u>.

All demands and notices hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid (except for notices to the Trustee which shall be deemed to have been duly given only when received), to (a) in the case of the Depositor, 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention:  President (RAMP), or such other address as may hereafter be furnished to the Master Servicer and the Trustee in writing by the Depositor; (b) in the case of the Master Servicer, 2255 North Ontario Street, Burbank, California 91504-3120, Attention: Bond Administration or such other address as may be hereafter furnished to the Depositor and the Trustee by the Master Servicer in writing; (c) in the case of the Trustee,

CONFIDENTIAL                                                      RC_FGIC9019_00031519

U.S. Bank Corporate Trust Services, 60 Livingston Avenue, EP-MN-WS3D, St. Paul, Minnesota 55107-2292, Attn: RAMP 2005-EFC7 or such other address as may hereafter be furnished to the Depositor and the Master Servicer in writing by the Trustee; (d) in the case of Moody's, 99 Church Street, New York, New York 10007, Attention: ABS Monitoring Department or such other address as may be hereafter furnished to the Depositor, the Trustee and the Master Servicer by Moody's, (e) in the case of the Insurer, 125 Park Avenue, New York, New York 10017, Attention: Research and Risk Management, RAMP Series 2005-EFC7 and (f) in the case of Standard & Poor's, 55 Water Street, New York, New York 10041 Attention; Mortgage Surveillance. Any notice required or permitted to be mailed to a Certificateholder shall be given by first class mail, postage prepaid, at the address of such holder as shown in the Certificate Register. Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder receives such notice.

Section 11.06. <u>Notices to Rating Agencies</u>.

The Depositor, the Master Servicer or the Trustee, as applicable, (a) shall notify each Rating Agency and the Insurer at such time as it is otherwise required pursuant to this Agreement to give notice of the occurrence of, any of the events described in clause (a), (b), (c), (d), (g), (h), (i) or (j) below, (b) shall notify the Subservicer at such time as it is otherwise required pursuant to this Agreement to give notice of the occurrence of any of the events described in clause (a), (b), (c)(1), (g)(1) or (i) below, or (c) provide a copy to each Rating Agency at such time as otherwise required to be delivered pursuant to this Agreement of any of the statements described in clauses (e) and (f) below:

(a)     a material change or amendment to this Agreement,

(b)     the occurrence of an Event of Default,

(c)     (1) the termination or appointment of a successor Master Servicer or (2) the termination or appointment of a successor Trustee or a change in the majority ownership of the Trustee,

(d)     the filing of any claim under the Master Servicer's blanket fidelity bond and the errors and omissions insurance policy required by Section 3.12 or the cancellation or modification of coverage under 152 any such instrument,

(e)     the statement required to be delivered to the Holders of each Class of Certificates pursuant to Section 4.03,

(f)     the statements required to be delivered pursuant to Sections 3.18 and 3.19,

(g)     (1) a change in the location of the Custodial Account or (2) a change in the location of the Certificate Account,

(h)     the occurrence of any monthly cash flow shortfall to the Holders of any Class of Certificates resulting from the failure by the Master Servicer to make an Advance pursuant to Section 4.04,

CONFIDENTIAL                                                    RC_FGIC9019_00031520

(i)      the occurrence of the Final Distribution Date, and

(j)      the repurchase of or substitution for any Mortgage Loan,

*provided, however*, that with respect to notice of the occurrence of the events described in clauses (d), (g) or (h) above, the Master Servicer shall provide prompt written notice to each Rating Agency, the Insurer and the Subservicer of any such event known to the Master Servicer. In addition to the above delivery requirements, the Depositor or the Master Servicer, as applicable, shall provide a copy to the Insurer, at such time as it otherwise is required to deliver pursuant to this Agreement, of any other written confirmation, written notice or legal opinion.

Section 11.07. Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

Section 11.08. Supplemental Provisions for Resecuritization.

(a)      This Agreement may be supplemented by means of the addition of a separate Article hereto (a "Supplemental Article") for the purpose of resecuritizing any of the Certificates issued hereunder, under the following circumstances. With respect to any Class or Classes of Certificates issued hereunder, or any portion of any such Class, as to which the Depositor or any of its Affiliates (or any designee thereof) is the registered Holder (the "Resecuritized Certificates"), the Depositor may deposit such Resecuritized Certificates into a new REMIC, grantor trust or custodial arrangement (a "Restructuring Vehicle") to be held by the Trustee pursuant to a Supplemental Article. The instrument adopting such Supplemental Article shall be executed by the Depositor, the Master Servicer and the Trustee; provided, that neither the Master Servicer nor the Trustee shall withhold their consent thereto if their respective interests would not be materially adversely affected thereby. To the extent that the terms of the Supplemental Article do not in any way affect any provisions of this Agreement as to any of the Certificates initially issued hereunder, the adoption of the Supplemental Article shall not constitute an "amendment" of this Agreement. Each Supplemental Article shall set forth all necessary provisions relating to the holding of the Resecuritized Certificates by the Trustee, the establishment of the Restructuring Vehicle, the issuing of various classes of new certificates by the Restructuring Vehicle and the distributions to be made thereon, and any other provisions necessary to the purposes thereof. In connection with each Supplemental Article, the Depositor shall deliver to the Trustee an Opinion of Counsel to the effect that (i) the Restructuring Vehicle will qualify as a REMIC, grantor trust or other entity not subject to taxation for federal income tax purposes and (ii) the adoption of the Supplemental Article will not endanger the status of any REMIC created hereunder as a REMIC or result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transaction as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC as set forth in Section 860G(d) of the Code.

CONFIDENTIAL                                    RC_FGIC9019_00031521

Section 11.09. <u>Rights of the Insurer</u>.

(a)      The Insurer is an express third-party beneficiary of this Agreement.

(b)      On each Distribution Date the Trustee shall make available to the Insurer a copy of the reports made available to the Class A Certificateholders and the Depositor on such Distribution Date.

(c)      The Trustee shall provide to the Insurer copies of any report, notice, Opinion of Counsel, Officers' Certificate, request for consent or request for amendment to any document related hereto promptly upon the Trustee's production or receipt thereof.

(d)      Unless an Insurer Default exists, the Trustee and the Depositor shall not agree to any amendment to this Agreement without first having obtained the prior written consent of the Insurer, which consent shall not be unreasonably withheld.

(e)      So long as there does not exist a failure by the Insurer to make a required payment under the Policy, the Insurer shall have the right to exercise all rights of the Holders of the Class A Certificates under this Agreement without any consent of such Holders, and such Holders may exercise such rights only with the prior written consent of the Insurer, except as provided herein.

(f)      The Insurer shall not be entitled to exercise any of its rights hereunder so long as there exists a failure by the Insurer to make a required payment under the Policy.

Section 11.10. <u>Third Party Beneficiaries</u>.

The Limited Repurchase Right Holder is an express third-party beneficiary of Section 4.08 of this Agreement, and shall have the right to enforce the related provisions of Section 4.08 of this Agreement as if it were a party hereto.


[SIGNATURE PAGES FOLLOW]

CONFIDENTIAL                                                        RC_FGIC9019_00031522

IN WITNESS WHEREOF, the Depositor, the Master Servicer and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized and their respective seals, duly attested, to be hereunto affixed, all as of the day and year first above written.

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

Attest: _____

By: _____

    Name: Pieter VanZyl
    Title:  Vice President

    Name: Joseph Orning
    Title:  Vice President

RESIDENTIAL FUNDING CORPORATION

Attest: _____

By: _____

    Name: Joseph Orning
    Title:  Associate

    Name: Pieter VanZyl
    Title:  Associate

U.S. BANK NATIONAL ASSOCIATION
as Trustee

Attest: _____

By: _____

    Name:
    Title:

    Name:
    Title:

5109327 05161514

*Pooling and Servicing Agreement*
*Series 2005-EFC7*

IN WITNESS WHEREOF, the Depositor, the Master Servicer and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized and their respective seals, duly attested, to be hereunto affixed, all as of the day and year first above written.

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

Attest: _____          By: _____
    Name:  Pieter VanZyl                    Name:  Joseph Orning
    Title:   Vice President                  Title:   Vice President

RESIDENTIAL FUNDING CORPORATION

Attest: _____          By: _____
    Name:  Joseph Orning                   Name:  Pieter VanZyl
    Title:   Associate                      Title:   Associate

U.S. BANK NATIONAL ASSOCIATION
as Trustee

Attest: _____          By: _____
    Name:                                  Name:   Tamara Schultz-Fugh
      Michelle Moeller                    Title:   Vice President
    Title:   Assistant Vice President

5109327 05161514

*Pooling and Servicing Agreement*
*Series 2005-EFC7*

CONFIDENTIAL

STATE OF MINNESOTA            )
                             ) ss.:
COUNTY OF HENNEPIN            )

On the 28th day of December, 2005 before me, a notary public in and for said State, personally appeared Joseph Orning, known to me to be a Vice President of Residential Asset Mortgage Products, Inc., one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public

AMY SUE OLSON
Notary Public
Minnesota
My Commission Expires Jan. 31, 2010

[Notarial Seal]

5109327 05161514

*Pooling and Servicing Agreement*
*Series 2005-EFC7*

CONFIDENTIAL

STATE OF MINNESOTA          )
                            ) ss.:
COUNTY OF HENNEPIN          )

On the 28th day of December, 2005 before me, a notary public in and for said State, personally appeared Pieter VanZyl, known to me to be an Associate of Residential Funding Corporation, one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

AMY SUE OLSON
Notary Public
Minnesota
My Commission Expires Jan. 31, 2010

Notary Public

[Notarial Seal]

5109327 05161514

*Pooling and Servicing Agreement*
*Series 2005-EFC7*

CONFIDENTIAL

STATE OF MINNESOTA          )
                            ) ss.:
COUNTY OF RAMSEY            )

On the 28th day of December, 2005 before me, a notary public in and for said State, personally appeared _____Tamara Schultz-Fugh_____, known to me to be a _____Vice President_____ of U.S. Bank National Association, a national banking association, that executed the within instrument, and also known to me to be the person who executed it on behalf of said banking association and acknowledged to me that such banking association executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

TRISHA L. WILLETT
Notary Public
Minnesota
My Commission Expires January 31, 2007

Notary Public

[signature]

[Notarial Seal]

5109327 05161514

*Pooling and Servicing Agreement*
*Series 2005-EFC7*

CONFIDENTIAL

# Tab B

# Trial Exhibit 117

HOME LOAN TRUST 2007-HI1

ISSUER

AND

LASALLE BANK NATIONAL ASSOCIATION

INDENTURE TRUSTEE

INDENTURE

DATED AS OF MARCH 30, 2007

_____

HOME LOAN-BACKED NOTES, SERIES 2007-HI1

_____

5156850 07031570

CONFIDENTIAL                                                                RC_FGIC9019_00009274

## TABLE OF CONTENTS

Page

ARTICLE I         DEFINITIONS ................................................................................ 2

    Section 1.01.    Definitions ................................................................................. 2

    Section 1.02.    Incorporation by Reference of Trust Indenture Act ..................... 2

    Section 1.03.    Rules of Construction ............................................................... 2

ARTICLE II        ORIGINAL ISSUANCE OF NOTES ........................................... 3

    Section 2.01.    Form ........................................................................................ 3

    Section 2.02.    Execution, Authentication and Delivery ................................... 3

ARTICLE III       COVENANTS ............................................................................. 4

    Section 3.01.    Collection of Payments with respect to the Home Loans ................... 4

    Section 3.02.    Maintenance of Office or Agency ............................................. 4

    Section 3.03.    Money for Payments To Be Held in Trust; Paying Agent ................. 4

    Section 3.04.    Existence .................................................................................. 5

    Section 3.05.    Payment of Principal and Interest; Defaulted Interest ..................... 6

    Section 3.06.    Protection of Trust Estate ......................................................... 8

    Section 3.07.    Opinions as to Trust Estate ....................................................... 8

    Section 3.08.    Performance of Obligations; Servicing Agreement ..................... 9

    Section 3.09.    Negative Covenants .................................................................. 9

    Section 3.10.    Annual Statement as to Compliance ......................................... 10

    Section 3.11.    Recording of Assignments ........................................................ 10

    Section 3.12.    Representations and Warranties Concerning the Home Loans ......... 10

    Section 3.13.    Assignee of Record of the Home Loans .................................... 10

    Section 3.14.    Master Servicer as Agent and Bailee of the Indenture Trustee ........ 11

    Section 3.15.    Investment Company Act .......................................................... 11

    Section 3.16.    Issuer May Consolidate, etc ..................................................... 11

    Section 3.17.    Successor or Transferee ............................................................ 13

    Section 3.18.    No Other Business .................................................................... 13

    Section 3.19.    No Borrowing ........................................................................... 13

    Section 3.20.    Guarantees, Loans, Advances and Other Liabilities ..................... 13

    Section 3.21.    Capital Expenditures ................................................................ 14

    Section 3.22.    Owner Trustee Not Liable for the Certificate or Related
                 Documents ............................................................................... 14

    Section 3.23.    Restricted Payments ................................................................. 14

    Section 3.24.    Notice of Events of Default ....................................................... 14

Confidential

CONFIDENTIAL                                                          RC_FGIC9019_00009275

# TABLE OF CONTENTS
## (cont'd)

Page

Section 3.25.    Further Instruments and Acts ............................................. 14

Section 3.26.    Statements to Noteholders ................................................. 14

Section 3.27.    Payments under the Credit Enhancement Instrument ..................... 15

Section 3.28.    Reserved ........................................................................ 15

Section 3.29.    Determination of Class A-1 Note Rate .................................. 15

Section 3.30.    Liquidation on Final Insured Payment Date ........................... 15

Section 3.31.    No Recourse ..................................................................... 15

Section 3.32.    Additional UCC Representations and Warranties ..................... 15

ARTICLE IV    THE NOTES; SATISFACTION AND DISCHARGE OF
INDENTURE ...................................................................... 16

Section 4.01.    The Notes ......................................................................... 16

Section 4.02.    Registration of and Limitations on Transfer and Exchange of
Notes; Appointment of Certificate Registrar ........................... 17

Section 4.03.    Mutilated, Destroyed, Lost or Stolen Notes ............................ 18

Section 4.04.    Persons Deemed Owners ..................................................... 19

Section 4.05.    Cancellation ...................................................................... 19

Section 4.06.    Book Entry Notes ............................................................... 19

Section 4.07.    Notices to Depository ......................................................... 20

Section 4.08.    Definitive Notes ................................................................ 20

Section 4.09.    Tax Treatment ................................................................... 21

Section 4.10.    Satisfaction and Discharge of Indenture ................................ 21

Section 4.11.    Application of Trust Money ................................................. 22

Section 4.12.    Subrogation and Cooperation .............................................. 22

Section 4.13.    Repayment of Monies Held by Paying Agent .......................... 23

Section 4.14.    Temporary Notes ............................................................... 23

ARTICLE V    DEFAULT AND REMEDIES ............................................... 24

Section 5.01.    Events of Default ............................................................... 24

Section 5.02.    Acceleration of Maturity; Rescission and Annulment ................ 24

Section 5.03.    Collection of Indebtedness and Suits for Enforcement by
Indenture Trustee .............................................................. 25

Section 5.04.    Remedies; Priorities ........................................................... 27

Section 5.05.    Optional Preservation of the Trust Estate ............................... 28

Confidential

CONFIDENTIAL                                                        RC_FGIC9019_00009276

# TABLE OF CONTENTS
## (cont'd)

Page

| | | |
|---|---|---|
| Section 5.06. | Limitation of Suits | 29 |
| Section 5.07. | Rights of Noteholders to Receive Principal and Interest | 29 |
| Section 5.08. | Restoration of Rights and Remedies | 30 |
| Section 5.09. | Rights and Remedies Cumulative | 30 |
| Section 5.10. | Delay or Omission Not a Waiver | 30 |
| Section 5.11. | Control by the Credit Enhancer or the Noteholders | 30 |
| Section 5.12. | Waiver of Past Defaults | 31 |
| Section 5.13. | Undertaking for Costs | 31 |
| Section 5.14. | Waiver of Stay or Extension Laws | 31 |
| Section 5.15. | Sale of Trust Estate | 32 |
| Section 5.16. | Action on Notes | 33 |
| Section 5.17. | Performance and Enforcement of Certain Obligations | 34 |
| ARTICLE VI | THE INDENTURE TRUSTEE | 34 |
| Section 6.01. | Duties of Indenture Trustee | 34 |
| Section 6.02. | Rights of Indenture Trustee | 35 |
| Section 6.03. | Individual Rights of Indenture Trustee | 36 |
| Section 6.04. | Indenture Trustee's Disclaimer | 36 |
| Section 6.05. | Notice of Event of Default | 36 |
| Section 6.06. | Reports by Indenture Trustee to Holders | 36 |
| Section 6.07. | Compensation and Indemnity | 37 |
| Section 6.08. | Replacement of Indenture Trustee | 37 |
| Section 6.09. | Successor Indenture Trustee by Merger | 38 |
| Section 6.10. | Appointment of Co-Indenture Trustee or Separate Indenture Trustee | 38 |
| Section 6.11. | Eligibility; Disqualification | 39 |
| Section 6.12. | Preferential Collection of Claims Against Issuer | 40 |
| Section 6.13. | Representations and Warranties | 40 |
| Section 6.14. | Directions to Indenture Trustee | 41 |
| Section 6.15. | Indenture Trustee May Own Securities | 41 |

CONFIDENTIAL                                                                    RC_FGIC9019_00009277

# TABLE OF CONTENTS
(cont'd)

Page

ARTICLE VII      NOTEHOLDERS' LISTS AND REPORTS ................................................. 41

Section 7.01.      Issuer to Furnish Indenture Trustee Names and Addresses of
Noteholders ................................................................................ 41

Section 7.02.      Preservation of Information; Communications to Noteholders ......... 42

Section 7.03.      Reports by Issuer ..................................................................... 42

Section 7.04.      Reports by Indenture Trustee ..................................................... 42

Section 7.05.      Exchange Act Reporting ............................................................ 43

ARTICLE VIII      ACCOUNTS, DISBURSEMENTS AND RELEASES ................................ 43

Section 8.01.      Collection of Money .................................................................. 43

Section 8.02.      Trust Accounts ........................................................................ 43

Section 8.03.      Officer's Certificate .................................................................. 44

Section 8.04.      Termination Upon Payment to Noteholders .................................. 44

Section 8.05.      Release of Trust Estate ............................................................. 44

Section 8.06.      Surrender of Notes Upon Final Payment ..................................... 44

ARTICLE IX      SUPPLEMENTAL INDENTURES ...................................................... 45

Section 9.01.      Supplemental Indentures Without Consent of Noteholders .............. 45

Section 9.02.      Supplemental Indentures With Consent of Noteholders ................... 47

Section 9.03.      Execution of Supplemental Indentures ......................................... 48

Section 9.04.      Effect of Supplemental Indenture ............................................... 49

Section 9.05.      Conformity with Trust Indenture Act ........................................... 49

Section 9.06.      Reference in Notes to Supplemental Indentures ............................ 49

ARTICLE X      MISCELLANEOUS ......................................................................... 49

Section 10.01.      Compliance Certificates and Opinions, etc. ................................. 49

Section 10.02.      Form of Documents Delivered to Indenture Trustee ........................ 51

Section 10.03.      Acts of Noteholders .................................................................. 52

Section 10.04.      Notices, etc., to Indenture Trustee, Issuer, Credit Enhancer and
Rating Agencies ........................................................................ 52

Section 10.05.      Notices to Noteholders; Waiver .................................................. 53

Section 10.06.      Alternate Payment and Notice Provisions .................................... 54

Section 10.07.      Conflict with Trust Indenture Act ............................................... 54

Section 10.08.      Effect of Headings .................................................................... 54

Confidential

CONFIDENTIAL                                                    RC_FGIC9019_00009278

# TABLE OF CONTENTS
## (cont'd)

|  |  | Page |
|---|---|---|
| Section 10.09. | Successors and Assigns | 54 |
| Section 10.10. | Separability | 54 |
| Section 10.11. | Benefits of Indenture | 54 |
| Section 10.12. | Legal Holidays | 54 |
| Section 10.13. | GOVERNING LAW | 54 |
| Section 10.14. | Counterparts | 55 |
| Section 10.15. | Recording of Indenture | 55 |
| Section 10.16. | Issuer Obligation | 55 |
| Section 10.17. | No Petition | 55 |
| Section 10.18. | Inspection | 55 |
| Exhibit A | Form of Notes | |
| Appendix A | Definitions | |

CONFIDENTIAL                                          RC_FGIC9019_00009279

## RECONCILIATION AND TIE BETWEEN TRUST INDENTURE
## ACT OF 1939 AND INDENTURE PROVISIONS[*]

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 6.11 |
| (a)(2) | 6.11 |
| (a)(3) | 6.10 |
| (a)(4) | Not Applicable |
| (a)(5) | 6.11 |
| (b) | 6.08, 6.11 |
| (c) | Not Applicable |
| 311(a) | 6.12 |
| (b) | 6.12 |
| (c) | Not Applicable |
| 312(a) | 7.01, 7.02(a) |
| (b) | 7.02(b) |
| (c) | 7.02(c) |
| 313(a) | 7.04 |
| (b) | 7.04 |
| (c) | 7.03(a)(iii), 7.04 |
| (d) | 7.04 |
| 314(a) | 3.10, 7.03(a) |
| (b) | 3.07 |
| (c)(1) | 8.05(c), 10.01(a) |
| (c)(2) | 8.05(c), 10.01(a) |
| (c)(3) | Not Applicable |
| (d)(1) | 8.05(c), 10.01(b) |
| (d)(2) | 8.05(c), 10.01(b) |
| (d)(3) | 8.05(c), 10.01(b) |
| (e) | 10.01(a) |
| 315(a) | 6.01(b) |
| (b) | 6.05 |
| (c) | 6.01(a) |
| (d) | 6.01(c) |
| (d)(1) | 6.01(c) |
| (d)(2) | 6.01(c) |
| (d)(3) | 6.01(c) |
| (e) | 5.13 |
| 316(a)(1)(A) | 5.11 |
| 316(a)(1)(B) | 5.12 |
| 316(a)(2) | Not Applicable |
| 316(b) | 5.07 |
| 317(a)(1) | 5.04 |
| 317(a)(2) | 5.03(d) |
| 317(b) | 3.03(a) |
| 318(a) | 10.07 |

---

[*]This reconciliation and tie shall not, for any purpose, be deemed to be part of the within indenture.

CONFIDENTIAL                                                RC_FGIC9019_00009280

Confidential

This is the Indenture, dated as of March 30, 2007, between HOME LOAN TRUST 2007-HI1, a Delaware statutory trust, as Issuer (the "Issuer"), and LaSalle Bank National Association, as Indenture Trustee (the "Indenture Trustee"),

## WITNESSETH THAT:

Each party hereto agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Issuer's Series 2007-HI1 Home Loan-Backed Notes (the "Notes").

## GRANTING CLAUSE

The Issuer and the Owner Trustee hereby Grant to the Indenture Trustee at the Closing Date, as trustee for the benefit of the Holders of the Notes, all of the Issuer's and the Owner Trustee's right, title and interest in and to whether now existing or hereafter created (a) the Home Loans; (b) all funds on deposit from time to time in the Payment Account and in all proceeds thereof; (c) all property securing the payment or performance of the Home Loans and all supporting obligations for the Home Loans; and (d) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in respect of, any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, checks, deposit accounts, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, the "Trust Estate" or the "Collateral").

The foregoing Grant is made in trust to secure the payment of principal of and interest on, and any other amounts owing in respect of, the Notes, equally and ratably without prejudice, priority or distinction, and to secure compliance with the provisions of this Indenture, all as provided in this Indenture.

The foregoing Grant shall inure to the benefit of the Credit Enhancer in respect of draws made on the Credit Enhancement Instrument and amounts owing from time to time pursuant to the Insurance Agreement (regardless of whether such amounts relate to the Notes or the Certificates), and such Grant shall continue in full force and effect for the benefit of the Credit Enhancer until all such amounts owing to it have been repaid in full.

The Indenture Trustee, as trustee on behalf of the Holders of the Notes: (i) acknowledges such Grant, (ii) accepts the trust under this Indenture in accordance with the provisions hereof, (iii) agrees to perform its duties as Indenture Trustee as required herein and (iv) acknowledges receipt of the Credit Enhancement Instrument and shall hold such Credit Enhancement Instrument in accordance with the terms of this Indenture for the benefit of the Holders of the Notes.

5156850 07031570

# ARTICLE I

## DEFINITIONS

Section 1.01. <u>Definitions</u>.   For all purposes of this Indenture, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Definitions attached hereto as <u>Appendix A</u> which is incorporated by reference herein.  All other capitalized terms used herein shall have the meanings specified herein.

Section 1.02. <u>Incorporation by Reference of Trust Indenture Act</u>.   Whenever this Indenture refers to a provision of the Trust Indenture Act (the "<u>TIA</u>"), the provision is incorporated by reference in and made a part of this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"<u>Commission</u>" means the Securities and Exchange Commission.

"<u>indenture securities</u>" means the Notes.

"<u>indenture security holder</u>" means a Noteholder.

"<u>indenture to be qualified</u>" means this Indenture.

"<u>indenture trustee</u>" means the Indenture Trustee.

"<u>obligor</u>" on the indenture securities means the Issuer and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule have the meaning assigned to them by such definitions.

Section 1.03. <u>Rules of Construction</u>.  Unless the context otherwise requires:

(i)       a term has the meaning assigned to it;

(ii)      an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect from time to time;

(iii)     "or" is not exclusive;

(iv)     "including" means including without limitation;

(v)      words in the singular include the plural and words in the plural include the singular; and

Confidential

(vi)     any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

## ARTICLE II

### ORIGINAL ISSUANCE OF NOTES

Section 2.01.  <u>Form</u>.   The Notes, together with the Indenture Trustee's certificate of authentication, shall be in substantially the form set forth in <u>Exhibit A</u>, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may, consistently herewith, be determined by the officers executing such Notes, as evidenced by their execution of the Notes.  Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

The Notes shall be typewritten, printed, lithographed or engraved or produced by any combination of these methods (with or without steel engraved borders), all as determined by the Authorized Officers executing such Notes, as evidenced by their execution of such Notes.  The terms of the Notes set forth in <u>Exhibit A</u> are part of the terms of this Indenture.

Section 2.02.  <u>Execution, Authentication and Delivery</u>.   The Notes shall be executed on behalf of the Issuer by any of its Authorized Officers.  The signature of any such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signature of individuals who were at any time Authorized Officers of the Issuer shall bind the Issuer, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of such Notes.

The Indenture Trustee shall upon Issuer Request authenticate and deliver Notes for original issue in an aggregate initial principal amount of $97,701,000 with respect to the Class A-1 Notes, $26,745,000 with respect to the Class A-2 Notes, $51,770,000 with respect to the Class A-3 Notes and $78,740,000 with respect to the Class A-4 Notes.

The Notes shall be dated the date of their authentication.  The Notes shall be issuable as registered Notes.  The Notes shall be issuable in the minimum initial Note Balances of $100,000 and in integral multiples of $1 in excess thereof.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication substantially in the form provided for herein executed by the Indenture Trustee by the manual signature of one of its authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

5156850 07031570                                                              3

CONFIDENTIAL                                                    RC_FGIC9019_00009283

Confidential

## ARTICLE III

## COVENANTS

Section 3.01.  <u>Collection of Payments with respect to the Home Loans</u>.  The Indenture Trustee shall establish and maintain with itself the Payment Account as further described in Section 5.01 of the Servicing Agreement in which the Indenture Trustee shall, subject to the terms of this paragraph, deposit, on the same day as it is received from the Master Servicer, each remittance received by the Indenture Trustee with respect to the Home Loans.  The Payment Account shall be a segregated account and an Eligible Account.  The Indenture Trustee shall make all payments of principal of and interest on the Notes, subject to <u>Section 3.03</u>, as provided in <u>Section 3.05</u> herein from monies on deposit in the Payment Account.

Section 3.02.  <u>Maintenance of Office or Agency</u>.  The Issuer will maintain in the City of New York, New York or Chicago, Illinois, an office or agency where, subject to satisfaction of conditions set forth herein, Notes may be surrendered for registration of transfer or exchange, and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.  The Issuer hereby initially appoints the Indenture Trustee to serve as its agent for the foregoing purposes.  If at any time the Issuer shall fail to maintain any such office or agency or shall fail to furnish the Indenture Trustee with the address thereof, such surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Issuer hereby appoints the Indenture Trustee as its agent to receive all such surrenders, notices and demands.

Section 3.03.  <u>Money for Payments To Be Held in Trust; Paying Agent</u>.  (a) As provided in <u>Section 3.01</u>, all payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account pursuant to <u>Section 3.01</u> shall be made on behalf of the Issuer by the Indenture Trustee or by the Paying Agent, and no amounts so withdrawn from the Payment Account for payments of Notes shall be paid over to the Issuer except as provided in this <u>Section 3.03</u>.  The Issuer will cause each Paying Agent other than the Indenture Trustee to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee (and if the Indenture Trustee acts as Paying Agent it hereby so agrees), subject to the provisions of this <u>Section 3.03</u>, that such Paying Agent will:

(i)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(ii)    give the Indenture Trustee and the Credit Enhancer written notice of any default by the Issuer of which it has actual knowledge in the making of any payment required to be made with respect to the Notes;

(iii)    at any time during the continuance of any such default, upon the written request of the Indenture Trustee, forthwith pay to the Indenture Trustee all sums so held in trust by such Paying Agent;

Confidential

CONFIDENTIAL                                                                    RC_FGIC9019_00009284

(iv)    immediately resign as Paying Agent and forthwith pay to the Indenture Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment;

(v)    comply with all requirements of the Code with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith; and

(vi)    deliver to the Indenture Trustee a copy of the report to Noteholders prepared with respect to each Payment Date by the Master Servicer pursuant to Section 4.01 of the Servicing Agreement.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Request direct any Paying Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums to be held by the Indenture Trustee upon the same trusts as those upon which the sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Subject to applicable laws with respect to escheat of funds, any money held by the Indenture Trustee or any Paying Agent in trust for the payment of any amount due with respect to any Note and remaining unclaimed for one year after such amount has become due and payable shall be discharged from such trust and be paid to the Issuer on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Issuer), and all liability of the Indenture Trustee or such Paying Agent with respect to such trust money shall thereupon cease; provided, however, that the Indenture Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense and direction of the Issuer cause to be published once, in an Authorized Newspaper, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Issuer. The Indenture Trustee may also adopt and employ, at the expense and direction of the Issuer, any other reasonable means of notification of such repayment (including, but not limited to, mailing notice of such repayment to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in monies due and payable but not claimed is determinable from the records of the Indenture Trustee or of any Paying Agent, at the last address of record for each such Holder).

Section 3.04.  Existence.  The Issuer will keep in full effect its existence, rights and franchises as a statutory trust under the laws of the State of Delaware (unless it becomes, or any successor Issuer hereunder is or becomes, organized under the laws of any other state or of the United States of America, in which case the Issuer will keep in full effect its existence, rights and franchises under the laws of such other jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes, the Home Loans and each other instrument or agreement included in the Trust Estate.

5156850 07031570

5

CONFIDENTIAL    RC_FGIC9019_00009285

Confidential

Section 3.05. <u>Payment of Principal and Interest; Defaulted Interest</u>.    (a) On each Payment Date from amounts on deposit in the Payment Account, the Paying Agent shall pay to the Noteholders, the Certificate Paying Agent on behalf of the Certificateholder and to other Persons the amounts to which they are entitled, as set forth in the statements delivered to the Indenture Trustee pursuant to Section 4.01 of the Servicing Agreement, as set forth below in the following order of priority:

(i)    to the Credit Enhancer, the Premium for the Credit Enhancement Instrument, plus any unpaid Premium from any prior Payment Date (with interest thereon as provided in the Insurance Agreement);

(ii)    to the Noteholders, Accrued Note Interest for such Payment Date, on a *pro rata* basis, based on the amount of Accrued Note Interest for such Payment Date, plus any Accrued Note Interest remaining unpaid from any prior Payment Date, less any Prepayment Interest Shortfalls and Relief Act Shortfalls allocated thereto as provided in <u>Section 3.05(d)</u> below;

(iii)    to the Noteholders as principal on the Notes, the Principal Collection Payment Amount for such Payment Date, in the order described in <u>Section 3.05(f)</u> below, until the Note Balances thereof have been reduced to zero;

(iv)    to the Noteholders as principal on the Notes, the Liquidation Loss Payment Amount for such Payment Date, in the order described in <u>Section 3.05(f)</u> below, until the Note Balances thereof have been reduced to zero;

(v)    to the Credit Enhancer, to reimburse it for prior draws made on the Credit Enhancement Instrument (with interest thereon as provided in the Insurance Agreement);

(vi)    to the Noteholders as principal on the Notes, the Reserve Increase Amount for such Payment Date, in the order described in <u>Section 3.05(f)</u> below, until the Note Balances thereof have been reduced to zero;

(vii)    to the Credit Enhancer, any other amounts owed to the Credit Enhancer pursuant to the Insurance Agreement; and

(viii)    any remaining amount to the Certificate Paying Agent, on behalf of the holders of the Certificates;

<u>provided</u>, <u>however</u>, in the event that on a Payment Date a Credit Enhancer Default shall have occurred and be continuing, (a) no payments will be made to the Credit Enhancer pursuant to <u>clause (v)</u> above until all Insured Payments that are due and required to be paid by the Credit Enhancer on the Notes on such Payment Date or were due and required to be paid by the Credit Enhancer on any prior Payment Date have been paid in full and (b) any amounts payable to the Credit Enhancer pursuant to <u>clause (v)</u> shall instead be paid pursuant to <u>clause (vii)</u>. In addition, on the Final Insured Payment Date or other final Payment Date (including the Payment Date following any purchase by the Master Servicer of the Home Loans pursuant to Section 8.08 of the Servicing Agreement), the amount to be paid pursuant to <u>clause (ii)</u> above shall be equal to the aggregate Note Balance of the Notes immediately prior to such Payment Date.

5156850 07031570                                    6

CONFIDENTIAL                                    RC_FGIC9019_00009286

Confidential

(b)     On each Payment Date, the Certificate Paying Agent shall deposit in the Certificate Distribution Account all amounts it received pursuant to this Section 3.05 for the purpose of distributing such funds to the Certificateholder.

(c)     The amounts paid to Noteholders shall be paid to the Notes in accordance with the applicable percentage as set forth in the definition of Note Rate.  Interest will accrue on the Notes (other than the Class A-1 Notes) on the basis of a 360-day year consisting of twelve 30-day months.  Interest will accrue on the Class A-1 Notes on the basis of a 360-day year and the actual number of days in the related Interest Accrual Period.

(d)     To the extent the amount available for interest distributions on the Notes is less than the aggregate amount of Accrued Note Interest on the Notes, a draw on the Credit Enhancement Instrument will be made; provided, however, that to the extent such shortfall is a result of Prepayment Interest Shortfalls or Relief Act Shortfalls, whether related to the current Collection Period or a prior Collection Period, the shortfall will not be covered by the Credit Enhancement Instrument, and the shortfall will be allocated to the amount of Accrued Note Interest on the Notes on a *pro rata* basis.

(e)     Any installment of interest or principal, if any, payable on any Note that is punctually paid or duly provided for by the Issuer on the applicable Payment Date shall be paid to each Holder of record on the preceding Record Date, by wire transfer to an account specified in writing by such Holder reasonably satisfactory to the Indenture Trustee as of the preceding Record Date or in all other cases or if no such instructions have been delivered to the Indenture Trustee, by check or money order to such Noteholder mailed to such Holder's address as it appears in the Note Register the amount required to be paid to such Holder on such Payment Date pursuant to such Holder's Securities; provided, however, that the Indenture Trustee shall not pay to such Holders any amount required to be withheld from a payment to such Holder by the Code.

(f)     Any payments to the Notes pursuant to clauses 3.05(a)(iii), (iv) and (vi) above plus amounts drawn on the Credit Enhancement Instrument in respect of principal shall be distributed to the Class A-1, Class A-2, Class A-3 and Class A-4 Notes, in that order, in each case until the outstanding Note Balance thereof has been reduced to zero.

(g)     The Note Balance of each Note shall be due and payable in full on the Final Insured Payment Date as provided in the form of Note set forth in Exhibit A.  All principal payments on the Notes shall be made to the Noteholders entitled thereto in accordance with the Percentage Interests represented by such Notes.  Upon written notice to the Indenture Trustee by the Issuer (or by the Master Servicer on behalf of the Issuer, pursuant to Section 8.08(c) of the Servicing Agreement) of the Final Insured Payment Date for the Notes or other final Payment Date, the Indenture Trustee shall notify the related Noteholders of record of the Final Insured Payment Date or other final Payment Date, by mail or facsimile, no later than five Business Days prior to the Final Insured Payment Date or other final Payment Date and shall specify:

(i)     that the Record Date otherwise applicable to such Payment Date is not applicable;

Confidential

(ii)    that payment of the principal amount and any interest due with respect to such Note at the Final Insured Payment Date or other final Payment Date will be payable only upon presentation and surrender of such Note and shall specify the place where such Note may be presented and surrendered for such final payment; and

(iii)    the amount of any such final payment, if known.

Section 3.06.  Protection of Trust Estate.  (a) The Issuer will from time to time execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to:

(i)    maintain or preserve the lien and security interest (and the priority thereof) of this Indenture or carry out more effectively the purposes hereof;

(ii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iii)    cause the Trust to enforce any of the Home Loans; and

(iv)    preserve and defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties.

(b)    Except as otherwise provided in this Indenture, the Indenture Trustee shall not remove any portion of the Trust Estate that consists of money or is evidenced by an instrument, certificate or other writing from the jurisdiction in which it was held at the date of the most recent Opinion of Counsel delivered pursuant to Section 3.07 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.07(a), if no Opinion of Counsel has yet been delivered pursuant to Section 3.07(b)) unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.  The Issuer hereby designates the Indenture Trustee its agent and attorney in fact to execute any financing statement, continuation statement or other instrument required to be executed pursuant to this Section 3.06.

Section 3.07.  Opinions as to Trust Estate.  (a) On the Closing Date, the Issuer shall furnish to the Indenture Trustee and the Owner Trustee an Opinion of Counsel at the expense of the Issuer either stating that, in the opinion of such counsel, such action has been taken with respect to the recording and filing of this Indenture, any indentures supplemental hereto, and any other requisite documents, and with respect to the execution and filing of any financing statements and continuation statements, as are necessary to perfect and make effective the lien and security interest in the Home Loans and reciting the details of such action, or stating that, in the opinion of such counsel, no such action is necessary to make such lien and security interest effective.

Confidential

Confidential

(b)    On or before December 31st in each calendar year, beginning in 2007, the Issuer shall furnish to the Indenture Trustee and the Credit Enhancer an Opinion of Counsel at the expense of the Issuer either stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, rerecording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and with respect to the execution and filing of any financing statements and continuation statements as is necessary to maintain the lien and security interest in the Home Loans and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain such lien and security interest.    Such Opinion of Counsel shall also describe the recording, filing, re recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and the execution and filing of any financing statements and continuation statements that will, in the opinion of such counsel, be required to maintain the lien and security interest in the Home Loans until December 31 in the following calendar year.

Section 3.08.    Performance of Obligations; Servicing Agreement.    (a) The Issuer will punctually perform and observe all of its obligations and agreements contained in this Indenture, the Basic Documents and in the instruments and agreements included in the Trust Estate.

(b)    The Issuer may contract with other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer.

(c)    The Issuer will not take any action or permit any action to be taken by others which would release any Person from any of such Person's covenants or obligations under any of the documents relating to the Home Loans or under any instrument included in the Trust Estate, or which would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any of the documents relating to the Home Loans or any such instrument, except such actions as the Master Servicer is expressly permitted to take in the Servicing Agreement.

(d)    The Issuer may retain an administrator and may enter into contracts with other Persons for the performance of the Issuer's obligations hereunder, and performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer.

Section 3.09.    Negative Covenants.    So long as any Notes are Outstanding, the Issuer shall not:

(i)    except as expressly permitted by this Indenture, sell, transfer, exchange or otherwise dispose of the Trust Estate, unless directed to do so by the Indenture Trustee;

(ii)    claim any credit on, or make any deduction from the principal or interest payable in respect of, the Notes (other than amounts properly withheld from such payments under the Code) or assert any claim against any present or former Noteholder by reason of the payment of the taxes levied or assessed upon any part of the Trust Estate;

5156850 07031570

9

CONFIDENTIAL

(iii)    (A) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Notes under this Indenture except as may be expressly permitted hereby, permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof or any interest therein or the proceeds thereof or (B) permit the lien of this Indenture not to constitute a valid first priority security interest in the Trust Estate; or

(iv)    waive or impair, or fail to assert rights under the Home Loans, or impair or cause to be impaired the Home Loans or the Issuer's interest in the Home Loans, the Home Loan Purchase Agreement or in any Basic Document, if any such action would materially and adversely affect the interests of the Noteholders.

Section 3.10.  <u>Annual Statement as to Compliance</u>.   The Issuer will deliver to the Indenture Trustee and the Credit Enhancer, within 120 days after the end of each fiscal year of the Issuer (commencing with the fiscal year 2008), an Officer's Certificate stating, as to the Authorized Officer signing such Officer's Certificate, that:

(i)    a review of the activities of the Issuer during such year and of its performance under this Indenture and the Trust Agreement has been made under such Authorized Officer's supervision; and

(ii)    to the best of such Authorized Officer's knowledge, based on such review, the Issuer has complied with all conditions and covenants under this Indenture and the provisions of the Trust Agreement throughout such year, or, if there has been a default in its compliance with any such condition or covenant, specifying each such default known to such Authorized Officer and the nature and status thereof.

Section 3.11.  <u>Recording of Assignments</u>.   The Issuer shall enforce the obligation of the Seller under the Home Loan Purchase Agreement to submit or cause to be submitted for recording all Assignments of Mortgages within 60 days of receipt of recording information by the Master Servicer.

Section 3.12.  <u>Representations and Warranties Concerning the Home Loans</u>.   The Indenture Trustee, as pledgee of the Home Loans, has the benefit of the representations and warranties made by the Seller in <u>Section 3.1(a)</u> and <u>Section 3.1(b)</u> of the Home Loan Purchase Agreement concerning the Home Loans and the right to enforce the remedies against the Seller provided in such <u>Section 3.1(a)</u> or <u>Section 3.1(b)</u> to the same extent as though such representations and warranties were made directly to the Indenture Trustee.

Section 3.13.  <u>Assignee of Record of the Home Loans</u>.   The Issuer hereby directs and authorizes the Indenture Trustee to hold record title to the Home Loans by being named as payee in the endorsements of the Mortgage Notes and assignee in the Assignments of Mortgage to be recorded under <u>Section 2.1</u> of the Home Loan Purchase Agreement.   Except as expressly provided in the Home Loan Purchase Agreement or in the Servicing Agreement with respect to

Confidential

any specific Home Loan, the Indenture Trustee shall not execute any endorsement or assignment or otherwise release or transfer such record title to any of the Home Loans until such time as the remaining Trust Estate may be released pursuant to Section 8.05(b). The Indenture Trustee's holding of such record title shall in all respects be subject to its fiduciary obligations to the Noteholders hereunder.

Section 3.14. Master Servicer as Agent and Bailee of the Indenture Trustee. Solely for purposes of perfection under Section 9-305 of the Uniform Commercial Code or other similar applicable law, rule or regulation of the state in which such property is held by the Master Servicer, the Issuer and the Indenture Trustee hereby acknowledge that the Master Servicer is acting as agent and bailee of the Indenture Trustee in holding amounts on deposit in the Custodial Account pursuant to Section 3.02 of the Servicing Agreement that are allocable to the Home Loans, as well as its agent and bailee in holding any Related Documents released to the Master Servicer pursuant to Section 3.06(c) of the Servicing Agreement, and any other items constituting a part of the Trust Estate which from time to time come into the possession of the Master Servicer. It is intended that, by the Master Servicer's acceptance of such agency pursuant to Section 3.02 of the Servicing Agreement, the Indenture Trustee, as a pledgee of the Home Loans, will be deemed to have possession of such Related Documents, such monies and such other items for purposes of Section 9-305 of the Uniform Commercial Code of the state in which such property is held by the Master Servicer.

Section 3.15. Investment Company Act. The Issuer shall not become an "investment company" or "controlled by" an investment company as such terms are defined in the Investment Company Act of 1940, as amended (or any successor or amendatory statute), and the rules and regulations thereunder (taking into account not only the general definition of the term "investment company" but also any available exceptions to such general definition); provided, however, that the Issuer shall be in compliance with this Section 3.15 if it shall have obtained an order exempting it from regulation as an "investment company" so long as it is in compliance with the conditions imposed in such order.

Section 3.16. Issuer May Consolidate, etc. (a) The Issuer shall not consolidate or merge with or into any other Person, unless:

(i)    the Person (if other than the Issuer) formed by or surviving such consolidation or merger shall be a Person organized and existing under the laws of the United States of America or any state or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form reasonably satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and to the Certificate Paying Agent, on behalf of the Certificateholder and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)    immediately after giving effect to such transaction, no Event of Default shall have occurred and be continuing;

Confidential

(iii)    the Issuer receives consent of the Credit Enhancer (so long as no Credit Enhancer Default exists) and the Rating Agencies shall have notified the Issuer (with a copy to the Indenture Trustee) that such transaction shall not cause the rating of the Notes, without regard to the Credit Enhancement Instrument, to be reduced, suspended or withdrawn or to be considered by either Rating Agency to be below investment grade without taking into account the Credit Enhancement Instrument;

(iv)    the Issuer shall have received an Opinion of Counsel (and shall have delivered copies thereof to the Indenture Trustee and the Credit Enhancer) to the effect that such transaction will not have any material adverse tax consequence to the Issuer, any Noteholder or any Certificateholder;

(v)    any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken; and

(vi)    the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such consolidation or merger and such supplemental indenture comply with this Article III and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act).

(b)    The Issuer shall not convey or transfer any of its properties or assets, including those included in the Trust Estate, to any Person, unless:

(i)    the Person that acquires by conveyance or transfer the properties and assets of the Issuer the conveyance or transfer of which is hereby restricted shall (A) be a United States citizen or a Person organized and existing under the laws of the United States of America or any state, (B) expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein, (C) expressly agree by means of such supplemental indenture that all right, title and interest so conveyed or transferred shall be subject and subordinate to the rights of Holders of the Notes, (D) unless otherwise provided in such supplemental indenture, expressly agree to indemnify, defend and hold harmless the Issuer against and from any loss, liability or expense arising under or related to this Indenture and the Notes and (E) expressly agree by means of such supplemental indenture that such Person (or if a group of Persons, then one specified Person) shall make all filings with the Commission (and any other appropriate Person) required by the Exchange Act in connection with the Notes;

(ii)    immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

Confidential

CONFIDENTIAL                                                    RC_FGIC9019_00009292

(iii)    the Issuer receives consent of the Credit Enhancer (so long as no Credit Enhancer Default exists) and the Rating Agencies shall have notified the Issuer (with a copy to the Indenture Trustee) that such transaction shall not cause the rating of the Notes, without regard to the Credit Enhancement Instrument, to be reduced, suspended or withdrawn;

(iv)    the Issuer shall have received an Opinion of Counsel (and shall have delivered copies thereof to the Indenture Trustee and the Credit Enhancer) to the effect that such transaction will not have any material adverse tax consequence to the Issuer or any Noteholder;

(v)    any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken; and

(vi)    the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such conveyance or transfer and such supplemental indenture comply with this Article III and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act).

Section 3.17.  Successor or Transferee.    (a) Upon any consolidation or merger of the Issuer in accordance with Section 3.16(a), the Person formed by or surviving such consolidation or merger (if other than the Issuer) shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture with the same effect as if such Person had been named as the Issuer herein.

(b)    Upon a conveyance or transfer of all the assets and properties of the Issuer pursuant to Section 3.16(b), the Issuer will be released from every covenant and agreement of this Indenture to be observed or performed on the part of the Issuer with respect to the Notes immediately upon the delivery of written notice to the Indenture Trustee of such conveyance or transfer.

Section 3.18.  No Other Business.    The Issuer shall not engage in any business other than financing, purchasing, owning and selling and managing the Home Loans and the issuance of the Notes and the Certificate in the manner contemplated by this Indenture and the Basic Documents and all activities incidental thereto.

Section 3.19.  No Borrowing.    The Issuer shall not issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except for the Notes.

Section 3.20.  Guarantees, Loans, Advances and Other Liabilities.    Except as contemplated by this Indenture or the Basic Documents, the Issuer shall not make any loan or advance or credit to, or guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person.

5156850 07031570                                         13

CONFIDENTIAL                                                                    RC_FGIC9019_00009293

Section 3.21. <u>Capital Expenditures</u>.  The Issuer shall not make any expenditure (by long term or operating lease or otherwise) for capital assets (either realty or personalty).

Section 3.22. <u>Owner Trustee Not Liable for the Certificate or Related Documents</u>.  The recitals contained herein shall be taken as the statements of the Depositor, and the Owner Trustee assumes no responsibility for the correctness thereof.  The Owner Trustee makes no representations as to the validity or sufficiency of this Indenture, of any Basic Document or of the Certificate (other than the signatures of the Owner Trustee on the Certificate) or the Notes, or of any Related Documents, or of MERS or the MERS® System.  The Owner Trustee shall at no time have any responsibility or liability with respect to the sufficiency of the Trust Estate or its ability to generate the payments to be distributed to the Certificateholder under the Trust Agreement or the Noteholders under this Indenture, including, the compliance by the Depositor or the Seller with any warranty or representation made under any Basic Document or in any related document or the accuracy of any such warranty or representation, or any action of the Certificate Paying Agent, the Certificate Registrar or the Indenture Trustee taken in the name of the Owner Trustee.

Section 3.23. <u>Restricted Payments</u>.  The Issuer shall not, directly or indirectly, (i) pay any dividend or make any payment (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to the Owner Trustee or any owner of a beneficial interest in the Issuer or otherwise with respect to any ownership or equity interest or security in or of the Issuer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; <u>provided</u>, <u>however</u>, that the Issuer may make, or cause to be made, (x) payments to the Owner Trustee and the Certificateholder as contemplated by, and to the extent funds are available for such purpose under the Trust Agreement, and (y) payments to the Master Servicer pursuant to the terms of the Servicing Agreement.  The Issuer will not, directly or indirectly, make payments to or payments from the Custodial Account except in accordance with this Indenture and the Basic Documents.

Section 3.24. <u>Notice of Events of Default</u>.  The Issuer shall give the Indenture Trustee, the Credit Enhancer and the Rating Agencies prompt written notice of each Event of Default hereunder and any default under the Trust Agreement.

Section 3.25. <u>Further Instruments and Acts</u>.  Upon request of the Indenture Trustee, the Issuer will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

Section 3.26. <u>Statements to Noteholders</u>.  On each Payment Date, the Indenture Trustee and the Certificate Registrar shall make available on its website initially located at "www.etrustee.net" to the Credit Enhancer and each Noteholder and Certificateholder, respectively, the statement delivered to it, on the Business Day following the related Determination Date pursuant to Section 4.01 of the Servicing Agreement.

5156850 07031570

14

Confidential

CONFIDENTIAL                                                                 RC_FGIC9019_00009294

Section 3.27.  Payments under the Credit Enhancement Instrument.  (a) On or prior to 12:00 noon New York City time on the second Business Day before any Payment Date, including the Final Insured Payment Date, the Indenture Trustee shall make a draw on the Credit Enhancement Instrument in an amount, if any, equal to the Insured Payment.

(b)    The Indenture Trustee shall submit, if an Insured Payment is specified in any Servicing Certificate prepared by the Master Servicer pursuant to Section 4.01 of the Servicing Agreement, the notice (in the form attached as Exhibit A to the Credit Enhancement Instrument) in the amount of the Insured Payment to the Credit Enhancer no later than 12:00 noon New York City time, on the second Business Day prior to the applicable Payment Date. Upon receipt of such Insured Payment in accordance with the terms of the Credit Enhancement Instrument, the Indenture Trustee shall deposit such Insured Payment in the Payment Account for distribution to Noteholders pursuant to Section 3.05.

Section 3.28.  Reserved.

Section 3.29.  Determination of Class A-1 Note Rate.  On the second LIBOR Business Day immediately preceding (i) the Closing Date in the case of the first Interest Accrual Period and (ii) the first day of each succeeding Interest Accrual Period, the Indenture Trustee shall determine LIBOR and the Master Servicer shall determine the Note Rate for the Class A-1 Notes for such Interest Accrual Period and shall inform the Issuer, the Master Servicer (with respect to the Indenture Trustee's determination of the LIBOR), the Indenture Trustee (with respect to the Master Servicer's determination of the Note Rate), the Credit Enhancer and the Depositor at their respective facsimile numbers given to the Master Servicer or the Indenture Trustee, as applicable, in writing.  All determinations of LIBOR by the Indenture Trustee shall, in the absence of manifest error, be conclusive for all purposes, and each holder of a Class A-1 Note, by accepting its Class A-1 Note, agrees to be bound by such determination.

Section 3.30.  Liquidation on Final Insured Payment Date.  On the Final Insured Payment Date, if the Notes are not paid in full on or prior to the Final Insured Payment Date, the Indenture Trustee shall take full account of the assets and liabilities of the Trust, shall liquidate the assets, in a commercially reasonable manner and on commercially reasonable terms, as promptly as is consistent with obtaining the fair value thereof and in accordance with Section 5.15, and shall apply and distribute the proceeds therefrom in the order of priority described in Section 3.05(c).

Section 3.31.  No Recourse.  Upon the occurrence of an Event of Default under the Notes, this Indenture or the other Basic Documents, Holders of the Notes shall have recourse only to the Collateral and all proceeds thereof, as and to the extent provided herein, and no recourse shall be had by such Holders against the Issuer or its other assets or properties.

Section 3.32.  Additional UCC Representations and Warranties.  The Issuer hereby represents and warrants that:

(i)    this Agreement creates a valid and continuing security interest (as defined in the applicable UCC) in the Trust Estate in favor of the Indenture Trustee on behalf of the Holders of the Notes, which security interest is prior to all other liens, and is enforceable as such as against creditors of the Issuer.

(ii)      the Issuer owns and has good and marketable title to the Trust Estate free and clear of any lien, claim or encumbrance of any Person.

(iii)      the Issuer will cause the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law within 10 days of the Closing Date in order to perfect the security interest in the Trust Estate granted to the Indenture Trustee on behalf of the Holders of the Notes.

(iv)      other than the security interest granted to the Indenture Trustee on behalf of the Holders of the Notes pursuant to the Basic Documents, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Trust Estate.  The Issuer is not aware of any judgment or tax lien filings against it.  The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Trust Estate other than any financing statement (i) relating to the security interest granted to Indenture Trustee on behalf of the Holders of the Notes hereunder or (ii) that has been terminated.

The foregoing representations may not be waived and shall survive the issuance of the Notes.

## ARTICLE IV

## THE NOTES; SATISFACTION AND DISCHARGE OF INDENTURE

Section 4.01.  The Notes.  The Notes shall be registered in the name of a nominee designated by the Depository.  Beneficial Owners will hold interests in the Notes as set forth in Section 4.06 herein.  The minimum initial Note Balances with respect to the Notes shall be $100,000 and integral multiples of $1 in excess thereof.

The Indenture Trustee may for all purposes (including the making of payments due on the Notes) deal with the Depository as the authorized representative of the Beneficial Owners with respect to the Notes for the purposes of exercising the rights of Holders of Notes hereunder.  Except as provided in the next succeeding paragraph of this Section 4.01, the rights of Beneficial Owners with respect to the Notes shall be limited to those established by law and agreements between such Beneficial Owners and the Depository and Depository Participants.  Except as provided in Section 4.08, Beneficial Owners shall not be entitled to definitive certificates for the Notes as to which they are the Beneficial Owners.  Requests and directions from, and votes of, the Depository as Holder of the Notes shall not be deemed inconsistent if they are made with respect to different Beneficial Owners.  The Indenture Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Noteholders and give notice to the Depository of such record date.  Without the consent of the Issuer and the Indenture Trustee, no Note may be transferred by the Depository except to a successor Depository that agrees to hold such Note for the account of the Beneficial Owners.

5156850 07031570                                    16

CONFIDENTIAL                                                                 RC_FGIC9019_00009296

In the event the Depository Trust Company resigns or is removed as Depository, the Indenture Trustee with the approval of the Issuer may appoint a successor Depository. If no successor Depository has been appointed within 30 days of the effective date of the Depository's resignation or removal, each Beneficial Owner shall be entitled to certificates representing the Notes it beneficially owns in the manner prescribed in Section 4.08.

The Notes shall, on original issue, be executed on behalf of the Issuer by the Owner Trustee, not in its individual capacity but solely as Owner Trustee, authenticated by the Note Registrar and delivered by the Indenture Trustee to or upon the order of the Issuer.

Section 4.02. Registration of and Limitations on Transfer and Exchange of Notes; Appointment of Certificate Registrar. The Issuer shall cause to be kept at the Indenture Trustee's Corporate Trust Office a Note Register in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and of transfers and exchanges of Notes as herein provided.

Subject to the restrictions and limitations set forth below, upon surrender for registration of transfer of any Note at the Corporate Trust Office, the Issuer shall execute and the Note Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes in authorized initial Note Balances evidencing the same aggregate Percentage Interests.

Subject to the foregoing, at the option of the Noteholders, Notes may be exchanged for other Notes of like tenor, in authorized initial Note Balances evidencing the same aggregate Percentage Interests upon surrender of the Notes to be exchanged at the Corporate Trust Office of the Note Registrar. Whenever any Notes are so surrendered for exchange, the Issuer shall execute and the Note Registrar shall authenticate and deliver the Notes which the Noteholder making the exchange is entitled to receive. Each Note presented or surrendered for registration of transfer or exchange shall (if so required by the Note Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form reasonably satisfactory to the Note Registrar duly executed by, the Holder thereof or his attorney duly authorized in writing with such signature guaranteed by a commercial bank or trust company located or having a correspondent located in the city of New York. Notes delivered upon any such transfer or exchange will evidence the same obligations, and will be entitled to the same rights and privileges, as the Notes surrendered.

No service charge shall be imposed for any registration of transfer or exchange of Notes, but the Note Registrar shall require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes.

All Notes surrendered for registration of transfer and exchange shall be cancelled by the Note Registrar and delivered to the Indenture Trustee for subsequent destruction without liability on the part of either.

Confidential

CONFIDENTIAL                                                                    RC_FGIC9019_00009297

The Issuer hereby appoints the Indenture Trustee as Certificate Registrar to keep at its Corporate Trust Office a Certificate Register pursuant to Section 3.09 of the Trust Agreement in which, subject to such reasonable regulations as it may prescribe, the Certificate Registrar shall provide for the registration of the Certificate and of transfers and exchanges thereof pursuant to Section 3.05 of the Trust Agreement. The Indenture Trustee hereby accepts such appointment.

Each purchaser and transferee of a Note, by its acceptance of the Note, shall be deemed to have represented and warranted that either (i) it is not acquiring the Note with the assets of an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to the provisions of Title I of ERISA, a "plan" described in Section 4975(e)(1) of the Code, an entity whose underlying assets include "plan assets" by reason of an employee benefit plan's or other plan's investment in such entity or any other plan that is subject to a law that is similar to Title I of ERISA or Section 4975 of the Code or (ii) the acquisition and holding of the Note will not give rise to a non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code or any similar applicable law.

Section 4.03.  Mutilated, Destroyed, Lost or Stolen Notes.  If (i) any mutilated Note is surrendered to the Indenture Trustee, or the Indenture Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Indenture Trustee such security or indemnity as may be required by it to hold the Issuer and the Indenture Trustee harmless, then, in the absence of notice to the Issuer, the Note Registrar or the Indenture Trustee that such Note has been acquired by a bona fide purchaser, and provided that the requirements of Section 8-405 of the UCC are met, the Issuer shall execute, and upon its request the Indenture Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note; provided, however, that if any such destroyed, lost or stolen Note, but not a mutilated Note, shall have become or within seven days shall be due and payable, instead of issuing a replacement Note, the Issuer may pay such destroyed, lost or stolen Note when so due or payable without surrender thereof.  If, after the delivery of such replacement Note or payment of a destroyed, lost or stolen Note pursuant to the proviso to the preceding sentence, a bona fide purchaser of the original Note in lieu of which such replacement Note was issued presents for payment such original Note, the Issuer and the Indenture Trustee shall be entitled to recover such replacement Note (or such payment) from the Person to whom it was delivered or any Person taking such replacement Note from such Person to whom such replacement Note was delivered or any assignee of such Person, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Indenture Trustee in connection therewith.

Upon the issuance of any replacement Note under this Section 4.03, the Issuer may require the payment by the Holder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Indenture Trustee) connected therewith.

5156850 07031570

Confidential

Every replacement Note issued pursuant to this <u>Section 4.03</u> in replacement of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation 7of the Issuer, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.  The provisions of this <u>Section 4.03</u> are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 4.04.  <u>Persons Deemed Owners</u>.  Prior to due presentment for registration of transfer of any Note, the Issuer, the Credit Enhancer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name any Note is registered (as of the day of determination) as the owner of such Note for the purpose of receiving payments of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note be overdue, and none of the Issuer, the Credit Enhancer, the Indenture Trustee or any agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

Section 4.05.  <u>Cancellation</u>.  All Notes surrendered for payment, registration of transfer, exchange or redemption shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly cancelled by the Indenture Trustee.  The Issuer may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly cancelled by the Indenture Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this <u>Section 4.05</u>, except as expressly permitted by this Indenture.  All cancelled Notes may be held or disposed of by the Indenture Trustee in accordance with its standard retention or disposal policy as in effect at the time unless the Issuer shall direct by an Issuer Request that they be destroyed or returned to it; <u>provided</u>, <u>however</u>, that such Issuer Request is timely and the Notes have not been previously disposed of by the Indenture Trustee.

Section 4.06.  <u>Book Entry Notes</u>.  Each Class of Notes shall initially be issued as one or more Notes held by the Book Entry Custodian or, if appointed to hold such Notes as provided below, the Depository Trust Company, the initial Depository, and registered in the name of its nominee Cede & Co.  Except as provided below, registration of such Notes may not be transferred by the Indenture Trustee except to another Depository that agrees to hold such Notes for the respective Beneficial Owners.  The Indenture Trustee is hereby initially appointed as the Book Entry Custodian and hereby agrees to act as such in accordance herewith and in accordance with the agreement that it has with the Depository authorizing it to act as such.  The Book Entry Custodian may, and, if it is no longer qualified to act as such, the Book Entry Custodian shall, appoint, by a written instrument delivered to the Depositor, the Master Servicer and, if the Indenture Trustee is not the Book Entry Custodian, the Indenture Trustee, any other transfer agent (including the Depository or any successor Depository) to act as Book Entry Custodian under such conditions as the predecessor Book Entry Custodian and the Depository or any successor Depository may prescribe, provided that the predecessor Book Entry Custodian shall not be relieved of any of its duties or responsibilities by reason of any new appointment, except if the Depository is the successor to the Book Entry Custodian.  If the Indenture Trustee resigns or is removed in accordance with the terms hereof, the successor trustee or, if it so elects, the Depository shall immediately succeed to its predecessor's duties as Book Entry Custodian.

CONFIDENTIAL                                                    RC_FGIC9019_00009299

Confidential

The Depositor shall have the right to inspect, and to obtain copies of, any Notes held as Book Entry Notes by the Book Entry Custodian. No Beneficial Owner will receive a Definitive Note representing such Beneficial Owner's interest in such Note, except as provided in Section 4.08. Unless and until definitive, fully registered Notes (the "Definitive Notes") have been issued to Beneficial Owners pursuant to Section 4.08:

(i)    the provisions of this Section 4.06 shall be in full force and effect;

(ii)    the Note Registrar and the Indenture Trustee shall be entitled to deal with the Depository for all purposes of this Indenture (including the payment of principal of and interest on the Notes and the giving of instructions or directions hereunder) as the sole holder of the Notes, and shall have no obligation to the Owners of Notes;

(iii)    to the extent that the provisions of this Section 4.06 conflict with any other provisions of this Indenture, the provisions of this Section 4.06 shall control;

(iv)    the rights of Beneficial Owners shall be exercised only through the Depository and shall be limited to those established by law and agreements between such Owners of Notes and the Depository and/or the Depository Participants. Unless and until Definitive Notes are issued pursuant to Section 4.08, the initial Depository will make book-entry transfers among the Depository Participants and receive and transmit payments of principal of and interest on the Notes to such Depository Participants; and

(v)    whenever this Indenture requires or permits actions to be taken based upon instructions or directions of Holders of Notes evidencing a specified percentage of the aggregate Note Balance of the Notes, the Depository shall be deemed to represent such percentage only to the extent that it has received instructions to such effect from Beneficial Owners and/or Depository Participants owning or representing, respectively, such required percentage of the beneficial interest in the Notes and has delivered such instructions to the Indenture Trustee.

Section 4.07. Notices to Depository. Whenever a notice or other communication to the Note Holders is required under this Indenture, unless and until Definitive Notes shall have been issued to Beneficial Owners pursuant to Section 4.08, the Indenture Trustee shall give all such notices and communications specified herein to be given to Holders of the Notes to the Depository, and shall have no obligation to the Beneficial Owners.

Section 4.08. Definitive Notes. If (i) the Indenture Trustee determines that the Depository is no longer willing or able to properly discharge its responsibilities with respect to the Notes and the Indenture Trustee is unable to locate a qualified successor, (ii) the Indenture Trustee elects to terminate the book-entry system through the Depository or (iii) after the occurrence of an Event of Default, Owners of Notes representing beneficial interests aggregating at least a majority of the aggregate Note Balance of the Notes advise the Depository in writing that the continuation of a book-entry system through the Depository is no longer in the best interests of the Beneficial Owners, then the Depository shall notify all Beneficial Owners and the Indenture Trustee of the occurrence of any such event and of the availability of Definitive Notes to Beneficial Owners requesting the same. Upon surrender to the Indenture Trustee of the

Confidential

typewritten Notes representing the Book Entry Notes by the Book Entry Custodian or the Depository, as applicable, accompanied by registration instructions, the Issuer shall execute and the Indenture Trustee shall authenticate the Definitive Notes in accordance with the instructions of the Depository.  None of the Issuer, the Note Registrar or the Indenture Trustee shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions.  Upon the issuance of Definitive Notes, the Indenture Trustee shall recognize the Holders of the Definitive Notes as Noteholders.

Section 4.09.  Tax Treatment.  The Issuer has entered into this Indenture, and the Notes will be issued, with the intention that, for federal, state and local income, single business and franchise tax purposes, the Notes will qualify as indebtedness of the Issuer.  The Issuer, by entering into this Indenture, and each Noteholder, by its acceptance of its Note (and each Beneficial Owner by its acceptance of an interest in the applicable Book Entry Note), agree to treat the Notes for federal, state and local income, single business and franchise tax purposes as indebtedness of the Issuer.

Section 4.10.  Satisfaction and Discharge of Indenture.  This Indenture shall cease to be of further effect with respect to the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, (iv) Sections 3.03, 3.04, 3.06, 3.09, 3.16, 3.17, 3.18, 3.19 and 3.20, (v) the rights, obligations and immunities of the Indenture Trustee hereunder (including the rights of the Indenture Trustee under Section 6.07 and the obligations of the Indenture Trustee under Section 4.11) and (vi) the rights of Noteholders as beneficiaries hereof with respect to the property so deposited with the Indenture Trustee payable to all or any of them, and the Indenture Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture with respect to the Notes, when

(A)     either

(1)     the Notes theretofore authenticated and delivered (other than (i) Notes that have been destroyed, lost or stolen and that have been replaced or paid as provided in Section 4.03 and (ii) Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 3.03) have been delivered to the Indenture Trustee for cancellation; or

(2)     the Notes not theretofore delivered to the Indenture Trustee for cancellation

a.      have become due and payable,

b.      will become due and payable at the Final Insured Payment Date within one year, or

c.      have been declared immediately due and payable pursuant to Section 5.02.

Confidential

and the Issuer, in the case of a. or b. above, has irrevocably deposited or caused to be irrevocably deposited with the Indenture Trustee cash or direct obligations of or obligations guaranteed by the United States of America (which will mature prior to the date such amounts are payable), in trust for such purpose, in an amount sufficient to pay and discharge the entire indebtedness on such Notes then outstanding not theretofore delivered to the Indenture Trustee for cancellation when due on the Final Insured Payment Date;

(B)    the Issuer has paid or caused to be paid all other sums payable hereunder and under the Insurance Agreement by the Issuer; and

(C)    the Issuer has delivered to the Indenture Trustee and the Credit Enhancer an Officer's Certificate and an Opinion of Counsel, each meeting the applicable requirements of Section 10.01 and each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with and, if the Opinion of Counsel relates to a deposit made in connection with Section 4.10(A)(2)b. above, such opinion shall further be to the effect that such deposit will not have any material adverse tax consequences to the Issuer, any Noteholders or any Certificateholder.

Section 4.11.  Application of Trust Money.  All monies deposited with the Indenture Trustee pursuant to Section 4.10 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent or Certificate Paying Agent, as the Indenture Trustee may determine, to the Holders of Securities, of all sums due and to become due thereon for principal and interest; but such monies need not be segregated from other funds except to the extent required herein or required by law.

Section 4.12.  Subrogation and Cooperation.   The Issuer and the Indenture Trustee acknowledge that (i) to the extent the Credit Enhancer makes payments under the Credit Enhancement Instrument on account of principal of or interest on the Home Loans, the Credit Enhancer will be fully subrogated to the rights of the Noteholders to receive such principal and interest from the Home Loans, and (ii) the Credit Enhancer shall be paid such principal and interest but only from the sources and in the manner provided herein and in the Insurance Agreement for the payment of such principal and interest.

The Indenture Trustee shall cooperate in all respects with any reasonable request by the Credit Enhancer for action to preserve or enforce the Credit Enhancer's rights or interest under this Indenture or the Insurance Agreement, consistent with this Indenture and without limiting the rights of the Noteholders as otherwise set forth in the Indenture, including, without limitation, upon the occurrence and continuance of a default under the Insurance Agreement, a request to take any one or more of the following actions:

(i)    institute Proceedings for the collection of all amounts then payable on the Notes, or under this Indenture in respect to the Notes and all amounts payable under the Insurance Agreement and to enforce any judgment obtained and collect from the Issuer monies adjudged due;

5156850 07031570                                                        22

CONFIDENTIAL

RC_FGIC9019_00009302

Confidential

(ii)     sell the Trust Estate or any portion thereof or rights or interest therein, at one or more public or private Sales (as defined in Section 5.15 hereof) called and conducted in any manner permitted by law;

(iii)     file or record all assignments that have not previously been recorded;

(iv)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture; and

(v)     exercise any remedies of a secured party under the Uniform Commercial Code and take any other appropriate action to protect and enforce the rights and remedies of the Credit Enhancer hereunder.

Following the payment in full of the Notes, the Credit Enhancer shall continue to have all rights and privileges provided to it under this Section and in all other provisions of this Indenture, until all amounts owing to the Credit Enhancer have been paid in full.

Section 4.13.  Repayment of Monies Held by Paying Agent.  In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Person other than the Indenture Trustee under the provisions of this Indenture with respect to such Notes shall, upon demand of the Issuer, be paid to the Indenture Trustee to be held and applied according to Section 3.05 and thereupon such Paying Agent shall be released from all further liability with respect to such monies.

Section 4.14.  Temporary Notes.  Pending the preparation of any Definitive Notes, the Issuer may execute and upon its written direction, the Indenture Trustee may authenticate and make available for delivery, temporary Notes that are printed, lithographed, typewritten, photocopied or otherwise produced, in any denomination, substantially of the tenor of the Definitive Notes in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Notes may determine, as evidenced by their execution of such Notes.

If temporary Notes are issued, the Issuer will cause Definitive Notes to be prepared without unreasonable delay.  After the preparation of the Definitive Notes, the temporary Notes shall be exchangeable for Definitive Notes upon surrender of the temporary Notes at the office or agency of the Indenture Trustee, without charge to the Holder.  Upon surrender for cancellation of any one or more temporary Notes, the Issuer shall execute and the Indenture Trustee shall authenticate and make available for delivery, in exchange therefor, Definitive Notes of authorized denominations and of like tenor and aggregate principal amount.  Until so exchanged, such temporary Notes shall in all respects be entitled to the same benefits under this Indenture as Definitive Notes.

Confidential

CONFIDENTIAL                                                                          RC_FGIC9019_00009303

## ARTICLE V

## DEFAULT AND REMEDIES

Section 5.01. <u>Events of Default</u>. The Issuer shall deliver to the Indenture Trustee and the Credit Enhancer within five calendar days after learning of the occurrence of any event which with the giving of notice and the lapse of time would become an Event of Default under <u>clause (iii)</u> of the definition of "Event of Default" written notice in the form of an Officer's Certificate of its status and what action the Issuer is taking or proposes to take with respect thereto.

Section 5.02. <u>Acceleration of Maturity; Rescission and Annulment</u>. If an Event of Default should occur and be continuing, then and in every such case the Indenture Trustee or the Holders of Notes representing not less than a majority of the aggregate Note Balance of all Notes with the written consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) may declare the Notes to be immediately due and payable, by a notice in writing to the Issuer (and to the Indenture Trustee if given by Noteholders), and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

At any time after such declaration of acceleration of maturity with respect to an Event of Default has been made and before a judgment or decree for payment of the money due has been obtained by the Indenture Trustee as hereinafter in this <u>Article V</u> provided, the Holders of Notes representing a majority of the aggregate Note Balance of all Notes, by written notice to the Issuer and the Indenture Trustee with the written consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) may in writing waive the related Event of Default and rescind and annul such declaration and its consequences if:

(i)    the Issuer has paid or deposited with the Indenture Trustee a sum sufficient to pay:

(A)    all sums due and payable to the Credit Enhancer; and

(B)    all payments of principal of and interest on the Notes and all other amounts that would then be due hereunder or upon the Notes if the Event of Default giving rise to such acceleration had not occurred; and

(C)    all sums paid or advanced by the Indenture Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel; and

(ii)    all Events of Default, other than the nonpayment of the principal of the Notes that has become due solely by such acceleration, have been cured or waived as provided in <u>Section 5.12</u>.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

Confidential

Section 5.03.  <u>Collection of Indebtedness and Suits for Enforcement by Indenture Trustee</u>.  (a) Subject to <u>Section 3.31</u>, the Issuer covenants that if default in the payment of (i) any interest on any Note when the same becomes due and payable, and such default continues for a period of five days, or (ii) the principal of or any installment of the principal of any Note when the same becomes due and payable, the Issuer shall, upon demand of the Indenture Trustee, pay to it, for the benefit of the Holders of Notes, the whole amount then due and payable on the Notes for principal and interest, with interest upon the overdue principal, and in addition thereto such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel.

(b)    In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee, in its own name and as trustee of an express trust, subject to the provisions of <u>Section 10.17</u> hereof may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or other obligor upon the Notes and collect in the manner provided by law out of the property of the Issuer or other obligor upon the Notes, wherever situated, the monies adjudged or decreed to be payable.

(c)    If an Event of Default occurs and is continuing, the Indenture Trustee subject to the provisions of <u>Section 10.17</u> hereof may, as more particularly provided in <u>Section 5.04</u>, in its discretion, proceed to protect and enforce its rights and the rights of the Noteholders, by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law.

(d)    In case there shall be pending, relative to the Issuer or any other obligor upon the Notes or any Person having or claiming an ownership interest in the Trust Estate, Proceedings under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor or Person, or in case of any other comparable judicial Proceedings relative to the Issuer or other obligor upon the Notes, or to the creditors or property of the Issuer or such other obligor, the Indenture Trustee, irrespective of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Indenture Trustee shall have made any demand pursuant to the provisions of this Section, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(i)    to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee (including any claim for reasonable compensation to the Indenture Trustee and each predecessor Indenture Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by

Confidential

the Indenture Trustee and each predecessor Indenture Trustee, except as a result of negligence, willful misconduct or bad faith) and of the Noteholders allowed in such Proceedings;

(ii)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of Notes in any election of a trustee, a standby trustee or Person performing similar functions in any such Proceedings;

(iii)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute all amounts received with respect to the claims of the Noteholders and of the Indenture Trustee on their behalf; and

(iv)     to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee or the Holders of Notes allowed in any judicial proceedings relative to the Issuer, its creditors and its property; and any trustee, receiver, liquidator, custodian or other similar official in any such Proceeding is hereby authorized by each of such Noteholders to make payments to the Indenture Trustee, and, in the event that the Indenture Trustee shall consent to the making of payments directly to such Noteholders, to pay to the Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee except as a result of negligence, willful misconduct or bad faith.

(e)     Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Indenture Trustee to vote in respect of the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

(f)     All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Indenture Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any such action or proceedings instituted by the Indenture Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each predecessor Indenture Trustee and their respective agents and attorneys, shall be for the ratable benefit of the Holders of the Notes.

(g)     In any Proceedings brought by the Indenture Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Indenture Trustee shall be a party), the Indenture Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Noteholder a party to any such Proceedings.

5156850 07031570

26

CONFIDENTIAL

RC_FGIC9019_00009306

Section 5.04.  Remedies; Priorities.  (a) If an Event of Default shall have occurred and be continuing, the Indenture Trustee subject to the provisions of Section 10.17 hereof may with the written consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or shall at the written direction of the Credit Enhancer (so long as no Credit Enhancer Default exists), do one or more of the following (subject to Section 5.05):

(i)    institute Proceedings in its own name and as trustee of an express trust for the collection of all amounts then payable on the Notes or under this Indenture with respect thereto, whether by declaration or otherwise, and all amounts payable under the Insurance Agreement enforce any judgment obtained, and collect from the Issuer and any other obligor upon such Notes monies adjudged due;

(ii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Trust Estate;

(iii)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes;

(iv)    sell the Trust Estate or any portion thereof or rights or interest therein, at one or more public or private sales called and conducted in any manner permitted by law; provided, however, that the Indenture Trustee may not sell or otherwise liquidate the Trust Estate following an Event of Default, unless (A) the Indenture Trustee obtains the consent of the Credit Enhancer, or if a Credit Enhancer Default has occurred and is continuing, the consent of the Holders of 100% of the aggregate Note Balance of the Notes, (B) the proceeds of such Sale distributable to Holders are sufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest and to reimburse the Credit Enhancer for any amounts drawn under the Credit Enhancement Instrument and any other amounts due the Credit Enhancer under the Insurance Agreement or (C) the Indenture Trustee determines that the Home Loans will not continue to provide sufficient funds for the payment of principal of and interest on the Notes as they would have become due if the Notes had not been declared due and payable, and the Indenture Trustee obtains the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), which consent will not be unreasonably withheld; provided further that the Indenture Trustee shall not sell or otherwise liquidate the Trust Estate if the proceeds of such sale or liquidation will not be sufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest and to reimburse the Credit Enhancer for any amounts drawn under the Credit Enhancement Instrument and any other amounts due the Credit Enhancer under the Insurance Agreement unless the Indenture Trustee obtains the consent of the Holders of 66 2/3% of the aggregate Note Balance of the Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists).  In determining such sufficiency or insufficiency with respect to clauses (B) and (C), the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose.  Notwithstanding the foregoing, so long as a Servicing Default has not

Confidential

CONFIDENTIAL                                                                    RC_FGIC9019_00009307

occurred, any Sale of the Trust Estate shall be made subject to the continued servicing of the Home Loans by the Master Servicer as provided in the Servicing Agreement.

(b)   If the Indenture Trustee collects any money or property pursuant to this Article V, it shall pay out the money or property in the following order:

FIRST: to the Indenture Trustee for all amounts due under Section 6.07 herein;

SECOND:  to the Holders of the Notes for amounts due and unpaid on the Notes for interest, according to the order and priority set forth in Section 3.05(a)(ii) from amounts available in the Trust Estate for such Noteholders;

THIRD:  on a *pro rata* basis, to Holders of the Notes for amounts due and unpaid on the Notes for principal, from amounts available in the Trust Estate for such Noteholders, according to the amounts due and payable on the Notes for principal, until the related Note Balances of the Notes are reduced to zero;

FOURTH:  [reserved];

FIFTH:  to the payment of all amounts due and owing to the Credit Enhancer under the Insurance Agreement;

SIXTH:  to the Certificate Paying Agent for amounts due under Article VIII of the Trust Agreement; and

SEVENTH: to the payment of the remainder, if any, to the Issuer or any other person legally entitled thereto.

The Indenture Trustee may fix a record date and payment date for any payment to Noteholders pursuant to this Section 5.04.  At least 15 days before such record date, the Indenture Trustee shall mail to each Noteholder a notice that states the record date, the payment date and the amount to be paid.

Section 5.05.  Optional Preservation of the Trust Estate.  If the Notes have been declared to be due and payable under Section 5.02 following an Event of Default and such declaration and its consequences have not been rescinded and annulled, the Indenture Trustee may, but need not (but shall at the written direction of the Credit Enhancer, so long as no Credit Enhancer Default exists) elect to take and maintain possession of the Trust Estate.  It is the desire of the parties hereto and the Noteholders that there be at all times sufficient funds for the payment of principal of and interest on the Notes and other obligations of the Issuer including payment to the Credit Enhancer and the Indenture Trustee shall take such desire into account when determining whether or not to take and maintain possession of the Trust Estate.  In determining whether to take and maintain possession of the Trust Estate, the Indenture Trustee may, but need not, obtain (at the expense of the Issuer) and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose.

5156850 07031570

28

Confidential

CONFIDENTIAL   RC_FGIC9019_00009308

Section 5.06.  <u>Limitation of Suits</u>.  No Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless and subject to the provisions of <u>Section 10.17</u> hereof:

(i)    such Holder has previously given written notice to the Indenture Trustee of a continuing Event of Default;

(ii)    the Holders of not less than 25% of the aggregate Note Balance of the Notes have made written request to the Indenture Trustee to institute such Proceeding in respect of such Event of Default in its own name as Indenture Trustee hereunder;

(iii)    such Holder or Holders have offered to the Indenture Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in complying with such request;

(iv)    the Indenture Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute such Proceedings; and

(v)    no direction inconsistent with such written request has been given to the Indenture Trustee during such 60 day period by the Holders of a majority of the aggregate Note Balance of the Notes or by the Credit Enhancer.

It is understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided.

In the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of Notes, each representing less than a majority of the aggregate Note Balance of the Notes, the Indenture Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Section 5.07.  <u>Rights of Noteholders to Receive Principal and Interest</u>.  Notwithstanding any other provisions in this Indenture, but subject to <u>Section 3.31</u>, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any, on such Note on or after the respective due dates thereof expressed in such Note or in this Indenture and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

Section 5.08. <u>Restoration of Rights and Remedies</u>.    If the Indenture Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Indenture Trustee or to such Noteholder, then and in every such case the Issuer, the Indenture Trustee and the Noteholders shall, subject to any determination in such Proceeding, be restored severally and respectively to their respective former positions hereunder, and thereafter all rights and remedies of the Indenture Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.09. <u>Rights and Remedies Cumulative</u>.    No right or remedy herein conferred upon or reserved to the Indenture Trustee, the Credit Enhancer or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.    The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.10. <u>Delay or Omission Not a Waiver</u>.    No delay or omission of the Indenture Trustee, the Credit Enhancer or any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.    Every right and remedy given by this <u>Article V</u> or by law to the Indenture Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

Section 5.11. <u>Control by the Credit Enhancer or the Noteholders</u>.    The Holders of a majority of the aggregate Note Balance of Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee; <u>provided</u> that:

(i)    such direction shall not be in conflict with any rule of law or with this Indenture;

(ii)    subject to the express terms of <u>Section 5.04</u>, any direction to the Indenture Trustee to sell or liquidate the Trust Estate shall be by Holders of Notes representing not less than 100% of the aggregate Note Balance of Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists);

(iii)    if the conditions set forth in <u>Section 5.05</u> have been satisfied and the Indenture Trustee elects to retain the Trust Estate pursuant to such Section, then any direction to the Indenture Trustee by Holders of Notes representing less than 100% of the aggregate Note Balance of Notes to sell or liquidate the Trust Estate shall be of no force and effect; and

Confidential

(iv)    the Indenture Trustee may take any other action deemed proper by the Indenture Trustee that is not inconsistent with such direction.

Notwithstanding the rights of Noteholders set forth in this Section, subject to Section 6.01, the Indenture Trustee need not take any action that it determines might involve it in liability or might materially adversely affect the rights of any Noteholders not consenting to such action unless the Indenture Trustee has received satisfactory indemnity from the Credit Enhancer or the Noteholders.

Section 5.12.  Waiver of Past Defaults.  Prior to the declaration of the acceleration of the maturity of the Notes as provided in Section 5.02, the Holders of Notes of not less than a majority of the aggregate Note Balance of the Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) may waive any past Event of Default and its consequences except an Event of Default (a) with respect to payment of principal of or interest on any of the Notes or (b) in respect of a covenant or provision hereof which cannot be modified or amended without the consent of the Holder of each Note.  In the case of any such waiver, the Issuer, the Indenture Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.

Upon any such waiver, any Event of Default arising therefrom shall be deemed to have been cured and not to have occurred, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.

Section 5.13.  Undertaking for Costs.  All parties to this Indenture agree, and each Holder of any Note by such Holder's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.13 shall not apply to (a) any suit instituted by the Indenture Trustee, (b) any suit instituted by any Noteholder, or group of Noteholders, in each case holding in the aggregate more than 10% of the aggregate Note Balance of the Notes or (c) any suit instituted by any Noteholder for the enforcement of the payment of principal of or interest on any Note on or after the respective due dates expressed in such Note and in this Indenture.

Section 5.14.  Waiver of Stay or Extension Laws.  The Issuer covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead or in any manner whatsoever, claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Confidential

CONFIDENTIAL                                                    RC_FGIC9019_00009311

Section 5.15.  Sale of Trust Estate.  (a) The power to effect any sale, liquidation or other disposition (a "Sale") of any portion of the Trust Estate pursuant to Section 5.04 is expressly subject to the provisions of Section 5.05 and this Section 5.15.  The power to effect any such Sale shall not be exhausted by any one or more Sales as to any portion of the Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate shall have been sold or all amounts payable on the Notes and under this Indenture and under the Insurance Agreement shall have been paid.  The Indenture Trustee may from time to time postpone any public Sale by public announcement made at the time and place of such Sale.  The Indenture Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale.

(b)    The Indenture Trustee shall not in any private Sale sell the Trust Estate, or any portion thereof, unless:

(1)    the Holders of all Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) consent to, or direct the Indenture Trustee to make, such Sale, or

(2)    the proceeds of such Sale would not be less than the entire amount which would be payable to the Noteholders under the Notes, the Certificateholder under the Certificate and the Credit Enhancer in respect of amounts drawn under the Credit Enhancement Instrument and any other amounts due the Indenture Trustee in connection with expenses incurred by reason of such sale and any other amounts due the Credit Enhancer under the Insurance Agreement, in full payment thereof in accordance with Section 5.02, on the Payment Date next succeeding the date of such Sale, or

(3)    the Indenture Trustee determines, in its sole discretion, that the conditions for retention of the Trust Estate set forth in Section 5.05 cannot be satisfied (in making any such determination, the Indenture Trustee may rely upon an opinion of an Independent investment banking firm obtained and delivered as provided in Section 5.05), and the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Holders representing at least 66-2/3% of the aggregate Note Balance of the Notes with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), consent to such Sale.

The purchase by the Indenture Trustee of all or any portion of the Trust Estate at a private Sale shall not be deemed a Sale or other disposition thereof for purposes of this Section 5.15(b).

(c)    Unless the Holders with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), or the Credit Enhancer (so long as no Credit Enhancer Default exists) have otherwise consented or directed the Indenture Trustee, at any public Sale of all or any portion of the Trust Estate at which a minimum bid equal to or greater than the amount described in paragraph (2) of subsection (b) of this Section 5.15 has not been established by the Indenture Trustee and no Person bids an amount equal to or greater than such amount, such Sale shall fail.

Confidential

(d)    In connection with a Sale of all or any portion of the Trust Estate:

(1)    any Holder or Holders of Notes may bid for and with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists) purchase the property offered for sale, and upon compliance with the terms of sale may hold, retain and possess and dispose of such property, without further accountability, and may, in paying the purchase money therefor, deliver any Notes or claims for interest thereon in lieu of cash up to the amount which shall, upon payment of the net proceeds of such sale, be payable thereon, and such Notes, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after being appropriately stamped to show such partial payment;

(2)    the Indenture Trustee may bid for and acquire the property offered for Sale in connection with any Sale thereof, and, subject to any requirements of, and to the extent permitted by, applicable law in connection therewith, may purchase all or any portion of the Trust Estate in a private sale, and, in lieu of paying cash therefor, may make settlement for the purchase price by crediting the gross Sale price against the sum of (A) the amount which would be distributable to the Holders of the Notes and the Holder of the Certificate and amounts owing to the Credit Enhancer as a result of such Sale in accordance with <u>Section 5.04(b)</u> on the Payment Date next succeeding the date of such Sale and (B) the expenses of the Sale and of any Proceedings in connection therewith which are reimbursable to it, without being required to produce the Notes in order to complete any such Sale or in order for the net Sale price to be credited against such Notes, and any property so acquired by the Indenture Trustee shall be held and dealt with by it in accordance with the provisions of this Indenture;

(3)    the Indenture Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Trust Estate in connection with a Sale thereof;

(4)    the Indenture Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with a Sale thereof, and to take all action necessary to effect such Sale; and

(5)    no purchaser or transferee at such a Sale shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.16.  <u>Action on Notes</u>.   The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Trust Estate or upon any of the assets of the Issuer.  Any money or property collected by the Indenture Trustee shall be applied in accordance with <u>Section 5.04(b)</u>.

Confidential

Section 5.17. <u>Performance and Enforcement of Certain Obligations</u>. (a) Promptly following a written request from the Credit Enhancer or the Indenture Trustee with the written consent of the Credit Enhancer to do so (so long as no Credit Enhancer Default exists), the Issuer, in its capacity as holder of the Home Loans, shall, with the written consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), take all such lawful action as the Indenture Trustee may request to cause the Issuer to compel or secure the performance and observance by the Seller and the Master Servicer, as applicable, of each of their obligations to the Issuer under or in connection with the Home Loan Purchase Agreement and the Servicing Agreement, and to exercise any and all rights, remedies, powers and privileges lawfully available to the Issuer under or in connection with the Home Loan Purchase Agreement and the Servicing Agreement to the extent and in the manner directed by the Indenture Trustee, as pledgee of the Home Loans, including the transmission of notices of default on the part of the Seller or the Master Servicer thereunder and the institution of legal or administrative actions or proceedings to compel or secure performance by the Seller or the Master Servicer of each of their obligations under the Home Loan Purchase Agreement and the Servicing Agreement.

(b)    If an Event of Default has occurred and is continuing, the Indenture Trustee, as pledgee of the Home Loans, subject to the rights of the Credit Enhancer under the Servicing Agreement may, and at the direction (which direction shall be in writing or by telephone (confirmed in writing promptly thereafter)) of the Credit Enhancer (or if a Credit Enhancer Default has occurred and is continuing, Holders of 66-2/3% of the aggregate Note Balance of the Notes) shall, exercise all rights, remedies, powers, privileges and claims of the Issuer against the Seller or the Master Servicer under or in connection with the Home Loan Purchase Agreement and the Servicing Agreement, including the right or power to take any action to compel or secure performance or observance by the Seller or the Master Servicer, as the case may be, of each of their obligations to the Issuer thereunder and to give any consent, request, notice, direction, approval, extension or waiver under the Home Loan Purchase Agreement and the Servicing Agreement, as the case may be, and any right of the Issuer to take such action shall not be suspended. In connection therewith, as determined by the Indenture Trustee, the Issuer shall take all actions necessary to effect the transfer of the Home Loans to the Indenture Trustee.

## ARTICLE VI

## THE INDENTURE TRUSTEE

Section 6.01. <u>Duties of Indenture Trustee</u>. (a) If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the Indenture Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee; and

CONFIDENTIAL                                                                RC_FGIC9019_00009314

(ii)    in the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and conforming to the requirements of this Indenture; however, the Indenture Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)    The Indenture Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)    this paragraph does not limit the effect of paragraph (b) of this Section 6.01;

(ii)    the Indenture Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Indenture Trustee was negligent in ascertaining the pertinent facts; and

(iii)    the Indenture Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it (A) pursuant to Section 5.11 or (B) from the Credit Enhancer, which it is entitled to give under any of the Basic Documents.

(d)    The Indenture Trustee shall not be liable for interest on any money received by it except as the Indenture Trustee may agree in writing with the Issuer.

(e)    Money held in trust by the Indenture Trustee need not be segregated from other funds except to the extent required by law or the terms of this Indenture or the Trust Agreement.

(f)    No provision of this Indenture shall require the Indenture Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(g)    Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Indenture Trustee shall be subject to the provisions of this Section and to the provisions of the TIA.

Section 6.02.    Rights of Indenture Trustee.    (a) The Indenture Trustee may rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Indenture Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Indenture Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel.  The Indenture Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an Officer's Certificate or Opinion of Counsel.

Confidential

(c)     The Indenture Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee, and the Indenture Trustee shall not be responsible for any misconduct or negligence on the part of, or for the supervision of, any such agent, attorney, custodian or nominee appointed with due care by it hereunder.  The Indenture Trustee shall not be liable for any action of the Custodian for so long as the Custodian is unaffiliated with the Indenture Trustee.

(d)     The Indenture Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, however, that the Indenture Trustee's conduct does not constitute willful misconduct, negligence or bad faith.

(e)     The Indenture Trustee may consult with counsel, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

Section 6.03.  Individual Rights of Indenture Trustee.  The Indenture Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Indenture Trustee.  Any Note Registrar, co registrar or co paying agent may do the same with like rights.  However, the Indenture Trustee must comply with Sections 6.11 and 6.12.

Section 6.04.  Indenture Trustee's Disclaimer.  The Indenture Trustee shall not be (i) responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, (ii) accountable for the Issuer's use of the proceeds from the Notes or (iii) responsible for any statement of the Issuer in the Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Indenture Trustee's certificate of authentication.

Section 6.05.  Notice of Event of Default.  If an Event of Default occurs and is continuing and if it is known to a Responsible Officer of the Indenture Trustee, the Indenture Trustee shall give notice thereof to the Credit Enhancer.  The Indenture Trustee shall mail to each Noteholder notice of the Event of Default within 90 days after it occurs.  Except in the case of an Event of Default in payment of principal of or interest on any Note, the Indenture Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of Noteholders.  The Indenture Trustee shall not be deemed to have knowledge of any Event of Default unless a Responsible Officer has written notice or actual knowledge thereof.

Section 6.06.  Reports by Indenture Trustee to Holders.  The Indenture Trustee shall deliver to each Noteholder such information, to the extent such information is in its possession, as may be required to enable such holder to prepare its federal and state income tax returns.  In addition, upon the Issuer's written request, the Indenture Trustee shall promptly furnish information reasonably requested by the Issuer that is reasonably available to the Indenture Trustee to enable the Issuer to perform its federal and state income tax reporting obligations.

Confidential

CONFIDENTIAL                                                                                      RC_FGIC9019_00009316

Section 6.07. <u>Compensation and Indemnity</u>.    The Indenture Trustee shall be compensated and indemnified by the Master Servicer in accordance with Section 6.06 of the Servicing Agreement.  The Indenture Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.

Section 6.08. <u>Replacement of Indenture Trustee</u>.    No resignation or removal of the Indenture Trustee and no appointment of a successor Indenture Trustee shall become effective until the acceptance of appointment by the successor Indenture Trustee pursuant to this <u>Section 6.08</u>.  The Indenture Trustee may resign at any time by so notifying the Issuer and the Credit Enhancer.  The Holders of a majority of the aggregate Note Balance of the Notes or the Credit Enhancer (so long as no Credit Enhancer Default exists) may remove the Indenture Trustee by so notifying the Indenture Trustee and the Credit Enhancer and may appoint a successor Indenture Trustee.  The Issuer shall remove the Indenture Trustee if:

(i)    the Indenture Trustee fails to comply with <u>Section 6.11</u>;

(ii)    the Indenture Trustee is adjudged a bankrupt or insolvent;

(iii)    a receiver or other public officer takes charge of the Indenture Trustee or its property; or

(iv)    the Indenture Trustee otherwise becomes incapable of acting.

If the Indenture Trustee resigns or is removed or if a vacancy exists in the office of the Indenture Trustee for any reason (the Indenture Trustee in such event being referred to herein as the retiring Indenture Trustee), the Issuer shall promptly appoint a successor Indenture Trustee with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), which consent will not be unreasonably withheld.  In addition, the Indenture Trustee will resign to avoid being directly or indirectly controlled by the Issuer.

A successor Indenture Trustee shall deliver a written acceptance of its appointment to the retiring Indenture Trustee and to the Issuer.  Thereupon, the resignation or removal of the retiring Indenture Trustee shall become effective, and the successor Indenture Trustee shall have all the rights, powers and duties of the Indenture Trustee under this Indenture.  The successor Indenture Trustee shall mail a notice of its succession to Noteholders.  The retiring Indenture Trustee shall promptly transfer all property held by it as Indenture Trustee to the successor Indenture Trustee.

If a successor Indenture Trustee does not take office within 60 days after the retiring Indenture Trustee resigns or is removed, the retiring Indenture Trustee, the Issuer or the Holders of a majority of the aggregate Note Balance of the Notes may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

If the Indenture Trustee fails to comply with <u>Section 6.11</u>, any Noteholder may petition any court of competent jurisdiction for the removal of the Indenture Trustee and the appointment of a successor Indenture Trustee.

Confidential

CONFIDENTIAL    RC_FGIC9019_00009317

Notwithstanding the replacement of the Indenture Trustee pursuant to this Section, the Issuer's obligations under Section 6.07 shall continue for the benefit of the retiring Indenture Trustee.

Section 6.09.  Successor Indenture Trustee by Merger.   If the Indenture Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Indenture Trustee; provided, that such corporation or banking association shall be otherwise qualified and eligible under Section 6.11.  The Indenture Trustee shall provide the Rating Agencies written notice of any such transaction occurring after the Closing Date.

In case at the time such successor or successors by merger, conversion or consolidation to the Indenture Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Indenture Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Indenture Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Indenture Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Indenture Trustee shall have.

Section 6.10.  Appointment of Co-Indenture Trustee or Separate Indenture Trustee.  (a) Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Trust Estate may at the time be located, the Indenture Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Trust Estate, and to vest in such Person or Persons, in such capacity and for the benefit of the Noteholders, such title to the Trust Estate, or any part thereof, and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Indenture Trustee may consider necessary or desirable.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.11 and no notice to Noteholders of the appointment of any co-trustee or separate trustee shall be required under Section 6.08 hereof.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee shall be conferred or imposed upon and exercised or performed by the Indenture Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Indenture Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Estate or

Confidential

CONFIDENTIAL                                                                      RC_FGIC9019_00009318

any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Indenture Trustee;

      (ii)     no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

      (iii)     the Indenture Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

      (c)     Any notice, request or other writing given to the Indenture Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VI. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Indenture Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Indenture Trustee. Every such instrument shall be filed with the Indenture Trustee.

      (d)     Any separate trustee or co-trustee may at any time constitute the Indenture Trustee, its agent or attorney in fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Indenture Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

      Section 6.11. Eligibility; Disqualification.   The Indenture Trustee shall at all times satisfy the requirements of TIA § 310(a). The Indenture Trustee shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition and it or its parent shall have a long term debt rating of A or better by Moody's. The Indenture Trustee shall comply with TIA § 310(b), including the optional provision permitted by the second sentence of TIA § 310(b)(9); provided, however, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

      Within 90 days after ascertaining the occurrence of an Event of Default which shall not have been cured or waived, unless authorized by the Securities and Exchange Commission, the Indenture Trustee shall resign with respect to one or more Classes of Notes in accordance with Section 6.08 of this Indenture, and the Issuer shall appoint a successor Indenture Trustee for such Classes. In the event the Indenture Trustee fails to comply with the terms of the preceding sentence, the Indenture Trustee shall comply with clause (ii) of TIA § 310(b).

Confidential

CONFIDENTIAL                                                    RC_FGIC9019_00009319

In the case of the appointment hereunder of a successor Indenture Trustee with respect to any Class of Notes pursuant to this Section 6.11, the Issuer, the retiring Indenture Trustee and the successor Indenture Trustee with respect to such Class of Notes shall execute and deliver an indenture supplemental hereto wherein each successor Indenture Trustee shall accept such appointment and which (i) shall contain such provisions as shall be necessary or desirable to transfer and confirm to, and to vest in, the successor Indenture Trustee all the rights, powers, trusts and duties of the retiring Indenture Trustee with respect to the Notes of the Class to which the appointment of such successor Indenture Trustee relates, (ii) if the retiring Indenture Trustee is not retiring with respect to all Classes of Notes, shall contain such provisions as shall be deemed necessary or desirable to confirm that all the rights, powers, trusts and duties of the retiring Indenture Trustee with respect to the Notes of each Class as to which the retiring Indenture Trustee is not retiring shall continue to be vested in the Indenture Trustee, and (iii) shall add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Indenture Trustee, it being understood that nothing herein or in such supplemental indenture shall constitute such Indenture Trustees co-trustees of the same trust and that each such Indenture Trustee shall be trustee of a trust or trusts hereunder separate and apart from any trust or trusts hereunder administered by any other such Indenture Trustee; and upon the removal of the retiring Indenture Trustee shall become effective to the extent provided therein.

Section 6.12.  <u>Preferential Collection of Claims Against Issuer</u>.  The Indenture Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  An Indenture Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

Section 6.13.  <u>Representations and Warranties</u>.  The Indenture Trustee hereby represents that:

(i)    The Indenture Trustee is a banking association duly organized, validly existing and in good standing under the laws of the United States with power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted.

(ii)    The Indenture Trustee has the power and authority to execute and deliver this Indenture and to carry out its terms; and the execution, delivery and performance of this Indenture have been duly authorized by the Indenture Trustee by all necessary corporate action.

(iii)    The consummation of the transactions contemplated by this Indenture and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the articles of organization or bylaws of the Indenture Trustee or any agreement or other instrument to which the Indenture Trustee is a party or by which it is bound.

5156850 07031570

CONFIDENTIAL                                                                        RC_FGIC9019_00009320

Confidential

(iv)    To the Indenture Trustee's best knowledge, there are no proceedings or investigations pending or threatened before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Indenture Trustee or its properties:  (A) asserting the invalidity of this Indenture (B) seeking to prevent the consummation of any of the transactions contemplated by this Indenture or (C) seeking any determination or ruling that might materially and adversely affect the performance by the Indenture Trustee of its obligations under, or the validity or enforceability of, this Indenture.

(v)    The Indenture Trustee does not have notice of any adverse claim (as such terms are used in Delaware UCC Section 8-302) with respect to the Home Loans.

Section 6.14.  <u>Directions to Indenture Trustee</u>.  The Indenture Trustee is hereby directed:

(a)    to accept the pledge of the Home Loans and hold the assets of the Trust in trust for the Noteholders and the Credit Enhancer;

(b)    to authenticate and deliver the Notes substantially in the form prescribed by <u>Exhibit A</u> in accordance with the terms of this Indenture;

(c)    on the Closing Date, to enter into the Credit Enhancement Instrument for the benefit of the Noteholders with the Credit Enhancer;

(d)    to execute the other Basic Documents to which it is a party; and

(e)    to take all other actions as shall be required to be taken by the terms of this Indenture.

Section 6.15.  <u>Indenture Trustee May Own Securities</u>.  The Indenture Trustee, in its individual or any other capacity may become the owner or pledgee of Securities with the same rights it would have if it were not Indenture Trustee.

## ARTICLE VII

## <u>NOTEHOLDERS' LISTS AND REPORTS</u>

Section 7.01.  <u>Issuer to Furnish Indenture Trustee Names and Addresses of Noteholders</u>.  The Issuer will furnish or cause to be furnished to the Indenture Trustee (a) not more than five days after each Record Date, a list, in such form as the Indenture Trustee may reasonably require, of the names and addresses of the Holders of Notes as of such Record Date and, (b) at such other times as the Indenture Trustee and the Credit Enhancer may request in writing, within 30 days after receipt by the Issuer of any such request, a list of similar form and content as of a date not more than 10 days prior to the time such list is furnished; <u>provided</u>, <u>however</u>, that so long as the Indenture Trustee is the Note Registrar, no such list shall be required to be furnished.

Confidential

CONFIDENTIAL                                            RC_FGIC9019_00009321

Section 7.02. <u>Preservation of Information; Communications to Noteholders</u>.  (a) The Indenture Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of the Holders of Notes contained in the most recent list furnished to the Indenture Trustee as provided in <u>Section 7.01</u> and the names and addresses of Holders of Notes received by the Indenture Trustee in its capacity as Note Registrar.  The Indenture Trustee may destroy any list furnished to it as provided in such <u>Section 7.01</u> upon receipt of a new list so furnished.

(b)    Noteholders may communicate pursuant to TIA § 312(b) with other Noteholders with respect to their rights under this Indenture or under the Notes.

(c)    The Issuer, the Indenture Trustee and the Note Registrar shall have the protection of TIA § 312(c).

Section 7.03. <u>Reports by Issuer</u>.  (a) The Issuer shall:

(i)    file with the Indenture Trustee, within 15 days after the Issuer is required to file the same with the Commission, copies of the annual reports and the information, documents and other reports (or copies of such portions of any of the foregoing as the Commission may from time to time by rules and regulations prescribe) that the Issuer may be required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act;

(ii)    file with the Indenture Trustee, and the Commission in accordance with rules and regulations prescribed from time to time by the Commission such additional information, documents and reports with respect to compliance by the Issuer with the conditions and covenants of this Indenture as may be required from time to time by such rules and regulations; and

(iii)    supply to the Indenture Trustee (and the Indenture Trustee shall transmit by mail to all Noteholders described in TIA § 313(c)) such summaries of any information, documents and reports required to be filed by the Issuer pursuant to <u>clauses (i)</u> and <u>(ii)</u> of this <u>Section 7.03(a)</u> and by rules and regulations prescribed from time to time by the Commission.

(b)    Unless the Issuer otherwise determines, the fiscal year of the Issuer shall end on December 31 of each year.

Section 7.04. <u>Reports by Indenture Trustee</u>.  If required by TIA § 313(a), within 60 days after each January 1 beginning with January 1, 2008, the Indenture Trustee shall mail to each Noteholder as required by TIA § 313(c) and to the Credit Enhancer a brief report dated as of such date that complies with TIA § 313(a).  The Indenture Trustee also shall comply with TIA § 313(b).  A copy of each report at the time of its mailing to Noteholders shall be filed by the Indenture Trustee with the Commission and each stock exchange, if any, on which the Notes are listed.  The Issuer shall notify the Indenture Trustee if and when the Notes are listed on any stock exchange.

CONFIDENTIAL                                                                      RC_FGIC9019_00009322

Section 7.05. <u>Exchange Act Reporting</u>.  In connection with the preparation and filing of periodic reports by the Master Servicer pursuant to Section 4.04 of the Servicing Agreement, the Indenture Trustee shall timely provide to the Master Servicer (I) a list of Holders as shown on the Note Register or Certificate Register as of the end of each calendar year, (II) copies of all pleadings, other legal process and any other documents relating to any claims, charges or complaints involving the Indenture Trustee, as indenture trustee hereunder, or the Trust Estate that are received by the Indenture Trustee, (III) notice of all matters that, to the actual knowledge of a Responsible Officer of the Indenture Trustee, have been submitted to a vote of the Holders, other than those matters that have been submitted to a vote of the Holders at the request of the Depositor or the Master Servicer, and (IV) notice of any failure of the Indenture Trustee to make any payment to the Holders as required pursuant to this Indenture.  Neither the Master Servicer nor the Indenture Trustee shall have any liability with respect to the Master Servicer's failure to properly prepare or file such periodic reports resulting from or relating to the Master Servicer's inability or failure to obtain any information not resulting from the Master Servicer's own negligence or willful misconduct.

## ARTICLE VIII

## ACCOUNTS, DISBURSEMENTS AND RELEASES

Section 8.01. <u>Collection of Money</u>.  Except as otherwise expressly provided herein, the Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to this Indenture.  The Indenture Trustee shall apply all such money received by it as provided in this Indenture.  Except as otherwise expressly provided in this Indenture, if any default occurs in the making of any payment or performance under any agreement or instrument that is part of the Trust Estate, the Indenture Trustee may take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate Proceedings.  Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture and any right to proceed thereafter as provided in <u>Article V</u>.

Section 8.02. <u>Trust Accounts</u>.  (a) On or prior to the Closing Date, the Issuer shall cause the Indenture Trustee to establish and maintain, in the name of the Indenture Trustee, for the benefit of the Noteholders and the Certificate Paying Agent, on behalf of the Certificateholder and the Credit Enhancer, the Payment Account as provided in <u>Section 3.01</u> of this Indenture.

(b)    All monies deposited from time to time in the Payment Account pursuant to the Servicing Agreement and all deposits therein pursuant to this Indenture are for the benefit of the Noteholders and the Certificate Paying Agent, on behalf of the Certificateholder and all investments made with such monies including all income or other gain from such investments are for the benefit of the Master Servicer as provided by the Servicing Agreement.

On each Payment Date, the Indenture Trustee shall distribute all amounts on deposit in the Payment Account to Noteholders in respect of the Notes and in its capacity as Certificate Paying Agent to the Certificateholder in the order of priority set forth in <u>Section 3.05</u> (except as otherwise provided in <u>Section 5.04(b)</u>).

Confidential

CONFIDENTIAL
RC_FGIC9019_00009323

The Master Servicer shall direct the Indenture Trustee in writing to invest any funds in the Payment Account in Permitted Investments maturing no later than the Business Day preceding each Payment Date and shall not be sold or disposed of prior to the maturity.

Section 8.03. Officer's Certificate.    The Indenture Trustee shall receive at least seven days notice when requested by the Issuer to take any action pursuant to Section 8.05(a), accompanied by copies of any instruments to be executed, and the Indenture Trustee shall also require, as a condition to such action, an Officer's Certificate, in form and substance satisfactory to the Indenture Trustee, stating the legal effect of any such action, outlining the steps required to complete the same, and concluding that all conditions precedent to the taking of such action have been complied with.

Section 8.04. Termination Upon Payment to Noteholders.    This Indenture and the respective obligations and responsibilities of the Issuer and the Indenture Trustee created hereby shall terminate upon the payment to the Noteholders, the Certificate Paying Agent (on behalf of the Certificateholder), the Credit Enhancer and the Indenture Trustee of all amounts required to be paid pursuant to Article III; provided, however, that in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St.  James, living on the date hereof.

Section 8.05. Release of Trust Estate.    (a) Subject to the payment of its fees and expenses, the Indenture Trustee may, and when required by the provisions of this Indenture shall, execute instruments to release property from the lien of this Indenture, or convey the Indenture Trustee's interest in the same, in a manner and under circumstances that are not inconsistent with the provisions of this Indenture.  No party relying upon an instrument executed by the Indenture Trustee as provided in Article VIII hereunder shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent, or see to the application of any monies.

(b)    The Indenture Trustee shall, at such time as (i) there are no Notes Outstanding, (ii) all sums due the Indenture Trustee pursuant to this Indenture and other Basic Documents have been paid and (iii) all sums due the Credit Enhancer have been paid, release any remaining portion of the Trust Estate that secured the Notes from the lien of this Indenture.

(c)    The Indenture Trustee shall release property from the lien of this Indenture pursuant to this Section 8.05 only upon receipt of a request from the Issuer accompanied by an Officers' Certificate and a letter from the Credit Enhancer, stating that the Credit Enhancer has no objection to such request from the Issuer.

(d)    The Indenture Trustee shall, at the request of the Issuer or the Depositor, surrender the Credit Enhancement Instrument to the Credit Enhancer for cancellation, upon final payment on the Notes.

Section 8.06. Surrender of Notes Upon Final Payment.  By acceptance of any Note, the Holder thereof agrees to surrender such Note to the Indenture Trustee promptly, prior to such Noteholder's receipt of the final payment thereon.

Confidential

CONFIDENTIAL                                                        RC_FGIC9019_00009324

Confidential

## ARTICLE IX

## SUPPLEMENTAL INDENTURES

Section 9.01.  Supplemental Indentures Without Consent of Noteholders.  (a) Without the consent of the Holders of any Notes but with prior notice to the Rating Agencies and the written consent of the Credit Enhancer (which consent shall not be unreasonably withheld), unless a Credit Enhancer Default has occurred and is continuing, the Issuer and the Indenture Trustee, when authorized by an Issuer Request, at any time and from time to time, may enter into one or more indentures supplemental hereto (which shall conform to the provisions of the Trust Indenture Act as in force at the date of the execution thereof), in form satisfactory to the Indenture Trustee, for any of the following purposes:

(i)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or better to assure, convey and confirm unto the Indenture Trustee any property subject or required to be subjected to the lien of this Indenture, or to subject to the lien of this Indenture additional property;

(ii)    to evidence the succession, in compliance with the applicable provisions hereof, of another person to the Issuer, and the assumption by any such successor of the covenants of the Issuer herein and in the Notes contained;

(iii)    to add to the covenants of the Issuer, for the benefit of the Holders of the Notes or the Credit Enhancer, or to surrender any right or power herein conferred upon the Issuer;

(iv)    to convey, transfer, assign, mortgage or pledge any property to or with the Indenture Trustee;

(v)    to cure any ambiguity, to correct any error, or to correct or supplement any provision herein or in any supplemental indenture that may be inconsistent with any other provision herein, in any supplemental indenture or in the Prospectus Supplement;

(vi)    to make any other provisions with respect to matters or questions arising under this Indenture or in any supplemental indenture; provided, that such action shall not materially and adversely affect the interests of the Holders of the Notes or the Credit Enhancer;

(vii)    to evidence and provide for the acceptance of the appointment hereunder by a successor trustee with respect to the Notes and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one trustee, pursuant to the requirements of Article VI; or

(viii)    to modify, eliminate or add to the provisions of this Indenture to such extent as shall be necessary to effect the qualification of this Indenture under the TIA or under any similar federal statute hereafter enacted and to add to this Indenture such other provisions as may be expressly required by the TIA;

Confidential

CONFIDENTIAL                                                        RC_FGIC9019_00009325

12-12020-mg    Doc 4444-1    Filed 07/31/13    Entered 07/31/13 18:18:10    Exhibit 1
Declaration of Mamta K. Scott    as Officer of U.S. Bank    as RMBS Truste    Pg 225 of 298

Confidential

provided, however, that no such indenture supplements shall be entered into unless the Indenture Trustee shall have received an Opinion of Counsel that entering into such indenture supplement will not have any material adverse tax consequences to the Noteholders. The Indenture Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.

(b)    The Issuer and the Indenture Trustee, when authorized by an Issuer Request, may, also without the consent of any of the Holders of the Notes, but with prior notice to the Rating Agencies and with the consent of the Credit Enhancer (so long as no Credit Enhancer Default exists), enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; provided, however, that such action shall not, as evidenced by an Opinion of Counsel (a copy of which shall be delivered to the Credit Enhancer), (i) adversely affect in any material respect the interests of any Noteholder or the Credit Enhancer or (ii) cause the Issuer to be subject to an entity level tax.

(c)    The Issuer and the Indenture Trustee shall, as directed by the Holders of Certificates which represent not less than 100% of the Certificate Percentage Interests thereof, enter into an indenture or indentures supplemental hereto for the purpose of providing for the issuance of one or more additional classes of Notes entitled to payments derived solely from all or a portion of the payments to which the Certificate issued on the Closing Date pursuant to the Trust Agreement are entitled; provided, however, that such action shall not, as evidenced by an Opinion of Counsel (a copy of which shall be delivered to the Credit Enhancer), (i) adversely affect in any material respect the interests of any Noteholder or the Credit Enhancer or (ii) cause the Issuer to be subject to an entity level tax. Each such class of Notes shall be a non-recourse obligation of the Issuer and shall be entitled to interest and principal in such amounts, and to such security for the repayment thereof, as shall be specified in such amendment or amendments. Promptly after the execution by the Issuer and the Indenture Trustee of any amendments pursuant to this Section or the creation of a new indenture and the issuance of the related class or classes of Notes, the Issuer shall require the Indenture Trustee to give notice to the Holders of the Notes and the Rating Agencies setting forth in general terms the substance of the provisions of such amendment. Any failure of the Indenture Trustee to provide such notice as is required under this paragraph, or any defect therein, shall not, however, in any way impair or affect the validity of such amendment or any class of Notes issued pursuant thereto. Unless the Credit Enhancer agrees in writing, (i) any classes of Notes issued pursuant to a supplemental indenture shall not be entitled to the insurance provided by the Credit Enhancement Instrument and (ii) the Holders of any such classes of Notes shall be entitled only to such distributions or a portion of such distributions as the Holders would have received as Holder of Certificate.

Confidential

CONFIDENTIAL                                                RC_FGIC9019_00009326

Section 9.02.  <u>Supplemental Indentures With Consent of Noteholders</u>.  The Issuer and the Indenture Trustee, when authorized by an Issuer Request, also may, with prior notice to the Rating Agencies and with the consent of the Holders of not less than a majority of the aggregate Note Balance of the Notes affected thereby and the Credit Enhancer (so long as no Credit Enhancer Default exists), by Act (as defined in Section 10.03 hereof) of such Holders delivered to the Issuer and the Indenture Trustee, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; <u>provided</u>, <u>however</u>, that no such supplemental indenture shall, without the consent of the Holder of each Note affected thereby:

(i)    change the date of payment of any installment of principal of or interest on any Note, or reduce the principal amount thereof or the interest rate thereon, change the provisions of this Indenture relating to the application of collections on, or the proceeds of the Sale of, the Trust Estate to payment of principal of or interest on the Notes, or change any place of payment where, or the coin or currency in which, any Note or the interest thereon is payable, or impair the right to institute suit for the enforcement of the provisions of this Indenture requiring the application of funds available therefor, as provided in <u>Article V</u>, to the payment of any such amount due on the Notes on or after the respective due dates thereof;

(ii)    reduce the percentage of the related Note Balance of any Class of Notes, the consent of the Holders of which is required for any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences provided for in this Indenture;

(iii)    modify or alter the provisions of the proviso to the definition of the term "Outstanding" or modify or alter the exception in the definition of the term "Holder";

(iv)    reduce the percentage of the aggregate Note Balance of the Notes required to direct the Indenture Trustee to direct the Issuer to sell or liquidate the Trust Estate pursuant to <u>Section 5.04</u>;

(v)    modify any provision of this <u>Section 9.02</u> except to increase any percentage specified herein or to provide that certain additional provisions of this Indenture or the Basic Documents cannot be modified or waived without the consent of the Holder of each Note affected thereby;

(vi)    modify any of the provisions of this Indenture in such manner as to affect the calculation of the amount of any payment of interest or principal due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation); or

5156850 07031570                                  47

CONFIDENTIAL                                                                        RC_FGIC9019_00009327

(vii)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Trust Estate or, except as otherwise permitted or contemplated herein, terminate the lien of this Indenture on any property at any time subject hereto or deprive the Holder of any Note of the security provided by the lien of this Indenture;

provided, that such action shall not, as evidenced by an Opinion of Counsel, cause the Issuer to be subject to an entity level tax and provided, further, that no such indenture supplements shall be entered into unless the Indenture Trustee shall have received an Opinion of Counsel that entering into such indenture supplement will not adversely affect in any material respect the interests of the Certificateholder or shall have received the express written consent of the Certificateholder to the indenture supplement.

The Indenture Trustee may in its discretion determine whether or not any Notes would be affected by any supplemental indenture and any such determination shall be conclusive upon the Holders of all Notes, whether theretofore or thereafter authenticated and delivered hereunder. The Indenture Trustee shall not be liable for any such determination made in good faith.

It shall not be necessary for any Act of Noteholders under this Section 9.02 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Issuer and the Indenture Trustee of any supplemental indenture pursuant to this Section 9.02, the Indenture Trustee shall mail to the Holders of the Notes and the Custodian to which such amendment or supplemental indenture relates a notice setting forth in general terms the substance of such supplemental indenture. Any failure of the Indenture Trustee to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Notwithstanding anything to the contrary herein, so long as there does not exist a failure by the Credit Enhancer to make a required payment under the Credit Enhancement Instrument, the Credit Enhancer shall have the right to exercise all rights of the Holders of the Notes under this Indenture and the Servicing Agreement without any consent of such Holders, and such Holders may exercise such rights only with the prior written consent of the Credit Enhancer.

Section 9.03. Execution of Supplemental Indentures. In executing, or permitting the additional trusts created by, any supplemental indenture permitted by this Article IX or the modification thereby of the trusts created by this Indenture, the Indenture Trustee shall be entitled to receive, and subject to Sections 6.01 and 6.02, shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and conforms to the requirements of the Trust Indenture Act. The Indenture Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise.

5156850 07031570

48

CONFIDENTIAL

Section 9.04. <u>Effect of Supplemental Indenture</u>.    Upon the execution of any supplemental indenture pursuant to the provisions hereof, this Indenture shall be and shall be deemed to be modified and amended in accordance therewith with respect to the Notes affected thereby, and the respective rights, limitations of rights, obligations, duties, liabilities and immunities under this Indenture of the Indenture Trustee, the Issuer and the Holders of the Notes shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 9.05. <u>Conformity with Trust Indenture Act</u>.  Every amendment of this Indenture and every supplemental indenture executed pursuant to this <u>Article IX</u> shall conform to the requirements of the Trust Indenture Act as then in effect so long as this Indenture shall then be qualified under the Trust Indenture Act.

Section 9.06. <u>Reference in Notes to Supplemental Indentures</u>.  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this <u>Article IX</u> may, and if required by the Indenture Trustee shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture.  If the Issuer or the Indenture Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee in exchange for Outstanding Notes.

## ARTICLE X

## MISCELLANEOUS

Section 10.01. <u>Compliance Certificates and Opinions, etc</u>.  (a) Upon any application or request by the Issuer to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish to the Indenture Trustee and to the Credit Enhancer (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with, except that, in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture, no additional certificate or opinion need be furnished.  Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

> (1)    a statement that each signatory of such certificate or opinion has read or has caused to be read such covenant or condition and the definitions herein relating thereto;

> (2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

Confidential

(3)    a statement that, in the opinion of each such signatory, such signatory has made such examination or investigation as is necessary to enable such signatory to express an informed opinion as to whether or not such covenant or condition has been complied with;

(4)    a statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with; and

(5)    if the signer of such certificate or Opinion is required to be Independent, the statement required by the definition of the term "Independent".

(b)    (i)    Prior to the deposit of any Collateral or other property or securities with the Indenture Trustee that is to be made the basis for the release of any property or securities subject to the lien of this Indenture, the Issuer shall, in addition to any obligation imposed in Section 10.01(a) or elsewhere in this Indenture, furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within 90 days of such deposit) to the Issuer of the Collateral or other property or securities to be so deposited.

(ii)    Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (i) above, the Issuer shall also deliver to the Indenture Trustee an Independent Certificate as to the same matters, if the fair value to the Issuer of the securities to be so deposited and of all other such securities made the basis of any such withdrawal or release since the commencement of the then current fiscal year of the Issuer, as set forth in the certificates delivered pursuant to clause (i) above and this clause (ii), is 10% or more of the aggregate Note Balance of the Notes, but such a certificate need not be furnished with respect to any securities so deposited, if the fair value thereof to the Issuer as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the aggregate Note Balance of the Notes.

(iii)    Whenever any property or securities are to be released from the lien of this Indenture, the Issuer shall also furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within 90 days of such release) of the property or securities proposed to be released and stating that in the opinion of such person the proposed release will not impair the security under this Indenture in contravention of the provisions hereof.

(iv)    Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (iii) above, the Issuer shall also furnish to the Indenture Trustee an Independent Certificate as to the same matters if the fair value of the property or securities and of all other property, other than property as contemplated by clause (v) below or securities released from the lien of this Indenture since the commencement of the then current calendar year, as set forth in the certificates required by clause (iii) above and this clause (iv), equals 10% or more of the aggregate Note Balance of the Notes, but such certificate need not be furnished in the case of any release of property or securities if the fair value thereof as set forth in the related Officer's

Confidential

Certificate is less than $25,000 or less than one percent of the then aggregate Note Balance of the Notes.

(v)    Notwithstanding any provision of this Indenture, the Issuer may, without compliance with the requirements of the other provisions of this Section 10.01, (A) collect, sell or otherwise dispose of the Home Loans as and to the extent permitted or required by the Basic Documents or (B) make cash payments out of the Payment Account as and to the extent permitted or required by the Basic Documents, so long as the Issuer shall deliver to the Indenture Trustee every six months, commencing six months after the closing date, an Officer's Certificate of the Issuer stating that all the dispositions of Collateral described in clauses (A) or (B) above that occurred during the preceding six calendar months were in the ordinary course of the Issuer's business and that the proceeds thereof were applied in accordance with the Basic Documents.

Section 10.02.  Form of Documents Delivered to Indenture Trustee.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Seller or the Issuer, stating that the information with respect to such factual matters is in the possession of the Seller or the Issuer, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture, in connection with any application or certificate or report to the Indenture Trustee, it is provided that the Issuer shall deliver any document as a condition of the granting of such application, or as evidence of the Issuer's compliance with any term hereof, it is intended that the truth and accuracy, at the time of the granting of such application or at the effective date of such certificate or report (as the case may be), of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer to have such application granted or to the sufficiency of such certificate or report.  The foregoing shall not, however, be construed to affect the Indenture Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article VI.

CONFIDENTIAL

Section 10.03.  Acts of Noteholders.  (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Indenture Trustee, and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 6.01) conclusive in favor of the Indenture Trustee and the Issuer, if made in the manner provided in this Section 10.03.

(b)    The fact and date of the execution by any person of any such instrument or writing may be proved in any manner that the Indenture Trustee deems sufficient.

(c)    The ownership of Notes shall be proved by the Note Registrar.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Indenture Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 10.04.  Notices, etc., to Indenture Trustee, Issuer, Credit Enhancer and Rating Agencies.  Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture shall be in writing and if such request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders is to be made upon, given or furnished to or filed with:

(i)    the Indenture Trustee by any Noteholder or by the Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Indenture Trustee at the Corporate Trust Office.  The Indenture Trustee shall promptly transmit any notice received by it from the Noteholders to the Issuer,

(ii)    the Issuer by the Indenture Trustee or by any Noteholder shall be sufficient for every purpose hereunder if in writing and mailed first class, postage prepaid to the Issuer addressed to: Home Loan Trust 2007-HI1, in care of Wilmington Trust Company, or at any other address previously furnished in writing to the Indenture Trustee by the Issuer.  The Issuer shall promptly transmit any notice received by it from the Noteholders to the Indenture Trustee, or

5156850 07031570

52

CONFIDENTIAL                                                            RC_FGIC9019_00009332

(iii)    the Credit Enhancer by the Issuer, the Indenture Trustee or by any Noteholders shall be sufficient for every purpose hereunder to in writing and mailed, first class postage pre-paid, or personally delivered or telecopied to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Structured Finance Surveillance (Home Loan Trust 2007-HI1), telecopier number (212) 312-3220, confirmation number (800) 352-0001. The Credit Enhancer shall promptly transmit any notice received by it from the Issuer, the Indenture Trustee or the Noteholders to the Issuer or Indenture Trustee, as the case may be.

Notices required to be given to the Rating Agencies by the Issuer, the Indenture Trustee or the Owner Trustee shall be in writing, personally delivered or mailed by certified mail, return receipt requested, to (i) in the case of Moody's, at the following address: Moody's Investors Service, Inc., ABS Monitoring Department, 99 Church Street, New York, New York 10007 and (ii) in the case of Standard & Poor's, at the following address: Standard & Poor's, a Division of the McGraw Hill Companies, Inc., 55 Water Street, 41st Floor, New York, New York 10041, Attention of Asset Backed Surveillance Department; or as to each of the foregoing, at such other address as shall be designated by written notice to the other parties.

Section 10.05.  Notices to Noteholders; Waiver.  Where this Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first class, postage prepaid to each Noteholder affected by such event, at such Person's address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.  In any case where notice to Noteholders is given by mail, neither the failure to mail such notice nor any defect in any notice so mailed to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice that is mailed in the manner herein provided shall conclusively be presumed to have been duly given regardless of whether such notice is in fact actually received.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Indenture Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such a waiver.

In case, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Indenture Trustee shall be deemed to be a sufficient giving of such notice.

Where this Indenture provides for notice to the Rating Agencies, failure to give such notice shall not affect any other rights or obligations created hereunder, and shall not under any circumstance constitute an Event of Default.

5156850 07031570

53

CONFIDENTIAL    RC_FGIC9019_00009333

Section 10.06. <u>Alternate Payment and Notice Provisions</u>. Notwithstanding any provision of this Indenture or any of the Notes to the contrary, the Issuer may enter into any agreement with any Holder of a Note providing for a method of payment, or notice by the Indenture Trustee to such Holder, that is different from the methods provided for in this Indenture for such payments or notices. The Issuer shall furnish to the Indenture Trustee a copy of each such agreement and the Indenture Trustee shall cause payments to be made and notices to be given in accordance with such agreements.

Section 10.07. <u>Conflict with Trust Indenture Act</u>. If any provision hereof limits, qualifies or conflicts with another provision hereof that is required to be included in this Indenture by any of the provisions of the Trust Indenture Act, such required provision shall control. The provisions of TIA §§ 310 through 317 that impose duties on any Person (including the provisions automatically deemed included herein unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

Section 10.08. <u>Effect of Headings</u>. The Article and Section headings herein are for convenience only and shall not affect the construction hereof.

Section 10.09. <u>Successors and Assigns</u>. All covenants and agreements in this Indenture and the Notes by the Issuer shall bind its successors and assigns, whether so expressed or not. All agreements of the Indenture Trustee in this Indenture shall bind its successors, co trustees and agents.

Section 10.10. <u>Separability</u>. In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 10.11. <u>Benefits of Indenture</u>. Nothing in this Indenture or in the Notes, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Noteholders, the Credit Enhancer and any other party secured hereunder, and any other Person with an ownership interest in any part of the Trust Estate, any benefit or any legal or equitable right, remedy or claim under this Indenture. The Credit Enhancer is a third-party beneficiary of this Indenture.

Section 10.12. <u>Legal Holidays</u>. In any case where the date on which any payment is due shall not be a Business Day, then (notwithstanding any other provision of the Notes or this Indenture) payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date on which nominally due, and no interest shall accrue for the period from and after any such nominal date.

Section 10.13. <u>GOVERNING LAW</u>. THIS INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Confidential

CONFIDENTIAL                                                                          RC_FGIC9019_00009334

Section 10.14. <u>Counterparts</u>.  This Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 10.15. <u>Recording of Indenture</u>.  If this Indenture is subject to recording in any appropriate public recording offices, such recording is to be effected by the Issuer and at its expense accompanied by an Opinion of Counsel (reasonably acceptable to the Indenture Trustee and the Credit Enhancer) to the effect that such recording is necessary either for the protection of the Noteholders or any other Person secured hereunder or for the enforcement of any right or remedy granted to the Indenture Trustee under this Indenture.

Section 10.16. <u>Issuer Obligation</u>.  No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the Owner Trustee or the Indenture Trustee on the Notes or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director, employee or agent of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed (it being understood that the Indenture Trustee and the Owner Trustee have no such obligations in their respective individual capacities) and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.  For all purposes of this Indenture, in the performance of any duties or obligations of the Issuer hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of <u>Articles VI</u>, VII and VIII of the Trust Agreement.

Section 10.17. <u>No Petition</u>.  The Indenture Trustee, by entering into this Indenture, and each Noteholder, by its acceptance of a Note, hereby covenant and agree that they will not at any time institute against the Depositor or the Issuer, or join in any institution against the Depositor or the Issuer of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Notes, this Indenture or any of the Basic Documents.

Section 10.18. <u>Inspection</u>.  The Issuer agrees that, on reasonable prior notice, it shall permit any representative of the Indenture Trustee, during the Issuer's normal business hours, to examine all the books of account, records, reports and other papers of the Issuer, to make copies and extracts therefrom, to cause such books to be audited by Independent certified public accountants, and to discuss the Issuer's affairs, finances and accounts with the Issuer's officers, employees, and Independent certified public accountants, all at such reasonable times and as often as may be reasonably requested.  The Indenture Trustee shall and shall cause its representatives to hold in confidence all such information except to the extent disclosure may be required by law (and all reasonable applications for confidential treatment are unavailing) and except to the extent that the Indenture Trustee may reasonably determine that such disclosure is consistent with its obligations hereunder.

Confidential

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

**HOME LOAN TRUST 2007-HI1**
as Issuer

By: **WILMINGTON TRUST COMPANY**
not in its individual capacity but solely
as Owner Trustee

By: _____

Name:

Title:

Michele C. Harra
Financial Services Officer

**LASALLE BANK NATIONAL ASSOCIATION,**
as Indenture Trustee

By: _____

Name:

Title:

**LASALLE BANK NATIONAL ASSOCIATION**
hereby accepts the appointment as Paying Agent
pursuant to Section 3.03 hereof and as
Note Registrar pursuant to Section 4.02 hereof.

By: _____

Name:

Title:

5156850 07031570

*Indenture*
*RFMSII Series 2007-HI1*

CONFIDENTIAL

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

**HOME LOAN TRUST 2007-HI1**
as Issuer

By: **WILMINGTON TRUST COMPANY**
    not in its individual capacity but solely
    as Owner Trustee

By:_____
Name:
Title:

**LASALLE BANK NATIONAL ASSOCIATION,**
as Indenture Trustee

By:_____
Name:              Susan L. Feld
Title:                Vice President

**LASALLE BANK NATIONAL ASSOCIATION**
hereby accepts the appointment as Paying Agent
pursuant to Section 3.03 hereof and as
Note Registrar pursuant to Section 4.02 hereof.

By:_____
Name:              Susan L. Feld
Title:                Vice President

CONFIDENTIAL                                                                    RC_FGIC9019_00009337

STATE OF DELAWARE          )
                                          ) ss.:
COUNTY OF NEW CASTLE     )

On this _26_ day of March, 2007, before me personally appeared ___Michele C. Harra___, to me known, who being by me duly sworn, did depose and say that he/she resides at Wilmington, Delaware, that he/she is a __Financial Services Officer__ of Wilmington Trust Company, as Owner Trustee, a Delaware banking corporation described in and which executed the above instrument; and that he/she signed his/her name thereto by like order.

_____
Notary Public

ROBERT J. PERKINS
Notary Public - State of Delaware
My Comm. Expires May 30, 2008

CONFIDENTIAL                                                              RC_FGIC9019_00009338

STATE OF ILLINOIS          )
                           ) ss.:
COUNTY OF COOK             )

On this _30th_ day of March, 2007, before me personally appeared _Susan L. Feld_, to me known, who being by me duly sworn, did depose and say that he/she is a _Vice President_ of the Indenture Trustee, a national banking association described in and which executed the above instrument; and that he/she signed his/her name thereto by like order

_____
Notary Public

5156850 07031570                      N-2

STATE OF ILLINOIS     )
                        ) ss.:
COUNTY OF COOK     )

    On this _30th_ day of March, 2007, before me, the undersigned Notary Public of said State, personally appeared ___Susan L. Feld___, personally known to me to be a duly authorized officer of LaSalle Bank National Association that executed the within instrument, and personally known to me to be the person who executed the within instrument on behalf of LaSalle Bank National Association therein named, and acknowledged to me that such LaSalle Bank National Association executed the within instrument pursuant to its by-laws.

                                        Notary Public

5156850 07031570             N-3

CONFIDENTIAL     RC_FGIC9019_00009340

## EXHIBIT A

FORM OF NOTES

CLASS A __ NOTES

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE PRINCIPAL OF THIS NOTE IS PAYABLE IN INSTALLMENTS AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THIS NOTE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE SELLER, THE DEPOSITOR, THE MASTER SERVICER, THE INDENTURE TRUSTEE, THE OWNER TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT AS EXPRESSLY PROVIDED IN THE INDENTURE OR THE BASIC DOCUMENTS.

EACH PURCHASER AND TRANSFEREE OF THIS NOTE, BY ITS ACCEPTANCE OF THIS NOTE, SHALL BE DEEMED TO HAVE REPRESENTED AND WARRANTED THAT EITHER (I) IT IS NOT ACQUIRING THIS NOTE WITH THE ASSETS OF AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), WHICH IS SUBJECT TO THE PROVISIONS OF TITLE I OF ERISA, A "PLAN" DESCRIBED IN SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF AN EMPLOYEE BENEFIT PLAN'S OR OTHER PLAN'S INVESTMENT IN SUCH ENTITY OR ANY OTHER PLAN THAT IS SUBJECT TO A LAW THAT IS SIMILAR TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE OR (II) THE ACQUISITION AND HOLDING OF THIS NOTE WILL NOT GIVE RISE TO A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA, SECTION 4975 OF THE CODE OR ANY SIMILAR APPLICABLE LAW.

Confidential

Confidential

## HOME LOAN TRUST 2007-HI1

### HOME LOAN-BACKED NOTE

Registered                                    Principal Amount: $_____

Class A __
No.  __                                        Percentage Interest: _____%

CUSIP No. _____                         Note Rate: [___%][Adjustable Rate]

Home Loan Trust 2007-HI1, a statutory trust duly organized and existing under the laws of the State of Delaware (herein referred to as the "Issuer"), for value received, hereby promises to pay to Cede & Co. or registered assigns, the principal sum of $_____, payable on each Payment Date in an amount equal to the Percentage Interest specified above of the aggregate amount, if any, payable from the Payment Account in respect of principal on the Class A-__ Notes pursuant to Section 3.05 of the Indenture dated as of March 30, 2007 (the "Indenture") between the Issuer, as Issuer, and LaSalle Bank National Association, as Indenture Trustee (the "Indenture Trustee"); provided, however, that the entire unpaid principal amount of this Note shall be due and payable on the Payment Date in March 2037, to the extent not previously paid on a prior Payment Date.  Capitalized terms used but not defined herein are defined in Appendix A of the Indenture.

[Interest on the Class A-__ Notes will be paid monthly on each Payment Date at the Note Rate.  The Note Rate for the Class A-__ Notes will be _____% per annum.  Interest will be computed on the basis of a 30 day month and a 360 day year.  Principal of and interest on this Note shall be paid in the manner specified on the reverse hereof.  On the Step Up Date, the Note Rate on the Class A-__ Notes will increase by 0.50% per annum.]

[Interest on the Class A-1 Notes will be paid monthly on each Payment Date at the Note Rate for the related Interest Accrual Period.  The Note Rate for each Interest Accrual Period will be equal to the lesser of (i) LIBOR plus___% per annum and (ii) ___% per annum.  LIBOR for each applicable Interest Accrual Period will be determined on the second LIBOR Business Day immediately preceding (i) the Closing Date in the case of the first Interest Accrual Period and (ii) the first day of each succeeding Interest Accrual Period by the Indenture Trustee as set forth in the Indenture.  All determinations of LIBOR by the Indenture Trustee shall, in the absence of manifest error, be conclusive for all purposes, and each holder of this Class A-1 Note, by accepting this Class A-1 Note, agrees to be bound by such determination.  Interest on this Class A-1 Note will accrue for each Payment Date from the most recent Payment Date on which interest has been paid (in the case of the first Payment Date, from the Closing Date) to but excluding such Payment Date.  Interest will be computed on the basis of the actual number of days in each Interest Accrual Period and a year assumed to consist of 360 days.  Principal of and interest on this Class A-1 Note shall be paid in the manner specified in the Indenture.]

Confidential

Confidential

Principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Issuer with respect to this Note shall be applied first to interest due and payable on this Note as provided above and then to the unpaid principal of this Note.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note.

Unless the certificate of authentication hereon has been executed by the Indenture Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Notes of the Issuer, designated as its Home Loan-Backed Notes (herein called the "Notes"), all issued under the Indenture, to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights and obligations thereunder of the Issuer, the Indenture Trustee and the holders of the Notes. The Notes are subject to all terms of the Indenture.

The Notes are and will be equally and ratably secured by the Collateral pledged as security therefor as provided in the Indenture.

This Note is entitled to the benefits of an irrevocable and unconditional financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

Principal of and interest on this Note will be payable on each Payment Date, commencing on April 25, 2007, as described in the Indenture. "Payment Date" means the twenty fifth day of each month, or, if any such date is not a Business Day, then the next Business Day.

The entire unpaid principal amount of this Note shall be due and payable in full on the Payment Date in _____, pursuant to the Indenture, to the extent not previously paid on a prior Payment Date. Notwithstanding the foregoing, if an Event of Default shall have occurred and be continuing, then the Indenture Trustee or the holders of Notes representing not less than a majority of the aggregate Note Balance of all Notes with the consent of the Credit Enhancer, or the Credit Enhancer may declare the Notes to be immediately due and payable in the manner provided in Section 5.02 of the Indenture. All principal payments on the Notes shall be paid in the manner and priority set forth in Section 3.05 of the Indenture.

Any installment of interest or principal, if any, payable on any Note that is punctually paid or duly provided for by the Issuer on the applicable Payment Date shall be paid to each Holder of record on the preceding Record Date, by wire transfer to an account specified in writing by such Holder reasonably satisfactory to the Indenture Trustee as of the preceding Record Date or in all other cases or if no such instructions have been delivered to the Indenture Trustee, by check or money order to such Noteholder mailed to such Holder's address as it appears in the Note Register the amount required to be paid to such Holder on such Payment Date pursuant to such Holder's Securities; provided, however, that the Indenture Trustee shall not pay to such Holders any amount required to be withheld from a payment to such Holder by the Code.

5156850 07031570

A-3

CONFIDENTIAL                                                                                  RC_FGIC9019_00009343

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the Corporate Trust Office, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Indenture Trustee duly executed by, the holder hereof or such holder's attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Note Registrar, which requirements include membership or participation in the Securities Transfer Agent's Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and thereupon one or more new Notes in authorized denominations and in the same aggregate principal amount will be issued to the designated transferee or transferees.  No service charge will be charged for any registration of transfer or exchange of this Note, but the Note Registrar shall require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any registration of transfer or exchange of this Note.

Each holder or Beneficial Owner of a Note, by acceptance of a Note, or, in the case of a Beneficial Owner of a Note, a beneficial interest in a Note, covenants and agrees that no recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the Owner Trustee, the Seller, the Master Servicer, the Depositor or the Indenture Trustee on the Notes or under the Indenture or any certificate or other writing delivered in connection therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director or employee of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.

Each holder or Beneficial Owner of a Note, by acceptance of a Note or, in the case of a Beneficial Owner of a Note, a beneficial interest in a Note, covenants and agrees by accepting the benefits of the Indenture that such holder or Beneficial Owner of a Note will not at any time institute against the Depositor, the Seller, the Master Servicer or the Issuer, or join in any institution against the Depositor, the Seller, the Master Servicer or the Issuer of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Notes, the Indenture or the Basic Documents.

The Issuer has entered into the Indenture and this Note is issued with the intention that, for federal, state and local income, single business and franchise tax purposes, the Notes will qualify as indebtedness of the Issuer.  Each holder of a Note, by acceptance of a Note (and each Beneficial Owner of a Note by acceptance of a beneficial interest in a Note), agrees to treat the Notes for federal, state and local income, single business and franchise tax purposes as indebtedness of the Issuer.

5156850 07031570                                          A-4

CONFIDENTIAL                                                    RC_FGIC9019_00009344

12-12020-mg    Doc 4444-1    Filed 07/31/13    Entered 07/31/13 18:18:10    Exhibit 1
Declaration of Mamta K. Scott    as Officer of U.S. Bank    as RMBS Truste    Pg 244 of 298

Confidential

Prior to the due presentment for registration of transfer of this Note, the Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name this Note is registered (as of the day of determination or as of such other date as may be specified in the Indenture) as the owner hereof for all purposes, whether or not this Note be overdue, and none of the Issuer, the Indenture Trustee or any such agent shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the Indenture Trustee and the rights of the holders of the Notes under the Indenture at any time by the Issuer and the Indenture Trustee with the consent of the holders of Notes representing a majority of the aggregate Note Balance of all Notes at the time Outstanding and the Credit Enhancer with prior notice to the Rating Agencies.  The Indenture also contains provisions permitting the holders of Notes representing specified percentages of the aggregate Note Balance of all Notes, on behalf of the holders of all the Notes with the consent of the Credit Enhancer, or the Credit Enhancer (so long as no Credit Enhancer Default exists), to waive compliance by the Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Credit Enhancer and the holder of this Note (or any one or more Predecessor Notes) shall be conclusive and binding upon such holder and upon all future holders of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note.  The Indenture also permits the Issuer and the Indenture Trustee to amend or waive certain terms and conditions set forth in the Indenture without the consent of holders of the Notes issued thereunder but with prior notice to the Rating Agencies and with the consent of the Credit Enhancer.

The term "Issuer" as used in this Note includes any successor or the Issuer under the Indenture.

The Issuer is permitted by the Indenture, under certain circumstances, to merge or consolidate, subject to the rights of the Indenture Trustee and the holders of Notes under the Indenture.

The Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations therein set forth.

This Note and the Indenture shall be construed in accordance with the laws of the State of New York, without reference to its conflict of law provisions and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair, the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

5156850 07031570                                        A-5

Anything herein to the contrary notwithstanding, except as expressly provided in the Basic Documents, none of Wilmington Trust Company in its individual capacity, LaSalle Bank National Association, in its individual capacity, any owner of a beneficial interest in the Issuer, or any of their respective partners, beneficiaries, agents, officers, directors, employees or successors or assigns shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on this Note or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in the Indenture.  The holder of this Note by its acceptance hereof agrees that, except as expressly provided in the Basic Documents, in the case of an Event of Default under the Indenture, the holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Note.

Confidential

CONFIDENTIAL                                                                RC_FGIC9019_00009346

Confidential

IN WITNESS WHEREOF, the Owner Trustee, on behalf of the Issuer and not in its individual capacity, has caused this Note to be duly executed.

HOME LOAN TRUST 2007-HI1

By    WILMINGTON TRUST COMPANY, not in
its individual capacity but solely as Owner
Trustee

Dated: March 30, 2007

By    _____
Authorized Signatory


CERTIFICATE OF AUTHENTICATION

This is one of the Class A-__ Notes referred to in the within mentioned Indenture.

LASALLE BANK NATIONAL ASSOCIATION,
not in its individual capacity but solely as Indenture
Trustee

Dated: March 30, 2007

By    _____
Authorized Signatory


5156850 07031570                    A-7

CONFIDENTIAL                    RC_FGIC9019_00009347

Confidential

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

_____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfer unto _____

_____
(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____

_____,

attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated:_____        _____*/

Signature Guaranteed:

---

\*     NOTICE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular, without alteration, enlargement or any change whatever. Such signature must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Note Registrar, which requirements include membership or participation in STAMP or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

5156850 07031570                               A-8

Confidential

CONFIDENTIAL                                                      RC_FGIC9019_00009348

12-12020-mg    Doc 4444-1    Filed 07/31/13    Entered 07/31/13 18:18:10    Exhibit 1
Declaration of Mamta K. Scott    as Officer of U.S. Bank    as RMBS Truste    Pg 248 of 298

Confidential

APPENDIX A

DEFINITIONS

Accrued Note Interest:  With respect to any class of Notes and any Payment Date, an amount equal to interest accrued for the related Interest Accrual Period on the related Note Balance immediately prior to that Payment Date at the related Note Rate for that Payment Date. Accrued Note Interest for the Class A Notes (other than the Class A-1 Notes) will be calculated on the basis of a 30-day month in the related Interest Accrual Period and a 360-day year. Accrued Note Interest for the Class A-1 Notes will be calculated on the basis of the actual number of days in the related Interest Accrual Period and a 360-day year.

Administrative Fees:  The Servicing Fees and the fees payable to the Owner Trustee and the Indenture Trustee.

Affiliate:  With respect to any Person, any other Person controlling, controlled by or under common control with such Person. For purposes of this definition, "control" means the power to direct the management and policies of a Person, directly or indirectly, whether through ownership of voting securities, by contract or otherwise and "controlling" and "controlled" shall have meanings correlative to the foregoing.

Appraised Value:  For any Home Loan the value of the related Mortgaged Property determined by the appraisal, sales price for such Mortgaged Property or alternative valuation method used in the origination of such Home Loan (which may have been obtained at an earlier time); provided that if such Home Loan was originated simultaneously with or not more than 12 months after a senior lien on the related Mortgaged Property which was originated in a purchase or cash-out refinance transaction, the appraised value shall be the lesser of the appraised value at the origination of the senior lien and the sales price for such Mortgaged Property.

Assignment of Mortgage:  With respect to any Mortgage, an assignment, notice of transfer or equivalent instrument, in recordable form, sufficient under the laws of the jurisdiction in which the related Mortgaged Property is located to reflect the sale of the Mortgage, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering Mortgages secured by Mortgaged Properties located in the same jurisdiction.

Authorized Newspaper: A newspaper of general circulation in the Borough of Manhattan, The City of New York, printed in the English language and customarily published on each Business Day, whether or not published on Saturdays, Sundays or holidays.

Authorized Officer:  With respect to the Issuer, any officer of the Owner Trustee who is authorized to act for the Owner Trustee in matters relating to the Issuer and who is identified on the list of Authorized Officers delivered by the Owner Trustee to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter).

Bankruptcy Code:  The Bankruptcy Code of 1978, as amended.

5156855 07031570

CONFIDENTIAL                                                                  RC_FGIC9019_00009349

Confidential

Basic Documents:  The Trust Agreement, the Indenture, the Home Loan Purchase Agreement, the Servicing Agreement, the Insurance Agreement, the Credit Enhancement Instrument, the Custodial Agreement and the other documents and certificates delivered in connection with any of the above.

Beneficial Owner:  With respect to any Note, the Person who is the beneficial owner of such Note as reflected on the books of the Depository or on the books of a Person maintaining an account with such Depository (directly as a Depository Participant or indirectly through a Depository Participant, in accordance with the rules of such Depository).

Book-Entry Custodian:  The custodian appointed pursuant to Section 4.06 of the Indenture.

Book-Entry Notes:  Beneficial interests in the Notes, ownership and transfers of which shall be made through book entries by the Depository as described in Section 4.06 of the Indenture.

Business Day:  Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the States of New York, California, Texas, Minnesota, Pennsylvania, Illinois or Delaware are required or authorized by law to be closed.

Calendar Quarter:  A Calendar Quarter shall consist of one of the following time periods in any given year:  January 1 through March 31, April 1 through June 30, July 1 though September 30, and October 1 through December 31.

Certificate:  The certificate issued in the form of Exhibit A to the Trust Agreement and outstanding pursuant to the terms of the Trust Agreement, evidencing a beneficial ownership interest in the Trust.

Certificate Distribution Account:  The account or accounts created and maintained by the Certificate Paying Agent pursuant to Section 3.10(c) of the Trust Agreement. The Certificate Paying Agent will make all distributions on the Certificate from money on deposit in the Certificate Distribution Account. The Certificate Distribution Account shall be an Eligible Account.

Certificate Distribution Amount:  The amount payable to the Certificate Paying Agent under Section 3.05 of the Indenture for payment to the holders of the Certificate under the Trust Agreement.

Certificate Paying Agent:  The meaning specified in Section 3.10 of the Trust Agreement.

Certificate Percentage Interest:  With respect to the Certificate and any date of determination, the percentage interest as stated on the face of the Certificate, which percentage may be recalculated in accordance with Section 3.03 of the Trust Agreement.

Certificate Principal Balance:  As of any Payment Date, with respect to the Certificate, an amount equal to the then applicable Certificate Percentage Interest of such Certificate, multiplied by the Outstanding Reserve Amount immediately prior to such Payment Date.

2

Confidential

Certificate Register:  The register maintained by the Certificate Registrar in which the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges of the Certificates.

Certificate Registrar:  Initially, the Indenture Trustee, in its capacity as Certificate Registrar, or any successor to the Indenture Trustee in such capacity.

Certificate of Trust:  The Certificate of Trust filed for the Trust pursuant to Section 3810(a) of the Statutory Trust Statute, including all amendments and restatements.

Certificateholder:  The Person in whose name a Certificate is registered in the Certificate Register except that, any Certificate registered in the name of the Issuer, the Owner Trustee or the Indenture Trustee or any Affiliate of any of them shall be deemed not to be outstanding and the registered holder will not be considered a Certificateholder or a holder for purposes of giving any request, demand, authorization, direction, notice, consent or waiver under the Indenture or the Trust Agreement provided that, in determining whether the Indenture Trustee or the Owner Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Certificates that the Indenture Trustee or the Owner Trustee knows to be so owned shall be so disregarded. Owners of the Certificates that have been pledged in good faith may be regarded as Holders if the pledgee establishes to the satisfaction of the Indenture Trustee or the Owner Trustee, as the case may be, the pledgee's right so to act with respect to such Certificates and that the pledgee is not the Issuer, any other obligor upon the Certificates or any Affiliate of any of the foregoing Persons.

Class:  Collectively, all of the Notes bearing the same designation.

Closing Date:  March 30, 2007.

Code:  The Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

Collateral:  The meaning specified in the Granting Clause of the Indenture.

Collection Period:  As to any Payment Date, the calendar month preceding the month of that Payment Date.

Combined Loan-to-Value Ratio:  With respect to each Home Loan, the ratio, expressed as a percentage, of (i) the sum of (A) the original principal balance of such Home Loan, and (B) any outstanding principal balance, at origination of such Home Loan, of all other mortgage loans, if any, secured by senior or subordinate liens on the related Mortgaged Property, to (ii) the Appraised Value, or, if permitted by the Program Guide, the purchase price of the Mortgaged Property, a statistical valuation or the Stated Value.

Commission:  The Securities and Exchange Commission.

5156855 07031570

CONFIDENTIAL                                                    RC_FGIC9019_00009351

Corporate Trust Office:  With respect to the Indenture Trustee, Certificate Registrar, Certificate Paying Agent and Paying Agent, the corporate trust office of the Indenture Trustee and Note Registrar from which at any particular time the Indenture shall be administered, which office at the date of the execution of this instrument is located at 135 South LaSalle Street, Suite 1511, Chicago, Illinois, Attention: Global Securities and Trust Services, RFMSII 2007-HI1.  With respect to the Owner Trustee, the principal corporate trust office of the Owner Trustee at which at any particular time its corporate trust business shall be administered, which office at the date of the execution of this Trust Agreement is located at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890, Attention:  Corporate Trust Administration.

Credit Enhancement Instrument:  The Financial Guaranty Insurance Policy, Number 07030014, dated as of the Closing Date, issued by the Credit Enhancer to the Indenture Trustee.

Credit Enhancer:  Financial Guaranty Insurance Company, a New York stock insurance corporation or any successor thereto.

Credit Enhancer Default:  If the Credit Enhancer fails to make a payment required under the Credit Enhancement Instrument in accordance with its terms.

Credit Repository:  Equifax, Transunion and Experian, or their successors in interest.

Credit Scores:  The figure assigned to a Home Loan that is designed to assess the Mortgagor's credit history which is obtained from credit reports provided by various credit reporting organizations and obtained by many lenders in connection with Home Loan applications to help assess a Mortgagor's creditworthiness.

Custodial Account:  The account or accounts created and maintained by the Master Servicer pursuant to Section 3.02(b) of the Servicing Agreement, in which the Master Servicer shall deposit or cause to be deposited certain amounts in respect of the Home Loans.

Custodial Agreement:  Any Custodial Agreement among the Custodian, the Indenture Trustee and the Master Servicer relating to the custody of the Home Loans and the Related Documents.

Custodial File:  Any mortgage loan document in the Mortgage File that is required to be delivered to the Custodian pursuant to Section 2.1(c) of the Home Loan Purchase Agreement.

Custodian:  Wells Fargo Bank, N.A., a national association, and its successors and assigns.

Cut-off Date:  March 1, 2007.

Cut-off Date Loan Balance:  With respect to any Home Loan, the unpaid principal balance thereof as of the close of business on the Business Day immediately prior to the Cut-off Date.

4

Confidential

<u>Default</u>:  Any occurrence which is or with notice or the lapse of time or both would become an Event of Default.

<u>Deficiency Amount</u>:  With respect to any class of Notes and any Payment Date, the sum of (i) the excess, if any, of (A) (1) the aggregate amount of Accrued Note Interest on such Payment Date less (2) an amount equal to any Prepayment Interest Shortfalls and Relief Act Shortfalls on the Home Loans during the related Collection Period, over (B) the amount available for interest distributions on the Notes on that Payment Date pursuant to the Indenture, (ii) any Liquidation Loss Amount, to the extent not distributed as part of the Liquidation Loss Payment Amount or covered by a reduction of the Outstanding Reserve Amount and (iii) the aggregate Note Balance on the Notes on the Final Insured Payment Date, if outstanding after giving effect to all other payments of principal on such Notes on such Payment Date from all sources other than the Credit Enhancement Instrument.

<u>Deficient Valuation</u>:  With respect to any Home Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Home Loan, or any reduction in the amount of principal to be paid in connection with any scheduled payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code.

<u>Definitive Notes</u>:  The meaning specified in Section 4.06 of the Indenture.

<u>Deleted Loan</u>:  A Home Loan replaced or to be replaced with an Eligible Substitute Loan.

<u>Delinquent</u>:  As used herein, a Home Loan is considered to be "30 to 59 days" or "30 or more days" delinquent when a payment due on any due date remains unpaid as of the close of business on the next following monthly due date. Since the determination as to whether a Home Loan falls into these categories is made as of the close of business on the last business day of each month, a Home Loan with a payment due on July 1 that remained unpaid as of the close of business on July 31 would still be considered current as of July 31. If that payment remained unpaid as of the close of business on August 31, the Home Loan would then be considered 30-59 days delinquent. Delinquency information as of the Cut-off Date is determined and prepared as of the close of business on the last business day immediately prior to the Cut-off Date.

<u>Depositor</u>:  Residential Funding Mortgage Securities II, Inc., a Delaware corporation, or its successor in interest.

<u>Depository or Depository Agency</u>:  The Depository Trust Company or a successor appointed by the Indenture Trustee with the approval of the Depositor. Any successor to the Depository shall be an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the regulations of the Securities and Exchange Commission thereunder.

<u>Depository Participant</u>:  A Person for whom, from time to time, the Depository effects book-entry transfers and pledges of securities deposited with the Depository.

5

CONFIDENTIAL                                                                 RC_FGIC9019_00009353

Determination Date:  With respect to any Payment Date, the 20th day of the month in which such Payment Date occurs or if such day is not a Business Day, the next succeeding Business Day.

Due Date:  The date on which the Monthly Payment on the related Home Loan is due in accordance with the terms of the related Mortgage Note.

Eligible Account:  An account that is any of the following:  (i) maintained with a depository institution whose short-term debt obligations of which have been rated by each Rating Agency in its highest rating category available, or (ii) an account or accounts in a depository institution in which such accounts are fully insured to the limits established by the FDIC, provided that any deposits not so insured shall, to the extent acceptable to each Rating Agency, as evidenced in writing, be maintained such that (as evidenced by an Opinion of Counsel delivered to the Indenture Trustee and each Rating Agency) the Indenture Trustee has a claim with respect to the funds in such account or a perfected first security interest against any collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution with which such account is maintained, or (iii) in the case of the Custodial Account, either (A) a trust account or accounts maintained at the corporate trust department of the Indenture Trustee or (B) an account or accounts maintained at the corporate trust department of the Indenture Trustee, as long as its short term debt obligations are rated P-1 by Moody's and A-1+ by Standard & Poor's (or the equivalent) or better by each Rating Agency and its long term debt obligations are rated A2 by Moody's and AA- by Standard & Poor's (or the equivalent) or better, by each Rating Agency, or (iv) in the case of the Custodial Account and the Payment Account, a trust account or accounts maintained in the corporate trust division of the Indenture Trustee, or (v) an account or accounts of a depository institution acceptable to each Rating Agency (as evidenced in writing by each Rating Agency that use of any such account as the Custodial Account or the Payment Account will not reduce the rating assigned to any of the Securities by such Rating Agency (if determined without regard to the Credit Enhancement Instrument) below the lower of the then-current rating or the rating assigned to such Securities (if determined without regard to the Credit Enhancement Instrument) as of the Closing Date by such Rating Agency).

Eligible Substitute Loan:  A Home Loan substituted by the Seller for a Deleted Loan which must, on the date of such substitution, as confirmed in an Officers' Certificate delivered to the Indenture Trustee, (i) have an outstanding principal balance, after deduction of the principal portion of the monthly payment due in the month of substitution (or in the case of a substitution of more than one Home Loan for a Deleted Loan, an aggregate outstanding principal balance, after such deduction), not in excess of the outstanding principal balance of the Deleted Loan (the amount of any shortfall to be deposited by the Seller in the Custodial Account in the month of substitution); (ii) comply with each representation and warranty (other than a statistical representation or warranty) set forth in Section 3.1(b) of the Home Loan Purchase Agreement as of the date of substitution; (iii) have a Loan Rate no lower than and not more than 1% in excess of the Loan Rate of such Deleted Loan; (iv) have a Combined Loan-to-Value Ratio at the time of substitution no higher than that of the Deleted Loan at the time of substitution; (v) have, at the time of substitution, a remaining term to stated maturity not greater than (and not more than one year less than) that of the Deleted Loan; (vi) be ineligible for inclusion in a real estate mortgage investment conduit ("REMIC") (a "REMIC Ineligible Loan") if the Deleted Loan was a REMIC

6

CONFIDENTIAL                                                            RC_FGIC9019_00009354

Ineligible Loan (because (a) the value of the real property securing the Deleted Loan was not at least equal to eighty percent of the adjusted issue price of such loan at the time of origination, calculated by subtracting the amount of any liens that are senior to such Home Loan and a proportionate amount of any lien of equal priority from the value of such property when the Deleted Loan was originated and (b) substantially all of the proceeds of the Deleted Loan were not used to acquire, improve or protect an interest in the real property securing such loan and such real property was the only security for such Deleted Loan); and (vii) not be 30 or more days delinquent.

ERISA:  The Employee Retirement Income Security Act of 1974, as amended.

Event of Default:  With respect to the Indenture, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(i)    a default in the payment of any interest on any Note when the same becomes due and payable, and such default shall continue for a period of five days; or

(ii)    a default in the payment of the principal of or any installment of the principal of any Note when the same becomes due and payable other than as a result of Prepayment Interest Shortfalls or Relief Act Shortfalls, and such default shall continue for a period of five days; or

(iii)    there occurs a default in the observance or performance of any covenant or agreement of the Issuer made in the Indenture, or any representation or warranty of the Issuer made in the Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proving to have been incorrect in any material respect as of the time when the same shall have been made which has a material adverse effect on Securityholders or the Credit Enhancer, and such default shall continue or not be cured, or the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured, for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 25% of the outstanding Note Balance of the Notes or the Credit Enhancer, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of default hereunder; or

(iv)    there occurs the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer or any substantial part of the Trust Estate in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Issuer or for any substantial part of the Trust Estate, or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or

5156855 07031570

Confidential

CONFIDENTIAL                                                                    RC_FGIC9019_00009355

(v)    there occurs the commencement by the Issuer of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuer to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Issuer or for any substantial part of the assets of the Trust Estate, or the making by the Issuer of any general assignment for the benefit of creditors, or the failure by the Issuer generally to pay its debts as such debts become due, or the taking of any action by the Issuer in furtherance of any of the foregoing.

Event of Servicer Termination:  With respect to the Servicing Agreement, a Servicing Default as defined in Section 7.01 of the Servicing Agreement.

Exchange Act:  The Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

Expenses:  The meaning specified in Section 7.02 of the Trust Agreement.

FDIC:  The Federal Deposit Insurance Corporation or any successor thereto.

FHLMC:  The Federal Home Loan Mortgage Corporation, or any successor thereto.

Final Insured Payment Date:  The Payment Date in March 2037.

FNMA:  The Federal National Mortgage Association, or any successor thereto.

Foreclosure Profit:  With respect to a Liquidated Home Loan, the excess, if any, of (x) Net Liquidation Proceeds over (y) the sum of (a) the Loan Balance of the related Home Loan immediately prior to the date it became a Liquidated Home Loan, less any Net Liquidation Proceeds previously received with respect to such Home Loan and applied as a recovery of principal, and (b) accrued and unpaid interest on the related Home Loan at the Net Loan Rate through the date of receipt of the proceeds.

Form 10-K Certification:  As defined in Section 4.04(b) of the Servicing Agreement.

Grant:  Pledge, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of set-off against, deposit, set over and confirm pursuant to the Indenture. A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of such collateral or other agreement or instrument and all other moneys payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

Holder:  Any of the Noteholders or Certificateholders.

8

5156855 07031570

Confidential

CONFIDENTIAL    RC_FGIC9019_00009356

12-12020-mg    Doc 4444-1    Filed 07/31/13    Entered 07/31/13 18:18:10    Exhibit 1
Declaration of Mamta K. Scott    as Officer of U.S. Bank    as RMBS Truste    Pg 256 of 298

Confidential

Homeownership Act:  The Home Ownership Protection Act of 1994.

Home Loans:  At any time, the Home Loans that have been sold by the Seller under the Home Loan Purchase Agreement, together with the Related Documents, and that remain subject to the terms thereof.

Home Loan Purchase Agreement:  The Home Loan Purchase Agreement, between the Seller, as seller, and the Depositor, as purchaser, with respect to the Home Loans, dated as of the Cut-off Date.

Home Loan Schedule:  The initial schedule of Home Loans as of the Cut-off Date set forth in Exhibit A of the Servicing Agreement, which schedule sets forth as to each Home Loan, among other things:

(i)      the Home Loan identifying number ("RFC LOAN #");

(ii)     the state, city and zip code of the Mortgaged Property;

(iii)    the maturity of the Mortgage Note ("MATURITY DATE");

(iv)    the Loan Rate ("CUR RATE");

(v)     the Principal Balance at origination ("ORG AMT");

(vi)    the type of property securing the Mortgage Note ("PROPERTY TYPE");

(vii)   the appraised value ("APPRSL");

(viii)  the initial scheduled monthly payment of principal, if any, and interest ("ORIGINAL P & I");

(ix)    the Cut-off Date Loan Balance ("CUT-OFF BAL");

(x)     the Combined Loan-to-Value Ratio at origination ("CLTV");

(xi)    the date of the Mortgage Note ("NOTE DATE");

(xii)   the original term to maturity of the Home Loan ("ORIGINAL TERM");

(xiii)  under the column "OCCP CODE," a code indicating whether the Home Loan is secured by a non-owner occupied residence;

(xiv)   the Principal Balance of any Home Loan senior thereto ("SR BAL");

(xv)    the Credit Score ("CR SCORE");

(xvi)   the debt to income ratio ("DTI");

(xvii)  product code ("PRODUCT CODE");

9

5156855 07031570

CONFIDENTIAL

(xviii)  loan purpose ("PURPOSE");

(xix)    the lien position of the related Mortgage ("LIEN");

(xx)    the Subservicer loan number (SERVICER LOAN #); and

(xxi)    the remaining term of the Home Loan (REMAINING TERM).

Such schedule may consist of multiple reports that collectively set forth all of the information required.

Indemnified Party:  The meaning specified in Section 7.02 of the Trust Agreement.

Indenture:  The indenture dated as of the Closing Date between the Issuer, as debtor, and the Indenture Trustee, as indenture trustee.

Indenture Trustee:  LaSalle Bank National Association, and its successors and assigns or any successor indenture trustee appointed pursuant to the terms of the Indenture.

Indenture Trustee Information:  As specified in Section 9.05(a)(i)(A) of the Servicing Agreement.

Independent:  When used with respect to any specified Person, the Person (i) is in fact independent of the Issuer, any other obligor on the Notes, the Seller, the Issuer, the Depositor and any Affiliate of any of the foregoing Persons, (ii) does not have any direct financial or any material indirect financial interest in the Issuer, any such other obligor, the Seller, the Issuer, the Depositor or any Affiliate of any of the foregoing Persons and (iii) is not connected with the Issuer, any such other obligor, the Seller, the Issuer, the Depositor or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Independent Certificate:  A certificate or opinion to be delivered to the Indenture Trustee under the circumstances described in, and otherwise complying with, the applicable requirements of Section 10.01 of the Indenture, made by an Independent appraiser or other expert appointed by an Issuer Request and approved by the Indenture Trustee in the exercise of reasonable care, and such opinion or certificate shall state that the signer has read the definition of "Independent" in this Indenture and that the signer is Independent within the meaning thereof.

Initial Certificate:  The Home Loan-Backed Certificates, Series 2007-HI1, issued on the Closing Date, each evidencing undivided beneficial interests in the Issuer and executed by the Owner Trustee.

Initial Note Balance:  With respect to the Class A-1 Notes, $97,701,000, with respect to the Class A-2 Notes, $26,745,000, with respect to the Class A-3 Notes, $51,770,000 and with respect to the Class A-4 Notes, $78,740,000.

10

5156855 07031570

Confidential

CONFIDENTIAL                                                                        RC_FGIC9019_00009358

Insolvency Event:  With respect to a specified Person, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or (b) the commencement by such Person of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or the making by such Person of any general assignment for the benefit of creditors, or the failure by such Person generally to pay its debts as such debts become due or the admission by such Person in writing (as to which the Indenture Trustee shall have written notice) of its inability to pay its debts generally, or the adoption by the Board of Directors or managing member of such Person of a resolution which authorizes action by such Person in furtherance of any of the foregoing.

Insurance Agreement:  The Insurance and Indemnity Agreement, dated as of March 30, 2007, among the Master Servicer, the Depositor, the Issuer, the Indenture Trustee and the Credit Enhancer, including any amendments and supplements thereto.

Insured Payment:  With respect to (a) any Payment Date, the sum of (i) any Deficiency Amount and (ii) any Preference Amount and (b) any other date, any Preference Amount.

Insurance Proceeds:  Proceeds paid by any insurer (other than the Credit Enhancer) pursuant to any insurance policy covering a Home Loan which are required to be remitted to the Master Servicer, or amounts required to be paid by the Master Servicer pursuant to the next to last sentence of Section 3.04 of the Servicing Agreement, net of any component thereof (i) covering any expenses incurred by or on behalf of the Master Servicer in connection with obtaining such proceeds, (ii) that is applied to the restoration or repair of the related Mortgaged Property, (iii) released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures or (iv) required to be paid to any holder of a mortgage senior to such Home Loan.

Interest Accrual Period:  With respect to (i) the Class A-1 Notes (a) as to the Payment Date in April 2007, the period commencing on the Closing Date and ending on the day preceding the Payment Date in April 2007, and (b) as to any Payment Date after the Payment Date in April 2007, the period commencing on the Payment Date in the month immediately preceding the month in which that Payment Date occurs and ending on the day preceding that Payment Date and (ii) each class of Notes, other than the Class A-1 Notes, and any Payment Date, the calendar month preceding the month in which the related Payment Date occurs.

5156855 07031570

CONFIDENTIAL                                                                RC_FGIC9019_00009359

Interest Collections:  With respect to any Payment Date, the sum of (i) the portion allocable to interest of all scheduled monthly payments on the Home Loans received during the related Collection Period reduced by the Administrative Fees for such Collection Period, (ii) the portion allocable to interest of all Net Liquidation Proceeds and proceeds from repurchases of, and some amounts received in connection with any substitutions for, the related Home Loans, received or deemed received during the related Collection Period, reduced by any related Administrative Fees for that Collection Period, (iii) the interest portion of the cash purchase price paid in connection with any optional purchase of the Home Loans by the Master Servicer and (iv) any proceeds and recoveries received during the related Collection Period on a Home Loan after it becomes a Liquidated Home Loan allocated to Interest Collections in accordance with the last paragraph of Section 3.07 of the Servicing Agreement, reduced by the Administrative Fees for such Collection Period.

Issuer or Trust:  The Home Loan Trust 2007-HI1, a Delaware statutory trust, or its successor in interest.

Issuer Request:  A written order or request signed in the name of the Issuer by any one of its Authorized Officers and delivered to the Indenture Trustee.

LIBOR:  For any Interest Accrual Period other than the first Interest Accrual Period, the rate for United States dollar deposits for one month which appears on the Dow Jones Telerate Screen Page 3750 as of 11:00 A.M., London, England time, on the second LIBOR Business Day prior to the first day of such Interest Accrual Period. With respect to the first Interest Accrual Period, the rate for United States dollar deposits for one month which appears on the Dow Jones Telerate Screen Page 3750 as of 11:00 A.M., London, England time, two LIBOR Business Days prior to the Closing Date. If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be reasonably selected by the Indenture Trustee after consultation with the Master Servicer and the Credit Enhancer), the rate will be the Reference Bank Rate. If no such quotations can be obtained and no Reference Bank Rate is available, LIBOR will be LIBOR applicable to the preceding Payment Date.

LIBOR Business Day:  Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the city of London, England are required or authorized by law to be closed.

Lien:  Any mortgage, deed of trust, pledge, conveyance, hypothecation, assignment, participation, deposit arrangement, encumbrance, lien (statutory or other), preference, priority right or interest or other security agreement or preferential arrangement of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than any such financing statement filed for informational purposes only) or comparable law of any jurisdiction to evidence any of the foregoing; provided, however, that any assignment pursuant to Section 6.02 of the Servicing Agreement shall not be deemed to constitute a Lien.

12

CONFIDENTIAL                                                                    RC_FGIC9019_00009360

Liquidated Home Loan: As to any Payment Date, any Home Loan which the Master Servicer has determined, based on the servicing procedures specified in the Servicing Agreement, as of the end of the preceding Collection Period, that all Liquidation Proceeds which it expects to recover in connection with the disposition of the related Mortgaged Property have been recovered. In addition, the Master Servicer will treat any Home Loan that is 180 days or more delinquent as having been finally liquidated.

Liquidation Expenses:  Out-of-pocket expenses (exclusive of overhead) which are incurred by or on behalf of the Master Servicer in connection with the liquidation of any Home Loan and not recovered under any insurance policy, such expenses including, without limitation, legal fees and expenses, any unreimbursed amount expended (including, without limitation, amounts advanced to correct defaults on any loan which is senior to such Home Loan and amounts advanced to keep current or pay off a loan that is senior to such Home Loan) respecting the related Home Loan and any related and unreimbursed expenditures for real estate property taxes or for property acquisition, restoration, preservation or disposition, or insurance against casualty loss or damage.

Liquidation Loss Amount: With respect to any Payment Date and any Home Loan that became a Liquidated Home Loan during the related Collection Period, the unrecovered portion of the related Loan Balance thereof at the end of such Collection Period, after giving effect to the Net Liquidation Proceeds applied to reduce the related Loan Balance. In addition, as to any Home Loan for which the principal balance has been reduced in connection with bankruptcy proceedings, the amount of the reduction will be treated as a Liquidation Loss Amount.

Liquidation Loss Payment Amount: As to any Payment Date, an amount equal to the lesser of (i) the amount available for payment of the Liquidation Loss Payment Amount for that Payment Date, as provided in clause (iv) of Section 3.05(a) of the Indenture and (ii) the sum of (a) 100% of the Liquidation Loss Amounts incurred on the related Home Loans during the related Collection Period and (b) any Liquidation Loss Amounts remaining unpaid from any preceding Collection Period, to the extent not reflected on such preceding Payment Date by a reduction of the Outstanding Reserve Amount.

Liquidation Proceeds:  Proceeds (including Insurance Proceeds but not including amounts drawn under the Credit Enhancement Instrument) if any received in connection with the liquidation of any Home Loan or related REO, whether through trustee's sale, foreclosure sale, the exercise of the power of eminent domain or condemnation or otherwise.

Loan Balance:  With respect to any Home Loan, other than a Liquidated Home Loan, and as of any day, the related Cut-off Date Loan Balance, minus all collections in respect of principal in accordance with the related Mortgage Note and applied in reduction of the Loan Balance thereof. For purposes of this definition, a Liquidated Home Loan shall be deemed to have a Loan Balance equal to zero.

Loan Rate or Mortgage Rate:  With respect to any Home Loan and any day, the per annum rate of interest set forth in the related Mortgage Note.

13

5156855 07031570

CONFIDENTIAL

<u>Lost Note Affidavit</u>:  With respect to any Home Loan as to which the original Mortgage Note has been permanently lost or destroyed and has not been replaced, an affidavit from the Seller certifying that the original Mortgage Note has been lost, misplaced or destroyed (together with a copy of the related Mortgage Note).

<u>Master Servicer</u>:  Residential Funding Company, LLC, a Delaware limited liability company, and its successors and assigns.

<u>Master Servicer Extension Notice</u>:  The meaning specified in Section 7.04(d) of the Servicing Agreement.

<u>MERS</u>:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

<u>MERS® System</u>:  The system of recording transfers of Mortgages electronically maintained by MERS.

<u>MIN</u>:  The Mortgage Identification Number for Home Loans registered with MERS on the MERS® System.

<u>MOM Loan</u>:  With respect to any Home Loan, MERS acting as the mortgagee of such Home Loan, solely as nominee for the originator of such Home Loan and its successors and assigns, at the origination thereof.

<u>Monthly Payment</u>:  With respect to any Home Loan (including any REO Property) and any Due Date, the payment of principal and interest due thereon in accordance with the amortization schedule at the time applicable thereto (after adjustment, if any, for partial prepayments and for Deficient Valuations occurring prior to such Due Date but before any adjustment to such amortization schedule by reason of any bankruptcy, other than a Deficient Valuation, or similar proceeding or any moratorium or similar waiver or grace period).

<u>Moody's</u>:  Moody's Investors Service, Inc. or its successor in interest.

<u>Mortgage</u>:  The mortgage, deed of trust or other instrument creating a first or second lien on an estate in fee simple or leasehold interest in real property securing a Home Loan.

<u>Mortgage File</u>:  The file containing the Related Documents pertaining to a particular Home Loan and any additional documents required to be added to the Mortgage File pursuant to the Home Loan Purchase Agreement or the Servicing Agreement.

<u>Mortgage Note</u>:  With respect to a Home Loan, the mortgage note pursuant to which the related mortgagor agrees to pay the indebtedness evidenced thereby and secured by the related Mortgage as modified or amended.

<u>Mortgaged Property</u>:  The underlying property, including real property and improvements thereon, securing a Home Loan.

<u>Mortgagor</u>:  The obligor or obligors under a Mortgage Note.

14

5156855 07031570

CONFIDENTIAL
RC_FGIC9019_00009362

Net Liquidation Proceeds:  As to any Liquidated Home Loan, the proceeds, including Insurance Proceeds but excluding amounts drawn on the Credit Enhancement Instrument, received in connection with the liquidation of the Home Loan, whether through trustee's sale, foreclosure sale or otherwise, reduced by related expenses, but not including the portion, if any, of the proceeds that exceed the principal balance of the Home Loan at the end of the Collection Period immediately preceding the Collection Period in which the Home Loan became a Liquidated Home Loan.

Net Loan Rate:  With respect to any Home Loan and any date of determination, a per annum rate of interest equal to the then applicable Loan Rate for such Home Loan minus the Servicing Fee Rate and the Premium Percentage.

Note Balance:  With respect to any Payment Date and any Class of Notes, the Initial Note Balance thereof reduced by all payments of the Principal Payment Amount thereon prior to and as of such Payment Date.

Note Owner:  The Beneficial Owner of a Note.

Note Rate:  With respect to (i) the Class A-1 Notes, will be the lesser of (a) LIBOR plus 0.13% per annum and (b) 9.000% per annum; and (ii) the Class A-2 Notes, Class A-3 Notes, and Class A-4 Notes and any Interest Accrual Period, 5.64%, 5.72% and 5.93% per annum, respectively; provided, that on the Step-Up Date, the Note Rate on the Class A-4 Notes shall increase by 0.50% per annum.

Note Register:  The register maintained by the Note Registrar in which the Note Registrar shall provide for the registration of Notes and of transfers and exchanges of Notes.

Note Registrar:   The Indenture Trustee, in its capacity as Note Registrar.

Noteholder:  The Person in whose name a Note is registered in the Note Register, except that, any Note registered in the name of the Depositor, the Issuer or the Indenture Trustee or any Affiliate of any of them shall be deemed not to be outstanding and the registered holder will not be considered a Noteholder or holder for purposes of giving any request, demand, authorization, direction, notice, consent or waiver under the Indenture or the Trust Agreement provided that, in determining whether the Indenture Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that the Indenture Trustee or the Owner Trustee knows to be so owned shall be so disregarded. Owners of Notes that have been pledged in good faith may be regarded as Holders if the pledgee establishes to the satisfaction of the Indenture Trustee or the Owner Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, any other obligor upon the Notes or any Affiliate of any of the foregoing Persons.  Any Notes on which payments are made under the Credit Enhancement Instrument shall be deemed Outstanding until the Credit Enhancer has been reimbursed with respect thereto and the Credit Enhancer shall be deemed the Noteholder thereof to the extent of such unreimbursed payment.

Notes:  Any one of the Class A-1, Class A-2, Class A-3 or Class A-4 Notes issued and outstanding at any time pursuant to the Indenture.

15

Officer's Certificate:  With respect to the Master Servicer, a certificate signed by the President, Managing Director, a Director, a Vice President or an Assistant Vice President, of the Master Servicer and delivered to the Indenture Trustee. With respect to the Issuer, a certificate signed by any Authorized Officer of the Issuer, under the circumstances described in, and otherwise complying with, the applicable requirements of Section 10.01 of the Indenture, and delivered to the Indenture Trustee. Unless otherwise specified, any reference in the Indenture to an Officer's Certificate shall be to an Officer's Certificate of any Authorized Officer of the Issuer.

Opinion of Counsel:  A written opinion of counsel. Any Opinion of Counsel for the Master Servicer may be provided by in-house counsel for the Master Servicer if reasonably acceptable to the Indenture Trustee, the Credit Enhancer and the Rating Agencies or counsel for the Depositor, as the case may be.

Optional Redemption:  The right of the Master Servicer to purchase the Home Loans on any Payment Date on which the aggregate Principal Balance of the Home Loans as of the end of the related Collection Period is less than 10% of the Cut-off Date Balance, pursuant to Section 8.08 of the Servicing Agreement.

Original Trust Agreement:  The Trust Agreement, dated as of March 19, 2007, between the Owner Trustee and the Depositor.

Outstanding:  With respect to the Notes, as of the date of determination, all Notes theretofore executed, authenticated and delivered under this Indenture except:

(i)    Notes theretofore cancelled by the Note Registrar or delivered to the Indenture Trustee for cancellation; and

(ii)    Notes in exchange for or in lieu of which other Notes have been executed, authenticated and delivered pursuant to the Indenture unless proof satisfactory to the Indenture Trustee is presented that any such Notes are held by a holder in due course;

provided, however, that for purposes of effectuating the Credit Enhancer's right of subrogation as set forth in Section 4.12 of the Indenture only, all Notes that have been paid with funds provided under the Credit Enhancement Instrument shall be deemed to be Outstanding until the Credit Enhancer has been reimbursed with respect thereto.

Outstanding Reserve Amount:  With respect to any Payment Date, the amount, if any, by which the Pool Balance after applying payments received in the related Collection Period exceeds the aggregate Note Balance of the Notes on such Payment Date, after application of Principal Collections and the Liquidation Loss Payment Amounts for that Payment Date.  The Outstanding Reserve Amount will be increased by distributions of Reserve Increase Amount, if any, to the Notes.  As of the Closing Date, the Outstanding Reserve Amount will be equal to approximately 1.00% of the aggregate unpaid principal balance of the Home Loans on the Business Day prior to the Cut-off Date.

Owner Trust Estate:  The meaning specified in Section 2.05 of the Trust Agreement.

16

CONFIDENTIAL

Confidential

<u>Owner Trustee</u>:  Wilmington Trust Company not in its individual capacity but solely as Owner Trustee of the Trust, and its successors and assigns or any successor owner trustee appointed pursuant to the terms of the Trust Agreement.

<u>Owner Trustee Information</u>:    As specified in Section 11.04(a)(i)(A) of the Trust Agreement.

<u>Paying Agent</u>:  Any paying agent or co-paying agent appointed pursuant to Section 3.03 of the Indenture, which initially shall be the Indenture Trustee.

<u>Payment Account</u>:    The account established by the Indenture Trustee pursuant to Section 8.02 of the Indenture and Section 5.01 of the Servicing Agreement. Amounts deposited in the Payment Account will be paid by the Indenture Trustee in accordance with Section 3.05 of the Indenture.

<u>Payment Date</u>:  The 25th day of each month, or if such day is not a Business Day, then the next Business Day.

<u>Percentage Interest</u>:    With respect to any Note and any date of determination, the percentage obtained by dividing the Note Balance of such Note, by the aggregate of the Note Balances of all Notes of the same Class.

<u>Permitted Investments</u>:  One or more of the following:

(i)    obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(ii)    repurchase agreements on obligations specified in clause (i) maturing not more than one month from the date of acquisition thereof, provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by each Rating Agency in its highest short-term rating category available;

(iii)    federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; <u>provided</u> that the debt obligations of such depository institution or trust company (or, if the only Rating Agency is Standard & Poor's, in the case of the principal depository institution in a depository institution holding company, debt obligations of the depository institution holding company) at the date of acquisition thereof have been rated by each Rating Agency in its highest short-term rating category available; and <u>provided</u> <u>further</u> that, if the only Rating Agency is Standard & Poor's and if the depository or trust company is a principal subsidiary of a bank holding company and the debt obligations of such subsidiary are not separately rated, the applicable rating shall be that of the bank holding company; and, <u>provided</u> <u>further</u> that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository

17

5156855 07031570

CONFIDENTIAL                                                                                    RC_FGIC9019_00009365

institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of Standard & Poor's if Standard & Poor's is the Rating Agency;

(iv)    commercial paper (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition has been rated by each Rating Agency in its highest short-term rating category available; provided that such commercial paper shall have a remaining maturity of not more than 30 days;

(v)    a money market fund or a qualified investment fund rated by each Rating Agency in its highest long-term rating category available; and

(vi)    other obligations or securities that are acceptable to each Rating Agency as an Permitted Investment hereunder and will not reduce the rating assigned to any Securities by such Rating Agency below the lower of the then-current rating or the rating assigned to such Securities as of the Closing Date by such Rating Agency, and which are acceptable to the Credit Enhancer, as evidenced in writing, provided that if the Master Servicer or any other Person controlled by the Master Servicer is the issuer or the obligor of any obligation or security described in this clause (vi) such obligation or security must have an interest rate or yield that is fixed or is variable based on an objective index that is not affected by the rate or amount of losses on the Home Loans;

provided, however, that no instrument shall be a Permitted Investment if it represents, either (1) the right to receive only interest payments with respect to the underlying debt instrument or (2) the right to receive both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations References herein to the highest rating available on unsecured long-term debt shall mean AAA in the case of Standard & Poor's and Aaa in the case of Moody's, and references herein to the highest rating available on unsecured commercial paper and short-term debt obligations shall mean A-1+ in the case of Standard & Poor's and P-1 in the case of Moody's. Any Permitted Investment may be held by or through the Indenture Trustee and its Affiliates.

Person:    Any legal individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Pool Balance:  With respect to any date, the aggregate of the Loan Balances of all Home Loans as of such date.

Predecessor Note:  With respect to any particular Note, every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purpose of this definition, any Note authenticated and delivered under Section 4.03 of the Indenture in lieu of a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note.

5156855 07031570

CONFIDENTIAL

Preference Amount:  Any amount previously paid to a Noteholder that is recoverable and sought to be recovered as a voidable preference by a trustee in bankruptcy court pursuant to the United States Bankruptcy Code (11 U.S.C.), as amended from time to time, in accordance with a final non-appealable order of a court exercising proper jurisdiction in an insolvency proceeding.

Premium:  The amount of premium due to the Credit Enhancer in accordance with the terms of the Insurance Agreement.

Premium Percentage:  As set forth in the Insurance Agreement.

Prepayment Assumption:  A 100% Prepayment Assumption used solely for determining the accrual of original issue discount, market discount and premium, if any, on the Notes for federal income tax purposes.  A 100% Prepayment Assumption assumes a constant prepayment rate of 5% per annum for the first month, increasing each month by an additional 20%/14 until the fifteenth month.  Beginning in the fifteenth month and in each month thereafter during the life of the Home Loans, a 100% Prepayment Assumption assumes a constant prepayment rate of 25% per annum each month.

Prepayment Interest Shortfall:  With respect to any Payment Date, the aggregate shortfall, if any, in collections of interest, adjusted to the related Net Loan Rate, resulting from borrower prepayments during the related Collection Period.  These shortfalls will not be covered by the Master Servicer, the Credit Enhancer or any other person.

Principal Collection Payment Amount:  As to any Payment Date, the total Principal Collections (reduced by any portion used to pay interest on the Notes) for such Payment Date; provided, however, on any Payment Date as to which the Outstanding Reserve Amount that would result without regard to this proviso exceeds the Reserve Amount Target, the Principal Collection Payment Amount will be reduced by the amount not less than zero by the amount of the excess until the Outstanding Reserve Amount equals the Reserve Amount Target.

Principal Collections:  As to any Payment Date, an amount equal to the sum of:

(i)    the principal portion of all scheduled Monthly Payments on the related Home Loans received during the related Collection Period;

(ii)    the principal portion of all proceeds of the repurchase of any Home Loans (or, in the case of a substitution, any Substitution Adjustment Amounts) as required by the Servicing Agreement received during the related Collection Period and the principal portion of the cash purchase price paid in connection with any optional purchase of the Home Loans by the Master Servicer; and

(iii)    the principal portion of all other unscheduled collections received on the Home Loans during the related Collection Period (or deemed to be received during the related Collection Period) (including, without limitation, full and partial Principal Prepayments made by the respective Mortgagors, Insurance Proceeds and Net Liquidation Proceeds), to the extent not previously paid;

19

5156855 07031570

CONFIDENTIAL                                                                RC_FGIC9019_00009367

provided, however, that Principal Collections shall be reduced by any amounts withdrawn from the Custodial Account pursuant to Section 3.03(ii), (v), (vi) and (vii) of the Servicing Agreement.

Principal Prepayment:  Any payment of principal made by the Mortgagor on a Home Loan which is received in advance of its scheduled Due Date and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Proceeding:  Any suit in equity, action at law or other judicial or administrative proceeding.

Program Guide:  Together, the Seller's Seller Guide and Servicing Guide, as in effect from time to time.

Prospectus Supplement:  The prospectus supplement, dated March 27, 2007, relating to the issuance of the Home Loan-Backed Notes, Series 2007-HI1.

Purchase Price:  The meaning specified in Section 2.2(a) of the Home Loan Purchase Agreement.

Purchaser:  Residential Funding Mortgage Securities II, Inc., a Delaware corporation, and its successors and assigns.

Qualified Insurer:  A mortgage guaranty insurance company duly qualified as such under the laws of the state of its principal place of business and each state having jurisdiction over such insurer in connection with the insurance policy issued by such insurer, duly authorized and licensed in such states to transact a mortgage guaranty insurance business in such states and to write the insurance provided by the insurance policy issued by it, approved as an insurer by the Master Servicer and as a FNMA-approved mortgage insurer.

Rating Agency:  Any nationally recognized statistical rating organization, or its successor, that rated the Securities at the request of the Depositor at the time of the initial issuance of the Securities, which initially shall be Moody's or Standard & Poor's. If such organization or a successor is no longer in existence, "Rating Agency" shall be such nationally recognized statistical rating organization, or other comparable Person, designated by the Depositor, notice of which designation shall be given to the Indenture Trustee. References herein to the highest short term unsecured rating category of a Rating Agency shall mean A-1 or better in the case of Standard & Poor's and P-1 or better in the case of Moody's and in the case of any other Rating Agency shall mean such equivalent ratings. References herein to the highest long-term rating category of a Rating Agency shall mean "AAA" in the case of Standard & Poor's and "Aaa" in the case of Moody's and in the case of any other Rating Agency, such equivalent rating.

Record Date:  With respect to the Class A-1 Notes and any Payment Date, the Business Day next preceding such Payment Date and with respect to the Notes (other than the Class A-1 Notes) and the Certificates and any Payment Date, the last Business Day of the month preceding the month of such Payment Date.

5156855 07031570

CONFIDENTIAL                                                    RC_FGIC9019_00009368

Confidential

Reference Bank Rate:  With respect to any Interest Accrual Period, as follows:  the arithmetic mean (rounded upwards, if necessary, to the nearest one sixteenth of a percent) of the offered rates for United States dollar deposits for one month which are offered by the Reference Banks as of 11:00 A.M., London, England time, on the second LIBOR Business Day prior to the first day of such Interest Accrual Period to prime banks in the London interbank market for a period of one month in amounts approximately equal to the sum of the outstanding Note Balance of the Class A-1 Notes; provided that at least two such Reference Banks provide such rate. If fewer than two offered rates appear, the Reference Bank Rate will be the arithmetic mean of the rates quoted by one or more major banks in New York City, selected by the Indenture Trustee after consultation with the Master Servicer and the Credit Enhancer, as of 11:00 a.m., New York time, on such date for loans in U.S. Dollars to leading European Banks for a period of one month in amounts approximately equal to the aggregate Note Balance of the Class A-1 Notes. If no such quotations can be obtained, the Reference Bank Rate shall be LIBOR applicable to the preceding Payment Date; provided however, that if, under the priorities indicated above, LIBOR for a Payment Date would be based on LIBOR for the previous Payment Date for the third consecutive Payment Date, the Indenture Trustee shall select an alternative comparable index over which the Indenture Trustee has no control, used for determining one-month Eurodollar lending rates that is calculated and published or otherwise made available by an independent party.

Reference Banks:  Barclays Bank PLC, Credit Suisse and Abbey National PLC.

Registered Holder:  The Person in whose name a Note is registered in the Note Register on the applicable Record Date.

Regulation AB:  Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,631 (January 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

Related Documents:  With respect to each Home Loan, the documents specified in Section 2.1(c) of the Home Loan Purchase Agreement and any documents required to be added to such documents pursuant to the Home Loan Purchase Agreement, the Trust Agreement or the Servicing Agreement.

Release Agreement:  A Release Agreement as defined in Section 3.05 of the Servicing Agreement.

Relief Act Shortfall:  With respect to any Payment Date, the aggregate shortfall, if any, in collections of interest, as a result of the application of the Servicemembers Civil Relief Act or similar legislation or regulations.  These shortfalls will reduce the amount of Interest Collections on the Home Loans and will not be amounts paid by the Master Servicer, the Credit Enhancer or any other person.

5156855 07031570

Confidential

                                                                RC_FGIC9019_00009369

REO:  A Mortgaged Property that is acquired by the Issuer in foreclosure or by deed in lieu of foreclosure.

Repurchase Event:  With respect to any Home Loan, one of the following:  (i) a discovery that, as of the Closing Date, the related Mortgage was not a valid lien on the related Mortgaged Property subject only to (A) the lien of any prior mortgage indicated on the Home Loan Schedule, (B) the lien of real property taxes and assessments not yet due and payable, (C) covenants, conditions, and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage and such other permissible title exceptions as are listed in the Program Guide and (D) other matters to which like properties are commonly subject which do not materially adversely affect the value, use, enjoyment or marketability of the related Mortgaged Property, or (ii) with respect to any Home Loan as to which the Seller delivers a Lost Note Affidavit, a subsequent default on such Home Loan if the enforcement thereof or of the related Mortgage is materially and adversely affected by the absence of the original Mortgage Note.

Repurchase Price:  With respect to any Home Loan required to be repurchased on any date pursuant to the Home Loan Purchase Agreement or purchased by the Master Servicer pursuant to the Servicing Agreement, an amount equal to the sum of (i) 100% of the Loan Balance thereof (without reduction for any amounts charged off) and (ii) unpaid accrued interest at the Loan Rate (or with respect to the last day of the month in the month of repurchase, the Loan Rate will be the Loan Rate in effect as to the second to last day in such month) on the outstanding principal balance thereof from the Due Date to which interest was last paid by the Mortgagor to the first day of the month following the month of purchase.

Request for Release:  The form attached as Exhibit 4 to the Custodial Agreement or an electronic request in a form acceptable to the Custodian.

Reserve Amount Floor:  An amount equal to 0.50% of the Pool Balance as of the Cut-off Date.

Reserve Amount Target:  As to any Payment Date prior to the Stepdown Date, an amount equal to 5.80% of the Cut-off Date Pool Balance.  On or after the Stepdown Date, the Reserve Amount Target will be equal to the lesser of:

(a)    11.60% of the Pool Balance after applying payments received in the related Collection Period; and

(b)    the Reserve Amount Target as of the Cut-off Date;

provided, however, that the Reserve Amount Target shall not be less than the Reserve Amount Floor; provided further, that any scheduled reduction to the Reserve Amount Target on or after the Stepdown Date as described above shall not be made on any Payment Date unless:

(i)    either (a) the aggregate cumulative Liquidation Loss Amount on the Home Loans from the Cut-off Date through the end of the Collection Period immediately prior to such Payment Date is less than:

5156855 07031570

CONFIDENTIAL                                                                                      RC_FGIC9019_00009370

(A)     6.55% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 31st through 36th Payment Dates,

(B)     8.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 37th through 48th Payment Dates, or

(C)     9.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 49th through 60th Payment Dates, or

(D)     12.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 61st through 72nd Payment Dates, or

(E)     14.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 73rd Payment Date (or any Payment Date thereafter) or

(b)     the average of the aggregate Liquidation Loss Amount on the Home Loans that became Liquidated Home Loans during the related Collection Period, as determined for the current and five previous Payment Dates, is less than 50% of the average of the amount remaining in the Payment Account on such Payment Date following distributions pursuant to clauses (i)-(v) of Section 3.05(a) of the Indenture (other than distributions made pursuant to clause (iii) thereof), as determined for the current and five previous Payment Dates and

(ii)     there has been no draw on the Credit Enhancement Instrument on such Payment Date that remains unreimbursed.

In addition, the Reserve Amount Target may be reduced with the prior written consent of the Credit Enhancer (so long as no Credit Enhancer Default exists) and notice to the Rating Agencies.

Reserve Increase Amount:  As to the any Payment Date, an amount equal to the lesser of (i) the amount available for payment of the Reserve Increase Amount for that Payment Date, as provided in clause (vi) of Section 3.05(a) of the Indenture and (ii) the excess, if any of (x) the Reserve Amount Target over (y) the Outstanding Reserve Amount.

Responsible Officer:  With respect to the Indenture Trustee, any officer of the Indenture Trustee with direct responsibility for administration of the Indenture, and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject in each case.

Sale:  The meaning specified in Section 5.15 of the Indenture.

Securities Act:  The Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

5156855 07031570

Confidential

CONFIDENTIAL                                                                    RC_FGIC9019_00009371

Securitization Transaction:   Any transaction involving a sale or other transfer of mortgage loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities.

Security:  Any of the Certificates or Notes.

Securityholder or Holder:  Any Noteholder or a Certificateholder.

Security Instrument:   A written instrument creating a valid first lien on a Mortgaged Property securing a Mortgage Note, which may be any applicable form of mortgage, deed of trust, deed to secure debt or security deed, including any riders or addenda thereto.

Seller:   Residential Funding Company, LLC, a Delaware limited liability company, and its successors and assigns.

Servicing Agreement:  The Servicing Agreement dated as of the Closing Date among the Indenture Trustee, the Issuer and the Master Servicer, as master servicer.

Servicing Certificate:   A certificate prepared by a Servicing Officer on behalf of the Master Servicer in accordance with Section 4.01 of the Servicing Agreement.

Servicing Criteria:   The "servicing criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

Servicing Default:  The meaning specified in Section 7.01 of the Servicing Agreement.

Servicing Fee:  With respect to any Home Loan, the related Subservicing Fee.

Servicing Fee Rate:  With respect to any Home Loan, the related Subservicing Fee Rate.

Servicing Officer:   Any officer of the Master Servicer involved in, or responsible for, the administration and servicing of the Home Loans whose name and specimen signature appear on a list of servicing officers furnished to the Indenture Trustee by the Master Servicer, as such list may be amended from time to time.

Servicing Trigger:   As of any Payment Date, for purposes of Section 7.04 of the Servicing Agreement, "Servicing Trigger; Removal of Master Servicer," the aggregate cumulative Liquidation Loss Amount on the Home Loans from the Cut-off Date through the end of the Collection Period immediately prior to such Payment Date is greater than:

(A)     13.50% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 31st through 36th Payment Dates,

(B)     14.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 37th through 48th Payment Dates, or

(C)     16.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 49th through 60th Payment Dates, or

5156855 07031570

CONFIDENTIAL                                                                     RC_FGIC9019_00009372

(D)    22.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 61st through 72nd Payment Dates, or

(E)    26.00% of the Pool Balance as of the Cut-off Date, if such Payment Date is the 73rd Payment Date (or any Payment Date thereafter).

Standard & Poor's:  Standard & Poor's, a Division of The McGraw-Hill Companies, Inc. or its successor in interest.

Stated Value:  The value of the Mortgaged Property as stated by the related Mortgagor in his or her application.

Statutory Trust Statute:  Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code §§3801 et seq., as the same may be amended from time to time.

Step-Up Date:  The second Payment Date immediately following the Payment Date on which the Master Servicer can purchase all or some of the Home Loans from the Trust pursuant to Section 8.08 of the Servicing Agreement.

Stepdown Date:  The later of (a) the Payment Date in October 2009 and (b) the first Payment Date on which the aggregate Pool Balance, after applying payments received in the related Collection Period, is less than or equal to 50.00% of the aggregate Pool Balance as of the Cut-off Date.

Subservicer:  Any Person with whom the Master Servicer has entered into a Subservicing Agreement as a Subservicer by the Master Servicer.

Subservicing Account:  An Eligible Account established or maintained by a Subservicer as provided for in Section 3.02(c) of the Servicing Agreement.

Subservicing Agreement:  The written contract between the Master Servicer and any Subservicer relating to servicing and administration of certain Home Loans as provided in Section 3.01 of the Servicing Agreement.

Subservicing Fee:  With respect to any Collection Period, the fee retained monthly by the Subservicer (or, in the case of a nonsubserviced Home Loan, by the Master Servicer) equal to the product of (i) the Subservicing Fee Rate divided by 12 and (ii) the Pool Balance as of the first day of such Collection Period.

Subservicing Fee Rate:  With respect to each Home Loan, the amount payable to the related Subservicer, equal to 0.50% per annum.

Substitution Adjustment Amounts:  With respect to any Eligible Substitute Loan, the amount as defined in Section 3.1(b) of the Home Loan Purchase Agreement and any Deleted Loan, the amount, if any, as determined by the Master Servicer, by which the aggregate principal balance of all such Eligible Substitute Loans as of the date of substitution is less than the aggregate principal balance of all such Deleted Loans (after application of the principal portion

5156855 07031570

CONFIDENTIAL                                                                                    RC_FGIC9019_00009373

of the Monthly Payments due in the month of substitution that are to be distributed to the Payment Account in the month of substitution).

Termination Price:  In the event that all of the Home Loans are purchased by the Master Servicer, the Termination Price will be an amount equal to 100% of the unpaid Loan Balance of each Home Loan so purchased, plus accrued and unpaid interest thereon at the weighted average of the Loan Rates through the day preceding the Payment Date on which such purchase occurs, plus any amounts owed by the Seller pursuant to the second paragraph of Section 3.1(c) of the Home Loan Purchase Agreement in respect of any liability, penalty or expense that resulted from a breach of the representation and warranty set forth in clause (x) of Section 3.1(b) of the Home Loan Purchase Agreement, that remain unpaid on the date of such purchase.

Transaction Party:  As specified in Section 9.02(a) of the Servicing Agreement.

Treasury Regulations:  Regulations, including proposed or temporary Regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

Trust Agreement: The Amended and Restated Trust Agreement, dated as of the Closing Date, between the Owner Trustee and the Depositor.

Trust Estate:  The meaning specified in the Granting Clause of the Indenture.

Trust Indenture Act or TIA:  The Trust Indenture Act of 1939, as amended from time to time, as in effect on any relevant date.

UCC:  The Uniform Commercial Code, as amended from time to time, as in effect in any specified jurisdiction.

Underwriters:  Bear, Stearns & Co. Inc. and Residential Funding Securities, LLC.

United States Person:  A citizen or resident of the United States, a corporation, partnership or other entity created or organized in, or under the laws of, the United States or any state thereof or the District of Columbia (except, in the case of a partnership, to the extent provided in regulations), or an estate whose income is subject to United States federal income tax regardless of its source, or a trust other than a "foreign trust" within the meaning of Section 7701(a)(30) of the Code.

5156855 07031570

CONFIDENTIAL                                                                 RC_FGIC9019_00009374

# Tab C

# Trial Exhibit 120

Filed Under Seal

# Tab D

# Trial Exhibit 123

Filed Under Seal

# Tab E

# Trial Exhibit 128

**TIME SENSITIVE NOTICE
REGARDING (A) PLAN SUPPORT AGREEMENT AMONG THE RESCAP DEBTORS
AND THE RMBS TRUSTEES, AMONG OTHERS, AND (B) SETTLEMENT
AGREEMENT AMONG THE DEBTORS, FINANCIAL GUARANTY INSURANCE
COMPANY AND CERTAIN OF THE RMBS TRUSTEES**

**NOTICE IS HEREBY GIVEN BY:**

**THE BANK OF NEW YORK MELLON,
THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
DEUTSCHE BANK NATIONAL TRUST COMPANY,
DEUTSCHE BANK TRUST COMPANY AMERICAS,
U.S. BANK NATIONAL ASSOCIATION,
WELLS FARGO BANK, N.A.,
HSBC BANK USA, N.A., AND
LAW DEBENTURE TRUST COMPANY OF NEW YORK**

**IN THEIR SEVERAL CAPACITIES AS TRUSTEES, MASTER SERVICERS, AND/OR
INDENTURE TRUSTEES OR SEPARATE TRUSTEES (COLLECTIVELY, THE
"RMBS TRUSTEES" AND EACH, AN "RMBS TRUSTEE"), TO THE HOLDERS (THE
"CERTIFICATEHOLDERS") OF CERTIFICATES, NOTES OR OTHER SECURITIES
(COLLECTIVELY, THE "CERTIFICATES") UNDER THE RESIDENTIAL
MORTGAGE-BACKED SECURITIZATION TRUSTS IDENTIFIED ON SCHEDULE A
AT http://www.rescaprmbssettlement.com (COLLECTIVELY, THE "TRUSTS" AND
EACH A "TRUST").**

**THIS NOTICE CONTAINS IMPORTANT TIME-SENSITIVE INFORMATION FOR
CERTIFICATEHOLDERS AND OTHER PERSONS POTENTIALLY INTERESTED IN
THE TRUSTS.  ALL DEPOSITORIES, CUSTODIANS AND OTHER
INTERMEDIARIES RECEIVING THIS NOTICE, AS APPLICABLE, ARE
REQUESTED TO EXPEDITE ITS RE-TRANSMITTAL TO CERTIFICATEHOLDERS
IN A TIMELY MANNER.**

Dated:  May 24, 2013

This notice (the "**Notice**") is given to you by the RMBS Trustees under the Pooling and
Servicing Agreements (including Series Supplements and Standard Terms of Pooling and
Servicing Agreements), Indentures and related Servicing Agreements (collectively, the
"**Governing Agreements**") governing the Trusts.  Capitalized terms used but not defined herein
shall have the meanings assigned to them in the Governing Agreements.

THIS NOTICE CONCERNS PROPOSED SETTLEMENTS IN A PLAN SUPPORT AGREEMENT, INCLUDING:[1]

1)  A SETTLEMENT OF ALL THE TRUSTS' CLAIMS AGAINST THE DEBTORS IN THE CHAPTER 11 CASES, AND AFI, INCLUDING, WITHOUT LIMITATION, AND WHERE APPLICABLE, CLAIMS RELATING TO THE ORIGINATION AND SALE BY A DEBTOR OF MORTGAGE LOANS TO THE TRUSTS, AND CLAIMS ARISING OUT OF A DEBTOR'S SERVICING OF THE MORTGAGE LOANS; AND

2)  A SETTLEMENT OF, AMONG OTHER THINGS, THE CLAIMS OF CERTAIN OF THE TRUSTS AGAINST FINANCIAL GUARANTY INSURANCE CORPORATION ("FGIC") UNDER THE INSURANCE POLICIES ISSUED BY FGIC IN RESPECT OF THE TRUSTS. A LIST OF THOSE TRUSTS AFFECTED BY THE FGIC SETTLEMENT IS AVAILABLE AT http://www.rescaprmbssettlement.com AS SCHEDULE B.

IF CERTIFICATEHOLDERS DO NOT OBJECT TO THESE SETTLEMENTS BEFORE THE DEADLINE OF JUNE 19, 2013 AT 4:00 P.M. (PREVAILING EASTERN TIME) TO OBJECT TO THE PLAN SUPPORT AGREEMENT MOTION, SUCH CERTIFICATEHOLDERS MAY BE PRECLUDED FROM OBJECTING TO THE PLAN AND THE BANKRUPTCY COURT MAY FIND THAT SUCH CERTIFICATEHOLDERS DO NOT HAVE STANDING TO OBJECT.

EACH OF THE PROPOSED SETTLEMENTS, IF APPROVED BY THE BANKRUPTCY COURT, AND ADDITIONALLY IN THE CASE OF THE FGIC SETTLEMENT AGREEMENT, BY THE NEW YORK STATE SUPREME COURT, WOULD BIND EACH APPLICABLE TRUST AND THE RELATED CERTIFICATEHOLDERS. THE PROPOSED SETTLEMENTS MATERIALLY AFFECT THE INTERESTS OF CERTIFICATEHOLDERS.  THE RMBS TRUSTEES THEREFORE RESPECTFULLY REQUEST THAT ALL CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS READ THIS NOTICE AND RELATED MATERIALS CAREFULLY IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS.

## I.    Background -- Residential Capital Bankruptcy Filing

On May 14, 2012, Residential Capital, LLC, and certain of its direct and indirect subsidiaries (collectively, "ResCap" or the "Debtors") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (*In re Residential Capital, LLC*, Case No. 12-12020 (MG) and related cases) (collectively, the "Chapter 11 Cases").  To obtain information regarding the Chapter 11 Cases, please see Section VI, below.

## II.    The Plan Support Agreement and Term Sheets

On May 13, 2013, the Debtors, Ally Financial Inc. ("AFI"), the Official Committee of Unsecured Creditors (the "Committee"), and the Consenting Claimants (as defined in the Plan Support Agreement, which defined term includes the RMBS Trustees; collectively with the Debtors, AFI, and the Committee, the "Plan Support Agreement Parties") entered into the Plan Support Agreement

---

[1]  Terms not otherwise defined in these initial summary paragraphs are defined below.

2

(the "**Plan Support Agreement**") pursuant to which the Plan Support Agreement Parties agreed to the terms of a consensual Chapter 11 plan of reorganization (the "**Plan**") and resolution of all claims and disputes between them as set forth in the Plan Term Sheet (the "**Plan Term Sheet**") and the Supplemental Term Sheet[2] (the "**Supplemental Term Sheet**," together with the Plan Term Sheet, the "**Term Sheets**") attached respectively as Exhibits A and B to the Plan Support Agreement. Copies of the Plan Support Agreement and the Term Sheets are available at **http://www.rescaprmbssettlement.com** or from The Garden City Group ("**GCG**") by contacting GCG in the manner described in Section VI, below.

The Plan Support Agreement and the Term Sheets provide for a payment by AFI to the Debtors' estates and its creditors totaling $2.1 billion and for an agreed upon division of that amount, as well as ResCap's other available assets, among all ResCap creditors. More specifically with respect to the Trusts, the Plan Support Agreement and Term Sheets settle (a) the claims of those Trusts (the "**Original Settlement Trusts**") that were originally included in the RMBS Trust Settlement Agreements, dated May 13, 2012, as amended, against the Debtors arising, among other things, from the origination and sale by the Debtors of mortgage loans (the "**Buyback Claims**"), (b) the Buyback Claims, if any, held by those Trusts that are not Original Settlement Trusts (the "**Additional Settlement Trusts**"), and (c) claims held by certain of the Trusts against the Debtors relating to alleged defaults under any servicing agreements or other executory contracts that were assumed by the Debtors and assigned to Ocwen Loan Servicing LLC or other successor servicers, if any, pursuant to the Bankruptcy Court's orders approving the sale of the Debtors' mortgage servicing rights or similar orders regarding the assignment or other disposition of such agreements(the "**Cure Claims**," and together with the Buyback Claims, the "**Claims**")). All the Claims that the Trusts have against AFI and ResCap will be released under the Plan in exchange for the consideration to be received pursuant to the Plan.

If the Plan Support Agreement is approved by the Bankruptcy Court, the RMBS Trustees will vote in favor of the Plan on behalf of each Trust, and the Certificateholders will be precluded from providing contrary direction to the RMBS Trustees with respect to the Plan.

**Under the Plan, if confirmed, all entities, including the Trusts, will be permanently enjoined after the effective date of the Plan, from commencing any actions against any of the Plan Support Agreement Parties with respect to the Claims. Pursuant to the Plan Support Agreement, it is contemplated that the Bankruptcy Court's order approving the Plan Support Agreement will contain findings that (a) the Plan Support Agreement, the Term Sheets, the RMBS Settlement (as defined in the Plan Support Agreement), and the FGIC Settlement Agreement contemplated thereunder are in the best interests of the investors in each of the RMBS Trusts, each such RMBS Trust and the RMBS Trustees, (b) the RMBS Trustees have acted reasonably, in good faith and in the best interests of the investors in each RMBS Trust and each such RMBS Trust in agreeing to the Plan Support Agreement, the Term Sheets, the RMBS Settlement, and the FGIC Settlement Agreement contemplated thereunder, and (c) the RMBS Trustees' notice of the Plan Support Agreement, the RMBS Settlement, the Term Sheets, and the FGIC Settlement Agreement was sufficient and effective. It is further contemplated that the order confirming the Plan will contain exculpatory provisions barring any entity from making any claim against the**

---

[2]    The Supplemental Tern Sheet was agreed to by the Plan Support Agreement Parties on May 23, 2013, as contemplated by the Plan Term Sheet.

**Plan Support Agreement Parties, including the RMBS Trustees, arising from their agreement to enter into the Plan Support Agreement, their consent to the terms in the Terms Sheets, or their agreement to support the Plan.**

The Supplemental Term Sheet sets forth the approximate percentage of ResCap assets and the amounts contributed by AFI that will be distributed under the Plan for the benefit of all the Trusts that have Claims.[3]  The allocation of such settlement amounts among the Trusts (the "**Allocation**") shall be determined by the RMBS Trustees pursuant to the advice of Duff & Phelps, LLC ("**Duff & Phelps**"), the primary financial advisor retained by the RMBS Trustees, and upon which advice the RMBS Trustees shall exclusively rely upon for the determination of the Allocation.  For all Trusts other than the Original Settlement Trusts, the Buyback Claims will be subject to further review, including objections as to the existence or amount of such claims asserted by the Institutional Investors (as defined in the Plan Support Agreement).

Information concerning the methodology to be used by Duff & Phelps to perform the Allocation can be found in Annex III and Schedule A to Annex III to the Supplemental Term Sheet, as amended from time to time.  Pursuant to the Allocation, the percent recovery on the Claims of any Trust will likely vary materially from, and in all cases be lower than, the recovery of other claims allowed against the relevant Debtors' estates.  This variation will be caused by a number of factors including, but not limited to: (i) the inclusion in the Allocation of the claims of the Additional Settlement Trusts and the inclusion of Cure Claims, none of which were fully factored into the Debtors' claims models, but which are, as a result of the settlement under the Plan Support Agreement, required to be paid out of the fixed aggregate allowed claims and recoveries to be received by the Trusts, and (ii) the determinations made, and to be made, by Duff & Phelps as required by the RMBS Trust Allocation Protocol attached to the Supplemental Term Sheet as Annex III, including Schedule A thereto.

*Please note that, based on each Trust's Governing Agreements and the facts and circumstances surrounding each Trust, each Trust has its own unique claim against one or more of the Debtors.  As a result, not all Trusts will be allocated amounts in respect of Cure Claims and not all Additional Settlement Trusts will be allocated amounts in respect of Buyback Claims. Further, the amounts available for distribution from the estate of each Debtor will differ.  Thus, the amounts recovered by each Trust may vary considerably, and some Trusts may not be entitled to any recovery, including certain Trusts that are subject to insurance policies issued by certain monoline insurance companies.*

On May 23, 2013, the Debtors filed with the Bankruptcy Court a motion to approve the Plan Support Agreement (the "**Plan Support Agreement Motion**") and to authorize the RMBS Trustees and ResCap to enter into the Plan Support Agreement. Pursuant to the Term Sheets, the Bankruptcy Court is to enter an order approving the Plan Support Agreement by no later than July 3, 2013.  **The hearing on the Plan Support Agreement Motion is scheduled for June 26, 2013 at 10:00 a.m. (prevailing Eastern Time), and objections, if any, must be filed and served by June 19, 2013 at 4:00 p.m. (prevailing Eastern Time).**  The Plan Support Agreement Motion and any notices and pleadings regarding same are available or will be available shortly after they are filed at **http://www.rescaprmbssettlement.com**, or by contacting

---

[3]  Trusts for which an RMBS Trustee acts as master servicer and for which no other RMBS Trustee acts as trustee are identified on Schedule A by an asterisk.  Pursuant to the Plan Support Agreement, any allowed Buyback Claims that any such Trusts may have will be included in, and treated consistently with, the Plan Support Agreement. Certificateholders of such Trusts should contact their trustees with respect to matters described in this Notice.

GCG in the manner described in Section VI, below.  The RMBS Trustees intend to provide evidence to support certain findings in the proposed order approving  the Plan Support Agreement Motion.  To the extent filed, the RMBS Trustees' additional evidence will be available at **http://www.rescaprmbssettlement.com** and from GCG not less than fourteen  (14) days before the hearing on the Plan Support Agreement Motion.

**Pursuant to the Plan Support Agreement, if Certificateholders do not desire the Trusts in which they hold Certificates to be bound by the Plan Support Agreement and the Term Sheets, they have the option, if they meet the requirements set forth in the applicable Governing Agreements, to issue a direction, which shall include an indemnity satisfactory to the applicable RMBS Trustee, directing the RMBS Trustee to withdraw its execution of the Plan Support Agreement in respect of the applicable Trust.  Any direction and indemnity must be in a form satisfactory to the applicable RMBS Trustee and must be received by such RMBS Trustee on or before June 19, 2013.  Any Certificateholder that intends to issue such a direction is strongly urged to contact the relevant RMBS Trustee as soon as possible.  If the Plan Support Agreement is approved by the Bankruptcy Court, the RMBS Trustees will vote in favor of the Plan on behalf of each Trust, and the Certificateholders will be precluded from providing contrary direction to the RMBS Trustees with respect to the Plan.**

Upon acceptance by the RMBS Trustee of any Trust of a valid and satisfactory direction to withdraw its execution of the Plan Support Agreement, that RMBS Trustee shall withdraw its execution of the Plan Support Agreement on behalf of such Trust and such Trust will no longer be subject to the Plan Support Agreement.  **The relevant RMBS Trustee may determine not to accept such an instruction for a number of reasons, including, but not limited to, its determination that (a) Certificateholders having greater voting rights in such Trust have indicated, in a manner satisfactory to such RMBS Trustee, their support for the Plan Support Agreement, (b) the indemnification tendered is insufficient in any respect, or (c) the direction tendered is not in the best interests of the Trust.  Any claims of a withdrawing Trust against the Debtors must be pursued individually against the appropriate Debtors**.

**Even if the Certificateholders provide a valid direction to the RMBS Trustees to withdraw their execution of the Plan Support Agreement in respect of the applicable Trust, the Plan Proponents (as defined in the Plan Support Agreement) may still seek confirmation of the Plan that provides the same treatment of that Trust's Claims as set forth in the Plan Support Agreement.  Certificateholders who provide a valid direction to the RMBS Trustees to withdraw their execution of the Plan Support Agreement will maintain their ability to object to the treatment of the applicable Trust's Claims under the Plan, although the Bankruptcy Court may find that such Certificateholders lack standing to object.**

**Certificateholders may also individually object to the Plan Support Agreement by filing and serving an objection to the Plan Support Agreement Motion by June 19, 2013 at 4:00 p.m. (prevailing Eastern Time) pursuant to the terms of the Plan Support Agreement Motion and any accompanying notices filed regarding the Plan Support Agreement Motion**.

*If a Certificateholder (a) does not file a timely objection to the Plan Support Agreement, (b) files a timely objection that is overruled by the Bankruptcy Court, or (c) does not timely issue a valid direction and indemnity to its respective RMBS Trustee to withdraw its execution of the Plan Support Agreement with respect to any Trust, and the Plan Support Agreement is approved by the Bankruptcy Court, the Certificateholder will be bound by the the Plan Support Agreement and the Plan once it is confirmed and becomes effective, including with respect to its recovery, if any, in respect of its Certificates pursuant to the Allocation and with respect to the releases as set forth in the Term Sheets.*

**CERTIFICATEHOLDERS ARE URGED TO REVIEW THE PLAN SUPPORT AGREEMENT AND TERM SHEETS CAREFULLY AND TO CONSULT WITH THEIR ADVISORS.**

### III.    The FGIC Settlement Agreement

The Plan Support Agreement incorporates a settlement agreement (the "**FGIC Settlement Agreement**") dated May 23, 2013, pursuant to which ResCap, FGIC, The Bank of New York Mellon and the Bank of New York Mellon Trust Company, N.A., US Bank National Association, Wells Fargo Bank, N.A., and Law Debenture Trust Company of New York (collectively, the "**FGIC Trustees**") as trustees or separate trustees under certain Trusts (the "**FGIC Trusts**") as set forth in the FGIC Settlement Agreement (as defined below) (collectively, the "**FGIC Settlement Parties**") settled their claims against each other, including the claims of the FGIC Trusts against FGIC for claims under the insurance policies issued by FGIC (the "**Policies**") in respect of the FGIC Trusts.[4]  Pursuant to the terms of the FGIC Settlement Agreement, among other things, (a) each FGIC Settlement Party shall release the other FGIC Settlement Parties in respect of the Policies and other Policy Agreements (as defined in the FGIC Settlement Agreement), (b) FGIC will pay to the FGIC Trusts certain amounts in settlement of the FGIC Trusts' claims against FGIC as set forth in the FGIC Settlement Agreement, (c) the FGIC Trustees shall release the Debtors in respect of Origination-Related Provisions (as defined in the FGIC Settlement Agreement), (d) the Policies and other Policy Agreements will be commuted, (e) FGIC will not be liable for any further payments under the Policies and other Policy Agreements, and (f) the FGIC Trusts will no longer make premium, reimbursement, or other payments to FGIC.  Copies of the FGIC Settlement will be made available on or after May 29, 2013 at **http://www.rescaprmbssettlement.com** or from GCG by contacting GCG in the manner described in Section VI, below.

By May 29, 2013, an affirmation (the "**Affirmation**") in support of a motion seeking approval of the FGIC Settlement Agreement will be filed in the New York State Supreme Court with jurisdiction over FGIC's rehabilitation proceeding (the "**State Court**"), and by June 4, 2013, a motion to approve the FGIC Settlement Agreement (the "**FGIC Motion**") will be filed in the Bankruptcy Court.  The FGIC Settlement Agreement shall not become effective unless and until it is approved by the Bankruptcy Court and the State Court.  In the Bankruptcy Court, the notice filed regarding the FGIC Motion will include the hearing date on the FGIC Motion and the

---

[4]  The Supplemental Term Sheet sets forth the  terms of any settlements with the other monoline insurance companies that are among the Plan Support Agreement Parties.  To the extent monoline insurance companies are not parties to the Plan Support Agreement, the Trusts reserve any and all claims against them.

6

procedures for objecting to same.  The FGIC Settlement Agreement, the FGIC Motion, the Affirmation, and any notices will be available once they have been filed at **http://www.rescaprmbssettlement.com** or from GCG by contacting GCG in the manner described in Section VI, below.

**Any Certificateholder of a FGIC Trust may object to the approval of the FGIC Settlement Agreement in the Bankruptcy Court pursuant to the terms of the FGIC Motion.  Any Certificateholder of a FGIC Trust also might have an opportunity in the State Court to object to the Affirmation and approval of the FGIC Settlement Agreement.**

*If a Certificateholder of a FGIC Trust does not file a timely objection to the FGIC Settlement Agreement Motion or if such Certificateholder's  timely objection is overruled, so long as the FGIC Settlement Agreement  and the Plan Support Agreement are approved by the Bankruptcy Court and the State Court, and the Bankruptcy Court confirms the Plan, such Certificateholder will be bound by the terms of the FGIC Settlement Agreement.*

**CERTIFICATEHOLDERS OF A FGIC TRUST ARE URGED TO CAREFULLY REVIEW THE FGIC SETTLEMENT AGREEMENT ONCE IT IS AVAILABLE AND TO CONSULT WITH THEIR ADVISORS.**

### IV.    Other RMBS Trusts that Have an Insurance Policy with a Monoline Insurance Company.

Pursuant to the Plan Support Agreement and the Term Sheets, any RMBS Trust that has an insurance policy with a Monoline (as defined in the Plan Support Agreement) reserves the ability to enforce its rights, in the Bankruptcy Court or otherwise, against any Monoline (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of that Trust.

### V.    This Notice Is a Summary.

This Notice is not intended as, nor does not provide, a detailed restatement of the Plan Support Agreement, the Term Sheets, the RMBS Settlement or the FGIC Settlement Agreement, relevant law or relevant legal procedures.  The RMBS Trustees, do not intend to send any further notices with respect to the matters addressed herein, and Certificateholders and other potentially interested persons are urged to review carefully the Plan Support Agreement, the Term Sheets, the FGIC Settlement Agreement, any related notices, and other related pleadings that have been filed, and that subsequently may be filed, in the Chapter 11 Cases, and to consult with their own legal and financial advisors.

### VI.    Other Sources of Information.

The Committee appointed in the Chapter 11 Cases has established an official website (the "**Committee Website**"), on which basic information concerning the Chapter 11 Cases has been posted, including, but not limited to, relevant contact information, upcoming dates and deadlines, statements and schedules filed by ResCap and a list of answers to frequently asked questions.  The Committee Website can be reached at **http://dm.epiq11.com/RES/Project**.

Information relevant to the Plan Support Agreement Motion, the Plan, the Affirmation, the FGIC Settlement Agreement, and any notices thereof will be available at **http://www.rescaprmbssettlement.com,** which will be updated regularly with related material documents filed or orders entered by the Bankruptcy Court or the State Court.  If a Certificateholder has any questions or would like to request copies of any of the relevant documents, Certificateholders may call GCG at (866) 241-7538 in the United States, +1 (202) 470-4565 outside the United States, or send an email to **questions@ rescaprmbssettlement.com**.

Certificateholders may also obtain any documents filed with the Bankruptcy Court in the Chapter 11 Cases by visiting ResCap's claims agent website at **http://www.kccllc.net/rescap,** or by logging on to PACER at **https://www.uscourts.gov** (a small fee is charged for this service). Documents filed in the Chapter 11 Cases may also be viewed during normal business hours at the Clerk's Office of the Bankruptcy Court, located at One Bowling Green, New York, New York 10004.

Inquiries with respect to any particular Trust for which The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Deutsche Bank National Trust Company, Deutsche Bank Trust Company Americas, or US Bank National Association, Wells Fargo Bank, N.A., serves as RMBS Trustee may be directed to the RMBS Trustee for such Trust using the "RMBS Trustee Contact Information" for such RMBS Trustee at **http://www.rescaprmbssettlement.com**.  With respect to those Trusts for which HSBC Bank USA, N.A. serves as RMBS Trustee, inquiries may be directed to **US.CTLA.Structured.Unit@us.hsbc.com**.  With respect to those Trusts for which Law Debenture Trust Company of New York serves as RMBS Trustee, inquires may be directed to **nytrustco@lawdeb.com**.  **With respect to all other trusts, Certificateholders of those trusts should refer to their respective Governing Agreements for contact information.**

## VII.    Other Matters.

Certificateholders and other persons interested in the Trusts should not rely on the RMBS Trustees, or on counsel or other advisors retained by the RMBS Trustees, as their sole source of information.

Please note that the foregoing is not intended and should not be construed as investment, accounting, financial, legal or tax advice by or on behalf of the RMBS Trustees, or their directors, officers, affiliates, agents, attorneys or employees. Each person or entity receiving this Notice should seek the advice of its own advisers in respect of the matters set forth herein.

Please be further advised that each of the RMBS Trustees reserves all of the rights, powers, claims and remedies available to it under the Governing Agreements and applicable law. No delay or forbearance by an RMBS Trustee to exercise any right or remedy accruing upon the occurrence of a default, or otherwise under the terms of the Governing Agreements, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or acquiescence therein.

Each of the RMBS Trustees expressly reserves its rights under each applicable Governing Agreement, including without limitation, its right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by such RMBS Trustee in performing its duties, indemnities owing or to become owing to such RMBS Trustee, compensation for such RMBS Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities which might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

Please be advised that with respect to any particular inquiry from individual Certificateholders, an RMBS Trustee may conclude that a specific response to such inquiry is not consistent with requirements under applicable law and regulation of equal and full dissemination of information to all Certificateholders.

THE BANK OF NEW YORK MELLON, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., DEUTSCHE BANK NATIONAL TRUST COMPANY, DEUTSCHE BANK TRUST COMPANY AMERICAS, U.S. BANK NATIONAL ASSOCIATION, WELLS FARGO BANK, N.A., HSBC BANK USA, N.A., AND LAW DEBENTURE TRUST COMPANY OF NEW YORK, severally, as trustees, master servicers, and/or indenture trustees or separate trustees of the Trusts

# Tab F

# Trial Exhibit 129

TIME SENSITIVE NOTICE
REGARDING SETTLEMENT AGREEMENT AMONG THE RESCAP DEBTORS,
FINANCIAL GUARANTY INSURANCE COMPANY AND THE FGIC TRUSTEES

NOTICE IS HEREBY GIVEN BY:

THE BANK OF NEW YORK MELLON,
THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
U.S. BANK NATIONAL ASSOCIATION,
WELLS FARGO BANK, N.A., AND
LAW DEBENTURE TRUST COMPANY OF NEW YORK

IN THEIR SEVERAL CAPACITIES AS TRUSTEES, INDENTURE TRUSTEES
AND/OR SEPARATE TRUSTEES (COLLECTIVELY, THE "FGIC TRUSTEES" AND
EACH, AN "FGIC TRUSTEE"), TO THE HOLDERS (THE
"CERTIFICATEHOLDERS") OF CERTIFICATES, NOTES OR OTHER SECURITIES
(COLLECTIVELY, THE "CERTIFICATES") UNDER THE RESIDENTIAL
MORTGAGE-BACKED SECURITIZATION TRUSTS IDENTIFIED ON SCHEDULE A
TO THIS NOTICE (COLLECTIVELY, THE "FGIC TRUSTS" AND EACH A "FGIC
TRUST").

THIS NOTICE CONTAINS IMPORTANT TIME-SENSITIVE INFORMATION FOR
CERTIFICATEHOLDERS AND OTHER PERSONS POTENTIALLY INTERESTED IN
THE FGIC TRUSTS. ALL DEPOSITORIES, CUSTODIANS AND OTHER
INTERMEDIARIES RECEIVING THIS NOTICE, AS APPLICABLE, ARE
REQUESTED TO EXPEDITE ITS RE-TRANSMITTAL TO CERTIFICATEHOLDERS
IN A TIMELY MANNER. FAILURE TO ACT PROMPTLY IN COMPLIANCE WITH
THIS PARAGRAPH MAY IMPAIR THE ABILITY OF THE CERTIFICATEHOLDERS
ON WHOSE BEHALF SUCH INTERMEDIARIES ACT TO CONSIDER THE
MATTERS DESCRIBED IN THIS NOTICE IN A TIMELY FASHION.

Dated:  June 4, 2013

This notice (the "Notice") is given to you by the FGIC Trustees under the Pooling and Servicing
Agreements (including Series Supplements and Standard Terms of Pooling and Servicing
Agreements), and Indentures and related Servicing Agreements (collectively, the "Governing
Agreements") governing the FGIC Trusts. This Notice incorporates by reference the notice
given by the RMBS Trustees (as defined therein) regarding (A) the Plan Support Agreement,
dated May 13, 2013 (the "Plan Support Agreement"), among the ResCap Debtors and the
RMBS Trustees (including the FGIC Trustees), among others, and (B) the Settlement Agreement
among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS
Trustees(including the FGIC Trustees), dated May 24, 2013 (the "May 24 Notice"). In the event
of any inconsistencies between the May 24 Notice and this Notice, this Notice shall govern.

Capitalized terms used but not defined herein shall have the meanings assigned to them in the Governing Agreements or in the FGIC Settlement Agreement, as defined below.

**THIS NOTICE CONCERNS A PROPOSED SETTLEMENT OF, AMONG OTHER THINGS, THE PRESENT AND FUTURE CLAIMS OF THE FGIC TRUSTS AGAINST FINANCIAL GUARANTY INSURANCE CORPORATION ("FGIC") UNDER THE INSURANCE POLICIES (THE "POLICIES") ISSUED BY FGIC IN RESPECT OF THE TRUSTS.[1]**

**IF THE FGIC SETTLEMENT AGREEMENT IS APPROVED BY THE STATE COURT AND THE BANKRUPTCY COURT, IT WILL BIND EACH APPLICABLE FGIC TRUST AND THE RELATED CERTIFICATEHOLDERS. THE PROPOSED FGIC SETTLEMENT AGREEMENT MATERIALLY AFFECTS THE INTERESTS OF THE CERTIFICATEHOLDERS. THE FGIC TRUSTEES THEREFORE RESPECTFULLY REQUEST THAT ALL CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS READ THIS NOTICE AND RELATED MATERIALS CAREFULLY IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS. CERTIFICATEHOLDERS THAT DO NOT WANT THE FGIC SETTLEMENT AGREEMENT TO BECOME EFFECTIVE SHOULD CONSIDER OBJECTING TO ITS APPROVAL IN THE STATE COURT ON OR BEFORE THE DEADLINE OF JULY 16, 2013 AT 3:00 P.M. (PREVAILING EASTERN TIME) AND/OR IN THE BANKRUPTCY COURT ON OR BEFORE THE DEADLINE THAT WILL BE SET ONCE THE NOTICE OF THE MOTION TO APPROVE THE FGIC SETTLEMENT AGREEMENT IS FILED (SUCH NOTICE IS EXPECTED TO BE FILED ON OR BEFORE JUNE 7, 2013).[2]**

## I.     Background--ResCap Bankruptcy Filing and FGIC Rehabilitation Proceeding.

On May 14, 2012, Residential Capital, LLC, and certain of its direct and indirect subsidiaries (collectively, "**ResCap**" or the "**Debtors**") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (*In re Residential Capital, LLC*, Case No. 12-12020 (MG) and related cases) (collectively, the "**Chapter 11 Cases**"). To obtain information regarding the Chapter 11 Cases, please see Section VI, below.

Pursuant to an order dated June 28, 2012, the Supreme Court of the State of New York (the "**State Court**") appointed Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as rehabilitator (the "**Rehabilitator**") of FGIC in the rehabilitation proceeding styled *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (the "**Rehabilitation Proceeding**").

---

[1] Terms not otherwise defined in these initial summary paragraphs are defined below.

[2] When the notice of the motion seeking Bankruptcy Court approval of the FGIC Settlement Agreement (the "**FGIC Motion**") is filed with the Bankruptcy Court, it will be available at http://www.rescaprmbssettlement.com, or from The Garden City Group ("**GCG**") by contacting GCG in the manner described in Section VI, below, and other means as set forth in Section VI. Any Certificateholder of a FGIC Trust may object to the approval of the FGIC Settlement Agreement in the Bankruptcy Court pursuant to the terms of the FGIC Motion.

SK 03687 0119 1385897 v5

## II.   The FGIC Settlement Agreement.

On May 23, 2013, ResCap, FGIC, and the FGIC Trustees as trustees or separate trustees under the FGIC Trusts, and certain other parties (collectively, the "**FGIC Settlement Parties**") entered into a settlement agreement (the "**FGIC Settlement Agreement**") pursuant to which the FGIC Settlement Parties settled their claims against each other, including the claims of the FGIC Trusts against FGIC for claims under the Policies under which FGIC insured the payment of principal and interest owing on certain of the Certificates. According to the terms of the FGIC Settlement Agreement, among other things, (a) each FGIC Settlement Party shall release the other FGIC Settlement Parties in respect of the Policies and other Policy Agreements (as defined in the FGIC Settlement Agreement), including the release by the FGIC Trusts of current claims in the amount of at least $789 million, and future claims against FGIC, (b) FGIC will pay to the FGIC Trusts for distribution to Certificateholders holding Certificates insured by the Policies cash in the aggregate amount of $253.3 million in settlement of the FGIC Trusts' claims against FGIC, (c) the FGIC Trustees shall release the Debtors in respect of Origination-Related Provisions (as defined in the FGIC Settlement Agreement), (d) FGIC will not be liable for any further payments under the Policies and other Policy Agreements, and (e) the FGIC Trusts will no longer make premium, reimbursement, or other payments to FGIC.[3]  Copies of the FGIC Settlement may be obtained at http://www.rescaprmbssettlement.com, at www.fgicrehabilitation.com or from GCG by contacting GCG in the manner described in Section VI, below.

In accordance with the allocation methodology set forth in Exhibit F to the FGIC Settlement Agreement, the FGIC Trustees, in consultation with their advisors, will have sole and exclusive authority to determine the share of the $253.3 million payable to each FGIC Trust and the allocation of such share among the CUSIPs issued by each such FGIC Trust that are insured by a Policy. On or before July 3, 2013, the FGIC Trustees will notify FGIC in writing of the cash amount that FGIC shall pay to each FGIC Trust once the FGIC settlement is effective.

**As of July 3, 2013, the FGIC Trustees will make available to any Certificateholders holding Certificates insured by a Policy information as to the cash amount that FGIC will pay to the FGIC Trust(s) that issued such Certificates, provided that any such Certificateholder submits a proper request for such information to the FGIC Trustee(s) for such FGIC Trust(s), and provides appropriate verification of its holdings.**

---

[3]  Pursuant to the FGIC Settlement Agreement, FGIC will receive an allowed claim against certain of the Debtors in the aggregate amount of (i) approximately $934 million, if the chapter 11 plan contemplated by the Plan Support Agreement attached to the FGIC Settlement Agreement as Exhibit C goes effective, or (ii) $596.5 million, if the Plan Support Agreement is terminated in accordance with its terms and the chapter 11 plan contemplated thereby does not go effective, subject to FGIC's right to assert a claim against each of three of the Debtors, in each case up to the amount of $596.5 million. FGIC has agreed under the Plan Support Agreement to cap its recovery from ResCap under (i), above, to $206.5 million. For more information on the Plan Support Agreement, please review the May 24 Notice.

SK 03687 0119 1385897 v5

**CERTIFICATEHOLDERS OF A FGIC TRUST ARE URGED TO REVIEW
CAREFULLY THE FGIC SETTLEMENT AGREEMENT AND TO CONSULT WITH
THEIR ADVISORS.**

III.　　**The Rehabilitation Proceeding and Related Deadlines.**

On May 29, 2013, an affirmation (the "**Affirmation**") in support of the Rehabilitator's motion
for an order approving the FGIC Settlement Agreement and relevant portions of the Plan Support
Agreement was filed in the State Court.  On May 30, 2013, the State Court entered an order to
show cause (the "Order to Show Cause") setting forth a schedule of deadlines and the date of a
hearing to consider approval of the FGIC Settlement Agreement and relevant portions of the Plan
Support Agreement (the "**State Court Hearing**").  Copies of the Affirmation and the Order to
Show Cause may be obtained at **www.fgicrehabilitation.com**, at
**http://www.rescaprmbssettlement.com** or from GCG by contacting GCG in the manner
described in Section VI, below.  Pursuant to the Order to Show Cause, the State Court Hearing
will take place on August 6, 2013 at 10:00 a.m. at IAS Part 36, Room 428, thereof, at the
Courthouse located at 60 Centre Street, New York, New York.

**Any Certificateholder objecting to any aspect of the FGIC Settlement Agreement must file
an objection with the State Court, and serve a copy of such objection via email upon
gary.holtzer@weil.com and joseph.verdesca@weil.com, attorneys for the Rehabilitator, so
that such objection is received on or before July 16, 2013 at 3:00p.m. (the "State Court
Objection Deadline").**

If no objection is filed on or before the State Court Objection Deadline, pursuant to the Order to
Show Cause, the State Court may approve the FGIC Settlement Agreement without holding the
State Court Hearing.[4]

IV.　　**Certificateholders Can Object to the FGIC Settlement Agreement.**

*Any Certificateholder objecting to any aspect of the FGIC Settlement Agreement can file an
objection with the Bankruptcy Court as set forth in footnote 2, above, and/or in the State
Court as set forth in Section III, above.  If a Certificateholder of a FGIC Trust does not file a
timely objection to the FGIC Settlement Agreement in the Bankruptcy Court or Rehabilitation
Proceeding or if such Certificateholder's timely objection(s) are overruled, so long as the
FGIC Settlement Agreement is approved by the Bankruptcy Court and the State Court, such
Certificateholder will be bound by the terms of the FGIC Settlement Agreement.[5]  If approved*

---

[4] As noted in footnote 2, above, Certificateholders of a FGIC Trust may also object to the FGIC Motion in the
Bankruptcy Court.

[5] Note that Bankruptcy Court approval of a plan of reorganization for the Debtors is *not* a condition to the
effectiveness of the FGIC Settlement Agreement.  By its terms, the FGIC Settlement Agreement will become
effective if and when both the Bankruptcy Court and the Rehabilitation Court have entered final orders approving it.
The May 24 Notice incorrectly stated that the Bankruptcy Court approval of a plan of reorganization for the Debtors
was a condition to the effectiveness of the FGIC Settlement Agreement.

4

*by the Bankruptcy Court and the State Court, all Certificateholders holding Certificates insured by FGIC's Policies, and any other persons or entities who received this Notice, will be bound by the FGIC Settlement Agreement and the settlements, releases and discharges contained therein, regardless of whether any Certificateholder or other person or entity appeared before the Bankruptcy Court and/or at the State Court Hearing or submitted an objection.*

*Certificateholders should review with their advisors the relevant Governing Agreements and any applicable orders that have been entered by the State Court, including the Order of Rehabilitation, dated June 28, 2012, to determine what legal position, if any, they intend to assert.*

## V.    This Notice Is a Summary.

This Notice is not intended as, nor does it provide, a detailed restatement of the FGIC Settlement Agreement, relevant law or relevant legal procedures. The FGIC Trustees do not intend to send any further notices with respect to the matters addressed herein, and Certificateholders and other potentially interested persons are urged to review carefully the FGIC Settlement Agreement, any related notices, and other related pleadings that have been filed, and that subsequently may be filed, in the Chapter 11 Cases and in the Rehabilitation Proceeding, and to consult with their own legal and financial advisors.

## VI.    Other Sources of Information.

Information relevant to the FGIC Settlement Agreement, the Plan Support Agreement, and any notices thereof will be available at **http://www.rescaprmbssettlement.com**, which will be updated regularly with related material documents filed or orders entered by the Bankruptcy Court and the State Court. Certificateholders may also access documents filed in the Rehabilitation Proceeding at **www.fgicrehabilitation.com**. If a Certificateholder has any questions or would like to request copies of any of the relevant documents, Certificateholders may call GCG at (866) 241-7538 in the United States, +1 (202) 470-4565 outside the United States, or send an email to **questions@ rescaprmbssettlement.com**.

Certificateholders may also obtain any documents filed with the Bankruptcy Court in the Chapter 11 Cases by visiting ResCap's claims agent website at **http://www.kccllc.net/rescap, or** by logging on to PACER at **https://www.uscourts.gov** (a small fee is charged for this service). Documents filed in the Chapter 11 Cases may also be viewed during normal business hours at the Clerk's Office of the Bankruptcy Court, located at One Bowling Green, New York, New York 10004.

The Committee appointed in the Chapter 11 Cases has established an official website (the "**Committee Website**"), on which basic information concerning the Chapter 11 Cases has been posted, including, but not limited to, relevant contact information, upcoming dates and deadlines, statements and schedules filed by ResCap and a list of answers to frequently asked questions. The Committee Website can be reached at **http://dm.epiq11.com/RES/Project**.

Inquiries with respect to any particular FGIC Trust for which The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association, or Wells Fargo Bank, N.A. serves as FGIC Trustee may be directed to the FGIC Trustee for such FGIC Trust using the "RMBS Trustee Contact Information" for such FGIC Trustee at **http://www.rescaprmbssettlement.com**. With respect to those FGIC Trusts for which Law Debenture Trust Company of New York serves as separate FGIC Trustee, inquiries may be directed to **nytrustco@lawdeb.com.** With respect to all other trusts, Certificateholders of those trusts should refer to their respective Governing Agreements for contact information.

## VII.    Other Matters.

Certificateholders and other persons interested in the FGIC Trusts should not rely on the FGIC Trustees, or on counsel or other advisors retained by the FGIC Trustees, as their sole source of information.

Please note that the foregoing is not intended and should not be construed as investment, accounting, financial, legal or tax advice by or on behalf of the FGIC Trustees, or their directors, officers, affiliates, agents, attorneys or employees. Each person or entity receiving this Notice should seek the advice of its own advisers in respect of the matters set forth herein.

Please be further advised that each of the FGIC Trustees reserves all of the rights, powers, claims and remedies available to it under the Governing Agreements and applicable law. No delay or forbearance by an FGIC Trustee to exercise any right or remedy accruing upon the occurrence of a default, or otherwise under the terms of the Governing Agreements, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or acquiescence therein.

Each of the FGIC Trustees expressly reserves its rights under each applicable Governing Agreement, including without limitation, its right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by such FGIC Trustee in performing its duties, indemnities owing or to become owing to such FGIC Trustee, compensation for such FGIC Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities which might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

6

Please be advised that with respect to any particular inquiry from individual Certificateholders, a FGIC Trustee may conclude that a specific response to such inquiry is not consistent with requirements under applicable law and regulation of equal and full dissemination of information to all Certificateholders.

THE BANK OF NEW YORK MELLON, THE BANK OF NEW
YORK MELLON TRUST COMPANY, N.A., U.S. BANK
NATIONAL ASSOCIATION, WELLS FARGO BANK, N.A.,
AND LAW DEBENTURE TRUST COMPANY OF NEW YORK,
severally, as trustees, and/or indenture trustees or separate trustees
of the FGIC Trusts

7

### Schedule A to June 4, 2013 Notice to Certificateholders in FGIC Trusts

| Trusts Insured by Financial Guaranty Insurance Company ("FGIC") | Trustee | Policy ID |
|---|---|---|
| GMACM 2001-HE2 | The Bank of New York Mellon and The Bank of New York Mellon Trust Company N.A. ("BNYM") | 1010293 |
| GMACM 2002-HE4 | Wells Fargo Bank, N.A. ("WFB")/Law Debenture Trust Company of NY ("LDTC") | 2030026 |
| GMACM 2003-HE2 | WFB/LDTC | 3030009 |
| GMACM 2004-HE5 | WFB/LDTC | 4030047 |
| GMACM 2005-HE2 | WFB/LDTC | 5030041 |
| GMACM 2006-HE2 | BNYM | 6030080 |
| GMACM 2006-HE3 | BNYM | 6030099 |
| GMACM 2006-HE5 | BNYM | 6030127 |
| GMACM 2007-HE2 | BNYM | 7030046 |
| GMACM 2001-HE2 | BNYM | 1010294 |
| GMACM 2001-HE3 | BNYM | 1030013 |
| GMACM 2002-HE1 | WFB/LDTC | 2030009 |
| GMACM 2003-HE1 | WFB/LDTC | 3030008 |
| GMACM 2004-HE1 | WFB/LDTC | 4030006 |
| GMACM 2005-HE1 | WFB/LDTC | 5030011 |
| GMACM 2006-HE1 | BNYM | 6030037 |
| GMACM 2004-HLTV1 | BNYM | 4030036 |
| GMACM 2006-HLTV1 | BNYM | 6030034 |
| RFC, RAMP 2004-RS7 | BNYM | 4030020 |
| RFC, RAMP 2004-RS7 | BNYM | 4030021 |
| RFC, RAMP 2005-EFC7 | U.S. Bank National Association ("USB") | 5030159 |
| RFC, RAMP 2005-NC1 | USB | 5030158 |
| RFC, RAMP 2005-RS9 | BNYM | 5030145 |
| RFC, RASC 2001-KS1 | BNYM | 1010248 |
| RFC, RASC 2001-KS1 | BNYM | 1010249 |
| RFC, RASC 2004-KS7 | BNYM | 4030022 |
| RFC, RASC 2004-KS7 | BNYM | 4030023 |
| RFC, RASC 2004-KS9 | BNYM | 4030032 |
| RFC, RASC 2004-KS9 | BNYM | 4030033 |
| RFC, RASC 2005-EMX5 | USB | 5030153 |
| RFC, RASC 2007-EMX1 | USB | 7030010 |

SK 03687 0119 1386095 v2

| Trusts Insured by Financial Guaranty Insurance Company ("FGIC") | Trustee | Policy ID |
|---|---|---|
| RFC, RFMSI 2005-S2 | USB | 5030006 |
| RFC, RFMSI 2005-S7 | USB | 5030142 |
| RFC, RFMSII 2002-HS3 | BNYM | 2030023 |
| RFC, RFMSII 2003-HS1 | BNYM | 3030004 |
| RFC, RFMSII 2004-HS1 | BNYM | 4030007 |
| RFC, RFMSII 2005-HS1 | BNYM | 5030097 |
| RFC, RFMSII 2005-HS2 | BNYM | 5030143 |
| RFC, RFMSII 2005-HSA1 | BNYM | 5030160 |
| RFC, RFMSII 2006-HSA1 | BNYM | 6030003 |
| RFC, RFMSII 2006-HSA2 | BNYM | 6030022 |
| RFC, RFMSII 2002-HS3 | BNYM | 2030024 |
| RFC, RFMSII 2003-HS1 | BNYM | 3030005 |
| RFC, RFMSII 2003-HS2 | BNYM | 3030017 |
| RFC, RFMSII 2004-HS1 | BNYM | 4030008 |
| RFC, RFMSII 2004-HS3 | BNYM | 4030035 |
| RFC, RFMSII 2005-HS1 | BNYM | 5030098 |
| RFC, RFMSII 2005-HS2 | BNYM | 5030146 |
| RFC, RFMSII 2005-HSA1 | BNYM | 5030161 |
| RFC, RFMSII 2006-HSA2 | BNYM | 6030026 |
| RFC, RAMP 2004-RZ2 | BNYM | 4030012 |
| RFC, RAMP 2004-RZ2 | BNYM | 4030013 |
| RFC, RFMSII 2004-HI2 | BNYM | 4030015 |
| RFC, RFMSII 2004-HI3 | BNYM | 4030034 |
| RFC, RFMSII 2005-HI1 | BNYM | 5030001 |
| RFC, RFMSII 2006-HI2 | BNYM | 6030063 |
| RFC, RFMSII 2006-HI3 | BNYM | 6030087 |
| RFC, RFMSII 2006-HI4 | BNYM | 6030113 |
| RFC, RFMSII 2006-HI5 | USB | 6030135 |
| RFC, RFMSII 2007-HI1 | USB | 7030014 |

## U.S. Bank FGIC Trusts

| Deal Name | | CUSIP[1] |
|---|---|---|
| RAMP 2005-EFC7 | | 76112BR69,76112BR77,76112BR85, 76112BR93,Class R-I & R-II |
| RAMP 2005-NC1 | | 76112BQ94,76112BR28,76112BR36, 76112BT67, Class R-I & R-II |
| RASC 2005-EMX5 | | 76110W7Q3,76110W7R1, 76110W7S9, Class R-I & R-II |
| RASC 2007-EMX1 | | 74924XAB1,74924XAC9,74924XAD7,74924XAE5, 74924XAF2, Class R. |
| RFMSI 2005-S2 | | 76111XTQ6, 76111XTR4, 76111XTS2, 76111XTT0, 76111XTU7, 76111XTV5, 76111XTW3, 76111XTX1, 76111XTY9, 76111XTZ6, 76111XUA9, 76111XUB7, 76111XUC5, 76111XUD3, 76111XUE1, 76111XUF8. |
| RFMSII 2006-HI5 | | 43718VAC8,43718VAD6, Owner Trust Certificate |
| RFMSII 2007-HI1 | | 43718WAC6,43718WAD4, Owner Trust Certificate |
| RFMSI 2005-S7 | | 76111XZR7, 76111XZS5, 76111XZT3, 76111XZU0, 76111XZV8, 76111XZW6, 76111XZX4, 76111XZY2, 76111XZZ9, 76111XA29, 76111XA37, 76111XA45, 76111XA52, 76111XA60, 76111XA78, 76111XA86, 76111XZN6, 76111XZP1, 76111XZQ9 |

[1] The CUSIP numbers appearing herein have been included solely for the convenience of the Securityholders. No representation is made as to the correctness of the CUSIP numbers either as printed on the certificates or notes related to the Trusts or as contained in this notice.

A-1