**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DECLARATION OF GINA HEALY IN SUPPORT OF FEDERAL HOME LOAN MORTGAGE CORPORATION'S OBJECTION TO DEBTORS' MOTION PURSUANT TO FED R. R BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS

Gina Healy declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:[1]

1.      My name is Gina Healy, and I am over 21 years of age.  I am of sound mind and, if called to testify, I will attest to the facts described herein.

2.      I am Vice President of Credit Risk Management, Mortgage Insurance and Credit Workout/Restructuring at Federal Home Loan Mortgage Corporation in conservatorship ("Freddie Mac"), where I have been employed since 2004.  I am responsible for managing credit risk and counterparty eligibility requirements for mortgage insurers and negotiating workouts and restructurings for special assets across the company.  I hold the Chartered Financial Analyst designation (CFA) and am a Certified Public Accountant (CPA Inactive).

3.      I submit this Declaration in support of Freddie Mac's objection (the "Objection") to the *Debtors' Motion Pursuant to Fed. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors.*

---

[1] This Declaration and accompanying exhibits have been filed publicly in redacted form pursuant to this Court's July 16, 2013, *Order Regarding the Exchange of Confidential Information* (the "Confidentiality Order") [ECF No. 4249]. Non-redacted copies of this Declaration will be delivered to the Court and served upon the parties covered by the Confidentiality Order.

McKool 912838v1

4.      Freddie Mac is a corporate instrumentality of the United States of America, chartered by Congress.  Congress created Freddie Mac for the purpose of increasing the funds available to homebuyers through the creation of a secondary mortgage market for the purchase and sale of conventional residential mortgage loans.  On September 6, 2008, the Director of the Federal Housing Finance Agency (the "FHFA" or the "Conservator") placed Freddie Mac into conservatorship pursuant to express authority granted under the Housing and Economic Recovery Act of 2008 to preserve and conserve Freddie Mac's assets and property.  As Conservator, FHFA immediately succeeded to "all rights, titles, powers and privileges" of Freddie Mac.

5.      Freddie Mac holds                                            various tranches of residential mortgage-backed securities ("RMBS") held in nine of the ResCap trusts (the "FGIC-Insured Trusts") covered by the  policies (the "Policies") issued by Federal Guaranty Insurance Company ("FGIC"), the payment of principal and interest due being guaranteed by FGIC.  Freddie Mac's holdings in the FGIC-Insured Trusts are summarized in the chart below::

## Freddie Mac's Holdings of FGIC-Insured RMBS

6.     Freddie Mac has long-outstanding policy claims against FGIC based upon the failure of principal and interest payments under certain of the FGIC-Insured Trusts and under policies issued by FGIC. Freddie Mac expects to have significant policy claims against FGIC for principal and interest shortfalls with respect to the FGIC-Insured Trusts in both the near and long-term future.

7.     On account of the underperformance of the trust collateral, Freddie Mac has not received the principal and interest payments that it should have received from the above-listed FGIC-Insured Trusts. In turn, claims are presented by the trustees of the FGIC-Insured Trusts (the "FGIC Trustees") to FGIC to cover the principal and interest shortfalls as required by the Policies.  FGIC, however, has not made any payments under any of the Policies since approximately November of 2009. As a result, Freddie Mac has long had outstanding claims that remain unpaid under the Policies, and Freddie Mac also expects to have significant and continuing policy claims against FGIC for principal and interest shortfalls in both the near and long-term future.

8.

McKool 912838v1

10.    During his negotiations with the Steering Committee, Mr. Dubel never discussed the possibility of commuting out the FGIC policies insuring holders of FGIC-wrapped RMBS. Rather, the discussions concerning commutation focused solely on commuting the claims collateralized-debt security ("CDS") holders and reinsurance commutation/termination or novation, because the amount of these claims and the potential priority of such claims had the greatest impact on RMBS holder recoveries.

11.    Discussions in earnest between the Rehabilitation/FGIC with the FGIC Trustees did not commence until after the Rehabilitation Plan was initially filed in September of 2012. Freddie Mac and other Steering Committee members sought to facilitate these discussions.  In order to participate in these discussions, FGIC Trustees requested that Freddie Mac provide them with information concerning Freddie Mac's holdings, which it did in mid-January of 2013.

13.     I understand based upon disclosures in the FGIC's rehabilitation proceeding

pending in state court in New York (the "Rehabilitation Proceeding") that the above-captioned

debtors and debtors-in-possession, FGIC, the trustees of the Trusts (the "FGIC Trustees"), and

certain institutional investors have agreed to enter into the a settlement agreement (the

"Settlement Agreement"), which I understand effectively terminates the Policies in exchange for

a one-time payment of $253.3 million (the "FGIC Commutation").  The FGIC Trustees neither

obtained nor solicited Freddie Mac's consent to enter into the Settlement Agreement, and, upon

---

[3] FGIC's offsets against initial CPP filed publicly is attached hereto as Exhibit B.

information and belief, none of the holders of the FGIC-insured RMBS were consulted on the proposed commutation of their claims against FGIC and no vote has been offered.

14.    Despite our attorney's requests to FGIC, I have received no information or data indicating that the terms of the Settlement Agreement, including the FGIC Commutation, are in the best interests of Freddie Mac, a major holder of the of FGIC-insured RMBS.

15.    The only available evidence indicates that the Settlement Agreement is not in the Freddie Mac's best interest.   F

16.    The                          is not acceptable for Freddie Mac given Freddie Mac's understanding that, under the Rehabilitation Plan, Freddie Mac is to receive a present-value recovery of 27 to 30 cents on the dollar.  Indeed, even the "Disclosure Statement" filed in the FGIC Rehabilitation proceeding, which I have reviewed, makes reference only the commutation of CDS contracts and in no way discusses the commutation/termination of the Policies guaranteeing the payment of principal and interest on Freddie Mac's FGIC-wrapped ResCap RMBS.[4]  For example, the Disclosure Statement states:

> The initial CPP will depend on several factors, including (i) actual or anticipated changes in the assumptions underlying the Run-Off Projections (including those relating to developments in actual or anticipated losses under FGIC's Policies or

---

[4] The Disclosure Statement is attached hereto as Exhibit C.

other financial circumstances or events), (ii) whether the Novation Agreement is approved by the Court, (iii) whether the two CDS Commutation Agreements executed thus far are approved by the Court, (iv) whether additional CDS Commutation Agreements are executed and approved by the Court (and the terms thereof), (v) whether the Reinsurance Commutation Agreement executed with AORe is approved by the Court and, if approved, whether FGIC receives the payment contemplated thereby, (vi) whether additional Reinsurance Commutation Agreements are executed and approved by the Court (and the terms thereof), (vii) whether FGIC receives the payments contemplated by any additional Reinsurance Commutation Agreements and (viii) other events and circumstances that may be beyond the Rehabilitator's control.[5]

Additionally, page 3 of the Disclosure Statement lists only CDS commutations and reinsurance novations; on my review, nowhere in the Disclosure Statement is the commutation/termination of the Policies mentioned. As a result of the successful commutation of the CDS holders' and reinsurance claims the Rehabilitator/FGIC informed the Steering Committee and Freddie Mac that the initial CPP amount would be increased from approximately 13 to 14% to 15% and than in December 2012 to 17.25.

17.    Based

, it was also my understanding that the Rehabilitation Plan must be "fair and equitable" to all beneficiaries of FGIC policies, whether long- or short-dated, and that claimants under FGIC-issued policies (including the Policies at issue here) would be treated the same whether their claims arose today or years from now. Indeed, the Disclosure Statement provides, on pages 20-21, as follows:

> Provisions of the Plan relevant to the Policy Restructuring are in the Restructured Policy Terms. The Restructured Policy Terms include the mechanism for paying Permitted Policy Claims, as well as procedures for revaluating FGIC's financial condition to determine whether additional Cash payments may be made on account of Permitted Policy Claims. **Consistent with the goal of the Plan, the Rehabilitator developed the Restructured Policy Terms to maximize the extent to which FGIC's Policyholders are treated in a fair and equitable**

---

[5] Disclosure Statement at 23.

**manner. The Restructured Policy Terms are designed to address challenges
the Rehabilitator faced in achieving this goal.**

\*       \*       \*

First, because FGIC likely will not have sufficient assets to pay in full in Cash all
Policy Claims that have arisen but have not been paid or that are expected to arise
over the Run-Off Period, which may last 40 years, the Restructured Policy Terms
provide for payment of only a portion of each Permitted Policy Claim in Cash.
**FGIC will satisfy the remainder of each Permitted Policy Claim through
future payments on account of a DPO for the related Policy, to the extent
payable under the Plan. FGIC will track DPOs on a Policy-by-Policy basis,
and will reduce each DPO by the amount of any Cash payments or Deemed
Cash** Payments made with respect to Permitted Policy Claims under the related
Policy, as discussed below. These contingent additional payments under DPOs
will be payable only if, when and to the extent FGIC determines, in consultation
with a third-party firm and with NYSDFS approval, that it has sufficient assets to
pay in Cash an increased portion of each previously Permitted Policy Claim and
each Policy Claim it expects to permit in a Stress Scenario during the Run-Off
Period.

**This approach is designed so that all of FGIC's Policyholders receive the
same percentage (or CPP) of Cash on account of their Permitted Policy
Claims, whether arising in the next five years or in the next few decades.**

18.     Although I understood that Freddie Mac would not receive 100 cents on the dollar

from FGIC as the insurer/guarantor of the FGIC-wrapped ResCap RMBS in Freddie Mac's

portfolio, Freddie Mac's impetus for approving the Rehabilitation Plan was the understanding

from the Affidavit of Michael W. Miller in Support of the Rehabilitation Plan (the "Miller

Affidavit") that FGIC policyholders would very likely recover 27-30 cents and, more

importantly, that the Rehabilitation Plan would be revised on an annual basis where, as the estate

increases its recoveries, the payout to all FGIC policyholders would be on a pro rata basis.

Freddie Mac would not have approved the Rehabilitation Plan had we known that the Policies

would be commuted for a one-time lump sum payment resulting in

19.    I declare under penalty of perjury that the information set forth in this Declaration

is true and correct to the best of my knowledge, information, and belief.

Dated: July 31, 2013
           Washington, D.C.

                                        /s/ Gina Healy
                                        Gina Healy

# EXHIBIT A

REDACTED

# EXHIBIT B

Exhibit 1

**Preliminary Analysis of FGIC Payments Not Paid to FGIC and
Resulting Reductions of Cash Payments on Certain Permitted Policy Claims**

**Preliminary Analysis of FGIC Payments Not Paid to FGIC and
Resulting Reductions of Cash Payments on Certain Permitted Policy Claims[1]**

The attached charts reflect FGIC's preliminary estimates of FGIC Payments not paid to FGIC and resulting reductions against projected initial Cash payments on account of certain Permitted Policy Claims and, to the extent applicable, subsequent Cash payments with respect to such Claims, in each case pursuant to the application of Section 1.4(A) of the Restructured Policy Terms.

In developing these preliminary estimates, FGIC (i) reviewed all Policies to assess whether there are any premiums due and payable to FGIC, which had not been paid to FGIC, and (ii) reviewed and analyzed the Policies and underlying servicer or trustee reports and Transaction Documents available to FGIC, as of September 30, 2012, in respect of over one hundred forty (140) transactions where FGIC has paid or received Claims, including over one hundred twenty (120) transactions that FGIC has classified as RMBS, to assess whether there are any reimbursements due and payable to FGIC and to what extent such amounts would be due and payable to FGIC within the meaning of FGIC Payments, which have not been paid to FGIC. Of these transactions, FGIC identified eighteen (18) transactions where amounts constituting FGIC Payments (i.e., premiums and/or reimbursements) should have been paid to FGIC by the trustees pursuant to the Transaction Documents but were not. Such identified transactions may be categorized as follows:

- For four (4) of these transactions, FGIC believes that the applicable trustees likely have set aside or escrowed unpaid FGIC Payments. Pursuant to the Plan, such trustees will be obligated to turn over to FGIC such unpaid amounts within five (5) Business Days of the Effective Date. Assuming compliance by the trustees with such requirement, there will be no unpaid FGIC Payments to offset against the initial Cash payments in respect of related Permitted Policy Claims (and this assumption is reflected in the attached charts) (See Schedule A);

- For four (4) of the identified transactions, FGIC believes that the applicable trustees likely distributed the FGIC Payment amounts to the underlying holders. For these transactions, pursuant to Section 1.4(A) of the Restructured Policy Terms, FGIC will offset such amounts against the Cash payments FGIC otherwise would have paid on related Permitted Policy Claims (See Schedule B); and

- For the remaining ten (10) transactions, FGIC has been unable, to date, to determine whether the applicable trustees have set aside the unpaid FGIC Payment amounts, or whether they have distributed such amounts to the

---

[1] Capitalized terms not defined herein or in the attached charts have the meanings ascribed to them in the Plan of Rehabilitation for Financial Guaranty Insurance Company, dated September 27, 2012 (as may be amended or supplemented).

underlying holders (in the attached charts it has been assumed that these amounts have been distributed to the underlying holders) (See Schedule C).

The attached charts identify which of the eighteen (18) transactions fall within each of the above-described categories. Each of the transactions is shown on a Policy-level basis, rather than a CUSIP-level basis. Many of the numbers reflected on the attached charts have been rounded.

With respect to the balance of the transactions analyzed by FGIC, FGIC believes, based upon its preliminary analysis, that no FGIC Payments are due and owing to FGIC as of September 30, 2012 with respect to those transactions.

Please note that the estimates set forth in the attached charts and summarized herein are based on FGIC's preliminary analysis as of September 30, 2012, are based in part upon information provided by third parties (including in trustee and servicer reports), and are subject to adjustment and correction based upon, without limitation, FGIC's continued investigation into and refinement of the underlying data, as well as any additional FGIC Payment amounts or Claims that have arisen or may arise subsequent to September 30, 2012. In addition, the analysis does not take into account, among other things, (i) errors (if any) that trustees or servicers may have made in interpreting the Transaction Documents or applying or distributing funds, (ii) incorrect or missing information in the trustee or servicer reports, (iii) Plan-imposed limitations on what may constitute a Permitted Claim (for which the information called for by the Proof of Policy Claim Form, to be completed and submitted following the Effective Date, will be required), or (iv) changes to the CPP. Accordingly, the amounts listed in the "Initial Cash Payment to Policyholder" column are not necessarily the amounts that ultimately will be paid pursuant to the Plan.

## Schedule A

Dated 11/14/2012
Data as of 9/30/2012

**Subject to Qualifications Contained in Attached Cover Sheets**          **Preliminary Estimates - Subject to Change**

Unpaid FGIC Payments Due to FGIC as of 9-30-12

| CUSIP | FGIC Description | Unpaid Premiums | Unpaid Reimbursements | Total Premiums and Reimbursements Due to FGIC | Post 1310 Order Unpaid Claims as of 9-30-12 | Initial Cash Calculation at 15% CPP | Reduction to Initial Cash Calculation for Unpaid FGIC Payments | Initial Cash Payment to Policyholder | Balance to be Reduced from Future Cash Payments |
|---|---|---|---|---|---|---|---|---|---|
| **Transactions where it appears unpaid FGIC Payments due to FGIC have been set aside by the trustees** | | | | | | | | | |
| 040104MX6 040104MY4 | ARSI 2005-W1 / AMLT | 1,340,000 | 12,360,000 | 13,700,000 | 26,216,083 | 3,932,412 | | 3,932,412 | |
| 45254NKQ9 45254NKR7 45254NKS5 | IMM 2004-8 2A1 / Impac 2004-8 | 350,000 | 6,990,000 | 7,340,000 | 9,514,297 | 1,427,145 | | 1,427,145 | |
| 45254NLJ4 45254NLK1 45254NLL9 | IMM 2004-10 1A1 / Impac 2004-10 | 860,000 | 14,340,000 | 15,200,000 | 15,222,225 | 2,283,334 | | 2,283,334 | |
| 45254NLZ8 45254NMA2 | IMM 2004-11 1A1 / Impac 2004-11 | - | 7,410,000 | 7,410,000 | 8,906,788 | 1,336,018 | | 1,336,018 | |
| Total | | 2,550,000 | 41,100,000 | 43,650,000 | 59,859,393 | 8,978,909 | - | 8,978,909 | - |

Schedule B

Dated 11/14/2012
Data as of 9/30/2012

**Subject to Qualifications Contained in Attached Cover Sheets**          **Preliminary Estimates - Subject to Change**

Unpaid FGIC Payments Due to FGIC as of 9-30-12

| CUSIP | FGIC Description | Unpaid Premiums | Unpaid Reimbursements | Total Premiums and Reimbursements Due to FGIC | Post 1310 Order Unpaid Claims as of 9-30-12 | Initial Cash Calculation at 15% CPP | Reduction to Initial Cash Calculation for Unpaid FGIC Payments | Initial Cash Payment to Policyholder | Balance to be Reduced from Future Cash Payments |
|---|---|---|---|---|---|---|---|---|---|
| **Transactions where it appears unpaid FGIC Payments due to FGIC have been passed through to holders by trustees** | | | | | | | | | |
| 126685DV5 126685DW3 126685DX1 126685DY9 126685DZ6 | CWHEQ 2006-S2 | - | 7,640,000 | 7,640,000 | 111,317,220 | 16,697,583 | 7,640,000 | 9,057,583 | - |
| 23242MAA9 23242MAB7 23242MAC5 23242MAD3 23242MAE1 | CWHEQ 2006-S3 | - | 13,330,000 | 13,330,000 | 128,424,707 | 19,263,706 | 13,330,000 | 5,933,706 | - |
| 126683AA9 126683AB7 126683AC5 126683AD3 126683AE1 126683AF8 | CWHEQ 2006-S5 | - | 14,070,000 | 14,070,000 | 155,433,080 | 23,314,962 | 14,070,000 | 9,244,962 | - |
| 43709KAA7 | IndyMac INDS 2006-2B | 990,000 | 16,980,000 | 17,970,000 | 72,713,857 | 10,907,079 | 10,907,079 | - | 7,062,921 |
| | Total | 990,000 | 52,020,000 | 53,010,000 | 467,888,863 | 70,183,329 | 45,947,079 | 24,236,251 | 7,062,921 |

Schedule C

Dated 11/14/2012
Data as of 9/30/2012

**Subject to Qualifications Contained in Attached Cover Sheets**          **Preliminary Estimates - Subject to Change**

Unpaid FGIC Payments Due to FGIC as of 9-30-12

| CUSIP | FGIC Description | Unpaid Premiums | Unpaid Reimbursements | Total Premiums and Reimbursements Due to FGIC | Post 1310 Order Unpaid Claims as of 9-30-12 | Initial Cash Calculation at 15% CPP | Reduction to Initial Cash Calculation for Unpaid FGIC Payments | Initial Cash Payment to Policyholder | Balance to be Reduced from Future Cash Payments |
|---|---|---|---|---|---|---|---|---|---|
| **Transactions where it is uncertain if unpaid FGIC Payments due to FGIC have been set aside by the trustees** | | | | | | | | | |
| 02660TDZ3 | American Home Mortg 2005-1 | 110,000 | - | 110,000 | 5,197,593 | 779,639 | 110,000 | 669,639 | - |
| 02660TEV1 | American Home Mortg 2005-2 | 210,000 | - | 210,000 | 11,015,910 | 1,652,387 | 210,000 | 1,442,387 | - |
| 748351AE3 748351AF0 | Ameriquest 2005-X2 | 230,000 | - | 230,000 | 1,280,847 | 192,127 | 192,127 | - | 37,873 |
| 361856EA1 361856EB9 361856BC7 361856ED5 361856EE3 361856EF0 | GMACM 2005-HE1 | - | 200,000 | 200,000 | 24,450,334 | 3,667,550 | 200,000 | 3,467,550 | - |
| 36185MAA0 36185MAB8 36185MAC6 36185MAD4 36185MAE2 36185MAF9 | GMACM 2005-HE2 | 100,000 | - | 100,000 | 1,783,116 | 267,467 | 100,000 | 167,467 | - |
| 361856ER4 | GMACM 2006-HE1 | - | 250,000 | 250,000 | 69,710,686 | 10,456,603 | 250,000 | 10,206,603 | - |

Dated 11/14/2012
Data as of 9/30/2012

**Subject to Qualifications Contained in Attached Cover Sheets**          **Preliminary Estimates - Subject to Change**

Unpaid FGIC Payments Due to FGIC as of 9-30-12

| CUSIP | FGIC Description | Unpaid Premiums | Unpaid Reimbursements | Total Premiums and Reimbursements Due to FGIC | Post 1310 Order Unpaid Claims as of 9-30-12 | Initial Cash Calculation at 15% CPP | Reduction to Initial Cash Calculation for Unpaid FGIC Payments | Initial Cash Payment to Policyholder | Balance to be Reduced from Future Cash Payments |
|---|---|---|---|---|---|---|---|---|---|
| **Transactions where it is uncertain if unpaid FGIC Payments due to FGIC have been set aside by the trustees (cont'd)** | | | | | | | | | |
| 36185HEF6<br>36185HEG4<br>36185HEH2<br>36185HEJ8<br>36185HEK5 | GMACM 2006-HLTV1 | 70,000 | - | 70,000 | 10,152 | 1,523 | 1,523 | - | 68,477 |
| 437089AA3<br>437089AB1<br>437089AC9<br>437089AD7<br>437089AE5 | IndyMac INDS 2006-1 | 580,000 | - | 580,000 | 49,241,947 | 7,386,292 | 580,000 | 6,806,292 | - |
| 456606MZ2 | IndyMac 2006-H1 | 480,000 | - | 480,000 | 40,735,618 | 6,110,343 | 480,000 | 5,630,343 | - |
| 76110VQY7<br>RFC4HS3VF | RFMSII 2004-HS3 | 100,000 | - | 100,000 | 1,048,792 | 157,319 | 100,000 | 57,319 | - |
| Total | | 1,880,000 | 450,000 | 2,330,000 | 204,474,997 | 30,671,250 | 2,223,650 | 28,447,600 | 106,350 |

# EXHIBIT C

<u>Exhibit D</u>

**Disclosure Statement**

TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................... 1

II. BACKGROUND ..................................................................................................... 5

    A.   Corporate Structure ....................................................................................... 5

    B.   Overview of FGIC ......................................................................................... 6

III. OVERVIEW OF THE PLAN ................................................................................. 7

    A.   Summary of Plan Treatment of Claims and Equity Interests ....................... 7

    B.   Approval of Plan/Objection Deadline ........................................................... 9

IV. KEY EVENTS LEADING TO THE
COMMENCEMENT OF THE REHABILITATION PROCEEDING ..................... 10

    A.   Background .................................................................................................. 10

    B.   Pre-Filing Actions ....................................................................................... 11

         1.   Commencement of Run-Off ............................................................. 11

         2.   Loss Mitigation Measures ................................................................ 11

         3.   Expense Reduction Measures ........................................................... 12

         4.   Suspension of Claims Payments ...................................................... 12

         5.   Surplus Restoration Plan and Related Exchange Offer .................... 13

         6.   Formation of Ad Hoc Instrument Holder Group .............................. 13

         7.   Pursuit of Claims Against Third Parties ........................................... 14

         8.   FGIC UK Separation ........................................................................ 15

         9.   Sponsorship of FGIC Corp. Chapter 11 Plan .................................. 15

         10.  FGIC Proposed Plan ......................................................................... 16

V. SIGNIFICANT POST-FILING ACTIONS ............................................................ 16

    A.   Order to Show Cause ................................................................................... 16

    B.   Order of Rehabilitation ............................................................................... 16

    C.   Loss Mitigation Efforts ............................................................................... 17

         1.   Novation of National Public Reinsured Policies ............................. 17

         2.   CDS Commutation Agreements ........................................................ 18

         3.   Reinsurance Commutation Agreement ............................................. 19

    D.   Discussions Concerning the Plan with Various Constituents ...................... 19

i

**TABLE OF CONTENTS**
(continued)

Page

    2.    Notification of Effective Date ...................................................................... 36

    3.    Waiver of Conditions ................................................................................... 37

F.    Effect of Effective Date ...................................................................................... 37

    1.    Discharge ...................................................................................................... 37

    2.    Releases ........................................................................................................ 37

    3.    Exculpation .................................................................................................. 37

    4.    No Liability for Information Provided by Trustees ..................................... 38

    5.    Indemnity .................................................................................................... 38

    6.    Termination of Rehabilitation Proceeding ................................................. 38

    7.    Termination of Duties of Rehabilitator ...................................................... 38

    8.    Injunctive Relief .......................................................................................... 38

    9.    Preservation of Causes of Action ............................................................... 39

    10.    Limitations on Operations Following Effective Date .................................. 39

    11.    Reporting ..................................................................................................... 39

G.    Retention of Jurisdiction .................................................................................... 39

H.    Miscellaneous Provisions ................................................................................... 40

VII.  FEASIBILITY/RECOVERY ANALYSIS ...................................................................... 40

A.    General Assets Available to Pay Liabilities ....................................................... 40

    1.    Investments ................................................................................................. 40

    2.    Premiums ..................................................................................................... 41

    3.    Potential Future Assets Available to Pay Liabilities ................................... 42

B.    Significant Liabilities .......................................................................................... 42

    1.    RMBS Exposure ........................................................................................... 42

    2.    CDO Exposure ............................................................................................. 43

    3.    U.S. Public Finance Exposure .................................................................... 43

    4.    International Finance Exposure ................................................................... 44

C.    Loss Reserves ..................................................................................................... 45

D.    Reinsurance ........................................................................................................ 46

E.    Rehabilitator's Recovery Analysis .................................................................... 48

## LIST OF EXHIBITS

Exhibit A  Plan of Rehabilitation

Exhibit B  Organizational Chart

Exhibit C  Run-Off Projections

Exhibit D  Liquidation Analysis

Exhibit E  Restructured Policy Terms:  Illustrative Example

# I.

## INTRODUCTION

On June 28, 2012, the Superintendent of Financial Services of the State of New York was appointed rehabilitator (the "**Rehabilitator**") of Financial Guaranty Insurance Company ("**FGIC**") by the Supreme Court of the State of New York, which is overseeing FGIC's rehabilitation proceeding (the "**Rehabilitation Proceeding**"). On September 27, 2012, the Rehabilitator filed a proposed Plan of Rehabilitation for FGIC, dated September 27, 2012 (attached hereto as Exhibit A) (the "**Plan**") and this disclosure statement, dated September 27, 2012 (the "**Disclosure Statement**"), in the Rehabilitation Proceeding. The Rehabilitator also intends to file documents that implement the Plan in one or more filings called the "Plan Supplement."

The goal of the Plan is to treat FGIC's Policyholders[1] in a fair and equitable manner while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary. The Plan provides for all of the value of FGIC, other than administrative expenses and certain other costs, to go to FGIC's Policyholders until Policyholders are paid in full. No claimants junior to Policyholders will receive any payment until Policyholders are paid in full in accordance with the terms of the Plan.

This Disclosure Statement describes the Plan, explains FGIC's current and projected financial outlook, outlines the alternatives to the Plan the Rehabilitator considered and explains the principal reasons the Rehabilitator selected the Plan, identifies material risk factors associated with the Plan and discusses the ways in which the Plan is expected to provide for greater recoveries to Policyholders than a liquidation of FGIC. Although the New York Insurance Law (the "**NYIL**") does not require a disclosure statement or permit FGIC's Policyholders or other creditors to vote on the Plan, given the size, complexity and unique circumstances surrounding the Rehabilitation of FGIC, the Rehabilitator voluntarily prepared this Disclosure Statement to aid the Court, Policyholders and other Persons in understanding the terms of the Plan.

Since November 2009, FGIC has worked with its primary regulator, the New York State Department of Financial Services ("**NYSDFS**"),[2] and then with the Rehabilitator to restructure FGIC. These efforts included extensive discussions with Policyholders, the Indenture Trustees (defined below), holders of Instruments insured by FGIC and other counterparties to FGIC's material agreements. FGIC's restructuring efforts also included resolving with its parent, FGIC Corporation ("**FGIC Corp.**"), issues raised concerning FGIC's continued use of

---

[1] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan.

[2] Prior to October 3, 2011, the New York State Insurance Department ("**NYID**") was the primary regulator for FGIC. As of October 3, 2011, the NYID and the New York State Banking Department were consolidated and merged into the NYSDFS, and the functions and authority of the NYID were transferred to the NYSDFS. References in this Disclosure Statement or the Plan to any actions taken by the NYSDFS prior to October 3, 2011 refer to such actions taken by the NYID during that time.

protect Policyholders with future anticipated Claims so that all Policyholders will receive the same CPP of their Permitted Policy Claims (ignoring the time value of money) regardless of whether their Claims arise two years or 30 years after the Effective Date. The Plan provides for an annual (and potentially more frequent) reassessment of FGIC's financial condition by a third party firm based on actual results and changing conditions from which adjustments to the CPP may be made.

Third, in an effort to mitigate FGIC's liabilities and increase recoveries for Policyholders, as part of the Plan, the Rehabilitator is seeking approval of certain settlements with counterparties to FGIC Contracts. There are two forms of settlements: a "novation" with National Public Finance Guarantee Corporation ("**National Public**") and "commutations" (the "**CDS Commutation Agreements**") with credit default swap ("**CDS**") counterparties (the "**CDS Counterparties**").[3] Consummation of the transactions contemplated in these agreements is subject to Court approval. The Novation Agreement (defined below) with National Public, an affiliate of MBIA Insurance Corporation ("**MBIA**"), eliminates FGIC's exposure to Policies having an aggregate par outstanding as of December 31, 2011 of approximately $138 billion. A copy of the Novation Agreement is included in the Plan Supplement filed contemporaneously herewith. In addition, two CDS Commutation Agreements have been executed (each of which is subject to approval by the Court) that will enable FGIC to resolve potential exposure of more than $3.8 billion (as of March 31, 2012) total net par in force ("**NPIF**") and to avoid potentially lengthy and costly litigation over the allowability and treatment of approximately $1.5 billion (as of March 31, 2012) in potential Termination Payment Claims. Payments by FGIC under these CDS Commutation Agreements will result in the cancellation or "tearing up" of FGIC's Policies related to that exposure for less than what these CDS Counterparties are projected to have received under the Plan on account of Policy Claims for realized "Credit Events" (as defined in the relevant CDS, or similar term provided therein) that the Rehabilitator projects would have been asserted against FGIC if the CDS with such CDS Counterparties were not "torn up" or terminated early. Copies (in certain instances, in redacted form) of the two executed CDS Commutation Agreements, and any additional CDS Commutation Agreements executed by FGIC, will be filed in an update to the Plan Supplement.

On the Effective Date, FGIC will emerge from this Rehabilitation Proceeding as a solvent insurance company under the NYIL by restructuring its Policies and consummating the commutation and novation transactions described above. FGIC's return to statutory solvency, together with other protections afforded by the Plan, enables the Rehabilitator to recommend terminating the Rehabilitation Proceeding once the Plan becomes effective. The Plan also provides for enhanced NYSDFS oversight of FGIC post-emergence and injunctive relief to protect FGIC and other Persons from violations of the Plan's provisions. Termination of the Rehabilitation Proceeding will avoid significant administrative burden associated with an ongoing Article 74 proceeding for the benefit of all of FGIC's Policyholders.

\*        \*        \*

---

[3] The Rehabilitator has also sought Court approval of an agreement to commute certain reinsurance transactions, a third type of settlement, as described in greater detail in Section V.C.3 below.

The Plan and this Disclosure Statement may contain certain statements that are, or may be deemed to be, "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Any such forward-looking statements (including the Run-Off Projections and Liquidation Analysis) are based upon a variety of estimates and assumptions that, though considered reasonable by the Rehabilitator, may not be realized, and are inherently subject to significant business, economic and competitive uncertainties and contingencies. Some assumptions inevitably will not materialize and events and circumstances occurring subsequent to the date on which the statements were prepared may be significantly different from those assumed, or may be unanticipated, and thus may affect financial results in a material and possibly adverse manner. The statements, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

**To ensure compliance with Internal Revenue Service ("IRS") Circular 230, holders of Claims and Equity Interests are hereby notified that: (a) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) holders of Claims or Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.**

The Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the exhibits annexed thereto. The interpretation provisions set forth in Section 9.14 of the Plan apply to this Disclosure Statement. In the event of any conflict between the descriptions set forth in this Disclosure Statement and the terms of the Plan, the terms of the Plan will govern. Summaries of certain provisions of agreements referred to in this Disclosure Statement do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the full text of the applicable agreement, including the definitions of terms contained in such agreement.

## II.

## BACKGROUND

### A.    CORPORATE STRUCTURE

FGIC is a direct, wholly owned subsidiary of FGIC Corp., a Delaware corporation. FGIC Corp. is a debtor under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), but is not a party to the Rehabilitation Proceeding. FGIC also has outstanding preferred stock (the "**Preferred Stock**") that is held by third parties.

FGIC is the parent company of FGIC UK Limited ("**FGIC UK**"), a wholly-owned United Kingdom insurance company. On July 1, 2009, FGIC UK filed a voluntary variation of permission with the UK Financial Services Authority (the "**FSA**"), its principal regulator, to remove its ability to write new insurance contracts, which the FSA approved on July 10, 2009. FGIC UK is not a party to the Rehabilitation Proceeding.

5

2012, as a result of FGIC's financial condition, FGIC's license to write financial guaranty insurance was suspended by state insurance departments or voluntarily surrendered or limited by FGIC in the following thirty-two (32) states: Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Iowa, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Hampshire, North Carolina, North Dakota, Ohio, Oregon, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia and Wyoming.

## III.

## OVERVIEW OF THE PLAN

**A.    SUMMARY OF PLAN TREATMENT OF CLAIMS AND EQUITY INTERESTS**

Other than Claims (including Policy Claims) paid in full prior to the Commencement Date, the Plan will be the exclusive means for resolving and paying (i) all Policy Claims, whenever arising, (ii) all other Claims arising during, or relating to, the period prior to the Effective Date and (iii) all Equity Interests in existence as of the Commencement Date. Claims arising during or relating to the period on and after the Effective Date (other than Policy Claims) are not covered by the Plan and will be resolved and paid by FGIC in the ordinary course of business. The following table lists the categories of Claims and Equity Interests that are treated by the Plan and summarizes the treatment for each category.

| CATEGORY | DESIGNATION | TREATMENT | TOTAL AMOUNT OF CLAIMS[4] | ESTIMATED RECOVERIES |
|---|---|---|---|---|
| A | Secured Claims | Permitted Secured Claims will be paid in full solely from the collateral securing such Claims. | $0 | N/A |
| B | Administrative Expense Claims | Permitted Administrative Expense Claims will be paid in full in Cash. | $16.9 million[5] | 100% |

---

[4] The amounts set forth herein are based on the Rehabilitator's estimation of all existing and anticipated Claims in each category and do not reflect the actual amounts of Claims in each category that may exist, arise or be Permitted.

[5] Estimated for the period from the date of the filing of this Disclosure Statement through December 31, 2012, the anticipated Effective Date.

| CATEGORY | DESIGNATION | TREATMENT | TOTAL AMOUNT OF CLAIMS[4] | ESTIMATED RECOVERIES |
|---|---|---|---|---|
| E | Late-Filed Claims | Holders of Permitted Late-Filed Claims will receive, on a pro rata basis, Cash, as and when available, until all such Claims are paid in full.  Permitted Late-Filed Claims will not be entitled to any distributions until all actual and expected Permitted Claims in Categories A through D are paid in full in Cash or fully reserved for. | Not estimable at this time. | 0% |
| F | Equity Interests | Equity Interests will remain in existence unaffected by the Plan. Holders of Equity Interests will not be entitled to any distributions, dividends or other payments on account of their Equity Interests until all actual and expected Permitted Claims in Categories A through E are paid in full in Cash or fully reserved for. | N/A | 0% |

**B.    APPROVAL OF PLAN/OBJECTION DEADLINE**

The Rehabilitator has filed a proposed order to show cause (the "**Scheduling Order**"), requesting that the Court set a hearing on December 18, 2012 at 2:15 p.m. to consider approval of the Plan. The Rehabilitator intends to provide notice of the filing of the Plan, the Rehabilitator's request for the Court to approve the Plan and the means for obtaining more detailed information regarding the Rehabilitation Proceeding, including copies of relevant documents, by (i) posting the Scheduling Order and supporting papers on the Policyholder Information Center, (ii) publishing notice of the hearing to approve the Plan in The Wall Street Journal and The Bond Buyer and (iii) mailing notice of the hearing to approve the Plan to all known Policyholders and other claimants (other than those who requested to stop receiving notices relating to the Rehabilitation Proceeding).

In the Scheduling Order, the Rehabilitator proposed deadlines and procedures for filing updates to the Plan Supplement, objections to the Plan and replies to such objections. A copy of the Scheduling Order, as well as certain other pleadings filed with the Court by the

**B.**     PRE-FILING ACTIONS

**1.**     **Commencement of Run-Off**

In January 2008, to preserve capital, FGIC voluntarily ceased writing Policies for new or additional risks and stopped paying dividends or other distributions to its shareholders.

Since January 2008, FGIC has sought to improve its financial position and liquidity, reduce the size and volatility of its insured portfolio, restore its statutory surplus position to the statutorily mandated amount and pursue loss mitigation strategies, including the remediation or commutation of certain CDS, RMBS, ABS CDO and CLO transactions. FGIC's loss mitigation strategies have been designed to (i) minimize its Claims payments, (ii) maximize its recoveries and (iii) mitigate its expected losses, including by (a) seeking to enforce obligations of third parties to repurchase ineligible mortgage loans and properly service the mortgage loan pools and (b) pursuing litigation or arbitration proceedings to recover losses already incurred by FGIC or to mitigate future losses that FGIC may incur.

**2.**     **Loss Mitigation Measures**

During the time period from January 2008, when FGIC ceased writing new business, through the Commencement Date, FGIC completed loss mitigation transactions and took other affirmative steps to mitigate potential losses, including the following transactions, which reduced FGIC's incurred losses by over $3.0 billion:

(a)   From January 2008 through July 2009, FGIC completed consensual commutation and termination transactions with eight CDS Counterparties to eliminate its insured exposure to ABS CDO with total NPIF of approximately $9.4 billion. These transactions enabled FGIC to obtain an aggregate surplus benefit of over $1.8 billion and to eliminate its exposure to further adverse loss developments and potential claims for significant Termination Payment Claims (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount," or other methodologies) under those transactions where FGIC had insured CDS relating to such ABS CDO;

(b)   As discussed in Section V.C.1 below, in September 2008, FGIC entered into the National Public Reinsurance Transaction (as defined below), which increased its surplus by approximately $534 million;

(c)   In the fourth quarter of 2008, FGIC issued Preferred Stock under a "soft capital" facility in exchange for a Cash purchase price of $300 million, which increased FGIC's surplus by an equal amount;

(d)   From September 2008 through August 2009, FGIC mitigated its insured exposure on FGIC-insured RMBS with total NPIF of approximately $538 million by either purchasing such RMBS (in the secondary market) or entering into private capital markets transactions where it purchased the right to receive the future Claims payments made by FGIC with respect to the subject RMBS. These transactions enabled FGIC to obtain an aggregate surplus benefit of approximately $129 million and to eliminate its exposure to further adverse loss developments on these RMBS. With respect to any purchased RMBS, FGIC is entitled to

11

The 1310 Order required FGIC to suspend payment of all Claims and prohibited FGIC from writing new Policies. In accordance with the 1310 Order, FGIC suspended all Claim payments in November 2009. FGIC previously had ceased writing new Policies in January 2008. The 1310 Order also directed FGIC to submit to the NYSDFS by January 5, 2010, a plan to eliminate the impairment of FGIC's policyholders' surplus and to remove the impairment of its capital and return to compliance with its minimum policyholders' surplus requirement by June 15, 2010. Under the 1310 Order, FGIC was allowed to operate only in the ordinary course of business and as necessary to effectuate the plan it was developing to eliminate impairment of FGIC's policyholders' surplus. The 1310 Order did not preclude the Superintendent from seeking rehabilitation or liquidation of FGIC at any time.

### 5.    Surplus Restoration Plan and Related Exchange Offer

On December 22, 2009, FGIC submitted to the NYSDFS a proposed surplus restoration plan (as amended and restated, the "**Surplus Restoration Plan**"). The Surplus Restoration Plan included three key loss mitigation components:

(a)   Remediating a substantial portion of FGIC's exposure to RMBS and ABS CDO insured by FGIC and for which it established statutory loss reserves, including by "stripping" FGIC insurance on all or a portion of such RMBS and ABS CDO through consensual remediation transactions and an exchange offer (the "**Offer**");

(b)   Commuting, terminating, restructuring or reinsuring a substantial portion of FGIC's remaining exposure to ABS CDO and other obligations for which it established loss reserves, including RMBS insured by FGIC in the secondary market, through consensual transactions; and

(c)   Mitigating FGIC's existing exposure to Termination Payment Claims under FGIC-insured CDS pursuant to consensual transactions with the CDS Counterparties.

Although FGIC reached definitive agreements or agreements in principle with CDS Counterparties and other policy beneficiaries to effectuate certain of the loss mitigation transactions under the Surplus Restoration Plan, the transactions were conditioned on successfully closing the Offer. The Offer did not receive participation from holders sufficient to satisfy the conditions necessary to complete the Offer. The Surplus Restoration Plan was therefore not implemented and FGIC was unable to remove the impairment of its capital as required by the 1310 Order.

### 6.    Formation of Ad Hoc Instrument Holder Group

As a consequence of its inability to gain the necessary level of participation in the Offer, in November 2010, FGIC began discussions with a group of certain holders of Instruments insured by FGIC (the "**Ad Hoc Instrument Holder Group**") in connection with its effort to, along with the NYSDFS, develop a plan of rehabilitation to restore FGIC to statutory solvency and to restructure FGIC's liabilities in a manner that is fair and equitable to its Policyholders and other creditors. The Ad Hoc Instrument Holder Group has been actively involved in discussing various aspects of the Plan, initially with FGIC, and then with the Rehabilitator.

13

actions against those defendants.  The claims against non-debtor defendants have also been stayed.

The Rehabilitator and FGIC continue to review potential claims against third parties, including originators, servicers, investment managers and rating agencies, to recover damages for losses suffered by FGIC in connection with its insurance of ABS and RMBS.

While FGIC may recover substantial amounts from litigations and arbitrations and from demands FGIC has made on third parties to repurchase breaching mortgage loans and properly service mortgage loan pools, FGIC has not included any potential recoveries therefrom in the determination of its statutory loss reserve (except for expected recoveries from certain mortgage insurance-related claims) because these recoveries are not sufficiently probable and estimable at this time.

### 8.    **FGIC UK Separation**

In June 2011, FGIC and FGIC UK entered into a Deed of Termination which terminated the Reinsurance Agreement dated March 31, 2004 and the Excess of Loss Reinsurance Agreement dated March 31, 2004 under which FGIC had provided reinsurance on financial guarantees or policies written by FGIC UK, and released each other from all present and future claims and liabilities under such agreements.  Pursuant to the Deed of Termination, FGIC was relieved of its reinsurance obligations in respect of approximately $8 billion of par exposure and permitted to retain 100% of all premiums (net of ceding commissions) previously paid to FGIC.

### 9.    **Sponsorship of FGIC Corp. Chapter 11 Plan**

On August 3, 2010, FGIC Corp. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Case No. 10-14215(SMB) (the "**Chapter 11 Case**").  On April 23, 2012, the Bankruptcy Court confirmed FGIC Corp.'s chapter 11 plan (the "**FGIC Corp. Plan**").  The FGIC Corp. Plan incorporates the terms of a Plan Sponsor Agreement that FGIC, with the authorization of the NYSDFS, executed with FGIC Corp. on February 3, 2012 (the "**Plan Sponsor Agreement**") and the Bankruptcy Court approved on February 28, 2012.  Pursuant to the Plan Sponsor Agreement, FGIC will pay $11 million to FGIC Corp. and, in exchange, FGIC Corp. will assume the Amended and Restated Income Tax Allocation Agreement (the "**Amended TAA**"), effective as of the effective date of the FGIC Corp. Plan.  The Amended TAA is designed to protect certain tax attributes of FGIC, including credits, losses, deductions (including any foreign tax credits, alternative minimum credits, NOLs and net capital losses), deferred deductions, tax basis in assets and any other tax attribute (collectively, the "**Tax Attributes**").  The Tax Attributes are valuable and as of December 31, 2011 include approximately $5.3 billion of NOLs attributable to FGIC.  FGIC's obligation to pay $11 million to FGIC Corp. is, however, subject to a number of conditions relating to the preservation of these valuable Tax Attributes, including receipt of a private letter ruling pursuant to its request for the same from the IRS.  As discussed in Section VI.E.1 hereof, receipt of this private letter ruling is also one of the conditions precedent to effectiveness of the Plan.  However, as discussed in

As provided in more detail therein, the Order of Rehabilitation also enjoined and restrained all Persons from taking certain actions for the duration of the Rehabilitation Proceeding, including (i) transacting FGIC's business, (ii) wasting or disposing of FGIC's property, (iii) interfering with the Rehabilitator's possession, control or management of FGIC's property, (iv) disclosing any non-public information that is proprietary to FGIC, (v) commencing, continuing, advancing or otherwise prosecuting any Legal Proceedings against the FGIC Parties and certain other Persons and (vi) paying any Claims or performing any obligations of the FGIC Parties without the consent of the Rehabilitator (or his designee).  The Order of Rehabilitation also provided additional injunctive relief tailored to the unique circumstances of a financial guaranty insurance company such as FGIC.  This relief, among other things, barred all Persons from (i) withholding or setting off FGIC Payments owed to the FGIC Parties, (ii) terminating FGIC Contracts and asserting Termination Payment Claims against the FGIC Parties and (iii) exercising or otherwise interfering with FGIC Rights, in each case despite contractual *ipso facto* provisions in certain FGIC Contracts and related Transaction Documents that might otherwise modify the FGIC Parties' rights as a result of the Rehabilitation Circumstances or Rehabilitation Proceeding.

The Order of Rehabilitation is available at the Policyholder Information Center. Persons that violate the injunctive relief in the Order to Show Cause or Order of Rehabilitation may be subject to sanctions, may not be entitled to Claims payments under the Plan and may be subject to partial or full disapproval of their Claims.  The injunctive relief in the Order of Rehabilitation will be superseded by injunctive relief set forth in Section 7.8 of the Plan.

## C.   LOSS MITIGATION EFFORTS

### 1.    Novation of National Public Reinsured Policies

In September 2008, FGIC entered into an agreement with MBIA, pursuant to which FGIC ceded to MBIA exposure under policies covering U.S. public finance credits with total NPIF of approximately $188 billion, of which $138 billion remained outstanding as of December 31, 2011 (collectively, the "**National Public Reinsured Policies**").  Shortly thereafter, National Public, an affiliate of MBIA, replaced MBIA as the party to such transaction and assumed MBIA's obligations thereunder (the "**National Public Reinsurance Transaction**").  Key features of the National Public Reinsurance Transaction included:

(a)   National Public agreed to pay on behalf of FGIC all obligations under the National Public Reinsured Policies (subject to certain limited exceptions);

(b)   Policyholders under the National Public Reinsured Policies were allowed to bring Claims directly against National Public without filing a Claim against FGIC (sometimes referred to as a "cut-through" feature);

(c)   National Public agreed to perform all services necessary for administration of the National Public Reinsured Policies, including policyholder service, billing and claims handling;

been executed with two such counterparties. These CDS Commutation Agreements will terminate FGIC CP-issued CDS and related FGIC-issued Policies in exchange for payments by FGIC aggregating approximately $51.5 million. As of March 31, 2012, the exposure to be commuted constitutes approximately $3.8 billion NPIF, represents approximately $293 million of statutory loss reserves and carries aggregate estimated exposure to potential Termination Payment Claims of approximately $1.5 billion. Payments by FGIC under these CDS Commutation Agreements will result in the cancellation or "tearing up" of FGIC's Policies related to that exposure for less than what these CDS Counterparties are projected to have received under the Plan on account of Policy Claims for realized credit events that the Rehabilitator projects would have been asserted against FGIC if the CDS with such CDS Counterparties were not "torn up" or terminated early. The Rehabilitator is also continuing negotiations with other CDS Counterparties and is seeking to execute additional CDS Commutation Agreements between FGIC and such counterparties. Consummation of the transactions contemplated by the CDS Commutation Agreements requires (or will require) approval by the Court. The Rehabilitator will file all executed CDS Commutation Agreements with the Court (potentially in redacted form) in an update to the Plan Supplement in accordance with the deadlines set forth in the Scheduling Order.

### 3.    Reinsurance Commutation Agreement

Following entry of the Order of Rehabilitation, the Rehabilitator negotiated a settlement, commutation and release agreement with American Overseas Reinsurance Company Limited, a Bermuda reinsurance company formerly known as RAM Reinsurance Company Limited ("**AORe**"), pursuant to which, as of August 20, 2012, FGIC and AORe agreed to commute and settle all of their obligations to one another under various reinsurance agreements effective upon AORe's payment to FGIC of approximately $64.8 million, subject to Court approval (which is currently pending). The Rehabilitator may seek Court approval of agreements with other Reinsurers to commute and settle FGIC's and such Reinsurer's obligations to one another (collectively, with the AORe agreement, the "**Reinsurance Commutation Agreements**").

### D.    DISCUSSIONS CONCERNING THE PLAN WITH VARIOUS CONSTITUENTS

Following the issuance of the Order of Rehabilitation, the Rehabilitator engaged in discussions with various parties, including the Ad Hoc Instrument Holder Group, an ad hoc group of CDS Counterparties and the Indenture Trustees that had initially objected to certain provisions of the injunctive relief requested in the Rehabilitation Petition. Following their review and discussion with the Rehabilitator, certain members of the Ad Hoc Instrument Holder Group have agreed to support or not object to the Plan.

Consistent with the goal of the Plan, the Rehabilitator developed the Restructured Policy Terms to maximize the extent to which FGIC's Policyholders are treated in a fair and equitable manner. The Restructured Policy Terms are designed to address challenges the Rehabilitator faced in achieving this goal.

*CPP/DPO Structure.* First, because FGIC likely will not have sufficient assets to pay in full in Cash all Policy Claims that have arisen but have not been paid or that are expected to arise over the Run-Off Period, which may last 40 years, the Restructured Policy Terms provide for payment of only a portion of each Permitted Policy Claim in Cash. FGIC will satisfy the remainder of each Permitted Policy Claim through future payments on account of a DPO for the related Policy, to the extent payable under the Plan. FGIC will track DPOs on a Policy-by-Policy basis, and will reduce each DPO by the amount of any Cash payments or Deemed Cash Payments made with respect to Permitted Policy Claims under the related Policy, as discussed below. These contingent additional payments under DPOs will be payable only if, when and to the extent FGIC determines, in consultation with a third-party firm and with NYSDFS approval, that it has sufficient assets to pay in Cash an increased portion of each previously Permitted Policy Claim and each Policy Claim it expects to permit in a Stress Scenario during the Run-Off Period.

This approach is designed so that all of FGIC's Policyholders receive the same percentage (or CPP) of Cash on account of their Permitted Policy Claims, whether arising in the next five years or in the next few decades. The Rehabilitator, in consultation with Lazard, will set the initial CPP based on assumptions intended to enable FGIC to pay at least the initial CPP of all Policy Claims Permitted over the Run-Off Period. However, the Rehabilitator expects the CPP to increase over time. To compensate Policyholders with Claims Permitted in the near term for receiving a lower initial Cash payment because of this approach, the Restructured Policy Terms provide for DPO Accretion, which is discussed below.

*Turnover of FGIC Payments.* Second, the Restructured Policy Terms require all FGIC Payment Payors to pay in Cash in full all FGIC Payments, as defined in the Plan, owed or that would have been owed to FGIC. The definition of FGIC Payments captures (i) all premiums, fees or other charges, (ii) all expense reimbursements, (iii) to the extent FGIC paid one or more Policy Claims in full under the applicable Policy prior to November 24, 2009 for which it has not yet been reimbursed, all recoveries, reimbursements, settlements and other amounts (other than proceeds of Trust Loan Repurchase Obligations) up to the amount of such reimbursement and (iv) the then-current CPP of all recoveries, reimbursements, settlements and other amounts (other than proceeds of Trust Loan Repurchase Obligations) with respect to Policies for which there are no unreimbursed Policy Claims that were paid in full prior to November 24, 2009, in all cases payable to the FGIC Parties under the terms of or in connection with the relevant Policy or related Transaction Documents, as if (x) the Plan been in effect at all times from and after the issuance of the 1310 Order and (y) FGIC at all times paid all Policy Claims in full in Cash. With respect to clauses (iii) and (iv), many of FGIC's Policies and related Transaction Documents tie certain amounts in respect of recoveries, reimbursements, settlements and other amounts owed to FGIC under such Policies to the amount of Cash payments FGIC makes with respect to Policy Claims thereunder. The Rehabilitator believes it is fair and equitable to require FGIC Payment Payors to pay the then-current CPP portion of the recoveries, reimbursements, settlements and other amounts (other than proceeds of Trust Loan

21

Accordingly, the injunctive relief set forth in Section 7.8 of the Plan prohibits any Person from taking such actions. However, if any Person attempts to terminate a FGIC Contract and assert a Termination Payment Claim or exercise FGIC Rights in violation of the injunctive relief in the Plan, the Restructured Policy Terms provide that FGIC may declare a Policy Crystallization Event, as defined in the Plan. The concept of a Policy Crystallization Event is intended to put FGIC in no worse a position than it would have been in had the injunctive relief not been violated. This declaration of a Policy Crystallization Event enables FGIC to determine its anticipated payment obligations under the applicable Policy for the remainder of the expected duration of the Policy, ignoring any actual or anticipated effects of the actions that gave rise to the Policy Crystallization Event.

The following mechanics in the Restructured Policy Terms are described more fully below: (i) the payment of a portion of each Permitted Policy Claim in Cash; (ii) the satisfaction of the remainder of each Permitted Policy Claim through a DPO for the related Policy which will entitle the holder of such Policy to contingent additional payments and the calculation of such DPO; (iii) the accrual, calculation and payment of DPO Accretion; (iv) the requirement to make certain payments to FGIC and adjustments thereto; (v) the conduct of annual CPP Revaluations; and (vi) FGIC's right to declare a Policy Crystallization Event. An illustrative example of how Permitted Policy Claims will be paid pursuant to the Restructured Policy Terms is attached hereto as Exhibit E.

(a) CPP

Section 1.1 of the Restructured Policy Terms sets forth FGIC's obligation to pay in Cash a percentage (the CPP) of each Permitted Policy Claim and provides the mechanics for establishing the CPP and calculating the initial CPP payment for each Permitted Policy Claim.

The Rehabilitator will set the initial CPP. The Rehabilitator currently expects an initial CPP of 15% based on assumptions designed to maximize fair and equitable treatment of all Permitted Policy Claims, no matter when arising. The initial CPP will depend on several factors, including (i) actual or anticipated changes in the assumptions underlying the Run-Off Projections (including those relating to developments in actual or anticipated losses under FGIC's Policies or other financial circumstances or events), (ii) whether the Novation Agreement is approved by the Court, (iii) whether the two CDS Commutation Agreements executed thus far are approved by the Court, (iv) whether additional CDS Commutation Agreements are executed and approved by the Court (and the terms thereof), (v) whether the Reinsurance Commutation Agreement executed with AORe is approved by the Court and, if approved, whether FGIC receives the payment contemplated thereby, (vi) whether additional Reinsurance Commutation Agreements are executed and approved by the Court (and the terms thereof), (vii) whether FGIC receives the payments contemplated by any additional Reinsurance Commutation Agreements and (viii) other events and circumstances that may be beyond the Rehabilitator's control. While the Rehabilitator currently anticipates that the initial CPP will be 15%, as set forth above, no assurance can be given as to what the initial CPP ultimately will be. The CPP will be subject to adjustment pursuant to annual CPP Revaluations, as described in subsection (e) of this Section VI.B.1. The Rehabilitator currently anticipates that the CPP will ultimately increase to 30.4% using assumptions described in the Run-Off Projections, attached

(c) <u>DPO Accretion</u>

Section 1.3 of the Restructured Policy Terms governs the accrual, calculation and payment of DPO Accretion. Each Policy will accrue DPO Accretion at a rate of 3% per year (on a daily basis on the basis of a 365-day year). DPO Accretion will be calculated based on a Policy's DPO as of (i) the preceding June 30 or (ii) for the first year in which there is a DPO under such Policy, the first date there is such DPO (the "**First Payment Date**"). DPO Accretion for a Policy will begin accruing on the First Payment Date and continue until such time (if ever) as the DPO for such Policy is permanently reduced to zero. All DPO Accretion will be calculated on a simple basis rather than a compound basis (*i.e.*, no DPO Accretion will accrete based on accumulated DPO Accretion). No DPO Accretion will be added to a DPO, but will be recorded separately for each Policy in FGIC's books and records.

Section 1.3(B) of the Restructured Policy Terms provides that, if there is a CPP Upward Adjustment pursuant to Section 1.5(C) of the Restructured Policy Terms, as described in subsection (e) of this Section VI.B.1, on the applicable DPO Payment Date FGIC will make Cash payments with respect to outstanding DPO Accretion. The amounts of such Cash payments (the DPO Accretion Payment Amounts) will be calculated as part of the CPP Revaluation that led to the CPP Upward Adjustment, as described in greater detail in subsection (e) below. The Rehabilitator expects that the DPO Accretion Payment Amounts will be a fraction of the outstanding DPO Accretion. However, the Rehabilitator makes no assurances as to if, when or in what amounts FGIC may ultimately make Cash payments with respect to any DPO Accretion. Further, Section 3.2 of the Restructured Policy Terms provides that DPO Accretion is not a separate security issued by FGIC or any of its affiliates, cannot be represented by any certificate or other instrument issued by FGIC or any of its affiliates, and does not represent any ownership in FGIC or any of its affiliates. In addition, Section 3.2 of the Restructured Policy Terms provides that FGIC will not be required to make any payments with respect to any DPO Accretion other than to the holder of the related Policy.

(d) <u>FGIC Payments</u>

Section 1.4 of the Restructured Policy Terms establishes FGIC's right to set off unpaid FGIC Payments and FGIC's obligation to account for the effect of CPP Adjustments on FGIC Payments. Section 1.4(A) of the Restructured Policy Terms requires all FGIC Payment Payors to pay in Cash to the FGIC Parties all FGIC Payments that would have been payable had the Plan been in effect at all times from and after the issuance of the 1310 Order, when due, or if such FGIC Payment would have been due prior to the Effective Date, by the fifth Business Day following the Effective Date. This requirement is intended to prevent certain Policyholders from gaining an unfair advantage to the detriment of other Policyholders by withholding FGIC Payments based on the Rehabilitation or the Rehabilitation Circumstances.

Section 1.4(A) of the Restructured Policy Terms also provides that if FGIC determines in good faith that all or a portion of any FGIC Payment has not been paid to the FGIC Parties when due, FGIC will (i) upon such determination, decrease the DPO for the applicable Policy by the amount of such unpaid FGIC Payment, (ii) reduce any Cash payments that would otherwise be payable by FGIC in respect of the applicable Policy as such Cash payments become due and (iii) increase the DPO for the applicable Policy as Cash payments are reduced pursuant

25

determination of such FGIC Payment Deficiency or FGIC Payment Excess, but before the next CPP Adjustment.

These four steps are intended, in connection with any CPP Adjustment, to place FGIC and each Policyholder, Policy Payee and FGIC Policy Payor in substantially the same economic position (ignoring the time value of money), on a Policy-by-Policy basis, that each party would have been in had FGIC paid all Permitted Policy Claims based on the Adjusted CPP from and after the Effective Date.

Finally, Section 1.4(B) of the Restructured Policy Terms does not apply to FGIC Payments related to Policy Claims that were paid in full prior to the 1310 Order. The definition of FGIC Payments indicates that, with respect to such Policy Claims, FGIC is entitled to all of the recoveries, reimbursements, settlements and other amounts (other than proceeds from Trust Loan Repurchase Obligations) payable to the FGIC Parties under such Policies or related Transaction Documents, until it has been reimbursed in full.

(e)  CPP Revaluation

Section 1.5 of the Restructured Policy Terms sets forth the terms and conditions governing CPP Revaluations, including (i) the frequency of CPP Revaluations, (ii) the engagement and role of a CPP Revaluation Firm, (iii) CPP Adjustments, (iv) cessation of CPP Upward Adjustments and (v) the Final CPP Revaluation.

Section 1.5(A) of the Restructured Policy Terms provides that, commencing in 2014, FGIC will conduct a CPP Revaluation (to determine whether the CPP should remain the same or be adjusted upward or downward) on an annual basis by June 30 of each year (or as soon as practicable thereafter). In addition, if FGIC receives within six months after the effective date of a CPP Revaluation or the Effective Date Cash recoveries aggregating $100 million or more than the related Cash recovery amounts, if any, predicted in the Run-Off Projections underlying such CPP Revaluation, the Board will decide whether to (i) update the latest CPP Revaluation, taking into account the new Cash recoveries, but without updating or otherwise changing any of the Base Scenario, Stress Scenario, Run-Off Projections, Run-Off Data, Minimum Cash Buffer or Run-Off Assumptions used in the latest CPP Revaluation or (ii) conduct a new CPP Revaluation as soon as practicable. If the Board decides to update the latest CPP Revaluation, instead of conducting a new one, it will provide NYSDFS with written notice of the results of the updated CPP Revaluation. However, FGIC will not conduct any CPP Revaluation if the NYSDFS directs it in writing to refrain from doing so.

Section 1.5(B) of the Restructured Policy Terms provides that FGIC will engage a CPP Revaluation Firm to conduct each CPP Revaluation. As part of each CPP Revaluation, the CPP Revaluation Firm will review certain components of its model that will help it determine whether to recommend a CPP Adjustment. These components include the then-current Base Scenario, Stress Scenario, Run-Off Projections, Run-Off Data, Minimum Cash Buffer and Run-Off Assumptions. The CPP Revaluation Firm will propose any updates, revisions, corrections or other modifications to these components that, in its professional opinion, are necessary or advisable to correct any errors, reflect events that have occurred or are reasonably likely to occur

prior to such CPP Upward Adjustment and (ii) the Aggregate Claims amount for such Policy less the amounts (if any) by which the DPO was reduced for such Policy pursuant to Section 1.2(i) of the Restructured Policy Terms (to account for payments a Policyholder already received from other sources on account of the loss insured by such Policy). This "catch-up" payment is intended to provide holders of such Policies the recoveries they would have received had the Adjusted CPP been in effect on the previous DPO Payment Date(s). FGIC will also reduce the DPO of any such Policy by the amount of such "catch-up" payments.

In the event of a CPP Downward Adjustment, any future Cash payments that would otherwise be payable by FGIC for Policies to which FGIC paid any Cash from and after the Effective Date but prior to the CPP Adjustment, based on a higher CPP (each an, "**Overpaid Policy**") will be subject to an Equalization Adjustment. The Equalization Adjustment will reduce (including to zero) the amount of Cash that would otherwise be payable by FGIC with respect to each Overpaid Policy until such time as the Aggregate Cash Payments Amount for each Overpaid Policy equals the amount of Cash that FGIC would have paid if the (downwardly) Adjusted CPP had been in effect from and after the Effective Date (including DPO Accretion Payment Amounts).

As there are significant costs involved in conducting CPP Revaluations, to help ensure that FGIC will have adequate assets to pay the Permitted Policy Claims of long-term Policyholders, Section 1.5(D) of the Restructured Policy Terms provides that once FGIC reasonably determines that approximately 90% or more of the total anticipated Policy Claims are no longer subject to contingencies or other developments (other than the passage of time and/or the submission of a valid request for payment thereof), FGIC may halt CPP Revaluations, unless (i) the value of FGIC's remaining admitted Cash, Cash equivalents, bonds and short-term investments exceeds 200% of the anticipated amount of remaining anticipated Policy Claims multiplied by the CPP then in effect, (ii) NYSDFS requests that FGIC continue to conduct CPP Revaluations or (iii) FGIC deems it prudent to continue conducting CPP Revaluations and NYSDFS approves. Section 1.5(E) of the Restructured Policy Terms provides that, once FGIC has reasonably determined that 100% of the total anticipated Policy Claims are no longer subject to contingencies or other developments (other than the passage of time and/or the submission of a valid Claim), FGIC will conduct the Final CPP Revaluation to distribute the aggregate amount of FGIC's remaining assets (less projected expenses) pro rata based on the outstanding DPO and DPO Accretion in respect of all Policies.

(f)  Policy Crystallization Events

Article II of the Restructured Policy Terms sets forth the terms and conditions governing the declaration of a Policy Crystallization Event and the effect of such declaration. Section 2.1 of the Restructured Policy Terms provides that if any Person (other than the FGIC Parties), notwithstanding the injunctive relief and other terms and conditions in the Plan, (i) exercises, seeks to exercise or in any manner fails to honor the FGIC Parties' exclusive authority to exercise FGIC Rights or otherwise fails to comply with the injunctive relief set forth in Section 7.8(e) of the Plan, (ii) exercises or seeks to exercise any Rehabilitation-Triggered Rights, (iii) declares or seeks to declare a Rehabilitation-Related Default or (iv) interferes or seeks to interfere with the FGIC Parties' pursuit of FGIC Direct Claims (clauses (i) through (iv) collectively, "**Purported FGIC Loss of Rights**"), FGIC may declare with respect to such Policy

29

novation to National Public of all reinsurance or any portion thereof covering the National Public Reinsured Policies that is in existence as of the Effective Date (after giving effect to any Reinsurance Commutation Agreements).

The Novation Agreement will enable FGIC to avoid holding additional assets to protect against potential Policy Claims under the National Public Reinsured Policies in a Stress Scenario should National Public be unwilling or unable to meet its obligations. In such a situation, and in light of the large potential exposure under the National Public Reinsured Policies (approximately $138 billion in aggregate par outstanding as of December 31, 2011), even a small increase in relative losses thereunder could result in significant exposure to FGIC. Under the Run-Off Projections, such additional loss exposure would approximate $17.7 billion. As a result of the Novation Agreement, FGIC will avoid that risk, resulting in a higher initial CPP and increased overall recoveries for Policyholders.

### 3.    Approval of CDS Commutation Agreements

As described in Section V.C.1 hereof, as part of approval of the Plan, the Rehabilitator is seeking the Court's approval of two CDS Commutation Agreements. The Rehabilitator is continuing negotiations with other CDS Counterparties in an effort to execute additional CDS Commutation Agreements between FGIC and such counterparties. The Rehabilitator will file all executed CDS Commutation Agreements with the Court (potentially in redacted form) in an update to the Plan Supplement in accordance with the deadlines set forth in the Scheduling Order. Effectiveness of each CDS Commutation Agreement is (or will be) conditioned on, among other things, approval thereof by the Court.

Pursuant to the two CDS Commutation Agreements executed thus far, in exchange for payments by FGIC aggregating approximately $51.5 million, FGIC will (i) eliminate all its insured exposure (approximately $3.8 billion NPIF) with respect to the CDS and certain other obligations covered by such CDS Commutation Agreements, (ii) significantly reduce its statutory loss reserves (by approximately $293 million) and (iii) avoid any uncertainty, delay and costs that could arise from litigating approximately $1.5 billion in potential Termination Payment Claims that may arise under such CDS. The CDS Counterparties commuting their Policies pursuant to these CDS Commutation Agreements will receive a Cash payment on or about the Effective Date in an amount less than what such counterparties are projected to have received under the Plan on account of Policy Claims for realized "Credit Events" (as defined in the relevant CDS, or similar term provided therein) that the Rehabilitator projects would have been asserted against FGIC if the CDS with such CDS Counterparties were not "torn up" or terminated early.

### 4.    Corporate Governance

The Plan contemplates that, upon termination of the Rehabilitation Proceeding, a new board of directors of FGIC will be appointed that will take over control of FGIC. The Rehabilitator will post a List of Initial Directors and Officers on the Policyholder Information Center before the Effective Date. In addition, the Rehabilitator has proposed certain changes to FGIC's corporate governance structure, which will be reflected in the Form of Amended and Restated Charter (the "**Charter**") and the Form of Amended and Restated By-Laws (the "**By-**

establishes a process for resolving certain conflicts that may arise between such holders and
FGIC with respect to the exercise of such rights and remedies. In addition, as mentioned above,
proceeds from Trust Loan Repurchase Obligations will not be treated as FGIC Payments, as such
term is defined in the Plan and described in Section VI.B.1 above. Instead, Sections 3.7(a)(iii)
and 3.7(b)(iv) of the Plan provide that such proceeds will be applied and distributed in
accordance with the express terms and conditions of the relevant Transaction Documents
assuming, solely for the purposes of determining FGIC's priority with respect to receipt of such
proceeds, that FGIC has not complied with its payment obligations under the relevant Policy.

## C.    CLAIM ADMINISTRATION AND DISTRIBUTIONS

### 1.    Claim Administration Generally

Section 4.1 of the Plan provides that, after the Effective Date, FGIC will be
responsible for resolving all Claims not resolved prior to the Effective Date in compliance with
the Plan and any NYSDFS Guidelines.

### 2.    Submission of Claims

#### (a)    Secured Claims and Administrative Expense Claims

Section 4.2(A) of the Plan requires all Secured Claims and Administrative
Expense Claims to be submitted to FGIC in writing in the ordinary course of business and
pursuant to the underlying FGIC Contracts (if applicable) giving rise to such Claims.

#### (b)    Policy Claims

Section 4.3(A) of the Plan requires holders of Policy Claims to submit a Proof of
Policy Claim Form (in a form that will be filed as part of an update to the Plan Supplement) in
addition to any information required by the applicable Policies for submission of Claims
thereunder. Section 4.3(A) of the Plan also establishes Policy Claim submission deadlines,
including a Claims Resubmission Deadline for Policy Claims previously submitted to FGIC that
remain unpaid in whole or in part as of the Effective Date. The Plan requires the resubmission of
such Policy Claims to facilitate and expedite the Claims reconciliation process by requiring the
holders of such Policy Claims to disclose additional information about their Policy Claims to
enable FGIC to determine whether any portions thereof should not be Permitted pursuant to
Section 4.10 of the Plan. Policy Claims not timely submitted pursuant to Section 4.3(A) of the
Plan will be treated as Late-Filed Claims. On and after the Novation Effective Date (as defined
in the Novation Agreement), claims arising under the National Public Reinsured Policies should
be submitted directly to National Public, and not to FGIC, regardless of when such claims arose.

#### (c)    Non-Policy Claims

Section 4.4(A) of the Plan establishes the Bar Date for submitting Non-Policy
Claims and provides that all Non-Policy Claims not submitted by the Bar Date will be treated as
Late-Filed Claims. Unlike Policy Claims, Non-Policy Claims submitted to FGIC or the
Rehabilitator prior to the Effective Date that remain unpaid as of the Effective Date need not be
resubmitted.

FGIC Payor becomes a subrogee of the holder of such Permitted Claim as a result of such payment; and *provided, further*, that this sentence will not modify any terms of the Plan regarding FGIC Payments.

### 6.    Alternative Resolutions of Claims

Section 4.8 of the Plan allows FGIC to, after the Effective Date and without further Court approval, resolve any Claim through a consensual Alternative Resolution as long as FGIC (i) determines in its reasonable business judgment that the Alternative Resolution is fair and equitable to Policyholders generally and not reasonably likely to result in a reduction of the CPP and (ii) provides NYSDFS notice pursuant to Section 7.10(d) of the Plan.

### 7.    Setoffs

Unless otherwise specified in the Plan, including in Section 4.7(B) thereof and the Restructured Policy Terms, Section 4.9 of the Plan generally authorizes FGIC to set off a Permitted Claim, or distributions owed under the Plan on account of such Permitted Claim, against any amounts FGIC reasonably determines to be owed to it under Causes of Action FGIC may have against the holder of such Permitted Claim.

### 8.    Certain Claims Not Permitted

Section 4.10 of the Plan lists types of Claims that will not be Permitted, including, among other things, post-Commencement Date interest on Claims, interest on the amount of any interest, principal or other amounts payable in respect of an insured obligation, which was the subject of a Permitted Policy Claim and satisfied with DPO rather than Cash pursuant to Section 2.3 the Plan, Duplicative Claims and Termination Payment Claims asserted in violation of the injunctive relief in the Plan.

### 9.    Address or Account for Delivery of Distributions/Unclaimed Distributions

Section 4.11 of the Plan provides that FGIC will make distributions under the Plan to a holder of a Permitted Policy Claim at the address or account of such holder, as set forth on the Proof of Claim or Proof of Policy Claim Form submitted by such holder, as applicable. Section 4.11 of the Plan also governs FGIC's obligations with respect to, and the treatment of, undeliverable distributions.

### 10.    Time Bar to Cash Payments

Section 4.12 of the Plan provides that any checks issued in respect of Permitted Claims will be null and void if not negotiated within 180 days after the date of issuance thereof, and establishes that requests for reissuance of any voided check must be made directly to FGIC by the holder of the Permitted Claim to whom such check was originally issued, before the applicable distribution becomes abandoned property under then-applicable law.

### 3.    Waiver of Conditions

Section 6.3 of the Plan authorizes the Rehabilitator to waive any of the conditions precedent listed in Section 6.1 of the Plan, except for the requirement in Section 6.1(a) thereof that the Plan Approval Order be signed.

## F.    EFFECT OF EFFECTIVE DATE

### 1.    Discharge

Section 7.1 of the Plan provides that Permitted Claims will be treated solely pursuant to the Plan and such treatment will effect a full and complete release, discharge and termination of any liens or other claims, interests or encumbrances upon the FGIC Parties with respect to such Permitted Claims.  Further, all liens and other claims, interests and encumbrances upon the FGIC Parties with respect to any Claim or portion thereof that is not Permitted will be released, discharged and terminated.

### 2.    Releases

Section 7.2 of the Plan provides that FGIC Parties will release the following Persons unconditionally and forever from any and all Causes of Action arising on or prior to the Commencement Date from or relating to the operation of FGIC or the Rehabilitation Proceeding: (i) the NYLB, (ii) the NYSDFS, (iii) the Rehabilitator, (iv) the Representatives and employees of each of the NYLB, the NYSDFS and the Rehabilitator, and any advisors retained by the Representatives of the foregoing, (v) the Representatives of FGIC and any advisors retained by any of such Representatives, in each case solely with respect to services provided on or after November 24, 2009 and (vi) those directors, officers, and employees of the FGIC Parties who served or were employed by the FGIC Parties in such capacity on or after November 24, 2009. The releases, however, do not apply to acts or omissions determined by a Final Order to constitute willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts.

### 3.    Exculpation

Section 7.3 of the Plan exculpates the following Persons as of the Effective Date from any and all Causes of Action based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or after November 24, 2009 and arising out of, in connection with or otherwise relating to the Rehabilitation Proceeding, the Disclosure Statement, the Plan or any agreement entered into as part of or pursuant to the Plan: (i) the FGIC Parties; (ii) the NYLB; (iii) the NYSDFS; (iv) the Rehabilitator; (v) the Representatives and employees of each of the FGIC Parties, the NYLB, the NYSDFS and the Rehabilitator, and any advisors retained by the Representatives of the foregoing; and (vi) directors and officers of the FGIC Parties.  The exculpation, however, does not apply to acts or omissions determined by a Final Order to constitute willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts.

Payment Claim (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount" or other methodologies), (iv) exercising or otherwise interfering with FGIC Rights, subject to Section 3.7 of the Plan, (v) seeking to acquire, acquiring or exercising voting or other corporate governance rights pursuant to or under the Preferred Stock and (vi) pursuing any Released Cause of Action or Exculpated Cause of Action.

### 9.    Preservation of Causes of Action

Section 7.9 of the Plan authorizes (but does not require) FGIC to prosecute, settle, release, compromise or enforce any and all Causes of Action not released or exculpated pursuant to the Plan, but requires FGIC to (i) provide to the NYSDFS 30 days' written notice (or such advance notice as the NYSDFS may agree to) before settling, releasing or compromising any Causes of Action where FGIC's claims would be expected to exceed $25 million (or such other amount as the NYSDFS may agree to) and (ii) obtain prior written approval from the NYSDFS if any such settlement, release or compromise would result in a payment by FGIC of $10 million (or such other amount as the NYSDFS may agree to) or more.

### 10.    Limitations on Operations Following Effective Date

Section 7.10 of the Plan sets forth limitations on FGIC's operations following the Effective Date that will apply until such time (if ever) as the NYSDFS grants written approval to remove them. The limitations, among other things, restrict FGIC's ability to (i) issue new insurance policies or provide new reinsurance, (ii) pay dividends, distributions or other payments on account of any Equity Interest, (iii) sell, reinsure or otherwise transfer 5% or more of its Admitted Assets, (iv) execute changes to its corporate governance structure or amend its Charter or By-laws or (v) effectuate a CPP Adjustment, each without the prior express written approval of the NYSDFS. Section 7.10 of the Plan also requires FGIC to provide the NYSDFS with 30 days' written notice (or such advance notice as the NYSDFS may agree to) before it may (a) effectuate an Alternative Transaction pursuant to Section 4.8 of the Plan that would extinguish or reduce any FGIC liability by more than $25 million (or such other amount as the NYSDFS may agree to) or (b) permit any Claim in an amount exceeding $10 million (or such other amount as the NYSDFS may agree to). In addition, Section 7.10 of the Plan requires FGIC to obtain the prior written approval of the NYSDFS for any Alternative Transaction that would result in a payment by FGIC of $10 million (or such other amount as the NYSDFS may agree to) or more.

### 11.    Reporting

Section 7.11(A) of the Plan requires FGIC to file annual reports on the status of the Rehabilitation with the NYSDFS and on the Policyholder Information Center. Further, FGIC must deliver to the NYSDFS annual and quarterly reports related to the Run-Off Projections pursuant to Section 7.11(B) of the Plan.

### G.    RETENTION OF JURISDICTION

Section 8.1 of the Plan provides that after the Effective Date and termination of the Rehabilitation Proceeding the Court will have exclusive jurisdiction over all matters arising out of or related to the Rehabilitation Proceeding and the Plan, including jurisdiction to, among

Company, for MacKay to act as investment manager and to manage the bulk of FGIC's investment portfolio commencing September 9, 2009.

The following table summarizes the composition of FGIC's Cash and investments at fair value:[10]

|  | As of March 31, 2012 ($ in millions) |
|---|---|
| Cash | $3.9 |
| Long-Term investments: |  |
| Municipal obligations | $590.1 |
| U.S. government obligations | $49.6 |
| Foreign government obligations | $34.6 |
| Mortgage and asset-backed securities | $346.6 |
| Corporate | $124.6 |
| Other | $7.2 |
| Subtotal | $1,152.7 |
| Short-term investments | $936.0 |
| Total | $2,092.6 |

## 2.    Premiums

The tables below present (i) statutory unearned premiums and the net present value of installment premiums FGIC expects to collect, in each case net of reinsurance, as of March 31, 2012, by business segment and (ii) the gross installment premiums FGIC expects to collect over the estimated term of the related Policies, as of March 31, 2012, by year. The expected installment premiums are based on various prepayment and collection assumptions as of March 31, 2012 and actual installment premiums collected could differ materially. In addition, the premium amounts in the tables below do not give effect to Policy or reinsurance terminations that have occurred or may occur subsequent to March 31, 2012, including pursuant to the CDS Commutation Agreements and Reinsurance Commutation Agreement, which could change such amounts.

| Business Segment ($ in millions) | Statutory Unearned Premiums | Net Present Value of Installment Premiums[1] | Total Expected Future Installments (Gross Value) |
|---|---|---|---|
| Public Finance | $145.5 | $63.4 | $105.2 |
| RMBS | $1.0 | $76.4 | $97.6 |
| Structured Finance (other than RMBS) | $1.2 | $60.4 | $82.1 |
| International | $13.9 | $51.2 | $80.6 |
| Total | $161.6 | $251.2 | $365.5 |

(1) Net Present Value of Installment Premiums is calculated using FGIC's expected premium schedule, discounted at 5%.

---

[10] The entries in the charts in this Section VII may not add up to the totals reflected therein because of rounding.

| Collateral Type | Number of policies outstanding | NPIF ($ in millions) | % of Total NPIF |
|---|---|---|---|
| Alternative-A Paper ("Alt-A") (1st lien) | 20 | $1,034.8 | 2.6% |
| Home Equity Line of Credit ("HELOC") | 44 | $4,164.3 | 10.4% |
| High Loan-to-Value ("LTV") | 13 | $857.5 | 2.1% |
| Closed end second mortgages | 26 | $3,799.8 | 9.5% |
| Subprime (1st lien) | 73 | $4,073.7 | 10.2% |
| Prime (1st lien) | 6 | $179.1 | 0.4% |
| **Total** | 182 | $14,109.3 | 35.2% |

2.    **CDO Exposure**

As of March 31, 2012, FGIC's NPIF, after giving effect to reinsurance, for CDO, by underlying collateral, totaled approximately $4.7601 billion, as reflected in the following table, representing approximately 11.9% of FGIC's NPIF of all liabilities at such date. FGIC insured the CDO directly where the form of credit enhancement is noted as (FG) in the following table and in all other cases insured CDS written by FGIC CP, which provided credit protection on the CDO:

| Underlying Collateral (Form of credit enhancement) | Number of transactions | NPIF ($ in millions) | % of Total NPIF |
|---|---|---|---|
| ABS CDO High Grade ABS | 2 | $1,231.7 | 3.1% |
| CLO High Yield Loans | 16 | $2,854.4 | 7.1% |
| CLO High Yield Loans (FG) | 1 | $145.9 | 0.36% |
| ABS CDO Mezzanine ABS | 1 | $181.0 | 0.45% |
| ABS CDO Mezzanine ABS (FG) | 1 | $203.5 | 0.51% |
| CLO International | 1 | $143.6 | 0.36% |
| Total | 22 | $4,760.1 | 11.9% |

3.    **U.S. Public Finance Exposure**

As of March 31, 2012, FGIC had approximately 6,090 outstanding Policies insuring the payment of the principal of, and interest on, U.S. public finance obligations with an aggregate outstanding principal amount of approximately $147.9 billion. FGIC's NPIF, after giving effect to reinsurance, for U.S. public finance obligations totaled approximately $12.3 billion, representing approximately 30.6% of FGIC's NPIF of all liabilities at such date. The following table presents FGIC's NPIF after giving effect to ceded reinsurance, by risk category, as of March 31, 2012:

| Insured Portfolio by Bond Type | NPIF ($ in millions) [1] | % of Total NPIF |
|---|---|---|
| Corporate Obligation | $241.2 | 0.6% |
| Sovereign | $139.2 | 0.3% |
| Sub-Sovereign | $268.4 | 0.7% |
| Utility | $570.8 | 1.4% |
| Toll Road | $13.3 | 0.0% |
| Project Finance | $2,709.9 | 6.8% |
| CLO | $143.6 | 0.4% |
| Other Structured Finance | $336.3 | 0.8% |
| Total International Finance | $4,422.7 | 11.0% |

## C.    LOSS RESERVES

FGIC has established its loss reserves based on the impact that the performance of the collateral or revenue stream for the respective transactions has on FGIC's obligation to support the scheduled debt service of such transactions. Reserves at March 31, 2012 relate predominantly to RMBS transactions.

Loss and loss adjustment expense reserves at March 31, 2012 do not reflect the potential impact, if any, of ongoing loss mitigation efforts, except for certain mortgage insurance-related claims. FGIC believes that the reserve for estimated losses as of March 31, 2012 makes adequate provision for expected future net claims. However, the establishment of the appropriate level of reserves is an inherently uncertain process involving numerous estimates and subjective judgments by management. Small changes in the assumptions underlying these estimates could result in significant changes in FGIC's loss expectations. Further deterioration in the performance of RMBS, ABS CDO, and other securities insured by FGIC or that are referenced in CDS insured by FGIC could lead to the establishment of additional loss reserves and further loss or reduction to income. The loss reserves for FGIC's insurance on CDS contracts recorded in its statutory financial statements at March 31, 2012 reflect only the actual credit impairment projected by FGIC and do not reflect any other amounts for potential Termination Payment Claims that could become payable under FGIC-insured CDS.

The following table presents FGIC's statutory loss and loss adjustment expense reserves, net of reinsurance, as of March 31, 2012, by business segment and inclusive of any related reserves for FGIC's insurance on CDS contracts:

with the Plan all Permitted Claims made by Policyholders under the reinsured Policies and would have to separately seek to enforce its rights and remedies against the defaulting Reinsurer in respect of these losses.

      As of March 31, 2012 (after giving effect to reinsurance commutations and terminations through such date), the composition of gross par outstanding ceded to Reinsurers was as follows:

| Reinsurer | Reinsurer Rating [1] | Ceded Gross Par Outstanding ($ in millions) | Public Finance FGIC Retained ($ in millions) | Public Finance National Public Reinsurance Transaction ($ in millions) | RMBS ($ in millions) | Structured Finance (other than RMBS) ($ in millions) | International Finance ($ in millions) |
|---|---|---|---|---|---|---|---|
| National Public Finance Guarantee Corp. | BBB/Baa2 | $123,484.5 | | $123,484.5 | | | |
| Assured Guaranty Re Ltd. | AA-/A1 | $5,473.7 | $1,021.9 | $3,733.4 | $86.3 | $632.1 | |
| American Overseas Reinsurance Company Ltd. (f/k/a RAM Reinsurance Company Ltd) | Withdrawn | $4,542.4 | $457.2 | $3,680.5 | $86.1 | $119.8 | $198.8 |
| Assured Guaranty Corp. | AA-/Aa3 | $1,928.3 | $428.1 | $1,494.2 | $0.4 | $0.0 | $5.5 |
| Radian Asset Assurance Inc. | BB-/Ba1 | $765.3 | $635.1 | | $46.7 | $0.0 | $83.5 |
| Assured Guaranty Re Overseas Ltd. | AA-/Aa3 | $99.2 | $1.6 | $97.3 | $0.2 | | |
| American Reinsurance Company | AA-/Aa3 | $53.6 | $50.8 | | $2.8 | | |
| Syncora Guarantee Inc. | Withdrawn/Ca | $45.1 | | | | | $45.1 |
| Other | | $95.8 | $4.5 | $55.5 | $2.1 | $0.0 | $33.8 |
| **Total:** | | $136,488.0 | $2,599.2 | $132,545.5 | $224.7 | $752.0 | $366.7 |

(1) Source: Individual company websites and rating agency reports.

The Run-Off Projections are run for both a Stress Scenario and a Base Scenario. As shown on Exhibit C hereto, the Run-Off Projections indicate that even in the Stress Scenario utilized by the Rehabilitator in formulating the Plan FGIC should be able to pay the initial CPP on all Permitted Policy Claims regardless of when such Claims arise, while maintaining a moderate Cash buffer intended to protect against potential adverse deviations from the Stress Scenario assumptions.

While the initial CPP and all subsequent revisions to the CPP will be based on a Stress Scenario, the Run-Off Assumptions will be adjusted over time (pursuant to the CPP Revaluation process) to reflect FGIC's actual experience. Should FGIC's experience prove more favorable than the Stress Scenario utilized by the Rehabilitator in formulating the Plan, which the Rehabilitator expects, the CPP will increase over time and additional amounts (including on account of DPO Accretion) will be paid out to holders of Permitted Policy Claims. The Base Case Run-Off Projections included in Exhibit C portray FGIC's expected performance during the Run-Off Period, including expected aggregate payments on Policy Claims.

## F.    ALTERNATIVE OPTIONS CONSIDERED

**Goal of the Plan**. The Rehabilitator's goal in this Rehabilitation Proceeding is to treat FGIC's Policyholders in a fair and equitable manner while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary.

**Means of Achieving Goal**. The Rehabilitator evaluated several means of achieving this goal, including the Plan, a liquidation of FGIC, an extended rehabilitation of FGIC (with and without modification of Policies), potential outsourcing of administrative services and a potential merger, sale, reinsurance or similar transaction. In addition, the Rehabilitator considered variations of features in the Plan (including how Policies are restructured, the methodology in setting CPP, treatment of FGIC Rights and FGIC Payments, accretion on DPO, scope and duration of injunctive relief and other matters), as well as features not included therein (such as segregation of assets and liabilities between entities, inclusion of opt-out provisions and deferral of accretion payments).

**Considerations Taken Into Account**. In evaluating the best means of achieving the goal described above, the Rehabilitator took into account numerous considerations, including:

- accounting for differing relative interests of holders and beneficiaries of various types of risks insured by Policies;

- preserving and maximizing assets of the estate;

- minimizing expenses of the estate;

- minimizing the risk of failure of the Plan;

- maintaining sufficient flexibility within the Plan to address unforeseen events; and

49



**Rejection of Alternatives**. The Rehabilitator ultimately rejected each alternative to the Plan and the variations on the Plan as not representing the best approach to satisfying the goal of this Rehabilitation Proceeding. For example, the Rehabilitator rejected a liquidation of FGIC because (among other things) it would result in significantly lower recoveries to Policyholders.[11]  No merger, sale, reinsurance or outsourcing transaction that would inure to the benefit of FGIC's Policyholders appeared viable to the Rehabilitator.  The Rehabilitator rejected allowing Policyholders to opt-out of the Policy Restructuring as a matter of right (rather than by means of individually negotiated commutations) due to concerns (among others) over adverse selection to the detriment of other Policyholders.  The Rehabilitator also considered numerous additional variations of Plan features, all of which were rejected as not being fair and equitable to all Policyholders.

**The Plan Is the Best Option**. The Rehabilitator has determined that the Plan presents the best approach to treating FGIC's Policyholders in a fair and equitable manner, while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary.  Such determination is based upon the Rehabilitator's review of the alternatives and variations described above, extensive legal, financial and strategic input from the Rehabilitator's advisors, FGIC, and the Ad Hoc Instrument Holder Group, and consideration of proposals made by third parties, among other things.  The Rehabilitator's determination is further supported by the following features of the Plan:

- **Superior to Alternatives**.  Payments on Permitted Policy Claims under the Plan are expected to be made sooner, and in greater amounts, than would be the case should FGIC remain in an extended rehabilitation proceeding, and creditors will receive under the Plan at least (and likely more than) what they would have received in a liquidation of FGIC;

---

[11] Additional detail about a potential liquidation of FGIC is set forth in Section VIII hereof and in the Liquidation Analysis set forth on Exhibit D hereto.

FGIC, as set forth in the summary of the Rehabilitator's liquidation analysis (the "**Liquidation Analysis**"), attached hereto as Exhibit D.

In calculating recoveries Policyholders would receive in a hypothetical liquidation in the Liquidation Analysis, the Rehabilitator assumed a bar date for claims at year-end 2052 (coinciding with maturity of the longest-dated Policy), with interim distributions on claims as described in the Liquidation Analysis. The timing and amount of such interim distributions are intended to be consistent with liquidations of other insurers.[12] Based on the Run-Off Projections and the Liquidation Analysis, Policyholders should receive present value recoveries of approximately 24% to 25% of Permitted Policy Claims under the Plan, rather than only approximately 9.3% to 15.9% thereof in a liquidation.[13] Thus, the Plan is designed to provide significantly greater recoveries to Policyholders than they would receive in a liquidation.

IX.

**CERTAIN FACTORS TO BE CONSIDERED**

**THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THESE FACTORS ARE NOT THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

A.    RISKS RELATING TO PLAN IMPLEMENTATION

1.    **Risk of Non-Approval, Withdrawal or Modification of the Plan**

Although the Rehabilitator believes that the implementation of the Plan, including consummation of the transactions contemplated by the Novation Agreement and the CDS Commutation Agreements, is fair and equitable and in the best interests of Policyholders and other creditors, there can be no assurance that the Court will reach the same conclusion, that modifications of the Plan may not be required for approval of the Plan, that approval of the Plan will not be overturned on appeal or that the Rehabilitator may not of his own initiative withdraw or modify the Plan for any reason. Any modifications of the Plan or failure of the Court to approve any of the Novation Agreement, the CDS Commutation Agreements or the Reinsurance

---

[12] The Rehabilitator ruled out an immediate liquidation of FGIC that would result in termination of all Policies in force as of the Effective Date, with no provision for payment of future losses, because this approach would be prejudicial to the substantial number of FGIC's Policyholders with respect to which the Rehabilitator expects Policy Claims to arise in the future.

[13] The range of recoveries under the Plan or in a liquidation provided herein are calculated on a net present value basis using discount rates of 20% and 10%. While the nominal amount of recoveries shown by the Liquidation Analysis as being payable in a liquidation (67.9% in the Base Scenario) exceeds the nominal amount of recoveries under the Plan as shown by the Run-Off Projections (34% in the Base Scenario), use of such undiscounted figures does not properly portray the actual value of such recoveries given the significantly longer delay in payment of recoveries in a liquidation.

to monitor it.  The CPP may be reduced at any time, subject to the relevant provisions of the Plan, as a result of litigation currently pending or that may be commenced in the future.

## 2.    CPP May Be Adjusted Downward

As set forth in the Restructured Policy Terms, FGIC, in consultation with the NYSDFS, may from time to time adjust the CPP downward.  Such CPP downward adjustments could be caused by a number of factors that could cause results to differ materially from those in the Run-Off Projections including, but not limited to, expected timing and magnitude of losses under Policies, returns on FGIC's investment portfolio, collection and recovery of premium, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs and operating expenses.  Reference is made to the Run-Off Projections contained in Exhibit C hereto for additional information and disclaimers regarding such analyses.

## 3.    Risks Relating to Run-Off Projections

The Run-Off Projections are inherently uncertain and, though considered reasonable by the Rehabilitator as of the date hereof, are subject to a wide variety of significant business, economic, competitive and political risks and uncertainties.  The Run-Off Projections are not necessarily indicative of FGIC's future financial position or results of operations, which may vary significantly from those set forth therein.  Consequently, the Run-Off Projections should not be regarded as the representation of the Rehabilitator, his advisors or any other Person that the projected financial position or results of operations can or will be achieved.  The Run-Off Projections may contain certain statements that are, or may be deemed, "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Many factors could cause actual results to differ materially from those in the Run-Off Projections.  Such factors include expected timing and magnitude of losses under Policies, returns on FGIC's investment portfolio, collection and recovery of premium, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs and operating expenses.  Reference is made to the Run-Off Projections contained in Exhibit C hereto for additional information and disclaimers regarding such analyses.

## 4.    Risks Relating to Use of Net Operating Losses

FGIC expects that the Plan becoming effective will result in significant immediate taxable income, but that such income will be offset with NOLs and will not result in material tax liability for FGIC.  In addition, FGIC expects that a significant portion of these NOLs will remain after the Plan becomes effective to offset taxable income that may arise in the future as the Plan is implemented over time.  This expectation as to the availability of NOLs both at the time of and after the Plan becomes effective is based on interpretations and applications of tax law rules that are not free from doubt.  It is possible that facts or circumstances existing prior to the Effective Date could cause FGIC's NOLs to become subject to limitation, reduced or otherwise unavailable for use (either in whole or in part) to offset FGIC's taxable income arising in connection with or after the Plan becomes effective.  FGIC has requested certain rulings, and plans to request additional rulings, from the IRS as to certain of these issues; it remains possible that the IRS, it is sole and absolute discretion, may decline to issue a favorable ruling or rulings on one or more of the issues that underlie FGIC's expectations regarding the tax consequences of

on the basis of such methodologies (as opposed to payment of Claims based on "Credit Events" (as defined in the relevant CDS, or similar term provided therein) under CDS not arising from the automatic or early termination thereof) would be inconsistent with the goal of the Rehabilitation Proceeding, namely, treating FGIC's Policyholders in a fair and equitable manner while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary.

One CDS Counterparty has unilaterally terminated its CDS due to the Rehabilitation Circumstances prior to commencement of the Rehabilitation Proceeding, and has asserted a Termination Payment Claim against FGIC CP.  Other CDS Counterparties may seek to terminate their CDS contracts and assert Termination Payment Claims against FGIC CP and related Claims against FGIC, due to the Rehabilitation Circumstances or the Rehabilitation Proceeding.

While FGIC has entered into CDS Commutation Agreements with two CDS Counterparties (as further described in Sections V.C.1 and VI.B.2 hereof), the potential Termination Payment Claims that could be brought under the CDS to be so commuted represent approximately 50% of the total Termination Payment Claims that CDS Counterparties might seek to assert against FGIC.

The Order of Rehabilitation enjoins the automatic or early termination of CDS contracts on the basis of the Rehabilitation Proceeding or the Rehabilitation Circumstances and the assertion of Termination Payment Claims relating to any such termination for the duration of the Rehabilitation Proceeding.  In addition, the Plan continues such injunctive relief on a permanent basis and provides that such Claims will not be Permitted under the Plan.  No assurance can be given, however, that the treatment of Termination Payment Claims contemplated by the Plan will be approved by the Court and, if not approved, whether Termination Payment Claims will be paid *pari passu* with Permitted Policy Claims.  Should the proposed treatment not be approved, FGIC's aggregate exposure to potential Termination Payment Claims could exceed $1.5 billion, after giving effect to the CDS Commutation Agreements executed to date, resulting in lower recoveries for Policyholders and potentially a decrease in CPP.

## C.    OTHER CONSIDERATIONS

### 1.    No Duty to Update

This Disclosure Statement does not reflect any events that may occur subsequent to the date hereof.  Such events may have a material impact on the information contained in this Disclosure Statement and any recovery that may be received by creditors of FGIC.  The Rehabilitator does not intend to update any of the information contained in this document (including the Run-Off Projections, Liquidation Analysis and other financial information, as well as underlying assumptions).

**X.**

**CONCLUSION**

The Rehabilitator believes that the Plan represents the most value to holders of Permitted Claims, and approval and implementation of the Plan is in the best interests of all Policyholders and other claimants.

Dated: September 11, 2012
        New York, New York

_Peter A. Giacone_

Peter A. Giacone
*Chief Financial Officer and Agent of the
Superintendent of Financial Services of the
State of New York, as Rehabilitator of
Financial Guaranty Insurance Company*

Exhibit B

(Organizational Chart)

Exhibit C

(Run-Off Projections)

STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO
OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE RUN-OFF PROJECTIONS, WHILE PRESENTED WITH NUMERICAL
SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND
ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE
REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO
SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET
AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE
BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC.  THE REHABILITATOR
CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE
ACCURACY OF THE RUN-OFF PROJECTIONS OR TO FGIC'S ABILITY TO ACHIEVE
THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE
INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING
SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR PREPARED THESE
RUN-OFF PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR,
ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE
OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A
MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE
REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE
NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE RUN-OFF PROJECTIONS
TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE
DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE
OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE RUN-OFF
PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER
ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN CONSIDERING THE
PROJECTED RECOVERIES UNDER THE PLAN, POLICYHOLDERS MUST MAKE THEIR
OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS
AND THE RELIABILITY OF THE RUN-OFF PROJECTIONS AND SHOULD CONSULT
WITH THEIR OWN ADVISORS.

The Run-Off Projections should be read in conjunction with the key assumptions
set forth below, as well as the other assumptions, qualifications, explanations and risk factors set
forth in the Disclosure Statement and the Plan (including the Plan Supplement), in their entirety,
and the historical financial statements (including the notes and schedules thereto) and other
financial information posted at www.fgic.com/investorrelations/financialreports/.

*Key Assumptions*

**A.    General**

1.    *Plan Effective Date:* The Run-Off Projections assume the Effective Date will be
      December 31, 2012.

2.    *Business Operations:*  The Run-Off Projections assume that FGIC will not write any new
      insurance policies throughout the Run-Off Period.

Reinsurers would likely experience under the Stress Scenario and the possibility that the reinsurers would have inadequate claims paying resources. In both scenarios, it is assumed that FGIC continues paying installment premiums to Reinsurers.

4.  *Commutation Payments*: As described in the Disclosure Statement, the Run-Off Projections assume that the two CDS Commutation Agreements that have already been executed and the Reinsurance Commutation Agreement are approved by the Court and are (for the purposes of the Run-Off Projections only, since the commutation agreements may require earlier payment) paid post-Effective Date.

5.  *Taxes:* The Run-Off Projections assume that FGIC will not generate taxable income post-Effective Date. Income is expected to be generated on the Effective Date, but existing NOL balances are expected to be sufficient to fully offset income recognized on both a regular and AMT tax basis.

6.  *Contribution Amount*: The $11 million payment to FGIC Corp pursuant to the Plan Sponsor Agreement (the "**Contribution Amount**"), which is described in Section IV.B.9 of the Disclosure Statement, is assumed to be made in the Run-Off Projections on the Effective Date.

7.  *Operating Expenses:* The Run-Off Projections assume approximately $592 million of operating expenses through 2052 (this represents net present value of $177 million as of December 2012 at a 15% discount rate), excluding rehabilitation proceeding –related professional fees and other costs.

8.  *Rehabilitation Proceeding-Related Professional Fees and Other Costs:* The Run-Off Projections assume approximately $22 million in non-contingent costs, and $18 million in costs contingent on the occurrence of certain milestones, in each case related to the preparation for and administration of the Rehabilitation Proceeding, including attorneys' fees, financial advisor fees and restructuring incentive bonuses for certain key FGIC employees, all of which were or are assumed to be incurred or paid in 2012.

9.  *Reserves and Valuation Allowances*: For statutory accounting purposes, FGIC will continue to account for the Policies, as restructured, as insurance policies. Upon the Effective Date, FGIC will reduce its statutory reserves to reflect the ultimate amount of cash payments expected to be made with respect to its Policies less an amount to be determined that will permit FGIC to maintain a certain minimum positive statutory surplus. In the event that FGIC determines that the ultimate amount of cash payments that are expected to be made with respect to its Policies has increased, FGIC will increase its statutory reserve in accordance with statutory accounting principles.

10. *Other:* The Run-Off Projections do not include proceeds from any recoveries from Material Litigation, which are described in Section IV.B.7 of the Disclosure Statement, due to the uncertainty regarding such recoveries today. The Projections also do not include any value associated with FGIC's equity interest in FGIC UK.

## *Base Scenario Illustrative Projected Financial*

### KEY FINANCIAL METRICS: BASE SCENARIO

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | | | | |
| Invested Assets Ending Balance | $1,674 | $1,479 | $1,379 | $1,366 | $1,340 | $986 | $558 | $500 | -- | NA |
| **Claim Payments (Cash)** | | | | | | | | | | |
| Initial CPP Payments 1 | ($322) | ($293) | ($168) | ($100) | ($80) | ($317) | ($396) | ($96) | ($231) | ($2,004) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (132) | (114) | (107) | (124) | (184) | (226) | | (285) | (1,173) |
| **Other** | | | | | | | | | | |
| Notional Claims | (2,149) | (1,767) | (827) | (450) | (340) | (1,209) | (1,401) | (336) | (808) | (9,288) |
| Ending CPP | 15.0% | 18.9% | 21.2% | 22.9% | 24.5% | 26.6% | 28.6% | 28.6% | 30.4% | |

### SUMMARY INCOME STATEMENT: BASE SCENARIO

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Premiums Earned | $53 | $171 | $109 | $71 | $65 | $35 | $17 | $5 | $0 | $526 |
| Net Investment Income | 40 | 248 | 224 | 216 | 215 | 199 | 146 | 85 | 69 | 1,443 |
| Total Revenue | $93 | $419 | $333 | $287 | $280 | $235 | $163 | $91 | $69 | $1,969 |
| Losses & Loss Adjustment Expense | $3,178 | ($291) | ($239) | ($228) | ($215) | ($166) | ($116) | ($41) | ($16) | $1,866 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Total Expenses | $3,110 | ($419) | ($333) | ($287) | ($280) | ($235) | ($163) | ($91) | ($69) | $1,234 |
| Net Income Before Taxes | $3,203 | -- | -- | -- | -- | -- | -- | -- | -- | $3,203 |
| Taxes | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Income | $3,203 | -- | -- | -- | -- | -- | -- | -- | -- | $3,203 |

### SUMMARY BALANCE SHEET: BASE SCENARIO

| | 2011 | 2012 | 2017 | 2022 | 2027 | 2032 | 2037 | 2042 | 2047 | 2052 |
|---|---|---|---|---|---|---|---|---|---|---|
| Invested Assets | $2,033 | $1,674 | $1,479 | $1,379 | $1,366 | $1,340 | $986 | $558 | $500 | -- |
| Other Assets | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | -- |
| Total Assets | $2,049 | $1,690 | $1,496 | $1,396 | $1,382 | $1,357 | $1,003 | $575 | $517 | -- |
| Unearned Premium Reserve | $171 | $158 | $118 | $82 | $60 | $33 | $14 | $3 | $0 | -- |
| Loss Reserves (expected CPP and DPO distributions) | 5,422 | 1,445 | 1,297 | 1,237 | 1,249 | 1,254 | 922 | 506 | 452 | -- |
| Other Liabilities | 24 | 22 | 16 | 11 | 8 | 5 | 2 | 0 | 0 | -- |
| Statutory Surplus | (3,567) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | -- |
| Liabilities and Equity | $2,049 | $1,690 | $1,496 | $1,396 | $1,382 | $1,357 | $1,003 | $575 | $517 | -- |

### SUMMARY CASH FLOWS: BASE SCENARIO

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash from Net Installment Premiums | $23 | $86 | $49 | $35 | $29 | $15 | $6 | $2 | $0 | $245 |
| Cash from Investment Income | 40 | 248 | 224 | 216 | 215 | 199 | 146 | 85 | 69 | 1,443 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Initial CPP Payments 1 | (322) | (293) | (168) | (100) | (80) | (317) | (396) | (96) | (231) | (2,004) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (132) | (114) | (107) | (124) | (184) | (226) | | (285) | (1,173) |
| Commutation Payments | 14 | -- | -- | -- | -- | -- | -- | -- | -- | 14 |
| Reinsurance Payments Received | 33 | 24 | 3 | 1 | 0 | 2 | 90 | 0 | -- | 153 |
| Contribution Amount | (11) | -- | -- | -- | -- | -- | -- | -- | -- | (11) |
| Loss Adjustment Expense | (68) | -- | -- | -- | -- | -- | -- | -- | -- | (68) |
| Operating Cash Flow | ($359) | ($195) | ($100) | ($13) | ($25) | ($354) | ($428) | ($58) | ($500) | ($2,033) |
| Change in Invested Assets | $359 | $195 | $100 | $13 | $25 | $354 | $428 | $58 | $500 | $2,033 |

### AVERAGE POLICYHOLDER RECOVERIES: BASE SCENARIO

| | |
|---|---|
| Nominal Recovery | 34% |
| 10% Discount Rate | 25% |
| 15% Discount Rate | 24% |
| 20% Discount Rate | 24% |

[1]"Initial CPP Payments" are CPP payments on Policy Claims first Permitted in the stated time period.

Exhibit D

(Liquidation Analysis)

OTHER RISK FACTORS, AS DETAILED IN SECTION IX OF THE DISCLOSURE STATEMENT.  POLICYHOLDERS AND OTHER PARTIES IN INTEREST ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTIES OF FUTURE PERFORMANCE OR RECOVERIES.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE LIQUIDATION ANALYSIS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC.  THE REHABILITATOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE LIQUIDATION ANALYSIS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR PREPARED THE LIQUIDATION ANALYSIS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE LIQUIDATION ANALYSIS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE LIQUIDATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WOULD OCCUR IN A HYPOTHETICAL LIQUIDATION.  IN CONSIDERING THE PROJECTED RECOVERIES UNDER THE PLAN AND IN A HYPOTHETICAL LIQUIDATION, POLICYHOLDERS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE LIQUIDATION ANALYSIS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Liquidation Analysis should be read in conjunction with the key assumptions set forth below, as well as the other assumptions, qualifications and explanations set forth in the Disclosure Statement and the Plan (including the Plan Supplement), in their entirety, and the historical financial statements (including the notes and schedules thereto) and other financial information posted at www.fgic.com/investorrelations/financialreports/.

in a final liquidation in 2052.  At each distribution date, Allowed Policy Claims that have previously received payments receive the difference between the new payment percentage and the prior payment percentage in effect when their last distribution was received.  Newly arisen Allowed Policy Claims receive the full payment percentage in effect at the time.  All Allowed Policy Claims would receive the same nominal recovery (*i.e.*, undiscounted cash flows received as a percentage of their original Policy Claim) because there is no interest accrual on unpaid Policy Claims.

2.  *Losses:* The Liquidation Analysis is based on two scenarios for determining losses under FGIC Policies, the Base Scenario and the Stress Scenario, each as described in the Plan, the Disclosure Statement and herein.

**D.    Revenues and Expenses**

1.  *Investment Income:* The Liquidation Analysis assumes gross investment income post-transaction to be 2.3% in 2012 and 3.25% thereafter.  Management fees are assumed to be 9.75 basis points of invested assets per year.

2.  *Premiums:* The Liquidation Analysis assumes premiums on existing installment policies to be collected as scheduled and that unearned premiums will not be returned.  However, a 10% reduction in expected premiums collection is assumed in the Liquidation Analysis to take into consideration potential shortfalls.

3.  *Reinsurance:* The Base Scenario assumes that reinsurance on Policy Claims that is not commuted will be collected from U.S.-domiciled investment grade Reinsurers in full and from non-U.S.-domiciled Reinsurers up to the amount of collateral posted if losses on reinsured policies are realized.  The Stress Scenario assumes that reinsurance on Policy Claims that is not commuted will not be collected due to the implied amount of losses Reinsurers would likely experience under the Stress Scenario and the possibility that the Reinsurers would have inadequate claims-paying resources.

4.  *Taxes:* The Liquidation Analysis assumes that the Contribution Amount - the $11 million payment to FGIC Corp. pursuant to the Plan Sponsor Agreement - will be paid.  Pretax income is expected to be realized in both the Base Scenario and Stress Scenario and the Liquidation Analysis assumes that existing NOLs are available and utilized going forward as income is generated.  NOLs are assumed to expire 20 years after they are generated.  Although NOLs are projected to be sufficient to offset taxable income in the Base Scenario and the Stress Scenario, if actual losses in liquidation are lower than what is projected in these two scenarios, material Cash tax payments may be required.

5.  *Operating Expenses:* The Liquidation Analysis assumes a total of approximately $533 million of operating expenses through 2052 (which amount is 10% less than operating expenses projected to be incurred under the Plan), excluding professional, NYLB and other expenses

Exhibit E

(Restructured Policy Terms:  Illustrative Example)

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | **Cash Payments** |
| 3. | CPP | 10% | This is the initial CPP assumed by this Example. |
| 4. | Cash payment to Policyholder 1 *(attributable to Permitted Policy Claim rather than to DPO Accretion)* | $10 | This is calculated by multiplying: <ul><li>the CPP in Line 3 (10%) by</li><li>the Permitted Policy Claim in Line 1 ($100),</li></ul> and subtracting from such product any FGIC Payments in Lines 9 ($0) and 10 ($0) to the extent that they have not been paid to FGIC. |
| 5. | Cash payment to Policyholder 2 *(attributable to Permitted Policy Claim rather than to DPO Accretion)* | $0 | As Policyholder 2 has no Permitted Policy Claims in Year One, there is no Cash payment. |
| | | | **DPO** |
| 6. | DPO for Policyholder 1 at end of Year One | $90 | DPO is the amount left after deducting Cash payments and Deemed Cash Payments made in respect of Permitted Policy Claims under a Policy from the aggregate Permitted Policy Claims under such Policy. DPO is further reduced by (i) FGIC Payments with respect to such Policy that are not paid to FGIC and (ii) Certificateholder Payments.  For purposes of this Example, "**Certificateholder Payments**" means any amounts recovered by a Policyholder with respect to such Policy that are paid to certificateholders instead of to FGIC and that would have been payable to FGIC had FGIC paid all Permitted Policy Claims under such Policy in full in the absence of the Policy Restructuring as specified in Lines 8, 25, 26, 45, 62 and 80. <br><br>On the date of Cash payment in Line 4, DPO is calculated by subtracting from the amount of the Permitted Policy Claim in Line 1 ($100) the sum of: <ul><li>the Cash payment paid by FGIC with respect to the Permitted Policy Claim in Line 4 ($10) and</li><li>the amount of the Certificateholder Payments by</li></ul> |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| 15. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 14 ($0) based upon the DPO Accretion Amount related to such Policy. |
| | **Period Summary** | | |
| 16. | Total Cash paid to Policyholder 1 during Year One | $10 | This is calculated by adding:<br>• the cash payment attributable to the Permitted Policy Claim in Line 4 ($10) plus<br>• the DPO Accretion Payment Amount for Policyholder 1 in Line 15 ($0). |
| 17. | Total Cash paid to Policyholder 2 during Year One | $0 | This is calculated by adding:<br>• the Cash payment attributable to the Permitted Policy Claim in Line 5 ($0) plus<br>• the DPO Accretion Payment Amount for Policyholder 2 in Line 15 ($0). |
| 18. | Total DPO and DPO Accretion Amount for Policy of Policyholder 1 as of the end of Year One | $92.70 | This is calculated by adding:<br>• the DPO at end of Year One in Line 6 ($90) plus<br>• the DPO Accretion Amount in Line 12 ($2.70) |
| 19. | Total DPO and DPO Accretion Amount for Policy of Policyholder 2 as of the end of Year One | $0 | This is calculated by adding:<br>• the DPO at end of Year One in Line 7 ($0) plus<br>• the DPO Accretion Amount in Line 13 ($0) |

### Year Two

**Overview:** In Year Two CPP remains unchanged. Neither Policyholder has additional Policy Claims Permitted in Year Two. There is are Certificateholder Payments, a FGIC Payment and DPO Accretion in respect of Policyholder 1.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | **Claims Permitted During Year Two** | | |
| 20. | Permitted Policy Claims | $0 | Neither Policyholder has any Policy Claims that |

EX.E-4

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|  |  |  | this recovery is payable to FGIC as a FGIC Payment (see Line 27 below). As set forth in Line 27, $1 of this recovery is a FGIC Payment that is assumed to be paid by Policyholder 1 to FGIC and $9 of this recovery is assumed to be paid by Policyholder 1 to certificateholders. The form of recovery in this Example is not proceeds of Trust Loan Repurchase Obligations. |
| 26. | Certificateholder Payments recovered by Policyholder 2 during Year Two | $0 | This Example assumes that no such amounts exist with respect to the Policy of this Policyholder. |
| **Required Payments** | | | |
| 27. | FGIC Payments payable to FGIC during Year Two | $1 | As discussed in Line 25, this Example assumes that in Year Two, Policyholder 1 receives a recovery of $10. The Plan provides that the current CPP percentage of this recovery is payable to FGIC as a FGIC Payment. FGIC Payment during Year Two is calculated by multiplying: <br>• the amount of the recovery Policyholder 1 receives during Year Two ($10) by <br>• the CPP in Line 21 (10%). |
| 28. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC for Policy Claims | $0 | No such amounts arose with respect to this Policy during prior periods. |
| **DPO Accretion** | | | |
| 29. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 30. | DPO Accretion Amount for Policyholder 1 at end of Year Two | $5.13 | This is calculated by multiplying: <br>• the DPO at end of Year Two for Policyholder 1 in Line 23 ($81) by <br>• the DPO Accretion Rate in Line 29 (3%) |

| Line | Item | Amount | Explanation |
|---|---|---|---|
| | Year Two | | ($0) plus<br>• the DPO Accretion Amount in Line 31 ($0). |

### Year Three

**Overview:** In Year Three CPP remains unchanged. There are no additional Policy Claims Permitted in respect of Policyholder 1. Policyholder 2 has its first Policy Claim Permitted in Year Three. Neither Policyholder owes any FGIC Payments or recovers any Certificateholder Payments in Year Three.

| Line | Item | Amount | Explanation |
|---|---|---|---|
| | **Claims Permitted in Year Three** | | |
| 38. | Permitted Policy Claim – Policyholder 1 | $0 | Policyholder 1 has no Policy Claims that were Permitted in Year Three. |
| 39. | Permitted Policy Claim – Policyholder 2 | $100 | Policyholder 2 filed a Policy Claim that was Permitted in accordance with the Plan in Year Three in the amount of $100. |
| | **Cash Payments** | | |
| 40. | CPP | 10% | This is the initial CPP assumed by this Example. |
| 41. | Cash payment to Policyholder 1 <br>*(attributable to Policy Claim rather than to DPO Accretion)* | $0 | As no Policy Claims were Permitted in Year Three for Policyholder 1, there is no Cash payment in Year Three to Policyholder 1 on account of Policy Claims. |
| 42. | Cash payment to Policyholder 2 <br>*(attributable to Policy Claim rather than to DPO Accretion)* | $10 | This is calculated by multiplying:<br>• the CPP in Line 40 (10%) by<br>• the Permitted Policy Claim in Line 39 ($100),<br>and subtracting from such product any FGIC Payments in Lines 46 ($0) and 47 ($0) to the extent that they have not been paid to FGIC. |

EX.E-8

| Line | Item | Amount | Explanation |
|---|---|---|---|
| | **FGIC Payments** | | |
| 46. | FGIC Payments payable to FGIC during Year Three | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year Three. |
| 47. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC on account of Permitted Policy Claims | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder. |
| | **DPO Accretion** | | |
| 48. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 49. | DPO Accretion Amount in respect of Policyholder 1 at end of Year Three | $7.56 | This is calculated by multiplying:<br>• the DPO at end of Year Three in Line 43 ($81) by<br>• the DPO Accretion Rate in Line 48 (3%) (the result of which is $2.43),<br>and adding the DPO Accretion Amount at end of Year Two in Line 30 ($5.13). |
| 50. | DPO Accretion Amount in respect of Policyholder 2 at end of Year Three | $2.70 | This is calculated by multiplying:<br>• the DPO at end of Year Three in Line 44 ($90) by<br>• the DPO Accretion Rate in Line 48 (3%),<br>and adding the DPO Accretion Amount at end of Year Two in Line 31 ($0). |
| 51. | DPO Accretion Payable Amount | $0 | There are no amounts available to pay DPO Accretion because the CPP has not increased in Year Three. |
| 52. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 51 ($0) based upon the DPO Accretion Amount related to such |

Year Four

**Overview:** In Year Four CPP remains unchanged.  There are no additional Policy Claims Permitted in respect of Policyholder 1 or Policyholder 2.  Neither Policyholder owes any FGIC Payments or recovers any Certificateholder Payments in Year Four.  The only change is an accrual of DPO Accretion.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | **Claims Permitted in Year Four** |
| 57. | Permitted Policy Claims | $0 | Neither Policyholder has any Policy Claims that were Permitted in Year Four. |
| | | | **Cash Payments** |
| 58. | CPP | 10% | This is the initial CPP assumed by this Example. |
| 59. | Cash payments to Policyholder 1 and Policyholder 2  *(attributable to Policy Claim rather than to DPO Accretion)* | $0 | As no Policy Claims were Permitted in Year Four for either Policyholder, there are no Cash payments in Year Four to either Policyholder on account of Policy Claims. |
| | | | **DPO** |
| 60. | DPO for Policyholder 1 at end of Year Four | $81 | DPO is the amount left after deducting cash payments and deemed cash payments made in respect of Permitted Policy Claims under a Policy from the aggregate Permitted Policy Claims under such Policy.  DPO is further reduced by (i) FGIC Payments with respect to such Policy that are not paid to FGIC and (ii) Certificateholder Payments. At the end of Year Four the DPO for Policyholder 1 is calculated by: <br>• the aggregate Policy Claims made by Policyholder 1 from Line 1 ($100), Line 20 ($0), Line 38 ($0) and Line 57 ($0), minus <br>• any amount of such Policy Claims paid in Cash from Line 4 ($10), Line 22 ($0), Line 41 ($0) and Line 59 ($0), less <br>• any Certificateholder Payments made by Policyholder 1 in Line 8 ($0), Line 25 ($9), Line 45 ($0) and Line 62 ($0). |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | and adding the DPO Accretion Amount at end of Year Three in Line 49 ($7.56). |
| 67. | DPO Accretion Amount in respect of Policyholder 2 at end of Year Four | $5.40 | This is calculated by multiplying:<br><br>• the DPO at end of Year Four in Line 61 ($90) by<br><br>• the DPO Accretion Rate in Line 48 (3%) (the result of which is $2.70),<br><br>and adding the DPO Accretion Amount at end of Year Three in Line 50 ($2.70). |
| 68. | DPO Accretion Payable Amount | $0 | There are no amounts available to pay DPO Accretion because the CPP has not increased in Year Four. |
| 69. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 68 ($0) based upon the DPO Accretion Amount related to such Policy. |
| | **Period Summary** | | |
| 70. | Total Cash paid to Policyholder 1 during Year Four | $0 | This is calculated by adding:<br><br>• the Cash payments to Policyholder 1 in Line 59 ($0) plus<br><br>• the DPO Accretion Payment Amount for Policyholder 1 in Line 69 ($0). |
| 71. | Total Cash paid to Policyholder 2 during Year Four | $0 | This is calculated by adding:<br><br>• the Cash payment to Policyholder 2 in Line 59 ($0) plus<br><br>• the DPO Accretion Payment Amount for Policyholder 2 in Line 69 ($0). |
| 72. | Total DPO and DPO Accretion Amount for Policy of Policyholder 1 as of the end Year Four | $90.99 | This is calculated by adding:<br><br>• the DPO at end of Year Four in Line 60 ($81) plus<br><br>• the DPO Accretion Amount in Line 66 |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | $9 from Line 25) ($91 x 5% = $4.55). |
| | | | This amount is then further reduced by the FGIC Payments by Policyholder 1 in Line 81 ($0.50). For purposes of this Example, it is assumed that Policyholder 1 does not pay the FGIC Payment in Line 81 in Cash and instead FGIC sets off this amount from this Cash payment. |
| 77. | Cash payments to Policyholder 2 *(attributable to Policy Claim rather than to DPO Accretion)* | $5 | Even though there are no Policy Claims in Year Five for Policyholder 2, the increase in CPP will result in a payment in respect of the Policy Claim previously Permitted in Year Three. This is calculated by: <br><br> • the difference between the CPP in Year Five in Line 75 (15%) and the CPP in Year Four in Line 58 (10%), which equals 5%, multiplied by <br><br> • the original amount of all Permitted Policy Claims for Policyholder 2 (in this case, $100 from Line 39) less all Certificateholder Payments by Policyholder 2 ($0) ($100 x 5% = $5). |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| 80. | Certificateholder Payments recovered by Policyholders during Year Five | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year Five. |
| **FGIC Payments** | | | |
| 81. | FGIC Payments payable to FGIC by Policyholder 1 during Year Five | $.50 | Because of the increase in CPP in Year Five, prior FGIC Payments must be adjusted to determine the amount of FGIC Payments that Policyholder 1 should have paid to FGIC had the CPP been 15% at the time of the FGIC Payment.  This is calculated by multiplying: <ul><li>the difference between the CPP in Year Five in Line 75 (15%) and the CPP in Year Four in Line 58 (10%), which equals 5%, and</li><li>The recovery Policyholder 1 recovered in Year 2 ($10) that is assumed in Lines 25 and 27.</li></ul> |
| 82. | FGIC Payments payable to FGIC by Policyholder 2 during Year Five | $0 | This Example assumes that no such amounts exist with respect to the Policy of Policyholder 2 in Year Five. |
| 83. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC on account of Permitted Policy Claims | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder. |
| **DPO Accretion** | | | |
| 84. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 85. | DPO Accretion Amount in respect of Policyholder 1 at end of Year Five | $10.48 | At the time of calculation of DPO Accretion Payment Amount, this is calculated by multiplying: <ul><li>the DPO at end of Year Five in Line 78 ($76.95) by</li></ul> |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | the DPO for Policy Claims projected to be Permitted in a Stress Scenario after Year Five. |
| 88. | DPO Accretion Payment Amount for Policyholder 1 | $1.82 | This is calculated by multiplying the DPO Accretion Payable Amount specified in Line 87 ($3) by:<br><br>• the End of Year Four DPO Accretion Amount in Line 66 ($9.99) plus<br>• the amount obtained by multiplying the End of Year Five DPO in Line 78 ($76.95) by the DPO Accretion Rate in Line 84 (3%) ($2.31),<br><br>divided by:<br><br>• the End of Year Four DPO Accretion Amount in Line 66 ($9.99) plus<br>• the amount obtained by multiplying the End of Year Five DPO in Line 78 ($76.50) by the DPO Accretion Rate in Line 84 (3%) ($2.31) plus<br>• the End of Year Four DPO Accretion Amount for Policyholder 2 in Line 67 ($5.40) plus<br>• the amount obtained by multiplying the End of Year Five DPO for Policyholder 2 in Line 79 ($85) by the DPO Accretion Rate in Line 84 (3%) ($2.55). |
| 89. | DPO Accretion Payment Amount for Policyholder 2 | $1.18 | This is calculated by multiplying the DPO Accretion Payable Amount specified in Line 87 ($3) by:<br><br>• the End of Year Four DPO Accretion Amount in Line 67 ($5.40) plus<br>• the amount obtained by multiplying the End of Year Five DPO in Line 79 ($85) by the DPO Accretion Rate in Line 84 (3%) ($2.55),<br><br>divided by: |

EX.E-20

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|      |      |        | ($6.77).    |