**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

REDACTED

In re:  ) Case No. 12-12020 (MG)
)
RESIDENTIAL CAPITAL, LLC, *et al.*, ) Chapter 11
)
Debtors. ) Jointly Administered
)

## DECLARATION OF SCOTT R. GIBSON

Scott R. Gibson declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. My name is Scott R. Gibson, and I am over 21 years of age. I am of sound mind, and I will attest to the facts described herein. I hold a Bachelor of Science degree from Lehigh University in Material Science and Engineering. I am a Senior Vice President, Independent Pricing Service & Analytics, at MountainView IPS, LLC ("MountainView IPS"), located at 999 18th Street, Suite 1001, Denver, Colorado 80202. MountainView IPS is a wholly owned subsidiary of MountainView Capital Holdings ("MountainView"). For 23 years, MountainView has been focusing on the diverse needs of participants in the fixed income capital markets and specializing in mortgage assets. With expertise in asset management, analytics, sales and trading, MountainView is uniquely qualified to create value for our clients in all market conditions. MountainView Capital Holdings offers a suite of services to institutional participants in the mortgage and fixed income capital markets. MountainView addresses their clients' needs through six wholly owned subsidiaries, including MountainView IPS.

2. MountainView IPS is an independent pricing service ("IPS") that provides analytics and fair value pricing of residential mortgage-backed securities, commercial mortgage-backed securities, asset-backed securities, and residential whole loans. MountainView IPS also

provides cash-flow projections and stress/scenario testing. As a market leading participant in the third-party valuation service sector, MountainView IPS, provides accurate third-party, fair market pricing of hard-to-value and other mortgage and asset-backed securities for fixed income managers and investors, leading investment and commercial banks, regulated savings and lending institutions, institutional investors, government agencies and service providers internationally. The MountainView IPS pricing process incorporates a blend of market and credit research, internal and external pricing models, and specialist judgment to determine and verify the correct set of performance assumptions that drive an asset's cash flow and ultimate fair market value.

3. The IPS valuation process captures collateral and structural performance for each individual bond or loan pool being valued, as well as the current market and credit considerations that will impact price. IPS provides full transparency of the inputs and assumptions used in the valuation process. The valuation methodology follows ASC 820-FAS 157 guidance for fair value measurements in accordance with generally accepted accounting principles (GAAP).

4. Prior to joining MountainView IPS, I held executive positions at Clayton, IPS, LLC, and CoreBrand, LLC. Throughout my fifteen-year career as a financial professional specializing fair value analysis, residential loan portfolio valuation, residential mortgage-backed securities ("RMBS") and asset-backed securities ("ABS") modeling, quantitative analysis, analytic processes development, and investment portfolio reporting, I have developed considerable experience in these fields. I have been recognized for, among other things, significant contributions to residential loan portfolio valuation and RMBS/ABS modeling.

5. I submit this declaration (the "Declaration") in support of the opposition of Federal Home Loan Mortgage Corporation ("Freddie Mac") to the *Debtors' Motion Pursuant to Fed. R. Bankr. P 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* dated June 7, 2013 [ECF No. 3929] (the "9019 Motion"). All facts set forth in this Declaration are based upon, among other things, (i) my personal knowledge; (ii) information supplied to me by (a) counsel for the Freddie Mac and (b) my colleagues; (iii) my review of relevant documents, including (a) deposition transcripts; (b) the 9019 Motion and the exhibits thereto; (c) the motion (Sequence No. 016, the "State Court Motion") of the rehabilitator (the "Rehabilitator") of Federal Guaranty Insurance Company ("FGIC") to approve a settlement agreement among the FGIC, Residential Capital, LLC ("ResCap," or the "Debtors"), and other parties (the "ResCap Settlement") in FGIC's rehabilitation proceeding in New York Supreme Court (the "Rehabilitation Proceeding"); and (d) FGIC's plan of rehabilitation and related documents (the "Rehabilitation Plan"); and (iv) my opinion based upon my experience and knowledge acquired over the fifteen years I have been involved as an professional in the IPS sector.

6. Based upon my experience and the analysis set forth herein, I believe holders of FGIC-Insured ResCap RMBS (defined below) collectively would receive materially superior recoveries under the Rehabilitation Plan than under the Settlement Agreement, and the FGIC Commutation Plan has more inherent risk than the Rehabilitation Plan as approved on June 11, 2013.

**INTRODUCTION AND PURPOSE**

7. Prior to the commencement of the Rehabilitation Proceeding, certain of the Debtors originated and/or serviced residential mortgage loans that they contributed or

- 3 -

otherwise sold to forty-seven trusts (the "FGIC-Insured Trusts"). These trusts then issued RMBS consisting of certificates collateralized by such residential mortgage loans. FGIC, a monoline financial guaranty insurance company, wrote policies that insured the payment of principal and interest with respect to the securities issued by the FGIC-Insured Trusts; by "wrapping" the securities the FGIC-Insured Trusts issued, FGIC essentially guaranteed the payment of principal and interest due on such securities.

8. FGIC has been unable to make payments under any of the Policies since approximately November of 2009 when the New York State Department of Insurance (now known as the New York Department of Financial Services) prevented FGIC from making payments on any policy claims.

9. The Rehabilitation Plan provides that the holders of FGIC policy claims will receive payments of 17.25% of the total amount of their claims against FGIC (the "Cash Payment Percentage" or "CPP"), which will be adjusted over time. The financial disclosures in connection with the Rehabilitation Plan contemplate that the present value of recoveries under a "Base Scenario" will be between 27 and 30 cents on the dollar for FGIC policy claims. The Rehabilitation Plan contains mechanisms that will "true up" earlier-filed FGIC policy claims such that these earlier-dated claims may receive subsequent payments based upon subsequent increases to CPP.

10. After the Rehabilitation Plan was approved, the Rehabilitator sought court approval of the ResCap Settlement, which, among other things, would provide for the commutation/termination of the Policies (the "FGIC Commutation") in exchange for a one-time, lump-sum payment of $253.3 million (the "FGIC Commutation Payment"), which would be distributed to holders (the "FGIC-Wrapped Holders") of FGIC-insured ResCap RMBS (the

"FGIC-Wrapped Securities") originated by ResCap and certain of its affiliates.

11.     At the request of Freddie Mac's counsel (McKool Smith, P.C., and Moss & Kalish, PLLC), MountainView IPS assessed the recoveries to FGIC-Wrapped Holders under the Rehabilitation Plan *vis-à-vis* the ResCap Settlement. While Freddie Mac did obtain limited discovery from the trustees of the FGIC-Insured Trusts and their expert (the "Trustees"), the Debtors, and FGIC, we did not receive enough material to complete an analysis that did not rely primarily on publicly available documents. Using publicly available information (and some of the limited discovery we received from FGIC), we were able to complete an analysis that demonstrated to us that the recoveries to FGIC-Wrapped Holders would be materially better under the Rehabilitation Plan than under the ResCap Settlement, which is inherently more risky than the Rehabilitation Plan as approved on June 11, 2013.

## ANALYSIS

12.     To compare the recoveries of FGIC-Wrapped Holders under the ResCap Settlement versus the Rehabilitation Plan, we first estimated the percentage recoveries under each using the Rehabilitator's and/or FGIC's own numbers as to future claims under the Policies. Then we applied this estimate of future claims to percentage recoveries under the ResCap Settlement Agreement and under the Rehabilitation Plan. We then calculated recoveries under the ResCap Settlement versus the Rehabilitation Plan to our view of Freddie Mac's projected losses with respect to the FGIC-Wrapped Securities it holds. Next, we calculated recoveries under the ResCap Settlement versus the Rehabilitation Plan to the projected losses to FGIC-Wrapped Holders generally. In both cases, we concluded that recoveries to FGIC-Wrapped Holders under the Rehabilitation Plan are materially superior to recoveries under the Settlement Agreement.

**Percentage Recovery: ResCap Settlement**

13. In analyzing the ResCap Settlement, we believe that FGIC-Wrapped Holders generally will receive a recovery on their claims under the Policies approximately 20 cents on the dollar. The Affirmation of Gary T. Holtzer in Support of the ResCap Settlement (Exhibit 10 to the 9019 Motion, the "Holtzer Affirmation") estimates that there are $789 million in claims currently pending against FGIC, with additional claims in <u>excess</u> of $400 million that will arise under the Policies in the future, totaling approximately $1.2 billion in claims. (Holtzer Affirmation ¶¶ 5, 21.)

14.

15.

16. To date, neither FGIC nor the Rehabilitator has made any updated disclosures related to the magnitude of liabilities under the Policies. Because we were not provided with information sufficient to form our own analysis of the magnitude of estimated claims against FGIC arising under the Policies,

17. Recoveries under the ResCap Settlement to FGIC-Wrapped Holders would not include the "litigation upside" of potential recoveries in FGIC's lawsuits/claims against ResCap and other mortgage servicers/originators for, among other things, breach of representations and warranties as to the value of the collateral securing the RMBS for which FGIC wrote policies. As set forth paragraph 13 of the Holzer Affirmation, if the ResCap Settlement Agreement is approved, FGIC's direct claims against ResCap would be settled for an allowed, unsecured claim of $934 million, of which FGIC estimates it will receive a cash recovery of $206.5 million. We assume that, if the ResCap Settlement is not approved, FGIC would receive at least $206.5 million on account of its direct claims against ResCap. Any such recoveries would be distributed to satisfy the claims of all FGIC policyholders.

18. As set forth in the Miller Affidavit, it is expected that there will be a total of approximately $6.3 billion in claims against FGIC. (Miller Affidavit Ex. 1, p 6.)

**Percentage Recovery: Rehabilitation Plan**

19.     In assessing recoveries under the Rehabilitation Plan, we relied upon the *Affidavit of Michael W. Miller in Further Support of First Amended Plan of Rehabilitation* the "Miller Affidavit"), filed in the Rehabilitation Proceeding in connection with Motion Sequence No. 4.   The Rehabilitation Plan provides that the holders of FGIC policy claims will receive payments of 17.25% of the total amount of their claims against FGIC (the "Cash Payment Percentage" or "CPP"), which will be adjusted over time to account for runoff of exposure to future policy claims, the maintenance and appreciation of FGIC's, assets, as well as the actual realization of estimated claim under FGIC-issued policies. (*See* Miller Affidavit ¶¶ 22-25.)

20.     The Miller Affidavit estimates that recoveries will be paid out, over time, from 2012 through 2052, though the majority of recoveries will be paid out through by 2017. (Miller Affidavit Ex. 1, p., 6.) The Miller Affidavit contemplates that FGIC-Issued policy claims will be paid in two ways:  policyholders will receive CPP of varying percentages from 2012 through 2047, with deferred payment obligations ("DPO") to be paid through 2052 to the extent FGIC has excess cash available after all direct policy-related claims are paid.

21.     To account for the delayed payout through 2052, the Miller Affidavit discounts the payment streams to present value using discount rates of 10% through 20%. The discount rate is meant to account for both the time horizon over which claims are paid, as well as to adjust for the riskiness of future cash flows. This permits an "apples-to-apples" comparison with the ResCap Settlement recoveries, which would be paid out at once, as opposed to being

paid over time.

22. The Miller Affidavit estimates the present value of recoveries differ with respect to certain assumptions under two scenarios: the "Base Scenario," which assumes relatively smaller future claims under FGIC-issued policies on account of a more favorable economic climate and a "Stress Scenario," which projects higher policy-related claims based on an unfavorable 2008 economic climate scenario. For the reasons set forth below, we believe that the "Base Scenario" is far more likely to occur.[1]

23. Recoveries under the "Base Scenario" are estimated to be between 27 and 30 cents on the Dollar, depending on the discount rate used, as summarized below:

**Percentage Recovery under Rehabilitation Plan: Base Scenario**

| Discount Rate | Percentage Recovery: Rehabilitation Plan |
| --- | --- |
| 10% | 30% |
| 15% | 28% |
| 20% | 27% |

24. The "Base Scenario" assumes "FGIC's then-current expectation of future Claims, investment performance, recoveries, financial markets and other factors of relevance to CPP Revaluations bases on circumstances, events and projections that FGIC anticipates are reasonably likely to occur." (Rehabilitation Plan Ex. A, p. A-2.) It my opinion that, if the economy improves even more than is contemplated by the "Base Scenario," the present value of cash payments would likely exceed the 27-30 cent range.

25. By contrast, under the "Stress Scenario," the present value of recoveries

---

[1] Indeed, the Base Scenario portrays FGIC's expected performance during the Run-Off Period, including expected aggregate payments on policy claims. The Stress Scenario portrays a more conservative loss scenario envisioning a severe economic recession characterized by sharp declines in home prices and financial markets, significant unemployment, high mortgage default rates, and other negative economic indicators. As mentioned above, based on industry research it is the opinion of IPS that the base case scenario is far more likely to occur than the stress case.

under the Rehabilitation Plan are estimated to be between 17 and 18 cents on the Dollar. (Miller Affidavit Ex. 1, p. 7.) Unlike the "Base Scenario," the "Stress Scenario" assumes "a non-catastrophic scenario envisioning a severe economic recession (i.e., 2008) that is accompanied by (i) sharp declines in home prices and the financial markets, (ii) significant unemployment, (iii) high mortgage default rates and (iv) other negative indicators of potential relevance to FGIC's insured exposures." (Rehabilitation Plan Ex. A, p. A-14.)

26.     Based on my assessment of current market conditions, we believe that the "Stress Scenario" by nature is extremely conservative, assuming an economic downturn equivalent to the 2008 economic crisis. Given the rarity of such events, we believe that the "Base Scenario" is far more likely to occur in the future than the "Stress Scenario."[2] Accordingly, we use the "Base Scenario" when assessing the recoveries to FGIC-Wrapped Holders under the Rehabilitation Plan. Furthermore, we believe that the discount rates of 10% to 20% are sufficiently high to apply in the circumstances taking into account FGIC's portfolio.

**Freddie Mac's Recoveries: ResCap Settlement versus Rehabilitation Plan**

27.     To understand Freddie Mac's recoveries under the ResCap Settlement versus the Rehabilitation Plan, we first estimated Freddie Mac's losses with respect to the FGIC-Wrapped Securities it holds. Indeed, Freddie Mac's losses related to FGIC-Wrapped Securities are critical to our analysis here as they identical to Freddie Mac's future claims against the

---

[2] In formulating this assessment, MountainView IPS consulted the following publicly available resources:

- JP Morgan Securitized Products Weekly, 20130621
- JP Morgan Home Price Monitor, 20130607
- http://data.bls.gov/timeseries/LNS14000000
- http://www.federalreserve.gov/monetarypolicy/files/fomcprojtabl20130619.pdf
- http://www.federalreserve.gov/monetarypolicy/files/fomcprojtabl20130619.pdf

Policies: any loss to a FGIC-Wrapped Holder related to a FGIC-Wrapped Security translates directly to a loss to a claim under the Policies.

28.

## Freddie Mac Holdings of FGIC-Insured RMBS

29. For each collateral portfolio analyzed, IPS Analysts create CPR (prepay), CDR (default), and loss severity assumptions, along with any other assumptions needed on an individual security basis. These assumptions are based on key characteristics of the collateral that are found in the data tape and/or deal documents. IPS' key loan characteristics include FICO, LTV, Loan Type, Occupancy, Loan Purpose, Prepayment Penalties, Loan Balance, Performance History (if applicable), Seasoning (age of security), Housing Price Appreciation, Geographic Location, and any other applicable collateral characteristics.

30. The assumptions (CPR, CDR, and Severity) are primarily derived from a combination of some or all of the following: industry performance research, internal expertise, Dealer market and sector research, Dealer performance assumptions (based on conversation and

research reports), and the IPS database comparing market assumptions for similar collateral pools. Changes in the IPS assumptions are driven by actual or forecasted changes in the condition of the underlying collateral, market expectations, and credit expectations.

31.   IPS utilizes Intex cash-flow models to perform our analysis. IPS analysts estimate the projected principal, interest and losses expected for each security by inputting the various collateral performance assumptions and deal cash flow model assumptions.

32.   The assumptions (CPR, CDR, and Severity) are primarily derived from a combination of some or all of the following: industry performance research, internal expertise, Dealer market and sector research, Dealer performance assumptions (based on conversation and research reports), and the IPS database comparing market assumptions for similar collateral pools. Changes in the IPS assumptions are driven by actual or forecasted changes in the condition of the underlying collateral, market expectations, and credit expectations.

33.   IPS utilizes Intex cash-flow models to perform our analysis. IPS analysts estimate the projected principal, interest and losses expected for each security by inputting the various collateral performance assumptions and deal cash flow model assumptions.

34.   We discounted these future losses using the same discount rates used in the Miller affidavit, i.e., discount rates of 10% to 20%. Using these tools, we estimate that Freddie Mac will realize a present value of actual and estimated losses (the "Freddie Mac Losses") on the FGIC-Wrapped Securities it holds in as follows:

**Freddie Mac Losses**

35. Under the ResCap Settlement Freddie Mac would realize the following recoveries, given the range of discount rates used:

**Freddie Mac Recoveries under the ResCap Settlement**

36. By contrast, Freddie Mac would realize the following recoveries under the Rehabilitation Plan under the more likely Base Scenario, which also must be further adjusted to account for the pro rata distribution of the "litigation upside." Freddie Mac's share of the litigation upside would be its pro rata share of the $41.3 million litigation upside(20% of the $206.5 coming from ResCap in satisfaction of FGIC's claims against ResCap) to all FGIC-Wrapped Holders, which claims are estimated by the Rehabilitator and FGIC to be $1.27 billion:

**Freddie Mac Share of the Litigation Upside**

37. After calculating the above share of the "litigation upside" against ResCap attributable to Freddie Mac if the ResCap Settlement is not approved, we estimate Freddie Mac's recoveries under the Rehabilitation Plan to be as follows:

**Freddie Mac Aggregate Recoveries under the Rehabilitation Plan**

38. Freddie Mac's recoveries under the Rehabilitation Plan, as the Rehabilitator's advisors' estimates show, provide a far better recovery than under the ResCap Settlement, and the Rehabilitation Plan is accordingly in Freddie Mac's best interests given the highly disparate recoveries under the Rehabilitation Plan versus the ResCap Settlement.

**FGIC-Wrapped Holders' Recoveries: ResCap Settlement versus Rehabilitation Plan**

39.

40.     By contrast, FGIC-Wrapped Holders generally would realize the following recoveries under the Rehabilitation Plan under the more likely Base Scenario:

**FGIC-Wrapped Holders' Aggregate Recoveries under the Rehabilitation Plan**

41.     Like Freddie Mac's recoveries, FGIC-Wrapped Holders' recoveries under the Rehabilitation Plan, as the Rehabilitator's advisors estimates show, provide a far better recovery than the $253.3 lump sum payment plus $18.3 million waived Policy premiums under the ResCap Settlement. As was the case with Freddie Mac individually, the Rehabilitation Plan is accordingly in best interests of FGIC-Wrapped Holders generally given the highly disparate recoveries under the Rehabilitation Plan versus the ResCap Settlement.

42.     Under the Rehabilitation Plan, the FGIC-Wrapped Holders will receive an

---

[3] It appears that the $481 million is FGIC's and the Rehabilitator's estimate of the nominal value of future claims and is not discounted to present value.

incremental increase to the payments received under the Rehabilitation Plan if losses to their respective tranches increase (holding all other FGIC policy claims constant). If losses were to increase for the individual bonds, the such holders would expect to receive an increasing amount of payments under the Rehabilitation Plan. This is because losses on each individual bond would be mitigated by a larger risk pool of all FGIC policyholders. Conversely, the FGIC Commutation provides no incremental benefit to increasing losses beyond current loss expectations. If losses were to increase beyond current expectations, the amount of the $253.3 million commutation amount (as a percentage of lifetime losses of individual bonds) would in fact decrease. Generally, the FGIC Commutation presents additional risk to individual holders of FGIC-Wrapped Holders when considering higher loss projections. Mr. Pfeiffer (the FGIC Trustees' expert) does not take this into account in his "range of reasonableness" analysis. Furthermore, each FGIC-Insured Trust's share of the $253.3 commutation payment will be allocated as a fixed recovery amount. Again, because this recovery is fixed, FGIC-Wrapped Holders cannot look to FGIC's entire portfolio, risk increases under the FGIC Commutation. It is much more likely that one of the FGIC-Insured Trusts may have a downturn than all of them or several of them at once.

43.

---

[4] Expert Report of Allen M. Pheiffer, July 19, 2013 at 30.

[5]

44.

45.

46.

---
[5]

[6] Expert Report of S.P. Kothari, Ph.D., July 19, 2013; I; Duff & Phelps' ResCap Policyholder Payout Assumptions – pp. 16.

## CONCLUSION

47.     In sum, based upon my experience and the analysis set forth above, I believe that it is reasonable to conclude that the FGIC-Wrapped Holders would receive materially superior recoveries under the Rehabilitation Plan than under the ResCap Settlement. It is therefore my conclusion that the ResCap Settlement is not in the best interests of the FGIC-Wrapped Holders.

## RESERVATION OF RIGHTS

48.     We reserve the right to amend and supplement this Declaration upon receipt of any new or updated information that may be produced either in documents and/or testimony in this matter. In addition, we reserve the right to submit a rebuttal report and/or otherwise amend and/or supplement this Declaration at any time for any reason.

I declare under penalty of perjury that the information set forth in this Declaration is true and correct to the best of my knowledge, information, and belief.

Dated: July 31, 2013
Denver, Colorado

/s/ Scott R. Gibson
Scott R. Gibson
MountainView IPS, LLC
999 18th Street, Suite 1001
Denver, Colorado 80202