# Exhibit 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**RESIDENTIAL CAPITAL, LLC,** *et al.*,<br><br>Debtors. | **Chapter 11**<br><br>**Case No.: 12-12020 (MG)**<br><br>**Jointly Administered** |

### DECLARATION OF R. FREDRICK WALTERS, DAVID M. SKEENS
### AND R. BRUCE CARLSON IN SUPPORT OF MOTION TO
### APPLY BANKRUPTCY RULE 7023 AND TO CERTIFY CLASS CLAIMS

R. Fredrick Walters, David M. Skeens and R. Bruce Carlson ("Declarants"), pursuant to

28 U.S.C. §1746, hereby declares as follows:

1.      Declarants Walters and Skeens are attorneys employed by the law firm of

Walters, Bender, Strohbehn & Vaughan, P.C. ("Walters Bender") and each have worked at this

firm since 2000 or earlier.  Walters and Skeens have each had substantial responsibility since

around 2000 with respect to a number of mortgage lending class action matters handled by their

firm, including a number of class action cases brought by persons represented by Walters Bender

against GMAC-Residential Funding Corporation n/k/a Residential Funding Company, LLC

("RFC").

2.      Declarant Carlson is an attorney employed by the law firm of Carlson Lynch, Ltd.

Declarant Carlson has had substantial responsibility since around 2000 with respect to a number

of mortgage lending class action matters, including a number of class action cases brought by

persons represented by Carlson against RFC.

2303330.1

1

1212020121102000000000057

3.     This Declaration is submitted on behalf of Rowena Drennen,[1] Flora Gaskin, Roger Turner, Christie Turner, John Picard, and Rebecca Picard (the "Class Claimants") in support of the Class Claimants' accompanying <u>Motion to Apply Bankruptcy Rule. 7023 and to Certify Class Claims</u>.

4.     The facts set forth in this Declaration are based upon (a) personal knowledge; (b) the review of testimony and records obtained in discovery or subpoenas to third parties in the representations mentioned in paragraph 1 and 2 (reviewed by Declarants or others at their respective law firms); and (c) information and belief acquired during the noted representations. Each Declarant attests that if called and sworn as a witness, he would testify competently to the matters set forth herein.

5.     This Declaration is organized as follows:

I.     OVERVIEW OF THE LITIGATION AGAINST RFC:
       IN RE COMMUNITY BANK OF NORTHERN VIRGINIA
       SECOND MORTGAGE LENDING PRACTICES LITIGATION ………………..   2

II.    RESPA, TILA, HOEPA and RICO– An Overview …………………………………   11

III.   INITIAL DAMAGE ESTIMATES FOR PUTATIVE CLASS MEMBERS ………   17

IV.    THE PROCEDURAL HISTORY OF THE CLASS LITIGATION ………………...   19

V.     CLASS CERTIFICATION ………………………………………………………..   23

I.     **OVERVIEW OF THE LITIGATION AGAINST RFC:** *IN RE COMMUNITY BANK OF NORTHERN VIRGINIA SECOND MORTGAGE LENDING PRACTICES LITIGATION*

6.     At the time of RFC's bankruptcy, four putative class actions against RFC and others were pending in the United States District Court for the Western District of Pennsylvania

---

[1] Rowena Drennen is a member of the Official Committee of Unsecured Creditors.  *See* Appointment of Official Committee of Unsecured Creditors, filed May 16, 2012 (Doc. No. 102).

2303330.1

as part of a multidistrict proceeding styled *In Re: Community Bank of Northern Virginia Second Mortgage Lending Practice Litigation,* MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 05-1386 (the "MDL Class Action"). The Class Claimants are among the 41 lead plaintiffs in the MDL Class Action and representative of that group of lead plaintiffs and of the overall putative class. They have pursued class action claims against RFC for over 10 years based upon its participation in a predatory lending scheme and racketeering enterprise perpetrated against 44,535 borrowers nationwide, as described in detail below. All 44,535 members of the proposed class are known and have been identified. Indeed, as part of the litigation against RFC, two class action settlements were approved (but later vacated on appeal) and pursuant to each settlement RFC undertook to mail notice of the settlement to the class members.

7.     The MDL Class Action is itself a consolidation of six separate class action lawsuits, filed between May 1, 2001 and February 26, 2003, brought by Declarant Carlson that were pending in the United States District Court for the Western District of Pennsylvania as of July 2003, at which time they were consolidated for purposes of a class action settlement.

8.     The claims pending against RFC in the MDL Class Action that were pending at the time of its bankruptcy are set forth in the Joint Consolidated Amended Class Action Complaint ("Complaint"), a copy of which is attached as **Exhibit A.** The Class Claimants' Class Proofs of Claim filed in this bankruptcy case (the "Class Claim" or "Claims") are based upon the same allegations set out in full in the Complaint and are attached to this Declaration as **Exhibits B, C, and D.**[2]

9.     The allegations in the MDL Class Action lay out a massive predatory and illegal lending scheme that involved many of the sharp practices underlying the recent collapse of the

---

[2] To avoid unnecessary duplication and bulk, Exhibits B, C, and D do not include Attachment 2, which in each instance is the Complaint attached to this Declaration as Exhibit A.

2303330.1

American mortgage market. The loans involved are all "high-cost" loans under the Home Ownership and Equity Protection Act, 15 U.S.C. § 1641 ("HOEPA"). Each loan transaction was governed by and subject to the Real Estate Settlement Practices Act 12 U.S.C. § 2601 *et seq.* ("RESPA"), the Truth in Lending Act ("TILA") and HOEPA (15 U.S.C. § 1602 and Regulation Z at 12 C.F.R. § 226.2). In addition, each loan was a federally-related mortgage loan obtained primarily for personal, family, or household purposes and, as such, constituted a consumer credit transaction within the meaning of the TILA and HOEPA. Complaint, at ¶¶ 2, 6, 9. RFC bought the loans at issue from the originating banks and because these are HOEPA loans, RFC is liable just as if it had originated the loans. 15 U.S.C. § 1641(d).

10. Each of the 44,535 individual loans at issue was purchased by RFC and our analysis shows that each had an average principal balance of approximately $35,000. The borrowers enticed to close one of these loans paid "origination" and "title" fees in excess of 12% of the original principal balance of the loan and exorbitant interest rates that were largely unrelated to the credit worthiness of the borrowers. The fees charged in connection with these loans were grossly excessive and far beyond those a borrower would pay in a true free market for settlement services rather than an illegitimate transaction centered on an underlying fraudulent kick-back scheme. Complaint, at ¶ 2.

11. As Plaintiffs allege, the kickback scheme at issue was initially conceived by three brothers, David, DeVan and Chris Shumway and Randy Bapst. The Shumway/Bapst "business plan" was to drive loan volume via a massive nationwide direct mail marketing campaign. Borrowers identified by the marketing campaign were referred to either Community Bank of Northern Virginia ("CBNV") or Guaranty National Bank of Tallahassee ("GNBT") (collectively the "Banks"), who would process and originate the loans in their own names, and then kick-back

2303330.1

the overwhelming majority of the settlement fees to companies controlled by Messrs. Shumway and Bapst, notwithstanding the fact that these Shumway/Bapst companies were not providing any compensable settlement services in connection with the loans. Complaint, at ¶ 3.

12.    The original conspirators who conceived the massive mortgage lending fraud developed familiarity with the residential mortgage industry beginning in the late 1980s.  By the late 1990s, some mortgage originators had begun to pursue an "originate and sell" business model whereby they would originate as many loans as possible, and derive most of their profit from the settlement fees that they would charge prior to selling the loans to investors like RFC. Their incentive, therefore, was to drive that fee income up as high as possible. Two of the aforementioned conspirators, brothers David and Devan Shumway, along with their colleague Randy Bapst collaborated to go into business for themselves to pursue this originate and sell approach to mortgage lending out of their headquarters in Northern Virginia,  (hereafter the "Shumway/Bapst Organization" or the "Organization"). The Shumway/Bapst Organization developed a particular expertise in originating "high loan to value" or "125" second mortgage loans, wherein the cumulative amount of mortgage indebtedness on the home at issue often exceeded the amount of equity in the home.  Complaint at ¶ 61-84.

13.    The Complaint alleges that the Organization's goal—fueled by seed capital provided by brother Chris Shumway's hedge fund successes —was to maximize the amount of settlement fees that it could extract from borrowers, irrespective of creditworthiness and irrespective of what settlement services were actually provided to a borrower in connection with a given loan.  To facilitate the maximization of cumulative settlement fees, the Organization invested substantial sums into a national direct mail marketing campaign that was calculated to generate as much loan volume as possible. Complaint at ¶¶3, 63.

2303330.1

14.     Regulatory problems, however, dogged the Shumway/Bapst Organization from its inception.  In the first instance, Virginia banking regulators challenged the Organization's ability to originate loans throughout the country without proper licensure.   Plaintiffs allege that to deflect this issue, and to simultaneously permit it to circumvent state settlement fee caps and interest ceilings that applied to non-depository lenders, the Organization conceived a plan whereby it would develop an association with a regulated depository institution, which would arguably not be subject to the same licensure obligations and fee and interest caps that constrained non-depository lenders. The business plan specifically contemplated that the Organization would target financially distressed banks, which would be offered the opportunity to derive significant income by making the loans referred to them by the Shumway/Bapst Organization, so long as the banks would agree to kick-back to the Organization the lion's share of the origination fees generated through the loans. Complaint at ¶¶ 64-66. The plan contemplated that the banks would not be required to hold the second mortgage loans in their own portfolio, but that the loans would instead be sold *en masse* to an investor, primarily RFC. Complaint at ¶¶ 78-81; 85-97.  The plan also required that the banks would use title companies controlled by the Organization to extract additional excessive and unearned fees from the borrowers. Complaint at ¶ 67.

15.     Plaintiffs allege that the initial structure used by the Organization and its co-conspirator CBNV was an entity denominated EquityPlus Financial, LLC (the "LLC").   A company owned by the Shumway/Bapst Organization with a confusingly similar name, EquityPlus Financial, Inc., owned 75% of the LLC, and CBNV owned the remaining 25%.  This structure was in place for the five month period between May 29, 1998 and October 29, 1998. All loans originated during this period violated the Affiliated Business Association ("ABA")

6

disclosure requirements of the RESPA in that CBNV did not disclose that substantially all of the settlement fees charged to Plaintiffs and the Class in connection with the loans were being paid to the LLC, contrary to what was represented to borrowers in the settlement papers (which showed the settlement fees as being paid to CBNV). Complaint at ¶¶ 68-70.

16.     However, the Virginia banking regulators continued to challenge the business structure being used by the Organization (now in combination with CBNV) to originate second mortgage loans.  In response, the Organization (in combination with CBNV and, the Plaintiffs allege, with the complicity of RFC) concocted the business structure that would remain in place during the period when the vast majority of loans at issue were originated. David Summers, the president of CBNV, described this structure in a March 11, 1999 letter to the Virginia banking regulators:

> [T]he mortgage affiliations have been restructured as loan production offices of Community Bank.  The loan originators and processors of the limited liability mortgage affiliates are now employees of the Bank and the principals of the limited liability companies (such as EquityPlus Financial, LLC) are now consultants to the Bank.

Complaint at ¶ 71.

17.     As alleged in the COMPLAINT, the Organization and CBNV created this consulting structure to deflect accusations by the Virginia banking regulators that it was unlawful for EquityPlus Financial, LLC to originate and process mortgage loans without proper state licensure. But the Shumway/Bapst crew was only clever by half.  This new consulting structure ultimately created a much larger federal law compliance issue.  The consulting agreements expressly prohibited the consultants (i.e., Messrs. Shumway and Bapst and their employees) from performing any settlement services in connection with the loans at issue (instead requiring that said services be provided by the banks and their employees). Notwithstanding this fact, the

7

very same agreements that precluded the consultants from performing work on the loans, required that the overwhelming majority of all settlement fees at issue be kicked-back to the consultants. Therefore, by the express terms of these consulting agreements the payment of these huge kickbacks to the consultants was ***not*** in exchange for the performance of settlement services, but was instead compensation for the referral of mortgage leads to CBNV and later other banks. Complaint at ¶¶ 72-74.

18.     Graphically, the Section 8(a) RESPA violation described in the Complaint can be demonstrated by the chart on the following page:



**SECTION 8(a) of RESPA:**

**No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.**

19.     The Complaint alleges that it is difficult to envision a more blatant violation of Section 8 of RESPA than an ***actual contract*** that precludes a party from performing any settlement services in connection with certain loans while also requiring payment of nearly all

settlement service fees resulting from those loans to that same party. The Shumway/Bapst organization established contractually mandated illegal RESPA kickbacks.

20.     While different iterations were utilized as the scheme evolved and the Organization looked to stay one step ahead of the regulators, the basic plan always involved having nearly all of the settlement costs and charges funneled to the Shumway/Bapst group. The kickbacks, of course, were never disclosed to borrowers in the federally-mandated loan documents issued to them. Instead, the loan documents fraudulently misrepresented the actual recipients of the settlement fees to conceal the kickback scheme.

21.     The scheme participants were not limited to the Shumway/Bapst organization and the Banks. Plaintiffs allege that RFC was a knowing and necessary part of the predatory lending scheme. RFC provided CBNV and GNBT with the operating capital necessary to fund the predatory loans. Without RFC's commitment to purchase the loan origination output generated by the predatory lending scheme, the scheme could not survive. Indeed, when RFC finally did pull out the scheme quickly collapsed.

22.     Specifically, RFC would purchase the loans from the Banks on a correspondent basis, shortly after the settlement of the loans. RFC profited from interest incurred while holding the loans in its own portfolio, and then again after it securitized pools of loans for sale on Wall Street. The capital provided by RFC was integral to the successful operation of the scheme, in that the Banks did not have sufficient capital to permit them to hold the loans in their own portfolios for any appreciable period of time. The profits realized by RFC from this scheme were directly tied to loan volume, and every participant in the scheme, including RFC, blatantly ignored the unlawful aspects of the settlement practices at issue in order to maximize the high loan volume. Complaint, at ¶¶ 4, 5.

2303330.1

23.     The factual basis for the Class Claims, summarized above, is set forth in great detail in the Complaint.  The legal relief available to the 44,535 Class Claimants arising from this long running scheme is as follows:

a.      Violations of the Real Estate Settlement Procedures Act for kickbacks, unearned fees and impermissible business relationships;

b.      Violations of the Truth in Lending Act and the Home Ownership and Equity Protection Act for inaccurate and understated material disclosures;

c.      Violations of other disclosure and substantive requirements of TILA and HOEPA; and

d.      Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") for racketeering activities used to perpetuate and further a predatory lending scheme.

## II.    RESPA, TILA, HOEPA and RICO– An Overview

*Real Estate Settlement Procedures Act*

24.     The Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq*. ("RESPA") was intended by Congress to protect residential mortgage borrowers from certain abusive practices in the mortgage settlement process that impede the operation of a free market for settlement services and inflate the costs of mortgages without providing any corresponding benefit to consumers.  Congress passed RESPA in order to "insure that consumers throughout the Nation are provided with greater and timelier information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country."  12 U.S.C. § 2601.  One of the abusive practices that Congress sought to eliminate through the enactment of RESPA was the payment of referral fees, kickbacks, and other unearned fees, including fees for which no

11

services were performed. S.Rep. No. 93-866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546, 6551.

25.     To combat these perceived abuses, Congress enacted Section 8 of RESPA, which prohibits business referral payments and unearned fees related to real estate settlement services, to wit:

§2607 Prohibition against Kickbacks and Unearned Fees

(a)     Business referrals.  No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b)     Splitting Charges.  No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. §2607.

26.     In practice, the application of RESPA is straightforward.  An individual or entity must provide settlement services in exchange for any settlement fees to be paid to that individual or entity in connection with a given mortgage loan.  If no settlement services are provided by that individual or entity, then, by definition, RESPA precludes that person or entity from being paid from the settlement proceeds generated by the loan.

27.     As to damages, RESPA states that "any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation *in an amount equal to three times the amount of any charge paid for such settlement service.*"  12 U.S.C.A. § 2607(d)(2)(emphasis added).  Thus, there is no discretion as to the award of damages.  As

2303330.1

courts have observed, the "[s]tatutory damages relieve litigants of the burden of having to prove an exact measure of pecuniary harm arising from a violation of their rights under the statute. They also provide litigants with a bounty for acting in the public interest." *Kahrer v. AmeriquestMortg. Co.,* 418 F.Supp.2d at 748, 755 (W.D. Pa. 2006).

*Truth in Lending Act and Home Ownership and Equity Protection Act*

28.     The Truth in Lending Act and the Home Ownership and Equity Protection Act are remedial consumer protection statutes. TILA applies to all consumer credit transactions, subject to limited exceptions which do not apply in the *In Re Community Bank* litigation. 15 U.S.C. §§ 1601-03. HOEPA, which is a part of TILA, applies only to certain high cost home mortgage loans, like those at issue. The basic premise of TILA is to require lenders to provide uniformly calculated, accurate and timely disclosures to prospective borrowers of the true cost of a loan.

29.     The Truth in Lending Act was enacted in 1968 in order to promote the informed use of consumer credit, including mortgage loans, by mandating standardized methods by which the costs associated with borrowing are calculated and disclosed to consumers – so the consumer knows the full cost of the credit and so the consumer can make an "apples to apples" comparison between two lenders. The regulations that implement the statute are known as "Regulation Z", codified at 12 CFR Part 226. Regulation Z contains most of the specific requirements imposed by TILA are found in Regulation Z.

30.     Recognizing the symbiotic relationship between the originators of predatory home loans and the secondary purchasers of those loans, Congress passed HOEPA in 1994. This enactment amended certain provisions of TILA to give special protections to borrowers obtaining high-interest and high-cost second mortgage loans. Notable among these protections is

the imposition of liability on the purchasers of HOEPA loans such that they are liable to the borrower just as if they had made the loans themselves:

> Any person who purchases or is otherwise assigned a mortgage referred to in section 1602(aa) of this title *shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage*…"

15 U.S.C. § 1641(d)(emphasis added).

31.    The true cost of a loan is described under the commonly recognized statutory terms "Amount Financed," "Finance Charge" and the "Annual Percentage Rate ("APR")". The APR is calculated through a mathematical formula that is derived from the Amount Financed (funds actually available to the borrower) and Finance Charge (interest, fees and costs – what the money will cost the borrower over the life of the loan). These two numbers are mutually exclusive; that is, a settlement charge is allocated to either one or the other but not to both. The higher the finance charges, the higher the APR.

32.    Under TILA, all settlement charges are presumed to be part of the Finance Charge. 15 U.S.C. § 1605(a); 12 C.F.R. § 226.4. There are exceptions to this rule. Items that can be excluded from the finance charge include charges for "[f]ees for title examination, abstract of title, title insurance, property survey, and similar purposes." 12 C.F.R. § 226.4(c)(7). Such fees can only be excluded from the finance charge, however, if they are "bona fide and reasonable in amount." *Id;* Official Staff Commentary to § 226.4 at ¶ 4(c)(7).

33.    In addition to the disclosures mandated by TILA, HOEPA requires the Lender-Banks to warn prospective borrowers about the high cost of their loans through an advance notice – the "HOEPA Notice" – of the loan's monthly payment amount and certain cost information, including a specific and separate disclosure of the APR at least three (3) business days prior to closing. 15 U.S.C. §§ 1639(a), (b)(1); 12 C.F.R. § 226.32 ("Section 32"). The idea

14

of the HOEPA Notice is to give the consumer the opportunity to reject the loan offer before

being rushed to sign numerous papers at a closing.

34.     HOEPA also has certain prohibitions relating to the imposition of prepayment

penalties.  *See* 15 U.S.C. § 1639(c); 12 C.F.R. § 226.32(d)(6)-(7).  For example, HOEPA does

not allow the collection of a prepayment penalty when the prepayment is made via a refinancing

with the current creditor under the mortgage. The inclusion of a prohibited prepayment penalty

in the terms of the loan is "deemed a failure to deliver the material disclosures" under HOEPA.

15 U.S.C. § 1639(j).

35.     A creditor's failure to make the "material disclosures" required by TILA and

HOEPA, or to make those disclosures at the time required by HOEPA, gives rise to substantial

damages as set forth in 15 U.S.C. § 1640 which include actual **and** statutory damages. 15 U.S.C.

§ 1640(a).  These same violations also provide the aggrieved borrower – each class member, for

example -- with a statutory right to rescind their loan as well as providing for injunctive and

declaratory relief.  15 U.S.C. § 1635; 12 C.F.R. § 226.23.

36.     The specific damages a borrower is entitled to recover under 15 U.S.C. § 1640 are

as follows:

a.      "Actual" Damages. Section 1640(a)(1) allows the class members their "actual"

        damages.  The case law has interpreted this to mean all bogus, unreasonable and

        marked up fees should be refunded as restitution to the borrowers. *In re Russell*,

        72 B.R. 855, 863-64 (E.D. Pa. 1987); *Goldman v. First National Bank of

        Chicago*, 532 F.2d 10, 15 (5th Cir. 1976).

b.      Statutory Damages. Sections 1640(a)(2), (3) and (4) provide for "statutory"

        awards of damages for non-HOEPA TILA violations and HOEPA violations.

Section 1640(a)(2) is applicable to <u>all violations</u> and limits the statutory award to the range of $200 to $2,000 where the borrowers' principal residence secures the loan. In a class action, the class is limited to a statutory award of $500,000 *per creditor* "for the same failure to comply" with the requirements of TILA and HOEPA. 15 U.S.C. § 1640(a)(2)(B).

c.    Also, prevailing class members are entitled to their costs and attorneys' fees. 15 U.S.C. § 1640(a)(3).

d.    <u>Additional HOEPA Statutory Damages</u>. For violations of HOEPA, in addition to the actual damages under § 1640(a)(1) and the statutory damages under § 1640(a)(2) and (3),each class member is entitled to additional statutory damages in "an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material." 15 U.S.C. § 1640(a)(4). "Material disclosures" are defined at 15 U.S.C. § 1602(u) to include "the annual percentage rate ,… the amount of the finance charge, the amount to be financed, … and the [HOEPA] disclosures required by section 1639(a) of this title." Thus, the failure to provide the borrower an accurate APR is a violation of § 1639 giving rise to these additional HOEPA damages under § 1640(a)(4). Statutory damages in HOEPA class actions are not limited since the limitation on class actions applies only to the penalty awarded under § 1640(a)(2)(B). There is no cap on the damages under § 1640(a)(4).

37.    Consequently, if a creditor violates HOEPA's disclosure requirements and/or if that creditor includes prohibited terms in a HOEPA loan, or engages in abusive practices, then that creditor *and its assignees* will not only be subject to civil liability and damages under 15

16

U.S.C. § 1640(a)(1), (2) and (3), but they will also be liable for damages under § 1640(a)(4) for those additional HOEPA violations.

*Racketeer Influenced and Corrupt Organizations Act*

38.    The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, was enacted in 1970.  The Act is intended to address ongoing and expansive criminal activities but it also provides for a civil cause of action, including trebled damages.

39.    In order to establish a RICO violation under § 1962(c), a plaintiff must establish the (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  Under § 1962(d), it is "unlawful for any person to conspire" to violate § 1962(c).

40.    RICO provides for civil remedies, including a cause of action for treble damages which is available to "[a]ny person injured in his business or property by reason of a violation of section 1962...." 18 U.S.C. § 1964(c).  The recoverable damages are simply those fairly traceable to the defendants' conduct.

41.    The additional legal and factual bases for the Class Claimants' RICO claims are fully set out, in great detail, in the First Amended RICO Case Statement ("RICO Statement") filed in the MDL Class Action in October 2011.  The size of that document precludes attaching it as an exhibit to this declaration but it can be located on PACER (U.S. District Court for the Western District of Pennsylvania, *In Re: Community Bank of Northern Virginia Second Mortgage Lending Practices Litigation*, Case No. 2:03-cv-00425, ECF No. 511).

## III.    INITIAL DAMAGE ESTIMATES FOR PUTATIVE CLASS MEMBERS

42.    The estimated per loan damages on Plaintiffs' claims for violations of the Real Estate Settlement Procedures Act ("RESPA"), which are the wrongful settlement charges, average over $4765 per loan before trebling, and over $14,000 after mandatory trebling.

17

43.     As explained above, the TILA statutory damages are capped in a class action at the lesser of $500,000 or 1% of the wrongdoer's net worth, making the Class Claims statutory TILA damages around $20 per borrower or, as to RFC, an even $1 million dollars. It is a much different story, however, with respect to HOEPA statutory damages.  Those damages include not only the illegal fees but also <u>all finance charges (i.e. the interest collected on the loan)</u>.  These amounts are, on average, over $26,000 per borrower. And this calculation is for a single TILA/HOEPA violation; there are multiple violations on many of the loans although for purposes of this Declaration the total of the damage calculations conservatively reference only a single HOEPA damage calculation.

44.     There is also a rescission remedy available under TILA. This is a remedy that is available to many of the class members.  The available damages in connection with a rescission remedy under the TILA are as follows:

a.     A refund of all of the finance or other charges that you have paid in connection with the transaction. 15 U.S.C. Sec. 1635 (b).

b.     The borrower may also be entitled to actual and/or statutory damages under 15 U.S.C. Sec. 1640 (a).

c.     Costs and attorney's fees. *Id.*

Thus, the rescission damages would mirror the HOEPA statutory damages which, as noted, average $26,477 per loan.  These damages would not be available to every class member but to a large number of them and those class members would appropriately be a separate sub-class.

45.     Given the Supreme Court's broad reading of RICO damages (whatever out-of-pocket damages are fairly traceable to the defendants' conduct), Plaintiffs contend that the appropriate damages could include all settlement charges on the loans paid to the enterprises and

all paid interest damages flowing from the class members' payment of excessive interest rates on their loans, such as the differences in the actual and disclosed interest rates and/or the increased interest payments resulting from the bogus fees.  However, for the purpose of the class claims asserted in this bankruptcy, Plaintiffs seek only the fraudulent title exam fees (line 1103) and the mark up on the abstract fees (line 1102), which on average are $428 and total $1284 under RICO's mandatory trebling.

46.     Based on the extensive record gathered during the pre-petition litigation, the Class Claimants' current  estimate (which is preliminary and without prejudice to the right of the Putative Class members to claim additional amounts as the facts and law may ultimately warrant) that the total amount recoverable on each individual Class Claim is, on average, $42,076.00. Because there are 44,535 known putative Class members, the damages for which RFC is liable on these claims is at least $1.87 billion dollars.

47.     All of these claims can be certified for Class treatment. As noted, the District Court has entered two orders approving previously proposed national settlements of the class claims at issue.  While each settlement was vacated on appeal, in both such rulings the Third Circuit confirmed that these claims are appropriate for class treatment.  *In re Community Bank of Northern Virginia*, 418 F.3d 277, 303-10 (3rd Cir. 2005) (CBNV I); *In re Community Bank of Northern Virginia*, 622 F.3d 275, 284 (3rd Cir. 2010) (CBNV II).

## IV.     THE PROCEDURAL HISTORY OF THE CLASS LITIGATION

48.     Beginning in 2001 as to loans originated by CBNV and 2002 as to GNBT loans, borrowers across the nation began to file class action lawsuits as the result of this predatory lending scheme.  Six of these actions were filed in Pennsylvania and these actions were led by Declarant Carlson. In July 2003, CBNV, GNBT, and RFC reached a nationwide settlement with the plaintiffs in six putative class actions filed by Carlson (the "Original Settlement"). The

19

Original Settlement Class was defined to include all persons: (i) who entered into a loan agreement with CBNV and/or GNBT;(ii) whose loan was secured by a second mortgage deed or trust on property located in the United States; (iii) whose loan was purchased by RFC; and (iv) who were not members of the class certified in the action captioned *Baxter v. Guaranty National Bank, et al.*, Case No. 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake County, North Carolina.

49.     In December 2003, the district court approved the $33 million class-wide settlement involving RFC.

50.     A number of class members, represented by Walters Bender and other counsel, objected to the settlement and appealed to the Third Circuit. The Objectors argued, inter alia, that the settlement was inadequate.

51.     While the appeals of the district court's first settlement approval and attendant rulings were pending in 2004, objecting class members filed an action captioned as *Hobson, et al. v. Irwin Union Bank and Trust, Co., et al.* in the Northern District of Alabama.

52.     *Hobson* was filed to assert TILA/HOEPA claims on behalf of all borrowers victimized by the predatory lending scheme, not just those whose loans were assigned to RFC. The *Hobson* plaintiffs pursued formal discovery and obtained thousands of pages of business records that graphically evidence the predatory lending scheme and overall merit of the federal consumer protection law claims, including the class-wide TILA/HOEPA claims.

53.     On May 5, 2005, the Joint Panel for Multi District Litigation transferred the *Hobson* action to the Western District of Pennsylvania as part of a multidistrict proceeding, No. 1674, captioned as "*In re Community Bank of Northern Virginia Second Mortgage Lending Practices Litigation.*"

54.     In August of 2005 the Third Circuit vacated the class settlement and remanded the case to the district court for further analysis of the TILA/HOEPA claims and the adequacy requirement for class certification. *In re Community Bank of Northern Virginia,* 418 F.3d 277 (3rd Cir. 2005).[3]

55.     On remand, the Settling Plaintiffs notified the district court that they had reached an agreement with the defendants to modify the earlier settlement, increasing it to in excess of $50 million dollars.  At oral argument, the district court noted that he believed the TILA/HOEPA claims were factually viable but he was not sure if they were timely.

56.     On October 6, 2006, the district court issued a *Memorandum* finding that the TILA/HOEPA claims were not "viable," because they were time-barred under a standard of review stated as: "whether the Class Plaintiffs were inadequate representatives under Rule 23 because they failed to assert TILA/HOEPA claims which would have survived a Rule 12(b)(6) motion to dismiss."

57.     The district court then appointed a retired district court judge Donald Ziegler as a "friend of the court" to review the fairness of the new settlement but he was expressly not to reconsider the district court's statute of limitations decision.

58.     Following Judge Ziegler's review, in January of 2008 the district court again certified a settlement class and approved a second, revised class-wide settlement totaling $57 million involving RFC. The Class included: All persons: (i) who entered into a loan agreement with CBNV and/or GNB; (ii) whose loan was secured by a second mortgage deed or trust on property located in the United States; (iii) whose loan was purchased by RFC; and (iv) who were

---

[3] In its opinion, the Third Circuit noted that all of the elements of Rule 23 had been satisfied with the possible exception of Fed. R. Civ. P. 23(a)(4), stating:  "We emphasize, as we stated above, that we do not preclude the possibility that the adequacy of class representation can be established on a more developed record. . . .Because we believe certification may indeed be appropriate, we examine some of the relevant factors to be considered on remand." *Community Bank I* at 308-309.

21

not members of the class certified in the action captioned *Baxter v. Guaranty National Bank, et al.*, Case No. 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake County, North Carolina.

59.     Objectors, with Walters Bender again serving as lead counsel for that group, timely filed their objections to the second proposed settlement.  The district court held a fairness hearing on June 30, 2008.  On August 14, 2008, the district court entered a final judgment approving this second class action settlement.

60.     Another appeal to the Third Circuit followed.  The Objectors again challenged the district court's order approving the settlement on grounds that the value of the claims being settled and released exceeded the $57 million offered in connection with the revised settlement. The Objectors also took issue with the district court's limitations ruling.  As to those borrowers outside the one-year limitations period, both the settling plaintiffs and Objectors have consistently contended that equitable tolling applies and thus the claims of all class members are timely.

61.     The Third Circuit again vacated the approval of the settlement based on concerns that the settlement Class did not satisfy Rule 23(a)(4).*See In re Community Bank of Northern Virginia*, 622 F.3d 275 (2005).  The Third Circuit found that because no class representatives for the Settling Plaintiffs had loans within one year of the operative filings, it was concerned about their ability to represent those class members who were within one-year.  In this regard, the Third Circuit also took issue with the district court's limitation ruling and its application of the principals of relation back under Fed. R. Civ. P. 15.[4]

---

[4] In its opinion, the Third Circuit Noted:  "As we noted in *Community Bank I*, however, this intra-class conflict is by no means fatal to whether these cases can be maintained as a class action.  The most obvious remedy would be to create sub-classes, as we suggested in our prior opinion." *Community Bank II* at 304.

62.     Following remand from *CBNV II*, counsel for Plaintiffs who had entered into the prior settlements and counsel for Objectors joined forces.  In connection with this allegiance, on September 20, 2011, the District Court appointed Declarant Carlson and Declarant Walters as co-lead Interim Class Counsel pursuant to Fed.R.Civ.P. 23(d) and 23(g)(3).

63.     The case has subsequently proceeded on a litigation track.  The parties have exchanged written discovery and Rule 26 disclosures.  All Defendants moved to dismiss nearly all portions of the claims of the putative class.  The district court scheduled oral argument on the Motions to Dismiss on September 18, 2012.  At that time, the district court announced that it would decide the Motion to Dismiss of PNC Bank (successor to CBNV) on the briefing and the Court also conferred with lead counsel for the parties and instructed them to submit a scheduling order to move forward with discovery relating to class certification. The district court did hear oral argument as to the separate motion to dismiss of the FDIC relating to its claim that no class claim can proceed against the FDIC as Receiver.  As of the date of this Declaration, the district court has not issued a ruling on either PNC's or the FDIC's motions to dismiss.

64.     As part of this bankruptcy filing, the district court has implemented a stay of the MDL Class Action as to Defendant Residential Funding Company, LLC and ordered the case closed as to RFC by its order of September 18, 2012.

## V.     CLASS CERTIFICATION

65.     As detailed above, Plaintiffs contend that the loans in question contained fraudulent, overcharged, marked up, unearned and bogus fees, in violation of and/or actionable under RESPA, TILA, HOEPA and RICO.  This relief is available on a class wide basis because of the uniformity of proof from borrower to borrower.

66.     The uniformity of proof flows primarily from each class member's loan file including the following sources of information:

23

a.   The federally-mandated Uniform Residential Loan Application in the loan files (Fannie Mae Form 1003) which identifies the date of initial loan intake by phone or Internet, the loan processors and agents of the defendants (and enterprises) that handled the borrowers' loan application (and thus who participated in acts of misrepresentation).

b.   The HOEPA Notice under 15 U.S.C. § 1639(a) and (b) that identifies the borrower's loan as a loan subject to HOEPA.  Notably, the purchaser of the loans, RFC, received a HOEPA Notice of Assignment which informed them that they were acquiring HOEPA loans.

c.   The federally-mandated HUD-1 or HUD-1A Settlement Statement for each borrower is perhaps the most important document. Essentially a receipt for the loan transaction, it will identify the Section 800 settlement charges for loan origination fees, loan discount fees and credit reports (Lines 801, 802, 804), the Line 1102 charge for abstracts of title fees, and Line 1103 charge for title examinations.  The HUD-1 or HUD-1A's for each borrower will also identify the disclosed recipients of those fees and charges (but not the true recipient).

d.   The federally mandated Itemization of Amount Financed, TILA and HOEPA disclosures, which set forth the amount financed, finance charges, and APR (which Plaintiffs allege were materially misstated).

67.   More specifically, as Plaintiffs allege, the class member borrowers were charged "loan origination" and/or "loan discount" fees" in connection with their second mortgage loans. Those charges were set forth on the HUD-1 Settlement Statement on Lines 801 and 802 as being wholly paid to CBNV and/or GNBT. In fact, Plaintiffs allege that only a small portion of the fees

24

were paid to the Banks and the remainder was paid to the loan origination office which generated the loan. Indeed, as explained in the COMPLAINT, and described in paragraphs 28-30 above, the contracts between the consultants (Shumway/Bapst) and the Banks required this kickback arrangement, a violation of section 8(a) of RESPA.

68.     Second, the Class members were also charged fees for credit reports at line 804 of the HUD-1 Settlement Statements, which charges were marked up and exceeded the true cost to the Banks, or provider of credit reports that were identified as the recipients of the fees on the borrowers' HUD-1 Settlement Statements. The Banks and loan production offices obtained "Negotiated Savings" on the true cost of the credit reports which were separately itemized as a single operating expense on the Bank's balance sheets and which are reflected as an "Operating Expense Ratio" or profit on expenses. These "Negotiated Savings" were not passed on to the Class members and thus the "Operating Expense Ratio" proves that there were mark ups on the credit report fees charged on Line 804 of the Class members' Settlement Statements. Thus, the was an unearned fee (the mark-up) charged in connection with this Line 804 charge in violation of section 8(b) of RESPA.

69.     Third, the Class members were charged fees for "abstract or title searches" on Line 1102 of HUD-1 Settlement Statements. Those fees were neither bona fide nor reasonable because no true title or abstract search was performed on the loans. Instead, the title companies who were listed as the recipients of the fees ordered "Property Reports" from third party vendors and Affiliated Service Providers such as General American Corp. and Service Link. This is another illegal, undisclosed fee split in violation of § 8(b) of RESPA and a false representation of the recipient of the fees on the HUD-1 Settlement Statements. Because the defendants possessed the Class Members' loan origination files, the Class members could not determine whether any

25

abstract of title appeared in their loan files such that they could discover that the charges for the abstracts of title were marked up.

70.     Fourth, the Class members were charged fees for "title examinations" on Line 1103 of HUD-1 Settlement Statements. These title examination charges are neither bona fide nor reasonable because *no* title examinations were performed on the loans. Because the defendants possessed the Class Members' loan origination files, the Class members could not determine whether any title examination appeared in their loan files such that they could discover that the charges for the title examinations were entirely bogus  This is yet another violation of RESPA § 8(b).

71.     Fifth, legitimate title charges are not included in the calculation of a loan's Finance Charge.  Correspondingly, legitimate title charges are included in the Amount Financed (the total amount of the loan principal).  These two calculations – Finance Charge and Amount Financed—determine a loan's Annual Percentage Rate. Plaintiffs contend that title charges to the borrowers under this scheme were not bona fide or reasonable. Nonetheless, such charges were excluded from the Finance Charge and included in the Amount Financed.  As a result, for each member of the class the Finance Charge was understated and the Amount Financed was overstated. And having improperly overstated the Finance Charge and understated the Amount Financed, the APR calculation was wrong, resulting in a materially understated APR, and all such figures – the Finance Charge, Amount Financed and APR were therefore inaccurately disclosed to each class member in violation of TILA and HOEPA.

72.     Sixth, the RICO claims relate to the same bogus and illegal fees and the same loan documents and uniform class-wide proof, including proof in the loan file of the predicate wire and mail fraud acts.

73.     Plaintiffs seek to proceed under Federal Rule of Civil Procedure 23, or its Bankruptcy equivalent, Rule 7023, with class action certification of what is known as a "(b)(3)" class.  To do so, Plaintiffs must establish the elements of Rule 23(a): numerosity, commonality, typicality and adequacy of representation. Plaintiffs must also establish, under Rule 23(b)(3) that common questions of fact and law predominate and that proceeding on a class action basis is the superior method of adjudicating the case. The uniformity of this class wide proof and the amenability of these claims to class action treatment was examined by the Third Circuit in both of its prior opinions and the Third Circuit advised that this matter is certifiable as a class action.

74.     Specifically, here is what the Third Circuit said about the conditionally certified settlement class, which analysis applies equally to the current litigation class:

- "There is no dispute that the conditionally certified class meets the numerosity and commonality prongs of Rule 23(a)." *CBNV I*, 418 F.3d at 303.

- "We likewise find that the requirements of typicality are met." *Id.*

- "Just as the record below supports a finding of typicality, it also supports a finding of predominance.  All Plaintiffs' claims arise from the same alleged fraudulent scheme." *Id.* at 309.

- "We find no reason, and Appellants fail to offer any, why a Rule 23(b)(3) class action is not the superior means to adjudicate this matter." *Id.*

75.     In its second decision, the Third Circuit described its early pronouncements about the propriety of class action certification: "we concluded [in *CBNV I*] that three of the four Rule 23(a) requirements – numerosity, typicality, and commonality – were met, as well as the Rule 23(b)(3) predominance and superiority requirements. *CBNV II*, 622 F.3d at 284.

76.     The sole class certification requirement that the Third Circuit had concern about was the adequacy of representation: "We therefore conclude preliminarily based on the record before us that all the requirements of Fed.R.Civ.P. 23(a) can be met with the exception of

2303330.1

adequacy of representation, which requires additional analysis." *CBNV I*, 418 F.3d at 309. The concern voiced in *CBNV I* was whether the named representatives were adequate because none of them had loans within one year of the operative filings and whether counsel for the settling plaintiffs was adequate based on their failure to advance the TILA and HOEPA claims. *Id.* at 307-308. In the second decision, the Third Circuit found again that these concerns had not been remedied. *CBNV II*, 622 F.3d at 303-308.

77.     Neither of those adequacy of representation concerns remains. In both the Pennsylvania Class Action and in this class proceeding proposed in the RFC bankruptcy, counsel for the putative classes consists of a combined force of counsel for the prior settling plaintiffs (primarily Mr. Carlson and Carlson Lynch, Ltd.) and the objectors (primarily Fred Walters and Walters Bender), the TILA and HOEPA claims are being pursued (along with RESPA and RICO claims), and the class representatives include, as to both Banks, borrowers with loans within one year of the operative filings (that do not rely on equitable tolling or class action tolling) as to the timeliness of their RESPA, TILA and HOEPA claims (RICO has a four year limitations period)) and borrowers with loans outside the one-year dates.

78.     The Class Claimants on whose behalf this Declaration is submitted are an appropriate subset of the class representatives in the Pennsylvania Class Action in that they likewise include, as to both Banks, borrowers with loans within one year of the operative filings and borrowers with loans outside the one-year dates.

79.     Thus, class certification is an issue already considered at length by the Third Circuit and as to which the Third Circuit concluded that certification of a class action in connection with the claims arising from this predatory lending scheme would be appropriate.

2303330.1

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.


Dated:  November 2, 2012                    /s/ R. Fredrick Walters
                                             R. Fredrick Walters



                                            /s/ David M. Skeens
                                            David M. Skeens



                                            /s/ R. Bruce Carlson
                                            R. Bruce Carlson