1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 12-12020-mg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    RESIDENTIAL CAPITAL, LLC, et al.,

9

10                Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                July 30, 2013

19                10:05 AM

20

21    B E F O R E:

22    HON. MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25

2

1

2    (CC: Doc# 4289, 4290, 4291) Motion of the Ad Hoc Group of

3    Junior Secured Noteholders for Entry of an Order (i) Directing

4    Each of Debtors' Counsel, Including Morrison & Foerster LLP,

5    Official Committee Counsel, Including Kramer Levin Naftalis &

6    Frankel LLP, and the Debtors' Management to Remain Strictly

7    Neutral in Any Dispute Regarding Claims by and Between Any

8    Debtors, (ii) Ordering the Limited Disqualification of Each of

9    the Foregoing to the Extent Necessary to Effectuate the

10   Foregoing, and (iii) Granting Related Relief.

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4          Attorneys for Debtors

5          1290 Avenue of the Americas

6          New York, NY 10104

7

8  BY:   GARY S. LEE, ESQ.

9

10

11  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

12          Conflicts Counsel to Debtors

13          101 Park Avenue

14          New York, NY 10178

15

16  BY:   THERESA A. FOUDY, ESQ.

17

18

19  KRAMER LEVIN NAFTALIS & FRANKEL LLP

20          Attorneys for Official Creditors' Committee

21          1177 Avenue of the Americas

22          New York, NY 10036

23

24  BY:   KENNETH H. ECKSTEIN, ESQ.

25          DOUGLAS MANNAL, ESQ.

4

1

2  PACHULSKI STANG ZIEHL & JONES LLP

3      Conflicts Counsel to Creditors' Committee

4      780 Third Avenue

5      36th Floor

6      New York, NY 10017

7

8  BY:   JOHN A. MORRIS, ESQ.

9      ROBERT J. FEINSTEIN, ESQ.

10

11

12  WHITE & CASE LLP

13      Attorneys for Ad Hoc Group of Junior Secured Noteholders

14      1155 Avenue of the Americas

15      New York, NY 10036

16

17  BY:   J. CHRISTOPHER SHORE, ESQ.

18      HARRISON DENMAN, ESQ.

19      DWIGHT A. HEALY, ESQ.

20      BRIAN E. FRITZ, ESQ.

21

22

23

24

25

5

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3        Attorneys for Ad Hoc Group of Junior Secured Noteholders

4        One Chase Manhattan Plaza

5        New York, NY 10005

6

7    BY:   GERARD UZZI, ESQ.

8

9

10   KIRKLAND & ELLIS LLP

11       Attorneys for Ally Bank and Ally Financial, Inc.

12       300 North LaSalle Street

13       Chicago, IL 60654

14

15   BY:   NOAH JEFFREY ORNSTEIN, ESQ.

16

17

18   CLEARY GOTTLIEB STEEN & HAMILTON LLP

19       Attorneys for Wilmington Trust

20       One Liberty Plaza

21       New York, NY 10006

22

23   BY:   THOMAS J. MOLONEY, ESQ.

24       SEAN A. O'NEAL, ESQ.

25

6

1

2  MUNGER, TOLLES & OLSON LLP

3      Attorneys for Berkshire Hathaway, Inc.

4      355 South Grand Avenue

5      35th Floor

6      Los Angeles, CA 90071

7

8  BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

9

10

11  JONES DAY

12      Attorneys for FGIC

13      222 East 41st Street

14      New York, NY 10017

15

16  BY:   RICHARD L. WYNNE, ESQ.

17

18

19  SEWARD & KISSEL LLP

20      Attorneys for US Bank as Securitization Trustee

21      One Battery Park Plaza

22      New York, NY 10004

23

24  BY:   LAURIE R. BINDER, ESQ.

25

7

LAW OFFICE OF ROBERT S. LEWIS, P.C.

        53 Burd Street

        Nyack, NY 10960


BY:    NICOLE L. PERSKIE, ESQ.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

8

1                        P R O C E E D I N G S

2              THE COURT:  Please be seated.  We're here in

3    Residential Capital, number 12-12020.  Mr. Lee?

4              MR. LEE:  Good morning, Your Honor.  Gary Lee from

5    Morrison & Foerster, representing the debtors.  Your Honor,

6    we're here on just one motion this morning, which is the motion

7    brought by the ad hoc group for -- I think they're defining it

8    as plan neutrality on the part of the debtors.

9              So I think I should turn it over to the movant, unless

10   you want me to address anything?

11             THE COURT:  No.  Mr. Shore?

12             MR. LEE:  Thank you, Your Honor.

13             MR. SHORE:  Thank you, Your Honor.  Chris Shore from

14   White & Case on behalf of the ad hoc group.  And let me thank

15   the Court for agreeing to hear this motion on such short

16   notice.  And we're cognizant that we have limited time today.

17   Because of that, I'll try to keep it brief, but making sure I

18   answer any questions you have.

19             I'd like to cover three areas:  one, defining the

20   issue that concerns us, because the objecting parties in their

21   papers muddy the waters a bit there.  Two, addressing what we

22   see as the prejudice to the estates and the creditors that the

23   problem is causing.  And three, to discuss the remedies, and in

24   particular Your Honor's question about what are the remedies

25   here, given the timing and the posture of this case.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**9**

1          I'd like to save for reply, responding to charges that

2     this was delayed or that we waived any rights.  I think the

3     opposition papers are a little bit inconsistent as to when they

4     thought the problem arose and when the motion should have been

5     brought.  I'd like to hear what they have to say before I

6     respond to that.  And then to deal with any accusations on

7     their part that this is just purely tactical on our part.  As I

8     said, I'm happy to answer any questions the Court has along the

9     way.

10          Let me define the problem that the motion seeks to

11    address.  When I use that construct, I'm not talking about

12    whether or not there are actually conflicts between the estates

13    right now.  There are conflicts right now.  No one disputes

14    that prior to the plan being confirmed, the estates have

15    material claims between each other, in the form of intercompany

16    claims, claims to an allocation of the Ally proceeds, and

17    allocation of expenses, are the main interdebtor issues, and

18    there are a few others.

19          No one disputes that depending on how one resolves

20    those issues, the location of distributable value within the

21    enterprise will change; that some estates will have more assets

22    to distribute to their creditors, some estates will have less.

23    And no one's disputing that it is a zero-sum game.  To the

24    extent that one estate wins in a litigation over an interdebtor

25    dispute, or even a settlement of an interdebtor dispute, some

**RESIDENTIAL CAPITAL, LLC, ET AL.**

10

1    other estate is going to lose.

2            Though that conflict raises problems of

3    disinterestedness, professional ethics, and fiduciary law, what

4    the objecting parties are saying in their papers is that the

5    problem isn't that dire, because in the end, all the estates

6    will win.  The estates have agreed to an allocation which is

7    supported by a number of creditors.  And if the confirmation

8    order is entered, and if the global settlement is approved, all

9    estates will win.  We understand that's a confirmation issue.

10   Whether the global settlement is a good settlement is not

11   something that is the subject of this motion.

12           The subject of this motion is the problem that's

13   created by litigating interdebtor conflicts prior to getting

14   approval of that settlement.  The estates have settled or have

15   agreed to settle.  But as the Court noted in connection with

16   the PSA, that settlement is not approved yet.  At the same

17   time, the debtors, the professionals, and the committee, are

18   taking litigation positions that clearly benefit one estate and

19   harm another; benefit one set of creditors of estates, and harm

20   another set of creditors.

21           The Court knows that more than a month ago, now, we

22   sent a letter asking the debtors how they proposed to deal with

23   that issue prior to the settlement being approved.  They still

24   have not engaged at all.  They've instead shifted back and

25   forth as to what they intend to do at confirmation and what

1    they intend to do prior to confirmation, with respect to

2    handling the interdebtor conflicts.  And we have no choice,

3    because they have constantly shifted, but to come into the

4    Court and seek a resolution now; to have the Court establish

5    the ground rules by which the estates aren't going to be

6    prejudiced before the Court hits the gavel on the global

7    settlement.

8              As best we can piece together, this is what the

9    debtors and the committee, as joint plan proponents, are

10   planning to do.  At confirmation they will be seeking to have

11   the global settlement approved.  That's not a problem.  But at

12   confirmation they will also be seeking a specific determination

13   by this Court that, in fact, the intercompany claims lack merit

14   and have no value, and that therefore, that particular aspect

15   of the settlement should be approved.

16             THE COURT:  Let me ask you.  Is it that they're

17   arguing that the intercompany claims have no value or that it

18   is in the best interests of the estates to avoid the cost,

19   time, and burden of litigating the intercompany claims, and

20   that it's in the best interests of the estate to seek

21   confirmation of a plan that embodies the terms of the PSA?

22             I don't understand them to be saying that the claims

23   have no value.  The plan proposes to settle the claims at zero.

24   That's very different than saying the claims have no value.

25             MR. SHORE:  This is why we're here on this motion.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

12

1        THE COURT:  Do you agree or disagree with what I just

2   said?

3        MR. SHORE:  I disagree.  They are going for the

4   former.  I've had numerous discussions.  They have made it

5   clear that at confirmation, they want, as part of the

6   confirmation findings, that the intercompany claims have no

7   value and should be waived, discharged, and canceled.

8        What are we supposed to do with that?  They want to

9   put on evidence at confirmation that the intercompany claims

10  have no value, we believe, as an attempt to litigate the issue

11  of adequate protection that I've raised with the Court before,

12  which is that if the claims are worth zero, they say they don't

13  need to compensate us for the loss of our collateral.  They

14  want to do that trial on a 9019 standard, and they want to put

15  on evidence before the Court -- that is the committee and the

16  debtors -- that the intercompany claims have no value.

17       It is a litigation tactic by them.  And quite frankly,

18  their failure to come forward to this Court and say exactly

19  what you said in the second part, we are not touching at all

20  the merits of the intercompany claims; it's our position

21  that --

22       THE COURT:  Well, are touching the merits of the

23  intercompany claims.  They're resolving a dispute -- this is

24  what I understand their position to be, and they'll tell me if

25  I misunderstand it.  They're resolving complex disputes as to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

13

1   the value of the intercompany claims.  They propose to resolve

2   it by valuing -- for settlement purposes, by valuing those

3   claims at zero.  That to me is different than saying the claims

4   have no value.

5         MR. SHORE:  Right.  And where your qualifier is, and

6   the reason we're here is that "for settlement purposes" has

7   never been part of their lexicon on this.  What they are

8   saying -- we have offered very clearly to say -- and I'll say

9   it again now, I think for the third time on the record -- if

10   they want to wait and try the issue as to whether or not the

11   intercompany claims actually have value --

12         THE COURT:  Mr. Shore, how many times do I have to

13   tell you that we are not waiting; that we are going to deal

14   with this issue as part of confirmation.  You have repeatedly

15   tried to derail the process in this case, specifically by

16   putting off the issue of the settlement of the intercompany

17   claims.  That is off the table.

18         If the parties come to an agreement, including the

19   JSNs, about a different proposed schedule, I will entertain it.

20   But as of now, we are moving forward.  So don't dwell on your

21   proposal, which I have rejected on numerous occasions, that

22   resolution of the issue of intercompany claims should be put

23   off until after confirmation.  It's off the table.

24         MR. SHORE:  All right.  And that causes the problem

25   that we have.  Because as part of that litigation, there needs

**RESIDENTIAL CAPITAL, LLC, ET AL.**

14

1     to be a determination as a matter of fact that the intercompany

2     claims have no value.

3            THE COURT:  I disagree.  I don't understand that

4     that's their position.  You keep -- you sound like a broken

5     record on this point, but a 9019 does not make a determination

6     on the merits whether claims do or don't have value.  I won't

7     recount the standard of a 9019.  You may not like the approach

8     they've adopted.  You're going to oppose it.  That's fine.  It

9     may or may not be approved.

10           There are definitely substantial litigable issues

11    regarding whether it will be approved.  But --

12           MR. SHORE:  Your Honor --

13           THE COURT:  -- that's not the standard for a 9019.  I

14    don't have to try the issue of whether specific intercompany

15    claims have value or not.

16           MR. SHORE:  I agree with you wholeheartedly, Your

17    Honor.  I'm -- the reason I am a broken record in this point is

18    not because of the 9019 issue.  I agree.  The Court -- and the

19    ad hoc group agrees -- the Court does not need to make a

20    specific finding in connection with 9019 that the intercompany

21    claims are, in fact, worth zero.  We are not fighting that, and

22    that's not why I'm here.

23           The reason I am here is because the adequate

24    protection argument, the claim we have asserted in the

25    litigation, that you can settle the intercompany claims for

**RESIDENTIAL CAPITAL, LLC, ET AL.**

15

1    whatever you want, provided you have the statutory basis to

2    settle a claim on which we have a lien -- but you can do

3    that -- but if it causes a diminution in the value of the

4    collateral, we are entitled to adequate protection.  That is

5    going to require a factual finding as to whether the

6    intercompany claims had value at the time they were settled for

7    zero.

8            I have said let's push that off post-confirmation.

9    The only reason I'm raising that again is because the debtors

10   and the committee have rejected that offer.  They have said no.

11   We want to actively litigate that issue at confirmation and we

12   want to, in fact, seek a factual finding from this Court that

13   the intercompany claims have no value.  That's the problem we

14   have.

15           And it's their insistence that this issue be tried at

16   confirmation with MoFo, Kramer Levin, and Mr. Kruger, and the

17   other debtors' management, to the extent they were involved,

18   that is causing the problem here.  And the problem is that

19   before that settlement is approved on a 9019 standard, we're

20   going to be litigating the issue of whether the intercompany

21   claims actually have merit.  Why they would want to try that

22   issue at the same time they're trying to settle is probably

23   only explainable by that's the position that they think is

24   going to provide the greatest leverage in the litigation.  You

25   wouldn't normally see that in the context of a 9019, because

**RESIDENTIAL CAPITAL, LLC, ET AL.**

16

1    the law is so clear.  You do not have to make a determination

2    that the claims are, in fact, worth zero.

3           Their explanation -- and let me start with a basic

4    point on prejudice.  It's the obligation of the fiduciary who

5    is in conflict to avoid causing any prejudice to his or her

6    charges.  The only explanation we have -- I guess we've

7    received two explanations from the objecting parties as to how

8    they're going to avoid the prejudice of actually litigating the

9    intercompany claims, while trying to settle the intercompany

10   claims -- is one, that they're going to resolve it all in a

11   manner that benefits all the estates.  That is, we can litigate

12   all we want over the intercompany claims, but at the end of the

13   day, it's going to benefit everybody that we just get the

14   global settlement done.

15          The problem is with that, that the proposed settlement

16   doesn't solve the problem.  As the Court said in Project

17   Orange, when DLA made an argument that we're settling with our

18   other client in a manner that benefits everybody, the Court

19   said that DLA was severely mistaken that the settlement of a

20   conflict, even if it's a good settlement, resolves the

21   conflict.  They can't bootstrap their way into saying there is

22   no conflict because the conflict is going to be resolved in a

23   manner that benefits everybody.

24          THE COURT:  The issue in Project Orange was an alleged

25   conflict between the debtor and the largest single creditor in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

17

1    the case with arguably divided duties between a client in the

2    bankruptcy case and a significant client that was a creditor in

3    the case.  Here, the debtors' counsel and the committee's

4    counsel have fiduciary duties -- I agree with this point --

5    their fiduciary duties extend to creditors of all of the

6    debtors, not just the one.  But this is not the same as Project

7    Orange.

8          MR. SHORE:  The debtors are proposing as follows, for

9    example:  with respect to RFC, Residential Funding; RFC has a

10   two-billion-dollar intercompany claim into ResCap, LLC,

11   which -- an entity which they are also representing.  It is the

12   largest single asset of RFC, other than its claim to the Ally

13   contribution.  They are proposing that RFC, as part of a global

14   settlement, release its claims against ResCap, LLC, based upon

15   advice that has been provided that that claim lacks substantive

16   merit.

17         Analytically, it's exactly the same as Project Orange.

18   Their largest client, ResCap, LLC, is also their client in the

19   context of representing RFC.  So analytically, it's not

20   different.  I'm going to come to a little bit in what's the

21   solution in the bankruptcy court.  But the conflict exists, and

22   they don't get away from the conflict by saying, but that claim

23   is being resolved as part of a global settlement that benefits

24   both ResCap, LLC and RFC.  It just begs the question.

25         And it comes to what is really their proposal to avoid

**RESIDENTIAL CAPITAL, LLC, ET AL.**

18

1    prejudice, which is one I've not heard before, which is let's

2    try it.  We're going to come forward at confirmation with

3    evidence about the value, for example, of the RFC claim into

4    ResCap, LLC, and we'll point out the many deficiencies that we

5    see in that claim:  the lack of existence of a note, the --

6    we'll have our interviews with management as to what they

7    expected.  We will claim privilege with respect to materials we

8    have provided.  And we're going to litigate that case.  And if

9    it turns out that the Court disagrees that the global

10   settlement doesn't benefit everybody, we'll just do a do-over.

11        No court has ever said that that avoids the prejudice

12   of a conflict.  And outside of a bankruptcy court, I can't

13   imagine a New York lawyer standing up and saying the time to

14   resolve my conflict is after I've tried the case and the Court

15   has determined that there was a taint in the process.  They

16   can't -- can't, as New York lawyers or as fiduciaries in the

17   bankruptcy court, appear and be heard with respect to the

18   merits of intercompany claims prior to the settlement occurring

19   and prior to each of the estates getting the releases, because

20   in connection with that litigation, as good litigators will do,

21   they will present the evidence that benefits the global

22   settlement.  They will not -- or try to avoid discovery,

23   legitimately, of issues that work against the global

24   settlement.

25        What are they going to do, for example, with the

1  memorandum or the legal advice that they disclose in the

2  disclosure statement?  Morrison & Foerster provided advice to

3  Mr. Kruger which was shared with the committee that laid out

4  that the intercompany claims had issues with them.  If that

5  memorandum contains information which is beneficial to an

6  estate like RFC, are they going to withhold that on privilege

7  grounds?  Are they going to advocate -- stand up in front of

8  the Court and say, Your Honor, I do not want that memorandum

9  turned over in the context of litigation; it is an attorney-

10  client document; even if they know that that memorandum

11  contains information which is contrary to the global

12  settlement?

13      They have softened their position to some extent in

14  the -- the debtors have, in the papers.  They're now not

15  claiming that every single intercompany claim lacks any merit,

16  that in fact, if all the claims were litigated in that giant

17  matrix that they have published, they would all reasonably

18  result in a zero recovery.  They're arguing, I think, now, that

19  each one is going to have to be analyzed individually, if what

20  we were really trying to do is an estate-by-estate judgment on

21  the settlement.

22      But what they're saying is, on a global basis it makes

23  sense to do that.  Again, that's a confirmation issue as to

24  whether or not on a global basis it makes sense.  But it's a

25  today issue if what they're trying to do is as part of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1  confirmation appear and be heard in an active litigation over

2  the merits of the intercompany claims.

3       It should be noted they did answer the complaint.

4  That's -- that had individualized allegations with respect to

5  intercompany claims.  MoFo did, one counsel, came in and denied

6  the allowability of one set of claims that was asserted against

7  another debtor.  And I'll come to the remedy in a bit, because

8  we're in bankruptcy court.

9       But there is clearly a conflict there, and there's

10  clearly prejudice when one counsel denies the allowability of

11  claims asserted by a creditor in that estate, particularly when

12  that same counsel is counsel to the creditor.  That's the

13  problem we see.

14       So the question is, from my perspective, really,

15  what's the remedy?  Outside of bankruptcy, I don't think --

16  reading Greene closely and its progeny in the New York State

17  courts -- that in these circumstances, given the materiality of

18  the claim, anybody would allow a waiver of the conflict to

19  allow Morrison & Foerster to appear and be heard in an active

20  litigation in the RFC claiming two billion dollars from ResCap,

21  LLC.

22       But there has been no waiver here by the estates.  And

23  I want to distinguish the waiver point which I'll discuss

24  later, that maybe we did something that waived the conflict.

25  The estates haven't waived any conflict against each other.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    The oppositions don't say that one exists.  The waiver would

2    have to be disclosed fully to the Court.  The underlying

3    conflict would have to be disclosed fully to the Court.  The

4    Court would have to approve a waiver:  ResCap, LLC hereby

5    consents to allow Morrison & Foerster to represent other

6    debtors in connection with the actual litigation of

7    intercompany claims.  And then the Court would have to modify

8    the retention orders in the case to allow the lawyers to appear

9    and be heard and represent an interest adverse to each

10   individual estate.

11           So there hasn't been an actual waiver.  The question

12   is, we're in bankruptcy; we recognize the cases have progressed

13   to a certain point; we recognize the consequence of a

14   disqualification at this point.  So the question is, what's the

15   appropriate remedy?

16           We haven't sought a wholesale disqualification.  We

17   have not sought the appointment of fifty-one sets of counsel.

18   We have not sought the appointment of an examiner to look into

19   this.  We have not sought the appointment of trustees.  All

20   remedies that have been imposed at various stages of various

21   cases that have progressed along.  All we've done is ask them

22   to change their plan strategy.  They should not, under any

23   circumstances, prior to confirmation of the plan and an

24   approval by the Court of releases between the individual debtor

25   estates, should not be allowed to appear and be heard on the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

22

1   interdebtor conflicts.  They should not be able to represent

2   each of the individual estates in the litigation of that issue.

3          Now, maybe that causes them to say, you know what,

4   let's have a discussion about pushing this until after

5   confirmation.  But it's their insistence that that issue be

6   tried at confirmation that's causing the problem.

7          So if they want to do that litigation still at

8   confirmation, then they have to stay neutral in it, and

9   somebody else is going to -- consenting creditors or otherwise,

10  is going to have to take up the oar on a litigation over

11  whether or not the intercompany claims or interdebtor claims

12  are all, in fact, worth zero.

13         And in connection with that, the debtors have to make

14  a full and fair disclosure of the conflict and the issues and

15  what it means for each of these estates to be releasing their

16  intercompany claims against the other.  And leave it for the

17  creditors to approve it; to have a 9019 and have it be able to

18  come before the Court and say the global settlement is a good

19  global settlement.  And they can advocate exactly what you

20  said, that the litigation associated with this would be timely

21  and consuming and all-consuming.  And they're complicated

22  issues.  And we believe -- Mr. Kruger believes that as a

23  fiduciary for all estates, it benefits all estates for it to be

24  settled.

25         And we'll have it out at confirmation, if in fact, we

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   disagree with that.  But what they can't do is appear and be

2   heard and say on behalf of ResCap, LLC -- or in the instance I

3   gave, on behalf of RFC -- I believe that the claim that RFC has

4   into ResCap, LLC, based on the advice of counsel, is subject to

5   material challenge and would never be allowed in the court.

6   And even if it were allowed, it would be recharacterized.  And

7   even if it were recharacterized as equity, there would be no

8   fraudulent conveyances that occurred when RFC transferred two

9   billion dollars of value up to ResCap, LLC.

10          So there needs to be a lot of disclosure around the

11  intercompany claims.  And they have to, in the end, be more

12  sensitive about the conflict position that they are in.  They

13  can't be coming in and taking the position -- let me say it

14  this way.  If you look at all the cases that have dealt with

15  interdebtor conflicts in the context of a bankruptcy case, from

16  a -- when they come up in the context of a retention issue or

17  they come up in the middle of the case or they come up at

18  confirmation, where the cases all seem to go, given that we are

19  in bankruptcy court and there are the interests of, in this

20  case, tens of thousands of creditors that need to be kept in

21  mind, the courts come out with the following precept.  While we

22  recognize counsel and the debtors are going to have a role in

23  resolving interdebtor conflicts, and can manage the process and

24  can act as an honest broker, they just can't flout the rules.

25          When people get into trouble is when they deny that a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

24

1    conflict exists or they argue that the conflict has been waived

2    or they try to release the claims in order to avoid the

3    conflict.  That's when people get into trouble.  Because at

4    that point, what they're saying is, the rules don't apply; that

5    because I am in bankruptcy court --

6            THE COURT:  I haven't read anything to suggest they're

7    releasing the claims to avoid a conflict.  So I don't know

8    where you get that from other than you've made it up.

9            MR. SHORE:  I'm not -- I wasn't attributing that to

10   the debtors here.  I was attributing it to --

11           THE COURT:  Let's deal with the case I have before me.

12           MR. SHORE:  Okay.  The case you have before you.  The

13   position they have taken is the conflict was waived.  It wasn't

14   an actual waiver, knowing written waiver that was approved by

15   the Court.  But the conflict was waived because of the passage

16   of time.

17           That is not a supportable position.  They've taken the

18   position that because we have filed a tactical motion they

19   don't have to respond to the issues --

20           THE COURT:  You know, I understand the law with

21   respect to sanctionable conduct, that a motion, for example,

22   that has elements of validity, if filed for an improper

23   purpose, can result in sanctions being imposed.  It doesn't --

24   the outcome of a -- and there is no sanctions motion before me.

25   But the outcome of a sanctions motion doesn't hinge upon

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  whether there were a fair ground for litigating the issues that

2  are raised by a motion.  If it's established that the motion

3  was filed in bad faith, that may be sufficient in and of

4  itself.  Do you agree or disagree with that?

5        MR. SHORE:  Well, the Second Circuit came out with a

6  case, six, seven years ago, maybe longer, on that issue, which

7  is whether or not a proper motion brought for an improper

8  purpose is sanctionable, and I believe said that the issue is

9  one that needs to -- that requires close inspection by the

10  Court in the context of resolving it and did not rule out of

11  hand that a proper motion brought for an improper purpose was

12  in fact -- could, in fact, be the subject of a sanctions

13  motion.

14        THE COURT:  Go ahead, Mr. Shore.

15        MR. SHORE:  Okay.  So let me address the issue now,

16  which is the one of tactics.

17        The position that they are taking here is that we --

18  not that we have no basis, I think, to bring this issue to the

19  Court's attention, but rather we're doing it in order to foster

20  our position in the litigation.  Not -- and although they seem

21  to say it, I don't think anybody clearly comes out and says

22  tactic -- tactical is an outright defense to a conflicts

23  motion.  In fact, I think that the Second Circuit has spoken on

24  that as well, saying that's why motions like this are

25  disfavored.  It just requires the Court to scrutinize them more

**RESIDENTIAL CAPITAL, LLC, ET AL.**

26

1    closely.

2           But what they're saying is you're bringing this motion

3    to blow up the global settlement, because the global settlement

4    has a provision which says "waive, cancel and discharge

5    intercompany claims".  That's not what we're doing.

6           If the motion said --

7           THE COURT:  Well, it's easy for you to say, but it's

8    certainly -- I must say -- I'm not making any determination

9    about it, but there would appear to be support for the position

10   of the debtors and the committee that your motion and the

11   timing of the motion is filed for an improper purpose, for the

12   purpose of blowing up the PSA and the proposed plan.  And

13   that's different, and I've said repeatedly, that the issues of

14   whether the proposed settlement are approved as part of the

15   plan raise litigable issues, and the Court will deal with them

16   on the merits as part of confirmation.  Okay?

17          So I'm not making any decision whether the motion was

18   or was not filed in bad faith.  But it seems to me that in the

19   multiple oppositions to your motion that have been filed,

20   credible arguments that the motion was filed at this time, in

21   these circumstances, in bad faith, also present litigable

22   issues.

23          MR. SHORE:  So let me address, then, the concept of

24   timing.  The objecting parties have been all over the lot as to

25   when the conflict arose or when we should have brought the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

27

1    motion.  Ally, I think, has it at the earliest period of time,

2    which is that at the time of the retention of Morrison &

3    Foerster, the issue should have been raised.  Filing a motion

4    then just raises a string-sight response, the mere existence of

5    intercompany claims does not present a conflict issue.  Among

6    other things, nobody had done any diligence into what the

7    disputes were around that.  But also, it wasn't clear that

8    there was going to be any value associated with intercompany

9    claims, depending on what the distributable value is within the

10   estate.  So that's too early.

11           Was it when the schedules were filed?  The schedules

12   say this is our best work at the time, and as the debtors point

13   out, it could go this way, it could go that way.  This is the

14   math.  They did schedule them as allowed claims.

15           Was it when the debtors started having discussions

16   about intercompany treatments, not publicly?  No, because it's

17   still -- at that time, it's unclear whether or not intercompany

18   claims, if litigated, mean anything in the context of the case.

19           The cases are clear, the conflict arises when the

20   dispute is one of both fair dispute, that is, there's an issue

21   here as to whether or not the claims should be allowed as debt

22   claims or should be recharacterized as equity, and if

23   recharacterized as equity they should be -- there should be a

24   Chapter 5 analysis that's associated with them, one.  And two,

25   that it matters; that it affects creditor recoveries.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

28

1              Before the Ally settlement occurred, as Your Honor may

2     recall, there was a question as to whether unsecured creditors

3     were going to get anything in the context of this case, or

4     whether these cases were going to go into administrative

5     insolvency, in which case, the intercompany claims don't

6     matter.  They're not going to get paid any more than any other

7     creditor was going to get paid.

8              When the issue arose was when, as the result of the

9     mediation, they published a document, the PSA, which says as

10    part of the global settlement, ultimately as a means to fix the

11    places in which distributable value was being put in the

12    enterprise, they were going to turn off the intercompany claims

13    and waive discharge.  That's when we sent the letter.  What do

14    you plan to do with that?  What do you mean by that?  Are you

15    really going to be litigating these issues?

16             What were we supposed to do when they didn't respond

17    and instead came in to the Court --

18             THE COURT:  Let me interrupt you for this.  I'm not

19    going to deal with whether -- at this stage, I'm not deciding

20    anything on the issue of whether the motion was filed in bad

21    faith.  Given the limits of time, let's move on with the

22    argument.

23             MR. SHORE:  Okay.

24             THE COURT:  And the same will apply to --

25             MR. SHORE:  So --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

29

1          THE COURT:  -- the other side.

2          MR. SHORE:  -- so I'll say this.  I think the conflict

3  arose -- the position we've taken very clearly, is the conflict

4  arose at that period of time.  We raised it.  We've tried to

5  deal with it.  We brought a motion before the Court.

6          If somebody wants to argue that the conflict arose

7  earlier, they should be addressing before the Court, when the

8  conflict was arose, and what disclosure was made to the Court

9  and other interested parties in these cases that there was, at

10  that point, a material conflict that was going to affect

11  creditor recoveries.

12          So as far as tactical is concerned, their only

13  argument is that they agreed to a provision in the PSA which

14  said that the intercompany claims would be canceled, waived,

15  and discharged; not that the intercompany claims are being

16  settled as part of this, and will receive no distribution.

17  Which is a plan construct we're very familiar with.  They said

18  that.

19          Now, if the global settlement had said, as part of a

20  global settlement, in the interim up to confirmation the

21  debtors will not spend any money preserving the JSN's

22  collateral, would it have been tactical for us to move to lift

23  the automatic stay and take possession of our collateral or

24  seek adequate protection?  It would have been defensive to

25  protect ourselves from them taking an action which violated the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Rules.

2          If there was a provision in the PSA which says the

3  debtors shall keep secret every bit of disclosure between the

4  parties in connection with settlement, would it be tactical for

5  us to come in and seek a determination that they actually had

6  to produce that in discovery?  It wouldn't be a defense to say,

7  well, we don't have to produce it in discovery, Your Honor,

8  because that would blow up the global settlement.  The fact is,

9  is they took a position in the global settlement, in the PSA,

10  that said we're going to waive, cancel, and discharge.  They've

11  clarified now that what that means is they're seeking a factual

12  finding at confirmation that the intercompany claims are worth

13  zero.

14          In response to that, which in our view violates the

15  Rules, we're asking the Court not to let them violate the

16  Rules.  If they want to stand up and say we are not going to

17  appear and be heard at confirmation on the merits of

18  intercompany claims, I don't have a problem.  They won't say

19  that.

20          And so in the absence of them voluntarily doing it,

21  and as a remedy for what is a violation of the Rules, we're

22  just asking the Court to establish the ground rules that I laid

23  out before.  They're not going to do it.  Somebody else can do

24  it.  If somebody else does it, they have to remain neutral.

25  And throughout the entire process, they're going to have to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1   make a lot of disclosure which allows the people, the real

2   parties-in-economic-interest on this, to make determinations as

3   to whether and how to litigate those intercompany claims.

4           Unless Your Honor has anything further, I'll sit down.

5           THE COURT:  No, go ahead.

6           Just give me a moment, Mr. Lee.

7           MR. LEE:  Sure.

8       (Pause)

9           THE COURT:  Go ahead, Mr. Lee.

10          MR. LEE:  Good morning, Your Honor.  Gary Lee from

11  Morrison & Foerster, for the debtors.

12          Your Honor, at the outset, I just want to make it

13  clear, if it wasn't already apparent, that the debtors, the

14  debtors' CRO, the debtors' professional, the management, and

15  speaking for the UCC, their counsel, and the members too, take

16  their fiduciary obligations very seriously.  And that is why,

17  Your Honor, we filed what we hope you saw was a fairly

18  temperate and thoughtful response to a motion that quite

19  frankly we didn't think should have been made.

20          The debtors -- and I think as Your Honor did --

21  struggled during our July 22nd conference -- struggled with the

22  timing of the motion, the motivation behind the motion, and the

23  practical import, if the relief that the ad hoc group are

24  looking for is granted.  And we, like Your Honor, were left

25  wondering whether fourteen months into the case, this is really

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1    just a rather unseemly tactical approach by one group that has

2    used these precise same tactics in several cases in the

3    Southern District of New York.

4           And we believe that tactically, what they are trying

5    to achieve, Your Honor, is to really seek an end-run around

6    what Your Honor decided on July the 3rd, just before we went

7    away on vacation.  And that is to challenge this Court's

8    decision to hear the global settlement -- the global

9    compromise, including the resolution of intercompany balances

10   and thirty other issues, under the Rule 9019 standard.  That's

11   what this is really an attack on.

12          THE COURT:  Can I ask this question?  Are the debtors

13   seeking to have the Court make a finding that each of the

14   intercompany claims is valued at zero?

15          MR. LEE:  No, Your Honor, what the debtors are saying

16   is something quite different from that.  What we're saying is

17   that the intercompany claims lack merit -- I'm sorry, not that

18   they lack merit -- but rather that they should be settled to

19   avoid the cost, time, and burden associated with trying to

20   litigate what are, in essence, hundreds of thousands of

21   individual intercompany balances which are typically not

22   reflected by any documentation, often the result of the cash

23   management.

24          What we're trying to do, Your Honor, is to avoid the

25   months and years of litigation that were spawned in the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1    Adelphia case, which the same counsel was involved in --

2            THE COURT:  Let me stop you.  Because what you've

3    articulated is essentially what I had understood what the

4    co-proponents of the plan are seeking; not a finding that the

5    intercompany claims are worth zero, but that litigation of the

6    substantial disputes would be expensive and time-consuming, and

7    that a settlement of the claims on the basis proposed is in the

8    best interests of the estates and their creditors.

9            When I asked that question of Mr. Shore, he argued

10   that no, if that's what the co-proponents were seeking, that

11   would be one situation.  But rather, the co-proponents are

12   seeking a specific factual finding by the Court that the

13   intercreditor claims are worth zero.

14           So I wrote that down in my notes in multiple places

15   during Mr. Shore's presentation.  He linked it to the issue of

16   adequate protection, that in order -- I understood his argument

17   to be that in order to avoid any obligation for adequate

18   protection, the co-proponents are seeking to try, as part of

19   confirmation, a valuation of the intercompany claims, and have

20   them valued at zero, not settled at zero, but valued at zero,

21   in order to avoid adequate protection.  Could you address that?

22           MR. LEE:  Yes, Your Honor.  So just to be absolutely

23   clear, we're not taking the position that the intercompany

24   claims are worthless or meritless at confirmation.  What we are

25   taking the position is that settling them pursuant to the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1  global settlement and having them discharged as part of that

2  global settlement, at least for the purposes of the adequate

3  protection, establishes the value of the claim for all

4  purposes.  That, Your Honor, we think is very different from

5  saying that if these claims were litigated today, they would be

6  worthless.  That may be true, but that is not what we will be

7  seeking at confirmation.

8         Your Honor, the other obvious follow-on point from

9  that is if you open the door to intercompany claims -- and

10  let's just take the RFC example that Mr. Shore was referring

11  to -- there is indeed a two-billion-dollar intercompany

12  balance.  And as reflected in the disclosure statement, that

13  intercompany balance is not documented in any way, shape, or

14  form.  In fact, the documentation refers to a reverse lending

15  relationship to the intercompany balance.

16         There is equally, and equally as interesting, a

17  sixteen-billion-dollar of debt forgiveness claim coming back

18  the other way.  So we're not saying that the intercompany claim

19  lacks merit, it just simply lacks documentation.  But we're not

20  saying that the sixteen-billion-dollar debt forgiveness claim

21  lacks merit, but what we are saying is, if you want to open the

22  door to this, then you can open the door to debt forgiveness

23  litigation, you can open the door to substantive consolidation

24  litigation.

25         Because if this settlement falls away and somebody

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1    tries to pursue the intercompany claims, there's simply no

2    question that somebody will seek to substantively consolidate

3    these estates.

4          So what we are saying is that you can't have fifty-one

5    debtors with fifty-one separate intercompany claims, fifty-one

6    separate sub-con arguments; fifty-one separate debt forgiveness

7    claims, fighting these and every other issue for the next ten

8    years.  That's why we, Your Honor, asked for a sitting federal

9    court bankruptcy judge to act as a mediator.  That's why all

10   the creditors wanted to settle.  And that's why, Your Honor, we

11   sought approval of --

12         THE COURT:  All the creditors didn't want --

13         MR. LEE:  -- the PSA --

14         THE COURT:  -- to settled.

15         MR. LEE:  All of the creditors apart from one.  But

16   I'm sure in the fullness of time they will come to realize that

17   paying them par plus accrued pre-petition interest was quite

18   generous.

19         Your Honor, we believe that the entire process was

20   designed to benefit all of the estates.  So if I may, I can run

21   through --

22         THE COURT:  Let me ask --

23         MR. LEE:  -- our arguments --

24         THE COURT:  -- you this --

25         MR. LEE:  Yes, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1          THE COURT:  -- because Mr. Shore stated, and I don't

2     know whether -- I'd like your response to this.  He said in

3     substance that the debtors will offer evidence at confirmation

4     of the evidence of the value of the RFC claim and the

5     deficiencies in that claim.  How do the co-proponents propose

6     to support a settlement of the intercompany claims?  Let's

7     focus, specifically, for a moment, on the RFC claim.

8          MR. LEE:  Well, Your Honor, we'll be guided by the

9     9019 standards.  And we think, actually, that what we put in

10    the disclosure statement, is, in fact, a fair and fairly

11    neutral description of the issues that surround the

12    intercompany claims.  So I think pursuant to 9019, what we'd do

13    is, in effect, replicate what we've done in the disclosure

14    statement and say given that and given the offsetting issues

15    that we're going to have to deal with, including, as I said, a

16    sixteen-billion-dollar debt forgiveness claim, as well as the

17    potential for sub-con, we thought that it was in the best

18    interests of all of the debtors' estates to resolve those

19    issues rather than be mired in litigation for the next five or

20    ten years. And we think that that, Your Honor, will be an

21    adequate proof for the resolution.

22         THE COURT:  Go ahead.

23         MR. LEE:  Your Honor, unless you want me to, I think

24    that our papers cover the five principal points that I was

25    going to make in opposition, which were, number one, there's

**RESIDENTIAL CAPITAL, LLC, ET AL.**

37

1  been significant and forthright disclosure by the debtors

2  throughout this case; and in fact, I'm quite happy to address

3  some of the comments that Mr. Shore made with that -- in that

4  regard.

5          I think, Your Honor -- and many of the cases that the

6  ad hoc group refer to, including Granite, focus on the debtors'

7  disclosure failures.  And that's not the case here.  The ad hoc

8  noteholders have known from day-one of these cases, and in

9  fact, going back to the pre-petition period, that the

10  intercompany balances represented a gating issue to a

11  confirmable plan.  And I believe that prior to the filing of

12  this case, Your Honor, we shared an analysis of the

13  intercompany balances with them which showed much the same

14  thing that's now currently filed in the disclosure statement.

15  And they knew from their own experience in the Adelphia case,

16  and obviously from what we told them, that any attempt to

17  enforce the intercompany claims balances would result in years

18  of litigation.

19          So we actually think, Your Honor, that the concept

20  that the conflict did not manifest itself until the PSA was

21  signed, is in fact, entirely inconsistent with a record that

22  goes back not just the fourteen months of this case, but prior

23  to it.  Again, the ad hoc group also knew over the seven months

24  that the debtors and their CRO were participating in the

25  mediation, that the issues that we were seeking to resolve --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1   the very issues, included the intercompany balances.  And they

2   knew that because we said it in at least three different

3   filings to this Court.

4          What we believe, Your Honor, and I will be quite frank

5   about this, is that now that the plan has been filed, the ad

6   hoc group has decided that the best way to attack it, given

7   that Your Honor has indicated that the 9019 standards apply, is

8   not to attack it through confirmation, but rather to raise a

9   conflict where none exists.

10         The second point, Your Honor, is we don't actually

11  believe that a conflict exists here.  And I understand there

12  are some concerns about the way in which we're describing the

13  PSA and the impact.  But I think for the record, it would be

14  helpful just to walk through that.

15         Your Honor, I think that we demonstrate just how

16  seriously we take conflicts and our fiduciary obligations, is

17  that we came to this Court over the objections of the ad hoc

18  noteholders, who said you don't need these findings, as well as

19  other objectors, to seek Your Honor's blessing to enter into

20  the PSA.  But it wasn't just to enter into the PSA, it was to

21  bind all of the debtors, to commit all of the debtors, to

22  prosecute a plan that we thought was in the best interests of

23  all of the estates.

24         That's why, Your Honor, we sought those findings.

25  What we did not want to do was embark on a plan, in a very

**RESIDENTIAL CAPITAL, LLC, ET AL.**

39

1    complex and very expensive case, that was dead before it

2    started.  And that is practically, Your Honor, what will happen

3    if the JSNs get the relief that they're seeking here.

4            There were objections to the findings, Your Honor.

5    But the fact remains, we're not hiding behind the PSA.  We're

6    not looking to prejudice them by referring to the PSA.  What

7    we're saying is that the PSA resolved any perceived conflict,

8    because it binds the debtors to act in unison in prosecuting

9    the plan.  That's the very purpose behind seeking approval from

10   the Court to embark on a course of action.

11           So what we're saying, Your Honor, is that the ad hoc

12   committee can't use a disqualification motion to control what

13   the debtors are already permitted to do, which is to prosecute

14   the plan embodied in the PSA.

15           THE COURT:  Let me ask this.  Is there something in

16   the PSA that would require the Court to make an express finding

17   at confirmation that the intercompany claims are meritless and

18   are valued at zero, as opposed to approving the settlement

19   that's embodied in the plan?

20           MR. LEE:  There is nothing, Your Honor.  We were quite

21   careful when we were drafting the disclosure statement to make

22   it quite clear, in the face of what we understood were some

23   misunderstandings, that what we were looking for is a finding

24   that they are, in effect, settled, waived, and discharged, as a

25   result of the global settlement.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1        Your Honor, we also don't think that the record

2   supports that the ad hoc group has met its 327(a) standards.

3   As I said, I think I've covered, we believe that there is now a

4   complete unity of interests among the debtors and their

5   estates, as Judge Lifland aptly put it in O.P.M., to pursue a

6   confirmable plan.  And indeed, we think that the fact that we

7   went through a seven-month mediation in and of itself to try

8   and address these issues, is the hallmark of a nonconflicted

9   party.

10        I think -- Your Honor, and this also goes to the heart

11   of it, and it's something that you noted at the July 22nd

12   conference.  Mr. Kruger, who is an acknowledged fiduciary to

13   these estates, but also a veteran of this bar, did make an

14   assessment of all of the different claims being asserted in

15   different directions that was entirely consistent with his

16   fiduciary duties.  And he reached the judgment, and I think

17   it's fair to say that everybody should accept that this was a

18   good judgment, that the global settlement that brings in 2.1

19   billion dollars is in the best interests of all of the debtors,

20   all of their estates, and all of their creditors.  And what we

21   will demonstrate at confirmation, Your Honor, that that is a

22   very appropriate resolution to the very complex issues.

23        THE COURT:  Let me ask you.  Mr. Shore, referring to

24   the disclosure statement, indicated that the Morrison &

25   Foerster memorandum to Mr. Kruger on the problems regarding the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

41

1    intercompany claims -- and I didn't see it in the disclosure

2    statement; I may have missed it -- but Mr. Shore suggested that

3    you've already indicated that you intend to assert privilege

4    and not produce the document.  First, is there something in the

5    disclosure statement about Morrison & Foerster advice to Mr.

6    Kruger regarding the problems -- I'll use it euphemistically --

7    with the intercompany claims?

8            MR. LEE:  Your Honor, could you bear with me one

9    second --

10            THE COURT:  Yes, sure.

11            MR. LEE:  -- I apologize.  It's about 400 pages long,

12    so --

13            THE COURT:  I understand that.  That's why I may have

14    missed it.

15            MR. LEE:  Your Honor, I now have to concede, I

16    absolutely have no idea what Mr. Shore is talking about.  I

17    think he might be talking about a notional piece of advice that

18    we might have given to Mr. Kruger about any specific issues so

19    that when Mr. Kruger is testifying why he thought it was

20    appropriate --

21            THE COURT:  Put that in plain English for me.

22            MR. LEE:  I don't know what he's talking about.  There

23    is -- there are lots of pieces of advice that we gave.  And I

24    think that what Mr. Shore is addressing to what extent can he

25    invade the privilege that Mr. Kruger has in relying on our

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1  advice.  And I think that what we've said, and we'll say it for

2  the tenth time, is that Mr. Kruger came to independent

3  judgments based not just on hearing what we viewed the facts to

4  be, but also the presentations, obviously, that we were

5  provided during the course of the mediation and hearing from

6  Judge Peck as well.

7          THE COURT:  Okay, thank you.

8          MR. LEE:  Your Honor, the last point, obviously, is

9  just to address the practical consequences of what I think is a

10  moving target of relief that are being sought by the ad hoc

11  group here.  I think that the solution was -- and this was

12  raised for the first time in their reply -- that the senior

13  unsecured notes, the holders of the RMBS securities, the

14  monoline insurers, and I guess anybody else who's somewhere

15  around the debtors' capital structure, could represent

16  somebody's interests with respect to the litigation over the

17  intercompany balances.

18          It think that the first reason why that particular

19  resolution doesn't work is because, as I said, and I'll say it

20  again, the intercompany balances are not being litigated,

21  they're being settled, pursuant to 9019.  And the second reason

22  why the solution is nonsensical is, Your Honor, how do we force

23  creditor constituencies to litigate this one specific issue.

24  Why doesn't it, and why won't it open the door to every other

25  single offsetting issue that we're trying to resolve through

**RESIDENTIAL CAPITAL, LLC, ET AL.**

43

1    the mediation?  I think it effectively undoes absolutely

2    element of progress that we've made in the last fourteen

3    months, Your Honor.  So --

4             Your Honor, I think at the end of the day, I think

5    that Mr. Shore did try to cite to cases like Augie/Restivo for

6    the proposition that the debtors can't enter into a settlement

7    for the benefit of all, to the detriment of one single debtor.

8    That, Your Honor, is just simply not the effect of the global

9    settlement.  That's what we'll show at confirmation.  And that,

10   Your Honor, is not an issue for today.

11            We hope, therefore, Your Honor, sees this motion for

12   exactly what it is.  Thank you.

13            THE COURT:  Thank you, Mr. Lee.

14            Mr. Eckstein?

15            MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

16   Eckstein on behalf of the creditors' committee.  Let me make a

17   number of additional comments.  I don't want to repeat what Mr.

18   Lee said.

19            We also tried to deal with this motion in a reasonably

20   constructive manner, although we continue to find the motion

21   puzzling and frankly disappointing.  I'm sure it's not lost on

22   Your Honor, I think we've been before Your Honor either in a

23   motion, a status conference, or discovery conference more than

24   thirteen times in the last several weeks, really dealing with

25   JSN issues.  And frankly, it's the same basic issue.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

44

1           And the JSNs have tried, I think, mightily, to create

2    a conflict that does not exist in this case.  And the JSNs,

3    notwithstanding what they understand to be the case, which is

4    that this case, at this juncture, involves a global settlement,

5    the JSNs are intent on trying to compel a litigation of

6    intercompany issues, that is not what is happening in this

7    case.

8           There are many, many intercompany issues.  And I heard

9    Mr. Shore at one point make the comment that in fact, the

10   debtors and the committee should be neutral on all interdebtor

11   issues, not just intercompany claims.  I mean, theoretically,

12   that would involve every claim in the case.  Because every

13   claim in the case is -- affects multiple debtors.

14          And as we all know, what was accomplished in the

15   mediation in this case was a resolution of issues that affect

16   all of the debtors, affect third-party claims, and have been

17   accomplished in the context of a comprehensive global

18   settlement.  It is significant to note that there really aren't

19   multiple parties lining up behind Mr. Shore to argue that there

20   are conflicts in this case, because one of the hallmarks of the

21   plan is that there is global consensus.  Now, unfortunately the

22   J --

23          THE COURT:  How many creditors signed the PSA?

24          MR. ECKSTEIN:  I don't have the number offhand, Your

25   Honor, but I believe every -- with the exception of the JSNs,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    every major constituency in this case signed the PSA.  The RMBS

2    trustees signed the PSA.  The two most significant monolines

3    signed the PSA.  The two securities claimants who are on the

4    committee signed the PSA, and there are twenty-one other

5    private securities claimants behind them.  The Carpenter's

6    class action signed the PSA or signed an agreement supporting

7    the plan.  A creditor representing the borrowers signed the

8    PSA.  The trustee for the HoldCo bond signed the PSA.  One of

9    the largest creditors in the HoldCos, they signed the PSA.  It

10   was comprehensive, Your Honor.

11         And we all know because we've been through this now

12   for many months.  The JSNs did not sign the PSA.  Regrettably,

13   they did not sign the PSA, but that didn't mean that the plan

14   was designed in a punitive fashion.  I recognize that we have

15   not been applauded, but the reality is, and it's relevant to

16   this motion, the plan provides that the JSNs under this plan

17   are receiving par plus pre-petition accrued, in cash, on the

18   effective date.  That is extraordinary treatment, far better

19   than the treatment the JSN ad hoc committee agreed to when this

20   case was filed.

21         We can't forget the JSN ad hoc committee signed a PSA

22   on the first day of this case.  That PSA provided that they

23   would be paid less than par plus pre-petition accrued; they'd

24   be paid over many, many months; they'd have to liquidate out

25   their collateral; they'd have to bear the risks of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

46

1    liquidation.  And they agreed to support a plan and that plan

2    was going to waive intercompany claims.

3          To walk in and suggest that somehow this is a surprise

4    is disingenuous.  They knew exactly -- they had the best vision

5    of this company's capital structure.  And as Mr. Shore said,

6    and it was very telling, he understands that absent the AFI

7    global settlement that was negotiated post-petition, through

8    the mediation, Mr. Shore represented in his argument that the

9    intercompany claims have little or no value.

10          THE COURT:  Let me just stop.  I want to make sure

11    because it's not a point that I had -- I am keenly aware of the

12    PSA that was signed at the start of the case.  I also remember

13    being told that this was a pre-pack.  It became clear, almost

14    on the first day, that the reality was going to be very

15    different, and it has been.  Are you telling me that the PSA

16    that the JSNs signed provided for a waiver of intercompany

17    claims?

18          MR. ECKSTEIN:  Yes, Your Honor.  That's what it had.

19          THE COURT:  All right.

20          MR. ECKSTEIN:  And Your Honor, we're not operating

21    from whole cloth here.  We understood the landscape that

22    existed.  And the fact of the matter is, we are not proposing

23    to litigate the intercompany claims.

24          THE COURT:  Oh, I understand that, Mr. Eckstein.

25          MR. ECKSTEIN:  And we're not proposing to litigate the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    RMBS claims.  We're not proposing to litigate the securities

2    claims.  They're being settled as part of a global settlement.

3    And the intercompany claims are part of the settlement, and one

4    of the rationales for the settlement is that the JSNs are

5    getting par plus pre-petition accrued in cash, which means that

6    if they're undersecured, as a matter of law, the JSNs are not

7    entitled to more.  So whether or not there is some value in

8    intercompany claims that might belong to their collateral, if

9    they're not oversecured, they're not entitled to more, which is

10   what's baffling to us about the dispute.

11          The plan provides -- and it's frustrating because

12   there's litigation -- the plan provides it in the event the

13   JSNs in fact are oversecured, if it turns out that the hard

14   assets are worth more than their prepetition debt, the plan

15   says they will receive post-petition interest.  And we'll have

16   litigation about whether they're oversecured, and I think Your

17   Honor has made it eminently clear that that's going to be

18   resolved prior to or in connection with confirmation.

19          But the intercompany claims, which are integral to the

20   global settlement that was negotiated with the mediator over

21   the past seven months, those are being resolved as part of the

22   global settlement where the JSNs are receiving par plus pre-

23   petition accrued in cash.  And we will demonstrate that that is

24   reasonable, and that it is better for the JSNs -- not just

25   other creditors -- better for the JSNs to receive that, rather

**RESIDENTIAL CAPITAL, LLC, ET AL.**

48

1    than to have this case lose the AFI settlement and be mired in

2    litigation over valueless intercompany claims for the next

3    several years.

4        And if the JSNs want to quarrel with that and

5    basically suggest we'll throw out the AFI settlement and we can

6    basically convert to Chapter 7, and we can have every estate

7    fight for the next several years over the intercompany claims,

8    they can put that case on at confirmation.  It's not -- that's

9    all we're talking about.  We are not proposing to litigate the

10   merits of the intercompany claims.

11       In the event Your Honor does not approve the global

12   settlement, and if the plan fails, the intercompany claims will

13   be pristine, and they can present whatever method they think is

14   best to litigate those intercompany claims.

15       THE COURT:  You agree with Mr. Lee and disagree with

16   Mr. Shore whether the Court is being required to make a finding

17   at confirmation that the intercompany claims are meritless and

18   have no value?

19       MR. ECKSTEIN:  I agree with Mr. Lee.  I agreed with

20   the way Your Honor articulated it.  We are resolving them for

21   settlement purposes at zero.  That is what is being proposed.

22   The merits of those claims are not being adjudicated in

23   connection with confirmation.  Same way the RMBS claims are not

24   being adjudicated in connection with confirmation.

25       If Your Honor does not confirm the plan, we will have

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**49**

1    plenty of litigation over the RMBS claims.  They may be more,

2    they may be less; but they're not being adjudicated on the

3    merits.  And that is true for many, many issues in this case.

4           And it is true; this is a complex case, but I agree

5    with Mr. Lee.  The fact of the matter is that if we do not

6    confirm this plan, and we ultimately devolve into the

7    litigation over all the different intercompany issues, it's

8    likely that at some point there will be a substantive

9    consolidation motion.  In which case, the guarantees will

10   disappear, the intercompany claims will disappear, and the JSNs

11   will get far less than they're getting under this plan.

12   That'll be an issue that will be presented, and it'll be one of

13   the factors that the Court will consider in connection with the

14   proposed settlement.

15          So all of these are very, very significant issues, but

16   they're confirmation issues.  And this persistent effort to

17   litigate the intercompany claims is something that frankly we

18   will continue to resist.

19          Now, in terms of the motion, Your Honor, I think we

20   tried to lay out as clearly as possible several reasons why we

21   believe this motion is improper.  We certainly believe this

22   motion has no basis with respect to the committee, and I don't

23   really believe that the JSNs even tried to make a wholehearted

24   argument that the committee should be disqualified.  They

25   didn't even respond to the cases that we put in our brief.  But

**RESIDENTIAL CAPITAL, LLC, ET AL.**

50

1  that to me is really secondary.

2           I believe the motion, in and of itself, should be

3  denied.  We believe it is tactical.  We believe it is untimely,

4  because the fact of the matter is, the JSNs knew very, very

5  clearly when the mediator was appointed in December, when the

6  CRO was appointed in February, that the purpose of the

7  mediation was to resolve the intercompany issues, including the

8  intercompany claims.

9           That was not something that was lost on the JSNs.

10  They knew full well we were mediating for five months, almost

11  nonstop, to resolve the intercompany issues.  And frankly, they

12  had a responsibility to be at the table.  And to come now, and

13  say that the parties who were proposing the plan should be

14  disqualified, we believe that's out of bounds.

15           It's one thing to object to the plan.  They have a

16  right to object to the plan.  But to come today, after having

17  gone through that process, knowing what the mediation was about

18  and suggest disqualification, we believe is out of bounds.

19           We believe that this issue was teed up in connection

20  with the approval of the PSA.  And while we did not suggest

21  that the Court approved the merits of the plan, we believe that

22  in connection with the PSA, the Court heard the objections of

23  the JSNs, the Court overruled the objections of the JSNs, and

24  the Court authorized the debtor to go forward with prosecuting

25  the plan that included the global settlement.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1        And as to the merits, Your Honor, as we've said, we

2    don't believe there is a conflict.  We believe that this is a

3    proposed settlement.  This is precisely the way the Court dealt

4    with a global settlement of intercompany issues in Charter,

5    where Judge Peck overruled almost precisely this same

6    objection, and said it was appropriate in the context of a

7    settlement for the debtor's board to consider the overall

8    resolution and its impact on multiple debtors rather than

9    looking at each individual creditor or each individual debtor,

10   one-by-one.  That was the ruling in Charter and it faced almost

11   the same objection involving how in Charter the Court could

12   settle the intercompany claims as part of a global settlement.

13       We don't believe this is new, and we believe this is

14   the way courts have allowed large, complex resolutions to be

15   considered.  We believe this is a case where there is

16   tremendous sort of provisions made for the interests of the

17   JSNs.  As I said, the plan specifically leaves open the

18   possibility that they may be oversecured and frankly, there is

19   an opportunity to litigate, and while they have the right to

20   bring whatever motions they want, this does become very

21   tactical because this is all-consuming, and at some point it

22   becomes overkill.

23       So, we're at the juncture where either we're going to

24   settle these issues or we're going to litigate these issues on

25   the merits.  And we believe that the Court has a plan before it

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  that's appropriately presented.  The debtor and the committee

2  are co-proponents with the support of the consenting claimants.

3  The Court is not going to be asked to adjudicate the

4  intercompany claims.

5       The Court will be asked to consider, number one,

6  whether the JSNs are over secured; and number two, whether the

7  global settlement that includes the resolution of the

8  intercompany claims as provided in the plan, including the

9  treatment of the JSNs, is reasonable, fair, and appropriate.

10       We absolutely resist the suggestion that there should

11  be a disqualification of the debtor or the committee

12  professionals or of Mr. Kruger at this late stage in the case.

13  And we believe it's time to move forward and resolve these

14  issues one way or the other on the merits.  Thank you.

15       THE COURT:  Thank you, Mr. Eckstein.

16       Anyone else wish to speak in opposition to the motion?

17  Mr. Moloney.

18       MR. MOLONEY:  Good morning, Your Honor.  Tom Moloney,

19  on behalf of Wilmington Trust, which is representing the senior

20  unsecured bondholders.  I'll be very brief because I think most

21  of the points have been made.

22       First, Your Honor, we agree completely with your

23  formulation of the issue.  There is no need for us to have a

24  finding that the intercompany claims are worth zero.  No one is

25  seeking that.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

53

1           Second, as a factual matter, however, the RFC claim --

2   Your Honor may recall, we filed a complaint in saying it was

3   worth nothing before the mediation even started.  That was

4   based on information we had that came from the debtor before

5   mediation even started, that that claim was simply a

6   bookkeeping error.  And that undoubtedly informed the decision

7   by the junior secured noteholders, pre-petition, to agree to a

8   plan that called for a waiver of all these claims, provided

9   they got the same plan treatment that they're receiving here,

10  except for timing.

11          That plan treatment called for them to be paid by

12  year-end, but it said if they got paid their pre-petition

13  interest plus accrued interest then all the intercompany claims

14  would be waived, even though unsecured creditors would've

15  received substantially less.  And that's the other point I

16  would like -- I rose to make, Your Honor.

17          I never understood the conflict here, because at the

18  moment what we have here, the conflict is between unsecured

19  creditors and a purportedly secured creditor.  In their

20  capacity as an unsecured creditor, the JSNs are being paid a

21  hundred cents on the dollar.  The plan is paying them in full.

22  So they can't claim that we're harming them by this plan in

23  their capacity as unsecured creditors is only in the -- so to

24  stand here before you only in their capacity as purportedly a

25  secured creditor, where they have the burden of proof, not us,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

54

1    of showing the value of their collateral, which could include

2    potentially some of these claims.  At some point, they may

3    carry that burden, though it seems almost impossible for them

4    to do that.

5            But at the moment, there's no fiduciary duty owed by

6    the unsecured creditors' committee to a secured creditor.

7    There's no fiduciary duty owed by the debtors' professionals to

8    any creditor.  They owe duties to the estates and the estates

9    are committed to prosecuting this plan, as already set forth.

10   So I think those are the issues I want to raise.  Thank Your

11   Honor.

12           THE COURT:  Thank you, Mr. Moloney.

13           Anybody else wish to speak in opposition to the

14   motion?

15           MR. WYNNE:  Thank Your Honor, Richard Wynne of Jones

16   Day, on behalf of FGIC.  Your Honor, along with several of the

17   creditors and Mr. Moloney's client, we filed a short joinder in

18   the oppositions, but I wanted to rise to really address just

19   two or three points.

20           I know that Your Honor preferred to stay away from the

21   tactical point, but I actually can't avoid it.  And I can't

22   avoid it for a very simple reason, that I was one of the --

23   I'll call it unfortunate souls who lived through the six or

24   seven years of the Adelphia wars.  And this is a game that we

25   have seen before, and in Adelphia, where we did have years of

1   intensive litigation over intercompany claims --

2           THE COURT:  Let me just stop you, Mr. Wynne.  This is

3   not going to be six or seven years of litigation.

4           MR. WYNNE:  Thank you.

5           THE COURT:  Full stop.

6           MR. WYNNE:  But my --

7           THE COURT:  Go ahead.

8           MR. WYNNE:  -- my point, Your Honor, was that midway

9   through that litigation Judge Gerber effectively called a halt

10  and appointed a mediator, and appointed Judge Morris to mediate

11  what ultimately became a largely global resolution.  I believe

12  that Mr. Shore's clients were -- they were part of that

13  settlement.  Another group of creditors opposed confirmation.

14          But what we effectively have here is that the debtor

15  and the committee and all the other professionals that were

16  involved -- Mr. Kruger -- through the mediation that Your Honor

17  entered, we short-circuited that first step.  And I think

18  that's a valuable thing to notice.

19          The other important point is that the prepetition PSA

20  that a majority of the JSNs signed, or the ad hoc group signed

21  and supported, included only the 750-million-dollar

22  contribution from AFI.  And a key component that we can't lose

23  sight of is that this global settlement brings in 2.1 billion

24  dollars.  And I believe the numbers in the disclosure statement

25  are that it's expected that there will be about 2.6 billion

**RESIDENTIAL CAPITAL, LLC, ET AL.**

56

1   dollars distributed to unsecured creditors in this case.  And

2   2.1 of that, the vast majority of that, is coming from the AFI

3   settlement.  So that was part of the components of the global

4   mediation that critically, we think, actually resolved any

5   potential conflicts that existed here.  And we think that was

6   the appropriate way to proceed.  Thank you, Your Honor.

7          THE COURT:  Thank you very much, Mr. Wynne.

8          Anybody else wish to speak in opposition to the

9   motion?

10          Mr. Shore?

11          MR. SHORE:  Thank Your Honor.  Let me first clarify a

12   couple of points.  With respect, you asked the direct question

13   about the prepetition PSA.  The treatment of intercompany

14   claims which comes on page 10 of that is not what Mr. Eckstein

15   said it was.  In fact, it says, "Unless the junior secured

16   claims have been paid in full, based upon their secured claim,

17   allowed" -- defined -- "intercompany claims shall receive in

18   full satisfaction of all such allowed intercompany claims an

19   amount equal to its pro rata share of ResCap unsecured claims

20   pool."  In other words, in the absence of payment in full, the

21   issue was punted as to whether or not the intercompany claims

22   would or would not be subject to allowance at a later date.

23          And responding to statements made by both the

24   committee and Mr. Wynne there, about the import of the

25   prepetition PSA, just for the record, thirty-eight percent of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**57**

1  the ad hoc group at that time, a substantial portion of that is

2  no longer members of our group and actually members of the

3  senior unsecured notes-- because there was a big trade-out in

4  positions -- were the ones who signed that.  But I don't need

5  to get in -- and I hope I don't need to get into the merits of

6  the underlying litigation right now.  We've got a litigation

7  going on.  What we're asking is that the litigation be

8  conducted in accordance with the rules.

9          THE COURT:  Mr. Shore, a point on which there's strong

10  disagreement between you on the one hand, Mr. Lee and Mr.

11  Eckstein on the other, is the issue of whether the Court is

12  being asked to make a finding at confirmation that the

13  intercompany claims have a value of zero as opposed to how I

14  framed the question during your argument-in-chief.

15          And Mr. Lee and Mr. Eckstein have responded quite

16  directly that the Court is not being asked to litigate and

17  value the intercompany claims.  Rather, the global settlement

18  proposes a settlement of it.  Do you have a document you can

19  point me to that supports your statement that I am being asked

20  to make a finding about the value of each intercompany claim?

21          MR. SHORE:  No, but I can, but I will say this --

22          THE COURT:  No, I -- look, you said one thing.

23          MR. SHORE:  No, I --

24          THE COURT:  They said the other.  I'm asking you, you

25  got something to back it up?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1          MR. SHORE:  Right, and I'll tell you this.  After we

2    filed the motion, we had our calls last week.  The debtors

3    didn't engage.  I engaged with the committee.  I will tell you

4    if it ever comes to a question as to whether this motion was

5    filed in good faith, I will submit a declaration to this Court

6    with respect to that conversation in which the opposite --

7          THE COURT:  Let's deal with the issues I have before

8    me today.

9          MR. SHORE:  Right.

10          THE COURT:  I've made clear I'm not resolving an issue

11    of bad faith.  I have questions about it.

12          MR. SHORE:  Um-hum.

13          THE COURT:  I'm not resolving that today, but -- okay.

14    You've --

15          MR. SHORE:  So --

16          THE COURT:  -- answered my question.  Go on.

17          MR. SHORE:  So maybe there's a miscommunication

18    between --

19          THE COURT:  Look --

20          MR. SHORE:   -- the litigation team --

21          THE COURT:  -- just go on to your next point.

22          MR. SHORE:  Well this, this is important because what

23    has been --

24          THE COURT:  It is important --

25          MR. SHORE:  Right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

59

1           THE COURT:  -- because you said definitively that I

2    was being asked to make a finding -- that I was being told I

3    had to make a finding valuing the intercompany claims at zero.

4    I've asked this question.  There's a record, and I think both

5    the co-proponents are quite clear that not being asked to make

6    such a finding.  So let's go on to the next point.

7           MR. SHORE:  Good.  And what they have described is

8    what we asked in the motion in which they were not --

9           THE COURT:  Could you go on to your next point?

10          MR. SHORE:  This is -- this is my next point.  They

11   have essentially agreed that what we said is they're going

12   to --

13          THE COURT:  Mr. Shore --

14          MR. SHORE:  -- appear neutrally.

15          THE COURT:  -- are you not listening to me?  This

16   issue, as far as I'm concerned, is put to rest.  Go on to your

17   next point in rebuttal.

18          MR. SHORE:  My last point on rebuttal is the only

19   piece of neutrality that is not addressed when they say we are

20   not seeking a finding and we're not going to be litigating the

21   issue as to whether the claims are worth zero, is what we're

22   going to do about the discovery in asso -- in connection with

23   that or anything else.  I think the answer to the question was

24   they are going to be claiming privilege on advice they gave to

25   conflicting counsel --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1        THE COURT:  I don't think I got -- I don't think I --

2        MR. SHORE:  -- we'll deal with at a later --

3        THE COURT:  -- I don't think that point was raised.

4  I'm going to deal with the discovery disputes today.  But I

5  asked a question; you indicated there's a statement in the

6  disclosure statement.  I didn't see it.  That's why I ask about

7  it.  Could you point me to a specific --

8        MR. SHORE:  Yeah, I --

9        THE COURT:  -- statement in --

10        MR. SHORE:  -- I thought --

11        THE COURT:  -- the disclosure statement?

12        MR. SHORE:  I'm -- I apologize.  I did not bring the

13  disclosure statement.  There is a passage when discussing

14  intercompany claims which discusses the advice that was

15  provided in presentations that were made.  I think the answer

16  was it's not one memorandum -- my problem -- but multiple

17  presentations which were made to Mr. Kruger on the issue.

18        THE COURT:  If and when the issue arises in discovery,

19  I'll deal with it at that time.

20        MR. SHORE:  That's -- so as I was saying, that issue

21  moves off.  But what the debtors are saying and what the

22  committee have said today, which is something they've never

23  said before in court is they are not going to be doing this.

24  That resolves --

25        THE COURT:  Mr. Shore --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1       MR. SHORE:  -- the substantial portion --

2       THE COURT:  -- what is it about what I've said you

3   don't understand?  Okay.  You sound like a broken record on

4   this.  It was an important point you raised.  I asked the

5   question of both Mr. Lee and Mr. Eckstein.  They responded

6   quite directly.  There'll be a transcript available.  Go on to

7   your next point.

8       MR. SHORE:  The only, then, point is we'll leave

9   discovery for a later date, and with respect to the adequacy of

10  the disclosure, we'll raise it in the context of a disclosure

11  statement objection to the extent that we have issues with the

12  level of disclosure around the treatment of intercompany

13  claims.

14      THE COURT:  All right.  Any other -- anything else you

15  want to raise?

16      MR. SHORE:  Nothing else, Your Honor.

17      THE COURT:  All right.  It's 11:30.  We're going to

18  take a recess of about twenty minutes or so, approximately, and

19  I'm going to rule from the bench.

20      (Recess from 11:27 a.m. until 11:57 a.m.)

21      THE COURT:  Please be seated.

22      Pending before the Court is the motion of the ad hoc

23  group of junior secured noteholders for entry of an order

24  (i) directing each of the debtors' counsel, including Morrison

25  & Foerster LLP, official committee counsel including Kramer,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Levin, Naftalis & Frankel LLP, and the debtors' management to

2    remain strictly neutral in any dispute regarding claims by and

3    between any debtors, (ii) ordering the limited disqualification

4    of each of the foregoing to the extent necessary to effectuate

5    the foregoing, and (iii) granting related relief.  I'll refer

6    to this as the motion.  It's at ECF 4282.

7          Dwight A. Healy submitted a declaration in support of

8    the motion.  It's at ECF docket number 4290.

9          On Friday, July 26, 2013, the following parties filed

10   objections.  The debtors, see ECF docket number 4368; the

11   committee ECF docket number 4372; joined by certain consenting

12   creditors ECF docket number 4371; and Ally Financial, Inc. ECF

13   docket number 4369.

14         The ad hoc group filed its reply on Monday, July 29th,

15   2013, ECF docket number 4389.

16         For the reasons I will explain on the record and may

17   follow up with a written opinion after I've had an opportunity

18   to review the transcript, the motion is denied.

19         The ad hoc group has been engaged in a pitted battle

20   with the debtors and the creditors' committee over the proposed

21   treatment of the junior secured noteholders -- I'll refer to

22   them as the JSNs -- in any plan of reorganization in this case.

23   The currently filed proposed plan contends that the JSNs are

24   undersecured but proposes to the pay JSNs all pre-petition

25   interest and principal.  The JSNs claim that they are

**RESIDENTIAL CAPITAL, LLC, ET AL.**

63

1   oversecured and therefore they are also entitled to post-

2   petition interest and fees as well.

3         The debtors and the committee have filed adversary

4   proceedings against the JSNs seeking a determination that the

5   JSNs are undersecured.  The two cases have been consolidated

6   for trial, with the issues bifurcated, and the first-phase

7   trial, likely to occur in early October, 2013.

8         The proposed reorganization plan that is on file is

9   the result of a successful mediation conducted by my colleague,

10  Honorable James M. Peck, over many months.  The direct result

11  of the mediation is a plan support agreement -- I'll refer to

12  it as the PSA -- by and between numerous creditor

13  constituencies in this large and complex case.  The parties to

14  the PSA agree to support a plan consistent with the terms of

15  the PSA and its two attached term sheets.  Because the members

16  of the ad hoc group refuse to agree to sign a nondisclosure

17  agreement required before members of the ad hoc group could

18  participate in the confidential mediation, the members of the

19  ad hoc group did not participate in the mediation; they are not

20  signatories to the PSA.

21        I would note that on July 26, 2013, the Court approved

22  the ad hoc group's motion for an order in aid of mediation.

23  With the signing of the order, members of the ad hoc group

24  agreed to sign an NDA and engage in mediation before Judge

25  Peck.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

64

1          Among the terms of the PSA and of the proposed

2   reorganization plan, is a proposed settlement agreed upon by

3   all parties to the PSA of all interdebtor claims for settlement

4   purposes, valuing them at zero.  That result may potentially

5   affect whether the JSNs are over- or undersecured, and thus,

6   whether they are entitled to post-petition interest and fees.

7          In support of this proposed settlement the parties to

8   the PSA argue that this settlement resolves disputed issues

9   that would be expensive and time-consuming to litigate.  Thus,

10  the parties to the PSA, including the debtors and the

11  creditors' committee, argue that this settlement is fair,

12  reasonable, and in the best interests of the debtors' estates

13  and their creditors.  Whether the settlement is approved will

14  be an issue at confirmation.

15         Since the announcement of the signing of the PSA,

16  which was approved by the Court over the objections of a number

17  of parties, the ad hoc group, through its counsel, has worked

18  tirelessly to blow up the PSA and the entire case.  The current

19  motion to disqualify counsel and debtors' CRO is only the

20  latest of many actions taken by the ad hoc group to derail this

21  case.

22         The Court wants to make clear, however, that many

23  issues arising from the currently proposed plan, including the

24  proposed settlement of interdebtor claims, are a fair ground

25  for litigation in the context of the Rule 9019 standards.  And

**RESIDENTIAL CAPITAL, LLC, ET AL.**

65

1    as the Court has made clear on numerous occasions, those issues

2    will be the subject of future proceedings.  This Court has not

3    prejudged any of the issues.

4            The question raised by this motion is the tactics

5    adopted by the ad hoc group to short-circuit the normal

6    litigation process that will be followed in this case.  The

7    timing of the filing of this motion raises substantial

8    questions whether the ad hoc group and its counsel have acted

9    in bad faith in filing the motion.

10           Members of the ad hoc group, primarily hedge funds,

11   previously declined to sign an NDA because they did not want to

12   become restricted from trading the debtors' securities.

13   Litigation conduct, such as the filing of the motion, that

14   threatens to derail confirmation of the proposed plan, has the

15   potential to affect the market price of the debtors'

16   securities.  Any trading by members of the ad hoc group upon

17   the filing of the motion may be relevant to the issue whether

18   motion was filed in bad faith.  The Court intends to defer

19   consideration whether the motion was filed in bad faith.  Until

20   this case is concluded, that issue is expressly reserved.

21           The ad hoc group seeks an order:  a) directing each of

22   the debtors' counsel, Morrison & Foerster, counsel to the

23   committee, including Kramer Levin, and the debtors' management

24   and chief restructuring officer, Lewis Kruger, to remain

25   strictly neutral in any dispute in this court regarding claims

**RESIDENTIAL CAPITAL, LLC, ET AL.**

66

1   by and between any debtors; b) ordering the limited

2   disqualification of each of the forgoing to the extent

3   necessary to effectuate the forgoing; c) granting related

4   relief; and d) awarding the ad hoc group such other and further

5   relief as the Court deems appropriate.

6          It is important that issues raised by this motion be

7   resolved quickly in light of the expedited schedule in this

8   case.   Therefore, for purposes of this ruling, the Court will

9   not recount all of the arguments raised by the parties in the

10  pleadings filed in support of and in opposition to the motion.

11  All arguments have been considered by the Court.

12         Section 327 of the Bankruptcy Code mandates that

13  counsel must be free of conflicts of interest in its

14  representation of an estate.   Section 327 imposes a two-pronged

15  test for the initial retention and continued employment of

16  professionals.   The professionals, 1) must not hold or

17  represent any interest adverse to the estate, and 2) must be

18  disinterested persons.   See Bank of Brussels Lambert v. Coan,

19  that's C-O-A-N; In re Aerochem Corp., 176 F.3d 610, 620-21 (2d

20  Cir. 1999); Bergrin v. Eerie World Entertainment, LLC, number

21  03 Civ. 4501(sas), 2003 WL 22861948 at *1, (S.D.N.Y., December

22  2, 2003); In re Vebeliunas, that's V-E-B-E-L-I-U-N-A-S, 231

23  B.R. 181. 188 (Bankr. S.D.N.Y. 1999); In re Granite Partners,

24  L.P., 219 B.R. 22, 32-34 (Bankr. S.D.N.Y. 1998).

25         When read in conjunction with the definition of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    "disinterested person" contained in Section 101, Subsection

2    (14)(c), which includes the requirement that the person not

3    have an interest materially adverse to the estate or any class

4    of creditors or equity holders, however, Section 327(a)

5    provides a single test to assess conflict.  See In re JMK

6    Construction Group, Ltd., 441 B.R. 222, 229, (Bankr. S.D.N.Y.

7    2010).

8        That test is whether the professional holds or

9    represents "an interest adverse to the estate."  Aerochem

10   Corp., 176 F.3d at 622-23.

11       An adverse interest is either, 1) the possession or

12   assertion of any economic interest that would tend to lessen

13   the value of bankruptcy estate or create an actual or potential

14   dispute with the estate as a rival claimant; or 2) a

15   predisposition of bias against the estate.  See Aerochem Corp.,

16   176 F.3d at 623; JMK Construction Group, Ltd., 441 B.R. at 229;

17   Granite Partners, L.P., 219 B.R. at 33.

18       The determination of adverse interest is objective and

19   it's concerned with the appearance of impropriety.  JMK

20   Construction Group, Ltd., 441 B.R. at 229.

21       A professional has a disabling conflict if it has

22   "either a meaningful incentive to act contrary to the best

23   interests of the estate and its sundry creditors -- an

24   incentive sufficient to place those parties at more than

25   acceptable risk -- or the reasonable perception of one."

**RESIDENTIAL CAPITAL, LLC, ET AL.**

68

1    Granite Partners, L.P., 219 B.R. at 33.

2          The "requirements of Section 327 must be taken

3    seriously as they ensure that a professional fulfils his duties

4    in accordance with his fiduciary duties to the estate."  JMK

5    Construction Group, Ltd., 441 B.R. at 230.

6          As this Court further noted in JMK, "Courts lack the

7    power to authorize the employment of a professional who has a

8    conflict of interest."  Id.

9          Nonetheless, it is standard practice to allow one law

10   firm to represent multiple debtors even when intercompany

11   claims exist, in order to conserve estate assets.  See In re

12   International Oil Co., 427 F.2d 186, 187 (2d Cir. 1970).  (The

13   existence of intercompany claims by itself is not a basis "to

14   saddle these estates with the expense of separate trustees and

15   trustees' attorneys.");  In re BH&P, Inc., 949 F.2d 1300, 1310

16   (3d Cir. 1991).  (Recognizing that a single representative of

17   multiple estates "is often able to maximize the return to

18   jointly administered estates through increased economy and

19   efficiency."); In re Global Marine, Inc., 108 B.R. 998, 1004

20   (Bankr. S.D.Tx. 1987), holding that, "The mere existence of an

21   intercompany claim does not in and of itself constitute an

22   impermissible conflict of interest that would justify

23   disqualification").

24         The issues raised by a single counsel representing

25   multiple debtors in a single case is far different than the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  issue addressed by this Court in In re Project Orange

2  Associates LLC, 431 B.R. 363 (Bankr. S.D.N.Y. 2010).

3       In Project Orange, the Court refused to approve the

4  retention of DLA Piper because in addition to representing the

5  debtor, the firm also represented in unrelated matters, the

6  largest creditor in the bankruptcy case.  The creditor's claims

7  were disputed and unliquidated.  A settlement of the claim was

8  critical to any successful reorganization of the debtor.  The

9  Court concluded that the representation of the debtor and the

10 largest creditor in the case precluded DLA Piper's retention as

11 general bankruptcy counsel.

12      Adelphia is an instructive case.  In Adelphia, Judge

13 Gerber reviewed sixteen different multi-debtor cases where

14 interdebtor disputes existed, and found that representation by

15 a single firm in such circumstances was a common and

16 appropriate practice.  See In re Adelphia Communications Corp.,

17 336 B.R. 610, 645-53 (Bankr. S.D.N.Y. 2006), affirmed 342 B.R.

18 122 (S.D.N.Y. 2006).  See also the transcript in In re General

19 Growth Properties, Inc., number 09-11977-alg, Bankruptcy Court,

20 Southern District of New York, it's docket number 90 -- excuse

21 me -- docket number 72, transcript at page 38.  (Court referred

22 to proposition that requiring each separate debtor to have

23 separate counsel "would be an absurdity").

24      Judge Gerber ultimately held that appointing a Chapter

25 11 trustee or directing the recusal of the debtor's officers

**RESIDENTIAL CAPITAL, LLC, ET AL.**

70

and directors, and ordering the appointment of independent
fiduciaries was not warranted.  To quote from the case, "To the
contrary, it is clear in this Court's view under the Bankruptcy
Code and the case law that there is no requirement of law, nor
should there be one, that says that any time interdebtor
disputes exist in a multi-debtor Chapter 11 case, and a
creditor constituency is upset that it may not be paid in full,
independent fiduciaries (of any kind) must be appointed per any
or all of the individual debtors so affected.  The imposition
of any such requirement would represent a sea-change in the law
and in Chapter 11 practice with a highly destructive effect on
the manner in which multi-debtor Chapter 11 cases are run.  As
importantly or more so, any such rule would in nearly all if
not all such cases have a material adverse effect on creditor
recoveries."  336 B.R. at 618.

Judge Gerber did find that debtors' counsel was
disqualified only for the limited purpose of representing the
debtor in the litigation -- I emphasize litigation -- between
certain subsidiaries of the debtor; I'll refer to those as
intercreditor disputes.

Judge Gerber found that "no relief beyond requiring
neutrality on the interdebtor disputes themselves is
warranted," but that "now that the interdebtor disputes are in
litigation, debtors' counsel cannot act on both sides of the
litigated controversy."  336 B.R. at 672-73.

1        The Court also noted that the debtors' counsel "can

2   continue to act as a facilitator to privately try to assist the

3   creditor groups whose money is at stake, to reach a

4   settlement." Id. at note 173.

5        In WorldCom, the court confirmed a Chapter 11 plan

6   that eliminated most intercompany claims because "resolution of

7   these disputes by virtue of the differing treatment of

8   differently situated classes of unsecured creditors, as

9   provided in the plan, avoids potentially massive and protracted

10  litigation over the following issues:  the precise allocation

11  of assets and liabilities among entities; the enforcement or

12  validity of different types of intercompany claims; and the

13  amount of intercompany claims."  In re WorldCom, Inc., 2003 WL

14  23861928 at *32, (Bankr. S.D.N.Y. October 31, 2003).

15       Similarly in Enron, the court confirmed a Chapter 11

16  plan that settled intercompany claims because "the global

17  compromise benefits all creditors by, inter alia, reducing the

18  potential costs of litigation including the costs of performing

19  diligence regarding a multitude of underlying facts and

20  transactions, the professional fees associated with the

21  litigation, the delays and uncertainty associated with

22  litigation, the prolonged costs of administering the estates,

23  the resulting depletion of the estates' assets, as well as

24  creditors' lost time value of money resulting from later

25  distributions."  See findings of fact and conclusions of law

**RESIDENTIAL CAPITAL, LLC, ET AL.**

72

confirming supplemental modified fifth amended joint plan of

affiliated debtors pursuant to Chapter 11 of the United States

Bankruptcy Code and related relief, In re Enron Corp., number

01-16034-ajg, Bankruptcy Court Southern District of New York,

July 15, 2004, docket entry 19758 at pages 78-79.

Neither court required each individual debtor to

retain separate counsel to resolve interdebtor claims.

Courts have also denied disqualification motions based

in part on the fact that the motion was brought as a litigation

tactic.  See, e.g., In Re Enron Corp., number 01-16034-ajg,

2002 WL 32034346 at *1, (Bankr. S.D.N.Y, May 23, 2003) -- I'll

refer to that as Enron 2 -- affirmed number 02 Civ. 5638 (bsj),

2003 WL 223455 at *4 note 2, (S.D.N.Y., February 3, 2003),

(Denying a disqualification motion three months into the case

because "delay in bringing any action to disqualify counsel is

generally frowned upon because of the disruption it would cause

to the case."); In re O.P.M. Leasing Services, Inc., 16 B.R. at

938-41; In re WorldCom, Inc., 311 B.R. 151 (Bankr. S.D.N.Y.

2004) -- I'll refer to that as WorldCom 2 -- (Denying

disqualification motion relating to debtors' auditors and tax

advisors on the eve of debtors' emergence from bankruptcy in

stating that, "the creditors acted in connection with a

litigation strategy that served their own pecuniary interest"

and "the delay in bringing the disqualification motion until

the eve of the debtors' emergence from bankruptcy was

**RESIDENTIAL CAPITAL, LLC, ET AL.**

73

potentially disruptive to the debtors' reorganization; the

interests of all creditors in these Chapter 11 cases would have

been hindered by the disqualification as emergence could have

been delayed without any foreseeable benefit to the debtors'

estates.")

The motion here must be denied.  While the ad hoc

committee attempts to make a distinction between what they are

asking for, an order of neutrality, and a substantive

disqualification motion, it is clear that the ad hoc group

intends to hamstring the co-proponents of the reorganization

plan from proceeding to seek confirmation of any plan that

settles interdebtor claims on any basis not to the liking of

the JSNs.  The ad hoc group says in its reply that "no one has

suggested that this conflict be resolved through the

appointment of fifty-plus sets of separate professionals or

trustees."  But that is the ineluctable conclusion that follows

from the ad hoc group's arguments.

Moreover, one of the issues at the heart of this

dispute is the ad hoc group's "misunderstanding" -- and I'll

put that term in quotes -- of the debtors' reasoning for

settling intercompany claims at zero.  The ad hoc group

repeatedly argues that the debtors are impermissibly seeking a

determination from the Court that the intercompany claims have

no value and that the settlement of such claims for zero is

inappropriate.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

74

1          This significantly misstates the debtors' and the

2     committee's position.  The Court specifically addressed this

3     issue during argument and the answer by counsel to the debtors

4     and the committee could not have been clearer; the Court is not

5     being asked to determine the value of the interdebtor claims.

6     The debtors do not argue that the intercompany claims have no

7     value.  They are arguing that 1) it is in the best interests of

8     the estates to avoid the cost, time, and burden, of litigating

9     hundreds if not thousands of intercompany claims; and 2) that

10    it is in the best interest of the estates to seek confirmation

11    of a plan that embodies the terms of the PSA.

12          In other words, what the ad hoc group misses and the

13    debtors acknowledge is the intercompany claims may have value,

14    but they believe that the estate will realize more value by

15    settling those claims at zero because doing so is a requirement

16    for AFI to provide its substantial contribution under the terms

17    of the PSA.

18          For the reasons I have explained, and after reviewing

19    the transcript I'll decide whether to supplement it with a

20    written opinion, the motion is denied.  An order will be

21    entered today denying the motions for the reasons stated on the

22    record.

23          All right.  Court is adjourned.

24       (Whereupon these proceedings were concluded at 12:23 p.m.)

25

75

1

2                              I N D E X

3

4                              RULINGS

5                                        Page     Line

6   Motion of the Ad Hoc Group of Junior Secured   62      18

7   Noteholders for Entry of an Order, (i)

8   Directing Each of the Debtors' Counsel

9   Including Morrison & Foerster LLP, Official

10  Committee Counsel Including Kramer, Levin,

11  Naftalis & Frankel LLP, and the Debtors'

12  Management to Remain Strictly Neutral in any

13  Dispute Regarding Claims by and Between Any

14  Debtors, (ii) Ordering the Limited

15  Disqualification of Each of the Foregoing to

16  the Extent Necessary to Effectuate the

17  Foregoing, and (iii) Granting Related Relief

18  is Denied

19

20

21

22

23

24

25

76

C E R T I F I C A T I O N

I, Penina Wolicki, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:   July 31, 2013

# #

**#607 (1)**
2:22

# *

**\*1 (2)**
66:21;72:11
**\*32 (1)**
71:14
**\*4 (1)**
72:13

# A

**able (3)**
22:1,17;68:17
**absence (2)**
30:20;56:20
**absent (1)**
46:6
**absolutely (4)**
33:22;41:16;43:1;
52:10
**absurdity (1)**
69:23
**accept (1)**
40:17
**acceptable (1)**
67:25
**accomplished (2)**
44:14,17
**accordance (2)**
57:8;68:4
**accrued (6)**
35:17;45:17,23;
47:5,23;53:13
**accusations (1)**
9:6
**achieve (1)**
32:5
**acknowledge (1)**
74:13
**acknowledged (1)**
40:12
**act (6)**
23:24;35:9;39:8;
67:22;70:24;71:2
**acted (2)**
65:8;72:22
**action (4)**
29:25;39:10;45:6;
72:15
**actions (1)**
64:20
**active (2)**
20:1,19
**actively (1)**
15:11
**actual (4)**
21:6,11;24:14;

**67:13**
**actually (11)**
9:12;13:11;15:21;
16:8;30:5;36:9;
37:19;38:10;54:21;
56:4;57:2
**Ad (42)**
2:2;4:13;5:3;8:7,
14;14:19;31:23;37:6,
7,23;38:5,17;39:11;
40:2;42:10;45:19,21;
55:20;57:1;61:22;
62:14,19;63:16,17,
19,22,23;64:17,20;
65:5,8,10,16,21;66:4;
73:6,9,13,17,19,21;
74:12
**addition (1)**
69:4
**additional (1)**
43:17
**address (9)**
8:10;9:11;25:15;
26:23;33:21;37:2;
40:8;42:9;54:18
**addressed (3)**
59:19;69:1;74:2
**addressing (3)**
8:21;29:7;41:24
**Adelphia (7)**
33:1;37:15;54:24,
25;69:12,12,16
**adequacy (1)**
61:9
**adequate (9)**
12:11;14:23;15:4;
29:24;33:16,17,21;
34:2;36:21
**adjourned (1)**
74:23
**adjudicate (1)**
52:3
**adjudicated (3)**
48:22,24;49:2
**administered (1)**
68:18
**administering (1)**
71:22
**administrative (1)**
28:4
**adopted (2)**
14:8;65:5
**adversary (1)**
63:3
**adverse (7)**
21:9;66:17;67:3,9,
11,18;70:14
**advice (10)**
17:15;19:1,2;23:4;
41:5,17,23;42:1;
59:24;60:14
**advisors (1)**
72:21

**advocate (2)**
19:7;22:19
**Aerochem (2)**
66:19;67:9,15
**affect (5)**
29:10;44:15,16;
64:5;65:15
**affected (1)**
70:9
**affects (2)**
27:25;44:13
**affiliated (1)**
72:2
**affirmed (2)**
69:17;72:12
**AFI (6)**
46:6;48:1,5;55:22;
56:2;74:16
**again (5)**
13:9;15:9;19:23;
37:23;42:20
**against (7)**
17:14;18:23;20:6,
25;22:16;63:4;67:15
**ago (2)**
10:21;25:6
**agree (12)**
12:1;14:16,18;
17:4;25:4;48:15,19;
49:4;52:22;53:7;
63:14,16
**agreed (9)**
10:6,15;29:13;
45:19;46:1;48:19;
59:11;63:24;64:2
**agreeing (1)**
8:15
**agreement (4)**
13:18;45:6;63:11,
17
**agrees (1)**
14:19
**ahead (5)**
25:14;31:5,9;
36:22;55:7
**aid (1)**
63:22
**alia (1)**
71:17
**all-consuming (2)**
22:21;51:21
**allegations (1)**
20:4
**alleged (1)**
16:24
**allocation (4)**
9:16,17;10:6;71:10
**allow (5)**
20:18,19;21:5,8;
68:9
**allowability (2)**
20:6,10
**allowance (1)**

**56:22**
**allowed (8)**
21:25;23:5,6;
27:14,21;51:14;
56:17,18
**allows (1)**
31:1
**Ally (7)**
5:11,11;9:16;
17:12;27:1;28:1;
62:12
**almost (5)**
46:13;50:10;51:5,
10;54:3
**along (3)**
9:8;21:21;54:16
**although (2)**
25:20;43:20
**amended (1)**
72:1
**Americas (1)**
4:14
**Among (4)**
27:5;40:4;64:1;
71:11
**amount (2)**
56:19;71:13
**analysis (2)**
27:24;37:12
**Analytically (2)**
17:17,19
**analyzed (1)**
19:19
**Angeles (1)**
6:6
**announcement (1)**
64:15
**answered (1)**
58:16
**apart (1)**
35:15
**apologize (2)**
41:11;60:12
**apparent (1)**
31:13
**appear (9)**
18:17;20:1,19;
21:8,25;23:1;26:9;
30:17;59:14
**appearance (1)**
67:19
**applauded (1)**
45:15
**apply (3)**
24:4;28:24;38:7
**appointed (5)**
50:5,6;55:10,10;
70:8
**appointing (1)**
69:24
**appointment (5)**
21:17,18,19;70:1;
73:15

**approach (2)**
14:7;32:1
**appropriate (8)**
21:15;40:22;41:20;
51:6;52:9;56:6;66:5;
69:16
**appropriately (1)**
52:1
**approval (5)**
10:14;21:24;35:11;
39:9;50:20
**approve (4)**
21:4;22:17;48:11;
69:3
**approved (14)**
10:8,16,23;11:11,
15;14:9,11;15:19;
24:14;26:14;50:21;
63:21;64:13,16
**approving (1)**
39:18
**approximately (1)**
61:18
**aptly (1)**
40:5
**areas (1)**
8:19
**arguably (1)**
17:1
**argue (6)**
24:1;29:6;44:19;
64:8,11;74:6
**argued (1)**
33:9
**argues (1)**
73:22
**arguing (3)**
11:17;19:18;74:7
**argument (8)**
14:24;16:17;28:22;
29:13;33:16;46:8;
49:24;74:3
**argument-in-chief (1)**
57:14
**arguments (6)**
26:20;35:6,23;
66:9,11;73:17
**arises (2)**
27:19;60:18
**arising (1)**
64:23
**arose (7)**
9:4;26:25;28:8;
29:3,4,6,8
**around (5)**
23:10;27:7;32:5;
42:15;61:12
**articulated (2)**
33:3;48:20
**aspect (1)**
11:14
**assert (1)**
41:3

**asserted (4)**
14:24;20:6,11;
40:14
**assertion (1)**
67:12
**assess (1)**
67:5
**assessment (1)**
40:14
**asset (1)**
17:12
**assets (5)**
9:21;47:14;68:11;
71:11,23
**assist (1)**
71:2
**asso (1)**
59:22
**associated (6)**
22:20;27:8,24;
32:19;71:20,21
**Associates (1)**
69:2
**attached (1)**
63:15
**attack (3)**
32:11;38:6,8
**attempt (2)**
12:10;37:16
**attempts (1)**
73:7
**attention (1)**
25:19
**attorney- (1)**
19:9
**Attorneys (8)**
4:13;5:3,11,19;6:3,
12,20;68:15
**attributing (2)**
24:9,10
**auditors (1)**
72:20
**Augie/Restivo (1)**
43:5
**authorize (1)**
68:7
**authorized (1)**
50:24
**automatic (1)**
29:23
**available (1)**
61:6
**Avenue (3)**
4:4,14;6:4
**avoid (14)**
11:18;16:5,8;
17:25;18:22;24:2,7;
32:19,24;33:17,21;
54:21,22;74:8
**avoids (2)**
18:11;71:9
**awarding (1)**
66:4

**aware (1)**
46:11
**away (4)**
17:22;32:7;34:25;
54:20

**B**

**back (5)**
10:24;34:17;37:9,
22;57:25
**bad (8)**
25:3;26:18,21;
28:20;58:11;65:9,18,
19
**baffling (1)**
47:10
**balance (3)**
34:12,13,15
**balances (8)**
32:9,21;37:10,13,
17;38:1;42:17,20
**Bank (3)**
5:11;6:20;66:18
**Bankr (9)**
66:23,24;67:6;
68:20;69:2,17;71:14;
72:11,18
**bankruptcy (21)**
17:2,21;18:12,17;
20:8,15;21:12;23:15,
19;24:5;35:9;66:12;
67:13;69:6,11,19;
70:3;72:3,4,21,25
**bar (1)**
40:13
**based (6)**
17:14;23:4;42:3;
53:4;56:16;72:8
**basic (2)**
16:3;43:25
**basically (2)**
48:5,6
**basis (8)**
15:1;19:22,24;
25:18;33:7;49:22;
68:13;73:12
**Battery (1)**
6:21
**battle (1)**
62:19
**bear (2)**
41:8;45:25
**became (2)**
46:13;55:11
**become (2)**
51:20;65:12
**becomes (1)**
51:22
**begs (1)**
17:24
**behalf (6)**
8:14;23:2,3;43:16;

52:19;54:16
**behind (5)**
31:22;39:5,9;
44:19;45:5
**believes (1)**
22:22
**belong (1)**
47:8
**bench (1)**
61:19
**beneficial (1)**
19:5
**benefit (7)**
10:18,19;16:13;
18:10;35:20;43:7;
73:4
**benefits (7)**
16:11,18,23;17:23;
18:21;22:23;71:17
**Bergrin (1)**
66:20
**Berkshire (1)**
6:3
**best (15)**
11:8,18,20;27:12;
33:8;36:17;38:6,22;
40:19;46:4;48:14;
64:12;67:22;74:7,10
**better (3)**
45:18;47:24,25
**beyond (1)**
70:21
**BH&P (1)**
68:15
**bias (1)**
67:15
**bifurcated (1)**
63:6
**big (1)**
57:3
**billion (5)**
20:20;23:9;40:19;
55:23,25
**bind (1)**
38:21
**BINDER (1)**
6:24
**binds (1)**
39:8
**bit (5)**
8:21;9:3;17:20;
20:7;30:3
**blessing (1)**
38:19
**blow (3)**
26:3;30:8;64:18
**blowing (1)**
26:12
**board (1)**
51:7
**bond (1)**
45:8
**bondholders (1)**

52:20
**bookkeeping (1)**
53:6
**bootstrap (1)**
16:21
**borrowers (1)**
45:7
**both (6)**
17:24;27:20;56:23;
59:4;61:5;70:24
**bounds (2)**
50:14,18
**BR (16)**
66:23,24;67:6,16,
17,20;68:1,5,19;69:2,
17,17;70:15,25;
72:17,18
**BRIAN (1)**
4:20
**brief (3)**
8:17;49:25;52:20
**bring (3)**
25:18;51:20;60:12
**bringing (3)**
26:2;72:15,24
**brings (2)**
40:18;55:23
**broken (3)**
14:4,17;61:3
**broker (1)**
23:24
**brought (7)**
8:7;9:5;25:7,11;
26:25;29:5;72:9
**Brussels (1)**
66:18
**bsj (1)**
72:12
**Burd (1)**
7:3
**burden (5)**
11:19;32:19;53:25;
54:3;74:8

**C**

**CA (1)**
6:6
**call (1)**
54:23
**called (3)**
53:8,11;55:9
**calls (1)**
58:2
**came (6)**
20:5;25:5;28:17;
38:17;42:2;53:4
**can (21)**
11:8;14:25;15:2;
16:11;22:19;23:23,
24;24:23;30:23;
32:12;34:22,23;
35:20;41:24;48:5,6,8,

13;57:18,21;71:1
**cancel (2)**
26:4;30:10
**canceled (2)**
12:7;29:14
**capacity (3)**
53:20,23,24
**Capital (3)**
8:3;42:15;46:5
**careful (1)**
39:21
**Carpenter's (1)**
45:5
**carry (1)**
54:3
**CASE (63)**
4:12;8:14,25;
13:15;17:1,2,3;18:8,
14;21:8;23:15,17,20;
24:11,12;25:6;27:18;
28:3,5;31:25;33:1;
37:2,7,12,15,22;39:1;
44:2,3,4,7,12,13,15,
20;45:1,20,22;46:12;
48:1,8;49:3,4,9;
51:15;52:12;56:1;
62:22;63:13;64:18,
21;65:6,20;66:8;
68:25;69:6,10,12;
70:2,4,6;72:14,17
**cases (17)**
21:12,21;23:14,18;
27:19;28:4;29:9;
32:2;37:5,8;43:5;
49:25;63:5;69:13;
70:12,14;73:2
**cash (4)**
32:22;45:17;47:5,
23
**cause (1)**
72:16
**causes (3)**
13:24;15:3;22:3
**causing (4)**
8:23;15:18;16:5;
22:6
**CC (1)**
2:2
**cents (1)**
53:21
**certain (3)**
21:13;62:11;70:19
**certainly (2)**
26:8;49:21
**challenge (2)**
23:5;32:7
**change (1)**
9:21;21:22
**Chapter (10)**
27:24;48:6;69:24;
70:6,11,12;71:5,15;
72:2;73:2
**charges (2)**

9:1;16:6
**Charter (3)**
51:4,10,11
**Chase (1)**
5:4
**Chicago (1)**
5:13
**chief (1)**
65:24
**choice (1)**
11:2
**Chris (1)**
8:13
**CHRISTOPHER (1)**
4:17
**Cir (3)**
66:20;68:12,16
**Circuit (2)**
25:5,23
**circumstances (4)**
20:17;21:23;26:21;
69:15
**cite (1)**
43:5
**Civ (2)**
66:21;72:12
**claim (30)**
14:24;15:2;17:10,
12,15,22;18:3,5,7;
19:15;20:18;23:3;
34:3,17,18,20;36:4,5,
7,16;44:12,13;53:1,5,
22;56:16;57:20;
62:25;68:21;69:7
**claimant (1)**
67:14
**claimants (3)**
45:3,5;52:2
**claiming (3)**
19:15;20:20;59:24
**Claims (146)**
2:7;9:15,16,16;
11:13,17,19,22,23,
24;12:6,9,12,16,20,
23;13:1,3,3,11,17,22;
14:2,6,15,21,25;15:6,
13,21;16:2,9,10,12;
17:14;18:18;19:4,16;
20:2,5,6,11;21:7;
22:11,11,16;23:11;
24:2,7;26:5;27:5,9,
14,18,21,22;28:5,12;
29:14,15;30:12,18;
31:3;32:14,17;33:5,7,
13,19,24;34:5,9;35:1,
5,7;36:6,12;37:17;
39:17;40:14;41:1,7;
44:11,16;46:2,9,17,
23;47:1,2,3,8,19;
48:2,7,10,12,14,17,
22,23;49:1,10,17;
50:8;51:12;52:4,8,
24;53:8,13;54:2;

55:1;56:14,16,17,18,
19,21;57:13,17;59:3,
21;60:14;61:13;62:2;
64:3,24;65:25;68:11,
13;69:6;71:6,12,13,
16;72:7;73:12,21,23,
24;74:5,6,9,13,15
**clarified (1)**
30:11
**clarify (1)**
56:11
**class (2)**
45:6;67:3
**classes (1)**
71:8
**clear (15)**
12:5;16:1;27:7,19;
31:13;33:23;39:22;
46:13;47:17;58:10;
59:5;64:22;65:1;
70:3;73:9
**clearer (1)**
74:4
**clearly (8)**
10:18;13:8;20:9,
10;25:21;29:3;49:20;
50:5
**CLEARY (1)**
5:18
**client (7)**
16:18;17:1,2,18,
18;19:10;54:17
**clients (1)**
55:12
**close (1)**
25:9
**closely (2)**
20:16;26:1
**cloth (1)**
46:21
**Co (1)**
68:12
**Coan (1)**
66:18
**C-O-A-N (1)**
66:19
**Code (3)**
66:12;70:4;72:3
**cognizant (1)**
8:16
**collateral (7)**
12:13;15:4;29:22,
23;45:25;47:8;54:1
**colleague (1)**
63:9
**coming (2)**
23:13;34:17;56:2
**comment (1)**
44:9
**comments (2)**
37:3;43:17
**commit (1)**
38:21

**committed (1)**
54:9
**Committee (31)**
2:5;4:3;10:17;
11:9;12:15;15:10;
19:3;26:10;39:12;
43:16;44:10;45:4,19,
21;49:22,24;52:1,11;
54:6;55:15;56:24;
58:3;60:22;61:25;
62:11,20;63:3;64:11;
65:23;73:7;74:4
**committee's (2)**
17:3;74:2
**common (1)**
69:15
**Communications (1)**
69:16
**company's (1)**
46:5
**compel (1)**
44:5
**compensate (1)**
12:13
**complaint (2)**
20:3;53:2
**complete (1)**
40:4
**completely (1)**
52:22
**complex (6)**
12:25;39:1;40:22;
49:4;51:14;63:13
**complicated (1)**
22:21
**component (1)**
55:22
**components (1)**
56:3
**comprehensive (2)**
44:17;45:10
**compromise (2)**
32:9;71:17
**concede (1)**
41:15
**concept (2)**
26:23;37:19
**concerned (3)**
29:12;59:16;67:19
**concerns (2)**
8:20;38:12
**concluded (3)**
65:20;69:9;74:24
**conclusion (1)**
73:16
**conclusions (1)**
71:25
**conduct (2)**
24:21;65:13
**conducted (2)**
57:8;63:9
**conference (4)**
31:21;40:12;43:23,

23
**confidential (1)**
63:18
**confirm (2)**
48:25;49:6
**confirmable (2)**
37:11;40:6
**confirmation (47)**
10:7,9,25;11:1,10,
12,21;12:5,6,9;13:14,
23;15:11,16;18:2;
19:23;20:1;21:23;
22:5,6,8,25;23:18;
26:16;29:20;30:12,
17;33:19,24;34:7;
36:3;38:8;39:17;
40:21;43:9;47:18;
48:8,17,23,24;49:16;
55:13;57:12;64:14;
65:14;73:11;74:10
**confirmed (3)**
9:14;71:5,15
**confirming (1)**
72:1
**conflict (45)**
10:2;16:5,20,21,22,
22,25;17:21,22;
18:12,14;20:9,18,24,
25;21:3;22:14;23:12;
24:1,1,3,7,13,15;
26:25;27:5,19;29:2,3,
6,8,10;37:20;38:9,11;
39:7;44:2;51:2;
53:17,18;67:5,21;
68:8,22;73:14
**conflicting (1)**
59:25
**Conflicts (13)**
4:3;9:12,13;10:13;
11:2;22:1;23:15,23;
25:22;38:16;44:20;
56:5;66:13
**conjunction (1)**
66:25
**connection (14)**
10:15;14:20;18:20;
21:6;22:13;30:4;
47:18;48:23,24;
49:13;50:19,22;
59:22;72:22
**consensus (1)**
44:21
**consenting (3)**
22:9;52:2;62:11
**consents (1)**
21:5
**consequence (1)**
21:13
**consequences (1)**
42:9
**conserve (1)**
68:11
**consider (3)**

49:13;51:7;52:5
**consideration (1)**
65:19
**considered (2)**
51:15;66:11
**consistent (2)**
40:15;63:14
**consolidate (1)**
35:2
**consolidated (1)**
63:5
**consolidation (2)**
34:23;49:9
**constantly (1)**
11:3
**constituencies (1)**
42:23;63:13
**constituency (2)**
45:1;70:7
**constitute (1)**
68:21
**construct (2)**
9:11;29:17
**Construction (4)**
67:6,16,20;68:5
**constructive (1)**
43:20
**consuming (1)**
22:21
**contained (1)**
67:1
**contains (2)**
19:5,11
**contends (1)**
62:23
**context (12)**
15:25;17:19;19:9;
23:15,16;25:10;
27:18;28:3;44:17;
51:6;61:10;64:25
**continue (3)**
43:20;49:18;71:2
**continued (1)**
66:15
**contrary (3)**
19:11;67:22;70:3
**contribution (3)**
17:13;55:22;74:16
**control (1)**
39:12
**controversy (1)**
70:25
**conversation (1)**
58:6
**convert (1)**
48:6
**conveyances (1)**
23:8
**co-proponents (8)**
33:4,10,11,18;
36:5;52:2;59:5;73:10
**Corp (6)**
66:19;67:10,15;

69:16;72:3,10

**cost (3)**
11:18;32:19;74:8

**costs (3)**
71:18,18,22

**Counsel (32)**
2:4,5;4:3;17:3,4;
20:5,10,12,12;21:17;
23:4,22;31:15;33:1;
59:25;61:24,25;
64:17,19;65:8,22,22;
66:13;68:24;69:11,
23;70:16,24;71:1;
72:7,15;74:3

**couple (1)**
56:12

**course (2)**
39:10;42:5

**COURT (160)**
8:2,11,15;9:8;
10:15,21;11:4,4,6,13,
16;12:1,11,15,18,22;
13:12;14:3,13,18,19;
15:12;16:16,18,24;
17:21;18:9,11,12,14,
17;19:8;20:8;21:2,3,
4,7,24;22:18;23:5,19;
24:5,6,11,15,20;
25:10,14,25;26:7,15;
28:17,18,24;29:1,5,7,
8;30:15,22;31:5,9;
32:12,13;33:2,12;
35:9,12,14,22,24;
36:1,22;38:3,17;
39:10,15,16;40:23;
41:10,13,21;42:7;
43:13;44:23;46:10,
19,24;48:15,16;
49:13;50:21,22,23,
24;51:3,11,25;52:3,5,
15;54:12;55:2,5,7;
56:7;57:9,11,16,22,
24;58:5,7,10,13,16,
19,21,24;59:1,9,13,
15;60:1,3,9,11,18,23,
25;61:2,14,17,21,22;
63:21;64:16,22;65:1,
2,18,25;66:5,8,11;
68:6;69:1,3,9,19,21;
71:1,5,15;72:4,6;
73:23;74:2,4,23

**courts (5)**
20:17;23:21;51:14;
68:6;72:8

**Court's (3)**
25:19;32:7;70:3

**cover (2)**
8:19;36:24

**covered (1)**
40:3

**create (2)**
44:1;67:13

**created (1)**

10:13

**credible (1)**
26:20

**creditor (21)**
16:25;17:2;20:11,
12;27:25;28:7;29:11;
42:23;45:7;51:9;
53:19,20,25;54:6,8;
63:12;69:6,10;70:7,
14;71:3

**creditors (32)**
8:22;9:22;10:7,19,
20;17:5;22:9,17;
23:20;28:2;33:8;
35:10,12,15;40:20;
44:23;45:9;47:25;
53:14,19,23;54:17;
55:13;56:1;62:12;
64:13;67:4,23;71:8,
17;72:22;73:2

**Creditors' (6)**
4:3;43:16;54:6;
62:20;64:11;71:24

**creditor's (1)**
69:6

**critical (1)**
69:8

**critically (1)**
56:4

**CRO (4)**
31:14;37:24;50:6;
64:19

**current (1)**
64:18

**currently (3)**
37:14;62:23;64:23

## D

**date (3)**
45:18;56:22;61:9

**DAY (6)**
6:11;16:13;43:4;
45:22;46:14;54:16

**day-one (1)**
37:8

**dead (1)**
39:1

**deal (13)**
9:6;10:22;13:13;
24:11;26:15;28:19;
29:5;36:15;43:19;
58:7;60:2,4,19

**dealing (1)**
43:24

**dealt (2)**
23:14;51:3

**debt (7)**
27:21;34:17,20,22;
35:6;36:16;47:14

**debtor (17)**
16:25;20:7;21:24;
43:7;50:24;51:9;

52:1,11;53:4;55:14;
69:5,8,9,22;70:18,19;
72:6

**Debtors (56)**
2:8;8:5,8;10:17,22;
11:9;12:16,15;9;
17:6,8;19:14;21:6;
22:13;23:22;24:10;
26:10;27:12,15;
29:21;30:3;31:11,13,
20;32:12,15;35:5;
36:3;37:1,24;38:21,
21;39:8,13;40:4,19;
43:6;44:10,13,16;
51:8;58:2;60:21;
62:3,10,20;63:3;
64:10;66:1;68:10,25;
70:9;72:2;73:22;
74:3,6,13

**Debtors' (28)**
2:4,6;15:17;17:3;
31:14,14;36:18;37:6;
42:15;54:7;61:24;
62:1;64:12,19;65:12,
15,22,23;70:16,24;
71:1;72:20,21,25;
73:1,4,20;74:1

**debtor's (2)**
51:7;69:25

**December (2)**
50:5;66:21

**decide (1)**
74:19

**decided (2)**
32:6;38:6

**deciding (1)**
28:19

**decision (3)**
26:17;32:8;53:6

**declaration (2)**
58:5;62:7

**declined (1)**
65:11

**deems (1)**
66:5

**defense (2)**
25:22;30:6

**defensive (1)**
29:24

**defer (1)**
65:18

**deficiencies (2)**
18:4;36:5

**define (1)**
9:10

**defined (1)**
56:17

**defining (2)**
8:7,19

**definitely (1)**
14:10

**definition (1)**
66:25

**definitively (1)**
59:1

**delay (2)**
72:15,24

**delayed (2)**
9:2;73:4

**delays (1)**
71:21

**demonstrate (3)**
38:15;40:21;47:23

**denied (6)**
20:5;50:3;62:18;
72:8;73:6;74:20

**denies (1)**
20:10

**DENMAN (1)**
4:18

**deny (1)**
23:25

**Denying (3)**
72:14,19;74:21

**depending (2)**
9:19;27:9

**depletion (1)**
71:23

**derail (3)**
13:15;64:20;65:14

**described (1)**
59:7

**describing (1)**
38:12

**description (1)**
36:11

**designed (2)**
35:20;45:14

**destructive (1)**
70:11

**determination (9)**
11:12;14:1,5;16:1;
26:8;30:5;63:4;
67:18;73:23

**determinations (1)**
31:2

**determine (1)**
74:5

**determined (1)**
18:15

**detriment (1)**
43:7

**devolve (1)**
49:6

**different (15)**
11:24;13:3,19;
17:20;26:13;32:16;
34:4;38:2;40:14,15;
46:15;49:7;68:25;
69:13;71:12

**differently (1)**
71:8

**differing (1)**
71:7

**diligence (2)**
27:6;71:19

**diminution (1)**
15:3

**dire (1)**
10:5

**direct (2)**
56:12;63:10

**Directing (4)**
2:3;61:24;65:21;
69:25

**directions (1)**
40:15

**directly (2)**
57:16;61:6

**directors (1)**
70:1

**disabling (1)**
67:21

**disagree (6)**
12:1,3;14:3;23:1;
25:4;48:15

**disagreement (1)**
57:10

**disagrees (1)**
18:9

**disappear (2)**
49:10,10

**disappointing (1)**
43:21

**discharge (3)**
26:4;28:13;30:10

**discharged (4)**
12:7;29:15;34:1;
39:24

**disclose (1)**
19:1

**disclosed (2)**
21:2,3

**disclosure (23)**
19:2;22:14;23:10;
29:8;30:3;31:1;
34:12;36:10,13;37:1,
7,14;39:21;40:24;
41:1,5;55:24;60:6,11,
13;61:10,10,12

**discovery (8)**
18:22;30:6,7;
43:23;59:22;60:4,18;
61:9

**discuss (2)**
8:23;20:23

**discusses (1)**
60:14

**discussing (1)**
60:13

**discussion (1)**
22:4

**discussions (2)**
12:4;27:15

**disfavored (1)**
25:25

**disingenuous (1)**
46:4

**disinterested (2)**

RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020-mg

July 30, 2013

66:18;67:1
**disinterestedness (1)**
  10:3
**Dispute (11)**
  2:7;9:25,25;12:23;
  27:20,20;47:10;62:2;
  65:25;67:14;73:19
**disputed (2)**
  64:8;69:7
**disputes (12)**
  9:13,19;12:25;
  27:7;33:6;60:4;
  69:14;70:6,20,22,23;
  71:7
**disputing (1)**
  9:23
**Disqualification (15)**
  2:8;21:14,16;
  39:12;50:18;52:11;
  62:3;66:2;68:23;
  72:8,14,20,24;73:3,9
**disqualified (3)**
  49:24;50:14;70:17
**disqualify (2)**
  64:19;72:15
**disruption (1)**
  72:16
**disruptive (1)**
  73:1
**distinction (1)**
  73:7
**distinguish (1)**
  20:23
**distributable (3)**
  9:20;27:9;28:11
**distribute (1)**
  9:22
**distributed (1)**
  56:1
**distribution (1)**
  29:16
**distributions (1)**
  71:25
**District (3)**
  32:3;69:20;72:4
**divided (1)**
  17:1
**DLA (4)**
  16:17,19;69:4,10
**Doc# (1)**
  2:2
**docket (9)**
  62:8,10,11,12,13,
  15;69:20,21;72:5
**document (4)**
  19:10;28:9;41:4;
  57:18
**documentation (3)**
  32:22;34:14,19
**documented (1)**
  34:13
**dollar (1)**
  53:21

**dollars (5)**
  20:20;23:9;40:19;
  55:24;56:1
**done (4)**
  16:14;21:21;27:6;
  36:13
**door (5)**
  34:9,22,22,23;
  42:24
**do-over (1)**
  18:10
**down (2)**
  31:4;33:14
**drafting (1)**
  39:21
**during (3)**
  31:21;33:15;42:5;
  57:14;74:3
**duties (7)**
  17:1,4,5;40:16;
  54:8;68:3,4
**duty (2)**
  54:5,7
**dwell (1)**
  13:20
**DWIGHT (2)**
  4:19;62:7

# E

**earlier (1)**
  29:7
**earliest (1)**
  27:1
**early (2)**
  27:10;63:7
**East (1)**
  6:13
**easy (1)**
  26:7
**ECF (7)**
  62:6,8,10,11,12,12,
  15
**Eckstein (14)**
  43:14,15,16;44:24;
  46:18,20,24,25;
  48:19;52:15;56:14;
  57:11,15;61:5
**economic (1)**
  67:12
**economy (1)**
  68:18
**Eerie (1)**
  66:20
**effect (5)**
  36:13;39:24;43:8;
  70:11,14
**effective (1)**
  45:18
**effectively (3)**
  43:1;55:9,14
**Effectuate (3)**
  2:9;62:4;66:3

**efficiency (1)**
  68:19
**effort (1)**
  49:16
**eg (1)**
  72:10
**either (4)**
  43:22;51:23;67:11,
  22
**element (1)**
  43:2
**elements (1)**
  24:22
**eliminated (1)**
  71:6
**ELLIS (1)**
  5:10
**else (10)**
  22:9;30:23,24;
  42:14;52:16;54:13;
  56:8;59:23;61:14,16
**embark (2)**
  38:25;39:10
**embodied (2)**
  39:14,19
**embodies (2)**
  11:21;74:11
**emergence (3)**
  72:21,25;73:3
**eminently (1)**
  47:17
**emphasize (1)**
  70:18
**employment (2)**
  66:15;68:7
**end (4)**
  10:5;16:12;23:11;
  43:4
**end-run (1)**
  32:5
**enforce (1)**
  37:17
**enforcement (1)**
  71:11
**engage (2)**
  58:3;63:24
**engaged (3)**
  10:24;58:3;62:19
**English (1)**
  41:21
**Enron (4)**
  71:15;72:3,10,12
**ensure (1)**
  68:3
**enter (3)**
  38:19,20;43:6
**entered (3)**
  10:8;55:17;74:21
**enterprise (1)**
  9:21;28:12
**entertain (1)**
  13:19
**Entertainment (1)**

66:20
**entire (3)**
  30:25;35:19;64:18
**entirely (2)**
  37:21;40:15
**entities (1)**
  71:11
**entitled (5)**
  15:4;47:7,9;63:1;
  64:6
**entity (1)**
  17:11
**Entry (2)**
  2:3;61:23;72:5
**equal (1)**
  56:19
**equally (2)**
  34:16,16
**equity (4)**
  23:7;27:22,23;67:4
**error (1)**
  53:6
**eScribers (1)**
  2:21
**ESQ (14)**
  4:8,9,17,18,19,20;
  5:7,15,23,24;6:8,16,
  24;7:6
**essence (1)**
  32:20
**essentially (2)**
  33:3;59:11
**establish (2)**
  11:4;30:22
**established (1)**
  25:2
**establishes (1)**
  34:3
**estate (20)**
  9:24;10:1,18;
  11:20;19:6;20:11;
  21:10;27:10;48:6;
  66:14,17;67:3,9,13,
  14,15,23;68:4,11;
  74:14
**estate-by-estate (1)**
  19:20
**estates (39)**
  8:22;9:12,14,21,
  22;10:5,6,9,14,19;
  11:5,18;16:11;18:19;
  20:22,25;21:25;22:2,
  15,23,23;33:8;35:3,
  20;36:18;38:23;40:5,
  13,20;54:8,8;64:12;
  68:14,17,18;71:22;
  73:5;74:8,10
**estates' (1)**
  71:23
**ethics (1)**
  10:3
**euphemistically (1)**
  41:6

**eve (2)**
  72:21,25
**even (11)**
  9:25;16:20;19:10;
  23:6,7;49:23,25;53:3,
  5,14;68:10
**event (2)**
  47:12;48:11
**everybody (5)**
  16:13,18,23;18:10;
  40:17
**evidence (6)**
  12:9,15;18:3,21;
  36:3,4
**exactly (5)**
  12:18;17:17;22:19;
  43:12;46:4
**examiner (1)**
  21:18
**example (5)**
  17:9;18:3,25;
  24:21;34:10
**except (1)**
  53:10
**exception (1)**
  44:25
**excuse (3)**
  69:20
**exist (3)**
  44:2;68:11;70:6
**existed (3)**
  46:22;56:5;69:14
**existence (4)**
  18:5;27:4;68:13,20
**exists (5)**
  17:21;21:1;24:1;
  38:9,11
**expected (2)**
  18:7;55:25
**expedited (1)**
  66:7
**expense (1)**
  68:14
**expenses (1)**
  9:17
**expensive (3)**
  33:6;39:1;64:9
**experience (1)**
  37:15
**explain (1)**
  62:16
**explainable (1)**
  15:23
**explained (1)**
  74:18
**explanation (2)**
  16:3,6
**explanations (1)**
  16:7
**express (1)**
  39:16
**expressly (1)**
  65:20

**extend (1)**
17:5
**Extent (8)**
2:9;9:24;15:17;
19:13;41:24;61:11;
62:4;66:2
**extraordinary (1)**
45:18

**F**

**F2d (2)**
68:12,15
**F3d (3)**
66:19;67:10,16
**face (1)**
39:22
**faced (1)**
51:10
**facilitator (1)**
71:2
**fact (27)**
11:13;14:1,21;
15:12;16:2;19:16;
22:12,25;25:12,12,
23;30:8;34:14;36:10;
37:2,9,21;39:5;40:6;
44:9;46:22;47:13;
49:5;50:4;56:15;
71:25;72:9
**factors (1)**
49:13
**facts (2)**
42:3;71:19
**factual (5)**
15:5,12;30:11;
33:12;53:1
**fails (1)**
48:12
**failure (1)**
12:18
**failures (1)**
37:7
**fair (8)**
22:14;25:1;27:20;
36:10;40:17;52:9;
64:11,24
**fairly (2)**
31:17;36:10
**faith (9)**
25:3;26:18,21;
28:21;58:5,11;65:9,
18,19
**falls (1)**
34:25
**familiar (1)**
29:17
**far (5)**
29:12;45:18;49:11;
59:16;68:25
**fashion (1)**
45:14
**February (2)**

50:6;72:13
**federal (1)**
35:8
**fees (3)**
63:2;64:6;71:20
**FEINSTEIN (1)**
4:9
**few (1)**
9:18
**FGIC (2)**
6:12;54:16
**fiduciaries (3)**
18:16;70:2,8
**fiduciary (12)**
10:3;16:4;17:4,5;
22:23;31:16;38:16;
40:12,16;54:5,7;68:4
**fifth (1)**
72:1
**fifty-one (5)**
21:17;35:4,5,5,6
**fifty-plus (1)**
73:15
**fight (1)**
48:7
**fighting (2)**
14:21;35:7
**file (1)**
63:8
**filed (24)**
24:18,22;25:3;
26:11,18,19,20;
27:11;28:20;31:17;
37:14;38:5;45:20;
53:2;54:17;58:2,5;
62:9,14,23;63:3;
65:18,19;66:10
**Filing (6)**
27:3;37:11;65:7,9,
13,17
**filings (1)**
38:3
**Financial (2)**
5:11;62:12
**find (2)**
43:20;70:16
**finding (17)**
14:20;15:5,12;
30:12;32:13;33:4,12;
39:16,23;48:16;
52:24;57:12,20;59:2,
3,6,20
**findings (5)**
12:6;38:18,24;
39:4;71:25
**fine (1)**
14:8
**firm (3)**
68:10;69:5,15
**First (8)**
41:4;42:12,18;
45:22;46:14;52:22;
55:17;56:11

**first-phase (1)**
63:6
**five (3)**
36:19,24;50:10
**fix (1)**
28:10
**Floor (2)**
4:5;6:5
**flout (1)**
23:24
**focus (2)**
36:7;37:6
**Foerster (11)**
2:4;8:5;19:2;
20:19;21:5;27:3;
31:11;40:25;41:5;
61:25;65:22
**follow (1)**
62:17
**followed (1)**
65:6
**following (3)**
23:21;62:9;71:10
**follow-on (1)**
34:8
**follows (2)**
17:8;73:16
**force (1)**
42:22
**Foregoing (4)**
2:9,10;62:4,5
**foreseeable (1)**
73:4
**forget (1)**
45:21
**forgiveness (5)**
34:17,20,22;35:6;
36:16
**forgoing (2)**
66:2,3
**form (2)**
9:15;34:14
**former (1)**
12:4
**formulation (1)**
52:23
**forth (2)**
10:25;54:9
**forthright (1)**
37:1
**forward (5)**
12:18;13:20;18:2;
50:24;52:13
**foster (1)**
25:19
**found (2)**
69:14;70:21
**fourteen (3)**
31:25;37:22;43:2
**framed (1)**
57:14
**frank (1)**
38:4

**Frankel (2)**
2:6;62:1
**frankly (7)**
12:17;31:19;43:21,
25;49:17;50:11;
51:18
**fraudulent (1)**
23:8
**free (1)**
66:13
**Friday (1)**
62:9
**FRITZ (1)**
4:20
**front (1)**
19:7
**frowned (1)**
72:16
**frustrating (1)**
47:11
**fulfils (1)**
68:3
**full (8)**
22:14;50:10;53:21;
55:5;56:16,18,20;
70:7
**fullness (1)**
35:16
**fully (2)**
21:2,3
**Funding (1)**
17:9
**funds (1)**
65:10
**further (3)**
31:4;66:4;68:6
**future (1)**
65:2

**G**

**game (2)**
9:23;54:24
**Gary (2)**
8:4;31:10
**gating (1)**
37:10
**gave (3)**
23:3;41:23;59:24
**gavel (1)**
11:6
**general (2)**
69:11,18
**generally (1)**
72:16
**generous (1)**
35:18
**GERARD (1)**
5:7
**Gerber (5)**
55:9;69:13,24;
70:16,21
**giant (1)**

19:16
**given (8)**
8:25;20:17;23:18;
28:21;36:14,14;38:6;
41:18
**global (47)**
10:8,10;11:6,11;
16:14;17:13,23;18:9,
21,23;19:11,22,24;
22:18,19;26:3,3,
28:10;29:19,20;30:8,
9;32:8,8;34:1,2;
39:25;40:18;43:8;
44:4,17,21;46:7;47:2,
20,22;48:11;50:25;
51:4,12;52:7;55:11,
23;56:3;57:17;68:19;
71:16
**goes (2)**
37:22;40:10
**Good (11)**
8:4;10:10;16:20;
18:20;22:18;31:10;
40:18;43:15;52:18;
58:5;59:7
**GOTTLIEB (1)**
5:18
**Grand (1)**
6:4
**Granite (4)**
37:6;66:23;67:17;
68:1
**granted (1)**
31:24
**Granting (3)**
2:10;62:5;66:3
**greatest (1)**
15:24
**Greene (1)**
20:16
**ground (4)**
11:5;25:1;30:22;
64:24
**grounds (1)**
19:7
**Group (40)**
2:2;4:13;5:3;8:7,
14;14:19;31:23;32:1;
37:6,23;38:6;40:2;
42:11;55:13,20;57:1,
2;61:23;62:14,19;
63:16,17,19,23;
64:17,20;65:5,8,10,
16,21;66:4;67:6,16,
20;68:5;73:9,13,21;
74:12
**groups (1)**
71:3
**group's (3)**
63:22;73:17,19
**Growth (1)**
69:19
**guarantees (1)**

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

July 30, 2013

49:9
**guess (2)**
16:6;42:14
**guided (1)**
36:8

# H

**HADLEY (1)**
5:2
**hallmark (1)**
40:8
**hallmarks (1)**
44:20
**halt (1)**
55:9
**HAMILTON (1)**
5:18
**hamstring (1)**
73:10
**hand (2)**
25:11;57:10
**handling (1)**
11:2
**happen (1)**
39:2
**happening (1)**
44:6
**happy (2)**
9:8;37:2
**hard (1)**
47:13
**harm (2)**
10:19,19
**harming (1)**
53:22
**HARRISON (1)**
4:18
**Hathaway (1)**
6:3
**HEALY (2)**
4:19;62:7
**hear (3)**
8:15;9:5;32:8
**heard (10)**
18:1,17;20:1,19;
21:9,25;23:2;30:17;
44:8;50:22
**hearing (2)**
42:3,5
**heart (2)**
40:10;73:18
**hedge (1)**
65:10
**held (1)**
69:24
**helpful (1)**
38:14
**hereby (1)**
21:4
**hiding (1)**
39:5
**highly (1)**

70:11
**hindered (1)**
73:3
**hinge (1)**
24:25
**hits (1)**
11:6
**Hoc (42)**
2:2;4:13;5:3;8:7,
14;14:19;31:23;37:6,
7,23;38:6,17;39:11;
40:2;42:10;45:19,21;
55:20;57:1;61:22;
62:14,19;63:16,17,
19,22,23;64:17,20;
65:5,8,10,16,21;66:4;
73:6,9,13,17,19,21;
74:12
**hold (1)**
66:16
**HoldCo (1)**
45:8
**HoldCos (1)**
45:9
**holders (2)**
42:13;67:4
**holding (1)**
68:20
**holds (1)**
67:8
**honest (1)**
23:24
**Honor (79)**
8:4,5,12,13;14:12,
17;19:8;28:1;30:7;
31:4,10,12,17,20,24;
32:5,6,15,24;33:22;
34:4,8;35:8,10,19,25;
36:8,20,23;37:5,12,
19;38:4,7,10,15,24;
39:2,4,11,20;40:1,10,
21;41:8,15;42:8,22;
43:3,4,8,10,11,15,22,
22;44:25;45:10;
46:18,20;47:17;
48:11,20,25;49:19;
51:1;52:18,22;53:2,
16;54:11,15,16,20;
55:8,16;56:6,11;
61:16
**Honorable (1)**
63:10
**Honor's (2)**
8:24;38:19
**hope (3)**
31:17;43:11;57:5
**hundred (1)**
53:21
**hundreds (2)**
32:20;74:9

# I

**Id (2)**
68:8;71:4
**idea (1)**
41:16
**ii (2)**
2:8;62:3
**iii (2)**
2:10;62:5
**IL (1)**
5:13
**imagine (1)**
18:13
**impact (2)**
38:13;51:8
**impermissible (1)**
68:22
**impermissibly (1)**
73:22
**import (2)**
31:23;56:24
**important (2)**
55:19;58:22,24;
61:4;66:6
**importantly (1)**
70:13
**imposed (2)**
21:20;24:23
**imposes (1)**
66:14
**imposition (1)**
70:9
**impossible (1)**
54:3
**improper (5)**
24:22;25:7,11;
26:11;49:21
**impropriety (1)**
67:19
**inappropriate (1)**
73:25
**Inc (9)**
5:11;6:3;62:12;
68:15,19;69:19;
71:13;72:17,18
**incentive (2)**
67:22,24
**include (1)**
54:1
**included (3)**
38:1;50:25;55:21
**includes (2)**
52:7;67:2
**Including (14)**
2:4,5;13:18;32:9;
36:15;37:6;50:7;
52:8;61:24,25;64:10,
23;65:23;71:18
**inconsistent (2)**
9:3;37:21
**increased (1)**
68:18
**indeed (2)**
34:11;40:6

**independent (3)**
42:2;70:1,8
**indicated (4)**
38:7;40:24;41:3;
60:5
**individual (8)**
21:10,24;22:2;
32:21;51:9,9;70:9;
72:6
**individualized (1)**
20:4
**individually (1)**
19:19
**ineluctable (1)**
73:16
**information (3)**
19:5,11;53:4
**informed (1)**
53:6
**initial (1)**
66:15
**insistence (2)**
15:15;22:5
**insolvency (1)**
28:5
**inspection (1)**
25:9
**instance (1)**
23:2
**instead (2)**
10:24;28:17
**instructive (1)**
69:12
**insurers (1)**
42:14
**integral (1)**
47:19
**intend (3)**
10:25;11:1;41:3
**intends (2)**
65:18;73:10
**intensive (1)**
55:1
**intent (1)**
44:5
**inter (1)**
71:17
**intercompany (121)**
9:15;11:13,17,19;
12:6,9,16,20,23;13:1,
11,16,22;14:1,14,20,
25;15:6,13,20;16:9,9,
12;17:10;18:18;19:4,
15;20:2,5;21:7;
22:11,16;23:11;26:5;
27:5,8,16,17;28:5,12;
29:14,15;30:12,18;
31:3;32:9,14,17,21;
33:5,19,23;34:9,11,
13,15,18;35:1,5;36:6,
12;37:10,13,17;38:1;
39:17;41:1,7;42:17,
20;44:6,8,11;46:2,9,

16,23;47:3,8,19;48:2,
7,10,12,14,17;49:7,
10,17;50:7,8,11;51:4,
12;52:4,8,24;53:13;
55:1;56:13,17,18,21;
57:13,17,20;59:3;
60:14;61:12;68:10,
13,21;71:6,12,13,16;
73:21,23;74:6,9,13
**intercreditor (2)**
33:13;70:20
**interdebtor (19)**
9:17,24,25;10:13;
11:2;12:1,11;23:15,
23;44:10;64:3,24;
69:14;70:5,22,23;
72:7;73:12;74:5
**interest (19)**
21:9;35:17;47:15;
53:13,13;62:25;63:2;
64:6;66:13,17;67:3,9,
11,12,18;68:8,22;
72:23;74:10
**interested (1)**
29:9
**interesting (1)**
34:16
**interests (14)**
11:18,20;23:19;
33:8;36:18;38:22;
40:4,19;42:16;51:16;
64:12;67:23;73:2;
74:7
**interim (1)**
29:20
**International (1)**
68:12
**interrupt (1)**
28:18
**interviews (1)**
18:6
**into (17)**
11:3;16:21;17:10;
18:3;21:18;23:4,25;
24:3;27:6;28:4;
31:25;38:19,20;43:6;
49:6;57:5;72:14
**invade (1)**
41:25
**involve (1)**
44:12
**involved (3)**
15:17;33:1;55:16
**involves (1)**
44:4
**involving (1)**
51:11
**issue (52)**
8:20;10:9,23;
12:10;13:10,14,16,
22;14:14,18;15:11,
15,20,22;16:24;
19:23,25;22:2,5;

12-12020-mg    Doc 4452    Filed 07/31/13    Entered 08/01/13 09:58:31    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg                Pg 84 of 92                    July 30, 2013

23:16;25:6,8,15,18;
27:3,5,20;28:8,20;
33:15;35:7;37:10;
42:23,25;43:10,25;
49:12;50:19;52:23;
56:21;57:11;58:10;
59:16,21;60:17,18,
20;64:14;65:17,20;
69:1;74:3
**issues (49)**
9:17,20;14:10;
18:23;19:4;22:14,22;
24:19;25:1;26:13,15,
22;28:15;32:10;
36:11,14,19;37:25;
38:1;40:8,22;41:18;
43:25;44:6,8,11,15;
49:3,7,15,16;50:7,11;
51:4,24,24;52:14;
54:10;58:7;61:11;
63:6;64:8,23;65:1,3;
66:6;68:24;71:10;
73:18

## J

**James (1)**
63:10
**JEFFREY (1)**
5:15
**JMK (5)**
67:5,16,19;68:4,6
**JOHN (1)**
4:8
**joinder (1)**
54:17
**joined (1)**
62:11
**joint (2)**
11:9;72:1
**jointly (1)**
68:18
**JONES (3)**
4:2;6:11;54:15
**JSN (3)**
43:25;45:19,21
**JSNs (35)**
13:19;39:3;44:1,2,
5,25;45:12,16;46:16;
47:4,6,13,22,24,25;
48:4;49:10,23;50:4,9,
23,23;51:17;52:6,9;
53:20;55:20;62:22,
23,24,25;63:4,5;64:5;
73:13
**JSN's (1)**
29:21
**judge (11)**
35:9;40:5;42:6;
51:5;55:9,10;63:24;
69:12,24;70:16,21
**judgment (3)**
19:20;40:16,18

**judgments (1)**
42:3
**July (7)**
31:21;32:6;40:11;
62:9,14;63:21;72:5
**juncture (2)**
44:4;51:23
**Junior (7)**
2:3;4:13;5:3;53:7;
56:15;61:23;62:21
**justify (1)**
68:22

## K

**keenly (1)**
46:11
**keep (3)**
8:17;14:4;30:3
**Kenneth (1)**
43:15
**kept (1)**
23:20
**key (1)**
55:22
**kind (1)**
70:8
**KIRKLAND (1)**
5:10
**KISSEL (1)**
6:19
**knew (6)**
37:15,23;38:2;
46:4;50:4,10
**knowing (2)**
24:14;50:17
**known (1)**
37:8
**knows (1)**
10:21
**Kramer (4)**
2:5;15:16;61:25;
65:23
**Kruger (14)**
15:16;19:3;22:22;
40:12,25;41:6,18,19,
25;42:2;52:12;55:16;
60:17;65:24

## L

**lack (5)**
11:13;18:5;32:17,
18;68:6
**lacks (5)**
17:15;19:15;34:19,
19,21
**laid (2)**
19:3;30:22
**Lambert (1)**
66:18
**landscape (1)**
46:21

**large (2)**
51:14;63:13
**largely (1)**
55:11
**largest (6)**
16:25;17:12,18;
45:9;69:6,10
**LaSalle (1)**
5:12
**last (5)**
42:8;43:2,24;58:2;
59:18
**late (1)**
52:12
**later (5)**
20:24;56:22;60:2;
61:9;71:24
**latest (1)**
64:20
**LAURIE (1)**
6:24
**LAW (10)**
7:2;10:3;16:1;
24:20;47:6;68:9;
70:4,4,10;71:25
**lawyer (1)**
18:13
**lawyers (2)**
18:16;21:8
**lay (1)**
49:20
**Leasing (1)**
72:17
**least (2)**
34:2;38:2
**leave (2)**
22:16;61:8
**leaves (1)**
51:17
**Lee (31)**
8:3,4,4,12;31:6,7,9,
10,10;32:15;33:22;
35:13,15,23,25;36:8,
23;39:20;41:8,11,15,
22;42:8;43:13,18;
48:15,19;49:5;57:10,
15;61:5
**left (1)**
31:24
**legal (1)**
19:1
**legitimately (1)**
18:23
**lending (1)**
34:14
**less (5)**
9:22;45:23;49:2,
11;53:15
**lessen (1)**
67:12
**letter (2)**
10:22;28:13
**level (1)**

61:12
**leverage (1)**
15:24
**Levin (4)**
2:5;15:16;62:1;
65:23
**LEWIS (2)**
7:2;65:24
**lexicon (1)**
13:7
**liabilities (1)**
71:11
**Liberty (1)**
5:20
**lien (1)**
15:2
**Lifland (1)**
40:5
**lift (1)**
29:22
**light (1)**
66:7
**likely (2)**
49:8;63:7
**liking (1)**
73:12
**Limited (5)**
2:8;8:16;62:3;
66:1;70:17
**limits (1)**
28:21
**lining (1)**
44:19
**linked (1)**
33:15
**liquidate (1)**
45:24
**liquidation (1)**
46:1
**listening (1)**
59:15
**litigable (3)**
14:10;26:15,21
**litigate (17)**
12:10;15:11;16:11;
18:8;31:3;32:20;
42:23;46:23,25;47:1;
48:9,14;49:17;51:19,
24;57:16;64:9
**litigated (5)**
19:16;27:18;34:5;
42:20;70:25
**litigating (8)**
10:13;11:19;15:20;
16:8;25:1;28:15;
59:20;74:8
**litigation (48)**
9:24;10:18;12:17;
13:25;14:25;15:24;
18:20;19:9;20:1,20;
21:6;22:2,7,10,20;
25:20;32:25;33:5;
34:23,24;36:19;

37:18;42:16;44:5;
47:12,16;48:2;49:1,
7;55:1,3,9;57:6,6,7;
58:20;64:25;65:6,13;
70:18,18,24;71:10,
18,21,22;72:9,23
**litigators (1)**
18:20
**little (3)**
9:3;17:20;46:9
**lived (1)**
54:23
**LLC (13)**
2:21;17:10,14,18,
24;18:4;20:21;21:4;
23:2,4,9;66:20;69:2
**LLP (11)**
2:4,6;4:2,12;5:2,
10,18;6:2,19;61:25;
62:1
**location (1)**
9:20
**long (1)**
41:11
**longer (2)**
25:6;57:2
**look (4)**
21:18;23:14;57:22;
58:19
**looking (4)**
31:24;39:6,23;51:9
**Los (1)**
6:6
**lose (3)**
10:1;48:1;55:22
**loss (1)**
12:13
**lost (3)**
43:21;50:9;71:24
**lot (3)**
23:10;26:24;31:1
**lots (1)**
41:23
**LP (3)**
66:24;67:17;68:1
**Ltd (4)**
67:6,16,20;68:5

## M

**main (1)**
9:17
**major (1)**
45:1
**majority (2)**
55:20;56:2
**makes (2)**
19:22,24
**making (1)**
8:17;26:8,17
**manage (1)**
23:23
**Management (7)**

12-12020-mg    Doc 4452    Filed 07/31/13    Entered 08/01/13 09:58:31    Main Document
Pg 85 of 92

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

July 30, 2013

2:6;15:17;18:6;
31:14;32:23;62:1;
65:23
**mandates (1)**
66:12
**Manhattan (1)**
5:4
**manifest (1)**
37:20
**manner (5)**
16:11,18,23;43:20;
70:12
**many (14)**
13:12;18:4;37:5;
44:8,8,23;45:12,24,
24;49:3,3;63:10;
64:20,22
**Marine (1)**
68:19
**market (1)**
65:15
**massive (1)**
71:9
**material (4)**
9:15;23:5;29:10;
70:14
**materiality (1)**
20:17
**materially (1)**
67:3
**materials (1)**
18:7
**math (1)**
27:14
**matrix (1)**
19:17
**matter (7)**
14:1;28:6;46:22;
47:6;49:5;50:4;53:1
**matters (2)**
27:25;69:5
**maximize (1)**
68:17
**may (20)**
14:7,9,9;25:3;28:1;
34:6;35:20;41:2,13;
49:1,2;51:18;53:2;
54:2;62:16;64:4;
65:17;70:7;72:11;
74:13
**maybe (4)**
20:24;22:3;25:6;
58:17
**MCCLOY (1)**
5:2
**mean (4)**
27:18;28:14;44:11;
45:13
**meaningful (1)**
67:22
**means (4)**
22:15;28:10;30:11;
47:5

**mediate (1)**
55:10
**mediating (1)**
50:10
**mediation (19)**
28:9;37:25;40:7;
42:5;43:1;44:15;
46:8;50:7,17;53:3,5;
55:16;56:4;63:9,11,
18,19,22,24
**mediator (4)**
35:9;47:20;50:5;
55:10
**members (9)**
31:15;57:2,2;
63:15,17,18,23;
65:10,16
**memorandum (6)**
19:1,5,8,10;40:25;
60:16
**mere (2)**
27:4;68:20
**merit (8)**
11:13;15:21;17:16;
19:15;32:17,18;
34:19,21
**meritless (3)**
33:24;39:17;48:17
**merits (15)**
12:20,22;14:6;
18:18;20:2;26:16;
30:17;48:10,22;49:3;
50:21;51:1,25;52:14;
57:5
**met (1)**
40:2
**method (1)**
48:13
**middle (1)**
23:17
**midway (1)**
55:8
**might (3)**
41:17,18;47:8
**mightily (1)**
44:1
**MILBANK (1)**
5:2
**mind (1)**
23:21
**minutes (1)**
61:18
**mired (2)**
36:19;48:1
**miscommunication (1)**
58:17
**missed (2)**
41:2,14
**misses (1)**
74:12
**misstates (1)**
74:1
**mistaken (1)**

16:19
**misunderstand (1)**
12:25
**misunderstanding (1)**
73:19
**misunderstandings (1)**
39:23
**modified (1)**
72:1
**modify (1)**
21:7
**MoFo (2)**
15:16;20:5
**MOLONEY (5)**
5:23;52:17,18,18;
54:12
**Moloney's (1)**
54:17
**moment (4)**
31:6;36:7;53:18;
54:5
**Monday (1)**
62:14
**money (3)**
29:21;71:3,24
**monoline (1)**
42:14
**monolines (1)**
45:2
**month (1)**
10:21
**months (11)**
31:25;32:25;37:22,
23;43:3;45:12,24;
47:21;50:10;63:10;
72:14
**more (13)**
9:21;10:21;23:11;
25:25;28:6;43:23;
47:7,9,14;49:1;
67:24;70:13;74:14
**Moreover (1)**
73:18
**morning (5)**
8:4,6;31:10;43:15;
52:18
**MORRIS (2)**
4:8;55:10
**Morrison (11)**
2:4;8:5;19:2;
20:19;21:5;27:2;
31:11;40:24;41:5;
61:24;65:22
**most (3)**
45:2;52:20;71:6
**Motion (72)**
2:2;8:6,6,15;9:4,
10;10:11,12;11:25;
24:18,21,24,25;25:2,
2,7,11,13,23;26:2,6,
10,11,17,19,20;27:1,
3;28:20;29:5;31:18,
22,22;39:12;43:11,

19,20,23;45:16;49:9,
19,21,22;50:2;52:16;
54:14;56:9;58:2,4;
59:8;61:22;62:6,8,
18;63:22;64:19;65:4,
7,9,13,17,18,19;66:6,
10;72:9,14,20,24;
73:6,9;74:20
**motions (4)**
25:24;51:20;72:8;
74:21
**motivation (1)**
31:22
**movant (1)**
8:9
**move (3)**
28:21;29:22;52:13
**moves (1)**
60:21
**moving (2)**
13:20;42:10
**much (2)**
37:13;56:7
**muddy (1)**
8:21
**multi-debtor (3)**
69:13;70:6,12
**multiple (9)**
26:19;33:14;44:13,
19;51:8;60:16;68:10,
17,25
**multitude (1)**
71:19
**MUNGER (1)**
6:2
**must (7)**
26:8;66:13,16,17;
68:2;70:8;73:6

## N

**Naftalis (2)**
2:5;62:1
**NDA (2)**
63:24;65:11
**nearly (1)**
70:13
**Necessary (3)**
2:9;62:4;66:3
**need (7)**
12:13;14:19;23:20;
38:18;52:23;57:4,5
**needs (3)**
13:25;23:10;25:9
**negotiated (2)**
46:7;47:20
**Neither (1)**
72:6
**Neutral (7)**
2:7;22:8;30:24;
36:11;44:10;62:2;
65:25
**neutrality (4)**

8:8;59:19;70:22;
73:8
**neutrally (1)**
59:14
**New (14)**
2:23;4:6,15;5:5,21;
6:14,22;18:13,16;
20:16;32:3;51:13;
69:20;72:4
**next (10)**
35:7;36:19;48:2,7;
58:21;59:6,9,10,17;
61:7
**NICOLE (1)**
7:6
**NOAH (1)**
5:15
**nobody (1)**
27:6
**nonconflicted (1)**
40:8
**nondisclosure (1)**
63:16
**none (1)**
38:9
**Nonetheless (1)**
68:9
**nonsensical (1)**
42:22
**nonstop (1)**
50:11
**nor (1)**
70:4
**normal (1)**
65:5
**normally (1)**
15:25
**North (1)**
5:12
**note (5)**
18:5;44:18;63:21;
71:4;72:13
**noted (5)**
10:15;20:3;40:11;
68:6;71:1
**Noteholders (8)**
2:3;4:13;5:3;37:8;
38:18;53:7;61:23;
62:21
**notes (2)**
33:14;42:13
**notes- (1)**
57:3
**notice (2)**
8:16;55:18
**notional (1)**
41:17
**notwithstanding (1)**
44:3
**number (21)**
8:3;10:7;36:25;
43:17;44:24;52:5,6;
62:8,10,11,12,13,15;

12-12020-mg    Doc 4452    Filed 07/31/13    Entered 08/01/13 09:58:31    Main Document
Pg 86 of 92

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

July 30, 2013

64:16;66:20;69:19,
20,21;72:3,10,12
**numbers (1)**
55:24
**numerous (4)**
12:4;13:21;63:12;
65:1
**NY (8)**
2:23;4:6,15;5:5,21;
6:14,22;7:4
**Nyack (1)**
7:4

# O

**oar (1)**
22:10
**object (2)**
50:15,16
**objecting (4)**
8:20;10:4;16:7;
26:24
**objection (3)**
51:6,11;61:11
**objections (6)**
38:17;39:4;50:22,
23;62:10;64:16
**objective (1)**
67:18
**objectors (1)**
38:19
**obligation (2)**
16:4;33:17
**obligations (2)**
31:16;38:16
**obvious (1)**
34:8
**obviously (3)**
37:16;42:4,8
**occasions (2)**
13:21;65:1
**occur (1)**
63:7
**occurred (2)**
23:8;28:1
**occurring (1)**
18:18
**October (2)**
63:7;71:14
**off (7)**
13:16,17,23,23;
15:8;28:12;60:21
**offer (2)**
15:10;36:3
**offered (1)**
13:8
**offhand (1)**
44:24
**OFFICE (1)**
7:2
**officer (1)**
65:24
**officers (1)**

69:25
**Official (2)**
2:5;61:25
**offsetting (2)**
36:14;42:25
**often (1)**
32:22;68:17
**Oil (1)**
68:12
**OLSON (1)**
6:2
**One (48)**
5:4,20;6:21;8:6,19;
9:13,19,19,24;10:18,
19;16:10;17:6;18:1;
19:19;20:5,6,10;
21:1;25:9,16;27:20,
24;32:1;33:11;35:15;
36:25;41:8;42:23;
43:7;44:9,20;45:8;
47:3;49:12;50:15;
52:5,14,24;54:22;
57:10,22;60:16;
67:25;68:9;70:5;
73:13,18
**O'NEAL (1)**
5:24
**one-by-one (1)**
51:10
**ones (1)**
57:4
**one's (1)**
9:23
**only (11)**
15:9,23;16:6;
29:12;53:23,24;
55:21;59:18;61:8;
64:19;70:17
**open (6)**
34:9,21,22,23;
42:24;51:17
**operating (1)**
46:20
operations@escribersnet (1)
2:25
**opinion (2)**
62:17;74:20
**OPM (2)**
40:5;72:17
**opportunity (2)**
51:19;62:17
**oppose (1)**
14:8
**opposed (3)**
39:18;55:13;57:13
**opposite (1)**
58:6
**opposition (6)**
9:3;36:25;52:16;
54:13;56:8;66:10
**oppositions (3)**
21:1;26:19;54:18
**Orange (6)**

16:17,24;17:7,17;
69:1,3
**Order (14)**
2:3;10:8;24:2;
25:19;33:16,17,21;
61:23;63:22,23;
65:21;68:11;73:8;
74:20
**Ordering (4)**
2:8;62:3;66:1;70:1
**orders (1)**
21:8
**ORNSTEIN (1)**
5:15
**others (1)**
9:18
**otherwise (1)**
22:9
**ourselves (1)**
29:25
**out (16)**
18:4;9:19:3;22:25;
23:21;25:5,10,21;
27:13;30:23;45:24;
47:13;48:5;49:20;
50:14,18
**outcome (2)**
24:24,25
**outright (1)**
25:22
**outset (1)**
31:12
**outside (2)**
18:12;20:15
**over (22)**
8:9;9:24;16:12;
19:9;20:1;22:10;
26:24;37:23;38:17;
42:16;45:24;47:20;
48:2,7;49:1,7;52:6;
55:1;62:20;63:10;
64:16;71:10
**over- (1)**
64:5
**overall (1)**
51:7
**overkill (1)**
51:22
**overruled (2)**
50:23;51:5
**oversecured (5)**
47:9,13,16;51:18;
63:1
**owe (1)**
54:8
**owed (2)**
54:5,7
**own (2)**
37:15;72:23

# P

**PACHULSKI (1)**

4:2
**page (2)**
56:14;69:21
**pages (2)**
41:11;72:5
**paid (9)**
28:6,7;45:23,24;
53:11,12,20;56:16;
70:7
**papers (5)**
8:21;9:3;10:4;
19:14;36:24
**par (5)**
35:17;45:17,23;
47:5,22
**Park (1)**
6:21
**part (25)**
8:8;9:7,7;12:5,19;
13:7,14,25;17:13,23;
19:25;26:14,16;
28:10;29:16,19;
33:18;34:1;47:2,3,
21;51:12;55:12;56:3;
72:9
**participate (2)**
63:18,19
**participating (1)**
37:24
**particular (3)**
8:24;11:14;42:18
**particularly (1)**
20:11
**parties (17)**
8:20;10:4;13:18;
16:7;26:24;29:9;
30:4;44:19;50:13;
62:9;63:13;64:3,7,10,
17;66:9;67:24
parties-in-economic-interest (1)
31:2
**Partners (3)**
66:23;67:17;68:1
**party (1)**
40:9
**passage (2)**
24:15;60:13
**past (1)**
47:21
**Pause (1)**
31:8
**pay (1)**
62:24
**paying (2)**
35:17;53:21
**payment (1)**
56:20
**PC (1)**
7:2
**Peck (4)**
42:6;51:5;63:10,25
**pecuniary (1)**
72:23

**Pending (1)**
61:22
**Penina (1)**
2:20
**people (3)**
23:25;24:3;31:1
**per (1)**
70:8
**perceived (1)**
39:7
**percent (1)**
56:25
**perception (1)**
67:25
**performing (1)**
71:18
**period (3)**
27:1;29:4;37:9
**permitted (1)**
39:13
**persistent (1)**
49:16
**PERSKIE (1)**
7:6
**person (2)**
67:1,2
**persons (1)**
66:18
**perspective (1)**
20:14
**petition (2)**
47:23;63:2
**piece (3)**
11:8;41:17;59:19
**pieces (1)**
41:23
**Piper (1)**
69:4
**Piper's (1)**
69:10
**pitted (1)**
62:19
**place (1)**
67:24
**places (2)**
28:11;33:14
**plain (1)**
41:21
**plan (63)**
8:8;9:14;11:9,21,
23;21:22,23;26:12,
15;28:14;29:17;33:4;
37:11;38:5,22,25;
39:9,14,19;40:6;
44:21;45:7,13,16,16;
46:1,1;47:11,12,14;
48:12,25;49:6,11;
50:13,15,16,21,25;
51:17,25;52:8;53:8,9,
11,21,22;54:9;62:22,
23;63:8,11,14;64:2,7,
10,23;65:14;71:5,9,16;
72:1;73:11,11;74:11

**planning (1)**
11:10
**Plaza (3)**
5:4,20;6:21
**pleadings (1)**
66:10
**Please (2)**
8:2;61:21
**plenty (1)**
49:1
**plus (6)**
35:17;45:17,23;
47:5,22;53:13
**pm (1)**
74:24
**point (36)**
14:5,17;16:4;17:4;
18:4;20:23;21:13,14;
24:4;27:12;29:10;
34:8;38:10;42:8;
44:9;46:11;49:8;
51:21;53:15;54:2,21;
55:8,19;57:9,19;
58:21;59:6,9,10,17,
18;60:3,7;61:4,7,8
**points (4)**
36:24;52:21;54:19;
56:12
**pool (1)**
56:20
**portion (2)**
57:1;61:1
**position (18)**
12:20,24;14:4;
15:23;19:13;23:12,
13;24:13,17,18;
25:17,20;26:9;29:3;
30:9;33:23,25;74:2
**positions (2)**
10:18;57:4
**possession (2)**
29:23;67:11
**possibility (1)**
51:18
**possible (1)**
49:20
**post- (1)**
63:1
**post-confirmation (1)**
15:8
**post-petition (3)**
46:7;47:15;64:6
**posture (1)**
8:25
**potential (5)**
36:17;56:5;65:15;
67:13;71:18
**potentially (4)**
54:2;64:4;71:9;
73:1
**power (1)**
68:7
**practical (2)**

31:23;42:9
**practically (1)**
39:2
**practice (3)**
68:9;69:16;70:11
**pre- (1)**
47:22
**precept (1)**
23:21
**precise (2)**
32:2;71:10
**precisely (2)**
51:3,5
**precluded (1)**
69:10
**predisposition (1)**
67:15
**preferred (1)**
54:20
**prejudged (1)**
65:3
**prejudice (8)**
8:22;16:4,5,8;18:1,
11;20:10;39:6
**prejudiced (1)**
11:6
**pre-pack (1)**
46:13
**prepetition (4)**
47:14;55:19;56:13,
25
**pre-petition (8)**
35:17;37:9;45:17,
23;47:5;53:7,12;
62:24
**present (4)**
18:21;26:21;27:5;
48:13
**presentation (1)**
33:15
**presentations (3)**
42:4;60:15,17
**presented (2)**
49:12;52:1
**preserving (1)**
29:21
**previously (1)**
65:11
**price (1)**
65:15
**primarily (1)**
65:10
**principal (2)**
36:24;62:25
**prior (10)**
9:14;10:13,23;
11:1;18:18,19;21:23;
37:11,22;47:18
**pristine (1)**
48:13
**private (1)**
45:5
**privately (1)**

71:2
**privilege (5)**
18:7;19:6;41:3,25;
59:24
**pro (1)**
56:19
**probably (1)**
15:22
**problem (16)**
8:23;9:4,10;10:5,
12;11:11;13:24;
15:13,18,18;16:15,
16;20:13;22:6;30:18;
60:16
**problems (3)**
10:2;40:25;41:6
**proceed (1)**
56:6
**proceeding (1)**
73:11
**proceedings (3)**
63:4;65:2;74:24
**proceeds (1)**
9:16
**process (7)**
13:15;18:15;23:23;
30:25;35:19;50:17;
65:6
**produce (3)**
30:6;7;41:4
**professional (7)**
10:3;31:14;67:8,
21;68:3,7;71:20
**professionals (7)**
10:17;52:12;54:7;
55:15;66:16,16;
73:15
**progeny (1)**
20:16
**progress (1)**
43:2
**progressed (2)**
21:12,21
**Project (6)**
16:16,24;17:6,17;
69:1,3
**prolonged (1)**
71:22
**proof (2)**
36:21;53:25
**proper (2)**
25:7,11
**Properties (1)**
69:19
**proponents (1)**
11:9
**proposal (2)**
13:21;17:25
**propose (2)**
13:1;36:5
**proposed (18)**
10:22;13:19;16:15;
26:12,14;33:7;48:21;

49:14;51:3;62:20,23;
63:8;64:1,2,7,23,24;
65:14
**proposes (3)**
11:23;57:18;62:24
**proposing (7)**
17:8,13;46:22,25;
47:1;48:9;50:13
**proposition (2)**
43:6;69:22
**prosecute (2)**
38:22;39:13
**prosecuting (5)**
39:8;50:24;54:9
**protect (1)**
29:25
**protection (8)**
12:11;14:24;15:4;
29:24;33:16,18,21;
34:3
**protracted (1)**
71:9
**provide (2)**
15:24;74:16
**provided (11)**
15:1;17:15;18:8;
19:2;42:5;45:22;
46:16;52:8;53:8;
60:15;71:9
**provides (4)**
45:16;47:11,12;
67:5
**provision (2)**
26:4;29:13;30:2
**provisions (1)**
51:16
**PSA (49)**
10:16;11:21;26:12;
28:9;29:13;30:2,9;
35:13;37:20;38:13,
20,20;39:5,6,7,14,16;
44:23;45:1,2,3,4,6,8,
8,9,12,13,21,22;
46:12,15;50:20,22;
55:19;56:13,25;
63:12,14,15,20;64:1,
3,8,10,15,18;74:11,
17
**publicly (1)**
27:16
**published (2)**
19:17;28:9
**punitive (1)**
45:14
**punted (1)**
56:21
**purely (1)**
9:7
**purportedly (2)**
53:19,24
**purpose (8)**
24:23;25:8,11;
26:11,12;39:9;50:6;

70:17
**purposes (7)**
13:2,6;34:2,4;
48:21;64:4;66:8
**pursuant (4)**
33:25;36:12;42:21;
72:2
**pursue (2)**
35:1;40:5
**push (1)**
15:8
**pushing (1)**
22:4
**put (11)**
12:9,14;13:22;
28:11;36:9;40:5;
41:21;48:8;49:25;
59:16;73:20
**putting (1)**
13:16
**puzzling (1)**
43:21

**Q**

**qualifier (1)**
13:5
**quarrel (1)**
48:4
**quickly (1)**
66:7
**quite (11)**
12:17;31:18;32:16;
35:17;37:2;38:4;
39:20,22;57:15;59:5;
61:6
**quote (1)**
70:2
**quotes (1)**
73:20

**R**

**raise (5)**
26:15;38:8;54:10;
61:10,15
**raised (11)**
12:11;25:2;27:3;
29:4;42:12;60:3;
61:4;65:4;66:6,9;
68:24
**raises (3)**
10:2;27:4;65:7
**raising (1)**
15:9
**rata (1)**
56:19
**rather (9)**
25:19;32:1,18;
33:11;36:19;38:8;
47:25;51:8;57:17
**rationales (1)**
47:4

12-12020-mg    Doc 4452    Filed 07/31/13    Entered 08/01/13 09:58:31    Main Document
Pg 88 of 92
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

July 30, 2013

re (15)
66:19,22,23;67:5;
68:11,15,19;69:1,16,
18;71:13;72:3,10,17,
18
reach (1)
71:3
reached (1)
40:16
read (2)
24:6;66:25
reading (1)
20:16
real (1)
31:1
reality (2)
45:15;46:14
realize (2)
35:16;74:14
really (12)
17:25;19:20;20:14;
28:15;31:25;32:5,11;
43:24;44:18;49:23;
50:1;54:18
reason (7)
13:6;14:17,23;
15:9;42:18,21;54:22
reasonable (4)
47:24;52:9;64:12;
67:25
reasonably (2)
19:17;43:19
reasoning (1)
73:20
reasons (4)
49:20;62:16;74:18,
21
rebuttal (2)
59:17,18
recall (2)
28:2;53:2
receive (4)
29:16;47:15,25;
56:17
received (2)
16:7;53:15
receiving (3)
45:17;47:22;53:9
recess (2)
61:18,20
recharacterized (4)
23:6,7;27:22,23
recognize (4)
21:12,13;23:22;
45:14
Recognizing (1)
68:16
record (11)
13:9;14:5,17;
37:21;38:13;40:1;
56:25;59:4;61:3;
62:16;74:22
recount (2)

14:7;66:9
recoveries (3)
27:25;29:11;70:15
recovery (1)
19:18
recusal (1)
69:25
reducing (1)
71:17
refer (7)
37:6;62:5,21;
63:11;70:19;72:12,
19
referred (1)
69:21
referring (3)
34:10;39:6;40:23
refers (1)
34:14
reflected (2)
32:22;34:12
refuse (1)
63:16
refused (1)
69:3
regard (1)
37:4
Regarding (7)
2:7;14:11;40:25;
41:6;62:2;65:25;
71:19
Regrettably (1)
45:12
rejected (2)
13:21;15:10
Related (4)
2:10;62:5;66:3;
72:3
relating (1)
72:20
relationship (1)
34:15
release (2)
17:14;24:2
releases (2)
18:19;21:24
releasing (2)
22:15;24:7
relevant (2)
45:15;65:17
Relief (9)
2:10;31:23;39:3;
42:10;62:5;66:4,5;
70:21;72:3
relying (1)
41:25
Remain (4)
2:6;30:24;62:2;
65:24
remains (1)
39:5
remedies (3)
8:23,24;21:20

remedy (4)
20:7,15;21:15;
30:21
remember (1)
46:12
reorganization (6)
62:22;63:8;64:2;
69:8;73:1,10
repeat (1)
43:17
repeatedly (3)
13:14;26:13;73:22
replicate (1)
36:13
reply (4)
9:1;42:12;62:14;
73:13
represent (7)
21:5,9;22:1;42:15;
66:17;68:10;70:10
representation (3)
66:14;69:9,14
representative (1)
68:16
represented (3)
37:10;46:8;69:5
representing (8)
8:5;17:11,19;45:7;
52:19;68:24;69:4;
70:17
represents (1)
67:9
require (2)
15:5;39:16
required (3)
48:16;63:17;72:6
requirement (4)
67:2;70:4,10;74:15
requirements (1)
68:2
requires (2)
25:9,25
requiring (2)
69:22;70:21
ResCap (11)
17:10,14,18,24;
18:4;20:20;21:4;
23:2,4,9;56:19
reserved (1)
65:20
Residential (2)
8:3;17:9
resist (2)
49:18;52:10
resolution (11)
11:4;13:22;32:9;
36:21;40:22;42:19;
44:15;51:8;52:7;
55:11;71:6
resolutions (1)
51:14
resolve (10)
13:1;16:10;18:14;

36:18;37:25;42:25;
50:7,11;52:13;72:7
resolved (8)
16:22;17:23;39:7;
47:18,21;56:4;66:7;
73:14
resolves (4)
9:19;16:20;60:24;
64:8
resolving (7)
12:23,25;23:23;
25:10;48:20;58:10,
13
respect (11)
11:1;17:9;18:7,17;
20:4;24:21;42:16;
49:22;56:12;58:6;
61:9
respond (4)
9:6;24:19;28:16;
49:25
responded (2)
57:15;61:5
responding (2)
9:1;56:23
response (4)
27:4;30:14;31:18;
36:2
responsibility (1)
50:12
rest (1)
59:16
restricted (1)
65:12
restructuring (1)
65:24
result (9)
19:18;24:23;28:8;
32:22;37:17;39:25;
63:9,10;64:4
resulting (2)
71:23,24
retain (1)
72:7
retention (6)
21:8;23:16;27:2;
66:15;69:4,10
return (1)
68:17
reverse (1)
34:14
review (1)
62:18
reviewed (1)
69:13
reviewing (1)
74:18
RFC (16)
17:9,9,12,13,19,24;
18:3;19:6;20:20;
23:3,3,8;34:10;36:4,
7;53:1
RICHARD (2)

6:16;54:15
right (14)
9:13,13;13:5,24;
46:19;50:16;51:19;
57:6;58:1,9,25;61:14,
17;74:23
rights (1)
9:2
rise (1)
54:18
risk (1)
67:25
risks (1)
45:25
rival (1)
67:14
RMBS (5)
42:13;45:1;47:1;
48:23;49:1
ROBERT (2)
4:9;7:2
role (1)
23:22
rose (1)
53:16
rule (5)
25:10;32:10;61:19;
64:25;70:13
rules (7)
11:5;23:24;24:4;
30:1,15,16,21,22;
57:8
ruling (2)
51:10;66:8
run (2)
35:20;70:12

## S

saddle (1)
68:14
same (14)
10:16;15:22;17:6,
17;20:12;28:24;32:2;
33:1;37:13;43:25;
48:23;51:5,11;53:9
sanctionable (2)
24:21;25:8
sanctions (4)
24:23,24,25;25:12
satisfaction (1)
56:18
save (1)
9:1
saw (1)
31:17
saying (24)
10:4;11:22,24;
13:3,8;16:21;17:22;
18:13;19:22;24:4;
25:24;26:2;32:15,16;
34:5,18,20,21;35:4;
39:7,11;53:2;60:20,

12-12020-mg    Doc 4452    Filed 07/31/13    Entered 08/01/13 09:58:31    Main Document
Pg 89 of 92
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

July 30, 2013

21
**schedule (3)**
13:19;27:14;66:7
**schedules (2)**
27:11,11
**scrutinize (1)**
25:25
**SDNY (11)**
66:21,23,24;67:6;
69:2,17,18;71:14;
72:11,13,18
**SDTx (1)**
68:20
**sea-change (1)**
70:10
**SEAN (1)**
5:24
**seated (2)**
8:2;61:21
**second (7)**
12:19;25:5,23;
38:10;41:9;42:21;
53:1
**secondary (1)**
50:1
**secret (1)**
30:3
**Section (5)**
66:12,14;67:1,4;
68:2
**Secured (12)**
2:3;4:13;5:3;52:6;
53:7,19,25;54:6;
56:15,16;61:23;
62:21
**securities (6)**
42:13;45:3,5;47:1;
65:12,16
**Securitization (1)**
6:20
**seek (10)**
11:4,20;15:12;
29:24;30:5;32:5;
35:2;38:19;73:11;
74:10
**seeking (16)**
11:10,12;30:11;
32:13;33:4,10,12,18;
34:7;37:25;39:3,9;
52:25;59:20;63:4;
73:22
**seeks (2)**
9:10;65:21
**seem (2)**
23:18;25:20
**seems (2)**
26:18;54:3
**sees (1)**
43:11
**senior (3)**
42:12;52:19;57:3
**sense (2)**
19:23,24

**sensitive (1)**
23:12
**sent (2)**
10:22;28:13
**separate (8)**
35:5,6,6;68:14;
69:22,23;72:7;73:15
**seriously (3)**
31:16;38:16;68:3
**served (1)**
72:23
**Services (1)**
72:17
**set (4)**
10:19,20;20:6;54:9
**sets (2)**
21:17;73:15
**settle (9)**
10:15;11:23;14:25;
15:2,22;16:9;35:10;
51:12,24
**settled (11)**
10:14;15:6;22:24;
29:16;32:18;33:20;
35:14;39:24;42:21;
47:2;71:16
**settlement (83)**
9:25;10:8,10,10,14,
16,23;11:7,11,15;
13:2,6,16;15:19;
16:14,15,19,20;
17:14,23;18:10,18,
22,24;19:12,21;
22:18,19;26:3,3,14;
28:1,10;29:19,20;
30:4,8,9;32:8;33:7;
34:1,2,25;36:6;39:18,
25;40:18;43:6,9;
44:4,18;46:7;47:2,3,
4,20,22;48:1,5,12,21;
49:14;50:25;51:3,4,7,
12;52:7;55:13,23;
56:3;57:17,18;64:2,3,
7,8,11,13,24;69:7;
71:4;73:24
**settles (1)**
73:12
**settling (4)**
16:17;33:25;73:21;
74:15
**seven (5)**
25:6;37:23;47:21;
54:24;55:3
**seven-month (1)**
40:7
**several (6)**
32:2;43:24;48:3,7;
49:20;54:16
**severely (1)**
16:19
**SEWARD (1)**
6:19
**shall (2)**

30:3;56:17
**shape (1)**
34:13
**share (1)**
56:19
**shared (2)**
19:3;37:12
**sheets (1)**
63:15
**shifted (2)**
10:24;11:3
**SHORE (62)**
4:17;8:11,13,13;
11:25;12:3;13:5,12,
24;14:12,16;17:8;
24:9,12;25:5,14,15;
26:23;28:23,25;29:2;
33:9;34:10;36:1;
37:3;40:23;41:2,16,
24;43:5;44:9,19;
46:5,8;48:16;56:10,
11;57:9,21,23;58:1,9,
12,15,17,20,22,25;
59:7,10,13,14,18;
60:2,8,10,12,20,25;
61:1,8,16
**Shore's (2)**
33:15;55:12
**short (2)**
8:15;54:17
**short-circuit (1)**
65:5
**short-circuited (1)**
55:17
**show (1)**
43:9
**showed (1)**
37:13
**showing (1)**
54:1
**side (1)**
29:1
**sides (1)**
70:24
**sight (1)**
55:23
**sign (5)**
45:12,13;63:16,24;
65:11
**signatories (1)**
63:20
**signed (17)**
37:21;44:23;45:1,
2,3,4,6,6,7,8,9,21;
46:12,16;55:20,20;
57:4
**significant (5)**
17:2;37:1;44:18;
45:2;49:15
**significantly (1)**
74:1
**signing (2)**
63:23;64:15

**Similarly (1)**
71:15
**simple (1)**
54:22
**simply (4)**
34:19;35:1;43:8;
53:5
**single (10)**
16:25;17:12;19:15;
42:25;43:7;67:5;
68:16,24,25;69:15
**sit (1)**
31:4
**sitting (1)**
35:8
**situated (1)**
71:8
**situation (1)**
33:11
**six (3)**
25:6;54:23;55:3
**sixteen (1)**
69:13
**sixteen-billion-dollar (3)**
34:17,20;36:16
**softened (1)**
19:13
**solution (3)**
17:21;42:11,22
**solve (1)**
16:16
**somebody (6)**
22:9;29:6;30:23,
24;34:25;35:2
**somebody's (1)**
42:16
**somehow (1)**
46:3
**somewhere (1)**
42:14
**sorry (1)**
32:17
**sort (1)**
51:16
**sought (7)**
21:16,17,18,19;
35:11;38:24;42:10
**souls (1)**
54:23
**sound (2)**
14:4;61:3
**South (1)**
6:4
**Southern (3)**
32:3;69:20;72:4
**spawned (1)**
32:25
**speak (3)**
52:16;54:13;56:8
**speaking (1)**
31:15
**specific (7)**
11:12;14:14,20;

33:12;41:18;42:23;
60:7
**specifically (4)**
13:15;36:7;51:17;
74:2
**spend (1)**
29:21
**spoken (1)**
25:23
**stage (2)**
28:19;52:12
**stages (1)**
21:20
**stake (1)**
71:3
**stand (3)**
19:7;30:16;53:24
**standard (6)**
12:14;14:7,13;
15:19;32:10;68:9
**standards (4)**
36:9;38:7;40:2;
64:25
**standing (1)**
18:13
**STANG (1)**
4:2
**start (2)**
16:3;46:12
**started (4)**
27:15;39:2;53:3,5
**State (1)**
20:16
**stated (2)**
36:1;74:21
**statement (7)**
19:2;34:12;36:10,
14;37:14;39:21;
40:24;41:2,5;55:24;
57:19;60:5,6,9,11,13;
61:11
**statements (1)**
56:23
**States (1)**
72:2
**stating (1)**
72:22
**status (1)**
43:23
**statutory (1)**
15:1
**stay (3)**
22:8;29:23;54:20
**STEEN (1)**
5:18
**step (1)**
55:17
**still (3)**
10:23;22:7;27:17
**stop (4)**
33:2;46:10;55:2,5
**strategy (1)**
21:22;72:23

**Street (4)**
2:22;5:12;6:13;7:3
**Strictly (3)**
2:6;62:2;65:25
**string-sight (1)**
27:4
**strong (1)**
57:9
**structure (2)**
42:15;46:5
**struggled (2)**
31:21,21
**sub-con (2)**
35:6;36:17
**subject (6)**
10:11,12;23:4;
25:12;56:22;65:2
**submit (1)**
58:5
**submitted (1)**
62:7
**Subsection (1)**
67:1
**subsidiaries (1)**
70:19
**substance (1)**
36:3
**substantial (6)**
14:10;33:6;57:1;
61:1;65:7;74:16
**substantially (1)**
53:15
**substantive (4)**
17:15;34:23;49:8;
73:8
**substantively (1)**
35:2
**successful (2)**
63:9;69:8
**sufficient (2)**
25:3;67:24
**suggest (5)**
24:6;46:3;48:5;
50:18,20
**suggested (2)**
41:2;73:14
**suggestion (1)**
52:10
**Suite (1)**
2:22
**sundry (1)**
67:23
**supplement (1)**
74:19
**supplemental (1)**
72:1
**support (9)**
26:9;36:6;46:1;
52:2;62:7;63:11,14;
64:7;66:10
**supportable (1)**
24:17
**supported (2)**

10:7;55:21
**supporting (1)**
45:6
**supports (2)**
40:2;57:19
**supposed (2)**
12:8;28:16
**sure (6)**
8:17;31:7;35:16;
41:10;43:21;46:10
**surprise (1)**
46:3
**surround (1)**
36:11

**T**

**table (3)**
13:17,23;50:12
**tactic (3)**
12:17;25:22;72:10
**tactical (10)**
9:7;24:18;25:22;
29:12,22;30:4;32:1;
50:3;51:21;54:21
**tactically (1)**
32:4
**tactics (3)**
25:16;32:2;65:4
**taint (1)**
18:15
**talking (5)**
9:11;41:16,17,22;
48:9
**target (1)**
42:10
**tax (1)**
72:20
**team (1)**
58:20
**teed (1)**
50:19
**TELEPHONICALLY (1)**
6:8
**telling (2)**
46:6,15
**temperate (1)**
31:18
**ten (2)**
35:7;36:20
**tend (1)**
67:12
**tens (1)**
23:20
**tenth (1)**
42:2
**term (2)**
63:15;73:20
**terms (6)**
11:21;49:19;63:14;
64:1;74:11,16
**test (3)**
66:15;67:5,8

**testifying (1)**
41:19
**That'll (1)**
49:12
**theoretically (1)**
44:11
**therefore (4)**
11:14;43:11;63:1;
66:8
**There'll (1)**
61:6
**Third (2)**
4:4;13:9
**third-party (1)**
44:16
**thirteen (1)**
43:24
**thirty (1)**
32:10
**thirty-eight (1)**
56:25
**THOMAS (2)**
5:23;6:8
**Though (3)**
10:2;53:14;54:3
**thought (5)**
9:4;36:17;38:22;
41:19;60:10
**thoughtful (1)**
31:18
**thousands (3)**
23:20;32:20;74:9
**threatens (1)**
65:14
**three (5)**
8:19,23;38:2;
54:19;72:14
**throughout (2)**
30:25;37:2
**throw (1)**
48:5
**thus (2)**
64:5,9
**time-consuming (2)**
33:6;64:9
**timely (1)**
22:20
**times (2)**
13:12;43:24
**timing (6)**
8:25;26:11,24;
31:22;53:10;65:7
**tirelessly (1)**
64:18
**today (10)**
8:16;19:25;34:5;
43:10;50:16;58:8,13;
60:4,22;74:21
**together (1)**
11:8
**told (3)**
37:16;46:13;59:2
**TOLLES (1)**

6:2
**Tom (1)**
52:18
**took (1)**
30:9
**touching (2)**
12:19,22
**trade-out (1)**
57:3
**trading (2)**
65:12,16
**transactions (1)**
71:20
**Transcribed (1)**
2:20
**transcript (5)**
61:6;62:18;69:18,
21;74:19
**transferred (1)**
23:8
**treatment (9)**
45:18,19;52:9;
53:9,11;56:13;61:12;
62:21;71:7
**treatments (1)**
27:16
**tremendous (1)**
51:16
**trial (3)**
12:14;63:6,7
**tried (9)**
13:15;15:15;18:14;
22:6;29:4;43:19;
44:1;49:20,23
**tries (1)**
35:1
**trouble (2)**
23:25;24:3
**true (3)**
34:6;49:3,4
**Trust (2)**
5:19;52:19
**Trustee (3)**
6:20;45:8;69:25
**trustees (4)**
21:19;45:2;68:14;
73:16
**trustees' (1)**
68:15
**try (11)**
8:17;13:10;14:14;
15:21;18:2,22;24:2;
33:18;40:7;43:5;71:2
**trying (9)**
15:22;16:9;19:20,
25;32:4,19,24;42:25;
44:5
**turn (2)**
8:9;28:12
**turned (1)**
19:9
**turns (2)**
18:9;47:13

**TWEED (1)**
5:2
**twenty (1)**
61:18
**twenty-one (1)**
45:4
**Two (11)**
8:21;16:7;20:20;
23:8;27:24;45:2,3;
52:6;54:19;63:5,15
**two-billion-dollar (2)**
17:10;34:11
**two-pronged (1)**
66:14
**types (1)**
71:12
**typically (1)**
32:21

**U**

**UCC (1)**
31:15
**ultimately (4)**
28:10;49:6;55:11;
69:24
**Um-hum (1)**
58:12
**uncertainty (1)**
71:21
**unclear (1)**
27:17
**under (6)**
21:22;32:10;45:16;
49:11;70:3;74:16
**underlying (3)**
21:2;57:6;71:19
**undersecured (4)**
47:6;62:24;63:5;
64:5
**understands (1)**
46:6
**understood (5)**
33:3,16;39:22;
46:21;53:17
**undoes (1)**
43:1
**undoubtedly (1)**
53:6
**unfortunate (1)**
54:23
**unfortunately (1)**
44:21
**unison (1)**
39:8
**United (1)**
72:2
**unity (1)**
40:4
**unless (4)**
8:9;31:4;36:23;
56:15
**unliquidated (1)**

69:7
**unrelated (1)**
    69:5
**unsecured (12)**
    28:2;42:13;52:20;
    53:14,18,20,23;54:6;
    56:1,19;57:3;71:8
**unseemly (1)**
    32:1
**untimely (1)**
    50:3
**up (18)**
    18:13;19:7;22:10;
    23:9,16,17,17;24:8;
    26:3,12;29:20;30:8,
    16;44:19;50:19;
    57:25;62:17;64:18
**upon (6)**
    17:14;24:25;56:16;
    64:2;65:16;72:16
**upset (1)**
    70:7
**use (3)**
    9:11;39:12;41:6
**used (1)**
    32:2
**UZZI (1)**
    5:7

## V

**vacation (1)**
    32:7
**validity (2)**
    24:22;71:12
**valuable (1)**
    55:18
**valuation (1)**
    33:19
**value (38)**
    9:20;11:14,17,23,
    24;12:7,10,16;13:1,4,
    11;14:2,6,15;15:3,6,
    13;18:3;23:9;27:8,9;
    28:11;34:3;36:4;
    46:9;47:7;48:18;
    54:1;57:13,17,20;
    67:13;71:24;73:24;
    74:5,7,13,14
**valued (4)**
    32:14;33:20,20;
    39:18
**valueless (1)**
    48:2
**valuing (4)**
    13:2,2;59:3;64:4
**various (2)**
    21:20,20
**vast (1)**
    56:2
**Vebeliunas (1)**
    66:22
**V-E-B-E-L-I-U-N-A-S (1)**

66:22
**veteran (1)**
    40:13
**view (2)**
    30:14;70:3
**viewed (1)**
    42:3
**violate (1)**
    30:15
**violated (1)**
    29:25
**violates (1)**
    30:14
**violation (1)**
    30:21
**virtue (1)**
    71:7
**vision (1)**
    46:4
**voluntarily (1)**
    30:20

## W

**wait (1)**
    13:10
**waiting (1)**
    13:13
**waive (4)**
    26:4;28:13;30:10;
    46:2
**waived (10)**
    9:2;12:7;20:24,25;
    24:1,13,15;29:14;
    39:24;53:14
**waiver (10)**
    20:18,22,23;21:1,4,
    11;24:14,14;46:16;
    53:8
**walk (2)**
    38:14;46:3
**WALPER (1)**
    6:8
**wants (2)**
    29:6;64:22
**warranted (2)**
    70:2,23
**wars (1)**
    54:24
**waters (1)**
    8:21
**way (15)**
    9:9;16:21;23:14;
    27:13,13;34:13,18;
    38:6,12;48:20,23;
    51:3,14;52:14;56:6
**week (1)**
    58:2
**weeks (1)**
    43:24
**West (1)**
    2:22
**what's (4)**

17:20;20:15;21:14;
    47:10
**Whereupon (1)**
    74:24
**WHITE (2)**
    4:12;8:14
**whole (1)**
    46:21
**wholehearted (1)**
    49:23
**wholeheartedly (1)**
    14:16
**wholesale (1)**
    21:16
**who's (1)**
    42:14
**whose (1)**
    71:3
**Wilmington (2)**
    5:19;52:19
**win (2)**
    10:6,9
**wins (1)**
    9:24
**wish (3)**
    52:16;54:13;56:8
**withhold (1)**
    19:6
**within (2)**
    9:20;27:9
**without (1)**
    73:4
**WL (2)**
    66:21;71:13;72:11,
    13
**Wolicki (1)**
    2:20
**wondering (1)**
    31:25
**words (2)**
    56:20;74:12
**work (3)**
    18:23;27:12;42:19
**worked (1)**
    64:17
**World (1)**
    66:20
**WorldCom (4)**
    71:5,13;72:18,19
**worth (11)**
    12:12;14:21;16:2;
    22:12;30:12;33:5,13;
    47:14;52:24;53:3;
    59:21
**worthless (2)**
    33:24;34:6
**written (3)**
    24:14;62:17;74:20
**wrote (1)**
    33:14
**WYNNE (9)**
    6:16;54:15,15;
    55:2,4,6,8;56:7,24

## Y

**year-end (1)**
    53:12
**years (10)**
    25:6;32:25;35:8;
    36:20;37:17;48:3,7;
    54:24,25;55:3
**York (13)**
    2:23;4:6,15;5:5,21;
    6:14,22;18:13,16;
    20:16;32:3;69:20;
    72:4

## Z

**zero (25)**
    11:23;12:12;13:3;
    14:21;15:7;16:2;
    19:18;22:12;30:13;
    32:14;33:5,13,20,20,
    20;39:18;48:21;
    52:24;57:13;59:3,21;
    64:4;73:21,24;74:15
**zero-sum (1)**
    9:23
**ZIEHL (1)**
    4:2

## 0

**01-16034-ajg (2)**
    72:4,10
**02 (1)**
    72:12
**03 (1)**
    66:21
**09-11977-alg (1)**
    69:19

## 1

**1 (3)**
    66:16;67:11;74:7
**10 (1)**
    56:14
**10004 (1)**
    6:22
**10005 (1)**
    5:5
**10006 (1)**
    5:21
**10017 (2)**
    4:6;6:14
**10036 (1)**
    4:15
**1004 (1)**
    68:19
**10040 (1)**
    2:23
**101 (1)**
    67:1

**108 (1)**
    68:19
**10960 (1)**
    7:4
**11 (8)**
    69:25;70:6,11,12;
    71:5,15;72:2;73:2
**11:27 (1)**
    61:20
**11:30 (1)**
    61:17
**11:57 (1)**
    61:20
**1155 (1)**
    4:14
**12:23 (1)**
    74:24
**12-12020 (1)**
    8:3
**122 (1)**
    69:18
**1300 (1)**
    68:15
**1310 (1)**
    68:15
**14c (1)**
    67:2
**15 (1)**
    72:5
**151 (1)**
    72:18
**16 (1)**
    72:17
**173 (1)**
    71:4
**176 (3)**
    66:19;67:10,16
**181 (1)**
    66:23
**186 (1)**
    68:12
**187 (1)**
    68:12
**188 (1)**
    66:23
**192nd (1)**
    2:22
**1970 (1)**
    68:12
**19758 (1)**
    72:5
**1987 (1)**
    68:20
**1991 (1)**
    68:16
**1998 (1)**
    66:24
**1999 (2)**
    66:20,23

## 2

**2 (7)**

66:17,22;67:14;
72:12,13,19;74:9
**2.1 (3)**
40:18;55:23;56:2
**2.6 (1)**
55:25
**2002 (1)**
72:11
**2003 (7)**
66:21,22;71:13,14;
72:11,13,13
**2004 (2)**
72:5,19
**2006 (2)**
69:17,18
**2010 (2)**
67:7;69:2
**2013 (4)**
62:9,15;63:7,21
**219 (3)**
66:24;67:17;68:1
**22 (1)**
66:24
**222 (2)**
6:13;67:6
**223455 (1)**
72:13
**22861948 (1)**
66:21
**229 (3)**
67:6,16,20
**22nd (2)**
31:21;40:11
**23 (1)**
72:11
**230 (1)**
68:5
**231 (1)**
66:22
**23861928 (1)**
71:14
**26 (2)**
62:9;63:21
**29th (1)**
62:14
**2d (2)**
66:19;68:12

**3**

**3 (1)**
72:13
**300 (1)**
5:12
**31 (1)**
71:14
**311 (1)**
72:18
**32034346 (1)**
72:11
**32-34 (1)**
66:24
**327 (3)**

66:12,14;68:2
**327a (2)**
40:2;67:4
**33 (2)**
67:17;68:1
**336 (3)**
69:17;70:15,25
**342 (1)**
69:17
**355 (1)**
6:4
**35th (1)**
6:5
**363 (1)**
69:2
**36th (1)**
4:5
**38 (1)**
69:21
**3d (1)**
68:16
**3rd (1)**
32:6

**4**

**400 (1)**
41:11
**41st (1)**
6:13
**427 (1)**
68:12
**4282 (1)**
62:6
**4289 (1)**
2:2
**4290 (2)**
2:2;62:8
**4291 (1)**
2:2
**431 (1)**
69:2
**4368 (1)**
62:10
**4369 (1)**
62:13
**4371 (1)**
62:12
**4372 (1)**
62:11
**4389 (1)**
62:15
**441 (4)**
67:6,16,20;68:5
**4501sas (1)**
66:21

**5**

**5 (1)**
27:24
**53 (1)**
7:3

**5638 (1)**
72:12

**6**

**60654 (1)**
5:13
**610 (2)**
66:19;69:17
**618 (1)**
70:15
**620-21 (1)**
66:19
**622-23 (1)**
67:10
**623 (1)**
67:16
**645-53 (1)**
69:17
**672-73 (1)**
70:25

**7**

**7 (1)**
48:6
**700 (1)**
2:22
**72 (1)**
69:21
**750-million-dollar (1)**
55:21
**780 (1)**
4:4
**78-79 (1)**
72:5

**9**

**90 (1)**
69:20
**90071 (1)**
6:6
**9019 (15)**
12:14;14:5,7,13,18,
20;15:19,25;22:17;
32:10;36:9,12;38:7;
42:21;64:25
**938-41 (1)**
72:18
**949 (1)**
68:15
**973406-2250 (1)**
2:24
**998 (1)**
68:19