**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

### NOTICE OF FILING OF CORRECTED DIRECT TESTIMONY DECLARATION OF ALLEN M. PFEIFFER, REGARDING DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES, AND CERTAIN INDIVIDUAL INVESTORS

**PLEASE TAKE NOTICE** that The Bank of New York Mellon, The Bank of New

York Mellon Trust Company, N.A. (collectively, "BNY Mellon"), U.S. Bank National

Association ("U.S. Bank"), and Wells Fargo Bank, N.A. ("Wells Fargo"), solely in their respective capacities as trustee or indenture trustee for certain mortgage backed securities trusts (collectively, the "FGIC Trustees") hereby file a corrected version of the *Direct Testimony Declaration of Allen M. Pfeiffer* (the "**Corrected Declaration**"), attached hereto as **Exhibit A**. On July 31, 2013, the FGIC Trustees filed the *Direct Testimony Declaration of Allen M. Pfeiffer* [ECF No. 4440] (the "**Original Declaration**").  Pursuant to the *Order Regarding Exchange of Confidential Information* [ECF No. 4249] (the "**Confidentiality Order**"), dated July 16, 2013, certain portions of the Original Declaration and exhibits thereto were filed in redacted form and under seal.  The Corrected Declaration is filed solely to remove certain of the redactions and does not alter the Original Declaration in any other way.

[*Remainder of page intentionally left blank.*]

Dated:  New York, New York
        August 1, 2013

**DECHERT LLP**
By:  /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon
and The Bank of New York Mellon Trust
Company, N.A., as Trustee of Certain
Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By:  /s/ Michael E. Johnson
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as
Trustee of Certain Mortgage Backed
Securities Trusts*

**SEWARD & KISSEL LLP**
By:  /s/ Mark D. Kotwick
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association,
as Trustee of Certain Mortgage-Backed
Securities Trusts*

# EXHIBIT A

**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
*Counsel to The Bank of New York Mellon and The*
*Bank of New York Mellon Trust Company, N.A., as*
*Trustee of Certain Mortgage-Backed Securities*
*Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421
*Counsel to U.S. Bank National Association, as*
*Trustee of Certain Mortgage-Backed Securities*
*Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
*Counsel to Wells Fargo Bank, N.A., as Trustee of*
*Certain Mortgage Backed Securities Trusts*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*,

Debtors.

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

## DIRECT TESTIMONY OF ALLEN M. PFEIFFER

I, Allen M. Pfeiffer, under penalty of perjury, testify as follows:

1.      I have been asked by the **FGIC Trustees**[1] to serve as an expert witness in connection with the FGIC Trustees' **Joinder**[2] to Debtors' Motion Pursuant to Fed. R. Bankr, P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors (the "**FGIC Motion**") [Docket No. 3929]. This Declaration is filed in accordance with paragraph 12 of this Court's Scheduling Order [ECF No. 4168]. Parts I through XII of this Declaration (beginning with paragraph 2 of Part I) are identical to my expert report dated and provided on July 19, 2013 (the "**Pfeiffer Report**" or "**my Report**") except that, in the last sentence of paragraph 26, I corrected a 3 typographical errors, changing (i) "18 to 24 percent" to read "19 to 24 percent" and (ii) "22 to 28 percent" to read "24 to 28 percent", in each case to match what is shown in Table 1, referenced in that sentence. In this declaration I add the following new sections: in Part XIII, I address contentions contained in those portions of the **Freddie Mac Objection**[3] and the **Monarch Group Objection**[4] (collectively, the "**Objections**") that relate to the valuation issues addressed in my Report; and in Part XIV, I amend Attachment II (List of Documents Considered) of the Pfeiffer Report. Attachments I and III, as originally attached to my Report, are attached at the end of this

---

[1]      The FGIC Trustees are The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association and Wells Fargo Bank, N.A., each solely in their respective capacities as trustees or indenture trustees for the FGIC Insured Trusts.

[2]      Joinder of FGIC Trustees to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, The FGIC Trustees and Certain Institutional Investors [Docket No. 3982]

[3]      *Federal Home Loan Mortgage Corporation's Objection to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Docket No. 4406]

[4]      *Objection of Monarch Alternative Capital, LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alphas Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Docket No. 4400]

declaration, and the revised Attachment II is also attached.  The new entries on the

revised Attachment II begin at item 127; items 1 – 126 are the same items contained in

Attachment II to my Report as originally provided on July 19.

I.    EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND
      QUALIFICATIONS

2.    I am a Managing Director in the New York, NY and the Morristown, NJ offices of Duff

      & Phelps, LLC ("**D&P**"). I am the Global Service Leader of Dispute Consulting-

      Complex Valuation and Bankruptcy Litigation. D&P is a leading financial advisory and

      investment banking firm offering an array of services in the areas of valuation,

      investment banking and transaction advice, and dispute consulting.

3.    I have more than seventeen years of valuation, solvency, damages cash flow assessment

      and capital structure analysis experience and have led hundreds of engagements related to

      the valuation of an entire business, a security, an interest in a business, or an asset.

      During my professional career, the New York Supreme Court, the United States

      Bankruptcy Court, the American Arbitration Association, and arbitrators operating under

      the rules of the International Chamber of Commerce have accepted me as a valuation and

      cash flow expert. In addition to my testifying experience, I have worked as a lead

      consultant to attorneys and corporations in the context of solvency and many other

      valuation and corporate finance matters. I also led the team of financial advisors to Anton

      Valukus, who served as the Examiner in the Lehman Brothers bankruptcy case.

4.    My Residential Mortgage-Backed Securities ("**RMBS**") experience includes serving as a

      consultant on the valuation and cash flows as part of a solvency matter related to a multi-

      billion-dollar, leading financial services company. I have been retained to advise on the

valuation of RMBS securities as part of the reorganization of an international, multi-billion-dollar financial services entity, and I have served as a debtor advisor in litigation related to the reorganization of a leading residential lender, and lead advisor on the solvency of a large, residential real estate subsidiary. In addition, I have been a consultant to a bank trustee in a multi-billion-dollar repurchase claim matter related to a bank merger, and, in another matter, advised the trustees in a multi-billion-dollar repurchase claim matter associated with a bankruptcy.

5.    While all the conclusions set forth in this Report derive from work performed by me, or performed under my direction, my conclusions relied, in part, on the input of two my colleagues at D&P, John W. Schrader, a Managing Director in the New York Office of D&P and Brendan Murphy, a Director in the New York Office of D&P.

6.    Mr. Schrader possesses over 21 years of Financial Advisory and Investment Banking experience centered on Collateralized Debt Obligations ("CDOs") and various structured products, including RMBS. Mr. Schrader also served as the global head of Mortgage Market Risk and Securitized Products for a leading investment bank. Mr. Schrader has estimated a range of reasonable mortgage repurchase liabilities in association with bankruptcies, has valued and assessed modeling and loan surveillance platforms for numerous domestic and internal whole-loan investments pertaining to performing, re-performing, and non performing mortgages, and has assisted various hedge funds and private equity firms in assessing value and measuring risk associated with structured products (specifically, CDOs, RMBS, Commercial Mortgage-Backed Securities, and Asset-Backed Securities, among others).

7.    Mr. Murphy is a Director in the Global Restructuring Advisory group at D&P with over

twelve years of experience in bankruptcy and restructuring. His experience includes

corporation and asset appraisal — including debt restructuring, liquidation analysis,

extensive valuation, and capital refinancing. His Chapter 11 experience includes Plan

development and creditor negotiations, business plan / capital structure assessment,

distressed M&A (via §363 sales), capital raising (DIP / Exit financing), and operational

turnarounds (cash flow / liquidity management). He has executed over 37 distressed

transactions throughout all phases of financial restructurings and represented clients

within all levels of the capital structure, both in- and out-of-court.

8.    My resume and testimony experience, for at least the past four years, and publications,

for at least the last ten years, are attached to this report as **Attachment I**.


II.    SCOPE OF WORK

9.    

---

[5]    The "FGIC Insured Trusts" are the 47 RMBS Trusts listed on Exhibit B to the Settlement Agreement, certain tranches of which are insured by FGIC.

[6]    Capitalized terms not defined in this Report shall have the meanings ascribed to them in the FGIC Motion or the Settlement Agreement, as applicable.

[7]    

10.    In performing the analyses, I, and/or others at D&P working under my direction, have reviewed, among other information, the following:

- The Settlement Agreement;

- The Plan Support Agreement;

- The Rehabilitation Plan (including the exhibits and attachments thereto);

- The Disclosure Statement for the Rehabilitation Plan, filed on September 27, 2012 (the "**FGIC Disclosure Statement**");

- Affidavit of Michael W. Miller[8] submitted on December 12, 2012, in Further Support of Approval of First Amended Plan of Rehabilitation (the "**Miller Affidavit**");

- The governing agreements for the FGIC Insured Trusts (the "**Governing Agreements**");

- Ibbotson Cost of Capital Yearbook 2012 and 2013 ("**Ibbotson**");

- ResCap's Vision Database[9];

- Intex[10];

- Bloomberg[11];

- Interview with Tim Travers (FGIC's Chief Restructuring Officer);

- Interview with certain Lazard personnel;

---

[8]    Mr. Miller is the Director of the Financial Institutions Group at Lazard Freres & Co. LLC ("**Lazard**").

[9]    The Vision database is ResCap's (now Ocwen's) investor services website and can be found at investor.gmacrfc.com/vision/.

[10]    Intex is a subscription based 3rd party application that models the deal structure and rules that govern cash flow distribution as defined in the governing documents.  It also maintains monthly updated collateral files for each deal, that may be at the loan level or based on summarized or aggregate data, depending on whether or not the Servicer of a deal furnishes then with servicing files.

[11]    Bloomberg is an industry-standard source for financial data, including data on the FGIC Insured Trusts.

- Additional publicly-available documents related to the FGIC Rehabilitation (fully listed in **Attachment II**).

11.  **Attachment II** lists all of the documents that were reviewed and / or considered in forming the basis for my conclusions. I reserve the right to update **Attachment II** as additional documentation is reviewed and / or considered.

III.  SUMMARY OF CONCLUSIONS

12.  <u>Conclusion 1</u>: Under the Settlement Agreement, the FGIC Insured Trusts forgo uncertain Projected Payments and receive the lump sum Commutation Payment upon execution of the Settlement Agreement. The Commutation Payment mitigates downside risk to Investors by securing a known payment to Investors following approval of the Settlement Agreement by the Bankruptcy Court and the Rehabilitation Court (and assuming that all conditions precedent to the Effective Date are satisfied or waived). Following an independent analysis performed by me, and those working under my direction, it is my conclusion that the Commutation Payment amount of approximately $253.3 million falls within a reasonable range, given the expected cash flows associated with the Projected Payments.

13.  <u>Conclusion 2</u>: From a financial perspective, it is my conclusion that it was reasonable for the FGIC Trustees to agree to the Settlement Agreement and thereby accept the Commutation Payment over the Projected Payments. While I do not conclude that acceptance of the Commutation Payment inevitably will be a superior result for all Investors; given the overall risks, benefits, and uncertainties involving both the Commutation Payment and the Projected Payments, and, given that the Settlement

Agreement is an integral part of the Plan Support Agreement that may result in the confirmation of a Plan that produces additional value for Investors in the FGIC Insured Trusts, it is my opinion that a decision by the FGIC Trustees to enter into the Settlement Agreement, and thus accept the Commutation Payment in lieu of the Projected Payments, was reasonable.

IV.    D&P'S ROLE AS FINANCIAL ADVISOR

14.    The conclusions presented in this Report result, in part, from work done by D&P in its role as Financial Advisor to the FGIC Trustees. In late March 2013, as part of the mediation (the "**Mediation**") overseen by the Court-appointed Mediator, Judge James M. Peck, the FGIC Trustees received a proposal for the commutation of insurance policies issued by FGIC to the FGIC Insured Trusts (the "**Proposal**"). ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Attachment III** contains the presentation given to the Trustees on May 15, 2013. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



V.    SUMMARY OF THE REHABILITATION PLAN

(i)    Background

15.    In January 2008, FGIC voluntarily ceased writing policies for new or additional risks,

stopped paying dividends or other distributions to its shareholders, and reduced its

operating expenditures. Despite these measures, FGIC's quarterly statement for the

period ending September 30, 2009 reflected a deficit in Policyholders'[12] surplus of

approximately $866 million, and an impairment of its required minimum surplus to

Policyholders of approximately $932 million.[13] As a result, on November 24, 2009, the

New York State Department of Financial Services ("**NYSDFS**") issued a 1310 Order,

requiring FGIC to suspend payment of all Claims and prohibited FGIC from writing new

Policies.

16.    On June 28, 2012, the Superintendent of Financial Services of the State of New York was

appointed rehabilitator (the "**Rehabilitator**") of FGIC by the Supreme Court of the State

of New York to oversee FGIC's rehabilitation proceeding (the "**Rehabilitation**

**Proceeding**"). On September 27, 2012, the Rehabilitator filed a proposed Plan of

Rehabilitation and a disclosure statement for FGIC, both dated September 27, 2012, in

---

[12]    All capitalized terms first used in this section of the Report have the meaning given in the Rehabilitation
Plan or the FGIC Disclosure Statement, as applicable.
[13]    FGIC Disclosure Statement, p 10.

the Rehabilitation Proceeding. Subsequently, the proposed Plan of Rehabilitation was
amended on December 12, 2012, April 12, 2013, and June 4, 2013 (as amended, the
"**Rehabilitation Plan**").

    (ii)    Goal of the Rehabilitation Plan

17.    The stated goal of the Rehabilitation Plan is to treat FGIC's Policyholders in a fair and
equitable manner in order to remove the causes and conditions that made the
Rehabilitation Proceeding necessary.[14] The Rehabilitation Plan provides for all of the
value of FGIC, other than administrative expenses and certain other costs, to go to
FGIC's Policyholders until the Policyholders are paid in full. No claimants junior to the
Policyholders will receive any payment until the Policyholders are paid in full in
accordance with the terms of the Rehabilitation Plan.

    (iii)    Distribution Methodology Under the Rehabilitation Plan

18.    FGIC's outstanding Policies have scheduled remaining terms that do not expire for as
long as another 40 years.[15] Consequently, FGIC expects to receive Policy Claims over an
extended period, defined in the Rehabilitation Plan as the "**Run-Off Period**."
Conversely, certain Policyholders either have Policy Claims that are accrued and unpaid
since the entry of the 1310 Order on November 24, 2009 ("**Accrued and Unpaid
Claims**") or have Policy Claims that are likely to materialize within the first five years
post-emergence.[16]

19.    The Rehabilitation Plan includes certain policy modifications to provide FGIC the ability
to pay a certain Cash Payment Percentage (the "**CPP**") of each Permitted Policy Claim,

---

[14]    Memorandum of Law in Support of Approval of Plan of Rehabilitation for FGIC (Oct. 25, 2012), p. 1.
[15]    Miller Affidavit at Exhibit II, p 6.
[16]    Miller Affidavit at p 10.

in cash, with the remainder of the Permitted Policy Claim treated as a Deferred Payment

Obligation (the "**DPO**"). The DPO accrues interest at a rate of three percent per annum

(the "**DPO Accretion**") on a simple (non-compounding) basis.

20.    Additionally, the Rehabilitation Plan provides for an initial, partial cash payment, based

on the initial CPP, of then-Permitted Policy Claims, no later than 150 days after the

effective date of the Rehabilitation Plan. The Rehabilitator estimates that the total

distributable value will provide all Policyholders with the same CPP of their Permitted

Policy Claim on a nominal basis (*i.e.*, excluding the time value of money).

21.    The Rehabilitation Plan also provides for an annual, or possibly more frequent,

adjustment of the CPP, based on an assessment of FGIC's financial condition. The

Restructured Policy Terms attached to the Rehabilitation Plan provides that each CPP

Revaluation will include certain updates, revisions, corrections, or other modifications

that are necessary to correct any errors, reflect events that have occurred, or are

reasonably likely to occur, and ensure that the CPP is set at a level consistent with the

Run-Off Principles. These modifications are then used to determine the amount (if any)

of Excess Cash available to recalculate the CPP and determine the amount of DPO

Accretion that may be paid.

22.    Upon a CPP Upward Adjustment, the DPO Accretion Payable Amount will be

distributed, pro rata, based on the outstanding DPO Accretion for each Policy. With

respect to the DPO, the Rehabilitator makes no assurances as to if, when, or in what

amounts, FGIC may ultimately make cash payments with respect to any DPO.

Additionally, the Rehabilitator expects that the DPO Accretion Payment Amounts will be

a fraction of the outstanding DPO Accretion. However, the Rehabilitator makes no

assurances as to if, when, or in what amounts, FGIC may ultimately make cash payments with respect to any DPO Accretion.[17]

23.    The distribution method outlined in the Restructured Policy Terms provides certain reserve mechanisms to prevent potential overpayments on Policy Claims that have already materialized. To the extent that overpayments on a particular Policy Claim are unable to be offset against projected losses, certain Policyholders with unrealized, projected claims may be disenfranchised in the event that the actual distributable value of the estate is unable to be equally distributed to all Policyholders via the CPP.

(iv)    Estimated Recoveries to Policyholders

24.    The Miller Affidavit includes the updated projections for the Run-Off Period (the "**Updated Run-Off Projections**") under both the Base and Stress Scenarios (as defined in the Rehabilitation Plan). The Updated Run-Off Projections estimate the initial CPP will be 17.25 percent. Subsequently, pursuant to the Plan Approval Order dated June 11, 2013, an initial CPP of 17.25 percent was approved. The initial CPP is subject to adjustment by the Rehabilitator in his sole discretion on or before the Effective Date.[18]

25.    The Updated Run-Off Projections offers different projections of the CPP under the Stress Scenario and under the Base Scenario. Under the Stress Scenario, the CPP is held constant at 17.25 percent, until a final distribution of all available assets to holders of policy claims permitted under the Rehabilitation Plan. Assuming a discount rate range of 10 to 20 percent, the present value of recoveries to such Policyholders under the Stress

---

[17]    Rehabilitation Plan at Exhibit B, B-2.
[18]    FGIC Plan Approval Order dated June 11, 2013 at p. 6.

Scenario is 17 to 18 percent, and a lower percentage of the notional (non-discounted) all

Permitted Policy Claims.

26.        Under the Base Scenario, in which the losses are lower than those projected under the

Stress Scenario, the CPP is estimated to increase every year until 2043.[19] Each

Policyholder is projected to receive a nominal recovery of 38.6 percent of their Permitted

Policy Claims by 2052 based on the final CPP estimate included in the Updated Run-Off

Projections. The nominal recovery on an aggregate basis for all Policyholders is

estimated to be 45 percent, that is, after taking into effect the recoveries on the DPO

Accretion. According to Lazard, the net present value of aggregate recoveries divided by

the net present value of all Permitted Policy Claims are estimated to be 27 to 30 percent

under the Rehabilitation Plan using a 10 to 20 percent discount rate range.[20]

VI.    SUMMARY OF THE COMMUTATION PAYMENT CONTAINED IN THE
       SETTLEMENT AGREEMENT

    (i)      Background on FGIC's Proofs of Claims

27.    On November 16, 2012, FGIC filed proofs of claims in the Chapter 11 Bankruptcy

against Residential Capital, LLC ("**ResCap**"), GMAC Mortgage, LLC ("**GMACM**") and

Residential Funding Company, LLC ("**RFC**") (collectively, the "**Debtors**") in an amount

of at least $1.85 billion at each debtor entity, in connection with the pre-petition litigation

(collectively, the "**FGIC Claims**"). I understand the FGIC Claims against the multiple

Debtor entities are generally similar to each other and allege that: (i) RFC and GMACM

breached various representations, warranties and/or covenants in the FGIC Trusts'

Governing Agreements, (ii) FGIC was fraudulently induced to issue the Policies in

connection with most of the FGIC Insured Trusts, and (iii) ResCap is liable for the

alleged breaches and fraud of GMACM and RFC under an alter ego liability theory.

FGIC also asserted claims related to the Debtors' alleged deficient servicing of the

mortgage loans in the FGIC Insured Trusts and based on the Debtors' alleged failure to

provide FGIC access to certain information in accordance with the RMBS Trusts'

Governing Agreements. FGIC further sought indemnification for "any and all claims,

losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or

relating to the breach" of the Governing Agreements. [21]

---

[21]     Declaration of Lewis Kruger in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For
Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees, and Certain Institutional
Investors [Docket No. 3929-3].

(ii)    Estimate of the Commuted Claims

28.



(iii)    Commutation Payment Proposed by FGIC

29.    The Settlement Agreement, among other things, provides a lump-sum Commutation

Payment of $253.3 million to be paid to the FGIC Insured Trusts in commutation of the

Policies and in exchange for FGIC's ability to assert a $596.5 million total general

unsecured claim in the ResCap Chapter 11 Bankruptcy cases.[23]

30.



---

22    See Attachment III.
23    See Attachment III.
24







(i)    Accrued and Unpaid Claims

33.    As stated above, on November 24, 2009, the NYSDFS placed FGIC into Rehabilitation,

ordering FGIC to suspend paying all claims. Since entering into Rehabilitation, FGIC has

continued to receive claims on its outstanding policies. These Accrued and Unpaid

Claims will become payable, according to the Plan, upon FGIC's exit from

Rehabilitation. The total Accrued and Unpaid Claims for the FGIC Insured Trusts on

December 31, 2012 was $753 million. This claim amount represents the total of the

principal loss and interest shortfalls to the insured tranches within the FGIC Insured

Trusts.[27] This information is reported monthly in Intex, confirmed, where available, to the

applicable remittance reports, and aggregated by D&P.

(ii)    Projected Claims

---

[27]    See Attachment III.





      (iii)    Projected Nominal Recoveries

42.    The Base and Stress Scenarios included in the Miller Affidavit contain summary

financials for the Updated Run-Off Period on a 5-year basis (as opposed to on an annual

basis). 













IX.    ADDITIONAL BENEFITS OF THE SETTLEMENT AGREEMENT OVER THE
       REHABILITATION PLAN

57.    In addition to the $253.3 million Commutation Payment, the FGIC Insured Trusts would

no longer need to pay future policy premiums of approximately $18.3 million, on a

present value basis[40]. Including the value of these waived policy premiums, the value of

the Settlement Agreement to the FGIC Insured Trusts increases to approximately $272

million. Along the same lines, the Settlement Agreement will allow any excess spread

(and any reimbursements arising from excess spread) to be distributed to the security

holders of the respective Trusts. That is, any incremental interest provided by the

underlying collateral over the interest paid to the security holders of the trusts go directly

---

[40]    Affirmation of Gary T. Holtzer, Case No. 401265-2012 [Docket #3929-10].

to the securities, rather than reimbursing FGIC, resulting in a potential benefit to Policyholders in addition to Commutation Payment amount of $272 million.[41]

    (i)       Potential Benefits of the Settlement Agreement from the Plan Support Agreement

58.    The approval of the Settlement Agreement is a condition to the effectiveness of the Plan Support Agreement, and it is my understanding that without the FGIC Trustees' acceptance of the Settlement Agreement, FGIC would not have entered into the Plan Support Agreement.

59.    Among other things, the Plan Support Agreement provides for a substantial contribution from Ally Financial (approximately $2.1 billion), which, together with other assets of the Debtors, will be available for distributed creditors, including the FGIC Insured Trusts. In the absence of the Plan Support Agreement (which, I understand, is dependent on the approval of the Settlement Agreement[42]), additional costs related to the extended litigation and administration would likely burden the Estate, which would in turn decrease recoveries to the FGIC Insured Trusts. While not part of D&P's May 15, 2013 presentation to the FGIC Trustees, I understand that the Plan Support Agreement provides that the FGIC Insured Trusts will have allowed claims in the contemplated ResCap Plan of Liquidation. In that regard, if the ResCap Plan of Liquidation contemplated by the Plan Support Agreement is confirmed, an additional estimated $92 million in value will be distributed to the FGIC Insured Trusts. This additional value (which would not necessarily be available absent the FGIC Trustees acceptance of the

---

41      See Attachment III.
42      Plan Term Sheet (Exhibit A to PSA) at page 16.

Settlement Agreement) would increase the total potential value of the Settlement

Agreement to the FGIC Insured Trusts to approximately $364 million.







XI.     RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE

63.     Although my study is based upon the current record, and I am in a position to render conclusions at this time based upon such information, the study is ongoing, and expert witness deposition testimony has not been completed. Accordingly, I reserve the right to revise or expand any expert conclusions to reflect any additional conclusions that I may formulate based upon newly acquired information or arising from reflection and reconsideration of the conclusions based upon views expressed by expert witnesses, if any, and upon further study and information, including, among other things, documentary and testimonial evidence introduced subsequently.

64.     D&P charges rates of $130 – $835 per hour for my professional services and the services of supporting staff in this matter. D&P has no financial interest in the outcome of this matter.

65.     This report is not to be reproduced, distributed, disclosed or used for any purposes other than the above-referenced proceedings without prior written approval.

















XIII.   Amendment to Attachment II

82.   I hereby amend Attachment II to my Report by adding those documents listed beginning at line 127 of that Attachment.

This 31st day of July, 2013

Allen M. Pfeiffer