GIBBS & BRUNS LLP
Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>Residential Capital, LLC, *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 12-12020 (MG)<br><br>Jointly Administered |

**REPLY OF THE STEERING COMMITTEE GROUP OF RMBS HOLDERS IN SUPPORT OF DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS**

TO THE HONORABLE MARTIN GLENN:

The Steering Committee Group of RMBS Holders (the "Steering Committee Group"),[1]

by and through its undersigned counsel, hereby submits this reply in support of the *Debtors'*

---

[1] The Steering Committee Group consists of AEGON USA Investment Management, LLC; Angelo, Gordon & Co., L.P.; Cascade Investment, LLC; Federal Home Loan Bank of Atlanta; Goldman Sachs Asset Management, L.P.;

*Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (the "Motion")[2] seeking approval of the Settlement Agreement dated May 23, 2012 among the Debtors, FGIC, the Steering Committee Group, and other Institutional Investors (the "FGIC Settlement Agreement"). In support thereof, the Steering Committee Group respectfully represents as follows:

## BACKGROUND

1. The Steering Committee Group is undoubtedly the largest group of holders of RMBS issued by the Debtors' securitization trusts. The Steering Committee Group collectively holds more than $12 billion of the Debtors' RMBS (based on unpaid principal balance),[3] and holds 25% or more of such securities in at least one tranche of 304 of the 392 trusts created by the Debtors between 2004 and 2007.[4] Included within the Steering Committee Group's holdings is approximately $316 million (based on unpaid principal balance) of the Debtors' RMBS issued by the FGIC Insured Trusts.[5]

2. Since before these cases were filed, the Steering Committee Group has taken a lead and active role in addressing the RMBS Trusts' claims against the Debtors, including negotiating the original RMBS Settlement Agreement that was announced on the first day of

---

ING Investment Management Co. LLC; ING Investment Management, LLC; Bayerische Landesbank; BlackRock Financial Management Inc.; Kore Advisors, L.P.; Pacific Investment Management Company LLC; Metropolitan Life Insurance Company; Neuberger Berman Europe Limited; SNB StabFund; The TCW Group, Inc.; Teachers Insurance and Annuity Association of America; Thrivent Financial for Lutherans; Western Asset Management Company; and certain of their affiliates, either in their own capacities or as advisors or investment managers.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed in the Motion.

[3] *See Verified Statement of Gibbs and Bruns LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 1741] (holdings as of Sept. 26, 2012).

[4] *See Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [D.I. 1887] ¶ 3 (holdings as of Sept. 17, 2012).

[5] *See id.* Ex. D to Ex. 21 (holdings as of Sept. 17, 2012).

these cases, an agreement that has now been fully incorporated into the proposed *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "Joint Plan").

3.      As the Court is well aware, the Joint Plan was the culmination of an extraordinary and lengthy mediation in which countless intercreditor and intercompany claims were resolved, resulting in the contribution of $2.1 billion by Ally Financial, Inc ("AFI"). An integral part of the Joint Plan is the FGIC Settlement Agreement, which reduced the claims pool against the Debtors' estates by billions of dollars. The importance of the FGIC Settlement Agreement is self-evident. Without this multi-billion dollar reduction in the claims pool, the nearly global compromise embodied in the Joint Plan could not have been achieved. And without the global compromise, there would have been — and if the FGIC Settlement Agreement is not approved there likely will be — no meaningful contribution from AFI. In either of these events, litigation over FGIC's claims (and the other claims that would have to be litigated if the global compromise collapsed) would drive these estates to the brink of administrative insolvency, reducing to a bare minimum (or, perhaps, nothing at all) the recoveries for all holders of RMBS trust securities, including those held by the objectors to the FGIC settlement.

## REPLY TO OBJECTIONS

4.      The FGIC Trustees will address the countless factual inaccuracies and unsupported assertions in the objections of the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the group of investors represented by Willkie Farr & Gallagher LLP (the "Willkie Investor Group").[6] The Steering Committee files this reply to focus on these objectors' failure to assess the proposed settlement in the broader context of these chapter 11 cases.

---

[6] The Willkie Investor Group consists of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited, and CQS ABS Alpha Master Fund Limited.

3

Specifically, the objectors ignore the significant and material benefits provided to the FGIC Insured Trusts under the Joint Plan, which benefits would not exist absent the FGIC Settlement Agreement. Thus, while the FGIC Settlement Agreement should be approved on its own merits, it should not be viewed in isolation.

I. WHEN PROPERLY COMPARED, THE OBJECTORS' OWN ANALYSIS DEMONSTRATES THAT THE FGIC SETTLEMENT IS IN THE BEST INTERESTS OF THE FGIC INSURED TRUSTS

5. The benefits provided to the FGIC Insured Trusts under the FGIC Settlement Agreement and Joint Plan can be demonstrated through the objectors' own framework. The only expert analysis by which an objector purports to quantitatively assess the FGIC Settlement Agreement was performed by Freddie Mac's expert, Mr. Scott R. Gibson.[7] Mr. Gibson's analysis concludes with a comparison of the FGIC Settlement Agreement against projected recoveries under the FGIC Rehabilitation Plan. Mr. Gibson's conclusions are set forth in the following chart:[8]

| Present Value of FGIC-Wrapped Holders' Losses | Base Scenario: 27% Recovery | Base Scenario: 28% Recovery | Base Scenario: 30% Recovery | ResCap Settlement: 21.4% Recovery |
|---|---|---|---|---|
|  |  |  |  | $253,300,000 |
| Plus "Litigation Upside" |  |  |  |  |
| Plus Waived Policy Premiums |  |  |  | $18,000,000 |
| TOTAL |  |  |  | **$271,300,000** |

6. As the table shows, Mr. Gibson's analysis includes ▮▮▮ in "litigation upside" as recoveries under the FGIC Rehabilitation Plan. This "litigation upside" represents

---

[7] The Willkie Investor Group submitted an expert report by Mr. Charles R. Goldstein which did not provide any independent analysis or comparison, but only critiqued the analysis of the FGIC Trustees' expert, Duff & Phelps.

[8] *See* Declaration of Scott R. Gibson ¶ 40.

4

recoveries that the FGIC Insured Trusts would ostensibly receive on account of FGIC's recoveries in the ResCap bankruptcy case.[9] Mr. Gibson calculated this ▆▆▆ in litigation upside from the ResCap estate by taking the $206.5 million that FGIC is projected to receive in distributions under the Joint Plan and calculating the portion of these bankruptcy distributions that would flow to FGIC and, in turn, the FGIC Insured Trusts in the FGIC Rehabilitation.[10]

7.  Mr. Gibson falsely assumes that the FGIC Insured Trusts will receive the benefits of the Joint Plan in the absence of the FGIC Settlement Agreement. Indeed, Mr. Gibson testified at deposition that he was not even aware that the $206.5 million in projected FGIC recoveries (and thus the ▆▆▆ for the FGIC Insured Trusts) was based on the Joint Plan.[11] He then admitted that the ▆▆▆ would, at a minimum, have to be discounted to reflect the absence of the FGIC Settlement Agreement.[12] The Objectors cannot have it both ways: they cannot, on the one hand, claim the *benefit* of the Joint Plan and the FGIC Settlement Agreement in projecting the FGIC Insured Trusts' recoveries, only to *attack* that compromise by arguing that it treats the FGIC Insured Trusts unfairly.

---

[9] *See* Gibson Transcript at 138:25-139:5 ("Q: The litigation upside figures reflect recoveries to the FGIC-wrapped trusts from the ResCap bankruptcy estate; is that right? A: Yes, that's correct."); 150:6-13 ▆▆▆

[10] Specifically, Mr. Gibson calculated that, based on the Miller Affidavit, that there are $6.3 billion in projected claims against FGIC. ▆▆▆

[11] Gibson Transcript at 149:14-151:4. Instead, Mr. Gibson simply lifted the $206.5 million from the Holtzer Affirmation without any understanding as to its basis.

[12] Gibson Transcript at 154:17-25 ▆▆▆

8.  Mr. Gibson also inexplicably excluded any "litigation upside" to the FGIC Insured Trusts under the FGIC Settlement Agreement, which is part of the Joint Plan. Duff & Phelps has calculated that the FGIC Insured Trusts are projected to receive $92 million on account of the RMBS Trusts' claims against ResCap.[13] This amount must be considered as "litigation upside" to properly compare the FGIC Rehabilitation Plan, on the one hand, against the FGIC Settlement and Joint Plan, on the other hand. Accordingly, even assuming that all of Mr. Gibson's other assumptions underlying his analysis are correct (including the omission of any stress case scenario), an apples-to-apples comparison would be as follows:

| Present Value of FGIC-Wrapped Holders' Losses | FGIC Rehabilitation Plan | | | FGIC Settlement Agreement |
|---|---|---|---|---|
| | Base Scenario: 27% Recovery | Base Scenario: 28% Recovery | Base Scenario: 30% Recovery | |
| | ■ | ■ | ■ | $253,300,000 |
| Plus "Litigation Upside" | ■ | ■ | ■ | $92,000,000 (recoveries to FGIC Insured Trusts under Joint Plan) |
| Plus Waived Policy Premiums | ■ | ■ | ■ | $18,000,000 |
| TOTAL | ■ | ■ | ■ | ■ |

9.  As this analysis demonstrates, the significant benefits of the Joint Plan to the FGIC Insured Trusts cannot be ignored. Even assuming all of Mr. Gibson's underlying assumptions are correct, the FGIC Settlement Agreement is well within the range of potential outcomes of both the 27% and 28% base case scenarios (in addition to all stress case scenarios).

10. Notably, this analysis does not include the other significant benefits provided to the FGIC Insured Trusts under the FGIC Settlement Agreement, such as FGIC's waiver of

---

[13] *See* Direct Testimony of Allen M. Pfeiffer ¶ 59.

significant reimbursement rights,[14] nor does this analysis include any stress case assumptions for the 40-year runoff period of the FGIC Rehabilitation.

## II. THE OBJECTORS' CANNOT CLAIM THAT THE FGIC SETTLEMENT AGREEMENT WAS A SURPRISE

11.     The objectors suggest that they were unaware of the global mediation and any negotiations regarding a commutation of the FGIC Policies prior to the public filing of the motion to approve the plan support agreement.  This is simply false.  The existence of the mediation was not a secret.  Objectors' counsel Willkie Farr & Gallagher LLP was aware of the mediation and signed a confidentiality agreement permitting counsel to freely discuss the progress of the mediation with other parties.  Even more to the point, certain objectors were actually represented by counsel at the mediation.  Specifically, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited, two of the members of the Willkie Group, were represented at the mediation by Talcott Franklin.  Mr. Franklin represents a separate group of institutional investors and signed both the Plan Support Agreement and the FGIC Settlement Agreement.[15]  Now, after having been in the fold at the mediation, these objectors are seeking a second bite at the proverbial apple.   This is unfair for all creditors, but is particularly unfair to the Steering Committee Group—and all other RMBS holders—who made significant compromises and sacrifices in the mediation to permit a compromise Joint Plan to be achieved.[16]

---

[14] *See* Witness Statement of John S. Dubel ¶¶ 28-29.

[15] *See* Plan Support Agreement, Docket No. 3814 Ex. 3; FGIC Settlement Agreement, Docket No. 3929, Ex. 2.

[16] Among these compromises were an agreement to support including the so-called "orphan trusts" within the RMBS Trusts' recoveries and a revised treatment of claimed servicing "cures" ostensibly owed to other ResCap serviced (but not ResCap originated) trusts.

7

III.     THE STEERING COMMITTEE GROUP SUPPORTS THE FGIC SETTLEMENT AGREEMENT AND THE REQUESTED FINDINGS

12.     The Steering Committee Group is a party to and supports the FGIC Settlement Agreement. The FGIC Trustees and their professionals independently analyzed the proposed settlement, negotiated the terms of the FGIC Settlement Agreement (including the financial benefits to the FGIC Insured Trusts in addition to the $253.3 million commutation payment), and determined that the FGIC Settlement Agreement was in the best interests of the FGIC Insured Trusts and their beneficiaries.

13.     The fundamental conceit of the objectors is that they want to reap the benefits of a global plan settlement without the Joint Plan's required and essential commutation of the FGIC Policies. That world simply does not exist. The question presented to the FGIC Trustees, and to be assessed for the proposed findings, is whether it was reasonable for the FGIC Trustees to agree to a net-present-value positive commutation of the FGIC Policies (using reasonable discount rates not bolstered by holdout value) in order to (i) receive the benefits of a Joint Plan that brought AFI to the table with a $2.1 billion contribution, (ii) permit the FGIC Insured Trusts to receive approximately $92 million on account of the FGIC Insured Trusts' claims against the Debtors, (iii) provide the FGIC Insured Trusts with $253.3 million in cash now rather than forcing the trusts and investors to wait for up to 40 years for the run-off of the FGIC Rehabilitation Plan,[17] (iv) permit the FGIC Insured Trusts to retain $18 million in premiums (on a net present value basis) that would otherwise be paid to FGIC, and (v) permit the FGIC Insured Trusts to retain significant excess spread reimbursements that would be otherwise paid to FGIC. When properly assessed, in the required context of the overall benefits of the Joint Plan, there

---

[17] Many investors, including the Steering Committee Group, prefer a cash payout now rather than waiting for recoveries from FGIC under the Rehabilitation Plan (which will be driven in part by their longest policy exposures) because any such payments will be received much later than the incurrence of the losses the Trusts will sustain in the interim.

8

can be no doubt that the FGIC Settlement Agreement is in the best interests of the certificateholders in the FGIC Insured Trusts. The FGIC Trustees acted properly in accepting the settlement.

WHEREFORE, the Steering Committee Group respectfully requests that the Court approve the FGIC Settlement Agreement and enter the Proposed Order, including the findings set forth therein.

Dated: August 2, 2013
New York, New York

/s/ Keith H. Wofford

Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

9