MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Anthony Princi
Charles L. Kerr
J. Alexander Lawrence
James A. Newton

*Counsel for the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| --------------------------------------------------------------- ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| --------------------------------------------------------------- ) | | |

**DEBTORS' OMNIBUS REPLY IN FURTHER SUPPORT OF DEBTORS'
MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE
SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC
TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT .............................................................................................................. 4

I.    THE INVESTOR OBJECTING PARTIES' OBJECTIONS HAVE NO MERIT ........... 4

    A.    This Court Has Jurisdiction to Make the Findings ................................. 5

        1.    Approval of the Motion and Findings Are Clearly Within a Core
Proceeding ........................................................................................ 5

        2.    The Findings Fit Squarely Within the Scope of the Motion ..................... 6

        3.    The Findings Are Consistent with the Rehabilitation Court's
Recent Order .................................................................................... 8

    B.    The McCarran–Ferguson Act Does Not Apply, Particularly in Light of the
Rehabilitation Order ................................................................................. 8

    C.    The Willkie Objecting Parties Misconstrue the Sale Order and the
Debtors' Potential Indemnification Obligations ................................. 10

    D.    The Evidence Supports the Findings Contained in the Proposed Order .............. 12

II.    THE AD HOC GROUP'S OBJECTIONS HAVE NO MERIT ................................. 13

    A.    The Ad Hoc Group's Objection to Matters Left To Be Decided as Part of
Plan Confirmation Should Be Disregarded ........................................... 13

    B.    The Ad Hoc Group's Objection to the Minimum Allowed Claim Amount
Provided in the Settlement Agreement Has No Merit ........................ 14

        1.    Providing FGIC the Minimum Allowed Claim Amount in Advance
of a Plan Is Entirely Appropriate ............................................ 15

        2.    In Exchange for the Minimum Allowed Claim Amount, the
Debtors Receive a Substantial Reduction in the Amount of Claims
that FGIC Could Pursue Against Any One Debtor and a Complete
Release of All Claims from the FGIC Insured Trusts ........................... 16

        3.    Settlement of the Subordination Issues in Connection with the
Minimum Allowed Claim Amount Is Appropriate ................................. 18

        4.    The Ad Hoc Group's Claim that the Releases Obtained in the
Settlement Agreement Are Illusory Has No Basis ................................. 22

III.    THE *IRIDIUM* FACTORS HAVE BEEN SATISFIED ................................................ 24

    A.    The Balance Between the Litigation's Possibility of Success and the
Settlement Agreement's Future Benefits ........................................... 25

    B.    The Likelihood of Complex and Protracted Litigation ........................ 27

    C.    The Paramount Interests of Creditors ................................................. 28

## TABLE OF CONTENTS
(continued)

**Page**

    D.      Support of Other Parties-in-Interest for the Settlement Agreement ................... 29

    E.      Nature and Breadth of Releases To Be Obtained by Officers and Directors....... 29

    F.      Competency and Experience of Counsel ........................................................... 29

    G.      Arm's-Length Negotiations ............................................................................... 30

CONCLUSION ...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ad Hoc Comm. of Kenton Cty. Bondholders v. Delta Air Lines, Inc.*,
309 Fed. Appx. 455 (2d Cir. 2009) ............................................................................7

*Anchorage Police & Ret. Sys. v. Official Comm. of Unsecured Creditors of the Holding
Co. Debtors (In re Conseco, Inc.)*,
No. 03-cv-7054, 2004 WL 1459270 (N.D. Ill. 2004) .............................................21

*Bailon v. Guane Coach Corp.*,
78 A.D.3d 608 (1st Dep't 2010) ............................................................................23

*Cibro Petroleum Prods. v. City of Albany (In re Winimo Realty Corp.)*,
270 B.R. 108 (S.D.N.Y. 2001).................................................................................5

*CIT Grp., Inc. v. Tyco Int'l Inc.*,
Case No. 12-16925, 2012 U.S. App. LEXIS 18696 (2d Cir. Sept. 12, 2012) ........20

*DePinto v. Ashley Scott, Inc.*,
222 A.D.2d 288 (1st Dep't 1995) ..........................................................................23

*Humana, Inc. v. Forsyth*,
525 U.S. 299 (1999)...........................................................................................9, 10

*HSBC Bank USA, N.A. v. Fane (In re MF Global Inc.)*,
466 B.R. 244 (Bankr. S.D.N.Y. 2012) ..............................................................24, 25

*In re Adelphia Commc'ns Corp.*,
327 B.R. 143 (Bankr. S.D.N.Y. 2005) .........................................................19, 20, 24

*In re Cincinnati Microwave, Inc.*,
210 B.R. 130 (Bankr. S.D. Ohio 1997)...................................................................21

*In re Delta Air Lines, Inc.*,
370 B.R. 537 (Bankr. S.D.N.Y. 2007) .....................................................................6

*In re Dewey & LeBoeuf LLP*,
478 B.R. 627 (Bankr. S.D.N.Y. 2012) ...............................................................19, 24

*In re Drexel Lambert Group, Inc.*,
138 B.R. 717 (Bankr. S.D.N.Y. 1992) ...................................................................21

*In re Laitasalo*,
193 B.R. 187 (Bankr. S.D.N.Y. 1996) .....................................................................9

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re MF Global Holdings Ltd.*,
  469 B.R. 177 (Bankr. S.D.N.Y 2012) ..........................................................................9

*In re Permian Producers Drilling, Inc.*,
  163 B.R. 510 (W.D. Tex. 2000) ..................................................................................21

*In re Rubin*,
  160 B.R. 269 (Bankr. S.D.N.Y. 1993) ..........................................................................9

*Krys v. Official Comm. Of Unsecured Creditors (In re Refco Inc.)*,
  505 F.3d 109 (2d Cir. 2007) ..........................................................................................7

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007) ....................................................................3, 24, 25, 29

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968) ....................................................................................................24

*Savage & Assocs., P.C. v. K&L Gates LLP (In re Teligent, Inc.)*,
  640 F.3d 53 (2d Cir. 2011) ..........................................................................................24

## STATUTES AND RULES

11 U.S.C. § 510 ....................................................................................................................11

11 U.S.C. §§ 1001-1015 ................................................................................................8, 9, 10

15 U.S.C. § 1012 ....................................................................................................................9

28 U.S.C. § 1334 ....................................................................................................................6

28 U.S.C. § 157 ......................................................................................................................5

N.Y. Ins. Law Art. 74 ............................................................................................................9

Fed. R. Bankr. P. 9019 ................................................................................................ passim

## OTHER AUTHORITIES

10 COLLIER ON BANKRUPTCY ¶ 9019.01 at 9019-2 (16th ed. rev. 2013) ......................24

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**EXHIBITS**

Exhibit 11: Order, Findings of Fact and Conclusions of Law Approving Settlement of Management and Other Claims, *In re Dewey & LeBoeuf LLP*, Case No. 12-12321 (MG) (Bankr. S.D.N.Y. May 30, 2013) [Dkt. No. 1472]

Exhibit 12: Order, *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, No. 401265/12 (N.Y. Sup. Ct. July 31, 2013) (Ling-Cohan, J.).

Exhibit 13: Order Granting Debtors' Motion for Approval of Compromise and Settlement with Securities and Exchange Commission, *In re WorldCom, Inc.*, No. 02-13533 (AJG) (Bankr. S.D.N.Y. Aug. 6, 2003) [Dkt. No. 8125]

The Debtors[1] hereby submit this omnibus reply (the "**Reply**") to the objections to the Debtors' motion [Dkt. No. 3929] (the "**Motion**") seeking approval of the Settlement Agreement, dated as of May 23, 2013, among the Debtors, FGIC, the FGIC Trustees, and certain Institutional Investors, and allowing the FGIC Claims in the Minimum Allowed Claim Amount, subject to FGIC's reservation of its rights to seek allowance of the FGIC Claims in a larger, but capped amount.[2]  In support of this Reply, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As the Court is aware, the Settlement Agreement arose in connection with a broader mediated settlement embodied in the PSA that forms the basis for the Debtors' Plan (as defined below) and is supported by most of the major constituents in this case.

2.      On a stand-alone basis, the Settlement Agreement reflects an important consensual agreement to collar the FGIC Claims with a floor and a ceiling, to resolve and release certain claims that the FGIC Insured Trusts have against the Debtors, and to resolve and release certain inter-creditor claims between FGIC and the FGIC Insured Trusts.  With the Settlement Agreement, the Debtors will circumscribe and substantially reduce the allowed amount of the FGIC Claims while receiving a release of the remainder of the FGIC Claims *and* a release of the bulk of the claims asserted by the FGIC Trustees in connection with the FGIC Insured Trusts.

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

[2] The Debtors specifically respond to the following objections: (1) Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors, dated June 19, 2013 [Dkt. No. 4027]  ("Ad Hoc Obj."); (2) Supplemental Objection of the Ad Hoc Group of Junior Secured Noteholders to the Debtors' FGIC Settlement Motion, dated July 29, 2013 [Dkt. No. 4401] ("Ad Hoc Sup. Obj."); (3) Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors, dated July 29, 2013 [Dkt. No. 4400] ("Willkie Obj."); and (4) Federal Home Loan Mortgage Corporation's Objection to Debtors' Motion Pursuant to Fed R. R Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors, dated July 29, 2013 [Dkt. No. 4453] ("Freddie Obj.").

3.      Under the stand-alone Settlement Agreement, rather than having claims for $1.85 billion against each of ResCap, GMAC Mortgage and RFC (collectively, the "**Settling Debtors**"), FGIC will be limited to seeking at most claims of $596.5 million against each of the Settling Debtors, and if the Plan is not approved, the Debtors will be able to continue to contest or seek to subordinate such claims to the extent they exceed the Minimum Allowed Claim Amount of $596.5 million in aggregate.  (If a Plan is approved, the terms of the Plan will govern the amount of the FGIC Claims.)  This Minimum Allowed Claim Amount reflects a floor set by the Settlement Agreement based on the fact that FGIC has previously paid $343.2 million in claims to the FGIC Insured Trusts and, as part of this settlement, will make an additional $253.3 million cash payment directly to the FGIC Insured Trusts in exchange for a release of the Policies.  The Minimum Allowed Claim Amount is the sum of these two figures.  Proceeding by way of a separate Settlement Agreement now further allows FGIC and the FGIC Trustees to resolve their significant inter-creditor disputes as part of the proceedings in the New York State Rehabilitation Court, which is in its final stages.

4.      The Court has received objections from two constituencies, each of which has expressed diametrically opposing positions.

5.      First, Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited, each of which is represented by Willkie Farr & Gallagher, LLP (the "**Willkie Objecting Parties**") and the Federal Home Loan Mortgage Corporation ("**Freddie Mac**" and, and together with the Willkie Objecting Parties, the "**Investor Objecting Parties**") object on the grounds that the $253.3 million cash payment from FGIC to the FGIC Insured Trusts is too small.  The Investor Objecting Parties take the position that FGIC and the Debtors got the better

of the bargain, specifically that the FGIC Trustees gave away too much and got too little in

return.  Of course, while it is understandable that aggressive, secondary market investors and

Freddie Mac, would prefer to have a greater return, nothing in their objections changes the fact

that in seeking approval of the Settlement Agreement, the Debtors have met the *Iridium*

standards and that the Settlement Agreement should therefore be approved.

6.      Second, the Ad Hoc Group of Junior Secured Noteholders ("**Ad Hoc Group**")

objects to the Settlement Agreement from the opposite perspective.  With respect to the

Minimum Allowed Claim Amount, the Ad Hoc Group argues that the Debtors gave FGIC too

much and received too little in return.  The Ad Hoc Group posits that if the Debtors simply

refused to settle and, instead, litigated all of these disputed claims, FGIC might get less or

perhaps nothing.  That there may be a chance that a creditor would receive less if their claims

were fully litigated does not mean that a debtor cannot or should not settle with that creditor.

Moreover, the Ad Hoc Group completely ignores key components of the Settlement Agreement

that provide substantial benefit to the Debtors, including the releases the Debtors will receive

from the FGIC Insured Trusts eliminating billions of dollars in potential unsecured claims

against the Debtors.

7.      The Ad Hoc Group does not stop there.  In its recurring effort to manufacture

disputes and attempt to litigate plan confirmation issues ahead of the confirmation hearing, the

Ad Hoc Group focuses on FGIC's potential treatment under the global settlement embodied in

the Debtors' Plan that had not even been filed at the time the Ad Hoc Group filed its initial

objection.  The Ad Hoc Group ignores the fact that the Debtors do not, at this time, seek

approval of FGIC's treatment under the now-filed Plan.  Instead, under the Settlement

Agreement that is the subject of ***this Motion***, the Debtors seek only to stem the further accrual of

the FGIC Claims by establishing a floor and a ceiling on the amount of the FGIC Claims while

simultaneously securing releases of potentially billions of dollars of additional claims.  The

Court should disregard the Ad Hoc Group's arguments regarding the Plan in that they are not

now at issue in this Motion.

8.      The evidence will establish that the Debtors, exercising their business judgment,

properly determined that the terms of the Settlement Agreement are fair, equitable and eminently

reasonable to the Debtors' estates and creditors, and that the timely resolution of the FGIC

Claims serves the best interests of the Debtors and their creditors.  The evidence will further

establish that all parties to the Settlement Agreement negotiated in good faith, with each party

advocating for their own interest and for the interests of the parties they represent.  This includes

the FGIC Trustees, who were representing the interest of the investors in the FGIC Insured

Trusts, including the Investor Objecting Parties here.  The Institutional Investors, who have

substantial holdings in the FGIC Insured Trusts, also had a seat at the table, and shared the

interest of the Investor Objecting Parties in maximizing their recovery on those trusts.[3]  There is

no support for the claim that the months-long negotiation of the Settlement Agreement that took

place as part of the mediation process under the guidance of Judge Peck was unfair or not at

arm's-length.

## ARGUMENT

## I.      THE INVESTOR OBJECTING PARTIES' OBJECTIONS HAVE NO MERIT.

9.      The Investor Objecting Parties' have focused their objection on a discrete part of

the Settlement Agreement.  The Investor Objecting Parties do not claim that the Settlement

---

[3] *See* Exhibits D to the Third Amended and Restated RMBS Trust Settlement Agreements, by and between ResCap
and the Institutional Investors [Dkt. Nos. 1887-2 and 1887-3].  Based on the schedules, the Steering Committee and
the Talcott Franklin Group held approximately $1.5 billion in original face value in FGIC Insured Truss as of
September 2012 and approximately $500 million in current face value.

Agreement is unfair, inequitable or unreasonable to the Debtors, the Debtors' estates and/or their

creditors. None of the Investor Objecting Parties are in fact creditors of the Debtors. Rather, the

Investor Objecting Parties object to the amount of the Settlement Payment from FGIC to the

FGIC Insured Trusts and certain findings on which the Settlement Agreement is conditioned (the

"**Findings**"). (*See* Settlement Agreement § 2.02 & Ex. D [Dkt. No. 3929-2].) The Investor

Objecting Parties further challenge this Court's jurisdiction to make the Findings.[4]

10.     The Findings are a critical component of the overall settlement of the FGIC

Claims and will enable the parties to continue working toward a consensual plan without being

drawn into an Article 77 proceeding in state court that could take years to resolve, thereby

harming the estate and the Debtors' creditors. The Findings are appropriate, factually supported,

and should be made. Moreover, this Court has clear jurisdiction to make the Findings.

**A.     This Court Has Jurisdiction to Make the Findings.**

**1.     Approval of the Motion and Findings Are Clearly Within a Core
Proceeding.**

11.     Approval of the Settlement Agreement is a core proceeding under 28 U.S.C. §

157(b)(2). "Core proceedings are matters arising under the Bankruptcy Code or arising in

bankruptcy cases." *Cibro Petroleum Prods. v. City of Albany (In re Winimo Realty Corp.),* 270

B.R. 108, 119 (S.D.N.Y. 2001) (citations omitted). Section 157 sets out a non-exhaustive list of

core bankruptcy proceedings, including, (i) matters concerning administration of the estate; (ii)

allowance or disallowance of claims against the estate, and (iii) other proceedings affecting the

liquidation of the assets of the estate. 28 U.S.C. § 157(b)(2)(A),(B), and (O).

12.     The Motion and Findings are inexorably linked and within a core proceeding for

at least three reasons: (i) resolution of the FGIC Claims and the FGIC Trustee Claims concerns

---

[4] The Debtors join and incorporate by reference the Statement of the FGIC Trustees' Reply in support of the Motion
and FGIC's Reply in support of the Motion.

administration of the estate and affects the liquidation of the assets of the estate; (ii) the Findings

are conditions to the Settlement Agreement (*see* Settlement Agreement §§ 1.03, 6.01(d) & Ex.

D), and approval of the Settlement Agreement is a condition precedent to effectiveness of the

Plan; and (iii) the Settlement Agreement resolves claims against the Debtors' estates, specifically

the FGIC Claims and the FGIC Trustee Claims.

### 2.    The Findings Fit Squarely Within the Scope of the Motion.

13.    The Findings sought with the Motion are also appropriate under 28 U.S.C. §

1334(b), this Court's "related to" jurisdiction,[5] and applicable precedent.  *See*, *e.g.*, *In re Delta*

*Air Lines, Inc.*, 370 B.R. 537, 549 (Bankr. S.D.N.Y. 2007) (holding court had jurisdiction to

approve a Rule 9019 settlement over bondholders' objections and the settlement was in the best

interests of both the debtor and the individual bondholders); Order, Findings of Fact and

Conclusions of Law Approving Settlement of Management and Other Claims, *In re Dewey &*

*LeBoeuf LLP*, Case No. 12-12321 (Bankr. S.D.N.Y. May 30, 2013) [Dkt. No. 1472] at ¶¶ I, J, 5,

8, annexed as Exhibit 11 (finding that insurer acted in good faith in entering into settlement with

a debtor and enjoining non-debtor insureds from pursuing certain claims against the insurer).

14.    Moreover, as one part of an integrated Settlement Agreement, the FGIC Trustees

bargained for and required as a condition to their entry into the Settlement Agreement that any

order approving the Settlement Agreement include the Findings.  The Findings, like any other

required term in a settlement agreement, must be viewed in the context of the entire Settlement

Agreement.  If this Court determines that the Findings are appropriate and supported by the

evidence, and that the approval of the Settlement Agreement is in the best interests of the

Debtors' estates, this Court can and should grant the Motion and make the requested Findings.

---

[5] *See* authorities set forth in the RMBS Trustees PSA Joinder at ¶¶ 5-8 [Dkt. No. 3940].

15.    The Willkie Objecting Parties argue that the Findings are outside of the scope of appropriate findings in connection with a motion under Bankruptcy Rule 9019.  They rely heavily on a decision in which a court concluded that a preference defendant's investors did not have standing to object to a settlement.  *See Krys v. Official Comm. Of Unsecured Creditors (In re Refco Inc.)*, 505 F.3d 109, 117-18 (2d Cir. 2007).  As a result, the court refused to involve itself in a dispute between a defendant in a preference litigation and its investors.  *Id.*  In *Refco*, investors sought to intervene and show that the preference defendant's entry into a settlement with the debtor was unauthorized and a product of tortious misconduct.  The court found that permitting the investors to object would frustrate the Bankruptcy Code's "goal of a speedy and efficient reorganization . . . ."  *Id.* at 118; *see also Ad Hoc Comm. of Kenton Cty. Bondholders v. Delta Air Lines, Inc.*, 309 Fed. Appx. 455, 457 (2d Cir. 2009) (finding bankruptcy court's decision regarding settlement in best interests of third-parties was "thorough" and "well-reasoned" and would be affirmed on the merits but for equitable mootness).

16.    This is not *Refco*.  Here, the settling parties do not contest the Investor Objecting Parties' standing, and this Court has expressly preserved their right to object to the Motion.[6]  Given that the Investor Objecting Parties have standing to object to the Motion, have engaged in discovery, have objected to the Motion on the merits, and are continuing to prosecute their objection, *Refco* is entirely inapposite, and this Court's consideration and entry of an order containing the Findings is an appropriate exercise of its discretion.

---

[6] *See* Mem. Op. Approving the PSA at 15, 45, dated June 27, 2013 [Dkt. No. 4102] (Proposed PSA Findings would not preclude the Investor Objecting Parties from objecting to the Motion or have preclusive effect in connection with the Motion).

### 3. The Findings Are Consistent with the Rehabilitation Court's Recent Order.

17. Moreover, the Rehabilitation Court has stated unequivocally that *this* Court is the appropriate forum for considering investor-related concerns regarding the Settlement Agreement. On July 31, 2013, the Rehabilitation Court denied the Willkie Objecting Parties' Order to Show Cause to (i) intervene in the Rehabilitation Proceeding and (ii) conduct limited and expedited discovery, each with respect to the Rehabilitation Court's approval of the Settlement Agreement (the "**Rehabilitation Order**", annexed as Exhibit 12). The Rehabilitation Court found that investor-specific concerns are not appropriately before the Rehabilitation Court and "can be raised [before the Bankruptcy Court]." (Ex. 12 at 3.) For these reasons, the Findings fit squarely within the Motion and the contours of this Court's jurisdiction.

### B. The McCarran–Ferguson Act Does Not Apply, Particularly in Light of the Rehabilitation Order.

18. The Investor Objecting Parties argue that: (i) this Court cannot "adjudicate whether it is appropriate for FGIC to commute the FGIC Policies [*i.e.*, rule on the Settlement Payment]," and (ii) this Court's authority to make findings regarding the Settlement Payment (*e.g.*, as being in the best interest of the Investors) is pre-empted by the McCarran-Ferguson Act, 11 U.S.C. §§ 1001-1015 (the "**MFA**"). (See Willkie Obj. ¶¶ 13, 15-17; Freddie Obj. ¶¶ 24-33.) These arguments have no merit.

19. <u>First</u>, the Debtors do not dispute that the Rehabilitation Court is charged with ruling on the merits of the Settlement Payment. (Motion ¶ 22.) While the Settlement Payment is part of the Settlement Agreement, the Settlement Payment is between FGIC and the FGIC Trustees, and within the purview of the Rehabilitation Court. Through the Findings, the Debtors request that this Court rule on issues that are investor-specific, *related* to the Settlement Payment, and integral to approval of the Settlement Agreement. The Rehabilitation Court has

made clear that investor-specific concerns, and by extension findings that relate to such

concerns, are properly before this Court.  (Ex. 12 at 3.)

20.    <u>Second</u>, as the Debtors do not seek this Court's ruling on the Settlement Payment,

and because the Findings do not invalidate, impair, or supersede NY insurance law, the MFA

does not apply.  The MFA creates an exemption to normal preemption rules for federal statutes

not directly related to insurance.  *In re MF Global Holdings Ltd.*, 469 B.R. 177, 195 n.17 (Bankr.

S.D.N.Y 2012).  The MFA provides: "No Act of Congress shall be construed to invalidate,

impair, or supersede any law enacted by any State for the purpose of regulating the business of

insurance . . . Unless such Act specifically relates to the business of insurance." 15 U.S.C. §

1012(b).  "Thus, pursuant to the [MFA], federal law, including the Bankruptcy Code, would be

reversed preempted by New York insurance law if: (i) the federal statute does not specifically

relate to insurance; (ii) the state law at issue was enacted to regulate the business of insurance;

and (iii) the federal statute at issue would invalidate, impair, or superseded the state law." *In re

MF Global Holdings Ltd.*, 469 B.R. at 195, n.17 (citation omitted).[7]

21.    While the Bankruptcy Code does not specifically relate to insurance, and Article

74 of the New York Insurance Law (the "**NYIL**") was enacted to regulate the business of

insurance, thereby satisfying the first two elements of the reverse-preemption test, the third

element of the MFA is not met because the Findings would not "invalidate, impair, or supersede"

the NYIL.  The Supreme Court defined the terms "invalidate," "impair" and "supersede" in

*Humana, Inc. v. Forsyth*, 525 U.S. 299, 307-10 (1999).  "Invalidate" ordinarily means "to render

ineffective, generally without providing a replacement rule or law."  And "supersede" ordinarily

---

[7] *See also In re Rubin*, 160 B.R. 269, 279 (Bankr. S.D.N.Y. 1993), *cited in Ochs v. Simon (In re First Cent. Fin.
Corp)*, 269 B.R. 502, 519 (Bankr. E.D.N.Y. 2001) (MFA did not bar adversary proceeding against officers and
directors of insurance company for breach of fiduciary duty as allegedly interfering with ability of the New York
Superintendent of Insurance to liquidate the company); *In re Laitasalo*, 193 B.R. 187, 190-91 (Bankr. S.D.N.Y.
1996) (finding ancillary proceedings brought by foreign representatives were not *per se* in violation of MFA).

means "to displace (and thus render ineffective) while providing a substitute rule." *Id.* at 307
(citations omitted).  In determining whether a state's law was "impaired", the Court stated
"[w]hen a federal law does not directly conflict with state regulation, and when application of the
federal law would not frustrate any declared state policy or interfere with a State's administrative
regime, the [Act] does not preclude its application." *Id.* at 310.

22.    Here, the Rehabilitation Order has already made it plain that the Rehabilitation
Court will *not* address specific investor disputes and, to the extent the investors seek redress
regarding their respective treatment under the Settlement Agreement, this Court is the
appropriate forum to hear such disputes.  (Ex. 12 at 2-3.)  While the Rehabilitator "is tasked with
ensuring that the best interests of FGIC's policyholders as a whole are served," (Ex. 12 at 2), that
in no way conflicts with this Court's "best interests findings" vis-à-vis investors, or the "good
faith" finding as to the FGIC Trustees.

23.    The Findings should be understood in the clearest practical terms:  with the
Findings, the Settling Parties are a significant step closer to effectiveness of the Settlement
Agreement, and by extension, the Plan. Without the Findings, the Debtors' emergence from
these chapter 11 cases is put at significant risk.  Furthermore, even assuming the MFA applied to
reverse preempt this Court from entering the Findings, the Rehabilitation Court has made clear
that it will not address investor-specific disputes, or apply an investor-specific standard to the
Settlement Agreement, effectively leaving the Investor Objecting Parties with no recourse
outside *this* Court.

### C.    The Willkie Objecting Parties Misconstrue the Sale Order and the Debtors' Potential Indemnification Obligations

24.    The Willkie Objecting Parties maintain that absent an indemnification obligation
from the Debtors, this Court has no jurisdiction to make the Findings, and that the sale order

entered by this Court on November 21, 2012 [Dkt. No. 2246] (the "**Sale Order**") approving

Ocwen Loan Servicing, LLC ("**Ocwen**") as the purchaser of the Debtors' servicing platform

effectively terminates the Debtors' indemnification obligations.  (Willkie Obj. ¶¶ 14, 18-20.)

This argument is wrong because it fundamentally misconstrues the terms of the Sale Order.

        25.      Although the Debtors are no longer the servicer of the loans in the FGIC Insured

Trusts, the Debtors nevertheless have ongoing indemnification obligations to the FGIC Trustees

by virtue of the Governing Agreements and the Sale Order.  Although the Sale Order makes

clear at paragraph 35 that:

> [n]othing contained in [the Sale] Order or in the Ocwen APA is intended to
> relieve Purchaser from the Servicer's indemnification obligations to the RMBS
> Trustees under the applicable provisions of the [Governing] Agreements that
> provide indemnification to the RMBS Trustees for losses, liabilities and expenses
> in connection with the performance of their obligations and the exercise of their
> rights under the Servicing Agreements (the "Trustee Indemnity Provisions")
> arising after the Closing Date, whether based on acts or omissions of the Debtors
> on or before the Closing Date[,]

Subparagraph B of the Sale Order also states that:

> *To the extent that any amounts paid to the RMBS Trustees by the Purchaser
> pursuant to the Trustee Indemnity Provisions arise out of or are based on any acts
> or omissions of the Debtors*, or other events or occurrences, which occur on or
> before the Closing Date *and such amounts are not reimbursed to Purchaser* by
> the applicable RMBS Trust under the applicable Servicing Agreements after
> seeking reimbursement therefor from the applicable RMBS Trusts,[9] *the
> Purchaser may assert such amounts against the Debtors as administrative
> expense claims under section 503(b) of the Bankruptcy Code and such claims
> shall be deemed "Allowed" [. . .]*

(Sale Order ¶ 35 (emphasis added).)  Together, these provisions make clear that to the extent

Ocwen is not reimbursed by the applicable RMBS Trust for payments relating to an indemnified

obligation under the Governing Agreements, the Debtors are nevertheless obligated to reimburse

Ocwen through payment of an administrative expense claim.  Furthermore, Paragraph P of the

Sale Order states that Ocwen incurred no liability arising out of or relating to any act or omission

of the Debtors occurring prior to the Closing Date:

> For avoidance of doubt, notwithstanding anything to the contrary contained in this
> Order or in the Ocwen APA, upon the assignment of the Servicing Agreements to
> Purchaser, Purchaser shall perform all of the obligations under the Servicing
> Agreements . . . from and after the Closing Date; provided, however, that
> Purchaser shall not incur any liability that arises out of or relates to any act or
> omission of the Debtors (whether as originator, servicer, or otherwise) that
> occurred before the Closing Date.

(Sale Order ¶ P.)  Accordingly, this Court continues to have "related to" jurisdiction given the

potential indemnification obligations of the Debtors under both the Governing Agreements, as

applicable, and the Sale Order.[8]

### D.    The Evidence Supports the Findings Contained in the Proposed Order.

26.    Finally, the evidence that will be presented to the Court fully supports the

Findings.  Over the course of the mediation overseen by Judge Peck, the parties to the Settlement

Agreement, which have divergent and different interests and agendas, negotiated the Settlement

Agreement.  (*See* Direct Testimony of Lewis Kruger, sworn to July 31, 2013, ¶¶ 14, 57-58

("Kruger Direct Test.") [Dkt. No. 4431].)  Each of the parties is highly sophisticated and

represented by experienced counsel and financial advisors.  (Kruger Direct Test. ¶¶ 41-42, 56.)

The evidence fully supports a finding that the FGIC Insured Trustees acted reasonably, in good

faith and in the best interests of the Investors in each Trust and each such Trust in agreeing to the

Settlement Agreement.[9]  The evidence further fully supports a finding that the Settlement

Agreement is in the best interests of all parties involved.

---

[8] As discussed in the Statement of the Trustees, the Debtors have a separate indemnification obligation to the FGIC
Trustees with respect to the cost of litigating these claims.

[9] See *also* Declaration of Mamta K. Scott, July 31, 2013 ("Scott Decl.") [Dkt. No. 4444-1]; Declaration of Mary L.
Sohlberg, July 31, 2013 ("Sohlberg Decl.") [Dkt. No. 4442]; Declaration of Robert H. Major, July 31, 2013 ("Major
Decl.") [Dkt. No. 4438]

## II.    THE AD HOC GROUP'S OBJECTIONS HAVE NO MERIT.

27.    The Ad Hoc Group has repeatedly expressed its intention to object to every

motion the Debtors make in these cases in an effort to create havoc and potential leverage as part

of their ongoing efforts to extract more money from the Debtors' estate.  The Ad Hoc Group,

however, has no basis to object to this Motion.

### A.    The Ad Hoc Group's Objection to Matters Left to Be Decided as Part of Plan Confirmation Should Be Disregarded.

28.    As part of its continuing effort to litigate plan confirmation issues ahead of the

confirmation hearing, the Ad Hoc Group raises purported concerns regarding the financial terms

of the recently proposed Joint Chapter 11 Plan [Dkt. No. 4153] (the "**Plan**"), of which the

Debtors do not seek approval at this time.  Specifically, the Ad Hoc Group objects to the fact that

under the Plan, if approved, FGIC will receive a fixed, allowed claim from ResCap, the parent

company of GMAC Mortgage and RFC.[10]

29.    Contrary to the Ad Hoc Group's suggestion, the Settlement Agreement does not

provide for an allowance of the FGIC Claims against ResCap.  As described in the Motion and in

the Settlement Agreement itself, the Minimum Allowed Claim Amount for which the Debtors

seek approval shall be "allocated among ResCap, LLC, GMAC[ Mortgage] and RFC pro rata

based on which of the Debtors would be obligated to reimburse FGIC for such payments under

the Governing Agreements" for the applicable FGIC Insured Trust.  (Settlement Agreement

§ 3.01(A).)  Under the Settlement Agreement, there would be no recovery of this Minimum

Allowed Claim Amount from ResCap because ResCap is not obligated to reimburse FGIC for

any such payments under the Governing Agreements.  The Ad Hoc Group ignores this aspect of

---

[10] In the event the Plan is approved, the Ad Hoc Group would be paid in full plus prepetition interest (and any post-petition interest to which the Court determines they are entitled), and thus the Ad Hoc Group would not be impacted by providing an allowed claim to FGIC in the Minimum Allowed Claim Amount, much less any other amount.

the Settlement Agreement and once again attempts to conflate the terms of the Settlement

Agreement with the terms of a Plan that the Debtors have not yet placed before the Court for

confirmation.

30.    What FGIC receives under the Settlement Agreement and what FGIC might

receive under the Plan, if approved at a future confirmation hearing, are separate and distinct

matters.  The Settlement Agreement and the releases provided thereunder are not conditioned on

approval of the Plan or on the approval of any specific amount of allowed claim as against

ResCap.  Section 6.01 of the Settlement Agreement clearly sets forth each of the conditions

precedent to the effectiveness of the Settlement Agreement, and none of those enumerated items

are conditioned upon the approval of the Plan.  (Settlement Agreement § 6.01.)

31.    Approval of FGIC's treatment under the Plan will be addressed in connection

with the future confirmation of the Plan (or any other plan the Debtors subsequently pursue) or

through litigation properly raising the remaining disputes.  As it has done on other recent

occasions, the Court should dismiss the Ad Hoc Group's attempts to litigate issues not before the

Court, in particular its attempt to litigate plan confirmation issues outside of the plan

confirmation process.

**B.    The Ad Hoc Group's Objection to the Minimum Allowed Claim Amount
Provided in the Settlement Agreement Has No Merit.**

32.    Putting aside the Ad Hoc Group's objections to the Plan, the Ad Hoc Group's

objections to the Settlement Agreement, which is what is actually before the Court for approval,

are based on fundamental misunderstandings, if not outright misstatements, regarding the

economics of the Settlement Agreement.  The Ad Hoc Group has no basis to object to allowing

the FGIC Claims in Minimum Allowed Claim Amount, subject to FGIC's reservation of rights to

assert on a contested basis additional claims up to $596.5 million in the aggregate against each of

the Settling Debtors.  In exchange for agreeing to this allowed claim, the Debtors receive

substantial value including (i) the release of the remainder of FGIC's $1.85 billion claims

asserted against each of the Settling Debtors and (ii) the release of all separate origination-related

claims (potentially in the billions of dollars) that may otherwise be asserted by the FGIC

Trustees on account of the wrapped tranches of the FGIC Insured Trusts.

### 1.    Providing FGIC the Minimum Allowed Claim Amount in Advance of a Plan Is Entirely Appropriate.

33.    One of the Ad Hoc Group's objections is to the timing of the settlement.  It is,

however, entirely appropriate under these circumstances to provide an allowed claim in the

Minimum Allowed Claim Amount to FGIC at this stage of the proceedings.

34.    In light of the pending proceedings in the Rehabilitation Court, the parties sought

approval of the Settlement Agreement in connection with and prior to FGIC's imminent

emergence from rehabilitation and separate from and prior to the plan confirmation process in

this Court.  Given the prospect of a trilateral settlement among the Settling Debtors, FGIC, and

the FGIC Trustees on what the Debtors believe to be fair and reasonable terms, the Debtors

determined that their entry into the Settlement Agreement prior to FGIC's emergence from

rehabilitation, and the resulting resolution of various important gating issues related to the

allowance of the FGIC Claims and the inter-creditor disputes between FGIC and the FGIC

Insured Trusts, was an appropriate exercise of their business judgment.  The Debtors also believe

that having the Settlement Agreement be reviewed as part of the proceedings in the

Rehabilitation Court is particularly appropriate because it involves a cash payment *from FGIC*

to the FGIC Trustees prior to the confirmation of a plan in these cases.[11]

---

[11] By Motion, dated May 29, 2013, the Rehabilitator has sought approval of the Settlement Agreement in the Rehabilitation Court.  Affirmation of Gary Holtzer, sworn to May 29, 2013, ¶ 3 [Dkt. No. 3929-10].

35.     In light of the fact that FGIC agrees to make an additional, substantial cash payment to the FGIC Insured Trusts outside of the Plan and in connection with the proceedings in the Rehabilitation Court, providing FGIC with an allowed claim in the Minimum Allowed Claim Amount that accounts for that substantial cash payment and its prior payments to the FGIC Trustees is entirely appropriate at this stage of these proceedings.

> **2.      In Exchange for the Minimum Allowed Claim Amount, the Debtors Receive a Substantial Reduction in the Amount of Claims that FGIC Could Pursue Against Any One Debtor and a Complete Release of All Claims from the FGIC Insured Trusts.**

36.     Based on fundamental misconceptions about the FGIC Claims and their treatment through the Settlement Agreement, the Ad Hoc Group further argues that the ceiling placed on the FGIC Claims has no value to the Debtors.  The Ad Hoc Group's argument does not withstand even passing scrutiny.

37.     FGIC has filed a proof of claim in these chapter 11 cases in the amount of $1.85 billion against each of the Settling Debtors.  FGIC has asserted in these chapter 11 cases and in pre-petition litigation against the Settling Debtors that it has claims against each of the Settling Debtors under, *inter alia*, aiding and abetting, alter-ego and veil piercing theories.  (*See* FGIC Claim No. 4868, ¶¶ 24-25, 28-33 [Dkt. No. 3929-6].)  The Ad Hoc Group asserts that because FGIC can only ever recover $1.85 billion, the Debtors are settling the FGIC Claims for "approximately 32% of the total claims filed against th[e Settling] Debtors" and providing FGIC with "a 'free option' to recover nearly the full amount of its claims."  (Ad Hoc Obj. ¶¶ 18-21.) This argument confuses the economics of the settlement.

38.     First, the Ad Hoc Group's objection attempts to inflate the amount of the FGIC Claims allowed under the Settlement Agreement while ignoring the fact that FGIC has asserted three separate proofs of claim in the amount of $1.85 billion against each of the Settling Debtors.

At the same time, the Ad Hoc Group inflates FGIC's expected recovery under the Settlement Agreement by arguing, incorrectly, that FGIC will retain the right to recover $1.79 billion. Implicit in this reasoning, however, is the assumption that the Debtors' creditors will receive a 100% dividend, allowing FGIC to recover $1.79 billion on the artificially deflated $1.85 billion in total claims. This argument also assumes, incorrectly, that if the Plan is not approved, the Debtors will not contest any claims asserted by FGIC in excess of the $596.5 million Minimum Allowed Claim Amount. Combined, these inaccuracies significantly undervalue the benefits to FGIC under the Settlement Agreement.

39.    Viewed appropriately, the Debtors have managed to reduce the asserted amount of the FGIC Claims by nearly two-thirds (from $1.85 billion to $596.5 million against each of the Settling Debtors) with two-thirds of the remaining asserted FGIC Claims still subject to objection and challenge by the Debtors.

40.    Additionally, the Ad Hoc Group completely ignores the releases being provided by the FGIC Trustees to the Debtors of potentially $5.0 billion in breach of representation and warranty and other origination-related claims under the Governing Agreements. Although the Debtors by no means believe that the FGIC Trustees could recover $5.0 billion from the Debtors, the FGIC Trustees have clearly asserted that they have substantial claims and that they intend to pursue recovery for any and all potential loss of collateral held by the FGIC Insured Trusts. Absent this settlement, the Debtors would have to address and litigate all of these claims and incur the attendant expense and delay of doing so. Through the Settlement Agreement, the Debtors obtain a release of the vast majority of the claims held by the FGIC Insured Trusts, avoiding protracted dual-tracked litigation over whether FGIC and/or the FGIC Trustees may assert claims in connection with the FGIC Insured Trusts.

41.    In sum, in exchange for an allowed claim of $596.5 million (subject to certain reservations of rights), the Settlement Agreement will reduce the asserted, aggregate amount of the FGIC Claims by nearly two-thirds—or from $5.5 billion to $1.79 billion—and a substantial portion of the remaining FGIC Claims will remain subject to challenge by the Debtor. Moreover, the Debtors will be released from substantial claims asserted by the FGIC Trustees. These releases amply and clearly show that the Settlement Agreement offer substantial benefits to the Debtors, the Debtors' estates and their creditors and falls well above the lowest point in the range of reasonableness and should be approved.

### 3.    Settlement of the Subordination Issues in Connection with the Minimum Allowed Claim Amount Is Appropriate.

42.    The Ad Hoc Group further objects to the Settlement Agreement because it has posited a legal theory that it contends, if successful, would result in FGIC receiving nothing. Specifically, the Ad Hoc Group argues that the Debtors have strong arguments under Section 510(b) of the Bankruptcy Code to subordinate the FGIC Claims.

43.    As the Debtors stated months ago when the Ad Hoc Group first trotted out this argument, the Debtors disagree with the Ad Hoc Group's underlying premise that contractual representation and warranty claims can be properly subordinated under Section 510(b).  *See Debtors' Reply Brief re Objection of Junior Secured Noteholders to Motion for Approval of RMBS Settlement Agreements*, dated March 15, 2013 [Dkt. No. 3221] ("RMBS Objection Reply") (addressing why the Ad Hoc Group's Section 510(b) subordination arguments have no merit).[12]  Although the Debtors were addressing the application of Section 510(b) in connection with trust claims, these arguments would be equally, if not more applicable, to contractual claims

---

[12] The Debtors incorporate their prior response to the Ad Hoc Group's subordination arguments by reference.  *See* RMBS Objection Reply at 12-15.

being asserted by an insurance company that issued policies to those trusts and is basing its claim

on the insurance agreements it has with the Debtors.

44.     Even if the Ad Hoc Group's subordination arguments had some merit, settlement

of these potential subordination issues is entirely appropriate.  Settlements are commonplace, and

even encouraged, in bankruptcy cases, and debtors and creditors regularly resolve legal and

factual issues through Bankruptcy Rule 9019 settlements.[13]  Indeed, although ignored by the Ad

Hoc Group, courts in this district have approved settlements of claims even when there exists

some dispute regarding the applicability of Section 510(b).

45.     In Order Granting Settlement, *In re WorldCom, Inc.*, No. 02-13533 (Bankr.

S.D.N.Y. Aug. 6, 2003) [Dkt. No. 8125] (annexed as Exhibit 13), and *In re Adelphia*

*Communications Corp.*, 327 B.R. 143,168-70 (Bankr. S.D.N.Y. 2005), *aff'd sub. nom. Ad Hoc*

*Adelphia Trade Claims Committee v. Adelphia Communications Corp.*, 337 B.R. 475, 478

(S.D.N.Y. 2006), the courts approved settlements between the respective debtors and the SEC

that resolved securities litigation initiated in the wake of accounting scandals within each of the

debtors' respective business organizations.  Objectors argued that because the hundreds of

millions of dollars paid into the anticipated settlement funds would most likely be used to

provide recoveries to the debtors' prior stockholders pursuant to Section 308 of the Sarbanes-

Oxley Act, the claims had to be subordinated under Section 510(b).  Although recognizing that

indeed the proceeds likely would be distributed to victim security holders on account of losses

related to the purchase or sale of debtor securities, the Court approved the settlements.  *See*

*Adelphia*, 327 B.R. at 168-69; *Worldcom Order* at *3-4.  The *Adelphia* court explained that

---

[13] *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640-41 (Bankr. S.D.N.Y. 2012) ("As a general matter, '[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.'" (quoting *In re MF Global Inc.*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012)).)

whether the SEC's claim would have been subordinated if the issue had been litigated was a

"matter of fair debate," but the issue of subordination was not before the court. *Adelphia*, 327

B.R. at 169. Instead, the court was being asked to approve a settlement under Bankruptcy Rule

9019. *Id*. Viewed in that light, the court explained that:

> the very difficulty of the underlying issue makes the [] issue before me—whether
> a settlement of such a controversy is inappropriate or unlawful—a rather easy
> one. The real issue before me, of course, is whether the Government and the
> Debtors could settle a controversy as to which that close and difficult issue [of
> subordination under Section 510(b) of the Bankruptcy Code] is an element, and
> the answer to that plainly is 'yes.' It is no different than the multitude of other
> difficult issues that are settled in litigation all the time.

*Id.*

46.    In this case as well, the Debtors seek to resolve the issue of potential

subordination of the FGIC Claims as one element of a broader settlement. Any litigation

regarding the allowance and potential subordination of the FGIC Claims would involve complex

and novel legal issues, both in connection with the underlying merits of the FGIC Claims, and

the application of Section 510(b) to those claims. As demonstrated by the complete lack of

applicable authority in the Ad Hoc Group's Objection, attempts to subordinate monoline or other

similar claims under Section 510(b) are untested through litigation. Indeed, the only case law

cited by the Ad Hoc Group on the applicability of Section 510(b) to the FGIC Claims stands for

the unremarkable proposition, also located in the Bankruptcy Code's definition of "securities,"

that notes can be securities for purposes of Section 510(b) of the Bankruptcy Code.[14]

---

[14] The lack of authority cited by the Ad Hoc Group also is not surprising given the broad application of Section 510(b) that the Ad Hoc Group advocates. The Ad Hoc Group appears to argue that simply because the insurance agreements under which the FGIC Claims arise were executed in connection with a securitization transaction, all claims arising under those insurance agreements "aris[e] from the purchase or sale of a security" for purposes of Section 510(b). Yet it is difficult to see where the Ad Hoc Groups' overly-broad reading of Section 510(b) would draw the line. The Second Circuit has held that the mere connection of a contract-based claim to the purchase or sale of a security is insufficient to support a finding that the claim "arises from" the purchase or sale of a security for purposes of Section 510(b) subordination. *CIT Grp., Inc. v. Tyco Int'l Inc.*, Case No. 12-16925, 2012 U.S. App. LEXIS 18696 (2d Cir. Sept. 12, 2012).

47.     The cases cited by the Ad Hoc Group fail to support their argument that the Debtors should not be permitted to settle, in part, issues related to the subordination of the FGIC Claims.  Each of the cases cited involved claims falling squarely within the scope of Section 510(b).  Two of the cases involved bankruptcy claims asserted by creditors based on pre-petition settlement agreements stemming from securities litigation and the other involved an attempt by the debtor to settle, post-petition, a pre-petition securities fraud class action.[15]  Moreover, in the only case involving a proposed settlement under Bankruptcy Rule 9019, the Court did not conclude that subordination issues could never be settled under Bankruptcy Rule 9019, but only that the settlement at hand was not in the best interests of the debtor's estate, where the claim was clearly subject to subordination.  *See In re Cincinnati Microwave*, *Inc*., 210 B.R. at 133-34.

48.     As indicated above, in cases where the determination regarding the applicability of Section 510(b) requires resolution of novel legal issues, settlement of those issues is appropriate if reasonable and in the best interests of the debtor's estate.  *See also*, *e.g.*, *In re Drexel Lambert Grp.*, *Inc*., 138 B.R. 717, 719 (Bankr. S.D.N.Y. 1992) (approving settlement resolving various employee ERISA and compensation claims "related principally to the purchase or acquisition of stock by employees or the divesture of stock by employees" over objections that those claims should be subordinated under Section 510(b) where it was unclear whether ERISA overrode the mandates of Section 510(b)), *aff'd sub. nom. Lambert Brussels Assocs. L.P. v. Drexel Burnham Lambert Group, Inc*. (*In re Drexel Burnham Lambert Group, Inc.*), 140 B.R. 347 (S.D.N.Y. 1992).

---

[15] *Anchorage Police & Ret. Sys. v. Official Comm. of Unsecured Creditors of the Holding Co. Debtors (In re Conseco, Inc.)*, No. 03-cv-7054, 2004 WL 1459270 (N.D. Ill. June 25, 2004) (classification dispute over the classification of a settlement agreement arising from securities fraud litigation); *In re Permian Producers Drilling, Inc.*, 263 B.R. 510 (W.D. Tex. 2000) (attempt by creditor to have claim based on settlement agreement resolving securities litigation classified with general unsecured claims); *In re Cincinnati Microwave, Inc.*, 210 B.R. 130, 133-34 (Bankr. S.D. Ohio 1997) (post-petition settlement of securities fraud class action).

49.     The Settlement Agreement represents a reasonable resolution of difficult and unresolved legal and factual issues regarding the merits of the FGIC Claims.  Even if the Ad Hoc Group's subordination arguments had any merit, which they do not, the settlement of Section 510(b) subordination issues is still appropriate.

**4.     The Ad Hoc Group's Claim That the Releases Obtained in the Settlement Agreement Are Illusory Has No Basis.**

50.     Finally, the Ad Hoc Group presents its most novel argument.  The Ad Hoc Group claims that, if the Plan is not approved, FGIC could still pursue its alter-ego, aiding and abetting, and veil piercing claims against Ally Financial Inc. ("**AFI**").  (Ad Hoc Sup. Obj. at 22.)  In that case, the Ad Hoc Group posits that FGIC might recover from AFI, and then AFI might seek indemnification from the Debtors.  Thus, according to the Ad Hoc Group, the Debtors are getting nothing of value in exchange for the Minimum Allowed Claim Amount.  The Ad Hoc Group's argument once again does not pass scrutiny.

51.     First, the Ad Hoc Group's hypothetical situation is premised on its assumption that FGIC could recover against AFI.  This is clearly an assumption that the Ad Hoc Group does not believe is likely to occur.  On the very next page of its Supplemental Objection, the Ad Hoc Group notes that the Examiner concluded that such third party claims against AFI are unlikely to prevail.  (Ad Hoc Sup. Obj. at 23 n. 8.)  It is also difficult to reconcile this argument with the Ad Hoc Group's claim that there is no basis for ResCap, which is the intermediate parent of RFC and GMAC Mortgage, to have any liability to FGIC.  (Ad Hoc. Obj. at 14.)  Moreover, the Ad Hoc Group's hypothetical situation is further premised on the faulty assumption that if the Plan is not approved that the Debtors would have remaining assets against which AFI could recover.

52.     Second, once again as it does throughout its objection, the Ad Hoc Group completely ignores the claims of the FGIC Insured Trusts that are being released.  Thus, while

the Settlement Agreement expressly provides that FGIC is not compromising its claims against

AFI, the Settlement Agreement includes no such provision for the claims of the FGIC Insured

Trusts. *See* Settlement Agreement § 2.01(d) ("nothing in this Agreement, including the

allowance of the FGIC Allowed Claims (as defined in Section 3.01 below) in the Chapter 11

Cases, is intended or shall be construed as a settlement, termination, release, discharge or waiver

of . . .(iv) any and all claims of any kind or nature, and whether based in contract, tort or

otherwise, FGIC may have against any non-Debtor affiliates of ResCap, LLC, including Ally

Financial Inc., or such entities' respective Representatives, whether such claims are now existing

or hereafter arising, and whether known or unknown, including the Prepetition Litigation."). In

fact, the release being provided by the FGIC Trustees with respect to origination-related claims

is extremely broad. *See* Settlement Agreement § 2.01(a)(iv) (releasing "all obligations, claims

and liabilities of any kind or nature, and whether based in contract, tort or otherwise, arising out

of or relating to any of the Origination-Related Provisions").[16]

\* \* \*

53.    None of the Ad Hoc Groups' objections to the Settlement Agreement have any

merit.[17] The Ad Hoc Group has no basis to argue that providing FGIC an allowed claim in the

---

[16] The FGIC Trustees therefore cannot, as the Ad Hoc Group suggests, pursue the released claims against AFI, resulting in additional indemnity claims to the estates. Absent an express carve-out, where a plaintiff releases claims against a defendant, the plaintiff necessarily releases any alleged alter egos as well. *See Bailon v. Guane Coach Corp.*, 912 N.Y.S.2d 188, 189 (1st Dep't 2010) ("To the extent that plaintiffs' theory against [co-defendants] was based on alter ego liability, arising out of [their] disregard of the corporate form of [the settling defendant] . . . the [co-defendants] must be treated as having stepped into the shoes of the [settling defendant], and their liability would be that of [the settling defendant]. By executing a release in favor of [the settling defendant] upon payment by its insurer of $ 100,000, plaintiffs necessarily released the [co-defendants] as well."). The same is true of any aiding and abetting claims where the defendant is an alleged alter ego of a releasee. *See DePinto v. Ashley Scott, Inc.*, 635 N.Y.S.2d 215, 217 (1st Dep't 1995) (affirming dismissal of aiding and abetting claims because the defendant "was, as the alter ego of the [releasee], a beneficiary of the releases in the prior action between the parties which released all claims"); *cf.* Settlement Agreement § 2.01(a)(ii) (releasing "all obligations, claims and liabilities").

[17] The Ad Hoc Group further suggest that the Debtors are improperly asserting reliance on counsel and/or are improperly relying on "the mediation defense" as a basis for seeking approval of this motion. (Ad Hoc Sup. Obj. at 27.) This is a complete straw-man argument. Mr. Kruger clearly testified in his direct testimony and at his deposition that, although he met with counsel to be briefed on the underlying issues relating to FGIC and the

Minimum Allowed Claim Amount in exchange for substantial releases from FGIC and the FGIC

Insured Trusts is not fair, equitable and eminently reasonable to the Debtors' estates and

creditors.

## III.    THE *IRIDUM* FACTORS HAVE BEEN SATISFIED.

54.    Bankruptcy Rule 9019(a) provides this Court with the authority to "approve a

compromise or settlement."  Indeed, "[s]ettlements and compromises are favored in bankruptcy

as they minimize costly litigation and further parties' interests in expediting the administration of

the bankruptcy estate." *HSBC Bank USA, N.A. v. Fane* (*In re MF Global Inc.*), 466 B.R. 244,

247 (Bankr. S.D.N.Y 2012); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re*

*Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (stating that settlements are important

in bankruptcy because they "help clear a path for the efficient administration of the bankrupt

estate . . . ."); 10 COLLIER ON BANKRUPTCY ¶ 9019.01 at 9019-2 (16th ed. rev. 2013)

(highlighting that "compromises are favored in bankruptcy").

55.    Prior to approval, the Court must determine that the settlement is fair, equitable

and in the best interest of the estate. *Protective Comm. for Indep. Stockholders of TMT Trailer*

*Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).  In so doing, the Court need not decide the

numerous issues of law and fact raised by the compromise or settlement, "but must only 'canvass

the issues and see whether the settlement falls below the lowest point in the range of

reasonableness.'" *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640-41 (Bankr. S.D.N.Y. 2012)

(citing *In re Adelphia Commc'ns Corp.*, 327 B.R. at 159)).

---

monoline claims, he reached his own independent business judgment in deciding to approve and execute the
Settlement Agreement.  (Kruger Direct Test. ¶¶ 5, 35, 36.)  With respect to the confidentiality requirements imposed
by this Court in its December 26, 2012 Order Appointing Mediator and General Order M-390, the Debtors have
properly complied with those Orders and the Ad Hoc Group has made absolutely no showing that the confidentiality
imposed by those orders should be modified. *See generally Savage & Assocs., P.C. v. K&L Gates LLP (In re*
*Teligent, Inc.)*, 640 F.3d 53 (2d Cir. 2011).

56.      In the Second Circuit, *In re Iridium Operating LLC* provides seven interrelated

factors for a court to consider in its determination.  These factors are:

> (1) the balance between the litigation's possibility of success and the settlement's
> future benefits; (2) the likelihood of complex and protracted litigation, with its
> attendant expense, inconvenience, and delay, including the difficulty in collecting
> on the judgment; (3) the paramount interests of the creditors, including each
> affected class's relative benefits and the degree to which creditors either do not
> object to or affirmatively support the proposed settlement; (4) whether other
> parties in interest support the settlement; (5) the competency and experience of
> counsel supporting, and [t]he experience and knowledge of the bankruptcy court
> judge reviewing, the settlement; (6) the nature and breadth of releases to be
> obtained by officers and directors; and (7) the extent to which the settlement is the
> product of arm's length bargaining.

*Iridium*, 478 F.3d at 462 (internal quotations omitted).

57.      The Settlement Agreement satisfies all seven *Iridium* factors.  Tellingly, none of

the objectors substantively address any *Iridium* factor, each of which is addressed below, nor do

they contend that these factors have not been met.

### A.      The Balance Between the Litigation's Possibility of Success and the Settlement Agreement's Future Benefits

58.      The compromises in the Settlement Agreement properly balance the possibility of

success of litigating the FGIC Claims and the FGIC Trustee Claims and the Settlement

Agreement's future benefits to the Debtors.

59.      <u>First</u>, there is significant uncertainty regarding the outcome of likely future

litigation involving FGIC and/or the FGIC Trustees absent the Settlement Agreement.  Although

the Debtors would, without question, contest each lawsuit, the novel legal issues presented pose

a substantial litigation risk.  The Debtors offer the testimony of Jeffrey Lipps, an attorney who

has over thirty years' experience as trial lawyer representing and counseling clients in complex

commercial litigation matters, to establish the great legal uncertainty facing the Debtors.  (*See*

Direct Testimony of Jeffrey A. Lipps, sworn to July 31, 2013 ("Lipps Direct Test.") [Dkt. No. 4433];[18] *see also* Kruger Direct Test. ¶¶ 44-45.)

60. The Ad Hoc Group references Mr. Lipps in their objection, but not to dispute his opinion that the Debtors would face great legal uncertainty and costs in litigating the merits of the FGIC Claims and the FGIC Trustee Claims. Instead, the Ad Hoc Group argues trivialities and misrepresents the evidence demonstrating Mr. Lipps's qualifications. In fact, the only alleged deficiency the Ad Hoc Group points to in Mr. Lipps's analysis of legal uncertainty is that he did not analyze the application of Section 510(b) subordination to FGIC's claims. (Ad Hoc Sup. Obj. at ¶ 19.) As discussed above, the Debtors considered the Ad Hoc Group's potential subordination claims under Section 510(b) and found those arguments lacking. *See* RMBS Objection Reply at 12-15.[19]

61. Second, the Settlement Agreement provides substantial future benefits to the Debtors' estate and creditors. In particular, the Settlement Agreement provides benefits in the form of (i) a substantial reduction of claims asserted against each of the Debtors' estates, (ii) increased certainty regarding the validity, priority and amount of the FGIC Claims and the FGIC Trustees' Claims, and (iii) substantial cost savings when compared with the likely costs of

---

[18] The Debtors have also previously submitted the *Declaration of Jeffrey A. Lipps in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees, and Certain Institutional Creditors*. [Dkt. No. 3929-4].

[19] The Ad Hoc Group also attacks Mr. Lipps' opinions claiming that they are a post hoc justification for the Settlement Agreement. (Ad Hoc Sup. Obj. at 12.) Of course, the Ad Hoc Group ignores the fact that Mr. Lipps has previously testified at length about these same legal issues in connection with the RMBS Trust Settlement 9019 Motion. *See* Declaration of Jeffrey A. Lipps, sworn to May 24, 2012 [Dkt. No. 320-9], the Supplemental Declaration of Jeffrey A. Lipps, dated September 28, 2012 [Dkt. No. 1887-4] and the Reply Declaration of Jeffrey A. Lipps, sworn to January 15, 2013 [Dkt. No. 2805]. The Ad Hoc Group further ignores Mr. Lipps's testimony concerning litigation burdens in support of the Debtors' motion to extend the stay, which was accepted by this Court. *See* July 10, 2012 Hearing Transcript in *Residential Capital, LLC v. Allstate Insurance Co., et al.* Adv. Proc. No. 12-01671-mg (Bankr. S.D.N.Y.) at 137-38 [Dkt. No. 75.]. The Ad Hoc Groups' claim that Mr. Lipps is offering new post hoc opinions on these matters is verifiably false.

professional fees and experts that would be needed if litigation over the FGIC Claims the FGIC

Trustee Claims proceeded.  (Kruger Direct Test. ¶¶ 30, 33-34, 37-38, 40, 46.)

### B.    The Likelihood of Complex and Protracted Litigation

62.    The Settlement Agreement avoids massive expense and delay that would result

from years of costly litigation.  Indeed, the Debtors' expert, Mr. Lipps, will establish the strong

likelihood of complex and protracted litigation that would result should the Court decline to

approve the Settlement Agreement.[20]  He will testify to the unique legal and evidentiary

challenges posed by likely litigation.  (Lipps Direct Test. ¶¶ 4, 26; *see also* Kruger Direct Test.

¶¶ 47-50.)  Such challenges include, but are not limited to, voluminous discovery involving tens

of millions of pages of documents, hundreds of days of deposition testimony from current and

former employees (Lipps Direct Test. ¶ 141), and dozens of underwriting parameters to evaluate

for thousands of individual loans (*id.* ¶ 77), and the weeks of trial required to review the

necessary evidence and numerous experts involved.  (*Id.* ¶ 140.)  Mr. Lipps will further testify

that even in connection with a bankruptcy proceeding, the costs of litigating the FGIC Claims

and the FGIC Trustees' Claims would be enormous.  (*Id.* ¶¶ 153-54.)

63.    Absent a settlement, this Court faces the likelihood of years of complex and

protracted litigation with its attendant expense, inconvenience, and delay.  (Kruger Direct Test.

---

[20] Again, the Ad Hoc Group does not dispute the substance of Mr. Lipps' conclusions, but instead misrepresents the
record in attacking his methods. Mr. Lipps has not, as the Ad Hoc Group claims, simply *assumed* the expense of
litigating FGIC's Claims in a bankruptcy will be as burdensome as it would be outside bankruptcy.  (Ad Hoc Sup.
Obj. ¶ 22.)  Instead, Mr. Lipps's experience has already borne this out, as he testified and explained in litigating the
FGIC Claims in these bankruptcy proceedings, FGIC has already served the Debtors with 117 document requests,
including a request for all 185,000+ loan files at issue in a subset of the FGIC Insured Trusts.  (Lipps Direct Test. ¶¶
146-48) (explaining continued litigation would be *more* burdensome than prepetition monoline litigation).)  The
Debtors, furthermore, produced to the Ad Hoc Group these document requests and hundreds of underlying
governing agreements for FGIC-wrapped trusts.  The Debtors thus gave the Ad Hoc Group ample opportunity to
rebut the opinion that responding to those requests and litigating those underlying agreements will be enormously
expensive and complex, but the Ad Hoc Group simply cannot.  Mr. Lipps also describes the costs and burdens of the
pre-petition litigation with MBIA, in which very similar type claims were being asserted against the Debtors by
another monoline insurer.  (*Id.* ¶¶ 142-45.)

¶ 50; *see also* Scott Decl. ¶ 39; Sohlberg Decl. ¶ 33; Major Decl. ¶ 42.)  This likelihood weighs

strongly in favor of the Settlement Agreement's approval.

### C.    The Paramount Interests of Creditors

64.    No objector can seriously challenge the fact that the Settlement Agreement

resolves substantial claims against the Settling Debtors to the benefit of all creditors.  The Ad

Hoc Group, as part of its continuing effort to litigate plan confirmation issues ahead of the

confirmation hearing, attempts to raise purported concerns about the paramount interests of

creditors.  (Ad Hoc Sup. Obj. at ¶ 16.)  But, as explained above, those concerns principally

pertain to the economics of a settlement not contained in the Settlement Agreement and, instead,

in the proposed Plan and for which the Debtors do not seek approval at this time.

65.    Recognizing the Settlement Agreement for what it is, and ignoring the Ad Hoc

Group's premature plan confirmation issues, it is clear that the Settlement Agreement resolves

substantial claims against the Debtors' estates, and it insures that the Debtors will not have to

litigate and face the risk of being responsible for the full amount of claims originally asserted by

FGIC and the FGIC Trustees.  (*See supra* section II.A; Kruger Direct Test. ¶¶ 4, 34, 37-38, 40,

51-52.)  As a result, relatively few claims against the Debtors will remain in connection with the

FGIC Insured Trusts, limited to an amount between (i) the Minimum Allowed Claim Amount

(subject to the reservations of rights described above) or the claims that FGIC is allowed to assert

in the event that plan contemplated under the PSA does not become effective, (ii) certain

servicing claims held by the FGIC Trustees, and (iii) claims attributable to losses by holders of

Securities not insured by the Policies.  The FGIC Trustees will receive $253.3 million in cash

compensation ***from FGIC*** and will be relieved of the responsibility of having to continue to pay

premiums on the Policies.  (Kruger Direct Test. ¶ 52; *see also* Witness Statement of John S.

Dubel ("Dubel Direct Test.") ¶¶ 22-25, July 31, 2013 [Dkt. No. 4436].)

66.    As described above, even if the Plan is not approved, the Settlement Agreement substantially narrows the universe of open disputes to be settled in connection with approval of the Plan or litigation regarding the allowance of the FGIC Claims at some later date, to the benefit of all creditors.  (*See supra* section II.B.2; Kruger Direct Test. ¶ 32.)

### D.    Support of Other Parties-in-Interest for the Settlement Agreement

67.    No objector has challenged the fact that the Settlement Agreement has support from entities that hold or represent the holders of the overwhelming majority of claims asserted in the Debtors' chapter 11 cases.  (Kruger Direct Test. ¶¶ 41, 54.).  As Mr. Kruger will testify, each of the Debtors' claimant constituencies that have signed on to the PSA also support the Settlement Agreement. (Kruger Direct Test. ¶ 54.)   Indeed, except for the Ad Hoc Group, none of the objectors are creditors.  *See In re Iridium*, 478 F.3d at 465 ("[I]t is telling that no other creditor objects to the Settlement.").

### E.    Nature and Breadth of Releases To Be Obtained by Officers and Directors

68.    No objector has challenged the fact that the releases of the Debtors' officers and directors in the Settlement Agreement are reasonable.  *In re Iridium*, 478 F.3d at 462.  Mr. Kruger will testify that, based on his understanding, the releases are consistent with those approved in other cases in the Southern District, providing only for voluntary releases by the non-debtor Settlement Parties.  (Kruger Direct Test. ¶ 55.)

### F.    Competency and Experience of Counsel

69.    No objector has challenged the fact that, as Mr. Kruger will testify, the Settlement Parties were represented by competent and experienced counsel throughout the negotiation of the FGIC Settlement Agreement.  *In re Iridium*, 478 F.3d at 465.  (*See* Kruger Direct Test. ¶¶ 14, 41-42, 56; *see also* Scott Decl. ¶ 13; Sohlberg Decl. ¶ 10; Major Decl. ¶ 16.)

-29-

### G.    Arm's-Length Negotiations

70.    Finally, no objector seriously challenges whether the negotiations that produced the Settlement Agreement were arm's-length.  The Ad Hoc Group complains that it has not seen "substantive communications between parties concerning the Settlement" as evidence of the arm's-length nature (Ad Hoc Sup. Obj. ¶ 34), but the Debtors are precluded from divulging such communications under General Order M-390 and this Court's Order Appointing Mediator. (General Order M-390 §5.1; Order Appointing Mediator ¶ 4, December 26, 2012 [Dkt. No. 2519].)  Instead, the Debtors have presented testimony, which no objector has challenged, that the Settlement Agreement arose out of the broader discussions in the mediation being directed by Judge Peck; many different parties engaged in that process; many of those parties had divergent and different interests and agendas, specifically evidenced by the ongoing litigation of the FGIC Claims during the timeframe of negotiations; the parties were sophisticated and represented by experienced counsel and financial advisors; and the negotiations occurred over months.  (Kruger Direct Test. ¶¶ 5, 14, 57-58; Dubel Direct Test. ¶¶ 10-18; Scott Decl. ¶¶ 18; Sohlberg Decl. ¶¶ 14-15; Major Decl. ¶¶ 20-21.)

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court overrule the Objections and enter an order, substantially in the form of the Proposed Order, granting the relief requested herein and granting such other relief as is just and proper.

New York, New York                          /s/  Gary S. Lee
Dated: August 2, 2013                       Gary S. Lee
                                            Anthony Princi
                                            Charles L. Kerr
                                            J. Alexander Lawrence
                                            James A. Newton
                                            MORRISON & FOERSTER LLP
                                            1290 Avenue of the Americas
                                            New York, New York 10104
                                            Telephone: (212) 468-8000
                                            Facsimile: (212) 468-7900

                                            *Counsel to the Debtors
                                            and Debtors in Possession*