**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Craig P. Druehl
James O. Moore
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**SEWARD & KISSEL LLP**
Dale C. Christensen, Jr.
Thomas Ross Hooper
Benay L. Josselson
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to Law Debenture Trust Company of New York, as Separate Trustee of Certain Mortgage-Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 12-12020 (MG) |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| Debtors. | ) **Jointly Administered** |

**STATEMENT OF THE FGIC TRUSTEES (I) IN SUPPORT OF THE DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS AND (II) IN REPLY TO CERTAIN OBJECTIONS THERETO**

15000377

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................2

BACKGROUND ........................................................................................................................5

OMNIBUS REPLY .....................................................................................................................5

I.     THE COURT HAS JURISDICTION TO APPROVE THE
SETTLEMENT AGREEMENT AND MAKE THE PROPOSED FINDINGS...................5

     A.    This Is a Core Proceeding ...........................................................................6

     B.    The Bankruptcy Court Is Not Adjudicating
the Appropriateness of the Commutation ................................................7

     C.    The Debtors' Indemnification Obligations Give this Court Jurisdiction.................8

     D.    Federal and State Due Process Requirements Have Been Satisfied ......................11

II.    THE GOVERNING AGREEMENTS AUTHORIZE
THE FGIC TRUSTEES TO ENTER INTO THE SETTLEMENT AGREEMENT..........13

     A.    The FGIC Trustees Have Authority to
Settle Claims of the FGIC Insured Trusts...............................................13

     B.    The Settlement Agreement Is Not an Amendment;
It Is a Resolution of a Claim against an Insurer in an Insolvency Proceeding .......15

III.   THE FGIC TRUSTEES HAVE ACTED REASONABLY AND IN GOOD FAITH
IN ENTERING INTO THE SETTLEMENT AGREEMENT, WHICH IS IN THE
BEST INTERESTS OF THE FGIC TRUSTS AND THE INVESTORS THEREIN. .......18

     A.    The Process Pursuant to which the Plan Support Agreement
and the Settlement Agreement Were Negotiated Was Robust and Fair ................18

     B.    The FGIC Settlement Is in the Best Interests of the RMBS Trusts ........................22

     C.    The FGIC Trustees Have Not Breached
Any Duties Owing to the FGIC Insured Trusts ......................................26

JOINDER .................................................................................................................................29

CONCLUSION........................................................................................................................31

**EXHIBITS**

<u>Exhibit A</u>    Sample Indenture

<u>Exhibit B</u>    Sample PSA

<u>Exhibit C</u>    Sample Policy

## TABLE OF AUTHORITIES

CASES

*Asset Securitization Corp. v. Orix Capital Mkts.,*
  LLC, 784 N.Y.S.2d 513 (App. Div. 2004) ........................................................... 14

*Brown v. John Hancock Mut. Life Ins. Co. of Boston,*
  145 Misc. 642 (N.Y. Mun. Ct. 1932) ................................................................... 15

*Haynes v. Haynes,*
  72 A.D.3d 535, 536 (N.Y. App. Div. 2010) ........................................................ 27

*In re "Agent Orange" Prod. Liab. Litig.,*
  597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd,* 818 F.2d 145 (2d Cir. 1987) ................ 29

*In re Delta Air Lines, Inc.,*
  370 B.R. 537 (Bankr. S.D.N.Y. 2007) ........................................... 7, 10, 15, 16, 17

*In re Dewey & LeBoeuf LLP, Case No. 12-12321, Order, Findings of Fact and
  Conclusions of Law Approving Settlement of Management and Other Claims
  [Docket No. 1472]* ............................................................................................... 7

*In re First Trust & Deposit Co.,*
  280 N.Y. 155, 163 (1939) .................................................................................... 27

*In re IBJ Schroder Bank & Trust Co.,*
  Index No. 101530/98, 2000 N.Y. Misc. LEXIS 692 (Sup. Ct. N.Y. Cnty. Aug. 16,
  2000) ................................................................................................................... 28

*In re Matter of De Sanchez,*
  2008 NY slip op. 50342U (Sup. Ct. N.Y County 2008) ....................................... 11

*In re Quigley Co., Inc.,*
  676 F.3d 45 (2d Cir. 2012) .................................................................................. 10

*In re River Center Holdings, LLC,*
  288 B.R. 59 (Bankr. S.D.N.Y. 2003) .................................................................... 8

*In re U.S. Lines, Inc.,*
  197 F.3d 631 (2d Cir. 1999) .................................................................................. 6

*Levine v. Behn,* 169 Misc. 601, 606 (Sup. Ct. N.Y. County 1938), *aff'd,* 257 A.D. 156 (1st
  Dep't 1939), reversed on other grounds, 282 N.Y. 129 (1940) ............................ 15

*Magten Asset Mgmt. Corp. v. Bank of New York,*
  2007 WL 1326795 (Sup. Ct. N.Y. Cnty. 2007) ................................................... 26

*Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus.)*,
   467 B.R. 694 (S.D.N.Y. 2012) ................................................................................................11

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ..............................................................................................................11

*Orentreich v. Prudential Ins. Co. of America*,
   275 A.D.2d 685 (N.Y. 1st Dep't 2000) ...............................................................................13

*Pike v. New York Life Ins. Co.*,
   72 A.D.3d 1043 (N.Y. 2d Dep't 2010) ................................................................................13

*Wells Fargo Bank, N.A., Trustee v. Konover*,
   No. 3:05 CV 1924(CFD), 2009 WL 2710229 (D. Conn. 2009) ..........................................15

**STATUTES**

11 U.S.C. § 109(b)(2) ................................................................................................................17

28 U.S.C. § 157(b)(1) ..................................................................................................................6

28 U.S.C. § 157(b)(2) ..................................................................................................................6

C.P.L.R. § 7701 .........................................................................................................................28

Trust Indenture Act of 1939, 11 U.S.C. §§ 777aaa ...................................................................16

**OTHER AUTHORITIES**

*Interpretive Response Section 202.01* (last updated May 3, 2012), available at
   http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm.................................................16

Restatement (Second) of Trusts (1959) ........................................................................13, 27, 28

The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A. (collectively, "**BNY Mellon**"), U.S. Bank National Association ("**U.S. Bank**"), Wells Fargo Bank, N.A. ("**Wells Fargo**"), and Law Debenture Trust Company of New York ("**Law Debenture**")[1], each in their respective capacities as a Trustee[2] for certain FGIC Insured Trusts[3] (collectively, the "**FGIC Trustees**"), by and through their undersigned counsel, hereby file this omnibus reply (the "**Omnibus Reply**")[4] to (i) *Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited* (the "**Monarch Group**") *to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Docket No. 4400] (the "**Monarch Group Objection**"), and (ii) *Federal Home Loan Mortgage Corporation's* ("**Freddie Mac**" and together with the Monarch Group, the "**Objectors**") *Objection to Debtors' Motion Pursuant to Fed. R. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC*

---

[1]    For certain mortgage-backed securities trusts for which Wells Fargo serves as FGIC Trustee, Law Debenture Trust was appointed Separate Trustee, pursuant to orders dated November 7, 2012 and November 8, 2012 (the "**Minnesota Orders**") issued by the District Court, Fourth Judicial District, State of Minnesota.  As Separate Trustee, Law Debenture is authorized, among other things, to pursue the claims covered by the RMBS Settlement Agreements.  Each of Wells Fargo and Law Debenture joins in this Omnibus Reply to the extent of their respective obligations as Trustee or Separate Trustee under the Instruments of Appointment and Acceptance attached to the Minnesota Orders.

[2]    The term "FGIC Trustees" has been defined, at different times in the Chapter 11 Cases, in slightly different ways.  As used herein, unless the context dictates otherwise, the term "Trustees" or "FGIC Trustees" shall include BNY Mellon, U.S. Bank, Wells Fargo, and, from the time of its appointment as Separate Trustee, Law Debenture, and refers to such entities in their capacities as trustee, indenture trustee, separate trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or other similar agencies or as master servicer for the FGIC Trusts.

[3]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Joinder of Certain FGIC Trustees to the Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee and the Consenting Claimants* [Docket No. 3940] (the "**PSA Joinder**") or the FGIC 9019 Motion (as defined below).

[4]    BNY Mellon and U.S. Bank file this Omnibus Reply solely in their capacity as FGIC Trustees and not as members of the Official Committee of Unsecured Creditors (the "**Committee**").  Law Debenture and Wells Fargo are not members of the Committee.

*Trustees and Certain Institutional Investors* [Docket No. 4406] (the "**Freddie Mac Objection**"), filed in response to the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (the "**FGIC 9019 Motion**") [Docket No. 3929], pursuant to which the Debtors seek the entry of an order, substantially in the form attached to the FGIC 9019 Motion as Exhibit 1 (the "**Proposed Order**"),[5] approving the Settlement Agreement (the "**Settlement Agreement**"), dated May 23, 2013, among the Debtors, Financial Guaranty Insurance Corporation ("**FGIC**"), the FGIC Trustees and the Institutional Investors, and in support of the Omnibus Reply respectfully state as follows:

## PRELIMINARY STATEMENT[6]

1.     The core of the Objectors' argument is that, because the amount of the upfront, lump-sum Settlement Payment is not as large as the uncertain amount the Objectors would have preferred to have received over 40 years under FGIC's Rehabilitation Plan, the FGIC Trustees did not discharge their duties with the requisite level of care. This argument, however, ignores several fundamental facts.

2.     First, the Objectors continue to focus solely on the $253.3 million amount of the Settlement Amount, ignoring all the economic benefits that the FGIC Insured Trusts might receive in connection with the Settlement Agreement and the Proposed ResCap Plan, which result in a

---

[5]     The Proposed Order includes the findings in paragraphs C, D and E of the Proposed Order (the "**Findings**"), which provide that: (i) the Settlement Agreement and the transactions contemplated thereby, including the releases given therein, are in the best interests of, *inter alia*, the Investors in each FGIC Insured Trust, the FGIC Insured Trusts and the FGIC Trustees, (ii) the FGIC Trustees acted reasonably and in good faith and in the best interests of the Investors in each FGIC Insured Trust and each such FGIC Insured Trust in agreeing to the Settlement Agreement, and (iii) the notice of the Settlement Agreement, including the FGIC Trustees' notice of same, was sufficient and effective, in satisfaction of federal and state due process requirements and other applicable law, to put the Investors in each FGIC Insured Trust on notice of the Settlement Agreement.

[6]     Capitalized terms not defined in this section shall have the meaning ascribed to them elsewhere in this Omnibus Reply.

value that is equal to or greater than the amount the Objectors themselves assert they should have recovered. In addition to the Settlement Payment, the FGIC Insured Trusts would be relieved under the Settlement Agreement from having to pay future insurance premiums (approximately $18 million net present value) and would retain various reimbursement amounts that otherwise would be paid to FGIC under the waterfall provisions in the relevant Governing Agreements (that amount has not been quantified, but is likely significant).[7] If the Proposed Plan is confirmed, the FGIC Insured Trusts are expected to receive an additional distribution from the Debtors' estates in excess of $90 million, while eliminating much of the uncertainty of the Projected Payments over 40 years under the Rehabilitation Plan. Notably, even under the Objectors' own analysis, were the Objectors to factor in the additional benefit of $92 million, which the FGIC Insured Trusts would receive only if the Settlement Agreement is approved and the Proposed Chapter 11 Plan goes effective, the FGIC Insured Trusts stand to recover a *fixed* amount under the Settlement Agreement that is equal to what the Objectors believe they *may possibly* recover under FGIC's Plan of Rehabilitation.[8]

3.      Second, the Objectors do not control the settlement of the FGIC Policies and have always been subject to the decisions that the FGIC Trustees might take so long as the FGIC Trustees have complied with their duties under the Governing Agreements.

4.      Third, the Objectors disregard the inherent value of taking the uncertain and possibly dilutive recoveries that each non-settling trust would otherwise receive under FGIC's Plan of Rehabilitation and fixing them with the lump-sum, one-time Settlement Payment.

---

[7]     *See* Witness Statement of John S. Dubel, filed July 31, 2013 [Docket No. 4436], ¶ 29 (the "**Dubel Declaration**").

[8]     *See* Monarch Group Objection ¶ 6 (arguing that "the value of the recoveries of the FGIC Insured Trusts under the Rehabilitation Plan, absent the Commutation, would be…over $100 million more than the proposed Commutation Amount"); *see also* Freddie Mac Objection ¶¶ 19, 46 (asserting that "FGIC imposed an arbitrary 'haircut' of 40% (amounting to an approximately $90.3 million reduction in Investor recovery) from what was provided in the Rehabilitation Plan" and referring to "an inferior recovery of over $90 million").

3

5.      Finally, there is no evidence to support the Objectors' assertion that the FGIC Trustees acted in their own self interest.  Rather, the FGIC Trustees have propounded substantial and sufficient evidence to establish that they acted reasonably under the circumstances to achieve the best possible result for all FGIC Insured Trusts and the investors therein.

6.      This Court has made clear that the standard for approval of the Settlement Agreement, and the Findings contemplated thereby, is whether "the settlement is in the range of reasonableness."[9]  As set forth in the PSA Joinder, the FGIC Joinder and herein, there is ample legal support for the FGIC Trustees' authority to enter into the Settlement Agreement, and there is sufficient factual evidence for the Court's authority to make the Findings.  Finally, it is both an express requirement of the Settlement Agreement and one of the Plan Support Agreement's milestones that the order approving the Settlement Agreement contain the Findings.  Should the Court not make the Findings, the Plan Support Agreement would terminate by its terms and the Proposed ResCap Plan would collapse.

7.      In sum, and notwithstanding the Objectors' last ditch efforts to torpedo the Settlement Agreement (and by extension, the Proposed ResCap Plan), this Court does have jurisdiction to approve the Settlement Agreement and make the Findings (*see* Point I *infra*), the Governing Agreements do authorize the FGIC Trustees to enter into the Settlement Agreement (*see* Point II *infra*), and the FGIC Trustees have acted reasonably and in good faith in entering into the Settlement Agreement, which is in the best interests of the FGIC Trusts and the investors therein (see Point III *infra*).

---

[9]     *See* 7/17/2013 Hearing Tr. 9:20 – 10:1.

## BACKGROUND

8.      The background for the FGIC 9019 Motion is set forth in the FGIC 9019 Motion,

the *Joinder of Certain RMBS Trustees to the Debtors' Motion for an Order under Bankruptcy*

*Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and Perform under a Plan*

*Support Agreement with Ally Financial Inc., the Creditors' Committee, and Certain Consenting*

*Claimants*, dated June 10, 2013 [Docket No. 3940] (the "**PSA Joinder**"), the declarations of the

FGIC Trustees attached to the PSA Joinder (the "**PSA Declarations**"), the *Joinder of FGIC*

*Trustees to the Debtors' Motion pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement*

*Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*,

dated June 14, 2013 [Docket No. 3982] (the "**FGIC Joinder**"), and the direct testimony of various

FGIC Trustees (the "**FGIC 9019 Motion Declarations**"),[10] all of which are incorporated by

reference herein.

## OMNIBUS REPLY

### I.      The Court Has Jurisdiction to Approve
the Settlement Agreement and Make the Proposed Findings.

9.      The Objectors argue that the Court lacks jurisdiction to approve the Settlement

Agreement and make the Findings.  Contrary to the Objectors' contentions, the Court does have

jurisdiction because (i) this is a core proceeding, (ii) the Court has already determined that it has

plenary jurisdiction over the dispute being compromised and approval of the Settlement

Agreement, (iii) the Court's approval of the Settlement Agreement is not preempted by the

---

[10]   The FGIC 9019 Motion Declarations include the *Declaration of Robert H. Major, as Officer of The Bank of New York Mellon Trust Company, N.A., as Trustee or Indenture Trustee*, filed July 31, 2013 [Docket No. 4438] (the "**Major Declaration**"), the *Declaration of Mary L. Sohlberg, as Officer of Wells Fargo Bank, N.A., RMBS Trustee*, filed July 31, 2013 [Docket No. 4249] (the "**Sohlberg Declaration**"), the *Declaration of Mamta K. Scott, as Officer of U.S. Bank, RMBS Trustee*, filed July 31, 2013 [Docket No. 4444] (the "**Scott Declaration**").  In addition, the FGIC Trustees filed the *Direct Testimony Declaration of Allen M. Pfeiffer*, filed August 1, 2013 [Docket No. 4454] (the "**Pfeiffer Declaration**").

McCarran-Ferguson Act, and (iv) the Court has "related to" jurisdiction over this dispute because the Debtors are required under the applicable Governing Agreements to indemnify the FGIC Trustees for the cost and expense of litigating the claims they seek to compromise.

        A.      ***This Is a Core Proceeding.***

      10.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) because the Findings are an integral part of both the Settlement Agreement and the Plan Support Agreement. Without the Findings, the FGIC Trustees would not have entered into the Settlement Agreement and the Plan Support Agreement. And should the Court not make the Findings, the FGIC Trustees will no longer be bound to the Settlement Agreement and the Plan Support Agreement. Section 157(b)(1) states that core proceedings are proceedings "arising under title 11, or arising in a case under title 11," in which the court may enter orders and judgments. 28 U.S.C. § 157(b)(1). Section 157(b)(2) also sets forth a non-exclusive list of proceedings which Congress thought to be core. The Second Circuit has held that "'core proceedings' should be given a broad interpretation that is 'close or congruent with constitutional limits'." *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999) (quoting *Resolution Trust Corp. v. Best Prods. Co., Inc. (In re Best Prods. Co.)*, 68 F.3d 26, 31 (2d Cir. 1995)). Accordingly, the Settlement Agreement falls within a core proceeding because the Settlement Agreement, in connection with the Plan Support Agreement resolves claims of both the FGIC Insured Trusts and FGIC against the Debtors' estates and provides for the terms of a plan of reorganization. *See* 28 U.S.C. § 157(b)(2)(A), (B), (O).

      11.     Furthermore, as this Court has previously stated at the June 26, 2013 hearing on the approval of the Plan Support Agreement, the Court has plenary jurisdiction over the disputes being compromised by the Settlement Agreement:

> approval of a 9019 settlement arises under or arises in a bankruptcy case and it's a core matter, [a]nd the cases that have been decided so far find that the bankruptcy court has the authority to enter the order.

6/26/2013 Hearing Tr. 61:9-11; 61:16-22.  Indeed, the Court in similar contexts has approved

similar findings.  *See*, *e.g.*, *In re Delta Air Lines, Inc.*, 370 B.R. 537 (Bankr. S.D.N.Y. 2007)

(approving a settlement over the objections of holders of debt issued by a trust holding rights to

payment under a lease, and making findings similar to the Findings that (i) the court had

jurisdiction over the settlement, (ii) the settlement was in the best interests of the debtor and the

individual bondholders, and (iii) certain releases were permissible) *aff'd sub nom. Kenton Cnty.*

*Bondholders Comm. v. Delta Air Lines, Inc.*, 374 B.R. 516 (S.D.N.Y. 2007), *aff'd*, 309 Fed. Appx.

455 (2d Cir. 2009); *In re Dewey & LeBoeuf LLP*, Case No. 12-12321, *Order, Findings of Fact and*

*Conclusions of Law Approving Settlement of Management and Other Claims* [Docket No. 1472] at

¶¶ I, J, 5, 8 (making a finding similar to the Finding that an insurer acted in good faith in entering

into settlement with a debtor and enjoining non-debtor insureds from pursuing certain claims

against the insurer).

### B.    *The Bankruptcy Court Is Not Adjudicating the Appropriateness of the Commutation.*

12.    The Objectors' assertion that this Court does not have jurisdiction to approve the

Settlement Agreement because it does not have the authority to determine "whether it is

appropriate for FGIC to commute the FGIC Policies" (Monarch Group Objection ¶ 13) and

because the McCarran-Ferguson Act preempts that determination lacks any merit.  The Settlement

Agreement plainly states that it will not be effective unless it is approved by this Court and the

Rehabilitation Court.  *See* Settlement Agreement, § 6.01; *see also* Freddie Mac Objection ¶ 15

("The Settlement Agreement's ultimate effectiveness largely depends on two conditions

precedent: the approval of the Settlement Agreement by this Court and the approval of the

Settlement by the N.Y. State Court in the Rehabilitation Proceeding.").  As Freddie Mac further

acknowledges, the Rehabilitation Court, and not this Court, will determine whether the

commutation of the FGIC Policies is appropriate. Freddie Mac Objection ¶ 1 ("the Court is not being asked to address the commutation itself."); *id.* ¶ 25 (acknowledging that the "cornerstone of the Settlement Agreement is the N.Y. State Court's approval of the FGIC Commutation").

13.    Thus, the Objectors' "reverse preemption" argument holds no water because neither federal bankruptcy law nor this Court are "imped[ing] or supersed[ing] the state processes regulating the business of insurance." *See* Freddie Mac Objection ¶ 26. Moreover, the Findings do not require application of any "federal statute [that] would invalidate, impair or supersede the state statute."[11] Freddie Mac Objection ¶ 29 (*quoting United States Dep't. of Treasury v. Fabe*, 508 U.S. 491, 501 (1993)). The Findings are factual determinations, and as such they do not impair or supersede any state insurance law statute.

### C.    *The Debtors' Indemnification Obligations Give this Court Jurisdiction.*

14.    Further, this Court has "related to" jurisdiction to make the Findings because the Debtors' indemnification obligations with respect to the FGIC Trustees are implicated by the Settlement Agreement in many respects. *See, e.g., In re River Center Holdings, LLC*, 288 B.R. 59, 65 (Bankr. S.D.N.Y. 2003) ("[i]n litigation involving non-debtors, 'relatedness' often turns on the estate's obligation to indemnify the losing party") (quoting *Masterwear Corp. v. Rubin Baum Levin Constant & Friedman (In re Masterwear Corp.)*, 241 B.R. 511, 516 (Bankr. S.D.N.Y. 1999)). Although the Monarch Group Objection acknowledges that "[c]ourts have found that a bankruptcy court has 'related to' jurisdiction where a debtor has indemnification obligations to a defendant in a lawsuit," it mistakenly contends that the Debtors have no extant indemnification obligations and that the conduct that forms the basis of the "related to" jurisdiction is the FGIC

---

[11]    Any other interpretation would lead to the absurd result that the Bankruptcy Court would be divested of jurisdiction any time a 9019 settlement implicated an insolvent insurance holding company.

Trustees' decision to enter into the Settlement Agreement.[12]   Monarch Group Objection ¶¶ 18-21.

Rather, the FGIC Insured Trusts' right to indemnification arises from the Debtors' prepetition

duties under the Governing Agreements.[13]

15.   The relevant Governing Agreements provide the FGIC Trustees with broad

indemnification rights against the Debtors for any action the FGIC Trustees take that affects the

administration of the property in the FGIC Insured Trusts.   The FGIC Policies are property of the

FGIC Insured Trusts.   The indemnity obligations include indemnifying the FGIC Trustees for the

liability and costs incurred in pursuing the FGIC Insured Trusts' pre-petition claims against the

Debtors and FGIC that the Settlement Agreement seeks to compromise.   *See* Supplemental

Servicing Order, ¶¶ 18-22; Sample Indenture § 6.07; Sample PSA § 8.05.   Because it is those

indemnity obligations arising from pre-petition events—and not as the Objectors contend any

purported liability for entering into the Settlement Agreement—that serves as the bases for the

---

[12]   Similarly, the Monarch Group's assertion that the FGIC Trustees are precluded from relying on "indemnification agreements" that they failed to produce in discovery is unsupportable.   *See* Monarch Group Objection ¶ 20. Indemnification of the RMBS Trusts is provided for in the Governing Agreements, some of which were produced by the Debtors.   Moreover, the indentures and pooling and servicing agreements that govern the trusts in which the Objectors invested are generally publicly available.   The Supplemental Servicing Order is also a public document.   The Debtors' obligations to indemnify the FGIC Trustees thus do not arise, as implied by the Monarch Group, from secret "indemnification agreements" that the FGIC Trustees failed to produce on the basis of privilege, but are based on agreements the Holders already have or that are generally publicly available.

[13]   *See Final Supplemental Order under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* [Docket No. 774] (the "**Supplemental Servicing Order**"), ¶¶ 18-22 (the Debtors' duties include, but are not limited to, "reimbursing, indemnifying, defending and holding harmless the Trustees and the securitization trusts for any liability, loss, or reasonable fees, cost or expense (including fees and disbursements of counsel or agents) incurred by any of the Trustees in the performance of their duties or their administration of the trusts or other agencies under the Agreements to the extent required by the Agreements."); *see also* § 6.07 of the Indenture, dated as of June 29, 2006 by and between GMACM Home Equity Loan Trust 2006-HE2 as issuer and JPMorgan Chase Bank, National Association, and indenture trustee is attached hereto as Exhibit A (the "**Sample Indenture**"); *see also* § 8.05 of the Pooling and Servicing Agreement for Mortgage Asset-Backed Pass-Through Certificates Series 2004-RS7, dated as of July 1, 2004, by and among Residential Asset Mortgage Products, Inc., as depositor, Residential Funding Corporation, as master servicer, and JPMorgan Chase Bank, as trustee is attached hereto as Exhibit B (the "**Sample PSA**").   To the best of the FGIC Trustees' knowledge, Exhibits A and B are representative of the Indentures and Pooling and Servicing Agreements to which the FGIC Insured Trusts are a party.

Court to exercise jurisdiction over approval of the Settlement Agreement, the Court plainly has related-to jurisdiction.[14]  *See In re Quigley Co., Inc.*, 676 F.3d 45, 53 (2d Cir. 2012) (holding that bankruptcy court jurisdiction is appropriate over third party non-debtor claims that directly affect the *res* of the bankruptcy estate, including the obligation to pay costs and liabilities incurred in defending suits); *Delta*, 370 B.R. at 539 (finding that jurisdiction existed to permit the release of third party claims where the releases of the non-debtors' indemnification claims comprised valuable consideration).

16.     The Monarch Group's assertion that the FGIC Trustees cannot be indemnified for negligence is a red herring.  *See* Monarch Group Objection ¶ 21.  The Monarch Group ignores the *potential* obligation to indemnify the FGIC Trustees for expenses associated with litigating the FGIC Insured Trusts' claims against the Debtors and FGIC in the event the Settlement Agreement is not approved, which has nothing to do with the Monarch Group's negligence allegations.  In any event, as demonstrated below, the FGIC Trustees have not acted negligently in entering into the Settlement Agreement, thereby refuting any allegation that the indemnity does not apply with respect to the FGIC Trustees' decision to enter into the Settlement Agreement.

---

[14]    Even if the conduct covered by the Debtors' indemnity obligations had not occurred pre-petition, that Ocwen Loan Servicing, LLC, as the Monarch Group notes, has agreed to assume the Debtors' indemnification obligations with respect to claims arising after the closing of the sale does not alter the conclusion that the Court has related-to jurisdiction, as Ocwen has claims over against the Debtors if the indemnification right arises out of events or occurrences that occur before the closing date of the Ocwen sale.  *See Order under 11 U.S.C. §§ 105, 363, and 365, and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* [Docket No. 2246] (the "**Ocwen Sale Order**") ¶ 35C.  In addition, the cure claims of the RMBS Trusts are fully reserved, Ocwen Sale Order ¶ 22, and the FGIC Insured Trusts have cure claims against the Debtors relating to their indemnity obligations.    Pursuant to the Settlement Agreement, and in connection with the Plan Support Agreement, those claims are being resolved and thus the Debtors' indemnification obligations are affected by the Settlement Agreement.

**D.**     ***Federal and State Due Process Requirements Have Been Satisfied.***

17.     This Court has jurisdiction to approve the Findings in the Proposed Order, which will become binding on the Objectors and all investors in the FGIC Insured Trusts, because the Objectors and all investors in the FGIC Insured Trusts whose rights would be affected by the Findings have received sufficient notice and have been given an opportunity to be heard.  Due process does not require that each investor actually receive notice.  Rather, it mandates only "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also In re Matter of De Sanchez*, 2008 NY slip op. 50342U, at 5 (Sup. Ct. N.Y. Cnty. 2008) (same); *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus.)*, 467 B.R. 694, 706–07 (S.D.N.Y. 2012) (same).  The FGIC Trustees have ensured that all investors in the FGIC Insured Trusts would have a full and fair opportunity in both the Rehabilitation Court and the Bankruptcy Court to voice any objections they may have to the Settlement Agreement, including that the Settlement Agreement is not in their best interests.  The Objectors have availed themselves of this opportunity.

18.     Neither the Monarch Group nor Freddie Mac has argued that they did not receive sufficient notice of the Settlement Agreement, nor do they assert that they have not had an opportunity to be heard with respect to the Settlement Agreement.  Instead, the Monarch Group, without citing to any authority, states that due process requirements have not been satisfied because "the Debtors and Trustees have unfairly and unjustifiably sought to block the Investors' access to the information needed to evaluate the Findings."  Monarch Group Objection ¶ 25.  In essence, the Monarch Group alleges that the mediation process created by this Court, including the mediation privilege, deprives the Objectors of due process.  On the contrary, the Court has not only provided the Objectors with the opportunity to be heard, it also adjourned the hearing on the

11

FGIC 9019 Motion to allow them to seek discovery.[15]  *See* Scheduling Order, July 8, 2013 [Docket No. 4168].

19.    The Objectors' argument that the FGIC Trustees "kept the terms of the Settlement Agreement a secret" fares no better.  Monarch Group Objection ¶ 25; *see also* Freddie Mac Objection ¶ 13.  Because all investors in the FGIC Insured Trusts have received sufficient notice and an opportunity to be heard and because their rights with regard to the FGIC Insured Trusts will not be affected by the Settlement Agreement unless it is approved by two courts, the due process rights of the Objectors have been met, as well as the due process rights of all investors in the FGIC Insured Trusts.

20.    Although the FGIC Trustees were precluded by the Mediation Order (as defined below) from disclosing the negotiations of the Settlement Agreement during the mediation sessions, the FGIC Trustees, in negotiating the Settlement Agreement, insisted that the Settlement Agreement not have any effect unless all the investors in the FGIC Insured Trusts have received prompt notice of the proposed agreement[16] and both this Court and the Rehabilitation Court have approved the Settlement Agreement.[17]  *See* Major Declaration ¶ 23; Sohlberg Declaration ¶ 18;

---

[15]    *See also* 7/17/2013 Hearing Tr. at 29:5-11:

    MS. EATON:    … no real mechanism has been put in place to allow investors a full and fair opportunity to object to the [Settlement] agreement.

    THE COURT:    What are you doing here?

    MS. EATON:    This is the only mechanism there is, Your Honor, and –

    THE COURT:    What's wrong with this mechanism?

[16]    Section 4.02 of the Settlement Agreement provides: "Within seven (7) Business Days following execution by all Parties of this Agreement, the Debtors shall file the 9019 Motion with the Bankruptcy Court and otherwise use commercially reasonable efforts to promptly obtain the Bankruptcy Court Order. Upon obtaining knowledge of the issuance of the Bankruptcy Court Order, the Debtors shall promptly notify the other Parties."

[17]    Section 6.01 of the FGIC Settlement Agreement provides that a condition precedent to the effectiveness of the FGIC Settlement Agreement is the signing of orders approving the Settlement Agreement by both the Bankruptcy Court and the Rehabilitation Court and that such orders shall become final.  The FGIC Settlement Agreement must also be approved by the Rehabilitation Court after notice. Section 4.01 of the FGIC Settlement Agreement provides: "Within three (3) Business Days following execution by all Parties of this Agreement, the Rehabilitator, on behalf of FGIC, shall file the Affirmation with the Rehabilitation Court and otherwise use commercially

Scott Declaration ¶ 20.    Indeed, the Court has already considered and rejected the Objectors

argument on the same grounds.  *See* 7/17/2013 Hearing Tr. 27:4-5 ("This is not unilateral or secret

action by the trustees; it requires two courts to approve it.").

## II.    The Governing Agreements Authorize the FGIC Trustees to Enter into the Settlement Agreement.

### A.    *The FGIC Trustees Have Authority to Settle Claims of the FGIC Insured Trusts.*

21.    Contrary to the Objectors' assertions, the FGIC Trustees are the proper parties to

enforce the FGIC Policies because the FGIC Trustees, on behalf of the FGIC Insured Trusts, are

the policyholders, and the FGIC Trustees have exclusive authority to assert claims against FGIC

on behalf of their respective trusts.    Thus, the FGIC Trustees have the power and authority to

commute, and nothing in the Governing Agreements provides otherwise.    The provisions in the

Governing Agreements cited to by the Objectors are either inapplicable or are otherwise satisfied,

as set forth herein.[18]

22.    Under New York law,[19] "only the policy owner has standing to sue based on an

insurance policy."  *Pike v. New York Life Ins. Co.*, 72 A.D.3d 1043, 1049 (N.Y. 2d Dep't 2010).

*See also Orentreich v. Prudential Ins. Co. of America*, 275 A.D.2d 685, 685 (N.Y. 1st Dep't 2000)

("The action was properly dismissed on the ground that since the policies in question are owned

by a trust, only the trustee, who was not named as a plaintiff in that capacity, may seek their

rescission or damages attributable to their issuance.") (citing Restatement (Second) of Trusts

§§ 280-82 (1959)).    The FGIC Policies provide that the FGIC Insured Trusts are the policyholders,

---

reasonable efforts to obtain the Rehabilitation Court Order. The Rehabilitator shall endeavor to schedule the
hearing on the Rehabilitation Court Order for a date that is no less than thirty-seven (37) days after the filing of
the Affirmation. Upon obtaining knowledge of the issuance of the Rehabilitation Court Order, the Rehabilitator,
on behalf of FGIC, shall promptly notify the other Parties."

[18]    In any event, the appropriateness of the Settlement Payment is before the Rehabilitation Court.

[19]    The Insurance Policies are "subject to and shall be governed by the laws of the State of New York."  Sample
Policy.

13

while recognizing that the FGIC Trustees act on behalf of the FGIC Insured Trusts. The FGIC Policies state that FGIC "unconditionally and irrevocably agrees to pay [amounts equal to the shortfall in payments to the Holders] to the Indenture Trustee …, as indenture trustee for the Holders of the Notes." Sample Policy.[20]

23.    Furthermore, pursuant to the Governing Agreements the FGIC Trustees are the only parties authorized to enforce the claims of the FGIC Insured Trusts, including those against FGIC, and accordingly to settle any of their respective FGIC Insured Trusts' claims. For instance, the Sample Indenture provides that, subject to certain restrictions, if the FGIC Insured Trust fails to make payments to the respective FGIC Trustee, that FGIC Trustee may institute proceedings for the collection of such amounts from the trust or other obligor on the notes.[21] Because the FGIC Policies "unconditionally and irrevocably" guarantee payment to the FGIC Trustees of principal and interest owed to the FGIC Insured Trusts, the FGIC Trustees alone have the power to institute collection actions against FGIC.[22] Similarly, the Sample PSA provides that, in the event of certain shortfalls in cash flow to the FGIC Insured Trust, the FGIC Trustees are required to submit a claim to FGIC under the respective FGIC Policy.[23] Accordingly, because the FGIC Trustees have

---

[20]    *See* Insurance Policy No. 06030127, Issuing Entity: GMACM Home Equity Loan Trust 2006-HE5, effective as of November 29, 2006, is attached hereto as Exhibit C (the "**Sample Policy**"). To the best of the ResCap Trustees' knowledge, Exhibit C is representative of the FGIC Policies to which the FGIC Insured Trusts are a party.

[21]    *See, e.g.*, Sample Indenture § 5.03(b) ("In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee, in its own name and as trustee of an express trust, subject to the provisions of Section 10.17 hereof, may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or other obligor on the Notes....").

[22]    The FGIC Trustees have the authority to institute collection actions against FGIC regardless of whether an event of default has occurred.

[23]    *See* Sample PSA § 4.10(a) ("If pursuant to Section 4.04(a)(iv), the Master Servicer determines and notifies the Trustee that a Deficiency Amount exists for such Distribution Date, the Trustee shall complete the Notice and submit such Notice in accordance with the related Policy to the Insurer..."); § 4.10(b) ("The Trustee shall establish and maintain the Insurance Account on behalf of the Holders of the Class A Certificates. Upon receipt of an Insured Payment from the Insurer on behalf of the Class A Certificateholders, the Trustee shall deposit such Insured Payment in the Insurance Account."); *see also Asset Securitization Corp. v. Orix Capital Mkts.*, LLC, 784

the obligation to submit claims to FGIC pursuant to the FGIC Policies, it necessarily follows that, if FGIC fails to make payments under the FGIC Policies, the FGIC Trustees also have the power to institute collection actions or assert claims against FGIC.

24.      It is also well-established that "[a]n incident to the right to sue or be sued is the power to compromise or settle suits."  *Levine v. Behn*, 169 Misc. 601, 606 (Sup. Ct. N.Y. County 1938), *aff'd*, 257 A.D. 156 (1st Dep't 1939), reversed on other grounds, 282 N.Y. 129 (1940); *see also Brown v. John Hancock Mut. Life Ins. Co. of Boston*, 145 Misc. 642, 646 (N.Y. Mun. Ct. 1932) ("The power to sue ordinarily carries with it the power to settle.").  The folly of the alternative—that any trustee that brings suit is irrevocably committed to gamble on ultimate success—is obvious.  The FGIC Trustees, therefore, have the authority to enter into settlement agreements with respect to the FGIC Insured Trusts' claims against FGIC under the FGIC Policies.  *See Delta*, 370 B.R. at 548 (overruling dissenting bondholders' objections to approval of a settlement entered into by trustee and finding that "implicit in the authority to commence proceedings to remedy defaults is the power to negotiate and agree upon settlements....").

**B.      *The Settlement Agreement Is Not an Amendment;
It Is a Resolution of a Claim against an Insurer in an Insolvency Proceeding*.**

25.      The ability of the FGIC Insured Trusts to recover from FGIC has been irreversibly altered because FGIC is insolvent and subject to rehabilitation, not because of any allegedly improper action of the FGIC Trustees.  Ignoring this economic reality, the Monarch Group attempts to characterize the Settlement Agreement as an "amendment" to the Governing Agreements or a "supplemental indenture" for which the FGIC Trustees do not have the required consent of the Holders.  Monarch Group Objection ¶ 30.  In an analogous context, courts have

---

N.Y.S.2d 513, 514 (App. Div. 2004) ("authority [to commence litigation under PSAs] is committed solely to the trustee of the pooled loans"); *Wells Fargo Bank, N.A., Trustee v. Konover*, No. 3:05 CV 1924(CFD), 2009 WL 2710229, at *3 (D. Conn. 2009) ("The PSA establishes that Wells Fargo as Trustee does have these customary powers [to sue], as other courts have held in cases involving similar PSAs").

held that contractual provisions requiring consent of the holders for an amendment are not implicated in bankruptcy cases:

> We are not concerned here with a "supplemental indenture" (Section 12.03) or amendments of the agreement or guaranty with or without consent of the owners (Sections 12.06, 12.07), and those provisions are simply irrelevant here. The impairment which the Objectors complain of results not from any agreement of the Bond Trustee, but from operation of the Bankruptcy Code and the simple economic fact that this insolvent debtor cannot pay its creditors unimpaired.

*Delta*, 370 B.R. at 546-47. The Settlement Agreement does not impair the Holders' rights to receive payment from the FGIC Insured Trusts. The Debtors' and FGIC's respective insolvencies, not the actions of the FGIC Trustees, have impaired their ability to pay in full the investors in the FGIC Insured Trusts. By entering into the Settlement Agreement, the FGIC Trustees have simply agreed to the form of impaired payment which the FGIC Insured Trusts will receive from the Debtors and from FGIC.

26.     The Objectors' reliance on the Trust Indenture Act of 1939, 11 U.S.C. §§ 777aaa (the "TIA") is similarly misplaced.[24] While there is conflicting authority on whether the TIA even applies to pass-through RMBS trust securitizations,[25] it is crystal clear that section 316(b)'s restrictions on majority action are inapplicable in insolvency proceedings. The Monarch Group and Freddie Mac both cite to section 316(b) of the TIA for the proposition that their right to receive principal and interest on their securities cannot be impaired without their consent. Monarch Group Objection ¶¶ 27, 31-32; Freddie Mac Objection ¶¶ 34, 39-41 (both quoting 15 U.S.C. § 77ppp(b)). Section 316(b) "was passed out of a concern about the motivation of insiders

---

[24]    Given their earlier reliance on the McCarran-Ferguson Act's "reverse preemption" of federal bankruptcy law, it is strange that the Objectors now attempt to rely on the TIA, a federal law. If the Court were to accept the Objectors' "reverse preemption" argument then it would necessarily have to ignore their TIA argument. As shown, however, the point is moot because the TIA does not apply in insolvency proceedings.

[25]    *Cf.* SEC Div. of Corp. Fin., *Trust Indenture Act of 1939 – Interpretive Response Section 202.01* (last updated May 3, 2012), *available at* http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm (According to the Securities and Exchange Commition's website "[c]ertificates representing a beneficial ownership interest in a trust... are treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof.").

and quasi-insiders to destroy a bond issue through insider control," *Delta*, 370 B.R. at 550, and is

inapplicable in bankruptcy proceedings:

> [I]n enacting Section 316(b), the SEC was "undoubtedly aware that requiring unanimity in bondholder voting -- rather than mere majority action -- would frustrate consensual workouts and help induce bankruptcy... [and] welcomed the prospect." It is self-evident that Section 316(b) could not have been intended to impair the capacity of a debtor and its creditors to restructure debt in the context of bankruptcy. The cases have uniformly recognized that reorganization proceedings in Chapter 11 are not within the purview of TIA Section 316(b).

*Id. (quoting UPIC & Co. v. Kinder-Care Learning Ctrs.*, 793 F. Supp. 448, 453 (S.D.N.Y. 1992)).

27.    Because insurance companies cannot be the subject of cases under the Bankruptcy

Code, *see* 11 U.S.C. § 109(b)(2), a state court insurance rehabilitation proceeding such as FGIC's

is the only forum for debt readjustment for an insurance company. Freddie Mac acknowledges the

similarity between the two proceedings: "Bankruptcy proceedings and insurance company

insolvency proceedings are indeed similar in that their goal is either to reorganize or liquidate the

debtor. The object of both is to group the assets of the debtor or the insolvent insurance company

into one estate for distribution to creditors according to certain priorities." Freddie Mac Objection

¶ 28 (citation omitted). Thus, the reasoning in *Delta* and *UPIC* is equally persuasive with respect

to FGIC's rehabilitation proceeding ("**FGIC's Rehabilitation Proceeding**") and section 316(b) of

the TIA should not be read to prohibit the FGIC Trustees' entry into the Settlement Agreement

given that both the Debtors and FGIC are subject to insolvency proceedings.[26]

---

[26]    Even if the TIA did apply, the FGIC Trustees' actions are consistent with the TIA because to the extent the Holders' rights were "impaired" or "affected," it was as a result of the Chapter 11 Cases and FGIC's Rehabilitation Proceeding, not the Settlement Agreement.

III.    **The FGIC Trustees Have Acted Reasonably and in
        Good Faith in Entering into the Settlement Agreement,
        <u>Which Is in the Best Interests of the FGIC Trusts and the Investors Therein.</u>**

   A.    *The Process Pursuant to which the Plan Support Agreement
         <u>and the Settlement Agreement Were Negotiated Was Robust and Fair.</u>*

28.    The Settlement Agreement, which represents a reasonable settlement of the FGIC

Insured Trusts' claims against FGIC, is the result of hard fought, arm's-length negotiations among

sophisticated parties. *See Memorandum Opinion Approving the Plan Support Agreement*, Case

No. 12-12020 (MG) (Bankr. S.D.N.Y. June 27, 2013) [Docket No. 4102] (the "**PSA Opinion**")

(stating that "[a]ll of the parties that signed the [the Settlement Agreement and the Plan Support

Agreement] are sophisticated" and that the Settlement Agreement and the Plan Support Agreement

were reached "after many months of the mediation led by Judge Peck and it reflects a heavily

negotiated resolution supported by a substantial majority of the Debtors' major claimant

constituencies").    The PSA Opinion also explicitly held that the FGIC Trustees acted reasonably

with respect to the Plan Support Agreement, of which the Settlement Agreement is a part.[27]

29.    By arguing that this Court has not provided them with a "full and fair opportunity

to be heard," *see* Monarch Group Objection ¶25, the Monarch Group is attacking the process

ordered by this Court and presided over by a sitting bankruptcy judge.[28]   Although the Mediation

---

[27]    When approving the Debtors' entry into the Plan Support Agreement, this Court had "no difficulty in concluding"
that the FGIC Trustees acted prudently and in good faith in entering into same:

> The RMBS Trustees acted prudently, considered the advice of Duff and the RMBS Trustees' legal
> advisors, and considered the potential litigation outcomes if no settlement was reached.  Based on
> the evidence in the record, the Court has no difficulty in concluding that the RMBS Trustees
> reached their decisions to sign and support the PSA in good faith and in what they believed was the
> best interests of the investors.

PSA Opinion at [45].

[28]    On December 6, 2012, the Debtors filed a motion in the Chapter 11 Cases [Docket No. 2357] seeking the entry of
an order appointing a mediator to assist certain parties in interest in resolving various plan issues in furtherance of
reaching a consensual Chapter 11 plan.  By order dated December 26, 2012 [Docket No. 2519] (the "**Mediation
Order**"), the Bankruptcy Court appointed Judge Peck as "**Mediator**" for an initial period through February 28,
2013.  By orders dated March 5, 2013 [Docket No. 3101] and June 4, 2013 [Docket No. 3877], the Bankruptcy
Court extended Judge Peck's appointment as Mediator through May 31, 2013 and October 31, 2013, respectively.

Order (as defined below) prohibits the FGIC Trustees from disclosing the substance of mediation discussions,[29] representatives from each of the FGIC Trustees have testified generally regarding their impressions of the negotiations and have testified at length regarding their review and consideration of Duff's Report, dated May 15, 2013 (the "**Duff Report**," which is attached to the Major Declaration as Exhibit 123).[30]  The Objectors have also received through discovery the Duff Report and all other material information the FGIC Trustees relied upon in deciding to enter into the Settlement Agreement.

30.    The Objectors make a series of exaggerated and incorrect statements as to the purportedly insufficient actions taken by the FGIC Trustees.  *See* Freddie Mac Objection ¶ 53 (referring to "the FGIC Trustees' alarming passivity and complete lack of interest" and further asserting that "the FGIC Trustees did absolutely no analysis and instead blindly relied on the Duff Report without understanding or even questioning it"); *see also* Monarch Group Objection ¶ 12 (asserting that the "Trustees failed to discharge their duties to the Investors by entering into the Settlement Agreement without first conducting an appropriate assessment of its terms").  But as set forth in greater detail in the FGIC Trustee Declarations, the FGIC Trustees gave careful and informed consideration of the Settlement Agreement, considering its merits on both a stand-alone basis and in the context of the context of the Plan Support Agreement of which the Settlement Agreement is a part.[31]

---

[29]    *See* Mediation Order, ¶ 4.  In repeated demonstration of their disregard for the Mediation Order, the Objectors allege that the FGIC Trustees have refused to provide information necessary for them to evaluate the Settlement Agreement under the "guise of the mediation privilege" and the attorney-client privilege.  *See* Monarch Group Objection ¶ 25; Freddie Mac Objection ¶¶ 12, 13.

[30]    Freddie Mac asserts that the FGIC Trustees have not "publically" disclosed information that is vital to their analysis, but Freddie Mac does not argue that the FGIC Trustees failed to produce such information to them. *See* Freddie Mac Objection ¶¶ 1(e), 17.

[31]    The Freddie Mac Objection makes an issue of the FGIC Trustees' failure to notify Freddie Mac of the Settlement Payment and cites to testimony from the depositions of representatives of the FGIC Trustees.  *See* Freddie Mac

31.     The Settlement Agreement was agreed to as part of an extensive mediation with numerous interested parties in these Chapter 11 Cases in an effort to reach a consensual chapter 11 plan (the "**Plan Mediation**").  The Plan Mediation occurred over the course of some five months beginning in December 2012 and was overseen by a sitting Bankruptcy Judge, the Honorable James M. Peck.  *See* Major Declaration ¶ 20; Sohlberg Declaration ¶ 14; Scott Declaration ¶ 17. The integrated, global settlement associated with the Plan Support Agreement (including the Settlement Agreement) is now part of the chapter 11 bankruptcy plan filed in accordance with the Plan Support Agreement (the "**Proposed ResCap Plan**"), and must be understood as the product of heavily negotiated, arm's-length negotiations conducted among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of the Mediator.  *See* Major Declaration ¶ 21; Sohlberg Declaration ¶ 15; Scott Declaration ¶ 18.

32.     In determining whether to enter into the Settlement Agreement, the FGIC Trustees also retained Duff & Phelps, LLC ("**Duff**"), a sophisticated and competent financial advisor, to review and analyze the Settlement Agreement.  Major Declaration ¶ 18; Sohlberg Declaration ¶ 11; Scott Declaration ¶ 15.  As the FGIC Trustees' witnesses note in their direct testimony, the Governing Agreements explicitly authorized the FGIC Trustees to utilize agents like Duff to fulfill their duties as trustees.  *See* Major Declaration ¶ 17; Scott Declaration ¶ 14.  In consideration of the Settlement Agreement, the FGIC Trustees requested that Duff analyze and compare the economic terms of the Settlement Payment against the Projected Payments under the Rehabilitation Plan and provide a recommendation to the FGIC Trustees.[32]

---

Objection ¶ 21, n.18.  The testimony cited by Freddie Mac does nothing more than confirm that the FGIC Trustees abided by the Mediation Order regarding the disclosure of information.

[32]  *See* Major Declaration ¶28; Sohlberg Declaration ¶21; Scott Declaration ¶25.  Major Dep. at Tr. 142:9-22, 190:19-191:2; Sohlberg Dep. at Tr. 73:25-74:4, 126:2-15; Scott Dep. at Tr. 42:17-22, 43:3-15.

33.     In conducting its analysis, Duff reviewed and analyzed publicly available information; obtained information concerning the Rehabilitation Plan directly from FGIC's Chief Restructuring Officer and Lazard Freres & Co. LLC, the FGIC Rehabilitator's financial advisors, and also obtained and considered certain information provided by parties to the Plan Mediation.[33] Prior to entering into the Settlement Agreement, representatives from each of the FGIC Trustees reviewed draft discussion materials prepared by Duff setting forth its analysis of the Settlement Agreement,[34] next attended a Duff presentation on its findings,[35] and lastly reviewed the Duff Report.[36]

34.     In evaluating the Settlement Agreement, the FGIC Trustees also considered that the Institutional Investors, which includes Investors in the FGIC Insured Trusts, actively participated in the Plan Mediation and supported the Settlement Agreement, ultimately becoming signatories to the FGIC Settlement Agreement.[37]   While the Monarch Group asserts that the Institutional Investors are conflicted and do not fairly support the holders in the FGIC Insured Trusts, *see* Monarch Group Objection, ¶ 10, the Institutional Investors have verified their holdings in the FGIC Insured Trusts,[38] and thus it was appropriate for the FGIC Trustees to consider their views.

---

[33]     *See* Major Declaration ¶29; Sohlberg Declaration ¶22; Scott Declaration ¶26.

[34]     *See* Major Declaration ¶30; Sohlberg Declaration ¶23; Scott Declaration ¶27.   Duff & Phelps' analysis of the Settlement Agreement is attached to the Major Declaration as Exhibit 119, to the Sohlberg Declaration as Exhibit B, and to the Scott Declaration as Exhibit 120, Tab C.

[35]     *See* Major Declaration ¶¶31-33; Sohlberg Declaration ¶¶24-25; Scott Declaration ¶¶28-30.  Major Dep., Tr. 15:25-16:18; Sohlberg Dep. at 122:4-124:14; Scott Dep. at Tr. 44:13-22, 47:9-11.

[36]     *See* Major Declaration ¶¶34-36; Sohlberg Declaration ¶¶26-27; Scott Declaration ¶¶31-33.  Major Dep. Tr. 15:25-16:18.  Freddie Mac asserts that the Trustees "blindly relied on the Duff & Phelps report without understanding or even questioning it."  Freddie Mac Objection ¶ 53.  This allegation is belied by the testimony of the FGIC Trustees' witnesses.  As Robert Major testified, he made sure that he understood the key terms of the Duff & Phelps Report, Major Dep Tr. at 47:15-48:4, 71:7-72:6, 72:20-73:8, 76:11-24, 79:10-12, 83:10-85:15, 95:16-25, 105:14-106:5, 108:24-109:16, 129:18-130:11, 132:5-23, and he understood the terms of the Settlement Agreement, Major Dep Tr. 165:10-25.

[37]     *See* Major Declaration ¶22; Sohlberg Declaration ¶ 16; Scott Declaration ¶ 19

[38]     The Steering Committee Group holds approximately $316 million (based on unpaid principal balance) of the Debtors' RMBS issued by the FGIC Insured Trusts.  *See Debtors' Second Supplemental Motion Pursuant to Fed.*

21

Moreover, most, if not all, of the Institutional Investors are money managers who equally owe

fiduciary duties to their clients in both FGIC Insured Trusts and non-FGIC Insured Trusts.  *See*

Dubel Declaration ¶ 7 (cataloging the banks, funds and financial institutions that make up the

Institutional Investors).

### B.   *The FGIC Settlement Is in the Best Interests of the RMBS Trusts.*

35.   Based on the advice of Duff, the FGIC Trustees determined that the Settlement

Agreement is in the bests interests of the FGIC Insured Trusts and all the investors therein because

(i) the Settlement Payment is within the range of reasonableness when compared to the Projected

Payments under the First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013 ("**FGIC's**

**Plan of Rehabilitation**"); (ii) FGIC is agreeing to forego insurance premiums and the right to

receive reimbursements from the FGIC Insured Trusts;[39] and (iii) the Settlement Agreement

potentially confers significant benefits upon the FGIC Insured Trusts as part of a global settlement

embodied in the Plan Support Agreement.  The Objectors' contentions to the contrary demonstrate

a complete misunderstanding of how the economics of the Settlement Agreement compare to

FGIC's Plan of Rehabilitation.

36.   The $253.3 million Settlement Payment is a fixed amount, whereas the amount that

each non-settling trust would otherwise receive under FGIC's Plan of Rehabilitation remains

uncertain.  Demonstrating the uncertainty underlying FGIC's ability to pay future claims is that

the FGIC Policies, despite the FGIC Insured Trusts' continued payment of premiums thereunder,

have not received payments on any claims since late 2009.  FGIC is also exposed to potentially

---

*R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [D.I. 1887] Ex. D to Ex. 2 (holdings as
of Sept. 17, 2012).

[39]   "Reimbursements" refer to recoveries on individual mortgage loans (such as foreclosure or REO sale proceeds)
that are received by a FGIC trustee after FGIC has paid a loss in respect of such loan.  Under the Policies and
Governing Agreements, as well as FGIC's Plan of Rehabilitation, the FGIC Trustees are obligated to pay to FGIC
certain of such reimbursements.  Another benefit of the Settlement Agreement is that FGIC agrees therein to
relinquish all its rights to reimbursements from the FGIC Trustees.  *See* Settlement Agreement § 2.01(b).

large future claims relating to, among other things, municipal bonds issued by the City of Detroit that could have the effect of diluting the Projected Payments.[40]  Although the Objectors assert that the Settlement Payment is inferior because it limits the "upside potential" if FGIC ends up distributing more than expected to policyholders under FGIC's Plan of Rehabilitation, *see, e.g.*, Monarch Objection ¶ 7 and ¶ 38 and Freddie Mac Objection ¶ 1(d) and ¶ 47, they fail to appreciate that the Settlement Payment eliminates the risk of dilution by an increase in policy claims against FGIC.

37.    With respect to the Settlement Payment, the Objectors make three other misguided contentions in their briefs, each of which is addressed in the Pfeiffer Declaration.  Pfeiffer Declaration ¶¶ 66-81.  First, the Freddie Mac Objection repeatedly criticizes Duff for not analyzing the "40% haircut that FGIC provided in its analysis."  *See, e.g.*, Freddie Mac Objection at ¶¶ 20, 22.[41]  The Monarch Group Objection calls it the "40% bargain barrel discount" and further asserts that the FGIC Trustees failed "to challenge FGIC's 40% haircut."  Monarch Group Objection ¶¶ 34, 42.  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[40]    *See* Major Declaration ¶ 28.  Various news agencies have reported on the possibility that, in light of the City of Detroit's default upon its bankruptcy filing, FGIC might now have obligations to make payments on the City of Detroit-issued municipal bonds.  *See, e.g.*, Mike Cherney, *In Detroit, Muni-Bond Insurance = Better Night's Sleep for Bondholders*, MoneyBeat Wall St. J., (July 26, 2013, 3:41 PM),
http://blogs.wsj.com/moneybeat/2013/07/26/in-detroit-muni-bond-insurance-better-nights-sleep-for-bondholders/.

[41]    Freddie Mac asserts that the discovery to date demonstrates that the FGIC Trustees' accepted the "baseless 40% 'haircut' … without any counter proposal or negotiation."  Freddie Mac Objection ¶ 21 and n.18.  In support of Freddie Mac's baseless assertion, which as stated above misconstrues the relevance and purpose of the 40% haircut, Freddie Mac cites to the testimony of BNY Mellon, US Bank and Allen Pfeiffer.  The cited testimony does nothing more than demonstrate that the FGIC Trustees engaged Duff & Phelps to analyze the terms of the Settlement Agreement and that Duff & Phelps prepared its own analysis of present value of the projected payments under FGIC's Plan of Rehabilitation.

████████████████████  Pfeiffer Declaration ¶¶ 68-69.  As the Objectors should now understand, Duff applied no haircut.

38.    Second, Freddie Mac argues that its recovery under the Settlement Agreement is inferior because Freddie Mac purportedly would receive a "27 to 30 percent recovery" under the Rehabilitation Plan.  Freddie Mac Objection ¶¶ 20, 46-47.  But as further set forth in the Pfeiffer Declaration, *see* Pfeiffer Declaration ¶¶ 70-76, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

39.    Third, the Monarch Objection takes issue with Duff's supposed error of applying the "highest discount rate" to "the most stable economy" scenario."  Monarch Group Objection ¶ 40.  But as further set forth in the Pfeiffer Declaration, *see* Pfeiffer Declaration, ¶ 81, ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

40.    In addition to the Settlement Payment, the Settlement Agreement also provides the FGIC Insured Trusts with several other substantial benefits:   (i) FGIC's agreement to forego approximately $18 million in future premiums paid to FGIC (on a present value basis); (ii) FGIC's agreement to forego reimbursements to FGIC from future recoveries on mortgage loans, payments to FGIC of "excess spread," and other future amounts otherwise payable to FGIC under the FGIC Policies and Governing Agreements; and (iii) the significant benefits that would inure to the FGIC Insured Trusts as part of a global settlement that is embodied in the Proposed ResCap Plan.

24

Specifically, the benefits that would be conferred upon the FGIC Insured Trusts by the Proposed

Plan, if and when the Proposed ResCap Plan goes effective, include:

- the ability for the FGIC Insured Trusts to share in the proceeds from the $2.1 billion contribution (the "**Ally Contribution**") from Ally Financial, Inc. to the Debtors' bankruptcy estates, which contribution was made possible by the Settlement Agreement and other elements of the global settlement embodied in the Plan Support Agreement;

- allocations to the FGIC Insured Trusts from the proceeds of the Ally Contribution totaling approximately $92 million for recoveries based on allegations of the Debtors' breaches of representations and warranties;

- certainty with respect to the amount of FGIC's allowed claims against the Debtors' bankruptcy estates;

- curtailment of the costs associated with litigating the validity and amount of FGIC's claims against the Debtors' estates; and

- curtailment of the amount of time that it will take to resolve the claims of FGIC, the FGIC Insured Trusts, and various other creditor constituencies against the Debtors' estates.

The Objectors, however, ignore these potential benefits altogether.[42]  If the Court does not approve

the Settlement Agreement, then the Plan Support Agreement will terminate and the FGIC Insured

Trusts will not receive these substantial benefits.

41.     Finally, the Monarch Group incorrectly asserts that the Settlement Agreement is

not in the best interest of the investors in the FGIC Insured Trusts because the FGIC Trustees

purportedly released the FGIC Insured Trusts' breach of representation and warranty claims

against the Debtor for zero recovery in the event that the Proposed Plan does not go effective.  *See*

Monarch Group Objection ¶¶ 7, 34, 41, n.17.  This assertion could not be further from the truth.

Section 2.01(a)(iv) of the Settlement Agreement, on which the Monarch Group relies upon,

---

[42]   In the course of the FGIC Trustees' discovery, the FGIC Trustees learned that, despite purportedly considering the Settlement Agreement as a whole before issuing their reports, neither of the Objectors' experts factored into their analysis the additional recoveries that the FGIC Insured Trusts would receive under the Settlement Agreement from the Debtors' estates should the Proposed ResCap Plan go effective, including recoveries based on the claims for breaches of representations and warranties.  *See* Goldstein Dep. Tr. 89:6-90:15, 161:24-162:25; Gibson Dep. at Tr. 108:9-20, 143:21-144:4.  In particular, Freddie Mac's expert never reviewed the Plan Support Agreement, the Term Sheets or even the Settlement Agreement itself, but rather based the entirety of his analysis on the Holtzer affirmation.  *See* Gibson Dep. at Tr. 35:20-36:8, 41:13-42:2, 44:18-23, 47:6-47:19, 48:16-49:2.

includes clarifying language that reserves to the FGIC Trustees the right to determine the allocation of any recovery on the claims of the hundreds of the RMBS Trusts, which necessarily would include distributions to the subset of 47 FGIC Insured Trusts.  Plan Support Agreement, § 2.01(a)(iv) ("For the avoidance of doubt, the foregoing sentence shall not affect distributions under the RMBS Trust Allocation Protocol appearing at Annex III to the Supplemental Term Sheet (as defined in the Plan Support Agreement).").  Because the RMBS Trust Allocation Protocol provides for distributions to all RMBS Trusts, including the FGIC Insured Trusts, the failure of the Proposed Plan to go effective would not prevent the FGIC Insured Trusts from receiving a distribution from the Debtors.

42.    Consequently, because the Settlement Payment represents a reasonable estimate of the present value of payments that the FGIC Insured Trusts would receive under FGIC's Plan of Rehabilitation, because under the Settlement Agreement FGIC agrees to forego both payment of approximately $18 million in future insurance premiums (on a present value basis) and reimbursements from the FGIC Insured Trusts (unquantifiable but likely to be a significant amount), and because the Settlement Agreement confers numerous other benefits on the FGIC Insured Trusts in connection with the global settlement embodied in the Plan Support Agreement, the Settlement Agreement is fair and equitable and in the best interest of all the FGIC Insured Trusts and the investors therein.

### C.    The FGIC Trustees Have Not Breached Any Duties Owing to the FGIC Insured Trusts.

43.    The FGIC Trustees do not have fiduciary duties similar to those of an ordinary trustee.  An indenture trustee's duties are defined by the trust instrument – here, the Governing Agreements.  *See Magten Asset Mgmt. Corp. v. Bank of New York*, 2007 WL 1326795, at *6 (Sup. Ct. N.Y. Cnty. 2007) ("The role of an indenture trustee differs from that of an ordinary trustee. . . .

[I]ts obligations are defined primarily by the indenture rather than by the common law of trusts")
(citations omitted).

44.     The Governing Agreements generally provide that, prior to the occurrence of an
event of default (as defined in the relevant agreement), the FGIC Trustees' duties are strictly
limited to those set forth explicitly in the contracts.  *See, e.g.*, Sample PSA § 8.01(a); Sample
Indenture § 6.01(b)(i).  Subsequent to an event of default that has not been cured or waived, the
RMBS Trustees must exercise such of the "rights and powers vested in [them] by [the Governing
Agreements], and use the same degree of care and skill in their exercise as a prudent investor
would exercise or use under the circumstances in the conduct of such investor's own affairs."
Sample PSA § 8.01(a); *see also* Sample Indenture, Indenture § 6.01.  Regardless of whether an
event of default has occurred here, in determining whether to enter into the Settlement Agreement
the FGIC Trustees have acted reasonably, in good faith, and in accordance with the "prudent
person" standard set forth in the Governing Agreements.

45.     Under longstanding law, courts review trustees' discretionary decisions for two
elements: good faith and reasonableness.  "Where a trustee has discretionary power, its exercise
should not be the subject of judicial interference, as long as it is exercised reasonably and in good
faith."  *Haynes v. Haynes*, 72 A.D.3d 535, 536 (N.Y. App. Div. 2010) (citing *Community Serv.
Soc'y v. N.Y. Cmty. Trust (In re Preiskel)*, 713 N.Y.S.2d 712, 719 (App. Div. 2000)); *see also In re
First Trust & Deposit Co.*, 280 N.Y. 155, 163 (1939) ("We find no abuse of discretion and no
evidence of bad faith or that the trustee administered the trust in a careless or negligent manner").
Similarly, section 187 of the Restatement (Second) of Trusts (1959) provides that "[w]here
discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not
subject to control by the court, except *to prevent an abuse by the trustee of his discretion*"

27

(emphasis added.).  *See also id.* § 259 cmt. d ("Where a matter rests within the discretion of the trustee, the court ordinarily will not instruct him how to exercise his discretion").

46.      In fact, numerous authorities have applied a deferential standard of review to trustees' decisions to settle.  Section 192 of the *Restatement (Second) of Trusts* provides that "[t]he trustee can properly compromise, submit to arbitration or abandon claims affecting the trust property provided that in doing so he exercises reasonable prudence."  The holding in *In re IBJ Schroder Bank & Trust Co.*, Index No. 101530/98, 2000 N.Y. Misc. LEXIS 692 (Sup. Ct. N.Y. Cnty. Aug. 16, 2000) further supports the FGIC Trustees' authority to enter into the Settlement Agreement and the Findings that the FGIC Trustees seek.  The case involved an Article 77 proceeding,[43] in which a securitization trustee sought approval of a settlement.  Nearly 200 beneficiaries objected, arguing that the trustee had settled too cheaply and "failed to take any discovery."  *Id.* at *7.  The court refused to "invalidate the proposed settlement merely because certain beneficiaries believe a greater recovery might be obtained if the... action is submitted to an expensive and unpredictable litigation."  *Id.* at *8.  Indeed, the Court held that the trustee's decision to compromise "was entitled to judicial deference," and "the trustee's view must prevail" because of "the trustee's showing of [its] reasonableness."  *Id.* ("the trustee's decision to compromise the... action is within the scope of the trustee's powers, is reasonable and prudent, and is entitled to judicial deference").

47.      The Monarch Group asserts that the FGIC Trustees "have failed to exercise their most fundamental duty to the investors in the FGIC Insured Trusts, that of maximizing repayment on the underlying securities."  Monarch Group Objection ¶ 36.  The FGIC Trustees, however, do not have a duty to maximize repayment on the underlying securities.  *See In re "Agent Orange"*

---

[43]    An Article 77 proceeding is an action provided for under the New York Civil Practice Law and Rules that may be brought to determine a matter relating to an express trust.  *See* N.Y. C.P.L.R.  § 7701.

*Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987) (holding that a settlement must not be judged "in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."). The unrebutted evidence demonstrates that the FGIC Trustees have fully performed the duties that would apply in the event of the occurrence of an event of default by acting reasonably and appropriately, in accordance with the "prudent Person" standard set forth in the Governing Agreements.[44]

48.    Furthermore, the Monarch Group's assertion that the FGIC Trustees have violated their duty of loyalty because of alleged conflicts of interests arising out of the FGIC Trustees' representation of various investors lacks any merit. *See* Monarch Group Objection ¶ 43. The Court has already correctly determined, in concluding that the fiduciary exception does not apply, that the Objectors do not have a colorable claim that the FGIC Trustees have a conflict of interest or that they engaged in self-dealing. *See* 7/17/2013 Hearing Tr. 69:12 – 71:13 ("And so, the Court concludes that the three issues raised by Ms. Eaton do not raise a colorable claim of self dealing or conflict-of-interest sufficient to trigger the fiduciary exception to the attorney-client privilege.").

## JOINDER

The FGIC Trustees hereby join in the (i) *Debtors' Omnibus Reply in Further Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (August 2,

---

[44]    The Monarch Group also contends that the FGIC Trustees "did not conduct a careful and informed deliberation." *See* Monarch Group Objection ¶ 37. Not only does the Monarch Group make the conclusory statement without citing to anything to substantiate it, but the FGIC Trustees' declarations and their deposition testimony also refute that statement. As discussed above, based on Duff's analysis of the respective benefits to the FGIC Insured Trusts of the Settlement Agreement and the respective benefits that such trusts would enjoy under FGIC's Plan of Rehabilitation, Duff advised the FGIC Trustees that the Settlement Payment provided for in the Settlement Agreement was within a range of reasonable estimates of the present value of the potential recoveries under FGIC's Plan of Rehabilitation.

2013) [Docket No. ____], (ii) *Statement of the Official Committee of Unsecured Creditors (I) in Support of the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors and (II) in Response to the Objections Thereto* (August 2, 2013) [Docket No. ____], and (iii) *Financial Guaranty Insurance Company's Reply in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Individual Investors* (August 2, 2013) [Docket No. ____], to the extent consistent herewith[45] and to the extent applicable to the FGIC Trustees. The FGIC Trustees reserve the right to amend, supplement, alter or modify this Omnibus Reply.

*[The remainder of this page is intentionally left blank.]*

---

[45]  For the avoidance of doubt, the FGIC Trustees do not join in any portions of these pleadings to the extent they assert that the Rehabilitation Court is not an appropriate forum for considering investor-related concerns regarding the Settlement Agreement. Each of this Court and the Rehabilitation Court is an appropriate forum to consider such concerns and neither this Court nor the Rehabilitation Court has found otherwise.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the FGIC Trustees request that the Court approve the Settlement Agreement, enter the Proposed Order substantially in the form attached to the FGIC 9019 Motion as Exhibit 1, and grant such other and further relief as the Court deems appropriate.

Dated:  New York, New York
        August 2, 2013

Respectfully submitted,

**DECHERT LLP**
By:  /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Craig P. Druehl
James O. Moore
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**SEWARD & KISSEL LLP**
By:  /s/ Mark D. Kotwick
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By: /s/ Michael E. Johnson
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
By: /s/ Dale C. Christensen, Jr.
Dale C. Christensen, Jr.
Thomas Ross Hooper
Benay L. Josselson
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to Law Debenture Trust Company of New York, as Separate Trustee of Certain Mortgage-Backed Securities Trusts*

31