Sidman Declaration Exhibit # 1

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

**PRESENT:**     **HON. DORIS LING-COHAN**      PART _36_
<em>Justice</em>

In the Matter of the Rehabilitation of

Financial Guaranty Insurance Company.

INDEX NO. _401265/12_

MOTION DATE _____

MOTION SEQ. NO. _004_

The following papers, numbered 1 to _11_ , were read on this motion to/for _approval of plan of rehabilitation_

Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s). _1, 2, 3_

Answering Affidavits — Exhibits _(miscellaneous papers)_ _____ | No(s). _4,5,6,7,8,9,10,11_

Replying Affidavits _____ | No(s). _____

Upon the foregoing papers, it is ordered that this motion is _granted, as per the attached Plan Approval Order, dated June 11, 2013, after hearing held ~~between~~ on June 11, 2013._

**FILED**

JUN 13 2013

NEW YORK
COUNTY CLERK'S OFFICE

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: _6/11/13_

_____, J.S.C.

**HON. DORIS LING-COHAN**

1. CHECK ONE: ................................................. ☐ CASE DISPOSED    ☐ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ................MOTION IS: ☐ GRANTED   ☐ DENIED   ☐ GRANTED IN PART   ☐ OTHER
3. CHECK IF APPROPRIATE: ................................ ☐ SETTLE ORDER        ☐ SUBMIT ORDER
                                  ☐ DO NOT POST     ☐ FIDUCIARY APPOINTMENT    ☐ REFERENCE

AT IAS PART 36 OF THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK, AT THE COURTHOUSE, 60 CENTRE STREET, IN THE COUNTY, CITY AND STATE OF NEW YORK, ON THE // DAY OF June , 2013

PRESENT:
HON. DORIS LING-COHAN, J.S.C.

-----------------------------------------

In the Matter of the Rehabilitation of
FINANCIAL GUARANTY INSURANCE
COMPANY.

    :    Index No. 401265/2012

    :

**FILED** **PLAN APPROVAL ORDER**

    :    Motion Sequence No. 4

JUN 13 2013

NEW YORK
COUNTY CLERK'S OFFICE

-----------------------------------------

Upon full consideration of the entire record of the above-captioned rehabilitation

proceeding (the "**Rehabilitation Proceeding**"), including (i) the affirmation (the "**Affirmation**")

of Gary T. Holtzer of Weil, Gotshal & Manges LLP, attorneys for Benjamin M. Lawsky,

Superintendent of Financial Services of the State of New York (the "**Superintendent**"), as the

court-appointed rehabilitator (the "**Rehabilitator**") of Financial Guaranty Insurance Company

("**FGIC**"), dated September 27, 2012, in support of the Rehabilitator's motion for an order

pursuant to Sections 7403(a) and 7403(d) of the New York Insurance Law (the "**NYIL**")

(a) approving the proposed First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013,

attached hereto as **Exhibit 1**, together with all exhibits and the Plan Supplement[1] thereto

(collectively, the "**Plan**"), including approving the Novation Agreement and consummation of

the transactions contemplated thereby and (b) terminating the Rehabilitation Proceeding upon the

effective date of the Plan (the "**Effective Date**"); (ii) the exhibits attached to the Affirmation,

including the Disclosure Statement for the Plan (the "**Disclosure Statement**"); (iii) the

Memorandum of Law in Support of Approval of the Plan (the "**Memorandum**"); (iv) the

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Plan.

Affidavit of Michael W. Miller in Further Support of the Plan, dated December 12, 2012 (the "**Lazard Affidavit**"); (v) the Affidavit of John S. Dubel in Further Support of the Plan, dated December 12, 2012 (the "**Dubel Affidavit**"); (vi) the letter setting forth the standard for approval of the Plan, dated January 22, 2013 (the "**Standard Letter**"); (vii) the order dated January 24, 2013, as amended on January 29, 2013, finding (a) a lack of sufficient evidence in the submissions to raise a material question of fact and (b) that the need for an evidentiary hearing had not been established (the "**January Order**"); (viii) the Amended Omnibus Reply Memorandum of Law in Further Support of Approval of the Plan, dated January 25, 2013, including the cover letter attached thereto, and the amended Omnibus Response Chart attached as Exhibit 1B thereto (the "**Amended Reply**"); (ix) the letter setting forth the remaining issues, dated February 11, 2013, including the further amended Omnibus Response Chart attached as Exhibit 1C thereto (the "**February 11 Letter**"); (x) the letter advising the Court that no party served an objection to the Plan Revisions (as defined in the Court's interim order dated February 19, 2013 (the "**Scheduling Order**")) and that each of the Trustees (defined below) filed notices withdrawing each of their objections to the Plan, dated April 12, 2013 (the "**April 12 Letter**"); (xi) the letter advising the Court of (a) the termination agreement and deed of release to be entered into by and among FGIC, Childrens Health Partnership Holdings Pty Ltd ("**CHP**") and certain related parties and (b) CHP's intention to withdraw its objections to the Plan, dated April 16, 2013 (the "**April 16 Letter**"); (xii) the notices of withdrawal of objections to the Plan filed by (a) Jefferson County Alabama, dated November 30, 2012, (b) Assured Guaranty Corp., Assured Guaranty Re Ltd. and Assured Guaranty Re Overseas Ltd, dated December 12, 2012, (c) Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, dated April 12, 2013, (d) Wells Fargo, N.A., dated April 12, 2013, (e) U.S. Bank National Association

2

Supreme Court Records OnLine Library - page 3 of 73

and U.S. Bank Trust National Association, dated April 12, 2013, (f) The Bank of New York

Mellon and The Bank of New York Mellon Trust Company, N.A., dated April 12, 2013,

(g) CHP, dated April 25, 2013, (h) certain holders of sewer warrants issued by Jefferson County,

Alabama, dated May 31, 2013, (i) Aurelius Capital Management, LP, dated June 4, 2013 and

(j) CQS ABS Master Fund Ltd., CQS Select ABS Master Fund Ltd and CQS ABS Alpha Master

Fund Ltd., dated June 4, 2013 (collectively, the "**Notices of Withdrawal**"), (xiii) the letter

advising the Court that all remaining objections to the Plan have been resolved, dated June 4,

2013 (the "**June 4 Letter**"); and (xiv) the presentation at the hearing held on June 11, 2013 to

consider approval of the Plan (the "**Plan Approval Hearing**");

      And upon reading and signing the order to show cause dated September 28, 2012

and the Scheduling Order;

      And all objections to the Plan having been withdrawn;

      And the Court having held the Plan Approval Hearing; and due and proper notice

of the Plan Approval Hearing having been provided as required by the order dated April 23,

2013, and no further notice being necessary;

      This Court finds that:

a.      The legal and factual bases set forth in the Affirmation and the exhibits
thereto, the Plan, the Disclosure Statement, the Memorandum, the Lazard
Affidavit, the Dubel Affidavit, the Standard Letter, the January Order, the
Amended Reply, the February 11 Letter, the April 12 Letter, the April 16
Letter, the Notices of Withdrawal, the June 4 Letter and the presentation
at the Plan Approval Hearing, establish just and sufficient cause to grant
the relief requested;

b.      The relief requested is in the best interests of, and fair and equitable to, all
of FGIC's Policyholders, creditors and other claimants;

c.      The relief requested provides Policyholders, creditors and other claimants
at least what they would expect to have received had FGIC been subject
to a liquidation pursuant to Article 74 of the NYIL;

3

d.    U.S. Bank National Bank Association and U.S. Bank Trust National
Association, The Bank of New York Mellon and The Bank of New York
Mellon Trust Company, N.A., Deutsche Bank National Trust Company
and Deutsche Bank Trust Company Americas and Wells Fargo Bank,
N.A., each in its capacity as trustee of various trusts (collectively, the
"**Trustees**") filed objections to the Plan of Rehabilitation for FGIC dated
September 27, 2012 and the First Amended Plan of Rehabilitation for
FGIC dated December 12, 2012. The Rehabilitator revised the Plan to
address the Trustees' concerns and the Trustees withdrew their objections
to approval of the Plan, as revised and set forth in the amended version of
the First Amended Plan of Rehabilitation for FGIC. The Court finds that
the Trustees' withdrawal of objections to approval of the Plan, as revised,
shall not be construed as consent by the Trustees to the First Amended
Plan of Rehabilitation for FGIC or to any modification to the Transaction
Documents effected by the provisions of such Plan. The Court finds that
the Trustees have acted reasonably and in good faith in making and
withdrawing the objections, and the Trustees have not acted negligently in
performing their duties in respect of the objections; and

e.    Based upon information available to FGIC as of the date hereof, FGIC has
determined that it shall not take any action to offset, recoup or otherwise
recover any Pre-Rehabilitation FGIC Premiums, Expenses and Recoveries
that have not been paid to FGIC but instead have been or shall be applied
by the Trustees to reduce the amount of Policy Claims ("**Unpaid Pre-
Rehabilitation Amounts**"), other than with respect to up to
approximately $5 million owed with respect to the IMM 2004-10
1A1/Impac 2004-10 transaction (the "**Impac Transaction**"), with respect
to which FGIC reserves all rights. FGIC represents that it has reviewed
all information concerning Unpaid Pre-Rehabilitation Amounts that has
been made available to it to date.

NOW, on motion of the Rehabilitator, it is ORDERED as follows:

1.    To the extent not already granted by prior order of this Court, the relief
requested, as set forth in the Affirmation, is granted;

2.    The Plan is approved and its implementation authorized;

3.    The form of amended and restated charter and the form of amended and
restated by-laws, each filed as part of the Plan Supplement, are approved
and shall constitute the charter and by-laws, respectively, of FGIC as of
the Effective Date;

4.    The Novation Agreement, including consummation of the transactions
contemplated thereby, is approved. The Rehabilitator and (with respect to
the period from and after the Effective Date) FGIC are authorized and
empowered to consummate the transactions contemplated by the Novation

4

Supreme Court Records OnLine Library - page 5 of 73

Agreement as of the Effective Date (or such other date for consummation of such transactions as may be set forth in such agreement); *provided, however*, that should the Rehabilitator waive the condition to the Effective Date that this Order becomes a Final Order, consummation of the transactions contemplated by the Novation Agreement shall not occur until the earlier of (i) this Order becoming a Final Order or (ii) FGIC waiving the requirement that this Order be a Final Order with respect to such agreement;

5.  Upon the Novation Effective Date (as defined in the Novation Agreement), the Covered Policies, the Covered Policy Rights and the Covered Policy Liabilities (each as defined in the Novation Agreement) shall be legally novated from FGIC to National Public Finance Guarantee Corporation in accordance with the terms and conditions of the Novation Agreement;

6.  An initial CPP of 17.25% is approved, subject to adjustment by the Rehabilitator in his sole discretion on or before the Effective Date;

7.  FGIC shall not take any action to offset, recoup or otherwise recover any Unpaid Pre-Rehabilitation Amounts, including challenging the propriety of any Unpaid Pre-Rehabilitation Amount *per se* except (i) with respect to the Impac Transaction and (ii) in the event that FGIC receives any additional information from the Trustees, servicers or calculation agents of relevance to the calculation of any Unpaid Pre-Rehabilitation Amounts or FGIC otherwise discovers that information previously provided by the Trustees, servicers or calculation agents regarding such amounts was incorrect. Any potential action by FGIC to offset, recoup or otherwise recover any unpaid Pre-Rehabilitation Amounts based on clause (ii) of the preceding sentence shall be limited to the amount of the potential Unpaid Pre-Rehabilitation Amounts determined by giving effect to such additional or corrected information;

8.  Pursuant to Section 7403(d) of the NYIL, on the Effective Date, the Rehabilitation Proceeding shall terminate without further order of this Court and the Superintendent shall be discharged from his duties as the Rehabilitator. The Rehabilitator's employees and agents shall be discharged of their duties with respect to all matters related to the Rehabilitation of FGIC and the Rehabilitator, the NYLB and each of their respective employees, attorneys, agents, advisors and representatives shall have no liability for actions taken by FGIC after the Effective Date;

9.  Pursuant to Section 7403(d) of the NYIL, on the Effective Date, FGIC shall resume possession of its property and the conduct of its business, subject to the limitations described in the Plan;

5

Supreme Court Records OnLine Library - page 6 of 73

10.     The Rehabilitator shall serve notice of this Order by (i) publishing notice
        substantially in the form of the Notice of Plan Approval Order attached
        hereto as **Exhibit 2** (the "**Plan Approval Notice**") in The Wall Street
        Journal and The Bond Buyer within ten (10) Business Days after receiving
        an entered copy of this Order, (ii) mailing the Plan Approval Notice to all
        known Policyholders and other claimants by first class mail within five (5)
        Business Days after receiving an entered copy of this Order and
        (iii) posting true copies of this Order and the Plan Approval Notice at
        http://www.fgicrehabilitation.com within five (5) Business Days after
        receiving an entered copy of this Order, and such service shall be deemed
        good and sufficient service;

11.     From and after the Effective Date, this Order, including the terms of the
        Plan attached hereto as **Exhibit 1**, shall supersede the Order of
        Rehabilitation and the Order to Show Cause, both of which shall remain in
        effect with respect to their respective periods prior to the Effective Date;
        and

12.     This Court shall retain exclusive jurisdiction to hear and determine all
        matters arising out of, or related to, the implementation, interpretation
        and/or enforcement of this Order, the Rehabilitation Proceeding and other
        matters as set forth in the Plan.


E N T E R

JUSTICE DORIS LING-COHAN                6/11/13

FILED

JUN 13 2013

NEW YORK
COUNTY CLERK'S OFFICE

6

# <u>Exhibit 1</u>

## Plan

Supreme Court Records OnLine Library -  page 8 of 73

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                        :    Index No. 401265/2012

In the Matter of the Rehabilitation of     :
FINANCIAL GUARANTY INSURANCE
COMPANY.                            :    **FIRST AMENDED PLAN OF**
                                    **REHABILITATION FOR**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X    **FINANCIAL GUARANTY**
                                    **<u>INSURANCE COMPANY</u>**

        This Plan of Rehabilitation is proposed pursuant to Article 74 of Chapter 28 of the Consolidated Laws of the State of New York by Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as Rehabilitator of Financial Guaranty Insurance Company.

Weil, Gotshal & Manges LLP
Gary T. Holtzer
Joseph T. Verdesca
767 Fifth Avenue
New York, NY 10153

*Attorneys for the Superintendent of Financial
Services of the State of New York, as Rehabilitator
of Financial Guaranty Insurance Company*

Date: June 4, 2013

# TABLE OF CONTENTS

**Page**

ARTICLE I.   CATEGORIES OF CLAIMS AND EQUITY INTERESTS ................................. 1
   1.1     Categories of Claims and Equity Interests ........................................... 1
ARTICLE II.   TREATMENT OF CLAIMS AND EQUITY INTERESTS ................................. 1
   2.1     Category A – Secured Claims ........................................... 1
   2.2     Category B – Administrative Expense Claims ................................. 1
   2.3     Category C – Policy Claims ........................................... 2
   2.4     Category D – Non-Policy Claims ........................................... 2
   2.5     Category E – Late-Filed Claims ........................................... 2
   2.6     Category F – Equity Interests ........................................... 2
ARTICLE III. MEANS OF IMPLEMENTATION ........................................... 3
   3.1     Policy Restructuring ........................................... 3
   3.2     Implementation of Plan by FGIC ........................................... 3
   3.3     Continued Authority of NYSDFS ........................................... 3
   3.4     Authorization to Act ........................................... 3
   3.5     No Defaults Arising from Rehabilitation or Rehabilitation
        Circumstances ........................................... 3
   3.6     Reinsurance ........................................... 5
   3.7     Control Rights ........................................... 5
ARTICLE IV. CLAIM ADMINISTRATION AND DISTRIBUTIONS ........................................... 9
   4.1     Claim Administration Generally ........................................... 9
   4.2     Secured Claims and Administrative Expense Claims ........................................... 9
   4.3     Policy Claims ........................................... 10
   4.4     Non-Policy Claims ........................................... 10
   4.5     Late-Filed Claims ........................................... 11
   4.6     Reconciliation of Disputed Claims ........................................... 11
   4.7     Payment of Claims ........................................... 12
   4.8     Alternative Resolution of Claims ........................................... 13
   4.9     Setoff of Cash Payments ........................................... 14
   4.10    Certain Claims Not Permitted ........................................... 14

i

# TABLE OF CONTENTS
## (continued)

**Page**

| | | | |
|---|---|---|---|
| 4.11 | Address or Account for Delivery of Plan Distributions/Unclaimed Distributions | 15 |
| 4.12 | Time Bar to Cash Payments | 15 |
| 4.13 | Rights of Subrogation | 15 |
| ARTICLE V. | CONTRACTS AND LEASES | 16 |
| 5.1 | Treatment of Contracts and Leases | 16 |
| 5.2 | Inclusiveness | 16 |
| 5.3 | Bar Date for Filing Proofs of Claim Relating to Contracts and Leases Terminated Pursuant to the Plan or During the Rehabilitation Proceeding | 16 |
| ARTICLE VI. | EFFECTIVE DATE | 16 |
| 6.1 | Conditions Precedent to the Effective Date | 16 |
| 6.2 | Notification of Effective Date | 17 |
| 6.3 | Waiver of Conditions | 17 |
| ARTICLE VII. | EFFECT OF EFFECTIVE DATE | 18 |
| 7.1 | Discharge | 18 |
| 7.2 | Releases | 18 |
| 7.3 | Exculpation | 18 |
| 7.4 | No Liability for Information Provided by Trustees | 19 |
| 7.5 | Indemnity | 19 |
| 7.6 | Termination of Rehabilitation Proceeding | 21 |
| 7.7 | Termination of Duties of Rehabilitator | 21 |
| 7.8 | Injunctive Relief | 21 |
| 7.9 | Preservation of Causes of Action | 23 |
| 7.10 | Limitations on Operations Following Effective Date | 24 |
| 7.11 | Reporting | 25 |
| ARTICLE VIII. | RETENTION OF JURISDICTION | 26 |
| 8.1 | Retention of Jurisdiction | 26 |
| ARTICLE IX. | MISCELLANEOUS | 27 |
| 9.1 | Binding Effect | 27 |
| 9.2 | Treatment in Subsequent Article 74 Proceeding | 27 |
| 9.3 | Modification | 27 |

ii

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| 9.4 | No Admissions | 27 |
| 9.5 | Notice to NYSDFS | 28 |
| 9.6 | Notice to FGIC | 28 |
| 9.7 | Notices | 28 |
| 9.8 | Incorporation | 28 |
| 9.9 | Headings | 29 |
| 9.10 | Governing Law | 29 |
| 9.11 | Severability | 29 |
| 9.12 | Inconsistency; Prior Orders | 29 |
| 9.13 | Rounding | 29 |
| 9.14 | Interpretation; Application of Definitions and Rules of Construction | 29 |
| 9.15 | Entire Plan | 31 |

**EXHIBITS**

| Exhibit A | Definitions and Interpretation |
|---|---|
| Exhibit B | Restructured Policy Terms |
| Exhibit C | Pending RMBS Litigations |

iii

# ARTICLE I.

## CATEGORIES OF CLAIMS AND EQUITY INTERESTS

### 1.1    Categories of Claims and Equity Interests.

The following table designates the categories of Claims and Equity Interests that are covered by the Plan:

| Category | Designation |
|----------|-------------|
| A | Secured Claims |
| B | Administrative Expense Claims |
| C | Policy Claims |
| D | Non-Policy Claims |
| E | Late-Filed Claims |
| F | Equity Interests |

Other than Claims (including Policy Claims) paid in full prior to the date of the Order of Rehabilitation, the Plan will be the exclusive means for resolving and paying (i) all Policy Claims, whenever arising, (ii) all other Claims arising during, or relating to, the period prior to the Effective Date and (iii) all Equity Interests in existence as of the date of the Order of Rehabilitation. Claims arising during or relating to the period on and after the Effective Date (other than Policy Claims) are not covered by the Plan and will be resolved and paid by FGIC in the ordinary course of business.

# ARTICLE II.

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 2.1    Category A – Secured Claims.

Except to the extent the holder of a Permitted Secured Claim and FGIC agree to a different treatment pursuant to Section 4.8 hereof, all Permitted Secured Claims shall be paid in full solely from the collateral securing such Claims in accordance with the terms of the underlying FGIC Contract giving rise to such Claims.

### 2.2    Category B – Administrative Expense Claims.

Except to the extent the holder of a Permitted Administrative Expense Claim and FGIC agree to a different treatment pursuant to Section 4.8 hereof, each holder of a Permitted Administrative Expense Claim shall receive Cash in the full amount of such Permitted Administrative Expense Claim.

### 2.3    Category C – Policy Claims.

Except to the extent the holder of a Permitted Policy Claim and FGIC agree to a different treatment pursuant to Section 4.8 hereof, each holder of a Permitted Policy Claim shall receive only (i) an upfront Cash payment with respect to each such Permitted Policy Claim in an amount equal to a specified percentage of such Permitted Policy Claim based on the CPP in effect at the time of payment and (ii) additional payments under a DPO with respect to the Policy under which such Permitted Policy Claim was made to the extent payable pursuant to the Plan, which DPO will be equal to the remainder of such Permitted Policy Claim (subject to increases and reductions to such DPO pursuant to the Plan).

### 2.4    Category D – Non-Policy Claims.

Except to the extent the holder of a Permitted Non-Policy Claim and FGIC agree to a different treatment pursuant to Section 4.8 hereof, each holder of a Permitted Non-Policy Claim shall receive, on a pro rata basis, Cash, as and when such funds become available, as determined by FGIC, until all such Claims have been paid in full; *provided, however*, that no Permitted Non-Policy Claims shall be entitled to any distributions until all actual and expected Permitted Secured Claims, Permitted Administrative Expense Claims and Permitted Policy Claims are paid in full in Cash or fully reserved for, as determined by FGIC with the express written consent of the NYSDFS.

### 2.5    Category E – Late-Filed Claims.

Except to the extent the holder of a Permitted Late-Filed Claim and FGIC agree to a different treatment pursuant to Section 4.8 hereof, each holder of a Permitted Late-Filed Claim shall receive, on a pro rata basis, Cash, as and when such funds become available, as determined by FGIC, until all such Claims have been paid in full; *provided, however*, that no Permitted Late-Filed Claims shall be entitled to any distributions until all actual and expected Permitted Secured Claims, Permitted Administrative Expense Claims, Permitted Policy Claims and Permitted Non-Policy Claims are paid in full in Cash or fully reserved for, as determined by FGIC with the express written consent of the NYSDFS.

### 2.6    Category F – Equity Interests.

Equity Interests shall remain in existence; *provided, however*, that no holder of Equity Interests shall be entitled to any distributions, dividends or other payments on account of its Equity Interests until all actual and expected Permitted Secured Claims, Permitted Administrative Expense Claims, Permitted Policy Claims, Permitted Non-Policy Claims and Permitted Late-Filed Claims are paid in full in Cash or fully reserved for, as determined by FGIC with the express written consent of the NYSDFS.

2

Supreme Court Records OnLine Library - page 14 of 73

# ARTICLE III.

## MEANS OF IMPLEMENTATION

### 3.1    Policy Restructuring.

Effective as of the Effective Date, any and all Policies in force as of the Effective Date (except for the Policies novated or terminated by the Novation Agreement or the CDS Commutation Agreements) automatically and without any further actions by the Rehabilitator, FGIC, the Superintendent, the Court, the Policyholders or any other Person shall be modified by the Plan. The Plan shall supersede any and all provisions of each Policy that are inconsistent with the Plan.

### 3.2    Implementation of Plan by FGIC.

FGIC shall continue to exist after the Effective Date with all powers available under applicable law and shall be responsible for administration and implementation of the Plan from and after the Effective Date, in each case pursuant to the terms of and subject to the limitations set forth in the Plan, including all applicable New York insurance laws and regulations, the continued oversight of the NYSDFS described in Sections 7.10 and 7.11 hereof and any NYSDFS Guidelines.

### 3.3    Continued Authority of NYSDFS.

From and after the Effective Date (i) FGIC shall continue to be subject to oversight by the NYSDFS pursuant to the NYIL as an insurance company licensed under Article 69 of the NYIL and the additional requirements set forth in the Plan and (ii) the NYSDFS shall have the authority to take such further actions as may be necessary or appropriate in its sole and absolute discretion to carry out the purposes and effects of the Plan, including modifying the Run-Off Principles, which modification shall be delivered in writing to FGIC and concurrently posted by FGIC on the Policyholder Information Center. All NYSDFS Guidelines shall be binding unless and to the extent the NYSDFS Guidelines are (x) revoked, withdrawn or inconsistent with subsequent guidance provided by the NYSDFS or (y) inconsistent with the Plan or any Final Order entered in the Rehabilitation Proceeding that has not been superseded by the Plan.

### 3.4    Authorization to Act.

The Plan Approval Order shall authorize FGIC from and after the Effective Date to take or cause to be taken all actions necessary or appropriate to implement the Plan, including executing and delivering all agreements, documents, instruments, notices and certificates, and such actions taken or caused to be taken shall be deemed approved by the Court without further approval, act or action under any applicable law, order, rule or regulation.

### 3.5    No Defaults Arising from Rehabilitation or Rehabilitation Circumstances.

(a)    Subject to Section 3.7 of the Plan, and except as part of a transaction subject to Section 4.8 hereof or as may be ordered or approved by the Court, from and after the date of the Order of Rehabilitation, any default, event of default or other event or circumstance relating to

3

the FGIC Parties then existing (or that would exist with the passing of time or the giving of notice or both) under any FGIC Contract or Transaction Document, as a result of (whether directly or indirectly) the Rehabilitation or the Rehabilitation Circumstances shall be deemed to be cured and not to have occurred (including, for the avoidance of doubt, any default, event of default or other event or circumstance that has arisen (or that may otherwise arise with the passing of time or the giving of notice or both) due to a lack of payment or performance of or by the FGIC Parties under any FGIC Contract or Transaction Document).

(b)    Neither the Rehabilitation nor the Rehabilitation Circumstances shall (i) subject to Section 3.7 of the Plan, prevent the FGIC Parties from exercising all FGIC Rights in the same manner and to the same extent as FGIC Parties would have been able to retain and exercise such rights in the absence of the Rehabilitation and the Rehabilitation Circumstances, (ii) prevent FGIC from pursuing or settling on its own behalf, for its own account and in its sole discretion all FGIC Direct Claims in the same manner and to the same extent as FGIC would have been able to retain and pursue or settle such FGIC Direct Claims on its own behalf in the absence of the Rehabilitation and the Rehabilitation Circumstances, (iii) subject to Section 3.7 of the Plan and the proviso at the end of this paragraph, cause to inure to any Person any greater right or Claim than that which would have existed in the absence of the Rehabilitation and the Rehabilitation Circumstances or (iv) subject to Sections 3.7(a)(iii) and 3.7(b)(iv) of the Plan and the proviso at the end of the paragraph, in any manner relieve or limit any obligation of any Person to the FGIC Parties, including for payment of premiums, recoveries, reimbursements, settlements and other amounts that would otherwise be due and owing to the FGIC Parties under any FGIC Contract, Transaction Document or other agreement in the absence of the Rehabilitation and the Rehabilitation Circumstances; *provided, however*, that notwithstanding anything to the contrary in this Section 3.5, nothing in the Plan shall prohibit any Person who, prior to the date of the Order of Rehabilitation, failed to pay FGIC any Pre-Rehabilitation FGIC Premiums, Expenses, and Recoveries relating to a Policy from properly exercising or having properly exercised a right of setoff or recoupment with respect to a Claim under such Policy arising prior to the date of the Order of Rehabilitation held by such Person against such unpaid Pre-Rehabilitation FGIC Premiums, Expenses, and Recoveries.

(c)    In certain RMBS transactions in which one or more Instruments are insured by FGIC, the priority of distributions between and among such Instruments may change upon the occurrence or during the continuance of an event that, but for the operation of the Plan, would constitute a payment default by FGIC under its Policies insuring such Instruments. Notwithstanding anything to the contrary in this Section 3.5, during any period of time in which a Claim has been submitted in accordance with the Plan with respect to a Policy and such Claim has not been satisfied in full in Cash and/or Deemed Cash Payments, this Section 3.5 shall not apply with respect to the determination of priority of distributions between and among such Instruments.

(d)    If based on or in connection with the occurrence or existence of any of the Rehabilitation Circumstances or of a lack of payment or performance of or by the FGIC Parties under any FGIC Contract or Transaction Document, FGIC would be precluded from exercising any FGIC Right under the express terms and conditions of such FGIC Contract or Transaction Document to direct or instruct the Trustee to take or refrain from taking any actions as specified therein (other than with respect to matters addressed in Section 3.7 below which shall be

4

Supreme Court Records OnLine Library -  page 16 of 73

governed by that Section), then FGIC may nonetheless exercise such FGIC Right to direct or instruct the Trustee; *provided, however*, that in the event FGIC determines to exercise any such FGIC Right under such FGIC Contract or Transaction Document during any period of time in which an outstanding DPO exists with respect to the related Policy, FGIC shall provide to the Trustee (i) an indemnification in accordance with the standard set forth in Section 7.5(b) herein and (ii) an officer certificate confirming that FGIC reasonably believes, based upon its good faith determination, that such direction or instruction is in the best interests of holders of Instruments insured by the relevant Policy, as a whole.

(e)     For the avoidance of doubt, nothing in this Plan is intended to modify, amend, supplement or waive the terms and conditions of any Transaction Documents, but rather is intended to clarify, in the context of and giving effect to all the provisions of the Plan, the relative rights of FGIC, the holders(s) of the insured Instruments, and the Trustees in respect of the exercise of their rights and remedies set forth in the Transaction Documents.

### 3.6    Reinsurance.

(a)     Each reinsurer shall pay FGIC in full in Cash for such reinsurer's reinsured portion of the entire amount of each Permitted Policy Claim (irrespective of when such Policy Claim is submitted to FGIC, whether before the date of the Order of Rehabilitation, during the Rehabilitation Proceeding or after the Effective Date), in each case without giving effect to the Policy Restructuring and regardless of the amount paid in Cash by FGIC on account of such Policy Claim. Consistent with the foregoing, the terms "Loss" or "Losses" (or similar terms) used in the Reinsurance Agreements shall be deemed to refer to the entire amount of Permitted Policy Claims as and when such Permitted Policy Claims are Permitted by FGIC, irrespective of (i) the amount and timing of any Cash payments that FGIC may make with respect to any such Permitted Policy Claims, (ii) the modification pursuant to the Policy Restructuring of FGIC's obligations to pay such Permitted Policy Claims in Cash and (iii) any language in the Reinsurance Agreements that contradicts this result.

(b)     Notwithstanding anything to the contrary in Section 3.6(a), all reinsurance covering, in whole or in part, the Policies covered by the Novation Agreement, to the extent such reinsurance has not been commuted prior to the novation of such Policies under the Novation Agreement, shall be automatically and without further action by any Person novated, to the extent of such coverage, to National Public.

(c)     Except as provided in clauses (a) or (b) above or otherwise agreed in writing between FGIC and a reinsurer, none of the terms and conditions of the Reinsurance Agreements or the parties' respective obligations thereunder are affected by virtue of the Plan.

### 3.7    Control Rights.

During any period of time in which an outstanding DPO exists with respect to any Policy insuring Instruments issued directly in connection with any RMBS transaction, then with respect to such RMBS transaction:

(a)     subject to the terms of this Section 3.7 and notwithstanding Section 3.5 hereof, the holders of Instruments insured by such Policy and the Trustee for such Instruments shall be

5

entitled to exercise all of their respective rights and remedies that are provided for under the express terms and conditions of the Transaction Documents relating to such Instruments or Policy in accordance with such terms and conditions to (x) enforce any obligation of the originator or other responsible party to cure, substitute or repurchase any defective mortgage or other loan, which is owed to the Trustee (or the related trust) or to such holders under such Transaction Documents (any such obligation owed to the Trustee (or the related trust) or to such holders being a "**Trust Loan Repurchase Obligation**") and (y) assert, investigate (including through requests for information or documentation concerning the Instruments or any mortgage(s) in the related trust(s)), compromise, settle or release any Cause of Action that the Trustee (or the related trust) or such holders may have with respect to any failure to perform any such Trust Loan Repurchase Obligation, including such holders' rights, if any, to direct or otherwise cause the Trustee or any servicer of such loans under the Transaction Documents (each being a "**Servicer**") to take any such action on behalf of such holders. Should any holder(s) of the Instruments insured by such Policy or the Trustee for such Instruments seek to exercise any right or remedy described above in this Section 3.7(a), any such Person:

    (i)    shall provide FGIC with seven (7) Business Days' prior written notice before (x) requesting or demanding that any originator or other responsible party perform any Trust Loan Repurchase Obligation (which notice shall identify the applicable Policy and contain a listing of the mortgage loan numbers or other identifier of the mortgages or other loans subject to, and the general basis for, such request or demand) or (y) filing any complaint, demand, or summons and notice relating to, or any other legal document beginning, a lawsuit, arbitration, mediation or other proceeding asserting any Cause of Action with respect to any failure to perform a Trust Loan Repurchase Obligation (which notice shall identify the applicable Policy and contain a description of such Causes of Action to be asserted);

    (ii)    shall, upon FGIC's request and at FGIC's sole expense, (x) allow, and take such action as may be requested by FGIC to allow, FGIC to join in any such lawsuit, arbitration, mediation or other proceeding which such Person has commenced or intends to commence, but only to the extent that FGIC would have been entitled to join in the absence of the occurrence or existence of the Rehabilitation Circumstances, the Rehabilitation or the lack of payment or performance of or by the FGIC Parties under the applicable FGIC Contract or Transaction Document and (y) *until* and *unless* FGIC becomes a party to any such lawsuit, arbitration, mediation or other proceeding, promptly provide FGIC with copies of all notices, pleadings and any other written communication delivered to or prepared by or on behalf of such Person in connection with any such lawsuit arbitration, mediation or other proceeding;

    (iii)    shall be deemed to agree, by taking any action to enforce any Trust Loan Repurchase Obligation, that any amount received in respect of a judgment or settlement or any other amount that is awarded or received in connection with any such action shall be applied and distributed in accordance with the express terms and conditions of the Transaction Documents relating to such Instruments or Policy, assuming, solely for the purposes of determining the

Supreme Court Records OnLine Library -  page 18 of 73

priority of FGIC to receive such amount in accordance therewith, that FGIC has not complied with its payment obligations under the related Policy; and

(iv)     shall not be able to exercise any right that it has or may have to compromise, settle or release any claim that the Trustee (or the related trust) or any such holder may have with respect to any failure to perform any such Trust Loan Repurchase Obligation, including such holder's rights to direct or otherwise cause the Trustee or any Servicer to take any such action, *unless* and *until* (x) such holder or the Trustee (as applicable) has provided thirty (30) days' prior written notice to FGIC (which notice shall identify the applicable Policy and contain a description of the material terms and conditions of the proposed compromise, settlement or release) and, at FGIC's request, such request to be provided within such thirty (30) day period, has consulted with FGIC concerning the terms and conditions of such compromise, settlement or release and (y) the terms of the definitive documentation for the proposed compromise, settlement or release expressly provide that such compromise, settlement or release does not, and is not intended to, compromise, settle or release all or any portion of any FGIC Direct Claims, including FGIC Direct Claims in connection with the transaction to which such compromise, settlement or release relates.

(b)     Notwithstanding Section 3.7(a) above, FGIC shall retain and may exercise any right or remedy it has or may have under such Policy or any Transaction Document relating to such Policy or the Instruments insured by such Policy to enforce any Trust Loan Repurchase Obligation or to assert, investigate, compromise, settle or release any Cause of Action that the Trustee (or the related trust) or the holders of such Instruments may have with respect to any failure to perform any such Trust Loan Repurchase Obligation, including its rights to direct or otherwise cause the Trustee or any Servicer to take any such action, in each case giving effect to Section 3.5 above.  The Trustee shall be required to follow any such direction issued pursuant to this Section 3.7(b) as long as FGIC provides an indemnification to such Trustee with respect to such direction in accordance with the standard set forth in Section 7.5(b) herein.  Should FGIC seek to exercise any such right or remedy to enforce any Trust Loan Repurchase Obligation, FGIC:

(i)     shall provide the applicable Trustee with seven (7) Business Days' prior written notice before (x) requesting or demanding that any originator or other responsible party perform any Trust Loan Repurchase Obligation (which notice shall identify the applicable Policy and contain a listing of the mortgage loan numbers or other identifier of the mortgages or other loans subject to, and the general basis for, such request or demand) or (y) filing any complaint, demand, or summons and notice relating to, or any other legal document beginning, a lawsuit, arbitration, mediation or other proceeding asserting any Cause of Action with respect to any failure to perform a Trust Loan Repurchase Obligation (which notice shall identify the applicable Policy and contain a description of such Causes of Action to be asserted);

7

Supreme Court Records OnLine Library -  page 19 of 73

(ii)    to the extent FGIC makes any request or direction to the Trustee to take or refrain from taking any action relating to a Trust Loan Repurchase Obligation, FGIC shall include therewith, to the extent entitled to do so under the relevant Transaction Documents, a request or direction that the Trustee provide notice of any such request or direction to the holders of the related Instruments; *provided, however*, that subject to Section 3.7(b)(iii) below, neither such request by FGIC, nor any determination by the Trustee, to provide notice to such holders shall entitle the Trustee to withhold, delay or condition its compliance with any such request or direction by FGIC;

(iii)    shall not be entitled to exercise any right that it has or may have under such Policy or any such Transaction Document to compromise, settle or release any Cause of Action that the Trustee (or the related trust) or such holders may have with respect to any failure to perform any such Trust Loan Repurchase Obligation, including its rights to direct or otherwise cause the Trustee or any Servicer to take any such action, *unless* and *until* (x) FGIC has provided written notice to the Trustee of the proposed compromise, settlement or release (which notice shall identify the applicable Policy and contain a description of the material terms and conditions of the proposed compromise, settlement or release) and (y) (1) the Requisite Holders have directed the Trustee to support or enter into such compromise, settlement or release or (2) in the absence of such direction, the Trustee, having provided such notice to the holders of the Instruments insured by such Policy, has not received objections from holders of at least twenty-five percent (25%) of the outstanding principal amount of the Instruments insured by such Policy within forty-five (45) days after the date that FGIC provided such notice to the Trustee. In the event that the Trustee receives any direction satisfying the requirements of Section 3.7(b)(iii)(y)(1) above, the Trustee shall promptly provide FGIC with notice thereof and shall promptly comply with FGIC's direction. In the event that the Trustee receives an objection satisfying the requirements of Section 3.7(b)(iii)(y)(2) above, the Trustee shall promptly provide FGIC with notice thereof, whereupon FGIC's direction shall be considered withdrawn; and

(iv)    shall be deemed to agree, that any amount a Trustee receives in a compromise, settlement or release pursuant to Section 3.7(b)(iii) shall be applied and distributed in accordance with the express terms and conditions of the relevant Transaction Documents, assuming, solely for the purposes of determining the priority of FGIC to receive such amount in accordance therewith, that FGIC has not complied with its payment obligations under the related Policy.

(c)    If any direction relating to an action specified in Section 3.7(b) above provided to the Trustee or any Servicer by FGIC (other than directions to settle, release or compromise claims which shall be governed by Section 3.7(b)(ii) above) conflicts with any direction or instruction provided by the Trustee or to the Trustee or such Servicer by the Requisite Holders in accordance with Section 3.7(a) prior to the Trustee or such Servicer taking the action as so directed by FGIC, (x) the Trustee or Servicer, as applicable, shall promptly notify FGIC in

8

Supreme Court Records OnLine Library - page 20 of 73

writing of such conflicting direction, (y) the Trustee or Servicer, as applicable, such holders and FGIC shall promptly meet to discuss their respective directions and seek in good faith to resolve their differences, and (z) if they are unable to resolve their differences within ten (10) Business Days thereafter, the direction by the Trustee or of such holders (as applicable) shall control, whereupon FGIC shall be deemed to have withdrawn its direction.

(d)    Nothing in the Plan, including the foregoing provisions of this Section 3.7, shall or is intended to in any manner prevent, limit, restrict or otherwise impair FGIC at any time from asserting, pursuing, enforcing, investigating, compromising, settling, releasing (on its own behalf, for its own account and in its sole discretion) or impose any additional obligations (including the giving of any notice) with respect to any and all FGIC Direct Claims in the same manner and to the same extent as FGIC would have been able in the absence of the Rehabilitation and the Rehabilitation Circumstances. If FGIC completes the settlement of any FGIC Direct Claims against any loan originator or other responsible party in any RMBS transaction or transactions to cure, substitute or repurchase any defective mortgage or other loan pursuant to which FGIC receives a settlement payment in an amount greater than $25 million, FGIC shall promptly thereafter notify the Trustee or Trustees of the transactions that included such loans; *provided, however*, that FGIC shall not have any obligation to provide such notice if FGIC is restricted by contract from disclosing to the Trustee or Trustees the existence of such settlement or any of its terms.

**ARTICLE IV.**

**CLAIM ADMINISTRATION AND DISTRIBUTIONS**

**4.1    Claim Administration Generally.**

Following the Effective Date, FGIC shall be responsible for administering, reviewing, verifying, reconciling, objecting to, compromising or otherwise resolving all Claims not resolved prior to the Effective Date, in each case in compliance with the Plan and any NYSDFS Guidelines.

**4.2    Secured Claims and Administrative Expense Claims.**

**A.    Submission of Secured Claims and Administrative Expense Claims.**

All Secured Claims and Administrative Expense Claims shall be submitted to FGIC in writing in the ordinary course of business and in accordance with, and including such information required by, the provisions of the underlying FGIC Contract (if applicable) giving rise to such Claim.

**B.    Reconciliation of Secured Claims and Administrative Expense Claims.**

FGIC shall evaluate each submitted Secured Claim and Administrative Expense Claim to determine whether and to what extent such Claim should be Permitted. If FGIC determines that all or part of such Claim should not be Permitted, such Claim (or the relevant portion thereof) shall constitute a Disputed Claim and be resolved pursuant to Section 4.6 hereof. Permitted Administrative Expense Claims arising on or after the date of the Order of Rehabilitation that

9

constitute claims for indemnification pursuant to Section 7.5(b) of the Plan shall be paid pursuant to Section 4.7(D) of the Plan.

### 4.3    Policy Claims.

### A.    Submission of Policy Claims.

Each holder of a Policy Claim, including Policy Claims arising but not submitted to FGIC prior to the Effective Date, shall submit to FGIC all information required by the applicable Policy for submission of a Claim thereunder and a fully completed and duly executed Proof of Policy Claim Form by the later of (i) one year from the date the Policy Claim arose and (ii) ninety (90) days after the Effective Date. Each holder of a Policy Claim submitted to FGIC prior to the Effective Date that remains unpaid in whole or in part as of the Effective Date shall resubmit such Policy Claim using a fully completed and duly executed Proof of Policy Claim Form, together with all information required by the applicable Policy for submission of a Policy Claim thereunder, within ninety (90) days after the Effective Date (the "**Claims Resubmission Deadline**"). Any Policy Claim not timely submitted pursuant to the foregoing sentences, including unpaid Policy Claims submitted prior to the Effective Date but not resubmitted by the Claims Resubmission Deadline, which, if paid in accordance with Section 4.7(E) of the Plan, could reasonably be expected to interfere with FGIC's ability to operate in accordance with the Run-Off Principles, including its ability to ensure that all holders of Permitted Policy Claims (whenever arising) receive the same CPP of their Permitted Policy Claims, shall be treated as a Late-Filed Claim rather than a Policy Claim.

### B.    Reconciliation of Policy Claims.

FGIC shall evaluate each submitted Policy Claim to determine whether and to what extent such Claim should be Permitted. If FGIC determines that all or part of such Claim should not be Permitted, such Claim (or the relevant portion thereof) shall constitute a Disputed Claim and be resolved pursuant to Section 4.6 hereof.

### 4.4    Non-Policy Claims.

### A.    Submission of Non-Policy Claims.

**The deadline for all holders of Non-Policy Claims to mail Proofs of Claim to FGIC at 125 Park Avenue, New York, NY 10017 (Attention: General Counsel) shall be no later than ninety (90) days after the Effective Date (the "Bar Date").** All Non-Policy Claims for which a Proof of Claim is not submitted to FGIC as provided herein by the Bar Date shall be treated as Late-Filed Claims, rather than Non-Policy Claims. Nothing in this Section 4.4(A) requires a holder of a Non-Policy Claim that timely submitted such Non-Policy Claim to FGIC as a Proof of Claim prior to the Effective Date to resubmit such Non-Policy Claim to FGIC.

### B.    Reconciliation of Non-Policy Claims.

FGIC shall not be required to evaluate any Non-Policy Claim unless and until it determines in its reasonable estimation, in consultation with the NYSDFS, that there is a substantial likelihood that sufficient assets will be available to make a distribution on account of

10

Non-Policy Claims.  If FGIC determines, in consultation with the NYSDFS, that there is a substantial likelihood that sufficient assets will be available for Non-Policy Claims, reconciliation of Non-Policy Claims shall be subject to Sections 4.1 and 4.6 hereof; *provided, however,* that the Objection Deadline in clause (x)(b) of Section 4.6 hereof shall run sixty (60) days from the date FGIC posts notice of such likelihood on the Policyholder Information Center.

### 4.5    Late-Filed Claims.

FGIC shall not be required to evaluate any Late-Filed Claim unless and until it determines in its reasonable estimation, in consultation with the NYSDFS, that there is a substantial likelihood that sufficient assets will be available to make a distribution on account of Late-Filed Claims.  If FGIC determines that there is a substantial likelihood that sufficient assets will be available for Late-Filed Claims, reconciliation of Late-Filed Claims shall be subject to Sections 4.1 and 4.6 hereof; *provided, however,* that (i) the fact that a Late-Filed Claim was asserted after the applicable deadline shall not be a ground for not permitting a Late-Filed Claim and (ii) the Objection Deadline in clause (x)(b) of Section 4.6 hereof shall run sixty (60) days from the date FGIC posts notice of such likelihood on the Policyholder Information Center.

### 4.6    Reconciliation of Disputed Claims.

FGIC may object to all or part of any Claim on any reasonable ground, including (i) a claimant's failure to provide sufficient information to evaluate a Claim, (ii) that all or part of a Claim is not a Permitted Claim pursuant to Section 4.10 hereof, (iii) that all or part of a Claim is a Late-Filed Claim or (iv) that the holder of such Claim or any party to the transaction relating to such Claim is in violation of the Plan or the injunctive relief in Section 7.8 hereof.  To do so, FGIC shall provide the holder of the Claim with written notice of the substance of its objection to such Claim (an "**Objection**") within the later of (x) sixty (60) days following the later of (a) the date of the proper submission to FGIC of such Claim in accordance with the terms of the Plan and (b) the Effective Date, (y) the deadline, if any, specified for such Objection in the underlying FGIC Contract or Transaction Document giving rise to such Claim, if any, or (z) such other applicable period fixed by the Court (the "**Objection Deadline**").  The Objection shall set forth the amount of the Claim that FGIC objects to and the amount, if any, that FGIC believes should be Permitted, as well as a reasonable summary of the bases for the Objection.  No later than the later of (a) sixty (60) days after FGIC sends (by email, overnight mail or other form of mailing containing proof of transmission) the Objection to the holder of such Claim and (b) the deadline, if any, specified for such response in the applicable FGIC Contract or Transaction Document giving rise to such Claim (the "**Response Deadline**"), the holder of the Claim, if it opposes the Objection, shall send to FGIC a written response to the Objection (the "**Response**").  Each Response must set forth the facts and the legal bases, if any, for the opposition and the reasons why the Claim should be Permitted in a greater amount than stated in the Objection.  If no Response is sent by the holder of such Claim on or prior to the Response Deadline, the Claim shall be Permitted in the applicable amount set forth in the Objection without order of the Court.  If a Response is submitted on or prior to the Response Deadline, FGIC shall have thirty (30) days after receipt of the Response to determine whether and in what amount the Claim should be Permitted in whole or in part and shall notify the holder of the Claim of its determination by email, overnight mail or other form of mailing containing proof of transmission (the "**FGIC Claim Determination**").  The holder of the Claim has the right to challenge the FGIC Claim

11

Supreme Court Records OnLine Library -  page 23 of 73

Determination in a court of competent jurisdiction so long as such challenge is initiated within ninety (90) days of FGIC's sending of the FGIC Claim Determination; *provided, however,* that if the determination of any Claim involves the interpretation, implementation or enforcement of the Plan, the Court shall be the exclusive venue for any party to challenge the validity of any FGIC Claim Determination. If the FGIC Claim Determination is not challenged by the holder of the Claim as provided in the preceding sentence, the Claim shall be Permitted in the amount set forth in the FGIC Claim Determination. No demand for documents or information and/or the failure to provide requested documents or information shall have the effect of staying or tolling any time period or deadline set forth in this Section 4.6.

### 4.7    Payment of Claims.

### A.    Payment of Claims Generally.

FGIC shall only pay a Claim to the extent that such Claim becomes a Permitted Claim. To the extent FGIC objects to a Claim pursuant to Section 4.6 hereof, in whole or in part, FGIC shall be entitled to withhold payment with respect to only the disputed portion of such Claim. Any remaining non-disputed portion of such Claim shall become a Permitted Claim and FGIC shall pay such non-disputed portion of such Claim pursuant to the Plan. Any and all Claims covered by the Plan, as described in Section 1.1 hereof, shall be resolved and paid solely pursuant to the Plan. In particular, the holders of Permitted Claims shall have no rights against FGIC on account of such Claims other than the treatment provided for such Claims under the Plan.

### B.    No Duplicative Recovery.

No holder of a Claim shall be entitled to receive distributions on account of its Permitted Claim that exceed 100% of the amount of such Permitted Claim; *provided, however,* that this shall not limit the payment of any DPO Accretion by FGIC in accordance with the provisions of the Plan. Furthermore, if and to the extent that the holder of a Permitted Claim receives payment in full or in part on account of such Permitted Claim from a Person that is not FGIC (such Person, a "**Non-FGIC Payor**"), FGIC shall reduce (i) the DPO with respect to a Permitted Policy Claim and (ii) distributions on account of a Permitted Claim (other than a Permitted Policy Claim); *provided, however,* FGIC shall not reduce DPO or distributions, as applicable, to the relevant Non-FGIC Payor on account of such Permitted Claim if and to the extent such Non-FGIC Payor becomes a subrogee of the holder of such Permitted Claim as a result of such payment; and *provided, further,* that this sentence shall not modify any terms of the Plan regarding FGIC Payments.

### C.    Payment of Permitted Secured Claims.

Promptly following FGIC's determination that all or a portion of a Secured Claim is Permitted, FGIC shall, from the collateral securing such Claim, pay in Cash such Claim or portion, as applicable, pursuant to the terms of the underlying FGIC Contract (if applicable) giving rise to such Claim. If a portion of a Secured Claim is disputed by FGIC pursuant to Section 4.6 hereof, FGIC shall have no obligation to pay such disputed portion of such Secured Claim unless and until such portion is Permitted pursuant to Section 4.6 hereof. Promptly

12

following the date, and to the extent, such portion of such Secured Claim, as applicable, is Permitted pursuant to Section 4.6 hereof, FGIC shall, from the collateral securing such Secured Claim pay in Cash such portion pursuant to the terms of the underlying FGIC Contract (if applicable) giving rise to such Claim.

### D.    Payment of Permitted Administrative Expense Claims.

Promptly following FGIC's determination that all or a portion of an Administrative Expense Claim is Permitted, FGIC shall pay in Cash such Claim or portion, as applicable, pursuant to FGIC's normal business practices. If a portion of an Administrative Expense Claim is disputed by FGIC pursuant to Section 4.6 hereof, FGIC shall have no obligation to pay such disputed portion of such Administrative Expense Claim unless and until such portion is Permitted pursuant to Section 4.6 hereof. Promptly following the date, and to the extent, such portion of such Administrative Expense Claim is Permitted pursuant to Section 4.6 hereof, FGIC shall pay in Cash such portion pursuant to FGIC's normal business practices.

### E.    Payment of Permitted Policy Claims.

Promptly following FGIC's determination that all or a portion of a Policy Claim is Permitted, FGIC shall pay such Claim or portion, as applicable, pursuant to the Restructured Policy Terms. With respect to each payment, FGIC shall indicate to the applicable Policyholder the Policy Claim to which such payment relates. Payments with respect to a Permitted Policy Claim consisting of both principal and interest payments insured by the related Policy shall be applied by the holder of such Permitted Policy Claim against principal and interest amounts pursuant to the applicable terms (if any) of the related Transaction Documents. If a portion of a Policy Claim is disputed by FGIC pursuant to Section 4.6 hereof, FGIC shall have no obligation to pay such disputed portion of such Policy Claim unless and until such portion is Permitted pursuant to Section 4.6 hereof. Promptly following the date, and to the extent, such portion of such Policy Claim is Permitted pursuant to Section 4.6 hereof, FGIC shall pay such portion pursuant to the Restructured Policy Terms.

### F.    Payment of Permitted Non-Policy Claims and Late-Filed Claims.

Promptly following FGIC's determination that all or a portion of a Non-Policy Claim or Late-Filed Claim is Permitted, FGIC shall pay such Claim or portion, as applicable, its pro rata portion of Cash that is available for distribution to Non-Policy Claims or Late-Filed Claims, as applicable. If a portion of a Non-Policy Claim or Late-Filed Claim is disputed, FGIC shall have no obligation to pay such disputed portion of such Claim unless and until such portion is Permitted pursuant to Section 4.6 hereof. Promptly following the date, and to the extent, such portion is Permitted pursuant to Section 4.6 hereof, FGIC shall pay such portion its pro rata portion of Cash that is available for distribution to Non-Policy Claims or Late-Filed Claims, as applicable.

### 4.8    Alternative Resolution of Claims.

Nothing in the Plan shall limit the ability of FGIC to resolve after the Effective Date, without further Court approval, any Claim through the consensual arrangement, negotiation, execution and effectuation of an amendment, restructuring, reinsurance, refinancing, purchase,

13

repurchase, termination, settlement, commutation, tender, synthetic commutation or tear-up or any similar transaction that results in the extinguishment or reduction of FGIC's liability, in respect of (i) all or part of any Policy, (ii) all or part of the underlying obligation or obligations insured by any such Policy or (iii) the underlying Instrument, contract or arrangement, if any, giving rise to such Claim (each of (i), (ii) and (iii), an "**Alternative Resolution**"), subject to the following requirements:

(a)    FGIC shall determine in its reasonable business judgment that the Alternative Resolution is fair and equitable to the interests of the Policyholders generally and not reasonably likely to result in a reduction of the CPP; and

(b)    FGIC shall comply with the notice requirements of clause (i) of Section 7.10(d) hereof.

### 4.9    Setoff of Cash Payments.

(a)    Except to the extent otherwise specified in the Plan, FGIC may set off in whole or in part against any Permitted Claim or any distribution to be made under the Plan on account of such Permitted Claim, all amounts owed to it under Causes of Action that FGIC may have against the holder of such Permitted Claim that are not otherwise waived, released or compromised pursuant to the Plan. Neither the failure to effect such a setoff nor the determination that any Claim or portion thereof is Permitted shall constitute a waiver or release by FGIC of any such Causes of Action, notwithstanding any compulsory counterclaim rules or requirements to the contrary.

(b)    Except to the extent otherwise specified in the Plan, a FGIC Payment Payor may properly exercise any rights it may have to exercise setoff or recoupment of any Cash amount (including on account of an Excess Payment) then owed under a Policy by FGIC to the FGIC Payment Payor pursuant to the Plan against a FGIC Payment relating to such Policy then payable by such FGIC Payment Payor to FGIC.

(c)    For the avoidance of doubt, nothing in Section 4.9 hereof prohibits or otherwise limits any Person who, prior to the date of the Order of Rehabilitation, failed to pay FGIC any Pre-Rehabilitation FGIC Premiums, Expenses, and Recoveries relating to a Policy from properly exercising or having properly exercised a right of setoff or recoupment with respect to a Claim under such Policy arising prior to the date of the Order of Rehabilitation held by such Person against such unpaid Pre-Rehabilitation FGIC Premiums, Expenses, and Recoveries.

### 4.10    Certain Claims Not Permitted.

A Permitted Claim shall not include any (i) interest on such Claim to the extent accruing or maturing on or after the date of the Order of Rehabilitation, (ii) interest on the amount of any interest, principal or other amounts payable in respect of an insured obligation, which was the subject of a Permitted Policy Claim and satisfied with DPO rather than Cash pursuant to Section 2.3 hereof, (iii) punitive, consequential, special or exemplary damages, (iv) fine, penalty, tax or forfeiture, including default or penalty interest or interest on interest purported to be imposed on the Claim or on the related insured obligation, if any, (v) payment obligation of FGIC or underlying obligation or risk of loss insured by FGIC that has, in either case, been

14

Supreme Court Records OnLine Library -  page 26 of 73

released, satisfied, terminated, commuted, novated or otherwise extinguished (pursuant to the Plan or otherwise), except to the extent that the release, satisfaction, termination, commutation, novation or extinguishment of an underlying obligation or risk of loss insured by FGIC results from a discharge or release granted in an insolvency proceeding of the related underlying obligor, (vi) award or reimbursement of attorneys' fees or related expenses or disbursements on, or in connection with, any Claim, except for any indemnity pursuant to Section 7.5 hereof, (vii) amount payable in respect of the termination of a CDS or other swap agreement in contravention of Section 7.8(d) hereof (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount" or other methodologies), (viii) any portion of a Claim that is a Duplicate Claim or (ix) any portion of a Claim arising directly or indirectly from any of the foregoing.

### 4.11    Address or Account for Delivery of Plan Distributions/Unclaimed Distributions.

Any distributions made under the Plan to a holder of a Permitted Claim shall be made at the address or account of such holder as set forth on the Proof of Claim or Proof of Policy Claim Form submitted by such holder, as applicable. If any distribution under the Plan is returned as undeliverable, FGIC shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until FGIC has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest from the original distribution date through the new distribution date; *provided* that if the current address of such holder remains unknown for long enough for such distribution to become abandoned property pursuant to then-applicable law, such undeliverable distribution shall become abandoned property and be dealt with pursuant to then-applicable law.

### 4.12    Time Bar to Cash Payments.

Any checks issued in respect of Permitted Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to FGIC by the holder of the Permitted Claim to whom such check was originally issued, *provided* that such request must be made before the applicable distribution becomes abandoned property pursuant to then-applicable law.

### 4.13    Rights of Subrogation.

Any contractual right to subrogation that FGIC may have under or with respect to any Policy or related FGIC Contract or Transaction Document shall be for an amount equal to the Cash payments or Deemed Cash Payments that FGIC ultimately pays thereunder or with respect thereto, including with respect to any Permitted Policy Claims under such Policy (including as a result of future CPP increases that may occur following any initial payment of Cash with respect to such Permitted Policy Claims), excluding any Cash payments or Deemed Cash Payments made in respect of DPO Accretion for such Policy.

15

## ARTICLE V.

## CONTRACTS AND LEASES

### 5.1    Treatment of Contracts and Leases.

Unless included on the Schedule of Terminated Contracts and Leases or terminated during the Rehabilitation Proceeding, all contracts and leases in existence as of the Effective Date shall continue in full force and effect after the Effective Date and any defaults thereunder shall be cured to the extent provided by the Plan. All contracts and leases listed on the Schedule of Terminated Contracts and Leases shall terminate on the Effective Date.

### 5.2    Inclusiveness.

Unless otherwise specified on the Schedule of Terminated Contracts and Leases, each contract and lease listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such contract or lease, without regard to whether such agreement, instrument or other document is listed on such schedule.

### 5.3    Bar Date for Filing Proofs of Claim Relating to Contracts and Leases Terminated Pursuant to the Plan or During the Rehabilitation Proceeding.

If a counterparty believes that termination of its contract or lease pursuant to the Plan or during the Rehabilitation Proceeding gives rise to a Claim (a "**Termination Damage Claim**"), such counterparty may submit a Termination Damage Claim in the form of a Proof of Claim. **All such proofs of Claim must be mailed to FGIC at 125 Park Avenue, New York, NY 10017 (Attention:  General Counsel) by the Bar Date.** All such Proofs of Claim not submitted as provided above by the Bar Date shall be treated as Late-Filed Claims for all purposes.

Termination Damage Claims shall be treated as Non-Policy Claims and are subject to reconciliation by FGIC pursuant to Sections 4.1 and 4.6 hereof.

## ARTICLE VI.

## EFFECTIVE DATE

### 6.1    Conditions Precedent to the Effective Date.

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived pursuant to Section 6.3 hereof:

(a)    The Plan Approval Order shall have been signed;

(b)    The Plan Approval Order shall have become a Final Order;

16

Supreme Court Records OnLine Library -  page 28 of 73

(c)     The Court shall have approved the form of amended and restated charter, the form of amended and restated by-laws, the Novation Agreement and each CDS Commutation Agreement;

(d)     The FGIC Corp. Plan shall have become effective;

(e)     All actions, agreements, authorizations, consents, letters, opinions, instruments and other documents necessary to implement the Plan shall have been obtained, effected or executed and delivered, as applicable, in form and substance satisfactory to the Rehabilitator, and shall not have been revoked;

(f)     The Rehabilitator or FGIC shall have received from each taxing authority to which application for a ruling has been made in connection with the Plan or the FGIC Corp. Chapter 11 Case such ruling in form and substance satisfactory to the Rehabilitator in his sole discretion;

(g)     No Legal Proceeding shall have been instituted or threatened, to the knowledge of the Rehabilitator, nor shall any claim or demand have been made against the Rehabilitator, FGIC or any other Person seeking to restrain, prohibit or obtain damages with respect to the consummation of the transactions contemplated by the Plan or the FGIC Corp. Plan, and there shall not be in effect any Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby or thereby;

(h)     No actual or threatened event, circumstance, condition, fact, effect or other matter exists, to the knowledge of the Rehabilitator, that, individually or in the aggregate with any other such event, circumstance, condition, fact, effect or other matter, has had or could reasonably be expected to have, as determined by the Rehabilitator in his sole discretion, an adverse effect on the viability or implementation of the Plan or treatment of Claims pursuant to the Plan following the Effective Date; and

(i)     The Rehabilitator shall have determined in his sole discretion that, after giving effect to the Plan and transactions contemplated hereby, the purposes of the Rehabilitation will have been fully accomplished.

**6.2    Notification of Effective Date.**

Upon the occurrence of the Effective Date, the Rehabilitator shall file a notice with the Court and post a notice on the Policyholder Information Center indicating the occurrence of the Effective Date.

**6.3    Waiver of Conditions.**

Each of the conditions precedent in Section 6.1 hereof, other than Section 6.1(a), may be waived, in whole or in part, by the Rehabilitator in his sole discretion. Any such waiver(s) may be effected at any time, without notice, leave or order of the Court or any formal action.

17

## ARTICLE VII.

## EFFECT OF EFFECTIVE DATE

### 7.1    Discharge.

(a)    <u>Permitted Claims</u>. Permitted Claims (irrespective of when arising, brought against FGIC or Permitted) shall be treated solely pursuant to the Plan and such treatment shall effect a full and complete release, discharge and termination of any liens or other claims, interests or encumbrances upon the FGIC Parties with respect to such Permitted Claims.

(b)    <u>Non-Permitted Claims</u>. All liens and other claims, interests and encumbrances upon the FGIC Parties with respect to any Claim or portion thereof that is not Permitted shall be released, discharged and terminated as of the date and to the extent such Claim is ultimately determined not to be Permitted pursuant to Section 4.6 hereof.

### 7.2    Releases.

Effective as of the Effective Date, the FGIC Parties shall release unconditionally and forever each of (i) the NYLB, (ii) the NYSDFS, (iii) the Rehabilitator, (iv) the attorneys, agents, advisors and representatives (collectively, the "**Representatives**") and employees of each of the NYLB, the NYSDFS and the Rehabilitator, and any advisors retained by the Representatives of the foregoing, (v) the Representatives of FGIC and any advisors retained by any of such Representatives, in each case solely with respect to services provided on or after November 24, 2009 and (vi) those directors, officers, and employees of the FGIC Parties who served or were employed by the FGIC Parties in such capacity on or after November 24, 2009, from any and all Causes of Action based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the date of the Order of Rehabilitation and arising from or relating to the operation of FGIC or the Rehabilitation Proceeding (including the Rehabilitation Circumstances, the commencement of the Rehabilitation Proceeding, the preparations therefor, negotiations relating thereto, any restructuring work relating thereto and preparation of the Plan) (collectively, the "**Released Causes of Action**"); *provided* that the foregoing shall not affect the liability of any such Person that otherwise would result from any act or omission that is determined by a Final Order to constitute willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts.

### 7.3    Exculpation.

Effective as of the Effective Date, each of (i) the FGIC Parties, (ii) the NYLB, (iii) the NYSDFS, (iv) the Rehabilitator, (v) the Representatives and employees of each of the FGIC Parties, the NYLB, the NYSDFS and the Rehabilitator, and any advisors retained by the Representatives of the foregoing, and (vi) directors and officers of the FGIC Parties (collectively, the "**Exculpated Parties**"), are exculpated from any and all Causes of Action based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or after November 24, 2009 arising out of, in connection with or otherwise relating to the Rehabilitation Proceeding (including the commencement of the Rehabilitation Proceeding, the preparation

18

therefor, negotiations relating thereto, any restructuring work relating thereto, any Court orders sought or obtained, and the administration of the Rehabilitation Proceeding), the Disclosure Statement (including the Disclosure Statement's formulation, negotiation, preparation and dissemination), the Plan (including the Plan's formulation, negotiation, preparation, dissemination and approval) or any contract, instrument, document or other agreement entered into as part of or pursuant to the Plan (collectively, the "**Exculpated Causes of Action**"); *provided* that the foregoing shall not affect the liability of any such Person that otherwise would result from any act or omission that is determined by a Final Order to constitute willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts.

### 7.4    No Liability for Information Provided by Trustees.

Effective as of the Effective Date, none of the Exculpated Parties shall be subject to any liability, directly or indirectly, for or in connection with (i) the completeness or accuracy of any information provided or published at any time by any corporate or other trustee or other Person or any failure of any corporate or other trustee or other Person to provide or publish at any time any information or (ii) any allocation, payment or distribution of any cash flows, recoveries, other funds, trust property or other property or proceeds, or any failure to make or pay the same, or any other action or inaction, at any time by any corporate or other trustee or other Person.

### 7.5    Indemnity.

(a)    FGIC shall indemnify and hold harmless each of (i) the NYLB, (ii) the NYSDFS, (iii) the Rehabilitator, (iv) the respective Representatives and employees of each of the NYLB, the NYSDFS and the Rehabilitator, and any advisors retained by the Representatives of the foregoing and (v) those directors, officers and employees of the FGIC Parties who served or were employed by the FGIC Parties in such capacity on or after November 24, 2009, against any and all Losses arising from any Released Causes of Action and Exculpated Causes of Action other than to the extent that such Losses result from any act or omission by such Person that is determined by a Final Order to constitute willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts. FGIC shall use commercially reasonable efforts to obtain payment under any available insurance with respect to such indemnification.

(b)    FGIC shall indemnify each Indemnified Trustee for any Losses incurred by such Indemnified Trustee arising from its compliance with the express terms and conditions of the Plan or any direction given to it by FGIC pursuant to the relevant FGIC Contract or Transaction Document (in each case, excluding Losses resulting from gross negligence or willful misconduct of such Indemnified Trustee); *provided, however*, that (i) no amounts shall be payable by FGIC pursuant to this Section 7.5(b) to any Indemnified Trustee to the extent that the same is reimbursed to the Indemnified Trustee under or pursuant to any of the Transaction Documents, (ii) FGIC shall not indemnify any Indemnified Trustee for any action taken or not taken at the direction of any Person other than FGIC, (iii) for purposes of this Section 7.5(b), any Indemnified Trustee's compliance with the express terms and conditions of the Plan or of any direction given to it by FGIC pursuant to the relevant FGIC Contract or Transaction Document shall be deemed to not constitute gross negligence or willful misconduct, (iv) promptly after

19

receiving notice from any Indemnified Trustee of the commencement of any Legal Proceeding against such Indemnified Trustee which may result in such Indemnified Trustee's incurrence of any Loss contemplated under this Section 7.5(b), FGIC may elect to assume the defense of such Legal Proceeding by providing notice of such assumption to such Indemnified Trustee, and in the event that (x) such Indemnified Trustee fails to promptly notify FGIC of the commencement of any such Legal Proceeding and (y) FGIC is materially adversely affected by such failure to promptly provide such notice, FGIC shall not be required under this Section 7.5(b) to indemnify such Indemnified Trustee for any such Loss relating to such Legal Proceeding, (v) to the extent that FGIC assumes the defense of a Legal Proceeding against an Indemnified Trustee pursuant to clause (iv), FGIC shall not, without the prior written consent of such Indemnified Trustee (which consent shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in any pending or threatened Legal Proceeding that may result in such Indemnified Trustee's incurrence of any Loss contemplated by this Section 7.5(b) *unless* such settlement, compromise or consent to the entry of any judgment (A) includes an unconditional release of the Indemnified Trustee from all liability arising out of such Legal Proceeding, (B) attributes no liability or fault to the Indemnified Trustee, (C) provides for no injunctive relief and imposes no specific performance, obligations or restrictions on the Indemnified Trustee (other than release) and (D) does not arise from or relate to any criminal action, suit or proceeding, and (vi) to the extent that FGIC does not assume the defense of a Legal Proceeding against an Indemnified Trustee pursuant to clause (iv), such Indemnified Trustee shall not settle, compromise or consent to the entry of any judgment in such pending or threatened Legal Proceeding that may result in such Indemnified Trustee's incurrence of any Loss contemplated under this Section 7.5(b) *unless* (x) FGIC has provided such Indemnified Trustee with its prior written consent thereto (which consent shall not be unreasonably withheld) or (y) such settlement, compromise or consent (A) includes an unconditional release of FGIC from all liability arising out of such Legal Proceeding, (B) attributes no liability or fault to FGIC, (C) provides for no injunctive relief and imposes no specific performance, obligations or restrictions on FGIC (other than release) (D) does not arise from or relate to any criminal action, suit or proceeding and (E) does not give rise to any Loss for which FGIC is required to indemnify such Indemnified Trustee under this Section 7.5(b). Actions taken in accordance with the Plan by any Indemnified Trustee shall be deemed not to be a violation of any provision in, or duty arising out of, any FGIC Contract or Transaction Document. Any provisions of a FGIC Contract or Transaction Document to the effect that the Indemnified Trustee be provided with an indemnity or security to or for its benefit prior to performing any action required under the Plan, including complying with any direction given to it by FGIC pursuant to the relevant FGIC Contract or Transaction Document, and including provisions that allow the Indemnified Trustee to refrain from performing any action in the absence of such an indemnity, shall be deemed satisfied if such Indemnified Trustee is provided with a reasonable indemnity under the circumstances in which such indemnity is being provided (notwithstanding any express or implied requirement that such indemnity be "adequate," "sufficient," "acceptable," "satisfactory" or similar terms, whether or not in the sole discretion of such Indemnified Trustee). Such requirement may, but (if not reasonably satisfactory to the Indemnified Trustee in light of the particular circumstances giving rise to the indemnification requirement) need not be, satisfied by this Section 7.5(b). If an Indemnified Trustee rejects an indemnity provided by FGIC (including the indemnity provided in this Section 7.5(b)), FGIC shall bear the burden of proving why such indemnity is reasonable under the circumstances in which such indemnity is being provided.

20

Supreme Court Records OnLine Library - page 32 of 73

### 7.6    Termination of Rehabilitation Proceeding.

The Rehabilitation Proceeding shall terminate on the Effective Date.  Upon termination of the Rehabilitation Proceeding, the 1310 Order shall be lifted and FGIC shall resume possession of its property and the conduct of its business, subject to the limitations described in the Plan.

### 7.7    Termination of Duties of Rehabilitator.

On the Effective Date, the Rehabilitator shall be discharged of all duties as Rehabilitator and the Rehabilitator's employees and appointed agents shall be discharged of their duties, if any, with respect to all matters related to the rehabilitation of FGIC.  The Rehabilitator, the NYLB and each of their respective employees and Representatives shall have no liability for actions taken by FGIC after the Effective Date.

### 7.8    Injunctive Relief.

From and after the Effective Date, all Persons shall be prohibited from:

(a)    commencing, continuing, advancing or otherwise prosecuting any Legal Proceeding against any Exculpated Parties with respect to any Released Cause of Action, Exculpated Cause of Action, Policy Claim, other Claim that arose or relates to the period prior to the Effective Date or Equity Interests in existence as of the date of the Order of Rehabilitation, in each case other than to enforce the terms of the Plan, challenge a FGIC Claim Determination or challenge FGIC's declaration of a Policy Crystallization Event;

(b)    taking any steps to transfer, foreclose, sell, assign, garnish, levy, encumber, attach, dispose of, exercise or enforce purported rights in or against any claimed interest in any property or assets of FGIC with respect to, or otherwise recover or collect payment on, other than in accordance with the Plan, (i) any Policy Claim or (ii) any other Claim that arose or relates to the period prior to the Effective Date;

(c)    except as set forth in Section 4.9 hereof, withholding or continuing to withhold, subordinating, failing to pay, setting-off, recouping or taking similar action with respect to FGIC Payments;

(d)    (i) terminating, accelerating, liquidating, closing out, collecting on, claiming against, making any demand or delivering any notice under, or otherwise exercising or enforcing rights or remedies or taking any action under or with respect to, or attempting to terminate, accelerate, liquidate, close out, collect on, claim against, make any demand or deliver any notice under, or otherwise exercise or enforce rights or remedies or take action under or with respect to any FGIC Contract or any Transaction Document executed in connection with the issuance of or entry into such FGIC Contract or related to such FGIC Contract or any obligations insured or covered thereby, on the basis of the Rehabilitation or the occurrence or existence of any of the Rehabilitation Circumstances, regardless of the existence of any provisions in such FGIC Contract or Transaction Document that would or may otherwise permit or require such termination, acceleration, liquidation, closing out, collection, claim, demand, notice, exercise, enforcement or action, and/or (ii) asserting a Claim as a result of any such actual or attempted

21

early termination of any FGIC Contract, including any Claim based on the termination of a CDS or other swap agreement (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount" or other methodologies) under or in relation to such FGIC Contract;

(e)     (i) except as expressly provided by Section 3.7 hereof, exercising or taking any action to exercise, including by asserting any defense based on the Rehabilitation or the occurrence or existence of any of the Rehabilitation Circumstances, any approval, consent, direction, determination, appointment, request, voting, veto, waiver or other right that the FGIC Parties have (through the right to direct or grant or withhold consent with respect to such exercise or otherwise) (or that the FGIC Parties would have but for the Rehabilitation or the occurrence or existence of any of the Rehabilitation Circumstances) under or with respect to any FGIC Contract or any Transaction Document executed in connection with the issuance of or entry into such FGIC Contract or related to such FGIC Contract or any obligations insured or covered thereby (all rights and remedies described in this clause (i), the "**FGIC Rights**"); (ii) except as expressly provided by Section 3.7 hereof, failing to take, or taking any action inconsistent with, any action (or inaction) directed (whether actively or passively) to be taken pursuant to the exercise by the FGIC Parties of any FGIC Rights or (iii) failing to provide, or causing to be provided, to the FGIC Parties any notice, request or other communication or document that the FGIC Parties may have the right to receive (or that the FGIC Parties would or may have the right to receive but for the Rehabilitation or the occurrence or existence of any of the Rehabilitation Circumstances). For the avoidance of doubt, this subsection 7.8(e) shall not enjoin or restrain any trustee from exercising any remedial power in the absence of any conflicting direction from FGIC (to the extent that FGIC is entitled to give such direction) or any servicer (including any master servicer, sub-servicer or special servicer) from servicing underlying collateral, in each case to the extent permitted under and in accordance with the terms and conditions of the applicable Transaction Documents (and in each case without regard to the Rehabilitation and the occurrence or existence of any of the Rehabilitation Circumstances);

(f)     acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, including any Exhibits hereto;

(g)     withholding, failing to pay, setting-off, or taking similar action with respect to any portions of reinsurance and other obligations to FGIC for reinsurance in respect of Policies that are due and owing, or would be due and owing had the Rehabilitation Proceeding not terminated, or would otherwise be due and owing in the absence of the Rehabilitation and the occurrence or existence of any of the Rehabilitation Circumstances;

(h)     seeking to acquire, acquiring or exercising voting or other corporate governance rights pursuant to or under the Preferred Stock until such time as the NYSDFS, in its sole discretion, determines such injunctive relief is no longer necessary; and

(i)     pursuing any Released Cause of Action or Exculpated Cause of Action.

Nothing in the Plan, including Section 7.8(a) or (c) hereof, or the Plan Approval Order shall (i) prohibit a holder of a Claim from asserting a Claim pursuant to the Plan, other than as provided in Section 7.8(d) hereof, (ii) preclude or impair any holder of a Permitted Claim from bringing an action in the Court against FGIC to compel the making of distributions contemplated by the Plan

22

on account of such Permitted Claim after such distributions shall have become due and payable pursuant to the Plan but remain unpaid by FGIC or (iii) except as may be otherwise agreed to in writing by FGIC and the relevant Debtor (as defined below), alter, limit, or otherwise modify any rights of (I) a debtor or debtor in possession (a "**Debtor**") under the federal bankruptcy code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), to take action with respect to the allowance, classification, discharge, priority, subordination, or treatment in such Debtor's bankruptcy case (a "**Bankruptcy Case**") (including in any plan of adjustment, liquidation, or reorganization proposed by or regarding such Debtor) of any claims (as defined in section 101(5) of the Bankruptcy Code) filed or otherwise asserted by the FGIC Parties in the Bankruptcy Case (the "**FGIC Claims**") (any such proposed action regarding the allowance, classification, discharge, priority, subordination, or treatment of the FGIC Claims by a Debtor, a "**Bankruptcy Case Claim Action**"), *provided* that (x) no Bankruptcy Case Claim Action may be based on (or on defenses based on) the Rehabilitation or the occurrence or existence of any of the Rehabilitation Circumstances (regardless of the existence of any provisions in any FGIC Contract or Transaction Document related to such claims that would or may permit the taking of any such action or similar action with respect to such claims) and (y) no Bankruptcy Case Claim Action may seek to collect any monetary amounts from FGIC, including, without limitation, by way of setoff or recoupment against FGIC Payments, if such setoff or recoupment is prohibited by Section 7.8(c) hereof; or (II) the FGIC Parties to challenge any such Bankruptcy Case Claim Action before the bankruptcy court or any other court that exercises competent jurisdiction over the Bankruptcy Case Claim Action (including, without limitation, on the basis that FGIC's payment of CPP of each Permitted Policy Claim pursuant to the Plan is a payment in full of FGIC's obligations under the related Policy, as revised by the Plan), so long as such challenge does not conflict with subclause (I) above.

### 7.9    Preservation of Causes of Action.

Following the Effective Date, FGIC shall retain and may (but is not required to) prosecute, settle, release, compromise or enforce any and all Causes of Action not released or exculpated pursuant to the Plan. FGIC shall determine, in its sole discretion, whether to bring, settle, release, compromise or enforce any rights with respect to such Causes of Action. FGIC shall provide to the NYSDFS thirty (30) days' written notice (or such advance notice as the NYSDFS may agree to, on a case-by-case basis) before settling, releasing or compromising any Causes of Action where FGIC's claims would be expected to exceed $25 million (or such other amount as the NYSDFS may agree to). FGIC shall obtain the written approval of the NYSDFS if any such settlement, release or compromise would result in a payment by FGIC of $10 million (or such other amount as the NYSDFS may agree to) or more. FGIC's failure to specifically list any Cause of Action in the Disclosure Statement or the Plan does not, and will not be deemed to, constitute a waiver or release by FGIC of such Causes of Action. FGIC will retain the right to pursue such Causes of Action and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action. In addition, payment of a Permitted Claim (or any portion thereof) shall not preclude FGIC from pursuing any remedies at law or in equity against a Policyholder or holder of a Claim.

23

Supreme Court Records OnLine Library - page 35 of 73

### 7.10    Limitations on Operations Following Effective Date.

From and after the Effective Date, until such time (if ever) as the NYSDFS grants written approval to remove any of the following requirements, the following shall apply to FGIC:

(a)    FGIC shall not issue any new insurance policies or guaranties or provide any new reinsurance in each case without the prior express written approval of the NYSDFS;

(b)    FGIC shall not pay any dividends, distributions or other payments to the holder of any Equity Interest on account thereof without the prior express written approval of the NYSDFS;

(c)    FGIC shall not sell, reinsure or otherwise transfer any portion of its assets and liabilities involving five percent (5%) or more of FGIC's Admitted Assets (other than investment management activities in the ordinary course of business) without the prior express written approval of the NYSDFS;

(d)    FGIC shall provide to the NYSDFS thirty (30) days' written notice (or such advance notice as the NYSDFS may agree to, on a case-by-case basis) before FGIC may (i) effectuate any Alternative Resolution pursuant to Section 4.8 hereof involving more than $25 million (or such other amount as the NYSDFS may agree to) in total economic cost to FGIC (including not only any proposed payment by FGIC, but also any loss of value to FGIC resulting from such transaction, such as through loss of future premiums or reinsurance coverage) or (ii) permit any Claim in an amount exceeding $10 million (or such other amount as the NYSDFS may agree to);

(e)    FGIC shall obtain the written approval of the NYSDFS if any Alternative Resolution referenced in subsection (d) of this Section 7.10 would result in a payment by FGIC of $10 million (or such other amount as the NYSDFS may agree to) or more;

(f)    Neither FGIC nor FGIC Corp. shall execute changes to its corporate governance structure, including amendment of FGIC's charter and bylaws, without the prior express written approval of the NYSDFS;

(g)    Any person nominated to serve as a director of FGIC or FGIC Corp shall require the prior written approval of the NYSDFS prior to being presented to the shareholders for election as a director;

(h)    FGIC shall comply with all applicable New York insurance laws and regulations;

(i)    No CPP Revaluation or CPP Adjustment shall become effective until FGIC has submitted to the NYSDFS a request for approval thereof that is accompanied by evidence justifying such change, as prepared by a CPP Revaluation Firm, and a certification by FGIC's CEO that, to the best of the CEO's information and belief, such request is consistent with the Run-Off Principles, and FGIC has received the NYSDFS's express prior written approval therefor; and

24

(j)      FGIC shall reimburse the NYSDFS for its expenses associated with its oversight of the post-Rehabilitation Proceeding run-off promptly following the request of the NYSDFS for such reimbursement.

### 7.11    Reporting.

#### A.      Status of Rehabilitation.

Following the Effective Date, no later than June 1 of each year, FGIC shall file with the NYSDFS and post on the Policyholder Information Center a report on the status of the Rehabilitation.  Such report shall include:

(a)      A report substantially in the form of the FGIC Quarterly Operating Review which has been previously published by FGIC, which shall include the information typically contained in such Operating Review and FGIC's statutory loss reserves and Admitted Assets, amount of Permitted Claims, Claims submitted that are pending but not yet Permitted and the amount of DPOs and DPO Accretion with respect to Permitted Claims, in each case as of the end of the most recent year;

(b)      The status of the implementation of the Plan;

(c)      A summary explanation of the basis for any change or determination not to change the CPP during such year; and

(d)      Such other information as may be requested by the NYSDFS.

#### B.      Run-Off Projections.

From and after the Effective Date until such time (if ever) as the NYSDFS grants written approval to remove any of the following requirements, FGIC shall make available to the NYSDFS the following reports:

(a)      Annual reports in a format acceptable to the NYSDFS of the updated Run-Off Projections and the cash flow projections under a Base Scenario based on actual results to date, each prepared by a CPP Revaluation Firm; and

(b)      Quarterly reports in a format acceptable to the NYSDFS comparing the most recent Run-Off Projections and the cash flow projections under a Base Scenario against actual results for such quarter, and informing the NYSDFS of key metrics of the post-Rehabilitation Proceeding run-off, including Claims filed, Permitted, ultimately determined not to be Permitted pursuant to Section 4.6 hereof and paid in Cash during such quarter and any contingency or loss reserves released during such quarter.

#### C.      Other Reports.

FGIC shall comply with all reporting requirements of applicable New York insurance laws and regulations.

25

# ARTICLE VIII.

## RETENTION OF JURISDICTION

### 8.1    Retention of Jurisdiction.

Notwithstanding the occurrence of the Effective Date and the termination of the Rehabilitation Proceeding, the Court shall have exclusive jurisdiction over all matters arising out of or related to the Rehabilitation Proceeding and the interpretation, implementation or enforcement of the Plan, including jurisdiction to:

(a)    consider Claims and Equity Interests, Objections and FGIC Claim Determinations with respect thereto, and the approval, characterization, compromise, estimation or payment of Claims and Equity Interests, in each case to the extent such consideration involves the interpretation, implementation or enforcement of the Plan;

(b)    enter, implement or enforce such orders and injunctions as are necessary to enforce FGIC's respective title, rights and powers, and the terms of the Plan, including as may be appropriate if the Plan Approval Order is for any reason stayed, reversed, revoked, modified or vacated, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court deems necessary;

(c)    take any action and issue such orders as may be necessary to enforce, implement, execute, consummate or maintain the integrity of the Plan, the Plan Approval Order or any other order of the Court, and determine all controversies, suits and disputes that may arise in connection with the foregoing;

(d)    recover all assets and property of FGIC, wherever located, including determining whether any assets or property are properly considered assets or property of FGIC;

(e)    correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in any order of the Court, including the Plan Approval Order;

(f)    hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan or any order of the Court, including the Plan Approval Order;

(g)    determine any and all motions, applications, and other contested matters that may be pending before the Court on the Effective Date;

(h)    consider any amendments to or modifications of the Plan or any exhibit thereto;

(i)    ensure that all Persons (including FGIC) comply with the Plan;

(j)    hear and determine disputes or issues arising in connection with FGIC taking any action to declare a Policy Crystallization Event pursuant to Section 2.1 of the Restructured Policy Terms;

26

(k)    interpret, enforce and determine all questions and disputes regarding the injunctions, releases, exculpations, and indemnifications provided for in the Plan, the Plan Approval Order or the NYIL; and

(l)    determine such other matters or proceedings as may be provided for under Article 74 of the NYIL, the Plan or in any order of the Court, including the Plan Approval Order or any order that may arise in connection with the Plan, the Rehabilitation Proceeding or the Plan Approval Order.

For purposes of clarity, this Section 8.1 shall not apply with respect to judicial proceedings seeking instructions regarding the administration or interpretation of a trust or its related Transaction Documents, or the trustee's duties thereunder, as long as such instructions do not involve the interpretation, implementation or enforcement of the Plan.

## ARTICLE IX.

## MISCELLANEOUS

### 9.1    Binding Effect.

The Plan shall be binding on FGIC, the holders of all Claims, the holders of Equity Interests, all other Persons and each of their respective successors and assigns, and shall apply from and after the Effective Date.  No Person shall have any Claim or right against FGIC or its assets other than as provided in the Plan.

### 9.2    Treatment in Subsequent Article 74 Proceeding.

Nothing in the Plan shall in any manner restrict actions that may be taken by any rehabilitator, liquidator or other receiver of FGIC in any subsequent proceeding under Article 74 of the NYIL.

### 9.3    Modification.

From and after the Effective Date, only the NYSDFS may modify the Plan and only to the extent it determines necessary for the fair and equitable treatment of Policyholders in general; *provided, however,* that the NYSDFS shall obtain prior Court approval for any material modification.

### 9.4    No Admissions.

As to Causes of Action or threatened Causes of Action, the Plan shall not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations. The Plan shall not be construed to be conclusive advice on the tax, securities and other legal effects of the Plan as to holders of Claims or Equity Interests.

27

### 9.5    Notice to NYSDFS.

After the Effective Date, if FGIC or any Person requests that the Court hear any matter arising out of, or related to, the Rehabilitation Proceeding or the Plan, FGIC, upon making such request or receiving notice of such a request, shall promptly provide notice thereof in writing to the NYSDFS.

### 9.6    Notice to FGIC.

After the Effective Date, if FGIC fails to comply with any of the provisions of the Plan or any FGIC Contract or Transaction Document, as modified by the Plan (as applicable), before taking any action with respect to such noncompliance, the affected Person shall provide notice to FGIC of such noncompliance and shall give FGIC the longer of (i) five (5) Business Days following FGIC's receipt of such notice and (ii) the period set forth in the applicable FGIC Contract or Transaction Document (if any) to cure any noncompliance by FGIC of an obligation it has under the Plan or such FGIC Contract or Transaction Document.

### 9.7    Notices.

All notices, Proofs of Claim, requests, demands, Responses and other documents required or permitted to be provided under the Plan to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed given or made when actually delivered to the following addresses:

If to the Rehabilitator:

New York Liquidation Bureau
110 William Street
New York, NY 10038
Attn: Special Deputy Superintendent
Facsimile No.: 212-341-6714

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Gary T. Holtzer
        Joseph T. Verdesca
Facsimile No.: 212-310-8007

If to FGIC:

Financial Guaranty Insurance
Company
125 Park Avenue
New York, NY 10017
Attn: General Counsel
Facsimile No.: 212-312-3221

If to NYSDFS:

New York State Department of
Financial Services
One State Street
New York, NY 10004
Attn: General Counsel
Facsimile No.: 212-709-1655

### 9.8    Incorporation.

All exhibits to the Plan and the Plan Supplement are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein.

Supreme Court Records OnLine Library  -  page 40 of 73

### 9.9    Headings.

The headings contained in the Plan and any Exhibit hereto, in the table of contents to the Plan, and in the Plan Supplement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

### 9.10    Governing Law.

The Plan and all Causes of Action that may be based on, arise out of or relate to the Plan or the negotiation, execution or performance of the Plan, shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the choice of law principles of the State of New York that would require or permit the application of laws of another jurisdiction.

### 9.11    Severability.

Without limiting the ability of the NYSDFS to modify the Plan pursuant to Section 9.3 hereof, if any provision of the Plan is determined by any court of competent jurisdiction to be unenforceable on its face, such provision shall be deemed deleted and such a determination of unenforceability shall not limit or affect the enforceability and operative effect of any other provision of the Plan; *provided, however*, that the NYSDFS may revoke the Plan, subject to Court approval, if the NYSDFS determines that the provision of the Plan that is determined by a court of competent jurisdiction to be unenforceable on its face is so material to the Plan that the Rehabilitator would have withdrawn the Plan had such determination been made prior to the Effective Date. If the NYSDFS revokes the Plan pursuant to the preceding sentence, then the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against FGIC or any other Person, or to prejudice in any manner the rights of FGIC or any other Person in any further proceedings involving FGIC.

### 9.12    Inconsistency; Prior Orders.

In the event of any inconsistency between the Plan and the Disclosure Statement, the provisions of the Plan shall govern. With respect to periods from and after the Effective Date, the Plan and Plan Approval Order shall supersede the Order of Rehabilitation and the Order to Show Cause, both of which shall remain in effect with respect to their respective periods prior to the Effective Date.

### 9.13    Rounding.

Any amount payable by FGIC pursuant to the Plan shall be rounded up to end with the next highest whole cent.

### 9.14    Interpretation; Application of Definitions and Rules of Construction.

For purposes of the Plan (including all Exhibits thereto), capitalized terms not defined herein (or therein) shall have the meaning ascribed to them in **Exhibit A** of the Plan.

29

Unless otherwise specified, all Section or Exhibit references in the Plan are to the respective Section in, or Exhibit to, the Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. Whenever the words "include," "includes" or "including" are used in the Plan, they are deemed to be followed by the words "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The word "or" shall be construed to have the same meaning as and effect as the inclusive term "and/or." The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." Unless otherwise specified, all references to "days" (other than "Business Days") shall mean calendar days. A term used herein that is not defined herein shall have the meaning ascribed to that term in the NYIL. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender and the neuter and words denoting the neuter shall include any applicable gender. Unless otherwise provided herein, in the event that a particular term of the Plan (including any exhibits hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder, the definitive documentation shall control and shall be binding on the parties thereto only if the definitive documentation expressly states that the terms thereof control over any terms of the Plan. Unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth therein).

Any reference in the Plan to FGIC taking any action during the Rehabilitation Proceeding shall be deemed to refer to the Rehabilitator, as receiver of FGIC, if such action is taken prior to the Effective Date.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

30

### 9.15  Entire Plan.

The Rehabilitator intends that all the terms set forth in this Plan constitute a complete, final and exclusive expression of the Plan and supersede any prior or contemporaneous oral or written agreements, drafts, proposed agreements, negotiations and discussions with respect to the subject matter hereof.  Prior drafts of this Plan (whether or not filed with the Court) or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Plan shall not be used as an aide of construction or otherwise constitute evidence of the intent of this Plan; and no presumption or burden of proof shall arise favoring or disfavoring any person by virtue of such prior drafts.

Dated: June 4, 2013
      New York, New York

                                                                  _Peter A. Giacone_

Peter A. Giacone
*Chief Financial Officer and Agent of the*
*Superintendent of Financial Services of the*
*State of New York, as Rehabilitator of*
*Financial Guaranty Insurance Company*

31

Supreme Court Records OnLine Library - page 43 of 73

## Exhibit A

### Definitions

## DEFINITIONS

For purposes of the Plan (including all exhibits thereto) the following terms shall have the meanings set forth below.

**"1310 Order"** means that certain order issued by the New York Insurance Department on November 24, 2009 pursuant to Section 1310 of the NYIL, as supplemented on March 25, 2010.

**"Adjusted CPP"** means, as of a date of determination, the CPP, after giving effect to all CPP Adjustments through and including such date.

**"Adjusted FGIC Payments"** has the meaning ascribed to such term in Section 1.4(B) of the Restructured Policy Terms.

**"Administrative Expense Claim"** means any Claim (i) for actual and necessary costs and expenses of administration incurred by the Rehabilitator during the Rehabilitation Proceeding or (ii) for indemnification pursuant to Section 7.5 of the Plan, to the extent that such Claim for indemnification arises on or after the date of the Order of Rehabilitation.

**"Admitted Assets"** has the meaning ascribed to such term in Section 1301 of the NYIL.

**"Aggregate Cash Payments Amount"** means, with respect to a Policy as of a date of determination, the sum of (i) the aggregate amount paid in Cash by FGIC with respect to such Policy (other than any DPO Accretion Payment Amount) from and after the Effective Date through such date and (ii) the aggregate amount of Deemed Cash Payments with respect to such Policy through such date.

**"Aggregate Claims Amount"** means, with respect to a Policy on a date of determination, the amount of all Permitted Policy Claims under such Policy as to which one or more Cash payments or Deemed Cash Payments have been made by FGIC on or prior to such date.

**"Aggregate DPO Accretion Amount"** means the sum of the DPO Accretion Amounts for all Policies as of the date of determination.

**"Alternative Resolution"** has the meaning ascribed to such term in Section 4.8 of the Plan.

**"Bankruptcy Case"** has the meaning ascribed to such term in Section 7.8 of the Plan.

**"Bankruptcy Case Claim Action"** has the meaning ascribed to such term in Section 7.8 of the Plan.

**"Bankruptcy Code"** has the meaning ascribed to such term in Section 7.8 of the Plan.

**"Bar Date"** has the meaning ascribed to such term in Section 4.4(A) of the Plan.

"**Base Scenario**" means FGIC's then-current expectation of future Claims, investment performance, recoveries, financial markets and other factors of relevance to CPP Revaluations based on circumstances, events and projections that FGIC anticipates are reasonably likely to occur.

"**Board**" means the board of directors of FGIC following the Effective Date.

"**Business Day**" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

"**Cash**" means (i) legal tender of the United States of America payable in immediately available funds, such as a wire transfer, bank or cashier's check and (ii) with respect to payment under a Policy, the currency required for payments under and pursuant to such Policy, or if no currency is specified in such Policy, legal tender of the United States of America.

"**Causes of Action**" means, without limitation, any and all claims, rights, actions, demands, proceedings, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, defenses, affirmative defenses, rights of setoff, offset, powers, privileges, licenses, franchises, third-party claims, counterclaims, cross-claims, actions for declaratory or injunctive relief, suits and other rights of recovery, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments against or with respect to any Person or property, wherever located, of any nature whatsoever, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, foreseen or unforeseen, asserted or unasserted or pending as of the Effective Date, whether direct, indirect, derivative or on any other basis, whether existing or hereafter arising, whether arising in whole or in part prior to, on or after the date of the Order of Rehabilitation, based in whole or in part upon any act or omission or other event occurring prior to the date of the Order of Rehabilitation or during the course of the Rehabilitation Proceeding or thereafter, in contract or in tort, at law or in equity, whether pursuant to any federal, state, local, statutory or common law or any other law, rule or regulation, or under any theory of law or equity, including any available: (i) rights of setoff, counterclaim, recoupment, replevin or reclamation, or claims on contracts or for breaches of duties imposed by law, and (ii) claims, causes of action or defenses against any Person, including for intentional or negligent misrepresentation, fraud, mistake, duress and usury, breach of fiduciary duty, malpractice, negligence, breach of contract, wrongful distribution, aiding and abetting or inducement.

"**CDS**" means a credit default swap.

"**CDS Commutation Agreements**" means the commutation, termination, settlement and/or release agreements contained in the Plan Supplement or otherwise approved by the Court prior to the Effective Date.

"**CEO**" means the Chief Executive Officer of FGIC.

"**Claim**" means (i) any right to payment from FGIC, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

A-2

unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and regardless of when such right arises or (ii) any right to an equitable remedy against FGIC for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and regardless of when such right arises.

"Claims Resubmission Deadline" has the meaning ascribed to such term in Section 4.3(A) of the Plan.

"Court" means the Supreme Court of the State of New York, New York County, or any appellate court having jurisdiction over orders or judgments of the Supreme Court of the State of New York, New York County.

"CPP" means, as of a date of determination, the Cash payment percentage for Permitted Policy Claims in effect as of such date.

"CPP Adjustment" means any CPP Upward Adjustment or CPP Downward Adjustment.

"CPP Downward Adjustment" has the meaning ascribed to such term in Section 1.5(C) of the Restructured Policy Terms.

"CPP Revaluation" has the meaning ascribed to such term in Section 1.5 of the Restructured Policy Terms.

"CPP Revaluation Filing" has the meaning ascribed to such term in Section 1.5(C) of the Restructured Policy Terms.

"CPP Revaluation Firm" has the meaning ascribed to such term in Section 1.5(B) of the Restructured Policy Terms.

"CPP Upward Adjustment" has the meaning ascribed to such term in Section 1.5(C) of the Restructured Policy Terms.

"Debtor" has the meaning ascribed to such term in Section 7.8 of the Plan.

"Deemed Cash Payments" means, for any Policy, any Cash payments that would have been paid at any time by FGIC in respect of such Policy (other than any DPO Accretion Payment Amount) but for the existence of one or more unpaid FGIC Payments.

"Disclosure Statement" means the Disclosure Statement for Plan of Rehabilitation for Financial Guaranty Insurance Company filed with the Court on September 27, 2012, including all exhibits thereto, as the same may be revised, supplemented or otherwise modified from time to time.

"Disputed Claim" means solely that portion of a Claim as to which (i) an Objection is raised, which has not been resolved or withdrawn or (ii) a FGIC Claim Determination is made, which has not been resolved, withdrawn or overruled by a Final Order.

A-3

**"DPO"** means, with respect to a Policy as of a date of determination, an amount, as may be adjusted pursuant to the Plan, equal to the Aggregate Claims Amount minus the Aggregate Cash Payments Amount, in each case for such Policy as of such date.

**"DPO Accretion"** has the meaning ascribed to such term in Section 1.3(A) of the Restructured Policy Terms.

**"DPO Accretion Amount"** means the aggregate amount of DPO Accretion accrued with respect to a Policy prior to the date of determination minus any DPO Accretion Payment Amounts previously paid with respect to such Policy.

**"DPO Accretion Payable Amount"** means, as of the date of determination, the product of (i) Excess Cash and (ii) the DPO Accretion Payable Percentage.

**"DPO Accretion Payable Percentage"** means, as of the date of determination, the percentage obtained by dividing (i) the Aggregate DPO Accretion Amount as of such date by (ii) the sum of (a) the Aggregate DPO Accretion Amount as of such date, (b) the DPO for Policy Claims that were Permitted on or prior to such date and (c) the DPO for Policy Claims projected to be Permitted in a Stress Scenario after such date through the remainder of the Run-Off Period.

**"DPO Accretion Payment Amount"** means, with respect to a Policy as of the date of determination, the product of (i) the then-current DPO Accretion Payable Amount and (ii) the quotient obtained by dividing the then-current DPO Accretion Amount for such Policy by the then-current Aggregate DPO Accretion Amount.

**"DPO Payment Date"** means the tenth (10th) Business Day following any date on which a CPP Upward Adjustment shall become effective.

**"Duplicate Claim"** means a Claim that, in whole or in part, is the subject of another Claim previously submitted to FGIC, including a Policy Claim for which the payment obligation of FGIC under the provisions of the underlying Instrument or contract giving rise to such Claim or the underlying risk of loss insured pursuant to the provisions of the FGIC Contract or Transaction Document giving rise to such Claim, in whole or in part, is the subject of another Claim previously submitted to FGIC and including an Undercollateralization Claim or any portion thereof that has already been submitted to FGIC as part of another Undercollateralization Claim.

**"Effective Date"** means the first Business Day on which all conditions to effectiveness set forth in Section 6.1 of the Plan have been satisfied or have been waived pursuant to Section 6.3 of the Plan.

**"Equalization Adjustment"** has the meaning ascribed to such term in Section 1.5(C) of the Restructured Policy Terms.

**"Equity Interests"** means the interests of any holders of equity securities of FGIC represented by any issued and outstanding shares of stock or other Instrument evidencing any ownership interest in FGIC, whether or not transferable, or any option, warrant, or right,

A-4

contractual or otherwise, to acquire such interest. For the avoidance of doubt, Equity Interests shall include all classes and types of stock, including the Preferred Stock, issued by FGIC.

**"Estimated Payment Obligations"** has the meaning ascribed to such term in Section 2.2 of the Restructured Policy Terms.

**"Estimated Payment Schedule"** has the meaning ascribed to such term in Section 2.2 of the Restructured Policy Terms.

**"Excess Cash"** means, as of the date of determination, the amount of Cash calculated in connection with a CPP Revaluation that would be available after accounting for, without limitation, (i) the Cash needed to make payments based on the then-current CPP with respect to all Policy Claims that were (a) Permitted on or prior to such date and (b) projected to be Permitted in a Stress Scenario from and after such date through the remainder of the Run-Off Period, (ii) certain operating expenses and (iii) the Minimum Cash Buffer, to make payments with respect to (x) the Aggregate DPO Accretion Amount as of such date, (y) the DPO for Policy Claims that were Permitted on or prior to such date and (z) the DPO for Policy Claims projected to be Permitted in a Stress Scenario from and after such date through the remainder of the Run-Off Period.

**"Excess Payment"** means, for any Policy, the portion, if any, of a payment made by a FGIC Payment Payor to the FGIC Parties pursuant to any related Transaction Document after the date of the Order of Rehabilitation and prior to the Effective Date that does not constitute a FGIC Payment (giving effect to the initial CPP).

**"Exculpated Causes of Action"** has the meaning ascribed to such term in Section 7.3 of the Plan.

**"Exculpated Parties"** has the meaning ascribed to such term in Section 7.3 of the Plan.

**"FGIC"** means Financial Guaranty Insurance Company, a New York stock insurance corporation.

**"FGIC Claim Determination"** has the meaning ascribed to such term in Section 4.6 of the Plan.

**"FGIC Claims"** has the meaning ascribed to such term in Section 7.8 of the Plan.

**"FGIC Contract"** means any Policy, contract or other Instrument to which the FGIC Parties are parties or by which the FGIC Parties are bound.

**"FGIC Corp."** means FGIC Corporation, a Delaware corporation.

**"FGIC Corp. Chapter 11 Case"** means the case under chapter 11 of title 11 of the United States Code commenced by FGIC Corp. on August 3, 2010, in the United States Bankruptcy Court for the Southern District of New York and styled *In re FGIC Corporation*, chapter 11 case No. 10-14215 (SMB), together with any Legal Proceeding brought (or sought to

Supreme Court Records OnLine Library - page 49 of 73

be brought) at any time by any Person that relates in any manner to such chapter 11 case, in each case together with any appeals thereto.

"**FGIC Corp. Court**" means the United States Bankruptcy Court for the Southern District of New York or any other court of the United States having jurisdiction over the FGIC Corp. Chapter 11 Case.

"**FGIC Corp. Plan**" means the Chapter 11 Plan of Reorganization of FGIC Corporation confirmed by the FGIC Corp. Court on April 23, 2012.

"**FGIC CP**" means FGIC Credit Products LLC, a Delaware limited liability company.

"**FGIC Direct Claim**" means any and all Causes of Action relating in any manner to any Instrument, Transaction Document or Policy that FGIC at any time may have, is pursuing or may pursue, in each case on its own behalf (and not on behalf of any trust), including (i) the Causes of Action asserted in the pending RMBS lawsuits listed on **Exhibit C** of the Plan, (ii) any Cause of Action as third party beneficiary or pursuant to a direct Cause of Action it may have under a FGIC Contract or Transaction Document and (iii) other Causes of Action of a similar nature that FGIC has already brought or asserted, or may in the future bring or assert, on its own behalf against any Person (and not on behalf of any trust).

"**FGIC Expense Reimbursements**" means, for any Policy, the out of pocket expenses incurred by FGIC for which it is entitled to reimbursement under such Policy or any related Transaction Document; *provided, however*, that FGIC Expense Reimbursements shall not include expenses incurred by FGIC or the Rehabilitator in connection with the Rehabilitation Proceeding or the Plan. Notwithstanding the foregoing, the term "FGIC Expense Reimbursements" shall not include out of pocket expenses incurred by FGIC in connection with the pursuit of FGIC Direct Claims. To the extent FGIC incurs out of pocket expenses (for which it is entitled to reimbursement under a Policy or related Transaction Document) in connection with the pursuit of both FGIC Direct Claims and other claims, then such expenses shall be apportioned by FGIC in good faith and only the expenses apportioned to non-FGIC Direct Claims shall be included in the definition of "FGIC Expense Reimbursements."

"**FGIC Parties**" means FGIC and/or FGIC CP.

"**FGIC Payment Deficiency**" has the meaning ascribed to such term in Section 1.4(B) of the Restructured Policy Terms.

"**FGIC Payment Excess**" has the meaning ascribed to such term in Section 1.4(B) of the Restructured Policy Terms.

"**FGIC Payment Payor**" means (i) with respect to any Policy for which the Policy Payee thereunder is acting as trustee or in a similar capacity (a) the Policy Payee, (b) any other Person acting under the direction, supervision or administration of such Policy Payee and (c) the obligor or obligors under such Policy or related Transaction Documents on whose behalf such Policy Payee is required to make FGIC Payments relating to such Policy or (ii) for any other Policy, the Policy Payee thereunder.

A-6

Supreme Court Records OnLine Library - page 50 of 73

"**FGIC Payments**" means, for any Policy, (i) all Pre-Rehabilitation FGIC Premiums, Expenses, and Recoveries, (ii) all Post-Rehabilitation FGIC Premiums and Expenses, and (iii) the then-current CPP multiplied by the amount of all Post-Rehabilitation FGIC Recoveries. Notwithstanding the foregoing, neither the term "FGIC Payments" nor the term "Post-Rehabilitation FGIC Recoveries" shall include (A) any of the foregoing to the extent arising solely under FGIC Direct Claims, including amounts arising under FGIC Direct Claims that are received by a trust, Policyholder or FGIC Payment Payor, which amounts to the extent received by a trust, Policyholder or FGIC Payment Payor shall be payable or otherwise remittable in accordance with the terms and conditions of the relevant Transaction Documents and, to the extent so received on or after the date of the Order of Rehabilitation, as if (i) the Plan, including the Policy Restructuring and Section 3.5 of the Plan, had been in effect at all times and (ii) FGIC had at all times paid Policy Claims in full in Cash or (B) any amounts to the extent that receipt by FGIC of such amounts at the time of distribution would, in light of proceeds of FGIC Direct Claims that FGIC had then already received, constitute a duplicative recovery by FGIC of an amount that has already been reimbursed to FGIC. Solely for the purposes of determining whether there is any such duplicative recovery, FGIC will allocate any proceeds, net of its expenses, that FGIC actually receives from FGIC Direct Claims to each Policy from which the FGIC Direct Claim arose pro rata based on the aggregate amount of FGIC's actual and projected life-time claims under those Policies, except to the extent inconsistent with an allocation provided in a court order awarding damages in respect of a FGIC Direct Claim, in which case the court ordered allocation applies.

"**FGIC Rights**" has the meaning ascribed to such term in Section 7.8(e) of the Plan.

"**Final CPP Revaluation**" has the meaning ascribed to such term in Section 1.5(E) of the Restructured Policy Terms.

"**Final Order**" means an order or judgment of a court of competent jurisdiction entered on the docket maintained by the clerk of such court that has not been reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (a) such order or judgment shall have been affirmed by the highest court to which such order was appealed, leave to appeal or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order or otherwise been dismissed with prejudice, and (b) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, Rule 5015 of the New York Civil Practice Law and Rules, or any analogous rule, may be filed relating to such order shall not prevent such order from being a Final Order.

"**First Payment Date**" has the meaning ascribed to such term in Section 1.3(A) of the Restructured Policy Terms.

A-7

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"**Indemnified Trustee**" means any of (i) a Trustee or any other indenture trustee (or other similar trustee) who is the named insured in respect of a Policy issued by FGIC, (ii) a trustee who holds a security interest in a Policy issued by FGIC, or (iii) a trustee of a trust which has issued Instruments that have the benefit of a Policy issued by FGIC; *provided*, that a trustee in respect of an Instrument constituting a reference obligation under a swap agreement between a holder of such Instrument and FGIC CP, with respect to which swap agreement the obligations of FGIC CP thereunder are insured by a Policy issued by FGIC, shall not be considered an "Indemnified Trustee" by virtue of such arrangement.

"**Initial Payment Date**" has the meaning ascribed to such term in Section 1.1(B) of the Restructured Policy Terms.

"**Instrument**" means a single class of securities, obligations or other instruments.

"**Late-Filed Claim**" means a Claim that (i) has not been submitted in compliance with the applicable deadline for asserting such Claim set forth in the Plan and (ii) if a Policy Claim and if paid in accordance with Section 4.7(E) of the Plan, could reasonably be expected to interfere with FGIC's ability to operate in accordance with the Run-Off Principles, including its ability to ensure that all holders of Permitted Policy Claims (whenever arising) receive the same CPP of their Permitted Policy Claims.

"**Legal Proceeding**" means any judicial, administrative or arbitral action, suit, mediation, investigation, inquiry, proceeding or claim (including counterclaims) by or before any Governmental Body.

"**Loss**" means any liability, obligation, loss, cost, expense, penalty or fine whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' and other professionals' fees and expenses).

"**Minimum Cash Buffer**" means, as of a date of determination, an amount equal to the greater of (i) 1% of Policy Claims projected to be Permitted in a Stress Scenario and (ii) $100 million, as may be amended pursuant to the provisions of Section 1.5 of the Restructured Policy Terms.

"**Minimum Surplus Position**" means, as of a date of determination, the greater of (i) $65 million and (ii) the minimum amount of statutory capital and surplus required to be held by New York domiciled financial guaranty insurance companies licensed to transact only financial guaranty insurance under the NYIL as of such date.

"**National Public**" means National Public Finance Guarantee Corporation, a New York stock insurance corporation.

"**Non-FGIC Payor**" has the meaning ascribed to such term in Section 4.7(B) of the Plan.

A-8

"**Non-Policy Claim**" means any Claim other than an Administrative Expense Claim, a Late-Filed Claim, a Policy Claim or a Secured Claim.

"**Novation Agreement**" means that certain agreement dated September 14, 2012 by and between FGIC and National Public.

"**NYIL**" means Chapter 28 of the Consolidated Laws of the State of New York.

"**NYLB**" means the New York Liquidation Bureau.

"**NYSDFS**" means the New York State Department of Financial Services.

"**NYSDFS Guidelines**" means any written guidelines or further directions posted on the Policyholder Information Center the NYSDFS may (but is not obligated to) issue from and after the Effective Date as may be necessary or appropriate in its sole and absolute discretion to carry out the purposes and effects of the Plan.

"**Objection**" has the meaning ascribed to such term in Section 4.6 of the Plan.

"**Objection Deadline**" has the meaning ascribed to such term in Section 4.6 of the Plan.

"**Order of Rehabilitation**" means the order of rehabilitation placing FGIC into the Rehabilitation Proceeding signed by the Honorable Doris Ling-Cohan of the Court on June 28, 2012.

"**Order to Show Cause**" means the order to show cause signed by the Honorable Doris Ling-Cohan of the Court on June 11, 2012 in the Rehabilitation Proceeding.

"**Overpaid Policy**" has the meaning ascribed to such term in Section 1.5(C) of the Restructured Policy Terms.

"**Permitted**" means, with respect to a Claim or any portion thereof, as applicable, determined by FGIC pursuant to the Plan (including the reconciliation procedures set forth in Section 4.6 of the Plan) or by Final Order to be allowed, but solely to the extent of the amount determined to be allowed.

"**Person**" means an individual, partnership, corporation, limited liability company, cooperative, trust, estate, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

"**Plan**" means the First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013, including all Exhibits thereto (including the Restructured Policy Terms) and the documents contained in the Plan Supplement, in each case, as the same may be revised, supplemented or otherwise modified from time to time.

"**Plan Approval Order**" means an order of the Court approving the Plan in form and substance acceptable to the Rehabilitator in his sole discretion.

A-9

"**Plan Supplement**" means the set of documents filed with the Court in one or more compendiums, which are relevant to implementation of the Plan, including (a) forms of amended and restated charter and by-laws of FGIC, (b) the Schedule of Terminated Contracts and Leases, (c) the CDS Commutation Agreements (terms and conditions of which may be redacted in the copies so filed), (d) the Novation Agreement and (e) the Proof of Policy Claim Form.

"**Policy**" means any financial guaranty insurance policy, surety bond or other insurance policy or contract issued or assumed at any time by FGIC, but excluding in all cases reinsurance and retrocession contracts.

"**Policy Claim**" means any Claim under the express terms of a Policy, whether arising (or projected to arise) prior to, on or at any time after the Effective Date, for losses incurred.

"**Policy Crystallization Event**" has the meaning ascribed to such term in Section 2.1 of the Restructured Policy Terms.

"**Policy Crystallization Event Effective Date**" has the meaning ascribed to such term in Section 2.1 of the Restructured Policy Terms.

"**Policy Crystallization Event Notice**" has the meaning ascribed to such term in Section 2.1 of the Restructured Policy Terms.

"**Policyholder**" means for each Policy the holder of such Policy as set forth therein.

"**Policyholder Information Center**" shall mean FGIC's website (www.fgic.com), www.fgicrehabilitation.com or such other means of making available to Policyholders information and documentation regarding the Plan and treatment of Policies and Policy Claims thereunder as the NYSDFS may from time to time approve.

"**Policy Payee**" means, with respect to any Policy, the Person to whom FGIC is contractually obligated to make any payment of Claims under such Policy; *provided* that the term "Policy Payee" shall refer to such Person solely in its capacity as the recipient of such payment of Claims from FGIC with respect to such Policy.

"**Policy Restructuring**" means the restructuring of Policies contemplated by Section 3.1 of the Plan.

"**Post-Rehabilitation FGIC Premiums and Expenses**" means, for any Policy, all (i) premiums, fees, or other charges and (ii) FGIC Expense Reimbursements, in each case payable or otherwise remittable to the FGIC Parties and falling due on or after the date of the Order of Rehabilitation under the terms (including terms that establish a priority of distribution) of or in connection with such Policy or any related Transaction Document, assuming for purposes of determining the amounts so payable or otherwise remittable that (x) the Plan, including the Policy Restructuring and Section 3.5 of the Plan, had been in effect at all times and (y) FGIC had at all times paid Policy Claims in full in Cash.

"**Post-Rehabilitation FGIC Recoveries**" means, for any Policy, all recoveries, reimbursements, settlements and other amounts, in each case payable or otherwise remittable to

A-10

the FGIC Parties and falling due on or after the date of the Order of Rehabilitation (other than proceeds of Trust Loan Repurchase Obligations, which shall be subject to application and distribution solely in accordance with Sections 3.7(a)(iii) and 3.7(b)(iv) of the Plan) under the terms (including terms that establish a priority of distribution) of or in connection with such Policy or any related Transaction Document, assuming for purposes of determining the amounts so payable or otherwise remittable that (x) the Plan, including the Policy Restructuring and Section 3.5 of the Plan, had been in effect at all times and (y) FGIC had at all times paid Policy Claims in full in Cash.

"**Preferred Stock**" means the non-cumulative redeemable preferred stock, par value $1,000 per share, of FGIC.

"**Pre-CPP Adjustment Period**" has the meaning ascribed to such term in Section 1.4(B) of the Restructured Policy Terms.

"**Pre-Rehabilitation FGIC Premiums, Expenses, and Recoveries**" means, for any Policy, all (i) premiums, fees, or other charges, (ii) FGIC Expense Reimbursements, and (iii) recoveries, reimbursements, settlements and other amounts, in each case payable or otherwise remittable to the FGIC Parties and falling due prior to the date of the Order of Rehabilitation under the terms (including terms that establish a priority of distribution) of or in connection with such Policy or any related Transaction Document and without giving any effect to the Plan, including the Policy Restructuring and Section 3.5 of the Plan.

"**Proof of Claim**" means a written statement asserting a Claim (other than a Policy Claim) that contains, among other things, the amount of the Claim and a description of the Claim, and attaches sufficient documentation to substantiate the basis of the Claim.

"**Proof of Policy Claim Form**" means the proof of policy claim form that will be filed as part of the Plan Supplement.

"**Proposed Refinements**" has the meaning ascribed to such term in Section 1.5(B) of the Restructured Policy Terms.

"**Purported FGIC Loss of Rights**" has the meaning ascribed to such term in Section 2.1 of the Restructured Policy Terms.

"**Purported FGIC Loss of Rights Notice**" has the meaning ascribed to such term in Section 2.1 of the Restructured Policy Terms.

"**Rehabilitation**" means the rehabilitation of FGIC pursuant to Article 74 of the NYIL as contemplated by the Plan, including (i) the commencement, prosecution and completion of the Rehabilitation Proceeding, (ii) the Policy Restructuring, the CDS Commutation Agreements, the Novation Agreement and other actions contemplated by, and other terms and conditions of, the Plan, (iii) the issuance of the Plan Approval Order, (iv) the granting of the injunctive relief set forth in the Order to Show Cause, the Order of Rehabilitation, and the Plan Approval Order, (v) the occurrence of the Effective Date, (vi) FGIC's compliance with the Policies as restructured by the Policy Restructuring (including FGIC's payment of only the CPP on each Permitted Policy Claim pursuant to the Plan, and on the timing and subject to the other terms and

A-11

Supreme Court Records OnLine Library - page 55 of 73

conditions set forth in the Plan, rather than amounts that would otherwise be payable, on the timing and subject to the terms and conditions that would otherwise be required, under the Policies but for the Policy Restructuring) and (vii) FGIC's noncompliance with any provision of any Policy or any Transaction Document to the extent that such provision has been superseded by or is inconsistent with the Plan.

"**Rehabilitation-Related Default**" means any default, event of default, termination event, insurer default or similar event with respect to the FGIC Parties arising (or that would arise but for the passing of time, the giving of notice or both) as a result of the Rehabilitation or any of the Rehabilitation Circumstances.

"**Rehabilitation-Triggered Right**" means any right or remedy under any Transaction Document that arises as a result of any Rehabilitation-Related Default.

"**Rehabilitation Circumstances**" means the circumstances and events, whenever arising, giving rise to the Rehabilitation Proceeding or in existence from and after, or giving rise to or at any time resulting from, issuance of the 1310 Order, including (i) the financial condition of the FGIC Parties, (ii) the grounds for the Rehabilitation Proceeding described in the Disclosure Statement, (iii) actions taken or statements made by the FGIC Parties, the NYSDFS, the Superintendent, the NYLB or any other Person in connection with or in contemplation of the 1310 Order or the Rehabilitation Proceeding, (iv) any ratings downgrade of FGIC or any affiliate thereof, (v) any failure by the FGIC Parties to pay any amount (whether due prior to the 1310 Order, the injunctive relief in the Order to Show Cause or the Order of Rehabilitation, or otherwise) and (vi) the issuance and existence of the 1310 Order.

"**Rehabilitation Proceeding**" means the legal proceeding currently pending before the Court governing the rehabilitation of FGIC, styled as *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012, together with any appeals thereto.

"**Rehabilitator**" means the Superintendent of Financial Services of the State of New York, as Court-appointed rehabilitator of FGIC.

"**Reinsurance Agreements**" means all reinsurance and retrocession agreements (including any and all amendments, endorsements and other modifications thereof) in effect as of the Effective Date pursuant to which FGIC has at any time prior to the Effective Date ceded any risk under or relating to any Policies to any third party.

"**Released Causes of Action**" has the meaning ascribed to such term in Section 7.2 of the Plan.

"**Representatives**" has the meaning ascribed to such term in Section 7.2 of the Plan.

"**Requisite Holders**" means, with respect to any transaction, (i) holders of not less than the percentage of Instruments required under the express terms of the relevant Transaction Documents to direct the Trustee in such transaction to take action or (ii) in the absence of such an express percentage in such Transaction Documents, holders of at least twenty-five percent (25%) of the aggregate outstanding principal amount of such Instruments, in each case for the

A-12

Supreme Court Records OnLine Library - page 56 of 73

purposes of determining the percentage of holders, any holders that are (x) the loan originator, other responsible party or Servicer for the applicable transaction, (y) FGIC or (z) any affiliates of any of the foregoing, shall not be included in any calculation as being holders of Instruments of such transaction.

"**Response**" has the meaning ascribed to such term in Section 4.6 of the Plan.

"**Response Deadline**" has the meaning ascribed to such term in Section 4.6 of the Plan.

"**Restructured Policy Terms**" means the terms and conditions attached to the Plan as **Exhibit B**.

"**RMBS**" means residential mortgage-backed securities.

"**Run-Off Assumptions**" means (i) from the Effective Date until, but not including, the first CPP Revaluation, the assumptions used by the Rehabilitator to prepare the cash flow projections in a Stress Scenario and (ii) from and after the first CPP Revaluation, the assumptions used in the Run-Off Projections, as may be modified pursuant to Section 1.5 of the Restructured Policy Terms.

"**Run-Off Data**" means the data used in the Run-Off Projections, as updated pursuant to Section 1.5(B) of the Restructured Policy Terms.

"**Run-Off Period**" means the period commencing on the Effective Date and ending on the date on which all potential Policy Claims are expected to have matured based on the then-current Run-Off Projections.

"**Run-Off Principles**" means maintaining the CPP at all times at a level designed to ensure that (i) all Policyholders are treated in a fair and equitable manner, including that all holders of Permitted Policy Claims receive the same CPP of their Permitted Policy Claims and (ii) FGIC at all times has Admitted Assets in an amount not less than the Minimum Surplus Position.

"**Run-Off Projections**" means (i) from the Effective Date until, but not including, the first CPP Revaluation, the Rehabilitator's cash flow projections for FGIC during the Run-Off Period based on a Stress Scenario and (ii) from and after the first CPP Revaluation, FGIC's projections of its cash flows during the Run-Off Period based on a Stress Scenario, as may be modified pursuant to Section 1.5 of the Restructured Policy Terms.

"**Schedule of Terminated Contracts and Leases**" means the schedule of contracts and leases included in the Plan Supplement.

"**Secured Claim**" means any Claim that is secured by a lien on collateral to the extent such lien is valid, perfected and enforceable under applicable law and is not subject to avoidance and to the extent of the value of such collateral. If the value of such collateral is less than the amount of the Claim, the Claim in the amount of the deficiency in the value of the collateral shall constitute a Non-Policy Claim or Late-Filed Claim, as applicable.

A-13

Supreme Court Records OnLine Library -  page 57 of 73

"**Servicer**" has the meaning ascribed to such term in Section 3.7 of the Plan.

"**Stress Scenario**" means a non-catastrophic scenario envisioning a severe economic recession that is accompanied by (i) sharp declines in home prices and the financial markets, (ii) significant unemployment, (iii) high mortgage default rates and (iv) other negative economic indicators of potential relevance to FGIC's insured exposures.

"**Subsequent FGIC Payment**" has the meaning ascribed to such term in Section 1.4(B) of the Restructured Policy Terms.

"**Superintendent**" means the Superintendent of Financial Services of the State of New York or his predecessor, the Superintendent of Insurance of the State of New York.

"**Termination Damage Claim**" has the meaning ascribed to such term in Section 5.3 of the Plan.

"**Transaction Documents**" means, with respect to any Policy, the related underlying Instruments, contracts, notes, indentures, trust agreements, certificates, servicing agreements, pooling agreements, collateral agreements, insurance agreements, assignments and/or other agreements, collectively.

"**Trustee**" means the trustee under a pooling and servicing agreement who holds the benefit of the trust fund under such pooling and servicing agreement for certificate holders or the indenture trustee under an indenture who holds a security interest in assets of an issuer of debt Instruments, in each case in respect of Instruments directly insured by FGIC, and in each case including such trustee's or indenture trustee's successors, delegates and assigns (to the extent such delegates or assigns are permitted under the relevant trust agreement).

"**Trust Loan Repurchase Obligation**" has the meaning ascribed to such term in Section 3.7 of the Plan.

"**Undercollateralization Claim**" means a Claim based on the principal amount or value of collateral securing an Instrument being less than the principal amount of such Instrument.

A-14

Supreme Court Records OnLine Library - page 58 of 73

## Exhibit B

**Restructured Policy Terms**

## FINANCIAL GUARANTY INSURANCE COMPANY
## RESTRUCTURED POLICY TERMS

The following terms and conditions (collectively, the "**Restructured Policy Terms**") implement the Policy Restructuring.  The Restructured Policy Terms are part of the Plan and shall, on the Effective Date, bind Policyholders, corporate and other trustees and all other Persons.  Capitalized terms not defined herein shall have the meanings ascribed to them in **Exhibit A** to the Plan.

### ARTICLE I.

### CLAIMS PAYMENTS

### 1.1    CPP.

### A.    Establishment of CPP.

The initial CPP shall be set by the Rehabilitator.  The CPP shall be subject to adjustment pursuant to Section 1.5 hereof.

### B.    Initial CPP Payment.

Promptly following FGIC's determination that all or part of a Policy Claim is Permitted or the date (and to the extent that) a Policy Claim is Permitted pursuant to Section 4.6 of the Plan (as applicable), FGIC shall pay in Cash to the applicable Policy Payee an amount equal to the product of the then-existing CPP and the Policy Claim to the extent Permitted; *provided* that the first date for payment of Permitted Policy Claims shall be a date determined by FGIC that is no later than sixty (60) days after the Claims Resubmission Deadline (the "**Initial Payment Date**").  Notwithstanding the immediately preceding sentence, all Cash payments in respect of Permitted Policy Claims by FGIC shall be subject to adjustment pursuant to Sections 1.4 and 1.5 hereof.

### 1.2    DPO.

The DPO for a Policy shall only be payable by FGIC when, if and to the extent provided herein and in the Plan.  The DPO for a Policy, at any time, shall be (i) reduced by any amounts that (a) would have been payable to the FGIC Parties under such Policy or any related Transaction Document at such time from and after the Effective Date (in each case giving effect to Section 3.5 of the Plan), assuming that FGIC had paid all Permitted Policy Claims in full in Cash (rather than as contemplated herein) and without duplication of any DPO reductions (but without limiting any Cash offsets) pursuant to Section 1.4 or 1.5 hereof and (b) were paid to holders of any Instrument insured by such Policy, (ii) increased or reduced pursuant to Section 1.4 or 1.5 hereof and (iii) to the extent not covered by clause (i) or (ii) of this Section 1.2, otherwise reduced pursuant to the Plan (including pursuant to Section 4.7(B) thereof).  For the avoidance of doubt, clause (i) of this Section 1.2 may be recalculated from time to time.

### 1.3    DPO Accretion.

### A.    Accrual of DPO Accretion.

Each Policy with an outstanding DPO shall accrue an amount based on such DPO at a rate of 3% per annum (on a daily basis on the basis of a 365-day year) ("**DPO Accretion**"). DPO Accretion shall be calculated using the DPO with respect to the applicable Policy as of the preceding June 30 or, with respect to the first year in which there is a DPO under such Policy and until the next June 30, the first date on or after the Effective Date that there is such DPO (the "**First Payment Date**"). DPO Accretion for any Policy shall commence on the First Payment Date for such Policy and continue until such time (if ever) as the DPO for such Policy is permanently reduced to zero. All DPO Accretion shall be calculated on a simple basis rather than a compound basis (*i.e.*, no DPO Accretion shall accrete based on accumulated DPO Accretion). No DPO Accretion shall be added to a DPO, but shall be recorded separately for each Policy in FGIC's books and records.

### B.    Payment of DPO Accretion.

FGIC shall on each DPO Payment Date, for each Policy having outstanding DPO Accretion, pay in Cash to the applicable Policy Payee the DPO Accretion Payment Amount for such Policy based on the CPP Revaluation relating to such date.

### 1.4    FGIC Payments.

### A.    Payment or Setoff of FGIC Payments.

(i)    Each FGIC Payment Payor shall pay, turn over or otherwise remit to the FGIC Parties all FGIC Payments payable or otherwise remittable by such FGIC Payment Payor when due under the applicable Policy or any related Transaction Document, or if such FGIC Payment would have been due prior to the Effective Date, by the fifth Business Day following the first publication of the CPP on or after the Effective Date; *provided, however*, that for the avoidance of doubt, FGIC shall have no right to the portions of the Post-Rehabilitation FGIC Recoveries that do not constitute FGIC Payments, which amounts shall otherwise be applied pursuant to the terms of the Transaction Documents, subject to any adjustments in accordance with Section 1.4(B) hereof.

(ii)    FGIC shall pay, turn over or otherwise remit to each FGIC Payment Payor that made an Excess Payment of which FGIC is aware as of the Effective Date, the amount of such Excess Payment within thirty (30) days following the Effective Date and, to the extent FGIC becomes aware of an Excess Payment after the Effective Date, then FGIC shall pay, turn over or otherwise remit such Excess Payment within thirty (30) days of the date on which FGIC becomes aware of the existence of such Excess Payment.

If either (x) FGIC determines in good faith that, notwithstanding the requirements of clause (i) of this Section 1.4(A), all or a portion of any FGIC Payment has not been paid or otherwise remitted to the FGIC Parties in accordance with such clause (i), or (y) a FGIC Payment Payor determines in good faith that, notwithstanding the requirements of clause (ii) of

B-2

this Section 1.4(A), all or a portion of any Excess Payment has not been paid or otherwise remitted to the FGIC Payment Payor in accordance with such clause (ii), then, in each case, in addition to any other rights or remedies that FGIC or the FGIC Payment Payor may have, Cash payments that would otherwise be payable by FGIC in respect of the applicable Policy, or FGIC Payments that would otherwise by payable by the FGIC Payment Payor in respect of the applicable Policy, shall be reduced by the amount of such unpaid or otherwise unremitted FGIC Payment or Excess Payment, as the case may be. The DPO for that Policy shall be reduced at the time of FGIC's determination that all or a portion of a FGIC Payment was not paid or otherwise remitted in accordance with such paragraph by the amount of such unpaid or otherwise unremitted FGIC Payment, but thereafter shall be increased to the extent that Cash payments in respect of that Policy are reduced pursuant to the preceding sentence.

To the extent FGIC reduces the amount of a Policy Claim that is Permitted by the amount of a FGIC Payment, then such FGIC Payment shall not be subject to the prior two paragraphs.

**B.    Effect of CPP Adjustments on FGIC Payments.**

Within a commercially reasonable time after each CPP Adjustment, FGIC shall take the applicable actions set forth in clauses (i) through (iv) below.

(i)    FGIC shall determine, on a Policy-by-Policy basis, the FGIC Payments that would have been payable to the FGIC Parties as set forth in Section 1.4(A) during the period from and including the Effective Date to and including the date of the CPP Adjustment (the "**Pre-CPP Adjustment Period**") had FGIC paid all Permitted Policy Claims during the Pre-CPP Adjustment Period based on the Adjusted CPP (such amount with respect to a Policy, the "**Adjusted FGIC Payments**");

(ii)    If the Adjusted FGIC Payments for a Policy exceed the FGIC Payments for that Policy payable (whether or not actually paid) by a FGIC Payment Payor to the FGIC Parties during the Pre-CPP Adjustment Period, then (a) FGIC shall promptly notify the applicable Policy Payee and the amount of such excess (a "**FGIC Payment Deficiency**") shall reduce any subsequent Cash payments that otherwise would be payable by FGIC in respect of that Policy (until the amount so reduced equals such FGIC Payment Deficiency) and (b) the DPO for that Policy shall be reduced by the amount of the FGIC Payment Deficiency at the time of FGIC's determination of such amount, but thereafter shall be increased to the extent that Cash payments in respect of that Policy are reduced pursuant to the preceding subclause (a). Reductions to subsequent Cash payments and the DPO as set forth in the preceding subclauses (a) and (b), respectively, shall be the sole means of recovering a FGIC Payment Deficiency;

(iii)    If the FGIC Payments payable (whether or not actually paid) by a FGIC Payment Payor to the FGIC Parties during a Pre-CPP Adjustment Period exceed the Adjusted FGIC Payments for such Policy, then FGIC shall promptly notify the related Policy Payee and the amount of such excess (a "**FGIC Payment Excess**") shall (a) offset any reductions to subsequent Cash payments by FGIC in respect of that Policy (until the amount so offset equals such FGIC Payment Excess) and (b) reduce the DPO for that Policy. Offset to reductions to subsequent Cash payments and reduction to the DPO as

B-3

set forth in the preceding subclauses (a) and (b), respectively, shall be the sole means of recovering a FGIC Payment Excess; and

(iv)   If a FGIC Payment for a Policy becomes payable (whether or not actually paid) by any FGIC Payment Payor after determination of a FGIC Payment Excess or FGIC Payment Deficiency for such Policy but prior to any subsequent CPP Adjustment (each, a "**Subsequent FGIC Payment**"), FGIC shall recalculate the FGIC Payment Excess or FGIC Payment Deficiency taking into account the Subsequent FGIC Payment; *provided* that any such recalculated FGIC Payment Deficiency or FGIC Payment Excess shall give effect to any reductions pursuant to clauses (ii)(a) or (iii)(a) above that occurred prior to such recalculation as a result of the FGIC Payment Deficiency or FGIC Payment Excess that is the subject of such recalculation.

For purposes of clauses (i) through (iv) of this Section 1.4(B), FGIC shall give effect to all other calculations that are required to be made, or actions that are required to be taken, pursuant to Section 1.5 hereof in connection with the applicable CPP Adjustment. The provisions of this Section 1.4(B) shall not apply to FGIC Payments allocable to Policy Claims that were paid in full prior to November 24, 2009.

## 1.5    CPP Revaluations.

FGIC shall re-evaluate the CPP pursuant to the procedures set forth below to determine whether, consistent with the Run-Off Principles, the CPP should remain the same or be adjusted upward or downward (each, a "**CPP Revaluation**"). All CPP Revaluations shall require review and approval by the Board.

## A.    Frequency of CPP Revaluations.

Commencing in 2014, FGIC shall conduct a CPP Revaluation on an annual basis by June 30 of each year (or as soon as practicable thereafter) based on Run-Off Data as of the end of the preceding calendar year. In addition, if FGIC receives within six (6) months after the effective date of a CPP Revaluation or the Effective Date Cash recoveries aggregating $100 million or more than the related Cash recovery amounts, if any, projected in the Run-Off Projections underlying such CPP Revaluation, the Board shall determine whether to cause FGIC to (i) update such CPP Revaluation by giving effect to the full amount of such Cash recoveries (but without updating or otherwise changing any of the Base Scenario, Stress Scenario, Run-Off Projections, Run-Off Data, Minimum Cash Buffer or Run-Off Assumptions used in connection with such CPP Revaluation) and calculate a CPP Upward Adjustment based on the results of such updated CPP Revaluation, which shall be approved by the Board, or (ii) conduct a new CPP Revaluation as soon as practicable thereafter. If the Board determines to update the most recent CPP Revaluation pursuant to clause (i) of the preceding sentence, (x) such updated CPP Revaluation and the related CPP Upward Adjustment shall not be subject to the provisions of Section 1.5(B) and 1.5(C)(i), except that FGIC shall make the calculations prescribed by Section 1.5(B)(iii) and (B)(iv), (y) FGIC shall provide the NYSDFS with written notice of the results of the updated CPP Revaluation and the related CPP Upward Adjustment and (z) FGIC shall not effectuate such CPP Upward Adjustment if the NYSDFS objects thereto within ten (10) days after receiving the notice described in clause (y) or such other time period to which FGIC and the NYSDFS may

B-4

agree. Notwithstanding the foregoing sentences of this paragraph, FGIC shall not conduct any CPP Revaluations if the NYSDFS directs it in writing to refrain from doing so.

**B.    Engagement and Role of CPP Revaluation Firm.**

As part of any CPP Revaluation, FGIC shall engage a qualified, independent firm acceptable to the NYSDFS (a "**CPP Revaluation Firm**") to:

(i)    review the then-current Base Scenario, Stress Scenario, Run-Off Projections, Run-Off Data, Minimum Cash Buffer and Run-Off Assumptions;

(ii)    propose any updates, revisions, corrections or other modifications to the Base Scenario, Stress Scenario, Run-Off Projections, Run-Off Data, Minimum Cash Buffer and Run-Off Assumptions that, in the professional opinion of the CPP Revaluation Firm, are necessary or advisable to correct any errors, reflect events that have occurred or are reasonably likely to occur and ensure that the then-current CPP is set at a level consistent with the Run-Off Principles (collectively, "**Proposed Refinements**");

(iii)    determine, as of the date of such CPP Revaluation, (a) the amount (if any) of Excess Cash available based on the Run-Off Projections, Run-Off Data and Run-Off Assumptions giving effect to the Proposed Refinements and (b) for each Policy, the DPO Accretion Payable Amount, the DPO Accretion Payable Percentage and the DPO Accretion Payment Amount; and

(iv)    recalculate the CPP based on any Excess Cash and the Run-Off Projections, Run-Off Data and Run-Off Assumptions giving effect to the Proposed Refinements.

With respect to clause (ii) of this Section 1.5(B), in reviewing the Run-Off Assumptions, the CPP Revaluation Firm shall in all instances utilize only assumptions that such firm, in its professional opinion, regards as conservative and based on such firm's view of a Stress Scenario rather than a Base Scenario. For purposes of each CPP Revaluation, the CPP Revaluation Firm shall disregard any reductions to DPO made pursuant to Section 1.4(A) and 1.4(B)(ii) hereof.

**C.    Adjustment to CPP.**

(i)    The Board shall review the results of each CPP Revaluation (including the Proposed Refinements) within thirty (30) days following completion thereof and discuss the results with the CPP Revaluation Firm and FGIC's senior management. The Board in good faith shall determine, pursuant to the Run-Off Principles, whether (a) any or all of the Proposed Refinements should be adopted in whole or in part and (b) the CPP proposed by the CPP Revaluation Firm should be adopted or otherwise whether the CPP should remain the same or be adjusted upward or downward (and if so, to what extent). If the Board determines not to adopt certain of the Proposed Refinements, the CPP Revaluation Firm shall then recalculate the CPP based on the Board's determinations as to the Proposed Refinements and shall provide an updated final report with respect to the CPP Revaluation to FGIC. FGIC shall promptly convey in writing the Board's determinations relating to the foregoing to the NYSDFS for approval (each, a "**CPP**

B-5

**Revaluation Filing**"). FGIC shall include with each CPP Revaluation Filing (x) any final reports from the CPP Revaluation Firm relating to such CPP Revaluation (including any Proposed Refinements and CPP calculations), (y) a certification by FGIC's CEO that, to the best of the CEO's information and belief, the adoption or rejection of Proposed Refinements and CPP proposed by the CPP Revaluation Firm are consistent with the Run-Off Principles and (z) other information the NYSDFS may request. FGIC shall make no change to the Run-Off Data (other than corrections), Run-Off Projections, Run-Off Assumptions, Stress Scenario, Minimum Cash Buffer or CPP unless and until such change has been approved by the NYSDFS. Any such change shall become effective on the date indicated by the NYSDFS in its approval thereof or, to the extent not so indicated, on the date FGIC requested, in the CPP Revaluation Filing, that such change become effective.

(ii)    If, as a result of any CPP Revaluation, the CPP is adjusted upward (a "**CPP Upward Adjustment**"), on the related DPO Payment Date, with respect to any Policy as to which FGIC paid any Cash from and after the Effective Date but prior to the CPP Upward Adjustment:

       (a)    FGIC shall pay the Policy Payee Cash in an amount equal to the product of (1) the Adjusted CPP minus the then-current CPP and (2) the Aggregate Claims Amount less the amounts (if any) by which the DPO has been reduced pursuant to Section 1.2(i) hereof, in each case with respect to such Policy as of such date; and

       (b)    the DPO of such Policy shall be reduced by the amount of Cash paid pursuant to clause (a) above.

(iii)    If, as a result of any CPP Revaluation, the CPP is adjusted downward (a "**CPP Downward Adjustment**"), any future Cash payments that would thereafter otherwise be payable by FGIC with respect to Policies as to which FGIC paid any Cash from and after the Effective Date but prior to the CPP Downward Adjustment based on a higher CPP (each, an "**Overpaid Policy**") will be subject to adjustment as described in Section 1.5(C)(iv) below (the "**Equalization Adjustment**").

(iv)    The Equalization Adjustment shall reduce (including to zero) the amount of Cash that would be payable by FGIC with respect to each Overpaid Policy following a CPP Downward Adjustment (whether with respect to future Permitted Policy Claims, amounts that would be payable on future DPO Payment Dates, or otherwise) until such time as the Aggregate Cash Payments Amount for such Policy shall equal the sum of (a) the product of (1) the Aggregate Claims Amount for such Policy as of such time and (2) the Adjusted CPP and (b) any DPO Accretion Payment Amounts that would have been paid with respect to such Policy if, at each CPP Upward Adjustment from the Effective Date through such CPP Downward Adjustment, the CPP had been increased to the lower of (1) the CPP in effect immediately after each such CPP Upward Adjustment and (2) the Adjusted CPP.

Supreme Court Records OnLine Library - page 65 of 73

D.    **Cessation of CPP Revaluations.**

Notwithstanding the other provisions of this Article I, from and after the date on which FGIC reasonably determines that ninety percent (90%) or more of the total anticipated Policy Claims are no longer subject to contingencies or other developments (other than the passage of time and/or the submission of a valid request for payment thereof), unless the value of FGIC's remaining admitted Cash, Cash equivalents, bonds and short-term investments exceeds two hundred percent (200%) of the amount of Cash needed to (i) make payments based on the then-current CPP with respect to all Policy Claims that were (a) Permitted (but not yet paid) on or prior to such date and (b) projected to be Permitted in a Stress Scenario from and after such date through the remainder of the Run-Off Period and (ii) pay operating expenses for the remainder of the Run-Off Period, FGIC shall not be obligated to conduct a CPP Revaluation thereafter (but may continue to conduct CPP Revaluations and make CPP Adjustments thereafter if requested by the NYSDFS or deemed prudent by FGIC with the approval of the NYSDFS). In making such determinations, FGIC shall act in good faith and based on input from the CPP Revaluation Firm. The provisions set forth in this Section 1.5(D) shall not apply to any Final CPP Revaluation.

E.    **Final CPP Revaluation.**

Upon FGIC's reasonable determination that 100% of all anticipated Policy Claims under a Stress Scenario have been submitted, or the deadline for submission of such Policy Claims to FGIC has expired, FGIC shall conduct a final CPP Revaluation (the "**Final CPP Revaluation**"). For purposes of the Final CPP Revaluation, FGIC shall not be required to maintain the Minimum Surplus Position or the Minimum Cash Buffer and FGIC shall consider as assets available for distribution all of FGIC's remaining assets less projected expenses through the end of the Run-Off Period. In determining when to conduct the Final CPP Revaluation, FGIC shall act in good faith and based on input from the CPP Revaluation Firm and with the approval of the NYSDFS.

## ARTICLE II.

## POLICY CRYSTALLIZATION EVENTS

2.1    **Declaration of a Policy Crystallization Event.**

If any Person (other than the FGIC Parties), notwithstanding the injunctive relief and other terms and conditions in the Plan (a) exercises, seeks to exercise or in any manner fails to honor the FGIC Parties' exclusive authority to exercise FGIC Rights or otherwise fails to comply with the injunctive relief set forth in Section 7.8(e) of the Plan, (b) exercises or seeks to exercise any Rehabilitation-Triggered Right, (c) declares or seeks to declare a Rehabilitation-Related Default or (d) interferes or seeks to interfere with the FGIC Parties' pursuit of FGIC Direct Claims (clauses (a) through (d) collectively, "**Purported FGIC Loss of Rights**"), FGIC may declare with respect to such Policy a "**Policy Crystallization Event**" by taking the applicable actions set forth in clauses (i) through (iv) below; *provided, however*, that the exercise by any Person of its rights, if any, under and in accordance with Section 3.7 of the Plan shall not constitute a Purported FGIC Loss of Rights.

B-7

Supreme Court Records OnLine Library - page 66 of 73

(i)    FGIC shall provide written notice to such Person of the Purported FGIC Loss of Rights within sixty (60) days after FGIC becomes aware of the Purported FGIC Loss of Rights (the "**Purported FGIC Loss of Rights Notice**");

(ii)    The Purported FGIC Loss of Rights Notice shall state (a) the nature of the Purported FGIC Loss of Rights, (b) the date(s) on or with respect to which the Purported FGIC Loss of Rights occurred, (c) that such Person has thirty (30) days to cure the Purported FGIC Loss of Rights and (d) the date as of which the Policy Crystallization Event will be effective, which shall be the earliest date on or with respect to which the Purported FGIC Loss of Rights occurred (the "**Policy Crystallization Event Effective Date**"); and

(iii)    If such Person fails to cure the Purported FGIC Loss of Rights, FGIC is permitted to declare a Policy Crystallization Event thirty (30) days after the later of (x) the date of the Purported FGIC Loss of Rights Notice and (y) the final resolution (including exhaustion of any right of appeal) or settlement of any judicial action commenced in accordance with Section 8.1(j) of the Plan, by providing written notice (the "**Policy Crystallization Event Notice**") which shall (a) state that the Purported FGIC Loss of Rights has not been cured and (b) declare that a Policy Crystallization Event has occurred; *provided* that, if a Person seeks a judicial determination in accordance with Section 8.1(j) of the Plan pursuant to clause (iii) of this Section 2.1, during the pendency (including any appeal) of such judicial action all Claims under the Policy subject to the Purported FGIC Loss of Rights Notice, to the extent that such Claims arise from or relate to the actions giving rise to the alleged Policy Crystallization Event, shall be deemed Disputed Claims.

## 2.2    Effect of Declaration of Policy Crystallization Event.

Any Policy Crystallization Event will be effective as of the Policy Crystallization Event Effective Date, as stated in the Purported FGIC Loss of Rights Notice. Following a declaration of a Policy Crystallization Event, FGIC shall determine its anticipated payment obligations under the Policy for the remainder of the expected duration of the Policy (collectively, the "**Estimated Payment Obligations**"). FGIC also shall determine the date on which each Estimated Payment Obligation is anticipated by FGIC to become due (the "**Estimated Payment Schedule**"). FGIC shall determine, in good faith, the Estimated Payment Obligations and Estimated Payment Schedules based on FGIC's reasonable judgment, in each case based on the reserve and related assumptions, calculations and projections as used by FGIC in estimating losses for such Policy in connection with FGIC's quarterly statutory financial statement immediately preceding the Policy Crystallization Event, but ignoring any actual or anticipated effects of any Purported FGIC Loss of Rights giving rise to the Policy Crystallization Event. For the avoidance of doubt, the Estimated Payment Obligations shall not include any amount in respect of termination of a CDS or other swap agreement in contravention of the Plan (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount" or other methodologies).

In respect of each Policy for which a Policy Crystallization Event has been declared, from and after the Policy Crystallization Event Effective Date:

B-8

(i)    a Claim shall be deemed to have been made as of each date on which an Estimated Payment Obligation was anticipated by FGIC to be due based upon the Estimated Payment Schedule and on each date a Claim is properly submitted by the Policyholder, in an amount equal to (a) the lesser of (x) the aggregate Estimated Payment Obligations that were anticipated to be due from and after the Policy Crystallization Event Effective Date through and including such date and (y) the aggregate amount of all Claims properly submitted with respect to events occurring from and after the Policy Crystallization Event Effective Date through and including such date, minus (b) the aggregate amount of all previously Permitted Policy Claims for such Policy with respect to events occurring from and after the Policy Crystallization Event Effective Date through and including such date;

(ii)    no Claims shall be Permitted with respect to such Policy except for those described in clause (i) of this Section 2.2, and, if the Claims discussed in in clause (i) of this Section 2.2 are Permitted pursuant to the Plan, such Permitted Claims shall be treated like other similarly-situated Permitted Claims under the Plan; and

(iii)    FGIC shall be entitled to receive all FGIC Payments arising, accrued or due at any time, whether prior to, on or after the Policy Crystallization Event Effective Date.

## ARTICLE III.

## MISCELLANEOUS

### 3.1    Integration of Plan into Each Policy.

From and after the Effective Date, the Plan shall (i) become part of each Policy and shall supersede any provision of any Policy that is inconsistent with the Plan and (ii) govern treatment of all Claims under Policies that have not been paid in full as of the date of the Order of Rehabilitation.

### 3.2    No Security or Ownership Interest Created.

Neither DPO nor DPO Accretion shall constitute a separate security issued by FGIC or any of its affiliates, be represented by any certificate or other instrument issued by FGIC or any of its affiliates or represent any ownership interest in FGIC or any of its affiliates.  FGIC shall not be required to make any payments with respect to DPO or DPO Accretion to any Person other than to a holder of a Policy.

B-9

Supreme Court Records OnLine Library -  page 68 of 73

# Exhibit C

## Pending RMBS Litigations

**Pending RMBS Litigations**

1. *Financial Guaranty Insurance Company. v. Countrywide Home Loans, Inc.* (N.Y. Sup.Ct., Index No. 650736/2009), which was amended to include allegations against Countrywide Financial Corp., Countrywide Securities Corp, Countrywide Bank, F.S.B. and Bank of America Corp.

2. *Financial Guaranty Insurance Company v. GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation); Ally Bank (f/k/a GMAC Bank); and Residential Capital, LLC (f/k/a Residential Capital Corporation)* (S.D.N.Y. Case No. 11-cv-9729) (relating to GMACM Home Equity Loan Trust 2006-HE1), which was amended to include allegations against Ally Financial, Inc. (f/k/a GMAC, LLC)

3. *Financial Guaranty Insurance Company v. Residential Funding Company, LLC (f/k/a Residential Funding Corporation); and Residential Capital, LLC (f/k/a Residential Capital Corporation)* (S.D.N.Y. Case No. 11-cv-9737) (relating to RAMP Series 2005-RS9 Trust)

4. *Financial Guaranty Insurance Company v. Residential Funding Company, LLC (f/k/a Residential Funding Corporation); and Residential Capital, LLC (f/k/a Residential Capital Corporation)* (S.D.N.Y. Case No. 11-cv-9736) (relating to RFMSII Home Equity Loan Trust 2005-HS1 and RFMSII Home Equity Loan Trust 2005-HS2)

5. *Financial Guaranty Insurance Company v. Ally Financial, Inc. (f/k/a GMAC LLC); Residential Capital, LLC (f/k/a Residential Capital Corporation); and Residential Funding Company, LLC (f/k/a Residential Funding Corporation)* (S.D.N.Y. Case No. 12-cv-0341) (relating to RASC Series 2005-EMX5 Trust)

6. *Financial Guaranty Insurance Company v. Ally Financial, Inc. (f/k/a GMAC LLC); Residential Capital, LLC (f/k/a Residential Capital Corporation;) and Residential Funding Company, LLC (f/k/a Residential Funding Corporation)* (S.D.N.Y. Case No. 12-cv-0338) (relating to RAMP Series 2005-EFC7 Trust)

7. *Financial Guaranty Insurance Company v. Ally Financial, Inc. (f/k/a GMAC LLC); Residential Capital, LLC (f/k/a Residential Capital Corporation); and Residential Funding Company, LLC (f/k/a Residential Funding Corporation)* (S.D.N.Y. Case No. 12-cv-0339) (relating to RAMP Series 2005-NC1 Trust)

8. *Financial Guaranty Insurance Company v. Ally Financial, Inc. (f/k/a GMAC LLC); Residential Capital, LLC (f/k/a Residential Capital Corporation); and Residential Funding Company, LLC (f/k/a Residential Funding Corporation)* (S.D.N.Y. Case No. 12-cv-0340) (relating to RFMSII Series 2005-HSA1 Trust, RFMSII Series 2006-HSA1 Trust and RFMSII Series 2006-HSA2 Trust)

9. *Financial Guaranty Insurance Company v. Ally Financial, Inc. (f/k/a GMAC LLC); Residential Capital, LLC (f/k/a Residential Capital Corporation); Ally Bank (f/k/a GMAC Bank); and GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation)* (S.D.N.Y., Case No. 12-cv-0780) (relating to GMACM Home Equity Loan Trust 2005-HE1)

10. *Financial Guaranty Insurance Company v. Ally Financial, Inc. (f/k/a GMAC LLC); Residential Capital, LLC; and Residential Funding Company, LLC* (S.D.N.Y. Case No. 12-cv-1601) (relating to RASC Series 2007-EMX1 Trust)

11. *Financial Guaranty Insurance Company v. Ally Financial, Inc. (f/k/a GMAC LLC); Residential Capital, LLC (f/k/a Residential Capital Corporation); Ally Bank (f/k/a GMAC Bank); and GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation)* (S.D.N.Y., Case No. 12-cv-1658) (relating to GMACM Home Equity Loan Trust 2006-HE3)

12. *Financial Guaranty Insurance Company v. Ally Financial, Inc. (f/k/a GMAC LLC); Residential Capital, LLC (f/k/a Residential Capital Corporation); Ally Bank (f/k/a GMAC Bank); and GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation)* (S.D.N.Y., Case No. 12-cv-1818) (relating to GMACM Home Equity Loan Trust 2006-HE2 and GMACM Home Equity Loan Trust 2007-HE2)

13. *Financial Guaranty Insurance Company v. Ally Financial, Inc. (f/k/a GMAC LLC); Residential Capital, LLC (f/k/a Residential Capital Corporation); and Residential Funding Company, LLC (f/k/a Residential Funding Corporation)* (S.D.N.Y. Case No. 12-cv- 1860) (relating to RFMSII Home Equity Loan Trust 2006-HI2, RFMSII Home Equity Loan Trust 2006-HI3, RFMSII Home Equity Loan Trust 2006-HI4, RFMSII Home Equity Loan Trust 2006-HI5 and RFMSII Home Equity Loan Trust 2007-HI1)

Supreme Court Records OnLine Library -  page 71 of 73

## Exhibit 2

## Plan Approval Notice

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

                         :     Index No. 401265/2012

In the Matter of the Rehabilitation of     :
FINANCIAL GUARANTY INSURANCE    :
COMPANY.                            :

                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## NOTICE OF PLAN APPROVAL

        BENJAMIN M. LAWSKY, the Superintendent of Financial Services of the State of New York, as the court-appointed rehabilitator (the "**Rehabilitator**") of Financial Guaranty Insurance Company ("**FGIC**") hereby gives you notice that on [_____] [__], 2013, the Honorable Doris Ling-Cohan of the Supreme Court of the State of New York, County of New York (the "**Court**"), signed an order (the "**Plan Approval Order**") (i) approving the proposed First Amended Plan of Rehabilitation for FGIC dated June 4, 2013 (the "**Plan**"), including approving the Novation Agreement[2] and consummation of the transactions contemplated thereby and (ii) terminating the above-captioned rehabilitation proceeding (the "**Rehabilitation Proceeding**") upon the effective date of the Plan (the "**Effective Date**").

        Please take further notice that:

        1.  The Plan Approval Order and the papers upon which it was granted, the Plan, the Plan Supplement and the Disclosure Statement have been posted at www.fgicrehabilitation.com;

        2.  Once the Effective Date occurs, notice thereof and of the termination of the Rehabilitation Proceeding will be posted at www.fgicrehabilitation.com and www.fgic.com;

        3.  All of FGIC's Policies in force as of the Effective Date will be modified by the Plan;

        4.  Upon the Effective Date, all Persons will be permanently enjoined from taking certain actions with respect to FGIC, FGIC Credit Products LLC and the property and businesses thereof, as set forth in the Plan;

        5.  All holders of Claims against FGIC must comply with the deadlines and procedures for submitting Claims that are set forth in the Plan; and

        6.  All requests for further information or questions should be directed to (877) 308-0011 or FGICRehab@gcginc.com.

                                  BENJAMIN M LAWSKY
                                  Superintendent of Financial Services of
                                  the State of New York, as Rehabilitator
                                  of Financial Guaranty Insurance
                                  Company

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Plan.