# Exhibit A

12-12020-mg    Doc 4549-1    Filed 08/07/13    Entered 08/07/13 17:00:41    Exhibit A
Pg 2 of 29

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
J. Alexander Lawrence
Kayvan B. Sadeghi
James A. Newton

*Counsel for the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

-------------------------------------------------------------------

## <u>DIRECT TESTIMONY OF LEWIS KRUGER</u>

I, Lewis Kruger, under penalty of perjury, testify as follows:

### SUMMARY OF TESTIMONY

1.       The FGIC Settlement Agreement, dated May 23, 2013 (the "**Settlement Agreement**"), among (i) the Debtors, (ii) Financial Guaranty Insurance Company ("**FGIC**"), (iii) The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association and Wells Fargo Bank, N.A (collectively, the "**FGIC Trustees**") and (iv) the Institutional Investors (as defined in the Settlement Agreement) is a critically important settlement within this Chapter 11 proceeding.[1]

2.       In my role as Chief Restructuring Officer for the Debtors, I evaluated the Settlement Agreement's terms and conditions and the releases provided therein and concluded that the Settlement Agreement constitutes a fair, equitable and reasonable compromise in connection with the claims that have been asserted by FGIC and by the FGIC Trustees in their respective proofs of claims filed in this case.

3.       Based on my review of the various issues presented by the underlying claims and the positions taken by various parties in this case and the risks associated with litigating those claims, I believe that the Settlement Agreement benefits the Debtors and their creditors by compromising, resolving and eliminating substantial claims that have been asserted by FGIC and the FGIC Trustees against the Debtors' estates.

4.       In addition, the Settlement Agreement is a part of a broader global settlement agreement (as reflected in the Court-approved Plan Support Agreement), which was agreed to by the Debtors and a large number of its creditors and stakeholders and which, if ultimately approved, will generate a significant and substantial benefit to all of the Debtors, the Debtors'

---

[1] Exhibit 1 is the Settlement Agreement.

estates and to their creditors.  As an important part of that global settlement plan, the Settlement

Agreement eliminates the enormous costs and complexities associated with potential future

litigation of claims surrounding the FGIC Insured Trusts, enables the Debtors and their estates to

receive a substantial financial contribution from Ally Financial, Inc. ("**AFI**"), and moves the

Debtors closer to accomplishing a successful plan of reorganization.  Absent the Settlement

Agreement and the overall global settlement, the Debtors' estates would be diminished

significantly and there is very little likelihood that the creditors would see a distribution, if any,

for years to come.

5.      Finally, the parties negotiated and agreed to the Settlement Agreement as part of

the mediation overseen by Judge Peck.  The parties to those negotiations, which lasted several

months, had highly divergent interests.  This is evident by the contentious disputes and issues

that were being litigated in the RMBS Trust Settlement 9019 Motion, and which were ultimately

resolved as part of and as a result of this overall process.  The Debtors and the parties to the

Settlement Agreement, as well as the other parties who were negotiating and ultimately agreed to

the global settlement agreement reflected in the PSA, were represented by competent and

experienced counsel and advisors.  I personally met numerous times with parties and their

counsel during the spring to work on resolving all of these issues.  In making my business

judgment that it was in the Debtors' best interests to enter into the Settlement Agreement, I was

able to draw on that firsthand experience, my work with Debtors' counsel and financial advisors,

my interaction with the Unsecured Creditors Committee and their counsel and advisors, and my

lengthy experience as a bankruptcy and restructuring lawyer.  From my perspective, I believe

that discussions and negotiations over the issues that ultimately lead to the Settlement were

conducted professionally and were done at arm's-length.

## EXPERIENCE AND ROLE

6.      Prior to my engagement as Chief Restructuring Officer ("**CRO**") for the Debtors,

I was a partner and Co-Chair of the Financial Restructuring Group at Stroock & Stroock &

Lavan LLP, a law firm that has extensive experience in all aspects of restructuring and

insolvency matters.  I have over fifty years of restructuring experience and have played a role in

many significant reorganization proceedings in the United States, representing debtors, official

and ad hoc creditors' committees, financial institutions and acquirers of assets.

7.      On February 11, 2013, I was appointed by the Debtors to serve as their CRO.  A

copy of my February 11, 2013 engagement letter, as amended (the "**Engagement Letter**"), is

Exhibit 30.  The Engagement Letter was sent to me by Tammy Hamzehpour, the then General

Counsel for Residential Capital, LLC ("**ResCap**"), and I reviewed and signed the Engagement

Letter to confirm my acceptance and agreement to its terms.  My appointment as CRO for the

Debtors and the terms of my Engagement Letter were approved by the Court on March 5, 2013

(the "Retention Order").  [Docket No. 3013].  A copy of the Retention Order is Exhibit 31.

8.      My Engagement Letter sets out my responsibilities and authority to act on behalf

of the Debtors.  Under the Scope of Services, the Engagement Letter provides that "Mr. Kruger

shall serve as the Chief Restructuring Officer (the "CRO") of the Debtors [and] shall report

directly to the Board Directors of Residential Capital, LLC (the "Board")".  Exh. 30 at 7.  It

further provides that:

> [T]he CRO shall be vested with the Debtors' powers to oversee,
> manage, and direct the acts, conduct, assets, liabilities and
> financial conditions of the Debtors, the operation of the Debtors'
> business [in] any matters relevant to the case, including without
> limitation, the authority to:
>
> i.      direct Debtors' respective management teams and
>         professionals in connection with the Debtors' efforts to
>         negotiate and settle the Claims against the Debtors, and

3

propose a schedule and process for the litigation of
disputed claims, including, but not limited to, those held by
the monolines, junior secured bonds, the RMBS Trustees,
and securities claimants;

ii.    direct the Debtors' executive management teams and
professionals in developing and implementing an efficient
liquidation of the Debtors' assets and of estate causes of
action;

iii.    direct the litigation strategy of the Debtors including the
investigation, prosecution, settlement and compromise of
claims filed against the Debtors and of estate causes of
action;

iv.    direct the Debtors' executive management team and
professionals in formulating a chapter 11 plan;

v.    communicate and negotiate with the Debtors' creditors and
key stakeholders, including the official committee of
unsecured creditors (the "Creditors Committee"), and assist
such parties in working towards a consensual chapter 11
plan;

vi.    make decisions on behalf of each Debtor with respect to
chapter 11 plan negotiations and formulation, in such a
manner as is consistent with the business judgment rule, the
provision of applicable law, taking into account the
respective fiduciary duties of the CRO to each Debtor's
respective estate;

vii.    cooperate with the Creditors' Committee in negotiations
with Ally Financial Inc. ("AFI") to attempt to pursue a
global settlement of the Debtors' claims against AFI that is
acceptable to all major stakeholders;

viii.    represent the Debtors' interests through counsel before this
Court; . . .

*Id.*  My Engagement Letter also makes clear that "[e]ach of the Debtors acknowledges and

agrees that the Services being provided hereunder are being provided on behalf of them, and the

Company, on behalf of each Debtor, hereby waives any and all conflicts of interest that may

arise on account of the Services being provided on behalf of any other entity."  *Id.* at 4.

4

## MY INITIAL WORK AS CRO

9.     Immediately after being retained as CRO, I worked closely with the Debtors' employees, the Debtors' counsel and the Debtors' financial advisors to learn about the Debtors, their businesses and their current condition.  I also spent substantial time familiarizing myself with the prior proceedings in the chapter 11 cases and became directly involved in the ongoing mediation process that was being overseen by Judge Peck.  I also began meeting with the various affiliates (such as AFI) and creditors of the Debtors so that I could better understand the nature of their claims and the Debtors' defenses and responses to those claims.  I also read materials and attended presentations about the Debtors' historical business, the nature of the Debtors' relationships to its affiliates, the RMBS Trusts and Trustees, the monoline insurers, such as FGIC and MBIA Insurance Corporation ("**MBIA**") that insured certain securities in certain of the Trusts, and various other creditors for the Debtors.

10.     I was also actively involved in developing and evaluating strategy in the chapter 11 cases and worked with Debtors' counsel and the Debtors' financial advisors on contested matters before the Court.  For example, in connection with the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [Docket No. 320], I reviewed pleadings filed by the various parties regarding the claims being asserted by the Trustees of the RMBS Trusts against the Debtors.  I read and reviewed the Declaration of Jeffrey A. Lipps, sworn to May 25, 2012 [Docket No. 320-9], the Supplemental Declaration of Jeffrey A. Lipps, dated September 28, 2012 [Docket No. 1887-4] and the Reply Declaration of Jeffrey A. Lipps, sworn to January 15, 2013 [Docket No. 2805], which provided a detailed overview of the types of claims that had been or could be asserted by the Trustees against the Debtors and described the complexities presented by the various litigations addressing those issues.

11.     ==Based on those efforts, my years of experience and my role as CRO for the
Debtors, I have become generally familiar with the parties' respective positions regarding the
priority and nature of the various claims asserted against the Debtors in these chapter 11 cases
(including the claims asserted by FGIC, the other monoline insurers and the FGIC Trustees).==

12.     Because the monoline insurers represent one of the largest creditor groups in the
Debtors' bankruptcy cases, resolution of the monoline claims has been a critical factor in
formulation of a chapter 11 plan and a central focus of my work as CRO.  In connection with
working to formulate a chapter 11 plan, I participated in analyzing the validity, priority and
amount of any claims asserted by the monoline insurers, including FGIC, as well as the
implications of the Bankruptcy Code on the treatment of monoline insurers' claims.  I have also
been involved in the process of (i)  preparing objections to the claims filed by certain monoline
insurers and (ii) planning for anticipated litigation regarding the monolines' claims, including
considering various defenses to those claims such as subordination.

13.     I have also read and reviewed proofs of claims submitted by FGIC in this chapter
11 cases.  Copies of those proofs of claim are identified as Exhibits 2, 3 and 4.  I have also read
and reviewed proofs of claims submitted by Law Debenture Trust Company of New York and
Wells Fargo Bank, N.A., the proofs of claims submitted by U.S. Bank, N.A. and the proof of
claim submitted by Bank of New York Mellon Trust Co., N.A.[2]  Each of these entities acted as
the Trustees for the "wrapped" portions of the FGIC Insured Trusts.  Copies of those proofs of
claim are identified as Exhibits 5, 6, and 7, respectively.  As I described previously, I was aware

---

[2] Law Debenture Trust Company of New York and Wells Fargo Bank, N.A. as Separate Trustee and Trustee and
U.S. Bank N.A. each filed a single proof of claim against fifty-one (51) Debtor entities.  Bank of New York Mellon
Trust Co., N.A. filed two separate proofs of claims against nine (9) of the Debtors.  *See* Claim Nos. 6758-6767 and
6772-6779 filed by Bank of New York Mellon Trust Co., N.A or Bank of New York Mellon; Claim Nos. 6604-6654
filed by Law Debenture Trust Company of New York and Wells Fargo Bank, N.A. as Separate Trustee and Trustee,
respectively, against fifty-one debtor entities; and Claim Nos. 6655-6705 filed by U.S. Bank N.A, against fifty-one
debtor entities.

of the types of claims being asserted by the Trustees, based on my involvement in the RMBS

Trust Settlement 9019 Motion.  To further familiarize myself with the types of claims at issue

with respect to the FGIC Insured Trusts specifically, I also read one of the pre-petition

complaints filed by FGIC against the Debtors.

## MY WORK ON THE GLOBAL SETTLEMENT AGREEMENT

14.    A key part of my role as the Debtors' CRO was to communicate and negotiate

with the Debtors' creditors and key stakeholders with the goal of working towards a consensual

chapter 11 plan.  *See* Exh. 30 at 7.  To do this, I worked hard to understand the claims and

interests of all of those parties and to identify the risks faced by the Debtors in this case and to

consider the potential compromises that could be achieved among the various and competing

constituencies.  My responsibility in this area dovetailed well with the ongoing mediation effort

being directed by Judge Peck.  That process allowed the various parties, which had very

competing and contrary interests, to meet in a confidential forum and to articulate and present

their respective positions and interests.  I attended and took an active role in those sessions.  I

was also able to meet separately with my counsel, my financial advisors and with individual

parties, such as the Unsecured Creditors Committee and their counsel and advisors, and the

monoline insurers and their counsel, to receive presentations about their respective positions and

to help me understand the issues at stake.  As I have noted previously, most, if not all, of those

parties are extremely sophisticated and were represented by experienced counsel and financial

advisors who could advocate on their behalf.

15.    As required by my Engagement Letter, throughout the Spring of 2013, I regularly

met with the Board of Directors of ResCap to update them about this process, the mediation

before Judge Peck and the positions taken by the various parties in the chapter 11 cases.  In those

meetings, I was able to answer the Board's questions and outline our efforts to reach a

consensual global settlement with as large of group of creditors as possible.  Although I had the

authority under my Engagement Letter to negotiate, approve and execute the FGIC Settlement

Agreement on behalf of the Debtors, I kept the Board generally informed about these matters.

For example, in advance of a Board meeting scheduled for May 23, 2013, a copy of a near final

version of the FGIC Settlement Agreement was sent to the Board.[3]

## THE FGIC CLAIMS

16.    As part of the Debtors' mortgage servicing and origination business, Debtors

GMAC Mortgage, LLC ("**GMACM**") and Residential Funding Company, LLC ("**RFC**") acted

in a variety of roles in connection with transactions involving the securitization of residential

mortgages through securitization trusts (the "**RMBS Transactions**").  In conjunction with their

various roles in the RMBS Transactions, certain of the Debtors were parties to applicable

Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures,

Mortgage Loan Purchase Agreements and/or other agreements governing the creation and

operation of the FGIC Insured Trusts (as defined below) (the "**Governing Agreements**").

17.    FGIC, a monoline financial guaranty insurance company, issued irrevocable

insurance policies (the "**Policies**") for certain Securities (as defined in the Settlement Agreement)

issued in connection with certain of the securitization trusts (the "**FGIC Insured Trusts**")

associated with the RMBS Transactions.  There are a total of forty-seven FGIC Insured Trusts.[4]

By issuing the Policies, FGIC guaranteed the payment of principal and interest due on the

---

[3] Exhibit 32 is a true and accurate copy of an email sent by Jennifer Shank, who is on ResCap's Legal Staff, to members of the Board in anticipation of the May 23, 2013 Board meeting.  I was a copy recipient of this email, and I recall receiving it on May 23, 2013.  It was a regular part of ResCap's business to prepare and send emails such as this to members of the Board in connection with upcoming Board meetings.  As indicated under the subject line in Exhibit 32 and in the text of the cover email, attached to that email was a copy of the then draft FGIC Settlement Agreement.  Because the draft FGIC Settlement Agreement was not yet in final form, when this email was produced that attachment was withheld pursuant to the terms of the Order Appointing Mediator, dated December 26, 2012.

[4] *See* Exh. 1 Exh. B; Affirmation of Gary T. Holtzer, dated May 29, 2013, ¶ 4 (the "Holtzer Aff."), which is Exhibit 33 and which is also attached as Exhibit 10 to the FGIC Settlement Agreement 9019 Motion [Docket No. 3929-10].

insured Securities.  Additionally, FGIC entered into an Insurance and Indemnity Agreement with

one or more of the Debtors in connection with each of the FGIC Insured Trusts (the "**Insurance**

**Agreements**").  Pursuant to the Insurance Agreements, the Debtor parties agreed, among other

things, to reimburse FGIC for certain payments FGIC made under the Policies that resulted from

the applicable Debtor's failure to repurchase or substitute mortgage loans that breached one or

more representations or warranties contained in the applicable Governing Agreements.

18.     Prior to the date on which the Debtors filed their petitions in these chapter 11

cases (the "**Petition Date**"), FGIC had filed a total of twelve civil suits asserting a variety of

claims against ResCap, GMACM, and RFC in connection with twenty of the FGIC Insured

Trusts.  The actions are currently pending in the United States District Court for the Southern

District of New York, and each action has been automatically stayed as against the Debtors.  As

of the Petition Date, the Debtors had not yet filed responsive pleadings or commenced discovery

in any of the FGIC actions.

19.     FGIC filed three proofs of claim numbered 4868, 4870 and 4871 against Debtors

RFC, ResCap and GMACM, respectively (collectively, the "**FGIC Claims**"), asserting general

unsecured claims against each such Debtor.  *See* Exhs. 2, 3 and 4.  The FGIC Claims, are all

substantially similar in form and nature and allege that: (i) RFC and GMACM breached various

representations, warranties and/or covenants in the Governing Agreements or the offering

documents, (ii) FGIC was fraudulently induced to issue the Policies in connection with most of

these FGIC Insured Trusts, and (iii) ResCap is liable for the alleged breaches and fraud of

GMACM and RFC under alter ego liability theory.  They also each assert that "because

GMACM and RFC were acting at the direction of ResCap, ResCap may be jointly and severally

liable to FGIC for the harms FGIC has suffered from the fraudulent inducement committed by

GMACM and RFC." *See, e.g.*, Exh. 2 at 13 ¶ 32. FGIC also asserts claims related to the

Debtors' allegedly deficient servicing of the mortgage loans in the FGIC Insured Trusts and

based on the Debtors' alleged failure to provide FGIC access to certain information in

accordance with the Governing Agreements. FGIC further seeks indemnification for "any and

all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or

relating to the breach" of the Governing Agreements. *Id*. at 14.

20.      In total, the FGIC Claims assert claims of "not less than $1.85 Billion" against

each of RFC, ResCap and GMACM. *See, e.g.*, Exh. 2 at 15. It is my understanding that the

aggregate amount of each of the FGIC Claims was determined by FGIC by calculating the total

expected lifetime claims against FGIC under the Policies and adding estimated interest and costs

that FGIC has incurred or expects to incur in connection with pursuing the claims. I further

understand that the total expected claims included historical claims received plus the present

value of the difference of (i) the projected expected future claims less (ii) expected future

premiums. *See, e.g., id.* at 14-15.

21.      In addition, it is my understanding that as of November 2009, and pursuant to an

order issued by the Superintendent of Financial Services of New York under Section 1310 of the

New York Insurance Law, dated November 24, 2009, FGIC ceased making payments on all

claims, including claims made by the FGIC Trustees under the Policies. As of that date, FGIC

represents that it had paid approximately $343.3 million in claims to the insureds under the

Policies for which it had not been reimbursed. As of March 31, 2013, FGIC represents that it

had received approximately $789 million in claims under the Policies that it had not yet paid.

*See* Exh. 1 at 1. Absent the settlement, discharge and release of FGIC's obligations under the

Policies, I understand that FGIC estimates that the present value of losses projected to arise

under the Policies in the future exceed $400 million.  See Exh. 33, Holtzer Aff. ¶ 5.

## THE RMBS TRUSTS' CLAIMS IN CONNECTION
## WITH THE FGIC TRANSACTIONS

22.    In addition to and separate from the claims asserted by FGIC in this chapter 11

case, each of the FGIC Trustees have asserted claims and have filed proofs of claim with respect

to the forty-seven FGIC Insured Trusts (the "**FGIC Trustees' Claims**").  Copies of those FGIC

Trustees' Claims are Exhibits 5, 6 and 7.  In their proofs of claim, the FGIC Trustees assert

servicing claims, representation and warranty claims, indemnification claims, fraud and

negligent misrepresentation claims, alter ego and veil piercing claims, setoff and recoupment

rights, among others, with respect to the forty-seven FGIC Insured Trusts.  *See, e.g.,* Exh. 5 at 14

¶¶ 32-33.  While the proofs of claim do not indicate an aggregate amount of damages being

sought, with respect to just the representation and warranty claims, each of the FGIC Trustees

assert a "Buyback Claim for an amount not less than its allocable portion of the Allowed

Repurchase Claim of $8.7 billion", which was at issue in the RMBS Trust Settlement 9019

Motion.  *Id.* at 15 ¶ 36.  Moreover, the FGIC Trustees have maintained throughout the case that,

in the absence of the proposed RMBS Trust Settlement, their asserted claims against each of

multiple Debtors in connection with the FGIC Insured Trusts could be equal to the aggregate

estimated lifetime reductions in the value of the collateral pools underlying those trusts.

23.    Based on my involvement in the RMBS Trust Settlement dispute, I was aware

that FGIC Insured Trusts represented roughly ten percent of the 392 trusts in the RMBS Trust

Settlement at issue in the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of

RMBS Trust Settlement Agreements* [Docket No. 320].  I also understood that those 392 trusts

had by April of 2013 suffered "over $30 billion in collateral losses" and "depending on what

assumptions are used, they [would] lose another $13.5 billion to $19.8 billion in coming years."

*Debtors' Reply Brief re Iridium Factors in Support of Motion for Approval of RMBS Settlement*

*Agreements* [Docket No. 2803]. Thus, for those 392 trusts, total aggregate losses would "range

(depending on the witness's assumptions and methods) from $43.5 billion to $49.8 billion." (*Id.*)

With this in mind, I understood that the total potential lifetime losses of collateral for the FGIC

Insured Trusts could likely be $3 to $4 billion dollars. Thus, I understood that, if the parties

were not able to reach an agreement to resolve the claims involving the FGIC Insured Trusts, the

FGIC Trustees' claims against the Debtors would be substantial and likely in the billions of

dollars, something that I considered and took into account when evaluating the FGIC Settlement

Agreement.

24.    In support of this Motion, the Debtors retained a financial expert, Dr. Ron D'Vari,

to provide an estimate of the total potential lifetime losses of collateral for the entire forty-seven

FGIC Insured Trusts. Based on the positions taken by the FGIC Trustees, this figure would

arguably represent the maximum amount that the Trustees could attempt to seek from the

Debtors resulting from collateral losses. Dr. D'Vari determined from publicly-available data that

the FGIC Trustees have already incurred several billion dollars of collateral losses with respect

the FGIC Insured Trusts and estimated that the total potential lifetime loss of collateral for the

FGIC Insured Trusts could total approximately $5.41 billion, the vast majority of which would

be released by the Settlement Agreement. While I did not have and, therefore, did not consider

Dr. D'Vari's calculations and estimates at the time I made the decision to enter into the FGIC

Settlement, his analysis and opinions are consistent with what I knew based on my involvement

in the RMBS Trust Settlement dispute. I also believe that Dr. D'Vari's conclusions confirm and

reinforce the view that, under the Settlement Agreement, the Debtors are receiving releases from the FGIC Trustees of substantial claims.

## THE FGIC SETTLEMENT

25.    In early April 2013, and in connection with the mediation process overseen by Judge Peck, I became aware of a prospective settlement between FGIC and the FGIC Trustees. While I had been aware of discussions regarding the possible settlement of the FGIC Claims earlier in March, this was the first time that I saw a written document with respect to that potential, prospective settlement.  As reflected in the PSA, the Term Sheet and the Supplemental Term Sheet and as part of the global settlement plan, the Settling Parties ultimately agreed in May 2013 to a proposed settlement of the monoline claims generally that will be part of the global settlement plan and ultimate plan confirmation process.  This global settlement plan contemplates and includes a resolution of any claims involving the FGIC Insured Trusts.

26.    In early April 2013, I learned that, because of the schedule of the ongoing FGIC Rehabilitation Proceeding in New York State Court, the FGIC settlement portion of the global settlement plan would have to be incorporated into a separate settlement agreement and separately presented to the Bankruptcy Court for approval in advance of the plan confirmation process.  Thus, concurrently with the negotiations leading up to the completion of the Supplemental Term Sheet during the period between May 13 and May 23, 2013, the Settlement Parties negotiated the terms of a separate settlement agreement involving the FGIC Insured Trusts that was acceptable to all of the Settlement Parties and supported by most of the Debtors' claimant constituencies, including each of the parties to the PSA.  That separate agreement is the Settlement Agreement at issue in this Motion.  (*See* Exh. 1.)  While the signature pages for the Settlement Agreement are dated May 23, I recall that minor changes to the language of the Settlement Agreement continued to be made through and including May 29, 2013.

13

27.     As discussed in more detail below, the Settlement Agreement consists of three principal parts: (i) allowance of the FGIC Claims against certain of the Debtors' estates in the minimum aggregate amount of $596.5 million (the "**Minimum Allowed Claim Amount**"), subject to FGIC's reservation of its rights to assert certain additional claims and the allowance of FGIC's claims in a larger amount in the event that the PSA is terminated or the plan contemplated thereunder is not approved; (ii) the settlement, discharge and release of FGIC's obligations under the Policies in exchange for a bulk, cash payment of $253.3 million from FGIC to the FGIC Trustees; and (iii) the release against the Debtors' estates of the remainder of the FGIC Claims and the vast majority of the FGIC Trustees' Claims.

28.     I understand that the Settlement Parties calculated this base $596.5 million allowed claim by taking the sum of $343.2 million, the amount of claims FGIC has already paid under the Policies but that remains unreimbursed by the Debtors (*see* Exh. 1 at 1), and $253.3 million, the amount of the Settlement Payment provided for under the Settlement Agreement (*id.* at 6).

29.     The Settlement Agreement also includes a definition of its "Effective Date", which is the first Business Day on which all of the conditions in Section 6.01 have been satisfied or waived.  Those conditions are that the New York State Rehabilitation Court has entered an order approving the Settlement Agreement and that order has become a final order and that the Bankruptcy Court has entered an order approving the Settlement Agreement and that order has become a final order.  (*See* Exh. 1 at 12-13.)  The Effective Date of the Settlement Agreement is not conditioned on the completion of the plan confirmation process or on the global settlement plan contemplated in the PSA being approved or becoming effective.

14

**The FGIC Allowed Claims**

30.     The first key component of the Settlement Agreement is the allowance of the
FGIC Claims in an amount that is significantly less than the total asserted amount of the FGIC
Claims filed in the chapter 11 cases.  Ultimately, the amount of the FGIC Allowed Claims will
depend on whether or not the plan contemplated in the PSA is or is not ultimately approved as
part of a plan confirmation process and becomes effective.

31.     The Settlement Agreement provides that, as of the Effective Date, the FGIC
Claims shall be deemed allowed as general unsecured claims against each of ResCap, GMACM
and RFC in the aggregate amount of $596.5 million, which I will refer to as the "Minimum
Allowed Claim Amount".  This Minimum Allowed Claim Amount will be allocated among
ResCap, GMACM and RFC pro rata based on which of the Debtors would be obligated to
reimburse FGIC for such payments under the Governing Agreement.  The Minimum Claim
Amount essentially becomes a floor for the amount of the claims that FGIC can assert against the
Debtors if the Settlement Agreement is approved and is substantially less than the $1.85 billion
in claims that FGIC has asserted against each of ResCap, GMACM and RFC under its proofs of
claim.

32.     The Settlement Agreement further provides that, if the PSA is terminated or the
plan contemplated under the PSA does not "go effective", then in addition to the single allowed
claim of $596.5 million, FGIC reserves the right to assert general unsecured claims against each
of ResCap, GMACM and RFC "with all claims by FGIC (including any FGIC Allowed Claims
or otherwise) against each such entity capped in each case at the amount of" $596.5 million.
Under this scenario, the Minimum Allowed Claim Amount will be treated *pari passu* with other
unsecured claims allowed against ResCap, GMACM and RFC.  Nothing in the Settlement
Agreement, however, prevents the Debtors from objecting to or otherwise seeking subordination

15

of any unsecured claims asserted by FGIC in excess of the Minimum Allowed Claim Amount.
Thus, the terms of the Settlement Agreement essentially sets a ceiling with respect to the claims
that FGIC can ever assert against the Debtors if the Settlement Agreement is approved. Again,
even this amount is substantially less the $1.85 billion in claims that FGIC has asserted against
each of ResCap, GMACM and RFC under its proofs of claim.[5]

### The Settlement, Discharge and Release of
### FGIC's Obligations Under the Policies

33.    The second element of the Settlement Agreement is a settlement, discharge and
release of FGIC's obligations under the Policies. In this regard, FGIC will obtain releases of its
obligations under the Policies, in exchange for a bulk, cash payment from FGIC to the FGIC
Trustees in an amount of up to $253.3 million (the "**Settlement Payment**"). Upon the effective
date of the Settlement Agreement, this settlement, discharge and release will prevent any further
claims against FGIC under the Policies, ending any further accrual of claims FGIC alleges it
holds against the Debtors.

### Release of Claims Against the Debtors

34.    I believe that a substantial benefit to the Debtors and the Debtors estates are the
releases that they are receiving under the Settlement Agreement. These releases become
effective and binding as of the Effective Date of the Settlement Agreement. Subject to the terms
and conditions of the Settlement Agreement, FGIC has agreed to a reduction of its total, asserted
claims in the aggregate amount of $5.55 billion (proofs of claim totaling $1.85 billion against

---

[5] Section 3.01(B) of the Settlement Agreement states that, if the Court approves the Plan Support Agreement and the
chapter 11 plan contemplated thereby becomes effective, the amount of the FGIC Allowed Claims will be specified
and will be the aggregate and allocated amounts set forth in the Supplemental Term Sheet, as such amounts may be
adjusted, amended or revised by agreement of the parties to such agreement. Because the effectiveness of the
Settlement Agreement is not dependent upon approval of the chapter 11 plan contemplated in the PSA, whether or
not these numbers will be allowed and/or whether they are appropriate, is a plan confirmation issue only and is not
required to be resolved to approve the Settlement Agreement.

each of ResCap, GMACM and RFC) to a specified range as described in Section 3.01 of the Settlement Agreement and to release any and all other claims against the Debtors and their estates under the Governing Agreements and the Policies. (Exh. 1 §§ 2.01(a)(i), (ii), (iii) & 2.01(b).) Additionally, the FGIC Insured Trustees agree to release all of their "origination-based" claims the FGIC Trustees have asserted in connection with the FGIC Insured Trusts, less the amount of any claims under the Governing Agreements for any past or future losses to holders of Securities not insured by the Policies. (Exh. 1 §§ 2.01(a)(iv) & 2.01(b).) Using the amounts sought by FGIC as against each Debtor in its proofs of claims and the lifetime estimated loss of collateral for the FGIC Insured Trusts calculated by Dr. D'Vari, this means that each of the Debtors will obtain a release of claims asserted by FGIC and the FGIC Trustees, in varying amounts of up to approximately $6.85 billion against any one Debtor, less the maximum claim FGIC is permitted to assert against that Debtor under Section 3.01 of the Settlement Agreement.

## ENTRY INTO THE FGIC SETTLEMENT AGREEMENT

35.     Pursuant to the authority given to me by the Board as approved by the Court in the Retention Order, I was responsible for negotiating with the Debtors' creditors and key stakeholders as part of working toward a consensual chapter 11 plan and to make decisions on behalf of the Debtors, and pursuant to and consistent with my business judgment, to negotiate and settle claims against the Debtors when appropriate. I took that responsibility seriously and actively engaged with my counsel and financial advisors and with the representatives, counsel and advisors of the Debtors' creditors and key stakeholders for months to work toward a global settlement plan. I am proud of the work we did, and I believe that the result of those efforts, which includes negotiating and entering into the Settlement Agreement, represents a unique accomplishment.

17

36.    Consistent with my authority as CRO, I reviewed, approved and executed the
PSA and I reviewed, approved and executed the Settlement Agreement involving the FGIC
Insured Trusts.  While the Settlement Agreement was provided to the Board in advance of the
May 23, 2013 Board meeting (Exh. 32), ultimately it was my responsibility as CRO to decide
whether the Settlement Agreement was reasonable, fair and equitable and in the best interests of
the Debtors and their estates.  After careful consideration, I concluded that the Settlement
Agreement more than met that test.  My conclusion is based on my careful review of the
financial and other terms of the Settlement Agreement, the proofs of claims submitted by FGIC,
my understanding of the claims asserted by FGIC and the FGIC Trustees, my assessment of the
strengths and weaknesses of those claims and any defenses to those claims, the risk and costs of
having to litigate those claims and the consequences of not settling.  My views were also
informed by discussions with my counsel and financial advisors and with the other parties and
constituencies involved in the effort to reach a global settlement.  While the Settlement
Agreement is being presented for purposes of this Motion as a stand-alone agreement, it is part
and parcel of the overall effort to reach a global settlement plan.  Although I consulted with
counsel and the Debtors' advisors, and participated in the long mediation process, I relied on and
exercised my own independent business judgment in ultimately determining that entry into the
Settlement Agreement was appropriate and in the best interests of the Debtors and their creditors.

37.    With respect to the benefits resulting to the Debtors and the Debtors' estates by
entering into the Settlement Agreement, I believe we were successful in substantially reducing
and limiting the amount and scope of claims faced by the Debtors.  Even though the Debtors
believe they have substantial factual and legal defenses to the claims asserted by FGIC and the
FGIC Trustees, I recognized and evaluated the risk that those claims, which totaled billions of

dollars in the aggregate, would present if successfully litigated to conclusion as part of a contested plan.  FGIC itself has asserted claims of $1.85 billion against each of ResCap, GMACM and RFC.  While the FGIC Trustees never placed a monetary value on their claims in their proof of claims, they have consistently asserted that they could seek recovery for any and all loss of collateral value under the Trusts.  Based on my review of materials in the RMBS Trust Settlement 9019 Motion, I understood that those losses could be between $3 to $4 billion.  As separately confirmed by Dr. D'Vari, those potential lifetime losses of collateral could total up to approximately $5.41 billion, the vast majority of which would be released by the Settlement Agreement.  I considered the potential risk that these claims might be successfully pursued against each of the Debtors when evaluating whether the agreed upon allowed claims in the Settlement Agreement were fair and reasonable and were in the best interests of the Debtors and their estates.

38.    In addition, under the terms of the Settlement Agreement, FGIC will be completely releasing all of its claims against the Debtors and the FGIC Trustees will be releasing all of their origination based claims against the Debtors.  By obtaining these releases, the Debtors would resolve a substantial number of difficult and complex claims and avoid the risk, costs and time of litigating those claims to conclusion in this Court.  As described by Mr. Lipps, the types of claims that have been asserted by FGIC and the FGIC Trustees are complex and multi-faceted and present no easy pathway to resolution.  Consistent with my authority and direction from the Board, I believe that resolving these difficult and complex issues as part of an overall consensual plan is in the best interests of the Debtors, the Debtors estates and the Debtors' creditors.

39.    In addition, I believe that the other, remaining terms of the Settlement Agreement —such as the provisions to obtain Court approval, the conditions precedent to the Effective Date

of the Agreement and the termination provisions under the Settlement Agreement—are reasonable, fair and equitable, and protect the interests of the Debtors and their estates.

40.    Finally, as I noted previously, I am aware that the Settlement Agreement is part of an overall global settlement plan that, if ultimately approved as part of the plan confirmation process, will generate significant benefits to all of the Debtors' estates and to their creditors.  In facilitating and supporting that global settlement plan, the Settlement Agreement allows the parties to eliminate enormous potential costs associated with future litigation involving the overall estates, enables the parties to receive a substantial $2.1 billion contribution from AFI, and moves the Debtors one step closer to accomplishing a successful chapter 11 plan.  Further, absent the Settlement Agreement and the overall global settlement, there is very little likelihood that any of the creditors (including the FGIC Insured Trusts and the investors in those Trusts) would see a distribution for years to come, and the estates would be diminished significantly. This alternative of endless litigation among the creditors and Debtors, and no resulting contribution from AFI in the Debtors' estates, is, in my judgment, a much worse alterative for all participants in this process.

41.    I am also aware that, in the proposed order submitted to the Court in connection with this Motion seeking approval of the Settlement Agreement, the Court has been asked to make certain findings not only with respect to the Debtors, the Debtors' estates and the Debtors' creditors, but also with respect to the Trustees and the investors in the FGIC Insured Trusts. While I cannot speak on behalf of the FGIC Trustees and/or the investors in the FGIC Insured Trusts, I am able to give my views, based on my perspective, of how this Settlement Agreement impacts those entities.  First, as I describe above, I believe that the Settlement Agreement is in the best interests of the Debtors and their creditors and substantially increases the potential

20

recovery by those creditors.  While those enhanced recoveries will flow to the FGIC Insured Trusts, under the operative Governing Agreements and/or under the terms of the global settlement plan (which incorporates and reflects the benefits of and recoveries under the Settlement Agreement), those enhanced recoveries will ultimately flow to the benefit of the investors in those FGIC Insured Trusts.  I also note that, one of the signatory groups to the Settlement Agreement is the "Institutional Investors", which is defined in the Settlement Agreement to be "the authorized investment managers and certificateholders, bondholder and noteholders in tranches of Securities insured by FGIC identified in the attached signature page." These groups of investors in the FGIC Insured Trusts, which were represented by Kathy Patrick at Gibbs & Bruns LLP, Talcott Franklin of Talcott Franklin P.C., and Ropes & Gray are themselves signatories and supporters of the Settlement Agreement, demonstrating that, in their judgment, the Settlement Agreement is in the best interests of the Investors in the FGIC Insured Trusts.

42.     Similarly, based on my dealings with counsel for the FGIC Trustees, I believe that the FGIC Trustees acted professionally and in good faith.  The three FGIC Trustees—Bank of New York, Wells Fargo and U.S. Bank—are some of the largest and most sophisticated financial institutions in the country.  They were all represented by sophisticated counsel and engaged with and were assisted by extremely competent and professional financial advisors.

43.     Additional benefits, and aspects, of the Settlement Agreement that informed my belief that it was fair and reasonable, are discussed below.

## THE IRIDIUM FACTORS

### The Balance Between the Litigation's Possibility
### of Success and the Settlement Agreement's Future Benefits

44.     As described in more detail by Mr. Lipps, I understand there is significant
uncertainty regarding the outcome of any litigation addressing the validity, priority and amount
of the FGIC Claims and the FGIC Trustees' Claims through the claims resolution process.  In
part due to this uncertainty, I, along with the Debtors, believe that the Settlement Agreement
provides substantial benefits to the Debtors, the Debtors' estates and their creditors.

45.     After reviewing the FGIC Claims, the claims submitted by FGIC pre-petition,
some of the filings in the RMBS Trust Settlement 9019, the Governing Agreements for the FGIC
Insured Trusts, and past adverse rulings for the monoline insurers, the Debtors believe that they
have strong defenses to those claims.  If forced to litigate, the Debtors would mount a vigorous
defense.  Nonetheless, I understand that the issues that would be involved in litigating the FGIC
Claims and/or the FGIC Trustees' Claims are likely to be fact-intensive in nature and the legal
issues involved are relatively novel.  I am also aware of various settlement trends in monoline
cases.  Accordingly, I, along with the Debtors, understand that litigation involving these types of
monoline claims would involve substantial litigation risk.  In fact, I understand that the results of
litigation among other RMBS sponsors and monoline insurers and/or securitization trustees have
resulted in some unfavorable outcomes for RMBS sponsors.  As a result, the Debtors and I
believe that they would face substantial litigation uncertainty and risk in connection with
litigating these issues.

46.     On the other hand, I, along with the Debtors believe that the Settlement
Agreement provides substantial benefits to their estates and their creditors.  In particular, the
Settlement Agreement provides benefits in the form of (i) a substantial reduction of claims

asserted against each of the Debtors' estates as described above, (ii) increased certainty regarding the validity, priority and amount of the FGIC Claims and the FGIC Trustees' Claims and (iii) substantial cost savings when compared with the likely costs of professional fees and experts that would be needed if litigation over the FGIC Claims and the FGIC Trustees' Claims proceeded. I believe that the alternative of not entering into the Settlement Agreement and, possibly not obtaining the advantages of the global settlement plan, is not in the best interests of the Debtors, the Debtors' estates and/or the Debtors' creditors.

**The Likelihood of Complex and Protracted Litigation**

47.    The ongoing disputes in recent years among mortgage originators on the one hand, and monoline insurers and securitization trustees on the other, are well publicized. A number of the lawsuits and other proceedings involving RMBS breach of representation and warranty and fraudulent inducement allegations against mortgage originators have been ongoing for years, in many cases without resolution. Indeed, based on my review of information from the RMBS Trust Settlement 9019 and as described in more detail in Mr. Lipps' testimony, I understand that, as of the Petition Date, the Debtors were involved in litigation with MBIA that had been pending since late 2008 and that had the prospect of continuing on for years if it had not been stayed.

48.    The Debtors' litigation with FGIC, on the other hand, commenced shortly before the Petition Date. As of the Petition Date, the Debtors had not yet filed responsive pleadings and discovery had not yet commenced. Similarly, I am not aware of any lawsuits commenced by the FGIC Trustees as of the Petition Date in connection with the breach of representation and warranty claims related to the FGIC Insured Trusts. As a result, absent a settlement, the Debtors are almost certain to become embroiled in additional, complex litigation with FGIC and the FGIC Trustees over the validity, amount and possible subordination of their asserted claims.

49.    Given the highly fact intensive nature of RMBS litigation, the litigation is also almost certain to be complex and protracted.  As described further in the Mr. Lipps' Declaration and in his direct testimony, the Debtors have experienced such litigation first-hand with MBIA, which spanned three and a half years leading up to the Petition Date.  The discovery necessary to resolve the FGIC Claims and the FGIC Trustees' Claims—along with the various pleadings and hearings necessary for the Court to decide the allowed amount of the FGIC Claims and the FGIC Trustees' Claims being released—would be massive, as each of the forty-seven FGIC Insured Trusts have different Governing Agreements and factual underpinnings, especially with respect to the fraud claims.

50.    In sum, litigation regarding the validity, amount and priority of the FGIC Claims, as well as the FGIC Trustees Claims' being released, would almost certainly be exceedingly complex and could drag on for years, much like other lawsuits of a similar nature that are currently pending in other state and federal courts.  Finally, as with any other complex litigation that extends for years, the expenses associated with any litigation of the FGIC Claims and the FGIC Trustees Claims' being released would almost certainly be high, inconvenient and, given the asserted size of those claims, could result in a delay of distributions to other creditors even in the event of a confirmed chapter 11 plan.

### The Paramount Interests of Creditors

51.    In my role at CRO for the Debtors, I take seriously my role to try to reach a fair and equitable resolution of claims brought against the Debtor and, if possible, to enter into a consensual chapter 11 plan that has the support of Debtors' creditors.  I believe that entering into the Settlement Agreement is consistent with those goals.  As described above, the Settlement Agreement resolves substantial claims against the Debtors' estates—in varying amounts of up to $6.85 billion against each Debtor, less the maximum claim FGIC is permitted to assert against

24

that Debtor under the terms of the Settlement Agreement.  Obtaining the releases in the Settlement Agreement insures that the Debtors will not have to litigate and face the risk of being responsible for the full amount of claims originally asserted by FGIC and the FGIC Trustees.

52.        As a result, relatively few claims against the Debtors will remain in connection with the FGIC Insured Trusts, limited to an amount between (i) the Minimum Allowed Claim Amount and the claims that FGIC is allowed to assert in the event that plan contemplated under the PSA does not become effective, (ii) certain servicing claims held by the FGIC Trustees, and (iii) claims attributable to losses by holders of Securities not insured by the Policies.  The FGIC Trustees will receive $253.3 million in cash compensation *from FGIC* and will be relieved of the responsibility of having to continue to pay premiums on the Policies.  I, along with the Debtors, believe that the Settlement Agreement represents a compromise that is in the paramount interests of creditors.

53.        Moreover, as described above, the Settlement Agreement is part of the global settlement plan that, if ultimately approved, will bring substantial, additional benefits to the Debtors' creditors.  While the approval of that global settlement plan is not before the Court on this Motion and will have to wait for the plan confirmation process, entry into and approval of the Settlement Agreement is a necessary and required step.

**Support of Other Parties-in-Interest for the Settlement Agreement**

54.        The Settlement Agreement has support from entities that hold or represent the holders of the overwhelming majority of claims asserted in the Debtors' chapter 11 cases.  Each of the Debtors' claimant constituencies that have signed on to the PSA also support the Settlement Agreement, including:

(a)    the Creditors' Committee;

(b)    AFI, on behalf of itself and its direct and indirect non-debtor subsidiaries;

(c)     Allstate Insurance Company and its subsidiaries and affiliates;

(d)     American International Group, as investment advisor for certain affiliated entities that have filed proofs of claim in the Debtors' chapter 11 cases;

(e)     the Kessler Class Claimants (as defined in the Plan Support Agreement);

(f)     Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates;

(g)     MBIA and its subsidiaries and affiliates;

(h)     Prudential Insurance Company of America and its subsidiaries and affiliates;

(i)     certain funds and accounts managed by Paulson & Co. Inc., holders of Senior Unsecured Notes issued by ResCap;

(j)     the RMBS Trusts (as defined in the Plan Support Agreement);

(k)     certain holders of the Senior Unsecured Notes issued by ResCap;

(l)     the Steering Committee Consenting Claimants (as defined in the Plan Support Agreement);

(m)     the Talcott Franklin Consenting Claimants (as defined in the Plan Support Agreement); and

(n)     Wilmington Trust, National Association, not individually, but solely in its capacity as Indenture Trustee for the Senior Unsecured Notes issued by ResCap.

**Nature and Breadth of Releases To Be Obtained by Officers and Directors**

55.     The releases of the Debtors' officers and directors in the Settlement Agreement are reasonable and, based on my understanding, consistent with releases in settlement agreements approved in other cases in this district, providing only for voluntary releases by the non-debtor Settlement Parties.

**Competency and Experience of Counsel**

56.     All of the Settlement Parties were represented by competent and experienced counsel throughout the negotiation of the FGIC Settlement Agreement.  I personally have over fifty years of experience as a practicing attorney in restructuring matters.  The Debtors were

represented by competent and experienced counsel.  Based on my involvement and interactions,

I believe that the Superintendent of Financial Services of New York, as Rehabilitator of FGIC;

the Bank of New York Mellon; the Bank of New York Mellon Trust Company, N.A.; Law

Debenture Trust Company of New York; U.S. Bank National Association; Wells Fargo Bank,

N.A.; the Steering Committee Consenting Claimants and the Talcott Franklin Consenting

Claimants were all represented by competent and experienced counsel.

**Arm's-Length Negotiations**

57.    From my perspective, I believe that the Settlement Agreement and the

compromises reflected in that agreement are the result of arm's-length negotiations.  As I

described previously, this Settlement Agreement arose out of the broader discussions in the

mediation being directed by Judge Peck, which was a very vigorous, robust process that went on

for months.  A substantial number of different parties engaged in that process, many of which

had very divergent and different interests and agendas.  That process allowed the various parties

to meet in a confidential forum and, under Judge Peck's guidance, to present their respective

positions and interests.  Most, if not all, of those parties are extremely sophisticated and were

represented by experienced counsel and financial advisors who could and did advocate on their

behalf.

58.    The Settlement Agreement itself was executed by the Debtors, FGIC, the FGIC

Trustees and the Institutional Investors.  Based on the claims asserted by these parties in these

chapter 11 cases and the positions they have taken in the various matters before the Court, it is

evident that their interests were divergent.  Moreover, as the Court is aware from overseeing the

pretrial proceedings in the RMBS Trust Settlement 9019 Motion, these groups were not hesitant

to advocate for their positions and were willing to aggressively pursue their own agendas.  As I

also describe above, the time period over which the prospective settlement involving the various

27

==claims surrounding the FGIC Insured Trusts is from at least early April to the end of May, if not==

==longer.==

59.    ==Accordingly, I, along with the Debtors, believe that the Settlement Agreement==

==was the result of arm's-length bargaining.==

## **CONCLUSION**

60.    Based on all of the factors described above, I believe that Settlement Agreement

is reasonable, fair and equitable and in the best interests of the Debtors, the Debtors' estates and

the Debtors' creditors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 31st day of July, 2013, at New York, New York.

_____/s/ Lewis Kruger_____
Lewis Kruger