# Exhibit B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                              )
In re:                                                        )   Case No. 12-12020 (MG)
                                                              )
RESIDENTIAL CAPITAL, LLC, et al.,                             )   Chapter 11
                                                              )
          Debtors.                                            )   Jointly Administered
                                                              )
                                                              )
                                                              )
------------------------------------------------------------- x

### WITNESS STATEMENT OF JOHN S. DUBEL

I, JOHN S. DUBEL, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.  I am Chief Executive Officer of Financial Guaranty Insurance Company ("FGIC"). I provide these services through my company, Dubel & Associates ("DA"). DA commenced its engagement with FGIC on January 2, 2008. I have over thirty years of experience restructuring companies. Prior to joining FGIC, I was a Managing Director of Gradient Partners, L.P., a single strategy distressed hedge fund, from 2006 through 2007. From 2002 to 2006, I was a Principal and Managing Director with AlixPartners, LLC, a firm specializing in turnaround and crisis management. While at AlixPartners, I served as Chief Executive Officer of Cable & Wireless America, President and Chief Operating Officer at RCN Corporation, Chief Restructuring Officer of Anchor Glass Container Corporation and Acterna Corporation, and CFO at WorldCom, Inc. I received a Bachelor in Business Administration degree from the College of William and Mary.

2.  I respectfully submit this witness statement, in lieu of direct testimony, on behalf of FGIC and in support of the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain*

1

*Institutional Investors* (Docket No. 3929). I will make myself available for cross-examination and further testimony at the hearing on the Debtors' motion.

3.  FGIC was appointed to the Official Committee of Unsecured Creditors (the "OCC") in the ResCap chapter 11 cases by the United States Trustee, and I represented FGIC on the OCC. I was the principal negotiator for FGIC with respect to the global mediation in the Residential Capital ("ResCap" and together with its subsidiaries, the "Debtors") bankruptcy case. The ResCap bankruptcy case is very large in size, and the estimated claims of administrative, secured and unsecured creditors is almost $18 billion. See Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors (July 4, 2013) (Docket No. 4157) ("Debtors' Disclosure Statement") (excerpt attached hereto as Exhibit A), Ex. 6 (ResCap Recovery Analysis).

### The Mediation Process

4.  The mediation was conducted pursuant to an order of the Bankruptcy Court beginning in December 2012. I was personally involved in all mediation sessions and negotiations on behalf of FGIC. I personally participated in the negotiation of the Plan Support Agreement,[1] signed on or about May 13, 2013, and the related term sheets and agreements negotiated and signed then and on May 23, 2013, as part of the overall global bankruptcy plan settlement. An integral part of the global bankruptcy plan negotiations, and a condition precedent to the ResCap bankruptcy plan proceeding to confirmation by the Bankruptcy Court, was negotiation and development of the settlement agreement (the "FGIC Settlement Agreement"), signed on May 23, 2013, among FGIC, the Debtors, the Trustees (defined below), the Steering Committee Group (defined below), and the Talcott Franklin Group (defined below).

---

[1] When I use terms not otherwise defined herein, I intend those terms to have the same meanings as in *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (Docket No. 3929).

2

Even though the signature pages of the FGIC Settlement Agreement are dated May 23, 2013, minor changes to the language of the agreement were made through May 29, 2013.

5. The First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013 (the "Plan"), is not in effect yet. The authority to settle policy claims is currently and expressly permitted by the FGIC Order of Rehabilitation, entered more than a year ago, which grants the Rehabilitator broad powers throughout the duration of the rehabilitation proceeding, including the power to operate and conduct FGIC's business. If the Plan were in effect, however, the terms of the Plan allow FGIC to enter into settlements of potential claims. In particular, section 4.8 of the Plan provides that FGIC may resolve claims "without further Court approval" through negotiation, settlement, or "any similar transaction that results in the extinguishment or reduction of FGIC's liability, in respect of [] all or part of any Policy . . . .". Section 4.8 (even if applicable here, which it is not) does not require FGIC to obtain the consent of investors holding securities of policyholders whose policies are being settled.

6. The Steering Committee Group and the Talcott Franklin Group were the only two groups of holders of RMBS securities that both regularly participated in the ResCap chapter 11 cases, and signed confidentiality agreements in order to participate fully in the mediation process, restricting their ability to trade in ResCap securities during the negotiation period. They actively participated in the mediation and in negotiation of the FGIC Settlement Agreement, along with the Trustees.

7. The Steering Committee Group[2] includes 18 sophisticated banks and financial institutions, such as Goldman Sachs, ING, BlackRock, Teachers Insurance and Annuity

---

[2] The investors in the "Steering Committee Group" consist of AEGON USA Investment Management, LLC, Angelo Gordon, Bayerische Landesbank, BlackRock Financial Management Inc., Cascade Investment, LLC, Federal Home Loan Bank of Atlanta, Goldman Sachs Asset Management, L.P., ING Investment Management Co. LLC, ING Investment Management LLC, Kore Advisors, L.P., Pacific Investment Management Company LLC, Maiden Lane LLC and Maiden Lane III LLC (by the Federal Reserve Bank of New York as managing member), Metropolitan Life Insurance Company, Neuberger Berman Europe Limited, SNB StabFund, The TCW Group, Inc.,

Association, TCW, Metropolitan Life, PIMCO, and Western Asset Management. They hold approximately $12.1 billion in current amount, and $29.8 billion in original face amount, of RMBS securities issued by various ResCap related trusts. Attached hereto as Exhibit B is the latest Bankruptcy Rule 2019 filing (Docket No. 1741), indicating the holdings of the Steering Committee Group. The Talcott Franklin Group[3] is a similar group of 57 banks, financial institutions and funds, which includes objectors CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited and holds $17 billion in original face amount, of RMBS securities issued by various ResCap related trusts. *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* at 30 (Docket No. 1887).

8.    At the commencement of the ResCap bankruptcy, the Steering Committee Group, the Talcott Franklin Group, and the Junior Secured Noteholders had negotiated and signed a pre-bankruptcy agreement with the Debtors and the Debtors' parent company, Ally Financial Inc.

---

(continued...)

Teachers Insurance and Annuity Association of America, Thrivent Financial for Lutherans, Western Asset Management Company, and certain of their affiliates, either in their own capacities or as advisors or investment managers. *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* at 4 n.8 (Docket No. 1887).

[3] The investors in the "Talcott Franklin Group" consist of: Anchor Bank, fsb, Bankwest, Inc., Blue Heron Funding V, Caterpillar Life Insurance Company, Caterpillar Insurance Co. Ltd., Caterpillar Product Services Corporation, Cedar Hill Mortgage Opportunity Master Fund, L.P., Citizens Bank & Trust Co., Commerce Bancshares, Inc., Commonwealth Advisors, Inc., CQS ABS Master Fund Limited, CQS Select ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Citizens Bank and Trust Company, DNB National Bank, Doubleline Capital LP, Ellington Management Group, LLC., Everest Reinsurance (Bermuda) Ltd., Everest International Re, Ltd., Farallon Capital Management, L.L.C., Farmers and Merchants Trust Company of Chambersburg, First National Bank and Trust Company of Rochelle, First National Banking Company, First National Bank of Wynne, First Farmers State Bank, First Bank, Gemstone CDO I, Gemstone CDO II, Gemstone CDO V, Gemstone CDO VII, HBK Master Fund L.P., Heartland Bank, Kerndt Brothers Savings Bank, Kleros Preferred Funding V plc, Knights of Columbus, LL Funds LLC, Lea County State Bank, Manichaean Capital, LLC, Mutual Savings Association FSA, Northwestern Bank N.A., Pinnacle Bank of South Carolina, Peoples Independent Bank, Perkins State Bank, Phoenix Light SF Limited, Radian Asset Assurance Inc., Randolph Bank and Trust, Rocky Mountain Bank & Trust, Royal Park Investments SA/NV, SBLI USA Mutual Life Insurance Company, Silver Elms CDO II Limited, Silver Elms CDO plc, South Carolina Medical Malpractice Liability JUA, Summit Credit Union, Thomaston Savings Bank, Union Investment Luxembourg S.A., United Educators Insurance - Reciprocal Risk Retention Group, Wells River Savings Bank, Vertical Capital, LLC, and certain of their affiliates, either in their own capacities or as advisors or investment managers. *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* at 4 n.8 (Docket No. 1887).

("AFI"), whereby AFI would contribute $750 million to the Debtors in exchange for general releases of all claims, including third party claims, and certain claims held by the Trustees against the Debtors would be compromised for $8.7 billion. That proposed pre-bankruptcy settlement agreement was opposed by many other parties in the bankruptcy case, including FGIC and the OCC, resulting in substantial litigation and uncertainty. Among the major issues in controversy were (1) the scope and size of the AFI contribution, (2) whether $750 million sufficed to settle and resolve all of the estate and third party claims against AFI, (3) the size and priority of claims asserted with respect to the RMBS trusts, (4) the validity, priority and interrelationship of those claims with respect to claims asserted by the monoline insurers, (5) the amount, priority or possible subordination of security law claims asserted against the Debtors in class actions and other lawsuits, and (6) the claims of various government entities and borrower class actions asserted against the Debtors.

9.   To move the bankruptcy case forward, and forestall potentially years of burdensome and extremely expensive litigation between and among the Debtors, their parent AFI, and all of the competing creditors and creditor groups, the Bankruptcy Court, by order entered on December 26, 2012, appointed the Honorable James M. Peck, a sitting bankruptcy judge with significant experience in complex, multi-party cases (such as the Lehman bankruptcy case) to act as global plan mediator. *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors*, ¶¶ 34-44 (Docket No. 3929). As part of the Bankruptcy Court's order, the Bankruptcy Court placed strict confidentiality protections in place, which preclude me from describing the substance of any of the negotiations, or the various proposals or counter-proposals. Attached as Exhibit C is a copy of the Mediation Order (Docket No. 2519), which

12-12020-mg    Doc 4436    Filed 07/31/13    Entered 07/31/13 16:49:07    Main Document
Pg 6 of 50

provides that all documents or discussions made or provided in connection with the mediation by parties participating in the mediation must be kept confidential. The Mediation Order states:

> [N]o person or party participating in the mediation . . . shall in any way *disclose to any non-party* or to any court, including, without limitation, in any pleading or other submission to any court, any such discussion, mediation statement, other *document or information*, correspondence, resolution, offer or counteroffer that may be made or provided in connection with the mediation, unless otherwise available and not subject to a separate confidentiality agreement that would prevent its disclosure *or as authorized by this Court*.

¶ 4 (emphasis added).

10. Without revealing the substance of the negotiations, however, I can describe in general terms the process of the mediation, the participants, and the good faith, arm's-length nature of the negotiations. The mediation in this case was the most complex and lengthy such process with which I have ever been personally involved, in any capacity. Judge Peck began by holding individual meetings with each of the main participants, and the process was very time intensive for all parties, particularly for Judge Peck. His initial meeting with FGIC and our counsel lasted approximately five hours. There were regular meetings among and between various parties including FGIC, to discuss the relevant issues, and Judge Peck regularly met with and communicated with the Debtors, the OCC, and other individual creditors and groups.

11. In addition to the above parties, the Trustees of the various ResCap related trusts that issued RMBS securities also actively participated in the mediation. The Trustees include The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A, Law Debenture Trust Company of New York, U.S. Bank National Association, and Wells Fargo Bank, N.A., who are the Trustees of the trusts that issued RMBS insured by FGIC (the "FGIC Insured Trusts"). Attorneys from law firms such as Dechert, Seward & Kissel, and Alston & Bird represented the Trustees during the mediations. The Trustees also received advice from

Duff & Phelps, a financial advisory firm serving as the Trustees' expert. Various other significant creditor groups, such as the Steering Committee Group and the Talcott Franklin Group, participated both in discussions and meetings with the Trustees and others.

12. The ResCap bankruptcy involves numerous parties and claims, and there are many complex interdebtor and intercreditor issues that would affect plan distributions. Accordingly, the mediation was necessary to address these complex issues. Specifically, the mediation process was designed by the Debtors and approved by the Court to encompass two major areas: (i) the claims asserted by the Debtors' estates and the third party claims held by individual creditors against AFI, as well as (ii) how the value of any recovery on those claims and the other assets of the Debtors' estates would be allocated among the many competing creditor groups. *See* Debtors' Disclosure Statement at 72. As reflected in the Debtors' Disclosure Statement, some 6,850 proofs of claim were filed, totaling $99.7 billion, although the Debtors estimate that they will end up with approximately $13.4 billion in allowed unsecured claims. *See id.*, Ex. 4 at 1.

13. The ultimate success of the global mediation was far from a certainty. In fact, on February 21, 2013, a group of Junior Secured Noteholders, who claim to have secured claims of approximately $2 billion, and who were participating in the global plan mediation, objected to the Debtors' motion to extend their exclusive time period to file a bankruptcy plan (where the Debtors in part relied upon the mediation process as cause for the extension) stating:

> For the past two months, the Ad Hoc Group has patiently participated in a plan mediation process that has, to date, not resulted in the global compromise envisioned by the Court at its inception. Perversely, these well-intentioned efforts to achieve consensus through mediation have seemingly emboldened certain parties to harden their negotiating positions, secure in the knowledge that the Debtors' present plan construct – with its non-consensual third party release provisions with Ally – remains the only show in town. Even the best efforts of a sitting bankruptcy

judge and experienced and respected mediator have been unable to break this impasse.

*Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* at 2-3 (Docket No. 2997).

14. From January through the end of May, 2013, I personally participated in dozens of meetings and innumerable conference calls with various parties to the mediation process, as well as significant internal work with FGIC's counsel as part of the mediation and negotiation process. A partial list of the dates of significant meetings and multi-party external conference calls is attached hereto on the "Timeline" labeled Exhibit D.[4]

15. There were a large variety of complex issues to understand and attempt to resolve through the mediation process. As reflected in the Timeline, Judge Peck participated in meetings with the OCC and other significant creditors from January through March, 2013, when he determined that it was appropriate to convene a series of large group mediation sessions, all of which I personally attended.

16. The first global group mediation session occurred on or about April 22, 2013, and lasted ten hours, and was followed by another session on April 23, 2013, which lasted approximately nine hours. I have reviewed the attendance list for the first day's session, and not including Judge Peck and his two law clerks, there were 140 participants. There were representatives from approximately 23 different creditors and creditor groups (groups such as the Steering Committee Group and the Talcott Franklin Group I count as only one group, even though they include many institutions). There were a total of 29 creditors or creditor group

---

[4] The Timeline does not include individual calls between FGIC, the Debtors or other single mediation participants.

business representatives in attendance, along with 75 attorneys and 36 financial advisors to the various parties.

17. The mediation was far from a secret or clandestine process. There were literally dozens of pleadings filed in the Bankruptcy Court and served on the Objectors' counsel that mentioned the mediation, along with extensive discussion at public court hearings, as well as substantial press coverage. Significantly, attending the mediation were attorneys for the Federal Housing Finance Agency, Freddie Mac's conservator and the federal agency currently exercising legal control over Freddie Mac, and attorneys for the Talcott Franklin Group, of which CQS was a member. Freddie Mac served special notice requests in the Bankruptcy Court and participated therein through its counsel, the same counsel that recently filed objections in this Court.

18. Over the next month, in late April and throughout much of May 2013, there were approximately five more large group mediation sessions, as well as many conference calls and smaller group meetings. The last set of large group negotiations started in the morning of May 22, 2013, and went through the following night, only ending with the signing of documents at approximately 9 a.m. on May 23, 2013.

### The Global Settlement and the FGIC Settlement Agreement

19. As reflected in the documents signed on May 23, 2013, and the related and supplemental term sheets and agreements, the global mediation successfully resolved the key major issues in the ResCap chapter 11 cases and obviated years of difficult, expensive, protracted and uncertain litigation. AFI agreed to contribute $2.1 billion to the ResCap bankruptcy estate, nearly tripling its prior agreement, and all of the significant participating creditor groups agreed to provide releases to AFI for all claims asserted against AFI in dozens of state and federal lawsuits. The parties participating in the Plan Support Agreement also agreed to allocation of the

total cash available for distribution to unsecured creditors, estimated at $2.62 billion. See Debtors' Disclosure Statement at 38.

20.     The FGIC Settlement Agreement, as reflected in the Plan Support Agreement, is a key component of this global plan construct, and is a required condition to effectiveness of the plan. Although the FGIC Settlement Agreement is a stand-alone settlement agreement, the global plan construct cannot move forward—and the $2.1 billion AFI settlement contribution cannot be realized—absent approval by this Court and the State Court overseeing the FGIC rehabilitation proceeding.

21.     The FGIC Insured Trusts will receive value under the settlement in a number of different ways.

22.     First, the FGIC Insured Trusts will receive an immediate, lump sum settlement payment of $253.3 million in lieu of partial cash payments over decades to come on account of potentially $1.1 billion in policy claims. FGIC will make this settlement payment in cash immediately after both court approvals are obtained and the FGIC Settlement Agreement becomes effective. The FGIC Insured Trusts and investors therein will not have to wait for confirmation of the ResCap Chapter 11 plans, which could take many months.

23.     Second, if the FGIC Settlement Agreement becomes effective, FGIC will forgo its right to collect a gross amount of approximately $40 million in future installment policy premium payments, which when discounted at a 15% rate, results in approximately $18.3 million in future policy premiums that FGIC estimates the FGIC Insured Trusts would otherwise be obligated to pay to FGIC over the life of FGIC's insurance policies. These amounts will instead be retained by the FGIC Insured Trusts and likely paid to the investors in the FGIC Insured Trusts.

24.     Third, if the plan of reorganization contemplated by the Plan Support Agreement is confirmed, and AFI's $2.1 billion settlement payment is realized, the FGIC Insured Trusts will be entitled to a distribution in excess of $90 million from the Trustees. *See generally* Debtors' Disclosure Statement; *see also* Expert Report of Allen M. Pfeiffer, ¶ 59 (July 19, 2013). Specifically, if the Bankruptcy Court confirms the proposed plan of reorganization, the Trustees collectively will receive an allowed general unsecured claim in the bankruptcy cases of $7.301 billion. *See* Debtors' Disclosure Statement at 27. This $7.301 billion allowed general unsecured claim will net the Trustees a distribution under the proposed reorganization plan of approximately $698.7 million (the "RMBS Proceeds"). *See* Debtors' Disclosure Statement, Ex. 6 (ResCap Recovery Analysis). The Plan Support Agreement (and the reorganization plan) provides that the RMBS Proceeds will be distributed to RMBS trusts in accordance with the RMBS Trust Protocol attached as Annex III to the supplemental term sheet. The RMBS Trust Protocol provides that insured RMBS trusts that both (i) have made policy claims against a monoline insurer and (ii) have not received full payment on their claims by the plan of reorganization's effective date, will be entitled to receive a distribution of the RMBS Proceeds on the terms provided therein. The FGIC Insured Trusts—which have made policy claims against FGIC that will not be paid in full at the time of the plan's effective date—will thus, if the reorganization plan is confirmed, be entitled to receive a distribution of RMBS Proceeds on the terms provided in the RMBS Trust Protocol. I am informed that the Trustees have calculated the amount of RMBS Proceeds to which the FGIC Insured Trusts will be entitled, and I have also reviewed the Disclosure Statement filed in the bankruptcy cases. I understand the amount of RMBS Proceeds to which the FGIC Insured Trusts will be entitled exceeds $90 million.

25.     Finally, and significantly, if the FGIC Settlement Agreement becomes effective, FGIC will forgo its right to receive any and all reimbursements from the FGIC Insured Trusts

pursuant to the waterfall provisions under the governing documents of the various trusts (as such reimbursement rights may be modified pursuant to the FGIC Rehabilitation Plan). These amounts will instead be retained by the FGIC Insured Trusts and likely paid to the investors in the FGIC Insured Trusts.

26. The Expert Witness Report of Charles R. Goldstein (the "Goldstein Report") submitted by Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited, and CQS ABS Alpha Master Fund Limited does not acknowledge this very significant financial benefit to the FGIC Insured Trusts (and their respective investors), among other errors. These other errors include, for example, the failure to account for any possibility for downside risk, including the risks presented by FGIC's substantial exposure to municipal bonds issuances, which account for one third of FGIC's portfolio. The analyses prepared by the objectors' experts ignore the possibility of future negative adjustments to the cash payment percentage ("CPP") resulting from the poor performance of certain FGIC-wrapped municipal bonds, including bonds issued by the City of Detroit and other distressed municipalities.

27. The Goldstein Report (¶¶ 12, 29) refers to FGIC's March 31, 2013 quarterly statements as projecting more than $1 billion in gross recoveries from loss mitigation activities. This statement mischaracterizes the nature of these projected gross recoveries. FGIC did not include in its March 31, 2013 quarterly statements any estimate of recoveries from loss mitigation activities, including litigation claims, as FGIC has not determined them to be probable and estimable. The approximately $1.06 billion projected recovery amount in FGIC's March 31, 2013 quarterly statements comprises recoveries that FGIC estimated it would receive through the waterfall provisions under the governing documents of the various trusts insured by FGIC from funds available from projected collateral cash flows and projected payments from other providers

of credit enhancement in the subject transactions. These projected recoveries were based on assumptions used by FGIC for statutory accounting purposes to estimate, among other things, collateral performance, which assumptions are subject to change; and it is uncertain whether and to what extent any projected recoveries will be realized.

28.   Also, these projected recoveries did not account for the terms of the FGIC Rehabilitation Plan, which limit FGIC's right to receive recoveries that otherwise would have been payable to FGIC pursuant to the waterfall provisions under the governing documents of the various trusts insured by FGIC. If such $1.06 billion projected gross recovery is realized, FGIC would be entitled to receive only approximately $300 million (utilizing the base case present value payout percentage of 28.5%) and the remainder would be retained by the trusts for application in accordance with such waterfall provisions, likely for payment to the trusts' investors.

29.   However, since approximately half of that $1.06 billion projected gross recovery amount represents FGIC's estimate of the reimbursements that will be due to FGIC in connection with ResCap-related transactions pursuant to the various trust waterfall provisions under the governing documents for the FGIC Insured Trusts, approximately half of that projected $300 million recovery will be forgiven by FGIC pursuant to the FGIC Settlement Agreement (§2.01(b)), which will allow the FGIC Insured Trusts to retain for themselves (and their investors) the portion of those estimated reimbursements that would otherwise be paid to FGIC. This is a significant benefit and improvement over the terms of the FGIC Rehabilitation Plan for the FGIC Insured Trusts (and their investors). If FGIC's projected gross recovery for the FGIC Insured Trusts is realized, the FGIC Insured Trusts would be entitled to retain (and pay to their investors) an additional $140 million (utilizing the base case present value payout percentage of

28.5%) that they would otherwise be required to pay to FGIC in the absence of the FGIC Settlement Agreement.

Executed on July 31, 2013
New York, New York

_____
John S. Dubel