**Hearing Date and Time: September 11, 2013 at 10:00 a.m.**
**Objection Deadline: August 28, 2013 at 4:00 p.m.**

**CHADBOURNE & PARKE LLP**
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 408-5100
Facsimile:   (212) 541-5369

*Counsel for the Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,[1] | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**THIRD INTERIM FEE APPLICATION OF CHADBOURNE & PARKE LLP,**
**COUNSEL TO THE EXAMINER, FOR ALLOWANCE OF**
**COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE**
**PERIOD JANUARY 1, 2013 THROUGH AND INCLUDING APRIL 30, 2013**

| | |
|---|---|
| Name of Applicant: | Chadbourne & Parke LLP |
| Authorized to Provide Professional Services To: | The Examiner |
| Date of Retention: | August 9, 2012, *nunc pro tunc* to July 11, 2012 |
| Period for Which Compensation and Reimbursement is Sought: | January 1, 2013 through April 30, 2013 |
| Amount of Compensation Sought as Actual, Reasonable and Necessary: | $23,771,407.75 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $ 1,528,915.11 |
| This is a(n):      ____ Monthly | __x__ Interim        ____ Final Application |

---

[1]   The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, filed with the Court on May 14, 2012.  Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis. As used herein, the term "Debtors" includes any such entities.

Prior Monthly Fee Statements:

| Date Served | Period Covered | Fees Requested | Expenses Requested | Fees Approved/ Paid (80%) | Expenses Approved/Paid |
|---|---|---|---|---|---|
| 9/28/2012 | 7/11/2012 - 8/31/2012 | $3,295,849.50 | $127,003.11 | $2,636,679.60 | $127,003.11 |
| 11/2/2012 | 9/1/2012 - 9/30/2012 | $3,580,139.00 | $  54,579.03 | $2,864,111.20 | $  54,579.03 |
| 11/30/2012 | 10/1/2012 - 10/31/2012 | $3,790,187.50 | $124,520.27 | $3,032,150.00 | $124,520.27 |
| 1/02/2013 | 11/1/2012 - 11/30/2012 | $5,658,240.50 | $125,324.05 | $4,526,592.40 | $125,324.05 |
| 1/30/2013 | 12/1/2012 - 12/31/2012 | $4,297,438.00 | $279,240.89 | $3,423,550.40 | $279,240.89 |
| 3/4/2013 | 1/1/2013 - 1/31/2013 | $5,374,400.50 | $333,054.69 | $4,299,520.40 | $333,054.69 |
| 4/5/2013 | 2/1/2013 - 2/28/2013 | $5,624,291.25 | $451,034.76 | $4,499,433.00 | $451,034.76 |
| 5/3/2013 | 3/1/2013 - 3/31/2013 | $4,958,969.00 | $344,542.04 | $3,967,175.20 | $344,542.04 |
| 6/17/2013 | 4/1/2013 - 4/30/2013 | $7,813,747.00 | $400,283.62 | $6,250,997.60 | $400,283.62 |

Interim Fee Applications Payment Summary

| Interim Fee Period | Dates Covered by Interim Fee Period | Bankruptcy Court Approval Date | Total Final Requested (Fees and Costs) | Amount Approved/ Paid | Holdback Amount Due (10%) |
|---|---|---|---|---|---|
| 1 (Docket No. 1897) | July 11, 2012 - Aug. 31, 2012 | Dec. 28, 2012 (Docket No. 2530) | $3,389,860.32[2] | $3,062,216.83 | $327,643.49 |
| 2 (Docket No. 3203) | Sept. 1, 2012 - Dec. 31, 202 | April 23, 2013 (Docket No. 3556) | $17,689,853.23[3] | $15,977,218.68 | $1,712,634.55 |

---

[2] Reflects certain deductions agreed to after discussions with the United States Trustee.

[3] Reflects certain fee deductions agreed to after discussions with the United States Trustee and certain expense deductions taken after payment was received but prior to filing application.

**Hearing Date and Time: September 11, 2013 at 10:00 a.m.**
**Objection Deadline: August 28, 2013 at 4:00 p.m.**

**CHADBOURNE & PARKE LLP**
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 408-5100
Facsimile:  (212) 541-5369

*Counsel for the Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**THIRD INTERIM FEE APPLICATION OF CHADBOURNE & PARKE LLP,**
**COUNSEL TO THE EXAMINER, FOR ALLOWANCE OF**
**COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE**
<u>**PERIOD JANUARY 1, 2013 THROUGH AND INCLUDING APRIL 30, 2013**</u>

Chadbourne & Parke LLP ("<u>Chadbourne</u>"), as counsel to the Court-appointed Examiner

(the "<u>Examiner</u>") in the Chapter 11 cases (the "<u>Chapter 11 Cases</u>") of the above-captioned

debtors and debtors in possession (collectively, the "<u>Debtors</u>"), hereby submits this Third Interim

Fee Application (the "<u>Application</u>") for Allowance of Compensation and Reimbursement of

Expenses For the Period January 1, 2013 Through April 30, 2013 (the "<u>Application Period</u>").

This Application is submitted pursuant to sections 330, 331 and 503(b) of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>"), and Rule 2016 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>") and the Order Establishing Procedures for Interim

Compensation and Reimbursement of Expenses of Professionals, dated July 17, 2012 (the

"Interim Compensation Order").  In support of the Application, Chadbourne respectfully

represents as follows:

## BACKGROUND

1.     The Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code on

May 14, 2012, and the Court authorized joint administration of the cases.  The Debtors continue

to operate their businesses and manage their properties as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

2.     On June 4, 2012, Berkshire Hathaway, Inc. filed a motion (the "Examiner

Motion") for the appointment of an examiner pursuant to 11 U.S.C. § 1104(c).  On June 20,

2012, the Court issued a Memorandum Opinion and Order granting the Examiner Motion (the

"Memorandum  Decision").  On June 28, 2012, the Court entered the Order Directing the

Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code (the

"Examiner Order").

3.     On July 3, 2012, the United States Trustee for the Southern District of New York

appointed Arthur J. Gonzalez as Examiner in the Chapter 11 Cases, subject to Court approval.

On that same date, the Court entered an order approving the appointment.

4.     On July 17, 2012, Arthur J. Gonzalez filed the Application of the Examiner for

Order Authorizing the Retention and Employment of Chadbourne & Parke LLP as Counsel to

the Examiner *Nunc Pro Tunc* to July 11, 2012.  On August 9, 2012, the Court entered an order

(the "Retention Order") approving Chadbourne's retention.

5.     Pursuant to the Examiner Order, and in accordance with the Memorandum

Decision, the Examiner was directed to conduct an investigation of a scope and timing to be set

by the Court after the Examiner had conferred with other parties in interest.  Examiner Order at

2

p. 2.  After the required consultations, the Court mandated that the Examiner conduct an investigation covering the topics set forth in the Order Approving Scope of Investigation of Arthur J. Gonzalez, Examiner, dated July 27, 2012 (the "Scope Order").

6.      On May 13, 2013, the Examiner filed his report under seal [Docket No. 3698] (the "Examiner's Report").  On June 26, 2013, the Bankruptcy Court entered its Order Unsealing the Examiners' Report.

7.      On July 3, 2013, the Debtors filed the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## COMPLIANCE WITH GUIDELINES AND ORDER GOVERNING APPLICATIONS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

9.      This Application has been prepared in accordance with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases effective as of February 5, 2013 (the "Local Guidelines") and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 adopted on January 30, 1996 (the "UST Guidelines" and, together with the Local Guidelines, the "Guidelines").  Pursuant to the Guidelines, a certification regarding compliance with same is attached hereto as Exhibit A.

3

## SUMMARY OF APPLICATION

10.     Chadbourne seeks compensation for professional services rendered to the Examiner during the Application Period in the aggregate amount of $23,771,407.75 and reimbursement of actual and necessary expenses incurred in connection with the rendition of services during the Application Period in the aggregate amount of $1,528,915.11.   During the Application Period, Chadbourne attorneys and paraprofessionals expended a total of 41,920.40 hours for which compensation is requested.

11.     A summary of the hours spent, the names of each professional and paraprofessional rendering services to the Examiner during the Application Period, the regular customary billing rates and the total value of time incurred by each of Chadbourne's professionals and paraprofessionals rendering services to the Examiner is attached hereto as Exhibit B.

12.     Pursuant to the Guidelines, a schedule setting forth a description of the project categories used in this case, the number of hours expended by Chadbourne partners, counsel, associates and paraprofessionals by project category, and the aggregate fees associated with each project category is attached hereto as Exhibit C.

13.     A summary of the actual and necessary expenses incurred by Chadbourne is attached as Exhibit D which provides itemized expense detail.

14.     Chadbourne maintains computerized records of the time spent by all professionals and paraprofessionals rendering services to the Examiner during the Application Period. Redacted copies of these computerized records are attached hereto as Exhibit E.

## SUMMARY OF SERVICES
## DURING THE APPLICATION PERIOD

15.     As set forth in the detailed computerized records attached hereto as Exhibit E,

fees incurred by Chadbourne during the Application Period total $23,771,407.75.  The services

rendered by Chadbourne during the Application Period are grouped into specific project

categories as set forth in Exhibit C.  The attorneys and paraprofessionals who rendered services

relating to each category are identified, along with the number of hours for each individual and

the total compensation sought for each category.

16.     The following is a summary of the activities performed by Chadbourne attorneys

and paraprofessionals during the Application Period, organized by project category.

**A.    Case Administration/General Bankruptcy Matters**

17.     This category consists of time spent on matters related to the investigation on

behalf of the Examiner that are not specifically within the scope of other categories.  Tasks in

this category include (i) daily monitoring and retrieval of all relevant newly filed pleadings from

the Bankruptcy Court's docket and preparation and distribution of related status reports; (ii)

assisting attorneys in preparation of papers for electronic filing; (iii) preparation and daily

updating of master task list, case calendar and timeline to facilitate the investigation process and

monitor report drafting progress and finalization; (iv) preparing for weekly meetings with the

Examiner and his professionals and meetings with other interested parties; (v) preparing for and

attending various omnibus hearings on behalf of the Examiner; and (vi) reviewing and preparing

summaries of pertinent case filings in which the Examiner has an interest.

18.     Chadbourne personnel also maintained a shared drive which provides a repository

for the numerous case-related documents.  Maintaining the shared drive allows members of the

Chadbourne investigation team to access and analyze case documents.

5

**B.**   **Report Drafting and Legal Research**

19.    During the Application Period, Chadbourne attorneys were substantially engaged in drafting the Examiner Report, which included, among other things, a chronological presentation of transactions and events relevant to the investigation, and analyses of (i) numerous transactions and agreements, (ii) the activities of the Debtors' directors and officers, (iii) material affiliate transactions, (iv) ResCap's financial condition, (v) estate causes of action implicated by the affiliate transactions and (vi) the relationship and course of dealing between and among ResCap, AFI, Ally Bank, and Cerberus, and third-party claims. Chadbourne attorneys also drafted an executive summary of the Examiner's principal findings and conclusions.

20.    The Report, which was ultimately filed under seal on May 13, 2013, comprised over 2,200 pages and contained approximately 9,500 footnotes and 180 exhibits and covered a myriad of legal issues. The Report analyzed every material transaction between and among ResCap, Ally Financial, and their corporate affiliates over a seven-year period, involving complicated financings, mortgage-backed securities, derivatives and swaps. The Report made determinations on every material transaction and business dealing and its impact on the overall liability.

**C.**   **Document Review and Analysis**

21.    A substantial component of the Examiner's investigation was the comprehensive review of all documents and materials produced by the parties that are relevant to the investigation. Following the Bankruptcy Court's entry of the Scope Order, the parties began production of documents responsive to the Examiner's request. Production continued for many months, including substantial inflows of documents during the first quarter of 2013.

22.     During the Application Period, over six million pages of documents were produced to the Examiner.  Accordingly, Chadbourne attorneys devoted a significant amount of time to the review of the documents.  Chadbourne's efforts in this regard included, but were not limited to, (a) oversight of the initial first tier review and analysis of each document produced;[4] (b) second tier review and analysis of key documents identified from the initial review by respective transaction team members; (c) specific and targeted review of documents and, in some cases, additional focused searches, for use by transaction teams in their transaction summaries and other case issue analyses; (d) review and analysis of relevant documents for use in interviews with parties-in-interest; and (e) review and analysis of relevant documents for use in the Examiner's Report.

23.     In addition to the substantial time spent identifying and summarizing critical documents (including the first and second tier reviews noted above) and incorporating the details of certain of those documents into the numerous transaction analyses and other case issue analyses (including the Examiner Report), Chadbourne expended substantial time during the Application Period addressing 24 separate document "clawback" requests that involved approximately 17,500 documents.  Such requests were made by producing parties pursuant to the Court's August 20, 2012 Order (I) Granting Examiner Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities, (II) Establishing Procedures for Responding to those  Subpoenas, (III) Approving Establishment of a Document Depository and Procedures to Govern Use and (IV) Approving Protective Order, as amended by the March 15, 2013 Order Modifying the Uniform Protective Order for Examiner Discovery (collectively, the "Protective Orders").

---

[4] In response to the large volume of documents produced, in November 2012 Chadbourne hired and trained contract attorneys to conduct first tier document review.  During the Application Period, all first tier document review was done by such contract attorneys.

24.     The Protective Orders permitted parties to obtain the return of documents that were mistakenly provided to the Examiner because the documents were protected by an applicable privilege -- such as the attorney-client privilege, the work-product immunity or another legally cognizable privilege or protection -- and should never have been produced. Chadbourne worked on reviewing the requested documents and determining whether a producing party's "clawback" request was proper or not.  A vast majority of the "clawback" requests were not challenged and the relevant materials were returned.  However, where a request was not proper in the view of the Examiner and his counsel, discussions with the requesting party were held.  In some cases, research and analysis was required on the scope of the asserted privilege.  Following substantial efforts by the Examiner's team and by the producing parties that made "clawback" requests, all disputed privilege issues were settled or otherwise resolved.  Most of these efforts were accomplished during the Application Period.

25.     Chadbourne also spent substantial time during the Application Period determining, when necessary, how to address almost 100,000 documents identified as "Professional Eyes Only" by producing parties, and approximately 3,000 documents identified by producing parties as "Highly Confidential."  These documents, constituting approximately 8% of the total documents, are hereafter referred to as the "Protected Documents."

26.     For each type of Protected Document, the specific protections provided by the Protective Orders were different but all required the Examiner and Chadbourne to take certain steps before a document could be used in the Report.  Chadbourne was required to notify producing parties of its intended use of approximately 670 Protected Documents in the Report. While many of the producing parties agreed to the use of an identified Protected Document, some did not.  Some of the disputes regarding these documents could not be consensually

resolved and the Examiner, through Chadbourne, was required to bring the matter before the Court.  This occurred on multiple occasions, largely during the second half of the Application Period.  Ultimately, the Examiner (with Chadbourne's assistance) was able to identify and otherwise use all of the documents it sought to use in the Report, in full or redacted form.

**D.      Witness Interviews and Discovery**

27.      In order to fulfill the Examiner's mandate, Chadbourne assisted the Examiner by conducting scores of witness interviews.  These interviews were very useful and permitted the Examiner to determine relevant facts for inclusion in the Report and to form the basis of the Examiner's conclusions.

28.      During the Application Period, 59 interviews were conducted.  Chadbourne devoted considerable professional and paraprofessional resources to preparing for and conducting these interviews.  Efforts included, but were not limited to, reviewing and analyzing documents relevant to the party to be examined, preparation of related document summaries, drafting of detailed outlines of areas of inquiry, analyzing certain transcripts from prior witness interviews that might assist in examining the party to be interviewed, and preparing memoranda to ensure that the interviewer was fully prepared for the interview.  Due to the nature and scope of the issues covered by the investigation, the interviews generally extended over many hours, and in some cases, multiple days.

29.      During the Application Period, Chadbourne attorneys continued to devote time to identifying potential individuals who might be interviewed and on further areas of discovery.  In connection therewith, Chadbourne attorneys collaborated with the Examiner's financial advisors on related protocols and strategies.

9

E.    **Investigation Planning and Coordination**

30.    This category includes time related to (a) internal meetings, (b) meetings with the

Examiner and Examiner's financial advisor, Mesirow Financial Consulting ("Mesirow"),

(c) meetings with third parties, including the Debtors, the Committee and Ally Financial and

(d) various Chambers conferences and court hearings.  Each of these subcategories is discussed

in detail below.

31.    Internal meetings and related planning steps enabled the Examiner, Chadbourne

and Mesirow to prepare for and coordinate steps going forward.  Such coordination was

necessary given the accelerated timeframe permitted for the investigation and the complexity of

the various transactions and issues under review.

32.    Chadbourne's efforts were led by eleven different substantive teams investigating

over 30 different transactions.  Given the enormity of the investigation (during the course of the

entire investigation, over nine million pages of documents were reviewed, 99 days of interviews

were conducted and 66 third-party meetings were held), the teams met routinely to discuss the

status of their analyses and other teams' analyses.  Such meetings were important as specific

findings could often be useful to other teams.  Moreover, the transaction teams met with the

report structuring team, the Examiner and engagement leaders to discuss their analyses and

conclusions and to make appropriate recommendations for development of the Examiner's

Report.

33.    Importantly, during the Application Period, over 60% of the time recorded in the

"Investigation Planning and Coordination" category was recorded by the three senior team

leaders and certain of the transaction team leaders.  This is logical as these nine individuals

needed to fully understand the various transactions and how they interacted, including by

10

keeping key individuals and teams apprised of relevant documents found in the millions of pages that were reviewed and highlighting the information gleaned from the interviews and third party meetings.  Again, such steps were necessary and appropriate in light of the size and scope of the investigation that was at hand.[5]

34.    The time in this category also reflects the efforts by Chadbourne professionals meeting with interested third parties to discuss a variety of different case issues and topics.   In all, during the course of the investigation, Chadbourne met on 66 occasions with such third parties.  During the Application Period, Chadbourne met with, among others, the Debtors, the Committee and Ally, sometimes on more than one occasion.  Such formal meetings were in addition to the numerous calls and less formal communications with third parties during the Application Period and which are recorded in the time entrees in this category.

35.    The last major subcategory of time in this category relates to chambers conferences and hearings.  Five conferences or hearings took place during the Application Period.  The February 7, and 28, 2013 conferences were held to discuss discovery-related issues and the timing of the Report.  The April 5, 9, and 15, 2013 conferences and hearings were held to address and resolve disputes with respect to the use of "Professional Eyes Only" (PEO) documents in the Report and related timing.  In addition, and related to the foregoing,

---

[5]    The need for the sharing of information among teams and team leaders was highlighted by Anton R. Valukas, the Examiner in the Lehman bankruptcy cases, in his April 1, 2010 letter to the U.S. Trustee on "Best Practices for Examiners."  He stated:

. . . . Individual witnesses and documents did not usually fit neatly within a single team's responsibility.  It was critical that every team knew what every other team was finding in real time.

We held weekly team leader meetings; key documents were circulated to all team leaders as they were found; interview summaries were circulated to all team leaders as they were prepared.  We decided that all team leaders needed to be kept as informed as possible about daily events; each team leader exercised discretion as to whether and to what extend to pass on information to team members.

*Id.* at pages 5-6.

Chadbourne prepared and filed the third supplement to the Examiner's work plan on February 28,

2013 and the fourth supplement to the Examiner's work plan on April 5, 2013.

**F.     Fee/Retention Applications**

36.     This category encompasses all tasks relating to compliance with the Interim

Compensation Order.  During the Application Period, Chadbourne prepared and served the

Examiner's and Chadbourne's monthly fee requests.  Also, Chadbourne prepared and filed the

Examiner's and Chadbourne's second interim fee applications and assisted Wolf Haldenstein in

preparing its first interim fee application.  Chadbourne reviewed and prepared a response to the

U.S. Trustee's objection to Chadbourne's second interim fee application and attended the related

hearing.

37.     Further work during this period included the research, preparation and filing of a

supplemental declaration with respect to additional client representations and interested party

connections as well as Chadbourne's employment of contract attorneys to temporarily assist in

the review of the millions of pages of documents produced to the Examiner.

38.     During this time, Chadbourne also assisted the Examiner in his efforts to retain

Leonard, Street and Deinard as special Minnesota counsel to represent the Examiner with respect

to matters of Minnesota law that were relevant to the investigation.

**G.     Non-Working Travel**

39.     During the Application Period, Chadbourne attorneys travelled to attend and

conduct witness interviews.  Chadbourne attorneys also travelled to Fort Washington,

Pennsylvania to attend a meeting with ResCap accounting personnel.  The hours reflect non-

working travel time and the fees requested are at 50% of Chadbourne's normal hourly rates.

## **ACTUAL AND NECESSARY EXPENSES**

40.     As set forth in Exhibit D hereto, Chadbourne has incurred $1,528,915.11 in actual,

necessary expenses in providing professional services to the Examiner during the Application

Period.

41.     With respect to photocopying expenses, Chadbourne's standard charge for

photocopies is $0.20/per page.  For purposes of these Chapter 11 cases, Chadbourne has reduced

this charge to $0.10/per page.  With respect to facsimile expenses, in compliance with the

Guidelines, Chadbourne does not charge for facsimile transmissions, other than the cost of long

distance facsimiles at applicable toll charge rates, which invariably are less than $1.25 per page

permitted by the Guidelines.  These charges are intended to cover Chadbourne's direct operating

costs, which costs are not incorporated into Chadbourne's hourly billing rates.  Only clients who

actually use services of the types set forth in Exhibit D are separately charged for such services.

The effect of including such expenses as part of the hourly billing rates would impose that cost

upon clients who do not require extensive photocopying and other facilities and services.  The

amount of the standard photocopying charge is intended to allow Chadbourne to cover the

related expenses of its photocopying service.  A determination of the actual expense per page for

photocopying, however, is dependent on both the volume of copies and the total expenses

attributable to photocopying on an annual basis.  Each of these categories of expenses does not

exceed the maximum rate set by the Guidelines.  With respect to word-processing costs,

Chadbourne does not include word processing charges in the firm's overhead for purposes of

setting billing rates, nor does Chadbourne seek reimbursement of any word-processing charges

in this Application.

42.     Given the vast amount of photocopying necessary to carry out the review of documents and preparation for witness interviews, Chadbourne used outside vendors to minimize turnaround time.  Chadbourne also utilized the services of an outside vendor (Merrill Communications) for technical assistance in processing the document production of a third party. When using these services, Chadbourne's policy is to bill the client for these services at the amount charged by the outside vendor.

43.     In accordance with the Guidelines, in seeking reimbursement for long distance telephone charges, Chadbourne currently charges clients its approximate actual cost paid to its long distance carriers.  Chadbourne uses outside vendors for conference call services and requests reimbursement only for the amount billed to Chadbourne by the third-party vendors.

44.     With respect to legal research expenses, Chadbourne has entered into flat-fee contracts with Lexis/Nexis and Westlaw for the provision of online research services.  In order to determine charges to individual clients, the flat fees charged to Chadbourne by Lexis/Nexis and Westlaw are allocated among those clients based on the actual number and scope of searches conducted on behalf of those clients.

45.     In connection with the investigation, Chadbourne entered into a contract for electronic data discovery services with Complete Document Source Inc. ("CDS").  Chadbourne uses the CDS hosted electronic discovery database (Relativity) in connection with its document review.  The CDS charges incurred during the Application Period represent a monthly hosting fee as well as processing fees for loading data and/or converting data to a searchable format.  In seeking reimbursement for these outside professional services, Chadbourne requests reimbursement for the actual costs incurred.

14

46.     To facilitate the investigation process, Chadbourne entered into a contract with Firmex, a virtual data room where the Examiner and his professionals can share large volumes of confidential material online with authorized parties.  The data limit, pursuant to the contract, was exceeded during the Application Period and the charges incurred represent additional storage fees.  In seeking reimbursement for these outside professional services, Chadbourne requests reimbursement for the actual costs incurred.

47.     With respect to court reporter fees, Chadbourne used the services of an outside vendor for transcription services in connection with certain interviews conducted by Chadbourne.  The reimbursement amounts also represent costs for obtaining court hearing transcripts and deposition transcripts.  In seeking reimbursement for these outside professional services, Chadbourne requests reimbursement for the actual costs incurred.

48.     With respect to the witness fee expense, Chadbourne reimbursed a witness for actual costs incurred with respect to his travel to New York and document production costs in connection with his interview.  The reimbursement amounts also represent charges for room rental and related food and beverage services in connection with interviews held in Providence, RI and Philadelphia, PA.

49.     Chadbourne attorneys and paraprofessionals used the services of West Publishing for research and retrieval of various court documents and public records to assist in the investigation.  Chadbourne attorneys also used Morningstar to provide research on various investment products.  In seeking reimbursement for these outside professional services, Chadbourne requests reimbursement for the actual costs incurred.

50.     Chadbourne attorneys and paraprofessionals also use PACER (Public Access to Court Electronic Records) as a tool to research and obtain vital information about these

15

Chapter 11 Cases and cases in interest.  Chadbourne charges $.10/per page for the first thirty

pages, the rate at which Chadbourne is charged by PACER.

51.     During the Application Period, Chadbourne used the services of process servers

(Provest Holdings and Demovsky Lawyer Services) for service on discovery targets.  In seeking

reimbursement for these outside professional services, Chadbourne requests reimbursement for

the actual costs incurred.

52.     During the Application Period, Chadbourne conducted numerous interviews and

held various meetings with the Examiner's professionals and third parties at Chadbourne's

offices.  In connection therewith, Chadbourne seeks reimbursement for catering services for

these events.  Itemized detail of these catering events was provided in Exhibit D-1 attached to

each monthly fee statement.

53.     During the Application Period, Chadbourne used temporary litigation support

services (Cybersearch).  These crucial services included the formatting of documents received by

the parties, working with vendors to receive hard copy and electronic versions of documents, and

uploading documents to the database.

54.     After consulting with the Examiner, Chadbourne entered into an agreement with

Update Legal, a legal staffing firm which has provided Chadbourne with a number of contract

attorneys to assist in the review of the millions of pages of documents produced and to be

produced to the Examiner.  The initial document review work is intensive but of limited

duration, and it is therefore most effective and cost-efficient for these services to be performed

by contract attorneys rather than by Chadbourne attorneys.  In seeking reimbursement for these

outside professional services, Chadbourne requests reimbursement for the actual costs incurred.

16

In connection with these services, Chadbourne incurred the expense of computer rental fees and seeks reimbursement for same in this Application.

55.    The time constraints frequently imposed by the circumstances of these cases have required Chadbourne's professionals and other employees at times to devote time during the evenings and on weekends to the performance of legal services on behalf of the Examiner. These extraordinary services were essential in order to meet deadlines and satisfy the demands in connection with the Examiner's investigation of these chapter 11 cases. Consequently, as a result of the physical inability to complete every task required of Chadbourne during ordinary business hours, Chadbourne professionals and employees were required to work in the evenings and on weekends. Given the significant demands on Chadbourne professionals and employees, Chadbourne has, consistent with firm policy, charged the Debtors $43,292.83 for paraprofessional overtime. During the Application Period, Chadbourne's paraprofessional team was substantially engaged in assisting Chadbourne attorneys by reviewing and preparing numerous documents and materials in preparation for witness interviews. This was a substantial undertaking considering Chadbourne conducted 59 interviews during the Application Period. Further, Chadbourne's paraprofessionals were tasked with reviewing the draft report and interview transcripts to identify and index all cited resource materials and document references to aid in the review of potential clawback and Protected Document issues.

56.    Travel expenses were incurred by Chadbourne professionals in connection with attending the various witness interviews, depositions and team meetings that took place during the Application Period. This category includes charges for coach class air travel, Amtrak train travel, reasonable hotel accommodations, meals and airport transportation.

57.     Also consistent with firm policy, attorneys and other employees of Chadbourne who worked late into the evenings or on weekends were reimbursed for their reasonable meal and transportation costs.  For purposes of these Chapter 11 cases, Chadbourne has capped overtime meal reimbursement to $20/per meal.  Chadbourne's regular practice is not to include components for those charges in overhead when establishing billing rates and to charge its clients for these and all other out-of-pocket disbursements incurred during the regular course of the rendition of services.  The reimbursement amounts do not exceed those set forth in the Guidelines.

58.     In addition, on several occasions, overnight delivery of documents and other materials was required as a result of emergencies necessitating the use of such express services. These disbursements are not included in Chadbourne's overhead for the purpose of setting billing rates.  Chadbourne has made every effort to minimize its disbursements in these cases.

59.     The actual expenses incurred in providing professional services were absolutely necessary, reasonable, and justified under the circumstances to serve the needs of the Examiner.

### DETERMINATION OF CHADBOURNE'S REQUESTED FEE

60.   In seeking compensation in these Chapter 11 Cases, Chadbourne has utilized its 2012 hourly rate structure in accordance with the Guidelines for the period January 1, 2013 through and including April 30, 2013.  For purposes of this Application, Chadbourne has calculated its request for compensation by multiplying (a) the hours of time spent on services rendered on behalf of the Examiner, by (b) the 2012 hourly rate assigned to each attorney or paraprofessional rendering such services.  The compensation sought herein is requested without prejudice to Chadbourne's entitlement to seek such additional and reasonable compensation for

18

any additional services rendered in these Chapter 11 Cases at the conclusion thereof upon the filing of an appropriate application.

61.    Chadbourne's fees during the Application Period are also reasonable under the prevailing legal standard and should be allowed.  The amount of these fees is not unusual given the complexity and size of these Chapter 11 Cases.  Chadbourne's fees are commensurate with fees that other attorneys of comparable experience and expertise have charged and been awarded in similar chapter 11 cases.  Accordingly, Chadbourne's fees are reasonable pursuant to section 330 of the Bankruptcy Code.[6]

62.    Section 330(a)(1)(B) of the Bankruptcy Code permits for reimbursement for actual, necessary expenses.  Chadbourne's legal services and expenses incurred during the Application Period constitute only those necessary expenses that were incurred for the benefit of the Debtors' estates.  Chadbourne has properly requested reimbursement of only actual, necessary and appropriate legal expenses.

63.    Except as permitted by rule 2016 of the Federal Rules of Bankruptcy Procedure, no agreement or undertaking exists between Chadbourne and/or any third person for the sharing or division of compensation.  All of the services for which compensation is requested in this Application were rendered at the request of and solely on behalf of the Examiner.

---

[6] Section 330(a)(1) of the Bankruptcy Code allows the payment of:

(A)    reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B)    reimbursement for actual, necessary expenses.

11 U.S.C. §330(a)(1).  Reasonableness of compensation is driven by the "market-driven approach" which considers the nature, extent and value of services provided by the professional and the cost of comparable services in non-bankruptcy contexts.  See Zolfo Cooper & Co. v. Sunbeam-Oster Co., 50 F.3d 253, 258 (3d Cir. 1995); In re Busy Beaver Bldg. Ctr., Inc., 19 F.3d 833, 849 (3d Cir. 1994).  Thus, the "baseline rule is for firms to receive their customary rates." Zolfo Cooper, 50 F.3d at 259.

64.   Pursuant to the standards set forth in sections 330 and 331 of the Bankruptcy Code, Chadbourne submits that the compensation requested is for actual and necessary services and expenses, and is reasonable, based upon the nature, extent and value of such services, the time spent thereon, and the costs of comparable services in a case under the Bankruptcy Code.

## NOTICE AND NO PRIOR APPLICATION

65.   Pursuant to the Interim Compensation Order, notice of this Application has been served upon the following parties (collectively, as further defined in the Interim Compensation Order, the "Notice Parties"):  (i) counsel for the Debtors; (ii) the Office of the United States Trustee for the Southern District of New York; (iii) counsel for the Official Committee of Unsecured Creditors; (iv) counsel for Ally Financial Inc.; and (v) counsel for Barclays Bank PLC.   In light of the nature of the relief requested herein, Chadbourne submits that no further or other notice is required.

66.   No previous application for relief sought herein has been made to this or any other court.

67.   As set forth in the attached certification, the Examiner has had the opportunity to review, and has approved, the amounts requested in the Application.

WHEREFORE, Chadbourne respectfully requests that this Court issue and enter an order (i) authorizing compensation in the amount of $23,771,407.75 for professional services rendered and reimbursement of actual and necessary expenses incurred in connection therewith in the amount of $1,528,915.11, for a total fee and expense request for the Application Period of $25,300,322.86; (ii) authorizing and directing the Debtors to remit payment to Chadbourne as set forth herein, less all amounts previously paid on account of such fees and expenses; and (ii) granting such other and further relief as this Court deems just and proper.

Dated:  New York, New York
          August 7, 2012

**CHADBOURNE & PARKE LLP**

By: */s/ Howard Seife*
     Howard Seife
     David M. LeMay
     30 Rockefeller Plaza
     New York, New York 10112
     Telephone:  (212) 408-5100
     Facsimile:  (212) 541-5369
     *Counsel for the Examiner*