*EX. 6*

# Social Security Administration
## Retirement, Survivors and Disability Insurance
Notice of Award

Mid-Atlantic Program Service Center
300 Spring Garden Street
Philadelphia, Pennsylvania 19123-2992
Date:  June 3, 20██
Claim Number: ████████████

600947 MCSM72 N3  2.358

PERRY E GOERNER
12 WANTAGE SCHOOL RD
WANTAGE, NJ 07461-3322

You are entitled to monthly disability benefits beginning October 2006.

**The Date You Became Disabled**

We found that you became disabled under our rules on April 27, 2006.

However, you have to be disabled for 5 full calendar months in a row before you can be entitled to benefits.  For these reasons, your first month of entitlement to benefits is October 2006.

# Your New Benefit Amount

2813849

**BENEFICIARY'S NAME:** PERRY E GOERNER

Your Social Security benefits will increase by 1.7 percent in 2013 because of a rise in the cost of living. **You can use this letter when you need proof of your benefit amount to receive food, rent, or energy assistance; bank loans; or for other business.** Saving this letter could save you the inconvenience of making a trip to a local office and waiting in line to obtain a new document.

## How Much Will I Get And When?

| | |
|---|---|
| • Your monthly amount (before deductions) is | $998.90 |
| • The amount we deduct for Medicare medical insurance is | $104.90 |
| (If you did not have Medicare as of Nov. 15, 2012, or if someone else pays your premium, we show $0.00.) | |
| • The amount we deduct for your Medicare prescription drug plan is | $0.00 |
| (If you did not elect withholding as of Nov. 1, 2012, we show $0.00.) | |
| • The amount we deduct for voluntary Federal tax withholding is | $0.00 |
| (If you did not elect voluntary tax withholding as of Nov. 15, 2012, we show $0.00.) | |
| • After we take any other deductions, you will receive on Jan. 23, 2013. | $894.00 |

If you disagree with any of these amounts, you must write to us within 60 days from the date you receive this letter. We would be happy to review the amounts.

You may receive your benefits through direct deposit, a Direct Express® card, or an Electronic Transfer Account. If you still receive a check, please remember that you must switch to an electronic payment by March 1, 2013. For more information, please visit *www.godirect.org* or call **1-800-333-1795.**

## What If I Have Questions?

Please visit our website at *www.socialsecurity.gov* for more information and a variety of online services. You also can call **1-800-772-1213** and speak to a representative from 7 a.m. until 7 p.m., Monday through Friday. Recorded information and services are available 24 hours a day. Our lines

2813849

Return To:
Crescent Lake Settlements
585 Stewart Ave
Suite 505
Garden City, NY 11530

Prepared By:
Homecomings Financial
9 Sylvan Way, Suite 310
Parsippany, NJ 07054

2008082901021675O    1/15
08/29/2008 09:24:29 AM  MTG
Bk: 8512 Pg: 962
Erma Gormley
Sussex County, NJ

[Space Above This Line For Recording Data]

# MORTGAGE

MIN 100062604733293577

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   MARCH 30TH, 2007
together with all Riders to this document.
(B) "Borrower" is
PERRY GOERNER

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3031 1/01
MFNJ7770 (09/2006) / 047-332935-7
-6A(NJ) (0512)
Page 1 of 15                    Initials:
VMP Mortgage Solutions, Inc.



(D) "Lender" is HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)
Lender is a   LIMITED LIABILITY COMPANY
organized and existing under the laws of   DELAWARE
Lender's address is   9 SYLVAN WAY, SUITE 100
PARSIPPANY, NJ 07054
(E) "Note" means the promissory note signed by Borrower and dated   MARCH 30TH, 2007
The Note states that Borrower owes Lender   THREE HUNDRED TWENTY TWO THOUSAND FIVE HUNDRED AND NO/100                                                                         Dollars
(U.S. $   322,500.00         ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   APRIL 1ST, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [ ] Adjustable Rate Rider   [ ] Condominium Rider   [ ] Second Home Rider
- [ ] Balloon Rider   [ ] Planned Unit Development Rider   [ ] 1-4 Family Rider
- [ ] VA Rider   [ ] Biweekly Payment Rider   [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Initials: _____

Form 3031 1/01

Page 2 of 16

-6A(NJ) (0512)
MFNJ7770 (09/2006) / 047-332935-7

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the COUNTY of SUSSEX :

[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

Legal description attached hereto and made a part hereof

Property Account Number: BLOCK: 43 LOT: 7.18                which currently has the address of
12 WANTAGE SCHOOL ROAD                                                        [Street]
SUSSEX                                           [City], New Jersey 07461        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: _____

Page 3 of 15                                                    Form 3031 1/01

-6A(NJ) (0512)
MFNJ7770 (09/2006) / 047-332935-7

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

Initials: ___

Page 4 of 15                                             Form 3031 1/01

-6A(NJ) (0512)
MFNJ7770 (09/2006) / 047-332935-7

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials: _____

Form 3031 1/01

-6A(NJ) (0512)
MFNJ7770 (09/2006)  /  047-332935-7

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: _____

Form 3031 1/01

Page 6 of 15

-6A(NJ) (0512)
MFNJ7770 (09/2006)  /  047-332935-7

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: _____

Form 3031 1/01

VMP® -6A(NJ) (0512)
MFNJ7770 (09/2006) / 047-332935-7

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Initials: _____        Form 3031 1/01

-6A(NJ) (0512)
MFNJ7770 (09/2006)  / 047-332935-7

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials:

Form 3031 1/01

-6A(NJ) (0512)

MFNJ7770 (09/2006) / 047-332935-7

Page 9 of 15

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: ⎯⎯⎯                    Form 3031 1/01

Page 10 of 15

-6A(NJ) (0512)
MFNJ7770 (09/2006) / 047-332935-7

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

Initials: _____

Form 3031 1/01

-6A(NJ) (0512)
MFNJ7770 (09/2006) / 047-332935-7

Page 13 of 15

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides, and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. No Claim of Credit for Taxes. Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

Initials: _____    Form 3031 1/01

# Fidelity National Title Insurance Company
## Commitment

## SCHEDULE C
### (Descriptions)

Title Commitment No.        7-1034CPN

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in **Wantage Township**, County of **Sussex** and State of New Jersey, being more particularly described as follows:

BEGINNING at a point in the southerly sideline of Wantage School Road, said point being the 1st corner of the whole tract of which is this lot is a part, and running, thence

(1) Leaving said road South 29 degrees 47 minutes 40 seconds East, 616.18 feet to the 2nd corner of said tract, thence

(2) South 57 degrees 41 minutes 00 seconds West 84.00 feet to the 3rd corner of said tract; thence

(3) South 30 degrees 19 minutes 30 seconds East 350.35 feet to the 4th corner of said tract; thence

(4) South 63 degrees 45 minutes 00 seconds West 162.80 feet to the 5th corner of said tract; thence

(5) Along said 5th course South 74 degrees 20 minutes 00 seconds West 179.00 feet; thence

(6) North 15 degrees 44 minutes 00 seconds West 955.50 feet to a point in the southerly sideline of said Wantage School Road and in the 9th corner of said whole tract; thence

(7) North 63 degrees 27 minutes 00 seconds East 185.00 feet to the place of BEGINNING.

## FOR INFORMATION PURPOSES ONLY:

BEING Known as Lot 7.18, Block 43, on the Official Tax Map of Wantage Township

BEING commonly known as 12 Wantage School Road, Sussex, New Jersey

**STATE OF NEW JERSEY,**

County ss:

On this 30th day of March 2007, before me, the subscriber,

personally appeared    PERRY GOERNER

who, I am satisfied,

is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein expressed.

Notary Public

CRAIG P. NAZZARO
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES JUNE 3, 2010

```
2008082901021675Ø      15/15
08/29/2008 09:24:29 AM  MTG
Recording Fee: $170.00
Tax Fee: $.00
Consideration: $.00
Buyers Fee: $.00
LPHIPPS
```

Initials:

Form 3031 1/01

-6A(NJ) (0512)

Page 15 of 15

MFNJ7770 (09/2006)  /  047-332935-7

FROM:
MACK APPRAISAL SERVICE
39 WHITFIELD STREET
CALDWELL, NJ  07006
973  226-4144

| INVOICE | DATE | REFERENCE |
|---|---|---|
| 12 WANTAGE S | MARCH 5, 200 | KENSINGTON FIN |

*EX. 10*

TO:
KENSINGTON FINANCIAL SERVICES
56 CHESTNUT RIDGE ROAD, MONTVALE, NJ 07645

| DESCRIPTION | | | | AMOUNT |
|---|---|---|---|---|
| GOERNER      12 WANTAGE SCHOOL ROAD      WANTAGE, NJ | | | | 275.00 |
| RECEIVED APPRAISAL FEE | | | | -275.00 |
| | | | | $ |
| | | | | $ |
| | | | TOTAL | $ |

Mack Appraisal Service
Form NIL — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address  12 WANTAGE SCHOOL ROAD | City  WANTAGE TOWNSHIP | State  N.J.  Zip Code  07461 | |
| Borrower  GOERNER | Owner of Public Record  GOERNER | County  SUSSEX | |
| Legal Description  BLOCK  43      LOT 7.18 | SMSA-5640 | | |
| Assessor's Parcel #  2824-0043-0000-00007-0018 | Tax Year  2006 | R.E. Taxes $  5,989.08 | |
| Neighborhood Name  N/A | Map Reference  DIGITAL | Census Tract  3711.00 | |
| Occupant  ☒ Owner   ☐ Tenant   ☐ Vacant | Special Assessments $  N/A | ☐ PUD  HOA $  N/A    ☐ per year   ☐ per month | |
| Property Rights Appraised  ☒ Fee Simple   ☐ Leasehold   ☐ Other (describe) | | | |
| Assignment Type  ☐ Purchase Transaction   ☒ Refinance Transaction   ☐ Other (describe) | | | |
| Lender/Client  KENSINGTON FINANCIAL SERVICES    Address  56 CHESTNUT RIDGE ROAD, MONTVALE, NJ 07645 | | | |

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?   ☒ Yes   ☐ No
Report data source(s) used, offering price(s), and date(s).   THE SUBJECT WAS LISTED FOR SALE ON JANUARY 30, 2006 FOR $449,900 AND
WITHDRAWN ON JUNE 8, 2006. GARDEN STATE MLS# 2240571
I ☐ did   ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

| | |
|---|---|
| Contract Price $ | Date of Contract |

Is the property seller the owner of public record?   ☐ Yes   ☐ No  Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?   ☐ Yes   ☒ No
If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|---|---|
| Location  ☐ Urban  ☒ Suburban  ☐ Rural | Property Values  ☐ Increasing  ☒ Stable  ☐ Declining | | PRICE  $ (000) | AGE  (yrs) | One-Unit  40 % |
| Built-Up  ☒ Over 75%  ☐ 25-75%  ☐ Under 25% | Demand/Supply  ☐ Shortage  ☒ In Balance  ☐ Over Supply | | 200  Low | NEW | 2-4 Unit  % |
| Growth  ☐ Rapid  ☒ Stable  ☐ Slow | Marketing Time  ☐ Under 3 mths  ☒ 3-6 mths  ☐ Over 6 mths | | 650+  High | 200+ | Multi-Family  % |
| Neighborhood Boundaries  ROSE MORROW ROAD TO THE NORTH, ROUTE 23 TO THE SOUTH & | | | 390  Pred. | 45 | Commercial  % |

WEST, ROUTE 284 TO THE EAST.   Other  60 %
Neighborhood Description  THE SUBJECT IS LOCATED IN A NEIGHBORHOOD WITH MIXED STYLE DWELLINGS. ADEQUATE ACCESS TO
SCHOOLS, LOCAL SHOPPING AND PUBLIC TRANSPORTATION. ENTRANCE TO ROUTE 23 IS WITHIN ONE MILE. FUTURE
MARKETABILITY SHOULD REMAIN SATISFACTORY.
Market Conditions (including support for the above conclusions)   A REVIEW OF THE MARKET AREA INDICATES A STABLE RESALE MARKET. TYPICAL
MARKETING TIME IS FROM ONE TO FOUR MONTHS.

| | | | |
|---|---|---|---|
| Dimensions  IRREGULAR | Area  6.07 ACRES | Shape  IRREGULAR | View  AVERAGE |
| Specific Zoning Classification  R-1 | Zoning Description  RESIDENTIAL | | |

Zoning Compliance  ☒ Legal   ☐ Legal Nonconforming (Grandfathered Use)   ☐ No Zoning   ☐ Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?   ☒ Yes   ☐ No  If No, describe

| Utilities  Public  Other (describe) | | Public  Other (describe) | Off-site Improvements – Type  Public  Private |
|---|---|---|---|
| Electricity  ☒ | | Water  ☐ ☒ WELL | Street  MACADAM  ☒ ☐ |
| Gas  ☐ ☒ ELEC/PROPANE | Sanitary Sewer  ☐ ☒ SEPTIC | Alley  NONE | |

FEMA Special Flood Hazard Area  ☐ Yes  ☒ No  FEMA Flood Zone  C   FEMA Map #  3406620030A   FEMA Map Date  2/15/84
Are the utilities and off-site improvements typical for the market area?   ☒ Yes   ☐ No  If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?   ☐ Yes   ☒ No  If Yes, describe

| General Description | Foundation | Exterior Description  materials/condition | Interior  materials/condition |
|---|---|---|---|
| Units  ☒ One  ☐ One with Accessory Unit | ☒ Concrete Slab  ☐ Crawl Space | Foundation Walls  CONCRETE/AVG | Floors  HDWD/TILE/VIN/AV |
| # of Stories  TWO | ☐ Full Basement  ☐ Partial Basement | Exterior Walls  WOOD/AVG | Walls  DRY WALL/AVG |
| Type  ☒ Det.  ☐ Att.  ☐ S-Det./End Unit | Basement Area  N/A  sq.ft. | Roof Surface  ASPHALT/AVG | Trim/Finish  WOOD/AVG |
| ☒ Existing  ☐ Proposed  ☐ Under Const. | Basement Finish  N/A  % | Gutters & Downspouts  ALUM/AVG | Bath Floor  CERAM/TILE/AVG |
| Design (Style)  CONTEMP | ☐ Outside Entry/Exit  ☐ Sump Pump | Window Type  COMBO/AVG | Bath Wainscot  CERAM/TILE/AVG |
| Year Built  1983 | Evidence of  ☐ Infestation | Storm Sash/Insulated  YES/AVG | Car Storage  ☐ None |
| Effective Age (Yrs)  10 | ☐ Dampness  ☐ Settlement | Screens  YES/AVG | ☒ Driveway  # of Cars  MULTIPLE |
| Attic  ☒ None | Heating  ☐ FWA  ☐ HWBB | Amenities  ☒ Woodstove(s) # 1 | Driveway Surface  STONE/GRAVE |
| ☐ Drop Stair  ☐ Stairs | ☒ Other  ELBB  Fuel  ELECTRIC | ☐ Fireplace(s) #  ☐ Fence | ☒ Garage  # of Cars  TWO |
| ☐ Floor  ☐ Scuttle | Cooling  ☐ Central Air Conditioning | ☒ Patio/Deck  PATIO  ☐ Porch | ☐ Carport  # of Cars |
| ☐ Finished  ☐ Heated | ☐ Individual  ☐ Other | ☐ Pool  ☒ Other  BALCONY | ☐ Att.  ☐ Det.  ☐ Built-In |

Appliances  ☒ Refrigerator  ☒ Range/Oven  ☒ Dishwasher  ☐ Disposal  ☐ Microwave  ☐ Washer/Dryer  ☐ Other (describe)
Finished area above grade contains:   8  Rooms   3  Bedrooms   1.5  Bath(s)   2,048  Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.).   WOOD STOVE, PATIO, BALCONY, POND ON PROPERTY, OUTBUILDINGS, THERMAL
WINDOWS/DOORS, VAULTED CEILINGS.
Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).   CONDITION OF IMPROVEMENTS RATED
AVERAGE.  NO NECESSARY REPAIRS NOTED.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?   ☐ Yes   ☒ No  If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?   ☒ Yes   ☐ No  If No, describe

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Uniform Residential Appraisal Report

KENSINGTON FINANCIAL
File # 12 WANTAGE SCHOOL R

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| There are N/A comparable properties currently offered for sale in the subject neighborhood ranging in price from $ N/A to $ N/A | | | | | | | |
| There are N/A comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ N/A to $ N/A | | | | | | | |
| Address | 12 WANTAGE SCHOOL ROAD WANTAGE TOWNSHIP, N.J. 074 | 72 SHERMAN RIDGE ROAD WANTAGE TOWNSHIP | | 109 SHERMAN RIDGE ROAD WANTAGE TOWNSHIP | | 11 PHILIP TERRACE WANTAGE TOWNSIP | |
| Proximity to Subject | | 2.04 miles | | 2.49 miles | | 2.28 miles | |
| Sale Price | $ | | $ 444,900 | | $ 412,000 | | $ 440,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 174.47 sq.ft. | | $ 228.89 sq.ft. | | $ 191.30 sq.ft. | |
| Data Source(s) | | GARDEN STATE MLS | | GARDEN STATE MLS | | GARDEN STATE MLS | |
| Verification Source(s) | | MLS#2272857 | | MLS#2274926 | | MLS#2336857 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | CONV MTGE NONE KNOWN | | N/A NONE KNOWN | | CASH NONE KNOWN | |
| Date of Sale/Time | | 1/17/2007 | | 10/11/2006 | | 1/19/2007 | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 6.07 ACRES | 4.62 ACRES | | 6 ACRES | | 1.41 ACRES | +18,000 |
| View | POND VIEW | AVERAGE | +10,000 | AVERAGE | +10,000 | AVERAGE | +10,000 |
| Design (Style) | CONTEMP | COLONIAL | | SPLIT LEVEL | | CONTEMP | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Actual Age | 24 | 6 | -5,000 | 22 | | 22 | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 8   3   1.5 | 8   4   2.5 | -2,000 | 7   3   2.5 | -2,000 | 10   4   3 | -3,000 |
| Gross Living Area | 2,048 sq.ft. | 2,550 sq.ft. | -18,000 | 1,800 sq.ft. | +9,000 | 2,300 sq.ft. | -9,000 |
| Basement & Finished | N/A | FULL BSMNT | -10,000 | PART BSMNT | -5,000 | NONE | |
| Rooms Below Grade | NONE | UNFINISHED | | FINISHED | -10,000 | NONE | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | ELBB/NONE | HWBB/CAC | -4,000 | HWBB/NONE | | HWBB/NONE | |
| Energy Efficient Items | THERM/PANE | THERM/PANE | | THERM/PANE | | THERM/PANE | |
| Garage/Carport | TWO CAR | TWO CAR | | TWO CAR | | TWO CAR | |
| Porch/Patio/Deck | PATIO | PORCH | -3,000 | PATIO/PORCH | -4,000 | PORCH/DECK | -7,000 |
| | WOODSTOVE | NONE | +1,000 | NONE | +1,000 | NONE | +1,000 |
| | BALCONY | NONE | +1,000 | I/G POOL | -8,000 | NONE | +1,000 |
| Net Adjustment (Total) | | ☐ + ☒ - $ | 30,000 | ☐ + ☒ - $ | 9,000 | ☒ + ☐ - $ | 11,000 |
| Adjusted Sale Price of Comparables | | Net Adj. 6.7% Gross Adj. 12.1% $ | 414,900 | Net Adj. 2.2% Gross Adj. 11.9% $ | 403,000 | Net Adj. 2.5% Gross Adj. 11.1% $ | 451,000 |
| ☐ did ☒ did I did not research the sale or transfer history of the subject property and comparable sales. If not, explain | | | | | | | |

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   GARDEN STATE MLS/TAX RECORDS
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   GARDEN STATE MLS/TAX RECORDS
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | N/A | N/A | N/A | N/A |
| Price of Prior Sale/Transfer | N/A | N/A | N/A | N/A |
| Data Source(s) | N/A | N/A | N/A | N/A |
| Effective Date of Data Source(s) | N/A | N/A | N/A | N/A |

Analysis of prior sale or transfer history of the subject property and comparable sales   A REVIEW OF AVAILABLE TAX AND MLS RECORDS INDICATES NO
SALES OF THE SUBJECT IN THE PAST 36 MONTHS. A REVIEW OF AVAILABLE TAX AND MLS RECORDS INDICATES NO OTHER   SALES
OF THE COMPARABLES.

Summary of Sales Comparison Approach   SITE AREA BASED ON $5,000 PER ACRE AND ROUNDED. NO ADJUSTMENT OVER 5 ACRES. GLA
BASED ON $35 PER SQUARE FOOT AND ROUNDED. COMPARABLE THREE PHOTO USED FROM APPRAISER'S FILES. EQUAL WEIGHT
GIVEN TO ALL SALES IN THE FINAL DETERMINATION OF MARKET VALUE.

Indicated Value by Sales Comparison Approach $ 430,000
Indicated Value by: Sales Comparison Approach $ 430,000   Cost Approach (if developed) $ 462,806   Income Approach (if developed) $
SALES COMPARISON APPROACH IS USED IN THE FINAL DETERMINATION OF MARKET VALUE. THIS METHOD BEST INDICATES
ACTIONS OF THE MARKET FOR THIS TYPE PROPERTY.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 430,000 , as of MARCH 5, 2007 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005                     Page 2 of 6                     Fannie Mae Form 1004 March 2005

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Uniform Residential Appraisal Report

File # 12 WANTAGE SCHOOL R

KENSINGTON FINANCIAL

| ADDITIONAL COMMENTS | |
|---|---|

**COST APPROACH TO VALUE** (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)  **SITE VALUE'S PERCENT OF TOTAL VALUE**

FOR SIMILAR PROPERTIES IN THIS MARKET AREA ARE TYPICALLY OVER 30%.

ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW

| | | |
|---|---|---|
| Source of cost data  RS MEANS RESIDENTIAL COST DATA | OPINION OF SITE VALUE | = $ 200,000 |
| Quality rating from cost service  AVG   Effective date of cost data  2007 | DWELLING  2,048  Sq.Ft. @ $  105.00  = $ | 215,040 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | N/A  Sq.Ft. @ $  = $ | |
| NO EXTERNAL OR FUNCTIONAL DEPRECIATION ASSIGNED,  SEE | PATIO/BALC/WD STVE/WELL/SEPTIC  = $ | 75,000 |
| SKETCH. | Garage/Carport  484  Sq.Ft. @ $  35.00  = $ | 16,940 |
| | Total Estimate of Cost-New  = $ | 306,980 |
| | Less  :  Physical  Functional  External | |
| | Depreciation  51,174  = $( | 51,174 ) |
| | Depreciated Cost of Improvements  = $ | 255,806 |
| | "As-Is" Value of Site Improvements  = $ | 7,000 |
| Estimated Remaining Economic Life (HUD and VA only)  50 Years | INDICATED VALUE BY COST APPROACH  = $ | 462,806 |

**INCOME APPROACH TO VALUE** (not required by Fannie Mae)

| | |
|---|---|
| Estimated Monthly Market Rent $  N/A   X Gross Rent Multiplier  N/A  = $ | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM)  N/A | |

**PROJECT INFORMATION FOR PUDs** (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No  Unit type(s)  ☐ Detached  ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source

Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

| | |
|---|---|
| Freddie Mac Form 70 March 2005 | Fannie Mae Form 1004 March 2005 |

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Uniform Residential Appraisal Report

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

## Uniform Residential Appraisal Report

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

KENSINGTON FINANCIAL

## Uniform Residential Appraisal Report

File # 12 WANTAGE SCHOOL R(

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 12 WANTAGE SCHOOL ROAD | 13 LOWE ROAD | | | | | |
|  | WANTAGE TOWNSHIP, N.J. 074 | WANTAGE TOWNSHIP | | | | | |
| Proximity to Subject |  | 1.68 miles | | | | | |
| Sale Price | $ | $ | 569,000 | $ | | $ | |
| Sale Price/Gross Liv. Area | $          sq.ft. | $ 167.35 sq.ft. | | $          sq.ft. | | $          sq.ft. | |
| Data Source(s) |  | GARDEN STATE MLS | | | | | |
| Verification Source(s) |  | MLS#2330836 | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing |  | N/A | | | | | |
| Concessions |  | NONE KNOWN | | | | | |
| Date of Sale/Time |  | 1/5/2007 | | | | | |
| Location | AVERAGE | AVERAGE | | | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | | | | |
| Site | 6.07 ACRES | 1.85 ACRES | +16,000 | | | | |
| View | POND VIEW | GOOD | | | | | |
| Design (Style) | CONTEMP | COLONIAL | | | | | |
| Quality of Construction | AVERAGE | AVERAGE | | | | | |
| Actual Age | 24 | 1 | -10,000 | | | | |
| Condition | AVERAGE | AVERAGE | | | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 8   3   1.5 | 10   4   3 | -3,000 | | | | |
| Gross Living Area | 2,048 sq.ft. | 3,400 sq.ft. | -47,000 | sq.ft. | | sq.ft. | |
| Basement & Finished | N/A | FULL BSMNT | -10,000 | | | | |
| Rooms Below Grade | NONE | UNFINISHED | | | | | |
| Functional Utility | AVERAGE | AVERAGE | | | | | |
| Heating/Cooling | ELBB/NONE | FWA/CAC | -4,000 | | | | |
| Energy Efficient Items | THERM/PANE | THERM/PANE | | | | | |
| Garage/Carport | TWO CAR | TWO CAR | | | | | |
| Porch/Patio/Deck | PATIO | PORCH/DECK | -7,000 | | | | |
|  | WOODSTOVE | FIREPLACE | -3,000 | | | | |
|  | BALCONY | GAZEBO | -3,000 | | | | |
| Net Adjustment (Total) |  | ☐ + ☒ - $ | 71,000 | ☐ + ☐ - $ | | ☐ + ☐ - $ | |
| Adjusted Sale Price |  | Net 12.5 % | | Net        % | | Net        % | |
| of Comparables |  | Gross 18.1 % $ | 498,000 | Gross        % $ | | Gross        % $ | |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | N/A | N/A | | |
| Price of Prior Sale/Transfer | N/A | N/A | | |
| Data Source(s) | N/A | N/A | | |
| Effective Date of Data Source(s) | N/A | N/A | | |

Analysis of prior sale or transfer history of the subject property and comparable sales

Analysis/Comments

Freddie Mac Form 70 March 2005

Fannie Mae Form 1004 March 2005

Form 1004.(AC) — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

KENSINGTON FINANCIAL
File # 12 WANTAGE SCHOOL R

## Uniform Residential Appraisal Report

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable, and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  LAURA E. READE | Name  JOHN MACK |
| Company Name  MACK APPRAISAL SERVICE | Company Name  MACK APPRAISAL SERVICE |
| Company Address  39 WHITFIELD STREET | Company Address  39 WHITFIELD STREET |
| CALDWELL, NJ  07006 | CALDWELL, NJ  07006 |
| Telephone Number  973 226-4144 | Telephone Number  973 226-4144 |
| Email Address  mackappr@aol.com | Email Address  mackappr@aol.com |
| Date of Signature and Report  March 12, 2007 | Date of Signature  March 12, 2007 |
| Effective Date of Appraisal  MARCH 5, 2007 | State Certification # |
| State Certification # | or State License #  03205 |
| or State License #  04041 | State  NJ |
| or Other (describe) _____ State # | Expiration Date of Certification or License  12/31/2007 |
| State  NJ | |
| Expiration Date of Certification or License  12/31/2007 | **SUBJECT PROPERTY** |
| | ☒ Did not inspect subject property |
| **ADDRESS OF PROPERTY APPRAISED** | ☐ Did inspect exterior of subject property from street |
| 12 WANTAGE SCHOOL ROAD | Date of Inspection |
| WANTAGE TOWNSHIP, N.J. 07461 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $  430,000 | Date of Inspection |
| LENDER/CLIENT | |
| Name | **COMPARABLE SALES** |
| Company Name  KENSINGTON FINANCIAL SERVICES | ☒ Did not inspect exterior of comparable sales from street |
| Company Address  56 CHESTNUT RIDGE ROAD, MONTVALE, NJ 07645 | ☐ Did inspect exterior of comparable sales from street |
| Email Address | Date of Inspection |

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Subject Photo Page

| Borrower/Client | GOERNER | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 12 WANTAGE SCHOOL ROAD | | | | | |
| City | WANTAGE TOWNSHIP | County | SUSSEX | State | N.J. | Zip Code  07461 |
| Lender | KENSINGTON FINANCIAL SERVICES | | | | | |



**Subject Front**
12 WANTAGE SCHOOL ROAD

2,046
8
3
1.5
AVERAGE
POND VIEW
6.07 ACRES
AVERAGE
24



**Subject Rear**



**Subject Street**

Subject Photo Page
Re No 12 WANTAGE School Road   Page # 9

**Subject Photo Page**

| | |
|---|---|
| Borrower/Client | GOERNER |
| Property Address | 12 WANTAGE SCHOOL ROAD |
| City WANTAGE TOWNSHIP | County SUSSEX    State N.J.    Zip Code 07461 |
| Lender KENSINGTON FINANCIAL SERVICES | |



**Subject Garage**

12 WANTAGE SCHOOL ROAD

2,048
8
3
1.5
AVERAGE
POND VIEW
6.07 ACRES
AVERAGE
24



**Subject Pond**

**Subject Interior Photo Page**

| Borrower/Client | GOERNER | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 12 WANTAGE SCHOOL ROAD | | | | | |
| City | WANTAGE TOWNSHIP | County | SUSSEX | State | N.J. | Zip Code  07461 |
| Lender | KENSINGTON FINANCIAL SERVICES | | | | | |



**Subject Interior**

12 WANTAGE SCHOOL ROAD
Sales Price
Gross Living Area     2,048
Total Rooms          8
Total Bedrooms       3
Total Bathrooms      1.5
Location             AVERAGE
View                 POND VIEW
Site                 6.07 ACRES
Quality              AVERAGE
Age                  24



**Subject Interior**



**Subject Interior**

**Comparable Photo Page**

| | |
|---|---|
| Borrower/Client | GOERNER |
| Property Address | 12 WANTAGE SCHOOL ROAD |
| City WANTAGE TOWNSHIP | County SUSSEX | State N.J. | Zip Code 07461 |
| Lender KENSINGTON FINANCIAL SERVICES | |



### Comparable 1
72 SHERMAN RIDGE ROAD
2.04 miles
444,900
2,550
8
4
2.5
AVERAGE
AVERAGE
4.62 ACRES
AVERAGE
6



### Comparable 2
109 SHERMAN RIDGE ROAD
2.49 miles
412,000
1,800
7
3
2.5
AVERAGE
AVERAGE
6 ACRES
AVERAGE
22



### Comparable 3
11 PHILIP TERRACE
2.28 miles
440,000
2,300
10
4
3
AVERAGE
AVERAGE
1.41 ACRES
AVERAGE
22

## Comparable Photo Page

| | |
|---|---|
| Borrower/Client  GOERNER | |
| Property Address  12 WANTAGE SCHOOL ROAD | |
| City  WANTAGE TOWNSHIP    County  SUSSEX    State  N.J.    Zip Code  07461 | |
| Lender  KENSINGTON FINANCIAL SERVICES | |



**Comparable 4**

13 LOWE ROAD

1.68 miles
569,000
3,400
10
4
3
AVERAGE
GOOD
1.85 ACRES
AVERAGE
1

**Comparable 5**

**Comparable 6**

Subject Building Sketch

| Borrower/Client | GOERNER | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 12 WANTAGE SCHOOL ROAD | | | | | |
| City | WANTAGE TOWNSHIP | County | SUSSEX | State | N.J. | Zip Code 07461 |
| Lender | KENSINGTON FINANCIAL SERVICES | | | | | |



**Location Map**

| Borrower/Client | GOERNER | | | | |
|---|---|---|---|---|---|
| Property Address | 12 WANTAGE SCHOOL ROAD | | | | |
| City | WANTAGE TOWNSHIP | County | SUSSEX | State | N.J. | Zip Code | 07461 |
| Lender | KENSINGTON FINANCIAL SERVICES | | | | |



**Homecomings Financial**
A GMAC Company

EX. 12

April 27, 2007

Perry Goerner
12 Wantage School Road
Sussex, NJ 07461

RE: Homecomings Loan Number 0473329357

Dear Perry Goerner:

This letter serves as notification that HomeComings will begin drafting your bank account for your mortgage payment pursuant to your request.

Your Monthly Automated Payment withdrawals are scheduled to begin 6/1/2007 in the amount of $2810.06.  This draft is based on the following information:

Checking Account #: XXXXXXXXX5893

If your regularly scheduled draft is returned for insufficient funds (NSF), a second draft will be attempted.  Each NSF will result in a fee.  We must receive 30 days advance notice to process all requests regarding your Automated Payment Option.

We appreciate you as a customer and we value your business.  If you have any questions, please write or contact our Customer Service Department at 1-800-206-2901.

Sincerely,

*Nancy Marks*

Nancy Marks
Account Manager

You can access and update your drafting information via our secure Web site at
**https://www.homecomings-loaninfo.com**

P.O. BOX 890036          DALLAS          TX          75389          1-800-206-2901

12-12020-mg    Doc 4579    Homecomings Account Statement    Entered 08/06/13 13:33:43    Exhibit C.

Exhibit 6  9  10  12 & 13   Pg 34 of 34

# Homecomings Financial
*A GMAC Company*

**CUSTOMER INFORMATION**

| | |
|---|---|
| Name: | PERRY GOERNER |
| Account Number: | 7473329357 |
| Home Phone #: | (973)875-6764 |

**PROPERTY ADDRESS**

12 WANTAGE SCHOOL ROAD
SUSSEX          NJ 07461

Visit us at www.homecomings.com for account information or to apply on-line.

EX. 13



951701 04/06/07 08:30 0005313 20070606 GF060102 HOREG   1 OZ DOM GF05010000* 148316   MU
#BWNHJPY
#KW75967B36782#

||||..||..||.||.||...||||..|||..||.|.|.|..||..|.|||.||

PERRY GOERNER
12 WANTAGE SCHOOL ROAD
SUSSEX NJ 07461-3322

| Customer Care Inquiries: | 1-800-206-2901 |
|---|---|
| Home Financing Needs: | 1-877-695-3633 |

Please verify your mailing address, borrower and co-borrower information. Make necessary corrections on this portion of the statement, detach and mail to address listed for inquiries on the reverse side.

## Account Information

| | |
|---|---|
| Account Number | 7473329357 |
| Current Statement Date | June 01, 2007 |
| Maturity Date | April 01, 2037 |
| Interest Rate | 7.50000 |
| Current Principal Balance* | $322,019.82 |
| Current Escrow Balance | $2,001.27 |
| Interest Paid Year-to-Date | $3,830.96 |
| Taxes Paid Year-to-Date | $0.00 |

**For Customer Care inquiries call: 1-800-206-2901**
**For Insurance inquiries call:    1-800-237-6787**
**For Payment Arrangements call:   1-800-799-9250**

## Details of Amount Due/Paid

| | |
|---|---|
| Principal and Interest | $2,254.97 |
| Subsidy/Buydown | $0.00 |
| Escrow | $555.09 |
| Amount Past Due | $0.00 |
| Outstanding Late Charges | $0.00 |
| Other | $0.00 |
| Total Amount Due | $2,810.06 |
| Account Due Date | July 01, 2007 |

## Account Activity Since Last Statement

| Description | Due Date | Tran. Date | Tran. Total | Principal | Interest | Escrow | Add'l Products | Late Charge | Other |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

*This is your Principal Balance only, not the amount required to pay the loan in full. For payoff figures and mailing instructions, call the Customer Care number above or you may obtain necessary payoff figures through our automated system (24 hours a day, 7 days a week).
See back for automatic payment sign-up information and other payment options.

## Important News

Get a $3,000 disability benefit for one full year at no cost to you. Please see the enclosed for more information.

Pay down debt! Fund a home improvement project or tuition! Call the number above to apply for a Home Equity Line or Loan!

### See Reverse Side For Important Information