**SUSSEX COUNTY BOARD OF TAXATION**

Appeal No. ___24-1300031D___

973−579−0970

# MEMORANDUM
# OF
# JUDGMENT

EX-31

GOERNER, PERRY
12 WANTAGE SCHOOL RD
WANTAGE, NJ          07461

GOERNER, PERRY
_____
                              **Petitioner**

                  vs

WANTAGE TWP
_____
                              **Respondent**

Taxing District   __WANTAGE TWP__          Address   __12 WANTAGE SCHOOL RD__

Block   _____43_____          Lot   __7.18__          Year   __2013__

A duly verified Petition of Appeal having been filed with the Sussex County Board of Taxation and said appeal having been heard and considered.

It is on this day __06/20/13__ ORDERED that Judgment be entered as follows:

| | ORIGINAL ASSESSMENT | | JUDGMENT |
|---|---|---|---|
| Land | $ 178,000 | Land | $ 178,000 |
| Improvement | $ 108,100 | Improvement | $ 68,100 |
| Abatement | $ 0 | Abatement | $ 0 |
| Total | $ 286,100 | Total | $ 246,100 |
| Prorated for | N/A months | Prorated for | N/A months |
| Prorated Amount | $ N/A | Prorated Amount | $ N/A |
| Original Property Class | 2 | Judged Property Class | |

JUDGMENT CODE # __3__   Stipulated
*(See Reverse Side)*

MARKET VALUE COMPARABLE SALES
_____

(Explanation for codes 1E and 5F)

COMMISSIONERS' SIGNATURES

ATTEST:

_Melissa Rockwell_

Date Mailed __06/21/13__
**Date Judgment Entered and Mailed by County Board of Taxation**
(a) A record shall be maintained noting the date each judgment is mailed.(b) Each Judgment shall be stamped with the date of entry and date mailed.

12-12020-mg    Doc 4579-10    Filed 07/31/13    Entered 08/08/13 13:33:43    Exhibit J 1 of 2
Craig Nazzaro | LinkedIn    Exhibits 31   32   33   34   35   36 & 37   Pg 2 of 36        Page 1 of 2
EX-32

# Craig Nazzaro

**Vice President and Assistant General Counsel at JPMorgan Chase**
Greater New York City Area · Law Practice

**Join LinkedIn and access Craig Nazzaro's full profile.**

As a LinkedIn member, you'll join 200 million other professionals who are sharing connections, ideas, and opportunities. And it's free! You'll also be able to:

- See who you and **Craig Nazzaro** know in common
- Get introduced to **Craig Nazzaro**
- Contact **Craig Nazzaro** directly

View full profile

## Craig Nazzaro's Overview

| | |
|---|---|
| Current | **Vice President and Assistant General Counsel at JPMorgan Chase** |
| Past | Partner at Law Offices of Craig P. Nazzaro |
| | Partner at Crescent Lake Settlement Services, LLC |
| | Associate at Stiene & Edwards |
| Education | Hofstra University School of Law |
| | American University |
| Connections | 62 connections |

## Craig Nazzaro's Summary

I have been practicing law since 2003. I am admitted in both New York and New Jersey specializing in Real Estate Lending (commercial & residential) and general corporate work. I previously worked at two boutique real estate/mortgage banking firms and am currently in house counsel at JP Morgan Chase providing support to the mortgage bank.

**Specialties**
Real Estate Transactions(Both Commercial & Residential), Including acquisition & sales, leasing, title and finance. Genral Coprporate transactions: including drafting and review of contracts of sale, leases, employment and sales contracts, non disclosure and non circumvent agreements, as well as operating, vendor and JV agreements

## Craig Nazzaro's Experience

**Vice President and Assistant General Counsel**
**JPMorgan Chase**
Public Company; 10,001+ employees; JPM; Financial Services industry
April 2011– Present (2 years)

- Identify risk trends and root causes of complaints originating from the Mortgage Banking Executive Office; consult with senior management to develop course of action for resolution.
- Provide feedback and determine corrective action to present to senior management and business teams.
- Provide direction to the mortgage bank regarding various customer complaint projects including high-risk cases and high profile media inquiries.
- Interface with regulators, attorneys and investors.
- Manage general litigation and supervise outside counsel in matters filed against or on behalf of the mortgage bank.

**Partner**
**Law Offices of Craig P. Nazzaro**
April 2005– April 2011 (6 years 1 month)

- Represented lenders, purchasers and sellers in residential and commercial real estate transactions. Drafted and reviewed all legal documents including mortgages, notes, consolidations, assignment of rents and leases, and lease abstracts.
- Negotiated and drafted agreements, including contracts of sale (commercial and residential property), commercial leases (including amendments, assignments, renewals, subleases and terminations), employment and sales contracts, non-disclosure and non-circumvent agreements, as well as operating, vendor and JV agreements.
- Advised national mortgage lender ($600M, 2009 sales) on all compliance and licensing issues at the time of company's expansion in the Northeast. Acted as liaison between retained counsel and the lender in matters of lending and employment disputes.
- Redesigned and implemented new closing procedures for a mortgage lender's closing department in order to facilitate cleaner origination files to improve turn time of investor purchases.
- Handled all stages of foreclosure actions from inception to completion.
- Cleared clouded title for bank-owned REO portfolios. Negotiate REO contracts and attend closing of title.
- Held monthly training seminars for mortgage banking clients educating their sales and processing personnel on issues including GFE reviews, RESPA reviews, TILA, and post closing collateral package reviews.
- Responsible for management of firm's employees and personnel issues.

**Partner**
**Crescent Lake Settlement Services, LLC**
April 2005– April 2011 (6 years 1 month)

- Supervised production, review and clearance of title abstracts for issuance of policies on residential and commercial properties.
- Oversaw process of loan originations from application, title clearance, closing and post-closing reviews for loan sales.
- Disposed of defects in title to issue commitments free from objections, clear defects, and restore chain of title on closed loans for sale on secondary markets.
- Responsible for all escrow accounts, including balancing, funding and reconciling all loans and escrowed funds.
- Established all software necessary to close, fund and track title and loan files.
- Formed and secured underwriting and agency agreements from Fidelity National Title. Fully staffed and manage the company.
- Grew business to insuring $15M a month in declining mortgage market.

**Associate**
**Stiene & Edwards**
August 2003– April 2005 (1 year 9 months)

- Represented J.P. Morgan Chase in courts of New York State on contested & uncontested foreclosure matters.
- Handled disposition of JP Morgan Chase's REO properties in New York
- Reviewed foreclosure searches to identify necessary title claims.
- Represented JP Morgan Chase in residential refinance and purchase transactions.
- Drafted, negotiated, and reviewed commercial leases for clients including amendments, assignments, renewals, subleases, and terminations.
- Headed projects to clear defects in closed loans, including unrecorded liens and/or missing documentation from collateral files.
- Consulted with brokers and mortgage banks regarding issues of compliance on documentation and payout practices.

Craig Nazzaro's Education

**Hofstra University School of Law**
J.D.,Corporate Law, Real Estate
2000 – 2003
*Activities and Societies:*Member: Corporate Law Society & Domestic Abuse Clinic

**American University**
B.A.,Communication
1997 – 2000

Contact Craig for:

- career opportunities
- expertise requests
- reference requests

- job inquiries
- business deals
- getting back in touch

View Craig Nazzaro's full profile to...

- See who you and **Craig Nazzaro** know in common
- Get introduced to **Craig Nazzaro**
- Contact **Craig Nazzaro** directly

**View Full Profile**

Not the Craig Nazzaro you were looking for?View more »

LinkedIn member directory - Browse members by country ab cd ef gh ij kl mn op qr st uv wx yz more

LinkedIn Corporation © 2011

*EX. 33*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------x

In re:                                          Case No. 810-74869-reg

CRAIG R. NAZZARO,                               Chapter 7

                        Debtor.
------------------------------------------------x

TD BANK, N.A.,

                        Plaintiff,

        - against -                             Adv. Proc. No. 810-8500-reg

CRAIG R. NAZZARO,

                        Defendant.
------------------------------------------------x

## MEMORANDUM DECISION

This matter is before the Court pursuant to an adversary proceeding commenced by TD

Bank, N.A. (the "Plaintiff") against Craig R. Nazzaro (the "Debtor") seeking, *inter alia*, to bar

the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(4)(A) and (a)(2)(A), and/or to have the

Debtor's obligation to the Plaintiff deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

The resolution of this adversary proceeding requires the Court to determine whether, when a

debtor fails to disclose an asset in his petition, denial of the Debtor's discharge under Bankruptcy

Code §§ 727(a)(4)(A) and/or (a)(2)(A) turns on a quantitative analysis of the omitted asset, or

whether the failure to disclose an asset which may have little worth can be sufficient to bar a

debtor's discharge . The Debtor's obligation to the Plaintiff arose as a result of the Debtor's

guarantee of loans incurred by the Debtor's mortgage loan business. After the business defaulted

, the Debtor was involved in the formation of a new company, capitalized with funds from third

parties. The Debtor received an ownership interest in this new company. Within months of the

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Plaintiff's commencement of an action against the mortgage loan business and the Debtor as guarantor, the Debtor transferred, for no consideration, his interest in the new company. The Debtor chose not to disclose the transfer of his interest in the new company in the petition. The Debtor argues that he never actually owned this interest and therefore did not have to disclose the transfer. The Debtor also claimed that the interest had little to no value, and any failure to disclose the transfer did not harm the creditors or the Debtor's estate in any meaningful way.

Based on the evidence provided at trial, including all of the documentary evidence, the Court finds that the Debtor's interest in the company had vested with the Debtor, the Debtor did in fact own the interest, and he transferred that interest to a third party for no consideration within several weeks prior to the filing of the Chapter 7 petition. Section 727(a)(4)(A) prohibits the granting of a discharge to a debtor who knowingly and fraudulently makes a false oath or account, which includes a false statement in the petition. While a debtor's discharge is not to be denied lightly, full disclosure by a debtor is critical in order to protect the integrity of the Bankruptcy process. The plain language of this section does not require multiple omissions or misstatements, nor does it require that the omitted transaction concern an asset of significant value. While a debtor is entitled to a fresh start, and inadvertent omissions should not result in the denial of a debtor's discharge, debtors act at their own peril when they knowingly fail to comply with the statute and make their own determination as to what is relevant or important enough to include in the petition. The Chapter 7 trustee and the creditors should not have to conduct their own investigation of the debtor's assets and prepetition activity, and have a right to rely on the accuracy of a debtor's petition and schedules. This statute is not ambiguous and clearly requires full disclosure by the debtor of all matters related to the disposition of the debtor's property.

Section 727(a)(2)(A), which bars the discharge of a debtor who transfers property within one year prior to the petition date with the intent to hinder, delay or defraud a creditor, does not require that the creditor be harmed by the transfer. In consideration of the circumstances surrounding the transfer, the Court finds that the Debtor transferred his interest in the new company with the intent to defraud or hinder his creditors. Based on these rulings, it is not necessary to rule on the dischargeability cause of action pursuant to § 523(a)(4).

## PROCEDURAL HISTORY

On June 24, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. On September 14, 2010, the Plaintiff filed this complaint objecting to the discharge of the Debtor pursuant to 11 U.S.C. §§ 727(a)(2)(A) and (a)(4)(A), and objecting to the dischargeability of the Debtor's debts to the Plaintiff pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(4). On November 29, 2010, the Debtor filed an answer to the complaint. On February 20, 2012, the Plaintiff filed a motion for summary judgment as to Counts One (§ 727(a)(2)(A)), Two (§ 727(a)(4)(A)) and Four (§523(a)(4)) of the complaint. Hearings on the Plaintiff's motion for summary judgment were held on April 18, 2012 and May 16, 2012. At the May 16, 2012 hearing, the Debtor, who had previously appeared through his counsel, appeared without counsel, and requested an opportunity to establish at trial that he never had a vested interest in the asset he allegedly failed to schedule in his petition. The motion for summary judgment was marked submitted.[1] On May 22, 2012, the Plaintiff and the Defendant filed a Joint Pretrial Memorandum. A trial was held on May 29, 2012 as to Counts One, Two

---

[1] In light of the fact that a trial has been held with respect to this adversary proceeding, the Plaintiff's motion for summary judgment is moot.

and Four.[2] On June 1 and June 5, 2012, the Plaintiff filed letters with the Court regarding the
outstanding legal issues, and on June 12, 2012, the Debtor's counsel filed a post-trial
memorandum. Thereafter, the adversary proceeding was marked submitted.

### FACTS

In May 2002, the Debtor and Richard Doran formed a limited liability company known
as Kensington Financial Services, LLC ("Kensington"), pursuant to the laws of Delaware.
Although Kensington was no longer operating as of the Petition Date, the Debtor held a 45%
membership interest in Kensington from 2002 through the Petition Date. Kensington
commenced operations as a mortgage broker with offices in New Jersey, Garden City, New
York, Warwick, New York and Florida. Kensington was not licensed as a mortgage lender,
except in Florida. May 29, 2012 Trial Transcript ("Trial Tr."), p. 76. Despite the fact that
Kensington was licensed to act as a mortgage lender, it never engaged in mortgage banking, and
surrendered its Florida mortgage banking license in the second quarter of 2009. Trial Tr., p. 77.
Kensington was not licensed to originate FHA loans. Trial Tr., p. 18 – 19.

In November 2007 and December 2007, TD Bank loaned $410,000.00 to Kensington,
and was granted a security interest in all of Kensington's accounts, chattel papers, goods,
inventory, equipment, fixtures, investment property, deposit accounts, documents, general
intangibles and other collateral. The Debtor and Doran each executed an Unlimited Guaranty
pursuant to which each personally guaranteed Kensington's indebtedness to TD Bank.
Thereafter, Kensington defaulted on its obligations under the loan agreements and the Debtor
and Doran defaulted under the guarantees. According to Doran's testimony, Kensington's

---

[2] The Court assumes that the Plaintiff withdrew Count Three prior to the trial, since the Plaintiff did not present
any evidence in support of this Count at trial, and did not address Count Three in the Joint Pretrial Memorandum.

business was suffering due to adverse changes in the mortgage lending business and the economic downturn. By 2008, it became more difficult for mortgage brokers to thrive as a result of the dramatic decrease in the number of mortgage loans being made. Trial Tr., p. 18.

In April 2008, the Debtor and Doran became employed by Geneva Mortgage as mortgage brokers, and continued to work at Geneva Mortgage until December 2008. Unlike Kensington, Geneva Mortgage was licensed to originate FHA loans through the Department of Housing and Urban Development. Trial Tr., p. 19. Kensington ceased operations in early 2009. In 2009, the Debtor and Doran abandoned the physical assets of Kensington, including the office furniture and files to the landlords of Kensington's various leased premises. The leased premises in Garden City were returned to Geneva Mortgage, which utilized the space and office equipment formerly leased and utilized by Kensington. According to the testimony of Doran at trial, the Plaintiff was approached by members of Kensington and asked if the Plaintiff wanted to take the office equipment remaining at the premises. According to Doran's testimony at trial, the Plaintiff declined to take the equipment. Trial Tr., p. 17.

In February 2009, the Debtor and Doran were employed by Secured Lending Solutions, LLC as mortgage brokers until early summer 2009. In the spring of 2009, the Debtor and Doran were approached by James DiPiazza, who was a partner at Secured Lending Solutions, LLC, about infusing new capital into Kensington. Trial Tr., p. 11, 12. The Debtor and Doran were receptive to the inquiry, but the Debtor and Doran agreed that due to the debts owed by Kensington, it would not be prudent to recapitalize Kensington. Trial Tr., p. 15, 33. The Debtor and Doran also believed that recapitalizing Kensington, which only had a broker's license and was not licensed as a mortgage banker, would not be a good business decision. Trial Tr., p. 33.

In April 2009, Chris Dover, James DiPiazza, Doran and the Debtor formed Bond Street Mortgage, LLC ("Bond Street") to engage in the business of mortgage brokering and banking. Trial Tr. p. 9. Bond Street was capitalized in the amount of $800,000 with funds from Chris Dover. Trial Tr., p. 11. Bond Street obtained its license as a mortgage broker and banker from New Jersey in December 2009, and commenced operations in January 2010. Bond Street operated out of the same Garden City office from which Geneva Mortgage and Kensington operated. Trial Tr., p. 56-57.[3]

Pursuant to a Limited Liability Operating Agreement for Bond Street dated December 30, 2009 ("Bond Operating Agreement"), Dover, DiPiazza, Doran, Business Management Services LLC and the Debtor were equity members of Bond Street. The Debtor held the title and office of Chief Operations Officer of Bond Street. Doran and DiPiazza also served as officers of Bond Street. According to Schedule A of the Bond Operating Agreement, the Debtor received a 7.5% interest in Bond Street for services provided to Bond Street. Plaintiff's Ex. 8. Article 7.6 of the Bond Operating Agreement provides as follows:

> The Members agree that no Member may voluntarily withdraw from the Limited Liability Company without the affirmative vote or consent of Members holding a supermajority of the Members' Percentage Interests (other than the withdrawing Member).
>
> A member may, however, request voluntary withdrawal after all of the following conditions are met: (a) the Company has operated for 3 years or more, (b) annual net profits have been equal or greater than the member's capital contribution during the preceding 3 year period, (c) the member provides six (6) months written notice of the request and (d) a supermajority of members agree that the member's withdrawal will not adversely impact business operations. In the event of such voluntary withdrawal, the value of the member's ownership interest will be calculated and paid out using the formula outlined in 7.3, Table 1.

Plaintiff's Ex. 8.

---

[3] The relationship, if any, between the owners of Kensington and Geneva was never clarified.

While the Bond Operating Agreement contains language restricting each member, including the Debtor, from transferring his interest in Bond Street, it does not contain any terms which reflect that the Debtor's membership interest is contingent or did not vest as of December 30, 2009, the effective date of the Bond Operating Agreement.   Article 8.2 of the Bond Operating Agreement further provides as follows:

> In the event of the sale or other disposition of all or substantially all of the Company's assets as decided by an affirmative vote of the supermajority of members, then a special distribution of 5% ownership interest shall be made to Rich Doran and Craig Nazzaro, with each receiving 2.5%. This distribution shall be made from the other members' shares in proportion of their respective ownership interest. The Company will not terminate or dissolve until all FHA-insured mortgages have been transferred to another approved mortgagee.

Plaintiff's Ex. 8. This provision appears to grant the Debtor an additional interest in Bond Street from certain other members in the event of a sale or disposition of the assets of Bond Street.   Notwithstanding the language of the Bond Operating Agreement, the Debtor testified that he believed he had no vesting interest in Bond Street for the first three years after December 30, 2009, which he understood to mean as follows:

> It has no execution value.  It means nothing to me until it is fully vested.  I can't trade it, I can't borrow against it.  I can't take any type of income from it before the three years and before the hurdles of sales, bondings to the company is achieved.

Trial Tr., p. 47.

According to the Debtor, he had no legal ownership interest in Bond Street, just a contingent right which did not ripen into a vested interest until certain requirements were met over three years from the date that Bond Street was formed.

DiPiazza testified that there were written riders to the Bond Operating Agreement providing that the Debtor's interest in Bond Street would not vest until certain financial hurdles

were met by the business. Trial Tr., p. 84.  In support of this testimony, Piazza submitted

documents to the Plaintiff post-trial, and the Plaintiff included them with their post-trial

submission.  The documents include a Resolution of the Members of Bond Street, dated

December 30, 2009 ("Bond Street Resolution").  The Bond Street Resolution provides that "in

the event the minimum hurdle of $500,000 net profit is not realized within the first 3 years of

operations then the members have the right to revoke to [sic] interest of the officers 'in lieu of

cash' service equity and it would be immediately returned to the company."  The Debtor also

submitted a financial statement from Bond Street as of December 31, 2010, which reflects that

the Debtor claimed a 7.5% interest in Bond Street.  The documents exchanged post-trial do not

support the Debtor's contention that the Debtor's interest in Bond Street did not vest for the first

three years of Bond Street's formation, or that the vesting was contingent upon some future

event.

At trial, the Debtor testified that under the compensation scheme for Bond Street, 55% of

the commissions generated from each loan made by Bond Street were divided into thirds, and the

Debtor was entitled to receive a 1/3 share.  The remaining 45% of the commissions were used to

pay the expenses for Bond Street and for reinvestment into Bond Street.  Trial Tr. P. 51, 52.

According to the Debtor, he was not a "vested" owner, so he was not entitled to take any share of

the 45% which was reinvested into Bond Street.  Trial Tr., p. 53.  The Debtor was also entitled to

receive 1/3 of the amount equal to ten basis points of the total gross loan volume generated by

Bond Street each month.  Trial Tr., p. 55.

At the time Bond Street was formed, the Debtor remained a managing member of

Kensington, which had ceased operations and was insolvent.  On December 4, 2009, TD Bank

commenced an action against Kensington, the Debtor and Doran to collect on the notes and guarantees.

On April 23, 2010, the Debtor assigned his "complete vesting interest" in Bond Street to DiPiazza for no consideration.[4]  The Debtor testified that when the transfer took place in April, 2010, he had approximately $200,000 in equity in his home. Trial Tr., p. 59.  After he transferred his interest in Bond Street to DiPiazza, the Debtor remained as Chief Operating Officer, and he continued to be entitled to receive commissions based on the same formula until he resigned from Bond Street at the end of September, 2010. Trial Tr., p. 75.

On June 24, 2010 (the "Petition Date") the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code.  As of the Petition Date, the Debtor held no equity interest in Bond Street, and the only equity holders of Bond Street were Dover and DiPiazza. The transfer of the Debtor's ownership interest to DiPiazza, which took place within eight weeks of the Petition Date, was not disclosed in the Debtor's petition, schedules or statement of financial affairs. The Debtor disclosed his interest in Kensington, and valued his interest at zero.  The Debtor failed to disclose the transfer of ownership interest in Bond Street in question number 10 of the Statement of Financial Affairs.  The Debtor testified that he had disclosed his interest in Bond Street to his bankruptcy attorney. Trial Tr., p. 65. The Debtor also failed to disclose Bond Street as a business interest he held within the last three years, pursuant to question number 18 in the Statement of Financial Affairs.  According to the Debtor, because his ownership interest never vested, he was not obligated to disclose his unvested interest in Bond Street as an asset.  Trial Tr., p. 68.  The Debtor also testified that he did not disclose the transfer because he believed his

---

[4] While the assignment agreement reflects that the Debtor's interest in Bond Street was transferred to DiPiazza, DiPiazza testified that the Debtor's shares were transferred back to Bond Street, and later 100% of the shares of Bond Street were redistributed between DiPiazza and Dover. Trial Tr., p. 90.

interest in Bond Street had no value to him as of the date of the transfer. Trial Tr., p. 67. Despite

the fact that the asset had no value to the Debtor, the Debtor believed that the membership

interest had value to Bond Street and could be offered to other investors.  Trial Tr., p. 68.

## DISCUSSION

1. *Denial of Discharge under 11 U.S.C. 727*

It is well-settled law that the denial of a debtor's discharge is a drastic remedy that must

be construed strictly in favor of the debtor. *State Bank of India v. Chalasani* (*In re Chalasani*),

92 F.3d 1300, 1310 (2d Cir. 1996).  However, a discharge under section 727 is a privilege, not a

right, and may only be granted to the honest debtor. *Congress Talcott Corp. v. Sicari* (*In re

Sicari*), 187 B.R. 861, 880 (Bankr. S.D.N.Y. 1994).  The plaintiff bears the burden of

establishing each of the elements of section 727 by a preponderance of the evidence. *See Minsky

v. Silverstein* (*In re Silverstein*), 151 B.R. 657, 660 (Bankr. E.D.N.Y. 1993); *see also* Fed. R.

Bankr. P. 4005.

### a. Count 2 – denial of the Debtor's discharge under § 727(a)(4)(A)

11 U.S.C. § 727(a)(4)(A) provides:

The court shall grant the debtor a discharge, unless –
(4) the debtor knowingly and fraudulently, in or in connection with the case –
(A) made a false oath or account.

Under this section, the Plaintiff must prove by a preponderance of the evidence that: (1)

the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the

statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the

statement related materially to the bankruptcy case. *Carlucci & Legum v. Murray (In re

Murray)*, 249 B.R. 223, 228 (E.D.N.Y. 2000).

12-12020-mg   Doc 4579-10   Filed 07/31/13   Entered 08/08/13 13:33:43   Exhibit J.

Case 8-10-08500-reg31  Doc 34-3   Filed 01/14/13   Entered 01/14/13 14:54:51

Exhibits 31  32  33  34  35  36 & 37   Pg 14 of 36

The burden of showing actual fraudulent intent lies with the party objecting to the debtor's discharge. *Pergament v. Smorto (In re Smorto)*, No. 07-CV-2727 (JFB), 2008 WL 699502, at *4 (E.D.N.Y. Mar. 12, 2008). "Once the [plaintiff] has produced persuasive evidence of a false statement, the burden shifts to the debtor to come forward with evidence to prove that it was not an intentional misrepresentation or provide some other credible explanation." *See Periera v. Gardner (In re Gardner)*, 384 B.R. 654, 662-63 (Bankr. S.D.N.Y. 2008) (citations omitted). "While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a *prima facie* case." *Palmer v. Downey (In re Downey)*, 242 B.R. 5, 14, 15 (Bankr. D. Idaho. 1999) (other citations omitted).

"It is well established that a deliberate omission may constitute a false oath, and thus result in a denial of the discharge." *Crews v. Stevens (In re Stevens)*, 250 B.R. 750, 754 (Bankr. M.D. Fla. 2000) (citing *Raiford v. Abney (In re Raiford)*, 695 F.2d 521, 522 (11th Cir. 1983); and *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)). A materially false statement made or omitted as part of the bankruptcy petition, schedules, at an examination or during the proceeding itself may constitute a false statement under oath for purposes of § 727(a)(4)(A). *New World Restaurant Group, Inc. v. Abramov (In re Abramov)*, 329 B.R. 125 (E.D.N.Y. 2005).

The plain language of this statute provides that one single false oath or account is sufficient to deny a debtor's discharge. *Olympic Coast Investment, Inc. v. Wright (In re Wright)*, 364 B.R. 51, 73 (Bankr D. Mont. 2007) (citing *Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 277 (1st Cir. BAP 1999), *Fogal Legware of Switzerland, Inc. v. Wills. (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999), and *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992)). It is crucial for

the successful administration of the estate that the debtor provide truthful information in connection with the bankruptcy case. *Dubrowsky v. Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 572 (E.D.N.Y. 2000). "[T]he very purpose of . . . § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction . . . ." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987).

It is not enough under section 727(a)(4)(A) that a debtor is merely careless in the preparation of documents to be filed with Court, or in his testimony in connection with the case. The omission must rise to the level of showing fraudulent intent. *Painewebber, Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 437 (S.D.N.Y.1996). Fraudulent intent may be inferred from the circumstances of the case. *Sperling v. Hoflund (In re Hoflund)*, 163 B.R. 879, 882, 883 (Bankr. N.D. Fla. 1993). Such circumstances may include "inferences from the debtor's conduct, all surrounding circumstances, and the apparent course of conduct." *Palmer v. Downey*, 242 B.R. at 13 (other citations omitted). If a debtor is found to have exhibited a "reckless indifference to the truth," then that may be enough to establish fraudulent intent sufficient to deny the discharge. *See Diorio v. Kreisler-Borg Constr. (In re Diorio)*, 407 F.2d 1330 (2d Cir. 1969) ("Successful administration of the Bankruptcy Act hangs heavily on the veracity of statements made by the bankrupt . . . . Statements called for in the schedules, or made under oath in answer to questions propounded during the bankrupt's examination or otherwise, must be regarded as serious business; reckless indifference to the truth . . . is the equivalent of fraud.") (citations omitted); *See also Perlbinder v. Dubrowsky*, 244 B.R. at 571-72.

Finally, the omissions and/or misstatements by a debtor must be material. However, "any matter bearing on the discovery of estate property or the disposition of the debtor's property is material for purposes of § 727(a)(4)(A)." *New World Restaurant Group, Inc. v. Abramov*, 329 B.R. at 134. The Court of Appeals for the Second Circuit has held that whether the inclusion of the assets would have increased the value of the debtor's estate is not determinative of whether the omission is material. *In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974). "The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious." *Chalik v. Moorefield*, 748 F.2d at 618 (citing *Diorio v. Kreisler-Borg Constr. Co.*, 407 F.2d at 1330).

A debtor is obligated to disclose even worthless assets and unprofitable business transactions, as it is not for the debtor to determine whether the asset is relevant or important to disclose. The debtor is charged with answering the questions accurately and completely. *New World Restaurant Group, Inc. v. Abramov*, 329 B.R. at 134. Furthermore, there is no requirement that the omission cause direct financial prejudice to creditors. *Olympic Coast Investment, Inc. v. Wright* 364 B.R. at 73 (citing *In re Weiner*, 208 B.R. 69, 72 (9th Cir. B.A.P. 1997), *rev'd on other grounds*, 161 F.3d 1216 (9th Cir. 1998) (other citations omitted)). An asset may be material even if it did not cause financial prejudice to the estate or creditors "if it aids in understanding the debtor's financial affairs and transactions." *In re Hoblitzell*, 223 B.R. 211, 215-16 (Bankr. E. D. Cal. 1998). For example, if the omission interferes with the ability to fully investigate potential preference or fraudulent conveyance actions, then the omission may be material. *Olympic Coast Investment, Inc. v. Wright*, 364 B.R. at 74.

"'Where persuasive evidence of a false statement under oath has been produced by a plaintiff, the burden shifts to the defendant to prove that it was not intentionally false. . . . Courts may consider the debtor's education, business experience, and reliance on counsel when evaluating the debtor's knowledge of a false statement, but the debtor is not exonerated by pleading that he or she relied on patently improper advice of counsel.'" *Wachovia Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272, 313 (Bankr. E. D. Pa. 2006) (quoting *In re Maletta*, 159 B.R. 108, 112 (Bankr. D. Conn. 1993)). A debtor's testimony at trial that he did not list certain property in his schedules because "in his mind" he did not own the property in question was "not worthy of belief." *Sergent v. Haverland (In re Haverland)*, 150 B.R. 768, 771 (Bankr. S.D. Cal. 1993). The debtor's unfounded belief that the asset had no value was insufficient as a defense to a claim under § 727 (a)(4)(A). *Id.* at 772.

In this case, the sole asset the Debtor is accused of failing to disclose is a 7.5% ownership interest in Bond Street, which the Debtor transferred to a third party for no consideration within weeks prior to the Petition Date. The Debtor does not dispute that he knowingly and consciously chose not to disclose the transaction in his petition, therefore the omission cannot be deemed unintentional. The Debtor claims that because he never had a vested interest in Bond Street there was no property transfer to disclose. The Debtor goes on to argue that even if he did have an interest in Bond Street, the ownership interest had no value.

In support of his argument that he never held a vested interest in Bond Street, the Debtor claimed at the hearing on the Plaintiff's motion for summary judgment that he had documentary evidence he wished to introduce at trial. At the scheduled trial, the Debtor relied on the Bond Operating Agreement to support his contention. However, the Bond Operating Agreement does not contain any language indicating that the Debtor's interest in Bond Street was a contingent

interest subject to meeting other requirements. In fact, the Bond Operating Agreement clearly states that the Debtor was granted a 7.5% interest in Bond Street, which interest would increase by an additional 2.5% if Bond Street was sold to a third party.

After the trial, the Debtor's witness, James DiPiazza, turned over additional documents to the Plaintiff, which the Plaintiff filed with the Court. The documents include a financial statement for Bond Street as of December 31, 2010, and a Resolution of the Members of Bond Street, dated December 30, 2009, reflecting that the Debtor was granted a 7.5% interest in Bond Street. The Resolution does not contain language reflecting that the grant is conditional or contingent. The Resolution also recites that profits would be distributed to all members in proportion to their ownership interest in Bond Street at the end of each quarter. The document entitled "Assignment of Ownership Interest" dated April 23, 2010, and executed by the Debtor reflects that the Debtor assigned his "complete vesting interest" in Bond Street to DiPiazza. (Plaintiff's Ex. 13).

In sum, the documentary evidence compels the Court to conclude that the Debtor had a vested ownership interest in Bond Street; an interest which he admits he transferred to James DiPiazza prepetition, and chose not to disclose in his petition. There is no evidence, documentary or otherwise, in the record to support the Debtor's alleged belief that his interest in Bond Street was contingent or subject to additional requirements. The Debtor's belief was completely unfounded and incompatible with the evidence submitted at trial. Even the document purporting to transfer the Debtor's interest refers to that interest as "vested." This begs the question of why the Debtor undertook the exercise of transferring something that he believed he did not own. Because the Debtor's explanation for failing to list the asset is so at odds with the evidence presented at trial, the Court finds that the Debtor's explanation lacks credibility.

Therefore, the Court concludes that the Debtor intentionally failed to list his vested interest in Bond Street.

While the value of the asset cannot be clearly ascertained from the documents submitted to the Court, it is undisputed that regardless of the actual value of the asset, the omission of the asset interfered with the investigation of the Debtor's business affairs. This failure to disclose the asset and its transfer deprived the Trustee and other creditors of the opportunity to examine whether the transfer should be avoided as a fraudulent conveyance, as the Debtor paid DiPiazza no consideration for the transfer, and the transfer most likely was made while the Debtor was insolvent. It is not for the Debtor to determine whether a business interest is of sufficient value to warrant disclosure. *Forrest and Stiebel v. Bressler (In re Bressler)*, 387 B.R. 446, 461 (Bankr. S.D.N.Y.) The Debtor's assertion that his attorney was aware of the transfer at the time the petition was prepared does not alter the Court's decision. For these reasons, the Debtor's discharge shall be denied pursuant to § 727(a)(4)(A).

### b. Count 1 - denial of the Debtor's discharge under 727(a)(2)(A)

Under Count One of the complaint, the Plaintiff seeks to deny the Debtor's discharge on the grounds that the Debtor concealed a beneficial equity interest in Bond Street for the purpose of hindering, delaying or defrauding the Plaintiff and/or the Trustee, and to avoid the administration of this interest in the bankruptcy case. A party seeking to bar a debtor's discharge under § 727(a)(2)(A) of the *Bankruptcy Code must show*:

(a) an act, such as a transfer or concealment of property in which the debtor has a direct proprietary interest;
(b) the debtor's subjective intent to hinder, delay, or defraud a creditor or the bankruptcy trustee through such act, and
(c) that such act and the debtor's subjective *intent occurred within the one year* period preceding the filing of the bankruptcy petition.

*Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993).

According to the Plaintiff, the Debtor failed to disclose his beneficial equity interest in Bond Street with the intent to hinder, delay or defraud the Plaintiff and/or the Trustee, and to avoid the Trustee's administration of this beneficial interest in Bond Street. First, there must be a disposition of property of the debtor, and the transfer or concealment must take place within one year of the petition date. In addition, the transfer or concealment must have been done to hinder, delay or defraud a creditor or the bankruptcy trustee. As this Court has found, the Debtor transferred an asset of the estate within one year of the Petition Date. An examination of the circumstances surrounding the transfer support a finding that the transfer was made with the intent to hinder, delay or defraud the Trustee and the creditors.

Proving actual intent to defraud is difficult because a debtor is unlikely to admit to fraudulent intent. *Minsky v. Silverstein*, 151 B.R. at 660. As a result, courts have looked to objective events which are deemed "badges of fraud" in order to determine whether fraudulent intent exists. *New World Restaurant Group v. Abramov*, 329 B.R. at 131 (*citing Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983) (other citations omitted).

These badges of fraud include:

1. the lack or inadequacy of consideration;

2. the family or other close relationship between the parties;

3. the retention by the transferor of possession, benefit or use of the property in question;

4. the financial condition of the transferor both before and after the transaction in question;

5.  the existence or cumulative effect of a pattern or series of transactions or a course of
    conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of
    suits by creditors; and

6.  the general chronology of the events and transactions under inquiry.

*Solomon v. Kaiser*, 722 F.2d at 1582 – 83.

The evidence supports a finding that the Debtor's transfer of his interest in Bond Street
was made with intent to defraud. The transfer was made for no consideration to another insider
of Bond Street, and the transfer was made just prior to the Petition Date, within several months
after the Plaintiff commenced its lawsuit. The transfer appears to be part of a scheme to insulate
the Debtor from having to repay the Plaintiff in the event the Plaintiff obtained a judgment. The
Debtor chose not to re-capitalize Kensington, which was indebted to the Plaintiff, and instead
formed a new company with a capital infusion from a third party. While Bond Street provided a
wider range of services, it was in a business similar to Kensington. After the Debtor transferred
his interest in Bond Street, the Debtor remained employed at Bond Street with the same
compensation scheme. According to the Debtor's petition, there was no equity in the Debtor's
residence as of the Petition Date, and the Debtor had no other significant assets. Based on the
circumstances surrounding the transaction and the badges of fraud inherent in the transfer, the
Court finds that the transfer was made with the intent to defraud the Debtor's estate and his
creditors.

As discussed above, the Debtor's excuse that he did not believe he owned the interest in
Bond Street lacks credibility and is belied by all of the documentary evidence. His claim that the
asset had no value does not absolve the Debtor of liability under § 727(a)(4)(A). The Court

believes that full disclosure by the Debtor is critical to the integrity of the bankruptcy process.   A

debtor who disregards these requirements does so at his risk.   There is no requirement in this

Circuit that the creditors be harmed by the Debtor's actions:

> Although some courts have held that the transfer of property in which the debtor
> lacks equity cannot constitute a fraudulent transfer, *see Discenza v. MacDonald
> (In re MacDonald)*, 50 B.R. 255, 259 (Bankr. D. Mass. 1985); *Farmers Bank v.
> McCloud (In re McCloud)*, 7 B.R. 819, 822 (Bankr. M.D. Tenn. 1980), our
> Second Circuit Court of Appeals has held that "once the fraud be proved, it makes
> no difference that the creditors are not seriously injured." *Feynman v. Rosenthal
> (In re Feynman)*, 77 F.2d 320, 322 (2d Cir. 1935); *see also Davis v. Davis (In re
> Davis)*, 911 F.2d 560, 561 (11th Cir. 1990) (concluding injury to creditors
> irrelevant when deciding a section 727(a) complaint); *First Beverly Bank v. Adeeb
> (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986) (same).

*In re Kablaoui*, 196 B.R. 705, 710 (Bankr. S.D.N.Y. 1996).

In sum, the Plaintiff has successfully established each element of § 727(a)(2)(A), and the Debtor

has failed to show that he lacked intent to defraud the creditors.   Therefore, the Court finds in

favor of the Plaintiff on Count One of the Complaint.

## 2.   *Dischargeability of debt pursuant to 11 U.S.C. § 523(a)(4)*

Having determined that the Debtor's discharge should be denied pursuant to Counts 1

and 2 of the complaint, the Court shall not rule on the fourth count of the complaint pursuant to

Section 523(a)(4).

12-12020-mg    Doc 4579-10    Filed 07/31/13    Entered 08/08/13 13:33:43    Exhibit J.

Case 8-10-08500-reg    Doc 34    Filed 01/14/13    Entered 01/14/13 14:54:31
Exhibits 91    92-35    36-35    36-&37    Pg 23 of 36

## CONCLUSION

For the foregoing reasons, judgment is granted in favor of the Plaintiff as to §§

727(a)(2)(A) and (a)(4)(A), and  the Debtor's discharge is denied.  The Court shall enter

judgment consistent with this Memorandum Decision forthwith.

Dated:  Central Islip, New York
        January   14, 2013             By:  */s/ Robert E. Grossman*
                                       Robert E. Grossman
                                       United States Bankruptcy Judge

PERRY GOERNER pro se
12 WANTAGE SCHOOL RD.
SUSSEX, NJ 07461
973-875-6474

*EX. 34*

OCWEN  LOAN SERVICING, LLC
CUSTOMER CARE
3451 HAMMOND AVE
WATERLOO, IA 50704-0780

RE; **LETTER OF INTENT  DISPUTING THE VALIDITY OF THE DEBT OWED TO
GMAC MORTGAGE Account #7473329357 & will serve as Notice that my house is
not vacant.**

To Whom it may Concern:

  I have recently received 2 letters from your company one dated **2/ 07/2013**, but was received on
**2/22/2013**, the other letter was received this week this week on **2/26/2013**, and was dated on
**2/16/2013**.
**I am disputing the validity of this debt by way of this letter and answer to the letter I
received on 2/22/2013, which was dated on 02/ 07/2013, this letter did not have a postmark,
I dispute the GMAC mortgage notes validity.
I received a letter that was postmarked 02/ 28/2013, was dated 02/26/2013, I received this
letter on 03/04/2013, enclosed is a copy of this letter which states that my house is vacant,
and you were sending someone to change my locks.**

**I was visited by your representative to change my locks on 02/ 28/2013, 5 days before I
received your letter, I built this house in 1982 and have had continued my residence for 30
years and will continue residing in said residence until this fraudulent mortgage note is
reviewed by the courts, and decided upon.**

I would like you to provide me with complete copies of the mortgage note as filed and the
mortgage instruments that were signed by me and ay and all files pertaining to the acquisition of
the mortgage note including the mortgage application from Kensington Financial Services llc.,
all files by Cresent Lake Settlements llc.,  Original mortgage documents that were signed by me
to Homecomings Financial llc., a GMAC company, and any and all documents that pertain to the
mortgage mentioned above that were signed by me.

Sincerely,

PERRY GOERNER pro se

CC: Ocwen Servicing LLC. By USPS Priority Mail  Dated : 03/11/2013





**OCWEN**

*Ocwen Loan Servicing, LLC*
*PO Box 780*
*Waterloo IA 50704-0780*
HELPING HOMEOWNERS IS WHAT WE DO!™
OCWEN.MORTGAGEBANKSITE.COM

02/26/13

PERRY GOERNER

12 WANTAGE SCHOOL ROAD

SUSSEX        NJ 07461



| RE: | Account Number | 7473329357 |
| | Property Address | 12 WANTAGE SCHOOL ROAD |
| | | SUSSEX         NJ 07461 |

Dear   PERRY GOERNER

It has come to our attention that the property listed above is currently vacant.

Within the next week, we will send a representative to change the locks and winterize the property (if necessary). We are taking these steps to protect our interest in the property per the terms of your Mortgage/Deed of Trust.  Any cost associated with this service will be assessed to your loan account.

If you are currently maintaining the property, please call our office at 800-850-4622 (weekdays, 8:00 a.m. - 11:00 p.m. CT; Saturday, 8:00 a.m. - 12:00 p.m.).

Collections Department
Loan Servicing

5:26

RECIEVED
2/26/2013



01/14/13 11:00 3  0003074 20130219 I87C5101 OCWENDUP 1 CIC DCM I87G510000* 160275  DM

PERRY GOERNER
12 WANTAGE SCHOOL ROAD
SUSSEX NJ  07461-3322

---

RE:    Account Number:      7473329357
       Property Address:    12 WANTAGE SCHOOL ROAD
                            SUSSEX NJ 7461

Dear PERRY GOERNER:

We recently provided a letter advising that the servicing of your account has been transferred to Ocwen Loan Servicing, LLC. As a result of this transfer, Federal law requires that we provide you with the following information.

Ocwen Loan Servicing, LLC is servicing your account on behalf of RESIDENTIAL FUNDING CORP, which currently owns the interest in your account. As of the date of this letter, the total amount of the debt is $387,506.62. Interest, late charges, legal costs, fees and other charges may also be included in the total amount of the debt. Please note that because interest, late charges, and other charges may continue to accrue on this account, the total amount owed may be greater than the amount indicated above.

Federal law provides that you have thirty (30) days from the date of this letter to dispute the validity of this debt or any portion thereof. If you DO NOT wish to dispute this debt or any portion thereof within the thirty-day period, we will assume the debt is valid. If you wish to dispute this debt, please notify us in writing within the thirty-day period and we will provide verification of the debt or a copy of the judgment by mail. We will also provide the name and address of the original creditor if a written request is received within the same thirty-day period.

(Continue to next page)



**Important Information About This Transfer**

**RESPA Notice:** You should be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a qualified written request to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number and your reasons for the request.

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account and must provide you with a written clarification regarding any dispute. During this 60-BusinessDay period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A Business Day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that section. You should seek legal advice if you believe your rights have been violated.

**Qualified Written Request:** Effective with the transfer date, please send all qualified written requests to: Ocwen, ATTN: Customer Care, P.O. Box 1330, Waterloo, IA 50704-1330.

**Optional Insurance:** The transfer of servicing rights may affect the term or the continued availability of mortgage life or disability or any other type of optional insurance. If you have been paying premiums for optional insurance coverage such as accidental death, life or disability, your coverage will likely continue at the same or a comparable premium. If a change of provider is necessary, you will receive new policy information in a separate letter. If Ocwen is not able to continue your coverage, Ocwen or GMACM will notify you in writing.

### Additional Information

**Online Services:** If you were previously using the GMACM website, you should continue to use your same username and password. You will be redirected to ocwen.mortgagebanksite.com to complete the login process. You do not need to re-enroll to continue using the same online payment programs. Any current online payment arrangements will continue uninterrupted through Ocwen.

**Payment by Phone:** If you previously scheduled a payment by phone through GMACM, this deduction will continue as scheduled.

**Automatic Payment:** If you were previously using GMACM's automatic payment service, this program will continue with Ocwen with no lapse in service. If you use a third party payment service, please request they update their records to have payments made to Ocwen Loan Servicing, LLC.

**Payment by Check:** If sending payment by check, please be aware you are authorizing Ocwen to use information on this check to make a one-time electronic debit to the account at the financial institution indicated on the check. This electronic debit will be for the amount on your check and no additional amount will be debited. Please be aware this bank account may be debited the same day Ocwen receives the check.

**Homeowner's Insurance:** Notice will be sent to your insurance carrier to provide the Ocwen address information following the transfer.

**Year-End:** GMACM will provide a 2012 year-end IRS form 1098 statement consistent with how you may have received it in prior years. Ocwen will provide a 2013 year-end IRS form 1098 that will include payments received in 2013 by GMACM and Ocwen.

**Loan Modifications:** Ocwen is committed to helping homeowners. If you are currently on a trial modification plan or have a modification review underway, this process will continue. You should continue making your payments as required in the modification plan. If you recently submitted financial documentation to be considered for payment options, it is not necessary to re-send the documents to Ocwen, as the information will automatically transfer.

**Short Sale:** Any previously approved short sale offers or pending short sale negotiations will continue. The original expiration date for a previous short sale approval still applies; if it has expired, the approval is no longer valid.

**Identity Theft Notice:** If you would like to obtain information regarding identity theft, you may contact the Federal Trade Commission at http://www.ftc.gov/bcp/edu/microsites/idtheft/ OR by calling 1-877-ID-THEFT (1-877-438-4338).

# GMAC Mortgage

## Notice of Servicing Transfer and Welcome to Ocwen Loan Servicing, LLC

February 7, 2013

*REC'D 2/22/2013*

12/27/12 10:00 3   0006842 20130207 I62N1105 GOODBYE  Z QZ DOM I62N110000* 190647 LT

PERRY GOERNER
12 WANTAGE SCHOOL ROAD
SUSSEX NJ  07461-3322



### Your Loan Account Details
### as of 02/04/2013

**Account Number:**
7473329357

**Property Address:**
12 WANTAGE SCHOOL ROAD
SUSSEX NJ 07461

**Transfer Date:**
02/16/2013

**Principal Balance:**
$310,823.71

**Escrow Balance:**
-$16,065.15

**Loan Rate:**
7.500%

**Next Payment Due:**
9/1/2010

**Payment Amount:**
Please refer to your
*mortgage account statement*

### Ocwen Loan Servicing, LLC
### Customer Care
### Contact Information

➤**Phone:**
800-766-4622

Personal assistance:

6:00 a.m. - 10:00 p.m. CT M-F

and 8:00 a.m. - 2:00 p.m. Sat

24-hour automated service

**Email:**
ocwen@mortgagebanksite.com

**Web:**
ocwen.mortgagebanksite.com

**Mail:**
PO Box 780
Waterloo, IA  50704-0780

02-1x85-7300(1/13)

Dear PERRY GOERNER,

The servicing of your mortgage loan, that is, the right to collect payments from you, is transferring from your current servicer, GMAC Mortgage ("GMACM") to your new servicer, Ocwen Loan Servicing, LLC ("Ocwen") effective February 16, 2013.

Rest assured this transfer of servicing does not affect any term or condition of the mortgage documents, other than those directly related to the servicing of your loan. There will be no change to your account number or payment address; only to the name of the company to which you make your payment. All mailing addresses and phone numbers you previously used to contact GMACM will remain the same but, as of February 16, 2013, they will be maintained by Ocwen. You will continue to be served in a knowledgeable and professional manner, just as you have in the past.

GMACM will stop accepting payments on February 15, 2013. Ocwen will begin to accept payments on February 16, 2013. Send all payments due on or after that date to Ocwen. A temporary coupon is provided below for your convenience. Any account notices prepared prior to February 16, 2013 will reflect GMACM; all notices prepared on or after February 16, 2013 will reflect Ocwen. In addition any payments received by GMACM after February 15, 2013 will automatically be processed by Ocwen.

If you are currently using GMACM's automatic payment service, this program will continue with no lapse in service. If you previously made your payment through GMACMortgage.com, on or after February 16, 2013 you can go to ocwen.mortgagebanksite.com and use your same login ID and password for account access. If you use a third party payment service, please request they update their records to have payments made payable to Ocwen Loan Servicing, LLC effective February 16, 2013.

Because GMACM is the subject of a bankruptcy proceeding, federal law requires either GMACM or Ocwen to send you this notice not more than 30 days after the effective date of the transfer of the servicing of your loan. In this case, all necessary information is combined in this one notice. Please review the reverse side of this letter for legal disclosures, notices and state requirements. It's our goal to make this transfer as seamless as possible.

Enclosed are your (1) final **GMAC Mortgage annual privacy notice** and (2) your **Ocwen initial privacy notice** that becomes effective with the start of your new customer relationship with Ocwen. Please see the Ocwen initial privacy notice for important opt-out elections.

We appreciate the opportunity to serve your home loan needs. If you have questions relating to the transfer of servicing please contact our Transfer Hotline at 1-888-926-3479 weekdays from 8:00 AM to 7:00 PM, Central Time. If you have questions about the general servicing of your loan please call GMACM Customer Care at 800-766-4622, 6:00 a.m. - 10:00 p.m. CT M-F and 8:00 a.m. - 2:00 p.m. Sat.

Sincerely,                                    Sincerely,

Charles R. Hoecker                   William C. Erbey
Sr. Vice President, Customer Care    President and Chief Executive Officer
GMAC Mortgage                         Ocwen Loan Servicing, LLC

Enclosure(s)

EX 35

Perry Goerner
12 Wantage School Rd.
Sussex , NJ, 07461
973-875-6474

March 6, 2012

GMAC
Account # 7473329357
Fax:866-509-6177

RE:    Notice of : CEASE AND DESIST

To whom it may concern:

This is a notice to cease and desist any and all phone calls or any other type of contact to the below mentioned phone number by which your company has been harassing said person's by calling at all hours of the day while trying to collect a debt.

You have been harassing a 100% Mentally & Physically Disabled Person, who resides at the above residence, and was given a fraudulent mortgage, and was denied a modification.

If you need to contact the above person, please send everything in writing at the above address.

DO NOT CALL : 973-875-6474 from this day forward.

Sincerely,

Perry Goerner

HP Officejet 5600 series 5610          Personal Printer/Fax/Copier/Scanner

Log for
perry goerner
973-875-6474
Mar 06 2012 12:10p

Last Transaction

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Mar 06 | 12:09p | Fax Sent | 18665096177 | 0:57 | 1 | OK |

# GMAC Mortgage

3451 Hammond Ave
P.O. Box 780
Waterloo, IA 50704-0780

02/07/11

PERRY GOERNER

12 WANTAGE SCHOOL ROAD

SUSSEX          NJ 07461

RE:    Account Number        7473329357
       Property Address      12 WANTAGE SCHOOL ROAD

                             SUSSEX          NJ 07461

Dear   PERRY GOERNER

As we have been informed the above-referenced property is vacant, we will be sending a
representative to the property within seven days to rekey and winterize, if applicable.

We are taking this action for the protection of our security under the terms of the
Mortgage/Deed of Trust.

If you are maintaining the property, please contact the Collections Department at
800-850-4622 and we will attempt to cancel the work order.

Collections Department
Loan Servicing

5:26

p Officejet 5600 series 5610

og for
perry goerner
873-875-6474
Feb 15 2011 11:19a

| Last Transaction | | | Identification | Duration | Pages | Result |
|---|---|---|---|---|---|---|
| Date | Time | Type | 18667094744 | 1:57 | 3 | OK |
| Feb 15 | 11:17a | Fax Sent | | | | |

# HARDSHIP LETTER

I am a Permanently Mentally and Physically Disabled Senior, I collect Social Security Disability in the amount of $852.00 Monthly, starting on 04/27/2006.

There has been no change in my income since the mortgage was procured , the first payment was on 5/1/07, I could not afford it then and not now.

In August we had a drought and I found the septic to be leeching/flowing into a pond that was built in front of my house, most if not all of the fish died and the pond had a green thick layer that smelled like septic until now, we have had rain and I try not to use the bathroom as it has backed up quite a few times, into the dishwasher and sink.
I had an excavator come out and give me an estimate for repair, I cannot afford the repairs.

I have asked for a modification and sent in documents in March Of 2009, got a confirmation # and no response, sent in more documents, had called at least 6 times , I have all the dates etc.. for litigation if need be, I have never been contacted by this mortgage company on any matter, not by phone or mail until I had called about this foreclosure, you never called me for late payments.

I stopped paying my mortgage 9/1/2010.

I was in an accident on 04/27/2006 where I was rear ended while on my motorcycle stopped behind a van , being ejected and striking the van's rear door with my head, I have permanent memory disability and physical injuries to my neck, back, arm's, legs, hands, etc...

I do not work, I am almost completely homebound, I walk in circles all day long because of my concentration/memory loss, I have to stay in the kitchen so I don't leave and forget what is on the stove, I have burnt many things because of this, I don't remember unless I smell something burning. I do some leathercraft to keep me busy suggested by my doctor.

I have constant ringing in my ears, and am dizzy continually, sleep a lot, I forget where I am going even to the store, I have to stop and try to remember, this is my life.

I cannot bend over because of my back and neck injuries, and do not clean very well, when I do I end up in bed for days, my back is severely damaged as my neck is too, I've had 2 back operations, and need another.

The truth of the matter is, this seems to be a fraudulent loan, I never lied on any documents:
1. I was solicited for this loan by the Mortgage Originator
2. Since 4/27/2006 I was on a fixed income of $852.00 a month, and Mortgagor knew of my inability to work, I had not worked for almost a year when I obtained the mortgage in 2007
3. I was given a Mortgage on my house for $2,879.00 monthly for 30 yrs with $852. Income
4. I was not mentally capable of signing these documents, and was on medication at the signing.

*EX. 37*

# GMAC Mortgage

3451 Hammond Ave
P.O. Box 780
Waterloo, IA 50704-0780

12/13/10

PERRY GOERNER

12 WANTAGE SCHOOL ROAD

SUSSEX        NJ 07461

RE:    Account Number    7473329357
Property Address    12 WANTAGE SCHOOL ROAD

SUSSEX        NJ 07461

Dear    PERRY GOERNER

In connection with your request for a loan modification, we regret to inform you that your
request has been denied for the following reason(s):

[X]    The financial information provided shows you have insufficient income to support your
request. We recommend you consider selling your property. If the value of your property has
declined and would not result in a full payoff of the mortgage please contact our office when an
offer is received so we can review for a possible short sale.

[]    The financial information provided shows that your income is sufficient to cover your
existing mortgage obligation; therefore, we are unable to modify your existing obligation.

[]    While you do not have sufficient income to support all of your monthly expenses, some of
your expenses could be reduced. We recommend you contact your other creditors to lower
their monthly payments before workout solutions can be considered on your mortgage.

[]    We previously requested additional information from you which has not been
received; therefore, we are unable to continue our review for workout solutions.

[]    We service your loan on behalf of an investor or group of investors that has not given us
authority to modify your loan under the program requested.

12/13/10
Account Number 7473329357
Page Two

[] The payment we received does not represent the correct amount as specified in the agreement.

[] The required payment was not received by the payment due date as specified in the agreement.

[] We have not received the properly signed and executed agreement.

[] You did not meet the requirement (s) for the Home Affordable Unemployment Program.

[] We have been unable to clear/resolve outstanding title issues in order to meet recording requirements.

[]

[]

At times like these we feel it is important for you to seek financial advice from a trusted source experienced with situations like yours. Therefore, we recommend you call 1.800.CALL.FHA to find a HUD-Certified housing counseling agency to discuss your needs. You can also call the HOPE hotline number (888-995-HOPE) to seek assistance at no charge from HUD-approved housing counselors and can request assistance in understanding this borrower notice letter by asking for MHA HELP.

We will continue to work with you to explore other options that may be available for your circumstances. If you have any questions regarding the above decision, please contact our office at 800-850-4622, between the hours of 7:00 a.m. and 9:00 p.m. Monday through Thursday Central Standard time, 7:00 a.m. to 6:00 p.m. Central Standard time Friday, and 8:00 a.m. to 12:00 p.m. Central Standard time on Saturday.

Loss Mitigation Department
Loan Servicing