**Hearing Date:  August 21, 2013 at 10:00 a.m. (Eastern Time)**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
J.  Christopher Shore
Harrison L. Denman

     - and -

MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi
Daniel Perry
Atara Miller

Attorneys for the Ad Hoc Group

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | | Re:  Docket Nos. 4152 & 4157 |

**OBJECTION OF AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS TO
PLAN PROPONENTS' MOTION FOR AN ORDER, <u>INTER ALIA</u>, APPROVING THE
DISCLOSURE STATEMENT AND ESTABLISHING PROCEDURES FOR
SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR
 REJECT THE PLAN PROPONENTS' JOINT CHAPTER 11 PLAN**

     The Ad Hoc Group of Junior Secured Noteholders (the "<u>Ad Hoc Group</u>"),[1] by and

through its undersigned counsel, hereby submits this objection (the "<u>Objection</u>") to the Plan

---

[1]    The Ad Hoc Group is comprised of certain entities (the "<u>Junior Secured Noteholders</u>" or the "<u>JSNs</u>") that hold or
manage holders of 9.625% Junior Secured Guaranteed Notes due 2015 issued under that certain Indenture dated
as of June 6, 2008.  Following the $800 million and $300 million paydowns previously approved by the Court,

Proponents' Motion for an Order (i) Approving the Disclosure Statement, (ii) Establishing

Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents'

Joint Chapter 11 Plan, (iii) Approving the Form of Ballots, (iv) Scheduling a Hearing on

Confirmation of the Plan, (v) Approving Procedures for Notice of the Confirmation Hearing and

for Filing Objections to Confirmation of the Plan, and (vi) Granting Related Relief [Docket No.

4152] (the "Motion"),[2] and in support thereof, respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Disclosure Statement, in its current form, fails to provide full and fair

disclosure regarding critical aspects of the Global Settlement and Plan.  It should not be

approved by this Court until it is amended to remedy the deficiencies discussed herein.

2.      Confirmation of the Plan is predicated on the satisfaction of three key

conditions: (i) resolution (by judgment or compromise) of the pending litigation prior to

confirmation between the Plan Proponents and the JSNs regarding the JSNs' secured status and

entitlement to post-petition interest; (ii) approval of the Global Settlement; and (iii) approval of,

and issuance to Ally, of the Debtor Releases and the Third Party Releases in exchange for the

Ally Contribution.  The Disclosure Statement, in its current form, does not fully and fairly

address any of these issues.

3.      *First*, the Disclosure Statement fails to address what happens if the JSNs'

entitlement to post-petition interest is decided on a ground that is inconsistent with the Global

Settlement.  The Plan Proponents have made clear that the JSNs will be paid post-petition

---

the outstanding amount of principal and pre-petition interest on the Junior Secured Noteholders' claim is now $1.122 billion and the outstanding amount of post-petition interest accrued through July 31, 2013 is approximately $287 million (collectively, the "JSN Claims").  The JSN Claims continue to increase by virtue of the ongoing accrual of post-petition interest at the rate of approximately $152 million per year.

[2]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion, the Disclosure Statement or the Plan, as applicable.

interest in the event they prevail on the subset of issues to be tried in the Phase I adversary proceeding. But if the Phase I proceedings do not fully resolve the issue and the JSNs thereafter establish an entitlement to post-petition interest at confirmation, the terms of the Global Settlement appear to contemplate that the Plan will not be confirmed. The Disclosure Statement does not currently address this issue and should be amended to do so.

4.    *Second*, the Disclosure Statement fails to address, in a balanced and detailed way, the key issues in dispute between the JSNs and the Plan Proponents. The Disclosure Statement fails to disclose that the Plan Proponents have assumed that they will prevail fully on all litigated issues without any adjustment for the risk of the litigation. In this way, the Disclosure Statement misleadingly creates the impression that the JSN Claims are undersecured by an insurmountable gap.

5.    *Third*, the Disclosure Statement does not provide full and fair disclosure of the Global Settlement. It provides no principled rationale for the allocation of value and the allowance of claims mandated by the proposed compromise. This failure is underscored by the fact that elements of the settlement are squarely inconsistent with (i) positions previously taken in these cases by the Plan Proponents and (ii) findings and conclusions from the Examiner's Report. Disclosure is particularly important in these cases because the Global Settlement involves a zero sum game—i.e., every dollar contributed to one creditor constituency reduces the recovery of every other creditor constituency. The impacted creditor constituencies are entitled to know precisely how and why value was allocated to other constituencies.

6.    *Fourth*, the Disclosure Statement does not provide full and fair disclosure as to the Ally Settlement. The Disclosure Statement fails to disclose sufficient facts that would enable a creditor to determine whether the Ally Contribution is substantial enough to warrant

3

either or both of the Debtor Releases and the Third Party Releases.  The Examiner's Report

reflects that Ally is receiving substantial tax benefits that it receives in connection with any

contribution to the Debtors and for which the Debtors possess substantial claims for

compensation.  Using the Examiner's Report as a guide, it appears as though Ally will actually

receive a ████████ windfall (after taking into account the tax benefits and contributions from

its insurers) for making the Ally Contribution.

**OBJECTION**

I.    **THE DISCLOSURE STATEMENT FAILS TO PROVIDE
      ADEQUATE INFORMATION TO ENABLE A REASONABLE
      CREDITOR TO CAST AN INFORMED VOTE**

7.    A chapter 11 plan proponent may only solicit votes on a plan of

reorganization after the Court has approved its written disclosure statement as containing

"adequate information."  11 U.S.C. § 1125(b).  "Adequate information" is defined in

section 1125(a)(1) of the Bankruptcy Code as information

> of a kind, and in sufficient detail, as far as is reasonably practicable in
> light of the nature and history of the debtor and the condition of the
> debtor's books and records . . . that would enable such a hypothetical
> investor of the relevant class to make an informed judgment about the
> plan.

8.    The disclosure statement "was intended by Congress to be the primary

source of information upon which creditors and shareholders would make an informed judgment

about a plan of reorganization."  In re Jeppson, 66 B.R. 269, 291 (Bankr. D. Utah 1986).

Because creditors rely on the disclosure statement for making an informed decision with respect

to voting on a plan of reorganization, "it is crucial that a debtor be absolutely truthful so that the

disclosure statement" satisfies section 1125(a)(1) of the Bankruptcy Code.  In re Galerie Des

Monnaies of Geneva, Ltd., 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985).  Moreover, it is of prime

4

importance that a debtor's disclosures be "full and fair."  In re Momentum Mfg. Corp., 25

F.3d 1132, 1136 (2d Cir. 1994).

9.      In the absence of honest, full and fair disclosure, a disclosure statement

should not be approved.  See In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr.

N.D.N.Y. 1988)  (holding that a disclosure statement must contain "simple and clear language

delineating the consequences of the proposed plan and the possible [Bankruptcy Code]

alternatives so that [creditors] can intelligently accept or reject the Plan."); In re Ferretti, 128

B.R. 16, 19 (Bankr. D.N.H. 1991) (disclosure statement must be "clear and comprehensible" and

"clearly and succinctly inform" creditor as to "what it is going to get, when it is going to get it,

and what contingencies there are to getting its distribution").

10.     The Disclosure Statement fails to provide basic information about matters

of primary concern to the JSNs, in the absence of which such creditors would lack "adequate

information" to make an informed decision as to whether to accept or reject the Plan.

### A.      The Failure to Provide Clarity on the Confirmability of the Plan in the Event the JSNs Are Determined to Be Oversecured

11.     The Plan Proponents represent that the Plan provides that "if the

Bankruptcy Court determines that the [JSNs] are entitled to post-petition interest, the Allowed

amount of such post-petition interest shall be paid in accordance with the requirements under the

Bankruptcy Code."   (Plan III.D.1(c); see also Disclosure Statement at 33; Transcript of July 30,

2013 Hearing at 47.)  This simple description of the interest component of the JSN Claims may

not be, based upon conversations with the Plan Proponents, completely accurate.  While it does

appear true that if the Court determines that the JSNs are oversecured based upon issues

addressed in the "Phase I" adversary proceeding, the JSNs will receive their post-petition interest

pursuant to the Plan (provided that all other conditions to confirmation are met) and the

Consenting Creditors will remain bound to support the Plan.

12.     But the Disclosure Statement fails to state how the JSNs' claim for post-

petition interest will be treated in the event that the JSNs' entitlement to such interest is not fully

resolved by the trial of the subset of issues in the Phase I adversary proceeding.  If this happens,

and the JSNs' entitlement to interest is decided in connection with confirmation, it could be

decided on grounds that are inconsistent with the terms of the Global Settlement and the Plan

will presumably not be confirmed.  The Disclosure Statement does not currently address this

contingency or its consequences.  Until it is amended to do so, creditors will have no clarity

regarding the ultimate confirmability of the Plan.

13.     The foregoing uncertainty, which has evolved into ambiguity, was first

raised by the Court itself at the May 29, 2013 conference in respect of the PSA.[3]  Creditors'

Committee counsel assured the Court that it "would not hold the Court hostage."[4]  Shortly

thereafter, however, the Plan Proponents suggested that if the Court were to make determinations

regarding the JSNs' entitlements that were not fully consistent with the terms of the Global

Settlement, the Plan would not be confirmable.[5]

14.     For example, the JSNs have liens on the Debtors' intercompany claims

(the "Intercompany Claims"), which are being improperly waived for zero consideration

pursuant to the Global Settlement.[6]  The Intercompany Claims have value that must be

considered in determining the JSNs' entitlement to post-petition interest.  Moreover, if the

---

[3]   Transcript of May 29, 2013 Status Conference at 32, 37.

[4]   Id. at 37.

[5]   Letter from Morrison & Foerster LLP to the Honorable Martin Glenn, United States Bankruptcy Judge (June 11,
      2013), at 3.

[6]   See Amended and Restated Third Priority Pledge and Security Agreement, dated as of December 30, 2009 (the
      "JSN Security Agreement") § 2; Final Cash Collateral Order [Docket No. 491] ¶¶ 5 and 28.

Intercompany Claims are compromised as part of the Global Settlement, the JSNs are entitled to adequately protection in an amount equal to their full value.[7]  The Disclosure Statement must clearly address (i) the impact on the JSNs, other creditors, the Debtors, and the Consenting Creditors of a determination by the Bankruptcy Court that the Intercompany Claims cannot be compromised for zero consideration; and (ii) whether the proposed compromise of the Intercompany Claims deprives the JSNs of a property right without consent, thereby requiring adequate protection for the JSNs.

15.    This is not an immaterial or theoretical issue.  The Plan Proponents now concede that the Intercompany Claims are not "worthless."  (Transcript of July 30, 2013 Hearing at 33.)  But it also apparently remains their position (or that of certain Consenting Creditors directing the Plan Proponents) that if the Court were to address the issue at confirmation and determine that the Intercompany Claims are worth anything but zero value, the Plan would be not confirmable.

16.    Based upon conversations with the Plan Proponents, the requisite disclosures should address at least the following questions:

a.    If the Court determines that the Intercompany Claims have value, will the Global Settlement fail and the Plan be unconfirmable?

b.    If the Court approves the Global Settlement, but determines that the JSNs are entitled to adequate protection equal to the value of the Intercompany Claims, will the Plan be confirmable?

c.    If the Court determines that the JSNs' liens attach to some or all of the Ally Contribution, will the Global Settlement fail and the Plan be unconfirmable?

---

[7]    See Answer, Affirmative Defenses and Counterclaims of Defendants UMB Bank, N.A. and the Ad Hoc Group of Junior Secured Noteholders to Debtors' First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment, Adv. Case No. 13-01277 (MG) [Docket No. 49] & 13-01343 (MG) [Docket No. 14] at ¶¶ 39-48 and 129-172.

    d.      If the Court determines that some or all of the Ally Contribution must be allocated to Debtors which have no material creditors but for which the JSNs have equity pledges, and that the JSNs are entitled to such value, will the Global Settlement fail and the Plan be unconfirmable?

    e.      If the Court approves the allocation of the Ally Contribution as contemplated by the Global Settlement, but determines that the JSNs are entitled to adequate protection equal to the value of the claims against Ally that represent JSN Collateral, will the Global Settlement fail and the Plan be unconfirmable?

17.      The answers to the foregoing questions are material and must be included in the Disclosure Statement for all creditors to receive adequate information.  If the answer to any of these questions is "yes," the Plan Proponents should disclose why (if they do not intend to hold the Court "hostage") they agreed to a structure whereby the Plan Proponents, on the one hand, agreed to pay the JSNs post-petition interest in the event that the JSNs prevailed on the issues to be tried in the Phase 1 trial two months prior to confirmation *but,* on the other hand, determined not to agree to pay the JSNs post-petition in the event that they prevailed on the issues the Court has determined to try at confirmation.

18.      Annexed hereto as Exhibit "A," for potential inclusion in the Disclosure Statement, is a proposed set of answers to these questions intended to resolve the ambiguity on this issue.

**B.**    **The Failure to Fully Describe the
Nature of the Dispute with the JSNs**

19.      The Disclosure Statement fails to provide an accurate, adequate, and balanced account of the current litigation relating to the JSNs' secured status.  Rather, the Disclosure Statement reflects the Plan Proponents' conclusory *belief* that the JSNs are "significantly undersecured," without further  discussion that adequately informs the reader as to the magnitude of the issues in dispute or the potential impact of the dispute on the chapter 11

process and the Debtors' estates. (Disclosure Statement at 33.) Annexed hereto as Exhibit "B,"

for potential inclusion in the Disclosure Statement, is a proposed supplemental discussion of the

Plan Proponents' dispute with the JSNs.

20.    The Disclosure Statement notes that the JSNs hold as of the Petition Date

claims of approximately $2.2 billion. (Id. at 91.)  The Plan Proponents state in the Disclosure

Statement that the value of the collateral securing the JSN Claims (the "JSN Collateral") is $1.69

billion. (Id.) The Disclosure Statement fails to provide an explanation of how the Plan

Proponents arrived at this $1.69 billion collateral value. That valuation presupposes a further

reduction in value attributable to the future use of ▮▮▮▮▮ of JSNs' cash collateral for

which the Debtors have no authority.  Thus, as it exists today, the lowest possible value that the

JSN Collateral could have is ▮▮▮▮ (before taking into consideration the partial paydown

previously authorized by this Court).  Also, the Plan Proponents have assumed that they will

prevail fully on all litigated issues without any adjustment for the risk of litigation.

21.    In this way, the Disclosure Statement misleadingly creates the impression

that the JSN Claims are undersecured by an insurmountable gap.  But the Plan Proponents need

to prevail completely on almost every issue at play in the various litigated proceedings for the

JSNs to be undersecured.  Certain of these issues are outlined below for the benefit of the Court.

22.    **Allocation of Ally Contribution**.  The JSNs have an undisputed lien on

certain causes of action, including prepetition breach of contract claims.  (JSN Security

Agreement, §§ 1-2, 4.)  The JSNs also have undisputed pledges of equity in certain Debtors

granting releases to Ally under the Plan.  (Id. § 3(a)-(j).)   The Plan Proponents, however, have

failed to allocate *any* portion of the Ally Contribution to the JSN Collateral.  (Disclosure

Statement at 36-37, 93-94.)  They failed to do so, notwithstanding their acknowledgement that

the Ally Contribution is being paid in consideration of releases of potential causes of action that
include breach of contract.  (Id. at 22-23.)

23.    The Examiner concluded that the majority of the Debtors' strongest claims
against Ally sounded in breach of contract.  (Examiner's Report at I-30-31.)  For instance, the
Examiner found that the Debtors were likely, or more likely than not, to prevail on claims related
to the breach of a prepetition loan brokering agreement and tax allocation agreement with Ally
that could yield more than $2.25 billion in damages against Ally.  (Id. at I-8-9, I-13-14.)

24.    The Plan Proponents, however, have taken the position that the Ally
Contribution is being made for the release of the causes of action sounding in tort or avoidance
actions under the Bankruptcy Code, which they claim are not subject to the JSNs' liens.  The
Plan Proponents also allocated no settlement consideration to the Debtors as to which the JSNs
have equity pledges, notwithstanding that such Debtors are granting releases under the Plan.
(Disclosure Statement at 36-37.)   Furthermore, similar to the settlement of the Intercompany
Claims discussed infra ¶¶ 30-35, the Plan Proponents do not disclose how they plan to satisfy
sections 363(e) and 363(f) with respect to the settlement of claims that constitute JSN Collateral.

25.    Although the JSNs dispute the Plan Proponents' contention that their liens
do not attach to *all* causes of action being released, there is no dispute that the JSNs' liens do
attach to at least *some* of these causes of action.  As there is no basis to provide a release without
consideration, and, as the Examiner determined, the most material and viable Debtor causes of
action are breach of contract claims, the JSNs' liens must attach to a material portion of the Ally
Contribution.

26.    **Adequate Protection Liens**.  The Final Cash Collateral Order (i) granted
the JSNs adequate protection liens for any diminution in value of the JSN Collateral and

(ii) included a waiver of the Debtors' right to surcharge the JSN Collateral under section 506(c) of the Bankruptcy Code.[8]   The Plan Proponents, however, take the position that the JSNs are not entitled to *any* adequate protection for the post-petition diminution in value of their collateral. (Disclosure Statement at 93.)

27.     What the Debtors do not fully disclose is that, through April 30, 2013, they have consumed more than ███████ of the JSNs' direct and indirect cash collateral to pay administrative expenses without providing *any* replacement collateral in exchange for such consumption of cash.[9]   Moreover, to arrive at the collateral value set forth in the Disclosure Statement, they presume the additional consumption of over ███████ in cash collateral, for the use of which the Debtors have not even received authority, without providing any replacement collateral or adequate protection.  (Disclosure Statement, Ex. 7, ¶ 30).  This brings the total cash burdening of the JSN Collateral to over ███████.

28.     Based upon the Debtors' numbers, had the Debtors not used any JSN cash collateral, the total value of the JSN Collateral available for distribution to the JSNs, would be not less than ███████, rendering the JSNs oversecured.  The Debtors, however, have consumed ███████ of the JSNs' cash collateral, and threaten to consume an additional ███████, without providing any replacement collateral or adequate protection to the JSNs.

29.     The Debtors have consumed the JSNs' collateral to fund overhead expenses, "allocating costs" based on the book value of the collateral.  Under this methodology, which bears no relationship to the actual costs of preserving the JSN Collateral, the Debtors are seeking to charge the JSNs for costs that they would not be permitted to charge for under section

---

[8]   Final Cash Collateral Order [Docket No. 491] ¶¶ 16(c), 22.

[9]   ███████████████████████████████████████████████████████████████████

506(c) of the Bankruptcy Code even if they had not waived the right to do so in the Final Cash

Collateral Order.  Indeed, of the JSNs' original collateral package, the Debtors have monetized

approximately ███████ of collateral (including amounts used to pay off the Ally revolver),

and collateral with a Debtor-estimated value of approximately ███████ remains

unmonetized.  The Debtors have projected that it will cost less than $35 million to monetize the

remaining collateral.[10]  Thus, in effect and incredibly, the Debtors are seeking to charge the JSNs

over ███████ for liquidating the first ███████ of collateral.  If the Bankruptcy Court

determined that the JSNs were entitled to adequate protection for the Debtors' full consumption

of cash, the JSNs would be nearly fully oversecured on this issue alone.

30.    **Enforcement of Intercompany Claims**.  The JSNs have undisputed

direct liens on certain material intercompany claims and equity pledges of certain Debtors that

are the beneficiaries of other material intercompany claims.  (JSN Security Agreement, §§ 2, 3,

4.)  While the Plan Proponents now concede that the Intercompany Claims are not "worthless"

and may have "some value," they ascribe absolutely no value to such claims for Plan distribution

purposes.  (Transcript of July 30, 2013 Hearing at 33, 47; Disclosure Statement at 36.)

31.    The JSNs contend that they are entitled to receive the value of the

Intercompany Claims as part of the distribution on account of their secured claim.  Under the

Plan, however, all Intercompany Claims are to be "waived, cancelled, and discharged"  for no

consideration.  (Disclosure Statement at 36.)  The Plan Proponents contend that such treatment

permits them to extinguish whatever "some value" is equal to without compensating or

adequately protecting the JSNs for such value destruction.  (Transcript of July 30, 2013 Hearing

at 47.)

---

[10]   Declaration of Jill Horner in Support of Debtors' Motion for Entry of Interim and Final Orders to Permit the
       Debtors to Continue Using Cash Collateral, dated April 9, 2013 [Docket No.  3394] ¶ 21.

32.    The Plan Proponents have also failed to disclose or discuss the JSNs'
contention that the Debtors do not possess the authority to "waive, cancel, and discharge" the
Intercompany Claims.  Pursuant to the rights granted under the relevant documents governing the
Junior Secured Notes, the New York Uniform Commercial Code, and the Constitution, but for
the imposition of the automatic stay, the JSNs would control the disposition of the Intercompany
Claims, not the Debtors.  See JSN Security Agreement § 9 (providing that, upon occurrence of
Event of Default, control over "Non-Tangible Collateral"—including Intercompany Claims—
shifts from the Issuer to the Collateral Agent (for the benefit of the JSNs)); N.Y. U.C.C. 9-607
(permitting secured lender, in event of default, to step into shoes of debtor and control
disposition of non-tangible collateral, like Intercompany Claims); U.S. Const. amend. v.

33.    In addition, the Plan Proponents have failed to disclose or discuss the
impediments to their proposed treatment of the Intercompany Claims under section 363 of the
Bankruptcy Code.  See Myers v. Martin (In re Martin), 91 F3d 389, 395 (3d Cir. 1996) (finding
that proposed settlement of estate causes of action "compromised an asset of the debtors' estate"
outside the ordinary course thereby "implicating Section 363").  Thus, where, as is the case here,
a debtor seeks to settle an estate-owned claim in which a third party has a secured interest "free
and clear" of that interest, the debtor must satisfy, not only Bankruptcy Rule 9019, but also
section 363(f) of the Bankruptcy Code.  Given that the compromise proposed in the Plan would
settle the relevant claims for *zero* consideration, the Debtors must disclose how they could
possibly satisfy Section 363(f).

34.    Furthermore, the Plan Proponents do not disclose how their Plan complies
with Section 363(e) with respect to the proposed treatment of Intercompany Claims.  Even if the
Debtors could satisfy section 363(f) and settle the Intercompany Claims pursuant thereto, they

would be required to provide adequate protection to the JSNs pursuant to section 363(e). The Plan makes no provision for such payments. In fact, the Plan Proponents have refused to provide any adequate protection to the JSNs based upon the proposed waiver of the Intercompany Claims, and have, on this basis alone, failed to satisfy section 363(e) of the Bankruptcy Code.

35.     Based upon the JSNs' calculations, if the Intercompany Claims were allowed as reflected on the Debtors' books and records, the value of the JSN Collateral would increase by in excess of ██████ .

36.     **Allocation of Ocwen/Walter Asset Sale Proceeds**. The JSNs have an undisputed lien on intangible assets, which, as of the Petition Date, included the Debtors' origination and servicing platform (the "Platform") that was sold during the chapter 11 cases to Ocwen/Walter.[11] The JSNs contend that some amount of the proceeds from the Ocwen/Walter sale represent proceeds of the Platform sale and, therefore, must be allocated to the JSNs' secured claim.[12] The Debtors, however, have allocated *no* portion of the sale proceeds to the Platform. (Disclosure Statement at 93.) They argue that the sale was limited to specific "financial assets" and did not include an ongoing business. (First Amended Complaint to Determine Extent of Liens and for Declaratory Judgment, Adv. Case 13-01343 (MG) [Docket No. 8], at ¶ 4 ("Ocwen and Walter paid only for the financial assets.").) They make this argument notwithstanding ample evidence of the Debtors' own often-acknowledged intent (as highlighted throughout Section III of the Examiner's Report) to enhance the Platform's value by selling it intact as a going concern. (See, e.g., Examiner's Report at III-277 n1.1636 (Debtors were seeking to "continue to underwrite and originate in bankruptcy and sell a platform as

---

[11]  See Asset Purchase Agreement between Ocwen Loan Servicing, LLC and certain of the Debtors, dated as of November 2, 2012 (attached as Exhibit A to Order approving Ocwen sale, entered November 21, 2012 [Docket No. 2246].)

[12]  See JSN Security Agreement § 2.

opposed to financial assets [because] that was going to be a big part of what would enhance the value of the return to creditors" (quoting Gary Lee, Debtors' counsel).)[13]

37.    While the precise value of the Platform is subject to further resolution, either by agreement or litigation, it is highly unlikely that such value is *zero* as the Plan Proponents have asserted without explanation.  Based upon the JSNs' calculations, if an appropriate portion of the sale proceeds were allocated to going-concern value, the value of the JSN Collateral would increase by hundreds of millions of dollars.

38.    In sum, the Plan Proponents suggest that the collateral deficiency, based upon Plan Proponents' assumed (but incorrect) $1.69 billion collateral valuation, is ███████ for the JSNs to be entitled to at least some post-petition interest; and ███████ for the JSNs to be entitled to full payment of interest accrued at the default rate.  Out of context, this suggestion leaves the impression that the collateral deficiency is insurmountable and that the assertions of the JSNs are unreasonable.  But, as demonstrated above, to establish such collateral deficiencies, the Plan Proponents (i) improperly assume ██████████ of further cash collateral consumption for which no authority or consent has been granted and (ii) assume that they will prevail completely on all issues that are subject to ongoing litigation (including additional issues not highlighted herein for the sake of brevity).

39.    The Plan Proponents take this position notwithstanding that most of the issues presented are not binary.  For instance, the Court might not agree with either side, conclude that the JSNs are entitled to *some* adequate protection, *some* going-concern value,

---

[13]   See also Examiner's Report at III-276-77 ("[E]verybody had the same [goal]—it was to keep the enterprise operating. . . . [S]o if you are to maximize the value for the company and for the creditors, which I was working for, I had to make sure that I kept the company and the value of the company intact, if I could.") (quoting J.Ilany interview, Debtor director).

*some* portion of the Ally Contribution, and *some* value from the Intercompany Claims (as the

Debtors recently conceded does actually exist).  Given that over ███████ is "in play" just on

the issues outlined above, the Plan Proponents' suggestion that the JSN Collateral is worth only

$1.69 billion is misleading.  They have not disclosed that they have ascribed zero value to

multiple claims, each of which is worth not less than hundreds of millions of dollars.

      C.      **The Failure to Provide an Adequate Description
of the Justification for the Global Settlement**

      40.      There are two principal elements to the Global Settlement that form the

basis for the Plan.  First, the Ally Contribution, which will be discussed in the next section.

Second, the allocation of the Ally Contribution and the Debtors' remaining assets to the various

creditor constituencies, including the allowance of previously disputed material claims.

      41.      With respect to the second element, the Disclosure Statement does not

provide a rationale for the allocation of value and the allowance of claims.  Whatever the

rationale, such disclosure is particularly important in these cases and should be made by the Plan

Proponents.  This is because the allocation of the Ally Contribution, the chief source of funds for

the Global Settlement, involves a zero-sum game.  Every dollar contributed to one creditor

constituency under the Global Settlement will reduce the recovery of another creditor

constituency.  Moreover, elements of the allocation are inconsistent with certain positions

previously taken in these cases by the Plan Proponents, as well as conclusions that can be drawn

from the Examiner's Report.

      42.      For instance, at the outset of the chapter 11 cases, the Creditors'

Committee vigorously opposed the settlement of the RMBS Trust Claims negotiated by the

Debtors prepetition.  The Creditors' Committee contended that $8.7 billion in damages that were

to be allowed under the proposed settlement were grossly inflated and suggested that the

Debtors' worst case was not greater $4 billion, and likely substantially less, on a number of bases

including the arguments that the RMBS Trust Claims would be subject to reduction on loss

causation, statute of limitations and election of remedies grounds.  (Objection of the Official

Committee of Unsecured Creditors to the Debtors Motion Pursuant to Fed. R. Bankr. P. 9019 For

Approval of the RMBS Trust Settlement Agreements [Docket No. 2825], at 28-41.)  But the

Creditors' Committee has now agreed to the allowance of the RMBS Trust Claims in an amount

greater than the $8.7 billion proposed in the original RMBS settlement.[14]  The Disclosure

Statement fails to disclose or discuss the Creditors' Committee's rationale for this change of

position.

43.    Similarly, the Plan Proponents granted claims to the FGIC and MBIA

monoline insurers at ResCap LLC without explanation as to why such claims are justified other

than that the monoline insurers asserted such claims.  Indeed, ResCap LLC was not even a party

to the pooling and servicing agreements out of which the relevant claims arise.  (Debtors' Reply

Brief Re Objection of Junior Secured Noteholders to Motion for Approval of RMBS Settlement

Agreements [Docket No. 3221], at 2 ("ResCap, of course, has little exposure to liability (only on

alter ego or corporate veil-piercing theories)…").  MBIA, for its part, never named ResCap LLC

as a defendant in its prepetition litigation against GMACM and RFC.  (See MBIA Insurance

Corp. v. GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation), Supreme Court of the

State of New York, County of New York, Index No. 10600837/2010, [Docket No. 1]

(Complaint); MBIA Insurance Corp. v. Residential Funding Co., LLC, Supreme Court of the

---

[14]   While, on their faces, the Original RMBS Settlement Agreement and current RMBS Settlement reference $8.7
billion and $7.3 billion claim amounts, respectively, this apparent discrepancy is explained by the fact that
certain claims that had been allocated to RMBS Trustees under the Original RMBS Settlement Agreement have
now been reallocated to the monoline insurers that provided insurance for those trustees.  (Disclosure Statement
at 28.)  When the claims allocated to the monoline insurers are taken into account, the aggregate value of the
current RMBS Trust Claims are greater than the $8.7 billion provided for in the original settlement.

State of New York, County of New York, Index No. 603552/2008 [Docket No. 28] (Amended

Complaint)).  And, in the context of the FGIC Settlement, the Debtors' CRO, Lewis Kruger, was

unable to provide any justification for the allowance of FGIC's claim against ResCap LLC.

(Transcript of the July 11, 2013 Deposition of Lewis Kruger, at 182.)

> 44.    Also unexplained is the basis for allocation of value to the Senior

Unsecured Noteholders.  While the Disclosure Statement allots only four lines to this aspect of

the Global Settlement, it reflects that the Senior Unsecured Noteholders will receive a 36.3%

(38.1% of face amount) recovery, or more than $364 million on their $1.003 billion claim.

(Disclosure Statement at 33; id. Ex. 6 ¶ 41.)   Most puzzling is the fact that the bulk of the claims

purportedly being settled are claims that the Senior Unsecured Noteholders have asserted against

Ally, and not against any of the Debtors—purported third-party claims against Ally that the

Examiner found to be without merit.  (Disclosure Statement at 33; Examiner Report VIII-186,

200 (concluding that the Senior Unsecured Noteholders' claims for breach of the "substantially

all" provision of the Indenture and for fraud were unlikely to prevail).)

> 45.    Without more disclosure regarding the material component parts of the

Global Settlement," it is not possible to determine whether the elements of the settlement are fair

and reasonable, including whether certain parties are receiving too much at the expense of other

parties.  Annexed hereto as Exhibit "C" is a rider of additional disclosures addressing certain of

the concerns set forth above.

> **D.    The Failure to Provide a Full and
> Fair Account of the Ally Settlement**

> 46.    The Ally Settlement is the centerpiece of the Plan, but, with a few

exceptions, the Disclosure Statement treats it as just another of the many compromises

incorporated into the Global Settlement.  If the Debtors' creditors are to receive the "adequate

information" they require to assess the merits of the Plan, additional disclosure must be made.

47.    As an initial matter, notwithstanding that Ally is making its contribution in exchange for both the Debtor Releases and the non-consensual Third Party Releases, neither the Plan Proponents nor Ally attempt to allocate value between the two.  The consideration paid by Ally must be sufficient to justify all releases, but the Disclosure Statement, in its current form, fails to establish that the Ally Contribution is, in fact, adequate to warrant the grant of both the Debtor Releases and the Third Party Releases to Ally.

48.    In this respect, the Disclosure Statement should be amended to include material from the Examiners' Report and other sources, as outlined for potential inclusion in the Disclosure Statement in Exhibit "D" hereto, to assist creditors in assessing the adequacy of the Ally Contribution and the merits of the Ally settlement.  The Examiner's Report concluded that the claims against Ally held by the Debtors had an aggregate value in excess of *$5.5 billion*, including (a) approximately $3.1 billion of Debtor claims which the Examiner concluded were likely or more likely than not to succeed and (b) another $2.4 billion of Debtor claims that the Examiner concluded involved close questions, but as to which the Debtors were more likely not to prevail.  (Examiner's Report, I-29-33.)

49.    One of the principal claims the Examiner identifies as a claim as to which the Debtors would be more likely than not to prevail is a claim for reimbursement under a Tax Allocation Agreement.  (Examiner's Report, I-13, I-30, VII.K-31.)  As set forth in the Examiner's Report, the Debtors are parties to a Tax Allocation Agreement with Ally, which— assuming that the Ally Contribution is made and the *status quo* is otherwise maintained—would yield more than *$2.2 billion* in tax benefits for Ally.[15]  (Examiner's Report VIIK-31.)   Viewed

---

[15]    The Examiner has calculated the amount of the benefit to be $1.77 billion at the time that Ally was proposing to contribute $750 million to the settlement, but the $1.4 billion increase in the amount of the contribution will

from this perspective, there is no net cost to Ally of making the Ally Contribution, only a ***net
benefit and a windfall***.   Ally is not paying to obtain—but is being paid (almost $300 million
after the insurer's contribution is deducted from the Ally Contribution)—to take the benefits of
the Debtor and Third Party Releases.  In sum, if the Tax Allocation Agreement is enforced as the
Examiner suggested it should be, Ally is securing the release for no consideration.  These tax
benefits to Ally should be disclosed so that creditors can make a full and fair assessment of
whether the Ally Contribution is sufficient.

50.    The Disclosure Statement must also describe, more fully than it currently
does, potential objections to the Global Settlement and what will be the result if the Global
Settlement is not approved.  In particular, even assuming that the Court were to determine that
the Ally Contribution was sufficient to justify the Debtor Releases, there is a serious question as
to whether such contribution is substantial enough to justify the additional Third Party Releases.

51.    In the Second Circuit, ***non-debtor releases***, such as the Third Party
Releases, are only proper in rare cases when the estate receives substantial consideration.  In
Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),
416 F.3d 136, 143 (2d Cir. 2005), the seminal Second Circuit case regarding third-party releases,
the court concluded that "[a] nondebtor release in a plan of reorganization should not be
approved absent the finding that truly unusual circumstances render the release terms important
to success of the plan."  Courts have approved third-party releases when "(i) the estate received
substantial consideration, (ii) the enjoined claims were 'channeled' to a settlement fund rather
than extinguished, (iii) the enjoined claims would indirectly impact the debtor's reorganization

---

increase Ally's tax benefits by almost ▮▮▮▮▮.  (Examiner's Report VIIK-31.)  Also these estimated
amounts do not take into consideration the likely state tax benefit that would increase the amounts owing to the
Debtors under the Tax Allocation Agreement.

by way of indemnity or contribution, and (iv) and the plan otherwise provided for the full

payment of the enjoined claims." Id. at 142.

52.     The Plan Proponents do not disclose that they have allocated the $2.1

billion of the Ally Contribution to the Third Party Releases.  Creditors do not, therefore, have

sufficient information to determine whether Ally is contributing the "substantial consideration"

necessary to justify the Third Party Releases.  Furthermore, while the Plan Proponents state in a

conclusory manner that Ally would be entitled to indemnification for the released claims, the

Plan Proponents provide no meaningful disclosure regarding the basis for such right.  While the

JSNs take no issue with the Consenting Creditors or any other creditor granting consensual

releases, it is quite another thing to impose these releases on non-consenting creditors without

even disclosing the precise consideration received for such putative releases.

### E.     Proposed Treatment of JSN Claims

53.     The Disclosure Statement fails to provide adequate information regarding

the treatment of the JSN Claims proposed under the Plan.  While the Disclosure Statement

explains that the Plan provides for "payment in full" of the allowed amount of the JSN Claims as

determined by the Court in the JSN Adversary Proceeding, the Disclosure Statement fails to

provide information that is "adequate" to enable the JSNs (or any other creditor) to understand

the precise treatment of the JSN Claims proposed in the Plan.

54.     The Disclosure Statement's description of the Plan's proposed treatment

of the JSNs' entitlement to post-petition interest is brief and imprecise:

> [I]f the Bankruptcy Court determines that the Junior Secured
> Noteholders are entitled to post-petition interest, the Allowed
> amount of such post-petition interest shall be paid in accordance
> with the requirements under the Bankruptcy Code, which may
> include at the Plan Proponents' election the payment of post-
> petition interest over time at the appropriate market rate.

(Disclosure Statement at 15.)  The Plan Proponents offer no further explanation as to the meaning of this provision, nor do they proffer any legal justification for the treatment of the JSNs' claims to post-petition interest proposed therein.

55.    Based on this abbreviated account, the JSNs cannot determine either the period of time over which the post-petition interest would be paid or the meaning of "appropriate market rate."  Nor do the Debtors appear willing or able to help.  In response to inquiries from the JSNs' counsel, they have stated they have not yet determined what the appropriate payment period and interest rate will be and will not do so until the Court has ruled on the JSNs' entitlement to post-petition interest.  Nor, moreover, does this account shed any light on the basis for the Plan Proponents' contention that the JSNs are better off with the Plan's treatment of the JSN Claims than any alternative proposed by the JSNs themselves.

56.    This is not full and fair disclosure for the purposes of voting on a Plan. See In re Ferretti, 128 B.R. at 19 (disclosure statement must be "clear and comprehensible" and "clearly and succinctly" creditor "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution").

## II.    TABULATION PROCEDURES MUST BE CLARIFIED

57.    The Tabulation Procedures set forth in the Disclosure Statement Approval Order contain a provision providing as follows:

> (c) If no holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims in such Class.

(Disclosure Statement Approval Order ¶ 80.)  The Ad Hoc Group has no issue with this provision to the extent that it is included solely for the purpose of satisfying the requirements of section 1129(a)(8) and, thereby, excusing the Debtors from having to seek to cram down such "empty" classes under section 1129(b) of the Bankruptcy Code.

58.    However, the Disclosure Statement, in describing "the voting rights of

Allowed Claims and Equity Interests," also states as follows:

> Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the
> purposes of Confirmation by acceptance of the Plan by an Impaired Class
> of Claims; provided, however, that in the event no holder of a Claim with
> respect to a specific Class for a particular Debtor timely submits a Ballot
> indicating acceptance or rejection of the Plan, such Class will be deemed
> to have accepted the Plan.

(Disclosure Statement at 7 (referencing Plan § III.C(iii)).)  This provision suggests that the Plan

Proponents may intend to use such a deemed accepting class as an impaired accepting class

under section 1129(a)(10) to cram down other affirmatively rejecting classes.  To the extent that

this is not the Plan Proponents' intent, the Tabulation Procedures should be clarified.

59.    If the Plan Proponents do intend to use deemed accepting classes for this

purpose, this is simply an incorrect statement of the law.  Section 1129(a)(10) requires that "[i]f a

class of claims is impaired under the plan, at least one class of claims that is impaired under the

plan has accepted the plan, determined without including any acceptance of the plan by any

insider."  11 U.S.C. § 1129(a)(10).   Moreover, Bankruptcy Rule 3018(c) requires an acceptance

of a plan to be in writing.  Fed. R. Bankr. P. 3018(c).  On its face, section 1129(a)(10), as

supplemented by Bankruptcy Rule 3018(c) requires the affirmative acceptance of a plan *in

writing*.

60.    There are, indeed, cases in which courts have decided that classes of

claims in which no member has actually voted may be deemed to have accepted a chapter 11 –

*for purposes of satisfying section 1129(a)(8)* of the Bankruptcy Code.  See Heins v. Ruti-

Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.), 836 F.2d 1263, 1266-67 (10th Cir. 1988);  In re

Adelphia Commc'ns.  Corp., 368 B.R. 140, 260 (Bankr. S.D.N.Y. 2007).  There are also cases

that hold the opposite.  See In re Arabians, 103 B.R. 211, 216 (B.A.P. 9th Cir. Ariz.  1989) ("The

holder of a claim must affirmatively accept the plan. . . . Since Bell Road, the only Class C claim

holder, did not vote affirmatively to accept the debtor's Plan . . ., Class C could not have voted to

accept the Plan").[16]

61.    Regardless, these cases do not stand for the proposition that a deemed

acceptance by a non-voting class can satisfy section 1129(a)(10).  In fact, courts that have

addressed this issue have explicitly held that section 1129(a)(10) ***cannot*** be satisfied by the

deemed acceptance of a non-voting class.  See In re Friese, 103 B.R. 90, 91 (Bankr. S.D.N.Y.

1989); In re Castaneda, No. 09-50101, 2009 WL 3756569 (S.D. Tex. Nov. 2, 2009).  Moreover,

even the seminal case holding that a deemed acceptance satisfies section 1129(a)(8) states that

"***actual*** acceptance of a plan by at least one class of impaired claims is necessary for a

bankruptcy court's confirmation of a plan under § 1129(a)(10)."  Ruti-Sweetwater, 836 F.2d

at 1267 (emphasis added).

62.    Thus, to the extent that the Plan fails to receive the actual affirmative

acceptance of at least one impaired class ***at each Debtor***, the Plan would be unconfirmable.  To

the extent that the Tabulation Procedures provide otherwise, and are intended by the Plan

Proponents to be binding for all purposes, they cannot be approved in their present form.

## **RESERVATION OF RIGHTS**

63.    The Ad Hoc Group expressly reserves all of its rights with respect to

confirmation of the Plan.

---

[16]    While the Second Circuit has held that a class of claims whose vote has been *designated* is deemed to accept a
plan for purposes of section 1129(a)(8), that court has explicitly declined to hold "whether the same result is
appropriate for other tests that the Code imposes, such as in §§ 1129(a)(7) and 1129(a)(10)" or "how the
bankruptcy court should treat classes in which no creditor files a timely vote."  Dish Network Corp. v. DBSD
North America, Inc. (In re DBSD North America, Inc.), 634 F.3d 79, 106 n.14 (2d Cir. 2011).

**WHEREFORE**, the Ad Hoc Group respectfully requests that the Court:

(i) sustain this Objection; (ii) deny the Motion to the extent that it seeks approval the Disclosure

Statement and Disclosure Statement Approval Order in their present form; and (iii) grant the Ad

Hoc Group such other and further relief as is just and proper.

Dated: New York, New York
      August 8, 2013

                                     **WHITE & CASE LLP**
                                     J.  Christopher Shore
                                     Harrison L. Denman
                                     1155 Avenue of the Americas
                                     New York, New York 10036-2787
                                     Telephone:  (212) 819-8200
                                     Facsimile:  (212) 354-8113
                                     cshore@whitecase.com
                                     harrison.denman@whitecase.com

                                     - and -

                                     **MILBANK, TWEED, HADLEY & MᶜCLOY LLP**

                                     /s/ Gerard Uzzi
                                     Gerard Uzzi
                                     Daniel Perry
                                     Atara Miller
                                     1 Chase Manhattan Plaza
                                     New York, New York 10005
                                     Telephone:  (212) 530-5000
                                     Facsimile:  (212) 530-5219
                                     guzzi@milbank.com
                                     dperry@milbank.com
                                     amiller@milbank.com

                                     *Attorneys for the Ad Hoc Group*

## EXHIBIT "A"

### Disclosure Statement Rider – Page 33

The Plan provides that if the Bankruptcy Court determines for any reason that the Junior Secured Noteholders are entitled to post-petition interest, the Junior Secured Noteholders will receive payment by the Liquidating Trust of such post-petition interest.  Among the reasons the Court could determine that the Junior Secured Noteholders are entitled to post-petition interest are that:

(1)  The Intercompany Balances have value.

(2)  The Junior Secured Noteholders are entitled to adequate protection equal to the value of the Intercompany Balances.

(3) The Junior Secured Noteholders' liens attach to some or all of the Ally Contribution.

(4) Some or all of the Ally Contribution must be allocated to Debtors which have no material creditors but for which the Junior Secured Noteholders have equity pledges.

(5) The Junior Secured Noteholders are entitled to adequate protection equal to the value of the claims against Ally that represent the Junior Secured Noteholders' collateral.

## EXHIBIT "B"

### Disclosure Statement Rider – Dispute with JSNs – Page 94

The Junior Secured Noteholders believe that there are compelling arguments that their claims are, in fact, substantially oversecured. The Plan Proponents and Junior Secured Noteholders are currently engaged in litigation with respect to such issues, which will be decided by the Bankruptcy Court as part of the Consolidated Proceedings and/or the Confirmation Hearing. The Junior Secured Noteholders submit that the Plan Proponents will need to prevail on *all* of the issues currently being litigated for the Junior Secured Noteholders' claims to be undersecured, whereas the Junior Secured Noteholders could prevail either partially or fully on certain of such issues to be fully secured and, thus, entitled to post-petition interest. The outcome of these disputes will have a significant impact on the recoveries of nearly all creditors under the Plan.

The Plan Proponents suggest that the collateral deficiency, based upon an assumed $1.69 billion collateral valuation, is ▮▮▮▮  ▮▮▮▮ for the Junior Secured Noteholders to be entitled to at least some post-petition interest; and ▮▮▮▮▮▮ for the Junior Secured Noteholders to be entitled to full payment of interest accrued at the default rate. Out of context, such suggestion leaves the impression that the collateral deficiency is insurmountable and that the assertions of the Junior Secured Noteholders are unreasonable.

As an initial matter, the Debtors assume a reduction of JSN Collateral value attributable to the future use of ▮▮▮▮▮ in cash collateral that the Debtors have no authority to use. Thus, based upon the Debtors' own numbers, the baseline collateral deficiency is only about ▮▮▮▮▮—and, to establish such collateral deficiencies, the Plan Proponents must prevail completely on all issues that are subject to ongoing litigation.

The Plan Proponents take this position, according to the Junior Secured Noteholders, notwithstanding that most of issues presented are not binary. For instance, the Court might not agree with either side, conclude that the Junior Secured Noteholders are entitled to *some* adequate protection, *some* going-concern value, *some* portion of the Ally Contribution, and *some* value from the Intercompany Balances. Given that over ▮▮▮▮▮ is in play just on the issues outlined below, the Junior Secured Noteholders argue that the Plan Proponents' suggestion that the JSN Collateral is worth only $1.69 billion is misleading.

The Junior Secured Noteholders point to following as key points in contention between the Plan Proponents and the Junior Secured Noteholders.

### (1) Allocation of Ally Contribution

The Junior Secured Noteholders assert that their undisputed direct security interests extend to certain causes of action arising in favor of the Debtors, including prepetition breach of contract claims against Ally. Further, the Junior Secured Noteholders have equity pledges of Debtor entities granting releases to Ally under the Plan. The Plan Proponents, however, have not allocated any portion of the Ally Contribution to the Junior Secured Noteholders' collateral notwithstanding that a substantial portion of the Ally Contribution is

being paid in consideration of the Debtors' releases of breach of contract actions against Ally. Furthermore, the Plan Proponents have allocated no settlement consideration to the Debtors as to which the Junior Secured Noteholders have equity pledges notwithstanding that such Debtors are granting releases to Ally under the Plan.

The Junior Secured Noteholders contend that the Examiner's conclusions support the position that the Debtors' causes of action most likely, or more likely than not, to prevail against Ally were related to the breach of a prepetition loan brokering agreement and tax allocation agreement with Ally that, together, could yield more than $2.25 billion in damages against Ally, and that therefore most of the $2.1 billion Ally Contribution should be allocated to such breach of contract claims. As such, the Junior Secured Noteholders' liens would attach to a material amount of the Ally Contribution, resulting in the Junior Secured Noteholders' claims being significantly oversecured.

### (2)  Adequate Protection Liens

The Final Cash Collateral Order (i) granted the Junior Secured Noteholders adequate protection liens for any diminution in value of the JSN Collateral and (ii) included a waiver of the Debtors' right to surcharge the JSN Collateral under section 506(c) of the Bankruptcy Code.[1] The Plan Proponents have taken the position that the Junior Secured Noteholders are not entitled to *any* adequate protection for the post-petition diminution in value of their collateral.

The Junior Secured Noteholders take issue with the Plan Proponents' position and assert that they are entitled to adequate protection for the Debtors' consumption (through April 30, 2013) of more than ▮▮▮▮▮▮▮▮ of the Junior Secured Noteholders' direct and indirect cash collateral to pay administrative expenses. Further, the Debtors assume the consumption of more than ▮▮▮▮▮▮ in additional cash collateral for which the Debtors have not yet received authority to use. Thus, the Plan proposals assume a total cash burdening of the Junior Secured Noteholders' collateral of almost ▮▮▮▮▮▮▮. If the Bankruptcy Court determined that the Junior Secured Noteholders were entitled to adequate protection for the full cash consumption, the Junior Secured Noteholders would, based upon their own calculations, be nearly fully oversecured.

### (3)  Enforcement of Intercompany Balances

While the Plan Proponents have stated their intention to waive, cancel and discharge the Intercompany Balances, the Junior Secured Noteholders assert that their undisputed security interests extends (directly or indirectly) to such Intercompany Balances. As a result, the Junior Secured Noteholders believe that the Debtors do not have the authority to unilaterally waive, cancel and discharge the Intercompany Balances and that the Junior Secured Noteholders are entitled to receive the value of the Intercompany Balances as part of the distribution on account of their secured claim.

As an initial matter, the Junior Secured Noteholders contend that the Plan Proponents lack the requisite authority to unilaterally "waive, cancel, and discharge" the Intercompany Balances without the consent of the Junior Secured Noteholders. Pursuant to the

---

[1]    Final Cash Collateral Order [Docket No. 491] ¶¶ 16(c), 22.

rights granted under the relevant documents governing the Junior Secured Notes and the New York Uniform Commercial Code, and the Constitution, but for the imposition of the automatic stay, the JSNs would have the right to control the disposition of the Intercompany Claims, not the Debtors. In addition, the Junior Secured Noteholders contend that the debtor must satisfy section 363(f) of the Bankruptcy Code. Given that the compromise proposed in the Plan would settle the relevant claims for *zero* consideration, the Junior Secured Noteholders argue that the Debtors cannot possibly satisfy any of section 363(f)'s five prongs, so authority to settle these claims cannot be obtained.

The Junior Secured Noteholders argue further that, even if the Court were to determine that the Debtors could settle the Intercompany Balances, the Debtors would be required to provide adequate protection to the Junior Secured Noteholders pursuant to section 363(e) of the Bankruptcy Code. The Junior Secured Noteholders point out that the Debtors have expressly refused to provide any adequate protection to the JSNs based upon the proposed waiver of the Intercompany Balances, and have, on this basis alone, failed to satisfy section 363(e) of the Bankruptcy Code.

Furthermore, the Junior Secured Noteholders believe that certain of the principal reasons the Plan Proponents have given for disregarding the Intercompany Balances provide no basis at all for doing so. For instance, the Plan Proponents have herein acknowledged that a substantial amount of the Intercompany Balances were forgiven prior to the Petition Date and appear to suggest that these prior waivers somehow justify the waiver proposed in the Plan. But the purpose of the past debt forgiveness was to allow the Debtors to comply with tangible net worth covenants because the Intercompany Balances were actually being recognized as real debt obligations in the Debtors' consolidated financial statements—which would support the opposite conclusion, i.e., that the Intercompany Balances are "valid," and not "unenforceable," intercompany obligations.

The Junior Secured Noteholders believe that the Plan Proponents' position that it would simply be too expensive to determine the Intercompany Balances is untenable, given that, if respected, the Intercompany Balances are worth hundreds of millions of dollars. Based upon the Junior Secured Noteholders' calculations, if the Intercompany Balances were allowed as reflected on the Debtors' books and records, the value of the Junior Secured Noteholders' Collateral would increase by more than ███████.

Finally, the Junior Secured Noteholders submit that the value of the Intercompany Balances is dependent upon a number of factors, including the extent to which the Bankruptcy Court determines that the Junior Secured Noteholders' liens attach to assets that are not Stipulated Collateral. For instance, if the Bankruptcy Court were to determine that the going-concern value of the Servicing Platform, which is part of the Stipulated Collateral, should be allocated only a small portion of the Ocwen/Walter sale proceeds, such determination with increase the value of the Intercompany Balances due to more consideration being able to flow through the waterfall. Thus, while the precise value of the Intercompany Balances is subject to litigation, that value is not zero.

### (4)  **Allocation of Ocwen/Walter Asset Sale Proceeds**

As discussed herein, the Debtors sold their Servicing Platform to Ocwen and Walter as part of the Asset Sales.  The Junior Secured Noteholders contend that their security interest extends to the value of the Servicing Platform.  The Plan Proponents, however, have not allocated any portion of such sale proceeds to the Servicing Platform itself and, thus, to the Junior Secured Noteholders' secured claim.  The Junior Secured Noteholders believe that the Plan Proponents' failure to allocate any portion of the sale proceeds to the value of the Servicing Platform is contrary to prior statements of the Debtors' representatives (as evidenced in the excerpts from Examiner's Report set forth below) that the Debtors intended to enhance the value of the Servicing Platform by selling it intact as a going concern.

---

**Cerberus** (Mark Neporent) recognizes that the platform had some value because it viewed Berkshire's offer to purchase the ResCap equity for $1 as an attempt "to steal that platform for a dollar."  Id. III-268 (quoting from Neporent interview).

**Centerview** (Marc Puntus) recognizes that the sale of a going concern business added incremental auction value because absent the ability of the Debtors to "continue to do business in the ordinary course, then we wouldn't have had a stalking horse, and we wouldn't have had a successful auction like we did in October 2012."  Id. III-269 (quoting Puntus interview).

**MoFo** (Gary Lee) recognizes that they sold a valuable platform, not just financial assets: "[T]here was a view that with those pieces of support together we'd be able to continue to underwrite and originate in bankruptcy and sell a platform as opposed to financial assets.  And that was going to be a big part of what would enhance the value of the return to creditors."  Id. III-277 n. 1636 (quoting Lee interview).

**Ally** (Tim Devine) recognizes that the Debtors sold a going concern not only financial assets: "…the fragility of the [pre-petition PSA] process was … is this going to see as something rather historical a going concern of this fifth largest mortgage servicer in the country or not."  Id. III-310 n. 1850 (quoting Devine interview)

**RMBS investors counsel** (Kathy Patrick) recognizes that the Debtors sold a platform:  her clients had a "high degree of concern about the potential buyers for servicing. And they wanted to be sure that the servicing was not dumped out for dollars in derogation of servicing performance."  Id. III-311 n. 1861 (quoting Patrick interview).

---

The Junior Secured Noteholders believe that it is highly unlikely that the going concern value of the Servicing Platform is *zero*, and if an appropriate portion of the sale proceeds were allocated to such going-concern value, the value of the Junior Secured Noteholders' collateral would increase by well over hundreds of millions of dollars.

- 4 -

* * *





## EXHIBIT "C"

### Disclosure Statement Rider – Global Settlement – Page 38

[Plan Proponents to insert basis for allocation of consideration and allowance of claims.]

The Junior Secured Noteholders contend that elements of the Global Settlement are inconsistent with certain positions previously taken in these cases by the Plan Proponents, as well as with conclusions that can be drawn from the Examiner's Report.

For instance, at the outset of the chapter 11 cases, the Creditors' Committee vigorously opposed the settlement of the RMBS Trust Claims that had been negotiated by the Debtors prior to the Petition Date. The Creditors' Committee contended that $8.7 billion in damages to be allowed under the proposed settlement were grossly inflated and suggested that the Debtors' worst case was not greater $4 billion, and likely substantially less, on a number of bases including the arguments that the RMBS Trust Claims would be subject to reduction on loss causation, statute of limitations and election of remedies grounds.[3]   The Creditors' Committee has now agreed to the allowance of the RMBS Trust Claims in an amount that the Creditors' Committee a short time before said was greater than twice the appropriate amount.

Similarly, the Junior Secured Noteholders have observed that the Plan Proponents granted claims to the FGIC and MBIA monoline insurers at ResCap LLC without explanation as to why such claims are justified other than that FGIC and MBIA asserted such claims. Indeed, ResCap LLC was not even a party to the pooling and servicing agreements out which the relevant claims arise.[4] MBIA, for its part, never named ResCap LLC as a defendant in its prepetition litigation against GMACM and RFC.[5] And, in the context of the FGIC Settlement, the Debtors' CRO, Lewis Kruger, was unable to provide any justification for the allowance of FGIC's claim against ResCap LLC.[6]

Also, the Disclosure Statement reflects that the Senior Unsecured Noteholders will receive a 36.3% (38.1% face amount) recovery, or more than $364 million on their $1.003 billion claim, however, the bulk of the claims purportedly being settled are claims that the Senior Unsecured Noteholders have asserted against Ally, and not against any of the Debtors—

---

[3]    See Objection of the Official Committee of Unsecured Creditors to the Debtors Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 28-41.

[4]    Debtors' Reply Brief Re Objection of Junior Secured Noteholders to Motion for Approval of RMBS Settlement Agreements [Docket No. 3221] at 2 ("ResCap, of course, has little exposure to liability (only on alter ego or corporate veil-piercing theories)…").

[5]    MBIA Insurance Corp. v. GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation), Supreme Court of the State of New York, County of New York, Index No. 10600837/2010, [Docket No. 1] (Complaint); MBIA Insurance Corp. v. Residential Funding Co., LLC, Supreme Court of the State of New York, County of New York, Index No. 603552/2008 (Fried, J.) [Docket No. 28] (Amended Complaint).

[6]    Transcript of the July 11, 2013 Deposition of Lewis Kruger, at 182.

purported third-party claims against Ally that the Examiner found to be without merit.[7] Furthermore, the Senior Unsecured Noteholders would receive materially less if the estates were substantively consolidated than under the Global Settlement, one of the enumerated "settled issues."

---

[7]      Id.; Examiner's Report at VIII-186, 200 (concluding that the Senior Unsecured Noteholders' claims for breach of the "substantially all" provision of the Indenture and for fraud were unlikely to prevail).

## EXHIBIT "D"

### Disclosure Statement Rider – Ally Settlement – Page 38

[Plan Proponents to disclose Ally's rights of indemnification for claims proposed to be released.]

The Junior Secured Noteholders note that the Examiner's Report concluded that the claims against Ally held by the Debtors had an aggregate value in excess of $5.5 billion, including (a) approximately $3.1 billion of Debtor claims which the Examiner concluded were likely or more likely than not to succeed and (b) another $2.4 billion of Debtor claims as to which the Examiner concluded there was a less than 50% chance of success.[1]    Given the magnitude of these claims, the Junior Secured Noteholders question whether $2.1 billion is sufficient consideration to justify the Debtor Releases.

The Junior Secured Noteholders also observe that one of the principal claims the Examiner identified as one as to which the Debtors would be more likely than not to prevail is claim for reimbursement under a Tax Allocation Agreement.[2]  As set forth in the Examiner's Report, the Debtors are parties to a Tax Allocation Agreement with Ally, which—assuming that the Ally Contribution is made and the *status quo* is otherwise maintained—would yield more than ███████ in tax benefits for Ally,[3] as illustrated in the chart below.[4]

---

[1]      See Examiner's Report at I-29–I-33.

[2]      Examiner's Report at I-13, I-30, VII.K-31.

[3]      ███████████████████████████████████████████████

█████████████ at VIIK-31.



Viewed from this perspective, the Junior Secured Noteholders contend, there is no net cost to Ally of making the Ally Contribution, only a net benefit of ████████. In sum, if the Tax Allocation Agreement is enforced as the Examiner suggested it should be, the Junior Secured Noteholders contend that Ally is securing the release for no consideration.

Even assuming that the Court were to determine that the Ally Contribution was sufficient to justify the Debtor Releases, there is, the Junior Secured Noteholders further contend, a serious question as to whether the remainder of such contribution is "substantial" enough to justify the additional Third-Party Releases under Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 143 (2d Cir. 2005), the controlling precedent on third-party releases in the Second Circuit.

The Plan Proponents do not disclose what portion of the $2.1 billion of the Ally Contribution is allocated to the Third-Party Releases. The Junior Secured Noteholders contend, however, that a material portion of the $2.1 billion must be attributed to the consideration for the

Third-Party Releases.  After factoring in such amount, significantly less than $2.1 billion is available to justify the Debtor Releases, calling into question whether Ally is contributing enough to obtain the benefit of either of these releases.