**HEARING DATE AND TIME: Sept. 11, 2013 at 10:00 a.m. (Prevailing Eastern Time)**
**RESPONSE DEADLINE: August 30, 2013 at 4:00 p.m. (Prevailing Eastern Time)**

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
Steven J. Reisman
Michael A. Cohen
Jonathan J. Walsh
Maryann Gallagher

*Conflicts Counsel for the Debtors and Debtors in Possession*

**BRYAN CAVE LLP**
560 Mission Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 675-3400
Facsimile: (415) 675-3434
K. Lee Marshall

One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
Michael G. Biggers
Darci F. Madden

*Litigation Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**NOTICE OF DEBTORS' OBJECTION TO PROOF OF CLAIM OF PNC BANK, N.A. (CLAIM NO. 4760)**

**PLEASE TAKE NOTICE** that the undersigned have filed the attached *Debtors' Objection to Proof of Claim of PNC Bank, N.A. (Claim No. 4760)* (the "Objection").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will take place on **September 11, 2013 at 10:00 a.m. (prevailing Eastern Time)** before the Honorable Judge Glenn, at the United States Bankruptcy Court for the Southern District of New York,

Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Room 501.

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Notice, Case Management, the Administrative Procedures approved by the Bankruptcy Court [Docket No. 141], and the *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1009, 3007 and 9019(b) Approving (I) Claim Objection Procedures, (II) Borrower Claim Procedures, (III) Settlement Procedures, and (IV) Schedule Amendment Procedures* [Docket No. 3294], be filed electronically by registered users of the Bankruptcy Court's electronic case filing system, and be served, so as to be received no later than **August 30, 2013 at 4:00 p.m. (prevailing Eastern Time)**, upon (a) conflicts counsel to the Debtors, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178-0061 (Attention: Steven J. Reisman, Michael A. Cohen, Jonathan J. Walsh, and Maryann Gallagher); (b) litigation counsel to the Debtors, Bryan Cave LLP at (i) 560 Mission Street, 25th Floor, San Francisco, CA 94105 (Attention: K. Lee Marshall) and (ii) One Metropolitan Square, 211 North Broadway, Suite 3600, St. Louis, Missouri 63102-2750 (Attention: Michael G. Biggers and Darci F. Madden); (c) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of Americas, New York, NY 10104 (Attention: Gary S. Lee, Norman S. Rosenbaum, Jordan A. Wishnew, and Erica J. Richards); (d) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (e) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington D.C. 20530-0001 (Attention: US Attorney General,

Eric H. Holder, Jr.); (f) Office of the New York State Attorney General, The Capitol, Albany, NY 12224-0341 (Attention: Nancy Lord, Esq. and Enid N. Stuart, Esq.); (g) Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.); (h) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock); (i) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman); (j) counsel for Berkshire Hathaway Inc., Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071 (Attention: Thomas Walper and Seth Goldman); (k) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016); and (l) Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attention: George S. Canellos, Regional Director).

**PLEASE TAKE FURTHER NOTICE** that should the relief requested in the Objection not be granted, the Debtors reserve all rights to object to the claims objected to therein on any other basis.

[*Remainder of page intentionally left blank.*]

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written response to the relief requested in the Objection, the Bankruptcy Court may deem any opposition waived, treat the Objection as conceded, and enter an order granting the relief requested in the Objection without further notice or hearing.

Dated: August 9, 2013
New York, New York

Respectfully submitted,

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By: /s/ Steven J. Reisman
Steven J. Reisman
Michael A. Cohen
Jonathan J. Walsh
Maryann Gallagher
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559

*Conflicts Counsel for the Debtors and Debtors in Possession*

BRYAN CAVE LLP

By: /s/ K. Lee Marshall
K. Lee Marshall
560 Mission Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 675-3400
Facsimile: (415) 675-3434

One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
Michael G. Biggers
Darci F. Madden

*Litigation Counsel for the Debtors and Debtors in Possession*

**HEARING DATE AND TIME: Sept. 11, 2013 at 10:00 a.m. (Prevailing Eastern Time)**
**RESPONSE DEADLINE: August 30, 2013 at 4:00 p.m. (Prevailing Eastern Time)**

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
Steven J. Reisman
Michael A. Cohen
Jonathan J. Walsh
Maryann Gallagher

*Conflicts Counsel for the Debtors and Debtors in Possession*

**BRYAN CAVE LLP**
560 Mission Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 675-3400
Facsimile: (415) 675-3434
K. Lee Marshall

One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
Michael G. Biggers
Darci F. Madden

*Litigation Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**DEBTORS' OBJECTION TO PROOF OF CLAIM OF PNC BANK, N.A. (CLAIM NO. 4760)**

# TABLE OF CONTENTS

**Page #**

JURISDICTION, VENUE AND STATUTORY PREDICATE .................................................. 2

PRELIMINARY STATEMENT .................................................................................... 2

FACTUAL BACKGROUND ....................................................................................... 5

RELIEF REQUESTED ................................................................................................ 7

OBJECTION .............................................................................................................. 7

**I.** THE PNC CLAIM IS UNENFORCEABLE PURSUANT TO 11 U.S.C. § 502(b)(1)......... 7

A. PNC HAS NO RIGHT TO CONTRIBUTION OR INDEMNIFICATION PURSUANT TO THE UNDERLYING AGREEMENTS .................................... 8

B. PNC HAS NO RIGHT OF STATUTORY OR IMPLIED CONTRIBUTION OR INDEMNITY UNDER APPLICABLE LAW ................................................ 8

1. No Right of Statutory or Implied Contribution or Indemnity Exists Under RICO. .......................................................................... 9

2. No Right of Statutory or Implied Contribution or Indemnity Exists Under TILA/HOEPA. ................................................................ 10

3. No Right of Statutory or Implied Contribution or Indemnity Exists Under RESPA. .......................................................................... 11

4. No Basis for Contribution or Indemnification Claims Against the Debtors Exists. ........................................................................ 11

**II.** ANY CONTINGENT RIGHT OF CONTRIBUTION OR INDEMNIFICATION PNC MAY HAVE IS UNENFORCEABLE PURSUANT TO 11 U.S.C. § 502(e)(1)(B) .......... 13

NOTICE .................................................................................................................... 17

# TABLE OF AUTHORITIES

PAGES

**Cases**

A & H, Inc.,
122 B.R. 84 (Bankr. W.D. Wis. 1990) ... 13

Ameriquest Mortg. Co. v. Northwest Title & Escrow Corp. (In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.),
589 F. Supp. 2d 987 (N.D. Ill. 2008) ... 10

Ames Assocs. v. ABS Partners Real Estate LLC,
No. 06 Civ. 928, WL 890034 (S.D.N.Y. Mar. 3, 2010) ... 9

Doherty v. Wireless Broad. Sys.,
151 F.3d 1129 (9th Cir. 1998) ... 9

Donovan v. Robbins,
752 F.2d 1170 (7th Cir. 1984) ... 9

Globus v. Law Research Serv., Inc.,
418 F.2d 1276 (2d Cir. 1969) ... 9

In re Alper Holdings USA,
No. 07-12148(BRL), 2008 WL 4186333 (Bankr. S.D.N.Y. Sep. 10, 2008) ... 13, 14, 15

In re APCO Liquidating Trust,
370 B.R. 625 (Bankr. D. Del. 2007) ... 16

In re Chemtura Corp.,
436 B.R. 286 (Bankr. S.D.N.Y. 2010) ... 14

In re Drexel Burnham Lambert Grp., Inc.,
148 B.R. 982 (Bankr. S.D.N.Y. 1992) ... 14

In re GCO Servs., LLC,
324 B.R. 459 (Bankr. S.D.N.Y. 2005) ... 13, 14, 15

In re Ins. Brokerage Antitrust Litig.,
618 F.3d 300 (3d Cir. 2010) ... 12

In re W.R. Grace & Co.,
346 B.R. 672 (Bankr. D. Del. 2006) ... 7

In re Wedtech Corp.,
85 B.R. 285 (Bankr. S.D.N.Y. 1988) ... 14, 15

Mazzeo v. United States (In re Mazzo),
131 F.3d 295 (2d Cir. 1997) ... 16

McSherry v. Capital One FSB,
236 F.R.D. 516 (W.D. Wash. 2006) ... 10

Minpeco, S.A. v. Conticommodity Serv., Inc.,
677 F. Supp. 151 (S.D.N.Y. 1988) ... 10



15494662

Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.,
266 B.R. 575 (S.D.N.Y. 2001) ........ 16

Route 21 Assocs. v. MHC, Inc.,
486 B.R. 75 (S.D.N.Y. 2012) ........ 15

Texas Indus., Inc. v. Radcliff Materials, Inc.,
451 U.S. 630 (1981) ........ 9

THC Holdings Corp. v. Tishman,
Nos. 93 Civ. 5393(KMW) & 95, Civ. 4422, 1998 WL 305639 (S.D.N.Y. June 9, 1998) ...... 10

Zino Davidoff SA v. Selective Distrib. Int'l Inc.,
No. 07 Civ. 10326 (PAE)(MHD), 2013 WL 1245974 (S.D.N.Y. Mar. 7, 2013) ........ 11

**Statutes and Regulations**

11 U.S.C. § 502(a) ........ 7

11 U.S.C. § 502(b)(1) ........ 7

11 U.S.C. § 502(e)(1)(B) ........ 14

12 C.F.R. § 226.32 ........ 2

12 U.S.C. § 2601(a) ........ 12

12 U.S.C. § 2607(d) ........ 12

12 U.S.C. §§ 2601-2617 ........ 2

15 U.S.C. § 1601 ........ 11

15 U.S.C. § 1607 ........ 11

15 U.S.C. § 1640 ........ 11

15 U.S.C. § 1641 ........ 11

15 U.S.C. §§ 1601-1667(f) ........ 2

18 U.S.C. §§ 1961-1968 ........ 2

**Other Authorities**

4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. Rev. 2012) ........ 7

H. Conf. Rep. 103-652, reprinted in 1994 U.S.C.C.A.N. 1977, 1988 ........ 10

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 354 (1977) ........ 14

**TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:**

Residential Funding Company, LLC ("RFC"), along with Residential Capital, LLC and its affiliated debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases"),[1] as debtors and debtors in possession (collectively with RFC, the "Debtors")[2] hereby file this objection (the "Objection"), seeking to disallow and expunge the *Proof of Claim* [Claim No. 4760] (the "PNC Claim") submitted against RFC by PNC Bank, N.A. ("PNC") on November 14, 2012 pursuant to sections 502(b)(1) and 502(e)(1)(B) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") on the grounds that there does not exist any statutory or contractual basis for the PNC Claim and, in the alternative, should the Court find that PNC has a basis for a contribution/indemnification claim against the Debtors alleged in the PNC Claim, the PNC Claim must be disallowed pursuant to section 502(e)(1)(B) of the Bankruptcy Code. The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit 1** (the "Proposed Order"), granting the requested relief. In support of the Objection, the Debtors rely on the *Declaration of K. Lee Marshall in Support of Debtors' Opposition to Motion to Apply Bankruptcy Rule 7023 and to Certify Class Claims*, dated December 3, 2012 [Docket No. 2338] (the "Marshall Class Decl."), previously filed in the Chapter 11 Cases,[3] and the *Declaration of K. Lee Marshall in Support of Debtors' Objection to Proof of Claim of PNC Bank, N.A. (Claim No.*

---

1 Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 Cases or the relief requested in this Objection may refer to http://www.kccllc.net/rescap for additional information.

2 The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6].

3 Due to its large size, the Marshall Class Decl. is not attached.

*4760)* (the "Marshall PNC Decl."), attached hereto as **Exhibit 2**, and respectfully represent as follows:

**JURISDICTION, VENUE AND STATUTORY PREDICATE**

1. This Court has jurisdiction over this Objection under 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicate for the relief requested herein is Bankruptcy Code sections 502(b)(1) and 502(e)(1)(B), and Bankruptcy Rule 3007(b).

**PRELIMINARY STATEMENT**

3. The PNC Claim should be disallowed and expunged on the grounds that PNC has no basis to assert a claim for contribution or indemnity under any agreement or applicable law, and therefore the claim is unenforceable pursuant to section 502(b)(1) of the Bankruptcy Code. In fact, as a matter of federal law, PNC has no right of contribution or indemnity against RFC or any of the Debtors for any of the claims asserted in the Putative Class Action (as defined below) and is unable to set forth any conceivable basis for recovery of contribution or indemnity from the Debtors for PNC's alleged violations of the Real Estate Settlement Practices Act[4] ("RESPA"), the Truth in Lending Act[5] ("TILA"), as amended by the Homeowner Equity Protection Act[6] ("HOEPA"), or the Racketeer Influenced and Corrupt Organizations Act[7] ("RICO").[8] In the very unlikely event that the Bankruptcy Court should find that PNC has a right for contribution or indemnification pursuant to any agreement between the

4 12 U.S.C. §§ 2601-2617.

5 15 U.S.C. §§ 1601-1667(f).

6 12 C.F.R. § 226.32.

7 18 U.S.C. §§ 1961-1968.

8 The only claims alleged in the Putative Class Action are violations of RESPA, TILA, HOEPA and RICO.

parties and/or applicable law, the PNC Claim would nevertheless be a contingent claim as of the time of allowance or disallowance and therefore unenforceable pursuant to section 502(e)(1)(B) of the Bankruptcy Code. Therefore, the PNC Claim should be disallowed and expunged from the Debtors' claims register in its entirety.

4. The PNC Claim asserts a contingent unliquidated claim for contribution and/or indemnity arising out of claims asserted in a series of putative class actions to which RFC was a party prior to its bankruptcy filing. A total of eleven cases have been consolidated and/or are being jointly administered in a multi-district litigation (collectively, the "Putative Class Action") pending before the United States District Court for the Western District of Pennsylvania (the "District Court") styled as *In re Community Bank of Northern Virginia Second Mortgage Practice Litigation*, MDL No. 1674, Case Nos. 03-0425, 02-02101, 05-1386. The claims at issue in that case relevant to the PNC Claim arise under federal law and relate to the lending practices of a non-debtor bank, Community Bank of Northern Virginia ("CBNV"), in connection with second mortgage loans made by CBNV to homeowners between 1998 and 2002. As noted in the PNC Claim, PNC is a successor to CBNV through a series of mergers and acquisitions and a defendant in the Putative Class Action. RFC was named as a defendant because it purchased many of the loans made by CBNV and purportedly funded the alleged "fraudulent kick-back scheme" allegedly perpetrated by CBNV. PNC Claim, Ex. 1, ¶¶ 3-4.

5. The allegations underlying the Putative Class Action which serve as the basis for the PNC Claim have been in litigation in one form or another for over eleven years, and prior settlement approvals have been twice reversed on appeal by the United States Court of Appeals for the Third Circuit. Notwithstanding the lengthy history, the District Court only recently certified a class on July 31, 2013.

6. Since the commencement of the Chapter 11 Cases, the Putative Class Action has been stayed with respect to RFC. In the Chapter 11 Cases, several plaintiffs of the Putative Class Action (the "Named Plaintiffs"), filed class proofs of claim, as well as the *Motion to Apply Bankruptcy Rule 7023 and to Certify Class Claims* [Docket No. 2044].[9] The Named Plaintiffs, along with the remaining members of the putative class represented in the Putative Class Action (collectively, the "Kessler Class Claimants"), have been actively represented and involved in the Chapter 11 Cases. The Kessler Class Claimants are among the many "Consenting Claimants" which are parties to the Plan Support Agreement entered on May 13, 2013 (the "PSA"), attached as Exhibit 3 to the *Debtors' Motion for an Order Under Bankruptcy Code Section 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial, Inc., the Creditors' Committee, and Certain Consenting Claimants*, filed on May 23, 2013 [Docket No. 3814]. While the PSA was not conditioned upon any settlement between the Debtors and the Kessler Class Claimants, it did contemplate that the Debtors and the Kessler Class Claimants would participate in settlement discussions. As a result of those discussions, the Debtors and the Named Plaintiffs, on behalf of themselves and similarly situated class members, reached a settlement and filed on July 31, 2013 the *Joint Motion Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 7023 and 9019 for an Order (1) Granting Class Certification for Purposes of Settlement Only, (2) Appointing Class Representative and Class Counsel for Purposes of Settlement Only, (3) Preliminary Approving the Settlement Agreement Between Plaintiffs, on Their Own Behalf of the Class of Similarly Situated Persons, and the Debtors, (4) Approving the Form and Manner of Notice to the Class, (5) Scheduling a Fairness Hearing to Consider Approval of the Settlement Agreement on a Final*

---

[9] One of the Named Plaintiffs is Rowena Drennan, a member of the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"). See *Appointment of Official Committee of Unsecured Creditors*, filed May 16, 2012 [Docket No. 102].

*Basis and Related Relief, and (6) Approving the Settlement Agreement on a Final Basis and Granting Related Relief* [Docket No. 4451] (the "Settlement Motion").[10] While the Settlement Motion seeks the Court's preliminary (and ultimately final) approval of the proposed settlement agreement between the Debtors and the Kessler Class Claimants (the "Settlement") resolving all claims against the Debtors arising out of the Putative Class Action, PNC is not a party to the Settlement and no such settlement exists between PNC and the Kessler Class Claimants—hence the continuation of the litigation between those non-debtor parties.

7. The PNC Claim should be disallowed and expunged because PNC has no right to indemnity or contribution from RFC. Even if such a right did exist, the PNC Claim is undeniably contingent and must be disallowed pursuant to section 502(e)(1)(B) of the Bankruptcy Code.

## FACTUAL BACKGROUND

8. On May 14, 2012 (the "Petition Date"), the Debtors filed for relief under chapter 11 of the Bankruptcy Code.

9. The relevant factual and procedural history of the Putative Class Action until December 2012 is set forth in detail in the Marshall Class Decl., and is incorporated herein in its entirety. Details regarding the subsequent procedural history in the Putative Class Action since submitting the Marshall Class Decl. and other relevant developments are set forth in detail in the Marshall PNC Decl.

10. Since the Petition Date, the Putative Class Action has continued against PNC, but has progressed only to the point of a partial grant and partial denial of PNC's motion to dismiss (together with the grant of a motion to dismiss the Federal Deposit Insurance

---

[10] A hearing to consider the preliminary relief requested in the Settlement Motion is scheduled for August 21, 2013 at 10:00 a.m. (EST).

Corporation as a defendant, sued as receiver for another non-debtor bank that made second mortgage loans). As to PNC's motion to dismiss, the District Court dismissed some of the RESPA claims and some of the named plaintiffs but otherwise denied the motion. See Marshall PNC Decl., ¶ 6 & Exs. 1 & 2.

11. The District Court also required submission and briefing on a motion for class certification in the Putative Class Action. On July 31, 2013, the District Court entered an Order of Court granting the relief requested in the motion for class certification in the Putative Class Action. Id., ¶ 7 & Ex. 3. Currently, there is no scheduling order in place as to further stages of the action. Id., ¶ 7.

12. In 2011, the plaintiffs in the Putative Class Action filed a Consolidated Amended Complaint (the "CAC") on behalf of forty-three named plaintiffs. In particular, the Marshall Class Decl. describes the CAC and the claims it asserts. Those claims are based exclusively on federal law: namely, RESPA, TILA/HOEPA, and RICO. PNC Claim, Ex. 1. State law claims alleged in prior complaints were abandoned in the CAC. Id.

13. The PNC Claim attaches the CAC as its Exhibit 1 and states that PNC's contingent claim against RFC for contribution and/or indemnity would arise "in the event the Claimant should be determined to have any such liability" for the allegations in the CAC. Schedule to PNC Claim, p. 2.

14. The relationship between Debtor RFC and PNC's predecessor-in-interest CBNV was governed by the Client Contract between RFC and CBNV, dated May 15, 1998 (the "Client Contract"). Marshall PNC Decl., ¶ 9 & its Exs. 4 & 5. The Client Contract in turn incorporated the terms of RFC's July 1, 1997 AlterNet Seller Guide. Id., Ex. 4 at § 1.

15. Section 274 of the July 1, 1997 AlterNet Seller Guide requires the loan originator (CBNV/PNC) to indemnify RFC in certain circumstances, but there is no provision requiring RFC to provide contribution or indemnity to CBNV/PNC under any circumstances. Id., Ex. 5, § 274.

## RELIEF REQUESTED

16. RFC and the other Debtors file this Objection pursuant to Bankruptcy Code sections 502(b)(1) and 502(e)(1)(B) and Bankruptcy Rule 3007, seeking to disallow and expunge the PNC Claim from the Debtors' claims register in its entirety.

## OBJECTION

17. A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). A party in interest may object to a proof of claim, and once an objection is made, the court must determine whether the objection is well founded. See 4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. Rev. 2012). The PNC Claim must be disallowed because (i) PNC has no basis to assert a claim for contribution or indemnity under any agreement or applicable law, and (ii) in the unlikely event that the Bankruptcy Court were to find that PNC has a contribution or indemnification claim against RFC, the PNC Claim would be unenforceable pursuant to section 502(e)(1)(B) of the Bankruptcy Code.

## I. THE PNC CLAIM IS UNENFORCEABLE PURSUANT TO 11 U.S.C. § 502(b)(1)

18. Bankruptcy Code section 502(b)(1) provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). Whether a claim is allowable "generally is determined by applicable nonbankruptcy law." In re W.R. Grace & Co., 346 B.R. 672, 674 (Bankr. D. Del. 2006).

19. As shown below, PNC has failed to establish and cannot provide any basis from the underlying agreements or applicable law for the PNC Claim. Because of PNC's inability to do so (as no such rights exist), the PNC Claim should be disallowed pursuant to section 502(b)(1) of the Bankruptcy Code.

## A. PNC HAS NO RIGHT TO CONTRIBUTION OR INDEMNIFICATION PURSUANT TO THE UNDERLYING AGREEMENTS

20. The PNC Claim does not cite any basis or authority for the assertion that PNC has a right to indemnification or contribution from RFC—and no such right exists.

21. There is no possible contractual basis for RFC to owe PNC any obligation of contribution or indemnity in connection with the CAC. As noted above, the relationship between RFC and PNC's predecessor-in-interest, CBNV, was governed by the Client Contract, which incorporated the terms of RFC's July 1, 1997 AlterNet Seller Guide. Marshall PNC Decl., ¶ 9 & its Exs. 4 & 5. While the Client Contract requires the loan originator (CBNV/PNC) to *indemnify RFC* in certain circumstances, there is no mutual provision requiring RFC to provide contribution or indemnity to CBNV/PNC under any circumstances. Id. ¶ 10 & its Ex. 5 § 274.

22. In fact, PNC has never asserted any cross-claims against RFC alleging indemnification and/or contribution obligations. PNC did not mention any alleged right to contribution or indemnity until July 2011, after RFC had notified PNC that RFC's position was that PNC will be required to indemnify RFC pursuant to the Client Contract. Id. ¶ 11.

## B. PNC HAS NO RIGHT OF STATUTORY OR IMPLIED CONTRIBUTION OR INDEMNITY UNDER APPLICABLE LAW

23. In addition to PNC not possessing the right of contribution or indemnity from RFC pursuant to any provision in the underlying agreements, PNC has no such rights, whether statutory or implied, under RICO, TILA/HOEPA or RESPA. As set forth below, an

analysis of such statutes and the CAC clearly shows that there is no basis on which PNC could obtain contribution or indemnification from RFC under RICO, TILA/HOEPA or RESPA.

24. Because the CAC asserts only federal statutory causes of action, the question of whether PNC has any implied right to either contribution or indemnity based on those claims is governed by federal law. See Donovan v. Robbins, 752 F.2d 1170, 1179 (7th Cir. 1984) (Posner, J.) ("Where contribution is sought by one who has had to pay damages for violating a federal statute, the scope and limitations of the right of contribution are invariably treated as questions of federal rather than state law.").

25. As a matter of federal law, a right of contribution may arise only though the affirmative creation of a right of action by Congress, either expressly or by clear implication, or through the judicial creation of a federal common law. Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 638 (1981). The Second Circuit Court of Appeals has ruled that indemnification is not permissible when it is inconsistent with the statutory language and purpose. Globus v. Law Research Serv., Inc., 418 F.2d 1276, 1288-89 (2d Cir. 1969) (rejecting indemnity for violations of the Securities Act of 1933). Indeed, courts often apply the *Texas Industries* analysis to reject indemnification claims. See Doherty v. Wireless Broad. Sys., 151 F.3d 1129, 1131 (9th Cir. 1998).

**1. No Right of Statutory or Implied Contribution or Indemnity Exists Under RICO.**

26. Courts in this District have consistently ruled as a matter of law that there is no right to statutory or implied contribution or indemnification under RICO. E.g., Ames Assocs. v. ABS Partners Real Estate LLC, No. 06 Civ. 928, 2010 WL 890034, at *3 (S.D.N.Y. Mar. 3, 2010) ("It is well-settled in this district that there is no right to obtain contribution for RICO liability because contribution is not included on the extensive list of civil remedies

proscribed by the RICO statute."); THC Holdings Corp. v. Tishman, Nos. 93 Civ. 5393(KMW) & 95 Civ. 4422, 1998 WL 305639, at *2 n.1 (S.D.N.Y. June 9, 1998) (citing cases and dismissing contribution and indemnification claims on ground that there is no such right under RICO); Minpeco, S.A. v. Conticommodity Serv., Inc., 677 F. Supp. 151, 154-55 (S.D.N.Y. 1988) ("Applying the analysis of *Texas Industries* to RICO . . . leads to the conclusion that there is no right to contribution under RICO."). As such, it is clear that PNC has no statutory or implied contribution or indemnification under RICO.

**2. No Right of Statutory or Implied Contribution or Indemnity Exists Under TILA/HOEPA.**

27. There is no express right of contribution or indemnification in TILA, despite the fact that the statute has elaborate and specific provisions on remedies. 15 U.S.C. §§ 1607, 1640 & 1641. The stated purpose of TILA is not to protect claimants like PNC, but rather to provide information to consumers and to "protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601. In addition, the amendments to TILA that are known as HOEPA were added to the statute expressly to "protect borrowers" and not lenders such as PNC. See H. Conf. Rep. 103-652, reprinted in 1994 U.S.C.C.A.N. 1977, 1988.

28. Courts therefore properly hold that there is no right of statutory or implied contribution or indemnity under TILA for a claimant such as PNC. Ameriquest Mortg. Co. v. Northwest Title & Escrow Corp. (In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.), 589 F. Supp. 2d 987, 993-95 (N.D. Ill. 2008) ("[W]e conclude that neither TILA, nor federal common law, authorize indemnification or contribution . . . ."); McSherry v. Capital One FSB, 236 F.R.D. 516, 522-23 (W.D. Wash. 2006) ("TILA does not expressly provide for a right to contribution. . . . [and] the . . . factors weigh decisively against a finding that [TILA] confers . . . an implied right to contribution or indemnity."); see also Zino Davidoff SA v. Selective Distrib.

Int'l Inc., No. 07 Civ. 10326(PAE)(MHD), 2013 WL 1245974, at *5 (S.D.N.Y. Mar. 7, 2013) (citing *McSherry* with approval).

**3. No Right of Statutory or Implied Contribution or Indemnity Exists Under RESPA.**

29. RESPA, like TILA, is a complex statute with specific provisions on remedies, and again there is no authorization for contribution or indemnification. See 12 U.S.C. § 2607(d). The statutory remedies do, however, include the potential for treble damages; the availability of treble damages for violations of the antitrust statutes was identified by the Supreme Court in *Texas Industries* as a factor counseling against allowing contribution under those statutes. Texas Industries, 451 U.S. at 639. Moreover, the stated reason for RESPA echoes that of TILA; RESPA was not enacted to help co-defendant claimants like PNC, but rather "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges." 12 U.S.C. § 2601(a).

30. Thus, although there are apparently no cases directly addressing contribution or indemnity under RESPA, the only possible conclusion under the *Texas Industries* analysis is that there are no rights of statutory or implied contribution or indemnity under RESPA for a claimant such as PNC.

**4. No Basis for Contribution or Indemnification Claims Against the Debtors Exists.**

31. The allegations of the CAC clearly establish that PNC's predecessor-in-interest, CBNV, was the lender for the second mortgages at issue in the CAC and is directly responsible for the entirety of any RESPA liability that might be established against PNC. The

Bank Defendants,[11] not RFC, are alleged to have paid kickbacks. PNC Claim, Ex. 1, ¶ 3. The Bank Defendants, not RFC, are alleged to have used HUD-1 statements to conceal kickbacks and unearned fees. Id., ¶ 439.[12]

32. Similarly, the allegations of the CAC provide that CBNV was directly and entirely responsible for any TILA/HOEPA liability that might be established against PNC. The allegations are that "the Banks" – not RFC – withheld and charged fees. PNC Claim, Ex. 1, ¶ 450. CBNV, not RFC, issued the HOEPA notices to its borrowers and therefore CBNV allegedly violated TILA and HOEPA through alleged inaccuracies in the disclosures and alleged omissions from those notices. Id. ¶¶ 451, 455-56, 459, 463 & 473. CBNV, not RFC, is alleged to have committed substantive violations of TILA and HOEPA through making allegedly untimely notices, allegedly failing to use a conspicuous type size in the notices, and issuing notices with allegedly false information about delivery. Id. ¶¶ 479, 481 & 484. In addition, CBNV, not RFC, used note forms that allegedly failed to make disclosures regarding prepayment penalties. Id. ¶ 486.

33. There is therefore no factual basis on which PNC could obtain contribution or indemnification from RFC under either RESPA or TILA/HOEPA.

34. Finally, there is no basis for contribution or indemnification for any RICO violations committed by CBNV. The statute requires that a defendant "participate[s], directly or indirectly, in the conduct of [the] enterprise's affairs" by means of a 'pattern of racketeering activity." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 371 (3d Cir. 2010) (citations omitted). The statutory language "dictates that it is the predicate acts of racketeering that must

[11] Bank Defendants, as defined in the CAC, include CBNV, PNC and Guaranty National Bank of Tallahassee. RFC is an "Investor Defendant" for the purposes of the CAC.

[12] In fact, the RESPA allegations based on the unearned title charges have been dismissed. See Marshall PNC Decl., ¶ 6 & Exs. 1 & 2.

be the 'means.'" Id. at 372 n.69. There are no allegations in the CAC that RFC acted with CBNV to commit predicate acts that were part of the conduct of the allegedly illegal enterprise's affairs or that were part of the conduct giving rise to CBNV's liability.

35. Because PNC has no right of contribution or indemnification arising from the underlying agreements or applicable law, the PNC Claim must be disallowed and expunged under section 502(b)(1) of the Bankruptcy Code.

## II. ANY CONTINGENT RIGHT OF CONTRIBUTION OR INDEMNIFICATION PNC MAY HAVE IS UNENFORCEABLE PURSUANT TO 11 U.S.C. § 502(e)(1)(B)

36. Assuming arguendo that PNC had contribution or indemnification rights against RFC (which it does not), because such claims are contingent, they are unenforceable and must be disallowed under section 502(e)(1)(B) of the Bankruptcy Code.

37. Section 502(e)(1)(B) of the Bankruptcy Code provides in pertinent part:

> [T]he court **shall disallow** any claim for reimbursement or contribution of an entity that is liable with the debtor . . . to the extent that … such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.

11 U.S.C. § 502(e)(1)(B) (emphasis added).

38. Congress enacted section 502(e)(1)(B) of the Bankruptcy Code "to prevent contingent, unresolved indemnification or contribution claims from delaying the consummation of a plan." In re GCO Servs., LLC, 324 B.R. 459, 466 (Bankr. S.D.N.Y. 2005); See also In re Alper Holdings USA, No. 07-12148(BRL), 2008 WL 4186333, at *7 (Bankr. S.D.N.Y. Sep. 10, 2008) ("[Section 502(e)(1)(B)] epitomizes a considered Congressional policy that underlies the Bankruptcy Code as a whole and Chapter 11 in particular: this is, the bankrupt's estate should not be burdened by estimated claims contingent in nature."); In re A & H, Inc., 122 B.R. 84, 85 (Bankr. W.D. Wis. 1990) ("[T]his provision reflects a congressional

belief that the bankruptcy scheme will most effectively meet its objectives if the bankrupt estate is not burdened by claims which have not come to fruition.”). In addition, Congress enacted section 502(e)(1)(B) of the Bankruptcy Code to avoid double payment by the estate by preventing competition between primary and secondary creditors for the “limited proceeds in the estate.” See In re Wedtech Corp., 85 B.R. 285, 289 n.4 (Bankr. S.D.N.Y. 1988) (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 354 (1977)).

39. Courts have established the following three-part test to determine whether a claim should be disallowed under section 502(e)(1)(B) of the Bankruptcy Code:

(a) “the claim must be for reimbursement or contribution;”

(b) “the party asserting the claim must be ‘liable with the debtor’ on the claim;” and

(c) “the claim must be contingent at the time of its allowance or disallowance.”

In re Chemtura Corp., 436 B.R. 286, 292-93 (Bankr. S.D.N.Y. 2010); Alper Holdings USA, 2008 WL 4186333, at *5 (quoting GCO Servs., 324 B.R. at 465 and In re Drexel Burnham Lambert Grp., Inc., 148 B.R. 982, 985 (Bankr. S.D.N.Y. 1992)). Even if PNC had a right to indemnification or contribution, the PNC Claim satisfies all three elements for mandatory disallowance pursuant to section 502(e)(1)(B) of the Bankruptcy Code and therefore must be disallowed and expunged.

40. The PNC Claim provides that “in the event” PNC is determined to have liability under the pending lawsuit, PNC “has a claim against RFC for contribution and/or indemnity, in an amount to be determined.” Schedule to PNC Claim, p. 2. With respect to the potential claim for indemnification, it is well established that indemnification claims arising under contractual agreements are claims for reimbursement or contribution within the meaning

of section 502(e)(1)(B) of the Bankruptcy Code. Route 21 Assocs. v. MHC, Inc.,486 B.R. 75, 95 (S.D.N.Y. 2012) ("[A] reading of the terms 'reimbursement or contribution' that includes indemnity comports with the goal of section 502(e)(1)(B) – avoiding double liability . . . ."); see also Alper Holdings USA, 2008 WL 4186333, at *5; see also Wedtech Corp., 85 B.R. at 289; GCO Servs., 324 B.R. at 465 ("Because 'the concept of reimbursement includes indemnity,' any claims for indemnification also fall within the scope of the first prong of 502(e)(1)(B).").

41. Here, the PNC Claim satisfies the first requirement under the three-part test because it states that it is either for "contribution and/or indemnity." Schedule to PNC Claim, p. 2. As the former clearly satisfies the requirement, the latter also falls within the category of claims for reimbursement or contribution as set forth above. Accordingly, PNC's claim is a claim for reimbursement or contribution pursuant to section 502(e)(1)(B) of the Bankruptcy Code.

42. Second, PNC would be "co-liable" with RFC for the contingent damages claims asserted in the Putative Class action within the meaning of section 502(e)(1)(B) of the Bankruptcy Code. Co-liability exists if by paying the primary creditor, the debtor would be eliminating a contingent requirement for the secondary claimant to make the same payment. In determining co-liability for purposes of section 502(e)(1)(B), courts look to whether the debtor could possibly have been liable with the claimant on the underlying liability. Alper Holdings USA, 2008 WL 4186333, at *6 ("The proper inquiry requires the Court to look to the underlying lawsuit to determine whether – absent the automatic stay – liability for the damages and injuries spewing from the [source of the claim] might have possibly been imposed on [the debtor].").

43. PNC's co-liability is evidenced by PNC's submission that its claim for contribution or indemnification only arises "in the event [PNC] should ultimately be determined

to have any . . . liability" arising from the underlying lawsuit. Schedule to PNC Claim, p. 2. In addition, the first time PNC raised its alleged indemnification or contribution rights, it claimed, without citing any authority, that it could assert "*inter alia*, a common law indemnity claims against RFC in the event PNC were to incur liability" in the Putative Class action. Marshall PNC Decl. ¶ 11. Therefore, RFC would allegedly be co-liable with PNC to the plaintiffs in the Putative Class Action.

44. Third, the PNC Claim is a "contingent" claim under section 502(e)(1)(B) of the Bankruptcy Code because it asserts future costs not yet incurred. Indeed, a claim is contingent until liquidated costs are *actually* expended. In re APCO Liquidating Trust, 370 B.R. 625, 636-37 (Bankr. D. Del. 2007) ("[T]he contingency contemplated by [section] 502(e)(1)(B) relates to both *payment and liability* . . . [t]herefore, a claimant's 'claim is contingent until their liability is established . . . *and* the co-debtor has paid the creditor.'") (citing Drexel, 148 B.R. at 986-87 (emphasis added); see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 580 (S.D.N.Y. 2001) ("[A] claim is contingent 'if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event.'" (citing Mazzeo v. United States (In re Mazzo), 131 F.3d 295, 303 (2d Cir. 1997))).

45. Here, PNC has not paid any damages or claims to the plaintiffs in the Putative Class Action. In fact, PNC currently has not incurred any liability to such plaintiffs as the case is continuing against PNC and only progressed to the point of a partial grant and partial denial of PNC's motion to dismiss. As noted above, by its own submission, PNC's claim is contingent and yet "to be determined." Schedule to PNC Claim, p. 2.

46. Thus, all three prerequisites for application of section 502(e)(1)(B) of the Bankruptcy Code are satisfied, and to the extent PNC is able to establish it has a right to

contribution and/or indemnification, PNC's contingent claim for contribution and/or indemnity should be disallowed.

47. Should the PNC Claim not be disallowed and expunged for the reasons set forth in this Objection, RFC and the other Debtors expressly reserve all rights to object to the PNC Claim on any other basis.

48. In addition, RFC and the other Debtors expressly reserve any and all rights to seek indemnification and/or contribution from PNC in connection with or related to the claims asserted in the CAC.

**NOTICE**

49. The Debtors have provided notice of this Objection in accordance with the *Case Management Procedures*, approved by this Court on May 23, 2012 [Docket No. 141] and the *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1009, 3007 and 9019(b) Approving (I) Claim Objection Procedures, (II) Borrower Claim Procedures, (III) Settlement Procedures, and (IV) Schedule Amendment Procedures*, entered on March 21, 2013 [Docket No. 3294].

[*Remainder of page intentionally left blank.*]

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem proper.

Dated: August 9, 2013
New York, New York

Respectfully submitted,

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By: /s/ Steven J. Reisman
Steven J. Reisman
Michael A. Cohen
Jonathan J. Walsh
Maryann Gallagher
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559

*Conflicts Counsel for the Debtors and Debtors in Possession*

BRYAN CAVE LLP

By: /s/ K. Lee Marshall
K. Lee Marshall
560 Mission Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 675-3400
Facsimile: (415) 675-3434

One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
Michael G. Biggers
Darci F. Madden

*Litigation Counsel for the Debtors and Debtors in Possession*

Exhibit 1

Proposed Order

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**ORDER GRANTING DEBTORS' OBJECTION TO PROOF
OF CLAIM OF PNC BANK, N.A. (CLAIM NO. 4760)**

Upon the *Debtors' Objection to Proof of Claim of PNC Bank, N.A. (Claim No. 4760)* [Docket No. __] (the "Objection"),[1] of Residential Capital, LLC and its affiliated debtors in the above-referenced Chapter 11 Cases, as debtors and debtors in possession (collectively, the "Debtors"), seeking entry of an order, pursuant to sections 502(b)(1) and 502(e)(1)(B) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), disallowing and expunging the PNC Claim on the basis that the PNC Claim fails to articulate any legal or factual justification for asserting a claim against the Debtors, as more fully described in the Objection, or, in the event PNC has a claim for contribution and/or indemnification, on the basis that such claim is contingent and unenforceable against the Debtors; and it appearing that this Court has jurisdiction to consider the Objection pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Objection and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Objection having been provided in accordance with the requirements of Bankruptcy Rule 3007(a), the Local Bankruptcy Rules of this Court, the Case Management Procedures entered on

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

May 23, 2012 [Docket No. 141] (the "Case Management Procedures"), and the *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1009, 3007 and 9019(b) Approving (I) Claim Objection Procedures, (II) Borrower Claim Procedures, (III) Settlement Procedures, and (IV) Schedule Amendment Procedures*, entered on March 21, 2013 [Docket No. 3294] (the "Claims Objection Procedures"), and it appearing that no other or further notice need be provided; and upon consideration of the Objection, the *Declaration of K. Lee Marshall in Support of Debtors' Opposition to Motion to Apply Bankruptcy Rule 7023 and to Certify Class Claims*, dated December 3, 2012 [Docket No. 2338], the *Declaration of K. Lee Marshall in Support of Debtors' Objection to Proof of Claim of PNC Bank, N.A. (Claim No. 4760)*, annexed to the Objection as Exhibit 1, and the PNC Claim; and the Court having found and determined that the relief sought in the Objection is in the best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual basis set forth in the Objection establish just cause for the relief granted therein; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the relief requested in the Objection is granted to the extent provided therein; and it is further

ORDERED that, pursuant to sections 502(b)(1) and 502(e)(1)(B) of the Bankruptcy Code, the PNC Claim is disallowed and expunged; and it is further

ORDERED that Kurtzman Carson Consultants LLC, the Debtors' claims and noticing agent, is directed to disallow and expunge the PNC Claim so that such claim is no longer maintained on the Debtors' claims register; and it is further

ORDERED that the Debtors are authorized and empowered to take all actions as may be necessary and appropriate to implement the terms of this Order; and it is further

ORDERED that notice of the Objection as provided therein shall be deemed good and sufficient notice, and the requirements of Bankruptcy Rule 3007(a), the Case Management Procedures, the Claims Objection Procedures, and the Local Bankruptcy Rules of this Court are satisfied by such notice; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated:_____________, 2013
New York, New York

_______________________________________
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

Exhibit 2

Declaration of K. Lee Marshall in Support of Debtors' Objection to Proof of Claim of PNC Bank, N.A. (Claim No. 4760)

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
Steven J. Reisman
Michael A. Cohen
Jonathan J. Walsh
Maryann Gallagher

*Conflicts Counsel for the Debtors and Debtors in Possession*

**BRYAN CAVE LLP**
560 Mission Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 675-3400
Facsimile: (415) 675-3434
K. Lee Marshall

One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
Michael G. Biggers
Darci F. Madden

*Litigation Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**DECLARATION OF K. LEE MARSHALL IN SUPPORT OF DEBTORS' OBJECTION TO PROOF OF CLAIM OF PNC BANK, N.A. (CLAIM NO. 4760)**

I, K. Lee Marshall, being duly sworn, state the following under penalty of perjury:

## A. Background And Qualifications

1. I am a partner in the law firm of Bryan Cave LLP ("Bryan Cave" or the "Firm"). The Firm maintains offices for the practice of law at, among other locations in the United States and worldwide, 560 Mission Street, 25th Floor, San Francisco, CA 94105. I am an attorney duly admitted and in good standing to practice before the courts of Missouri and California, as well as federal trial and appellate courts across the country.

2. I submit this declaration (the "Marshall PNC Decl.") in support of the *Debtors' Objection to Proof of Claim of PNC Bank, N.A. (Claim No. 4760)* filed contemporaneously herewith (the "Objection"). I previously in this case submitted the *Declaration of K. Lee Marshall in Support of Debtors' Opposition to Motion to Apply Bankruptcy Rule 7023 and to Certify Class Claims*, dated and entered on December 3, 2012 [Docket No. 2338] (the "Marshall Class Decl."). I hereby reaffirm and incorporate by reference the Marshall Class Decl.[1]

3. Bryan Cave has been counsel to certain of the Debtors on the matter described in the Marshall Class Decl. since the Spring of 2011. Except as otherwise indicated, the facts set forth in this declaration are based on (i) personal knowledge, and (ii) my review of the records obtained in connection with the Consolidated Cases and MDL Cases (each as defined in the Marshall Class Decl.). If called as a witness, I could and would testify thereto.

**B. Procedural History Of The Putative Class Actions**

4. The Marshall Class Decl. recites in detail the procedural history of various lawsuits filed against Debtor Residential Funding Company, LLC ("RFC") prior to its bankruptcy filing that were ultimately consolidated and/or jointly administered in a multi-district litigation (collectively, the "Putative Class Action") pending before the United States District Court for the Western District of Pennsylvania (the "District Court") and styled as *In re Community Bank of Northern Virginia Second Mortgage Practice Litigation*, MDL No. 1674, Case Nos. 03-0425, 02-02101, 05-1386.

5. As relevant to the *Proof of Claim* [Claim No. 4760] (the "PNC Claim"), submitted against RFC by PNC Bank, N.A. ("PNC"), the claims at issue in the Putative Class

---

1 Due to its large size, the Marshall Class Decl. is not attached.

Action relate to the lending practices of a non-debtor bank, Community Bank of Northern Virginia ("CBNV"), in connection with second mortgage loans. RFC was named as a defendant because it purchased many of those loans from CBNV. As set forth in the PNC Claim, PNC is a defendant in the Putative Class Action because it is the successor to CBNV through a series of mergers and acquisitions.

6. Subsequent to my execution of the Marshall Class Decl., the District Court has issued a ruling in the Putative Class Action granting in part and denying in part PNC's motion to dismiss Plaintiffs' Joint Consolidated Amended Class Action Complaint. In the same Order the District Court also granted a motion to dismiss filed by the Federal Deposit Insurance Corporation, sued as receiver for another non-debtor bank that made second mortgage loans. See Order, annexed hereto as **Marshall PNC Decl. Exhibit 1**, and Memorandum Opinion, annexed hereto as **Marshall PNC Decl. Exhibit 2.**

7. The District Court also required submission and briefing on a motion for class certification in the Putative Class Action. On July 31, 2013, the District Court entered an Order of Court granting the relief requested in the motion for class certification in the Putative Class Action, annexed hereto as **Marshal PNC Decl. Exhibit 3**. Currently, there is still no scheduling order in place as to further stages of that action.

**C. Background Of PNC's Claims For Contribution And Indemnity**

8. The PNC Claim does not cite any contractual or statutory authority for the asserted rights of contribution and/or indemnity claimed therein.

9. The relationship between Debtor RFC and PNC's predecessor-in-interest CBNV was governed by the Client Contract between RFC and CBNV, dated May 15, 1998 (the "Client Contract"), annexed hereto as **Marshall PNC Decl. Exhibit 4.** The Client Contract in turn incorporated the terms of RFC's July 1, 1997 AlterNet Seller Guide. See Marshall PNC

Decl. Ex. 4 at § 1. The Table of Contents and Chapter 2 of RFC's July 1, 1997 AlterNet Seller Guide are annexed hereto as **Marshall PNC Decl. Exhibit 5**.

10. Section 274 of the July 1, 1997 AlterNet Seller Guide requires the loan originator (CBNV/PNC) to indemnify RFC in certain circumstances, but there is no provision requiring RFC to provide contribution or indemnity to CBNV/PNC under any circumstances. See Marshall PNC Decl. Ex. 5, § 274.

11. PNC first claimed that it could assert "*inter alia*, a common law indemnity claim against RFC in the event PNC were to incur liability" in the Putative Class Action in a letter to me from its counsel dated July 13, 2011. This assertion came only after I had notified PNC that RFC's position was that PNC will be required to indemnify RFC pursuant to the Client Contract between RFC and CBNV.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 6, 2013

K. Lee Marshall

Marshall PNC Decl. Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

| | |
|---|---|
| COMMUNITY BANK OF NORTHERN VIRGINIA MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1674<br>02-1201, 03-0425, 05-0688, 05-1386<br>**ELECTRONICALLY FILED** |

**ORDER OF COURT**

This case was reassigned to this Court on May 16, 2013. Doc. no. 593. Since then, the Court has reviewed:

(1) the FDIC's Motion to Dismiss for Lack of Jurisdiction and Motion to Dismiss/Strike Plaintiffs' Class Action Claims and Certain Prayers for Relief Against the FDIC and its Brief in Support (doc. nos. 516, 517);

(2) PNC's Motion to Dismiss for Failure to State a Claim and its Brief in Support (doc. nos. 520, 521);

(3) Plaintiffs' Briefs in Opposition to each of the Motions (doc. nos. 539, 540, respectively);

(4) the Reply Brief filed by the FDIC and PNC as to PNC's Motion to Dismiss (doc. no. 548);

(5) the Reply Brief filed by the FDIC as to the FDIC's Motion to Dismiss and Motion to Dismiss/Strike (doc. no. 549);

(6) Plaintiffs' Sur-Reply Brief as to PNC's Motion to Dismiss (doc. no. 554);

(7) Plaintiffs' Sur-Reply Brief as to the FDIC's Motion to Dismiss and Motion to Dismiss/Strike (doc. no. 561); and

Case 2:03-cv-00425-AJS Document 605 Filed 06/12/13 Page 2 of 3

(8) a transcript of the September 18, 2012, oral argument related to the above-referenced Motions (doc. no. 591); as well as

(9) all supplemental authority filed by the parties related to these Motions (doc. nos. 562, 565, 573, 577-579, 594, 598, 599, 600, 602, and 603).

The Court ordered the parties to attend a status conference on June 12, 2013. On June 5, 2013, the Court notified the parties that any new argument pertaining to the Motions should be made orally during the status conference. The parties have not advanced any new arguments.

**AND NOW,** this **12th day of June, 2013**, upon consideration of all of the written and oral submissions proffered by the parties:

The Court **GRANTS** Defendant FDIC's Motion to Dismiss for Lack of Subject Matter Jurisdiction (doc. no. 516).

The Court **GRANTS IN PART and DENIES IN PART** Defendant PNC's Motion to Dismiss for Failure to State a Claim (doc. no. 520) as follows:

(1) PNC's Motion to Dismiss the named representatives who did not schedule their claims in this case as an asset of their bankruptcy estate and/or who are not the real party in interest, is **GRANTED**;

(2) PNC's Motion to Dismiss any claims brought against it by any Plaintiff whose loan did not originate with PNC nor was assigned to PNC, is **GRANTED**;

(3) PNC's Motion to Dismiss claims made pursuant to §2607(b) of Real Estate Settlement Procedures Act ("Section 1100 fees"), 12 U.S.C. § 2607 ("RESPA"), is **GRANTED**;

(4) PNC's Motion to Dismiss Plaintiffs Edward Kruszka and Richard Montgomery for failure to join an indispensable party pursuant to Fed.R.Civ.P. 12(b)(7), is **GRANTED**;

(5) PNC's Motion to Dismiss actual damages under the Truth in Lending Act, as amended by the Home Ownership Equity Protection Act, 15 U.S.C. § 1601 ("TILA/HOEPA"), *et seq.*, is **DENIED;**

(6) PNC's Motion to Dismiss TILA/HOEPA claims and the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d), is **DENIED;** and

(7) PNC's Motion to Dismiss claims made pursuant to any Section of RESPA other than Section §2607(b) of RESPA ("Section 1100 fees"), is **DENIED**.

The Court's Opinion related to this Order shall be filed in due course.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel

Marshall PNC Decl. Exhibit 2

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 1 of 42

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| IN RE: | COMMUNITY BANK OF NORTHERN VIRGINIA MORTGAGE LENDING PRACTICES LITIGATION | ) | MDL No. 1674 Civ. Action Nos. 02-1201, 03-425, 05-688, 05-1386 ELECTRONICALLY FILED |
|---|---|---|---|

**MEMORANDUM OPINION**

This matter is before the Court on Defendants' Motions to Dismiss. Doc. nos. 516 and 520. Plaintiffs have filed a putative class action alleging that Defendants' issuance of second mortgages violated, *inter alia*, the Real Estate Settlement Practices Act, 12 U.S.C. § 2601, *et seq*. ("RESPA"), the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq*., as amended by the Home Ownerships Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639 *et seq*. and the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO").

Defendant Federal Deposit Insurance Corporation ("FDIC"), as receiver for the Guarantee National Bank of Tallahassee ("GNBT"), has filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6), 12(b)(7), 12(f), 15, 19(a) and 23(d)(1)(D) and 12 U.S.C. §§ 1821 and 1825 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. 101-73, 103 Stat. 183 (1989) ("FIRREA").[1] Doc. no. 516.

[1] As noted, Defendant FDIC filed its Motion, in part, pursuant to F.R.Civ.P. 12(f), which is a Motion to Strike. Because this Court granted Defendant FDIC's Motion to Dismiss, the Court will not address the Motion to Strike in this Opinion.

Defendant PNC has filed a Fed.R.Civ.P. 12(b)(6) Motion arguing that Plaintiffs have failed to state a claim upon which relief can be granted. Doc. no. 520. Defendant PNC further seeks dismissal of certain named Plaintiffs' claims against it for lack of standing. Both Defendants also argue that other named representatives' claims should be dismissed for failure to join their spouses, who, Defendants claim, are indispensable parties. Defendants jointly further contend that Plaintiffs' claims under RESPA and RICO should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

The Court has reviewed the following: (1) the FDIC's Motion to Dismiss for Lack of Jurisdiction and Motion to Dismiss/Strike Plaintiffs' Class Action Claims and Certain Prayers for Relief Against the FDIC and its Brief in Support (doc. nos. 516, 517); (2) PNC's Motion to Dismiss for Failure to State a Claim and its Brief in Support (doc. nos. 520, 521); (3) Plaintiffs' Briefs in Opposition to each of the Motions (doc. nos. 539, 540, respectively); (4) the Reply Brief filed by the FDIC and PNC as to PNC's Motion to Dismiss (doc. no. 548); (5) the Reply Brief filed by the FDIC as to the FDIC's Motion to Dismiss and Motion to Dismiss/Strike (doc. no. 549); (6) Plaintiffs' Sur-Reply Brief as to PNC's Motion to Dismiss (doc. no. 554); (7) Plaintiffs' Sur-Reply Brief as to the FDIC's Motion to Dismiss and Motion to Dismiss/Strike (doc. no. 561); and (8) a transcript of the September 18, 2012, oral argument related to the above-referenced Motions (doc. no. 591); as well as (9) all supplemental authority filed by the parties related to these Motions (doc. nos. 562, 565, 573, 577-579, 594, 598, 599, 600, 602, and 603).

The Court ordered the parties to attend a status conference on June 12, 2013. On June 5, 2013, the Court notified the parties that any new argument pertaining to the Motions to Dismiss should be made orally during the status conference. Upon hearing no new arguments, the Court ruled on these Motions and entered an Order disposing of them. Doc. no. 605. Set forth below is the Court's reasoning for each ruling in that Order (doc. no. 605), which is incorporated post, as if fully set forth herein.

I. BACKGROUND

The parties and the Court are conversant in the procedural and factual background of this case. The United States Court of Appeals for the Third Circuit has previously set forth, in detail, the convoluted procedural history of these cases. *See In re Cmty. Bank of N. Va.*, 622 F.3d 275, 279–90 (3d Cir. 2010); *In re Cmty. Bank of N. Va*., 418 F.3d 277, 283–98 (3d Cir. 2005). After the latest remand, Chief Judge Lancaster, who had been assigned these cases, *In re Cmty. Bank of N. Va. Mortgage Lending Practices Litig.*, 368 F.Supp. 2d 1354, 1355 (J.P.M.L. 2005), issued a Case Management Order (doc. no. 506). Thereafter, Plaintiffs filed a Joint Consolidated Amended Complaint (doc. no. 507), Defendants filed Motions to Dismiss (doc. nos. 516 & 520), and Chief Judge Lancaster heard argument thereon. See doc. no. 591. After Chief Judge Lancaster's untimely death, the Judicial Panel on Multidistrict Litigation re-assigned these cases to this Court. *In re Cmty. Bank of N. Va. Mortgage Lending Practices Litig.*, MDL 1674 (J.P.M.L. May 17, 2013). All references to actions taken by "this Court" prior to May 17, 2013, refer to actions taken by Chief Judge Lancaster.

The following facts are taken from the Joint Consolidated Amended Complaint (doc. no. 507), and are accepted as true solely for the purposes of this Memorandum Opinion. Other facts relevant to this Court's decision are set forth in context as necessary.

In the late 1990s, an organization run by David Shumway, Devan Shumway, and Randy Bapst founded an organization to originate and sell second mortgages to investors. This organization partnered with Defendant PNC (then known as the Community Bank of Northern Virginia ("CBNV"), a regulated depository institution), to originate second mortgages, charge origination fees, and then sell them almost immediately to investors such as the Residential Funding Corporation ("RFC"). The Joint Consolidated Amended Complaint alleges that the issuance of these second mortgages violated RESPA, TILA/HOEPA, and RICO.

A. CBNV and GNBT

CBNV is a Virginia Corporation with its principal place of business in Virginia and, as a lender, made approximately 22,810 of the loans at issue here. CBNV is now known as PNC National Bank. GNBT was a national bank with its principal place of business in Tallahassee, Florida. GNBT made at least 21,725 of the loans at issue here. GNBT was closed by the Office of Comptroller of Currency in 2004. The FDIC was substituted for GNBT in this litigation in 2004. Facts regarding the FDIC receivership relevant to these Motions are set forth, *infra,* at section C.

B. Representative Plaintiffs

Named as representative Plaintiffs are: Ruth J. Davis, Phillp F. and Jeannie C. Kossler, Brian W. and Carl M. Kessler, Patrice Porco, Thomas T. Mathis, Stephen R. and Amy L. Haney,

John and Rebecca Picard, William and Ellen Sabo, Russell and Kathleen Ulrich, Nora H. Miller, Robert A. and Rebecca A. Clark, Edward R. Kruszka, Jr., Tina Merl Boor, Martin J. Baratz, Clell L. Hobson, Rosa Kelly Parkinson, John and Kathy Nixon, Brian Cartee, Mack and Robin Dorman, Jerome and Charetta Roberts, Melba Brown, Flora A. Gaskin, Roy Lee and Ruthie Mae Logan, Shawn and Lorene Starkey, John and Rowena Drennen, Richard Montgomery, and Tammy and David Waseem.

1. Ruth Davis

Ms. Davis had a CBNV loan, which closed on February 22, 1999. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures. The principal balance of her loan was $24,100.00 to be repaid, with an interest rate of 13.75% (APR of 15.456%), monthly for 24 years. Ms. Davis executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Ms. Davis. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 (a "Loan Discount"), 804 ("Credit Report"), and 807 (a "Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), and 1112 ("Processing Fee"). Ms. Davis was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $63,971.58 and her APR as 15.46%. Ms. Davis filed for personal bankruptcy on April 15, 2005. She did not schedule this action in her petition.

2. Phillp F. and Jeannie C. Kossler

The Kosslers had a CBNV loan, which closed on or about July 28, 1998. According to the Joint Consolidated Amended Complaint, this was the date the Kosslers were first given their TILA and HOEPA disclosures. The principal balance of their loan was $30,000.00 to be repaid with an interest rate of 12.99% (APR of 14.817%) monthly for 15 years. The Kosslers executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Kosslers. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 804 ("Credit Report"), and 808 ("Document Review"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1111 ("Signing Agent"). The Kosslers were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $40,938.40 and their APR as 14.817%.

3. Brian W. and Carl M. Kessler

The Kesslers had a CBNV loan, which closed on or about April 30, 1999. According to the Joint Consolidated Amended Complaint, this was the date the Kesslers were first given their TILA and HOEPA disclosures. The principal balance of their loan was $33,000.00 to be repaid, with an interest rate of 14.75% (APR of 17.841%), monthly for 15 years. The Kesslers executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Kesslers. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a

"Loan Origination Fee"), 802 ("Loan Discount"), 807 ("Application Fee"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), and 1112 ("Document Review"). The Kosslers were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $53,587.45 and their APR as 17.841%.

4. Patrice Porco

Patrice Porco had a GNBT loan which closed on or about September 9, 2000. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures. The principal balance of her loan was $29,800.00 to be repaid, with an interest rate of 12.99% (APR of 16.71%), monthly for 15 years. Ms. Porco executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Ms. Porco. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 811 ("Underwriting Fee"), and 813 ("Application Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). Ms. Porco was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $43,024.86 and her APR as 16.7196%.

5. Thomas T. Mathis

Thomas T. Mathis had a GNBT loan which closed on or about June 7, 2001. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures. The principal balance of his loan was $25,000.00 to be repaid, with an interest rate of 14.99% (APR of 17.24%), monthly for 25 years. Mr. Mathis executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Mr. Mathis. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 804 ("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). Mr. Mathis was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $74,020.58 and their APR as 17.2411%. Mr. Mathis filed for personal bankruptcy on April 29, 2004. He did not schedule this action in his petition.

6. Stephen R. and Amy L. Haney

Stephen R. and Amy L. Haney had a GNBT loan which closed on May 23, 2001. According to the Joint Consolidated Amended Complaint, this was the date the Haneys were first given their TILA and HOEPA disclosures. The principal balance of their loan was $24,500.00 to be paid monthly for 15 years. The Joint Consolidated Amended Complaint does not indicate the interest rate or APR. The Haneys executed a deed of trust that granted GNBT a security lien in

residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Haneys. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Haneys were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $31,996.99 and their APR as 15.0957%. The Haneys filed for personal bankruptcy on June 2, 2009. They did not schedule this action in their petition.

7. John and Rebecca Picard

John and Rebecca Picard had a CBNV loan which closed on November 30, 1999. According to the Joint Consolidated Amended Complaint, this was the date the Picards were first given their TILA and HOEPA disclosures. The principal balance of the loan was $47,900.00 to be repaid monthly for 15 years. The interest rate was 14.99% (APR of 18.416%). The Picards executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Picards. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 803 ("Appraisal Fee"), 807 ("Application Fee"), and 811 ("Underwriting Fee). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"),

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 10 of 42

1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Picards were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $79,767.89 and their APR as 18.416%.

8. William and Ellen Sabo

William and Ellen Sabo had a CBNV loan which closed on or about October 15, 1999. According to the Joint Consolidated Amended Complaint, this was the date the Sabos were first given their TILA and HOEPA disclosures. The principal balance of their loan was $35,000.00 to be paid over 15 years. The interest rate was 14.75% (APR of 17.390%). The Sabos executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Sabos. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 808 ("Application Fee"), and 809 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), and 1112 ("Document Review"). The Sabos were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $56,211.00 and their APR as 17.39%. Ms. Sabo filed for personal bankruptcy on December 13, 2007. She did not schedule this action in her petition.

9. Russell and Kathleen Ulrich

Russell and Kathleen Ulrich had a GNBT loan which closed on or about August 8, 2000. According to the Joint Consolidated Amended Complaint, this was the date the Ulriches were

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 11 of 42

first given their TILA and HOEPA disclosures. The principal balance of their loan was $46,850.00 to be paid over 25 years. The interest rate was 12.99% (APR of 15.469%). The Ulriches executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Ulriches. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 807 ("Application Fee"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Ulriches were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $118,324.73 and their APR as 15.49%. Mrs. Ulrich filed for personal bankruptcy on February 26, 2007. She did not schedule this action in her petition.

10. <u>Nora H. Miller</u>

Nora H. Miller had a CBNV loan which closed on or about April 30, 1999. According to the JOINT CONSOLIDATED AMENDED COMPLAINT, this was the date she was first given her TILA and HOEPA disclosures. The principal balance of her loan was $34,000.00 to be paid over 15 years. The interest rate was 12.50% (APR of 15.590%). Ms. Miller executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Ms. Miller. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan

Origination Fee"), and 802 ("Loan Discount"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), and 1112 ("Document Review"). Ms. Miller was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $46,332.99 and her APR as 15.59%. Ms. Miller filed for personal bankruptcy on August 15, 2003 and August 20, 2009. She did not schedule this action in either petition.

11. <u>Robert A. and Rebecca A. Clark</u>

Robert A. and Rebecca A. Clark had a GNBT loan which closed on or about March 20, 2001. According to the Joint Consolidated Amended Complaint, this was the date the Clarks were first given their TILA and HOEPA disclosures. The principal balance of their loan was $27,500.00 to be paid over 10 years. The interest rate was 11.99% (APR of 16.0042%). The Clarks executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Clarks. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Clarks were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $23,785.92 and their APR

as 16.0042%. The Clarks filed for personal bankruptcy on April 28, 1997 and July 16, 2009. They did not schedule this action in either petition.

12. Edward R. Kruszka, Jr.

Edward R. Kruszka, Jr. had a GNBT loan which closed on or about May 5, 2001. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures. The principal balance of his loan was $20,100.00 to be paid over 20 years. The interest rate was 16.99% (APR of 19.772%). Mr. Kruska executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Mr. Kruszka. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 807 ("Application Fee"), 810 ("E Appraisal"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). Mr. Kruszka was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $53,198.40 and his APR as 19.722%. Mr. Kruszka filed for bankruptcy on May 24, 2002. He did not schedule this action in his petition.

13. Tina Merl Boor

Tina Merl Boor, formerly known as Tina Merl, had a CBNV loan which closed on or about December 9, 2000. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures. The principal balance of her loan

was not included in the Joint Consolidated Amended Complaint. Several fees were itemized on the HUD-1 settlement statement given to Ms. Boor. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 808 ("Lender Document Review Fee"), 810 ("Lender Underwriting Fee"), and 811 ("Document Review"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1105 ("Document Preparation"). The Joint Consolidated Amended Complaint contains no information regarding the Finance Charge, nor does it contain any information regarding the APR. Ms. Boor field for bankruptcy on August 20, 2007. She did not schedule this action in her petition.

14. Martin J. Baratz

Martin J. Baratz had a GNBT loan which closed on or about January 16, 2002. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures. The Joint Consolidated Amended Complaint contains no further allegations regarding Mr. Baratz's loan.

15. Clell L. Hobson

Clell L. Hobson had a CBNV loan which closed on or about May 2, 2001, via FedEx delivery with return, pre-paid, next-day return envelope. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures. The principal balance of his loan was $55,500.00 to be paid over 20 years. The interest rate was 17.75% (APR of 19.904%). Mr. Hobson executed a deed of trust that granted CBNV a security

lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Mr. Hobson. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 808 ("Lender Document Review"), 809 ("Lender Underwriting Fee"), and 810 ("Lender Application Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1105 ("Document Preparation"). Mr. Hobson was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $152,996.30 and his APR as 19.904%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Mr. Hobson violated HOEPA. Mr. Hobson filed for personal bankruptcy on December 2, 2002. He did not schedule this claim in his petition.

16. Rosa Kelly Parkinson

Rosa Kelly Parkinson, then known as Rosa Kelly, had a GNBT loan which closed on or about Septmber 27, 2000 via a courier who obtained the execution of the loans in a public library near Decatur, George. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures. The principal balance of her loan was $51,000.00 to be paid over 25 years. The interest rate was 13.99% (APR of 16.532%). Captain Kelly executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Captain Parkinson. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 807

("Application Fee"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1112 ("Document Review"), and 1113 ("Processing Fee"). Captain Kelly was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $109,105.81 and her APR as 16.532%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Captain Kelly violated HOEPA and Georgia law.

17. John and Kathy Nixon

John and Kathy Nixon had a CBNV loan which closed on or about February 2, 2001, via FedEx to their home in Florida. According to the Joint Consolidated Amended Complaint, this was the date the Nixons were first given their TILA and HOEPA disclosures. The principal balance of their loan was $49,999.00 to be paid over 25 years. The interest rate was 18.25% (APR of 20.261%). The Nixons executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Nixons. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee") and 807 ("Application"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1105 ("Document Preparation"). The Nixons were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $185,347.31 and their APR as 20.261%. The

Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Nixons violated HOEPA.

18. Brian Cartee

Brian Cartee had a GNBT loan which closed on or about February 25, 2002. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures, via FedEx. The principal balance of his loan was $29,500.00 to be paid over 15 years. The interest rate was 12.750% (APR of 15.556%). Mr. Cartee executed a deed of trust which granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Mr. Cartee. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 808 ("GA State Tax Fee"), and 810 ("Lender Application Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1113 ("Processing Fee"). Mr. Cartee was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $40,694.64 and his APR as 15.5596%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Mr. Cartee violated HOEPA.

19. Mack and Robin Dorman

Mack and Robin Dorman had a GNBT loan which closed on or about February 11, 2002. According to the Joint Consolidated Amended Complaint, this was the date the Dormans were first given their TILA and HOEPA disclosures, which arrived via FedEx delivery. The principal

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 18 of 42

balance of their loan was $29,600.00 to be paid over 10 years. The Joint Consolidated Amended Complaint does not identify the interest rate but alleges that the APR was 16.4352%. The Dormans executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Dormans. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 808 ("GA State Tax Fee"), and 810 ("Lender Application Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1113 ("Processing Fee"). The Dormans were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $40,694.64 and their APR as 16.4532%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Dormans violated HOEPA.

20. Jerome and Charetta Roberts

Jerome and Charetta Roberts had a GNBT loan which closed on or about October 9, 2000. According to the Joint Consolidated Amended Complaint, this was the date the Roberts were first given their TILA and HOEPA disclosures via courier to Mr. Roberts' place of work. The principal balance of their loan was $39,00.00 to be paid over 25 years. The interest rate was 14.99% (APR of 17.828%). The Roberts executed a deed of trust which granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Roberts. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 19 of 42

Discount"), 811 ("Underwriting Fee"), and 813 ("Application Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Roberts were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $116,570.41 and their APR as 17.828%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Roberts violated HOEPA and Georgia law.

21. Flora A. Gaskin

Flora A. Gaskin had a GNBT loan which closed on or about August 8, 2001. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures via a courier who conducted the closing. The principal balance of their loan was $30,000.00 to be paid over 15 years. The interest rate was 15.99% (APR of 17.965%). Ms. Gaskin executed a deed of trust that granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Ms. Gaskin. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 805 ("Application Fee"), 810 ("Underwriting Fee"), and 811 ("Lender Document Review Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1105 ("Document Preparation Fee"). Ms. Gaskin was given a Federal Truth in Lending Disclosure Statement that identified

her Finance Charge as $49,435.17 and her APR as 17.965%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Ms. Gaskin violated HOEPA.

22. Melba Brown

Melba Brown had a CBNV loan which closed on or about August 12, 2000. According to the Joint Consolidated Amended Complaint, this was the date she was first given her TILA and HOEPA disclosures via courier. The principal balance of her loan was $30,000.00 to be paid over 15 years. The interest rate was 17.450% (APR of 20.704%). Ms. Brown executed a deed of trust that granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Ms. Brown. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 808 ("Lender Underwriting Fee"), and 810 ("Lender Document Review Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), and 1111 ("Disbursement Fee"). Ms. Brown was given a Federal Truth in Lending Disclosure Statement that identified her Finance Charge as $58,774.00 and her APR as 20.704%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to Ms. Brown violated HOEPA. Ms. Brown filed for personal bankruptcy on August 24, 2005. She did not schedule this action in her petition.

23. Mr. and Mrs. Roger Turner

Mr. and Mrs. Roger Turner first mentioned in the Joint Consolidated Amended Complaint at paragraph 339, had a GNBT loan that closed on or about October 10, 2000.

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 21 of 42

According to the Joint Consolidated Amended Complaint, this was the date the Turners were first given their TILA and HOEPA disclosures via courier. The principal balance of their loan was $16,200.00 to be paid over 25 years. The interest rate was 14.375% (APR of 18.033%). The Turners executed a security deed for the benefit of GNBT. This security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Turners. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 807 ("Application Fee"), and 811 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review Fee"), and 1113 ("Processing Fee"). The Turners were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $46,731.38 and their APR as 18.033%. The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Tuners violated HOEPA.

24. Roy Lee and Ruthie Mae Logan

Roy Lee and Ruthie Mae Logan had a GNBT loan which closed on or about July 11, 2001. According to the Joint Consolidated Amended Complaint, this was the date the Logans were first given their TILA and HOEPA disclosures via courier who conducted the closing. The principal balance of their loan was $18,600.00 to be paid over 10 years. The interest rate was 11.99% (APR of 15.692%). The Logans executed a security deed in favor of GNBT. The security deed granted GNBT a security lien in residential real estate subject to one or more prior

mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Logans. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 804 ("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Logans were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $15,904.64 and their APR as 15.6972%.[2] The Joint Consolidated Amended Complaint further alleges that other aspects of the notices given to the Logans violated HOEPA.

25. Shawn and Lorene Starkey

Shawn and Lorene Starkey had a GNBT loan which closed on or about October 31, 2001. According to the Joint Consolidated Amended Complaint, this was the date the Starkeys were first given their TILA and HOEPA disclosures. The principal balance of their loan was $30,300.00 to be paid over 15 years. The interest rate was 11.99%. The Starkeys executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Starkeys. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804

[2] The Court notes that the Joint Consolidated Amended Complaint indicates in one place that the APR is 15.692%, and in another place the APR is 15.6972%.

("Credit Report"), 811 ("Underwriting Fee"), and 812 ("Flood Certification Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Starkeys were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $39,391.81 and their APR as 14.9528%. The Starkeys filed for personal bankruptcy on May 13, 2005. They did not schedule this action in their petition.

26. John and Rowena Drennen

John and Rowena Drennen had a GNBT loan which closed on or about July 28, 2001. According to the Joint Consolidated Amended Complaint, this was the date they were first given their TILA and HOEPA disclosures. The principal balance of their loan was $47,100.00 to be paid over 25 years. The interest rate was 15.99% (APR of 18.6284%). The Drennens executed a deed of trust for the benefit of GNBT. This deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Drennens. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 811 ("Underwriting Fee"), 812 ("Flood Certification Fee"), and 813 ("E Appraisal Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). The Drennens were given a Federal Truth in Lending Disclosure Statement that identified

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 24 of 42

their Finance Charge as $150,605.00 and their APR as 15.49%. The Drennens filed for personal bankruptcy on October 19, 2004, and Ms. Drennen filed for bankruptcy on August 4, 2005. This action was not scheduled in either petition. According to Plaintiffs, Ms. Drennen has reopened her bankruptcy, and the trustee has abandoned this claim to her.

27. Richard Montgomery

Richard Montgomery, had a GNBT loan which closed on or about November 16, 2001. According to the Joint Consolidated Amended Complaint, this was the date he was first given his TILA and HOEPA disclosures. The principal balance of his loan was $81,000.00 to be paid over 15 years. The interest rate was 13.2483% (APR of 18.6284%). Mr. Montgomery executed a deed of trust for the benefit of GNBT. This trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to Mr. Montgomery. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 802 ("Loan Discount"), 804 ("Credit Report"), 812 ("Flood Certification Fee"), and 813 ("E Appraisal"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1111 ("Overnight Fee"), 1112 ("Document Review"), and 1113 ("Processing Fee"). Mr. Montgomery was given a Federal Truth in Lending Disclosure Statement that identified his Finance Charge as $92,588.65 and his APR was 13.248%.

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 25 of 42

28. Tammy and David Wasem

Tammy and David Wasem had a CBNV loan which closed on or about August 9, 2001. According to the Joint Consolidated Amended Complaint, this was the date the Wasems were first given their TILA and HOEPA disclosures. The principal balance of their loan was $47,000.00 to be paid over 15 years. The interest rate was 14.5% (APR of 15.456%). The Wasems executed a deed of trust for the benefit of CBNV. This deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans. Several fees were itemized on the HUD-1 settlement statement given to the Wasems. Among those fees were the "Section 800" fees contained in Line Nos. 801 (a "Loan Origination Fee"), 805 ("Application Fee"), and 810 ("Underwriting Fee"). In addition, there were several "Section 1100" fees contained in Line Nos. 1101 (a "Settlement or Closing Fee"), 1102 ("Abstract or Title Search"), 1103 ("Title Examination"), 1105 ("Document Preparation"), and 1112 ("Document Review"). The Wasems were given a Federal Truth in Lending Disclosure Statement that identified their Finance Charge as $60,683.67 and their APR as 14.527%.

C. Facts related to FDIC Appointment as Receiver for GNBT

The FDIC was appointed as receiver for GNBT in 2004. The FDIC published notice of its appointment in the newspapers local to the GNBT headquarters in Florida. The FDIC further sent notice to Plaintiffs' counsel. Plaintiffs' counsel filed three claims post receivership. On June 14, 2004, Plaintiffs' counsel filed three (3) proofs of claim. The first proof of claim was filed as a class claim on behalf of a class of unnamed borrowers of GNBT, as defined by the first settlement agreement approved by this Court on December 4, 2003. This claim was disallowed

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 26 of 42

by the non-action of the FDIC 180 days after it was filed on December 11, 2004. The second proof of claim was filed on behalf of a class of borrowers as defined by Civil Action No. 02-1201. This claim was denied on November 22, 2004. The third proof of claim was filed on behalf of the putative class in *Phipps v. GNBT*, Case No. 03-420 (W.D. Mo., April 3, 2003). This case was dismissed by the United States District Court for the Western District of Missouri on September 17, 2003, several months prior to the claim being filed. *Phipps v. GNBT*, 2003 WL 2214964. This claim was denied by the FDIC on November 2, 2004. The dismissal of the case was upheld by the Court of Appeals for the Eighth Circuit on July 28, 2005. *Phipps v. FDIC,* 417 F.3d 1006 (8th Cir. 2005).

II. STANDARD OF REVIEW

A. Rule 12(b)(1)

A party may move for dismissal pursuant to Fed.R.Civ.P. 12(b)(1) based on lack of subject matter jurisdiction. When analyzing a Rule 12(b)(1) challenge, the Court must first determine whether the moving party is making a facial or factual jurisdictional attack. *CNA v. U.S.*, 535 F.3d 132, 139 (3d Cir. 2008). "If [it] is a facial attack, the court looks only at the allegations in the pleadings and does so in the light most favorable to the [non-moving party]." *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 513 (3d Cir. 2007). However, if it is a factual jurisdictional attack, where the moving party argues that the Court lacks jurisdiction based on evidence outside of the pleadings, the Court may "consider and weigh evidence outside the pleadings . . . ." *Id*. at 514. A jurisdictional challenge is a factual challenge if "it concerns not an alleged pleading deficiency, but rather the actual failure of [the non-moving party's]

claims to comport with the jurisdictional prerequisites." *Id*. Under these circumstances, the Court is not "confined to the allegations in [the . . .] complaint," and the Court is "entitled to independently evaluate the evidence to resolve disputes over jurisdictional facts." *S.R.P. ex rel Abunabba v. U.S.*, 676 F.3d 329, 332 (3d Cir. 2012).

Here, Defendant FDIC makes a factual challenge to this Court's subject matter jurisdiction as to Plaintiffs' claims against it. Thus, the Court is free to consider and weigh evidence outside the pleadings.

B. Rule 12(b)(6)

Federal Courts require notice pleading, rather than the heightened standard of fact pleading when evaluating a motion brought pursuant to Fed.R.Civ.P. 12(b)(6). Fed.R.Civ.P. 8(a)(2) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give defendant fair notice of what the . . . claim is and the grounds on which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

After the United States Supreme Court decided *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Court of Appeals for the Third Circuit explained that a District Court must engage in analysis of the following three steps to test the sufficiency of a Complaint:

> First, the court must take note of the elements a plaintiff must plea to state a claim. Second the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and the determine whether they plausibly give rise to an entitled for relief.

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 28 of 42

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013) (citation omitted).

The third step of this analysis requires this Court to consider the specific nature of the claims presented and to determine whether the facts pled to substantiate the claims are sufficient to show a "plausible claim for relief." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013). "While legal conclusions can provide the framework of a Complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664.

This Court may not dismiss a Complaint merely because it appears unlikely or improbable that Plaintiff can prove the facts alleged or will ultimately prevail on the merits. *Twombly*, 550 U.S. at 563, n. 8. Instead, this Court must ask whether facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements. *Id*. at 556. Generally speaking, a Complaint that provides adequate facts to establish "how, when, and where" will survive a Motion to Dismiss. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 212 (3d Cir. 2009). In short, a Fed.R.Civ.P. 12(b)(6) Motion to Dismiss should not be granted if a party alleges facts which could, if established at trial, entitle that party to relief. *Twombly*, 550 U.S. at 563, n. 8.

In addition, Defendants challenge the standing of some of the named representatives. The doctrine of standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *In re Majestic Star Casino*, --- F.3d ---, 2013 WL 2162781 (3d Cir. May 21, 2013) (quoting *Valley Forge Christian Coll. v. Ams. United For Separation of Church & State, Inc.*, 454 U.S. 464, 484(1982)) (internal quotation marks omitted). It "involves both constitutional limitations on federal-court jurisdiction and prudential

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 29 of 42

limitations on its exercise." *Id*. at *6, (citation and internal quotations omitted). "One of those prudential limits demands that the plaintiff generally . . . assert his own legal rights and interests, and [ ]not rest his claim to relief on the legal rights or interests of third parties." *Id*.

C. Failure to Join Indispensable Parties - 12(b)(7) and 19(a)

A movant must show that the plaintiff has failed to join a party under Fed.R.Civ.P. 19 in order to prevail on a Fed.R.Civ.P. 12(b)(7) Motion to Dismiss. Fed.R.Civ.P. 19(a) states, in material part, that the following are:

> (a) Persons Required to Be Joined if Feasible.
>
> Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: as a practical matter impair or impede the person's ability to protect the interest; leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

F.R.Civ.P. 19(a).

When reviewing a motion brought pursuant to Fed.R.Civ.P. 12(b)(7), the Court must accept the allegations in the Complaint as true and draw all reasonable inferences in favor of the non-moving party. *Pittsburgh Logistics Sys., Inc. v. C.R. England, Inc.,* 699 F.Supp.2d 613, 618 (W.D. Pa. 2009). In addition, a Court may consider "relevant, extra-pleading evidence" during

its evaluation of a Fed.R.Civ.P. 12(b)(7) motion. *Citizen Band Potawatomi Indian Tribe of OK v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994). Defendants argue that some of the named representatives have failed to join their spouses who, they argue, must be joined if feasible.

III. FDIC MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

The FDIC took over as receiver for GNBT in 2004. The FDIC argues that several Plaintiffs, who have loans that originated with GNBT, failed to file a claim with the FDIC as required by the Financial Industry Reform and Recovery Act, ("FIRREA"), 12 U.S.C. § 1821. The FDIC argues that Plaintiffs' claims are barred by their failure to exhaust administrative remedies. Although the FDIC does acknowledge that seven Plaintiffs filed claims, the FDIC notes that it disallowed those claims. Even if any one of those claims should be allowed, the FDIC argues that FIRREA does not allow those seven Plaintiffs to pursue their administrative claims on a class-wide basis.

Plaintiffs contend that FIRREA does allow claims to be administratively pursued on a class-wide basis. In the alternative, Plaintiffs argue that the FDIC should be estopped from asserting this defense at this juncture, because of its continued participation in this litigation, and because of its failure to provide Plaintiffs with sufficient notice of the receivership.

A. Failure to Exhaust Administrative Remedies Generally

"FIRREA, which was passed in response to the savings and loan crisis of the 1980s, gives the FDIC the authority to act as a receiver or conservator for failed institutions." *Tellado v. IndyMac Mtg. Svcs.*, 707 F.3d 275, 279, (3d Cir. 2013). "The statute also creates an administrative claims process for institutions in receivership and limits judicial review of certain

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 31 of 42

claims." *Id.*, citing 12 U.S.C. § 1821(d)(3)-(13). The United States Court of Appeals for the Third Circuit interpreted Section 1821(d)(13) to be "a statutory exhaustion requirement: in order to obtain jurisdiction to bring a claim in federal court, one must exhaust administrative remedies by submitting the claim to the receiver in accordance with the administrative scheme for adjudicating claims detailed in Section 1821(d)." *Id.*, (citing *Nat'l Union Fire Ins. Co. v. City Sav., F.S.B.,* 28 F.3d 376, 383 (3d Cir. 1991)). The District Court has jurisdiction to review the claim *de novo* only after a claim has been filed with the FDIC and processed. *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 392, n. 11.

Turning to the instant matter, of the forty three (43) named Plaintiffs, only twenty-five (25) had loans that were originated by GNBT. Of these 25, as set forth above, only a handful filed claims with the FDIC post-receivership. Therefore, the question becomes, whether these claims satisfy the administrative exhaustion requirement and, if so, can they constitute class claims under FIRREA.

As to the first question, the FDIC disallowed the claims of the seven named representatives who filed claims. The FDIC argues that after the disallowance, FIRREA requires Plaintiffs to take some affirmative action to continue their pre-receivership lawsuits. Plaintiffs contend that they are not required to take any affirmative action. Rather, Plaintiffs argue that the expiration of the claims period, which accompanies the stay is, in itself, a continuation of the action as defined by the statute.

No authority from the Court of Appeals for the Third Circuit defines the term "continue" under FIRREA. However, persuasive authority suggests that Plaintiffs have failed to comply

with 12 U.S.C. § 1821(d)(6)(B), which requires Plaintiffs to "continue an action commenced before the appointment of a receiver" after the notice of disallowance. *See Holmes v. FDIC*, 861 F.Supp.2d 955 (E.D. Wis. 2012); and *Dougherty v. Deutsche Bank Nat.*, 2011 WL 3565079 (E.D. Pa. Aug. 12, 2011).

B. Exhaustion - Class Claims

Moreover, pursuant to FIRREA, claims cannot be filed on a class-wide basis. The FDIC argues that FIRREA, by its silence on class claims, is analogous to the Bankruptcy Code, and therefore, impliedly prohibits class-wide claims. The GNBT Plaintiffs contend that, pursuant to Rule 23, class-wide claims can be properly maintained on a class-wide basis. In the alternative, the GNBT Plaintiffs contend that if class-wide claims are held to be improper, the FDIC should not be allowed to pursue this defense because the FDIC failed to provide the individual notice required by FIRREA. The GNBT Plaintiffs argue that the FDIC must mail individual notice to each GNBT class member and then accept otherwise untimely claims.

The Court finds that neither FIRREA nor Rule 23 authorize claims against the FDIC to be filed on a class-wide basis. With regard to FIRREA itself, the Court of Appeals for the Third Circuit has suggested in other contexts that "in the absence of more specific legislative authority, in interpreting FIRREA we will apply the definition of 'claim' . . . contained in the Bankruptcy Code . . . ." *Nat'l Union Fire Ins. Co. v. City Sav., F.S.B.*, 28 F.3d 376, 386-87 (3d Cir. 1994). The Court of Appeals suggested, in an unpublished decision, that claims may not be filed on a class-wide basis under the Bankruptcy Code. *In re W.R. Grace & Co.,* 316 Fed. Appx. 134 (3d Cir. 2009). In *W.R. Grace,* the Court reasoned that "the authority to act for a class pursuant to

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 33 of 42

Rule 23 does not imply any authorization to file a proof of claim for an individual in bankruptcy proceedings." *Id*. at 136.

Further, the Rules Enabling Act prohibits the Federal Rules from expanding any substantive rights. The Rules Enabling Act, which gives the judicial branch the power to promulgate the Federal Rules of Civil Procedure, requires that these rules "not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072. If read as the Plaintiffs suggest, Rule 23 would effectively trump FIRREA's administrative scheme and thereby effectively abridge FIRREA and enlarge the class members rights against the FDIC. As a matter of first impression, the Court finds that, like the Bankruptcy Code, FIRREA does not authorize the pursuit of claims on a class-wide basis.

C. Waiver Based on Estoppel and Lack of Notice

Plaintiffs argue that the FDIC should be estopped from raising its attack on subject matter jurisdiction because of the FDIC's continued participation in this litigation. This argument is specious. It is well established that this Court's "subject matter jurisdiction cannot be expanded to account for the parties' litigation conduct." *Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 570 (2004) (internal quotations and citations omitted); see also *Insurance Corp. of Ireland, Ltd. v. Campagnie des Bauxites de Guinee,* 456 U.S. 694 (1982); and *American Fire & Casualty Co. v. Finn*, 341 U.S. 6 (1951).

It is equally well established that if, at any time prior to final judgment, it appears that there is no longer subject matter jurisdiction, a Court must immediately dismiss the action and, in

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 34 of 42

fact, is powerless to do otherwise. As the Supreme Court has stated, in two cases nearly 100 years apart:

> [T]he rule, springing from the nature and limits of the judicial power of the United States is inflexible and without exception, which requires this court, of its own motion, to deny its jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record.

*Insurance Corp. of Ireland, Ltd.*, 456 U.S. at 702, quoting *Mansfield, Coldwater & Lake Michigan Ry. v. Swan*, 111 U.S. 379, 382 (1884).

Plaintiffs argue in the further alternative that the FDIC failed to give the individual notice required by FIRREA. Plaintiffs argue, therefore, that they should be excused from exhausting their administrative remedies.

The FDIC argues that it provided notice by: (1) publishing notice of the receivership in a Tallahassee, Florida area newspaper; (2) mailing notice of the receivership to the class members' attorneys and to the opt out Plaintiffs' attorneys; and (3) substituting itself for GNBT in this action.

The Court of Appeals for the Third Circuit has not addressed this issue. Under FIRREA, there are two separate and distinct procedures for notice – one governing notice of the receivership, and the other governing notice of the claims' bar date and the need to file claims with the receiver.

When the FDIC takes over a failed bank as a receiver, FIRREA mandates that the FDIC must first give notice that it has been so appointed. 12 U.S.C. § 1821(d)(5)(C)(ii). Then, the receiver must notify creditors that they must "present their claims, together with proof" by a specified date. 12 U.S.C. §§ 1821(d)(3)(B)(1), 1821(d)(3)C). Courts that have addressed the issue have consistently interpreted the two provisions as separate requirements having separate remedies. See *infra.*

Section 1821(d)(5)(C)(ii)(I) provides that the receiver may not disallow a claim as untimely if "the claimant did not receive notice of the appointment of the receiver in time to file such claim before" the bar date. Section 1821(d)(5)(C)(ii)(I). Importantly, this section does not proscribe the form of notice necessary to satisfy this provision. There is no dispute that the FDIC did mail notice to class counsel upon being appointed receiver for GNBT.

Section 1821(d)(3)(C), requiring notice to creditors, applies only to the creditors' need to file claims with the FDIC before the bar date. FIRREA requires that the FDIC "promptly publish a notice to the depository institution's creditors to present their claims, together with proof, to the receiver by a date specified in the notice," followed by republication approximately one or two months later. 12 U.S.C. § 1821(d)(3)(B). It must also mail a similar notice "to any creditor shown on the institution's books . . . ." Section 1821(d)(3)(C). The statute does not provide any penalties if the FDIC fails to comply with the notice requirements.

Plaintiffs argue that the individual GNBT claimants both appeared on the banks' books and, because Plaintiffs were members of a then certified class, were easily discoverable by the FDIC. Under § 1821(d)(5), they argue, the claims of absent members cannot be disallowed

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 36 of 42

because Plaintiffs received no notice of the bar date. Plaintiffs further argue that due process requires that they should be given individual notice consistent with Rule 23.

Most Courts that have considered the notice provisions of FIRREA have compared § 1821(d)(3)(C) to § 1821(d)(5) and concluded that, because the latter contains a statutory penalty for failure to comply and the former does not, Congress did not intend to provide a remedy for violations of § 1821(d)(3)(C). *See Freeman v. FDIC*, 56 F.3d 1394, 1402 (D.C. Cir. 1995); *Intercontinental Travel Mktg. v. FDIC*, 45 F.3d 1278 (9th Cir. 1994); *Meliezer v. Resolution Trust Corp*. 952 F.2d 879, 882-82 (1st Cir. 1992).

Further, the remedy provided by § 1821(d)(5) for claimants has been construed as requiring only actual notice of the receivership, rather than mailed individual notice. Substitution of the receiver into a pending lawsuit has been held to be sufficient actual notice to parties in that action. *See Tri-State Hotels v. FDIC*, 79 F.3d 707, 716 (8th Cir. 1996) (exhaustion of administrative remedies not required when claimant had actual notice); *Freeman*, 56 F.3d at 1404 (actual notice of receivership put plaintiffs on inquiry notice of claims bar date); and *Intercontinental Travel Mktg.*, 45 F.3d at 1281 (stipulation of substitution provided notice of receivership). Publication in local newspapers is sufficient notice of the receivership. *Tillman v. Resolution Trust Corp*., 37 F.3d 1032, 1036 (4th Cir. 1994) (holding that evidence of publication in local newspapers precludes defense of lack of notice of receivership). Further, notice was given to class counsel for a then certified class. Although Plaintiffs attempt to argue that individual notice to each class member was required, this argument makes no sense under FIRREA or the Rules of Professional Conduct. Counsel for the FDIC was almost certainly

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 37 of 42

barred by the Rules of Professional Conduct from directly communicating with absent class members. At that time, they were adverse parties the FDIC knew to be represented after Rule 23 certification. Instead, the FDIC sent notice to Plaintiffs' counsel. Accordingly, Plaintiffs' argument that they should be excused from FIRREA's administrative exhaustion requirement due to lack of notice is without merit.

IV. ALL DEFENDANTS' MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A. Personal Bankruptcies - Lack of Standing

Defendants argue that seventeen (17) out of forty-three (43) named representatives have filed for personal bankruptcy and failed to list this action as an asset of the bankruptcy estate. Plaintiffs concede that these representatives have filed for bankruptcy. Plaintiffs further concede that their failure to list this action as an asset means they are not the "real party in interest." *Killmeyer v. Ogelbay Norton Company*, 817 F.Supp.2d 681 (W.D. Pa. 2011).

However, Plaintiffs contend, that they should be given time to reopen their bankruptcies, and substitute the bankruptcy trustee as the real party in interest. Plaintiffs request that this Court wait until final judgment to require Plaintiffs to reopen their bankruptcy proceedings. This would be unprecedented.

Plaintiffs submit that one representative plaintiff, Rowena Drennen, has reopened her bankruptcy and that the Trustee has abandoned this claim to her. On this record, it appears that Ms. Drennen may have successfully reopened the relevant bankruptcy proceeding, and therefore, may be the real party in interest for her claim. Accordingly, her individual claim survives at this

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 38 of 42

juncture. The remainder of the claims of those Plaintiffs who are not the real parties in interest are dismissed.

B. Loans Not Originated or Assigned to Defendants

Plaintiffs concede that they lack standing against some Defendants, and therefore, they concede that they can only pursue claims against those Defendants who either originated or were assigned their loans. Accordingly, all Plaintiffs' claims against a Defendant that did not issue or otherwise acquire their loans are dismissed for lack of standing.

C. RESPA

Defendants contend that Plaintiffs have failed to state a claim for RESPA violations. Defendants argue that Plaintiffs' claims regarding discount fees are not settlement services under RESPA. Defendants further argue that Plaintiffs' RESPA claim fails because there is no allegation that the fees were split among entities. Defendants also contend that Plaintiffs' arguments in support of their kickback claims fail.

Plaintiffs allege RESPA violations related to two different sections of the statute, which govern two different types of fees. Broadly speaking, the fees are: (1) loan origination and other loan fees and (2) title fees. The first are often referred to as "Section 800" fees, based upon the section of the HUD - 1 form where they are located. The other type of fee is a "Section 1100" fee.

In *Freeman v. Quicken Loans*, 132 S.Ct. 2034 (2012), the United States Supreme Court held that "Section 2607 (b) [which governs Section 1100 fees] unambiguously covers only a settlement service provider's splitting of a fee with one or more other person; it cannot be

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 39 of 42

understood to reach a single provider's retention of an unearned fee." *Id.* at 2040 (footnote omitted). Defendants contend that this holding is fatal to Plaintiffs' Section 1100 claims. Plaintiffs only real response appears to be that the majority of their RESPA claims are Section 800 claims. Accordingly, pursuant to *Freeman*, Plaintiffs' Section 1100 claims, which allege only a single provider's retention of an unearned fee, are properly dismissed.

D. Failure to Join Spouses

Defendants argue that Plaintiffs Edward Kruszka and Richard Montgomery should be dismissed pursuant to Fed.R.Civ.P. 12(b)(7) because their spouses have not been joined. Plaintiffs contend that Defendants have failed to meet their burden of proving that spouses are "necessary and indispensable parties" whose joinder is not feasible under Rule 19. "The moving party bears the burden of showing that a non-party is both necessary and indispensable." *Pittsburgh Logistics Systems, Inc. v. C.R. England, Inc.,* 669 F.Supp.2d 613, 618 (W.D. Pa 2009).

The plain language of Rule 19(a) supports Defendants' position. Plaintiffs have not joined the spouses of Mr. Kruszka and Mr. Montgomery, nor have they identified why joinder is not feasible. Accordingly, their claims are dismissed.

E. Timeliness - RESPA and TILA

1. One Year Statute of Limitations

Much ink has been spilled on this issue. Defendants argue that Plaintiffs did not file any case within the one-year statute of limitations applicable to RESPA actions and to TILA actual damages actions under § 1640(e) of that statute. Plaintiffs contend that the Court of Appeals

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 40 of 42

comments, albeit in *dicta*, regarding the applicability and interplay of the relation-back theory and class action tolling make this issue inappropriate for resolution on a Fed.R.Civ.P. 12(b)(6) Motion. Plaintiffs further point to recent decisions which hold that, under the proper circumstances, Plaintiffs would be entitled to equitable tolling: *Riddle v. Bank of America*, No. 12-cv-1740, 2013 WL 1482668 (E.D. Pa. April 11, 2013); *Barlee v. First Horizon National Corp.,* No. 12-cv-3045, 2013 WL 1389747 (E.D. Pa. Apr. 5, 2013); and *Barlee v. First Horizon National Corp.,* No. 12-cv-3045, 2013 WL 706091 (E.D. Pa. Feb. 27, 2013). The Court of Appeals for the Third Circuit observed in this case that "because the question of equitable tolling generally requires consideration of evidence beyond the pleadings, such tolling is not generally amenable to resolution on a Rule 12(b)(6) Motion." *In re Community Bank*, 622 F.3d 275, 301-02 (3d Cir. 2010). Accordingly, this part of Defendants' Motion to Dismiss is denied, without prejudice to Defendants' right to assert this defense on a fully developed record.

2. Rescission

Defendants argue that Plaintiffs have failed to state a claim for rescission under § 1635(f) of TILA because: (1) rescission is subject to a statute of repose which cannot be tolled for any reason; (2) the right to rescind is barred by Plaintiffs' refinancing of the loans at issue; and (3) Plaintiffs have failed to tender back.

As to the latter two arguments, evaluation of these claims would require an inquiry into factual issues outside the allegations of the Joint Consolidated Amended Complaint. Plaintiffs contend that Defendants Rule 12(b)(6) Motions on this issue should be denied.

Case 2:03-cv-00425-AJS Document 610 Filed 06/27/13 Page 41 of 42

With regard to the issue of equitable tolling, Plaintiffs contend they are seeking to apply class action, or *American Pipe* tolling (see *American Pipe and Constr. Co. v. Utah,* 414 U.S. 538 (1974)), which they argue can trump a statute of repose. On this issue, the Court of Appeals for the Third Circuit recently held that a TILA claim for rescission need not be filed in Court within three (3) years, but rather, the plaintiffs need only provide written notice to their lender within three years. *Sherzer v. Homestar Mtg Services*, 707 F.3d 255 (3d Cir. 2013).

In order to evaluate this Motion, the Court would be required to engage in a detailed analysis of whether, and when, each putative class member who seeks rescission provided written notice to their lender. This inquiry is not appropriate for resolution on a Motion to Dismiss. Accordingly, this part of Defendants' Motion to Dismiss is denied, without prejudice to Defendants' right to assert this defense on a fully developed record.

F. <u>TILA and RICO</u>

Defendants argue that Plaintiffs have failed to state a claim upon which relief can be granted under either TILA or RICO. Plaintiffs contend that there are numerous factual issues in dispute on this issue which preclude granting a Rule 12(b)(6) Motion to Dismiss. In this case, the Court of Appeals has repeatedly emphasized that a statute of limitations defense should not be evaluated at this stage of the pleadings. See, *In re Community Bank of Northern Virginia*, 622 F.3d 275, 292-93 (3d Cir. 2010). Accordingly, this part of Defendants' Motion to Dismiss is denied, without prejudice to Defendants' right to assert this defense on a fully developed record.

V. CONCLUSION

For the reasons set forth above, the Court entered its Order (doc. no. 605), on the then-pending Motions to Dismiss (doc. nos. 516 and 520), on June 12, 2013. That Order is incorporated by reference as if fully set forth herein.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Counsel of Record

Marshall PNC Decl. Exhibit 3

Case 2:03-cv-00425-AJS Document 618 Filed 07/31/13 Page 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

COMMUNITY BANK OF NORTHERN VIRGINIA MORTGAGE LENDING PRACTICES LITIGATION

MDL No. 1674
03cv0425 and 05cv0688
(Order relates to all cases)
**ELECTRONICALLY FILED**

**ORDER OF COURT**

AND NOW, this 31st day of July, 2013, upon consideration of Plaintiffs' Motion for Class Certification (doc. no. 607 as amended by doc. no. 611) ("Motion"), Declaration and Brief in support thereof (doc. nos. 608 & 609), Defendant PNC's Brief in Opposition (doc. no. 612), and oral argument held on July 19, 2013 (doc. no. 615), IT IS HEREBY ORDERED THAT Plaintiffs' Motion is GRANTED, and the following class and sub-classes are certified:

GENERAL CLASS

All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling, for the period May 1998-December 2002.

All of the named Plaintiffs are appointed as representatives of the General Class.

SUB-CLASSES

Sub-Class 1: (RESPA ABA Disclosure Sub-Class) (Plaintiffs: Philip and Jeannie Kossler) – All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period May 1998-October 1998.

Sub-Class 2: (RESPA Kickback Sub-Class) (Plaintiffs: Brian and Carla Kessler; John and Rebecca Picard) – All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period October 1998-November 1999.

Case 2:03-cv-00425-AJS Document 618 Filed 07/31/13 Page 2 of 3

Sub-Class 3: (TILA/HOEPA Non-Equitable Tolling Sub-Class) (Plaintiffs: Kathy and John Nixon; Flora Gaskin; and, Tammy and David Wasem) – All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period May 1, 2000-December 2002.

Sub-Class 4: (TILA/HOEPA Equitable Tolling Sub-Class) (Plaintiffs: All Plaintiffs other than: Kathy and John Nixon, Flora Gaskin, and Tammy and David Wasem) – All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period May 1998-April 30, 2000.

Sub-Class 5: (RICO Sub-Class) (Plaintiffs: John and Rebecca Picard; Brian and Carla Kessler) – All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period May 1998-November 1999.

The Plaintiffs noted for each of the Sub-Classes above are hereby appointed as representatives for those Sub-Classes.

IT IS FURTHER ORDERED THAT the class claims and issues shall be the claims set forth in Plaintiffs' Joint Consolidated Amended Complaint (doc. no. 507) as follows:

(1) Plaintiffs' claims for violations of the RESPA ABA disclosure requirements (for the period May 1998-October 1998);

(2) Plaintiffs' claims for violations of the RESPA anti-kickback and unearned fee requirements (Section 800 Origination Fees) (for the period October 1998-November 1999);

(3) Plaintiffs' claims for violations of TILA/HOEPA;

(4) Plaintiffs' claims for violations of RICO;

(5) The defenses set forth to each of the above claims; and,

Case 2:03-cv-00425-AJS Document 618 Filed 07/31/13 Page 3 of 3

(6) The proper measure of damages for Plaintiffs and each member of the certified class, in the event that Plaintiffs establish liability on one or more of their claims.

IT IS FURTHER ORDERED THAT R. Bruce Carlson (and the law firm Carlson Lynch Ltd.) and R. Frederick Walters (and the law firm Walters Bender Strohbehn & Vaughan) are appointed as Co-Lead Counsel for the Class, and that the following law firms shall serve as additional counsel for the Class: Richardson, Patrick, Westbrook & Brickman; The Law Offices of Daniel O. Myers; Legg Law Firm; Law Offices of Franklin Nix.

/s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All ECF Counsel of Record

Marshall PNC Decl. Exhibit 4

# Client Contract

This Client Contract (as may be amended, supplemented or otherwise modified from time to time, this "Contract") is made this 15th day of MAY, 1998, by and between Residential Funding Corporation, its successors and assigns ("Residential Funding"), and Community Bank Northern Va (the "Customer", and, together with Residential Funding, the "parties" and each, individually, a "party").

WHEREAS, the Customer desires to sell Loans to, and/or service Loans for, Residential Funding, and Residential Funding desires to purchase Loans from, and/or have the Customer service Loans for, Residential Funding, pursuant to the terms of this Contract and the Guides (as that term is defined below).

NOW, THEREFORE, in consideration of the premises, and the terms, conditions and agreements set forth below, the parties agree as follows:

**1. Incorporation of Guides by Reference.**

Residential Funding has approved the Customer to sell Loans to, and/or service Loans for, Residential Funding under the Guide(s) checked below. Each Guide that is checked below (as each may be amended, supplemented or otherwise modified from time to time, together, the "Guides"), is hereby incorporated into this Contract by reference and for all purposes made a part hereof.

The Customer has been approved by Residential Funding to sell Loans to and/or service Loans for Residential Funding, as indicated below, under the following Guide(s):

| STATUS | APPLICABLE GUIDES |
|---|---|
| ☑ Seller Only | ☐ Client Guide |
| ☐ Servicer Only | ☑ AlterNet Seller Guide |
| ☐ Seller and Servicer | ☐ Servicer Guide |

If a box next to a Guide shown above has not been checked, the Customer has not been approved by Residential Funding to sell Loans to, or, as appropriate, service Loans for, Residential Funding, under that Guide(s) at this time; but, Residential Funding may in the exercise of its sole discretion approve the Customer to sell Loans to, or, as appropriate, service Loans for, Residential Funding under that Guide(s) at some time in the future and the Customer will be authorized to do so upon the execution and delivery by both Residential Funding and the Customer of an addendum to this Contract in a form provided to the Customer by Residential Funding containing that approval and incorporating that Guide(s) into this Contract by reference.

The Customer acknowledges that it has received and read the Guides. All provisions of the Guides are incorporated by reference into and made a part of this Contract, and shall be binding upon the parties; *provided, however,* that the Customer shall be entitled to sell Loans to and/or service Loans for Residential Funding only if and for so long as it shall have been authorized to do so by Residential Funding in writing. Specific reference in this Contract to particular provisions of the Guides and not to other provisions does not mean that those provisions of the Guides not specifically cited in this Contract are not applicable. All terms used herein shall have the same meanings as such terms have in the Guides, unless the context clearly requires otherwise.

**2. Amendments.**

This Contract may not be amended or modified orally, and no provision of this Contract may be waived or amended except in writing signed by the party against whom enforcement is sought. Such a written waiver or amendment must expressly reference this Contract. However, by their terms, the Guides may be amended, modified or supplemented by Residential Funding from time to time. Any such amendment(s) to the Guides shall be binding upon the parties hereto.

**3. Representations and Warranties.**

*a. Reciprocal Representations and Warranties.*

The Customer and Residential Funding each represents and warrants to the other that as of the date of this Contract:

(1) Each party is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, is qualified, if necessary, to do business and in good standing in each jurisdiction in which it is required to be so qualified, and has the requisite power and authority to enter into this Contract and all other

agreements which are contemplated by this Contract and to carry out its obligations hereunder and under the Guides and under such other agreements.

(2) This Contract has been duly authorized, executed and delivered by each party and constitutes a valid and legally binding agreement of each party enforceable in accordance with its terms.

(3) There is no action proceeding or investigation pending or threatened, and no basis therefor is known to either party, that could affect the validity or prospective validity of this Contract.

(4) Insofar as its capacity to carry out any obligation under this Contract is concerned, neither party is in violation of any charter, articles of incorporation, bylaws, mortgage, indenture, indebtedness, agreement, instrument, judgment, decree, order, statute, rule or regulation and none of the foregoing adversely affects its capacity to fulfill any of its obligations under this Contract. Its execution of, and performance pursuant to, this Contract will not result in a violation of any of the foregoing.

*b. Customer's Representations, Warranties and Covenants.*

In addition to the representations, warranties and covenants made by the Customer pursuant to subparagraph (a) of this paragraph 3, the Customer makes the representations, warranties and covenants set forth in the Guides and agrees to deliver to Residential Funding the certified Resolution of Board of Directors which authorizes the execution and delivery of this Contract.

**4. Remedies of Residential Funding.**

If an Event of Client Default or Event of Servicer Default shall occur, Residential Funding may, at its option, exercise one or more of the remedies set forth in the Guides.

**5. Customer's Status as Independent Contractor.**

At no time shall the Customer represent that it is acting as an agent of Residential Funding. The Customer shall, at all times, act as an independent contractor.

**6. Prior Agreements Superseded.**

This Contract restates, amends and supersedes any and all prior Client Contracts or Servicer Contracts between the parties except that any subservicing agreement executed by the Customer in connection with any loan-security exchange transaction shall not be affected.

**7. Assignment.**

This Contract may not be assigned or transferred, in whole or in part, by the Customer without the prior written consent of Residential Funding. Residential Funding may sell, assign, convey, hypothecate, pledge or in any other way transfer, in whole or in part, without restriction, its rights under this Contract and the Guides with respect to any Commitment or Loan.

**8. Notices.**

All notices, requests, demands or other communications that are to be given under this Contract shall be in writing, addressed to the appropriate parties and sent by telefacsimile, by overnight courier or by first class United States mail, postage prepaid, to the addresses and telefacsimile numbers specified below. However, another name, address and/or telefacsimile number may be substituted by the Customer pursuant to the requirements of this paragraph 8, or by Residential Funding pursuant to an amendment to the Guides.

If to Residential Funding, notices must be sent to the appropriate address or telefacsimile number specified in the Guides.

If to the Customer, notices must be sent to:

Community Bank of Northern Virginia

107 Free Court

Sterling, VA 20164

Attention: Jack Grace

Telefacsimile Number: (703) 430-0587

**9. Jurisdiction and Venue.**

Each of the parties irrevocably submits to the jurisdiction of any state or federal court located in Hennepin County, Minnesota, over any action, suit or proceeding to enforce or defend any right under this Contract or otherwise arising from any loan sale or servicing relationship existing in connection with this Contract, and each of the parties irrevocably agrees that all claims in respect of any such action or proceeding may be heard or determined in such state or federal court. Each of the parties irrevocably waives the defense of an inconvenient forum to the maintenance of any such action or proceeding and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in any such forum. Each of the parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law. Each of the parties further agrees not to institute any legal actions or proceedings against the other party or any director, officer, employee, attorney, agent or property of the other party, arising out of or relating to this Contract in any court other than as hereinabove specified in this paragraph 9.

**10. Miscellaneous.**

This Contract, including all documents incorporated by reference herein, constitutes the entire understanding between the parties hereto and supersedes all other agreements, covenants, representations, warranties, understandings and communications between the parties, whether written or oral, with respect to the transactions contemplated by this Contract. All paragraph headings contained herein are for convenience only and shall not be construed as part of this Contract. Any provision of this Contract that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and, to this end, the provisions hereof are severable. This Contract shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of Minnesota.

This Contract shall be of no force and effect unless and until it has been executed by both parties.

IN WITNESS WHEREOF, the duly authorized officers of the Customer and Residential Funding have executed this Contract as of the date first above written.

[Corporate Seal]
(if none, so state)

ATTEST:

By: Valerie Cintron
(Signature)

Name: Valerie Cintron
(Typed or Printed)

Title: Closer

CUSTOMER

Community Bank of Northern Virginia
(Name of Customer)

By: [signature]
(Signature)

Name: John E. Grace
(Typed or Printed)

Title: Secondary Marketing Officer

---

ATTEST:

By: [signature]
(Signature)

Name: Darrin George
(Typed or Printed)

Title: Risk Analyst

RESIDENTIAL FUNDING CORPORATION

By: [signature]
(Signature)

Name: BRIAN WOODBURY
(Typed or Printed)

Title: DIRECTOR

# Limited Power of Attorney 1204

Community Bank of Northern Virginia (the "Seller"), a Virginia corporation through the duly authorized representative whose signature appears below, makes and appoints and by this Limited Power of Attorney does make, constitute and appoint Residential Funding corporation (hereinafter referred to as "GMAC-RFC"), a Delaware corporation, the true and lawful attorney-in-fact for the SELLER; and in the SELLER's name and stead to execute, by the signature of any authorized GMAC-RFC employee or agent, any and all documents for the purpose of assigning and transferring to GMAC-RFC any and all mortgages, deeds of trust, security instruments, and the related notes, including, but not limited to the assignments of mortgages, deeds of trust, and security instruments; the note endorsements, affidavit and agreements, for any mortgage loan transaction closed and funded in the SELLER's name or transferred and assigned to Seller and committed to GMAC-RFC by SELLER under the Client Contract(s) between the SELLER and GMAC-RFC [dated May 15, 20 1995 and ________, 20__] (the "Client Contract(s)"); giving and granting unto the said attorney-in-fact full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done, and to make, correct, amend, endorse, accept, or deliver all agreements and instruments; as fully, to all intents and purposes, as the SELLER might or could do if present at the doing thereof through one of its authorized representatives, with full power of substitution and revocation. The Seller hereby ratifies and confirms all that the said attorney-in-fact shall lawfully do or cause to be done by virtue of this Limited Power of Attorney. The SELLER may only revoke this Limited Power of Attorney in writing, and only upon the expiration of one hundred eighty (180) days from the effective date of the Client Contract's termination in accordance with the Client Contract's terms, and this Limited Power of Attorney shall be deemed to be a power coupled with an interest for such purpose.

IN TESTIMONY WHEREOF, I have hereto set my hand and seal this 5 day of September, 2001.

SELLER: Community Bank of Northern Virginia
(Full legal name of SELLER entity and, if applicable, full name of any and all d/b/a entities)

BY: [signature]
(Signature of authorized officer of SELLER)

John E. Grace
(Printed name of authorized officer)

Mortgage Operations Officer
(Title of authorized officer)

---

ACKNOWLEDGMENT
SECRETARY'S CERTIFICATE

I hereby certify that I am the duly elected and qualified Secretary of the SELLER, and that, as such, I am authorized to execute this certificate on behalf of the SELLER. I further certify that the above-named officer of the SELLER ("Authorized Officer") is a duly elected, qualified, and acting officer of the SELLER, holding on the date hereof the title set forth below his/her name, and that the Board of Directors of the SELLER has duly authorized, empowered, and directed the Authorized Officer to execute and deliver this Limited Power of Attorney in the name of and on behalf of the SELLER.

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the SELLER as of this 18th day of September, 2001.

[SEAL] [signature] Secretary SELLER ID # M43

Marshall PNC Decl. Exhibit 5




Page

# 1

## Introduction

110 Residential Funding Corporation Objective . . . . . . . . . . . 1.1
120 AlterNet Seller/Servicer Contractual Obligations . . . . . . . . 1.2
121 Single Contract . . . . . . . . . . . . . . . . . . . . . . 1.2
122 Forward Commitment Letter . . . . . . . . . . . . . . 1.2
130 AlterNet Seller ID Number . . . . . . . . . . . . . . . . . . . 1.3
131 AlterNet Forward Commitment Number . . . . . . . . 1.3
140 Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.4
141 Legibility of Copies . . . . . . . . . . . . . . . . . . . 1.4
150 Hours of Operation and Holidays . . . . . . . . . . . . . . . . 1.5
160 AlterNet Guide . . . . . . . . . . . . . . . . . . . . . . . . . 1.5
161 Organization . . . . . . . . . . . . . . . . . . . . . . 1.5
162 Updates and Amendments . . . . . . . . . . . . . . . 1.6
163 Headings and Definitions . . . . . . . . . . . . . . . . 1.6
164 Exhibit and Form Numbering . . . . . . . . . . . . . . 1.6
170 Use of Node Software . . . . . . . . . . . . . . . . . . 1.7
180 Use of AlterNet Seller's Name . . . . . . . . . . . . . . . . . 1.7
181 Use of Residential Funding Name and Service Marks . . . . . . . . . . . . . . . . . . . 1.7
182 Customer Loan Status Inquiry Application . . . . . 1.8




Page

# 2

**Seller Eligibility** .......... 2.1
200 Client Eligibility .......... 2.1
210 Eligibility Standards .......... 2.1
220 Client Contract .......... 2.3
221 Client Underwriting Responsibilities .......... 2.3
230 Continuing Client Obligations .......... 2.3
231 Disqualification or Suspension .......... 2.3
232 Reporting Requirements .......... 2.4
233 Audits and Inspections .......... 2.5
240 Disclosure of Information .......... 2.5
241 Maintenance of Records .......... 2.6
242 Disclosure of Borrower Information .......... 2.6
243 Quality Control .......... 2.7
250 Client Representations and Warranties .......... 2.10
251-1 Specific Warranties .......... 2.11
251-2 Additional Client Representations and Warranties for the Home Equity Program .......... 2.21
252 Non-Standard Documents .......... 2.23
253 Proof of Compliance .......... 2.26
254 Integrity of Information .......... 2.26
255 Third-Party Originators .......... 2.27
260 Events of Default .......... 2.28
270 Remedies of RFC .......... 2.28
271. Conversion, Repurchase or Substitution .......... 2.29
272. Repurchase Price of Home Equity Product .......... 2.34
273. Disqualification or Suspension .......... 2.35
274 Indemnification .......... 2.36
275 Right of Set-Off .......... 2.37
280 Merger or Consolidation of Client .......... 2.37
281 Notification of Changes in Client Status .......... 2.38




Page

# 3 Underwriting


| | | | Page |
|---|---|---|---|
| 310 | Allowable Types of Financing | | 3.5 |
| | 311 | Application Type | 3.6 |
| | 312 | Arm's Length Transactions | 3.7 |
| | 313 | Asset Verification | 3.7 |
| | 314 | Borrower | 3.10 |
| | 315 | Exception Approval Procedure | 3.13 |
| | 316 | Financing Closing Costs | 3.13 |
| | 317 | Grading Method | 3.14 |
| | 318 | Loan Application | 3.15 |
| | 319 | Loan Requirements | 3.15 |
| | 320 | Loan-To-Value Ratio (LTV) | 3.18 |
| | 321 | Maximum Home-seller Subsidy | 3.21 |
| | 322 | Minimum Down Payment | 3.21 |
| | 323 | Quality Control | 3.22 |
| | 324 | Risk Upgrade | 3.24 |
| | 325 | Seasoning Requirements | 3.24 |
| 330 | Credit Verification and Analysis | | 3.25 |
| | 331 | Credit Evaluation Methods | 3.26 |
| | 332 | Bankruptcy History | 3.33 |
| | 333 | Debt Ratio | 3.33 |
| | 334 | Divorce Situations | 3.34 |
| | 335 | Mortgage Credit | 3.35 |
| 340 | Income Verification and Qualification | | 3.39 |
| | 341 | Fixed Income | 3.39 |
| | 342 | Rental Income | 3.42 |
| | 343 | Self-employment Income | 3.43 |
| | 344 | Wages (Wage Earner) | 3.44 |
| 350 | Property and Appraisal Standards | | 3.49 |
| | 351 | Acceptable Properties | 3.49 |
| | 352 | Property Standards | 3.68 |
| | 353 | Appraisal Standards | 3.68 |
| | 354 | Review Requirements | 3.74 |
| | 355 | Appraiser Requirements | 3.77 |




Page

# 3SR

## Servicing Released

SR-310 Servicing Released Overview . . . . . . . . . . . . . . . . . . 3.1
SR-311 Designated Servicer . . . . . . . . . . . . . . . . . . . 3.1
SR-312 Servicing Released Contractual Obligations . . . . . 3.2
SR-313 Final Documents . . . . . . . . . . . . . . . . . . . . 3.2
SR-320 Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.2
SR-321 Maintenance of Records . . . . . . . . . . . . . . . 3.2
SR-322 Quality Control Procedures . . . . . . . . . . . . . . . 3.2
SR-323 Disclosure of Information; Cooperation . . . . . . . 3.3
SR-324 Representations and Warranties of AlterNet Seller; Events of Servicer Default Prior to Transfer . . . . . 3.3
SR-325 Specific Warranties and Covenants . . . . . . . . . . 3.3
SR-326 Disqualification or Suspension . . . . . . . . . . . . 3.7
SR-327 Restrictions On Loan Eligibility . . . . . . . . . . . 3.8
SR-330 Notification of Change in Servicer . . . . . . . . . . . . . . 3.8
SR-331 Interest on Escrows . . . . . . . . . . . . . . . . . . . 3.9
SR-332 Termination of Automatic Payment . . . . . . . . . 3.9
SR-340 Purchase of Servicing . . . . . . . . . . . . . . . . . . . . . 3.10
SR-341 Servicing Document Delivery . . . . . . . . . . . 3.10
SR-342 Required Servicing Documents . . . . . . . . . . . 3.10
SR-343 Notification of Purchase . . . . . . . . . . . . . . 3.11
SR-344 Effective Date of Transfer . . . . . . . . . . . . . 3.11
SR-345 Reconciliation by RFC . . . . . . . . . . . . . . . 3.11
SR-346 Loans Paid in Full . . . . . . . . . . . . . . . . . . 3.12
SR-350 Servicing Document Corrections . . . . . . . . . . . . . 3.13
SR-360 Bulk Servicing Acquisitions . . . . . . . . . . . . . . . . 3.13
SR-370 Subservicing Election . . . . . . . . . . . . . . . . . . . . 3.13




Page

# 4

## Loan Eligibility


| | | | |
|---|---|---|---|
| 410 | General Loan Eligibility | | 4.1 |
| | 411 | Loan Payment Status At Purchase | 4.1 |
| 420 | Property Standards | | 4.1 |
| | 421 | Deminimis PUD | 4.1 |
| | 422 | Condominium and PUD Warranties | 4.2 |
| | 423 | Insurance Requirements | 4.2 |
| 430 | Hazard Insurance | | 4.2 |
| | 431 | Flood Certification | 4.4 |
| | 432 | Flood Insurance | 4.4 |
| | 433 | Condominium Insurance | 4.5 |
| | 434 | PUD Insurance | 4.7 |
| | 435 | Title Insurance | 4.9 |
| | 436 | Survey Requirements | 4.15 |
| 440 | Note Requirements | | 4.17 |
| | 441 | Loan Document Requirements | 4.17 |
| | 442 | High Cost, High Fee Mortgages | 4.19 |




Page

# 5 AlterNet Loan Programs

510-AlterNet FRM-30 Mortgage (FRM-30) . . . . . . . . . . . . . . . . . . 5.3
511-AlterNet Eligibility Standards for FRM-30 Mortgages . . . . . . . . . . . . . . . . . . . . 5.3
520-AlterNet FRM-15 Mortgage (FRM-15) . . . . . . . . . . . . . . . . . . 5.5
521-AlterNet Eligibility Standards for FRM-15 Mortgages . . . . . . . . . . . . . . . . . . . . 5.5
540-AlterNet One-Year Treasury Adjustable Rate Mortgage (One-Year Treasury ARM) . . . . . . . . . . . . . . . . . . . . . . . . . 5.7
541-AlterNet Eligibility Standards for One-Year Treasury ARMs . . . . . . . . . . . . . . . . . . . . . 5.7
542-AlterNet Conversion Option . . . . . . . . . . . . . . . 5.9
543-AlterNet Assumability . . . . . . . . . . . . . . . . . . 5.9
544-AlterNet Adjustable Rate Mortgage (ARM) Definitions . . . . . . . . . . . . . . . . . . 5.9
545-AlterNet Documentation . . . . . . . . . . . . . . . . 5.11
546-AlterNet Disclosure at Application . . . . . . . . . . . 5.11
550-AlterNet LIBOR Six-Month Adjustable Rate Mortgage (6-Month LIBOR ARM) . . . . . . . . . . . . . . . . . . . . 5.13
551-AlterNet Eligibility Standards for 6-Month LIBOR ARM . . . . . . . . . . . . . . . . 5.13
552-AlterNet Conversion Option . . . . . . . . . . . . . . 5.15
553-AlterNet Assumability . . . . . . . . . . . . . . . . . 5.15
554-AlterNet Adjustable Rate Mortgage (ARM) Definitions . . . . . . . . . . . . . . . . . 5.15
555-AlterNet Documentation . . . . . . . . . . . . . . . . 5.17
556-AlterNet Disclosure at Application . . . . . . . . . . . 5.17
560-AlterNet 3-Year/6-Month LIBOR ARM . . . . . . . . . . . . . . 5.19
561-AlterNet Eligibility Standards for 3-Year/6-Month LIBOR ARM . . . . . . . . . . . . . . . . 5.19
562-AlterNet Conversion Option . . . . . . . . . . . . . . 5.21
563-AlterNet Assumability . . . . . . . . . . . . . . . . . 5.21
564-AlterNet Adjustable Rate Mortgage(ARM) Definitions . . . . . . . . . . . . . . . . . . 5.21
565-AlterNet Documentation . . . . . . . . . . . . . . . . 5.23
566-AlterNet Disclosure at Application . . . . . . . . . . 5.23




# 5M AlterNet Matrices

Credit and Income Underwriting Summary
Maximum LTV, Loan Amount, and Cash-out Amount Matrix
Grade Ax Loan Program
Grade Am Loan Program
Grade B Loan Program
Grade C Loan Program
Grade Cm Loan Program




Page

# 3CC

**Conforming Credit Loan Eligibility** ........................ **3.1CC**
300 Occupancy .................................... 3.1CC
310 Borrower Eligibility ............................ 3.4CC
311 Required Signatures ...................... 3.7CC
312 Number of Loans to One Borrower .......... 3.7CC
320 Ownership Interests ............................ 3.8CC
330 Transaction Types ............................. 3.13CC
331 Arm's Length Transaction ................ 3.16CC
340 Financing ...................................... 3.16CC
341 Determining Amount to be Financed ........ 3.16CC
342 Calculating LTV Ratios .................. 3.17CC
343 Financing Closing Costs .................. 3.19CC
344 Secondary or Subordinate Financing ........ 3.20CC
350 Sales Concessions or Home-Seller Subsidy .......... 3.21CC
360 Documentation ................................. 3.22CC
361 Age of Documents ...................... 3.22CC
362 Note Requirements ...................... 3.24CC
363 Loan Documents ......................... 3.26CC
364 Escrow Issues .......................... 3.28CC
365 Temporary Buydowns .................... 3.30CC
366 Current Payment History ................. 3.32CC
370 Property Issues ............................... 3.32CC
371 Eligible Property Locations ............... 3.32CC
372 Eligible Property Types .................. 3.33CC
373 Ineligible Property Types ................. 3.35CC
374 Project Requirements for Warrantable Condominiums and PUDS ................ 3.36CC
375 Insurance Requirements .................. 3.41CC
376 Survey Requirements .................... 3.59CC



Page

# 4CC

**Conforming Credit Underwriting** .......................... 4.1CC
400. Underwriting .................................. 4.1CC
401. Client Underwriting Responsibility .......... 4.1CC
402. RFC Underwriting Review ................. 4.1CC
410. Loan Application Analysis.......................... 4.2CC
420. Credit Report Requirements........................ 4.2CC
430. Credit Score Requirements.......................... 4.3CC
431 Selecting Credit Score...................... 4.3CC
432 Minimum Credit History.................. 4.3CC
440 Credit Evaluation ................................. 4.4CC
441 Credit Evaluation Components .................. 4.5CC
442 Upgrading the Credit Quality ............... 4.9CC
450 Borrower Income .................................. 4.16CC
451 Borrower's Liabilities ...................... 4.16CC
452 Debt Payoff.................................. 4.16CC
453 Co-Signed and Divorce Debt ............... 4.17CC
454 Business Debt ............................... 4.17CC
455 Borrower Capacity ......................... 4.17CC
460 Qualifying Ratios ................................ 4.18CC
461 Employment and Income Analysis.......... 4.20CC
462 Documentation Standards.................. 4.21CC
463 Income Types .............................. 4.22CC
463-1 Wage Earners ............................. 4.22CC
463-2 Self-Employed Income Earners ............ 4.25CC
463-3 Fixed Income .............................. 4.28CC
463-4 Secondary Income.......................... 4.30CC
464 Trailing or Relocating Co-Borrower......... 4.35CC
465 Cash to Close .............................. 4.35CC
470 Collateral Property Underwriting................... 4.39CC
471 Appraiser Requirements .................. 4.39CC
472 Appraisal Requirements .................. 4.40CC
473 Appraisal Evaluation....................... 4.43CC
474 Additional Review Considerations.......... 4.56CC
480 Subjective Credit Evaluation ...................... 4.60CC




Page

# 5CC

**Conforming Credit Loan Programs** ........................ **5.1CC**

500. Loan Programs .................................. 5.1CC

510. Jumbo A Program .............................. 5.3CC

- 511. Eligibility Standards ...................... 5.3CC
- 512. Stated Income for Jumbo A ................ 5.9CC
- 513. EasyFi℠ or Streamline Refinance ........... 5.12CC
- 514. Converted and/or Modified Loans - Contemplated by Original Note ............ 5.17CC
- 515. Converted and/or Modified Loans - Not Contemplated by Original Note......... 5.20CC

520 Expanded Criteria Program ........................ 5.25CC

- 521 Eligibility Standards ...................... 5.25CC
- 522 Expanded Criteria Uninsured LTV Feature ... 5.38CC
- 523 Expanded Criteria International Borrower .... 5.40CC
- 524 Expanded Criteria Stated Income ........... 5.45CC
- 525 Expanded Criteria No Ratio ............... 5.48CC
- 526 Expanded Criteria Exception Policy......... 5.52CC

530 Product Descriptions ............................ 5.57CC

- 531 Fixed Rate Mortgage 30 (FRM-30) ......... 5.58CC
- 532 Fixed Rate Mortgage 15 (FRM-15) ......... 5.59CC
- 533 Six-Month LIBOR ARM .................. 5.60CC
- 534 One-Year Treasury ARM.................. 5.65CC
- 535 Three-One Treasury ARM ................. 5.70CC
- 536 Five-One Treasury ARM .................. 5.72CC
- 537 Two-Year/Six- Month LIBOR ARM......... 5.74CC
- 538 Three-Year/Six-Month LIBOR ARM ........ 5.74CC
- 539 30/15 Balloon Mortgage.................. 5.74CC

540 Home Equity Program.......................... 5.77CC

- 541 Home Equity Program First Time Home Buyer 5.95CC
- 542 Streamlined Home Equity Program .......... 5.95CC
- 543 Home Equity Program Stated Income ....... 5.96CC
- 544 Supplemental Home Equity Information ..... 5.97CC
- 545 Home Equity Program Terms............. 5.102CC
- 546 Home Equity Program Goal Line℠ Product Description .................... 5.104CC
- 547 Home Equity Program Goal Loan℠ Product Description ................... 5.112CC




Page

# 6 Commitments and Delivery


| | | | |
|---|---|---|---|
| 610 | Loan Pricing Information | | 6.1 |
| 620 | Wire Transfer Authorization | | 6.2 |
| | 621 | Wire Transfer Process | 6.3 |
| | 622 | Notification of Wire Transfer | 6.3 |
| 630 | Prior Underwriting Review | | 6.5 |
| 640 | Best Efforts Delivery Commitment | | 6.9 |
| | 641 | RFC AlterNet Best Efforts Delivery Commitment Periods | 6.9 |
| | 642 | Delivery | 6.10 |
| | 643 | Loan Grade Selection | 6.11 |
| | 644 | Ordering Best Efforts Delivery Commitments | 6.11 |
| | 645 | Corrections | 6.12 |
| | 646 | Transferability of Commitments | 6.13 |
| | 647 | Delivery For Funding | 6.13 |
| | 648 | Payoff Prior to Funding Date | 6.13 |
| | 649 | Submission of Funding Documents/ Required Funding Documents | 6.13 |
| 650 | Required Servicing Documents | | 6.17 |
| | 651 | Obligation to Sell Upon Submission of Funding Documents | 6.17 |
| | 652 | Loan Purchase | 6.17 |
| | 653 | Funding Amount | 6.18 |
| | 654 | Final Delivery | 6.18 |
| | 655 | Submission of Final Documents | 6.18 |
| | 656 | Required Final Documents | 6.19 |
| 660 | Extensions For Final Delivery | | 6.20 |
| | 661 | Request for Additional Documentation | 6.20 |




Page

**7** **Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7.1

**8** **Exhibits**

800 Required RFC Forms . . . . . . . . . . . . . . . . . . . . . 8.1






# 2

## AlterNet Seller Eligibility

### 200

**AlterNet Seller Eligibility**

RFC will approve Sellers of RFC as mortgage Loan lenders "approved in good standing." Sellers of RFC will be eligible to participate in RFC's Loan Programs.

In order to become a AlterNet Seller, a mortgage Loan lender must:

- Satisfy the RFC AlterNet Seller Eligibility Standards;
- Have its completed AlterNet Seller Application approved by RFC;
- Enter into the AlterNet Seller Contract; and
- Deliver a certified Resolution of Board of Directors to RFC.

In order to remain eligible to participate in RFC's Loan Programs, the AlterNet Seller must comply with all of the terms of the AlterNet Seller Contract, including this AlterNet Guide.

### 210

**Eligibility Standards**

(A) For conforming Jumbo A and Expanded Criteria only, the AlterNet Seller must be:

- Fannie Mae and/or Freddie Mac approved and in good standing;
- A member of the BIF or the SAIF under the FDIC or NCUSIF and in good standing (if the AlterNet Seller is a federally insured institution);
- A HUD approved.mortgagee (if the AlterNet Seller is a mortgage banker); and
- In compliance with all capital requirements and other requirements specified by the Office of Thrift Supervision, the Federal Deposit Insurance Corporation (FDIC) or the Office of the Comptroller of the Currency or any other State or federal regulatory agency that are applicable to the AlterNet Seller.

Or, if none of the above mentioned criteria are met then loans will have to be approved by RFC prior to closing as set forth in section 251-1 (FF).

Note: The above criteria is not necessary if selling AlterNet or HELOC products.




(B) Net worth requirements:

- The Seller must maintain GAAP tangible net worth (defined as GAAP total net worth minus any intangible assets) of at least $250,000.

*Example:*

| | | |
|---|---|---|
| Audited Book Net Worth at (6/30/96) | | $750,000 |
| Intangible assets (from audited financial statements) | *minus* | $125,000 |
| Tangible Net Worth (Acceptable - exceeds $250,000) | | $625,000 |

(C) Independent auditor's opinion:

- An independent auditor must review the AlterNet Seller's most recent annual financial statements and render them acceptable.
- An independent auditor's report on the Uniform Single Attestation Program for Mortgage Bankers (USAP) indicates no significant exceptions.

(D) The AlterNet Seller must demonstrate an ability to originate mortgage Loans, which can be evidenced by:

- Two (2) years of conventional mortgage Loan originations;
- $10 million in mortgage Loan originations in the twelve (12) months immediately preceding application; and
- A staff knowledgeable in originating, quality control and selling conventional mortgage Loans.

(E) The AlterNet Seller must maintain adequate fidelity, errors and omissions insurance coverage for its operations and the carrier of such insurance coverage must be rated B/III, A/II or better in the current Best's Key Rating Guide.

(F) The AlterNet Seller's Delinquency rates on all Loan production must be acceptable to RFC.

(G) The AlterNet Seller must adhere to prudent standards for written policies and procedures for mortgage Loan origination and an internal audit program (including quality control).






(H) The AlterNet Seller's mortgage insurance claim experience must be acceptable to RFC.

(I) The AlterNet Seller must comply with all State and federal laws and regulations applicable to its business and operations, including, without limitation, all fair lending laws. If the AlterNet Seller has been cited by any regulatory authority for having violated any fair lending laws or regulations, it must demonstrate to RFC's satisfaction that it has taken corrective action to remedy such violation.

## 220

**AlterNet Seller Contract**

Upon application approval, the AlterNet Seller and RFC will enter into RFC's AlterNet Seller Contract. This contract incorporates by reference the provisions of this AlterNet Guide, which outlines the terms by which the AlterNet Seller may sell Loans to RFC.

## 221

**AlterNet Seller Underwriting Responsibilities**

The AlterNet Seller must ensure that Loans sold to RFC meet the eligibility and underwriting guidelines as outlined in this AlterNet Guide. The AlterNet Seller represents and warrants such compliance.

The AlterNet Seller is responsible for credit and property underwriting performed by it or by entities other than the AlterNet Seller which have been retained by the AlterNet Seller to perform such underwriting on AlterNet Seller's behalf. This applies even if the credit information and appraisal were requested by or if any Loan processing functions were performed by an entity other than the AlterNet Seller or an entity related to the AlterNet Seller.

## 230

**Continuing AlterNet Seller Obligations**

In order to remain eligible, the AlterNet Seller must be active with RFC in the preceding calendar year, maintain the initial eligibility standards or eligibility standards currently in effect, and comply with the continuing obligations as defined in this Part. In addition, RFC reserves the right to amend any or all continuing eligibility standards for a AlterNet Seller based upon its current financial strength, volume and performance.

## 231

**Disqualification or Suspension**

If the AlterNet Seller does not meet the continuing AlterNet Seller obligations, RFC may disqualify or suspend the AlterNet Seller from selling Loans to RFC, or may take any other action RFC deems appropriate. The AlterNet Seller will be ineligible to obtain new Commitments during any period of disqualification or suspension. RFC will determine the length of any suspension period, and may prescribe the terms and conditions for reinstatement.







232

**Reporting Requirements**

**(A) ANNUAL REQUIREMENTS**

Within ninety (90) days after the AlterNet Seller's fiscal year end, it must send the following documents to RFC:

(1) Annual financial statements that include:

- An independent auditor's opinion on financial statements;
- An independent auditor's report on the Uniform Single Attestation Program (USAP) for Mortgage Bankers; and
- A copy of the 10-K if the AlterNet Seller is required to prepare an annual Form 10-K.

(2) A completed Freddie Mac Annual Eligibility Certification Report (Freddie Mac Form 16). If the AlterNet Seller is not required to submit Freddie Mac Form 16, then the Annual AlterNet Seller Certification (RFC Form 1230) may be substituted.

**(B) OTHER REPORTING REQUIREMENTS**

**(1) INTERIM FINANCIAL STATEMENTS; OTHER INFORMATION**

The AlterNet Seller shall, upon the reasonable request of RFC, provide its quarterly unaudited financial statements, Form 10-Qs, or any other financial information pertaining to the AlterNet Seller.

**(2) FIDELITY AND ERRORS AND OMISSIONS INSURANCE**

- The AlterNet Seller must notify RFC if it receives notice from its insurer of intent to cancel, not renew, or otherwise modify the AlterNet Seller's coverage. This notification must be sent to RFC by registered mail at least ten (10) days before it becomes effective.
- The AlterNet Seller must report to RFC all cases of material theft, embezzlement or fraud and all claims made against the insurer within ten (10) days after the occurrence.
- If requested by RFC, the AlterNet Seller must provide current certificates of insurance outlining its fidelity and errors and omissions insurance.

**(C) MAILING ADDRESS**

Submit all documents required in this Reporting Requirements Section to:

Residential Funding Corporation
8400 Normandale Lake Blvd.
Suite 600
Minneapolis, MN 55437
Attention: AlterNet Seller Risk Management






## 233

**Audits and Inspections**

The AlterNet Seller agrees to allow RFC to conduct, from time to time, audits or inspections at one or more of the AlterNet Seller's offices during normal business hours. At that time, the AlterNet Seller shall provide the assistance of a knowledgeable and responsible individual and will grant RFC access to all books, records and files pertaining to:

- The Loans, and
- The AlterNet Seller's compliance with the terms and provisions of the AlterNet Seller Contract, including this AlterNet Guide.

The AlterNet Seller also agrees, upon the request of RFC, to deliver the material described in the Maintenance of Records Section of this AlterNet Guide. RFC may, from time to time, conduct audits at RFC offices using information and documents provided by the AlterNet Seller. During these audits the AlterNet Seller should provide a person or persons to contact by telephone for additional information.

## 240

**Disclosure of Information**

The AlterNet Seller shall, upon the request of RFC, disclose to RFC information relating to the AlterNet Seller's origination or Servicing experience. This information may include, but is not limited to, information on losses, mortgage insurance claims, Delinquency, and declination experience on mortgage Loans originated or serviced by the AlterNet Seller, as well as related information. The AlterNet Seller also consents to the disclosure by RFC, of any such information to investors, rating agencies, credit enhancement providers, or any other entity that needs the information in connection with RFC's secondary marketing operation. The AlterNet Seller releases and agrees to hold harmless RFC, and any insurer or other entity which discloses information as provided above, from and against any claims or liabilities connected with such disclosure.




## 241

**Maintenance of Records**

The AlterNet Seller shall maintain adequate records of all Loans submitted to RFC for underwriting approval for such periods of time as may be necessary to comply with the Equal Credit Opportunity Act and other applicable laws and regulations. The AlterNet Seller shall maintain a file for each Loan purchased by RFC, clearly marked with the RFC Loan number. The AlterNet Seller shall maintain each file throughout the time RFC owns the Loan and thereafter for a period of three (3) years from the date the Loan is fully paid or, if the Loan is accelerated, for at least six (6) years from the date the Loan is fully paid. The file must contain:

- Copies of all documents delivered in their original form to RFC;
- Originals of all documents, copies of which were delivered to RFC; and
- All other Loan and related documents not required to be sent to RFC.

In lieu of retaining copies and originals as stated above, the AlterNet Seller may retain microfiche, microfilm or magnetic media copies or acceptable Write Once Read Many [WORM] technology.

## 242

**Disclosure of Borrower Information**

The following guidelines apply to the confidentiality of Borrower information:

- To the extent required by applicable law, RFC will hold in confidence any information received from a AlterNet Seller in connection with a Loan, including, but not limited to, any Borrower information.
- Borrower information will not be disclosed to a third party, unless permitted or required by law.
- RFC may use Borrower and Loan information in connection with its secondary market operations, the purchase and sale of Loans, Servicing Packages, and the ongoing servicing of Loans.

243

**Quality Control** (A) RECOMMENDED PROGRAM

The AlterNet Seller shall maintain an internal quality control program, that ensures the accuracy of legal and origination documents, as well as the soundness of underwriting decisions. The program should be supported by a written plan outlining the objectives and scope of the review and applicable policies and procedures and shall include, at a minimum, post- and pre-closing review procedures.

(1) PRE-CLOSING REVIEW

A pre-closing review should, at a minimum, consist of the following procedures on all or a representative sample of Loan production:

- Review legal documentation for accuracy and completeness;
- Obtain duplicate credit reports (in-file or residential mortgage credit reports);
- Reverify (by telephone) Loan information (i.e. employment, deposits, source of funds, etc.);
- Obtain review appraisals;
- Reverify other origination documentation as deemed appropriate by the AlterNet Seller.

For all B, C and Cm grade Loans, as defined in this AlterNet Guide, the following is required to be obtained within five (5) days prior to closing:

- Documented telephone verification of employment; and
- Updated credit report.

(2) POST-CLOSING REVIEW

In the interest of sound quality control measures, RFC requires that the AlterNet Seller audits at least a 10% randomly selected sample of recently closed Loan inventory sold to RFC and reviews the product within ninety (90) days of its origination. The AlterNet Seller may elect to replace the 10% randomly selected sample with a statistically valid random sample provided the sample ensures a 95% confidence level and 2% level of precision in the results. The random sample should include both servicing retained and servicing released Loans and ensure that Loans from all underwriters, appraisers, Loan originators, third-party originators and branch offices are audited within each calendar year. The quality control plan should also allow for discretionary and targeted sampling where appropriate. RFC recommends that the AlterNet Seller increase the scope or sample of Loans audited when new employees, appraisers or third-party originators are added.




Unless performed as an element of the pre-closing review, the post-closing audit should, at a minimum, consist of the following:

- Complete underwriting of each Loan, including an evaluation of the appraisal report by the quality control staff to evaluate the soundness of underwriting judgment and compliance with program criteria and to determine the existence of any irregularities. The presence of irregularities should lead to a more thorough investigation.
- Written reverification of Loan documentation (i.e. employment and income, deposits, source of funds, etc.). In this process, a blanket authorization form is required. The AlterNet Seller must use the IRS Request for Copy of Tax Returns (IRS Form 4506) if the income used for qualification purposes can be verified through tax returns.
- The AlterNet Seller must obtain a new appraisal from a qualified source, independent of the original appraiser, on at least 10% of the audited sample [one out of ten (10) Loans]. This appraisal may take the form of a new appraisal or a field review. It should include, at a minimum, an exterior inspection of the Mortgaged Premises and comparables and a validation of the factual data on the original appraisal report.
- The AlterNet Seller must obtain and review a new credit report (independent of the original reporting agency) on each Loan. RFC recommends that the AlterNet Seller order a new residential mortgage credit report or a source in-file credit report on all the sample Loans selected for the audit. These credit reports must meet the requirements set forth in the Credit Report Section of this AlterNet Guide, including the requirement of a public records search.
- Review the remaining documentation, including the Loan application and closing documents, for consistency, accuracy, validity, completeness, etc.
- Review the Loans included in the audit sample to determine compliance to the various RFC representations and warranties set forth in this AlterNet Guide.

The AlterNet Seller must also include in its quality control review all Loans in which a thirty (30) day Delinquency occurred within the first four (4) months of the Loan. In addition, the AlterNet Seller should include any Loan in which foreclosure proceedings have been instituted within the first three (3) years of the Loan if a Delinquency occurred during the first year with respect to that Loan. In this case, the AlterNet Seller should obtain a new credit report and new appraisal.






RFC recommends that the AlterNet Seller expand the scope of its quality control review whenever irregularities or discrepancies are discovered. This supplemental audit should include verifying the occupancy of the Mortgaged Premises, investigating the presence of undisclosed Secondary Financing and validating or determining possible self-employment income of the Borrower.

The AlterNet Seller must maintain accurate records (log books, etc.) of all Loans audited, the work performed, results, and necessary follow-up and should make these records available to RFC upon request. The AlterNet Seller must retain these records as long as RFC owns the Loan. The quality control staff should report general results as well as variances discovered during any phase of the audit to the AlterNet Seller's senior management on at least a quarterly basis. These reports should correct and prevent deficiencies in the AlterNet Seller's ongoing origination, underwriting, appraisal and closing functions. If the quality control audit discovers that a breach of any representations or warranty has occurred, the AlterNet Seller must give RFC prompt written notification of such breach, outlining the details of the discovery and any supporting documents. Send this notice to:

Residential Funding Corporation
8400 Normandale Lake Blvd.
Suite 600
Minneapolis, MN 55437
Attention: Portfolio Risk Management

RFC may ask the AlterNet Seller to increase its quality control sampling requirements or may take any action deemed necessary if the AlterNet Seller experiences a number of variances which significantly impact the investment quality of the Loans sold to RFC.

**(B) LOAN AUDIT**

The AlterNet Seller agrees to conduct a Loan audit on any Loan upon the written request of RFC. The AlterNet Seller must determine whether the Loan was prudently originated and if an Event of Default has occurred.

If an audit discovers an Event of Default, the AlterNet Seller must promptly notify RFC in writing as specified in this AlterNet Guide.

The AlterNet Seller shall complete the audit of any Loan in which foreclosure proceedings have been instituted in a thorough and timely manner. During this investigation, RFC may manage the foreclosure process, making decisions regarding short payoffs, deed-in-lieu transactions, and REO sales prices and dispositions. RFC will make these decisions without regard to this investigation and as though it, or its investor, will incur the loss on the Loan.







However, if the investigation shows that an Event of Default has occurred, RFC may ask the AlterNet Seller to repurchase the Loan or the property, or to reimburse RFC for its loss, if the property has been disposed of, depending on the stage of the foreclosure process at the time of the determination.

## 250

**AlterNet Seller Representations and Warranties**

The AlterNet Seller acknowledges that RFC purchases Loans in reliance upon the accuracy and truth of the AlterNet Seller's warranties and representations and upon the AlterNet Seller's compliance with the agreements, requirements, terms and conditions set forth in the AlterNet Seller Contract and this AlterNet Guide.

All such representations and warranties are absolute, and the AlterNet Seller is fully liable for any misrepresentation or breach of warranty regardless of whether it or RFC actually had, or reasonably could have been expected to obtain, knowledge of the facts giving rise to such misrepresentation or breach of warranty.

The representations and warranties pertaining to each Loan purchased by RFC survive the Funding Date, any simultaneous or post-purchase sale of servicing with respect to the Loan and any termination of the AlterNet Seller Contract, and are not affected by any investigation or review made by, or on behalf of, RFC except when expressly waived in writing by RFC.

The representations and warranties contained herein are made as of each Funding Date (and each Substitution Date, if applicable), unless the specific representation or warranty provides to the contrary. Making these representations and warranties does not release the AlterNet Seller from its obligations under the representations and warranties contained in other Sections of this AlterNet Guide.






## 251-1

**Specific Warranties**

For all first mortgage Loans, the AlterNet Seller represents and warrants to RFC as follows:

### (A) LOANS ARE ELIGIBLE; ACCURACY OF INFORMATION

Each of the Loans delivered and sold to RFC meet the terms and criteria set forth in this AlterNet Guide. All information relating to each Loan delivered and sold to RFC is true, complete and accurate and there are no omissions of material facts. All data provided by the AlterNet Seller to RFC relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file.

### (B) COMPLIANCE WITH WARRANTIES

The AlterNet Seller is in compliance with, and has taken all necessary action to ensure that each Loan is in compliance with all representations, warranties and requirements contained in this AlterNet Guide.

### (C) LOAN PROVISIONS

The provisions of the Loan have not been impaired, waived, altered or modified in any respect, unless approved in writing by RFC.

### (D) DOCUMENTS

All Loan Documents, Funding Documents and Final Documents have been completed, duly and properly executed and delivered in the form and manner specified in this AlterNet Guide, and all originals and copies of such documents and all other documents, materials, and other information required to be submitted to RFC have been so submitted, and are complete and accurate and remain complete and accurate through the Funding Date. All Loan Documents, Funding Documents, Final Documents and all other documents describing or otherwise relating thereto are in compliance with all applicable local and State laws, regulations and orders.

### (E) OWNERSHIP; TRANSFER

The AlterNet Seller has good title to, and is the sole owner of, each Loan delivered and sold to RFC and the assignment of the Loan by the AlterNet Seller validly transfers such Loan to RFC free and clear of any pledge, lien or security interest or other encumbrance.




### (F) DISBURSEMENT; NO PAYOFFS OR FUTURE ADVANCEMENTS

Each Loan has been closed and fully disbursed, except as permitted in the Escrow for Postponed Improvements and Repairs Section of this AlterNet Guide. There are no payoffs, assumptions or insurance claims pending on any Loan or pertaining to the Mortgaged Premises and the Borrower may not exercise any option under any of the Loan Documents to borrow additional funds secured thereby from the AlterNet Seller or any other person or entity without the Noteholder's consent.

Additionally, the AlterNet Seller warrants that the AlterNet Seller has not made arrangements with any Borrower for any payment forbearance or future refinancing with respect to any Loan.

### (G) NO DEFAULT

There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to RFC, and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by the AlterNet Seller or by any other entity involved in originating or servicing the Loan.

### (H) NO DEFENSES

Except as provided in a buydown or subsidy agreement, if any, meeting the requirements set forth in this AlterNet Guide, the Borrower (including any party secondarily liable under the Loan Documents) has neither a legally enforceable right of set-off, defense, counterclaim or right of rescission to any Loan Document nor has given notice of an intention to assert same.






## (I) COMPLIANCE WITH LAW

The AlterNet Seller and any other originator, Servicer or other previous owner of each Loan has obtained all licenses and registrations required under applicable local, State and federal laws, regulations and orders by virtue of any of the activities conducted, or property owned, by the AlterNet Seller or any such other originator, Servicer or other previous owner of any Loan.

The sale and transfer of each Loan to RFC does not violate any applicable State laws. To the extent that any applicable State law places any restrictions on the transfer of any Loan, the AlterNet Seller has notified RFC in writing of that restriction and any related State licensing or registration requirements.

Each RFC Loan Application (Fannie Mae 1003/Freddie Mac Form 65) was taken from the Borrower and processed for each Loan, and each Loan has been originated, closed, and transferred in compliance with all applicable local, State and federal laws and regulations including, but not limited to, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act, the Fair Housing Act, and the National Flood Insurance Act. This warranty is made by the AlterNet Seller with respect to each RFC Loan Application taken and processed for each Loan and with respect to each Loan made by the AlterNet Seller or any other entity.

The AlterNet Seller further warrants that, to the best of its knowledge, the funds utilized by the Borrower in the purchase of the Mortgaged Premises and in obtaining a Loan relating thereto were not obtained through trafficking of illegal substances or through any other illegal activity.

## (J) SECTION 32 MORTGAGES

For "high cost," "high fee" Loans as defined in Regulation Z, Section 226.32 (Section 32 Mortgages), the AlterNet Seller specifically warrants that all Section 32 Mortgages have been accurately identified, that accurate disclosures have been provided to the consumer and to RFC in accordance with Regulation Z, that the Section 32 Mortgages do not contain any prohibited terms as specified in Regulation Z, Section 226.32(d) and that the AlterNet Seller has not engaged in any prohibited acts and practices as specified in Regulation Z, Section 226.32(e). Representations and warranties made by the AlterNet Seller that Loans delivered for purchase are in compliance with all laws and regulations and are not subject to any defenses or set offs apply to Section 32 Mortgages regardless of any liability imposed on an assignee by the Truth-in-Lending Act and Regulation Z.




### (K) TITLE INSURANCE

A policy of title insurance, in the form and amount required by this AlterNet Guide, is effective as of the day the Security Instrument is recorded, is valid and binding, and remains in full force and effect, unless the Mortgaged Premises are located in the State of Iowa and an attorney's certificate has been provided as described in clause (L) below. No claims have been made under such title insurance policy and no holder of the related mortgage, including the AlterNet Seller, has done or omitted to do anything which would impair the coverage of such title insurance policy.

### (L) ATTORNEY'S CERTIFICATE IN IOWA

As to each Loan secured by Mortgaged Premises located in the State of Iowa, and if an American Land Title Association (ALTA) Loan policy of title insurance has not been provided, an attorney's certificate, in the form and amount required by this AlterNet Guide, duly delivered and effective as of the closing of each such Loan, is valid and binding, and remains in full force and effect.

### (M) VALID FIRST LIENS

Each Security Instrument transferred to RFC constitutes a valid first lien on the Mortgaged Premises subject only to the minor impediments described in the Title Insurance Section of this AlterNet Guide, and such impediments do not adversely affect the Value, use, enjoyment or marketability of the Mortgaged Premises. Each Security Instrument and all related documents (including, without limitation, releases of prior security instruments, assumption agreements, assignments, amendments, powers of attorney, and modification, extension and consolidation agreements) that are required to be recorded or filed under applicable law in order to preserve in favor of RFC the validity and enforceability of the Security Instrument and the liens created thereby, have been duly recorded in all appropriate recording offices, and all associated recording fees or taxes must be paid.

### (N) NO ENCROACHMENTS BY ADJOINING PROPERTIES

No improvements by adjoining properties encroach upon the Mortgaged Premises in any respect so as to affect the Value or marketability of the Mortgaged Premises.

### (O) SURVEY

All improvements which were considered in determining the appraised Value of the Mortgaged Premises lie wholly within its boundaries and the building restriction lines of the Mortgaged Premises, or the policy of title insurance insures against loss or damage by reason of any violation, variation, encroachment or adverse circumstance that either is disclosed or would have been disclosed by an accurate survey.






(P) NO LIENS

There are no delinquent tax or delinquent assessment liens against the Mortgaged Premises, and there are no mechanic's liens or claims for work, labor or material or any other liens affecting the Mortgaged Premises, which are or may be a lien prior to, or equal with, the lien of the Security Instrument assigned to RFC, except those liens that are insured against by the policy of title insurance as described above.

(Q) NO ADVERSE CIRCUMSTANCES

The Mortgaged Premises are free of damage and in good repair, and no notice of condemnation has been given with respect thereto, and no circumstances exist involving the Loan Documents, the Mortgaged Premises, the Borrower or the Borrower's credit standing that could: (i) cause private institutional investors to regard the Loan as an unacceptable investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value or marketability of the Mortgaged Premises or the Loan. The AlterNet Seller warrants that it neither has actual knowledge of the presence of, nor reasonable grounds to suspect the presence of, any toxic materials or other environmental hazards on, in or that could affect any of the Mortgaged Premises. The AlterNet Seller warrants compliance with local, State or federal law or regulation designed to protect the health and safety of the occupants of the property.

(R) CASUALTY INSURANCE

The improvements upon the Mortgaged Premises are insured against loss by fire and other hazards as required by this AlterNet Guide, including flood insurance if required under the National Flood Insurance Act of 1968, as amended. The Security Instrument requires the Borrower to maintain such casualty insurance at the Borrower's expense, or on the Borrower's failure to do so, authorizes the holder of the Security Instrument to obtain and maintain such insurance at the Borrower's expense and to seek reimbursement from the Borrower.

(S) PRIMARY MORTGAGE INSURANCE

If required by this AlterNet Guide, primary mortgage insurance has been obtained, the premium has been paid, and the mortgage insurance coverage is in full force and effect meeting the requirements of this AlterNet Guide.



### (T) UNDERWRITING; APPRAISAL; APPRAISER

The Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this AlterNet Guide.

The appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in this AlterNet Guide. The market Value of the Mortgaged Premises is at least equal to the appraised Value stated on the Loan appraisal except to the extent that the market Value of the Mortgaged Premises is lower than the appraised Value due to the effect of any toxic materials or other environmental hazards of which neither the appraiser nor the AlterNet Seller had actual knowledge or reasonable grounds to suspect.

### (U) ENFORCEABILITY; ENFORCEMENT PROVISIONS

Each Note and Security Instrument constitutes a legal, valid and binding obligation of the Borrower enforceable in accordance with its terms except as limited by bankruptcy, insolvency or other similar laws affecting generally the enforcement of creditors' rights.

Each Security Instrument contains customary and enforceable provisions which render the rights and remedies of the holder adequate to realize the benefits of the security against the Mortgaged Premises, including: (i) in the case of a Security Instrument designated as a deed of trust, by trustee's sale, (ii) by summary foreclosure, if available under applicable law; and (iii) otherwise by foreclosure, and there are no homestead or other exemptions or dower, courtesy or other rights or interests available to the Borrower or the Borrower's spouse, survivors or estate or any other person or entity that would, or could, interfere with such right to sell at a trustee's sale or to foreclose. To the extent necessary to protect the interests of the holder of the Note and the Security Instrument, both spouses shall be signatories on, and jointly and severally liable under, the Note and the Security Instrument.

### (V) HOLDER-IN-DUE-COURSE

The AlterNet Seller is the owner and holder-in-due-course of each Note and is named as mortgagee/beneficiary or assignee under each Security Instrument, and all Loan Documents requiring execution have been appropriately executed, witnessed or notarized by the persons whose names appear as signatories and witnesses, or, as appropriate, notaries who constitute the valid and binding legal obligation of the Borrower, enforceable in accordance with their respective terms. Notwithstanding the foregoing, with respect to adjustable rate mortgage Loans (ARMs), the AlterNet Seller represents and warrants that there are no claims to the Note on the part of any person or defenses of any party to the Note other than those that validly could be raised against a holder-in-due-course.






### (W) TRUSTEE DESIGNATED

With respect to each Security Instrument that is a deed of trust, a trustee duly qualified under applicable law to serve as such is properly named, designated and serving.

### (X) NO FEES DUE TRUSTEE

Except in connection with a trustee's sale after default by the Borrower, no fees or expenses are payable by the AlterNet Seller or RFC to the trustee under any Security Instrument that is a deed of trust.

### (Y) EXECUTION OF DOCUMENTS

All agreements, contracts, assignments, endorsements and issuances of checks or drafts, reports, Loan Documents or other papers related to a Loan that are required by this AlterNet Guide to be executed by the AlterNet Seller have been properly executed by an officer on behalf of the AlterNet Seller pursuant to a duly adopted Resolution of Board of Directors.

### (Z) LEASEHOLDS

Where permitted by the applicable Loan Program, each Mortgaged Premises involving a Leasehold estate complies with the applicable Leasehold warranties set forth in this AlterNet Guide.

### (AA) CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS (PUDS)

Each Mortgaged Premises that is a unit in a condominium or PUD complies with the applicable condominium or PUD warranties set forth in this AlterNet Guide.

### (BB) HOMEOWNERS' ASSOCIATIONS

With respect to any lien currently held by or which may arise in the future in favor of a homeowners' association, special district or similar organization for assessments, maintenance fees or similar charges against a Mortgaged Premises subject to any Security Instrument which lien is, or appears to be, prior to the lien of such Security Instrument, the homeowners' association, special district or similar organization has agreed in writing to give at least sixty (60) days' written notice to the Servicer before foreclosing on such lien.




### (CC) COMPLIANCE BY OTHERS

When a person or entity: (i) originates a Loan on behalf of a AlterNet Seller, (ii) originates a Loan on its own behalf and sells it to a AlterNet Seller, or (iii) performs any act for a AlterNet Seller which the AlterNet Seller is required to perform under this AlterNet Guide, the AlterNet Seller warrants that such person or entity has complied with all requirements of this AlterNet Guide with respect to all such Loans and acts.

### (DD) NO DEFENSES AGAINST RFC

The AlterNet Seller has no judgment, court order, claim, counterclaim, defense, right of set-off or similar right against RFC.

### (EE) SELLER CONTRACT WARRANTIES

The representations and warranties made at the time of the AlterNet Seller's execution of the Seller/Servicer Contract must remain true, correct and complete.

### (FF) SELLER AND ORIGINATORS

The AlterNet Seller either is an institution insured by FDIC which is supervised and examined by a federal or State authority, or is a HUD approved mortgagee, and was so at the time the Loan was originated. The Loan either was: (i) closed in the name of the AlterNet Seller, (ii) closed in the name of another entity that either is a HUD approved mortgagee or a member of BIF or SAIF under the FDIC or NCUSIF, and was so at the time the Loan was originated (the AlterNet Seller or such other entity shall be called the "originator"), or (iii) closed in the name of a Loan broker under the circumstances described in the following sentence: If the Loan was originated through a Loan broker, the originator approved the Loan prior to funding by the Loan broker and the originator acquired the Loan from the Loan broker contemporaneously with the origination thereof. If you are selling RFC Conforming Jumbo A product and Expanded Criteria and do not meet this requirement, your loan must receive prior approval before closing by RFC.

### (GG) AUTHORIZED PRIOR HOLDERS

All parties which have had any interest in the Security Instrument, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were): (i) in compliance with any and all applicable licensing requirements of the laws of the State wherein the Mortgaged Premises are located, and (ii) organized under the laws of such State, or qualified to do business in such State, or federal savings and loan associations or national banks having principal offices in such State, or not doing business in such State so as to require qualification as a foreign corporation in order to use the courts of such State to enforce the Security Instrument.






## (HH) NO IMPAIRMENT OF INSURANCE

No action, error, omission, misrepresentation, negligence, fraud or similar occurrence in respect of a Loan has taken place on the part of any person, including, without limitation, the Borrower, any appraiser, any builder or developer or any party involved in the origination of the Loan or in the application of any insurance in relation to such Loan that might result in a denial, contesting, failure or impairment of full and timely coverage under any insurance policies required to be obtained or any pool insurance policy covering such Loan.

## (II) TEMPORARY BUYDOWNS

Where permitted by the applicable Loan Program, each Temporary Buydown Loan delivered to RFC was entered into pursuant to a buydown agreement which complies with the Temporary Buydown Section of this AlterNet Guide.

## (JJ) PRIMARY MORTGAGE INSURANCE CANCELLATION

The AlterNet Seller has disclosed in writing to the Borrower(s) the terms and conditions that must be met prior to the primary mortgage insurance being eligible for cancellation. A copy of this disclosure has been retained in the Loan file as a permanent record.

## (KK) VALUE OF PREMISES UPON CONVERSION

The current market Value of any Mortgaged Premises as of the date of an interest rate conversion of the type contemplated in the Converted and/or Modified Loan Sections of this AlterNet Guide with respect to the Loan secured thereby, is at least equal to the appraised Value of the Mortgaged Premises as reflected on the appraisal(s) delivered to RFC at the time such Loan was purchased.

## (LL) NO DEFICIENCY IN ESCROW DEPOSITS OR PAYMENTS

The mortgage Loan has been serviced by the AlterNet Seller and any predecessor Servicer in accordance with the terms of the mortgage Note. With respect to escrow deposits and escrow payments, if any, all such payments are in the possession of, or under the control of, the AlterNet Seller, and there exists no deficiency in connection therewith for which customary arrangements for repayment thereof have not been made. No escrow deposits, escrow payments or other charges or payments due the AlterNet Seller have been capitalized under any mortgage or related mortgage Note.




(MM) LOAN SECURITIZATION

The AlterNet Seller recognizes that it is RFC's intent to securitize some or all of the Loans sold to RFC by the AlterNet Seller. The AlterNet Seller agrees to provide RFC with all such information concerning the AlterNet Seller generally and, if applicable, the AlterNet Seller's servicing experience, as may be reasonably requested by RFC for inclusion in a prospectus or private placement memorandum published in connection with such securitization.

In addition, the AlterNet Seller will cooperate in a similar manner with RFC in connection with any whole Loan sale or other disposition of any Loan sold to RFC by the AlterNet Seller. The AlterNet Seller agrees to indemnify and hold RFC harmless from and against any loss, damage, penalty, fine, forfeiture, court cost, reasonable attorneys' fees, judgment, cost, fee, expense or liability incurred by RFC as a result of any material misstatement in or omission from any information provided by the AlterNet Seller to RFC; or from any claim, demand, defense or assertion against or involving RFC based on or grounded upon, or resulting from such misstatement or omission or a breach of any representation, warranty or obligation made by RFC in reliance upon such misstatement or omission.

The AlterNet Seller further agrees to cooperate fully with RFC, rating agencies, attorneys, bond insurers, purchasers of Loans or any other parties that may be involved in the sale or securitization of any Loan, including, without limitation, all cooperation as may be necessary in order to accommodate due diligence activity.






## 251-2

**Additional AlterNet Seller Representations and Warranties for the Home Equity Program**

The Home Equity Program adheres to the AlterNet Seller representations and warranties in Section 251-1 as well as those stated below.

Unless the Home Equity Loan is a valid first lien on the Mortgaged Premises, the following representation and warranty applies:

**Valid Second Lien**

Each Security Instrument transferred to RFC constitutes a valid lien on the Mortgaged Premises which is subordinated only to a lien of the holder of a first mortgage Loan, and is subject only to the minor impediments described in the Title Insurance Section of this AlterNet Guide. No such impediment shall adversely affect the Value, use, enjoyment or marketability of the Mortgaged Premises.

The following additional representations and warranties are made by the AlterNet Seller to RFC as of the purchase date of each Home Equity Loan:

### (A) LICENSING

The AlterNet Seller and any agents or correspondents originating for the AlterNet Seller have obtained all licenses and approvals required with respect to the origination of the Home Equity Loans, including, to the extent applicable, licenses and approvals required for small Loans or small advances and licenses and approvals required to charge the maximum interest rate allowable under State law.

### (B) NO CONTRACTOR OR DEALER LOANS

No home improvement contractor or dealer was involved as a third party originator of a Home Equity Loan or received compensation in any form from the AlterNet Seller.

### (C) NO BORROWER DEFENSES OR CLAIMS

No unresolved defense or claim has been made or asserted in writing by the Borrower(s) with respect to the Home Equity Loan, including, without limitation, any defenses or claims based on unsatisfactory workmanship or materials in connection with any home improvements financed with the proceeds of the Home Equity Loan.

### (D) NO PROHIBITION ON THE HOME EQUITY LOAN

None of the documents evidencing, securing or otherwise relating to the first mortgage Loan in any way restricts or prohibits the Borrower(s) from obtaining the Home Equity Loan or from creating any of the liens granted as security for the Home Equity Loan, and the Home Equity Loan does not violate any term or condition imposed by any such document.




### (E) NON-SOLICITATION

With respect to any Home Equity Loan, the AlterNet Seller has not solicited or provided information to another party for the purpose of soliciting, and covenants and agrees that it will not solicit or provide information to another party for the purpose of soliciting, the refinance of any Home Equity Loan. The term "solicit" as used herein shall mean a direct request or offer to refinance a servicing released Loan, and shall not include general solicitations, advertisements or promotions directed to the public at large.

### (F) NO DEFAULTS

The Borrower is not in default or otherwise in violation of any terms or conditions of the Home Equity Loan security agreement or Note, and no grounds exist for restricting or limiting access to, or accelerating the maturity of, the Home Equity Loan.

### (G) HOME EQUITY LOAN FEES, CHARGES AND CONSUMER DISCLOSURES

Any fees or charges paid by the Borrower in connection with the origination of the Home Equity Loan to the AlterNet Seller or any agent or correspondent originating for the AlterNet Seller, must comply with applicable State, federal and other laws.

### (H) SECTION 32 MORTGAGES

The AlterNet Seller is responsible for ensuring that Section 32 Mortgages are properly identified to RFC in accordance with the requirements of the Borrower Disclosure Requirements subsection of the Home Equity Loan Section of Part 5, Loan Programs. All disclosures required by Regulation Z and all other applicable laws must be properly made.

### (I) NON-STANDARD FIRST MORTGAGE LOAN DOCUMENT

No Non-Standard Document evidencing, securing or otherwise relating to any first mortgage Loan contains any provision not contained in the Uniform Instruments that could in any material way tend to delay, hinder or otherwise adversely affect realizing upon the collateral for a Home Equity Loan or enforce any of the rights or remedies granted to the holder of the Home Equity Loan under the Loan Documents with respect to that Home Equity Loan.

### (J) COMPLIANCE WITH GUIDELINES

Each Home Equity Loan has been originated, processed, closed and delivered in compliance with the underwriting and program guidelines and requirements included in the Home Equity Loan Section of Part 5, Loan Programs.





### (K) NO FRAUD OR MISREPRESENTATION

No fraud or misrepresentation by the Borrower or by the AlterNet Seller, broker, correspondent, appraiser or any independent contractor retained by the AlterNet Seller, broker, correspondent, appraiser or any employee of any of the foregoing occurred with respect to or in connection with the origination or underwriting of any Home Equity Loan and all information and documents provided to RFC in connection with the Home Equity Loan are complete and accurate.

### (L) PROPERTY VALUE

With respect to each Home Equity Loan, the current market Value of the Mortgaged Premises is at least equal to the appraised Value submitted to RFC by the AlterNet Seller in connection with the sale of the Home Equity Loan to RFC.

## 252

**Non-Standard Documents**

While RFC is not obligated to purchase a Loan secured by Non-Standard Documents, it may choose to do so from time to time. In this event, the AlterNet Seller represents and warrants that:

(1) The terms of the Non-Standard Documents do not violate and are fully enforceable under applicable laws and regulations.

(2) The Non-Standard Documents contain covenants of the Borrower similar to those outlined in the Uniform Instruments of this AlterNet Guide. The Non-Standard Documents should also grant rights to the AlterNet Seller (including default and foreclosure rights, rights to inspect and rights upon condemnation) equivalent to the Uniform Instruments.

(3) The Non-Standard Documents contain a fully enforceable due-on-sale or due-on-transfer clause in accordance with this AlterNet Guide.

(4) The Non-Standard Documents grant no more favorable rights to the Borrower upon default and foreclosure than are contained in the Uniform Instruments for the jurisdiction in which the Mortgaged Premises are located.




(5) If it is necessary to protect the interest of the Note's holder, the Non-Standard Documents should contain a specific waiver by the Borrower and the Borrower's spouse of:

- any statutory right of redemption after foreclosure; and
- any right of homestead, dower, courtesy or similar marital right.

(6) The Non-Standard Documents expressly permit the AlterNet Seller to advance sums for unpaid insurance premiums, property taxes, and/or any other payments necessary to protect the Value of the Mortgaged Premises or the rights of the Note holder in the Mortgaged Premises. The Non-Standard Documents permit, but do not require, the AlterNet Seller to add such amounts to the indebtedness secured by the Security Instrument. The AlterNet Seller additionally warrants that no capitalization of any such payments or any delinquent principal and interest obligations will occur in the future.

(7) The Non-Standard Documents contain fully enforceable acceleration clauses for the Borrower's default in payments and for the Borrower's breach of any covenant.

(8) The Non-Standard Documents provide for monthly principal and interest payments due on the first day of the month, fully amortized over thirty (30) years or less from the date of the Note. The interest portion of each payment is determined by computing thirty (30) days interest on the outstanding principal balance of the Note as of the scheduled installment date.

(9) The Non-Standard Documents provide that if more than one person executes the Note, then each signatory's obligation under the Note is joint and several.

(10) The Non-Standard Documents do not provide for:

- a grace period to the Borrower for delinquent principal and interest payments; or
- the application of a prior prepayment of principal to delinquent payments.






(11) The Non-Standard Documents provide for application of payments first to Escrow/Impounds, second to interest, third to negative amortization and finally to principal.

(12) The Non-Standard Documents provide for a late charge in compliance with the requirements set forth in this AlterNet Guide.

(13) If any of the Mortgaged Premises covered by the Non-Standard Documents is rental property (one- to four-family units), then these documents should contain covenants and agreements of the Borrower, including an enforceable assignment of rents, substantially similar to the covenants and agreements contained in the Uniform Instruments. These documents should also grant rights to the AlterNet Seller equivalent to those contained in the Uniform Instruments.

(14) If any of the Mortgaged Premises covered by the Non-Standard Documents is part of a planned unit development (PUD), then these documents should contain covenants and agreements of the Borrower. These documents should also grant rights to the AlterNet Seller equivalent to the Uniform Instruments.

(15) The use of Non-Standard Documents will not preclude the AlterNet Seller from performing all servicing and accounting requirements outlined under this AlterNet Guide.

The foregoing representations and warranties with respect to Loans evidenced or secured by Non-Standard Documents shall be in addition to all other representations and warranties contained in this AlterNet Guide or in the AlterNet Seller Contract.



253

**Proof of Compliance**

The AlterNet Seller will, upon the request of RFC, supply proof satisfactory to RFC of its:

(1) compliance with all representations and warranties contained in this AlterNet Guide, and

(2) compliance with all local, State and federal laws, rules and regulations, including, but not limited to:

**The Fair Credit Reporting Act**

If RFC underwrites an unclosed Loan application and no credit is offered to the applicant or the applicant does not expressly accept or use any credit offered, the AlterNet Seller must provide the proper adverse action notice required by the Equal Credit Opportunity Act (ECOA), Regulation B Section 202.9(g).

The notice must disclose RFC as a creditor on whose behalf the notice is given and must indicate the specific reason(s) for RFC's denial of the application. RFC will provide the AlterNet Seller with the specific reasons for its denial.

254

**Integrity of Information**

The AlterNet Seller is responsible for credit and property underwriting regardless of whether the information was provided by the AlterNet Seller, an entity related to the AlterNet Seller or designated by the AlterNet Seller to perform the function. This includes credit information, appraisals, or other documents/information used in the Loan's evaluation.

The AlterNet Seller should take all steps necessary to ensure that each Loan sold to RFC has been prudently originated and underwritten, and that all information supplied by, on behalf of, or concerning the Borrower is true, accurate and complete. The AlterNet Seller should ensure that interested parties are sufficiently independent from the Loan transaction and that adequate organizational controls are in place to ensure the independence, validity and reliability of the Loan information.

In addition, the AlterNet Seller should implement prudent practices when relying on designated agents (such as escrow companies, title companies, etc.) in order to ensure that they comply with its instructions and that the integrity of the Loan transaction has been maintained.






255

**Third-Party Originators**

When relying on the actions or services of third-party originators, the AlterNet Seller should establish qualification and eligibility standards. The AlterNet Seller should consider the functions being performed by the third-party originator in establishing these standards. These standards should be reviewed periodically to ensure ongoing eligibility by the third-party originator.

The AlterNet Seller is encouraged to include the following items in formulating its qualification and eligibility standards and procedures:

(1) Review personnel resumes and references of management and Loan origination staff (Loan officers, processors, underwriters, closers, etc.);

(2) Establish minimum net worth requirements and evaluate the financial viability of the firm on an ongoing basis;

(3) Establish minimum requirements for errors and omissions insurance and fidelity bond coverage and monitor ongoing compliance with these standards;

(4) Document the relationship with a contractual agreement that contains specific warranties related to each party's responsibilities, as well as recourse rights in the event of warranty violations; and

(5) Review the performance of Loans originated by third parties to evaluate trends or patterns of Delinquency.

The AlterNet Seller should include a representative, random sample of third-party Loans in the quality control program through both pre- and post-closing quality control audits to ensure the quality of Loan information.




## 260

**Events of Default**

Any one or more of the following events constitute an Event of Default:

(1) The AlterNet Seller has not complied with one (1) or more of the requirements (including any requirement outlined in the Eligibility Standards Part of this AlterNet Guide), terms or conditions outlined in this AlterNet Guide.

(2) The AlterNet Seller has breached any agreement outlined or incorporated by reference in the AlterNet Seller Contract or any other agreement between the AlterNet Seller and RFC.

(3) The AlterNet Seller has made one (1) or more false or misleading representations or warranties to RFC or has failed to provide RFC with information that is true, complete and accurate.

(4) The Borrower(s) or any other person or entity involved in the Loan transaction or in its underwriting or documentation (including any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with such transaction, whether or not the AlterNet Seller was a party to or had knowledge of such misrepresentation or incorrect information.

(5) Occurrence of an Event of Servicer Default with respect to any Loans serviced by the AlterNet Seller.

## 270

**Remedies of RFC**

### (A) NON-EXCLUSIVE, CUMULATIVE REMEDIES

RFC may exercise any remedy outlined in this AlterNet Guide. RFC's exercise of one or more remedies in connection with a particular Event of Default will not prevent it from exercising:

- One (1) or more other remedies in connection with the same Event of Default, and/or
- Any other rights which it may have at law or in equity deemed appropriate to protect its interest.

### (B) NO WAIVER OF REMEDIES

RFC's failure to exercise any of its remedies does not constitute a waiver of that remedy in the future as to the same or any other Event of Default.






271

**Conversion, Repurchase, Substitution, Purchase Premium Recapture**

**(A) REPURCHASE AS A RESULT OF CONVERSION**

The AlterNet Seller (or, if the AlterNet Seller has transferred servicing of the Loans, the Servicer) shall repurchase a Loan which has converted from an ARM to a fixed rate. The Servicer must submit the ARM Conversion Notification Report no less than fifteen (15) days prior to the conversion date.

If the AlterNet Seller or Servicer repurchases a converted Loan and subsequently resells that converted Loan to RFC, all the AlterNet Seller's representations and warranties with respect to that Loan shall survive such repurchase and resale. In addition, the AlterNet Seller shall be subject to all rights and remedies (including repurchase) available to RFC as a result of any misrepresentation or breach of warranty with respect to that Loan prior to conversion.

The AlterNet Seller shall also submit the modification agreement if requested by RFC or its assigns.

After its receipt of the Loan funds, RFC will endorse the Note to the party which repurchased the Loan. The Loan will then be assigned to such party, and all credit documentation will be returned. Failure to submit the ARM Conversion Notification Report in a timely manner may delay the receipt of the endorsed Note and other legal documents.

The Servicer shall submit a Payoff/Liquidation Report and wire transfer Loan funds to the RFC Loan Accounting Department in Los Angeles no later than the last Business Day prior to the conversion date. The Servicer must remit interest for the entire month preceding the conversion date. The AlterNet Seller shall attach a copy of the ARM Conversion Notification Report.

If the appropriate amount is not wired on time, RFC will charge a late payment fee. This fee will equal the amount due multiplied by the "Prime Rate" plus 3% multiplied by the number of days overdue divided by 365. The term "Prime Rate" shall mean the highest quoted Prime Rate printed in the *Wall Street Journal* in its regular column Section "Money Rates" on the first Business Day of the month in which the payment was due and not paid. If the Prime Rate is not available, RFC will determine a comparable rate.



### (B) NOTICE; FILING AN APPEAL

If the AlterNet Seller discovers an Event of Default, it should give RFC prompt written notice. Such notice should include a written description of the Event of Default. Upon receipt of this notice, RFC will review these materials and any additional information or documentation that the AlterNet Seller believes may influence RFC's decision to require repurchase.

If RFC decides to require repurchase, the AlterNet Seller shall repurchase the Loan and the servicing (if the Loan was sold servicing released) within thirty (30) days after RFC's decision. The AlterNet Seller may appeal RFC's decision by providing any additional information or documentation it believes may affect RFC's determination. All information and documentation submitted to RFC in connection with an appeal should be received within thirty (30) days after the AlterNet Seller's receipt of the notice of an Event of Default. RFC will review all appeals and advise the AlterNet Seller in writing of the appeal decision.

Send all notifications and appeals to:

Residential Funding Corporation
8400 Normandale Lake Boulevard
Suite 600
Minneapolis, MN 55437
Attention: AlterNet Internal Risk Management





### (C) REPURCHASE OBLIGATIONS

If RFC determines that an Event of Default has occurred with respect to a specific Loan, the AlterNet Seller agrees to repurchase the Loan and its servicing (if the Loan was sold servicing released) within thirty (30) days of receiving a repurchase letter from RFC.

RFC will notify the AlterNet Seller of a repurchase obligation in writing. To expedite the wiring of funds to RFC, the AlterNet Seller should use the Repurchase Liquidation Report (RFC Form 1270). RFC will send this form to the AlterNet Seller along with the notification of repurchase.

RFC may also determine the validity of any appeal filed by the AlterNet Seller in regard to an Event of Default. If RFC's decision remains firm following an appeal, the AlterNet Seller shall repurchase the Loan and its servicing (if the Loan was sold servicing released) within ten (10) days of notification by RFC that the appeal has been denied.

RFC is not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase. However, any delay in making this demand does not constitute a waiver by RFC of any of its rights or remedies.

As indicated below, the repurchase price of the Loan is calculated, in part, on the basis of the Scheduled Principal Balance and the Accrued and Unpaid RFC Scheduled Interest RFC scheduled interest. It is not calculated on the basis of the actual outstanding principal balance and actual accrued and unpaid interest on the Loan. As a result, the AlterNet Seller must repurchase a Loan after foreclosure even if the full amount of its outstanding debt was bid by or on behalf of the Loan's owner to acquire the Mortgaged Premises at the foreclosure sale.

Where RFC determines that repurchase of a Loan and/or the servicing is not appropriate, the AlterNet Seller shall pay RFC all losses, costs and expenses incurred by RFC and/or the Loan's Servicer as a result of an Event of Default. This includes all attorneys' fees and other costs and expenses incurred in connection with enforcement efforts undertaken.

Upon the AlterNet Seller's satisfaction of its repurchase obligation, RFC will endorse the Note showing the Loan in blank and will deliver it and other pertinent Loan Documents to the AlterNet Seller. In addition, if RFC acquired title to any of the real property securing that Loan pursuant to a foreclosure and has not disposed of such property, it will transfer such property to the AlterNet Seller on a "quit claim" basis.

If the AlterNet Seller is also the Servicer of a Loan repurchased by reason of the occurrence of an Event of Default, RFC will not reimburse the AlterNet Seller for any principal, interest or other advances made by the AlterNet Seller with respect to that Loan.




### (D) REPURCHASE PRICE OF FIRST MORTGAGE PRODUCT

In the event the AlterNet Seller is obligated to repurchase a Loan the AlterNet Seller must pay to RFC a repurchase price equal to the sum of:

- The actual principal balance of the Loan at the time of repurchase calculated without regard to the amount of debt, if any, bid by the owner of the Loan at any foreclosure sale conducted with respect to the Loan (if the AlterNet Seller sold the Loan to RFC at a discount or a premium, the repurchase price above will be adjusted to reflect the actual principal balance minus the discount percentage multiplied by the actual principal balance, or plus the premium percentage multiplied by the actual principal balance, as appropriate, including that price paid for servicing rights), plus
- All accrued and unpaid interest on the Loan through the last day of the month of the date of repurchase (which amount shall be calculated without regard to the amount of debt, if any, bid by the owner of the Loan at any foreclosure sale conducted with respect to the Loan); plus
- All interest, principal and other advances made to investors and all out of pocket costs and expenses of any kind incurred by RFC and/or the primary servicer in connection with the Loan, including, but not limited to, advances for taxes or insurance, and repair, foreclosure and insurance costs and attorneys' fees; plus
- The amount of the buyout factor multiplied by the actual principal balance as calculated in the Buyouts and Extension Section of this AlterNet Guide; plus
- In the event that RFC or any of its Affiliates is required to repurchase the Loan from any subsequent assignee, then any additional amount as may be required to make the repurchase price that the AlterNet Seller is obligated to pay hereunder equal to the repurchase price that RFC or its Affiliate is required to pay to such subsequent assignee; minus
- The net amount of any proceeds realized by the owner of the Loan upon the final liquidation of the Loan or the Mortgaged Premises to an unrelated third party.

The Designated Servicer will return to the AlterNet Seller any escrow funds, unapplied funds and prepaid principal and interest installments.

In the event the AlterNet Seller is obligated to repurchase a Loan after foreclosure, it will be obligated to do so for the repurchase price specified above even if the full amount of the outstanding debt with respect to that Loan was bid by or on behalf of the owner of the Loan to acquire the Mortgaged Premises at the foreclosure sale.






### (E) REPURCHASE PRICE OF A SERVICING RELEASED LOAN

In the event the AlterNet Seller repurchases a Loan for which the servicing has also been sold to RFC, the AlterNet Seller will also be required to repurchase the servicing. If the repurchase of the servicing of the Loan is for any reason other than a breach of the Delinquency Payoff/Liquidation warranty contained in the Servicing Released Part, the AlterNet Seller must pay to RFC a repurchase price equal to the original Servicing Premium percentage multiplied by the actual unpaid principal balance at the time of repurchase.

In no event however, will the required repurchase Servicing Premium be greater than the original Servicing Premium paid to the AlterNet Seller.

The Designated Servicer will return to the AlterNet Seller any escrow funds, Temporary Buydown funds, unapplied funds and prepaid principal and interest installments. The AlterNet Seller will be required to reimburse the Designated Servicer for any delinquent principal and interest advances, and any escrow advances and foreclosure expenses they have made and not recovered on a repurchased Loan.

### (F) SUBSTITUTION

Instead of requiring the AlterNet Seller to repurchase a Loan as provided above, RFC, at its discretion, may allow the AlterNet Seller to substitute another Loan satisfactory to RFC in place of the original Loan, within ten (10) days of notification by RFC, unless otherwise notified. If the substituted Loan contains terms different from those of the Loan that it is replacing, a purchase price adjustment will be calculated by RFC based on market changes and Loan characteristics. Every Loan substituted will be subject to all agreements, terms, conditions, representations and warranties in this AlterNet Guide as of the Substitution Date.

In the event a Loan is eligible for purchase by RFC but the servicing is ineligible for purchase by RFC, the Loan will be purchased and the sale of servicing denied. RFC will not allow the AlterNet Seller to substitute another servicing released Loan.

### (G) COST OF TRANSFER FEES DUE TO REPURCHASE

The AlterNet Seller agrees that, if it is required to repurchase a Loan and the related Servicing, it will pay all documentary stamp taxes, recording fees, transfer taxes and all other expenses payable in connection with the repurchase and will indemnify and hold harmless RFC and the Designated Servicer against all losses, costs and expenses, including attorney fees, resulting from such required repurchases or the breach giving rise hereto.

- If the AlterNet Seller is obligated to repurchase an AlterNet Loan, the adjustment to the principal balance is adjusted as set forth in this Section only if the AlterNet Seller is obligated to repurchase the Loan within twelve (12) months of the date the Loan was purchased by RFC.




### (H) PURCHASE PREMIUM RECAPTURE

Not withstanding any other provisions of this AlterNet Guide, if any payoff or liquidation occurs of a loan within ninety (90) days after the Funding Date, the AlterNet Seller will be required to repay to RFC the original purchase premium paid for the loan by RFC, regardless of whether a new loan is being originated by the AlterNet Seller or a different lender.

272

**Repurchase Price of Home Equity Product**

In the event the AlterNet Seller is obligated to repurchase a Home Equity Loan, the AlterNet Seller must, upon repurchase, service such Home Equity Loan. The repurchase price for such Home Equity Loan shall be equal to the sum of:

- The unpaid principal balance of the Home Equity Loan;
- All accrued and unpaid interest on the Home Equity Loan;
- The amount of all fees and/or purchase premium paid, if any, to the AlterNet Seller by RFC for origination of the Home Equity Loan;
- All fees paid to any Servicer or Sub-Servicer of a Home Equity Loan by reason of the termination of that Servicer's or Sub-Servicer's right to service that Home Equity Loan;
- All costs incurred or paid by RFC or any Servicer in collecting or enforcing the Home Equity Loan, including, without limitation, interest or other costs paid to bring or maintain a prior lien current or up to date, costs to insure or pay delinquent taxes, attorneys' fees, court costs, appraisal and title expenses and other similar costs or expenses (collectively, "Foreclosure Expenses"); and
- Any additional amount RFC or any of its Affiliates is required to pay to repurchase the Home Equity Loan from a subsequent assignee.

In lieu of repurchasing a Home Equity Loan that has not yet been foreclosed and accepting the servicing of such Home Equity Loan, the AlterNet Seller may pay to RFC the Estimated Loss (as defined below). The AlterNet Seller shall elect whether it will be repurchasing the Home Equity Loan and accepting the servicing thereof or paying the Estimated Loss within thirty (30) days of the date of the corresponding letter to the AlterNet Seller from RFC demanding such repurchase. Estimated Loss, as it relates to each Home Equity Loan subject to repurchase, shall equal the product of:

120% multiplied by the result of:

- Repurchase price as calculated above, plus






- Accrued interest on the Home Equity Loan through the date RFC estimates that the Home Equity Loan will be fully liquidated (which in the case of a foreclosure, shall mean the date that RFC estimates that the Mortgaged Premises will be sold to a third party and which in any other case means the date that RFC estimates that all collection efforts on the Home Equity Loan will be abandoned) and estimated foreclosure and other enforcement expenses for the entire collection process, less
- Amount by which the current market value of the Mortgaged Premises as determined by RFC using valuation services provided by an independent third party exceeds the current outstanding amount of indebtedness secured by the Mortgaged Premises that is senior to the Home Equity Loan.

**273**

**Disqualification or Suspension**

Termination of servicing for cause is a basis for the AlterNet Seller's immediate disqualification or suspension. Action taken by RFC to terminate servicing may be merged with an action to disqualify or suspend the AlterNet Seller.

**GROUNDS FOR DISQUALIFICATION OR SUSPENSION**

RFC may disqualify or suspend a AlterNet Seller for any of the following reasons:

(1) Impending or actual insolvency of the AlterNet Seller;

(2) The filing of a voluntary petition by the AlterNet Seller under the federal bankruptcy laws or under any State bankruptcy or insolvency laws;

(3) The filing of an answer by the AlterNet Seller in an involuntary proceeding admitting insolvency or inability to pay debts;

(4) The AlterNet Seller's entry of an order for relief under the federal bankruptcy laws;

(5) The appointment of a trustee or receiver for the AlterNet Seller or its property;

(6) The execution by the AlterNet Seller of an assignment for the benefit of creditors;

(7) The failure of the AlterNet Seller to obtain a vacation or stay of involuntary proceedings brought for its reorganization, dissolution, or liquidation;

(8) Any other change in the financial or organizational status of the AlterNet Seller that, in the opinion of RFC, could adversely affect RFC or any Loans sold to RFC;

(9) The placement of the AlterNet Seller on probation or restriction of its activities in any manner by a federal or State government agency, including Freddie Mac, Fannie Mae or HUD;




(10) The determination by RFC that the AlterNet Seller's sales and warranty obligations are disproportionate to its capital and/or assets;

(11) The AlterNet Seller's failure to deliver any document required by RFC;

(12) The AlterNet Seller's misstatement or omission of any material fact on any application, certification or other document submitted to RFC;

(13) The AlterNet Seller's assignment or attempt to assign its interests, rights, or obligations under the AlterNet Seller Contract without prior written consent by RFC;

(14) The occurrence of an Event of Default;

(15) The AlterNet Seller's failure to repurchase any Loan upon the written notification by RFC;

(16) The AlterNet Seller's inability to meet the approval standards of any insurer or other entity that provides insurance or other credit enhancements in connection with the efforts of RFC to sell the Loans or to borrow based on the collateral Value of the Loans;

(17) The AlterNet Seller or Servicer's failure to maintain a qualified Loan origination, servicing and quality control staff, an acceptable ongoing quality control program, adequate facilities and written policies and procedures to ensure:

- The investment quality of Loans sold to RFC, and
- The adequacy of the servicing of Loans purchased by RFC; or

(18) The failure of the AlterNet Seller or the Servicer to meet any test as may be prescribed for eligibility.

274

**Indemnification** The AlterNet Seller shall indemnify RFC from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses resulting from any Event of Default. This includes any act or failure to act or any breach of warranty, obligation or representation contained in the AlterNet Seller Contract; or from any claim, demand, defense or assertion against or involving RFC based on or resulting from such breach or a breach of any representation, warranty or obligation made by RFC in reliance upon any warranty, obligation or representation made by the AlterNet Seller contained in the AlterNet Seller Contract.





The AlterNet Seller also shall indemnify RFC and hold it harmless against all court costs, attorney's fees and any other costs, fees and expenses incurred by RFC in enforcing the AlterNet Seller Contract. The obligations of the AlterNet Seller under this Section shall survive the Delivery Date, the Funding Date (and each Substitution Date, if applicable) and the termination of the AlterNet Seller Contract and the disqualification or suspension of the AlterNet Seller.

**275**

**Right of Set-Off**

Upon any Event of Default, RFC may, at any time, to the fullest extent permitted by applicable laws and without prior notice to the AlterNet Seller (the AlterNet Seller waives any right to receive any such notice) set-off and apply all or any portion of the purchase price owed by RFC to the AlterNet Seller with respect to any Loan, any principal, interest or other advances that were made by the AlterNet Seller with respect to any Loans serviced by the AlterNet Seller on behalf of RFC that are reimbursable under the AlterNet Guide, and any other indebtedness at any time owing by RFC to the AlterNet Seller against any or all outstanding repurchase, indemnification, or other obligations of any kind owing by the AlterNet Seller to RFC, irrespective of whether RFC shall have exercised any other rights that it has or may have with respect to such outstanding obligations.

RFC will notify the AlterNet Seller promptly after any such set-off and application, provided that the failure by RFC to give such notice to the AlterNet Seller shall not affect the validity of such set-off and application. The rights of RFC under this Right of Set-Off Section are in addition to any other rights and remedies including, without limitation, other rights of set-off that RFC may have.

**280**

**Merger or Consolidation of AlterNet Seller**

Any person or entity into which the AlterNet Seller may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the AlterNet Seller shall be a party shall be the successor of the AlterNet Seller under the AlterNet Seller Contract. This does not require the execution or filing of any paper or any further act on the part of any of the parties to the AlterNet Seller Contract.

However, the AlterNet Seller's successor shall satisfy the RFC AlterNet Seller Eligibility Standards, as described in this AlterNet Guide.

The AlterNet Seller's successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the AlterNet Seller as if it were originally named a party to the AlterNet Seller Contract.




**281**

**Notification of Changes in AlterNet Seller Status**

The AlterNet Seller should notify RFC in writing of any change in the AlterNet Seller's organization which affects the legal structure, name or continued eligibility of the company. Such changes include mergers, consolidations, and other items as stated under the Grounds For Disqualification and/or Suspension subsection of this AlterNet Guide.

If the AlterNet Seller is merged with or acquired by another entity and remains a subsidiary, the written notice should clarify whether the AlterNet Seller will continue as a AlterNet Seller and whether there will be any changes involving the servicing of RFC Loans.

When RFC receives this written notification, it will contact the AlterNet Seller if further documentation is required. RFC reserves the right to suspend further business with the AlterNet Seller while determining the impact of the change on the AlterNet Seller's qualifications. Failure to notify RFC of any such change may result in suspension, disqualification, termination, or other remedies available to RFC under the AlterNet Seller Contract.