MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Anthony Princi
Charles L. Kerr
J. Alexander Lawrence
James A. Newton

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------- ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ----------------------------------------------- ) | | |

**THE DEBTORS' OMNIBUS OPPOSITION TO THE MOTIONS *IN LIMINE*
OF THE PARTIES OBJECTING TO THE DEBTORS' MOTION
PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE
SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC
TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 2

I.    THERE IS NO BASIS TO PRECLUDE ANY TESTIMONY BASED ON
THE CONFIDENTIALITY REQUIREMENTS OF THIS COURT'S
ORDER APPOINTING MEDIATOR ................................................................ 2

    A.    The Objecting Parties Misconstrue the Court's Mediation
Confidentiality Restrictions, with which the Debtors Have
Complied .................................................................................................. 3

    B.    The Objecting Parties Have Had Meaningful Discovery Into and
Examination of the Aspects of the Mediation the Debtors Can
Disclose ................................................................................................... 6

    C.    The Ad Hoc Group's Assertion That Mr. Kruger Should Not Be
Allowed To Testify Because He "Relied Heavily" on Privileged
Analyses Is Unsupported ........................................................................ 8

II.    THERE IS NO BASIS TO PRECLUDE ANY OF MR. LIPPS'S
TESTIMONY ................................................................................................ 10

    A.    Mr. Lipps's Opinions Do Not Address the Ultimate Legal Issues .......... 12

    B.    The Fact That Mr. Lipps Did Not Opine on All the Issues in the
Present Litigation Does Not Preclude Him from Testifying .................... 14

    C.    Mr. Lipps's Methodology in Evaluating The FGIC Settlement Is
Commonly Used by Attorneys Across the Country ................................ 15

    D.    Mr. Lipps's Work for The Debtors Is No Different Than the Work
Done by Other Expert Witnesses ............................................................ 19

    E.    The Debtors Have Complied with their Production Obligations in
Respect to Mr. Lipps's Testimony .......................................................... 20

III.    THERE IS NO BASIS TO PRECLUDE ANY OF DR. D'VARI'S
TESTIMONY ................................................................................................ 20

    A.    Dr. D'Vari's Declaration and Testimony Are Consistent and
Freddie Mac's Transparent Mischaracterization of That Testimony
Is Disingenuous ...................................................................................... 21

    B.    There Is No Basis for the Ad Hoc Group's Accusation That Dr.
D'Vari Is Conflicted Or Impartial Based on Prior Work for FGIC ......... 23

        1.    Dr. D'Vari's Prior Work for FGIC Provides No Basis for
the Objecting Parties to Move to Exclude Him from
Testifying .................................................................................... 24

-i-

# TABLE OF CONTENTS
(continued)

**Page**

2.    The Debtors Fully Disclosed Dr. D'Vari's Prior Work for
FGIC Long Before His Deposition ............................................... 27

CONCLUSION ..................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,*
  727 F. Supp. 2d 256 (S.D.N.Y. 2010)........................................................................9

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,*
  No. 95 Civ. 8833 (RPP), 2000 WL 42202 (S.D.N.Y. Jan. 19, 2000)....................24

*Driscoll v. Morris,*
  111 F.R.D. 459 (D. Conn. 1986)..............................................................................5

*Fiataruol v. United States,*
  8 F.3d 930 (2d Cir. 1993) ......................................................................................12

*Figueroa v. Boston Scientific Corp.,*
  254 F. Supp. 2d 361 (S.D.N.Y. 2003).....................................................................15

*Floyd v. City of New York,*
  861 F. Supp. 2d 274 (S.D.N.Y. 2012).....................................................................13

*Hays v. Equitex, Inc. (In re RDM Sports Group, Inc.),*
  277 B.R. 415 (Bankr. N.D. Ga. 2002) .....................................................................5

*In re Ambac Financial Group, Inc.,*
  457 B.R. 299 (Bankr. S.D.N.Y. 2011).....................................................................13

*In re Dreier LLP,*
  482, B.R. 863 (Bankr. S.D.N.Y. 2012)..............................................................24, 25

*In re Isack Rosenberg,*
  419 B.R. 532 (Bankr. E.D.N.Y. 2009).....................................................................11

*In re Methyl Tertiary Butyl Ether Products Liability Litigation,*
  No. 1:00-1898, MDL 1358 (SAS),
  2008 U.S. Dist. LEXIS 37331 (S.D.N.Y. May 7, 2008) ....................................15, 18

*In re MF Global, Inc.,*
  No. 11-2790 (MG), 2012 Bankr. LEXIS 3701 (Bankr. S.D.N.Y. Aug. 10, 2012).......... passim

*In re MSTG, Inc.,*
  675 F.3d 1337 (Fed. Cir. 2012)................................................................................5

*In re Purofied Down Products Corp.,*
  150 B.R. 519 (S.D.N.Y. 1993)...........................................................................13, 14

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Veeco Instruments, Inc., Securities Litigation*,
    05-MC-01695, 2007 U.S. Dist. LEXIS 102363 (S.D.N.Y. June 28, 2007)...............................9

*Joseph S. v. Hogan*,
    No. 06 Civ. 1042, 2011 U.S. Dist. LEXIS 76762 (S.D.N.Y. July 15, 2011)...........................15

*Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*,
    608 F.2d 928 (2d Cir. 1979)...................................................................................................5

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003)...............................................................................................19

*MBIA Insurance Co. v. GMAC Mortgage LLC*,
    914 N.Y.S.2d 604 (Sup. Ct., N.Y. Cnty. 2010) ....................................................................16

*Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
    No. 83 Civ. 8898 (MEL), 1989 WL 31514 (S.D.N.Y. Mar. 28, 1989) ..................................25

*Molina v. LexMark International, Inc.*,
    No. CV 08-04796 MMM, 2008 U.S. Dist. LEXIS 83014 (C.D. Cal. Sept. 30, 2008) .............4

*Motorola, Inc. v. Official Committee of Unsecured Creditors
    (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007).......................................................................................... passim

*Norwest Financial, Inc. v. Fernandez*,
    86 F. Supp. 2d 212 (S.D.N.Y. 2000).....................................................................................20

*Pritchard v. County of Erie (In re County of Erie)*,
    546 F.3d 222 (2d Cir. 2008)....................................................................................................9

*Rodriguez v. Pataki*,
    293 F. Supp. 2d 305 (S.D.N.Y. 2003)...................................................................................25

*Savage & Associates P.C. v. K&L Gates LLP (In re Teligent, Inc.)*,
    640 F.3d 53 (2d Cir. 2011).......................................................................................................5

*Swift Spindrift, Ltd. v. Alvada Insurance, Inc.*,
    09 Civ. 9342 (AJN) (FM), 2013 U.S. Dist. LEXIS 104296 (S.D.N.Y. July 24, 2013) .............9

*TVT Records v. Island Def Jam Music Group*,
    250 F. Supp. 2d 341 (S.D.N.Y. 2003)...................................................................................27

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Bilzerian*,
　　926 F.2d 1285 (2d Cir. 1991)....................................................................................5

*Victoria's Secret Stores Brand Management v. Sexy Hair Concepts, LLC*,
　　No. 07 Civ. 5804, 2009 U.S. Dist. LEXIS 30458 (S.D.N.Y. April 8, 2009).........................15


**STATUTES, RULES, & REGULATIONS**

11 U.S.C.
　　§ 327...................................................................................................................27
　　§ 328...................................................................................................................27

Fed. R. Bankr. P.
　　Rule 9014.............................................................................................................28
　　Rule 9019........................................................................................................ passim

Fed. R. Civ. P.
　　Rule 26.............................................................................................................5, 28

Fed. R. Evid.
　　Rule 702..............................................................................................................14

Local Rule 9019-1......................................................................................................3


**EXHIBITS**

Exhibit 1 – Chart listing cross-references and direct testimony Objecting Parties are
　　seeking to exclude

Exhibit 2 – Transcript of deposition of Lewis Kruger, dated July 11, 2013

Exhibit 3 – Transcript of deposition of John S. Dubel, dated July 10, 2013

Exhibit 4 – Transcript of deposition of Mamta Scott, dated July 18, 2013

Exhibit 5 – Transcript of deposition of Mary Sohlberg, dated July 16, 2013

Exhibit 6 – Transcript of deposition of Robert Major, dated July 17, 2013

Exhibit 7 – Transcript of deposition of Jeffrey A. Lipps, dated July 23, 2013

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Exhibit 8 – Transcript of deposition of Ron D'Vari, dated July 25, 2013

Exhibit 9 – Complaint, *MBIA Insurance Corp. v. Countrywide Home Loans*, No. 602825/2008 (Sup. Ct., N.Y. Cnty., Sept. 30, 2008)

Exhibit 10 - Complaint, *MBIA Insurance Co. v. Residential Funding Co., LLC*, No. 08-cv-08819 (S.D.N.Y. Oct. 15, 2008)

Exhibit 11 – Order, *MBIA Insurance Co. v. Residential Funding Co., LLC*, No. 603552/2008, (Sup. Ct., N.Y. Cnty. Nov. 9, 2010)

Exhibit 12 – Stipulation and Order of Substitution of Counsel, *Union Central Life Insurance Co. v. Credit Suisse First Boston Mortgage Securities Corp.*, No. 11-cv-2890 (S.D.N.Y. Mar. 30, 2012)

Exhibit 13 – Motion of Defendants Deutsche Bank Securities Inc. and J.P. Morgan Securities LLC to Dismiss Plaintiffs' Amended Complaint, *Western & Southern Life Insurance Co. v. Residential Funding Co., LLC*, No. A 1105042 (Ohio Ct. Common Pleas Dec. 9, 2011)

Exhibit 14 – Order to Show Cause, *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, No. 401265/2012 (N.Y. Sup. Ct. May 31, 2013)

Exhibit 15 – Motion for Approval of an Agreement Providing for the Return of MFGI Property, Extinguishment of Duplicate Claims Filed with CME Group Inc., and Allocation of MFGI Property to Customers of the MFGI Estate, *In re MF Global, Inc.*, No. 11-2790 (MG) SIPA (Bankr. S.D.N.Y. June 14, 2012) (Dkt. No. 2029)

Exhibit 16 – Email from J. Alexander Lawrence to Mary Eaton, dated August 7, 2013

Exhibit 17 – Letter from Howard F. Sidman to Michael R. Carney *et al.*, dated July 29, 2013

The Debtors[1] submit this omnibus opposition (the "**Opposition**") to the _seven_ separate

motions *in limine* filed by Monarch Alternative Capital LP, Stonehill Capital Management LLC,

Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master

Fund Limited, each of which is represented by Willkie Farr & Gallagher, LLP (the "**Willkie**

**Objecting Parties**") and the Federal Home Loan Mortgage Corporation ("**Freddie Mac**" and,

together with the Willkie Objecting Parties, the "**Investor Objecting Parties**"), and the Ad Hoc

Group of Junior Secured Noteholders (the "**Ad Hoc Group**" and, together with the Investor

Objecting Parties, the "**Objecting Parties**").  Consistent with their blunderbuss approach of

attacking every aspect of this process, the Objecting Parties are seeking to exclude some or all of

the testimony of virtually every witness who will testify in support of the Motion.[2]  In support of

this Opposition,[3] the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.        Contrary to the picture they attempt to draw for the Court, the Objecting Parties

have had a full opportunity to and have engaged in extensive discovery in opposition to the

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

[2] The Objecting Parties filed the following Motions *in Limine*:  (1) The Willkie Objecting Parties' Motion *in Limine* to Preclude the Testimony of Jeffrey A. Lipps Regarding the Debtors' 9019 Motion (*in Limine* Motion One) ("**Investor Lipps Motion**") [Dkt. No. 4539]; (2) The Willkie Objecting Parties' Motion *in Limine* to Preclude the Testimony of S.P. Kothari Regarding the Debtors' 9019 Motion (*in Limine* Motion Two) [Dkt. No. 4541]; (3) The Willkie Objecting Parties' Motion *in Limine* to Preclude the Testimony of Allen M. Pfeiffer Regarding the Debtors' 9019 Motion (Motion *in Limine* Three) [Dkt. No. 4546]; (4) The Willkie Objecting Parties' Motion *in Limine* to Preclude the Trustees from Offering Any Evidence of their Reliance on Counsel in Support of Debtors' 9019 Motion (*in Limine* Motion Four) ("**Investor Reliance Motion**") [Dkt. No. 4548]; (5) The Willkie Objecting Parties' Motion *in Limine* to Preclude Evidence on the Debtors' 9019 Motion Concerning the Negotiations Leading up to the FGIC Settlement Agreement and the Conclusory Statements Offered by the FGIC Trustees and Others About the Nature of those Negotiations (*in Limine* Motion Five) ("**Investor Negotiation Motion**") [Dkt. No. 4545]; (6) Freddie Mac's Motion *in Limine* to Preclude Certain Expert Testimony of Dr. Ron D'Vari in Connection with the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors ("**Freddie D'Vari Motion**") [Dkt. No. 4554]; (7) Omnibus Motion *in Limine* of the Ad Hoc Group to Preclude Certain Aspects of the Testimony of Lewis Kruger and John Dubel and the Expert Testimony of Ron D'Vari and Jeffrey Lipps Proffered in Connection with the FGIC Settlement Motion ("**Ad Hoc Group Motion**") [Dkt. No. 4549]; (8) Joinder of Freddie Mac to Five Motions *in Limine* ("**Freddie Joinder**") [Dkt. No. 4576].

[3] The Debtors incorporate by reference the opposition briefs of FGIC, the FGIC Trustees, and the Creditors' Committee to these motions *in limine*.

Motion. Collectively the Settlement Parties have produced thousands of pages of documents, with the Debtors alone producing over thirty-five thousand pages of material. The Objecting Parties have taken nine depositions of witnesses who, consistent with this Court's Orders, have testified about the underlying facts and circumstances supporting this Motion. The Objecting Parties have designated substantial portions of those deposition transcripts and over two hundred exhibits that they seek to introduce into evidence at the hearing in opposition to the Motion.

2.      Notwithstanding this full and fair opportunity to take discovery, review documents and examine witnesses, the Objecting Parties have found that they are unable to refute that the terms of the Settlement Agreement are fair, equitable and eminently reasonable to the Debtors' estates and creditors, and that the timely resolution of the FGIC Claims and the FGIC Trustees' Claims serves the best interests of the Debtors and their creditors. Faced with the inability to challenge the Motion on its merits and unhappy with the evidence that confronts them, the Objecting Parties take the well-worn path of seeking, *in limine*, simply to exclude that evidence rather than addressing it on the merits. In their blunderbuss effort to preclude highly relevant but unfavorable evidence, the Objecting Parties have filed seven *in limine* motions seeking to preclude virtually any testimony in support of the Motion. Each of the Objecting Parties' seven *in limine* motions should be denied.

## **ARGUMENT**

## **I.      THERE IS NO BASIS TO PRECLUDE ANY TESTIMONY BASED ON THE CONFIDENTIALITY REQUIREMENTS OF THIS COURT'S ORDER APPOINTING MEDIATOR.**

3.      The *in limine* motions seeking to preclude testimony based on the confidentiality requirements imposed by this Court's Order Appointing Mediator, entered December 26, 2012

ny-1104019

[Dkt. No. 2519] (the "Mediation Confidentiality Order"), and General Order M-390[4] are

premised on a mischaracterization of the record and how those Orders apply in fact.[5]  The

Objecting Parties do not contend that the Settlement Parties have improperly disclosed

information that was required to have remained confidential.  Instead they argue that, because the

Settlement Parties could and did disclose non-confidential information concerning the basis for

this Motion but were prevented by this Court's Orders from disclosing communications among

and documents exchanged by the parties during the mediation process before Judge Peck, the

evidence properly before the Court must now be excluded.  The Objecting Parties also

mischaracterize the way the Settlement Parties have properly complied with those Orders while

still allowing the Objecting Parties to pursue discovery so that they can test the merits of and the

basis for entering into the Settlement Agreement.

> **A.    The Objecting Parties Misconstrue the Court's Mediation Confidentiality
> Restrictions, with which the Debtors Have Complied.**

4.      The Objecting Parties' motions are premised on the false claim that the Debtors

and the other Settlement Parties made a "tactical choice" to preclude discovery into the

mediation process based on an assertion of a so-called "mediation privilege."  (Investor

Negotiation Motion at 9; Ad Hoc Group Motion ¶ 6.)  According to the Objecting Parties,

because the Settlement Parties made this "choice," Mr. Kruger, Mr. Dubel and the witnesses for

---

[4] At the time the Court issued the Mediation Confidentiality Order, and throughout the mediation that produced the FGIC Settlement Agreement, Local Rule 9019-1 had stated that "[a]lternative dispute resolution shall be conducted in the manner required by any applicable standing order of the Court [e.g., General Order M-390]."  As of August 1, 2013, Local Rule 9019-1 was amended to state that alternative dispute resolution will now be conducted in accordance with the "Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings."  The confidentiality provisions in the new Procedures Governing Mediation are identical to those in General Order M-390.  (*Compare* Procedures Governing Mediation § 5.0 *with* General Order M-390 § 5.0.)  The Debtors continue to refer to General Order M-390 because that order, in addition to the Court's Mediation Confidentiality Order, was the operative order at the time of the mediation at issue here.

[5] *See* Investor Negotiation Motion [Dkt. No. 4545] and Section I of the Ad Hoc Group Motion [Dkt. No. 4549].

ny-1104019

the FGIC Trustees should be precluded from testifying about nearly anything and everything

related to the negotiation of and basis for the Settlement Agreement.  Indeed, the Objecting

Parties collectively seek to preclude nearly all of Mr. Kruger's written direct testimony,

including the basic facts describing his role as CRO, his understanding of the claims being

asserted by FGIC and the FGIC Trustees, that he even participated in a mediation that led to the

Settlement Agreement, the descriptions of the Agreement's terms and the basis for Mr. Kruger's

decision to enter into the Agreement on behalf of the Debtors.[6]  The Objecting Parties make

other, similar sweeping attacks in an effort to preclude testimony by Mr. Dubel, Ms. Sohlberg,

Mr. Major and Ms. Scott.

5.      The Settlement Parties, however, have made no such "tactical choice" and at no

time sought to invoke a "mediation privilege," which they could choose to assert or not.  Rather

the Settlement Parties have been and remain bound by the confidentiality requirements in this

Court's Mediation Confidentiality Order and General Order M-390, which *preclude* them from

disclosing mediation confidential statements and documents.  In light of those Orders, the

Settlement Parties do not have a choice whether to assert confidentiality (as a party could do with

a privilege held by that party) and they do not have a choice to voluntarily waive confidentiality

(again, as a party could do with a privilege it held personally).  *See Molina v. LexMark Int'l, Inc.*,

No. CV 08-04796 MMM (FMx), 2008 U.S. Dist. LEXIS 83014, at *34-38 (C.D. Cal. Sept. 30,

2008) (distinguishing between confidentiality imposed by court order and the assertion of

privilege).  Instead, the confidentiality provisions in the Court's Mediation Confidentiality Order

and General Order M-390 apply to all parties and all parties can and have relied upon that

---

[6] *See* Ad Hoc Group Motion, Ex. A *and* Investor Negotiation Motion at 10 (outlining testimony sought to be
excluded, including, for example, Kruger Direct Test. ¶¶ 5, 25, 26, 28, 31, 32, describing the Settlement Agreement,
and exhibits cited therein, like the Settlement Agreement itself).

confidentiality as a basis to act in the mediation.  *See Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608 F.2d 928, 930 (2d Cir. 1979); *see also Savage & Assocs. P.C. v. K&L Gates LLP (In re Teligent, Inc.)*, 640 F.3d 53, 57-58 (2d Cir. 2011) (equating the confidentiality requirements of a mediation order to a protective order issued by the Court under Rule 26).[7]  As the Debtors have consistently explained throughout this contested matter, those Orders, taken together, prevent any mediation party from disclosing (i) statements made to the mediator and/or the mediation parties during the mediation process; (ii) records, reports, or documents received or made by the mediator; (iii) discussions among mediation parties; (iv) mediation statements and any other documents or information provided to mediation parties; and (v) correspondence, draft resolutions, offers, and counteroffers produced for or as a result of the mediation.[8]

6.    By framing their arguments as they do, the Objecting Parties are attempting to shoehorn the Settlement Parties' proper compliance with this Court's confidentiality orders into a situation where a party holding a personal privilege attempts, unfairly, to use that privilege as both a sword and a shield.[9]  But the Objecting parties do not contend that the Settlement Parties have improperly disclosed information that should have been withheld under the Orders, but

---

[7] In fact, the Debtors are unaware of any decision by a court in the Second Circuit recognizing a federal common law mediation privilege.

[8] *See, e.g.*, Kruger Dep. Tr. at 15:6-18, 191:11-193:21; July 15, 2013 Hr'g Tr. at 24:3-12, *Residential Capital LLC v. UMB Bank, N.A.*, No. 13-01343 (MG) [Dkt. No. 24] (explaining that the Debtors "are never going to open the door to the production of mediation documents. . . . [T]he general order of this Court, M-390, in addition to this Court's December 26, 2012 order, could not be more clear that all discussions among mediation parties . . . shall be strictly confidential and not admissible for any purpose."); *id.* at 31:6-13 ("It's not a privilege. . . .  It's a rule against disclosure of mediation materials.").

[9] *See United States v. Bilzerian*, 926 F.2d 1285, 1291 (2d Cir. 1991) (affirming denial of motion *in limine* seeking order that defendant's anticipated testimony about his counsel's advice would not have waived privilege); *Hays v. Equitex, Inc. (In re RDM Sports Group, Inc.)*, 277 B.R. 415 (Bankr. N.D. Ga. 2002) (denying motion to compel, finding that mediation documents were subject to federal common-law privilege—not any mediation confidentiality order—and finding no at-issue waiver because plaintiff had not used mediation documents as a sword); *Driscoll v. Morris*, 111 F.R.D. 459 (D. Conn. 1986) (granting motion to compel, finding waiver of First Amendment reporter's privilege where reporter put identity of confidential sources at issue in claiming damage to relationships with sources); *see also In re MSTG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012) (requiring discovery of confidential information relied upon by a testifying expert witness).

ny-1104019

rather that, because some information about the circumstances surrounding the Settlement

Agreement is confidential and some is not under the terms of those Orders, it is improper for the

Settlement Parties to present any evidence about the Settlement Agreement in support of this

Motion.  The Objecting Parties provide no authority for such a sweeping rule.

> **B.      The Objecting Parties Have Had Meaningful Discovery Into and
> Examination of the Aspects of the Mediation the Debtors Can Disclose.**

7.       In their moving papers, the Objecting Parties make broad assertions that the

Settlement Parties "have refused to allow any witness to answer any questions as to anything that

happened or was discussed by anyone during the Mediation period" and that "at every

deposition, the [Settlement Parties] refused to let witnesses testify about anything that involved

the negotiations among the parties or anything else that otherwise preceded the execution of the

Settlement Agreement."  (Investor Negotiation Motion at 2, 4; Ad hoc Group Motion ¶¶ 6-7.)

That is incorrect.  In fact, during Mr. Kruger's deposition, he testified at length about the facts

that form the basis for his direct testimony and which the Objecting Parties now seek to exclude.

While Mr. Kruger was directed, based on this Court's Orders, not to answer questions about

specific discussions among the parties during the mediation, he testified at length about his

retention and role as CRO, the process he used to learn about the underlying claims brought by

FGIC and the FGIC Trustees, when and how he learned about the proposed FGIC Settlement

Agreement, his authority to negotiate and ultimately execute the Settlement Agreement on behalf

of the Debtors, and the basis on which he concluded that the Settlement Agreement is fair,

equitable and in the best interests of the Debtors and their creditors. To assist the Court, the

Debtors have attached as Exhibit 1 a chart listing the specific paragraphs of direct testimony that

the Objecting Parties are seeking to exclude and a cross-reference to a witness's deposition

testimony where that witness was asked about and provided testimony concerning the same topic.[10]

8.      For example, the Objecting Parties seek to preclude paragraphs 9, 10, and 14 of Mr. Kruger's testimony, where Mr. Kruger discusses his role as CRO.  (The Willkie Objecting Parties also inexplicably request that the Court preclude Mr. Kruger's publicly filed engagement letter itself, which is Debtors' Exhibit 30, cited in paragraph 14 of Mr. Kruger's testimony.)  The Objecting Parties had ample opportunity to question Mr. Kruger, and did question him, about his engagement, activities and authority as CRO, and the Debtors did not invoke mediation confidentiality.  (*See, e.g.*, Deposition of Lewis Kruger ("**Kruger Dep. Tr.**") at 11:9-16, 21:21-22:7, 22:20-28:18, Ex. 2.)  Similarly, the Objecting Parties seek to preclude Mr. Kruger's testimony that, in his opinion, the negotiations that led to the Settlement Agreement were conducted at arm's-length, among parties with divergent interests.  (*See* Direct Testimony of Lewis Kruger ("**Kruger Direct Test.**") ¶¶ 5, 57-59 [Dkt. No. 4431].)  But, again, the Objecting Parties questioned Mr. Kruger about this opinion, and Mr. Kruger did not claim further explanation was barred by the Mediation Confidentiality Order.  (*See, e.g.*, Kruger Dep. Tr. at 43:7-49:15, 119:16-23, 192:6-193:21.)[11]  The Objecting Parties also seek to exclude Mr. Kruger's testimony about the basis on which he concluded that the Settlement Agreement was fair and reasonable and in the best interests of the Debtors and their creditors.  (Kruger Direct Test. ¶¶ 10-11, 36-39.)  Again, he testified extensively to these facts in his deposition.  (*See, e.g.*,

---

[10] In this section of the Opposition, the Debtors will focus on the Objecting Parties' challenge to Mr. Kruger's direct testimony.  The Debtors refer to the opposition briefs being filed by FGIC and by the FGIC Trustees with respect to the Objecting Parties' challenge to the direct testimony of Mr. Dubel, Ms. Sohlberg, Mr. Major and Ms. Scott.

[11] In seeking to preclude any assertion that the negotiations were arm's-length and between parties with divergent interests, the Ad Hoc Group refers to FGIC's and the Committee's litigation *against* the Debtors in connection with the RMBS 9019 motion, while the mediation was ongoing.  (*See* Ad Hoc Group Motion ¶ 9 (citing FGIC and the Committee's motions to preclude Debtors' evidence.)  The Objecting Parties cannot be heard to complain that they have no means to determine whether the negotiations were contentious while, at the same time, citing publicly available evidence of that fact.

Kruger Dep. Tr. at 37:12-38:11, 53:7-54:10, 69:19-70:21, 125:7-126:14.)  Finally, the Objecting

Parties also seek to preclude Mr. Kruger's testimony about the likelihood of complex and

protracted litigation when, again, they have questioned Mr. Kruger's at length about litigation

risk.  (*See, e.g.*, Kruger Dep. Tr. at 153:24-155:16, 172:9-20, 173:16-174:9, 180:8-184:2.)

9.      A fair review of Mr. Kruger's deposition testimony makes clear that the Objecting

Parties had an ample opportunity to take discovery, and in no instance have they actually

demonstrated circumstances where the Debtors asserted mediation confidentiality to prevent the

Objecting Parties from questioning Mr. Kruger about the facts asserted in his original

Declaration or in his written direct testimony.  Accordingly, the Court should deny the Willkie

Negotiation Motion [Dkt. No. 4545] and the Ad Hoc Group Motion [Dkt. No. 4549].[12]

**C.      The Ad Hoc Group's Assertion That Mr. Kruger Should Not Be Allowed To Testify Because He "Relied Heavily" on Privileged Analyses Is Unsupported.**

10.     Finally, the Ad Hoc Group contends that the Debtors' privilege logs "appear to

imply that extensive legal advice was rendered [to the Board]" and that therefore "it appears that

Mr. Kruger relied heavily on written privileged analyses in deciding to settle."  (Ad Hoc Group

Motion ¶ 5.)  Arguing that "many of Mr. Kruger's summary conclusions expressed in his

Declaration proved to be supported only by the advice of counsel and the mediation privilege—

none of which was disclosed during discovery", the Ad Hoc Group seeks to exclude substantial

portions of Mr. Kruger's direct testimony.  (Ad Hoc Group Motion ¶ 10.)  That is a total non

sequitur.

---

[12] For the reasons stated above, the Court should also deny the same motions to the extent they seek to preclude the testimony of John Dubel regarding the mediation process and the arm's-length nature of the negotiations.  (Investor Negotiation Motion at 10; Ad Hoc Group Motion ¶ 10.)  The Objecting Parties had ample opportunity to question Mr. Dubel regarding these subjects, and he did not invoke any privilege or the protections of the Mediation Confidentiality Order when they did so.  (*See* Deposition of John Dubel ("**Dubel Dep. Tr.**") at 89:6-90:10, 94:18-25, 142:25-156:6, 161:22-162:6, Ex. 3)  The Objecting Parties' complaint that the Settlement Parties have used mediation confidentiality as both a sword and shield is thus, again, completely baseless.

ny-1104019

11.     The Ad Hoc Group is clearly hoping to create the illusion that Mr. Kruger's testimony in support of this Motion is based upon his reliance on advice of counsel and, on that basis, that advice of counsel must either be disclosed or any testimony based on the reliance of privileged advice must be excluded.  (*Id*. ¶ 8 (citing to *In re Residential Capital, LLC*, 491 B.R. 63, 70 (Bankr. S.D.N.Y. 2013).)  The premise of this argument is directly contradicted by the record.  First the Debtors have made absolutely clear that they are not asserting reliance on counsel as a basis for why this Motion should be granted.  (Kruger Dep. Tr. at 126:19-127:8.) *See In re Veeco Instruments, Inc., Sec. Litig.*, 05-MC-01695 (CM) (GAY), 2007 U.S. Dist. LEXIS 102363, at *23 (S.D.N.Y. June 28, 2007) (denying motion to preclude where "defendants have not asserted, and apparently do not intend to assert, an advice of counsel defense"); *see also Swift Spindrift, Ltd. v. Alvada Ins., Inc*., 09 Civ. 9342 (AJN) (FM), 2013 U.S. Dist. LEXIS 104296, at *18 (S.D.N.Y. July 24, 2013) (denying motion to compel, finding no at-issue waiver where party expressly disavowed reliance on counsel defense).  Second, while Mr. Kruger noted that, in his role as CRO he met with counsel on a number of topics during the mediation, in deciding to enter into the Settlement Agreement he made his own independent judgment.  (*See* Kruger Dep. Tr. at 126:6-14; Kruger Direct Test. ¶ 36.)  The Second Circuit has made clear that simply consulting with counsel is an insufficient basis on which to trigger a waiver of the privilege; instead a party must be actually _relying_ on privileged advice as a basis for a claim or defense to trigger a waiver.  *Pritchard v. County of Erie (In re County of Erie)*, 546 F.3d 222, 228-29 (2d Cir. 2008); *see Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 727 F. Supp. 2d 256, 273-74 (S.D.N.Y. 2010) (merely consulting with counsel is insufficient to trigger a waiver, the client must be relying on the advice as the basis for a claim or defense).

ny-1104019

12.     As the Ad Hoc Group itself recognizes, Mr. Kruger testified that he "had the authority under [his] Engagement Letter to negotiate, approve and execute the FGIC Settlement Agreement on behalf of the Debtors" on his own, but that he "kept the Board generally informed about these matters." (Kruger Direct Test. ¶ 15.)  Therefore, the extent to which the Debtors' privilege logs reflect that some privileged attorney-client advice was rendered to the Board is irrelevant, because the decision of whether to settle had been delegated to Mr. Kruger under the terms of his engagement letter.  (*See* Kruger Dep. Tr. at 38:15-23; Debtors' Ex. 30, Engagement Letter [Dkt. Nos. 2887-5, 3074-1].)  It also simply does not follow that Mr. Kruger relied on that same advice in deciding to settle.  As noted above, Mr. Kruger has testified repeatedly that he made the decision to enter into the Settlement Agreement based upon his own independent business judgment.  (Kruger Dep. Tr. at 68:7-11, 126:10-127:2; Kruger Direct Test. ¶ 36.)

13.     The Ad Hoc Group's assumption that Mr. Kruger relied on advice of counsel in deciding to settle is thus belied by the evidence.  And, as outlined above and on Exhibit 1, the Objecting Parties have had ample discovery to test the bases of the Debtors' business judgment.  Accordingly, their efforts to preclude Mr. Kruger's testimony about this basis must also fail.

## II.    THERE IS NO BASIS TO PRECLUDE ANY OF MR. LIPPS'S TESTIMONY.

14.     The Objecting Parties have also moved to preclude Mr. Lipps from testifying as an expert witness.  Mr. Lipps's testimony is completely appropriate in the context of a motion to approve a settlement under Bankruptcy Rule 9019, especially in light of the factors this Court must consider under *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007) ("*Iridium*").

15.     *First*, the Willkie Objecting Parties claim that Mr. Lipps's testimony should be precluded because it constitutes impermissible expert testimony on issues of law.  (Investor Lipps Motion at 6.)  But Mr. Lipps does not purport to opine on the ultimate issue before the

ny-1104019

Court.  Instead, his testimony is offered to assist the Court in evaluating the complexity of, and

the cost and risk of litigating, the claims and defenses that are being resolved by the proposed

FGIC settlement.  The Willkie Objecting Parties ignore the line of bankruptcy cases allowing

reliance on substantially similar testimony in evaluating the merits of a Rule 9019 settlement.

*See In re Isack Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009) (citing cases).  Indeed,

this Court has previously relied on similar opinions in evaluating Rule 9019 settlements.  *See,*

*e.g.*, *In re MF Global, Inc.*, No. 11-2790 (MG), 2012 Bankr. LEXIS 3701, at *17 (Bankr.

S.D.N.Y. Aug. 10, 2012) (Glenn, J.) ("[C]ourts may give weight to the opinion of bankruptcy

counsel supporting the settlement.")

16.     *Second,* the Willkie Objecting Parties take the unusual position that, because Mr.

Lipps's testimony does not address the proposed findings regarding the settlement being in the

best interests of the investors, his opinions should be completely excluded.  (Investor Lipps

Motion at 7.)  As Mr. Lipps clearly testified in his deposition (and as the Willkie Objecting

Parties quoted in the motion), that was not within the scope of his opinion.  The fact that an

expert's opinions only address certain issues in a case does not mean that expert's testimony is

inadmissible.

17.     *Third*, the Willkie Objecting Parties question Mr. Lipps's methodology and

expertise to offer his opinions.  (Investor Lipps Motion at 8-9.)  The Willkie Objecting Parties'

assault on Mr. Lipps's methodology in analyzing FGIC's and the FGIC Trustees' potential

claims against the Debtors misses its mark.  In forming his opinions, Mr. Lipps surveyed the case

law and applied it to the facts; in other words, he did the type of work other professionals in his

field do every day.  His analysis employed the requisite intellectual rigor normally employed by

experienced lawyers evaluating settlements.  Contrary to the allegations of the Willkie Objecting

Parties, Mr. Lipps's years of experience and his specialized experience in RMBS litigation make him well-qualified to give the opinions he offers here.

18.     *Fourth*, the Willkie Objecting Parties argue that Mr. Lipps cannot testify because of his role as the Debtors' counsel.  The Ad Hoc Group also uses this as the sole basis for their attempt to exclude Mr. Lipps's testimony.  *See* Ad Hoc Group Motion at 12-14.  Mr. Lipps was not involved in negotiating the FGIC Settlement Agreement or advising the Debtors whether or not to accept the settlement.

19.     *Finally,* the Willkie Objecting Parties allege that the Debtors *may* not have complied with their production burden with respect to Mr. Lipps's work product.  This is a red herring.  As the Debtors' counsel have previously and repeatedly advised the Willkie Objecting Parties, Mr. Lipps prepared no work papers in connection with his Declaration, and any documents that he did consider in providing his opinions have been identified and produced.

**A.     Mr. Lipps's Opinions Do Not Address the Ultimate Legal Issues.**

20.     Mr. Lipps's opinions do not address the ultimate legal issue this Court must decide:  whether the FGIC settlement is fair, equitable and in the best interests of the Debtors and their estates.  Instead, he opines on (a) the legal uncertainty regarding the underlying claims being released and the defenses to those claims, and (b) the expense of litigating those claims and defenses in the absence of a settlement.

21.     Contrary to the Willkie Objecting Parties' allegation, legal experts can provide testimony as long as they are not opining on the *ultimate* legal issue the Court has to decide. *Fiataruol v. United States*, 8 F.3d 930, 941 (2d Cir. 1993); *see also In re MF Global, Inc.*, 2012 Bankr. LEXIS 3701, at *17 (court relied on testimony of bankruptcy counsel on fairness of proposed settlement).  Expert opinions that address mixed questions of law and fact are proper and admissible. *Fiataruol*, 8 F.3d at 941 ("[e]xperts may testify on . . . mixed questions of fact

and law"); *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (same); *see MF Global, Inc.*, 2012 Bankr. LEXIS 3701, at \*17 ("courts may give weight to the opinion of bankruptcy counsel supporting the settlement").

22.    Furthermore, opinions of bankruptcy counsel are regularly admitted in the Second Circuit when evaluating whether a settlement is fair and equitable in light of the factors the Court must consider under *Iridium*. *See, e.g.*, *In re MF Global, Inc.*, 2012 Bankr. LEXIS 3701, at \*17; *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522-23 (S.D.N.Y. 1993) ("informed by the opinion of the parties, the Trustee, and counsel and its familiarity with the litigation, the bankruptcy court must make a considered, independent judgment as to whether a settlement is fair and equitable and 'in the best interests of the estate.'"); *In re Ambac Fin. Group, Inc.*, 457 B.R. 299, 306 (Bankr. S.D.N.Y. 2011) (citations omitted), *aff'd*, *Police & Fire Ret. Sys. of the City v. Ambac Fin. Group, Inc.*, Nos. 10-B-15973 (SCC), 11 Civ. 7529 (NRB), 2011 U.S. Dist. LEXIS 149610, at \*18-19 (S.D.N.Y. Dec. 28, 2011) (Rule 9019 settlement approved after consideration of declaration and testimony of debtors' general counsel on matters including discovery expenses and litigation burdens that would arise absent settlement), *aff'd*, 2012 U.S. App. LEXIS 14229 (2d Cir. July 12, 2012).

23.    In *MF Global*, this Court relied on the declaration of bankruptcy counsel in connection with a Rule 9019 motion. The *MF Global* declaration contained statements addressing the *Iridium* factors and, in approving the settlement, the Court cited that declaration when holding litigation "would be time consuming and expensive as these issues present novel issues of law and complex issues of fact." *In re MF Global, Inc.*, 2012 Bankr. LEXIS 3701, at \*20. Mr. Lipps's testimony addresses similar issues.

24.     The Willkie Objecting Parties fail to acknowledge, much less distinguish, *MF Global*.  Instead, the Willkie Objecting Parties rely on cases outside the bankruptcy context to support its argument that legal experts are *per se* prohibited.  But these cases do not address the well-established principle that a court, in considering a motion under Bankruptcy Rule 9019, "may credit and consider the opinion of the Trustee **and counsel** that the settlement is fair and equitable."  *In re Purofied Down Prods. Corp.*, 150 B.R. at 522 (emphasis added).

25.     Mr. Lipps's testimony does not address the ultimate legal issue this Court must resolve under Rule 9019 and, instead, simply provides the Court with some of the factual and legal background it needs to consider when evaluating certain of the *Iridium* factors.  Accordingly, the Court should reject the Willkie Objecting Parties' motion to exclude Mr. Lipps under Federal Rule of Evidence 702.

**B.      The Fact That Mr. Lipps Did Not Opine on All the Issues in the Present Litigation Does Not Preclude Him from Testifying.**

26.     Mr. Lipps's testimony addresses two issues.  First, he addresses the litigation risks involved with litigating the underlying contract and tort claims against the Debtors covered by the FGIC settlement.  Second, he addresses the litigation costs the Debtors' will likely face if FGIC and the FGIC Trustees were to litigate their claims against the Debtors instead of having them resolved as part of the FGIC Settlement.  The fact that his testimony does not speak to the Willkie Objecting Parties' objection to certain of the proposed findings in the proposed Order does not render his testimony inadmissible.  Mr. Lipps's testimony directly relates to two of the factors this Court must consider when evaluating whether to approve the FGIC Settlement:  the balance between the litigation's possibility of success and the settlement's future benefits and the likelihood of complex and protracted litigation.  *See Iridium*, 478 F.3d at 462.  The Ad Hoc Group has challenged whether the Debtors have satisfied each of these factors (*see* Ad Hoc

Group Supp. Obj. [Dkt. No. 4401 at 3]), and thus Mr. Lipps's testimony and opinions are relevant to and may assist the Court in assessing whether the FGIC Settlement should be approved.

### C.   Mr. Lipps's Methodology in Evaluating The FGIC Settlement Is Commonly Used by Attorneys Across the Country.

27.    Courts in the Second Circuit follow the long-standing principle that expert witnesses may "draw a conclusion from a set of observations based on extensive and specialized experience." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 1:00-1898, MDL 1358 (SAS), M21-88, 2008 U.S. Dist. LEXIS 37331, at *22 (S.D.N.Y. May 7, 2008).[13]  Indeed, an expert's testimony is deemed reliable as long as the expert applies his or her experience to the facts in a reasonable manner and the opinion is sufficiently based on the facts. *See id*. at *22-23. There is no requirement that an expert use or follow a particular methodology or quantitative analysis to render his testimony reliable, or provide the court with a plethora of numbers. *See id.* at *28-31; *see also Figueroa v. Boston Scientific Corp*., 254 F. Supp. 2d 361, 368 (S.D.N.Y. 2003) ("Even assuming [the expert] had no data to support his opinions, whether from his own testing or from others' data in the medical literature, such a contention is not fatal to the admissibility of his testimony.").  Rather, an expert may "properly rely on his experience to testify about all matters within his experience," if the expert "do[es] so with the same degree of intellectual rigor as a professional in his field." *See In re MTBE Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 37331, at *28.

---

[13] The standard for admissibility of expert testimony is somewhat relaxed in bench trials.  In *Joseph S. v. Hogan*, No. 06 Civ. 1042, 2011 U.S. Dist. LEXIS 76762, at *8 (E.D.N.Y. July 15, 2011), the court noted that the moving party was "essentially asking me to gate-keep expert testimony from myself.  Of course if the expert testimony amounts to pure speculation, it would have no probative value and would not assist the fact finder, be it the Court or the jury. But short of that, expert testimony should be admitted so that the Court could have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions."  *See also Victoria's Secret Stores Brand Mgmt. v. Sexy Hair Concepts, LLC*, No. 07 Civ. 5804, 2009 U.S. Dist. LEXIS 30458, at *18 n.3 (S.D.N.Y. April 8, 2009) ("[W]here a bench trial is in prospect, resolving *Daubert* questions at a pretrial stage is generally less efficient than simply hearing the evidence . . . .").

28.     The Willkie Objecting Parties claim Mr. Lipps lacks the relevant experience in

RMBS litigation to testify and that his prepetition experience in handling this very type of

litigation, including litigation brought by other monoline insurers, does not qualify him as an

expert with respect to the opinions he is offering.  (Investor Lipps Motion at 8-9.)  The Willkie

Objecting Parties completely ignore the fact that large-scale RMBS litigation is a recent

development with the first monoline suits only being filed in the fall of 2008.  *See MBIA Ins.*

*Corp. v. Countrywide Home Loans,* Case No. 602825/2008 (Sup. Ct., N.Y. Cnty., Sept. 30,

2008), Ex. 9.  *MBIA Ins. Co. v. Residential Funding Co.*, *LLC,* Case No. 08-cv-08819 (S.D.N.Y.

Oct. 15, 2008), Ex. 10.  Because of the fact intensive nature of discovery in these cases, the suits

have been slow moving.  As Mr. Lipps disclosed in his testimony only <u>one</u> monoline RMBS suit

has actually gone to trial—the *Assured Guaranty v. Flagstar* case.  (*See* Direct Testimony of

Jeffrey A. Lipps ("**Lipps Direct Test.**") ¶¶ 134-35 [Dkt. No. 4433].)

29.     The Willkie Objecting Parties claim that Mr. Lipps lacks experience as he has not

"so much as filed a dispositive motion."  (Investor Lipps Motion at 8.)  They fail to note,

however, that Mr. Lipps has filed motions to dismiss claims in litigation brought by monoline

insurers involving RMBS, and in fact, has obtained dismissal of certain claims.  *See, e.g., MBIA*

*Ins. Co. v. GMAC Mortg. LLC*, 914 N.Y.S.2d 604 (Sup. Ct., N.Y. Cnty. 2010) (dismissing claims

for negligent misrepresentation and breach of the covenant of good faith and fair dealing); *MBIA*

*Ins. Co. v. Residential Funding Co., LLC,* No. 603552/2008, (Sup. Ct., N.Y. Cnty. Nov. 9, 2010)

(dismissing claims for negligent misrepresentation, breach of good faith and fair dealing,

equitable and implied indemnification, and unjust enrichment), Ex. 11.  The fact that other

claims survived the motions to dismiss is not surprising, and in any event, does not indicate a

lack of expertise.

ny-1104019

30.     Other parties have recognized Mr. Lipps's expertise in RMBS litigation.  Before

the Debtors filed for bankruptcy, Mr. Lipps represented several third party underwriters in

RMBS securities litigation based on offerings sponsored by the Debtors.  *See, e.g., Union Cent.*

*Life Ins. Co. v. Credit Suisse First Boston Mortg. Sec. Corp.*, Case No. 11-cv-2890 (S.D.N.Y.

Mar. 30, 2012) (stipulation substituting Carpenter Lipps & Leland LLP in as counsel for, among

others, Deutsche Bank Securities, Inc.), Ex. 12; *Western & Southern Life Ins. Co. v. Residential*

*Funding Co., LLC*, Case No. A 1105042 (Ohio Ct. Common Pleas Dec. 9, 2011) (Carpenter

Lipps & Leland filing motion to dismiss amended complaint on behalf of Deutsche Bank

Securities Inc. and JP Morgan Securities LLC), Ex. 13.  In objecting to the RMBS 9019

settlement, the Creditors' Committee admitted that "it had little quarrel with the soundness of

many of Mr. Lipps's legal and factual conclusions."  (Committee Objection to Rule 9019 Motion

at 23 [Dkt. No. 2825].)  Recognizing Mr. Lipps's experience and expertise, the Examiner met

with Mr. Lipps to discuss the RMBS claims asserted by the Debtors and cited to that presentation

in his report.  (*See* Examiner Report at II-13, VIII-17 [Dkt. No. 3698].)  Moreover, this Court has

previously accepted Mr. Lipps's testimony concerning litigation burdens in support of the

Debtors' motion to extend the stay.  *See* July 10, 2012 Hearing Transcript in *Residential Capital,*

*LLC v. Allstate Ins. Co., et al.* Adv. Proc. No. 12-01671-mg (Bankr. S.D.N.Y.) at 137-38 [Dkt.

No. 75.].

31.     The Willkie Objecting Parties claim that Mr. Lipps's testimony is impermissible

"*ipse dixit*" analysis because he does not numerically quantify the risks of the claims.  (*See*

Investor Lipps Motion at 9.)  Mr. Lipps's methodology easily meets the *Daubert* standard.  In his

testimony, Mr. Lipps identifies the variety of data points he considered in forming his

conclusion, including the Debtors' repurchase rates, allegations in RMBS complaints, and

comparable RMBS settlements. (*See* Lipps Direct Test. ¶¶ 12, 14.) He also relied on his 30-plus

years of experience in complex commercial litigation and did what lawyers do every day: survey

case law and apply that law to a set of facts to assess the risks of proceeding with litigation. (*See*

*id*.) He reviewed the one monoline RMBS case that has been tried and analyzed the publicly

available information regarding settlements that resolved substantially similar claims. (*See id.*

¶¶ 134-139.) The Willkie Objecting Parties cannot reasonably characterize such a "detailed and

sophisticated" analysis as *ipse dixit* merely because Mr. Lipps did not assign numerical

probabilities to claims in an area of great uncertainty.

      32.     The Willkie Objecting Parties do not contest that professionals in Mr. Lipps's

field (*i.e.*, sophisticated litigation counsel) regularly employ similar techniques to evaluate the

merits of potential settlements. Instead, the Willkie Objecting Parties complain that Mr. Lipps

did not assign probabilities and dollar values to the various potential outcomes in litigation. But

this criticism rests on the faulty premise that an expert must employ specific quantitative

methods under the *Daubert* standard. *See In re MTBE Prods. Liab. Litig.*, 2008 U.S. Dist.

LEXIS 37331, at *28-31.

      33.     Under well-settled law, Mr. Lipps was only required to engage in the "same

degree of intellectual rigor as a professional in his field." *See id*. at *28. As explained above,

Mr. Lipps has easily met that standard in his testimony and opinions. The Willkie Objecting

Parties do not even try to refute Mr. Lipps's claim that the law governing the sale of mortgage-

backed securities is unsettled and fraught with uncertainty and that there is significant

uncertainty and risk about the outcome of the claims released by the FGIC Settlement

Agreement. (*See* Lipps Direct Test. ¶ 26.)

**D.** **Mr. Lipps's Work for The Debtors Is No Different Than the Work Done by Other Expert Witnesses.**

34.      The fact that Mr. Lipps has previously represented the Debtors in their pre-petition litigation with FGIC and in other aspects of these bankruptcy proceedings does not disqualify him as an expert.  Mr. Lipps had no involvement with negotiating the FGIC Settlement Agreement presently before the Court.  Mr. Lipps testified in his deposition that the first time he was shown the FGIC Settlement Agreement was on May 31, 2013, several days after it had already been publicly filed in the state court rehabilitation proceeding.  (Deposition of Jeffrey A. Lipps ("**Lipps Dep. Tr.**") at 15:10, Ex. 7; *see* Order to Show Cause, dated May 29, 2013, Ex. 14.)  Mr. Lipps also testified he did not participate in the plan mediation process or know the status of the mediation negotiations.  (Lipps Dep. Tr. at 64:4-10.)

35.      The Willkie Objecting Parties' reliance on *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), is misplaced.  In *Lippe*, the expert's opinion was excluded because the expert "develop[ed] [an] argument as counsel and then opin[ed] on it as an expert."  *Id*. at 684.  In contrast, bankruptcy courts routinely consider the opinions of bankruptcy counsel in analyzing settlements under the *Iridium* factors.  *See In re MF Global, Inc.*, 2012 Bankr. LEXIS 3701, at *17.  In *MF Global*, the attorney who submitted the declaration cited by this Court played a much more central role in settlement negotiations, and his name appeared on the signature block of the motion approving settlement.  (*See* Motion for Approval of an Agreement Providing for the Return of MFGI Property, Extinguishment of Duplicate Claims Filed with CME Group Inc., and Allocation of MFGI Property to Customers of the MFGI Estate, Dkt. No. 2029, Case No. 11-2790 (MG) SIPA (Bankr. S.D.N.Y. June 14, 2012), Ex. 15.)  Unlike the attorney in *MF Global*, Mr. Lipps did not play an advocacy role in connection with the FGIC Settlement and had no role in the negotiations leading up to the FGIC Settlement Agreement or in the plan mediation

process more generally.  In any event, any alleged bias of an expert witness goes to the weight of

the expert's testimony, not the admissibility.  *See, e.g.*, *Norwest Fin., Inc. v. Fernandez*, 86 F.

Supp. 2d 212, 228 n.15 (S.D.N.Y. 2000) ("'An expert witness's bias goes to the weight, not the

admissibility, of the testimony, and should be brought out on cross-examination.'") (quoting

4 Weinstein's *Federal Evidence* § 702.06[8], at 702-59 (2d ed. 1999))).

> **E.    The Debtors Have Complied with their Production Obligations in Respect to
> Mr. Lipps's Testimony.**

36.    The last objection advanced by the Willkie Objecting Parties is that Mr. Lipps

should be barred from testifying to the extent the Debtors have not produced Mr. Lipps's work

papers.  (Investor Lipps Motion at 11-13; Investor Reliance Motion at 12-13, 18-19).  As counsel

to the Debtors advised counsel to the Willkie Objecting Parties, before the filing of the *in limine*

motion, Mr. Lipps has no work papers to produce.  (*See* Email to M. Eaton, Ex. 16).

## III.    THERE IS NO BASIS TO PRECLUDE ANY OF DR. D'VARI'S TESTIMONY.

37.    Both the Ad Hoc Group and Freddie Mac seek to preclude certain expert

testimony of Dr. Ron D'Vari.  As demonstrated below, both motions lack merit.

38.    Dr. D'Vari's expert testimony presents straightforward and unassailable

calculations of possible lifetime collateral losses for the FGIC Insured Trusts and bond losses for

certain unwrapped tranches in the FGIC Insured Trusts.  For good reasons, Freddie Mac and the

Ad Hoc Group do not challenge Dr. D'Vari's methodology.  Approximately two-thirds of the

expected losses have already occurred and are simply a historical data point drawn from the

industry-standard third party data provider, Intex.  (*See* Direct Testimony of Dr. Ron D'Vari

("**D'Vari Direct Test.**") ¶ 23 [Dkt. No. 4432].)  And because the FGIC Insured Trusts are now

many years old, their continuing losses have stabilized, leaving relatively little room for

divergence of opinion as to the likely future losses.  (D'Vari Direct Test. ¶¶ 24, 37.)  None of this is disputed.

39.    Lacking any basis to challenge the merits of his analysis, Freddie Mac and the Ad Hoc Group seek to exclude Dr. D'Vari's testimony on the basis of two misleading and meritless arguments: (1) feigned confusion as to the meaning of Dr. D'Vari's calculations to assert that there is some inconsistency between Dr. D'Vari's Declaration and his Direct Testimony (*see* Freddie Mac Motion ¶ 2, 8-10, 12); and (2) a purported conflict of interest or lack of impartiality arising from Dr. D'Vari's prior work for FGIC, notwithstanding that this prior work, done several years ago, has no asserted—or conceivable—bearing on the opinion offered here and despite the fact that FGIC and the Debtors have no divergence of interests on this motion.  (*See* Ad Hoc Group Motion ¶¶ 15-18.)  As demonstrated below, neither of these arguments has any merit.

**A.    Dr. D'Vari's Declaration and Testimony Are Consistent and Freddie Mac's Transparent Mischaracterization of That Testimony Is Disingenuous**

40.    Dr. D'Vari calculated two things: (1) the expected *collateral* losses to the FGIC Insured *Trusts* and (2) the expected losses to *certificateholders* of Non-Wrapped Bonds.  (D'Vari Declaration ("**D'Vari Decl.**") ¶ 2 [Dkt. No. 3929-5].)[14]  The losses to the Wrapped Bonds, however is *not* simply the difference between those two numbers.  Freddie Mac knows this perfectly well, and its motion to preclude D'Vari's testimony based on that premise (Freddie Mac Motion ¶ 17) is disingenuous at best.

41.    Freddie Mac's objection to Dr. D'Vari's Direct Testimony is based on the false premise that every dollar of collateral loss translates to a dollar of loss to bondholders, so that all

---

[14] The reason Dr. D'Vari was asked to calculate those two numbers is because the FGIC Trustees have asserted that they are entitled to recover total *collateral* losses, and while the Settlement releases those claims, it does not release claims for losses to the holders of Non-Wrapped Bonds. (D'Vari Decl. ¶ 2.)

collateral losses must either be attributed to the Non-Wrapped Bonds or to the Wrapped Bonds.
On that basis, Freddie Mac asserts that the approximately $5 billion of *collateral* loss in excess
of losses to Non-Wrapped Bonds *must* be losses to the Wrapped Bonds. (*E.g.*, Freddie Mac
Motion ¶ 5.) Freddie Mac then feigns disbelief when Dr. D'Vari states otherwise. (*Id.* ¶¶ 9-10.)

42.    But, as Freddie Mac well knows, collateral losses do not translate automatically
into bond losses. No one ever expected the mortgage loans underlying the Trusts to suffer *zero*
collateral loss. In fact, the securitizations were structured to ensure that collateral losses *do not*
translate directly into losses to bondholders. Dr. D'Vari noted, for example, that the Bonds are
supported by over-collateralization as well as excess interest payments. (D'Vari Decl. ¶ 15, 34.)
In short, the FGIC Insured Trusts can—and were always expected to—suffer some collateral loss
without any resulting loss to bondholders.

43.    But the FGIC Trustees did not limit their proofs of claim to seeking losses to
bondholders, and instead assert that they are entitled to recover the entire collateral loss (*i.e.,*
even where it does not translate to bond losses). Dr. D'Vari clearly states that he is offering no
opinion on the legal merit of the FGIC Trustees' assertion that they are entitled to recover all
collateral losses. (D'Vari Direct Test. ¶ 2.) His calculation of expected lifetime collateral loss is
offered simply to place a dollar value on what the FGIC Trustees claim that they could be
entitled to recover, which they declined to quantify with a dollar value in their proofs of claim.

44.    Dr. D'Vari calculated expected collateral losses for the FGIC Insured Trusts to be
$5,414,532,474, and he calculated expected losses to Non-Wrapped Bonds to be $412,923,171.
(D'Vari Decl. ¶¶ 31, 55; D'Vari Direct Test. ¶¶ 40, 67 (same).) Dr. D'Vari also explained that,
assuming the collateral loss is what the FGIC Trustees seek in their proofs of claim, and the
losses to Non-Wrapped Bonds is the only portion not released by the Settlement, the released

-22-

portion would be $5,001,609,304. (D'Vari Decl. ¶ 56.) As explained above, the released portion would therefore include both the losses to Wrapped Bonds as well as—the part Freddie Mac ignores—all collateral losses to the FGIC Insured Trusts that exceed the losses to any bondholders.

45.     During his deposition, the questions put to Dr. D'Vari repeatedly tried to attribute the entire released *collateral* loss to the Wrapped Bonds, and Dr. D'Vari repeatedly explained that that simply was not the case:

> You just proved the difference is not something you can do mathematically and I don't believe any financial expert would do the numbers the way you are representing. The tranche losses are very specific calculations that are not directly and simply calculated from collateral losses because there are other cash flows that come into the picture and there is also priority of interests.

(Deposition of Ron D'Vari ("**D'Vari Dep. Tr.**") at 126:20-127:5 (explaining why the historical collateral losses so greatly exceed the historical losses to the Wrapped Bonds), Ex. 8; *see also, e.g.*, D'Vari Dep. Tr. at 100:4-6; 101:11-23; 102:1-15; 111:3-11; 113:6-20; 119:4-11). With the distinction between collateral losses and bond losses in mind, it is clear that there is no inconsistency in Dr. D'Vari's direct testimony. Despite the repeated attempts to misrepresent his analysis, Dr. D'Vari simply reiterated in his direct testimony that FGIC Insured Trusts' released claim for *collateral* losses is not the same as the expected losses to Wrapped *Bonds*.

**B.     There Is No Basis for the Ad Hoc Group's Accusation That Dr. D'Vari Is Conflicted Or Impartial Based on Prior Work for FGIC**

46.     The Ad Hoc Group asserts that Dr. D'Vari's testimony should be precluded because he previously did work for FGIC in 2010 and 2011, two years before his engagement by the Debtors (Ad Hoc Group Motion ¶ 2), and that because the substance of Dr. D'Vari's prior confidential work for FGIC has not been disclosed to them, they are left to speculate as to "how he could have possibly rendered an impartial and objective opinion for the Debtors." (*Id.* ¶ 17.)

ny-1104019

The argument fails because there is no asserted or conceivable way in which Dr. D'Vari's prior work for FGIC could have impacted the analysis he conducted for the Debtors in connection with this Motion.

      **1.**      **Dr. D'Vari's Prior Work for FGIC Provides No Basis for the Objecting Parties to Move to Exclude Him from Testifying.**

47.      In seeking to exclude Dr. D'Vari based on his prior work for FGIC, the Ad Hoc Group completely misapplies the standard for determining whether an expert witness is conflicted. This issue was recently addressed in *In re Dreier LLP*, 482 B.R. 863 (Bankr. S.D.N.Y. 2012), in which the court held:

> Where disqualification of an expert is sought ***based on a prior relationship between the expert and an adverse party***, courts apply a two-part test: (1) was it objectively reasonable for the first party who retained the expert to conclude that a confidential relationship existed, and (2) was confidential or privileged information disclosed by the first party to the expert?

482 B.R. at 869 (emphasis added). The analysis stops before the Ad Hoc Group even gets to the two prong test. The Ad Hoc Group does not claim any "**prior relationship**" between Dr. D'Vari and "**an adverse party**." Rather, the Ad Hoc Group claims that Dr. D'Vari had a prior confidential relationship with FGIC, which is a proponent of this Motion.

48.      Thus, the Ad Hoc Groups assertion that Dr. D'Vari cannot testify without "implicating his prior duties to FGIC to retain its confidences" (Ad Hoc Group Motion ¶ 17) makes no sense. FGIC itself has raised no concern that Dr. D'Vari's loss calculations implicate any of their confidential information, because they do not. And, the Ad Hoc Group cites no authority for the proposition that they can challenge Dr. D'Vari's testimony simply on the grounds that FGIC, which does not object to Dr. D'Vari's testimony as an expert, provided him with confidential information. The cases the Ad Hoc Group cite involve the moving party trying to protect their own confidential information. *See Bristol-Myers Squibb Co. v. Rhone-Poulenc*

*Rorer, Inc.,* No. 95 Civ. 8833 (RPP), 2000 WL 42202, at *4 (S.D.N.Y. Jan. 19, 2000) (plaintiff

challenging defendant's expert on the basis of its own "prior non-testimonial relationship" with

expert); *Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, No. 83 Civ. 8898 (MEL), 1989

WL 31514, at *3 (S.D.N.Y. Mar. 28, 1989) ("the moving parties contend that they gave [the

expert] confidential information").

49.    Moreover, "[i]t is not enough that the expert received confidential information in

the first litigation.  Under the second prong of the disqualification test, the confidential

information must be *relevant* to the current litigation, or substantially related."  *In re Dreier LLP*,

482 B.R. at 870 (internal citation omitted). "The movant must identify 'specific and

unambiguous disclosures that if revealed would prejudice the party'. . . . Mere conclusory or ipse

dixit assertions will not suffice." *Id.*  (internal quotations marks and citation omitted); *see also*

*Rodriguez* v. *Pataki*, 293 F. Supp. 2d 305, 312-13 (S.D.N.Y. 2003) (conclusory assertions

insufficient to meet burden to disqualify).

50.    Here there is no conceivable prejudice to the Objecting Parties because they have

no confidential information at stake.  Instead, the Ad Hoc Group asserts that, because FGIC

counsel instructed Dr. D'Vari not to reveal information about his prior work for FGIC—over

which FGIC claims both privilege and work product protection—they are left to speculate as to

whether FGIC's confidential information might be implicated.  (Ad Hoc Group Motion ¶ 17.)

The argument is nonsensical, amounting to an assertion that FGIC—which again does not object

to Dr. D'Vari's testimony—must divulge its privileged and confidential information to the Ad

Hoc Group so that they can confirm that Dr. D'Vari's testimony will not reveal that confidential

information to them.

51.     Moreover, Dr. D'Vari specifically testified that he "did not review, consider, or rely on NewOak's prior work for FGIC in connection with my work for the Debtors, and that prior analysis had no impact on my opinions expressed here." (D'Vari Direct. Test. ¶ 70; *see also* D'Vari Dep. Tr. 132:24-133:5, 136:10-138:22.) Dr. D'Vari clearly testified that he did not consider or use any of this prior work for FGIC in forming his opinions. (D'Vari Dep. Tr. 132:24-133:5, 136:10-138:22.) He also testified that none of his staff at NewOak who worked with him in this matter also worked on the prior work for FGIC. (D'Vari Dep. Tr. 129:6-22.)

52.     Thus, the Ad Hoc Group offers no basis for concluding that Dr. D'Vari's "prior expert retention *could* potentially impact the proposed expert's current testimony." (Ad Hoc Group Motion ¶ 2 (emphasis added).) They simply note that Dr. D'Vari previously conducted analysis that included the same FGIC Insured Trusts. (*Id.* ¶ 16.) But that could not possibly have any bearing on his current analysis. As Dr. D'Vari explained, the only trust-specific information used in his analysis is the publicly available historical data and cash flow model of each trust that is maintained by Intex. (D'Vari Direct Test. ¶¶ 23, 26.) To project future losses, Dr. D'Vari starts with that public information and applies NewOak's macro-economic forecasts for housing prices, unemployment, and the like. As Dr. D'Vari explained, those macro-economic forecasts are arrived at by committee based on general market information, independent of any particular engagement. (D'Vari Direct Test. ¶¶ 30-31.) NewOak's macroeconomic forecasts used for his opinions offered here were produced (*see* D'Vari Dep. Exhs. 1-3), and no one has disputed the reasonableness of those forecasts or suggested any way in which NewOak's current forecasts could be impacted by work for FGIC two years ago.

53.     Because Dr. D'Vari's prior work for FGIC has no asserted or conceivable impact on his current testimony, and because Dr. D'Vari has expressly testified that the prior work in

-26-

fact had no impact on his current testimony, there is no basis to preclude his testimony here.  The

decision in *TVT Records v. Island Def Jam Music Group*, 250 F. Supp. 2d 341 (S.D.N.Y. 2003)

is instructive.  There, an expert's testimony was allowed because:

> TVT does not assert that any information [the expert] may have acquired in the
> course of those services formed the basis of the content of his report in this case
> . . . TVT does not adequately explain what portions of this report may reflect
> improper reliance on confidential information . . . [and the expert] represents that,
> in authoring the reports submitted in connection with TVT's present dispute with
> IDJ, he did not rely on any information previously conveyed to him by TVT
> during their past relationship.

*TVT Records*, 250 F. Supp. 2d at 345.  The same is true here, and Dr. D'Vari's testimony should

be allowed for all the same reasons.

### 2.    The Debtors Fully Disclosed Dr. D'Vari's Prior Work for FGIC Long Before His Deposition.

54.    In moving to exclude Dr. D'Vari's testimony, the Ad Hoc Group seeks to create

the misimpression that Dr. D'Vari's prior work for FGIC first came to light during the course of

his deposition.  That is false.

55.    The Ad Hoc Group acknowledges that, shortly after his retention by the Debtors

to provide expert testimony in connection with the Motion, the Debtors filed a motion to retain

Dr. D'Vari.[15]  The Ad Hoc Group even quotes from the retention application.  (Ad Hoc Group

Motion at 10.)  Incredibly, the Ad Hoc Group fails to mention that in the application, the Debtors

publicly disclosed that Dr. D'Vari had previously performed stress case scenario analyses of

FGIC's financial guaranty portfolio in 2010 and 2011.  The application specifically provides:

> NewOak provided independent advisory services to FGIC in the fourth quarter of
> 2010 and into 2011, estimating future cash flow liabilities for FGIC under certain
> stress scenarios with respect to FGIC's financial guaranty portfolio, including
> wrapped public finance and structured finance transactions.

---

[15] *See* Notice of Presentment of Debtors' Application for an Order under Bankruptcy Code Sections 327(A) and
328(A) Authorizing the Employment and Retention of NewOak Capital Advisors LLC as Consultant Nunc Pro Tunc
to May 24, 2013 [Dkt. No. 3953].

ny-1104019

D'Vari Retention Decl., dated June 11, 2013 [Dkt. No. 3953-2]. After omitting the most

important part of the retention application, the Ad Hoc Group proceeds directly to discuss Dr.

D'Vari's deposition, stating that "[a]t Mr. D'Vari's deposition, however, he testified that he and

NewOak had provided services to FGIC related to the very same FGIC Insured Trusts . . ." (Ad

Hoc Group Motion at 11.)

56.     Notwithstanding, the Ad Hoc Group's misleading recitation of the events, the

Debtors fully disclosed Dr. D'Vari's prior work for FGIC. Dr. D'Vari's retention application

was on file days before the Objecting Parties served their initial document demands in this

matter. It speaks volumes that none of the Objecting Parties said a single word about Dr.

D'Vari's prior work for FGIC until his deposition on the day before the close of discovery.[16]

With its motion, the Ad Hoc Group seeks to create issues where none exist.

---

[16] In a footnote, the Ad Hoc Group further suggests that Dr. D'Vari should not be allowed to testify because FGIC did not agree to waive privilege and work product protection over Dr. D'Vari's prior work. (Ad Hoc Group Motion at 11 n. 3.) FGIC fully set forth the basis for its position in a letter to the Objecting Parties. (Jones Day Letter, dated July 29, 2013, Ex. 17.) None of the Objecting Parties moved for production of that material. In any event, the Debtors do not have Dr. D'Vari's prior work product, and Dr. D'Vari does not have the right to produce his prior work product over which FGIC asserts privilege and work product protection. Even if Dr. D'Vari had the authority to disclose his prior work product, it is not subject to discovery under Federal Rule of Civil Procedure 26(a)(2)(B), to the extent it applies in a contested matter under Bankruptcy Rule 9014(c), nor Federal Rule of Civil Procedure 26(b)(4). It is clearly protected work product, and Dr. D'Vari did not consider or rely on that work in forming his opinions here. In fact, he testified that he would not have reviewed a two-year old stress case analysis for bond losses on all FGIC trusts, including non-Debtor sponsored trusts, when he was performing present day base case lifetime collateral loss analysis of a subset of the FGIC trusts.

ny-1104019

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court deny each of the seven

motions *in limine* filed by the Objecting Parties.

New York, New York  
Dated: August 13, 2013

/s/ Gary S. Lee  
Gary S. Lee  
Anthony Princi  
Charles L. Kerr  
J. Alexander Lawrence  
James A. Newton  
MORRISON & FOERSTER LLP  
1290 Avenue of the Americas  
New York, New York 10104  
Telephone: (212) 468-8000  
Facsimile: (212) 468-7900

*Counsel to the Debtors*  
*and Debtors in Possession*

ny-1104019