# Exhibit 2

Page 1

1                          L. Kruger

2            UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4

5      ---------------------------x

6      In Re:                              Case No.

                                           12-12020(MG)

7      RESIDENTIAL CAPITAL, LLC,

       et al.,                    (Jointly Administered)

8                                   (Bankr. S.D.N.Y.)

               Debtors

9

       ---------------------------x

10

11

12

13

14

15            DEPOSITION OF LEWIS KRUGER

16              New York, New York

17            Thursday, July 11, 2013

18

19

20

21

22

23     Reported by:

24     THOMAS A. FERNICOLA, RPR

25     JOB NO. 63547

Page 2

L. Kruger

July 11, 2013
10:06 a.m.

Deposition of LEWIS KRUGER, held at the Law Offices of White & Case, LLP, 1155 Avenue of the Americas, New York, New York, before Thomas A. Fernicola, a Registered Professional Reporter and Notary Public of the State of New York.

Page 3

L. Kruger
A P P E A R A N C E S:

WHITE & CASE
Attorneys for the Ad Hoc Group of
  Junior Secured Noteholders
  1155 Avenue of the Americas
  New York, New York  10036
BY:  J. CHRISTOPHER SHORE, ESQ.
  VANESSA SODERBERG, ESQ.

MORRISON & FOERSTER
Attorneys for the Debtor and the Witness
  1290 Avenue of the Americas
  New York, New York 10104
BY:  CHARLES KERR, ESQ.
  J. ALEXANDER LAWRENCE, ESQ.

Page 4

L. Kruger
A P P E A R A N C E S (Continued):

KRAMER LEVIN NAFTALIS & FRANKEL
Attorneys for the Official Committee
  of Unsecured Creditors
  1177 Avenue of the Americas
  New York, New York  10036
BY:  PHILIP KAUFMAN, ESQ.
  DANIEL EGGERMANN, ESQ.

WILLKIE FARR & GALLAGHER
Attorneys for Monarch, Stonehill,
  Bayview and CQS
  787 Seventh Avenue
  New York, New York  10019
BY:  MARY EATON, ESQ.
  EMMA JAMES, ESQ.

Page 5

L. Kruger
A P P E A R A N C E S (Continued):

JONES DAY
Attorneys for FGIC
  222 East 41st Street
  New York, New York  10017
BY:  RICHARD WYNNE, ESQ.

ALSTON & BIRD
Attorneys for Wells Fargo
  90 Park Avenue
  New York, New York  10016
BY:  WILLIAM HAO, ESQ.

McKOOL SMITH
Attorneys for Freddie Mac
  One Bryant Park
  New York, New York  10036
BY:  MICHAEL CARNEY, ESQ.

2  (Pages 2 to 5)

Page 6

1      L. Kruger
2  A P P E A R A N C E S  (Continued):
3
4      DECHERT
5      Attorneys for Bank of New York Mellon
6        1095 Avenue of the Americas
7        New York, New York  10036
8      BY:  JAMES MOORE, ESQ.
9
10
11     SEWARD & KISSEL
12     Attorneys for Law Debenture Trust
13       Company of New York
14       One Battery Park
15       New York, New York  10004
16     BY:  MICHAEL WEITMAN, ESQ.
17
18
19
20
21
22
23
24
25

Page 7

1      L. Kruger
2  A P P E A R A N C E S  (Continued):
3
4      ROPES & GRAY
5      Attorneys for Steering Committee of
6      RMBS Holders
7        800 Boylston Street
8        Boston, Massachusetts  02199
9      BY:  ANDREW DEVORE, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1      L. Kruger
2  L E W I S  K R U G E R,
3     called as a witness, having been duly sworn
4     by a Notary Public, was examined and
5     testified as follows:
6  BY THE REPORTER:
7     Q.   Please state your full name and
8  address for the record.
9     A.   Lewis Kruger, 257 West 86th Street,
10  New York, New York.
11     (A Discussion was Held off the
12  Record.)
13     MS. EATON:  Mary Eaton, Willkie
14  Farr & Gallagher, on behalf of Monarch,
15  Stonehill, Bayview and CQS, together with
16  my colleague, Emma James.
17     MR. KERR:  Charles Kerr of Morrison
18  Foerster, on behalf of the debtor.  And
19  I'll be representing Mr. Kruger, and with
20  my colleague, Alex Lawrence.
21     MR. WYNNE:  Richard Wynne of Jones
22  Day on behalf of FGIC.
23     MR. HAO:  William Hao, on behalf of
24  Wells Fargo.
25     MR. KAUFMAN:  Phillip Kaufman from

Page 9

1      L. Kruger
2  Kramer Levin, on behalf of the committee.
3  And with me is Daniel Eggermann, also on
4  behalf of the committee.
5     MR. CARNEY:  Michael Carney from
6  McKool Smith, on behalf of Freddie Mac.
7     MR. MOORE:  James Moore from Dechert,
8  on behalf of Bank of New York Mellon.
9     MR. WEITMAN:  Mike Weitman from
10  Seward & Kissel, on behalf of Law
11  Debenture.
12     MS. SODERBERG:  Vanessa Soderberg
13  from White & Case, on behalf of Junior
14  Secured Noteholders.
15     MR. SHORE:  Chris Shore from White &
16  Case on behalf of Junior Secured
17  Noteholders.
18
19  EXAMINATION BY MS. EATON:
20     Q.   Good morning, Mr. Kruger.  I see
21  you've got a cup of coffee --
22     A.   I do.
23     Q.   -- and you're comfortable, I hope.
24     A.   I am.
25     Q.   If ever you need a --

3  (Pages 6 to 9)

## Page 10

L. Kruger

1
2      MR. KERR:  Let her -- he is the most
3  important person here --
4      THE WITNESS:  Okay.
5      MR. KERR:  -- so let her ask her
6  question and then you respond.
7  BY MS. EATON:
8      Q.   If ever you need a break, just let me
9  know and we'll take one for you.
10      A.   Thank you.
11      Q.   Now, I understand that you served or
12  are still serving as chief restructuring
13  officer of the debtors?
14      A.   Yes, I am.
15      Q.   And you were appointed in that role,
16  I believe on February 11th of 2013?
17      A.   Yes.
18      Q.   And is it also correct that the court
19  approved your appointment as CRO of the debtors
20  on March 5, 2013?
21      A.   That is correct.
22      Q.   Now, I have read a little bit about
23  your background.  You've worked for many years
24  as a restructuring attorney; is that correct?
25      A.   Yes, it is.

## Page 11

L. Kruger

1
2      Q.   And prior to your serving as CRO of
3  the debtors, you were a partner at Stroock; is
4  that correct?
5      A.   Correct.
6      Q.   And you were co-head of the
7  restructuring department at that firm?
8      A.   Yes.
9      Q.   When you started in your role as
10  chief restructuring officer of the debtors, you
11  were not serving the debtors in any kind of
12  legal capacity, were you?
13      A.   No, I was not.
14      Q.   It was not part of your role as CRO
15  to give legal advice to the debtors; correct?
16      A.   Correct.
17      MS. EATON:  This will be Kruger 1.
18  BY MS. EATON:
19      Q.   In a moment the court reporter is
20  going to be handing you a document that we will
21  mark as Kruger Exhibit 1, which is the
22  Settlement Agreement dated as of May 23, 2013,
23  filed in the debtor's Chapter 11 cases under
24  Docket No. 3929-2.
25

## Page 12

L. Kruger

1
2      (Kruger's Exhibit 1, Settlement
3      Agreement dated May 23, 2013, was marked
4      for identification.)
5  BY MS. EATON:
6      Q.   Are you familiar with this document?
7      A.   Yes, I am.
8      Q.   And this is the Settlement Agreement
9  between the parties listed on this second
10  physical page of the document, between FGIC,
11  the debtors, the trustees and others?
12      A.   Yes.
13      Q.   If I refer to this as the "FGIC
14  Settlement Agreement," would that be all right
15  with you?
16      A.   Yes, it will be.
17      Q.   By the way, did you refer to this
18  agreement using any particular description?
19      A.   No.
20      Q.   When did you first become aware of
21  the FGIC Settlement Agreement?
22      A.   During the latter part of May of this
23  year.
24      Q.   How did you first become aware of the
25  FGIC Settlement Agreement?

## Page 13

L. Kruger

1
2      A.   I saw the document May 20th, 22nd,
3  23rd, some date like that.
4      Q.   How did you come to first see the
5  FGIC Settlement Agreement on or about May 23,
6  2013?
7      A.   I don't recall.
8      Q.   You don't remember who showed it to
9  you?
10      A.   No.
11      Q.   You don't remember if your counsel
12  provided it to you?
13      A.   I just don't recall.
14      Q.   Were you aware of the existence of a
15  settlement agreement involving the FGIC wrapped
16  trusts before May 23, 2013?
17      A.   I'm sorry, can you repeat the
18  question?  You're talking about a settlement
19  agreement or a settlement?
20      Q.   It's a fair point.
21      Prior to May 23, 2013, were you aware
22  that there were discussions underway between
23  and among FGIC, the trustees and others, with
24  respect to potential commutation of the FGIC
25  wrapped policies?

4 (Pages 10 to 13)

Page 14

L. Kruger

1  
2      MR. KERR:  Objection.
3  BY MS. EATON:
4      Q.    You can answer.
5      A.    Yes.
6      Q.    And how did you become aware that
7  there were negotiations on that subject?
8      A.    In, I guess in early April as part of
9  the mediation, I became aware that there was a
10 prospective settlement between FGIC and the
11 trusts.
12     Q.    Did you say a "prospective
13 settlement"?
14     A.    Yes.
15     Q.    How did you come to learn that there
16 was a prospective settlement of that sort?
17     A.    Through the mediation process.
18     Q.    What do you mean by that?
19     MR. KERR:  Mary, we're going to
20 have -- let me just help the witness here.
21     MS. EATON:  Well --
22     MR. KERR:  No.
23     MS. EATON:  -- they're his words.
24 Those are the words he used.  I'm just
25 asking him what he meant by that, and I

Page 15

L. Kruger

1  
2  prefer that you not make speaking
3  objections or assist the witness in
4  answering a question regarding his own
5  language.
6      MR. KERR:  I'm not trying to assist
7  the witness.  All I wanted to state is, as
8  you were aware, there is an order entered
9  by the court providing for confidentiality
10 with respect to the mediation.
11     In answering any questions,
12 Mr. Kruger, is respecting that
13 confidentiality.  So he is free to answer
14 questions as he can, consistent with that
15 confidentiality order.
16     I just want to be very clear that
17 what he is going to be acting and
18 testifying consistently.  Okay.
19     MS. EATON:  I understand your
20 position.  You understand we disagree with
21 that position.  Both of us are reserving
22 our rights.
23 BY MS. EATON:
24     Q.    Can you please answer the question,
25 Mr. Kruger, what did you mean when you used the

Page 16

L. Kruger

1  
2  words, quote, "through the mediation process,"
3  close quote?
4      A.    I saw a -- I saw a proposal for a
5  settlement.
6      Q.    A physical proposal, as in a
7  document?
8      A.    I believe so.
9      Q.    Was it a term sheet?
10     A.    I think it may have been.
11     Q.    It wasn't a fully fleshed out
12 agreement in any sense of that term; is that
13 fair?
14     A.    Yes.
15     Q.    Who showed you the proposal?
16     A.    I don't recall.
17     Q.    Was it during a mediation session,
18 per se, with the mediator that you saw that
19 document?
20     MR. KERR:  Objection.
21 BY MS. EATON:
22     Q.    Let me fix it.
23     Was it in a session at which the
24 mediator was present that you first saw that
25 document?

Page 17

L. Kruger

1  
2      A.    I just don't recall.
3      Q.    It could have been in the presence of
4  Judge Peck or outside the presence of Judge
5  Peck?
6      MR. KERR:  Objection.
7      A.    No.
8      Q.    You don't remember one way or the
9  other?
10     A.    No.
11     Q.    Who else was there?
12     A.    I think counsel from MoFo.
13     Q.    Anyone else?
14     A.    Not that I recall.
15     Q.    Was it counsel from MoFo who showed
16 you the document?
17     A.    I don't recall.
18     Q.    Do you have any understanding of how
19 that document came to be, that is, how it came
20 to be prepared?
21     A.    No, I don't.
22     Q.    Do you know who was involved in
23 preparing the document?
24     A.    No, I don't.
25     Q.    Do you know anything at all about the

Page 18

L. Kruger

1  L. Kruger
2  discussions that led to the preparation of that
3  document?
4      A.  No.
5      Q.  That's a "yes" or "no" question.
6          MR. KERR:  That's fair.
7  BY MS. EATON:
8      Q.  Let me, just so the court reporter
9  gets it down straight, do you know anything at
10 all about the facts and circumstances that led
11 to the preparation of that document?
12     A.  No, I do not.
13     Q.  Would it be fair to say that you
14 personally had no idea that there were
15 discussions underway about an -- possible
16 settlement involving the FGIC wrapped trusts?
17         MR. KERR:  Objection.
18     A.  I don't recall knowing anything about
19 that before I saw the April presentation.
20     Q.  Prior to the date when you saw that
21 that document, the term sheet, had you
22 participated in mediation sessions with
23 Magistrate Judge Peck?
24     A.  Yes.
25     Q.  And during any of those sessions, was

Page 19

1  L. Kruger
2  the subject of a potential settlement involving
3  the FGIC wrapped trusts ever discussed?  I'm
4  not asking you to describe it, just "yes" or
5  "no," was it ever discussed?
6          MR. KERR:  And I will let him answer
7      that question, but no further, if you
8      recall.
9      A.  Yes.
10     Q.  When?
11     A.  During mediation sessions.
12     Q.  Can you give the date?
13     A.  No.
14     Q.  Even an approximate date?
15     A.  March.
16     Q.  Some time in March?  Early March,
17 late March, any idea?
18     A.  No recollection.
19     Q.  Who was at the mediation session when
20 that subject was raised?
21     A.  I have no idea.
22     Q.  Was it the -- was it an all-hands
23 session?  Do you know what I mean by that?
24         MR. KERR:  Objection.
25

Page 20

1  L. Kruger
2  BY MS. EATON:
3      Q.  Okay.
4          Let me rephrase the question.
5          There were -- isn't it correct that
6  there were sessions with the mediator that
7  sometimes involved all of the mediating parties
8  and sometimes involved a subset of the
9  mediating parties?
10     A.  Yes.
11     Q.  At this particular session that you
12 described, was this an occasion where all of
13 the mediating parties were present or rather an
14 occasion where a subset of the mediation
15 parties were present?
16         MR. KERR:  Objection to form.
17     A.  I think a subset.  I don't recall.
18     Q.  At that session, did anyone present
19 indicate whether the prospective settlement
20 under discussion had been reduced to any kind
21 of a writing?
22         MR. KERR:  Objection.  And I'll
23     direct him not to answer that in
24     confidentiality, based on the
25     confidentiality mediation.

Page 21

1  L. Kruger
2  BY MS. EATON:
3      Q.  I assume you're going to follow your
4  counsel's direction.
5      A.  I am going to in this case.
6      Q.  Do you know who was involved in those
7  discussions about this potential settlement?
8          MR. KERR:  Objection.  Asked and
9      answered.
10     A.  No.
11     Q.  Do you know whether anyone else at
12 the debtor's knew who was involved in those
13 discussions?
14     A.  I don't know.
15     Q.  Is that something that you would have
16 known in your capacity as chief restructuring
17 officer of the debtor's?
18         MR. KERR:  Objection.
19     A.  I just don't know whether anybody
20 from the debtor had any of those discussions.
21     Q.  Did you have discussions with --
22 leaving aside, the debtors have a board of
23 directors; right?
24     A.  Yes.
25     Q.  And you discussed from time to time

6 (Pages 18 to 21)

Page 22

L. Kruger

1  the progress of discussions, mediation
2  discussions, didn't you?
3  A.  Yes.
4  Q.  You would report to the board on what
5  was occurring during the mediation sessions?
6  A.  Yes.
7  Q.  Apart from members of the board, did
8  you discuss the mediation with anyone else at
9  the debtors?  And I'm excluding the debtor's
10  outside counsel.
11  MR. KERR:  So anyone other than
12  board?
13  BY MS. EATON:
14  Q.  Anyone other than board and apart
15  from the debtor's outside counsel, did you
16  discuss with anyone else at the debtor's
17  anything to do with the mediation?
18  A.  Not that I recall.
19  Q.  At the mediation sessions, did anyone
20  from the debtors present the debtors other than
21  yourself?  And, again, I'm excluding outside
22  counsel.
23  A.  No.
24  Q.  But you yourself represented the

Page 23

L. Kruger

1  debtors at those sessions?
2  A.  Yes.
3  Q.  I just want to make sure I understand
4  something.
5  So in early April when you learned of
6  this prospective settlement, I think is what
7  you said, would it be fair to say this was news
8  to you?
9  MR. KERR:  Objection.  Asked and
10  answered.
11  THE WITNESS:  Can I answer?
12  MR. KERR:  You can answer.
13  A.  Yes.
14  Q.  During the period between this
15  mediation session in early April and the time
16  you first saw the agreement on May 23rd, did
17  you have any discussions about the FGIC
18  settlement or a prospective FGIC settlement?
19  MR. KERR:  You can answer that "yes"
20  or "no."
21  A.  No.
22  Q.  When you first learned about the
23  prospective FGIC settlement in early
24  April 2013, did you report that fact to the

Page 24

L. Kruger

1  debtors, the board of directors of the debtors?
2  A.  I don't recall.
3  Q.  Did you discuss that with the
4  debtor's outside counsel, "yes" or "no"?
5  A.  Yes.
6  Q.  You did?
7  A.  Yes.
8  Q.  On how many occasions?
9  A.  Several.
10  Q.  Did you discuss that the settlement,
11  the FGIC settlement with the board on or about
12  May 23rd?
13  A.  Yes.
14  Q.  But you had not discussed the FGIC
15  settlement or a prospective FGIC settlement
16  with the board before that date; correct?
17  A.  No, that's not correct.
18  Q.  Okay.
19  Then I misunderstood.  When did you
20  discuss the FGIC settlement or the prospective
21  FGIC settlement with the board of directors of
22  the debtor's?
23  A.  My best recollection is probably
24  early May.

Page 25

L. Kruger

1  Q.  Is that the first time that you
2  discussed the prospective FGIC settlement with
3  the board?
4  A.  I think so.
5  Q.  Did you discuss the, either the
6  settlement itself or the prospective FGIC
7  settlement with the board after that?
8  A.  Yes.
9  Q.  How many times?
10  A.  I don't recall.
11  Q.  More than once?
12  A.  I just don't recall.
13  Q.  What did you discuss in this early
14  May discussion you had with --
15  MS. EATON:  Let me get my question
16  out and you can make your objection.  I
17  think you know that's the way it works.
18  BY MS. EATON:
19  Q.  Was this early May discussion with
20  debtor's board that you referenced, was
21  that at a board meeting?
22  A.  Yes.
23  Q.  Was it a telephonic board meeting,
24  in-person meeting?

7 (Pages 22 to 25)

Page 26

L. Kruger

1
2    A.    I don't recall.
3    Q.    Would your time records reflect
4    whether it was an in-person meeting or a
5    telephonic meeting?
6    A.    They probably do.
7    Q.    By the way, did you -- you're aware
8    that there was a request for documents made in
9    connection with the present dispute?
10    A.    Yes.
11    Q.    Did you look for any documents?
12    A.    Yes, I did.
13    Q.    Okay.
14        Did you look at your time records?
15    A.    I reviewed them myself.
16    Q.    To see whether they were responsive
17    to the request that had been propounded;
18    correct?
19    A.    Yes.
20    Q.    And did you find anything in your
21    time records that was responsive?
22    A.    I don't think so.
23    Q.    Was there a reference in your time
24    records to the early May board meeting?
25    A.    I don't recall.

Page 27

L. Kruger

1
2    Q.    Was the settlement agreement
3    referenced in your time records at all?
4    A.    Well, the settlement agreement didn't
5    come into existence until the latter part of
6    May.
7    Q.    Uh-huh.
8    A.    I could not have referenced it prior
9    to that time.
10    Q.    That wasn't a time limited question,
11    actually, so if you were confused, let's get
12    that sorted out.
13        Let's talk about your time records
14    generally.  And correct me if I am wrong, I
15    understood that -- you to say, to testify, that
16    in connection with producing documents as part
17    of this, the present motion, you reviewed your
18    time records for responsive information.
19    A.    Correct.
20    Q.    And did you see anything in reviewing
21    your time records that referenced the FGIC
22    Settlement Agreement?
23    A.    No.
24    Q.    Did you see anything in your time
25    records that referenced a prospective FGIC

Page 28

L. Kruger

1
2    settlement?
3    A.    No.
4    Q.    Discussions about a potential FGIC
5    settlement?
6    A.    I don't recall seeing it.
7    Q.    What did your time records say about
8    this meeting with the board in early May 2013?
9        MR. KERR:  Objection.  Assumes facts
10    not in evidence.
11    BY MS. EATON:
12    Q.    Do your time records reflect the fact
13    that there was a board meeting in early
14    May 2013?
15    A.    I believe so.
16    Q.    What do your time records say about
17    that meeting, if anything?
18    A.    I don't recall.
19    Q.    Are there minutes of that meeting?
20    A.    I don't know.
21    Q.    Was there a person responsible for
22    preparing minutes of the board of directors
23    meetings?
24    A.    I don't know.
25    Q.    Have you ever seen minutes of the

Page 29

L. Kruger

1
2    meetings of the board of directors of the
3    debtor's that you attended?
4    A.    No.
5    Q.    Neither the final minutes nor draft
6    minutes?
7    A.    No.
8    Q.    Does the board of directors of the
9    debtors maintain a minute book?  Do the debtors
10    maintain a book of minutes reflecting the
11    meetings of its board?
12    A.    I don't know.
13    Q.    You have no idea one way or the
14    other?
15    A.    Correct.
16    Q.    So when you were brought on as chief
17    restructuring officer of the debtors, you did
18    not as part of your duties, you did not look at
19    any board minutes in connection with that; is
20    that right?
21    A.    That's correct.
22    Q.    And you didn't ask anybody whether
23    there were any minutes?
24    A.    That's correct.
25    Q.    And you didn't ask anybody whether

8 (Pages 26 to 29)

Page 30

L. Kruger

1  the board had made any decisions with respect
2  to the issues in dispute in connection with the
3  Chapter 11 cases more generally?
4      MR. KERR:  Objection.
5      A.   Do you want to ask me that question
6  again?
7      MR. KERR:  Could we have the question
8  read back.
9      MS. EATON:  I'll withdraw that --
10 I'll withdraw the question.
11 BY MS. EATON:
12     Q.   Do you know whether the board passed
13 any resolutions related to the FGIC settlement
14 agreement?
15     A.   I believe so.
16     Q.   And were you at the meeting of the
17 board of directors where that resolution was
18 passed?
19     A.   Yes.
20     Q.   And was a written resolution provided
21 to the members of the board in advance of the
22 vote?
23     A.   I don't know.
24     Q.   You don't remember one way or the

Page 31

L. Kruger

1  other?
2      A.   No, I don't remember.
3      Q.   Do you remember what the resolution
4  said?
5      A.   The board authorized me to proceed
6  with the FGIC settlement.
7      Q.   And when did the board give you that
8  authorization?
9      A.   During May of 2013.
10     Q.   At what meeting?
11     A.   I don't recall.
12     Q.   How many meetings of the board of
13 directors took place in May 2013?
14     A.   Several.
15     Q.   Presumably it was some time before
16 May 23rd?
17     A.   Yes.
18     Q.   What did you and the board discuss
19 about with respect to your being authorized to
20 proceed with the FGIC settlement?
21     MR. KERR:  And here I'm going to
22 interject, and I believe you can ask the
23 witness, I believe the board meetings were
24 with counsel present.  And to the extent

Page 32

L. Kruger

1  they were, I think we're going to assert
2  attorney-client privilege.
3      So if you want to determine that, you
4  can; but to the extent that these board
5  meetings were with counsel present, we will
6  assert a privilege.
7      MR. MOORE:  Just a clarification from
8  counsel.  Irrespective of what was said,
9  it's just the presence of an attorney at
10 that meeting which would lead to an
11 assertion of a privilege?
12     MR. KERR:  I'm not asserting that
13 across all aspects, but with respect to
14 this aspect of it, I will.
15     MS. EATON:  I don't understand your
16 answer.  I thought Chris's question was a
17 fair one.
18     MR. KERR:  My response to Chris was
19 simply that I'm not saying all board
20 meetings just because counsel present we
21 are asserting a privilege; but with respect
22 to this issue, we will assert a privilege.
23     MS. EATON:  So with respect to --
24 just to be clear, Mr. Kerr, with respect to

Page 33

L. Kruger

1  this meeting, the debtors are asserting a
2  privilege on the basis that counsel was
3  present at the meeting?
4      MR. KERR:  With respect to the
5  board's -- discussions with the board about
6  authorizing Mr. Kruger, to enter in -- to
7  delegate to Mr. Kruger the responsibility
8  of negotiating an entry in the FGIC
9  settlement; correct.
10 BY MS. EATON:
11     Q.   Did the board make a business
12 decision to authorize you to enter into that
13 agreement?
14     MR. KERR:  Objection.
15     A.   I don't know whether it's a business
16 decision, but they authorized me to enter into
17 an agreement.
18     Q.   Well, you understand something about
19 what the role of the board of directors of a
20 company is; right?
21     A.   Yes.
22     Q.   You're a very experienced attorney
23 and you've been working in the field for quite
24 some time; right?

Page 34

L. Kruger

1
2    A.   Yes.
3    Q.   And you understand that part of the
4    role of a board of directors is to make
5    business determinations about what's in the
6    best interests of the entity; right?
7         MR. KERR:  Objection.
8    BY MS. EATON:
9    Q.   Isn't that right?
10    A.   Yes.
11    Q.   And in exercising the board's
12    business judgment, one of the things that they
13    sometimes do is to determine whether to enter
14    into settlement agreements; isn't that right?
15         MR. KERR:  Objection.
16    A.   I assume so.
17    Q.   Okay.
18         Do you know whether the board of
19    directors exercised any business judgment in
20    authorizing you to enter into the FGIC
21    Settlement Agreement?
22         MR. KERR:  Objection.
23    A.   As I said before, they authorized me
24    to enter into the FGIC Settlement Agreement.
25    Q.   Do you know anything about the reason

Page 35

L. Kruger

1
2    why the board authorized you to do so?
3    A.   That would be facetious wisdom and
4    good judgment on their part.
5    Q.   I'm sorry, I didn't understand your
6    last answer.
7    A.   Why don't you ask me the question
8    again and I'll answer it.
9    Q.   Sure.  I'll ask you a new question.
10         What were the reasons why the board
11    authorized you to enter into the FGIC
12    Settlement Agreement?
13         MR. KERR:  Objection.
14    A.   Because I was the chief restructuring
15    officer of the company and I had the authority
16    to do so, and they gave me that authority.
17    Q.   Did you think entering into the
18    agreement was a good idea?
19    A.   Yes, I did.
20    Q.   Did you believe it was in the best
21    interest of the debtors?
22    A.   Yes, I did.
23    Q.   Did you express that view to the
24    board of directors?
25    A.   I'm sure I did.

Page 36

L. Kruger

1
2    Q.   What did you say to them in that
3    regard?
4         MR. KERR:  Objection.  Again, to the
5         extent you had discussions with the board
6         with counsel present, I will object to
7         privilege; but to the extent that you had
8         discussions without counsel present, you
9         can testify to that.
10    A.   They were all with counsel present.
11    Q.   You formed your own view about the
12    benefits of entering into this agreement for
13    the debtors; right?
14    A.   Yes, I did.
15    Q.   And in forming that view, you were
16    doing so in your capacity as chief
17    restructuring officer of the debtor's; correct?
18    A.   Correct.
19    Q.   And we've already established, I
20    think, that in that capacity you were not
21    serving the debtors in any kind of legal role;
22    right?
23    A.   Correct.
24    Q.   Okay.
25         So what did you tell the board of

Page 37

L. Kruger

1
2    directors about your view why entering into the
3    agreement was in the debtor's best interests?
4         MR. KERR:  And, again, if you had
5         conversations with the board with counsel
6         present, I'm going to assert a privilege.
7         To the extent you had conversations with
8         the board without counsel present, you can
9         answer the question.
10    A.   The only conversation I had with the
11    board were with counsel present.
12    Q.   In forming -- you had thoughts
13    internally about whether it was in the best
14    interests of the debtor's to enter into this
15    agreement; right?
16    A.   Yes.
17    Q.   What were your thoughts on that
18    subject?
19    A.   I thought that this agreement as part
20    of the overall global settlement agreement, was
21    sensible from the debtor's perspective, which
22    is my perspective, in that it eliminated from
23    the debtor's estates significant claims by the
24    trusts and by FGIC.
25         At the same time it was part of the

## Page 38

L. Kruger

mosaic of the global settlement agreement,
which generated in my mind a significant
benefit to all of the debtor's estates and to
their creditors, as well, with the injection of
the Ally contribution, the elimination of
significant litigation, the shortening of the
time process of the Chapter 11 proceedings.

And for all those reasons, I thought
this was a sensible things for the debtors to
do.

Q.   And did you convey that view to the
board of directors?

A.   I don't recall.

Q.   Do you have any knowledge of the
basis on which the board of directors
authorized you to enter into the FGIC
Settlement Agreement on the debtor's behalf?

A.   As I said, in my engagement letter I
believe I have the authority to act on behalf
of the debtors with respect to Chapter 11
issues, disclosure statements and the like.  I
can refer to it, if you like.

And I think the board was merely
confirming my authority to do so.

## Page 39

L. Kruger

Q.   Do you believe that you had authority
to enter into the FGIC Settlement Agreement
without the approval of the board of directors?

A.   I believe so.

Q.   Why then did the board of directors
pass a resolution authorizing you to sign the
agreement?

MR. KERR:  Objection.

BY MS. EATON:

Q.   Do you know?

MR. KERR:  Misstates --
mischaracterizes testimony.

A.   I reported to the board the results
of mediation as it progressed, and they
suggested that I continue on and authorized me
to continue on with the FGIC settlement.

Q.   At the time you got the authorization
from the board to execute the settlement, had
you seen a physical copy of a draft settlement
agreement?

A.   I don't recall.

Q.   Did you have an understanding at that
time as to what the material terms of the
agreement were to be?

## Page 40

L. Kruger

A.   Yes, I did.

Q.   Did those material terms change in
any way between the time that you received
authorization from the board of directors to
sign the document agreement and when you
actually signed the agreement itself?

MR. KERR:  Objection to form.

A.   Not materially, to my mind.

Q.   What do you mean by that?

A.   There were changes to the settlement
agreement after May 23rd, I believe, but I
believe that they were inconsequential.  I
don't recall what they were.

Q.   During the period of time between the
date where you got authorization to sign the
agreement and when you actually signed the
agreement -- let me rephrase that.

During the period of time when you
received authorization from the board to sign
the agreement and May 23rd, were there any
material changes to the agreement or draft --

A.   No.

Q.   -- agreement during that period?

A.   No.

## Page 41

L. Kruger

Q.   Okay.

So, what you -- in other words, what
you had authorization to sign, whenever you got
that authorization, was essentially the same
deal that you actually signed?

MR. KERR:  Objection to form.

A.   Yes.

Q.   Is it correct that the only two
documents that you saw reflecting the agreement
or potential agreement were the physical
document that you signed, the agreement itself
that we've marked as Kruger Exhibit 1, and the
term sheet that you referenced earlier in your
testimony?

MR. KERR:  Objection.

A.   You're talking just about documents,
correct?

Q.   Yes.

A.   That's correct.

Q.   So the only two documents that you
saw that reflected the agreement, the potential
agreement, were those two documents, namely,
Kruger Exhibit 1 and the term sheet that you
referenced previously?

Page 42

L. Kruger

1
2    MR. KERR: Objection.
3    A.   I'm trying to answer the question,
4  but in terms of documents, that's correct.
5    Q.   How about in terms other than
6  documents?
7    A.   Well, there were always conversations
8  during mediation about various aspects of the
9  mediation.
10    Q.   Including with respect to this
11  particular agreement or potential agreement?
12    A.   Yes.
13    Q.   But those discussions did not take
14  place before early April, if I understood your
15  testimony.
16    MR. WYNNE: Objection.
17  Mischaracterizes testimony.
18    A.   That's not what I said.  I think I
19  said there were discussions in March, as I
20  recall.
21    Q.   You're right.  I apologize.
22        How many times during the mediation
23  process was the prospect of a FGIC settlement
24  discussed?
25    A.   I don't recall that.

Page 43

L. Kruger

1
2    Q.   Do you remember who discussed that
3  issue?  Just names, not what they said.
4    A.   Who discussed that issue with me?
5    Q.   At the mediation.  During the
6  mediation sessions -- let's back up.
7        During the mediation sessions, the
8  subject of an agreement or prospective
9  agreement with FGIC was discussed; correct?
10    A.   Yes.
11    Q.   And it was discussed more than one
12  time?
13    A.   Yes.
14    Q.   You can't remember how many times?
15    A.   Correct.
16    Q.   Do you remember who discussed that
17  issue during those sessions?
18    MR. KERR:  Objection.
19    Go ahead.
20    A.   Judge Peck.
21    Q.   Anyone else?
22    A.   Counsel for the trustees.
23    Q.   Anyone else?
24    A.   Not that I recall.
25    Q.   When you referred to "counsel for the

Page 44

L. Kruger

1
2  trustees," who were you referring to?
3    A.   Glenn Siegel at Dechert.
4    Q.   Anyone else?
5    A.   I don't recall anybody else.
6    Q.   How about Michael Johnson, did he
7  discuss that issue at all during the sessions?
8    A.   Not with me.
9    Q.   How about Mark Kotlick (phonetic)?
10    A.   Not with me.
11    Q.   Do you know whether any of those
12  individuals discussed the FGIC settlement or
13  potential FGIC settlement outside of these
14  mediation sessions?
15    A.   I have no idea.
16    Q.   Did you ever have any discussions
17  with -- strike that.
18        Did you participate in mediation
19  sessions outside of the presence of Judge Peck?
20    A.   Yes.
21    Q.   And during any of those sessions was
22  the subject of the FGIC Settlement Agreement
23  discussed?
24    A.   Yes.
25    Q.   Who was present at those discussions?

Page 45

L. Kruger

1
2    MR. EGGERMANN:  I'm going to
3  interpose an objection, in my view of the
4  dynamics that occurred during the mediation
5  were probably within the ambit of the
6  court's order.  And a lot of the questions
7  that are being asked seems to be designed
8  to elicit the dynamics which, to me, are
9  not far off from the substance of the
10  mediation.
11  BY MS. EATON:
12    Q.   Would you answer the question,
13  please, Mr. --
14    A.   Do you want to repeat it again for
15  me.
16    MS. EATON:  Could you read the
17  question back, please.
18    (The Record was Read.)
19  BY MS. EATON:
20    Q.   Who was present at those discussions?
21    A.   My counsel.  In each session, I don't
22  recall.  My counsel certainly in each session.
23    Q.   Was counsel for any of the trustees
24  present during those discussions?
25    MR. KERR:  Objection.

12  (Pages 42 to 45)

Page 46

L. Kruger

1
2    A.   I believe that counsel for the
3    trustees may have been present during some of
4    those sessions.
5    Q.   Was that Mr. Siegel that you're
6    referring to?
7    A.   Yes.
8    Q.   By the way, was Mr. Siegel
9    representing all of the trustees during those
10   discussions, do you know?
11   A.   I have no idea.
12   Q.   Well, did you have a sense of what
13   his role was?
14   MR. KERR:  Objection.
15   A.   No.
16   Q.   You had no idea one way or the other
17   whether he was speaking only on behalf of the
18   Bank of New York or anybody else?
19   MR. KERR:  Objection.
20   A.   I don't know.
21   Q.   You didn't inquire?
22   A.   No.
23   Q.   It didn't matter to you?
24   A.   No.
25   MR. KERR:  Objection.  Come on.

Page 47

L. Kruger

1
2    BY MS. EATON:
3    Q.   Did you have any discussions about
4    the -- prior to May 23, 2013, did you have any
5    discussions with anyone, apart from your
6    outside counsel, about the commutation aspect
7    of the FGIC Settlement Agreement?
8    A.   Yes.
9    Q.   Who did you have those discussions
10   with?
11   A.   Judge Peck.
12   Q.   So you discussed the commutation
13   aspect of the agreement with Judge Peck?
14   A.   Yes.
15   Q.   Did you discuss the commutation
16   aspect of the agreement with anyone else,
17   again, leaving the debtor's counsel aside?
18   A.   Unsecured Creditors' Committee
19   counsel.
20   Q.   Who was that?
21   A.   Kramer Levin.
22   Q.   Anyone else?
23   A.   I think not.
24   Q.   How about Cathy Patrick?  Did you
25   ever discuss that issue with her?

Page 48

L. Kruger

1
2    A.   I don't recall.
3    Q.   So maybe you did, maybe you didn't;
4    you just don't remember?
5    MR. KERR:  Objection.
6    BY MS. EATON:
7    Q.   I'm trying to clarify whether you
8    don't remember that having happened or you
9    don't remember one way or the other?
10   A.   I don't remember one way or the
11   other.
12   Q.   Was this more than one discussion,
13   was it one discussion, do you recall?
14   A.   Is your question how often I spoke to
15   Cathy Patrick?
16   Q.   No.  We were discussing whether you
17   had had any discussions about the commutation
18   aspect of the settlement agreement.  And I
19   asked you with whom did you have those
20   discussions, and you named a variety of people.
21   Was there more than one such
22   discussion?
23   A.   Yes.
24   Q.   And were the same people present at
25   each of those discussions?

Page 49

L. Kruger

1
2    A.   Certainly Unsecured Creditors'
3    Committee counsel, my own counsel.
4    Q.   Okay.
5    But not Judge Peck?
6    A.   I think you asked whether or not
7    these were conversations outside of the
8    presence of Judge Peck.
9    Q.   Actually, that's not my --
10   A.   I'm confused.
11   Q.   Okay.  That's fine.
12   A.   But if your question was Judge Peck
13   present at those.
14   Q.   Yes.
15   A.   Sometimes yes, sometimes no.
16   Q.   Sometimes yes, sometimes no.  Okay.
17   During those conversations when Judge
18   Peck was not present, what did you discuss with
19   the others about the commutation aspect of the
20   FGIC Settlement Agreement?
21   MR. KERR:  I'm going to object, and I
22   guess we -- that is within the
23   confidentiality order of the mediation.
24   And I'll direct the witness not to
25   answer.

13  (Pages 46 to 49)

Page 50

1          L. Kruger
2   BY MS. EATON:
3       Q.   Did you have any discussions about
4   any aspect of the FGIC Settlement Agreement
5   outside the mediation process, as you defined
6   it earlier in your testimony?
7       A.   No.
8       Q.   Was every discussion that you had
9   about the FGIC Settlement Agreement part of the
10  mediation process, so far as you understand?
11      A.   I believe so.
12      Q.   And that would include the
13  discussions that you had with the board of
14  directors of the debtor's, is that part of the
15  mediation process, too?
16      A.   I believe so.
17      Q.   Did you have any discussions about
18  the plan support agreement outside of the
19  mediation process?
20      A.   No.
21      Q.   Did you have any discussions with
22  anybody about the Chapter 11 cases more
23  generally outside of the mediation process?
24      MR. KERR:  Objection.  I'll let him
25  answer this question, but this deposition

Page 51

1          L. Kruger
2   is about the FGIC settlement, not about
3   border plan issues.
4       So you can answer that question if
5   you can.
6       THE WITNESS:  Could you read it for
7   me.
8       (The Record was Read.)
9       A.   Other than my counsel, no.
10      Q.   Did you draw any distinction in your
11  own mind between discussions during this period
12  of time, that is, between the time you were
13  appointed as chief restructuring officer and
14  May 23, 2013?
15      Let me back up so I get a clean
16  question.
17      My question that I'm about to ask you
18  relates to the period between the time that you
19  were appointed as chief restructuring officer
20  and May 23, 2013.
21      Okay?
22      A.   Okay.
23      Q.   That's the time period we're talking
24  about.
25      Did you draw any distinction in your

Page 52

1          L. Kruger
2   own mind between discussions that were part of
3   the mediation process and discussions that were
4   not part of the mediation process?
5       A.   I think I had mediation conversations
6   and conversations with my counsel and advisors
7   and nothing else.
8       Q.   And they were all part of the
9   mediation process?
10      A.   I believe so.
11      Q.   And I may have asked you this
12  question before.  If I did, I apologize, but
13  even if I did, I don't think I quite got an
14  answer.
15      You used the phrase "mediation
16  process."  What does that phrase mean to you?
17      A.   It meant the process initiated by the
18  court who appointed Judge Peck as a mediator,
19  and meetings both with Judge Peck and without
20  Judge Peck as part of the process seeking a
21  global resolution of the issue.
22      Q.   So would it be fair to say anything
23  that you discussed that had any relation to a
24  potential resolution of a Chapter 11 cases fell
25  within the rubric of the mediation process?

Page 53

1          L. Kruger
2       A.   I believe so.
3       Q.   You had no role in negotiating any of
4   the terms of the FGIC Settlement Agreement; is
5   that correct?
6       A.   That is correct.
7       Q.   What analysis, if any, did you
8   undertake on behalf of the debtors to determine
9   whether the FGIC Settlement Agreement was in
10  their best interest?
11      A.   Well, I was aware of the fact that
12  the FGIC Settlement Agreement was part of the
13  global settlement agreement reached by the
14  various parties who were parties to the
15  mediation process.
16      And I recognized in reaching the
17  conclusion that I reached on behalf of the
18  debtors, which is the respective that I have
19  with respect to these issues, that reducing the
20  claims that might be asserted against the
21  debtors both by FGIC and by the trusts was a
22  significant step forward on behalf of the
23  debtor's estates, and as part of the overall
24  global settlement it enabled us to both achieve
25  an Ally contribution of significance, enabled

Page 54

L. Kruger

1 us to avoided significant litigation with
2 respect to the FGIC and the trusts, enabled us
3 to come to the conclusion where we might
4 actually accomplish a reorganization plan and
5 have that confirmed, rather than the
6 alternative, which looked to me to be an
7 endless litigation at great cost to the estate,
8 no Ally contribution and a diminution of value
9 to the creditors generally of the estates.
10     Q.    Did anyone on behalf of the debtors
11 perform any kind of economic analysis of the
12 impact of the FGIC Settlement Agreement?
13     A.    Sure.
14     Q.    Who did that?
15     A.    FTI and Centerview, my financial
16 advisors and the debtors.
17     Q.    Anyone else?
18     A.    No.
19     Q.    Did FTI analyze the impact of the
20 FGIC settlement agreement on anyone other than
21 the debtors?
22         MR. KERR:  I'm not sure I understood
23     the question.
24         Do you understand the question?

Page 55

L. Kruger

1     A.    Why don't you repeat the question so
2 I can answer it.
3         MR. KERR:  I'm not sure I understand
4     the question.
5 BY MS. EATON:
6     Q.    You indicated that FTI and Clearview
7 undertook an analysis of the FGIC Settlement
8 Agreement with respect to its impact on the
9 debtors; right?
10         MR. KERR:  Objection.
11     Mischaracterizes the testimony.
12 BY MS. EATON:
13     Q.    Is that incorrect, Mr. Kruger?
14     A.    Why don't you go back and read my
15 original question and my answer.
16     Q.    What did FT --
17     A.    I don't want to speculate as to
18 whether I answered the second one.
19     Q.    Fine.
20         What did FTI -- what work did FTI
21 perform for on behalf of the debtors with
22 respect to FGIC Settlement Agreement?
23         MR. KERR:  Objection.  Mr. Kruger,
24     let me just state my objection.

Page 56

L. Kruger

1         Work that FTI was doing on behalf of
2 the debtors is both subject to work product
3 and potentially attorney-client
4 communications with counsel, and may be
5 subject of the confidentiality order.
6         So in answering this question, if you
7 could describe in very general terms
8 whether they did or not, but without giving
9 the particulars, I'll let you answer the
10 question.
11     A.    Well, they produced -- I guess what I
12 would say is that they produced analysis of
13 various aspects of the creditor committees
14 claims, including the FGIC settlement, as part
15 of the mediation process.
16     Q.    Is that reflected in any written
17 document?
18     A.    I think so.
19     Q.    And that's a document that you saw?
20     A.    As part of the mediation process,
21 yes.
22     Q.    Okay.
23         Was there more than one iteration of
24 that document?

Page 57

L. Kruger

1     A.    I don't recall.
2     Q.    What work did Centerview perform
3 by -- for or on behalf of the debtors in
4 connection with the FGIC Settlement Agreement?
5         MR. KERR:  Again, the same --
6     debtor's view is that the work that
7     Centerview was doing is work product
8     potentially subject to privilege and
9     subject to confidentiality.
10         So if you could describe in just
11     general terms if they -- what you recall if
12     anything they did, that's fine, but nothing
13     more than that.
14     A.    I'm not sure that they produced a
15 document.
16     Q.    Did either FTI or Clearview perform
17 any analysis of the amount of the commutation
18 payment provided for under the FGIC Settlement
19 Agreement?
20     A.    In looking at -- looking at
21 allocations of recoveries for creditors, we
22 took into consideration commutation payment,
23 but we did not analyze whether there was a
24 correct number or not a correct number.  That

15  (Pages 54 to 57)

Page 58

L. Kruger

1  was not our purview.
2      Q.   You undertook no analysis of whether
3  the amount of the commutation payment was
4  significant from the point of view of persons,
5  entities other than the debtors; correct?
6      MR. KERR:  Objection.
7      A.   We did not undertake any analysis
8  like that.
9      Q.   Did you discuss that issue with
10  anyone?
11      MR. KERR:  You can answer that
12  question -- which issue are you talking
13  about?
14      MS. EATON:  The amount of the
15  commutation payment provided for under the
16  FGIC Settlement Agreement.
17      MR. KERR:  Objection.  Asked and
18  answered.
19      A.   The answer is no.
20      Q.   Did you form a view with respect to
21  the adequacy of the amount of the commutation
22  payment?
23      A.   No.
24      Q.   Were you aware at any point of

Page 59

L. Kruger

1  whether Duff & Phelps was performing an
2  analysis of the terms of the FGIC Settlement
3  Agreement for the trustees?
4      MR. KERR:  Objection.
5  BY MS. EATON:
6      Q.   Do you know that was going on?
7      A.   No.
8      Q.   Did you know that the trustees had
9  engaged Duff & Phelps?
10      A.   Yes.
11      Q.   And how did you become aware of that?
12      A.   Because I got to see some of their
13  bills.
14      Q.   Apart from that, did you know
15  anything about what they were doing?
16      A.   No.
17      Q.   Did the bills reflect the kind of
18  work that they were doing?
19      A.   I did not see any details.
20      Q.   They were undetailed invoices?
21      A.   Besides not seeing them --
22      Q.   Did you approve --
23      A.   -- I was just aware of the amounts.
24      Q.   Did you have any responsibility for

Page 60

L. Kruger

1  approving those amounts?
2      A.   No.
3      Q.   Well, how did you come to get the
4  bills?
5      A.   I heard some discussions with my
6  counsel with respect to the size of their
7  bills.
8      Q.   Did you discuss the size of the
9  Duff & Phelps's bills with anyone other than
10  your counsel?
11      A.   No.
12      Q.   Did you discuss it with the board of
13  directors?
14      A.   No.
15      Q.   Was the size of the Duff & Phelps's
16  bills of any concern to the debtors?
17      MR. KERR:  Objection.  I'm going to
18  direct him not to answer on the grounds of
19  privilege.
20      MS. EATON:  It's a "yes" or "no"
21  question.  How can you direct him not to
22  answer the question?
23      MR. KERR:  My direction stands.  You
24  want to ask him if he had a concern, that's

Page 61

L. Kruger

1  fine.
2  BY MS. EATON:
3      Q.   Who paid Duff & Phelps's bills, do
4  you know?
5      A.   No, I'm not sure.
6      Q.   It wasn't the debtors?
7      A.   I don't know.  I think it may have
8  been.
9      Q.   I see.
10      Who had -- in your role as CRO, were
11  you responsible for approving vendor bills?
12      A.   No.
13      Q.   Who was, at the --
14      A.   I don't know.
15      Q.   Would you review, in your capacity as
16  CRO of the debtor's, would you review any
17  reports or whatnot about vendor payments?
18      MR. KERR:  I just want to read that
19  question.
20      Objection to form.
21      MS. EATON:  I think he doesn't like
22  the phrase "whatnot" that I included in my
23  question, so I guess I have to rephrase.

16 (Pages 58 to 61)

Page 62

1    L. Kruger
2  BY MS. EATON:
3      Q.   What responsibility, if any, did you
4  have in your capacity as chief restructuring
5  officer of the debtor's with respect to the
6  payment of vendor bills?
7      MR. KERR:  Objection.  Asked and
8  answered.
9      A.   I have not reviewed vendor bills.
10     Q.   And you did not review the Duff &
11 Phelps's bills?
12     A.   No.
13     Q.   But you were aware of the amount?
14     A.   No.
15     Q.   Well, you were aware of generally of
16 the size of those bills?
17     A.   No.
18     Q.   I take it you never saw any analysis
19 that Duff & Phelps had performed?
20     A.   Correct.
21     Q.   Okay.
22     What about Lazard?  Do you know what
23 Lazard's role was in connection with the --
24     A.   No, I do not.
25     Q.   Did you ever see any analysis

Page 63

1    L. Kruger
2  performed by Lazard --
3      MR. KERR:  Objection.  In connection
4  with this?
5      MS. EATON:  You objected before I had
6  finished my question, so --
7      MR. KERR:  I apologize.
8      MS. EATON:  That's okay.
9  BY MS. EATON:
10     Q.   Did you see any analysis performed by
11 Lazard relating in any way to the FGIC
12 Settlement Agreement?
13     A.   I did not.
14     Q.   Were you aware of whether Lazard was
15 performing such an analysis?
16     A.   I was not.
17     Q.   Were you aware of whether Lazard was
18 performing any analysis related to the planned
19 support agreement?
20     A.   No.
21     Q.   Were you aware of whether Lazard was
22 performing any analysis with respect to the
23 FGIC rehabilitation plan?
24     A.   No.
25     Q.   And I take it from your answers that

Page 64

1    L. Kruger
2  you never saw any analysis that Lazard prepared
3  with respect to any of those subjects?
4      A.   Correct.
5      Q.   And I take it from that also that you
6  have no idea one way or another whether
7  Lazard's conclusions were with respect to those
8  subjects?
9      A.   Correct.
10     Q.   You didn't learn it from anybody else
11 or a discussion, for example?
12     A.   No, I did not.
13     Q.   Okay.
14     MS. EATON:  This will be Kruger
15 Exhibit 2.
16     (Kruger's Exhibit 2, Document
17 entitled Declaration of Lewis Kruger, was
18 marked for identification.)
19     (A Discussion was Held off the
20 Record.)
21     MS. EATON:  This is a document
22 entitled, "Declaration of Lewis Kruger in
23 Support of Debtor's Motion for an Order
24 under Bankruptcy Code Sections 1 through 5A
25 and 363B Authorizing the Debtors to enter

Page 65

1    L. Kruger
2  into and Perform under a Planned Support
3  Agreement with Ally Financial, Inc., the
4  Creditors' Committee and Certain Consenting
5  Claimants."
6  BY MS. EATON:
7      Q.   Do you recognize Kruger Exhibit 2,
8  Mr. Kruger?
9      A.   Yes, I do.
10     Q.   This is your declaration?
11     A.   Yes, it is.
12     Q.   And you were aware that this
13 declaration was filed with the Bankruptcy Court
14 in connection with the Chapter 11 cases?
15     A.   Yes.
16     Q.   And did you read this declaration
17 carefully before you signed it?
18     A.   Yes, I did.
19     Q.   And, to the best of your knowledge,
20 is there anything inaccurate or untrue in this
21 declaration?
22     A.   Not that I am aware of.
23     Q.   Okay.
24     Now, turning your attention, first of
25 all, to paragraph 2, which is on unnumbered

17 (Pages 62 to 65)

Page 66

1          L. Kruger
2  page 1 of Exhibit 2.
3          Do you have that?
4      A.   Yes.
5      Q.   It says there, "I offer this
6  declaration to show that the debtor's decision
7  to enter into the plan support agreement was a
8  sound exercise of business judgment."
9          Do you see that?
10     A.   Yes, I do.
11     Q.   Is it the case that the
12  debtors -- well, let me back up.
13         Who exercised -- who at the debtor's
14  exercised the business judgment to enter into
15  the planned support agreement?
16         MR. KERR:  And I'm going to object at
17  this point.  The plan support agreement has
18  already been approved by the court.  You
19  know that.  That's not what this deposition
20  is about.
21         I don't know why you're asking
22  Mr. Kruger about a plan support agreement
23  that's already been approved.  I'll give
24  you some latitude here, but you're using up
25  your time asking him not about the FGIC

Page 67

1          L. Kruger
2  settlement but about a plan support
3  agreement that has already been vetted and
4  approved by the court, so --
5          MS. EATON:  I need to register my
6  objection to Mr. Kerr's speaking objection,
7  which he should know is completely
8  improper.
9  BY MS. EATON:
10     Q.   Could you please answer my question,
11  Mr. Kruger?
12     A.   My business judgment.
13     Q.   Not the board of directors?
14     A.   Both.  They --
15     Q.   So the board of directors exercised
16  their business --
17     A.   They exercised their judgment by
18  authorizing me to proceed with the FGIC
19  settlement.  I think I've said that before.
20  It's still true.
21     Q.   This is about the plan support
22  agreement, sir.  So let me just get -- let's
23  get a clean question and answer on the record.
24         I've drawn your attention to the
25  first sentence of paragraph 2 of your

Page 68

1          L. Kruger
2  declaration.  And the question is:  Did the --
3  who at the debtor's exercised their business
4  judgment in determining to enter into the plan
5  support agreement?
6      A.   I did.
7      Q.   And did you, likewise, exercise your
8  business judgment in determining on behalf of
9  the debtor's to enter into the FGIC Settlement
10  Agreement?
11     A.   Yes, I did.
12     Q.   What was the -- strike that.
13         Now, please turn to paragraph 14 of
14  your declaration.  Do you have that before you?
15     A.   Yes, I do.
16     Q.   That paragraph reads as follows.
17  Quote, "Each of the creditor groups was
18  required to participate in a give and take
19  process through the mediation.  In my opinion
20  the process of good-faith negotiations
21  undertaken by all participants resulted in an
22  agreement that is in the best interests not
23  only of the debtor's but also the other
24  mediation participants, including the RMBS
25  trustees and the investors in the RMBS trusts

Page 69

1          L. Kruger
2  and all other creditors of the debtor's
3  estates," period, close quote.
4          Do you see that?
5      A.   Yes, I do.
6      Q.   What was your basis for testifying
7  that the agreement was in the best interests of
8  the investors of the RMBS trusts?
9          MR. KERR:  And I'm going to, again,
10  object that your questioning relates to the
11  plan support agreement.  And I think it's
12  improper.  Mr. Kruger can answer, but I
13  think this is an improper inquiry in this
14  deposition.
15         MS. EATON:  I disagree.
16  BY MS. EATON:
17     Q.   Please answer the question,
18  Mr. Kruger.
19     A.   In my opinion, looking at it from the
20  perspective of as chief restructuring officer
21  of the debtor's estates, and taking into
22  consideration all the other interests of the
23  interested parties, I believe that the
24  combination of the work that had been done
25  during the mediation process under Judge Peck's

Page 70

1                L. Kruger
2    direction, together with the Ally contribution
3    and -- resulted in an availability of funds for
4    all parties far greater than would have been
5    the case had there been no global plan
6    settlement, no PSA, and the result would have
7    been, had there not been, significant
8    litigation among the creditors, among
9    themselves, creditors and the debtor, no Ally
10   contribution.
11              And my personal opinion would be and
12   my business judgment was that if we ended up in
13   that situation, there was a very little
14   likelihood of a distribution to creditors for
15   years to come and that this estate would be
16   diminished significantly by the cost of that
17   litigation.
18              So, for me, it was very easy to think
19   this transaction was in the best interest, both
20   of the -- of all of the creditors of the
21   debtor's estates, as well as the investors.
22       Q.   And by "transaction" you mean all of
23   the transactions contemplated by what you've
24   defined in your declaration in paragraph 5 as
25   the agreement; right?

Page 71

1                L. Kruger
2        A.   Yes.
3        Q.   In other words, the plan support
4    agreement, the planned term sheet, and the
5    supplemental term sheet?
6        A.   Correct.
7        Q.   And you formed a business judgment,
8    if I understand your testimony correctly, that
9    that agreement, comprised of at least those
10   three elements, was in the best interests of
11   the investors in the RMBS trusts?
12       A.   Correct.
13       Q.   But you never did any analysis of the
14   impact of that agreement on those investors;
15   correct?
16           MR. KERR:  Objection.
17   Mischaracterizes testimony.  He testified
18   what he did.
19       A.   Want to repeat the question.
20       Q.   I'll ask a new question.
21           What analysis, if any, did you do of
22   the impact of the agreement defined in
23   paragraph 5 of your declaration on the
24   investors of the RMBS trusts?
25           MR. KERR:  Objection.  Asked and

Page 72

1                L. Kruger
2    answered.
3        A.   I consulted both with my counsel, my
4    advisors, Unsecured Creditors' Committee
5    counsel, their advisors.  I claim to the
6    conclusion which I just restated, which is that
7    I believe that the benefits for the
8    participants in the estates is far greater as a
9    result of the global settlement provided for in
10   paragraph 5, as you described it, than the
11   alternatives would have been for those same
12   creditors.
13       Q.   But you did not consult with either
14   the investors in the RMBS trusts or anyone
15   representing the investors in the RMBS trusts;
16   correct?
17           MR. KERR:  Objection.
18       A.   As part of the global mediation
19   process, over the course of the months I had
20   presentations made to me by various of the
21   parties to the mediation and learned from those
22   presentations the views of the various
23   participating parties.  That informed me and
24   helped my decision-making process.
25       Q.   Who was representing the interests of

Page 73

1                L. Kruger
2    the investors in the RMBS trusts during those
3    discussions you just referenced?
4        A.   I assumed the trusts do that.
5        Q.   But you didn't know?
6        A.   No.
7        Q.   Did you actually speak with anyone
8    representing the trusts about the impact of the
9    agreement on the investors in the RMBS trusts?
10       A.   No.
11       Q.   You spoke, instead, with your
12   counsel, the debtor's advisors and advisors to
13   the creditors' committee?
14           MR. KERR:  Objection.
15   Mischaracterizes testimony.
16   BY MS. EATON:
17       Q.   Isn't that right?
18           MR. KERR:  Objection.
19       A.   Over the course of the months, I
20   spoke with any of the mediation participants.
21       Q.   There was nobody representing the
22   investors in the RMBS trusts, the wrapped
23   trusts at the mediation; isn't that true?
24           MR. KERR:  Objection.
25       A.   I'm not sure I understand your

Page 74

1           L. Kruger
2   question.  If your question -- I'm not sure I
3   understand your question.
4       Q.   Who, if anyone, represented the
5   interests of investors in the FGIC wrapped RMBS
6   trusts at the mediation?
7           MR. KERR:  Objection.
8       A.   I believe the trustees do that.
9       Q.   But you never spoke to the -- if I
10  understand your testimony correctly, you never
11  spoke with those people about the impact of the
12  agreement on investors in the RMBS trusts?
13      A.   That's correct.
14      Q.   You spoke, instead, I think you said
15  with other people?
16      A.   Uh-huh.
17      Q.   And none of those other people were
18  representing the interests of those investors;
19  isn't that so?
20      A.   Correct.
21      Q.   So with respect to the interests of
22  investors in the FGIC wrapped securities, what
23  was the basis for your sworn conclusion that
24  the agreement was in their best interests?
25      A.   Because I thought that --

Page 75

1           L. Kruger
2           MR. KERR:  Objection.  Asked and
3   answered several times.
4           Tell her again.
5   BY MS. EATON:
6       Q.   Just -- I haven't.  It's with respect
7   to the -- this specific question is with
8   respect to the interests of investors in the
9   FGIC wrapped securities.  Okay.
10          What was the basis for your
11  conclusion set forth in the declaration that
12  you swore to that was signed with the court
13  that the agreement was in their best interests?
14          MR. KERR:  Objection.  Asked and
15  answered.
16      A.   That in my review of all of the facts
17  and circumstances arising all of the mediation,
18  I believed that the global settlement produced
19  a result for every creditor far better than the
20  alternatives.  And I include the Ally
21  settlement and weigh that against the prospect
22  of endless litigation, administration of the
23  estate, no Ally contribution, I conclude that
24  the result of the global settlement agreement
25  was for the benefit of every creditor of the

Page 76

1           L. Kruger
2   estate.
3       Q.   Were those investors creditors of the
4   estate?
5       A.   No.  They're investors in the RMBS
6   trusts.
7       Q.   Right.
8           So, again, what was the basis for
9   your conclusion that the agreement was in the
10  best interests of that group of people --
11  wait -- that group of people who we agree were
12  not among the creditors of the estate?
13          MR. KERR:  Objection.  Asked and
14  answered.
15      A.   I still believe, and I'll say it
16  again, that for everybody, including the
17  investors in the RMBS trusts, had there been
18  no -- is if there is no global settlement and
19  litigation ensues with respect to the
20  inter-creditor issues and there is no Ally
21  contribution and passage of time and the cost
22  of that litigation, there will be a much lesser
23  recovery for all participants, including the
24  investors in the RMBS trusts.
25      Q.   Any other basis for the conclusion

Page 77

1           L. Kruger
2   you swore to in your declaration we've marked
3   as Kruger Exhibit 2?
4       A.   No.
5           MR. KERR:  Mary, we've been maybe
6   we've been going about an hour and a half,
7   when you come to a point, we can maybe just
8   take a five-minute break.
9           MS. EATON:  If you'd like to take a
10  break now, that would be fine.
11          MR. KERR:  Sure.  Let's just take a
12  break.
13          (Recess taken from 11:22 a.m. to
14  11:30 a.m.)
15  BY MS. EATON:
16      Q.   Did you ever discuss with Judge Peck
17  who the -- the prospect of having other people
18  participate in the mediation?
19      A.   No.
20      Q.   Do you know who decided which
21  constituencies were permitted to -- sorry --
22  permitted to participate in the mediation?
23      A.   Judge Peck.
24      Q.   Would you agree that the FGIC
25  Settlement Agreement was a critical component

Page 78

L. Kruger

1
2  of the agreement referenced in the declaration
3  we've marked as Kruger Exhibit 2?
4       MR. KERR:  Objection.
5       A.   It was one of many elements of the
6  global settlement.
7       Q.   Okay.
8            But do you agree that it was a
9  critical component of the global settlement?
10      MR. KERR:  Objection.
11      A.   Each consenting creditor was a
12 critical part of the transaction.
13      Q.   So --
14           (Kruger's Exhibit 3, Declaration of
15           Lewis Kruger, was marked for
16           identification.)
17 BY MS. EATON:
18      Q.   Let's take a look at the document
19 that we've marked as Kruger Exhibit 3, which is
20 another declaration you filed in these Chapter
21 11 cases entitled, "Declaration of Lewis Kruger
22 in Support of Debtor's Motion Pursuant to
23 Federal Rules of Bankruptcy Procedure 9019 for
24 the Approval of the Settlement Agreement among
25 the Debtors, FGIC, for FGIC Trustees and

Page 79

L. Kruger

1
2  Certain Institutional Investors."
3       Do you see that?
4       A.   Yes.
5       Q.   And, again, that is a declaration
6  that you swore; right?
7       A.   Yes.
8       Q.   And you read it carefully before you
9  signed it?
10      A.   Yes, I did.
11      Q.   And you don't have any reason to
12 believe that there's anything in that
13 declaration that is not true and accurate, do
14 you?
15      A.   Correct.
16      Q.   Okay.
17           Now, if you draw your attention to
18 paragraph 2, which appears on page 1 of your
19 declaration, you state, quote, "I offer this
20 declaration to show that the settlement
21 agreement dated May 23, 2013 (the Settlement
22 Agreement) represents a fair and reasonable
23 compromise in connection with certain claims
24 held by Financial Guaranty Insurance Company
25 (FGIC) and the FGIC Trustees, and to attest

Page 80

L. Kruger

1
2  that the debtors negotiated the settlement
3  agreement at arm's length without undue
4  influence or coercion by any party."
5       Do you see that?
6       A.   Yes, I do.
7       Q.   Now, it says there that the debtors
8  negotiated the settlement agreement.
9       Do you see that?
10      A.   Yes.
11      Q.   I may have misunderstood you, but I
12 thought you had testified previously that the
13 debtors did not negotiate the FGIC Settlement
14 Agreement?
15      A.   If that's what I said before, that's
16 not accurate.  We did.
17      Q.   Who negotiated the FGIC Settlement
18 Agreement on behalf of the debtors?
19      A.   My counsel and myself.
20      Q.   And yourself.  Okay.
21           When did you -- at what point in time
22 did you negotiate the terms of the FGIC
23 Settlement Agreement?
24      A.   During the process of the mediation.
25      Q.   Can you be more precise about --

Page 81

L. Kruger

1
2  about when that occurred?
3       A.   During the months of April and May of
4  2013.
5       Q.   And while you were negotiating the
6  terms of the FGIC Settlement Agreement, did you
7  see drafts of the agreement?
8       A.   Yes.
9       Q.   So you saw drafts of the document
10 that we've marked as Kruger Exhibit 1; is that
11 right?
12      MR. KERR:  Take a look Kruger
13      Exhibit 1.
14      A.   Yes.
15      Q.   All right then.
16           So in addition to the two documents
17 you identified earlier in your testimony, that
18 is, the final version of the settlement
19 agreement which is marked as Kruger Exhibit 1
20 and the term sheet that you referenced
21 previously, you saw additional documents
22 regarding the terms or proposed terms of the
23 FGIC Settlement Agreement, true?
24      MR. KERR:  Objection.
25      A.   I think before the final settlement

21 (Pages 78 to 81)

Page 82

1           L. Kruger
2  agreement was executed, there were drafts
3  before that.
4      Q.   In other words, there were more than
5  the two documents --
6      A.   There may have been.  I don't recall.
7      Q.   You don't recall -- is it the case
8  that you don't recall whether you saw documents
9  other than the two documents that --
10     A.   I think that's correct.
11     Q.   You need to let me finish my
12 question, if you don't mind.  Nothing personal.
13 He just needs to get it down.
14     A.   Sorry.
15     Q.   So now you're not clear whether you
16 saw drafts of it or not?
17     A.   Right.
18     Q.   Is that right?
19         MR. KERR:  Lew, let Ms. Eaton finish
20     her question and then you can -- that way
21     he gets to take it down.  I apologize.
22 BY MS. EATON:
23     Q.   I'm just trying to find out whether
24 there were other documents.  First you said
25 there were only those two.  Then you said you

Page 83

1           L. Kruger
2  saw another draft of Exhibit 1 --
3         MR. KERR:  Let her finish the
4     question.
5  BY MS. EATON:
6      Q.   Did you see -- I have to ask you
7  again.  Did you see, given the lack of clarity
8  in your testimony, did you see any other --
9         MR. KERR:  Objection.
10        MS. EATON:  Please don't inter -- you
11    can object after I finish my question.
12        MR. KERR:  Don't characterize his
13    testimony that way.  Don't do it.
14    Let her ask the question.
15        MS. EATON:  He's letting me ask the
16    question.  You are not.
17 BY MS. EATON:
18     Q.   Did you see any other documents
19 besides the term sheet that you referenced
20 earlier in your testimony and the final version
21 of the FGIC Settlement Agreement?
22     A.   I don't think so.
23     Q.   Okay.
24         But it is the case that you
25 participated in negotiating the terms of that

Page 84

1           L. Kruger
2  agreement; right?
3      A.   Correct.
4      Q.   Did you participate in negotiating
5  the amount of the commutation payment?
6      A.   No.
7      Q.   Are there particular aspects of the
8  agreement that you participated in negotiating?
9         MR. KERR:  Objection.  On that, I am
10    going to direct him not to answer the
11    confidential --
12 BY MS. EATON:
13     Q.   Okay.
14        Could you please turn to page 6 of
15 your declaration, paragraph 14.
16     A.   Yes.
17     Q.   And it reads there, quote, "Following
18 the court's appointment of United States
19 Bankruptcy Judge James M. Peck as mediator and
20 months of arm's length negotiations, the
21 debtors and most of their claim constituencies
22 reached a broad settlement set forth in the
23 global plan agreement.  The settlement
24 agreement represents a critical component of
25 the global plan agreement."

Page 85

1           L. Kruger
2      Do you see that?
3      A.   Yes.
4      Q.   So is it, in fact, the case that the
5  FGIC Settlement Agreement was a critical
6  component --
7      A.   Yes.
8      Q.   -- of the global plan agreement?
9      A.   Yes.
10     Q.   And the global plan agreement is
11 defined in your declaration as the plan support
12 agreement, the supplemental term sheet, and the
13 plan term sheet; correct?
14     A.   Correct.
15     Q.   And that's the same agreement that
16 was referenced in -- in the declaration we
17 previously marked as Kruger Exhibit 2, I think?
18     A.   Yes.
19     Q.   So in that declaration when you
20 stated that the agreement was in the best
21 interests of the investors in the RMBS trusts,
22 you were stating, were you not, that in your
23 view the FGIC Settlement Agreement was in the
24 best interests of those investors?
25         MR. KERR:  Objection.

Page 86

L. Kruger

1

2    A.   Yes.
3    Q.   And you've already stated -- I've
4    already asked you and you already answered my
5    question about the basis for your conclusion in
6    that regard.
7         Do you remember that?
8    A.   Yes.
9    Q.   Do you have anything to add to your
10   answer about the basis for that conclusion?
11        MR. KERR:  Objection.
12   A.   No.
13   Q.   Okay.
14        Let's move on to Kruger Exhibit 4.
15        (Kruger's Exhibit 4, Order Granting
16        Debtor's Motion Pursuant to Rule 9019,
17        was marked for identification.)
18   BY MS. EATON:
19   Q.   This is another document that's been
20   filed in connection with these Chapter 11 cases
21   entitled, "Order Granting Debtor's Motion
22   Pursuant to Rule 9019 for Approval of the
23   Settlement Agreement among FGIC, the Debtors,
24   the Trustees and the Institutional Investors."
25        Do you see that?

Page 87

L. Kruger

1

2    A.   Yes.
3    Q.   Have you seen this document before?
4    A.   Yes, I have.
5    Q.   Did you have any input into its
6    contents?
7    A.   No.
8    Q.   Did you review the document before it
9    was filed with the court?
10   A.   Yes.
11   Q.   In reviewing the document, did you --
12   was there anything that you saw that you did
13   not agree with?
14   A.   No.
15   Q.   Now, you'll notice in paragraph C at
16   page 2, there's a sentence which reads, quote,
17   "The settlement agreement and the transactions
18   contemplated thereby, including the releases
19   given therein, are in the best interests of the
20   debtors, their estates, the creditors, the
21   investors in each trust -- each such trust, the
22   trustee and all other parties in interest."
23        Do you see that?
24   A.   Yes.
25   Q.   And you agree with that statement?

Page 88

L. Kruger

1

2    A.   I do.
3    Q.   In what respect was the settlement
4    agreement in the best interest of the trustees?
5    A.   I assumed -- I shouldn't say I
6    assume.  Pardon.
7         It's to the benefit of the trustees,
8    I assume, because they've satisfied their
9    fiduciary duty to their constituency.
10   Q.   Do you have any basis to believe that
11   they did so?
12   A.   The trustees are among the largest
13   financial institutions in the United States.
14   They were well-represented by counsel and
15   advisors.  I can only assume that they acted in
16   the best interests of those whom they represent
17   as trustees.
18   Q.   But it's just an assumption on your
19   part; correct?
20        MR. KERR:  Objection.
21   A.   Well, beyond that, I continue to
22   believe that it's in the best interest of all
23   the parties, including the trustees, that there
24   be a global settlement, that the global
25   settlement has the benefit of the Ally

Page 89

L. Kruger

1

2    contribution, eliminates years of struggling in
3    litigation, complex and costly, and results in
4    a recovery for all parties that is far better
5    than the alternative.
6         That, I think, encompasses both the
7    debtors, their estates, their creditors, the
8    investors in each trust, each trust and the
9    trustees.
10   Q.   What interest do the trustees, as
11   opposed to the trusts or the investors in the
12   trusts, have in the outcome of this dispute?
13        MR. KERR:  Objection.
14   BY MS. EATON:
15   Q.   Do you know?
16   A.   Well, I assume that they are -- I
17   should not assume.
18        No, I don't.
19   Q.   Now, let's turn to Paragraph D, which
20   states, quote, "The trustees acted reasonably
21   and in good faith and in the best interest of the
22   investors in each trust and each such trust in
23   agreeing to the settlement agreement," period,
24   close quote.
25        Do you see that?

23 (Pages 86 to 89)

Page 90

L. Kruger

1
2    A.   Yes, I do.
3    Q.   Do you agree with that statement?
4    A.   Yes, I do.
5    Q.   On what basis do you agree that the
6    trustees acted reasonably in good faith and in
7    the best interests of the investors in each
8    trust?
9    A.   Well, as part of the mediation
10   process led by Judge Peck, the trustees were an
11   important part of that mediation process. As I
12   said, they are among the largest financial
13   institutions in the United States. They're
14   experienced trustees. They have the advice of
15   very competent counsel, financial advisors, and
16   acted -- I saw nothing to persuade me to the
17   contrary.
18        I believe that they were acting in
19   good faith and in the best interests of the
20   investors in each trust in agreeing to the
21   settlement agreement.
22   Q.   I thought I heard you testify
23   previously that the only trustee,
24   representative of the trustees that you spoke
25   with was Mr. Siegel?

Page 91

L. Kruger

1
2        MR. KERR: Objection. That's not
3    correct. Mischaracterizes testimony.
4    BY MS. EATON:
5    Q.   Did you speak with any representative
6    of the trustees other than Mr. Siegel during
7    that process?
8        MR. KERR: You're talking about the
9    mediation process overall; is that your
10   question?
11   BY MS. EATON:
12   Q.   Yes.
13   A.   Just with -- I'll say no.
14   Q.   Okay.
15        So do you have any factual basis for
16   believing that the Bank of New York acted in
17   the best interests of my clients in agreeing to
18   this settlement agreement?
19        MR. KERR: Objection. Asked and
20   answered.
21   BY MS. EATON:
22   Q.   Beyond what you've -- beyond what
23   you've already testified to.
24   A.   No.
25   Q.   I'll be handing you now Exhibit -- a

Page 92

L. Kruger

1
2    document we'll mark as Exhibit 5.
3        (Kruger's Exhibit 5, Notice of
4    Filing of Lewis Kruger's First Monthly
5    Fee Report, Compensation for Professional
6    Services Rendered and Reimbursement of
7    Expenses Occurred, was marked for
8    identification.)
9    BY MS. EATON:
10   Q.   The document marked as Kruger
11   Exhibit 5 is entitled "Notice of Filing of
12   Lewis Kruger's First Monthly Fee Report,
13   Compensation for Professional Services
14   Rendered, And reimbursement of Expenses
15   Occurred through the period from February 10,
16   2013 through February 28, 2013."
17   A.   Uh-huh.
18   Q.   Do you recognize this document?
19   A.   Yes, I do.
20   Q.   These are the fee and expense reports
21   that you would submit, that the debtors would
22   submit periodically to the Bankruptcy Court?
23   A.   Right.
24   Q.   Okay.
25        Now, if you flip to the second to

Page 93

L. Kruger

1
2    last page of Exhibit 5 which is headed
3    Exhibit B.
4        Do you see that it's a chart?
5    A.   Oh, yes. Sorry. Uh-huh.
6    Q.   It says Project Category
7    Descriptions.
8        Do you see that?
9    A.   Yes.
10   Q.   Okay.
11        And to the left of the chart there's
12   a heading entitled Project Category, and then a
13   list of six categories.
14        Do you see that?
15   A.   Uh-huh.
16   Q.   The first of which is Plan Mediation.
17   A.   Yes.
18   Q.   And the second is Plan General.
19        Do you see that?
20   A.   Yes.
21   Q.   And the third is RMBS Settlement.
22        Do you see that?
23   A.   Yes.
24   Q.   And the purpose of these project
25   categories was to allocate to -- let me strike

## Page 94

L. Kruger

1
2  that.
3       What was the purpose of recording
4  your time under these different categories?
5       MR. KERR:  Objection.  Assumes facts
6  not in evidence.
7  BY MS. EATON:
8       Q.   Did you record your time under these
9  different categories?
10      A.   Yes, I did.
11      Q.   Why did you do that?
12      A.   I thought it would be helpful to give
13 our creditors and other interested parties some
14 sense of how I was spending my time.
15      Q.   And how did you differentiate between
16 Category 1, which is Plan Mediation, and
17 Category 2, which is Plan General?
18      A.   It's very hard to distinguish between
19 the two of them.  I did the best I could and
20 tried to distinguish between those activities I
21 thought were plan mediation directly and others
22 were developing the debtor's plan of
23 reorganization.
24      Q.   But there was a distinction in your
25 mind between those two things?

## Page 95

L. Kruger

1
2       A.   A very fuzzy distinction.
3       Q.   Well, fuzzy or not, there was a
4  distinction.  And when these expense fee and
5  expense reports were submitted, you allocated
6  your time between those two categories, among
7  others; right?
8       MR. KERR:  Objection.
9       A.   Correct.
10      Q.   And that's why, for example, you see
11 on the previous page, which is headed Exhibit
12 A, that you allocated 9 hours of your time to
13 Plan Mediation and 16-1/2 hours of your time to
14 Plan General and 6-1/2 hours of your time to
15 the RMBS Settlement; right?
16      A.   Yes.
17           (Recess taken from 11:52 a.m. to
18 11:54 a.m.)
19           (Kruger's Exhibit 6, Document,
20 Bates Nos. FGIC 901933899 through 34122,
21 was marked for identification.)
22           (Kruger's Exhibit 7, Document,
23 Bates Nos. FGIC 901933813 through 33898,
24 was marked for identification.)
25

## Page 96

L. Kruger

1
2           (Kruger's Exhibit 8, Document,
3  Bates Nos. FGIC 901933760 through 33812,
4  was marked for identification.)
5           (Kruger's Exhibit 9, Document,
6  Bates Nos. FGIC 901934123 through 34204,
7  was marked for identification.)
8           (Kruger's Exhibit 10, Document,
9  Bates Nos. FGIC 901934258 through 34324,
10 was marked for identification.)
11 BY MS. EATON:
12      Q.   Mr. Kruger, in the interest of time
13 during the break we've marked a series of
14 exhibits that's numbers 6 through 10, which
15 you're free to look at as much or as little as
16 you like, but essentially they're a series of
17 e-mails to the ResCap board of directors or the
18 board of directors of the ResCap subsidiaries,
19 attaching materials, including drafts of the
20 PSA and things of that sort.
21      MR. KERR:  Could we just identify
22 them so the record is clear.
23      MS. EATON:  Sure.  I'm happy to do
24 that.
25      So Exhibit 6 is Bates stamped FGIC

## Page 97

L. Kruger

1
2  901933899 through --
3           (A Discussion was Held off the
4  Record.)
5       MS. JAMES:  Exhibit 6 is FGIC 9019
6  Bates 33899 through 34122.
7       Exhibit 7 is FGIC 901933813 through
8  33898.
9       Exhibit 8 is FGIC 901933760 through
10 33812.
11      Exhibit 9 is FGIC 901934123 through
12 34204.
13      And Exhibit 10 is FGIC 901934258
14 through 34324.
15      MR. KERR:  Great.
16 BY MS. EATON:
17      Q.   Your name is referenced on each of
18 these -- each of these exhibits.  And I don't
19 have very many questions to ask you about them.
20      It would be fair to say that these
21 are communications with the board of ResCap and
22 its subsidiaries with respect to the agreement
23 that we've been talking about, the plan support
24 agreement, the term sheet, the supplemental
25 term sheet, and the FGIC Settlement Agreement?

Page 98

L. Kruger

1
2  MR. KERR: Objection. You need to
3  look at each document to respond to that
4  question.
5  MS. EATON: If he needs to, he needs
6  to.
7  A.  That appears to be correct.
8  Q.  And these exhibits reflect what was
9  presented to those two boards with respect to
10 those agreements; correct?
11 MR. KERR: Objection.
12 A.  I don't know.
13 Q.  A lot of the attachments to these
14 exhibits have been redacted.
15        Are you aware of any presentations in
16 the form of PowerPoint slides or otherwise that
17 were made to the directors with respect to the
18 PSA, the term sheet, the supplemental term
19 sheet, or the FGIC Settlement Agreement?
20 A.  No, I am not.
21 Q.  Did you have any discussions with
22 anyone at Monarch about the FGIC Settlement
23 Agreement?
24 A.  No.
25 Q.  The PSA?

Page 99

L. Kruger

1
2  A.  No.
3  Q.  The FGIC rehabilitation proceedings?
4  A.  No.
5  Q.  Same question with respect to anyone
6  at Stonehill?
7  A.  No.
8  Q.  Same question with respect to anyone
9  at Bayview?
10 A.  No.
11 Q.  And the same question with respect to
12 anyone at CQS?
13 A.  No.
14 MS. EATON: I'm reserving my rights,
15 but I'm told that other people want to take
16 the seat; so, I'm going to conclude my
17 questions for now, with the understanding
18 that I'm reserving my rights.
19 MR. CARNEY: I'll just stand. I have
20 three questions.
21
22 EXAMINATION BY MR. CARNEY:
23 Q.  I'm Michael Carney from McKool Smith,
24 on behalf of Freddie Mac.
25        My first question is: All else being

Page 100

L. Kruger

1
2  equal, would you have entered the FGIC
3  Settlement Agreement if it did not contain a
4  FGIC commutation?
5  MR. KERR: Objection.
6  A.  I'm not -- I would entered it if the
7  documents defined the releases and a reduction
8  in claims that we got. I assume that was part
9  and parcel of getting a commutation. If there
10 was no commutation and I would not have gotten
11 those releases, there would not have been a
12 settlement.
13 Q.  But if you would have gotten releases
14 and everything else but just absent the
15 commutation, would you have entered the
16 settlement agreement?
17 MR. KERR: Objection. Assumes facts
18 not in evidence.
19 BY MR. CARNEY:
20 Q.  It's a "yes" or "no" question.
21 A.  Can you describe to me one more time
22 what the agreement is.
23 Q.  The agreement is all else being
24 equal, everything else is the same, but it does
25 not contain the FGIC commutation, would you

Page 101

L. Kruger

1
2  have entered the agreement?
3  A.  But it still contains the reduction
4  in claim amounts?
5  Q.  Yes.
6  MR. KERR: Objection.
7  MR. WYNNE: Objection. Improper
8  hypothetical.
9  BY MR. CARNEY:
10 Q.  You can answer.
11 A.  Yes.
12 Q.  Okay.
13        And so, in fact, the FGIC commutation
14 aspect itself wasn't important to the debtors,
15 was it?
16 MR. KERR: Objection.
17 Mischaracterizes testimony.
18 A.  It was important as part of the
19 global --
20 MR. CARNEY: Are you instructing him
21 not to answer?
22 MR. KERR: It's a highly improper
23 hypothetical question. If you can answer
24 that question not -- recognizing those
25 facts aren't what they are, without

26 (Pages 98 to 101)

## Page 102

L. Kruger

1 disclosing anything from the mediation.
2 A.  Want to try your question again.
3 Q.  Certainly.
4     The FGIC commutation aspect of the
5 FGIC settlement -- scratch that.
6     The FGIC commutation aspect of the
7 FGIC settlement wasn't important to the
8 debtors, was it?
9     MR. KERR:  Objection.
10 Mischaracterizes his testimony.
11 A.  It was part of the global settlement,
12 so all of that was important to us.
13 Q.  But in itself it wasn't important to
14 the debtors if you would have gotten everything
15 else?
16     MR. KERR:  Objection.  Improper
17 hypothetical.
18 BY MR. CARNEY:
19 Q.  You can answer.
20 A.  Yes.
21 Q.  Why was the commutation itself
22 important?
23     MR. KERR:  Objection.
24 A.  I thought -- I'm confused.

## Page 103

L. Kruger

1 Q.  You said that you would have, had you
2 received everything else in this global
3 settlement, you would have entered it had the
4 FGIC commutation not been a part of it; is that
5 correct?
6 A.  From the debtor's perspective.
7 Q.  Yes.  From the debtor's perspective.
8 A.  Assuming the rest of the global
9 settlement stayed in place --
10 Q.  Yes.
11 A.  -- and everything else was in place.
12 Q.  Yes.
13 A.  And I would have the same result in
14 terms of the releases that would have been
15 forthcoming?
16 Q.  Yes.
17 A.  Sounds fine to me.
18     MR. CARNEY:  All right.
19     Those are my questions.  Thank you.
20 I'll reserve any time at the end, if
21 there's any left.
22     (A Discussion was Held off the
23 Record.)

## Page 104

L. Kruger

1     (Kruger's Exhibit 11, Notice of
2 Deposition, was marked for
3 identification.)
4
5 EXAMINATION BY MR. SHORE:
6 Q.  Good afternoon, Mr. Kruger.  I'm
7 Chris Shore from White & Case, on behalf of the
8 Ad Hoc Group of Junior Secured Notes.
9     I've handed you a document that's
10 been marked as Kruger No. 11.  Have you seen
11 that document before?
12     MR. WYNNE:  Could you identify it?
13     MR. SHORE:  Yes.  It's a Notice of
14 Deposition of the Ad Hoc Group calling for
15 a 30(b)(6) witness from the debtors.
16 A.  Yes.
17 Q.  And are you here today to testify on
18 behalf of each of ResCap, LLC, which I'll call
19 ResCap, Residential Funding Corporation,
20 which I'll call RSC, and GMAC Mortgage, LLC,
21 which I'll call GMACM.
22     MR. KERR:  Mr. Shore, you requested
23 Mr. Kruger to appear at this point here.
24 He's is prepared to testify about the

## Page 105

L. Kruger

1 topics, but so --
2     MR. SHORE:  Well, no, I called for a
3 30(b)6 witness.  I asked you who you were
4 going to provide.  You said Mr. Kruger.  So
5 I'm just -- he's here as a 30(b)6 witness
6 on behalf of each of those entities; right?
7     MR. KERR:  Correct.
8 BY MR. SHORE:
9 Q.  Okay.
10     And you're prepared to testify today
11 about each of the topics which are listed on
12 the last page of Kruger No. 11?
13 A.  Yes.
14 Q.  Okay.
15     Let me clear up an authority issue
16 from some questions from this morning.
17     With respect to GMACM, did you obtain
18 any specific authority from the board of GMACM
19 to negotiate the FGIC settlement?
20 A.  The board of -- I don't -- I believe
21 I had the authority under my engagement letter
22 to negotiate the FGIC settlement.  In addition
23 to that, the board of ResCap certainly gave me
24 that authority initially.

27 (Pages 102 to 105)

L. Kruger

1
2  Q.  Okay.
3      And with respect to RFC, do you
4  recall getting a specific authorization from
5  the board of RFC to authorize -- authorizing
6  you to negotiate on behalf of RFC with respect
7  to the FGIC claims?
8  A.  No.
9  Q.  Okay.
10     And with respect to GMACM, did you
11 get a specific authorization from the board of
12 GMACM to execute the FGIC Settlement Agreement?
13 A.  No.
14 Q.  Okay.
15     And on behalf of ResCap, LLC -- I'm
16 sorry.  On behalf of RFC, did you get a
17 specific authorization from that board to
18 execute the FGIC Settlement Agreement?
19 A.  I don't know.
20 Q.  Did you seek authority or did
21 somebody seek authority on your behalf to sign
22 that agreement, the FGIC Settlement Agreement,
23 on behalf of GMACM and RFC?
24     MR. KERR:  Objection.
25 A.  I think I had that authority.

L. Kruger

1
2  Q.  And that's based upon your engagement
3  letter?
4  A.  Yes.
5  Q.  Any other thing you're relying upon
6  to give your testimony with respect to
7  authority?
8  A.  I would say conversation with the
9  board.
10 Q.  Which board?
11 A.  The board of ResCap.
12 Q.  Okay.
13     Have you ever met with the board of
14 GMACM in these cases?
15 A.  I don't know.
16 Q.  And do you recall ever meeting with
17 the board of RFC in these cases?
18 A.  I don't know.
19 Q.  Do you know who is on the board of
20 GMACM?
21 A.  No.
22 Q.  Do you know who is on the board of
23 RFC?
24 A.  No.
25 Q.  All right.

L. Kruger

1
2      Referring to 30(b)6, Topic 2, "Any
3  materials or analysis concerning
4  substantive" -- no, leave that aside.  I'm
5  sorry.
6      I want to focus first on your
7  personal diligence with respect to any FGIC
8  claims.
9      To date, have you read any of the
10 FGIC complaints that were filed prepetition?
11 A.  I've read one.
12 Q.  And which one was that?
13 A.  I don't recall which one.
14 Q.  And did you read that prior to or
15 after executing the settlement agreement?
16 A.  Prior to.
17 Q.  And what impact, if any, did your
18 reading of that complaint have on your decision
19 to execute the FGIC settlement agreement?
20 A.  It was one of a number of things that
21 I thought about in preparing and executing the
22 FGIC agreement.
23 Q.  And how did that play into your
24 decision?
25 A.  Well, I read it.  It set forth the

L. Kruger

1
2  claims that were being made by FGIC.  And those
3  informed me and they were part of the
4  considerations that I had in terms of
5  determining whether we should go forward with
6  the settlement agreement.
7  Q.  To date, have you read any of FGIC's
8  proofs of claim?
9  A.  I read one of FGIC's proofs of
10 claims, as well.
11 Q.  And did you read that prior to or
12 after the determination to settle?
13 A.  Prior to.
14 Q.  Okay.
15     And did you read any of the RMBS
16 trust claims, proofs of claim and they relate
17 to the FGIC wrapped trusts?
18 A.  No, I did not.
19 Q.  Okay.
20     And you haven't done that to date?
21 A.  No.
22 Q.  Did you do any independent legal
23 research into FGIC issues at all?
24     MR. KERR:  Objection.
25 A.  No.

28  (Pages 106 to 109)

Page 110

L. Kruger

1
2       MR. KERR: Are you talking about
3   Mr. Kruger, personally?
4       MR. SHORE: Yes. Personally. I said
5   the, lead-in with all this, I just want his
6   personal diligence.
7       MR. KERR: All right.
8   BY MR. SHORE:
9       Q. And have you done any personal legal
10  research into RMBS-related issues?
11      A. No.
12      Q. And did you have any experience in
13  dealing with RMBS-related issues in private
14  practice?
15      A. No.
16      Q. Did you talk to any existing ResCap
17  employees about facts in their possession
18  related to the FGIC complaint or the FGIC
19  proofs of claim?
20      A. No.
21      Q. Have you reviewed any prepetition
22  memoranda regarding the merits of the FGIC
23  claims which have been asserted?
24      MR. KERR: You can answer that "yes"
25  or "no."

Page 111

L. Kruger

1
2       A. Yes.
3       Q. Okay.
4       And what law firm had prepared that
5   memorandum?
6       A. Morrison & Foerster.
7       Q. And that was a memorandum that they
8   prepared prepetition with respect to the RMBS
9   claims?
10      A. I believe so.
11      Q. Have you reviewed any fact summaries
12  with respect to the claims asserted either in
13  the FGIC complaint that you read or the FGIC
14  proof of claim that you read?
15      A. Fact summaries outside of the content
16  of those two documents.
17      Q. Yes.
18      A. I don't think so.
19      Q. Okay.
20      And have you read any witness
21  interviews or reviewed any witness interviews
22  with respect to any of the facts that fall
23  within those two documents, being the proof of
24  claim that you reviewed and the complaint that
25  you reviewed?

Page 112

L. Kruger

1
2       MR. KERR: Objection.
3       A. Ask me the question one more time,
4   please.
5       Q. Sure.
6       Have you reviewed any witness
7   interviews or summaries of witness interviews
8   that go to the facts that are alleged either in
9   the FGIC proof of claim or the FGIC complaint
10  that you read?
11      A. At one point I read a Carpenter Lipps
12  presentation, but I don't recall whether they
13  were a witness or -- so that's my answer.
14      Q. And what was the general subject of
15  that presentation?
16      A. The monoline claims.
17      Q. At any time, have you spoken to any
18  FGIC officer, director or employee with respect
19  to the -- either the facts or the law related
20  to the FGIC claims asserted either in the FGIC
21  complaint that you read or the FGIC proof of
22  claim?
23      A. John Dubel.
24      Q. And when did you speak with him?
25      A. During the context of mediation over

Page 113

L. Kruger

1
2   the course of months.
3       Q. And did you speak with him about
4   underlying facts asserted in the, either the
5   FGIC proof of claim or the FGIC complaint?
6       MR. KERR: Objection. To the extent
7   this was during the mediation, I'm going to
8   direct him not to answer.
9   BY MR. SHORE:
10      Q. Are you going to follow that
11  direction?
12      A. Yes.
13      Q. And did you have any discussion about
14  the law underlying the FGIC proof of claim or
15  the FGIC complaint that you read?
16      MR. KERR: Same direction, with
17  respect to which if you can ask about
18  conversations he had with Mr. Dubel, if
19  any, outside the context of the mediation,
20  but within the mediation I'm going to
21  direct him not to answer.
22  BY MR. SHORE:
23      Q. Are you going to follow that
24  direction?
25      A. Yes.

29 (Pages 110 to 113)

Page 114

1              L. Kruger
2        Q.   And if you had -- so, let me ask this
3   then.
4              Have you had any discussions with
5   anybody who is an officer, director, employee
6   of FGIC outside the context of the mediation?
7        A.   No.
8        Q.   How about their advisors?  Have you
9   spoken to any advisor for FGIC outside of the
10  mediation regarding the FGIC claims?
11       A.   No.
12             MR. SHORE:  And I take it that the
13       instruction is that to the extent that
14       there were any discussions in connection
15       with the -- within the mediation, no matter
16       what the content was of those discussions,
17       those are going to be the subject of the
18       mediation privilege assertion?
19             MR. KERR:  Correct.
20  BY MR. SHORE:
21       Q.   Other than your review of the FGIC
22  proof of claim and the FGIC complaint, what
23  other materials did you review in reaching your
24  determination that the settlement agreement was
25  a proper exercise of your business judgment?

Page 115

1              L. Kruger
2        A.   I had read presentations by
3   Morrison & Foerster on monoline claims.
4        Q.   Okay.
5             How many?
6        A.   Some.
7        Q.   Anything else?  Any other written
8   materials you relied upon?
9        A.   I don't think so.
10       Q.   Let me ask this question.
11             Did any of your discussions with
12  Mr. Dubel inform your business decision to
13  enter into the settlement agreement?
14       A.   No.
15       Q.   Okay.
16             Let me understand and clarify another
17  set of issues.  Who was on the -- how would you
18  describe the ResCap/FGIC team, that is, the
19  people on your team, both lawyers, advisors,
20  who were responsible for addressing issues
21  related to the FGIC proofs of claim?
22       A.   Do you want specific attorneys at
23  Morrison Foerster?
24       Q.   Yes.  Yes.
25             MR. KERR:  This is with respect to

Page 116

1              L. Kruger
2   the FGIC proof of claim, not the settlement
3   agreement?
4             MR. SHORE:  The FGIC proof of claim
5   which is settled in the settlement
6   agreement.  Just the FGIC issues.
7        A.   Gary Lee, I think.  I think Lorenzo
8   Marinuzzi.  Maybe Jennifer Marines.
9        Q.   Okay.
10             What business people --
11             MR. KERR:  Are you through?
12             MR. SHORE:  I'm not asking for an
13       exhaustive list.  I'm trying to get --
14       A.   I'm not sure who at the financial
15  advisors.  Probably Mark Ramsey.
16       Q.   Okay.  Ramsey.
17             What about Puntus?
18       A.   Marc Puntus.
19       Q.   Okay.
20             And who at the -- who at, either an
21  officer, director, employee of ResCap would be
22  on that team?  ResCap, I'm meaning all the
23  debtor entities.
24       A.   When you say "on the team," what do
25  you mean by that?

Page 117

1              L. Kruger
2        Q.   People at any debtor who had a
3   material role in the process of negotiation or
4   in making a determination to enter into the
5   FGIC settlement agreement.
6        A.   No one.
7        Q.   Other than yourself?
8        A.   Other than myself.
9        Q.   Okay.
10             And what did you consider to be the
11  MoFo lawyers's role in -- on the FGIC team?
12       A.   To render advice to me, to answer
13  questions from me, to review the strengths and
14  weaknesses of the FGIC claims, trustees claims.
15       Q.   And is there anything else that you
16  considered their responsibility on that team?
17       A.   Well, to engage in the drafting of
18  the settlement agreement, documentation of it.
19       Q.   Anything else?
20       A.   No, I think that's it.
21       Q.   Okay.
22             And what was the role of the
23  financial advisors on that team?
24       A.   To review for me the FGIC settlement
25  in the context of the overall global

Page 118

```
 1              L. Kruger
 2   settlement.
 3      Q.   Did they -- was any part of their
 4   responsibility to run permutations on the
 5   amounts of FGIC claims under certain scenarios?
 6         MR. KERR:  Objection.  You say "FGIC
 7   claims."  Just to understand --
 8         MR. SHORE:  The claims asserted by
 9   FGIC.
10         MR. KERR:  Objection to form.
11      A.   In the context of the mediation,
12   there were financial presentations which looked
13   at various claims, FGIC and others.
14      Q.   Okay.
15         Specifically in connection with your
16   determination to execute the settlement
17   agreement, did they provide you any specialized
18   presentation on claims that were either
19   asserted by FGIC or the RMBS trust with respect
20   to FGIC wrapped trusts?
21      A.   No.
22         MR. KERR:  Objection to form.
23   BY MR. SHORE:
24      Q.   All right.
25         What did you consider your role to be
```

Page 119

```
 1              L. Kruger
 2   on that team?
 3      A.   The business person making the
 4   decision to go forward or not.
 5      Q.   And what did you understand to be
 6   your role in the negotiation of that business
 7   arrangement?
 8      A.   Just as I said, to be the person on
 9   behalf of the debtors to determine whether or
10   not to enter into the agreement.
11      Q.   Well, other than review materials
12   that were given to you by either MoFo or the
13   financial advisors, what role did you play in
14   negotiating the FGIC settlement agreement?
15         MR. KERR:  Objection.
16      A.   I participated in the mediation
17   sessions, which were attended by a cast of, you
18   know, large numbers of people, sort of a
19   swirling kaleidoscope of activity.  I was a
20   participant in those.
21         I had discussions with people
22   present, Cathy Patrick among them, and others,
23   counsel for the trustees.
24      Q.   Well, let me focus on the time.
25         There came a time when there was a
```

Page 120

```
 1              L. Kruger
 2   plan support agreement that was executed;
 3   right?
 4      A.   Yes.
 5      Q.   And, but at that time the FGIC claim
 6   amounts had not been set?
 7         MR. KERR:  Objection.
 8   Mischaracterizes his testimony.
 9   BY MR. SHORE:
10      Q.   Right?
11      A.   I'm not sure I'm following the
12   question.
13      Q.   Okay.
14         Were the FGIC -- well, let me ask
15   this question.
16         What's your understanding of why the
17   FGIC settlement is being proposed now rather
18   than as part of the plan?
19      A.   Because of the rehabilitation
20   process, is my understanding.
21      Q.   Is it your testimony that at the time
22   the PSA was signed, all aspects of the FGIC
23   settlement agreement had been negotiated?
24         MR. KERR:  Objection.  Asked and
25   answered.
```

Page 121

```
 1              L. Kruger
 2      A.   Essentially, yes.
 3      Q.   Okay.
 4         And what was outside that?  When you
 5   say "essentially yes."
 6         MR. KERR:  Objection.
 7      A.   At the time the PSA was executed,
 8   there was not a written settlement agreement.
 9      Q.   So let me focus on that period of
10   time.
11         What role did you play in the post
12   PSA signing with respect to the FGIC settlement
13   agreement?
14      A.   Reading of the document that is now
15   called the Settlement Agreement.
16      Q.   Okay.
17         Anything else?
18      A.   Conversation with my counsel.
19      Q.   Did you have any conversations
20   directly with FGIC or any FGIC attorney or
21   representative?
22      A.   I don't recall.
23      Q.   And did you have any direct
24   communications with any FGIC attorney or
25   representative?
```

31 (Pages 118 to 121)

Page 122

```
 1              L. Kruger
 2      A.   I don't think so.
 3      Q.   What was the role of Judge Peck in
 4  the -- in your determination to -- if any, in
 5  your determination to execute the FGIC
 6  Settlement Agreement?
 7          MR. KERR:  Okay.  Again, I'm just
 8  trying to be careful about the
 9  confidentiality of the mediation process.
10  I don't want you to reveal what was
11  discussed or whatever in the mediation
12  role.
13          If you can answer that question
14  without doing so.  If not --
15      A.   I mean, Judge Peck was sort of the
16  person running the mediation process and the
17  agreements that were reached were reached sort
18  of under his process, if you will.
19          So I don't know how else to answer
20  that question.
21      Q.   Did Judge Peck provide the debtors
22  with any advice as to what a reasonable FGIC
23  claim amount would be?
24          MR. KERR:  Objection.  I'm going to
25  direct the witness not to answer the
```

Page 123

```
 1              L. Kruger
 2  confidentiality --
 3  BY MR. SHORE:
 4      Q.   Are you going to follow that
 5  direction?
 6      A.   Yes.
 7      Q.   Okay.
 8          Do any of the debtors contend that
 9  they relied upon the reviews of Judge Peck with
10  respect to their determination to enter into
11  the FGIC Settlement Agreement?
12          MR. KERR:  Objection.
13      A.   Only to the extent that Judge Peck
14  was obviously part of the process that reached
15  the global settlement agreement.  So to that
16  extent, sort of relied upon his participation.
17      Q.   What do you mean by that?
18      A.   Just that.
19      Q.   You can't provide any further
20  testimony?
21      A.   Why don't you reask your question.
22  I'll see if I can answer it.
23      Q.   Sure.
24          Is it -- do any of the debtors
25  contend in connection with the motion they
```

Page 124

```
 1              L. Kruger
 2  filed for approving the FGIC settlement
 3  agreement, that Judge Peck played any
 4  substantive role in the determination with
 5  respect to the amount of any FGIC claims which
 6  were agreed to?
 7          MR. KERR:  Objection.  Again, I think
 8  you're invading the confidentiality
 9  mediation, and I'm going to direct the
10  witness not to answer.
11          MR. SHERWIN:  I'm just asking him yes
12  or no.
13          MR. KERR:  And I'm going to direct
14  the witness not to answer that question.
15  BY MR. SHORE:
16      Q.   So it's possible that Judge -- that
17  your determination with respect to FGIC claim
18  amounts was based upon a recommendation of any
19  sort from Judge Peck --
20          MR. KERR:  Again --
21      Q.   -- as to an appropriate amount of the
22  claim?
23          MR. KERR:  -- I direct the witness
24  not to answer.  And, again, just so I'm
25  clear, based on the confidentiality order
```

Page 125

```
 1              L. Kruger
 2  in place respecting the issue.
 3  BY MR. SHORE:
 4      Q.   And you're going to follow that
 5  instruction?
 6      A.   Yes.
 7      Q.   So what did you rely upon in
 8  determining to execute the FGIC Settlement
 9  Agreement?
10      A.   That the FGIC Settlement Agreement
11  was part of the general overall global
12  settlement that, as I've said before in
13  testimony here today, seemed to me to be an
14  outstanding good result for the various
15  participants in the process and for all
16  creditors of the various estates.
17          And it seemed to be that the
18  alternative of endless litigation among the
19  creditors, the debtor, no Ally contribution and
20  the like, was a much worse alternative for all
21  participants in this process.
22      Q.   Let me restate my question.
23          Just what did you rely upon?  I take
24  it one thing you relied upon was the -- were
25  the presentations that MoFo was giving?
```

32 (Pages 122 to 125)

Page 126

L. Kruger

1  
2     MR. KERR: Objection.
3     A.   I relied on a lot of things.  That
4  was among them.
5     Q.   Okay.
6         That was one.  First of all, let's be
7  clear what the -- Morrison & Foerster presented
8  you with presentations and you relied upon them
9  in determining to execute the --
10    A.   No.  They -- I sought their -- they
11 told me their views of various issues,
12 strengths and weaknesses of various of the
13 parties's claims.  Then I made my own decision
14 as to whether or not to proceed.
15    Q.   Good.  So let's clear that up.
16        You are not stating that -- that
17 reliance upon counsel is a basis for approving
18 the FGIC motion?
19    MR. KERR: Let me respond to that,
20 because that's really a legal question.
21    We're not asserting a reliance on
22 counsel, defense or however you want to
23 characterize it here.  Mr. Kruger made his
24 independent judgment.  He has testified --
25 he has testified about the basis of his

Page 127

L. Kruger

1  
2  independent judgment.
3     MR. SHORE: Okay.
4     MR. KERR: Clearly he had discussions
5  with counsel, he had discussions in the
6  mediation.  They're confidential that all,
7  as he described part and parcel, into what
8  the thought processes were.
9  BY MR. SHORE:
10    Q.   Okay.
11        So what of the things you relied upon
12 in making your determination with respect to
13 the advisability of entering into the FGIC
14 Settlement Agreement do you feel can be
15 appropriately disclosed without waiving an
16 attorney-client privilege or waiving a
17 mediation privilege?
18    MR. KERR: Objection.  Asked and
19 answered.
20    A.   I don't think there's anything.
21    MR. KERR: Other than what he has
22 already testified to.
23    MR. SHORE: You're not testifying.
24    MR. KERR: Okay.  But you --
25    MR. SHORE: No.  Make an appropriate

Page 128

L. Kruger

1  
2  objection to the form.  You can't do that
3  and you know you can't do that.  And if I
4  show Judge Glenn that little statement you
5  made at the end of the witness's testimony
6  when he was completed, there was a period
7  at the end of that, he wouldn't be pleased.
8     MR. KERR: Okay.  And I would ask,
9  Mr. Shore, that you ask clear questions so
10 the witness can answer them clearly and
11 make sure that he understands what you're
12 asking him so he can answer it.  Okay.
13    MR. SHORE: Well, I would have
14 expected that if you thought my question
15 was unclear, you would have interposed a
16 form objection, not made a speaking
17 statement on the record which attempted to
18 modify your witness's statement.
19    So please feel free, it doesn't hurt
20 my feelings, you can object to any question
21 you think is unclear by saying "Objection
22 to form." Okay.
23 BY MR. SHORE:
24    Q.   So what role do you believe the
25 ResCap, LLC board had in approving the FGIC

Page 129

L. Kruger

1  
2  Settlement Agreement?
3     A.   I think, as I've said before, they
4  were aware of its terms and they authorized me
5  to proceed.
6     Q.   Okay.
7         But you believe you already had the
8  authorization to do so?
9     A.   I believe so.
10    Q.   And did the board express to you any
11 views on their part with respect to the merits
12 or propriety of entering into the FGIC
13 Settlement Agreement?  Yes or no, let's start
14 there.
15    MR. KERR: Well, objection.  I just
16 want to, again, to the extent you can
17 answer "yes" or "no" without disclosing
18 privileged communications, I think you can
19 answer that question "yes" or "no."
20    A.   No.
21    Q.   So there wasn't a single board member
22 who had a communication with you, either oral
23 or written, where they expressed any view with
24 respect to whether or not you should be
25 entering into the FGIC Settlement Agreement?

33  (Pages 126 to 129)

Page 130

L. Kruger

1
2    A.   Oh, I'm sorry, I misunderstood your
3    question.  Why don't you restate your question,
4    Chris.
5    Q.   Sure.
6        Did you have any communications with
7    any board member of ResCap, LLC, where they
8    expressed their views as to the propriety of
9    you executing the FGIC Settlement Agreement?
10    A.   I think the board --
11        MR. KERR:  Again, you can answer that
12    "yes" or "no" without revealing
13    communications, if you can.
14    A.   Yes.
15    Q.   And what did they say?
16        MR. KERR:  Objection.  To the extent
17    you had conversations with the board
18    outside the presence of counsel, you can
19    answer the question; but to the extent you
20    had conversations with the board in the
21    presence of counsel, I will object to --
22    BY MR. SHORE:
23    Q.   Well, first let's find out, outside
24    the presence of counsel.
25    A.   None.

Page 131

L. Kruger

1
2    Q.   Okay.
3        Within the presence of counsel?
4        MR. KERR:  Again, if your question is
5    what was communicated with the board in the
6    presence of counsel, I think that is within
7    the privilege, and I will direct the
8    witness not to answer that question.
9        MR. SHORE:  Within which privilege?
10        MR. KERR:  Attorney-client privilege.
11        MR. SHORE:  Attorney-client
12    privilege.  All right.  So let's break that
13    down.
14    BY MR. SHORE:
15    Q.   First of all, can you isolate how
16    many such communications there were?
17    A.   Some.
18    Q.   Was it at one meeting, two meetings,
19    outside meetings, what can you tell me that
20    won't evade the privilege first, to the extent
21    one exists?
22    A.   I don't remember the number of
23    discussions we had with the board or I had with
24    the board.  A few.
25    Q.   Okay.

Page 132

L. Kruger

1
2        Do you any recollection of what a --
3    the substance of what the -- any particular
4    board member said?
5        MR. KERR:  Again, you can answer that
6    question "yes" or "no" without revealing
7    the substance, if you recall.
8    A.   No.
9    Q.   And can you remember the identity of
10    any board member who expressed a view?
11    A.   No.
12    Q.   Okay.
13        So you think that there were some
14    communications coming from the board members to
15    you with respect to the FGIC Settlement
16    Agreement, but you can't remember who said it,
17    what they said, or when they said it?
18    A.   Well, they said it during board
19    meetings.
20    Q.   Okay.
21        So -- but you don't know which board
22    meeting?
23    A.   Correct.
24    Q.   And you don't know who said it?
25    A.   Correct.

Page 133

L. Kruger

1
2    Q.   And you don't recall what they said?
3    A.   Correct.
4    Q.   Did you assist -- at the board
5    meetings that we're talking about now, did you
6    assist in the presentation of any materials
7    that were presented to the ResCap, LLC board?
8        MR. KERR:  Objection.
9    A.   About what?
10    Q.   About -- sorry.  About the FGIC
11    Settlement Agreement.
12    A.   No.
13    Q.   Did you assist in the preparation of
14    any materials that were presented to the
15    ResCap, LLC board on monoline claims?
16    A.   No.
17    Q.   How many ResCap, LLC board meetings
18    did you attend, either in person or on the
19    phone, with respect to the FGIC issues, which
20    would either be the negotiation of the
21    agreement with FGIC or the entry into the FGIC
22    Settlement Agreement?
23    A.   As I said before, some.
24    Q.   And I think you said before, but
25    there are no minutes kept of who attends what

Page 134

1           L. Kruger
2  board meetings?
3      A.  I don't know.
4      Q.  Okay.
5          You've never been asked to review
6  board minutes of meetings you've been at?
7      A.  Correct.
8      Q.  What did you view your role to be at
9  the ResCap, LLC board meetings you've testified
10 to, that is, to discuss any kind of FGIC
11 related or a monoline-related issue?
12     A.  That's what I thought my role was, to
13 discuss with the board the FGIC settlement.  My
14 view of it.
15     Q.  And did you express your views in
16 writing at those board meetings?
17     A.  No.
18     Q.  Was there a secretary present keeping
19 notes?
20     A.  I don't know.
21     Q.  Were you aware of whether there were
22 any corporate resolutions at GMACM with respect
23 to the FGIC Settlement Agreement?
24     A.  I don't know.
25     Q.  What about at RFC?

Page 135

1           L. Kruger
2      A.  I don't know.
3      Q.  Do you know whether there were any
4  shareholder or member consents that were given
5  for those entities in connection with the FGIC
6  Settlement Agreement?
7      A.  Not that I know of.
8      Q.  So let's just focus on the proofs of
9  claim.
10         You understand that as part of the
11 FGIC Settlement Agreement, FGIC is compromising
12 the proofs of claim it filed at GMACM, RFC and
13 ResCap, LLC; right?
14     A.  Yes.
15     Q.  And it's also compromising the trust
16 claims filed at those three estates; right?
17         MR. KERR:  Objection.
18     A.  I assume the trusts are compromising
19 their claims.
20     Q.  Right.
21         Well, the settlement agreement is
22 compromising those claims; right?  Because the
23 trusts are providing releases.
24     A.  Correct.
25     Q.  And are you aware of who on the FGIC

Page 136

1           L. Kruger
2  team that we defined earlier reviewed the trust
3  claims that are being comprised as part of the
4  settlement?
5      A.  No.
6      Q.  And are you aware of who on the FGIC
7  team reviewed the other proofs of claim that
8  had been filed by FGIC that you hadn't
9  reviewed?
10     A.  I don't know.
11     Q.  Is it your assumption that somebody
12 reviewed those?
13     A.  I assume, but I don't know.
14     Q.  And, as you sit here today, on behalf
15 of any of the three debtors you're appearing
16 for, did any of those debtors have a reason to
17 believe that those proofs of claim could be
18 amended to add additional claims at this time?
19         MR. KERR:  Objection.
20     A.  I don't know.
21     Q.  Each of those estates has a bar date
22 in it; right?
23     A.  Yes.
24     Q.  Okay.
25         Let me ask you to explain, and maybe

Page 137

1           L. Kruger
2  you can turn to your declaration, which is
3  marked as Kruger No. 2 --
4          (A Discussion was Held off the
5  Record.)
6          MR. SHORE:  Kruger No. 2, which is
7  the declaration.
8          MR. KERR:  You want the PSA
9  declaration or the FGIC declaration?
10         MR. SHORE:  The FGIC declaration.
11 Sorry.  It's right here.
12 BY MR. SHORE:
13     Q.  Can you turn to page 10, Footnote 7.
14 I ask you to review that.
15     A.  (Document Review.)
16         Okay.
17     Q.  All right.
18         Who wrote that footnote?
19     A.  My counsel.
20     Q.  And you believe everything in there
21 to be true?
22     A.  I believe so.
23     Q.  All right.
24         Can you explain how the FGIC trustees
25 proofs of claim and the FGIC proofs of claim

35 (Pages 134 to 137)

Page 138

```
1              L. Kruger
2    overlap, if they do?
3              MR. KERR:  Objection.
4         A.   Explain how they overlap?
5         Q.   Yes.
6              MR. KERR:  Objection, to the extent
7    you're asking for a legal conclusion.  Two,
8    I object to the extent you are -- you would
9    be revealing privileged communications with
10   respect to answering that question.
11        So if you can answer that question
12   without revealing privileged
13   communications, you can do so.
14        A.   Do you want to repeat the question.
15        Q.   Sure.
16             How, in your view, nonlegal view, if
17   you have one, do the FGIC proofs of claim and
18   the FGIC trust proofs of claim overlap?  Let me
19   ask it more colloquially for you.
20             Do you believe that those proofs of
21   claim set forth claims for separate debts or
22   obligations, or that in some respects they
23   assert claims for the same debts and
24   obligations?
25        A.   I don't know.
```

Page 139

```
1              L. Kruger
2              MR. KERR:  Again, and I -- I just
3    counsel the witness -- I'm going to state
4    my objection.
5              Counsel the witness that in answering
6    that question you don't reveal any
7    privileged communications.
8         A.   I don't know.
9         Q.   Okay.
10             So I take it that any understanding
11   of how those claims might overlap or not
12   overlap didn't form a basis for you to
13   determine to execute the FGIC settlement
14   agreement?
15        A.   Is your question who owns those
16   claims?
17        Q.   My question -- well, first of all,
18   can you answer the question I just gave you,
19   which is, in your execution of the FGIC
20   Settlement Agreement, did you have any view
21   in your mind as to whether or not FGIC and the
22   trustees were separate -- were asserting the
23   same claims or different claims?
24             MR. KERR:  Again, I'm going to
25   object.  You can answer that question to
```

Page 140

```
1              L. Kruger
2    the extent you don't reveal any
3    communications with counsel, but you can
4    answer the question.
5         A.   I believe they had separate claims.
6         Q.   Okay.
7              And what's the basis for your belief?
8              MR. KERR:  Same objection.
9         A.   FGIC had its claims and the trustees
10   had their claims.
11        Q.   Okay.
12             Did you understand that those claims
13   were for separate obligations?
14        A.   I believe so.
15        Q.   And what is the basis of that belief?
16             MR. KERR:  Same objection.
17        A.   Conversation with my counsel and my
18   own business decision.
19        Q.   Okay.
20             But your own business decision wasn't
21   based upon any review of the RMBS trusts proofs
22   of claim; right, because you didn't do that?
23             MR. KERR:  Objection.
24        A.   I had not reviewed those.
25        Q.   Okay.
```

Page 141

```
1              L. Kruger
2              So let me ask you a question now, and
3    you may want to pull out No. 1, which is the
4    settlement agreement.
5         A.   Okay.
6         Q.   All right.
7              I'm going to ask you to turn to
8    page 4, Section 2.01, the releases.
9         A.   Uh-huh.
10        Q.   Now, you don't need to review that.
11   Let me give you a lead-in question on this.
12             Am I right that the FGIC settlement
13   agreement contemplates two scenarios, one in
14   which the plan is confirmed and one in which
15   the plan is not confirmed; right?
16        A.   Correct.
17        Q.   I want to focus on the situation in
18   which the plan is not confirmed.  All right.
19             And I want to focus on the trustee
20   claims.  What happens to the trustee claims as
21   your business understanding in the deal you
22   reached, what happens to the trustee claims if
23   the plan is not confirmed?
24        A.   I believe they are released.
25        Q.   Okay.
```

36 (Pages 138 to 141)

Page 142

L. Kruger

1  
2       So notwithstanding their assertion of
3  a five -- or I think you said in here more than
4  five billion dollars of claims, they give up
5  those claims in the debtor's view if the plan
6  is not confirmed?
7       MR. KERR:  Objection.
8       A.   And the settlement agreement is
9  confirmed by the court.
10      Q.   Right.
11      A.   Yes.
12      Q.   Okay.
13           And then, I take it that the -- that
14 if this settlement agreement is approved,
15 you're right to put that qualification in, but
16 the plan does not close, the trustees are free
17 to go -- to pursue their claims against Ally,
18 whatever claims they might have; right?
19      A.   I assume so.  I assume the global
20 settlement goes away.
21      Q.   And in the same scenario, FGIC is
22 permitted to pursue its claims against Ally?
23           MR. KERR:  Objection.
24      A.   Yes.
25      Q.   What analysis, if any, have you seen

Page 143

L. Kruger

1  
2  as to whether or not Ally has a right of
3  indemnity or contribution if it is liable to
4  any RMBS trust or FGIC with respect to its
5  claims?
6       Have you seen one?  Let's start yes
7  or no.
8       A.   Yes.
9       Q.   And in forming -- in forming your
10 determination to execute the FGIC Settlement
11 Agreement, did you consider the possibility
12 that if this settlement agreement is approved
13 and the plan is not confirmed, that FGIC can
14 sue Ally, and if it recovers, Ally might be
15 able to make a claim back against any debtor
16 estate?
17      MR. KERR:  Objection.
18      A.   I discussed that with my counsel.
19      Q.   Okay.
20           And did you reach a conclusion, yes
21 or no?
22      MR. KERR:  Objection.
23 BY MR. SHORE:
24      Q.   And to whether there was any risk of
25 that?

Page 144

L. Kruger

1  
2       A.   No.
3           MR. KERR:  Again, you can answer that
4  "yes" or "no."
5  BY MR. SHORE:
6       Q.   And did you perform a business view
7  as to the level of the risk of that happening?
8       A.   No.
9       Q.   But you agree with me that
10 technically the way the settlement agreement
11 works, FGIC would be able to assert claims
12 against Ally and Ally might be able to assert
13 claims back against the debtors?
14           MR. KERR:  Objection.
15      A.   I have to stop and read the agreement
16 to be sure.  You are correct.
17      Q.   In reviewing -- do you understand
18 that one of the theories that FGIC had asserted
19 in its proofs of claim was that RFC was
20 derivatively liable for the debts of GMACM and
21 GMACM was derivatively liable for the debts of
22 RFC?
23      A.   I don't know if I saw that.  I saw
24 that in the alter ego argument.
25      Q.   Okay.

Page 145

L. Kruger

1  
2       Well, so, let me talk about
3  derivative liability and I'll give you a
4  definition of derivative liability.
5       Where a particular debtor entity
6  would be held responsible for the debts of
7  another legal entity without ever having
8  transacted with the third party.
9       Okay?
10      A.   Uh-huh.
11      Q.   All right.
12           (A Discussion was Held off the
13 Record.)
14           (Kruger's Exhibit 12, Proof of
15 Claim by FGIC, was marked for
16 identification.)
17 BY MR. SHORE:
18      Q.   All right.
19           Kruger No. 12, for the record, is a
20 proof of claim filed by FGIC against
21 Residential Funding Company, LLC.  I know that
22 people out here might be holding ones with
23 different names on them.
24      A.   Okay.
25      Q.   But I will represent that is the same

37  (Pages 142 to 145)

Page 146

```
 1              L. Kruger
 2   substance that was attached to each of them.
 3   I'm just doing it for convenience of counsel so
 4   that more people can have a copy of it.
 5          And if you look at the attachment on
 6   the third page of Kruger No. 12, is this the
 7   attachment you reviewed before when you said
 8   you reviewed a FGIC proof of claim?
 9          MR. KERR:  Objection.
10      A.   As I said, I reviewed one FGIC proof
11   of claim, but I assume -- you said that they're
12   the same. I take your word for it.
13      Q.   Okay.
14          Well, as I said, do you recall
15   reviewing this document entitled "Attachment to
16   Proofs of Claim of FGIC against" -- you see
17   it's ResCap, LLC, GMAC Mortgage and RFC?
18      A.   Yes.
19      Q.   Okay.
20          If you turn to -- turn to
21   paragraph 39. So, actually, let me focus you
22   on 38. All right.
23          You see in 38, FGIC claims it's
24   entitled to receive damages from each of the
25   debtors in an amount not less than 1.85
```

Page 147

```
 1              L. Kruger
 2   billion?
 3      A.   Uh-huh.
 4      Q.   Okay.
 5          And in little 3 there, "Expectation
 6   damages from -- for any losses on the trusts."
 7      A.   Yes.
 8      Q.   Do you understand that the RMBS
 9   trusts also asserted claims against these three
10   debtors at issue for expectation damages for
11   losses on the trust?
12          MR. KERR:  Objection.
13      A.   I don't know.
14      Q.   Then if you look on paragraph 39, I'm
15   going to come back that the first sentence that
16   says that ResCap is liable, but it says,
17   "Additionally, as described previously, GMACM
18   and RFC are likewise jointly and severally
19   liable for FGIC's damages."
20          Do you see that?
21      A.   Yes.
22      Q.   Okay.
23          What role, if any, did you -- well, first
24   of all, did you consider the possibility that
25   GMACM and RFC might be jointly and severally
```

Page 148

```
 1              L. Kruger
 2   liable in making your determination as to
 3   whether or not to settle in the FGIC Settlement
 4   Agreement?
 5      A.   Yes.
 6      Q.   Okay.
 7          And what role did that have?
 8      A.   I discussed it with my counsel.
 9      Q.   And did you form a business view as
10   to the level of risk that that would happen?
11      A.   No.
12      Q.   But I take it as part of the
13   settlement agreement, there is no -- that there
14   is no joint and several liability, there are
15   fixed amounts set at each estate?
16          MR. KERR:  Objection.
17      A.   Under which scenario, plan, no plan?
18      Q.   Well, okay.
19          The -- only one claim can be asserted
20   against GMACM by FGIC; right?
21          MR. KERR: Objection.
22      A.   Under --
23      Q.   Under the settlement agreement.
24      A.   Right.
25      Q.   Even if the plan isn't consummated,
```

Page 149

```
 1              L. Kruger
 2   there is only ever going to be one claim
 3   against GMACM?
 4      A.   Correct.
 5      Q.   And whether or not the plan is ever
 6   consummated, there's only going to be one FGIC
 7   claim against RFC?
 8      A.   Correct.
 9      Q.   Now, with respect to the claims that
10   are listed in paragraph 38, did you understand
11   that there was a possibility that if litigated
12   to conclusion, those claims could result in a
13   zero recovery by FGIC?
14      A.   I discussed the status --
15          MR. KERR:  Wait. Again, you can
16   answer that question without revealing
17   communications with clients, with your
18   attorneys, but why don't you listen to the
19   question again.
20      A.   Give it again.
21      Q.   Sure.
22          With respect to the claims that are
23   outlined in paragraph 38 of Kruger No. 12, did
24   you reach an understanding that there was a
25   possibility that, if litigated to conclusion,
```

Page 150

L. Kruger

1
2  FGIC would be -- would have no claims at any of
3  the three debtors?
4      A.  No.
5      Q.  You had always believed that, if
6  litigated, FGIC would be entitled to some
7  claim?
8      A.  I've had all these discussions with
9  counsel.  I'm uncomfortable describing those
10  conversations or the conclusions of them.
11      Q.  When you say you're uncomfortable,
12  are you going to get an instruction from
13  counsel?  Are you going to follow counsel's
14  instructions?
15      MR. KERR:  Let me help the witness
16  out.
17      Mr. Kruger, you -- I think the
18  question is did you reach an understanding.
19  And if you can testify to any understanding
20  you reached as a business person, that's
21  fine.  I just don't want you to reveal any
22  communications that you had with counsel in
23  connection with responding to that
24  question.
25      And if you don't know, you don't

Page 151

L. Kruger

1
2  know, but --
3      A.  I don't know.
4      Q.  And did you understand that there was
5  a possibility that even if the FGIC claims were
6  litigated to conclusion and resulted in a
7  recovery or a claim amount awarded to FGIC,
8  that, nonetheless, it might not be able to
9  receive any distribution if its claim was
10  subordinated?
11      A.  Yes.
12      Q.  Okay.
13      And while you were negotiating the
14  FGIC Settlement Agreement, did you have an
15  understanding as to what the likelihood of
16  distribution was at GMACM on account of a
17  subordinated unsecured claim?
18      MR. KERR:  Again, you can answer that
19  question to the extent you don't reveal any
20  privileged communications.
21  BY MR. SHORE:
22      Q.  I'm just talking about the math here.
23      A.  Repeat that question.
24      Q.  Sure.
25      Let me ask it in a different way.

Page 152

L. Kruger

1
2      Have you seen any financial analysis
3  since you have been CRO of these three
4  particular debtors in which GMACM has
5  distributable value available for a class of
6  claims that are subordinate to general
7  unsecured claims?
8      A.  No.
9      Q.  And what about with respect to RFC?
10      A.  No.
11      Q.  So was it your working assumption
12  when negotiating the FGIC settlement agreement
13  that if FGIC's claims were subordinated, that
14  they would not receive any recovery at
15  either -- at any of the three estates?
16      MR. KERR:  Objection.  Assumes facts
17  not in evidence.
18      A.  I did not consider that.
19      Q.  Well, did you consider at any time
20  during the negotiation of the FGIC Settlement
21  Agreement that whether, by way of litigation or
22  by subordination, that FGIC would get a zero
23  recovery in the GMACM estate?
24      A.  I did consider whether or not their
25  claims could be subordinated, and I discussed

Page 153

L. Kruger

1
2  that with my counsel.
3      Q.  Uh-huh.
4      But you didn't consider the effect of
5  what subordination would mean?
6      MR. KERR:  Objection.
7      A.  I did consider the effect of what
8  subordination would mean.
9      Q.  And what was your conclusion?
10      A.  That the risk of -- that the
11  alternative of the settlement agreement was far
12  superior to them engaging in litigation.
13      Q.  Now, I'm just trying to focus on the
14  consequence of what subordination meant and I'm
15  just trying to harmonize the answers you gave.
16      You haven't seen anything that shows
17  that a subordinated claim would get a
18  distribution.  Did you understand that in the
19  context of the allowance of the FGIC claims or
20  the litigation of the FGIC claims, that FGIC
21  might, in fact, get zero?
22      A.  Yes.
23      Q.  Okay.
24      Have you seen any -- well, let me ask
25  it this way.  What was the working, your

39 (Pages 150 to 153)

Page 154

```
 1           L. Kruger
 2  working assumption in negotiating the FGIC
 3  Settlement Agreement as to the possibility
 4  that -- I'm going to deal with a different
 5  theory of derivative liability -- that at any
 6  creditor would pierce the corporate veil
 7  between GMACM and ResCap, LLC?
 8      A.   It's another subject that I discussed
 9  with my counsel.
10      Q.   But you formed no view as to the risk
11  that would happen?
12      A.   I understood the risk and I thought
13  that the litigation to get to the conclusion
14  was not worth the risk.
15      Q.   Okay.
16           And what about with respect to
17  piercing the corporate veil between RFC and
18  ResCap, LLC?
19      A.   Same answer.
20      Q.   And did you, in analyzing the --
21  whether or not to enter into the FGIC
22  Settlement Agreement, the possibility that
23  GMACM and ResCap, LLC, could be substantively
24  consolidated in the bankruptcy cases?
25      A.   If there was no settlement agreement.
```

Page 155

```
 1           L. Kruger
 2      Q.   Yes.
 3      A.   Sure.
 4      Q.   Okay.
 5           And did you form a view as to the
 6  risk of that?
 7      A.   Yes.
 8      Q.   And did that inform your decision to
 9  enter into the FGIC Settlement Agreement?
10      A.   Yes.
11      Q.   Okay.
12           And what about with respect to the
13  RFC side?
14      A.   Yes.
15      Q.   Same answers?
16      A.   Same answer.
17           MR. KERR:  Chris, at some point, I
18  don't know whether you're going to take a
19  break for lunch or --
20           MR. SHORE:  Sure.  I'm happy to take
21  a break.  Let's take a break.
22           (Recess taken from 12:59 p.m. to
23  1:30 p.m.)
24
25
```

Page 156

```
 1           L. Kruger
 2           AFTERNOON SESSION
 3           (Time noted:  1:30 p.m.)
 4
 5  L E W I S   K R U G E R,
 6      resumed and testified as follows:
 7  CONTINUED EXAMINATION
 8  BY MR. SHORE:
 9      Q.   Let's focus on the claims that are
10  being allowed at RFC -- sorry, ResCap, LLC.
11           What's the reason why the claim is
12  fixed if the plan is confirmed but left
13  unliquidated if the plan is not confirmed?
14           MR. KERR:  Again, Chris, as you know,
15  there's a question about whether or not
16  plan confirmation issues need to be
17  addressed as part of the plan confirmation
18  process.
19           I recognize that there's stuff in the
20  FGIC Settlement Agreement, so -- and I --
21  this is not a place to be talking about
22  broader plan confirmation issues.  So I
23  will object if I think we're getting there.
24      A.   Want to start the question again.
25      Q.   Sure.
```

Page 157

```
 1           L. Kruger
 2           What's the reason why the FGIC claim
 3  at ResCap, LLC, is fixed if the plan is
 4  confirmed but left unliquidated if the plan is
 5  not?
 6           MR. KERR:  And, again, are you
 7  talking -- you're referring to the FGIC
 8  Settlement Agreement, because if you're
 9  talking more than that, then I don't think
10  it's appropriate.
11  BY MR. SHORE:
12      Q.   Can you answer the question?
13      A.   Are you asking -- if I can respond by
14  this way.  Are you talking about the
15  $337 billion allocation?
16      Q.   Yes.
17      A.   I think it is in the context of the
18  plan.  But having said that, I think the reason
19  that there is a claim there is that FGIC did
20  have, indeed, claims against ResCap, as well as
21  against Ally, and it seemed to be appropriate
22  that it should be there and it's part of the
23  global summary and part of the allocation
24  process that we went through as part of the
25  mediation.
```

40  (Pages 154 to 157)

Page 158

L. Kruger

Q.   All right.  So let me break that into
two pieces.

First of all, why was it left
unliquidated in the event that the plan was not
confirmed?

MR. WYNNE:  I'm going to object to
the extent that that would require him to
disclose what was discussed in the
mediation.

MR. KERR:  Let me state it this way.
All right.

MR. SHORE:  Please.

MR. KERR:  To the extent you can
answer the question without revealing
discussions that happened in mediation --
let me read the question again.

To the extent you can answer the
question without disclosing anything that
occurred in the mediation, that's fine.

Again, Chris --

A.   It was part of the --

MR. KERR:  Chris, if you're asking
about the FGIC Settlement Agreement and
you're referring us to why is it this way

Page 159

L. Kruger

in the FGIC Settlement Agreement, I think
that's a fair question.

So -- but if you're going to be
talking more broadly about what was the
discussion at the mediation, I'm going to
direct him not to answer.  If you're going
to be talking about what is in the plan
confirmation, that is not what we're here
for, as well.

A.   It was part of the negotiation of the
settlement agreement in the mediation.

Q.   And what were the reasons that the
debtors were willing to proceed or ResCap, LLC
was willing to proceed with the settlement
agreement in which it didn't fix its claim, the
claim asserted by FGIC against it?

MR. KERR:  Again, on that question,
I'm going to direct him not to answer due
to the confidentiality provision.

BY MR. SHORE:

Q.   So you're not going to testify at all
as to why the claim is left unliquidated at
ResCap, LLC in the event that the plan doesn't
close?

Page 160

L. Kruger

MR. KERR:  Chris, you can ask him --
you can show him the settlement agreement,
ask him what's your understanding of why
this is.  And if you can answer that
question without revealing discussions in
the mediation, you can answer that.

MR. SHORE:  Well, look, I've been
avoiding making speeches, unlike some
others at the table.  I don't agree that
you can come in and take the position that
the agreement was negotiated at arm's
length, but then say you're not entitled to
ask any questions with respect to what I
meant by arm's lengths, and we'll get to
those questions.

You guys can take whatever positions
you want, but you can't take a sword and a
shield.  I'm here on the FGIC Settlement
Agreement.

BY MR. SHORE:

Q.   If you turn to Article III, am I
correct that Article or Section 3.01 describes
the two scenarios in which -- in which the
claims that FGIC has asserted at ResCap, LLC

Page 161

L. Kruger

will be treated?

A.   Yes.

Q.   And in one scenario they get an
allowed general unsecured claim of 331 million;
right?

MR. KERR:  Objection.

A.   I don't see that in 3.01.

Q.   They get -- it gets broken up into
the allocation between ResCap, LLC, GMACM and
RFC.

A.   Uh-huh.

Q.   All right.

So there's also the scenario in which
the plan is not co-effective.  Okay.

And then it says down at the -- it's
five lines up from the bottom.  "FGIC reserves
all rights to assert general unsecured claims
against each of ResCap, LLC, GMACM and RFC, as
reflected in the proofs of claim, with all
claims by FGIC including any FGIC allowed
claims, or otherwise against each such entity
capped each case in the amount of 596 million."

Do you see that?

A.   Yes.

Page 162

L. Kruger

1
2    Q.   Okay.
3         First of all, in the event that the
4    plan doesn't go effective -- I think we've gone
5    through this -- the total amount of claims
6    asserted at RFC and GMACM totals 596 million;
7    right?
8    A.   Yes.
9         MR. KERR:  Objection.
10   BY MR. SHORE:
11   Q.   And there are no RMBS trust claims at
12   that point.  They've been released; right?
13   A.   Yes.
14   Q.   So the maximum amount that -- okay.
15   Let's break this even further.
16        What do you understand to be the
17   theory by which FGIC has asserted in either its
18   complaint or the proof of claim with respect to
19   why it has a claim at ResCap, LLC?
20        MR. KERR:  Again, you can answer that
21   question again without revealing
22   communications with counsel.
23   A.   They argue alter ego may be aiding
24   and abetting.
25   Q.   And you say "may be aiding and

Page 163

L. Kruger

1
2    abetting," what are you referring to?
3    A.   I mean that would be part of their
4    claim.
5    Q.   When you say you think that would be
6    "part of their claim," would that be something
7    you read in the complaint?
8    A.   I think I read that in the complaint.
9    Q.   Okay.
10        And what about the proof of claim?
11   Are you aware of whether there's any statement,
12   any assertion of an aiding and abetting theory
13   against Res --
14   A.   I have to go back and read the proof
15   of claim.
16   Q.   Let me just finish my question.
17   A.   Sorry.
18   Q.   Are you aware of any assertion of an
19   aiding and abetting claim in the FGIC proof of
20   claim, at least as it pertains to ResCap, LLC?
21   A.   I don't see those words in the actual
22   proof of claim that you submitted earlier, I
23   guess, as No. 12.
24   Q.   So what do you understand to be the
25   maximum liability in the event that ResCap --

Page 164

L. Kruger

1
2    sorry -- in the event that the plan does not
3    close?  And when I say maximum liability, at
4    ResCap, LLC.
5    A.   596.
6    Q.   All right.
7         And under the Settlement Agreement,
8    ResCap, LLC has reserved all its rights to
9    argue that it doesn't owe anything?
10   A.   Owe that money.
11   Q.   Right.
12        You said before, though, that the
13   claim in the plan setting is getting allowed at
14   331?
15        MR. KERR:  Objection.
16   BY MR. SHORE:
17   Q.   Why do I have the wrong number?  Do I
18   have the wrong number?
19   A.   I think it's 337.
20   Q.   337.  Yes.  Sorry.  My eyes are gone.
21   Okay.
22        But it gets allowed at 337 in the
23   context of the plan being confirmed?
24   A.   Correct.
25   Q.   Okay.

Page 165

L. Kruger

1
2         Does that 337 reflect just a view of
3    management, you -- as advised by the lawyers
4    that that's the liability for a alter ego
5    theory; in other words, one way to look at this
6    is that if you looked at the allowance of 337
7    versus a total maximum liability of 596, that
8    represents more than a 50 percent likelihood
9    that if you litigated it to conclusion, that
10   ResCap, LLC would be held liable for the debts
11   of GMACM and RFC?
12        MR. KERR:  Objection.
13   A.   Is there a question in there?
14   Q.   Yes.
15        First of all, is that the proper way
16   of looking at it?
17   A.   I think the way I looked at the, if
18   that's the question that you're asking, with
19   respect to the plan being confirmed, then it
20   seems to be that the way to think about it is
21   in the context of the global settlement and the
22   mediation process.
23        And we came to a conclusion and I
24   came to a conclusion myself that it was not an
25   appropriate for there to be a FGIC claim at

42 (Pages 162 to 165)

Page 166

```
 1              L. Kruger
 2  ResCap, because they had alleged theories why
 3  they should have claims at the ResCap level and
 4  theories why they should have claims against
 5  Ally.
 6          So it seemed to be not inappropriate
 7  for them to have a claim against ResCap in the
 8  context of a confirmed plan, although I really
 9  think in part it's a planned confirmation
10  issue; but, nonetheless, that's why it came
11  out.
12      Q.   But what do you mean by it would be
13  not -- was it not inappropriate to give them a
14  claim on account of they had claims against
15  Ally.
16          I don't understand what that means.
17      A.   Well, there is an Ally settlement as
18  part of the global claim settlement, global
19  claim agreement.  And I think and my thought
20  was that in light of that and in view of the
21  fact that, in my mind, the prospect of
22  litigating with FGIC over the proof of claims
23  on alter ego theories would be a unfortunate
24  outcome because we would spend years in
25  litigation with uncertain results, and that the
```

Page 167

```
 1              L. Kruger
 2  global plan agreement was a far better outcome.
 3          And part of that global plan
 4  agreement was an acknowledgment that they're
 5  entitled to a claim against ResCap.
 6      Q.   So let me ask it this way.
 7          Do you believe that $337 million
 8  claim at ResCap outside the context of the
 9  global settlement would be an appropriate claim
10  amount?
11          MR. KERR:  Objection.
12      A.   I haven't considered that, no.
13      Q.   Okay.
14          What was the reason you didn't just
15  agree to fix the liability at 337 under all
16  circumstances?
17          MR. KERR:  Objection.  Again, if you
18  can -- again, I don't want you to disclose
19  anything that was discussed in the
20  mediation, you can answer that question
21  without disclosing what was discussed in
22  the mediation.
23      A.   It was part of the mediation in the
24  global settlement agreement.  It's hard for me
25  to separate out.
```

Page 168

```
 1              L. Kruger
 2      Q.   You said before that it was
 3  compensating for their claims against Ally.
 4          What did you mean about that?
 5      A.   Well, they alleged that they had
 6  claims against Ally.
 7      Q.   So?
 8      A.   Domination control of ResCap, Ally is
 9  paying $2.1 billion to settle these claims.
10  They are looking for releases from FGIC, as
11  well.  It's not inappropriate for part of the
12  proceeds of their contribution to be used to
13  satisfy the FGIC claims.
14      Q.   Okay.
15          Well, did GMACM contribute more
16  claims or give more claims to FGIC in the event
17  of the settlement?
18          Its claim is fixed; right?
19      A.   When you say it's fixed, I'm not sure
20  I'm following that.
21      Q.   Okay.
22          The claim against GMACM that you're
23  allowing FGIC is the same claim whether the
24  plan is confirmed or not; right?
25      A.   It's 596.
```

Page 169

```
 1              L. Kruger
 2      Q.   Right.
 3          Well, 596 is combined for both GMACM
 4  and RFC; right?
 5      A.   Correct.
 6      Q.   Okay.
 7          Well, let's just ask it that way.
 8  And it's 596, whether or not the plan is
 9  confirmed; right?
10          MR. KERR:  Objection.
11          MR. WYNNE:  Objection.
12      A.   I don't think I can answer that
13  outside of the context of the mediation.
14      Q.   So what is it?  You're here as the
15  business person.  What is the claim that FGIC
16  has against GMACM in the event that the plan is
17  confirmed or is not confirmed?
18      A.   That was just set forth in the
19  settlement agreement.
20      Q.   Okay.
21          What is it?  What is your business
22  understanding?
23      A.   My business understanding is that
24  those claims, if the plan is not confirmed,
25  right, is that those allocations are, in part,
```

43 (Pages 166 to 169)

Page 170

L. Kruger

1 L. Kruger
2 based upon the governing agreements under the
3 trusts and FGIC and the debt.
4 Q. Okay.
5 And if it isn't confirmed -- or,
6 sorry, if it is confirmed?
7 A. Then if it is confirmed, then FGIC
8 does get a claim against ResCap.
9 Q. Okay.
10 But why -- when you say "ResCap," you
11 mean ResCap, LLC?
12 A. LLC.
13 Q. Okay.
14 But why would ResCap, LLC be the one
15 giving the claim in the event that there is a
16 confirmation?
17 MR. KERR: Objection.
18 A. Again, Chris, that's part of the
19 global settlement that was agreed to during the
20 course of the mediation.
21 Q. Okay.
22 Let me just ask it this way. Is what
23 you're saying is that this is the way in which
24 FGIC gets a direct or gets a piece of the Ally
25 settlement by resolving the claim -- resolving

Page 171

L. Kruger

1 L. Kruger
2 its claims and signing a plan support
3 agreement?
4 MR. KERR: Again, you can answer that
5 question without revealing anything that
6 was discussed in the mediation, you can do
7 so.
8 A. Well, it comes out of the mediation.
9 It's in the context of the global settlement
10 where the parties agreed to an allocation among
11 themselves as to what would they would hope
12 their outcomes would be as set forth in the
13 appendix to the PSA and term sheet.
14 And this was a portion of the way to
15 achieve the result and a way that we thought
16 was fair and reasonable to all the parties.
17 Q. So I take it that the allowance -- so
18 if there's not an Ally settlement, there would
19 be no plan confirmed; right?
20 A. Correct.
21 Q. And in that case, nobody would need
22 to be dividing up the Ally contribution; right?
23 Because there wouldn't be one?
24 A. There wouldn't be one.
25 Q. Right.

Page 172

L. Kruger

1 L. Kruger
2 So I just need to know, is your view
3 that the 337 would stay the same, go up, go
4 down, in the event that the debtors were
5 negotiating with FGIC for an allowance of the
6 claim at ResCap, LLC?
7 MR. KERR: Objection.
8 A. I have no idea.
9 Q. Are you aware that from time to time
10 the debtors, their counsel, even the
11 prepetition debtors expressed views as to the
12 likelihood that any of the RMBS trust claimants
13 or monoline claimants could pierce the
14 corporate veil?
15 A. I've had discussions with my counsel
16 about piercing the corporate veil, alter ego
17 theories and the like. I've taken those into
18 consideration. It's part of my judgment as to
19 why I think this settlement agreement is an
20 appropriate one.
21 Q. Are you aware from time to time the
22 debtors have published waterfall analyses that
23 have shown that there would be no RMBS or
24 monoline claims allowed at the ResCap, LLC
25 level?

Page 173

L. Kruger

1 L. Kruger
2 MR. KERR: Objection.
3 A. I have no idea.
4 Q. Were you involved in any discussions
5 with the financial advisors or the financial
6 teams at ResCap, LLC, to discuss the -- the
7 ability of any RMBS trust or monoline to assert
8 claims at ResCap, LLC?
9 MR. KERR: And, again, I don't want
10 you to reveal any communications, either
11 privileged communications or communications
12 in the context of the confidentiality. You
13 can answer that question "yes" or "no," if
14 you can.
15 A. Yes.
16 Q. And what was your involvement?
17 A. I participated in presentations by my
18 counsel, financial advisors, and the like
19 discussing alter ego theories, piercing
20 corporate veil theories. I took that into
21 consideration in the process of litigating with
22 respect to those and the absence of the global
23 settlement and what that would mean to
24 everybody.
25 And it's part of what informed my

1        L. Kruger
2   decision that this was a good idea.
3       Q.    And were you aware -- were you
4   involved in the determination to reflect in
5   those waterfall analyses a zero recovery for
6   RMBS and monolines at ResCap, LLC?
7       MR. KERR: Objection. Assumes facts
8   not in evidence.
9   A.    No.
10  Q.    All right.
11      You want the facts in evidence?
12      (Kruger's Exhibit 13, Documents,
13  was marked for identification.)
14      MR. KERR: Chris, can I just ask you,
15  were these -- what were these documents?
16      MR. SHORE: These were from a prior
17  production. This was in connection with
18  the RMBS settlement. It's marked
19  professional eyes only, so let's keep that
20  in mind when you guys are looking at it.
21      MR. KERR: Chris, I was not involved
22  with the RMBS proceeding. I don't know
23  under what kind of confidentiality
24  restrictions these were produced.
25      MR. SHORE: I'm saying, just make

1        L. Kruger
2   sure they stay with outside professional
3   eyes only.
4       MR. KERR: Do you know whether they
5   can be used outside the context of the
6   RMBS?
7       MR. SHORE: I don't know. I don't
8   need to be able to use them to ask the
9   witness questions.
10      MR. KERR: Okay. I just want to make
11  sure, Chris. Again, I have not seen this
12  document before. I don't know in what kind
13  of confidentiality it was produced under.
14      If you want go ahead and do that,
15  that's your call. I'll just tell you I
16  just don't know and that's why I was
17  asking.
18      MR. SHORE: Okay. Well, you had made
19  a foundation question about assuming facts
20  not in evidence. I assumed you had an
21  understanding as to what the record was
22  with respect to the waterfalls that have
23  been presented starting with the board
24  meeting and working over the last year.
25      What you're telling me is you didn't

1        L. Kruger
2   really have a basis to assert that such
3   that I don't need to go through the
4   waterfall analyses to show that
5   consistently over time the debtors have
6   always reflected that there would not be a
7   recovery at ResCap, LLC by any monoline or
8   RMBS trust claimant. I don't have to go
9   through it.
10      We're on a time limit with the
11  witness. I won't do that. But I'm going
12  to ask you when we get to a hearing on this
13  and I ask that question, please inform
14  yourself as to what the facts are before
15  you make that objection. Okay?
16      MR. KERR: Okay. And I'm going to
17  say this, Chris. The document you just
18  gave me is from May 9, 2012, which predated
19  the bankruptcy hearing.
20      MR. SHORE: No question. What I'm
21  saying is, we can start there and we can
22  work through all the waterfall analyses
23  both coming into bankruptcy and through and
24  all the way until the present discussions.
25  Okay. So that's all I'm saying. That's

1        L. Kruger
2   the earliest one I found.
3       Okay. And then we can go through the
4   pleadings in which the debtors have
5   represented that they don't believe that
6   there's any liability at ResCap, LLC.
7   BY MR. SHORE:
8       Q.    Let me ask you this question.
9       Have you ever seen a waterfall
10  analysis leading up to the mediation in which
11  ResCap or any of its -- ResCap, LLC or any of
12  its subsidiaries was reflecting that the RMBS
13  claimants or any monoline would be getting an
14  allowed claim at ResCap, LLC?
15      MR. KERR: Are you talking prior to
16  the mediation?
17  BY MR. SHORE:
18      Q.    Prior to the mediation. That's what
19  I said.
20      A.    They didn't exist. I haven't seen
21  those.
22      Q.    Okay.
23      But you haven't come across any of
24  those in connection with your --
25      A.    No.

L. Kruger

1
2   Q.   Okay.
3        And what role, if any, have you
4   played in the filing of any pleadings in which
5   ResCap, LLC's liability on either an alter ego
6   or veil piercing or subsequent consolidation
7   basis has been discussed by the debtors?
8        MR. KERR:  Objection.
9   A.   I think I've said before, all I think
10  I can say about that is I had conversations
11  with my counsel and my advisors as to the veil
12  piercing arguments and the alter-ego
13  arrangements, and I've come to my own
14  conclusion with respect to them.
15  Q.   Are you aware that -- the counsel is
16  Morrison & Foerster; right?
17  A.   Yes.
18  Q.   And are you aware that counsel has
19  made public statements as to their views with
20  respect to what the likelihood is that that
21  would happen?
22  A.   I'm not surprised.
23  Q.   Okay.
24       And do you understand what they have
25  expressed in that regard?

L. Kruger

1
2   A.   No.
3   Q.   Let me just read you a statement and
4   see whether it's consistent or completely at
5   odds with what you've been talking about with
6   your lawyers.
7        This is from the ResCap or the
8   debtor's reply to the objection of Junior
9   Secured Noteholders, the Motion for Approval of
10  the RMBS Settlement Agreements.  Let me just
11  read it for the record.  It's Docket No. 3221.
12       "ResCap, LLC, of course, has little
13  exposure to liability, only on an alter ego or
14  a corporate veil piercing theories, and also as
15  no assets and so likely will not face future
16  litigation."
17       Is that consistent with or at odds
18  with the general tenor of the discussions
19  you've been having about the likelihood that
20  ResCap, LLC might be viable on a veil piercing
21  or alter ego theory?
22       MR. KERR:  I will object to that
23  question to the extent it invades a
24  privilege.  You want to ask him his
25  understanding.

L. Kruger

1
2        MR. SHORE:  Sure.
3        MR. KERR:  If you're asking about
4   conversations with counsel, and if you ask
5   it that way, I will direct the witness not
6   to answer.
7   BY MR. SHORE:
8   Q.   Is it consistent with your
9   understanding that ResCap faces little, if any,
10  liability on alter ego or veil piercing
11  theories?
12       MR. WYNNE:  Objection.
13       MR. KERR:  Objection.
14  A.   As a business person understanding
15  the arguments for why people would say that,
16  it's still my considered opinion that a better
17  outcome is a settlement agreement --
18  Q.   And you wouldn't --
19       MR. KERR:  Let him finish his answer.
20  A.   Because the alternative of trying to
21  prove and argue against a veil piercing
22  argument or an alter ego argument would be both
23  time consuming, would destroy the global
24  settlement agreement, would not, in my mind, be
25  sensible or benefit the creditors of this

L. Kruger

1
2   estate or the estates.
3   Q.   Well, you wouldn't be allowing claims
4   that you thought were illegitimate claims just
5   to foster a settlement, would you?
6        MR. KERR:  Objection.
7   A.   What do you mean?  I'm not sure what
8   you mean.
9   Q.   Well you wouldn't, for example, if
10  FGIC said I'm only going to settle if you give
11  me a secured claim at ResCap, LLC, that
12  wouldn't have been something in your
13  consideration; right?
14  A.   I would consider whatever a party
15  suggests was appropriate for them to be part of
16  the process of choosing a global settlement
17  agreement.
18  Q.   Okay.
19       So why is the global settlement so
20  important here?
21  A.   I think it's very important, because
22  it does seemed to me that the alternative to
23  the global settlement is no Ally contribution
24  of $2.1 billion, which I believe is a lot of
25  money; secondly, that the outcome of no Ally

Page 182

```
 1              L. Kruger
 2  settlement and no global settlement agreement
 3  would mean that the parties themselves, all the
 4  inter-creditor issues would come to the forth
 5  creditors would be suing each other, creditors
 6  would all be suing ResCap.  This case would go
 7  on forever.  Professional fees and the costs of
 8  administering this estate are enormous.
 9          And it seems to me that that will be
10  to the detriment of all competitors.  And I
11  think that's not helpful.  I think in my
12  business judgment this is a far better
13  alternative.
14      Q.   So in your view that you would
15  consider what anybody asked you for a claim
16  amount, if that --
17      A.   That's why I asked him whether
18  Ms. Lincoln was happy or -- I don't understand
19  that.  You can't ask me that question that way.
20      Q.   Let me ask you the question.
21          Are you saying then that in order to
22  allow that global settlement with all what you
23  believed to be the important benefits of that
24  global settlement to go forward, you'd give a
25  claim to somebody if they wanted it in exchange
```

Page 183

```
 1              L. Kruger
 2  for the support for that settlement?
 3          MR. KERR:  Objection.
 4      A.   Of course not.
 5      Q.   Okay.
 6          So what are the criteria you apply to
 7  determine whether or not they should be getting
 8  a claim?
 9      A.   The same one --
10          MR. KERR:  Objection.  Asked and
11  answered.
12      A.   The same one I just gave before.  In
13  my judgment, the arguments as to whether or not
14  the claims of FGIC or the trust should be
15  equitably subordinated, could be subordinated
16  under the Bankruptcy Code, whether alter ego
17  arguments are possible, whether aiding and
18  abetting arguments are possible, all of those I
19  believe are the subject of litigation that
20  would be time consuming, costly, destroy the
21  global settlement agreement, and ultimately not
22  be for the benefit of the creditors for this
23  estate or for the estate of which I'm
24  responsible.
25          So, in my mind, a global settlement
```

Page 184

```
 1              L. Kruger
 2  agreement is a far better outcome.
 3      Q.   I got time consuming.  We're all
 4  caught up in time consuming right now.  I want
 5  to talk about the merits.  The merits.
 6          Does a $331 million claim at ResCap,
 7  LLC reflect, in your view, the merits of
 8  litigating a $596 million claim to conclusion?
 9          MR. KERR:  Objection.
10          MR. WYNNE:  Objection.  Asked and
11  answered.  Mischaracterizes his testimony.
12      A.   I think I've answered that question.
13      Q.   Answer it again, please.
14          MR. KERR:  Objection.  Asked and
15  answered.
16  BY MR. SHORE:
17      Q.   That's your objection.
18          You can answer it again.
19      A.   In my mind, as I've had said before,
20  I think the $337 million claim in the context
21  of the global settlement agreement is an
22  appropriate resolution as part of the mosaic of
23  the global settlement agreement and is
24  appropriate under the circumstances as
25  reasonable and appropriate.
```

Page 185

```
 1              L. Kruger
 2      Q.   That wasn't my question.  That's why
 3  I wanted you to answer my question.
 4          Does $337 million reflect your
 5  understanding of the likely result or within
 6  the range of results that would occur if
 7  independent of the global settlement FGIC
 8  pressed its $596 million claim?
 9      A.   I don't know the answer to that
10  question.
11      Q.   Okay.
12          Let's focus on the disclosure
13  statement.  Did you play any role in the
14  drafting of the disclosure statement sections
15  that discuss substantive consolidation?
16          MR. KERR:  Objection.  Objection.
17  This is not the time to be talking about
18  disclosure of planned confirmation issues.
19  All right?  And if you're not going to
20  focus on the FGIC settlement, I will direct
21  him not to answer and Judge Glenn, I think,
22  will support me down the line on it.
23  BY MR. SHORE:
24      Q.   Well, let me ask you this question.
25          Is there any basis for allowing FGIC
```

Page 186

L. Kruger

to assert a derivative liability claim at
ResCap, LLC that would not exist for any other
creditor of RFC?  Are you aware of any factual
distinction in the assertion of their claims at
ResCap, LLC?

A.  I can't answer that question.

Q.  And what about with respect to GMACM,
are you aware of any factual basis under which
FGIC should be able to assert a claim at
ResCap, LLC that makes them any different than
any other creditor of GMACM Mortgage?

A.  I have not read the 6500 file proofs
of claim, so I don't know how to answer that
question.

Q.  Okay.
So let's just deal with a
hypothetical creditor, and you can preserve
your objection and we'll see if we can get back
to an actual fact.

Hypothetically speaking, if another
creditor at GMACM had asserted a claim at
GMACM, is there any reason -- and asserted a
claim at GMACM Mortgage -- I'm sorry,
withdrawn.

---

Page 187

L. Kruger

Hypothetical creditor who asserts a
claim at GMACM Mortgage and at ResCap, LLC, on
alter ego theories, shouldn't they also be able
to get a claim at G -- sorry -- at ResCap, LLC?

MR. KERR:  Objection.  I'll direct
him not to answer that question.

MR. SHERWIN:  On what basis?

MR. KERR:  That's a hypothetical.  It
has to do with planned confirmation.  It
has nothing to do with the FGIC Settlement
Agreement.

MR. SHORE:  Let me take a quick
break.

MR. KERR:  Sure.
(Recess taken from 2:03 p.m. to
2:09 p.m.)

BY MR. SHORE:

Q.  All right.
If you could turn to the Iridian
(phonetic) factors, which start on page 11.

We've gone through the -- with
respect to A, right, the balance between the
possibility of success, I take it that you're
following your counsel's instruction that

---

Page 188

L. Kruger

you're not going to disclose any of the legal
advice that your lawyers gave you with respect
to the merits of the litigation that would
ensue with FGIC or the RMBS trusts; right?

MR. KERR:  Let's put it this way.  I
don't want him to disclose communications
he's had with counsel about those topics.
You can ask him with a judgments he has
reached after eliciting all this.

MR. SHORE:  But I don't get the
substance of any of the advice that was
given to you?

MR. KERR:  Right.  It's privileged.

BY MR. SHORE:

Q.  Let's go to the second, the
likelihood of complex and protracted
litigation.  Let me just understand your
business perspective on this.

You've given a $337 million claim at
ResCap, LLC.  I take it that that's not just
because it would be a protracted litigation; in
other words, you don't have -- you didn't base
that on any view that the debtors would spend
hundreds of millions of dollars litigating that

---

Page 189

L. Kruger

case; right, that proof of claim?

MR. KERR:  Objection.

A.  I don't know how much of that is
spent in litigating that proof of claim, but it
was part obviously of the global settlement
agreement, and that's what motivated me in part
to apply for a claim at the ResCap level.  And
the recognition that if there were to be
litigation, there would obviously be no global
settlement agreement, and the litigation would
be both time consuming, costly and uncertain
outcome.

Q.  Okay.
Did you have any views, form any
views of what it would take, how much it would
cost to litigate the FGIC issues at the time
you entered into the settlement agreement?

A.  I was aware that there had been MBIA
litigation against ResCap prior to the filing
of the petition and had gone for three and a
half years.  So I assumed this was going to be
a lengthy litigation, as well.  I believe in
the MBIA more than a million documents were
produced.  This looks to me like complex and

1       L. Kruger
2   long-term litigation.
3       Q.   Okay.
4           Other than your knowledge that the
5   MBIA litigation had gone on for three and a
6   half years, did you have any other view, any
7   other basis on which you formed your
8   conclusions that it would be a complex and
9   protracted litigation?
10      A.   I had read, I think I referred to
11  before, the Carpenter Lipps report, memorandum.
12  That's what informed my view.
13      Q.   Just so we are clear.  I forgot to
14  ask this question before.
15          The NewOak analysis, Dr. D'Vari, did
16  you have that before you decided to enter into
17  the settlement agreement?
18      A.   No, I did not.
19      Q.   Okay.
20          Had they performed any analysis for
21  you prior to the entering into the settlement
22  agreement?
23      A.   Not for me, no, they did not.
24      Q.   Okay.
25          So I take it that your decision to

1       L. Kruger
2   enter into the settlement agreement was not
3   based in any way on any conclusions, either
4   preliminary or final, that NewOak had reached
5   with respect to the analysis set forth in
6   Dr. D'Vari's report?
7       A.   That's correct.
8       Q.   Okay.
9           Then if you turn to paragraph 34.
10      A.   Yes.
11      Q.   The arm's length negotiations, and
12  just so I'm clear.  It's the debtor's position
13  that the mediation confidentiality order in
14  place prohibits the disclosure of any substance
15  between FGIC or its counsel, on the one side,
16  and the debtors and their counsel, on the other
17  side, with respect to the FGIC claims?
18          MR. KERR: Let me put it this way.  I
19  think Mr. Kruger has described the
20  mediation, the involvement of people or
21  whatever; but I think the communications,
22  the substance, the back and forth, is
23  subject to the confidentiality order
24  entered by Judge Glenn, relied upon by
25  Judge Peck and all the parties.

1       L. Kruger
2           And so, in terms of the substance of
3   the communications back and forth, that's
4   confidential.
5   BY MR. SHORE:
6       Q.   So what can you, beyond what you've
7   testified to today, tell me about the arm's
8   length nature of the negotiations with FGIC?
9           MR. KERR: Again, just without
10  disclosing any of the substance of the
11  conversations.
12      A.   I can say that they were obviously
13  experienced trustees, experienced counsel,
14  experienced advisors, FGIC itself were
15  well-represented, and all of that a process
16  overseen by Judge Peck, looked to me like a
17  very vigorous, robust process that went on for
18  months.
19      Q.   And let me talk about it from the
20  debtor's side.
21          What can you testify to today, other
22  than what you already have, to give any
23  creditor, creditors within the case, leave
24  aside the non-creditors in the case, comfort
25  that the debtors didn't just roll over and give

1       L. Kruger
2   a 330 million, $337 million claim to FGIC in
3   exchange for a signature on a plan support
4   agreement?
5           MR. KERR: Objection.
6       A.   Let me answer it this way.
7           We were part of the mediation process
8   all through it.  I've only been part of the
9   mediation process since the middle of February.
10  And the mediation process, as I saw it myself,
11  was one that was both vigorously contested by
12  the parties.  We had reviewed with people,
13  parties, the pros and cons of their positions.
14  We did that for Judge Peck, as well.
15          So I was informed with respect to all
16  of those kinds of issues, that presentations
17  made to me by parties, all of that led me to
18  believe that the global settlement agreement
19  was a sensible thing to pursue and that this
20  settlement agreement was an important part of
21  that.
22      Q.   And that's the extent of your defense
23  of a concern that creditors at ResCap, LLC
24  might have that a 330 million, $337 million
25  claim was given in exchange for a plan support

Page 194

1           L. Kruger
2   agreement to foster the global settlement
3   which, of course, is important?
4           MR. KERR:  Objection.
5       A.   Because I believe that if there was
6   no global settlement agreement and there would
7   be no $337 million claim available at ResCap,
8   there would be no $2.1 billion coming into the
9   estate, there would be very little recovery for
10  a creditors out of this estate, and ResCap,
11  GMAC or RFC.
12      Q.   Well, let's peel that apart.
13          First of all, if the global
14  settlement didn't occur, the -- no one would
15  release claims against Ally; right?
16      A.   Right.
17      Q.   And we would have every cause of
18  action that was identified against Ally in the
19  examiner's report would still be a valid claim
20  that the debtors would bring that's not time
21  barred; right?
22      A.   Examiner's report?
23      Q.   In the examiner's report.  The
24  examiner's report lays out all sorts of claims
25  that the debtors could bring and might even win

Page 195

1           L. Kruger
2   against Ally; right?
3       A.   I'm not going to comment on the
4   examiner's report.  It's all hearsay whether
5   the advised causes of action that are sensible
6   to pursue or not is subject to a different
7   conversation.
8       Q.   But the claims, whatever the claims
9   are, whether you believe what Judge Gonzales
10  said or whatever ResCap has looked at
11  internally, the claims would still be there?
12      A.   Which claims are these?
13      Q.   The claims against Ally --
14      A.   Sure.
15      Q.   -- that you're trying to preserve
16  again.
17          Why does the -- what I don't
18  understand is, why does the amount of the claim
19  at ResCap, LLC go up or down depending upon the
20  global settlement?  I could understand that the
21  recovery would go up.  You're right.  They will
22  recover a lot more on their $337 million claim
23  in the event of a global settlement than they
24  will in the event that these cases get
25  converted.  I get that.

Page 196

1           L. Kruger
2           Why does the claim amount differ?
3           MR. KERR:  And, again, if you can
4   answer that question without revealing what
5   was discussed and agreed to in the
6   confidential mediation.
7       A.   All I can say is that that claim
8   amount results from the global settlement
9   agreement.
10      Q.   And that's it?
11      A.   That's it.
12          MR. SHORE:  Okay.
13          I have no further questions.
14          Anybody else?
15          MR. CARNEY:  Mike Carney.  I have
16  about 10 minutes.
17
18  EXAMINATION BY MR. CARNEY:
19      Q.   Sir, I'm Michael Carney again from
20  McKool Smith for Freddie Mac.
21          The ResCap trust holding FGIC wrapped
22  securities claims have claims against the
23  debtors; is that correct?
24      A.   Sorry?  Say that again.
25      Q.   The ResCap trust holding FGIC wrapped

Page 197

1           L. Kruger
2   securities have claims against the debtors; is
3   that correct?
4       A.   Yes.
5       Q.   Okay.
6           What's your understanding of these
7   claims?
8       A.   What the trust claims are against the
9   debtor?
10      Q.   Yes.
11      A.   Representation and warranty claims,
12  indemnity and insurance claims.  Also
13  securities claims, rider claims.
14      Q.   Any others you can think of off the
15  top of your head?
16      A.   No.
17      Q.   Okay.
18          And FGIC has claims against the
19  debtors, too; right?
20      A.   Yes.
21      Q.   And what's your understanding of the
22  nature of those claims?
23      A.   FGIC has laid out funds on behalf of
24  the debtors.  The debtors has not reimbursed
25  them for those expenditures.  FGIC has also

50  (Pages 194 to 197)

Page 198

L. Kruger

1
2  submitted claims against the debtor with
3  respect to the funds that it advanced that the
4  debtor has not responded to.  So I assume they
5  have money damage claims.
6      Q.  Okay.
7          I think Exhibit 1 was the settlement
8  agreement.  I'd like to turn to that briefly.
9  And I'd just like you to turn to Section 2.02
10  of that.
11      A.  Yes.
12      Q.  And it just begins with the paragraph
13  Trustees, just the first sentence where it
14  says, "The trustees, in consultation with their
15  advisors, shall have the sole -- shall have
16  sole and exclusive authority to determine each
17  payment amount payable to a trust, such
18  denomination to be made in accordance with the
19  allocation methodology set forth in Exhibit F
20  hereto.  The sum of all payment amounts shall
21  not exceed $253.3 million."
22      A.  Uh-huh.
23      Q.  The first question is:  To your
24  knowledge, will the trustees, if the settlement
25  is approved, receive a set amount of

Page 199

L. Kruger

1
2  $253.3 million?
3      A.  As a group, I would I assume so, yes.
4      Q.  So then what I just was curious about
5  is if you have any understanding of this --
6      A.  Not to exceed.
7      Q.  Yes.
8          Why is it phrased that the sum of all
9  payments will not exceed 253.3 million?
10      A.  I'm not sure I know the answer
11  sitting here.
12      Q.  Okay.
13          But, to your knowledge, the cash
14  payment, if the settlement is approved, of
15  253.3 million, will go to the trustees; is that
16  correct?
17      A.  I believe so.
18      Q.  All right.  Thank you.
19          Obviously, I don't want you to go
20  into the substance of the mediation, but were
21  you aware that the debtors, ResCap, was
22  negotiating the amount the trust would receive
23  in satisfaction of the trust policy claims?
24          MR. KERR:  Objection.  Assumes facts
25  not in evidence.

Page 200

L. Kruger

1
2      A.  No.
3      Q.  No.  Okay.
4          So was -- what is your idea of how
5  that or -- so you're saying the 253.3 million
6  amount was never on the negotiating table, to
7  your knowledge?
8          MR. KERR:  Objection.
9      A.  Not for me, not to my knowledge.
10      Q.  Okay.
11          MR. CARNEY:  I don't believe -- has
12  the D'Vari objection been marked yet?  I
13  don't believe it has.  I'm sorry, the
14  D'Vari declaration.
15          MR. KERR:  No, I don't think so.
16          MR. CARNEY:  Then I'd like to mark it
17  as Exhibit -- what are we up to?  14.
18          (Kruger's Exhibit 14, D'Vari
19  Declaration, was marked for
20  identification.)
21  BY MR. CARNEY:
22      Q.  Do you recognize this declaration?
23      A.  Yes, I do.
24      Q.  And can you tell me why was it
25  prepared?

Page 201

L. Kruger

1
2      A.  It was prepared as part of the
3  process of getting approval of the 9019 motion
4  with respect to the FGIC settlement, but for
5  Dr. D'Vari to provide an analysis of what the
6  maximum lifetime collateral losses of FGIC
7  trusts might be.
8      Q.  And why was that important?
9      A.  Because that prospective liability is
10  what was being released as part of the FGIC
11  settlement.
12      Q.  Okay.
13          And so can you just explain -- this
14  might be asking the same question a different
15  way, but why are the losses to the RMBS trust
16  important to you?
17      A.  Well, because those represent claims
18  against the estates that I am CRO for, and I'm
19  happy to have them go way.
20      Q.  Fair enough.
21          And could you please turn to page 31
22  of the D'Vari declaration.  I'm sorry,
23  paragraph 31.  Paragraph 31 on page 9.
24          Do you see here that it estimates the
25  trustees's losses at a total lifetime

Page 202

```
1            L. Kruger
2    collateral losses at around 5.4 billion?
3        A.   Yes.
4        Q.   Yes.  Okay.
5            MR. CARNEY:  I don't believe that
6    Mr. Holzer's affidavit has been marked, has
7    it?
8            All right.  I'll mark that.
9            (Kruger's Exhibit 15, Holzer
10           Affidavit, was marked for
11           identification.)
12   BY MR. CARNEY:
13       Q.   Unfortunately, this looks as if the
14   second page is missing, but this is Exhibit 10
15   to the 9019 motion.
16           And you can see on the top, you can
17   see the case number and the doc number and the
18   Holzer affirmation.
19           MR. KERR:  You'll see that it looks
20   like the first page of the Holzer was not
21   copied.
22           (A Discussion was Held off the
23   Record.)
24           MR. CARNEY:  Let's mark a clean copy.
25   If we could disregard that one and just
```

Page 203

```
1            L. Kruger
2    replace it with this.
3            MR. KERR:  Well, actually, this is --
4    this looks like it's a broader document.
5            MR. CARNEY:  It is, but we can
6    only -- I'm only going to refer in this to
7    the -- after the order to show cause, this
8    portion of it.
9            (Kruger's Exhibit 15, Holzer
10           Affidavit, was remarked for
11           identification.)
12   BY MR. CARNEY:
13       Q.   Sorry about that.  Bear with me.
14           If you could just turn to the
15   actual -- it's double-sided, so the first --
16   the back side of the third page.
17           And it begins with "Supreme Court of
18   the State of New York," and it's called an
19   affirmation.
20       A.   Right.
21       Q.   If you could turn to paragraph --
22   first of all, do you recognize this document?
23       A.   Yes.
24       Q.   Okay.
25           And do you agree that it was attached
```

Page 204

```
1            L. Kruger
2    as Exhibit 10 to the 9019 motion?
3        A.   I believe it was, yes.
4        Q.   Okay.
5            And are you familiar with this
6    document?
7        A.   I've read it.
8        Q.   Okay.
9            And if you could please turn to
10   paragraph 14 on page 6.
11       A.   Uh-huh.
12       Q.   It appears to me that -- I mean, here
13   FGIC claims that there are total amount of
14   596.5 million of claims against ResCap entities
15   for -- which is equal to 342 million previously
16   paid, plus a 253.3 million payment --
17   253.3 million payment which would be paid under
18   the settlement in settlement of all future
19   claims; is that correct?
20       A.   Uh-huh.
21       Q.   Okay.
22           But then if you turn to paragraph 21
23   of the Holzer affidavit or affirmation, when it
24   discusses why the rehabilitation court should
25   approve the settlement, it, FGIC, or Mr. Holzer
```

Page 205

```
1            L. Kruger
2    has estimated that there are $789 million in
3    claims currently pending against FGIC, as well
4    as $400 million in claims FGIC expects will
5    arise in the future.
6            Do you agree with that?
7            MR. KERR:  Objection.  Do you agree?
8    It's written in the document.
9    BY MR. CARNEY:
10       Q.   Do you agree it's written in the
11   document?  Yes, certainly.
12       A.   Yes.
13       Q.   Okay.
14           And my question is:  Can you account
15   for the difference in numbers in Dr. D'Vari's
16   declaration of losses to the RMBS trustees of
17   5.4 million, which I believe are all FGIC
18   wrapped trusts, versus FGIC's estimated losses
19   that total, I think around 1.1 billion?
20           Do you --
21           MR. KERR:  Objection.
22   BY MR. CARNEY:
23       Q.   Can you tell me why those two numbers
24   are different?
25       A.   No.
```

Page 206

```
 1              L. Kruger
 2       Q.   And you have no idea why they would
 3  be?
 4       A.   No.
 5          All right.  Just cover one more.
 6  When do you remember the, what we've been
 7  calling the FGIC commutation, when do you
 8  remember that first being discussed?
 9          MR. KERR:  Objection.  Asked and
10     answered.
11       A.   March sometime.
12       Q.   March.  Thank you.
13          I can't remember from the beginning
14  of the day.
15          And do you know who suggested it
16  originally?
17       A.   No.
18       Q.   You don't.  You do not.  Okay.
19          And did the debtors have an opinion
20  about the FGIC commutation once you became
21  aware of it?
22          MR. KERR:  Objection.
23       A.   Happy to see it take place.  I guess
24  I'm not sure how to answer that question.
25       Q.   Strike that.
```

Page 207

```
 1              L. Kruger
 2          Did you personally have an opinion
 3  about it when you became aware of it?
 4          MR. KERR:  Objection.
 5       A.   Yes.
 6       Q.   And what was that opinion?
 7       A.   That if it could be accomplished in
 8  the context of a global settlement agreement,
 9  it would be helpful.
10       Q.   Uh-huh.
11          But other than -- strike that.
12          Is it your understanding that the
13  FGIC computation was insisted upon as part of
14  that global settlement?
15          MR. KERR:  Objection.  On that, I
16     will direct -- I think that's covered by
17     the confidential mediation order, and I'll
18     direct the witness not to answer that.
19  BY MR. CARNEY:
20       Q.   And I assume you're going to abide by
21  your counsel's direction?
22       A.   Yes.
23       Q.   Did you or did the debtors, rather --
24  first we'll start with the debtors -- did the
25  debtors do any substantive analysis of the FGIC
```

Page 208

```
 1              L. Kruger
 2  computation?
 3          MR. KERR:  Objection.  Asked and
 4     answered.
 5       A.   No.
 6       Q.   Okay.
 7          And just to close the circle one more
 8  time, and I -- if the FGIC computation were not
 9  part of a global settlement but everything else
10  was, would it have mattered to you that the
11  FGIC computation wasn't included as part of
12  that settlement?
13          MR. KERR:  Objection.  Asked and
14     answered.  You asked that question before.
15     I objected to it as a hypothetical.
16          MR. CARNEY:  I understand.  I just --
17     he can answer.
18       A.   If everything else was in place and I
19  didn't -- we didn't pay -- the $253 million
20  didn't get paid and the releases all took place
21  and there was a consideration for them,
22  everything else could have been perfect, yes.
23       Q.   You could have cared less?
24          MR. CARNEY:  Thank you.  That's all I
25  have.
```

Page 209

```
 1              L. Kruger
 2  FURTHER EXAMINATION BY MR. SHORE:
 3       Q.   The assertion of this mediation
 4  privilege works both ways.
 5          First of all, what are the concerns
 6  the debtors have, if any, about disclosing what
 7  they said to people about the FGIC claims?
 8          MR. KERR:  Are you asking Mr. Kruger
 9     or me?
10          MR. CARNEY:  Mr. Kruger.
11  BY MR. SHORE:
12       Q.   Do you have any concerns about any of
13  the substance of materials that passed from the
14  debtors to FGIC should remain confidential?
15          MR. KERR:  Objection.
16       A.   I think they should.
17       Q.   Why?
18       A.   Because I think otherwise people who
19  are participating in the mediation process
20  would not have comfort in knowing that
21  everything that they said and talked about was
22  confidential.
23       Q.   So --
24       A.   That might have chilled the
25  negotiation process.
```

53 (Pages 206 to 209)

## Page 210

L. Kruger

2  Q.   Okay.
3      So are you saying that you would have
4  been chilled in the negotiation process if you
5  knew that ultimately some court might need to
6  see what you said to people in the negotiation?
7      MR. KERR:  Objection.
8  A.   I don't know.
9  Q.   Can you think -- just answer yes or
10  no.  Can you think of something you said to
11  FGIC in the mediation you wouldn't want Judge
12  Glenn to see?
13      MR. KERR:  Objection.  I'll direct
14  him not to answer.  That -- there's an
15  existent order, Chris, directing the
16  parties to comply with it.  The fact that
17  the debtors complied with an order, I don't
18  understand where this is going.
19  BY MR. SHORE:
20  Q.   Can you answer my question?
21  A.   No.
22  Q.   Okay.
23      And has there been any consideration
24  on the debtor's part to seek to have that
25  confidentiality -- confidentiality order

## Page 211

L. Kruger

2  modified now that you have an approved PSA?
3  A.   No.
4  Q.   Okay.
5      And have you had any discussions with
6  FGIC to see whether FGIC would be willing, now
7  that the PSA is approved, of allowing the
8  materials it gave to the debtors during the
9  negotiations to be disclosed as part of the
10  9019?
11      MR. KERR:  Did Mr. Kruger have those
12  conversations?
13  A.   No.
14      MR. SHORE:  Nothing further.
15
16  FURTHER EXAMINATION BY MS. EATON:
17  Q.   How are you being compensated for
18  your work as --
19  A.   Pursuant to the court order of March
20  5th, I get paid $895 an hour for a time period.
21  And I have the right to request a success fee,
22  whatever that might mean, at some point during
23  the course of this process.
24  Q.   Have you made any request for a
25  success fee?

## Page 212

L. Kruger

2  A.   Not yet.
3  Q.   Have you discussed the amounts of the
4  success fee with anyone at ResCap?
5  A.   With anyone at ResCap?
6  Q.   Pardon me.  At the debtor's?
7  A.   Yes.
8  Q.   What did you discuss in that regard?
9  A.   I discussed it with members of the
10  board.
11  Q.   What did you discuss with members of
12  the board about the success fee?
13      MR. KERR:  Again, if you had
14  discussions outside the presence of
15  counsel --
16  A.   Not outside the presence of counsel.
17  Q.   Have you settled on the terms of your
18  success fee?
19  A.   No.
20  Q.   Have you discussed whether you would
21  get any portion of a success fee -- let me
22  start over.
23      In your discussions with the board
24  about your success fee, has it been tied in any
25  way, directly or indirectly, to the approval of

## Page 213

L. Kruger

2  the FGIC Settlement Agreement?
3  A.   No.
4  Q.   When you were being interviewed --
5  you were interviewed prior to your appointment
6  as chief restructuring officer?
7  A.   Yes, I was.
8  Q.   Who were you interviewed by?
9  A.   Members of the board of ResCap.
10  Q.   Do you remember who those people
11  were?
12  A.   I think so.  Some of them anyway.
13  Certainly Jonathan Ilany, John Mack, Tom
14  Marano.  I don't recall who else might have
15  been present.
16  Q.   During that interview process, did
17  you discuss with any one or more of those
18  people the status of the settlement discussions
19  that were ongoing at that time?
20  A.   No.
21  Q.   You didn't discuss the mediation at
22  all?
23  A.   I knew the mediation was ongoing, but
24  I did not discuss it with them.
25  Q.   What, if anything, did any of those

54 (Pages 210 to 213)

Page 214

```
 1              L. Kruger
 2   individuals say to you about what the outcome
 3   that the debtors were seeking with respect to
 4   those negotiations?
 5          MR. KERR:  This is while he was
 6      interviewed?
 7   BY MS. EATON:
 8      Q.   Yes.  Before he became chief
 9   restructuring officer.
10      A.   That their goal was to see a
11   confirmed reorganization plan that treated
12   creditors fairly in a reasonable time frame.
13      Q.   Did you discuss the FGIC wrapped
14   trust at all?
15      A.   No.
16          MS. EATON:  That's it.
17          MR. KERR:  Anybody else?
18          MR. KAUFMAN:  I have a couple of
19      questions.
20
21   EXAMINATION BY MR. KAUFMAN:
22      Q.   I just want to touch briefly,
23   Mr. Kruger, on a couple of the things that
24   Mr. Shore was asking you about.
25      A.   Uh-huh.
```

Page 215

```
 1              L. Kruger
 2      Q.   You remember Mr. Shore asking you
 3   about the proof of claim filed by FGIC, which I
 4   think is Kruger Exhibit 12?
 5      A.   Yes.
 6      Q.   And --
 7      A.   Give me a minute to find it without
 8   spilling my Coca-Cola.
 9          Ready.
10      Q.   Do you have that?
11      A.   Yes, I do.
12      Q.   Okay.
13          And Mr. Shore asked you in connection
14   with that proof of claim whether you recalled
15   it containing some recitation of an aiding and
16   abetting claim.
17          Do you remember that?
18      A.   Yes.
19      Q.   And I believe your answer was you
20   don't remember or don't see that it contains
21   the words "aiding and abetting."
22          Do you remember that?
23      A.   Yes.
24      Q.   Okay.
25          In fact, let me direct your attention
```

Page 216

```
 1              L. Kruger
 2   to paragraph 32 of the proof of claim which
 3   appears on page 13.
 4      A.   I have it.
 5      Q.   Okay.
 6          And in the first sentence of that
 7   paragraph, it reads, "For the reasons discussed
 8   above in paragraphs 24 to 26, and further in
 9   FGIC's complaints, ResCap is jointly and
10   severally liable to FGIC under a theory of
11   alter ego liability for the harms FGIC has
12   suffered from the fraudulently inducement
13   committed by GMACM and RFC."
14          Do you see that?
15      A.   Yes, I do.
16      Q.   And that, do you agree that that
17   sentence references an alter ego theory of
18   liability?
19      A.   Correct.
20      Q.   The next sentence of the proof of
21   claim states, "In addition, because GMACM and
22   RFC were acting at the direction of ResCap,
23   ResCap may be jointly and severally liable to
24   FGIC for the harms FGIC has suffered from the
25   fraudulent inducement committed by GMACM and
```

Page 217

```
 1              L. Kruger
 2   RFC."
 3          Do you see that?
 4      A.   Yes, I do.
 5      Q.   Would you agree that that sentence,
 6   although not specifically containing the words
 7   "aiding and abetting," in fact, reflects the
 8   aiding and abetting theory that is contained in
 9   the 12 complaints filed by FGIC prior to the
10   bankruptcy?
11          MR. SHORE:  Objection to form.
12      A.   Yes.
13      Q.   Okay.
14          Speaking of those complaints, do you
15   remember Mr. Shore asking you whether you could
16   think of any differences between FGIC as a
17   creditor and other creditors?
18          Do you remember that line of
19   questions?
20      A.   Yes.
21      Q.   Did every other creditor file
22   complaints prior to the bankruptcy?
23      A.   No.
24      Q.   So that would be one way in which
25   FGIC was distinct?
```

55 (Pages 214 to 217)

## Page 218

```
 1              L. Kruger
 2    A.   Yes.
 3    Q.   Okay.
 4    A.   12 of them.
 5         MR. KAUFMAN:  No further questions.
 6         MR. KERR:  Other questions?
 7         I think we're done then.
 8         Thank you, everybody.  I appreciate
 9    everybody working to keep it within the
10    time restraints set by the judge.
11         Thank you.
12         (The deposition was concluded at
13    2:40 p.m.)
14         (The exhibits were retained by the
15    court reporter.)
16
17
18         _____
19              LEWIS KRUGER
20
21    Subscribed and sworn to before me
22    this     day of        2013.
23
24    _____
25
```

## Page 219

```
 1              L. Kruger
 2
 3         C E R T I F I C A T E
 4
 5    STATE OF NEW YORK  )
 6                       ) ss.:
 7    COUNTY OF NEW YORK )
 8
 9         I, THOMAS A. FERNICOLA, Registered
10    Reporter and Notary Public within and for
11    the State of New York, do hereby certify
12    that the within is a true and accurate
13    transcript of the proceedings held on
14    July 11, 2013.
15         That I am not related to any of the
16    parties to this action by blood or
17    marriage; and that I am in no way
18    interested in the outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto
20    set my hand this 11th day of July, 2013.
21
22         _____
23         THOMAS A. FERNICOLA, RPR
24
25
```

## Page 220

```
 1              L. Kruger
 2    ------------------ INDEX ------------------
 3    ATTORNEY                          PAGE
 4    Ms. Eaton                         9
 5    Mr. Carney                        99
 6    Mr. Shore                         104
 7    Mr. Carney                        196
 8    Mr. Shore                         209
 9    Ms. Eaton                         211
10    Mr. KAUFMAN                       214
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 221

```
 1              L. Kruger
 2    ---------------- EXHIBITS ----------------
 3    KRUGER'S
 4    DESCRIPTION              PAGE  LINE
 5    Exhibit 1 Settlement Agreement   11   25
 6    dated May 23, 2013,
 7    Exhibit 2 Document entitled      64   16
 8    Declaration of Lewis Kruger,
 9    Exhibit 3 Declaration of Lewis   78   14
10    Kruger,
11    Exhibit 4 Order Granting Debtor's  86  15
12    Motion Pursuant to Rule 9019,
13    Exhibit 5 Notice of Filing of    92   3
14    Lewis Kruger's First Monthly Fee
15    Report, Compensation for
16    Professional Services Rendered and
17    Reimbursement of Expenses Occurred,
18    Exhibit 6 Document, Bates Nos.   95   19
19    FGIC 901933899 through 34122,
20    Exhibit 7 Document, Bates Nos.   95   22
21    FGIC 901933813 through 33898,
22    Exhibit 8 Document, Bates Nos.   95   25
23    FGIC 901933760 through 33812,
24    Exhibit 9 Document, Bates Nos.   96   5
25    FGIC 901934123 through 34204,
```

Page 222

```
 1              L. Kruger
 2      -------------- EXHIBITS (Cont'd) ---------------
 3   KRUGER'S
 4   DESCRIPTION                    PAGE   LINE
 5    Exhibit 10 Document, Bates Nos.     96    8
 6   FGIC 901934258 through 34324,
 7    Exhibit 11 Notice of Deposition,    103   25
 8    Exhibit 12 Proof of Claim by FGIC,  145   14
 9    Exhibit 13 Documents,               174   12
10    Exhibit 14 D'Vari Declaration,      200   18
11    Exhibit 15 Holzer Affidavit,        202    9
12    Exhibit 15 Holzer Affidavit,        203    9
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 223

```
 1              L. Kruger
 2      ERRATA SHEET FOR THE TRANSCRIPT OF:
 3   Case Name:  In Re: Residential Capital, LLC, et al
 4   Dep. Date:  July 11, 2013
 5   Deponent:  LEWIS KRUGER
 6   Reason codes:
 7      1. To clarify the record.
        2. To conform to the facts.
 8      3. To correct transcription errors.
 9   Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19
20            _____
21            LEWIS KRUGER
22
23      Subscribed and sworn to before me
24   this    day of         2013.
25      _____
```

TSG Reporting - Worldwide      877-702-9580

### Deposition Errata Sheet

### *In re Residential Capital, LLC, et al.,*
### Case No. 12-12020(MG)

Deponent:          Lewis Kruger
Deposition Date:   July 11, 2013

| Citation | Testimony |
|---|---|
| 20:23-25 | direct him not to answer that ~~in confidentiality,~~ based on ~~the confidentiality~~ mediation confidentiality. |
| 23:22 | A. ~~No.~~ Yes. |
| 41:20 | A. That's correct.  These were the only documents that I saw reflecting and incorporating the terms of the agreement. |
| 42:3-4 | A.  I'm trying to answer the question, but in terms of documents that I saw reflecting and incorporating the terms of the agreement, that's correct. |
| 48:15 | ~~Cathy~~ Kathy Patrick? |
| 51:3 | ~~border~~ broader plan issues. |
| 53:6 | A.  That is not correct. |
| 68:6 | A. I did, as did the Debtors' Board of Directors. |
| 115:9 | A. I don't think ~~so~~ I relied on other written materials. |
| 119:22 | present, ~~Cathy~~ Kathy Patrick among them, and others |
| 127:20 | A.  I don't think there's anything else. |
| 157:15 | $337 ~~billion~~ million allocation? |
| 162:23-24 | A.  They argue alter ego and maybe ~~may be~~ aiding |
| 165:24-25 | came to a conclusion myself that it was not ~~an appropriate~~ inappropriate for there to be a FGIC claim at |
| 166:9 | think it's a ~~planned~~ plan confirmation |

| Citation | Testimony |
|---|---|
| 181:22-182:6 | it does ~~seemed~~ seem to me that the alternative to the global settlement is no Ally contribution of $2.1 billion, which I believe is a lot of money; secondly, that the outcome of no Ally settlement and no global settlement agreement would mean that the parties themselves, all the inter-creditor issues would come the ~~forth~~ fore, creditors would be suing each other, creditors would be suing ResCap. |
| 182:10 | to the detriment of all ~~competitors~~ creditors. And I |
| 187:10 | has to do with ~~planned~~ plan confirmation. It |

Date: _____8/8/13_____

Signed: _____Lewis Kruger_____
             Lewis Kruger

2