# Exhibit 3

Page 1

1

2               UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4

5

6   IN RE:                      )

    RESIDENTIAL CAPITAL, LLC,    )

7   Et al.,                      )

                                 )Civil Action No.

8            Debtors,            )12-12020 (MG)

9

10

11

12

13

14      CONFIDENTIAL DEPOSITION OF JOHN S. DUBEL

15              New York, New York

16           Wednesday, July 10, 2013

17

18

19

20

21

22

23

24   Reported by:

     JOMANNA DeROSA, CSR

25   JOB NO. 63468

## Page 2

```
1
2            July 10, 2013
3             1:43 p.m.
4
5
6       Confidential Deposition of
7  JOHN S. DUBEL, held at the offices
8  of McKool Smith, One Bryant Park,
9  47th Floor, New York, New York,
10  before Jomanna DeRosa, a Certified
11  Shorthand Reporter and Notary Public
12  of the States of New York, New Jersey,
13  California and Arizona.
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1
2  A P P E A R A N C E S:
3
4     MORRISON & FOERSTER
5     Attorneys for Debtors
6        1290 Avenue of the Americas
7        New York, New York 10104
8     BY:  J. ALEXANDER LAWRENCE, ESQ.
9
10     MCKOOL SMITH
11     Attorneys for Freddie Mac
12        One Bryant Park
13        New York, New York 10036
14     BY:  PETER GOODMAN, ESQ.
15         MICHAEL CARNEY, ESQ.
16
17     JONES DAY
18     Attorneys for FGIC
19        222 East 41st Street
20        New York, New York 10017
21     BY:  HOWARD SIDMAN, ESQ.
22         RICHARD WYNNE, ESQ.
23
24
25     ///
```

## Page 4

```
1
2  A P P E A R A N C E S:
3     WILLKIE FARR & GALLAGHER
4     Attorneys for Stonehill, Monarch, CQS,
5     Bayview Fund Management,
6        787 Seventh Avenue
7        New York, New York 10019
8     BY:  JOSEPH BAIO, ESQ.
9         EMMA JAMES, ESQ.
10
11     WEIL GOTSHAL & MANGES
12     Attorneys for FGIC,
13        767 Fifth Avenue
14        New York, New York 10153
15     BY:  RICHARD SLACK, ESQ.
16
17     KRAMER LEVIN NAFTALIS & FRANKEL
18     Attorneys for Official Committee of
19     Unsecured Creditors,
20        1117 Avenue of the Americas
21        New York, New York 10036
22     BY:  DANIEL EGGERMANN, ESQ.
23
24
25     ///
```

## Page 5

```
1
2  A P P E A R A N C E S:
3     ROPES & GRAY
4     Attorneys for Steering Committee of
5     of RMBS Investors
6        800 Boylston Street
7        Boston, Massachusetts 02199
8     BY:  ANDREW DEVORE, ESQ.
9
10     DECHERT
11     Attorneys for Bank of New York Mellon
12        1095 Avenue of the Americas
13        New York, New York 10036
14     BY:  JAMES MOORE, ESQ.
15         NEGISA BALLUKU, ESQ.
16
17     THE LAW OFFICES OF THOMAS M. MULLANEY
18     Attorneys for CQS
19        489 Fifth Avenue
20        New York, New York 10017
21     BY:  THOMAS MULLANEY, ESQ.
22
23
24
25     ///
```

2 (Pages 2 to 5)

Page 6

1
2    A P P E A R A N C E S:
3    SEWARD & KISSEL
4    Attorneys for U.S. Bank,
5        One Battery Park Plaza
6        New York, New York 10004
7    BY:  MARK KOTWICK, ESQ.
8        DALE CHRISTENSEN, JR., ESQ.
9
10   ALSTON & BIRD
11   Attorneys for Wells Fargo Bank,
12       90 Park Avenue
13       New York, New York 10016
14   BY:  MICHAEL JOHNSON, ESQ.
15
16   GIBBS & BRUNS
17   Attorneys for Steering Committee of
18   RMBS Investors
19       1100 Louisiana
20       Houston, Texas 77002
21   BY:  DAVID SHEEREN, ESQ.
22
23   ALSO PRESENT:
24   PHIL GLAUBERSON, Legal Video Specialist
25   SHAUNA AARON (Summer Associate at Weil)

Page 7

1    J. DUBEL - CONFIDENTIAL
2        THE VIDEOGRAPHER:  This is Tape
3    No. 1 of the videotaped deposition of John
4    Dubel in re:  Residential Capital, LLC, et al.
5    in the United States Bankruptcy Court,
6    Southern District of New York, case number
7    1212020MG.  This deposition is being held at
8    McKool Smith, One Bryant Park, New York, New
9    York, on July 10th, 2013, at approximately
10   1:43 p.m..  My name is Phil Glauberson from
11   the firm of TSG Reporting, and I am the legal
12   video specialist.  The court reporter is
13   Jomanna DeRosa with TSG Reporting.
14       Will counsel please introduce
15   themselves?
16       MR. GOODMAN:  My name is Peter
17   Goodman, and I'm with the firm of McKool
18   Smith, and we are counsel to Freddie Mac.
19       MR. BAIO:  Joseph Baio from Willkie
20   Farr & Gallagher.  I'm also here with Emma
21   James.  We represent Stonehill, Monarch, the
22   CQS and Bayview Fund Management.
23       MR. DEVORE:  Andrew Devore from
24   Ropes & Gray for the Steering Committee of
25   RMBS Investors.

Page 8

1        J. DUBEL - CONFIDENTIAL
2        MR. SHEEREN:  David Sheeren, Gibbs
3    Bruns, Steering Committee of RMBS Investors.
4        MR. CHRISTENSEN:  Dale Christensen,
5    Seward & Kissel for Law Debenture.
6        MR. JOHNSON:  Michael Johnson from
7    Alston & Bird for Wells Fargo Bank as trustee.
8        MR. MULLANEY:  Tom Mullaney from
9    the Law Offices of Thomas M. Mullaney for CQS.
10       MR. KOTWICK:  Mark Kotwick from
11   Seward & Kissel on behalf of U.S. Bank as
12   Trustee.
13       MR. EGGERMANN:  Daniel Eggermann
14   from Kramer Levin on behalf of the Official
15   Creditors.
16       MR. MOORE:  James Moore from
17   Dechert on behalf of Bank New York Mellon.
18       MR. LAWRENCE:  Alex Lawrence,
19   Morrison Foerster on behalf of the Debtors.
20       MR. SLACK:  Richard Slack from Weil
21   Gotshal & manges for FGIC and the FGIC
22   rehabilitator.  And with me today is Shauna
23   Aaron who is one of our summer associates.
24       MR. WYNNE:  Richard Wynne of Jones
25   Day for FGIC.

Page 9

1        J. DUBEL - CONFIDENTIAL
2        MR. SIDMAN:  Howard Sidman, Jones
3    Day for FGIC.
4        THE VIDEOGRAPHER:  Will the court
5    reporter please swear in the witness.
6    J O H N  S.  D U B E L, called as a witness,
7        having been duly sworn by a Notary
8        Public, was examined and testified as
9        follows:
10   EXAMINATION BY
11   MR. GOODMAN:
12       Q.  Good afternoon, Mr. Dubel.  We've
13   met before, but again I'm Peter Goodman from
14   McKool Smith for the purpose of the record.
15       Mr. Dubel, have you ever been
16   deposed before?
17       A.  I have.
18       Q.  How many times?
19       A.  Twenty or thirty times.  I'm not --
20   I don't have an exact count.
21       Q.  And so you know the ground rules in
22   terms of deposition, the court reporter needs you
23   to answer audibly.  The court reporter can't pick
24   up hand gestures or facial gestures or nods.  The
25   videographer obviously can, so -- and if you need

3 (Pages 6 to 9)

Page 10

J. DUBEL - CONFIDENTIAL

1
2  a break, you know, just let us know, and we can
3  take a break.  Okay?
4      A.  I understand.  Thank you.
5      Q.  I just -- to the extent we are in a
6  line of questioning, I'd like to finish that line
7  of questioning before we do the break, but just
8  let us know, and we'll find a convenient time for
9  you to break.
10      Okay.  So you said --
11      A.  Can I -- can I just -- can you hear
12  me okay on my microphone?  All right.
13      Q.  Okay.  You mentioned that you've
14  been deposed, I think, 20 or 30 times.  Is that
15  correct?
16      A.  Approximately, yes.
17      Q.  Generally, the last ten times that
18  you've been deposed, what was the nature of the
19  depositions, if you can recall?
20      A.  It would have been related to -- I
21  do restructuring work for my career so it would
22  have been related to a bankruptcy situation or
23  some litigation within a restructuring environment
24  where, you know, I -- I was deposed.
25      Q.  And were you deposed as a fact

Page 11

J. DUBEL - CONFIDENTIAL

1
2  witness in those cases, or were you deposed as an
3  expert in those cases?
4      A.  I'm not sure -- generally, as a
5  fact witness.  I'm not sure I've ever been deposed
6  as an expert, but I'm assuming I'm a fact witness
7  with expertise of what -- you know, knowledge of
8  the company.
9      Q.  Have -- have you ever served as an
10  expert witness in a case, a litigation case?
11      A.  As a witness, no.
12      Q.  Expert witness?
13      A.  Correct, as an expert witness, I'm
14  sorry, yes, no.
15      Q.  Have you ever testified in court
16  before?
17      A.  I have.
18      Q.  How many times?
19      A.  Probably a dozen times.
20      Q.  And what period of time are we
21  talking about in terms of being deposed over a
22  dozen times?  Was it over a ten-year period, a
23  five-year period?
24      MR. SIDMAN:  Objection to form.
25      MR. GOODMAN:  You can answer.

Page 12

J. DUBEL - CONFIDENTIAL

1
2      MR. SIDMAN:  You can answer.
3      A.  Over the last 30 years of my
4  career.
5      Q.  Well, why don't we stick to maybe
6  the last ten years of your career.  How many have
7  you testified within the last ten years of your
8  career?
9      A.  In court?
10      Q.  In court.
11      A.  Approximately two or three times.
12      Q.  And what were the nature of those
13  cases that you testified in court two or three
14  times over the past ten years?
15      A.  It would have been bankruptcy
16  cases, either confirmation hearings or litigation
17  related to a confirmation, or it might have been a
18  DIP hearing.  I just don't -- I don't recall
19  exactly what -- you know, which cases, but --
20      Q.  And what were those cases, the
21  names of those cases?
22      A.  WorldCom would have been one.  I
23  believe I testified in Acterna, in RCN, in re,
24  obviously, on the names of those.  Those are the
25  only actual in-court appearances.

Page 13

J. DUBEL - CONFIDENTIAL

1
2      Q.  Okay.  WorldCom.  Actera?
3      A.  Acterna.
4      Q.  Acterna.
5      A.  A-C-T-E-R-N-A.
6      Q.  And RCN.
7      Okay.  Let's talk about WorldCom
8  for a moment.  Do you recall the nature of your
9  testimony in WorldCom?
10      A.  It was related to the confirmation
11  hearings.
12      Q.  Okay.  In what aspect of the
13  confirmation hearings?
14      A.  I previously served as the chief
15  financial officer of WorldCom prior to the
16  permanent management team being brought in, and i
17  continued to assist WorldCom.  So I had knowledge
18  of all of the issues related to the -- the
19  accounting records of WorldCom.
20      Q.  So the testimony -- I'm trying to
21  understand.  It was testimony concerning the
22  accounting records of WorldCom?
23      A.  I don't recall exactly what the
24  testimony was.  I'd have to go back and, you know,
25  look at something; but it had to do with issues

4 (Pages 10 to 13)

Page 14

1          J. DUBEL - CONFIDENTIAL
2    surrounding the confirmation hearings.
3          Q.    And how about Acterna, what was the
4    nature of that testimony?
5          A.    Acterna would have been
6    confirmation.
7          Q.    And what aspect of confirmation
8    would the testimony have been about?
9          A.    I was the chief restructuring
10   officer, so I would have been called upon to
11   proffer testimony as it related to the
12   confirmation hearing.
13         Q.    And you say "proffer testimony."
14   Did you actually testify, or did you put in a
15   declaration or affidavit?
16         A.    I definitely put in a declaration
17   or affidavit, whatever it was.  I -- I don't
18   recall whether I actually got up on the stand or
19   not.  I might have testified from the back.  You
20   know, the judge might have asked me a question or
21   two.  I just don't recall.  It was -- it was
22   generally not a contested hearing.
23         Q.    Can you summarize the substance of
24   the proffer briefly?
25         A.    Just around the facts and

Page 15

1          J. DUBEL - CONFIDENTIAL
2    circumstances of having Acterna emerge from its
3    Chapter 11.
4          Q.    And did the testimony include a
5    narrative on the plan of reorganization in the
6    case?
7               MR. SIDMAN:  Objection to form.
8          You can answer.
9          A.    I don't recall.
10         Q.    How about in the WorldCom case, did
11   your testimony also relate to a narrative of or
12   summary of the plan of reorganization in that
13   case?
14              MR. SIDMAN:  Objection to form.
15         You can answer.
16         A.    I don't think it did.
17         Q.    What was the nature of your
18   testimony in the RCN case?
19         A.    I don't recall whether -- I -- I
20   might have testified, I just don't recall, it's
21   been several years, on the -- on the DIP loan or,
22   you know, again on -- on any issues related to the
23   confirmation.  Again, I might have just proffered
24   my testimony.
25         Q.    Do you recall what aspect of the

Page 16

1          J. DUBEL - CONFIDENTIAL
2    confirmation you testified or proffered to?
3          A.    I was the president of RCN, so I
4    would have been the person who would have been
5    proffering or testifying as to all of the -- you
6    know, all of the issues needed for -- what they
7    would have needed the witness for, getting the --
8    you know, the plan confirmed.
9          Q.    And what does that mean all of the
10   issues necessary to get the plan confirmed?
11         A.    I'm not the expert on this, but I
12   believe was -- 1129 has certain steps that you
13   have to go through in front of the judge to get
14   the judge to approve saying that the company has
15   done all of the things that it needs to do, and I
16   would have been the factual witness in that.
17         Q.    So -- just so I understand, you
18   were confirming to the Court that RCN had met all
19   of the requirements in the plan.  Is that correct?
20              MR. SIDMAN:  Objection to form.
21         You can answer.
22         Q.    To -- to the confirmation.
23              MR. SIDMAN:  Same objection.
24         You can answer.
25         A.    I don't recall exactly what it was.

Page 17

1          J. DUBEL - CONFIDENTIAL
2    I mean, there's a -- it's probably in the records
3    at the -- at the court for RCN.  I just don't
4    recall exactly what it was.
5          Q.    But it had something to do with
6    confirmation of the plan and the meeting of the
7    1129 requirements.  Correct?
8          A.    That's what I believe, yes.
9          Q.    Okay.  How about your testimony
10   with respect to the DIP loan, do you recall the
11   substance of that testimony?
12         A.    No, I don't recall it.  It probably
13   would have just been -- if we even did testimony,
14   it would have been just, you know, getting the
15   loan in place at the initial outset of the case.
16         Q.    So would it have been financial
17   testimony?
18              MR. SIDMAN:  Objection to form.
19         You can answer.
20         A.    I assume so.  I just don't recall
21   the testimony.
22         Q.    Would the testimony have been in
23   the nature of the ability to meet the terms of the
24   DIP loan?
25         A.    Again, I -- I don't recall.

5 (Pages 14 to 17)

Page 18

1      J. DUBEL - CONFIDENTIAL
2      Q.    Now, have you provided in-court
3    testimony on any other matters other than these
4    three matters within the past ten years?
5          MR. SIDMAN:  Objection to form.
6          You can answer.
7      A.   I may have.  I just -- you know,
8    sitting here right now, I don't remember.
9      Q.   These are -- would you view these
10   three cases as the material cases that you've been
11   involved in where you provided testimony over the
12   last ten years?
13         MR. SIDMAN:  Objection to form.
14         You can answer.
15     A.   If there were another case that I
16   testified in, which I don't recall right now, that
17   might also be.  I don't really know what you mean
18   by "material" in relation to the question, but I
19   would have testified as it related to what I
20   explained before, so --
21     Q.   I guess from one of a better word
22   material, important?  Significant?
23     A.   Significant to what, to the case or
24   to -- I'm not sure I understand.
25     Q.   Yes, significant to the case.

Page 19

1      J. DUBEL - CONFIDENTIAL
2    Let's try that.
3          MR. SIDMAN:  Objection to the form
4    of the question.
5          If there is a question, then you
6    can answer.
7      A.   If it were a confirmation hearing,
8    then I would view that as significant to the case
9    because that's how the companies emerge from
10   Chapter 11.
11     Q.   So in terms of significant, as you
12   defined it, as confirmation of a case, these are
13   the three cases that you can recall testifying in?
14     A.   If I did testify.  Again, I don't
15   remember if I testified in all of them.
16   Generally, I would have prepared for it.  Whether
17   I actually got up on the stand for a minute or
18   just stood in the back and was proffered, I just
19   don't recall every case whether I did or did not.
20     Q.   Okay.  Now, how about testimony in
21   connection with confirmation of a plan over the
22   interval of 30 years ago to 20 to ten years ago,
23   because we just talked about the ten-year
24   interval, do you recall testifying as to
25   confirmation within that ten to 20, 30-year

Page 20

1      J. DUBEL - CONFIDENTIAL
2    interval in any case?
3      A.   I don't recall.  At that point I
4    don't recall which -- when and where I testified,
5    you know, specifically.
6      Q.   Fair enough.  It's a long time.
7      A.   Yes.
8      Q.   Is it possible that you may have
9    testified during that time interval concerning
10   confirmation of a plan?
11     A.   I might have.
12     Q.   Are you familiar with what a plan
13   of reorganization is in a bankruptcy case?
14     A.   I am.
15     Q.   Okay.  What is your understanding
16   of a plan of reorganization?
17     A.   It is the legal document that
18   outlines how the company will emerge from the
19   Chapter 11 proceedings.
20     Q.   Do you know whether a plan of
21   reorganization provides for how creditors are
22   going to get paid?
23         MR. SIDMAN:  Objection to form.
24         You can answer.
25     A.   Yes, it generally does.

Page 21

1      J. DUBEL - CONFIDENTIAL
2          MR. GOODMAN:  Can you --
3          MR. SIDMAN:  Off the record,
4    please.
5          MR. GOODMAN:  We'll go off the
6    record.
7          THE VIDEOGRAPHER:  We're going off
8    the record.  The time is 1:59 p.m..
9          (Recess taken.)
10         THE VIDEOGRAPHER:  We're back on
11   the record.  The time is 2:02 p.m.
12     Q.   Now, when you were involved in the
13   WorldCom case, were you involved in coming up with
14   the plan of reorganization for that case?
15         MR. SIDMAN:  Objection to form.
16         Answer, if you can.
17     A.   No, I was not.
18     Q.   Who was involved in coming up with
19   the plan of reorganization in that case?
20     A.   The current management and counsel,
21   along with, I assume, a variety of creditors.
22     Q.   And so you didn't participate at
23   all in the development of the plan of
24   reorganization in that case?
25         MR. SIDMAN:  Object to form.

6 (Pages 18 to 21)

Page 22

1          J. DUBEL - CONFIDENTIAL
2          You can answer.
3      A.   No, I did not.
4      Q.   How about Acterna, were you
5  involved at all in the development of the plan of
6  reorganization in the Acterna case?
7      A.   Yes, I was.
8      Q.   And what was your role?
9      A.   In Acterna, I was the chief
10  restructuring officer for the company.  In that
11  role I was the -- you know, the lead management
12  person responsible for all of the restructuring
13  activities, including the bankruptcy proceedings.
14      Q.   And would you have reviewed the
15  plan of reorganization?
16      A.   In the Acterna case?
17      Q.   Yes.
18      A.   Absolutely, yes.
19      Q.   How about in the RCN case, were you
20  involved in all -- at all in the development of
21  plan of reorganization in the RCN case?
22      A.   Yes, I was.
23      Q.   And what was your role in that
24  regard?
25      A.   I was the president of RCN; and I

Page 23

1          J. DUBEL - CONFIDENTIAL
2  guess towards the latter part, I converted over to
3  the chief restructuring officer.  And similar to
4  Acterna, would have had all the lead
5  responsibilities for the restructuring process,
6  the bankruptcy and as a member of management
7  leading the bankruptcy process.
8      Q.   In your -- in the past 30 years, do
9  you recall how many bankruptcy cases you've been
10  involved in where you had a role in developing the
11  plan of reorganization?
12      A.   In various different positions,
13  probably 15 or 20.
14      Q.   And generally, how would you
15  summarize your roles in those 15 to 20 cases in
16  terms of developing a plan of reorganization?
17          MR. SIDMAN:  Objection to form.  Do
18      you want him to go through each one, or do you
19      want --
20      Q.   I said generally, if you could
21  summarize.
22      A.   If I was on the company side,
23  then -- and I had the, you know, key role or a
24  lead role in management or as an advisor, I would
25  have been working, you know, closely with advisors

Page 24

1          J. DUBEL - CONFIDENTIAL
2  to develop the plan.  If I was on the creditor
3  side, I would have been as a creditor working
4  towards the development of a plan.
5      Q.   Do you know what a Disclosure
6  Statement is?
7      A.   I do.
8      Q.   What's your understanding of a
9  Disclosure Statement?
10      A.   The best nonlegal way to describe
11  it, since I'm not a lawyer, is it's kind of a
12  plain English document that provides a simpler to
13  read and understand interpretation of the plan and
14  also provides additional information that the
15  readers of the document can use to understand so
16  that they can make a determination as to whether
17  or not they would like to either vote, vote in
18  favor or vote to reject the plan.
19      Q.   And do you know whether Disclosure
20  Statements generally summarize, in layman's terms,
21  the plan of reorganization?
22          MR. SIDMAN:  Objection to form.
23          You can answer.
24      A.   They generally do.
25      Q.   Do they provide financial

Page 25

1          J. DUBEL - CONFIDENTIAL
2  information?
3          MR. SIDMAN:  Object to form.
4          You can answer.
5      A.   Most Disclosure Statements will
6  provide some level of financial information, yes.
7      Q.   What kind of financial information?
8      A.   Depending on the facts and
9  circumstances in the particular situation, they
10  can either provide projections or historical
11  financial information or both.
12      Q.   And what's the purpose of the
13  financial information, to your understanding?
14          MR. SIDMAN:  Objection.
15          You can answer.
16      A.   Again, it's for the readers to
17  understand and be able to make a determination as
18  to which they -- which way they would like to vote
19  on the plan of reorganization.
20      Q.   And you've been involved in -- in
21  developing Disclosure Statements.  Is that
22  correct?
23          MR. SIDMAN:  Objection.
24          You can answer.
25      A.   Yes, I have.

Page 26

1          J. DUBEL - CONFIDENTIAL
2          Q.   What would your role normally be in
3     terms of providing or developing a Disclosure
4     Statement?
5          A.   It would depend on what role I had
6     in the reorganization process.  If I was on the
7     management side of the debtor, I would have been
8     involved in the actual drafting of it and
9     providing input and information to include in the
10    Disclosure Statement.  If I was on the creditors'
11    side, I would generally have been involved in
12    trying to determine if there was information that
13    I felt would be appropriate to have in the
14    Disclosure Statement.
15         Q.   Would you have been involved in
16    providing the financial information that is
17    contained in a Disclosure Statement in some of the
18    cases you've worked on?
19             MR. SIDMAN:  Objection.
20             You can answer.
21         A.   In some of the cases, yes.
22         Q.   Do you recall how many cases you
23    provided financial information?
24         A.   In the majority of the cases that I
25    would have been involved with from the management

Page 27

1          J. DUBEL - CONFIDENTIAL
2     side, it would have been either my role as -- if I
3     was a chief financial officer or if I was a CRO or
4     what have you, I might have been someone working
5     under my direction to provide information.
6          Q.   And who would have been under your
7     direction?
8          A.   A CFO or a finance or controller, a
9     finance person or controller.
10         Q.   How about a financial advisor to
11    the company?
12         A.   Well, not within the management,
13    but as an outside party, yes, a financial advisor.
14         Q.   And you would have worked with a
15    financial advisor on the financial information
16    that would have been contained in a Disclosure
17    Statement.  Is that correct?
18             MR. SIDMAN:  Objection.
19             You can answer.
20         A.   Generally, yes.
21         Q.   Do you know how many times -- do
22    you recall how many times you worked with a
23    financial advisor with respect to financial
24    information that was contained in a Disclosure
25    Statement?

Page 28

1          J. DUBEL - CONFIDENTIAL
2          A.   The vast majority of the situations
3     where I was working on the management side, I
4     would have been working with a financial advisor.
5          Q.   Now, if someone provided you with
6     financial information you believe was wrong or
7     incorrect, would you notify that person that you
8     didn't believe the financial information was
9     correct?
10             MR. SIDMAN:  Objection to the form.
11             You can answer.
12         A.   If I was -- I'm sorry.  Could you
13    repeat the question?
14         Q.   Okay.  If someone working under
15    your direction or control provided you with
16    information for a Disclosure Statement that was
17    not correct, would you have notified that person
18    that you believed the information was incorrect?
19             MR. SIDMAN:  Objection to form.
20             You can answer.
21         A.   If it was information that was
22    going to be included in the Disclosure Statement,
23    I might have notified that person or someone else
24    about my views on it.
25         Q.   And why would you do that?

Page 29

1          J. DUBEL - CONFIDENTIAL
2          A.   If there was information that I
3     believed was not accurate and it was going to be
4     included in a Disclosure Statement, I would want
5     to make sure that it was accurate to the best of
6     our ability to make it accurate.
7          Q.   So it wouldn't be appropriate for
8     information to be put into a Disclosure Statement
9     where you had control over that financial
10    information and you believed that information to
11    be incorrect.  Is that correct?
12             MR. SIDMAN:  Objection to the form.
13             You can answer, if you can.
14         A.   I'm not sure.  I think you're
15    asking me a legal question.  I'm not a lawyer.
16         Q.   It's not a legal question.  It's
17    just a layman's question.
18         A.   If I knew that information was
19    inaccurate and was going to be included, as I said
20    earlier, I would have informed somebody to find
21    out why it was inaccurate and correct it.
22         Q.   Because you wouldn't want incorrect
23    information to be disseminated to parties
24    interested in the Disclosure Statement.  Correct?
25             MR. SIDMAN:  Objection to form.

8 (Pages 26 to 29)

Page 30

1           J. DUBEL - CONFIDENTIAL
2        You can answer.
3        A.    Because I would like to have the
4    information as accurate as possible.
5        Q.    And why is that?
6            MR. SIDMAN:  Objection.
7        Answer.
8        A.    Because I would like to have the
9    information available to the people who are the
10   readers of the document to have accurate
11   information to use it in whatever shape, fashion
12   or form they would like to use it in.
13       Q.    So they can make an informed
14   decision about the plan of reorganization.  Right?
15           MR. SIDMAN:  Objection.
16       You can answer.
17       A.    I don't know what users are always
18   going to be doing.  Some people don't even read
19   the Disclosure Statement.  So I don't know whether
20   they would use it for that purpose or not.
21       Q.    I'm not talking about one or two
22   people.  I'm talking about generally.  You want to
23   make sure that people are informed of and have
24   sufficient and accurate information about the plan
25   of reorganization.  Right?

Page 31

1           J. DUBEL - CONFIDENTIAL
2        A.    I think I've testified to that
3    before, yes.
4        Q.    So the answer is yes?
5        A.    Yes.
6        Q.    And you worked on the development
7    of a Disclosure Statement in RCN.  Is that right?
8        A.    I did.
9        Q.    And what was your role in -- in
10   working on a Disclosure Statement for the RCN
11   matter?
12       A.    As I testified previously, I was
13   the president of RCN.  And then towards the latter
14   stages, I switched my title and role to chief
15   restructuring officer.
16       Q.    So would you say you had major
17   involvement in the development of the Disclosure
18   Statement in the RCN case?
19           MR. SIDMAN:  Objection to form.
20       You can answer.
21       A.    I believe I testified earlier to
22   that, yes.
23       Q.    How about Acterna, what was your
24   role in the development of the Disclosure
25   Statement in Acterna?

Page 32

1           J. DUBEL - CONFIDENTIAL
2        A.    As I testified earlier, I was the
3    chief restructuring officer at Acterna.
4        Q.    And would you have had major
5    involvement in the Disclosure Statement at
6    Acterna?
7            MR. SIDMAN:  Objection.
8        You can answer.
9        A.    Yes.
10       Q.    And the WorldCom case, were you
11   involved in the development of the Disclosure
12   Statement in WorldCom?
13       A.    I believe I testified earlier that
14   I was not.
15       Q.    You were not, okay.
16           How many cases over the past 30
17   years were you involved in the development of a
18   Disclosure Statement?
19       A.    Probably somewhere in the range of
20   15 to 20.
21       Q.    And how many of those 15 to 20 do
22   you recall having material involvement in the
23   development of a Disclosure Statement?
24           MR. SIDMAN:  Objection.
25       You can answer.

Page 33

1           J. DUBEL - CONFIDENTIAL
2        A.    The majority.
3        Q.    More than ten?
4        A.    Yes.
5        Q.    Fourteen out of 15?
6        A.    I'd have to go back and kind of
7    spend some time thinking about each case and kind
8    of figuring it out, but the majority.
9        Q.    Okay.  When did you come to be
10   employed by FGIC?
11       A.    On or about January 2nd of 2008.
12       Q.    And for the purpose of the record,
13   FGIC, what's the full name of the company that you
14   worked for -- worked for in 2008?
15       A.    Financial Guaranty Insurance
16   Company commonly referred to as FGIC.
17       Q.    For the purpose of today's record,
18   I'll be referring to it as FGIC.
19       A.    Yes, FGIC or -- or F-G-I-C,
20   either -- either one.
21       Q.    And how did you come to be employed
22   by FGIC in January of 2008?
23       A.    My company was retained by FGIC to
24   provide temporary employment services of John
25   Dubel.

Page 34

1         J. DUBEL - CONFIDENTIAL
2         Q.    And what type of temporary
3    employment services did you provide to FGIC?
4         A.    Initially, I was the chief risk
5    officer and subsequently became the chief
6    executive officer.
7         Q.    As chief risk officer of FGIC, what
8    were your duties?
9         A.    My duties were -- were basically to
10    lead all of the restructuring activities that FGIC
11    had to deal with.
12         Q.    And what kind of restructuring
13    activities did FGIC have to deal with?
14         A.    We had to develop a restructuring
15    or workout department since we did not have an
16    active workout department at the time.  We had to
17    determine how to restructure the overall
18    organization in light of the financial situation
19    that FGIC was in.  And so I managed work -- you
20    know, groups of people and worked with advisors
21    both legal and others in that aspect.
22         Q.    And what was the financial
23    situation that FGIC was in in 2008 when you joined
24    the company?
25         A.    When I joined the company, we

Page 35

1         J. DUBEL - CONFIDENTIAL
2    had -- since it was on or about January 2nd, we
3    had yet to report our fourth quarter 2007 numbers,
4    but the -- it became apparent that, based upon
5    what was happening in the marketplace with a
6    variety of different CDO transactions, that we had
7    insured that there were going to be some problems
8    with those transactions.
9         So we knew that there was -- it was
10    not going to be an easy situation to work through.
11    And we had also been, I believe at that point,
12    been put on notice by one or more of the rating
13    agencies that there was a potential review of the
14    triple A rating that FGIC had.
15         Q.    Was there a concern that FGIC was
16    going to default on its obligations to its
17    creditors?
18         MR. SIDMAN:  Objection to form.
19         A.    At that time, no; not when I
20    joined.
21         Q.    Did there come a time that FGIC
22    became concerned that it was going to default on
23    its obligations?
24         A.    There came a time when we felt we
25    might fall below the statutory required capital

Page 36

1         J. DUBEL - CONFIDENTIAL
2    initially; and then subsequent to that, there
3    became a time where we felt we might be in a
4    position where we might default on our obligations
5    to our -- to our policyholders.
6         Q.    And when did you become concerned
7    that you might fall below the statutory required
8    capital?
9         MR. SIDMAN:  Objection.  I'm just
10    going to instruct the witness not to answer to
11    the extent he obtained that information
12    through attorney-client communications.
13         THE WITNESS:  I can answer?
14         MR. SIDMAN:  Okay.
15         A.    Okay.  When we were filing our
16    fourth quarter 2007 statutory financial
17    statements.
18         Q.    And approximately what date would
19    that have been?
20         A.    I don't recall exactly.  It would
21    have been some time in the first six months of the
22    year.  Probably in the May or June time frame.  I
23    know we were late in filing them -- 2008, that is.
24    Sorry.
25         Q.    Thank you.

Page 37

1         J. DUBEL - CONFIDENTIAL
2         And when did FGIC become concerned
3    that it might default on its obligations to its
4    policyholders?
5         MR. SIDMAN:  Objection to form.
6    And once again, I'll instruct the witness not
7    to answer if that information was obtained
8    through attorney-client communications.
9         You can answer, if you can.
10         A.    Could you repeat the question to
11    make sure I --
12         Q.    Yeah.  When did FGIC become
13    concerned that it might default on its obligations
14    to its policyholders?
15         A.    The answer to that question is
16    based upon -- it was based upon discussions with
17    counsel.
18         Q.    It might have been based upon
19    discussions with counsel, but did you ever discuss
20    that matter with anyone else not with FGIC?
21         MR. SIDMAN:  Objection to form.
22         Q.    The concern that you were going to
23    default with respect to policyholders.
24         A.    Let me answer it this way:  In the
25    latter part of 2008, as we were getting prepared

Page 38

1        J. DUBEL - CONFIDENTIAL
2   to file additional financial statements for the
3   second quarter and the third quarter of 2008, we
4   were closer to our statutory limits, and so I
5   would say in the third quarter of 2008 is when
6   it -- it looked like we might have a problem.
7        Q.   And was that about the same time
8   when you had discussions with counsel on that
9   issue?
10           MR. SIDMAN:  Objection to form.
11           You can answer.  You can answer.
12       A.   On or about that same time.
13       Q.   And did you make disclosure in your
14  financial statements in the third quarter of 2008
15  that you might not be able to meet your
16  obligations to your policyholders?
17       A.   I don't recall the financial -- you
18  know, the -- all the financial disclosures, but I
19  believe we put in a number of risk factors in our
20  financial statements in our footnotes and other
21  disclosures that would have laid out some of the
22  concerns.
23       Q.   And, generally, do you recall what
24  those concerns might have been?
25       A.   As I sit here right now, I don't

Page 39

1        J. DUBEL - CONFIDENTIAL
2   recall exactly what we would have disclosed.  I'd
3   have to go back and, you know, look at the
4   financial statements.
5        Q.   And this is all in the fourth
6   quarter of 2008 I believe you testified to.
7   Correct?
8           MR. SIDMAN:  Objection.
9        A.   The risk factors would have
10  probably been disclosed in the -- in whatever
11  financials we filed during 2008.  So I think I
12  testified earlier it was the third and the fourth
13  quarter.
14       Q.   And did there come a time when you
15  realized that you were going to need to
16  restructure the company's balance sheet in order
17  for the company to maintain a sufficient statutory
18  capital and meet its obligations to its
19  policyholders?
20           MR. SIDMAN:  Objection to form, and
21      I object -- I instruct the witness not to
22      answer to the extent that he obtained this
23      information via attorney-client
24      communications.
25           Otherwise, go ahead and answer.

Page 40

1        J. DUBEL - CONFIDENTIAL
2           MR. GOODMAN:  Well, I asked him if
3      -- did there come a time.
4           MR. SIDMAN:  Okay.  You're only
5      asking of the time?  That's fine.
6           You can answer that question.
7        A.   Yes.
8        Q.   When was that?
9           MR. SIDMAN:  Objection.
10       A.   Well, I -- I think all through the
11  2008 time frame and through 2009 as the company
12  struggled to stay above the statutory minimum
13  requirements that are set forth by the -- what was
14  at the time the New York State Insurance
15  Department.
16       Q.   And did FGIC come up with a plan to
17  meet the issues concerning the statutory capital
18  requirements and its obligations to its
19  policyholders?
20       A.   We did.
21       Q.   And what was the plan?
22       A.   We developed a plan that would have
23  attempted to restore our statutory surplus through
24  a variety of different mechanisms.
25       Q.   Do you recall what those mechanisms

Page 41

1        J. DUBEL - CONFIDENTIAL
2   were?
3        A.   Yes.  The initial plan was -- it
4   was generally in three areas.  The first area
5   would have been an offer to exchange securities,
6   the second would have been commutations of certain
7   policies, and the third would have been the
8   restructuring of certain other policies.
9        Q.   Under this type of plan, what types
10  of obligations were you seeking to commute?
11       A.   Generally, they would have been CDO
12  obligations that were in CDS form that we would
13  have sought to commute.
14       Q.   Any other types of obligations you
15  were seeking to commute?
16       A.   I don't recall.  There might have
17  been one or two others smaller transactions that
18  would have been in -- not in CDS form.
19       Q.   And explain to me what you mean
20  under this plan by "restructuring policies"?
21       A.   We had certain other policies that
22  were issued, financial guaranty policies that were
23  guarantying CDS transactions which we were going
24  to restructure and put into a separate
25  organization through a separate subsidiary.

Page 42

1        J. DUBEL - CONFIDENTIAL
2        Q.   And what about exchange of
3   securities, what did you mean by that?
4        A.   In terms of security -- in terms of
5   policies that we had issued, there were many
6   policies where the underlying bonds that were part
7   of the securitization, we offered to exchange
8   those bonds for a -- an upfront payment and split
9   the bonds -- effectively put those bonds into a --
10  into separate trusts whereby any of the insurance
11  payment proceeds that would go into the -- the
12  securitization trust would flow down into that
13  subtrust, and we would receive those payments back
14  in exchange -- over time in exchange for the
15  upfront payment.  And the other portion of that
16  subtrust, the underlying cash flows of the
17  securitizations, would go to the holders of that
18  certificate.
19       Q.   Were you working at that time with
20  any informal creditor group?
21       A.   No.
22       Q.   Was this an exchange offer that --
23  that -- that you were trying to accomplish or
24  effectuate?
25       A.   We referred to it as an offer to

Page 43

1        J. DUBEL - CONFIDENTIAL
2   exchange.
3        Q.   And was that offer to exchange
4   successful?
5        A.   No, it was not.
6        Q.   Okay.  So the offer to exchange
7   wasn't successful.  I would assume the company was
8   still having its -- the same financial issues that
9   you mentioned earlier.  Isn't that correct?
10           MR. SIDMAN:  Objection to form.
11           You can answer.
12       A.   At that point in time, the
13  company's statutory surplus was below the minimum
14  required by New York State Insurance Department
15  regulations, and we also were under what's
16  referred to as a 1310 order from the New York
17  State Insurance Department, which precluded us
18  from paying any claims that we'd received under
19  our policies but continue to operate in the
20  ordinary course other than that.
21       Q.   Okay.  And did the 1310 order ask
22  the company to address those issues?
23       A.   Yes, it did.
24       Q.   And how did the company address
25  those issues?

Page 44

1        J. DUBEL - CONFIDENTIAL
2        A.   Through the restructuring that I
3   just outlined for you.
4        Q.   The one that didn't work?
5           MR. SIDMAN:  Objection to form.
6        A.   Through the offer to exchange
7   commutation and restructuring of other policies,
8   yes.
9        Q.   Yeah, but that -- but that was not
10  successful.  Correct?
11       A.   That's correct, that was not
12  successful.
13       Q.   So what did the company, FGIC, do
14  next to comply with the 1310 order?
15       A.   We developed an alternative plan
16  which was a plan to put the company into a
17  rehabilitation proceeding so that it could go into
18  and out of the rehabilitation proceeding as
19  quickly as would be appropriate and come out on
20  the other side a restructured entity and be able
21  to pay its policyholders in a fair and equitable
22  manner.
23       Q.   And it -- did FGIC work with an
24  informal committee of creditors or policyholders
25  on that plan?

Page 45

1        J. DUBEL - CONFIDENTIAL
2        A.   We did.
3        Q.   And was that plan ever memorialized
4   between FGIC and this informal
5   creditor/policyholder group?
6           MR. SIDMAN:  Object to form.
7        A.   Yeah, I'm not -- I'm not sure I
8   know what you mean by "memorialized."  FGIC did
9   put forward a plan that it presented to the New
10  York State Insurance Department as a proposal as a
11  means to restructure FGIC through a rehabilitation
12  process.
13       Q.   And did -- what form did the
14  proposal take?  Was it a contract?  I mean --
15       A.   It was a proposed plan of
16  rehabilitation which was presented to, I'll call
17  it, the New York State Insurance Department
18  because I just don't recall exactly the timing of
19  when they changed their name to the New York State
20  Department of Financial Services, but I'll use
21  them interchangeably at this point in time.
22       Q.   Okay.  How did the plan propose to
23  treat FGIC-wrapped RMBS security holders?
24       A.   How did that initial proposed plan?
25       Q.   Yes, that you submitted.

Page 46

1          J. DUBEL - CONFIDENTIAL
2          A.   Well, there were multiple
3    components of that plan.  One of the -- one of the
4    components was that all policyholders that chose
5    not to work with FGIC to commute or settle their
6    transactions would be dealt with across the board
7    in a fair and equitable manner similarly, not
8    differentiating RMBS from other policyholders.
9               And the way in that -- in which
10   that was proposed was that the policyholders
11   would -- policyholders would receive an initial
12   payment on claims that -- as they were received or
13   that had been received to date with the hope that
14   there may be further payments down the road.
15        Q.   When I say "FGIC-wrapped RMBS
16   security holders," do you understand what that
17   means?
18        A.   I -- well, maybe you can explain it
19   to me.
20        Q.   Well, you seemed to know because
21   you were helping the court reporter.  I'd like to
22   see what your understanding is.
23             MR. SIDMAN:  Objection to form.
24        A.   What I was referring to in my
25   answer was the FGIC policyholders.  Okay?  I

Page 47

1          J. DUBEL - CONFIDENTIAL
2    wasn't referring to the FGIC-wrapped security,
3    whatever -- whatever the term you used was.
4         Q.   Okay.  So you don't understand what
5    that means?
6         A.   I --
7              MR. SIDMAN:  Objection to form.
8    He's asked -- the witness has asked you for
9    your -- your understanding.  You asked the
10   question.
11             MR. GOODMAN:  I'm trying to find
12   out if he understands what I mean.
13        A.   Repeat the term.
14        Q.   FGIC-wrapped RMBS security holders.
15        A.   Well, I can only assume that you
16   mean the parties that hold the bonds that are part
17   of the securitization that FGIC would have ensured
18   through the policyholder or the trust in that --
19   trustees in that case.
20        Q.   Okay.  So let's go with that
21   understanding.  Okay?  When I say "FGIC-wrapped
22   RMBS security holders," I am referring to the
23   definition that you just gave me.  Okay?
24        A.   Okay.
25        Q.   And what did the plan call for with

Page 48

1          J. DUBEL - CONFIDENTIAL
2    respect to FGIC-wrapped RMBS security holders?
3         A.   I don't recall that it had anything
4    to do with the FGIC-wrapped RMBS security holders.
5    As I testified earlier, it was for the FGIC
6    policyholders.
7         Q.   Okay.  And by "policyholders," did
8    the FGIC-wrapped RMBS security holders that we
9    referred to earlier, we just referred to, these
10   are bonds that were issued under a trust.  Is that
11   your understanding?
12             MR. SIDMAN:  Object to the form.
13             You can answer.
14        A.   They can be bonds, notes --
15        Q.   Certificates --
16        A.   -- certificates, any different --
17   you know, there's many different forms that they
18   could come in.
19        Q.   And I believe what you were trying
20   to distinguish in terms of what -- how you
21   responded to my question is that the certificate
22   holders, the bondholders, they don't hold the
23   underlying FGIC policy guaranty that something
24   that is held by the trustee that issued the
25   securities.  Correct?

Page 49

1          J. DUBEL - CONFIDENTIAL
2              MR. SIDMAN:  Object to the form.
3              Answer, if you can.
4         A.   I'm not sure what you mean by "the
5    underlying."  There was a relationship that FGIC
6    has with a policyholder, and in the RMBS
7    securitizations, those were -- the policyholder
8    was the trustee.
9         Q.   The trustee.  Okay.
10             And how did the FGIC plan propose
11   to deal with those policyholders, the trustees?
12        A.   I believe I testified earlier that
13   -- that --
14        Q.   Just so I'm clear.  I'm not sure.
15        A.   As I testified earlier, the -- as
16   claims would be received or had been received
17   upon -- emerging from the rehabilitation process
18   and the lifting of any 1310 order, FGIC would pay
19   a percentage of the claims to the policyholders.
20   And then if in the future there was any available
21   ability to make any further payments, they would
22   if they could.
23        Q.   Okay.  And in terms of the initial
24   payments to the policyholders, did the plan have a
25   term for what that initial payment represented?

13 (Pages 46 to 49)

---

Page 50

1           J. DUBEL - CONFIDENTIAL
2           MR. SIDMAN:  Object to the form.
3       A.   When you say "represented," what
4    did you mean -- what do you mean?
5       Q.   Was there a term that -- that was
6    used within the plan to define that initial
7    payment?
8       A.   Yes.
9       Q.   What was that term?
10      A.   It's the cash payment percentage.
11      Q.   CPP.  Okay.
12      A.   Shorthand, CPP, yes.
13      Q.   And with respect to payments over
14   time that you referred to earlier, did the plan
15   have a term for that payment with respect to the
16   policyholders?
17      A.   It would -- it would be the CPP, if
18   the CPP percentage were to change.
19      Q.   Okay.  And did the plan have any
20   kind of deferred payment, obligation that it
21   committed to pay to policyholders?
22           MR. SIDMAN:  Objection to form.
23   You can answer.
24      A.   The plan made reference to the fact
25   that there were deferred payment amounts.  I don't

---

Page 51

1           J. DUBEL - CONFIDENTIAL
2    believe the initial plan had any obligation or
3    commitment to pay those because it was the -- it
4    was undetermined if there was even the ability to
5    make those payments.
6       Q.   But if the company had the ability
7    to make the payments, they would make payments,
8    deferred payments over time.  Correct?
9       A.   The company would increase its CPP,
10   cash payment percentage --
11      Q.   Okay.
12      A.   -- which to the extent that it
13   would go up from -- just make up numbers -- 10
14   percent to 12 percent, then that differential
15   would be on account of amounts that had not been
16   paid in the past.  And the company could also have
17   a lower CPP, in which case it would have
18   mechanisms to clawback any overpayments that it
19   made previously.
20      Q.   Okay.  Have you ever heard of the
21   term "DPO"?
22      A.   I have.
23      Q.   Okay.  When have you heard of that
24   term with respect to FGIC?
25      A.   When the initial plan was

---

Page 52

1           J. DUBEL - CONFIDENTIAL
2    developed, it was a term of art used in the
3    initial plan.
4       Q.   Okay.  So was the DPO part of the
5    plan that you submitted to New York State?
6           MR. SIDMAN:  Objection to form.
7       A.   You're talking about the initial?
8       Q.   Yes.
9       A.   I don't remember whether it was
10   that term or something very similar, but the -- it
11   was either that or that deferred payment
12   percentage or something -- yeah, something along
13   the lines of that, yes.
14      Q.   And let's just call it DPO for now.
15      A.   Fine.
16      Q.   What's your understanding of what
17   the DPO is --
18      A.   Well --
19      Q.   -- for the purpose of the initial
20   plan?
21      A.   -- it's very clear that it's not a
22   certificate, an instrument or anything else along
23   those lines.  It is a notional amount that
24   represents the difference between the original
25   claim, allowed claim amount, and the amount of

---

Page 53

1           J. DUBEL - CONFIDENTIAL
2    cash that would have been previously paid on that
3    claim.
4       Q.   Now, did the initial plan also
5    provide for the commutation of the policies that
6    FGIC issued to the trustees?
7           MR. SIDMAN:  Object to the form.
8       A.   You can answer.
9       A.   There were certain policies that
10   FGIC might have issued to a -- to a -- to the
11   trustees that were included in the commutation.
12      Q.   Which trustees are we talking
13   about?
14      A.   I -- I don't recall which --
15   which -- there's seven or eight different trustees
16   that FGIC's dealt with.  I just don't recall which
17   ones right now.
18      Q.   What types of trusts are we talking
19   about?
20      A.   These would have been trust related
21   to CDO transactions.
22      Q.   So with respect to trusts that were
23   involved in RMBS transactions, am I correct that
24   the initial plan had no provision for commutation
25   of the policies that FGIC issued to those trusts?

---

14  (Pages 50 to 53)

Page 54

```
1           J. DUBEL - CONFIDENTIAL
2           MR. SIDMAN:  Object to the form.
3           You can answer.
4      A.   No, you're not correct.
5      Q.   Okay.  Why am I not correct?
6      A.   The plan had provisions for FGIC to
7  do any types of commutations with any parties, any
8  policyholders that it had.
9      Q.   Was there ever any discussions with
10 the informal policyholder groups with respect to
11 FGIC having the right to commute policies that
12 were issued to the trust that had --
13          MR. SIDMAN:  Object to --
14     Q.   -- that were dealing with the RMBS
15 securities?
16          MR. SIDMAN:  Object to the form.
17          You can answer.
18     A.   I'm sorry.  Go back and restate
19 that.  I apologize.  Just repeat it, please.  I'm
20 sorry.
21     Q.   That's fine.
22          Was there ever any discussions with
23 the informal policyholder group concerning FGIC
24 having the right to commute policies that were
25 issued to the trust dealing with the RMBS
```

Page 55

```
1           J. DUBEL - CONFIDENTIAL
2  securities?
3      A.   Yes.
4      Q.   When were those discussions?
5      A.   From the time of the initial
6  discussions about the proposal plan throughout the
7  process.
8      Q.   And who did you have those
9  discussions with?
10     A.   It would have been members of the
11 ad hoc policy.  I think it was referred to as the
12 ad hoc -- I can't remember what the name -- the
13 official term was.  You might know because I think
14 your organization was part of it.  I don't
15 remember the official title of the group, but it
16 would have been members of that group.
17     Q.   And what did you tell those members
18 of that group with respect to your right to
19 commute the policies that insured their
20 securities?
21          MR. SLACK:  Can -- can we -- can we
22 go off the record, and -- and I've go to --
23 I've got to ask the witness a question and
24 make sure that we're -- we're able to answer
25 this question.
```

Page 56

```
1           J. DUBEL - CONFIDENTIAL
2           MR. GOODMAN:  Well, I -- let's go
3  off the record, but -- are we off the record?
4           THE VIDEOGRAPHER:  No, not yet.
5           MR. GOODMAN:  Okay.  Let's go off
6  the record.
7           THE VIDEOGRAPHER:  This is the end
8  of Videotape No. 1 of the deposition of John
9  Dubel.  The time is July 10th, 2013, 2:49
10 p.m..
11          (Recess taken.)
12          THE VIDEOGRAPHER:  We're now on the
13 record beginning approximately 2:59 p.m., July
14 10th, 2013.  This will be Videotape No. 2 in
15 the deposition of John Dubel.
16          MR. SIDMAN:  Counsel, before we, I
17 wanted to just make a brief statement on the
18 record.  Before our first break, there were a
19 series of questions about communications
20 between FGIC and ad hoc policy in connection
21 with the initial claim.  It was my
22 understanding that those discussions were
23 pursuant to certain confidentialities, and we
24 do not know if those confidentiality
25 agreements are still in place or still
```

Page 57

```
1           J. DUBEL - CONFIDENTIAL
2  applicable.  So on that basis, we want to
3  designate the instruction of those questions
4  and answers with respect to the issue as
5  confidential in terms of a confidentiality
6  agreement, and if we later on learn that
7  they're confidential, we will deal with that
8  issue, but right now for purposes of this
9  deposition moving forward, we want to
10 designate that the questions and answers
11 previously as confidential and any other
12 questions and answers with respect to that
13 issue confidential.
14          MR. GOODMAN:  Okay.  For now, I
15 would agree to your proposal.  I would ask
16 that you look at the confidentiality agreement
17 in the next two or three days and let us know
18 if you still have a concern with respect to
19 the issue that you just raised.
20          MR. SIDMAN:  We'll do our best to
21 do that.
22          MR. GOODMAN:  Okay.
23     Q.   Before we went off the record, we
24 were talking about the discussions that you had
25 with the Steering Committee regarding the right to
```

Page 58

J. DUBEL - CONFIDENTIAL
1
2 commute their policies, and I had asked you about
3 the nature of those discussions, and you were
4 about to answer, I believe, when we went on a
5 break.
6     A.   Yes, it was -- it would have been
7 the right to commute any policies, not just
8 specifically their policies, but any policies
9 that -- in fact, they weren't their policies.  I
10 think you're referring to them as their policies.
11 They would be policies with a trustee in those
12 particular situations if you're referring to RMBS
13 securitizations, but we would have the right -- we
14 discussed that we would have the right to commute
15 any policies that FGIC has.
16     Q.   And did the Committee -- Steering
17 Committee agree with you that you had the right to
18 commute the policies insuring the trusts that had
19 issued their securities?
20     A.   They agreed that -- they were in
21 full agreement that we should have the right to
22 commute any policies that -- that we could work
23 out arrangements with.
24     Q.   Including the policies insuring
25 their underlying securities in the trust?

Page 59

J. DUBEL - CONFIDENTIAL
1
2     MR. SIDMAN:  Objection to the form.
3     You can answer.
4     A.   I don't believe that we talked
5 about specific policies.  We talked about any
6 policies that FGIC had issued, and they were fully
7 supportive of us commuting any policies that FGIC
8 had -- had issued.
9     Q.   Do you recall who you had those
10 conversations with?
11     A.   It would have been members of
12 the -- we'll call it the ad hoc group because I
13 don't remember what their official, if there was
14 an official title, but I'll call it the ad hoc
15 group, the Steering Committee, the ad hoc group.
16 So it could have been somebody from Fir Tree, AIG,
17 MetLife, Citibank, New York Life, and I believe
18 that your client would have been involved in some
19 of those discussions.  Your client, as I
20 understand, was not necessarily part -- officially
21 part of that group but participated in all of
22 those discussions and -- that we had.
23     Q.   And did -- do you recall whether
24 the committee asked you what you meant by
25 commuting their policies?

Page 60

J. DUBEL - CONFIDENTIAL
1
2     MR. SIDMAN:  Objection to the form.
3     A.   As I previously stated, we didn't
4 have discussions about, specific discussions about
5 commuting RMBS security policies.  So if you were
6 referring to that before, the -- the group also
7 did hold other than RMBS securitization policies.
8     Q.   No, I'm just talking about RMBS
9 securities.
10     Did you have a discussion with the
11 Steering Committee about commuting specifically
12 RMBS policies?
13     MR. SIDMAN:  Objection to form.
14     You can answer.
15     A.   I don't recall having discussions
16 about those specific -- you know, the specifics of
17 the -- the policies that we would have discussed
18 other than there was some discussions pertaining
19 to CDOs and others but not specifically about
20 RMBS-related policies.
21     Q.   Thank you.  And what happened with
22 this initial plan?
23     A.   What do you mean by what happened
24 with it?
25     Q.   Did the New York State Department

Page 61

J. DUBEL - CONFIDENTIAL
1
2 of Finance approve the plan when they received it?
3 What was the next step?
4     A.   The next step was at, I'll call it,
5 the DFS, Department of Financial Services.  The
6 DFS, or whoever it was at the time, retained
7 counsel to -- to look at it and worked with the
8 New York Liquidation Bureau to determine if it was
9 something that would be something they would be
10 willing to work towards.
11     Q.   And was it something they were
12 willing to work towards?
13     A.   Yes.
14     Q.   At the time of the initial plan,
15 what was your title at FGIC?
16     A.   I was the chief executive officer.
17 I don't remember if I was the vice chairman of the
18 board at the time or not.  I subsequently became
19 the vice chairman of the board.
20     Q.   And with respect to the initial
21 plan, I think you mentioned earlier it required
22 FGIC to go through a rehabilitation process.  Is
23 that correct?
24     A.   That was the proposal, yes.
25     Q.   And did FGIC, in fact, go through a

16  (Pages 58 to 61)

Page 62

1             J. DUBEL - CONFIDENTIAL
2  rehabilitation process?
3         A.   It is currently still in a
4  rehabilitation process.
5         Q.   And what is your role in the
6  rehabilitation process?
7             MR. SIDMAN:  Object to the form.
8         A.   I am the chief executive officer
9  of -- of FGIC.
10        Q.   And who do you report to?
11            MR. SIDMAN:  Object to the form.
12            You can answer.
13            MR. SLACK:  Objection to the form.
14        A.   I'm not sure I know who I report
15  to.  It's a -- rehabilitation process is a unique
16  process.  It's developed under the laws of the New
17  York State insurance law, and there is a
18  rehabilitator in place.  So I guess I report to
19  the rehabilitator, but, you know, I -- there's no
20  org chart or anything that shows that.
21        Q.   And who is the rehabilitator?
22        A.   Benjamin Lawsky.
23        Q.   And when did the company file for
24  rehabilitation?
25        A.   I'm not sure technically whether

Page 63

1             J. DUBEL - CONFIDENTIAL
2  the company filed -- I think the company filed to
3  seek the rehabilitation, but effectively I think
4  the question you're getting at is in June of 2012,
5  there was a petition made to put the company into
6  rehabilitation.  I believe it was done by the
7  superintendent of the Department of Financial
8  Services to appoint him as the rehabilitator, and
9  FGIC did not object to that.
10        Q.   Fair enough.  And --
11        A.   I may have that just a little bit
12  off, but the lawyers can always correct that.
13        Q.   On or about the time, for one of a
14  better word, FGIC filed for rehabilitation, did
15  FGIC file a plan of rehabilitation?
16            MR. SIDMAN:  Object to the form.
17        A.   The rehabilitator filed, I want to
18  say it was the latter part of September of 2012, a
19  proposed plan of rehabilitation.
20        Q.   And did it also at that time file a
21  Disclosure Statement?
22        A.   Yes, it did -- or he did, I should
23  say.  The rehabilitator did.
24        Q.   Were you involved in developing the
25  plan of reorganization that the rehabilitator

Page 64

1             J. DUBEL - CONFIDENTIAL
2  filed?
3             MR. SIDMAN:  Object to the form.
4         A.   There are quite a few similarities
5  to the -- from the plan that the rehabilitator
6  filed to the initial plan that was proposed by --
7  by FGIC.  And during the time from -- in the point
8  in time I think it was the end of June when the
9  rehabilitator was actually appointed until the
10  time in which the plan was filed by the
11  rehabilitator, I did work with counsel to the
12  rehabilitator in the -- to -- in the development
13  of that plan.
14        Q.   And did you also work with the
15  rehabilitator and his counsel on the Disclosure
16  Statement?
17        A.   I think technically I worked with
18  an agent for the rehabilitator.  Not with the
19  rehabilitator himself but an agent for the
20  rehabilitator and counsel on the Disclosure
21  Statement, yes.
22        Q.   And by -- who was the agent?
23        A.   The individual who signed the
24  rehabilitation plan and Disclosure Statement,
25  Peter Giacone.

Page 65

1             J. DUBEL - CONFIDENTIAL
2         Q.   And did you have significant
3  involvement in the development of the Disclosure
4  Statement?
5             MR. SIDMAN:  Object to the form.
6         A.   I had involvement.  I'm not sure I
7  understand what you mean "significant" in terms
8  of -- was I actively involved in it?  Yes.
9         Q.   Did you spend a lot of hours
10  working on it?
11        A.   Yes.
12        Q.   Did you review it?
13        A.   Yes.
14        Q.   Did the rehabilitator or his agent
15  ask you if you were okay with it?
16            MR. SIDMAN:  Objection.
17            MR. SLACK:  I object, and I
18  instruct him not to answer.
19            MR. GOODMAN:  And what's the basis?
20            MR. SLACK:  Privilege and work
21  product.
22            MR. SIDMAN:  Same objection; same
23  instruction.
24            MR. GOODMAN:  Privilege between the
25  rehabilitator and Mr. Dubel?

                                    17 (Pages 62 to 65)

Page 66

1      J. DUBEL - CONFIDENTIAL
2          MR. SLACK: Well, privilege between
3      the rehabilitator, his counsel, FGIC,
4      Mr. Dubel, all those are all covered by the
5      same privilege.
6          MR. GOODMAN: I was just talking
7      about the rehabilitator and Mr. Dubel at the
8      time.
9          MR. SIDMAN: No. You said did the
10     rehabilitator or his counsel ask --
11         MR. SLACK: Then I'm sure the
12     answer is going to actually be no because
13     he -- I don't think he talked to Benjamin
14     Lawsky about it, if that's really what you're
15     asking.
16         MR. GOODMAN: Okay.
17         Q.   Did you talk to the
18     rehabilitator -- did the rehabilitator or his
19     agent ask you if you were okay with the Disclosure
20     Statement?
21         MR. SLACK: He's asking whether or
22     agents? I'm going to instruct him not to
23     answer on the basis --
24         MR. GOODMAN: Okay. We just
25     defined the agent as Peter Giacone.

Page 67

1      J. DUBEL - CONFIDENTIAL
2          Q.   Did the rehabilitator or
3      Mr. Giacone ask you whether you were okay with the
4      Disclosure Statement?
5          MR. SLACK: I'll instruct him not
6      to answer on the basis of privilege.
7          MR. GOODMAN: How does he share a
8      privilege? I really don't understand that.
9      How does he share a privilege with those two
10     individuals?
11         MR. SLACK: What two individuals?
12         MR. GOODMAN: We just identified
13     the two individuals. It was Mr. Giacone --
14         MR. SLACK: Yes.
15         MR. GOODMAN: -- and Benjamin
16     Lawsky.
17         MR. SLACK: This is all part of the
18     rehabilitation process.
19         MR. GOODMAN: Yeah. So?
20         MR. SLACK: You're not entitled --
21     the entire process there is -- is --
22     everything in there is work product or -- or
23     attorney-client privilege, and you're not
24     entitled to get to the communications that
25     went on between the rehabilitator and its

Page 68

1      J. DUBEL - CONFIDENTIAL
2      agent and Mr. Dubel about the rehabilitation
3      process, any of the documents that were filed
4      in the rehabilitation on the basis of both
5      attorney-client and work product.
6          MR. GOODMAN: You haven't made a
7      case for an attorney-client or work product.
8      Are you instructing him not to answer this
9      question?
10         MR. SLACK: I thought I just did
11     that.
12         MR. GOODMAN: Okay. So you're -- I
13     just want the record to be clear. You're
14     instructing him not to answer a question about
15     his communication between the rehabilitator
16     and Mr. Giacone and himself. Is that what
17     you're saying?
18         MR. SLACK: I did that already. I
19     don't have to repeat myself. I don't think
20     you're hard of hearing.
21         MR. GOODMAN: All right. I just --
22     no, but you have a remarkable theory of what
23     the attorney and work -- client privilege is
24     about.
25         MR. SLACK: I actually think it's

Page 69

1      J. DUBEL - CONFIDENTIAL
2      -- I actually think not. It's pretty basic.
3      The fact is -- is that these were --
4      these were documents that were prepared in
5      connection with the rehabilitation. The
6      rehabilitation is a proceeding.
7          Therefore, if you're asking
8      questions about the development of the
9      rehabilitation, and you're asking for
10     communications about it, that is going to be
11     either work product or privilege. Sometimes
12     both; sometimes one.
13         MR. GOODMAN: Okay. Note my
14     objection for the record, but -- and I'm --
15     I'm going to reserve the right to recall this
16     witness.
17         Let's mark the Disclosure
18     Statement.
19         MR. SIDMAN: For the record, I also
20     instruct the witness not to answer on the same
21     basis.
22         (Dubel Exhibit 1 marked for
23     identification.)
24         Q.   Mr. Dubel, could you please turn to
25     page 2 of Dubel Exhibit 1. Are you there?

18 (Pages 66 to 69)

Page 70

1            J. DUBEL - CONFIDENTIAL
2       A.   Yes.
3       Q.   I draw your attention to the third
4  full paragraph starting, "The plan addresses these
5  challenges."
6            Do you see that?
7       A.   I do.
8       Q.   And it says, "The plan addresses
9  these challenges:  First, essential to the plan
10 are the proposed modifications to the plan which
11 are in the restructured policy terms."
12           Do you see that sentence?
13      A.   No, could you repeat the sentence
14 that you just said?
15      Q.   The third -- first -- the third
16 full paragraph, "The plan addresses these
17 challenges."
18      A.   Yes, okay.
19      Q.   "First, essential to the plan are
20 the proposed modifications to the policies which
21 are in the restructured policy terms."
22      A.   Okay.  I think -- I thought I heard
23 you say something different before.  Sorry.
24      Q.   So you're on that paragraph?
25      A.   Yes.

Page 71

1            J. DUBEL - CONFIDENTIAL
2       Q.   Have you reviewed that paragraph
3  before?
4       A.   I have.
5       Q.   And do you agree with what's set
6  forth in this paragraph?
7            MR. SIDMAN:  Are you asking about
8       the entire paragraph?
9            MR. GOODMAN:  Yes.
10           MR. SIDMAN:  Go ahead and read it.
11      A.   This is an earlier draft of it --
12 or I shouldn't say "draft."  If this is an earlier
13 version of the plan, it's subsequently been
14 amended.
15      Q.   It's been amended to increase the
16 initial CPP.  Isn't that correct?
17           MR. SIDMAN:  Objection to form.
18      A.   Without looking at the subsequent
19 documents, I couldn't tell you if there were other
20 amendments in that particular paragraph.
21      Q.   Do you know whether the Disclosure
22 Statement has been amended?
23           MR. SIDMAN:  Objection to the form.
24      A.   I don't believe the Disclosure
25 Statement has been amended, but there has been a

Page 72

1            J. DUBEL - CONFIDENTIAL
2  subsequent affidavit that references those numbers
3  that are in there and also the plan approval
4  order.
5       Q.   Do you know what -- the current CPP
6  under the plan of rehabilitation that was
7  confirmed by the board, do you know what the
8  amount of the initial CPP is?
9       A.   At this point in time has been -- I
10 think it was approved by the court at 17 and a
11 quarter percent, but it is subject to the
12 rehabilitator modifying it up or down prior to the
13 effective date.
14      Q.   Okay.  But other than the changes
15 to the initial CPP and the ultimate recovery to
16 policyholders, do you agree with the summary set
17 forth in this paragraph?
18      A.   Again, the -- the plan itself has
19 been amended and modified, and this refers to
20 issues central to the plan.  I'd have to go back
21 and look at the rest of the plan to see if there's
22 other, you know, changes in here.  But in general,
23 I would agree with it, the concept, yes; but there
24 may be other changes that I'm not recollecting as
25 we sit here right now.

Page 73

1            J. DUBEL - CONFIDENTIAL
2       Q.   And with respect to the next
3  paragraph starting with, "Second, the
4  rehabilitator has designed the plan to address
5  potential competing interests of policyholders
6  with claims in the short-term as compared to
7  others with claims not anticipated for decades."
8            Do you see that paragraph?
9       A.   I do.
10      Q.   Do you agree with the summary of
11 the plan that's contained in this second
12 paragraph?
13      A.   Let me just review it again.  I
14 believe that there have been payment -- there have
15 been certain changes to the plan that would modify
16 some of the language in here.
17      Q.   Can you point us to where that
18 might be?
19      A.   I believe that FGIC has -- no, I
20 take that back.  I was looking at the 150 days.  I
21 was thinking of a different time frame.
22           No.  In general, yes, this is --
23 this is fine.  Again, there may be minor little
24 changes that modify this, but they would all have
25 been laid out in black lines of the plan that

| Page 74 | Page 75 |
|---|---|

**Page 74**

1         J. DUBEL - CONFIDENTIAL
2  would have been filed.
3      Q.   And who were the policyholders that
4  these two paragraphs that you just reviewed
5  addressed at?
6        MR. SIDMAN:  Objection to form.
7      Q.   Addressed to.
8      A.   It would be any policyholder that
9  would exist at the time of the effective date of
10  the plan.
11      Q.   Would it include policyholders of
12  trusts dealing with RMBS's?
13      A.   It -- it would include any
14  policyholders that FGIC has that exist at the time
15  of the effective date of the plan.
16      Q.   Including trusts involved with
17  issuing RMBS securities that FGIC had issued
18  policies to.  Correct?
19        MR. SIDMAN:  Objection to the form.
20      A.   If there were trusts in -- in place
21  at the time that -- that policy issued by FGIC
22  then, yes.
23      Q.   And turn the page to page 3 for a
24  moment.  It says -- the paragraph including,
25  "Third, in an effort to mitigate FGIC's

**Page 75**

1         J. DUBEL - CONFIDENTIAL
2  liabilities and increase recoveries to
3  policyholders."
4      Do you see that paragraph?
5      A.   I do.
6      Q.   Had you previously reviewed this
7  paragraph?
8      A.   Previously I -- I would have, yes.
9      Q.   And do you agree with the summary
10  set forth in the paragraph?
11      A.   Let me just read it real quick.
12      Q.   Sure.
13      A.   Subject to the fact that time is
14  ticking -- you know, has gone on and there were
15  have been certain modifications because of events
16  that have occurred, yes, I agree with that.
17      Q.   And what modifications have
18  occurred?
19      A.   I'm not a lawyer.  I'm just trying
20  to read it from a plain English point of view, but
21  it -- the way I read it implies that the plan
22  would contemplate as part of the plan doing
23  certain commutations.  I think those commutations
24  were all done, not as part of the plan, but -- but
25  in the rehabilitation proceedings prior to the

| Page 76 | Page 77 |
|---|---|

**Page 76**

1         J. DUBEL - CONFIDENTIAL
2  plan going effective.
3      Q.   But these are CDS commutations.
4  That's what that paragraph is referring to.
5  Correct?
6        MR. SIDMAN:  Objection to the form.
7      A.   It's referring to certain CDS
8  commutations, yes.
9      Q.   To only CDS commutations.  Isn't
10  that correct?
11        MR. SIDMAN:  Objection to the form.
12      A.   As I said, it's referring to
13  certain CDS commutations.
14      Q.   But it's not referring to commuting
15  policies issued to RMBS trusts; is it?
16      A.   This paragraph does not.
17      Q.   Do you know whether this Disclosure
18  Statement contains disclosure concerning commuting
19  specific RMBS policies issued to trusts?
20        MR. SIDMAN:  Object to the form.
21  Are you asking him to review the entire
22  Disclosure Statement?
23        MR. GOODMAN:  I'm asking to his
24  knowledge.
25      Q.   Do you know?

**Page 77**

1        J. DUBEL - CONFIDENTIAL
2      A.   To my knowledge, there were not
3  specific references to commutations of policies
4  that were issued to trustees of RMBS
5  securitizations.
6      Q.   Turn to page 20 of the Disclosure
7  Statement, please, Mr. Dubel, and I ask you to
8  turn your attention to the bottom of page 20 of
9  the paragraph starting with, "Provisions of the
10  plan relevant to the policy restructuring are in
11  the restructured policy terms."
12      Do you see that?
13      A.   That one particular paragraph?
14      Q.   Yes.
15      A.   Okay.  I do see that.
16      Q.   Do you recall reviewing that
17  paragraph?
18      A.   I do.
19      Q.   And do you agree with the sentence
20  beginning on page -- top of 20, "Consistent with
21  the goal of the plan, the rehabilitator developed
22  the restructured policy terms" --
23      A.   I'm sorry.  Top of page 20?
24      Q.   Yes.
25        MR. SIDMAN:  21 you mean?

Page 78

1        J. DUBEL - CONFIDENTIAL
2            MR. GOODMAN:  What's that?
3            MR. SIDMAN:  I think you meant 21.
4        Q.  Oh, 21.  I apologize.  Yes.
5        A.  Hold on.  I can't tell whether
6    that's a carry-over paragraph, but I see where
7    you're referring to.
8        Q.  So do you see that paragraph, and
9    it states, "Consistent with the goal of the plan,
10   the rehabilitator developed the restructured
11   policy terms to maximize the extent to which FGIC
12   policyholders are treated fair and
13   equitable manner -- in a fair and equitable
14   manner."
15           Do you see that?
16       A.  I do.
17       Q.  Do you agree with that statement?
18       A.  I do.
19       Q.  And the next sentence that says,
20   "The restructured policy terms are designed to
21   address challenges the rehabilitator faced in
22   achieving those goals."
23           Is that correct?
24           MR. SIDMAN:  Objection.  You're
25   slightly misreading the sentence.

Page 79

1        J. DUBEL - CONFIDENTIAL
2            But you see the sentence?
3            THE WITNESS:  I see the sentence.
4        A.  I think you meant "this goal."
5    Yes, I -- I see that sentence.
6        Q.  And do you agree with that
7    sentence?
8        A.  Yes, I do.
9        Q.  And what does the sentence
10   referring to in the defined term "restructured
11   policy terms," if you know?
12       A.  I'm sorry.  What --
13       Q.  What -- what is this sentence
14   referring to with respect to the defined term
15   "restructured policy terms," if you know?
16       A.  Which sentence, the second sentence
17   or the first --
18       Q.  Yeah, "The restructured policy
19   terms are designed to address the challenges the
20   rehabilitator faced in achieving this goal."
21       A.  I believe the term "restructured
22   policy terms" references a separate part of the
23   plan of rehabilitation which describes how the
24   policies will be restructured.
25       Q.  And that's an exhibit to the plan.

Page 80

1        J. DUBEL - CONFIDENTIAL
2    Correct?
3            MR. SIDMAN:  Objection.
4        A.  I'd have to see if it was an
5    exhibit an annex or what.  I just don't remember
6    what the technical portion of it is.
7        Q.  Do you recall whether the
8    restructured policy terms provided for the right
9    to FGIC -- for FGIC to commute the policies --
10           MR. SIDMAN:  Objection.
11       Q.   -- under the restructured policy
12   terms?
13           MR. SIDMAN:  Objection to the form.
14   He already answered the question.
15       A.  I don't recall which document that
16   right would be in.
17       Q.  Okay.  I'm -- I'm referring to the
18   restructured policy terms.
19           Do you know whether there's a
20   provision in the restructured policy terms which
21   permits FGIC to commute policies that are governed
22   by the restructured policy terms?
23           MR. SIDMAN:  Objection to form.
24       A.  I don't recall, but I'd be happy to
25   look it over and see if I --

Page 81

1        J. DUBEL - CONFIDENTIAL
2            MR. GOODMAN:  Okay.  We're going to
3    mark this as Exhibit 2.
4            (Dubel Exhibit 2 marked for
5    identification.)
6        Q.  Mr. Dubel, do you have what's been
7    identified as Exhibit No. 2?
8        A.  Dubel-2?
9        Q.  Yes.
10       A.  I do.
11       Q.  Do you know what Dubel-2 is?
12       A.  I'm not sure of the exact technical
13   term, but it looks like it's the approval cover
14   note that Justice -- Judge Lynn Cohen attached to
15   the plan approval order which Justice Lynn Cohen
16   signed and attached to that as an exhibit -- as
17   Exhibit 1 as the First Amended Plan of
18   Rehabilitation for Financial Guaranty Insurance
19   Company.
20       Q.  And I'd ask you to turn to Exhibit
21   B to the plan entitled Restructured Policy Terms.
22   It's towards the back.
23       A.  Yes.
24       Q.  And in terms of the Restructured
25   Policy Terms, do you know whether the restructured

Page 82

1            J. DUBEL - CONFIDENTIAL
2  terms provides for the commutation of the policies
3  that were issued to the RMBS trust?
4            MR. SIDMAN:  Object to the form.
5       A.    Let me just take a look.
6       Q.    Sure.
7       A.    I apologize.  Could you repeat your
8  question?  It's been a while.
9       Q.    Do you know whether the
10 Restructured Policy Terms provides for the
11 commutation of the policies that were issued to
12 the RMBS trusts --
13            MR. SIDMAN:  Objection.
14      Q.    -- following your review of the
15 revised policy terms?
16      A.    Yes.
17      Q.    It does provide?
18      A.    I believe it does.
19      Q.    And can you point to where in the
20 revised policy terms it permits the commutation of
21 the policies issued to the RMBS trust?
22            MR. SIDMAN:  Object to the form.
23      Q.    Is there a specific provision that
24 you saw?
25      A.    In Article 3 under the heading

Page 83

1            J. DUBEL - CONFIDENTIAL
2  Miscellaneous, this is on page B-9, Section 3.1
3  integration of plan into each policy, and this is,
4  again, Exhibit B which is the Restructured Policy
5  Terms that you were referring to earlier.  I'm not
6  a lawyer, so, you know, my interpretation may be
7  not exact, but the way I read this it says from
8  and after the effective date the plan, which is
9  referring to the First Amended Plan of
10 Rehabilitation for Financial Guaranty Insurance
11 Company, says, "The plan shall become part of each
12 policy and shall supersede any provision of any
13 policy that is inconsistent with the plan."  And
14 little two, "I govern treatment of all claims
15 under the policies that have not been paid in full
16 as of the date of the order of rehabilitation."
17      Q.    Okay.  Let's go back to Exhibit 1,
18 which is the Disclosure Statement, page 21?  The
19 first full paragraph on page 21, the CPP DPO
20 structure, do you see that?
21      A.    I do.
22      Q.    Are you familiar with this
23 paragraph?  Have you read this -- seen this
24 paragraph before?
25            MR. SIDMAN:  Object to the form.

Page 84

1            J. DUBEL - CONFIDENTIAL
2       A.    I have seen it before.
3       Q.    And do you agree with the summary
4  that's in it?
5       A.    Let me just quickly read through it
6  again.
7            I do.
8       Q.    Okay.  And am I right that what
9  this paragraph provides is that -- what the
10 Department of Finance is trying to effectuate is
11 that a -- a current claimant today is going to
12 receive X cents on the dollar and that a claimant
13 17 years from today will receive at least that
14 same X amount on the dollar that the earlier
15 claimant received?
16            MR. SIDMAN:  Object to the form.
17      You can answer, if you can.
18      A.    It's attempting to do that subject
19 to all of the provisions in the plan.
20      Q.    Okay.  And the next paragraph
21 states that:  "This approach" -- and it's
22 referring to, I believe, the paragraph above,
23 "This approach is designed so that all
24 policyholders receive the same percentage (or CPP)
25 of cash on account of their permitted claims

Page 85

1            J. DUBEL - CONFIDENTIAL
2  whether arising in the next five years or in the
3  next few decades."
4            Do you see that?
5       A.    I do.
6       Q.    Do you agree with that statement?
7       A.    I agree -- obviously, it's subject
8  to the actual plan of rehabilitation which is
9  outlined in the Restructured Policy Terms.  Things
10 could be modified.
11      Q.    And we'll talk about modifications
12 in a moment, but as we mentioned earlier, the
13 purpose of the Disclosure Statement is to describe
14 the plan in layman's terms.  Isn't -- isn't that
15 correct?
16            MR. SIDMAN:  Objection to form.
17      A.    That's what I believe it to be.
18 I'm not a lawyer.
19      Q.    Okay.
20      A.    It's a unique document in a
21 rehabilitation, and I don't know that there's an
22 actual legal requirement to have this document in
23 the rehabilitation.
24      Q.    But lawyers can be tricky, I guess,
25 sometimes.  Right?  So --

Page 86

1         J. DUBEL - CONFIDENTIAL
2         A.    Not my lawyers.
3         Q.    Okay.
4         A.    Not my lawyers.
5         Q.    Fair enough.  Fair enough.
6               Turn to paragraph --
7               MR. SLACK:  Maybe lawyers taking
8         depositions.
9               MR. GOODMAN:  It's a joke.
10        Q.    If you could, turn to Exhibit 2 for
11   a moment, Section 9.3.
12        A.    On page 27?  Is that what you're
13   referring to?
14        Q.    Uh-huh.  And we're talking about
15   how the Disclosure Statement -- I guess earlier
16   how the Disclosure Statement is subject to the
17   plan.  9.3 starts with the heading Modification.
18   Correct?
19        A.    I'm sorry.  I didn't understand
20   what you said before.  The Disclosure Statement
21   is --
22        Q.    Fair enough.  Strike that.
23              Let's just turn to Section 9.3,
24   page 27 of Exhibit 2.
25        A.    Yes.

Page 87

1         J. DUBEL - CONFIDENTIAL
2         Q.    And that's entitled To
3    Modification.
4         A.    It's entitled Modification.
5         Q.    Okay.  Correct.  And it states from
6    time -- from and after -- let me start over.
7               "From and after the effective date,
8    only the NYSDFS may modify the plan and only to
9    the extent it determines necessary for the fair
10   and equitable treatment of policyholders in
11   general provided, however, that the NYSDFS shall
12   obtain Court approval for material modification."
13   Correct?
14              MR. SIDMAN:  Objection to the form.
15        You missed a word, but that's okay.
16              MR. GOODMAN:  Okay.
17        Q.    Do you agree that that's what's
18   stated in Section 9.3 of the plan subject to your
19   client -- your attorney's --
20        A.    I'll agree that 9.3 states certain
21   stuff.  It is what it -- it says what it says.  If
22   you're asking me a question, I can respond to the
23   question.
24        Q.    Okay.  What's your understanding --
25        A.    But the wording -- the wording is

Page 88

1         J. DUBEL - CONFIDENTIAL
2    what it is.
3         Q.    Yeah.  And what's your
4    understanding of 9.3 of the plan?
5         A.    That from and after the effective
6    date, only the NYSDFS, as I referred to before as
7    the DFS, may modify the plan and only to the
8    extent that it determines it's necessary for the
9    fair and equitable treatment of policyholders in
10   general provided, however, that DFS shall obtain
11   prior Court approval for any material
12   modification.
13        Q.    Okay.  And you're familiar with the
14   proposed ResCap FGIC settlement with -- aren't
15   you?  Is that correct?
16              MR. SIDMAN:  Objection to form.
17        Q.    Fair enough.  Strike that.
18              Are you familiar with -- are you
19   familiar with the ResCap FGIC settlement --
20              MR. SIDMAN:  Object to the form.
21        Q.    -- that's at issue before the
22   Court?
23        A.    Are you referring to the settlement
24   agreement?
25        Q.    Yes, the settlement agreement.

Page 89

1         J. DUBEL - CONFIDENTIAL
2         A.    I am familiar with it, yes.
3         Q.    Were you involved in the
4    negotiations of that agreement?
5         A.    I was.
6         Q.    Did you have a significant
7    involvement in that settlement agreement?
8               MR. SIDMAN:  Objection to the form.
9         You can answer.
10        A.    Yes.
11        Q.    Spent a lot of hours negotiating on
12   it?
13              MR. SIDMAN:  Object to the form.
14        A.    Yes.
15        Q.    How many hours, would you say?
16        A.    I'm fortunately not required to
17   keep time records, like attorneys are.  But it
18   was a -- all of that which went into the
19   settlement agreement would have been over a period
20   of many months and many, many hours.  I don't have
21   a time record to know how many exact hours, but it
22   was a lot of time.
23        Q.    And when did the negotiations
24   begin?
25        A.    On the --

Page 90

```
1         J. DUBEL - CONFIDENTIAL
2     Q.   On the settlement --
3     A.   -- actual document -- the
4  settlement agreement, I don't recall.  But on the
5  concepts that were incorporated into the
6  settlement agreement --
7     Q.   Fair enough.
8     A.   -- it would have been sometime in
9  mid to the latter part of January of 2013.  It was
10 all part of the mediation process.
11        THE WITNESS:  Could I interrupt for
12    one second?  Could I ask one of you guys down
13    there to throw me a water, please?  Make that
14    two, please, for the court reporter, also?
15    Q.   Mr. Dubel, do you know whether the
16 settlement is a condition for the rehabilitation
17 plan to go effective?
18        MR. SIDMAN:  Object to the form.
19    A.   I'm not an attorney, so I can't
20 answer that question.
21    Q.   But you know the plan has not gone
22 effective yet.  Isn't that correct?
23    A.   That's correct.
24    Q.   And the plan of reorganization has
25 provisions regarding the conditions to the
```

Page 91

```
1         J. DUBEL - CONFIDENTIAL
2  effective date.  Are you familiar with those?
3        MR. SIDMAN:  Objection to the form.
4     A.   Which plan of reorganization are
5  you referring to?
6     Q.   I'm sorry, the Plan of
7  Rehabilitation.  Fair enough.  Exhibit No. 2.
8     A.   Okay.  I'm sorry.
9     Q.   Does Exhibit -- the Plan of
10 Rehabilitation, Exhibit No. 2 have, conditions --
11 list conditions before it will go effective?
12    A.   Give me a second.  Let me just
13 glance at it.
14    Q.   Okay.  Well, I'll refer you to
15 Section 6.1 of Exhibit 2.
16    A.   The sections refers to conditions
17 precedent to the effective date, yes.
18    Q.   And do you know whether the
19 settlement is a condition to the effective date of
20 the plan?
21    A.   Again, you're asking me for a legal
22 interpretation, and I'm not a -- I'm not the
23 attorney.  I didn't draft this document, so I
24 would not want to --
25    Q.   I'm asking -- I'm asking you for a
```

Page 92

```
1         J. DUBEL - CONFIDENTIAL
2  layman's understanding.
3        Was it your understanding that the
4  plan would ever be conditioned upon the ResCap
5  settlement?
6        MR. SIDMAN:  Objection to the form.
7     A.   Again, I'm not an attorney, so I
8  can't answer that question.
9     Q.   I'm not asking your legal view.
10 I'm just asking, was it ever your understanding
11 that the plan of reorganization would be
12 conditioned upon entering into a settlement --
13 entering into the ResCap settlement that we've
14 been discussing.
15        MR. SIDMAN:  Same objection.
16        MR. SLACK:  I'm going -- I'm going
17    to say, if he has an understanding that's
18    based -- he doesn't have an understanding, but
19    if he does, if it's based on communications
20    with counsel, I instruct you not to answer.
21        MR. SIDMAN:  Same instruction.
22    A.   And I'm assuming you're referring
23 to the Plan of Rehabilitation?
24    Q.   Yes.
25    A.   Because I think you had stated the
```

Page 93

```
1         J. DUBEL - CONFIDENTIAL
2  plan of reorganization, so --
3     Q.   If I did that again, I'm
4  apologizing.
5     A.   Again, I'm not an attorney.  Any
6  knowledge I have about these conditions and
7  whether or not that is something that has to do
8  with the settlement -- the settlement agreement is
9  tied into this effective date, I would have to
10 consult with counsel who drafted this plan.
11    Q.   Okay.  Well, put it this way, was
12 it ever your -- the settlement negotiations began
13 in earnest for the current settlement in January
14 2013.  Correct?
15        MR. SIDMAN:  Objection.
16    A.   Yeah -- well, they started it.
17 You're using the term "earnest."  I wouldn't, you
18 know.
19    Q.   Okay.  Use your term --
20    A.   They started.
21    Q.   -- they started in earnest.  Okay.
22    A.   No.
23        MR. SIDMAN:  You said in "earnest."
24    He said "started."
25        MR. GOODMAN:  Okay.  They started.
```

24 (Pages 90 to 93)

Page 94

1         J. DUBEL - CONFIDENTIAL
2    Okay.
3         Q.    Prior to January of 2013, did you
4    believe -- was it your understanding that you
5    could not -- that FGIC could not confirm its plan
6    of rehabilitation until it settled with ResCap?
7         MR. SIDMAN: Once again, if -- I
8    instruct the witness not to answer if that
9    understanding is based on communications with
10   counsel, if he has any understanding.
11        A.    I don't have any understanding.
12        Q.    So you don't know whether the FGIC
13   rehabilitation plan could have been confirmed in
14   December 2012 if all the policyholders and all the
15   objectors had agreed?
16        MR. SIDMAN: Objection. Asked and
17   answered.
18        A.    As I stated earlier, the concept of
19   a settlement agreement first came up in January of
20   2013. So if you are asking me if in December the
21   plan could have gone effective, if it was
22   effective at that point in time, it would have
23   been prior to any discussion of the things
24   contemplated in the settlement agreement, which
25   commenced discussions in January of 2013.

Page 95

1         J. DUBEL - CONFIDENTIAL
2         Q.    You were very involved in the
3    negotiations of the Plan of Rehabilitation.
4    Correct?
5         MR. SIDMAN: Object to the form.
6         A.    There were not negotiations on the
7    Plan of Rehabilitation.
8         Q.    Okay. You were very involved in
9    the promulgation of the Plan of Rehabilitation?
10        MR. SIDMAN: Object to the form.
11        A.    I don't know what you mean by "the
12   promulgation." What we did was we sought input on
13   the Plan of Rehabilitation from any number of
14   parties, anyone who had an interest in talking to
15   us. The rehabilitator does not have a
16   requirement, as I understand it, to -- to seek the
17   input. He did. He does not have a requirement in
18   the rehabilitation process to go out and obtain
19   votes, and there were none. So there weren't
20   negotiations. This was a situation where we
21   sought input from parties.
22        Q.    And what your -- so in your view,
23   there was no negotiations that went into getting
24   the plan approved. Is that -- is that correct?
25        MR. SIDMAN: Object to the form.

Page 96

1         J. DUBEL - CONFIDENTIAL
2         A.    I just answered your question.
3         Q.    So there were no negotiations?
4         MR. SIDMAN: Object to the form.
5         A.    I think I just answered your
6    question.
7         Q.    Is --
8         A.    Three questions ago.
9         Q.    So is that a yes? Is that a yes,
10   there were no negotiations?
11        THE WITNESS: Could you repeat my
12   answer -- read back my answer for me, please?
13        (The requested portion of the
14   record was read.)
15        Q.    So you only sought input. There
16   were no negotiations. That's your answer.
17        MR. SIDMAN: Object to the form.
18   He's -- he's made his answer already three
19   times.
20        Q.    I asked a question.
21        A.    The answer that the court
22   reporter -- that I stated earlier and the court
23   reporter just read back is -- is what I stand by.
24        Q.    And am I correct that what you mean
25   by your answer is that there were no negotiations?

Page 97

1         J. DUBEL - CONFIDENTIAL
2         MR. SIDMAN: Objection. We've been
3    through this already.
4         MR. SLACK: Objection to the form.
5    Asked and answered. Badgering the witness.
6         MR. SIDMAN: Let's move on.
7         You can answer.
8         A.    I believe I just answered that
9    question now for the third or fourth time, and
10   I've answered it and had the court reporter read
11   it back, and I stand by my answer.
12        MR. GOODMAN: Well, I move to
13   strike the witness' answer as nonresponsive.
14   I'm going to move on.
15        Q.    Okay. Had the ResCap settlement
16   not been finalized and signed by the parties,
17   is -- is it your understanding that FGIC could
18   have gone effective under its Plan of
19   Rehabilitation?
20        MR. SIDMAN: Objection. Asked and
21   answered. You can answer it.
22        A.    I believe I answered the question
23   already.
24        Q.    And what was your answer?
25        THE WITNESS: Would you go back and

25 (Pages 94 to 97)

Page 98

1        J. DUBEL - CONFIDENTIAL
2    re-read it?
3            THE COURT REPORTER:  The one I just
4    read?
5            THE WITNESS:  No.  I think it was
6    after that.
7        Q.    So, in other words, you need to go
8    back into the record to find your answer?  Is that
9    what you're saying, Mr. Dubel?
10        A.    No.  I'm saying I answered the
11    question already.
12        Q.    Okay.  And so that we have to go
13    search the record for your answer?  You don't
14    recall your answer?
15            MR. SIDMAN:  I think he just said
16    that he already answered the question.
17            MR. GOODMAN:  I don't believe he's
18    answered the question.  I've changed the
19    question.
20            MR. SIDMAN:  What is your current
21    question, Counsel?
22            MR. GOODMAN:  He said --
23        Q.    If the ResCap settlement was not
24    entered into, was not signed, not negotiated, is
25    it your understanding that the FGIC plan could

Page 99

1        J. DUBEL - CONFIDENTIAL
2    have gone -- can go effective?  Is it your
3    understanding?
4            MR. SIDMAN:  I'm going to object on
5    the same basis as before.  Asked and answered.
6    But I also want to instruct the witness not to
7    answer if -- if his understanding -- if he has
8    an understanding is based on any
9    communications with counsel.
10        A.    First off, I don't believe you
11    stated the same question over again, so maybe if
12    you did, I apologize.
13        Q.    That's okay.
14        A.    But could you repeat it one last
15    time?  I'm sorry.
16        Q.    My question is:  Is it your
17    understanding, I'm not asking for your
18    understanding from discussions with counsel, your
19    understanding of the Plan of Rehabilitation, could
20    it have gone effective if FGIC had not entered
21    into a settlement with ResCap?
22            MR. SIDMAN:  Same objection.  Same
23    instruction.
24        A.    I guess the answer is yes.  If
25    there was no settlement agreement with ResCap, the

Page 100

1        J. DUBEL - CONFIDENTIAL
2    answer is yes, the plan could go effective.  But
3    it's effective so the plan is subject to many
4    other issues that I'm not an attorney to be able
5    to interpret whether it could have gone effective
6    or not because of all those other issues.
7        Q.    All right.  Thank you.
8            MR. SIDMAN:  Is this a good time to
9    take a break?
10            MR. GOODMAN:  Sure.
11            THE WITNESS:  Thank you.
12            THE VIDEOGRAPHER:  This is the end
13    of Videotape No. 2 of the deposition John
14    Dubel, and we're going off the record.  The
15    time is 4:05 p.m., July 10, 2013.
16            (Recess taken.)
17            THE VIDEOGRAPHER:  We're now on the
18    record beginning approximately at 4:17 p.m.,
19    July 10th, 2013.  This will begin Videotape
20    No. 3 of the deposition of John Dubel.
21            (Dubel Exhibit 3 marked for
22    identification.)
23        Q.    Mr. Dubel, you should have in front
24    of you -- soon to have what's been marked as Dubel
25    Exhibit 3.

Page 101

1        J. DUBEL - CONFIDENTIAL
2        A.    Hold on one second.
3            (Discussion off the record.)
4        Q.    Mr. Dubel, what is Dubel Exhibit 3?
5        A.    Dubel Exhibit 3 is the Affidavit of
6    Michael W. Miller in Further Support of Approval
7    of the First Amended Plan of Rehabilitation in the
8    Matter of Rehabilitation of Financial Guaranty
9    Insurance Company.
10        Q.    Have you seen Dubel Exhibit No. 3
11    before?
12        A.    I have.
13        Q.    When did you first see it?
14        A.    This exhibit?  On or after it would
15    have been filed with the -- the court in
16    the Supreme Court of the State of New York.
17        Q.    Did you have discussions with
18    Mr. Miller prior to his filing of this
19    affidavit -- signing of this affidavit?
20            MR. SIDMAN:  You can answer that
21    question.  I would instruct you not to reveal
22    the subject of that discussion, but you can
23    ask -- you answer the fact that -- whether or
24    not you had discussions with Mr. Miller.
25        A.    Okay.  I'm sorry.  Could you repeat

26 (Pages 98 to 101)

Page 102

1    J. DUBEL - CONFIDENTIAL
2  the question?
3    Q.   Did you have discussions with
4  Mr. Miller prior to his signing of Exhibit 3?
5    A.   Yes.
6    Q.   And was counsel present during
7  those discussions?
8    MR. SIDMAN:  You can answer.
9    A.   I'm not sure what discussions
10  you're referring to other than -- you asked if I
11  had discussions with Mr. Miller?
12    Q.   Yes.
13    A.   Well, you know, over the years I've
14  had many discussions with Mr. Miller.
15    Q.   With respect to Debtor's Exhibit
16  No -- Dubel Exhibit No. 3.
17    A.   Okay.  Counsel would have been
18  present, yes.
19    Q.   At all times?
20    A.   To the best of my knowledge, yes.
21    Q.   Did you provide any input
22  into Dubel Exhibit 3?
23    A.   What do you mean by "input"?
24    Q.   Did you offer any assistance
25    MR. SIDMAN:  I'm going to object

Page 103

1    J. DUBEL - CONFIDENTIAL
2  and just instruct the witness to answer the
3  question yes or no and not provide the -- the
4  actual information or assistance, if any, that
5  you provided in connection with Dubel Exhibit
6  3.
7    A.   Can I ask my counsel a
8  clarification?
9    Q.   In order to ask -- answer this
10  question, you need to discuss the answer with your
11  attorney?  Is that what you're saying?
12    A.   I'm not sure I -- I'm not sure I
13  understand exactly what you're referring to as
14  "input" and as it relates to this, so I'd like to
15  make sure that I don't say anything that's --
16  comes through, you know, from a result of
17  privileged conversations that might have been had
18  with counsel or privileged, you know, work product
19  communications.  That's my concern.  That's why.
20    Q.   I'm not asking you about the
21  substance of those conversations.
22    MR. SLACK:  But I will say this, is
23  if the witness at any time has a concern that
24  his answer is going to disclose
25  attorney-client or work product, that is the

Page 104

1    J. DUBEL - CONFIDENTIAL
2  time where it's completely appropriate for him
3  to talk to his lawyers.
4    So I would caution the witness.
5  I'm fine if you -- if you're -- if you're
6  confident you can answer the question without
7  revealing attorney-client or work product, you
8  should go ahead and do that.  If -- if
9  you're -- if you're not confident, you should
10  have a conversation with your counsel.
11    MR. SIDMAN:  Do you want to go off
12  the record for a second?
13    THE WITNESS:  Please.
14    MR. GOODMAN:  Sure.
15    THE VIDEOGRAPHER:  We're going off
16  the record.  The time is 4:22 p.m.
17    (Discussion off the record.)
18    THE VIDEOGRAPHER:  We're back on
19  the record.  The time is 4:24 p.m.
20    Q.   Did you have any discussions with
21  Mr. Miller prior to Mr. Miller signing Dubel
22  Exhibit 3 about Dubel Exhibit 3?
23    A.   No.
24    Q.   Have you reviewed Dubel Exhibit 3
25  prior to seeing it today?

Page 105

1    J. DUBEL - CONFIDENTIAL
2    MR. SIDMAN:  Objection.  Asked and
3  answered.
4    A.   Yes.
5    Q.   When was the first time you
6  reviewed it?
7    A.   I think as I answered before, it
8  was after it -- after it was filed on or about --
9  I think the date is December 12th of 2012.  I -- I
10  did not see it prior to it -- its completion.
11    Q.   I apologize.  I might have missed
12  that.
13    A.   Yeah.  I did not see it prior to
14  its completion.
15    Q.   And you had no discussions with
16  Mr. Miller about the substance of his affidavit
17  prior to first seeing it after it was filed?
18    MR. SIDMAN:  Objection to the form.
19  Once again, I instruct the witness to answer
20  yes or no with respect to -- with respect to
21  the question as to whether or not he had
22  sub- -- discussions regarding the substance of
23  the affidavit not revealing the actual
24  substance of those conversations.
25    A.   I had discussions with Mr. Miller

27 (Pages 102 to 105)

Page 106

1       J. DUBEL - CONFIDENTIAL
2  prior to his filing of the affidavit.  I -- I
3  don't -- I did not have discussions about his
4  affidavit or any of the information in the
5  affidavit that was subsequently filed that -- that
6  I knew were going to be in the form of this, but I
7  had discussions with him and, through counsel,
8  provided input to -- to Mr. Miller for a variety
9  of different things.
10      Q.   Well, can you turn to page 9,
11 paragraph 28, please?  What is your understanding
12 of -- of paragraph 28?
13      MR. SIDMAN:  Once again, I would
14   instruct the witness that if his understanding
15   is based on communications with counsel,
16   that -- that do not answer the question.  If
17   it is based on your independent understanding,
18   not -- not based on communications with
19   counsel, then you can answer the question.
20      A.   My understanding of everything in
21 this affidavit, you know, and -- I'm sorry, in
22 paragraph 28 of this affidavit, is based upon
23 discussions with counsel.
24      MR. SIDMAN:  On that basis, I'm
25   going to instruct you not to answer the

Page 107

1       J. DUBEL - CONFIDENTIAL
2  question.
3      Q.   So let me make sure I understand
4  the basis for the instruction.  Is it currently
5  your understanding that permitted policy claims
6  can recover between 27 and 30 percent of the
7  permitted policy claims at a 10 to 20 percent
8  illustrative discount rate?
9      MR. SIDMAN:  Once again, same
10   instruction.  If that is -- if that
11   understanding -- the same question asked a
12   different way.  If that understanding is based
13   on communications with counsel, then I
14   instruct you not to answer it, and it sounds
15   like it was, but you decide that yourself, Mr.
16   Dubel.
17      A.   Could you repeat the question,
18 please?
19      Q.   Is it currently your understanding
20 that permitted policy claims can recover between
21 27 and 30 percent of the permitted policy claims
22 at a 10 to 20 percent illustrative discount rate?
23 Illustrative.  Excuse me.
24      MR. SIDMAN:  Same instruction.
25      A.   What you're referring to is a -- a

Page 108

1       J. DUBEL - CONFIDENTIAL
2  base case scenario which is a set of projections
3  that go out over 41 years and, obviously,
4  projections are -- are just that.  They're --
5  they're not a guarantee of anything, especially
6  when you have such long-term projections that have
7  such high levels of risk in them.  So it could be
8  at those illustrative discount rates.  It could be
9  27 to 30 percent.  It could be higher, or it could
10 be an awful lot lower depending on the actual
11 results.
12      Q.   What's your understanding of the
13 "base case scenario," the meaning of the "base
14 case scenario"?
15      MR. SIDMAN:  I will instruct the
16   witness not to answer that question if his
17   understanding of the -- the meaning of the
18   "base case scenario" is based on the
19   communications with counsel.
20      A.   Okay.  I can read what -- how it's
21 defined, the "base case scenario," but my
22 understanding of the meanings of it and how
23 it's -- how it was developed and all are -- are
24 the result of discussions with counsel.
25      Q.   I'm not talking about how it was

Page 109

1       J. DUBEL - CONFIDENTIAL
2  developed.
3      Do you have, independent of your
4  discussions with counsel, an understanding of the
5  definition of "base case"?
6      MR. SIDMAN:  Same --
7      A.   If I can refer back to --
8      Q.   Yes, please.
9      MR. SIDMAN:  Same instruction.
10      Q.   Maybe I can assist you.  The "base
11 case scenario" means -- is it your understanding
12 that the "base case scenario" means FGIC's then
13 current expectation of future claims, investment
14 performance, recoveries, financial markets and
15 other factors of relevance to CPP, re-evaluations
16 based on the circumstances, events and projections
17 that FGIC anticipates are reasonably likely to
18 occur?
19      MR. SIDMAN:  Objection.  Once
20   again, if you're asking him for his
21   understanding, if it's based on counsel --
22   communications with counsel, I instruct the
23   witness not to answer.
24      Are you referring to a particular
25   provision?  Maybe you can point it out to him

28 (Pages 106 to 109)

Page 110

1          J. DUBEL - CONFIDENTIAL
2    so that --
3          MR. GOODMAN:  It's in --
4          MR. SIDMAN:  If you're citing to a
5    particular provision, maybe you --
6          Q.   If you look at Exhibit 2, it's in
7    the definition section.
8          A.   That's where it was?  I'm sorry.
9          Q.   It's okay.  It comes after the
10   plan.
11         A.   Uh-huh.
12         Q.   Page A2.
13         A.   I'm sorry.  Go ahead with your
14   question.
15         Q.   Do you have an independent
16   understanding of the base case scenario,
17   independent upon discussions with counsel, do you
18   understand the meaning of that provision?
19         MR. SIDMAN:  Object to the form.
20         Q.   Independent of your discussions
21   with counsel.
22         MR. SIDMAN:  Object to the form.
23         A.   All of my understanding as it
24   relates to this would have been based upon
25   discussions with counsel.

Page 111

1          J. DUBEL - CONFIDENTIAL
2          Q.   So -- just so I understand it, you
3    don't have an understanding outside of your
4    discussions with counsel of the meaning of "base
5    case scenario" in the rehabilitation plan?
6          MR. SIDMAN:  Objection.
7          A.   My understanding of "base case" or
8    "base scenario" are all, I'll use the term, based
9    upon discussions with counsel.
10         Q.   Do you -- have you ever looked at
11   models using the base case scenario?  Looked at
12   projection models based on the base case scenario?
13         MR. SIDMAN:  Objection to the form.
14         A.   I have never been involved in a
15   prior rehabilitation plan.  So the answer is no.
16         Q.   Did you ever receive a projection
17   from an independent financial advisor retained by
18   FGIC or the rehabilitator which illustrated
19   projections based upon a base case scenario?
20         MR. SIDMAN:  Objection.  I'm going
21   to instruct the witness not to answer on the
22   basis of work product.
23         MR. GOODMAN:  You're -- you're
24   instructing him not to answer?
25         MR. SIDMAN:  Yes.

Page 112

1          J. DUBEL - CONFIDENTIAL
2          MR. GOODMAN:  On what basis?
3          MR. SIDMAN:  Work product and
4    attorney-client, if the communication --
5          MR. GOODMAN:  It's not work product
6    if I ask him a question whether he'd ever seen
7    a set of projections utilized -- showing a
8    base case scenario.  There are projections
9    here that show --
10         MR. SIDMAN:  Well, then why don't
11   you ask him about those?
12         MR. GOODMAN:  Okay.
13         Q.   Let's turn back to Exhibit 3.  Do
14   you understand -- if you turn to page 6 of Exhibit
15   3 -- I'm sorry.  Turn to Exhibit 1 of Exhibit 3.
16   I apologize.  Page 6.
17         MR. SIDMAN:  Exhibit 1 of Exhibit
18   3.
19         MR. GOODMAN:  Yeah.
20         MR. SIDMAN:  Exhibit 1 of Dubel 3.
21         MR. GOODMAN:  I'm sorry?
22         MR. SIDMAN:  Exhibit 1 of Dubel 3.
23         MR. GOODMAN:  Of Dubel 3, yes.
24         A.   Just so everybody's aware, and so
25   I'm clear on what page, can you refer to the --

Page 113

1          J. DUBEL - CONFIDENTIAL
2    just read the top of it, make sure we're all
3    looking at the same page.
4          Q.   Updated Base Case Scenario
5    Illustrated Financial Projections.
6          Are you saying that you cannot
7    understand these projections without the
8    assistance of counsel?  Is that your testimony
9    here today?
10         MR. SIDMAN:  I think what he
11   testified was to has been all of the
12   understandings.
13         MR. GOODMAN:  That's my question.
14         MR. SIDMAN:  I think you have your
15   answer, Counsel.
16         You can go ahead and answer.
17         A.   Please repeat the question.
18         Q.   Are you saying that you cannot
19   understand these projections without the
20   assistance of counsel that are set forth on page
21   6, Updated Base Case Scenario Illustrated
22   Projected Financials?
23         MR. SLACK:  Objection to the form.
24         A.   I don't believe that that's what I
25   previously said.

29 (Pages 110 to 113)

Page 114

1            J. DUBEL - CONFIDENTIAL
2      Q.   Okay.  What's your understanding of
3  page 6 to Dubel Exhibit 3?
4            MR. SIDMAN:  Once again, to the
5  extent that understanding is based on
6  communications with counsel, I would instruct
7  the witness not to answer.
8            MR. GOODMAN:  And I would ask that
9  the -- you not coach the witness.  He's had
10  the instruction.  He understands that you've
11  raised an issue of privilege, and I'm asking
12  him if he has an understanding of this.
13            MR. SIDMAN:  I'm not coaching the
14  witness.  I'm making an -- I'm making an
15  objection and instruction, which is well
16  within my rights under the rules.
17            You can answer the question.
18      A.   Page 6 of Dubel Exhibit No. 3,
19  which happens to be page 6's part of --
20      Q.   I'm talking about the Updated Base
21  Case Scenario.
22      A.   I'm -- I'm making sure I'm
23  referring to the right thing.
24      Q.   Okay.
25      A.   So let me restart it and make sure

Page 115

1            J. DUBEL - CONFIDENTIAL
2  I say it properly.
3      Q.   Okay.
4      A.   Dubel Exhibit 3, the Miller
5  affidavit, has an exhibit, Exhibit 1, Updated
6  Runoff Projections, which you're referring to
7  as -- you're referring me to page 6?
8      Q.   Uh-huh.
9      A.   Page 6 is an updated base scenario
10  illustrative projected financial statement, if you
11  want to call it that.
12      Q.   Yes.
13      A.   Yes.
14      Q.   What's your understanding of that?
15            MR. SIDMAN:  Same instruction.
16            Go ahead.
17      A.   That it is an illustrative
18  projected financial statement.
19      Q.   And is it your understanding that
20  under these projections, policyholders in the base
21  case can receive a present value of between 27 and
22  30 cents on the dollar?
23            MR. SIDMAN:  Same instruction to
24  the witness.
25      A.   What this particular page of this

Page 116

1            J. DUBEL - CONFIDENTIAL
2  document shows at the bottom is that there's an
3  illustrative average policyholder recoveries base
4  case that shows, based upon various different
5  discount rates, that the recoveries could be 27 to
6  30 percent.  But in looking at that, you would
7  have to incorporate all of the assumptions that
8  are outlined earlier in the document because these
9  are literally projections, as I stated before,
10  that are -- these were 40 -- 40-year projections
11  with various different risks involved.
12      Q.   Okay.  Let's turn to Exhibit No. 1,
13  Dubel Exhibit No. 1, page 2.
14      A.   Dubel 1, page 2?
15      Q.   Yes.
16      A.   Yes, sir.
17      Q.   The last sentence starting with,
18  "The rehabilitator estimates that the initial CPP
19  will be 15 percent" --
20      A.   I'm sorry.  Where are you referring
21  to?
22      Q.   I'm sorry.  Last full paragraph,
23  page 2.
24            MR. SIDMAN:  Right there.
25      A.   Yes.  I'm sorry.

Page 117

1            J. DUBEL - CONFIDENTIAL
2      Q.   The rehabilitator estimates that
3  the initial CPP will be 15 percent, but as set
4  forth in the runoff projections attached hereto as
5  Exhibit C, that the ultimate recovery to
6  policyholders will be approximately 24 to 25
7  percent of permitted policy claims on a net
8  present value basis using a 20 -- a discount rate
9  of 20 and 10 percent.
10            Do you see that?
11            MR. SLACK:  You didn't read it
12  right.
13            MR. GOODMAN:  Okay.  He can read it
14  himself.
15      A.   Did you intend to leave out the
16  word "average," or is that just a --
17      Q.   No.
18      A.   Okay.
19      Q.   We looked at this paragraph
20  earlier.
21      A.   I do see it, yes.
22      Q.   We looked at this paragraph
23  earlier, and you said you agreed with this
24  paragraph, the statement in this paragraph, as I
25  recall.

Page 118

1           J. DUBEL - CONFIDENTIAL
2           MR. SIDMAN:  I think that was not
3    his testimony, but you can clarify.  You can
4    answer.
5           A.   Is there a question?  I'm not
6    sure --
7           Q.   Do you agree -- do you agree with
8    what's set forth, the summary set forth in this
9    paragraph?
10          A.   As I answered before, I agree with
11   the concepts.  Obviously, it has -- it has changed
12   since.  There have been an additional set of
13   projections, but the general concepts I agree with
14   recognizing that these are, again, what the -- the
15   numbers that are incorporated in the runoff
16   projections that are attached to this document as
17   Exhibit C are a set of -- I think at the time it
18   would have been a 41-year set of projections with
19   a tremendous amount of risk, so that that number
20   could be higher or could be a lot lower.
21          Q.   But here it says that the
22   rehabilitator estimates that there will be a 15
23   percent, but as set forth in the runoff
24   projections -- and then he goes on, right, to say
25   it will be approximately 24 to 25 percent of

Page 119

1           J. DUBEL - CONFIDENTIAL
2    permitted policy claims.  Right?
3           A.   I think it says that the
4    rehabilitator is estimating that, yes.
5           Q.   Yeah, yeah.  And you just mentioned
6    that the 24 to 25 percent has been updated.
7    Correct?
8           MR. SIDMAN:  Object to the form.
9           Q.   And it was updated -- you pointed
10   to a document.  What document were you pointing to
11   with respect to the update?
12          MR. SIDMAN:  Object to the form.
13          A.   I don't recall pointing to a
14   document.
15          Q.   Okay.  I thought you were referring
16   to a document.
17          Is there a document that updates
18   this information?
19          MR. SIDMAN:  Object to the form.
20          A.   There is.
21          Q.   And what document is that?
22          A.   It would be Dubel Exhibit 3.
23          Q.   And how does it update that
24   information?  Which numbers in this paragraph have
25   changed?

Page 120

1           J. DUBEL - CONFIDENTIAL
2           MR. SIDMAN:  Object to the form.
3           A.   I'm sorry.  Which numbers have
4    changed?
5           Q.   Which numbers in this last sentence
6    have changed?
7           A.   Without reviewing Exhibit 3, I
8    don't recall whether or not -- I believe it's in
9    here that the 15 percent is now 17 and a quarter
10   percent.
11          Q.   Okay.
12          A.   And the reference to the average
13   ultimate recovery to policyholders, which had
14   previously -- would be approximately 24 to 25
15   percent of each permitted policy claim on a net
16   present value basis using a discount rate of 20 to
17   -- 20 and 10 percent, that those numbers would
18   change to 27 to 30 percent.  But I would have to
19   go back and see, you know, make sure it's exactly
20   right, but that's what I believe is the change.
21          Q.   Okay.  Now, it's the -- you're the
22   CEO of FGIC currently.  Is that correct?
23          A.   That's correct.
24          Q.   You're also on the board of FGIC.
25   Correct?

Page 121

1           J. DUBEL - CONFIDENTIAL
2           MR. SIDMAN:  Objection.
3           A.   No.
4           Q.   I'm sorry.  That's not correct?
5           A.   No, that is not correct.
6           Q.   Okay.  Independent of
7    counsel, you don't have any understanding, am I
8    correct, of the definition of "base case scenario"
9    that you just reviewed in the plan of
10   reorganization?
11          MR. SIDMAN:  Object to the form.
12          A.   The definition in the plan of
13   reorganization was developed by counsel.  When I
14   read it, in order to understand it, I asked
15   counsel questions.  And so my understanding is
16   based upon -- my understanding of that definition
17   is based upon discussions with counsel.
18          Q.   You may have an understanding,
19   okay, of the definition of "base case scenario"
20   from counsel, I understand that, but do you employ
21   in your position as CEO of FGIC this definition as
22   part of your job responsibilities?
23          MR. SIDMAN:  Object to the form.
24          You can answer.
25          A.   Say -- I'm sorry.  Could you just

| Page 122 | Page 123 |
|---|---|

**Page 122**

J. DUBEL - CONFIDENTIAL

1  
2  repeat it again, your question?
3      Q.   Said you have -- you may have an
4  understanding of the definition of "base case
5  scenario" from counsel, I understand that.  But do
6  you employ in your position as the CEO of FGIC
7  this definition as part of your job
8  responsibilities?
9          MR. SIDMAN:  Same objection.
10     A.   When you say "employ," do we -- do
11  we utilize that definition?  Yes, in connection
12  with the Plan of Rehabilitation.
13     Q.   Okay.  And you utilize it in
14  connection with the plan of reorganization.
15  That's your testimony.  Correct?
16     A.   No.
17         MR. SIDMAN:  No.  Objection.
18     Q.   What is your testimony?
19     A.   I think I just said.  The -- the --
20  we utilize it in connection with the Plan of
21  Rehabilitation.
22     Q.   Rehabilitation, I'm sorry.  You got
23  me.  Okay.  All right.
24     A.   I'm sorry.  I wasn't trying to get
25  you.  I was trying to make sure I answered the

**Page 123**

J. DUBEL - CONFIDENTIAL

1  
2  question properly.
3      Q.   No prob.  Just kidding.  I've made
4  that mistake constantly throughout here, and I
5  apologize.
6      A.   It's just that we have a plan of
7  reorganization in ResCap.  I want to make sure I'm
8  answering the correct question.
9      Q.   So as part of your
10  responsibilities, do you have an understanding of
11  the term "base case scenario"?
12         MR. SIDMAN:  Objection.  Same
13     instruction.  If that understanding I think --
14     if that understanding is based on consultation
15     or communications with counsel, I would
16     instruct you not to answer -- or -- instruct
17     you not to answer that question.
18     A.   I do.
19     Q.   Okay.  And what's your
20  understanding?
21     A.   As I stated before, my
22  understanding is based upon discussions with
23  counsel.  I did not draft the language in
24  the definition.  I did not draft the definition.
25  When I read it, I asked counsel what it meant, and

| Page 124 | Page 125 |
|---|---|

**Page 124**

J. DUBEL - CONFIDENTIAL

1  
2  so my understanding of the definition is based
3  upon discussions with counsel.
4      Q.   So, in other words, in order for a
5  layman to understand this Disclosure Statement, do
6  they need to get advice of counsel on the
7  definition of "base case scenario"?
8          MR. SIDMAN:  Object to the form.
9     Answer if you can.
10     A.   I would have no idea what someone
11  reading it -- I'm answering that my understanding
12  is based upon discussions with counsel.  I don't
13  know what other parties would understand or would
14  not understand.  I don't -- there are a lot of
15  laymen who are lawyers by training.  They might
16  have a different understanding.  There are other
17  people who do.
18         In this case, I got my
19  understanding of this definition after discussing
20  it with counsel.
21     Q.   And without the assistance of
22  counsel, you would not understand how to employ
23  the term "base case scenario"?
24         MR. SIDMAN:  Objection.  Asked and
25     answered.

**Page 125**

J. DUBEL - CONFIDENTIAL

1  
2      A.   I think you're asking me a
3  hypothetical question, which I can't answer,
4  because my understanding of the definition is
5  based upon reading a document that was drafted by
6  counsel and asking counsel for the interpretation
7  of that definition.
8      Q.   Did you ever communicate or discuss
9  the base case scenario with the Steering
10  Committee?
11         MR. SIDMAN:  Objection to form.
12     And, once again, mark this portion of the
13     transcript confidential.
14     A.   I don't recall.
15     Q.   You don't recall ever having
16  discussions with the Steering Committee on the
17  base case scenario?
18         MR. SIDMAN:  Object to the form.
19     Asked and answered.
20     A.   I don't recall.
21     Q.   Did you have a discussion with any
22  of the policyholders regarding the base case
23  scenario?
24         MR. SIDMAN:  Object to the form.
25     A.   I don't recall having any.

TSG Reporting - Worldwide    (877) 702-9580

Page 126

1        J. DUBEL - CONFIDENTIAL
2        Q.   Let's look at Exhibit 3 for a
3   moment, paragraph 8 -- paragraph 28.
4        A.   Are you referring to the previously
5   discussed paragraph on page 9?
6        Q.   Yes, please.
7        A.   Thank you.
8        Q.   Do you see where it states, and you
9   can read it for yourself, in the last two lines,
10  "Compared to approximately 27 through 30 percent
11  of permitted policy claims under the plan at a 10
12  through 20 percent illustrative discount rate."
13  Do you see that?
14       A.   I do.
15       Q.   Do you agree with the Miller
16  affidavit's use of a 10 to 20 percent illustrative
17  discount rate?
18       MR. SIDMAN:  Object to the form.
19       A.   I have no reason not to agree --
20  not to agree with that.
21       Q.   Do you think that the illustrative
22  discount rate should be higher or should be lower?
23       MR. SIDMAN:  Object to the form.
24       A.   I have no reason to disagree with
25  the use of that range.

Page 127

1        J. DUBEL - CONFIDENTIAL
2        Q.   Did you ever discuss with anyone
3   other than counsel whether the illustrative
4   discount rate should be something other than the
5   10 to 20 percent that was utilized by Miller in
6   his affidavit?
7        MR. SIDMAN:  Objection to form.
8        A.   No.
9        (Dubel Exhibit 4 marked for
10  identification.)
11       Q.   Mr. Dubel, you have what's been
12  marked as Dubel Exhibit 4 in front of you.  Do you
13  see that?
14       A.   I do.
15       Q.   What is Dubel Exhibit 4?
16       A.   It appears to be an exhibit,
17  Exhibit No. 2.  It's referred to as -- I don't
18  recall exactly what document it's attached to, but
19  it is a Settlement Agreement by and among
20  Residential Capital, LLC, and its direct and
21  indirect subsidiaries listed on an exhibit to this
22  Settlement Agreement.  Financial Guaranty
23  Insurance Company, the Bank of New York, the Bank
24  of New York Mellon Trust Company, Law Debenture,
25  U.S. Bank National Association and Wells Fargo

Page 128

1        J. DUBEL - CONFIDENTIAL
2   Bank, and I might have missed a couple of NAs and
3   other defining portions of the document.
4        Q.   And is this Settlement Agreement
5   signed?
6        A.   Yes.
7        Q.   And do you believe this is the
8   Settlement Agreement that was entered into by the
9   parties that you just mentioned on the record?
10       A.   Well, you're -- you're handing me a
11  document that I've never seen -- you know, I've
12  never seen this physical document, but if it's
13  the -- if you're referring to the Settlement
14  Agreement that was, you know, signed by all these
15  parties and it's the exact replica of all of it,
16  then I would believe it is the -- a copy of it,
17  but I, obviously, have not read the whole thing to
18  determine if there was a page missing or anything.
19       Q.   Understood.  Do you mind if I refer
20  to this as the ResCap settlement?
21       A.   Sure.
22       Q.   Do you know whether the ResCap
23  settlement provides for the commutation of
24  policies that were issued to RMBS Trust with
25  ResCap affiliates?

Page 129

1        J. DUBEL - CONFIDENTIAL
2        MR. SIDMAN:  Objection to the form.
3   You can answer.
4        A.   I'm not sure what your definition
5   of commutation is, so I don't feel comfortable
6   answering the question.
7        Q.   Does it provide for the termination
8   of those policies?
9        A.   No, it does not.
10       Q.   What does it provide for with
11  respect to the policies that were issued to the
12  RMBS Trust involving ResCap affiliates?
13       A.   Well, I can't -- you're asking a
14  question that's encompassed in, you know, 20 --
15  16, 17 pages of -- of a legal document.  It's --
16       Q.   I'm asking for your understanding,
17  though?
18       A.   It's a settlement of the -- of the
19  claims that have yet to be paid and future claims
20  and it also incorporates other relief in the
21  docu-- -- in the Settlement Agreement.
22       Q.   And that's -- that's correct.  And
23  what does the settlement provide for with respect
24  to the RMBS Trust with ResCap -- with ResCap
25  affiliates?

33 (Pages 126 to 129)

Page 130

1        J. DUBEL - CONFIDENTIAL
2        MR. SIDMAN: Objection.
3        Q.    What does it provide for with
4    respect to the treatment of those policies?
5        MR. SIDMAN: Object to the form.
6        A.    Well, it provides for -- and,
7    again, this is all laid out in the document, but
8    it provides for FGIC to pay $253.3 million to
9    those trusts to forego the receipt of future
10   premium payments and to give up certain other
11   rights that FGIC would have as it relates to those
12   trusts.
13       Q.    And do you know what the current
14   claims are that the trust have against their FGIC
15   policies, what the current amount of those claims
16   are?
17           MR. SIDMAN: Objection to the form,
18       and I'll instruct the witness that it's a
19       yes-or-no question at this point. If that --
20       I don't want you to -- I don't want you to
21       provide any substance of any communications
22       that was provided by counsel to you.
23       A.    There is a reference in here that
24   states that FGIC has received approximately $789
25   million of claims of -- under the policies.

Page 131

1        J. DUBEL - CONFIDENTIAL
2        Q.    And where is it that you're
3    referring to?
4        A.    I guess it's page 1 at the bottom
5    in the last whereas. But it says approximately,
6    and those claims have not yet been reconciled. So
7    for FGIC, there is a process laid out in the plan
8    in which FGIC would have to reconcile those
9    claims. So it's an approximate number because
10   that number could change based upon the
11   resubmission of the claims and the reconciliation
12   that FGIC has to go through of those claims.
13   That's why it's, you know, approximately.
14       Q.    So the amount of those claims could
15   be higher? Is that a possibility?
16           MR. SIDMAN: Objection. You can
17       answer.
18       A.    It could be lower. It could be
19   higher.
20       Q.    And when will FGIC be able to
21   determine the exact amounts of those claims?
22           MR. SIDMAN: Objection.
23           You can answer.
24       A.    If this settlement agreement goes
25   effective and FGIC makes the payments and all of

Page 132

1        J. DUBEL - CONFIDENTIAL
2    the other conditions to this are satisfied, then
3    it will not be the full-blown reconciliation
4    process that is incorporated in the FGIC
5    rehabilitation plan.
6        Q.    And how about future claims? Has
7    FGIC estimated the future claims under those
8    policies?
9        A.    We have.
10       Q.    And do you know what the amount of
11   those future claims are?
12           MR. SIDMAN: Objection. If you
13       received that information as a result of
14       communications from counsel, I would instruct
15       the witness not to answer.
16           MR. GOODMAN: That's a ridiculous
17       -- that's a ridiculous question. That's a
18       ridic- -- that's a ridiculous objection. The
19       number is out there as part of -- and has been
20       disclosed as part of the settlement. Okay?
21       So he knows the number.
22           MR. SLACK: It begs the question
23       why you're asking if you know -- if you know
24       the number. If --
25           MR. GOODMAN: Because I want to --

Page 133

1        J. DUBEL - CONFIDENTIAL
2    I want to know the witness's understanding.
3    He's the one testifying, not me.
4        THE WITNESS: Can I answer?
5        MR. SIDMAN: Oh, yeah.
6        A.    I'm sorry. Just wanted to make
7    sure I could answer.
8        Over $400 million is our -- is our
9    estimate, but that is a complete estimate and is
10   subject to many variables in which it could
11   change.
12       Q.    It could be higher; it could be
13   lower?
14       A.    It could be higher, and it could be
15   significantly lower.
16       (Discussion off the record.)
17       MR. GOODMAN: Can we take a quick
18   break?
19       THE VIDEOGRAPHER: Going off the
20   record. The time is 5:05 p.m.
21       (Recess taken.)
22       THE VIDEOGRAPHER: We're going on
23   the record. The time is 5:16 p.m.
24       Q.    Now, Mr. Dubel, we were talking
25   about the ResCap settlement before the break.

34 (Pages 130 to 133)

| Page 134 | Page 135 |
|---|---|

**Page 134**

1  J. DUBEL - CONFIDENTIAL
2  Am I correct that at least with
3  respect to the RMBS Trust, the guts of the
4  settlement is FGIC is going to pay them $253
5  million to satisfy claims that have been received
6  of about $789 million of unpaid claims and an
7  additional $400 million of estimated future
8  claims. Is that correct?
9  MR. SIDMAN: Objection to form and
10  to the use of the word "them."
11  A. I think, as I stated before, FGIC
12  will be -- would pay $253.3 million, plus forego
13  future premiums, plus give up certain rights that
14  it currently has related to those trusts, and in
15  exchange it will have settled up the existing
16  claims that remain that is received plus any
17  future claims.
18  Q. And have you had the occasion to
19  estimate the average recovery for these RMBS
20  Trusts as a result of these settlements?
21  MR. SIDMAN: Objection to form.
22  Q. From FGIC?
23  A. I'm not sure -- when you say
24  "average recovery" --
25  Q. Like, I mean, taking this into

**Page 135**

1  J. DUBEL - CONFIDENTIAL
2  account, the claims that are being released, the
3  premiums that -- not being paid, the cash they're
4  receiving. How much are the trusts receiving on
5  the dollar? Have you had occasion to calculate
6  that?
7  A. Well, the trusts are receiving
8  $253.3 million, plus they're getting the value of
9  the future premiums, plus they're getting the
10  value of all of the rights that FGIC is foregoing.
11  Q. And do you agree that their
12  recovery is about 21 cents on the dollar?
13  MR. SIDMAN: Object to the form.
14  A. I have no reason to -- to believe
15  that that's the number because it is all premised
16  on both the finalization of the claims that are
17  received and the future claims that come in and
18  the value to the trustees as policyholders of
19  receiving back the rights that FGIC has.
20  Q. So are you saying it could be
21  higher or it could be lower than 21 cents?
22  MR. SIDMAN: Object to the form.
23  A. I'm -- I'm not saying it is or
24  isn't 21 cents. So to say it's higher or lower, I
25  can't comment on that.

| Page 136 | Page 137 |
|---|---|

**Page 136**

1  J. DUBEL - CONFIDENTIAL
2  Q. Have you ever ball parked it?
3  MR. SIDMAN: Objection.
4  A. Not with all the factors that I've
5  discussed.
6  Q. Okay. So you haven't done that.
7  And once this settlement with the
8  RMBS Trust is done, they have no more claim
9  against FGIC -- the FGIC policies. Is that
10  correct? Is that the result of the settlement?
11  MR. SIDMAN: Objection.
12  A. The document speaks for itself, and
13  it's a legal document. So I'm not going to --
14  Q. What's you under- -- what's -- but
15  what's your understanding of it? You were chief
16  negotiator. What's your understanding of it?
17  MR. SIDMAN: Object to the form.
18  A. My understanding is that all
19  existing, received and unpaid claims and any
20  future claims that could be put to FGIC under the
21  policies would be settled, and FGIC would have no
22  liabilities under those or any further obligations
23  under those.
24  Q. Okay. And so the ResCap RMBS
25  Trusts are settled. Right?

**Page 137**

1  J. DUBEL - CONFIDENTIAL
2  Now, isn't it correct that with
3  respect to the non-ResCap RMBS Trust policies,
4  don't they stand to get a greater return than the
5  base case scenario set forth in the Miller
6  affidavit as a result of the satisfaction of that
7  liability?
8  MR. SIDMAN: Object to the form.
9  You can answer, if you can.
10  A. What the other policies that FGIC
11  has that would be in place at the time of the
12  effective date will get whatever they would be
13  entitled to under the FGIC rehabilitation plan
14  over the next 40 years.
15  Q. And have you had occasion -- I'm
16  sorry. I didn't realize you weren't finished with
17  your answer. Please finish.
18  A. And as -- as I've stated before, it
19  could be greater or a lot less than what's in the
20  Miller affidavit.
21  Q. Okay. Have you had occasion to
22  value how much more they will receive as a result
23  of the ResCap settlement on their policy claims?
24  MR. SIDMAN: Object to the form and
25  the use of "they."

35  (Pages 134 to 137)

Page 138

1          J. DUBEL - CONFIDENTIAL
2      A.   I'm sorry.  Repeat the question.
3      Q.   Have you had occasion to value how
4  much more the non-ResCap Trusts will receive as a
5  result of the ResCap settlement?
6          MR. SIDMAN:  Object to the form.
7  Misstates his testimony.
8          MR. GOODMAN:  I didn't ask him
9  about his testimony.  I asked if he had
10  occasion.
11     A.   I've looked at that, yes.
12     Q.   And you've looked at it, and did
13  you come up with a number?
14         MR. SLACK:  Let me -- let me object
15  to only -- only to the extent that whatever
16  analysis he's thinking about was done in
17  furtherance of either the -- the settlement
18  or -- or the plan, then I would instruct you
19  not to answer on the basis of work -- work
20  product privilege and attorney-client and the
21  mediation privilege.
22         MR. SIDMAN:  Same objection.  Same
23  instruction.
24     Q.   Are you following your counsel's
25  instruction?

Page 139

1          J. DUBEL - CONFIDENTIAL
2      A.   I'm following my counsel's
3  instruction.
4      Q.   So you -- you will not answer that
5  question?
6      A.   I'm following my counsel's
7  instruction.
8      Q.   And just to be clear --
9          MR. SIDMAN:  I am instructing the
10  witness not to answer your question.
11     Q.   And is it your testimony that that
12  calculation was done as part of the mediation?
13         MR. SIDMAN:  You can answer that
14  question.
15     A.   Yes.
16     Q.   In terms of the $253 million
17  payment, just so I understand, is it your
18  understanding that that's an actual payment of
19  $253 million to the trust?  Could it be more or
20  could it be less?  That's my question.
21         MR. SIDMAN:  Objection to form.
22     A.   It would be an actual cash payment
23  to all of the trusts.
24     Q.   Of 253 million.
25     A.   Of $253.3 million.

Page 140

1          J. DUBEL - CONFIDENTIAL
2          And as I said earlier, there would
3  be a foregoing of insurance, you know, premiums
4  and the give up of certain other rights.
5      Q.   Okay.  Does -- under the
6  settlement, does FGIC have the right to recover
7  any of the $253 million dollars under the
8  waterfall's policies that underlie the trusts?
9          MR. SIDMAN:  Object to the form.
10     Q.   Do you understand the question?
11     A.   I'm not sure I do.
12     Q.   FGIC pays the trust $253 million.
13     A.   Right.
14     Q.   The trusts pay off its claim
15  pursuant to the trust indenture agreement and the
16  waterfall provisions.  Are you with me?
17     A.   Uh-huh.
18     Q.   Does FGIC have a right to collect
19  under the waterfall provisions any of the $253
20  million that its paid over to the trust?  Is that
21  your understanding?
22         MR. SIDMAN:  Object to the form.
23  If your understanding is based on
24  communications with counsel, then I would
25  instruct you not to answer the question.  If

Page 141

1          J. DUBEL - CONFIDENTIAL
2  it's not based on communications with counsel,
3  then go ahead and answer the question.
4      A.   As I stated earlier, FGIC is paying
5  out $253.3 million, foregoing certain premiums and
6  certain other rights, and I think what you're
7  referring to is what I've referred to as some of
8  those other rights.  So any rights that it might
9  get -- that it might have to receive
10  reimbursements or anything else, FGIC is
11  foregoing, as I understand it.
12         MR. GOODMAN:  Okay.  I'm going to
13  turn this over to counsel for Stonehill and
14  Monarch.  Just so I'm clear on the record, I
15  reserve the right to recall this witness
16  particularly with respect to directions given
17  my counsel, which we don't agree, with respect
18  to the work product privilege, the
19  attorney-client privilege and the mediation
20  privilege that have been asserted on the
21  record.
22         MR. SHEEREN:  I propose you change
23  the tape.  Then we go to the end.
24         THE VIDEOGRAPHER:  Okay.  This will
25  end Videotape No. 3 of the deposition of John

36  (Pages 138 to 141)

Page 142

```
 1          J. DUBEL - CONFIDENTIAL
 2    Dubel.  We're going off the record at
 3    approximately 5:26 p.m., July 10th, 2013.
 4          (Recess taken.)
 5          THE VIDEOGRAPHER:  We are now on
 6    the record beginning approximately 5:29 p.m.,
 7    July 10th, 2013.  This will begin videotape
 8    No. 4 of the deposition of John Dubel.
 9    EXAMINATION BY
10    MR. BAIO:
11    Q.    Mr. Dubel, my name is Joe Baio.  I
12    represent the parties whom I identified at the
13    beginning of this proceeding, and I'll have some
14    questions for you.
15    A.    Good afternoon.
16    Q.    Good afternoon.
17          You have had before you Exhibit 4
18    which is a Settlement Agreement, which is before,
19    as I understand it, both the bankruptcy court and
20    the New York State Court.  Is that correct?
21    A.    Yes, I've had the exhibit before
22    me.  Is that -- that the question?
23    Q.    Yes, that's the question.
24    A.    Yes.
25    Q.    And I think it is your testimony
```

Page 143

```
 1          J. DUBEL - CONFIDENTIAL
 2    that you participated significantly in discussions
 3    leading to the ultimate execution of that
 4    agreement.  Is that correct?
 5          MR. SIDMAN:  Object to the form.
 6          You can answer.
 7    A.    I was involved in the -- in the
 8    negotiation and the development of this.
 9    Q.    All right.  And -- and you referred
10    to securing some input from various constituencies
11    as early as January of 2015.  Is that correct?
12          MR. SIDMAN:  Objection.  I think it
13    misstates his testimony.  You said 2015.  I
14    think that's --
15          MR. BAIO:  I did?
16          MR. SIDMAN:  Yes.
17          MR. BAIO:  2013.
18          MR. SIDMAN:  I still think that's
19    not exactly right, but you an answer.
20    A.    That's not what I testified before.
21    Q.    All right.  What -- what were you
22    engaging in in January of 2013 about which you
23    testified earlier this -- this afternoon?
24    A.    Discussions commenced that
25    ultimately resulted in the execution of this
```

Page 144

```
 1          J. DUBEL - CONFIDENTIAL
 2    doc- -- this Settlement Agreement document.
 3    Q.    Okay.  And the discussions
 4    commenced in January of 2013?
 5    A.    Discussions that ultimately
 6    resulted in this, yes, January of 2013.
 7    Q.    And with whom did you have
 8    discussions at the outset about the matters that
 9    ultimately led to this Settlement Agreement?
10    A.    There were a variety of parties.
11    It would have been folks from investor group, or I
12    don't know what the official term is, but people
13    represented by Kathy Patrick's group and other
14    parties that were involved in the mediation
15    process and what had been represented to me was
16    that Kathy's group was having discussions with the
17    various different trustees.
18    Q.    And in January of 2013, did you
19    have an understanding as to who those discussions
20    were with?
21          MR. SIDMAN:  Object to the form.
22    A.    I don't know whether -- as I said,
23    it was the latter part of January, mid to latter
24    part of January.  So I don't know exactly when I
25    got the understanding of who they were with, other
```

Page 145

```
 1          J. DUBEL - CONFIDENTIAL
 2    than it would have been later in February that --
 3    that I would have had that clear understanding.
 4    Q.    Okay.  So later in February you had
 5    an understanding that Ms. Patrick was
 6    communicating with other investors about the
 7    subjects that you were discussing with her.  Is
 8    that correct?
 9          MR. SIDMAN:  Object to the form.
10          You can answer.
11    A.    Ms. -- well, Ms. Patrick
12    represented, or maybe she doesn't -- I'm not sure
13    of her official role, technical role, but whatever
14    group that she represented, but also that there
15    were discussions taking place with the trustees.
16    Q.    Okay.  You understood that she was
17    having discussions with the trustees in February
18    of 2013?
19          MR. SIDMAN:  Object to the form.
20    A.    I believe that's the time frame
21    that the initial discussions with the trustees,
22    but I don't -- wasn't part of those discussions.
23    So I may be incorrect or I may have misunderstood
24    what was originally said to me at that time.
25    Q.    All right.  Well, do you have an
```

37 (Pages 142 to 145)

Page 146

1        J. DUBEL - CONFIDENTIAL
2   understanding as to when the trustees became
3   involved in the discussions about which you are
4   testifying?
5        A.    I know that in March of 2013 that
6   representatives of the trustees were communicating
7   with me and with my counsel as it related to the
8   ultimate -- the issues that ultimately came down
9   into the Settlement Agreement, and this was,
10  again, all part of the mediation process.
11       Q.    Okay.  And -- and when you refer to
12  March of 2013, who were the representatives of the
13  trustees that you were communicating with at that
14  time about what ultimately became the settlement?
15       A.    It would have been -- my
16  communications would have been with -- with my
17  counsel and with counsel for the Bank of New York.
18       Q.    Was it just Bank of New York,
19  counsel for Bank of New York, or was it also
20  counsel for other of the trustees?  And I'm
21  referring to March of 2013.
22            MR. SIDMAN:  Objection to form.
23            You can answer.
24       A.    My discussions were with counsel
25  for Bank of New York as it related to this

Page 147

1        J. DUBEL - CONFIDENTIAL
2   particular issue, but I don't know if they were --
3   you know, if they were communicating amongst
4   themselves or not.
5        Q.    Okay.  But you do know that some
6   representative of the Bank of New York counsel did
7   participate in discussions with you sometime in
8   March about the subject?
9            MR. SIDMAN:  Object to the form.
10       A.    That's correct.
11       Q.    Prior to that time, in March of
12  2013, had you had any communications with any of
13  the trustees or their counsel on any of the
14  subjects that eventually became embodied in the
15  settlement agreement?
16       A.    No -- prior to -- I'm sorry, prior
17  to March?
18       Q.    Well, you've identified this March
19  2013 time when I believe you recall that an
20  attorney for the Bank of New York became involved
21  in these discussions.
22            What I'm trying to find out is if
23  there were any discussions that you were involved
24  in prior to that time with any of the other
25  trustees or their representatives.

Page 148

1        J. DUBEL - CONFIDENTIAL
2            MR. SIDMAN:  Objection to the form.
3        A.    I happen to serve on the creditors
4   committee of ResCap, the unofficial -- the
5   official unsecured creditors committee of ResCap
6   and all of its debtors.  We had frequent meetings.
7   We had frequent meetings as it relates to the
8   mediation process.  I don't recall -- I mean, I
9   spoke to them all the time.  I don't recall
10  specifically anything prior to March with
11  individual trustees or their representatives other
12  than the Bank of New York.
13       Q.    Okay.
14       A.    But I may have.  I just don't
15  recall since we had constant meetings.
16       Q.    Would you have documents that would
17  reflect communications with others beyond Bank of
18  New York in connection with this process?
19            MR. SIDMAN:  Objection to the form.
20            You can answer with respect to
21       whether or not there are documents that exist,
22       but not to the -- not with respect to the
23       substance of those documents.
24       A.    And, again, prior to March?
25       Q.    Yes.

Page 149

1        J. DUBEL - CONFIDENTIAL
2        A.    I don't recall.  There were a
3   tremendous number of communications by committee
4   counsel, and I don't recall if, you know, those
5   would have -- but I don't recall myself having
6   any, you know, documents.
7        Q.    All right.
8        A.    That -- you know, that I would have
9   originated, you know -- if creditors committee
10  counsel did, I -- you know, I don't recall them
11  all.
12       Q.    How about what you received as
13  well?  And there's no mystery here.  I'm trying to
14  find out when the various trustees were involved
15  in these discussions.  They have certain
16  declarations where they've identified dates, and I
17  just want your recollection as to when they became
18  involved, to the extent you remember?
19            MR. SIDMAN:  Object to the form.
20       Q.    You said Bank of New York in
21  2000 -- I'm sorry, in March of 2013.
22            Who were the other trustee
23  representatives, and when do you recall meeting
24  with them for the first time to discuss the
25  settlement?

Page 150

J. DUBEL - CONFIDENTIAL

1
2          MR. SIDMAN:  Objection to the form.
3          You can answer.
4      A.   Again, I have no idea when the
5  other trustees had their communications.  I do
6  know that I met with the Bank of New York.  There
7  are multiple trustees.  There was one individual
8  counsel from Bank of New York who was, I'll call
9  it, leading the charge.  I don't know whether he
10  had official capacity to do that, but he was
11  acting as a spokesman or -- or that's how I viewed
12  it.  And I was acting on -- you know,
13  communicating with all the rest of the trustees,
14  and that was the person from -- counsel for Bank
15  of New York.
16      Q.   And who was that?
17      A.   It was Glen Segal from my -- Seward
18  & Kissel.
19      Q.   And did you in March of 2000 --
20      A.   I'm sorry.  Dechert.  Yeah, I'm
21  sorry.  Sorry.
22      Q.   And did you have written
23  communications back and forth with him?
24      A.   At various times, yes.
25      Q.   And did you initiate the contact

Page 151

J. DUBEL - CONFIDENTIAL

1
2  with him, or did he initiate the contact with you
3  on the subject of the Settlement Agreement or what
4  eventually became the Settlement Agreement?
5          MR. SIDMAN:  Objection to the form.
6      A.   I did not initiate the contact.
7      Q.   Did he initiate the contact with
8  you?
9      A.   I don't know whether he initiated
10  it or somebody else, i.e., the Kathy Patrick, you
11  know, Group, I'll call it, had initiated that.
12      Q.   When did the subject of commutation
13  come up in connection with the discussions that
14  you were involved in that eventually led to the
15  Settlement Agreement?
16          MR. SIDMAN:  You are asking him the
17      date.  Right?  You're not asking him for the
18      substantive communications?
19          MR. BAIO:  No sub- -- I'm just
20      going dates at this point.
21      Q.   When did it come up?
22      A.   It would have come up as part of
23  the mediation process.  Initial first time that
24  there was a reference to it would have been the
25  middle of January, 14th or 15th, something along

Page 152

J. DUBEL - CONFIDENTIAL

1
2  those lines.
3      Q.   So the subject of the commutation
4  that is embodied eventually in the settlement
5  agreement came up in some discussions as early as
6  January of 2013.  Is that your testimony?
7          MR. SIDMAN:  Object to the form.
8          You can answer, if you can.
9      A.   This is not -- the Settlement
10  Agreement is not a commutation.  I just want to
11  make sure that I don't misstate what you're
12  referring to.
13      Q.   Okay.
14      A.   It's a -- it's a settlement
15  agreement as opposed to a -- what I view as a
16  commutation.
17      Q.   Does the -- in -- in your view,
18  does the Settlement Agreement embrace the notion
19  of a commutation?
20      A.   No.
21      Q.   Okay.  You -- you said however that
22  the -- the notion of a commutation did come up in
23  discussions as early as January of 2013.  Is that
24  correct?
25      A.   That is correct.

Page 153

J. DUBEL - CONFIDENTIAL

1
2      Q.   With whom did those discussions
3  come up?
4      A.   As I mentioned earlier, it would
5  have been Kathy Patrick, folks from MBIA or their
6  representatives.
7      Q.   Anyone else?
8      A.   In that early time frame, I don't
9  recall anyone else.
10      Q.   Okay.  And where -- where were
11  these communications occurring?  Were they on the
12  phone?  Were they in writing?  And that is
13  particularly about commutation.
14      A.   They would have probably been on
15  the phone or in person.
16      Q.   In person -- where did the
17  in-person meetings take place?
18      A.   We had numerous in-person meetings
19  at the offices of Kramer Levin who was counsel for
20  the official unsecured creditors committee, all as
21  part of the mediation process.
22      Q.   Okay.  Is that where pretty much
23  all of the meetings that took place face to face
24  occurred during that process?
25          MR. SIDMAN:  Object to the form.

39  (Pages 150 to 153)

Page 154

1          J. DUBEL - CONFIDENTIAL
2      Q.    That you were involved in.
3      A.    There may have been one or two
4   other meetings, not at their offices, at a lunch
5   or other offices.  But we had numerous, numerous
6   meetings during that time frame as part of the
7   mediation process.
8      Q.    And who was the representative from
9   MBIA?
10     A.    Mitchell Sonkin, S-O-N-K-I-N.
11     Q.    And he is from MBIA as opposed to
12  an outside counsel?
13     A.    He is a lawyer, as I understand,
14  by -- by background.  I don't know what his
15  official status is, whether he's an employee of
16  MBIA or a contractor for MBIA.  He used to be an
17  employee.  I'm not sure what his official status
18  is, though.  But he's their representative, as I
19  view it.
20     Q.    In the mediation, when for the
21  first time did the subject of a flat payment to
22  the RMBS holders come up?
23          MR. SIDMAN:  Objection to the form.
24  You can answer.
25     A.    It would -- it would have been in

Page 155

1   that January time frame.
2      Q.    So -- and that's before Bank of New
3   York is involved.  It's really, at least with
4   respect to representatives of either investors or
5   trustees, just Ms. Patrick.  Is that correct?
6      A.    I -- I don't know when Bank of New
7   York was involved in that, whether they were
8   involved early on, earlier, you know, I -- I just
9   don't know because, as I stated earlier, my
10  contacts directly with Bank of New York were -- I
11  believe they started in March.  They might have
12  started earlier in February as it relates to this,
13  obviously, almost daily on, you know, the
14  committee and the mediation.
15          MR. SIDMAN:  Hold on one second.
16  Give me one second, Counsel.
17          (Discussion off the record.)
18          MR. BAIO:  Let's go off for a
19  minute.
20          THE VIDEOGRAPHER:  Going off the
21  record at 5:45 p.m.
22          (Recess taken.)
23          THE VIDEOGRAPHER:  We're back on
24  the record.  The time is 5:48 p.m.

Page 156

1          J. DUBEL - CONFIDENTIAL
2      Q.    So in the mediation, the first time
3   that the subject of a flat payment to the RMBS
4   holders came up was sometime in January of 2013.
5   Correct?
6      A.    That's correct.
7      Q.    And by "came up," was it
8   communicated to people other than those
9   representing or representatives of FGIC?  In other
10  words, I'm not talking about internally.  I'm
11  talking about an external communication for the
12  first time on that subject.
13          MR. SIDMAN:  Counsel, at this point
14  I let you have a little bit of latitude in
15  terms of when the first time the topic of
16  commutation ever came up because -- especially
17  with respect to your firm and the position
18  your clients have taken, we represented to you
19  -- we represented to you that the topic of
20  commutations started and came up sometime for
21  the first time around the middle of January.
22  I think where you're going now is covered by
23  the mediation privilege, and on that basis,
24  I'm instructing my client not to answer this
25  question.

Page 157

1          J. DUBEL - CONFIDENTIAL
2          MR. BAIO:  All right.
3      Q.    Who brought up the concept of
4   commutation in those discussions?
5          MR. SIDMAN:  Objection.  I'm going
6   to instruct the -- my client not to answer on
7   the -- on the basis of the mediation
8   privilege.
9      Q.    You mentioned that there were
10  meetings from time to time that you participated
11  in on the official committee.  Is that correct?
12          MR. EGGERMANN:  I'm going to
13  interject for one moment.  Daniel Eggermann
14  from Kramer Levin on behalf of the creditors
15  committee.  I want to caution the witness not
16  to disclose any privileged communications with
17  counsel.
18          MR. BAIO:  So you're trying to get
19  me coming and going is what I'm hearing.
20     Q.    Anyway, you've heard the caution.
21          My question is:  You mentioned that
22  there had been meetings from time to time that you
23  participated in on the official committee.  Is
24  that correct?  You had meetings from time to time?
25     A.    I serve as a member of the official

40 (Pages 154 to 157)

---

Page 158

1    J. DUBEL - CONFIDENTIAL
2  unsecured creditors committee, and we have
3  meetings from time to time, yes.
4       Q.   And are there minutes of such
5  meetings?
6       A.   I believe that there are minutes of
7  certain of the meetings. I don't know if there
8  are minutes of all the meetings.
9       Q.   And have you seen minutes of those
10 meetings?
11      A.   I have seen minutes of certain of
12 the meetings. I have not seen minutes of all of
13 the meetings.
14      Q.   Have you seen minutes of meetings
15 since January of 2013?
16      A.   I'll be honest with you, I don't
17 recall what the last set of meeting minutes that
18 I've seen are.
19      Q.   Not even the last set. Have you
20 seen, in the entire period since January of 2013
21 to the present, minutes or draft minutes of
22 meetings of the official committee?
23      MR. SIDMAN:  Objection. Asked and
24 answered.
25      A.   Actually, I -- I probably didn't

---

Page 159

1    J. DUBEL - CONFIDENTIAL
2  answer it correctly. I don't recall if I've seen
3  any meeting minutes from the time period in which
4  you're referring to. I just don't recall. I may
5  have gotten them. I just don't recall right now.
6       Q.   Did you have communications with
7  committee members either in anticipation of
8  meetings, in connection of meetings or following
9  meetings? And by "communications," I mean in
10 writing.
11      A.   Okay. Restate -- go back and say
12 that over again just so I know.
13      Q.   Okay. I'm now focusing just in
14 your functioning as a committee member, did you,
15 since January of 2013, have written communications
16 with committee members about matters relating to
17 the committee?
18      MR. SIDMAN:  Objection to the form.
19      A.   When you say "have communications,"
20 are you referring to inbound or outbound?
21      Q.   Yes, both.
22      MR. SIDMAN:  Objection to the form.
23      A.   Yes.
24      Q.   And were they both inbound and
25 outbound?

---

Page 160

1    J. DUBEL - CONFIDENTIAL
2       A.   There would have been inbound and
3  outbound communications, yes.
4       Q.   And did those communications
5  involve anything to do with commutation?
6       MR. EGGERMANN:  I'm going to
7  object. Again you're getting into the
8  substance of communications that are
9  privileged.
10      MR. SIDMAN:  I'm going to -- I'm
11 going to object as well and instruct him he's
12 not to answer.
13      Q.   I'm not asking about mediation at
14 this point. I'm asking about communications in
15 connection with the work that you do as a
16 committee member. I just want that clear.
17      MR. EGGERMANN:  To the extent that
18 work is at the direction of or in the presence
19 of counsel, we assert a privilege, and we
20 object to the question.
21      MR. BAIO:  I'm, of course,
22 reserving my right with respect to all of
23 these invocations, and the amount of time that
24 I have, so I will also be asking for more
25 time, but that's for another day.

---

Page 161

1    J. DUBEL - CONFIDENTIAL
2       Q.   In connection with discussions and
3  communications leading up to the settlement
4  agreement, were there term sheets that you and
5  FGIC exchanged with other parties? I'm not asking
6  about the substance right now. I just want to
7  know if there were term sheets.
8       MR. SIDMAN:  That's fine.
9       You can answer the question.
10      A.   Everything having to do with the
11 Settlement Agreement, what was originally may have
12 been referred to as the commutation which
13 ultimately became the Settlement Agreement, which
14 is not a commutation, all of that would have been
15 done in conjunction with the mediation process.
16      Q.   That's not what my question is,
17 though. Right? It's whether there simply were
18 exchanges of term sheets.
19      A.   You didn't give me a chance to
20 finish my answer.
21      Q.   I'm sorry. I apologize.
22      A.   So I wanted to make sure you
23 understood. So anything that would have been done
24 in terms of exchanges of anything would have been
25 in connection with the mediation process. There

---

41 (Pages 158 to 161)

Page 162

J. DUBEL - CONFIDENTIAL
1   J. DUBEL - CONFIDENTIAL
2   were drafts of the Settlement Agreement that were
3   communicated to -- from FGIC to other parties and
4   it came back from other parties with comments.
5       Q.   When was the first such term sheet,
6   if you can recall?
7           MR. SIDMAN: I'm going to object
8   and instruct the witness not to answer that
9   question on the basis of mediation privilege.
10          MR. BAIO: Again, I'm not asking
11  for the substance. I believe that to test the
12  claim that this is all part of the mediation
13  and nothing else is subject to my being able
14  to challenge and explore.
15      Q.   Did you see a document request that
16  we served in this case?
17          MR. SIDMAN: Objection to the form.
18      A.   I don't know what the technical
19  term of it was, but I saw a request to FGIC of --
20  it was a document request or, you know, notice of
21  discovery. I don't know what the actual term was.
22  I saw something to that effect, yes.
23      Q.   Okay. And did you search for
24  documents in connection with that?
25          MR. SIDMAN: I'm going to object --

Page 163

1       J. DUBEL - CONFIDENTIAL
2   I'm going to object.
3           You can answer the question.
4       A.   I took direction from counsel as to
5   what to do in connection with that.
6       Q.   Did you actually conduct any kind
7   of search?
8           MR. SIDMAN: I'm going to -- at
9   this point he's already told you that he took
10  direction from counsel. I'm going to instruct
11  him not to answer.
12          MR. SLACK: And the "you" here, are
13  you talking about him personally or are you
14  talking about FGIC?
15          MR. BAIO: This is an unusual case
16  that we have more than one person -- are you
17  representing the same party?
18          MR. SLACK: I represent the
19  rehabilitator that -- that actually controls
20  the privilege.
21          MR. BAIO: So you represent a
22  different party?
23          MR. SLACK: I'm sorry. When you
24  say "party," a different party --
25          MR. BAIO: The witness or FGIC.

Page 164

1       J. DUBEL - CONFIDENTIAL
2           MR. SLACK: I represent both FGIC
3   and the FGIC's rehabilitator, and he's here in
4   this deposition in order to protect the
5   privileges which include searching for
6   documents and those kinds of things. So yes,
7   that's the reason I'm here in order to protect
8   the privilege that the rehabilitator has the
9   right to assert.
10      Q.   All right. My question, though, is
11  whether you personally searched for documents.
12          MR. SIDMAN: You can answer that
13  question.
14      A.   No.
15      Q.   Does the word or the notion of
16  something called sharpes, S-H-A-R-P-E-S, mean
17  anything to you?
18      A.   Yes, it does.
19      Q.   What does it mean to you?
20      A.   If what you're referring to is the
21  offer to exchange that FGIC had initiated through
22  a third party back in the 2010 time frame, then
23  that's the meaning that I assume that you're
24  referring to.
25      Q.   That is, and the offer of exchange,

Page 165

1       J. DUBEL - CONFIDENTIAL
2   was it made to, among others, the clients that you
3   now know I represent? Any of them.
4           MR. SIDMAN: Objection. I'm going
5   to -- I'm going to advise the witness not to
6   answer the question if his understanding of
7   how the offer was made or to whom it was made
8   is based on communications with counsel. If
9   it's not based on communications with counsel,
10  then you are free to answer the question.
11      A.   FGIC retained an investment banking
12  firm to go out and seek the exchange, you know, to
13  perform the exchange offer. That investment
14  banking firm was given a list of securitizations
15  that FGIC was willing to exchange or do the
16  exchange offer with, and that investment banking
17  firm did its work. They contacted numerous
18  people. I don't have a listing in front of me of
19  all the parties that they contacted.
20      Q.   I see. Who was the investment bank
21  or the investment advisor?
22      A.   I'm going to shorthand it because
23  I'm not sure of the technical name, but it was
24  Deutsche Bank. It may have been like another
25  subsidiary or something of Deutsche Bank, but

TSG Reporting - Worldwide    (877) 702-9580

Page 166

1      J. DUBEL - CONFIDENTIAL
2  commonly referred to as Deutsche Bank.
3      Q.    And did Deutsche Bank report to you
4  in connection with any communications they
5  received following the exchange offer?  Is the
6  answer yes?
7      A.    I think that's a whole different
8  question than what you asked before so --
9      Q.    Okay.  But what's the answer to my
10 question that I just -- that's on the record?
11     MR. SIDMAN:  I'm going to object.
12 What's your question?
13     Q.    Did Deutsche Bank report to you in
14 connection with any communications they received
15 following the communication of the exchange offer?
16     MR. SIDMAN:  The question is a
17 yes-or-no question with respect to --
18     A.    Yes, it was just a little different
19 than what you had said before so I just wanted to
20 make sure.
21     Q.    It was, correct.
22     A.    Yes.
23     Q.    And this all occurred in 2010?
24     A.    Yes.
25     Q.    And is it fair and accurate to say

Page 167

1      J. DUBEL - CONFIDENTIAL
2  that there were multiple exchange offers that were
3  made over the course of months?
4      MR. SIDMAN:  Object to the form.
5      A.    No.
6      Q.    It was only one?
7      A.    Well, when you say "multiple,"
8  there was one offer to exchange that encompassed
9  many different securitizations and other entities
10 that we had policies with, and that exchange offer
11 was extended multiple times.
12     Q.    Okay.  Was it also altered during
13 that extended period in any way?
14     MR. SIDMAN:  Object to the form.
15     A.    Yes.
16     Q.    Okay.  And about how many times was
17 it extended and altered, if you remember?
18     A.    I don't recall.
19     Q.    Were those discussions in part a --
20 a request to commute policy obligations that FGIC
21 had, in your understanding?
22     MR. SIDMAN:  Object to the form,
23 and I would instruct the witness if he's
24 basing his understanding on the advice of --
25 on the communications with counsel, then I

Page 168

1      J. DUBEL - CONFIDENTIAL
2  would instruct the witness not to answer the
3  question.
4      A.    Could you repeat the question?  I'm
5  sorry.
6      Q.    Did the -- did the offer of
7  exchange contemplate a commutation of policy
8  obligations, if you remember?
9      A.    No.
10     MR. SIDMAN:  Same objection.
11     A.    No.
12     Q.    It was just a settlement for a
13 dollar amount that would then lead to the
14 retirement of the bonds -- I mean, of the
15 policies?
16     MR. SIDMAN:  Object to the form.
17     A.    No.
18     Q.    What was it?  Was the offer?
19     A.    I think as I testified earlier, it
20 was a situation where an offer was made to -- to
21 the holders of the bonds, notes, whatever the term
22 for that particular security was in which FGIC
23 would pay a set amount, and then FGIC would, in
24 essence, through that set up a separate trust, and
25 it would receive back any of the insurance

Page 169

1      J. DUBEL - CONFIDENTIAL
2  payments that would have been made to the
3  policyholder that would have flowed down and
4  through to the -- to the underlying bonds, and
5  FGIC would have received that piece back.
6      Q.    I see, for a flat payment of some
7  amount?
8      A.    Yes.
9      Q.    And that exchange offer was
10 rejected by investors.  Is that correct?
11     A.    No.
12     Q.    Did any investors accept it?
13     A.    Yes.
14     Q.    Whom?
15     A.    I don't remember the final number,
16 but approximately 50 percent of the investors
17 accepted it.
18     Q.    And 50 percent approximately
19 rejected it?
20     A.    No.
21     Q.    What did the other 50 percent do?
22     A.    They did not accept it.
23     Q.    I see.  And then did it go forward
24 with the 50 percent that agreed to go forward with
25 it?

43  (Pages 166 to 169)

Page 170

1          J. DUBEL - CONFIDENTIAL
2              MR. SIDMAN:  Object to the form.
3      A.   No.
4      Q.   It did not go forward with them.
5  Is that correct?
6      A.   That's correct.
7      Q.   So it went forward with none of the
8  investors?
9              MR. SIDMAN:  Object to the form.
10     A.   We did not complete the offer to
11  exchange.
12     Q.   All right.  And why was that?
13     A.   It would not have provided us the
14  resolution of what we needed to restore our -- our
15  statutory capital surplus.
16     Q.   I see.  So it was abandoned?  How
17  would you describe how it ended?
18              MR. SIDMAN:  Object to the form.
19     Q.   Use your word.  Don't use mine.  Or
20  words.
21     A.   I'm not sure of the technical term
22  because I'm sure Deutsche Bank has some type of a
23  technical term for it, but I'll call it -- it
24  was -- the offer was terminated.
25     Q.   Now, in connection with either the

Page 171

1          J. DUBEL - CONFIDENTIAL
2  events that led up to the settlement agreement --
3  let me -- let me change that.
4              Have you had discussions in the
5  last year or so with representatives of my client?
6  And let's start with representatives of CQS.
7      A.   Yes.
8      Q.   With whom?
9      A.   David Williams, and I don't recall
10  if there was anyone else from CQS.  There might
11  have been.  I don't recall.
12     Q.   And when did those conversations
13  take place?
14     A.   Sometime -- well, I believe the
15  first time that I had conversations with him, I'm
16  not going to get the exact date, but it would have
17  been after the filing of -- or after the
18  appointment of the rehabilitator.
19     Q.   That would be in what year?
20     A.   That would have been June of 2012.
21     Q.   Okay.  And did you ask to meet with
22  him, or did he ask to meet with you?
23     A.   He sought a meeting with us.
24     Q.   And did you meet with him?
25     A.   Yes.

Page 172

1          J. DUBEL - CONFIDENTIAL
2      Q.   And how many times did you meet
3  with him thereafter?  There was an initial
4  meeting, I assume, and then some follow-ups?
5      A.   Yes, there was an initial meeting,
6  and then there were multiple follow-ups.  I don't
7  recall exactly how many times.
8      Q.   When was the most recent meeting
9  that you had with Mr. Williams?
10     A.   In-person meeting?
11     Q.   Let's take in-person, but you know
12  what I'm going to do next.
13     A.   I just want to make sure I answer
14  your question properly.
15     Q.   Go ahead.  In person.
16     A.   It would have been the initial
17  meeting.
18     Q.   Okay.  Sometime June or shortly
19  after of 2010?
20     A.   I'm sorry.  The in-person
21  meeting -- let me strike that.  It would have been
22  an initial meeting in person, and then there was
23  one other meeting -- I know there was another
24  meeting at my office.  I just don't remember right
25  now when it was.

Page 173

1          J. DUBEL - CONFIDENTIAL
2      Q.   Was it in 2013?
3      A.   I don't recall.
4      Q.   Was it within the last few months?
5      A.   Not an in-person meeting -- well, I
6  -- I don't recall an in-person meeting.
7      Q.   When's the last time you recall
8  speaking to him?
9      A.   On or about June 10th.
10     Q.   Of this year?
11     A.   Yes.
12     Q.   And that would be on the phone?
13     A.   Yes.
14     Q.   And prior to that, during the
15  course of this calendar year, about how many times
16  did you have a discussion or a conversation with
17  him, whether it was on the phone or live?
18     A.   Probably a half dozen times or so.
19     Q.   And during any of those
20  conversations, did you discuss settlement of the
21  ResCap litigation with him?
22     A.   Mr. Williams had asked me in an
23  earlier conversation not to discuss with him
24  anything that was not public information.
25     Q.   But that's not my question.

44 (Pages 170 to 173)

Page 174

1    J. DUBEL - CONFIDENTIAL
2    Did you discuss or raise the
3 subject with him of a potential settlement of the
4 ResCap litigation?
5    MR. SIDMAN:  Object to the form.
6    A.    I was trying to be cognizant of his
7 request, so I did not discuss anything that was
8 not public information with him.
9    Q.    So what were you discussing with
10 him over those last communications in 2013?
11    A.    We were -- I was listening to his
12 input and having discussions with him about the
13 objections that he had to the FGIC rehabilitation
14 plan.
15    Q.    And what did he say in that regard,
16 and what did you say in that regard?
17    A.    Let me just correct -- when I
18 say that he had, I really refer to the objections
19 of CQS.
20    Q.    Fair enough, but he's the
21 representative of CQS, and that's what these
22 conversations assumed.  Right?  You were the
23 representative for FGIC.  He was the
24 representative for CQS?
25    A.    Yes.

Page 175

1    J. DUBEL - CONFIDENTIAL
2    Q.    Okay.  And what did you say, and
3 what did he say in that regard?
4    A.    They had -- CQS had a variety of
5 different objections to the rehabilitation plan
6 that -- and put forth by the rehabilitator.  And
7 so I was discussing his thoughts on that and
8 wanted to get his input to see if there were
9 things that we could do to the plan based upon his
10 input that the rehabilitator would accept and
11 to -- to make the plan as fair and equitable as
12 possible.
13    Q.    And what were his objections, if
14 you can recall?  Or by that I mean CQS.
15    MR. SIDMAN:  Objection to the form.
16    A.    They were related, as I recall, to
17 the treatment of certain reimbursements that would
18 flow through RMBS securitizations.  And the other
19 objection that they had was -- I believe it was --
20 yeah, it was related to the novation agreement
21 that FGIC had that was going to -- that would be
22 executed upon the effective date of the Plan of
23 Rehabilitation.
24    Q.    And what did you understand the
25 nature of CQS's objection with respect to the

Page 176

1    J. DUBEL - CONFIDENTIAL
2 novation?
3    A.    They did not think that it was --
4 my understanding is they did not think it was
5 something that FGIC should enter into.
6    Q.    Now, as a result of your
7 conversations with Mr. Williams did you, in fact,
8 secure any changes to address his objections?
9    MR. SLACK:  I would say this:  I
10    think you can answer yes or no to that, but I
11    don't think you should go into any of the
12    discussions that you had with anyone.
13    A.    I'm sorry.  Could you repeat the
14 question?
15    Q.    Yes.  As a result of or following
16 your conversations with Mr. Williams, did you, in
17 fact, secure any changes to address his
18 objections?
19    A.    I made suggestions to the
20 rehabilitator to encompass certain of the items
21 that had been discussed with Mr. Williams.
22    Q.    And did you communicate back to
23 Mr. Williams the result of those communications
24 that you had with the rehabilitator?
25    A.    I would not have discussed anything

Page 177

1    J. DUBEL - CONFIDENTIAL
2 about the discussions that I would have with the
3 rehabilitator.  I did communicate that FGIC would
4 seek certain changes, and the resulting document
5 speaks for itself.
6    Q.    And what changes did you tell him
7 that FGIC would seek?
8    A.    He had questions about the
9 recoveries on the reimbursements, and he had
10 questions related to how certain trusts might be
11 treated, and I communicated back to him that we
12 would make all of that information available in a
13 public forum as part of the updated plan that
14 ultimately was filed.  And I communicated back to
15 him.  I believe that I did not have the
16 information about the trust that he was concerned
17 about, counsel did.  But I communicated back to
18 him that the trusts that he had concerns about
19 would not be affected.
20    Q.    Would not be affected?
21    A.    Would not be affected.
22    Q.    And did he say anything in response
23 like thank you or good to hear or anything?
24    A.    Yes, he did.
25    Q.    What did he say?

45  (Pages 174 to 177)

Page 178

1              J. DUBEL - CONFIDENTIAL
2         A.   He invited me out for drinks
3    afterwards.
4         Q.   Did you have drinks with him?
5         A.   No.
6         Q.   You thought that your last
7    conversation with him was June 10th, I think.  Is
8    that correct?
9         A.   On or about -- on or about that.
10         Q.   Is there a reason why you remember
11    that date?
12         A.   I do remember that it was June 4th.
13    When you say conversations, I'm also referring
14    to -- he might have sent me an e-mail on or about
15    that -- not a conversation but an e-mail
16    communication.
17         Q.   Okay.  And do you remember having a
18    conversation with him after June 4th?
19         A.   I don't remember the exact date.  I
20    do recall -- I don't remember whether it was a
21    phone call or an e-mail in which he asked to talk
22    to me about the issues surrounding the settlement
23    agreement, and as I recall I told him that I would
24    have to see if there was anything that I could say
25    that was -- if I could talk to him in a manner

Page 179

1              J. DUBEL - CONFIDENTIAL
2    that was public because I was cognizant of his not
3    wanting to obtain material non-public information.
4         Q.   And what did he say in response to
5    your saying that?
6         A.   I don't remember.  It was something
7    to that effect of fine.  If you can, great.  If
8    not -- you know, something to that effect.
9         Q.   And did you get back to him?
10              MR. SIDMAN:  Object to the form.
11         A.   I -- I don't recall.
12         Q.   This would be in June.  So last
13    month we're talking about.  You don't recall if
14    you got back to him after that?
15              MR. SIDMAN:  Objection.  Asked and
16         answered.
17         A.   I did not have any phone
18    conversations with him.  I don't recall if there
19    was an e-mail conversation.
20         Q.   Okay.  And there might be e-mails
21    that were exchanged or there are e-mails that you
22    exchanged with him back and forth.  Is that
23    correct?
24              MR. SIDMAN:  Object to the form.
25         Q.   And I'll limit myself to 2013.

Page 180

1              J. DUBEL - CONFIDENTIAL
2         A.   Yes.
3         Q.   Do you view him as a friend?
4              MR. SIDMAN:  Objection.
5         A.   I view him as a business associate.
6         Q.   In these conversations and
7    communications that you had with him in 2013, you
8    did not tell him anything about the settlement
9    agreement or the negotiations relating to the
10    settlement agreement.  Is that correct?
11              MR. SIDMAN:  Objection.  Asked and
12         answered.
13         A.   All of the information about the
14    mediation process which the settlement agreement
15    was part of, were all subject to a variety of
16    confidentiality agreements, and I had no knowledge
17    that he had, you know, signed the confidentiality
18    agreements.  So I would not have disclosed
19    anything because I would not have wanted to
20    violate the confidentiality agreements.
21         Q.   Okay.  So you didn't have any such
22    communications with him in writing, orally, over
23    drinks, anywhere, about the Settlement Agreement
24    that was being negotiated or discussions about
25    commutation.  Is that fair and accurate?

Page 181

1              J. DUBEL - CONFIDENTIAL
2              MR. SIDMAN:  Object to the form.
3         A.   During what time frame are you
4    referring to?
5         Q.   Up to June 4th of 2010 -- 2013.
6         A.   On or about June 1st, he made a
7    reference to the Settlement Agreement that at that
8    point was a publicly filed document in a
9    conversation that we had that was not related to
10    it.  He made some references to it, but, again,
11    because he was not wanting to get non-public
12    information, I could not talk about it.
13         Q.   Prior to June 1st of 2013, you
14    didn't have any -- strike that.
15              Prior to the public disclosure of
16    the Settlement Agreement, you did not have any
17    discussion with him where you identified the
18    Settlement Agreement, the negotiations or the
19    potential that there would be a commutation of
20    policies.  Is that fair and accurate?
21              MR. SIDMAN:  Objection to form.
22         You can answer.
23         A.   As I said earlier, I would have
24    been -- you know, I wouldn't have done that
25    because I would not have wanted to violate any of

Page 182

1    J. DUBEL - CONFIDENTIAL
2  the confidentiality agreements that were in place.
3    Q.   Understood.  I just want to be sure
4  you didn't.  I understand you didn't want to, but
5  testimony is funny.
6    You didn't have such conversations.
7  Correct?
8    MR. SIDMAN:  Object to the form.
9    A.   I did not.
10    MR. BAIO:  Okay.  Thank you.  Let's
11  take a short break.  We're running in to time
12  issues.  I do have more than would be needed,
13  but we'll talk right after the break.
14    THE VIDEOGRAPHER:  Going off the
15  record.  The time is 6:18 p.m.
16    (Recess taken.)
17    THE VIDEOGRAPHER:  Back on the
18  record.  The time is 6:29 p.m.
19    Q.   Mr. Dubel, do you recall executing
20  a -- an affidavit in December of 2012 and
21  submitting it to the supreme Court of New York in
22  connection with the rehabilitation matters?
23    A.   I recall executing an affidavit.  I
24  had nothing to do with the submission of it.  It
25  was done through counsel.

Page 183

1    J. DUBEL - CONFIDENTIAL
2    Q.   Okay.  But you read the declaration
3  and you signed it because you thought it was
4  accurate.  Correct?
5    MR. SIDMAN:  Object to the form.
6    A.   I believe it was an affidavit.  I'm
7  not sure if a declaration is the same thing.
8    Q.   Okay.  No, it was an affidavit.  I
9  just -- because time's ticking, I don't have a lot
10  of questions about it, but I can show you if you
11  want to see it, as long as you promise not to take
12  more than one minute.
13    A.   If you have questions about it,
14  obviously, you know --
15    Q.   Okay.  You made references to the
16  base case and other work that was done by a number
17  of outside experts, including Lazard.  Do you
18  recall that?
19    A.   In the affidavit?
20    Q.   Yes.
21    A.   I hate to do this, but if you show
22  it to me, I'll look at it quickly.
23    Q.   Okay.  We're going to have it --
24    MR. BAIO:  Yeah, let's mark it as
25  Exhibit 5.

Page 184

1    J. DUBEL - CONFIDENTIAL
2    (Dubel Exhibit 5 marked for
3  identification.)
4    Q.   My only question is:  Is this the
5  declaration, first at least, that you submitted to
6  the court in December of 2012?
7    MR. SIDMAN:  Counselor, he
8  testified earlier he didn't submit anything.
9  He signed it.
10    MR. BAIO:  I'm sorry.  I apologize.
11    Q.   Is this the one that you executed o
12  or about the date it bears, December 12th, 2012?
13    A.   Again, it was an affidavit, not a
14  declaration.
15    Q.   Yes, affidavit.  I'm sorry.
16    A.   And I would have executed it on the
17  12th of December, 2012.
18    Q.   Okay.  And -- and -- and did you
19  read it before you executed it?
20    A.   Yes.
21    Q.   Did you believe it was accurate?
22    A.   I do.
23    Q.   And there are references if you
24  look at page -- if you look at page 9, one of the
25  sentences there, which appears about eight lines

Page 185

1    J. DUBEL - CONFIDENTIAL
2  above paragraph 18, it says, "Even though FGIC
3  initially only expects to pay 17.25 percent of
4  permitted policy claims, with greater payments
5  likely over time, since FGIC is actually paying
6  such claims, it is always in FGIC's interest to
7  maximize the value of the collateral and,
8  therefore, minimize losses to policyholders and
9  FGIC's overall obligations to FGIC's
10  policyholders."
11    Do you see that language?
12    A.   I do.
13    Q.   And did you believe that was
14  accurate at the time that you executed this?
15    A.   I would want to refresh my
16  recollection and read the whole paragraph because
17  you're taking a piece of the paragraph out, so if
18  you just give me one quick second.
19    Q.   Sure.  Accurate?
20    A.   I understand.  I -- when you say --
21  mean accurate, I mean, it's -- I believe what it
22  says.
23    Q.   Okay.  Now, you recall also that
24  there was the affidavit which is Exhibit 3 that
25  was put in by the Lazard representative.  Correct?

Page 186

1          J. DUBEL - CONFIDENTIAL
2      A.   I do recall it, yes.
3      Q.   And you had seen that before and
4  after it was filed.  Correct?
5          MR. SIDMAN:  Objection.  That's not
6  what he said, actually.
7      A.   No, I have not.
8      Q.   Okay.  You had never seen it?  Even
9  as you sat here today, you had not seen it?
10     A.   That's not what I testified to
11 earlier.
12     Q.   Okay.  Have you seen it before?
13     A.   Before when?
14     Q.   Before today.
15     A.   I have.
16     Q.   When was the first time you saw it?
17     A.   I believe, as I testified earlier,
18 it was on or shortly after it was -- it was filed.
19     Q.   Now, since the time that was filed,
20 has Lazard done any more analyses for FGIC?
21         MR. SIDMAN:  Yes-or-no question.
22 You can answer the question whether you know,
23 yes or no.  But I'm instructing the witness
24 not to reveal any -- any substance with
25 respect to that, to any analysis which may or

Page 187

1          J. DUBEL - CONFIDENTIAL
2  may not have occurred.
3      A.   I'm sorry.  Could you repeat the
4  question?
5      Q.   Has Lazard done any work for FGIC
6  since December of 2012 concerning any analysis of
7  claims, exposures and the like?
8      A.   No.
9          MR. SIDMAN:  Object to the form.
10     Q.   Okay.  Has it done a base case
11 analysis or updated any of its data?
12     A.   I -- I do not know.
13     Q.   Does Lazard -- have you met with
14 Lazard since December of 2012?
15     A.   Yes.
16     Q.   When is the most recent time that
17 you met with them?
18     A.   I really don't recall.
19     Q.   Within the last month?
20     A.   No.
21     Q.   Have you seen any reports that they
22 generated in 2013?
23         MR. SIDMAN:  Object to the form.
24     A.   No.
25     Q.   Have you seen any summaries of

Page 188

1          J. DUBEL - CONFIDENTIAL
2  reports that they have generated?
3          MR. SIDMAN:  Object to the form.
4      A.   No.
5      Q.   Have they done any work for FGIC in
6  2013?
7          MR. SIDMAN:  Object to the form.
8  They don't do work for FGIC, but --
9      A.   No.
10     Q.   Do they do work for a
11 representative of FGIC?
12     A.   They have been retained by counsel
13 Weil Gotshal.
14     Q.   All right.  And have they done work
15 for Weil Gotshal on behalf of FGIC or in
16 connection with Weil Gotshal's representation of
17 FGIC in 2013?
18         MR. SLACK:  Object to the form.
19 And you can answer that yes or no.
20     A.   Would you repeat the question?
21     Q.   Yes.
22          Has Lazard done any work for Weil
23 in connection with these matters in 2013?
24         MR. SIDMAN:  Once again, yes or no.
25     A.   I don't know.

Page 189

1          J. DUBEL - CONFIDENTIAL
2      Q.   You don't know whether they've done
3  any analysis for Weil in connection with these
4  matters?
5          MR. SIDMAN:  Objection.  Asked and
6  answered.
7          MR. SLACK:  And I object to the
8  form of the question.
9      Q.   Okay.  Go ahead.  You can answer
10 it?
11     A.   I don't know.
12     Q.   Who would know?
13     A.   Weil.
14     Q.   Okay.  Did you reach any conclusion
15 as to whether the proposed settlement is in the
16 best interest of policyholders?  You personally.
17     A.   Yes.
18     Q.   And what conclusion did you reach?
19     A.   I reached the conclusion that the
20 Settlement Agreement or settlement is in the best
21 interest of all of FGIC's policyholders.
22     Q.   All of them collectively?
23     A.   FGIC's policyholders, yes.
24     Q.   Not any subgroup.  Did you do any
25 analysis, yourself, as to whether any subgroup of

48 (Pages 186 to 189)

Page 190

1              J. DUBEL - CONFIDENTIAL
2    policyholders was relatively disadvantaged as a
3    result of the settlement?
4              MR. SIDMAN:  Object to the form.
5         A.   I don't know what you mean by
6    "relatively disadvantaged."
7         Q.   That they get less than other
8    policyholders get.  Did you do any analysis on
9    that?
10             MR. SIDMAN:  Object to the form.
11        A.   The settlement agreement
12   contemplates an upfront payment that would de-risk
13   all future issues for those claims so that there
14   would be an immediate upfront payment that would
15   settle all the future -- pending and future
16   claims.
17             So we looked at that to determine
18   if that would make sense for FGIC.  We did not
19   look at it specifically for individual trusts
20   because we were discussing and negotiating with
21   the policyholders on who were our policyholders in
22   those trusts.
23        Q.   And when you say "policyholders,"
24   whom do you mean?
25        A.   The policyholders, the trustees.

Page 191

1              J. DUBEL - CONFIDENTIAL
2              MR. BAIO:  I have more questions.
3    We're at the four o'clock time.  I'll ask one
4    thing.
5         Q.   If the Settlement Agreement is
6    approved, do you personally benefit through any
7    compensation arrangement?
8         A.   No.
9              MR. BAIO:  So, you know, I'm ready
10   to continue, if you'll let me.
11             MR. SIDMAN:  We have an order from
12   the judge saying to cut the depositions off at
13   four hours.
14             MR. BAIO:  All right.  We all are
15   reserving our rights.
16             THE VIDEOGRAPHER:  This will end
17   Videotape No. 4 of the deposition of John
18   Dubel and conclude the recording of this
19   deposition.  We're going off the record at
20   approximately 6:40 p.m., July 10, 2013.
21             (Discussion off the record.)
22             MR. SIDMAN:  At the conclusion of
23   the deposition, my client has indicated that
24   he wants to clarify one of his answers that he
25   just gave.  So I'm going to allow him this

Page 192

1              J. DUBEL - CONFIDENTIAL
2    opportunity to do that on the record.
3         A.   There was a question that you asked
4    about the information -- and I don't remember the
5    exact answer, but the information --
6         Q.   All right.  We can read it.  It may
7    be a good way to do it.
8         A.   That Weil and Lazard were doing, so
9    I just want to make sure.
10             (Discussion off the record.)
11             (The requested portion of the
12        record was read.)
13        A.   I did not direct Weil -- I mean,
14   Weil or -- I don't direct Weil or Lazard.  They
15   may have done work for Weil in connection with
16   matters since then.  We don't see them -- we,
17   FGIC, don't always see them.  So I don't know all
18   of the different things that they have done.  I
19   believe that they looked at this Settlement
20   Agreement to give advice to Weil, but I don't know
21   what exactly they did.  I just wanted to make sure
22   I was accurate.
23
24             (Continued on the next page to
25        allow for signature line and jurat.)

Page 193

1              J. DUBEL - CONFIDENTIAL
2              MR. BAIO:  Fair enough.  Thank you.
3    Accuracy is good.
4              (Time Ended:  6:45 p.m.)
5
6
7              _____
8              JOHN S. DUBEL
9
10   Subscribed and sworn to
11   before me this    day
12   of        , 2013.
13
14   _____
15
16
17
18
19
20
21
22
23
24
25

49 (Pages 190 to 193)

## Page 194

```
1
2                INDEX:
3  WITNESS        EXAM BY:        PAGE:
4  J. Dubel    Mr. Goodman        9
5              Mr. Baio        142
6
7
8
9            EXHIBITS
10 Exhibit No.                    Page:
11 Dubel Exhibit 1   Disclosure Statement    69
                    For Plan of Rehabilitation
12                  For FGIC
13 Dubel Exhibit 2   Plan Approval Order    81
14 Dubel Exhibit 3   Affidavit of Michael W.   100
                    Miller
15
                Dubel Exhibit 4   Exhibit 2        127
16
   Dubel Exhibit 5   Affidavit of John S.    184
17                  Dubel
18
19
20
21
22
23
24
25
```

## Page 195

```
1
2        LITIGATION SUPPORT INDEX
3
4  DIRECTION TO WITNESS NOT TO ANSWER
5     Page   Line   Page   Line
6        (NONE)
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS
9     Page   Line   Page   Line
10       (NONE)
11
12   INFORMATION TO BE FURNISHED
13     Page   Line   Page   Line
14       (NONE)
15
16   QUESTIONS MARKED FOR A RULING
17     Page   Line   Page   Line
18       (NONE)
19
20
21
22
23
24
25
```

## Page 196

```
1
2            CERTIFICATE
3  STATE OF NEW YORK )
4              )ss:
5  COUNTY OF NEW YORK)
6     I, JOMANNA DeROSA, a Certified
7  Shorthand Reporter and Notary Public within
8  and for the States of New York, New Jersey,
9  California and Arizona, do hereby certify:
10     That JOHN S. DUBEL, the witness
11 whose deposition is hereinbefore set forth, was
12 duly sworn by me and that such deposition is a
13 true record of the testimony given by such
14 witness.
15     I further certify that I am not
16 related to any of the parties to this action
17 by blood or marriage, and that I am in no
18 way interested in the outcome of this
19 matter.
20     In witness whereof, I have hereunto
21 set my hand this 11th day of July, 2013.
22
23     _____
24
25            JOMANNA DeROSA
```

## Page 197

```
1
2        * * *ERRATA SHEET* * *
3
4  NAME OF CASE:  In Re: Residential Capital
5  DATE OF DEPOSITION:  7/10/13
6  NAME OF WITNESS:  John S. Dubel
7  Reason codes:
8     1. To clarify the record.
      2. To conform to the facts.
9     3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
   From _____ to _____
11
   Page _____ Line _____ Reason _____
12 From _____ to _____
13 Page _____ Line _____ Reason _____
   From _____ to _____
14
   Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
   From _____ to _____
17
   Page _____ Line _____ Reason _____
18 From _____ to _____
19 Page _____ Line _____ Reason _____
   From _____ to _____
20
21     _____
22       JOHN S. DUBEL
23
24
25
```

## Deposition Errata Sheet

### *In re Residential Capital, LLC, et al.*
### Case No. 12-12020 (MG)

Deponent:              John S. Dubel
Deposition Date:       July 10, 2013

## WITNESS CORRECTIONS

| Page | Line | Correction | Reason |
|------|------|------------|--------|
| 18 | 17 | Insert "material" after "be" | Clarification |
| 27 | 4 | Delete "been" | Clarification |
| 36 | 3 | Replace "became" with "came" | Transcription error |
| 41 | 18 | Delete "in --" | Clarification |
| 47 | 17 | Replace "ensured" with "insured" | Transcription error |
| 55 | 11 | Replace "policy" with "group" | Clarification |
| 56 | 20 | Replace "policy" with "group" | Clarification |
| 73 | 14 | Delete "there have been payment --" | Clarification |
| 81 | 14 | Replace "Lynn Cohen" with "Ling-Cohan" | Transcription error |
| 81 | 15 | Replace "Lynn Cohen" with "Ling-Cohan" | Transcription error |
| 83 | 14 | Delete "I" | Transcription error |
| 93 | 16 | Delete "it" | Clarification |
| 130 | 9 | Insert "and" after "trusts" | Clarification |

Dated:  August _9_, 2013

By: _____
John S. Dubel
Deponent

Sworn and Subscribed to before me this
9th day of August 2013

_____
Notary Public

Camille A. Taylor
Notary Public, State of New York
No. 43-01TA4994058
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires March 30, 20 14