# Exhibit 4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------X
In Re: ) Case No.
) 12-12020 (MG)
RESIDENTIAL CAPITAL, LLC, )
et al., ) Jointly Administered
) Bankr. S.D.N.Y.
Debtors. )
----------------------------X

CONFIDENTIAL

DEPOSITION OF MAMTA SCOTT
Chicago, Illinois
Thursday, July 18, 2013

Reported by:
PAULA CAMPBELL, CSR, RDR, CRR, CCP
JOB NO. 63796

July 18, 2013
11:05 A.M.

Discovery deposition of MAMTA SCOTT, held at the offices of MAYER BROWN, 71 South Wacker Drive, Chicago, Illinois, pursuant to notice before Paula Campbell, CSR, RDR, CRR, CCP.



A P P E A R A N C E S:

WILLKIE FARR & GALLAGHER
Attorneys for Monarch, Stonehill, Bayview and CQS
787 Seventh Avenue
New York, New York 10019
BY: EMMA JAMES, ESQ.

SEWARD & KISSEL
Attorneys for U.S. Bank and the witness
One Battery Park Plaza
New York, New York 10004
BY: MARK KOTWICK, ESQ.

U.S. BANK
214 N. Tyron Street
Charlotte, North Carolina 28202
BY: SUZANNE CRESS WILLIAMS, ESQ.

JONES DAY
Attorneys for FGIC
222 East 41st Street
New York, New York 10017
BY: BART GREEN, ESQ.

MOSS & KALISH
Attorneys for Freddie Mac
122 East 42nd Street
New York, New York 10168
BY: DAVID GELFARB, ESQ.

DECHERT
Attorneys for Bank of New York Mellon
1095 Avenue of the Americas
New York, New York 10036
BY: REBECCA KAHAN, ESQ. (telephonically)

MORRISON & FOERSTER
Attorneys for the Debtor
1290 Avenue of the Americas
New York, New York 10104
BY: DAVID ZIEGLER, ESQ. (telephonically)



KRAMER LEVIN NAFTALIS & FRANKEL
Attorneys for the Official Committee of Unsecured Creditors
1177 Avenue of the Americas
New York, New York 10036
BY: PHILIP KAUFMAN, ESQ. (telephonically)

ALSTON & BIRD
Attorneys for Wells Fargo
90 Park Avenue
New York, New York 10016
BY: WILLIAM HAO, ESQ. (telephonically)

ROPES & GRAY
Attorneys for the Steering Committee of RMBS Holders
800 Boylston Street
Boston, Massachusetts 02199
BY: ANDREW DEVORE, ESQ. (telephonically)

SEWARD & KISSEL
Attorneys for Law Debenture Trust Company of New York
One Battery Park Plaza
New York, New York 10004
BY: MICHAEL WEITMAN, ESQ. (telephonically)



CONFIDENTIAL - M. SCOTT

MR. KOTWICK: This is Mark Kotwick. This is the Mamta Scott deposition. If this is not what you thought it was, feel free to log off. Otherwise, I think what we are going to do is just go around the room and introduce the counsel who are here and then maybe take a roll call on the phone so the court reporter knows who is present and attending either telephonically or otherwise.

Why don't we start at the one end of the table.

MR. GELFARB: Good morning. David Gelfarb, G-e-l-f-a-r-b, representing Freddie Mac.

MS. JAMES: I'm Emma James, Willkie Farr & Gallagher, and I'm here representing Monarch, Stonehill, CQS and Bayview.

MR. KOTWICK: My name is Mark Kotwick. I'm with Seward & Kissel. I represent U.S. Bank as indenture trustee as well as the witness, Mamta Scott, who is seated to my right.

MS. WILLIAMS: Suzanne Williams, in-house counsel at U.S. Bank here representing U.S. Bank and the witness.

MR. GREEN: Bart Green of Jones Day on

behalf of Financial Guaranty Insurance Company.

MR. KOTWICK: That's it for the people in the room. If the people on the phone could introduce themselves, please.

MR. KAUFMAN: Philip Kaufman, Kramer Levin, on behalf of the Official Committee of Unsecured Creditors.

MR. GELFARB: Can you spell your name?

MR. KAUFMAN: K-a-u-f-m-a-n.

MR. KOTWICK: Kaufman, K-a-u-f-m-a-n, Philip.

MS. KAHAN: Rebecca Kahan, K-a-h-a-n, from Dechert, on behalf of the Bank of New York Mellon Trust Company, N.A., as trustee or indenture trustee.

MR. ZIEGLER: David Ziegler from Morrison & Foerster on behalf of the debtor. That's Z-i-e-g-l-e-r.

MR. KOTWICK: It's Ziegler, Z-i-e-g-l-e-r.

MR. ZIEGLER: Morrison & Foerster.

MR. HAO: William Hao, H-a-o, of Alston & Bird on behalf of Wells Fargo Bank.

MR. WEITMAN: Mike Weitman, W-e-i-t-m-a-n, from Seward & Kissel and on behalf of Law





Debenture Trust Company of New York.

MR. DEVORE: Andrew Devore, D, as in dog, e-v, as in Victor, o-r-e, of Ropes & Gray on behalf of the Steering Committee of RMBS Investors.

MS. JAMES: Anyone else on the phone? Okay. Good morning, Ms. Scott.

REPORTER: Would you please raise your right hand.

M A M T A S C O T T,

called as a witness, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. JAMES:

Q. All right. Ms. Scott, can you tell me what your role at U.S. Bank is?

A. I am a vice president and a default account -- Default Group account manager.

Q. Okay. And how long have you had that position?

A. I've been with U.S. Bank for two and a half years.

Q. Two and a half years. And when did you first become involved with matters relating to the





ResCap bankruptcy?

A. Approximately two weeks before they filed for bankruptcy.

Q. Okay. And have you had any responsibility or involvement with the FGIC rehabilitation proceedings in New York state court?

A. No.

Q. Okay. Does someone in your department have involvement with the FGIC rehabilitation proceedings?

A. Yes.

Q. Yes. Who is that?

A. Laura Moran.

Q. And what's Laura Moran's title?

A. She is also a Default Group account manager. I also believe she is a vice president of the bank.

Q. Okay.

MR. KOTWICK: Hey, could I ask the people who are on the phone to please put it on mute, please, unless you are going to be speaking. Thank you.

Q. Ms. Scott, how many people are in your Default Group?





A. I would say approximately 28 account managers.

Q. Okay. And Ms. Moran is in the same Default Group as you are?

A. Yes.

Q. Okay. Who do you report to?

A. Tim Pillar, P-i-l-l-a-r.

Q. And what's Mr. Pillar's title?

A. The same, Default Group account manager. He is also a vice president.

Q. What have your responsibilities been in connection with the ResCap bankruptcy?

A. To pull together all of the affected transactions, pull together all of the documents related to those transactions, review any motions, anything that we would file on behalf of the bank, understand the claims involved. Several responsibilities. The list goes on and on.

Q. Is it fair to say that the -- that matters relating to the ResCap bankruptcy have taken up a significant amount of your time since two and a half weeks before they filed for bankruptcy?

MR. KOTWICK: Objection to the form.

A. That's correct.

Q. The court reporter has marked as Scott Exhibit 1 the Notice of Deposition to U.S. Bank, and that's in front of you now. Feel free to take a look at it.

(Scott Exhibit 1 marked for identification.)

Q. Have you seen that before?

A. Yes.

Q. Okay. And when did you first see this?

A. I can't recall the exact date, but a few weeks back. Yeah, I can't remember the exact date.

Q. Okay. And have -- did you meet with counsel in preparation for this deposition today?

A. I did.

Q. When did you first meet with counsel?

A. July 3rd.

Q. July 3rd, okay. Did you meet with counsel in connection with this deposition at any other time?

A. Yes.

Q. When was that?

A. Yesterday.

Q. And approximately how long did you meet on July 3rd?





A. I would say approximately five hours.

Q. Okay. And how long did you meet yesterday?

A. Approximately seven hours.

Q. Okay. Did you do anything else in preparation for this deposition today, other than meeting with counsel?

A. No.

Q. Did you review any documents in preparation for this deposition today?

A. I did.

Q. Okay. And that was with counsel?

A. That's correct.

Q. Did you take the time to look over your own files in connection with the ResCap bankruptcy and, more specifically, the FGIC settlement agreement?

MR. KOTWICK: Objection to the form.

A. I did review certain documents, you know, after meeting with counsel, yeah.

Q. Okay. And what documents were they?

A. I went over my declaration. I can't remember, you know, exactly all of the other documents involved.

Q. Okay. And when you say your declaration, are you referring to the declaration that was filed





along with the trustees' joinder to the 9019 motion to approve the FGIC settlement agreement?

A. That's right.

Q. And we will -- we will look at that shortly. I'm going to ask the reporter to mark now as Scott Exhibit 2 the debtors' motion pursuant to federal rules of bankruptcy 9019 for approval of the settlement agreement among the debtors, FGIC, the FGIC trustees, and certain institutional investors.

(Scott Exhibit 2 marked for identification.)

Q. Have you seen this before, Ms. Scott?

A. Yes, I believe I've seen this.

Q. Okay. And when did you first see this document?

A. I can't recall.

Q. Did you see it before it was filed with the court?

A. No, I don't -- I don't believe so.

Q. Okay. And do you have an understanding as to what is discussed in this document?

MR. KOTWICK: Answer yes or no, please.

A. Yes.

Q. Okay. Maybe we will go through it. If you





look at paragraph 1 on the first page, it's after the table of authorities, it states, "The debtors seek approval of a settlement agreement involving 47 separate securitizations with securities insured by FGIC, each a FGIC insured trust and collectively the FGIC insured trusts."

Is U.S. Bank a trustee or an indentured trustee in connection with some or all of these 47 trusts?

A. Yes.

Q. How many trusts is U.S. Bank the trustee or indentured trustee for out of these 47?

A. Eight.

Q. Eight. The next sentence goes on to say, "The settlement agreement provides for a broad release of claims asserted by both FGIC and the FGIC trustees in connection with the FGIC insured trusts."

What's your understanding of the broad release of claims that were asserted by FGIC and the FGIC trustees?

MR. KOTWICK: I'm going to object and caution the witness to exclude from her answer any information she may have learned through a

conversation with counsel.
You can answer the question otherwise.
A. Can you repeat the question?
Q. Sure.
What's your understanding of the broad release of claims that were asserted -- let me rephrase it.
What's your understanding of the claims that were asserted by FGIC and the FGIC trustees? Let's start with the claims asserted by FGIC.
A. I don't believe I can answer the question.
Q. Okay. Let's look at paragraph 2, which defines the FGIC claims, and it says that "The settlement agreement," and here we are referring to the FGIC settlement agreement, "resolves three proofs of claim filed by FGIC totaling 5.55 billion in the aggregate."
Do you see that?
A. I do.
Q. All right. Does that help you understand what the FGIC claims are?
A. It does not.
Q. Okay. Let's go on to paragraph 3, which discusses the FGIC trustees' claims. You understand





that -- you just told me that U.S. Bank is trustee, or indentured trustee to eight of the 47 trusts involved here; correct?
A. That's right.
Q. Okay. So I assume that the FGIC trustee claims include claims made by U.S. Bank; is that correct?
A. It might mean that.
Q. Okay. Did U.S. Bank, as trustee or indentured trustee, assert any claims against the ResCap debtors in connection with the bankruptcy?
MR. KOTWICK: Objection to the form.
A. Can you repeat the question?
Q. Sure.
Did the FGIC trustees, including U.S. Bank, assert any claims against the debtors in connection with the ResCap bankruptcy?
MR. KOTWICK: Ms. James, do you mean proofs of claim?
MS. JAMES: I mean proofs of claim.
MR. KOTWICK: Thank you.
A. Yes.
Q. Okay. And is it your understanding that those proofs of claim have an aggregate total of





5.41 billion?
MR. KOTWICK: Objection to the form.
A. It appears that that's what it says here in paragraph 3.
Q. Okay. And do you understand that the FGIC settlement agreement releases those claims in varying amounts of up to 5 billion against each of the 51 debtors?
MR. KOTWICK: Objection to the form, to the extent you've got an understanding outside of your discussions with counsel.
A. I -- I mean, I would need to refer to the settlement agreement to confirm.
Q. Okay. Is it your understanding that as part of this agreement the FGIC trustees released some claims of some amount against the debtors' estate?
A. By debtor, are you referring to ResCap?
Q. I'm referring to ResCap and the ResCap affiliated entities considered debtors in the ResCap bankruptcy.
A. Okay. Can you repeat the question?
Q. Sure.
Is it your understanding that as part of





the FGIC settlement agreement, the FGIC trustees released some claims of some amount against the debtors' estate?
A. I don't think I have an understanding of that.
Q. Okay. Did U.S. Bank perform any analysis of the value of the claims it was asserting against the ResCap estate?
MR. KOTWICK: Objection to form.
A. For all of the trusts that were impacted for which we are trustee?
Q. Uh-huh.
A. Yes.
Q. Okay. And what value did U.S. Bank place on the claims it was asserting in the ResCap bankruptcy?
A. I don't recall.
Q. You don't recall. Okay.
All right. If you look at paragraph 5 of this 9019 motion, it's on page 3, it reads, "Following the court's appointment as mediator of United States Bankruptcy Judge James M. Peck and months of arm's-length negotiations, the debtors and most of the claimant constituencies reached a broad

settlement consisting of a Plan Support Agreement (the 'Plan Support Agreement') and Plan Term Sheet (the 'Plan Term Sheet'), each dated May 13, 2013, and the Supplemental Term Sheet dated May 23, 2013, for which the debtors separately seek court approval."

You understand there was a mediation in this case?

A. Yes.

Q. Were you involved in the mediation?

A. Yes.

Q. Okay. What was your involvement in the mediation?

A. I attended meetings. I was regularly involved in conversations with counsel about what was going on at the mediation.

Q. Okay. When was the first mediation meeting you attended in person?

A. Are you referring to a mediation session?

Q. I'm referring to a mediation -- mediation session, yes. Sorry.

MR. KOTWICK: Objection to the form.

MS. JAMES: Of the question that she rephrased or my initial question?





MR. KOTWICK: Of both questions. And my objection is to what both of you mean by "mediation session."

MS. JAMES: Sure.

Q. What do you understand a mediation to mean?

A. I believe there were two in-person lengthy sessions in around April and the beginning of May.

Q. Okay. And you attended those mediation sessions in person?

A. I did not.

Q. You did not, okay.

Did you attend any mediation sessions in person?

A. Any mediation related meetings outside of those two, I can't recall. I may have when it began end of December/early January. I can't remember.

Q. Okay. And who was at mediation -- who was at these mediation related meetings outside of the two that you recall occurring in April and early May?

MR. KOTWICK: Objection to the form.

A. I don't understand.

Q. You just stated that you attended mediation related meetings.





A. So the mediation was a lengthy process over five months. There could have been an in-person meeting early on that I may have attended. Outside -- are you asking who would have attended if I did not attend?

Q. Well, let's start -- let's start with the meetings early on that you could have attended. Are these -- were these meetings meetings in New York?

A. Yes.

Q. And did they take place at Kramer Levin?

A. Yes, they may have.

Q. Okay. They may have?

A. I don't want to speculate, so I mean, I can -- I just -- I don't know. I don't remember.

Q. Have you attended meetings at Kramer Levin in New York?

A. Yes.

Q. And those meetings were in connection, at least, with the ResCap bankruptcy?

A. That's right.

Q. Okay. Have you also attended meetings at Kramer Levin for other reasons?

A. For reasons other than the ResCap bankruptcy? No.





Q. Okay. But you have attended meetings at Kramer Levin in connection with the ResCap bankruptcy but not in connection with the mediation?

A. It may have been in connection with the mediation.

Q. May have been in connection with the mediation. Is U.S. Bank on the Official Committee of Unsecured Creditors?

A. Yes.

Q. Okay. Are any other FGIC trustees on that committee?

A. Yes.

Q. Who?

A. Bank of New York. I believe that's it.

Q. Okay. And how many meetings of the unsecured creditors' committee have you attended in person?

A. I couldn't say exactly.

Q. Are they once a month, twice a month?

A. I believe they are once a month currently.

Q. Okay. And how about the period -- for the period January 2013 through May 2013?

A. It wouldn't have been more than a couple of times.

Q. Okay. And are those the meetings that you are questioning whether they were mediation related meetings or simply ResCap bankruptcy related meetings?

A. That's right.

Q. Okay. And during these meetings, was the progress or status of the mediation discussed?

MR. KAUFMAN: This is Philip Kaufman. I object on the grounds that the committee deliberations are privileged.

MR. GREEN: I'm also going to object to the extent this is seeking discussions or information about mediation and mediation negotiations.

MR. KOTWICK: I'm going to allow the witness to answer yes or no to the initial question to see if she has any recollection.

A. And can you repeat the question?

Q. Sure.

During these meetings of the Official Committee of the Unsecured Creditors was the progress or status of the mediation discussed?

A. I don't recall.

Q. Okay. Other than your in-person attendance





at meetings of the unsecured creditors committee, did you attend any in-person meetings that solely concerned the mediation?

MR. KOTWICK: You can answer yes or no.

A. No.

Q. No, okay.

Did anyone else from U.S. Bank attend meetings solely regarding the mediation?

A. Yes.

Q. And who would that have been?

A. Laura Moran.

Q. Laura Moran, who you report to?

A. I don't report to her.

Q. I'm sorry. Laura Moran, who is -- who has responsibility for the FGIC rehabilitation proceedings at U.S. Bank?

A. That's right.

Q. Okay. Did you speak with Laura Moran about her participation in the meetings concerning the progress and status of the mediation?

A. I did.

Q. Okay. And what did Ms. Moran tell you about that -- those meetings?

MR. KOTWICK: I object and direct the





witness not to answer to the extent that it's going to reveal issues and discussions/negotiations that occurred within the mediation that are covered by the mediation order.

MR. GREEN: And I join in that objection.

A. I can't respond.

Q. Okay. You understand that as part of the 9019 motion that's in front of you describing the FGIC settlement agreement that the trustees have accepted on behalf of the trusts a lump sum payment from FGIC; correct?

MR. KOTWICK: Objection to the form.

A. The trustees have entered into a settlement agreement with FGIC.

Q. Okay. And do you have an understanding of the provision in that settlement agreement for a lump sum payment to be made to the trusts?

A. I do.

Q. Okay. What is that lump sum payment being -- in connection to?

A. I'm not sure I follow, what is it in connection to?

Q. Why is FGIC paying -- making a lump sum





payment to the trusts?

MR. GREEN: Objection to the form.

A. The 253 million will be a payment that is paid out to all 47 trusts in connection, I believe, with claims asserted by those trusts.

Q. And is that $253 million, does that $253 million secure the commutation of the FGIC policies wrapping those trusts?

MR. KOTWICK: Objection to the form.

A. Can you repeat the question?

Q. Does that $253 million secure the commutation of the FGIC policies wrapping the 47 trusts we discussed previously?

MR. KOTWICK: Same objection.

A. What do you mean by "secure the commutation"?

Q. In exchange for the $253.3 million, have the trustees agreed to the commutation of the FGIC policies wrapping the trusts --

MR. KOTWICK: Objection to the form.

Q. -- in question?

A. I mean that is a piece of the settlement.

Q. Okay. So the $253 million secures the commutation of the FGIC wrappers on those trusts?

MR. KOTWICK: Objection to the form. Asked and answered.
A. That -- yeah, that's a piece of the settlement agreement.
Q. Okay. All right. When was the first time that you learned of the possibility of these commutations?
MR. KOTWICK: Objection to the form.
A. The bank was approached --
MR. KOTWICK: Can you just -- just answer the question. The question was when -- when was the first time you learned of the possibility of these commutations.
A. End of March or early April.
Q. Okay. And how did you learn of the possibility of these commutations?
MR. GREEN: I'm going to object to the extent it's seeking information that is covered by the mediation privilege.
MR. KOTWICK: I'm going to allow the witness to answer that question in large part because it, I believe, is part of the declaration that was filed in connection with the 9019.





A. And can you repeat the question?
Q. Sure thing.
How did you learn of the possibility of these commutations?
A. We were approached by the steering committee.
Q. And who -- who is on the steering committee?
A. It's a group of institutional investors that are represented by Kathy Patrick.
Q. And do you have an understanding as to which institutional investors are part of the steering group?
A. I do not.
Q. Okay. Are the institutional investors that are part of this steering group holders of FGIC wrapped notes or certificates?
MR. DEVORE: Objection to form.
This is Andrew Devore.
MR. KOTWICK: Allow the witness to answer yes or no.
I'm sorry. Can you reread the question?
MS. JAMES: Would you reread the question?
(Record was read as requested.)





MR. KOTWICK: You can answer the question yes or no.
A. Yes.
Q. Are the institutional investors on the steering group also holders of non-wrapped notes or certificates issued by the debtor?
MR. DEVORE: Objection to form.
A. Yes.
Q. Do you have an understanding of the percentage ownership of the total universe of FGIC wrapped notes or certificates held by those on the institutional investors' steering group committee?
MR. KOTWICK: I'm going to object and direct the witness not to answer that question to the extent that she might have learned that information in the context of the mediation, which is subject to mediation order.
A. No.
Q. Did you do anything to find out the personal ownership held by the steering group of FGIC wrapped notes?
MR. KOTWICK: I'm going to object and direct the witness not to answer to the extent that any such efforts were made in the context





of the mediation.
A. I can't answer that.
Q. Is it important for you to know the percentage ownership held by the steering group of FGIC wrapped notes or certificates?
MR. KOTWICK: I'm going to object to the extent that the witness' knowledge in that respect or understanding is the result of any discussions with counsel.
To the extent that you have information outside of your conversations with counsel, you're free to answer that.
A. I can't answer the question.
Q. Okay. Do you have an understanding as to why the steering group approached U.S. Bank with a offer of commutation?
MR. DEVORE: Objection to form. Assumes facts not in evidence.
A. No.
Q. Who on the steering group approached U.S. Bank regarding the possible commutations?
A. I can't recall who it was exactly.
Q. And at this point did the steering group attach a dollar figure to the commutation offer?

MR. KOTWICK: Objection.
MR. DEVORE: Objection to form.
MR. KOTWICK: Objection to form. To the extent that information was part of the mediation discussion, I'm going to direct the witness not to answer the question on the basis of the mediation order.
A. I can't answer the question.
Q. Can you turn -- going back to Scott Exhibit 2, which is the 9019 motion, and look to paragraph 5 of that exhibit. It states, "The settlement agreement, while a standalone agreement, represents a critical component of the global plan agreement."
What's your understanding of what is meant by "standalone agreement"?
MR. KOTWICK: Objection to the extent that the witness, I think, has testified that she had not seen this document before today.
MS. JAMES: I don't think that was her testimony, Mark.
Q. You saw this document before today?
A. I believe I did. I'm not 100 percent sure.
MR. KOTWICK: To the extent you have an





understanding, you can -- you can testify.
A. And can you repeat the question?
Q. Sure.
In paragraph 5 it states that "The settlement agreement," it's referring to the FGIC settlement agreement, "is a standalone agreement."
Do you have an understanding as to what it means by standalone agreement?
A. I could speculate what is meant here, which I don't want to do.
Q. If you go further down that paragraph it says that "The agreement, along with the global plan agreement, was painstakingly negotiated with Judge Peck's assistance." Does that comment, in your understanding, include the FGIC settlement agreement or is it referring only to the global settlement agreement?
MR. KOTWICK: Objection to the form.
A. And I can't be certain what the person who drafted this meant.
Q. Okay. Will you turn to paragraph 21 of this motion.
A. (Witness complies.)
Q. The first sentence reads, "Concurrently





with the negotiations leading up to the completion of the supplemental term sheet, the settlement parties negotiated the terms of the settlement involving FGIC and the FGIC trustees that was acceptable to all of the settlement parties and supported by the -- by many of the debtors' claimant constituencies including each of the parties to the global plan agreement."
Do you see that?
A. I do.
Q. Okay. What is meant by "concurrently with the negotiations leading up to the completion of the supplemental term sheet"?
MR. KOTWICK: Objection to the form.
A. I couldn't speculate as to what it's -- what it means.
Q. Okay. And other than the steering group, who you have stated this morning approached U.S. Bank about the commutations, who else was involved in the negotiations that led to the FGIC settlement agreement?
MR. DEVORE: Objection to form.
A. I don't know.
Q. You don't know.





When the steering group approached U.S. Bank about the commutations, did they represent any other -- did they represent to you that other parties had been involved in the negotiations?
MR. KOTWICK: Objection.
MR. DEVORE: Objection to form. Assumes facts not in evidence.
MR. KOTWICK: Objection to the extent that any discussions surrounding the proposal that was made are going to be subject to the mediation privilege, and I'm going to direct the witness not to answer with respect to the substance of those discussions.
A. Yeah, I couldn't speak to who else was involved.
Q. Okay. If you -- if you look at the front of this motion, it discusses the parties that are signing up to this agreement; is that fair?
MR. KOTWICK: Emma, are we looking at the first page of the exhibit?
MS. JAMES: Yeah, we are looking at page 1 of the 9019, which states, in relevant part, that the settlement agreement is among the debtors, FGIC, the FGIC trustees, and the

institutional investors.
Q. Do you see that?
A. I do.
Q. Is it your understanding that those parties were involved in the negotiation of the FGIC settlement agreement?
A. It's my understanding that those are the parties that entered into the settlement agreement.
Q. Okay. Is it your understanding that all of them were involved in the negotiation of the FGIC settlement agreement?
A. I don't know who is involved in the negotiation.
Q. Okay. Was U.S. Bank involved in the negotiation of the FGIC settlement agreement?
A. No.
Q. It was not involved in the negotiation of the settlement agreement?
A. No.
Q. When was U.S. Bank first presented with the terms of the FGIC settlement agreement?
A. As I stated, I believe it was the end of March or early April.
Q. And U.S. Bank accepted all of those terms





without negotiation?
MR. KOTWICK: Objection to the form.
A. We reviewed the terms, vetted the terms, engaged a financial advisor to do an analysis.
Q. But did not negotiate any of the terms in the FGIC settlement agreement as presented to you?
A. We did not.
Q. Okay. Did the FGIC settlement agreement, as presented to U.S. Bank, change from the time it was first presented to U.S. Bank through the time it was executed?
MR. KOTWICK: Objection. I'm going to direct the witness not to answer to the extent that those discussions or any changes, if any, would have occurred during the mediation process, which is subject to the mediation order.
A. I can't answer the question.
MS. JAMES: Can we go off the record and take a break?
(Recess taken from 11:43 A.M. to 11:49 A.M.)
MS. JAMES: I'm going to hand you the exhibit -- I'm sorry. I'm going to hand to the





reporter an exhibit to be marked as Exhibit 3, which is the proposed order attached to debtors 9019 motion.
(Scott Exhibit 3 marked for identification.)
BY MS. JAMES:
Q. I will give you a moment to take a look at that, Ms. Scott.
A. Okay.
Q. Have you seen this document before?
A. Yes.
Q. Okay. When was the first time you saw this document?
A. I can't recall the exact date.
Q. Okay. And you understand that this document is a proposed order that if the court approves the 9019 motion it's being asked to enter?
A. Yes.
Q. Okay. And if you look at the second page of this proposed order, we see there is a heading that says, "Adjudged, found and determined"?
A. I do.
Q. And I'd like to draw your attention to paragraph C under that heading, which reads, "The





settlement agreement and the transactions contemplated thereby, including the releases given therein, are in the best interests of the debtors, their estates, their creditors, the investors in each trust, each such trust, the trustees, and all other parties in interest."
Do you see that?
A. I do.
Q. Do you believe that statement to be true?
A. I do.
Q. Why is the settlement agreement in the best interests of the debtors?
A. So my understanding is that as part of the global settlement, the global ResCap settlement that is -- parties would consider that to be in their best interests as they have signed up to it.
Q. So your basis for believing that the FGIC settlement agreement is in the debtors' best interest is that they have signed up to it?
A. That would be my understanding.
Q. Okay. How about the statement that "The settlement agreement and the transactions contemplated thereby, including the releases therein, are in the best interests of the trustees,"

what is your understanding as to why the FGIC settlement agreement is in the best interest of the trustees?

A. I think the trustees and the trusts and the holders, all of that goes hand in hand.

Q. Okay. And why -- why is this agreement in the best interest of the trustees, the trusts and the holders?

A. Well, I would say we are -- we have eight transactions for which we are trustee where we are paying premiums and not seeing any protection or payments by FGIC on claims. When we saw this proposal, we engaged Duff to do the analysis, do a comparison of this proposed settlement versus what was being offered in the rehabilitation plan. Duff, you know, provided insight. They provided feedback that the lump sum payment was within a range of reasonableness. They also highlighted the fact that there is a lot of uncertainty that surrounds what's being offered under the rehabilitation plan. So considering those facts and the facts that these trusts no longer have to pay premiums, we considered that to be in the trusts' best interests.

Along with that, we know that this





settlement, this FGIC settlement, is a part of the larger global ResCap settlement which for various factors we consider that to be in the best interest of the trusts and the holders. You know, there is a large -- a significant increase to the value of the estate because of the larger settlement. Given the AFI contribution, the larger settlement resolves a lot of potential litigation, you know, surrounding the 9019, the RMBS 9019, surrounding the claims for the additional settlement trusts, the cure claims, all of those have been allowed. The global settlement, it does a lot to stop the large accrual of administrative expenses.

So for various reasons we considered that to be in the best interest of holders. And then, you know, finally, these particular trusts, they have the ability -- they have allowed claims now within the ResCap bankruptcy. So several reasons.

Q. Okay. All right. Let's start with the trusts now having allowed claims in the bankruptcy.

What's your understanding as to the value of those allowed claims if the agreement goes through?

A. What's my understanding of the claims'





monetary -- what the amounts are? I would have to refer to the schedules.

Q. Okay. And you stated that another reason why it's in the best interest of the trusts is that the trusts would no longer have to pay premiums to FGIC; is that correct?

A. That's correct.

Q. And what value was placed on the -- on the premiums that are now no longer owed, should the settlement agreement go through?

A. I believe that is approximately 18 million.

Q. Okay. And you mentioned that it resolves potential litigation. What do you mean by that?

A. Well, there were objections filed related to the 9019. The committee, MBAA, filed some objections. There could have been potential litigation related to asserting claims for the trusts that were not included in the settlement, the 9019, the additional settlement trusts and the cure claims.

There were also intercreditor issues and litigation related to certain intercreditor issues.

Q. What issues were they?

A. For example, the trustees and the monolines





may have had the same claims in discussing, you know, subordination, and priority of those claims could have been an issue.

Q. And when you say that the monolines -- the monolines and the trustees may have had the same claims, you are referring to claims made against the ResCap estate?

A. That's correct.

Q. And the settlement agreement releases all of those claims, whether made by the monolines or by the trustees; is that correct?

MR. KOTWICK: Objection to the form.

A. Which settlement agreement?

Q. The FGIC settlement agreement.

A. And can you repeat the -- your question?

Q. The FGIC settlement agreement releases all of those claims, whether made by the monolines or by the trustees; is that correct?

MR. KOTWICK: Objection to the form.

A. I think what I was outlining was provisions under the global ResCap settlement.

Q. Okay. Not the -- not the debtors' motion pursuant to federal rules of bankruptcy 9019 for the approval of the settlement agreement among FGIC, the

debtors, the trustees and the institutional investors?
A. No, what I was just outlining had to do with the global settlement, the ResCap settlement.
Q. Okay. But why is the FGIC settlement agreement in the best interests of the investors and the trusts, each trust, and the trustees?
MR. KOTWICK: Objection to the form. Asked and answered.
A. Right, I think I went over that as, you know, the settlement -- the FGIC settlement itself, why that was in the best interest of investors, but what I was saying is this is also a piece of a larger global settlement which we consider to be in the best interest of holders.
Q. Okay. All right. You mentioned that the trustees engaged a financial advisor in connection with the FGIC settlement agreement; is that true?
A. Yes.
Q. And who was the financial advisor?
A. Duff & Phelps.
Q. And Duff & Phelps had previously been doing work with the trustees in connection with the broader bankruptcy; is that fair?





A. That's right.
Q. When was Duff & Phelps first asked to provide an opinion or perform analysis of the FGIC -- of the terms of the FGIC settlement proposal?
A. I don't -- I can't recall.
Q. Was it in January 2013?
A. It would have been shortly after we saw the proposal come through.
Q. Okay. And what was Duff & Phelps asked to do in connection with the FGIC settlement proposal?
A. At a very high level, they reviewed -- they compared the FGIC settlement to what was being offered under the rehabilitation plan.
Q. In order to perform that analysis, what -- what information was Duff & Phelps provided?
MR. KOTWICK: Objection to the form.
A. I can't speak to that.
Q. Did you meet with Duff & Phelps in connection with the FGIC settlement agreement or FGIC settlement proposal?
A. We did.
Q. When was the first time you met with Duff & Phelps in connection with the FGIC settlement





proposal?
A. I can't recall.
Q. Was it in March 2013?
A. Again, I can't -- I can't recall exactly.
Q. Was that an in-person meeting?
A. I don't know.
Q. You don't know, okay.
What was discussed during that meeting with Duff & Phelps?
A. I believe counsel was involved with any meetings with Duff & Phelps.
Q. But you -- you did meet with Duff & Phelps?
A. Counsel on behalf of U.S. Bank may have met with Duff & Phelps. If you are asking me personally, I was -- I attended, you know, the presentation that they provided after they did their analysis.
Q. Okay. And did you attend that presentation in person?
A. No, I attended over the phone. They did -- they did a web presentation.
Q. Okay. And do you recall the approximate date of that telephone call?
A. I don't. I don't.





Q. Were materials sent out to the participants on that telephone call in advance of the call?
A. I can't recall.
Q. Duff & Phelps provided a report to the trustees in connection with its analysis; correct?
A. That's right.
Q. Okay. Did Duff & Phelps provide a draft report?
A. Yes, I believe they did.
Q. Okay. How many drafts of the Duff & Phelps report did you receive?
A. I can't recall.
Q. Was the telephone call with Duff & Phelps in connection with the Duff & Phelps draft report or was it in connection with Duff & Phelps' final report to the trustees?
A. I can't recall.
Q. Was it just one telephone call?
A. That's my recollection.
Q. How long did that call last?
A. It was well over an hour.
Q. Well over an hour, okay.
And what happened during that call? Who did the talking?

A. I can't remember who did -- well, are you asking from Duff? I can't remember who led or -- it was a couple of different people.
Q. Okay. And it was mainly representatives of Duff & Phelps speaking on this call?
A. No. The participants asked questions as well.
Q. And who were the other participants on the call other than yourself?
A. I can't remember specifically. I know there were other trustee representatives and counsel for the trustees.
Q. Okay. Was FGIC on this call?
A. No.
Q. Was the rehabilitator on this call?
A. No.
Q. Was Lazard on this call?
A. No, not that -- I mean, I don't recall any of these people, no.
Q. Okay. Was there anyone else from the Official Committee of the Unsecured Creditors on this call?
A. I don't --
MR. KOTWICK: Objection to the form. Other





than the FGIC trustees who might have been --
MS. JAMES: That's fair, sorry.
Q. Other than the other FGIC trustees who were also on the UCC, were there any other representatives from the unsecured creditors committee on the call?
A. I don't believe so.
Q. Okay. During this call, did Duff & Phelps walk you through their analysis?
A. They did.
Q. Okay. And in order to do that did you have something in front of you to review?
A. I mentioned they had a WebEx, so the presentation was up online.
Q. Okay. But you are not sure whether you received a copy of what they were walking through in advance of the call?
A. I'm not sure.
Q. Okay. Did you at some point receive a copy of the draft Duff & Phelps report?
A. Whether it was a draft or final, I can't recall.
Q. Okay. Let's take a look at some of the documents that you received.





MS. JAMES: Handing to the court reporter to mark as Exhibit 4 a document Bates stamped USB-MS00068 through 00078.
(Scott Exhibit 4 marked for identification.)
Q. Ms. Scott, I'll give you a moment to take a look at that document.
A. Okay.
Q. Do you recognize this document?
A. Yes.
Q. Okay. And you'll see on the top of the first page it appears to be an e-mail coming from alves@sewkis.com to Mamta Scott. I assume that's you?
A. Yes.
Q. Laura Moran, I think you testified previously she was -- she is also in your group and is the individual responsible for the FGIC rehabilitation side -- rehabilitation proceedings; correct?
A. Yes.
Q. And also to James Byrnes. Who is James Byrnes?
A. He is also a member of the default group.





Q. And why was this e-mail sent to him?
A. He was working on matters related to the ResCap bankruptcy for a short period of time.
Q. Okay. When did Mr. Byrnes start working on the ResCap bankruptcy?
A. Probably mid-January through the end of April of this year.
Q. And were you working on the ResCap bankruptcy with Mr. Byrnes during that period, January through the end of April of this year?
A. I was not.
Q. You were not, okay.
Why did you stop working on the ResCap bankruptcy during that period?
A. I was on maternity leave.
Q. Okay. And have you spoken with Mr. Byrnes in connection with your preparation for this deposition today?
A. No.
Q. Do you know if Mr. Byrnes attended any meetings in connection with the FGIC proposal?
A. I don't believe he did. I can't say for sure.
Q. Okay. And you see that most of this e-mail

is redacted.
MR. KOTWICK: Objection to the form.
Q. Attached to this e-mail, and starting on page Bates stamped USB-MS00071 appears to be a report from Duff & Phelps.
What's your understanding as to what this report is?
A. My understanding is that this is Duff & Phelps' analysis of the comparison they did of the FGIC settlement versus what was being offered in the rehabilitation plan.
Q. Okay. And you see on the first page there it says, "Draft." Is this the draft report that you believe that you were sent?
A. It appears this -- yeah, this is the report that was sent to me.
Q. Okay. And when you received this report, did you review it?
A. I'm sure I did. I can't recall for sure.
Q. Okay. And do you know if Mr. Byrnes reviewed it?
A. I couldn't speak for him.
Q. Okay. And what about Ms. Moran?
A. I also could not speak for her.





Q. Okay. Did you speak with Ms. Moran or Mr. Byrnes about the contents of this draft report?
A. I do not believe I did.
Q. Okay. In connection with the FGIC settlement agreement, you signed that on behalf of U.S. Bank; is that correct?
A. I did.
Q. Okay. Whose permission did you need to secure within U.S. Bank before you were able to sign that agreement?
MR. KOTWICK: Objection to the form.
A. I'm a vice president of the bank. I'm an authorized signer. I'm able to sign on behalf of the bank, and I, you know, I vetted the terms of the agreement with my manager, his manager, some business line folks, so...
Q. Okay. And who were those people?
A. I believe I gave you my manager's name already, Tim Pillar. His manager, do you need the name?
Q. Yes, please.
A. Scott Strodhoff, S-t-r-o-d-h-o-f-f, and Diane Reynolds.
Q. And who is Diane Reynolds?





A. She is a manager in the -- I would say a manager of the account managers who work on the various RMBS transactions.
Q. Okay. And when you say that you vetted the terms of the agreement with Mr. Pillar, Mr. Strodhoff and Ms. Reynolds, what do you mean by that?
A. Well, I brought up the proposed settlement agreement on a group call, you know, outlined the terms of the agreement, walked them through, you know, Duff's analysis and kind of our internal process to see if there, you know, was any feedback or any issues. That's pretty much the extent of it.
Q. Okay. And when you say that you brought up the proposed settlement agreement on a group call, did you send them -- did you send Mr. Pillar, Mr. Strodhoff, and Ms. Reynolds the Duff & Phelps analysis before that call?
MR. KOTWICK: Objection to the form.
A. No.
Q. Did you send it to them at any time?
A. No.
Q. So on this call you simply gave a summary of Duff & Phelps' analysis?





A. That's right.
Q. Okay. Did Mr. Pillar, Mr. Strodhoff, or Ms. Reynolds raise any questions about the terms of the proposed settlement agreement?
MR. KOTWICK: Objection to the form.
A. Can you repeat the question?
(Record was read as requested.)
A. No.
Q. Did they have any concerns about the proposed settlement agreement?
MR. KOTWICK: Objection to the form.
A. No.
Q. Did they have any concerns about the Duff & Phelps analysis as you described it?
MR. KOTWICK: Objection to the form.
A. No.
Q. Did any of them have a different opinion as to the adequacy of the FGIC settlement agreement than the opinion you expressed during that call?
MR. KOTWICK: Objection to the form.
A. I don't think I expressed an opinion. I was laying out the facts.
Q. Okay. During that call did you -- did you state that you intended to sign the FGIC settlement

agreement on behalf of the bank?
A. No.
Q. When did you inform Mr. Pillar, Mr. Strodhoff, and Ms. Reynolds that you intended to enter into the FGIC settlement agreement on behalf of U.S. Bank?
MR. KOTWICK: Objection to the form.
A. I can't remember exactly when. It was very, very close to actually executing the agreement.
Q. Okay. And that agreement was executed on May 23rd, 2013; is that correct?
A. That's my recollection. I would need to confirm the date on the agreement.
Q. Okay. And when you informed them that you were going to enter into the agreement, did any of them raise any concerns?
MR. KOTWICK: Objection to the form.
A. No.
Q. Did any of them at any time receive a copy of the Duff & Phelps analysis?
A. No.
MR. KOTWICK: Objection to the form.
Q. Did you have any e-mail communications with





any of them regarding the FGIC settlement agreement or the Duff & Phelps analysis?
MR. KOTWICK: Objection to the form.
A. No.
Q. You didn't e-mail them to tell them that the FGIC settlement agreement had been executed?
A. Everything -- I find it easier to call people, quicker, and you can answer questions easier.
Q. Okay. What about when the FGIC settlement agreement was entered into, did you send them a copy of the executed agreement?
A. No.
Q. Did you send anyone at the bank a copy of the executed agreement?
A. I can't recall. Yeah, I can't recall.
Q. Would it be your usual practice when you enter into an agreement on behalf of the bank, of U.S. Bank, to send that agreement around within the bank to those who needed to be informed?
A. That's -- yeah, that would be -- but, I mean, I was handling the issue.
Q. Okay. And your superiors don't need to be kept informed about agreements that you sign on





behalf of U.S. Bank?
MR. KOTWICK: Objection to the form.
A. I think I just mentioned that I did keep them informed.
Q. Okay. But they never requested to see a copy of the agreement you entered into on behalf of the bank?
A. No.
Q. All right. Let's turn back to Exhibit 4, which attaches the draft Duff & Phelps analysis. And I'm looking now at the page Bates stamped 00072. The first sentence on that page reads, "In late March FGIC delivered a commutation proposal (Proposal) to the Steering Committee Group of RMBS holders for ResCap related trusts to provide global resolution regarding the pending RMBS litigation."
Do you see that?
A. I do.
Q. Is it your understanding that this proposal was delivered to the steering committee by FGIC?
A. I mean, according to what that statement says, that would be my understanding.
Q. Okay. And do you have an understanding as to how Duff & Phelps learned of this information?





A. I would -- I mean, I would speculate here that when we found out about it, we -- I mean, they're our financial advisor, that we approached them to do the analysis.
Q. Okay. And who approached them to do the analysis?
A. I couldn't say.
Q. Have you read the FGIC rehabilitation plans referred to in the first bullet point on this page?
A. No.
Q. You haven't?
A. No.
Q. Has anyone at U.S. Bank read the FGIC rehabilitation plans?
MR. KOTWICK: Object as outside the scope of the 30(b)(6).
A. I don't know.
Q. About two thirds of the way down the page is a statement, "In the revised base case scenario, the policyholders would receive a recovery of 28.5 percent on their claim based on a net present value of the distributions discounted at an illustrative rate of 15 percent."
Do you see that?

A. I do.
Q. What's your understanding of what that means?
A. You know, as I sit here today, I don't have an understanding. At the time I'm sure Duff would have covered this information, and I would have known.
Q. Do you have an understanding that under the FGIC rehabilitation plan policyholders were expected to receive a recovery, if it was reviewed, with a 15 percent discount rate of 28.5 percent on their claim?
MR. DEVORE: Objection to form.
A. And can you repeat the question?
Q. Do you have an understanding, or do you understand that under the FGIC rehabilitation plan the policyholders were projected to receive a recovery with -- using a 15 percent discount rate of 28.5 percent on their claims?
MR. KOTWICK: Objection to form.
A. I may have had an understanding of that -- of that during the presentation.
Q. Okay. Do you know what Duff & Phelps reviewed in order to reach this, the conclusions





contained in this report?
A. Specifically I don't know what they reviewed.
Q. Generally?
A. Materials provided by Lazard, but other than that, I don't know what else they would have reviewed.
Q. Okay. And what was Lazard's role in this?
A. I don't know.
Q. Why was Lazard providing Duff & Phelps with materials?
A. I believe they work on the FGIC rehabilitation. In what capacity -- I knew at one point -- I don't know right now.
Q. Okay. All right. If we look at page 3 of this draft report, it's Bates stamped 73, and the heading there is "FGIC proposal commutation and claim."
It says, "The proposal outlines a cash payment of approximately 253 million by FGIC upon emergence in exchange for the ability for FGIC to assert approximately 597 million of allowed claims at ResCap."
Do you see that?





A. I do.
Q. And then there is an analysis of -- there appears to be an analysis of this proposal. Is that a fair characterization of the right-hand side of this page?
MR. KOTWICK: Objection to the form.
A. Can you repeat what --
Q. Sure. It was a bad question. I will rephrase.
On the left-hand side there is a bullet point that starts, "The following proposal is based on the following three main assumptions," and there is, "A. Initial cash payment percentage of 17.25 percent based on the updated stress scenario pursuant to the plan."
What's your understanding as to what that means?
A. I mean, again, as I sit here today, I don't -- I couldn't speak to my understanding. At the time, as they were going through it, I'm sure I would have been able to speak to that.
Q. Okay. And you have testified here this morning that the Duff & Phelps analysis compares recoveries under the FGIC rehabilitation plan to the





FGIC proposal; is that fair?
A. Yes, I believe so.
Q. Okay. And this -- this bullet point that we just looked at is speaking of an initial cash payment percentage of 17.25 percent based on the updated stress scenario pursuant to the plan. What plan do you understand is being referred to here?
A. I would assume what was being offered under the plan of rehabilitation.
Q. Okay. And you understand that under the plan of rehabilitation, policyholders would receive an initial cash payment percentage of 72 -- of 17.25 percent of their claims?
MR. KOTWICK: Objection to the form.
A. That's what it appears to be saying here.
Q. Okay. And if you look at point B here, "The base case payout to policyholders of 28.5 percent based on the updated base case scenario pursuant to the plan, assuming a 15 percent discount rate."
Do you see that?
A. I do.
Q. Okay. What's your understanding as to what that means?

CONFIDENTIAL - M. SCOTT

A. I mean, again, I don't -- I couldn't speak to that right now, but during the presentation I would have had a better understanding.

Q. Did you review this document in preparation for this deposition?

A. I did.

Q. You did, okay.

Did you review any other documents referring to the FGIC rehabilitation plan?

MR. KOTWICK: Objection to the form.

A. Can you repeat that?

Q. Did you review any other documents referring to the potential recoveries under the FGIC rehabilitation plan, which is referred to obviously in this document?

A. No.

Q. You did not, okay.

You understand that the projections under the FGIC rehabilitation plan, as described by Duff in this report, project a 28.5 percent recovery if a 15 percent discount rate is used; is that fair?

MR. KOTWICK: Objection to the form.

A. I mean, I can just confirm what is written here.



CONFIDENTIAL - M. SCOTT

Q. Does a 15 percent discount rate strike you as high?

MR. KOTWICK: Objection to the form.

A. I couldn't speak to that.

Q. Okay. How are discount rates usually determined?

A. I also couldn't speak to that.

Q. What's your educational background, Ms. Scott?

A. I went to the University of Chicago and graduated with a bachelor's in economics.

Q. Do you have any graduate qualifications?

A. I don't.

Q. When you were going through this report with Duff & Phelps, did you have an understanding as to what the term "discount rate" referred to?

A. As we were going through the presentation, I may have had a better understanding as they described "discount rate." I couldn't speak to it right now.

Q. So sitting here today, you don't understand the term "discount rate"?

MR. KOTWICK: Objection to the form.

A. Not enough to speak to it.



CONFIDENTIAL - M. SCOTT

Q. Not enough to speak to it, okay.

And you don't know, therefore, if you don't know enough to speak to the term "discount rate" how discount rates are determined in general?

A. That's right.

Q. Let's go to point -- let's go to J, beside it, it's the next point on this list and it refers to a haircut or 40 percent on unpaid payout claim estimates. Do you have an understanding as to what that refers to?

A. As I sit here today, I don't. During the presentation, I would have.

Q. Okay. Do you recall anyone asking any questions as to the 40 percent haircut on unpaid payout claim estimates?

A. I can't recall.

Q. Okay. Do you know what a haircut refers to --

MR. KOTWICK: Objection.

Q. -- in this context?

A. You know, the same thing, not enough to speak to it.

Q. Okay. Looking at the figures on the right there, does it -- is it fair to say that the



CONFIDENTIAL - M. SCOTT

40 percent haircut identified by the letter J causes the total amount of the cash commutation paid by FGIC to reduce, to become smaller?

MR. KOTWICK: Objection to the form.

A. Can you repeat that?

Q. Looking at the figures on the right of this page, is it fair to say that the 40 percent haircut, and that's identified by the letter J in the parenthetical on the left-hand side, causes the total amount of the cash commutation to be paid by FGIC to become smaller?

MR. KOTWICK: Objection to the form.

A. Again, I couldn't speak to it.

Q. Okay. If you look at the next page of this exhibit, Bates stamped 74, there is a heading that says "FGIC Plan of Rehabilitation Summary." I will give you a moment to read through that.

MR. KOTWICK: Would you like her to read the entire page or any particular part?

MS. JAMES: It's pretty short, so if she wants to read the page, it might help refresh her recollection.

THE WITNESS: Okay.

Q. Okay. Does that refresh your recollection

as to the terms of the FGIC rehabilitation plan?
MR. KOTWICK: Objection to the form.
A. Can you repeat that?
Q. Does this page refresh your recollection as to the terms of the FGIC rehabilitation plan?
MR. KOTWICK: Objection to the form.
A. I mean, it covers the plan as described by Duff & Phelps.
Q. Okay. Did you independently verify that the plan as described by Duff & Phelps was, in fact, the plan that had been described in the context of the FGIC rehabilitation proceedings?
A. I did not.
Q. Okay. And you -- I take it, therefore, you did not go and look at any filings made in the FGIC rehabilitation proceedings to confirm?
A. That's correct.
Q. All right. Here there is a heading, "Base Scenario" and a heading "Stress Scenario." What was your understanding or what is your understanding of those terms in the context of the FGIC plan of rehabilitation?
MR. KOTWICK: Objection to the form.
A. My understanding, I mean, just based off of





what is summarized here, is one scenario is expectations based off of kind of the status quo and one scenario is based off of stresses to the economy.
Q. Okay. And was there an upside scenario discussed during the Duff & Phelps call?
MR. KOTWICK: Objection to the form.
A. I believe so.
Q. And do you recall what the conclusion of Duff & Phelps was as to the potential recoveries under this upside scenario that was discussed?
MR. KOTWICK: Objection to the form.
A. I don't recall.
Q. Have you reviewed analyses such as these in connection with other work you've performed for U.S. Bank as trustee?
MR. KOTWICK: Objection to the form.
A. Can you repeat the question?
Q. Have you reviewed analyses such as these, you know, projecting recoveries under some sort of plan, in connection with other work you've performed for U.S. Bank as trustee or indenture trustee?
MR. KOTWICK: Objection to the form.
A. No.





Q. No, okay.
Was it surprising to you here that there was a base scenario, which you described as a status quo scenario, and a stress scenario but no upside scenario?
A. Was it surprising to me? I don't know what that means.
Q. Would you expect that if there is a status quo scenario and a stress scenario, that there would likely also be a scenario that captured improving economic conditions?
MR. KOTWICK: Objection to the form.
A. I couldn't speak to that. I would expect our financial advisors to highlight the relevant information.
Q. Okay. And you don't understand -- you -- strike that.
Do you have an understanding as to whether Lazard performed an analysis of an upside scenario?
MR. KOTWICK: To be clear --
MS. JAMES: Lazard.
MR. KOTWICK: -- you said Lazard, okay.
A. I don't know.
Q. If you go to the next page, which has the





heading "FGIC Plan of Rehabilitation, Base versus Stress Scenario."
Do you see that?
A. Yes.
Q. And there is two dark boxes on this page, one described as "All FGIC Policyholders, Lazard Affidavit," and the next box reads "Claims for Policyholders of ResCap related RMBS Trusts Per D & P Estimates."
Do you see that?
A. I do.
Q. What's your understanding of the difference between box one and box two?
MR. KOTWICK: Just so I'm understanding, when you say dark -- I've got a copy, so I'm just trying to understand. The dark boxes you are referring to are the square boxes in the lower run of numbers?
MS. JAMES: No, it's the boxes I read out.
MR. KOTWICK: Oh, okay, the dark boxes on the left-hand side.
MS. JAMES: Yeah, sorry.
MR. KOTWICK: Okay. I'm sorry.
Object to the form.

A. I mean, my understanding is how it's represented here on the page. So one section discusses all FGIC policyholders and it appears to discuss their claims, and then the second box discusses claims for policyholders of ResCap related RMBS trusts per Duff & Phelps estimates.

Q. Okay. And do you have an understanding as to how Duff & Phelps arrived at their estimate?

A. I can't speak to that now. I may have at the time.

Q. Did anyone on the call that you referred to earlier ask how Duff arrived at these estimates?

A. There may have been questions. I can't recall.

Q. And in the second half of the page where there are the Duff estimates, there is a heading "Low Case" and a heading "High Case."

Do you have an understanding as to the difference -- or what the -- what "Low Case" refers to?

A. As I sit here today, no, I don't. I may have at the time.

Q. Okay. And how about "High Case"?

A. Same.





Q. If you go to the next page, you can see again there is "Low Case" and "High Case." I ask you to take a look and see if your recollection is refreshed as to what these terms mean?

A. It doesn't appear that those are defined here on the page. So, again, they may have discussed it during the presentation, but I couldn't speak to it right now.

Q. Okay. You see the top of that page, it says, "Under the base scenario the ResCap RMBS trust policyholders may receive approximately 200 million to 320 million on a net present value basis."

Do you see that? Do you have an understanding as to how those numbers were reached?

A. I can't recall.

Q. Okay. If you look down on this page, you can see there are boxes containing projections under a heading of "Total Recovery Applied at Different Discount Rates." And you will see the $200 million figure appears under the heading "Low Case," using a discounted cash flow of 20 percent?

A. Okay.

Q. You have already stated that you don't understand what "Discount Rate" means. So -- is





that fair?

MR. KOTWICK: Objection to the form.

A. In this context, I wouldn't.

Q. Okay. So I take it you have no opinion as to the application of a 20 percent discount rate under this analysis?

A. That's right.

Q. And did you have an opinion at the time of the Duff & Phelps telephone call?

A. Did I have an opinion of what?

Q. The use of a 20 percent discount rate?

A. In what context?

Q. In the context of the Duff & Phelps call, did you have an opinion as to the use of a 20 percent discount rate?

A. I guess related to this page, I may have had an opinion as they were walking through their analysis.

Q. Okay. All right. If you go to the last page of this document, there is a heading "Next Steps and Follow-up Questions."

Do you see that?

A. I do.

Q. It says, "Prior to the confirmation hearing





currently set for June 11, 2013, additional follow-up discussions on the commutation proposal will likely be centered around the following key issues," and then there are seven issues.

One of those issues is, "Effect of unpaid payout assumption of 60 percent included in the proposal."

Do you have an understanding as to what that means?

A. As I sit here today, I don't. At the time I may have had an understanding.

Q. Okay. Do you know what's meant generally by the heading here, "Next Steps and Follow-up Questions"?

A. Do I know what that means?

Q. Why was this page included, do you know?

A. I can't remember.

Q. Okay. Who -- who was going to be asking these follow-up questions?

A. I don't know.

Q. Was Duff & Phelps -- did Duff & Phelps make any statements on the call as to why follow-up questions had been included in their draft presentation?

A. I can't remember.

Q. Did Duff & Phelps say anything about having to follow up with Lazard on some of the assumptions included in the FGIC proposal?

A. They may have, but I can't remember for sure.

Q. Okay. Was it your understanding that Duff was in dialogue with Lazard as to the -- as to the FGIC proposal?

A. Yeah, I think that's fair.

Q. And was it your understanding that Lazard was providing any answers to questions Duff & Phelps may have had about their proposal?

MR. GREEN: I'd like to object to the extent that is asking for information that's covered by the mediation privilege and the order from the court.

A. And can you repeat the question?

Q. Sure.

Was it your understanding that Lazard was providing answers to questions Duff & Phelps may have had about the FGIC proposal?

A. I don't have an understanding as far as the communications went between the two parties.





Q. Okay. And was it your understanding that FGIC was providing answers to any questions Duff & Phelps may have had about the FGIC proposal?

A. I don't know that.

Q. Okay. There is a final bullet point on this page, "Timing of commutation related to overall FGIC rehabilitation proceeding."

Do you see that?

A. I do.

Q. Do you have an understanding as to what was -- what was being referred to in that bullet point?

A. I can't recall.

MS. JAMES: Okay. Can we take a break?

(Lunch recess taken from 12:42 P.M. to 1:29 P.M.)





AFTERNOON SESSION

(Time noted: 1:29 P.M.)

M A M T A S C O T T,

resumed and testified as follows:

CONTINUED EXAMINATION

BY MS. JAMES:

Q. Ms. Scott, you said before that U.S. Bank has eight FGIC wrapped trusts that are part of the FGIC settlement agreement; is that correct?

A. That's correct.

Q. Did U.S. Bank determine or has U.S. Bank determined whether or not there has been an event of default for any of these trusts?

A. No.

Q. Hasn't determined whether or not there has been an event of default?

A. That's correct.

Q. And you are not aware of any analysis being done to determine whether or not an event of default has occurred under any of the trusts?

MR. KOTWICK: Objection. To -- to the extent you can answer that without revealing any discussions of counsel, you should -- you should answer the question.





A. No.

Q. You are not aware of any analysis being performed?

A. That's right.

Q. Do you understand the duties that the trustees owed to the noteholders or certificate holders under the trusts?

MR. KOTWICK: Objection to form.

A. Specifically, I would have to look at the transaction documents.

Q. Okay. Is there -- do the trustees owe fiduciary duties to the certificate holders or noteholders under the trusts?

MR. KOTWICK: Objection to form. Calls for a legal conclusion.

A. I'm not sure what you mean by "fiduciary."

Q. You don't understand the term "fiduciary"?

A. I'm not a lawyer.

Q. You're not a lawyer, okay.

Have you heard the term "fiduciary" before?

A. I have.

Q. And what's your non-lawyer understanding of the definition of that term?

A. I couldn't really even speak to it.

MS. JAMES: Okay. All right. I'm going to ask the reporter to mark as exhibit -- ask the reporter to mark as Exhibit 5 a document filed with the bankruptcy court Docket 3940-5 entitled "Declaration of Mamta K. Scott as Officer of U.S. Bank as RMBS Trustee."

(Scott Exhibit 5 marked for identification.)

Q. Have you seen this document before, Ms. Scott?

A. I have.

Q. And is that your signature on page 27 of that document?

A. It is.

Q. Did you review this document before signing it?

A. I did.

Q. Did you write this document?

A. I did not.

Q. Do you agree with everything in this document?

A. I would say yes.

Q. Okay. At the time -- at the time of signing, you agreed with all of the statements





contained in this document?

A. That's correct.

Q. Okay. If you can look at paragraph 1, you state that -- you state, "I have personal knowledge of the facts set forth herein except as to certain matters that I believe to be true based on (a) information provided by Duff & Phelps, LLC, (b) information about positions of parties in these Chapter 11 cases contained in pleadings that I reviewed, were reported to me by counsel, or I learned during my participation in the plan mediation (defined below), and (c) my review of business records of U.S. Bank, N.A."

Do you see that?

A. I do.

Q. As to C, what business records of U.S. Bank, N.A., did you review in connection with the signing of this declaration?

A. I can't recall exactly what was reviewed.

Q. How about generally?

A. Again, specific documents I can't -- I can't recall. There were various documents reviewed.

Q. Can you give me an example of some of those





documents?

A. I can't right now. I can't think of anything.

Q. Can't think of a single document you reviewed in connection with the --

A. Maybe as we go through --

MR. KOTWICK: Objection to the form. Argumentative.

A. Maybe as we go through this, I may refresh my recollection.

Q. Okay. If we can turn to paragraph 64, which is on page 24. In that paragraph starting on the second line -- or the first line you say, "Duff & Phelps conducted an analysis of the economic terms of the FGIC settlement using both publicly available and non-public information from Lazard, the financial advisor to the rehabilitator, as to projected future claims and anticipated payouts pursuant to the plan of rehabilitation."

Do you have an understanding as to what non-public information from Lazard you were referring to in this paragraph?

A. Of what exactly it was, I can't recall.

Q. Did you see any of this non-public





information from Lazard?

A. No.

Q. Did you see any information from Lazard other than what's contained in the draft Duff & Phelps report and the final Duff & Phelps report?

A. No.

Q. In paragraph 65 you write that "Duff & Phelps advised the FGIC RMBS trustees that the FGIC settlement, including the FGIC lump sum payment, represented a reasonable resolution of the accrued and unpaid claims and projected future claims against FGIC under the FGIC policies."

What did you mean by "represented a reasonable resolution"?

A. According to Duff & Phelps in their presentation, the 253 million lump sum payment fell within a range of reasonableness.

Q. As compared to what?

A. They did a comparison of the FGIC settlement with what was being provided under the plan of rehabilitation.

Q. Did Duff & Phelps opine that the FGIC proposal was better than the FGIC rehabilitation plan projections?

MR. KOTWICK: Objection to the form.
A. Can you repeat the question?
Q. Did Duff & Phelps opine that the FGIC proposal was better than the FGIC rehabilitation plan projections?
A. I can't recall if they used that language.
Q. Did Duff & Phelps opine that the FGIC proposal was in the best interests of the investors in the trusts?
A. I don't recall. Like I said, I believe that they stated the amount was within a certain range of reasonableness.
Q. And is your understanding that the amount -- that Duff & Phelps' conclusion that the amount was within a range of reasonableness meant that Duff & Phelps believed that the $253 million amount fell within the low end -- fell somewhere between the low end of the Lazard projections and the high end of the Lazard projections?
MR. KOTWICK: Objection to the form.
A. And can you repeat the question one more time?
Q. Yeah, that was a very poorly worded question. I apologize.





When you say that -- that Duff & Phelps believed that the $253 million amount was within a certain range of reasonableness, is that certain range the range from the low end of the Lazard projections to the high end of the Lazard projections?
MR. KOTWICK: Objection to the form.
A. I would need to confirm with their report.
Q. Okay. Go for it. Have a look.
A. Actually, the report provided here is a draft.
MS. JAMES: Sure. Let me -- let me hand the reporter a document that is Bates stamped TR-MS000001 through TR-MS000009.
(Scott Exhibit 6 marked for identification.)
Q. Have you seen this document before?
A. I have.
Q. And do you understand this to be the final Duff & Phelps report?
A. Yes.
Q. Okay. And if you take a moment now to look and see whether the range of reasonableness you were referring to is, in fact, the range projected under





the Lazard FGIC rehabilitation plan?
MR. KOTWICK: Objection to the form.
A. So what I see here is that it's stating that the settlement proposal is within the range of reasonableness under either scenario, the base scenario or the stress scenario outlined in their presentation.
Q. Okay. And the base scenario and the stress scenario that they are referring to is a base scenario and the stress scenario contained in Lazard's projections in connection with the FGIC rehabilitation proceedings; is that correct?
MR. KOTWICK: Objection to the form.
A. I think I would have -- I would know that at the time of their presentation. I couldn't confirm that now without knowing what these scenarios are.
Q. Does the heading at the top of the chart here that says "FGIC Plan" on page 3 help you?
A. Oh, it appears that, yes, the base scenario and the stress scenario fall under the column that says "FGIC Plan."
Q. Okay. Does Duff & Phelps reach the conclusion anywhere in this report that the FGIC





proposal is in the best interests of the investors?
A. Do you want me to go through the report?
Q. Do you understand Duff & Phelps to have reached the conclusion that the FGIC commutation proposal was in the best interests of the investors?
A. I believe that they, you know, they state that the amount falls within a range of reasonableness, and, I mean, they highlight aspects of both plans and they basically state that the amount falls within a range of reasonableness.
Q. Okay. And does that mean the same thing as it is in the best interests of the investors?
A. Unless they would use that terminology, I wouldn't know if they meant the same thing.
Q. Okay. What does "in the best interests" mean?
A. Just generally speaking, by whose definition or --
Q. By yours.
A. You know, as I outlined, there were several factors that went into why we considered this plan and the global settlement to be in the best interest of holders. What -- what are you looking for exactly?

Q. I'm asking -- I'm asking for a definition of "best interests." I'm asking if "best interests" means within a range of reasonableness.

MR. KOTWICK: Objection to the form.

A. No, I wouldn't consider that to mean the same thing.

Q. Going back to your declaration, do you state in your declaration that the FGIC settlement agreement is in the best interests of the holders?

A. I would have to go through my declaration to see.

Q. You don't recall whether or not you made that statement in your declaration?

A. I mean, the statement is a pretty lengthy document. I can't remember every sentence.

MS. JAMES: Handing the reporter now a document Bates stamped USB-MS00084 through zero -- sorry. I'm going to pull that one back.

Can we go off the record for a minute.

(Recess taken from 1:46 P.M. to 1:47 P.M.)

BY MS. JAMES:

Q. Ms. Scott, when you received the final





Duff & Phelps analysis, which is sitting -- sitting in front of you, was there an additional call with Duff & Phelps to discuss the conclusions contained in that analysis?

A. The call that we had was the call that I mentioned. I don't recall if this was the presentation they used or not. I believe that the presentation that they used in that call was the final version.

Q. Was the final version?

A. I don't know for sure, but...

Q. Okay. Did you ask any questions during that call?

A. I did not, but my counsel did.

Q. Your counsel did, okay.

Did other trustees ask questions during that call?

A. I can't remember.

Q. Did anyone during that call question any of the assumptions contained in the report?

A. They may have. There were several questions asked.

Q. But you don't --

A. There was a lot of discussion.





Q. Sure. Sorry for interrupting you.

You don't recall any of those questions?

A. I can't think of any.

Q. And you didn't ask any questions yourself?

A. I did not.

Q. And other than your counsel, did anyone else from U.S. Bank ask any questions?

MR. KOTWICK: Objection to the form.

A. I was the only one on the call from U.S. Bank.

Q. Okay. You stated before that U.S. Bank is a member of the Official Unsecured Creditors Committee; is that correct?

A. That's right.

Q. Is FGIC also a member of the Unsecured Creditors Committee?

A. Yes.

Q. And have you attended meetings of the Unsecured Creditors Committee which FGIC was also participating?

A. Yes.

Q. And who from FGIC would attend those meetings?

A. I can't remember.





Q. Okay. Did Mr. Dubel attend those meetings?

A. Yes.

Q. Are you aware of a conflict in that committee concerning the participation of MBIA and FGIC?

MR. KOTWICK: Objection. To the extent that you are asking her to disclose communications that occurred in the context of a committee meeting, my understanding is that the bylaws have certain confidentiality, and until I get clarification from committee counsel that it doesn't apply in this situation, I'm going to ask the witness not to disclose any communications that occurred within the context of the committee process.

MR. GREEN: And I join in that objection.

Q. Are you aware of a letter that was filed with the court by Kathy Patrick claiming that MB -- MBIA and FGIC were seeking through the committee to pursue an individual litigation agenda that was at odds with the best interests of the majority of unsecured creditors?

MR. KOTWICK: You can answer yes or no.

A. No.

Q. You've never seen this letter?
A. No.
Q. And you've never heard Ms. Patrick or anyone else express those views outside of a committee meeting?
A. No.
Q. Was it your view that FGIC and MBIA were pursuing an individual litigation agenda at odds with the best interests of the majority of unsecured creditors?
A. No.
MS. JAMES: Those are all the questions I have for the moment. If you want to go --
MR. GELFARB: Break for a moment.
(Recess taken from 1:51 P.M. to 2:01 P.M.)
EXAMINATION
BY MR. GELFARB:
Q. Good afternoon, Ms. Scott. My name is Dave Gelfarb. I represent Freddie Mac in this matter.
Do you understand you are still under oath?
A. I do.
Q. Is there any reason you would be unable to testify truthfully and accurately today?





A. No.
Q. Are you under any medications or anything that would influence your ability to remember clearly and accurately?
A. No.
Q. Okay. Do you have any experience in financial modeling?
A. No.
Q. Any experience in financial analysis?
MR. KOTWICK: Objection to form.
A. I mean, I don't know what you mean by those.
Q. Can you tell me, what type of work have you done since you graduated from the University of Chicago?
A. I started working with LaSalle Bank in their corporate trust group shortly after I graduated, I was working on CDO products. I began as a, you know, junior analyst and worked my way up to account manager, relationship manager, and then I transitioned into their risk group shortly after 2009.
Q. And what year did you graduate from University of Chicago?





A. 2002.
Q. And what year did you transfer or switch jobs from LaSalle to U.S. Bank?
A. So LaSalle -- our group was acquired by Bank of America and then ultimately by U.S. Bank around two and a half years ago.
Q. And what type of work did you do while you were employed by Bank of America?
A. I still worked in the CDO group for a period of time and then I transferred over to the risk group.
Q. And what do you do in the risk group?
A. It was reviewing all sorts of distressed issues affecting our transactions for which we were trustee.
Q. You are aware, are you not, that the plan of rehabilitation has been proposed for a FGIC by the New York Department of Financial Services?
A. I am.
Q. And do you have any understanding of the terms and condition of that plan as to how it would affect my client, Freddie Mac?
A. I have an understanding as it was related to us by Duff & Phelps.





Q. And what is your understanding as to how that plan of rehabilitation would affect Freddie Mac?
MR. KOTWICK: Objection to the form. Just -- you are talking about Freddie Mac specifically now?
MR. GELFARB: Freddie Mac specifically, yes.
A. I don't have an understanding of how it would affect Freddie Mac specifically.
Q. And how about -- how about RMBS trusts generally?
A. I have an understanding, again, according to what was presented to us by Duff & Phelps.
Q. And what is your understanding based upon what Duff & Phelps told you?
A. Regarding what point?
Q. What is it that the R -- that the holders of certificates, which includes, of course, Freddie Mac, are to receive under the plan of rehabilitation?
A. My understanding is that's not certain.
Q. Do you have any idea what they are to receive?

CONFIDENTIAL - M. SCOTT

A. I think -- we could refer to the presentation again. We can walk through.

Q. Okay. So you have no independent knowledge of what the terms of any deal are unless it was what has been conveyed to you by Duff & Phelps; is that correct?

A. That's right.

Q. Okay. And the information that was conveyed to you by Duff & Phelps is set forth in Exhibit 6, for example, today?

A. Yes.

Q. Okay. Do you know the term "disclosure statement"?

A. I do.

Q. Okay. Have you ever seen a disclosure statement with respect to the plan of rehabilitation of FGIC?

A. No.

Q. I'm going to represent to you that the disclosure statement says that FGIC engaged in extensive discussions with the indenture trustees. Do you know whether FGIC engaged in discussions with U.S. Bank about the FGIC rehabilitation plan?

MR. KOTWICK: Objection to the form.



CONFIDENTIAL - M. SCOTT

A. I don't know.

Q. Did you personally engage in any discussions with FGIC about the FGIC rehabilitation plan?

A. No.

MR. KOTWICK: Objection to the form and outside the scope of the 30(b)(6).

Q. Do you know whether any of your colleagues at U.S. Bank, other than counsel, engaged in discussions with FGIC --

MR. KOTWICK: Same objections.

Q. -- about the FGIC rehabilitation plan?

A. No.

Q. Do you know whether any court sitting in New York found that the FGIC rehabilitation plan was fair and equitable to certificate holders?

MR. KOTWICK: Objection. Outside the scope.

A. No.

Q. Do you personally, sitting here today, have any idea whether the plan of rehabilitation for FGIC was or is fair and equitable to my client, Freddie Mac?

MR. KOTWICK: Objection to the form.



CONFIDENTIAL - M. SCOTT

A. No.

Q. Do you have any opinion or understanding as to whether the plan of rehabilitation for FGIC is fair and equitable to certificate holders as a whole?

MR. KOTWICK: Objection to the form. Hold on just a minute. Outside the scope.

A. Can you repeat the question?

Q. Do you have any understanding as to whether the plan of rehabilitation is fair and equitable to certificate holders as a whole, not just including Freddie Mac?

MR. GREEN: I'm going to object to this line of questioning as being outside the scope as well. It's seeking information for discovery in a different proceeding.

A. No.

Q. Have you personally ever performed any analysis of the terms and conditions of the FGIC rehabilitation plan?

MR. KOTWICK: Objection. Outside the scope.

And just to be clear, when you say "you personally," you are now talking about her, not



CONFIDENTIAL - M. SCOTT

U.S. Bank?

MR. GELFARB: I'm sorry.

Q. Have you at your work at U.S. Bank performed any analysis of the terms and conditions of the FGIC rehabilitation plan?

MR. KOTWICK: Objection. Outside the scope.

MR. GREEN: Objection.

A. No.

Q. Do you know whether anyone else at U.S. Bank has performed any analysis of the terms and conditions of the FGIC rehabilitation plan, other than counsel?

MR. KOTWICK: Objection. Outside the scope.

A. I don't know.

Q. Do you know what the term "rehabilitator" means with respect to the FGIC rehabilitation plan, Ms. Scott?

MR. KOTWICK: Objection. Outside the scope.

A. No.

Q. Have you -- when I say "personally," I mean you but, of course, in connection with your work at

U.S. Bank, not in your personal life. Do you know -- have you ever engaged in any discussions with the Superintendent of Insurance -- excuse me, the Department of Financial Services of the state of New York --

MR. GREEN: Objection. This is seeking information and asking about discussions protected by the mediation privilege and the court's order.

MR. KOTWICK: Objection. Outside the scope.

MR. GELFARB: Can I finish the question? Thanks.

Q. Have you engaged in any discussions with the New York Department of Financial Services with respect to the FGIC rehabilitation plan?

MR. KOTWICK: Objection. Outside the scope.

You can answer yes or no.

MR. GREEN: Objection.

A. No.

Q. And just for the record, when I say "Department of Financial Services," that department used to be called something to the effect of





"Superintendent of Insurance." So if I ask you a question about it, I mean when it was the Department of Insurance as well as the Department of Financial Services. Is that clear?

A. That is.

Q. Thanks. Now, do you know whether anyone else at U.S. Bank engaged in any discussions with the Department of Financial Services with respect to the FGIC rehabilitation plan?

MR. KOTWICK: Outside the scope.

You can answer the question yes or no.

MR. GREEN: Objection.

A. No.

Q. Do you know what the term "run-off projections" means in connection with the FGIC rehabilitation plan?

MR. KOTWICK: Objection. Outside the scope.

A. No.

Q. Have you ever heard the name Michael Miller before?

A. No.

Q. Have you -- you are aware, are you not, that Lazard -- have you ever heard of the company





called Lazard?

A. Yes.

Q. Okay. Do you know that Lazard, or are you aware that Lazard is in the financial business?

A. Yes.

Q. Okay. Do you know whether Lazard performed any services in connection with the FGIC rehabilitation plan?

A. Yes.

Q. What services do you know that they have performed?

MR. GREEN: I'm going to object to this to the extent it's seeking information or information about communications regarding the mediation and that is protected by the mediation privilege, and I continue to object to this line of questioning about the FGIC rehabilitation as beyond the scope of the 30(b)(6) notice.

MR. KOTWICK: Just let me read the question back.

Object as outside the scope.

You can answer yes or no.

A. Can you repeat the question?





MR. GELFARB: Can you read back the question.

(Record was read as requested.)

MR. KOTWICK: I'm sorry, what was the question before?

(Record was read as requested.)

A. I think I already stated earlier today that I knew they were involved, but in what capacity I'm not -- I can't remember.

Q. Okay. Have you ever heard the name Michael Miller with respect to Lazard?

A. No.

Q. I apologize if I asked you that earlier.

Okay. Have you ever seen any affidavit or any documents prepared by a Michael Miller?

A. No.

Q. Has U.S. Bank ever discussed the FGIC rehabilitation plan with Freddie Mac?

MR. KOTWICK: Objection. Outside the scope.

A. I don't know.

Q. Do you know whether anyone has ever written to Freddie Mac about the FGIC rehabilitation plan, whether anyone at U.S. Bank has written to anyone at

Freddie Mac about the FGIC rehabilitation plan at any time?
MR. KOTWICK: Objection. Outside the scope.
A. I don't know.
Q. Were you ever asked to communicate with Freddie Mac about the FGIC rehabilitation plan?
MR. KOTWICK: Objection. Outside the scope.
A. No.
MR. GELFARB: I want to ask you, Madam Reporter, to mark this Exhibit 7.
(Scott Exhibit 7 marked for identification.)
Q. Ms. Scott, have you had an opportunity to look at Exhibit 7?
A. Yes.
Q. Okay. Can you identify this document?
A. This appears to be the FGIC settlement agreement.
Q. And have you seen this document before?
A. I have.
Q. Okay. And did you sign this document?
A. Yes.





Q. Okay. I direct your attention to the fifth page past page 17. Is that your signature?
A. This is.
Q. Now, did you personally engage in any negotiations that led to the execution of this agreement?
A. No.
Q. Were you asked to sign this agreement by someone at U.S. Bank?
A. No.
Q. You took it upon yourself to sign the agreement?
MR. KOTWICK: Objection to the form.
A. I reviewed the agreement, vetted the agreement, discussed it internally, as I mentioned earlier today, and signed the agreement.
Q. Okay. What did you do when you say you vetted the agreement?
MR. KOTWICK: Objection to the form. Asked and answered.
A. Again, discussed it internally, discussed it with my manager.
Q. Did you discuss the amounts that the RMBS holders were to receive under this agreement with





your manager or anyone else at U.S. Bank?
A. I believe I did mention the amounts, yes.
Q. Okay. And was some kind of consensus reached or was -- how did you determine -- well, did you agree that the amount was satisfactory?
A. Again, as stated, we engaged Duff & Phelps to do the analysis and compare the terms of this agreement with what was being offered under their rehabilitation plan, and according to Duff & Phelps the amount was in the range of reasonableness.
Q. When you say the word "a range," is there a range with a lower number and a higher number?
A. I believe we referred to that in the report, yes.
Q. Okay. Do you recall what that range was from top to bottom? And if you need to look at one of the previous exhibits, that's fine.
A. It appears that there are two ranges listed.
Q. And what are those two ranges?
A. There is a range under a base case scenario and a range under the stress scenario.
Q. What does the base scenario refer to, as far as you understand?





A. I think, as I mentioned before, the status quo, things kind of going along normally with the economy.
Q. Now, what is the amount that this says that the noteholders are to receive under the FGIC settlement proposal?
A. Can you repeat that?
Q. What is the amount that the Exhibit 6 says that the FGIC noteholders, policyholders, are to receive under the FGIC settlement proposal?
MR. KOTWICK: Objection to form.
A. The first bullet point in Duff & Phelps' presentation under that column, the FGIC plan states that the RMBS policyholders would receive approximately 150 million upon plan confirmation on or around December 2013, remainder of the payments will be made over 40 years.
Q. And do you see a range for the base scenario toward the bottom of the page?
A. I do.
Q. And what is that range?
A. It says approximately 220 to 340 million.
Q. Okay. And do you understand that range reflects certain discount rates?

CONFIDENTIAL - M. SCOTT

A. Can you repeat the question?
Q. Do you understand that that range reflects certain discount rates?
A. I mean, as I'm looking at this today, I don't know what that reflects.
Q. Okay. Do you know how much Freddie Mac is to receive under the FGIC settlement proposal?
A. Specifically, no.
Q. Did you send me an e-mail with the amounts that the trusts in which Freddie Mac holds securities is to receive?
A. I sent you an e-mail with the amounts due to the trusts, yes.
MR. GELFARB: I'd like you to take a look -- this would be Exhibit 8.
(Scott Exhibit 8 marked for identification.)
Q. Ms. Scott, I ask you to look at Exhibit 8. Please feel free to read the entire exhibit, but I'm really only going to focus on the first half of the first page.
A. Okay.
Q. Have you had an opportunity to look at the first half of the first page?



CONFIDENTIAL - M. SCOTT

A. Yes.
Q. And do you -- can you identify that document?
A. This is a response from me to you in e-mail form.
Q. And I was asking you the amounts that each trust in which Freddie Mac has invested will receive if the policies are commuted; is that correct?
A. Yes.
Q. And do you see that you listed three numbers in your e-mail?
A. Yes.
Q. And can you tell me how each of those numbers was calculated?
A. The amounts were determined by Duff & Phelps.
Q. They were not determined by U.S. Bank?
A. No.
Q. Did you check Duff & Phelps' work?
A. We engaged Duff & Phelps to do certain analysis and provide the allocations.
Q. Okay. My question is did you check the work that they did?
MR. KOTWICK: Objection to the form.



CONFIDENTIAL - M. SCOTT

A. No. We engaged them as our financial advisor to do this work.
Q. And when I say "you," I mean U.S. Bank. Did anyone else at U.S. Bank check the work?
A. The answer is the same.
Q. So the answer is no. Thanks.
MR. KOTWICK: Just make sure you verbalize your answers and not nods.
THE WITNESS: Sorry.
A. No.
Q. Do you know when Duff & Phelps determined the amount that each of these three trusts were to receive, did Duff & Phelps take into account future losses expected on the securities in these three trusts?
A. Can you repeat the question?
Q. Yes.
Do you know when you -- did you ask Duff & Phelps to take into account future projected losses on the securities in the trusts in determining the amounts that Freddie Mac was to receive if the policies were commuted?
MR. KOTWICK: Objection to the form.
A. We engaged Duff & Phelps and asked them to



CONFIDENTIAL - M. SCOTT

provide the allocations --
Q. And what did you --
A. -- per trust.
Q. What did you exactly ask them to do?
A. I couldn't speak to you exactly what we asked them to do.
Q. Who asked them?
MR. KOTWICK: And I will counsel the witness to the extent that any knowledge that she has that is part of discussions that she had with counsel, not to disclose the discussions with counsel.
MR. GELFARB: Of course.
Q. Who -- were you the one who asked Duff & Phelps to make these computations?
A. No.
Q. Do you know who asked Duff & Phelps to do this from U.S. Bank?
A. It would have been through counsel that the request was made.
Q. Oh, all right.
MR. GELFARB: I'm going to ask you to mark this as Exhibit 9.
(Scott Exhibit 9 marked for

CONFIDENTIAL - M. SCOTT

identification.)

Q. Ms. Scott, are you familiar with the term "Intex"?

A. I've heard the term.

Q. What is Intex?

A. Exactly what it is, I can't say.

Q. I'd like you to take a look at Exhibit 9. I'm not asking whether you recognize the specific numbers on this page, but have you ever seen a screenshot that looks similar to this in your work?

A. No.

Q. Has it ever been your job within U.S. Bank to account for, to study, or report on accumulated write-downs on securities?

MR. KOTWICK: Objection. Outside the scope.

A. And can you repeat the question?

Q. Yeah.

Has it ever been one of your duties at U.S. Bank to report on or to study or analyze accumulated write-downs on securities in the RMBS trusts?

A. No.

Q. I'm going to ask you to take a look again at Scott Exhibit No. 6. I think you testified



CONFIDENTIAL - M. SCOTT

earlier that you understand that according to the FGIC settlement that the policyholders are to receive the amount of $253 million; is that correct?

MR. KOTWICK: Objection to the form.

A. Can you repeat the question?

Q. Is it correct that you testified earlier that you understand that the policyholders are to receive the sum of approximately $253 million under the FGIC settlement plan?

A. Yes.

Q. Do you know what that $253 million represents as a percentage of the claims of policyholders?

A. I do not.

Q. Have you ever heard that $253 million represents approximately 21 percent of the claims of policyholders?

A. I don't recall.

MR. GELFARB: Okay. I'm going to mark this -- I think we are up to 9?

REPORTER: 10.

(Scott Exhibit 10 marked for identification.)

Q. Ms. Scott, I ask you to take a look at



CONFIDENTIAL - M. SCOTT

what's been marked as Scott Exhibit No. 10.

Can you identify this document?

A. Yes, this is the draft Duff & Phelps report.

Q. Have you seen this document before?

MR. KOTWICK: Objection. Are you -- is this document something different than what's been previously marked as --

MR. GELFARB: Yes, Mr. Kotwick. Just for the record, this document, on the first page on the bottom right says DUFF-MS0003, and I think Exhibit No. 6 is MS, a bunch of zeros, 1, but you will notice that on the middle of the first page on the right the earlier Exhibit No. 6 was dated May 15th, 2013, and this one is dated May 2013.

MR. KOTWICK: I'm looking at Scott No. 4. And I recognize it's got a different Bates stamp number.

MR. GELFARB: I think they are the same. I apologize.

MR. KOTWICK: I believe they are, but I'm not -- not going to represent that on the record.



CONFIDENTIAL - M. SCOTT

MR. GELFARB: That's okay. We can go -- we can use mine, if that's okay with you.

MR. KOTWICK: That's fine, but I will caution the witness that this may or may not be the same as the Scott No. 4.

BY MR. GELFARB:

Q. Okay. I believe it is, but please -- please take a look at what's now Scott No. 10, Ms. Scott. So you have seen Scott No. 10 before?

A. I saw it earlier today.

Q. Oh, was today the first time you saw it?

A. No, I believe I've seen it before.

Q. Okay. Did you review it before today?

MR. KOTWICK: Objection to the form.

A. So I can't recall if I've reviewed the draft version versus the final.

Q. Do you recall receiving the draft version?

MR. KOTWICK: Objection. Form. Asked and answered.

A. I mean, I saw that I received the draft. I saw that earlier today.

Q. You saw an e-mail indicating that the draft was sent to you; correct?

A. That's right.

Q. Okay. Now, I'd like you to take a look on Exhibit No. 10, do you see a page -- well, page 7, can you take a look at that.
Do you see that page, Ms. Scott?
A. Yes.
Q. Okay. Do you see where it says "nominal recovery" toward the bottom of the page?
A. Yes.
Q. Do you see it says, "Approximately 19-20 percent"?
A. Yes.
Q. Do you know what that means?
A. As I sit here today, I don't -- I can't speak to it, but at the time during Duff's presentation, if this is the version that they presented to us, I would have understood it.
Q. Did Duff present one version to you -- well, to the group or two, if you recall, during the presentation that you testified about earlier?
A. We had one call that I was on where they presented their report.
Q. Now, when you received the e-mail containing Exhibit No. 10, did you engage in any review of it at that time or at any time prior to





the discussion with Duff & Phelps?
MR. KOTWICK: Objection to the form.
A. And can you repeat the question?
Q. Yeah.
When you received Exhibit No. 10 via e-mail, which you agree you did; correct?
A. Yes.
Q. Okay. Did you personally engage in any review of the document prior to the discussion with Duff & Phelps?
A. I don't recall.
Q. Do you have any recollection sitting here today whether you saw that line on page No. 7 that says, "Nominal recovery, approximately 19-20 percent"?
A. As I sit here today, no.
Q. Do you have any recollection whether you ever discussed that line with anyone at U.S. Bank?
MR. KOTWICK: Objection to the form.
A. No.
Q. During the discussion with Duff & Phelps, did Duff & Phelps indicate or state or in any way allude to a percentage of losses that the $253 million would make up?





A. I don't recall.
Q. Did anybody ask what percentage of the losses that were suffered by the policyholders would be reimbursed under the FGIC settlement plan?
A. I don't recall.
Q. Did you ever -- did you ever discuss with anyone at U.S. Bank what percentage of the policyholder losses would be reimbursed by the FGIC settlement plan?
A. No.
Q. Did you think -- do you think sitting here today that it's significant to know what percentage of the policyholder losses are being reimbursed?
MR. KOTWICK: Objection to the form.
A. Sitting here today, I think what Duff & Phelps presented to us was -- was what we needed to know and what was relevant.
Q. Okay. And do you think -- do you believe sitting here today that the FGIC settlement plan is fair and equitable to the certificate holders?
MR. KOTWICK: Just -- okay. You can answer the question.
A. Can you repeat the question?
Q. Yeah.





Do you think sitting here today that the FGIC rehabilitation plan is fair and equitable to the policyholders?
MR. KOTWICK: That was a different question.
MR. GELFARB: Well, read back the first question, Miss Reporter.
(Record was read as requested.)
MR. KOTWICK: Objection to the form.
Do you mean the FGIC settlement proposal or the FGIC rehab plan?
MR. GELFARB: FGIC settlement proposal.
A. I'm not sure what you mean by "fair and equitable."
Q. Do you know what the word "fair" means in the English language?
MR. KOTWICK: Objection to the form. Argumentative.
Q. What does the words "fair and equitable" mean to you?
A. It depends on the context. I understand the FGIC settlement as we determined based off of the presentation from Duff & Phelps was reasonable and it was in the best interest of the holders.

Q. Okay. But did anyone at U.S. Bank make a determination as to whether it was fair and equitable to the policyholders?

MR. KOTWICK: Objection to the form.

A. I spoke to what the determination made was by U.S. Bank.

Q. And what was that again?

A. That it was reasonable and in the best interest of the holders.

Q. Do you understand that there was a FGIC rehabilitation plan; correct?

A. Yes.

MR. KOTWICK: Objection. Outside the scope.

Q. And you understand that the FGIC settlement is modifying the FGIC rehabilitation plan; correct?

MR. KOTWICK: Objection. Outside the scope.

Q. Do you understand that?

A. I do not.

Q. Do you know whether there is any difference between what the certificate holders, such as Freddie Mac, are to receive under the FGIC rehabilitation plan versus what they are to receive





under the FGIC settlement plan?

A. Can you repeat the question?

Q. Yeah.

Do you understand that there is a difference between what the FGIC -- excuse me -- what the certificate holders are to receive under the FGIC rehabilitation plan versus what they are to receive under the FGIC settlement plan?

A. I mean, I understand, again, pursuant to the report that Duff created, the differences between each plan.

Q. Okay. And can you tell me sitting here today why the -- well, first, do you believe that the FGIC settlement plan is better for the certificate holders than the FGIC rehabilitation plan?

MR. KOTWICK: Objection to the form.

A. I believe that, after viewing the analysis done by Duff and understanding their presentation, this -- the FGIC settlement was reasonable and in the best interest of holders.

Q. Okay. That's fine. My question is do you think it's better?

MR. KOTWICK: Objection to form.





MR. GREEN: Asked -- asked and answered.

MR. GELFARB: Can she answer?

MR. KOTWICK: Yeah, no --

MR. GELFARB: Mr. Kotwick is your counsel.

MR. KOTWICK: I object to the form. You can answer.

A. Again, I stated that the settlement was reasonable and in the best interest of the holders.

Q. Okay. Sitting here today, do you have an opinion as to whether the FGIC commutation plan is better for the certificate holders than the FGIC rehabilitation plan? And if you don't, that's fine.

MR. KOTWICK: Objection to form. Can you read the question --

MR. GELFARB: Read the question, Miss Reporter.

MR. KOTWICK: It's an unclear question.

(Record was read as requested.)

A. No.

Q. Do you think it's your duty as a trustee to have an understanding as to which plan is better?

MR. KOTWICK: Objection to the form.

A. I asserted that we made a determination that the FGIC settlement plan was reasonable and in





the best interest of the holders.

MR. KOTWICK: When you get a break in topics, can we take a short recess, please.

MR. GELFARB: That will be fine.

Q. Take a look, please, at Scott Exhibit No. 6 again. Please direct your attention, Ms. Scott, to page No. 3. It's Bates stamped MS, lots of zeros, 3. Do you see that page, it says "Executive Summary" at the top?

A. Yes.

Q. All right. I want you to take a look at where the column says "FGIC Settlement Proposal."

Do you see that?

A. I do.

Q. And do you see where it says "Risk" and the sentence? If you could please read that sentence, out loud?

A. Can you repeat which sentence?

Q. Next to the word "Risk," fifth bullet point on the left side of the page.

A. Read it to myself?

Q. No, read it out loud.

A. "Potential risk of relinquished upside economics in the event that the base scenario under

the plan is met and correspondingly exceeded."
Q. Do you understand what that means?
A. I would have understood it at the time. As I sit here today, I can't recall what...
MR. GELFARB: Off the record. If you'd like to take a break, Mr. Kotwick, that's fine.
MR. KOTWICK: I think the witness has some -- needs to take a break.
MR. GELFARB: Okay. It's up to you.
(Recess taken from 2:44 P.M. to 3:10 P.M.)
BY MR. GELFARB:
Q. Ms. Scott, you understand you are still on the record and still under oath?
A. Yes.
Q. Ms. Scott, have you ever spoken to anyone at FGIC about the -- anyone at Freddie Mac about the FGIC settlement plan?
MR. KOTWICK: Objection to form.
Are you talking about the FGIC settlement proposal?
MR. GELFARB: The settlement proposal. Yeah, to make it simpler, I'm going to call it now the "ResCap settlement." Is that okay?





That's what we called it yesterday.
Q. Do you understand what I mean by the term "ResCap settlement"?
A. I think that might be a bit confusing because there is a ResCap settlement as well.
Q. That's fine.
Have you spoken to anyone at Freddie Mac about the FGIC settlement proposal that was addressed with Duff & Phelps, that plan?
A. No.
Q. Do you know whether anyone at U.S. Bank talked with anyone at Freddie Mac about the FGIC settlement proposal?
MR. KOTWICK: At any time?
MR. GELFARB: At any time.
A. No.
Q. Do you know whether there was any written communication between U.S. Bank and Freddie Mac about the FGIC settlement proposal?
A. No.
Q. Did you ever tell Freddie Mac that there was any possibility of its FGIC policies being commuted?
MR. KOTWICK: Objection to form.





A. Specifically, no.
Q. Well, did you ever tell anyone at Freddie Mac in general that there was discussion about their policies being commuted?
MR. KOTWICK: Prior to the acceptance of the settlement agreement?
MR. GELFARB: Correct.
A. No.
Q. Do you know whether anyone else at U.S. Bank spoke to anyone at Freddie Mac about the possibility of the FGIC policies being commuted?
A. No.
Q. Let's go back to the Duff & Phelps exhibit. I think that was No. 6 that has the May 15th writing on it. Can you -- you have that in front of you --
A. I have that.
Q. -- Exhibit No. 6?
All right. Do you see the sentence, and I'll read it, just let me know if it's too fast.
MR. KOTWICK: On what page?
MR. GELFARB: On page 3, Mr. Kotwick.
MR. KOTWICK: Thank you.
Q. "Based on D & P's loss estimates of the wrapped portion of the ResCap-sponsored RMBS trusts,





the cash commutation proposal provided by FGIC is within the range of expected payments under the plan of rehabilitation on discounted cash flow basis."
Do you see that, Ms. Scott?
A. I do.
Q. Do you understand what that means?
A. I understand it as I read it here, yes.
Q. Okay. Did you understand it prior to today?
A. I understood it during the presentation.
Q. Did you independently determine whether the cash commutation proposal was in the range of expected payments?
A. Can you repeat the question?
Q. Did you independently determine whether the cash commutation proposal was within the range of expected payments?
A. We relied on Duff to make that determination and they have outlined that here.
Q. Has anyone at U.S. Bank ever addressed whether the FGIC rehabilitation plan was better than the FGIC settlement plan, and I mean better for certificate holders?
MR. KOTWICK: Objection to the form.

CONFIDENTIAL - M. SCOTT

A. Has anyone at U.S. Bank -- can you repeat the question?
Q. Yeah.
Has anyone at U.S. Bank ever made a determination as to whether the FGIC rehabilitation plan was better than the FGIC settlement plan?
A. I don't know.
Q. And has anyone ever made a determination with respect to whether the settlement plan was better than the rehabilitation plan?
MR. KOTWICK: Objection to form.
A. As I mentioned before, I -- I reviewed, you know, the presentation as Duff presented it and, according to that, made a determination that the FGIC settlement was in the best interest of holders and it was reasonable.
Q. Did FGIC ever address -- excuse me. I apologize.
Did Duff & Phelps ever say in sum and substance one plan is offering 27 to 30 cents on the dollar and one plan is offering approximately 21 cents on the dollar, and yet this is why we think the plan offering less cents on the dollar is better for certificate holders?



CONFIDENTIAL - M. SCOTT

MR. GREEN: Objection to the form.
MR. KOTWICK: Objection to form.
A. And I actually was distracted. Can you repeat the question?
Q. Sure.
MR. GELFARB: Can you read the question?
(Record was read as requested.)
A. I don't recall.
Q. Do you recall anyone on the conference asking Duff & Phelps something to that effect?
MR. KOTWICK: Objection to the form.
A. No.
Q. Excuse me?
A. No.
Q. Now, looking at page 3 again, and that's the executive summary, do you see that with the cash payments, and do you see the base scenario has a range of 220 to 340 million?
A. Yes.
Q. Okay. Have you ever undertaken any analysis as to whether that base scenario is reasonable?
MR. KOTWICK: Objection to form.
A. No.



CONFIDENTIAL - M. SCOTT

Q. Do you know whether anyone -- whether anyone at U.S. Bank has undertaken any analysis as to whether that scenario is reasonable?
MR. KOTWICK: Objection to form.
A. No.
Q. And did you undertake any analysis yourself as to whether the stress scenario was reasonable?
A. No.
MR. KOTWICK: Objection.
Q. Do you know whether anyone at U.S. Bank other than yourself undertook any analysis as to whether the stress scenario was reasonable?
MR. KOTWICK: Objection to form.
A. No.
Q. During the Duff & Phelps discussion, did they go into in any way any kind of discussion as to the reasonableness of the discount rates being applied under the base scenario?
A. I don't recall.
Q. And did they go into any analysis of the discount rates being applied under the stress scenario?
A. I don't recall.
Q. Do you know whether U.S. Bank ever asserted



CONFIDENTIAL - M. SCOTT

any claims against ResCap?
MR. KOTWICK: Objection to the form.
A. U.S. Bank as trustee filed proofs of claim in the ResCap bankruptcy.
Q. Against ResCap; correct?
A. Against ResCap, the different debtor entities, yes.
Q. Okay. Now, if the FGIC plan is accepted, do you know what's going to happen to those claims that U.S. Bank filed against ResCap?
MR. GREEN: Objection to the form.
Can you clarify "FGIC plan"?
MR. GELFARB: By "FGIC plan" I'm referring to the plan by which the policies will be commuted in exchange for payment of 253 million and other consideration.
A. And can you repeat the question?
Q. Yes.
What -- if that plan is accepted, the plan whereby the trusts will receive 253 million plus other consideration, what is going to happen to U.S. Bank's claims against ResCap?
MR. KOTWICK: Objection to the form.
Can I offer a clarification?

MR. GELFARB: Sure.
MR. KOTWICK: Are you talking about the proofs of claim for the FGIC trusts? Are you talking about proofs of claim generally?
MR. GELFARB: I'm interested in FGIC trusts.
A. So as this FGIC plan -- or, sorry -- the FGIC settlement agreement is a part of the global ResCap plan, as a part of that, these trusts, these eight trusts for which U.S. Bank is trustee, will have an allowed claim in the ResCap bankruptcy.
Q. And what is the amount of that claim?
A. For these eight trusts?
Q. Right.
A. I don't have that information with me.
Q. Is there anyone at U.S. Bank who would know?
A. The information is listed on the schedules to the plan and disclosure statements. We could refer to those.
Q. Do you believe that, as far as you know, and I understand you are not an attorney, that U.S. Bank has the authority to accept the commutation of the policies in exchange for the $253 million





without Freddie Mac's consent?
MR. KOTWICK: Objection to the form. Calls for a legal conclusion.
MR. GELFARB: Can she answer the question?
MR. KOTWICK: Yes, she can, to the extent she is able to.
A. Can you repeat the question?
Q. Yes.
Is it your understanding that U.S. Bank has the authority to agree to commute the policies in exchange for the payment of 253 million plus other consideration without -- without Freddie Mac's consent?
MR. KOTWICK: Same objection.
A. Yes.
Q. And what is that -- what is that based upon, that ability?
A. At a very basic level, the trustee is able to act on behalf of the trust.
Q. Do you know -- I mean, do you know where that authority is derived from exactly?
A. We can refer to the various agreements. It could be derived from New York law.
Q. I'd like to direct your attention to the





settlement agreement again. That's Exhibit 7.
Now, you reviewed this document before you signed it; correct?
A. Yes.
Q. Okay. Now, take a look at Exhibit D. In particular, did you look at Exhibit D before you signed the agreement?
MR. KOTWICK: D as in dog?
MR. GELFARB: D as in dog.
MR. KOTWICK: Objection. Asked and answered.
A. I don't recall.
Q. Do you see on page 2 there is a paragraph D?
A. Yes.
Q. All right. Do you understand that the settlement agreement referred to in that paragraph is the agreement for the $253 million --
A. Yes.
Q. -- that we've been discussing? All right.
Do you know why paragraph D is included in this document?
MR. KOTWICK: To the extent that your knowledge is based on discussions with counsel,





I direct the witness not to answer the question. To the extent you have an independent basis, you should answer to the best of your knowledge.
A. I can't answer the question.
Q. All right. Have you worked on other deals that involve commuting of insurance policies while you've been at U.S. Bank?
A. No.
Q. Have you ever worked on a deal where you saw a judge being asked to sign something that said that U.S. Bank acted reasonably?
A. Can you repeat the question?
Q. Yeah.
Have you ever worked on a deal while you've been at U.S. Bank where a judge was asked to sign an order saying that U.S. Bank acted reasonably?
MR. KOTWICK: Objection to the form.
A. I can't recall.
Q. And what about a deal where a judge was asked to sign an order saying that U.S. Bank acted in good faith?
MR. KOTWICK: Objection to the form.
A. I can't recall.

Q. And what about a deal where a judge was asked to sign an order saying that U.S. Bank acted in the best interests of investors in trusts for which U.S. Bank was a trustee?

MR. KOTWICK: Objection to the form.

A. I can't recall.

Q. And what about a deal where a judge was asked to state that you were -- acted in the best interests of the investors in each trust?

MR. KOTWICK: Objection to form.

A. I don't recall.

Q. Is your understanding that U.S. Bank has acted in good faith with respect to the commutation agreement?

A. Yes.

Q. And you have acted in good faith towards Freddie Mac?

A. Yes.

Q. And why do you believe that to be the case?

A. We were approached with the settlement, the FGIC settlement. We engaged Duff & Phelps to do the analysis. We worked with counsel. We worked with the other trustees. We provided notice. I mean, this -- all of this was part of a mediation process





which demands acting in good faith.

Q. What kind of notice did you ever give to Freddie Mac? You said you gave notice. Do you mean notice to Freddie Mac?

A. Related to the FGIC settlement?

Q. Yes.

A. The trustee groups -- the trustee group gave a notice to all holders regarding the entry into the plan support agreement and the FGIC settlement and another notice went out on the eight trusts for which U.S. Bank is trustee regarding the FGIC settlement.

Q. And by FGIC settlement, you mean a commuting of the policies?

MR. KOTWICK: Objection to the form.

A. Yes.

Q. When did that notice to FGIC -- excuse me -- to Freddie Mac go out?

MR. KOTWICK: Objection to the form.

A. I would have to refer to the notices for the exact dates.

Q. Can you approximate?

A. It was very short after the entry into the plan support agreement, the first -- the first





notice went out and then shortly thereafter the second notice went out.

Q. Is there any reason that Freddie Mac was not apprised of the possibility that policies might be commuted prior to the entry into the plan support agreement?

A. We couldn't disclose any information. We were bound by court ordered confidentiality.

Q. And did you think that Freddie Mac might have wanted to know that this was going on prior to the entry into the plan support agreement?

MR. KOTWICK: Objection to the form.

A. Can you repeat the question?

Q. Yeah.

Did you ever think that Freddie Mac might have wanted to know that this possibility of commutation of policies was going on prior to the entry into the plan support agreement?

MR. KOTWICK: Objection to the form.

A. Sure, they may have wanted to know.

Q. Did you ever raise the issue of letting Freddie Mac know prior to the entry into the plan support agreement?

MR. KOTWICK: Objection to the form.





A. Again, we were bound by court ordered confidentiality.

Q. Now, you see paragraph C says that "The settlement agreement and the transactions are in the best interests of the investors in each trust"?

Do you see that?

A. I do.

Q. And you understand that Freddie Mac is an investor in the trust, in some trusts?

A. Yes.

Q. Why do you think it's in Freddie Mac's best interests to have this settlement agreement entered into?

MR. KOTWICK: Objection. Asked and answered.

A. Do you want me to go through all of the reasons --

Q. Sure.

A. -- again? So the settlement agreement itself, the trusts would no longer have to pay premiums. They are receiving a guaranteed amount, a set amount in this 253 million versus the alternative, which, you know, there's a lot of uncertainty surrounding the alternative plan.

This particular FGIC settlement, again, was wrapped up within a larger global ResCap settlement for which there were various reasons we considered that to be in the best interest of holders. I can run through those reasons again for you, if you'd like.

Q. Sure.

A. You know, again, the global settlement allowed for a substantial increase to the value of the estate with the AFI contribution, resolved a lot of potential litigation, allowed for claims related to the additional settling trust to be allowed, servicing claims to be allowed. It made -- you know, it -- administrative expenses related to those disputes, that was, you know, abated, the decrease to the estate related to those administrative expenses, and then at the, you know, end of the day, these FGIC trusts had an allowed claim within the ResCap bankruptcy.

Q. Do you understand that under the FGIC rehabilitation claim there is also going to be a lump sum payment?

A. Pursuant to the Duff & Phelps report, yes, I believe they outlined a lump sum payment.





Q. Do you know what the lump sum payment is supposed to be?

A. I would have to confirm. I recall it being around 150 million, maybe.

Q. Now, there are certain trusts and certain noteholders that are still going to be covered by the FGIC rehabilitation plan; correct?

MR. KOTWICK: Objection.

Q. Even if the -- even if the commutation agreement is entered into; correct?

MR. KOTWICK: Objection. Form. Outside the scope.

Q. Do you understand the question?

A. Can you repeat the question?

Q. Even -- even assuming that the commutation agreement is entered into, there are still going to be trusts that are going to get the deal that's proposed in the FGIC rehabilitation plan; correct?

MR. KOTWICK: Objection to form.

A. I'm not working on the FGIC rehabilitation, so I'm not familiar with what's involved.

Q. So you don't know if, for example, U.S. Bank is still acting as trustee for trusts that will receive the FGIC rehabilitation plan, even if





certain of -- certain trusts are -- come under the commutation agreement; correct?

MR. KOTWICK: Objection to the form. Outside the scope.

A. Correct. I don't work on that issue, so I'm not familiar enough to speak.

Q. Now, can you please take a look at Exhibit E to Exhibit No. 7?

A. I'm sorry. Where did you want me to look?

Q. Exhibit E of Exhibit 7.

A. Oh, okay.

Q. Have you read this document before today?

A. This does not look familiar.

Q. Okay. Now, referring back, Ms. Scott, to Exhibit D, do you know what will happen to the commutation agreement if the findings set forth in paragraphs C and D are not signed off, signed by the judge?

MR. KOTWICK: Objection to the form, and to the extent any of your knowledge is based on communications with counsel, I advise you not to disclose that. To the extent you have independent basis outside of counsel, you should answer the question the best you can.





A. Can you repeat the question?

Q. In the event that paragraphs C and D are not signed off on by the judge, do you know what will happen to the commutation agreement?

MR. KOTWICK: Same objections. Same advice.

A. I can't answer the question.

MR. GELFARB: Okay. All right. No further questions. Thank you, Ms. Scott.

MS. JAMES: I just have a couple of follow-up questions.

EXAMINATION

BY MS. JAMES:

Q. Did U.S. Bank require the consent of the holders before entering into the FGIC settlement agreement?

MR. KOTWICK: Objection. Calls for a legal conclusion.

A. No.

Q. Can holders of notes or certificates in the FGIC trusts opt out of the FGIC settlement agreement?

A. No.

Q. What if they don't like it, is there any

solution?
A. They --
MR. KOTWICK: Objection. Objection to the form.
A. They can object, as your clients are doing.
Q. Okay. Can noteholders or certificate holders direct the trustees not to enter into the -- not to -- not to agree to the commutations?
A. Can you repeat that?
Q. Can noteholders and certificate holders under the various trusts direct the trustees not to continue with the commutation agreement?
A. No.
Q. No? Why not?
A. My understanding is that FGIC is the controlling party in the documents.
Q. So even if all noteholders under a particular trust contacted U.S. Bank and said, "Don't do this, we don't like it," it's your view that it's too late, FGIC has a right to decide, not the noteholders?
MR. KOTWICK: Objection. Calls for a legal conclusion.
A. And I can't really speak to hypotheticals.





I mean, I do know that holders object. There is an opportunity to object to the settlement if holders don't agree to it.
Q. Have any holders of notes or certificates under any of the FGIC wrapped U.S. Bank trusts directed the trustees to stop the commutations or to take a different path?
MR. KOTWICK: Objection to form.
A. Can you repeat the question?
Q. Has U.S. Bank received any directions from any certificate holders or noteholders regarding the commutations?
A. Other than your clients?
Q. We are objecting to the bankruptcy court. I'm asking if U.S. Bank has received any directions from noteholders or certificate holders in connection with the commutations?
A. No.
MS. JAMES: Okay. Thank you. Those were my questions.
THE WITNESS: Okay.
MS. JAMES: Are you good?
MR. GELFARB: That's it.
MR. KOTWICK: Mr. Green, do you have any





questions?
MR. GREEN: Nothing. Thank you. I've got nothing, nothing in terms of redirect. I think this concludes.
(Time noted: 3:41 P.M.)

_________________________
MAMTA SCOTT

Subscribed and sworn to before me
this _______ day of ____________ 20__.
_____________________________________



C E R T I F I C A T E

I, Paula Campbell, CSR, RDR, CRR, CCP, do hereby certify that on Thursday, July 18, 2013 appeared before me, MAMTA SCOTT.

I further certify that the said witness was first duly sworn to testify to the truth in the cause aforesaid.

I further certify that the signature of the witness to the foregoing deposition was not waived by agreement of counsel.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor financially interested in the action.

IN TESTIMONY WHEREOF, I have hereunto set my hand on this 18th day of July, 2013.

______________________________
Paula Campbell, CSR, RDR, CRR, CCP
Certified Shorthand Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
Certified CART Provider
Illinois C.S.R. No. 084-003481

----------------------- I N D E X ------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| MAMTA SCOTT | MS. JAMES | 7, 141 |
| | MR. GELFARB | 90 |

----------------------EXHIBITS-----------------------

| SCOTT | | PAGE | LINE |
|---|---|---|---|
| Exhibit 1 | Notice of Deposition of U.S. Bank National Association | 10 | 6 |
| Exhibit 2 | Notice of Hearing on Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, The FGIC Trustees and Certain Institutional Investors | 12 | 11 |
| Exhibit 3 | Exhibit 1 to the 9019 motion | 36 | 5 |
| Exhibit 4 | e-mail exchange with attachment, Bates stamped USB-MS 00068 through 078 | 48 | 5 |
| Exhibit 5 | Declaration of Mamta K. Scott as Officer of U.S. Bank, as RMBS Trustee | 78 | 8 |
| Exhibit 6 | Duff & Phelps FGIC Commutation Proposal Discussion Materials, Bates stamped TR-MS000001 through 009 | 83 | 16 |
| Exhibit 7 | Settlement Agreement dated 5/23/13 | 102 | 14 |
| Exhibit 8 | e-mail chain between Mamta Scott and David Gelfarb | 106 | 17 |
| Exhibit 9 | Intex desktop screenshot | 109 | 25 |





----------------------EXHIBITS-----------------------

| SCOTT | | PAGE | LINE |
|---|---|---|---|
| Exhibit 10 | Duff & Phelps draft FGIC Commutation Proposal Discussion Materials, Bates stamped DUFF-MD 00003 through 010 | 111 | 23 |




ERRATA SHEET FOR THE TRANSCRIPT OF:

CASE NAME: In Re: Residential Capital
DEPOSITION DATE: July 18, 2013
WITNESS NAME: Mamta Scott

Reason codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line _____ Reason _____
From ______________________ to ____________________

Page _____ Line _____ Reason _____
From ______________________ to ____________________

Page _____ Line _____ Reason _____
From ______________________ to ____________________

Page _____ Line _____ Reason _____
From ______________________ to ____________________

Page _____ Line _____ Reason _____
From ______________________ to ____________________

Page _____ Line _____ Reason _____
From ______________________ to ____________________

Page _____ Line _____ Reason _____
From ______________________ to ____________________

Page _____ Line _____ Reason _____
From ______________________ to ____________________

_________________________
MAMTA SCOTT

SUBSCRIBED TO AND SWORN BEFORE ME
THIS _____ DAY OF ____________, 20__.

_________________________
(Notary Public) MY COMMISSION EXPIRES:_____________

questions?

MR. GREEN: Nothing. Thank you. I've got nothing, nothing in terms of redirect. I think this concludes.

(Time noted: 3:41 P.M.)

MAMTA SCOTT

Subscribed and sworn to before me this 25TH day of JULY 2013.

"OFFICIAL SEAL"
CHRISTOPHER J NUXOLL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES APR. 15, 2014

ERRATA SHEET FOR THE TRANSCRIPT OF:

CASE NAME: In Re: Residential Capital

DEPOSITION DATE: July 18, 2013

WITNESS NAME: Mamta Scott

Reason codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page 40 Line 16 Reason 3
From MBAA to MBIA

Page ______ Line ______ Reason ______
From ______________________ to ______________________

Page ______ Line ______ Reason ______
From ______________________ to ______________________

Page ______ Line ______ Reason ______
From ______________________ to ______________________

Page ______ Line ______ Reason ______
From ______________________ to ______________________

Page ______ Line ______ Reason ______
From ______________________ to ______________________

Page ______ Line ______ Reason ______
From ______________________ to ______________________

Page ______ Line ______ Reason ______
From ______________________ to ______________________

[signature]
MAMTA SCOTT

SUBSCRIBED TO AND SWORN BEFORE ME THIS 25TH DAY OF JULY, 2013.

"OFFICIAL SEAL"
CHRISTOPHER J NUXOLL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES APR. 15, 2014

[signature]
(Notary Public) MY COMMISSION EXPIRES: 4/15/14