# Exhibit 5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------)
IN RE:                   )   Case No. 12-120202
                         )           (MG)
RESIDENTIAL CAPITAL,     )
LLC, et al.,             )   Chapter 11
            Debtors.     )   Adminstered Jointly
-------------------------)
```

July 16, 2013
9:09 a.m.

DEPOSITION of MARY SOHLBERG, 30(b)(6) witness on behalf of Wells Fargo, pursuant to Notice, held at the offices of Wilkie Farr & Gallagher, LLP, 787 Seventh Avenue, New York, New York, before Eileen Mulvenna, CSR/RMR/CRR, Certified Shorthand Reporter, Registered Merit Reporter, Certified Realtime Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

WILLKIE FARR & GALLAGHER, ESQS.
Attorneys for Investors Monarch, Stonehill, Bayview and CQS
787 Seventh Avenue
New York, New York 10019
BY: MARY EATON, ESQ.
meaton@willkie.com
EMMA JAMES, ESQ.
ejames@willkie.com

ALSTON & BIRD, LLP
Attorneys for Wells Fargo as Trustee and the Witness
90 Park Avenue
New York, New York 10016
BY: MICHAEL E. JOHNSON, ESQ.
michael.johnson@alston.com

DECHERT, LLP
Attorneys for Bank of New York Mellon Trust Company, N.A. as Trustee or Investor Trustee
1095 Avenue of the Americas
New York, New York 10036-6797
BY: REBECCA S. KAHAN, ESQ.
rebecca.kahan@dechert

SEWARD & KISSEL, LLP
Attorneys for Law Debenture Trust Company of New York
One Battery Park Plaza
New York, New York 10004
BY: THOMAS ROSS HOOPER, ESQ.
hooper@sewkis.com

A P P E A R A N C E S (Continued):

SEWARD & KISSEL, LLP
Attorneys for US Bank
One Battery Park Plaza
New York, New York 10004
BY: MARK D. KOTWICK, ESQ.
kotwick@sewkis.com
ARLENE R. ALVES, ESQ.
alves@dewkis.com

KRAMER LEVIN NAFTALIS & FRANKEL,LLP
Attorneys for the Official Committee of the Unsecured Creditors
1177 Avenue of the Americas
New York, New York 10036
BY: PHILIP S. KAUFMAN, ESQ.
pkaufman@kramerlevin.com

JONES DAY
Attorneys for Financial Guaranty Insurance Company
222 East 41st Street
New York, New York 10017-6702
BY: RICHARD L. WYNNE, ESQ.
rlwynne@jones day.com
BART GREEN, ESQ.
bartgreen@jonesday.com

MORRISON & FOERSTER, LLP
Attorneys on behalf of the debtors
1290 Avenue of the Americas
New York, New York 10104
BY: CHARLES L. KERR, ESQ.
ckerr@mofo.com

A P P E A R A N C E S (Continued):

ROPES & GRAY, LLP
Attorneys on Behalf of the Steering Committee of RMBS Investors
1211 Avenue of the Americas
New York, New York 10036-8704
BY: ANDREW G. DEVORE, ESQ.
andrew.devore@ropesgray.com

THE LAW OFFICE OF THOMAS M. MULLANEY
Attorneys for CQS parties
489 Fifth Avenue, Suite 1900
New York, New York 10017
BY: THOMAS M. MULLANEY, ESQ.
tmm@mullaw.com

Mary Sohlberg

THE REPORTER: Will counsel please state their appearances and who you represent for the record.

MR. JOHNSON: Good morning. Michael Johnson from Alston & Bird. We represent Wells Fargo as trustee. And I also represent the witness today.

MS. KAHAN: Rebecca Kahan from Dechert representing the Bank of New York Mellon Trust Company, N.A. as trustee or investor trustee.

MR. HOOPER: Ross Hooper from Seward & Kissel representing Law Debenture Trust Company of New York, a separate trustee.

MR. KOTWICK: Mark Kotwick, Seward & Kissel, on behalf of US Bank as trustee.

MS. ALVES: Arlene Alves, Seward & Kissel, on behalf of US Bank as trustee.

MR. KAUFMAN: Philip Kaufman, Kramer Levin, on behalf of the official committee of the unsecured creditors.

MR. GREEN: Bart Green from Jones Day on behalf of Financial Guaranty

Mary Sohlberg

Insurance Company.

MR. WYNNE: Richard Wynne, Jones Day, also on behalf FGIC.

MR. KERR: Charles Kerr of Morrison & Foerster on behalf of the debtors.

MR. DEVORE: Andrew Devore of Ropes & Gray on behalf of the steering committee of RMBS investors.

MR. MULLANEY: Tom Mullaney from the Law Offices of Thomas M. Mullaney for the CQS parties.

MS. EATON: Mary Eaton, Willkie Farr & Gallagher, on behalf of Monarch, Stonehill, Bayview and CQS. And joined by my colleague Emma James, also from Willkie Farr.

THE REPORTER: Please state your name and address for the record.

THE WITNESS: Mary Sohlberg. My business address, 625 Marquette Avenue, Minneapolis, Minnesota.

Mary Sohlberg

MARY SOHLBERG,

Having been duly sworn by Eileen Mulvenna, a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION

BY MS. EATON:

Q. Good morning, Miss Sohlberg.
A. Good morning.
Q. You understand that you are here testifying here today as a representative of Wells Fargo; is that correct?
A. Yes.
Q. And are you prepared to testify on behalf of that entity?
A. Yes.
Q. What did you do to prepare yourself to testify on behalf of Wells Fargo today?
A. I met with counsel yesterday afternoon. We reviewed some documents, had a lot of discussion, reviewed some of my own records related to the bankruptcy.
Q. Anything else?
A. No.

Mary Sohlberg

Q. When you say you met with counsel, who was that?
A. Alston & Bird.
Q. Can you name the individuals who were there?
A. Michael Johnson and Kit Weitnauer.
Q. Anyone else?
A. No.
Q. And that was yesterday afternoon, you said?
A. Yes.
Q. And how long did that meeting last?
A. I believe we started around and finished around 5:00, 5:30.
Q. And did you have any other meetings besides the meeting yesterday afternoon to prepare for your deposition today?
A. I had a brief meeting several weeks ago, when I expected to be deposed.
Q. Where did that meeting take place?
A. At Alston & Bird.
Q. Who was there?
A. Michael Johnson and Kit Weitnauer.
Q. And did you discuss the substance of

Mary Sohlberg

your testimony or potential testimony at that meeting?

MR. JOHNSON: Objection to the form.

THE WITNESS: Not really.

Because --

BY MS. EATON:

Q. Sorry, go ahead.
A. -- shortly after I arrived, we were informed that the deposition wasn't going to occur.
Q. I see.

How long did that meeting last?
A. I would say half hour.
Q. Now, you say at your session yesterday, you looked at some of your own records, I think you said; is that correct?
A. I looked at some of my own records prior to the meeting.
Q. Could you describe those records for us.
A. I looked at various documents related to the bankruptcy, the PSA term sheet, supplemental term sheet, my declaration, the settlement agreement, Duff report.

Mary Sohlberg

Q. Did you look at any other documents besides the ones you've just described?
A. Yes.
Q. What documents were those?
A. I can't recall.
Q. Do you know whether all of those documents have been produced in this litigation?
A. I don't know.
Q. Did you maintain a file, by the way, with respect to the ResCap bankruptcy, you personally?
A. My file more or less is on my -- I have a folder on my Outlook. That's where I maintain the bulk of the records that I have. Other than if I choose to make a hard copy to read, which I do sometimes.
Q. Did you choose to make hard copies in respect of this matter?
MR. JOHNSON: Objection to form.
THE WITNESS: Yes.
BY MS. EATON:
Q. So do you have a file of documents with respect to -- the hard copy documents with respect to the ResCap bankruptcy?

Mary Sohlberg

A. Yes.
Q. And how is that file organized?
MR. JOHNSON: Objection to form.
THE WITNESS: It's -- each document is in a folder with the name on it.
BY MS. EATON:
Q. Did you have a folder dedicated to the FGIC settlement agreement?
A. Yes.
Q. What documents were in that folder?
A. The settlement agreement.
Q. And anything else?
A. I don't believe so.
Q. Do you keep any other hard copy documents, whether in that folder or otherwise, with respect to the FGIC settlement agreement?
A. I don't believe so.
Q. Do you have any electronic documents concerning the FGIC settlement agreement that you maintain in your own files?
A. I have electronic documents that I maintain on my Outlook.
Q. And the question is, do any of them relate to the FGIC settlement agreement?

Mary Sohlberg

A. Yes.
Q. What documents are those?
A. Well, they're -- just about any e-mail communication that I've received on the ResCap bankruptcy I maintain in my Outlook. So that would include any communications that I've received regarding the FGIC settlement, which I would have to state would come from counsel.
Q. Did you look at that -- back up.
You understand that a request for documents was made in connection with this motion and the objections to this motion?
Do you understand that?
A. Yes.
Q. And did you look at the documents in your folder to determine whether there were any responsive documents located there?
A. Yes.
Q. And did you turn over those documents to counsel?
A. Actually, the way that we did -- I did turn over some documents to counsel, but then a decision was made to bring in our tech group, who scanned all of my -- my folders for documents

Mary Sohlberg

related to FGIC.
Q. Does Wells Fargo maintain any documents in its systems, or files, with respect to the ResCap bankruptcy?
MR. JOHNSON: Objection; beyond the scope.
BY MS. EATON:
Q. Let me --
A. Yes.
Q. -- put it this way --
A. Yes.
Q. -- you have your own personal files.
A. Yes.
Q. And you work for Wells Fargo; right?
A. Yes.
Q. Does Wells Fargo, the entity, maintain any files with respect to the ResCap bankruptcy?
MR. JOHNSON: Same objections.
THE WITNESS: Yes.
BY MS. EATON:
Q. And do you know whether those files were searched for responsive documents in connection with the discovery that's taking

Mary Sohlberg

place --

MR. JOHNSON: Objection.

BY MS. EATON:

Q. -- with respect to this?

MR. JOHNSON: Sorry.

BY MS. EATON:

Q. With respect to this motion?

MR. JOHNSON: Objection.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Have you looked at the documents that Wells Fargo has produced in connection with this motion?

A. No.

Q. Do you know what documents Wells Fargo has produced in response to my clients' discovery requests?

A. Do I know what documents?

Q. Yes.

A. No, not specifically.

Q. You do have e-mail communications in your files regarding the FGIC settlement agreement; is that right?

A. Yes.

Mary Sohlberg

Q. And I think you mentioned that all of those communications were with counsel?

A. I said the bulk of the communications were with counsel.

Q. And how is it that you know that?

A. Because I -- I work with my Outlook folders all the time. I don't know who else would be communicating to me about the FGIC settlement.

Q. So some of the items in your Outlook folder were with counsel and some of them were not; correct?

A. I would say the bulk were with counsel, and some of them may have been from other parties. I just don't recall.

Q. Did you see the privilege log that was produced by Wells Fargo in connection with this motion?

A. No.

Q. Are you aware that Wells Fargo has withheld documents from production on the grounds that they're protected by one privilege or another?

A. Yes.

Mary Sohlberg

Q. Who else did you communicate with about the FGIC settlement apart from counsel?

A. I would have communicated periodically with my manager.

Q. Who was that?

A. Linda Stinson.

Q. Anyone else?

A. Internal counsel.

Q. Could you identify those individuals?

A. Jim Park and Bradley.

Q. Bradley?

A. I'm not sure how to pronounce his last name. He's our new senior counsel. Chatigny.

MR. JOHNSON: Spell it for the reporter.

THE WITNESS: I think it's C-H-A-T-I-G-N-Y.

MR. JOHNSON: I think it's Chatigny.

THE WITNESS: Chatigny.

BY MS. EATON:

Q. Okay. Did you speak with anyone else besides those four individuals?

Mary Sohlberg

MR. JOHNSON: Objection to form.

THE WITNESS: I don't recall anyone else.

BY MS. EATON:

Q. Did you speak with anyone associated with any of the other trustees of the RMBS securities at issue here?

A. No.

Q. So all of your communications were confined to discussions with your outside counsel and the four individuals that you've identified?

MR. JOHNSON: Objection to form.

THE WITNESS: I believe so, yes.

MR. WYNNE: Speak up a little. It was a little hard to hear.

MS. EATON: Sure.

BY MS. EATON:

Q. Who is Brian Bartlett?

A. Brian Bartlett is the head of corporate trust.

Q. Did you speak with Mr. Bartlett about the ResCap bankruptcy?

A. I communicated with Brian Bartlett. I did not speak with him.

Mary Sohlberg

Q. Communicated by what means?
A. E-mail.
Q. Did you communicate with Mr. Bartlett by e-mail or otherwise concerning the FGIC settlement agreement?
A. I don't believe so, no.
Q. Did you communicate with Mr. Bartlett by e-mail or otherwise concerning the PSA?
A. Yes.
Q. What is Mr. -- Mr. Bartlett works for Wells Fargo?
A. Yes.
Q. What's his role there?
A. He is the head of corporate trust services.
Q. Is he your boss?
A. No, I report through other individuals to Brian Bartlett.
Q. What other individuals?
A. Linda Stinson, who reports to Bob Campitelli. Bob now reports to Michael Watchke. And Michael Watchke reports to Brian Bartlett.
Q. So apart from Linda Stinson, did you

Mary Sohlberg

communicate with -- if I understand your testimony correctly, you did not communicate with any of those individuals about the FGIC settlement apart from Linda Stinson; is that correct?
A. Correct.
Q. Do you know whether Miss Stinson spoke with -- or rather communicated with any of those individuals regarding the FGIC settlement?
A. I don't know.
Q. Did you have authority to approve of the FGIC settlement, you personally?
A. Yes.
Q. Where did you get that authority from?
A. I'm an officer of Wells Fargo Bank.
MS. EATON: Let's mark this as Sohlberg 1, I guess.
(Sohlberg Exhibit 1, No Bates numbers, Notice of Deposition of Wells Fargo, Bank, N.A., marked for identification.)
BY MS. EATON:
Q. The court reporter is showing you a

Mary Sohlberg

document we've marked as Sohlberg 1, which is a multipage document, a notice of deposition of Wells Fargo Bank, N.A.
Have you seen this document before?
A. Yes.
Q. Did you look at this document in preparation for your testimony today?
A. Yes.
Q. Did you also -- are you aware that Wells Fargo has interposed objections to some of the topics listed on -- listed at pages 8 through 13 of Sohlberg 1?
A. Yes.
Q. Did you review those objections in preparing for your testimony today?
A. I didn't review the document, but I was made aware by counsel that there were objections to specific --
Q. And subject to those objections, are you prepared to testify on behalf of Wells Fargo with respect to each of the topics listed under Exhibit A to Sohlberg 1?
A. Yes.
Q. What is your position at Wells

Mary Sohlberg

Fargo?
A. I'm a default and restructuring account manager.
Q. What do your duties entail in performing that role?
A. The duties vary depending on the issue that I'm managing.
Q. Could you explain.
A. The way we're structured is we have individuals who -- responsibilities are the daily administration of deals. And if there are specific issues with the deal, we take that out of the -- out of the client team. They're the ones responsible for the daily administration. We take that issue out of the client team and we manage it in default and restructuring.
That issue could be -- it could be litigation. It could be a payment issue. It could be a bankruptcy or a restructuring of a deal. Like if there's a downgrade, we may need to put some additional documentation in place if a deal party is downgraded.
So basically we take out -- issues out of the ordinary course of the administration

Mary Sohlberg

of the deal. They go to the default and restructuring, and we manage just that issue.

Q. Okay. Is there a default/restructuring group at Wells Fargo?

A. Yes.

Q. And you're a member of that group?

A. Yes.

Q. Who are the other members of that group?

A. Bill Fay. Daniel Cohen. Charles Brown. Revathi Manohar. Bob Borhart. Peter Favorite. Denise Roy. And Linda Stinson.

Q. Is Linda Stinson the head of this group?

A. Yes.

Q. And are -- you and the other individuals you identified, do you all report to her?

A. Yes.

Q. When did you become -- are you the only person in the default/restructuring group with responsibility for the ResCap RMBS securitizations at issue in this case?

MR. JOHNSON: Objection to form.

Mary Sohlberg

THE WITNESS: I am the only person in the structured product groups at corporate trust responsible for ResCap.

BY MS. EATON:

Q. Are there other people in other groups responsible for ResCap?

MR. JOHNSON: Objection to form.

THE WITNESS: We also have a corporate municipal and escrow services. I believe they did have an issue that they were managing related to the ResCap bankruptcy. I'm not familiar with the issue.

BY MS. EATON:

Q. When did you first become -- strike that.

In your capacity as a member of the default/restructuring group, when did you first become involved with issues surrounding the ResCap RMBS securitizations at issue here?

MR. JOHNSON: Objection to form.

THE WITNESS: I would say shortly before they filed bankruptcy.

Mary Sohlberg

BY MS. EATON:

Q. And how did you become involved? What happened?

A. Only that there were -- there was speculation that they would be filing bankruptcy. So I believe we were gearing up in the event that they did file bankruptcy. So I had discussions with my manager.

Q. Miss Stinson?

A. Yes. When -- when it was felt that there was a possibility of ResCap filing bankruptcy, my manager talked to me and assigned the bankruptcy to me.

Q. And just to be clear, you were the only one in the group that worked on issues related to the ResCap bankruptcy; is that correct?

MR. JOHNSON: Objection to form.

THE WITNESS: You have to be more specific about "the group." Are you talking in default and restructuring or -- or a larger group?

BY MS. EATON:

Q. I was referring to the

Mary Sohlberg

default/restructuring group.

A. Yes.

Q. Okay.

A. Although we had a new account manager. I can't say he worked on ResCap. I just included him in -- initially in a lot of calls, just as part of his training.

Q. Who was that?

A. Peter Favorite.

Q. Now, you mentioned the corporate municipal and escrow group --

A. Yes.

Q. -- I think?

And you said that they also had some involvement with ResCap?

A. Yes.

Q. What was their -- what was that group's involvement?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: I only know that they had some involvement because of a document that I received related to, I believe, Wells Fargo's role as maybe a collateral

agent or collateral manager and found out that it was related to a deal that was in corporate and municipal and forwarded to them. That was the extent of my involvement.

BY MS. EATON:

Q. Apart from the default/restructuring group and the corporate municipal and escrow group, were there other groups at Wells Fargo involved with the ResCap RMBS securitizations let's say from the time these Chapter 11 cases were commenced?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: The other groups that may have been affected by the bankruptcy was servicing oversight. They were involved to the extent that there was a likely servicing transition, and they managed that process.

BY MS. EATON:

Q. Any other groups?

A. There was our trust administration group to the extent that there were some

amendments that were executed, and they managed the amendment process.

Q. I'm sorry, which amendments?

A. There were some amendments regarding advanced facilities that were put in place, I believe last fall.

Q. Amendments to -- are you referring to amendments to certain documents?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: Yes.

BY MS. EATON:

Q. Can you tell us what documents you're referring to?

MR. JOHNSON: Same objection.

THE WITNESS: It would be the governing document, the indenture. And there was a need to provide for an advanced facility. A lot of the newer deals, that tends to be standard. These were other deals and they needed to facilitate an amendment to put this in place.

BY MS. EATON:

Q. Is the trust administration group at

Wells Fargo responsible for amendments to the governing documents?

MR. JOHNSON: Objection.

THE WITNESS: They're responsible for processing the amendment.

BY MS. EATON:

Q. Which group, if any, at Wells Fargo is responsible for approving amendments?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: By processing an amendment, what the trust administration group does is they want to make sure that all the different various areas of corporate trust is aware that the documents are going to be amended in the event that that amendment affects their area.

And they actually execute the amendment, with the exception if there's a bankruptcy, I have more involvement or I make a decision how much involvement -- how much I need to be involved.

BY MS. EATON:

Q. Is there a group at Wells Fargo

responsible for approving those sorts of amendments?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: The process differs somewhat depending on the product. So I'll be answering just for RMBS.

BY MS. EATON:

Q. Okay.

A. I believe the trust administration group executes the amendment with involvement of internal counsel. After they have distributed the amendment to various groups and, if those groups have no issues, then it gets executed.

Q. Is there a particular group that is -- with respect to RMBS, which is how you limited your answer, which is fine -- is there a particular group at Wells Fargo responsible for approving amendments?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: The best way I can explain it is the trust administration group processes the amendment. Part of

Mary Sohlberg

that process is to make sure that the various groups, whether it's the cash payment group or the account managers group, have seen the amendment and have no issues with it, especially how it relates to what they do. And they will sign off on it; no issues, no issues, no issues.

The trust administration group is also working with counsel. And when they've taken it through the process and there are no objections or issues being raised, they're the ones that is going to approve and execute it.

BY MS. EATON:

Q. In connection with the negotiation of the FGIC settlement agreement, was there any discussion at Wells Fargo about the need, if any, to amend any of the governing documents with respect to the RMBS securitizations at issue?

MR. JOHNSON: Objection to form.

THE WITNESS: Regarding the FGIC settlement --

BY MS. EATON:

Q. Yes.

Mary Sohlberg

A. -- no.

Q. Was there any discussion about the need, if any, to amend the governing documents in connection with the negotiation and finalization of the PSA?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: No.

BY MS. EATON:

Q. Did Wells Fargo give any consideration to the actual or potential need to amend the governing documents before executing the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

And, Miss Sohlberg, you should exclude in your response to Miss Eaton's question any communications on that subject that Wells Fargo might have had with counsel.

MS. EATON: Well, it's a yes-or-no question.

BY MS. EATON:

Q. Did Wells Fargo give any consideration to the need, whether actual or

Mary Sohlberg

potential, to amend the governing documents before executing the FGIC settlement agreement?

MR. JOHNSON: Same objection and same instruction.

THE WITNESS: No.

BY MS. EATON:

Q. Did Wells Fargo give any consideration to the need, whether actual or potential, to amend the governing documents before executing the PSA?

MR. JOHNSON: Objection to form; outside the scope.

And exclude from your response any communications that Wells Fargo had with counsel that are responsive to Miss Eaton's question.

THE WITNESS: No.

BY MS. EATON:

Q. Now, Wells Fargo served as trustee for certain RMBS securitization trusts sponsored by the ResCap debtors; is that correct?

A. Yes.

Q. And what -- what was Wells Fargo's -- could you describe for us what Wells

Mary Sohlberg

Fargo's role was in that regard.

MR. JOHNSON: Objection to form.

THE WITNESS: I'm sorry, could you repeat the question.

BY MS. EATON:

Q. Wells Fargo served as trustee for certain RMBS securitization trusts sponsored by the ResCap debtors; correct?

A. Yes.

Q. Could you describe for us what Wells Fargo's role was as trustee in that regard.

MR. JOHNSON: Objection to form.

THE WITNESS: If I understand your question, Wells Fargo's role as trustee is set forth in the governing documents.

BY MS. EATON:

Q. I'm sorry, were you finished with your answer?

A. I'm struggling with the question a little bit because it's -- when you say Wells Fargo's -- as trustee, what the role is, the role is as trustee. The governing documents set forth various responsibilities and obligations for Wells Fargo as a trustee.

Mary Sohlberg

Q. Are the governing documents the sole source of Wells Fargo's responsibilities and obligations as trustee?

MR. JOHNSON: Objection to form; calls for a legal conclusion.

THE WITNESS: I would have to say yes.

BY MS. EATON:

Q. Did Wells Fargo as trustee owe any responsibilities to the investors in these RMBS securitizations?

MR. JOHNSON: Objection to form; calls for a legal conclusion.

THE WITNESS: Yes.

BY MS. EATON:

Q. What were those responsibilities?

MR. JOHNSON: Same objection.

THE WITNESS: Our duties as trustee to the holders were contractual up until the point that there's any event of default. After an event of default, we -- our role changes to a prudent person standard.

Mary Sohlberg

BY MS. EATON:

Q. You understand that certain of these -- of the trusts at issue were wrapped by FGIC? You know what I mean by that?

A. Yes.

Q. And you understand that there were -- that my clients are certificate holders of the FGIC-wrapped trusts?

A. Yes.

Q. Did Wells Fargo's responsibilities to the investors differ depending on whether the investors were holders of FGIC-wrapped trusts as opposed to non-FGIC-wrapped trusts?

MR. JOHNSON: Objection to form; calls for a legal conclusion.

THE WITNESS: No.

BY MS. EATON:

Q. So in Wells Fargo -- in Wells Fargo's understanding, its duties to the certificate holders was the same irrespective of whether the particular certificates were wrapped by FGIC or not --

MR. JOHNSON: Objection to form.

Mary Sohlberg

BY MS. EATON:

Q. -- is that correct?

A. Yes.

Q. Were the interests of the certificate holders in the FGIC-wrapped trusts and the unwrapped trusts the same with respect to the FGIC settlement agreement?

MR. JOHNSON: Objection to form; beyond the scope and outside -- calls for a legal conclusion.

THE WITNESS: Would you repeat the question.

BY MS. EATON:

Q. Sure. It was probably a bad question, so let me try it another way.

The FGIC settlement agreement -- the terms of the FGIC settlement agreement applied equally to holders of the FGIC-wrapped securities and holders of the securities that were not wrapped by FGIC; right?

MR. JOHNSON: Objection to form; calls for a legal conclusion.

THE WITNESS: I'm sorry, I'm just not understanding the question.

Mary Sohlberg

BY MS. EATON:

Q. Now, you said that the duties of Wells Fargo were different depending on whether there was an event of default, I think you said?

A. Yes.

Q. What did you mean by that?

MR. JOHNSON: Objection to form.

THE WITNESS: The documents lay out various provisions that, should they occur, result in an event of default.

BY MS. EATON:

Q. An event of default is defined in the governing documents --

A. Yes.

Q. -- is that what you're saying?

A. Uh-huh.

Q. And in the event that -- of an event of default, how do the duties of Wells Fargo to the investors in the affected trusts change?

MR. JOHNSON: Objection to form; outside the scope, calls for a legal conclusion.

THE WITNESS: They change in the sense that we're no longer just bound by

Mary Sohlberg

the contract or the duties outlined in the contract. We are now acting as a prudent person in protecting the interests of the certificate holders.

BY MS. EATON:

Q. What does it mean to act as a prudent person in protecting the interests of the certificate holders?

MR. JOHNSON: Objection to form; outside the scope, calls for a legal conclusion.

THE WITNESS: It means essentially that we are now acting as a fiduciary.

BY MS. EATON:

Q. Did Wells Fargo act as a fiduciary to the investors in the FGIC trust?

MR. JOHNSON: Objection to form; calls for a legal conclusion.

THE WITNESS: Yes.

BY MS. EATON:

Q. And that is because I take it Wells Fargo concluded that an event of default had occurred?

MR. JOHNSON: Objection to form;

Mary Sohlberg

outside the scope, calls for a legal conclusion.

THE WITNESS: Yes.

BY MS. EATON:

Q. What was that event of default? Or if there was more than one, explain.

A. An event of default was declared on the GMAC 2005-HE1 I believe in 2008 due to either an early amortization event or rapid amortization event. I'm not sure of the specifics. So that pushed that deal into an event of default.

And in dealing with the issues before Wells Fargo, we acted in the same manner for all of the trusts in which we were trustee that were involved in the FGIC settlement. We also issued notices to the holders that there may have been an event of default on all of the ResCap deals.

Q. Apart from the GMAC 2005-HGE1 [sic], Fargo conclude that an event of default had occurred with respect to the other trusts to which it was serving as trustee?

MR. JOHNSON: Objection to form; outside the scope and asked and answered.

Mary Sohlberg

THE WITNESS: We issued notices to all of our deals that an event of default may have occurred.

BY MS. EATON:

Q. I understand that. I'm asking something slightly different, which is whether Wells Fargo concluded with respect to those other trusts that an event of default had, in fact, occurred.

MR. JOHNSON: Objection to form; outside the scope, asked and answered.

And also in answering that question, you should exclude any communication that Wells Fargo had with counsel on that subject.

THE WITNESS: I can't answer that -- that question, that -- because of the involvement of our counsel in -- in our sending out the notices that an event of default may have occurred.

BY MS. EATON:

Q. Did Wells Fargo attempt to ascertain whether an event of default had occurred with respect to those other trusts?

Mary Sohlberg

MR. JOHNSON: You can answer that question, Miss Eaton [sic], with a simple yes or no, but you should not disclose the substance of any communications Wells Fargo had with counsel on that topic.

THE WITNESS: Yes.

BY MS. EATON:

Q. Did Wells Fargo undertake an analysis of whether an event of default had occurred on a trust-by-trust basis?

A. Yes.

Q. Who performed -- who at Wells Fargo performed that analysis?

A. No one at Wells Fargo.

Q. Did someone outside of Wells Fargo perform that analysis?

A. Yes.

Q. Who was that?

A. Alston Bird.

Q. And Alston & Bird communicated that analysis to Wells Fargo?

A. Yes.

Q. Did Alston & Bird conclude that an event of default had occurred with respect to any

Mary Sohlberg

trusts other than the one trust that you identified?

MR. JOHNSON: Miss Eaton [sic], I instruct you not to answer that question because to do so you would be required to disclose the advice of counsel.

BY MS. EATON:

Q. Is it the case that Wells Fargo had concluded that at least some of the trusts for which it was serving as trustee no event of default had occurred?

MR. JOHNSON: Objection to form; calls for a legal conclusion, outside the scope.

THE WITNESS: So you're asking me if Wells Fargo had concluded that no event of default had occurred?

BY MS. EATON:

Q. Right. You said -- I'm just trying to get some clarity. Let me try it again.

So you told us that Wells Fargo had concluded that an event of default had occurred with respect to GMAC 2005-HE1. And now I'm asking you whether Wells Fargo had concluded that

Mary Sohlberg

an event of default had not occurred with respect to any of the other trusts for which Wells Fargo served as trustee.

MR. JOHNSON: Objection to form; outside the scope and calls for a legal conclusion.

THE WITNESS: No.

BY MS. EATON:

Q. Did Wells Fargo conclude that an event of default had occurred with respect to the GMACM 2003-HE2?

MR. JOHNSON: Objection to form; calls for a legal conclusion, outside the scope.

And I caution the witness not to disclose any advice that Wells Fargo received from counsel.

THE WITNESS: Wells Fargo declared an event of default on the 2005 HE -- I believe it was 1. On the other deals, all the other deals, we concluded that events of default may have occurred.

BY MS. EATON:

Q. They could have occurred; they could

Mary Sohlberg

not have occurred?

A. Correct.

Q. Did an event of default occur with respect to the GMACM 2003-HE2?

MR. JOHNSON: Objection to form; outside the scope, calls for a legal conclusion.

And, Miss Eaton [sic], I caution you not to disclose any advice of counsel which you may have received or that Wells Fargo may have received on that subject.

MS. EATON: I promise I won't.

MR. JOHNSON: I'm sorry. Miss Sohlberg. Got my Marys mixed up this morning.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Did an event of default occur with respect to the GMACM 2004-HE5?

MR. JOHNSON: Objection to form; outside the scope, calls for a legal conclusion.

And, Miss Sohlberg, I caution you not to disclose any advice that Wells Fargo

Mary Sohlberg

received from counsel on that subject.

MS. EATON: Especially to Miss Eaton.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Did an event of default occur with respect to the GMACM 2005-HE2?

MR. JOHNSON: Objection to form; outside the scope, calls for a legal conclusion.

And please do not disclose any advice that Wells Fargo received from counsel on that subject.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Why did Wells Fargo conclude that there may have been an event of default with respect to the trusts other than the GMAC 2005-HE1?

MR. JOHNSON: Outside the scope, calls for a legal conclusion.

And, again, you can answer that question to the extent that you can do so without disclosing advice Wells Fargo

Mary Sohlberg

received from counsel.

Do you need the question read back to see if you understand it?

THE WITNESS: I understand the question. I'm just trying to figure out how to answer it without disclosing any advice from counsel.

I don't think I can answer it. You're asking me why Wells Fargo concluded that an event of default may have occurred?

BY MS. EATON:

Q. I'm asking for the factual basis for Wells Fargo's conclusion that an event of default may have occurred with respect to those other trusts?

A. Advice of counsel.

Q. That was legal advice that Wells Fargo received in that regard; correct? That's what you're referring to?

A. Correct.

Q. Can you share with us the factual basis for the conclusion that an event of default may have occurred with respect to those other trusts?

Mary Sohlberg

MR. JOHNSON: You can answer that question if Wells Fargo independently made a determination as to what facts were relevant to the conclusion that there was or was not an event of default; but if those facts or legal advice were conveyed to you by counsel, you should not disclose that advice of counsel.

THE WITNESS: We acted on advice of counsel.

BY MS. EATON:

Q. So Wells Fargo is not independently aware of any facts bearing on the question of whether an event of default occurred with respect to those trusts; is that correct?

MR. JOHNSON: Objection to form; outside the scope, calls for a legal conclusion.

THE WITNESS: We have the analysis provided to us by our counsel, but we acted on the advice of counsel.

BY MS. EATON:

Q. Correct me if I'm wrong, but I think that you indicated in your testimony that Wells

Mary Sohlberg

Fargo acted as fiduciary for all of the trusts irrespective of whether it concluded an event of default had occurred or not.

Did I understand you correctly?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes.

BY MS. EATON:

Q. What did it mean for Wells Fargo to act as a fiduciary with respect to those trusts?

A. What it means is we step outside of the -- outside of the governing document, outside of the contract. So we have to -- that we have to act in the best interests of the holders as issues are presented to us as a result of the event of default or otherwise. So we're not merely just adhering to the duties and obligations of the contract.

Q. And in Wells Fargo's understanding, was it required to act in the best interests of the holders in the absence of an event of default?

MR. JOHNSON: Objection to form; outside the scope.

THE WITNESS: In this situation, I

Mary Sohlberg

would say yes.

BY MS. EATON:

Q. What do you mean by that, "in this situation"?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: Because we couldn't conclude that an event of default did not occur.

BY MS. EATON:

Q. Why not?

MR. JOHNSON: Objection to form; outside the scope, calls for a legal conclusion.

And, again, you can answer the question, but please do not disclose any advice Wells Fargo received from counsel.

THE WITNESS: I would have to disclose advice we received from counsel to answer that question.

BY MS. EATON:

Q. With respect to the event of default that Wells Fargo did identify, when did that occur?

Mary Sohlberg

MR. JOHNSON: Objection to form; outside the scope.

THE WITNESS: That occurred in 2008.

BY MS. EATON:

Q. Prior to 2008, was it Wells Fargo's understanding that it was required to act in the best interests of the holders of the trusts at issue?

MR. JOHNSON: Objection to form; outside the scope.

THE WITNESS: On that particular deal, prior to declaring the event of default, we would have been responsible for adhering to the contract.

BY MS. EATON:

Q. Okay. But in Wells Fargo's understanding, did adhering to the contract entail acting in the investors' -- certificate holders' best interests?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: Well, certainly in adhering to the contract, we are acting in the best interests of the holders as

Mary Sohlberg

opposed to if we had not adhered to the contract. I'm struggling with the question. If acting on -- in accordance with the contract is in the best interests of the holders, then we did so.

BY MS. EATON:

Q. Did Wells Fargo act in the best interests of the certificate holders in agreeing to the FGIC settlement agreement?

MR. JOHNSON: Objection to form. Sorry. Go ahead.

THE WITNESS: Yes.

BY MS. EATON:

Q. What is the basis for Wells Fargo's conclusion that it acted in the best interests of the certificate holders in agreeing to the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: The basis is the sequence of events. I mean, an offer was made of a lump-sum payment. We acted in the best interests of the holders by having that offer evaluated by our financial expert. We acted in the best interests of

Mary Sohlberg

the holders by ensuring that, in the entering into an agreement, they still had a means of objecting to the agreement.

BY MS. EATON:

Q. What did you mean when you said that the basis for Wells Fargo's conclusion that it acted in the best interests of the certificate holders in agreeing to the FGIC settlement agreement was the, quote, sequence of events, close quote?

A. By "sequence of events" -- maybe that's not the proper phrasing. It's what we did when an offer was made. You know, we asked our financial expert to review the offer, and we ensured that provisions were made in the settlement agreement that would allow us to -- or allow us to facilitate any objections that an investor wanted to make.

Q. Could you explain what you mean when you said that you ensured that provisions were made in the settlement agreement that would allow you to facilitate any objections that an investor wanted to make?

MR. JOHNSON: Objection to form; the

Mary Sohlberg

document speaks for itself.

THE WITNESS: We ensured that the agreement provided for the fact that we would need to communicate the settlement to the holders and that -- and also communicate a means by which they could object to the settlement.

BY MS. EATON:

Q. What was that means?

A. By filing an objection.

Q. Like the investors, like my clients are doing now?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes.

BY MS. EATON:

Q. Did the settlement agreement provide for any other mechanism to facilitate any objections that an investor wanted to make?

MR. JOHNSON: Objection to form and the document speaks for itself.

THE WITNESS: Not that I recall.

BY MS. EATON:

Q. Okay. Apart from providing -- as you've described, providing a mechanism that

Mary Sohlberg

allowed Wells Fargo to facilitate any objections that an investor wanted to make to the FGIC settlement agreement and having your financial expert review the offer, were there any other bases for Wells Fargo's conclusion that it acted in the best interests of the certificate holders in agreeing to the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: Well, while not a driving force, it was important to the overall settlement in the bankruptcy that the FGIC issue get settled.

BY MS. EATON:

Q. What do you mean by that?

A. Well, there's -- the FGIC issue or the FGIC settlement is a part of the overall settlement under the PSA. So while not the driving force, certainly it was important that the issue or the claims of FGIC get resolved.

Q. Important to whom?

A. To the holders.

MR. JOHNSON: Objection to form.

THE WITNESS: I'm sorry.

MR. JOHNSON: That's okay.

Mary Sohlberg

THE WITNESS: To the holders.

BY MS. EATON:

Q. To the certificate holders?

A. Yes.

Q. Why was it important to the certificate holders that the FGIC claims get resolved?

A. Because the PSA was in the best interest of all the holders. This was one aspect of the plan support agreement.

Q. Why -- I'm sorry. I didn't mean to interrupt you.

A. No.

While -- the main issue at hand was -- the offer made by FGIC of a lump-sum payment as opposed to a payment over 40 time [sic] was the driving issue of the FGIC settlement agreement and was analyzed separately in terms of our engagement of our financial expert to analyze the lump sum in comparison to getting paid over a period of time.

And that conclusion was that it was in the best interests of the holders to take the lump-sum payment. That issue itself was a part

Mary Sohlberg

of the plan support agreement.

Q. Why was it in the best interests of the certificate holders to take the lump-sum payment?

MR. JOHNSON: Objection to form; asked and answered.

THE WITNESS: We engaged a financial expert to analyze whether or not it was in the best interests of the holders to take a lump-sum payment now as opposed to being paid over a period of 40 years and -- which would also present to the holders certain risks of payment.

Our financial expert analyzed and compared the two and concluded that the lump-sum payment was in the best interests of the holders.

BY MS. EATON:

Q. And by that, do you mean that it was in the -- in the best interests of the holders from an economic perspective?

MR. JOHNSON: Objection to form.

THE WITNESS: In my view, it was an economic analysis, so I would say yes.

Mary Sohlberg

BY MS. EATON:

Q. So it was Wells Fargo's conclusion that the FGIC settlement agreement was more economically advantageous to the holders than the payments that the certificate holders would have received under the FGIC rehabilitation plan; is that correct?

MR. JOHNSON: Objection to form and asked and answered.

THE WITNESS: Yes.

BY MS. EATON:

Q. What was the basis for Wells Fargo's conclusion that the FGIC settlement agreement was more economically advantageous to the certificate holders than the payments they would have received under the FGIC rehabilitation plan?

MR. JOHNSON: Objection to form; asked and answered.

But you can testify again.

THE WITNESS: The basis was the recommendation of our financial expert.

BY MS. EATON:

Q. Did Wells Fargo have any other basis for concluding that the FGIC settlement agreement

Mary Sohlberg

was more economically advantageous to the certificate holders than the payments they would have received under the FGIC rehabilitation plan?

A. Any other basis?

Q. Yes.

A. I would say no. Only in the sense that by accepting payments over a period of time, that presents certain risks and uncertainty in terms of what recovery the holders would ultimately receive.

Q. Is it the case -- well, did Wells Fargo conclude that the FGIC settlement agreement was more economically advantageous to the certificate holders than the FGIC rehabilitation plan in terms of what recovery the holders would ultimately receive?

MR. JOHNSON: Objection to form.

BY MS. EATON:

Q. Do you understand the question?

A. Could you rephrase it.

Q. Did Wells Fargo conclude that the holders would achieve a greater recovery under the FGIC settlement agreement than the FGIC rehabilitation plan?

Mary Sohlberg

MR. JOHNSON: Objection to form.

THE WITNESS: Wells Fargo concluded, based on the results of the -- of our financial expert, that the lump sum was in the best interests of the holders. Now, any questions related to recovery and how FGIC included that in their analysis would best be addressed with FGIC. I can't answer that.

BY MS. EATON:

Q. Did Wells Fargo exercise its business judgment in determining to execute the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: I'm not sure I'm understanding the question correctly. Did we use our business judgment in entering into the agreement? Well, certainly we used our judgment in terms of the facts that we were presented as a result of the expert analysis and -- and the fact that we provided for a method for holders to --

(Telephonic interruption.)

MS. EATON: I'll withdraw the

Mary Sohlberg

question. It makes it easier.

BY MS. EATON:

Q. Wells Fargo was not directed by any certificate holders to execute the FGIC settlement agreement; is that correct?

A. Not formally. We do know that the institutional investors were in agreement with the settlement, but there was no formal direction.

Q. Understood.

So Wells Fargo then, I take it, made its own determination to enter into the FGIC settlement agreement on the investors' behalf?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes, with the proviso that if a holder objected to it, they had a means to go in that direction in terms of objecting to the court.

BY MS. EATON:

Q. Meaning that they could lodge an objection to the Rule 9019 motion made by the debtors?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes.

Mary Sohlberg

BY MS. EATON:

Q. But, otherwise, the FGIC settlement agreement was binding on the certificate holders; isn't that true?

MR. JOHNSON: Objection to form; mischaracterizes the document, and the document speaks for itself.

THE WITNESS: It is a binding -- yes.

BY MS. EATON:

Q. And it was intended to be binding on the certificate holders; isn't that also true?

MR. JOHNSON: Objection to form; calls for a legal conclusion.

You can answer.

THE WITNESS: As I understand it, yes.

BY MS. EATON:

Q. So in executing the FGIC settlement agreement, Wells Fargo made its own determination that that was appropriate; right?

MR. JOHNSON: Objection to form.

THE WITNESS: Well, it was certainly -- Wells Fargo executed the

Mary Sohlberg

settlement agreement, but it was not done in isolation. I mean, there were certain things that needed to be in place in order for us to move forward with the settlement agreement. And that -- one of which was the results of the expert's analysis and the other, again, was ensuring that there was a provision for holders to object.

MR. JOHNSON: We've been going for over an hour. When it's appropriate, would you mind taking a break, please?

MS. EATON: Absolutely. Now would be fine.

MR. JOHNSON: Thank you.

(Recess from the record.)

BY MS. EATON:

Q. Welcome back.

A. Thank you.

Q. Before we took the break, I asked had asked you some questions about the -- about Wells Fargo's conclusion that the FGIC settlement agreement was in the best interests of the certificate holders. And there's one issue by your testimony I wanted to get some clarity on.

Mary Sohlberg

I think that you referred to advice that Wells Fargo got from its financial adviser as one of the bases for its conclusion that it was in the certificate holders best interests; is that correct?

A. Yes.

Q. Was that financial adviser Duff & Phelps?

A. Yes.

Q. Was there any other financial adviser advising the trustees with respect to the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

BY MS. EATON:

Q. I'll withdraw the question and ask you a different . . .

Apart from your legal counsel, was Wells Fargo being advised by anyone else with respect to the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes.

MR. JOHNSON: And Duff & Phelps?

BY MS. EATON:

Q. Apart from Duff & Phelps, that's

Mary Sohlberg

what I'm asking you. Duff & Phelps was advising Wells Fargo with respect to the FGIC settlement agreement; correct?

A. Correct.

Q. And Wells Fargo was being advised by legal counsel in connection with the FGIC settlement agreement; correct?

A. Yes.

Q. Was Wells Fargo getting advice from anyone else in connection with the FGIC settlement agreement?

A. No.

Q. You mentioned previously that a lump-sum offer had been made, or words to that effect.

Do you remember that?

A. Yes.

Q. What was the lump-sum offer that you were referring to.

MR. KAUFMAN: I'm going to object on the basis of mediation privilege.

MR. JOHNSON: Right.

Objection to form.

And, also, you shouldn't disclose

Mary Sohlberg

any substance of any communication that emerged from the mediation process.

THE WITNESS: I can't answer that.

BY MS. EATON:

Q. You can't tell me what the lump-sum offer was that you referred to earlier in your testimony?

MR. JOHNSON: Same objection.

You should not disclose any substantive communication on that subject that came out of the mediation process.

MS. EATON: Just to be clear, are you instructing her not to answer the question?

MR. JOHNSON: I'm instructing her not to answer to the extent that the information that you're seeking is information that is the substance of a communication in the mediation process.

THE WITNESS: I can't answer that.

BY MS. EATON:

Q. Did you participate in the mediation process, you personally, Miss Sohlberg?

MR. JOHNSON: Objection to form.

Mary Sohlberg
What do you mean by "participate"?
BY MS. EATON:
Q. Did you understand the question?
A. I'm struggling with the question.
MR. JOHNSON: You want to ask her if she attended the mediation? That might be a place to start.
MS. EATON: That's a separate -- that's a separate question.
BY MS. EATON:
Q. Who was directing Wells Fargo with respect to the negotiations during the mediation process?
A. Counsel.
Q. Who at Wells Fargo gave authority to counsel to make -- to participate in the negotiations during the mediation process?
A. I did, as the account manager responsible for the ResCap bankruptcy.
Q. Did you give authority to counsel to make offers and counteroffers during the mediation process?
MR. WYNNE: I couldn't hear that, Mary. Could you repeat it.

Mary Sohlberg
BY MS. EATON:
Q. Did you give authority to counsel to make any offers during the mediation process?
MR. JOHNSON: Miss Sohlberg, you shouldn't disclose the substance of any attorney-client privileged communications. You can answer that question yes, no, I don't remember, I don't know; but no substance.
THE WITNESS: The best way I can answer that, because I'm struggling with the word "authority," our counsel had the ability to act and negotiate on behalf of Wells Fargo as trustee. That's the best way I can answer that question.
BY MS. EATON:
Q. And did your counsel have authority to bind Wells Fargo to any agreements without getting specific authority to do so?
A. I'm struggling with that question. Wells Fargo was the party that executed the agreement. So we're the ones that -- that bound the trusts to the agreement. That's the best way I can answer the question.

Mary Sohlberg
Q. Did you attend any of the mediation sessions?
A. Yes.
Q. How many such sessions did you attend?
A. I attended four --
Q. Were these --
A. -- sessions.
Q. -- in-person sessions?
A. Yes.
Q. When was the first such session you attended?
A. I believe it was April 22nd.
Q. Where did that meeting take place?
A. In New York.
Q. Can you be more precise.
A. The offices of Kramer Levin, I believe.
Q. How did you come to participate in the mediation session that took place on April 22nd at Kramer Levin's offices?
MR. JOHNSON: Objection to form.
And in answering that question, Miss Sohlberg, please do not disclose the

Mary Sohlberg
substance of any communication that you might have had with counsel.
THE WITNESS: I was informed of the meetings that had been scheduled, I believe by Judge Peck, and made a decision to attend.
BY MS. EATON:
Q. Meaning that the sessions had been scheduled by Judge Peck? Is that what you meant? Or that Judge Peck told you about the sessions?
A. I believe the -- and I'm not certain of this. I believe that the meetings were scheduled as a result of the direction by Judge Peck.
Q. You said that you made a decision to attend. What was the reason you made that decision?
A. Because it was my understanding that it was an important, critical mediation.
Q. Where did you gain that understanding?
A. Pardon?
Q. Where did you gain that understanding?

A. Counsel.

MR. JOHNSON: Miss Sohlberg, I did not know that your prior answer involved advice you got from counsel. So please do not divulge any further advice you might have gotten from counsel.

BY MS. EATON:

Q. How long did that meeting last?

A. I believe it was April 22nd and 23rd the meetings were held. I think each meeting was about eight hours, if I can remember.

Q. So the first meeting -- you said there were four sessions that you attended, the first being on April 22nd. When was the second session?

A. The next day.

Q. April 23rd?

A. Yes.

Q. And the third session, when was that?

A. It was the beginning of May. I believe it was maybe the 2nd and 3rd. I'm not sure of the dates.

Q. And the fourth session you attended,

when was that?

A. That was the next day. So --

Q. May 3 or 4th?

A. Yes.

Q. Those are the only mediation sessions you attended in person; right?

A. Yes.

Q. Okay. So the first session on the 22nd at Kramer Levin's offices lasted about eight hours; is that right?

A. I believe so, yes.

Q. Was there anyone there from Wells Fargo apart from yourself?

A. No.

Q. Was the lump-sum offer discussed at that meeting?

A. I don't recall.

Q. Did you take any notes of that meeting?

A. I'm sure that I took some notes. Not a lot, but I'm sure I must have taken some.

Q. Do you keep a notebook?

MR. JOHNSON: Objection to form.

THE WITNESS: I keep a notebook, but

I didn't have the notebook with me.

BY MS. EATON:

Q. Is there anything that you could look at to refresh your recollection as to whether the lump-sum offer was discussed at this April 22 mediation session?

A. No.

Q. What is your first recollection -- when do you first recall having learned about the lump sum offer?

MR. WYNNE: I'll object to that.

THE WITNESS: I don't recall.

BY MS. EATON:

Q. Do you recall whether it was in -- before or after a mediator was appointed?

MR. JOHNSON: Objection to form; foundation.

THE WITNESS: Judge Peck? By mediator?

BY MS. EATON:

Q. You recall that Judge Peck was appointed -- he's making a foundational --

A. I just --

Q. Just so we have a clean record, you

recall that Judge Peck was appointed as the mediator in this matter by Judge Glenn?

A. Yes.

Q. And do you recall that Judge Peck was appointed to that role in December of 2012?

A. Yes.

Q. Do you recall whether you learned of the lump-sum payment before or after the point in time when Judge Peck was appointed as mediator?

A. My recollection is that it would have been after.

Q. Do you recall how long after Judge Peck was appointed as mediator that you first learned of this offer of a lump-sum payment?

A. No.

Q. Do you recall whether you first learned about it in January of 2013?

MR. JOHNSON: Objection; asked and answered.

THE WITNESS: I don't recall when I first learned of the lump-sum payment.

BY MS. EATON:

Q. How long before -- strike that.

At a certain point, Wells Fargo

Mary Sohlberg

instructed Duff & Phelps to perform an analysis of the FGIC proposal; right?

A. Yes.

Q. And at that point, the FGIC proposal contemplated a lump-sum payment; correct?

A. Yeah.

Q. And that was the same -- was that the same lump-sum payment that you were referring to earlier in your testimony?

MR. JOHNSON: Objection to form.

You mean the precise dollar amount? If you mean the precise dollar amount, I'm going to object because the question is designed the elicit subsequent mediation and settlement communications.

BY MS. EATON:

Q. Was there more than one offer of a lump-sum payment?

MR. KAUFMAN: I'm going to object.

Mary, I think that you are really going past mediation privilege. I think there's a pretty clear court order. And I think that the parties have tried to give you some latitude, but I think you're going

Mary Sohlberg

past it.

MS. EATON: I appreciate that that's your view of the -- we have a disagreement about that.

MR. KAUFMAN: Well, I'm sorry. If you look at paragraph 4, it says, "No person or party participating in the mediation shall in any way disclose to any nonparty or any court, et cetera, any document or discussion, mediation statement, other document or information, correspondence, resolution or offer or counteroffer that may be made or provided in connection with the mediation."

I fail to see how that's not clear.

MS. EATON: Are you going to instruct your witness not to answer the question?

MR. JOHNSON: I'm not sure what the pending question is, but I am concerned. If the suggestion is that you have gone past what is in a court order, I'm not going to allow my client to make a disclosure that could be interpreted or

Mary Sohlberg

deemed a violation of a court order.

MS. EATON: Let me repeat the question.

BY MS. EATON:

Q. Was more than one offer of a lump-sum payment made?

MR. KAUFMAN: Objection.

MR. JOHNSON: Are you objecting, Mr. Kaufman, on the basis of the mediation form of privilege?

MR. KAUFMAN: Yes.

MR. JOHNSON: Miss Sohlberg, I cannot run the risk that Wells Fargo is going to be deemed to have run afoul of a court order requiring that we maintain in confidence communications associated with the mediation. So on that basis, I'm going to instruct you not to answer the question.

BY MS. EATON:

Q. Were all of the discussions that Wells Fargo participated in with respect to the lump-sum payment -- did they all take place within the context of the mediation?

MR. JOHNSON: Objection to form;

Mary Sohlberg

calls for a legal conclusion.

THE WITNESS: I'm struggling with that question. Because I have to conclude that there were other discussions, but I wasn't in those meetings, so it's difficult for me to answer the question.

BY MS. EATON:

Q. I was asking you that question in your capacity as the Wells Fargo representative, not you personally.

A. Uh-huh.

Q. Can you answer the question --

MR. JOHNSON: In that case, I object; it's beyond the scope. This is not a topic listed in the 30(b)(6) notice.

MS. EATON: Are you instructing her not to answer?

MR. JOHNSON: Of course not, but I'm saying that you can't fault the witness for not being prepared on a category that you did not include in your list of 42 topics.

BY MS. EATON:

Q. Let me ask you a different question.

Did Wells Fargo participate in any

Mary Sohlberg

discussions about what ultimately came to be the FGIC settlement agreement apart from discussions that happened during the mediation process?

MR. KAUFMAN: Sorry, I couldn't hear the question. I'm sorry. So far away from you, it's very hard to hear you.

Could you read back the question, please.

(Record read.)

MR. JOHNSON: Objection to form; calls for a legal conclusion and outside the scope.

THE WITNESS: My answer would be yes.

BY MS. EATON:

Q. Let's focus on those discussions that took place outside the mediation process, then, shall we? Okay?

A. Yes.

Q. Was the lump-sum payment discussed during those discussions that took place outside the mediation process?

MR. JOHNSON: Objection to form; calls for a legal conclusion and outside

Mary Sohlberg

the scope.

THE WITNESS: Those discussions would have occurred with counsel.

BY MS. EATON:

Q. Meaning who?

A. Alston & Bird.

Q. All of the discussions that took place outside the mediation process took place with Alston & Bird?

A. Yes.

Q. And were you personally present during all of those -- were you -- were those in-person discussions, oral discussions, mix of both?

A. Oral discussions.

Q. There were telephone calls about what was going on in the mediation?

A. Correct.

Q. And Alston & Bird was reporting to you in your capacity as a representative of Wells Fargo --

MR. JOHNSON: Objection to form --

BY MS. EATON:

Q. -- is that right?

Mary Sohlberg

MR. JOHNSON: -- calls for a legal conclusion.

You can answer.

THE WITNESS: Yes.

BY MS. EATON:

Q. And it was during those discussions that -- that -- is it true that it was during those discussions that you first learned that an offer had been made to make a lump-sum payment?

MR. KAUFMAN: Objection. To the extent the witness just indicated that -- based on your question, that counsel was reporting to her concerning the mediation, to me that's part of the mediation process.

MR. JOHNSON: Miss Sohlberg, I direct you not to answer that question.

THE WITNESS: I can't answer that.

BY MS. EATON:

Q. Did Wells Fargo negotiate the amount of the lump-sum payment?

MR. JOHNSON: Objection to form; calls for a legal conclusion.

And, Miss Sohlberg, I direct you not to answer on the basis that doing so would

Mary Sohlberg

implicate both the attorney-client privilege and the mediation privilege.

BY MS. EATON:

Q. Are you going to follow your counsel's instruction?

A. Yes.

Q. Were the negotiations over the FGIC settlement agreement hard fought?

MR. JOHNSON: Objection to form.

And, Miss Sohlberg, in answering that question, I direct you not to disclose any attorney-client privileged information that you might have received.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Did Wells Fargo take great pains to preserve and protect the investors' rights during the negotiation of the FGIC settlement agreement?

MR. WYNNE: I'm sorry, could you repeat that. You dropped at the end.

Or just could the reporter read that back.

(Record read.)

MR. WYNNE: Thank you.

Mary Sohlberg

MR. JOHNSON: Objection to form.

And in answering that question, Miss Sohlberg, I direct you not to disclose information you might have received from counsel. If you otherwise have knowledge, you can disclose that information.

THE WITNESS: I can only say that -- starting with great pains, I can only say that Wells Fargo would not have entered into the settlement agreement without a provision for holders to object.

BY MS. EATON:

Q. Is that the basis for Wells Fargo's --

MR. WYNNE: Is there a question pending or --

(Sohlberg Exhibit 2, No Bates numbers, Joinder of Certain RMBS Trustees to the Debtors' Motion for an Order, marked for identification.)

MR. WYNNE: Is there a question pending or --

MR. JOHNSON: Take a minute to look at that and familiarize yourself with it.

Mary Sohlberg

BY MS. EATON:

Q. The court reporter has handed you a copy of a multipage document that we've marked as Sohlberg Exhibit 2. And you can see the title of the document on page 2 is rather lengthy, but starts "Joinder of Certain RMBS Trustees to the Debtors' Motion for an Order under Bankruptcy Code Section 105(a) and 360(b) Authorizing the Debtors to Enter Into and Perform under a Plan Support Agreement," et cetera.

Do you see that?

A. Yes.

Q. Do you recognize this document?

A. Yes.

Q. Did you see it before it was filed?

A. I don't recall.

Q. Who at Wells Fargo approved the filing of this document with the court before it was filed, if anyone?

(Witness peruses the exhibit.)

A. I don't recall. I don't recall if we received a draft of this particular document or not.

Q. Do you know why the Wells Fargo

Mary Sohlberg

caused its counsel to file this joinder on behalf of itself and the other RMBS trustees?

MR. JOHNSON: Objection to form.

You can answer that question, but in doing so, please do not disclose any attorney-client communications that Wells Fargo had.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Do you recall that Wells Fargo filed a joinder in support of the debtors' motion to approve the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes.

BY MS. EATON:

Q. That was because Wells Fargo supported the debtors' motion to have the court approve the FGIC settlement agreement; right?

A. Yes.

Q. And you understood, didn't you, that this joinder that was filed was intended to set out the reasons why Wells Fargo was supporting the debtors' motion to have the court approve the FGIC settlement agreement --

Mary Sohlberg

MR. JOHNSON: Objection --

BY MS. EATON:

Q. Didn't you?

MR. JOHNSON: Objection to form; vague.

THE WITNESS: Yes.

BY MS. EATON:

Q. Why don't you turn to page 19. I'm referring to the little numbers at the bottom of the page, middle bottom of the page.

Do you have that page?

A. Yes.

Q. And directing your attention now to paragraph 34, where it states, "As described in the RMBS trustee declarations, each of the above deal points was the result of hard-fought negotiations with the RMBS trustees taking great pains to preserve and protect the investors' rights and the RMBS trusts' interests and ensure that the agreement and the settlements contemplated therein are in the best interests of the RMBS trusts and the investors."

Do you see that?

A. Yes.

Q. Did you submit -- did you submit -- you, Miss Sohlberg, did you submit a declaration in connection with that motion?
A. I submitted a declaration, yes.
Q. And was it true that the agreement was the result of hard-fought negotiations, as stated in paragraph 34 of the RMBS trustees' joinder?
MR. JOHNSON: Objection to form; asked and answered.
And in answering that question, please do not disclose any privileged communications that Wells Fargo received from counsel.
THE WITNESS: Could you repeat the question.
BY MS. EATON:
Q. Is it true that the FGIC settlement agreement was the result of, quote, hard-fought negotiations, close quote, as is stated in paragraph 34 of Sohlberg Exhibit 2?
MR. KERR: Objection to form.
MR. JOHNSON: Same objections as I previously stated.

THE WITNESS: As I understand the question, yes.
BY MS. EATON:
Q. What is the basis for Wells Fargo's assertion that the FGIC settlement agreement was the result of, quote, hard-fought negotiations, close quote, as is stated in paragraph 34 of Sohlberg Exhibit 2?
MR. JOHNSON: Objection to form.
MR. KERR: Objection to form.
THE WITNESS: I can -- you know, I still struggle with the term "hard-fought." I can only state that it was critical for certain things to be in place to protect the interests of the holders, and that may not have come easily during the course of the negotiation.
MR. JOHNSON: And, Miss Sohlberg, again I will remind you, do not disclose any discussions that occurred in the context of the negotiations associated with the mediation.
BY MS. EATON:
Q. What were the things -- you stated

in your prior answer, "I can only state that it was critical for certain things to be in place to protect the interests of the holders, and that may not have come easily during the course of the negotiation."
What did you mean by that?
A. Well, for me -- well, as I've stated before, you know, one of the provisions that was critical in entering into any settlement agreement was to provide for the ability of holders to object to the settlement.
Q. And does the FGIC settlement agreement expressly provide -- make provision for that --
MR. JOHNSON: Objection to form --
BY MS. EATON:
Q. -- do you know?
MR. JOHNSON: -- asked and answered and the document speaks for itself.
THE WITNESS: I believe so, yes.
BY MS. EATON:
Q. What is the basis for the assertion in paragraph 34 of the RMBS trustees' joinder that the trustees took, quote, great pains to

preserve and protect the investors' rights, close quote, during the negotiation process over the FGIC settlement agreement?
MR. JOHNSON: Objection to form.
MR. KERR: Objection to form.
THE WITNESS: I can't answer that. I'm not sure I understand the question.
BY MS. EATON:
Q. Well, you see here that it -- in paragraph 34 that it states that the RMBS trustees, of which Wells Fargo is one, took, quote, great pains to preserve and protect the investors' rights, close quote.
Do you see that?
MR. JOHNSON: Objection to form; mischaracterizes the document and suggests that this witness is the author of this document, which she is not.
MS. EATON: I don't think it suggests any such thing.
BY MS. EATON:
Q. It says that in paragraph 34, does it not?
MR. JOHNSON: The document speaks

Mary Sohlberg

for itself. It says what it says.

THE WITNESS: I can only answer that in the context of what -- of the issue that I've mentioned several times. In entering into the settlement agreement, it was important for Wells Fargo to have a provision that would allow the holders to object to the settlement.

BY MS. EATON:

Q. Why?

A. Wells Fargo entered into the settlement agreement concluding that it was in the best interests of all of the holders. That decision was made based on the analysis by FGIC. And typically, in making a decision of this type, as a trustee and being interested in acting in the best interests of the holders, you have to give a voice to that holder in the event they don't agree with the decision that you've made.

Q. Did Wells Fargo believe that it had the authority to bind the holders to the terms of the FGIC settlement agreement without giving them a voice, as you say?

MR. JOHNSON: Objection to form;

Mary Sohlberg

calls for a legal conclusion.

THE WITNESS: We gave them a voice in giving them the ability to object to the settlement.

BY MS. EATON:

Q. That wasn't my question.

My question was whether Wells Fargo concluded that it was required to give such a voice to the investors before it could bind them by signing the FGIC settlement agreement.

MR. JOHNSON: Objection to form.

And, Miss Sohlberg, in answering that question, do not disclose advice that Wells Fargo might have received from counsel.

THE WITNESS: Could you repeat the question.

BY MS. EATON:

Q. Did Wells Fargo believe that it was required to give a voice to the investors before it could bind them to the FGIC settlement agreement?

MR. JOHNSON: Same objection.

And same direction, Miss Sohlberg.

Mary Sohlberg

THE WITNESS: As I understand the question, no, because we did enter into the settlement agreement with the provision that the holders would be notified of the settlement and notified of their ability to object to the settlement.

BY MS. EATON:

Q. What did you understand about the investors' ability to object to the settlement?

MR. JOHNSON: Objection to form.

Do you understand the question?

THE WITNESS: I believe so.

That the holders could object to the settlement through the courts.

BY MS. EATON:

Q. And did the trustees provide the -- well, did Wells Fargo provide the holders with any information about the basis for its determination that the FGIC settlement agreement was in their best interests?

MR. JOHNSON: Objection to form.

THE WITNESS: We referred them to -- we notified them by way of a notice, and we referred them to a website in which they

Mary Sohlberg

could review documents related to the ResCap bankruptcy.

BY MS. EATON:

Q. Did any of those documents reflect the trustees' determination that entering into the FGIC settlement agreement was in the best interests of the investors?

A. I don't recall.

Q. Did Wells Fargo believe it was necessary in giving the investors a, quote-unquote, voice to provide them with information about the basis for its determination that entering into the settlement agreement was in their best interests?

MR. JOHNSON: Objection to form.

THE WITNESS: Could you repeat the question.

BY MS. EATON:

Q. In giving the investors a, quote-unquote, voice, as you've stated previously, did Wells Fargo believe that it was necessary to provide the investors with information about the basis for Wells Fargo's determination that the FGIC settlement agreement

Mary Sohlberg

was in the investors' best interests?

MR. JOHNSON: Objection to form.

THE WITNESS: As I recall, the vehicle for holders in obtaining additional information would be through the courts, but I don't know.

BY MS. EATON:

Q. You mean through the discovery process?

A. Yes.

Q. Including, for example, the discovery process that's going on now?

A. Yes.

Q. Just to finish up this other issue that we were talking about, you said that you had attended four sessions -- mediation sessions in person, the first one being on April 22nd. Let's move now to the next one the following day, on April 23rd. You were present at that discussion, were you?

A. Yes.

Q. And was there any discussion of what ultimately came to be the FGIC settlement agreement at that session?

Mary Sohlberg

MR. JOHNSON: Objection to form.

THE WITNESS: The FGIC settlement came up, but I can't recall any specifics. There was a lot of information being shared --

MR. JOHNSON: Be careful in answering that question not to disclose the substance of any information that was shared on that day in the mediation.

THE WITNESS: I can only answer that the subject of FGIC came up during the course of the mediation.

BY MS. EATON:

Q. On April 23rd?

A. It came up -- I look at the mediation as one mediation session that lasted two days. So during the course of those two days.

Q. I think I know the answer, but is there anything else that you can tell me about the discussion of the -- what ultimately came to be the FGIC settlement agreement at the meetings that took place on April 22nd and April 23rd?

A. No.

Mary Sohlberg

Q. And is that because you don't remember or because it's a privileged matter that you're not at liberty to reveal, or perhaps some combination of the two?

A. It's a combination of the two.

Q. Now, there was another two-day session at some point in early May, either May 2 to 3 or May 2 to 4, I think you said.

A. Yes.

Q. What ultimately came to be the FGIC settlement agreement, was that a subject that was addressed at that mediation session?

MR. JOHNSON: Objection to form.

THE WITNESS: It came up in the mediation session along with a lot of other issues, but it did come up.

BY MS. EATON:

Q. And what was discussed about the -- what ultimately came to be the FGIC settlement agreement during that session?

MR. KAUFMAN: Objection; mediation privilege.

MR. JOHNSON: Yes, objection. I will say, to facilitate

Mary Sohlberg

Miss Eaton's question, if you don't remember, you can tell her you don't remember; but if you do remember anything about the substance, I direct you not to disclose that substance.

THE WITNESS: I don't remember.

BY MS. EATON:

Q. When was the FGIC settlement agreement signed by Wells Fargo?

A. I believe it was on May 22nd.

Q. When was the FGIC settlement agreement first made public?

MR. JOHNSON: Objection to form.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Is Wells Fargo aware that the rehabilitator filed an order to show cause in New York State court, where the rehabilitation proceedings are pending, which included a copy of the FGIC settlement agreement?

MR. JOHNSON: Objection to form and outside the scope.

BY MS. EATON:

Q. Does Wells Fargo know that that

Mary Sohlberg

happened?

MR. JOHNSON: Same objection.

THE WITNESS: No.

BY MS. EATON:

Q. Well, is Wells Fargo aware that the -- as part of the deal, the FGIC settlement agreement needed to be approved by both the bankruptcy court and the rehabilitation court?

A. Yes.

Q. With respect to bankruptcy court approval, is Wells Fargo aware that the motion to approve the FGIC settlement agreement was made on June -- I believe it was June the 7th, 2013?

MR. JOHNSON: Objection to form; outside the scope.

THE WITNESS: I don't recall.

BY MS. EATON:

Q. When did the -- does Wells Fargo know when the debtors' motion to approve the PSA was filed?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: The PSA, to approve the PSA? I believe it was May 23rd.

Mary Sohlberg

BY MS. EATON:

Q. And the FGIC settlement agreement was a critical part of the PSA and its related term sheets, was it not?

MR. JOHNSON: Objection to form.

THE WITNESS: It was a part of the PSA, yes.

BY MS. EATON:

Q. Is there a reason why the FGIC settlement agreement was not -- so far as Wells Fargo was aware, was not included with the debtors' motion to approve the PSA that was filed on May 23rd, 2013?

MR. JOHNSON: Objection to form.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Was there any reason from Wells Fargo's perspective not to make the fact that the FGIC settlement agreement had been signed public right away?

MR. JOHNSON: Objection to form; mischaracterizes the facts.

THE WITNESS: Could you repeat the question.

Mary Sohlberg

BY MS. EATON:

Q. Let me try it a different way.

You said that it was important from Wells Fargo's perspective that investors have an opportunity to object to the FGIC settlement agreement.

A. Yes.

Q. The FGIC settlement agreement was signed on May 22nd, I believe you said.

MR. JOHNSON: Objection to form.

THE WITNESS: Uh-huh.

BY MS. EATON:

Q. Why -- why was it then that the FGIC settlement agreement was not made public immediately after it was finalized?

MR. JOHNSON: Objection to form; assumes facts not in evidence.

MS. EATON: Withdraw the question.

BY MS. EATON:

Q. If you wanted to -- if Wells Fargo wanted to give investors a full opportunity to object to the FGIC settlement, would it not serve that objective to make the agreement available to those investors as soon as possible?

Mary Sohlberg

MR. JOHNSON: Objection to form.

THE WITNESS: Well, as I recall, what -- the PSA didn't include the settlement -- I believe the supplemental terms included the terms of the FGIC settlement, and that was the public document. We acted as quickly as possible to get notices out to the holders, to communicate to them directly about the settlement.

BY MS. EATON:

Q. Why were there two separate motions to approve those agreements made, in other words, one motion to approve the PSA and a separate motion to approve the FGIC settlement agreement, if you know?

MR. JOHNSON: Objection to form; it calls for a legal conclusion.

And, Miss Sohlberg, you can answer Miss Eaton's question, but in doing so please do not disclose any Information that you might have received from counsel.

THE WITNESS: I don't know.

Mary Sohlberg

BY MS. EATON:

Q. Did Wells Fargo endeavor to give the investors as much time as possible to object to the FGIC settlement before it was to be approved by the bankruptcy court?

MR. JOHNSON: Objection to form.

THE WITNESS: We tried to give them as much time as possible within the constraints of the bankruptcy.

BY MS. EATON:

Q. What were those constraints?

A. I believe there were certain provisions for notification and timing, but I can't speak specifically. All I know is we acted as quickly as possible to communicate to the holders.

(Discussion off the record.)

MS. EATON: I guess this will be Exhibit 3.

(Sohlberg Exhibit 3, No Bates numbers, Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among FGIC, the Debtors, the Trustees and the

Mary Sohlberg

Institutional Investors, marked for identification.)

MS. EATON: Sohlberg Exhibit 3 is a multipage document that was filed in connection with the bankruptcy action under Docket No. 3929-1.

BY MS. EATON:

Q. Have you seen this document before?

A. Yes.

Q. Did you see it before it was filed?

A. I don't recall.

Q. Directing your attention to the second page of the document, in particular to paragraph C.

Do you see that?

A. Uh-huh.

Q. And it says, in paragraph C, "The settlement agreement and the transactions contemplated thereby, including the releases given therein, are in the best interests of the debtors, their estates, their creditors, the investors in each trust, each such trust, the trustees and all other parties in interest."

Do you see that?

Mary Sohlberg

A. Yes.

Q. Why was the settlement agreement in the best interests of the trustees?

MR. JOHNSON: Objection to form.

THE WITNESS: I can't answer that based on previous discussions with counsel on this particular paragraph.

BY MS. EATON:

Q. Did Wells Fargo believe that the FGIC settlement agreement was in its best interests as a trustee of the subject trusts?

MR. JOHNSON: Objection to form.

And, Miss Sohlberg, if in answering that question -- to the extent answering that question requires you to disclose conversations with counsel, then you shouldn't disclose those communications.

THE WITNESS: It would require me revealing conversations with counsel.

BY MS. EATON:

Q. Did Wells Fargo have any -- let's back up.

You understand that this was a proposed order that the debtors filed together

Mary Sohlberg

with the motion to approve the FGIC settlement agreement?

A. Yes.

Q. Did Wells Fargo have any input into the findings set forth on the second page of the document that the court was requested to make?

MR. JOHNSON: Miss Sohlberg, in answering the question, I caution you not to disclose any communications that you might have had with counsel or any communications that occurred in connection with the mediation process.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Didn't Wells Fargo ask for this language in paragraph C of the proposed order to be included, that is that the settlement agreement was in the best interests of the trustees?

MR. JOHNSON: Miss Sohlberg, I instruct you not to answer that question because in doing so it would require that you disclose communications with counsel and/or mediation communications.

Mary Sohlberg

THE WITNESS: I can't answer it.

BY MS. EATON:

Q. As a result of the FGIC settlement -- once -- strike that.

Once the FGIC settlement is approved by the courts, assuming that is the case, what obligations, if any, does Wells Fargo have to the RMBS trusts and the certificate holders of the trusts that are to be commuted?

MR. JOHNSON: Objection to form; vague and ambiguous, calls for a legal conclusion.

If you understand the question, Miss Sohlberg, you can answer it.

MS. EATON: I can do it --

BY MS. EATON:

Q. You understand that -- I'm withdrawing the question.

You understand that under the -- the FGIC settlement agreement contemplates the commutation of certain policies --

A. Yes.

Q. -- right?

And once those policies are

Mary Sohlberg

commuted, what obligations, if any, would Wells Fargo have as trustee with respect to the -- with respect to the subject trusts?

MR. JOHNSON: Objection to form; vague and ambiguous, calls for a legal conclusion.

THE WITNESS: The only remaining obligation that I can see, because of the commutation, would be the distribution of the fund.

BY MS. EATON:

Q. Did Wells Fargo request that the proposed order submitted in connection with the motion to approve the FGIC settlement agreement contain a finding that the agreement was in the best interests of the investors in each trust?

MR. JOHNSON: Miss Sohlberg, I instruct you not to answer that question because doing so would require you to disclose attorney-client communications and/or mediation communications.

THE WITNESS: I can't answer that question.

Mary Sohlberg

BY MS. EATON:

Q. On the grounds of privilege?

A. And advice of counsel.

Q. Same question with respect to the language in paragraph C that the settlement agreement and the transactions contemplated thereby are in the best interests of each trust.

Is that something that Wells Fargo asked to be included in the proposed order submitted in connection with the motion to approve the FGIC settlement agreement?

MR. JOHNSON: And I have the same instruction. Miss Sohlberg, I instruct you not to answer the question if doing so would require you to disclose attorney-client communications and mediation communications.

THE WITNESS: I can't answer that question.

BY MS. EATON:

Q. Let's take a look at paragraph D, which reads, "The trustees acted reasonably, in good faith and in the best interests of the investors in each trust and each such trust in

Mary Sohlberg

agreeing to the settlement agreement."

Do you see that?

A. Yes.

Q. Did Wells Fargo ask for that language to be included in this proposed order?

MR. JOHNSON: Objection to form.

And, Miss Sohlberg, I instruct you not to answer the question because doing so would require you to disclose the attorney-client communications and/or mediation communications.

THE WITNESS: I can't answer that question.

BY MS. EATON:

Q. Did Wells Fargo act reasonably in agreeing to the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes.

BY MS. EATON:

Q. What is your basis for believing that Wells Fargo acted reasonably in agreeing to the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: That we engaged

Mary Sohlberg

financial experts to analyze the settlement agreement in terms of the amount of the lump-sum payment in comparison to receiving payments under the rehabilitation plan over 40 years. And we acted in the best interest in ensuring that the holders would have a vehicle for objecting to the settlement.

BY MS. EATON:

Q. Did Wells Fargo solicit any input from the investors who would be -- certificate holders who would be affected by the FGIC settlement agreement as to whether the lump-sum payment was in their best interests?

MR. JOHNSON: Objection to form.

THE WITNESS: We didn't solicit direction from the other holders. We do know that the institutional investors were in agreement that the lump-sum payment was in the best interests of the holders. So we did have that input, along with the recommendation of the financial expert.

BY MS. EATON:

Q. Who were the institutional investors

Mary Sohlberg

you just referred to?

A. The institutional investors were -- it's a defined term in various documents. They were the -- the initial steering committee and Talcott [ph] investors.

Q. Did Wells Fargo have any discussions with any of those investors directly?

A. No.

Q. Did Wells Fargo have any discussions with representatives of those investors with respect to the lump-sum payment?

MR. JOHNSON: Objection to form; vague.

THE WITNESS: No.

BY MS. EATON:

Q. What discussions, if any, did Wells Fargo have with representatives of those investors about the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

And in answering that question, Miss Sohlberg, I direct you not to -- I don't think you can answer that question without disclosing attorney-client privileged communications and/or mediation

Mary Sohlberg

communications.

THE WITNESS: I agree.

I can't answer that.

BY MS. EATON:

Q. You said previously that Wells Fargo knew that the institutional investors were in agreement that the lump-sum payment was in the best interests of the holders.

Do you remember making that statement?

A. Yes.

Q. What's your basis for making that statement?

A. I can't answer that.

Q. Because?

MR. JOHNSON: Is that because it's based on advice of counsel?

THE WITNESS: Yes.

MR. JOHNSON: Okay.

BY MS. EATON:

Q. Were any of those institutional investors holders of the FGIC-wrapped trusts?

MR. JOHNSON: Objection to form.

And in answering that question,

Mary Sohlberg

don't disclose any information that might have been revealed to you by counsel.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Did Wells Fargo consult with any investors who were holders of the FGIC-wrapped trusts before agreeing to the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

And don't disclose any communications you might have had with counsel in that regard.

THE WITNESS: Wells Fargo directly didn't have any discussions.

BY MS. EATON:

Q. How about indirectly?

A. I don't know.

Q. Did Wells Fargo consider in any way what impact entry into the FGIC settlement agreement would have upon certificate holders of the FGIC-wrapped trust as opposed to certificate holders of the unwrapped trusts?

MR. JOHNSON: Objection to form.

THE WITNESS: In entering into a

Mary Sohlberg

settlement agreement with FGIC, we would only be concerned about how that settlement agreement impacted the holders in securities that were wrapped by FGIC.

BY MS. EATON:

Q. With respect to any given trust, certain of the securities were wrapped and certain of the securities were not; correct?

MR. JOHNSON: Objection to form; assumes facts not in evidence.

THE WITNESS: Correct.

BY MS. EATON:

Q. So for some of the trusts for which Wells Fargo served as trustee, it owed duties both to certificate holders of unwrapped securities and duties to certificate holders of wrapped securities; correct?

A. Yes.

Q. So in considering -- in determining, rather, to enter into the FGIC settlement agreement, did Wells Fargo in any way take into account how those two different groups of certificate holders would be impacted, if at all?

MR. JOHNSON: Objection to form.

Mary Sohlberg

THE WITNESS: Wells Fargo would be -- in entering into a settlement agreement with FGIC, we would be concerned about the impact of the settlement on the holders of the wrapped trusts.

BY MS. EATON:

Q. And what was that impact?

A. Whether there was -- whether receiving a lump-sum payment was -- I'm going to use the term "better" than receiving the payments over a period of 40 years that would be subject to certain uncertainty and risk. The best interests of the holders -- based on the financial analysis done by our expert that it would be in the best interest of the holders to accept the lump-sum payment now as opposed to the risk and uncertainty of payments over time.

MR. JOHNSON: Miss Eaton, when it's appropriate, I'd like to take a break, please.

MS. EATON: Now is fine.

MR. JOHNSON: Thank you.

(Recess from the record.)

Mary Sohlberg

BY MS. EATON:

Q. Miss Sohlberg, you signed the FGIC settlement agreement on Wells Fargo's behalf; correct?

A. Yes.

Q. Did you -- before signing the agreement, did you see more than one version?

A. I believe I saw a draft or drafts.

Q. More than one draft?

A. I can only recollect seeing one draft.

Q. Were there any differences between the draft that you saw and the version that you signed?

A. I don't recall.

(Sohlberg Exhibit 4, Bates Nos. WFB-MS000009 through 18, E-mail Chain with attachments, marked for identification.)

BY MS. EATON:

Q. I'm handing you now Sohlberg Exhibit 4, which is a multipage document Bates stamped WFB-MS -9 through MS -18.

Have you seen this document before?

A. Yes.

Mary Sohlberg

Q. Can you tell us what it is.

A. It's the analysis of the lump-sum payment in comparison to the payments under the rehabilitation plan as completed by Duff.

Q. And you're referring to the attachment to this -- the e-mail exchange that's reflected on the first page of the document; is that right?

A. Yes.

Q. In other words, there's -- the first page of Exhibit 4 is an e-mail exchange between people at Duff & Phelps, Mr. Johnson, yourself and others, and the balance of the document is a document prepared by Duff & Phelps as an attachment?

A. Yes.

Q. And if you go back to page 1, you'll see that Mr. Johnson is sending you a copy of Duff's FGIC presentation on May 10, 2013?

A. Yes.

Q. And the attachment to Exhibit 4 is the FGIC presentation that Mr. Johnson was referring to; is that correct?

A. Yes.

Mary Sohlberg

Q. Is this the first iteration of any analysis prepared by Duff & Phelps that you saw with respect to the proposed commutation of the FGIC-wrapped trust?

A. As I recall, yes.

Q. When did Duff & Phelps begin working on that analysis?

MR. JOHNSON: Objection to form. And in responding to that question, don't disclose the substance of any information you might have received from counsel.

THE WITNESS: I don't recall.

BY MS. EATON:

Q. Who hired Duff & Phelps?

A. The trustees engaged Duff & Phelps.

Q. When did the trustees engage Duff & Phelps?

A. I believe it was August of 2012.

Q. What kind of process did the trustees undergo in engaging Duff & Phelps, if any?

MR. JOHNSON: Objection to form.

THE WITNESS: Our counsel

Mary Sohlberg

participated in scrutinizing five professionals, five service providers. It was narrowed down to two, and a decision was made to go with Duff.

BY MS. EATON:

Q. Did Wells Fargo participate in scrutinizing those five professional candidates?

MR. JOHNSON: Objection to form.

THE WITNESS: Our counsel participated in scrutinizing the five.

BY MS. EATON:

Q. Anybody -- did anybody at Wells Fargo participate in the selection process?

MR. JOHNSON: Objection to form.

THE WITNESS: Wells Fargo reviewed the qualifications of Duff. We reviewed the presentation that they prepared as one of the two finalists. And I also had a conversation directly with Duff.

BY MS. EATON:

Q. Who did you speak with at Duff?

A. I don't recall the names.

Q. When did that conversation take place?

Mary Sohlberg

A. On or about the time that we were engaging a professional.

Q. What did you say to the people at Duff, and what did they say to you as far as you can recall?

A. It was -- it was more or less a general conversation. As I recall, we talked about stratifying samples, the importance of evaluating whether or not your more robust results would be the result of stratifying a sample as opposed to using a general random sample. I think we may have also talked about materiality, but it was just a very general conversation that we had regarding issues related to reps and warrantees and the use of samples.

Q. What do you mean by "stratifying" the sample.

A. Stratifying samples is when you -- when you -- you could take a random sample of 50,000 loans or you can stratify your sample in terms of product type, vintage. Those are some of the examples. You make it -- more robust results through a stratification. So it was really -- really more a general conversation as

Mary Sohlberg

opposed to specifically their review of ResCap proposal.

Q. When you received a copy of Duff's presentation from Mr. Johnson, did you read it?

A. I reviewed it, but I did wait for their actual presentation that they gave to us through a conference call.

Q. Now, this presentation that was sent to you by -- forwarded to you, rather, by Mr. Johnson is marked as a draft; isn't that --

A. Yes.

Q. This was not the final presentation by Duff & Phelps?

A. Correct.

Q. Did you see any other drafts besides the draft that is attached to Exhibit 4?

A. I don't recall seeing any other drafts.

Q. The best you can recall, there was one draft and then one final presentation?

A. Yes.

(Sohlberg Exhibit 5, Bates Nos. WFB-MS000001 through 8, May 2013 Draft Duff & Phelps Presentation, marked for

identification.)

BY MS. EATON:

Q. I'm handing you now, Miss Sohlberg, Exhibit 5, which is Bates stamped WFB MS1 through WFB MS 8.

Do you recognize Exhibit 5?

A. Yes.

Q. Tell us what it is.

A. This is a copy of a draft that I had before me when Duff gave their presentation.

Q. Is this the same draft that was attached to Exhibit 4?

MR. JOHNSON: Objection to form.

THE WITNESS: I believe so.

BY MS. EATON:

Q. You'll notice on Exhibit 5, there's some -- for example, on page 2, there's some handwriting and some underlining, also on page 3 and elsewhere throughout the document.

Do you see that?

A. Yes.

Q. Is that your handwriting?

A. Yes.

Q. And these are notes, I think you

said, you made on the document during the presentation by Duff & Phelps?

A. Yes.

Q. When was that presentation made?

A. I believe it was around May 15th. I'm not sure of the exact date.

Q. Who was present for that presentation?

A. I don't know. I participated by conference call.

Q. There were people from Duff & Phelps, I assume.

A. Oh, definitely, yes. I'm sorry.

Q. Do you know who those people were?

A. I don't recall their names, no.

Q. Do you recall the names of anybody who was on the phone -- who was either present or on the phone when this presentation was made?

A. I don't recall that they took a roll call, so I would hate to --

Q. Was the presentation -- was the presentation made in person someplace?

A. I believe so, yes.

Q. So there was an in-person

presentation that you participated in by telephone?

A. Yes.

Q. And where was the in-person presentation?

A. I don't know.

Q. Who set up the meeting?

A. I don't know.

Q. How long did the meeting last?

A. I don't recall.

Q. What was discussed at the meeting?

A. Duff went through their -- their report.

Q. Did you ask any questions of the people from Duff as they went through their report?

A. No, I don't believe I did.

Q. Did anyone else who participated either in person or telephonically in the meeting ask any questions of the people from Duff as they went through their report?

A. I don't recall.

Q. Did you understand the presentation that Duff was making?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes.

MR. JOHNSON: Go ahead.

THE WITNESS: Yes.

BY MS. EATON:

Q. Did you understand fully the analysis that Duff & Phelps had done with respect to the subject of this presentation?

MR. JOHNSON: Objection to form.

THE WITNESS: I'm struggling with the word "fully." I'm not a financial expert. I understand the concepts of -- and use of discounted cash flows, so, in that sense, I understood the methodology that was used by Duff.

There are certain areas of the analysis that I understood the reasonableness as they went through it. I couldn't repeat it.

BY MS. EATON:

Q. Well, you weren't confused in any way about the analysis they were presenting, were you?

A. No.

Mary Sohlberg

Q. What was the purpose of the analysis that Duff was performing?

A. The purpose of the analysis -- they had the -- an offer of a lump-sum payment. So it would be payment to the holders now. Okay.

Or under the rehabilitation plan, they could receive payments over a period of 40 years.

So the task before FGIC is to compare whether it's more beneficial to accept a lump sum now or take the payments over a period of 40 years with the possibility of uncertainty and risk related to that -- the receiving the payments over a period of time.

Q. Who instructed Duff & Phelps to perform that analysis?

A. I don't know.

Q. It wasn't you?

A. It was not me.

Q. In performing the analysis, is it the case that Duff & Phelps was -- was to assume that the lump-sum payment was fixed?

MR. JOHNSON: Objection to form.

THE WITNESS: I think you have to

Mary Sohlberg

assume that the lump-sum payment is fixed.

BY MS. EATON:

Q. In other words, it wasn't the task of Duff & Phelps to try and determine what an appropriate amount of a lump-sum payment would be --

MR. JOHNSON: Objection to form.

BY MS. EATON:

Q. -- correct?

A. I don't believe so, no.

Q. They were asked to -- to analyze whether it was in the investors' best interests to accept the FGIC proposal assuming that the lump-sum payment would remain the same?

MR. JOHNSON: Objection to form.

THE WITNESS: Correct.

BY MS. EATON:

Q. And that lump-sum payment was approximately $253 million; correct?

A. Yes.

Q. Did you have an understanding of how much the investors of the FGIC-wrapped trust stood to recover under the FGIC rehabilitation plan?

Mary Sohlberg

MR. JOHNSON: Objection to form.

THE WITNESS: I have an understanding through the analysis completed by Duff.

BY MS. EATON:

Q. What was your understanding?

A. That they gave two -- they gave two ranges, I believe a base case and then a stress scenario. And they gave ranges in terms of -- in their report in terms of recovery.

Q. Are you referring to the numbers at the bottom right-hand portion of the page Bates stamped No. 7?

A. Yes.

Q. Did you have an understanding of what assumptions Duff & Phelps made in running those two scenarios?

A. I have an understanding generally of some of the assumptions that they -- they made.

Q. What is your understanding?

A. Well, they did include in their report, you know, the -- the assumption of -- making certain assumptions regarding how the payments would flow over a period of time.

Mary Sohlberg

Q. Is that reflected in Exhibit 5?

A. I believe -- yes.

Q. Where?

A. At the bottom of the page.

Q. Which page?

A. Page 5.

Q. Which payments are you referring to?

A. The stream of loss payments that they've indicated on here, they had indicated the loss estimates at between 1.1 and 1.5 billion. And as you see at the bottom of the page, they've done -- they set forth those loss payments over a period of time starting in 2012.

Q. Are these -- these are loss -- are these expected future losses or something else?

A. These are loss estimates over a period of time.

Q. Right.

But loss estimate -- estimates of which losses? Already incurred losses or simply losses estimated to be incurred in the future?

MR. JOHNSON: Objection to form.

MR. WYNNE: Could you repeat that or have the reporter read it back.

Mary Sohlberg

BY MS. EATON:

Q. I'm wondering -- let me ask a new question.

When you referred to "losses," which losses -- losses analyzed on this page, which losses are you referring to?

A. These are the loss estimates, on the lower half of the page, that run, at the low end, 1.1 to 1.4.

Q. Does that include or exclude the losses that have already been incurred at the time this report was prepared?

A. I believe it would have to include the ones that already incurred -- were incurred. Because they used 2012.

Q. Okay. Now, there are -- let's take a look at -- let me back up.

In the bottom half of the page, it refers to claims for policy holders of ResCap-related RMBS trusts (per D&P's estimates)."

Do you see that?

A. Yes.

Q. These are just -- if I'm

Mary Sohlberg

understanding this correctly, these are just projected loss estimates for ResCap-related RMBS trusts as opposed to other RMBS trusts that FGIC had insured; is that correct?

A. At the bottom --

MR. JOHNSON: Objection to the form. Go ahead.

THE WITNESS: At the bottom of the page, yes.

BY MS. EATON:

Q. The numbers at the top of the page where it says, "All FGIC policy holders (Lazard affidavit)," does that refer to something different?

MR. JOHNSON: Objection to form.

THE WITNESS: I would assume it reflects all of FGIC's policy holders.

BY MS. EATON:

Q. Whereas the numbers at the bottom refer to a subset of FGIC's --

A. Yes.

Q. -- policy holders?

And that subset is comprised of the ResCap-related RMBS trusts; correct?

Mary Sohlberg

A. Correct.

Q. Now, let's focus for a moment on the low case in the ResCap-related trusts analysis.

Do you see that?

A. Yes.

Q. And then under the year 2012, it has the number 709.

Do you see that?

A. Yes.

Q. And that's $709 million in losses as of the end of 2012; is that your understanding?

A. That's my understanding.

Q. And there's a percentage number below that. What does that refer to?

MR. JOHNSON: Objection to form.

THE WITNESS: If you assume a hundred -- if you assume a period of time at which there would be a hundred percent -- where you would reach a hundred percent in terms of your estimated losses, the percentage underneath these figures assumes that as of 2012, 64 percent of the losses would occur.

Mary Sohlberg

BY MS. EATON:

Q. Okay. And then reading along from left to right, this page indicates that 77 percent of the low-case estimated losses would occur between 2013 through 2017.

Do you see that?

MR. JOHNSON: Objection to form.

THE WITNESS: Correct.

BY MS. EATON:

Q. And then going over further to the right, 84 percent of the expected losses are estimated to have occurred by 2022.

Do you see that?

A. Yes.

Q. And then reading further along, by 2028 to 2032, 95 percent of the expected losses were projected to occur?

A. Correct.

Q. Now, if you take a look at the second bullet point at the top of the page, it says there that "A majority of the claims for the policy holders of ResCap-related RMBS trusts are expected to arise in the next five years."

Do you see that?

Mary Sohlberg

A. Yes.

Q. What impact did that have, if any, on your assessment of whether entry into the FGIC settlement agreement as opposed to the FGIC rehab plan was in the best interests of the investors?

MR. JOHNSON: Objection to form.

THE WITNESS: I don't think it had -- I mean, I certainly looked at it; but I think, in terms of my view, I'm relying on our financial expert -- I'm relying on the fact that to receive the payments over a period of time is still subject to certain uncertainty and risk and focus my attention on the recommendation of the expert that the lump-sum payment was in the best interests.

BY MS. EATON:

Q. Is that something that Duff & Phelps recommended, that is that the lump-sum payment was in the best interests of the investors?

A. The -- I don't think they used the term "best interests." I believe they used the term -- that -- I can't remember their exact -- how they worded their recommendation.

Mary Sohlberg

Q. But you're certain that Duff & Phelps made a recommendation?

A. Yes.

Q. And however they worded it, their recommendation was in favor of the proposed commutation rather than the FGIC rehabilitation plan?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes.

MR. WYNNE: I'm sorry, Mary, I didn't hear the question. Could you read it back.

(Record read.)

BY MS. EATON:

Q. Focusing your attention now on page 3. On the right-hand side of the page, there's a line item that says, "Factor percent of unpaid payout."

Do you see that?

A. Yes.

Q. And then there's the number 60 percent in a box?

A. Yes.

Q. And then beside that, there's some

Mary Sohlberg

handwriting that appears to read "Settlement discount."

Do you see that?

A. Yes.

Q. What does that refer to?

MR. JOHNSON: Objection to form.

THE WITNESS: That refers to the haircut that's mentioned on the left side of the page.

BY MS. EATON:

Q. That is the haircut of 40 percent on unpaid payout claim estimates?

A. Yes.

Q. What was the basis for applying a 40 percent haircut on unpaid payout claim estimates?

MR. JOHNSON: Objection to form; assumes facts not in evidence.

THE WITNESS: I don't recall how Duff addressed the 60 percent other than I believe they referred to it as the settlement discount.

BY MS. EATON:

Q. Do you have any recollection of what

Mary Sohlberg

they meant when they referred to it as the settlement discount?

MR. JOHNSON: Objection to form.

THE WITNESS: No.

BY MS. EATON:

Q. And I take it from your last answer that you did not ask Duff & Phelps any questions about what they meant when they referred to it as a settlement discount?

MR. JOHNSON: Objection to form.

THE WITNESS: I did not ask any questions, no.

BY MS. EATON:

Q. Did you form a view in your own mind as to the appropriateness of the settlement discount Duff & Phelps applied?

MR. JOHNSON: Objection to form; assumes facts not in evidence.

There's been no testimony that Duff & Phelps as opposed to FGIC applied a 40 percent haircut.

THE WITNESS: Could you repeat the question.

Mary Sohlberg

BY MS. EATON:

Q. Did you form a view in your own mind as to the appropriateness of the settlement discount Duff & Phelps applied?

MR. JOHNSON: Objection to form; assumes facts not in evidence.

MS. EATON: Then she can testify to that. You don't have to coach her.

MR. WYNNE: I'm sorry, could you read the question. I couldn't hear it.

(Record read.)

THE WITNESS: No.

BY MS. EATON:

Q. In reaching its determination that the FGIC settlement agreement was in the best interests of the investors, did Wells Fargo take into account this settlement discount?

MR. JOHNSON: Objection to form.

THE WITNESS: Duff was tasked with evaluating the 253 million lump-sum payment and making a determination whether receiving the money now was a better deal for the holders than receiving it over a period of time.

Mary Sohlberg

So the analysis was focused on the 253 million and comparing that number to the discounted present value on the stream of payments expected to be received over 40 years.

BY MS. EATON:

Q. Why do you say it was expected to be -- those payments were expected to be received over 40 years?

A. Well, they did a cash flow analysis that -- well, that more or less sets out the stream of payments over a long period of time.

Q. You're referring to the analysis on page 5?

A. Yes.

Q. This is the analysis that shows, at least in the low case, that 95 percent of the claims were expected to arise by 2032; isn't that correct?

MR. JOHNSON: Objection to form.

THE WITNESS: Yes.

BY MS. EATON:

Q. Which is not 40 years from now; right?

Mary Sohlberg

MR. JOHNSON: Objection to form.

THE WITNESS: Correct.

BY MS. EATON:

Q. Well, did Wells Fargo form a view with respect to the percentage of the payments that were -- stream of payments that were expected to be made over, let's say, the next ten years?

A. No.

Q. On page 7, there's some handwriting on the right-hand portion of the page that I'm having trouble reading, to be honest with you. Do you mind reading them out loud?

A. "195 million worst case if we don't settle. 250 million to 320 best case."

Q. What do those notes refer to?

A. It's taking the -- as I recall -- again, I'm struggling a little bit with my notes, but I believe it had to do with the range that was identified at the bottom of page 7. It looks like the range is 190 million to 320.

Q. That's the range --

A. Yeah. I don't recall what those are because the numbers aren't matching.

Mary Sohlberg

Q. There's some more handwriting beneath that. Can you read that out loud for us, please.

A. It says, "D&P recommends. Offer is 253 cash today. It won't bear any risk going forward and no premium payments."

Q. What does that refer to?

A. That refers to the -- what I've commented several times here today in that the analysis before us was is it better for the holders to accept 253 now and they won't have to bear the risk going forward in terms of the uncertainty and risk associated under the -- getting the payments over a period of time.

Plus, another condition of the settlement was that the trust would no longer have to make any insurance payments. They wouldn't have to pay any premiums.

Q. At the bottom of page 7, there are the words -- bottom left there -- "10 to 20 percent discount rate."

Do you see that?

A. Yes.

Q. And then under -- there are two

Mary Sohlberg

columns, one for "Proposal" and one for "Plan." And under the base scenario, there are the numbers 24 to 28 percent and under the stress scenario, there are the numbers 17 to 18 percent.

Do you see that?

A. Yes.

Q. Do you know what those percentage figures refer to?

A. I believe they refer to recovery.

Q. What do you mean by that?

A. I believe it's the recovery expected to be received under the rehabilitation plan in terms of percentage of losses.

Q. Do you know what discount rates Duff & Phelps applied in running those numbers?

A. They used a 10 to 20 percent discount rate.

Q. Was there any discussion of that range of discount rates during this telephone call that you participated in where Duff & Phelps made their presentation?

A. I don't recall.

Q. Did you form a view in your own mind as to the appropriateness of using a 10 to

Mary Sohlberg

20 percent discount rate?

A. I relied on the expertise of our financial expert which we engaged. Certainly I do understand the concept of a discounted cash flow and -- but I don't have the expertise, which is why we engaged a service provider such as Duff & Phelps to do the analysis.

Q. I take it then that Wells Fargo didn't have a view one way or another as to the appropriateness of using a 10 to 20 percent discount rate in performing this analysis?

MR. JOHNSON: Objection to form.

Go ahead.

THE WITNESS: Wells Fargo is not the expert. We are the trustee on these deals. The documents give us the ability to hire the experts, and that's what we did in this case. We went through -- and our attorneys went through an expenditure of a significant amount of time evaluating a party to act as the financial expert.

So I'm the trustee. I am not going to make evaluations on the discount rate used by a party that's a financial expert.

Mary Sohlberg

I certainly would notice if it was extremely low or extremely high. I might ask questions about it. But I'm not the expert in this regard. I would rely on Duff & Phelps.

BY MS. EATON:

Q. So did you notice whether that range of discount rates was extremely low or extremely high?

A. Based on my knowledge, it did not appear unreasonable; but I would -- again, I can't stress enough that we hired a financial expert to do the analysis.

Q. When you say based on your knowledge it did not appear unreasonable, can you explain.

A. If they used a 3 percent discount rate, I might say, Why is it so low? This is the -- discount rate is typically your cost of capital. I might wonder if it was really low, or I might question if it was 30 percent or 40 percent. But I relied on our financial expert. The 10 to 20 percent seemed reasonable to me.

Q. Did Duff & Phelps explain why they

Mary Sohlberg

used a range of discount rates between 10 and 20 percent?

A. I don't recall if it was discussed in the presentation.

Q. Take a look, if you wouldn't mind, at page 6. There's some handwriting in the middle of the page on the left-hand side, and it appears to be a note following the line item, "Portion of DPO accretion payout."

Do you see that?

A. Uh-huh.

Q. What did you write there?

A. "Assuming no settlement." And then there's a word, I don't know what it is. And then underneath it is "FGIC plan."

Q. Do you recall whether your note is referring to the line item "Portion of DPO accretion payout"?

A. I don't know.

Q. Do you know what that line item refers to?

A. What the line item refers to?

Q. Yes.

A. I would have to defer to Duff &

Mary Sohlberg

Phelps. I don't know.

Q. Do you know what DPO accretion payout means?

MR. JOHNSON: Objection to form.

THE WITNESS: I believe DPO stands for deferred payment. And generally accretion is a -- I don't know. We're getting into a level of detail that I don't have the expertise to explain.

BY MS. EATON:

Q. Did you read the FGIC rehab plan before this meeting with Duff & Phelps took place?

A. No.

Q. Were you familiar with the terms of the FGIC rehab plan before this discussion took place?

A. No.

Q. How long after this discussion did you conclude that entry into the FGIC settlement agreement was in the investors' best interests?

A. You mean after the presentation?

Q. Yes.

A. I think I would have concluded, in

Mary Sohlberg

the presentation as they went through it, that it was in the best interests of the holders, relying on the analysis done by a financial expert.

Q. Before concluding that the FGIC settlement agreement was in the investors' best interests, did Wells Fargo -- anyone at Wells Fargo review the terms of the FGIC rehabilitation plan?

MR. JOHNSON: Objection to form; outside the scope.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Was Wells Fargo involved in the FGIC rehabilitation action?

A. Yes.

Q. Were you the person at Wells Fargo -- strike that.

Was there a particular individual at Wells Fargo who served as the point person in that regard?

A. Yes.

Q. Who was that person?

A. Charles Brehm.

Q. Did you discuss with Mr. Brehm the

Mary Sohlberg

Duff & Phelps analysis?

A. No.

Q. Was Mr. Brehm aware of the Duff & Phelps analysis?

MR. JOHNSON: Objection to form; foundation.

THE WITNESS: I don't believe so, no.

BY MS. EATON:

Q. Do you know whether Mr. Brehm was familiar with the terms of the FGIC rehabilitation plan?

MR. JOHNSON: Objection to form; foundation.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Before making your determination that entering into the FGIC settlement agreement was in the best interests of the investors, did it occur to you to discuss the issue with Mr. Brehm first?

A. No.

Q. And that's true even though what Duff & Phelps was comparing was the investors'

Mary Sohlberg

potential recoveries under the commutation proposal as opposed to the investors' potential recoveries under the FGIC rehabilitation plan; correct?

MR. JOHNSON: Objection to form; argumentative.

MR. KERR: Read back that question.

(Record read.)

THE WITNESS: You're going to have to repeat the question.

MR. JOHNSON: Do you want it repeated or do you want her to restate it?

THE WITNESS: Restate the question. Thank you.

BY MS. EATON:

Q. You can't answer the question?

A. I'm struggling with the question.

Q. What is it about the question you find confusing?

A. You said is it true even though -- either repeat it or restate it. I'm just struggling with the question.

Q. Mr. Brehm knew more about the FGIC rehabilitation plan than you did; correct?

Mary Sohlberg

MR. JOHNSON: Objection to form; foundation.

THE WITNESS: I don't know.

BY MS. EATON:

Q. He was the point person on behalf of Wells Fargo responsible for the FGIC rehabilitation action?

A. Yes.

Q. Can you think of anyone other than -- who would have known more about the filings in the FGIC rehabilitation action than Mr. Brehm?

MR. JOHNSON: Objection to form.

THE WITNESS: No.

BY MS. EATON:

Q. So if there were anyone at Wells Fargo who would have known anything about the filings in that proceeding, it would have been Mr. Brehm?

A. Correct.

Q. And you did not speak to Mr. Brehm about what, if anything, the FGIC rehabilitation plan provided for in the way of potential recoveries for the investors?

Mary Sohlberg

MR. JOHNSON: Objection to form; asked and answered.

THE WITNESS: No.

BY MS. EATON:

Q. And you elected not to speak with Mr. Brehm about that issue even though Duff & Phelps was providing an analysis of what the investors' -- rather, the investors' potential recoveries under the FGIC rehabilitation plan as opposed to the commutation proposal?

MR. JOHNSON: Objection; argumentative.

THE WITNESS: Correct. Charles Brehm is an account manager, and we act as trustee in these deals. We are not financial experts. So I would defer to the analysis completed by the financial expert that we engaged.

BY MS. EATON:

Q. Did you have any concerns about the analysis of the potential recoveries of the investors under the FGIC rehabilitation plan?

A. No.

Q. Are you aware that Wells Fargo filed

Mary Sohlberg

objections to the FGIC rehabilitation plan?

A. No.

Q. I take it, based on that answer, you were unaware of the fact that Wells Fargo withdrew its objections to the FGIC rehabilitation plan on April 12, 2013?

MR. JOHNSON: Objection to form.

THE WITNESS: I don't recall that I was aware of it. I don't believe I was.

BY MS. EATON:

Q. Who would know about that at Wells Fargo?

A. I don't know.

Q. Did the withdrawal of Wells Fargo's objections to the FGIC rehabilitation plan have any connection with the negotiations that led to the consummation of the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: I don't know.

(Sohlberg Exhibit 6, Bates Nos. TR-MS000001 through 9, May 15, 2013 Duff & Phelps Presentation, marked for identification.)

Mary Sohlberg

BY MS. EATON:

Q. Exhibit 6 is Bates stamped TRMS1 through TRMS9.

Take as much time as you need to look over Exhibit 6, Miss Sohlberg, and my question will be whether you recognize the document.

(Witness peruses the exhibit.)

A. I recognize the document.

Q. Can you tell us what it is.

A. It's just -- it's another version of the -- Duff's analysis. This one includes an executive summary.

Q. Did you participate in any discussions with people at Duff & Phelps about -- about this document?

A. I did not, no.

Q. Did anyone else at Wells Fargo participate in any discussions with Duff & Phelps about this document?

A. I don't believe so, no.

Q. Do you know why this document was prepared?

A. I don't know.

Mary Sohlberg

Q. Had Wells Fargo -- this is dated May 15, 2013. Had Wells Fargo -- by May 15, 2013, had Wells Fargo made the determination that entry into the FGIC settlement agreement was in the investors' best interests?

A. Yes.

Q. Did you receive a copy of Exhibit 6?

A. Yes, I did.

Q. Is it something that you kept in your files?

A. Yes, I have a copy.

Q. Does the copy you have have any handwriting on it?

A. No.

Q. Since Wells Fargo made the determination that entry into the FGIC settlement agreement was in the investors' best interests, has Wells Fargo learned any additional information that would cast any doubt on that conclusion?

A. No.

Q. It is, in other words, still Wells Fargo's view today that entry into the FGIC settlement agreement is in the investors' best

Mary Sohlberg

interests?

A. Yes.

Q. And that conclusion is based on what?

A. Based on the recommendation of Duff.

Q. Did Duff ever update its analysis so far as you're aware?

A. Well, this is updated. Again, I don't -- I don't recall the circumstances around this particular document, but I do know that -- I think there are some changes.

(Discussion off the record.)

MS. EATON: Bear with us for a sec.

(Pause from the record.)

BY MS. EATON:

Q. If you wouldn't mind turning back to Exhibit 5 for a moment, please. And please turn to page 7 of that document.

Do you have that page?

A. Yes.

Q. If you look at the third bullet point down on the right-hand side of the page in the column headed "Plan," you'll see that it says, "Recoveries based on financial projections

Mary Sohlberg

and claim estimates from December 2011. Updates have not yet been provided."

Do you see that?

A. Yes.

Q. Do you know whether Duff & Phelps ever performed any analysis with updated financial projections and claim estimates that postdated December 2011?

A. I don't know.

Q. Did you discuss the Duff & Phelps analysis with anyone else at Wells Fargo?

A. Yes. As I recall, yes.

Q. Who?

A. Linda Stinson.

Q. What did you and she discuss in that regard?

A. It really wasn't a discussion. I just informed her of the analysis and that the analysis recommended the lump-sum payment. That, as I recall, was the extent of the discussion.

Q. Was that an in-person discussion?

A. Yes.

Q. What did you say to Miss Stinson and what did she say to you?

Mary Sohlberg

MR. JOHNSON: Objection; asked and answered.

THE WITNESS: I recall informing Linda that the Duff analysis recommended the lump-sum payment and also letting her know that the settlement agreement provided for holders to object to the settlement.

BY MS. EATON:

Q. That's what you said to her?

A. Uh-huh.

Q. What did she say to you?

A. I don't recall if she said anything. I was just informing her. That's why I indicated I don't think it was really a discussion; it was more me informing her.

Q. Did you have any duty or obligation to get consent from anyone at Wells Fargo before executing the FGIC settlement agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: In this case, no.

BY MS. EATON:

Q. What do you mean, "In this case, no"?

A. Well, if -- because -- because we

Mary Sohlberg

engaged an expert, we had an expert do the analysis and make a recommendation, and we were going to rely on that recommendation -- again, wells Fargo is the trustee, it's not a financial analyst -- and given that -- that we provided for -- and I'll call it a backstop, that if any holder objected to our actions, they had the ability to object. And that was key.

Now, if the course of this was different, if there were issues surrounding the financial analysis, if we did not have the ability to provide a mechanism for the holders to object, how this went and was handled at Wells Fargo would be quite different.

Q. Is there a set of policies or procedures in place at Wells Fargo about -- that deal with the ability of people at your level to execute settlement agreements on behalf of the trust for which Wells Fargo serves as trustee?

A. No.

Q. So how do you go about determining when you have the ability to sign such an agreement without getting authority or approval from the people you report to?

Mary Sohlberg

A. How do I go about it?

Q. Yes.

A. I think I just explained it, that given the fact that what was most important to us is that we engaged a financial expert who made a recommendation. As a result of that recommendation, we entered into a settlement agreement. Key here was the ability for the holders to object.

Q. That's not what I'm asking.

Did you make the determination yourself that you did not need to get consent or approval from your boss or anyone else at Wells Fargo before executing the FGIC settlement agreement?

A. No, I informed my manager. My expectation is that if she had any issues with it, we would have done something differently. But I was not asked to do anything differently. I did have the settlement agreement reviewed by internal counsel, which is part of the process.

Q. Which internal counsel?

A. Jim Park.

Q. Did you have the settlement

Mary Sohlberg

agreement reviewed by anyone else before you signed it?

A. No.

Q. Did you share a copy of the settlement agreement with Miss Stinson?

A. No, not before signing it.

Q. Did you read the settlement agreement -- did you read the settlement agreement before you signed it?

A. Yes.

Q. The entire document?

A. Yes.

Q. In reading it, you saw that the provision was made for the investors to object?

A. Yes.

MR. JOHNSON: Objection to form.

THE WITNESS: Oh.

BY MS. EATON:

Q. Between the time -- well, between the time that Duff & Phelps made the presentation, which we've already discussed, and the time that you executed the FGIC settlement agreement, did you have any discussions with anyone outside of Wells Fargo about whether

Mary Sohlberg

entering into the FGIC settlement agreement was in the investors' best interests?

A. No.

Q. Is it correct then that the only people that you discussed that issue with during that period of time were Mr. Parks [sic] and Miss Stinson?

MR. JOHNSON: Objection to form.

THE WITNESS: At Wells Fargo, yes.

BY MS. EATON:

Q. Did you have a discussion with Mr. Parks about what the settlement agreement provided?

MR. JOHNSON: Objection to form.

Miss Sohlberg, you should not disclose the substance of any communications that you had with Mr. Park.

THE WITNESS: Okay.

I can't answer that.

BY MS. EATON:

Q. I'm just asking you whether -- it's a yes-or-no question.

Did you have discussions with Mr. Parks about the terms of the settlement

Mary Sohlberg

agreement, without going into your discussion?

MR. JOHNSON: I'm okay with you giving her a yes, no, I don't remember.

THE WITNESS: I don't believe so.

BY MS. EATON:

Q. Did you read the affidavit submitted in the state court proceeding by Mr. Miller?

A. No.

Q. Were you aware that Mr. Miller had submitted an affidavit in that proceeding?

A. Yes.

Q. Did you ever ask anyone for a copy of Mr. Miller's affidavit?

A. No.

Q. You weren't curious about what it said?

MR. JOHNSON: Objection to form; argumentative.

THE WITNESS: I did not ask to see a copy of it, no.

BY MS. EATON:

Q. What, if anything, did you do to familiarize yourself with the terms of the FGIC rehabilitation plan and the economic assumptions

Mary Sohlberg

on which it was based?

MR. JOHNSON: Objection to form; compound.

THE WITNESS: I engaged a financial expert to evaluate the lump-sum payment and compare it to the stream of payments under the rehabilitation plan. I relied on our financial expert.

BY MS. EATON:

Q. What benefits, if any, would entering into the FGIC settlement agreement provide for Wells Fargo?

MR. JOHNSON: Objection to form.

THE WITNESS: There's no benefit to Wells Fargo in entering into the agreement.

BY MS. EATON:

Q. Are the trustees presently being indemnified by anyone in connection with the ResCap bankruptcy?

A. I don't believe so, no. I think I need to clarify that. Other than the fact that ResCap has agreed to pay expenses of the trustees.

Q. Is there a written indemnification

Mary Sohlberg

agreement with the debtors?

A. I don't know.

Q. If there were such an agreement, is that something that you would be responsible for signing?

A. I believe it's -- I believe it's an order, but I could be wrong. Under the bankruptcy, I think it was an order.

Q. Has Wells Fargo ever had any discussions with the debtors about indemnification issues?

MR. JOHNSON: Objection to form.

THE WITNESS: I don't know.

Just to clarify. I do know that Wells Fargo didn't have any discussions. What I don't know is if our counsel did.

BY MS. EATON:

Q. Understood.

Did Wells Fargo enter into any confidentiality agreements with the debtors?

MR. JOHNSON: Objection to form; outside the scope.

THE WITNESS: I don't recall.

Mary Sohlberg

BY MS. EATON:

Q. Did Wells Fargo enter into any -- do you know who the Kathy Patrick Group is?

A. Yes.

Q. Did Wells Fargo enter into a confidentiality agreement with the Kathy Patrick Group?

MR. JOHNSON: Objection to form; outside the scope.

THE WITNESS: I don't recall. I've entered into a number of confidentiality agreements and I'm not prepared to speak about them today. I don't recall.

BY MS. EATON:

Q. Did Wells Fargo enter into a confidentiality agreement with FGIC about the proposed commutation?

A. Yes, that I do know.

Q. How did that come to pass?

MR. JOHNSON: Objection to form.

And, Miss Sohlberg, in answering Miss Eaton's question, I caution you not to disclose any privileged communications that Wells Fargo might have had with counsel.

Mary Sohlberg

THE WITNESS: I don't know.

(Sohlberg Exhibit 7, Bates Nos. WFB-MS000054 through 58, Confidentiality Agreement, marked for identification.)

BY MS. EATON:

Q. I'm handing you now Exhibit 7, which is Bates stamped WFB MS54 through 58.

Do you recognize Exhibit 7?

A. Yes.

Q. If you turn to the last page of the document, which is the signature page, did you sign this agreement on behalf of Wells Fargo Bank, N.A.?

A. Yes.

Q. Was this document signed by you on or about April 12, 2013?

A. April 12th, yes.

Q. Why did you sign this document?

A. We signed it because we needed access to FGIC information.

Q. Had you and Wells Fargo attempted to get access to FGIC information unsuccessfully before this agreement was signed?

MR. JOHNSON: I'm going to caution

Mary Sohlberg

you not to disclose any communications that you or Wells Fargo had with counsel in connection with that subject.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Prior to April 12, 2013, had Wells Fargo requested information from FGIC with respect to the proposed commutation?

A. I don't know if it's late in the day. Wells Fargo -- when you say "Wells Fargo," do you mean Wells Fargo or its counsel or Wells Fargo?

Q. Anyone either at Wells Fargo or acting on Wells Fargo's behalf.

A. Okay. I don't know.

Q. After April 12, 2013, did FGIC provide Wells Fargo with any information pursuant to the agreement we've marked as Exhibit 7?

A. Yes.

Q. What information did FGIC provide?

A. The information requested I believe by Duff.

Q. What information was requested by --

A. I can't answer that. That would be

Mary Sohlberg

a question for Duff.

Q. Who asked you to sign this agreement?

MR. JOHNSON: Objection to form.

THE WITNESS: Counsel.

BY MS. EATON:

Q. Did you form a conclusion in your own mind that it was necessary to sign this agreement in order for Duff to get the information it needed to perform the analysis it did?

A. Yes.

Q. When did Duff first begin working on the analysis that was presented during the telephone conference you testified about previously?

MR. JOHNSON: Objection to form.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Was it -- do you recall whether it was in January, February, March --

A. I don't recall.

Q. Did you have -- did Wells Fargo have any discussions with Duff about the information

Mary Sohlberg

it needed from FGIC in order to perform its analysis?

A. I don't know.

Q. Were you satisfied -- was Wells Fargo -- strike that.

Was Wells Fargo satisfied that Duff had access to all of the information it needed in order to provide its recommendation to Wells Fargo as to whether entry into the FGIC settlement agreement was in the investors' best interests?

MR. JOHNSON: Objection to form.

THE WITNESS: I had to conclude that Duff had sufficient information to make a recommendation.

BY MS. EATON:

Q. And why did you have to conclude that?

A. Because they've made a recommendation, and I don't believe they would have made a recommendation if they felt they did not have sufficient information.

Q. Did you discuss with Duff & Phelps what information it felt it needed from FGIC?

Mary Sohlberg

A. No.

Q. Did you have an understanding of what information Duff & Phelps felt it needed from FGIC?

A. I have an understanding of what information they would need.

Q. What was your understanding?

A. Loss information.

Q. What do you mean by that?

A. Well, they would want sufficient information in order to evaluate what the losses are expected to be. Losses are claims, so . . .

Q. Do you know what kind of analysis Duff made of those losses?

A. No.

Q. Do you know whether Duff analyzed those losses on a CUSIP-by-CUSIP basis?

MR. JOHNSON: Objection to form.

THE WITNESS: I don't know.

BY MS. EATON:

Q. Did you ask Duff & Phelps what kind of analysis -- loss analysis it performed?

MR. JOHNSON: Objection to form; asked and answered.

Mary Sohlberg

THE WITNESS: No.

MS. EATON: I think we may be close to the end. You want to take a quick break so I can go over my notes?

MR. JOHNSON: Sure.

(Recess from the record.)

BY MS. EATON:

Q. I'm handing you now, Miss Sohlberg, Exhibit 8, which is two-page document bearing Bates Nos. WFB MS32 through 33.

(Sohlberg Exhibit 8, Bates Nos. WFB-MS000032 through 33, Confidentiality Undertaking, marked for identification.)

BY MS. EATON:

Q. Do you recognize Exhibit 8?

(Witness peruses the exhibit.)

A. No.

Q. Turn to the second page of the document. Appears to be your signature there. Is that your signature?

A. Yes, it is.

Q. Do you recall entering into a confidentiality agreement with the Kathy Patrick Group with respect to the provision of holdings

Mary Sohlberg

information?

A. Well, now I recall entering into it.

Q. Did the Kathy Patrick Group supply Wells Fargo with holdings information as contemplated by the agreement?

A. I don't recall.

Q. Do you recall whether any member of the Kathy Patrick Group held positions in the FGIC-wrapped trusts?

A. I don't recall.

Q. At the time you executed the FGIC settlement agreement, did you know whether any member of the Kathy Patrick Group held positions in the FGIC-wrapped trusts?

A. I don't recall.

Q. Let's go back to Exhibit 2, please, which is the joinder we were talking about earlier today.

Focusing your attention on page 7, and in particular Footnote 1. It's numbered page 7 at the top, where it says, "Page 7 of 28." It's the first full page of the text after the table of authorities. Why don't you read Footnote 1 to yourself and let me know when

Mary Sohlberg

you're done.

(Witness peruses the exhibit.)

A. Okay.

Q. Why was Law Debenture appointed as separate trustee for certain mortgage-backed securities trusts for which Wells Fargo serves as RMBS trustee?

A. We filed petitions in the Minnesota court and received orders allowing us to appoint Law Debenture as a separate trustee. And the reason we did that was concerns that -- that there could be a perceived -- or a perception of a conflict of interest involving Wells Fargo and any responsibilities we had in terms of enforcing repurchased obligations.

Q. Could you be more specific about what those concerns about a perceived conflict of interest involving Wells Fargo -- what those concerns were?

MR. JOHNSON: Miss Sohlberg, in responding to that question, I caution you not to disclose any advice that Wells Fargo received from its counsel.

THE WITNESS: The concern was a

Mary Sohlberg

perceived conflict of interest basically as a result of the fact that Wells Fargo is such a large originator of mortgage loans with their own repurchase obligations under those loans -- or those deals. And Wells Fargo also acts as trustees.

BY MS. EATON:

Q. For the same deals?

A. No, not for the same deals. It's -- there's -- the perceived conflict centers on Wells Fargo as a trustee enforcing repurchase obligations and Wells Fargo in its capacity as the originator defending itself against repurchase claims.

Q. And that concern about a perceived or potential conflict of interest existed with respect to RMBS securitizations sponsored by the ResCap debtors?

MR. JOHNSON: Objection to form; calls for a legal conclusion.

In responding to that question, I urge you not to disclose any communications that Wells Fargo had with counsel.

THE WITNESS: As I understand it,

Mary Sohlberg

yes.

BY MS. EATON:

Q. As separate trustee, in what respects does Law Debenture's role differ from Wells Fargo's?

MR. JOHNSON: Objection to form.

BY MS. EATON:

Q. Obviously talking about these securitizations and not generally.

MR. JOHNSON: Same objection.

THE WITNESS: Law Debenture has the obligation to enforce repurchases, whatever that entails. If it means -- if it entails getting loan files for review, if it entails entering into litigation regarding the rep and warranty obligation, if it means settling, they have those duties and responsibilities. Wells Fargo as trustee has everything else.

BY MS. EATON:

Q. What led Wells Fargo to make the application to the Minnesota court for the appointment of Law Debenture as separate trustee?

MR. JOHNSON: Objection to form.

Mary Sohlberg

THE WITNESS: I don't know.

BY MS. EATON:

Q. When did Wells Fargo make that application to the Minnesota court?

MR. JOHNSON: Objection to form and outside the scope.

THE WITNESS: We've been doing it for a period of time, probably commencing -- maybe March 2012.

BY MS. EATON:

Q. Do you recall -- with respect to the RMBS securitizations through which the debtors serve as a sponsor, do you recall when Wells Fargo made the application to the Minnesota court to have Law Debenture appointed as separate trustee?

MR. JOHNSON: Objection to the form and outside the scope.

THE WITNESS: As I recall, it was probably October, maybe earlier, of 2012.

BY MS. EATON:

Q. Was it after ResCap and the affiliated debtors filed for Chapter 11?

MR. JOHNSON: Objection to form and

Mary Sohlberg

outside the scope.

THE WITNESS: Yes.

BY MS. EATON:

Q. With respect to those RMBS securitizations, did Wells Fargo conclude that there was an actual conflict of interest?

A. No.

MS. EATON: I think that's all I have. Thank you very much for your time.

MR. JOHNSON: Nothing? Anybody else have any questions? Okay. No questions, then.

(Examination concluded. The time is 1:46 p.m.)

STATE OF NEW YORK )
ss:
COUNTY OF WESTCHESTER )

I, MARY SOHLBERG, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the correction, if any, shown on the attached page.

oOo

______________________________
MARY SOHLBERG

Subscribed and sworn before me this _____ day of______________, 2013.

________________________________
NOTARY PUBLIC

July 16, 2013

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| MARY SOHLBERG | | |
| | MS. EATON | 7 |

E X H I B I T S

| SOHLBERG | | PAGE |
|---|---|---|
| Exhibit 1 | No Bates numbers, Notice of Deposition of Wells Fargo, Bank, N.A. | 19 |
| Exhibit 2 | No Bates numbers, Joinder of Certain RMBS Trustees to the Debtors' Motion for an Order | 82 |
| Exhibit 3 | No Bates numbers, Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among FGIC, the Debtors, the Trustees and the Institutional Investors | 103 |

(Continued)

E X H I B I T S

| | | |
|---|---|---|
| Exhibit 4 | Bates Nos. WFB-MS000009 through 18, E-mail Chain with attachments | 116 |
| Exhibit 5 | Bates Nos. WFB-MS000001 through 8, May 2013 Draft Duff & Phelps Presentation | 122 |
| Exhibit 6 | Bates Nos. TR-MS000001 through 9, May 15, 2013 Duff & Phelps Presentation | 153 |
| Exhibit 7 | Bates Nos. WFB-MS000054 through 58, Confidentiality Agreement | 166 |
| Exhibit 8 | Bates Nos. WFB-MS000032 through 33, Confidentiality Undertaking | 171 |

ERRATA SHEET
VERITEXT REPORTING COMPANY
1250 BROADWAY
NEW YORK, NEW YORK 10001
212-279-9424

NAME OF CASE: IN RE RESIDENTIAL CAPITAL
DATE OF DEPOSITION: JULY 16, 2013
NAME OF DEPONENT: MARY SOHLBERG

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |
| ____ | ________ | ________________ | ________________ |

____________________
MARY SOHLBERG

SUBSCRIBED AND SWORN TO BEFORE ME THIS___DAY OF ____________, 20__.

____________________ ____________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES:

STATE OF NEW YORK )
ss:
COUNTY OF NEW YORK )

I, Eileen Mulvenna, Notary Public within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of said proceedings.

I further certify that I am not related to any of the parties to the action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of July, 2013.

______________________________

Eileen Mulvenna, CSR/RMR

ERRATA SHEET

VERITEXT REPORTING COMPANY

1250 BROADWAY

NEW YORK, NEW YORK 10001

212-279-9424

NAME OF CASE: IN RE RESIDENTIAL CAPITAL

DATE OF DEPOSITION: JULY 16, 2013

NAME OF DEPONENT: MARY SOHLBERG

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| 8 | 14 | around "noon" | omission |
| 22 | 12 | Brehm not Brown | spelling |
| 59 | 9 | Duff not FGIC | error |
| 107 | 11 | funds not fund | spelling |
| 90 | 15 | Duff not FGIC | error |
| 126 | 10 | Duff no FGIC | error |

Mary Sohlberg
MARY SOHLBERG

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 26th DAY OF July, 2013.

Denise A. Roy
(NOTARY PUBLIC)

MY COMMISSION EXPIRES: 1/31/15

DENISE A. ROY
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/15