# Exhibit 6

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

    SOUTHERN DISTRICT OF NEW YORK

3   ------------------------)

    IN RE:                  )   Case No. 12-12020

4                           )            (MG)

    RESIDENTIAL CAPITAL,    )

5   LLC, et al.,            )   Chapter 11

              Debtors.      )   Adminstered Jointly

6   ------------------------)

7

8                           July 17, 2013

9                           9:08 a.m.

10

11          DEPOSITION of ROBERT MAJOR,

12   30(b)(6) witness on behalf of Bank of New York

13   Mellon, pursuant to Notice, held at the offices

14   of Wilkie Farr & Gallagher, LLP, 787 Seventh

15   Avenue, New York, New York, before Eileen

16   Mulvenna, CSR/RMR/CRR, Certified Shorthand

17   Reporter, Registered Merit Reporter, Certified

18   Realtime Reporter and Notary Public of the State

19   of New York.

20

21

22

23

24

25

Page 2

```
 1
 2  A P P E A R A N C E S :
 3
 4    WILLKIE FARR & GALLAGHER, ESQS
         Attorneys for Investors Monarch, Stonehill,
 5    Bayview and CQS
            787 Seventh Avenue
 6       New York, New York 10019
      BY:  JOSEPH BAIO, ESQ
 7       jbaio@willkie.com
         PIA WILLIAMS, ESQ
 8       pwilliams@willkie.com
         EMMA JAMES, ESQ
 9       ejames@willkie.com
10
11    ALSTON & BIRD, LLP
         Attorneys for Wells Fargo as Trustee and the
12    Witness
            90 Park Avenue
13       New York, New York 10016
      BY:  WILLIAM HAO, ESQ
14       william.hao@alston.com
15
16    DECHERT, LLP
         Attorneys for Bank of New York Mellon Trust
17    Company, N.A. as Trustee or Investor
      Trustee and the Witness
18       1095 Avenue of the Americas
         New York, New York 10036-6797
19    BY:  MAURICIO ESPAÑA, ESQ
         mauricio.espana@dechert.com
20       GLENN E. SIEGEL, ESQ
         glenn.siegel@dechert.com
21
22    SEWARD & KISSEL, LLP
         Attorneys for Law Debenture Trust Company of
23    New York
         One Battery Park Plaza
24       New York, New York 10004
      BY:  THOMAS ROSS HOOPER, ESQ
25       hooper@sewkis.com
```

Page 3

```
 1
 2  A P P E A R A N C E S  (Continued):
 3
 4    SEWARD & KISSEL, LLP
         Attorneys for US Bank
 5       One Battery Park Plaza
         New York, New York 10004
 6    BY:  ARLENE R. ALVES, ESQ
         alves@dewkis.com
 7
 8
 9    KRAMER LEVIN NAFTALIS & FRANKEL,LLP
         Attorneys for the Official Committee of the
10    Unsecured Creditors
         1177 Avenue of the Americas
11       New York, New York 10036
      BY:  PHILIP S. KAUFMAN, ESQ
12       pkaufman@kramerlevin.com
13
14    JONES DAY
         Attorneys for Financial Guaranty Insurance
15    Company
         222 East 41st Street
16       New York, New York 10017-6702
      BY:  HOWARD SIDMAN, ESQ
17       hsidman@jonesday.com
         RICHARD L. WYNNE, ESQ
18       rlwynne@jones.day.com
19
20    MORRISON & FOERSTER, LLP
         Attorneys on behalf of the debtors
21       1290 Avenue of the Americas
         New York, New York 10104
22    BY:  ROBERT BAEHR, ESQ
         rbaher@mofo.com
23       (Present via telephone)
24
25
```

Page 4

```
 1
 2  A P P E A R A N C E S  (Continued):
 3
 4    ROPES & GRAY, LLP
         Attorneys on behalf of the Steering
 5    Committee of RMBS Investors
         1211 Avenue of the Americas
 6       New York, New York 10036-8704
         (NOT PRESENT)
 7
 8
 9    THE LAW OFFICE OF THOMAS M. MULLANEY
         Attorneys for CQS parties
10       489 Fifth Avenue, Suite 1900
         New York, New York 10017
11    BY:  THOMAS M. MULLANEY, ESQ
         tmm@mullaw.com
12
13
14    GIBBS & BRUNS, LLP
         Attorneys for the Steering Committee
15    of RMBS Investors
         1000 Louisiana, Suite 5300
16       Houston, Texas 77002
      BY:  DAVID SHEEREN, ESQ
17       dsheeren@gibbsbruns.com
18
19    MCKOOL SMITH, P.C
         Attorneys for Freddie Mac
20       One Bryant Park, 47th Floor
         New York, New York 10036
21    BY:  MICHAEL R. CARNEY, ESQ
         mcarney@mckoolsmith.com
22
23
24
25
```

Page 5

```
 1
 2       (Witness sworn)
 3       THE REPORTER:  Will everyone please
 4    state their appearance, firm and the party
 5    they represent.
 6       MR. ESPANA:  Mauricio España,
 7    Dechert LLP, on behalf of the Bank of New
 8    York Mellon entities.
 9       MR. SIEGEL:  Glenn Siegel,
10    Dechert LLP, on behalf of the Bank of New
11    York Mellon entities.
12       MS. ALVES:  Arlene Alves, Seward &
13    Kissel, on behalf of US Bank as trustee.
14       MR. SHEEREN:  David Sheeren, Gibbs &
15    Bruns, on behalf of the Steering Committee
16    of RMBS Investors.
17       MR. HOOPER:  Ross Hooper from Seward
18    & Kissel on behalf of Law Debenture Trust
19    Company of New York, a separate trustee.
20       MR. HAO:  William Hao of Alston &
21    Bird for Wells Fargo Bank.
22       MR. SIDMAN:  Howard Sidman, Jones
23    Day, for FGIC.
24       MR. KAUFMAN:  Philip Kaufman, Kramer
25    Levin, for the creditors committee.
```

2 (Pages 2 - 5)

Page 6

1
2          MR. CARNEY:  Michael Carney, McKool
3   Smith, for Freddie Mac.
4          MR. MULLANEY:  Tom Mullaney from the
5   Law Office of Thomas M. Mullaney for CQS.
6          MS. JAMES:  Emma James for Monarch,
7   Stonehill, CQS and Bayview.
8          MS. WILLIAMS:  Pia Williams for
9   Monarch, Stonehill, CQS and Bayview.
10          MR. BAIO:  Joseph Baio of Willkie
11   Farr for those same entities.
12          MR. BAEHR:  Robert Baehr from
13   Morrison & Foerster on behalf of the
14   debtors.
15   ROBERT MAJOR,
16       having been duly sworn by Eileen Mulvenna,
17       a Notary Public of the State of New York,
18       was examined and testified as follows:
19   EXAMINATION
20   BY MR. BAIO:
21      Q.    State your name and address for the
22   record, please.
23      A.    Robert Major, 6525 West Campus Oval,
24   New Albany, Ohio 43054.
25      Q.    Good morning, Mr. Major.

Page 7

1                Robert Major
2                For whom do you work?
3      A.    The Bank of New York Mellon Trust
4   Company.
5      Q.    And where do you work, that is what
6   location?
7      A.    New Albany, Ohio.
8      Q.    How long have you been at -- and can
9   I call it Bank of New York?
10      A.    Yes.
11      Q.    How long have you been at Bank of
12   New York?
13      A.    Six years.
14      Q.    What was your initial position at
15   Bank of New York?
16      A.    Default administrator.
17      Q.    And what did you do as a default
18   administrator?
19      A.    I administer finance transactions
20   that are in various states of distress and
21   default.
22      Q.    And how long did you have that title
23   and that position?
24      A.    Ever since I've been at Bank of New
25   York.  Six years.

Page 8

1                Robert Major
2      Q.    Has your title changed during the
3   course of those six years?
4      A.    No.
5      Q.    Have your duties changed over the
6   course of those six years?
7      A.    No.
8          MR. BAIO:  I'm going to ask the
9   reporter to mark as the first exhibit a
10   notice of deposition of the Bank of New
11   York.
12          (Major Exhibit 1, No Bates numbers,
13   Notice of Deposition of the Bank of New
14   York Mellon Trust Company, N.A., marked for
15   identification.)
16   BY MR. BAIO:
17      Q.    Can you look at Exhibit 1 and tell
18   me if you've seen it before.
19      A.    Yes.
20      Q.    What is it?
21      A.    It is the notice to the Bank of New
22   York that these investors intend to take my
23   deposition.
24      Q.    And you understand that you are
25   appearing today as the representative of Bank of

Page 9

1                Robert Major
2   New York in connection with the matters that are
3   identified in this document?
4      A.    Yes.
5      Q.    And did you review the Exhibit A,
6   which starts on page 8 and identifies a series of
7   topics?
8      A.    Yes.
9      Q.    And are you prepared to testify
10   about those topics today?
11      A.    Yes.
12      Q.    And what did you do to prepare
13   yourself to testify about those topics?
14          MR. ESPANA:  Just one second.  I
15   want to clarify, just so the record is
16   clear.  There were responses and
17   objections --
18          MR. BAIO:  Yes.
19          MR. ESPANA:  -- served.
20          MR. BAIO:  I understand, and those
21   are in the record.
22   BY MR. BAIO:
23      Q.    What did you do to prepare for the
24   deposition today?
25      A.    I reviewed the motion that was filed

3 (Pages 6 - 9)

Page 10

Robert Major

1 in connection --
2     MR. ESPANA:  I'm going to counsel
3     the witness not to disclose the specific
4     documents, just generally what you did.
5         THE WITNESS:  Okay.
6     I reviewed the materials that were
7     filed in connection with the settlement
8     agreement.
9 BY MR. BAIO:
10    Q.     Did you do anything else?
11    A.     No.
12    Q.     Did you review a Duff & Phelps
13 report?
14    A.     Yes.
15    Q.     Does that refresh your recollection
16 that you did other things in connection with
17 preparing for this?
18    A.     That was material -- it was material
19 in connection with the -- I reviewed material
20 prepared in connection with the settlement.
21    Q.     And is that true whether it was
22 filed or not?
23    A.     Yes.
24    Q.     And when did you prepare?

Page 11

Robert Major

1    A.     Ever since -- once I received this
2 notice of deposition.
3    Q.     And did you meet with counsel?
4    A.     Yes.
5    Q.     When?
6    A.     Yesterday.
7    Q.     For about how long?
8    A.     About four hours.
9         MR. BAIO:  I'm going to ask the
10    reporter to mark as Exhibit 2 the
11    declaration of Robert H. Major.
12        (Major Exhibit 2, No Bates numbers,
13    Exhibit A, Declaration of Robert H. Major,
14    marked for identification.)
15 BY MR. BAIO:
16    Q.     Have you seen that document before?
17    A.     Yes.
18    Q.     What is it?
19    A.     It is the declaration -- my
20 declaration that was filed in connection with the
21 motion in support of the plan support agreement.
22    Q.     And is that your handwriting -- or
23 your signature on page 32?
24    A.     It is.

Page 12

Robert Major

1    Q.     Did you execute this declaration on
2 June 10, 2013?
3    A.     Yes.
4    Q.     And you read it before you executed
5 it; correct?
6    A.     Correct.
7    Q.     Did you write it?
8    A.     No.
9    Q.     Who wrote it?
10    A.     My counsel.
11    Q.     But you read it and you believed
12 everything in it was accurate --
13    A.     Yes.
14    Q.     -- prior to the time you signed it?
15 Yes.
16        MR. BAIO:  I'm going to ask the
17    reporter --
18 BY MR. BAIO:
19    Q.     You can put that aside for now, but
20 we will be coming back to it.
21        MR. BAIO:  I'm going to ask the
22    reporter to mark as Exhibit 3 a proposed
23    order granting debtors' motion for approval
24    of the settlement agreement among FGIC, the

Page 13

Robert Major

1 debtors, the trustees and the institutional
2 investors.
3        (Major Exhibit 3, No Bates numbers,
4    Exhibit 1, Order Granting Debtors' Motion
5    Pursuant to Fed. R. Bankr. P. 9019, marked
6    for identification.)
7 BY MR. BAIO:
8    Q.     Have you seen that document before?
9    A.     Yes.
10    Q.     What is it?
11    A.     It is the proposed form of order
12 granting the debtors' motion to approve the FGIC
13 settlement.
14    Q.     Is it your understanding that --
15 that Bank of New York has joined in the request
16 for this order?
17    A.     We joined in the motion in support
18 of approval of the settlement.
19    Q.     And the entry of this order; is that
20 correct?
21    A.     Yes.
22    Q.     Did you see this document, the
23 proposed order, prior to the time that it was
24 filed with the court?

4 (Pages 10 - 13)

Page 14

Robert Major

1
2　A.　I don't believe so.
3　Q.　If you look at the second page of
4 this proposed order, Item C states, "The
5 settlement agreement and the transactions
6 contemplated thereby, including the releases
7 given therein, are in the best interests of the
8 debtors, their estates, their creditors, the
9 investors in each trust, each such trust, the
10 trustees and all other parties in interest."
11　　Do you see that?
12　A.　Yes.
13　Q.　Do you believe that the settlement
14 agreement and the transactions contemplated
15 thereby, including about the releases therein,
16 are in the best interests of the investors in
17 each trust?
18　A.　Yes.
19　Q.　And what do you base that conclusion
20 on?
21　A.　I base that conclusion on the
22 recommendation of our financial adviser, the
23 recommendation of our legal advisers, and the
24 analysis of our financial adviser that the
25 settlement was reasonable.

Page 15

Robert Major

1
2　Q.　Anything else?
3　A.　No.
4　Q.　So let's take them one at a time.
5　　Your conclusion that the settlement
6 agreement and the releases are in the best
7 interests of the investors in each trust are
8 based first on recommendations of your financial
9 advisers.
10　　To whom are you referring?
11　A.　Duff & Phelps.
12　Q.　And when did they provide you the
13 recommendation that you identified?
14　A.　On May 15, 2013.
15　Q.　And was that in person?
16　A.　It was in a report delivered that
17 date.
18　Q.　And was it delivered to you?
19　A.　Yes.
20　Q.　Was it a draft report or a final
21 report?
22　A.　A final report.
23　Q.　Did you also see a draft report?
24　A.　Yes.
25　Q.　And at the time that the final

Page 16

Robert Major

1
2 report was delivered, did Duff & Phelps make a
3 presentation to you and other trustees?
4　A.　I believe the presentation was prior
5 to the delivery of the final report.
6　Q.　When was the presentation?
7　A.　I believe it was on May 13.
8　Q.　And was that in person or telephone?
9　A.　For me it was telephonic.
10　Q.　You were at your home base?
11　A.　Yes.
12　Q.　Who participated in that meeting?
13　A.　Duff & Phelps, counsel for the
14 various trustees, my counsel, and myself, and I
15 believe some of the other trustee
16 representatives.
17　Q.　How long did the meeting take place?
18　A.　I believe it was about an hour.
19　Q.　Prior to that time, had you had any
20 meetings or discussions with representatives of
21 Duff & Phelps?
22　　MR. ESPANA:  Regarding the FGIC
23　　settlement agreement?
24　　MR. BAIO:  Yes, regarding the FGIC
25　　settlement agreement.

Page 17

Robert Major

1
2　　THE WITNESS:  Yes.
3 BY MR. BAIO:
4　Q.　When prior to May 13?
5　A.　At the mediation sessions, there
6 were discussions about -- at the in-person
7 mediation sessions which I attended, there were
8 some discussions about the settlement.
9　Q.　How many did you attend?
10　A.　All of them that the trustees were
11 invited to.  There was professional-only sessions
12 that I did not attend.
13　Q.　"Professional" meaning lawyers --
14　A.　Correct.
15　Q.　-- and investment advisers?
16　A.　Yes.
17　Q.　You didn't attend those?
18　A.　Correct.
19　Q.　When did you attend the first
20 meeting on the subject of the FGIC settlement?
21　A.　I don't recall the specific dates.
22 It's the dates of the mediation, the in-person
23 mediation sessions at Kramer Levin.
24　Q.　Was it as early as January of this
25 year?

5 (Pages 14 - 17)

Page 18

Robert Major

1
2    A.    No.
3    Q.    February of this year?
4    A.    No. I think the first one I
5  attended was in April.
6    Q.    We'll come back to that.
7        So when you stated that you relied
8  upon the recommendation of your investment
9  advisers, you were referring to the
10 recommendation that was made by Duff & Phelps
11 orally to you on May 13 and the written report
12 that they provided to you on May 15th; is that
13 correct?
14   A.    That is correct.
15   Q.    You also said that you based your
16 conclusion that the settlement was in the best
17 interests of the investors based on legal advice
18 that you received; is that correct?
19       MR. ESPANA:  Objection;
20   mischaracterizes the witness' testimony.
21 BY MR. BAIO:
22   Q.    Is that accurate or not?
23   A.    Yes.
24   Q.    And who provided that legal advice?
25   A.    My outside counsel.

Page 19

Robert Major

1
2    Q.    When did they provide it?
3    A.    On or around May 15th.
4    Q.    And what did they say?
5        MR. ESPANA:  Objection.
6        I'm instructing the witness not to
7    disclose privileged information.
8  BY MR. BAIO:
9    Q.    But you did rely on whatever it was
10 that they told you in reaching your conclusion
11 that the settlement is in the best interests of
12 the investors; is that correct?
13   A.    Yes.
14   Q.    You then made reference again to
15 financial advisers.  Is there a third component
16 of what you relied on in reaching the conclusion
17 that the settlement was in the best interests of
18 the investors?
19   A.    I don't know what you mean by "third
20 component."
21       MR. BAIO:  How do I go back?
22       (Discussion off the record.)
23 BY MR. BAIO:
24   Q.    When I asked you what you based that
25 conclusion on, and I'm on line 12 of page 17,

Page 20

Robert Major

1
2  your response was, "I base that conclusion on the
3  recommendation of our financial adviser, of the
4  recommendation of our legal advisers, and the
5  analysis of our financial adviser that the
6  settlement was reasonable."
7        Do you remember testifying to that?
8    A.    Yes.
9    Q.    That third component, the analysis
10 of your financial advisers that the settlement
11 was reasonable, is that Duff & Phelps as well?
12   A.    Yes.
13   Q.    And was that a recommendation or
14 statement that was made to you in connection with
15 the May 13th meeting and the final report?
16   A.    With the -- in connection with the
17 final report.
18   Q.    Nothing separate from that?
19   A.    No.
20   Q.    Is there anything else that you
21 relied on in reaching the conclusion that the
22 proposed FGIC settlement agreement is in the best
23 interests of the investors?
24   A.    Yes.
25   Q.    What else?

Page 21

Robert Major

1
2    A.    The fact that we were going to
3  notice the investors and give them an opportunity
4  to weigh in or object.
5    Q.    And you understand that people have
6  weighed in and they are objecting?
7    A.    I certainly do.
8    Q.    What else, if anything, led you to
9  conclude that the FGIC settlement agreement is in
10 the best interests of the investors?
11   A.    I believe I've stated what I've
12 relied on.
13   Q.    Now, Duff & Phelps did not say to
14 you that they believed that the settlement was in
15 the best interests of the investors; is that
16 correct?
17       MR. ESPANA:  Objection to form.
18       THE WITNESS:  I believe that is
19   correct, yes.
20 BY MR. BAIO:
21   Q.    They opined as to the adequacy of
22 the consideration; is that fair and accurate?
23   A.    In my view, they opined that the
24 consideration that was being offered to the trust
25 fell within a certain range of possible

6 (Pages 18 - 21)

Page 22

Robert Major

1
2 recoveries out of the FGIC rehabilitation plan.
3    Q.    And you understand, don't you, that
4 that's different from a conclusion that the
5 settlement -- the FGIC settlement agreement is in
6 the best interests of the investors --
7    A.    No, I don't --
8    Q.    -- is that correct?
9    A.    I don't understand that.
10    Q.    You believe that by them saying that
11 the amount of the settlement was adequate, that
12 they were asserting that the settlement,
13 therefore, is in the best interests of the
14 investors; is that your understanding?
15    A.    I don't recall them -- I'm sorry.
16    Q.    Is that your understanding?
17    A.    No.
18    Q.    So your understanding is their
19 statement as to adequacy is different from a
20 statement as to whether it's in the best
21 interests of the investors; right?
22    A.    I don't recall a statement of
23 adequacy.
24    Q.    What do you recall them saying about
25 the consideration that was being offered in the

Page 23

Robert Major

1
2 settlement agreement?
3    A.    That that consideration fell within
4 a range of potential recoveries out of the FGIC
5 rehabilitation plan.
6    Q.    And you understand that that is not
7 the equivalent of saying that the settlement
8 agreement is in the best interests of the
9 investors; correct?
10    MR. ESPANA:  Objection; asked and
11    answered.
12 BY MR. BAIO:
13    Q.    Correct?
14    A.    Not expressly, no.
15    Q.    How about impliedly?
16    MR. ESPANA:  Objection to form.
17    THE WITNESS:  I would say it was --
18    it did imply that it was in the best
19    interests of the investors.
20 BY MR. BAIO:
21    Q.    So the fact that the advisers stated
22 that they believed that the settlement fell
23 within the range of reasonableness, that you
24 believe that is the equivalent of saying that
25 it's in the best interests of the investors --

Page 24

Robert Major

1
2    A.    Not --
3    Q.    -- is that correct?
4    A.    Not only that fact.
5    Q.    What else did they say that led you
6 to conclude that it was in the best interests of
7 the investors?
8    A.    There were a number of risks and
9 benefits to the settlement that, when considered
10 with the consideration falling within the range
11 of reasonableness, led me to conclude that it was
12 in the best interests of the investors.
13    Q.    But they didn't tell you that it was
14 in the best interests of the investors; correct?
15    MR. ESPANA:  Objection; asked and
16    answered.
17 BY MR. BAIO:
18    Q.    Correct?
19    A.    I don't believe expressly.
20    Q.    Well, when you say "expressly," did
21 they say it indirectly?
22    MR. ESPANA:  Objection; asked and
23    answered, fourth time.
24    MR. BAIO:  I keep getting different
25    answers.

Page 25

Robert Major

1
2    THE WITNESS:  They were hired to do
3    this analysis.
4 BY MR. BAIO:
5    Q.    Yes.
6    A.    They knew what we were going to use
7 the analysis for.  So my view is that their
8 recommendation to us was -- supported the
9 conclusion that we needed to reach.
10    Q.    Did you ask them either during the
11 May 13 meeting or at any time, for that matter,
12 Is this settlement in the best interests of the
13 investors?
14    A.    I don't recall.
15    Q.    Did you ask them, Might the
16 investors do better in the absence of the
17 settlement?
18    A.    Did I ask them that?
19    Q.    Yes.
20    A.    No.
21    Q.    Did you ask them whether they would
22 do better, in Duff & Phelps' view, under the
23 rehabilitation plan?
24    A.    Did I ask them that?
25    Q.    Yes.

7 (Pages 22 - 25)

Page 26

Robert Major

1
2    A.    No.
3    Q.    Did they tell you whether the
4 investors would do better under the
5 rehabilitation plan and in the absence of the
6 settlement agreement?
7    A.    They performed an analysis to
8 compare the two scenarios.
9    Q.    Did they tell you that the investors
10 would do better under the settlement agreement
11 than they would under the rehabilitation plan?
12    A.    No.
13    Q.    Did anyone ask them if that were the
14 case?
15    A.    Not that I recall.
16    Q.    The reference -- let's go back to
17 the proposed order.
18        Item C again states, "The settlement
19 agreement and the transactions contemplated
20 therein -- thereby, including the releases given
21 therein."
22        Do you see that?
23    A.    Yes.
24    Q.    What is your understanding as to the
25 releases given therein?

Page 27

Robert Major

1
2    A.    The mutual releases given to each of
3 the parties that executed the FGIC settlement
4 agreement.
5    Q.    And do you believe that the
6 settlement agreement and the transactions
7 contemplated thereby, including the releases
8 given therein, are in the best interests of the
9 trustees?
10    A.    In their capacity as trustees for
11 the trusts?
12    Q.    Yes.
13    A.    Yes.
14    Q.    And why is that?  Why is it in their
15 best interests -- or Bank of New York's best
16 interests and the other trustees'?
17    A.    It avoided -- these releases avoided
18 protracted litigation in connection with claims
19 against ResCap and claims between FGIC and the
20 trustees.
21    Q.    How was that in the best interests
22 of the trustees?
23    A.    The trustees were able to minimize
24 or eliminate the cost of that protracted
25 litigation and the time that that protracted

Page 28

Robert Major

1
2 litigation would -- could take.
3    Q.    And would the trustees under the
4 settlement agreement also have no further
5 obligations, as you understand it, going forward
6 after the commutation of the policies?
7    A.    Obligations with respect to what?
8    Q.    The trusts.
9    A.    No, we would have continuing
10 obligations with respect to the trusts.
11    Q.    Would you have any continuing
12 potential liability to the investors?
13    A.    Yes.
14    Q.    For what?
15    A.    For the continued administration of
16 those trusts.
17    Q.    And -- but the -- but the investors
18 would be waiving claims -- historical claims
19 against the trustees; correct?  If you
20 understand.
21    A.    I'm sorry, who -- repeat the
22 question.
23    Q.    The investors would be waiving
24 claims against the trustees?
25        MR. ESPANA:  Objection to form.

Page 29

Robert Major

1
2        THE WITNESS:  I don't believe the
3    investors were -- which investors are you
4    referring to?
5 BY MR. BAIO:
6    Q.    The investors in the trusts.
7    A.    That are parties to the settlement
8 agreement or just in general?
9    Q.    No, in general.
10    A.    I don't believe they gave any
11 releases.
12    Q.    In D in this proposed order, there
13 is the following language:  "The trustees acted
14 reasonably, in good faith and in the best
15 interests of the investors in each trust and each
16 such trust in agreeing to the settlement
17 agreement."
18        Do you see that?
19    A.    I do.
20    Q.    Do you believe that is accurate?
21    A.    Yes.
22    Q.    What do you base that conclusion on?
23    A.    The same factors that I've stated
24 before, the advice of our professionals and the
25 fact that the trustees did not benefit in their

8 (Pages 26 - 29)

Page 30

Robert Major

1
2 individual -- or individually -- individual
3 entities of the trusts did not benefit in this
4 settlement at all; it was just in our capacities
5 as trustees.
6     Q.    But you did benefit in your capacity
7 as trustees; correct?
8     A.    Yes.
9     Q.    Including securing releases?
10     A.    Yes.
11         MR. BAIO:  I'm going to ask the
12     reporter to mark as the next exhibit a
13     multipage document with the Bates
14     Nos. BNYM-MS079 through 088.
15         (Major Exhibit 4, Bates Nos. BNYM-MS
16     0000079 through 88, E-mail Chain with
17     attachments, marked for identification.)
18 BY MR. BAIO:
19     Q.    Have you seen Exhibit 4 before?
20     A.    Yes.
21     Q.    What is it?
22     A.    It is an e-mail from my outside
23 counsel to me with the proposed FGIC analysis --
24 proposed FGIC settlement analysis of Duff &
25 Phelps attached.

Page 31

Robert Major

1
2     Q.    Did you receive it on or about
3 May 8, 2013?
4     A.    Yes.
5     Q.    Did you look at it after you
6 received it?
7     A.    I believe so, yes.
8     Q.    Approximately the same time?
9     A.    Yes.
10     Q.    Had you had any discussions with
11 anyone about the substance of the report -- the
12 draft report prior to the time that you received
13 it?
14     A.    Yes.
15     Q.    With whom?
16     A.    With my outside counsel.
17     Q.    And was it anything more than you'll
18 be getting the report?
19     A.    Yes.
20     Q.    Did you have any discussions with
21 anyone at Duff & Phelps about the report prior to
22 the time that you received it?
23     A.    No.
24     Q.    Did you have any questions that you
25 put to Duff & Phelps about the analysis that they

Page 32

Robert Major

1
2 were undertaking prior to the time that you saw
3 Exhibit 4?
4         MR. ESPANA:  Objection to form.
5         THE WITNESS:  No.
6 BY MR. BAIO:
7     Q.    And after you received it and
8 reviewed it, did you do anything with the draft
9 report, Exhibit 4?
10     A.    What do you mean, did I do anything?
11     Q.    Did you mark it up?
12     A.    I don't believe so.
13     Q.    Did you take any notes with respect
14 to it as you reviewed it?
15     A.    I don't believe so.
16     Q.    Did you have any questions after you
17 reviewed it that you intended to put to Duff &
18 Phelps?
19     A.    Yes.
20     Q.    Did you make them in writing?
21     A.    No.
22     Q.    Do you recall what any of those
23 questions were?
24     A.    Not specifically, no.
25     Q.    Generally?

Page 33

Robert Major

1
2     A.    Yes.
3     Q.    Generally, what?
4     A.    Just --
5         MR. ESPANA:  Just instructing the
6     witness, if these were disclosed with
7     counsel, not to disclose them.
8         THE WITNESS:  Okay.  They were
9     discussed with counsel.
10 BY MR. BAIO:
11     Q.    These are the questions that you
12 intended to ask them, not discussions with
13 counsel.
14     A.    They were generally questions about
15 things in the analysis, where certain numbers
16 came from --
17     Q.    Okay.
18     A.    -- and how they were derived.
19     Q.    Did you eventually ask them those
20 questions?
21     A.    Yes.
22     Q.    And did you get answers?
23     A.    Yes.
24     Q.    Let's go through this now.
25         If you turn to the page with the

9 (Pages 30 - 33)

Page 34

1          Robert Major
2 Bates No. 82, I believe it's page 2 of this
3 document, under the heading, "Situation
4 Overview," it states, "In late March, FGIC
5 delivered a commutation proposal to the Steering
6 Committee Group of RMBS Holders for
7 ResCap-related trusts to provide a global
8 resolution regarding the pending RMBS
9 litigation."
10          Do you see that?
11    A.    Yes.
12    Q.    Did you see that commutation
13 proposal at any time?
14    A.    No.
15    Q.    Even up till today, you don't know
16 what the -- you didn't see the commutation
17 proposal that was provided to the Steering
18 Committee Group of RMBS Holders in late March?
19    A.    Not that I recall.
20    Q.    Did you learn what the terms were?
21    A.    Generally speaking, yes.
22    Q.    And were they consistent with the
23 terms that eventually were included in the
24 agreement?
25          MR. ESPANA:  Objection to form.

Page 35

1          Robert Major
2          I'm going to instruct the witness
3    not to answer based on mediation.
4 BY MR. BAIO:
5    Q.    Are you going to follow that
6 direction?
7    A.    Yes.
8    Q.    Was there a commutation proposal
9 that was made, so far as you know, by FGIC to the
10 Steering Committee?
11    A.    Yes.
12    Q.    What is your understanding of the
13 term "commutation proposal" or "commutation"?
14    A.    The commutation was a feature of the
15 settlement whereby, in exchange for a onetime
16 cash payment to the trusts, the policies would be
17 terminated and the trustees would have no further
18 obligation to pay premiums to FGIC on those
19 policies.
20    Q.    And FGIC would have no obligation to
21 make payments; correct?
22    A.    Well, other than the payments
23 contemplated in the settlement.
24    Q.    But all other payments would be
25 terminated?

Page 36

1          Robert Major
2    A.    Future --
3    Q.    Future payments?
4    A.    Correct.
5    Q.    And there would be a release
6 releasing FGIC; correct?
7    A.    Who would be releasing FGIC?
8    Q.    Any of the holders of the
9 securities.
10          MR. ESPANA:  Objection to form.
11 BY MR. BAIO:
12    Q.    Of the policies.
13    A.    I don't -- I can't answer that, if
14 the investors were releasing FGIC.
15    Q.    Who would receive the payment from
16 FGIC under the commutation?
17    A.    The trusts.
18    Q.    The trusts would give up any future
19 claims against FGIC; correct?
20    A.    Correct.
21    Q.    As part of the settlement?
22    A.    Yes.
23    Q.    Now, in the initial commutation
24 proposal, was there an initial amount -- strike
25 that -- was there a payment number that was

Page 37

1          Robert Major
2 proposed by FGIC?
3          MR. ESPANA:  Objection to form.
4 BY MR. BAIO:
5    Q.    I'm not asking what it was.  Was
6 there a number?
7    A.    I believe so.
8    Q.    Were you told what that number was?
9    A.    I don't recall if I was given a
10 specific number.
11    Q.    Were you ever given a number other
12 than the $253.3 million figure?
13          MR. ESPANA:  Objection.
14          Instruct the witness not to answer.
15          MR. BAIO:  I just want to know if
16    there was another number.  I'm not asking
17    what the number was.
18          MR. ESPANA:  I'm instructing him not
19    to answer.
20 BY MR. BAIO:
21    Q.    Did the trustees, in their
22 negotiations, attempt to get a higher number?
23          MR. ESPANA:  Objection.
24          I'm instructing him not to answer.
25

10 (Pages 34 - 37)

Page 38

Robert Major

1
2 BY MR. BAIO:
3    Q.    Were there negotiations around the
4 number?
5        MR. ESPANA:  You can answer yes or
6    no.
7        THE WITNESS:  Yes.
8 BY MR. BAIO:
9    Q.    And did you participate in those
10 negotiations?
11    A.    Not directly.
12    Q.    When you say "not directly," what do
13 you mean?
14    A.    My outside counsel participated in
15 those discussions.
16    Q.    The next sentence says, "The
17 proposal from FGIC sets forth a lump-sum cash
18 consideration paid to the policy holders of the
19 ResCap-related wrapped trusts in exchange for the
20 ability to assert a general unsecured claim in
21 the ResCap bankruptcy cases."
22        Do you see that?
23    A.    Yes.
24    Q.    And does that accurately describe
25 what the proposal includes?

Page 39

Robert Major

1
2    A.    Yes.
3    Q.    So that those are quid pro quo;
4 lump-sum cash payment on the one hand in exchange
5 for the ability to assert a general unsecured
6 claim in the ResCap bankruptcy cases on the other
7 hand?
8    A.    Is that a question?
9    Q.    Yes.
10        Is that a quid pro quo?
11        MR. ESPANA:  Objection to form;
12    calls for a legal conclusion.
13 BY MR. BAIO:
14    Q.    You can answer in your commonsense
15 notion.  I'm not asking for a legal conclusion.
16    A.    It's part of it, yes.
17    Q.    And that's what this says here?
18    A.    Yes.
19    Q.    Now, is that sentence referring to
20 the proposal that was made in March or the
21 proposal that you were evaluating in May of 2013?
22        MR. ESPANA:  I'm instructing him not
23    to answer based on mediation privilege.
24        MR. BAIO:  I'm just asking what the
25    document means.  You're standing on that

Page 40

Robert Major

1
2    objection?
3        MR. ESPANA:  Yes.
4        MR. BAIO:  Okay.
5 BY MR. BAIO:
6    Q.    The first bullet refers to the
7 filing of a rehabilitation petition on behalf of
8 FGIC.
9        Do you see that?
10    A.    I do.
11    Q.    Have you seen that petition?
12    A.    Yes.
13    Q.    Did you review it at any time?
14    A.    I've looked at it at various -- I
15 don't know if I've completed a full review of it,
16 but I'm familiar with it.
17    Q.    It's next dash states, "The
18 rehabilitator filed an initial plan of
19 rehabilitation for FGIC on September 27, 2012,
20 and filed the first amended plan of
21 rehabilitation on December 12, 2012."
22        Do you see that?
23    A.    Yes.
24    Q.    Have you seen that initial plan of
25 rehabilitation?

Page 41

Robert Major

1
2    A.    Yes.
3    Q.    Are you generally familiar with it?
4    A.    Yes.
5    Q.    There then is, in the next dash, the
6 following language:  "In connection with the
7 first amended plan of rehabilitation, Lazard, as
8 financial adviser to the New York Liquidation
9 Bureau submitted an affidavit which contained
10 revised projections."
11        Do you see that?
12    A.    Yes.
13    Q.    And have you seen that first amended
14 plan of rehabilitation?
15    A.    Yes.
16    Q.    And did you see the affidavit that
17 was submitted which contained revised projections
18 as identified there?
19    A.    Yes.
20    Q.    And you're general familiar with
21 those documents?
22    A.    Yes.
23    Q.    And then there's the reference to
24 the revised first amended plan, which was filed
25 on April 12th, 2013.  You've seen that as well?

11 (Pages 38 - 41)

Page 42

1         Robert Major
2     A.    Yes.
3     Q.    And you're familiar with that?
4     A.    Yes.
5     Q.    And it's your understanding that
6 Lazard did certain financial analyses; correct?
7     A.    Yes.
8     Q.    What is your understanding as to
9 what they did?
10    A.    They were advising the rehabilitator
11 in the FGIC proceeding.
12    Q.    As to what, in your understanding?
13    A.    Just generally the restructuring
14 advice with respect to the FGIC plan of
15 rehabilitation.
16    Q.    And you understand that they
17 provided a base-case analysis and a stress-case
18 analysis; correct?
19    A.    Of --
20    Q.    Does that sound familiar to you,
21 that Lazard prepared a base-case and a
22 stress-case?
23    A.    A case in relation to what?
24    Q.    In relation to the matters that
25 we're talking about.

Page 43

1         Robert Major
2         MR. ESPANA:  Which matters?
3         MR. BAIO:  The rehabilitation.
4         THE WITNESS:  Yes.
5 BY MR. BAIO:
6     Q.    And you know they did a base-case
7 and a stress-case?
8     A.    Yes.
9     Q.    What is your understanding of what
10 the base-case is?
11    A.    The base-case is their projection of
12 claims and recoveries in the rehabilitation under
13 normal circumstances, economic circumstances.
14    Q.    And what is your understanding of
15 the stress-case analysis that they did?
16    A.    The stress-case takes into account
17 downturns in the economy and various other
18 detrimental economic factors that could occur.
19    Q.    And you reviewed the assumptions
20 that were included in the stress-case; is that
21 correct?
22    A.    So far as they were put into the
23 Duff analysis, yes.
24    Q.    And you do understand that Lazard
25 provided revised projections; correct?

Page 44

1         Robert Major
2     A.    Yes.
3     Q.    And revised projections of what, in
4 your understanding?
5     A.    Of the cases, the base-case and the
6 stress-case.
7     Q.    Projections of what, payments?
8     A.    Recoveries and claims.
9     Q.    Recoveries and claims by whom?
10    A.    Creditors of FGIC.
11    Q.    Against FGIC; correct?
12    A.    Right.
13    Q.    And as a general matter, do you
14 understand that the revised projections in each
15 of the cases, the base-case and the stress-case,
16 were higher than the initial projections?
17    A.    Higher in what sense?
18    Q.    A larger number would be recovered,
19 would be paid.
20    A.    I was not aware of that.
21    Q.    You weren't aware that there was a
22 certain percentage estimated in the initial plan
23 and that that percentage increased?
24    A.    What is the date of the revised
25 figures that you're referring to?

Page 45

1         Robert Major
2     Q.    They are referring to here
3 December 12, 2012.
4     A.    Yes.
5     Q.    And those numbers increased from
6 prior estimations; is that correct?
7     A.    That's my understanding.
8     Q.    The next bullet states, "Based on
9 the current plan, holders of permitted policy
10 claims (policy holders) would receive (i) an
11 up-front cash payment in an amount equal to a
12 specified cash payout percentage upon the initial
13 incurrence of the policy claim, and (ii)
14 additional catch-up payments through a rateable
15 payout mechanism as set forth in the plan."
16        Do you see that?
17    A.    Yes.
18    Q.    What was your understanding as to
19 what that means?
20    A.    With respect to romanette i, that
21 would be the initial payment that would be paid
22 by FGIC at the effective date of their plan.  And
23 number ii would be payments made over time
24 following the effective date of their plan.
25    Q.    And those two components are what

12 (Pages 42 - 45)

Page 46

Robert Major

1
2 were projected in connection with the proposed
3 rehabilitation plan; correct?
4     A.    They are part of that, yes.
5     Q.    And those are projections relating
6 to what the recoveries would be for the investors
7 in the absence of a settlement agreement; is that
8 fair?
9         MR. ESPANA:  Objection to form.
10         THE WITNESS:  They are -- they are
11     what the -- what creditors of FGIC would
12     receive under the rehabilitation plan.
13 BY MR. BAIO:
14     Q.    As opposed to under the settlement
15 agreement?
16     A.    Yes.
17     Q.    And you compared those two in your
18 analyses, didn't you, what would the investors
19 have secured under the proposed rehabilitation
20 plan and what would they recover under the
21 settlement agreement?  You did that analysis;
22 correct?
23     A.    I didn't do the analysis, but I
24 reviewed an analysis.
25     Q.    And that's the Duff & Phelps

Page 47

Robert Major

1
2 analysis?
3     A.    Yes.
4     Q.    And that was important to you; yes?
5     A.    Yes.
6     Q.    Why?
7     A.    It was the basis of our -- of us
8 reaching a decision on the settlement agreement.
9     Q.    That's because under the
10 rehabilitation plan, the investors would -- were
11 projected to get some type of recovery; and under
12 the settlement plan, they would get a different
13 recovery?
14     A.    Yes.
15     Q.    The document then goes on to state,
16 "In the revised base scenario, the policy holders
17 would receive a recovery of 28.5 percent on their
18 claim based on a net present value of the
19 distributions discounted at an illustrative rate
20 of 15 percent."
21         Do you see that?
22     A.    I do.
23     Q.    What do you understand that to mean?
24     A.    I understand that the present value
25 of the payments that FGIC was to make in the

Page 48

Robert Major

1
2 future to its creditors, discounted at
3 15 percent, would amount to a 25 1/2 percent
4 recovery.
5     Q.    28.5 percent.
6     A.    I'm sorry, 28.5.
7     Q.    And when you read this, did you ask
8 yourself why did they pick an illustrative rate
9 of 15 percent?
10     A.    No.
11     Q.    Illustrative.  Sorry.
12     A.    No.
13     Q.    Did you ask them, Duff & Phelps, why
14 they picked a 15 percent discount rate?
15         MR. ESPANA:  Objection to form;
16     mischaracterizes the exhibit.
17         THE WITNESS:  I don't believe Duff &
18     Phelps picked the discount rate.
19 BY MR. BAIO:
20     Q.    Did you ask them why they put
21 15 percent as an illustrative rate in this bullet
22 for the situation overview?
23     A.    Did I ask Duff & Phelps?
24     Q.    Yes.
25     A.    No.

Page 49

Robert Major

1
2     Q.    Did they tell you why they used the
3 15 percent figure in the situation overview,
4 page 2 of the report?
5     A.    I believe the discount rates were
6 selected by FGIC.
7     Q.    What discount rates were selected by
8 FGIC?
9     A.    The 10 to 20 percent.
10     Q.    10 to 20 percent is different from a
11 fixed 15 percent; correct?  You'll agree with me?
12     A.    Yes.
13     Q.    Did you ask Duff & Phelps, Since
14 FGIC used between 10 percent and 20 percent, why
15 do you use 15 percent in this bullet?
16     A.    No.
17     Q.    And did you wonder why they used
18 15 percent?
19     A.    No.
20     Q.    Did you ask them what the
21 percentages would be of proposed recovery at
22 different numbers, 10 percent and a 20 percent
23 discount rates?
24     A.    No.
25     Q.    Do you know what they were?

13 (Pages 46 - 49)

Page 50

Robert Major

1
2      A.    Yes.
3      Q.    And you knew that from your review
4  of the rehabilitation plan and the Lazard
5  documents that were submitted therein; right?
6      A.    No, the Duff & Phelps report.
7      Q.    Oh, in this very report?  In your
8  draft --
9      A.    Yes.
10     Q.    -- report that we're looking at and
11 then the final report?
12     A.    Correct.
13     Q.    Did you know it from any other
14 source?
15     A.    No.
16     Q.    Do you know what the recovery rates
17 are at a 10 percent discount rate?
18     A.    Yes.
19     Q.    What are the recovery rate -- what
20 is the recovery rate at a 10 percent discount
21 rate?
22     A.    I would have to refer to the report
23 since --
24     Q.    The report that's before you?
25     A.    The final report.

Page 51

Robert Major

1
2      Q.    Oh, let's mark it.  We'll mark the
3  final report as well so you'll have both and you
4  can look at either one of them.
5          MR. BAIO:  We're going to mark as
6  Exhibit 5 what we believe is the final
7  Duff & Phelps report.
8          (Major Exhibit 5, Bates Nos.
9  TR-MS000001 through 9, FGIC Commutation
10 Proposal May 15, 2013, marked for
11 identification.)
12 BY MR. BAIO:
13     Q.    Can you look at Exhibit 5 and tell
14 me what it is.
15     A.    This is the final report of Duff &
16 Phelps dated May 15, 2013, regarding the FGIC
17 commutation proposal.
18     Q.    And you thought that if you had that
19 document, you would be able to say what the
20 percentage rate of recovery under the base
21 scenario would be using a discount rate of
22 10 percent.
23          Does that help you in that regard?
24     A.    Yes, I believe so.
25     Q.    Which page are you referring to in

Page 52

Robert Major

1
2  Exhibit 5?
3      A.    Page 7.
4      Q.    And can you read into the record the
5  words that lead you -- that would identify what
6  that percentage rate is.
7      A.    30 percent.
8      Q.    You're looking at the bottom of that
9  page where there includes various numbers
10 following the heading "Notional Claims" and the
11 various titles that appear under; is that
12 correct?  Is that where you're looking?
13     A.    Yes.
14     Q.    What is your understanding of what
15 the notional claims numbers that are identified
16 in the final Duff report -- Duff & Phelps report
17 refer to?
18     A.    The notional claims are the face
19 amount of the claims expected to be filed in the
20 base scenario.
21     Q.    That's the 6.3 billion?
22     A.    Correct.
23     Q.    And under the stress scenario, what
24 did -- what was expected by way of notional
25 claims?

Page 53

Robert Major

1
2      A.    We reference to Duff.
3      Q.    Are these numbers Duff & Phelps
4  numbers or Lazard numbers?
5      A.    I believe these are Lazard numbers.
6      Q.    And does Duff & Phelps adopt them in
7  this plan?
8      A.    Can we take just a short --
9      Q.    Absolutely.  Sure.  Do you want to
10 take an actual two-minute break?
11     A.    I don't need it.  I just need about
12 30 seconds.
13          (Pause from the record.)
14     A.    Okay.
15     Q.    So what is your understanding as to
16 the source of the information that appears in the
17 charts about which -- to which I've drawn your
18 attention?  Is it Lazard or is it Duff & Phelps?
19     A.    I believe this data is Lazard's.
20     Q.    And did Duff & Phelps either agree
21 or disagree with that data, so far as you know?
22          MR. ESPANA:  Objection to form.
23          THE WITNESS:  I don't believe they
24     stated an opinion other than it was sourced
25     from Lazard.

14 (Pages 50 - 53)

Page 54

1                Robert Major
2  BY MR. BAIO:
3      Q.    And what is your understanding as to
4  how Duff & Phelps used the Lazard data in its
5  analysis?
6      A.    To -- to demonstrate what the
7  recoveries were to creditors under the FGIC plan
8  of rehabilitation.
9      Q.    And that's what they would -- they
10 would receive in the absence of a settlement
11 agreement; correct?
12         MR. KAUFMAN:  Objection to the form.
13         You mean what they might receive?
14         MR. BAIO:  Fair enough.
15 BY MR. BAIO:
16     Q.    It's Lazard's estimates under
17 different scenarios of what they may receive in
18 the absence of the settlement agreement; right?
19         MR. ESPANA:  Objection; asked and
20     answered.
21         THE WITNESS:  What the FGIC trusts
22     that were part of the settlement would
23     receive if they weren't part of the
24     settlement agreement?
25

Page 55

1                Robert Major
2  BY MR. BAIO:
3      Q.    Yes.
4      A.    Yes.
5      Q.    Did Duff & Phelps ever state to you
6  that they believed those numbers were wrong?
7          MR. ESPANA:  Objection; asked and
8      answered.
9          THE WITNESS:  Not to my knowledge.
10 BY MR. BAIO:
11     Q.    Did they ever state to you, in words
12 or substance, that they believed that they were
13 appropriate?
14     A.    Not to my knowledge.
15     Q.    Did they criticize the Lazard
16 analysis to you?
17         MR. ESPANA:  Asked and answered.
18         THE WITNESS:  Not to my knowledge.
19 BY MR. BAIO:
20     Q.    So if you go down the rest of this
21 chart, under base scenario and stress scenario,
22 you'll see "Total Payments."
23         What is your understanding as to
24 what "Total Payments" are?
25     A.    That is the estimated total amount

Page 56

1                Robert Major
2  of payments expected to be paid out by FGIC on
3  its -- on the claims.
4      Q.    Under the various scenarios, under
5  the two scenarios?
6      A.    Correct.
7      Q.    What is then the next entry, initial
8  "CPP"?
9      A.    That's the initial cash percentage
10 payout -- initial payout percentage, which
11 represents the amount of the initial payment to
12 the notional claims under each scenario.
13     Q.    And under each scenario, it's
14 17.25 percent; correct?
15     A.    Yes.
16     Q.    The "Nominal Recovery," what is that
17 referring to?
18     A.    The nominal recovery is the initial
19 cash payout percentage plus the recovery
20 percentage of the net present value of the future
21 payments to be made under each scenario.
22     Q.    And the nominal recovery is the net
23 present value, or is it the total dollar amount?
24     A.    It's the initial cash percentage --
25 the initial cash payment plus the net present

Page 57

1                Robert Major
2  value of the future payments added together.  So
3  it's a total recovery.
4      Q.    And the total recovery nominally
5  would be 45 percent under the base scenario?
6      A.    Yes.
7      Q.    And 23 percent under the stress
8  scenario?
9      A.    Yes.
10     Q.    According to Lazard.
11     A.    Yeah, I -- just to clarify, these
12 are not -- the nominal recovery is not discounted
13 cash flows.
14     Q.    I didn't think so.
15     A.    Sorry.
16     Q.    I tried.
17         So it's before you would apply any
18 discount; right?
19     A.    Yes.
20     Q.    And then the next three lines in
21 this table show what the nominal recovery
22 converts to if you use some discount rate to get
23 a present value of those future payments; is that
24 fair?
25     A.    Yes.

15 (Pages 54 - 57)

Page 58

Robert Major

1
2    Q.    So at a 10 percent discount rate
3  under the base scenario, the recoveries would be
4  30 percent?
5    A.    Yes.
6    Q.    And at 15 percent discount rate, it
7  would be 28.5 percent?
8    A.    Yes.
9    Q.    And at a 20 percent discount rate,
10  it would be 27 percent; is that what you
11  understand this to mean?
12    A.    Yes.
13    Q.    The numbers that are under the
14  stress scenario are what the percentage
15  recoveries are estimated to be under those
16  assumptions, that is the stress scenario
17  assumptions; correct?
18    A.    Correct.
19    Q.    Did you ask Duff & Phelps what they
20  thought the appropriate discount rate should be?
21    A.    No.
22    Q.    Did you ask them to run any numbers
23  as to what the present value of those future
24  income streams plus the initial CPP would be at a
25  discount rate lower than 10 percent?

Page 59

Robert Major

1
2    A.    No.
3    Q.    Did they tell you that a discount
4  rate lower than 10 percent would be
5  inappropriate?
6    A.    No.
7    Q.    Did you believe that a discount rate
8  of less than 10 percent would be inappropriate?
9    A.    I didn't consider that.
10    Q.    You didn't consider the
11  appropriateness of the discount rate yourself?
12    A.    No.
13    Q.    And you didn't ask anyone what is
14  the appropriate discount rate?
15    A.    No.
16    Q.    Did you ask anyone are these
17  discount rates too high?
18    A.    No.
19    Q.    Did Duff & Phelps say anything about
20  the propriety of using these discount rates?
21    A.    Not to my knowledge.
22    Q.    And you didn't ask?
23    A.    No.
24    Q.    And no one asked, as far as you
25  know?

Page 60

Robert Major

1
2    A.    As far as I know.
3    Q.    Did you ask Duff & Phelps why
4  there's a base-case scenario and a stress
5  scenario?
6    A.    No.
7    Q.    Did you ever learn why those two
8  scenarios were presented to you?
9    A.    Did I learn why?
10    Q.    Yes.
11    A.    I drew my own conclusions as to
12  why -- these were part of disclosures made in
13  support of the FGIC plan, and I assumed that they
14  were -- made to help the creditors of FGIC
15  evaluate the proposal of -- you know, at the time
16  the FGIC plan was being considered.
17    Q.    And did you use those scenarios to
18  evaluate the plan at the time it was being
19  considered?
20    A.    Did I consider --
21    Q.    As a representative of a trustee,
22  did you consider those numbers in any respect to
23  the scenarios?
24        MR. ESPANA:  I want to raise an
25    objection; outside the scope of the

Page 61

Robert Major

1
2    30(b)(6) topics.
3  BY MR. BAIO:
4    Q.    You can answer.
5    A.    Yes.
6    Q.    What conclusion did you reach?
7        MR. ESPANA:  Same objection.
8        THE WITNESS:  I don't know that I
9    reached a conclusion other than it was
10    information that was important to the
11    creditors of FGIC in evaluating their plan.
12  BY MR. BAIO:
13    Q.    And was it important to you?
14    A.    Yes.
15    Q.    Had you seen in other matters base
16  scenarios and stress scenarios done by financial
17  analysts?
18    A.    Yes.
19    Q.    And have you seen them in the course
20  of the business that you have done for Bank of
21  New York?
22    A.    Yes.
23    Q.    What is your understanding as to --
24  if you have a general understanding -- as to why
25  such scenarios are provided?

16 (Pages 58 - 61)

Page 62

Robert Major

1
2    A.    Sure.  When evaluating
3  restructurings, the more information that can be
4  provided to the creditors to make a decision the
5  better.  And, you know, giving a stress scenario
6  is an enhanced disclosure that can help a
7  creditor evaluate a plan.
8    Q.    Did you ask Duff & Phelps if there
9  was an upside scenario that you should consider?
10   A.    No.
11   Q.    Did you believe that you should
12  consider an upside scenario?
13         MR. ESPANA:  Objection to form.
14         THE WITNESS:  I don't believe I had
15    an opinion on that.
16  BY MR. BAIO:
17   Q.    You didn't form one, one way or the
18  other?
19   A.    No.
20   Q.    You didn't ask Duff & Phelps, Let's
21  assume not the base scenario assumptions, but
22  something that might be a little more positive,
23  what would the numbers look like then?
24         MR. ESPANA:  Objection.
25

Page 63

Robert Major

1
2  BY MR. BAIO:
3    Q.    You didn't ask them to do that;
4  correct?
5         MR. ESPANA:  Objection to form;
6    vague.
7         THE WITNESS:  No.
8  BY MR. BAIO:
9    Q.    Did anybody, so far as you know?
10   A.    Not as far as I know.
11   Q.    Did they tell you, in words or
12  substance, that an upside scenario would be
13  inappropriate to evaluate?
14         MR. ESPANA:  Objection to form;
15    vague and ambiguous.
16         THE WITNESS:  No.
17  BY MR. BAIO:
18   Q.    Did you believe an upside scenario
19  would be inappropriate to evaluate?
20   A.    I don't believe I considered an
21  upside scenario at all.
22   Q.    Do you believe that if an upside
23  scenario was provided, that the nominal recovery
24  and the discounted recoveries would increase
25  likely, in your experience?

Page 64

Robert Major

1
2    A.    Can you repeat the question.
3    Q.    Yes.
4         If an upside scenario had been
5  provided, do you believe that it would have
6  identified higher recoveries than the base-case?
7         MR. ESPANA:  Objection to form;
8    calls for speculation.
9         THE WITNESS:  Yes, I'd be
10    speculating, but I would assume, yes.
11  BY MR. BAIO:
12   Q.    Which of the two reports, Exhibit 4
13  and Exhibit 5, did you rely on in reaching the
14  conclusion that the settlement is in the best
15  interests of the investors?
16   A.    Exhibit 5.
17   Q.    So we should -- let's use Exhibit 5.
18         Did you note for yourself what
19  changes were made in the final draft as compared
20  to the preliminary draft?
21   A.    No.
22   Q.    Do you remember finding anything
23  that was a significant change that impacted on
24  the analysis that you did in connection with
25  evaluating the settlement agreement?

Page 65

Robert Major

1
2         MR. ESPANA:  Objection to form.
3         THE WITNESS:  Can you repeat the
4    question.
5  BY MR. BAIO:
6    Q.    Yes.  It wasn't very good.
7         Did you note any of the changes that
8  occurred between the draft, Exhibit 4, and the
9  final, Exhibit 5?
10         MR. ESPANA:  Objection; asked and
11    answered.
12         THE WITNESS:  No.
13  BY MR. BAIO:
14   Q.    The next bullet -- I'm sorry.  We're
15  now on page 2 of Exhibit 5.  And the third bullet
16  states, "In connection with the plan, FGIC
17  presented the proposal to the Steering Committee
18  Group of RMBS Holders for ResCap trusts in late
19  March."
20         Do you see that language?
21   A.    I do.
22   Q.    And it then identifies the proposal
23  that was provided in late March; is that correct?
24   A.    Yes.
25   Q.    So that was the proposal that was

17 (Pages 62 - 65)

Page 66

1              Robert Major
2   proposed in late March, so far as you know;
3   correct?
4       A.    Correct.
5       Q.    And was there any proposal prior to
6   that?
7              MR. ESPANA:  Objection.
8              I'm instructing him not to answer
9       based on the mediation privilege.
10  BY MR. BAIO:
11      Q.    One way or the other, I'm not asking
12  what it was, was there a prior proposal?
13             MR. ESPANA:  I'm instructing him not
14      to answer.
15  BY MR. BAIO:
16      Q.    Do you understand that there were
17  actually negotiations involving the trustees or
18  their representatives prior to March -- prior to
19  late March of 2013?
20             MR. ESPANA:  Objection to form;
21      vague.
22  BY MR. BAIO:
23      Q.    In the mediation.
24      A.    Yes.
25      Q.    They were involved in the

Page 67

1              Robert Major
2   negotiations?
3       A.    I'm sorry, who was involved?
4       Q.    Representatives of your firm.
5       A.    Involved with who in negotiations?
6       Q.    In negotiating with FGIC.  What
7   eventually becomes the settlement agreement.
8              MR. ESPANA:  I'm sorry, can you just
9       repeat the question.  It was broken up.
10      I'm not even sure what the question is.
11             MR. BAIO:  Okay.
12  BY MR. BAIO:
13      Q.    When did Bank of New York first
14  become involved in negotiations with FGIC in
15  connection with the commutation issue?
16      A.    I first became aware in late March
17  or early April.
18      Q.    Do you know if anyone from Bank of
19  New York was involved in such negotiations prior
20  thereto?
21      A.    I don't know.
22      Q.    Do you have any information that
23  they were involved in negotiations prior to the
24  time that you learned of them?
25             MR. ESPANA:  Objection to form;

Page 68

1              Robert Major
2       asked and answered.
3              THE WITNESS:  No.
4   BY MR. BAIO:
5       Q.    So the proposal in late March --
6   let's read the first dash -- states, "The
7   proposal provides a cash payout from FGIC of
8   approximately $253 million to the ResCap-related
9   RMBS policy holders in exchange for FGIC to have
10  the right to assert an approximately $597 million
11  claim in the ResCap case."
12             Is that correct?  Did I read that
13  correctly first?
14      A.    You did read that correctly.
15      Q.    Is it your understanding that that
16  was the proposal that was presented in late
17  March?
18      A.    Yes.
19      Q.    Now, do you have an understanding as
20  to what the investors received -- what benefit
21  the investors get -- strike that.
22             Let's go to the next page,
23  "Executive Summary - Continued."
24             It states at the top, "Based on DP's
25  loss estimates of the wrapped portion of the

Page 69

1              Robert Major
2   ResCap-sponsored RMBS trusts, the cash
3   commutation proposal provided by FGIC is within
4   the range of expected payments under the plan of
5   rehabilitation on discounted cash flow basis."
6              Do you see that?
7       A.    Yes.
8       Q.    And what is your understanding as to
9   what that means?
10      A.    That the commutation payment plus
11  the foregone premiums that would otherwise have
12  been paid to FGIC under the policies, those two
13  things, fell into the possible range of
14  recoveries that a creditor would receive under
15  the FGIC plan of rehabilitation.
16      Q.    Let's look at page 5 of Exhibit 5.
17  Did you review this page at any time?
18      A.    Yes.
19      Q.    Did Duff & Phelps walk you through
20  this page at any time?
21      A.    Yes.
22      Q.    Was that at the telephone
23  conversation -- I'm sorry -- the meeting that you
24  participated in by telephone?
25      A.    Yes.

18 (Pages 66 - 69)

Page 70

Robert Major

1
2      Q.    Was there any subsequent meeting
3  that you participated in, that is after March 13,
4  concerning this proposal?
5          MR. ESPANA:  With Duff & Phelps?
6          MR. BAIO:  Yes, with Duff & Phelps.
7          MR. ESPANA:  Objection; asked and
8  answered.
9          But you can answer.
10          THE WITNESS:  Yes.
11 BY MR. BAIO:
12     Q.    That was on the 15th.
13          (Witness confers with counsel.)
14          MR. ESPANA:  You got to answer.
15          THE WITNESS:  Sorry.
16          I don't recall the date.  It may
17     have been at a mediation session.
18 BY MR. BAIO:
19     Q.    But there was another session that
20  you had where Duff & Phelps was present and
21  communicated to you; yes or no?
22     A.    Yes.
23     Q.    Were there more than one?
24     A.    I don't recall.
25     Q.    You only recall one?

Page 71

Robert Major

1
2      A.    I don't recall how many there were.
3      Q.    Were there more than five?
4      A.    No.
5      Q.    But it was after March 13?
6      A.    I believe so, yes.
7      Q.    All right.  Let's go through this
8  chart and tell me what -- I'll ask you your
9  understanding and things that were said.
10          The text at the top of this page,
11  under the initial heading, is, "The proposal
12  outlines a cash payment of approximately
13  $253 million by FGIC upon emergence in exchange
14  for the ability for FGIC to assert approximately
15  $597 million of allowed claims at ResCap";
16  correct?
17     A.    Correct.
18     Q.    There then is a bullet on the
19  left-hand side that states, "The following
20  proposal is based on the following three main
21  assumptions:  (A) Initial cash payment
22  percentages of 17.25 percent based on the updated
23  stress scenario pursuant to the plan."
24          Do you see that language?
25     A.    Yes.

Page 72

Robert Major

1
2      Q.    What is your understanding as to
3  that assumption?
4      A.    That is the projection in FGIC's
5  plan of rehabilitation of what that initial cash
6  payment will amount to as a percentage of claims.
7      Q.    And did Duff & Phelps tell you why
8  they used the stress scenario for that as opposed
9  to the base-case scenario?
10     A.    No.
11     Q.    Did you ask them that?
12     A.    No.
13     Q.    Did any other trustee ask?
14     A.    Not to my knowledge.
15     Q.    Did the subject come up in the
16  conversations that you had with Duff & Phelps?
17     A.    That I had?
18     Q.    Yes.
19     A.    No.
20     Q.    The next assumption is "(B)
21  Base-case payouts to policy holders of
22  28.5 percent based on the updated base scenario
23  pursuant to the plan assuming a 15 percent
24  discount rate."
25          Do you see that?

Page 73

Robert Major

1
2      A.    Yes.
3      Q.    What is your understanding as to
4  that?
5      A.    That that is the recovery of the --
6  of the -- the total recovery of the payments to
7  be received under the FGIC plan, discounted at
8  15 percent.
9      Q.    Did Duff & Phelps tell you why they
10  used 15 percent discount rate as an assumption?
11          MR. ESPANA:  Objection to form.
12          Who is the "they"?
13          MR. BAIO:  Pardon me?
14          MR. ESPANA:  Who is the "they"?
15          MR. BAIO:  Oh, Duff & Phelps.
16          Sorry.
17          MR. ESPANA:  That Duff & Phelps used
18     the 15 percent?
19          MR. BAIO:  Yes.
20          THE WITNESS:  No.
21 BY MR. BAIO:
22     Q.    It's your understanding that, in
23  their calculation, Duff & Phelps selected a
24  15 percent discount rate; correct?
25     A.    I thought that that came from -- I

19 (Pages 70 - 73)

Page 74

Robert Major

1 believe that that number came from FGIC's
2 projections.
3    Q.    Well, FGIC's projections were --
4 they showed a 10 percent, 15 percent and
5 20 percent.  The assumptions that are used in
6 this calculation are 15 percent; correct?
7    A.    Correct.
8    Q.    Did you ask Duff & Phelps, Why did
9 you pick 15 percent as opposed to 10 percent?
10    MR. ESPANA:  Objection;
11    mischaracterizes the witness' testimony,
12    asked and answered.
13    THE WITNESS:  I did not ask.
14 BY MR. BAIO:
15    Q.    Did they tell you?
16    A.    No.
17    Q.    Did anybody say, Why did you pick
18 15 percent?
19    A.    Not to my knowledge.
20    Q.    Did anybody ask, What do these
21 numbers look like if we use 10 percent?
22    A.    They're -- the analysis shows what
23 happens to these numbers at 10 percent later in
24 the analysis.

Page 75

Robert Major

1    Q.    I'm just saying on this page --
2    A.    On this page?
3    Q.    Yes.
4    On this page there are certain
5 assumptions; correct?
6    A.    Right.
7    Q.    I'm just trying to get this page
8 now.
9    A.    Okay.
10    Q.    We're going to go through the whole
11 thing.
12    A.    Okay.
13    Q.    Did you or anyone ask Duff & Phelps,
14 Why is the assumption that the discount rate to
15 be used is 15 percent?
16    A.    No.
17    Q.    But it is your understanding that
18 15 percent is what is used for the calculations
19 that appear on this page; correct?
20    A.    Correct.
21    Q.    And did you or anyone ask Duff &
22 Phelps, What would this page look like if you
23 used a 10 percent discount rate?
24    A.    No.

Page 76

Robert Major

1    Q.    Did it cross your mind that perhaps
2 you would be interested to know what it would
3 look like if it where a 10 percent discount rate?
4    MR. ESPANA:  Objection; calls for
5    speculation.
6    THE WITNESS:  On this page?
7 BY MR. BAIO:
8    Q.    Yes.
9    A.    No.
10    Q.    There is now a third assumption,
11 "(J) A haircut of 40 percent on unpaid payout
12 claim estimates."
13    Do you see that?
14    A.    Yes.
15    Q.    What is that?
16    A.    I understand that to be FGIC's
17 estimate of what the value of the future -- the
18 discounted value of the future payments to be.
19 They were the component -- the future payment
20 component to the 253 million, that is the
21 discounted amount of those -- of those future
22 payments that was used as the component to the
23 253 million.  It's a mouthful.
24    Q.    Yes.

Page 77

Robert Major

1    Can you -- is there another way you
2 can articulate it, or is that as good as it gets?
3    A.    Well, it's on this page.
4    Q.    Yes.
5    A.    So 225 million is the sum of the
6 future payouts less --
7    Q.    Where's the 225 million?
8    A.    In the second section, "Commutation
9 Consideration."
10    Q.    Yes.
11    A.    Okay.  At the bottom, there's a
12 subtotal in that section, 225.8 million.  That
13 225.8 million is the sum of the future payments
14 under the FGIC plan.  And then that 225 million
15 is discounted at 40 percent to get to the next
16 line down, 135 million.
17    Q.    Okay.  Now, you said that was FGIC's
18 estimate, the 40 percent; is that accurate?
19    A.    Yes.
20    Q.    Where did you see the 40 percent
21 haircut in anything that FGIC provided?
22    A.    I didn't, other than Duff tells me
23 that this number comes from their proposal.
24    Q.    So in addition to discounting the

20 (Pages 74 - 77)

Page 78

Robert Major

1
2 flow of potential future payments by 15 percent,
3 there's then another haircut of 40 percent?
4     A.    No.
5     Q.    Okay.  Is there a discount -- well,
6 let's -- did they tell you why there should be a
7 40 percent haircut?
8         MR. ESPANA:  Object.
9         Who's the "they"?
10        MR. BAIO:  Duff & Phelps.
11        THE WITNESS:  Yes.
12 BY MR. BAIO:
13    Q.    What did they say?
14    A.    That FGIC put a discounted value on
15 those future payments that were to be made under
16 their plan because of the difficulty in
17 estimating future claims, the difficulty in
18 estimating recoveries by FGIC to pay those
19 claims.
20    Q.    Anything else?
21    A.    No, not to my knowledge.
22    Q.    Did they tell you how the 40 percent
23 figure was reached?
24    A.    No.
25    Q.    Did they tell you they thought the

Page 79

Robert Major

1
2 40 percent figure was reasonable?
3     A.    No.
4     Q.    Did they tell you it was
5 unreasonable?
6     A.    No.
7     Q.    Did you ask whether 30 percent is a
8 better number or 20 percent?
9     A.    No.
10    Q.    Did you question that number at all?
11    A.    Only to make sure that I understood
12 what it represented.
13    Q.    And it's a FGIC-directed number?
14    A.    That's my understanding, yes.
15    Q.    And Duff & Phelps, so far as you
16 know, didn't evaluate whether it was appropriate
17 or not?
18    A.    Not to my knowledge.
19    Q.    Do you know if they evaluated
20 whether there was any double counting in the
21 discounting?
22    A.    I don't -- repeat the question,
23 please.
24    Q.    I'll withdraw it.
25        So the base-case -- is it your

Page 80

Robert Major

1
2 understanding that the base-case has certain
3 assumptions, it is based on certain assumptions?
4     A.    Yes.
5     Q.    And that, notwithstanding those
6 assumptions, there still is a 40 percent haircut
7 on future payments --
8     A.    Yes.
9     Q.    -- is that your understanding?
10        Did you ask Duff & Phelps to run the
11 numbers with a lower haircut percentage?
12    A.    No.
13    Q.    Is it your understanding that this
14 settlement is, in fact, or involves a commutation
15 of the policies?
16    A.    Yes.
17    Q.    There was actually some debate about
18 that, but --
19        And what -- what is the effect of
20 the commutation of the policies from the point of
21 view of the investors?
22        MR. ESPANA:  Objection; asked and
23        answered.
24        THE WITNESS:  The trusts?
25

Page 81

Robert Major

1
2 BY MR. BAIO:
3     Q.    Yes.
4     A.    The trusts would -- in exchange for
5 terminating those policies and, therefore, giving
6 up the right to make future claims against FGIC,
7 the trusts would be able to forego the payment of
8 premiums, it would also get mutual releases from
9 FGIC.
10    Q.    When you refer to the foregoing the
11 paying of premiums, is that the $18.3 million
12 figure that is identified in the chart that
13 appears on the right?
14    A.    Yes.
15    Q.    Is that a present value number?
16    A.    I believe so, yes.
17    Q.    And who calculated that?
18    A.    I believe on this page, it was
19 FGIC's calculation.
20    Q.    Did Duff & Phelps do anything to
21 evaluate the accuracy of that number, so far as
22 you know?
23    A.    I'm not sure.
24    Q.    So looking now at the chart, under
25 "Information Points," do you see that?  It's on

21 (Pages 78 - 81)

Page 82

Robert Major

1
2 the right-hand side.  You see that; yes?
3     A.    I do.
4     Q.    The initial cash payment percentage
5 is 17.25 percent; correct?
6     A.    Yes.
7     Q.    The base-case payout, which was then
8 used in this analysis, was 28.5 percent; correct?
9     A.    Yes.
10     Q.    But that's based on a 15 percent
11 discount rate; correct?
12     A.    Correct.
13     Q.    And if it were a 10 percent discount
14 rate, that number would increase to 30 percent;
15 correct?
16     A.    I'd have to refer to the other page
17 to confirm that --
18     Q.    Refer away.
19     A.    Okay.
20         (Witness peruses the exhibit.)
21     A.    Correct.
22     Q.    And that then would increase the
23 numbers -- some of the numbers that follow;
24 correct?
25     A.    Yes.

Page 83

Robert Major

1
2     Q.    Did you do any calculation as to the
3 effect of a 10 percent discount rate on any of
4 the numbers that follow?
5     A.    No.
6     Q.    Did you ask Duff & Phelps to do
7 that?
8     A.    They did it in other places in this
9 report.
10     Q.    Okay.  Then just go through each
11 line and tell me what you understand that it
12 reflects.
13     A.    Where would you like me to start?
14     Q.    "ResCap-sponsored RMBS claim per
15 FGIC."
16     A.    That is the -- FGIC's estimation of
17 the total amount of claims that the wrapped
18 trusts had in the FGIC rehabilitation -- in the
19 ResCap proceeding.
20     Q.    The next line?
21     A.    This I understand to be certain
22 costs that could be avoided -- that would be
23 avoided by doing the settlement.
24     Q.    And what are those costs?  That is,
25 what -- what is it that's being avoided?

Page 84

Robert Major

1
2     A.    Litigation, interest on unpaid
3 claims and so forth.
4     Q.    And whose calculation is that?
5     A.    I believe it's FGIC's.
6     Q.    Did Duff & Phelps analyze the
7 propriety of that number?
8     A.    I'm not sure.
9     Q.    Did they provide you any other
10 number?
11     A.    No.
12     Q.    What's the next number?
13     A.    The next number is the total amount
14 of claims, less the costs and interest, to derive
15 projected claims.
16     Q.    And then what is the next line?
17     A.    Those are the claims paid to date by
18 FGIC.
19     Q.    And those are actual claims that had
20 been paid, in your understanding?
21     A.    Yes.
22     Q.    What is the next line?
23     A.    Those are the estimated unpaid
24 claims.
25     Q.    And then what is the next line?

Page 85

Robert Major

1
2     A.    Those are the accrued and unpaid
3 claims as of March 31st.
4     Q.    And what is your understanding as to
5 what that reflects?
6     A.    That is the portion of estimated
7 unpaid claims that had been -- that had accrued
8 as of March 31, 2013.
9     Q.    Was that number updated or has it
10 been updated?
11     A.    I'm not sure.
12     Q.    What is the next number, "Future
13 Estimated Claims"?
14     A.    Those are the amount of claims
15 expected to arise from these trusts in the
16 future.
17     Q.    It's $481 million?
18     A.    Yes.
19     Q.    Is that a present value number?
20     A.    I'm not sure.
21     Q.    Is there anything in this document
22 that would lead you to conclude either that it is
23 a present value number or it isn't?
24     A.    If you give me an opportunity to
25 look, I can --

22 (Pages 82 - 85)

Robert Major

1
2    Q.    Please do.
3         (Witness peruses the exhibit.)
4    A.    I'm not sure.
5    Q.    Would it make a difference in your
6 own analysis if it is a discounted or is not a
7 discounted number?
8    A.    Yes.
9    Q.    Did you ask Duff & Phelps people
10 whether, in fact, it's a discounted or not a
11 discounted number?
12   A.    No. I'm just not recalling -- I
13 think I know -- I know whether or not -- I just
14 don't recall if it was or not at this time.
15   Q.    You did say it would make a
16 difference in your own analysis if it is a
17 discounted number as opposed to a nondiscounted
18 number?
19   A.    Yes.
20   Q.    In what way?
21   A.    The discounted number would reflect
22 the time value of receiving those payments in the
23 future.
24   Q.    And that would be the more accurate
25 number to use?

Robert Major

1
2    A.    It would give you a better sense in
3 today's dollars what it was worth.
4    Q.    There then is "Commutation
5 Consideration."
6         Can you tell me what each one of
7 those lines refer to.
8    A.    These -- this is FGIC's calculation
9 of the $253 million payment to the wrapped
10 trusts.
11   Q.    Walk through each line and tell me
12 how -- how that is the case.
13   A.    Okay. The first line, "Claims
14 Accrued and Unpaid at Initial Cash Payment
15 Percentage," is the payment that would be made to
16 claimant -- FGIC claimants at the effective date
17 of its plan. And it's the amount of accrued and
18 unpaid claims as of March 31st at the
19 17.25 percent recovery rate.
20   Q.    What is the next line?
21   A.    The next line is the accrued and
22 unpaid claims in the base-case payout less the
23 initial cash payment percentage.
24   Q.    And that is a number derived by
25 applying a 15 percent discount rate; correct?

Robert Major

1
2    A.    Yes.
3    Q.    And if a 10 percent discount rate
4 were applied, it would be higher; correct?
5    A.    Yes.
6    Q.    Is there anything that shows what
7 that number would be at a 10 percent discount
8 rate? And by that I mean anything in this
9 document, in other pages. You had referred to
10 the possibility that other pages show an analysis
11 of the impact at 10 percent.
12   A.    No.
13   Q.    It doesn't?
14        So you've looked at it now and there
15 is nothing in this document that shows what that
16 calculation would be at a 10 percent discount
17 rate; correct?
18   A.    This is a calculation of the
19 253 million. So as the component of that
20 payment, no.
21   Q.    Right.
22   A.    There are other analysis that show
23 what happens under the FGIC rehabilitation plan
24 using a 10 percent discount rate.
25   Q.    But not that calculation?

Robert Major

1
2    A.    But not as a component -- this is
3 a --
4    Q.    Because it's not a component?
5    A.    I'm sorry?
6    Q.    It's not a component of the
7 settlement agreement?
8    A.    It's not a component of the
9 calculation of the $253 million payment.
10   Q.    And is it your understanding that
11 FGIC used a 15 percent discount rate in deriving
12 that number?
13   A.    Yes.
14   Q.    Did Duff & Phelps tell you why they
15 used 15 percent as opposed to the other
16 percentages that appeared in the stress and
17 base-case analysis?
18        MR. ESPANA: Objection; asked and
19 answered.
20        THE WITNESS: No.
21 BY MR. BAIO:
22   Q.    And you didn't ask them?
23        MR. ESPANA: Same objection.
24        THE WITNESS: No.
25

23 (Pages 86 - 89)

Page 90

1            Robert Major
2  BY MR. BAIO:
3      Q.    What does the next line show?
4      A.    That is the future estimated claims
5  paid out at the 25 1/2 percent recovery rate.
6      Q.    28.5 percent recovery rate?
7      A.    Yes.  Did I get that wrong again?
8      Q.    Yes.
9      A.    Sorry.
10     Q.    That's all right.
11          That, again, is employing a
12  15 percent discount rate; yes?
13     A.    Yes.
14     Q.    Then the total of those numbers is
15  the next line, 225.8; correct?
16     A.    Correct.
17          MR. BAIO:  Let's take a few-minutes
18  break.
19          (Recess from the record.)
20          MR. BAIO:  Going back on the record.
21  BY MR. BAIO:
22     Q.    Can you turn to page 3 of
23  Exhibit 5, the continuation of the executive
24  summary.
25          Now, there appears, at the bottom

Page 91

1            Robert Major
2  part of this chart, "Duff & Phelps'
3  Recommendation."
4          Do you see that?
5      A.    Yes.
6      Q.    And there's an "X."  What does that
7  X mean, so far as you understand?
8      A.    That between the two scenarios that
9  are laid out on this page, the FGIC settlement
10  proposal and the FGIC plan, that the X means that
11  their recommendation is that FGIC settlement
12  proposal is within the range of reasonableness
13  under either the base scenario or stress
14  scenario.
15     Q.    Not that it's more advantageous;
16  correct?  It's that it's within the band or
17  within the range of reasonableness?
18     A.    Right.
19     Q.    They did not do an evaluation as to
20  whether it's more advantageous from the point of
21  view of the investors; is that correct?
22          MR. ESPANA:  Objection to form;
23  vague.
24          THE WITNESS:  Can you repeat the
25  question.

Page 92

1            Robert Major
2  BY MR. BAIO:
3      Q.    Yes.
4          It is your understanding that they
5  did not tell you or the other trustees that the
6  FGIC settlement proposal is better than what
7  investors can receive under the plan?  They did
8  not say that?
9      A.    They did not, correct.
10     Q.    And they didn't pick one over the
11  other as a preference from a financial point of
12  view; is that correct?
13          MR. ESPANA:  Objection to form.
14          THE WITNESS:  One over the other --
15  can you --
16  BY MR. BAIO:
17     Q.    Recommend that you accept the FGIC
18  settlement proposal as opposed to the recoveries
19  that would be received under the plan.
20          MR. ESPANA:  Objection to the form;
21  mischaracterizes the document, which speaks
22  for itself.
23          THE WITNESS:  Please repeat the
24  question.
25

Page 93

1            Robert Major
2  BY MR. BAIO:
3      Q.    They did not recommend that you
4  accept the FGIC settlement proposal over the
5  plan.
6          MR. ESPANA:  Which plan?
7  BY MR. BAIO:
8      Q.    The FGIC plan in the absence of a
9  settlement agreement.
10     A.    I'm sorry, one more time, please.
11     Q.    Under the plan, there are potential
12  recoveries; correct?
13     A.    Yes.
14     Q.    And under the settlement proposal,
15  there's a specific recovery for the trusts;
16  correct?
17     A.    Correct.
18     Q.    Duff & Phelps did not tell you that
19  the settlement proposal is preferred over the
20  nonsettlement proposal scenario, which is
21  whatever recoveries would be received under the
22  plan --
23          MR. KAUFMAN:  Objection to the form.
24  BY MR. BAIO:
25     Q.    -- is that correct?

24 (Pages 90 - 93)

Robert Major

1
2       MR. KAUFMAN: Doesn't change the
3   objection.
4       THE WITNESS: I believe that Duff &
5   Phelps recommended the FGIC settlement
6   proposal.
7   BY MR. BAIO:
8       Q.    Over rejecting the FGIC settlement
9   proposal?
10      MR. ESPANA: Objection --
11      THE WITNESS: I don't understand the
12  question.
13  BY MR. BAIO:
14      Q.    They said -- is it your
15  understanding that they said that you should --
16      MR. ESPANA: I think you got your
17  question wrong.
18  BY MR. BAIO:
19      Q.    -- enter into the settlement?
20      Did Duff & Phelps say that, in their
21  view, the trusts -- the trustees should enter
22  into the settlement?
23      A.    I believe so, yes.
24      Q.    They said that it's preferred to a
25  nonsettlement scenario; is that your testimony?

Robert Major

1
2       A.    No.
3       MR. ESPANA: Objection to form.
4   BY MR. BAIO:
5       Q.    Okay. They didn't say that? They
6   didn't say that, You're better off settling than
7   not settling?
8       MR. ESPANA: Objection to form.
9       THE WITNESS: No.
10  BY MR. BAIO:
11      Q.    They didn't say that?
12      A.    No.
13      Q.    Did they say, You're better off
14  settling than not settling?
15      A.    No.
16      Q.    There is a base scenario and a
17  stress scenario, and the ranges go from
18  220 million to 340 million under the base
19  scenario, and 190 million to 250 million under
20  the stress scenario.
21      Do you see that?
22      A.    Yes.
23      Q.    How were those numbers derived?
24      A.    Those numbers reflect discount --
25  present value discount rates ranging from 10 to

Robert Major

1
2   20 percent on the future cash flows.
3       Q.    Is that the only difference? That
4   is, the $220 million figure under the base-case
5   scenario is the result of a 20 percent discount
6   rate applied to projected payouts, as opposed to
7   340 million, which is the result of using a
8   10 percent discount rate; is that correct?
9       A.    That's my understanding.
10      Q.    There's no other factor that goes
11  into the range that's provided?
12      A.    In that scenario?
13      Q.    Yes.
14      A.    Not to my knowledge.
15      Q.    And the same thing is true in the
16  stress scenario; is that correct?
17      A.    There's another footnote there, so I
18  would say that that's not correct. There's
19  another factor in the --
20      Q.    What is your understanding as to
21  what the other footnote is?
22      A.    That the stress scenario range, as
23  noted in Footnote B, reflects a 17 to 18 percent
24  recovery on Duff & Phelps' low and high
25  estimates -- high loss estimates.

Robert Major

1
2       Q.    Do you understand that there are
3   claims that FGIC has brought against ResCap,
4   Countrywide and others, reps and warranty claims?
5       A.    Yes.
6       Q.    And do you understand that FGIC has
7   evaluated the strength of those claims?
8       A.    Not specifically; but I would assume
9   they have, yes.
10      Q.    And do you understand that they have
11  placed an estimated value on those claims?
12      A.    Yes.
13      Q.    What is the estimated value that
14  they've put on those claims, if you can recall?
15      A.    I don't -- I don't recall. I
16  believe it's a $5.4 billion number, something
17  like that.
18      Q.    And did they provide an estimate of
19  what they think the recovery would be on those
20  claims, so far as you know?
21      MR. ESPANA: Objection to form.
22      Who's the "they"?
23      MR. BAIO: FGIC.
24      THE WITNESS: I don't know.
25

Page 98

1          Robert Major
2 BY MR. BAIO:
3      Q.    Have you heard about approximately a
4 billion-dollar estimate by FGIC of what they
5 think those claims are worth?
6      A.    I don't recall.
7      Q.    Did you look at the FGIC statutory
8 filings?
9      A.    Some of them.
10     Q.    Do you recall them including in
11 those statutory filings an estimate of what they
12 thought the recoveries would be?
13     A.    No.
14     Q.    Whatever those recoveries are, they
15 are not included in this analysis; is that
16 correct?
17     A.    Yes.
18     Q.    It's correct that they're not
19 included?
20     A.    Correct.
21     Q.    And if, in fact, those recoveries
22 occur, in whatever dollar amount, minus the
23 expenses of bringing those claims, that would be
24 an added amount that FGIC could use to pay
25 claims --

Page 99

1          Robert Major
2          MR. WYNNE:  Objection to form.
3          MR. ESPANA:  Objection to form.
4 BY MR. BAIO:
5      Q.    -- is that correct?
6      A.    Yes.
7      Q.    And that would increase these
8 potential recoveries; isn't that correct?
9          MR. ESPANA:  Objection to form;
10     calls for speculation.
11         THE WITNESS:  Yeah, I'm speculating.
12     I really don't know.
13 BY MR. BAIO:
14     Q.    Well, they would have more money and
15 they would have a higher ability to pay; is that
16 correct?  FGIC, in that case.
17     A.    Yes, if they recovered more and the
18 policies weren't being commuted, they would have
19 more money to pay claims.
20     Q.    And there's no estimate -- there's
21 no dollar amount included in this analysis based
22 on potential recoveries of such claims; correct?
23         MR. ESPANA:  Objection; asked and
24     answered.
25

Page 100

1          Robert Major
2 BY MR. BAIO:
3      Q.    By "this analysis," I mean the
4 Duff Phelps analysis.
5      A.    Can you repeat it, please.
6      Q.    There's no -- no inclusion of
7 potential recoveries in the Duff & Phelps
8 analysis, that's Exhibit 5, potential recoveries
9 for rep and warranty claims?
10     A.    By FGIC?
11     Q.    Yes.
12     A.    That's correct.
13     Q.    And those could enhance FGIC's
14 ability to pay in the future?
15         MR. ESPANA:  Objection to form.
16         THE WITNESS:  Perhaps.
17 BY MR. BAIO:
18     Q.    Right.
19         If they recover; correct?
20     A.    Correct.
21     Q.    Did you ask Duff & Phelps whether
22 such potential recoveries should be included in
23 any analysis as to whether the FGIC settlement
24 proposal falls within the range of reasonableness
25 under the two scenarios?

Page 101

1          Robert Major
2      A.    No.
3      Q.    Did anybody ask that question?
4      A.    Not to my knowledge.
5      Q.    Did you think it was appropriate to
6 ask such a question?
7      A.    I don't believe I considered the
8 question.
9      Q.    Well, thinking of it now, do you
10 think you should consider that in determining
11 which of the -- whether the settlement is
12 advisable?
13     A.    No -- I don't know.
14     Q.    You don't know?
15     A.    No.
16     Q.    But it wasn't considered; correct?
17     A.    Not to my knowledge.
18     Q.    And where are the calculations that
19 lead to the base-case scenario range and the
20 stress scenario range in this document, if you
21 know?
22     A.    If you give me a moment.
23         (Witness peruses the exhibit.)
24     A.    I don't believe that there is a page
25 that sets forth the ranges under the base and

26 (Pages 98 - 101)

Page 102

1          Robert Major
2 stress scenario for the settlement trusts
3 themselves. There's an analysis of all policies,
4 but not the -- not one for the wrapped trusts
5 under the base and stress.
6     Q.    Let's go back to --
7     A.    Not to my knowledge. As I look
8 through --
9     Q.    You can take another minute and see
10 if you find anything. If you don't, that's fine.
11    A.    I don't see it.
12    Q.    So we can't tell from Exhibit 5, at
13 least from a calculation that appears in
14 Exhibit 5, how the $220 million figure was
15 derived; is that correct?
16    A.    I don't know.
17         MR. WYNNE: I just received an
18    e-mail that the phone is muted.
19         (Discussion off the record.)
20 BY MR. BAIO:
21    Q.    So just going back to my question,
22 there's a $220 million figure in the range of
23 220 million to 340 million, correct, that's on
24 page 3?
25    A.    Yes.

Page 103

1          Robert Major
2     Q.    And part of the analysis is the
3 253 million fits within that range; correct?
4 That's part of what Duff & Phelps stated to you;
5 is that correct?
6     A.    Yes.
7     Q.    Show me how they got the
8 $220 million figure.
9     A.    I believe that this -- the
10 $220 million figure is the net present value of
11 the cash payments under the FGIC plan in the base
12 scenario.
13    Q.    And is there anything in this
14 document that shows the FGIC plan base scenario
15 payouts?
16    A.    Yes, but not for the wrapped trusts.
17    Q.    So that calculation is missing?
18    A.    I'm not --
19    Q.    It's not here?
20    A.    I'm not finding it right now. If it
21 is in there, I'm not finding it.
22    Q.    But in your view, the fact that the
23 base scenario has a range that is lower than the
24 actual $253 million proposed payment, that is an
25 important factor in your conclusion that the

Page 104

1          Robert Major
2 settlement is in the best interests of the
3 investors; is that correct?
4     A.    It is a factor, yes.
5     Q.    And, indeed, if the base scenario
6 included a range that was above $253 million, you
7 would have to think more about it, as to whether
8 it's in the best interests of the investors; is
9 that fair?
10    A.    It would be a factor. Whatever the
11 range came out to be would be a factor that we
12 would consider.
13    Q.    And if it's a range that's above the
14 actual payment, that would be an important
15 consideration for you?
16    A.    Whatever the range is is an
17 important consideration.
18    Q.    So the accuracy of the range
19 calculation is important to you --
20         MR. KAUFMAN: Objection to form.
21 BY MR. BAIO:
22    Q.    -- is that correct?
23         MR. KAUFMAN: Doesn't change the
24    objection when you say "is that correct?"
25         MR. BAIO: Just object again. I

Page 105

1          Robert Major
2 understand.
3         THE WITNESS: Yes, the accuracy --
4    yes.
5 BY MR. BAIO:
6     Q.    Did you do anything, take any steps,
7 to confirm the accuracy of the $220 million
8 calculation?
9     A.    No.
10    Q.    Look at page 3. On the right-hand
11 side, under "FGIC Plan," do you see a number of
12 bullets?
13    A.    Yes.
14    Q.    The third bullet identifies a risk.
15 And it states, "A significant portion of cash
16 distributions from deferred payout obligations
17 and other true-up payments are significantly
18 back-ended, although a majority of the claims are
19 expected to arise in the first five years," and
20 then in parentheses it says, "(greater than
21 70 percent)."
22         Do you see that?
23    A.    Yes.
24    Q.    What is your understanding as to
25 what that is stating?

27 (Pages 102 - 105)

Page 106

Robert Major

2    A.    That the risk in receiving -- as a
3 payment is estimated to be made farther into the
4 future, the risk of actually collecting it is
5 greater.
6    Q.    And is it your understanding that
7 Lazard considered that under their two scenarios,
8 that is, the likelihood of recoveries out in
9 time?
10    A.    Yes.
11    Q.    And --
12    A.    I take -- I don't know what --
13    Q.    Okay.
14    A.    I don't know.
15    Q.    The statement that "a majority of
16 the claims are expected to arise in the first
17 five years," do you know where that came from?
18    A.    No.
19    Q.    Is that a Lazard assumption?
20    A.    I assume so.
21    Q.    But you don't know.
22          Actually, did -- did Duff &
23 Phelps -- well, strike that.
24          The figures and the calculations
25 that appear on page 5 of Exhibit 5, the Duff &

Page 107

Robert Major

2 Phelps report, those numbers were all provided by
3 FGIC; is that correct?
4    A.    That's my understanding.
5    Q.    Those are not generated by Duff &
6 Phelps?
7    A.    That's my understanding.
8    Q.    The figures that appear in -- on
9 page 7, which is the Bates No. 007 of Exhibit 5,
10 also were provided entirely by FGIC; correct?
11    A.    That's my understanding, yes.
12    Q.    What about the figures and the
13 calculations that appear in -- on page 8; who is
14 the source of those calculations?
15    A.    Some of them are FGIC's numbers;
16 some of them are Duff's numbers.
17    Q.    Okay.  And can you articulate which
18 ones are Duff's numbers and which ones are
19 Lazard's numbers [sic]?
20    A.    The top half of the chart called
21 "All FGIC Policy Holders - Lazard Affidavit,"
22 those are FGIC's numbers.
23          The bottom part of the chart,
24 "Claims for Policy Holders of ResCap-Related
25 Trusts per D&P's Estimates" are Duff & Phelps'

Page 108

Robert Major

2 numbers.
3    Q.    And how did Duff & Phelps derive the
4 numbers that appear in the section relating to
5 their calculations, if you know?
6    A.    That is their -- I don't recall
7 right -- I don't recall right now.
8    Q.    Well, let's go through it.  It says
9 that FGIC's total notional claims estimates is
10 approximately 6.3 billion in the base-case and
11 11.7 billion in the stress-case.
12          Do you see that?
13    A.    Sorry.  Repeat that, please.
14    Q.    I just read the first line
15 underneath the heading, "FGIC's total notional
16 claims estimates is approximately 6.3 billion in
17 the base-case and 11.7 billion in the
18 stress-case."
19          Do you see that language?
20    A.    I do.
21    Q.    That's a FGIC-derived number;
22 correct?
23    A.    Yes.
24    Q.    Next it says, "Based on D&P loss
25 estimates of approximately 1.2 billion to

Page 109

Robert Major

2 1.5 billion, the policy holders for the
3 ResCap-sponsored RMBS trusts may potentially
4 represent 10 percent to 24 percent of the overall
5 pool."
6          What is your understanding as to
7 what that means?
8    A.    That based on Duff & Phelps'
9 analysis of the wrapped trusts, it is their
10 estimate of losses over the time covered by the
11 FGIC plan.
12    Q.    And how do they derive those
13 numbers, if you know?
14    A.    I believe they sampled loans and did
15 certain analysis to estimate losses on a
16 trust-by-trust basis.
17    Q.    And were there underlying documents,
18 so far as you know, that show those calculations?
19    A.    Not that I'm aware of.
20    Q.    You never saw them.
21    A.    Correct.
22    Q.    You would be surprised if there
23 aren't any, though; is that correct?
24          MR. ESPANA:  Objection to form.
25          THE WITNESS:  I don't -- I don't

28 (Pages 106 - 109)

Page 110

Robert Major

1 know if I'd be surprised.
2 BY MR. BAIO:
3     Q.    Now, did, so far as you understand
4 it, Duff & Phelps use the 10 percent to
5 24 percent numbers in their analysis as to
6 whether the proposed settlement falls within a
7 reasonable range?
8     A.    Can you repeat that, please.
9     Q.    Did they use this calculation in
10 their analysis -- let me ask first this way:  Did
11 they use this calculation in their estimate of a
12 range of 220 million to $340 million under the
13 base-case scenario?
14         MR. ESPANA:  Just objection; it's
15     vague.
16         Are you talking about the
17     1.2 billion to 1.5 billion in losses?  Are
18     you talking about the percentages?
19         MR. BAIO:  I'm talking about the
20     percentages.
21         MR. ESPANA:  Just the actual
22     percentage numbers?
23         MR. BAIO:  Yes.
24
25

Page 111

Robert Major

1
2 BY MR. BAIO:
3     Q.    Did that have any impact on the
4 range under the base-case, so far as you know?
5     A.    I don't know.
6     Q.    Why are these numbers here?
7     A.    Which -- which section of the chart
8 are you referring to?
9     Q.    I'm just talking about the first
10 bullet on page 8.
11     A.    Right.
12     Q.    How was that calculation -- those
13 calculations, how were they employed in the
14 analysis of whether the settlement fell within a
15 reasonable range, if you know?
16     A.    I don't know.
17     Q.    Do you know if it had any role in
18 that calculation?
19         MR. ESPANA:  And, again, we're
20     talking about percentages or the actual
21     losses?
22         MR. BAIO:  Now I'm talking about
23     both.  I'm talking about --
24 BY MR. BAIO:
25     Q.    Is there any way in which these

Page 112

Robert Major

1
2 numbers, so far as you understand it, impact
3 whether the $253 million figure falls within the
4 reasonable range either under the stress-case or
5 the base-case?
6         MR. ESPANA:  Do you want to take a
7     minute to look through the presentation?
8         THE WITNESS:  Sure.
9         MR. BAIO:  Okay.
10         (Witness peruses the exhibit.)
11         THE WITNESS:  May I ask you to
12     clarify your question.
13 BY MR. BAIO:
14     Q.    Sure.
15     A.    Whether those numbers --
16     Q.    Have --
17     A.    Referring back to page 3 --
18     Q.    Yes.
19     A.    -- whether those loss estimates have
20 related in any way to these ranges on page 3?
21     Q.    Yes.
22     A.    No.
23     Q.    They don't?
24     A.    Not to my knowledge.
25     Q.    You believe they don't?

Page 113

Robert Major

1
2     A.    I believe they don't.
3     Q.    Why is it here then?  What is this
4 analysis -- what is the purpose of this analysis
5 from your perspective, as a trustee who had to
6 evaluate the settlement?
7     A.    If you go to the next page,
8 page 9 --
9     Q.    Yes.
10     A.    -- those loss estimates are used to
11 derive a recovery percentage under the plan of
12 rehabilitation.  So this would be Duff's view of
13 recoveries under the plan of rehabilitation.
14     Q.    When you say "this" -- let's get
15 it --
16     A.    Sorry.
17     Q.    That's all right.
18         Let me make sure I'm on page 9.  Is
19 it page 9 at the bottom that you were looking at?
20         (Witness peruses the exhibit.)
21     Q.    The calculations that appear on
22 page 9, are they FGIC calculations by Lazard or
23 are they Duff & Phelps calculations or a mixture
24 of the two?
25     A.    The -- the claim amounts are

29 (Pages 110 - 113)

Page 114

Robert Major

1    Robert Major
2    Duff's -- Duff's loss estimates. Those are based
3    on Duff's loss estimates. I believe the payouts
4    on those claims are FGIC's numbers.
5        Q.    Let's go through this in a little
6    more detail.
7        A.    Okay.
8        Q.    By "this" I mean page 9 of
9    Exhibit 5.
10       On the right-hand side, there are
11   letters A, B and C.
12       Do you see that?
13       A.    Yes.
14       Q.    A says, "A majority of the notional
15   claims for the ResCap RMBS trust policy holders
16   are presented within the first five years post
17   emergence in both the low and high cases."
18       Do you see that?
19       A.    Yes.
20       Q.    What is -- what is the low and high
21   case -- or what are the low and high cases that
22   are being referred to here?
23       A.    In the chart on page 9, the upper
24   part of the chart contains Duff & Phelps'
25   low-case claim estimates, that is, if claims come

Page 115

1    in -- future claims come in on the lower end. At
2    the bottom of that chart is the high-case
3    analysis, if the claims were higher.
4        Q.    And are the low-case and the
5    high-case scenarios that are referred to in
6    page 9 scenarios that were created by Duff &
7    Phelps?
8        A.    The claim amounts are, yes.
9        Q.    And when you say "the claim
10   amounts," what do you mean when we look at the
11   chart, the notional claim amounts, ResCap, for
12   example?
13       A.    Yes.
14       Q.    So under "Low-case," where it says,
15   "Notional Claims ResCap: Initial 814 million;
16   '14 to '17, 112 million; and from 2018 to 2052,
17   236 million," is that an estimate that Duff &
18   Phelps made of claims under a low-case scenario?
19       A.    I believe so, yes.
20       Q.    What is the Duff & Phelps low-case
21   scenario, if you know? What are the assumptions
22   that are built into it?
23       A.    That is their estimation of losses
24   to these trusts on the low end in the future.

Page 116

1    Robert Major
2        Q.    And they also have a high end, a
3    high-case; correct?
4        A.    Yes.
5        Q.    Do you know what criteria they used
6    to establish a low-case as opposed to a
7    high-case? Did they make certain assumptions
8    that led them to a low estimate that you are
9    aware of and other assumptions that led them to a
10   high estimate?
11       MR. ESPANA: Objection to form.
12   BY MR. BAIO:
13       Q.    Again, this is whatever you're aware
14   of.
15       A.    I'm generally aware of some of the
16   factors, such as future default rates and things
17   like that, that they would use to estimate future
18   claim amounts.
19       Q.    And is that different from what
20   FGIC's expert, Lazard, did, so far as you know?
21       A.    I don't know.
22       Q.    And what are those assumptions, if
23   you know?
24       A.    I don't know.
25       Q.    Did you ask them how it is that they

Page 117

1    Robert Major
2    derived those numbers, the low-case and the
3    high-case?
4        A.    No.
5        Q.    But those numbers are -- that is the
6    notional claims amounts under both the high-case
7    and the low-case are estimates that Duff & Phelps
8    provided?
9        A.    Yes.
10       Q.    And they're estimates of claims
11   rerating to ResCap as opposed to other potential
12   claims against FGIC; is that your understanding?
13       MR. ESPANA: Objection to form.
14       THE WITNESS: Claims by whom against
15   FGIC?
16   BY MR. BAIO:
17       Q.    They're ResCap claims; correct?
18       A.    These are the claims of the wrapped
19   trusts that are the subject of the settlement
20   agreement, which are ResCap-related trusts.
21       Q.    And there's nothing in this document
22   that says what criteria were used or what
23   assumptions were made in developing the low-case
24   numbers or the high-case numbers; is that
25   accurate?

30 (Pages 114 - 117)

Page 118

Robert Major

1
2    A.    I don't know.  I'd have to look
3 through the report again.
4    Q.    It's not a long report.
5    A.    Okay.
6        (Witness peruses the exhibit.)
7    Q.    You know, the question is whether
8 there's anything in this document that identifies
9 the criteria or assumptions that were made or
10 used in developing the low-case estimates and the
11 high-case estimates.
12    A.    These are Duff & Phelps' loss
13 estimates.  And I don't believe that they --
14 there's a slide in this deck that sets forth how
15 they derived their loss estimates.
16    Q.    And you don't know how they derived
17 those loss estimates?
18    A.    Not specifically, no.
19    Q.    Then are nominal cash flow figures
20 that run through the chart on page 9.
21        Do you see that?
22    A.    Yes.
23    Q.    And whose numbers are those?
24    A.    I believe those are Duff & Phelps'.
25    Q.    And --

Page 119

Robert Major

1
2    A.    I'm sorry, I believe those are
3 FGIC's.
4    Q.    The "Initial CPP Payments" under
5 "Nominal Cash Flow," do you see that?
6    A.    Yes.
7    Q.    Those numbers going across, the
8 150 million, the 23 million, and the 67 million,
9 it's your understanding that those were generated
10 by FGIC?
11    A.    I don't know.
12    Q.    Would it matter to you as to whose
13 figures those are in your evaluation as to
14 whether the settlement agreement is in the best
15 interests of the investors?
16    A.    Yes.
17    Q.    But looking at it, you don't know
18 whose numbers they are?
19    A.    No, not as -- not at this time.
20    Q.    "Catch-up CPP Payments," do you see
21 that line?
22    A.    Yes.
23    Q.    Whose numbers are those?
24    A.    I believe those are FGIC's.
25    Q.    Where did FGIC provide those

Page 120

Robert Major

1
2 numbers, if you know?
3    A.    I don't know.
4    Q.    The "Portion of CPO Accretion Payout
5 for the Various Periods that are Identified,"
6 who's numbers are those?
7    A.    I believe they're FGIC's.
8    Q.    So it's your understanding that FGIC
9 had specific ResCap-sponsored RMBS trust figures
10 in their calculations?
11    A.    I don't know.
12    Q.    Yet you think these were derived
13 from FGIC, these numbers?
14    A.    Yes.
15    Q.    And what makes you think that
16 they're FGIC numbers?
17    A.    These are the true-up estimates --
18 yeah, I don't know.
19    Q.    You don't know what?
20    A.    I don't -- I don't know what would
21 lead me to believe who they're derived from.
22    Q.    But you do have a belief as to who
23 some of the numbers were derived from?
24    A.    Yes.
25    Q.    But you don't know why?

Page 121

Robert Major

1
2    A.    Correct.
3    Q.    Then in this chart on page 9, there
4 are discounted cash flows.
5        Do you see that?
6    A.    Yes.
7    Q.    The 10 percent, 15 percent, and
8 20 percent are numbers that were used by FGIC in
9 its -- FGIC and Lazard in Lazard's analysis;
10 correct?
11    A.    Yes.
12    Q.    What about the figures that appear
13 to the right, the 150 million, 53 million, and
14 65 million; where are -- what is the source of
15 those numbers, if you know?
16    A.    So if you go up one section in that
17 same chart, "Total Payout" --
18    Q.    Yes.
19    A.    -- those are -- the discounted cash
20 flows are those cash flows discounted at those
21 rates.
22    Q.    I see.
23        So whoever generated the total
24 payout numbers, whatever combination of people or
25 whoever did that, this then is just what that --

31 (Pages 118 - 121)

Page 122

Robert Major

1
2 what each one of those numbers above would be
3 discounted at the various discount rates; is that
4 correct?
5    A.    Yes.
6    Q.    And then what about "Total Recovery"
7 on the right-hand side; what is that showing?
8    A.    Those are the total recovery dollars
9 at the various -- in present value dollars and
10 then the recovery percentages on a notional
11 basis.
12    Q.    Do you see, on the right-hand side,
13 the "Percentage Discounted" --
14    A.    Yes.
15    Q.    -- column?
16        And it has 27 percent at a
17 10 percent discount rate, 25 percent at a
18 15 percent discount rate, and 24 percent at a
19 20 percent discount rate.
20        Do you see that?
21    A.    Yes.
22    Q.    Are those FGIC numbers or are those
23 Duff & Phelps numbers?
24    A.    It's a combination.
25    Q.    FGIC's numbers for the 10 percent,

Page 123

Robert Major

1
2 15 percent, and 20 percent discount rate were
3 higher, weren't they?  And you can look at
4 page 7.
5        (Witness peruses the exhibit.)
6    A.    I don't believe you can compare --
7 well --
8        (Witness peruses the exhibit.)
9    A.    I don't believe you can compare
10 page 7 to page 9.
11    Q.    Why is that?
12    A.    Because page 9 is Duff & Phelps'
13 estimate of losses, low-case and high-case;
14 page 7 is a summary of FGIC's plan of
15 rehabilitation.
16    Q.    Which is also an estimate of losses,
17 isn't it?
18    A.    Yes, but I don't think you can
19 compare the recoveries on the right side of the
20 chart on page 9 to the recoveries on page 7.
21    Q.    Is that because, among other things,
22    A.    Because they're -- they're different
23 analysis, using different numbers.
24    Q.    Is that because, among other things,
25 the low-case scenario used by Duff & Phelps may

Page 124

Robert Major

1
2 be or is different from the base-case scenario
3 used by FGIC?
4    A.    They are different.
5    Q.    And would that attribute -- would
6 that contribute to the different percentages,
7 among other potential things?
8    A.    Yes.
9    Q.    What other things could contribute
10 to the different percentages?
11    A.    I don't know, but they're different
12 numbers.  One is FGIC's numbers; the other is
13 Duff & Phelps' calculations.
14    Q.    And the $220 million figure in the
15 chart --
16        MR. ESPANA:  Are you talking about
17    the number on page 9?
18        MR. BAIO:  No, now I'm going to --
19 BY MR. BAIO:
20    Q.    The numbers on page 3.  Please look
21 at page 3.
22        (Witness peruses the exhibit.)
23    Q.    Again there is a range of
24 220 million to $340 million under the base-case
25 scenario.

Page 125

Robert Major

1
2        Do you see that?
3    A.    Yes.
4    Q.    Does any of the Duff & Phelps
5 estimation impact the $220 million number?
6    A.    May I have a moment?
7    Q.    Yes.
8        (Witness peruses the exhibit.)
9    A.    Can you repeat the question.
10    Q.    Do any of the Duff & Phelps
11 estimations or calculations appearing on page 9
12 impact or play any role in deriving the
13 $220 million figure identified on page 3?
14    A.    Yes.
15    Q.    How so?
16    A.    The ranges on page 3 are derived
17 from the recovery ranges on the first column of
18 the total recovery section on the chart on
19 page 9, which contains data that is -- that
20 includes Duff & Phelps loss estimates.
21    Q.    And can you tell me how the
22 calculation was done based on these documents?
23 I'm trying to see how --
24    A.    Which calculation?
25    Q.    The one that led to $220 million as

32 (Pages 122 - 125)

Page 126

1          Robert Major
2 the low end of the base-case scenario that
3 appears on page 3.
4          MR. ESPANA:  Other than what's in
5     the document or --
6          MR. BAIO:  No, within the document.
7 BY MR. BAIO:
8     Q.    Is there anything that shows you how
9 the Duff & Phelps numbers were used to derive
10 that $220 million figure?
11    A.    Yes.
12    Q.    And what is that?
13    A.    Page 9 --
14    Q.    Yep.
15    A.    -- is the FGIC base scenario cash
16 flows.
17    Q.    I'm sorry.  Where are those base
18 scenario cash flows identified?
19    A.    In the -- there's a low-case and a
20 high-case scenario using Duff & Phelps' loss
21 estimates.  Under Duff & Phelps' loss
22 estimates -- loss estimates in each of those
23 sections, it says, "Nominal Cash Flow."
24          So those are the cash flows expected
25 under the FGIC plan.

Page 127

1          Robert Major
2     Q.    By Duff & Phelps?
3     A.    Right -- no, I believe by FGIC.
4          And then those cash flows are
5 discounted at the various rates at the bottom of
6 each section to derive a net present value
7 figure, which is then -- it's those net present
8 value figures in the total recovery section
9 that -- where the range on page 3 is derived
10 from.  And it's approximate, as noted in Note C
11 on page 9.
12    Q.    Show me what was multiplied by what
13 to get the 220 million.
14    A.    Well, again, it says approximately
15 220 million.  But if you look at the low-case
16 20 percent discounted recovery, you get
17 217 million.  And that's in the total recovery
18 section under the low-case scenario.
19    Q.    Yes.
20    A.    So that would be the low end of the
21 range.
22          Under the high-case scenario, under
23 the 10 percent discounted cash flow, you get 339.
24 And as Note C indicates, that's the approximate
25 range of recovery.

Page 128

1          Robert Major
2     Q.    I see.
3          Now, is it correct then, looking at
4 the chart on page 9, that if a 10 percent
5 discounted cash flow number is used for both the
6 low-case and the high-case, the resulting range
7 is between 268 million and 339 million?
8     A.    That's what the chart indicates.
9     Q.    And you don't have any reason to
10 believe that that -- that's inaccurate, do you?
11          MR. KAUFMAN:  Objection to form.
12          THE WITNESS:  No.
13          Pardon me, can I have a minute?
14          MR. BAIO:  Yes.
15          THE WITNESS:  Thanks.
16          (Pause from the record.)
17          THE WITNESS:  Okay.
18 BY MR. BAIO:
19    Q.    Staying on page 9, on the right-hand
20 side, A, it says, "A majority of the notional
21 claims for ResCap RMBS trust policy holders are
22 presented within the first five years post
23 emergence in both the low and high cases."
24          Do you see that?
25    A.    Yes.

Page 129

1          Robert Major
2     Q.    Whose conclusion -- strike that.
3          Is that a FGIC conclusion or a
4 Duff & Phelps conclusion or both, if you know?
5          MR. ESPANA:  Objection; asked and
6     answered.
7          THE WITNESS:  In the case of this
8     footpoint A -- or Footnote -- or Note A, it
9     would be FGIC's loss estimates.
10 BY MR. BAIO:
11    Q.    And now --
12    A.    I'm sorry, Duff & Phelps' loss
13 estimates.
14    Q.    Okay.  And is it Duff & Phelps
15 estimating that the majority of the claims will
16 be presented within the first five years?
17    A.    Yes.
18    Q.    In B it states, "However, the
19 nominal cash flows to the policy holders are
20 mostly back-ended due to the true-up payments
21 related to the projected CPP increases and the
22 payments on account of the DPO accretion."
23          Do you see that?
24    A.    Yes.
25    Q.    Do you understand what that means?

33 (Pages 126 - 129)

Page 130

1          Robert Major
2     A.    Generally.
3     Q.    Can you describe, at least in your
4 own words, what you believe it means.
5     A.    It is my understanding that as the
6 FGIC plan becomes effective and payments are made
7 and time goes by, that certain adjustments to the
8 payout percentages will need to be made based on
9 the amount of claims presented and as well as the
10 recoveries FGIC is able to realize after it
11 emerges from its plan of rehabilitation.
12     Q.    And is that a FGIC-generated
13 statement or a Duff & Phelps-generated statement,
14 if you know?
15          MR. ESPANA:  Are you asking the
16     actual statement -- the words in B?
17          MR. BAIO:  Yes.
18          THE WITNESS:  I don't know.
19 BY MR. BAIO:
20     Q.    Can you look at Exhibit 3, please --
21 not Exhibit 3, sorry.  The draft, Exhibit 4.
22          Can you look at the last page.  And
23 this is -- this is -- Exhibit 4 is something that
24 you received on or around May 8, 2013; correct?
25     A.    Correct.

Page 131

1          Robert Major
2     Q.    And it identifies "Next Steps and
3 Follow-up Questions:  Prior to the confirmation
4 hearing currently set for June 11, 2013,
5 additional follow-up discussions on the
6 commutation proposal will likely be centered
7 around the following key issues."
8          Do you remember reading that at or
9 about the time that you received this?
10     A.    I don't.
11     Q.    The first bullet is "Base-case
12 payout assumption of 28.5 percent included in the
13 proposal."
14          Do you see that?
15     A.    Yes.
16     Q.    What was your understanding as to --
17 strike that.
18          Were there follow-up discussions
19 that you participated in following the receipt of
20 Exhibit 4 on that subject?
21          MR. ESPANA:  With whom?
22          MR. BAIO:  First with Duff & Phelps.
23          THE WITNESS:  No -- I take that
24     back.  I don't know.  I don't know.
25

Page 132

1          Robert Major
2 BY MR. BAIO:
3     Q.    You don't remember?
4     A.    Yeah, I don't know.
5     Q.    Did you have any discussions with
6 Duff & Phelps about the next bullet, independent
7 from what you've already testified about, "The
8 factor of unpaid payout assumptions of 60 percent
9 included in the proposal"?
10     A.    Yes.
11     Q.    And what do you recall about those
12 discussions?
13     A.    Just making sure that I understood
14 what that discount was meant to represent.
15     Q.    The next bullet is "Resolution
16 regarding the accrued and unpaid claims to date."
17          Did you understand that -- at the
18 time you received the draft, that there were
19 still some questions around that?
20     A.    Yes.
21     Q.    And were those questions resolved,
22 so far as you know?
23     A.    So far as I know.
24     Q.    And what were the questions and how
25 were they resolved?

Page 133

1          Robert Major
2          MR. ESPANA:  Again with Duff &
3     Phelps?
4          MR. BAIO:  Yes.
5          THE WITNESS:  I don't know what the
6     specific questions are.  I just generally
7     know that there's always a question about
8     the calculation of claims that are used in
9     the proposal.
10 BY MR. BAIO:
11     Q.    And do you remember any discussions
12 with Duff & Phelps about the other items that are
13 identified on page 8 of Exhibit 4 following your
14 receipt of the exhibit?
15     A.    No.
16          MR. ESPANA:  Are we done with 4 and
17     5?
18          MR. BAIO:  We're never done --
19          MR. ESPANA:  For now?
20          MR. BAIO:  We're done for now.  As
21     long as the deposition's going on, I may go
22     back to them.
23          I'll ask the reporter to mark as
24     Exhibit 6 --
25          Is that what we're up to?

34 (Pages 130 - 133)

Page 134

1          Robert Major
2          THE REPORTER:  Yes.
3          MR. BAIO:  -- the affidavit of
4    Michael Miller in further support of
5    approval of first amended plan of
6    rehabilitation.
7          (Major Exhibit 6, No Bates numbers,
8    Affidavit of Michael W. Miller, marked for
9    identification.)
10          MR. ESPANA:  Just for the record,
11    I'll just raise my objection on the scope
12    of testimony and questions regarding this
13    Exhibit 6.
14          MR. BAIO:  Okay.
15 BY MR. BAIO:
16    Q.    My first question is just, have you
17 seen this document before?
18    A.    I have seen it.
19    Q.    And in what context did you see it?
20 How did it get to you and what did you do with
21 it?  It's compound, but . . .
22    A.    I understand that this was the
23 document filed in support of FGIC's plan of
24 rehabilitation.
25    Q.    And did you look at it at or about

Page 135

1          Robert Major
2 the time you received it?
3    A.    Not thoroughly, no.
4    Q.    Did you ever look at it at any time?
5    A.    Yes.
6    Q.    And if you can turn to what, near
7 the back, appear as pages 6 and 7.  Can you tell
8 me what you understand them to be, if you have an
9 understanding.
10    A.    I don't.  I don't -- I have not
11 reviewed these specifically.
12    Q.    The updated base scenario
13 illustrative projected financial -- you have to
14 go to the back.  I'm sorry.
15    A.    Oh, 6 and 7?
16    Q.    6 and 7 in the back.  There are
17 repeated pages.
18    A.    Okay.
19          MR. ESPANA:  Are you referring us to
20 a specific exhibit?
21          MR. BAIO:  Well, yes.  They're not
22 designated as a specific exhibit.  It's an
23 attachment -- I'm sorry.  It's pages --
24          MR. ESPANA:  One says Exhibit 1.
25          MR. BAIO:  Exhibit 1.  Yes,

Page 136

1          Robert Major
2    Exhibit 1, pages 6 and 7, within Exhibit 6.
3          THE WITNESS:  These pages
4    (indicating)?
5 BY MR. BAIO:
6    Q.    Yes, sir.
7    A.    Okay.
8    Q.    Do you have an understanding as to
9 what they are?
10    A.    I've not looked at these before.
11    Q.    Never seen them?
12    A.    I don't recall studying them, no.
13    Q.    And just to try to refresh your
14 recollection, if you look at the bottom of
15 page 6, you'll see nominal recovery of
16 45 percent, 10 percent discount rate, 30 percent,
17 et cetera.  Does that refresh your recollection
18 that you've seen this page?
19    A.    Not that I've seen this specific
20 page, no.
21    Q.    Okay.  Let's turn to your
22 declaration, which I think is Exhibit 2.  If you
23 look at paragraph 1.  You can read it to
24 yourself.  I'm going to ask you about the
25 little i, ii and iii.

Page 137

1          Robert Major
2    A.    Okay.
3    Q.    You refer to "Information provided
4 by Duff & Phelps" in little i on paragraph 1.
5          Do you see that?
6    A.    Yes.
7    Q.    What were you referring to?
8    A.    The reports that we've gone over.
9 There were presentations given on the fly at the
10 mediations by Duff & Phelps.  And information
11 that may have been communicated verbally at
12 meetings with Duff & Phelps.
13    Q.    Do you recall any of that verbal
14 communication that's not covered in the reports?
15    A.    No.
16    Q.    You then refer, in ii, to
17 "Information about positions of parties in these
18 Chapter 11 cases contained in pleadings that I
19 reviewed."
20          What are you referring to there?
21    A.    I don't recall what the specific
22 pleadings were, but some of the documents that
23 were filed in support of the plan support
24 agreement and the FGIC settlement.
25    Q.    You also relied on information

35 (Pages 134 - 137)

Page 138

Robert Major

1         Robert Major
2 provided to you by counsel?
3    A.   Yes.
4    Q.   And information you learned during
5 your participation in the plan mediation?
6    A.   Yes.
7    Q.   You also refer to, in iii, "Review
8 of business records of BNY Mellon."
9      Do you see that?
10    A.   Yes.
11    Q.   What records were you referring to?
12    A.   Just generally our account records
13 with respect to the trusts covered by both the
14 plan support agreement and the FGIC settlement.
15    Q.   If you look at paragraph 2, you
16 identify, among other duties or responsibilities,
17 "Declaring events of default."
18      Do you see that?
19    A.   Yes.
20    Q.   Have you declared events of default
21 in connection with any of the trusts about which
22 you've been testifying?
23    A.   We issued a notice shortly after
24 ResCap filed for bankruptcy that stated that
25 events of default may have occurred as a result

Page 139

Robert Major

1         Robert Major
2 of those -- of the bankruptcy and related events.
3    Q.   Can you look at paragraph 10, which
4 is on page 5.
5      (Witness peruses the exhibit.)
6    Q.   It refers to "A series of proof of
7 claims that BNY Mellon filed in the bankruptcy
8 proceedings."
9      Do you see that?
10    A.   Yes.
11    Q.   Did you play any role in preparing
12 them?
13    A.   Yes.
14    Q.   And can you turn to page 27 of your
15 declaration, Exhibit 2. It says, in
16 paragraph 67, "In or about early April 2013, the
17 FGIC RMBS trustees were asked to consider a
18 settlement agreement among the Steering
19 Committee, consenting claimants, FGIC and MBIA."
20      Do you see that?
21    A.   Yes.
22    Q.   What are you referring to there?
23    A.   This was a --
24      MR. ESPANA: I just caution the
25 witness not to disclose any communications

Page 140

Robert Major

1         Robert Major
2 that were considered covered by the
3 mediation privilege.
4      MR. WYNNE: Objection to form. Same
5 objection based on the mediation privilege.
6 BY MR. BAIO:
7    Q.   You can answer with that admonition.
8      MR. ESPANA: And if you think -- if
9 you have a question about it, let us know.
10      THE WITNESS: I do have a question.
11 I'd like to --
12      MR. ESPANA: Can we take a quick
13 break?
14      MR. BAIO: Yes.
15      (Counsel and the witness leave the
16 room.)
17 BY MR. BAIO:
18    Q.   First, what is the proposed monoline
19 agreement that you are referring to in
20 Exhibit 67 -- in paragraph 67 of your
21 declaration?
22      MR. ESPANA: And I'll just rephrase
23 my caution to the witness not to disclose
24 anything covered by the mediation
25 privilege.

Page 141

Robert Major

1         Robert Major
2      THE WITNESS: It's the proposed
3 agreement that's described in this
4 paragraph 67.
5 BY MR. BAIO:
6    Q.   And that's different from the FGIC
7 settlement about which you've been testifying?
8    A.   Yes.
9    Q.   It says, in the concluding sentence
10 in that paragraph, "Those terms form the basis of
11 a settlement agreement entered into as of May 23,
12 2013, by and among debtors, FGIC, the FGIC RMBS
13 trustees, and the institutional investors, which
14 is a central piece of the RMBS settlement and
15 plan support agreement."
16      Do you see that language?
17    A.   Yes.
18    Q.   How is it that those terms form the
19 basis of the settlement agreement?
20      MR. ESPANA: I'm going to object.
21      And I'm instructing him not to
22 answer based on the mediation privilege.
23 BY MR. BAIO:
24    Q.   You make reference in that
25 paragraph 67 to an estimate by Duff & Phelps to

36 (Pages 138 - 141)

Page 142

Robert Major

1
2 be approximately $18.3 million.  What are you
3 referring to there?
4     A.    The premiums that would be due on
5 the FGIC policies in the future.
6     Q.    And do you know if FGIC itself did a
7 similar analysis, whether Lazard did?
8     A.    Whether Lazard -- I don't know.
9     Q.    Paragraph 68, you state, "At the
10 request of the FGIC RMBS trustees, Duff & Phelps
11 conducted an analysis of the economic terms of
12 the FGIC settlement using both publicly available
13 and nonpublic information from Lazard, the
14 financial adviser to the rehabilitator, as to
15 projected future claims and anticipated payouts
16 pursuant to the plan of rehabilitation."
17        Do you see that?
18     A.    Yes.
19     Q.    And is the analysis that you're
20 referring to there the analysis embodied in the
21 report which we've marked as Exhibit 5?
22     A.    Some of it, yes.
23     Q.    What's not included in Exhibit 5
24 that you're referring to there?
25     A.    I don't know that all the

Page 143

Robert Major

1
2 information that they derived was actually put
3 into Exhibit 5.
4     Q.    Okay.  Do you know of any analysis
5 that they did that was not included in Exhibit 5
6 other than what you've already testified to?
7     A.    I do not.
8     Q.    You then go on to state in that
9 affidavit, "Duff & Phelps utilized this
10 information to compare the FGIC lump-sum payment
11 under the FGIC settlement with the discounted
12 value of the stream of payments the FGIC insured
13 RMB trusts would be projected to receive under
14 the rehabilitation plan if the FGIC RMBS trustees
15 decline to enter into the FGIC settlement."
16        Do you see that?
17     A.    Yes.
18     Q.    Did you understand that that's what
19 Duff & Phelps, in fact, did?
20     A.    Yes.
21     Q.    In paragraph 69 and 70, you
22 identify -- I'm sorry, paragraph 69 states,
23 "Based on its analysis of the respective benefits
24 to the FGIC insured RMBS trusts of the FGIC
25 settlement and those that such trusts would enjoy

Page 144

Robert Major

1
2 under the plan of rehabilitation, Duff & Phelps
3 advised the FGIC RMBS trustees that the FGIC
4 settlement, including the FGIC lump-sum payment,
5 represented a reasonable resolution of the
6 accrued and unpaid claims and projected future
7 claims against FGIC under the FGIC policies."
8        Do you see that?
9     A.    Yes.
10     Q.    And does that accurately reflect
11 what you were told by Duff & Phelps?
12     A.    Yes.
13     Q.    Did they represent anything else to
14 you with respect to that subject?
15     A.    "They" Duff & Phelps?
16     Q.    Yes.
17        MR. ESPANA:  And other than what
18 we've discussed in the report?
19        MR. BAIO:  Yes.
20        THE WITNESS:  No.
21 BY MR. BAIO:
22     Q.    In paragraph 70, you state, "Based
23 on the analysis provided by Duff & Phelps, BNY
24 Mellon concluded that the treatment of the claims
25 of the FGIC insured RMBS trusts under the plan

Page 145

Robert Major

1
2 support agreement was reasonable."
3        Do you see that?
4     A.    Yes.
5     Q.    Reasonable as to whom?
6     A.    As to those trusts, the FGIC-wrapped
7 portion of those trusts.
8     Q.    You didn't state in this declaration
9 that you thought that the settlement was in the
10 best interests of the investors, did you?
11     A.    Not -- I don't know throughout the
12 entire document, but not in this place here.
13     Q.    Is there a reason why you didn't
14 include it in this exhibit?
15     A.    No.  I don't know.
16     Q.    You state in paragraph 71, "It was
17 important to BNY Mellon that the institutional
18 investors - two large investor groups holding
19 significant and, for some RMBS trusts,
20 controlling investments in certificates issued by
21 RMBS trusts - were informed, involved and
22 supportive of the RMBS settlement."
23        Do you see that?
24     A.    Yes.
25     Q.    Why was that important to BNY

37 (Pages 142 - 145)

Page 146

1          Robert Major
2 Mellon?
3      A.    These were two groups of
4 sophisticated investors that were privy to the
5 settlement discussions and participated in the
6 mediation and were getting information as we were
7 receiving it and, therefore, were well informed
8 of what was going on.
9      Q.    And did you understand whether the
10 institutional investors had any conflicts of
11 interest with other RMBS investors --
12          MR. ESPANA: Objection --
13 BY MR. BAIO:
14      Q.    -- or RMBS trust investors?
15          MR. ESPANA: Objection to form and
16      calls for a legal conclusion.
17          THE WITNESS: I don't understand the
18      question.
19 BY MR. BAIO:
20      Q.    Well, it was important that you get
21 two large investor groups holding significant
22 investments in the certificates; correct?
23      A.    Correct.
24      Q.    Do you know whether those investor
25 groups had conflicts such that it could have

Page 147

1          Robert Major
2 tainted their evaluation of the settlement?
3          MR. ESPANA: Objection to form.
4          MR. SHEEREN: Objection to form.
5          MR. ESPANA: Calls for a legal
6      conclusion.
7          THE WITNESS: Conflicts with whom?
8 BY MR. BAIO:
9      Q.    That because they had other
10 interests that were being advanced in the
11 settlement, that they might not have been
12 representing the interests of other investors in
13 the RMBS trusts.
14          MR. ESPANA: Objection to form.
15          THE WITNESS: Again, your question
16      was, was --
17 BY MR. BAIO:
18      Q.    Were you -- did you do any analysis
19 to determine whether they had such conflicts?
20      A.    No.
21      Q.    Can you look at Exhibit 1. Page 8,
22 paragraph 5, calls for you to testify about any
23 determination by the trustees that entry into the
24 FGIC settlement agreement was in the best
25 interests of the trusts.

Page 148

1          Robert Major
2          Is there anything beyond what you've
3 already testified to that led to Bank of New
4 York's conclusion that entry into the FGIC
5 settlement agreement was in the best interests of
6 the trusts?
7          MR. ESPANA: Objection.
8          How are the trusts defined here?
9          MR. BAIO: If you look back, it's --
10          THE WITNESS: This is the PSA, not
11      the FGIC settlement. Which paragraph are
12      you referring to in that exhibit?
13 BY MR. BAIO:
14      Q.    Paragraph 5.
15      A.    Oh, 5?
16      Q.    Yes.
17          I'm not doing the PSA. Trusts are
18 identified as "Bank of New York Mellon, Mellon
19 Trust, collectively and individually in their
20 respective capacity as trustees for the trusts at
21 issue in this case."
22      A.    Okay. I need to go back and
23 understand what Exhibit A -- these are just --
24      Q.    They're just topics.
25          MR. ESPANA: Actually, that wasn't

Page 149

1          Robert Major
2 the definition of trusts. That was the
3 trustees. Trusts are "The residential
4 mortgage-backed securitizations identified
5 on Exhibit B of the FGIC settlement
6 agreement."
7          MR. BAIO: Okay. Sorry about that.
8          THE WITNESS: So there's a topic
9 here --
10 BY MR. BAIO:
11      Q.    Yes.
12      A.    And your question regarding this
13 topic again?
14      Q.    Well, did the trustees determine
15 that entry into the FGIC settlement agreement was
16 in the best interests of the trusts?
17      A.    Yes.
18          MR. ESPANA: Asked and answered.
19          MR. BAIO: I think so.
20 BY MR. BAIO:
21      Q.    Is there anything, in addition to
22 what you've already testified to, that led to
23 your determination that entry into the FGIC
24 settlement agreement was in the best interests of
25 the trusts?

38 (Pages 146 - 149)

Page 150

Robert Major

1
2    A.    Not to my knowledge.
3    Q.    If you look at paragraph 6, similar
4  question about the best interests of the holders.
5        Do you see that language?
6    A.    Yes.
7    Q.    And holders are defined as persons
8  or entities holding securities in the trusts.
9        MR. ESPANA:  Objection to form;
10  vague.
11        I don't understand what that means.
12        I don't know if the witness does.
13  BY MR. BAIO:
14    Q.    Do you know what that means,
15  investors?
16    A.    The holders of the securities.
17    Q.    Yes.
18        Did you make a determination that
19  entry into the FGIC settlement was in the best
20  interests of the holders?
21    A.    Yes.
22    Q.    And have you testified fully, to the
23  best of your recollection, as to the factors that
24  you considered in reaching that determination?
25    A.    Yes.

Page 151

Robert Major

1
2    Q.    Paragraph 7 says, "Any determination
3  by the trustees, including Bank of New York, that
4  entry into the FGIC settlement was in the best
5  interests of the holders of the securities that
6  are ensured by FGIC."
7    A.    How's that different from 6?
8    Q.    I have no idea.  So I'll just skip
9  over it, in light of that.
10    A.    Thank you.
11        (Discussion held off the record.)
12  BY MR. BAIO:
13    Q.    If you look at paragraph 13, I
14  believe there's an objection on legal conclusion;
15  but the issue was "Any determination by the
16  trustees that entry into the FGIC settlement
17  agreement did not or should not require the
18  consent of the insured holders under the
19  governing agreements."
20        Do you see that?
21    A.    Yes.
22    Q.    Do you know of any such
23  determination?
24        MR. ESPANA:  I'll just raise my
25  objection again; calls for a legal

Page 152

Robert Major

1
2  conclusion.
3  BY MR. BAIO:
4    Q.    Independent from a legal conclusion,
5  do you have a layperson's understanding?
6    A.    Yes.
7    Q.    What is that understanding?
8    A.    That these were -- well, first of
9  all, these were not amendments or something that
10  would constitute something that the holders
11  needed to consent to in that sense.  And that we
12  gave notice and gave holders the opportunity to
13  object, which goes into whether -- the
14  determination requiring consent.  So . . .
15  BY MR. BAIO:
16    Q.    Okay.  Independent from what they
17  may have said, did you see different term sheets
18  for the proposed FGIC settlement agreement?
19        MR. ESPANA:  Objection.
20        I'm instructing the witness not to
21  answer.
22        MR. BAIO:  Again, not substantively.
23  I'm asking whether there were different
24  term sheets at different times.
25        MR. ESPANA:  Who's "they"?  You said

Page 153

Robert Major

1
2  independently of "what they may have said."
3  I don't know who the "they" is.
4        MR. BAIO:  Oh, I'm sorry.
5  BY MR. BAIO:
6    Q.    The "they" meaning the --
7  independent from what appears in the term sheets.
8  I don't want to know the substance of the term
9  sheets in this question; I just want to know
10  whether there were different term sheets for the
11  FGIC settlement agreement over time.
12        MR. ESPANA:  What term sheets are
13  you referring to?
14  BY MR. BAIO:
15    Q.    Were there term sheets that
16  identified the terms of prospective or potential
17  settlements that you saw?
18    A.    No.
19    Q.    You eventually, though, saw the
20  settlement proposed by FGIC; correct?
21    A.    Yes.
22    Q.    Without going into the substance of
23  what they may have said, did you see prior
24  settlement proposals by FGIC?
25        MR. ESPANA:  Objection; asked and

39 (Pages 150 - 153)

Page 154

Robert Major

1  answered.
2        MR. WYNNE: I'm going to object
3  based on the mediation privilege.
4        MR. ESPANA: Don't answer it.
5        MR. BAIO: You're saying he can't
6  answer that because of the mediation
7  privilege?
8        MR. WYNNE: I'm sorry, I missed
9  your -- I'm looking at the screen. I
10  missed your "without going into the
11  substance" part, so I'll withdraw the
12  objection.
13        MR. BAIO: I don't know whether
14  he --
15        MR. ESPANA: You want to repeat the
16  question?
17        MR. BAIO: Let me finish this
18  thought and then I'll get back to that.
19        (Discussion off the record.)
20  BY MR. BAIO:
21    Q.   Yes, the question is, without going
22  into the substance of what any settlement
23  proposals might have said, did you see any prior
24  settlement proposals by FGIC?

Page 155

Robert Major

1        MR. ESPANA: You can answer.
2        THE WITNESS: Yes.
3  BY MR. BAIO:
4    Q.   You did?
5    A.   (Witness nods head in the
6  affirmative.)
7    Q.   How many?
8    A.   I don't recall.
9    Q.   When did you see the first one?
10        MR. ESPANA: Objection.
11  I will instruct you not to answer.
12  BY MR. BAIO:
13    Q.   Do you believe that the negotiations
14  of the settlement agreement were at arm's length
15  and hard fought?
16    A.   Yes.
17    Q.   How so?
18        MR. ESPANA: Again, I just caution
19  you not to disclose the substance of
20  communications just generally.
21        THE WITNESS: It was a tri-party
22  agreement with disputes between the three
23  parties; ResCap, FGIC, and the trustees.
24  The claims against -- among the three

Page 156

Robert Major

1  parties were very complex. And resolution
2  was very important in the context of the
3  mediation and also vis-a-vis between FGIC
4  and the trustees.
5  BY MR. BAIO:
6    Q.   And do you intend to testify about
7  the hard-fought negotiations at the hearing?
8    A.   If I'm called to testify, yes.
9    Q.   Well, give me examples of some of
10  the hard-fought exchanges that you engaged in
11  that benefited the investors.
12        MR. ESPANA: I'm instructing the
13  witness not to answer. You can answer
14  generally in describing why you thought
15  there were hard-fought negotiations, but
16  don't go into the substance.
17        MR. BAIO: Just so I'm clear, I'm
18  asking about the substance because it's the
19  only way that I can test whether it was
20  hard fought.
21        MR. ESPANA: Then I'm instructing
22  you not to answer.
23        MR. BAIO: Let's take a few minutes.
24        (Recess from the record.)

Page 157

Robert Major

1        MR. BAIO: Let's go back on the
2  record.
3  BY MR. BAIO:
4    Q.   Can you look at Exhibit -- put
5  before you Exhibit 5 again. And turn to page 3.
6  The chart under "FGIC Settlement
7  Proposal and FGIC Plan," do you see that darkened
8  chart?
9    A.   Yes.
10    Q.   Who provided the information
11  contained in that upper box, "Considerations,
12  Benefits and Risks"?
13    A.   Duff & Phelps.
14    Q.   And did Duff & Phelps, during the
15  time that you met with them -- strike that.
16  Were you advised by Duff & Phelps of
17  any other benefits and risks to the investors
18  under the FGIC settlement proposal beyond what
19  appears here?
20    A.   Advised of any risks to the FGIC
21  settlement investors?
22    Q.   Yes -- not -- I said to the
23  investors -- I hope I did. Did Duff -- were you
24  advised by Duff & Phelps of any other benefits or

40 (Pages 154 - 157)

Page 158

```
1            Robert Major
2  risks to the investors under the FGIC settlement
3  proposal beyond what appears here?
4     A.    No.
5     Q.    Did you consider that there were
6  other things, rights or claims that the investors
7  were giving up under the FGIC settlement proposal
8  that should be considered in evaluating the
9  settlement?
10        MR. ESPANA:  Objection to form;
11    vague and ambiguous.
12        THE WITNESS:  Could you repeat the
13    question, please.
14  BY MR. BAIO:
15    Q.    Sure.
16        Did you think -- did you -- strike
17  that.
18        Did you consider any other
19  consideration that was being provided by the
20  investors under the settlement agreement in
21  evaluating whether it was good or bad for them?
22        MR. ESPANA:  Objection to form;
23    vague and ambiguous.
24        THE WITNESS:  The investors are not
25    a party to the settlement agreement.  Do
```

Page 159

```
1            Robert Major
2    you mean the trusts?
3  BY MR. BAIO:
4     Q.    No, I mean the investors themselves.
5  You did conclude that the trustees entering into
6  the settlement agreement was in the best
7  interests of the investors; correct?
8        MR. ESPANA:  Mr. Baio, your question
9    was --
10        MR. BAIO:  I'm asking a different
11    question now.
12        THE WITNESS:  I'm sorry, can you
13    start over.
14  BY MR. BAIO:
15    Q.    Sure.
16        Did you conclude that by entering
17  into the settlement agreement, the trustees would
18  be doing that in the best interests of the
19  investors?
20    A.    Yes.
21    Q.    And in doing that, did you consider
22  what the investors would give up as a result of
23  the settlement?
24        MR. ESPANA:  Objection to form;
25    calls for speculation.
```

Page 160

```
1            Robert Major
2        THE WITNESS:  Yes.
3  BY MR. BAIO:
4     Q.    And are the things that the
5  investors are giving up identified in the chart
6  that appears on page 3 of Exhibit 5?
7     A.    Yes.
8     Q.    Are there any others that you
9  considered, that is, other rights that the -- or
10  entitlements that the investors would not be able
11  to pursue if the FGIC settlement proposal were
12  executed and approved?
13        MR. ESPANA:  Objection to form.
14        THE WITNESS:  I'm sorry.  Repeat,
15    please.
16  BY MR. BAIO:
17    Q.    It mentions, for example, they are
18  "relinquishing upside economics in the event that
19  the base scenario under the plan is met and
20  correspondingly exceeded."
21        Do you see that?
22    A.    Yes.
23    Q.    Are there any other risks or
24  downsides to entering into the settlement
25  agreement from the perspective of the investors
```

Page 161

```
1            Robert Major
2  that you considered in evaluating whether to
3  enter into the settlement agreement?
4     A.    Not to my knowledge.
5     Q.    So you did not consider any benefits
6  that the investors might secure in the future if
7  FGIC were to be successful in its claims against
8  ResCap, Countrywide and other entities; is that
9  correct?
10    A.    From their lawsuits that they --
11    Q.    Yes.
12    A.    No.
13        MR. MULLANEY:  Joe, to be clear for
14    the record, it's no, that's not correct or
15    no, I didn't consider it?
16        MR. BAIO:  Fair enough.
17  BY MR. BAIO:
18    Q.    So it's accurate that you did not
19  consider any benefits that the investors might
20  secure in the future if FGIC were to be
21  successful in its claims against ResCap,
22  Countrywide and other entities?
23        MR. WYNNE:  Objection to form.
24        MR. ESPANA:  Objection to form.
25        THE WITNESS:  Again, please.  Sorry.
```

41 (Pages 158 - 161)

Page 162

1          Robert Major
2 BY MR. BAIO:
3     Q.    Did you consider any benefits that
4 the investors might secure in the future if FGIC
5 were to be successful in its claims against
6 ResCap, Countrywide and other entities in
7 evaluating whether the settlement was in the best
8 interests of the investors?
9          MR. ESPANA:  Same objection.
10          MR. SIDMAN:  Same objection.
11          THE WITNESS:  No, I did not consider
12 them.
13 BY MR. BAIO:
14     Q.    Again, on page 3 -- I may have asked
15 you this.  I'm not certain as to what the answer
16 was, or at least I don't remember it --
17 Footnote B says, "Reflects 17 to 18 percent
18 recovery on D&P's low and high loss estimates."
19          Do you see that?
20     A.    Yes.
21     Q.    What is that referring to?
22     A.    I'm not sure.
23     Q.    Then it says, "Note:  D&P has not
24 estimated projected losses that correspond to the
25 underlying macro assumptions as assumed under the

Page 163

1          Robert Major
2 stress scenario per the Lazard affidavit."
3          What do you understand that to mean?
4     A.    That the loss estimates were --
5 corresponded to -- Duff & Phelps' loss estimates
6 corresponded more to the base scenario.
7     Q.    Turn to page 5.  The left-hand side,
8 bottom bullet says, "In consideration for the
9 cash commutation payment of approximately
10 $253 million, FGIC in return would receive a
11 claim in the ResCap case for the sum of," the i,
12 "payouts made to date related to the RFC and
13 GMACM-sponsored trusts and," ii, "the cash
14 commutation."
15          Do you see that?
16     A.    Yes.
17     Q.    Would the investors share in any of
18 the monies that FGIC will receive as a result of
19 that claim?
20     A.    No.
21     Q.    Can you turn to page 8.  We had gone
22 through some of this chart.  I just want to pick
23 up on the -- some of the things that are
24 discussed here.  That first bullet talking about
25 10 percent to 24 percent of the overall pool, do

Page 164

1          Robert Major
2 you see that language?
3     A.    Yes.
4     Q.    What is it referring to -- what is
5 the "overall pool" that that language is
6 referring to?
7     A.    So the first -- the upper section of
8 the chart is FGIC's estimate of claims for all
9 policy holders.  That is the pool.  The bottom
10 section of the chart is Duff & Phelps' claim
11 estimates.  And the 10 to 24 percent would
12 represent the lower part of the chart as a
13 percentage of the upper part.
14     Q.    You can put that away.
15          MR. BAIO:  Let me ask the reporter
16 to mark as the next exhibit a one-page
17 document bearing the Bates
18 No. BNYM-MS0000153 to 154.
19          (Major Exhibit 7, Bates Nos. BNYM-MS
20 0000153 through 54, E-mail Chain, marked
21 for identification.)
22 BY MR. BAIO:
23     Q.    Can you look at Exhibit 7 and tell
24 me if you've seen it before.
25     A.    Yes.

Page 165

1          Robert Major
2     Q.    What is it?
3     A.    That is an e-mail from myself to
4 Gerry Facendola.
5     Q.    Who is Gerry Facendola?
6     A.    He is my manager at BNY Mellon.
7     Q.    And do you see that, under your
8 e-mail to him, there's an e-mail from him to you?
9     A.    Yes.
10     Q.    And he asked you -- or he said, "I
11 assume you have reviewed everything?"
12          Do you see that?
13     A.    Yes.
14     Q.    And your response was, "I understand
15 the MBS trust deal."
16          Do you see that?
17     A.    Yes.
18     Q.    Did that mean you hadn't reviewed
19 everything?
20     A.    No, I was clarifying the FGIC --
21 there's the issue of FGIC's rehabilitation in
22 general and then the issue of this particular
23 settlement in ResCap.  And so I was clarifying
24 that I had understood that -- the settlement
25 within the ResCap case.

42 (Pages 162 - 165)

Page 166

1          Robert Major
2     Q.    Is it your understanding that Bank
3  of New York has fiduciary duties to the
4  investors?
5          MR. ESPANA: Objection to form, to
6     the extent it calls for a legal conclusion.
7          THE WITNESS: We can in some
8     circumstances.
9  BY MR. BAIO:
10    Q.    In what circumstances?
11    A.    Usually following a default.
12         MR. BAIO: I have no further
13    questions at this time.
14         MR. CARNEY: Maybe we can take a
15    couple minutes to get myself set up.
16         (Recess from the record.)
17  EXAMINATION
18  BY MR. CARNEY:
19    Q.    Mr. Major, I'm Michael Carney from
20  McKool Smith. We represent Freddie Mac and I
21  just have a few questions to follow up on
22  Mr. Baio's questions.
23         Are you familiar with the disclosure
24  statement that FGIC filed in the ResCap
25  rehabilitation proceeding?

Page 167

1          Robert Major
2     A.    The disclosure statement that FGIC
3  filed?
4     Q.    Yes, in the rehabilitation -- strike
5  that.
6          The disclosure statement that the
7  rehabilitator filed in the FGIC rehabilitation
8  proceeding.
9     A.    Yes.
10         MR. CARNEY: I'd like to mark that.
11    What exhibit are we up to?
12         THE REPORTER: 8.
13         (Major Exhibit 8, No Bates numbers,
14    Exhibit D, Disclosure Statement, marked for
15    identification.)
16         MR. ESPANA: I'll just raise an
17    objection to the introduction of the
18    disclosure statement and any questions
19    concerning this document as outside the
20    scope of the 30(b)(6) deposition.
21         MR. CARNEY: It's our position that
22    he can also testify as to 30(b)(1) in his
23    personal knowledge as well. I'd just like
24    to note that.
25         MR. ESPANA: I'll object to that,

Page 168

1     but it's your --
2          MR. CARNEY: Fair enough.
3  BY MR. CARNEY:
4     Q.    Did you review this document?
5     A.    No.
6     Q.    Did anyone at BNY review this
7  document, to your knowledge?
8     A.    Like study it?
9     Q.    Let's just start with review it,
10  just look at it.
11    A.    Yes. Looked at it, yes.
12    Q.    And you did not look at it?
13    A.    Yes, I've looked at it.
14    Q.    You've looked at it?
15    A.    Yes.
16    Q.    Did you read it?
17    A.    Not in its entirety.
18    Q.    Did anyone at BNY to do any analysis
19  with respect to the disclosure statement?
20    A.    Not to my knowledge.
21    Q.    And did BNY engage outside
22  professionals to review the terms of the
23  disclosure statement?
24    A.    Yes.

Page 169

1          Robert Major
2     Q.    Whom did they engage?
3     A.    The law firm of Carter Ledyard.
4     Q.    And did Carter Ledyard provide BNY
5  with any analysis of the disclosure statement?
6     A.    Yes.
7     Q.    Was it a written analysis?
8     A.    I believe so.
9     Q.    And I know what's coming, but can
10  you tell me what that analysis contained?
11         MR. ESPANA: Objection.
12         You cannot disclose privileged
13    communications.
14  BY MR. CARNEY:
15    Q.    So you're not going to answer that
16  question; is that correct?
17    A.    Nope.
18    Q.    What is your understanding of the
19  treatment of FGIC-wrapped ResCap RMBS holders
20  under the disclosure statement?
21         MR. ESPANA: Objection to form.
22         THE WITNESS: I understood just
23    generally what creditors were getting under
24    the proposed FGIC plan of rehabilitation,
25    not necessarily the wrapped holders.

43 (Pages 166 - 169)

Page 170

1              Robert Major
2  BY MR. CARNEY:
3      Q.    So you didn't form an opinion with
4  respect to just the wrapped holders.
5          MR. SIDMAN:  Objection to form.
6          THE WITNESS:  Not when evaluating
7  the FGIC plan of rehabilitation.
8  BY MR. CARNEY:
9      Q.    And what was your understanding of
10  what --
11          MR. CARNEY:  I'm not getting any
12      feed here.
13          THE REPORTER:  Try hitting escape.
14  BY MR. CARNEY:
15      Q.    So, Mr. Major, you testified that
16  you understood just generally what creditors were
17  getting under the proposed FGIC plan of
18  rehabilitation earlier.
19          What was that understanding?
20      A.    That they were getting an initial
21  cash payout percentage and then payments
22  following the effective date of the plan over
23  time.
24      Q.    And did you have an understanding as
25  to the details of that arrangement, proposed

Page 171

1              Robert Major
2  arrangement; right?
3      A.    What details?
4      Q.    You testified "That they were
5  getting initial cash payout percentage and then
6  payments following the effective date of the plan
7  over time."
8          Did you have an understanding as to
9  what was detailed in that, such as what that new
10  percentage was and what the payouts over time
11  would be?
12      A.    Yes.
13      Q.    What was your understanding?
14      A.    The 17 -- the 17.25 percent at the
15  effective date and then payments over time that
16  would amount to 28 1/2 percent recovery.
17      Q.    And what was the basis of that
18  understanding?
19      A.    Communications with my outside
20  counsel.
21      Q.    And did you come to that
22  understanding in part from your own reading of
23  the disclosure statement?
24      A.    Perhaps referring to it after
25  conferring with my outside counsel.

Page 172

1              Robert Major
2      Q.    Could you turn to page 21 of the
3  disclosure statement, please.
4          MR. ESPANA:  Mr. Carney, you
5      understand that I'm objecting to all of the
6      entire line of questioning; you don't need
7      me to object to every question --
8          MR. CARNEY:  Yeah, I'll acknowledge
9      that you have a running objection --
10          MR. ESPANA:  Thank you.
11          MR. CARNEY:  -- to the scope.  And
12      I, of course, think he can testify as a
13      30(b)(1), as to his knowledge.
14          MR. ESPANA:  I just wanted to make
15      sure.
16          MR. CARNEY:  Certainly.
17  BY MR. CARNEY:
18      Q.    So I think we were at 21, correct,
19  page 21?
20          Do you see the -- it's the first
21  full paragraph that -- actually, the first two
22  full paragraphs beginning with "CPP DPO
23  structure."
24          Did you review this section of the
25  disclosure statement?

Page 173

1              Robert Major
2      A.    I don't recall.
3      Q.    Do you have any understanding of
4  what this paragraph means?
5      A.    May I read it?
6      Q.    Certainly.
7          (Witness peruses the exhibit.)
8      A.    Okay.
9      Q.    So I'll ask you again, what is your
10  understanding of the meaning of these two
11  paragraphs?
12      A.    That the future -- it describes how
13  the future -- the portion of FGIC recoveries that
14  are based on payments in the future will be paid
15  out under the FGIC plan.
16      Q.    And so do you mean that policy
17  claimants under the rehabilitation plan, as
18  summarized in the disclosure statement, would
19  receive the same percentage of CPP over time,
20  cash percentage payment?
21      A.    I believe so, yes.
22      Q.    Do you see any reference to a
23  commutation of the policies insuring the
24  FGIC-wrapped RMBS securities?
25          MR. ESPANA:  In these two

44 (Pages 170 - 173)

Page 174

Robert Major

1
2    paragraphs?
3            MR. CARNEY:  In these two
4    paragraphs.
5            THE WITNESS:  Oh -- then.  I didn't
6    read the second paragraph the first time.
7    I'm sorry.
8            (Witness peruses the exhibit.)
9            THE WITNESS:  Can you repeat the
10   question.
11   BY MR. CARNEY:
12       Q.    In those two paragraphs, you don't
13   see any reference to the commutation of the
14   policies at issue in this dispute, do you?
15       A.    Correct.
16       Q.    And do you recall from what you
17   understand from your own review -- I'm not
18   talking about what counsel advised me, but from
19   your own review of the disclosure statement
20   whether a commutation of the policies at issue in
21   this dispute were ever mentioned?
22       A.    I believe that FGIC had the right to
23   commute any policy, you know, subject to
24   agreement by the parties to that policy, under
25   its plan.  I can't tell you where or when -- if

Page 175

Robert Major

1
2    it's in the disclosure statement or the plan
3    itself, but I believe they did have the right to
4    do that.
5        Q.    With the consent of the insured
6    parties; is that your understanding?
7        A.    Yes.  With the consent of the
8    parties to the policy, yes.
9        Q.    How did you come by that
10   understanding?
11       A.    Through discussions with counsel.
12       Q.    And you didn't -- you did not obtain
13   that understanding through your own independent
14   analysis then, only through discussions with
15   counsel; is that correct?
16       A.    I believe so, yes.
17       Q.    I believe we marked -- the Miller
18   affidavit I believe was Exhibit 6.  And as I
19   understood from your prior testimony, you did not
20   review the Miller affidavit; is that correct?
21       A.    No.
22       Q.    By "review," had you seen it before?
23       A.    Yes, I've seen it.
24       Q.    Had you read it before?
25       A.    Parts of it.

Page 176

Robert Major

1
2        Q.    Which parts?
3        A.    I can't recall.  I may refer to
4    things when I'm reviewing other documents and may
5    refer to a particular section, but I certainly
6    didn't review the entire document or study it.
7        Q.    Okay.  Let's turn to that document
8    briefly, to paragraph 28 and the table above it
9    on page 9.  Did you review -- do you recall
10   reading paragraph 28?
11           MR. ESPANA:  I'll also object to
12   questioning on this document as outside the
13   scope.
14           MR. CARNEY:  Understood.  Again I'll
15   reiterate that he can testify as a
16   30(b)(1).
17           THE WITNESS:  I'm sorry, the
18   question again?
19   BY MR. CARNEY:
20       Q.    Have you reviewed -- or do you
21   recall reading paragraph 28 of the Miller
22   affidavit?
23       A.    I don't.
24       Q.    Could you take a moment to review
25   Table A in paragraph 28, if you would.

Page 177

Robert Major

1
2        A.    28 or 27?
3        Q.    28 and the table preceding it.
4        A.    Okay.
5            (Witness peruses the exhibit.)
6        A.    Okay.
7        Q.    Do you see that the Miller affidavit
8    is assuming, in both the base-case and the
9    stress-case, discount rates of 10 to 20 percent?
10       A.    Yes.
11       Q.    Now, in your experience, would you
12   agree that 10 percent is a fairly high discount
13   rate?
14           MR. ESPANA:  Objection to form.
15           MR. WYNNE:  Object.
16           THE WITNESS:  I'm not in the
17   business of evaluating discount rates.
18   BY MR. CARNEY:
19       Q.    So you have no opinion as to the
20   significance or the -- strike that.
21           You have no opinion as to the
22   magnitude of a 10 percent discount rate?
23           MR. ESPANA:  Objection to form;
24   vague.
25           THE WITNESS:  That would be correct

45 (Pages 174 - 177)

Page 178

1            Robert Major
2    BY MR. CARNEY:
3        Q.    Same for the 20 percent?
4        A.    Yes.
5            MR. ESPANA:  Same objection.
6            MR. CARNEY:  I'm going to mark as
7        Exhibit 9 -- this is the order to show
8        cause and accompanying documents filed in
9        the rehabilitation case on May 29th.
10           (Major Exhibit 9, No Bates numbers,
11       Order to Show Cause, marked for
12       identification.)
13   BY MR. CARNEY:
14       Q.    This document contains a lot of
15   documents.  And the first -- strike that.
16           To begin with, do you recognize this
17   document at all?
18       A.    Yes.
19       Q.    Can you please turn to -- it is
20   Exhibit B to this document.  It is the settlement
21   agreement at issue here.  It's Exhibit B to
22   the -- I think you're past it, actually.  Those
23   are the signature pages to it, I believe.
24       A.    Exhibit B?
25       Q.    B, yes.

Page 179

1            Robert Major
2            MR. ESPANA:  You passed it.
3            THE WITNESS:  Exhibit E?
4    BY MR. CARNEY:
5        Q.    B.
6            MR. ESPANA:  Here you go
7        (indicating).
8            THE WITNESS:  Thanks.
9    BY MR. CARNEY:
10       Q.    And if you could turn to page 4 of
11   Exhibit B to this -- Section 2.1, titled
12   "Releases."
13           If you look at Section 2.1,
14   Exhibit -- strike that.
15           Section 2.1A romanette i, do you
16   agree that this is the section, to your
17   knowledge, that embodies what we've been calling
18   the commutation?
19           MR. SIDMAN:  Objection to form.
20           MR. ESPANA:  Same objection.
21           THE WITNESS:  Can I read it?
22   BY MR. CARNEY:
23       Q.    Certainly.
24       A.    I don't know what --
25       Q.    Certainly.

Page 180

1            Robert Major
2            (Witness peruses the exhibit.)
3        A.    Yes.  At least part of it, yes.
4        Q.    And did you ever inform the Steering
5    Committee in the FGIC rehabilitation proceeding
6    about the FGIC commutation?
7            MR. ESPANA:  Objection to form.
8        Who's the Steering Committee?
9            MR. CARNEY:  It would have been
10       parties of various insurers, I believe
11       including MBIA and others.
12           MR. ESPANA:  And what's the question
13       again?
14           THE WITNESS:  In the FGIC
15       rehabilitation?
16   BY MR. CARNEY:
17       Q.    Yes, in the FGIC rehabilitation.
18           Did you ever inform the Steering
19   Committee about the FGIC commutation?
20           MR. SIDMAN:  Objection to form.
21           THE WITNESS:  In the ResCap --
22   BY MR. CARNEY:
23       Q.    In the ResCap -- pardon me.
24           In the rehabilitation proceeding.
25       A.    The Steering Committee --

Page 181

1            Robert Major
2        Q.    Yes.
3        A.    -- of the --
4        Q.    Let me start over.
5            Did you ever inform Freddie Mac
6    about the FGIC commutation?
7        A.    Yes.
8        Q.    When?
9        A.    We issued a notice to all holders of
10   the subject -- of the wrapped trusts informing
11   them of the settlement proposal.
12       Q.    When was that notice issued?
13       A.    June 4, I believe.
14       Q.    Do you recall who sent it?
15       A.    I believe we sent a copy to DTC as
16   well as any registered holders.  And our -- I
17   believe our noticing agent may have sent the
18   notice out as well.
19           MR. CARNEY:  I would ask BNY's
20       counsel if we can possibly get a copy of
21       that notice.  Because I have looked and we
22       have not received it from our records.  So
23       if you could please have someone e-mail
24       that to me, I would appreciate it.
25           MR. ESPANA:  It's on the website.

46 (Pages 178 - 181)

Page 182

Robert Major

1
2     MR. SIEGEL:  We have a standard
3  website.  There's links to every single
4  notice.  Do you know the website?
5     MR. CARNEY:  This is the FGIC
6  rehabilitation website?
7     MR. SIEGEL:  No, it's the ResCap
8  website.
9     MR. CARNEY:  The -- PlainVision's
10  website?
11     MR. SIEGEL:  The trustees have their
12  own independent website for the trusts that
13  are part of the ResCap -- that have claims
14  in the ResCap proceeding.
15     MR. CARNEY:  If you could just
16  e-mail me a link to that, I would
17  appreciate it.
18     MR. ESPANA:  It's also attached to
19  the May 19 notice.
20     MR. CARNEY:  Thanks.
21 BY MR. CARNEY:
22     Q.   My next question is, did you ever
23 inform the holders -- strike that.
24     MR. CARNEY:  I'm going to mark this
25  as Exhibit 10, I believe.  It's a

Page 183

Robert Major

1
2  confidentiality agreement in the
3  rehabilitation proceeding between BNY and
4  our client.
5     (Major Exhibit 10, No Bates numbers,
6  Confidentiality Agreement, marked for
7  identification.)
8 BY MR. CARNEY:
9     Q.   Do you recognize this document?
10     A.   No.
11     Q.   You've never seen it before?
12     A.   I don't know that I've never seen
13 it, but I don't recognize it now.
14     Q.   Is there a reason why you didn't
15 inform FGIC RMBS holders prior to June 4 about
16 the FGIC commutation?
17     MR. ESPANA:  Objection to form.
18     Other than the mediation order
19     that's in place by the court?
20     MR. CARNEY:  I don't understand your
21  objection.
22     MR. ESPANA:  I'm asking -- I'm just
23  clarifying your question.
24 BY MR. CARNEY:
25     Q.   I am not asking you to violate the

Page 184

Robert Major

1
2  court's December 26th order.  I'm just asking you
3  why, prior to June 4, you didn't inform
4  FGIC-wrapped RMBS holders of the FGIC
5  commutation.
6     A.   I don't believe any holders that
7  were not parties to confidentiality agreements in
8  the ResCap case were informed of the FGIC
9  commutation negotiations.
10     Q.   So the -- was the only reason -- was
11 there any other reason aside from the mediation
12 order that you did not inform FGIC-wrapped
13 security holders of the FGIC commutation?
14     MR. ESPANA:  I'll caution the
15  witness -- I don't know whether you know or
16  not, but to the extent the answer calls for
17  communications you had with counsel, I
18  instruct you not to answer.
19     THE WITNESS:  At what point in time?
20 BY MR. CARNEY:
21     Q.   Prior to June 4.
22     A.   Prior to June 4.
23     The agreement wasn't reached until
24 May 23, so there was nothing -- prior to May 23,
25 there was nothing to report.

Page 185

Robert Major

1
2     Q.   But you were -- you were
3  discussing -- the commutation idea had been
4  presented to you prior to that time; is that
5  correct?
6     A.   Yes.
7     Q.   When was that idea presented to you?
8     A.   In late March, early April.
9     Q.   And that was at the same time you
10 were -- you were negotiating the rehabilitation
11 plan; is that correct?
12     MR. ESPANA:  Objection to form.
13     You mean meaning the bank of BNY?
14     MR. CARNEY:  The bank of BNY.
15     THE WITNESS:  I believe the
16  rehabilitation plan had largely been -- I
17  don't recall when the revised amended plan
18  of rehabilitation was filed, but -- you
19  know, I don't -- I don't know -- I don't
20  know where the settlement negotiations fell
21  in the timeline with the -- you know, where
22  the status of the rehabilitation plan
23  stood.
24 BY MR. CARNEY:
25     Q.   Fair enough.

47 (Pages 182 - 185)

Page 186

Robert Major

1          Then why -- in late March, early
2  April, once you were presented with the idea of
3  the FGIC commutation, why didn't you inform
4  holders at that point that the idea was being
5  discussed?
6     A.    I'm sorry, at what point?
7     Q.    When you were presented with the
8  idea of the FGIC commutation, as you testified in
9  late March, early April.
10    A.    We were under a settlement
11 mediation.  We couldn't disclose what was going
12 on.
13    Q.    Was there any other reason other
14 than the mediation order that you didn't share
15 such information?
16    A.    I don't know that there was anything
17 to report.  It was -- it was, you know,
18 speculative negotiation.  There was nothing
19 concrete to report to investors.  And there were
20 investors that were parties to those negotiations
21 as well.  It's my understanding that any investor
22 that was aware of the mediation and was a
23 creditor of ResCap could have participated in
24 those discussions.

Page 187

Robert Major

1     Q.    So just to circle back, was there
2  any reason other than the mediation order that
3  you didn't inform ResCap FGIC-wrapped security
4  holders of the fact that you had been presented
5  with the idea of the FGIC commutation?
6       MR. ESPANA:  Objection; asked and
7     answered.
8       MR. KAUFMAN:  Other than what he
9     just said.
10      THE WITNESS:  There was a Steering
11    Committee of investors party to those
12    negotiations.  And the negotiations were
13    not in a concrete phase at that time.  So
14    we did not feel that there was anything to
15    report to -- to the investors generally at
16    that time.
17 BY MR. CARNEY:
18    Q.    Do you think that the idea of the
19 FGIC commutation would have been important to the
20 investors that weren't party to the mediation --
21      MR. ESPANA:  Objection --
22 BY MR. CARNEY:
23    Q.    -- in your opinion?
24      MR. KAUFMAN:  Objection to form.

Page 188

Robert Major

1       THE WITNESS:  Yes.
2  BY MR. CARNEY:
3     Q.    But you didn't present them with the
4  information because -- I believe you testified
5  because of the mediation order and because the
6  negotiations hadn't been completed; is that
7  correct?
8     A.    Right, there was nothing to report.
9     Q.    Was there any other reason?
10    A.    The presence of the Steering
11 Committee of investors in participating in those
12 negotiations.
13    Q.    Do you have any sense of how the
14 holdings of that Steering Committee -- do you
15 have any sense of how much of those holdings were
16 FGIC-wrapped as opposed to nonwrapped?
17    A.    I don't know.
18    Q.    No -- you have no idea of the
19 magnitude of it?
20    A.    Not as I sit here, no.
21    Q.    Did BNY demand anything in exchange
22 for the FGIC commutation?
23      MR. KAUFMAN:  Objection based on
24    mediation privilege.

Page 189

Robert Major

1       MR. ESPANA:  I'm instructing you not
2  to disclose.
3  BY MR. CARNEY:
4     Q.    So you're not going to disclose
5  that?
6     A.    (Witness nods head in the negative.)
7     Q.    What, from your perspective as you
8  sit here today, is the benefits of the FGIC
9  commutation?
10    A.    The benefit is you get an up-front
11 cash payment and you forego the payment of
12 premiums at the full charge of those premiums to
13 collect discounted policy recoveries in the
14 future over a long period of time.
15    Q.    So you see -- as I understand it,
16 you see two benefits.  The first one is the
17 up-front cash payment of the 253.2 million;
18 correct?
19    A.    Right.
20    Q.    The second is the trust won't have
21 to pay premiums to FGIC on the policies --
22    A.    Right, and a third.  And it's a
23 resolution of claims between ResCap, the trusts
24 and FGIC that would have -- it avoided protracted

48 (Pages 186 - 189)

Page 190

Robert Major

1 and costly litigation.
2
3    Q.    So let's go through the third one.
4         What is the benefit, in your view as
5 you sit here today, of the lump-sum payment of
6 the 253.3 versus the treatment that would have
7 otherwise been afforded under the rehabilitation
8 plan?
9    A.    A large portion of those payments
10 that would have been paid under the
11 rehabilitation plan were to be paid in the
12 future, and the certainty of receipt of those
13 payments was in question.
14    Q.    When you say "in question," what
15 analysis did you do to determine the -- to
16 determiner that opinion?
17         MR. ESPANA:  "You" being Mr. Major?
18 BY MR. CARNEY:
19    Q.    Let's start with BNY as you, your
20 firm.
21         MR. ESPANA:  Asked and answered.
22         THE WITNESS:  We hired a financial
23    adviser to do that analysis for us.
24 BY MR. CARNEY:
25    Q.    And that was Duff & Phelps?

Page 191

Robert Major

1
2    A.    Correct.
3    Q.    So aside from the Duff & Phelps
4 report that we've gone over at length, you didn't
5 do any other independent analysis of the
6 recoveries under the settlement agreement versus
7 the rehabilitation plan?
8         MR. ESPANA:  Asked and answered.
9         THE WITNESS:  No.
10 BY MR. CARNEY:
11    Q.    The answer is no.
12         So you -- okay.
13         And I believe the second benefit of
14 the -- of the settlement you testified was the --
15 first, you have the 253.3.  What was the second
16 benefit that you testified to?  I forgot --
17    A.    You forego payment of the full cost
18 of the premiums.
19    Q.    And you may have testified to this
20 before, but maybe I'm forgetting.
21         How did you -- what did you do to
22 analyze the premiums that you would save?
23    A.    Duff & Phelps calculated a figure
24 for us.
25    Q.    And, again, you did no independent

Page 192

Robert Major

1
2 analysis of that figure or the amount you would
3 save?
4    A.    No.
5    Q.    And I believe you mentioned a third
6 benefit.  What was that again?
7    A.    Oh, the -- avoiding the costly and
8 protracted litigation.
9    Q.    So can you just explain to me your
10 view as to the -- can you describe the nature of
11 that litigation for the record?
12    A.    Sure.
13         FGIC had a number of lawsuits filed
14 against ResCap and its affiliates that would have
15 needed to be adjudicated prior to ResCap being
16 able to emerge from bankruptcy.  There was also
17 an issue between the trusts and FGIC as to how --
18 who had the claim in the ResCap case, who had the
19 claim on the wrapped trusts against ResCap.  Was
20 it the trustees?  Was it FGIC?  Did our claims
21 overlap?  Intercreditor issues.
22    Q.    What was your estimation of the
23 costs of fully litigating those issues?
24    A.    I'm not qualified to speculate on
25 that.  I know generally litigation is very

Page 193

Robert Major

1
2 expensive.
3    Q.    Did anyone ever project those costs
4 for you?
5    A.    No.
6    Q.    Do you have any idea of the
7 magnitude of what those costs might be?
8    A.    I would say millions of dollars, but
9 I -- like I said, I'm not qualified to -- I'm not
10 a litigation expert.  I can't estimate how much
11 it would cost to --
12    Q.    You said millions of dollars.  You
13 mean 2 million, 20 million?  I mean, there's --
14         MR. ESPANA:  Objection.
15         THE WITNESS:  I don't know.
16 BY MR. CARNEY:
17    Q.    You have no idea of how much it
18 would cost to litigate those claims?
19         MR. ESPANA:  Objection.
20         THE WITNESS:  No.
21 BY MR. CARNEY:
22    Q.    All else being equal, absent the
23 commutation, would you have entered into the
24 settlement agreement?
25         MR. WYNNE:  Objection.

49 (Pages 190 - 193)

Page 194

1          Robert Major
2 BY MR. CARNEY:
3     Q.    As you sit here today.
4        MR. ESPANA: Calls for speculation.
5        THE WITNESS: We weren't offered --
6 we weren't offered a -- FGIC didn't propose
7 a scenario where there was no commutation,
8 so we never considered that.
9 BY MR. CARNEY:
10    Q.    So FGIC proposed a commutation to
11 you, if I understand.
12    A.    From my understanding, yes.
13    Q.    And were there any -- I'm not asking
14 for the substance of -- I understand the
15 sacrosanct nature of the mediation privilege in
16 some people's minds, but --
17        MR. KAUFMAN: Actually, the court's
18 mind.
19        MR. ESPANA: That's right.
20        MR. SIDMAN: Is there a question?
21        MR. CARNEY: Yes, there is a
22 question.
23 BY MR. CARNEY:
24    Q.    Did you engage in any negotiations
25 about the FGIC commutation?

Page 195

1          Robert Major
2        MR. ESPANA: Objection to form.
3 You're asking whether he or the
4 bank?
5 BY MR. CARNEY:
6     Q.    What I'm trying to get at is, was
7 the FGIC commutation simply proposed to BNY and
8 take it or leave it, or did BNY engage in any
9 kind of negotiations --
10        MR. ESPANA: You can just answer if
11 there were any negotiations.
12        THE WITNESS: There were
13 negotiations about the commutation.
14 BY MR. CARNEY:
15    Q.    Can you explain to me the nature of
16 those negotiations?
17        MR. ESPANA: No.
18 BY MR. CARNEY:
19    Q.    You're refusing to answer that --
20        MR. ESPANA: I'm instructing him not
21 to answer.
22        MR. CARNEY: Okay. Fair enough.
23 BY MR. CARNEY:
24    Q.    Did BNY -- prior to the mediation,
25 prior to the mediation, prior to December 26th,

Page 196

1          Robert Major
2 did BNY ever consider requesting that the
3 policies at issue be commuted?
4     A.    Not to my knowledge.
5     Q.    So the -- so -- okay.
6        So did the -- did FGIC's proposal of
7 the commutation actually come as a surprise to
8 you?
9     A.    No. I mean, I don't know what my
10 emotional state was, but we were in a mediation,
11 so lots of people were proposing lots of things.
12        MR. CARNEY: Let me mark this as
13 Exhibit 11.
14 BY MR. CARNEY:
15    Q.    This is an e-mail exchange between
16 you and, I believe, Jennifer Provenzano.
17    A.    Yep.
18        (Major Exhibit 11, Bates Nos.
19 BNYM-MS 0000155 through 158, E-mail Chain,
20 marked for identification.)
21        (Witness peruses the exhibit.)
22 BY MR. CARNEY:
23    Q.    So do you see here we have an
24 e-mail -- I believe it's dated May 22nd of 2013
25 from -- it's a chain. It's from -- if you want

Page 197

1          Robert Major
2 to move down I think to the May 22, 2013, e-mail
3 at 10:03 a.m. from you to Jennifer Provenzano --
4 by the way, who is Jennifer Provenzano?
5     A.    Jennifer is the administrator of the
6 ResCap trusts. She does the day-to-day
7 administration on them.
8     Q.    And it says -- and I'll just read
9 it -- "Thanks, Jen. This settlement has FGIC
10 paying the trusts who commute (terminate) the
11 policies. If approved, each trust will receive a
12 lump sum from FGIC and there will be no further
13 obligation to pay premiums. Holders will be
14 noticed and have the opportunity to object."
15        Are you familiar with this e-mail?
16    A.    Yes.
17    Q.    So did you expect the holders of
18 FGIC-wrapped ResCap securities to object to the
19 commutation?
20    A.    I don't know that I expected it, but
21 that's why we noticed -- sent out notices, to
22 give people the opportunity to object. So I
23 wouldn't be surprised if they object. I can't
24 say that I was expecting objections.
25    Q.    But you weren't surprised?

50 (Pages 194 - 197)

Page 198

Robert Major

1
2     A.   No.
3     Q.   And the notice you're discussing
4 here is the one I believe you said was sent out
5 on June 4; is that correct?
6     A.   Yes.
7     Q.   Were there any other notices that
8 you contemplated that you were referencing here?
9     A.   No.
10    Q.   Now, I see the -- a little up the
11 chain, Jennifer e-mails in response to you, "Oh,
12 wow, so the deals won't be insured anymore."
13         So if someone says, "wow," which to
14 me means she was a bit surprised -- and you
15 didn't follow up.  What does "wow" mean to you --
16 strike that.
17         When you read her response, what was
18 your impression of what she meant?
19    A.   Jennifer does the day-to-day
20 administration.  So she oversees the application
21 of the waterfalls.  And she's not familiar or has
22 any expertise in bankruptcy or restructuring.  So
23 her surprise is that a result out of a
24 restructuring would be that a deal was not
25 insured anymore and that she would, you know --

Page 199

Robert Major

1
2 her concern is that someone's going to have to
3 tell her how to do the waterfalls without the
4 insurer being involved in the future.  She's
5 concerned about her day-to-day administration.
6     Q.   And other than your response, which
7 I believe is just a simple "Correct" in the 10 --
8 sorry -- 11:04 e-mail at the top, did you have
9 any other discussions with her about the
10 commutation of the policies?
11    A.   Probably, yeah.  I keep in touch
12 with her, keep her informed of what's going on.
13    Q.   Can you describe for me just the
14 nature of those discussions.
15    A.   Again, her main concern is the
16 administration of the periodic waterfalls and the
17 trust accounting.  So whenever something is going
18 to change or not be -- you know, not be as
19 expected under the documents, she needs to know
20 well in advance of how things may be different
21 than what the documents say.
22    Q.   So other than simply her -- so it's
23 your testimony that other than her capacity as
24 just sort of -- from administration point of
25 view, was it your testimony that that is the

Page 200

Robert Major

1
2 reason she expressed surprise to you?
3         MR. ESPANA:  Asked and answered.
4         THE WITNESS:  Can you repeat that,
5     please.
6 BY MR. CARNEY:
7     Q.   Her surprise -- strike that.
8         Was it your testimony that her
9 surprise at the commutation of the policies was
10 on account of how it would affect her day-to-day
11 duties in administering the trust?
12        MR. KAUFMAN:  Objection to form.
13        MR. ESPANA:  Objection; asked and
14    answered.
15        THE WITNESS:  Yes.
16 BY MR. CARNEY:
17    Q.   Any other reason why you think she
18 would be surprised other than the administration
19 issues?
20        MR. ESPANA:  Same objection.
21        THE WITNESS:  No, no other --
22 BY MR. CARNEY:
23    Q.   No other reason?
24    A.   Right.
25    Q.   Okay.  Thank you.

Page 201

Robert Major

1
2         Is it your understanding -- I don't
3 want you to go into anything you discussed with
4 your counsel, but is it your understanding that
5 you had a right to agree to the FGIC commutation
6 without consulting the holders of FGIC-wrapped
7 securities?
8         MR. ESPANA:  Objection to form;
9     calls for a legal conclusion.
10        MR. SIDMAN:  Objection to form.
11        THE WITNESS:  A right to agree?
12 BY MR. CARNEY:
13    Q.   Yes.
14    A.   I mean, this -- we -- we reached a
15 compromise with the other parties of time that's
16 subject to court approval.  So, you know, I don't
17 think at any time we thought we were definitely
18 agreeing without any further action that needed
19 to be taken, such as court approval and
20 opportunity of parties to object to it.
21    Q.   But BNY -- you're not disputing, are
22 you, that BNY was a party to the settlement
23 agreement we looked at earlier?
24    A.   Yes -- no, we are.
25    Q.   Is it your understanding that you

51 (Pages 198 - 201)

Page 202

Robert Major

1                Robert Major
2  had a right to actually enter that settlement
3  agreement that includes the FGIC commutation?
4        A.    Yes, it is my understanding we had
5  the right to do that.
6        Q.    What is the basis of that
7  understanding other than discussions with
8  counsel?
9        A.    We had claims in the ResCap case
10 that needed to be resolved, and the settlement
11 agreement reflects a resolution of those claims.
12       Q.    Any other reason other than what you
13 just testified to?
14       A.    No.
15       Q.    Can you turn to -- I believe this
16 was already marked as Exhibit -- it was a
17 proposed order on the 9019 motion.  I think it
18 was marked as Exhibit, I think, 2.  It's also in
19 this packet I have if you can't find that.  Since
20 we've already marked it --
21            MR. ESPANA:  I think it's 3.
22            MR. CARNEY:  3.
23 BY MR. CARNEY:
24       Q.    If you turn again to -- I believe
25 Mr. Baio discussed with you paragraphs B and C,

Page 203

Robert Major

1                Robert Major
2  the findings that the --
3        A.    I think you mean C and D.
4        Q.    I mean C and D.  Thank you.
5              -- that the trustees acted in good
6  faith and invested for some investors, in
7  paragraph D and, in paragraph C, that the
8  settlement agreement was in the best interests
9  of, among other parties, including investors.
10             You're familiar with those
11 paragraphs; is that correct?
12       A.    Yes.
13       Q.    You testified you had the right to
14 enter into the settlement agreement just earlier.
15             If you believe you were entitled to
16 enter into the ResCap settlement agreement, why
17 do you need these findings in C and D, from your
18 perspective?
19             MR. ESPANA:  I'm just going to
20       caution you, if your answer entails
21       communications that you had with counsel,
22       then I'm instructing you not to answer.
23             THE WITNESS:  It does.
24             MR. ESPANA:  I instruct you not to
25       answer.

Page 204

Robert Major

1                Robert Major
2  BY MR. CARNEY:
3        Q.    All right.  Can you tell me in any
4  other -- to your knowledge, have you ever
5  requested findings such as these in other
6  cases -- in any order -- do you recall, other
7  than advice from counsel, whether or not BNY has
8  ever been given any, in any court order, a
9  finding that it acted in the best interests of
10 its -- the holders that it's trustee for?  Do you
11 recall ever receiving that relief?
12       A.    Yes.
13       Q.    And do you ever recall receiving, in
14 any court order, a finding that the trustee's
15 actions were in the best interests of holders of
16 the securities that it represents?
17       A.    Yes.
18       Q.    Which cases were those?
19       A.    The ResCap plan support agreement
20 motion that contained similar findings as to
21 this.
22       Q.    Other than the ResCap cases, can you
23 recall any other cases where a court has issued
24 similar findings with respect to BNY's conduct?
25       A.    I can't recall as I sit here.

Page 205

Robert Major

1                Robert Major
2        Q.    So you don't know of any other cases
3  aside from ResCap where this has happened?
4             MR. ESPANA:  Objection to form;
5       mischaracterizes the witness' testimony.
6  BY MR. CARNEY:
7        Q.    You can answer to the extent you
8  understand, or I can repeat it.
9        A.    I cannot recall any cases at this
10 time.
11       Q.    Now, again, I don't want to go into
12 anything covered under the mediation privilege
13 or -- what you think that means, but were there
14 any internal meetings on the FGIC commutation
15 internal to BNY, not with other parties to the
16 mediation?
17       A.    Yes.
18       Q.    Who met?
19       A.    That would be myself, a
20 representative from our legal department, my
21 manager, and the director of our group, default
22 administration.
23       Q.    Can you tell me who those people
24 were?
25       A.    Sure.

Page 206

Robert Major

1
2    Nandini Mani from our legal
3 department was involved.  My manager, Jerry
4 Facendola.  And Loretta Lundberg, who's the
5 managing director of the default administration
6 group.
7    Q.    How often did you all meet with
8 respect to the ResCap settlement agreement?
9    A.    I think we met once to discuss it.
10    Q.    Did you have calls internally to
11 discuss it?
12    A.    Everything is a call for me, so yes.
13    Q.    So you had one call to discuss the
14 ResCap settlement with those parties?
15    A.    With the four of us, yes.
16    Q.    Did you have other meetings with a
17 subset of those four?
18    A.    Probably, yes.
19    Q.    How many, approximately?
20    A.    I don't recall how many.
21    Q.    What did you review in connection
22 with those meetings?
23    A.    We reviewed the Duff & Phelps
24 report.  We discussed the recommendation that we
25 got from our legal advisers and --

Page 207

Robert Major

1
2    Q.    Who are those legal advisers?
3    A.    Dechert.
4    -- and we discussed the noticing
5 that would be done around the settlement
6 agreement.
7    Q.    Did you provide anyone else outside
8 that group internally to BNY information on the
9 FGIC settlement?
10    A.    Jen Provenzano, yes.
11    Q.    How about anyone like on the board
12 or anyone -- you know.
13    A.    Loretta may be on the board of the
14 trust company, but she wouldn't have been
15 considering this in that capacity.
16    Q.    Did you do any internal analysis
17 about the FGIC commutation?
18    MR. ESPANA:  Objection; asked and
19    answered.
20    THE WITNESS:  No.
21 BY MR. CARNEY:
22    Q.    Okay.  Why did you engage Duff &
23 Phelps?
24    A.    We engaged Duff & Phelps due to
25 their expertise in the residential

Page 208

Robert Major

1
2 mortgage-backed securities space, their ability
3 to evaluate losses in these types of
4 transactions, and to give the advice that we
5 needed to have going forward in the ResCap case.
6    Q.    Were you required to engage Duff &
7 Phelps --
8    A.    No.
9    Q.    -- to your knowledge?
10    A.    No.
11    Q.    Other than Duff & Phelps' expertise,
12 if you -- as you testified -- you testified that
13 you had the right to enter into the settlement
14 agreement.  Now, why was it necessary for you to
15 engage Duff & Phelps if you thought you had the
16 right to enter into the settlement agreement and
17 support the commutation of the policies?
18    MR. ESPANA:  Objection to form;
19    mischaracterizes the witness' testimony.
20    He just said he didn't think it was
21    necessary.  He wasn't required to do it.
22    THE WITNESS:  We engaged Duff &
23    Phelps for the mediation well before the
24    mediation even began.
25

Page 209

Robert Major

1
2 BY MR. CARNEY:
3    Q.    What was the original role as you
4 originally engaged them?
5    A.    To evaluate our claims in the ResCap
6 bankruptcy.
7    Q.    Did -- was reviewing the settlement
8 agreement per their -- per the Duff & Phelps
9 report, would you view that as an expansion of
10 the scope of their original engagement?
11    A.    I'm not sure.
12    Q.    Why did you think it was necessary
13 for them to evaluate the rehabilitation plan
14 versus the proposed settlement agreement?
15    MR. ESPANA:  Objection to form.
16 BY MR. CARNEY:
17    Q.    Why did you think it was necessary
18 for Duff & Phelps to produce a Duff & Phelps
19 report?
20    MR. ESPANA:  Objection to form.
21    THE WITNESS:  To assist the trustees
22    in understanding the complexities of the
23    recoveries in the two different scenarios.
24 BY MR. CARNEY:
25    Q.    Have you ever engaged -- have you

53 (Pages 206 - 209)

Page 210

Robert Major

1
2 ever engaged Duff & Phelps before?
3    A.    Not to my knowledge.
4    Q.    Have you ever engaged a financial
5 adviser doing the same scope of work as Duff &
6 Phelps before?
7    A.    Are you asking me personally or the
8 bank?
9    Q.    The bank.
10    A.    Yes.
11    Q.    What instances?
12    A.    We engage advisers all the time to
13 assist us with complex financial matters.
14    Q.    Have you ever engaged financial
15 advisers -- strike that.
16        Have you ever engaged in a
17 situation -- strike that.
18        Have you ever engaged financial
19 advisers to do analysis similar to what Duff &
20 Phelps did here?
21    A.    I'm not sure.
22    Q.    To your knowledge -- so the answer
23 is no, you don't --
24    A.    No, the answer is not no.  I just
25 don't know.  I mean, there are similar cases.

Page 211

Robert Major

1
2 I'm not particularly familiar with what the exact
3 scope of those engagements are to the financial
4 advisers.
5    Q.    Do you have a general idea?
6    A.    Yes, I would say that there's
7 engagement of advisers doing similar work at the
8 bank.
9    Q.    And can you describe for me what
10 those situations are that you're aware of?
11        MR. ESPANA:  Just caution the
12    witness to the extent there are any
13    confidentiality agreements, that you should
14    not disclose those -- the substance of
15    those transactions or anything along those
16    lines.
17        THE WITNESS:  There are other
18    instances of RMBS transactions where
19    investors and/or the trustees may have
20    claims for breaches of reps and warranties
21    against the sponsors of those trusts.  And
22    there may have been advisers engaged to
23    assist us in the evaluation of those
24    claims.
25

Page 212

Robert Major

1
2 BY MR. CARNEY:
3    Q.    To your knowledge, did any of those
4 instances involve the commutation of policies
5 insuring payment of principal and interest on
6 such securities?
7    A.    Not to my knowledge.
8    Q.    So then this is, in your view, a
9 fairly unique case then?
10        MR. ESPANA:  Objection to form;
11    mischaracterizes the witness' testimony.
12        MR. SIDMAN:  Objection.
13        THE WITNESS:  Yes.
14 BY MR. CARNEY:
15    Q.    How much have you paid Duff & Phelps
16 for the opinion that they produced?
17    A.    I don't have that information with
18 me today.
19    Q.    Who would have that information?
20    A.    I would have it back at my office,
21 or I can confer with my legal advisers and find
22 out what that number is, but I don't know it as
23 we sit here.
24    Q.    I'd appreciate if -- obviously you
25 can talk to your legal advisers about this, but I

Page 213

Robert Major

1
2 would appreciate being informed of that
3 information.
4        MR. CARNEY:  I'll just note that for
5    the record.
6        MR. ESPANA:  Okay.  Send us a
7    letter.
8 BY MR. CARNEY:
9    Q.    Do you know if you're paying Duff &
10 Phelps as an administrative expense of the trust?
11        MR. ESPANA:  Objection to form.
12        THE WITNESS:  Yes, I believe so.
13 BY MR. CARNEY:
14    Q.    You are?
15    A.    Yes.
16    Q.    Okay.  And do you have an
17 understanding as to any indemnification of BNY by
18 FGIC in the rehabilitation plan?
19    A.    Indemnification of --
20    Q.    Of BNY by FGIC.
21        MR. ESPANA:  Objection to the extent
22    it's outside the scope of the 30(b)(6)
23    notice.
24        MR. CARNEY:  Same as my 30(b)(1)
25    point.

54 (Pages 210 - 213)

Page 214

Robert Major

1          Robert Major
2          THE WITNESS:  I'm not sure as we sit
3      here.
4  BY MR. CARNEY:
5      Q.    You're not sure whether BNY received
6  an indemnification from FGIC in the
7  rehabilitation proceeding?
8      A.    Yes, that's correct.
9      Q.    You don't know?
10     A.    I'm not sure.
11     Q.    Did you personally have any
12  conversations with anyone at Duff & Phelps?
13     A.    Yes.
14     Q.    I believe you testified -- let's go
15  back to the Duff & Phelps report.  I think that's
16  Exhibit 5, the final version that we discussed.
17         MR. ESPANA:  Just so you know, by my
18     calculation, you have around 12 minutes.
19         MR. CARNEY:  Twelve minutes?  I'll
20     be quick.
21  BY MR. CARNEY:
22     Q.    Actually, let's -- let's actually
23  skip that.
24         Did BNY do any analysis on why
25  FGIC-wrapped security holders should accept the

Page 215

Robert Major

1          Robert Major
2  ResCap settlement agreement?
3         MR. ESPANA:  Asked and answered.
4         THE WITNESS:  We engaged Duff &
5      Phelps to do that analysis for us.
6  BY MR. CARNEY:
7      Q.    And, again, you also testified that
8  you had -- you don't know the magnitude of
9  FGIC-wrapped versus non-FGIC-wrapped securities
10  owned by the investors that were part of the
11  mediation; correct?
12     A.    Correct.
13     Q.    Did you -- can you turn to the
14  settlement agreement, Exhibit F, allocation
15  methodology.
16     A.    Which exhibit?
17     Q.    F to the settlement agreement.
18         MR. ESPANA:  Exhibit 8.
19         THE WITNESS:  Exhibit 8.  Okay.
20  BY MR. CARNEY:
21     Q.    I think you're well past it.
22     A.    I'm having trouble here with these.
23  Exhibit D, disclosure statement, that's where I
24  should be?
25     Q.    No, you should be in the order to

Page 216

Robert Major

1          Robert Major
2  show cause.  It's under -- it's that one.
3         MR. ESPANA:  Exhibit 9.
4         MR. CARNEY:  Yes, Exhibit 9.
5         THE WITNESS:  Okay.
6  BY MR. CARNEY:
7      Q.    Then you'll see the settlement
8  agreement that we went over is attached to that.
9  And then attached to the settlement agreement is
10  Exhibit F.  If it's easier, I can flip --
11     A.    Thanks.  Might save you some time.
12     Q.    Here (handing).
13     A.    Thanks.
14     Q.    Are you familiar with this exhibit
15  entitled, "Allocation Methodology"?
16     A.    Yes.
17     Q.    Can you explain to me how it works.
18     A.    Basically each wrapped trust
19  receives its pro rata share of the FGIC
20  recovery -- or the FGIC payment based on roughly
21  its -- each trust's present and future losses
22  divided by the total present and future losses.
23     Q.    How was the 253.3 million allocated
24  to each of the trusts?
25     A.    That was done later by Duff &

Page 217

Robert Major

1          Robert Major
2  Phelps.  I have -- I don't -- I can't explain how
3  it was done.  I have the results of that
4  allocation, but I can't explain as we sit here
5  how that was done, other than it was done on the
6  basis of present and future losses divided by --
7  for each trust divided by the total losses.
8      Q.    How are those present and future
9  losses for each trust calculated, to your
10  knowledge?
11     A.    Duff & Phelps sampled a number of
12  mortgage loans and estimated the losses.
13     Q.    So is it fair to say that Duff &
14  Phelps did the entire allocation of 253.3 million
15  to the trusts?
16     A.    Yes.
17     Q.    Does that information exist in a
18  document?
19     A.    We have made it available to
20  investors who -- of those securities that have
21  inquired about it --
22     Q.    So --
23     A.    -- on a trust-by-trust basis.
24     Q.    So if I inquired about it on a
25  trust-by-trust basis, you would share with me

55 (Pages 214 - 217)

Page 218

Robert Major

1
2 that information?
3    A.    Yes.
4    Q.    I'd like to --
5        MR. ESPANA:  Just to note, obviously
6    subject to whatever the requirements are in
7    the agreement and --
8        MR. SIEGEL:  Just as long as we're
9    on that, we already gave you that
10    information.  You asked for it and we gave
11    it --
12        MR. CARNEY:  That's my next exhibit,
13    actually.
14        MR. SIEGEL:  Okay.
15        MR. CARNEY:  Let's mark this as
16    Exhibit 11 -- 12.
17        (Major Exhibit 12, No Bates numbers,
18    E-mail Chain, marked for identification.)
19 BY MR. CARNEY:
20    Q.    Following on with what Mr. Siegel
21 said, this is the allocation that we received
22 from your counsel as to the allocation of the
23 253.3 million to the trusts that we -- my client
24 has investments in.
25        Do you know how these numbers were

Page 219

Robert Major

1
2 calculated?
3    A.    Generally speaking, yes.  They were
4 calculated in accordance with the allocation
5 methodology.
6    Q.    And Duff & Phelps would have done
7 that allocation?
8    A.    That's right.
9    Q.    Do you have any idea how -- within
10 each trust, how the 253.3 million share in each
11 trust was allocated among the different tranches
12 in each trust?
13    A.    Not yet.
14    Q.    Not yet.
15        Do you plan to have that analysis?
16    A.    Yes.
17    Q.    When?
18    A.    When the -- when it comes -- when
19 the payment is going to be realized and put
20 through the trusts.
21    Q.    And Duff & Phelps will do that
22 analysis as well?
23    A.    I don't know that that's been
24 determined yet.
25    Q.    But it's fair to say you have not

Page 220

Robert Major

1
2 yet determined how you'll allocate the amount to
3 each trust among the tranches?
4    A.    Correct.
5    Q.    And so when you look at these
6 numbers here of the allocation, that is to the
7 entire trust generally, to your knowledge, not to
8 a specific tranche; is that correct?
9        MR. ESPANA:  Are you asking other
10    than what's already in the allocation
11    methodology?  I mean, other -- I don't
12    understand the question.  If it's -- other
13    than what's explained here, are you asking
14    him --
15        MR. CARNEY:  I'm asking him whether
16    or not he's yet figured out -- I understand
17    that Duff & Phelps has allocated the
18    amounts of the 253 million that would be
19    given to each trust.  What I'm asking is --
20    the further question is, has it been
21    determined how -- within each trust, how
22    that will be allocated amongst the
23    tranches?
24        MR. ESPANA:  Now I'm completely
25    confused because I thought that's what this

Page 221

Robert Major

1
2    says, how it will actually happen.
3        MR. CARNEY:  Well, I understood,
4    from what he said, was that this governs
5    how it will be allocated to each trust.
6        MR. ESPANA:  That's right, number 1.
7        MR. CARNEY:  And then amongst the
8    tranches in each trust.
9        MR. ESPANA:  Number 2.
10        MR. CARNEY:  And -- okay.
11 BY MR. CARNEY:
12    Q.    So what's your understanding --
13 what's your understanding of what your counsel --
14 number 2 in the allocation methodology.  What's
15 your understanding of how the funds allocated to
16 each trust will be further allocated amongst the
17 tranches?
18    A.    They will be treated as insurance
19 recoveries.
20    Q.    Under the governing documents.
21    A.    Yes.
22    Q.    And, again, it hasn't been
23 determined who will do that calculation yet?
24    A.    Not to my knowledge.
25    Q.    And that calculation has not been

56 (Pages 218 - 221)

Page 222

1        Robert Major
2 completed; correct?
3      A.    Not to my knowledge.
4      Q.    Okay.  I've only got one question
5 left.
6         If the court -- bankruptcy court --
7 what's your understanding -- if the bankruptcy
8 court does not issue the findings in paragraphs C
9 and D of the proposed order we looked at as to
10 the good faith of the trustees and the best
11 interests of investors, what is your idea as to
12 what happens to the settlement agreement if those
13 findings are not entered?
14        MR. ESPANA:  Objection to form;
15     calls for speculation.
16        THE WITNESS:  I'd have to confer
17     with my legal advisers as to what the
18     effect of that would be.
19 BY MR. CARNEY:
20     Q.    So sitting here today, you have no
21 independent opinion as to what would happen to
22 the settlement agreement if the court --
23 bankruptcy court does not issue those findings;
24 is that correct?
25     A.    So you're saying the judge would

Page 223

1        Robert Major
2 take -- would otherwise approve of the settlement
3 agreement, but take out those findings?
4     Q.    Yes.
5        MR. ESPANA:  Objection to form;
6     calls for speculation.
7        THE WITNESS:  I don't know what
8     would happen.
9 BY MR. CARNEY:
10     Q.    Do you have an opinion as to what
11 you think should happen in that instance?
12     A.    Not as I sit here, no.
13        MR. CARNEY:  I think that's all I
14     have for now.
15        MR. ESPANA:  I just have -- I may
16     have one or two questions.
17 EXAMINATION
18 BY MR. ESPANA:
19     Q.    Mr. Major, what is your
20 understanding of the benefit, if any, that the
21 FGIC trustees would receive under the FGIC
22 settlement agreement?
23        MR. CARNEY:  Objection; leading.
24        THE WITNESS:  The trustees don't
25     receive a benefit under the settlement

Page 224

1        Robert Major
2     agreement.
3 BY MR. ESPANA:
4     Q.    What is your understanding as to
5 whether or not the trustees would receive any
6 releases under the FGIC settlement agreement?
7        MR. CARNEY:  Same objection.
8        THE WITNESS:  The trustees don't
9     receive releases under the settlement
10     agreement.
11        MR. ESPANA:  No further questions.
12        (Examination concluded.  The time is
13     1:40 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 225

1
2 STATE OF NEW YORK      )
3              ss:
4 COUNTY OF WESTCHESTER  )
5
6
7        I, ROBERT MAJOR, the witness herein,
8 having read the foregoing testimony of the pages
9 of this deposition, do hereby certify it to be a
10 true and correct transcript, subject to the
11 correction, if any, shown on the attached page.
12
13            oOo
14
15
16
17     _____
18            ROBERT MAJOR
19
20
21 Subscribed and sworn before me
22 this _____ day of _____, 2013.
23
24 _____
25        Notary Public

57 (Pages 222 - 225)

**Page 226**

```
1
2     July 17, 2013
3            I N D E X
4     WITNESS      EXAMINATION BY      PAGE
5
      ROBERT MAJOR
6
            MR. BAIO           6
7           MR. CARNEY       166
            MR. ESPANA      223
8
9            E X H I B I T S
10    MAJOR                      PAGE
11
12    Exhibit 1    No Bates numbers, Notice of    8
13              Deposition of the Bank of
14              New York Mellon Trust
15              Company, N.A.
16    Exhibit 2    No Bates numbers, Exhibit    11
17              A, Declaration of Robert H.
18              Major
19    Exhibit 3    No Bates numbers, Exhibit    13
20              1, Order Granting Debtors'
21              Motion Pursuant to Fed. R.
22              Bankr. P. 9019
23    Exhibit 4    Bates Nos. BNYM-MS 0000079    30
24              through 88, E-mail Chain
25              with attachments
```

**Page 227**

```
1
2     (Continued)
3            E X H I B I T S
4
5     Exhibit 5    Bates Nos. TR-MS000001    51
6              through 9, FGIC Commutation
7              Proposal May 15, 2013
8     Exhibit 6    No Bates numbers, Affidavit    134
9              of Michael W. Miller
10    Exhibit 7    Bates Nos. BNYM-MS 0000153    164
11              through 54, E-mail Chain
12    Exhibit 8    No Bates numbers, Exhibit    167
13              D, Disclosure Statement
14    Exhibit 9    No Bates numbers, Order to    178
15              Show Cause
16    Exhibit 10    No Bates numbers,    183
17              Confidentiality Agreement
18    Exhibit 11    Bates Nos. BNYM-MS 0000155    196
19              through 158, E-mail Chain
20    Exhibit 12    No Bates numbers, E-mail    218
21              Chain
22
23
24
25
```

**Page 228**

```
1            ERRATA SHEET
         VERITEXT REPORTING COMPANY
2             1250 BROADWAY
          NEW YORK, NEW YORK 10001
3             800-362-2520
4     CASE: IN RE RESIDENTIAL CAPITAL
      DEPOSITION DATE: JULY 17, 2013
5     DEPONENT: ROBERT MAJOR
6     PAGE LINE(S)  CHANGE        REASON
7     ____|____|_____|_____
8     ____|____|_____|_____
9     ____|____|_____|_____
10    ____|____|_____|_____
11    ____|____|_____|_____
12    ____|____|_____|_____
13    ____|____|_____|_____
14    ____|____|_____|_____
15    ____|____|_____|_____
16    ____|____|_____|_____
17    ____|____|_____|_____
18    ____|____|_____|_____
19    ____|____|_____|_____
20
21    _____
22        ROBERT MAJOR
      SUBSCRIBED AND SWORN TO BEFORE ME
23    THIS _____ DAY OF _____, 20___.
24
      _____    _____
25    (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```

**Page 229**

```
1
2     STATE OF NEW YORK    )
3                 ss:
4     COUNTY OF NEW YORK   )
5
6         I, Eileen Mulvenna, Notary Public
7     within and for the State of New York, do hereby
8     certify:
9
10        That I reported the proceedings in
11    the within entitled matter, and that the within
12    transcript is a true record of said proceedings.
13
14        I further certify that I am not
15    related to any of the parties to the action by
16    blood or marriage, and that I am in no way
17    interested in the outcome of this matter.
18
19        IN WITNESS WHEREOF, I have hereunto
20    set my hand this 17th day of July, 2013.
21
22    _____
23        Eileen Mulvenna, CSR/RMR
24
25
```

58 (Pages 226 - 229)

Page 228

1                          ERRATA SHEET

                VERITEXT REPORTING COMPANY

2                          1250 BROADWAY

                   NEW YORK, NEW YORK 10001

3                          800-362-2520

4    CASE: IN RE RESIDENTIAL CAPITAL

     DEPOSITION DATE: JULY 17, 2013

5    DEPONENT: ROBERT MAJOR

6    PAGE LINE(S)    CHANGE              REASON

7    70 | 3 | "March" should be "May" transcription error

8    71 | 5 | "March" should be "May" Transcription error

9    117 | 11 | "Yerahng" should be "relahng" "relating" Transcription error

10   120 | 4 | "CPO" Should be "OPO" | Transcription error

11   185 | 13 | "the bank of BNY" should be | "The Bank of New York" transcription

12   185 | 14 | " " | " " error

13   ___ | ___ | _____ | _____

14   ___ | ___ | _____ | _____

15   ___ | ___ | _____ | _____

16   ___ | ___ | _____ | _____

17   ___ | ___ | _____ | _____

18   ___ | ___ | _____ | _____

19   ___ | ___ | _____ | _____

20

21   _____

                    ROBERT MAJOR

22

     SUBSCRIBED AND SWORN TO BEFORE ME

23   THIS 26th DAY OF ___July___, 20 13.

24

     _____          N/A

25   (NOTARY PUBLIC)          MY COMMISSION EXPIRES:

DONNA J. PARISI, Atty.
Notary Public - State of Ohio
Commission has no expiration date
Section 147.03 O.R.C.
6868