# Exhibit 7

Page 1

1

2              UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF NEW YORK

4   IN RE:                      )
    RESIDENTIAL CAPITAL, LLC,    )Civil Action No.
5   et al.,                      )12-12020 (MG)
                    Debtors,     )
6   ------------------------------)

7

8

9

10

11

12       CONFIDENTIAL DEPOSITION OF JEFFREY A. LIPPS

13              New York, New York

14            Tuesday, July 23, 2013

15

16

17

18

19

20

21

22

23

24   Reported by:
     JOMANNA DeROSA, CSR
25   JOB NO. 64088

## Page 2

1
2       July 23, 2013
3       10:00 a.m.
4
5
6       Confidential Deposition of
7   JEFFREY LIPPS, held at the offices
8   of McKool Smith, One Bryant Park,
9   New York, New York, before Johanna
10  DeRosa, a Certified Shorthand Reporter
11  and Notary Public of the States of
12  New York, New Jersey, California
13  and Arizona.
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2   A P P E A R A N C E S :
3
4       MORRISON & FOERSTER
5           Attorneys for Debtors
                1290 Avenue of the Americas
                New York, New York 10104
6       BY:   CHARLES KERR, ESQ.
                ROBERT BAEHR, ESQ.
7
8       CARPENTER LIPPS & LELAND
            Attorneys for Debtors
                280 Plaza
9               280 North High Street
                Columbus, Ohio 43215
10      BY:   DAVID BECK, ESQ.
11      JONES DAY
            Attorneys for FGIC
12              222 East 41st Street
                New York, New York 10017
13      BY:   MICHAEL THAYER, ESQ.
14      WILLKIE FARR & GALLAGHER
            Attorneys for Stonehill, Monarch, CQS, and
15      Bayview Fund Management
                787 Seventh Avenue
16              New York, New York 10019
        BY:   EMMA JAMES, ESQ.
17              PIA WILLIAMS, ESQ.
18      KRAMER LEVIN NAFTALIS & FRANKEL
            Attorneys for Official Committee of
19      Unsecured Creditors
                1177 Avenue of the Americas
20              New York, New York 10036
        BY:   PHILIP KAUFMAN, ESQ.
21
22      ROPES & GRAY
            Attorneys for Steering Committee of
        RMBS Investors
23              800 Boylston Street
                Boston, Massachusetts 02199
24      BY:   ANDREW DEVORE, ESQ.
25

## Page 4

1
2   A P P E A R A N C E S (Continued):
3
4       MCKOOL SMITH
5           Attorneys for Freddie Mac
6               One Bryant Park
7               New York, New York 10036
8       BY:   MICHAEL CARNEY, ESQ.
9
        DECHERT
10          Attorneys for Bank of New York Mellon
                1095 Avenue of the Americas
11              New York, New York 10036
        BY:   JOCELYN HANAMIRIAN, ESQ.
12
        WHITE & CASE
13          Attorneys for Ad Hoc Group of Junior
            Secured Noteholders
14              1155 Avenue of the Americas
                New York, New York 10036
15      BY:   J. CHRISTOPHER SHORE, ESQ.
                VANESSA SODERBERG, ESQ.
16
        ALSTON & BIRD
17          Attorneys for Wells Fargo Bank
                90 Park Avenue
18              New York, New York 10016
        BY:   WILLIAM HAO, ESQ.
19
        SEWARD & KISSEL
20          Attorneys for Law Adventure
                One Battery Park Plaza
21              New York, New York 10004
        BY:   MICHAEL WEITMAN, ESQ.
22              (via telephone)
23
24
25

## Page 5

1       J. LIPPS - CONFIDENTIAL
2   J E F F R E Y   L I P P S, called as a witness,
3       having been duly sworn by a Notary
4       Public, was examined and testified as
5       follows:
6   EXAMINATION BY
7   MS. JAMES:
8       Q.   Mr. Lipps, my name is Emma James
9   from the law firm Willkie Farr & Gallagher, and
10  I'm here today representing Monarch, Stonehill,
11  CQS, and Bayview, some of the parties objecting to
12  Debtors' 9019 motion regarding the Settlement
13  Agreement with FGIC.
14          Are you okay today if I refer to
15  that agreement as the FGIC Settlement Agreement?
16      A.   Certainly.
17          MS. JAMES:  Before we start,
18  perhaps counsel could introduce themselves,
19  counsel in the room.
20          MR. KERR:  Charles Kerr, Morrison &
21  Foerster, on behalf of the Debtors and the
22  witness.
23          MR. KAUFMAN:  Philip Kaufman,
24  Kramer Levin, on behalf of the Creditors
25  Committee.

2 (Pages 2 to 5)

Page 6

1    J. LIPPS - CONFIDENTIAL
2    MR. THAYER:  Michael Thayer, Jones
3    Day, on behalf of Financial Guaranty Insurance
4    Company.
5    MR. DEVORE:  Andrew Devore of Ropes
6    & Gray, Steering Committee of RMBS Investors.
7    MR. BECK:  David Beck on behalf of
8    the Debtors.
9    MR. BAEHR:  Robert Baehr of
10   Morrison & Foerster, on behalf of the Debtors.
11   MR. SHORE:  Chris Shore from White
12   & Case, on behalf of the Ad Hoc Group of
13   Junior Secured Noteholders.
14   MS. SODERBERG:  Vanessa Soderberg
15   from White & Case on behalf of the Junior
16   Secured Noteholders.
17   MR. HAO:  William Hao, Alston &
18   Bird, on behalf of Wells Fargo Bank.
19   MS. HANAMIRIAN:  Jocelyn
20   Hanamirian, Deckert, LLP, representing Bank of
21   New York Mellon.
22   MR. CARNEY:  Michael Carney.  I'm
23   from McKool Smith on behalf of Freddie Mac.
24   MS. WILLIAMS:  Pia Williams,
25   Willkie Farr & Gallagher, on behalf of

Page 7

1    J. LIPPS - CONFIDENTIAL
2    Monarch, Stonehill, Bayview, and CQS.
3    Q.    Mr. Lipps, do you understand that
4    your Declaration that was filed with the Court in
5    connection with Debtors 9019 motion pursuant to
6    Federal Rules of Bankruptcy Procedure 9019 for
7    approval of the Settlement Agreement among the
8    Debtors FGIC, the FGIC trustees, and certain
9    institutional investors has been resubmitted by
10   Debtors in connection with my clients' objections
11   to the 9019 motion?
12   A.    Are you just asking me if I filed a
13   Declaration?
14   Q.    I'm asking if you understand that
15   that Declaration has been submitted as an Expert
16   Declaration in connection with the objections to
17   the 9019 motion?
18   A.    I understand my Declaration has
19   been filed in connection with the 9019.
20   Q.    And, Mr. Lipps, can you tell us
21   what your expert qualifications are?
22   A.    Well, I think I've set forth in the
23   Declaration my experiences.  For purposes of the
24   opinions that I'm offering here, I think my
25   qualifications are based on my experience as a

Page 8

1    J. LIPPS - CONFIDENTIAL
2    commercial litigator for now 32 years.  The last
3    three years of which -- or I guess two years
4    before the filing of the bankruptcy and the year
5    after I have been actively involved with respect
6    to RMBS securitizations, and rep and warranty
7    claims, as well as PLS claims.  So, I have had
8    substantial experience in the area.
9    And as part of my ongoing
10   assistance with the Debtors' counsel, I continue
11   to stay abreast of what is developing in the law
12   with respect to the legal issues, and I have
13   direct experience in terms of representing the
14   Debtors and some of the non-Debtors pre-petition
15   in these cases, and have a very good understanding
16   of what the complexities are in terms of the
17   discovery that will be encountered, as well as the
18   legal issues that you have to confront in these
19   kinds of claims.
20   Q.    So, is it fair that you have
21   submitted a Declaration as an expert in the
22   litigation of complex commercial disputes with
23   specific subject matter expertise in the body of
24   law that is developed in disputes regarding the
25   sale of residential mortgage-backed securities or

Page 9

1    J. LIPPS - CONFIDENTIAL
2    RMBS?
3    A.    It sounds like you're reading that
4    from the Declaration.  That certainly is -- if
5    that's what you've read from it, that is exactly
6    what I said.  That's what I tried to articulate in
7    terms of my qualifications earlier.
8    Q.    And other than your experience that
9    you've just summarized as a lawyer of 32 years,
10   litigating complex commercial disputes, and your
11   three years of experience with RMBS claims, are
12   there any other bases upon which you are holding
13   yourself out as an expert in this matter?
14   A.    I guess the only other bases, and
15   it's embedded within the three years of
16   experience, as I do understand the Debtors.  I
17   understand their processes and procedures, not
18   only in defending them, but also in assisting
19   counsel.
20   So, I have some unique perspectives
21   on the processes, procedures, types of witnesses
22   that would be involved in these RMBS claims, were
23   they to be litigated, and I could take that
24   experience and be able to look at other cases and
25   see whether there are paths that you can get

J. LIPPS - CONFIDENTIAL

1    around the cases or put yourself in the case, if
2    you want to do it. So, you know, I've got to
3    emphasize that I have what I consider to be some
4    unique specific factual knowledge, that it would
5    take years of discovery and interviews and active
6    involvement in litigation, I think, to replicate.
7        Q.    When were you first retained by
8    Residential Capital, LLC or any of its affiliates
9    as counsel?
10       A.    I believe that back in, I'm going
11   to say the '90s, I did some work for RFC when they
12   had their commercial mortgage unit, that I was
13   engaged to represent them on some lender liability
14   cases that they had and some legal disputes
15   related to some portfolios that they had acquired.
16       But that was the commercial
17   division. And then I continued to represent them
18   in that capacity up until they sold off that unit.
19   I can't remember the exact year. It might have
20   been 2004/2005.
21       And then as far as representing
22   Residential Capital, I believe that I was first
23   retained in, say, March or April of 2010, and
24   there were MBIA versus RFC was pending at the

J. LIPPS - CONFIDENTIAL

1    time. New Jersey Carpenters was pending at the
2    time, and the MBIA/GMAC Mortgage case had just
3    been filed. So, those were the three cases I
4    started working on, one which was in the midst of
5    discovery at that point.
6        Q.    So, for the period from 2004 or
7    2005, when you said that the commercial unit --
8    the commercial mortgage unit was sold, through
9    2010, when you said you were retained by ResCap,
10   did you do any work for Residential Capital or any
11   of the Residential Capital affiliates?
12       A.    I guess I should probably take a
13   step back because I've represented GM for many
14   many, many years, and then I also represented
15   GMAC, principally on its auto finance side,
16   handling a lot of major cases for them. And then
17   at some point in time, probably in the 2000s, my
18   firm got retained to assist them in foreclosure
19   actions where the borrowers asserted counterclaims
20   or made direct challenges to the actual loan.
21       So, we had represented them for a
22   number of years, more on one-off type cases, and
23   then at or about the time that I gotten engaged
24   for RMBS litigation we also entered into a

J. LIPPS - CONFIDENTIAL

1    relationship with GMAC Mortgage, where we were
2    defending all of their cases in Ohio that involved
3    counterclaims and/or contested foreclosures.
4        Q.    I believe you stated earlier that
5    when you were retained in connection with the
6    MBIA, the RFC case, that discovery was ongoing?
7        A.    It just started.
8        Q.    It had just started?
9        A.    They had had document production.
10   My firm replaced McGuire Woods, and there were a
11   lot of very contentious disputes at the time with
12   respect to the scope of document production. So,
13   I jumped right in, battling on motions to compel
14   and scheduling issues.
15       But we didn't start depositions
16   until -- the end of 2010 I think is when we first
17   started, maybe the beginning of 2011.
18       Q.    Could you briefly describe your
19   legal education -- educational background?
20       A.    I went to law school at University
21   of Cincinnati in 1978, graduated in 1981. Do you
22   want college?
23       Q.    I don't need college. What did you
24   do after law school?

J. LIPPS - CONFIDENTIAL

1        A.    I joined a firm then called Frost &
2    Jacobs in Cincinnati, and did litigation for them
3    for about six years, and then Jones Day extended
4    me an offer to move from Cincinnati up to
5    Columbus, and I began handling litigation in the
6    Columbus office nationally for Jones Day until
7    1994 when I left and started what's now Carpenter
8    Lipps & Leland.
9        Q.    And that's where you are currently?
10       A.    Correct.
11       Q.    And when was the first time, for
12   any entity, that you were involved in an RMBS
13   litigation?
14       A.    It would be in March or April of
15   2010. I was hired to represent the RFC entity in
16   the MBIA case, the GMAC Mortgage entity in the
17   MBIA case, and then ResCap and the various
18   affiliates involved in the securitizations at
19   issue in the New Jersey Carpenters suit.
20       MS. JAMES: I'm handing to the
21   Court Reporter a document to mark as Exhibit
22   1. And I'll state for the record that this
23   document was filed in the bankruptcy case,
24   Docket No. 3929-4, and it's captioned

Page 14

1        J. LIPPS - CONFIDENTIAL
2    "Declaration of Jeffrey A. Lipps In Support of
3    Debtors' Motion Pursuant to Federal Rules of
4    Bankruptcy Procedure 9019 for Approval of the
5    Settlement Agreement Among the Debtors, FGIC,
6    the FGIC Trustees, and Certain Institutional
7    Investors."
8        (Lipps Exhibit 1 marked for
9    identification.)
10        Q.   Do you recognize this document as
11    your Declaration?
12        A.   It is my Declaration.
13        Q.   Did you write this Declaration?
14        A.   I did.
15        Q.   And your electronic signature
16    appears on page 54.  Is that correct?
17        A.   This version does have an
18    electronic signature.  I think I probably had a
19    wet signature on it that I did on the 7th of June,
20    too.
21        Q.   And when did you begin drafting
22    this Declaration, Mr. Lipps?
23        A.   This particular Declaration, I
24    started working on it, I'm going to say, on May
25    31st.

Page 15

1        J. LIPPS - CONFIDENTIAL
2        Q.   And what caused you to begin
3    drafting this Declaration on May 31st?
4        A.   I met with Debtors' counsel at
5    Morrison & Foerster, and they asked me if I would
6    review the FGIC settlement and offer some opinions
7    with respect to that settlement.
8        Q.   And was May 31st the first date you
9    had been shown the FGIC Settlement Agreement?
10        A.   I believe that's right.
11        Q.   Okay.  When did you first learn
12    that a FGIC Settlement Agreement was being
13    negotiated?
14        A.   I don't know that I could answer
15    that because I don't know that I knew a FGIC
16    Settlement Agreement was being negotiated until I
17    was asked to come to New York, and have the
18    meeting with Morrison & Foerster to take on an
19    evaluation of the Settlement Agreement.
20        Q.   And that meeting was on May 31st?
21        A.   That's what I best remember.
22        Q.   And what documents were provided to
23    you in connection with your evaluation of the FGIC
24    Settlement Agreement?
25        MR. KERR:  Objection.  Are you

Page 16

1        J. LIPPS - CONFIDENTIAL
2    talking about that first meeting or overall?
3        MS. JAMES:  I guess I'm talking
4    about the period from May 31 until this was
5    filed on June 7, 2013.
6        A.   Well, as far as at the meeting
7    itself, I was given the FGIC Settlement Agreement.
8    You may or may not know that I had filed a
9    Declaration -- I guess I filed a couple
10    declarations during the course of the bankruptcy.
11    So, I had many other documents that I've looked at
12    over the time period since May 14th of 2012
13    associated with RMBS litigation, private label
14    securities litigation, and costs associated with
15    that litigation.
16        So, I had other declarations that I
17    had that could form a backbone for this, and there
18    were documents that were referenced in there.  But
19    as far as any specific document that I was given
20    in connection with the FGIC settlement, it would
21    have just been the Settlement Agreement.
22        Q.   What was the question or the
23    assignment that Morrison & Foerster asked you to
24    address?
25        A.   Well, I think in my Declaration I

Page 17

1        J. LIPPS - CONFIDENTIAL
2    put forward the two issues.  But what I was
3    essentially asked to look at -- I mean, I am
4    familiar with the array of factors that have to be
5    evaluated with respect to the 9019, and I was
6    being asked to provide my opinions with respect to
7    the uncertainty and/or risk associated with
8    prosecuting or defending the various claims that
9    were being asserted initially by FGIC and the
10    litigation that I was involved in representing the
11    various Debtors on, as well as in the proofs of
12    claim.
13        And then I was also asked to offer
14    my view on the complexity of defending and/or
15    prosecuting these cases and the costs and burdens
16    associated with such prosecution or defense.
17        Q.   And those opinions, is it fair to
18    say they're summarized in the two bullet points in
19    your Declaration, appearing on page 2?
20        A.   Correct.  Under legal uncertainty
21    and expensive resolution.
22        Q.   Okay.  And referring to the legal
23    uncertainty opinion, the first sentence there
24    reads:
25        "The liabilities to be released

5 (Pages 14 to 17)

Page 18

J. LIPPS - CONFIDENTIAL

1 under the Settlement Agreement relate to claims
2 that pose unique legal and evidentiary challenges,
3 many of which are not fully developed in a
4 definitive way in the case law to date, and none
5 of which has been litigated to resolution with
6 respect to the Debtors specifically such that
7 there is considerable uncertainty and risk in the
8 outcome."
9        Did I read that correctly?
10       A.   Yes.
11       Q.   Okay. When you refer to the
12 liabilities to be released, what are you referring
13 to?
14       A.   I'm referring to the claims that
15 FGIC has against the Debtors, as well as the
16 claims that the trustees would have against the
17 Debtors on origination matters. I think that's
18 what I'm referring to.
19       Q.   FGIC has filed complaints against
20 the Debtors in connection with these?
21       A.   Pre-petition they filed, I think
22 over several months, 12 different lawsuits.
23       Q.   And you're counsel to the Debtor
24 entities in each of those lawsuits?

Page 19

J. LIPPS - CONFIDENTIAL

1       A.   I was co-counsel with Orrick, with
2 the Orrick law firm, in each of those complaints.
3       Q.   And what's the status of those
4 complaints today?
5       A.   I think it's stayed, if I remember
6 correctly.
7       Q.   And when were those complaints
8 stayed?
9       A.   You know, I have a recollection
10 that FGIC's counsel, given all the swirl of rumors
11 pre-petition, approached us about deferring the
12 pre-motion conference with Judge Crotty that had
13 been scheduled I think pre-petition, and they just
14 said why don't we take an extension and let's see
15 what happens.
16       Everybody had an idea as a date if
17 it came and went without a filing that there may
18 not be a filing. That's what I seem to recall.
19 So, we had informally stated, with the blessing of
20 the Judge, and then once the filing occurred I
21 seem to recall that there was a formal stay that
22 was put on that was of a limited duration, and
23 then it's been extended a couple times.
24       Q.   And when you say pre-petition, you

Page 20

J. LIPPS - CONFIDENTIAL

1 mean the period of time before ResCap filed its
2 Chapter 11 petition?
3       A.   It would have been prior to May
4 14th.
5       Q.   2012?
6       A.   2012.
7       Q.   At the time that those cases were
8 stayed, what progress had been made in connection
9 with discovery?
10       A.   Nothing. We hadn't even answered.
11       Q.   So, there was no progress in
12 connection with the FGIC claims or the FGIC
13 lawsuits?
14       MR. KERR: Objection.
15       MS. JAMES: I'll rephrase it.
16       That's fair.
17       Q.   There had been no progress as to
18 discovery in connection with the FGIC lawsuits
19 filed against Debtors?
20       A.   That's probably fair. I know under
21 the Federal Rules you can't start discovery until
22 after you have your Rule 16 conference, as I
23 recall, and we were going to test the pleadings in
24 various regards with a Motion to Dismiss was our

Page 21

J. LIPPS - CONFIDENTIAL

1 plan at the time, and under Judge Crotty's
2 procedure we had to send a letter and get -- and
3 go through a pre-motion conference. And that's
4 what I referenced before that had been continued,
5 as I recall, prior to May 14th.
6       Q.   If you look at Paragraph 7 of your
7 Expert Declaration, you write that:
8       "I currently represent or have
9 represented, over the past several years, a number
10 of the Debtor entities, including Residential
11 Capital, LLC, Residential Funding Co., and GMAC
12 Mortgage, LLC."
13       And then you say:
14       "Four non-debtor affiliated
15 entities."
16       What do you mean -- what are the
17 names of those non-Debtor affiliated entities that
18 you refer to in Paragraph 7?
19       A.   AFI, Ally Financial, GMAC Holding,
20 Ally Bank, and what's now called Ally Securities,
21 the broker-dealer. Those are the four entities
22 that at different times in different suits I had
23 represented them.
24       Q.   And although these entities are not

Page 22

```
 1            J. LIPPS - CONFIDENTIAL
 2  Debtor-affiliated entities, is it fair to say that
 3  each has some relationship with the Debtor?
 4            MR. KERR:  Objection.
 5       A.   I don't know what you're asking.
 6       Q.   Does AFI, GMAC Holding, Ally Bank,
 7  and Ally Securities have some relationship with
 8  Residential Capital and its affiliated entities?
 9       A.   Well, I have some understanding as
10  to the corporate structure.  I think AFI and GMAC
11  Holding are still the parent -- indirect and
12  direct parent of Residential Capital.  Ally Bank
13  would be, at best, just affiliate, and the same
14  with Ally Securities, at least at the time I was
15  representing them.
16            At one point in time both of those
17  entities were owned either by RFC or GMAC
18  Mortgage, but I don't think at the time of my
19  representation they were in that ownership chain,
20  so they would have been subsidiaries of either
21  GMAC Holdings or Ally Financial.
22       Q.   Your representation of these -- was
23  your representation of these four non-Debtor
24  affiliated entities in connection with RMBS
25  litigation?
```

Page 23

```
 1            J. LIPPS - CONFIDENTIAL
 2       A.   Mostly.  As I said, I have
 3  represented GMAC for many, many years, and GMAC
 4  was renamed to Ally Financial.  So, I've had a lot
 5  of representation with GMAC over the years.
 6            But what I was -- to the extent in
 7  my Declaration I'm talking about RMBS, that would
 8  be -- those would be the only circumstances in
 9  which I was representing those entities, would be
10  in RMBS, other than GMAC, or now known as Ally
11  Financial.
12       Q.   And in Paragraph 8 of your
13  Declaration, toward the end of that paragraph, you
14  write that:
15            "The cases involve claims of
16  breaches of representations and warranties and
17  related claims of alleged failure to repurchase
18  loans pursuant to the terms of the applicable
19  contracts."
20            Is it okay if I refer to these
21  types of cases as reps and warranties cases?
22       A.   Specifically the FGIC/MBIA -- or
23  specifically the 12 FGIC and MBIA suits, sure.
24       Q.   And were the cases for the four
25  non-Debtor affiliated entities also rep and
```

Page 24

```
 1            J. LIPPS - CONFIDENTIAL
 2  warranty cases?
 3       A.   Arguably, yes, with respect to the
 4  FGIC claims.  In the MBIA cases I didn't represent
 5  the non-Debtor affiliated entities because they
 6  weren't sued.  It was only directly MBIA versus
 7  Residential Funding and GMAC Mortgage.
 8       Q.   In Paragraph 7 you also refer to
 9  your representation of several individual former
10  directors and officers of Debtor entities in over
11  a dozen separate lawsuits involving certain Debtor
12  entities issuance of RMBS.
13            Are the cases you're referring to
14  in that part of Paragraph 7 connected to the 12
15  FGIC cases brought against the Debtor?
16       A.   That's part of it.  At one point in
17  time I think pre-petition there were about 17
18  lawsuits that I was counsel of record for Debtors,
19  some combination of Debtors, individual
20  shareholders and/or the non-affiliated entities.
21            The pure rep and warranty claims
22  were really brought by the credit enhancers, MBIA
23  and FGIC.  Most of the other suits were investors
24  in the securities that were bringing any number of
25  claims.
```

Page 25

```
 1            J. LIPPS - CONFIDENTIAL
 2       Q.   In Paragraph 8 you name three
 3  cases.  You refer to a lead case, Financial
 4  Guaranty Insurance Company v. GMAC Mortgage, LLC.
 5            Does that lead case -- is that lead
 6  case in connection with all 12 FGIC cases?
 7       A.   I think it's probably my way of
 8  saying it was the first filed.
 9       Q.   Okay.  But that case -- by
10  referring to that case you're effectively
11  referring to all 12 cases filed by FGIC against
12  the Debtors?
13       A.   I think the sentence refers to 12.
14       Q.   And you also refer to MBIA
15  Insurance Corporation v. Residential Funding Co.,
16  LLC, and MBIA Insurance Corporation v. GMAC
17  Mortgage, LLC.  Is that correct?
18       A.   I do refer to those.
19       Q.   Are those three cases, albeit with
20  one actually referring to 12, all of the -- and
21  you refer to it as pure reps and warranties cases
22  that you have been involved in?
23            MR. KERR:  Objection.
24       A.   In terms of actual lawsuits filed,
25  that is the case.  There were some investors that
```

Page 26

J. LIPPS - CONFIDENTIAL

1    took advantage of the New York procedure that
2    allowed for you to put a party on notice of
3    intention to file a lawsuit, and not actually file
4    the complaint, but just preserve or hold the
5    statute. So, there were some of those that had
6    rep and warranty assertions in it.
7         Well, I don't want to disclose any
8    specific advice that I gave the client
9    pre-petition. I know we were involved in a number
10   of rep and warranty related claims that I think
11   ultimately led to some tolling agreements and
12   things like that.
13        So, in terms of pure rep and
14   warranty lawsuits, yes, that would be the case.
15   But I had advised the counsel -- or advised the
16   client and been involved in looking at other rep
17   and warranty claims that didn't manifest into
18   suits.
19        Q.    And those tolling agreements that
20   the Debtor's entered into with some investors, are
21   they still in place?
22        A.    I don't know.
23        Q.    Were any complaints ever filed in
24   connection with any of those notices?

Page 27

J. LIPPS - CONFIDENTIAL

1         A.    I can't answer that. I really
2    haven't kept up with what has been filed as it
3    relates to the non-Debtor entity since the filing.
4    I transitioned out of at the filing all of my
5    representation of all the Ally entities that were
6    non-Debtors. It took a little bit or time, but I
7    did transition out of that, and I just, frankly,
8    haven't kept track of what they were doing.
9    There's more than enough work to do to assist
10   Morrison and Foerster with respect to analyzing
11   proofs of claim and dealing with the various
12   issues of the bankruptcy.
13        Q.    Okay. Going back to paragraph 8,
14   you said that the FGIC Guaranty Insurance Company,
15   the GMAC lead case, along with the 11 other cases
16   filed in connection with that, are stayed or were
17   stayed pending the Chapter 11 petition.
18        What progress -- in what stage is
19   the MBIA Insurance Corporation V Residential
20   Funding Co. case?
21        A.    At the time of filing of the
22   petition?
23        Q.    Now.
24        A.    It's stayed.

Page 28

J. LIPPS - CONFIDENTIAL

1         Q.    It's stayed as well?
2         A.    An automatic stay stayed it because
3    it was the only against an entity that filed for
4    bankruptcy. I do seem to recall that there may
5    have been an order that was put into the state
6    file by the judge that acknowledged that it was
7    stayed. But I think we filed various notices of
8    bankruptcy in the litigation, and those that were
9    automatically stayed were automatically stayed.
10   Some courts did enter orders.
11        Q.    At the time that the MBIA Insurance
12   Corp. V Residential Funding Co. matter was stayed,
13   what phase was it in?
14        A.    We still had some remaining fact
15   discovery to complete, and the first round of
16   expert reports had been exchanged. And by that I
17   mean, MBIA offered up its five or six expert
18   reports. And on behalf of RFC, we offered up
19   expert reports on affirmative defenses that we had
20   the burden on. Both sides were in the midst of
21   preparing rebuttal reports. I don't think they
22   were due to be exchanged until mid-July, and so at
23   the filing of that, it just stopped.
24        Q.    And you said that MBIA had

Page 29

J. LIPPS - CONFIDENTIAL

1    submitted five or six expert reports.
2         What subjects did those expert
3    reports cover?
4         A.    You're taxing my memory now on
5    that. It's been a long time since I've looked at
6    those.
7         Generally, they covered things like
8    damages. They had a statistician, as I recall, to
9    offer up some opinions on how they could prove
10   violations -- I don't know if it was a pure
11   sample, but they did do some sampling, and they
12   had that as support. There was a servicing
13   expert, and then there was an expert on loan
14   breaches. That's what I recall, as I sit here
15   right now.
16        Q.    And of the RFC expert reports on
17   affirmative defenses, can you recall what
18   affirmative defenses those covered?
19        A.    I can. They covered the housing
20   crisis and they covered the due diligence of MBIA
21   or lack thereof.
22        Q.    The next case in paragraph 12 is
23   the MBIA Insurance Corp. V GMAC Mortgage Corp.,
24   LLC?

8  (Pages 26 to 29)

Page 30

J. LIPPS - CONFIDENTIAL

1
2    A.    You mean in paragraph 8?
3    Q.    Paragraph 8, sorry.  I assume that
4  case was also stayed when the Debtors filed for
5  bankruptcy?
6    A.    Automatic stay stayed it, yes.
7    Q.    And what phase was that litigation
8  in at the time of the stay?
9    A.    We were in fact discovery.  Quinn
10 Emanuel represented MBIA in that case and actually
11 I think the week or so before filing with all the
12 rumors that were swirling around, they cancelled
13 some depositions that they had scheduled.  So
14 let's just take a hiatus, so to speak, and see
15 what happens.  But we were only -- it's hard to
16 say for sure, but I'd say probably about halfway
17 through the fact depositions, maybe a little
18 further.
19    Q.    And no expert reports had been
20 exchanged in that matter?
21    A.    No.  And just so you're aware, I'm
22 probably volunteering, and I shouldn't, but, I
23 mean, the expert phase was under both and both
24 cases was very similar, and it was going to be a
25 very lengthy process.  I think the expert phase

Page 31

J. LIPPS - CONFIDENTIAL

1
2  potentially in the RFC case could have lasted a
3  year because that was at the point in which MBIA
4  was going to disclose at the loan level what its
5  alleged breaches of warranties and reps were.
6  They had resisted answering interrogatories and
7  providing discovery.  And so it was structured in
8  a way that we do the basic fact discovery, and
9  then their actual allegations as individual loans
10 would be disclosed, and then we would have a
11 chance to review those with our underwriting
12 expert and come in and rebut.
13         So depending on how many loans they
14 really wanted to contest, all of them or something
15 less, it was on a rolling period that could go out
16 for a year or more.  A same structure was set in
17 place with GMAC mortgage.  We just didn't get to
18 that point because we were in still in fact
19 discovery.
20    Q.    Other than the pure reps and
21 warranties cases described in paragraph 8 of your
22 declaration, have you been involved in any other
23 reps and warranties cases on behalf of a Debtor
24 affiliated entity or any other entity?
25    A.    For pure reps and warranties

Page 32

J. LIPPS - CONFIDENTIAL

1
2  claims, no.
3    Q.    If I can ask you to take a look at
4  paragraph 14 of your declaration, and I'm looking
5  specifically at the end of that paragraph where
6  you write, "It is my opinion that the settlement
7  of the claims and liabilities released by the FGIC
8  Settlement Agreement would remove a significant
9  risk of an unfavorable legal outcome and the
10 necessity of incurring the significant expense of
11 litigating these claims to final resolution."
12         Did I read that correctly?
13    A.    You did.
14    Q.    What do you mean when you say
15 "would remove a significant risk of an unfavorable
16 legal outcome"?
17    A.    Well, I believe that the claims and
18 liabilities released by the FGIC Settlement
19 Agreement were expressed in quite a few proofs of
20 claims that were filed by both the trustees and
21 FGIC that would have necessitated resolution
22 through some contested proceeding, if you didn't
23 have a settlement.
24    Q.    Referring to the claims brought by
25 FGIC against the Debtor-related entities, the

Page 33

J. LIPPS - CONFIDENTIAL

1
2  suits filed by FGIC against the Debtor, regarding
3  reps and warranties, what's your understanding of
4  the amount of those claims?
5         MR. KERR:  So I'm clear, are you
6  talking about pre-petition claims?
7         MS. JAMES:  I am.  I apologize.  I
8  shouldn't say Debtor.  Against ResCap and
9  ResCap-related entities.
10    A.    I don't think they were quantified
11 a dollar amount.  I don't think we were at that
12 point.
13    Q.    What was your understanding of the
14 exposure of ResCap and ResCap-related entities
15 under these claims?
16         MR. KERR:  Objection.
17         THE WITNESS:  Can I hear that
18 again?
19         (The requested portion of the
20 record was read.)
21    A.    Again, I don't know that I ever got
22 to the point in that case where we quantified
23 anything that would allow me to answer that
24 question other than to indicate that I knew there
25 were 20 some securitizations that were at issue,

Page 34

1         J. LIPPS - CONFIDENTIAL
2    and I can't remember at this point what the total
3    outstanding was on it.
4            You know, FGIC wasn't just pure rep
5    and warranty claims.  They were also asserting a
6    number of tort claims, and they were asserting
7    aiding and abetting claims and trying to pierce
8    the corporate veil.  So from the standpoint of
9    where I sat when I was defending those
10   pre-petition, we were just basically looking at in
11   terms of initial outstanding balances on the
12   securitizations was the outer limits of what we
13   were doing.  Plus, I guess, punitive damages if
14   somebody could prove a fraud claim.
15       Q.   In your expert declaration where
16   you write that the "settlement of claims and
17   liabilities released by the FGIC Settlement
18   Agreement would remove a significant risk," you're
19   not opining as to the monetary amount associated
20   with that risk?
21       A.   What I evaluated was the claims
22   that were being asserted or would be asserted --
23   actually, let me step back.
24           What I was evaluating was the
25   claims that were being released, and I did have

Page 35

1         J. LIPPS - CONFIDENTIAL
2    knowledge of both the claims that had been
3    asserted in the complaints, as well as the proofs
4    of claim, and that is what I was looking at in
5    terms of complexity in offering my opinion on
6    that.
7            Now, there is a little bit of a
8    monetary component because I know what the burdens
9    were in terms of the expense associated with
10   defending a claim.  So to an extent, I am offering
11   some view on cost associated with defending these
12   claims.  But as to the settlement of the legal
13   outcome, no, I'm not opining as to a specific
14   dollar amount.
15           Does that answer what you asked?
16       Q.   It does.  I'm going to ask you a
17   few more questions, if I may.  You just said that
18   you had knowledge of the claims asserted in the
19   Complaint, as well as the proofs of claim.
20           Are you aware of the aggregate
21   amount of those claims asserted in the Complaint,
22   as well as the proofs of claim?
23       A.   Again, I'm not sure an aggregate
24   amount was put in the Complaint, but the proof of
25   claims, obviously, had an aggregate amount.  For

Page 36

1         J. LIPPS - CONFIDENTIAL
2    some reason, I can't remember the exact amount,
3    but it may be somewhere -- I want to say the
4    trustees were asserting claims around eight
5    billion maybe, and five billion was the amount
6    being asserted by FGIC, but I could be off on
7    that.  I just know there's a lot of claims that
8    have been filed that aggregate into numbers that
9    were at least north of a billion.
10       Q.   Going back to your declaration,
11   your second opinion, which is captured in bullet
12   point two on page 2, you discuss the expense of
13   resolution of the claims and liabilities covered
14   by the FGIC Settlement Agreement, and you opine
15   that resolving those claims would be, and I'm
16   quoting, "enormously expensive."
17           Did you put a dollar figure on the
18   expense associated with resolving the claims and
19   liabilities covered by the FGIC Settlement
20   Agreement?
21       A.   I don't think I've ever attached a
22   specific dollar figure to it.
23       Q.   And when you wrote "enormously
24   expensive," did you have a dollar figure in mind?
25       A.   No, there's not a dollar figure

Page 37

1         J. LIPPS - CONFIDENTIAL
2    attached to the use of enormous.  It's my
3    midwestern style.
4        Q.   In considering the concept of the
5    resolution of claims being "enormously expensive,"
6    did you consider that the potential losses that
7    may be incurred by the Debtors, ResCap and its
8    related entities, if it were to lose the cases
9    brought by FGIC?
10           MR. KERR:  Objection.
11       A.   Well, I was aware of what was being
12   claimed in the proofs of claim, and I was also
13   aware of what the outer limits were of -- outer
14   limits based on the securitizations.
15           I think in one of the complaints,
16   just by way of example, FGIC asserted there was a
17   97 percent breach rate.  So you could basically
18   take the initial outstanding balance and take 97
19   percent of that and say that's the outer limit if
20   they're right and they hit.  So to that extent,
21   yes, I was taking into account the outer limits of
22   exposure that could happen.
23       Q.   Could you turn to paragraph 134 of
24   your declaration?  And paragraph 134 appears under
25   a heading Outcomes in Other Monoline Litigations.

10 (Pages 34 to 37)

Page 38

```
1           J. LIPPS - CONFIDENTIAL
2    Do you see that?
3          A.   I do.
4          Q.   Did you consider outcomes in other
5    monoline litigations in connection with your
6    declaration?
7          A.   I don't think my opinions were
8    dependent on what I was seeing in other
9    litigation.  I just wanted for thoroughness and to
10   make sure that the full chain of events that were
11   occurring within the industry were recorded.  But
12   I wasn't making any comparison between any
13   particular settlement and this settlement.
14         Q.   If we can go through the other
15   monoline outcomes, in paragraph 134, you state
16   toward the end, "The only monoline case which has
17   gone to trial resulted in a sizable verdict for
18   the monoline."
19              Which case are you referring to in
20   that paragraph?
21         A.   I think that's the Flagstar case.
22         Q.   That's the case discussed in
23   paragraph 135 of your opinion?
24         A.   Yes.  In the raw dollar amount, I
25   can't remember what it is as I'm sitting here.  In
```

Page 39

```
1           J. LIPPS - CONFIDENTIAL
2    the raw dollar amount, it may not be huge, but as
3    I understand it, they almost got 100 percent of
4    what they were asking, if they didn't get 100
5    percent.  That's what I meant by a substantial
6    verdict.
7          Q.   Was that surprising to you that in
8    that case, the monoline recovered 100 percent or
9    nearly 100 percent of its claims?
10              MR. KERR:  Objection.
11         A.   I didn't study the case to know all
12   of the specifics.  I know some of the differences.
13   And being a confident trial lawyer, I would have
14   expected a different outcome had I been trying it.
15   I think some tactical decisions were made in the
16   course of the litigation that didn't turn out as
17   well as they would have hoped.  The reps are
18   completely different between the reps that you're
19   seeing here and what they were principally relying
20   on in Flagstar.
21         Q.   How are they different?
22         A.   I think Flagstar did have a hard
23   fraud rep to Assured.  And in the area of stated
24   documents, it's just a tougher case to defend with
25   a fraud rep.  And they didn't really contest
```

Page 40

```
1           J. LIPPS - CONFIDENTIAL
2    Assured's diligence, as I recall.  They basically
3    banked the case on being able to discredit
4    Assured's expert, and that didn't work.
5          Q.   And at the end of paragraph 135,
6    you write, "I have, however, considered that
7    adverse outcome in that coming to my opinion that
8    there is a risk of an unfavorable legal outcome if
9    the claims and liabilities released by the FGIC
10   Settlement Agreement were litigated."
11              What did you mean by that?
12         A.   When you're looking at any
13   potential settlement and you're evaluating the
14   complexities and the risks associated with it, you
15   have to take notice of an adverse jury verdict --
16   not adverse.  It wasn't a jury verdict; it was a
17   bench trial.  It was Judge Rycroft.  But you have
18   to take into account how that trier of fact
19   evaluated those issues.  And I weighed it into
20   my -- basically just confirmed and corroborated my
21   own view that there is a lot of uncertainty here
22   and there's risks associated with proceeding to
23   trial.
24         Q.   In paragraph 136, you discuss or
25   you write, "Several of the monolines have also
```

Page 41

```
1           J. LIPPS - CONFIDENTIAL
2    obtained significant monetary payments in
3    settlement of pending or unfiled litigation."  You
4    then refer to two cases, again, in connection with
5    Assured Guaranty Corp.  What is your understanding
6    of these settlements and the claims that were
7    settled pursuant to these settlement agreements?
8          A.   Incomplete.  As I think I noted
9    elsewhere, I was limited to public information.
10   There's not a whole lot of full disclosure, at
11   least at the time that I was doing this on those
12   settlements.  So I was just making note of dollar
13   amounts that were settled and whether they were
14   involving other claims that I couldn't really have
15   visibility into.
16         Q.   And in that paragraph you refer to
17   a settlement for roughly 165 million and another
18   settlement reportedly for 358 million.
19              Do you have an understanding as to
20   what percentage of the initial claims those
21   settlement figures represented?
22         A.   No.
23         Q.   Paragraph 137, you refer to a
24   Syncora Guaranty, Inc. settlement.
25              Do you see that?
```

11 (Pages 38 to 41)

Page 42

1    J. LIPPS - CONFIDENTIAL
2        A.    I do.
3        Q.    And there you write that those
4    claims settled for 375 million, and you finish
5    that paragraph by writing, "Bank of America later
6    publicly announced that the settlement resolved
7    roughly $600 million of outstanding put-back
8    claims against Countrywide."
9            Do you see that?
10       A.    Yes.
11       Q.    That recovery, is it fair to say,
12   is approximately 62, 63 percent of the claims?
13       A.    I don't think it's appropriate to
14   say that. I don't know what percentage ultimately
15   was at issue. I don't know what ultimately was at
16   issue. I haven't been able to delve into it in
17   the public available information to reach a
18   conclusion on whether 375 is 60 percent because I
19   don't know if the base was 600 million. They
20   publicly announced that that resolved roughly 600
21   million. That doesn't mean that's the totality of
22   what was at issue and ultimately settled.
23       Q.    Paragraph 138, you refer to MBIA V
24   Flagstar. Do you see that?
25       A.    Yes.

Page 43

1    J. LIPPS - CONFIDENTIAL
2        Q.    And, again, there's a settlement
3    discussed here for 110 million, and you write, "In
4    that case MBIA initially pled that it had paid
5    more than $165 million in claims arising from
6    Flagstar's alleged breaches of representations and
7    warranties."
8            Do you see that?
9        A.    Yes.
10       Q.    Do you understand there that the
11   settlement of 110 million represented
12   approximately, say, 70 percent of the initial
13   claims?
14           MR. KERR: Objection.
15       A.    I don't know that you can do the
16   math the way you've done that. I think we have
17   two data points. One that they had initially pled
18   that they paid 165 million in claims. Now, that
19   would have been fixed at whatever point in time
20   they made the filing. There, obviously, would be
21   expert testimony on what they expect the future
22   losses to be and the future claims to be paid.
23           So, again, I don't know whether
24   that 165 is the totality of what was involved in
25   settling. And often these involve other exposures

Page 44

1    J. LIPPS - CONFIDENTIAL
2    that are being wrapped up into a global
3    settlement. I don't know if that's the case here.
4    So I don't think you can do the math the way you
5    want to do it.
6        Q.    And then finally you refer to a
7    MBIA settlement against Countrywide for 1.6
8    billion in cash from Bank of America, plus other
9    consideration. Do you see that?
10       A.    I do.
11       Q.    Do you have an understanding as to
12   what percentage of the initial claims that $1.6
13   billion in cash represented?
14           MR. KERR: Objection.
15       A.    No.
16       Q.    And you finish this section by
17   writing, "I have considered these settlements as
18   showing that other defendants facing similar
19   allegations thought they were faced with a
20   significant risk of an adverse outcome if the
21   claims were litigated on the merits."
22           Do you see that?
23       A.    Right.
24       Q.    Do you believe that Debtors or
25   ResCap and ResCap-related entities facing the FGIC

Page 45

1    J. LIPPS - CONFIDENTIAL
2    claims were faced with a significant risk of an
3    adverse outcome if the claims were litigated on
4    the merits?
5        A.    I think that's the whole import of
6    what I've put in my declarations, that there are
7    any number of issues that could result ultimately
8    in an adverse verdict. And that's true on FGIC's
9    claims, as well as the trustee's claims that were
10   being released.
11       Q.    Is it fair to say that's true in a
12   lot of lawsuits?
13           MR. KERR: Objection.
14       A.    No. There are some suits where
15   they shouldn't be filed and they get dismissed
16   very early on, or you have suits that are nuisance
17   settlements. I didn't perceive any of these
18   settlements to be what I would call a nuisance
19   settlement. So their clearly was and should be,
20   given the uncertainty of this law, some attention
21   given to the fact that you are at a risk of an
22   adverse outcome in this space.
23       Q.    You're not saying that any of the
24   FGIC lawsuits were nuisance suits or frivolous
25   suits?

12 (Pages 42 to 45)

Page 46

```
1            J. LIPPS - CONFIDENTIAL
2       A.   We were going to test some of them
3  on a motion to dismiss basis.  So I believed at
4  the time that we had some valid motions to
5  dismiss.  I've been around the block enough to
6  know that motions to dismiss tend to be the first
7  stage that then is followed on with an amended
8  complaint and then another motion and another
9  amended complaint.  So I didn't see any finality
10 that was going to be quickly achieved in this
11 litigation.
12      Q.   None of the arguments that you were
13 considering making in your motions to dismiss
14 involved the notion that FGIC had brought these
15 claims -- let me rephrase.
16           In making your motion to dismiss or
17 considering in making a motion to dismiss, were
18 you considering making the argument that FGIC had
19 brought frivolous claims against ResCap and
20 ResCap-related entities?
21      A.   I did not intend to assert any Rule
22 11 motion.
23      Q.   If these cases brought by FGIC
24 against ResCap and ResCap-related entities are not
25 settled and the stay is lifted, will you continue
```

Page 47

```
1            J. LIPPS - CONFIDENTIAL
2  to act as counsel to the ResCap and ResCap-related
3  entities?
4       A.   I guess we'd have to ask the client
5  that.  I think they were happy with my
6  representation.  But if the case activated again,
7  in front of Judge Crotty, I would probably expect
8  to be representing the Debtor entities.
9            Now, Maher Brown represented the
10 non-Debtor entities in that case.  So if the case
11 gets activated for some reason, I wouldn't be
12 representing those entities.
13      Q.   The expert declaration that you
14 filed in connection with Debtor's 9019 motion is
15 publicly available.  Is that true?
16      A.   Say that again?
17      Q.   Your expert declaration that we're
18 looking at right now, Lipps Exhibit 1, is publicly
19 available.  Is that true?
20      A.   I believe so.  I believe that's a
21 PACER number at the top.
22      Q.   Did you consider the fact that your
23 expert declaration would be available to the FGIC
24 plaintiffs should the FGIC cases continue?
25      A.   I assume that they would have keen
```

Page 48

```
1            J. LIPPS - CONFIDENTIAL
2  interest in anything I say about the litigation.
3       Q.   Did you consider that while writing
4  this expert declaration?
5       A.   No, I was given a specific
6  assignment.  I went about researching on the
7  specific assignment and writing on it.  I didn't
8  worry about any views of others.
9            (Recess taken.)
10      Q.   Mr. Lipps, are you familiar with
11 the order entered in the Bankruptcy Court
12 authorizing the employment and retention of
13 Carpenter Lipps & Leland, LLP as special
14 litigation to the Debtors?
15      A.   I am aware that it was entered.
16 It's been a while since I looked at it.
17           MS. JAMES:  Okay.  I'm handing to
18 the Reporter a document to be marked as Lipps
19 Exhibit 2.  This was filed with the Bankruptcy
20 Court, Docket 907, and it's the order I just
21 referred to.
22           (Lipps Exhibit 2 marked for
23 identification.)
24      Q.   Have you seen this document before,
25 Mr. Lipps?
```

Page 49

```
1            J. LIPPS - CONFIDENTIAL
2       A.   I'm sure I have.
3       Q.   If I could draw your attention to
4  page 2, Paragraph 3, which begins:
5            "As special litigation counsel,
6  CLL, which is Carpenter Lipps & Leland, LLP, is
7  authorized to provide the following services in
8  connection with the Debtors' cases."
9            Do you see that?
10      A.   I do.
11      Q.   Where in this -- the following
12 areas in which you're authorized to provide
13 services does it state that you are authorized to
14 provide expert services?
15           MR. KERR:  Objection.
16      A.   I don't know that those words are
17 specifically in here, but certainly in my judgment
18 it would be subsumed within 3(b).
19      Q.   And that reads:
20           "Assist the Debtors in responding
21 to claims, defenses, or settlement discussions
22 related to PLS litigation of Financial Guaranty
23 Insurance."
24      A.   It goes on:
25           "Including assisting Morrison &
```

13 (Pages 46 to 49)

Page 50

1  J. LIPPS - CONFIDENTIAL
2  Foerster with respect to a motion to stay, motions
3  to approve settlements of liability related to PLS
4  litigation, potential claims that may be made by
5  PLS, investors, trustees, underwriters or
6  Financial Guaranty insurers, and providing advice
7  concerning the Debtors' rights and
8  responsibilities under the transaction documents
9  for these securitizations."
10      Q.   And under 3(b), in connection with
11  your Expert Declaration here, do you believe that
12  you are providing assistance to Morrison &
13  Foerster with this motion?
14          MR. KERR: Objection.
15      A.   Morrison & Foerster asked me to
16  look at the FGIC settlement and see if I could
17  provide some opinions on matters that were
18  pertinent to the 9019.
19      Q.   And they asked you to do that in
20  your role as special litigation counsel?
21          MR. KERR: Objection.
22      A.   I don't think I signed the
23  declaration as special litigation counsel. I was
24  an outlet that was available to them, having been
25  previously approved by the Bankruptcy Court to

Page 51

1  J. LIPPS - CONFIDENTIAL
2  assist them in connection with motions to approve
3  settlements and matters related to PLS litigation.
4      Q.   But your role in the ResCap
5  bankruptcy is as special litigation counsel.
6          Is that fair?
7      A.   It's what my firm was retained to
8  do. In that capacity we've assisted Morrison &
9  Foerster throughout the bankruptcy, and a whole
10  host of activities, all of which have been
11  recorded in our time records and submitted to the
12  Court and approved during the approval process.
13      Q.   When is your third interim request
14  for reimbursement due with the Court, Mr. Lipps?
15      A.   I saw an e-mail about that the
16  other day. I think it's next month.
17      Q.   Did you play any role in drafting
18  the Debtors' 9019 motion in referring to the FGIC
19  settlement?
20          MR. KERR: Objection. Are you
21      talking about the motion itself or -- because
22      you talked about his Declaration.
23          MS. JAMES: I'm sorry. I'm talking
24      about his motion, the Debtors' motion.
25      A.   I saw it after it was filed, but I

Page 52

1  J. LIPPS - CONFIDENTIAL
2  didn't have any role in drafting it. I noticed
3  that my Declaration was referred to throughout, so
4  I guess to that extent I had some involvement in
5  that they used my Declaration in the motion.
6          MS. JAMES: I have no further
7      questions at this time, Mr. Lipps. I believe
8      Mr. Carney has some questions. Thank you.
9  EXAMINATION BY
10  MR. CARNEY:
11      Q.   Good morning. I am Michael Carney
12  from McKool Smith. We represent Freddie Mac.
13      A.   Nice to meet you.
14      Q.   Same here. Have you ever been
15  deposed before?
16      A.   I have.
17      Q.   How many times?
18      A.   I think one time.
19      Q.   And when was that?
20      A.   It was in connection with the 9019
21  for the RMBS Trust Settlement.
22      Q.   And can you describe for me, to
23  your knowledge, why you were deposed in connection
24  with that?
25          MR. KERR: Objection.

Page 53

1  J. LIPPS - CONFIDENTIAL
2      A.   I think you'd probably have to ask
3  the Creditors Committee or I think MBIA at the
4  time. They've asked some questions.
5      Q.   And so, to your understanding, what
6  was the subject of your deposition? Do you have
7  any idea why you were called?
8      A.   Well, sure. I had given a
9  Declaration in support of the 9019 motion for
10  approval of the RMBS Trust Settlement.
11      Q.   And how -- I don't want to go
12  through a line-by-line comparison, but can you
13  tell me how similar, in your review, the substance
14  of that Declaration is, the Declaration you're
15  giving in support of the ResCap settlement?
16          MR. KERR: Objection.
17      A.   I think you'd have to lay the two
18  side-by-side. Certainly one component of the
19  Declaration that I offered in connection with the
20  9019 was to analyze the uncertain state of the law
21  and assess risks associated with prosecuting the
22  claims in the environment of that law.
23          And so, there would be some
24  similarity in terms of identifying the legal
25  issues. I think the law continues to evolve. And

14 (Pages 50 to 53)

Page 54

1    J. LIPPS - CONFIDENTIAL
2  so, I would expect that there's probably some
3  additional cases and additional theories that are
4  contained in the Declaration that's been filed for
5  the FGIC 9019 that were not there in the RMBS
6  Trust Settlement Declaration.
7        Q.    As you sit here today, can you tell
8  me what those differences would be?
9        MR. KERR: Objection.
10       A.    Whatever cases have come out since
11 I filed that Declaration.  I remember in the
12 deposition Mr. Bentley was asking me some
13 questions about -- I think it was a WMC case that
14 had just come out between when I submitted the
15 Declaration and the deposition.
16       And so, that's been written up in
17 this Declaration in a form that was not in my
18 initial Declaration.  I believe there's been some
19 statute of limitations cases that have come out
20 since I filed the Declaration in the RMBS trust
21 litigation relating to whether or not the statute
22 runs from issuance of the securitization or from a
23 repurchase demand.
24       Those are just some examples of
25 some of the case law developments that have

Page 55

1    J. LIPPS - CONFIDENTIAL
2  occurred between those two declarations.
3        Q.    Any others you can think of that
4  would be in this Declaration?
5        MR. KERR:  Objection.  Which
6  Declaration are you referring to?
7        MR. CARNEY:  The 9019 Declaration
8  regarding the FGIC settlement.
9        A.    I mean, I think the basic elements
10 of the claim are the same, and I would expect that
11 the backbone, if you will, of each of those as
12 you're analyzing these RMBS claims would be the
13 same.  It's just there's a more robust discussion
14 as the law develops in certain areas between the
15 two declarations.  And I can't tell you, since
16 it's been a long time since I looked at the RMBS
17 Declaration, what specifically the changes were.
18       Q.    So, to say that there were changes,
19 I understand that you testified the changes were,
20 among other things, changes in the law, case law,
21 and the statutes of limitations.  Is that correct?
22       A.    Well, there's more cases out there.
23 I don't think anything has ever reached an
24 appellate level that I recall, other than the
25 first department ruled on an appeal in the

Page 56

1    J. LIPPS - CONFIDENTIAL
2  MBIA/Countrywide case.  It's been mostly at the
3  trial court level and the magistrate level, and
4  some of the evidentiary decisions that I
5  reference.
6        I think the Flagstar case, for
7  example, did go to trial after I submitted the
8  first Declaration.  And Judge Rycroft may have
9  issued more opinions related to that case that
10 would be discussed in the current Declaration that
11 were not in the original.
12       Q.    So, is it safe to say that the
13 current Declaration -- the Declaration in support
14 of the 9019 motion regarding the FGIC settlement,
15 is it safe to say that that is an update of your
16 previous Declaration in support of the RMBS 9019
17 motion?
18       MR. KERR:  Objection.
19       A.    No, I wouldn't characterize it that
20 way.  I mean, there are portions of this
21 Declaration filed in the FGIC 9019 that would have
22 appeared in the RMBS Trust Settlement Declaration,
23 but the two projects were not identical, and some
24 of the opinions offered in connection with the
25 RMBS Trust are not opinions that are offered here.

Page 57

1    J. LIPPS - CONFIDENTIAL
2  So, I don't think it's fair to say it's an update.
3        Q.    Okay.  Then could we just start out
4  with how were -- how was the project that you were
5  engaged to do with respect to the FGIC settlement
6  different from the project you're engaged to do
7  with the RMBS settlement?
8        A.    Well, what I remember about the
9  RMBS Trust Settlement is I had substantial
10 dialogue with the examiners regarding whether the
11 settlement was within the range of reasonableness
12 and in the best interest of the estate.  That was
13 a specific opinion that I offered in connection
14 with that settlement.  I have not been asked to
15 offer that opinion in this case.
16       Q.    Anything else you can think of?
17       A.    Like I said, it's been a while
18 since I looked at the earlier Declaration.  I
19 certainly, in the earlier Declaration, talked
20 about the risks and uncertainty associated with
21 this area of law and these kinds of claims, and I
22 talked about cost.  So, I can't think of any other
23 differences, in terms of the scope of the project.
24       Q.    So, was there anything in the
25 Declaration, in support of the FGIC settlement

Page 58

1    J. LIPPS - CONFIDENTIAL
2  that we're looking at, this Exhibit 4 in front of
3  you, is there anything in this Declaration that
4  was not in your Declaration in connection with the
5  RMBS settlement?
6        MR. KERR:  Objection.
7        A.    Well, probably a whole lot because
8  in this particular Declaration I'm looking at a
9  different settlement, two different settlement
10 documents.  I was analyzing claims that were
11 asserted specifically by FGIC here.  I certainly
12 had an awareness with FGIC claims in the RMBS
13 settlement, but it was a broader series of
14 claimants that were being considered in the RMBS
15 Trust Settlement.
16       Q.    To your recollection, were you
17 addressing the FGIC and the Trustee's claims in
18 the RMBS Settlement Declaration?
19       A.    I believe some of the FGIC wrapped
20 trusts were in the RMBS Trust Settlement.  I think
21 certainly in my Cost and Expense Declaration I did
22 talk about the FGIC suits, the 12 different suits
23 that have been filed with the securitizations
24 being placed at issue.
25       But I had different release

Page 59

1    J. LIPPS - CONFIDENTIAL
2  language and a different Settlement Agreement that
3  I was looking at.  So, without going back and
4  looking at that earlier Declaration I can't see if
5  the focus was quite the same because this one has
6  specific release language in here with claims that
7  are being released by the Trustees and FGIC that I
8  looked at for this project.
9        Q.    And you wouldn't have looked at
10 those claims in connection with the RMBS
11 settlement project.  Is that safe to say?
12       MR. KERR:  Objection.
13       A.    I mean, to the extent some of the
14 FGIC wrapped trusts were in the RMBS Settlement, I
15 would have at least been aware of those.  But I
16 was looking at the aggregate number.  I wasn't
17 involved in allocating any specific amounts to any
18 particular trust.  I was looking at the aggregate
19 settlement with the number of trusts that were
20 involved over the period of time.
21       Q.    I think Ms. James had asked you
22 earlier in Paragraph 4 of the current Declaration
23 that we're looking at, that the legal uncertainty
24 and the expense resolution, that those are the two
25 primary opinions you're offering in connection

Page 60

1    J. LIPPS - CONFIDENTIAL
2  with this -- in this Declaration.
3        Is that correct?
4        MR. KERR:  Just so we're clear,
5  you're talking about Lipps Exhibit No. 1?
6        MR. CARNEY:  Yes, Lipps Exhibit
7  No. 1.
8        A.    In Paragraph 4, those two bullet
9  points are the overview of my opinions that I'm
10 offering in this Declaration.
11       Q.    And did you offer opinions as to
12 legal uncertainty and expense of resolution in the
13 RMBS Declaration?
14       A.    I expect I probably did.  Again,
15 it's been a while since I've looked at it.
16       Q.    And can you tell me, was the RMBS
17 Declaration admitted as evidence in connection
18 with that Settlement Agreement, the RMBS
19 settlement?
20       MR. KERR:  Objection.
21       A.    I don't think the motion ever went
22 to hearing.  It was submitted.
23       Well, let me take one step back.  I
24 seem to remember in the RMBS Trust Settlement that
25 I also -- that my Declaration in support of the

Page 61

1    J. LIPPS - CONFIDENTIAL
2  motion to extend stay was re-filed and attached to
3  the 9019 motion for the RMBS Trust.  And I know
4  that was accepted by the Court as evidence.  And,
5  in fact, in the one contested proceeding related
6  to the motion to extend stay, Western Southern,
7  the Judge did, in fact, cite favorably and rely on
8  some of my conclusions with respect to the expense
9  of prosecuting and/or defending these cases.
10       MR. CARNEY:  Let me mark this
11 document as Lipps Exhibit 3.  This is the
12 Motion in Limine of the Creditors Committee to
13 Preclude the Expert Testimony of Jeffrey Lipps
14 in Connection With the Debtors' Motion For
15 Approval of the RMBS Trust Settlement
16 Agreements.
17       (Lipps Exhibit 3 marked for
18 identification.)
19       Q.    Have you seen this document before?
20       A.    I have.
21       Q.    And can you describe for me what
22 your understanding of what this document is?
23       A.    It's a motion that the Creditors
24 Committee filed to preclude me from testifying in
25 connection with the RMBS Trust Settlement.

Page 62

J. LIPPS - CONFIDENTIAL
1
2    Q.    And do you recall whether the Court
3  ever ruled on this motion?
4    A.    I don't believe it ever did.
5    Q.    Can you tell me the context of how
6  the -- well, strike that.
7         Can you tell me how -- do you have
8  any idea why the Court wasn't called to rule on
9  this motion?
10        MR. KERR:  Objection.
11        MR. CARNEY:  Let me strike that.
12       Q.    Do you recall why the Court
13  wasn't -- why the Court never ruled on this motion
14  in limine to exclude your --
15       A.    You'll have to ask Judge Glen
16  (phonetic) that question.  I understand that it was
17  fully briefed.  I was preparing to be in
18  attendance at the trial when I think a Plan
19  Support Agreement -- I may get it wrong -- but
20  when a Plan Support Agreement was announced, and
21  it was taken off docket.  The proceeding was taken
22  off docket.  I assume that the Judge has many
23  other things to do other than rule on a motion
24  that's no longer pertinent to a hearing that's
25  been cancelled.

Page 63

J. LIPPS - CONFIDENTIAL
1
2    Q.    So, is it your understanding the
3  reason that this motion in limine was no longer
4  pertinent was on account of the Plan Support
5  Agreement?
6         MR. KERR:  Objection.
7    A.    I don't think I said that.  I said
8  it was fully briefed.  I was preparing to testify,
9  and the proceeding was taken off the docket.
10       Q.    Do you know why the proceeding was
11  taken off the docket?
12       A.    I wasn't involved in any of those
13  discussions.  I just understand that there were
14  various agreements that were reached as part of a
15  plan mediation process.
16       Q.    And why would the fact that those
17  agreements were reached have -- in your view,
18  would have meant that you no longer needed to
19  testify?
20        MR. KERR:  Objection.
21       A.    I can't answer that.  I just know I
22  was told I didn't need to come for a trial.
23       Q.    And the reason you -- I believe you
24  testified the reason that you believe that was
25  because, as you said -- were there various

Page 64

J. LIPPS - CONFIDENTIAL
1
2  agreements that were reached as part of a plan
3  mediation process, and that --
4    A.    That, in my very naive way -- my
5  incomplete understanding, because I wasn't
6  involved in the plan mediation process.  I can't
7  even tell you I knew what -- whether complete
8  agreements were being reached at that time.  I
9  just know that the case -- the proceeding on the
10  RMBS Trust Settlement was taken off docket.
11       Q.    But you were never involved in the
12  mediation process at all, as you said?
13       A.    I did not attend mediation, and I
14  did not participate in negotiations related to it.
15  I would suspect that at various times, as special
16  litigation counsel, we were asked to provide some
17  information to Morrison & Foerster or some views
18  on various things that they may have factored in,
19  in the negotiations, but I don't know any
20  specifics on that.
21         We certainly were continuing to
22  work with Morrison & Foerster in dealing with the
23  various PLS claims that were out there.
24       Q.    Do you recall -- can you tell me
25  what any of those things were, what any of the

Page 65

J. LIPPS - CONFIDENTIAL
1
2  information was you were asked to provide?
3         MR. KERR:  Objection.
4    A.    No, I don't have any specific
5  recall.
6    Q.    But you were asked to provide
7  information regarding the mediation process.
8         Is that correct?
9         MR. KERR:  Objection.  That
10  mischaracterizes his testimony.
11        MR. KAUFMAN:  I object also on the
12  grounds that the order of the Court prohibits
13  disclosure of information relating to the
14  mediation process.
15       Q.    I'm not asking you what information
16  you may have been asked to opine on, but were you
17  asked to give an opinion with respect to the
18  mediation process?
19       A.    No.
20       Q.    And if you can flip in the
21  Creditors Committee motion in limine, there's a
22  deposition transcript in here.  I believe it's on
23  page 36 of 130 -- no, I'm sorry, 27 of 130.
24         Is that the -- does this represent
25  the one time that you've been deposed?

17 (Pages 62 to 65)

Page 66

J. LIPPS - CONFIDENTIAL
1
2    MR. KERR:  Objection.  I think this
3  is a -- I'm not sure this is a
4  complete transcript.
5    MR. CARNEY:  It's not.  It's not.
6  It was what was filed with the motion in
7  limine.
8    Q.   But I'm just asking, does this --
9  does the --
10    A.   I think November 19th of 2012 was
11  the one and only time before today that I had been
12  deposed.
13    Q.   Have you ever appeared as a witness
14  at trial?
15    A.   It depends on how you define
16  "trial."  I certainly was present at the extend
17  stay proceeding in which my Declaration was
18  offered, and I was offered for cross-examination,
19  and the other side decide not to cross-examine me.
20    Q.   Can you tell me what the substance,
21  in your view, of that Declaration was?
22    A.   I believe it's of record.  It was
23  dealing with the cost and expense associated with
24  prosecuting PLS.  And it's probably just PLS
25  claims.  Maybe rep and warranty too.

Page 67

J. LIPPS - CONFIDENTIAL
1
2    Because at that time, if I remember
3  right, you know, the automatic stay was only
4  affecting the Debtors, and there were claims that
5  were against AFI, officers and directors, and Ally
6  Securities.  And motion was made to extend the
7  stay to those entities.  So, part of the Court's
8  consideration was cost and burdens that would be
9  associated with allowing those cases to go
10  forward.
11    Q.   And what was your conclusion in
12  that Declaration?
13    MR. KERR:  Objection.
14    A.   I haven't looked at it in a long
15  time.  What I remember is that I held a similar
16  view, if not identical view, to what I hold today,
17  which is these are very complex cases that involve
18  and will involve a lot of discovery and a lot of
19  expense and burden associated with them.
20    And like I said, the Judge was
21  asked to rule on one of those cases, the Western
22  Southern case, and I think he cited favorably my
23  views on the burdens and expense associated with
24  defending these cases.
25    Q.   To your recollection, did anyone

Page 68

J. LIPPS - CONFIDENTIAL
1
2  oppose the introduction of your Declaration in the
3  extend stay matter?
4    A.   I don't have any memory of anybody
5  standing up and objecting to it.  Like I said, I
6  know at least three of the objectors to that
7  motion indicated that they wanted to cross-examine
8  me.  The Court took a break and two of the three
9  wound up resolving their disagreements with the
10  Debtors on the motion, and then the one that
11  preceded, they decided to forego cross-examining
12  me.
13    Q.   I'm a little confused.  I want to
14  backtrack.
15    Two of them reached an agreement
16  with the Debtor on the substance of their
17  objection.  Is that correct?
18    A.   On the motion to extend stay.
19    Q.   And the other didn't reach an
20  agreement, but simply declined to cross-examine
21  you?
22    A.   Correct.  They went ahead and
23  proceeded to argue the motion, and the Judge
24  issued an opinion on it.
25    Q.   But you have no idea why they

Page 69

J. LIPPS - CONFIDENTIAL
1
2  declined to cross-examine you?
3    A.   I could speculate, but I won't.
4    Q.   But no one actively filed any
5  pleading or introduced something similar to a
6  motion in limine to exclude your Declaration in
7  that instance.  Is that correct?
8    A.   That's correct.
9    Q.   To switch gears, have you hired
10  experts in the past in your law practice?
11    MR. KERR:  Objection.
12    A.   Yes.
13    Q.   Say in the past five years, in what
14  instances can you recall generally that you've
15  hired experts?
16    A.   In the past five years?  I couldn't
17  even begin to tell you how many experts I've hired
18  in the past five years.
19    Q.   But could you tell me generally why
20  you hire experts in your law practice?
21    A.   Usually it is because they can
22  offer opinion testimony that I believe would be a
23  benefit to the trier of fact.
24    Q.   And so, can you give me some
25  examples of instances where you have thought that

Page 70

1    J. LIPPS - CONFIDENTIAL
2  the experts that you've hired could assist a trier
3  of fact?
4        MR. KERR: Objection. In any kind
5    of case?
6        MR. CARNEY: I'm just saying
7    whatever comes to mind.
8        Q.    Just in your knowledge generally.
9  When you hire an expert, in what instances do you
10 hire people, which as you testified, can assist a
11 trier of fact?
12       MR. KERR: Objection.
13       Q.    What are some instances?
14       MR. KAUFMAN: Is this relevant to
15   something?
16       MR. KERR: Yeah. What's the
17   relevance of this?
18       MR. CARNEY: I think it's relevant.
19   And I don't think relevance is an objection.
20   I think he can go ahead and answer.
21       MR. KERR: Okay. But it's your
22   time. You've got four hours. If you want to
23   ask him about unrelated litigation and
24   experts, feel free to do so.
25       MR. CARNEY: No. In his experience

Page 71

1       J. LIPPS - CONFIDENTIAL
2  as an attorney.
3        MR. KERR: Objection.
4        A.   I mean, it's -- you know, it's hard
5  for me to identify because I'm trying to think
6  through all the cases that I've had over the last
7  five years, and, you know, I've had different
8  situations where I've needed experts. I've had
9  cases involving valuation of businesses, and I'll
10 bring in an expert to assist in valuing that.
11       I had the pre-petition MBIA cases,
12 where we felt we wanted to present evidence to the
13 trier of fact on certain affirmative defenses, and
14 I wanted some opinion testimony related to the due
15 diligence or lack thereof by MBIA, and I wanted to
16 have expert testimony with respect to what was
17 happening in the housing market beginning really
18 in mid-2006, but principally what happened in 2008
19 and going forward. Those are just some examples.
20       Q.    Anything else that immediately
21 comes to mind?
22       A.   No.
23       Q.    So, you said that you had experts
24 where you mentioned valuation, the pre-petition
25 MBIA cases to present evidence on certain

Page 72

1       J. LIPPS - CONFIDENTIAL
2  affirmative defenses.
3        What kind of evidence on
4  affirmative defenses did you seek expert testimony
5  in that instance?
6        MR. KERR: Objection. Asked and
7    answered.
8        A.   Well, I think I just told you. It
9  related to MBIA's diligence or lack thereof, as
10 well as providing opinions with respect to the
11 housing market crisis and how that impacted
12 performance on RMBS securitizations.
13       Q.    So, then these were experts that
14 were opining on matters of fact. Is that correct?
15 As I understand it, they were opining on MBIA's
16 due diligence and what they did. Is that correct?
17       A.   Say that again.
18       Q.    When you hired the
19 experts regarding --
20       A.   I hired one to deal with due
21 diligence.
22       Q.    Right. And so, in connection with
23 MBIA's affirmative defenses you hired an expert
24 to, say, look at what MBIA did, as far as due
25 diligence is concerned. Is that correct?

Page 73

1       J. LIPPS - CONFIDENTIAL
2        MR. KERR: Objection.
3        A.   I think that was part of the
4  information that they had available to me. I
5  mean, I can give you another example I just
6  thought of. I've represented Nationwide
7  Insurance, for example, over the years. I've
8  represented GM over the years, as I've said, and
9  there have been class actions where there's been
10 class action settlements. And typically an expert
11 will enter into the case. I've cross-examined a
12 couple of them, but they talk about what the risks
13 were associated with the litigation. So, I mean,
14 I've seen lawyers in the last five years, in the
15 context of class actions, come in and testify and
16 provide some expertise for the Court on
17 uncertainty associated with the claims as they're
18 evaluating the fairness of a class action
19 settlement.
20       Q.    And then when you had experts that
21 were opining on the housing market, that also was
22 a sort of -- a factual point of view of the state
23 of the housing market. Is that correct?
24       MR. KERR: Objection.
25       A.   I don't know that that's correct.

19 (Pages 70 to 73)

Page 74

```
 1            J. LIPPS - CONFIDENTIAL
 2   It's been a while since I looked at it. I think a
 3   regression analysis was done on it with respect to
 4   performance of RMBS -- various RMBS
 5   securitizations, and there was an analysis of some
 6   of the factual analysis of some of the events that
 7   were occurring within the housing market, and some
 8   conclusions that were reached with respect to
 9   impact of underwriting on the performance of those
10   loans or those securitizations.
11        Q.    But was that expert a lawyer?
12        A.    I don't think he had a law degree.
13        Q.    How about the expert that was
14   opining on MBIA's due diligence? Was that expert
15   a lawyer?
16        A.    Yes.
17        Q.    And have you ever hired an expert
18   to opine solely on a legal issue?
19        A.    I don't know that I can answer that
20   question because embedded within it is a potential
21   objection to that testimony if someone is just
22   offering a legal opinion on an ultimate issue in
23   the case. It's hard for me to answer that way. I
24   have used lawyers to offer opinions on various
25   issues that are relevant to various cases, most
```

Page 75

```
 1            J. LIPPS - CONFIDENTIAL
 2   particularly using a lawyer on the MBIA due
 3   diligence.
 4        Q.    And what was the subject -- if you
 5   go a little deeper, what was the subject of that
 6   expert's testimony? What did he or she testify
 7   about -- or, actually, strike that.
 8             Was that expert actually -- did an
 9   expert testify at trial?
10        A.    The case was stayed.
11        Q.    Was there ever an objection to that
12   expert's testimony?
13        A.    No objection was filed prior to the
14   stay.
15        Q.    And that expert was never qualified
16   as an expert in the case?
17        A.    He was clearly qualified.
18        Q.    Did the Court ever qualify him as
19   an expert?
20        A.    It never got to that, before the
21   stay.
22        Q.    So is it fair to say that whether
23   or not -- so that expert was never approved by the
24   Court to testify as an expert?
25        A.    Our expert on MBIA's due diligence
```

Page 76

```
 1            J. LIPPS - CONFIDENTIAL
 2   was not presented to the Court on a qualification
 3   challenge prior to the automatic stay going into
 4   effect.
 5        Q.    And the reason for that was because
 6   the automatic stay, once the Debtors filed, stayed
 7   that case?
 8        A.    You would have to ask my opposing
 9   counsel as to whether or not they ever attempted
10   to challenge the credentials of that witness. I
11   thought he was very well qualified.
12        Q.    My question was: The issue of that
13   witness's qualification as an expert never came up
14   because of the Debtors' bankruptcy filing. Is
15   that correct?
16             MR. KERR: Objection.
17        A.    I don't know that they would have
18   filed a motion. Your question, as I hear it, is
19   assuming that it would have happened but for the
20   filing. I don't know that that's the case. I
21   don't know that they would have challenged him on
22   credentials or the fact that he holds a law
23   degree. He was offering opinions on matters that
24   were pertinent to the case in my judgment,
25   pertinent to our affirmative defense where we had
```

Page 77

```
 1            J. LIPPS - CONFIDENTIAL
 2   the burden.
 3        Q.    But that issue never came up
 4   because of the automatic stay, though. Correct?
 5   It never had a chance to come up because of the
 6   automatic stay?
 7             MR. KERR: What issue are you
 8   talking about?
 9             MR. CARNEY: The witness's
10   qualification in the MBIA due diligence expert
11   testimony we've been talking about where he
12   hired a lawyer.
13        Q.    My question is: That issue of his
14   being qualified or not never had a chance to arise
15   because of the automatic stay. Is that correct?
16             MR. KERR: Objection.
17        A.    I don't know that that's true, but
18   I think once I tender an expert report, they could
19   file a motion if they wanted to.
20        Q.    So did that expert tender a report
21   in that case before the automatic stay took
22   effect?
23        A.    Yes. I think I testified earlier
24   that we had submitted expert reports in the first
25   round in terms of MBIA's affirmative experts, and
```

Page 78

J. LIPPS - CONFIDENTIAL

1
2  I had two affirmative experts on matters that we
3  felt we had the burden of proof on as affirmative
4  defenses.
5        I've been in situations over the
6  years where if I get an expert report, sometimes I
7  want to challenge it right away if I think there's
8  a credential issue or qualification issue rather
9  than spending money getting a rebuttal expert on a
10 matter that I think I can knock them out.  I don't
11 think it's fair to conclude that the automatic
12 stay was the reason there was no challenge because
13 I'm not sure there ever would have been a
14 challenge to his credentials.
15       Q.   Do you always challenge an expert
16 report you don't like once it comes across --
17       A.   There are no alwayses or nevers in
18 this business.
19       Q.   So you may some times; you may not
20 other times?
21            MR. KERR:  Let him answer, then ask
22       your question, all right, so the reporter can
23       get it down and I have time to object.  What's
24       your question?
25       Q.   My question was:  You testified

Page 79

J. LIPPS - CONFIDENTIAL

1
2  that sometimes you challenge an expert report as
3  soon as it comes across your desk.
4        A.   That is one strategic decision that
5  you could make to challenge an expert's
6  credentials or even scope of testimony.
7        Q.   But you don't always do that.  Is
8  that correct?
9        A.   No, I don't always do that when the
10 other side submits an expert report.
11       Q.   Even if you plan to challenge in
12 the future?
13       A.   I don't think you waive anything by
14 waiting until a later point in a case with respect
15 to an expert to challenge him.
16       Q.   So it's a strategic decision?
17       A.   As to whether to challenge
18 credentials and when to challenge credentials, I
19 would agree that's the strategic decision.
20       Q.   I may have asked this, but I don't
21 think I asked it quite in this context.
22            Have you ever been qualified as an
23 expert witness before?
24            MR. KERR:  Objection.
25       A.   Well, I offered opinion testimony,

Page 80

J. LIPPS - CONFIDENTIAL

1
2  like I said, in connection with the extend stay.
3  But in terms of actually having a Court say
4  "you're qualified," other than that situation, I
5  don't think I've ever served as an expert,
6  frankly, before.
7        Q.   And other than the creditors
8  committee's motion in limine to exclude your RMBS
9  declaration we've been discussing, has any expert
10 opinion that you've offered ever been criticized,
11 questioned or objected to --
12            MR. KERR:  Objection.  By any party
13       or litigant?
14            MR. CARNEY:  Start with any party.
15       A.   Well, you could -- it's been a
16 while since I looked at what the objections were
17 to the motion to extend stay.  As I sit here right
18 now, I can't tell you whether somebody was saying
19 these are really inexpensive to defend.  I would
20 be surprised if somebody took that strong of a
21 position.  That would be the only context that I
22 would think of prior to the motion being filed by
23 the creditors committee.
24       Q.   And has any court ever criticized
25 any expert testimony that you've offered?

Page 81

J. LIPPS - CONFIDENTIAL

1
2        A.   I don't think I've ever been
3  criticized by any court in anything I've done on
4  behalf of a client or a party.
5        Q.   Has a Court ever written about any
6  expert testimony you've ever offered?
7            MR. KERR:  Objection.
8        A.   No -- well, again, other than the
9  decision that Judge Glen had on the Western and
10 Southern extend stay.  I believe he cited
11 extensively from my declaration.
12       Q.   And do you plan on testifying at
13 the hearing on the motion to approve the --
14       A.   Let me just add one other thing.  I
15 believe, I can't remember -- well, it would have
16 been post-petition.  I believe I filed a
17 declaration, maybe two, in the FHFA case related
18 to some burden and cost issues associated with
19 discovery of the Debtors in connection with the
20 prosecution of those cases.
21       Q.   Can you describe for me --
22            MR. KERR:  Are you finished?
23            THE WITNESS:  Yes.  I just wanted
24       to give you a complete -- that just sprung to
25       memory that I think I did that.

21  (Pages 78 to 81)

Page 82

```
 1          J. LIPPS - CONFIDENTIAL
 2      Q.   Well, can you tell me -- when you
 3 say "with discovery of the Debtors," what -- can
 4 you tell me the substance of what you were --
 5 well, was that -- were you submitting the
 6 declaration as an expert in that instance or a
 7 fact witness?
 8      A.   I was offering opinion testimony
 9 with respect to the burdens that would be placed
10 upon the Debtors were they to comply with
11 discovery requests that were being directed to the
12 Debtors by FHFA.  Specifically my recollection is
13 loan files.
14      Q.   And were you ever called to testify
15 with respect to that opinion that you put in?
16      A.   I never got up on a witness stand.
17 I certainly had some conversations with Judge Code
18 at various times either on telephone conferences
19 or perhaps at one of the proceedings related to
20 the opinions that I had and the burden.
21      Q.   Were you ever deposed with respect
22 to those?
23      A.   No.
24      Q.   And did anyone ever object to the
25 submission of those declarations?
```

Page 83

```
 1          J. LIPPS - CONFIDENTIAL
 2      A.   Not to my recollection.
 3      Q.   But that was -- but those
 4 declarations purely, as I understand, had to do
 5 with the burden to the Debtors of complying with
 6 the FHFA discovery requests.  Is that correct?
 7      A.   I think that was the specific
 8 issue.  Again, its been a while since I've looked
 9 at that, but I think I had a more robust
10 discussion on discovery in general that could be
11 associated with the prosecution by FHFA of those
12 claims and how that would burden the state based
13 on my experience in defending these cases through
14 discovery.
15      Q.   And what were those claims of the
16 FHFA?
17      A.   I believe they had some Securities
18 Act claims, both federal and perhaps state, and I
19 think they had a common law fraud claim.  The
20 foundation was that there were misrepresentations
21 in the prospectus associated with those offerings
22 and typically they targeted on exactly the same
23 type issues that would arise in the context of rep
24 and warranties, specifically underwriting
25 challenges, appraisal challenges.  I think those
```

Page 84

```
 1          J. LIPPS - CONFIDENTIAL
 2 are the two big ones.  Maybe occupancy was another
 3 one that, I think, FHFA was focusing on.
 4      Q.   So in the FHFA declarations that
 5 you said you submitted, did any part -- did that
 6 declaration -- how many declarations did you
 7 submit in connection with that?
 8      A.   I can recall one, but I'm -- there
 9 may have been two, but I do recall one.
10      Q.   And did you do an analysis similar
11 to the one in the declaration marked as Lipps
12 Exhibit 1 in that declaration?
13          MR. KERR:  Objection.
14      A.   I certainly offer an opinion
15 related to the expenses associated with the
16 discovery.  As part of that, I brought forth the
17 basis for my opinion, which would have involved
18 experiences in defending these cases and having an
19 understanding of how generally discovery would
20 proceed in these kinds of claims involving the
21 issues that were being asserted by FHFA.
22      Q.   And did you discuss the merits of
23 those claims of the FHFA?
24      A.   No, I did not offer any opinions on
25 the merits of the claims or risks associated with
```

Page 85

```
 1          J. LIPPS - CONFIDENTIAL
 2 it.  It was simply discovery based.
 3      Q.   So it was an opinion of the cost of
 4 the discovery process in litigating the claims
 5 FHFA had brought?
 6          MR. KERR:  Objection.  Asked and
 7      answered.
 8      A.   It's been a while since I looked at
 9 it.  I can't remember whether I used the word
10 "cost" or "burden" or both, but it was clearly
11 focused on discovery-related activities and what
12 an imposition it would be on the debtor at that
13 point in the reorganization process.
14      Q.   And do you recall what your
15 conclusions were?
16      A.   I think it was that discovery would
17 be burdensome.
18      Q.   How burdensome?
19          MR. KERR:  Objection.
20      A.   I can't remember.
21      Q.   Enough to cause them to liquidate?
22      A.   No.
23      Q.   So not that bad, but something --
24          MR. KERR:  Objection.
25      A.   Well, the entity was in
```

Page 86

1     J. LIPPS - CONFIDENTIAL
2  reorganization at the time.  It had filed.  And in
3  an environment of limited resources and demands
4  that were placed on the personnel that existed at
5  the company, in my view, as I recall, was it would
6  be burdensome and it would be distracting to the
7  reorganization process to engage the type of
8  people and the resources that would be associated
9  with both the FHFA discovery and the general
10  defense of those cases.
11     Q.   And do you recall what the outcome
12  of that issue was?
13     A.   I knew you were going to ask me
14  that.  I just barely remember, as you know, the
15  declaration.
16     I seem to remember that there was a
17  negotiated resolution of it, and it got a little
18  more complicated because there was the shared
19  services agreement between the Debtors and Ally
20  Financial, and Ally Financial was also a defendant
21  in the case.  So there were unique to Ally
22  Financial possession, custody and control issues
23  and whether or not the Shared Services Agreement
24  gave them an outlet to get to the loan files.
25     What I was looking at it from was

Page 87

1     J. LIPPS - CONFIDENTIAL
2  the pure perspective of if the Debtors had to do
3  it.  And I think ultimately that there was a
4  resolution to it, but I could be wrong.
5     Q.   But, to your knowledge, the Court
6  never opined on the issue?
7     A.   I think she probably opined on it.
8  I just can't remember what it was.
9     Q.   She never issued a formal opinion?
10     A.   What I remember is she said go ask
11  the -- in the context, generally, I think she told
12  the FHFA to go ask for a lift stay from Judge Glen
13  and then depending on your level of satisfaction
14  from that, come back to me.  And there may have
15  been some context in which she withdrew some
16  reference associated with it.  And I think it may
17  actually be on appeal right now to the Second
18  Circuit, some aspect of that.  That's the best
19  memory that I can give you right now.  I haven't
20  gone back and looked at it in probably a year.
21     Q.   But, again, the issue you're being
22  qualified as an expert and you're testifying to
23  those declarations never came up.  That's correct,
24  right?
25     MR. KERR:  Objection.

Page 88

1     J. LIPPS - CONFIDENTIAL
2     A.   They were submitted, and they were
3  never stricken.
4     Q.   Did anyone ever move to strike
5  them?
6     A.   Not that I know of.
7     Q.   Do you plan on testifying at the
8  hearing on the FGIC settlement?
9     A.   I think I'll have to rely on my
10  counsel to decide that.  I suspect that my
11  testimony will be offered.
12     Q.   And, to your knowledge, will the
13  declaration marked as Lipps Exhibit 1, will that
14  be the -- to your understanding, be your direct
15  testimony for the hearing on the 9019 motion on
16  the FGIC settlement motion?
17     MR. KERR:  Objection.
18     A.   Again, it's hard for me to predict.
19  I know in the RMBS trust settlement, I think I
20  filed a supplemental declaration.  There may be
21  issues that counsel asked me to look at as the
22  case continues to develop that may be outside or
23  an expansion of what's in my declaration.  I can't
24  predict at that point.
25     Q.   Let's take out your declaration,

Page 89

1     J. LIPPS - CONFIDENTIAL
2  which, I believe, is Exhibit 1.  Can you -- we
3  have the first two bullet points that we
4  discussed, Legal Uncertainty and Expense Of
5  Resolution.
6     Can you point out to me in your
7  declaration where else your opinions are
8  expressed?
9     A.   Well, I'm sure at various points I
10  had opinion statements throughout the entire
11  discussion.  This was intended to be a summary,
12  and there may have been something at the
13  conclusion.
14     Q.   I understand that this may be a
15  summary.  What I'm trying to get at is what points
16  in this declaration actually set forth your
17  opinion on the 9019 motion?
18     MR. KERR:  Objection.
19     A.   I think the entirety of it does.
20     Q.   Well, there's recitations of fact.
21  You say, in paragraph 16, say with FGIC, as a
22  credit enhancer, typically would have done.  I
23  don't see that as an opinion.  What I want to get
24  at is where are you expressing these opinions that
25  are set forth in these two bullet points.  I want

Page 90

1    J. LIPPS - CONFIDENTIAL
2  to get to the actual paragraphs where you're
3  taking what you summarize here.  So if you want to
4  go through it, we can take a break, but that's
5  what I'd like to know.
6        MR. KAUFMAN:  He just told you that
7    the entirety of it was supportive of the
8    summary at the outset.  What more do you want
9    him to tell you?
10        MR. CARNEY:  Tell me the paragraphs
11    that actually set forth his independent
12    analysis, what his opinion is.
13    A.   It begins in paragraph 15 and
14  continues all the way through on the two issues
15  through paragraph 149.  In order to offer
16  opinions, I have to do some analysis, I have to do
17  some review, and what I've done throughout this is
18  I've let the reader know in the declaration how
19  I've reached the conclusions I've reached and what
20  my thought process was and what various matters I
21  took into account.  So I can't segregate it the
22  way you want it.  The entirety of it is my opinion
23  and what I base it on.
24    Q.   You did segregate it.  You said it
25  through your entire opinion what you base it on.

Page 91

1    J. LIPPS - CONFIDENTIAL
2  I know that you base your opinions on certain
3  facts.  What I'd like to go to is what those
4  opinions are.  You have mostly recitations of the
5  law, the state of the law, and that sort of thing.
6  What I want to get to is where is your actual
7  opinion based on those background facts that
8  you've accumulated?  Where are those in this
9  document?
10        MR. KERR:  Objection.  Asked and
11    answered.  You've been asking him about the
12    opinions in paragraph 4 that are summarized
13    there, and he's told you that the entire
14    declaration supports those.  I don't
15    understand what you're asking about.
16        MR. KAUFMAN:  Do you want to know
17    if the word "opinion" appears somewhere in the
18    document?
19        MR. CARNEY:  No.
20        MR. KAUFMAN:  The document speaks
21    for itself.  You're wasting all of our time
22    with these questions, you really are.
23        MR. CARNEY:  Well, I have my four
24    hours.
25        MR. KAUFMAN:  You're not entitled

Page 92

1    J. LIPPS - CONFIDENTIAL
2  to simply waste time.
3        MR. CARNEY:  I don't think I'm
4    wasting time.
5    Q.   What I'm asking for is other than a
6  recitation of the current state of the law and a
7  recitation of the facts that you've accumulated,
8  other than those two bullet points where is your
9  actual opinion stated here?  That's all I want to
10  get at.
11    A.   The summary of it is in page 2, in
12  the two bullets in paragraph 4.  And throughout
13  the analysis, I am reaching various conclusions
14  and offering opinions that are summarized in those
15  two bullets.  You have the entirety of what I've
16  written here to review.  I can't say that there's
17  any specific opinion versus analysis.  It's -- the
18  entirety of my opinion is in this report.
19    Q.   Okay.  So let me go through this
20  then.  Other than cases that you've accumulated
21  through research, other than facts that you've
22  either researched or have been given to you, other
23  than facts and the law, how is this an opinion and
24  not a legal brief?  That's my question.
25        MR. KERR:  Objection.

Page 93

1    J. LIPPS - CONFIDENTIAL
2    A.   I've offered opinions on the legal
3  uncertainty associated with the claims that are
4  being released in the FGIC settlement, and I've
5  offered opinions with respect to the expensive
6  resolution.  In connection with those, I brought
7  to the table my direct experience with the
8  Debtors.  Both in terms of understanding their
9  specific facts and how that contributes to legal
10  uncertainty and how those specific facts
11  distinguish it from -- or potentially distinguish
12  it from other results, other cases.  And I brought
13  the specific experience on the expense of
14  resolution.
15        So I think this is about as far
16  from a legal brief, frankly, as one can be.
17  Certainly I had to make observations in order to
18  assess the legal uncertainty of what the elements
19  were to a cause of action and make a determination
20  in order to offer an opinion whether there was a
21  dispositive all-encompassing ruling or whether
22  there were various outcomes, various results at
23  any of those issue points.  So that's what the
24  entirety of this declaration is intended to
25  present.

Page 94

1      J. LIPPS - CONFIDENTIAL
2      Q.  So if I hear you correctly, and
3  correct me if I am wrong, you testified just now
4  that you brought -- as I hear it, you brought two
5  things to the table:  Your direct experience with
6  the Debtors, correct, and your experience as an
7  attorney with respect to the expense of
8  litigation?
9        MR. KERR:  Objection.  Asked and
10  answered.
11      Q.  Is that correct?
12        MR. KERR:  Objection.  Asked and
13  answered.  Mischaracterizes his testimony.
14      A.  I've set forth in the section
15  beginning on page 2 my qualifications, and I don't
16  think that it's limited entirely to those two
17  issues.
18      Q.  Okay.  What else is there besides
19  those two, those are the two that you mentioned,
20  other than legal analysis and factual background?
21        MR. KERR:  Objection.
22  Mischaracterizes his testimony.  Go back and
23  read his testimony, Mike.  Come on.
24        MR. CARNEY:  I did.  So I'm asking
25  him.

Page 95

1      J. LIPPS - CONFIDENTIAL
2      Q.  Other than those two things, what
3  else?  Just let me know.
4        MR. KERR:  Objection.
5      A.  Do you want me to read through the
6  qualifications for you?  Look, I've been
7  litigating RMBS-related claims since 2010 for the
8  Debtors, former officers and directors, and
9  certain affiliated non-Debtor entities.  I've been
10  a litigator in commercial matters for 32 years.  I
11  understand as a result of that experience how
12  cases proceed from filing to ultimate disposition
13  either by way of settlement or trial with appeals
14  involved in it.  You have to take it into account
15  when you're trying to assess legal uncertainties.
16      I have firsthand experience in
17  litigating in the RMBS context for the Debtors a
18  number of the issues that are presented in my
19  analysis.  I've looked at what other courts have
20  done in other cases on those issues.  I've tried
21  to understand what the distinctions were between
22  them, and I can only do that by virtue of my
23  experience as a litigator and my experience as
24  somebody specifically on this.
25      I've looked at and lived with for

Page 96

1      J. LIPPS - CONFIDENTIAL
2  years many of the governing documents or governing
3  agreements that tend to be similar from
4  securitization to securitization.  I've had to
5  deal with -- since being appointed as special
6  counsel, I've had to deal with the various proofs
7  of claim that have been filed and assessing those.
8      Q.  So other than being a lawyer, what
9  specialized knowledge do you have that's going to
10  assist the trier of fact?
11        MR. KERR:  Objection.  Just asked
12  and just answered.
13      A.  I can't do any better than I've
14  just given you.
15      Q.  We'll come back to that.
16      How do you think in this sense that
17  you're actually going to assist the trier of fact
18  in deciding whether the 9019 motion meets the
19  standard for approval under bankruptcy Rule 9019?
20        MR. KERR:  Objection.
21      A.  How do you think I'm going to
22  assist?
23      Q.  Yes.
24      A.  I'm going to offer my opinions and
25  hopefully he'll find me credible, and the judge

Page 97

1      J. LIPPS - CONFIDENTIAL
2  will concur with him.  He certainly has, in the
3  context of the motion to extend stay, found my
4  views on burden and expense to be a value to him
5  as he analyzed that issue.
6      Q.  So you're going to offer your
7  opinion then from declaration from your previous
8  testimony.  You're going to offer your opinion on
9  the state of the law.  Correct?
10        MR. KAUFMAN:  His opinion --
11        MR. KERR:  His opinion is stated in
12  the declaration.
13        MR. KAUFMAN:  It's not that he's
14  going to offer it.  He has offered it in
15  Exhibit 1.
16      Q.  Again, if called to assist a trier
17  of fact, you're going to offer through your
18  declaration, one, your opinion on the state of the
19  law.  Is that correct?
20        MR. KERR:  Objection.
21      A.  I don't think that's what I'm
22  doing.  I think what I'm doing is assessing the
23  legal uncertainty associated with the claims that
24  are being resolved in the FGIC settlement.
25      Q.  And to do that --

Page 98

J. LIPPS - CONFIDENTIAL

1
2    A.    To do that you need to survey the
3    law and -- the decisions and the state of the law,
4    and just the infancy stage of it without the
5    appellate rulings on these, depending on state
6    law, I mean, there's a whole a lot of things that
7    contribute to risk associated with prosecuting or
8    defending these claims and contributing to the
9    uncertainty of it.
10            So that's what I've tried to
11   articulate in my declaration, and I would expect
12   that if my counsel asked me to testify either by
13   written direct testimony or from the witness
14   stand, I would offer the same opinions that I've
15   put in my declaration and amplify as they feel is
16   appropriate based on how they question me.
17      Q.    So in your declaration then, that
18   you are -- that you may offer as your direct
19   testimony, your opinion is based on, to begin
20   with, the state of the law?  I keep getting
21   objections to that.
22      MR. KERR:  You know what?  And I'm
23   going to object to that because you're now
24   trying to -- you're not reading his opinions.
25   You're trying to characterize the way you've

Page 99

J. LIPPS - CONFIDENTIAL

1
2    asked and answered that.  He's answer the
3    question.  You want to ask him again, he can
4    keep doing this all day long, but your four
5    hours are being used, Mike.  You've asked your
6    question.  He' answer your question several
7    times now.  This is a waste.
8       MR. CARNEY:  I want him to break --
9       Q.    Can you break your -- then can you
10   tell me, can you break down your declaration into
11   different discreet bullet points of what you've
12   done, please?  I already established that you've
13   analyzed the law.  That's one point.
14            What else have you done?
15       MR. KERR:  Objection.
16   Mischaracterizes his testimony.  Go back and
17   read his testimony.  If you have got a
18   question about specific parts of his
19   declaration, feel free to ask him, but don't
20   mischaracterize his testimony, Mike.  Don't do
21   that.
22       MR. CARNEY:  I'm asking him to give
23   me in subject matter headings what he did,
24   what his opinion is based on.
25       A.    It's in the declaration.

Page 100

J. LIPPS - CONFIDENTIAL

1
2       Q.    Then why can't you tell me?
3       MR. KERR:  He just did.
4       MR. CARNEY:  No, he didn't.
5       A.    You can sit there and see.  There's
6    a summary section to help the reader understand
7    what the summary is of my opinion.  I go through
8    qualifications.  I then go through an overview of
9    potential claims.
10      Q.    Okay.
11      MR. KERR:  Let him finish.
12      A.    Let me finish.
13      Q.    All right.
14      A.    Elements of cause of action
15   focusing on the scope of the reps and warranties
16   generally in those cases or in the documents, and
17   that goes on for several pages.  Then I have an
18   analysis a little deeper of some of the elements
19   of a cause of action starting with existence of a
20   breach, and I identify a number of issues that are
21   relevant to that breach that, in my experience, in
22   defending these cases, as well as knowledge of
23   other cases that are progressing that come up.
24   And we go to the materiality of a breach.  We've
25   got causation, harm and damages, go through some

Page 101

J. LIPPS - CONFIDENTIAL

1
2    of the defenses that are out there that create
3    risk and uncertainties, the statute of
4    limitations, plaintiff's due diligence, and the
5    housing crisis defense.
6            There's some other intervening
7    causes that are associated with the nature of the
8    loans that can cause or contribute to defaulting
9    of loans that would be unrelated to underwriting
10   issues, as well as things you can't underwrite
11   for, like loss of job or death of a spouse or
12   other sicknesses that I've called and identified
13   as intervening causes that affect the risk and
14   uncertainty associated with these cases.
15   Identified some evidentiary issues.  Identified
16   some other litigation that's been going on and
17   resulted in resolution, and then I have a whole
18   section that deals with cost of litigating these
19   claims and how FGIC's claims will be costly.
20       MR. CARNEY:  Can we take a quick
21   break?
22       (Recess taken.)
23       Q.    Let's quickly flip back to your
24   Declaration and then we can move on.
25       MR. KERR:  You're talking about

26 (Pages 98 to 101)

Page 102

1    J. LIPPS - CONFIDENTIAL
2    Exhibit 1?
3         MR. CARNEY:  Yes, Lipps Exhibit 1.
4         Q.   I think before we left you just
5    flipped through it and discussed kind of the
6    subject headings of what it contained.  And I
7    think we had, to begin, a summary of the -- called
8    Summary of Testimony, which that's a summary of
9    the opinion you're offering.  Is that correct?
10        A.   That was what I intended to do in
11   that section.
12        Q.   And some of your qualifications.
13   That describes your career and your history in
14   these cases.  Is that correct?
15        MR. KERR:  Objection.
16        A.   My intention in this section was to
17   provide information that I felt was pertinent to
18   my qualification to offer the opinions I was going
19   to offer.
20        Q.   Now, in the overview of potential
21   claims, other than legal analysis, does anything
22   in this section express your independent opinion?
23        MR. KERR:  Objection.
24        A.   Well, it's all part of my
25   independent opinion.  I've just simply called out

Page 103

1    J. LIPPS - CONFIDENTIAL
2    a section of the Declaration and identified for
3    the reader what I wanted to talk about in that
4    section.
5         Q.   And what did you want to talk about
6    in that section?
7         A.   An overview of the potential
8    claims.
9         Q.   And how did you come by that
10   knowledge?
11        A.   By looking at the FGIC Settlement
12   Agreement, looking at the claims that were going
13   to be released in that Settlement Agreement, by
14   bringing to the process my experience in
15   defending, however brief it was, against the
16   complaints that had been filed by FGIC, as well as
17   the proofs of claim that had been filed by FGIC
18   and the Trustees, and also bringing to the table
19   my experience in the types of claims that had been
20   asserted in these -- in the rep and warranty
21   context.
22        Q.   And in the section "Elements of
23   Cause of Action," beginning with Paragraph 24,
24   where is your independent opinion expressed, other
25   than in this section?

Page 104

1    J. LIPPS - CONFIDENTIAL
2         MR. KERR:  Objection.
3         A.   The Declaration, in its entirety,
4    is my opinion, and the basis for it.  In this
5    section what I wanted to provide to the reader was
6    a discussion of the elements of the causes of
7    action with FGIC and/or the trustees have asserted
8    in pre-petition litigation and proofs of claim,
9    and/or might assert in the context of a
10   prosecution of these claims.
11        Q.   And how did you come by the
12   knowledge that you put forth in this section?
13        A.   Based on my review of the
14   pre-petition litigation that I was defending on
15   behalf of the Debtors brought by FGIC, as well as
16   litigation brought by other credit enhancers
17   and/or investors, an analysis of the proofs of
18   claim, and my experience in defending these cases,
19   and knowledge of what types of elements were
20   necessary to be proven either to prosecute a claim
21   or to defend against it.
22        Q.   And would you agree that the
23   knowledge of what types of elements were necessary
24   to be proven either to prosecute a claim or defend
25   against it is essentially a legal analysis?

Page 105

1    J. LIPPS - CONFIDENTIAL
2         MR. KERR:  Objection.
3         A.   Well, I would agree that elements
4    of cause of action are either part of a statutory
5    cause of action or based on common law decisional
6    authority.  So, to that extent, yeah, there is an
7    identification of legal issues, but, you know, as
8    far as the elements, I think you have to be able
9    to break down the complaint and the proofs of
10   claim, as any litigator would, to try and assess
11   where they're going to have to put on evidence and
12   then understand what the risks are and uncertainty
13   associated with being able to prove those
14   elements.  And then the same with defenses.
15        Q.   And when you say the same with
16   defenses, would your answer change with respect to
17   the additional defenses section beginning on page
18   37?
19        MR. KERR:  Objection.  I don't
20   understand the question.
21        A.   I guess I don't understand it
22   either.  You're asking me if my answer would
23   change?
24        Q.   Yes, with respect to the additional
25   defenses section, as opposed to the elements of

27 (Pages 102 to 105)

Page 106

1       J. LIPPS - CONFIDENTIAL
2    cause of action section.
3          MR. KERR: Objection.
4       A.   Well, what I did in the additional
5    defenses section was, again, identify a number of
6    defenses that I have asserted in defending against
7    these claims, as well as defenses that others have
8    asserted in other cases, to my knowledge.  And
9    then what I did was, again, assess whether there
10   was certainty on resolution of those issues.  And
11   I think almost to an issue I concluded that there
12   was uncertainty and risks associated with banking
13   your case on a particular affirmative defense.
14      Q.   How did you come by knowledge of
15   those defenses listed in that section?
16      A.   Well, I actually asserted those
17   defenses in defending the Debtors in rep and
18   warranty cases that were brought by MBIA.  And as
19   I indicated earlier, at least for two of those
20   defenses I had expert opinions being offered on
21   those defenses.  I've also -- I'm aware of other
22   litigation defended by other law firms in which
23   some variation of those defenses have been
24   asserted.
25      Q.   And did you assert those defenses

Page 107

1       J. LIPPS - CONFIDENTIAL
2    in legal pleadings that you just mentioned?
3       A.   I didn't do the answer in the RFC
4    case.  I think my predecessor counsel did it.  I
5    may have done an answer to the amended complaint.
6    If I did do the answer to the amended complaint,
7    I'm pretty certain that I asserted the housing
8    crisis defense, as well as a lack of due diligence
9    because you can debate on whether in a fraud case
10   justifiable reliance is something that the
11   plaintiff has to prove the absence -- actual --
12   whether they justifiably relied on it or whether I
13   have the burden, as the defendant, to demonstrate
14   that they could not have justifiably relied on it.
15   So, in that area of uncertainty I typically do
16   assert that defense in the pleading.
17         In the GMAC Mortgage case we
18   probably did put it in as an affirmative defense.
19      Q.   And then the outcomes in other
20   monoline litigation section.  How did you come by
21   the -- strike that.
22         What was your objective in this
23   section?
24      A.   Well, in this section -- I mean, it
25   is a fact that there have been a number of these

Page 108

1       J. LIPPS - CONFIDENTIAL
2    RMBS type cases that have settled.  And what I was
3    doing in this section was taking advantage of what
4    public information was available out there to
5    record the settlements that I was aware of.
6         Again, it's incomplete information.
7    And as I discussed earlier, you can't
8    mathematically reach a conclusion on percentages
9    that were involved in these, but what I was trying
10   to demonstrate is that these did not appear to me
11   to be nuisance type settlements.  And, in fact,
12   they were settlements that would have been part of
13   a recognition by the settling parties that there
14   was significant risk for both sides on the claims,
15   and a resolution was reached.
16         So, what that did is corroborate my
17   view that there is substantial uncertainty here,
18   and there's a certain measure of significant risk
19   associated with it from a legal elements and proof
20   standpoint.  You know, I later talk about how the
21   expense factors into it.
22      Q.   And so, is it fair to say that the
23   cases that you cite in this section, "Outcomes In
24   Other Monoline Litigations," actually are -- the
25   reported cases and the cases you've been able to

Page 109

1       J. LIPPS - CONFIDENTIAL
2    locate to date actually favor the monoline
3    insurers?
4         MR. KERR: Objection.
5       A.   No, I don't think I reached that
6    conclusion.
7       Q.   Do you cite a case in this section,
8    "Outcomes and Other Monoline Litigations," that
9    you view as an outcome unfavorable to the monoline
10   insurers?
11      A.   I don't think you can reach a
12   conclusion favorable or unfavorable by looking at
13   these settlements.  I think what you see is
14   settlements that are above nuisance value.  So,
15   both parties were recognizing some risk of an
16   uncertain outcome associated with it, and they, in
17   the context of their individual claims and
18   defenses, reached an accommodation.
19         And presumably each party found
20   something beneficial to them.  What I took from
21   it, as I indicated in here in Paragraph 139, is
22   that I thought they were reflective of similar
23   claims where the litigants had obviously
24   recognized some risk of outcome because there was
25   a settlement that was somewhere between a complete

TSG Reporting - Worldwide 877-702-9580

Page 110

J. LIPPS - CONFIDENTIAL

1
2    defense and victory and a complete plaintiff's
3    victory, and it was above a nuisance.
4        Q.    But that's not really true with
5    Assured Guaranty and Flagstar; is it?
6        A.    I don't understand the question.
7    It sounds like an argument to me.
8        Q.    Well, in Assured Guaranty v.
9    Flagstar, there wasn't a settlement.
10            Is that correct?
11        A.    That one was a trial.  You're
12    right.
13        Q.    And are you aware, other than that
14    case, of any other case that went to verdict,
15    where a monoline insurer did not prevail?
16            MR. KERR:  Objection.
17        A.    I don't think I know of any other
18    case that went to verdict.  So, out of that one
19    case the monoline did prevail.
20            MR. CARNEY:  I'd like to mark as
21        Exhibit 4 -- it's the FGIC settlement at
22        issue.  It's Exhibit 2 to the 9019 motion.
23            (Lipps Exhibit 4 marked for
24        identification.)
25        Q.    Do you recognize this document?

Page 111

J. LIPPS - CONFIDENTIAL

1
2        A.    I have seen it before.
3        Q.    Can you tell me the context --
4    strike that.
5            Can you tell me the first time you
6    saw it?
7            MR. KERR:  Objection.  Asked and
8        answered.
9        A.    I believe, as I testified earlier,
10    I saw it during a meeting on May 31st of this
11    year.
12        Q.    And did you also testify that you
13    considered this in formulating your Declaration
14    that's marked as Exhibit 1?
15            MR. KERR:  Objection.
16        A.    I did review this in connection
17    with offering the opinions that I offered in my
18    Declaration.
19        Q.    Did you consider anything else,
20    other than this Settlement Agreement, other than
21    what we've already talked about, in formulating
22    your Declaration marked as Exhibit 1?
23            MR. KERR:  Other than what we've
24        already talked about.  What he's testified to?
25            MR. CARNEY:  What he's testified

Page 112

J. LIPPS - CONFIDENTIAL

1
2    to.
3        A.    I can't, as I sit here at this
4    moment, think of anything that in the two
5    examinations that I considered that we didn't
6    discuss or at least that I didn't advise you of.
7    Obviously, there's things that are in the
8    Declaration that we haven't discussed.  For
9    example, the governing documents.
10            In various points I do cite
11    provisions from the governing agreements for some
12    of the securitizations, the FGIC wrap.  So, I
13    mean, that's something I don't think we've
14    specifically discussed, but that was something I
15    did look at and take into account.
16        Q.    And you reviewed the governing
17    agreements in connection with your Declaration?
18        A.    At some point I probably reviewed
19    all -- certainly the 20 that were in the initial
20    suits.  And I've looked at other securitizations
21    that are involved in this settlement.
22        Q.    So, what is your understanding of
23    the claims between the ResCap Debtors and FGIC
24    that are being settled or proposed to be settled
25    under this Settlement Agreement marked as, I

Page 113

J. LIPPS - CONFIDENTIAL

1
2    believe, Exhibit 4?
3        A.    Just between FGIC and the Debtors?
4        Q.    For right now, yes.
5        A.    Well, I think all potential claims
6    that they have, including those related to
7    origination and servicing, are being resolved.
8        Q.    Have you reviewed this Settlement
9    Agreement in detail?
10            MR. KERR:  Objection.
11        A.    I've reviewed it, and I've reviewed
12    it in sufficient detail to offer the opinions that
13    I've offered.
14        Q.    So, if you turn to Article 3 on
15    page 6 of the Settlement Agreement, what is your
16    understanding of what FGIC's allowed claims
17    against the ResCap Debtors will be if a settlement
18    is approved?
19        A.    Well, I think my understanding is
20    what it says in Article 3.  Do you want me to read
21    it?  My understanding is what's set forth in
22    Article 3.
23        Q.    Well, do you have an
24    interpretation -- do you have an understanding,
25    other than the actual text of what's set forth in

Page 114

1    J. LIPPS - CONFIDENTIAL
2  Article 3, kind of what's going on, what's going
3  on or proposed to happen?
4        MR. KERR:  Objection.
5        A.   I've read the agreement.  I think I
6  can read English sentences and understand it.  I
7  wasn't involved in negotiating it.  I wasn't
8  involved in understanding what the issues were, if
9  any, that gave rise to the specific language.  So,
10  I don't know if I consider myself an interpretive
11  body on Section 3.01.
12        Q.   But do you have a general idea?
13        A.   As I said, I read the sentences,
14  and I believe I understand, based on those
15  sentences, what the intention is.
16        Q.   And what is your understanding of
17  the intention, based on your reading of those
18  sentences?
19        MR. KERR:  Objection.
20        A.   It's to articulate the amount of an
21  allowed general unsecured claim for various
22  Debtors under at least two potential scenarios.
23        Q.   And do you have an understanding of
24  what those two potential scenarios are?
25        A.   I think one is if there is not a

Page 115

1    J. LIPPS - CONFIDENTIAL
2  plan of reorganization that's approved, and one
3  is -- did I say if not?
4        Q.   You said if not.
5        A.   And then one if it is.
6        Q.   So, what's your understanding if
7  the plan of reorganization isn't approved?
8        MR. KERR:  Objection.
9  Understanding as to what?
10        Q.   Of what FGIC's allowed claims will
11  be against the Debtors under the settlement.
12        A.   If it's approved or if it's not
13  approved?
14        Q.   If it's not approved.
15        A.   Ask me the question again then.
16        Q.   I'll repeat it.
17        What's your understanding of FGIC's
18  allowed unsecured claim against the Debtors if a
19  plan of reorganization is not confirmed?
20        MR. KERR:  Objection.  Mr. Lipps is
21  not here to give opinions about the meaning of
22  3.01.  If you can respond to his question
23  reading the language, feel free, but that's
24  not what he's giving his opinion about, and I
25  think you know that.  So, I object.

Page 116

1    J. LIPPS - CONFIDENTIAL
2        MR. CARNEY:  I just want his
3  understanding.
4        A.   Ask me the question again.
5        Q.   What's your understanding of what
6  happens to FGIC's allowed claim against the ResCap
7  Debtors under the settlement if a plan of
8  reorganization is not confirmed?
9        MR. KERR:  Objection.
10        A.   My understanding is that there is a
11  general unsecured claim in the amount of
12  $596,500,000.  There is no determination, at this
13  point, as to how that will be allocated.  And
14  there are possibilities for FGIC to assert
15  additional claims up to a certain cap amount, and
16  reservation by the Debtors to challenge this.
17        Q.   Do you have any idea of how much
18  cash FGIC will get on account of its $596.5
19  million claim?
20        A.   I have no understanding of any
21  waterfall related to general unsecured claims.
22        Q.   So, you don't know?
23        A.   I don't know how the waterfall
24  would flow on those general unsecured allowed
25  claims.

Page 117

1    J. LIPPS - CONFIDENTIAL
2        MR. CARNEY:  I'm going to mark as
3  Lipps Exhibit 5 -- this is the Order to Show
4  Cause and related documents filed in the
5  Rehabilitation Court.
6        (Lipps Exhibit 5 marked for
7  identification.)
8        Q.   Mr. Lipps, have you seen this
9  document before?
10        A.   I have not.
11        Q.   You have not?
12        A.   I have not.
13        Q.   Okay.  Can you turn to page -- can
14  you turn to three pages into it?  It begins with a
15  caption, and then it says "affirmation."
16        Have you seen that document before?
17        A.   You mean an affirmation by Gary
18  Holtzer?
19        Q.   Yes.
20        A.   No.
21        Q.   Did you review all of the exhibits
22  to the 9019 motion to approve this Settlement
23  Agreement marked as Exhibit 4?
24        A.   As I recall, I reviewed the motion
25  papers itself.  I principally focused on what

Page 118

1          J. LIPPS - CONFIDENTIAL
2  references there were to my Declaration.  I looked
3  at the -- obviously the FGIC Settlement Agreement,
4  which I believe is attached, and I briefly looked
5  at Mr. Kruger's Declaration.
6       Q.   So, you did not look at any of the
7  other declarations?
8       A.   I may have looked at -- is it
9  D'Vari?
10      Q.   Okay.  Anyone else?
11      A.   I don't think I looked at any
12 others.
13           MR. CARNEY:  I'd like to mark this
14 as Lipps Exhibit 6.
15           (Lipps Exhibit 6 marked for
16 identification.)
17      Q.   Do you recognize this document at
18 all as Exhibit 10 to the 9019 motion?
19      A.   I don't recognize it as Exhibit 10
20 to the 9019 motion.  If you're representing it is,
21 I don't have any basis to dispute it.  I did not
22 review it.
23      Q.   Do you understand that the
24 indenture trustees have claims against ResCap?
25           MR. KERR:  Objection.  The

Page 119

1          J. LIPPS - CONFIDENTIAL
2  indenture trustee with respect to the FGIC
3  settlements or just broadly?
4       Q.   With respect to Exhibit 2, the
5  Settlement Agreement that I believe is marked as
6  Lipps Exhibit 4, do you understand that this
7  Settlement Agreement that we're discussing today,
8  which people have been calling the FGIC Settlement
9  Agreement, do you understand that this also
10 settles certain claims of the indenture trustees
11 against the Debtors, the ResCap Debtors.
12           MR. HAO:  Objection to form.
13      A.   I do understand that there is a
14 release of origination-based claims asserted by
15 the Trustees on behalf of the Trust, against
16 Debtors.
17      Q.   And what is your understanding of
18 the nature of such claims?
19      A.   Well, my understanding is based on
20 my experience in defending these rep and warranty
21 claims.  I understand under purchase agreements
22 certain remedies that the Trustees have available
23 to them, and I've seen the proofs of claim filed
24 by the trustees.
25      Q.   That wasn't quite my question.

Page 120

1          J. LIPPS - CONFIDENTIAL
2  What's your understanding of the nature of these
3  claims?  What are they based on?  What are the
4  claims about?
5       A.   Well, I think the Trustees have
6  asserted rep and warranty claims, and they have
7  asserted tort claims.
8       Q.   What kind of tort claims?
9       A.   I seem to recall there may be
10 negligent misrepresentation in there.  Fraud -- I
11 can't remember for certain whether or not aiding
12 and abetting was in there, but I think it may be
13 in piercing the corporate veil.
14      Q.   So, their rep and warranty
15 claims are among those claims, in your
16 understanding.  Is that correct?
17      A.   I think they have asserted some
18 claims that would be available to them for breach
19 of rep and warranty.
20      Q.   And are those claims, to your
21 knowledge, being settled in the Settlement
22 Agreement, the FGIC Settlement Agreement?
23           MR. KERR:  Objection.
24      A.   My understanding is that the
25 origination claims of the trustee -- and that

Page 121

1          J. LIPPS - CONFIDENTIAL
2  would be the loan level rep and warranties -- are
3  being released as part of this settlement, if it's
4  approved.
5       Q.   And do you have an understanding of
6  how those claims are being settled?
7       A.   I don't know what you mean by that.
8       Q.   Do you understand what kind of
9  consideration is going to the Trustees to settle
10 those claims?
11           MR. KERR:  Objection.
12      A.   I mean, I think the Settlement
13 Agreement sets forth what the consideration is for
14 the various parties that are signatories to it.
15      Q.   And do you have an understanding --
16 other than just referring to the actual text of
17 the Settlement Agreement, what's your
18 understanding of how that's done; if you know?
19      A.   Well, my only understanding -- of
20 how what's done?
21      Q.   Of how those claims are being
22 settled under the Settlement Agreement.
23      A.   Well, I think they're being
24 released.  I think there's release language that
25 describes what the trustees are releasing as part

Page 122

1    J. LIPPS - CONFIDENTIAL
2  of the settlement.
3       Q.   And do you have an understanding of
4  what they're receiving on account of those
5  releases?
6       A.   I think from a review of the
7  Settlement Agreement I have an understanding of
8  it.
9       Q.   And what is that understanding?
10      A.   I believe -- if I can reference it,
11 I think there is a payment by FGIC of about 256
12 million -- 253.3 million that I think goes to the
13 Trust, based on an allocation where there's a
14 methodology in the back of the settlement as to
15 how that will be allocated.
16      I understand that there will be a
17 savings going forward for the Trust on premiums
18 that they would otherwise pay for the Financial
19 Guaranty policies.
20      Q.   And is that understanding based on
21 anything other than your own independent reading
22 of the Settlement Agreement?
23      A.   No.  That would be the source of
24 it.
25      Q.   So, no one explained to you how the

Page 123

1    J. LIPPS - CONFIDENTIAL
2  Settlement Agreement works?
3       MR. KERR:  Objection.  You don't --
4  you can answer that question.  I'm not going
5  to have you reveal any privileged
6  communications, if any, but you can answer the
7  question.
8       A.   I reviewed the Settlement Agreement
9  and took from it what I needed to take from it in
10 order to offer the opinions.
11      As I indicated, I had a meeting
12 with Morrison & Foerster on May 31st, and I don't
13 think I'm in a position where I should be
14 disclosing what we may have discussed in that
15 meeting.
16      Q.   Is that on the grounds of
17 privilege?
18      MR. KERR:  Mr. Lipps, as an expert,
19 can testify to communications he had with us
20 in the context as an expert.  I have no
21 problem with that.
22      Mr. Lipps, in his capacity as an
23 expert on this 9019 motion, is free to testify
24 about any communication he had with Morrison &
25 Foerster about his expert opinion, and as a

Page 124

1    J. LIPPS - CONFIDENTIAL
2  basis for that expert opinion.  He has been
3  special counsel for the Debtors, who have
4  since been appointed by the Bankruptcy Court,
5  and I just don't want him to be revealing
6  communications he may have had with the
7  Debtors or Morrison & Foerster outside the
8  context of his role as an expert witness.
9       A.   And the May 31st meeting was not a
10 specific agenda that says FGIC settlement and the
11 project.  There were other things that were
12 discussed related to other issues.  I'm working
13 with the same lawyers on a number of other related
14 matters -- related to the bankruptcy matters.
15      As far as the discussion related to
16 the 9019, they gave me a copy of the Settlement
17 Agreement, and I'm sure that I got, in a very
18 brief overview, some of the essential terms of the
19 agreement, but I don't remember specifically what
20 was told to me.
21      In forming my opinions and offering
22 them here, I based it on my review of the
23 Settlement Agreement.
24      Q.   And I believe you said earlier that
25 you took what you needed from the Settlement

Page 125

1    J. LIPPS - CONFIDENTIAL
2  Agreement to form the opinion in your Declaration.
3       Can you tell me what portions of
4  the Settlement Agreement you used in forming your
5  opinion that you're submitting?
6       A.   Well, I looked at the entirety of
7  it, but the key focus for purposes of what I was
8  offering an opinion on was what claims were being
9  released so that I could understand what the risks
10 and uncertainties were associated with those
11 claims, and what the cost and/or burden would be
12 in prosecuting or defending those claims, which,
13 as you know, was the focus of my opinion.
14      Q.   And can you point me to those
15 sections of the Settlement Agreement that you did
16 specifically rely upon to form your Declaration?
17      MR. KERR:  Objection.
18      A.   Well, again, I read the whole
19 thing.
20      MR. KERR:  He just testified he
21 relied on the whole thing.
22      A.   But, you know, wherever in here
23 there was some discussion of releases of claims
24 and what the scope of the release was, and it's
25 not confined to just one clean little paragraph,

Page 126

1          J. LIPPS - CONFIDENTIAL
2    as I recall, that would be what I would be looking
3    at for purposes of assessing what the risks and
4    uncertainties were associated with those claims.
5          Q.    But sitting here today you can't
6    flip through this and actually tell me
7    specifically what those sections were?
8          A.    Article 2 talks about the releases.
9    And the definition section is important in order
10   to read the release section. I'm sure I would
11   have looked at Article 3 because it talks about
12   allowed claims in the context of the bankruptcy,
13   but I would want to make sure that I had a full
14   understanding of what the claims were that were
15   either subject to or not subject to the release.
16   And I probably would have looked at the conditions
17   preceding the section to see how, if at all, that
18   would impact the claims. I may have looked at the
19   representation section just to see what was being
20   represented by the releasing parties.
21          On a quick glance that's what I
22   probably would have focused on.
23          Q.    All right. Anything else?
24          A.    Well, like I said, I would have
25   read the whole thing, but those are the principal

Page 127

1          J. LIPPS - CONFIDENTIAL
2    sections, I think, that gave me the -- I mean, I
3    would have looked at the listing of the trust, and
4    the suits to see -- because that's part of the
5    scope of the claims.
6          MR. CARNEY:  To the extent we have
7      any left, I will reserve my time, but that's
8      all I have for now.
9          (Recess taken.)
10   EXAMINATION BY
11   MR. SHORE:
12          Q.    Good afternoon.
13          A.    Good afternoon.
14          Q.    I'm Chris Shore from White & Case
15   on behalf of the Ad Hoc Group of Junior Secured
16   Notes.
17          You testified to a May 31 meeting.
18   Prior to that date had anybody talked to you about
19   preparing a Declaration in support of a FGIC
20   settlement?
21          A.    I may have had a brief call or an
22   e-mail just saying we'd like to meet with you.
23   There is a FGIC settlement, and we'd like to have
24   a discussion with you to see if you could offer
25   any opinions to assist in the 9019, but it would

Page 128

1          J. LIPPS - CONFIDENTIAL
2    have been no more than a brief alerting me on what
3    one of the items of the meeting was, and
4    scheduling it.
5          Q.    And where did that meeting take
6    place?
7          A.    At the offices of Morrison &
8    Foerster.
9          Q.    And who was there?
10          A.    I remember Alex. Lawrence was
11   there. Rob Baehr was there. Jim Newton. There
12   was one other associate. I was there with my
13   partner, Jen Battle.
14          Q.    I'm sorry. Her name?
15          A.    Jen Battle, Jennifer Battle.
16          Q.    And how long did the meeting take
17   place?
18          A.    That portion of the discussion that
19   related to FGIC was fairly brief. I would say 15,
20   20 minutes.
21          Q.    What did anybody tell you about
22   what the assignment was?
23          MR. KERR:  And just so we're clear,
24      Chris, as he's testified, there were other
25      aspects. So, this is just the aspect of the

Page 129

1          J. LIPPS - CONFIDENTIAL
2    FGIC settlement. You're free to testify about
3    that. That's fine.
4          Q.    What did anybody tell you about
5    what the assignment was?
6          A.    I had already offered a Declaration
7    that related to the RMBS Trust Settlement. So, I
8    had an expectation going in that they want
9    me to look at uncertainties, risks associated with
10   those claims that were being resolved in the
11   settlement, and I had an expectation that they
12   would ask me to offer some opinions related to the
13   costs associated with it.
14          So, going in I had the expectation
15   that they wanted me to look at the settlement,
16   look at the claims that were being released, and
17   advise them as to whether I could offer some
18   opinions related to that.
19          What I didn't know is whether or
20   not they wanted me to offer an opinion on range of
21   reasonableness or things like that, and in the
22   best interest. And ultimately I did not include
23   that in the report. I certainly have some views
24   on it.
25          Q.    Did they ask you to provide opinion

33 (Pages 126 to 129)

Page 130

J. LIPPS - CONFIDENTIAL

1    J. LIPPS - CONFIDENTIAL
2    testimony on range of reasonableness?
3         A.    No.
4         Q.    And what about best interests?
5         A.    No.  They asked me to offer the
6    opinions I could offer on the matters that I
7    identified.
8         Q.    And did they tell you anything else
9    at that meeting about what the scope of your
10   assignment was?
11        A.    No, I don't think they ever really
12   told me what the scope of the assignment was.  I
13   think we identified the issues that they felt
14   opinion testimony would be helpful on in the
15   context of the 9019, and I defined the scope of
16   what I was going to do from that point going
17   forward.
18        Q.    And did they tell you what the
19   timing was for the assignment?
20        A.    I seem to recall under the
21   Settlement Agreement there was a need for a
22   filing, June 7th.
23        Q.    And did you express any concerns at
24   that meeting with respect to whether you would
25   have enough time to form your independent opinions

Page 131

1    J. LIPPS - CONFIDENTIAL
2    with respect to the matters on which the Debtors
3    wanted you to testify?
4         A.    No.  I had enough time.
5         Q.    Did you keep any record of that
6    meeting?
7         A.    No, other than I think I looked at
8    my calendar book to see when it was.
9         Q.    Are you aware of whether anybody
10   else kept a record of that meeting?
11        A.    No.  I don't know.  By "records"
12   you mean notes?
13        Q.    Sure.
14        A.    No, I didn't take any notes.
15        Q.    Do you know whether Ms. Battle kept
16   any notes?
17        A.    I don't believe she took any notes.
18        Q.    All right.  What did you do next
19   after the meeting with respect to the assignment?
20        A.    I might have gotten lunch, but with
21   respect to the assignment I believe what I did was
22   I read the Settlement Agreement.
23        Q.    Okay.  Who else worked with you on
24   the preparation of your Declaration?
25        A.    I was assisted by Jennifer Battle

Page 132

1    J. LIPPS - CONFIDENTIAL
2    from my office and David Beck from my office.
3         Q.    Anybody from MoFo assist you?
4         A.    No.
5         Q.    And when after the May 31 meeting
6    did you form the opinions that you expressed in
7    what's been marked as Lipps No. 1?
8         A.    Probably over the ensuing three or
9    four days.  I think I had -- I was clearly in the
10   drafting phase by Monday and Tuesday.
11        Q.    And what was Ms. Battle's role in
12   the preparation of Lipps 1?
13        A.    She assisted me in the writing of
14   it.
15        Q.    Did she provide you any facts or
16   other data which you used in forming your
17   opinions?
18        A.    No.
19        Q.    And what about Mr. Beck?  Did he
20   provide you -- what was his role?
21        A.    The same.  He assisted me with the
22   drafting of it and pulling some of the sites and
23   references to cases.
24        Q.    Did he provide you with any facts
25   or other data upon which you formed your opinions?

Page 133

1    J. LIPPS - CONFIDENTIAL
2         A.    No.
3         Q.    So, what did you do in the three to
4    four days following the 5/31 meeting to gather
5    facts and data that you felt were necessary to
6    form your opinions?
7         A.    I reviewed the Settlement
8    Agreement.  I pulled out, once again, the FGIC
9    complaints that have been filed pre-petition.  I
10   reviewed proofs of claim that were filed by FGIC
11   and by the Trustees.
12        Q.    Who gave those to you?
13        A.    I had had them.  I was special
14   counsel.  We'd been reviewing proofs of claim both
15   by monolines and trustees for months.
16        Q.    When you say "we," who is we?
17        A.    My firm and myself in particular,
18   in conjunction with Morrison & Foerster.
19        Q.    Okay.
20        A.    And I did pull out my prior
21   declarations that I'd filed in connection with the
22   RMBS Trust Settlement to see what portions of
23   those would be applicable to my analysis in this
24   case.  And I probably looked at some exemplar
25   governing documents.

Page 134

```
1            J. LIPPS - CONFIDENTIAL
2         I mean, I had pretty intimate
3  familiarity with the second lien documentation,
4  which is a lot of what FGIC was wrapping, both
5  from defending RFC and GMAC Mortgage, as well as
6  through my work as special counsel for the
7  Debtors.
8         But I probably pulled out some
9  exemplars, as I recall, of subprime, which is an
10 alternate, and I think I probably looked at an
11 NCA, a negotiated conduit asset securitization
12 documentation and then some first liens, just to
13 familiarize myself with what the rights were of
14 the monoline as described in those documents, and
15 get a sense of the reps and warranties that were
16 in there.  And, obviously, I had a lot between my
17 ears that I had from my various defense of these
18 cases.
19     Q.   Well, let me see if you can break
20 that down.  How much of your report is based upon
21 what you had between your ears before you got
22 asked to do Lipps No. 1, and how much was based
23 upon review you did in the three or four days
24 after you got the assignment?
25         MR. KERR:  Objection.
```

Page 135

```
1            J. LIPPS - CONFIDENTIAL
2     A.   That's hard to say because much of
3  what I did prior to getting the assignment was
4  useful in putting together the Declaration.  And
5  by that I mean -- very specifically I mean the
6  FGIC complaints, the proofs of claims, the Trustee
7  stuff that I had -- proofs of claims that I'd
8  looked at.  We'd done analysis at various points
9  in time on defenses to monoline claims and things
10 like that.
11        So, I had a lot of materials that I
12 could quickly pick up.  I absorbed what I felt I
13 needed in terms of re-reviewing proofs of claims
14 and things like that over that day period, but,
15 you know, in terms of new stuff, really the only
16 thing probably specifically new that I had not
17 looked at before that date was the FGIC
18 settlement.
19     Q.   Yes.  So, let me maybe ask it this
20 way:  Do you believe that you would have been in a
21 position to reach the conclusions you expressed in
22 Lipps No. 1 in three or four days had you not been
23 special counsel to the Debtors before that date?
24        MR. KERR:  Objection.
25     A.   Probably based on my pre-petition
```

Page 136

```
1            J. LIPPS - CONFIDENTIAL
2  litigation experience.
3     Q.   For the Debtors or in relation to
4  other RMBS?
5     A.   Well, pre-petition they weren't
6  Debtors, but it was the same entities, and then
7  representing non-Debtor affiliated entities and
8  former officers and directors.
9         If you wipe out the time period
10 from May of 2012 to May 31, 2013, I may have had
11 to do a little more research on what the state of
12 the law was, because I would have been going dark
13 if I wouldn't have been special counsel, but by
14 being special counsel and being relied upon to
15 formulate potential grounds for objections and
16 things like that, I kept abreast of the state of
17 the law on some of those issues.
18     Q.   Yeah, let me rephrase my question
19 then.
20        Had you not been counsel to the
21 Debtors or to the entities before they became
22 Debtors, would you have been able to provide the
23 opinions you expressed in Lipps No. 1 based solely
24 upon the work you did after the 5/31 meeting?
25        MR. KERR:  Objection.
```

Page 137

```
1            J. LIPPS - CONFIDENTIAL
2     A.   Well, that's speculative, and it's
3  really hard for me to divorce myself from all the
4  experience that I had since I was retained in
5  2010.
6         So, I really don't know, one,
7  whether they would have come to me to see if I
8  could offer some opinions that would be of value
9  but for the fact that I had this experience in
10 defending the company specifically on RMBS cases
11 and being deeply immersed in that area of the law.
12     Q.   Well, I'm not asking you to
13 speculate.  Can you testify, as a matter of fact,
14 that had you not been employed by ResCap, LLC or
15 any of its affiliates prior to 5/31, that you
16 would have been in a position to file Lipps 1 on
17 June 7?
18        MR. KERR:  Objection.
19     A.   I probably would have taken a
20 little more support than I needed at the time.
21 But I probably could have dug into the law, and
22 based on my experience as a litigator offered some
23 views on expenses and things like that, and legal
24 uncertainties, but it would have taken a lot more
25 research and probably resources in my firm than it
```

Page 138

1    J. LIPPS - CONFIDENTIAL
2  otherwise took.
3       Q.  How much time did your firm spend?
4  So, that's you, Ms. Battle, and Mr. Beck spend on
5  preparing Lipps No. 1?
6       A.  I don't know.  I haven't looked at
7  that.
8       Q.  You don't have any idea?  How much
9  time did you spend?
10      A.  Well, I would have spent part of
11 the afternoon and evening of the 31st looking at
12 the FGIC Settlement Agreement, and I would have
13 worked on it over the weekend.  But I had other
14 things going on at the time, so it's hard for me
15 to segregate it out without going back, looking at
16 the records.  But I probably had a few hours each
17 of Saturday, Sunday, Monday.  You know, Monday and
18 Tuesday may have been more than a few hours.
19      Q.  So, under 20 hours between the time
20 that you got the assignment and the time you
21 formed the opinions that led to -- that are
22 expressed in Lipps No. 1?
23      A.  I can't pin a specific time on it.
24      Q.  Would it be reflected in your time
25 records?

Page 139

1    J. LIPPS - CONFIDENTIAL
2       A.  It would be.
3       MR. SHORE:  Can we just ask --
4  they're going to have to be disclosed anyway.
5  Can we get the time records associated just
6  with the preparation of the Lipps report for
7  Battle, Beck, and Lipps, please.
8       MR. KERR:  I'll take that under
9  advisement.
10      MR. SHORE:  Okay.
11      Q.  At any time between the 5/31
12 meeting and the filing of Lipps No. 1 did you
13 communicate with anybody at the Debtors, that is
14 an officer, a director, an employee, or Board
15 member?
16      A.  What's the time period?
17      Q.  5/31 and June 7.
18      A.  On any matter?
19      Q.  No, I'm sorry.  With respect to the
20 matters addressed in Lipps No. 1.
21      A.  And who was the universe again?
22      Q.  Anybody that's an officer,
23 director, employee of any of the Debtors.
24      A.  I don't believe so, with one
25 exception.  I may have, or somebody else working

Page 140

1    J. LIPPS - CONFIDENTIAL
2  with me, either Ms. Battle or Mr. Beck, may have
3  had to reach out to somebody at the company to get
4  some of the governing documents.  I don't have all
5  of the hundreds of governing documents necessarily
6  at my fingertips.  So, we may have had to reach
7  out for a couple of those exemplars that I
8  mentioned.
9       Q.  Other than are you aware of any
10 communications?
11      A.  No.
12      Q.  Have you ever spoken to Mr. Kruger
13 directly?
14      A.  At any point in time?
15      Q.  Yes.
16      A.  Sure.
17      Q.  Okay.  Have you ever spoken to
18 Mr. Kruger about the subject matter of Lipps
19 No. 1?
20      A.  That one is a little trickier
21 because I have not discussed with him the actual
22 declaration, the product as it was being developed
23 and finished.  I'm sure that I've had
24 conversations and been in meetings where
25 Mr. Kruger was there where we discussed monoline

Page 141

1    J. LIPPS - CONFIDENTIAL
2  claims, potential defenses to monoline claims;
3  trustee claims, potential defenses to trustee
4  claims.
5       Q.  Did you ever provide any legal
6  advice to Mr. Kruger with respect to the FGIC
7  settlement?
8       A.  No.
9       Q.  Did you provide any legal advice to
10 Mr. Kruger with respect to the claims asserted by
11 FGIC or the trust that are revolved in connection
12 with the FGIC settlement?
13      MR. KERR:  Objection, and you can
14 answer that question yes or no.
15      A.  I would say yes.
16      Q.  And when did you do that?
17      A.  In the course of time since he has
18 been engaged as the CRO, I have been in meetings
19 and conversations with him about claims by
20 securities holders as well as monolines as well as
21 trustees in which I'm certain he's asked my view
22 on certain issues and I've offered my view.
23      Q.  And are you aware of whether any of
24 your advice was used in connection with
25 determining whether or not to enter into the FGIC

Page 142

```
1           J. LIPPS - CONFIDENTIAL
2    Settlement Agreement?
3         A.   I'm not aware of that.
4         Q.   Have you or anyone at your firm
5    represented trusts in connection with RMBS
6    litigation?
7         A.   I don't believe so.
8         Q.   Any monoline insurers?
9         A.   No.
10        Q.   Any security holders of any RMBS
11   trusts?
12        A.   No.
13        Q.   Where are you licensed to practice
14   law?
15        A.   Licensed in the state of Ohio in
16   all courts and in a number of federal courts
17   around the country.
18        Q.   Do you understand that Ohio law
19   governs any of the claims that have been asserted
20   by FGIC or the trusts that are being resolved with
21   the FGIC Settlement Agreement?
22        A.   There could be some Ohio law
23   issues, as I identified in my declaration, with
24   respect to loans and whether or not foreclosed
25   loans are loans that could be subject to
```

Page 143

```
1           J. LIPPS - CONFIDENTIAL
2    repurchase.  That was one specific thing I looked
3    at that could be implicated.  But it's principally
4    New York law in terms of the governing documents
5    and the claims and Minnesota law, I think, has
6    been involved.
7         Q.   And what about any kind of fraud
8    claims or others that are addressed in footnote 3
9    to Lipps No. 1?
10        A.   Well, it could be.  There could be
11   other law that's applicable under the conflict of
12   law principles.
13        Q.   But you haven't done any analysis
14   as to which law would apply to the claims that
15   you're testifying to in connection with Lipps No.
16   1?
17             MR. KERR:  Objection.
18        A.   No, I think -- well, certainly with
19   respect to the FGIC claims, I think it is New York
20   law.
21        Q.   Okay.  And are you aware of whether
22   there are any New York licensed attorneys who
23   would be qualified to provide opinions with
24   respect to claims under New York law that are
25   discussed in Lipps No. 1?
```

Page 144

```
1           J. LIPPS - CONFIDENTIAL
2         A.   That would be speculation on my
3    part, but I assume there probably are other
4    licensed attorneys that could do the analysis that
5    I did.
6         Q.   I think you testified before you
7    were not involved in any way in the mediation
8    process, but you would suspect you or someone at
9    your firm was consulted.
10             What did you mean by that?
11             MR. KERR:  Objection.
12        A.   I understand that at the end of the
13   process that there was resolution that was reached
14   with FGIC, MBIA, certain holders of securities.
15   Before that process, I was involved in consulting
16   with Morrison and Foerster on defenses and
17   potential objections on those claims.  So that's
18   why I say I suspect.  I'm sure they probably took
19   some of my information that I provided and walked
20   into the room, for example.
21        Q.   Do you have any personal knowledge
22   that they did?
23        A.   No, I don't.
24        Q.   Have you ever been involved in any
25   bankruptcy case outside of ResCap?
```

Page 145

```
1           J. LIPPS - CONFIDENTIAL
2         A.   I have.
3         Q.   And what cases were those?
4         A.   When I was at Jones Day, Jones Day
5    was in the Federated bankruptcy down in
6    Cincinnati, and I was one of the litigators that
7    was handling adversary proceedings to the extent
8    they needed litigation help.  I tried a case
9    against Justice on the -- whether takeover
10   expenses needed to be capitalized or whether they
11   could be expensed as ordinary necessary business
12   expenses, and that was important to get the
13   expense in order to restructure the company.
14             I've also been involved in some
15   bankruptcies related, specifically, for example,
16   to GMAC.  I think when it started it was GMAC.
17   But it was related to some odometer rollbacks by
18   one of the lessees on some commercial leases, and
19   that company filed bankruptcy, and we had to
20   proceed on some adversary proceedings associated
21   with that.  And I know I've been in bankruptcy
22   court on adversary proceedings on a few other
23   cases.
24        Q.   Have you ever appeared in a
25   bankruptcy court in connection with RMBS claims?
```

37 (Pages 142 to 145)

Page 146

1         J. LIPPS - CONFIDENTIAL
2         MR. KERR:  Other than --
3         A.   Just in the context of my role as
4    special counsel here.
5         Q.   I want to focus now just on the
6    claims that are being allowed at GMAC Mortgage and
7    at RFC.  I asked you before whether you were asked
8    to opine on the range of reasonableness.
9         Did anybody at MoFo or at the
10   Debtors ask you informally whether you had a view
11   as to whether the claims amounts set forth in the
12   FGIC Settlement Agreement were in the zone of
13   reasonableness as you understood it?
14        MR. KERR:  Objection.
15        A.   Not that I recall.
16        Q.   And did you volunteer in connection
17   with your assignment, your views with respect to
18   whether or not the claims that were allowed fell
19   within some zone of reasonableness?
20        A.   With respect to FGIC, I wouldn't
21   know.
22        Q.   You didn't comment at any time as
23   special counsel as to whether you thought the
24   claims were too high, too low, just right?
25        MR. KERR:  If you're asking him in

Page 147

1         J. LIPPS - CONFIDENTIAL
2    the context in his role as an expert --
3         MR. SHORE:  Let me rephrase the
4    question.
5         Q.   You were special counsel with
6    respect to the FGIC claims prior to the
7    settlement.  Right?
8         A.   In my role as special counsel for
9    the Debtors, I did have an occasion to look at the
10   and consult on the FGIC claims as well as the
11   trustee claims associated with FGIC wrapped trust.
12        Q.   Did you form any views as to what
13   the appropriate level of those claims were?  Yes
14   or no.
15        MR. KERR:  Objection.
16        A.   No.
17        Q.   Well, you said before you had some
18   views as to -- I think you testified before that
19   you had some views with respect to whether the
20   allowed claims fall within the range of
21   reasonableness.
22        A.   But your question you just asked me
23   was bracketed in a different time period.
24        Q.   So as you sit here today do you
25   have views?

Page 148

1         J. LIPPS - CONFIDENTIAL
2         A.   The amount of the allowed claim
3    does fall within the range of reasonableness and
4    is in the best interest of the state to resolve.
5         Q.   But that's not an opinion you
6    expressed in Lipps No. 1?
7         A.   I was not asked to put that into a
8    declaration and provide it to the Court.
9         Q.   And so we're clear, whether you
10   were asked or not, those views are not expressed
11   in Lipps No. 1?
12        A.   I think the opinions that you just
13   asked me about that I offered you are not
14   contained within my declaration, which I believe
15   is marked as Lipps 1.
16        Q.   And so we're clear, as part of your
17   responsibilities in connection with fulfilling
18   your assignment for the preparation of Lipps No.
19   1, you did not express those views to the company,
20   that is the Debtors?
21        A.   What views?
22        Q.   The views that you said that they
23   fall within the range of reasonableness.
24        A.   No, I did not express those views
25   to the company.

Page 149

1         J. LIPPS - CONFIDENTIAL
2         Q.   Do you know what Section 501B of
3    the bankruptcy code is?
4         A.   I've been advised of what it is.
5         Q.   And when were you first advised
6    with respect to Sectio 510B is?
7         A.   Assuming I haven't ever encountered
8    it in some of my other experiences, I know and
9    became fairly familiar with it when AIG filed its
10   subordination motion.  I think it wound up being
11   taken off docket.
12        Q.   And what do you understand Section
13   501B in the bankruptcy code to address?
14        MR. KERR:  Objection.
15        A.   I think it addresses subordination
16   in association with sales of securities.
17        Q.   And do you understand it also to
18   apply to purchase of securities and recision of
19   any purchase or sale of securities?
20        A.   I'd have to look at it to know
21   whether that -- what you just said would be
22   accurate.
23        Q.   What, if any, portion of your
24   report takes into consideration -- of Lipps No. 1
25   takes into consideration the application of

38 (Pages 146 to 149)

1      J. LIPPS - CONFIDENTIAL
2   Section 510B of the bankruptcy code to any of the
3   claims asserted against GMAC M or RFC that are
4   resolved in the FGIC Settlement Agreement?
5      A.   I did not analyze subordination
6   under 510B for purposes of offering my opinions.
7      Q.   Did you analyze any affirmative
8   defenses that any of the Debtors might have by
9   virtue of being Debtors that could be asserted in
10  response to claims that are being settled in the
11  FGIC Settlement Agreement?
12      MR. KERR:  Objection.
13      A.   Either restate that or read it
14  back.
15      Q.   You set forth a number of defenses
16  in Lipps No. 1.
17      A.   Right.
18      Q.   Did you consider at all whether
19  GMAC M or RFC had any other defenses by virtue of
20  there being Debtors in pending bankruptcy cases?
21      A.   I was aware of that by virtue of
22  being in special counsel -- in my special counsel
23  role, and I certainly would know that adds
24  complexity and perhaps even uncertainty -- well, I
25  think it probably does add uncertainty as to how

1      J. LIPPS - CONFIDENTIAL
2   issues like subordination would come out and
3   potential challenges to allocation of claims and
4   different entities.  But it wasn't something I
5   needed to express or write about in my
6   declaration, my view, to offer the opinions I was
7   offering.  I could look at the foundation claims
8   that were being released and that was a sufficient
9   review, in my judgment, to allow me to reach the
10  conclusion I did regarding legal uncertainties.
11      Q.   With respect to the opinion you
12  expressed on the range of reasonableness, which is
13  not included in Lipps No. 1, how much of your
14  opinion with respect to it falling -- the amounts
15  falling within the range of reasonableness took
16  into consideration defenses that the Debtors would
17  have by virtue of being Debtors?
18      MR. KERR:  Objection.
19      A.   I didn't take that into account in
20  reaching what I offered you today as a view on
21  range of reasonableness.
22      Q.   Do you understand what the effect
23  of subordination of claims asserted by FGIC or the
24  trusts would have on their ability to recover on
25  claims?

1      J. LIPPS - CONFIDENTIAL
2      A.   I think I testified before I don't
3   have an appreciation of the waterfall that would
4   be involved and how those numbers, if they were
5   subordinated, would shake out versus not
6   subordinated.
7      Q.   Do you have an appreciation that if
8   a claim at GMAC M or RFC was subordinated to
9   claims of unsecured creditors, that no matter what
10  size of claim that existed, it would get a zero
11  recovery?
12      MR. KERR:  Objection.
13      A.   I have a sense that subordination
14  results in much less if not zero recovery than a
15  nonsubordinated claim.  I, at least, have that
16  appreciation.
17      Q.   Did you ever litigate a proof of
18  claim in a bankruptcy case?
19      A.   Litigate?  I've certainly filed
20  proofs of claim, and I've been involved in
21  discussions that fall off of that, but I don't
22  know that I've ever litigated in the sense of a
23  full-blown hearing or estimation proceeding or
24  something like that related to a proof of claim or
25  proofs of claim.

1      J. LIPPS - CONFIDENTIAL
2      Q.   That was my next question.
3      Have you ever participated in a
4   claims estimation proceeding?
5      A.   No.
6      Q.   So what is your basis for
7   testifying as to the costs of litigating a proof
8   of claim versus litigating a claim asserted in a
9   federal or state court?
10      A.   The basis is experience in these
11  cases with respect to the scope and the range of
12  discovery that is typically necessary and/or
13  requested in these types of claims, and I have the
14  added experience here of FGIC having served, I
15  think, some 117 document requests.  So I can see
16  that the breath and scope of what FGIC had
17  intended to do in discovery was commensurate with
18  what had been experienced in the MBIA cases and
19  what I had observed in other rep and warranty
20  cases.  Obviously, it's -- from my experience as
21  special litigation counsel and in other cases,
22  it's more expedited in the context of a
23  bankruptcy.  That doesn't necessarily mean that
24  the same work isn't done.  It takes more people
25  and more time and the expense is still essentially

Page 154

J. LIPPS - CONFIDENTIAL

1  J. LIPPS - CONFIDENTIAL
2  there.
3      Q.   Well, did you witness the
4  litigation of any RMBS proof of claim in these
5  cases beyond looking at what document requests
6  FGIC presented?
7      A.   I don't know what you mean by
8  witness.
9      Q.   Let's make this clear.  You've
10 never been involved in an actual litigation of a
11 proof of claim in a bankruptcy case.  Right?
12     A.   I believe I testified to that.
13     Q.   And I thought your testimony was
14 that your views with respect to the costs of
15 litigating a proof of claim were based upon
16 witnessing what FGIC had served as far as document
17 requests.
18         Is there anything else that you're
19 relying upon to substantiate your assumption that
20 the litigation of a proof of claim would have the
21 same costs and delay associated with litigating a
22 claim outside of bankruptcy?
23         MR. KERR:  Objection.
24     A.   The proofs of claim themselves.
25     Q.   So we have the document requests

Page 155

1  J. LIPPS - CONFIDENTIAL
2  and the proofs of claim.
3         Anything else that you're relying
4  on to substantiate your assumption?
5      A.   Other than the experience I've
6  talked about in litigating these cases --
7      Q.   Outside of bankruptcy.
8      A.   Right, but you still have the same
9  discovery.  I mean, I will tell you in the context
10 of the creditors committee 2004 requests that
11 started off, I mean, we were replicating a lot of
12 what had already been done in discovery.  So I can
13 see the same thing in terms of scope and breath of
14 what's necessary happening with FGIC requests and
15 the proofs of claim.  It's the same range of
16 claims and the same type of discovery.
17         As I said in the declarations, it's
18 different because I have a little bit of insight
19 into the specific space of this company, and I
20 know that the custodians, for example, that would
21 be associated with FGIC deals are not the same
22 custodians that we dealt with in MBIA.  Just to do
23 a simple e-mail search is going to require
24 restoration, and work associated with that for
25 some 60 custodians is immense.  Then you've got

Page 156

1  J. LIPPS - CONFIDENTIAL
2  the number of loan files which I personally know
3  is more difficult now with the sale of the
4  platform; that you have got some of the loans
5  going to ACH 1 and others, and not always the
6  entire loan file goes there.  So there's the
7  burden and expense associated with that.
8         I have some visibility into some
9  specifics that I know will come into play even in
10 the context of the bankruptcy and will impose
11 costs on the state.
12     Q.   Did you ever prepare a budget for
13 the litigation of a proof of claim?
14     A.   No.
15     Q.   Do you ever prepare a timeline for
16 the litigation of a proof of claim?
17         MR. KERR:  Any proof of claim at
18 all?
19         MR. SHORE:  Yes.
20     A.   I may have in the context of some
21 that I've filed in the past, but I can't recall
22 specifically.
23     Q.   And have you ever prepared a
24 discovery plan for the litigation of a proof of
25 claim?

Page 157

1  J. LIPPS - CONFIDENTIAL
2      A.   I have been involved since I've
3  been special counsel in consulting with Morrison
4  and Foerster regarding discovery plans that would
5  be associated with potential challenges to proofs
6  of claim.
7      Q.   Anything related to RMBS claims?
8      A.   That would be what I was dealing
9  with was PLS and -- or private label securities
10 claims by security holders and RMBS.
11     Q.   And what was your role in those
12 discussions?
13     A.   Meetings and discussions with them
14 and sharing the experiences and advice that I have
15 and providing recommendations on types of
16 discovery to pursue against RMBS and/or PLS proof
17 of claim claimants and assessing whether we file
18 an adversary and seek discovery in that context or
19 whether we try and do it informally or through a
20 2004.
21     Q.   Other than as special counsel to
22 the Debtors, have you ever been involved in
23 preparing a discovery plan for the litigation of a
24 proof of claim?
25     A.   The only other context that I could

TSG Reporting - Worldwide 877-702-9580

Page 158

1      J. LIPPS - CONFIDENTIAL
2  have been is in the Federated case. It's been
3  quite a few years ago. I can't remember all the
4  specifics that I would have been involved in.
5  There may have been some proofs of claim that were
6  substantial enough that we didn't need to talk and
7  plan for discovery, but that's sort of faded from
8  my memory.
9      Q.   And so I take it, it didn't form or
10 help you form any of the opinions that you have
11 expressed in Lipps No. 1?
12     A.   No.
13     Q.   What do you understand claims
14 estimation proceedings to be?
15     A.   I'm not a bankruptcy lawyer, so I
16 may not get it right, but I understand it's part
17 of a plan process. It's an effort to try and
18 establish or estimate an amount that would be set
19 up to deal with a group of claims or potential
20 claims, and I did have -- it's been a while since
21 I've looked at it, but I did have early on in the
22 bankruptcy an opportunity to look at what was
23 occurring in the Lehman case with respect to the
24 estimation of -- I think it was an RMBS claims,
25 actually.

Page 159

1      J. LIPPS - CONFIDENTIAL
2      Q.   And what about -- what, if
3  anything -- let me withdraw that question.
4          In forming the opinions expressed
5  in Lipps No. 1, how did you factor in any
6  knowledge you had with respect to estimation
7  proceedings, if any?
8      A.   As specifically relates to FGIC, I
9  didn't specifically discuss, as you can read,
10 estimation proceedings. I know I became a little
11 bit more familiar with them, and particularly the
12 Lehman, in the context of the declaration that I
13 offered or declarations that I offered in context
14 with the 9019 for the RMBS trust settlement, and I
15 know I offered opinions with respect to costs
16 there. And I didn't find anything associated with
17 the estimating proceeding, something that would
18 cause me to rachet back my views on the
19 estimating -- or on the costs associated with
20 litigating those claims. So I naturally didn't go
21 backwards and try and see if this would affect
22 that. I saw that the scope of discovery would be
23 sufficient, even in a compressed time, and the
24 preparation associated with it, that that cost
25 could be supported -- or my opinion could be

Page 160

1      J. LIPPS - CONFIDENTIAL
2  supported in those costs.
3      Q.   And do you express those views at
4  all in Lipps No. 1?
5      A.   What I've just said?
6      Q.   Yes. That estimation would have no
7  impact on your views with respect to the costs
8  associated with litigating the claims that are
9  resolved in the FGIC Settlement Agreement?
10         MR. KERR: Objection.
11     A.   Well, I still think in the
12 estimation process you have to address these
13 issues. It may be in a more compressed time
14 period, but you still have got the discovery that
15 leads up to it. In my experience, it's fairly
16 massive discovery, and it will be in a more
17 compressed time, but a lot of discovery is going
18 to happen which is, I think, what you see in the
19 foundation of my costs being essentially what the
20 demands are in connection with the discovery
21 associated with this.
22     Q.   Did anybody ask you to prepare a
23 budget for what it would cost to litigate the
24 claims that are being resolved in the FGIC
25 Settlement Agreement?

Page 161

1      J. LIPPS - CONFIDENTIAL
2      A.   No.
3      Q.   And did you form any views as to
4  the costs?
5          MR. KERR: Objection.
6      A.   Well, I offered views on -- I
7  offered my opinion with respect to the costs
8  associated with prosecuting and/or defending these
9  claims. If you're asking me if I quantified a
10 dollar amount, no, I never did that.
11     Q.   And did you quantify a range?
12     A.   In my declaration I don't think I
13 put a range in, as I recall, or a specific dollar
14 amount. I may have in some of my earlier
15 declarations, particularly when I talked about
16 that the judge utilized in the Western and
17 Southern decision. I may have put some numbers in
18 there associated with restoration of e-mails
19 and/or retrieval and review of loan files, and I
20 probably had some numbers associated with hosting
21 documents in the course of discovery preparation.
22 So I think --
23     Q.   That's not expressed in Lipps No.
24 1?
25     A.   Not specifically.

Page 162

J. LIPPS - CONFIDENTIAL

1
2    Q.    When was the first time you
3    reviewed the claims that either FGIC or the FGIC
4    wrapped trust asserted against ResCap, LLC?
5    A.    When was the bar date?  Probably
6    about the bar date.
7    Q.    And what do you understand to be
8    the nature of the claims that those entities have
9    asserted against ResCap, LLC?
10    A.    I understand them to be in the
11    nature of aiding and abetting and piercing the
12    corporate veil.
13    Q.    And do you understand alter ego
14    claims might also have been asserted?
15    A.    Yes, alter ego.  I'm sorry I think
16    of piercing --
17    Q.    Sure.
18        Did you perform any analysis of
19    those claims in connection with forming the
20    opinions you expressed in Lipps No. 1?
21    A.    I did not get down into an
22    allocation and an assessment of allocation at
23    various entity levels.  I was looking at the
24    aggregate.  I was looking at the aggregate of the
25    claims that were being released.  But, I mean, I

Page 163

J. LIPPS - CONFIDENTIAL

1
2    have at different times looked at aiding and
3    abetting claims, alter ego, piercing the corporate
4    veil.
5    Q.    As they relate to claims asserted
6    by RMBS claimants against ResCap, LLC?
7    A.    Yes.
8    Q.    I'm going to come back to that in a
9    second.  With respect to Lipps No. 1, though, you
10    note in footnote No. 3 that the underlying fraud
11    claims and misrepresentation claims are beyond the
12    scope of your report.  Right?
13        MR. KERR:  Objection.
14    A.    I don't know that I said they're
15    beyond the scope of it.  I think I said I could
16    look at the riskier claim, the rep and warranty
17    claim, at least I think that's the way I described
18    it, and support my conclusion with an analysis of
19    that.
20    Q.    Okay.  And so did you perform any
21    analysis of any tort-based claims in forming the
22    opinions expressed in Lipps No. 1?
23    A.    Beyond what I put in that footnote,
24    no.
25    Q.    And you don't mention aiding or

Page 164

J. LIPPS - CONFIDENTIAL

1
2    abetting, piercing the corporate veil or alter ego
3    anywhere in Lipps No. 1.  Why is that?
4    A.    For purposes of offering my
5    opinion, I didn't need to concern myself with
6    allocation between the various entities.
7    Q.    Why do you say that?
8    A.    I was more interested in what
9    claims were being released and who was being
10    released of those claims.  And as I understood it
11    ResCap, GMAC Mortgage, RFC were receiving releases
12    from FGIC of all claims that they could have
13    against them and from the trustees on the
14    origination-based claims.
15    Q.    Do you express anywhere in Lipps
16    No. 1 your views of the costs for ResCap, LLC, to
17    litigate aiding and abetting, piercing the
18    corporate veil and alter ego claims?
19    A.    I did not specifically isolate
20    costs associated with litigating those issues.
21    Q.    And do you express anywhere in
22    Lipps No. 1 any risks associated with ResCap, LLC,
23    litigating aiding and abetting, piercing the
24    corporate veil and alter ego claims?
25    A.    Yes, I would say I do.

Page 165

J. LIPPS - CONFIDENTIAL

1
2    Q.    And where in Lipps No. 1 do you
3    express the risks associated with just ResCap,
4    LLC, litigating the claims that are asserted
5    against it?
6    A.    I think if you take that in
7    isolation, there has to be a foundation for aider
8    and abetter, so the litigation associated with
9    defending that claim would be -- unless you're
10    going to take a lay down on the fraud itself
11    because you would go and fight the fraud.  And to
12    do that, you're basically in the core of what I've
13    got in here in terms of fighting on the reps and
14    warranties.
15    Q.    Well, except to the extent that you
16    would have defenses that are particularly to a
17    fraud litigation, that would not exist with
18    respect to a breach of contract claim.
19    A.    There clearly are additional
20    defenses that are associated with a fraud claim
21    that may not be present in a rep and warranty
22    claim.  But as I tried to say earlier, there --
23    you know, the rep and warranty claim is based on
24    breaches of these loan level reps.  And when you
25    get into the fraud, they're essentially claiming

42 (Pages 162 to 165)

Page 166

1    J. LIPPS - CONFIDENTIAL
2  the same thing.  You've misrepresented your
3  underwriting or you've misrepresented the
4  appraisal information.  So you're right back into
5  the wheelhouse of these rep and warranty claims no
6  matter what theory you use.
7    Q.   And what's your basis for saying
8  that aiding and abetting was a claim asserted by
9  either ResCap, LLC, by either FGIC or the FGIC
10 wrapped trusts?
11   A.   I think that the proofs of claim
12 submitted by the trusts.  They never sued, but I
13 think the proof of claims have aiding and abetting
14 theories in there.
15        I know that the FGIC Complaints, I
16 believe every one of them, had ResCap in there,
17 and they indicate in their allegations that ResCap
18 directed the actions of the GMAC and RFC in
19 perpetuating the fraud and/or breaches, and the
20 proof of claim also has aiding and abetting in
21 there, the proof of claim filed by FGIC.
22   Q.   Let me focus just on the claims
23 asserted against ResCap, LLC, and be very
24 particular about this.
25        Did you do any analysis in forming

Page 167

1    J. LIPPS - CONFIDENTIAL
2  the opinions expressed in Lipps No. 1 as to the
3  merits of the claims asserted against ResCap, LLC?
4        MR. KERR:  Objection.
5        MR. SHORE:  He can answer it yes or
6  no.
7        MR. KERR:  Are you talking in
8  connection with his role as an expert?
9        MR. SHORE:  Yes.
10   A.   Just in the expert report, no, I
11 did not analyze the ResCap, LLC, claims in
12 isolation.  I said that I did -- you do have to
13 have an underlying fraud or an underlying breach
14 that then gives rise to -- or action of control
15 that gives rise to these various theories.  I
16 would have looked at it from that perspective.
17   Q.   And is it your expert testimony
18 that just because somebody asserts a claim that is
19 RMBS related with reps and warranties underlying
20 it or the wheelhouse, as you called it, that that
21 entity should settle under all circumstances?
22   A.   Should settle under all
23 circumstances.  No, I would never say that
24 somebody should settle under all circumstances.
25   Q.   Right.  In some instances, the

Page 168

1    J. LIPPS - CONFIDENTIAL
2  claims that are asserted are -- have nuisance
3  value?
4    A.   Are you talking specifically RMBS,
5  or are you talking in general?
6    Q.   I'm talking about RMBS in general.
7  I think you testified before you've come across
8  circumstances in which a settlement is done on a
9  nuisance value basis.
10   A.   In my career, I have seen
11 settlements that I would consider to be
12 nuisance-based settlements.
13   Q.   Prior to the petition date, I think
14 you testified that you were contemplating moving
15 to dismiss certain of the FGIC claims?
16   A.   That is true.
17   Q.   Was certain of the claims that you
18 were seeking to dismiss were the claims asserted
19 against ResCap, LLC?
20   A.   I believe we did advise Judge
21 Crotty in a communication that we were intending
22 on filing a motion to dismiss as it related to the
23 claims asserted against ResCap, LLC.
24   Q.   And what was the basis for making
25 that motion to dismiss or seeking to make that

Page 169

1    J. LIPPS - CONFIDENTIAL
2  motion to dismiss?
3    A.   Based on my assessment of the
4  complaint as it was pled and my knowledge of the
5  companies at that time.
6    Q.   What was the rule upon which you
7  were going to be basing your motion to dismiss?
8    A.   What do you mean "a rule"?  It
9  would be a 12B-6 probably, failure to state a
10 cause of action.
11   Q.   So you had represented to Judge
12 Crotty that you believed that ResCap, LLC, had a
13 basis to dismiss the FGIC claims because the FGIC
14 claims as pleaded in the FGIC Complaint at issue
15 failed to state a viable claim against ResCap,
16 LLC.
17   A.   You may have said it more
18 eloquently than I did in the letter, but I
19 certainly said in the letter that they were not a
20 signatory to the underlying contract and I did not
21 believe they had pled sufficient facts on those
22 Complaints such that we could test the sufficiency
23 of those claims against ResCap, LLC.
24   Q.   And you said based upon your
25 knowledge of the companies.  Were you aware at

J. LIPPS - CONFIDENTIAL
1
2  that time of any facts that would support a claim
3  by FGIC that it could bring RMBS-related claims
4  directly against ResCap, LLC?
5        A.   As I recall, prior to FGIC's sued,
6  we never had a trustee suit, and the monoline
7  claimed suits that we had were MBIA, and they only
8  sued the contracting party.  In the investor
9  cases, obviously, they sued everybody that was
10 involved in the securitization, including ResCap.
11 So I'm certain in the context of the securities
12 case, I would have been looking at the facts.  I
13 know in some of them we actually did file some
14 motions to dismiss -- no, we never filed a motion
15 to dismiss ResCap.  We filed a motion to dismiss
16 Ally.
17        However, having said that, I didn't
18 need to or hadn't up to that point in time delved
19 into the relationship between GMAC Mortgage, RFC
20 and ResCap that I now have knowledge of.  There's
21 two things that I would say about that.  One is I
22 doubt that in this current environment, based on
23 publicly available information, that the Complaint
24 against ResCap would be pled the same way and
25 would be pled as skinny, as I believe it was at

J. LIPPS - CONFIDENTIAL
1
2  the time that FGIC filed its Complaints.  And I
3  have more knowledge, again, based on these facts
4  that I know from public information and involved
5  with representing the Debtors, that I'd probably
6  have to weigh, in my mind, whether or not it was a
7  good tactical decision to make that motion to
8  dismiss or rather fight the case to a point where
9  maybe you could do a summary judgment motion.  I
10 think, based on some of the facts, that the
11 dynamics have changed from when I sent that letter
12 on, whether you can bring claims against ResCap on
13 aiding and abetting, alter ego and piercing the
14 corporate veil.
15        MR. KERR:  I don't know whether
16    we're at our four hours or not.
17        MR. SHORE:  I'm getting close.  I'm
18    on my last page.
19        MR. KERR:  That's fine.  Finish up,
20    but let's just kind of --
21        Q.   Let me see if I understand your
22 question.  Are you aware of any facts that would
23 support a piercing or alter ego claim against
24 ResCap, LLC, related to FGIC or FGIC wrapped trust
25 that you believe would create a triable issue of

J. LIPPS - CONFIDENTIAL
1
2  fact in favor of FGIC or the FGIC wrapped trusts?
3        A.   I believe there are facts upon
4  which one could base those claims.
5        Q.   I'm just saying that you drew a
6  distinction between whether you'd seek to get rid
7  of it at a motion to dismiss stage or a summary
8  judgment stage?
9        A.   What's the question?
10        Q.   Are you saying now that you're
11 aware of facts to support a piercing claim between
12 GMAC M and ResCap, LLC?
13        A.   I think the examiner report has
14 various discussions in there that an adept pleader
15 could utilize to plead a piercing, alter ego,
16 aiding and abetting claim against ResCap that
17 would cause me to decide not to file a motion to
18 dismiss and maybe not even a motion for summary
19 judgment.  It depends on how it's pled.  I am
20 aware of a lot more information on the
21 relationship between ResCap, GMAC Mortgage and RFC
22 than I knew at the time that the FGIC claims were
23 first filed.
24        Q.   Were you ever asked to provide any
25 of the Debtors legal advice with respect to

J. LIPPS - CONFIDENTIAL
1
2  whether or not any of the corporate relationships
3  between the Debtors could be disregarded?
4        MR. KERR:  Just yes or no.
5        A.   Yes.
6        Q.   When was that?
7        MR. KERR:  You can answer the
8    question when.  Let's clarify, Chris.
9    Separate from his role as an expert here?
10        MR. SHORE:  He's testifying to a
11    whole bunch of stuff so --
12        A.   I'm answering questions.  None of
13 this is in my report, as I told you.  I didn't
14 need to deal with allocation.  I didn't need to
15 deal with those piercing issues other than at the
16 core fraud or breach of rep.
17        MR. KERR:  Chris, I just want to
18    make sure that we're clear on the record that
19    if you're asking about advice he has given the
20    Debtors outside -- let me finish -- separate
21    from his role as an expert, I want him to be
22    aware that that may implicate privileged
23    communications.
24        Q.   In connection with the preparation
25 of Lipps No. 1, were you providing legal advice to

Page 174

J. LIPPS - CONFIDENTIAL
1
2  the Debtors?
3      A.   No.
4      Q.   So when did you provide legal
5  advice to the Debtors with respect to the ability
6  of anybody to disregard the corporate relationship
7  that's been established between any of the
8  Debtors?
9      A.   I have been involved in discussions
10 for months on that.  As you certainly know, there
11 was an examiner, investigation, and my firm
12 together with Morrison and Foerster was involved
13 in that interview process, and we had many
14 discussions about potential claims that would be
15 identified by the examiner, both by and between
16 GMAC and RFC and ResCap and then outside into the
17 unaffiliated entities.
18     Q.   And did you provide any written
19 memoranda to the companies on that?
20         THE WITNESS:  Do I answer?
21         MR. KERR:  You can answer that
22     question yes or no.
23     A.   There may have been.
24     Q.   What's your reticence in saying
25 there is or isn't?

Page 175

J. LIPPS - CONFIDENTIAL
1
2      A.   Because I can't remember all the
3  analyses that we've done over the years or over
4  the year, I guess, a little more than a year.
5      Q.   It seems like years.
6      A.   Our input and involvement has been
7  fairly wide ranging, and I do know that there have
8  been discussions related to piercing up to the
9  ResCap level, as well as cross-piercing, and I
10 would imagine some of that's been reflected in a
11 writing.
12     Q.   And are you aware of any facts to
13 support a claim that any of the ResCap Debtors
14 committed fraud in connection with any of the
15 claims that were asserted by FGIC or the FGIC
16 wrapped trusts that are being resolved in
17 connection with the Settlement Agreement?
18         MR. KERR:  You can answer that
19     question yes or no.  If in answering that
20     question -- I just don't want you to reveal
21     any privileged communication.
22         THE WITNESS:  Can you read that
23     back?
24         (The requested portion of the
25     record was read.)

Page 176

J. LIPPS - CONFIDENTIAL
1
2      A.   I think there have been fraud
3  claims that have been asserted in --
4      Q.   No.  Are you aware of any facts to
5  support such a claim?
6      A.   Well, there have been facts that
7  have been alleged, and certainly in the context of
8  the MBIA litigation -- they had a fraud claim, and
9  they were going after practices and procedures and
10 alleging fraud in association with that.  I was
11 defending, so I didn't necessarily have the same
12 perspective on what context for particular facts.
13 There clearly has been a case that has been
14 advanced by various claimants and was echoed to a
15 certain extent -- we were still in the very early
16 stages of FGIC, but echoed by FGIC, and I could
17 see where they would muster certain facts.  And we
18 would be responding with either additional facts
19 or trying to put context in things that they were
20 using out of context.
21     Q.   So the answer, I guess, is yes you
22 were aware of facts that other people have
23 mustered that support a claim that one or more of
24 the Debtors committed fraud in connection with the
25 claims that are being settled in the FGIC

Page 177

J. LIPPS - CONFIDENTIAL
1
2  Settlement Agreement?
3          MR. KERR:  Objection.  Asked and
4      answered.
5      A.   I think I have answered that.  I
6  think you framed the question in a way that I'm
7  more comfortable which is it's facts that have
8  been alleged.  The way you were asking it to me,
9  you were asking me to acknowledge that there was
10 fraud, and I won't do that.
11     Q.   In connection with the pre-petition
12 FGIC litigation, did you also seek authority to
13 dismiss fraud-based claims asserted against the
14 ResCap entities?
15     A.   I don't have those letters
16 committed to memory.  I know that I had been
17 through that battle in the MBIA context, and we
18 were a little bit late to the game because Goodwin
19 & Proctor had already tested that on a motion to
20 dismiss with the Countrywide case.  I know we made
21 a pass at it in the GMAC Mortgage case, and I was
22 unsuccessful.
23          So as I sit here today, it may be
24 in the letter, but I think that was probably a
25 little bit of an arm wrestle and a closer tactical

45 (Pages 174 to 177)

Page 178

1    J. LIPPS - CONFIDENTIAL
2  call between my co-counsel and myself. I thought
3  that was a difficult motion to make based on what
4  the authority was that was out there.
5      Q.   In expressing your views on the --
6  sorry.
7      Do you have any personal knowledge
8  with respect to how or why ResCap, LLC, agreed to
9  a $337,000,000 claim in favor of FGIC?
10      MR. KERR:  Objection.
11      A.   I was not involved in those
12  discussions.
13      Q.   So the answer is you don't have any
14  personal knowledge?
15      A.   I have no personal knowledge.
16      MR. SHORE:  I have nothing further.
17      (Time Ended:  2:19 p.m.)
18  _____
19    JEFFREY LIPPS
20
21  Subscribed and sworn to
22  before me this    day
23  of      , 2013.
24
25  _____

Page 179

1
2    INDEX:
3  WITNESS      EXAM BY:      PAGE:
4  J. Lipps    Ms. James      5
5    Mr. Carney    52
6    Mr. Shore    127
7
8    EXHIBITS
9  Exhibit No.      Page:
10 Lipps Exhibit 1  Declaration      14
11 Lipps Exhibit 2  Order      48
12 Lipps Exhibit 3  Motion      61
13 Lipps Exhibit 4  Settlement      110
14 Lipps Exhibit 5  Order To Show Cause    117
15 Lipps Exhibit 6  Document      118
16
17
18
19
20
21
22
23
24
25

Page 180

1
2    LITIGATION SUPPORT INDEX
3
4  DIRECTION TO WITNESS NOT TO ANSWER
5    Page    Line   Page   Line
6      (NONE)
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS
9    Page    Line   Page   Line
10   139    5
11
12    INFORMATION TO BE FURNISHED
13   Page    Line   Page   Line
14      (NONE)
15
16    QUESTIONS MARKED FOR A RULING
17   Page    Line   Page   Line
18      (NONE)
19
20
21
22
23
24
25

Page 181

1
2    CERTIFICATE
3  STATE OF NEW YORK )
4      )ss:
5  COUNTY OF NEW YORK)
6    I, JOMANNA DeROSA, a Certified
7  Shorthand Reporter and Notary Public within
8  and for the States of New York, New Jersey,
9  California and Arizona, do hereby certify:
10    That JEFFREY LIPPS, the witness
11 whose deposition is hereinbefore set forth, was
12 duly sworn by me and that such deposition is a
13 true record of the testimony given by such
14 witness.
15    I further certify that I am not
16 related to any of the parties to this action
17 by blood or marriage, and that I am in no
18 way interested in the outcome of this
19 matter.
20    In witness whereof, I have hereunto
21 set my hand this 23rd day of July, 2013.
22
23  _____
24    JOMANNA DeROSA
25

Page 182

```
 1
 2              * * *ERRATA SHEET* * *
 3     NAME OF CASE:  In re Residential Capital
 4     DATE OF DEPOSITION:  7/23/13
 5     NAME OF WITNESS:  J. Lipps
 6     Reason codes:
 7         1.  To clarify the record.
           2.  To conform to the facts.
 8         3.  To correct transcription errors.
 9     Page _____ Line _____ Reason _____
       From _____ to _____
10
       Page _____ Line _____ Reason _____
11     From _____ to _____
12     Page _____ Line _____ Reason _____
       From _____ to _____
13
       Page _____ Line _____ Reason _____
14     From _____ to _____
15     Page _____ Line _____ Reason _____
       From _____ to _____
16
       Page _____ Line _____ Reason _____
17     From _____ to _____
18     Page _____ Line _____ Reason _____
       From _____ to _____
19
20     _____
           JEFFREY LIPPS
21
22
23
24
25
```

47 (Page 182)

### Deposition Errata Sheet

### *In re Residential Capital, LLC, et al.,*
### Case No. 12-12020(MG)

Deponent:          Jeffrey A. Lipps
Deposition Date:   July 23, 2013

| Citation | Testimony |
|---|---|
| 11:24 | then at or about the time that I ~~gotten~~ got engaged |
| 17:20–21 | A. Correct. Under legal uncertainty and ~~expensive~~ expense of resolution. |
| 19:20 | So, we had informally ~~stated~~ stayed, with the blessing of |
| 26:8–10 | ~~Well,~~ I don't want to disclose any specific advice that I gave the client pre-petition~~.~~, but I know we were involved in a number |
| 27:5–7 | I transitioned out of at the filing all of my related representations of all the Ally entities that were non-Debtors. |
| 28:13 | Corp. ~~V~~ v. Residential Funding Co. matter was stayed, |
| 29:24 | the MBIA Insurance Corp. ~~V~~ v. GMAC Mortgage Corp., |
| 30:23–24 | mean, the expert phase was ~~under~~ underway in both and ~~in~~ both cases was very similar, and it was going to be a |
| 31:16 | for a year or more. ~~A~~ The same structure was set in |
| 37:20 | they're right and they hit it. So to that extent, |
| 40:7 | adverse outcome in ~~that~~ coming to my opinion that |
| 40:16–17 | not an adverse jury verdict. It wasn't a jury verdict; it was a bench trial. It was Judge ~~Rycroft~~ Rakoff. But you have |
| 42:15–16 | was at issue. I don't know what claims ultimately were ~~was~~ at issue. I haven't been able to delve into it ~~in~~ through |
| 42:23–24 | Q. Paragraph 138, you refer to MBIA ~~V~~ v. Flagstar. Do you see that? |
| 45:19 | settlement. So ~~their~~ there clearly was and should be, |
| 47:9 | Now, ~~Maher~~ Mayer Brown represented the |

| Citation | Testimony |
|---|---|
| 51:24 | about ~~his~~ this motion, the Debtors' motion. |
| 56:8 | first Declaration. And Judge ~~Rycroft~~ Rakoff may have |
| 61:6 | to the motion to extend stay, regarding Western Southern, |
| 62:15–16 | A. You'll have to ask Judge ~~Glen (phonetic)~~ Glenn that question. I understand it was |
| 73:4 | information that ~~they~~ I had available to me. I |
| 74:5–6 | securitizations, and there was ~~an analysis of some of the~~ a factual analysis of some of the events that |
| 75:2 | ~~particularly~~ recently using a lawyer on the MBIA due |
| 82:17–20 | I certainly had some conversations with Judge ~~Code~~ Cote at various times either on telephone conferences or perhaps at one of the proceedings related to the opinions that I had and the burden. |
| 83:12 | claims and how that would burden the ~~state~~ estate based |
| 83:21 | in the ~~prospectus~~ prospectuses associated with those offerings |
| 88:21 | issues that counsel ~~asked~~ asks me to look at as the |
| 96:21 | A. How do ~~you~~ I think I'm going to |
| 97:2 | will concur with ~~him~~ them. He certainly has, in the |
| 98:3–6 | and ~~just~~ address the infancy stage of it without the benefit of appellate rulings on these cases. ~~, depending on state law,~~ I mean, there's a whole lot of things that |
| 98:15 | put in my declaration and amplify as ~~they~~ I feel is |
| 98:24 | trying to -- you're not reading his ~~opinions~~ answers.  You're trying to characterize ~~in~~ the way you've asked and answered that. He's ~~answer~~ answered the question. You want to ask him again, he can keep doing this all day long, but your four hours are being used, Mike. You've asked your question. ~~He' answer~~ He's answered your question several times now. This is a waste. |
| 110:2 | defense ~~and~~ victory and a complete plaintiff's |
| 112:12 | of the securitizations, the FGIC ~~wrap~~ wrapped ones. So, I |

2

| Citation | Testimony |
|---|---|
| 128:10 | I remember Alex. Lawrence was |
| 135:14 | and things like that over that ~~three or four~~ three or four day period, but, |
| 148:1–3 | The amount of the allowed claim does fall within the range of reasonableness and is in the best interest of the ~~state~~ estate to resolve" |
| 149:2–3 | Q. Do you know what Section ~~501B~~ 510(b) of the bankruptcy code is? |
| 149:5–6 | Q. And when were you first advised with respect to ~~Sectio~~ section ~~501B~~ 510(b) is? |
| 149:12–13 | Q. And what do you understand Section ~~501B~~ 510(b) in the bankruptcy code to address? |
| 152:21 | discussions that ~~fall off of~~ follow from that, but I don't |
| 156:4–6 | that you have got some of the loans going to ~~ACH 1~~ Ocwen and others, and not always the entire loan file goes there. |
| 158:6 | substantial enough that we ~~didn't~~ did need to talk and |
| 159:17–160:2 | the ~~estimating~~ estimation proceeding, something that would cause me to ~~rachet~~ ratchet back my views on the ~~estimating~~ estimation -- or on the costs associated with litigating those claims. So I naturally didn't go backwards and try and see if this would affect that. I saw that the scope of discovery would be ~~sufficient~~ significant, even in a compressed time, and the preparation associated with it, that that cost could be supported -- or my opinion could be supported ~~in~~ by those costs. |
| 165:7–10 | isolation, there has to be a foundation for ~~aider~~ aiding and ~~abetter~~ abetting, so the litigation associated with defending that claim would be -- unless you're going to ~~take a~~ lay down on the fraud itself |
| 169:8–10 | A. What do you mean "~~a~~ the rule"? It would be a ~~12B-6~~ 12(b)(6) probably, failure to state a cause of action. |
| 170:5–7 | A. As I recall, prior to FGIC's ~~sued~~ suits, we never had a trustee suit, and the monoline ~~claimed~~ claims suits that we had were MBIA, and they only |
| 174:11 | was an examiner, investigation, and my firm |

3

| Citation | Testimony |
|---|---|
| 176:11–20 | defending, so I didn't necessarily have the same perspective on ~~what~~ the context for particular facts.  There clearly has been a case that has been  advanced by various claimants and was echoed to a  certain extent -- we were still in the very early stages of FGIC, but echoed by FGIC, and I could  see where they would muster certain facts. And we  would be responding with either additional facts  or trying to put into context ~~in~~ things that they were  using out of context. |
| 177:6 | think ~~you~~ I framed the question in a way that I'm |

Date: AUGUST 5, 2013

Signed:

Jeffrey A. Lipps