# Exhibit 8

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   ---------------------------------------X

    IN RE:

4   RESIDENTIAL CAPITAL, LLC, et al.

5

    Civil Action No. 12-12020 (MG)

6   ---------------------------------------X

7

8           ***CONFIDENTIAL***

9       DEPOSITION OF RON D'VARI

10         New York, New York

11         July 25, 2013

12

13

14

15

16

17

18  Reported by:

19  Rebecca Schaumloffel, RPR, CLR

20  Job No:  64177

21

22

23

24

25

## Page 2

```
1
2
3              July 25, 2013
4              9:08 a.m.
5
6
7
8        Deposition of RON D'VARI, held at
9   the offices of McKool Smith, One Bryant Park,
10  New York, New York, before Rebecca
11  Schaumloffel, a Registered Professional
12  Reporter, Certified Livenote Reporter and
13  Notary Public of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1
2   A P P E A R A N C E S :
3
4     MORRISON & FOERSTER
5        Attorneys for the Debtors
         1290 Avenue of the Americas
         New York, New York 10104
6        BY:  J. ALEXANDER LAWRENCE, ESQ.
              KAYVAN SADEGHI, ESQ.
7
8
9
10    JONES DAY
         Attorneys for FGIC
         222 East 41st Street
11       New York, New York 10017
         BY:  BART GREEN, ESQ.
12
13
14
15    KRAMER LEVIN NAFTALIS & FRANKEL
         Attorneys for Official Committee of
         Unsecured Creditors
16       1177 Avenue of the Americas
         New York, New York 10036
17       BY:  PHILIP KAUFMAN, ESQ.
18
19
20    ROPES & GRAY
         Attorneys for Steering Committee of
         RMBS Investors
21       800 Boylston Street
         Boston, Massachusetts 02199
22       BY:  ANDREW DEVORE, ESQ.
23
24
25    ///
```

## Page 4

```
1
2
         APPEARANCES (continued:)
3
4
5     McKOOL SMITH
         Attorneys for Freddie Mac
6        One Bryant Park
         New York, New York 10036
7        BY:  MICHAEL CARNEY, ESQ.
8
9
10
         DECHERT
11       Attorneys for Bank of New York
         Mellon
12       1095 Avenue of the Americas
         New York, New York 10036
13       BY:  JOCELYN HANAMIRIAN, ESQ.
14
15
16    WHITE & CASE
         Attorneys for Ad Hoc Group of Junior
17       Secured Noteholders
         1155 Avenue of the Americas
18       New York, New York 10036
         BY:  J. CHRISTOPHER SHORE, ESQ.
19            VANESSA SODERBERG, ESQ.
20
21
22    ALSTON & BIRD
         Attorneys for Wells Fargo Bank
23       90 Park Avenue
         New York, New York 10016
24       BY:  WILLIAM HAO, ESQ.
25    ///
```

## Page 5

```
1
2        APPEARANCES (continued:)
3
4
5     SEWARD & KISSEL
         Attorneys for Law Adventure
6        One Battery Park Plaza
         New York, New York 10004
7        BY:  MICHAEL WEITMAN, ESQ.
8
9
10
11    WILLKIE FARR & GALLAGHER
         Attorneys for Stonehill, Monarch,
         CQS and Bayview Fund Management
12       787 Seventh Avenue
         New York, New York 10019
13       BY:  JOSEPH BAIO, ESQ.
              ARTHUR BILLER, ESQ.
14
15
16
17    NEWOAK CAPITAL
         485 Lexington Avenue
         New York, New York 10017
18       BY:  EDWARD NAPOLI, ESQ.
19
20
21
         ALSO PRESENT:
22
23          Richard Kelly, NewOak
24          Scott Gibson, Mountainview
25       *     *     *
```

Page 6

1            R. D'VARI
2    R O N  D'V A R I, called as a witness,
3    having been duly sworn, testified as follows:
4    EXAMINATION BY
5    MR. CARNEY:
6        Q.   Good morning, Dr. D'Vari.  I'm
7    Michael Carney from McKool Smith, and we
8    represent Freddie Mac in this matter.
9            And have you been deposed before?
10       A.   Yes, I have.
11       Q.   Okay.  So I am sure you
12   understand the -- understand the rules of a
13   deposition, but to answer my questions under
14   oath and I need verbal answers, so try to,
15   instead of nodding, no gestures, please
16   answer the questions verbally, and of course,
17   if something is confusing and you don't
18   understand, ask me, I will rephrase it, and
19   if you need a break, just answer the question
20   pending and then we will break after that.
21           And one important thing your
22   counsel may object to something I say.
23   Unless he instructs you not to answer, please
24   answer the question after he interposes his
25   objection.

Page 7

1            R. D'VARI
2            So you said you have been deposed
3    before.  About how many times?
4        A.   Two times.
5        Q.   Can you tell me about those
6    times?
7        A.   One in 2008 and once 2011.
8        Q.   So --
9        A.   Or '12.
10       Q.   In 2008, can you tell me what
11   your role was in the case?
12       A.   I was an expert witness.
13       Q.   Can you just kind of tell me a
14   little bit about what the case was about?
15       A.   The case was confidential.
16       Q.   Okay.  Can you tell me what it
17   was about at all?
18       A.   Sub prime, essentially.  OTTI
19   analysis, Other Than Temporary Impairments.
20       Q.   Okay.  Can you tell me, without
21   breaking any sort of Confidentiality
22   Agreement you agreed to, can you tell me sort
23   of the nature of your opinion in that matter?
24           MR. NAPOLI:  Objection.  I think
25   we are touching upon confidential

Page 8

1            R. D'VARI
2    information here.
3            MR. CARNEY:  So are you
4    instructing him not to answer anything
5    surrounding that case?
6            MR. NAPOLI:  Yes.
7        Q.   What was the second time you were
8    deposed?
9        A.   In 2012.  '11, '12.
10       Q.   And can you tell me about the
11   case you were deposed in in 2012?
12       A.   No, it was a confidential matter
13   as well.
14       Q.   Can you tell me generally,
15   without impinging on any confidentiality that
16   you had agreed to, what the matter was about?
17           MR. NAPOLI:  Objection.  This
18   is, again, we are touching upon
19   confidential information that he
20   cannot speak to.  So I am instructing
21   him not to answer that question.
22           MR. CARNEY:  Even without
23   mentioning the parties, without
24   mentioning, he can't even tell me
25   about what the case was about?

Page 9

1            R. D'VARI
2            MR. NAPOLI:  I think he has
3    given you an idea of it.
4            MR. CARNEY:  Not for the
5    2011-case, he hasn't told me anything.
6    I just want know what it is about.
7    Whether he was an expert.  What it was
8    about.
9            MR. NAPOLI:  General, very
10   general discussion.
11       A.   Evaluation, essentially, and
12   market conditions and sub-prime mortgages.
13       Q.   So in both of those cases that
14   you testified as -- that you were deposed in
15   2008 and 2012, those all had to do with
16   the -- with sub-prime mortgages, generally?
17       A.   Structured products and RMBS and
18   sub-prime, correct.  Clarification,
19   sub-prime, I mean non-agency RMBS.
20       Q.   When you mean non-agency RMBS,
21   what do you mean by that?
22       A.   Meanings things are not
23   conforming, Freddie and Fannie guaranteed
24   bonds.  Anything such as Alt A sub-prime and
25   non-agency mortgages.  Agency being Freddie

3 (Pages 6 to 9)

| | Page 10 | | Page 11 |
|---|---|---|---|

**Page 10**

R. D'VARI

1
2  and/or one of the government guarantees,
3  GSEs.
4      Q.    Were you an expert in the 2012
5  matter, too, 2011 matter as well?
6      A.    I'm sorry?
7      Q.    Were you an expert in that case
8  as well?
9      A.    Yes, I was.
10      Q.    So have you ever appeared as a
11  witness at trial?
12      A.    No.
13      Q.    In any matter, not as an expert?
14      A.    In any matter.
15      Q.    Have you done anything to prepare
16  for your deposition today?
17      A.    Yes.
18      Q.    Can you just describe for me what
19  you have done?
20      A.    I read my Declaration once more.
21      Q.    Did you have any conversations
22  with your counsel to prepare for this
23  deposition?
24          MR. NAPOLI:  Objection.  That's
25  legally privileged, isn't it?

**Page 11**

R. D'VARI

1
2          MR. CARNEY:  I can ask him if he
3  had the conversation.  I didn't ask
4  what it was about.
5          MR. LAWRENCE:  You can answer
6  yes or no.
7      A.    Yes.
8      Q.    About how many conversations did
9  you have?
10      A.    Two.
11      Q.    And during those conversations to
12  prepare for your deposition, did you receive
13  any information from counsel that you relied
14  upon in forming your opinions in this case?
15      A.    No.
16      Q.    So other than meeting with your
17  counsel, did you have any other meetings or
18  discussions with anyone else to prepare for
19  your deposition?
20      A.    Typically I speak to my team,
21  review the work that we have all done.
22      Q.    Okay.  Did you do that in this
23  instance?
24      A.    Yes, I did.
25      Q.    Who did you talk to?

**Page 12**

R. D'VARI

1
2      A.    My analyst as well as my
3  associates and managing directors that have
4  been involved and used in my normal course of
5  work.
6      Q.    Okay.  Can you -- how many people
7  are we talking about here?
8      A.    Three, four.
9      Q.    Okay.  Can you tell me who they
10  were and what they do?
11      A.    They are NewOak employees and
12  they are primarily analysts for residential
13  mortgage backed securities, and they report
14  to myself as the head of advisory.
15      Q.    Can you just tell me their names
16  so I can kind of complete the record?
17          MR. CARNEY:  You can answer.
18      A.    Alex Selinger.  Roger Piekta,
19  P-I-E-K-T-A.  Harood.  For some reason I am
20  skipping his last name.
21      Q.    You just don't know it?
22      A.    No, I just skipped.
23          MR. LAWRENCE:  If you know it,
24  you can answer it.
25      A.    No, I don't.

**Page 13**

R. D'VARI

1
2      Q.    If you don't know, if you forgot,
3  fair enough.  I won't tell him that.  Those
4  are the only three people from NewOak that
5  you talked about to prepare for your
6  deposition today?
7      A.    That is the three I recall.
8      Q.    Three, okay.  Those were the
9  three?
10      A.    Yes.
11      Q.    Okay.  During those conversations
12  with your -- with those NewOak employees, did
13  you receive any information that you relied
14  upon to form your opinions in the case?
15      A.    New information?
16      Q.    Yes.
17      A.    No.
18      Q.    Did they provide you any
19  documents that you haven't already provided
20  to us, to your knowledge?
21      A.    No.  We're actually working on
22  documents that we were submitting to your
23  side.
24      Q.    Okay.
25      A.    Essentially preparing for sending

Page 14

R. D'VARI

1 material.
2     Q.   I see.  And were those, I am not
3 sure I introduced these, but I will introduce
4 these as exhibits D'Vari 1, 2 and 3.
5         (Whereupon, D'Vari Exhibit 1,
6     Home Price Index Used In Analysis was
7     marked for identification as of this
8     date by the Reporter.)
9         (Whereupon, D'Vari Exhibit 2,
10    Index Parameters Used In Analysis was
11    marked for identification as of this
12    date by the Reporter.)
13        (Whereupon, D'Vari Exhibit 3,
14    Import to Analysis was marked for
15    identification as of this date by the
16    Reporter.)
17    Q.   If you can just review those
18 documents for a moment.
19    A.   I think I --
20    Q.   Do you recognize those documents?
21    A.   Sure, I do.
22    Q.   Can you just tell me what
23 they are?
24    A.   Should I refer to the exhibit

Page 15

R. D'VARI

1 numbers?
2     Q.   Yes.  Let's start with Exhibit 1.
3     A.   Exhibit 1 is -- refers to the,
4 effectively, home price index that are used
5 for our typical analysis.
6     Q.   Okay.  And Exhibit 2?
7     A.   Exhibit 2 is unemployment as of
8 April 2013 based on our analysis.
9     Q.   No, I think that's a separate
10 worksheet included.
11    A.   I'm sorry.  These are all
12 Exhibit 1?
13    Q.   Yes, they are included in the
14 same worksheet.
15    A.   I'm sorry.
16    Q.   Then Exhibit 2 is the second one.
17    A.   Yes.  Those are effectively
18 the -- effectively you are looking at
19 index -- index parameters that were used in
20 our analysis.
21    Q.   Then Exhibit 3?
22    A.   Exhibit 3 is really the import
23 that goes to the analysis.
24    Q.   Now, you said that you were

Page 16

R. D'VARI

1 working with your three employees to
2 produce -- to work on documents that you were
3 going to produce to McKool Smith.  Are those
4 the documents that you were working on?
5     A.   Yes, they are.
6     Q.   Did you work on any other
7 documents with your employees before this
8 deposition, related to your Declaration?
9     A.   Primarily these documents.
10    Q.   Anything else?
11    A.   As it relates to this?
12    Q.   Yes.
13    A.   We generally, you know, discuss
14 and look at our models and things of that
15 nature.  But not -- but that's it.
16    Q.   Okay.  So aside from those
17 documents, what else did you look at prior to
18 prepare for your deposition today?
19    A.   No documents.  These and the
20 testimony -- the Declaration that I provided.
21    Q.   Thank you.  How is your firm
22 being compensated for your work in this
23 matter?
24    A.   Effectively, at a fixed -- as, A,

Page 17

R. D'VARI

1 we have an hourly rate, fixed hourly rate
2 schedule and also per CUSIP and calculation
3 analysis.
4     Q.   Now I didn't -- strike that.
5         What is the -- so can you
6 describe for me your compensation structure,
7 what your hourly rate is and the CUSIP --
8     A.   It varies by the level of the
9 employees, from analysts to managing director
10 to essentially the principal or the expert,
11 which in this case would be me.
12    Q.   So what's a range?
13    A.   I don't know the exact range
14 because I don't review really the engagement
15 letter and all those matters.  But the range
16 should be anywhere from, you know, 400 to
17 potentially to 950.
18    Q.   When you said you get, I believe
19 you said you are paid to do with the CUSIPs,
20 what does that mean?
21    A.   Well, each tranche of interest
22 within a trust essentially has designation
23 that is recognized by market and those
24 designations are called CUSIPs in the United

Page 18

R. D'VARI

1    States.
2
3        Q.   Right.  But you said that that
4    had -- that had something to do with your
5    compensation?
6        A.   Sure.  We perform an analysis on
7    a particular CUSIP that work on that and that
8    depends on the number of parts set up, we get
9    paid essentially a fixed fee on that.
10       Q.   So how much is that fixed fee?
11       A.   I don't recall.
12       Q.   You don't recall, okay.  Now I
13   saw that you -- did you file a retention
14   application with the bankruptcy court?
15       A.   Did I?
16       Q.   Your firm.
17       A.   I believe so.  I don't know the
18   exact circumstances.  Counsel handled that.
19       Q.   Okay.  Do you know if you were --
20   if your retention was approved by the
21   bankruptcy court?
22       MR. NAPOLI:  Objection.
23       A.   Again, I don't have any
24   information on that.
25       MR. NAPOLI:  Objection.  That's

Page 19

R. D'VARI

1    privileged information.
2        MR. CARNEY:  How is his
3    retention, his compensation privileged
4    information?  I mean, if he was
5    approved by the bankruptcy court,
6    there would be an order on the docket
7    and I didn't see one.
8        MR. LAWRENCE:  I think what
9    Mr. Napoli is saying, to the extent
10   there is information you learned only
11   through counsel, you shouldn't
12   disclose your communications with
13   counsel.
14       MR. CARNEY:  I think if it has
15   do with his compensation structure,
16   we can.
17       MR. LAWRENCE:  I don't know that
18   it has anything to do with his
19   compensation structure, per se, but go
20   ahead and ask your question
21   Mr. Carney.
22       Q.   All I want to know is do you know
23   if your retention was approved by the
24   bankruptcy court?
25

Page 20

R. D'VARI

1
2        A.   Again, the counsel handled the --
3    that work.  I was just provided the
4    information that was required.
5        Q.   So you don't know?
6        A.   I don't know the exact
7    circumstances, no.
8        Q.   But do you have a formal
9    engagement letter with Residential Capital?
10       A.   Yes, we do.
11       MR. CARNEY:  I just request that
12   you provide me with that.
13       MR. LAWRENCE:  It's been filed
14   with the court.
15       MR. CARNEY:  It has been, okay.
16       Q.   So do you know if you need court
17   approval for your fees?
18       MR. LAWRENCE:  To the extent
19   that this is, you would be revealing
20   communications with counsel, you
21   shouldn't do that.  But if you can
22   answer that without revealing
23   communications with counsel, you can.
24   So just respond to the extent that you
25   can respond without revealing

Page 21

R. D'VARI

1
2    communications with counsel.  And if
3    you can't, you won't respond.
4        A.   I don't think I know the exact
5    details.
6        Q.   All right.  So can you describe
7    for me the circumstances of how you got to be
8    engaged in this matter?
9        A.   Please clarify.
10       Q.   How were you approached to do
11   work for Residential Capital?
12       MR. NAPOLI:  Objection.  That's
13   legally privileged.
14       MR. CARNEY:  How he was
15   approached to be retained by
16   Residential Capital is legally
17   privileged?  That's a yes?
18       MR. NAPOLI:  Yes.
19       MR. CARNEY:  You are instructing
20   him not to answer that.
21       MR. LAWRENCE:  Ed, I think if
22   you want to generally ask when he was
23   approached and by whom, I think that
24   that's fine.  But we should not reveal
25   communications with counsel.

TSG Reporting - Worldwide    (877) 702-9580

Confidential

Page 22

R. D'VARI

1
2     THE WITNESS: I understand.
3     MR. LAWRENCE: But let
4  Mr. Carney ask the question.
5     Q.   Again, can you describe for me
6  how you got to be engaged in this matter, how
7  were you approached?
8     A.   We received a call and primarily,
9  ultimately, ended up being from the counsel.
10    Q.   Whose counsel?
11    A.   Morrison.
12    Q.   And --
13    MR. CARNEY: You shouldn't
14  reveal communications with counsel.
15    THE WITNESS: I understand.
16    A.   Essentially, subject matter was
17  something that we're right to deal with and
18  were asked to answer some questions and we
19  felt we were qualified to answer them and we
20  accepted the retention.
21    Q.   And when you were approached,
22  what were you told about the -- about what
23  you would be asked to be retained for, to do?
24    A.   It's, I think, all revealed in
25  the Declaration.

Page 23

R. D'VARI

1
2     Q.   I just want to know what your
3  understanding is as we sit here today.
4     A.   Would you like me to repeat what
5  our assignment was as per the Declaration?
6     MR. LAWRENCE: If you would like
7  to review your Declaration, you can
8  definitely do that.
9     MR. CARNEY: I just want to talk
10  about how he was retained for right
11  now and the circumstances of it.
12    A.   Again, the matters were, as
13  identified were presented to us whether our
14  firm and myself are capable of handling.
15    Q.   Okay.
16    A.   As stated in the Declaration and
17  we were able to -- and determine that we not
18  only would be able to handle that, we would
19  be able do it in a timely fashion.
20    Q.   Okay.  And can you just describe
21  for me in an initial conversation what they
22  asked you to do?
23    A.   Calculate essentially the
24  lifetime losses for certain tranches and
25  trusts.

Page 24

R. D'VARI

1
2     Q.   Okay.  And was there anything
3  else that they asked you to do aside from
4  that?
5     A.   No.
6     Q.   So have you worked for
7  Residential Capital in the past?
8     A.   No.
9     Q.   And has Morrison and Foerster
10  engaged you before in other cases?
11    A.   No.
12    Q.   And when were you retained by
13  Morrison and Foerster?
14    A.   I don't exactly remember the
15  exact date.
16    Q.   Ballpark?
17    A.   The day I was approached or the
18  day we were engaged?
19    Q.   How about both, when you were
20  approached first?
21    A.   I think about essentially, June,
22  July.
23    Q.   Of 2013?
24    A.   Yes.
25    Q.   Do you recall -- so it was late

Page 25

R. D'VARI

1
2  June, early July?
3     A.   Yeah.
4     Q.   And do you recall when you were
5  actually retained?
6     A.   Same timeframe.  Not exact dates.
7     Q.   So a little bit after that?
8     A.   Sure.
9     Q.   So a week after, two weeks?
10    A.   Yeah, probably.  A week probably.
11  I don't know the exact.
12    Q.   All right.
13    MR. LAWRENCE: Again, that
14  retention application is on file with
15  the court, so if you want the exact
16  date, you can get it there.
17    Q.   Have you ever been retained by
18  FGIC?
19    A.   It was already -- by the FGIC's
20  counsel, yes.
21    Q.   And when were you retained by
22  FGIC?
23    A.   Would have been, I believe 2010.
24    Q.   When in 2010?
25    A.   I don't remember the exact date.

7 (Pages 22 to 25)

Confidential

---

Page 26

R. D'VARI

1
2  Would have been probably -- I don't want to
3  speculate but sometime in 2010.
4      Q.   The middle of the year, end of
5  the year?
6      A.   You are asking me to tell you
7  something I don't remember.
8      Q.   So you don't know, you can't give
9  me an approximate time in 2010?
10         MR. LAWRENCE:  Objection.  Asked
11     and answered.
12     A.   No, I can't.
13     Q.   You can answer.
14     A.   As I said, I don't necessarily
15  keep track of time that way.
16     Q.   All right.  Are you still
17  retained by FGIC now?
18     A.   No.  But again, you know, the --
19  I am not exactly sure, you know, the
20  termination clauses, but we haven't worked
21  for FGIC for sometime now.
22     Q.   How long has it been since you
23  worked for FGIC?
24     A.   I think our effort would have
25  probably ended in late 2011.

---

Page 27

R. D'VARI

1
2      Q.   And can you describe for me how
3  that ended?
4      A.   Very normal fashion, completed
5  our assignment.
6      Q.   What was that assignment?  V?
7      A.   Really we were asked to calculate
8  losses for --
9         MR. GREEN:  Bart Green
10     representing FGIC.  I am going to
11     object to the extent you are asking
12     him to reveal communications with
13     counsel.
14         So to the extent that answer is
15     revealing your conversations with FGIC
16     or FGIC's counsel, I instruct you not
17     to answer.
18         MR. SHORE:  Chris Shore.  Can we
19     get a clarification on that?  Are you
20     instructing him not answer with
21     respect to communications that
22     occurred since he was retained by the
23     debtors in this case or this is only
24     with respect to the prior matter?
25         MR. GREEN:  Only to the prior

---

Page 28

R. D'VARI

1
2  matter.
3      Q.   So let me repeat my question.
4         So I asked you, Dr. D'Vari, can
5  you describe for me how that ended your
6  retention with FGIC and you said very normal
7  fashion, completed your assignment.  I asked
8  you what was that assignment.  So if you can
9  answer that question for me.
10     A.   That matter is really
11  confidential in nature.  And that's really as
12  far as I can go.
13     Q.   Okay.  Let me mark as, I believe,
14  Exhibit 4.  This is the Affidavit of
15  Michael W. Miller in further Support of the
16  first amended plan of rehabilitation.
17         (Whereupon, D'Vari Exhibit 4,
18     Affidavit of Michael W. Miller in
19     Further Support of the First Amended
20     Plan of Rehabilitation was marked for
21     identification as of this date by the
22     Reporter.)
23     Q.   We may look at this for other
24  issues again later, but if you can turn to
25  paragraph 12 on page --

---

Page 29

R. D'VARI

1
2      A.   Pardon me?  Can I take some time
3  to examine the document?
4      Q.   Certainly you can.
5      A.   Is there a date attached to this
6  document that I am not seeing?
7      Q.   It would be in the last page.  It
8  would be on page 13, December 12, 2012.
9      A.   Okay.  That's just around -- yep.
10  I see it.
11     Q.   Okay.
12         MR. LAWRENCE:  Dr. D'Vari, if
13     you have not seen this document, feel
14     free to review the document for as
15     long as you would like to review it.
16         THE WITNESS:  Thank you so much.
17     A.   I reserve the right to take time
18  to read it and when you present me with a
19  question.
20     Q.   Of course.  I would not -- I
21  would not object to that at all.
22     A.   Let's continue on.
23     Q.   So if you can please turn to
24  paragraph 12 on page 4 of this Affidavit.
25     A.   Please ask your question.

---

TSG Reporting - Worldwide     (877) 702-9580

Page 30

R. D'VARI

1
2      Q.   It says here that "Lazard also
3  reviewed runoff projections previously
4  prepared by FGIC in consultation with its
5  advisors, including Blackstone Advisory
6  Partners LP, Blackstone, and stress case
7  assumptions for FGIC's insured portfolio
8  developed by NewOak Capital Investors LLC,
9  NewOak an independent financial advisor
10 retained by counsel to FGIC."
11     Do you agree with the statement
12 in this Affidavit that you -- strike that.
13     Do you agree that you provided
14 stress case assumptions for FGIC's insured
15 portfolio?
16     A.   Yes, I do.
17     Q.   In connection with your retention
18 with them?
19     A.   Based on this document, yes.
20     Q.   Was there anything else that FGIC
21 asked you to do other than what's stated in
22 the Miller Affidavit?
23     A.   It is confidential --
24     MR. GREEN:  I object to the
25 question to the extent it is asking

Page 31

R. D'VARI

1
2  for work product or attorney/client
3  communications.
4      MR. CARNEY:  I didn't ask that.
5  I will repeat the question.
6      Q.   Was there anything else FGIC
7  asked you to do other than what's stated in
8  the Miller Affidavit?
9      A.   Our work under that contract is
10 confidential.  Therefore, I am not allowed to
11 say -- I am not able to tell you anything
12 more than what you already know.
13     Q.   So if -- so you won't answer
14 anymore questions about your retention by
15 FGIC?
16     A.   Not to the extent that it is in
17 public or it's been put in our Declaration or
18 you have available documents.
19     MR. LAWRENCE:  Just to be clear
20 you're talking about a prior
21 engagement with FGIC and FGIC's
22 counsel is here and instructing
23 Mr. D'Vari not to reveal those
24 communications.
25     MR. CARNEY:  I assume that --

Page 32

R. D'VARI

1
2      MR. LAWRENCE:  And Mr. D'Vari is
3  following those instructions based on
4  his obligations to FGIC.
5      Q.   Let me ask you:  Are you
6  following FGIC's counsel instructions not to
7  answer?
8      A.   Correct.
9      Q.   Okay.
10     MR. LAWRENCE:  It is not the
11 debtor's privilege to waive.  Just to
12 be clear.  Nor Mr. D'Vari's.
13     Q.   Can you tell me if the work you
14 did for FGIC was related to the ResCap
15 bankruptcy?
16     A.   The answer is no.
17     Q.   In connection with paragraph,
18 what's stated in paragraph 12 of the Miller
19 Affidavit, did you or did your firm NewOak
20 review the results of the analysis you
21 provided with Lazard?
22     A.   Confidential.  I am under -- I
23 cannot make references or reveal any
24 assignment within.  I have been instructed by
25 FGIC attorneys not to answer anything related

Page 33

R. D'VARI

1
2  to that.
3      Q.   I think you can answer -- I am
4  not asking for the substance, I'm just asking
5  if you reviewed the results with Lazard?
6      MR. LAWRENCE:  Objection; vague.
7  I also object to this whole line of
8  questioning as beyond the scope of
9  Mr. D'Vari's opinions in this case.
10     MR. SHORE:  Can we get a
11 clarification from FGIC's counsel?
12 Are you directing him not to answer
13 anything that calls for a confidence
14 that FGIC controls even though we can
15 designate it as Attorney's Eyes Only
16 under the existing confidentiality
17 stip and order?
18     MR. GREEN:  Will you repeat
19 that?
20     MR. SHORE:  Sure.  The
21 confidential order and stip allows to
22 have deposition transcripts sought
23 designated as whatever we ended up
24 with, highly confidential or
25 Attorney's Eyes Only.  We will happily

9 (Pages 30 to 33)

Page 34

```
 1           R. D'VARI
 2   take that information subject to an
 3   Attorney's Eyes Only designation.
 4       MR. GREEN:  I am objecting to
 5   the line of questioning as it's
 6   seeking information that's protected
 7   with, I believe a Confidentiality
 8   Agreement with the witness on a
 9   previous engagement and previous
10   matter.
11       MR. NAPOLI:  This is Ed Napoli
12   from NewOak Capital.  I concur and I
13   object also with any discussion of
14   that as, again, touching upon
15   confidential information.
16       MR. SHORE:  I'm just trying to
17   get -- the confidential information is
18   controlled by FGIC, right?
19       MR. NAPOLI:  We are party to
20   that agreement and it is also our
21   responsibility to protect and enforce
22   that agreement.  So I am concurring
23   with FGIC's objection and adding
24   NewOak's objection to it.
25       MR. SHORE:  That would be that
```

Page 35

```
 1           R. D'VARI
 2   notwithstanding the ability to
 3   designate it as Attorney's Eyes Only
 4   or highly confidential material you do
 5   not want to disclose to anybody?
 6       MR. NAPOLI:  That's correct.
 7   BY MR. CARNEY:
 8       Q.   And --
 9       A.   I would like to take a quick
10   break to consult my attorney.
11       MR. CARNEY:  Certainly.
12       MR. LAWRENCE:  There is no
13   question pending.
14       MR. CARNEY:  If there is, I will
15   ask it again.  That's fine.
16       (Whereupon, a recess was held.)
17       A.   Yes, please.
18   BY MR. CARNEY:
19       Q.   I believe you testified earlier
20   that your engagement with FGIC ended in, I
21   believe it was late 2011; is that correct?
22       A.   Our last work was done around --
23   end of 2011.
24       Q.   And I believe you testified that
25   that work was done when you -- I believe you
```

Page 36

```
 1           R. D'VARI
 2   said the phrase was you completed your
 3   assignment; is that correct?
 4       MR. LAWRENCE:  Objection.
 5       A.   I believe that's what I said,
 6   yes.  That's in the transcript.
 7       Q.   And I also believe you testified
 8   after reviewing paragraph 12 of the Miller
 9   Affidavit, which I believe is marked as
10   exhibit --
11       A.   4.
12       Q.   -- 4, yes, thank you.
13       That one of the things you did
14   for FGIC was prepare runoff projections and
15   stress case assumptions for FGIC's insured
16   portfolio; is that correct?
17       A.   I don't believe I -- I don't
18   recall saying that.
19       Q.   Well, let's take another look
20   again at paragraph 12 of the Miller
21   Affidavit.
22       A.   Sure.
23       Q.   You can just read it.
24       A.   Sure.
25       Q.   So do you believe that the
```

Page 37

```
 1           R. D'VARI
 2   description of at least one of the things
 3   that you did for FGIC in paragraph 12 is
 4   correct?
 5       MR. LAWRENCE:  Objection; vague.
 6       A.   As I highlighted the
 7   paragraph 12, I believe is correct.
 8       Q.   In connection with what you --
 9   the work you did for FGIC, did you produce a
10   written deliverable?
11       A.   Again, I think we are going into
12   confidential matters.  Anything related to
13   that, unless -- I would like to ask you
14   whether there is an objection to that.
15       MR. LAWRENCE:  It is FGIC's
16   objection.  So FGIC will object if
17   they think that it goes beyond the
18   bounds of what you can testify to with
19   your relationship.
20       Q.   My question was, again, in
21   connection with the work you did for FGIC,
22   did you produce a written deliverable?
23       MR. GREEN:  The witness can
24   answer that question with a yes or
25   a no.
```

Page 38

R. D'VARI

1
2    A.    Yes.
3    Q.    Did that written deliverable
4  contain runoff projections?
5        MR. GREEN:  I will object to the
6    question to the extent it is seeking
7    confidential and privileged
8    information about a previous
9    engagement that's not related to this
10    deposition or this matter.
11        MR. CARNEY:  Are you instructing
12    him not to answer that question?
13        MR. GREEN:  He can answer the
14    question with a yes or a no.
15    A.    Please repeat the question.
16    Q.    Certainly.  Did the written
17  deliverable contain runoff projections?
18    A.    Yes.
19    Q.    Okay.  And did that written
20  deliverable contain stress case assumptions
21  for FGIC's insured portfolio?
22    A.    Yes.
23    Q.    Did that written deliverable
24  contain Base Case assumptions for FGIC's
25  insured portfolio?

Page 39

R. D'VARI

1
2    A.    Frankly, I don't recall.
3    Q.    Did that written --
4    A.    Let me -- most likely not but I
5  don't remember.
6    Q.    Why would you say "most
7  likely not"?
8        MR. GREEN:  I will object to
9    this question to the extent it is
10    seeking information about a previously
11    engagement that's confidential.
12        MR. CARNEY:  Are you instructing
13    him not to answer?
14        MR. GREEN:  To the he's going to
15    reveal confidential information, yes.
16        MR. LAWRENCE:  I think he has
17    already answered.
18    Q.    Let me ask the question again
19  with that objection.  My question was, did
20  that written deliverable contain Base Case
21  assumptions for FGIC's portfolio?  You
22  answered frankly, I don't recall.  Then you
23  said most likely not but I don't remember.
24        And then I just asked you why
25  would you say most likely not and we had

Page 40

R. D'VARI

1
2  Mr. Green interpose his objection, and I am
3  asking you the question again.  Why would you
4  say that your written deliverable to FGIC
5  most likely did not contain a Base Case
6  assumption for FGIC's insured portfolio?
7    A.    I don't have any further comment.
8        MR. GREEN:  Same objection.
9        MR. LAWRENCE:  Let FGIC object,
10    Dr. D'Vari.
11        MR. GREEN:  Same objection.
12    A.    I am being instructed not to
13  answer.
14        MR. CARNEY:  Did you instruct
15    him not to answer?
16        MR. GREEN:  To the extent it is
17    revealing confidential information,
18    yes.  Or privileged information, yes.
19    Q.    And you believe my question
20  implicates privileged and confidential
21  information?
22    A.    I do believe.
23    Q.    As to why there is no Base Case
24  scenario in your written to FGIC, correct?
25    A.    Correct.

Page 41

R. D'VARI

1
2    Q.    Now, can you tell me whether your
3  written deliverable contained anything other
4  than runoff projections and stress case
5  assumptions for FGIC's insured portfolio?
6        MR. GREEN:  I object to this
7    questioning.
8        MR. CARNEY:  It is a yes or no
9    question, anything other than.
10        MR. GREEN:  I object to the
11    question.
12        MR. CARNEY:  Are you instructing
13    him not to answer?
14        MR. GREEN:  Yes.
15        MR. CARNEY:  You are instructing
16    him not to answer, yes or no, whether
17    or not his report to deliver to FGIC
18    contained anything other than runoff
19    projections and stress case
20    assumptions for FGIC's insured
21    portfolio?  You won't let him answer
22    yes or no to that question?
23        MR. GREEN:  Yes, I think that's
24    requiring him to reveal confidential
25    information about the previous

Page 42

R. D'VARI

1
2  engagement.  You have asked a number
3  of questions like this and you are
4  getting the same objection, yes.
5      Q.    Are you abiding by FGIC's counsel
6  instruction not to answer?
7      A.    Yes.
8      MR. LAWRENCE:  It is improper to
9  ask whether he is abiding by -- by a
10  prior engagement where it is their
11  privilege to waive to say to the
12  witness are you abiding by it.  If he
13  is instructed not to answer by counsel
14  in a prior engagement, he has to
15  follow that.  It is improper to ask
16  him as if it is his choice.
17      MR. CARNEY:  I completely
18  disagree with that but duly noted.
19      MR. SHORE:  As far as perfecting
20  our objection and our right to seek
21  discovery, are you saying that every
22  time he is instructed not to answer,
23  the witness is not going to answer and
24  we don't have to follow-up?
25      MR. LAWRENCE:  It is not the

Page 43

R. D'VARI

1
2  debtor's privilege to waive.  It is
3  FGIC's privilege to waive.  It is an
4  unrelated matter.
5      MR. SHORE:  You're not answering
6  my question.  Every time he is
7  instructed not to answer, do we need
8  to follow-up with the perfection of
9  our discovery objection by asking the
10  witness are you going to follow that
11  instruction?  That's all.
12      MR. LAWRENCE:  You don't have to
13  ask the witness whether he will follow
14  the instruction.  The witness is not
15  going to disobey instructions from
16  counsel.
17      MR. SHORE:  Thank you.
18  BY MR. CARNEY:
19      Q.    This is another yes or no
20  question, I want a yes or no answer.  Did
21  anyone within NewOak review the results of
22  your written deliverable to FGIC with Lazard?
23      MR. LAWRENCE:  Objection.  Vague
24  as to time.
25      Q.    In late 2011.

Page 44

R. D'VARI

1
2      MR. GREEN:  Object to form.
3      Q.    You can answer.
4      A.    Please repeat the question again.
5      Q.    Did anyone within -- did you or
6  anyone within NewOak review the results of
7  your analysis related to runoff projections
8  and the stress case assumptions for FGIC's
9  insured portfolio with Lazard?
10      A.    Timeframe, please.
11      Q.    Late 2011.
12      A.    Yes.
13      Q.    Can you tell me with whom at
14  Lazard?
15      A.    Confidential information.
16      Q.    Can you tell me whether it was
17  with Michael Miller?
18      A.    Again, confidential information.
19      MR. LAWRENCE:  Again,
20  Dr. D'Vari, that's FGIC's call as to
21  what you can respond to and what you
22  cannot.
23      THE WITNESS:  Sorry.  I request
24  that you actually repeat your
25  objection and instruct me every time a

Page 45

R. D'VARI

1
2  question for a yes or no.  Because I
3  am under -- I am not going to be, just
4  for your information, I am not going
5  to, you know -- I am under
6  confidential agreement.  I am going to
7  honor that and I just need to, as long
8  as you are going down those questions,
9  I would like to have for every
10  question that is being asked, clarify
11  whether I can answer yes or no.
12      MR. GREEN:  Can we take a break
13  just to clear -- I need some
14  clarification on this type of
15  question?
16      MR. LAWRENCE:  Do you mind?
17      MR. CARNEY:  No.
18      MR. LAWRENCE:  Let's take a
19  quick break.
20      (Whereupon, a recess was held.)
21  BY MR. CARNEY:
22      Q.    So before we took a break,
23  Dr. D'Vari, I asked you whether anyone --
24  whether anyone within NewOak reviewed the
25  results of your analysis related to runoff

Page 46

R. D'VARI

1  projections and the stress case assumption
2  for FGIC's portfolio with Lazard, and I
3  clarified the timeframe as late 2011, and you
4  answered yes, such review did take place.  I
5  asked you with whom at Lazard and we went off
6  the record.  So --
7      MR. LAWRENCE:  I will object.
8      If that's a question, I don't know if
9      it was, but it is a very long compound
10     question if it was one.
11     MR. CARNEY:  It was more of a
12     narrative, so I can ask the question
13     again.
14     MR. LAWRENCE:  Please ask a
15     question.
16     Q.  I will start over.  Did you or
17  anyone within NewOak review the results of
18  your analysis related to runoff projections
19  and stress case assumptions for FGIC's
20  insured portfolio with anyone at Lazard?
21     MR. LAWRENCE:  Objection.  Asked
22     and answered.  Vague as to time.
23     Q.  In late 2011.
24     MR. GREEN:  I will let the

Page 47

R. D'VARI

1  witness answer who he may have spoken
2  with but not what the substance of
3  those conversations were.
4      Q.  Whom did you speak with,
5  Dr. D'Vari?
6      A.  A team from Lazard on credit.
7      Q.  And who was on the team, do you
8  recall?
9      A.  I think there was a litany of
10 people.
11     Q.  Do you recall any names
12 specifically?
13     A.  Not in particular.
14     Q.  Do you recall ever meeting with
15 Michael Miller?
16     A.  Don't believe so.
17     Q.  Do you recall if anyone on your
18 team ever met with Michael Miller?
19     A.  Personally recall?  I don't
20 necessarily know all the -- who people have
21 met or not met.  But I don't recall it
22 specifically.
23     Q.  Do you have any reason to believe
24 that someone on your team may have met with

Page 48

R. D'VARI

1  Michael Miller?
2      MR. LAWRENCE:  Objection.
3      Vague.
4      A.  That's speculation.
5      Q.  So you don't know if anyone on --
6  at NewOak met with Michael Miller?
7      A.  Not aware of.  More
8  appropriately, I don't recall.
9      Q.  Do you know if the results of
10 your -- the analysis you did for FGIC that we
11 have been discussing, was considered in
12 regard to the analysis in the Miller
13 Affidavit conducted by Lazard?
14     MR. GREEN:  Objection to the
15     form.
16     Q.  You can answer.
17     A.  I have no information past
18 delivery of our services.
19     Q.  So just to clarify, you don't
20 know what FGIC did with your report after you
21 produced it to them?
22     A.  We are not a party to that.
23     MR. CARNEY:  Can we mark as
24     Exhibit 5.  This is your Declaration

Page 49

R. D'VARI

1  in connection with the 9019 motion.
2      (Whereupon, D'Vari Exhibit 5,
3      D'Vari Declaration Regarding 9019
4      Motion was marked for identification
5      as of this date by the Reporter.)
6      A.  Yes, I have read it.
7      Q.  Okay.  Now, before we get into
8  this Declaration, there was one other thing I
9  wanted to clarify with respect to the Lazard
10 analysis we have been talking about.  When
11 you were -- when you were producing your
12 deliverable with respect to runoff
13 projections and stress case assumptions for
14 FGIC insured portfolio?
15     A.  You are referring back to
16 Clause 12?
17     Q.  Yes.  In connection with the work
18 you performed for FGIC.  Did you analyze any
19 trusts that FGIC insured?
20     MR. GREEN:  Objection to the
21     form and objection to the extent he is
22     seeking confidential information about
23     a previous confidential work you did
24     for FGIC in a separate matter and

13 (Pages 46 to 49)

Page 50

R. D'VARI

1  instruct you not to answer.
2  Q.  It is a yes or no question did
3  you analyze trusts?
4  MR. GREEN:  I think answering
5  yes or no is asking for that
6  confidential information, so I
7  instruct you not to answer.
8  MR. LAWRENCE:  It's FGIC's
9  privilege to assert or not assert.  So
10  Dr. D'Vari will follow FGIC's
11  instructions on that.  He has to.  He
12  has no choice but to.
13  Q.  So looking at your Declaration,
14  are you providing an opinion in connection
15  with the debtor's 9019 motion to approve the
16  ResCap, FGIC settlement agreement?
17  A.  I am providing opinion within --
18  I have been instructed to calculate certain
19  things and I have calculated irrespective of
20  them.
21  Q.  Can you tell me what is the
22  opinion that you provided ResCap?
23  A.  My opinion --
24  MR. LAWRENCE:  Objection.

Page 51

R. D'VARI

1  Vague.
2  THE WITNESS:  Sorry.
3  MR. LAWRENCE:  Objecting to the
4  vagueness of the question.
5  A.  Please clarify.
6  Q.  What is your understanding -- I
7  am asking you whether or not you are
8  providing an opinion in connection with the
9  debtor's 9019 motion?
10  MR. LAWRENCE:  Objection.  Asked
11  and answered.
12  THE WITNESS:  Sir?
13  MR. LAWRENCE:  I objected.  It's
14  already been asked and answered was my
15  objection.
16  Q.  You can answer.
17  A.  I am providing opinions in the
18  Declaration within the questions asked.
19  Q.  Okay.  And what is your opinion
20  that you are providing?
21  MR. LAWRENCE:  I object because
22  it is a very vague question.
23  A.  It is a vague question.  Be
24  specific on the specific opinions.

Page 52

R. D'VARI

1  Q.  Well, you know it is your
2  Declaration so in your Declaration, can you
3  please point out where your opinions are
4  expressed?
5  A.  Opinions are only expressed in
6  our conclusions as well along the way about
7  every question asked.  So you are more than
8  free to point to specifics and I will be able
9  to answer very specifically.
10  Q.  Why don't we start out with
11  describing for me the scope of your
12  assignment then.
13  A.  Yes.  I am here to offer you -- I
14  was offering, essentially, answering to
15  two questions.  One, both related to a
16  lifetime expected losses.  One related to the
17  collateral underneath certain trusts, and,
18  second, was the lifetime losses related to
19  certain -- the certificates that were not
20  wrapped by FGIC.
21  Q.  Do you know -- strike that.
22  So when you said that one of the
23  questions you were asked to offer an opinion
24  on was related to the collateral underneath

Page 53

R. D'VARI

1  certain trusts?
2  MR. LAWRENCE:  Objection.
3  Q.  What does "that" mean?
4  MR. LAWRENCE:  Objection.
5  Misstates his testimony.
6  MR. CARNEY:  I read it verbatim.
7  Q.  What does "that" mean?
8  A.  I said lifetime collateral losses
9  that are backing -- are underneath certain
10  trusts.
11  Q.  Can you explain for me in greater
12  detail what you did to do that?
13  A.  Are you asking us how -- how we
14  analyzed and calculated lifetime expected
15  losses?
16  Q.  Yes.
17  A.  I don't want to give you a very
18  long answer.  The bottom line is we calculate
19  cash flows for the underlying mortgages going
20  forward, that's the forecast element.  But we
21  also calculate losses that have already
22  occurred with regard to the mortgages that
23  are -- that were in the trust from the day of
24  insurance to the date of the analysis.

14 (Pages 50 to 53)

Page 54

R. D'VARI

1
2      Q.   You said there were two parts to
3   the questions you were asked to answer?
4      A.   Yes.
5      Q.   What is the second part?
6          MR. LAWRENCE:  Objection.
7   Vague.
8          But you can answer if you can.
9      A.   As I said, there are separate
10   questions, unrelated questions.  One relates
11   to the collateral underneath the 47 trusts,
12   and the second question is lifetime losses as
13   it relates to the tranches or interest
14   certificates.  Certificate -- you know, the
15   interest tranches, which as I highlighted by
16   CUSIPS, that are not wrapped by FGIC.  In
17   both cases the, the question is lifetime
18   losses.  One is the collateral and for life.
19      Q.   Do you know why you're asked to
20   prepare your opinion?
21          MR. LAWRENCE:  Objection.
22          To the extent that you can
23      answer that question without revealing
24      communications with counsel, you can.
25      You can testify as to things you were

Page 55

R. D'VARI

1
2   asked to assume but not the why as to
3   why you were doing what you were
4   doing.
5      A.   That was really not my role to
6   really get involved with entire, but it is in
7   support as it is declared in relationship to
8   a motion that is in paragraph 1.
9      Q.   And who gave you the issues that
10   you were to address in your Declaration?
11      A.   Morrison.
12      Q.   And can you tell me what they
13   told you the issues that they wanted you to
14   address?
15      A.   I think it is very specific in
16   paragraph 2 in my Declaration.
17      Q.   Can you point me to that?
18      A.   Paragraph 2, which is I offer
19   this Declaration to opine on, one, lifetime
20   expected collateral losses.  Would you rather
21   me to verbatim?
22      Q.   No, no, you can point me.
23      A.   All the issues -- all the nature
24   of my Declaration is limited and contained in
25   paragraph 2.  So that's the scope.  That's

Page 56

R. D'VARI

1
2   really what I am here to opine on.  To
3   describe.
4      Q.   So the lifetime expected
5   collateral losses of the RMBS trusts
6   referenced in Exhibit B to the FGIC ResCap
7   settlement agreement and the extent of any
8   quote past or future loss to holders of
9   securities issued by the FGIC insured trusts
10   not insured by FGIC; is that correct?
11      A.   Correct.
12      Q.   I see that you have quotes around
13   some of the phrasing in Clause 2.
14      A.   Um-hum.
15      Q.   Where is that language coming
16   from?
17      A.   The language itself?
18      Q.   Yes, the quote "any past or
19   future losses to holders of securities,
20   bracket, issued by the FGIC insured trust,
21   close bracket, not insured by, bracket, FGIC,
22   close bracket, comma, close quote."  Where is
23   that language from?
24      A.   The language itself?
25      Q.   Yes.  It is quoted so I assume it

Page 57

R. D'VARI

1
2   is not yours.
3      A.   Frankly, I don't recall why the
4   quotes are in there or the brackets at the
5   moment.
6      Q.   Now, other than what's in your
7   Declaration, is it true -- is it correct that
8   you have no other opinions with respect to
9   the debtor's 9019 motion?
10      A.   Correct.
11      Q.   And you have no other opinions
12   with respect to the 9019 motion, correct?
13      A.   Correct.
14      Q.   Are all the bases of your
15   Declaration fairly and accurately set forth
16   in your Declaration?
17      A.   Correct.
18      Q.   Do you know, to your knowledge,
19   were the results of the analysis in your
20   Declaration used in support of or as
21   reference with any other analysis or support?
22          MR. LAWRENCE:  Objection; vague.
23      A.   I don't -- the Declaration is
24   what it is.
25      Q.   But you don't know if it's been

1           R. D'VARI
2  used?
3       A.   I've not been privileged for
4  that.
5       Q.   Can you describe for me how
6  materials were provided to you in connection
7  with the preparation of your Declaration?
8       A.   Please clarify.
9       Q.   What sources did you use for your
10 Declaration?
11      A.   The sources were the trusts
12 themselves, essentially, we were given the
13 name of the trusts and we were also provided
14 and confirmed the tranches were -- which
15 tranches were wrapped and which tranches were
16 not wrapped.  That's really the extent of
17 what we really relied on.
18      Q.   And can you point me in your
19 Declaration to the trust that you analyzed?
20      A.   Let me identify the page for you,
21 the table.
22      Q.   Sure.
23      A.   Yes, there is Schedule 1.
24      Q.   Okay.  So Schedule 1 represents
25 all of the trusts that you analyzed; is that

1           R. D'VARI
2  correct?
3       A.   Correct.
4       Q.   Okay.  Are these all what you
5  defined to be FGIC insured trusts?
6       A.   Yes.  The definition is -- the
7  trust, of course, not to be interpreted that
8  the trust itself was insured, but there were
9  tranches within those trusts that were
10 insured.
11      Q.   I understand.  And who provided
12 you with the trusts that you were to analyze?
13      A.   Morrison.
14      Q.   And what other materials did you
15 consider in forming your Declaration?
16      A.   Broad question but I will answer.
17 Primarily Intech.  We also used MBS data,
18 which is -- MBS data.  We then use our own
19 economic forecasts.
20      Q.   Before we go into the
21 Declaration, I want to ask you to circle back
22 for a bit to the questions about your work
23 for FGIC.  In your deliverable to FGIC that
24 we were discussing, did any part of -- the
25 analysis you did in any part of that

1           R. D'VARI
2  deliverable, did you analyze or consider any
3  of the trusts listed on Schedule 1 to your
4  Declaration here?
5       MR. GREEN:  I am going to object
6  to that question and answering yes or
7  no is going to ask the witness to
8  reveal confidential information about
9  a previous matter.  I think we have he
10 harped on this over and over again, so
11 I am renewing my objection.
12      MR. SHORE:  I would make a
13 request on the record that FGIC
14 reconsider the objection, which
15 essentially is instructing the witness
16 not to answer whether he had, in
17 performing work for the debtors with
18 respect to certain trusts on behalf of
19 the debtors, had previously done work
20 for FGIC is on the other side of the
21 settlement with respect to the very
22 same trust.  So please reconsider and
23 either allow the witness to answer now
24 or allow him to answer later.  We
25 certainly think it is highly relevant

1           R. D'VARI
2  information for the purposes of
3  determining, among other things, the
4  credibility of the witness.
5       MR. BAIO:  We join in that.
6       MR. GREEN:  The question is
7  about previous work that the witness
8  did for FGIC that is covered by a
9  Confidentiality Agreement, and I don't
10 have authority to permit him to
11 testify about substance of his work.
12      MR. SHORE:  When would you be
13 able to get that authority?
14      MR. CARNEY:  Do you want to see
15 if you can get that authority in a
16 break?
17      MR. GREEN:  When we have a break
18 later today, I will check.
19      MR. CARNEY:  While we are on the
20 question.  How long would it take you
21 to check?
22      MR. GREEN:  There is a hearing
23 going on in this matter right now.  So
24 that might cause some limitations.
25 But I will check at the next break.

16 (Pages 58 to 61)

Page 62

1            R. D'VARI
2       MR. CARNEY:  All right.
3       MR. SHORE:  Just to be clear for
4  the record, we are not closing the
5  deposition until we get the answer to
6  that question.
7       MR. LAWRENCE:  And you have the
8  debtor's objection to that, to not
9  closing the deposition.
10      MR. SHORE:  Then I guess what we
11 will do is why don't we continue on,
12 and then, if we don't have an answer
13 from FGIC, we will go to the court
14 prior to the close of the deposition
15 and get the court's views with respect
16 to whether or not the witness can
17 answer at least at this point on an
18 Attorney's Eyes Only bases such that
19 we can address the confidentiality at
20 a later date.
21      MR. LAWRENCE:  Just for the
22 debtor's perspective, Mr. D'Vari is
23 here to talk about his Declaration in
24 connection -- his opinions in
25 connection with this matter.  That's

Page 63

1            R. D'VARI
2  an unrelated matter.  No one has even
3  asked him whether he looked at that
4  prior work in connection with this
5  opinion.
6       MR. CARNEY:  I completely
7  disagree.
8       MR. SHORE:  Let me ask this
9  though.  Because the debtors are
10 trying to say it is a FGIC issue.  Is
11 it the debtor's position that they
12 don't know whether Mr. D'Vari did work
13 for FGIC on the very same trusts that
14 they have retained this witness to
15 provide expert testimony on?
16      MR. LAWRENCE:  It is debtor's
17 position this is completely unrelated
18 to his opinions.
19      MR. SHORE:  Does that mean you
20 know or does that mean you don't know?
21      MR. LAWRENCE:  It is completely
22 unrelated to his opinions, Chris.
23      MR. CARNEY:  I disagree.
24      MR. LAWRENCE:  If we have a
25 standing objection to this whole line

Page 64

1            R. D'VARI
2  of questioning, but if you want to
3  waste your time asking him about
4  something that has nothing to do with
5  his opinions, go right ahead.
6       MR. CARNEY:  I think that if he
7  analyzed the same trust he is
8  analyzing here and they were analyzed
9  differently or even the same in a
10 different engagement, I think that's
11 highly relevant, but I think we will
12 keep this question open until late in
13 the deposition when Mr. Green can see
14 what authority he can or can't get.
15 So we will move on at this point, but
16 obviously, we will come back to this
17 later.
18      MR. LAWRENCE:  Ask him whether
19 he considered any prior work in
20 connection with his opinions here.
21      MR. CARNEY:  Let's just move on.
22      MR. LAWRENCE:  You don't want to
23 ask that question.  I understand.
24      MR. CARNEY:  I might ask it
25 later.

Page 65

1            R. D'VARI
2       MR. SHORE:  I will take it out
3  of turn and ask the question, if you
4  want me to.
5       THE WITNESS:  Please.
6       MR. SHORE:  Go ahead.  I got my
7  list.  I will get to it later.
8       MR. LAWRENCE:  No one wants to
9  ask the question.
10      MR. SHORE:  I don't have -- it
11 is out of deference.
12      THE WITNESS:  I will call my
13 secretary and cancel my matinee.
14      MR. LAWRENCE:  Go ahead.
15 BY MR. CARNEY:
16   Q.   Did you consider any prior work
17 in connection with your opinions here?
18   A.   No.
19      MR. SHORE:  Did your team?
20   Q.   Did your team?
21   A.   No.
22   Q.   Have you ever analyzed any of
23 these trusts before on Schedule 3 in
24 connection with any other -- any other -- at
25 any other time, other than in this engagement

                              17 (Pages 62 to 65)

Page 66

R. D'VARI

1   R. D'VARI
2   with ResCap?
3       MR. GREEN:  I am going to object
4   to that question.  If it is asking
5   about his previous work for FGIC on a
6   separate matter, that's confidential.
7       MR. CARNEY:  I am asking if he
8   ever, in any capacity before you get
9   your authority or not, I am asking if
10  him ever analyzed the trusts in any
11  capacity before.  It is a yes or no.
12      MR. GREEN:  Other than his
13  previous work for FGIC?
14      MR. SHORE:  I think a yes or no
15  answer will not reveal if it had been
16  done for FGIC.
17      MR. GREEN:  If it was only for
18  previous work for FGIC, yes, it will
19  reveal the answer for that.  Logically
20  it would.
21      MR. CARNEY:  Logically, I am
22  asking if he ever looked at these
23  before in connection with any other
24  engagement.  That's all I want to know
25  right now.

Page 67

R. D'VARI

1   R. D'VARI
2       MR. GREEN:  Other than his
3   previous work for FGIC.
4       MR. CARNEY:  I didn't say --
5       MR. GREEN:  Otherwise you are
6   asking the same question you are just
7   broadening the universe of what you
8   are looking at.
9       MR. CARNEY:  I am asking a
10  legitimate question about whether he
11  looked at these before.  If he is not
12  going to answer, that's fine.  But I
13  think that's highly out of line for
14  you to instruct him not answer a
15  question that doesn't involve FGIC as
16  it's been asked.
17      MR. LAWRENCE:  Mr. Carney, I
18  think you are asking the same question
19  and it is, we shouldn't have these
20  lengthy dialogues.  It is wasting
21  time.  If FGIC believes you are asking
22  the same question and instructing him
23  not to answer, Mr. D'Vari will follow
24  their instructions on that.
25      MR. GREEN:  I will check on the

Page 68

R. D'VARI

1   R. D'VARI
2   open issue we have asked about at the
3   next break.  But to the extent this
4   question is asking about his previous
5   work for FGIC and it is confidential,
6   I ask the witness not answer it.
7   BY MR. CARNEY:
8       Q.   Other than what you may have
9   looked at in your engagement with FGIC, have
10  you ever analyzed these trusts before in any
11  other capacity?
12      A.   The answer is I don't actually
13  remember at this point, and when you say we
14  or me, it also involved my team.  And I don't
15  have that information being able to clearly
16  answer yes or no.
17      Q.   So as you sit here today, do you
18  personally recall, other than with respect to
19  your engagement with ResCap and perhaps with
20  FGIC, do you personally recall ever analyzing
21  these trusts before in any prior engagement?
22      MR. LAWRENCE:  Asked and
23  answered.
24      MR. GREEN:  Object to the form.
25      MR. LAWRENCE:  But you can

Page 69

R. D'VARI

1   R. D'VARI
2   answer.  You already have.
3       A.   I already said I don't
4   particularly recall that this work -- this
5   set of securities had been looked at in other
6   matters or not.
7       Q.   Do you have a general idea?
8       MR. LAWRENCE:  Objection.
9       A.   As I said, you are asking a very
10  specific question there could be one of these
11  that we have looked at in another matter.
12  Could have been five of them.  Could have
13  been six of them.  So the answer is I cannot
14  answer specifically to that.
15      Q.   So if you reviewed this list in
16  Schedule 3, sorry, Schedule 1?
17      A.   Yes.
18      Q.   Although you may have analyzed
19  these before, you can't tell me definitely
20  whether or not; is that correct?
21      A.   There is 106 or 7, I don't
22  exactly recall specific tranches involved
23  here.  And we are a firm that analyzed things
24  daily for large financial institutions in
25  relationship to legal and non-legal matters.

18 (Pages 66 to 69)

Page 70

R. D'VARI

1 So I would not be able to tell you whether we
2 have or not because then I would be perjuring
3 myself if I answered.
4     Q.   So you don't know?
5     A.   I don't know.
6         MR. CARNEY:  I want to take a
7     quick break for a couple of minutes,
8     if that's all right.
9         MR. LAWRENCE:  That's fine
10     with us.
11         (Whereupon, a recess was held.)
12 BY MR. CARNEY:
13     Q.   I would like to -- going to ask
14 you a question I previously asked again, and
15 based on discussion I had with FGIC counsel,
16 and if you would look at Schedule 1 to your
17 Declaration again.
18     A.   Sure.  Did you analyze any of
19 these trusts on Schedule 1 in connection with
20 the deliverable you produced to FGIC that we
21 discussed earlier?
22         MR. GREEN:  The witness can
23     answer that question with a yes or
24     a no.

Page 71

R. D'VARI

1     A.   Yes.
2     Q.   Can you tell me which ones?
3         MR. GREEN:  You can answer that
4     question.
5     A.   All of them.
6     Q.   All of them?
7     A.   Only -- of the trusts themselves
8 or the tranches?  Yes, we have looked at all
9 of these.  But not as it relates to
10 Question 1.  But, again, the answer is all of
11 them as far as looking at bonds -- I have to
12 be very careful.  The Question 1 is not
13 really relates to that assignment.  What we
14 are talking about is our work is tranche
15 based.
16     Q.   Okay.  So --
17     A.   Did we look at these trusts, all
18 of these trusts were looked at.
19     Q.   Okay.  If you turn to Schedule 3
20 of your Declaration.
21     A.   Yes.
22     Q.   Could you describe for me what is
23 on Schedule 3 of your Declaration?
24     A.   It lists the tranches of the FGIC

Page 72

R. D'VARI

1 trusts.  Again, clarify, FGIC trusts means
2 that they wrapped one or all of the tranches
3 or anywhere in between and the list of the
4 actual tranches that were wrapped by FGIC
5 within those 47 specific trusts are listed in
6 Schedule 3.
7     Q.   In connection with your
8 deliverable we have been discussing to FGIC,
9 did you analyze any of the FGIC wrapped bonds
10 on Schedule 3?
11         MR. GREEN:  The witness can
12     answer with a yes or a no.
13     A.   Yes.
14     Q.   Which ones?
15     A.   My guess is all of them, but I
16 haven't double checked.
17     Q.   Let's turn back to page 1 of your
18 Declaration.  In paragraph 2, when you
19 describe the FGIC Insured Trusts, are you
20 specifically referring to the securities that
21 have monoline insurance policies covering
22 losses or are you referring to the entire
23 trust?
24     A.   Question 1 refers to trusts

Page 73

R. D'VARI

1 themselves.  And no specific tranche
2 specifically.  It's a whole different
3 question.
4     Q.   Right.  So while a certain
5 tranche of bonds in that trust may be
6 insured, the entire trust is not; is that
7 correct?
8     A.   Correct.  In some cases.  Well,
9 in no cases trusts are insured.  But there
10 could be situations where all bonds,
11 certificates that are issued are insured.
12     Q.   I understand.  For your
13 historical loss information, did you rely --
14 what sources of information did you rely
15 upon?
16     A.   Primarily Intex and -- Intex.
17 Would you like me to define it?
18     Q.   No.  Any other vendors, any other
19 sources?
20     A.   Intex.
21     Q.   If you look back again at what we
22 marked previously as Exhibits 1, 2 and 3.
23     A.   Exhibit 1, okay.
24     Q.   Take Exhibits 1, 2 and 3 as a

19 (Pages 70 to 73)

Page 74

1           R. D'VARI
2    whole.
3        A.    Okay.
4        Q.    Now, do these represent the
5    underlying analysis, what you did that
6    supports the underlying analysis in your
7    Declaration?
8        A.    Correct.
9        Q.    Is there any -- are there any
10   other documents that you have other than
11   these three, what's contained in these
12   three exhibits that would represent what you
13   did as part of the underlying analysis to
14   your Declaration?
15       A.    The answer is this is
16   substantially what we rely on to do the
17   analysis.  But there are certain parameters
18   in here that, for example, that home pricing
19   index, that's an import that is derived by
20   NewOak and so this is not something that
21   we -- it is relied on for further analysis
22   but this is our output.
23       Q.    Okay.  So just to be clear, the
24   first part of your analysis, the lifetime
25   expected collateral losses?

Page 75

1           R. D'VARI
2        MR. LAWRENCE:  Objection.
3    Assumes facts not in evidence.
4        MR. CARNEY:  I will withdraw the
5    question.
6        Q.    So for historical loss
7    information, you relied only on Intex; is
8    that correct?
9        A.    Correct.
10       Q.    So can you tell me why you
11   divided your Declaration into two parts?
12       A.    Because the questions --
13       MR. LAWRENCE:  Objection.
14       A.    The questions are in two parts.
15       Q.    Those were the questions
16   presented to you; is that correct?
17       A.    Correct.
18       Q.    Can you tell me how you
19   calculated the cumulative collateral losses?
20       A.    To what extent?
21       Q.    Turn to page 6.
22       MR. LAWRENCE:  Page 6 of what?
23       MR. CARNEY:  Of his Declaration.
24       A.    Yes.
25       Q.    In paragraph 18 you write "It is

Page 76

1           R. D'VARI
2    determined the total lifetime expected
3    collateral losses for each of the 47 FGIC
4    Insured Trusts" --
5        A.    Just one second.  Sorry which
6    page?
7        Q.    Page 6 of your Declaration, which
8    I believe is Exhibit 4.
9        A.    I got it.
10       Q.    It is paragraph 18.
11       A.    Yep.
12       Q.    And paragraph 18 reads that "to
13   determine the total lifetime expected
14   collateral losses for each of the 47 FGIC
15   Insured Trusts, my analysis is divided into
16   two parts."
17       A.    Correct.
18       Q.    "One, cumulative collateral loss
19   up to the analysis date plus forecasted
20   future collateral losses."  My question is,
21   how did you calculate the cumulative
22   collateral losses up to the analysis date in
23   Clause 1?
24       A.    That is as reported by the
25   trustee, collected by Intex, and effectively

Page 77

1           R. D'VARI
2    reads presenting that back to -- so those are
3    the actual numbers reported to trustee.
4    Trustee reports are used by Intex and Intex
5    reports those numbers.
6        Q.    So this number is directly pulled
7    from Intex; is that correct?
8        A.    Correct.  By running an analysis.
9    Essentially factual information that has
10   occurred and reported by Intex.
11       Q.    So in your work papers, have you
12   presented the settings and assumptions you
13   used in pulling those cumulative collateral
14   losses from Intex?
15       MR. KAUFMAN:  Objection to form.
16       MR. LAWRENCE:  Objection. Lacks
17   foundation.
18       You can answer.
19       A.    There is no really setting
20   required.  Those are numbers, again, that
21   part of the analysis is fairly factual and
22   so -- and it is effectively pulling data out
23   of the database and reporting it in an Excel
24   output.
25       Q.    So it is an objective number?

20  (Pages 74 to 77)

Confidential

Page 78

R. D'VARI

1     A.   It is an objective number.  So
2  that means it doesn't really matter who
3  actually pulls that number.  It is what it
4  was there as of the analysis date.
5     Q.   When you calculated those
6  cumulative collateral losses -- strike that.
7     Did you review the historical
8  FGIC wrapped -- the losses on the FGIC
9  wrapped securities in conjunction with the
10  historical collateral losses on the FGIC
11  Insured Trusts?
12     A.   Sorry, are we back on my
13  Declaration?
14     Q.   Yes, on your Declaration.
15     A.   Review historical losses on the
16  trusts?
17     Q.   Did you review -- let me rephrase
18  that.
19     Did you review the historical
20  bond losses on the FGIC wrapped tranches, the
21  FGIC wrapped bonds, did you review those
22  separately from the historical collateral
23  losses on the FGIC Insured Trusts themselves?
24     A.   That's not part of the question
25

Page 79

R. D'VARI

1  within -- we did not look at the FGIC wrapped
2  bonds in this analysis.  Bonds are different
3  than trusts.
4     Q.   Right.  But with respect to the
5  trusts, you didn't do an analysis of the FGIC
6  Insured Trusts and separate out from that
7  analysis an analysis of the FGIC wrapped
8  bonds; is that correct?
9     A.   Had that number come out of, for
10  example, the analysis when you are running
11  the trust, we didn't look at those as --
12  because it was not part of our exercise.  It
13  may have been a byproduct of analysis.  I
14  don't quite -- that's not something that I
15  either focused nor cared about at that point.
16     Q.   Okay.  And that was, again,
17  because that wasn't part of the scope of your
18  assignment; is that correct?
19     A.   This is a very specific
20  assignment with very specific requests.
21     Q.   Okay.  Now, if you look at
22  paragraph 20 of your Declaration, you, the
23  last sentence of that paragraph reads that
24  "The aggregate cumulative collateral losses
25

Page 80

R. D'VARI

1  for the FGIC Insured Trusts are
2  $3,670,792,103."  Do you see that?
3     A.   Sorry, you are referring to
4  paragraph 20?
5     Q.   Paragraph 20, last sentence.
6     MR. LAWRENCE:  On page 7.
7     Q.   It is on page 6.
8     A.   Yes, the aggregate, yes, that's
9  our number.
10     Q.   And that number, again, that's
11  pulled directly from Intex; is that correct?
12     A.   Correct.  You won't pool that
13  number.  You have to get it from individual
14  trusts and you need to perform summation to
15  get to those numbers.  And there may be some
16  multiplications involved as well.  It depends
17  on the balance and things of that nature.
18     Q.   But the underlying data is
19  generated by Intex?
20     A.   There are no assumptions built
21  into that.
22     Q.   Okay.  It is an objective number?
23     A.   It is an objective number.
24     Q.   Can you tell me in the next
25

Page 81

R. D'VARI

1  section beginning with paragraph 22 on page 7
2  how did you calculate future collateral
3  losses?
4     A.   That involves, essentially, using
5  NewOak expected -- NewOak analysis of the --
6  do you want me to get into details?  We
7  essentially run forecast cash flows on
8  those -- and then I use Intex.  We use Intex
9  and RMBS data and our assumptions to get to
10  the forecast numbers.
11     Q.   Well, let's back up.  If you look
12  at paragraph 22, the first sentence.  You say
13  that -- that you and your team of experienced
14  analysts acting under your supervision
15  applied NewOak's RMBS Analysis Methodology.
16     A.   Correct.
17     Q.   Is that correct?
18     So my next question is what is
19  NewOak's RMBS Analysis Methodology and how
20  does it work, can you please explain that
21  to me?
22     A.   Sure.  Starts out with macro
23  assumptions that are highlighted in
24  Exhibit 1.  Those are then translated to what
25

21 (Pages 78 to 81)

Page 82

R. D'VARI

1
2  Intex expects as of the analysis date forward
3  looking, voluntary prepayments, forward
4  looking essentially default rates and forward
5  looking severities combined with interest,
6  term structure as of time of analysis.
7      Q.   Is that analysis that you just
8  described for me, is that a standard
9  analysis?
10     A.   That is a -- for NewOak?
11     Q.   No, for RMBS.  Would other
12  people -- other participants in your
13  industry, would that be an analysis they
14  would use in looking at the questions you
15  were asked to evaluate in your Declaration?
16     A.   Yes.
17     Q.   Are there other methodologies
18  that are commonly accepted in your industry
19  that others use?
20     A.   With regard to the tools?
21     Q.   Pardon me?
22     A.   As regard to the tools used?
23     Q.   Well, no.  You said that you
24  have -- you used NewOak's RMBS Analysis
25  Methodology?

Page 83

R. D'VARI

1
2      A.   Right.
3      Q.   You said, I believe, that it
4  is -- that would be standard methodology in
5  the industry, correct?
6      A.   In its form, correct.
7      Q.   Yes.  Are there other -- my
8  question is, are there other methodologies
9  that differ from that that are also standard
10  in the industry?
11     A.   My answer to that would be
12  probably not.
13     Q.   Okay.
14     A.   Again, varies in details but --
15  and the shape and their form is effectively
16  predicting collateral prepayments, collateral
17  defaults, collateral severity rates,
18  converting those to -- in this particular
19  case, you are looking at the underlying
20  collateral itself not necessarily the
21  tranches.  And that would be standard.
22     Q.   Now, when you say that "NewOak's
23  RMBS Analysis Methodology considers
24  information, relies upon assumptions
25  customarily employed by market participants."

Page 84

R. D'VARI

1
2  I believe that's the first of paragraph 23.
3  And that you next go on to write that your
4  "information is culled from a wide variety of
5  internal and external sources."
6          Can you tell me what information
7  is -- well, first of all, can you tell me
8  what assumptions customarily employed by
9  market participants do you use in NewOak's
10  RMBS market methodology?
11     A.   Again, it varies in form.
12  Typically in the marketplace.  But you have
13  voluntary prepayment, voluntary default
14  rates, and severities and various people use
15  different ways to get to those forward
16  looking assumptions.  And, but at the end of
17  the day if you are going -- if Intex is your
18  primary tool, which Intex is by far one of
19  the most widely used tools for analyzing
20  RMBS, then you have to be able -- you have to
21  put in those inputs.  Whether they are
22  provided in a vector form or provided in a
23  constant vector or effectively trying to get
24  at ultimate cum loss, and that varies in
25  terms of resolution but it doesn't vary in

Page 85

R. D'VARI

1
2  form.
3      Q.   So are those inputs or settings
4  that you use, are those identified in your
5  work papers?
6      A.   Correct, they are.  If you allow
7  me, I can specifically point to it.
8      Q.   Please do.
9      A.   There are, in Exhibit 3, and the
10  information, again, repeatedly are done
11  for -- let me actually see whether -- there
12  are two dates, but ultimately, they apply to,
13  as relative to the trust that they are in.
14  So a trust may have multiple tranches, but
15  the same assumption will be used for every
16  single bond within that trust and they would
17  be under -- there are no column headings.  I
18  mean the Column A, B, C, D.  But there is a
19  prepay rate default and those would be
20  numbers that you can see.  Vector -- they are
21  not printed fully here but would be provided
22  in Excel sheet format.
23     Q.   Right.  I understand.  Are there
24  any assumptions that were used that are not
25  reported in your work papers?

22 (Pages 82 to 85)

Page 86

R. D'VARI

1
2      A.    No. I think we have highlighted
3  our macro.  We have highlighted specific run,
4  which is, that's Exhibit 2, actually, that
5  use those ultimately, the information that is
6  provided in Exhibit 3, that goes into.  The
7  interest rate is obviously, if you run Intex
8  with these inputs, you should be able to get
9  similar answers.
10     Q.    So can you explain for me just
11 what a group vector set is?
12     A.    Each trust has multiple groups of
13 loans that are different.  And those
14 groups -- some trusts only have one group.
15 Some may have two.  Some may have three.  We
16 are identifying the number of groups
17 within -- I think it was the first, you know,
18 within the trust we have identified.  If you
19 want to take -- give me one second.
20     Q.    Sure.
21     A.    You will have in Schedule 1,
22 Exhibit 5, the number of collateral groups
23 are identified.  So, and you would identify
24 vectors for those groups and you apply them.
25     Q.    So I suppose in layman's terms,

Page 87

R. D'VARI

1
2  each tranche is backed by its own certain
3  kind of collateral and you use different
4  assumptions to approximate the loss on each
5  type of collateral?
6      A.    If necessary.
7      Q.    Why would that be necessary
8  versus why wouldn't it be necessary?
9          MR. LAWRENCE:  Objection; vague.
10     A.    Why would they have -- the
11 different groups would have different
12 assumptions you mean?
13     Q.    Yes.
14     A.    Potentially, because they may
15 have different characteristics.  But there
16 are two ways to get to the final number.  One
17 is make the Group 1 and Group 2 match, and
18 then second thing is you are actually
19 measuring total pool performance because
20 that's the historical on progression you have
21 is the total pool.  So in -- the alternatives
22 do that.  You can actually apply Group 1 and
23 Group 2 as being the future forecast or you
24 can run them together or use identical
25 numbers.  But make sure that you are blending

Page 88

R. D'VARI

1
2  CPR, CDR, VDR is actually representative of
3  the total pool.  So different levels of
4  assumptions.
5      Q.    In paragraph 26 of your
6  Declaration on page 8, you mention -- you
7  mention the steps that you undertake to
8  calculate your forecasts represented in these
9  group vectors.  In Item 4, adjustment of
10 projections for macroeconomic factors.
11     A.    Correct.  You are under 25?
12     Q.    26. 26, subparagraph -- I guess
13 Item 4.
14     A.    Sure.
15     Q.    What macroeconomic factors are
16 considered or do you consider?
17     A.    I think those are provided in
18 Exhibit 1, which is a product of our credit
19 committee that produces effectively what we
20 believe the most important factors for RMBS.
21 We believe home price indices going forward
22 affects different pools in different ways in
23 different times and those are provided.  Then
24 there is also unemployment, because
25 ultimately, unemployment relates to

Page 89

R. D'VARI

1
2  performance of mortgages in general, the
3  amount of supply and also use what is called
4  credit availability.  Is it easy to get a
5  mortgage or is it not and that's really a
6  subjective, not an objective parameter that
7  considers to be able to track its forecast
8  and calibrate it against the market forecast
9  on an ongoing basis and use that as a basis
10 for performing analysis for not just these
11 bonds but a large of number of bonds that we
12 actually performed for our clients on a
13 monthly or weekly basis.
14     Q.    Other than those macroeconomic
15 factors that you mentioned, do you consider
16 any others?
17     A.    No, this is the, effectively, the
18 net results of the blended views of what we
19 call the street research, the views we hear
20 in the marketplace as market observer and
21 participant in an advisory firm and we
22 effectively blend that into a committee
23 analysis of what we believe, based on those
24 inputs, the future is going to hold.
25     Q.    Is that a committee within your

23 (Pages 86 to 89)

Page 90

R. D'VARI

1      firm?
2          A.   It is.
3          Q.   Are you on the committee?
4          A.   Yes, I am.
5          Q.   How many people are on the
6      committee?
7          A.   I don't know exact number, but it
8      would be somewhere between half a dozen to
9      maybe a dozen.  At different times different
10     people participate.  It is a fairly open
11     meeting.
12         Q.   How does the committee come to a
13     decision on, you know, the final -- the
14     actual macroeconomic factors that NewOak is
15     going to use in its analysis?
16         A.   Again, in -- it comes down from
17     top to the bottom.  The top being obviously
18     the state of housing industry, the current
19     performance that has already occurred and
20     observed and housing is a very well reported
21     sector.  If you Google it, you will find
22     essentially there are a lot of opinions out
23     there.  But every single Street firm, Wall
24     Street firm that provides research

Page 91

R. D'VARI

1      effectively puts out a view, and that
2      ultimately leads to something we look at and
3      we observe.  But there is not a mechanical
4      way that we can combine those.  This is
5      subject to a discussions within the team what
6      factors going forward will be relevant.
7          Q.   Who makes the final decision?
8          A.   Ultimately, it falls on my
9      shoulder whether I agree with that.  But I
10     take everybody's input including my own.
11         Q.   I see.  And you probably -- I
12     believe you may have answered this, but if
13     you can just tell me again how you obtain the
14     information that goes into these
15     macroeconomic factors again so I am clear?
16         A.   That's a research reports that we
17     get from Street firms, and the number of them
18     are numerous.  And we also actually look at
19     the performance that we have seen on --
20     NewOak subscribes to MBSData.  MBSData was
21     not as specifically applied, you know, in
22     this run, but there are -- the performance
23     and surveillance that we get from those would
24     highlight to us, for example, how the housing

Page 92

R. D'VARI

1      market is working because of the severity
2      that are imbedded in the underlying actual
3      performance that we see.
4          Q.   In paragraph -- moving on to
5      paragraph 28 now on page 9 of your
6      Declaration.  You reference that the -- that
7      "The NewOak analysis accounts for
8      macroeconomic influences resulting in what
9      you call a Base Case collateral performance
10     projection"; is that correct?
11         A.   Correct.
12         Q.   Now, specifically, these
13     macroeconomic projections I understand
14     include home prices, unemployment, and credit
15     availability, correct?
16         A.   Correct.
17         Q.   So can you describe for me the
18     projections that are used for each of those
19     references?
20         A.   The projections for --
21         Q.   Home prices?
22         A.   Home prices, they are provided to
23     you in terms of ultimately what we have come
24     up with.  We certainly look at home prices,

Page 93

R. D'VARI

1      historical home prices as of that particular
2      point in time.  The dynamics that's going on.
3      The availability of credit that, by the way,
4      sort of the three factors that are
5      highlighted that are somewhat related.  So
6      but that -- but independently, we arrive at
7      those three depending on the direction of the
8      actual observed home prices, the actual
9      description of what's going on in terms of
10     the economy and those are converted to our
11     view of home prices versus, for example, the
12     consensus from the Street.
13         Q.   Okay.  So I understand.  So to
14     the results of your analysis --
15         A.   Sure.
16         Q.   -- and your Declaration, do the
17     results of this report reflect your Base Case
18     forecast?
19         A.   Correct.
20         Q.   So did you conduct alternative
21     stress scenarios in this Declaration?
22         A.   No.
23         MR. LAWRENCE:  When you have a
24     chance to take a break, my colleague

24 (Pages 90 to 93)

Page 94

R. D'VARI

1
2    needs to take a break actually, if you
3    have a chance.  At any point.
4          MR. CARNEY:  I will -- one more
5    question and then I think it would be
6    a good time to take a break.
7          Q.    Before we take a break, I will
8    ask you, is it your opinion that the Base
9    Case -- the Base Case analysis in your
10   Declaration reflects the expected outcome
11   under the current economic environment?
12         A.    Right.
13         MR. CARNEY:  I think we can take
14   a break.
15         (Whereupon, a recess was held.)
16   BY MR. CARNEY:
17         Q.    Dr. D'Vari, whenever you are
18   ready.
19         A.    I am ready.
20         Q.    Okay.  So I am going to ask you a
21   little more about the NewOak RMBS
22   methodology.  How long has -- how long has
23   NewOak RMBS Analysis Methodology been in
24   place, how long have you used it?
25         A.    With the continuous process from

Page 95

R. D'VARI

1
2    my own Black Rock days to NewOak to the
3    methodology itself and the approach is really
4    accumulation of, you know, both NewOak team's
5    experience and myself.
6          Q.    So the NewOak methodology,
7    NewOak's RMBS Analysis Methodology was in
8    place in 2011, you used it in 2011?
9          A.    Methodology versus the actual
10   inputs are two different things.
11         Q.    I am asking you about the
12   methodology.
13         A.    The general methodology, as I
14   said, market standard and, yes.
15         Q.    The general methodology also
16   would have been used by you in 2012, too,
17   correct?
18         A.    To various degrees of refinement.
19         Q.    Okay.
20         A.    Inputs.  Definitely subject to a
21   lot of the inputs.
22         Q.    So would you -- so if you were
23   going to analyze a CUSIP bond, would any
24   CUSIP that you analyzed be analyzed using
25   NewOak's RMBS Analysis Methodology?

Page 96

R. D'VARI

1
2          A.    If I were going to?
3          Q.    Yes.
4          A.    When and how?
5          Q.    If I asked you to analyze a CUSIP
6    listed in your schedule today --
7          A.    Yes.
8          Q.    -- you would use NewOak's RMBS
9    Analysis Methodology?
10         A.    Absolutely every single security
11   that we price and calculate cash flows are
12   used using NewOak's evolving methodology.
13         Q.    And the same would have been true
14   in 2011?
15         A.    Same -- it would have been using
16   the macro information from NewOak's.  It
17   would have used ultimately getting to these
18   vectors and then ultimately calculating cash
19   flows and then calculating losses.
20         Q.    And the answer would be the same
21   for analysis you may have done in 2012?
22         A.    Yes, that's a generic process
23   that we have been using.
24         Q.    So if you ran the -- this Base
25   Case that you ran in for the purposes of your

Page 97

R. D'VARI

1
2    Declaration, if you ran that in -- on the
3    securities listed in the trust list on
4    Schedule 1 and the securities listed in
5    Schedule 3, if you ran this -- the Base Case
6    on those securities and trusts in 2011 and
7    2012, would NewOak's RMBS Analysis
8    Methodology reflect NewOak's opinion and
9    economic collateral performance of the then
10   current economic conditions?
11         MR. LAWRENCE:  Objection.
12   Vague.
13         A.    As I said, this process would
14   have been run, as a process in general would
15   have been using all the information up to
16   that point, generating inputs that would go
17   into Intex.  Then from Intex, we would have
18   had output.  So that process has never
19   changed.
20         Q.    So would that process, had it
21   been run in 2011 and 2012, reflected your
22   opinion of the collateral performance of the
23   economic conditions current at that time?
24         A.    Again, you have to define the
25   scenario.  You know, scenario being Base

Page 98

R. D'VARI

1  Case.
2      Q.    Base Case?
3      A.    There would have been a Base Case
4  as of then and then in general there would
5  have been credit committee outputs and there
6  would have been ultimately reaching
7  conclusions of home prices but not
8  necessarily the exact set of tools that would
9  gotten to the same vectors, but ultimately,
10  we would have used vectors to analyze.
11      Q.    Right.  And your analysis and
12  would, again, reflect your opinion of the
13  collateral performance at that time under
14  those economic conditions?
15      MR. LAWRENCE:  Objection.  It is
16  an improper hypothetical.
17      MR. CARNEY:  He is an expert I
18  can ask him hypothetical questions.
19      A.    In general, any time we do an
20  analysis that's ultimately our opinion.
21      Q.    Okay.  And this analysis, had it
22  been run at that time, 2011, 2012, would be
23  the basis of your opinion?
24      A.    It would have been -- yes,
25

Page 99

R. D'VARI

1  exactly.  Our analysis is independent.
2      Q.    You had mentioned inputs to Intex
3  and one thing I want to ask before I move on,
4  in the papers you provided in your work
5  papers, Exhibits 1, 2 and 3, did you provide
6  the Intex settings files using connection
7  with this analysis?
8      A.    I am not exactly sure that was
9  provided or not.  I would be more than glad
10  to provide -- to examine that at a later
11  date.
12      MR. CARNEY:  We ask that those
13  be provided, and I will contact your
14  counsel about that.  Thank you.
15      Q.    So let's move on to paragraph 31
16  on page 9 of your Declaration.
17      A.    Right.
18      Q.    And you indicate that your
19  expected -- pardon me.
20      You indicate that your remaining
21  future expected loss is approximately
22  1.7 billion; is that correct?
23      A.    1.7 billion and change, right.
24      Q.    Now, does this reflect the loss
25

Page 100

R. D'VARI

1  to all of the tranches within the 47 Insured
2  Trusts both wrapped and not wrapped?
3      A.    This is a collateral losses.  The
4  translation of collateral loss to individual
5  tranche losses is a whole different exercise.
6  So what you are looking at here is primarily
7  collateral loss and we are opining on
8  collateral loss here.
9      Q.    Just so I am clear, so this
10  reflects the loss to the entire insured
11  trust; is that correct?
12      A.    This reflects the entire
13  collateral loss.  Collateral being the only
14  asset that the trusts have is the mortgage
15  loans.
16      Q.    Right.
17      A.    And this reflects the principal
18  losses to those mortgages.
19      Q.    And that's to the mortgages
20  backing -- or collateral -- the mortgages
21  backing both the wrapped bonds and the
22  non-wrapped bonds?
23      A.    Correct.  This is the entire
24  grouping of mortgages within each trust.
25

Page 101

R. D'VARI

1      Q.    Okay.  Now, did you also forecast
2  the expected losses to the FGIC wrapped
3  securities independent of those total losses?
4      A.    As I said, that was not the
5  subject of our Declaration.  Had it been by
6  accident produced, we have not looked at it.
7      Q.    And you didn't do that because
8  you weren't asked to; is that correct?
9      A.    Correct.
10      Q.    So your conclusion is that the
11  FGIC insured RMBS losses total 5.4 billion
12  today; is that correct, around 5.4 billion?
13      A.    For the trust.
14      MR. LAWRENCE:  Objection.
15  Misstates his prior testimony.
16      Q.    So your conclusion is that FGIC
17  insured RMBS losses total around $5.4 billion
18  today?
19      MR. LAWRENCE:  Same objection.
20      A.    RMBS.  We are not talking about
21  RMBS.  We are talking about trusts.
22  Two different things.
23      Q.    So explain to me what the
24  five point --
25

26 (Pages 98 to 101)

Page 102

R. D'VARI

1
2     A.    Securities versus trusts are two
3  different things.
4     Q.    So explain to me what the
5  5.4 billion in losses represent?
6     A.    I think we have gone over it.  It
7  is collateral loss.  Meaning mortgage loans
8  underneath the trust.  The exercise from
9  those to specific RMBSs, it's a totally
10  different exercise, which we had not taken up
11  for FGIC wrapped bonds.
12     Q.    So then the remaining expected
13  future loss to the collateral in the FGIC
14  insured trust --
15     A.    Trusts.
16     Q.    -- is you predict that to be
17  around 1.7 billion; is that correct?
18     A.    Yes, that's our opinion.
19     Q.    That's your opinion.  So have you
20  reviewed any other references for past unpaid
21  claims or -- strike that.
22        So did any part of your analysis
23  consider past payments FGIC would have made
24  on account of its insurance policies with
25  respect to the wrapped bonds?

Page 103

R. D'VARI

1
2     A.    As of the numbers you are seeing
3  here.
4     Q.    As part of your analysis.
5     A.    Entire analysis?
6     Q.    Yes, entire analysis.  Did do you
7  that calculation, did you take that number
8  into account?
9     A.    No, we -- I would like to answer
10  that question when we get into the RMBS
11  positions, which is a different question than
12  collateral.  This is strictly speaking the
13  mortgage loan losses that underneath -- which
14  doesn't relate directly to the RMBSs.  And it
15  is not a straightforward calculation.
16     Q.    But with respect to the RMBS?
17     A.    So we are moving on to RMBS?
18     Q.    Well, for now.
19     A.    Okay.
20     Q.    With respect to the RMBS, in your
21  Declaration, did you come to a -- an estimate
22  of the total losses with respect to FGIC
23  wrapped RMBS?
24        MR. LAWRENCE:  Asked and
25  answered.

Page 104

R. D'VARI

1
2     A.    Asked and answered, no.
3     Q.    No, okay.  Turn to paragraph 2 of
4  your Declaration, please.  You say in
5  paragraph 2, based on this understanding of
6  the scope of your assignment, right, you
7  write "I believe that a conservative estimate
8  of the aggregate amount of the claims
9  released by the FGIC trustees as defined
10  below under the Settlement Agreement is
11  $5 billion and change."
12     A.    Yes.
13     Q.    What are those claims related to
14  then?
15     A.    You will allow me to read my --
16     Q.    Yes, of course.
17     A.    I don't really recall where that
18  number comes from, but I suspect it was out
19  of the settlement.
20     Q.    Well, but -- it is in your
21  Declaration and the thing that troubles me or
22  makes me curious, rather, is you said you did
23  not do any estimate of the losses to the FGIC
24  wrapped bonds, but you are saying that the
25  claims released by the FGIC trustees under

Page 105

R. D'VARI

1
2  the Settlement Agreement is $5 billion, and I
3  am curious if those claims don't relate to
4  FGIC wrapped bonds, what do they relate to
5  and what does that number mean?
6     A.    They are related.  I don't
7  believe this a computed number.  I think it
8  may be coming from the settlement.  The
9  specific.
10     Q.    Have you reviewed the Settlement
11  Agreement?
12     A.    Not in detail at all.
13     Q.    Well --
14     A.    I think that's a number -- I need
15  to -- at this point, I need to examine this
16  number further.
17     Q.    Turn to paragraph 56 of your
18  Declaration, please.  It is on page 15.
19     A.    Oh, sorry, yes.
20     Q.    Could you explain to me what --
21  let's turn first to 55 and 56.  Let's take
22  them together.  Could you read those
23  paragraphs?  Take a moment to review them and
24  explain to me what you are trying to convey
25  in those paragraphs, please.

27 (Pages 102 to 105)

| Page 106 | Page 107 |
|---|---|

**Page 106**

1              R. D'VARI
2      A.   Okay.  Thank you.
3          I need to do some calculations in
4  my head if you don't mind.
5      Q.   Sure.
6      A.   Okay.  I think this is a derived
7  number, actually.  Taking the overall
8  collateral loss, subtracting the,
9  essentially, what we estimate as being the
10  total losses to non-wrapped bonds, you should
11  arrive at that number, but I haven't done
12  that in my calculation.  In my head.
13      Q.   Okay.  So let me walk through
14  this again.  So you are saying -- let's start
15  at paragraph 55.
16      A.   Yes.
17      Q.   Your analysis tells you that
18  the -- or you represent in your Declaration,
19  rather, that the total lifetime loss to
20  non-wrapped bonds is $22,537,395, correct?
21      A.   Correct.
22      Q.   And the estimated losses to
23  senior IO certificates is zero.  And the
24  estimated upper bound of unrealized loss
25  expected residual economic value is

**Page 107**

1              R. D'VARI
2  390,385,776?
3      A.   That's correct.
4      Q.   And so you believe that the total
5  estimated lifetime loss to non-wrapped
6  interest in the FGIC insured trust is
7  412,923,171; is that correct?
8      A.   Yes.
9      Q.   Okay.  So on to paragraph 55.
10          MR. LAWRENCE:  You are referring
11  to 56?
12          MR. CARNEY:  56, thank you.
13      Q.   And you -- then you say based on
14  your understanding that the FGIC Insured
15  Trusts and the FGIC trustees have estimated
16  claims to be 5,414,532,474 and you said you
17  obtained that estimate from the Settlement
18  Agreement?
19      A.   No, I did not say that.  It could
20  be, but there is actually a subtraction of
21  the total collateral loss estimated by us
22  less non-wrapped bonds, which would be
23  allocated or attributed.  So if you -- if you
24  actually, you know, consider the potential
25  claims by non-wrapped bonds, subtracted by

| Page 108 | Page 109 |
|---|---|

**Page 108**

1              R. D'VARI
2  the estimated collateral loss, you could say
3  that this amount is what it potentially
4  could be.
5      Q.   The 5.4 billion?
6      A.   Yes.  5.001.  5 billion
7  essentially.
8      Q.   Okay.  Let me get this straight.
9      A.   No, 54 is total collateral.
10      Q.   Okay.
11      A.   That's the total collateral loss.
12      Q.   So the 5.4 billion is a total
13  collateral loss to the FGIC Insured Trusts in
14  the aggregate?
15      A.   Correct.
16      Q.   And then subtracting out,
17  subtracting from that the 412,923,171?
18      A.   Correct.
19      Q.   You are then estimating that the
20  actual losses to the FGIC wrapped bonds, by
21  backing out the non-wrapped stuff is
22  5 billion; is that correct?
23          MR. LAWRENCE:  Objection.
24      A.   I am not saying that that's the
25  number.  I am saying this is what we are

**Page 109**

1              R. D'VARI
2  effectively -- if you have a -- that's the
3  upper bound.  But what I am trying to say is
4  that if you have a total loss and you
5  allocate certain loss to a non-wrapped bond
6  the other part is what gets released.
7      Q.   Is the best estimate or your
8  estimate in your Declaration of the
9  collateral losses to the FGIC wrapped bonds
10  is approximately $5 billion; is that correct?
11          MR. LAWRENCE:  Objection.
12      A.   No, the collateral loss is very
13  different.
14      Q.   Okay.  I understand we are
15  talking about RMBS?
16      A.   We are talking about RMBS, mixing
17  it with collateral.  This number is nothing
18  but subtraction of the cumulative loss that
19  mortgages underneath would incur, and if you
20  had losses to a tranches of bonds, that would
21  remain -- essentially, this is the
22  subtraction of two numbers at this point
23  without regard to anything else.
24      Q.   Okay.  So if you circle back,
25  then, so this basis is 55 and 56?

Page 110

1          R. D'VARI
2     A.    That's the same number.
3     Q.    That's where, going back to
4 paragraph 2, is where you believe that a
5 conservative estimate of the aggregate amount
6 of the claims released by the FGIC trustees
7 under the Settlement Agreement is $5 billion;
8 is that correct?
9     A.    As I said it, if you take the
10 upper bound, meaning the collateral loss, if
11 you take it as a given not as a matter of
12 fact, I am not stating an opinion on that at
13 all, I am just saying if you take that as an
14 upper bound, the lifetime, my opinion on the
15 lifetime collateral loss and if you also take
16 my opinion for the non-wrapped bonds, if you
17 subtract those two numbers, that would be an
18 upper bound for what gets released. But it
19 doesn't attribute it to anything and doesn't
20 opine on any other matter.
21     Q.    But that would be the upper bound
22 to the losses on the FGIC wrapped bonds?
23     A.    This is actually --
24          MR. LAWRENCE: Let him finish
25     the question before you answer.

Page 111

1          R. D'VARI
2     Q.    My question but that would be, as
3 I understand what you are saying, that would
4 be an upper bound to the losses on the FGIC
5 wrapped bonds; is that correct?
6          MR. LAWRENCE: Objection.
7     A.    I am saying it is a conservative
8 number.
9     Q.    Under your analysis?
10     A.    Again, that's not the subject of
11 my opinion but that's a side derived number
12 from that.
13     Q.    I am going to mark this, I
14 believe, as Exhibit 6. This the
15 Gary C. Holtzer's affirmation in support of
16 the Settlement Agreement in the
17 rehabilitation court.
18          (Whereupon, D'Vari Exhibit 6,
19          Gary C. Holtzer's Affirmation in
20          Support of the Settlement Agreement in
21          the Rehabilitation Court was marked
22          for identification as of this date by
23          the Reporter.)
24          (Whereupon, a recess was held.)
25

Page 112

1          R. D'VARI
2 BY MR. CARNEY:
3     Q.    Before we go on to that document
4 that I marked, let's go back to paragraph 31
5 on page 9 of your Declaration.
6     A.    Correct.
7     Q.    Now, here -- now, here you are --
8 you've opined that the total collateral
9 losses to the FGIC Insured Trust is about
10 5.4 billion; is that correct?
11     A.    Again, collateral.
12     Q.    Collateral, yes, yes.
13     A.    Yes.
14     Q.    Now, if you look at the -- your
15 estimation that we just talked about in
16 paragraph 55 and 56 and let's turn back to
17 that. At the end of 56 that your aggregate
18 of the amount of the claims released by the
19 FGIC trustees under the Settlement Agreement
20 would be approximately -- so it would be
21 approximately 5 billion; is that correct?
22     A.    It says what it says, correct.
23     Q.    So if you took the ratio of that
24 5 billion loss, the $5 billion in claims of
25 the FGIC trustees related to the wrapped

Page 113

1          R. D'VARI
2 bonds here?
3          MR. LAWRENCE: Objection.
4     A.    The word's claims released not
5 claims. Two different. In my view.
6     Q.    Fair enough. So if you take the
7 claims released by the FGIC trustees, now can
8 you confirm for me that those claims
9 released, of the 5 billion, that those claims
10 released are related to the FGIC wrapped
11 bonds; is that correct?
12          MR. LAWRENCE: Objection.
13     A.    No. This is exactly simple
14 subtraction of collateral loss less the
15 non-wrapped bonds and it is what it is.
16     Q.    Okay.
17     A.    We are not opining on any other
18 matters except the two questions asked. What
19 is the total collateral loss and what is the
20 non-wrapped certificate losses.
21     Q.    Okay.
22     A.    It doesn't really relate to any
23 other claims.
24     Q.    Mr. D'Vari if you turn again to
25 paragraph 2, please.

29 (Pages 110 to 113)

Page 114

R. D'VARI

1    A.    Yes.
2    Q.    On page 2, paragraph 2, it
3  continues onto page 2, you say "Are you
4  right, that you believe, you believe, that a
5  conservative estimate of the aggregate amount
6  of the claims released by the FGIC trustees
7  under the Settlement Agreement is five --
8  approximately $5 billion"; is that correct?
9    A.    Claims released?
10    Q.    Yes.
11    A.    Again, with the definition to be
12  defined and not mistaken with other matters.
13  It is just a subtraction of two numbers.  It
14  really is not saying anything more than that.
15    Q.    Well, it says you believe a
16  conservative estimate of the claims released.
17  That's what it says, correct?
18    A.    Correct.  There is a
19  conservative -- there is a word estimate and
20  there is a word claims released.
21    Q.    Okay.
22    A.    You have to put those
23  two together to -- the answer is that number
24  represents the subtraction of two numbers and

Page 115

R. D'VARI

1  you or anybody else could interpret that
2  number any way they want.
3    Q.    Okay.  But again, that is the
4  total amount of claims released; is that
5  correct?
6    MR. LAWRENCE:  Objection.  Asked
7  and answered.
8    A.    That is the estimate of when you
9  take -- you subtract the total collateral
10  loss from the interest in the tranches that
11  are not wrapped.  You get that number.
12    Q.    Okay.  And if you take that
13  number and divide it by the total collateral
14  loss of 5.4 billion?
15    A.    Correct.
16    Q.    You want to take that ratio, I
17  can get a calculator if you need, would you
18  agree that's around 92.6%, over 5.4?
19    A.    Let me just run -- take a look
20  at.  That is correct but, also, I would want
21  to refer you to page 5, Table 1.  That's also
22  the ratio of par amounts.
23    Q.    So the ratio of par amounts is
24  actually a little higher, isn't it, 96.27%?

Page 116

R. D'VARI

1    A.    Correct.
2    Q.    Okay.
3    A.    But, again, those are -- I want
4  to be very clear that extrapolation from
5  collateral to actual tranche losses is a
6  mathematical exercise that we have only done
7  for non-wrapped bonds.  So we are not opining
8  on the extrapolation of that anywhere else.
9    Q.    Okay.  Let's do another
10  mathematical exercise of non-wrapped bonds --
11  for wrapped bonds that we are talking about.
12  So we have the mathematical exercise of the
13  5.0 with the 5.4, which gets us to about say,
14  92.6%.
15    A.    Yes.
16    Q.    Is that correct?
17    A.    Yep.
18    Q.    Now, if you go back and look at
19  the current collateral loss, and that, I
20  believe, was in paragraph 31, of that 5.4 in
21  current collateral losses, we have around 3.7
22  in current collateral losses.  Do you see
23  that?
24    A.    3.67.

Page 117

R. D'VARI

1    Q.    3.67, okay, to be more precise.
2  So if we take that 3.67 in current collateral
3  losses?
4    A.    Current.
5    Q.    And we once again extrapolate
6  using a mathematical exercise, say taking the
7  portion of those collateral losses of 3.67
8  and multiplying it by the portion that is
9  wrapped, which is 96.2% in your table; is
10  that correct, 96.27?
11    A.    I think I want to be --
12    MR. LAWRENCE:  Dr. D'Vari, let
13  him ask the question because I will
14  have an objection to the question
15  because it is a compound question and
16  extremely vague.
17    MR. CARNEY:  It is not that
18  vague.
19    Q.    So if you take the 3 point --
20    MR. LAWRENCE:  It is vague.
21    Q.    If you take the 3.67 billion in
22  current collateral losses, correct, multiply
23  that by the total original par amount of
24  wrapped bonds, which is 96.27% in

Page 118

```
 1              R. D'VARI
 2   paragraph 5, do you have any idea of what
 3   that is?
 4         MR. LAWRENCE:  You want him to
 5   do the math?
 6    Q.   I will represent it is about
 7   3.53 billion.  Does that sound right to you?
 8         MR. LAWRENCE:  If you have a
 9   calculator and you want to give him
10   the calculator, he can.
11         MR. CARNEY:  I can get him a
12   calculator.
13         MR. LAWRENCE:  If you represent
14   to us that you have done the math and
15   the math equals the number, we will
16   take your representation on that.
17    Q.   So just as you did the sort of
18   backing out of the, what you said you
19   believed to be a total estimate of the
20   aggregate amount of claims released by the
21   FGIC trustees as 5.0 billion, would you agree
22   that the portion of those aggregate amount of
23   claims released by the FGIC trustees
24   attributable to claims as to losses that have
25   already occurred would be about 3.53 billion?
```

Page 119

```
 1              R. D'VARI
 2         MR. LAWRENCE:  Objection.
 3   Vague.
 4    A.   Objection, no, I think you're
 5   mixing apples and oranges, not subject to our
 6   opinion, I go back and repeat, attribution of
 7   collateral losses to individual tranches in
 8   claims is a very complex and it requires
 9   specific calculations.  So simple math that
10   you are presenting doesn't necessarily -- is
11   not one that I have done and it is not done,
12   what I attempt to do here today.
13    Q.   But simple math, I thought you
14   testified was how you came by your belief of
15   a conservative estimate in the aggregate
16   amount of claims released by the FGIC
17   trustees; is that correct?
18    A.   If you read that properly, saying
19   that if, not as a matter of fact, total
20   claims may be X and subtracted non-wrapped
21   holders, non-released, in this particular
22   example that we were saying, that
23   effectively, the subtraction of those
24   two numbers gets you the 5 billion.  That's
25   all it says.  Nothing more.  Nothing less.
```

Page 120

```
 1              R. D'VARI
 2    Q.   That gets you the 5 billion?
 3    A.   Yes.
 4    Q.   Would you agree that if you took
 5   the portion of the 96.27% portion of the
 6   original par amount that is wrapped, if you
 7   multiply that by the current amount of
 8   collateral losses you would get a number of
 9   3.53 million?
10    A.   Again, you are mixing apples and
11   oranges.
12    Q.   I am just talking about a
13   mathematical calculation.
14         MR. LAWRENCE:  If you have a
15   mathematical calculation that you have
16   calculated, we will stipulate to the
17   math.
18    A.   But not the meaning of it.
19    Q.   Okay.
20    A.   The meaning of it is complex and
21   I hate to go there.  That's all I am saying.
22         MR. LAWRENCE:  We will take your
23   representation that your math is
24   correct.  We will go home and do the
25   numbers ourselves later, but I am
```

Page 121

```
 1              R. D'VARI
 2   assuming you have done the math
 3   correct.
 4    Q.   Let's look at the Holtzer
 5   Affidavit that I gave you.  Have you ever
 6   seen this before?
 7    A.   No.
 8    Q.   Could you please turn to --
 9    A.   Correctly, before.
10    Q.   Before today?
11    A.   I have seen it while here.
12    Q.   Okay.  Could you please turn
13   to --
14         MR. SHORE:  Off the record.
15         (Whereupon, an off-the-record
16   discussion was held.)
17    Q.   We would like to have him hand in
18   what is now 6 and let's get rid of that and
19   remark this version.  We will remark the
20   version I am about to hand you D'Vari
21   number 6.
22         Let me know when you are ready,
23   when you have had a chance to look
24   through it.
25    A.   Please go ahead.  I haven't
```

31 (Pages 118 to 121)

Page 122

R. D'VARI

1
2    completed my review of the document, but I
3    will take it in the context.
4        Q.    Have you ever seen this
5    document -- actually, turn to page 4 of the
6    document.  It begins with the caption -- in
7    the caption says "affirmation," four pages
8    in.  So front and back.
9        A.    Based on the numbers?
10            MR. LAWRENCE:  No, this page.
11        Q.    Now, I am going to talk about the
12    document from this page up to the end, and
13    have you ever seen, before, prior to when I
14    just gave it to you, have you ever seen this
15    document before?
16        A.    No.
17        Q.    Would you please turn to
18    Paragraph 5.
19        A.    Okay.
20        Q.    Can you read Paragraph 5, please.
21    Do you understand what the Paragraph 5 means?
22            MR. LAWRENCE:  Objection; vague.
23        Q.    After reading Paragraph 5, do you
24    have an understanding of it?
25        A.    I think the context is important.

Page 123

R. D'VARI

1
2    I have not obviously studied the context.
3    But I can read the numbers and the
4    statements.
5        Q.    Okay.  Upon reading this
6    paragraph, what do you understand -- do you
7    have an understanding of what Mr. Holtzer --
8    of what the author of this Affidavit is
9    trying to convey by the numbers?
10            MR. LAWRENCE:  Do you want him
11        to read what's in the paragraph?
12            MR. CARNEY:  No.
13            MR. LAWRENCE:  I don't
14        understand the question.
15        Q.    The paragraph states that as of
16    March 31, 2013, the aggregate par amount
17    outstanding covered by the policies, which we
18    can look at the definitions in front are the
19    FGIC -- are the policies wrapping the FGIC
20    wrapped RMBS, was approximately 4.9 billion.
21    It goes on to say, "As of such date, FGIC
22    paid approximately 343.2 billion of claims
23    into the policies -- 343.2 million of claims
24    under the policies, which it has not been yet
25    reimbursed, approximately 789 million of

Page 124

R. D'VARI

1
2    additional claims had been asserted against
3    FGIC that remain unpaid."
4            We can do the math.  I can
5    represent that that total of what Mr. Holtzer
6    is representing in his Affidavit is that
7    there are 1.132 billion, if you add up
8    343.2 million plus 789 million, in claims
9    that have either been paid or have been
10    asserted that have not been paid as of
11    March 31st?
12        A.    In regard to what?
13        Q.    Claims under -- claims related to
14    losses under the FGIC wrapped RMBS that are
15    related to ResCap?
16        A.    I am not sure whether this set is
17    exactly the same or not.  I have not really
18    reviewed the -- whether there is a direct
19    mapping of those.  So the answer is -- those
20    are the numbers and -- and the summation as
21    you represented, I haven't done it in my
22    head, but I am not exactly sure what you are
23    asking me to represent or to declare.
24        Q.    I am not asking you to declare
25    anything.  I am just asking you, do you

Page 125

R. D'VARI

1
2    understand that what Mr. Holtzer is conveying
3    in this Affidavit --
4        A.    In reference to what?  There is a
5    totality of the concentration that I am not
6    aware of, what bonds we are looking at, what
7    tranches, what underlying securities, those
8    are not very clear from that statement.
9        Q.    If you turn back one page, you
10    will see in Paragraph 4, you can read that.
11        A.    Um-hum.
12        Q.    And I will have to -- I will
13    represent to you that these 47 trusts
14    mentioned on -- in Paragraph 4 are the same
15    47 FGIC Insured Trusts that you analyzed in
16    connection with your Declaration.
17        A.    Okay.
18        Q.    I will further represent to you
19    that, in Paragraph 5, Mr. Holtzer is saying
20    that with respect to the FGIC wrapped
21    tranches of those trusts, that FGIC has paid
22    343 million -- 343.2 million of claims and
23    that there are 789 million of additional
24    claims related to the FGIC wrapped tranches
25    in those trusts that have been asserted

32 (Pages 122 to 125)

Page 126

R. D'VARI

1  against FGIC that remain unpaid. My question
2  to you is, when we looked at the total
3  current loss, collateral losses in
4  Paragraph 31 of your Declaration and we
5  multiplied that by the portion of the FGIC
6  Insured Trusts that are wrapped, we came up
7  with 3.533 billion. My question is, why does
8  that 3.533 billion number differ so
9  significantly from the 1.132 billion number
10 by adding up the numbers in Paragraph 5?
11     MR. LAWRENCE: Object to the
12     question. It's hopelessly vague.
13     A.  I can answer. I think, again,
14 you are comparing losses on collateral versus
15 tranches, which are pieces of -- they have
16 rights and claims from cash flows and
17 waterfalls, and it is very complex
18 attribution.
19         You just proved the difference is
20 not something you can do mathematically and I
21 don't believe any financial expert would do
22 the numbers the way you are representing.
23 The tranche losses are very specific
24 calculations that are not directly and simply

Page 127

R. D'VARI

1  calculated from collateral losses because
2  there are other cash flows that come into the
3  picture and there is also priority of
4  interests.
5     Q.  You can put that away. I just
6  have a couple of more questions and then I
7  will yield my time, if you will. I would
8  like to go back to something we talked about
9  at the beginning of this. Your work in
10 analyzing the bonds referenced in your
11 Declaration for FGIC. And I would -- can you
12 tell me how much you were compensated by FGIC
13 for your work?
14     A.  Confidential.
15     Q.  Your compensation is
16 confidential?
17         MR. GREEN: I object to that as
18     being confidential.
19         MR. CARNEY: Okay. And you are
20     instructing him not to answer that
21     question?
22         MR. GREEN: Yes.
23     Q.  And you did say that you worked
24 on your engagement for FGIC from, I believe,

Page 128

R. D'VARI

1  you said 2010 to late 2011; is that correct?
2     A.  That is my current understanding.
3  But I haven't fully verified those dates.
4     Q.  That's your current
5  understanding?
6     A.  Yes. Estimates, yes.
7     Q.  Can you tell me how many people
8  from your firm worked on that FGIC
9  engagement?
10        MR. GREEN: You can answer the
11     question.
12     A.  Not the exact number but a pretty
13 reasonable number of people.
14     Q.  Were they any of the same people
15 that worked on your engagement for ResCap in
16 producing your Declaration that we are
17 talking about today?
18     A.  Not directly, actually.
19     Q.  What do you mean by "not
20 directly"?
21     A.  Some of those -- again, I can't
22 tell you the scope and -- the scope was not
23 necessarily, you know, something that we can
24 discuss. So the folks that are working --

Page 129

R. D'VARI

1  had worked on this assignment specifically
2  and the names that I have highlighted
3  specifically did the work, have not been
4  affiliated or worked on the prior assignment.
5     Q.  So those three people that you
6  worked with in your Declaration?
7     A.  Sure.
8     Q.  Did not work on the FGIC
9  engagement?
10    A.  Correct. Also, I want to add one
11 more name. Matt Lewis, didn't work directly
12 for me on this assignment but he
13 participated.
14    Q.  That's a segue to my other
15 question.
16    A.  And he was also not involved.
17    Q.  Did anyone that worked on the
18 analysis in your Declaration work on the FGIC
19 engagement?
20    A.  The answer is no, to the extent
21 that I recall.
22    Q.  How many -- can you tell me how
23 many hours you spent or your firm spent,
24 rather, on the FGIC engagement?

33 (Pages 126 to 129)

Page 130

R. D'VARI

1
2       MR. LAWRENCE:  You can answer to
3   the extent that counsel for FGIC
4   allows you to do that.
5       MR. GREEN:  You can answer the
6   question.
7       A.   Frankly, I didn't even prepare it
8   to look at.  I am not the CFO.  I don't look
9   at numbers that way and those are produced
10  and normally handled so I am not -- I
11  haven't -- I haven't watched that.
12      Q.   So sitting here today, you
13  have -- you are testifying you have no idea
14  of the amount of hours you have spent -- your
15  firm spent on the FGIC engagement?
16      MR. LAWRENCE:  Objection.
17  Misstates his testimony.
18      A.   The way we are compensated in
19  different assignments are different and not
20  often always hourly.  They have components of
21  hourly.  They have components of -- again,
22  this is a general statement, not referring to
23  any specific assignments.  Each assignments
24  would have different parameters to the way to
25  get compensated.  Part of that has to do with

Page 131

R. D'VARI

1
2   the time we are allowed to spend on
3   particular assignment.  Part of that relates
4   to urgency of that matter and how we can
5   reallocate resources.  Sometimes we get paid
6   on a fixed fee for a given defined set of
7   parameters.  Sometimes we get paid for
8   writing reports.  Sometimes we get paid for
9   doing certain things that are not necessarily
10  in the actual outputs.  So what I am saying
11  is I don't know the exact number of hours.
12  In some cases the exact hours were not
13  tracked because we may have, in a specific
14  project, because you are doing it on a fixed
15  price basis.
16      Q.   But do you have an idea whether
17  the hours were tracked or not, how much
18  employee time was spent on the FGIC
19  engagement?
20      MR. LAWRENCE:  Asked and
21  answered.
22      A.   As I said, I can't even give you
23  the ballpark.  Given that I haven't
24  followed it.
25      Q.   Can you give me the ballpark on

Page 132

R. D'VARI

1
2   how much time you personally spent working on
3   the FGIC matter?
4       A.   Actually, I think on that one the
5   hours would have been, in my view, very
6   contained.
7       Q.   What do you mean by "contained"?
8       A.   Small.  I wasn't running the
9   analysis.  But I was supervising.
10      Q.   When you say "small," do you
11  mean --
12      A.   Small that means it is not
13  eight hours a day, you know, six months,
14  12 months.  That's what it means.
15      Q.   Two hours a day?  I'm trying to
16  get an idea.
17      A.   It is not a pattern that I
18  actually, you know, recall or paid
19  attention to.
20      Q.   So you couldn't tell me sitting
21  here today how much time you spent on it?
22      A.   No.  We can review things but not
23  at this moment.
24      Q.   Now, I would like to ask you, did
25  you consider the work you did in the FGIC

Page 133

R. D'VARI

1
2   engagement in connection with the analysis
3   you did in the Declaration we have been
4   talking about today?
5       A.   As I said, no.
6       Q.   So you are telling me that
7   nothing you learned from your work at FGIC,
8   where you analyzed -- you say you analyzed
9   the same bonds and the same trust and same
10  time tranches, are you telling me that
11  nothing you learned from your work at FGIC
12  was used by you at all in the analysis you
13  contained -- contained in your Declaration?
14      MR. LAWRENCE:  Objection.  Asked
15  and answered.
16      You can answer.
17      A.   If every timeframe post crisis to
18  now, you have a totally different set of
19  circumstances.  The 2013 June 1 versus the
20  market conditions as of, what you referred to
21  as FGIC exercise, 2011 and '10 are
22  dramatically different.  So are the prices of
23  securities.  So is the value of the stocks in
24  the marketplace.  So are the home prices.  So
25  the -- that's why we actually update our

34 (Pages 130 to 133)

Page 134

R. D'VARI

1    analysis, the macro. We are now in a
2    different position. Weeks was in a
3    different position. Asia was in a different position.
4    These are all factors that go into -- the
5    specific of the trust obviously is documented
6    and they're at Intex. That's not something
7    that we need to. What's common is really
8    what already Intex and everybody has. What
9    is not common is how environment has changed
10   from one point to another. So if you have a
11   situation where you are dealing with
12   essentially a different environment, you
13   often -- you know, you will come up with
14   different answers. You have had markets that
15   have actually gone up by 60%. So therefore,
16   the, everything is really at the point of the
17   analysis. This is what the market you are
18   looking at.
19       Q.    But you still used the NewOak
20   RMBS Analysis Methodology in the FGIC
21   engagement as well as this engagement,
22   correct?
23       A.    The methodology --
24           MR. GREEN: Objection.

Page 135

R. D'VARI

1       Objection. That's asking for
2    confidential information about a
3    previous engagement.
4           MR. CARNEY: You are instructing
5    him not to answer?
6           MR. GREEN: To the extent it is
7    revealing confidential information
8    about the previous engagement, yes.
9       A.    I can comment on our methodology
10   in general in context of anything else. Our
11   methodology is independent and it is not
12   client dependent.
13       Q.    But would you have used that
14   methodology in the FGIC engagement and in
15   this engagement?
16       A.    Again, I am not making comment
17   about any specific assignment. I am saying I
18   am giving you -- our methodology is our
19   methodology and it is really, ultimately
20   comes down to the scenarios that you are
21   running, scenarios you are running for each
22   case may be different depending on the type
23   of questions you are trying to answer.
24       Q.    So you are telling me that

Page 136

R. D'VARI

1    basically when you were doing this analysis,
2    you essentially shut your brain down from
3    even thinking about FGIC?
4           MR. LAWRENCE: Objection. Asked
5    and answered. And it is becoming
6    harassing actually.
7           MR. GREEN: Objection to the
8    form.
9       Q.    You didn't look at any of your
10   notes from the FGIC engagement when you were
11   doing this analysis?
12       A.    Again, you are asking -- at this
13   point, we did not -- what we relied on is
14   already provided here, which is, again, is a
15   time varying evolving process. The specifics
16   of the actual individual trusts are provided
17   by Intex, and they are updated over time. So
18   that's not something that I need to go back
19   to anything. I just need to go back to
20   Intex. Intex has that information that's
21   available to everyone. And so do you.
22           So as far as the methodology
23   works, you need to look at on the forecast
24   basis, which I talked to, on a forecast basis

Page 137

R. D'VARI

1    you have an input, which is dependent on the
2    market condition as of the date of the
3    analysis and every day in the market you have
4    a -- not every day, but as time evolves, the
5    assumptions evolve. So what I am saying is
6    that the analysis as of any other date in the
7    last five, six years, would not directly be
8    relevant because you already have captured
9    the history between that point to now. What
10   you need to concern yourself with is what is
11   going to happen from this point onward, which
12   really depends on the market conditions of to
13   date onward. So that's the way the analysis
14   works.
15           So therefore, not only there's no
16   need for me to look back at what I did
17   sometime in the past is actually not a
18   general practice. Unless I was asked to
19   review 2011 or 2010, there is no need for me
20   to look at what happens because there -- it's
21   a night and day.
22       Q.    So you used nothing from the FGIC
23   engagement to do your analysis in this case?
24           MR. LAWRENCE: Objection. Asked

Page 138

R. D'VARI

1      R. D'VARI
2    and answered.
3      A.   I have provided you what we
4    arrived on.  The analysis is very blind.  It
5    is only to the date you are looking at it and
6    what assumptions do we have, and we have
7    already provided you the inputs.  The inputs
8    were freshly calculated as of the analysis
9    date.
10     Q.   So a yes or no question.  Again,
11   this is my last question.
12        MR. LAWRENCE:  It is asked and
13   answered.
14        But if you can answer a yes or
15   no, you can.
16     A.   Sure.
17     Q.   My question is, so you are
18   testifying that you used nothing from the
19   FGIC engagement we have been discussing in
20   connection with the analysis in this
21   Declaration?
22     A.   Yes.
23        MR. CARNEY:  Okay.  With that, I
24   will yield the rest of the time.  If I
25   preserve any, I might have leftover.

Page 139

R. D'VARI

1      R. D'VARI
2        MR. LAWRENCE:  It is 1:00 p.m.
3        (Whereupon, a lunch recess was
4    held.)

Page 140

R. D'VARI

1      R. D'VARI
2      ***AFTERNOON SESSION***
3    CONTINUED EXAMINATION BY
4    MR. BAIO:
5      Q.   My name is Joe Baio.  I represent
6    certain investors in certain of the FGIC
7    Insured Trusts, and I will be asking you some
8    questions now.
9        Do you prefer to be called
10   Dr. D'Vari or Mr. D'Vari?
11     A.   D'Vari, Ron, it doesn't really
12   matter.
13     Q.   I won't use your first name, but
14   Mr. or Doctor, which should I use.
15     A.   Mr. is fine, with or without.
16     Q.   Okay.  I won't -- just the last
17   name.  Mr. D'Vari.  Mr. D'Vari, can you look
18   at Exhibit 4, which is the Declaration that
19   you provided in support of the motion.
20     A.   Is that 5 or 4?
21     Q.   I may have the wrong number.  It
22   is Exhibit 5, I apologize.  Exhibit 5.
23     A.   No problem.
24     Q.   Did you write any of the words
25   that appear in this report?

Page 141

R. D'VARI

1      R. D'VARI
2      A.   Yes.
3      Q.   Or on this Declaration?
4      A.   Yes.
5      Q.   You did.  Did others write it
6    with you?
7      A.   Yes, I have a staff that
8    helps out.
9      Q.   Did you review it carefully
10   before you signed it?
11     A.   Yes, I did.  This ultimately was
12   my opinion.
13     Q.   Did you believe at the time that
14   you signed it, which was June 7th, 2013, that
15   everything in there was accurate?
16     A.   Accurate?
17     Q.   Yes.
18     A.   Yes.
19     Q.   And did you ask your colleagues
20   who work with you to similarly be sure that
21   everything in this document was accurate?
22     A.   Correct.
23     Q.   Now, let's look at your opinion
24   in Paragraph 2.  I know you have testified a
25   bit about it, but I want to focus a little

36  (Pages 138 to 141)

Page 142

1          R. D'VARI
2    bit more on it.
3        A.   Sure.
4        Q.   You offer this Declaration to
5    opine on and then you have two items; is that
6    correct?
7        A.   Yes.
8        Q.   Let's go over the first item,
9    first in your opinion.  You are to opine on
10   quote "the lifetime expected collateral
11   losses of the RMBS trusts, paren the FGIC
12   Insured Trusts close paren, referenced in
13   Exhibit B of the FGIC ResCap Settlement
14   Agreement, paren the Settlement Agreement,
15   close paren, which I understand to be the
16   basis asserted by the trustees for the amount
17   of their claims" and let's do close quote
18   there.  You see that language, right?
19       A.   Yes, I do.
20       Q.   What is the Settlement Agreement
21   that you are referring to in the document
22   that you signed on June 7th?
23       A.   The Settlement Agreement is
24   between FGIC trustees and ResCap.
25       Q.   Okay.  And you reviewed that

Page 143

1          R. D'VARI
2    Settlement Agreement; is that correct?
3        A.   Not in details.
4        Q.   Did you review it in any way,
5    shape, or form?
6        A.   Very casually.
7        Q.   Do you understand that it
8    involves a proposed $253.3 million
9    commutation payment?
10       A.   I did not go through the details
11   of that at all.
12       Q.   Okay.  You do refer to Exhibit B
13   of that Settlement Agreement.  Did you review
14   that document?
15       A.   It wasn't something that we
16   relied on.
17       Q.   Well, when you look at page 12 --
18   sorry, Paragraph 12 of your Declaration, your
19   first sentence in Paragraph 12 is quote "I
20   examined 47 FGIC Insured Trusts listed in
21   Exhibit B to the Settlement Agreement."
22       A.   Right.
23       Q.   Do you see that?
24       A.   Yes, I do.
25       Q.   So what you looked at were the

Page 144

1          R. D'VARI
2    FGIC Insured Trusts that were identified in
3    the Settlement Agreement, correct?
4        A.   That's really the most -- the
5    only relevant connection between the
6    settlement.
7        Q.   That is the population that you
8    looked at; is that correct?
9        A.   The population was provided to us
10   by the counsel, which was represented as part
11   of the Exhibit B of the Settlement Agreement.
12       Q.   And you have no reason to believe
13   that representation was inaccurate, do you?
14       A.   Perhaps.
15           MR. LAWRENCE:  Dr. D'Vari, if
16       you let Mr. Baio finish his question
17       before you answer.  It is for the
18       Court Reporter's -- so she can't type
19       over both of your conversations.
20       Q.   You have no reason to believe
21   that representation that you received about
22   the 47 trusts in Exhibit B was inaccurate; is
23   that correct?
24       A.   Correct.
25       Q.   Now, you refer in the sentence --

Page 145

1          R. D'VARI
2    or the first opinion that you provided that
3    quote, "you understand to be the basis
4    asserted by the trustees for the amount of
5    their claims."  Do you see that?
6        A.   Correct, I do.
7        Q.   Where did you get that
8    understanding?
9        A.   From primarily the counsel.
10       Q.   When you are referring to claims
11   asserted by the trustees, do you mean by the
12   FGIC Insured Trust trustees?
13       A.   No, the trustees of the bonds.  I
14   mean the vehicles.
15       Q.   And the vehicles are the
16   47 trusts that you reviewed, correct?
17       A.   The 47 trusts, yes.
18       Q.   So this is the trust that would
19   be asserted by the trustees of those
20   47 trusts?
21       A.   Correct.
22       Q.   That's the claims that you were
23   referring to, correct?
24       A.   References those.
25       Q.   Yes.  And claims against whom?

| Page 146 | Page 147 |
|---|---|

**Page 146**

R. D'VARI

1
2     A.    Not really something that we
3 needed to know.
4     Q.    Well, is it your understanding,
5 as you provided this opinion and when you
6 referred to claims, that it was claims by
7 those trustees against FGIC?
8     A.    No.
9     Q.    Okay.  Who did you understand
10 that those claims would be against?
11     A.    The debtors.
12     Q.    Okay.  It is only against the
13 debtors, not against FGIC?
14     A.    That's my understanding.
15     Q.    When you look at the -- I am
16 going to go to the based on this
17 understanding and then I will go back to --
18 let me do it in a different order.
19     Your second opinion relates to
20 the following, quote, "The extent of any past
21 or future losses to holders of securities
22 issued by the FGIC Insured Trusts not insured
23 FGIC."
24     Do you see that?
25     A.    Yes, I do.

**Page 147**

R. D'VARI

1
2     Q.    You state, "which I understand to
3 be outside the scope of the release provided
4 by the Settlement Agreement."  Close quote.
5     Do you see that?
6     A.    I do.
7     Q.    What release were you
8 referring to?
9     A.    Let me just think through that
10 and I will answer.  My understanding that
11 would be the release effectively by FGIC
12 against the debtors.
13     Q.    Well, read the next sentence and
14 see if that changes your view, and by the
15 next sentence I mean "Based on this
16 understanding, as described further below, I
17 believe that a conservative estimate of the
18 aggregate amount of the claims released by
19 the FGIC trustees as defined below under the
20 Settlement Agreement is approximately
21 $5 billion."
22     A.    I want to correct the prior
23 answer that would have been FGIC and the
24 trustees as it relates to tranches of
25 borrowings that would be wrapped by FGIC.  So

| Page 148 | Page 149 |
|---|---|

**Page 148**

R. D'VARI

1
2 I assume that's a three way.  Now, please ask
3 the question -- the second question.
4     Q.    Is it your understanding that the
5 released claims that you identify in the
6 sentence I just read are, among other things,
7 claims by the FGIC trustees against others
8 that are being released?
9     A.    If you go back to the sentence
10 that you had before.
11     Q.    Yes.
12     A.    That is, which I understand to be
13 the basis, I take that as a given.
14     Q.    Okay.
15     A.    Not something that I am
16 opining on.
17     Q.    Understood.  But it is an
18 understanding that you have and then reaching
19 the conclusion that is described in the
20 sentence that begins with the words "based on
21 this understanding"; is that correct?
22     A.    Correct.
23     Q.    Okay.  And when you referred to
24 the claims released by the FGIC trustees you
25 are referring to the aggregate amount of the

**Page 149**

R. D'VARI

1
2 claims that the FGIC trustees will be
3 given -- giving up in the settlement which
4 includes claims against FGIC, correct?
5     A.    Not the actual claim, but the --
6 it says "conservative estimate."  So there is
7 nothing in the sentence talks about
8 actualities, talks about the potential size
9 and again, it is a mathematical construct as
10 opposed to opining on what the claims may or
11 may not be.
12     Q.    Well, you did give an estimate of
13 those claims, correct?
14     A.    No.
15     Q.    You gave an estimate of what the
16 losses would be that would be suffered by the
17 trusts as a result of impairments in the
18 collateral?
19     A.    No.
20     Q.    I want to go back to the sentence
21 and see what you are referring to.  Leave
22 aside conservative estimate.
23     A.    Yes.
24     Q.    When you referred to the claims
25 released by the FGIC trustees, in that

Page 150

1           R. D'VARI
2    sentence, is it accurate that you are
3    referring to claims that the FGIC trustees
4    are releasing under the Settlement Agreement
5    against FGIC, among others?
6           MR. DEVORE:  Objection to form.
7       A.    Again, it is based on assumption,
8    not the total losses of collateral is their
9    claim, which I was provided.  That's the
10   understanding.
11      Q.    Yes.  And it is the claims that
12   are being released are claims against FGIC,
13   among others?
14          MR. DEVORE:  Objection to form.
15          MR. LAWRENCE:  Objection.
16      Q.    Correct?
17      A.    Again, the particulars is not
18   what I reviewed.  All I am saying is that
19   that number is nothing but subtraction math.
20   Collateral losses less our estimated losses
21   on tranches, two different animals, you get
22   to a number and if certain claims are
23   released by definition, if you assume the
24   total claim is equal, assumed, not a given
25   fact, it is not our place to opine on, was

Page 151

1           R. D'VARI
2    5.4 billion was the total, then the
3    difference between those two would be
4    attributable to the difference.
5       Q.    I hear what you're saying and I
6    am going to move to strike.  I am asking you
7    about the claims.  You are using a word in
8    your document that you signed "claims
9    released by the FGIC trustees under the
10   Settlement Agreement."  What claims were you
11   referring to when you used those words in
12   Paragraph 2, the opinion paragraph, that you
13   have provided to us and to the court?
14      A.    Please repeat the question and
15   specifically on the what.
16      Q.    Claims released by the FGIC
17   trustees, what claims were you talking about
18   in that sentence?
19      A.    They are aggregate total claims
20   of the trustees in this matter is the
21   collateral losses as I was told.
22      Q.    Okay.
23      A.    So if certain -- if the estimate,
24   there are two parties, several parties
25   involved.  And if you estimate one piece, you

Page 152

1           R. D'VARI
2    subtract it from the total, not saying that
3    the total is representing anything, the
4    number you get is five point -- 5 billion and
5    change.  That would be effectively the
6    difference between those two numbers.  That's
7    all I am saying.
8       Q.    I move to strike again.  I'm only
9    asking about the claims that you are
10   referring to in this sentence you're talking
11   about claims released by the FGIC trustees
12   under the Settlement Agreement.  Let's leave
13   aside the valuation.  Those claims are claims
14   that have been asserted by the FGIC trustees
15   against, among others, FGIC, correct?
16          MR. DEVORE:  Objection to form.
17          MR. LAWRENCE:  Objection.
18   Misstates his testimony.
19      A.    Yes.
20      Q.    Can you answer that yes or no?
21      A.    Please repeat it again.
22      Q.    The claims that you are referring
23   to, when you refer to claims released by the
24   FGIC trustees under the Settlement Agreement,
25   what are those claims?

Page 153

1           R. D'VARI
2       A.    It goes back to the prior
3    sentence that it says assuming, based on our
4    understanding, not our opinion.
5       Q.    Yes.
6       A.    Right.  Very different.  Based on
7    our understanding, if the total claims
8    asserted is the total collateral losses and
9    we estimate the total collateral losses to be
10   5.4 billion.
11      Q.    Yes.
12      A.    And if we then also -- the Part 2
13   of our question is to estimate the non-FGIC
14   wrapped potential losses, which also
15   calculated, if you subtract those
16   two numbers, you effectively -- and if they
17   are released by the trustee is specifically
18   saying then they will release everything.
19      Q.    Yes.
20      A.    Except the potential claim for
21   the non-wrap portion, it is a simple
22   mathematical subtraction that what would be
23   remaining would be 5 billion that would be
24   released from trustees point of view when
25   they do that.  It is a mathematical, not an

Page 154

R. D'VARI

1 opinion.
2     Q.   I think you have answered the
3 question as to what the claims are.  I am not
4 asking about the opinion.  I asked what the
5 claims were.
6         MR. LAWRENCE:  I will object to
7     that whole line of questioning as
8     calling for a legal conclusion.
9     Q.   Okay.  I am just asking what the
10 words were that he used.  Do you want to
11 change any of the words that you used in the
12 opinion paragraph that you have here?
13     A.   No.  It is just your
14 interpretation.  I will leave it at that.
15     Q.   The words are okay, you don't
16 want to change a single word?
17     A.   It is what it is.
18     Q.   Good.  Now, let's look at
19 Paragraph 22 of the Declaration that you
20 signed on June 7th.  By the way, have you
21 done any analysis or undertaken any work
22 since June 7th that causes you to change
23 anything that appears in this Declaration?
24     A.   No.

Page 155

R. D'VARI

1     Q.   Now, Paragraph 22 talks about
2 forecasting future collateral losses,
3 correct?
4     A.   For specifically the collateral
5 losses in this case.  Nothing -- again, we
6 are not talking about bonds.
7     Q.   And you state in Paragraph 22,
8 quote, "To evaluate the expected future
9 losses for each FGIC insured trust I and my
10 team of experienced analysts acting under my
11 supervision applied NewOak's RMBS Analysis
12 Methodology."  Do you see that language?
13     A.   Yes, I do.
14     Q.   And that's accurate, correct?
15     A.   That's definitely accurate.
16     Q.   Now, the RMBS -- the NewOak RMBS
17 Analysis Methodology, how long have you been
18 using that?
19     A.   Process is very similar along the
20 way.  The assumptions are market dependent
21 and NewOak has been in existence for more
22 than five years, and I have been in the
23 business more than -- from effectively doing
24 this type of work as early as 1998 on

Page 156

R. D'VARI

1 sub-prime non-agency.
2     Q.   Okay.  Leaving aside the fact
3 that the inputs can change based on market
4 developments, is the methodology that you
5 have been using and that you used here
6 approximately the same methodology over the
7 years that you identified?
8     A.   To the extent that you arrive at
9 the vectors for voluntary prepayment, for CDR
10 and for severity, once you get there, then
11 everything else is very mechanical process
12 going to -- through Intex and that portion,
13 typically doesn't change.  Whether you use it
14 from an Excel sheet running into Intex or you
15 use it from a web based or you use it --
16 from, you know, a C code driven application,
17 but the actual mechanical process effectively
18 would be similar.
19     Q.   Over the range of from 1998 to
20 the present; is that correct?
21     A.   No, no.
22     Q.   From when?  Over what period?
23     A.   Let's say from the history of
24 NewOak Capital.

Page 157

R. D'VARI

1     Q.   Which is five years?
2     A.   Five years, yes.
3     Q.   You then state in that paragraph,
4 quote "that methodology creates independent
5 projections for each trust and group of loans
6 based on their own characteristics and
7 historical performance."
8     A.   Correct.
9     Q.   Period, close quote.  You say
10 that that's accurate, correct?
11     A.   Yes, it is.
12     Q.   Your next sentence says "NewOak
13 has applied this methodology successfully for
14 its RMBS whole loan pools and mortgage
15 servicing rights cash flow analysis and loss
16 estimation for many of its large
17 institutional clients."
18         Do you see that?
19     A.   Yes, I do.
20     Q.   That also is accurate; is that
21 correct?
22     A.   It sure is.
23     Q.   The next paragraph states quote
24 "NewOak's RMBS Analysis Methodology considers

Page 158

1          R. D'VARI
2 information and relies upon assumptions
3 customarily employed by market participants."
4          Do you see that?
5     A.   Yes.
6     Q.   What do you mean by that?  What
7 do you mean by "market participants"?
8     A.   Well, there are bondholders.
9 There are investors.  There are people that
10 buy and sell.  There are intermediaries.
11 There are regulators that potentially want to
12 see numbers.  They hire agents.  So
13 institutional investors including the
14 sovereign trade practitioners.
15     Q.   Is it your testimony that the
16 methodology that you employed in this matter
17 considers information and relies upon
18 assumptions that those market participants
19 themselves employ so far as you know?
20     A.   Customarily.  Customarily.  Again
21 I go back -- voluntary prepayment, CDRs and
22 severities.  That is a customary way to drive
23 Intex to get cash flows and then from those
24 cash flows, estimate tranches.  Intex is a
25 market accepted tool.  Securities get traded

Page 159

1          R. D'VARI
2 on that basis and they use it for accounting
3 purposes.  They use it for all sorts of other
4 things.  Now, as far as developing your own
5 assumptions, you need to take input from the
6 market and you also need to have internal
7 assessment of what future has and then apply
8 those in that manner.  So that's what the
9 process is.
10     Q.   That's what you did, if you go
11 back to Paragraph 2, to opine on the lifetime
12 expected collateral losses of the RMBS
13 trusts; is that correct?
14     A.   Correct.  And on the forecasted
15 portion.
16     Q.   On the forecasted portion because
17 the non-forecasted portion is given as you
18 have testified, correct?
19     A.   It is an objective number that
20 you need to have information on, which is
21 Intex provides.
22     Q.   All right.  Now if you look at
23 Paragraph 28 you refer to -- you state the
24 following, quote, "Next, we account for
25 macroeconomic influences resulting in a

Page 160

1          R. D'VARI
2 quote, 'Base Case,' close quote, collateral
3 performance projection."
4          Do you see that?
5     A.   Yes.
6     Q.   What do you mean by "Base Case"?
7     A.   Base Case is our expected case
8 given everything we know as of today and our
9 view of how things will develop and I will
10 leave it at that.
11     Q.   When you say "expected," you mean
12 more expected than either a more optimistic
13 case or a more pessimistic case, is that what
14 you mean?
15     A.   Please clarify the question
16 again.  Repeat it.
17     Q.   You said "The Base Case is our
18 expected case given everything we know as of
19 today and our view of how things will
20 develop," correct?
21     A.   That's the expected numbers.
22     Q.   You also do other -- you make
23 other assumptions that are more optimistic or
24 more pessimistic than those that you use in
25 the Base Case, correct?

Page 161

1          R. D'VARI
2     A.   Not in this case but in general.
3     Q.   Let's look at Exhibit 1 because I
4 do want to understand what Exhibit 1 is.
5     A.   Sure.
6     Q.   In Exhibit 1 you have certain
7 elements, you may have another word for them.
8     A.   It is a driving elements.
9     Q.   Okay.  It Includes change in HPI,
10 housing price index, unemployment and credit
11 availability, as you have testified?
12     A.   Absolutely.
13     Q.   If you look on the left-hand side
14 of this chart, there are percentages.  You
15 will see most optimistic, optimistic, Base
16 Case, pessimistic, most pessimistic.  Do you
17 see that?
18     A.   I do.
19     Q.   And why do you have those
20 changes?
21     A.   Those are for stress testing that
22 is done for -- often regulatory purposes for
23 determining some of the capital adequacy for
24 some larger banks and so on and so forth.
25     Q.   So you did not do that in

Page 162

R. D'VARI

1    connection with the work that you did that is
2    embodied in Exhibit 5, correct?
3    A.    No.
4    Q.    But this is work that you do --
5    that is you -- strike that.
6        You include most optimistic,
7    optimistic, Base Case, pessimistic, and most
8    pessimistic considerations in evaluations you
9    do using your methodologies for other
10   purposes, correct?
11   A.    Correct.  As you notice, this is
12   as of April 2013.  So predates our analysis
13   for, or even being contacted.
14   Q.    You are on the committee that
15   establishes these?
16   A.    Yes.
17   Q.    You head that committee, correct?
18   A.    Yes, I coach it.
19   Q.    You what?
20   A.    Coach it.
21   Q.    Coach?
22   A.    Coach.
23   Q.    Okay.  You are involved in the
24   deliberations to determine what should be put

Page 163

R. D'VARI

1    in the Base Case, what should be put in the
2    most optimistic case, et cetera?
3    A.    Sometimes I am present.
4    Sometimes I am not.  But I do definitely
5    review the output.
6    Q.    You do the final okay on them,
7    correct?
8    A.    The committee comes up and if I
9    have an objection, I will raise it.
10   Q.    Okay.  Now, since April of 2013,
11   have you updated any of these estimates?
12   A.    No, April, May numbers were not
13   updated.  After, you know -- this is, again,
14   the analysis was June 1st, so April, May, we
15   effectively stayed on course.
16   Q.    Independent from what you did in
17   this case, have you at NewOak updated any of
18   these evaluations?
19   A.    To my understanding, this is the
20   latest we have as of June 1st.
21   Q.    When do you anticipate doing the
22   next one?
23   A.    I believe, actually, we may have
24   done one very recently.

Page 164

R. D'VARI

1    Q.    Okay.  And do you remember if,
2    with respect to HPI, the numbers that appear
3    here have changed?
4    A.    As you notice at the bottom,
5    there are 036, these are effectively as of
6    day of application.
7    Q.    Yes.
8    A.    So when you come to a certain
9    point, you need to essentially think about
10   whether -- whether the curve has shifted or
11   is it the same date.
12   Q.    Yes.
13   A.    I don't fully recall whether
14   those numbers have changed since the date of
15   the analysis.
16   Q.    Do you recall the direction that
17   they may have changed, up or down, more
18   optimistic, less optimistic with respect
19   to HPI?
20       MR. LAWRENCE:  Objection.  That
21   mischaracterizes his testimony.
22   Q.    With respect to HPI?
23   A.    I don't specifically recall
24   whether those numbers turned up or down, but

Page 165

R. D'VARI

1    we do believe these numbers are affected by
2    other factors including, you know,
3    testimonies and other things.
4    Q.    And you have been collecting,
5    evaluating those, that data, correct?
6    A.    Correct.
7    Q.    On a regular basis?
8    A.    Right.  But the analysis is done
9    as of a certain date.
10   Q.    Yes.
11   A.    So the date of the analysis is
12   June 1st.
13   Q.    Right.  But what I am asking you
14   is if you have done these estimations, if you
15   have done an update of those estimations not
16   for purposes of this case but for purposes of
17   the work that do you at NewOak?
18   A.    Post release of this --
19   Q.    Yes.
20   A.    -- report and the analysis?  The
21   numbers may have changed, but I don't recall
22   exactly which way.
23   Q.    We request them for all of the --
24   all of the indications here, HPI, credit

42 (Pages 162 to 165)

Page 166

R. D'VARI

1        R. D'VARI
2   availability, and unemployment.
3        I assume you will take it under
4   advisement and get back to me?
5        A.   I will take it under advisement.
6        MR. LAWRENCE:  We will take it
7   under advisement.
8        Q.   From that date, just based on all
9   of your experience, do you think things are
10  getting better or worse?
11       A.   In general?
12       Q.   Yes.
13       A.   I think they are -- effectively
14  they are in the same range.
15       Q.   Okay.
16       A.   Effectively.  With the potential,
17  you know -- we are effectively in the same
18  range.
19       Q.   You continue to monitor and you
20  may reevaluate that based on events that
21  occur?
22       A.   Yes.
23       Q.   Okay.  Now, if you look at
24  Paragraph 31 of your Declaration, which is
25  Exhibit 5.

Page 167

R. D'VARI

1        R. D'VARI
2        A.   Yes.
3        Q.   You state, quote, "In summary,
4   the total lifetime collateral losses in FGIC
5   Insured Trusts are" and then you have a
6   number of calculations, "which lead to a
7   future remaining expected loss of
8   $1,743,740,371."
9        Do you see that?
10       A.   I do.
11       Q.   And that is the expected
12  remaining -- sorry, the remaining future
13  expected loss as you have described here
14  based on the calculations that you performed
15  as described in this document, correct?
16       A.   For collateral?
17       Q.   Yes.
18       A.   As of the date of the analysis.
19       Q.   Is that a nominal number or is it
20  present valued in any way?
21       A.   No, those are denominal numbers.
22       Q.   Did you do any present value
23  work?
24       A.   No.  That was not required.
25       Q.   In connection with what you do at

Page 168

R. D'VARI

1        R. D'VARI
2   NewOak, do you do present valuing for any of
3   the evaluations that you do for market
4   participants?
5        A.   For different purposes, yes.
6        Q.   Okay.  Have you done it in
7   connection with these trusts?
8        A.   No, we did not.
9        Q.   Can you look at what we have
10  marked as Exhibit 4, the Miller Affidavit,
11  Paragraph 12?
12       A.   Yes.
13       Q.   It states "Lazard also reviewed
14  runoff projections previously prepared by
15  FGIC in consultation with its advisors,
16  including Blackstone Advisory Partners and
17  stress case assumptions for FGIC's insured
18  portfolio developed by NewOak Capital
19  Advisors an independent financial advisor
20  retained by counsel to FGIC."
21       Do you see that?
22       A.   Yes.
23       Q.   You have no reason to believe
24  that that statement is inaccurate, correct?
25       A.   Correct.

Page 169

R. D'VARI

1        R. D'VARI
2        Q.   You believe it is accurate?
3        A.   Yes.
4        Q.   You believe that Lazard did, in
5   fact, review stress assumptions, stress case
6   assumptions for FGIC's insured portfolio
7   developed by your firm, correct?
8        MR. LAWRENCE:  Objection.  Lacks
9   foundation.  Calls for speculation.
10       A.   It is what it says.
11       Q.   And you, in fact, performed
12  stress case assumptions for FGIC's insured
13  portfolio; isn't that correct?
14       THE WITNESS:  Counsel?
15       MR. GREEN:  You can answer that
16  to the extent it is not revealing
17  confidential information about that
18  previous engagement that's not already
19  stated here.
20       MR. LAWRENCE:  So just a yes
21  or no.
22       A.   Yes.
23       Q.   Okay.  And do you know if we have
24  been provided that, that is anyone on the --
25  do you know if any of the trustees or --

43 (Pages 166 to 169)

Page 170

R. D'VARI

1
2  strike that.
3       Do you know if any of the
4  investors in the trust have received this
5  information that Lazard claims to have
6  reviewed?
7       A.   Not through us.
8       MR. BAIO:  So that it is crystal
9  clear, we request it if we haven't
10 received it.  It is something that
11 Lazard reviewed.  It refers to stress
12 case assumptions.  I don't know how we
13 are suppose to cross-examine without
14 that.  So I will renew the request and
15 I want it clear on the record that we
16 want that stuff.
17      MR. GREEN:  Just to clarify, you
18 are requesting information that the
19 witness has testified that he did not
20 consider at all in writing the report
21 that is before us?
22      MR. BAIO:  Lazard considered
23 certain things and people have used
24 those numbers.  We want to know what
25 the basis is.  And we will go to the

Page 171

R. D'VARI

1
2  court on that.  That's all.
3       MR. DEVORE:  To be clear you
4  have not deposed Lazard.
5       MR. BAIO:  We have just
6  requested to do so.
7       MR. DEVORE:  You have not prior
8  to today.
9       MR. BAIO:  If you think we are
10 not entitled, we will bring it up with
11 the court.  We don't need a lot time.
12 I don't know if we did with this.  I'm
13 not sure we knew we didn't have it.
14 Any way it is what it is.
15      MR. LAWRENCE:  It was stated in
16 here.  I will state the debtor's
17 objection that Mr. -- that Dr. D'Vari
18 is here as an expert witness, not as a
19 fact witness.  He is here to testify
20 about his opinions in his Declaration.
21 Not some document that's in a
22 Declaration from some Mr. Miller from
23 Lazard.
24      MR. BAIO:  Fine.  We have made
25 the request and we will dance before

Page 172

R. D'VARI

1
2  the court.
3       MR. GREEN:  One more
4  clarification.  Who is the request
5  being made to?
6       MR. BAIO:  It's being made both
7  to FGIC, to the witness, and to
8  anybody else who has it who is in the
9  room.
10      MR. HAO:  Can you explain the
11 basis for the request?
12      MR. BAIO:  I'm explaining
13 nothing.  I am done now.  I've
14 explained it on the record.  We are
15 not burning any more time here.  If
16 you're confused, we will talk off the
17 record.
18 BY MR. BAIO:
19      Q.   Have you seen this Affidavit
20 before?
21      A.   No.  Other than today.
22      Q.   Have you seen any Duff & Phelps
23 report?
24      A.   No.
25      Q.   Do you know what the Duff &

Page 173

R. D'VARI

1
2  Phelps report is?
3       A.   No.
4       MR. BAIO:  I have no further
5  questions.
6  EXAMINATION BY
7  MR. SHORE:
8       Q.   Good afternoon, Mr. D'Vari.  I am
9  Chris Shore from White & Case on behalf of
10 the Ad Hoc Group of Junior Secured
11 Noteholders.  I have some follow-up
12 questions.
13      How did you get the ResCap
14 assignment?
15      A.   I got a call from a -- actually,
16 one of our new employees had been approached
17 and then by Morrison, ultimately.
18      Q.   Okay.  And when did you first
19 start work on the ResCap assignment?
20      MR. LAWRENCE:  Objection.  Asked
21 and answered.
22      Q.   Well, I think you said the end of
23 June but your Declaration is June 7th.  So
24 can you give me a little more specificity
25 when in relation to the issuance of your

44 (Pages 170 to 173)

## Page 174

R. D'VARI

1
2  report you were retained by the debtors?
3      A.   Somewhere in between.  I mean,
4  essentially between those two dates, yes.
5      Q.   Well, when did you first start
6  work on the ResCap matter?
7      A.   Immediately.
8      Q.   Okay.  And when was that in
9  relation to the issuance of your report?
10     A.   When was -- sorry, please
11 clarify.
12     Q.   Your report was, you signed on
13 June 7th?
14     A.   Right.
15     Q.   Okay.  How much prior to that or
16 how long --
17     A.   Sorry, did you say June or July?
18     Q.   June.
19         MR. LAWRENCE:  Take a look at
20     Exhibit 5 just to clarify things,
21     Chris.  So get Exhibit 5, it is right
22     here, Dr. D'Vari.
23     Q.   Tell me what date you signed that
24 document.
25     A.   The approach was towards the

## Page 175

R. D'VARI

1
2  Thanksgiving day.  And the report was issued
3  June 7th.
4      Q.   Your approach was towards
5  Thanksgiving day, November?
6      A.   Sorry, essentially around end
7  of May.
8      Q.   End of May, okay.  So when around
9  the end of May?
10     A.   Don't recall the exact date.
11     Q.   Did you keep time records on this
12 engagement?
13     A.   Yes, we do.
14         MR. SHORE:  Will you produce the
15     time records that will show, you can
16     redact whenever you want, but I want
17     know when the start date was for the
18     work that Mr. D'Vari did in connection
19     with the issuance of his report.
20         MR. LAWRENCE:  We will take it
21     under advisement.  I will say that his
22     retention application includes the
23     engagement letter.  So you should be
24     able to get the information there as
25     well.

## Page 176

R. D'VARI

1
2          MR. SHORE:  But the engagement
3      letter doesn't tell me when the
4      witness started working on it.
5      Q.   How much time did you spend in
6  the preparation of D'Vari Number 5?
7      A.   The team?
8      Q.   You.
9      A.   Oh, myself?
10     Q.   Yes.
11     A.   The portion of the assignment
12 that relates to calculating the actual
13 numbers that goes into the report are not
14 really recorded per se.
15     Q.   How much time did you personally
16 spend on the preparation of the D'Vari
17 Number 5?
18     A.   I would say that would exceed,
19 perhaps, 20 or 30 hours.
20     Q.   And how much of that 20 to
21 30 hours was spent in forming the opinions
22 and how much was spent in drafting the
23 document?
24     A.   The drafting is not -- I have a
25 team.  You have to recognize the number of

## Page 177

R. D'VARI

1
2  people involved here, at least we mentioned
3  four of them, including myself, would be
4  five, and the analysis -- there was quite a
5  bit of interaction by myself and the team in
6  terms of -- as a matter of fact, figuring out
7  the non-wrapped bonds and how to approach
8  those.  So there is a substantial amount of
9  time spent.
10     Q.   Let me ask my question again.
11 Can you breakdown the 20 to 30 hours in the
12 time you spent analyzing the issue and the
13 time you spent drafting the report?
14     A.   That was an estimate that I need
15 to verify and I will come back to you on
16 that, if you wish.
17         MR. LAWRENCE:  Dr. D'Vari, I
18     mean, you are here to testify to what
19     you can recall here today.  So that's
20     how this works.  So just testify to
21     what you can recall here today.  If
22     Mr. Shore has any requests to the
23     debtors, he will make those requests
24     to the debtors.  Just based on your
25     memory here today.

45 (Pages 174 to 177)

## Page 178

R. D'VARI

1          R. D'VARI
2      A.   It would be, based on my memory,
3  it would have been more than 30, 40 hours.
4      Q.   So now we are at --
5      A.   That's just myself.
6      Q.   I am just asking for yourself.
7  How much time did you personally spend in the
8  preparation of D'Vari Number 5, both in doing
9  the analysis that's expressed therein and
10  drafting it?
11      A.   That's probably around 30 to 40,
12  as I said.  But again, totally an estimate.
13      Q.   In connection -- at any time
14  since being hired by ResCap, have you spoken
15  with ResCap management?
16      A.   No.
17      Q.   Have you ever spoken to the --
18  the board of directors of ResCap?
19      A.   No.
20      Q.   Have you ever spoken to
21  Lewis Kruger?
22      A.   No.
23      Q.   Do you know who Lewis Kruger is?
24      A.   No.
25      Q.   Did you ever speak to anybody

## Page 179

R. D'VARI

1  representing the official committee of
2  unsecured creditors in ResCap?
3      A.   Unsecured credit committee.
4      Q.   That you know of.
5      A.   I don't know who they are, so I
6  can't tell you.
7      Q.   Have you ever spoken to anybody
8  at Kramer Levin with respect to the opinions
9  expressed in D'Vari Number 5?
10      A.   No.
11      Q.   How much have you charged the
12  estate for the preparation of D'Vari
13  Number 5?
14      A.   The total dollar amount?
15      Q.   The total.
16      A.   I can't -- I don't know the exact
17  numbers to state.  If you can -- you want to
18  bracket it?
19      Q.   Sure.  You can bracket it.
20      A.   Probably around 300 or 200.
21  Somewhere or that's --
22      Q.   When in relation to the signing
23  of D'Vari 5, which is June 7th, did you first
24  reach your conclusions that you are

## Page 180

R. D'VARI

1          R. D'VARI
2  expressing in D'Vari 5?
3      A.   Yes, when we actually have -- we
4  have already been drafting.
5      Q.   Okay.  So when did you reach the
6  conclusions in relation to June 7th, was it
7  on June 7th, was it June 3rd?
8      A.   The numbers were being produced,
9  being examined, being looked at, tables were
10  getting produced and so on and so forth.
11  There is a lot of aggregation of numbers
12  involved.  So in between, my team was working
13  for plug ins in the numbers.
14      Q.   When was the first date you can
15  recall giving Morrison & Foerster an
16  indication of what the numbers were going
17  to be?
18      A.   Until I have signed on something,
19  it is not my opinion.
20      Q.   So you would not have told
21  Morrison & Foerster before June 7th that your
22  expert opinion with respect to the aggregate
23  collateral losses was a specific number?
24      A.   That is not -- that is not true.
25      Q.   Well, what is?

## Page 181

R. D'VARI

1          R. D'VARI
2      A.   As I said, people talk estimates
3  and exchange estimates or speak about it.
4  But it is not final until it is final.
5      Q.   When was the first time you
6  exchanged an estimate?
7      A.   I don't recall.
8      Q.   When in relation to June 7th, a
9  day before, two days before, the day you got
10  hired?
11      A.   You have to recognize NewOak does
12  this analysis.  We are setup to do the
13  analysis.  We do hundreds and thousands of
14  CUSIPS and trusts.  Our process is fairly
15  standardized and it is independent and
16  individual case.  So this particular case
17  would not have been much different than that.
18  And when we run the analysis, we -- I think
19  there is a lot of discussions on other
20  things, but I don't exactly remember if it
21  was 6th or the 5th or a few days, you know,
22  in between those numbers.  But that
23  essentially would have been the -- sometime
24  in between those two half point, we would
25  have had preliminary analysis done already.

Page 182

1              R. D'VARI
2      Q.   Is it possible that you would
3  have expressed at least your estimates of
4  your conclusions in May?
5      A.   In May, no.
6      Q.   Okay.
7      A.   Not before we were engaged.  Not
8  at the time of engagement.  None of that
9  stuff.
10     Q.   Okay.  Just a few followups on
11 the FGIC work that you guys did.  Have you
12 been paid for that work?
13     A.   Yes, we have.
14     Q.   Okay.  When were you paid?
15     A.   As we worked.
16     Q.   Has anybody at NewOak, as far as
17 you know, worked for any of the trustees on
18 the trusts that are in the schedules to
19 D'Vari Number 5?
20     A.   I can't tell.  I don't know.
21     Q.   What about indentured trustees on
22 any securities issued by those trusts?
23     A.   I don't know.
24     Q.   And what about holders of
25 securities or certificates in the trusts?

Page 183

1              R. D'VARI
2      A.   I don't know.
3      Q.   When did you advise debtor's
4  counsel that you had worked for FGIC in
5  connection with the 47 trusts?
6          MR. LAWRENCE:  I will let you --
7          you can testify as to the timing of
8          the conversation with counsel but not
9          the substance of the conversation with
10         counsel.  So his question was when.
11     A.   When did I highlight that I had
12 worked previously for FGIC?
13     Q.   Yes.
14     A.   We never state that we've worked
15 with something.  You know, we typically,
16 initially, highlight that there may be a
17 conflict or not conflict and so on and so
18 forth.  It would be sometime during the
19 initial discussions of our engagement letter.
20     Q.   So you believe that you told
21 Morrison & Foerster that you had worked for
22 FGIC in connection with the 47 trusts prior
23 to executing the engagement letter?
24         MR. LAWRENCE:  I don't want you
25         to testify about the substance of

Page 184

1              R. D'VARI
2  conversations, but, Chris' question is
3  loaded with substance of conversation.
4  But if you want to answer as to a
5  timing of when prior work was
6  discussed, you can do that.
7      A.   It became apparent but not
8  necessarily, you know, directly a statement.
9  I am sorry, there is a public document that
10 is already out there that is one of the
11 exhibits that NewOak has prior to, to this.
12 It is public information, which is not a
13 confidential as to the fact that NewOak has
14 worked for FGIC at some point.  So we had
15 raised that as something that needs to be
16 valued.
17     Q.   Did you raise that before or
18 after the execution of the retention letter?
19     A.   No, it wasn't after.  It was not
20 after.
21     Q.   So you raised it before?
22     A.   Yes.
23     Q.   In your Declaration, Paragraph 2,
24 let me clear up some things.  Mr. Baio was
25 asking you about the questions, the aggregate

Page 185

1              R. D'VARI
2  amount of the claims released by the FGIC
3  trustees.
4      A.   Yes.
5      Q.   In your testimony that was, as I
6  understand it, claims both against the
7  debtors and claims against FGIC, right?
8      A.   Again, I am not -- I haven't
9  studied the exact settlements.  For us, this
10 is the aggregate amount that the trustee had
11 claimed.  I don't know from who and when and
12 what.  That's a legal question.  All we are
13 saying, if that's the total aggregate, that
14 is an if, we don't know whether that is or
15 not, it is a given number, then you subtract
16 that number from the non-wrapped FGIC --
17 sorry, non-wrapped bonds by FGIC, you get to
18 this number which, if it is released, that
19 would be the number.  It is a simple math.
20     Q.   Right.  I want to be clear.  You
21 didn't review any of the FGIC insurance
22 policies, did you?
23     A.   No.
24     Q.   So you're not opining that the
25 FGIC trustees could make a claim under those

Page 186

1          R. D'VARI
2   policies in the amount of $5 billion?
3       A.   Absolutely not.
4           MR. BAIO:  Object to the form.
5       Q.   You didn't look at any of the
6   individual reps and warranties that any of
7   the debtors made?
8       A.   No.
9       Q.   Okay.
10      A.   None of that are within the scope
11  of our opinion or we are not presenting any
12  opinion on that.
13      Q.   Right.  So you're not presenting
14  any opinion that that -- that the FGIC
15  trustees could present a valid claim under
16  any existing document in the amount of
17  $5 billion against the debtors?
18      A.   The answer to your question is
19  yes, we are not.  That's a double negative.
20      Q.   All right.
21      A.   It is a single negative.  Yes, we
22  are not saying that number represents
23  something we are opining on except the
24  difference of two numbers.
25      Q.   So when you use the word claim

Page 187

1          R. D'VARI
2   here, is it fair to say what you are saying
3   is the trustees could write that down on a
4   piece of paper as an amount that they could
5   claim they lost?
6           MR. LAWRENCE:  Object.
7           MR. BAIO:  Object to the form.
8       A.   I go again, we are not saying
9   that this is a valid claim or not.  We are
10  saying if that is the total number, they are
11  claiming, if, if they release that -- I mean,
12  if the rest of this and you subtract it from
13  our total, then that's the number you get.
14  But there is no other representation or
15  opinion attached to that number.
16      Q.   Okay.  And by the way, you're not
17  expressing any opinion as to which of the
18  debtor entities the trustees could assert a
19  claim of $5 billion?
20      A.   Absolutely not.
21      Q.   All right.  Or the priority of
22  what that claim would be?
23      A.   Absolutely not.
24      Q.   And you're not opining as to the
25  basis for any of those claims, for example,

Page 188

1          R. D'VARI
2   you're not opining that they have fraud
3   claims?
4       A.   Absolutely not.
5       Q.   Which could -- okay.  Or contract
6   claims?
7       A.   That is true, I am not claiming
8   any of that.
9       Q.   And you're not claiming that they
10  have valid alter ego or aiding and abetting
11  or piercing claims or anything else?
12      A.   True, I am not claiming this.
13      Q.   You used a valuation date of --
14  or a date of June 1, 2003.
15      A.   Right.
16          MR. BAIO:  2013.
17      Q.   As the analysis date of?
18          MR. LAWRENCE:  Just to clarify
19  the record, you said 2003 but I think
20  you mean 2013.
21      Q.   2013.
22      A.   2013, yes.
23      Q.   Why do you use that date?
24      A.   That was the recent date
25  available for us to do our analysis.

Page 189

1          R. D'VARI
2       Q.   Was that your decision or was
3   that an assumption which you were given by
4   counsel?
5       A.   I don't necessarily recall but
6   that would be the natural date to pick, which
7   is the -- to not try to estimate something
8   that has already occurred.
9       Q.   At any time in the preparation of
10  your report, did you consider using the
11  petition date that the debtors filed for
12  bankruptcy as the date on which you would
13  determine the amount of collateral loss?
14      A.   No, because we were not asked to
15  do that.
16      Q.   Would there be a variance in your
17  view, I'm not asking you to quantify the
18  variance, but would there be a variance in
19  your conclusions if you used a 2012 date for
20  your analysis versus using a 2013 date?
21          MR. LAWRENCE:  Objection.
22  Objection.  Calls for speculation.
23          Go ahead.
24      A.   The petition date was what date?
25      Q.   It was May 2012?

48  (Pages 186 to 189)

Page 190

```
 1          R. D'VARI
 2     A.   From my point of view,
 3   absolutely, there is a huge, a time versus
 4   now is, you know, you are still in the
 5   housing downturn.  Now you are in a housing
 6   upturn.
 7     Q.   So it would be directionally
 8   going which way, if you moved it back to the
 9   petition date?
10     A.   Again, I do not want to speculate
11   to the extent, you know, there are
12   two things.  Losses that occurred between
13   that date until today and you need to
14   consider that because those are actual now
15   rather than estimated.  In addition to that,
16   you know, essentially, I would -- you know,
17   these pools are highly seasoned.  So they
18   there would be some change and that would
19   probably be improving or reducing the losses.
20     Q.   Okay.  Did you review any proofs
21   of claim filed by any creditors in the ResCap
22   bankruptcy cases?
23     A.   No.
24     Q.   Were you asked to participate in
25   any negotiations between the debtors and FGIC
```

Page 191

```
 1          R. D'VARI
 2   with respect to the Settlement Agreement?
 3     A.   Absolutely not.
 4     Q.   Did you even know that a
 5   Settlement Agreement was being negotiated at
 6   the time you were retained?
 7     A.   No.  At the time I was retained,
 8   yes, because we referred to it.
 9     Q.   You referred to it in your
10   report.  I'm asking about when you were
11   retained, which seems like two weeks earlier?
12     A.   Yes, but I think that
13   discussion's from -- yes, we were aware of
14   that.
15     Q.   At any time from your retention
16   to the issuance of your report, did you
17   express the view to Morrison & Foerster that
18   you didn't have enough time to issue your
19   report?
20     A.   No.  Because that highlighted,
21   this is a very typical exercise that we do
22   and we are very well prepared for it and we
23   have a team of 70 people and we have more
24   than residential space as one of our top
25   areas and we monitor this space.  So, you
```

Page 192

```
 1          R. D'VARI
 2   know, looking at another 47 trusts, you know,
 3   at month end we probably look at, you know
 4   hundreds of them over a period of three days.
 5     Q.   Sure.  So I want to make
 6   perfectly clear the fact that you were
 7   retained two weeks prior to you issuing this
 8   report and doing 2 to $300,000 worth of work
 9   was -- did not impact at all the quality of
10   the work you were able do in that period?
11        MR. LAWRENCE:  Objection to the
12     characterization.
13     A.   The seven-day in terms of
14   analysis day for this is not something that a
15   practitioner like myself or other qualified
16   RMBS experts would consider actually a short
17   time.  They would not consider it a short
18   time.  Because when you trade these
19   instruments on an instant basis, you are
20   prepared.  You are laid up.  You will have
21   all your tools ready.  This is not
22   something -- we are not foreign to this
23   space.  This is, you know, like asking the
24   milk man to produce milk.
25     Q.   Is it your recollection now that
```

Page 193

```
 1          R. D'VARI
 2   your -- from the time of your retention to
 3   the issue of your report it was seven days, I
 4   think you said seven days in your answer?
 5     A.   You are asking me to nail it
 6   down.  But what I am saying is, it was
 7   relatively short.
 8     Q.   Okay.  I have nothing --
 9     A.   Relatively within a 7 to 14 day
10   kind of timeframe.
11        MR. SHORE:  No further
12     questions.
13     A.   Not short for this work but from
14   the standpoint of perhaps others.
15        MR. SHORE:  Okay.  I have no
16     further questions.
17        MR. LAWRENCE:  Anyone else have
18     any further questions?
19        MR. CARNEY:  I just have
20     one question, but I want to ask anyone
21     from trustee's counsel if they have
22     produced the work papers of
23     Mr. D'Vari.  I don't recall receiving
24     them.
25        MR. LAWRENCE:  Let's go off the
```

Page 194

```
 1              R. D'VARI
 2    record.
 3         (Whereupon, at 2:13 p.m., the
 4    Examination of this Witness was
 5    concluded.)
 6
 7
 8    _____
 9         RON D'VARI

      Subscribed and sworn to before me
10    this _____ day of _____, 2013.
11    _____
          NOTARY PUBLIC
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 195

```
 1
 2         E X H I B I T S
 3
 4
 5    EXHIBIT   EXHIBIT            PAGE
 6    NUMBER    DESCRIPTION
 7    Exhibit 1  Home Price Index Used   14
 8              In Analysis
 9    Exhibit 2  Index Parameters Used   14
10              In Analysis
11    Exhibit 3  Import to Analysis      14
12    Exhibit 4  Affidavit of            28
13              Michael W. Miller in
14              Further Support of the
15              First Amended Plan of
16              Rehabilitation
17    Exhibit 5  D'Vari Declaration      49
18              Regarding 9019 Motion
19    Exhibit 6  Gary C. Holtzer's      111
20              Affirmation in Support
21              of the Settlement
22              Agreement in the
23              Rehabilitation Court
24
25
```

Page 196

```
 1
 2
 3         I N D E X
 4
 5    EXAMINATION BY          PAGE
 6    MR. CARNEY              6
 7    MR. BAIO               140
 8    MR. SHORE             173
 9
10
11
12    INFORMATION AND/OR DOCUMENTS REQUESTED
13    INFORMATION AND/OR DOCUMENTS    PAGE
14    Request for engagement letter   20
15    Request for information        169
16
17
18
19
20
21
22
23
24
25
```

Page 197

```
 1
 2         C E R T I F I C A T E
 3
 4    STATE OF NEW YORK     )
 5                    : SS.:
 5    COUNTY OF NASSAU      )
 6
 7         I, REBECCA SCHAUMLOFFEL, a Notary
 8    Public for and within the State of New York,
 9    do hereby certify:
10         That the witness whose examination
11    is hereinbefore set forth was duly sworn and
12    that such examination is a true record of the
13    testimony given by that witness.
14         I further certify that I am not
15    related to any of the parties to this action
16    by blood or by marriage and that I am in no
17    way interested in the outcome of this matter.
18         IN WITNESS WHEREOF, I have hereunto
19    set my hand this 25th day of July, 2013.
20
                _____
21              REBECCA SCHAUMLOFFEL
22
23
24
25
```

Confidential

Page 198

1                  WITNESS ERRATA SHEET
       Witness Name: Ron D'Vari
2      Case Name: In Re:  Residential Capital
3      Date Taken: July 25, 2013
4      Page #_____  Line #_____
5        Should Read:  _____
6        Reason for Change:  _____
7
       Page #_____  Line #_____
8
         Should Read:  _____
9
         Reason for Change:  _____
10
11     Page #_____  Line #_____
12       Should Read:  _____
13       Reason for Change:  _____
14
       Page #_____  Line #_____
15
         Should Read:  _____
16
         Reason for Change:  _____
17
18     Page #_____  Line #_____
19       Should Read:  _____
20     Reason for Change:  _____
21
       Witness Signature:  _____
22
23
24
25

### Deposition Errata Sheet

### *In re Residential Capital, LLC, et al.,*
### Case No. 12-12020(MG)

Deponent:          Ron D'Vari
Deposition Date:   July 25, 2013

| Citation | Testimony |
|---|---|
| 9:22-25 | A. ~~Meaning things are~~ <u>I mean</u> not conforming, Freddie and Fannie guaranteed bonds.  Anything such as Alt A, sub-prime and non-agency mortgages. |
| 10:2 | and/or one of the <u>Government Sponsored Entities</u> ~~guarantees~~, |
| 12:2-5 | A.  My analys<u>ts</u> as well as my associates and managing directors that have been involved ~~and used~~ in my normal course of work. |
| 12:19 | P-I-E-K-T-A ~~Harood~~ <u>Haroon</u> Jawadi.  For some reason I am |
| 13:21 | A.  No. ~~We're~~ <u>We were</u> actually working on |
| 15:19-21 | the – effectively you are looking at ~~index    index~~ <u>Intex</u> parameters that were used in our analysis. |
| 18:6-9 | A.  Sure.  <u>When W</u>we perform an analysis on a particular CUSIP ~~that work on that and that depends on the number of parts set up~~, we get paid essentially a fixed fee on that. |
| 22:13 | MR. ~~CARNEY~~ <u>LAWRENCE</u>:  You shouldn't |
| 22:16-18 | A.  Essentially, <u>the</u> subject matter was something that we're ~~tight~~ <u>qualified</u> to deal with and <u>we</u> were asked to answer some questions and we |
| 25:11 | I don't know ~~the~~ exact<u>ly</u>. |
| 32:24 | assignment ~~within~~.  I have been instructed by |
| 45:2-6 | question for a yes or no. Because I am under ~~I am not going to be, just for your information, I am not going to, you know~~  I am under <u>a</u> ~~confidential~~ <u>confidentiality</u> agreement. |
| 48:8 | A.  Not <u>that I'm</u> aware of. |
| 48:18 | A. I have no information ~~past~~ <u>post</u> |

| Citation | Testimony |
|---|---|
| 50:18-21 | A. ~~I am providing opinion within~~ the boundaries of what -- I have been instructed to calculate certain things and I have calculated irrespective of ~~them~~ how they are used. |
| 52:14-19 | A. Yes. I am here to offer ~~you -- I~~ was offering, ~~essentially,~~ answer~~ing~~ to two questions~~.,~~ ~~One,~~ both related to a lifetime expected losses. One relates to the collateral underneath certain trusts, and~~,~~ the second~~,~~ was the lifetime losses related to |
| 53:25 | ~~insurance~~ issuance to the date of the analysis. |
| 55:20-21 | Would you rather me ~~to~~ read verbatim? |
| 58:3-4 | A. I've not been ~~privileged for~~ privy to that |
| 59:16-19 | A. Broad question but I will answer. Primarily ~~Intech~~ Intex. ~~We also used MBS data, which is -- MBS data.~~ We then use our own economic forecasts. |
| 69:21 | A. There ~~is~~ are 106 or ~~7~~ 107, I don't |
| 71:8-16 | A. Only -- of the trusts themselves or the tranches? Yes, we have looked at all of these. But not as it relates to Question 1. But, again, the answer is all of them as far as looking at bonds -- I have to be very careful. The Question 1 is not really ~~relates~~ related to that assignment. What we are talking about is that our work is tranche based. |
| 73:9-12 | A. Correct. ~~In some cases.~~ Well, ~~in no cases~~ the trusts are not insured. But there could be situations where all bonds~~, certificates~~ that are issued are insured. |
| 74:19 | index, that's an ~~import~~ output that is derived by |
| 76:25 - 77:2-3 | trustee, collected by Intex, and ~~effectively reads presenting that back to~~ so those are the actual numbers reported ~~to~~ by the trustee. |
| 80:13 | A. Correct. You won't ~~pool~~ pull that |
| 81:10 | ~~and RMBS data~~ and our assumptions to get to |
| 82:2-6 | Intex expects: as of the analysis date, forward looking, voluntary prepayments, forward looking ~~essentially~~ default rates and forward looking severities, combined with interest, term structure as of time of analysis. |

ny-1102943

| Citation | Testimony |
|---|---|
| 83:14-21 | A.  Again, it varies in details but ~~and the shape and~~ their form is effectively predicting collateral prepayments, collateral defaults, collateral severity rates~~.,~~ ~~converting those to~~ in this particular case, you are looking at the ~~underlying collateral itself not necessarily the tranches.~~  And that would be standard. |
| 84:11-12 | A.  Again, it varies ~~in form.  Typically~~ in the marketplace.  But you have |
| 84:24 | at ultimate ~~eum~~ cumulative loss, and that varies in |
| 85:9-22 | A. They~~re are;~~ in Exhibit 3~~.,~~ ~~and the information, again, repeatedly are done~~ ~~for  let me actually see whether   there are two dates, but ultimately, they~~ ~~apply to, as relative to the trust that they are in.  So~~ A trust may have multiple tranches, but the same assumption will be used for every single bond within that trust~~.~~ ~~and they would be under   there are no column~~ ~~headings.  I mean the Column A, B, C, D.  But there is a prepay rate default~~ ~~and those would be numbers that you can see.  Vector~~  They are not printed fully here but ~~would be~~ have been provided in Excel sheet format. |
| 86:2-9 | A.  No. I think we have highlighted our macro.  We have highlighted the specific run, which is~~, that's~~ Exhibit 2, based on ~~actually, that use those~~ ~~ultimately,~~ the information ~~that is~~ provided in Exhibit 3. ~~that goes into.  The~~ ~~interest rate is obviously,~~ If you run Intex with these inputs, you should be able to get similar answers. |
| 88:20 | believe are the most important factors for RMBS. |
| 89:3 | amount of supply and we also use what is called |
| 89:6-7 | subjective, not an objective parameter~~,~~ ~~that considers~~ to be able to track its forecast |
| 89:12 | ~~actually performed~~ analyze for our clients on a |
| 89:20 | in the marketplace as a market observer and |
| 91:17-25 | A.  ~~That's a~~ That includes research reports that we get from Street firms, and ~~the number of them~~ they are numerous.  And we also actually look at the performance that we have seen on ~~NewOak subscribes to~~ MBSData, to which NewOak subscribes.  MBSData was not ~~as~~ specifically applied~~, you~~ ~~know,~~ in this ~~run~~ analysis, but ~~there are~~ the performance and surveillance that we get from ~~those~~ MBSData would highlight to us, for example, how the housing |
| 92:2 | market is working because of the ~~severity~~ severities |

ny-1102943

| Citation | Testimony |
|---|---|
| 96:12 | ~~used~~ analyzed using NewOak's evolving methodology. |
| 96:15-17 | A. ~~Same~~ Yes – it would have been using the macro information ~~from NewOak's. It would have used~~ and ultimately getting to these |
| 103:13 | mortgage loan losses ~~that~~ underneath – which |
| 106:12 | that ~~in my~~ calculation~~.~~ in my head. |
| 107:25 | claims by non-wrapped bonds, subtracted ~~by~~ from |
| 108:3-4 | that this amount is what ~~it~~ is potentially ~~could be~~ released. |
| 108:6 | A. ~~Yes.~~ 5.001, approximately 5 billion. |
| 108:9 | A. No, ~~54~~approximately 5.4 billion is total collateral. |
| 111:7-8 | A. ~~I am saying it is a conservative number.~~ No. |
| 111:10-12 | A. Again, that's not the subject of my opinion~~, but that's a side derived number from that.~~ |
| 115:10-11 | take – you subtract from the total collateral loss ~~from~~ the interest in the tranches that |
| 115:16 | A. ~~Correct.~~ Okay. |
| 116: 25 | A. 3.67~~.~~billion. |
| 119:4 | A. ~~Objection,~~ No, I think you're |
| 119:8 | claims is ~~a~~ very complex and it requires |
| 119:11-12 | not one that I have done and it is not done.~~, what I attempt here today.~~ |
| 119:20 | claims may be X and we subtracted non-wrapped |
| 125:4-6 | A. In reference to what? ~~There is a totality of the concentration that~~ I am not aware of~~;~~ what bonds we are looking at, what |
| 129:4 | specifically did the work on this engagement for the debtors~~, have not been~~ |
| 129:17 | A. And he was also not involved with the prior work for FGIC . |
| 133:17 | A. ~~If~~ In every timeframe post crisis to |

4

| Citation | Testimony |
|---|---|
| 134:3 | different position. ~~Weeks~~ Greece was in a different |
| 134:9-10 | what is already in Intex and everybody has. What is not common is how the environment is changed |
| 135:10-11 | A. I can comment on our methodology in general but not in the context of anything else. Our |
| 135:17 | A. Again, I am not making any comment |
| 136:24-25 | works, you need to look at it on the forecast basis, which I ~~talked~~ spoke to. On a forecast basis |
| 138:3-4 | A. I have provided you what we ~~arrived~~ relied on. The analysis is very blind. It |
| 143:3 | A. Not in ~~details~~ detail. |
| 144:6 | settlement and my analysis. |
| 144:10 | By ~~the~~ counsel, which was represented as part |
| 145:9 | A. From ~~primarily the~~ counsel. |
| 145:24 | A. It references those. |
| 146:2-3 | A. That is not really something that we needed to know. |
| 148:2 | I assume that's a three way arrangement. Now, please ask. |
| 149:8 | actualities, it talks about the potential size |
| 149:19 | A. ~~No.~~ Yes. |
| 152:19 | A. ~~Yes.~~ I don't know. |
| 153:14-18 | wrapped potential losses, which we also calculated, and then subtracted. ~~if you subtract those two numbers, you effectively   and if they are released by the trustee is specifically saying then they will release everything.~~ |
| 153:21 | the non-wrapped portion, it is a simple |
| 153:25 | they do that. It is ~~a~~ mathematical, not an |
| 156:12 | everything else is a very mechanical process |
| 159:7 | assessment of what the future ~~has~~ holds and then apply |

5

ny-1102943

| Citation | Testimony |
|---|---|
| 159:14-15 | A. Correct, ~~And~~ on the forecasted portion. |
| 159:20 | you need to have information on, which ~~is~~ |
| 161:8 | A. ~~It is a~~ They are driving elements. |
| 162:13-14 | As of April 2013.  So ~~it~~ predates our analysis for, or even being contacted ~~.~~ by, the debtors. |
| 164:6 | there are ~~036~~ X-axis markings 0, 3, 6 months.  These are effectively as of |
| 165:4 | ~~testimonies~~ economics and other things. |
| 167:21 | A. No, those are ~~de~~ nominal numbers. |
| 173:17 | ~~and then~~ by Morrison, ultimately. |
| 174:3-4 | A. ~~Somewhere in between.  I mean. essentially between those dates, yes.~~ I don't recall. |
| 179:21-22 | A. Probably around 300,000 or 200,000.  ~~Somewhere or that's---~~ |
| 180:3-4 | A. ~~Yes, when we actually have--- we have already been~~ While we were drafting. |
| 181:21-24 | was 6th or the 5th or a few days ~~., you know, in between those numbers,~~ But ~~that essentially would have been the---~~ sometime in between those two ~~half~~ points, we would |
| 183:15 | with ~~something~~ someone.  You know, we typically, |
| 184:11-12 | exhibits that ~~says~~ NewOak has worked for FGIC prior to, to this.  It is public information, which is not ~~a~~ |
| 184:15-16 | raised that as something that needs to be ~~valued~~ evaluated. |
| 185:15-19 | not, it is a given number, then you subtract from that number ~~from~~ the ~~non-wrapped FGIC --- sorry, non-wrapped~~ bonds not wrapped by FGIC, and you get to this number which, if it is released, that would be the number.  It is ~~a~~ simple math. |
| 186:10-11 | A. None of that ~~are~~ is within the scope of our opinion ~~or~~ so we are not presenting any |
| 187:11-13 | claiming, if, if they release that ~~--- I mean, if the rest of this and you subtract it from our total~~ except for the part we subtract, then that's the number you get. |
| 188:24 | A. That was the most recent date |

6

| Citation | Testimony |
|---|---|
| 190:3-5 | absolutely, there is a huge <u>difference from that</u>, ~~a~~ time versus now ~~is~~, you know, <u>then</u> you ~~are~~ <u>were</u> still in the housing downturn. Now you are in a housing |
| 191:7 | A. ~~No.~~ At the time I was retained, |
| 191:20-25 | A. No. Because ~~that highlighted,~~ this is a very typical exercise that we do and we are very well prepared for it and we have a team of 70 people and ~~we have more~~ <u>the</u> ~~than~~ residential space ~~as~~ <u>is</u> one of our top areas and we monitor this space. So, you |
| 193:13-14 | A. The seven-day<u>s</u> in terms of analysis ~~day~~ <u>time</u> for this is not something that a |

Date:    8/6/2013

Signed:    Ron D'Vari