# Exhibit 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK CITY

| | |
|---|---|
| MBIA Insurance Corporation,<br><br>                    Plaintiff,<br><br>         -against-<br><br>Countrywide Home Loans, Inc., Countrywide<br>Securities Corp., and Countrywide Financial<br>Corp.<br><br>                    Defendants. | Index No. 08) 602 325<br><br>**COMPLAINT**<br><br>NEW YORK<br>COUNTY CLERK<br><br>SEP 3 0 2008<br><br>NOT COMPARED<br>WITH COPY FILED |

Plaintiff MBIA Insurance Corporation ("MBIA"), by its attorneys, Quinn

Emanuel Urquhart Oliver & Hedges LLP, for its Complaint herein against Countrywide Home

Loans, Inc. ("Countrywide Home"), Countrywide Securities Corporation ("Countrywide

Securities") and Countrywide Financial Corporation ("Countrywide Financial") (collectively,

"Countrywide"), alleges as follows:


## NATURE OF ACTION

1.      This action arises out of the fraudulent acts and breaches of contract of

Countrywide in connection with the securitizations of pools of home equity loans (the "Mortgage

Loans"). Countrywide, the largest residential mortgage originator and servicer in the country,

originated and sold (or otherwise conveyed) Mortgage Loans to trusts that in turn issued and sold

residential mortgage-backed securities ("RMBS") to investors. To make these securitizations

more marketable, Countrywide induced MBIA to provide billions of dollars of credit

enhancements in the form of guarantees of the trust obligations on particular classes of RMBS.

In order to do so, Countrywide falsely represented to both MBIA and the trust investors that

Countrywide had originated the Mortgage Loans in strict compliance with its underwriting standards and guidelines, which were developed over time to screen the creditworthiness of borrowers and the likelihood that mortgage loans would be repaid.

2.    In reality, as it fought aggressively to expand its already enormous market share in the mortgage lending boom of the past few years, Countrywide—under the direction of former Chief Executive Officer Angelo Mozilo and former President and Chief Operating Officer David Sambol—developed a systematic pattern and practice of abandoning its own guidelines for loan origination:  knowingly lending to borrowers who could not afford to repay the loans, or who committed fraud in loan applications, or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use.

3.    From at least 2005 through 2007, in securitization after securitization, these practices fundamentally changed the risk profile of the Mortgage Loans from that represented by Countrywide.  As a direct result of Countrywide's deliberate misconduct as a loan originator, and its fraudulent representations as to the characteristics of the loan pools in the securitizations for which MBIA provided guarantees, thousands of Mortgage Loans are in default and/or foreclosure, while MBIA has already paid out over $459 million on its guarantees and is exposed to claims in excess of several hundred million dollars more.

4.    Further, compounding the harms of its original fraud, Countrywide has refused to repurchase or replace non-compliant Mortgage Loans with eligible loans that do meet Countrywide's own guidelines, thereby breaching express representations and warranties in its contracts with MBIA.  If Countrywide had truthfully represented its deliberate deviation from guidelines and past practice in loan origination, MBIA never would have issued guarantees on

the RMBS notes, and MBIA would not have suffered the related declines in its market value and other losses.

5.      As alleged by the Attorney General for the State of California: "Countrywide's deceptive scheme had one primary goal—to supply the secondary market with as many loans as possible, ideally loans that would earn the highest premiums. Over a period of several years, Defendants constantly expanded Countrywide's share of the consumer market for mortgage loans through a wide variety of deceptive practices, undertaken with the direction, authorization, and ratification of Sambol and Mozilo, in order to maximize its profits from the sale of those loans to the secondary market."

6.      In short, Countrywide deliberately abandoned its own guidelines to drive up revenues from increased origination fees, securitization fees, and servicing fees—no matter the cost to borrowers, investors, or guarantors like MBIA.

7.      Accordingly, MBIA now brings this action against Countrywide for fraud, negligent misrepresentation and breach of contract.

## PARTIES

8.      Plaintiff MBIA Insurance Corporation is a New York corporation with its principal place of business at 113 King Street, Armonk, New York. MBIA is one of the nation's oldest and largest monoline insurers, and provides financial guarantee insurance and other forms of credit protection, generally on financial obligations which are sold in the new issue and secondary markets.

9.      Defendant Countrywide Financial Corporation is a Delaware corporation with its principal executive offices in Calabasas, California. Countrywide Financial, itself or through its

subsidiaries, is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, securities dealing, and insurance underwriting.

10.    Defendant Countrywide Home Loans, Inc., a wholly-owned subsidiary of Countrywide Financial, is a New York corporation with its principal executive offices in Calabasas, California.  Countrywide Home originates and services residential home mortgage loans.

11.    Defendant Countrywide Securities Corporation, a wholly-owned subsidiary of Countrywide Financial, is a Delaware corporation with executive offices in Calabasas, California and in New York, New York.  Countrywide Securities is a registered broker-dealer and underwrites offerings of mortgage-backed securities.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this proceeding pursuant to CPLR § 301. Countrywide Home is a New York corporation, and has appointed an agent for service of process and has consented to the jurisdiction of Courts within the State.  In addition, each of Defendants Countrywide Financial, Countrywide Home and Countrywide Securities expressly consented to the jurisdiction of this Court over contractual and all other claims arising out of the transactions that give rise to the claims in the Complaint.  Each is registered and/or licensed to do business within the State and has agreed to the jurisdiction of the Courts within the State over matters arising out of its activities within the State.  Each has offices and regularly transacts business within the State.  Each participated in negotiations and other activities within the State which led to the transactions that give rise to the claims in the Complaint, and the transactions themselves occurred within the State.

4

13.    Venue is proper in this Court pursuant to CPLR § 503(c). Each of Defendants Countrywide Financial, Countrywide Home, and Countrywide Securities expressly agreed that the Courts within the County and State of New York are an appropriate venue for all actions arising out of the transactions that give rise to the claims in the Complaint. In addition, negotiations and other substantial activities relating to the transactions that give rise to the claims in the Complaint occurred within the State.

## FACTUAL ALLEGATIONS

**I.    Countrywide Promotes Itself As a Reputable and Conservative Loan Originator.**

14.    Co-founded in 1969 by Angelo Mozilo, Countrywide is an industry leader of the residential mortgage lending industry. As of March 31, 2008, Countrywide was the largest originator of residential mortgage loans in the country, and also the largest servicer of mortgage loans in the country. In the first quarter of 2008 alone, despite a sharp decline in residential home sales, Countrywide originated $73 billion in mortgage loans. During that same quarter, Countrywide serviced and administered approximately $1.5 trillion of residential loans originated by itself and other lenders, generating $1.4 billion in revenues.

15.    In addition to origination and servicing of residential mortgage loans, Countrywide, itself or through affiliates, purchases and sells mortgage loans, provides loan closing services, provides residential real estate and home appraisal services in connection with loan origination and servicing, manages a captive mortgage reinsurance company, packages and arranges securitizations of mortgage loan pools, and underwrites public offerings of mortgage-backed securities in the secondary market.

16.    On information and belief, prior to 2004, the substantial majority of mortgage loans that Countrywide originated each year were traditional long term, fixed-rate, first lien

mortgage loans to prime borrowers which met the guidelines for sale to the Federal National

Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation

("Freddie Mac"). Fannie Mae and Freddie Mac are authorized to purchase only mortgage loans

that conform to specific regulatory guidelines (known in the industry as "conforming loans").

Conforming loans, if properly underwritten and serviced, historically were the most conservative

loans, with the lowest rates of delinquency and default, in the residential mortgage industry.

Mortgage loans which fail to meet the regulatory guidelines are known in the industry as "non-

conforming loans."

     17.     Countrywide extolled its conservative Credit Policy, which it proclaimed was

"designed to produce high quality loans through a rigorous pre-loan screening procedure and

post-loan auditing and appraisal and underwriting reviews." In its 2004 annual report,

Countrywide summarized the comprehensive standards and procedures of its Credit Policy:

> Our Credit Policy establishes standards for the determination of acceptable credit
> risks. Those standards encompass borrower and collateral quality, underwriting
> guidelines and loan origination standards and procedures. Borrower quality
> includes consideration of the borrower's credit and capacity to pay. We assess
> credit and capacity to pay through . . . manual or automated underwriting of
> additional credit characteristics. Our loan origination standards and procedures
> are designed to produce high quality loans. These standards and procedures
> encompass underwriter qualifications and authority levels, appraisal review
> requirements, fraud prevention, funds disbursement controls, training of our
> employees and ongoing review of their work . . . In addition, we employ
> proprietary underwriting systems in our loan origination process that improve the
> consistency of underwriting standards, assess collateral adequacy and help to
> prevent fraud, while at the same time increasing productivity.

In addition, Countrywide described the extensive post-origination Credit Policy procedures that

had been implemented to ensure consistency, accuracy and fraud detection:

> In addition to our pre-funding controls and procedures, we employ an extensive
> post-funding quality control process. Our Quality Control Department, under the
> direction of the Chief Credit Officer, is responsible for completing comprehensive
> loan audits that consist of a re-verification of loan documentation, an in-depth
> underwriting and appraisal review, and if necessary, a fraud investigation.

18.    Countrywide claimed that its disciplined underwriting standards not only

distinguished it from other lenders in the industry, but reflected best-in-class practices to be

emulated. For example, in an investor forum hosted by Countrywide in September 2006, Mozilo

explained that Countrywide not only led the industry in developing efficiencies, but also in

responsible lending:

> Not only did we drive efficiency in the marketplace, but as an industry leader we
> served as a role model to others in terms of responsible lending. We take
> seriously the role of a responsible lender for all of our constituencies. . . . *To help
> protect our bond holder customers, we engage in prudent underwriting
> guidelines.* (Emphasis added.)

19.    At the same forum, Sambol added that:

> We're extremely competitive in terms of our desire to win, and we have a
> particular focus on offense, which at the same time is supplemented by a strong
> defense as well, meaning that we have an intense and ongoing focus on share
> growth while at the same time maintaining a very strong internal control
> environment and what we believe is best-of-class governance. . . . *[O]ur culture is
> also characterized by a very high degree of ethics and integrity in everything that
> we do.* (Emphasis added.)

## II.    Countrywide Seeks More Market Share But Pledges Continued Rigorous Underwriting.

20.    In or around 2003, there was rising demand on Wall Street for "private label"

securitizations of non-conforming loans. Private label securitizations are arranged and

underwritten by private firms (i.e., not government-sponsored entities) and are comprised of non-

conforming loans that cannot be purchased by Fannie Mae and Freddie Mac. Because they may

be comprised of riskier loans than those meeting Fannie Mae and Freddie Mac's criteria, private

label securitizations generate higher returns for investors, as well as greater revenues for

originators.

21.    Increased securitizations required increased loan origination to generate the

underlying pools of loans. Countrywide pledged, however, that the growth in originations would

not compromise its strict underwriting standards. In a January 2004 call with analysts, Mozilo
announced that Countrywide, already the industry leader with nearly a 15% loan origination
market share, planned to double its market share within four years: "Our goal is market
dominance, and we are talking 30% origination market share by 2008." Mozilo pledged,
however, that Countrywide would target the safest borrowers in this market in order to maintain
its commitment to quality. *"Going for 30% mortgage share here is totally unrelated to quality of
loans we go after.... There will be no compromise in that as we grow market share.* Nor is there a
necessity to do that." (Emphasis added.)

　　　　22.　　Starting in 2004 and accelerating in 2005, Countrywide expanded its origination
and securitization of riskier lines of products, including subprime mortgages, interest-only loans,
Pay Option ARMs (an adjustable rate mortgage loan that allows a borrower to make initial
minimum monthly payments less than monthly accrued interest), closed-end second liens
("CES"), and home equity lines of credit ("HELOCs"), with a much broader base of potential
borrowers. A HELOC is a second lien on residential property. The borrower's equity in the
property (i.e., the value of the property that is not used as collateral for the first lien)
collateralizes a specified line of credit that may be drawn down by the borrower. A CES is also
collateralized by the borrower's equity, but the loan is of a fixed amount. Because they are both
second liens, HELOCs and CESs are junior in priority to the first lien. As a consequence, if the
property is foreclosed, the proceeds must be used to fully satisfy the first lien before the second
lien is paid.

　　　　23.　　At the same time, Countrywide reassured investors and credit enhancers, such as
MBIA, that its underwriting procedures and credit risk management remained highly rigorous.

For example, in its 2005 10-K and thereafter, and incorporated in the Prospectus for each

securitization for which MBIA provided a guarantee, Countrywide represented that:

> [Countrywide] ensure[s] ... ongoing access to the secondary mortgage market by
> consistently producing quality mortgages and servicing those mortgages at levels that
> meet or exceed secondary mortgage market standards....[W]e have a major focus on
> ensuring the quality of our mortgage loan production and we make significant
> investments in personnel and technology in this regard.

24.     In particular, Countrywide touted its underwriting guidelines, claiming to

ascertain facts about "borrower and collateral quality" including applicant assets and liabilities,

income, employment history, and other demographics and personal information, as well as a full

property appraisal. Countrywide claimed that it obtained all applicable income, liability, asset,

employment, credit, and property information, on the basis of which it ascertained debt-to-

income ratios (the ratio of a borrower's total monthly debt obligations to gross monthly income)

and combined loan-to-value ratios (the ratio of the total outstanding value of the senior and

subordinate loans on a property to the value of such property). Because the guidelines are

ostensibly designed to ensure that loans perform over time, Countrywide knew that the quality of

its guidelines—and its adherence to them—would materially affect the risks of investing in or

guaranteeing its securitizations.

25.     Throughout Countrywide's expansion, Mozilo consistently represented that

Countrywide would not sacrifice the strict and disciplined underwriting standards that had made

it an industry leader in responsible lending. During a March 15, 2005 conference with analysts,

Mozilo responded to a question about Countrywide's strategy for increasing market share, and

again assured Countrywide's constituents:

> Your question is 30 percent; is that realistic, the 30 percent goal that we set for
> ourselves 2008? ... Is it achievable? Absolutely ... But I will say this to you,
> that *under no circumstances will Countrywide ever sacrifice sound lending and*

*margins for the sake of getting to that 30 percent market share.* (Emphasis added.)

26.    Other Countrywide senior officers echoed that Countrywide had not, and would not, loosen its underwriting standards. For example, in an April 2005 conference call with analysts, Eric Sieracki, Countrywide's Chief Financial Officer, responding to a question asking whether Countrywide had changed its underwriting protocols, said: "I think they [FICO scores, combined loan-to-value and debt-to-income ratios] will remain . . . consistent with the first quarter and most of what we did in 2004. *We don't see any change in our protocol relative to the volume [of] loans that we're originating.*" Sieracki added that, as to the Countrywide-originated HELOCs: "*The credit quality of our home equities should be emphasized* here as well. We are 730 FICO on these home equities, and that's *extraordinary* throughout the industry" (emphases added).

## III.    Nature of the Securitizations at Issue.

27.    This case concerns ten RMBS securitizations of HELOCs and CESs reflecting over $14 billion of Mortgage Loans:  CWHEQ 2005-E, CWHEQ 2005-I, CWHEQ 2005-M, CWHEQ 2006-E, CWHEQ 2006-G, CWHEQ 2006-S8, CWHEQ 2007-E, CWHEQ 2007-S1, CWHEQ 2007-S2, CWHEQ 2007-S3 (together, the "Securitizations").

28.    An RMBS is an entity (typically a trust) that issues notes securitized by a pool of residential mortgage loans. The cashflows from these loans (in the form of payments of interest and principal) are used to pay obligations on the RMBS notes. A purchase of an RMBS is thus the purchase of a right to participate in the cashflows generated by the pool of mortgages. Because the mortgages are the only collateral supporting the RMBS, their credit quality is of critical importance to an RMBS noteholder.

29.    Countrywide acted in several capacities on the Securitizations, in each of which it stood to profit. First, Countrywide Home originated or acquired all the Mortgage Loans for each Securitization, and sold (or otherwise conveyed) the Mortgage Loans to the Trusts that issued the RMBS. Second, Countrywide Securities arranged and underwrote each Securitization, structuring and marketing the transaction as well as making SEC filings. Third, Countrywide Home acted as servicer for the Mortgage Loans in each Securitization, contracting with each of the Trusts that it caused to be created to issue the RMBS.

30.    To increase the marketability of the Notes, Countrywide also engaged MBIA to provide credit enhancement on the RMBS. The credit enhancement—in the form of a guarantee of repayment of principal and interest for the RMBS notes in each Securitization—allowed the guaranteed, or wrapped, tranches of RMBS to have higher credit quality (reflected by a "AAA" or equivalent credit rating) than the underlying collateral. Because the trust obligations are backed by MBIA, in its capacity as insurer, any shortfalls in trust payments of principal or interest are covered by MBIA. That allowed Countrywide to market the Notes on the basis of MBIA's then-AAA credit rating, rather than the lower credit quality implied by the collateral and the RMBS structure alone.

31.    For each Securitization, Countrywide generally solicited bids from several monoline insurers, requiring responses within a short time period. Each securitization generally comprised one or two pools of mortgage loans of between approximately 8,000 and 48,000 mortgage loans. As part of its solicitation of bids, Countrywide encouraged insurers to rely, and was aware that insurers in fact relied, on Countrywide's public commitment to conservative underwriting and historical record of strong loan performance, including lower rates of delinquencies and defaults than that of most lenders in the industry.

11

32.    To induce MBIA to guarantee these Securitizations. Countrywide went well

beyond its representations in each Prospectus regarding its underwriting guidelines and process.

It also made a large number of contractual representations and warranties to MBIA concerning

the origination and quality of the Mortgage Loans, including that the Mortgage Loans had been

underwritten pursuant to its extensive set of approved guidelines. Countrywide further

represented that the Mortgage Loans would be selected from among the outstanding home equity

loan agreements in its portfolio that met stated criteria, and that "[n]o selection will be made in a

manner that adversely affects the interests of the Noteholders or [MBIA]" in the Securitizations.

33.    Countrywide backed up its representations by agreeing that, in the event of a

breach of any representation or warranty related to a Mortgage Loan (a "Defective Loan"),

Countrywide would either cure the breach or repurchase or substitute eligible Mortgage Loans

for the Defective Loan. Because identifying Defective Loans is itself costly and time-

consuming, this "put-back" remedy was intended to address situations where only a small

number of loans failed to satisfy eligibility requirements. As set forth in greater detail below,

MBIA relied upon Countrywide's guidelines, representations, and warranties in evaluating the

risks presented by the Securitizations and in agreeing to guarantee the obligations to the Notes.

34.    From 2002 through 2007, MBIA provided credit enhancement in a total of 17

second-tier Countrywide securitizations of mortgage loans. This action concerns the MBIA-

guaranteed Securitizations underwritten by Countrywide for the period from 2005 through 2007,

after Countrywide's adoption of the corrupt practices alleged herein. In an effort to induce

MBIA to guarantee the Securitizations, Countrywide made available to MBIA, in addition to the

representations alleged above, a summary of its underwriting procedures for each Securitization,

and represented that its underwriting of the Mortgage Loans conformed to its stated underwriting

procedures as well as industry standards. Countrywide provided MBIA with specific data points for each loan in what is known as a loan tape. The loan tape reported information such as the loan-to-value ratio (LTV) for each loan and the debt-to-income (DTI) ratio for each borrower, as well as each borrower's FICO score, which is a measure of creditworthiness. Countrywide also represented that it was not aware of any reason why a borrower would not be able to repay a mortgage loan.

35.    Countrywide further provided MBIA with shadow credit ratings on the proposed pool of mortgage loans intended for Securitization. On information and belief, Countrywide solicited the shadow ratings from credit rating agencies based on information and representations provided by Countrywide as to the credit quality of the mortgage loans and the amount of overcollateralization in the deal. All of the Securitizations had shadow ratings of at least BBB- or the equivalent. Absent credit quality reflected by a shadow rating of at least BBB-, MBIA would not have agreed to provide credit enhancement.

36.    Countrywide also provided, or referenced, the December 14, 2004 Prospectus filed with the SEC in connection with each public offering of mortgage-backed securities (including the Securitizations). In that Prospectus, Countrywide described its business and operations, its purportedly disciplined underwriting standards, and the quality of the mortgage loans it originated. Countrywide also provided Supplemental Prospectuses that would be filed with the SEC shortly before the securities for each deal were issued to the public. The Supplemental Prospectuses provided more specific information about, among other things, the Mortgage Loans backing the securities in each Securitization.

37.    Countrywide also made regular presentations to MBIA at MBIA's offices in New York, including on June 23, 2004 and in May 2005, and at Countrywide's offices in California in

13

March 2007. During these meetings, Countrywide touted its expertise and capabilities in loan origination and servicing, and repeatedly represented that its risk management systems were state of the art—both in its origination of loans and in its servicing of mortgages.

## IV.   The Contractual Provisions of Each Securitization.

38.    Countrywide arranged and securitized each of the ten Securitizations through a similar series of contracts, including: (a) a Purchase Agreement which provided for the sale of mortgage loans to a Countrywide affiliate created to effect the securitizations; (b) a Sale and Servicing Agreement which transferred the mortgage loans to a single purpose Trust, and confirmed the terms of Countrywide's engagement by the Trust to service the mortgage loans; (c) a Prospectus and Supplemental Prospectus filed by the Trust, which Countrywide used to sell the mortgage-backed securities; and (d) a Trust Indenture, which, among other things, established the rights of holders of securities and the obligations of the Trustee (collectively, the "Transaction Documents").

39.    Countrywide, the Trust and MBIA then entered into an Insurance Agreement which provided the terms for the issuance of an MBIA financial guaranty policy (a "Policy") that would be issued to the Trust. In each transaction, the Insurance Agreement incorporated the representations and warranties and the obligations of the parties in the Transaction Documents, and gave MBIA the right to rely on representations in the Transaction Documents, to enforce their terms, and to exercise remedies for any breach.

40.    The first transaction, CWHEQ 2005-E, is described in greater detail below. Each of the subsequent transactions is substantially similar in every material respect.

*(a) The Purchase Agreement*

41.     On or about August 30, 2005, Countrywide entered into the Purchase Agreement with its affiliate CWHEQ, Inc. ("CWHEQ") for the 2005-E transaction, in which Countrywide agreed to sell the pool of Mortgage Loans to CWHEQ. In the Purchase Agreement, Countrywide made extensive representations and warranties, including representations and warranties relating to the Mortgage Loans in Section 3.02 of the Purchase Agreement (the "Mortgage Loan Representations"). The representations included that: (i) the mortgage file relating to each Mortgage Loan was complete; (ii) information provided by Countrywide regarding the Mortgage Loans was true and correct in all material respects; (iii) each Mortgage Loan complied with applicable local, state and federal laws; (iv) the Mortgage Loans, individually and in the aggregate, complied with underwriting criteria, such as the ratio of total unpaid balance of loans on the mortgaged property to the value of the mortgaged property, the ratio of borrower debt to income, and borrower credit scores; (v) the nature of the property was as specified in the Mortgage Loan; and (vi) Countrywide did not have knowledge of any fact that would cause a reasonable originator of mortgage loans to conclude that the Mortgage Loan would not be paid in full when due.

42.     The Purchase Agreement provides that, if a Mortgage Loan Representation was inaccurate at the time when made, and such inaccuracy materially and adversely affected the interests of MBIA, the inaccuracy constitutes a breach regardless of Countrywide's knowledge of the inaccuracy at the time of the representation. If Countrywide fails to cure a breached Mortgage Loan Representation, Countrywide can be compelled to cure the breach by repurchasing each Mortgage Loan that is inconsistent with the Mortgage Loan Representation (a "Defective Loan") or by substituting an eligible loan in place of a Defective Loan.

*(b) The Sale and Servicing Agreement*

43.    On or about August 30, 2005, CWHEQ, Countrywide, CWHEQ Revolving Home

Equity Loan Trust, Series 2005-E (the "Trust") and JPMorgan Chase Bank, N.A. (the "Indenture

Trustee") entered into the Sale and Servicing Agreement. CWHEQ agreed to convey all right,

title and interest in the Mortgage Loans to the Trust for the purpose of using the Mortgage Loans

as collateral for asset-backed securities to be sold to investors.

44.    The Mortgage Loan Representations were incorporated by reference into the Sale

and Servicing Agreement. Like the Purchase Agreement, the Sale and Servicing Agreement

states that if a Mortgage Loan Representation was inaccurate at the time it was made, and the

inaccuracy materially and adversely affects the interests of MBIA, the inaccuracy is a breach of

the applicable representation or warranty even if Countrywide had no knowledge that the

representation was inaccurate at the time it was made. If Countrywide fails to cure a breached

Mortgage Loan Representation, Countrywide can be compelled to repurchase each Defective

Loan or substitute an eligible loan for the Defective Loan.

45.    The Sale and Servicing Agreement also defines the obligations of Countrywide

with respect to servicing the Mortgage Loans, including covenants (i) to administer the Mortgage

Loans consistently with industry practice, (ii) to use reasonable efforts to collect all payments

owed on the Mortgage Loans, and to follow the same collection procedures it follows for

servicing mortgage loans in its own portfolio, and (iii) to allow MBIA access to information

regarding the Mortgage Loans and its rights.

*(c) The Prospectus and Supplemental Prospectus*

46.    The Prospectus describes Countrywide's business and operations. The Prospectus

provides a description of Countrywide's purportedly disciplined and conservative underwriting

standards as well as a description of the Mortgage Loans, and advises that a Supplemental
Prospectus will be filed with the SEC at the time of each offering of mortgage-backed securities.

47.     The Supplemental Prospectus provides more specific information about the
Mortgage Loans backing the securities. The Supplemental Prospectus represents that each
Mortgage Loan was evaluated in accordance with Countrywide's traditional underwriting
standards. The Supplemental Prospectus also states that appraisals were conducted on home
equity loans. Although the specific type of appraisal might vary, the appraisals were conducted
by an "independent third-party" appraiser, and "completed on forms approved by Fannie Mae or
Freddie Mac."

        *(d)  The Insurance Agreement*

48.     MBIA's agreement to provide a financial guarantee policy to the Trust is reflected
in the Insurance Agreement, a contract that was entered into by MBIA, Countrywide, the Trust
and the other parties to the Transaction Documents.

49.     On or about August 30, 2005, MBIA, Countrywide, CWHEQ, Inc., the Trust, and
the Indenture Trustee entered into the Insurance Agreement with respect to the 2005-E
transaction. In the event that defaults in the Mortgage Loan pool result in a shortfall of funds for
the Trust to make required payments on the securities, the Trustee is to submit a claim on the
Policy, and MBIA is to fund the shortfall.

50.     Under the Insurance Agreement, MBIA has standing to seek recovery for
breaches, and to enforce the obligations of parties to the other contracts related to the 2005-E
transaction (including contracts to which MBIA is not a party), including the Purchase
Agreement, Sale and Service Agreement, Indenture, Trust Agreement, the Underwriting
Agreement, the Securities issued by the Trust, and other documents associated with the
transaction.

51.     Countrywide expressly represents and warrants in the Insurance Agreement that:

a.      The Countrywide Financial Statements are complete and correct in all material respects, and Countrywide is not aware of any undisclosed contingent liabilities that could reasonably be expected to cause a Material Adverse Change;

b.      No practice, procedure or policy in the conduct of business violates any law, regulation, judgment, agreement, order or decree that, if enforced, reasonably could be expected to result in a Material Adverse Change;

c.      Neither the Transaction Documents nor other material information relating to the Mortgage Loans, the operations of Countrywide (including servicing or origination of loans) or the financial condition of Countrywide, or any other information furnished to MBIA, contains any statement of a material fact which was untrue or misleading in any material adverse respect when made; and

d.      The offer and sale of the Securities complies with all securities laws, and the Prospectus and Supplemental Prospectus do not contain any untrue statement of a material fact and do not omit to state a material fact.

52.     Countrywide also agreed to perform various obligations throughout the term of the Insurance Agreement, including the following:

a.      Countrywide shall allow MBIA access to information, including, on an annual basis as well as in the event of a Material Adverse Change or default: (i) to inspect books and records relating to the Securities, the obligations, and the transaction; (ii) to discuss the affairs, finances and accounts with corporate officers, and (iii) to discuss the affairs, finances and accounts with their independent accountants;

b.    Countrywide shall perform such actions as are required by or provided in the Sale and Servicing Agreement;

c.    Countrywide shall not take any action, or fail to take any action, if such could reasonably be expected to result in a material adverse change in ability to perform obligations under the Transaction Documents; and

d.    Except as otherwise permitted, Countrywide shall not alter or amend any Mortgage Loan, collection policies or charge-off policies in a manner that materially adversely affects MBIA.

53.    Under the Insurance Agreement, an Event of Default is defined to include a breached representation or warranty, or a failure to materially perform an obligation, by a party to any Transaction Document.

54.    Like CWHEQ 2005-E, the other nine transactions (CWHEQ 2005-I, CWHEQ 2005-M, CWHEQ 2006-E, CWHEQ 2006-G, CWHEQ 2006-S8, CWHEQ 2007-E, CWHEQ 2007-S1, CWHEQ 2007-S2, and CWHEQ-S3) were securitized through the use of similar types of agreements that contained substantially similar terms, representations, warranties and/or obligations. In addition, Countrywide, the Trust, and MBIA entered into similar Insurance Agreements incorporating the representations, warranties and obligations of the parties set forth in the Transaction Documents. The dates of the remaining nine transactions are as follows:

|                |                    |
|----------------|--------------------|
| CWHEQ 2005-I   | December 28, 2005  |
| CWHEQ 2005-M   | December 29, 2005  |
| CWHEQ 2006-E   | June 29, 2006      |
| CWHEQ 2006-G   | August 30, 2006    |
| CWHEQ 2006-S8  | December 28, 2006  |

| CWHEQ 2007-E | May 31, 2007 |
| CWHEQ 2007-S1 | February 28, 2007 |
| CWHEQ 2007-S2 | March 30, 2007 |
| CWHEQ 2007-S3 | March 30, 2007 |

## V.    The Countrywide Mortgage Loans Show Excessive Defaults and Incurable Breaches.

55.    Starting in the summer of 2007, the Securitizations began experiencing an increase in delinquencies. A material increase in delinquencies and subsequent charge-offs did not occur until November 2007. Because of the inordinate number of loan delinquencies, the total cash flow from the mortgage payments in several of the Securitizations was insufficient for the Trusts to meet their payment obligations to holders of the RMBS notes. These deficiencies caused the Trusts to submit claims on MBIA's insurance policies, demanding that MBIA cover the shortage of funds. Many of the delinquent loans resulted in defaults, which led to further losses on the loans, despite the availability of foreclosure and other remedies. These defaulted loans were subsequently charged off, increasing MBIA's exposure to even greater claims.

56.    By the fourth quarter of 2007, the Securitizations experienced significant deterioration in enhancement levels. As these events occurred, MBIA diligently complied with its obligations under the Insurance Agreements, and in November 2007, paid claims of $2.49 million on the CWHEQ 2006-E transaction and $11.3 million on the CWHEQ 2006-G transaction. As of September 2008, while reserving its rights, MBIA has paid over $459 million on the Policies issued by MBIA that covered Countrywide's Securitizations. As result of the problems in connection with the loans, MBIA also made a series of requests for approximately 19,000 loan files from Countrywide for review in order to determine the cause of defaults.

57.    Despite its contractual obligation to do so under the Transaction Documents,
however, Countrywide has failed promptly to provide responses and information on all of the
requested loan files to MBIA. To the contrary, Countrywide has stonewalled MBIA's access and
review of these files by persistent delay and refusal to provide complete information. Moreover,
the loan files it has provided, sometimes many months after MBIA's request, often have been
incomplete. This has forced MBIA to make supplemental requests regarding the same loan files.
Countrywide's responses to these supplemental requests likewise have been dilatory. Even now,
over seven months since MBIA made its first requests, Countrywide still has not provided all of
the requested files.

58.    But even the loan files obtained to date reveal substantial breaches of Mortgage
Loan Representations, including an extraordinarily high incidence of material deviations from
the underwriting guidelines Countrywide represented it would follow. A material discrepancy
from underwriting guidelines is very serious, and means that the loan should never have been
made. For example, the loan application may: lack key documentation, such as a verification of
borrower assets or income; include an invalid or incomplete appraisal; demonstrate fraud by the
borrower on the face of the application; or reflect that any of borrower income, FICO score, or
debt, or DTI or CLTV, fails to meet stated Countrywide guidelines (without any permissible
exception).

59.    In fact, MBIA's re-underwriting review has revealed that almost 90% of defaulted
or delinquent loans in the Countrywide Securitizations show material discrepancies. That high
level of material discrepancies clearly evidences Countrywide's deliberate or reckless disregard
of the very underwriting guidelines it touted to sell its loans and the Securitizations, and to
induce MBIA to issue its guarantees. The tight correlation between material discrepancies and

21

defaults/delinquencies further makes plain that Countrywide's misconduct is both a substantial and direct cause of the non-performance of Mortgage Loans in the Securitizations, and —because large numbers of delinquencies or defaults trigger MBIA's payment obligations under the guarantees—a proximate cause of MBIA's harm.

60.    On May 9, and August 7, 2008, MBIA provided notices of breach of Mortgage Loan Representations relating to the Defective Loans from MBIA's initial reviews. Pursuant to the remedies provided in the Transaction Documents, MBIA demanded that Countrywide repurchase the following Defective Loans:

> CWHEQ 2005-E
> 362 loans with an original unpaid principal balance of $27.6 million.
>
> CWHEQ 2005-I
> 476 loans with an original unpaid principal balance of $41.7 million.
>
> CWHEQ 2006-E
> 569 loans with an original unpaid principal balance of $61.4 million.
>
> CWHEQ 2006-G
> 489 loans with an original unpaid principal balance of $57 million.
>
> CWHEQ 2006-S8
> 85 loans with an original unpaid principal balance of $5.6 million.
>
> CWHEQ 2007-E
> 131 loans with an original unpaid principal balance of $13.9 million.
>
> CWHEQ 2007-S1
> 114 loans with an original unpaid principal balance of $10.1 million.
>
> CWHEQ 2007-S2
> 32 loans with an original unpaid principal balance of $3.3 million.
>
> CWHEQ 2007-S3
> 34 loans with an original unpaid principal balance of $3.3 million.
>
> ***Total: 2,292 loans with an original unpaid principal balance of $224 million.***

Significantly, the Defective Loans run across Countrywide's Securitizations from 2005-07,
demonstrating the consistency of Countrywide's disregard for its own underwriting guidelines
during this period. Further, based upon the extraordinarily high incidence of material
discrepancies in the loan files reviewed to date, the true number of Defective Loans in the
Securitizations is far higher than the 2,292 loans already identified by MBIA.

61.     MBIA's initial notices reflect Countrywide's material discrepancies in two
primary respects: (i) that each Defective Loan "was originated in accordance with the Sponsor's
underwriting guidelines"—where in fact the Defective Loans had debt-to-income ratios or
combined loan-to-value ratios exceeding maximum guideline levels, or (ii) that the "Sponsor had
no knowledge of any fact that would have caused a reasonable originator of mortgage loans to
conclude on the date of origination of each Mortgage Loan that each such Mortgage Loan would
not be paid in full when due"—where in fact the Defective Loans were approved on the basis of
unverified borrower stated income that was patently unreasonable. Each breach described in the
Notice materially and adversely affects the interests of MBIA.

62.     Notwithstanding MBIA's Notices, Countrywide to date has failed to repurchase
or replace any of the Defective Loans. As alleged below, Countrywide was aware that the Loans
were Defective at the time they were sold to the Trusts—and thus the loans never should have
been included in the Securitizations at all. Moreover, even if Countrywide had not been so
aware, the Transaction Documents provide that the breaches must be cured within no more than
90 days of written notice. MBIA provided notice that $136.5 million of these loans constituted
Defective Loans on May 9, 2008, well over 90 days ago. Any cure period for the $136.5 million
in loans, even if available, has passed. Countrywide's improper selection and failure to

repurchase the Defective Loans therefore constitutes an Event of Default under the respective
Insurance Agreements.

63.      In addition, Countrywide Home has breached its obligations under each of the
Sale and Servicing Agreements—which breaches also constitute Events of Default under the
related Insurance Agreements. Fundamentally, Countrywide has failed to provide service and
administration of the Mortgage Loans consistent with the standards in the industry, as
contractually required. Countrywide has failed to allocate sufficient resources to service and
administer the Mortgage Loans, with (i) inadequate staff to address customer inquiries and to
conduct follow-up efforts and call out programs to delinquent borrowers, and (ii) inadequate
resources for work-out plans and updated software programs. That failure is exacerbated by its
break-neck origination of loans in disregard of its own underwriting guidelines, which led to an
extraordinary increase in delinquencies, defaults, foreclosures, bankruptcies, litigation and other
proceedings—all of which place greater demands on Countrywide Home itself in its capacity as
servicer.

64.      Countrywide Home also has exploited its role as agent for the owner of the
Mortgage Loans for its own gain and at the expense of MBIA. For example, Countrywide has
continued to service loans—and charge servicing fees as well as late fees that it retains as
compensation—long after any reasonable expectation that defaulted Mortgage Loans could still
result in payments. It is standard in the industry to charge off a loan after it has been delinquent
for 180 days, as Countrywide itself acknowledged on page S-9 of the Supplemental Prospectus
for CWHEQ 2007-S1, in which it defined a charged-off loan as one that had been delinquent for
more than 180 days. In some cases, however, Countrywide has continued to service Mortgage
Loans more than 270 days after the last payment on amounts owed on the Mortgage Loans had

been received. Countrywide further has failed to service the Mortgage Loans consistently with the standards of the industry, including, for example, refusing to accept partial payments from borrowers (ostensibly because of the added accounting and administrative burdens of accounting for partial payments). Countrywide has also charged off loans where the borrower has made payments after the date of the charge-off, to the direct detriment of MBIA.

65.    Countrywide Home's improper servicing of the loans has enabled it to reap the benefit of additional service and late payment fees without bearing the risk of losses from delinquencies and defaults, all at the expense of MBIA, which it fraudulently induced to accept that risk.

## VI.    Countrywide's Pattern and Practice of Fraud.

66.    At the time of the Securitizations, Countrywide knew that its statements regarding its underwriting guidelines and credit risk management process were false, and Countrywide had no intention of abiding by its contractual representations and warranties. Under the direction of Mozilo and Sambol, Countrywide adopted a new "corporate culture" of writing as many mortgage loans as possible—and at the highest interest rates and fees possible—regardless of the creditworthiness or evident fraud of the borrower. Once Mozilo and Sambol had determined that profit growth through securitization required accelerating loan origination, Countrywide motivated its loan officers and external brokers to drive up loan volume regardless of material deviations from stated underwriting guidelines.

67.    Countrywide's deteriorating underwriting practices enabled loan applications that reflected blatant borrower fraud, inadequate documentation, missing verifications (for example, of borrower assets and income), title defects, excessive DTI ratios, inadequate FICO scores, and

other material violations of guidelines. These violations made Countrywide's related representations regarding the Mortgage Loans materially false and misleading.

68.    The incidence of material discrepancies is so extraordinarily high—close to 90 percent of the applications reviewed by MBIA for currently non-performing loans—that it could not have been the result of human error. Instead, Countrywide was clearly ignoring sound underwriting methodology, and it knew that its failure to follow its underwriting guidelines would result in the origination of loans in which the borrower would not be able to repay.

69.    For each of the ten Securitizations, these failures to adhere to the underwriting guidelines fundamentally changed the risk profile that Countrywide represented to MBIA and, as Countrywide knew, raised the likelihood of losses through defaults—and thus payments by MBIA as the credit enhancement provider—to levels that far exceeded the value of the premiums payable to MBIA.

70.    These material breaches further call into question the integrity of the shadow ratings assigned to the collateral pools by the ratings agencies. Each of these pools was assigned a rating of BBB- or the equivalent. Yet the presence of such a large percentage of loans that fail to meet underwriting guidelines renders those ratings false and misleading because they materially understate the true risk profile of the pool. Countrywide, as originator of the loans, knew but failed to disclose these facts either to MBIA or to the ratings agencies. One of the consequences of Countrywide's material breaches was that the amount of overcollateralization is insufficient to protect MBIA from delinquencies and defaults in the mortgage pools, as Countrywide was well aware. Had MBIA been aware of these facts, it would not have entered into any of these transactions.

*Countrywide Misrepresented Its Actual Underwriting Standards*

71.     Countrywide promoted the Securitizations based in large part on Countrywide's reputation for disciplined underwriting standards, its commitment to high quality mortgage loans to prime borrowers, and its comprehensive Credit Policy. Countrywide intentionally induced MBIA to believe that the same commitment, expertise and practices, and specifically the disciplined application of Countrywide's Credit Policy, would be applied to the Mortgage Loans.

72.     Countrywide, however, had adopted an aggressive strategy to drive up revenues, which prompted significant changes to its underwriting standards and other aspects of its Credit Policy. Countrywide knew that these changes, both in formal policy and in practical application, would result in origination of mortgage loans that were materially inconsistent with its representations. By contrast, MBIA was deprived of material information, and therefore never had the opportunity to make such a determination.

73.     Countrywide also adopted policies and practices that reduced their relevance. On information and belief, Countrywide's senior management approved compensation plans that offered incentives for new mortgage loan originations, with higher incentives for riskier nonprime mortgage loans. According to the Attorney General of California, Countrywide's senior management imposed intense pressure on underwriters to approve mortgage loans, in some instances requiring underwriters to process 60 to 70 mortgage loan applications in a single day and to justify each rejection. This created an incentive not to review loans thoroughly but instead simply to approve them. Senior management expanded the authority of underwriters and other employees to grant exceptions to mortgage loans that failed to meet Countrywide's underwriting standards, which made it easier to accept a mortgage loan and move on.

74.     On information and belief, Mozilo and Sambol authorized the establishment of the Structured Loan Desk in Plano, Texas, which was created specifically to grant underwriting

exceptions for nonprime mortgage loan applications. According to the California Attorney

General's complaint against Countrywide and Mozilo, based on information provided by a

former Countrywide employee, during 2006, the Structured Loan Desk processed 15,000 to

20,000 mortgage loan applications a month, which represented approximately 7.5% to 10% of all

mortgage loans actually originated.

*Countrywide Failed to Disclose the Extent to Which Fraudulent Applications
Were Processed Through Reduced Documentation Application Programs*

75.    Countrywide adopted reduced documentation application programs which excuse

qualified borrowers from the general requirement of submitting documentation to confirm

income and assets. Countrywide itself has publicly admitted that the failure to maintain rigorous

standards for such loans will result in higher delinquencies. In a July 2007 call with analysts,

John McMurray, Countrywide's Chief Risk Officer, acknowledged that the reduced

documentation programs lead to higher delinquencies absent adequate controls:

"[D]ocumentation matters. The less documentation, the higher the serious delinquency, all else

equal."

76.    But Countrywide failed to use adequate controls. While it claimed these "low-

doc" applications were designed for self-employed professionals and business owners with high

credit scores, it made its reduced documentation applications widely available without careful

oversight, a material risk it failed to disclose to MBIA or the market at large.

77.    For example, Countrywide falsely represented that it verified employment and

current salary for every loan applicant before approving a Mortgage Loan. In the Supplemental

Prospectus, Countrywide represented that even for loan applications under the Super-

Streamlined Documentation Program, Countrywide obtained telephonic verification of

employment, which, according to the Prospectus, "is obtained from an independent source

28

(typically the borrower's employer) [and] which verification reports, among other things, the length of employment with that organization *and the borrower's current salary*" (emphasis added). That representation was false. MBIA later discovered that Countrywide often did not obtain independent verification of income for borrowers who applied under the Super-Streamlined Documentation Program, which constituted a significant percentage of the total number of Mortgage Loans.

78.     Countrywide also approved Mortgage Loans in which the borrower's stated income was unreasonable on its face and could not have been accurately reported. Countrywide was required to exercise meaningful oversight, on information and belief, pursuant to its Credit Policy and the standards in the industry. It is standard practice among mortgage lenders generally to try to verify employment income that appears suspicious. A borrower who inflates his income is less likely to be able to repay his loan, which leads to a higher incidence of delinquencies and defaults in the Mortgage Loans, to the direct detriment of MBIA. Despite the prevalence of a substantial number of loan applications that contained highly suspicious reported employment income, Countrywide failed to take sufficient, if any, corrective action.

79.     On information and belief, Countrywide's senior management was aware that Countrywide loan officers participated in submitting fraudulent applications through the reduced documentation application programs. According to Mark Zachary, a former Countrywide executive who has filed suit against Countrywide for wrongful termination, in and around 2006, Countrywide loan officers engaged in a practice known within Countrywide as "flipping" an application. Loan officers who learned that a loan application submitted under the Full Documentation Program was unlikely to be approved would "flip" the application for consideration under a reduced documentation application program. According to Zachary, loan

officers would coach applicants on the level of employment income needed to qualify for a

mortgage loan, and then would accept a revised loan application containing an inflated reported

income. The loan officer would submit the revised loan application under a reduced

documentation program for consideration by the subprime mortgage loan operations unit in

Plano, Texas. According to Zachary, he complained to Countrywide's regional management, but

his complaints were ignored.

*Countywide Misrepresented That it Obtained Independent Appraisals*

80.    In the Supplemental Prospectus, Countrywide represented that one or more

appraisals were obtained for nearly every Mortgage Loan. The type of appraisal obtained for a

Mortgage Loan varied; however, Countrywide assured MBIA and others that every appraisal

was determined "on the basis for an originator-approved, independent third-party, fee-based

appraisal."

81.    On information and belief, Countrywide's representations that the Mortgage

Loans were appraised by independent third-parties were also untrue. Countrywide regularly

engaged appraisers which were affiliated with Countrywide, including, on information and

belief, appraisers that were owned or controlled by Countrywide, either directly or indirectly

through intermediate subsidiaries and/or subject to influence by Countrywide. This

misrepresentation caused harm to MBIA because it created a conflict of interest for

Countrywide. As originator and securitizer of the loans, Countrywide had an incentive to inflate

the value of properties if that inflation would allow a loan to be approved when it otherwise

would not be. But loans based on inflated appraisals are more likely to default and less likely to

produce sufficient assets to repay the second lien holder in foreclosure, both of which directly

harm the credit enhancement provider. An independent appraisal is necessary to ensure that

appraisals are not inflated.

## VII.    Countrywide's Corrupt Practices Are Revealed.

82.    The impact of the Mozilo-Sambol plan on Countrywide has been a disaster. Countrywide's market capitalization declined by more than 90% in just one year, losing $25 billion in value. Bank of America has now acquired Countrywide for just 27% of Countrywide's stated $15.3 billion book value.

83.    The scope and breadth of Countrywide's fraudulent schemes and other unlawful conduct have prompted a substantial number of public and private inquiries, investigations and actions. The actions are based, in part, upon actions and misconduct by Countrywide that are inconsistent with its representations, warranties and covenants in the Insurance Agreements.

84.    On information and belief, the Department of Justice and the SEC are investigating potential securities frauds in the securitizations of mortgage loans and offerings of mortgage-backed securities in the secondary market, as well as allegations that false and misleading disclosures were made to influence the stock trading price and allegations of insider trading by Mozilo and Sambol.

85.    A number of States and municipalities have announced investigations of Countrywide's lending practices, and several commenced actions against Countrywide, including:

a.    In *People of the State of California v. Countrywide Financial Corp.*, the Attorney General for the State of California has filed a civil action on behalf of Countrywide borrowers in California against Countrywide, Mozilo and Sambol, asserting statutory claims for false advertising and unfair competition based on a plan by Mozilo and Sambol to increase the volume of mortgage loans for securitization without regard to borrower creditworthiness.

31

b.      In *People of the State of Illinois v. Countrywide Financial Corp.*, the
Attorney General for the State of Illinois has filed a civil suit on behalf of Illinois borrowers
against Countrywide and Mozilo, and asserts state consumer protection and unfair competition
statutory claims, alleging that beginning in or around 2004, Countrywide engaged in unfair and
deceptive practices, including loosening underwriting standards, structuring unfair loan products
with risky features, and engaging in misleading marketing and sales practices.

c.      In *State of Connecticut v. Countrywide Financial Corp.*, the Connecticut
Insurance Commissioner commenced a civil action asserting that Countrywide violated state
unfair and deceptive practices statutory law by deceiving consumers into obtaining mortgage
loans for which they were not suited and could not afford.

d.      In *Office of the Attorney General for the State of Florida v. Countrywide
Financial Corp.*, the Florida Attorney General commenced a civil action against Countrywide
and Mozilo, asserting state unfair practices statutory claims, alleging that since January 2004,
Countrywide promoted a deceptive scheme to originate subprime mortgage loans to unqualified
borrowers, and a related fraudulent scheme to sell securities. The Attorney General alleges that
Countrywide violated state statutory lender laws by falsely representing that Countrywide
originated each mortgage loan in accordance with its underwriting guidelines and that each
borrower had the ability to repay the mortgage loan. The Attorney General also asserts state
securities law claims, alleging that Countrywide sold mortgage-backed securities based on
fraudulent misrepresentations.

e.      In *State of Washington v. Countrywide Financial Corp.*, the Washington
Attorney General filed a civil action asserting that Countrywide violated state anti-discrimination
laws in 2005 and 2006 by engaging in racially discriminatory lending.

  f. In *State of Indiana v. Countrywide Financial Corp.*, the State of Indiana filed a civil action asserting that Countrywide violated the state's unfair and deceptive practices law from 2005 through 2008 by deceiving consumers into obtaining mortgage loans for which they were not suited and could not afford.

  g. In *State of West Virginia v. Countrywide Financial Corp.*, the West Virginia Attorney General has asserted civil claims against Countrywide alleging violations of state unfair competition statutes.

  h. In *City of Cleveland v. Countrywide Financial Corp.*, the City has asserted claims against Countrywide for, among other things, extending loans to borrowers it knew could not afford to repay them.

  i. In *City of San Diego v. Countrywide Financial Corp.*, the City has asserted claims against Countrywide for engaging in predatory lending practices in violation of consumer protection statutes.

  86. The Department of Justice and the U.S. Trustees for federal bankruptcy courts in several judicial districts, including the Districts of Rhode Island, Western Pennsylvania, Texas, Florida and Georgia, have commenced investigations of Countrywide's alleged fraudulent foreclosure practices. For example, in the Western District of Pennsylvania, on information and belief, within the last year, Countrywide's practices were under investigation in connection with at least 300 debtors' proceedings in that district. Similarly, the Assistant U.S. Trustee for the District of Rhode Island, in testimony about his investigation, explained that after reviewing cases filed since 2002, "we have a specific and grave concern that Countrywide" is trying to obtain money and property from debtors "under false pretenses." The U.S. Trustee for the District of Georgia filed suit against Countrywide, and likewise noted: "Countrywide's failure to

ensure the accuracy of its pleadings and accounts in this case is not an isolated incident. . . . In

recent years, Countrywide and its representatives have been sanctioned for filing inaccurate

pleadings and other similar abuses within the bankruptcy system."

87.     In addition, a number of private actions have been commenced against

Countrywide, including shareholder actions challenging the accuracy and completeness of

Countrywide's statements in and around the period between 2004 and 2007, particularly

allegations that Countrywide failed to disclose the expansion of its origination of subprime and

other higher-risk mortgage loans; and consumer actions challenging Countrywide's lending

practices.

## VIII.  MBIA Has Been Substantially Damaged by Countrywide's Fraud.

88.     Countrywide's misconduct has caused manifold harm to MBIA. Because

Countrywide originated and sold to the Securitizations an extremely large number of Mortgage

Loans that materially failed to comply with its underwriting guidelines, the number of

delinquencies and defaults in those Securitizations has been extremely high, as those loans were

therefore made to borrowers who were unlikely to be able to repay. Yet, despite its knowledge

of these material breaches of its underwriting guidelines, and MBIA's notices to that effect with

respect to the first sets of files reviewed (for $136.5 million and $87.4 million), Countrywide has

refused to repurchase those loans, contrary to its clear contractual obligations.

89.     In addition, the delinquencies and defaults those loans have suffered have greatly

reduced the cashflows available to pay noteholders, and the levels of overcollateralization have

not been sufficient to absorb those losses. As a direct consequence, MBIA has been forced

through the Insurance Agreements to pay those shortfalls to the Trusts, resulting in hundreds of

millions of dollars of losses to MBIA. MBIA's losses bear no reasonable relationship to the
risks that MBIA intended to assume or the premiums paid by Countrywide.

      90.     As a direct result of Countrywide's misrepresentations and breaches of contract,
MBIA is therefore exposed to enormous risks of payments under the Insurance Agreements for
which it is not being adequately compensated. This exposure has decreased MBIA's revenues
significantly, forced it to take substantial reserves, and caused it to suffer other losses.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (FRAUD)

91.    MBIA incorporates by reference all the foregoing allegations as though fully set forth herein.

92.    This is a claim for fraud against Countrywide.

93.    As set forth above, Countrywide has made untrue statements of material fact and has omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

94.    Countrywide's business primarily involved residential mortgage banking. Countrywide Financial, Countrywide Home, and Countrywide Securities each had a distinct and specific role in the administration of a securitization of a portfolio of mortgage loans.

a.    Defendant Countrywide Financial is engaged primarily in the residential mortgage banking business. As part of its business, Countrywide Financial is responsible for the origination, purchase, securitization, and servicing of residential mortgage loans across the United States. As the corporate parent of Countrywide Home and Countrywide Securities, two wholly-owned subsidiaries, Countrywide Financial directed the activities of Countrywide Home and Countrywide Securities.

b.    Defendant Countrywide Home—which advertises itself as "the nation's leading independent home loan lender"—is specifically responsible for the production and servicing of residential mortgage loans through a variety of channels on a national scale.

c.    Both Defendants Countrywide Financial and Countrywide Home are responsible for selecting the mortgage loans for securitization, generally selecting from among

36

mortgage loans that had been originated by Countrywide Home, and also selecting from among mortgage loans acquired from other mortgage lenders. Additionally, Defendant Countrywide Home is responsible for transferring the mortgage loans into the Trusts for securitization, and entering into servicing agreements with the Trusts to service the mortgage loans.

        d.      Defendant Countrywide Securities is a broker-dealer that primarily specializes in underwriting and trading in residential mortgage-backed securities. These securities are then sold in the national market. As such, Countrywide Securities is responsible for underwriting and managing the offering of each Trust's securities to buyers in the secondary mortgage market.

        e.      The Trusts distribute payments on the mortgage loans collected and remitted by Countrywide Home to the securities holders. Each Trust, along with Countrywide Home, also entered into the Insurance Agreement with the credit enhancer, MBIA, who guaranteed the obligations of each Trust to the securities holders. The Trusts are responsible for filing claims against MBIA's insurance policies in the event of shortfalls in principal or interest payments.

        95.      As part of Countrywide's fraud, Countrywide Financial and Countrywide Home expanded their origination of mortgage loans in order to increase overall origination revenues, as well as to increase the inventory of mortgage loans available to securitize and sell in the secondary mortgage market. Many of these mortgage loans had significant but undisclosed credit risk, in violation of Countrywide's underwriting guidelines and standards.

        96.      Countrywide Home then transferred the portfolio of mortgage loans originated to the Trust. Through the Trust, Countrywide Securities, securitized the mortgage loans, and then, through offerings of securities, offloaded the risks associated with the mortgage loans that

Countrywide Home had originated. Although the securities were collateralized by the risk-challenged mortgage loans, Countrywide Securities marketed the securities by fraudulently representing that the mortgage loans had been originated consistently with Countrywide Financial and Countrywide Home's traditional underwriting standards, and the strength of their reputation for conservative lending practices and high quality loans.

97.     A critical component of the fraud required the procurement of credit enhancement on the securitization, including from MBIA, as described in detail above. Countrywide needed credit enhancement to improve marketability and reduce interest liabilities of the securities, and importantly to further disperse the risks of defaults on the mortgage loans among the investors in the secondary mortgage market. Although Countrywide still held the residuals, it had effectively transferred the risks of default through securitization, and therefore it was protected from the impact of mortgage loan defaults. Further, the higher credit rating obtained through credit enhancement allowed Countrywide to sell a greater number of securities in a wider market. By obtaining credit enhancement, usually by fraudulently misrepresenting the risk profile of the portfolio of mortgage loans to the credit enhancer, Countrywide transferred economic risk of defaults on the mortgage loans, generally at a fraudulently low premium, and improved the marketability and pricing of the securities. The proceeds from the offering of securities were used to finance new originations of mortgage loans, thereby further perpetuating the fraud.

98.     In an effort to fraudulently induce MBIA to provide credit enhancement for each of the ten securitizations, Countrywide made the following representations with respect to and at the time of execution of each Insurance Agreement and that, inter alia, were untrue:

a.    All of the Mortgage Loans had been evaluated pursuant to Countrywide

Financial and Countrywide Home's underwriting standards and policies and complied with all

applicable local, state and federal laws;

b.    Countrywide did not have knowledge of any fact that would have caused a

reasonable originator to conclude that a borrower would not be able to repay the loan;

c.    Each of the Mortgage Loans had been evaluated pursuant to a meaningful

application of Countrywide's underwriting standards, conducted in good faith, and that the

Mortgage Loan Schedule accurately reflected Countrywide's good faith belief as to the

underwriting criteria of the Mortgage Loans;

d.    Countrywide disclosed to MBIA its underwriting guidelines, including

any material changes to the guidelines;

e.    Each mortgaged property had been appraised by an independent third-

party appraiser;

f.    Countrywide Home obtained, or least sought to obtain, verification of

employment and current salary for each Mortgage Loan borrower; and

g.    Countrywide operated in compliance with all relevant federal, state and

local laws, regulations and rules.

99.    On numerous occasions, between at least 2005 and the present, Countrywide

knowingly and with the intent to defraud, caused its employees and agents to submit materially

false and misleading mortgage loan documentation to MBIA in order to procure credit

enhancement.

100.    Countrywide Home delivered to MBIA materially false and misleading loan

documentation, including requests for bids, loan tapes, and Transaction Documents, for each of

the below Securitizations insured by MBIA. Among other things, Countrywide Home's
representations regarding the Mortgage Loans, including information such as the loan-to-value
ratio, the debt-to-income ratio, and the borrower's FICO score, were materially false and
misleading.

        a.      On August 2, 2005, David Andersen of Countrywide Home sent MBIA a
materially false and misleading request for bids for the 2005-E transaction, including a materially
false and misleading 2005-E loan tape, by e-mail.

        b.      On November 4, 2005, Garrett Galati of Countrywide Home sent MBIA a
materially false and misleading request for bids for the 2005-I transaction, including a materially
false and misleading 2005-I loan tape, by e-mail.

        c.      On December 12, 2005, Garrett Galati of Countrywide Home sent MBIA
a materially false and misleading request for bids for the 2005-M transaction, including a
materially false and misleading 2005-M loan tape, by e-mail.

        d.      On May 29, 2006 Garrett Galati of Countrywide Home sent MBIA a
materially false and misleading request for bids for the 2006-E transaction, including a materially
false and misleading 2006-E loan tape, by e-mail.

        e.      On July 27, 2006 Garrett Galati of Countrywide Home sent MBIA a
materially false and misleading request for bids for the 2006-G transaction, including a
materially false and misleading 2006-G loan tape, by e-mail.

        f.      On December 4, 2006 Garrett Galati of Countrywide Home sent MBIA a
materially false and misleading request for bids for the 2006-S8 transaction, including a
materially false and misleading 2006-S8 loan tape, by e-mail.

g.    On February 15, 2007 Garrett Galati of Countrywide Home sent MBIA a materially false and misleading request for bids for the 2007-S1 transaction, including a materially false and misleading 2007-S1 loan tape, by e-mail.

h.    On March 13, 2007 Garrett Galati of Countrywide Home sent MBIA a materially false and misleading request for bids for the 2007-S2 transaction, including a materially false and misleading 2007-S2 loan tape, by e-mail.

i.    On March 19, 2007 Garrett Galati of Countrywide Home sent MBIA a materially false and misleading request for bids for the 2007-S3 transaction, including a materially false and misleading 2007-S3 loan tape, by e-mail.

j.    On May 21, 2007 Garrett Galati of Countrywide Home sent MBIA a materially false and misleading request for bids for the 2007-E transaction, including a materially false and misleading 2007-E loan tape, by e-mail.

101.    Countrywide Securities also provided materially false and misleading information to MBIA regarding the Securitizations when it transmitted the Prospectuses and Supplemental Prospectuses for each Securitization to MBIA as detailed below:  Among other things, Countrywide Securities' representations regarding Countrywide's compliance with its underwriting guidelines; Countrywide's knowledge of facts that would have caused a reasonable originator to conclude that a borrower would not be able to repay the loan; and Countrywide's information regarding the Mortgage Loans, including the loan-to-value ratio, the debt-to-income ratio, and the borrower's FICO score, were materially false and misleading.

a.    Countrywide Securities provided materially false information to MBIA concerning the 2005-E transaction in an August 30, 2005 e-mail from Mahsa Kazeminy of Countrywide transmitting the final version of the Prospectus for the 2005-E transaction.

41

b.    Countrywide Securities provided materially false information to MBIA concerning the 2005-I transaction in a December 23, 2005 e-mail from its attorneys transmitting the final version of the Prospectus for the 2005-I transaction.

c.    Countrywide Securities provided materially false information to MBIA concerning the 2005-M transaction in a December 28, 2005 e-mail from its attorneys transmitting the final version of the Prospectus for the 2005-M transaction.

d.    Countrywide Securities provided materially false information to MBIA concerning the 2006-E transaction in a July 11, 2006 e-mail from its attorneys transmitting the final version of the Prospectus for the 2006-E transaction.

e.    Countrywide Securities provided materially false information to MBIA concerning the 2006-G transaction in an August 30, 2006 e-mail from its attorneys, transmitting the final version of the Prospectus for the 2006-G transaction.

f.    Countrywide Securities provided materially false information to MBIA concerning the 2006-S8 transaction in a December 28, 2006 e-mail from its attorneys, transmitting the final version of the Prospectus for the 2006-S8 transaction. A December 28, 2006 e-mail from Miranda Wang of Countrywide apprised Melissa Brice of MBIA that the same Prospectus was available from Countrywide Securities via an internet portal controlled by Countrywide Securities.

g.    Countrywide Securities provided materially false information to MBIA concerning the 2007-S1 transaction in a February 28, 2007 e-mail from its attorneys, transmitting the final version of the Prospectus for the 2007-S1 transaction. A February 28, 2007 e-mail from Sean Daily of Countrywide apprised Melissa Brice of MBIA that the same Prospectus was

available from Countrywide Securities via an internet portal controlled by Countrywide Securities.

        h.    Countrywide Securities provided materially false information to MBIA concerning the 2007-S2 transaction in a March 30, 2007 e-mail from its attorneys, transmitting the final version of the Prospectus for the 2007-S2 transaction. A March 30, 2007 e-mail from Sean Daily of Countrywide apprised Carl Webb of MBIA that the same Prospectus was available from Countrywide Securities via an internet portal controlled by Countrywide Securities.

        i.    Countrywide Securities provided materially false information to MBIA concerning the 2007-S3 transaction in a March 30, 2007 e-mail from its attorneys, transmitting the final version of the Prospectus for the 2007-S3 transaction. A March 30, 2007 e-mail from Sean Daily of Countrywide apprised Melissa Brice of MBIA that the same Prospectus was available from Countrywide Securities via an internet portal controlled by Countrywide Securities.

        j.    Countrywide Securities provided materially false information to MBIA concerning the 2007-E transaction in a May 31, 2007 e-mail from its attorneys, transmitting the final version of the Prospectus for the 2007-E transaction.

102.    Countrywide failed to disclose material facts, which they were obliged to disclose and which, in the absence of disclosure, caused other representations to be misleading in a material way, including that:

        a.    Countrywide Financial and Countrywide Home had adopted a strategy of increasing origination of mortgage loans, including mortgage loans that increased credit risk compared to the mortgage loans it traditionally had originated; and

b.    Countrywide Financial and Countrywide Home expected to reduce its underwriting standards and guidelines to facilitate increased origination of mortgage loans.

103.    MBIA or its predecessors justifiably, reasonably and foreseeably relied on these representations and false statements.

104.    Countrywide's misrepresentations of facts, and omissions of fact that caused other statements of fact to be misleading, related to contemporaneous matters and to the state of affairs as of and then existing at the time MBIA was induced to enter into an Insurance Agreement.

105.    Countrywide's misrepresentations of facts, and omissions of fact that caused other statements of fact to be misleading, relate to its own acts and omissions, and it was only by making such representations that Countrywide was able to obtain the credit enhancement from MBIA for the Securitizations.

106.    Countrywide Home knew at the time it entered into each Insurance Agreement that the above statements were false or, at the very least, made recklessly, without any belief in the truth of the statements.

107.    Countrywide intended to defraud MBIA and induce reliance by MBIA in this regard, as Countrywide sought to securitize the Mortgage Loans and transfer the risk of such loans to other parties, including (as described above) MBIA. Countrywide knew that the securities issued by the Trusts would be rated higher by rating agencies and would be more attractive to investors, and therefore would likely be sold at a higher price and/or lower cost to Countrywide, if MBIA agreed to guarantee payments on the securities.

108.    Countrywide knew that MBIA was relying on Countrywide's expertise, and Countrywide encouraged such reliance. Countrywide knew that its representations described above would be relied upon by MBIA in connection with its decision to enter into each Insurance

Agreement. Based on its expertise and specialized knowledge, and in light of its false and misleading representations, Countrywide owed a duty to MBIA to disclose material facts about the Securitizations.

109.    Countrywide's representations substantially influenced MBIA's decision to enter into each Insurance Agreement. MBIA would never have agreed to provide any of the Policies had it known that Countrywide's representations about the Mortgage Loans were false and that Countrywide had omitted material information.

110.    As a result of Countrywide's false and misleading statements and omissions as alleged herein, MBIA has suffered, and is reasonably certain to continue suffering, damages, including, but not limited to, paying out claims on the Insurance Agreements caused by the excessively high default rates within the pools of Mortgage Loans. MBIA is further entitled to rescission of the Insurance Agreements because of Countrywide's fraudulent inducement.

111.    Because Countrywide committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of Countrywide's acts knowingly affected the general public, including but not limited to all persons with interests in the Securitizations, MBIA is entitled to recover punitive damages.

## SECOND CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION)

112.    MBIA incorporates by reference all the foregoing allegations as if fully set forth herein.

113.    This is a claim for negligent misrepresentation against Countrywide.

114.    Countrywide was aware that MBIA relied on Countrywide's expertise and experience and depended upon Countrywide for accurate and truthful information. Countrywide

also knew that the facts regarding Countrywide's compliance with its underwriting standards
were exclusively within Countrywide's knowledge.

115.    Countrywide had a duty to provide MBIA complete, accurate, and timely
information regarding the Mortgage Loans and the Securitizations.  Countrywide breached its
duty to provide such information to MBIA.

116.    MBIA reasonably relied on the information Countrywide did provide and was
damaged as a result of Countrywide's misrepresentations.

### THIRD CAUSE OF ACTION
### (BREACH OF CONTRACT:  INSURANCE AGREEMENT)

117.    MBIA incorporates by reference all the foregoing allegations as though fully set
forth herein.

118.    This is a claim for breach of contract against Countrywide.

119.    The Insurance Agreement is a valid and enforceable contract that gives rise to
certain obligations on the part of Countrywide with respect to the Mortgage Loans.  Each Sale
and Servicing Agreement provides that MBIA is a third-party beneficiary with the right to
enforce the covenants and obligations of the parties thereto.

120.    MBIA has performed and continues to perform all conditions, covenants, and
promises required on its part to be performed in accordance with the terms and conditions of the
Insurance Agreement.

121.    Countrywide's express representations and warranties in the Insurance
Agreement, and representations and warranties incorporated by reference within the Insurance
Agreement, are untrue and inaccurate in material ways as of the date of the Insurance

Agreement. The untrue and inaccurate representations and warranties materially and adversely affect MBIA's interests with respect to transactions in the Transaction Documents.

122.    In addition to others described above, the following express representations and warranties were untrue and inaccurate as of the date of each applicable Insurance Agreement:

a.    Countrywide's representation that: "Neither the Transaction Documents nor other material information relating to the Mortgage Loans, the operations of the Master Servicer, the Sponsor or the Depositor (including servicing or origination of loans) or the financial condition of the Master Servicer, the Sponsor or the Depositor or any other information (collectively, the 'Documents') furnished to the Insurer contains any statement of a material fact which was untrue or misleading in any material adverse respect when made." Among other things, the Prospectuses and Supplemental Prospectuses contain statements of material facts which are untrue and/or misleading in material adverse respects;

b.    Countrywide's representation that "[N]o practice, procedure or policy employed, or proposed to be employed, by the Servicer, Sponsor or Depositor in the conduct of its business violates any law, regulation, judgment, agreement, order or decree that, if enforced, could reasonably be expected to result in a Material Adverse Change to the Servicer, Sponsor or Depositor." On information and belief, and based on the publicly-filed actions commenced by States and acknowledgments by other States' representatives of investigations of alleged unlawful conduct by Countrywide, Countrywide knew or should have known that it employed practices, procedures and policies that violated, among other things, state consumer protection and predatory lending laws in connection with the origination of mortgages and servicing of mortgage loans, state nondiscrimination lending laws, state banking laws, and federal and state

securities laws. At the time of the Insurance Agreements, enforcement of such laws reasonably could be expected to result, and has resulted, in a Material Adverse Change to Countrywide.

      c.     Countrywide's representation that: "[T]he sale and offer of Securities complies with all requirements of law, including registration requirements and that the Offering Document does not contain any untrue statement of material fact or omit to state a material fact." Among other things, the Supplemental Prospectus contains untrue statements of material fact and omits to state material facts, and the sale of Securities otherwise failed to comply with the requirements of laws.

      d.     Countrywide's representations that: "Financial Statements of Sponsor and Master Servicer (i) are complete and correct in all material respects, (ii) present fairly financial condition and results. There has been no Material Adverse Change and no undisclosed contingent liabilities that, individually or in the aggregate, could cause a Material Adverse Change." At the time of Countrywide's representation, the Financial Statements, inter alia, were not complete and correct in all material respects, and did not present fairly the financial condition and results, and did not disclose contingent liabilities which Countrywide knew, or reasonably should have known, could (and did) cause a Material Adverse Change.

    123.    Countrywide's representations and warranties were material to each decision by MBIA to enter into an Insurance Agreement. MBIA relied on Countrywide's express and incorporated representations and warranties, and was induced thereby to enter into each Insurance Agreement and to perform its obligations and covenants thereunder.

    124.    Countrywide also breached a Mortgage Loan Representation in the Purchase Agreement, which is incorporated within the Insurance Agreement. Under the Purchase Agreement, Countrywide represented that the Mortgage Loans had been originated in accordance

with Countrywide's underwriting guidelines, and also consistently with the standards in the industry. In addition, Countrywide represented and warranted it was not aware of any information that would suggest that a Mortgage Loan would not be repaid. On information and belief, Countrywide had not applied its underwriting guidelines to any of the Mortgage Loans.

125.   Under the Purchase Agreement, Countrywide also was to provide a Mortgage Loan Schedule that accurately reflected the Mortgage Loans. The Mortgage Loan Schedule accurately reflected the results of Countrywide's purported underwriting exercise; however, it failed to accurately reflect the Mortgage Loans.

126.   Countrywide's representations and warranties in the Purchase Agreement were untrue and accurate, and therefore constitute an Event of Default under the Insurance Agreement.

127.   Countrywide is further in breach of the Mortgage Loan Representations with respect to a substantial number of Defective Loans, and has breached its obligations, under each Insurance Agreement and the applicable Purchase Agreement and the Sale and Servicing Agreement, to cure, repurchase or substitute for each of the Defective Loans.

128.   Each Insurance Agreement and other relevant Transaction Document further requires Countrywide, after becoming aware of defective or missing documentation in the Mortgage Loan files, or of another breach by Countrywide of a Mortgage Loan Representation contained in a Transaction Document, to cure such breach within ninety days from the date that Countrywide was notified of such breach or not later than the business day prior to the payment date in which such cure period expired (the "Cure Date"), or to repurchase and/or substitute an eligible loan for the Defective Loan in accordance with the applicable Sale and Servicing Agreement.

129.    MBIA's written notice of Defective Loans constitutes notice of breach of the Mortgage Loan Representation, and commences the running of the cure period. The Cure Date has long passed. As of the date of this filing, Countrywide has failed and refused, and continues to fail and refuse, to perform its obligations under each Insurance Agreement and the applicable Purchase Agreement and the Sale and Servicing Agreement, in that Countrywide refuses to cure the breaches of the Mortgage Loan Representations, repurchase the Defective Loans, and/or substitute qualified mortgage loans in their place.

130.    Countrywide has also breached the covenants in Article 2 of the Insurance Agreement, including:

a.    Countrywide was obliged to comply with all material requirements, laws, rules and regulations where noncompliance could reasonably be expected to result in a Material Adverse Change. On information and belief, and based on the publicly-filed actions commenced by States and acknowledgments by other States of investigations of alleged unlawful conduct by Countrywide, Countrywide knew or should have known that it employed practices, procedures and policies that violated, among other things, state consumer protection and predatory lending laws in connection with the origination of mortgage and servicing of mortgage loans, state nondiscrimination lending laws, state banking laws, and federal and state securities laws.

b.    Countrywide was obliged not to take any action, or fail to take any action, that "could reasonably be expected to result in a Material Adverse Change to the Master Servicer, Sponsor or Depositor." As described above, Countrywide engaged in actions that at the time could reasonably be expected to result in a Material Adverse Change, including its failure to originate mortgage loans consistently with prudent underwriting standards and consistently with states' laws; failure to disclose material information to shareholders and others

in connection with the purchase or sale of stock; and failure to administer pension funds consistent with ERISA and its fiduciary duties.

131.    At the time of Countrywide's action or inaction in breach of a covenant in Article 2 of the Insurance Agreement, it could reasonably be expected to, and, as described above, did, result in a Material Adverse Change to Countrywide's business, financial condition, results of operations or properties; and also Countrywide's ability to perform its obligations under any of the Transaction Documents.  Countrywide's breach of covenants has led to substantial impairment of Countrywide's business and financial condition, nearly forcing it into bankruptcy, and of Countrywide's ability to perform its obligations, including to repurchase Defective Loans, to service the Mortgage Loans and to provide MBIA with access to information.

132.    Countrywide has also breached its covenant in the Insurance Agreement to not take any action, or fail to take any action, that may "interfere with the enforcement of any rights of the Insurer under or with respect to the Transaction Documents."

        a.    Countrywide has interfered with the enforcement of MBIA's rights under the Purchase Agreement, including by failing to repurchase the Defective Loans, and by failing to provide full and timely access to Mortgage Loan files, records and information.

        b.    Countrywide has breached its obligations under the Sale and Servicing Agreement to service the Mortgage Loans consistently with the standards in the industry, and to refrain from altering its collection and charge-off policies in ways that materially and adversely affect MBIA.

133.    MBIA is entitled to rescission of the Insurance Agreement based on Countrywide's untrue and inaccurate representations and warranties.

134.    In the alternative, MBIA is entitled to damages in an amount to be proved at trial.

51

## FOURTH CAUSE OF ACTION
### (BREACH OF CONTRACT: SALE AND SERVICING AGREEMENT)

135.    MBIA incorporates by reference all the foregoing allegations as though fully set forth herein.

136.    This is a claim for breach of contract against Countrywide.

137.    Each Sale and Servicing Agreement is a valid and enforceable contract that gives rise to certain obligations on the part of Countrywide.

138.    Each Sale and Servicing Agreement expressly provides that MBIA is a third-party beneficiary thereunder, with the right to enforce the covenants and the obligations of the parties thereto.

139.    Under the Sale and Servicing Agreement, Countrywide is obligated, among other things, to provide service and administration consistent with the standards in the industry. Countrywide has failed to perform service and administration at industry standards.

140.    Countrywide has failed to commit adequate resources even to perform its obligations, such as staff to respond to customer inquiries, conduct follow-up efforts and call out programs to delinquent borrowers, and resources for work-out plans and updated software programs. This inadequate resource commitment has been exacerbated by Countrywide's blatant disregard of its own underwriting guidelines, which has led to substantial increases in delinquencies and defaults.

141.    Countrywide also has exploited its role as agent for the owner of the Mortgage Loans for its own gain at the expense of MBIA. For example, Countrywide has continued to service loans—and collect servicing fees—even where it has become reasonably certain that a defaulted Mortgage Loan will not produce any further payments to reduce amounts of accrued interest or outstanding principal. It is standard in the industry to charge off a loan after it has

been delinquent for 180 days, as Countrywide itself acknowledged on page S-9 of the

Supplemental Prospectus for CWHEQ 2007-S1, in which it defined a charged-off loan as one

that had been delinquent for more than 180 days. In some cases, however, Countrywide has

continued to service Mortgage Loans more than 270 days after the last payment on amounts

owed on the Mortgage Loans had been received. Countrywide has continued to service such

Mortgage Loans for the sole purpose of continuing to collect service, late payment and other fees

that it retains as compensation. When a payment on a Mortgage Loan is delinquent, a late

payment fee is accrued on the account. Countrywide, as Master Servicer, is entitled to retain all

such late payment fees and service charges and any interest thereon as its compensation.

142.    Countrywide has otherwise failed to service the Mortgage Loans consistently with

the standards of the industry, including, for example, refusing to accept partial payments from

borrowers ostensibly because of the added accounting and administrative burdens of accounting

for partial payments. Countrywide has also charged off loans where the borrower has made

payments after the date of the charge-off, to the direct detriment of MBIA.

143.    Countrywide's breach of the Sale and Servicing Agreement has caused substantial

harm and damages to MBIA, in an amount to be proved at trial, but at a minimum including

substantially higher claims on Policies and other losses and expenses.

## FIFTH CAUSE OF ACTION
## (BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING)

144.    MBIA incorporates by reference all the foregoing allegations as though fully set

forth herein.

145.    This is a claim for breach of the implied covenant of good faith and fair dealing

against Countrywide.

146.    The Insurance Agreement and the Transaction Documents incorporated therein were built on the premise that, as Countrywide affirmatively represented, the Mortgage Loans had been evaluated consistently with the underwriting standards that led Countrywide to be an industry leader. Countrywide encouraged trust and reliance on its underwriting precisely because of its expertise and experience.

147.    The implied duty of good faith and fair dealing required application of underwriting standards consistent with MBIA's understanding, and with Countrywide's awareness of what MBIA had understood.

148.    Countrywide's breach has caused substantial harm and damages to MBIA, in an amount to be proved at trial. At a minimum, Countrywide's breach has caused:

a.    Damages representing the aggregate amount of actual and future claims on its Policies substantially in excess of the aggregate amount of claims that would have been made in the absence of Countrywide's breach;

b.    Damages representing losses sustained by MBIA because of its credit risk and exposure on the Policies, which are substantially greater than the parties bargained, and has led to loss of business and other losses and expenses.

## SIXTH CAUSE OF ACTION
## (INDEMNIFICATION)

149.    MBIA repeats incorporates by reference all the foregoing allegations as if fully stated herein.

150.    This is a claim for indemnification against Countrywide.

151.    In addition to the obligation to repurchase or substitute eligible loans for the Defective Loans, each Insurance Agreement requires Countrywide to indemnify MBIA for any

losses, costs, and expenses resulting from the breach of any representations and warranties contained in the Transaction Documents.

152.    Countrywide is further obliged to indemnify MBIA for its attorneys' fees and costs associated with enforcing its legal rights under the agreements.

## PRAYER FOR RELIEF

WHEREFORE MBIA prays for relief as follows:

An award of damages against Countrywide, in an amount to be proven at trial, but including at a minimum representing:

a.    MBIA's payments on current and future claims under the Policies, including draw downs on guarantees;

b.    MBIA's losses, including lost profits and opportunities;

c.    Indemnification for MBIA's attorneys' fees and costs associated with enforcing its legal rights under the Transaction Documents;

d.    Punitive damages;

e.    Prejudgment interest at the maximum legal rate; and

f.    Such other and further relief as the Court may deem just and proper.


DATED:    New York, New York
          September 30, 2008

                                QUINN EMANUEL URQUHART OLIVER &
                                HEDGES, LLP

                                By:
                                   Peter E. Calamari
                                   Philippe Z. Selendy

                                51 Madison Avenue, 22nd Floor
                                New York, New York 10010-1601
                                (212) 849-7000

                                Attorneys for Plaintiff

56

Index No. 08/602 825

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK CITY

MBIA Insurance Corporation,

Plaintiff,

-against-

Countrywide Home Loans, Inc., Countrywide Securities Corp.,
and Countrywide Financial Corp.,

Defendants.

## COMPLAINT

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiff*
*MBIA Insurance Corporation*