# Exhibit 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'08 CIV 8819**



---

MBIA INSURANCE CORPORATION,

                Plaintiff,

       -against-

RESIDENTIAL FUNDING COMPANY, LLC,

                Defendant.

Index No.

Judge Pauley

**COMPLAINT**

---

Plaintiff MBIA Insurance Corporation ("MBIA") for its Complaint against
defendant Residential Funding Company, LLC ("RFC") alleges, on information and belief as to
all facts other than as to itself, as follows:

## NATURE OF THE ACTION

1.    This action arises from defendant RFC's misleading inducement of
plaintiff MBIA to provide financial guaranty insurance policies (each a "Policy" and,
collectively, the "Policies") for five securitization transactions sponsored by RFC and RFC's
breaches of contractual representations and warranties made to MBIA in connection with those
five securitizations.

2.    RFC, a Delaware limited liability company with its principal place of
business in Minneapolis, Minnesota, is engaged in the business of, among other things,
originating and acquiring residential mortgage loans and selling those loans through
securitization programs. During 2006 and 2007, RFC sought to sell certain of its residential
home equity loans by means of securitization transactions and approached MBIA to provide the
Policies for certain of these securitization transactions. These policies were intended to insure

payments to investors who purchased certain of the securities that were issued through the securitization transactions.

3.      Among other representations and warranties, RFC represented to MBIA, and also to the investors in the securitization transactions, that the mortgage loans underlying the securitization transactions were of a certain quality and had been underwritten in accordance with RFC's underwriting guidelines and policies.  RFC made this representation to assure MBIA that for each individual mortgage loan there was a reasonable expectation that the borrower would be able to repay the mortgage debt.

4.      In reality, and contrary to RFC's representations and warranties, the portfolios of mortgage loans that RFC included in the securitization transactions were of a fundamentally different quality and character than RFC represented to MBIA.  In that regard, a material number of mortgage loans included in the mortgage loan pools underlying the securitizations were made to borrowers who could not reasonably have been expected to be able to repay the mortgage loans, and the risks inherent in the portfolios were significantly higher than what RFC represented to MBIA.  Moreover, there were fundamental, material and consistent violations of RFC's purported underwriting guidelines and policies in connection with the underwriting of the mortgage loans that RFC included in the securitization transactions.  The undisclosed and misrepresented risks were pervasive throughout the mortgage loan portfolios for the securitization transactions.  Had MBIA been aware of the condition of the mortgage loan portfolios and RFC's material disregard of its underwriting guidelines and policies, MBIA would not have issued the Policies for the securitization transactions.

5.      MBIA's agreement to provide the Policies with respect to the securitizations was based on representations and warranties from RFC that, at best, were negligently or recklessly made and, at worst, constituted an intentional scheme to defraud MBIA

into providing financial guaranty insurance in connection with the securitization transactions sponsored by RFC. MBIA, as the financial guaranty insurer, is now exposed to liability for the losses incurred by RFC's misrepresentations with respect to the mortgage loans.

6.      RFC also has breached its contractual obligations and has acted in bad faith by refusing to cure or otherwise remedy the material deficiencies in respect of individual mortgage loans.

## PARTIES

7.      Plaintiff MBIA Insurance Corporation is a New York stock insurance corporation with its principal place of business in Armonk, New York.

8.      Defendant Residential Funding Company, LLC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. Residential Funding Company, LLC is successor-in-interest to Residential Funding Corporation, a Delaware corporation with its principal place of business in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

9.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

10.     The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Venue is proper in this District under 28 U.S.C. § 1391(a) and (c) because a substantial part of the events giving rise to these claims occurred in this District. Defendant conducts operations from offices in New York. Further, Defendant has consented to jurisdiction in the United States District Court for the Southern District of New York.

# FACTS

## A.    RFC

12.    RFC is engaged in the acquisition of residential mortgage loans under several loan purchase programs from individual mortgage loan originators or sellers nationwide. RFC, through its affiliates, also originates residential mortgage loans.  Further, RFC acts as a servicer for mortgage loans.

13.    RFC's practice is to sell, by means of securitization transactions, mortgage loans that it has acquired, as well as mortgage loans it originated through its affiliates.  RFC has sponsored securitizations of mortgage loans secured by first liens on one- to four- family residential properties since 1986.  In 1995, RFC expanded its business to include second lien mortgage loans.   In fact, from 2002 through the first quarter of 2007, RFC sponsored securitizations of 1,313,052 first lien mortgage loans with an aggregate principal balance of $243,493,046,962.  During the same period, RFC sponsored securitizations of 338,441 second lien mortgage loans with an aggregate principal balance of $14,393,392,561.

14.    RFC is a wholly-owned subsidiary of Residential Capital Corporation, which is itself a wholly-owned subsidiary of General Motors Acceptance Corporation.

## B.    The Securitization Of Residential Mortgage Loans

15.    Acquirers and originators of mortgage loans may sponsor securitization transactions to sell mortgage loans and to enable the acquisition or origination of additional mortgage loans.  Securitization is the act of using a financial asset, such as a mortgage loan, as security for another instrument.

16.    Securitizations can take various forms.  The most common form used for mortgage loans involves the creation of a trust, to which the sponsoring entity sells a portfolio of mortgage loans.  The trust will then divide the portfolio of mortgage loans into various pieces or

tranches and issue securities, which are sold to investors. Those pieces or tranches underlying the securities have different economic rights to principal and interest, among other things, and have different attributes of repayment risk. As the United States Securities and Exchange Commission ("SEC") has observed, in many instances the transfer of assets to the trust "is a two-step process: the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor for a securitization program and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions." SEC Release "Asset-Backed Securities" (Regulation AB), SEC Release Nos. 33-8518; 34-50905, 70 Fed. Reg. 1,506-1,631.

17.     Because the mortgage loans, and their underlying cash flows, are sold to an entity, such as a trust, in connection with the securitization, the appointment of a servicer is also necessary. The servicer is responsible for handling all administrative duties under the securitization agreements, including collecting mortgage payments and determining whether a mortgage loan is in default of the obligations established by the transaction documents. The servicer remits proceeds from the mortgage loans to the trustee of the trust. The trustee is responsible for administering the funds of the trust, determining the adequacy of the trust's funds to satisfy the trust's obligations in connection with the securities issued by the trust and making payments to the investors.

18.     Mortgage loans may consist of, among others, closed-end mortgage loans ("Closed-End Mortgage Loans") and home equity lines of credit ("Home Equity Loans"). For Closed-End Mortgage Loans, a borrower receives the full borrowed amount of the loan at the time of origination. For Home Equity Loans, a borrower receives the right to draw upon a line of credit, which is collateralized by a mortgage lien, at any time after origination of the Home

Equity Loan up to the full amount of the Home Equity Loan. The amount of a Home Equity Loan that has been drawn upon as of any date of determination is known as the "Utilization."

19.     The financial viability of an investment in a securitization is based on the quality of the underlying mortgage loans. If, for instance, the lender that originated the mortgage loans employed substandard underwriting practices, risk increases. This risk manifests itself through delinquencies on mortgage loan payments eventually leading to defaults on these mortgage loans. After a mortgage loan is in default, if a servicer of a mortgage loan determines that net recoveries to be achieved by foreclosing upon, or comparably converting, the mortgage loan are unlikely to equal or exceed the outstanding principal balance of the delinquent mortgage loan, plus certain costs and expenses related thereto, the servicer will charge-off such delinquent mortgage loan, meaning that the servicer will write down or recognize the outstanding principal balance of such mortgage loan as zero, without a corresponding payment or receipt of principal. These delinquencies, defaults and charge-offs result in a shortfall of anticipated cash flows to the trust and, consequently, a shortfall in cash flows payable to the investors.

20.     To increase marketability, lower interest costs and mitigate the risk to the investors of a potential shortfall in anticipated cash flows to the trust, many securitizations include the purchase of a financial guaranty insurance policy from a financial guaranty insurer, such as MBIA. Under the terms of such a policy, a financial guaranty insurer, in consideration of a premium and subject to the terms and conditions of the policy, will unconditionally and irrevocably guarantee to the investors that, in the event there is a shortfall in cash flows to the trust, the financial guaranty insurer will insure certain payments with respect to current interest and ultimate collection of principal to the trustee for the benefit of the investors. In this way, the risk to the investors of a shortfall in the anticipated cash flows to the trust is mitigated, thus increasing the marketability and pricing of the securities.

21.     To satisfy both the investors and the financial guaranty insurer as to the quality of a particular portfolio of mortgage loans, the sponsor of a securitization typically makes disclosures and representations regarding the quality and character of the underlying mortgage loans and the underwriting standards used to underwrite the mortgage loans.  While these disclosures and representations do not entirely remove the risk of default, they are intended to assure the financial guaranty insurer that risks are known to the insurer and that the financial guaranty insurer does not face additional, hidden risks.

22.     A sponsor's disclosures and representations in a residential mortgage-backed securitization are extremely important.  The sponsor's disclosures and representations regarding the quality and character of the mortgages included in the mortgage loan portfolios and the underwriting standards used to underwrite the mortgage loans are necessary because it is neither practical nor feasible for the financial guaranty insurer to review the many thousands of mortgage loans in the loan portfolios.  Individual loan files are typically voluminous, containing mortgage applications, credit reports, income and employment verifications, the lender's internal documentation and many other forms of documentation necessary to support underwriting decisions.

23.     Because the review of all the loan files underlying a securitization is impractical and infeasible, a sponsor will provide to the financial guaranty insurer and the rating agencies, among others, schedules and due diligence tapes that set forth general financial characteristics of the mortgage loans that will be transferred by the sponsor to the securitization trust.  The rating agencies rely upon the data contained in the schedules and due diligence tapes to create expected loan level default and loss assumptions.  The loan level default and loss assumptions are then used to create cash flow projections – that is, estimates of potential losses – for the securitizations.  The rating agencies then provide shadow ratings for the securitization

transactions, which shadow ratings are based on the expected losses for the proposed securitization structure. A financial guaranty insurer must rely on the sponsor's representations and data with respect to the quality of the mortgage loan portfolio underlying the securitizations as well as the integrity of the sponsor's underwriting policies and practices. Further, the financial guaranty insurer must also rely on the shadow ratings provided by the ratings agencies, which are based on the same representations, warranties and data provided to the financial guaranty insurer. In addition, it is infeasible and impractical for a financial guaranty insurer to confirm based on schedules or due diligence tapes whether a sponsor has underwritten the mortgage loans in compliance with its underwriting criteria.

  **C.**  **The RFC Transactions**

    24.  RFC, through its subsidiaries and affiliates, originates mortgage loans that RFC then sells by means of securitization transactions, including the RFC Transactions. RFC also purchases mortgage loans from other entities, which it sells by means of securitization transactions. RFC is both the seller and the master servicer for the RFC Transactions. RFC outsources certain of its servicing functions to affiliated entities.

    25.  Starting in approximately June 2006, RFC contacted MBIA to provide the Policies with respect to five securitizations sponsored by RFC: Home Equity Loan Trust 2006-HSA4 ("2006-HSA4"), Home Equity Loan Trust 2006-HSA5 ("2006-HSA5"), Home Equity Loan Trust 2007-HSA1 ("2007-HSA1"), Home Equity Loan Trust 2007-HSA2 ("2007-HSA2") and Home Equity Loan Trust ("2007-HSA3," and collectively with 2006-HSA4, 2006-HSA5, 2007-HSA1 and 2007-HSA2, the "RFC Transactions").

    26.  2006-HSA4 is a securitization that was issued on or about July 28, 2006. The 2006-HSA4 mortgage loan pool consists of adjustable rate, revolving Home Equity Loans. Approximately 99.05% of the Home Equity Loans in the 2006-HSA4 mortgage loan pool are

secured by second liens on one- to four- family residential properties with the remaining approximately 0.95% of the Home Equity Loans secured by first liens. As of July 1, 2006 (the "2006-HSA4 Cut-off Date"), the mortgage loan pool for 2006-HSA4 contained 8,954 Home Equity Loans with an approximate initial principal mortgage loan balance of $402,118,000 as of the 2006-HSA4 Cut-off Date. The weighted average amount of Utilization of the Home Equity Loans as of the 2006-HSA4 Cut-off Date was 77.89% of the available credit limit.

27.     2006-HSA5 is a securitization that was issued on or about September 28, 2006. The 2006-HSA5 mortgage loan pool consists of adjustable rate, revolving Home Equity Loans. Approximately 99.2% of the Home Equity Loans in the 2006-HSA5 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 0.80% of the Home Equity Loans secured by first liens. As of September 1, 2006 (the "2006-HSA5 Cut-off Date"), the mortgage loan pool for 2006-HSA5 contained 5,124 Home Equity Loans with an approximate initial principal mortgage loan balance of $295,648,000 as of the 2006-HSA5 Cut-off Date. The weighted average amount of Utilization of the Home Equity Loans as of the 2006-HSA5 Cut-off Date was 87.98% of the available credit limit.

28.     2007-HSA1 is a securitization that was issued on or about February 27, 2007. The 2007-HSA1 mortgage loan pool consists of adjustable rate, revolving Home Equity Loans. Approximately 98.3% of the home equity loans in the 2007-HSA1 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 1.7% of the Home Equity Loans secured by first liens. As of February 1, 2007 (the "2007-HSA1 Cut-off Date"), the mortgage loan pool for 2007-HSA1 contained 9,484 Home Equity Loans with an approximately initial mortgage loan principal balance of $546,774,000 as of the 2007-HSA1 Cut-off Date. The weighted average amount of Utilization of the Home Equity Loans as of the 2007-HSA1 Cut-off Date was 85.84% of the available credit limit.

29.     2007-HSA2 is a securitization that was issued on or about April 27, 2007. The 2007-HSA2 mortgage loan pool consists of fixed rate Closed-End Mortgage Loans. Approximately 99.84% of the Closed-End Mortgage Loans in the 2007-HSA2 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 0.16% of the Closed-End Mortgage Loans secured by first liens. As of April 1, 2007 (the "2007-HSA2 Cut-off Date"), the mortgage loan pool for 2007-HSA2 contained 24,092 Closed-End Mortgage Loans with an approximate initial mortgage loan principal balance of $1,300,997,943 as of the 2007-HSA2 Cut-off Date.

30.     2007-HSA3 is a securitization that was issued on or about May 30, 2007. The 2007-HSA3 mortgage loan pool contains two mortgage loan groups. One loan group ("2007-HSA3 Loan Group 1") contains 11,268 fixed rate Closed-End Mortgage Loans with an aggregate initial mortgage loan principal balance of $590,465,000 as of May 1, 2007 (the "2007-HSA3 Cut-off Date"). The other loan group ("2007-HSA3 Loan Group 2") contains 4,146 adjustable rate, revolving Home Equity Loans with an aggregate initial mortgage loan principal balance of $239,848,476 as of the 2007-HSA3 Cut-off Date. Approximately 99.87% of the 2007-HSA3 Loan Group 1 loans and 99.26% of the 2007-HSA3 Loan Group 2 loans are secured by second liens on one- to four- family residential properties with the remaining approximately 0.13% and 0.74% of the respective group mortgage loans secured by first liens. As of the 2007-HSA3 Cut-off Date, the weighted average amount of Utilization of the Home Equity Loans in 2007-HSA3 Loan Group 2 was 86.0% of the available credit limit.

### D.     RFC's Representations And Warranties

31.     In connection with each RFC Transaction, MBIA and RFC entered into Insurance Agreements pursuant to which MBIA issued the Policies for the RFC Transactions. The Policies increased the marketability of the securities by mitigating the risk to potential

investors of any shortfalls in anticipated cash flows, which allowed for better pricing of the securities for RFC. These insurance agreements are: (1) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust 2006-HSA4 and Residential Funding Mortgage Securities II, Inc. ("RFMS II"), dated July 28, 2006 (the "2006-HSA4 Insurance Agreement"); (2) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust 2006-HSA5 and RFMS II, dated September 28, 2006 (the "2006-HSA5 Insurance Agreement"); (3) an Insurance Agreement, among MBIA, RFC, Home Equity Loan Trust 2007-HSA1 and RFMS II, dated February 27, 2007 (the "2007-HSA1 Insurance Agreement"); (4) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust 2007-HSA2 and RFMS II, dated April 27, 2007 (the "2007-HSA2 Insurance Agreement"); and (5) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust 2007-HSA3 and RFMS II, dated May 30, 2007 (the "2007-HSA3 Insurance Agreement" and, collectively with the foregoing, the "Insurance Agreements").

32. RFC made numerous representations and warranties to MBIA in connection with the Insurance Agreements. RFC further made numerous representations and warranties to the rating agencies that contributed to the issuance of incorrect shadow ratings by the rating agencies. These representations and warranties, as well as, the shadow ratings, were a material inducement to MBIA to enter into the Policies.

33. Specifically, the Insurance Agreements incorporated by reference, for the benefit of MBIA, the representations and warranties contained in the "Transaction Documents," as that term was defined in the Insurance Agreements. The incorporation by reference of the Transaction Documents into the Insurance Agreements was intended to allow MBIA to itself rely upon any representation and warranty that RFC made to any other entities, such as investors, in connection with each of the RFC Transactions. For 2006-HSA4, 2006-HSA5, 2007-HSA1 and 2007-HSA3, the "Transaction Documents" included, among others, the purchase agreements that

set forth the terms of the sale of the mortgage loans to the relevant trust in connection with the respective transaction (the "Purchase Agreements"); the servicing agreements that set forth the terms for servicing the mortgage loans in connection with the respective transaction (the "Servicing Agreements"); and offering materials provided to potential investors and filed with the SEC in connection with the respective transaction (the "Offering Documents"). For 2007-HSA2, the "Transaction Documents" included the assignment agreement ("2007-HSA2 Assignment Agreement"), which sets forth the terms of the assignment of the mortgage loans to the 2007-HSA2 Trust, the pooling and servicing agreement ("2007-HSA2 PSA"), which sets forth the terms for servicing the mortgage loans for 2007-HSA2, and the Offering Documents, among others. MBIA is an express third-party beneficiary of the Purchase Agreements, the Servicing Agreements, the 2007-HSA2 Assignment Agreement and the 2007-HSA2 PSA.

34. RFC also separately represented and warranted in the Insurance Agreements that "The Offering Documents did not, as of the Closing Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading." Moreover, RFC represented and warranted that its financial statements were "complete and correct in all material respects, [] present fairly the financial condition and results of operations of RFC as of the dates and for the periods indicated and [] have been prepared in accordance with generally accepted accounting principles consistently applied . . . ."

35. By incorporating in the Insurance Agreements the representations and warranties in the Transaction Documents, RFC incorporated the following general representations and warranties regarding the underwriting of the mortgage loans contributed to the RFC Transactions, which were stated in the Purchase Agreements, the Servicing

Agreements, the 2007-HSA2 Assignment Agreement and the 2007-HSA2 PSA, for the benefit of MBIA:

- **Compliance With Underwriting Guidelines:** All of the mortgage loans were underwritten in substantial compliance with the criteria set forth in the relevant program guide (the "Underwriting Guidelines").

- **Accurate Loan Information:** Certain information about the Home Equity Loans or the Closed-End Mortgage Loans was true and correct in all material respects when the information was furnished by RFC to MBIA and others.

- **CLTV Ratio:** As of the Cut-off Dates, the combined loan-to-value ratio of each Home Equity Loan or Closed-End Mortgage Loan was not in excess of 100%.

- **Proper Documentation:** Except for a few specifically identified instances, each Home Equity Loan file or Closed-End Mortgage Loan file was complete, and all of the required documents and instruments were contained therein.

- **Compliance With Applicable Laws:** The loan agreements and mortgage notes underlying the RFC Transactions complied, when made, in all material respects with local, state and federal laws, including anti-predatory lending laws.

- **No High Cost Or Covered Loans:** None of the Home Equity Loans or Closed-End Mortgage Loans were loans that, under applicable state or local law in effect at the time of origination of such loans, were referred to as (1) 'high cost' or 'covered' loans or (2) any other similar designation if the law imposes greater restriction or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

These representations and warranties set forth the standards governing each mortgage loan contributed to the RFC Transactions, including, significantly, the standard that each mortgage loan had been underwritten in substantial compliance with RFC's Underwriting Guidelines.

36.    RFC's Underwriting Guidelines specified criteria that the mortgage loans must meet depending upon the individual loan program and circumstances of each mortgage

loan. In general, the Underwriting Guidelines stipulated what documentation was required to be included in the mortgage loan files for each loan product (which may include, depending upon the loan product, verifications of income, assets, closing funds and payment histories, among others) and criteria for eligibility, including tests for debt-to-income ("DTI") and combined loan-to-value ("CLTV") ratios. The Underwriting Guidelines provided, for example, that for a borrower under a home equity loan program for a primary residence who applies for a loan based on the borrower's declaration of his or her income (a "stated income" loan) and has a Fair, Isaac & Co. ("FICO") credit score of 630, the maximum acceptable DTI would be 45%, the maximum CLTV would be 80%, the maximum loan amount would be $150,000 and a full appraisal of the property would be required.

37. An important variable affecting the applicable criteria for evaluating a loan under the Underwriting Guidelines was the level of documentation of a borrower's income. Under RFC's Underwriting Guidelines, a borrower could apply for a loan by providing "full documentation" or could apply through other reduced documentation programs such as "lite doc," "stated income," or "no doc" programs, among others. The principal difference with respect to these RFC loan programs was that for loan programs other than "full documentation," RFC would not undertake to independently verify a borrower's income, if required to be stated. However, despite differing levels of necessary verification, RFC's Underwriting Guidelines required that for all the loan programs, borrowers must have a history of receiving stable income from employment or other sources and a reasonable expectation that the income will continue for the foreseeable future. Moreover, if a borrower stated his or her income, even if RFC was not required to verify the income, RFC was required to determine that a borrower's stated income was at least reasonable for the borrower's type of employment, line of work and assets. In fact, for stated income loan programs, RFC's Underwriting Guidelines clearly state that

"[e]mployment stability is a critical component in evaluating the Borrower's continuing ability to meet obligations" and that "[o]ther factors in the [loan] file, including but not limited to Borrowers employment and position disclosed, geographical location, assets, and liabilities must demonstrate the reasonableness of the income stated."

38.     In addition to giving representations and warranties, RFC also provided information to MBIA with respect to the mortgage loans contributed to the RFC Transactions. This information included data tapes and schedules incorporated in the Offering Documents that contained representations regarding CLTV, DTI and FICO score statistics for mortgage loans for each RFC Transaction. RFC also conveyed information to MBIA during MBIA's discussions with RFC regarding the issuance of Policies for the RFC Transactions.

39.     Because it was impractical and infeasible for MBIA to review the almost 60,000 mortgage loans contributed to the RFC Transactions, MBIA, like all financial guaranty insurers, required these representations and warranties from RFC to ensure that risks in the RFC Transactions were known and fully disclosed to MBIA and that MBIA would not face additional risks hidden in the mortgage loan pools by RFC. MBIA relied on RFC's representations and warranties in making its decisions to issue the Policies for the RFC Transactions.

40.     RFC provided information to the rating agencies with respect to the mortgage loans contributed to the RFC Transactions. The rating agencies relied on this information to issue shadow ratings for the RFC Transactions. MBIA also relied on the shadow rating in making its decisions to issue the Policies for the RFC Transactions.

41.     RFC further covenanted, represented and warranted that it would service the mortgage loans in each of the RFC Transactions in a manner consistent with its servicing guidelines and the Servicing Agreements and would employ, in its good faith business judgment, all its "normal and usual" procedures in servicing the mortgage loans. In return, RFC collects

servicing fees equal to 0.50% per annum of the outstanding principal balance of each serviced loan, payable monthly. As of September 2008, RFC has collected approximately $20,000,000 in servicing fees related to the RFC Transactions. In addition, RFC, as the master servicer for all of the RFC Transactions, takes as its master servicing fee either a percentage of the principal balance of the underlying mortgage loans or the interest from certain accounts created in connection with the transaction, depending on the specific structure of the individual RFC Transactions. As of September 2008, RFC has collected approximately $3,000,000 in master servicing fees related to the RFC Transactions.

### E. RFC's Breaches Of Its Representations And Warranties

42. The RFC Transactions have performed poorly. Delinquencies and defaults for mortgage loans on the RFC Transactions have been substantial, diminishing cash flow to the trusts, which has required and will continue to require MBIA to satisfy its obligations under the Insurance Agreements and the Policies by making payments to cover these shortfalls. As of September 2008, MBIA has paid approximately $264 million in claims in connection with the RFC Transactions.

43. Concerned about the high delinquencies and default rates, MBIA requested that RFC provide MBIA and its representatives and agents access to certain documents with respect to the mortgage loans underlying the RFC Transactions.

44. In January 2008, MBIA requested access to all relevant documentation to facilitate MBIA's review of the loan files for all mortgage loans that were delinquent as of December 31, 2007, that is, those mortgage loans that became delinquent less than 18 months after the closing dates of the RFC Transactions.

45. Further, MBIA has requested access to mortgage loans that have become delinquent after January 1, 2008. Pursuant to the Servicing Agreements and the Insurance

Agreements, MBIA is entitled to reasonable access to the documentation regarding the mortgage loans. RFC has consistently thwarted MBIA's good faith efforts to obtain information regarding these additional mortgage loans by arbitrarily and unreasonably limiting the number of days that MBIA may review the additional mortgage loan files in RFC's possession, by arbitrarily and unreasonably limiting the space available to MBIA's personnel for review of the additional mortgage loan files and by arbitrarily and unreasonably limiting the number of MBIA personnel allowed to review the additional mortgage loan files, among other actions. RFC established these arbitrary and unreasonable limitations in direct breach of its contractual obligations to provide MBIA with reasonable access to mortgage loans. Many of the loan files provided by RFC were incomplete, in direct breach of RFC's representation and warranty that the mortgage loan files were complete, thus forcing MBIA to make supplemental requests to RFC regarding the same loan files. Further, despite MBIA's request, RFC has refused to provide MBIA with any documents or information reflecting RFC's decisions or actions with respect to the servicing of delinquent or defaulted mortgage loans.

46.     MBIA's review of the selected delinquent mortgage loans revealed startling and disturbing information. Of the approximately 60,000 mortgage loans included in the mortgage loan pools for the RFC Transactions, 1,847 mortgage loans, approximately 3%, were in default as of December 31, 2007, representing an unexpected and unusually high default rate given the close proximity in time from the Closing Dates of the RFC Transactions. Of these 1,847 defaulted mortgage loans for the RFC Transactions that were reviewed by MBIA, only 129 mortgage loans – less than 7% of the mortgage loans reviewed – were originated or acquired in material compliance with RFC's representations and warranties. Notably, in the three-month period from January 1, 2008 through March 31, 2008, another 1,195 mortgage loans – 2% of the RFC Transactions – became delinquent.

47.    MBIA's review uncovered that a significant percentage of these delinquent mortgage loans were in breach of one or more of RFC's representations and warranties with respect to the underwriting of the mortgage loans contributed to the RFC Transactions. The following examples are illustrative of the substantial number of mortgage loans in the RFC Transactions and their non-compliance with RFC's representations and warranties in connection with the RFC Transactions:

a.    On March 8, 2006, a loan with a principal balance of $55,000 was made to a borrower in Perris, California on a property with an original appraisal value of $225,000 and a senior loan balance of $440,000. The borrower stated his income to be $9,800 per month ($117,800 per year) as a dispatcher at a freight company. Further, the borrower could only demonstrate $22,270.80 in liquid assets, the majority of which was in a 401K retirement account. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. In that regard, the borrower's credit profile indicated a prior bankruptcy filing, an existing loan against the borrower's 401K retirement account and an automobile repossession. (Loan # 10570977 – 2006-HSA4)

b.    On November 30, 2006, a loan with a principal balance of $140,000 was made to a borrower in Newton, Massachusetts on a property with an original appraisal value of $740,000 and a senior loan balance of $513,567. The property subject to the loan was a non-owner occupied investment property. The borrower stated his income to be $41,666 per month ($500,000 per year) as the owner of a Wine/Spirits store. Further, the dorrower did not demonstrate any liquid assets. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2007 in connection with which the borrower claimed to have earned $0.00 for 2006. Further, the appraisal indicated the property failed to conform to legal standards and the loan file lacked any letter from the local authority regarding rebuilding. RFC Underwriting Guidelines require verification of 6 months of reserves for the monthly Principle, Interest, Taxes and Insurance ("PITI") payments for stated income loans on non-owner occupied investment properties yet there is no indication in the loan files that these reserves were identified or verified. Finally, RFC guidelines limit loans under the non-owner occupied loan program to

$100,000, $40,000 less than was loaned.  (Loan # 11169067 – 2007-HSA2).

c.  On June 9, 2006, a loan with a principal balance of $132,000 was made to a borrower in Agoura Hills, California on a property with an original appraisal value of $660,000 and a senior loan balance of $528,000.  This loan was originated as a loan for an owner-occupied property.  The borrower owned his prior residence for only three months, for which he provided a two month payment history.  RFC's Underwriting Guidelines, however, require documentation of a minimum of one year mortgage or rental history and no such documentation is included in the loan file.  Moreover, the final loan application states monthly income of $21,700 and the initial application states rental income of $6,750.  However, the underwriting transmittal states income of $14,500 and the final loan application states rental income of $3,000.  Based on these lower values, the DTI for loan is 67.37% and exceeds the maximum DTI of 50% under RFC's Underwriting Guidelines.  Notably, the borrower could only demonstrate $34,469.41 in liquid assets.  (Loan # 10776379 – 2006-HSA5).

d.  On March 16, 2007, a loan with a principal balance of $40,000 was made to a borrower in Bradenton, Florida on a property with an original appraisal value of $440,000 and a senior loan balance of $328,000.  The borrower is retired and receives a fixed income that was stated as $6,450 per month.  The borrower's FICO credit score of 688 required the DTI for the loan not to exceed 45%, however, the borrower's DTI was 55.93%.  Because the borrower receives a fixed income, the borrower does not meet the residual income requirements for a higher DTI under RFC's Underwriting Guidelines.  Further, the loan file lacks any evidence of 2 months of PITI reserves as required by RFC's Underwriting Guidelines.  (Loan # 11434381 – RFC 2007-HSA3).

e.  On July 24, 2006, a loan with a principal balance of $29,500 was made to a borrower in Flint, Michigan on a property with an original appraisal value of $57,497 and a senior loan balance of $24,676.  The borrower stated income of $3,700 per month and had a FICO score of 650.  The CLTV for the mortgage loan was 94.2%.  Pursuant to RFC's Underwriting Guidelines, the borrower was required to have monthly income of $4,000 and the CLTV for the loan could not exceed 80%.  Further, the loan file lacks evidence of a full appraisal for the property as well as evidence of 2 months of PITI reserves, both of which are required by RFC's Underwriting Guidelines.  (Loan # 11147061 – RFC 2007-HSA1).

    f.    On November 12, 2006, a loan with a principal balance of $135,000.00 was made to a borrower in Scottsdale, Arizona on a property with an original appraisal value of $540,000.00 and a senior loan balance of $405,000.00. The borrower stated income of $11,000 per month as a sales manager at a concrete company, however, the borrower could only demonstrate assets of $11,491. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2008 in connection with which the borrower claimed to have actually earned $43,523 for 2006 and $20,401 for 2007. Additionally, the bank account used to verify the borrower's reserves is actually held in the name of the loan officer that issued the loan. (Loan # 11165457 – RFC 2007-HSA3).

48.    The mortgage loans identified above all fail to comply with the general representations and warranties regarding the underwriting of the mortgage loans contributed to the RFC Transactions, which were stated in the Purchase Agreements, the Servicing Agreements, the 2007-HSA2 Assignment Agreement and the 2007-HSA2 PSA, for the benefit of MBIA and identified in Paragraph 35, supra. These mortgage loans are illustrative of the pervasive breaches of RFC's representations to MBIA throughout the portfolios for the RFC Transactions. In that regard:

    a.    RFC breached its representation and warranty that the mortgage loans were underwritten in substantial compliance with RFC's Underwriting Guidelines. A significant number of mortgage loans have DTI ratios far in excess of RFC's Underwriting Guidelines, have CLTV ratios far in excess of RFC's Underwriting Guidelines and were made on the basis of "stated incomes" that were grossly unreasonable. In certain circumstances, CLTV ratios not only exceeded the permissible ratio pursuant to RFC's Underwriting Guidelines, but they even exceeded 100%, in breach of RFC's explicit representation and warranty in the Purchase Agreements and the 2007-HSA2 Assignment Agreement that the CLTV ratio for each of the mortgage loans was not in excess of 100%. Moreover, contrary to RFC's Underwriting Guidelines, RFC failed, with respect to a significant number of mortgage loans, to verify employment for mortgage loan borrowers where required to do so, failed to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with credit scores that are ineligible

under the Underwriting Guidelines and closed mortgage loans without verifying that the borrower had sufficient funds or reserves as required by the Underwriting Guidelines.

b.     RFC breached its representations and warranties that the mortgage loan files contained all necessary documents and complied with applicable law. Numerous mortgage loan files are missing necessary mortgage loan documents and are missing certain disclosures, such as disclosures relating to loan transfers, which are necessary under applicable law. The absence of these documents from the loan files may greatly impede the ability of the trustees for the respective RFC Transactions to enforce their rights and remedies with respect to delinquent mortgages.

c.     RFC breached its representation and warranty that the RFC Transactions would not contain high cost loans. In fact, RFC even contributed mortgage loans to the mortgage loan pools that violated either, or both, the federal Home Ownership and Equity Protection Act ("HOEPA") and state predatory lending laws. These laws are designed to protect borrowers from abusive lending practices. Among other violations of these laws, the mortgage loan pools include mortgage loans for which the finance charges were materially understated, the annual percentage rate ("APR") was materially understated or exceeded the maximum cap and high cost thresholds were exceeded. Notably, it is standard in the mortgage loan industry to test for HOEPA compliance by means of a simple mathematical calculation. RFC's failure to identify HOEPA violations indicates that RFC failed to perform the calculation, incompetently performed the calculation or performed the calculation but purposely ignored the result.

49.     RFC also breached its representation and warranty in the Insurance Agreements that "[t]he Offering Documents did not, as of the Closing Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading." In the Offering Documents, RFC made a number of untrue statements of material fact, including that the mortgage loans contributed to the RFC Transactions were underwritten in compliance with RFC's Underwriting Guidelines, that the mortgage loans complied with local, state and federal laws and that the RFC Transactions did not contain high cost loans. These statements are

materially false because a significant number of mortgage loans have DTI or CLTV ratios far in excess of RFC's Underwriting Guidelines, were made on the basis of "stated incomes" that were unreasonable or were originated in violation of federal and state predatory lending laws.

50.     Moreover, the information RFC provided MBIA in the data tapes and the schedules included in the prospectus was materially false and misleading. RFC provided MBIA data tapes regarding each of the RFC Transactions on numerous occasions. Specifically:

a.     On July 12, 2006, Lonnie Proechel of RFC sent a data tape to MBIA by e-mail with respect to mortgage loans included in the mortgage loan pool for 2006-HSA4 that included materially false and misleading information regarding the mortgage loans contributed to the 2006-HSA4 mortgage loan pool.

b.     On August 1, 2006, Lonnie Proechel of RFC sent a data tape to MBIA by e-mail with respect to mortgage loans included in the mortgage loan pool for 2006-HSA5 that included materially false and misleading information regarding the mortgage loans contributed to the 2006-HSA5 mortgage loan pool.

c.     On January 30, 2007, Jesse J. Roth of RFC sent a data tape to MBIA by e-mail with respect to mortgage loans included in the mortgage loan pool for 2007-HSA1 that included materially false and misleading information regarding the mortgage loans contributed to the 2007-HSA1 mortgage loan pool.

d.     On March 1, 2007, Joseph Orning of RFC sent a preliminary data tape to MBIA by e-mail with respect to mortgage loans to be included in the mortgage loan pool for 2007-HSA2 that included materially false and misleading information regarding the mortgage loans contributed to the 2007-HSA2 mortgage loan pool. This preliminary data tape was supplemented with additional data tapes sent by Lonnie Prochel of RFC to MBIA by e-mail on April 4, 2007, which also included materially false and misleading information regarding the mortgage loans contributed to the 2007-HSA2 mortgage loan pool.

e.     On May 8, 2007, Jeffrey Blaschko of RFC sent data tapes to MBIA by e-mail with respect to mortgage loans included in the mortgage loan pool for 2007-HSA3 that included materially false and misleading information regarding the mortgage loans contributed to the 2007-HSA3 mortgage loan pool.

51. These data tapes and schedules indicated characteristics of the mortgage loans sold to the RFC Transactions; however, the data on these data tapes was materially false and misleading as a result of RFC's breaches of its representations and warranties. For example, mortgage loan statistics such as DTI and CLTV were materially understated as a result of RFC's failure to underwrite the mortgage loans in compliance with its Underwriting Guidelines. Further, there was no way for MBIA to confirm based on schedules or due diligence tapes whether RFC had underwritten the mortgage loans in compliance with its underwriting criteria.

52. RFC's breaches of its representations and warranties establish that the information conveyed to MBIA, including the schedules in the Offering Documents containing DTI and CLTV statistics for the mortgage loan pools, as well as, specific loan information provided to MBIA by RFC, was materially false. Notably, the DTI and CLTV statistics for the mortgage loan pools contained in the Offering Documents are based on "stated incomes" that are grossly inflated and unreasonable. Further, RFC's breaches of its representations and warranties establish that the information conveyed to the rating agencies was materially false, causing the rating agencies to issue incorrect shadow ratings for the RFC Transactions.

53. In addition, the high percentage of delinquencies and defaults on mortgage loans for the RFC Transactions has been unusual. RFC have not obtained any significant recoveries on defaulted or delinquent mortgage loans, resulting in greater losses than anticipated and reflecting RFC's failure to service the mortgage loans pursuant to its normal and usual servicing procedures and as otherwise required pursuant to the Transaction Documents.

54. RFC has admitted to MBIA that it was aware that mortgage loans contributed to the mortgage loan pools for the RFC Transactions failed to comply with RFC's Underwriting Guidelines and, thus, were in breach of RFC's contractual representations and warranties. In that regard, RFC underwrote or purchased a significant number of non-compliant

-23-

mortgage loans by purporting to grant "exceptions" to RFC's Underwriting Guidelines. The Underwriting Guidelines, however, only allowed RFC to make exceptions to the Underwriting Guidelines in specifically defined and limited circumstances. For example, the Underwriting Guidelines state that certain loans with a DTI exceeding the standards for its individual loan program "may be eligible for purchase as an exception under a non-standard Loan Program or will be slotted to a Loan Program that accepts higher DTIs regardless of credit grade." Further, RFC's Underwriting Guidelines required that a form – Form 1600 – be completed and approved for any exceptions made to the Underwriting Guidelines in connection with the underwriting or purchase of a mortgage loan.

55.     For a significant number of non-compliant mortgage loans, RFC did not identify any specifically defined exception that was permitted under the Underwriting Guidelines. Further, for a significant number of mortgage loans, RFC failed to document the alleged exceptions on a Form 1600 as required by the Underwriting Guidelines. Instead, RFC engaged extensively in three improper underwriting practices that were not permitted under the Underwriting Guidelines. As a result of these practices, RFC deliberately contributed a significant number of non-compliant mortgage loans to the RFC Transactions.

56.     The first improper practice engaged in by RFC was called a "negotiated commitment." In a "negotiated commitment," RFC prospectively entered into an agreement with a loan originator whereby RFC agreed that the loan originator could in the future originate mortgage loans that failed to comply with RFC's Underwriting Guidelines and that RFC would still purchase these mortgage loans from the loan originator after the origination of the mortgage loans, notwithstanding the fact that RFC understood that these mortgage loans would not comply with RFC's Underwriting Guidelines.

57. Even though RFC knew that mortgage loans acquired from the loan originators through the "negotiated commitments" did not comply with RFC's Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the RFC Transactions and falsely represented to MBIA that these mortgage loans, in fact, were underwritten in substantial compliance with RFC's Underwriting Guidelines. Further, RFC wrongfully attempted to justify its conduct by claiming that mortgage loans purchased in connection with "negotiated commitments" were excepted from the Underwriting Guidelines. To the contrary, the Underwriting Guidelines, the Purchase Agreements, the 2007-HSA2 Assignment Agreement, the Insurance Agreements or the Offering Documents contain no provision permitting RFC to make exceptions to the Underwriting Guidelines on the basis of "negotiated commitments."

58. The second improper practice engaged in by RFC was called a "bulk purchase program." In a "bulk purchase program," RFC entered into a transaction with a loan seller – that is, an entity that owned mortgage loans – whereby RFC agreed to purchase a bulk amount of mortgage loans that had already been originated and were owned by that loan seller. In connection with these "bulk purchases," RFC did not undertake to "re-underwrite" or confirm that the mortgage loans being acquired complied with RFC's Underwriting Guidelines. Instead, RFC agreed with the loan seller that RFC would acquire mortgage loans from that loan seller regardless of whether the mortgage loans complied with RFC's Underwriting Guidelines. In many instances, the mortgage loans, in fact, did not comply with RFC's Underwriting Guidelines.

59. Notwithstanding that RFC knew that mortgage loans acquired through the "bulk purchase programs" did not comply with RFC's Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the RFC

Transactions and falsely represented to MBIA that these mortgage loans, in fact, were underwritten in substantial compliance with RFC's Underwriting Guidelines. Further, RFC wrongfully attempted to justify its conduct by claiming that mortgage loans purchased in connection with "bulk purchase programs" are excepted from the Underwriting Guidelines. The Underwriting Guidelines, the Purchase Agreements, the 2007-HSA2 Assignment Agreement, the Insurance Agreements or the Offering Documents contain no provision permitting RFC to make exceptions on this basis.

60.     RFC also underwrote or purchased mortgage loans that failed to comply with the Underwriting Guidelines but were approved for purchase by RFC's proprietary automated electronic loan underwriting program known as "Assetwise." Assetwise was used by loan originators as a tool to assist in the underwriting of mortgage loans that would be acceptable to RFC. Assetwise is a software program in which a loan originator inputs certain characteristics of a proposed mortgage loan. The program then permits the user to determine whether the loan meets the pre-specified underwriting criteria that are set up in the program. MBIA understood, based on the Underwriting Guidelines, that Assetwise was programmed so that the characteristics of proposed mortgage loans would be analyzed to determine whether they complied with the Underwriting Guidelines.

61.     RFC used Assetwise to originate mortgage loans through its affiliates. RFC also made Assetwise available to unaffiliated loan originators, which would sell the mortgage loans to RFC.

62.     The Assetwise program utilized by RFC, either as an originator or as made available to unaffiliated originators, did not analyze proposed mortgage loans on the basis of the RFC Underwriting Guidelines. Indeed, a significant number of mortgage loans originated or

purchased by RFC on the basis of Assetwise did not comply with RFC's Underwriting Guidelines.

63.     Moreover, RFC's reliance on Assetwise itself was a violation of the Underwriting Guidelines. RFC's Underwriting Guidelines expressly state that "clients who use the Assetwise electronic services are still bound by the representations and warranties as set forth in the [Underwriting Guidelines]. Additionally, use of Assetwise does not relieve Clients of loan eligibility and underwriting requirements set forth in [the Underwriting Guidelines]." The Underwriting Guidelines further state that "[t]he loan must conform to the [Underwriting Guidelines] and Loan eligibility requirements. Assetwise provides program eligibility grading and slotting. Clients are responsible to ensure the Loan conforms to [the Underwriting Guidelines]." RFC never stated in the Underwriting Guidelines or in its representations and warranties to MBIA its intention to allow Assetwise to approve mortgage loans that failed to comply with RFC's Underwriting Guidelines.

64.     Notwithstanding that RFC knew that numerous mortgage loans underwritten by use of the Assetwise program failed to comply with the Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the RFC Transactions and falsely represented to MBIA that these mortgage loans in fact were underwritten in substantial compliance with RFC's Underwriting Guidelines. RFC wrongfully attempted to justify its conduct by claiming that loans underwritten by use of the Assetwise program are excepted from the Underwriting Guidelines. The Underwriting Guidelines, the Purchase Agreements, the 2007-HSA2 Assignment Agreement, the Insurance Agreements or the Offering Documents contain no provision permitted RFC to make exceptions on this basis.

65.    As a result of its "negotiated commitments," "bulk purchases" and use of Assetwise, RFC deliberately contributed a substantial and material number of loans to the RFC Transactions that failed to comply with its Underwriting Guidelines.  RFC's claim that these mortgage loans were issued through "exceptions" to the Underwriting Guidelines or "substantially" complied with the Underwriting Guidelines essentially eliminated any meaningful role that RFC's Underwriting Guidelines would serve in the mortgage loan origination and purchase process for mortgage loans contributed to the RFC Transactions.

66.    Through its egregious and pervasive breaches of its representations and warranties, including, without limitation, RFC's representation and warranty that the mortgage loans were underwritten "in substantial compliance with [the Underwriting Guidelines]," RFC knowingly misled MBIA into issuing the Policies for the RFC Transactions without disclosing their substantial, hidden risks, thereby passing those risks to MBIA.  By misleading MBIA into issuing the Policies, RFC was able to sell mortgage loans it held at a higher price to investors in the RFC Transactions for an inflated price and to then earn fees for servicing the mortgage loans underlying the RFC Transactions.

67.    Further, through its egregious and pervasive breaches of its representations and warranties, RFC caused the rating agencies to issue incorrect shadow ratings for the RFC Transactions, on which MBIA relied.

68.    RFC's breaches of its representations and warranties materially undermine and distort the fundamental basis upon which MBIA agreed to issue the Policies.  The substantial and hidden risks present in the RFC Transactions, which were hidden by RFC's misrepresentations, have caused the mortgage loans in the RFC Transactions to default at a severe and unexpected rate, thus causing significant shortfalls in cash flows to investors in the RFC Transactions.  Further, RFC's failure to minimize losses on the mortgage loans through its

normal and usual mortgage loan servicing procedures has exacerbated shortfalls to investors in the RFC Transactions. Consequently, MBIA has incurred, and will continue to incur, significant losses in connection with its obligations under the Policies to insure certain shortfalls in payments to investors in the RFC Transactions, all as a result of RFC's misrepresentations and misleading conduct.

**CLAIM I**
**(BREACH OF CONTRACT -**
**SPECIFIC PERFORMANCE, DAMAGES & DECLARATORY JUDGMENT)**

69.     MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 68.

70.     Pursuant to the Purchase Agreements and the 2007-HSA2 Assignment Agreement, in the event that MBIA determined that RFC breached its representations and warranties such that the breach "materially and adversely affects the interests of [MBIA]," including, without limitation, by contributing mortgage loans to the mortgage loan pools for the RFC Transactions that failed to comply with RFC's representations and warranties and with RFC's Underwriting Guidelines, MBIA could give notice to RFC of the presence of a non-compliant mortgage loan and RFC would have 90 days to cure the breach. If RFC failed to cure the breach within the 90 day period, RFC agreed, within such 90 day period, to repurchase the mortgage loan from the mortgage loan pool or, if substitution could be completed within two years of the respective closing dates of the RFC Transactions, RFC could substitute a performing, compliant mortgage loan to the mortgage loan pools (the "Loan Breach Remedy Procedure").

71.     Pursuant to Section 3.03 of the Insurance Agreements, RFC agreed to indemnify MBIA for (i) damages as a result of RFC's failure to comply with the Transaction Documents, including, without limitation, RFC's failure to comply with the Loan Breach

Remedy Procedure, with interest, and (ii) reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA reasonably incurs, in connection with the enforcement, defense or preservation of any rights in respect of any of the Transaction Documents.

72.     The parties established the Loan Breach Remedy Procedure because they recognized that it was possible that an isolated and limited number of mortgage loans, among thousands of mortgage loans in the mortgage loan pools underlying the RFC Transactions, may not comply with RFC's representations and warranties and RFC's Underwriting Guidelines. Because of this possibility with respect to an isolated and limited number of mortgage loans, the intent of the parties regarding the Loan Breach Remedy Procedure was to establish an agreed-upon mechanism whereby MBIA could give notice to RFC of an isolated and limited number of mortgage loans and remedy such non-compliant mortgage loans in the mortgage loan pools without implicating an event of default for the RFC Transactions in their entirety.

73.     On May 22, 2008, MBIA sent notices (the "First Remedy Notices") to RFC identifying numerous mortgage loans in the mortgage loan pools underlying the RFC Transactions that were in breach of one or more of RFC's representations and warranties pursuant to Section 3.1(b) of the Purchase Agreements and Section 4 of the 2007-HSA2 Assignment Agreement and such breach materially and adversely affected the interests of MBIA. The mortgage loans identified in the First Remedy Notices were among those mortgage loans included in the group of mortgage loans reviewed by MBIA that were limited to mortgage loans that were delinquent as of December 31, 2007.

74.     On September 2, 2008, September 5, 2008, September 17, 2008 and September 25, 2008, MBIA sent notices to RFC with respect to each of the RFC Transactions, identifying additional mortgage loans that were in breach of one or more of RFC's

representations and warranties pursuant to Section 3.1(b) of the Purchase Agreements and Section 4 of the 2007-HSA2 Assignment Agreement and such breach materially and adversely affected the interests of MBIA (the "Second Remedy Notices" and, collectively with the First Remedy Notices, the "Remedy Notices"). The Remedy Notices did not identify all mortgage loans that were in breach of RFC's representations and warranties.

75. The mortgage loans identified in the Remedy Notices were included in the Remedy Notices because the mortgage loans failed to comply with one or more of RFC's representations and warranties. For example, many of the mortgage loans were underwritten on the basis of "stated incomes" that were clearly unreasonable for the circumstances of the individual borrower or were based on DTI or CLTV ratios that exceeded the Underwriting Guidelines based on the circumstances of the individual borrower. In addition, the files for the mortgage loans lacked necessary documents including mortgage notes, disclosures relating to the sale of the mortgage loan, disclosures relating to the transfer of servicing for the mortgage loan, documents confirming appropriate reserves and documents necessary for compliance with the Patriot Act.

76. For a small sub-set of mortgage loans identified in the First Remedy Notices, RFC and MBIA reached agreements that either the mortgage loans failed to comply with the Underwriting Guidelines, in which case RFC agreed to repurchase the mortgage loans, or that the mortgage loans complied with the Underwriting Guidelines, in which case MBIA agreed to rescind its First Remedy Notice with respect to the compliant mortgage loan. This sub-set accounts for only approximately 20% of the mortgage loans identified in the First Remedy Notices. For the vast majority of the mortgage loans identified in the First Remedy Notices (approximately 80% of the identified mortgage loans), RFC has neither cured the material breaches for the non-compliant mortgage loans in the mortgage loan pools that were identified in

-31-

the First Remedy Notices nor repurchased or substituted non-compliant mortgage loans as required by the Loan Breach Remedy Procedure.

77. Similarly, RFC has failed to cure the material breaches for the non-compliant mortgage loans in the mortgage loan pools that were identified in the Second Remedy Notices, and on information and belief, RFC will not cure those breaches nor will it substitute for or repurchase the non-compliant mortgage loans.

78. MBIA seeks specific performance of the Loan Breach Remedy Procedure to require RFC to repurchase or substitute for the mortgage loans identified in the Remedy Notices. Due to the unique and specific nature of mortgage loans intended for securitization, MBIA has no adequate remedy at law for redress of RFC's breaches of the representations and warranties with respect to the mortgage loans. Thus, MBIA is entitled to a judgment requiring RFC to specifically perform its obligations pursuant to the Loan Remedy Procedure.

79. As a result of RFC's failure to comply with its obligations under the Loan Remedy Breach Procedure with respect to the mortgage loans identified in the Remedy Notices, MBIA has incurred, and will continue to incur, damages in an amount to be proved at trial. MBIA has been, and will continue to be, required to make payments to investors as a result of shortfalls in cash flow to the trusts in the RFC Transactions. By failing to either cure the defective aspects of the non-compliant mortgage loans identified in the Remedy Notices or to repurchase or substitute those non-compliant mortgage loans, RFC is causing MBIA to incur payments for certain shortfalls in cash flows to investors when, in fact, such shortfalls should be properly paid by RFC as a result of RFC's repurchase or substitution of non-compliant mortgage loans. Thus, even if RFC ultimately repurchases or substitutes these non-compliant mortgage loans, MBIA has incurred and will continue to incur damages as a result of RFC's breaches. In addition, MBIA has incurred and will continue to incur significant fees for professional services,

including attorneys' fees, to engage in, and enforce RFC's obligations under, the Loan Breach Remedy Procedure with RFC.

80.    RFC also has not indemnified MBIA, pursuant to Section 3.03 of the Insurance Agreements for the damages it has incurred as a result of RFC's failure to comply with its obligations under the Loan Breach Remedy Procedure with respect to the mortgage loans identified in the Remedy Notices, including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred.

81.    MBIA has fully complied with its obligations under the Transaction Documents and the financial guarantee insurance policies with respect to the RFC Transactions.

82.    A justiciable controversy exists as to (a) RFC's obligation to comply with the Loan Breach Remedy Procedure with respect to the mortgage loans identified in the Remedy Notices and (b) MBIA's entitlement to damages as a result of RFC's breach of its representations and warranties and RFC's failure to comply with the Loan Breach Remedy Procedure with respect to the mortgage loans identified in the Remedy Notices. Accordingly, MBIA seeks a declaratory judgment that (a) RFC is required to repurchase the mortgage loans identified in the Remedy Notices, or, if substitution could be completed within two years of the respective closing dates of the RFC Transactions, substitute a performing, compliant mortgage loan to the mortgage loan pool and (b) RFC is required to indemnify MBIA for any and all damages it has as a result of RFC's breaches of its representations and warranties and RFC's failure to comply with the Loan Breach Remedy Procedure with respect to the mortgage loans identified in the Remedy Notices.

## CLAIM II
## (BREACH OF CONTRACT – GOOD FAITH AND FAIR DEALING)

83.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 82.

84.    Under the Insurance Agreements, the Purchase Agreements and the 2007-HSA2 Assignment Agreement, RFC is required to comply with the covenant or duty of good faith and fair dealing that is implied in all contracts.

85.    By entering into the Insurance Agreements with MBIA, which incorporated by reference the representations and warranties stated in the Purchase Agreements and the 2007-HSA2 Assignment Agreement, RFC agreed to act in good faith with respect to its contribution of mortgage loans to the mortgage loan pools underlying the RFC Transactions.

86.    RFC breached its implied covenant or duty of good faith and fair dealing. In that regard, RFC represented and warranted to MBIA that the mortgage loans contributed to the mortgage loan pools underlying the RFC Transactions were underwritten in substantial compliance with RFC's Underwriting Guidelines, among other representations and warranties. However, RFC, in bad faith, knowingly and systematically contributed mortgage loans to the mortgage loan pools underlying the RFC Transactions that RFC knew breached one or more of RFC's representations and warranties.  RFC further breached its implied covenant or duty of good faith and fair dealing by failing to employ mortgage loan servicing procedures consistent with mortgage loan servicing industry standards, and otherwise failing to comply with its obligations pursuant to the Transaction Documents, to service, in good faith, the mortgage loans for the RFC Transactions.

87.    RFC's breach of its implied covenant or duty of good faith and fair dealing deprived MBIA of its right to receive the full benefits of the Insurance Agreements by

compelling MBIA to make payments on insurance claims that would not have arisen but for RFC's bad faith conduct. Further, RFC, in bad faith, has denied MBIA reasonable access to information necessary to evaluate RFC's actions as servicers for the mortgage loans or to enforce MBIA's contractual rights in connection with the RFC Transactions .

88.     Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

89.     As a result of RFC's material breach of the implied covenant of good faith and fair dealing, MBIA has incurred, and will continue to incur, damages, including, without limitation, interest and reasonable attorneys' and accountants' fees and expenses. Because MBIA would not have issued the Policies if MBIA had known the true risk profile of the loan portfolios in the RFC Transactions, RFC is responsible for all losses incurred by MBIA whether or not such losses relate directly to non-compliant mortgage loans.

90.     MBIA has fully complied with its obligations under the Transaction Documents and the financial guarantee insurance policies with respect to the RFC Transactions.

91.     A justiciable controversy exists as to (a) whether RFC breached the covenant or duty of good faith and fair dealing implied in the Transaction Documents in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## CLAIM III
## (EQUITABLE INDEMNIFICATION)

92.     MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 91.

93. In connection with the RFC Transactions, RFC made representations and warranties to MBIA and provided information with respect to the mortgage loans contributed to the mortgage loan pools for the RFC Transactions to MBIA. RFC's representations and warranties were materially false. In reliance upon RFC's representations and warranties and other information with respect to the mortgage loans, MBIA issued the Policies in connection with the RFC Transactions.

94. RFC's breaches of its representations and warranties materially undermined and distorted the fundamental basis upon which MBIA agreed to issue the Policies for the RFC Transactions. Moreover, the substantial and hidden risks present in the RFC Transactions, which were hidden by RFC's representations and warranties and were pervasive to the mortgage loan pools for the RFC Transactions, have caused the mortgage loans in the RFC Transactions to default at a severe and unexpected rate, thus causing significant shortfalls in cash flows to investors in the RFC Transactions. Further, RFC's failure to minimize losses on the mortgage loans through normal and usual mortgage loan servicing procedures, and as otherwise required pursuant to the Transaction Documents, has exacerbated shortfalls to investors in the RFC Transactions and, accordingly, losses to MBIA.

95. Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

96. As a result of having issued the Policies, MBIA is contractually liable to the trusts, and, in that regard, the investors, in the RFC Transactions, to insure the payment of certain cash flows to the investors in the RFC Transactions in the event of shortfalls in the cash flows to the trust for the RFC Transactions.

97.     MBIA has paid and will continue to pay all insurance claims made in connection with the RFC Transactions pursuant to the terms of the Policies.

98.     MBIA, however, is in whole or in part, discharging a duty which is owed by MBIA to investors in the RFC Transactions pursuant to the Policies but which, as between MBIA and RFC, should in equity and good conscience be discharged by RFC because the Policies were procured based on RFC's providing MBIA materially false representations and warranties.

99.     MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial as a result of discharging a duty which is owed by MBIA to investors in the RFC Transactions but which, as between MBIA and RFC, should in equity and good conscience have been discharged by RFC.  Because MBIA would not have issued the insurance policies had it known the true risk profile of the loan portfolios in the RFC Transactions, RFC is responsible for all losses incurred by MBIA whether or not such losses relate directly to non-compliant mortgage loans.

100.    A justiciable controversy exists as to (a) whether RFC, in equity and good conscience, is liable for all insurance claims against MBIA and other losses incurred by MBIA with respect to the Policies issued by MBIA in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

**CLAIM IV**
**(UNJUST ENRICHMENT)**

101.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 100.

102.   MBIA has conferred a benefit on RFC by issuing the Policies with the reasonable expectation of receiving the full rights and value negotiated in connection with that benefit.

103.   RFC was unjustly enriched at MBIA's expense and equity and good conscience require RFC to compensate MBIA for the unjust benefit conferred on RFC. In that regard, had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

104.   If MBIA had not issued the Policies, RFC would have had to follow either of two courses of action:

  a.   RFC may have sold the securities issued in connection with the RFC Transactions without the Policies. In this scenario, RFC would have received a substantially lower amount from the sale of the securities than it did because the investors in the RFC Transactions would demand a discount in the purchase price of the securities to compensate for the additional, uninsured risk of shortfalls in cash flows; or

  b.   RFC may not have been able to consummate the RFC Transactions. In this scenario, RFC would not have sold the mortgage loans by means of the RFC Transactions. RFC may have sold the mortgage loans to another purchaser, possibly for a lesser purchase price. If RFC was unable to sell the mortgage loans, all of the losses with respect to the mortgage loans would have been borne by RFC, and only RFC. Further, if the RFC Transactions were not consummated, RFC and its affiliate would not have been entitled to servicing fees for servicing the mortgage loans in connection with the RFC Transactions.

105.   By improperly and unjustly inducing MBIA to issue the Policies as a result of its materially false representations and warranties, RFC was able to obtain payments under the Policies for investors in the RFC Transactions in the event of shortfalls of cash flows to the trusts for the RFC Transactions. Consequently, investors in the RFC Transactions were willing to pay more to RFC for securities issued in connection with the RFC Transactions

because of the presence of the MBIA insurance policies. Thus, RFC was able to receive a higher payment for the securities issued in connection with the RFC Transactions by causing the risk of liability for insuring certain cash flows for the RFC Transactions to pass to MBIA. Further, RFC earned servicing fees in connection with the servicing of the mortgage loans for the RFC Transactions while passing the risk of shortfalls in cash flows to investors in the RFC Transactions to MBIA. RFC earned these servicing fees despite failing to utilize good faith business judgment to employ its normal and usual mortgage loan servicing procedures, and otherwise comply with its obligations pursuant to the Transaction Documents, to service the mortgage loans for the RFC Transactions.

106. As a result of RFC's improper and unjust actions, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities.

107. As a result of RFC's improper and unjust actions, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

108. A justiciable controversy exists as to (a) whether RFC was unjustly enriched with respect to the Policies issued by MBIA in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

### CLAIM V
### (NEGLIGENT MISREPRESENTATION)

109. MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 108.

110. In connection with MBIA's issuance of the Policies, RFC had a duty to communicate accurate and complete information to MBIA.

111. RFC misrepresented existing material facts with respect to the RFC Transactions.

112. RFC possessed clear and reasonable grounds for believing or determining that its representations were materially false and should have known that its representations were materially false. Moreover, RFC knew or should have known that MBIA would rely on RFC's materially false representations. Accordingly, RFC acted either recklessly or negligently in making the materially false representations to MBIA with respect to the underwriting of the mortgage loans contributed to the mortgage loan pools for the RFC Transactions.

113. RFC knew or should have known that RFC's false representations were essential and material to MBIA's decision to issue the Policies in connection with the RFC Transactions. MBIA was not aware and could not reasonably have been aware of the falsity of RFC's representations.

114. MBIA reasonably relied to its detriment on RFC's misrepresentations. Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

115. As a proximate result of its reasonable reliance on RFC's negligent or reckless misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities.

116. As a result of RFC's negligent misrepresentations, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

117. A justiciable controversy exists as to (a) whether RFC made negligent or reckless misrepresentations to MBIA with respect to the Policies issued by MBIA in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## CLAIM VI
## (FRAUD)

118.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 117.

119.    In connection with MBIA's issuance of the Policies, RFC had a duty to communicate accurate and complete information to MBIA.

120.    RFC intentionally misrepresented existing material facts with respect to the RFC Transactions.

121.    RFC knew that its representations were materially false and that its false representations were essential and material to MBIA's decision to issue the Policies in connection with the RFC Transactions. MBIA was not aware and could not reasonably have been aware of the falsity of RFC's representations. Accordingly, RFC acted intentionally and purposefully in making the materially false representations to MBIA with respect to the RFC Transactions.

122.    Additionally, RFC intentionally and purposely misled MBIA by making representations with respect to the underwriting of the mortgage loans that were contributed to the mortgage loan pools underlying the RFC Transactions that RFC knew were untrue. RFC materially misrepresented to MBIA that the mortgage loans in the RFC Transactions were underwritten in substantial compliance with its Underwriting Guidelines and failed to disclose RFC's consistent violations and manipulations of its Underwriting Guidelines. RFC falsely misled MBIA into believing that RFC's Underwriting Guidelines employed appropriate underwriting standards.

123.    To the contrary, RFC underwrote mortgage loans by intentionally and consistently issuing improper "exceptions" to its Underwriting Guidelines, including by issuing

purported "exceptions" in connection with RFC's use of "negotiated commitments," "bulk purchase programs" and the use of Assetwise in blatant violation of the Underwriting Guidelines. RFC knew that the purported "exceptions" would cause the mortgage loans to fail to comply with its Underwriting Guidelines, yet knowingly contributed these non-compliant mortgage loans to the mortgage loan pools for the RFC Transactions notwithstanding their failure to comply with the Underwriting Guidelines. RFC knowingly defrauded MBIA by representing to MBIA that the mortgage loans contributed to the RFC Transactions were underwritten in substantial compliance with the Underwriting Guidelines.

124.   As a result of its knowing misrepresentations, RFC intended to, and, in fact, did defraud MBIA into issuing the Policies for the RFC Transactions. RFC defrauded MBIA so that it could earn both proceeds on the securitization and sale of the mortgage loans underlying the RFC Transactions and fees for servicing those loans after their securitization while passing the risks inherent in the poorly-underwritten mortgage loans to MBIA.

125.   MBIA reasonably relied to its detriment on RFC's misrepresentations. Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

126.   As a direct result of, and in reliance upon, RFC's misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities.

127.   As a result of RFC's fraud, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

128.   A justiciable controversy exists as to (a) whether RFC fraudulently induced MBIA to issue the Policies in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

### RELIEF DEMANDED

WHEREFORE, plaintiff MBIA Insurance Corporation demands judgment against defendant Residential Funding Company, LLC, as follows:

1. With respect to Claim I, a judgment (a) declaring that RFC has breached its obligations to comply with the Loan Breach Remedy Procedure with respect to the mortgage loans identified in the Remedy Notices and is required to repurchase non-compliant mortgage loans, or substitute compliant mortgage loans for non-compliant mortgage loans, identified by MBIA in the Remedy Notices; (b) requiring RFC to specifically perform its obligations under the Loan Breach Remedy Procedure by repurchasing mortgage loans, or substituting compliant mortgage loans for non-compliant mortgage loans, identified in the Remedy Notices and (c) awarding damages to MBIA for losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, losses relating to RFC's failure to comply with the Loan Breach Remedy Procedure, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, in an amount to be determined at trial; and

2. With respect to Claim II, a judgment (a) declaring that RFC has breached the covenant or duty of good faith and fair dealing implied in the Transaction Documents in connection with the RFC Transactions and must compensate MBIA for all losses incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, all losses resulting from RFC's failure to properly service the mortgage loans in the RFC Transactions, as well as, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate

-43-

directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

       3.     With respect to Claim III, a judgment (a) declaring that RFC is liable for all insurance claims against MBIA and must compensate MBIA for all losses incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) award damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, all losses resulting from RFC's failure to properly service the mortgage loans in the RFC Transactions, as well as, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

       4.     With respect to Claim IV, a judgment (a) declaring that RFC has been unjustly enriched with respect to the Policies issued by MBIA in connection with the RFC Transactions and must compensate MBIA for all losses incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, all losses resulting from RFC's failure to properly service the mortgage loans in the RFC Transactions, as well as, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate

USActive 14052133.10

directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

5.      With respect to Claim V, a judgment (a) declaring that RFC made negligent or reckless misrepresentations to MBIA with respect to the Policies issued by MBIA in connection with the RFC Transactions and must compensate MBIA for all losses incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

6.      With respect to Claim VI, a judgment (a) declaring that RFC fraudulently induced MBIA to issue the Policies in connection with the RFC Transactions and must compensate MBIA for all losses incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages (including punitive and consequential damages) to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly

to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

     7.     The full amount of MBIA's attorneys' fees and expenses with respect to this action; and

     8.     For such other relief, as the Court may deem just and proper.

Dated:      October 15, 2008


CADWALADER, WICKERSHAM & TAFT LLP

By:  _____
      Gregory M. Petrick (GP 2175)
      Jonathan M. Hoff (JH 7282)
      Mitchell E. Hochberg (MH 0602)
      One World Financial Center
      New York, New York 10281
      (212) 504-6000

      *Attorneys for Plaintiff*
      *MBIA Insurance Corporation*