# Exhibit 13



# TRACY WINKLER
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

```
ELECTRONICALLY FILED
December 9, 2011 03:59 PM
      TRACY WINKLER
     Clerk of Courts
  Hamilton County, Ohio
  CONFIRMATION 108924
```

**THE WESTERN AND SOUTHERN LIFE INSURANCE COMPANY**

vs.

**RESIDENTIAL FUNDING COMPANY LLC**

**A 1105042**

**JUDGE
BETH A MYERS**

## FILING TYPE:  MOTION

## PAGES FILED: 68

EFR200

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| THE WESTERN AND SOUTHERN LIFE INSURANCE COMPANY, et al., | : | CASE NO. A1105042 |
| | : | |
| Plaintiffs, | : | JUDGE BETH A. MYERS |
| | : | |
| v. | : | **ORAL ARGUMENT** |
| | : | **REQUESTED** |
| RESIDENTIAL FUNDING COMPANY, LLC, et al., | : | |
| | : | |
| Defendants. | : | |

## MOTION OF DEFENDANTS DEUTSCHE BANK SECURITIES INC. AND J.P. MORGAN SECURITIES LLC TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Pursuant to Ohio Rules of Civil Procedure 9(B) and 12(B)(6), defendant Deutsche Bank Securities Inc. ("DBS") and J.P. Morgan Securities LLC ("J.P. Morgan") move to dismiss Plaintiffs' Amended Complaint. Grounds for the Motion are provided in the accompanying Memorandum In Support.

Respectfully submitted,

Jeffrey A. Lipps  (0005541)
  Trial Attorney
Jennifer A. Battle (0085761)
Michael N. Beekhuizen (0065722)
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio  43215
Telephone:  (614) 365-4105
Facsimile:  (614) 365-9145
Lipps@CarpenterLipps.com
Battle@CarpenterLipps.com
Beekhuizen@CarpenterLipps.com

*Attorneys for Defendants Residential Funding Company, LLC, GMAC Mortgage, LLC, Residential Accredit Loans, Inc., Residential Asset Mortgage Products, Inc., Residential Funding Mortgage Securities I, Inc., Residential Funding Securities, LLC, Bruce J. Paradis, Davee L. Olson, David C. Walker, Kenneth M. Duncan, Ralph T. Flees, James G. Jones, David M. Bricker, Deutsche Bank Securities Inc., and J.P. Morgan Securities LLC*

2

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

**I.    Introduction.**

In the interest of judicial economy, J.P. Morgan and DBS join in, and incorporate by reference, the arguments in the motions to dismiss filed by the RFC Defendants and by defendants UBS Securities LLC and RBS Securities Inc.

J.P. Morgan and DBS write separately, however, to highlight additional arguments and issues particularly relevant to them.[1]  Generally, Plaintiffs contend that J.P. Morgan was the underwriter for only one, and DBS was the underwriter for only two, of the subject securitizations.  On their face, however, Plaintiffs' claims against J.P. Morgan and DBS are time-barred as a matter of law by the applicable five-year statute of repose and two-year statute of limitations. O.R.C. § 1707.43(B).

Furthermore, Plaintiffs' allegations as to J.P. Morgan and DBS are woefully inadequate. Plaintiffs do not bother identifying even *a single* affirmative representation purportedly made to them by J.P. Morgan or DBS.  Plaintiffs also cannot rely on any purported omissions because, under black-letter Ohio law, J.P. Morgan and DBS had no "duty to speak" as to Plaintiffs. Accordingly, in the absence of any affirmative representations, Plaintiffs' claims against J.P. Morgan and DBS must be dismissed as a matter of law.

But even assuming that Plaintiffs have pled affirmative representations attributable to J.P. Morgan and DBS – and Plaintiffs have not done so – any such representations are not actionable as a matter of law.  As with the other securitizations at issue in this case, Plaintiffs' allegations regarding purported misrepresentations are directly contradicted by the actual disclosures in the offering materials for the securitizations underwritten by J.P. Morgan and DBS.

---

[1]  There is no corporate affiliation between DBS and J.P. Morgan.  Their arguments are presented here jointly solely for the Court's convenience.

3

Lastly, Plaintiffs have failed to plead their claims with particularity and have failed to adequately plead critical elements of their claims, such as knowledge and materiality as to J.P. Morgan and DBS. Plaintiffs' claims against J.P. Morgan and DBS should therefore be dismissed in their entirety as a matter of law.

## II.    Background.

### A.    J.P. Morgan.

Plaintiffs allege that J.P. Morgan served as the underwriter for only one of the subject securitizations: GMAC 2007-HE1. See Amended Complaint ¶ 68 (page 22). Plaintiffs allege that GMAC Mortgage (one of the "RFC" Defendants) was the sponsor of this securitization. Plaintiffs do not allege that J.P. Morgan served any role in any of the remaining securitizations.

### B.    DBS.

Plaintiffs allege that DBS served as the underwriter for three of the subject securitizations. Amended Complaint ¶ 26. Plaintiffs, however, only specifically identify two securitizations purportedly involving DBS: RALI 2006-QS3 and RAMC 2007-1. See Amended Complaint ¶ 68. The "RALI" securitization relates to the RFC Defendants who, generally, are alleged to be the sponsors and/or depositors for those deals. The "RAMC" securitization, however, involves non-parties Delta Funding Corporation and Renaissance Mortgage Acceptance Corp., who allegedly originated and securitized the mortgage loans for RAMC 2007-1. See Amended Complaint ¶¶ 40-41.

### C.    Plaintiffs' Claims Against J.P. Morgan And DBS.

Plaintiffs have alleged five statutory causes of action against J.P. Morgan and DBS for purported violations of O.R.C. §§ 1707.41, 1707.43, and 1707.44. Plaintiffs also assert two

4

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

common law claims for civil conspiracy and common-law fraud. Plaintiffs' remaining claim for

negligent misrepresentation is not asserted against J.P. Morgan or DBS.

## III.   Plaintiffs' Claims Are Barred By The Statute Of Repose And The Statute Of Limitations.

### A.   J.P. Morgan: GMAC 2007-HE1.

Plaintiffs' claims against J.P. Morgan should be dismissed for the threshold reason that

they are barred by the applicable statute of limitations. O.R.C. § 1707.43(B) provides a two-year

statute of limitations that applies to all of Plaintiffs' claims. See RFC Defendants' Motion To

Dismiss at Section IV. Plaintiffs had constructive notice by March 2009 that the GMAC 2007-

HE1 securitization—the only securitization involving J.P. Morgan—was experiencing a 7.64%

delinquency rate. Id. at Section IV.B.2. Furthermore, the rating for GMAC 2007-HE1 was

downgraded on multiple occasions throughout 2008 and early 2009. See Ex. A.

Because Plaintiffs allege that these delinquency rates and rating downgrades were

sufficient to demonstrate a purported disregard of underwriting standards, Plaintiffs had

constructive notice of their claims no later than March 2009 – the very same time Plaintiffs' Vice

President was testifying to Congress regarding purported "rampant fraud" and "poor

underwriting standards" in the mortgage securitization industry. Id. at Section IV.B.1 & IV.B.3.

In other words, if delinquencies and rating downgrades are sufficient to serve as the basis for

Plaintiffs' claims, then the same information is sufficient to put Plaintiffs' on notice of those

claims.

Should any doubt remain, there were numerous media reports, government reports,

lawsuits and other publicly available sources throughout 2008 and early 2009 regarding

purported problems with residential mortgage-backed securities. See RBS/UBS Motion To

Dismiss at Section I.C. This included information specific to originators involved with the

ELECTRONICALLY FILED 12/09/2011 15:59 / MOTN / A 1105042 / CONFIRMATION NUMBER 108924

securitizations at issue in this lawsuit. Id. These publicly available sources of information also provided Plaintiffs with constructive notice of their claims. Plaintiffs, however, did not file the original Complaint until June 29, 2011, more than two years after the March 2009 delinquency rates, the March 2009 testimony of Western & Southern's Vice President, and the numerous public reports throughout 2008 and early 2009. Accordingly, Plaintiffs' claims against J.P. Morgan as to GMAC 2007-HE1 are time-barred as a matter of law. No further analysis is required to dismiss all of the claims against J.P. Morgan.

### B.    DBS: RALI 2006-QS3 And RAMC 2007-1.

Plaintiffs' claims against DBS are also time-barred by both the applicable statute of repose and the statute of limitations. Specifically, O.R.C. § 1707.43(B) provides a five-year statute of repose that applies to all of Plaintiffs' claims. See RFC Defendants' Motion To Dismiss at Section IV. Plaintiffs allege they purchased certificates for the RALI 2006-QS3 deal on March 30, 2006. See Amended Complaint at page 19. Applying the five-year statute of repose, Plaintiffs were required to file any claims relating to their purchase of RALI 2006-QS3 certificates on or before March 29, 2011. They filed their original complaint, however, on June 29, 2011 – three months after the statute of repose cutoff date. Accordingly, Plaintiffs' claims relating to RALI 2006-QS3 are time-barred as a matter of law by the five-year statute of repose.

Plaintiffs' claims relating to RAMC 2007-1, in turn, are barred by the applicable two-year statute of limitations. O.R.C. § 1707.43(B). Plaintiffs contend that twenty-four months after issuance, the delinquency rate for the RAMC 2007-1 deal reached 34.76%. The certificates for this deal were issued beginning in March 2007. Twenty-four months thereafter is March 2009. This delinquency rate – 34.76% – exceeds the maximum delinquency rate alleged by Plaintiffs with respect to seven of the subject securitizations, all of which Plaintiffs say confirms

6

the purported abandonment of underwriting standards. <u>See</u> Amended Complaint at pages 34-36. Furthermore, the RAMC 2007-1 rating was downgraded multiple times between December 2007 and March 2009. <u>See</u> Exs. B-F.

Accepting Plaintiffs' allegations as true for purposes of this motion, the 34.76% delinquency rate for the RAMC 2007-1 deal and the ratings downgrades provided Plaintiffs with constructive notice of their claims no later than March 2009 – again, the very same time Plaintiffs' Vice President was testifying to Congress regarding purported "rampant fraud" and "poor underwriting standards" in the mortgage securitization industry. And, as already noted, there were numerous public sources of information providing Plaintiffs with constructive notice of their claims. This information included the December 2007 bankruptcy of Delta Funding Corporation and Renaissance Mortgage Acceptance Corporation – the entities that allegedly originated and securitized the mortgage loans for RAMC 2007-1. <u>See</u> RBS/UBS Motion To Dismiss at Section I.C. ("Originator-Specific Information").

Despite having constructive notice no later than March 2009, Plaintiffs did not file any claims within the applicable two-year statute of limitations. In fact, Plaintiffs did not file any claims relating to RAMC 2007-1 until September 9, 2011, when they filed their Amended Complaint. Accordingly, Plaintiffs' claims as to RAMC 2007-1 are time-barred as a matter of law.[2]

## IV.  Plaintiffs Have Failed To Identify Any Affirmative Representations Purportedly Made By J.P. Morgan or DBS.

Plaintiffs' common-law fraud claim and claims under § 1707.44 also fail because Plaintiffs have not identified any affirmative representations made to them by J.P. Morgan or

---

[2]  Plaintiffs did not include any allegations relating to RAMC 2007-1 in their original complaint. Rather, Plaintiffs asserted claims relating to RAMC 2007-1 for the first time when they filed their Amended Complaint on September 9, 2011.

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

DBS. Plaintiffs, for example, expressly allege that the relevant representations regarding underwriting standards were made by the RFC Defendants or the "Renaissance" non-parties – not by J.P. Morgan or DBS. See, e.g., Amended Complaint at Section IV.A.1 & 3 (pages 27, 31). Furthermore, all of the affirmative representations cited by Plaintiffs are contained in the applicable offering materials. Plaintiffs expressly allege that it is the "Depositor" entities that had "responsibility for preparing the Offering Materials that were used to solicit the purchases of the Certificates"; that the "Depositors were responsible for registering the offerings with the SEC"; and that the "officers of the Depositors" were the ones who signed the registration statements publicly filed with the SEC. Amended Complaint ¶¶ 216, 218. J.P. Morgan and DBS, however, are not the "Depositor" for any of the subject transactions. In short, Plaintiffs have not identified any affirmative representations attributable to J.P. Morgan or DBS. Courts routinely dismiss misrepresentation claims where, as here, Plaintiffs are unable to identify any purported representations made by the defendants. See Williams v. U.S. Bank Shaker Square, 2008-Ohio-1414, ¶ 15 (8th App. Dt.) (dismissing fraud claim for failure to identify any representations by defendant).

Plaintiffs cannot avoid this problem by relying on purported omissions or failure to disclose. As the Ohio Supreme Court has made clear, sections 1707.44(B)(4) and (J) "prohibit only affirmative misrepresentation; they do not apply to fraudulent nondisclosure." State v. Warner, 55 Ohio St.3d 31, 52 (1990). While section 1707.44(G) can be based on an alleged failure to disclose, there must be "a duty to speak" before liability exits. Id. at 54. Plaintiffs' common law claims likewise cannot be based on a failure to disclose unless there is a duty to speak. See id.; see also Federated Management Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 383-384 (10th App. Dt. 2000) (duty to speak required for fraud claim).

8

A duty to speak, in turn, exists only "when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" Warner at 54 (citations omitted; alteration in original). No such fiduciary relationship exists where the parties entered into an arm's length transaction. Steinfels v. Ohio Dep't of Commerce, Div. of Securities, 129 Ohio App.3d 800, 807 (10th App. Dt. 1998) (dismissing claim under section 1707.44(G)); see also Federated at 383-384 (finding no duty to disclose existed as to potential investors).

Here, Plaintiffs do not allege any fiduciary relationship with J.P. Morgan or DBS, nor could they. Accordingly, Plaintiffs cannot base their claims on any purported "omission" or "failure to disclose" any purported facts. Given the absence of any affirmative representations made by J.P. Morgan or DBS, Plaintiffs' common-law fraud claim and § 1707.44 claims against fail as a matter of law.[3]

## V.    Plaintiffs Have Not Alleged Any Actionable Representations As To J.P. Morgan And DBS.

Even if Plaintiffs had alleged representations that are somehow attributable to DBS or JP Morgan – and they have not – none of those representations are actionable. To the contrary, Plaintiffs' claims are based on non-actionable statements of future intent or statements of opinion. See RFC Defendants' Motion To Dismiss at Section VI.

And, as with the other securitizations in this case, the offering materials for the securitizations allegedly underwritten by J.P. Morgan and DBS contain disclosures, which directly contradict Plaintiffs' allegations. Specifically, the GMAC 2007-HE1 and RALI 2006-

---

[3]    To the extent Plaintiffs purport to base their §§ 1707.41 and 1707.43 claims on affirmative representations by J.P. Morgan or DBS, those claims likewise fail given the lack of any such representations. Furthermore, J.P. Morgan and DBS are unaware of any case involving Ohio Securities Act (or Ohio common law) claims, in which the court attributed to underwriters responsibility for making the representations contained in offering materials such as those in this case. This Court should decline Plaintiffs' invitation to expand Ohio law in such an unprecedented manner.

9

QS3 (allegedly underwritten by J.P. Morgan and DBS, respectively) are alleged to be RFC

Defendant securitizations.    As discussed in the RFC Defendants' Motion To Dismiss, the

disclosures in the offering materials for those transactions directly contradict Plaintiffs'

allegations regarding purported misrepresentations.    Plaintiffs' claims with respect to GMAC

2007-HE1 and RALI 2006-QS3 should therefore be dismissed as a matter of law.    See RFC

Defendants Motion To Dismiss at Section V.

The remaining transaction allegedly underwritten by DBS (RAMC 2007-1) involves non-

parties Delta Funding Corporation and Renaissance Mortgage Acceptance Corp.    See Amended

Complaint ¶¶ 40-41.    The offering material disclosures for RAMC 2007-1 are similar to the RFC

Defendant securitizations in relevant part, and likewise refute Plaintiffs' various alleged

categories of misrepresentations:

- **Purported Abandonment Of Underwriting Standards.** There is no representation that
all loans would satisfy all underwriting guidelines.    Rather, the RAMC 2007-1 Prospectus

explicitly states that "we may determine that the prospective borrower warrants an exception

from the guidelines if sufficient compensating facts exist."    See RAMC 2007-1 Prospectus at 8

(excerpts attached as Ex. G).

- **Transfer Of Title.** DBS would not have been involved in transferring title of the loans,
and Plaintiffs do not allege otherwise.    In any event, contrary to Plaintiffs' assertion, there are no

blanket representations in the offering materials that title would be transferred to the trustee or

that assignments would be recorded.    Rather, the Prospectus Supplement expressly states that

mortgage documents would be delivered to the trustee "or the Custodian."    See Ex. G. at S-108;

see also id. at 32.    The Prospectus Supplement also states that "in lieu of providing the duly

executed assignment . . . the Seller may at its discretion provide evidence that the related

10

mortgage is held through the MERS® System." See id. at S-108. In short, Plaintiffs' allegations regarding transfer of title are directly contradicted by the actual disclosures in the offering materials.

- **Ratings Process.** Plaintiffs say that the loan profiles provided to the ratings agencies were false. Amended Complaint at p. 72. Again, DBS would have played no role in providing loan profiles to the rating agencies and Plaintiffs do not allege otherwise.

- **Appraisals.** DBS was not responsible for appraising the properties underlying the RAMC 2007-1 deal. In any event, the Prospectus Supplement discloses that, when appraisals are used, "we require that they be performed by third-party, fee-based appraisers[.]" See Ex. G at 9. There are no specific allegations demonstrating that this statement was not true with respect to the mortgages in the RAMC 2007-1 deals.

- **Loan To Value Ratios**. The Prospectus Supplement expressly discloses that "we generally adjust our . . . LTV ratios based on many other risk parameters." See Ex. G at 9. Plaintiffs do not allege that their purported re-calculation of LTV takes into consideration such risk parameters.

The RAMC 2007-1 Prospectus Supplement also discloses that automated valuation models were used for certain loans (exactly as Plaintiffs have purportedly done) and also expressly represented that "there can be no assurance that the LTV . . . of any Mortgage Loan determined at any time after origination is less than or equal to its original LTV[.]" See Ex. G at S-22, 10. Accordingly, Plaintiffs' purported after-the-fact re-calculation of LTV ratios is simply irrelevant.

- **Owner Occupancy Status.** The Prospectus Supplement discloses that occupancy type was determined "[b]ased upon representations made by the borrowers at the time of the

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

Mortgage Loans origination." See Ex. G at S-31. There is no allegation that these borrower representations were not accurately reported in the Prospectus Supplement. See Footbridge Ltd. v. Countrywide Home Loans, Inc., 2010 U.S. Dist. LEXIS 102134 at at *25-26 (S.D.N.Y. Sept. 28, 2010) ("The [complaint] does not allege that the [borrower occupancy status] percentages reported in the [offering materials] are inaccurate representations of the data received from borrowers"). Plaintiffs' use of an alternative method to purportedly determine occupancy status does not render this disclosure fraudulent.

Furthermore, Plaintiffs also do not contend that the alternative method they purportedly used somehow determined occupancy status "at the time" the mortgages were originated. Again, Plaintiffs' allegations are simply irrelevant and are contradicted by the actual disclosures in the offering materials. Accordingly, as with the other securitizations, Plaintiffs' allegations regarding purported misrepresentations as to RAMC 2007-1 should be dismissed as a matter of law.

## VI.    Additional Grounds Support Dismissal Of Plaintiffs' Claims As To J.P. Morgan And DBS.

### A.    Plaintiffs Have Failed To Allege The Requisite Knowledge And Materiality Elements Of Their Claims.

Plaintiffs' claims should also be dismissed for failure to plead the requisite knowledge and materiality elements as to J.P. Morgan and DBS. Plaintiffs' common-law fraud claim, for example, requires allegations of knowledge of falsity, intent to deceive, and materiality. See Williams v. U.S. Bank Shaker Square, 2008-Ohio-1414, ¶ 14 (8th App. Dt.) (describing elements of fraud claim; citing cases); Federated Management Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 383-384 (10th App. Dt. 2000) (same). Plaintiffs' statutory claims likewise require knowledge, intent to deceive, and materiality:

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

- Plaintiffs' First Cause of Action is based on O.R.C. § 1707.41(A). It provides for liability to "any person that purchased the security *relying* on the circular, prospectus, or advertisement, *for the loss or damage sustained* by the relying person *by reason of the falsity of any material statement* contained therein . . . ." ("Emphasis added).

- Plaintiffs' Second Cause of Action is based on O.R.C. § 1707.44(B)(4). This statutory section provides that "No person shall *knowingly* make or cause to be made any false representation concerning a *material* and relevant fact . . . ." (Emphasis added).

- Plaintiffs' Third Cause of Action is based on O.R.C. § 1707.44(J). This statutory section provides that "No person, *with purpose to deceive*, shall make . . . any statement . . . as to the value of securities . . . when the person *knows* that the statement or advertisement is false in any *material* respect." (Emphasis added).

- Plaintiffs' Fourth Cause of Action is based on O.R.C. § 1707.44(G). This statutory section provides that "No person in purchasing or selling securities shall *knowingly* engage in any act or practice that is, in this chapter, declared illegal, *defined as fraudulent*, or prohibited." (Emphasis added).

- Plaintiffs' Fifth Cause of Action is based on O.R.C. § 1707.43. It provides that the sale of securities "is voidable at the election of the purchaser" for "every sale or contract for sale made in violation of Chapter 1707[.]" In other words, it does not provide an independent basis for recovery, but rather is dependent on the purported violations of Chapter 1707 alleged in Plaintiffs' First through Fourth causes of action. By its express terms, it also only applies to "material" violations. Id.

Noticeably, Plaintiffs have failed to plead these required elements with particularity as to J.P. Morgan or DBS. Plaintiffs, for example, merely allege, without any supporting facts, that the "Underwriters" were "responsible for underwriting and managing the sale of the Certificates, including screening the mortgage loans for compliance with the appropriate guidelines." Amended Complaint ¶ 219. Plaintiffs further allege, again without any supporting facts, that the "Underwriter Defendants were aware that proper due diligence would have revealed the misrepresentations, but they nevertheless failed to conduct adequate due diligence or consciously disregarded the misstatements in the Offering Materials." Id. ¶ 223.

Plaintiffs, however, are not entitled to lump all the defendants together in this manner. Rather, Plaintiffs were required to plead their claims with particularity by alleging, among other

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

things, "the time, place, and content of the false representation; the fact misrepresented; [and] the identification of the individual giving the false representation[.]" Hamblin v. Daugherty, 2007-Ohio-5893, ¶ 20 (9th App. Dt.); see also Reinglass v. Morgan Stanley Dean Witter, Inc., 2006 Ohio 1542 2006-Ohio-1542 (8th App. Dt.) (same). Plaintiffs must also allege particularized facts showing that J.P. Morgan and DBS (as opposed to "Defendants" generally) acted with the requisite knowledge and intent to deceive. See Galloway v. Lorimar Motion Picture Management, Inc., 55 Ohio App. 3d 78, 82 (5th App. Dt. 1989) ("conclusory allegations" of intent to defraud not sufficient to satisfy Rule 9(b)). Despite the fact that their Amended Complaint includes 277 paragraphs and spans more than 100 pages, Plaintiffs have not bothered to plead particularized facts demonstrating the requisite knowledge of J.P. Morgan or DBS.

Similarly, Plaintiffs have not pled the requisite materiality of any alleged representations with sufficient particularity. As already discussed, J.P. Morgan and DBS did not make any affirmative representations to Plaintiffs. Indeed, the offering materials contain ***no representations whatsoever*** regarding the underwriters' purported "due diligence" or "screening" of mortgage loans for compliance with underwriting guidelines. Accordingly, any such purported "due diligence" could not have been material to Plaintiffs for purposes of their claims in this lawsuit. Conclusory allegations to the contrary are not sufficient to support Plaintiffs' claims. Mitchell v. Lawson Milk Company, 40 Ohio St. 3d 190, 193 (1988) ("Unsupported conclusions . . . are not taken as admitted by a motion to dismiss and are not sufficient to withstand such a motion"). [4]

---

[4]  As already discussed, J.P. Morgan and DBS had no "duty to speak" because there is no fiduciary relationship between them and Plaintiffs. Accordingly, there was no obligation for them to conduct "adequate" due diligence – whatever Plaintiffs believe that may be – let alone to disclose any such due diligence results to Plaintiffs.

14

Lastly, the materiality of any representations (made by other defendants) would be negated by the extensive warnings and disclosures contained in the subject offering materials. See RFC Defendants' Motion To Dismiss at Section VII.D; RBS/UBS Motion To Dismiss at Section II.D. Plaintiffs' claims should therefore be dismissed as a matter of law.

### B.    Plaintiffs Cannot Rely On Other Purported Investigations.

The only specific allegations in the Amended Complaint regarding J.P. Morgan and DBS involve purported findings of Clayton Holdings presented to the Financial Crisis Inquiry Commission ("FCIC"). See Amended Complaint ¶¶ 226, 227. The referenced findings were presented to the FCIC through written testimony on September 23, 2010. See Testimony (attached as Ex. H). Clayton Holdings is one of several firms in the securitization industry that participated in the due diligence process by reviewing a sample of loans for compliance with underwriting guidelines. See id. at 2. Plaintiffs contend that Clayton Holdings' testimony demonstrates J.P. Morgan and DBS permitted exceptions and "waived in" certain mortgage loans that Clayton Holdings had "rejected as outside underwriting guidelines." Amended Complaint ¶¶ 226, 227.

This FCIC testimony is irrelevant for several reasons. First, Plaintiffs cannot satisfy their burden to plead with particularity by relying on other investigations. See RFC Defendants' Motion at Section V.G. Second, there is no allegation that Clayton Holdings was involved with any of the specific deals at issue in this case: Nothing in the testimony refers specifically to any loans underlying the securitizations involving J.P Morgan or DBS. Consequently, Clayton Holding's purported findings regarding securitizations generally are simply irrelevant. See, e.g., Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., 2011 U.S. Dist. LEXIS 110601 at *14 (S.D.N.Y. Sept. 28, 2011) (dismissing fraud and negligent misrepresentation claims against

15

Goldman Sachs, with prejudice, because, among other reasons, the complaint "fail[ed] to allege any connection between the mortgages reviewed in the Clayton Report and those collateralizing" the security at issue).

Third, Plaintiffs fail to inform this Court what the Clayton Holdings testimony actually says. Clayton Holdings explained to the FCIC that its "exception numbers should not be viewed in isolation." Testimony at 7. Specifically, it warned that "Exceptions must be reviewed in conjunction with the corresponding underwriting guidelines and client tolerances." Id. Clayton Holdings explained that a finding of non-compliance with underwriting guidelines (*i.e.*, graded as "EV-3") does not mean "that a loan is bad and is not likely to perform." Id. And it expressly warned that "it may not be possible to draw an 'apples to apples' comparison of deals from different clients and/or different sellers." Id. Clayton Holdings also explained that exceptions to underwriting guidelines can be "benign, such as a debt to income ratio exception of less than 5%[.]" Id. at 6. In light of this actual testimony to the FCIC, Plaintiffs' allegations regarding Clayton Holdings are wholly irrelevant and cannot satisfy Plaintiffs' burden to plead their claims with particularity.[5]

## VII.   Conclusion.

For the foregoing reasons, this Court should dismiss Plaintiffs' claims against J.P. Morgan and DBS in their entirety with prejudice.

---

[5]  J.P. Morgan and DBS also join the arguments of defendants RBS and UBS regarding the inapplicability of the Ohio Securities Act to the claims of Plaintiff National Integrity Life Insurance Company ("National Integrity"), a New York corporation. See RBS/UBS Motion To Dismiss at Section VI. The Ohio Securities Act only applies to securities transactions within Ohio. Here, Plaintiffs' Amended Complaint contains no allegations indicating that the "offer, sale, and purchase" of the subject securities occurred within Ohio. Because the Amended Complaint fails to plead that the sale of securities to National Integrity, a New York corporation, occurred within Ohio, National Integrity's Ohio Securities Act claims should be dismissed as a matter of law. J.P. Morgan and DBS reserve the right to challenge the applicability of the Ohio Securities Act to the remaining Ohio plaintiffs following development of the factual record regarding the location of the subject transactions.

16

Respectfully submitted,

Jeffrey A. Lipps  (0005541)
  Trial Attorney
Jennifer A. Battle (0085761)
Michael N. Beekhuizen  (0065722)
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio  43215
Telephone:  (614) 365-4105
Facsimile:  (614) 365-9145
Lipps@CarpenterLipps.com
Battle@CarpenterLipps.com
Beekhuizen@CarpenterLipps.com

*Attorneys for Defendants Residential Funding Company, LLC, GMAC Mortgage, LLC, Residential Accredit Loans, Inc., Residential Asset Mortgage Products, Inc., Residential Funding Mortgage Securities I, Inc., Residential Funding Securities, LLC, Bruce J. Paradis, Davee L. Olson, David C. Walker, Kenneth M. Duncan, Ralph T. Flees, James G. Jones, David M. Bricker, Deutsche Bank Securities Inc., RBS Securities Inc. and J.P. Morgan Securities LLC*

17

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing MOTION OF DEFENDANTS DBS SECURITIES

INC. AND J.P. MORGAN SECURITIES LLC TO DISMISS PLAINTIFFS' AMENDED

COMPLAINT was served on the 9th day of December, 2011 via e-mail on:

Glenn V. Whitaker
Eric W. Richardson
Adam C. Sherman
Erik B. Bond
Vorys, Sater, Seymour and Pease, LLP
Suite 2000, Atrium Two
221 East Fourth Street
Cincinnati, Ohio 45202

David H. Wollmuth (*pro hac vice*)
Vincent T. Chang (*pro hac vice*)
Steven S. Fitzgerald (*pro hac vice*)
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110

*Attorneys for Plaintiffs The Western and
Southern Life Insurance Company, Western-
Southern Life Assurance Company, Columbus
Life Insurance Company, Integrity Life
Insurance Company, National Integrity Life
Insurance Company and Fort Washington
Investment Advisors, Inc.*

Robert A. Pitcairn, Jr.
Laura A. Hinegardner
Katz Teller Brant & Hild
255 East 5th Street, Suite 2400
Cincinnati, OH 45202-4724

Alan Turner
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017-3954

*Attorneys for UBS Securities LLC and RBS
Securities Inc.*

Pierre H. Bergeron
Squire Sanders & Dempsey LLP
221 E. Fourth St., Suite 2900
Cincinnati, OH 45202

Robin A. Henry
Motty Shulman
James Ostaszewski
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, New York 10504

*Attorneys for BNP Paribas Mortgage
Corporation and BNP Paribas Mortgage
Securities LLC*

Christine M. Haaker
Thompson Hine LLP
Austin Landing I
10050 Innovation Drive, Suite 400
Dayton, Ohio, 45342-4934

Susanna M. Buergel
Caitlin E. Grusauskas
Paul, Weiss, Rifkind, Wharton &
 Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

*Attorneys for Citigroup Global Markets Inc.*

18

One of the Attorneys for Defendants Residential
Funding Company, LLC, GMAC Mortgage, LLC,
Residential Accredit Loans, Inc., Residential Asset
Mortgage Products, Inc., Residential Funding
Mortgage Securities I, Inc., Residential Funding
Securities, LLC, Bruce J. Paradis, Davee L. Olson,
David C. Walker, Kenneth M. Duncan, Ralph T.
Flees, James G. Jones, David M. Bricker, Deutsche
Bank Securities Inc., and J.P. Morgan Securities
LLC

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

# EXHIBIT A

```
<HELP> for explanation, <MENU> for similar functions.          Mtge  RCHG
25<GO>Setup Rating Change Alert
                          RATING  CHANGES
                        GMACM 2007-HE1 A2
```

CUSIP: 36186KAB1                                    5.621%   8/25/2037
ABS:  CSTR,AFC,AS                                   Issued:  3/29/2007

Agencies

| Agency | Rating Type | Rating | Effective Date |
|---|---|---|---|
| Standard & Poor's | Long Term | B (sf) | 1/14/2011 |
| Moody's | Long Term | B3*- | 3/18/2010 |
| Standard & Poor's | Long Term | BB+ (sf) | 10/14/2009 |
| Moody's | Long Term | B3 (sf) | 7/15/2009 |
| Standard & Poor's | Long Term | BBB | 6/16/2009 |
| Standard & Poor's | Long Term | BBB+ | 2/19/2009 |
| Moody's | Long Term | Baa3 | 2/18/2009 |
| Moody's | Long Term | Baa1 | 11/16/2008 |
| Moody's | Long Term | A2*- | 9/18/2008 |
| Standard & Poor's | Long Term | AA | 8/15/2008 |
| Moody's | Long Term | A2 | 6/19/2008 |
| Standard & Poor's | Long Term | AA*- | 6/06/2008 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2011 Bloomberg Finance L.P.
                                          SN 632905 EST  GMT-5:00 G622-94-0 09-Dec-2011 14:14:11

<HELP> for explanation, <MENU> for similar functions.          Mtge  **RCHG**
Screen Printed

# RATING CHANGES
### GMACM 2007-HE1 A2

CUSIP: 36186KAB1                                    5.621%    8/25/2037
ABS:   CSTR,AFC,AS                                 Issued:   3/29/2007


Agencies

| Agency | Rating Type | Rating | Effective Date |
|---|---|---|---|
| Moody's | Long Term | Baa1 | 11/16/2008 |
| Moody's | Long Term | A2*- | 9/18/2008 |
| Standard & Poor's | Long Term | AA | 8/15/2008 |
| Moody's | Long Term | A2 | 6/19/2008 |
| Standard & Poor's | Long Term | AA*- | 6/06/2008 |
| Moody's | Long Term | Aaa*- | 6/04/2008 |
| Moody's | Long Term | Aaa | 2/26/2008 |
| Standard & Poor's | Long Term | AAA | 2/26/2008 |
| Standard & Poor's | Long Term | AAA*- | 2/04/2008 |
| Moody's | Long Term | Aaa*- | 1/17/2008 |
| Moody's | Long Term | Aaa | 4/19/2007 |
| Standard & Poor's | Long Term | AAA | 4/03/2007 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2011 Bloomberg Finance L.P.
SN 632905 EST  GMT-5:00 G622-94-0 09-Dec-2011 14:14:24

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

# EXHIBIT B

## MOODY'S
### INVESTORS SERVICE

**Rating Action:** Moody's downgrades Renaissance subprime deals issued in 2007

Global Credit Research - 10 Dec 2007

New York, December 10, 2007 -- Moody's Investors Service has downgraded the ratings of 12 tranches and placed on review for possible downgrade the ratings of one tranche issued by Renaissance Home Equity Loan Trust in 2007. The collateral backing these classes consists of primarily first lien, fixed and adjustable-rate, subprime mortgage loans.

In its analysis, Moody's has combined its published methodology updates as of July 13th, 2007 to the non delinquent portion of the transactions. Collateral backing these transactions is also experiencing higher than anticipated rates of delinquency, foreclosure, and REO relative to credit enhancement levels.

Complete list of Rating Actions:

Issuer: Renaissance Home Equity Loan Trust 2007-1

Cl. M-3 Currently Aa3 on review for possible downgrade,

Cl. M-4, Downgraded to A3, previously A1,

Cl. M-5, Downgraded to Baa2, previously A2,

Cl. M-6, Downgraded to Ba2, previously A3,

Cl. M-7, Downgraded to B2, previously Baa1,

Cl. M-8, Downgraded to Ca, previously Baa2,

Cl. M-9, Downgraded to C, previously Baa3.

Issuer: Renaissance Home Equity Loan Trust 2007-2

Cl. M-4, Downgraded to A2, previously A1,

Cl. M-5, Downgraded to Baa1, previously A2,

Cl. M-6, Downgraded to Baa3, previously A3,

Cl. M-7, Downgraded to Ba3, previously Baa1,

Cl. M-8, Downgraded to B3, previously Baa2,

Cl. M-9, Downgraded to Ca, previously Baa3.

For more information see www.Moodys.com

New York
Nicolas S. Weill
Managing Director - Chief Credit Officer
Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

New York
Joseph Rocco
Associate Analyst
Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653



## MOODY'S
### INVESTORS SERVICE

© 2011 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT

OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources Moody's considers to be reliable, including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness or a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make

any investment decision based on this credit rating. If in doubt you should contact your financial or other professional
adviser.

# EXHIBIT C



## MOODY'S
### INVESTORS SERVICE

**Rating Action:** Moody's Downgrades Certain Renaissance Subprime RMBS

Global Credit Research - 18 Apr 2008

New York, April 18, 2008 -- Moody's Investors Service has downgraded the ratings of 61 tranches from 8 subprime RMBS transactions issued by Renaissance. 20 downgraded tranches remain on review for possible further downgrade. The collateral backing these transactions consists primarily of first-lien, fixed and adjustable-rate, subprime residential mortgage loans.

The ratings were downgraded, in general, based on higher than anticipated rates of delinquency, foreclosure, and REO in the underlying collateral relative to credit enhancement levels. The actions described below are a result of Moody's on-going surveillance process.

Complete rating actions are as follows:

Issuer: Renaissance Home Equity Loan Trust 2005-3

Cl. M-5, Downgraded to Baa1 from A2

Cl. M-6, Downgraded to Baa3 from A3

Cl. M-7, Downgraded to B1 from Baa1

Cl. M-8, Downgraded to B2 from Baa2; Placed Under Review for further Possible Downgrade

Cl. M-9, Downgraded to Caa1 from Baa3

Issuer: Renaissance Home Equity Loan Trust 2005-4

Cl. M-6, Downgraded to Baa2 from A3

Cl. M-7, Downgraded to Ba2 from Baa1

Cl. M-8, Downgraded to B1 from Baa2; Placed Under Review for further Possible Downgrade

Cl. M-9, Downgraded to B2 from Baa3; Placed Under Review for further Possible Downgrade

Issuer: Renaissance Home Equity Loan Trust 2006-1

Cl. M-4, Downgraded to A2 from A1

Cl. M-5, Downgraded to Baa3 from A2

Cl. M-6, Downgraded to B1 from A3

Cl. M-7, Downgraded to B2 from Baa1; Placed Under Review for further Possible Downgrade

Cl. M-8, Downgraded to B3 from Baa2; Placed Under Review for further Possible Downgrade

Cl. M-9, Downgraded to Caa1 from Baa3

Cl. M-10, Downgraded to Caa2 from Ba1

Issuer: Renaissance Home Equity Loan Trust 2006-2

Cl. M-3, Downgraded to A2 from Aa3

Cl. M-4, Downgraded to Baa2 from A1

Cl. M-5, Downgraded to B1 from A2

Cl. M-6, Downgraded to B1 from A3; Placed Under Review for further Possible Downgrade

Cl. M-7, Downgraded to B2 from Baa2; Placed Under Review for further Possible Downgrade

Cl. M-8, Downgraded to B3 from Baa3; Placed Under Review for further Possible Downgrade

Cl. M-9, Downgraded to Caa1 from Ba1

Cl. M-10, Downgraded to Caa2 from Ba3

Issuer: Renaissance Home Equity Loan Trust 2006-3

Cl. M-1, Downgraded to A3 from Aa1

Cl. M-2, Downgraded to B1 from Aa2

Cl. M-3, Downgraded to B1 from Aa3; Placed Under Review for further Possible Downgrade

Cl. M-4, Downgraded to B2 from A1; Placed Under Review for further Possible Downgrade

Cl. M-5, Downgraded to B3 from A3; Placed Under Review for further Possible Downgrade

Cl. M-6, Downgraded to Caa1 from Baa2

Cl. M-7, Downgraded to Caa2 from Ba1

Cl. M-8, Downgraded to Caa3 from Ba2

Cl. M-9, Downgraded to Caa3 from B1

Issuer: Renaissance Home Equity Loan Trust 2006-4

Cl. M-1, Downgraded to Aa3 from Aa1

Cl. M-2, Downgraded to Baa3 from Aa2

Cl. M-3, Downgraded to B1 from Aa3; Placed Under Review for further Possible Downgrade

Cl. M-4, Downgraded to B2 from A2; Placed Under Review for further Possible Downgrade

Cl. M-5, Downgraded to B3 from A3; Placed Under Review for further Possible Downgrade

Cl. M-6, Downgraded to Caa1 from Baa1

Cl. M-7, Downgraded to Caa2 from Baa3

Cl. M-8, Downgraded to Caa3 from Ba1

Cl. M-9, Downgraded to Caa3 from Ba2

Issuer: Renaissance Home Equity Loan Trust 2007-1

Cl. AV-3, Downgraded to Aa3 from Aaa

Cl. AF-6, Downgraded to Aa2 from Aaa

Cl. M-1, Downgraded to Baa3 from Aa1

Cl. M-2, Downgraded to B1 from Aa2

Cl. M-3, Downgraded to B1 from Aa3; Placed Under Review for further Possible Downgrade

Cl. M-4, Downgraded to B2 from A3; Placed Under Review for further Possible Downgrade

Cl. M-5, Downgraded to B3 from Baa2; Placed Under Review for further Possible Downgrade

Cl. M-6, Downgraded to Caa1 from Ba2

Cl. M-7, Downgraded to Caa2 from B2

Issuer: Renaissance Home Equity Loan Trust 2007-2

Cl. AV-3, Downgraded to Aa3 from Aaa

Cl. AF-6, Downgraded to Aa3 from Aaa

Cl. M-1, Downgraded to Ba1 from Aa1

Cl. M-2, Downgraded to B1 from Aa2

Cl. M-3, Downgraded to B1 from Aa3; Placed Under Review for further Possible Downgrade

Cl. M-4, Downgraded to B2 from A2; Placed Under Review for further Possible Downgrade

Cl. M-5, Downgraded to B3 from Baa1; Placed Under Review for further Possible Downgrade

Cl. M-6, Downgraded to Caa1 from Baa3

Cl. M-7, Downgraded to Caa2 from Ba3

Cl. M-8, Downgraded to Caa3 from B3

A list of these actions including CUSIP identifiers may be found at:

PDF: http://www.moodys.com/cust/getdocumentByNotesDocId.asp?criteria=PBS_SF129796

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

Excel: http://www.moodys.com/cust/getdocumentByNotesDocId.asp?criteria=PBS_SF129797

For more information please see www.moodys.com.

New York
Navneet Agarwal
VP - Senior Credit Officer
Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

New York
Joseph Rocco
Associate Analyst
Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653



**MOODY'S**
INVESTORS SERVICE

© 2011 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources Moody's considers to be reliable, including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness or a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.

# EXHIBIT D

# Moody's
### INVESTORS SERVICE

**Rating Action:** Moody's Downgrades Certain Renaissance Subprime RMBS

Global Credit Research - 28 Oct 2008

New York, October 28, 2008 -- Moody's Investors Service has downgraded the ratings of 99 tranches from 11 subprime RMBS transactions issued by Renaissance. Additionally, four ratings were confirmed after previously being on review for possible further downgrade. The collateral backing these transactions consists primarily of first-lien, fixed and adjustable-rate, subprime residential mortgage loans.

These actions follow and are as a result of Moody's September 18th 2008 announcement that it had updated its loss projections on first-lien subprime RMBS. (See Moodys.com for the report: Subprime RMBS Loss Projection Update: September 2008 for details)

Complete rating actions are as follows:

Issuer: Renaissance Home Equity Loan Trust 2005-1

Cl. M-3, Downgraded to A1 from Aa3

Cl. M-4, Downgraded to A2 from A1

Cl. M-5, Downgraded to Baa1 from A2

Cl. M-6, Downgraded to Baa2 from A3

Cl. M-7, Downgraded to Baa3 from Baa1

Cl. M-8, Downgraded to Ba3 from Ba1

Cl. M-9, Downgraded to Ca from Ba3

Issuer: Renaissance Home Equity Loan Trust 2005-2

Cl. M-3, Downgraded to A2 from Aa3

Cl. M-4, Downgraded to Baa2 from A1

Cl. M-5, Downgraded to Baa3 from A2

Cl. M-6, Downgraded to Ba3 from A3

Cl. M-7, Downgraded to B2 from Baa1

Cl. M-8, Downgraded to Ca from Ba1

Cl. M-9, Downgraded to Ca from Ba3

Issuer: Renaissance Home Equity Loan Trust 2005-3

Cl. M-8, Confirmed at B2

Cl. M-9, Downgraded to Ca from Caa1

Issuer: Renaissance Home Equity Loan Trust 2005-4

Cl. M-4, Downgraded to A2 from A1

Cl. M-5, Downgraded to Baa2 from A2

Cl. M-6, Downgraded to Ba1 from Baa2

Cl. M-7, Downgraded to B2 from Ba2

Cl. M-8, Downgraded to Caa2 from B1

Cl. M-9, Downgraded to C from B2

Issuer: Renaissance Home Equity Loan Trust 2006-1

Cl. M-2, Downgraded to Aa3 from Aa2

Cl. M-3, Downgraded to A3 from Aa3

Cl. M-4, Downgraded to Baa2 from A2

Cl. M-7, Downgraded to Caa2 from B2

Cl. M-8, Downgraded to C from B3

Cl. M-9, Downgraded to C from Caa1

Cl. M-10, Downgraded to C from Caa2

Issuer: Renaissance Home Equity Loan Trust 2006-2

Cl. M-1, Downgraded to Aa3 from Aa1

Cl. M-2, Downgraded to A3 from Aa2

Cl. M-3, Downgraded to Baa2 from A2

Cl. M-4, Downgraded to Ba1 from Baa2

Cl. M-5, Downgraded to B2 from B1

Cl. M-6, Downgraded to Ca from B1

Cl. M-7, Downgraded to C from B2

Cl. M-8, Downgraded to C from B3

Cl. M-9, Downgraded to C from Caa1

Cl. M-10, Downgraded to C from Caa2

Issuer: Renaissance Home Equity Loan Trust 2006-3

Cl. AF-5, Downgraded to Aa1 from Aaa

Cl. AV-2, Downgraded to Aa1 from Aaa

Cl. AV-3, Downgraded to Aa3 from Aaa

Cl. M-3, Confirmed at B1

Cl. M-4, Downgraded to B3 from B2

Cl. M-5, Downgraded to Ca from B3

Cl. M-6, Downgraded to C from Caa1

Cl. M-7, Downgraded to C from Caa2

Cl. M-8, Downgraded to C from Caa3

Cl. M-9, Downgraded to C from Caa3

Issuer: Renaissance Home Equity Loan Trust 2006-4

Cl. AF-4, Downgraded to Aa2 from Aaa

Cl. AF-5, Downgraded to A1 from Aaa

Cl. AF-6, Downgraded to Aa3 from Aaa

Cl. AV-2, Downgraded to A3 from Aaa

Cl. AV-3, Downgraded to Baa1 from Aaa

Cl. M-1, Downgraded to Ba1 from Aa3

Cl. M-2, Downgraded to B3 from Baa3

Cl. M-3, Downgraded to Caa2 from B1

Cl. M-4, Downgraded to C from B2

Cl. M-5, Downgraded to C from B3

Cl. M-6, Downgraded to C from Caa1

Cl. M-7, Downgraded to C from Caa2

Cl. M-8, Downgraded to C from Caa3

Cl. M-9, Downgraded to C from Caa3

Issuer: Renaissance Home Equity Loan Trust 2007-1

Cl. AF-3, Downgraded to A1 from Aaa

Cl. AF-4, Downgraded to A3 from Aaa

Cl. AF-5, Downgraded to Baa1 from Aaa

Cl. AF-6, Downgraded to A3 from Aa2

Cl. AV-1, Downgraded to Aa2 from Aaa

Cl. AV-2, Downgraded to Baa1 from Aaa

Cl. AV-3, Downgraded to Baa2 from Aa3

Cl. M-1, Downgraded to Ba2 from Baa3

Cl. M-2, Downgraded to B3 from B1

Cl. M-3, Downgraded to Caa2 from B1

Cl. M-4, Downgraded to C from B2

Cl. M-5, Downgraded to C from B3

Cl. M-6, Downgraded to C from Caa1

Cl. M-7, Downgraded to C from Caa2

Cl. M-8, Downgraded to C from Ca

Issuer: Renaissance Home Equity Loan Trust 2007-2

Cl. AF-3, Downgraded to A1 from Aaa

Cl. AF-4, Downgraded to A3 from Aaa

Cl. AF-5, Downgraded to Baa1 from Aaa

Cl. AF-6, Downgraded to A3 from Aa3

Cl. AV-2, Downgraded to Baa1 from Aaa

Cl. AV-3, Downgraded to Baa2 from Aa3

Cl. M-1, Downgraded to Ba3 from Ba1

Cl. M-2, Downgraded to Caa2 from B1

Cl. M-3, Downgraded to Caa3 from B1

Cl. M-4, Downgraded to C from B2

Cl. M-5, Downgraded to C from B3

Cl. M-6, Downgraded to C from Caa1

Cl. M-7, Downgraded to C from Caa2

Cl. M-8, Downgraded to C from Caa3

Cl. M-9, Downgraded to C from Ca

Issuer: Renaissance Home Equity Loan Trust 2007-3

Cl. AF-2, Confirmed at Aaa

Cl. AF-3, Downgraded to Aa2 from Aaa

Cl. AF-4, Downgraded to A3 from Aaa

Cl. AF-5, Downgraded to Baa1 from Aaa

Cl. AF-6, Downgraded to A3 from Aaa

Cl. AV-1, Downgraded to A3 from Aaa

Cl. AV-2, Downgraded to Baa1 from Aaa

Cl. AV-3, Downgraded to Baa2 from Aaa

Cl. M-2, Confirmed at B1

Cl. M-3, Downgraded to Caa2 from B2

A list of these actions including CUSIP identifiers may be found at:

Excel: http://www.moodys.com/cust/getdocumentByNotesDocld.asp?criteria=PBS_SF146403

For more information please see www.moodys.com.

New York
Navneet Agarwal
VP - Senior Credit Officer
Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

New York
Kimberly Spinney
Senior Associate
Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653



MOODY'S
INVESTORS SERVICE

© 2011 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources Moody's considers to be reliable, including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or

recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness or a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.

# EXHIBIT E

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924



## MOODY'S
### INVESTORS SERVICE

**Announcement: Moody's places 2005-2007 subprime RMBS on review for downgrade**

Global Credit Research - 26 Feb 2009

New York, February 26, 2009 — Moody's Investors Service announced today that it is raising its loss expectations for US subprime residential mortgage-backed securities (RMBS) issued between 2005 and 2007. As a result, it has placed 7,942 tranches of subprime RMBS with an original balance of $680 billion, on review for possible downgrade.

The revised loss projection for 2006 vintage subprime pools is expected to fall within the range of 28% to 32% of the original balance of such pools, whereas Moody's previous estimate was 22%. For 2005 and 2007 pools, such projections are expected to range from 12% to 14% and 33% to 37% of original balance, respectively.

Moody's attributes the higher loss expectations to the continued deterioration in home prices, rising loss severities on liquidated loans, persistent elevated default rates, and progressively diminishing prepayment rates throughout the sector. The updated projections will reflect current home price projections from Moody's Economy.com. The Homeowner Affordability and Stability Plan (the "Homeowner Plan"), first announced February 18th with specific guidelines expected to be released on March 4th, is expected to have a mitigating impact on Moody's loss estimates. Moody's has formed a preliminary estimate of the impact of the Homeowner Plan and included that estimate in the numbers discussed in this press release, recognizing that our estimate could change when additional detail becomes available next week.

Moody's loss projections will be calculated in three stages. First, we project delinquency rates and eventual losses during the period through late 2009, when we anticipate that home prices will reach bottom in many parts of the US. This is done assuming no government intervention or concerted industry-wide modification effort. Second, still assuming no intervention, losses are projected for the remaining life of a deal. In this no-intervention case, Moody's expectation for the 2006 vintage is that projected losses would reach 33% of the original balance. Under such conditions, Moody's would expect existing subprime loans to default at a rate of 72%, with loss severities on liquidated properties of 70% on average. Parallel projections for 2005 and 2007 would be losses of 14% and 40% of original securitized balances, respectively. The third stage of the deal-specific analysis quantifies the anticipated impact of loan modifications and other aspects of government support under the Homeowner Plan.

Currently, 42% of outstanding 2006-vintage subprime loans are at least 60 days delinquent, in foreclosure, or held for sale (REO). Moody's believes that, without intervention, nearly all of the already-delinquent loans will eventually default. This assessment is based on very high current observed roll rates to foreclosure combined with increasing unemployment and decreasing property values. In addition, Moody's believes that, by year end, one-third of borrowers who are currently paying on their mortgages will become delinquent and eventually default (representing 19% of today's outstanding loans). This projection is based on loan-level analysis of the mortgages, including forecasted loan-to-value ratios (LTVs) for the end of 2009. The LTV ratios were determined by using projections from Moody's Economy.com for metropolitan statistical areas (MSAs). In addition, other predictive metrics such as loan type, occupancy status and documentation level were considered in the analysis.

Despite anticipating modest recovery in the housing environment in the next few years, Moody's expects subprime borrowers will find limited refinancing opportunities due to negative equity and lack of available credit. Moody's projects that an additional 22% of today's non-delinquent loans would default after 2009 (representing 13% of outstanding loans). This, when added to the defaults anticipated from both existing delinquencies and delinquencies expected by year-end, would lead to the overall default rate of 72% discussed above.

Loss severities have also worsened in the last few months, rising to 63%. Moody's is anticipating loss severities to rise to around 70%, based on an expected further 10-15% decline in home values. Even as the housing market boomed in recent years, subprime loss severities increased with loan age. This is generally attributable to accrual of servicer advances and declines in property condition associated with lengthened foreclosure timelines. The likelihood of similar issues persisting in the future leads Moody's to conclude that, despite the anticipated recovery in the housing market, subprime severities are likely to remain elevated over time.

As noted above, Moody's will likely temper its loss expectations discussed in the preceding paragraphs in light of the Homeowner Plan. We anticipate that final subprime loss projections will be reduced from the 33% no-intervention case outlined above to the area of 28% to 32% for the 2006 vintage, depending on additional details of the government's plans.

The announced reviews impact all ratings within the subprime RMBS sector currently rated Ca and above. The ratings of senior bonds that are highly likely to be paid in full in the near term are expected to be confirmed when rating actions are taken. The same may also be true for bonds with structural mitigants relative to the revised loss expectation.

The anticipated actions will vary by vintage, but based on our anticipated average loss projections, it is likely that the vast majority of mezzanine and subordinate certificates currently rated B or above would be downgraded to ratings of Caa or below, particularly for bonds issued in 2006 and 2007. As noted above, actions on senior bonds will differ based on payment priority and protection relative to projected losses. Given the level of losses currently being projected, a majority of senior certificates will likely be downgraded below investment grade. Many are expected to be downgraded to Caa or below, particularly longer duration bonds from 2006 and 2007.

More detailed information about our revised loss assumptions and their application to the review of Moody's-rated subprime RMBS will be published in a report and made available on Moodys.com within several days of publication of the guidelines associated with the Homeowner Plan.

A list of the review actions associated with this announcement may be found at:

Excel: http://www.moodys.com/cust/getdocumentByNotesDocId.asp?criteria=PBS_SF157819

New York
John Park
Managing Director

Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

New York
Amelia (Amy) Tobey
VP - Senior Credit Officer
Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653



© 2011 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE
MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT
COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH
PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT
OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR
DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET
ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS
IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT
LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND
MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR
HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE
INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND
DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES.
NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN
INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES
MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL
MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR
PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT
LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED,
FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR
SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY
MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information
contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the
possibility of human or mechanical error as well as other factors, however, all information contained herein is provided
"AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in
assigning a credit rating is of sufficient quality and from sources Moody's considers to be reliable, including, when
appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance
independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have
any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to,
any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any
of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis,
interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special,
consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if
MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such
information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the
information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or
recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its
own study and evaluation of each security it may consider purchasing, holding or selling. NO WARRANTY, EXPRESS
OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY
PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY
MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers
of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred
stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services
rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and
procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations
that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have

also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness or a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.

# EXHIBIT F

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924



## Moody's
### INVESTORS SERVICE

**Rating Action:** Moody's takes action on certain Renaissance subprime RMBS

---

Global Credit Research - 25 Mar 2009

New York, March 25, 2009 -- Moody's Investors Service has downgraded 126 ratings and confirmed 22 ratings from 11 Renaissance subprime residential mortgage-backed securities (RMBS) transactions.

The collateral backing these transactions consists primarily of first-lien, fixed-rate, subprime residential mortgage loans. The actions are triggered by a combination of factors that can include increased delinquencies, higher loss severities, slower prepayments and mounting losses in the underlying collateral. Additionally, the continued deterioration of the housing market has also contributed to the increased loss expectations for subprime pools. The actions listed below reflect Moody's updated loss projections for the subprime RMBS sector first announced in a press release on February 29, 2009, and are part of Moody's on-going review process.

Moody's final rating actions are based on collateral performance and updated pool-level loss expectations relative to current levels of tranche-specific credit enhancement. Moody's took into account credit enhancement provided by subordination, cross-collateralization, excess spread, time tranching, and other structural features.

The principal methodology used in rating these transactions was "Subprime RMBS Loss Projection Update: March 2009", which can be found at www.moodys.com in the Credit Policy & Methodologies directory, in the Ratings Methodologies subdirectory. Other methodologies and factors that may have been considered in the process of rating this issue can also be found on this page.

Moody's approach to analyzing more seasoned pools (prior to the 2nd half of 2005) takes into account the annualized loss rate from last 12 months ("Recent Losses") and the projected loss rate over next 12 months ("Pipeline Losses"), and then translates these measures into lifetime losses based on a deal's expected remaining life. Recent Losses are calculated by assessing cumulative losses incurred over the past 12-months as a percentage of the average pool factor in the last year. For Pipeline Losses, Moody's uses annualized roll rates of 15%, 30%, 65% and 90% for loans that are delinquent 60-days, 90+ days, are in foreclosure, and REO, respectively. Moody's then applies deal-specific severity assumptions to arrive at projected losses. The results of these two calculations - Recent Losses and Pipeline Losses - are weighted to arrive at the lifetime cumulative loss projection.

Other methodologies and factors that may have been considered in the process of rating this issue can also be found at www.moodys.com in the Credit Policy & Methodologies directory.

Complete rating actions are as follows:

Renaissance Home Equity Loan Trust 2005-1

Cl. AF-3, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-4, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-5, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-6, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to Aa1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to A1; previously on 2/26/2009 Aa1 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to A3; previously on 2/26/2009 Aa2 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to Baa2; previously on 2/26/2009 A1 Placed Under Review for Possible Downgrade

Cl. M-4, Downgraded to Ba1; previously on 2/26/2009 A2 Placed Under Review for Possible Downgrade

Cl. M-5, Downgraded to Ba3; previously on 2/26/2009 Baa1 Placed Under Review for Possible Downgrade

Cl. M-6, Downgraded to B2; previously on 2/26/2009 Baa2 Placed Under Review for Possible Downgrade

Cl. M-7, Downgraded to Caa1; previously on 2/26/2009 Baa3 Placed Under Review for Possible Downgrade

Cl. M-8, Downgraded to Ca; previously on 2/26/2009 Ba3 Placed Under Review for Possible Downgrade

Cl. M-9, Downgraded to C; previously on 2/26/2009 Ca Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2005-2

Cl. AF-3, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-4, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-5, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-6, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-2, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to Aa1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to A1; previously on 2/26/2009 Aa1 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to Baa1; previously on 2/26/2009 Aa2 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to Ba1; previously on 2/26/2009 A2 Placed Under Review for Possible Downgrade

Cl. M-4, Downgraded to Ba2; previously on 2/26/2009 Baa2 Placed Under Review for Possible Downgrade

Cl. M-5, Downgraded to B1; previously on 2/26/2009 Baa3 Placed Under Review for Possible Downgrade

Cl. M-6, Downgraded to B3; previously on 2/26/2009 Ba3 Placed Under Review for Possible Downgrade

Cl. M-7, Downgraded to Ca; previously on 2/26/2009 B2 Placed Under Review for Possible Downgrade

Cl. M-8, Downgraded to C; previously on 2/26/2009 Ca Placed Under Review for Possible Downgrade

Cl. M-9, Downgraded to C; previously on 2/26/2009 Ca Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2005-3

Cl. AF-3, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-4, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-5, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-6, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-2, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to Aa2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to A2; previously on 2/26/2009 Aa1 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to Baa2; previously on 2/26/2009 Aa2 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to Ba1; previously on 2/26/2009 Aa3 Placed Under Review for Possible Downgrade

Cl. M-4, Downgraded to Ba3; previously on 2/26/2009 A1 Placed Under Review for Possible Downgrade

Cl. M-5, Downgraded to B3; previously on 2/26/2009 Baa1 Placed Under Review for Possible Downgrade

Cl. M-6, Downgraded to Ca; previously on 2/26/2009 Baa3 Placed Under Review for Possible Downgrade

Cl. M-7, Downgraded to Ca; previously on 2/26/2009 B1 Placed Under Review for Possible Downgrade

Cl. M-8, Downgraded to Ca; previously on 2/26/2009 B2 Placed Under Review for Possible Downgrade

Cl. M-9, Downgraded to C; previously on 2/26/2009 Ca Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2005-4

Cl. A-3, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. A-4, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. A-5, Downgraded to Aa2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. A-6, Downgraded to Aa1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to A2; previously on 2/26/2009 Aa1 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to Baa2; previously on 2/26/2009 Aa2 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to Ba1; previously on 2/26/2009 Aa3 Placed Under Review for Possible Downgrade

Cl. M-4, Downgraded to Ba3; previously on 2/26/2009 A2 Placed Under Review for Possible Downgrade

Cl. M-5, Downgraded to B3; previously on 2/26/2009 Baa2 Placed Under Review for Possible Downgrade

Cl. M-6, Downgraded to Ca; previously on 2/26/2009 Ba1 Placed Under Review for Possible Downgrade

Cl. M-7, Downgraded to Ca; previously on 2/26/2009 B2 Placed Under Review for Possible Downgrade

Cl. M-8, Downgraded to C; previously on 2/26/2009 Caa2 Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2006-1

Cl. AF-2, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-3, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-4, Downgraded to Aa2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-5, Downgraded to A1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-6, Downgraded to Aa3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-2, Downgraded to A3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to Baa1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to Baa3; previously on 2/26/2009 Aa1 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to Ba2; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to B3; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. M-4, Downgraded to Ca; previously on 2/26/2009 Baa2 Placed Under Review for Possible Downgrade

Cl. M-5, Downgraded to C; previously on 2/26/2009 Baa3 Placed Under Review for Possible Downgrade

Cl. M-6, Downgraded to C; previously on 2/26/2009 B1 Placed Under Review for Possible Downgrade

Cl. M-7, Downgraded to C; previously on 2/26/2009 Caa2 Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2006-2

Cl. AF-2, Downgraded to Aa2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-3, Downgraded to A1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-4, Downgraded to A3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-5, Downgraded to Baa1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-6, Downgraded to A3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-2, Downgraded to Baa2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to Baa3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to Ba3; previously on 2/26/2009 Aa3 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to B3; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to Ca; previously on 2/26/2009 Baa2 Placed Under Review for Possible Downgrade

Cl. M-4, Downgraded to C; previously on 2/26/2009 Ba1 Placed Under Review for Possible Downgrade

Cl. M-5, Downgraded to C; previously on 2/26/2009 B2 Placed Under Review for Possible Downgrade

Cl. M-6, Downgraded to C; previously on 2/26/2009 Ca Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2006-3

Cl. AF-2, Downgraded to Baa2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-3, Downgraded to Baa3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-4, Downgraded to Ba1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-5, Downgraded to Ba2; previously on 2/26/2009 Aa1 Placed Under Review for Possible Downgrade

Cl. AF-6, Downgraded to Ba1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-1, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-2, Downgraded to Ba2; previously on 2/26/2009 Aa1 Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to Ba3; previously on 2/26/2009 Aa3 Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to B3; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to Ca; previously on 2/26/2009 B1 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to C; previously on 2/26/2009 B1 Placed Under Review for Possible Downgrade

Cl. M-4, Downgraded to C; previously on 2/26/2009 B3 Placed Under Review for Possible Downgrade

Cl. M-5, Downgraded to C; previously on 2/26/2009 Ca Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2006-4

Cl. AF-1, Confirmed at Aaa; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-2, Downgraded to Baa2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-3, Downgraded to Baa3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-4, Downgraded to Baa3; previously on 2/26/2009 Aa2 Placed Under Review for Possible Downgrade

Cl. AF-5, Downgraded to Ba1; previously on 2/26/2009 A1 Placed Under Review for Possible Downgrade

Cl. AF-6, Downgraded to Baa3; previously on 2/26/2009 Aa3 Placed Under Review for Possible Downgrade

Cl. AV-1, Downgraded to A2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-2, Downgraded to B1; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to B2; previously on 2/26/2009 Baa1 Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to Caa2; previously on 2/26/2009 Ba1 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to C; previously on 2/26/2009 B3 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to C; previously on 2/26/2009 Caa2 Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2007-1

Cl. AF-1, Downgraded to A2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-1A, Downgraded to A1; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-1B, Downgraded to A2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-1Z, Downgraded to A2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-2, Downgraded to Ba3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-3, Downgraded to B2; previously on 2/26/2009 A1 Placed Under Review for Possible Downgrade

Cl. AF-4, Downgraded to B2; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. AF-5, Downgraded to B3; previously on 2/26/2009 Baa1 Placed Under Review for Possible Downgrade

Cl. AF-6, Downgraded to B2; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. AV-1, Downgraded to B3; previously on 2/26/2009 Aa2 Placed Under Review for Possible Downgrade

Cl. AV-2, Downgraded to Ca; previously on 2/26/2009 Baa1 Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to Ca; previously on 2/26/2009 Baa2 Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to C; previously on 2/26/2009 Ba2 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to C; previously on 2/26/2009 B3 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to C; previously on 2/26/2009 Caa2 Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2007-2

Cl. AF-1, Downgraded to Baa2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-2, Downgraded to Ba2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-3, Downgraded to Ba3; previously on 2/26/2009 A1 Placed Under Review for Possible Downgrade

Cl. AF-4, Downgraded to Ba3; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. AF-5, Downgraded to B1; previously on 2/26/2009 Baa1 Placed Under Review for Possible Downgrade

Cl. AF-6, Downgraded to Ba3; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. AV-1, Downgraded to Ba3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AV-2, Downgraded to B2; previously on 2/26/2009 Baa1 Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to B3; previously on 2/26/2009 Baa2 Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to Ca; previously on 2/26/2009 Ba3 Placed Under Review for Possible Downgrade

Cl. M-2, Downgraded to C; previously on 2/26/2009 Caa2 Placed Under Review for Possible Downgrade

Cl. M-3, Downgraded to C; previously on 2/26/2009 Caa3 Placed Under Review for Possible Downgrade

Renaissance Home Equity Loan Trust 2007-3

Cl. AF-1, Downgraded to A2; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-2, Downgraded to A3; previously on 2/26/2009 Aaa Placed Under Review for Possible Downgrade

Cl. AF-3, Downgraded to Baa1; previously on 2/26/2009 Aa2 Placed Under Review for Possible Downgrade

Cl. AF-4, Downgraded to Baa1; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. AF-5, Downgraded to Baa2; previously on 2/26/2009 Baa1 Placed Under Review for Possible Downgrade

Cl. AF-6, Downgraded to Baa1; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. AV-1, Downgraded to Baa2; previously on 2/26/2009 A3 Placed Under Review for Possible Downgrade

Cl. AV-2, Downgraded to Baa3; previously on 2/26/2009 Baa1 Placed Under Review for Possible Downgrade

Cl. AV-3, Downgraded to Ba1; previously on 2/26/2009 Baa2 Placed Under Review for Possible Downgrade

Cl. M-1, Downgraded to Ba3; previously on 2/26/2009 Ba1 Placed Under Review for Possible Downgrade

Cl. M-2, Confirmed at B1; previously on 2/26/2009 B1 Placed Under Review for Possible Downgrade

Cl. M-3, Confirmed at Caa2; previously on 2/26/2009 Caa2 Placed Under Review for Possible Downgrade

Cl. M-4, Downgraded to C; previously on 2/26/2009 Ca Placed Under Review for Possible Downgrade

A list of these actions including CUSIP identifiers may be found at:

Excel: http://www.moodys.com/cust/getdocumentByNotesDocId.asp?criteria=PBS_SF160930

A list of updated estimated pool losses is being updated regularly and may be found at:

Excel: http://www.moodys.com/cust/getdocumentByNotesDocId.asp?criteria=PBS_SF159460

For more information please see www.moodys.com.

New York
John Park
Managing Director
Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

New York
Ilana Fried
Senior Associate
Structured Finance Group
Moody's Investors Service
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653



© 2011 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE
MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT
COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH
PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT
OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR
DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET
ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS

IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources Moody's considers to be reliable, including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness or a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.

# EXHIBIT G

Prospectus Supplement for use with Prospectus dated March 8, 2007

## $918,650,000 (Approximate)

## Renaissance Home Equity Loan Trust 2007-1
*Issuing Entity*

## Delta Funding Corporation
*Originator and Sponsor*

## Renaissance Mortgage Acceptance Corp.
*Depositor*

## Wells Fargo Bank, N.A.
*Master Servicer and Securities Administrator*

## Ocwen Loan Servicing, LLC
*Servicer*

## Home Equity Loan Asset-Backed Notes, Series 2007-1

---

| | |
|---|---|
| **You should carefully consider the risk factors beginning on page S-13 in this prospectus supplement.**<br><br>The notes are obligations only of the issuing entity.<br><br>The mortgage loans are not insured or guaranteed by any governmental agency or by any other person. | **Offered Notes**<br>• Twenty-one classes of asset-backed notes listed below.<br>**Assets**<br>• Fixed and adjustable-rate, first and second lien, sub-prime residential and mixed-use mortgage loans.<br>**Credit Enhancement**<br>• Excess interest;<br>• Overcollateralization;<br>• Cross-collateralization; and<br>• Subordination.<br>The holders of the offered notes will also have the benefit of an interest rate swap agreement as described in this prospectus supplement under "Description of the Notes—Interest Rate Swap Agreement." |

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved these securities or determined if this prospectus supplement or the attached prospectus is accurate or complete. Making any contrary representation is a criminal offense.

| | Initial Class Note Balance[1] | Note Rate | Price to Public | Underwriting Discount | Proceeds to the Depositor[4] |
|---|---|---|---|---|---|
| Class AV-1 | $ 34,000,000 | Adjustable[2] | 100.0000% | 0.2000% | 99.8000% |
| Class AV-2 | $ 13,336,000 | Adjustable[2] | 100.0000% | 0.2000% | 99.8000% |
| Class AV-3 | $ 17,664,000 | Adjustable[2] | 100.0000% | 0.2000% | 99.8000% |
| Class AF-1 | $ 148,019,000 | 5.742% per annum[3] | 99.9990% | 0.2000% | 99.7990% |
| Class AF-1A | $ 100,000,000 | 5.721% per annum[3] | 99.9990% | 0.2000% | 99.7990% |
| Class AF-1B | $ 25,000,000 | 5.784% per annum[3] | 99.9990% | 0.2000% | 99.7990% |
| Class AF-1Z | $ 25,000,000 | 5.345% per annum[3] | 99.9980% | 0.2000% | 99.7980% |
| Class AF-2 | $ 53,347,000 | 5.512% per annum[3] | 99.9980% | 0.2000% | 99.7980% |
| Class AF-3 | $ 170,514,000 | 5.612% per annum[3] | 99.9970% | 0.2000% | 99.7970% |
| Class AF-4 | $ 41,476,000 | 5.761% per annum[3] | 99.9960% | 0.2000% | 99.7960% |
| Class AF-5 | $ 74,541,000 | 5.909% per annum[3] | 99.9960% | 0.2000% | 99.7960% |
| Class AF-6 | $ 70,877,000 | 5.710% per annum[3] | 99.9940% | 0.2000% | 99.7940% |
| Class M-1 | $ 29,925,000 | 5.843% per annum[3] | 99.9950% | 0.2000% | 99.7950% |
| Class M-2 | $ 27,550,000 | 6.042% per annum[3] | 99.9970% | 0.2000% | 99.7970% |
| Class M-3 | $ 16,625,000 | 6.141% per annum[3] | 99.9970% | 0.2000% | 99.7970% |
| Class M-4 | $ 15,675,000 | 6.438% per annum[3] | 99.9950% | 0.2000% | 99.7950% |
| Class M-5 | $ 13,300,000 | 6.884% per annum[3] | 99.9980% | 0.2000% | 99.7980% |
| Class M-6 | $ 12,351,000 | 7.427% per annum[3] | 99.9950% | 0.2000% | 99.7950% |
| Class M-7 | $ 10,450,000 | 7.500% per annum[3] | 90.4010% | 0.2000% | 90.2010% |
| Class M-8 | $ 9,500,000 | 7.500% per annum[3] | 82.7920% | 0.2000% | 82.5920% |
| Class M-9 | $ 9,500,000 | 7.500% per annum[3] | 71.9620% | 0.2000% | 71.7620% |
| Total | $ 918,650,000 | | | | |

[1]    Subject to a variance of plus or minus 10%.

[2]    The note rate on each such class of Offered Notes are based on one-month LIBOR plus an applicable margin, subject to increase and a rate cap as described in this prospectus supplement under "Description of the Notes—Note Rates."

[3]    The note rate on each such class of Offered Notes will increase by 0.50% per annum after the optional redemption date.

[4]    The proceeds to the Depositor from the sale of the Offered Notes, before deducting expenses, will be approximately $915,260,812.76. The proceeds to the Depositor include accrued interest in the case of the Fixed-Rate Notes.

**Citigroup**                                                      **Banc of America Securities LLC**
**Deutsche Bank Securities**          **JPMorgan**          **RBS Greenwich Capital**

March 14, 2007

**The Offered Notes Are Not Suitable Investments For All Investors**

The Offered Notes are not a suitable investment for any investor that requires a regular or predictable schedule of payments or payment on any specific date. The Offered Notes are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment, and the interaction of these factors.

**Additional Risks Associated With the Mortgage Loans**

A portion of the Mortgage Loans in the mortgage pool had a LTV or CLTV (each as defined in the Indenture) at origination in excess of 80% and no such Mortgage Loan is covered by primary mortgage insurance. No Mortgage Loan had a LTV or CLTV exceeding 100% at origination. Mortgage Loans with higher LTVs (or CLTVs) may present a greater risk of loss. In addition, there can be no assurance that the LTV (or CLTV) of any Mortgage Loan determined at any time after origination is less than or equal to its original LTV (or CLTV). An overall decline in the residential real estate market, a rise in interest rates over a period of time or the general condition of a mortgaged property, as well as other factors, may have the effect of reducing the value of such mortgaged property from the value determined by an appraisal or an Insured AVM at the time the Mortgage Loan was originated. If there is a reduction in value of the mortgaged property, the likelihood of a default and the amount of a loss may increase.

**Credit Scores May Not Accurately Predict the Performance of the Mortgage Loans**

Credit scores are obtained by many lenders in connection with mortgage loan applications to help them assess a borrower's creditworthiness. Credit scores are generated by models developed by a third party which analyzed data on consumers in order to establish patterns which are believed to be indicative of the borrower's probability of default over a two-year period. The credit score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience. Credit scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However, a credit score purports only to be a measurement of the relative degree of risk a borrower represents to a lender (i.e., a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score). Lenders have varying ways of analyzing credit scores and, as a result, the analysis of credit scores across the industry is not consistent. In addition, it should be noted that credit scores were developed to indicate a level of default probability over a two year period, which does not correspond to the life of a mortgage loan. Furthermore, credit scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general, and assess only the borrower's past credit history. Therefore, a credit score does not take into consideration the effect of mortgage loan characteristics (which may differ from consumer loan characteristics) on the probability of repayment by the borrower. There can be no assurance that the credit scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans.

### Affiliations, Certain Relationships and Related Transactions

Each of the Depositor and the Seller is a direct, wholly owned subsidiary of the Sponsor. The Issuing Entity will be a wholly owned subsidiary of the Seller. The Swap Provider is an affiliate of Citigroup Global Markets Inc., an underwriter.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's length transaction with an unrelated third party, between (a) any of the Sponsor, the Depositor and the Issuing Entity and (b) any of the Seller, the Master Servicer, the Servicer, the Trustee or the Originator.

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

## STATISTIC CALCULATION MORTGAGE LOANS
### OCCUPANCY TYPE[1]

| Occupancy Type | Number of Statistic Calculation Mortgage Loans | Current Principal Balance | % of Current Principal Balance | Weighted Average Gross Coupon | Weighted Average Stated Remaining Term | Weighted Average Original CLTV | Weighted Average FICO |
|---|---|---|---|---|---|---|---|
| Non-owner | 262 | $ 39,714,138.92 | 5.22% | 9.199% | 344 | 70.43% | 641 |
| Primary | 4,323 | 720,947,298.77 | 94.78 | 8.524 | 337 | 76.10 | 614 |
| Total | 4,585 | $ 760,661,437.69 | 100.00% | 8.559% | 337 | 75.81% | 616 |

[1]    Based upon representations made by the borrowers at the time of the Mortgage Loans origination.

## STATISTIC CALCULATION MORTGAGE LOANS
### PROPERTY TYPE

| Property Type | Number of Statistic Calculation Mortgage Loans | Current Principal Balance | % of Current Principal Balance | Weighted Average Gross Coupon | Weighted Average Stated Remaining Term | Weighted Average Original CLTV | Weighted Average FICO |
|---|---|---|---|---|---|---|---|
| Single Family | 3,955 | $ 609,784,406.65 | 80.17% | 8.612% | 334 | 75.93% | 614 |
| Two-to-Four Family | 394 | 107,717,422.86 | 14.16 | 7.953 | 353 | 76.72 | 624 |
| Condominium | 167 | 26,282,175.84 | 3.46 | 8.864 | 342 | 74.46 | 610 |
| Mixed-Use | 45 | 11,305,664.63 | 1.49 | 10.043 | 358 | 68.05 | 641 |
| Five-to-Eight Family | 24 | 5,571,767.71 | 0.73 | 9.975 | 353 | 67.32 | 650 |
| Total | 4,585 | $ 760,661,437.69 | 100.00% | 8.559% | 337 | 75.81% | 616 |

## STATISTIC CALCULATION MORTGAGE LOANS
### LOAN PURPOSE

| Loan Purpose | Number of Statistic Calculation Mortgage Loans | Current Principal Balance | % of Current Principal Balance | Weighted Average Gross Coupon | Weighted Average Stated Remaining Term | Weighted Average Original CLTV | Weighted Average FICO |
|---|---|---|---|---|---|---|---|
| Cash Out Refinance | 2,512 | $ 398,382,218.31 | 52.37% | 8.543% | 338 | 71.47% | 610 |
| Debt Consolidation | 1,444 | 259,249,128.35 | 34.08 | 8.474 | 333 | 79.39 | 620 |
| Purchase | 220 | 40,920,463.41 | 5.38 | 9.339 | 356 | 88.60 | 628 |
| Rate/Term Refinance | 409 | 62,109,627.62 | 8.17 | 8.506 | 341 | 80.24 | 624 |
| Total | 4,585 | $ 760,661,437.69 | 100.00% | 8.559% | 337 | 75.81% | 616 |

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

The Mortgage Loan Sale and Contribution Agreement will require that the Seller deliver to the Indenture Trustee, or the Custodian, as the Indenture Trustee's agent for this purpose, the Mortgage Loans endorsed to the Indenture Trustee and the Related Documents. In lieu of delivery of original mortgages, if the original is not available, the Seller may deliver true and correct copies of the original mortgages.

Under the terms of the Mortgage Loan Sale and Contribution Agreement, except with respect to any Mortgage Loan recorded on the MERS® System, the Seller will promptly and in no event later than 30 days after the Closing Date, prepare and record assignments of the mortgages related to each Mortgage Loan in favor of the Indenture Trustee. If the recording information with respect to any assignment of mortgage is unavailable within 30 days of the Closing Date, the assignment will be submitted for recording within 30 days after receipt of this information, but in no event later than one year after the Closing Date.

Notwithstanding the foregoing, in lieu of providing the duly executed assignment of the mortgage to the Indenture Trustee and the original recorded assignment or assignments of the mortgage together with all interim recorded assignments of that mortgage, the Seller may at its discretion provide evidence that the related mortgage is held through the MERS® System. In addition, the mortgages for some or all of the Mortgage Loans in the Trust that are not already held through the MERS® System may, at the discretion of the Servicer, in the future be held through the MERS® System. For any mortgage held through the MERS® System, the mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for the owner of the Mortgage Loan and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the Servicer, registered electronically through the MERS® System. For each of these Mortgage Loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the Indenture Trustee, and does not have any interest in the Mortgage Loan.

Within 45 days of the Closing Date, the Indenture Trustee, or the Custodian on behalf of the Indenture Trustee, will review the Mortgage Loans and the Related Documents pursuant to the Indenture and if any Mortgage Loan or Related Document is found to be defective in any material respect and the defect is not cured within 90 days following notification of the defect to the Depositor, the Originator and the Seller by the Indenture Trustee or the Custodian, the Originator will be obligated to either (a) substitute for the Mortgage Loan an Eligible Substitute Mortgage Loan or (b) repurchase the Mortgage Loan at a price equal to the outstanding Principal Balance of the Mortgage Loan as of the date of purchase, plus unpaid interest on the Mortgage Loan from the date interest was last paid or with respect to which interest was advanced and not reimbursed through the end of the calendar month in which the purchase occurred, computed at the Loan Rate, plus the amount of any unreimbursed Servicing Advances made by the Servicer, plus any costs due to violations of any predatory or abusive lending law. The purchase price will be deposited in the collection account on or prior to the next succeeding determination date after the obligation arises. The obligation of the Originator to repurchase or substitute for a Defective Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and Related Documents available to the Indenture Trustee or the Noteholders. In addition, pursuant to the Mortgage Loan Sale and Contribution Agreement, on any Payment Date the Seller may, at its option, repurchase Mortgage Loans at the purchase price described above from the Trust; provided, however, that the total amount of all repurchases made by the Originator may not exceed one percent of the aggregate outstanding Principal Balance of the Mortgage Loans as of the Cut-Off Date.

In connection with the substitution of an Eligible Substitute Mortgage Loan, the Originator will be required to remit to the Servicer for deposit in the collection account on or prior to the next succeeding determination date after the obligation arises a substitution amount equal to the excess of the Principal Balance of the related Defective Mortgage Loan over the Principal Balance of the Eligible Substitute Mortgage Loan.

An "Eligible Substitute" Mortgage Loan is a Mortgage Loan to be substituted by the Originator for a Defective Mortgage Loan that must, on the date of the substitution:

- have an outstanding Principal Balance after deducting all scheduled principal payments due in the month of the substitution, or in the case of a substitution of more than one Mortgage Loan for a Defective Mortgage Loan, an aggregate Principal Balance, not in excess of, and not less than 95% of, the Principal Balance of the Defective Mortgage Loan;

We use these categories and characteristics as guidelines only. On a case-by-case basis, we may determine that the prospective borrower warrants an exception from the guidelines if sufficient compensating factors exist. Examples of compensating factors we consider include the following:

- low debt ratio;

- long-term stability of employment and/or residence;

- excellent payment history on past mortgages; or

- a significant reduction in monthly expenses.

The mortgage loans we originate generally have amortization schedules ranging from five years to 30 years, and bear interest at fixed rates and require equal monthly payments, which are due as of a scheduled day of each month. The adjustable-rate loans we originate, referred to as "2/28" or "3/27" products, generally contain features where rates are fixed for some period of time (two to three years) and then adjust every six months thereafter. We also offer an interest-only loan product that requires interest-only payments for the first five years of the loan, and then becomes a fully amortizing loan in year six through the end of its 30 year term. Additionally, we offer products which have a fixed rate throughout its term, and a thirty year maturity without a balloon payment that is comprised of a fixed monthly payment based on either a forty-year or a fifty-year amortization during the first ten years of such Mortgage Loan's term and a fixed monthly payment based on a twenty year amortization during the next twenty years of such Mortgage Loan's term. Substantially all of our mortgage loans are fully amortizing loans. The principal amounts of the loans we originate generally range from $40,000 to $800,000, however, we will consider loans of up to $1.2 million. We will lend up to 100% of the combined LTV ratio. Our loans are generally secured by one- to four-family residences, including condominiums and town-houses, and these properties are usually occupied by the owner. It is our policy not to accept commercial properties or unimproved land as collateral. However, we will accept mixed-use properties, such as a property where a portion of the property is used for residential purposes and the balance is used for commercial purposes, and we will accept small multifamily properties of five to eight units, both at reduced LTV ratios. We do not originate loans where any senior mortgage contains an open-end advance, negative amortization or shared appreciation provisions – all of which could have the effect of increasing the amount of the senior mortgage, thereby increasing the combined LTV, and increasing the risk of the loan to us.

*Documentation and Review.* Our mortgage loan programs include:

- a full income verification program;

- a limited income verification program;

- a no income verification program for self-employed borrowers; and

- a stated income program.

Our borrowers' total monthly debt obligations – which include principal and interest on the new loan and all other mortgages, loans, charge accounts and scheduled indebtedness – generally are 50% or less of the borrower's monthly gross income. Some of our borrowers will qualify using our maximum debt-to-income ratio of 55%. For loans to borrowers who are salaried employees, we require current employment information in addition to employment history. We verify this information based on one or more of the following items: written confirmation from employers, recent pay-stub, recent W-2 tax form, recent tax return, bank statements and telephone confirmation from the employer. For our limited income verification program, we require either six months of bank statements or a job letter to be submitted which contains substantially the same information one would find on a standard verification of employment form, including:

- job position;

- length of time on job;

- current salary; and

- the job letter should appear on the employer's letterhead and include the telephone number and signature of the individual completing the letter on behalf of the employer.

8

For our no income verification program, we require proof of self-employment in the same business for two years. We only offer our stated income program, which represents a very small percentage of our loans, for better credit quality borrowers where telephone verification is performed by an underwriter to verify that the borrower is employed. We usually require lower combined LTV ratios with respect to loans made under programs other than the full documentation program.

We assess a borrower's credit-worthiness primarily based on the borrower's mortgage history and credit score, and we generally adjust our pricing and LTV ratios based on many other risk parameters. Our borrowers often have either (a) mortgage or other credit delinquencies, (b) problems providing documentation generally required by traditional lenders, and/or (c) collateral types against which traditional lenders generally will not lend. Qualification for a loan is based primarily upon our risk-based pricing model and guidelines, which we have developed over our 25-year history and our extensive database of prior loan performance. Because there are compelling circumstances with some borrowers, we employ experienced non-conforming mortgage loan underwriters to review the applicant's credit profile and to evaluate whether an impaired credit history is a result of adverse circumstances or a continuing inability or unwillingness to meet credit obligations in a timely manner. An applicant's credit record will often be impaired by personal circumstances, including divorce, family illnesses or deaths and temporary job loss due to layoffs and corporate downsizing.

As of December 31, 2006, we had a staff of 92 underwriters with an average of nine years of non-conforming lending experience and six years working for us. All underwriting functions for broker originations are conducted in our Woodbury, New York headquarters and our regional offices in Jacksonville, Florida and Dallas, Texas. All underwriting functions for retail originations are conducted in our Cincinnati, Ohio retail underwriting "hub," our Phoenix, Arizona regional office and our Woodbury, New York headquarters. We do not delegate underwriting authority to any third party. Our underwriting department functions independently of our business development and sales departments and does not report to any individual directly involved in the sales origination process. Our underwriters are trained to review all components of the loan to determine its compliance with our underwriting guidelines.

As the underwriting department employs underwriters with different levels of experience and seniority, we have instituted underwriting internal controls that limit approval authority by underwriting position. These limits are based on maximum loan amount and LTV ratios, ensuring that loans at the highest dollar or LTV limits we offer are reviewed and approved only by the underwriting department's most senior members. Also, for all files initially reviewed by lower level underwriters, a second review of the file is performed by a more senior underwriter prior to closing the loan.

*Appraisals; Insured AVMs and Quality Control.* We underwrite every loan submitted by thoroughly reviewing credit and by performing the following:

- a separate appraisal review is conducted by our underwriter and/or appraisal review department, except where an appraisal is centrally ordered by us or an Insured AVM is utilized; and

- a full compliance review, to ensure that all documents have been properly prepared, all applicable disclosures given in a timely fashion, and proper compliance with all federal and state regulations.

When we utilize appraisals, we require that they be performed by third-party, fee-based appraisers and to conform generally to current Fannie Mae and Freddie Mac secondary market requirements for residential property appraisals. Each appraisal includes, among other things, an inspection of both the exterior and interior of the subject property and data from sales within the preceding 12 months of similar properties within the same general location as the subject property. We perform an appraisal review on each loan prior to closing on appraisals that were not centrally ordered by us. We do not believe that the general quality control practices of many conventional mortgage lenders, which is to perform only drive-by appraisals after closings, provides sufficient protection for non-centrally ordered appraisals. As such, in addition to reviewing each of these appraisals for accuracy, we access alternate sources to validate sales used in the appraisals to determine market value. These sources include:

- Multiple Listing Services;

- assessment and sales services, such as Comps, Inc., Pace and RealQuest;

9

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

- on-line Internet services, such as Realtor.com; and
- other sources for verification, including broker price opinions and market analyses by local real estate agents.

For quality control purposes, using the criteria that we have developed over time, we actively track and grade all appraisers from whom we accept appraisals. We do not accept work from appraisers who have not conformed to our review standards.

When certain underwriting criteria have been met, we may utilize an Insured AVM in lieu of an appraisal for certain originations. If a borrower has a 620 or higher credit score, the property is either one-family or condominium and the loan amount is $500,000 or less, we may utilize an Insured AVM in lieu of an appraisal, as described below. An Insured AVM is the coupling of a third party valuation estimate and insurance on that value. The third-party automated valuation models ("AVM") providers have created computer programs that use relevant real estate information, such as sales prices, property characteristics and demographics, to calculate a value for a specific property. Public records are the primary data source for an Insured AVM, and the quality of the values that they generate varies depending upon the data they use and their design. AVMs are complex programs incorporating a variety of forecasting techniques including linear regression, expert systems, neural networks, artificial intelligence and other methodologies. The different methodologies, algorithms, and variables used by the third-party AVM providers may vary greatly and affect their reliability and accuracy.

Once an acceptable AVM has been generated, we will order a property condition report through the third-party AVM provider. One of the weaknesses in using an AVM to value a property is the lack of a physical exterior or interior inspection of the property. To mitigate some of this inherent weakness, we require a property condition report for each AVM considered for use. A property condition report is a limited physical external inspection of the property. The primary benefit of using AVMs is that they substantially reduce the time to complete a value estimate on a property.

At the closing of the loan, we will purchase insurance from a company that meets our minimum requirements (i.e. A.M. Best Rating of A+) that will insure the value of the property. In the event the borrower defaults upon their loan, resulting in the liquidation of the property, the insurance company may have to pay a portion of any losses we incur. A retroactive appraisal is performed as of the original valuation date when a loss arises involving an Insured AVM. If the Insured AVM value is found to exceed the appraisal value by more than a specific tolerance percentage (i.e., 10%), the insurer must reimburse us for the losses incurred from the disposal of the property or for the difference in values, whichever is less, plus certain other expenses.

For quality control purposes, we perform post-funding reviews on Insured AVMs, similar to our appraisal post-funding reviews.

After completing the underwriting and processing of a brokered loan, we schedule the closing of the loan with an approved closing attorney or settlement agent. We hold the closing attorney or settlement agent responsible for completing the loan closing transaction in accordance with applicable law and our operating procedures. We also require title insurance that insures our interest as a lender, and evidence of adequate homeowner's insurance naming us or our servicing agent as an additional insured party on all loans.

We perform a post-funding quality control review to monitor and evaluate our loan origination policies and procedures. The quality control department is separate from the underwriting department and reports directly to a member of senior management.

Our quality control department samples at least 10% of all loan originations and performs a full quality control re-underwriting and review, the results of which are reported to senior management on a quarterly basis. On a daily basis, should the need arise, the manager of quality control underwriting will notify senior management of any critical loan findings. The sample of loans reviewed is selected in the following manner:

- all early default payments and customer complaints;
- at least 5% of all funded loans each month are selected on a random basis; and

10

Each applicable agreement will provide that the servicer will not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its duties under the applicable agreement and that in its opinion may involve it in any expense or liability. The servicer, however, in its discretion, may undertake any action that it may deem necessary or desirable with respect to the applicable agreement and the rights and duties of the parties to that agreement and the interest of the securityholders and the credit enhancer, if any, under that agreement. In this event, the legal expenses and costs of an action and any liability resulting from the action will be expenses, costs and liabilities of the trust fund and the servicer will be entitled to be reimbursed for these expenses to the extent provided in the applicable agreement. The servicer's right to indemnity or reimbursement will survive any resignation or termination of the servicer with respect to any losses, expenses, costs or liabilities arising prior to the servicer's resignation or termination, or arising from events that occurred prior to any resignation or termination. Any claims by or on behalf of the securityholders or the trust fund will be made only against the servicer, who will be liable with respect to its own acts and omissions as well as the acts and omissions of its directors, officers, employees and agents.

## The Agreements

The following summaries describe the material provisions of the agreements common to each series of securities. The summaries do not purport to be complete and are subject to, and qualified in their entirety by reference to, the provisions of the agreements. Where particular provisions or terms used in the agreements are referred to, these provisions or terms are as specified in the related agreements.

### Assignment of primary assets

At the time of issuance of the securities of a series, the seller will transfer, convey and assign to the Depositor and the Depositor will transfer, convey and assign to the trust fund, all right, title and interest of the transferor in the primary assets and other property to be transferred to the trust fund for a series. An assignment will include all principal and interest due or received on or with respect to the primary assets after the cut-off date to the extent specified in the related prospectus supplement, except for any retained interests. The trustee will, concurrently with an assignment, execute and deliver the securities.

*Assignment of loans.* The Depositor will, as to each loan, deliver or cause to be delivered by the seller to the trustee, or, as specified in the related prospectus supplement a custodian on behalf of the trustee:

- the mortgage note endorsed without recourse to the order of the trustee or in blank;

- the original mortgage with evidence of recording indicated thereon, except for any mortgage not returned from the public recording office, in which case the seller will certify that the original of such mortgage was delivered to such recording office; and

- an assignment of the mortgage in recordable form.

The trustee or the custodian will hold such documents in trust for the benefit of the holders.

The seller will, at the time of issuance of the securities, cause assignments to the trustee of the mortgages relating to the loans for a series to be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel acceptable to the trustee, recording is not required to protect the trustee's interest in the related loans. If specified in the related prospectus supplement, the seller will cause assignments to the trustee to be so recorded within the time after issuance of the securities as is specified in the related prospectus supplement, in which event, the applicable agreement may require the seller to repurchase from the trustee any loan the related mortgage of which is not recorded within the specified time, at the price described below with respect to repurchases by reason of defective documentation. The enforcement of the repurchase obligation would constitute the sole remedy available to the holders or the trustee for the failure of a mortgage to be recorded.

Each loan will be identified in a schedule appearing as an exhibit to the related agreement. This schedule will specify with respect to each loan:

- the original principal amount and unpaid principal balance as of the cut-off date;

32

# EXHIBIT H

TESTIMONY OF VICKI BEAL
SENIOR VICE PRESIDENT
CLAYTON HOLDINGS


BEFORE THE FINANCIAL CRISIS INQUIRY COMMISSION
SEPTEMBER 23, 2010

Good afternoon. I am Vicki Beal, Senior Vice President of Clayton Holdings, a
mortgage services outsourcing, analytics and consulting company headquartered in
Shelton, Connecticut.

## CLAYTON HISTORY

Clayton pioneered the residential mortgage loan due diligence business with its
formation in 1990. In 2005, the company combined with the top credit risk management
surveillance firm (which was founded in 1997) creating a leading information and
analytics company serving investment banks, commercial banks, mortgage insurance
companies, fixed income investors and loan servicers, primarily in the secondary market
for non-agency mortgages. With a full suite of outsourced services, information-based
analytics and specialty consulting services, Clayton helps its clients enhance liquidity,
grow revenues, reduce costs and manage risk.


## COMPETITION

The market for due diligence services is highly fragmented, highly competitive
and rapidly changing. Because there are very few publicly traded firms specializing in
due diligence, little is known about the majority of service providers in terms of loan
review volume, market share and revenue. Nevertheless, some of our competitors include
Core Logic's Bohan Group unit, Fidelity Information Services Watterson Prime unit, 406
Partners, Allonhill, American Mortgage Consultants, Opus Capital Markets Consultants,
and RR Donnelly.

1

## DUE DILIGENCE – INTRODUCTION

We are retained by our clients to review samples of closed loan pools that they are considering for purchase. Clayton is not retained by its clients to provide an opinion as to whether a loan is a good loan or a bad loan. Rather, our clients use Clayton's due diligence to identify issues with loans, negotiate better prices on pools of loans they are considering for purchase, negotiate expanded representations and warranties in purchase and sale agreements from sellers, and, on occasion, to negotiate an increase in pool sample sizes where the results indicate to the client that a broader review is necessary.

The type and scope of our due diligence work is <u>dictated by our clients based on their individual objectives</u>. Our assessments are performed on a <u>sample of loans</u> being purchased for likely placement in a residential mortgage-backed security (RMBS). Clients select the samples, generally 10% to 20% of the total pool of loans.

Clayton typically reviews loans against the seller or originating institution's guidelines and the client's tolerance. Clayton reviews for: (1) adherence to seller credit underwriting guidelines and client risk tolerances; (2) compliance with federal, state and local regulatory laws, and; (3) the integrity of electronic loan data provided by the seller to the prospective buyer. This review scope is commonly referred to as a ***credit and compliance review.***

Our diligence clients include investment banks, commercial banks and other financial institutions, mortgage and bond insurance companies and more recently government agencies, private equity firms and hedge funds. Clayton's contractual relationships with its diligence clients are standard, fee for service vendor contract

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924

arrangements. Clayton's fees are not contingent on its findings; rather we are typically compensated with a standard service fee for each loan reviewed.

Accordingly, Clayton is <u>not</u> paid any fees based on: (1) its grading of the loans it reviews, (2) the ultimate performance of the loans it reviews, (3) the securitization of any loans it reviews, or (4) the ultimate disposition of the loans in any structured finance transaction.

The work product produced by Clayton is comprised of reports that include loan-level data reports and loan exception reports. Such reports are "works for hire", the property of our clients and provided exclusively to our clients. When Clayton provides its reports to its clients, its work on those loans is generally completed — <u>Clayton is not involved in the further processes of securitizing the loans and does not review nor opine on the securitization prospectus</u>. To our knowledge, prospectuses do not refer to Clayton and its due diligence work. Moreover, Clayton does not participate in the securities sales process, nor does it have knowledge of our loan exception reports being provided to investors or the rating agencies as part of the securitization process.

## DUE DILIGENCE REVIEW STAFFING

The individuals who conduct the due diligence reviews for Clayton consist of (1) a client services manager, (2) loan underwriters, (3) a lead underwriter and (4) a quality control specialist. The client services manager works with a client's transaction manager to facilitate the flow of information between the operations at Clayton and the client. The client services manager is responsible for providing the reports that Clayton produces to its clients.

3

The actual review of the loan files is performed by contract underwriters, who review the loan file, compare tape data with hard copy or scanned file data to verify loan information and identify discrepancies of key data points, calculate income (for full verification loans) and grade loans based on seller guidelines and client tolerances (if applicable to a transaction). These individuals are managed by "lead underwriters," who are more experienced underwriters. Lead underwriters manage the transaction, coordinate the delivery of the loan files, set up equipment (for deals at a seller or client site), manage underwriters and quality control, and run reports that summarize the daily findings. The lead underwriters communicate with the client services manager and clients about particular loan exceptions. They also clear stipulations, meaning that they will regrade loans after a seller cures a loan exception (such as when a seller provides missing file documentation). A quality control (QC) specialist, helps ensure that the data in the CLAS system is accurate and complete and verifies that the loan grades and, in particular, exceptions are warranted.

With the deterioration of the non-agency and mortgage market since mid-2007, Clayton has not had enough due diligence work for many underwriters — forcing them to find other types of work.

## THE DUE DILIGENCE REVIEW PROCESS

The loan review process is conducted as follows:

* A client reviews a pool of loans and selects a sample of loans for diligence review. The sample can be adverse or random – Clayton is generally not told whether sample is adverse or random. An example of an adverse sample is

4

loans where a certain characteristic (i.e. below x borrower credit score) might
be of concern to a client in their assessment of the pool value.

- Client hires Clayton to perform diligence on the sample. Client gives
  Clayton's Client Services Manager instructions on the type and scope of
  review and the time frame for the deal.

- Client sends or has sent to Clayton a tape containing loan information from
  the originator, which Clayton programmers "crack" and loads into our CLAS
  system.

- At the end of each day, the lead underwriter generates reports for the client
  that summarizes Clayton's findings, including exception reports.

- Exception reports are provided to the client and seller. The seller then begins
  process of "stip-clearing" (usually providing additional information to Clayton
  on specific loans). The seller tries to cure an exception by providing missing
  documentation or otherwise explaining to Clayton why a loan should not be
  graded EV-3 (more particularly defined below). This iterative process is on-
  going throughout the transaction and continues until a deal "tie-out" call is
  conducted between the client and seller.

- Once stips have been cleared by Clayton and reports are given to client,
  Clayton's review is complete.

- Prior to closing date, the seller and client have an independent "tie-out" call
  where they discuss EV-3 loans, negotiate prices and additional representations
  and warranties, and finalize the purchase of loans. Clayton generally does not
  participate in that "tie-out" call unless the client and/or seller have a question

5

about a specific loan.  Clayton generally does not know which or how many

loans the client ultimately purchases.

Any time a grade change is made, Clayton documents the basis for the change in

the exception report.  Clayton will make changes to loan grades if they are justified,

meaning:

- Clayton clearly made a mistake in grading the loan;

- The seller provided missing documentation; or

- Clayton determines that compensating factors were sufficient or insufficient, thereby warranting a grade change.

Separately, a client can waive an exception, which results in the loan received a

grade of EV-2W.

## EXCEPTIONS

An important part of Clayton's diligence service is the production of exception

reports. Prior to Clayton instituting an exception tracking system across its client base in

late 2005, continuing through 2006, loans were simply graded as follows:

EV-1:  Loans that meet guidelines;

EV-2:  Loans that do not meet guidelines, but have sufficient compensating

factors; and

EV3:  Loans that did not meet guidelines and had insufficient compensating

factors.

Exceptions to underwriting guidelines can vary from being severe — such as the

valuation of a property not being supported by an appraisal, stated income not being

reasonable for the job stated, or missing critical documents in a file such as a HUD-1,

loan application, or an appraisal — to benign, such as a debt to income ratio exception of

6

less than 5%, or a loan to value exception of 5% or less, or a credit score that is within an acceptable tolerance (i.e. 650 score required, 640 actual).

Our exception numbers should not be viewed in isolation. Exceptions must be reviewed in conjunction with the corresponding underwriting guidelines and client tolerances. Simply stated, a Clayton grade of EV-1 does not mean that a loan is good or is likely to perform. Nor does a Clayton grade of EV-3 mean that a loan is bad and is not likely to perform. Moreover, it may not be possible to draw an "apples to apples" comparison of deals from different clients and/or different sellers.

Beginning in 2003, Clayton worked to develop a more comprehensive scoring system for its clients, one which would allow Clayton to expand its exception review system to more specifically identify and track exceptions. The new system was called Exception Tracking and it allowed our clients to better manage exceptions (*E.g.*, show client what portfolio would look like if seller cured what it could) and it allowed for better reporting to clients.

Exception Tracking provided more granularity into the reporting of loan exceptions to its clients. All exceptions to guidelines or client tolerances are tagged with specific exception codes. Underwriter comments and exceptions are then tied together so they can be reviewed and discussed by relevant parties. Under Exception Tracking Clayton grades loans as follows:

EV-1: Loans that meet guidelines

EV-2: Loans that do not meet guidelines but have sufficient compensating factors

EV-2W: Loans that are graded EV-3 by Clayton, but waived by the client

7

EV-2T: Loans for which side letters are issued allowing seller 30 days after closing to cure exceptions

EV-3C: Loans that do not meet guidelines but have curable exceptions

EV-3D: Loans that do not meet guidelines due to missing material documentation

EV-3: Loans that do not meet guidelines and have insufficient compensating factors

## DUE DILIGENCE – WHAT IT IS NOT

It is important to understand what Clayton does not do. Clayton does **not**:

- Confirm the authenticity of information in the file — the loan has already closed, and due diligence firms historically have relied on the documentation within the file for the review

- Know whether a loan was placed into securitization, the type of securitization or if it was held in portfolio by the client

- Tell clients which loans to buy or not buy

- Participate in the actual trading of or pricing of the loans

- Participate in the structuring or rating of a security

- Participate in deciding which rating agency should be used to rate a security.

8

## DUE DILIGENCE IN THE FUTURE

There are many improvements that need to be made throughout the mortgage industry, which will help restore investor confidence and rebuild the mortgage market. Clayton fully supports the Asset Securitization Forum (ASF) and Securities Industry and Financial Markets Association (SIFMA) who are making significant contributions to the development of asset securitization markets that investors will have confidence in. Specifically in the area of due diligence, we have seen the rating agencies adopt specific improvements that relate to mortgage securitization which call for:

1. Independent, third-party pre-securitization review of samples of underlying mortgage loans, and including disclosure to investors of all exceptions found and an assessment of underwriting guidelines

2. Standardized post-securitization forensic reviews

3. Expanded loan-level data reporting of initial mortgage pool and ongoing loan performance

It should also be noted that the rating agencies in a limited number of mortgage transactions they have recently rated, have taken a more active role in the due diligence review process, reviewing due diligence findings prior to issuing ratings in those transactions. Clayton views this as a significant and positive change that over time will help the market to recover.

We are also hopeful that the SEC will adopt these requirements and others as part of their new Regulation AB, following the enactment of Financial Reform legislation. We believe that such reforms will provide greater disclosure and transparency for investors.

ELECTRONICALLY FILED 12/09/2011 15:59  /  MOTN  /  A 1105042  /  CONFIRMATION NUMBER 108924